Highly Confidential - Subject to Further Confidentiality Review

```
0   01


2      `      IN THE UNITED STATES DISTRICT COURT

3          FOR THE NORTHERN DISTRICT OF OHIO

4                EASTERN DIVISION

5      ----------------------------X

       IN RE: NATIONAL PRESCRIPTION  MDL No. 2804
6      OPIATE LITIGATION,

                               Case No. 17-MD-2804

7      This document relates to:

8      All Cases                 Hon. Dan A. Polster

9      ----------------------------X

10               * HIGHLY CONFIDENTIAL *

11     * SUBJECT TO FURTHER CONFIDENTIALITY REVIEW  *

12             VIDEOTAPED DEPOSITION

13                    OF

14            LACEY R. KELLER

15           New York, New York

16          Thursday, June 13, 2019

17

18

19

20

21

22

23

       Reported by:

24     ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2

 3

 4

 5                          June 13, 2019

 6                          9:10 a.m.

 7

 8            HIGHLY CONFIDENTIAL - SUBJECT TO

 9       FURTHER CONFIDENTIALITY REVIEW

10       videotaped deposition of LACEY R.

11       KELLER, held at the offices of

12       KIRKLAND & ELLIS LLP, 601 Lexington

13       Avenue, New York, New York, pursuant to

14       Notice, before Annette Arlequin, a

15       Certified Court Reporter, a Registered

16       Professional Reporter, a Realtime

17       Systems Administrator, a Certified

18       Realtime Reporter, and a Notary Public

19       of the State of New York and New

20       Jersey.

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2      A P P E A R A N C E S:

 3

 4      SIMMONS HANLY CONROY LLC

 5      Counsel for Plaintiffs

 6          112 Madison Avenue, 7th floor

 7          New York, New York  10016-7416

 8      BY: JAYNE CONROY, ESQ.

 9           JConroy@simmonsfirm.com

10      BY: LAURA L. FITZPATRICK, ESQ.

11          Lfitzpatrick@simmonsfirm.com

12              - and -

13      MOTLEY RICE LLC

14      Counsel for Plaintiffs

15          28 Bridgeside Boulevard

16          Mt. Pleasant, South Carolina  29464

17      BY: JAMES W. LEDLIE, ESQ.

18          Jledlie@motleyrice.com

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2      A P P E A R A N C E S(Cont'd.):
 3
 4      KIRKLAND & ELLIS LLP
 5      Counsel for Allergan Finance
 6          1301 Pennsylvania Avenue, N.W.
 7          Washington, D.C. 20004
 8      BY: JENNIFER LEVY, ESQ.
 9          Jennifer.levy@kirkland.com
10      BY: CATIE VENTURA, ESQ.
11          Catie.ventura@kirkland.com
12
13      O'MELVENY & MYERS LLP
14      Counsel for Janssen Pharmaceutical and
15        Johnson & Johnson
16          1999 Avenue of the Stars - 8th Floor
17          Los Angeles, California  90067-6035
18      BY: AMY R. LUCAS, ESQ.
19          Alucas@omm.com
20      BY: J. KEITH KOBYLKA, ESQ.
21          (Telephonically/realtime stream)
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2      A P P E A R A N C E S(Cont'd.):

 3

 4      MORGAN LEWIS & BOCKIUS LLP

 5      Counsel for Teva, Cephalon and Actavis

 6          1701 Market Street

 7          Philadelphia, Pennsylvania  19103-2921

 8      BY: ADAM HAMMOUD, ESQ.

 9          Adam.hammoud@morganlewis.com

10

11      ARNOLD & PORTER KAYE SCHOLER LLP

12      Counsel for Endo Health Solutions Endo

13        Pharmaceuticals, Inc.; Par Pharmaceutical

14        Companies, Inc. f/k/a Par Pharmaceutical

15        Holdings, Inc.

16          601 Massachusetts Avenue N.W.

17          Washington, D.C.  20001-3743

18      BY: JOANNA PERSIO, ESQ.

19          Joanna.persio@arnoldporter.com

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2      A P P E A R A N C E S(Cont'd.):

 3      DECHERT LLP

 4      Counsel for Purdue Pharmaceuticals

 5          Three Bryant Park

 6          1095 Avenue of the Americas

 7          New York, New York  10036-6797

 8      BY: DEBRA D. O'GORMAN, ESQ.

 9          Debra.ogorman@dechert.com

10

11      ZUCKERMAN SPAEDER LLP

12      Counsel for CVS Indiana, LLC and CVS RX

13        Services, Inc.

14          1800 M Street N.W. - Suite 1000

15          Washington, D.C.  20036-5807

16      BY: PAUL B. HYNES, JR., ESQ.

17          Phynes@zuckerman.com

18

19      MORGAN LEWIS & BOCKIUS LLP

20      Counsel for Rite Aid of Maryland

21          1701 Market Street

22          Philadelphia, Pennsylvania  19103-2921

23      BY: JOHN P. LAVELLE, JR., Partner

24          John.lavelle@morganlewis.com

25
```

```
 1

 2      A P P E A R A N C E S(Cont'd.):

 3      ROPES & GRAY LLP

 4      Counsel for Mallinckrodt

 5          Prudential Tower

 6          800 Boylston Street

 7          Boston, Massachusetts  02199

 8      BY: JOSH GOLDSTEIN, ESQ.

 9          Joshua.goldstein@ropesgray.com

10      BY: FEIFEI (ANDREA) REN, ESQ.

11          Andrea.Ren@ropesgray.com

12

13      COVINGTON & BURLING LLP

14      Counsel for McKesson

15          One CityCenter

16          850 Tenth Street, N.W.

17          Washington D.C. 20001-4956

18      BY: CLAIRE CATALANO DEAN, ESQ.

19          ccdean@cov.com

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2      A P P E A R A N C E S(Cont'd.):

 3      BARTLIT BECK LLP

 4      Counsel for Walgreens

 5          54 West Hubbard Street - Suite 300

 6          Chicago, IL 60654

 7      BY: PETER B. BENSINGER, JR., ESQ.

 8          Peter.bensinger@bartlitt-beck.com

 9          (Telephonically/realtime stream.)

10

11      FOLEY LARDNER LLP

12      Counsel for Anda, Inc.

13          111 Huntington Avenue - Suite 2500

14          Boston, MA 02199-7610

15      BY: GRAHAM D. WELCH, ESQ.

16          Gwelch@foley.com

17          (Telephonically/realtime stream.)

18

19      BARNES & THORNBURG LLP

20      Counsel for H.D. Smith

21          11 South Meridian Street

22          Indianapolis Indiana  46204-3535

23      BY: KATHLEEN L. MATSOUKAS, ESQ.

24          Kathleen.matsoukas@btlaw.com

25          (Telephonically/realtime stream.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2      A P P E A R A N C E S(Cont'd.):

 3

 4      LOCKE LORD LLP

 5      Counsel for Henry Schein, Inc. and

 6         Henry Schein Medical Systems, Inc.

 7          2200 Ross Avenue - Suite 2800

 8          Dallas, Texas   75201

 9      BY: BRANDAN MONTMINY, ESQ.

10          Brandan.montminy@lockelord.com

11          (Telephonically/realtime stream.)

12

13      ALSO PRESENT:

14

15      VINCE ROSICA, Golkow, Legal Video Specialist

16      DAN LAWLOR, Golkow, Legal Video Specialist

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2              IT IS HEREBY STIPULATED AND

 3         AGREED by and between the attorneys for

 4         the respective parties herein, that

 5         filing and sealing be and the same are

 6         hereby waived;

 7              IT IS FURTHER STIPULATED AND

 8         AGREED that all objections, except as

 9         to the form of the question, shall be

10         reserved to the time of the trial;

11              IT IS FURTHER STIPULATED AND

12         AGREED that the within deposition may

13         be sworn to and signed before any

14         officer authorized to administer an

15         oath, with the same force and effect as

16         if signed and sworn to before the

17         Court.

18

19                   - o0o -

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2              THE VIDEOGRAPHER:  We are now on
 3         the record.  My name is Vince Rosica.
 4         I'm a videographer for Golkow
 5         Litigation Services.
 6              Today's date is June 13, 2019,
 7         and the time is 9:10 a.m.
 8              This video deposition is being
 9         held in New York, New York, in the
10         matter of National Prescription Opiate
11         Litigation, MDL No. 2804, for the
12         United States District Court for the
13         Northern District of Ohio, Eastern
14         Division.
15              The deponent is Lacey Keller.
16              Counsel will be noted on the
17         stenographic record.
18              The court reporter is Annette
19         Arlequin and will now swear in the
20         witness.
21              *         *         *
22    L A C E Y  R.  K E L L E R,  called as a
23         witness, having been duly sworn by a
24         Notary Public, was examined and
25         testified as follows:
```

Highly Confidential - Subject to Further Confidentiality Review

1

2            THE WITNESS:  I do.

3            Lacey Rae Keller.

4    EXAMINATION BY

5    MS. LEVY:

6        Q.   Good morning, Ms. Keller.  My

7    name is Jenny Levy, and I'm an attorney

8    here at Kirkland & Ellis.  I represent the

9    Allergan defendants in this case.

10           Thank you for being here today.

11   Apologies in advance for my scratchy voice

12   and sniffles.  I'm feeling very under the

13   weather, so I will do my best to keep my

14   germs away from you.

15           Have you ever had your deposition

16   before?

17       A.   Good morning, Jenny.  Thanks for

18   having me.  And no.

19       Q.   This is the first deposition

20   experience you've ever had?

21       A.   Correct.

22       Q.   In the course of your work either

23   at the New York Attorney General's Office

24   or previously with SEIU, did you sit in on

25   any depositions or is this the first time

Highly Confidential - Subject to Further Confidentiality Review

1

2      you've had this experience?

3           A.   This is the first time I've had

4      this experience.

5           Q.   You've never been to a deposition

6      before?

7           A.   That is correct.

8           Q.   Okay.  Let me tell you, just so

9      you're comfortable, how this is going to

10     go.

11               We have a court reporter to my

12     right, your left, who is typing out every

13     word that I'm saying and every word that

14     you will say, in addition to our

15     videographer.

16               Because she is typing all of our

17     words, it's important that instead of the

18     way we would normally communicate, maybe

19     nodding our your head or saying "uh-huh,"

20     that you do your best to speak in words

21     when you answer my question.

22               Does that make sense?

23           A.   That makes sense.

24           Q.   Okay.  Thanks.

25               And if you don't understand the

Highly Confidential - Subject to Further Confidentiality Review

1

2     question I'm asking you, please absolutely

3     feel free to tell me that, and I will do my

4     very best to rephrase it.  I don't want the

5     questions to be tricky.  They're not

6     intended to confuse you.  I would like to

7     make sure that you understand them before

8     you answer them.

9              Can we agree that if you don't,

10    you'll ask me to rephrase?

11         A.    Thanks.  I will.

12         Q.    Is there any reason that you

13    can't give truthful, honest testimony

14    today?

15         A.    No.

16         Q.    Okay.  I'm going to ask you

17    questions.  The attorneys that came with

18    you today may object to questions that I

19    ask.  Unless they instruct you not to

20    answer, I would ask that you please answer

21    the questions.

22              If they instruct you not to

23    answer, we'll probably quibble about that,

24    but you'll get to follow your counsel's

25    advice on that; otherwise, we can take

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2    breaks?
 3             If you need a break at any time,
 4    I would ask that you just answer any
 5    pending question I have before we take a
 6    break.
 7             So if you need to use the
 8    restroom or check your email or are hungry
 9    or any of that, feel free to just tell me
10    and we can take a break when we get to an
11    appropriate stopping point.
12             MS. LEVY:  Okay.  I would like to
13        mark as Exhibit 1, the deposition
14        notice that was issued in this case.
15             (Keller Exhibit 1, Track 1
16        Defendants' Second Amended Notice of
17        Oral Videotaped Deposition of Lacey R.
18        Keller, marked for identification, as
19        of this date.)
20             MS. LEVY:  Do you folks want
21        copies, physical copies of the
22        exhibits?  If you do, just raise your
23        hand.  I'm going to pass them down
24        through Catie.  And share them among
25        yourselves.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2              If there are any exhibits that
 3         folks would like me to put on the ELMO,
 4         please just say so.
 5    BY MS. LEVY:
 6         Q.   Ms. Keller, have you seen this
 7    deposition notice before?
 8         A.   No.
 9         Q.   This is the first time you've
10    taken a look at it?
11         A.   Yes.
12         Q.   Okay.  If you don't mind, please
13    turn to the back page that says Exhibit A.
14              Exhibit A is a request for three
15    categories of documents.
16              Do you see that?
17         A.   I do.
18         Q.   Okay.  Let's start with No. 1,
19    "All documents or other materials you
20    reviewed since the date of your report that
21    have not specifically been identified in
22    your report in preparation for your
23    expected testimony."
24              Do you see that?
25         A.   I do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2          Q.   Have you prepared a list of
 3     documents that would respond to No. 1?
 4          A.   I believe I have.
 5          Q.   Okay.  I'm going to mark what
 6     is -- I'm going to hand you what we're
 7     going to mark as Exhibit 2.
 8               (Keller Exhibit 2, List of
 9          documents that respond to request 1 in
10          Exhibit A on Exhibit 1, marked for
11          identification, as of this date.)
12     BY MS. LEVY:
13          Q.   Do you see Exhibit 2?
14          A.   I do.
15          Q.   Take a look at that.  Is
16     Exhibit 2 a list of documents that respond
17     to request 1 in Exhibit A on Exhibit 1?
18          A.   It's my intention that it does.
19          Q.   Okay.  That's what I figured.
20               How did -- who prepared
21     Exhibit 2?
22          A.   Exhibit 2, I'm sorry, yes.  I
23     did.
24          Q.   And how did you prepare
25     Exhibit 2?  What did you do to come up with
```

Highly Confidential - Subject to Further Confidentiality Review

1

2      that list?

3          A.   Specifically to make the list or

4      for the items?

5          Q.   To make the list.

6          A.   To make the list?  To be honest,

7      we wrote a Python script to go through all

8      the documents that I used to rely on, and

9      then I compiled the actual Excel

10     spreadsheet or list that you guys received.

11         Q.   You used data science to make a

12     list.  I'm impressed.

13              And so am I correct that

14     Exhibit 2 reflects all the materials that

15     were not cited in your report but that you

16     have reviewed and relied on to form your

17     opinions since your report?  Is that

18     correct?

19         A.   Yes.  There may be some overlap.

20     There might be some citations here that

21     were in the original covered items, but I

22     just didn't want to exclude anything, so to

23     be thorough, I put them all here.

24         Q.   Got it.

25              And other than the materials

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2      cited in your report and the materials
 3      listed in Exhibit 2 as additional reliance
 4      materials, are there any other materials
 5      that you relied on in forming your opinions
 6      in this case?
 7           A.   No.
 8           Q.   If we look back at Exhibit 1,
 9      Item No. 2 in Exhibit A in Exhibit 1 asked
10      for an "itemization of the hours spent, the
11      compensation paid or to be paid for your
12      work in this matter and your staff's work
13      in this matter, including all invoices you
14      have submitted to counsel."
15                Do you see that?
16           A.   Yes, I do.
17           Q.   Did you prepare and give to
18      counsel a list of your invoices that
19      reflect all of the work you've done in this
20      case?
21           A.   Yes, I have.
22           Q.   Okay.
23                (Keller Exhibit 3, Gryphon
24           Strategies Invoice dated 5/30/19,
25           Bates-stamped OPIOIDMDL_KELLER_000036
```

Highly Confidential - Subject to Further Confidentiality Review

1

2          through 35, marked for identification,

3          as of this date.)

4               MS. LEVY:  Let's go off the

5          record for just a minute.

6               THE VIDEOGRAPHER:  The time is

7          9:18 a.m.  We are now off the record.

8               (Off the record.)

9               THE VIDEOGRAPHER:  The time is

10          9:20 a.m. We are back on the record.

11     BY MS. LEVY:

12          Q.   Ms. Keller, take a look at

13     Exhibit 3 that we've put in front of you.

14          A.   I have it.

15          Q.   What is Exhibit 3?

16          A.   These are our invoices.

17          Q.   And is Exhibit 3 a comprehensive

18     list of all invoices that Gryphon

19     Strategies has submitted in this case?

20               MS. CONROY:  Objection.

21               You can go ahead and answer.

22               THE WITNESS:  Okay.

23          A.   To the best of my knowledge, yes.

24          Q.   Okay.

25          A.   And it's Gryphon.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.    Sorry.  Thank you.

3          A.    Everyone says Gryphon so...

4          Q.    The dragon makes it look like it

5     should be a more dramatic name.  Gryphon.

6     Okay.  Thank you for correcting me.

7                What is Gryphon Strategies?

8          A.    Gryphon Strategies is a private

9     investigation consulting firm.

10         Q.    And you went to work at Gryphon

11    Strategies in 2017?

12         A.    Yes.

13         Q.    From the New York Attorney

14    General's Office?

15         A.    Correct.

16         Q.    You weren't the founder.  It

17    existed before you got there, correct?

18         A.    Correct.

19         Q.    How many individuals, roughly,

20    work at Gryphon Strategies?

21         A.    When I started, it was probably

22    around 50.  My guess is that number is much

23    larger now.  Probably around 70.

24         Q.    Does Gryphon have, like, multiple

25    places of business or is it all located in

Highly Confidential - Subject to Further Confidentiality Review

1

2      White Plains?

3           A.   There are multiple offices.  So

4      the headquarters is in White Plains.  We

5      have a satellite office in the city here.

6      And I believe they're in process of opening

7      a few offices around the rest of the world.

8           Q.   And where do you work?

9           A.   I work in New York City.

10          Q.   How many folks work with you in

11     New York City?

12          A.   Around seven to nine, depending

13     on our intern flux.

14          Q.   Okay.  And how many individuals

15     have worked with you on this case?

16          A.   Sorry, let me just do the math.

17          Q.   Sure.

18          A.   Around six.

19          Q.   Got it.

20               Is there anybody above you or

21     that you report to within Gryphon on this

22     case or are you the boss?

23          A.   I'm the boss of our division,

24     yes.

25          Q.   And the other individuals that

Highly Confidential - Subject to Further Confidentiality Review

1

2      have worked on this matter are reporting to

3      you or work for you; is that fair?

4           A.   Correct.  They report directly to

5      me.

6           Q.   Gotcha.

7                Does Exhibit 3 and the work that

8      is covered by the invoices in Exhibit 3

9      cover all of the work that Gryphon

10     Strategies has done on this matter?

11          A.   For data mining and analytics.

12     Correct.

13          Q.   Is there other work besides data

14     mining and analytics that Gryphon

15     Strategies has done on this matter?

16               MS. CONROY:  Objection.

17               You can answer.

18          A.   Yes.

19          Q.   And what category of other work?

20               MS. CONROY:  Just before you

21          answer, I don't want -- this is an area

22          where there is some attorney work

23          product.  If you inquire a little bit

24          more, it has nothing to do -- Lacey is

25          not involved in that.

Highly Confidential - Subject to Further Confidentiality Review

1

2             MS. LEVY:  Okay.

3      BY MS. LEVY:

4           Q.   For the questions that I ask you

5      about this other work, I do not want you to

6      answer any specifics of that.  We are very

7      worried about attorney-client privilege, so

8      we don't want, we don't want anything

9      confidential that attorneys have said to

10     you or you have said to attorneys or that

11     you know of that attorneys have said to

12     Gryphon or Gryphon has said to be revealed

13     in my questions.

14               But, generally, is it true to say

15     in addition to data mining and analytics,

16     Gryphon Strategies has performed other

17     services related to the opioid matter?

18          A.   That is correct to say.

19          Q.   And have you been involved in any

20     work other than data mining and analytics

21     for this matter?

22          A.   No.  I have only done data mining

23     and analytics for this matter.

24          Q.   Have you participated in meetings

25     related to the other work that Gryphon

Highly Confidential - Subject to Further Confidentiality Review

1

2     Strategies is doing or has done for the

3     opioid matter?

4          A.   No.

5          Q.   Has there been any overlap

6     between your work and the other work that

7     Gryphon Strategies is doing?

8          A.   How would you define overlap?

9          Q.   So is there a wall between you

10    and your team that Gryphon has put in place

11    and others at Gryphon who are doing

12    different work?

13         A.   No.  We share an office.  So like

14    we're all in the same work space.  Even

15    physically, there is not a wall.  But even

16    metaphorically, no.

17         Q.   I guess I should be more clear

18    about that.

19              Has Gryphon Strategies put in

20    place what lawyers would call a Chinese

21    wall?

22              Are you familiar with the term

23    "Chinese wall"?

24         A.   Yeah, sort of.

25         Q.   Has Gryphon Strategies put in

Highly Confidential - Subject to Further Confidentiality Review

1

2      place a procedure by which your team is

3      walled off from other teams at Gryphon

4      doing work on the opioid litigation?

5           A.    Not explicitly, no.

6           Q.    Have you had communications, you

7      personally, with others at Gryphon who are

8      doing other types of work other than data

9      mining and analytics about the opioid

10     litigation or the work that's being done in

11     the opioid litigation?

12          A.    Yes.

13          Q.    Who, just names of individuals,

14     who specifically have you communicated with

15     at Gryphon that's not on your team

16     regarding your work in this case?

17          A.    So in not great detail, my boss,

18     Jay Dawdy.  He is the president of the

19     firm.  Mostly just to update him on what

20     we're doing with all of our time.  And Eric

21     Nawrocki.  I can provide a spelling on that

22     one if that's difficult.

23          Q.    Who is Eric Nawrocki?

24          A.    Eric Nawrocki is another managing

25     director.

1

2          Q.    And what is your title at Gryphon

3     Strategies?  You're a managing director as

4     well, right?

5          A.    Correct.

6          Q.    How many managing directors are

7     there?

8          A.    I think there's around four or

9     five.  I'd have to check the website to be

10    certain.

11         Q.    Have you done any work relating

12    in any way to the opioid litigation or your

13    retention in this case with individuals

14    outside of the New York City office?

15              MS. CONROY:  You mean Gryphon?

16              MS. LEVY:  Yes.

17         A.    So Jay Dawdy is primarily based

18    in the White Plains office.  Eric is based

19    primarily in the New York City office, if

20    that helps answer the question.

21         Q.    And how has the work that you

22    have done on data and analytics overlapped

23    with the work that -- with what you've

24    communicated with others in the firm?  What

25    is the overlap?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   There's very little.  Their work

3     is primarily concerned with people and

4     we're more with the numbers, to the extent

5     that the people have numbers.  For example,

6     like numbers of prescriptions in the IQVIA

7     data, that would be one place where you

8     could imagine some overlap.

9          Q.   Have you shared data sets with

10    other teams in Gryphon working on opioid

11    matters?

12         A.   Data sets?

13         Q.   Yes.

14         A.   No.

15         Q.   Have you shared ARCOS data with

16    other teams in Gryphon?

17         A.   No.

18         Q.   Have you shared chargeback data

19    with other teams in Gryphon?

20         A.   No.

21         Q.   Have you shared any of the data

22    provided to you by the attorneys in this

23    case with others at Gryphon?

24         A.   Not in its raw form, no.

25         Q.   Have you shared in any form?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.    I have provided some aggregated

3     statistics.

4          Q.    What aggregated statistics have

5     you provided to others in your firm?

6          A.    One -- an example would be like

7     the prescriptions of a physician over time.

8     Just like in the report, we talk about

9     Adolf Harper, so the number of

10    prescriptions that Adolf Harper wrote over

11    time.

12         Q.    I think I understand.

13               So aggregated statistics relating

14    to individuals, is that the category of

15    data that you shared?

16         A.    Yes, individuals --

17         Q.    Individual prescribers?

18         A.    Yeah.  Maybe a pharmacy.

19         Q.    Is there any other category of

20    data that you can think of that you shared

21    with others that are not on your data and

22    analytics team?

23         A.    Not at this time, no.

24         Q.    Okay.

25               MS. LEVY:  I think we're up to

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2          Exhibit 4.
 3               (Keller Exhibit 4, Resume of
 4          Lacey R. Keller, not Bates-stamped,
 5          marked for identification, as of this
 6          date.)
 7     BY MS. LEVY:
 8          Q.   What is Exhibit 4?
 9          A.   That's a question for me?  Sorry.
10          Q.   Yes.
11          A.   Okay.
12          Q.   It should be an easy one.
13          A.   Boy, I hope so.  That's my CV or
14     my resumé.
15          Q.   Okay.  And going back to
16     Exhibit 1, Exhibit 1, the last page of
17     Exhibit 1 on Exhibit A, No. 3 asked for a
18     "copy of the most current and accurate
19     curriculum vitae, CV, as of the date of
20     your deposition."
21               Is the document that we've
22     labeled Exhibit 4 a copy of your most
23     recent CV?
24          A.   Yes.
25          Q.   And when was this created?
```

1

2          A.    Just before we filed the report.

3          Q.    And you haven't added anything to

4    your resumé since then?

5          A.    No.

6          Q.    Taking a look at Exhibit 4, and

7    starting at the top left, you are currently

8    a managing director at Gryphon where you've

9    worked from November 2017 to the present,

10   about a year-and-a-half, correct?

11         A.    That is correct.

12         Q.    Did you start at Gryphon as a

13   managing director or did you start with a

14   different title?

15         A.    I started as a managing director.

16         Q.    How did you get the job at

17   Gryphon?  Who hired you?  How did that come

18   about?

19         A.    Yeah, so at the time, I was

20   working at the Attorney General's Office

21   and Jay Dawdy had approached me about

22   coming to the firm to start their data

23   mining and analytics practice.  He thought

24   the work that we were doing at the AG's

25   office was super innovative and wanted to

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2    see if I'd be interested in doing that with

 3    him.

 4         Q.   Did you know Jay Dawdy before

 5    that?

 6         A.   No, I didn't.

 7         Q.   How do you spell Dawdy?

 8         A.   D-a-w-d-y.

 9         Q.   Dawdy.  I'm from the south.  We

10    say "Dowdy."

11         A.   Yes.

12         Q.   And so how did he know about you?

13         A.   Boy, I have to remember.  I

14    believe we had an intern in common.  And so

15    I had an intern and then that intern went

16    to be his intern or staff.  And the intern

17    had said, boy, there's this lady, you need

18    to speak with her.  And so I think that's

19    how we got to know each other.

20         Q.   Have your job response -- what,

21    in general, are your job responsibilities

22    as a managing director at Gryphon?

23         A.   So generally that means running

24    the data team and building out that

25    practice.
```

Highly Confidential - Subject to Further Confidentiality Review

1

2      Q.   Do you have clients right now

3   other than clients related to this

4   litigation?  Not tell me what they are,

5   just a "yes" or "no" question.

6      A.   Yes.

7      Q.   What percentage of your work is

8   related to this litigation as opposed to

9   other clients not related to this

10   litigation?

11      A.   I don't have an exact number, but

12   the vast majority is this litigation.

13      Q.   Would you say like 75, 80

14   percentish?  I know you're estimating.

15      A.   Yeah, the data part of me doesn't

16   want to do that, but, yeah --

17      Q.   Okay.

18      A.   -- or more.

19      Q.   And not naming other clients,

20   particularly if they're confidential, but

21   other than this litigation, what types of

22   other clients and work are you doing in

23   addition to this?

24      A.   So we have governmental clients.

25      Q.   And your governmental clients, is

Highly Confidential - Subject to Further Confidentiality Review

1

2     that related to pharmaceuticals or other

3     issues?

4          A.    Completely separate issues.

5          Q.    Okay.  Do you have any other

6     clients that relate in any way to

7     pharmaceuticals or opioids?

8          A.    No.

9          Q.    Okay.  Now turning to your work

10    at the New York Attorney General's Office,

11    how did you get that job?

12         A.    So I was at the union at the time

13    and was looking for the next step.  A

14    friend of mine had said that they were

15    looking for a researcher at the AG's

16    office, and I thought that would be at

17    first a pretty boring job and that I would

18    just be reading documents all day in a

19    taupe office.  But after meeting with them,

20    I realized it would be a pretty exciting

21    job because they wanted to build out a data

22    mining practice there and make leads out of

23    big data.

24         Q.    I'm smiling because I actually

25    did some research on you and I watched your

Highly Confidential - Subject to Further Confidentiality Review

1

2       YouTube video on this, and I've seen how

3       excitedly you describe particularly how you

4       thought it was going to be boring.

5              Is the work that you did -- you

6       were at the New York Attorney's General

7       Office from October 2013 through

8       November 2017, just over four years,

9       correct?

10       A.   That is correct.

11       Q.   Is the work that you did or the

12       categories or types of matters you worked

13       on all summarized on Exhibit 4 in the

14       section under New York State Attorney

15       General's Office?

16       A.   I am sure there's much more that

17       I worked on or supervised.

18       Q.   Okay.  Fair enough.

19              From your, from the YouTube

20       video -- you know what YouTube video I'm

21       referring to?  It was a Washburn alumni

22       thing?

23       A.   Yeah.

24       Q.   From the YouTube video, I -- you

25       made some comment about why you thought it

Highly Confidential - Subject to Further Confidentiality Review

1

2      wasn't boring, which is you realized that

3      you could take data and learn how to chase

4      leads.

5              Do you remember saying that?

6      A.   Yes.

7      Q.   Is that a good description of

8      what you were doing at the U.S. Attorney

9      General's Office?

10     A.   It's New York Attorney General's

11     Office and -- for the record.

12             Yeah.

13     Q.   I'm sorry.  I thought -- I didn't

14     mean to say U.S. Attorney General, I meant

15     to say New York.

16             So on your CV, you list several

17     areas in which you used data and data

18     mining techniques in order to generate

19     leads on cases.  And one is in the gun and

20     firearms space.

21             And a second one is using data

22     analytics to figure out leads on, I guess,

23     vendors with respect to Internet speed?

24     A.   Oh, yes.

25     Q.   I also see here, I'm combining

1

2      your CV and your report, but experience

3      that you have with using data to generate

4      leads in the Airbnb rental space.

5              Is that also part of your work?

6          A.   Those all three are part of my

7      work, yes.

8          Q.   And you also used data analytics

9      to do modeling of landlord complaints?

10     Specifically, generate leads with, like,

11     landlords who are out of compliance with

12     tax laws?

13         A.   Oh, yes, that would be the

14     421(a).

15         Q.   I see that you, in your

16     experience, have used data to generate

17     leads on fake trades in foreign currency?

18         A.   Yes, I supervised that work, but,

19     yes.

20         Q.   In your, in the combination of

21     your report and other information I could

22     find about you and your CV, I see one area

23     where you have, where your work in data

24     analytics has overlapped with the

25     pharmaceutical industry, and that is when

Highly Confidential - Subject to Further Confidentiality Review

1

2     you were modeling data that could help with

3     the deployment of Naloxone?

4          A.   Sure.

5          Q.   Am I correct about that?

6          A.   Yes, you're correct about that.

7          Q.   So up until your work on this

8     case, have you done any other work with

9     data and analytics related to the

10    pharmaceutical industry?

11         A.   Yes.

12         Q.   What was that?

13         A.   At a high level, it would have

14    been pulling publicly available data on

15    opioids, hospitalizations, opioid

16    prescribing, so that would be like the

17    public ARCOS reports.  And, I'm sorry,

18    those aren't prescribed, those are

19    shipments.  So the public ARCOS reports and

20    New York State hospitalization data, is one

21    example.

22         Q.   Okay.  So I want to make sure my

23    record is clear.

24              Prior to your work on this case

25    that you're doing through Gryphon, you had

Highly Confidential - Subject to Further Confidentiality Review

1

2          prior experience with a project at the New

3          York Attorney General's Office that related

4          to, I'm going to say, Naloxone deployment.

5                    Is that a fair way to categorize

6          it?

7               A.   So the Naloxone deployment, yes,

8          that was the Community Overdose and

9          Prevention program is what we called it,

10         the COP program.  And so that was the

11         deployment of Naloxone around the state and

12         to police officers.  So we equipped every

13         police officer with the life-saving Narcan.

14         And so I managed that program.

15              Q.   And the way you did that,

16         describe what data you looked at generally.

17         We don't need to educate ourselves fully

18         about the project, but, generally, what was

19         the data, what did you look at, and what

20         was your methodology for working on the COP

21         project?

22              A.   So, I remember it was the fall

23         that Philip Seymour Hoffman died that that

24         was when the office took an interest in

25         opioids generally.  And so I was tasked

Highly Confidential - Subject to Further Confidentiality Review

1

2      with finding something that was of

3      importance to do in the area.

4              And so I wouldn't say that it was

5      really data driven.  I didn't deploy based

6      off of, you know, this is where the most

7      overdoses were occurring, because at that

8      time, that data set really didn't exist in

9      a robust fashion.

10             So it was just a "raise your

11     hand" program, if you will.  So if a police

12     department came to us and said, look, we

13     could use some money to buy this Narcan,

14     then we would give them that, that funds.

15         Q.   And so you analyzed a segment of

16     ARCOS data in your in your work in figuring

17     out how to best deploy Naloxone.

18             Is that true or false?

19         A.   That's not -- that would be

20     false.

21         Q.   Okay.  Did you not -- you did not

22     use ARCOS data?

23         A.   No.

24         Q.   Okay.

25         A.   Not for the -- I used ARCOS data

Highly Confidential - Subject to Further Confidentiality Review

1

2      for other things, but not for that, no.

3           Q.   Okay.   What in the past have you

4      used ARCOS data for?

5           A.   So I've only used the public

6      ARCOS data in the past, and that was mostly

7      to get a general sense of where the

8      shipments were going into New York.

9           Q.   And was that in conjunction with

10     the Naloxone project or was that for

11     something else?

12          A.   I can't be -- I can't really

13     recall the timing, but it was either around

14     that time or shortly -- or probably

15     subsequent.   I'm trying to think of where I

16     was, but, yeah.

17          Q.   And what did you do with the

18     results of your analysis?   What was the

19     results and what did you do with it?

20          A.   I wrote a pretty high level memo

21     about, like, the state of opioids in New

22     York as much as I could from public data.

23          Q.   And what did you -- what did it

24     say?

25          A.   I mean, I wrote it years ago, so

Highly Confidential - Subject to Further Confidentiality Review

1

2      I can't remember exactly.  But at a high

3      level, it would have the number of

4      shipments into the state.  I think we were

5      able to get it by ZIP three.  I think we

6      ended up mapping it to counties because

7      people have counties here, not ZIP codes.

8             The number of deaths over time,

9      the number of hospitalizations over time,

10     specifically opioid-related deaths and

11     opioid-related hospitalizations.

12            My guess is it would have also

13     included some open payments data as well

14     from Center for Medicaid Studies.  And it

15     would have just summarized all of those at

16     a fairly high level.

17        Q.   And do you know what it would

18     used for?  Who it was submitted to?

19        A.   I'm not sure exactly who it was

20     submitted to.

21        Q.   Or what happened with it?

22        A.   I don't know exactly what

23     happened with it.  It's hard to tell.

24        Q.   And what year were you conducting

25     this analysis and drafting this memo?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   I'm sorry, I have to think a

3     little bit.  I want to say around

4     2015-2016.

5               Things get picked up and put down

6     quite a bit in government, especially as

7     more pressing matters come to light so...

8          Q.   On your -- so other than the work

9     you've just described in analyzing -- what

10    do you call that project that you just

11    talked about?  It's different from the

12    Naloxone COP project.  What do you call

13    that segment of work?

14         A.   So that segment of work is a

15    pretty typical request of my team at the

16    AG's offices.  Like, we were the -- we were

17    a data-driven research team, but

18    fundamentally we are a research team.  So

19    give us the facts about whatever.  So, you

20    know, you could call it briefings or

21    whatnot, but they were, you know, fact,

22    factual-driven documents so...

23         Q.   Opioid research?

24         A.   Yes.  It was one example, but

25    I've written them on, you know, payroll

1

2      cards and other unrelated things as well.

3      That's pretty much what we did at that

4      office, in addition to data support.

5          Q.   So if I want to hone in on your

6      opioid and pharmaceutical experience, I --

7      you've told me about the Naloxone

8      deployment COP project.  You've told me

9      about opioid research and data that you did

10     with the New York Attorney General's

11     Office.

12              Aside from those two things, do

13     you have any other experience looking at

14     pharmaceutical data prior to this case?

15         A.   Not prior to this case, that I

16     recall.

17         Q.   Since you have begun your work on

18     this case, do you have any additional work

19     in the pharmaceutical space?  Without

20     revealing any confidences.

21         A.   Not that I am currently

22     contracted for or being paid to do work on.

23         Q.   Like potential leads or potential

24     clients you're thinking about, but nothing

25     that you've actually done yet; is that

Highly Confidential - Subject to Further Confidentiality Review

1

2     correct?

3          A.   Correct, nothing that I've

4     submitted an invoice to or could bill hours

5     to.

6          Q.   Is the education in the top

7     right-hand corner that is reflected in

8     Exhibit 4, does this continue to be

9     accurate today?

10         A.   Yes.

11         Q.   Do you have a Master's of Arts

12    from the New School in 2010; is that

13    correct?

14         A.   That is correct.

15         Q.   Bachelor of Business

16    Administration in Economics from Washburn

17    University, 2008?

18         A.   That is correct.

19         Q.   And a certificate in data

20    science, it says General Assembly, 2015.

21              What does that mean?

22         A.   General Assembly, I'm not sure if

23    it's still around, was like an evening boot

24    camp for-profit -- I think it's a

25    for-profit institution to learn data

Highly Confidential - Subject to Further Confidentiality Review

1

2      science.

3             So I took a semester-long evening

4      class while I was at the AG's office to

5      kind of brush up on my skills because I

6      wanted to know a little bit more about the

7      field and where we were headed.

8             Q.   When you describe your profession

9      to people at the dinner table, are you a

10     data scientist?

11            A.   So that term gets thrown around a

12     lot.  I would say -- pure data scientist,

13     would say no.  I use that title because

14     it's a known quantity.  I would not call

15     myself a data scientist.  I'm a manager of

16     data scientists, is a much better

17     reflection of my --

18            Q.   Okay.  And what is the difference

19     between those two things in your mind?

20     I've never heard the distinction.  I'm

21     asking very genuinely.

22            A.   So a data scientist, in my

23     opinion, are going to be fluent in several

24     different languages.  And not like French

25     or Arabic like as you and I would think of

Highly Confidential - Subject to Further Confidentiality Review

1

2      them, but more like SQL, Python, whatever

3      programming languages you fancy, and be

4      able to work in multiple platforms easily.

5              I have those skills as well, but

6      I don't use them every single day like they

7      do.  And so I'm much more in the managing

8      and prioritizing of the workflow,

9      fact-checking, confirming that the process

10     is right, the assumptions are correct.

11         Q.   Got it.

12              And so if I ask you, what is your

13     expertise, how do you describe it to me?  I

14     am an expert in?

15         A.   I'm an expert in seeing the big

16     picture, the data sources that are

17     available to me, combining them, whether

18     they be public, private, confidential, and

19     using them for results.

20         Q.   I think I know the answer to

21     these, but I have to ask them anyway.

22              You don't have a law degree,

23     correct?

24         A.   That is correct.

25         Q.   And you are not an expert in the

1

2      law, right?

3           A.   I am not an expert in the law.

4           Q.   And you don't intend to offer any

5      legal opinions in this case?

6           A.   I do not.

7           Q.   You have not ever worked in drug

8      enforcement, have you?

9           A.   No, I have never worked in drug

10     enforcement.

11          Q.   You are not an expert on the

12     Controlled Substances Act, are you?

13          A.   That is correct, I am not an

14     expert in the Controlled Substance Act.

15          Q.   You have not ever worked with the

16     DEA, have you?

17          A.   I have not.  I have not worked

18     with the DEA.

19          Q.   And you are not an expert in DEA

20     requirements and regulations, correct?

21          A.   That is correct.

22          Q.   You are not an expert or don't

23     intend to offer yourself as an expert in

24     what the DEA regulations actually mean,

25     correct?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   That is correct.

3          Q.   You do not intend to offer

4    yourself as an expert in what DEA

5    registrants should or are supposed to do in

6    accordance with those guidance and

7    regulations, correct?

8          A.   That is correct.

9          Q.   And from a big picture level, if

10   I understand your report correctly, what

11   you have done is offer -- is do analyses

12   offering 16 different metrics and

13   illustrate what the results of those

14   metrics would show at a high level.

15              Do you agree with me that that's

16   what your report does?

17         A.   Yes.  I didn't actually count how

18   many metrics, so I'm taking your word that

19   there are 16.

20         Q.   I will represent to you that I

21   count 16.  But what I'm trying to parse

22   out, I don't mean to be mysterious, is I

23   want to make sure that I understand the

24   expertise you do intend to offer and the

25   expertise you don't intend to offer.

Highly Confidential - Subject to Further Confidentiality Review

1

2            So as I understand your opinions,

3    they are opinions from a data science point

4    of view that say if you ran these metrics,

5    here's what the results would look like.

6            Is that a fair assessment at a

7    very, very high level?

8            MS. CONROY:  Objection.

9            You can answer.

10    A.    I would say that's a fair

11    assessment.  I was asked to apply the

12    compliance metrics to the labeler's data,

13    including chargebacks and IMS, IQ, yeah.

14    Q.    And you don't intend to offer any

15    opinions about which one of those metrics

16    is the right one, do you?

17    A.    That is correct.  I don't endorse

18    any of the metrics or not endorse.

19    Agnostic would be the correct term, yeah.

20    Q.    Okay.  And you're not going to

21    offer any opinions that a particular

22    registrant should have or is required to

23    employ which ones of the metrics?  That is

24    not what you were retained to do, correct?

25    A.    That is correct.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   And that is beyond your expertise

3      to do.

4               Do you agree with that?

5          A.   That is correct.

6          Q.   And I think, if I'm reading your

7      report correctly, you don't take any

8      opinion as to what the DEA or the

9      Controlled Substances Act means when it

10     talks about suspicious orders.

11              You are not taking a position as

12     to what specifically the DEA means, right?

13         A.   Yes, I believe that's right.

14         Q.   And I think it can make our day

15     easier if I understand the scope of this.

16              What you have done is you've used

17     a number of different metrics to show that

18     if a particular defendant had looked at the

19     data this way, this is what that defendant

20     would have seen.

21              Is that fair?

22         A.   Yes.

23         Q.   And when you use the term

24     "suspicious," which you do quite a number

25     of times in your report, what you mean by

Highly Confidential - Subject to Further Confidentiality Review

1

2    that is the result of your own metrics,

3    right?

4         A.   Yes, you can characterize it that

5    way.

6         Q.   You don't mean to use

7    "suspicious" as a technical term meaning

8    suspicious under the Controlled Substances

9    Act, right?

10              MR. LEDLIE:  Object to the form.

11              You can answer.

12         A.   Yes, when I say "suspicious," I

13   mean that they have either triggered one of

14   the metrics, which are -- I'll leave it at

15   that.

16         Q.   Okay.  And you haven't, you

17   haven't gone -- have you ever met with

18   anyone from DEA about this case and your

19   report?

20         A.   I have not met with anyone about

21   this case or my report from the DEA.

22         Q.   Okay.  Why do you hesitate?

23         A.   I have spoken to DEA officials

24   about the ARCOS data and how to process it,

25   but clarifying questions of what does an S

Highly Confidential - Subject to Further Confidentiality Review

 1

 2    mean and what does this correction number

 3    mean like...

 4         Q.   Okay.   When you have spoken to

 5    the DEA, it has been entirely in the

 6    context of the data itself, correct?

 7         A.   Absolutely.

 8         Q.   You've never asked anyone from

 9    DEA, "Do these various metrics make sense

10    to you"?  You've never asked that question?

11         A.   Never.

12         Q.   And you've never asked anybody

13    from DEA, "Are these metrics in line with

14    what DEA expects or requires"?  That's

15    nothing you've ever asked the DEA, correct?

16         A.   That is correct.

17         Q.   And that wasn't -- the point of

18    your report is not to say what the DEA

19    requires, but rather to say what the data

20    had available for people to look at.

21              Is that a proper simplification?

22              MS. CONROY:  Objection.

23              You can answer.

24         A.   I would say, yes, it was what

25    data was available to apply the -- what

Highly Confidential - Subject to Further Confidentiality Review

1

2      data was available to apply the compliance

3      metrics and what those metrics would have

4      revealed.

5          Q.   And, again, I think you've

6      answered this, but I want to be sure.

7               You do not offer the opinion that

8      any defendant had an obligation to apply

9      any of the particular compliance metrics,

10     right?

11         A.   That is correct.

12         Q.   And it is also beyond your

13     expertise to opine on what would have

14     happened in the real world if someone had

15     applied the metrics?  That is beyond what

16     you are an expert in, correct?

17               MS. CONROY:  Objection.

18               You can answer.

19         A.   Yes.  There is a section in the

20     report, the small labeler impact section,

21     that, depending on how this question is

22     worded, might come in conflict with that,

23     but that's not the intention.

24         Q.   We'll get to that.

25               But just generally, in the small

Highly Confidential - Subject to Further Confidentiality Review

1

2      labeler impact, in your own words, you

3      phrase it as a hypothetical, right?

4           A.   Correct.

5           Q.   You aren't suggesting -- the

6      defendant that's subject to the small

7      labeler impact is Janssen, correct?

8           A.   Yes, I believe so.

9           Q.   And what you do in that section

10     is you model, hypothetically, if Janssen

11     had looked at the data this way, then

12     hypothetically, orders could have been

13     stopped, right?

14          A.   That is correct.

15          Q.   But you do not go further in this

16     report to opine that Janssen had an

17     obligation to do that or should have done

18     that or that the DEA expected Janssen to do

19     that.

20               That's beyond your expertise,

21     right?

22          A.   That is beyond, yes.

23          Q.   Okay.  And, also, you don't know

24     or you don't have the expertise to know --

25     you don't consider yourself an expert in

Highly Confidential - Subject to Further Confidentiality Review

1

2      DEA reporting requirements, do you?

3           A.    No.

4           Q.    And you don't know what triggers

5      a reporting requirement for a manufacturer?

6           A.    No.

7           Q.    You don't know what triggers a

8      reporting requirement for a distributor, do

9      you?

10          A.    No.

11          Q.    And you don't know what triggers

12     reporting requirements for pharmacies?

13          A.    No.

14          Q.    It is beyond the scope of your

15     expertise to opine on what triggers a

16     reporting responsibility specifically?

17     That's beyond what you have been asked to

18     do here, correct?

19          A.    Correct.

20          Q.    And also just to make sure we

21     narrow in on what your opinions are, you

22     are not an expert in what DEA does with

23     suspicious reports?  That is beyond your

24     expertise as well, right?

25          A.    That is correct.

Highly Confidential - Subject to Further Confidentiality Review

1

2      Q.   And I think there are places in

3   your report where you talk about orders

4   that could have been stopped.  And I just

5   want to make sure that I understand the

6   parameters of what you intend to say about

7   that.

8           When you talk about orders that

9   could have been stopped, you mean from a

10  data perspective hypothetically, correct?

11     A.   Yes.  I mean that the compliance

12  metrics showed that order or that triggered

13  that order and so, yes, it could have been

14  stopped.

15     Q.   So someone, somewhere could have

16  stopped those orders?

17     A.   Yes, they could have seen it or

18  stopped it.

19     Q.   But beyond what the data shows,

20  do you have any opinions whatsoever on how

21  that would work in the real world?

22          MS. CONROY:  Objection.

23          You can answer.

24     A.   No, I have no opinions on the

25  real world.

Highly Confidential - Subject to Further Confidentiality Review

1

2      Q.   So going back to what we were

3    talking about, Section 9, in the small

4    manufacturer impact -- I think I've gotten

5    it wrong.  It's called...

6           (Document review.)

7      Q.   Small labeler impact.

8           You use the term "labeler" and

9    "manufacturer" interchangeably, correct?

10     A.   I do.

11     Q.   Actually, you just use the term

12   "labeler"?

13     A.   I think I use the term "labeler."

14   I think at the beginning of the report, in

15   the event that we do say "manufacturer," I

16   always mean labeler because I...

17     Q.   Why do you do that, just out of

18   curiosity?  Most of the time I hear people

19   talk about manufacturers.  Why do you make

20   that distinction?

21     A.   So as I understand it from when

22   we process the data from the FDA, they call

23   it the labeler.  So when they say that the

24   NDC was labeled by that entity, that was

25   the -- I understand that to be like the

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2    last person that put that, if you will, a

 3    box together.

 4            So I don't know how often that

 5    box was created by somebody else and

 6    labeled by someone else.  They might always

 7    be the same.  But to be most correct, I

 8    wanted to use the DEA's and the FDA's

 9    terminology.  I'm not sure which one, where

10    that term came from, but I saw that as part

11    of the data set.

12        Q.   And so going back to the small

13    labeler impact, when you talk about orders

14    that could have been stopped, you did not

15    analyze how that would have happened, who

16    would have stopped the orders, who had a

17    duty to stop the orders, what would have

18    had to happen to stop the orders?  You

19    didn't do any of that work, did you?

20        A.   Correct.

21        Q.   And you certainly don't intend to

22    opine that Janssen, in particular, should

23    have stopped those transactions.  That is

24    beyond what you're saying.  You're simply

25    saying it could have happened, correct?
```

1

2          A.   That is correct.

3          Q.   And really, as you sit here, you

4     don't even know how Janssen or any other

5     registrant would actually stop those orders

6     in practice in the real world?  That is not

7     something that you have ever studied or

8     know if it would even be possible, right?

9          A.   That's correct.

10         Q.   Okay.  So let's go to the

11    summary.  Let me mark your report as

12    Exhibit 5.

13              (Keller Exhibit 5, Expert

14         Analysis of Lacey R. Keller, not

15         Bates-stamped, marked for

16         identification, as of this date.)

17    BY MS. LEVY:

18         Q.   Do you recognize what we've

19    handed you as Exhibit 5?

20         A.   I do.

21         Q.   What is that?

22         A.   That is my report.

23         Q.   How did this document spring

24    forth into the world?  What -- who typed

25    it?  Whose computer was it on?  How did it

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2     get created?
 3          A.   So it was a collective effort by
 4     my team.  So we have folks working on some
 5     of the coding, some of the data loading,
 6     some of the writing.  It sits on my
 7     computer, their computers.  But all of it
 8     is in my team.
 9          Q.   And you said there were roughly
10     six people working under you on your team
11     to create Exhibit 5?
12          A.   Yes.
13          Q.   Nobody working above you to
14     create Exhibit 5?
15          A.   Correct.
16          Q.   And you communicated with the
17     lawyers in this case to prepare Exhibit 5,
18     correct?
19          A.   Correct.
20          Q.   And what lawyers specifically did
21     you communicate with in your work in this
22     case?
23          A.   I'd have to think, but primarily
24     Linda Singer.
25          Q.   Can you think of any other
```

Highly Confidential - Subject to Further Confidentiality Review

1

2     attorneys that you worked with other than

3     Linda Singer?

4          A.   Jayne Conroy.

5          Q.   Anybody else?  Any man attorneys

6     or just -- did you have an all-women team?

7          A.   We're a strong team.

8               Not that I can think of at this

9     time.

10         Q.   And who typed the report?

11         A.   The report was primarily typed by

12    one of my staffers and then myself as well.

13         Q.   Just very generally, like what

14    was the process in writing it?  Who did

15    what in the process?

16         A.   Sure.

17               So there's a pipeline.  So we --

18    you know, someone is usually in charge of

19    loading the data, so bringing it in.

20    Another person is in charge of the metrics

21    and applying them.  Another person is in

22    charge of pulling charts, tables and

23    graphs.  And another person is in charge of

24    making everything look pretty, write the

25    words.  And then it goes and flows up to

Highly Confidential - Subject to Further Confidentiality Review

1

2      me.

3              And then to the extent that I

4      interject myself, either willingly or

5      unwillingly from my staff, along each

6      different places is how that usually looks.

7          Q.   And then did you ever -- strike

8      that.

9              For the 16 different analyses or

10     the 16 different metrics, those metrics,

11     you were asked to run by the attorneys in

12     the case?  They were not metrics that you

13     yourself thought of, correct?

14         A.   I would say that is correct.  We

15     didn't create a metric to the extent that

16     multiple distributor was kind of like --

17     there was no, "here's how to apply a

18     multiple distributor metric."  You are just

19     looking for whether or not they exist or

20     not.  Everything else was either created by

21     another entity or found by us, if that

22     makes sense.

23         Q.   So I guess that's what I'm trying

24     to figure out.

25              If we look at the index of your

Highly Confidential - Subject to Further Confidentiality Review

1

2      report, so Exhibit 5, page 2 is the index.

3      And particularly in J, Compliance Metric

4      Application.

5              Do you see -- are you with me?

6          A.   I'm with you.

7          Q.   The twice trailing 12-month

8      average, which you referred to as the

9      double national average metric, that's a

10     metric that the lawyers in the case asked

11     you to run, correct?  You didn't develop

12     that?  You didn't think of that yourself,

13     right?

14         A.   I would say that's a fair

15     representation.

16         Q.   Same is true for the triple

17     national average right below, right?  The

18     lawyers asked you to do that analysis; you

19     didn't generate that?

20         A.   I would say that's a fair --

21         Q.   Same with the McKesson 8,000 rule

22     metric, the lawyers in the case asked you

23     to run that metric; that's not something

24     you thought of on your own, right?

25         A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   The same with the trailing

3     six-month threshold, which you referred to

4     as "common sense," that's something that

5     the lawyers asked you to run.

6               You didn't come up with that

7     yourself, right?

8          A.   Correct.

9          Q.   You who came up with the term

10    "common sense"?

11         A.   I've always heard of that metric

12    being called that.

13         Q.   That's not your term?  Somebody

14    else told that to you?

15         A.   That's correct.

16         Q.   And you certainly don't use that

17    term to mean that it's your opinion that

18    this is the common sense answer.

19               That is not how you use that

20    term, correct?

21         A.   Correct.  It's any one of these

22    that has quotes in it is -- well, really,

23    that is the only one that does after the

24    correction sheet, so, yes.

25         Q.   And is it your opinion that J4,

1

2    the maximum monthly trailing six-month

3    threshold, is the most common sense in the

4    ordinary use of that term?  That is not

5    your opinion, is it?

6         A.    That is not my opinion.

7         Q.    Okay.  And then No. 5, the

8    Qualitest, Endo, 25/50 percent national

9    average, the lawyers in the case asked you

10   to run that.

11             That was not a metric you came up

12   with, right?

13        A.    Correct, with a clarification.

14             So on some of the labeler

15   metrics, some of them were found by

16   attorneys and some we found on our own by

17   reading documents.

18        Q.    So that's exactly what I want to

19   find out.

20             Which ones did you find all on

21   your own that lawyers didn't ask you to do?

22        A.    I don't know specifically.  I

23   actually didn't keep track.  It was kind of

24   a --

25        Q.    All of the documents that you

Highly Confidential - Subject to Further Confidentiality Review

1

2      were provided in this case were provided to

3      you by the lawyers in the case, right?

4          A.    No.   We had access to anything

5      that we had asked for, and I also could

6      search for documents.

7          Q.    So what documents -- did you get

8      any documents that did not come to you

9      through the lawyers in the case?

10         A.    Yes.

11             MS. CONROY:   Objection.

12     BY MS. LEVY:

13         Q.    And what types of documents were

14     those?

15         A.    There were a few compliance

16     documents --

17         Q.    Let me -- I think we might be

18     talking -- I might be asking the question

19     in a confusing way.

20             Internal company documents that

21     you reviewed, those you were given access

22     to by the lawyers in the case, right?

23         A.    That is correct.   True.   Let's

24     say relativity.

25         Q.    Okay.   And how did that process

Highly Confidential - Subject to Further Confidentiality Review

1

2      work?  Did you say, I'd like to see

3      documents of X category, provide them to

4      me?  Or did you search the whole relativity

5      database and found them on your own?  Just

6      generally, how did that process go?

7           A.   A little bit of both.  So to the

8      extent that lawyers had already identified

9      documents of categories, so we said give me

10     compliance documents, those would be

11     already provided to us.

12               To the extent we felt like we

13     wanted to find more, we'd go looking.

14          Q.   Going back to the index of

15     Exhibit 5, No. J5, this Qualitest, Endo

16     metric, that was a metric that the

17     attorneys asked you to run, correct?

18          A.   Correct, or that we found.

19          Q.   You don't know which?

20          A.   I don't.  I'm sorry, I don't know

21     which.

22          Q.   And what about No. 6, J6, the

23     Qualitest, Endo 30,000 rule, that's a

24     metric that the attorneys asked you to run?

25     That was their idea, correct?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   Or that we found.

3          Q.   You just don't know?

4          A.   I just don't know.  I didn't keep

5     track.

6          Q.   Same with 7, 8, 9, 10, 11, 12,

7     whose idea was it to run those metrics?

8     Are these things that you thought of out of

9     the blue or metrics that the attorneys

10    asked you to run?

11            MS. CONROY:  Objection.

12         A.   They're metrics that either the

13    attorneys asked us to run or that we found

14    in the compliance documents.

15         Q.   And you don't know which?

16         A.   I don't know.  I mean, I do

17    remember Mallinckrodt was known at the

18    beginning, but I don't remember at what

19    point these we found and others were given.

20         Q.   And then for part 1, the

21    manufacturer prescriber analysis, was the

22    methodology to look at IQVIA data and come

23    up with this analysis, was that your idea

24    or was that something that the lawyers

25    asked you to do?

1

2      A.   That was what lawyers had asked

3   me to do.  They had asked me to apply the

4   known compliance metrics to labelers' data

5   which would have included chargebacks and

6   IQVIA.

7      Q.   And then for part 2, the

8   manufacturer to pharmacy analysis, that

9   also was something that the lawyers asked

10   you to do; they asked you to apply these

11   various metrics to chargeback data,

12   correct?

13      A.   To chargeback data, correct, or

14   867 data.

15      Q.   What is 867 data?

16      A.   So I want to make sure I get the

17   definition right because -- so let me flip

18   to my report.

19           (Document review.)

20      A.   Sorry, I wish you could do a

21   control F while you're in the room.  It

22   would make things is so much easier.

23      Q.   Can you do that?  I'll see if I

24   can get Catie to narrow it quickly.

25           (Document review.)

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   No, I can't find the definition.

3     But I understand it to be -- go ahead -- to

4     be data that the labelers have at their

5     hands of where their opioids are going down

6     to the pharmacy level.

7          Q.   Do you know anything else about

8     867 data or does that reflect your entire

9     understanding?

10         A.   I mean, I have some backup with

11    me that I can pull up if you'd like.  But I

12    don't have a deep, deep knowledge of it.  I

13    understand just generally definitionally

14    what it was and then what was provided to

15    me.

16         Q.   And your understanding of what

17    867 data is comes from what the attorneys

18    told you in this case, correct?

19              MS. CONROY:  Objection.

20         A.   I also have a few documents that

21    are in this list and reading through

22    depositions of, like, understanding what it

23    was.

24         Q.   How comprehensive is 867 data?

25    Who has it and to what extent do they have

1

2     it?  Do you know that?

3          A.   I only know what 867 data I

4     received.  And I believe I only received it

5     from Purdue, but that -- that at least is

6     all I've seen.

7          Q.   Okay.  And you didn't do any

8     analysis on anybody else's 867 data other

9     than Purdue?

10         A.   That I was aware of, yes.

11         Q.   Okay.  What is 852 data?

12         A.   It's just another type of data

13    that labelers have to them.

14         Q.   Can you be more specific than

15    that?

16         A.   I don't -- I have never seen it,

17    so I don't know that much about it.  But I

18    understand it to be more of a labeler to

19    manufacturer.

20         Q.   What it is, who has it, how

21    comprehensive it is, all of that is beyond

22    the scope of your expertise, correct?

23         A.   For 852 data, yes.

24         Q.   And 867 data, too?

25         A.   Correct.  I would say I only use

Highly Confidential - Subject to Further Confidentiality Review

1

2     the data as I saw it and know of that exact

3     data set and those Bates numbers.

4          Q.   When you used the term -- strike

5     that.

6               Chargeback data, you are familiar

7     with and did a number of analyses on

8     chargeback data, correct?

9          A.   That is correct.

10         Q.   I am not an expert in data

11    science, so I'm going to try to get this

12    right.

13              But in your backup files, you

14    have an enormous file with all of the

15    chargeback data that you were given in this

16    case, correct?

17         A.   Yes.  I think you're referring to

18    the aggregated, we call it the chargeback

19    summary table.

20         Q.   And the title of that file is

21    called chargeback_flagging, correct?

22         A.   So I think there are two tables.

23    There's one, the base chargebacks table,

24    and then that table is used to run

25    flagging.  And when I say "flagging," I

Highly Confidential - Subject to Further Confidentiality Review

1

2     mean the compliance metrics.

3          Q.   The metrics that are reflected in

4     your report.  I tried to print it.  It was

5     so --

6          A.   Oh, no.

7          Q.   It was very hard.

8               But if I understand -- I've done

9     some digging in your backup files.

10              You were provided nationwide

11    chargeback data, correct?

12         A.   I think so, yes.

13         Q.   And one of the columns in the

14    enormous amount of data is Buyer County,

15    correct?

16         A.   Correct.

17         Q.   And that allowed you to look at

18    chargeback data by county?

19         A.   Yes.

20         Q.   So you can isolate a chargeback

21    in Cuyahoga County or in Summit County,

22    right?

23         A.   Yes, to the best that we could

24    identify the county, because not all

25    chargeback data had a county.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   Okay.

3               MS. LEVY:  Can we take a break?

4          Thanks.  Let's go off the record.

5               THE VIDEOGRAPHER:  The time is

6          10:19 a.m. We are now off the record.

7               (Recess is taken.)

8               THE VIDEOGRAPHER:  The time is

9          10:37 a.m.  We are now back on the

10         record.

11    BY MS. LEVY:

12         Q.   Ms. Keller, before the break, we

13    talked about several data sets, including

14    ARCOS, A-r-c-o-s, data.

15              To what extent did you use ARCOS

16    data for your report in this case?

17         A.   I believe there is one metric

18    that required the use of ARCOS data.  And

19    that would be the Qualitest 25, 50.

20         Q.   On page 18 of your report?

21         A.   18 to 19, yes.

22         Q.   Can you turn with me to page 85

23    of your report?

24              (Witness complies.)

25         Q.   Specifically, paragraph 159.  In

Highly Confidential - Subject to Further Confidentiality Review

 1

 2      159(b) -- well, let me back up.

 3               Page 85 of your report describes

 4      the methodology you followed in this case,

 5      correct?

 6          A.   To the best that we could, yes.

 7          Q.   And Section 1 in paragraph 159 on

 8      page 85 describes how you treated six of

 9      the labeler defendants.

10               Do you see that in paragraph

11      159(b)?

12          A.   Yes, table 75.

13          Q.   Okay.  Table 75 on page 85 shows

14      how you have grouped particular labels into

15      combined labeler names.

16               Is that what that table reflects?

17          A.   Yes.

18          Q.   So how did you come up with these

19      groupings?  What methodology did you use to

20      come up with these groupings?

21          A.   I understood them to be the

22      subsidiaries or part of the grouped

23      labeler.

24          Q.   And how did you arrive at that

25      understanding?

1

2          Is that something that the

3     lawyers told you?

4          A.   Yes, through our own research,

5     through what the lawyers told us, through

6     corporate filing documents that we had

7     access to, yes.

8          Q.   Did you review corporate filing

9     documents in order to come up with these

10    groupings in table 75?

11         A.   It was a summary of corporate

12    filing documents.  So it was like, you

13    know, for example, this entity and this

14    entity cite this filing document.

15         Q.   So you had access to a summary of

16    the corporate groupings in order to come up

17    with table 75?

18         A.   I think that would be correct.

19         Q.   I don't see that cited anywhere

20    in your report.

21              Where is the cite to whatever it

22    was that you used to come up with these

23    groupings?  Where is that summary?  Where

24    would I go to find it?

25         A.   We could provide that, I guess,

Highly Confidential - Subject to Further Confidentiality Review

1
2      if it wasn't part of the documents.
3           Q.    Who prepared the summary of the
4      documents that you used to do these
5      groupings?
6                The lawyers prepared that, right?
7           A.    Yes.
8           Q.    Basically they told you who to
9      use and what groupings, right?
10          A.    That would be correct, yes.
11          Q.    And table 75, it looks like for
12     purposes of your report, you have assumed
13     that the labelers in the right-hand column
14     are subsidiaries of the parents in the
15     left-hand column; is that correct?
16               MS. CONROY:   Objection.
17          A.    Yes, I think that's accurate.
18          Q.    And so you're assuming that
19     Allergan, Inc. is a subsidiary of Teva; is
20     that right?
21          A.    Yes.
22          Q.    And looking also on table 7 of
23     your report, which is on, I believe --
24               MR. LEDLIE:   29, I believe.
25     BY MS. LEVY:

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   -- page 29.

3               I'm sorry, that is the wrong one.

4     Page 28 of your report, table 6.

5               (Document review.)

6          Q.   Are you with me?

7          A.   Yes.

8          Q.   Okay.  In the left-hand column,

9     it says Parent Company.  In the right-hand

10    column, it has different label names.

11              Do you see that?

12         A.   In the right-hand column, it has

13    different label -- help me out here.

14    Different than table 77?

15         Q.   I'm sorry.  Let me reask that in

16    a less confusing way.

17              Right now I am looking at page 28

18    of your report in table 6.

19         A.   I'm there.

20         Q.   Okay.  The left-hand column in

21    table 6 is labeled Parent Company.

22              What does that mean?

23         A.   It's like the parent company of

24    the labelers to the right or how we, I

25    would say, collectively referred to those,

Highly Confidential - Subject to Further Confidentiality Review

1

2      that company and its subsidiaries

3      throughout the report or through -- it's a

4      way to show who's part of -- when I say,

5      let's say in table 8, when I say Endo, who

6      is part of that Endo number.

7           Q.    So in other words, taking the

8      Endo example, when you refer to Endo, you

9      are assuming that Endo, Par and Qualitest

10     are all subsidiaries of Endo, correct?

11          A.    Correct.

12          Q.    And these were assumptions you

13     were asked to make based on the summary you

14     were provided?  These are not independent

15     conclusions of your own, correct?

16          A.    Yes.  To some extent.  I mean,

17     I've done some research on my own to make

18     sure that we're getting the odd subsidiary

19     names, to make sure that those are correct.

20               And I want to point out that

21     table 77 is an ARCOS table.  The groupings

22     for the chargeback -- or, I'm sorry, for

23     the IQVIA table -- I'm sorry.  Let me make

24     sure I'm saying this right.

25               Table 75, which is where we

Highly Confidential - Subject to Further Confidentiality Review

1

2      started, that's an ARCOS table.

3              Table 6 is an IQVIA table.

4      Q.   In both sets of analyses, you

5      were asked to use the same assumptions as

6      to whose parent companies go with which

7      subsidiaries, correct?

8      A.   That's correct.

9      Q.   And those were assumptions that

10     the lawyers asked you to make, correct?

11     A.   Yeah, or that we knew ourselves,

12     yes.

13     Q.   Okay.  So looking specifically on

14     page 28, we've talked about Endo.  I want

15     to look down at the Teva parent company.

16             And here, you have listed as Teva

17     as the parent company and then you have

18     Actavis, Allergan and Teva as the labelers

19     that belong with that parent.

20             Do you see that?

21     A.   I do see that.

22     Q.   Did you do independent analysis

23     to arrive at that specific grouping or is

24     that one that the lawyers asked you to

25     make?

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2          A.   A little bit of both.

 3          Q.   Okay.  What specific independent

 4    analysis did you do to determine that

 5    Allergan is a subsidiary of Teva?

 6          A.   We read online documents, some

 7    corporate history of the companies on their

 8    websites.

 9          Q.   And who did that work?

10          A.   I reviewed it, as well as another

11    staff of mine.

12          Q.   And tell me what you know about

13    the relationship between Allergan and Teva.

14               What did your research on that

15    show?

16          A.   I'd have to recall exactly, but I

17    recall a long history of one -- the company

18    begetting another and those -- the

19    corporate history, I would say, is maybe

20    complicated.

21          Q.   You are not being offered as an

22    expert in corporate history, I assume?

23          A.   No.

24          Q.   And that is beyond your expertise

25    or anything that you would be comfortable
```

Highly Confidential - Subject to Further Confidentiality Review

1

2      opining on, correct?

3           A.    Yes, that would be correct.

4           Q.    You don't know, as you sit here

5      today, if Allergan is a subsidiary of Teva?

6      That is not something that you have

7      knowledge of?

8           A.    Not that is different than what's

9      purported in this report, then no.

10          Q.    So I think I need to get more

11     clarity on that.

12                You have treated Allergan as a

13     subsidiary of Teva for purposes of some of

14     your analyses in this report, right?

15          A.    That's correct.

16          Q.    But as you sit here today, you

17     don't know if, in actuality, Allergan

18     really is a subsidiary of Teva?  That's not

19     something that you know, is it?

20          A.    I think that's correct.

21          Q.    And in the ARCOS data and in the

22     IQVIA data, you recognize from your data

23     work that Allergan is, in fact, separate

24     from Teva?

25                They have different NDC labeler

Highly Confidential - Subject to Further Confidentiality Review

1

2     codes, correct?

3          A.    In ARCOS, they have different NDC

4     codes.  In IQVIA, IQVIA has its own IQVIA

5     code in there, and so that's assigned by

6     IQVIA.

7          Q.    In the IQVIA data, Allergan is

8     also different from Teva, isn't it?

9          A.    It appears so, yes.

10         Q.    All right.  So going back to your

11    report overview on page 16 where you begin

12    to describe in table 1, the labeler market

13    shares in Summit County and in table 2, the

14    labeler market shares in Cuyahoga County.

15              Do you see that?

16         A.    I do.

17         Q.    And what is the source of the

18    data that you drew from to create these

19    market shares?  The sources is IQVIA data,

20    correct?

21         A.    That is correct.

22         Q.    In this IQVIA data, you could

23    have separated out the entities that you

24    believe are subsidiaries of Teva, but you

25    did not do that, right?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   I believe I could.

3          Q.   And same for Endo, you could have

4    separated out the entities that were

5    subsidiaries of Endo in your view, but you

6    did not do that, correct?

7          A.   Yes.  I could break Endo into

8    Endo generic, Endo labs and Par.

9          Q.   And you could break Teva into --

10   you could break Allergan out from Teva as

11   well?  That's something else you could have

12   done?

13         A.   I could break Allergan, Teva -- I

14   could break Allergan and Teva out from

15   Teva.

16         Q.   And what would, for example,

17   Allergan's market share have been if you

18   had broken it out in table 1 in Cuyahoga

19   and Summit?

20         A.   I'd have to run that number.

21         Q.   You've never run that?

22         A.   I don't think so, no.

23         Q.   Okay.  And the same is the true

24   for the other subsidiaries that you've

25   wrapped into the parents, you've never run

Highly Confidential - Subject to Further Confidentiality Review

1

2      them separately, correct?

3           A.    That is correct.

4           Q.    And the reason you didn't is

5      because you were asked to assume these

6      groupings and to present the data this way;

7      is that right?

8                 MS. CONROY:   Objection.

9           A.    Yes or from our own

10      understanding.  Yes.

11           Q.    Well, that's what I want to know.

12      Which one was it?

13                 With Allergan specifically,

14      because that's my client, were you asked to

15      group it with Teva or did you independently

16      decide to do it that way?

17           A.    I would say it would be most

18      correct to say that we had grouped them

19      from doing this for a long time and that it

20      was agreed upon that that was okay.

21           Q.    Okay.

22           A.    So the data doesn't come that

23      way.  I have to process it and do the

24      groupings.  We presented the groupings.  We

25      continued with those groupings as agreed

Highly Confidential - Subject to Further Confidentiality Review

1

2      upon.

3              Does that help?

4          Q.    And so when you talk in table 7,

5      for example, about Allergan and you do

6      break it out for table 7, what is the

7      difference there in Allergan and Teva?

8      What Allergan products?

9          A.    I'm sorry, table 7?

10         Q.    I'm sorry, my fault.  Let me

11     reask the question.

12             Table 6.  I keep saying 7, but

13     it's table 6.

14             In table 6 on page 28, what I

15     really would like to understand is what you

16     understand the difference between Allergan

17     and Teva in that table?

18         A.    So for that table, I think there

19     were -- the purpose of this table is to

20     show compliance metrics over time, and so

21     there were differences over time.

22             And so to the extent that we

23     could help show that granularity, that was

24     the purpose of breaking them apart.

25         Q.    But you didn't ask -- you

Highly Confidential - Subject to Further Confidentiality Review

1

2     didn't -- you were not asked to and you

3     didn't look specifically at Allergan?

4            MS. CONROY:  Objection.

5        A.   As far as we were presenting

6     results, let's say, ala, table 1 and 2,

7     correct.

8        Q.   Now beginning on page 16 in

9     Section J, you describe your compliance

10    metric application.

11           Are you with me?

12       A.   Yes.

13       Q.   And you state in paragraph 51, "I

14    was instructed by counsel to apply metrics

15    derived and used by any manufacturer or

16    distributor and also to apply metrics

17    applied in enforcement actions, McKesson

18    and Masters, to all data sets to detect

19    prescribing and purchasing patterns of

20    unusual size, frequency and pattern."

21           Do you see that?

22       A.   I do.

23       Q.   When you say "I was instructed by

24    counsel," who does that refer to?  What

25    counsel?

Highly Confidential - Subject to Further Confidentiality Review

1

2      A.   That would refer to Linda Singer.

3      Q.   And so when we talk about

4  counsel, it's Linda Singer who asked you to

5  do these various metrics that we are going

6  to talk about in a minute?

7      A.   Linda Singer provided us with the

8  assignment, yes.

9      Q.   In No. 1 -- well, this term that

10  is used in the end of paragraph 51,

11  "patterns of unusual size, frequency and

12  pattern" and there is a cite there, what is

13  that cite?  Do you know?

14      A.   I understand that to be the Code

15  of Federal Regulations when it comes to

16  diversion, but I'd have to have the actual

17  language in front of me to know.

18      Q.   I don't mean to give you a memory

19  quiz on the cites.  That is not the purpose

20  of the question.

21          There are no specific

22  requirements for how a registrant is

23  supposed to calculate patterns of unusual

24  size, frequency, and purchasing patterns of

25  a -- sorry, let me ask the question again.

Highly Confidential - Subject to Further Confidentiality Review

1

2          You are not aware of any specific

3     rules or regulations for a registrant on

4     how to calculate patterns of unusual size

5     or frequency, correct?

6          A.   So I think, as I stated earlier,

7     that's not my area of expertise.

8          Q.   And you're not aware of any?

9          A.   I wouldn't be able to say, but...

10         Q.   Okay.  The first metric that you

11    employ is double the national average.  And

12    I'm looking now on page 17.

13         A.   Correct.

14         Q.   Are you with me?

15         And that metric, again, was one

16    that Linda Singer asked you to do, correct?

17         A.   Correct.

18         Q.   And you didn't find it in any DEA

19    regulations?

20         A.   Correct.

21         Q.   You are not aware of any place in

22    the real world where this metric is used,

23    correct?

24         MS. CONROY:  Objection.

25         A.   I wouldn't know for sure.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   Do you have a guess?

3               MS. CONROY:   Objection.

4          A.   No.

5          Q.   Okay.  And you are -- I think you

6     already answered this earlier, but you are

7     not offering any opinion that this metric

8     is somehow a requirement on registrants,

9     right?  That is not your opinion?

10         A.   Correct.  That's not my area of

11    expertise.

12         Q.   And you are not offering an

13    opinion that failure to employ this metric

14    is somehow unlawful or misconduct?

15              That is beyond your expertise,

16    correct?

17         A.   Correct.

18         Q.   Going to the second metric that

19    you applied, triple national average,

20    again, that metric you were asked to run by

21    Linda Singer, correct?

22         A.   Correct.

23         Q.   That did not come from any DEA

24    guidance or any DEA regulations, correct?

25         A.   Correct.

1

2          Q.   You do not know of any place in

3     the real world that applies that average,

4     correct?

5               MS. CONROY:  Objection.

6          A.   I wouldn't know.

7          Q.   And it is not your opinion that

8     any registrant should have or had any

9     requirement to employ that metric in the

10    real world?  That is not the opinion you're

11    offering in this case, correct?

12         A.   Correct, that's not my area of

13    expertise.

14         Q.   Looking at No. 3, the McKesson

15    8,000 rule, again -- I apologize if this is

16    getting tedious.  The McKesson 8,000 rule

17    is a metric that you are asked to apply by

18    Linda Singer, correct?

19         A.   Correct.

20         Q.   And you were asked to look at

21    what would the data show if you used this

22    set of assumptions, right?

23              MS. CONROY:  Objection.

24         A.   Yes.

25         Q.   Like No. 1 and 2, the McKesson

Highly Confidential - Subject to Further Confidentiality Review

1

2    8,000 rule is not a metric that you have

3    ever seen in any DEA guidance or

4    regulation, correct?

5         A.   I think that's correct.

6         Q.   Are you aware of any limitation

7    anywhere in the DEA regulations or in the

8    Controlled Substances Act or any guidance

9    interpreting them that puts a specific

10   limitation on dosage units?

11            MS. CONROY:  Objection.

12        A.   I would say that's outside of my

13   expertise.

14        Q.   And it is not your opinion in

15   this case that any particular defendant was

16   required or obligated to employ this metric

17   in running its business, correct?

18        A.   That's correct.  That's outside

19   of my expertise.

20        Q.   Even with respect to McKesson, it

21   is outside your area of expertise to say

22   that anybody, McKesson or anybody else, had

23   a duty to run a metric in the way that you

24   have, right?

25        A.   Yes, I believe that is correct.

1

2          Q.   Going down to No. 4, Maximum

3     Monthly Trailing Six-Month Threshold, which

4     in parentheses says, quote, "common sense."

5               I think you told me this before

6     the break, common sense is not a term that

7     you came up with, right?

8          A.   Correct.  I've heard this rule

9     referred to colloquially as the common

10    sense rule.

11         Q.   Who have you heard that

12    colloquially?  Who has referred to this

13    rule as the common sense rule?

14         A.   I honestly couldn't remember.

15    It's been -- I've heard it so many times

16    that I --

17         Q.   Had you heard it from lawyers in

18    the case?

19         A.   Sure.

20         Q.   Have you ever heard it from DEA?

21         A.   No.  Like I said, I only spoke to

22    the DEA about the ARCOS data.

23         Q.   Okay.  And it is not your opinion

24    in this case that this metric is the most

25    sensible metric?  Even though the term

Highly Confidential - Subject to Further Confidentiality Review

1

2      might suggest that, that's actually not

3      your opinion in this case.  Am I right

4      about that?

5          A.    That's correct.

6          Q.    Okay.  Have you read the Masters

7      Pharmaceutical opinion from the D.C.

8      circuit in 2017?

9          A.    I think I skimmed it a while ago.

10         Q.    You don't intend to offer any

11     opinions about what the law is as a result

12     of that opinion, correct?

13         A.    That's correct.

14         Q.    And you don't intend to offer any

15     opinions as to what the law might require

16     as a result of that opinion, do you?

17         A.    That's correct.

18         Q.    Okay.  Sorry, back to the common

19     sense threshold.  That is not a threshold

20     that came from -- where did that threshold

21     come from?

22         A.    Do you mean where was the metric

23     derived or?

24         Q.    Yes.  Where was metric derived?

25         A.    So I have it -- whatever citation

1

2     I have there, that's where it would have

3     been derived from.

4          Q.   And beyond that, you don't know

5     anything other than you were asked to run

6     it, correct?

7          A.   Yeah, I was asked to review the

8     metric and implement it on the data.

9          Q.   With respect to the Qualitest

10    Endo 25/50 percent national average, that

11    metric also came -- that metric was

12    presented to you by the attorneys as

13    something that you should run based on

14    documents that you were provided, correct?

15         A.   It was either a metric that we

16    found or the attorneys provided.  I

17    honestly can't remember.

18         Q.   And for this metric, which was

19    it?  Did you stumble across a document and

20    say, hey, we should run this?  Or did the

21    attorneys provide you documents and say

22    based on these documents, we'd like for you

23    to run it as if this were the law of the

24    land?

25              MS. CONROY:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1

     A.  I'd really have to review my
notes to know for sure.  I don't remember.

     Q.  Okay.  And you don't recall
seeing this metric in any directive from
DEA or any guidance from DEA?  That's not
your opinion in this case?

     A.  That's correct.  I don't recall
seeing it in any guidance, nor is it my
opinion to offer.

     Q.  And I think, to short-circuit
this, if we look at page 19, 20, 21, and 22
of your report, those list other metrics
that you were asked to run, correct?

     A.  Yes.  I would say I was asked to
review the documents, interpret the metrics
and run them on the data.

     Q.  You will not offer any opinion in
this case as to whether these metrics are
appropriate for a registrant to do in real
life, whether a registrant should have done
them or had any requirement to do them in
real life?  That is outside of the scope of
the opinions you intend to offer in this
case, correct?

1

2          A.   Correct.

3          Q.   With respect to every one of the

4    metrics that are listed in 19 through 21 of

5    your report, you have no opinion as to

6    whether there was a duty to do them,

7    whether it was feasible in the real world

8    to do them, or what the result would have

9    been had a registrant attempted to

10   implement these metrics?

11             All of that is beyond the scope

12   of what you have been asked to opine on,

13   correct?

14             MS. CONROY:  Objection.

15        A.   So I would say all the metrics in

16   17 through 22, so all of them that we've

17   covered today and that are in the report, I

18   would not be offering that opinion,

19   correct.

20        Q.   Okay.  Let's go to page 23,

21   Manufacturer to Prescriber Analysis.

22             Table 4 reflects your work with

23   IQVIA -- is that how you pronounce it?  How

24   do you say it?

25        A.   I say IQVIA.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.    IQVIA.

3          A.    I've heard it IQVIA.  I've heard

4     it all.  I'm from Kansas.  I'm not super

5     good at pronouncing words.

6          Q.    Me either.

7          A.    We said Par-mee-zian cheese for a

8     long time --

9          Q.    Really?

10         A.    -- instead of Parmesan.

11         Q.    Parmesan.

12               IQVIA, I say it both ways.

13               You looked at that set of data

14    and based on your data analytics, you

15    grouped prescribers by specialty and the

16    results of that work is reflected in table

17    4; is that right?

18         A.    Yes.  And the groupings are in

19    the methodology.

20         Q.    Now your report suggests that you

21    were missing data for 2017, right?

22         A.    For 2007.

23         Q.    I'm sorry, for 2007.

24               So your analyses skipped 2007; is

25    that right?

Highly Confidential - Subject to Further Confidentiality Review

1

2      A.   Yes, it does not include 2007,

3   which would only increase any of the

4   numbers or -- depending on the metrics,

5   either increased the number of transactions

6   or might impact this.

7      Q.   Do you know whether the 2007 data

8   is actually missing or whether it's

9   actually in your reliance materials but

10   just in a different format than the rest of

11   the years?  Have you looked at that issue?

12      A.   So I actually just -- we just

13   found this out this week that the 2007 data

14   is in the production and the reliance

15   materials that we listed.  It was in such a

16   different format in function, and we were

17   provided no data dictionary on how to

18   process it, that we didn't feel comfortable

19   with including it because it didn't look

20   like any of the other years.

21           We weren't quite sure if it was a

22   secondary file because we just had the

23   Bates number and nothing, like, else to

24   process it.  So we felt that it was most

25   conservative to leave it out as opposed to

Highly Confidential - Subject to Further Confidentiality Review

1

2      maybe including some data erroneously.

3            Q.   Okay.  That's what I thought you

4      would say.

5                 Does anything that you have

6      subsequently seen in the 2007 data change

7      your report or your opinions in any way?

8            A.   So to be honest, we're still

9      loading that data.  But I would say that it

10     wouldn't because all it would do is just

11     create a bigger base on which to run

12     that --

13           Q.   And just really fill in the gap

14     of that one year in a 20-year period that

15     you didn't have hard data and had to

16     extrapolate, right?

17           A.   Correct.  And I would say there's

18     some metrics that have a lookback period

19     that are somewhat impacted by that lack of

20     data because you can't employ those when

21     you're missing a year of data, so those

22     would be impacted.

23           Q.   Do you have any present intention

24     to create a supplemental report in this

25     case?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   I don't know.

3          Q.   Do you have a supplemental report

4    in process?

5          A.   No.

6          Q.   Okay.  And if your opinions

7    change in any way as a result of additional

8    analysis of the 2000 [sic] data or for any

9    other reason, we would ask that you bring

10   that to the attention of counsel.

11         A.   Of course.

12         Q.   Okay.  Page 27 of the report,

13   paragraph 76, heading No. 1 at the top of

14   page 27.

15              Are you with me?

16         A.   I am.

17         Q.   It says, "Defendant access to

18   IQVIA data."

19              And then down in paragraph 78 you

20   make the statement that "Each of the

21   defendant labelers had access to IQVIA

22   XPONENT data."

23              Do you see that?

24         A.   I do.

25         Q.   That is an assumption that you

Highly Confidential - Subject to Further Confidentiality Review

1

2      were asked to make.  You did not look at

3      each labeler and do an analysis of what

4      data each labeler had during what time

5      periods in the real world?  You did not do

6      that, did you?

7           A.    I would say it's a mix.

8           Q.    Okay.

9           A.    It was an assumption that we made

10     at the beginning of the report.  But we

11     also, in part of the reliance materials

12     that are provided to you today, also

13     include dates in which we identified

14     defendant access to -- defendant labeler

15     access, I should be more specific, to the

16     IQVIA XPONENT data or purchase.  I should

17     say purchase, not access.

18          Q.    So let's go through on page 28 in

19     table 6.

20               For Endo, did you an analysis of

21     what IQVIA data Endo had in its files, what

22     type of IQVIA data Endo actually had, and

23     for what years in the 20-year time period

24     that you looked at?  Is that something that

25     you did?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   I would say yes.

3          Q.   Okay.  And what is the answer for

4    Endo?

5          A.   I'd have to pull up my files to

6    look specifically.

7          Q.   You don't know?

8          A.   I don't remember, no.

9          Q.   Okay.  Do you know -- can you

10   say, as you sit here, are you going to give

11   the opinion that Endo actually had the full

12   set of IQVIA data in its files for the

13   whole 20-year period?  Is that an opinion

14   you intend to offer in this case?

15         A.   So I would say it's an assumption

16   of the report but not an opinion, yes.

17         Q.   Okay.  And so I just want to --

18   I'm not trying to be tricky.  I'm looking

19   at the first statement in 78.  You say,

20   "Each of the defendant labelers had access

21   to IQVIA XPONENT data."

22              What you mean by that is they

23   could have purchased that data, right?

24         A.   I would say that's correct, if

25   they didn't already purchase some form of

Highly Confidential - Subject to Further Confidentiality Review

1
2    it, yes.
3         Q.   And in -- some of the labelers or
4    some of the defendants in this case might
5    have purchased some data for some time
6    periods.  And you do not know and did not
7    do a deep analysis of every single labeler,
8    every single time period?  You didn't do a
9    look at what each labeler had in the real
10   world, right?
11        A.   We had a -- we had a high level
12   review, but I couldn't write a report on
13   each labeler's access on every year, no.
14        Q.   And the metrics that you run that
15   flow from the IQVIA data are based on the
16   assumption that any of these labelers could
17   have had it all, but not assuming that they
18   actually did have it all in the real world?
19        A.   Yes.
20        Q.   And --
21        A.   When you say "it all," I would
22   say -- I want to clarify that, if you're
23   saying that the Allergan data is it all.  I
24   don't know what the "all" could be from
25   IQVIA.  You know, I know only what Allergan

Highly Confidential - Subject to Further Confidentiality Review

 1

 2    had produced.  So to that extent.

 3         Q.   And so when you're talking about

 4    what Allergan produced, let's look at -- I

 5    think I know what you're referring to, but

 6    I want to make sure we're clear.  It's

 7    footnote --

 8         A.   Actually I think it's in that --

 9         Q.   I think it's on page 28 and

10    footnote 81 in your report.

11              When you talk about the data that

12    Allergan produced, is that what you're

13    referring to?

14         A.   Yes.  When I talk about the IQVIA

15    data that we're using throughout the

16    report, that was the Bates number given to

17    me for that production.

18         Q.   And you have no idea whether

19    Allergan had that data in its possession

20    during the time period you're analyzing

21    between 2000 and -- or 1997 and 2017?

22              You don't know whether Allergan

23    had that body of data then or purchased it

24    later like for litigation?  You don't know

25    that, do you?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   I would not know that, no.

3          Q.   Okay.  And so you're not

4     assuming -- let me phrase it differently.

5     Strike that.

6               When you say in paragraph 78 that

7     each of the defendant labelers had access

8     to IQVIA data, you mean had access to the

9     data that is referred to in 81, the

10    footnote?

11              MS. CONROY:  Objection.

12         A.   I would say they could have had

13    access to the data referred to in footnote

14    81.

15         Q.   And you've drawn the exact

16    distinction that I'm trying to hone in on.

17              They could have had access.  You

18    don't know and you did not analyze on a

19    labeler-by-labeler basis who did have

20    access to it and specifically when they had

21    access to it and specifically which piece

22    of footnote 81 that each labeler had access

23    to?  You did not drill down and look at the

24    minutia of that, did you?

25         A.   I would say some of the reliance

Highly Confidential - Subject to Further Confidentiality Review

1

2     that I've read today does look at that, but

3     not every year for every labeler.  It

4     goes -- it reviews -- I don't even want to

5     the say what percentage, but we did look at

6     a high level to make sure.  Or I would say

7     the materials that we've provided to date

8     will reflect, let's say, purchase orders

9     from Purdue for several years of Xponent

10    data and reveal -- and show what data or

11    what baskets of data, I think is what they

12    referred to them, might have been included

13    as part of that purchase.

14        Q.   I think I understand.

15             You have seen documents that

16    reflect some purchases in some time periods

17    of some Xponent IQVIA data, right?

18        A.   Correct.

19        Q.   You cannot say for Allergan what

20    data Allergan had in what time period.

21    That's not something you can do, right?

22        A.   If it's in the reliance, then I

23    could.  But other than that, no.

24        Q.   Gotcha.

25             All you know about who had what,

Highly Confidential - Subject to Further Confidentiality Review

1

2      when is what is in your reliance materials?

3           A.    Correct.

4           Q.    And for the Allergan data that

5      you referred to in footnote 81, you do not

6      know when that data was acquired or what

7      portion of that data was received during

8      the 20-year time period by Allergan or any

9      other defendant in this case?

10               You only know snippets from other

11      documents; is that right?

12               MS. CONROY:  Objection.

13           A.    Yes, I have documents that show

14      purchases.  Again, I don't have that data

15      from that time provided to me.

16           Q.    Okay.  I think I understand.

17               And the thing I'm getting at, to

18      demystify it, is you are not offering any

19      opinions that the defendants in this case

20      actually had all this data in their hands.

21               Your opinion is, if they had it

22      and if they looked at it in the way I did,

23      here's what the metrics would have shown.

24               Do you see the distinction I'm

25      drawing?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.    I think I see the distinction.

3     If we're talking about IQVIA, chargebacks,

4     they of course had.

5          Q.    Okay.  And you agree with me if

6     we are talking about IQVIA?  We'll talk

7     about chargebacks in a minute.  Am I right?

8          A.    I think so.

9          Q.    Okay.  Let's look at page 30 of

10    your report.

11          (Witness complies.)

12          Q.    Page 30 in table 9.  In table 9,

13    you take four of the metrics and show a

14    summary of what it would look like if these

15    metrics would have been run, correct?

16          A.    Yes.  We show what number of

17    prescriptions would have been flagged by

18    the compliance metrics if they were run,

19    yes.

20          Q.    And when you say in the

21    right-hand column any flag, again, this is

22    depending on the metrics, you get different

23    numbers.

24          If you use double national

25    average, you get a different number from

Highly Confidential - Subject to Further Confidentiality Review

1

2      triple national average, from McKesson

3      8,000, and from common sense.

4              Each of these metrics generates a

5      different number of flags, right?

6          A.   Correct.

7          Q.   You do not intend to offer any

8      opinion in this case as to which one of

9      these is right.  I think you've told us

10     that, correct?

11         A.   Right.

12         Q.   And relatedly, you don't intend

13     to offer any opinion that any particular

14     set of these prescriptions are suspicious

15     prescribing as the DEA would define it?

16     That is not what you're here to do,

17     correct?

18         A.   Correct.  Whenever we use the

19     word "suspicious," we mean that it tripped

20     one of the metrics.

21         Q.   When you use the term

22     "suspicious," you mean flagged by your

23     metrics?

24         A.   That's precisely what we mean.

25         Q.   And that is all that you mean by

1

2    that?

3         A.    Correct.

4         Q.    And so under your metrics, in

5    table 10, we can see the number of

6    physicians in Summit and Cuyahoga County

7    who would have been flagged by the

8    compliance metrics that you use, right?

9         A.    Correct.

10        Q.    And depending on which metric you

11   use, your metrics would generate thousands

12   and thousands of physicians in these two

13   counties who get flags, right?

14        A.    I would say they're not my

15   metrics, but by applying these metrics,

16   yes, you would have.

17        Q.    And I think I know the answer

18   now, but you are not suggesting that there

19   are actually, looking at the first row,

20   4,207 family or general physicians in

21   Summit and Cuyahoga County that are

22   actually prescribing suspiciously?  That is

23   not what you mean to suggest here, correct?

24        A.    Correct.  What I mean to say is

25   that they were -- they tripped one of the

Highly Confidential - Subject to Further Confidentiality Review

1

2    compliance metrics.

3         Q.   Okay.  And in figure 2, figure 2

4    reflects what the dosage unit numbers look

5    like between some really tiny colorful

6    chart on the bottom left-hand side.

7              I think the orange chart at the

8    top is the dosage units reflected by any

9    flagged prescription of any of your

10   compliance metrics.

11             You see the orange one on top?

12        A.   It's black and white, but...

13        Q.   Oh, I'm sorry about that.  You

14   see the line at the top?

15        A.   I think it is orange.  The top

16   one mathematically should be any metric.

17        Q.   Okay.  And, again, when we're

18   looking at these, this is not information

19   that you are suggesting that the labelers

20   actually had, correct?

21        A.   Yes.  I'm saying that they could

22   have had.

23        Q.   Could have had.

24             And this is not -- you're not

25   opining on anything that the labelers could

Highly Confidential - Subject to Further Confidentiality Review

1

2      have or should have done with this data?

3      That is not what you're offering here?

4           A.   It's a little confusing.  The

5      whole analysis is if they had applied, this

6      would be the results.

7                But I am not saying that they

8      should have.  That would not be my expert

9      opinion.

10          Q.   Okay.  And you say in paragraph

11     82 that you've done a diligent search and

12     you haven't seen any labelers reporting any

13     of these physicians to law enforcement.

14               Do you see where it says that in

15     82?

16          A.   Correct.  I do see that.

17          Q.   My question is:  What was the

18     diligent search that you describe there?

19          A.   So we were reviewing --

20     specifically, especially for the examples

21     in the report, searching for their names,

22     for documents within the production for

23     those names would be one example of how we

24     did that search.

25          Q.   Flip with me to page 32 of your

Highly Confidential - Subject to Further Confidentiality Review

1

2      report, table 11.

3          A.    Yup.

4          Q.    In your prior answer when you say

5      "those names," you're referring to the

6      physicians that are listed in table 11,

7      right?

8          A.    The physicians in table 11, as

9      well as any exemplar physicians in the

10     report.  I think Yang is the only one

11     that's not part of table 11.

12         Q.    Why is he not in table 11?

13         A.    So from what I -- so table --

14     this is very confusing for people and I

15     apologize.

16              These -- the intention of table

17     11 was to identify the physicians that

18     labelers had documented somewhere that were

19     suspicious.  They said either for Purdue,

20     for example, that would be your do-not-call

21     list regency rule.  I could not find Yang

22     on those documents.

23         Q.    But you don't know, as you sit

24     here today, whether these doctors were

25     actually reported to authorities?  You

Highly Confidential - Subject to Further Confidentiality Review

1

2      don't know that one way or the other?

3          A.   I would say I don't know that one

4      way or the other.

5          Q.   Okay.  And you don't know if

6      authorities actually investigated these

7      guys?  That is beyond what you would know,

8      correct?

9              MS. CONROY:  Objection.

10         A.   To the extent that there isn't

11     news articles.  I mean, I think I do cite

12     some news articles about some of these

13     doctors, so I would assume an arrest -- or

14     there was an investigation leading to an

15     arrest.

16         Q.   Other than the public

17     information, you don't have any knowledge

18     about investigations that might or might

19     not have gone on about these physicians,

20     correct?

21         A.   Correct.

22         Q.   And you did not take a look at

23     what proportion of these doctors'

24     prescriptions were lawful versus unlawful?

25     That is not something that you were asked

Highly Confidential - Subject to Further Confidentiality Review

1

2      to do here?

3            A.    Correct.  I would not know what

4      was lawful versus unlawful.

5            Q.    Okay.  And did you talk to

6      anybody at DEA and ask if these doctors

7      ever were on DEA's radar screen or what

8      they knew about these doctors and when?

9            A.    No.  Like I said earlier, the

10     only contact I've had with the DEA is just

11     to talk about our ARCOS data process.

12           Q.    And turning to page 33 of your

13     report, figure 3, for one of those

14     prescribers, this is an illustration of

15     Dr. Sinoff's dosage units compared to other

16     physicians in his specialty between '97 and

17     2017.

18                 Is that what this chart reflects?

19           A.    Yes.

20           Q.    The limit of your opinion is:  If

21     the metrics I employed had been used, this

22     is what they would show, correct?

23           A.    I would say that there were -- to

24     make this graph "no metrics needed to be

25     applied," I just graphed the IQVIA data for

Highly Confidential - Subject to Further Confidentiality Review

 1

 2    this prescriber.

 3         Q.   Well, you had to figure out a

 4    national average, you had to figure out

 5    what specialty, isolate the specialty,

 6    create an average, and then run the metric,

 7    right?

 8         A.   Yes, I did have to calculate an

 9    average for that specialty for that year.

10    But then as far as flagging, that would be

11    recorded in a separate table.

12         Q.   Looking at figure 3, you're not

13    going to offer any opinions as to, you

14    know, whether a labeler should have sliced

15    the data or looked at the data this way?

16              The "should have done" or

17    "required to do" is beyond your opinion,

18    correct?

19         A.   Correct.

20         Q.   You are not intending to offer

21    any opinions as to what point in the

22    timeline reflected in figure 3 a labeler

23    might have a reporting duty with respect to

24    this doctor, correct?

25              That's beyond the scope of what

Highly Confidential - Subject to Further Confidentiality Review

1

2      you have expertise to do?

3            A.    Correct.

4            Q.    You don't intend to offer any

5      opinions as to what might have happened if

6      someone reported Dr. Sinoff to someone

7      else, what might have happened in the real

8      world if that had happened?  That is beyond

9      what you will offer in this case, correct?

10            A.    Correct.

11            Q.    Somewhere in the report you

12      conclude by using a phrase "that orders

13      might have been stopped."

14                  You haven't looked at and you

15      don't know the process by which orders get

16      stopped, do you?

17            A.    Not thoroughly, no.

18            Q.    Okay.  And you don't have the

19      expertise to offer opinions about how a

20      distributor or a manufacturer or a pharmacy

21      would stop an order?  That is not -- that

22      is beyond the limits of your expertise,

23      correct?

24            A.    Correct.

25            Q.    Okay.  And for each of the

Highly Confidential - Subject to Further Confidentiality Review

1

2      doctors that are analyzed in pages 32

3      through 52 of your report, again, your

4      opinions offered at trial will be limited

5      to this is what the data could have shown,

6      but you do not intend to offer any opinions

7      as to what should have been done, what was

8      required to be done, or what would have

9      happened in the real world had an action

10     been taken, correct?

11          A.   That's correct.

12          Q.   Okay.  Page 54 of your report in

13     paragraph 115 -- sorry.  Let me back up.

14               Page 53 gives us the heading

15     "Small Labeler Impact."

16               We talked a little bit about this

17     analysis before the break, correct?

18          A.   Correct.

19          Q.   I believe you agreed with me that

20     the small labeler impact analysis is

21     hypothetical only, correct?

22          A.   Yes, hypothetical only.

23          Q.   You do not intend to offer any

24     opinions that this analysis should have

25     been done by Janssen or anyone else,

Highly Confidential - Subject to Further Confidentiality Review

1

2    correct?

3         A.    Correct.

4         Q.    You have no idea how many opioids

5    went into Cuyahoga and Summit County, how

6    many of those opioids were excessive versus

7    medically necessary?  You have no idea of

8    that, do you?

9         A.    That's outside of my expertise,

10   correct.

11        Q.    Okay.  And you do not intend to

12   offer any opinions in this case that the

13   actions of any manufacturer would have or

14   could have prevented excess orders into

15   Cuyahoga and Summit County?  That is beyond

16   your expertise?

17             MS. CONROY:  Objection.

18        A.    Sorry, I think so, yes.  I would

19   say throughout the report, we say if they

20   had used the compliance metrics, they could

21   have been identified, but nothing about

22   should.

23        Q.    And when you say "could have had

24   a curtailing affect on the excess of

25   opioids prescribed in the counties," do you

Highly Confidential - Subject to Further Confidentiality Review

1

2     see where it says that in 115?

3          A.   Yes, I'm there.

4          Q.   That is hypothetical only.  You

5     do not know whether there was, in fact, an

6     excess of opioids or to what extent the

7     opioids in Cuyahoga or Summit County were

8     excessive?  That is not something you know,

9     correct?

10               MS. CONROY:  Objection.

11          A.   Correct.

12          Q.   And you don't know and it would

13     be outside of your expertise to know how or

14     whether Janssen's actions could have

15     curtailed that and to what extent excessive

16     prescribing could have been curtailed?

17     That is outside of what you've been asked

18     to do here, correct?

19               MS. CONROY:  Objection.

20          A.   Outside of what we've offered

21     here of the hypothetical situation of what

22     the impact on the prescriptions would have

23     been, then no.

24          Q.   Okay.  Page 56 and 57 talk about

25     a baseline year analysis.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Are you with me?

3          A.    Yes.

4          Q.    I am not data scientist, so let

5    me say that.  I'm just a lawyer.  But I

6    understand this analysis to be a

7    supplemental analysis that looks at what

8    would have been the change to certain of

9    your metrics if you had used 1997 as a

10   baseline year as opposed to using the

11   year-over-year actual averages.

12          Is that a fair simplification?

13          A.    That is a fair simplification.

14          Q.    Okay.  And what you conclude

15   about that is reflected in tables 30

16   through 32 on page 57, correct?

17          A.    Yes.

18          Q.    You do not have any opinion as to

19   whether it's more appropriate to use '97 at

20   a baseline year or to use the

21   year-over-year averages that are reflected

22   elsewhere in your report.

23          You are not taking a position on

24   that, correct?

25          A.    Correct.  It's another

Highly Confidential - Subject to Further Confidentiality Review

1

2      hypothetical situation.

3          Q.    It's just another option to show

4      the data, correct?

5          A.    That's a great way to say it.

6          Q.    And then in table 30, table 30

7      shows the additional physicians that would

8      have been flagged if you used '97 as the

9      baseline; is that right?

10         A.    Correct.

11         Q.    And under the, air quote, "common

12     sense" metric, if you used the '97

13     baseline, you would have gotten 8,736 more

14     physicians flagged than if you used the

15     year-over-year metrics, right?

16         A.    Yes.

17         Q.    You have no opinion on whether

18     there were really 8,700 suspicious

19     prescribers in Cuyahoga and Summit County?

20     You have no opinion whatsoever on that, do

21     you?

22         A.    Correct.

23         Q.    Okay.  Part 2 of your report is

24     Manufacturer to Pharmacy Analysis.

25                And this analysis uses chargeback

Highly Confidential - Subject to Further Confidentiality Review

1

2     data as opposed to IQVIA data, correct?

3          A.    Correct.

4          Q.    We talked about this before the

5     break, but you were provided a gigantic

6     chargeback data file, correct?

7          A.    That is not a full

8     representation.

9          Q.    Okay.  Sorry.  Let me get in your

10    words.

11               What did you have with respect to

12    chargeback data?

13         A.    I have thousands of chargeback

14    files that were produced by defendants.  So

15    those are, the Bates for those are in my

16    report somewhere.  And so to create the

17    massive chargeback file that you're looking

18    at that you tried to print out, which

19    probably broke your whole computer, was an

20    amalgamation of those data sets to make

21    them processable.

22         Q.    And, again, this data science is

23    too hard for me, but to the extent that my

24    lawyer brain can understand it, what I

25    believe you did was you put all of those

Highly Confidential - Subject to Further Confidentiality Review

1

2    different kinds of files that you received

3    from different productions of labelers into

4    a chargeback file, and then you ran the

5    metrics in various ways and created a file

6    that's called chargeback_flagging that's

7    giant in itself and shows you the times

8    that the flags hit based on each of the

9    metrics you ran.

10           Is that essentially what you did

11   in your analysis?

12        A.   Yes.  So the process -- and I

13   actually wrote the chargebacks scripts, so

14   I can talk a lot about it.  And so what it

15   does, for some labelers, we had like two

16   files.  Mallinckrodt produced two.  Those

17   were just stacked on top of one another and

18   put into the table.

19           Some had literally thousands of

20   files that had to be appended onto one

21   another because they were chunked in such a

22   way to make them smaller, maybe more

23   manageable for processing.  I don't know

24   the reasons behind that production.  So

25   those, again, were stacked on top of one

Highly Confidential - Subject to Further Confidentiality Review

1

2      another.

3              And then relevant fields moved

4      over into the main chargeback table.  So

5      relevant fields would be date, who they

6      went to, DEA numbers if they were there, so

7      on and so forth.

8          Q.   And you had the buyer county, so

9      you could look at it -- you could look at

10     the flags and your metrics specific to

11     Cuyahoga and Summit County, correct?

12         A.   Yes.  So if the county wasn't

13     provided in the data, some had it, some did

14     not, we would find that county, either

15     using ZIP code, buyer DEA, registrant

16     information.  From the ARCOS data, that

17     would be another touch point for the ARCOS

18     data.  Or through just geolocation, which

19     would be like a lat/long, latitude and

20     longitudinal.

21         Q.   Part of what a data scientist

22     does and part of what's reflected in your

23     invoices is, as I understand it, actually

24     making the data usable so you can analyze

25     it, right?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   That's the part they don't ever

3     tell anybody.  That is kind of the un-sexy

4     part of the job is cleaning the data and

5     putting it together.

6          Q.   Okay.  Looking at page 58 of your

7     report, part L is where you describe the

8     results of the analysis that you ran,

9     right?

10               And if I understand the process,

11    you made the data, and it seems like it

12    wasn't easy, but you made the data usable

13    and then you ran your metrics over it.  And

14    what is presented in the analysis, similar

15    to what we talked about earlier, is what

16    the results would be if these metrics were

17    run, what your metric show.

18               Do I have that right?

19         A.   Yes, I would say the data wasn't

20    unusable, so I don't want to characterize

21    it that way, but we made it that an

22    easy-to-flag format.  And, yes, we applied

23    the metrics and here's what the results

24    were.

25         Q.   And, again, like the other

1

2      analyses we've talked about, you do not

3      intend to offer any opinions that any

4      labeler should have done this; is that

5      right?

6           A.   Correct.  It's a --

7           Q.   You have no opinions as to

8      whether there was any requirement by any

9      defendant in this case to do analyses like

10     you have done here, correct?

11          A.   Correct.

12          Q.   Okay.  What your part L of your

13     report shows us is merely if the data is

14     looked at in this way, here's what it would

15     show.

16               Do I have that right?

17          A.   I think that is a nice

18     representation.

19          Q.   Okay.  Paragraph 125 refers to

20     chargebacks as a -- let me strike that.

21               Do you see paragraph 125 of your

22     report on page 58?

23          A.   I am there.

24          Q.   Okay.  In the third sentence

25     there, you say, "For Mallinckrodt, between

Highly Confidential - Subject to Further Confidentiality Review

1

2      2009 and 2012, 96 percent of oxycodone

3      orders and 98 percent of oxycodone 30

4      orders were subject to chargeback request

5      and hence would be in the chargeback data."

6                    And then you have a footnote

7      there.

8                    Do you see that?

9           A.   Yes.

10          Q.   And then you go on to say, "In

11     2017, Teva stated that about 51 percent of

12     controlled substance transactions resulted

13     in a chargeback."

14                   And then you have a cite there.

15                   Is that correct?

16          A.   Yes.

17          Q.   Do you see that?

18                   Okay.  The only information that

19     you rely upon to know the percentages of

20     how many of Mallinckrodt and Teva's sales

21     were subject to chargebacks is reflected in

22     those two footnotes in the reliance

23     materials you looked at that's cited there,

24     right?

25          A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   And you don't know more broadly

3     if those percentages could be expanded over

4     different years for different products?

5               That's beyond what you looked at?

6          A.   That's correct.

7          Q.   Okay.  And just in general, from

8     a data perspective, using like the higher

9     the percentage of orders that are subject

10    to a chargeback, the more useful that tool

11    would be, correct?

12              MS. CONROY:  Objection.

13         A.   I wouldn't say useful.  It would

14    just provide more data on which to flag.

15         Q.   And that's what I wanted to

16    check.  Because in that next sentence in

17    paragraph 125, you say, "Even with only

18    partial coverage of downstream customer

19    purchases, chargebacks were a useful tool

20    in monitoring suspicious transactions at

21    the pharmacy level from a manufacturer's

22    perspective."

23              Do you see where I read that?

24         A.   I do.

25         Q.   Okay.  And the extent to which

Highly Confidential - Subject to Further Confidentiality Review

1

2     monitoring chargebacks could be a useful

3     tool varies depending on how many

4     chargebacks there are, right?

5          A.   I don't want to speak to its

6     usefulness, but I would say the more data

7     you have, the more of a complete picture

8     you have.

9          Q.   If you have one order, two

10    orders, you can't use that to analyze

11    chargebacks, correct?

12         A.   Of course --

13              MS. CONROY:  Objection.

14         A.   -- in this hypothetical, yes, if

15    you had two, that's a pretty difficult --

16         Q.   Too small to analyze?

17         A.   Yeah.

18         Q.   So when you say here -- is there

19    a threshold number beyond which I would not

20    consider that data really useful to me?

21         A.   No.  I don't have a hard

22    threshold that I would set, no.

23         Q.   In looking at table 34 on page

24    59, in the left-hand column we have the

25    parent companies.

Highly Confidential - Subject to Further Confidentiality Review

1

2                    Are you with me?

3         A.    Yup.  Sorry.

4         Q.    The next column says Labeler

5    Names, and that shows what companies you

6    aggregated into the parent company.

7                    Am I right about that?

8         A.    Yes.

9                    And I think throughout this

10   section we keep things -- keep companies

11   generally separated based off the

12   productions.

13        Q.    Exactly where I was going.

14                   So here, I represent Allergan,

15   and so I'll just look at Allergan, for

16   example.

17                   Here, you break out Allergan from

18   Teva in the chargeback analysis, right?

19        A.    Correct.  Because of the

20   different productions.

21        Q.    The data that is reflected in

22   table 34, this shows nationwide data.  This

23   is not limited to Cuyahoga and Summit

24   County, right?

25        A.    I honestly don't remember.  I'd

Highly Confidential - Subject to Further Confidentiality Review

1

2      have to consult the code that pulled that

3      table to be for certain.

4           Q.   Okay.  You don't know one way or

5      the other as you sit here whether this

6      is -- the number of chargebacks in the

7      right-hand column, so the 7,519,723 for

8      Endo, is that total number of chargebacks

9      or is that in Cuyahoga and Summit County or

10     you don't know?

11          A.   I'd have to check the code.  I'm

12     really sorry.  Usually I put in the paren

13     what it is, and this one slipped by me.

14          Q.   So I'll represent to you -- I

15     don't mean this to be a trick.  I will

16     represent to you that from our analysis of

17     your data, this appears to be the

18     nationwide chargeback data.

19          A.   Okay.

20          Q.   And so for Cuyahoga -- do you

21     know how many counties are in the United

22     States, roughly?

23          A.   Well, over 3,000.

24          Q.   And so for each county, for

25     example Allergan, do you see there that it

Highly Confidential - Subject to Further Confidentiality Review

1

2      says 13,986 total chargebacks in the data?

3             That do you understand that to be

4      the total number of chargebacks that you

5      found in the Allergan data?

6          A.   Yes, after processing, yes.

7          Q.   And then -- and that's 16 years

8      of data, right?

9          A.   Yes.

10         Q.   And if you divide that by 3,000

11     counties, you only have a, on average,

12     couple chargebacks per county, right?

13         A.   Sure.  I don't want to do mental

14     math on camera, but sure.

15         Q.   I won't make you, I won't make

16     you commit to actual numbers, but I think

17     you get my point.

18             For -- I assume you're not going

19     to offer the opinion that analyzing a

20     handful of chargebacks less than a dozen

21     over a 20-year time period would be a

22     useful tool for suspicious order

23     monitoring.

24             You would agree with me that it

25     would not in fact be a useful tool for that

Highly Confidential - Subject to Further Confidentiality Review

1

2      based on a matter of data, correct?

3              MS. CONROY:  Objection.

4          A.   Let me think about this a little

5      bit.  I think it really depends on the data

6      and...

7          Q.   So I'm going to mark as

8      Exhibit 6, a very, very long piece of

9      paper.

10             (Keller Exhibit 6, Spreadsheet,

11             not Bates-stamped, marked for

12             identification, as of this date.)

13     BY MS. LEVY:

14         Q.   I'm going to tell you what this

15     is in a minute.  But take a look at it and

16     see if you recognize what this data is

17     before I describe it to you.

18             (Document review.)

19         A.   I do recognize it.

20         Q.   You do or don't?

21         A.   I do.

22         Q.   Okay.  This is what we were

23     talking about earlier, like, the ginormous

24     amount of information in the file that you

25     have.

Highly Confidential - Subject to Further Confidentiality Review

1

2          If you look at the top left-hand

3    corner, that says "chargeback_flagging."

4          Do you see that?

5    A.    Um-hmm.

6    Q.    Okay.

7          MS. LEVY:   [Directed to court

8          reporter] What exhibit are we on, 6?

9          THE REPORTER:   (Nodding

10         affirmatively.)

11   BY MS. LEVY:

12   Q.    So the chargeback_flagging file

13   has a very long number of columns that go

14   from left to right.

15         Do you see that?

16   A.    Um-hmm.

17   Q.    And reflected in each of the

18   columns are the metrics that you ran across

19   the chargeback data and the flags that came

20   up as a result; is that right?

21   A.    I think that's correct.

22   Q.    And so in other words, when I

23   looked across all of this data, the only

24   values in each of these columns are zero or

25   1.

Highly Confidential - Subject to Further Confidentiality Review

1

2          That's like a data science thing,

3     yes?

4          A.   Yeah, flagged or not flagged,

5     yeah.  It's not meant to be a joke or

6     anything.

7          Q.   We don't talk like that as

8     lawyers, but I think how I interpret this

9     data is, if there is a zero in the column,

10    that means it did not trigger a flag under

11    that particular metric.  And if there is a

12    1, this metric did trigger a flag.

13          Is that correct?

14          A.   That's great.

15          Q.   Okay.  And so if you look at, up

16    here in the top left, "query," it says

17    "from chargeback_flagging."

18          That is, you understand, to be

19    your chargeback flagging reliance file,

20    correct?

21          A.   Yeah, the table name is familiar

22    to me.

23          Q.   And where it says "Where labeler

24    name equals Allergan and buyer_state equals

25    Ohio and_county in Cuyahoga and Summit,"

Highly Confidential - Subject to Further Confidentiality Review

1

2      what does all that mean in data-speak?

3            A.   So this looks like a SQL query to

4      me that's pulling from a schema name DBO to

5      a chargeback flagging table, which is

6      probably your renaming of our table, which

7      is totally fine.  And it's pulling data

8      where it is Allergan as the labeler, where

9      the state is Ohio, and Cuyahoga and Summit

10     are the counties.  So good job at SQL.

11           Q.   And is this the way you would

12     query it if you want to see how many

13     Allergan chargebacks got a flag in Cuyahoga

14     and Summit County?  Is that the methodology

15     you'd use?

16           A.   I would take it one step further.

17     If I wanted to look at those that were

18     flagged for Allergan and Summit or

19     Cuyahoga, I would say where one of these

20     would be equal to 1.

21           Q.   So you would have to add up

22     everything in this table that got a 1 and

23     that's how you would know how many flags it

24     got?

25           A.   Or a really massive "or" clause

Highly Confidential - Subject to Further Confidentiality Review

1

2  where you would say where two times the

3  national average is equal to one or three

4  times the national average is equal to one

5  or so on and so forth.

6      Q.   But in Exhibit 6, each one of

7  those queries appears separately from right

8  to left.

9         Do you see that?

10      A.   They're columns, not queries,

11  but, sure.

12      Q.   Okay.  So what this shows us is,

13  there were a total of 15 chargebacks over

14  this 20-year period for Allergan drugs,

15  right?

16      A.   I'm not sure that that is correct

17  because this appears to be an aggregation.

18  Like I said, the chargeback flagging table

19  is an aggregation of chargebacks, and I

20  would have to look at this myself.  A

21  couple of them have 2s next to them so like

22  at line 7, there is a value of 2.  So this

23  could be 15, 16, 17, 18.

24      Q.   So I apologize.  And you have --

25  I accept your correction.

Highly Confidential - Subject to Further Confidentiality Review

1

2              So in the first column to the

3      right of the row number, we see total

4      number of chargebacks, and there is a value

5      of 1 listed for all of them except for row

6      7, 13 and 15, and that has two chargebacks

7      in each of those, correct?

8          A.   7, 13 and 15, correct, have two

9      chargebacks.

10         Q.   And so what that tells us is

11     there were 18 chargebacks, not 15, but 18

12     chargebacks over this 20-year time period

13     for the Allergan labeler code, correct?

14         A.   That were submitted to us or that

15     I had in the data set, yes.

16         Q.   Okay.  And I'm going to pass over

17     to you, just to make this easier and

18     faster, my version of this.

19             (Handing.)

20         A.   Do we need to mark this?

21         Q.   And I will represent to you that

22     I have highlighted the three transactions

23     or the three rows that reflect any flag

24     from your metrics.  So take a look at that

25     and -- is yours highlighted too?

1

2     A.   Yes.  Would you like this back?

3     Q.   Yes.

4          (Handing.)

5     Q.   Thank you.  This would make it

6     easier.

7          So what I've done in the

8     highlighted -- we highlighted everything

9     that had a flag.

10         Do you see that?

11    A.   Yes, sorry.  Yes.

12    Q.   And so what this shows us is that

13    in the 20-year time period, you came up

14    with or your data would reflect four

15    chargebacks that would get a flag if you

16    applied all of your metrics in total for

17    Allergan.

18         Do you see that?

19    A.    I'm trying to look at this

20    without grids, but I'm going to take your

21    word for it.

22         (Document review.)

23    A.    But I see where you're flagging

24    the 1s.  And there are a line, and so that

25    reflects that group of chargebacks to that

1

2     buyer ID.

3          Q.   And then if you just look at row

4     11, for example, the total doses, what does

5     total doses mean?

6          A.   So one could think of that as the

7     number of pills it's like the dosage units.

8     And so generally, that's a field in the

9     data.

10          Q.   And if you look at the doses in

11     row 11, that's 200 doses.  And then right

12     beside it, it says total MMEs is 2,000.

13               Do you see that?

14          A.   Correct.

15          Q.   So it means 200 pills at 10

16     milligrams a pill in that order, correct?

17          A.   Because it is hydrocodone, yes,

18     you can do that math.

19          Q.   And so that reflects -- if you go

20     over to data date, that reflects 9/1/2005,

21     an order of 200 pills of 10-milligram

22     hydrocodone for a chain pharmacy in Summit

23     County, correct?

24          A.   Yes, it's a chargeback request

25     for that.  I wouldn't say it's an order.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   And my point from this data is --

3     did you look at what product this is?  You

4     didn't go behind any of the flags and look

5     for what product this is or how many

6     prescriptions this would fill?  That's not

7     something you did, is it?

8          A.   So to the extent that we needed

9     the product to get the MME conversion

10    factor, I would have looked at that on the

11    aggregate.

12               To the extent that the product

13    mattered for a particular flag, because I

14    think some flags go to the NDC, I would

15    have looked at that.

16               For this specific order on this

17    specific date to this specific buyer, I did

18    not look at that particular NDC code.

19               And to your second question, I

20    did not, across the board, analyze how many

21    prescriptions that would or should or could

22    have filled.

23          Q.   Okay.  And so I think just taking

24    a step back, there comes a point when you

25    have so little data that it is not useful

Highly Confidential - Subject to Further Confidentiality Review

1

2      for using as an order for suspicion.

3              Would you agree that that is true

4      in the abstract?

5              MS. CONROY:  Objection.

6          A.   As like the example that you

7      pointed out earlier, one or two, yes,

8      unusable.

9          Q.   Okay.  And in here, you do not

10     intend to offer any opinions that a flag

11     for a single order should have been labeled

12     by Allergan as suspicious?  That is beyond

13     what your offering in this case, correct?

14              MS. CONROY:  Objection.

15         A.   Yes, because you used the word

16     "should."  No, I'm not.

17         Q.   Okay.  Which of the orders that

18     were subject to the chargebacks in

19     Exhibit 6 are suspicious in your analysis?

20         A.   So I think that's what we were

21     covering earlier.  And for one, when I

22     answer this question, when I say

23     suspicious, they triggered the compliance

24     metrics.

25              So those would be this order here

Highly Confidential - Subject to Further Confidentiality Review

1

2     on row 15.  I'm taking your math for it,

3     but it looks to be generally right.  Row 11

4     and row No. 4.

5          Q.   And you don't intend to offer any

6     opinion that actually in the real world,

7     these were suspicious orders or DEA would

8     consider these suspicious orders, correct?

9          A.   Correct.

10         Q.   Okay.  And the same analysis,

11    this one in Exhibit 6 is unique to

12    Allergan.

13              Did you isolate for any other

14    labeler the exact number of chargebacks in

15    Cuyahoga and Summit County?

16         A.   Where we would, like, create a

17    table like 34 for Summit and Cuyahoga, no.

18         Q.   Okay.  Why didn't do you that?

19    There are many other places in your report

20    that you looked specifically at Cuyahoga

21    and Summit County.  Why did you not do that

22    for purposes of table 34?

23         A.   Honestly, I have no idea, but

24    it's easy to run and could be done no

25    problem, and I'd be happy to do that for

Highly Confidential - Subject to Further Confidentiality Review

1

2      you guys.

3          Q.   If you look at table 38 on page

4      61, this gives you -- the table is called

5      "Number of flagged buyers attributed to

6      each labeler."

7               Again this is on a national

8      level, not Cuyahoga and Summit, right?

9          A.   I would think this would be

10     Cuyahoga and Summit.

11         Q.   Do you know one way or the other?

12              (Document review.)

13         A.   It should be Cuyahoga and Summit.

14         Q.   Okay.  And the numbers for

15     flagged buyers varied depending on which

16     one of the metrics or matrices you run

17     across table 38, right?

18         A.   Correct.

19         Q.   So if you run -- for Allergan, if

20     you ran the double national metric, you

21     would find one flagged buyer in Cuyahoga

22     and Summit County?  Is that what that

23     means?

24         A.   Correct.

25         Q.   And you would find zero for some

Highly Confidential - Subject to Further Confidentiality Review

1

2      of these and two they hit on any flag.

3                  Is that a correct reading of this

4      table?

5           A.   Correct.

6           Q.   And again, I think you've now

7      said this many, many times, but it's not --

8      you do not intend to offer any opinion that

9      these are, in fact, suspicious orders or

10     suspicious purchases by buyers.  That is

11     beyond what you are able to do and beyond

12     your expertise, correct?

13                  MS. CONROY:  Objection.

14          A.   Correct.

15          Q.   And that's true for Allergan, but

16     also all of the other labelers on the

17     left-hand column?

18          A.   I would say so, yes.

19          Q.   Okay.  And the same with table 39

20     and the dosage units, I think generally the

21     same thing applies.

22                  The number of flagged dosage unit

23     changes, depending on which one of your

24     metrics are applied, correct?

25          A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   And for Allergan specifically,

3     where there's no value in a column, that

4     means there's no flagged dosage units under

5     that metric, right?

6          A.   Correct.

7          Q.   And then where there is a value

8     for Allergan under these columns, that is

9     the total amount of dosage units

10    attributable to Allergan in this 20-year

11    period that got a flag; is that right?

12         A.   Based on the data that we had

13    available, yes.

14         Q.   And the dosage units are pills

15    basically, correct?

16         A.   Correct.

17         Q.   So 200 pills in 20 years for

18    Allergan under the "common sense, masters"

19    column.

20              Do you see that?

21         A.   Correct.  I do see it.  That

22    should be the right answer, sorry.

23         Q.   Okay.  And 200 pills, you don't

24    have any idea how many prescriptions that

25    would fill, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2          A.   No.

 3          Q.   It could be just one prescription

 4     or two prescriptions, right?

 5               MS. CONROY:  Objection.

 6          A.   I would have no idea.

 7          Q.   Okay.  And the same is true for

 8     all of the labelers listed in table 39, you

 9     don't have any opinion on whether the

10     dosage units listed in these tables were

11     actually suspicious or improper or not?

12     You don't have any opinion on that, do you?

13          A.   That's correct.

14          Q.   Okay.

15               MS. LEVY:  Let's take a -- would

16          you rather take a short break or break

17          for lunch?

18               MS. CONROY:  Do you think the --

19          well, isn't food there?  Do you know?

20               MS. VENTURA:  Yes.

21               MS. LEVY:  There is.  Are you

22          hungry yet?

23               THE WITNESS:  Yes, always.

24               MS. LEVY:  Let's go off the

25          record.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2              THE VIDEOGRAPHER:  The time is

 3        12:05 p.m.  We are now going off the

 4        record.

 5              (Recess is taken.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2

 3          A F T E R N O O N    S E S S I O N

 4            (Time noted:   1:06 p.m.)

 5             THE VIDEOGRAPHER:  The time is

 6       1:06 p.m.  We are back on the record.

 7              *       *       *

 8    L A C E Y   R.   K E L L E R,    resumed

 9        and testified as follows:

10    EXAMINATION BY (Cont'd.)

11    MS. LEVY:

12        Q.   Ms. Keller, I have a few more

13    questions to ask you based on my review of

14    the material at lunch and then I will pass

15    you off to some of the other defendants'

16    counsel in this room to ask questions.  But

17    I do have a few more things that I wanted

18    to follow up on based on our conversation

19    this morning and some other things that I

20    had flagged in your report that I meant to

21    ask you about --

22        A.   Sure.

23        Q.   -- and I have not yet done so.

24             If we look at, back to your

25    report marked I think as Exhibit 2 and we
```

1

2      look at paragraph 2 on page 9.  I'm sorry,

3      Exhibit 5.

4          A.   I'm sorry, we're at the report?

5          Q.   Yeah, your report on page 9,

6      paragraph 22, that is under the heading

7      "Scope of report."

8          A.   Sure.

9          Q.   You mention in the first sentence

10     in paragraph 22 that your report "focuses

11     specifically and exclusively on

12     manufacturers' anti-diversion and

13     suspicious order monitoring programs."

14              Do you see that?

15         A.   Correct, I do see that.

16         Q.   Okay.  I want to make sure that I

17     understand the limitations of what you mean

18     by that.

19              When you talk about in that

20     sentence in 22, focusing on manufacturers'

21     suspicious order monitoring programs,

22     you're referring to what we've already been

23     talking about all day today, which is what

24     might have been or could have been in a

25     hypothetical world had your metrics been

Highly Confidential - Subject to Further Confidentiality Review

1

2      employed, right?

3              MS. CONROY:  Objection.

4          A.   Yes, I think that's a correct

5      characterization.

6          Q.   And your analysis does not

7      include, for example, an analysis of

8      Allergan and a look at every single order

9      that it did investigate.

10             You didn't conduct such an

11     analysis for Allergan or any other labeler,

12     correct?

13         A.   Let me think about that for a

14     second just to make sure I'm clear.

15             I was... I think that is correct.

16     I didn't look at the practices, I didn't

17     evaluate the practices of Allergan.  I

18     didn't look at how each process was -- how

19     each order was processed, monitored,

20     flagged, unflagged or released, et cetera.

21         Q.   And to be clear, you had some

22     information about suspicious order

23     monitoring programs for the various

24     labelers.  You had some information, but

25     you didn't do an analysis of which ones of

Highly Confidential - Subject to Further Confidentiality Review

1

2      the orders were investigated versus weren't

3      investigated.

4                     That was beyond what you did,

5      right?

6            Q.    I think -- I think that's

7      correct.

8            Q.    Yeah, I'm not trying to be

9      tricky.  I just want to make sure.

10                    You never looked at for any of

11     the flags that came up for any of your

12     metrics in the real world whether a labeler

13     actually did investigate those particular

14     transactions?  That, you never looked at,

15     right?

16                    MS. CONROY:  Objection.

17           A.    I think that's correct.  I did

18     have access to the Mallinckrodt peculiar

19     orders data, but I didn't go as far as

20     beyond looking at that data set.

21           Q.    And so for the set of

22     transactions that are flagged under

23     different matrices, you can't say which

24     ones of those actually got investigated,

25     which ones didn't, which ones were

Highly Confidential - Subject to Further Confidentiality Review

1

2      legitimate, which ones weren't legitimate?

3      That is not something that you did in

4      connection with your work in this case,

5      right?

6          A.   Yes, I would not be able to state

7      which ones were legitimate or not.

8          Q.   Okay.  And the extension of that

9      is, you have no opinion, you cannot opine

10     on what the impact would have been if a

11     labeler had investigated because you don't

12     know what those investigations would have

13     found, what would have happened after that,

14     correct?

15         A.   Yes, I think we've covered this

16     one earlier, but with the exception of the

17     hypothetical Janssen analysis, that is a

18     correct statement.

19         Q.   Okay.  I forgot to talk to you

20     about your addendum.  You provided an

21     addendum to your expert report.

22              Do you know what I'm talking

23     about when I say the addendum?

24         A.   Yes, I do.

25         Q.   So how did this addendum come

Highly Confidential - Subject to Further Confidentiality Review

 1

 2     about?  Tell me the story of the addendum.

 3          A.   Yes.  So --

 4               MS. CONROY:  Is it marked?

 5               THE WITNESS:  I don't know

 6     that --

 7               MS. CONROY:  Can we just mark it?

 8               MS. VENTURA:  Just a second.

 9               MS. LEVY:  It's Tab 3 in my

10     binder.

11               Mark this as Exhibit 7.

12               (Keller Exhibit 7, Expert

13          Analysis - Addendum: Lacey R. Keller,

14          marked for identification, as of this

15          date.)

16     BY MS. LEVY:

17          Q.   Exhibit 7 is your addendum,

18     correct?

19          A.   Correct.

20          Q.   Okay.  So what's the story as to

21     how this came about?

22          A.   So one is a -- let me make sure

23     I've got this all here.

24               So one is the persistent flagging

25     as I would say is similar to the

Highly Confidential - Subject to Further Confidentiality Review

1

2     methodology that was contained in McCann's

3     report, so I wanted to enact this here just

4     to see what would be the results of the

5     data after reviewing his report, also a

6     similar 12-month trailing average.  And

7     then the final metrics are the Purdue

8     metrics that we became aware of at the last

9     moment, right before filing, and did not

10    have time to enact.  So I wanted to have a

11    chance to adopt it or implement the Purdue

12    metrics because I thought it was important

13    to do so.

14         Q.   Your original report was dated

15    April 15th, correct?

16         A.   Correct.

17         Q.   This addendum, do you remember

18    the date of it?  I don't see it on here.

19         A.   I do not.

20         Q.   I'll represent to you that the

21    addendum was submitted on May 11th.

22              Does that sound about right to

23    you?

24         A.   That seems generally correct.

25         Q.   Was there any reason that you

Highly Confidential - Subject to Further Confidentiality Review

1

2    could not have done your persistent

3    flagging analysis in advance of your

4    April 15th report?

5         A.    Mostly just time.

6         Q.    What do you mean by that?

7         A.    Just ran out of time already

8    preparing we had there, so it was a very

9    natural place to just let's do what we have

10   here and then we'll do that as a separate

11   addendum.

12        Q.    And you didn't get any additional

13   information between April 15th and May 11th

14   that would have created that analysis?

15        A.    Correct.

16        Q.    You had the information all

17   along, correct?

18        A.    Correct.

19        Q.    You just ran out of time to do it

20   before April 15th?

21        A.    Correct.  Because I believe the

22   first McCann report uses the persistent

23   flagging methodology that he had filed.  So

24   yes, we could have filed this with the

25   April 15th.  I just ran out of time.

Highly Confidential - Subject to Further Confidentiality Review

1

2          And the Purdue metrics that we

3     found, like I said, we literally found them

4     days before, and I just didn't feel that it

5     was prudent to implement something that I

6     found doing a document review.

7          Q.   You do not take an opinion in the

8     addendum as to whether the persistent

9     flagging approach makes any sense or not?

10    That's outside the scope of your opinion,

11    right?

12          MS. CONROY:  Objection.

13          A.   Yes, as with all the other

14    metrics or approaches, I'm agnostic.

15          Q.   And did you ever ask DEA, does

16    this make any sense to you, DEA to put a

17    flag on and keep it for perpetuity?  Did

18    you ever ask that question of DEA?

19          A.   No.  Like I said earlier, my only

20    correspondence with the DEA has been over

21    basic ARCOS processing.

22          Q.   Okay.  And you don't intend to

23    offer any position at trial as to whether

24    it makes more sense to employ the

25    persistent flagging approach or the

Highly Confidential - Subject to Further Confidentiality Review

1

2      continuous evaluation approach?

3          A.   Sure.

4              If you want to -- what I think

5      you're saying is one where we reset the

6      flags every month or every X time period

7      versus leaving the flag on once it's

8      flagged?  Yes, I have no opinion on

9      whether -- on either -- sorry, I'm getting

10     hung up on my words -- on whether each one

11     is correct or not correct.  We just

12     implement them.

13         Q.   If we look at your addendum on

14     page 9, table 1, and if we compare that

15     side by side with, I think it's table 36 at

16     page 34 in your report.

17             (Document review.)

18         A.   I'm going to bet that you may

19     want table 7.

20         Q.   Table 7 on page 29.  These two

21     reports or these two tables represent the

22     results -- the composite results of this

23     analysis under the two different

24     approaches, correct?

25         A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   And if you look at -- for these

3     two analyses, you just picked four of the

4     metrics.  You didn't do them all.

5               Do you see that?

6          A.   So it wasn't happenstance like

7     cherry-picking or not.  No, that wasn't the

8     case.

9               So with some of the metrics where

10    they could have applied to IQVIA, I did.

11    Where it came to the labeler's own metrics,

12    it felt most appropriate to apply those

13    only to the chargeback, their own data

14    so...

15         Q.   And that was most appropriate

16    because that's the data set that those

17    metrics were designed to look at, right?

18         A.   Correct.  In reading the metrics

19    and the documentation behind them, it

20    looked as if they were designed to apply to

21    pharmacies or to sales data or to some sort

22    of internally housed data set, so that was

23    my intention, yes.

24         Q.   I was going to ask you about

25    that.  That's important to keep straight

Highly Confidential - Subject to Further Confidentiality Review

1

2      because if you apply a metric that is

3      designed to look at distributor orders, if

4      you apply it to pharmacies, the results are

5      going to be in some ways skewed, right,

6      because the metric is not designed to apply

7      to that kind of data?  Is that what you're

8      getting at?

9          A.   I would say it's more that I felt

10     like it was most honest or most like in the

11     truest sense of the metric to apply it to

12     the data set that it was intended for.  Not

13     to mix distributor versus manufacturer

14     metrics, but just to the data set that it

15     was designed for.

16              The larger ones, the double

17     national, triple national, common sense,

18     and McKesson, were kind of at a -- I viewed

19     them as a different level as the

20     manufacturer's own metrics.  Because I

21     don't know that, let's say, Purdue would

22     know Mallinckrodt's metric.  But these

23     other metrics are like in a different

24     realm, if you will, is because they were

25     the result of an enforcement action or --

Highly Confidential - Subject to Further Confidentiality Review

1

2    so to me, they got a different treatment

3    among the data sets.

4              Any metric could have been ran

5    against all the data, and I could do that

6    very easily for you and would be happy to,

7    but it was my intention to try to keep

8    things to their truest sense.

9         Q.   I think I understand what you're

10   saying.

11             You tried to apply the metric

12   designed for that type of data to that type

13   of data?

14        A.   That's a very nice way of saying

15   it much more succinctly than I did.

16        Q.   And so for these four metrics,

17   common sense, I'm using that term in air

18   quotes for the video, air quote words for

19   the transcript, the metric that is referred

20   to, air quote, common sense, double

21   national average, triple national average,

22   and McKesson 8,000, those were the ones you

23   picked to run over the IQVIA data for the

24   tables that we see in table 1 of the

25   addendum and table 7 of your original

1
2      report, right?
3           A.   Yes, those four metrics we ran on
4      the IQVIA data, correct.
5           Q.   The results of the metrics change
6      a little bit depending on whether you do
7      the resetting flags or the persistent
8      flagging, correct?
9           A.   Correct.  As --
10          Q.   Go ahead.  I didn't mean to cut
11     you off.  Go ahead and finish your answer.
12          A.   I was going to say, yes, it
13     depends on what metric you're looking at
14     there.
15          Q.   But if you look at column 1,
16     "Defendant labeler flagged physicians,"
17     that number actually doesn't change between
18     the two analyses, right?
19          A.   Right.  Because that one makes
20     sense, right?  Because once a foot position
21     is flagged, at some point that is a 1 or a
22     zero, so it doesn't really, it won't -- it
23     doesn't change whether you leave that flag
24     on or not.
25          Q.   A number of physicians get

Highly Confidential - Subject to Further Confidentiality Review

1

2      flagged in these counties varies wildly

3      depending on which metrics you use, right?

4          A.    Yes.  Like you can see here

5      anywhere between 1 and 75 percent.

6          Q.    And you take no position as to

7      which one is right or which one is closest

8      to right, do you?

9          A.    That would be correct.

10         Q.    But it doesn't make much sense as

11     a matter of common sense that 8 out of 10

12     physicians in these counties are

13     prescribing suspiciously.

14             That is not what you mean to

15     suggest with this analysis, correct?

16             MS. CONROY:  Objection.

17         A.    So I'm going to break that into

18     two pieces.

19             One, I'm making no assessment of

20     the real world of who is suspicious or not.

21     I will say with physicians, with that count

22     of physicians specifically, if you get

23     flagged once, and I think we say this in

24     the report, if you get flagged once or you

25     get flagged hundreds of times for every

Highly Confidential - Subject to Further Confidentiality Review

1

2     month that you've ever prescribed, you're

3     still counted the same.

4            So that's why that number looks

5     as it does compared to the prescriptions.

6     Q.   The number is -- the percentage

7     of physicians is grossly larger than the

8     percentage of physicians in the real world

9     that actually prescribe suspiciously.  It's

10    not meant to represent that, right?

11           MS. CONROY:  Objection.

12    A.   I wouldn't know.

13    Q.   Okay.  I mean, you could design a

14    metric that uses a parameter that all

15    opioids are suspicious and 100 percent of

16    prescribers who prescribe them should be

17    suspicious.  You can define it that way and

18    get 100 percent suspicious under some

19    metric, right?  That's something you could

20    do if you used the right definition?

21    A.   I would say that would be

22    something that someone could do.  I don't

23    know that I would do it, but that could be

24    done if asked of someone.

25    Q.   It would not be useful to

Highly Confidential - Subject to Further Confidentiality Review

1

2    describe a metric so comprehensive that it

3    captured 100 percent of the prescribers in

4    a jurisdiction?  That would not be a useful

5    thing to do, would it?

6        A.    I would say, you know, I'm not --

7    I don't want to weed into or wade into

8    evaluating metrics, so I'm not really going

9    to pontificate on that.

10       Q.    Well, if we take a step back to

11   what you do as a data scientist to generate

12   leads, if you create a metric that captures

13   everybody who is doing something, that

14   doesn't generate any leads for you, does

15   it?

16       A.    Or it generates all the leads

17   but --

18       Q.    It generates the lead of

19   everybody in the whole --

20       A.    -- it doesn't prioritize them.

21       Q.    Right.

22            So when you're looking to create

23   sensible useful metrics, the ideal way to

24   do so is to create metrics that come up

25   with, as close as you can, to the actual

Highly Confidential - Subject to Further Confidentiality Review

1

2      behavior you're trying to analyze, correct?

3            MS. CONROY:  Objection.

4      A.    I'm not really in a position to

5      evaluate metrics.  I think we've talked

6      about that earlier.  So I don't really want

7      to wade into that.

8      Q.    Well, I understand that you're

9      not offering any opinions about

10     specifically in this case what the metrics

11     should be or shouldn't be.  I understand

12     that and you've testified a great deal

13     about that.

14            But stepping back, like for

15     example, your other work in the New York

16     Attorney General's Office, when you

17     designed metrics to analyze data and target

18     gun traffickers -- that was something that

19     you did, right?  When you're doing that,

20     you're trying to design metrics that

21     isolate the bad guys, right?

22            MS. CONROY:  Objection.

23     A.    Correct.

24     Q.    And the most -- you know, in the

25     ideal world, what someone should do to try

Highly Confidential - Subject to Further Confidentiality Review

1

2     to look for aberrant behavior is to create

3     sets of metrics that get as close to as you

4     can isolating the behavior that you're

5     targeting?  I mean, that's the goal in

6     doing all this, yes?

7          A.   I would think from a logical

8     perspective, that makes sense.

9          Q.   And metrics that are overly

10    comprehensive that capture everybody or the

11    vast majority of people doing something as

12    opposed to just the bad guys, those are

13    less helpful than more targeted metrics

14    designed more closely to target bad

15    behavior, as a conceptual matter that would

16    be true, right?

17              MS. CONROY:  Objection.

18         A.   Yeah, I guess I don't -- I don't

19    really...

20              I think when you're looking for

21    bad -- I think when's designing metrics,

22    you have different goals in mind for

23    whatever you're doing, right?

24              For gun trafficking, for example,

25    maybe I'm only looking for straw purchasers

Highly Confidential - Subject to Further Confidentiality Review

1

2     or whatnot.  That is a very unique fact

3     pattern.

4              I think by looping things into

5     bad guys or good guys or suspicious

6     activity or not, there is a lot that's

7     packed into that that I don't really want

8     to blanket state like a metric that should

9     or shouldn't do anything when it comes to

10    that.

11        Q.    I mean, if I'm a labeler and I

12    design a metric that captures 80 percent of

13    prescribers, that's not going to be very

14    helpful to me, is it?

15             MS. CONROY:  Objection.

16        A.    I wouldn't know.

17        Q.    Page 13 of your original report,

18    if you can flip with me to that.

19             (Witness complies.)

20        Q.    I'm confused on where I want to

21    look at.  Just a minute.

22             What is LRX data?

23        A.    So I haven't seen it, so I can't

24    speak definitively.  But what I have read,

25    as I understand it to be longitudinal -- I

Highly Confidential - Subject to Further Confidentiality Review

1

2      think that's what it stands for like

3      longitudinal data from IQVIA that allows

4      you to see a little bit more granular, a

5      little bit more granularity about the -- I

6      think it has patient, prescriber, pharmacy,

7      like all of that in the data.

8              And again, this is a little bit

9      hearsay because I have never seen the data,

10     so I can't speak to that definitively.

11         Q.   Okay.  You don't know really know

12     what it looks like because you've never

13     seen it?

14         A.   Correct.  I've seen references to

15     it.

16         Q.   Looking at page 13 of your

17     report, in paragraph 40, this is under

18     limitations of your analyses, I assume,

19     from what you just told me, that you did

20     not do any analysis on LRX data if you

21     haven't ever seen it?

22         A.   Correct, I did not do any

23     analysis on LRX data.  The only reason why

24     I know it exists, I think, is from that --

25     if that cite doesn't capture it, somewhere

Highly Confidential - Subject to Further Confidentiality Review

1

2      I have a cite that would -- that -- where

3      we know it exists.

4          Q.   And when you make the blanket

5      statement in paragraph 40 about LRX data

6      being used in investigations of suspicious

7      prescribers and downstream customers, the

8      only information you have about that is

9      what is cited in footnote 10, correct?

10             MS. CONROY:  Objection.

11         A.   I'm sure there's more, but I

12     believe so.  And I can't recall which of

13     those many cites for that paragraph are

14     there, which has the reference to the LRX

15     data, but...

16         Q.   You don't know which

17     manufacturers had or didn't have it?

18         A.   I don't -- so I would know from

19     the cite here who references that, but I

20     did not, as we were discussing earlier, do

21     a comprehensive review of who purchased or

22     didn't purchase.

23         Q.   Or what time periods it might

24     have been purchased or what portion of it

25     might have been purchased, that's not an

Highly Confidential - Subject to Further Confidentiality Review

1

2    analysis that you did?

3        A.   Correct.  I did not look at who

4    purchased, when, where, why or how LRX

5    data.

6        Q.   And both with respect to LRX

7    data, but also more broadly with respect to

8    Xponent data and IQVIA data in general,

9    there is no requirement that a manufacturer

10   buy that data, right?

11       A.   I wouldn't be able to say that.

12       Q.   You don't know one way or the

13   other?

14       A.   It's outside of my expertise.

15       Q.   Okay.  IQVIA data, you're aware

16   that the IQVIA data for a particular drug

17   reflects the labeler that holds that drug

18   today for the entirety of the IQVIA

19   database?  You're aware of that, right?

20       A.   So I would say what we understood

21   based off the files that we received, we

22   were given, maybe you can call it a control

23   file, that had the keys to the codes of

24   which labeler were what.  We had asked

25   repeatedly for historical versions of this

Highly Confidential - Subject to Further Confidentiality Review

1

2     file so that we could identify the labeler

3     historically.  But, yes, I think that file

4     was dated fairly recently.

5         Q.   You just said it a thousand times

6     better than I could.

7              You were unable to tell from the

8     code that IQVIA provides how long a

9     particular labeler had held that product?

10    In other words, you couldn't tell who had

11    the product historically, right?

12        A.   Correct, even though we had asked

13    for historical versions of that file.

14        Q.   And so the limitations of that

15    data would not allow you to separate out

16    for Allergan a time period that it didn't

17    have one of the products, that's not

18    something you could do with the IQVIA data

19    that you were given?

20        A.   Correct.  If they were assigned

21    whatever code they were in the control file

22    that we were given as part of the Allergan

23    production, then that's what was applied

24    for the entire data set.

25        Q.   And so for Allergan and its

Highly Confidential - Subject to Further Confidentiality Review

1

2      product, Kadian, for example, if IQVIA has

3      Kadian under the Allergan labeler code

4      today, your analysis would have Kadian as

5      an Allergan product for the whole 20-year

6      time period because you had no way to

7      understand or take out any other time

8      periods?  Am I right about that?

9           A.   That's correct.  We had asked for

10     that file.  It wasn't either available or

11     producible, so, yes.

12          Q.   And if you came to understand

13     that Allergan did not own Kadian for a

14     portion of that time period, that would

15     change your analysis, correct?

16          A.   Someone else would have been

17     attributed that Kadian product in the data

18     set.  It's not to say that that point of

19     data would drop out completely or anything

20     like that.  And it wouldn't change my

21     fundamental findings of applying the

22     compliance metrics.  It might change a few

23     numbers in the tables, what's attributed to

24     Allergan or not, but I wouldn't say -- I

25     wouldn't characterize that as changing my

Highly Confidential - Subject to Further Confidentiality Review

1

2    analysis.

3        Q.   The flags would still be there,

4    they would just be somebody's else's flags,

5    not Allergan's, right?

6        A.   Depending on the purchasing

7    history, but, yes.

8        Q.   Got it.

9             And the same would be true for

10   any other labeler who had historically

11   changed possession of products over time,

12   right?

13       A.   Correct, which is why we asked

14   very hard to obtain that file.

15       Q.   And IQVIA could not provide it,

16   could they?

17            MS. CONROY:  Objection.

18       A.   I don't know who it was asked of

19   or where.  I know I had requested it and

20   was very firm in those requests.  I don't

21   know if it was requested of defense or by

22   IQVIA directly.  That's beyond me.

23       Q.   Because that was data that you

24   really wanted to see and it would have been

25   important for you to know, right?

Highly Confidential - Subject to Further Confidentiality Review

 1
 2              MS. CONROY:  Objection.
 3         A.   Yes, it would -- you know, I want
 4     things to be most accurate and so I want --
 5     if I had historical knowledge I would have
 6     liked to have applied that, yes.  But I
 7     don't -- I don't know that it -- like I
 8     said earlier, I don't know -- it doesn't
 9     fundamentally change the results.
10         Q.   It doesn't change the number of
11     flags?
12         A.   I mean each flag depends on the
13     purchasing history of a particular
14     prescribing history, so it's a little bit
15     more complicated than that, but the flags
16     would still exist, but --
17         Q.   They'd be attributed to different
18     defendants?
19         A.   Correct, with a big asterisk
20     there.
21              MS. LEVY:  Okay.  Let's mark this
22         document as Exhibit 8.
23              Do you have more copies of this,
24         Jayne?  These are the corrections you
25         brought today.

```
 1
 2              MS. CONROY:  We have a copy over
 3         here.  I think I gave everybody --
 4              MS. LEVY:  We passed them out.
 5         Okay.  Let's mark this as Exhibit 8.
 6         I've got another one that I can ask
 7         about.
 8              (Keller Exhibit 8, "Corrections
 9         to Expert Analysis," prepared by Lacey
10         R. Keller, not Bates-stamped, marked
11         for identification, as of this date.)
12    BY MS. LEVY:
13         Q.   Who created Exhibit 8?
14         A.   I did.
15         Q.   Did you use fancy data science or
16    is it a plain old Excel or Word document?
17         A.   That is a plain old Word document
18    that actually started with old chicken
19    scratch of my reports.  For nicety for you
20    guys, I didn't hand you the chicken
21    scratch.
22         Q.   How did Exhibit 8 come about?
23    Like how, when, and why was it created?
24         A.   So I would say I compiled it, we
25    compiled it last night to send to you just
```

Highly Confidential - Subject to Further Confidentiality Review

1

2    to make sure that everything was nice and

3    neat as opposed to, you know, all over my

4    report here.

5           I would say it's the culmination

6    of, since I filed it, a review of the

7    report trying to make things correct.  I'm

8    sure there is some typos and such, but

9    these were substantive changes that I

10    wanted to point out.

11    Q.   And are these changes that are

12    reflected in the right-hand column, are

13    these things that others pointed out to you

14    or that you just discovered on your own the

15    more you read it after the fact?

16    A.   Every single one of them, I

17    discovered.

18    Q.   Okay.  This is a classic woman

19    second-guessing and second-guessing and

20    second-guessing her own work.

21           Okay.  And so none of these were

22    like the lawyers telling you to change it

23    from something to another?  These are just,

24    these are just corrections you discovered

25    you want to make on your own?

1

2          A.    Correct.

3          Q.    And you said this was prepared

4    last night.

5          A.    For production to you guys I

6    think just to make today easier.  I had

7    them for quite some time and was putting

8    them, but, yes, the document here.

9          Q.    I just want to run through this

10   quickly.

11              In paragraph 33, you say that

12   "would" should be "could."  And that

13   relates to what we've already talked about

14   today, is that you are not saying what

15   would have happened, you're saying

16   hypothetically what could happen, correct?

17         A.    Correct.  You've made a lot of

18   these quite easy to explain now.

19         Q.    In paragraph 86, the 7,000 to

20   5,000, how did you discover that

21   discrepancy?

22         A.    I went through after filing the

23   report and, like you said, we always check

24   and recheck our work, and I just -- I

25   wanted to make sure that every number was

Highly Confidential - Subject to Further Confidentiality Review

1

2    as right as I could make it.  So that one,

3    I just reran it and realized that there was

4    a discrepancy there.

5        Q.   Okay.  And the change in

6    paragraph 125 for table 35, last column, it

7    says the second, third and fourth "no"

8    should be a "yes."

9             So where you say "no, Endo did

10   not use chargeback in SOM program," you

11   mean -- so let me speak in a way that our

12   court reporter can transcribe.

13            Turning to table 35, on page 59

14   of your report and looking at that in

15   conjunction with Exhibit 8, your

16   corrections, you note that in table 35, in

17   the last column of that table, the second

18   "no" should be a "yes"; is that right?

19       A.   Yes.  So Endo's "no" in the "used

20   chargeback in SOMS program" should be

21   "yes," followed by "Par and Qualitest."

22            And that's to jive with the

23   language below.

24       Q.   Okay.  The metrics that you've

25   used, I'm getting to the end of my

1

2      questioning, the metrics that you've used

3      in your report in its addendum, these

4      metrics could have been used by others

5      other than the defendants in this case,

6      right?

7                MS. CONROY:  Objection.

8           A.   Because you used the word

9      "could," I would say yes.

10          Q.   The DEA could have run these

11     metrics had it chosen to do that, right?

12          A.   I would think so, yes.

13          Q.   Law enforcement of other types,

14     other than DEA, could have run these

15     metrics if they had chosen to do that?

16          A.   I would think so, yes.

17          Q.   Cuyahoga, Summit County could

18     have run these metrics if their law

19     enforcement wanted to run them?  They could

20     have done that?

21          A.   Correct.  Anyone who had access

22     to the data or had access to the metrics

23     could run them.

24                MS. LEVY:  I'm going to mark the

25                invoices.

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   Do me a favor and get your

3     invoices, which I believe we marked

4     previously as Exhibit 3.

5               MS. LEVY:  Did we mark the

6          invoices?

7               MS. CONROY:  Yes.

8          A.   We did.

9               MS. LEVY:  Okay.  We already have

10         them marked as Exhibit 3.

11              (Keller Exhibit 9, Word document

12         prepared by Keller, not Bates-stamped,

13         marked for identification, as of this

14         date.)

15    BY MS. LEVY:

16         Q.   I'm going to hand you Exhibit 9,

17    and I will represent to you that Exhibit 9

18    was created by asking data entry folks to

19    put into a table the information that came

20    from your invoices in Exhibit 3.

21              You've never seen Exhibit 9

22    before, correct?

23         A.   That is correct.

24         Q.   And this is something that we

25    created, not something that came from you.

Highly Confidential - Subject to Further Confidentiality Review

1

2     But do you recognize the content of the

3     information generally?  I'm not asking you

4     to tell me whether it's correct or not, but

5     do you recognize what the types of

6     information in here are?

7          A.   Yes.  The case names look similar

8     to ones that are in the invoices.

9          Q.   Okay.  And for purposes of these

10    questions, I will ask you to accept that

11    this is an accurate extraction from the

12    invoices here, but I recognize that you

13    just have to accept my assumption on that.

14    I'm not asking you to compare thing by

15    thing.  But if you accept that assumption,

16    then I'd like to go through and ask, just,

17    you know, what do these descriptions mean.

18              What does opioid DMA mean in the

19    Project column on the first page of

20    Exhibit 9?

21         A.   It means -- I mean, there's a

22    number in front of it, which is some

23    computer-generated case number by the

24    OpenAir system.

25              Opioid DMA is data mining

1

2     analytics.

3          Q.   Data mining?

4          A.   Analytics.

5          Q.   Analytics.

6          A.   So anywhere you see DMA, that's

7     data mining analytics.

8          Q.   Got it.

9               And there are four invoices that

10    are dated May 31st, 2018.

11              Do you see that --

12         A.   I think --

13         Q.   -- far left column.

14         A.   Yeah.  It looks like the line

15    items are entered, so just give me a

16    second.

17         Q.   Oh, right.

18              And these line items are all

19    related to travel, correct?

20         A.   Can I move this?  Sorry.

21              (Document review.)

22         A.   So the first four appear to be

23    line items for travel, yes.

24         Q.   And they reflect that there was a

25    meeting on May 24th in D.C.?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   Correct.

3          Q.   Who was that meeting with?

4          A.   I don't recall specifically who

5     was in the room.  I remember it was at -- I

6     remember meeting like Paul Farrell and some

7     attorneys.  Linda Singer of course was

8     there.  And then there is a lot of faces I

9     don't remember or know.

10         Q.   A lot of other people, but you

11    don't know who?

12         A.   Correct.  It was --

13         Q.   How many people were there for

14    that meeting?

15         A.   Oh, I couldn't guess.  It was a

16    room smaller than this for sure.

17         Q.   Less people than in this room

18    today?

19         A.   Maybe the same but in a much

20    tighter quarters.

21         Q.   Was anyone from DEA at that

22    meeting?

23         A.   Like I said, I don't know who was

24    exactly in that meeting.  I didn't -- we

25    didn't do like a check-in, but I don't

Highly Confidential - Subject to Further Confidentiality Review

1

2    recall somebody being introduced as, hi,

3    I'm so-and-so from the DEA.

4        Q.   Did you understand that meeting

5    to be -- were there any other experts in

6    the meeting aside from you?

7        A.   At that time, I wasn't even an

8    expert, so I wouldn't have even known then

9    who would have been an expert or as an

10    expert.

11        Q.   What did you do at the meeting?

12        A.   So that was... if I recall, I

13    think it was a preliminary meeting about

14    the ARCOS data.  I think we had just gotten

15    maybe the first or second production about

16    it and everyone kind of putting their heads

17    together of what the heck is this and how

18    do we use it.

19        Q.   I don't see a hotel, so I would

20    assume that was just a single

21    there-and-back meeting?

22        A.   Yeah, I specialize in those.

23        Q.   So do I.

24        Okay.  And then we see another

25    set of line items underneath the travel

Highly Confidential - Subject to Further Confidentiality Review

1

2     ones that are the next four entries in gray

3     that are charges for data mining and

4     analytics.

5              Do you see that?

6        A.   Correct.

7        Q.   But the one right before we get

8     to data mining and analytics says "air gap

9     server for ARCOS."

10             What is air gap server?

11        A.   So you'll see a couple charges

12     throughout here that are just to charge for

13     our server space.

14        Q.   Like the hosting fee?

15        A.   Exactly.

16        Q.   Because it's a ginormous amount

17     of data?

18        A.   Yes.  It doesn't just sit

19     somewhere for free if you want it to be

20     super secure.

21        Q.   And then data mining and

22     analytics reflect various numbers of hours

23     and various billing rates.  One is $250 an

24     hour, one is 475 and one is 275.

25             Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   Yes.

3          Q.   475 is you, correct?

4          A.   That is me.

5          Q.   You're the only person that bills

6     at the 475 rate on these, on this matter?

7          A.   I believe so, yes.

8          Q.   Okay.  So anywhere we see a 475,

9     I can know that's work you did personally?

10         A.   Correct.

11         Q.   And those are your hours.

12              And then what is the difference

13    between the 250 and the 275, just out of

14    curiosity?

15         A.   Our analysts are generally paid

16    on the lower end of the scale.  I don't

17    know exactly the structure.  The data

18    scientists and the more senior staff, more

19    senior than analysts, I should say, get

20    paid at that 275.

21         Q.   It's like a sliding scale of

22    seniority?

23         A.   Exactly.

24         Q.   What are "investigative services"

25    that are reflected on 6/22/2018 invoice?

Highly Confidential - Subject to Further Confidentiality Review

 1

 2          A.   Yeah.  So some of the earlier

 3     invoices when we were first setting up the

 4     firm, they just -- so the firm would bill

 5     everything as investigative services

 6     because it's all that they had and never

 7     bothered to change it to data mining and

 8     analytics.  And you'll notice that that

 9     disappears after some point in time,

10     probably in the fall where we open up the

11     "own data mining" categories, because I

12     wanted to have my own for tracking so...

13          Q.   So here, it looks like the

14     opposite to me, because it starts out being

15     described as "data mining and analytics" in

16     5/31/2018, but then it changes to

17     "investigative services" from their amount

18     if you look down that.  And sometimes it's

19     called "U.S. jurisdiction."

20               But I think the 5/31/18 is the

21     last time we see "data mining and

22     analytics."  Am I right about that?

23          A.   I'd have to put them in order to

24     look, but that's how the -- when I asked

25     the billing team to put this together for

Highly Confidential - Subject to Further Confidentiality Review

1

2     me, that's how it was described to me is at

3     some point, the case was opened and called

4     data -- investigative services and then at

5     some point, it was data mining analytics.

6          I recognize that there's these

7     three here that say "data mining and

8     analytics" instead of "investigative

9     services," but, again, this is from the DMA

10    side of things, not from the investigation

11    side of things.

12    Q.   And is there any substantive

13    difference in what the people are doing

14    when it's described as data mining and

15    analytics versus investigative services?

16    A.   When it's on this paper, no.

17    Q.   Okay.  As opposed to what?

18    A.   If there were -- as we talked

19    earlier, Gryphon has two lines of -- or

20    multiple lines of business, and we

21    discussed the investigative side and not if

22    the -- I can't speak to what their stuff is

23    billed as, for example.

24    Q.   Okay.  And so all the entries

25    that have the description "investigative

Highly Confidential - Subject to Further Confidentiality Review

1

2     services," those are people that are doing

3     work with the data sets that are described

4     in your report?

5          A.   Correct, you could understand

6     them to be that.

7          Q.   What is DMA methodology and data

8     overlays, what does that mean?  DMA

9     methodology and data overlays at the bottom

10    of the first page of this exhibit, what

11    does that mean?

12         A.   So that's the case where we -- if

13    there is not a specific jurisdiction to

14    bill that case towards -- so you'll notice

15    some of these are for Summit County,

16    Cuyahoga.  At some point, those become

17    Bellwether, et cetera.  Methodology and

18    data overlays are the analysis and work

19    that we do that could touch multiple

20    jurisdictions, right?  So like a great

21    example is the ARCOS data.  There's a good

22    chunk of time that goes into understanding

23    it, processing it, filtering it, making

24    sure that you're looking at the right

25    thing, because it's not an easy thing to

1

2      just ingest.

3          Q.   So this, in the fourth column

4      where we're talking about in reference to,

5      that is how you know internally who pays

6      which part of the bills?  That's what that

7      column is designed to help be used for?

8      Whether it should be allocated to Cuyahoga,

9      to Summit or is relevant to multiple

10     analyses?

11         A.   Yeah, I guess the invoice is

12     reflected as that.  We actually view that

13     as the case title when we're billing

14     against it.

15         Q.   On the second page of Exhibit 9,

16     at the top, there is an entry in the

17     reference to column that says, "DMA Ohio

18     5."

19              What's that mean?

20         A.   So there were five counties in

21     Ohio.  Some of these are just shorthand,

22     you know, we just call them internally, not

23     thinking that they would ever been produced

24     as exhibits.  There were five counties that

25     we were producing analysis on in Ohio, so

Highly Confidential - Subject to Further Confidentiality Review

1

2      those were part of this.

3          Q.    And so those hours would be

4      relevant to all five counties?

5          A.    Correct.

6          Q.    And I think I can guess what you

7      would say if I looked down to "DMA

8      Cleveland," that's relevant to work about,

9      specific to Cleveland?

10         A.    Precisely.

11         Q.    And in the fifth column, which

12     the heading in the column indicates that it

13     came from the description part of your

14     actual invoices, under "Description," on

15     the top of page 2 where it says "United

16     States," what does that mean?

17         A.    I have no idea.  I asked our

18     billing team why it says United States.

19     Sometimes it says U.S.  I don't know if

20     it's to delineate whether or not it's a

21     U.S. versus international investigation

22     because they are an international firm.

23     But as far as I'm concerned, it doesn't

24     reflect anything for us.

25         Q.    Have you done any international

Highly Confidential - Subject to Further Confidentiality Review

1

2      analysis in conjunction with this case?

3          A.   No.

4          Q.   Have you done any work for the

5      United States of America as opposed to the

6      Ohio counties in conjunction with this

7      matter?

8          A.   No.

9          Q.   Under the project name, which is

10     the third column, flipping through this

11     document to page 4 of Exhibit 9, at the

12     top, the first set of white ones, November

13     of 2018, they say "labeler flagging."

14              What's labeler flagging?

15         A.   That's the -- that's an analysis

16     of flagging metrics similar to what's in

17     the report here to labelers' data.

18         Q.   Same question with "Bellwether

19     follow-up" at the bottom of the page, what

20     does that mean?

21         A.   So, one, I've been informed that

22     it's Bellwether without the A, so

23     apologies.  And then, two, at some point in

24     time -- so we had been billing Summit and

25     Cuyahoga separately, and the request to us

Highly Confidential - Subject to Further Confidentiality Review

1

2      for analysis started grouping them more

3      frequently, so we just pushed them into one

4      case.

5          Q.   These invoices that you provided

6      us in Exhibit 3 and that have been

7      summarized in Exhibit 9, they cover a time

8      period from May 31st, 2018, to May 30th,

9      2019.

10             Is that correct -- is that the

11     correct time period for which Gryphon

12     Strategies has actually billed for work on

13     this matter?

14         A.   Correct.  You know, we invoice

15     monthly, so I don't know exactly at what

16     point in May that I would have started on a

17     case, but, yes.

18         Q.   And obviously you've done work in

19     June, this month?

20         A.   Correct, yes.  Those have not

21     been --

22         Q.   Those have not been billed yet?

23         A.   Yes.

24         Q.   Do you know, as you sit here

25     today, the amount of hours that you've put

1

2      in, in June?

3          A.   No, I don't, but I'm sure they're

4      somewhere similar as to what we've done in

5      the past or so.

6          Q.   Did the information contained in

7      Exhibit 3 and summarized in Exhibit 9

8      reflect the entirety of the work that

9      you've don't in this case?

10         A.   On this case, yes.

11         Q.   Is there any work related to

12     opioids for this litigation that you've

13     done that's not reflected in these

14     exhibits?

15         A.   For this litigation, this is

16     complete.

17         Q.   What is the distinction you're

18     drawing there?  What would be incomplete?

19     What other work that you've done that is

20     not for this litigation?

21             MS. CONROY:  Objection.  That's

22         actually beyond the scope, if that's

23         what your question means.

24     BY MS. LEVY:

25         Q.   I'm asking you, personally, what

Highly Confidential - Subject to Further Confidentiality Review

1

2     work have you done that is not reflected in

3     this litigation that relates to opioids?

4         A.    So there are other cases around

5     the country that I've done work on.

6         Q.    Okay.  Understood.

7               Have you done any work for free,

8     pro bono?

9         A.    Yes, but not on opioids.

10        Q.    I meant with respect to this

11    litigation.

12              Have you done any work with

13    respect to opioids or this litigation under

14    any organization other than Gryphon?

15        A.    For this litigation, no.

16        Q.    For other litigations, have you?

17    For other cases in this litigation, have

18    you billed through somewhere else other

19    than Gryphon?

20        A.    No.

21        Q.    All of your work on opioids has

22    gone through Gryphon Strategies?

23        A.    I want to make sure I'm super

24    clear.  Because like we discussed earlier,

25    I did work at the AG's office.  Of course I

Highly Confidential - Subject to Further Confidentiality Review

1

2      didn't bill for that.  They're not part of

3      this litigation.  So that's what I'm

4      struggling with, making sure that I say the

5      right thing.

6          Q.   You haven't received any payment

7      for your work on the opioid litigation that

8      we don't see in these exhibits, correct?

9          A.   That's correct.

10         Q.   What is your compensation

11     structure at Gryphon?

12         A.   We're all salaried.

13         Q.   What is your salary annually?

14         A.   180.

15         Q.   And is that -- the salary is the

16     same regardless of what you bill?

17         A.   There is a salary and then there

18     is a bonus at the end of the year.

19         Q.   How is the bonus calculated?

20         A.   I would love to know.  But my

21     boss decides what it is at the end of the

22     year.

23         Q.   Did you get a bonus at the end of

24     2018?

25         A.   I did.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   What was your bonus?

3          A.   It was either 20 or 25,000 I

4    actually can't remember.

5          Q.   And you don't know how it was

6    calculated?

7          A.   No.

8          Q.   Is it based on the amount that

9    you bill or the amount you bring in?

10         A.   Yes and no.  I don't really know

11   exactly.  I've asked my boss for more

12   complete metrics.  I am metric person.

13   Some of it is time with the firm, some of

14   it is billable, some of it is just a factor

15   X, I think.

16         Q.   But you, Lacey Keller, are

17   getting paid 180,000 a year regardless of

18   what Gryphon is billing, correct?

19         A.   Correct.

20         Q.   Plus whatever bonus you get?

21         A.   Correct.

22         Q.   Got it.

23              And have you calculated how much

24   money Gryphon has brought in as a result of

25   the opioid litigation?

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2          A.   No.

 3          Q.   If I represent to you that your

 4     own hours total 470 hours over the course

 5     of the last year, does that sound about

 6     right to you?

 7          A.   470 hours?

 8          Q.   I'm sorry, 870 hours.

 9          A.   That probably feels about right.

10          Q.   And are you aware that Gryphon

11     Strategies has invoiced over a

12     million-and-a-half dollars for work that

13     you and your team have done on the opioid

14     litigation for these particular matters?

15          A.   That probably makes sense.

16          MS. LEVY:  Okay.  I do not have

17          any further questions for this witness.

18          I will pass you along to the next

19          co-defendant who wishes to be in this

20          seat.

21          Let's go off the record for a

22          minute so we can change questioners.

23          THE VIDEOGRAPHER:  The time is

24          2:04 p.m.  We are now off the record.

25          (Recess is taken.)
```

Highly Confidential - Subject to Further Confidentiality Review

1

2          THE VIDEOGRAPHER:  The time is

3          2:18 p.m.  We are now back on the

4          record.

5     EXAMINATION BY

6     MS. LUCAS:

7          Q.   Good afternoon, Ms. Keller.  I'm

8     Amy Lucas.  I represent Janssen and J&J.

9               Can you turn to Exhibit 5, which

10    is your report, at page 6 and look at

11    paragraph 4, please?

12         A.   Sure.

13         Q.   It says, "The work I've done

14    throughout my career relates directly to

15    analysis undertaken in this report."

16              Is that accurate?

17         A.   Correct.

18         Q.   And you believe that, correct?

19         A.   Correct.

20         Q.   So if you take a look at

21    paragraph 6 down at the bottom, the second

22    sentence -- or the first about when you

23    were the at New York AG's office, the

24    second sentence says, "Frequently I was

25    given a subject area to investigate without

Highly Confidential - Subject to Further Confidentiality Review

1

2      having any prior expertise in the area.  I

3      would then educate myself through research

4      and talking with subject matter experts to

5      allow me to help them identify new areas of

6      investigation."

7                 Is that accurate?

8           A.   That is.

9           Q.   In circumstances where are you

10     were given an area to investigate without

11     having prior expertise in the area, why

12     would you educate yourself through research

13     and talking with subject matter experts?

14          A.   So that I can best do my job.

15          Q.   It's important to you to

16     understand the subject area that you're

17     working in, right?

18          A.   Of course.

19          Q.   And you wouldn't want to offer

20     opinions in a subject area without doing

21     the work to understand that subject area,

22     right?

23          A.   Yes.

24          Q.   I think you said earlier that you

25     did not consider yourself to have expertise

Highly Confidential - Subject to Further Confidentiality Review

1

2     in the area of manufacturers'

3     anti-diversion and suspicious order

4     monitoring programs before you were

5     retained in this matter; is that correct?

6          A.   That is correct.

7          Q.   And you also said earlier that

8     you never worked at the DEA, correct?

9          A.   That is correct, I never worked

10    at the DEA.

11         Q.   And other than speaking to

12    someone at DEA regarding the ARCOS data,

13    you hadn't spoken to anyone else at the

14    DEA, correct?

15         A.   That is correct.

16         Q.   You've also never worked as a

17    detective on a DEA task force, right?

18         A.   That is correct.

19         Q.   You've never investigated any

20    doctor who was suspected of overprescribing

21    opioids for purposes of bringing charges

22    against that doctor, correct?

23         A.   That is correct.

24         Q.   You've never spoken to anyone who

25    has investigated a doctor suspected of

1

2      overprescribing, correct, for purposes of

3      bringing charges?

4           A.    Not that I can recall right now.

5           Q.    You have never worked on any

6      investigation by any doctor by any state

7      medical board related to suspected

8      overprescribing, correct?

9           A.    Correct.

10          Q.    You've never spoken to anybody

11     who does such investigations, correct?

12          A.    I don't think I have, no.

13          Q.    You have never managed a

14     registrant's suspicious order monitoring

15     program, correct?

16          A.    That is correct.

17          Q.    What did you do to educate

18     yourself on manufacturers' anti-diversion

19     and suspicious order monitoring programs in

20     connection with your work in this matter?

21          A.    I read documents through

22     discovery, so their own protocols, all of

23     which are in my reliance materials.

24          Q.    And those are the documents cited

25     in your report in your reliance materials,

Highly Confidential - Subject to Further Confidentiality Review

1

2      correct?

3          A.   Correct.

4          Q.   Other than reading those

5      documents, what else did you do to educate

6      yourself on manufacturers' anti-diversion

7      and suspicious order monitoring programs?

8          A.   I reviewed some depositions.

9          Q.   Which depositions did you review?

10         A.   I wouldn't be able to recall from

11     memory right now, but those are definitely

12     in my reliance materials.

13         Q.   Anything else?

14         A.   I believe I already cited the

15     Masters decision and things like that.  So

16     I believe that's all.

17         Q.   Did you talk to any subject

18     matter experts other than the one DEA

19     employee regarding ARCOS data?

20         A.   We might have random -- like

21     there might have been one phone call, but I

22     don't know that they would be subject

23     matter experts in the area.

24         Q.   Who was the phone call with that

25     you have in mind?

1

2          A.    I remember having a call on a

3    Saturday morning with someone who might

4    have worked at the DEA, but I actually

5    can't remember.  It was like, you need to

6    talk to this person, and we briefly

7    discussed compliance metrics.

8               And I don't remember a ton of the

9    details from the conversation other than I

10   was particularly interested in grouping or

11   not grouping by drug code.  That's --

12         Q.    What do you mean by that?

13         A.    So when you're applying

14   compliance metrics, you can choose -- some

15   of them call for applying certain drug

16   codes.  So a great example is the 8,000

17   rule, right?  It says it should only apply

18   to hydrocodone and a few other ones.  And

19   so that hydrocodone would be considered its

20   own drug code or drug grouping.

21              And so when applying other

22   compliance metrics, did it make sense or

23   not make sense, depending on the metric, to

24   group by a drug code if there is any

25   ambiguity in the documentation.

Highly Confidential - Subject to Further Confidentiality Review

1

2      Q.   And what did -- this person was a

3    current DEA employee?

4      A.   I believe a former.

5      Q.   And what did this person say?

6      A.   I don't really recall because it

7    didn't really change how we were going to

8    do it.  I think, if I recall, there was

9    some hedging of, well, it could be this or

10   it could be that, so we just continued with

11   exactly how we had planned.

12     Q.   Other than asking a former DEA

13   employee about grouping by drug code for

14   compliance metrics, have you had any other

15   conversations with any subject matter

16   experts regarding your work in this matter?

17     A.   Not that I can recall at this

18   time.

19     Q.   How long did that call last?

20     A.   Oh, less than an hour for sure.

21     Q.   And when was that call?

22     A.   I don't recall the exact date.

23   Like I said, I remember it being a Saturday

24   morning because I remember walking my dog

25   while I was on the call.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   Do you know what makes an order

3     reportable to the DEA as a suspicious

4     order?

5          A.   No, I do not.  As we discussed

6     earlier, outside of my expertise.

7          Q.   Do you know whether DEA expects

8     registrants to conduct due diligence into

9     flagging orders -- into flagged orders to

10    determine whether they're actually

11    suspicious before reporting it?

12         A.   Again, as discussed earlier,

13    outside of my expertise.

14         Q.   Did you ever discuss whether

15    to -- strike that.

16              Did you ever discuss whether to

17    consider due diligence in running the

18    metrics that you ran?

19         A.   So --

20         Q.   Let me start over.

21              You said earlier that in your

22    report, if something is suspicious, you

23    mean it just was tripped by one of the

24    metrics, right?

25         A.   That is correct.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.    And just because you used the

3     word "suspicious" in your report, that

4     doesn't mean it's suspicious as the DEA

5     defines under the Controlled Substances

6     Act, correct?

7          A.    That's accurate.

8          Q.    So did you ever consider whether

9     you should take due diligence into account

10    in creating your definition of suspicious?

11         A.    So I'm pausing for this because

12    there's the addendum that does the

13    persistent flagging which assumes no due

14    diligence because once the flag is

15    triggered, it stays on for the perpetuity

16    of the data set.

17               So in the sphere that is around

18    that, then, yes.  And if we're talking

19    about anything outside of that, then no.

20         Q.    Are you aware whether -- strike

21    that.

22               Did you look at any documents or

23    deposition testimony regarding Janssen's

24    due diligence of flagged orders?

25         A.    I might have read a document or

Highly Confidential - Subject to Further Confidentiality Review

1

2      two.  But, again, evaluating due diligence

3      or any of that is outside of the scope of

4      my expertise.

5          Q.   So even if you evaluated it, you

6      would not have incorporated any documents

7      related to Janssen's due diligence of its

8      flagged orders into your opinions?

9          A.   I think the answer to that would

10     be yes.  If I read a document, it doesn't

11     impact the findings of the report.  The

12     report was to apply the known compliance

13     metrics to labelers on data.

14         Q.   I want to ask you about the known

15     compliance metrics.

16              Do you know what -- strike that.

17              A compliance metric is the same

18     way of saying an algorithm, right?

19         A.   Sure.

20         Q.   Okay.  The SOMS algorithm, do you

21     know what Janssen used for its suspicious

22     order monitoring algorithm?

23         A.   If it's not in my report, then

24     no.  Or if it's in my report, then, yes.

25     But if it's not in my report, then, no.

Highly Confidential - Subject to Further Confidentiality Review

1

2      But I don't believe that we had a Janssen

3      algorithm.

4           Q.   I'll represent to you we haven't

5      found one.

6                Why is it that you didn't use

7      Janssen's suspicious order monitoring

8      algorithm or compliance metric in your

9      report?

10          A.   If it's not here, then, which I

11     don't think it is, I didn't know of it.  So

12     if there was one, I'd be happy to implement

13     it.

14          Q.   How did you choose the compliance

15     metrics that got included in the report?

16          A.   As we were stating earlier, some

17     were provided by counsel, others we found.

18          Q.   So there was no instruction by

19     anyone to make sure you included all of the

20     defendants' algorithms in your report?

21          A.   Well, I would say that's correct,

22     there was no explicit instruction to

23     include all or exclude all, include what

24     you could find and go from there.

25          Q.   Is it your understanding that

Highly Confidential - Subject to Further Confidentiality Review

1

2      nobody could find Janssen's suspicious

3      order monitoring algorithm?

4            A.   I just wanted to look at one

5      thing really quick.

6                  (Document review.)

7            Q.   What page are you on?

8            A.   I'm trying to find it.  I'm

9      sorry.

10           Q.   Are you looking for the metrics?

11           A.   Yeah.  I'm looking actually for

12     the footnote about Janssen that describes

13     the SOMS program.

14                 (Document review.)

15           A.   Because as I understood it, there

16     wasn't one to implement.  But I just...

17     that's what I wanted to review.

18                 (Document review.)

19           A.   So, yes, it was my understanding

20     that there wasn't a metric.

21           Q.   It was your understanding?

22           A.   Correct.

23           Q.   Did you ask anybody to confirm

24     that?

25           A.   I did.

1

2          Q.   Who did you ask?

3          A.   Evan Janush, I think is his last

4     name.  J-a-n-u s-h.

5          Q.   And your understanding is that

6     Mr. Janush told you that Janssen did not

7     have a suspicious order monitoring

8     compliance metric or algorithm?

9          A.   Correct, that we could implement,

10    yes.

11         Q.   Did you find that footnote?

12         A.   Yes.  I was on page 28 here.

13    Footnote 83 is what I was looking for just

14    to make sure.

15         Q.   And footnote 83 says, "Janssen

16    used chargeback and value track data on

17    occasion for size only."

18              Is that what you were thinking

19    of?

20         A.   That is exactly what I was

21    thinking of.

22         Q.   And what makes you think that

23    that supports the notion that Janssen did

24    not have a suspicious order monitoring

25    algorithm?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   So in some of these footnotes, we

3     cite when SOMS programs were developed and

4     what Bates numbers support those

5     development.  And I wanted to make sure

6     that Janssen didn't have one.

7          Q.   Are you aware that -- have you

8     ever spoken to James Rafalski?

9          A.   I might have, but I'm not sure.

10         Q.   Have you read his report?

11         A.   Yes.

12         Q.   You're aware that he's a

13    plaintiff's expert in this case?

14         A.   Yes.

15         Q.   And are you aware that he

16    evaluated Janssen's suspicious order

17    monitoring program and, in particular, the

18    algorithm that Janssen used?

19         A.   If it was part of his report,

20    then it would have been, yes.

21         Q.   And so if you read his report and

22    you understood that, then why is Janssen's

23    suspicious order monitoring algorithm not

24    part of your report?

25              MS. CONROY:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1

2         A.   I believe his report was filed at

3    the same time ours was.

4         Q.   And so you learned that Janssen

5    had a suspicious order monitoring algorithm

6    after your report was already in?

7         A.   Do you have Rafalski's report?

8    I'd like to review it just to make sure

9    that I know --

10        Q.   I don't.

11        A.   So I don't know what algorithm

12   was discussed.  I mean, his report was

13   quite lengthy, if I recall.  And so I'd

14   have to look at it to know exactly what the

15   algorithm was.

16        Q.   But if you would have had the

17   algorithm, you would have incorporated it

18   into your report; is that correct?

19        A.   Absolutely.

20             MS. CONROY:  Objection.

21   BY MS. LUCAS:

22        Q.   What are the Janssen products at

23   issue in this litigation?

24        A.   I don't know that I can name them

25   by name.  It would be anything that

Highly Confidential - Subject to Further Confidentiality Review

1

2      appeared in the IQVIA data or your own

3      chargeback data.

4           Q.    If you can take a look at page

5      14, paragraph 44.

6                (Witness complies.)

7           Q.    "I implemented the manufacturer

8      and distributor-developed compliance

9      metrics as documented without endorsement."

10               What does that mean to you?

11          A.    That means what we were stating

12     earlier on the record about I'm not

13     endorsing saying one metric is better than

14     another.

15          Q.    "I implemented the metrics using

16     a close reading of the best information

17     available for produced documents and

18     instruction by counsel, providing the most

19     accurate reflection of labeler defendants'

20     monitoring programs as they were

21     represented in their own operating

22     procedures and documentation."

23               What does that mean?

24          A.    Sure.

25               So when you're reading a metric,

Highly Confidential - Subject to Further Confidentiality Review

1

2      sometimes people explain -- you know, it

3      may say take the 30 day average.  Well,

4      what does that mean?  Does that mean a

5      rolling 30 day or calendar 30 day?

6              So, you know, what I'm trying to

7      encapsulate there is there might be -- you

8      know, we're trying to do the best that we

9      can, given the documents, to implement them

10     to their truest meaning based off of

11     testimony, depositions, the documents

12     themselves.  That's what I'm trying to

13     represent there.

14     Q.   So what you did, though, here was

15     you implemented metrics that Janssen didn't

16     use, correct?

17     A.   I couldn't speak to whether

18     Janssen did or did not use a metric.

19     Q.   Do you have any reason to believe

20     that Janssen used any of the metrics listed

21     in your report?

22     A.   I wouldn't know.

23     Q.   Let me ask it again.

24              Do you have any reason to believe

25     that Janssen used any of those metrics

Highly Confidential - Subject to Further Confidentiality Review

1

2    listed in your report, yes or no?

3              MS. CONROY:  Objection.

4         A.   It's really outside the scope of

5    my expertise.

6         Q.   You haven't seen any information

7    to suggest that Janssen used any of those

8    metrics, correct?

9         A.   I have not read a document that

10   led me to believe that, correct.

11        Q.   Therefore, since you didn't use

12   Janssen's algorithm in your report, you

13   don't have any opinion on what Janssen's

14   algorithm would or would not have flagged,

15   correct?

16        A.   That is correct.  And I would

17   like to know, just so if we're going to

18   continue to talk about an algorithm, maybe

19   what it was, so I can be a little bit more

20   informed.

21        Q.   One of the great things about

22   deposing people is I get to ask the

23   questions.  Your counsel can provide that

24   to you afterwards.

25              MS. CONROY:  Objection.  Assumes

Highly Confidential - Subject to Further Confidentiality Review

1

2          that it exists.

3                MS. LUCAS:  I think Mr. Janush

4          knows about our -- Janssen's algorithm.

5     BY MS. LUCAS:

6          Q.   So I wanted to talk about your

7     small labeler opinion.

8                And that applies only to Janssen,

9     correct?

10         A.   That is correct.

11         Q.   And why is that?

12         A.   So small labeler, I don't mean

13    any offense to that because I understand

14    Johnson & Johnson is a very large company,

15    but when it comes to opioids, you have very

16    few as it pertains to the market share,

17    right?  You're a much lower market share.

18         Q.   Actually, if you want to turn

19    really quickly to page --

20         A.   16 you're probably looking for.

21         Q.   I am.

22               Page 16, table 1 and table 2.

23    That reflects Janssen's market share in

24    Summit County and Cuyahoga County, correct?

25         A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.    And the largest percentage on

3     that table is 0.9 percent, and the smallest

4     one is 0.1 percent, correct?

5          A.    That appears to be correct.

6          Q.    Did you calculate those numbers?

7          A.    I didn't do it by hand, but an

8     algorithm did.

9          Q.    How did you do that?

10          A.    SQL query.

11          Q.    And you concluded that Janssen

12     had between 0.1 percent and 0.9 percent

13     market share in Summit and Cuyahoga,

14     correct?

15          A.    Yes, depending on the metric and

16     depending on the county.

17          Q.    And other manufacturers, either

18     defendants or otherwise not named in the

19     complaints, had between 99.1 and 99.9

20     percent of the market share, correct?

21          A.    Yes.  I'm assuming you're taking

22     the hundred minus yourselves and that's

23     everybody else, yes.

24          Q.    So then back to your small

25     labeler opinion, why then did you conduct

Highly Confidential - Subject to Further Confidentiality Review

1

2      the small labeler impact analysis as to

3      Janssen?

4          A.   It was asked of me to see what

5      would happen if -- again, this is a

6      hypothetical scenario.  And let me just

7      flip to there just so I'm on the right

8      page.

9               Do you have it.

10         Q.   Small labelers starts on page 53.

11         A.   Thank you so much.

12              (Document review.)

13         A.   So it would be if a labeler, like

14     yourselves, had identified a suspicious

15     physician -- and when I say identified

16     suspicious, I mean using the metrics -- and

17     then flagged them and reported them and

18     they were taken off-line completely, what

19     would be the downstream impact of that.

20         Q.   And why did you conduct that

21     analysis?

22         A.   It was requested.

23         Q.   Who requested it?

24         A.   Linda Singer.

25         Q.   When did she request that you do

Highly Confidential - Subject to Further Confidentiality Review

1

2     the small labeler analysis?

3         A.   At some point in March or April.

4         Q.   Did you have any input into the

5     methodology of the small labeler impact

6     analysis?

7         A.   Of course.

8              MS. CONROY:   Objection.

9     BY MS. LUCAS:

10        Q.   What exactly were your

11    instructions from Ms. Singer, to the best

12    of your recollection?

13        A.    I would say pretty much as

14    written was it's a hypothetical scenario,

15    assuming that, let's say, a physician is

16    flagged, he then or she was reported and

17    taken off-line for the duration of his or

18    her prescribing habits or prescribing

19    history, I should say.  How we went about

20    doing that was on our own.

21             And even --

22        Q.   So let me just make sure I

23    understand.  You were instructed to work

24    backwards from a hypothetical scenario

25    where a physician is flagged and reported

Highly Confidential - Subject to Further Confidentiality Review

1

2      and taken off-line and then figure out how

3      to create that methodology?

4              MS. CONROY:  Objection.

5         A.   I'm not sure I would characterize

6      it that way.  We were given an assignment

7      of someone is -- a physician is flagged and

8      then there is, you know, a lot of things

9      that have to come after that, but assuming

10     once they've been flagged, they're taken

11     off-line, what is the impact on the rest of

12     the county.

13        Q.   You said a lot of things have to

14     happen after the flagging.

15             What are those things that have

16     to happen after a physician is flagged?

17        A.   So like I said earlier, I'm not

18     an expert in due diligence or reporting

19     requirements to the DEA.

20             So with that in mind, to make

21     this work, I had to make the assumption

22     that once flagged, they stopped

23     prescribing.

24        Q.   At the moment the flagging

25     happened; is that correct?

Highly Confidential - Subject to Further Confidentiality Review

1

2      A.   I believe so, yes.  I'd have to

3      look at the code to be for certain.

4      Q.   So in order for this analysis to

5      work, you had to assume that the prescriber

6      was taken off-line the moment the metrics

7      used were tripped and there was a flag,

8      correct?

9           MS. CONROY:  Objection.

10     A.   I would say for this hypothetical

11     situation to present itself, yes, once

12     someone was flagged and they were taken

13     off-line, what their, what amount of

14     prescriptions were then taken off-line.

15          I'm trying to say it the best way

16     I can.  I'm sorry if I'm not being clear.

17     Q.   Do you believe that your small

18     labeler impact opinion is an accurate

19     representation of what happens in the real

20     world?

21     A.   I'm not really an expert to say

22     that.

23     Q.   Do you have any beliefs on

24     whether it's an accurate representation of

25     what would happen in the real world?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   Any beliefs?  Outside of my

3     expertise here.

4          Q.   You haven't considered it at all?

5          A.   Not as an expert.

6          Q.   As a non-expert?

7          A.   I mean, of course you think about

8     things, but I'm not here to talk about

9     those.

10         Q.   What do you think about it?

11         A.   I mean, I think it's a -- I

12    guess, I mean it's like you give it

13    fleeting thoughts of like -- I don't even

14    really know how to talk about like random

15    thoughts that you have like while riding a

16    bicycle on the way to work about things.

17    Like, you know, I'm thinking about my small

18    labeler impact; I don't really carry it

19    down the logical path of, well, does due

20    diligence actually happen or does this

21    actually happen.  I don't go into that

22    great detail.  So maybe it was a

23    mischaracterization to say do I think about

24    it.  I don't know.  I've kind of walked

25    myself into --

Highly Confidential - Subject to Further Confidentiality Review

 1

 2          Q.   Well, if you want to go back to

 3     page 11, paragraph 34:  "I was asked by

 4     plaintiff's counsel to include additional

 5     analysis that examined what would have

 6     happened if a labeler with a comparatively

 7     small market share had reported and stopped

 8     supplies to suspicious prescribers.

 9              "I demonstrated that if Janssen,

10     the defendant labeler with the second

11     smallest market share in Summit and

12     Cuyahoga Counties, had reported suspicious

13     activity, prescriptions for millions of

14     dosage units could have been stopped in

15     Summit and Cuyahoga Counties."

16              That's very definitive.  Do you

17     believe that is an accurate statement?

18          A.   It's a hypothetical situation.

19     As we discussed in that section, it's a

20     hypothetical analysis.

21          Q.   Right, but paragraph 34 says you

22     were asked to examine what would have

23     happened.

24              Are you saying now that your

25     small labeler opinion is not a statement of

1

2      your opinion of what would happen?

3          A.   So I would say that the change

4      that we made earlier in the corrections

5      where we went from "would" to "could,"

6      those should have been throughout.  I

7      didn't really get to talk about every

8      single change here.  But, again, these are

9      "could" statements, and I think we stated

10     that pretty definitively in the first part

11     of this deposition.

12         Q.   Right.  I asked because I noticed

13     that the corrections didn't apply to this

14     paragraph.  And so you are now saying that

15     you meant to say "could" have happened?

16         A.   I would be most comfortable with

17     saying "could."

18         Q.   And "could" means that it's

19     feasible, correct?

20         A.   I think that's what that word

21     means, yes.

22         Q.   Do you believe that your small

23     labeler impact opinion is feasible in the

24     real world?

25         A.   I'm not here -- I won't talk

Highly Confidential - Subject to Further Confidentiality Review

1

2      about real world.  It's outside of my

3      expertise.

4           Q.   So you're not offering any

5      opinion about whether your small labeler

6      impact opinion could happen in the real

7      world, right?

8                MS. CONROY:  Objection.

9           A.   So I think we've said here that

10     this was what could happen.  I'm not

11     offering an opinion about what would happen

12     or should happen.

13          Q.   Right.

14               But you're also not offering an

15     opinion about what could happen as applied

16     in the real world, right?

17          A.   I guess I'm not really

18     understanding the difference between that

19     question and the one that I just answered.

20          Q.   Well, because you said this is

21     all hypothetical.

22          A.   Sure, but it relies on real-world

23     data.

24          Q.   Which data?

25          A.   The IQVIA data.

Highly Confidential - Subject to Further Confidentiality Review

1

2      Q.   It is then your opinion that this

3   could happen in the real world, correct?

4      A.   It seems a little... it's a lot

5   of time to spend on a hypothetical, but,

6   yes, if all of the assumptions that were

7   outlined in the report that the labeler was

8   -- or that the labeler identified the

9   prescriber and that all the different steps

10  were taken to take them off-line, then,

11  yes, it could happen in the real world.

12     Q.   Well, the only two assumptions I

13  think I heard were that one of the metrics

14  was tripped and a flag went up, correct?

15     A.   That is one part of the

16  hypothetical.

17     Q.   And Janssen would report that

18  prescriber to law enforcement as

19  suspicious, right?

20     A.   So as part of the hypothetical,

21  they would be tripped, Janssen could report

22  them.  That prescriber, through whatever --

23  or they could be reported, or they could

24  stop prescribing, whatever the means are to

25  get them to stop prescribing.

Highly Confidential - Subject to Further Confidentiality Review

1

2          But the whole point of the

3     analysis is that that prescriber who was

4     flagged then stops prescribing.  I don't

5     really claim or really fill out the blanks

6     between what gets from A to B.

7          Q.   You said that your assumption is

8     that the prescriber would stop prescribing

9     immediately upon the metric being tripped,

10    right?

11         A.   Correct.

12         Q.   Do you have any basis to believe

13    that those assumptions would happen in the

14    real world?

15         A.   It's really outside of my

16    expertise.

17         Q.   You don't know?

18         A.   I don't know.

19         Q.   Have you ever thought when you

20    were thinking about this analysis whether

21    it was flawed?

22              MS. CONROY:  Objection.

23         A.   I think --

24              MS. CONROY:  Which analysis?  The

25              hypothetical you're talking about or --

1

2          MS. LUCAS:  Her small labeler

3      analysis.

4          MS. LEVY:  Okay.  I just want --

5      it's a pretty broad question.

6          MS. LUCAS:  The report, no.

7      We've been talking about the small

8      labeler.  Let me ask it again.

9  BY MS. LUCAS:

10     Q.  You said earlier that, you know,

11  sometimes you thought about the analysis

12  and the small labeler impact.

13          Did you ever think that it was

14  flawed?

15     A.  No.  But I will say I always

16  think about where things could go wrong.

17  That's the point of being a good analyst

18  and data scientist.  It's always are we

19  looking for the right things, have we

20  applied things correctly, are we making

21  conservative assumptions.

22     Q.  Where do you think things could

23  have gone wrong in the small labeler

24  analysis?

25     A.  So the whole hypothetical I think

1

2      is maybe what's at issue here.  That's the

3      hypothetical situation that I was asked to

4      enact, so that is what it is.

5           Q.   Do you think there is anything

6      that could have gone wrong in the small

7      labeler analysis in the assumptions that

8      you were making?

9                You just said "I want things to

10     be accurate."

11               Do you think this is accurate?

12          A.   I think it is an accurate

13     implementation of the hypothetical

14     situation that we were asked to enact.

15          Q.   We'll come back to this one in a

16     minute.

17               I want to talk about chargeback

18     analysis for a moment.

19               Can you take a look at page 59

20     and table 35.

21               (Witness complies.)

22          Q.   And I think we said -- you said

23     earlier that you changed -- table 35 is the

24     use of chargeback data for compliance,

25     right?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.    Correct.

3          Q.    And you changed in your

4    corrections the Endo, Par and Qualitest nos

5    in that far right column of whether they

6    used chargeback in suspicious order

7    monitoring program from "no" to "yes."  But

8    Johnson & Johnson and Janssen is listed as

9    no without any citation.

10               Why is that?

11         A.    So it's hard to cite to a

12   document that I don't have.  If there was a

13   "yes," then there would be a document to

14   cite to.

15         Q.    And did somebody tell you to

16   assume "no" for these purposes?

17         A.    I was told, and I think reflects

18   similarly in the footnote earlier that we

19   discussed, maybe it was 83.

20               Give me one second.

21               (Document review.)

22         Q.    Well, let me ask you a different

23   way.

24               When you say "suspicious order

25   monitoring program," are you talking about

Highly Confidential - Subject to Further Confidentiality Review

1

2      only the algorithm?

3          A.   Yes, I think that would be a

4      better characterization.

5          Q.   So you're excluding from

6      suspicious order monitoring program, any

7      follow-up due diligence that the suspicious

8      order monitoring department did when an

9      order was flagged, right?

10             MS. CONROY:  Objection.

11         A.   Yeah, I would say that's outside

12     of the scope.  So to the extent that there

13     was an algorithm that we could implement

14     and chargebacks were used as part of that

15     algorithm, then they get the "yes" here.

16         Q.   Got it.

17             And so...

18             (Document review.)

19         Q.   All right.  Take a look at page 4

20     of the --

21             MS. LUCAS:  Do we have the errata

22       sheet marked?

23             MS. CONROY:  Yes.

24             MS. LUCAS:  From 5/11?

25             Has this been marked?

Highly Confidential - Subject to Further Confidentiality Review

1

2          MS. VENTURA:  No.

3          (Keller Exhibit 10, Expert

4     Analysis - Errata Sheet: Lacey R.

5     Keller, not Bates-stamped, marked for

6     identification, as of this date.)

7  BY MS. LUCAS:

8     Q.   If you look at page 4, table 4.

9          MS. CONROY:  Do you have another

10    copy?

11         MS. LUCAS:  Sure.  I'm sorry,

12    Jayne.

13  BY MS. LUCAS:

14    Q.   This identifies a number of

15  pharmacies flagged by running your

16  compliance metrics over each labeler's

17  chargeback data, correct?

18    A.   Sorry.  Give me one second.

19         (Document review.)

20    A.   Yes.

21    Q.   And for Janssen, it says total

22  buyers 12.

23         Does that mean total buyers in

24  all or total buyers in the chargeback data?

25    A.   That would be total buyers that

Highly Confidential - Subject to Further Confidentiality Review

1

2      appeared in the chargeback data.

3            Q.   And for seven of them, you say

4      that seven were flagged by any metric,

5      correct?

6            A.   Sorry, just a second.  I just

7      want to make sure.

8                 So your question earlier, it says

9      total buyers, 12.  Yes, total buyers in the

10     chargeback data.  And then seven of which

11     were flagged by any metric.

12           Q.   Did you do any research yourself

13     to determine whether any of those buyers

14     were actually suspicious?

15                MS. CONROY:  Objection.

16           A.   That would be outside of the

17     scope of my expertise.

18           Q.   And if you take a look back at

19     your report in Exhibit 5 at page 28, table

20     6, this is about IQVIA data.

21                I want to confirm what I think is

22     going to be the case based on what you just

23     told me.

24                In paragraph 80, it says,

25     "Janssen discusses using IQVIA data for

1

2     one-off investigations of suspicious

3     activity."

4              There's no citation there.  What

5     is the basis for that statement?

6              (Document review.)

7        A.   If it's not in my reliance, then

8     it would have been from an attorney.

9        Q.   And the reason that you have "no"

10    listed in the table, whether Janssen used

11    IQVIA data for compliance, is because you

12    were considering only the algorithm,

13    correct?

14       A.   Yes.  And now that I'm thinking

15    about this, this citation here, chargeback

16    and value track should really -- that

17    citation makes more sense on the table

18    later in the document.

19              But again, yes, if there is an

20    algorithm that would have referenced using

21    IQVIA data in some way, that's the

22    intention of giving a "yes" there.

23       Q.   Do you believe the IQVIA data

24    that forms the basis of part one of your

25    report, the prescriber opinions, is

Highly Confidential - Subject to Further Confidentiality Review

1

2      accurate?

3            A.    I have to assume that it is.

4            Q.    Is it important that that data be

5      accurate?

6            A.    Yes.

7            Q.    If the IQVIA data turned out to

8      not be accurate, would that potentially

9      affect your opinions?

10                 MS. CONROY:   Objection.

11           A.    It really would depend on the

12     error or what might be considered accurate.

13     As we were talking earlier, the data was

14     thought to be missing 2007.  The inclusion

15     of that would lead to a potentially

16     additional flagging.

17                 So depending on characterization,

18     that could be accurate/inaccurate.  You

19     know, that's a term of art, so it really

20     depends.

21                 MS. LUCAS:   I'm going to mark

22           this Exhibit 11 an FDA report stating,

23           "FDA reports quality problems for data

24           provided by the firm IQVIA that were

25           used to inform estimates for some

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2          controlled substances."
 3               (Keller Exhibit 11, Press release
 4          entitled "FDA reports quality problems
 5          for data provided by the firm IQVIA
 6          that were used to inform estimates for
 7          some controlled substances", marked for
 8          identification, as of this date.)
 9   BY MS. LUCAS:
10        Q.   Have you seen this document
11   before?
12        A.   This document, no, but I do
13   remember reading the press release when it
14   came out.
15        Q.   And when did you review the press
16   release?  In May of 2008?
17        A.   2018, I believe.
18        Q.   I'm sorry, 2018.
19               And did you have any concerns
20   when you read this report about IQVIA data
21   inaccuracies when you read it in 2018?
22        A.   I mean, it really depends on
23   which data set.  IQVIA offers many.
24        Q.   Did you ever ask anyone whether
25   the data set that you had might be subject
```

1

2      to the inaccuracies that are reported in

3      this press release?

4           A.   I mean, the data set was provided

5      by Allergan.  We did not purchase it.

6           Q.   Do you know where Allergan got

7      the data set?

8           A.   I do not.  But I assume that it's

9      IQVIA.

10          Q.   Did you ever ask anyone, though,

11     whether anybody had checked to see whether

12     the data set suffered from the same

13     inaccuracies that are in this report in

14     Exhibit 11?

15          A.   I need to review the inaccuracies

16     here before I answer that.

17               (Document review.)

18          Q.   Well, it says, "While conducting

19     analyses," this is fourth paragraph, "While

20     conducting analyses to estimate the amount

21     of prescription opioids sold in the U.S.,

22     FDA found a discrepancy in the IQVIA data

23     that showed a more than 20 percent drop in

24     the reported amount expressed in kilograms

25     of Fentanyl sold for a minimum of the past

Highly Confidential - Subject to Further Confidentiality Review

1

2    five years compared to what IQVIA's

3    database had previously reported."

4              Is that something that would have

5    been relevant to your analysis?

6         A.   It really depends on what data

7    set's impacted, whether or not the data set

8    was purchased prior to or after this.

9    There's lots of factors that could go into

10   that.

11        Q.   And did you ask anyone whether

12   the data set you had might be affected by

13   this inaccuracy?

14        A.   I really just needed to take the

15   data set as it was presented.

16        Q.   Is that a no?

17        A.   Yes.  Yes, that is a no, to make

18   that clear.

19        Q.   And then if you look at the

20   second to last paragraph of the document,

21   third to last says, "Since the FDA

22   identified these issues, our scientists

23   have being looking methodically at the

24   IQVIA data for similar errors relating to

25   other opioids and non-opioid controlled

Highly Confidential - Subject to Further Confidentiality Review

1

2      substances."

3              And then the next paragraph says,

4      "As a result of this work, we identified

5      additional data quality issues related to

6      several other controlled substances with

7      similar weight-based conversion factors

8      including oxymorphone and hydrocodone.

9      These additional errors raised serious

10     concerns about systemic issues with IQVIA's

11     data and quality control procedures."

12             Is that something that you would

13     want to know, whether these errors affected

14     the data set you were working on?

15     A.   I would definitely like to know

16     the extent of the errors, what particular

17     NDC codes they affected and whether this

18     data set would be affected.  But, again,

19     there's lots of unknowns here, which data

20     set.  Is at the IQVIA XPO or other data

21     sets.

22     Q.   So it would be important to know

23     if the data set you were working with was

24     affected by these errors, correct?

25             MS. CONROY:  Objection.

1

2          A.   Yes.

3          Q.   I want to go back through --

4               MS. CONROY:  Is this a good time

5          for a break?  We've been going for

6          about an hour.  Is this a good time for

7          a break if we finished with this

8          document?

9               MS. LUCAS:  Yeah, we can take a

10         short break.

11              THE VIDEOGRAPHER:  The time is

12         3:05 p.m.  We are now off the record.

13              (Recess is taken.)

14              THE VIDEOGRAPHER:  The time is

15         3:23 p.m.  We are back on the record.

16    BY MS. LUCAS:

17         Q.   Ms. Keller, can you take a look

18    at page 30 of the report at Exhibit 5 and

19    look at table 9?

20              (Witness complies.)

21         Q.   It's the total prescriptions

22    flagged by compliance metrics by labeler.

23         A.   Yup.

24         Q.   Then it lists the manufacturers

25    and the number of prescriptions that were

Highly Confidential - Subject to Further Confidentiality Review

1

2    flagged by the different standards and then

3    any flag.

4         Do you see that?

5    A.   Yes.

6    Q.   Did you ever consider what

7    percentage of prescriptions were being

8    flagged by these metrics in relation to the

9    total number of prescriptions for each

10    manufacturer?

11    A.   It doesn't appear to be one of

12    these tables, but it would be possible to

13    pull.

14    Q.   Did you consider it?

15    A.   I don't remember if I pulled that

16    exact breakdown, but it's definitely a way

17    that you can pull the data.

18    Q.   Do you know about what percentage

19    of the prescriptions were flagged?

20    A.   By each metric?  Yes.  That's on

21    table 7.

22    Q.   No, by prescriber.

23    A.   By each prescriber?

24    Q.   Right.

25    A.   So we do that --

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   Or, sorry, by labeler.  Strike

3      that.

4               Do you know each labeler, what

5      percentage of their prescriptions were

6      being flagged?

7          A.   Not with me, no.

8          Q.   Do you have any opinions on what

9      percentage of doctors in the Cuyahoga and

10     Summit County areas were prescribing

11     irresponsibly?

12         A.   No.  I stated earlier in

13     testimony today, that's outside of my

14     expertise.

15         Q.   I have a few more questions about

16     your small labeler impact opinions, if you

17     want to go back to page 53.

18         A.   Thank you.

19              (Document review.)

20         Q.   I wanted to confirm, in your

21     small labeler analysis, were doctors

22     flagged for their prescriptions of Janssen

23     products only or did you flag a doctor

24     based on number of non-Janssen

25     prescriptions so long as that doctor

Highly Confidential - Subject to Further Confidentiality Review

1

2      prescribed any Janssen product?

3            A.    Give me one moment to re-review

4      the methodology here.

5                  (Document review.)

6            A.    So I'd have to look at the code

7      to make sure I'm saying this most

8      accurately, and I would be happy to do

9      that, but I think what we did was you had

10     to have six months of consecutive

11     prescribing Janssen products first.  And

12     then once you reached that threshold, you

13     were then flagged.  And I think we say

14     here, in paragraph 114, that we used

15     Janssen drugs as well as everybody else's.

16           Q.    Where do you see that?

17           A.    The very last statement.  Oh,

18     hang on, actually.  Maybe I am misstating

19     that.  Give me one second.

20           Q.    Okay.

21                 (Document review.)

22           A.    I don't know that we actually

23     specifically addressed whether we flagged

24     them based off of all drugs or just Janssen

25     products.  I'd have to consult the code to

Highly Confidential - Subject to Further Confidentiality Review

1

2     be for certain.

3          Q.   Let's quickly run through the

4     code.  Exhibit 12.

5               (Keller Exhibit 12, Report on

6          Script.SQL, not Bates-stamped, marked

7          for identification, as of this date.)

8     BY MS. LUCAS:

9          Q.   If you can take a look at page 7

10    through 12.  Pages 7 -- starting at the

11    middle where it says "drop table" through

12    page 12 that ends kind of towards the

13    middle-ish where it says "B, year" and then

14    the next word is "select," that's our

15    understanding of the small labeler

16    analysis.

17              Could you confirm that, please?

18              (Document review.)

19         A.   Sorry, dense code.

20              (Document review.)

21         A.   Yes, this appears to be the small

22    labeler analysis.

23         Q.   And by looking at this analysis,

24    does that tell you whether or not doctors

25    were flagged based on Janssen prescriptions

1

2      or all labelers' prescriptions?

3          A.   It will, but I have to find it.

4      Sorry.

5               (Document review.)

6          A.   So what this appears to me is

7      that Janssen -- so you first have to

8      prescribe a Janssen product for six months.

9      And after that point, the first flag that

10     you're flagged on is the flag no matter

11     what the labeler is.

12         Q.   Where do you see that in the

13     code?

14         A.   It's through a series of steps.

15     So first there is a chunk of code that

16     identifies the first date of flagging.  And

17     there is a chunk of code with a bunch of

18     nested queries.

19         Q.   What page are you on, 7?

20         A.   I start on 7.

21              It's actually really hard to read

22     formatted this way, so I'm sorry.  It's

23     really hard to follow.  But the gist of it

24     is, yes, you first have a date you're

25     flagged, your earliest flag date.  And then

Highly Confidential - Subject to Further Confidentiality Review

1

2     there is a date in which you are -- your

3     first date of -- your sixth month of

4     prescribing a Janssen product.  And

5     whatever flag date that occurs after that

6     six month of prescribing Janssen, then you

7     would be...

8           Q.   So let me make sure I understand

9     this correctly.

10               This small labeler analysis

11     requires, in order for someone to be

12     flagged, first requires prescribing a

13     Janssen product for six months, correct?

14           A.   Correct, for six -- I believe

15     it's even more stringent.  It's six months

16     within a year.

17               Because I think we partitioned it

18     by data date, which would give it a year.

19     But, again, it's definitely six months of

20     Janssen prescribing.  And then after which,

21     that point in time, then the first date of

22     flagging.

23           Q.   Okay.  So in order for a

24     prescriber to be flagged, it would have to

25     be six months of Janssen prescribing and

Highly Confidential - Subject to Further Confidentiality Review

1

2    then one of these three metrics being

3    tripped, not just for a Janssen product but

4    it could be for any opioid product,

5    correct?

6         A.   Correct.  For the three products

7    that -- so we exclude one because -- and I

8    believe that's the McKesson 8,000 because

9    Janssen doesn't have those drugs, and so it

10   wouldn't really be paying attention to that

11   line of business.

12              And so our assumption would be,

13   yes, any of the other three metrics could

14   have been applied.

15        Q.   But let me just say, does the --

16   strike that.

17              Does the small prescriber

18   analysis include flags that Janssen should

19   have seen for Endo's medications?

20        A.   I'm not going to talk about what

21   should have been seen.

22        Q.   I'm meaning that like in could it

23   be tripped.

24        A.   Yes, because the assumption with

25   IQVIA, just like Allergan has access to

1

2      data on Purdue, is that, yes, Janssen could

3      see prescriptions being written about other

4      labelers.

5          Q.   So in addition to the assumptions

6      that we talked about before that Janssen --

7      that one of the flags was tripped and then

8      Janssen reported and then immediately the

9      prescriber stopped prescribing after being

10     reported to law enforcement authorities,

11     the other assumption that's baked into here

12     is that Janssen was monitoring other

13     manufacturer's medications being

14     prescribed, correct?

15             MS. CONROY:  Objection.

16         A.   I wouldn't say that they are

17     monitoring, but --

18         Q.   Under this hypothetical.

19         A.   -- that they were looking at the

20     prescribing history that would have

21     included those labelers.

22             So it depends on the metric.

23     Some metrics look at -- some of the

24     metric -- or, I'm sorry.  Some of the

25     metrics, so if it's "common sense" or

Highly Confidential - Subject to Further Confidentiality Review

1

2    whatnot, they look at all of them together.

3    They're not really labeler by labeler

4    because it's the whole prescribing history

5    that matters.

6        Q.  Do you have any basis in the

7    evidence to say that Janssen was ever

8    monitoring for reporting purposes other

9    labelers' medications?

10        A.  That would be outside of my

11    expertise.

12        Q.  Is that a "no"?

13        A.  Again, it's just outside of my

14    expertise.

15        Q.  Well, my question is a little

16    different.

17        Do you have any basis in the

18    evidence to say that you know Janssen was

19    ever monitoring for reporting to law

20    enforcement purposes other labeler's

21    medications?

22        A.  So it's not as easy as a "yes" or

23    "no" because you're asking me to review

24    evidence that I wasn't asked to review.  So

25    I can't really make a statement here.

1

2          Q.   So you have not seen any evidence

3     that Janssen was reviewing for law

4     enforcement reporting purposes other

5     labeler's medications, correct?

6          A.   Again, I have not reviewed that.

7     That was not my expertise.

8          Q.   Do you have any basis to believe

9     that there is a duty under the Controlled

10    Substances Act for any manufacturer to

11    monitor other manufacturer's medications

12    for purposes of reporting to law

13    enforcement authorities?

14          MS. CONROY:  Objection.

15          A.   Again, that's outside of my

16    expertise.

17          Q.   And you've never seen any

18    evidence of that, right?

19          A.   Again, it's outside of my

20    expertise, so I wouldn't be looking at that

21    type of evidence.

22          Q.   But you haven't seen any of that

23    evidence, correct?

24          MS. CONROY:  Objection.

25          A.   Again, I wouldn't have been

1

2    looking for it.

3         Q.   Well, I guess I'm trying to

4    understand why this opinion exists if you

5    can't tell me that there is any evidence in

6    the record that it reflects things that

7    actually happened.

8         A.   I mean, it was a hypothetical

9    request by -- to me, and so that's what I

10   enacted.  I was asked to enact that.

11        Q.   Quickly, you said that your

12   opinion assumes that the doctor would stop

13   prescribing immediately upon being reported

14   to law enforcement, correct?

15             MS. CONROY:  Objection.

16        A.   I would say the assumption is

17   that they do not have any more

18   prescriptions.  However that comes to be

19   is...

20        Q.   But do you know how long

21   investigations into prescribers take?

22        A.   Outside of my expertise.

23        Q.   Well, if you look at page 40 of

24   your report, on paragraph 96, it's talking

25   about a prescriber named Ronald Celeste.

Highly Confidential - Subject to Further Confidentiality Review

1

2     And there was an "...uptick in

3     prescriptions caught the attention of the

4     authorities, who launched a two-year

5     investigation into his practice in 2014."

6            So you know here, in your report,

7     is that the investigation into Mr. Celeste

8     lasted two years, correct?

9     A.    That was what was reported in the

10    news.

11    Q.    And that's in your report, right?

12    A.    It is, but it's one

13    investigation.  I can't say what's typical

14    length of time for an investigation.  It's

15    outside of my expertise.

16    Q.    Yes or no, are you aware of any

17    instance ever in the real world where a

18    prescriber stopped prescribing the moment

19    that an investigation was opened into him

20    or her?

21           MS. CONROY:  Objection.

22    A.    I'm not really here to talk about

23    the real world.  It's outside of my

24    expertise, so I can't answer a "yes" or

25    "no" to that.

1

2          Q.   Well, that's not my question.

3     I'm asking you if are aware of any instance

4     in the real world where a prescriber ever

5     stopped prescribing the moment an

6     investigation was opened.

7          A.   Again outside of my expertise, so

8     I can't speak to something that I know or

9     don't know.

10         Q.   You don't know what you don't

11    know?

12         A.   Actually, I don't know what I

13    don't know?

14         Q.   I mean, I'm -- you're avoiding my

15    question because my question is pretty

16    simple.

17              It's are you aware of any

18    instance where a prescriber stopped

19    prescribing the minute that an

20    investigation was opened into his or her

21    prescribing practices?

22              MS. CONROY:  Objection.

23    BY MS. LUCAS:

24         Q.   Do you know of that, yes or no?

25         A.   I just am not going to answer a

Highly Confidential - Subject to Further Confidentiality Review

1

2     question about something that's not my area

3     of expertise.

4          Q.   Well, refusing to answer

5     something and not knowing are different

6     things.

7               Is it then correct that you don't

8     know of any instance where a prescriber

9     stopped prescribing the minute that an

10    investigation was opened into his or her

11    prescribing practices?

12         A.   Look, I haven't looked at that.

13    It's not part of my expertise.  I would not

14    know because it's not part of my expertise.

15         Q.   But you're offering an expert

16    opinion on this fact that assumes this.

17    And in order to offer this opinion, you

18    have to have some factual basis for it.

19               So do you have a factual basis

20    for this opinion or not?

21               MS. CONROY:  Objection.

22         A.   So what I'm offering is a

23    hypothetical scenario using the data that's

24    been provided to me.  I have no expertise

25    in the real world, due diligence, et

Highly Confidential - Subject to Further Confidentiality Review

1

2     cetera, that goes beyond that.  So there's

3     a set of assumptions that go into this and

4     that is all.

5          Q.   So in order for you to get on the

6     stand and testify about this opinion at

7     trial, you must identify a factual basis.

8               Can you do that today?

9               MS. CONROY:  Objection.

10         A.   I really don't know what will go

11    into that and so I can't answer that.

12         Q.   Is one of the other assumptions

13    in your small labeler impact analysis that

14    the patient who would have gotten the

15    prescription of the flagged doctor does not

16    go to another doctor and get that same

17    prescription?

18         A.   I wouldn't say that we talk about

19    anything about patients in this report.

20         Q.   You didn't consider that?

21         A.   That was not something I would

22    consider as part of this set of

23    assumptions.  The patients are not

24    considered in really anywhere in this

25    report.

Highly Confidential - Subject to Further Confidentiality Review

1

2      Q.   And you didn't consider also

3   whether or not whether the medical board

4   would revoke prescribing privileges

5   immediately, correct?

6      A.   Again, it was not part of the

7   assumptions yes or no.  It's just we had

8   too make the assumption -- to do the

9   analysis, you make the assumption that the

10   prescriber stopped prescribing.  The steps

11   between medical board, due diligence, et

12   cetera...

13      Q.   Right.  Because it doesn't work

14   unless you assume that the prescriber

15   stopped prescribing immediately, correct?

16      A.   I wouldn't characterize it as it

17   doesn't work.  It's just part of the

18   exercise.

19      Q.   Well, does it work if the

20   prescriber didn't stop prescribing

21   immediately?  Does the result stay the

22   same?

23      A.   So you could create a period of

24   which time -- you know, you could say give

25   them six months after which they were first

Highly Confidential - Subject to Further Confidentiality Review

1

2      flagged and implement that.  It's an

3      analysis.  How I complete the analysis can

4      work -- you can bake in any amount of time

5      you'd like, after which time they're first

6      flagged if that's --

7           Q.   But for this --

8           A.   -- part of this.

9           Q.   Sorry.

10          A.   Yes, but for this, that was not

11     part assumption.

12               MS. LUCAS:  I will reserve my

13          rights given the time constraints and

14          that I have a few more questions or

15          many more questions.  If I were given

16          the time, we could spend much more time

17          together, but subject to that

18          Reservation of Rights, we are done and

19          I will pass the witness.

20               Can we go off the record for just

21          a moment?

22               THE VIDEOGRAPHER:  The time is

23          3:42 p.m.  We are now off the record.

24               (Recess is taken.)

25               THE VIDEOGRAPHER:  The time is

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2              3:45 p.m.  We are back on the record.
 3      EXAMINATION BY
 4      MS. DEAN:
 5          Q.   Ms. Keller, my name is Claire
 6      Dean.  I'm with Covington & Burling, and
 7      I'm here on behalf of McKesson.
 8              Your time with me will be very
 9      brief.
10              So if we could turn to page 9 of
11      your report and to paragraph 22.  And just
12      let me know once you're there.
13              (Witness complies.)
14          A.   Sorry.
15          Q.   No problem.
16          A.   Here we are.
17          Q.   Okay.  So paragraph 22, first
18      sentence, "This report focuses specifically
19      and exclusively on manufacturers
20      anti-diversion and suspicious order
21      monitoring programs."
22              Did I read that correctly?
23          A.   You did.
24          Q.   And just to make sure I
25      understand what that means, to confirm, you
```

Highly Confidential - Subject to Further Confidentiality Review

1

2    are not offering any opinions about the

3    suspicious order monitoring programs of any

4    wholesale distributors, correct?

5         A.   Correct.

6         Q.   You also did not review or

7    analyze the suspicious order monitoring

8    programs of the wholesale distributors,

9    right?

10        A.   Correct.

11        Q.   And you're not offering any

12   opinions here today or in the future about

13   the anti-diversion efforts of any of the

14   wholesale distributors; is that right?

15        A.   Not to my knowledge.

16        Q.   And you also didn't undertake a

17   review or an analysis of the anti-diversion

18   efforts undertaken by any wholesale

19   distributor; is that right?

20        A.   Correct.

21        Q.   Now you offer no opinions about

22   whether or how the distributors may have

23   applied any of the compliance metrics

24   discussed in your report; is that right?

25        A.   That's correct.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   And you offer no opinions on what

3     categories of data any of the wholesale

4     distributors may have had access to between

5     1997 and 2017; is that right?

6          A.   That is correct.

7          Q.   You haven't reviewed any

8     communications between DEA and

9     distributors, right?

10         A.   That is correct.

11         Q.   And you offer no opinions about

12    whether the distributors could have even

13    applied any of the compliance metrics

14    outlined in your report; is that correct?

15         A.   That is correct.

16         Q.   And with respect to opinions on

17    suspicious order monitoring programs and

18    the anti-diversion efforts, you also offer

19    no opinions as to McKesson specifically; is

20    that correct?

21         A.   That is correct.

22         Q.   Now I'd like to turn to page 18

23    of your report, paragraph 57.

24              Now this is where you introduce

25    the McKesson 8,000 rule.

Highly Confidential - Subject to Further Confidentiality Review

1

2              Now you cite a single McKesson

3      document here.

4              You are not offering any opinions

5      about how McKesson may have applied its

6      lifestyle drug monitoring program; is that

7      right?

8          A.   Correct.

9          Q.   You're not offering any opinions

10     about how McKesson's lifestyle drug

11     management program was operated at

12     McKesson?

13         A.   That is correct.

14         Q.   You're not offering any opinions

15     about whether the lifestyle drug monitoring

16     program complied or did not comply with the

17     Controlled Substances Act; is that correct?

18         A.   That's correct.  Outside of my

19     expertise.

20         Q.   You're not offering any opinions

21     about what due diligence steps may have

22     been taken by McKesson personnel during the

23     lifestyle drug monitoring program, right?

24         A.   That is correct.  Outside of my

25     expertise.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   And you didn't undertake any

3     review or analysis to determine due

4     diligence steps that may have been taken by

5     McKesson under the lifestyle drug

6     monitoring program, right?

7          A.   That is correct.  Outside of my

8     expertise.

9          Q.   Now last couple of questions from

10    me and then we will move on to somebody

11    else.

12               I'd like to turn to page 79 of

13    your report, please.

14          A.   Sure.

15          Q.   And actually if you could turn

16    over to page 80, paragraph 151.

17               (Witness complies.)

18          Q.   In paragraph 151, you referenced

19    McKesson.  So I wanted to confirm that you

20    are not offering any opinions about

21    McKesson as it relates to the Rite Aid

22    pharmacy you're discussing in paragraph

23    151, correct?

24          A.   Correct.  I think all we're doing

25    is just citing that document there and the

Highly Confidential - Subject to Further Confidentiality Review

1

2    facts behind it.

3         Q.   But you're not offering any

4    opinions about McKesson's involvement with

5    that pharmacy or with Dr. Adolf Harper; is

6    that correct?

7         A.   Correct.  I would -- that's

8    outside of my expertise.

9         Q.   Okay.  And that's outside of the

10   scope of the opinion in the report and the

11   opinion you may intend to offer at trial;

12   is that right?

13        A.   I think that's a correct

14   characterization.

15        Q.   Okay.  And, sorry, I just want to

16   make sure I'm clear because I'm not

17   positive that he was included in this.

18            The same is true for Dr. Adolf

19   Harper, you're not offering any opinions

20   about McKesson as it relates to Dr. Adolf

21   Harper; is that right?

22        A.   Correct.

23        Q.   Now last questions.

24            Sitting here today, are you aware

25   of any future opinions you may be offering

Highly Confidential - Subject to Further Confidentiality Review

1

2      against McKesson?

3           A.   I mean, anything is possible, but

4      not right this second.

5           Q.   So as it stands today and as

6      outlined in your report, your opinions are

7      being offered exclusively against the

8      labeler defendants and no opinions

9      currently being offered against

10     distributors including McKesson; is that

11     right?

12          A.   Yes.  The report focuses solely

13     on labelers.

14               MS. DEAN:  Okay.  I don't have

15          any further questions, and I will pass

16          my time to someone else.

17               Thank you, Ms. Keller.

18               THE WITNESS:  Thanks, Ms. Dean.

19               THE VIDEOGRAPHER:  The time is

20          3:52 p.m.  We are now off the record.

21               (Recess is taken.)

22               THE VIDEOGRAPHER:  The time is

23          3:54 p.m.  We are now on the record.

24

25     EXAMINATION BY

1

2     MR. LAVELLE:

3         Q.   Good afternoon, Ms. Keller.  My

4     name is John Lavelle.  I'm an attorney at

5     Morgan Lewis, and I am representing

6     defendant Rite Aid of Maryland.

7              I'd like to ask you to turn to

8     your report, page 63.

9              (Witness complies.)

10        A.   I'm there.  Sorry.

11        Q.   Thank you.  That's fine.

12             So beginning in paragraph 127 of

13    your report, you start a discussion of what

14    you refer to as "suspicious pharmacies"; is

15    that right?

16        A.   Correct, we use that term.

17        Q.   Where does that term come from?

18    What do you mean by "suspicious

19    pharmacies"?

20        A.   So as we stated earlier on the

21    record today, it's those pharmacies that

22    triggered our metrics or the metrics that

23    we employed, I should be more correct to

24    say.

25        Q.   And you discuss in your report

1

2     six different pharmacies that you label as

3     suspicious pharmacies, right?

4          A.   They were six pharmacies that at

5     some point triggered one of the compliance

6     metrics.

7          Q.   How are these six pharmacies

8     selected?

9          A.   Some were selected because of

10    their size in the county.  Some were

11    selected because of the number of -- like I

12    think their prescriptions, so if they were

13    particularly high dose or not.  Others were

14    because they were known to the court.  And

15    others -- and I believe the Rite Aid, for

16    example, was because it was mentioned in

17    conjunction with Adolf Harper.

18         Q.   So I think you referred to three

19    different reasons there, if I got what you

20    just testified correctly.

21              You referred to some as being

22    selected because of their size in the

23    county, some because they were known to the

24    court, and then the Rite Aid because it was

25    mentioned in conjunction with Adolf Harper?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   And then probably a fourth, I

3    would add, of just unusual prescribing --

4    or, I'm sorry, we've been talking about

5    physicians all day.  Chargebacks or

6    purchases.  So if it's particularly high

7    dose or -- I don't really recall exactly

8    what reason went into each one, but that's

9    generally how examples come to me.

10         Q.   Who selected them?

11         A.   I did.

12         Q.   Anybody else involved in your

13    selection process?

14         A.   I think there was... I think the

15    New Choice Pharmacy was one that was either

16    known to the court or was requested of me.

17         Q.   When you say "known to the

18    court," can you tell us what you mean by

19    that?

20         A.   Yeah.  From what I understand or

21    what I recall is like there's documents

22    about Adolf Harper or some of the other

23    physicians in the report.  And so with the

24    pharmacies, I understood there to be

25    documentation about them as well.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   So anyone else at Gryphon

3     involved in the selection of these six

4     pharmacies other than yourself?

5          A.   My staff.

6          Q.   Anyone in particular assigned

7     with that task?

8          A.   I would say a group of them

9     worked on it just to determine, you know,

10    what would be a short list of good examples

11    to show in the report.

12         Q.   Were you asked by counsel to

13    identify any particular pharmacies?

14         A.   As a said earlier, I think New

15    Choice would have been one.

16         Q.   Were you -- how did you learn

17    about Dr. Harper?

18         A.   That's a good question.

19         Q.   I thought so.

20              (Laughter.)

21         A.   I honestly don't know if it was

22    from reading court documents or being in

23    the same office as some of the -- and I

24    don't want to get into privilege here, but

25    working in the same office as our

Highly Confidential - Subject to Further Confidentiality Review

1

2      investigative team.

3           Q.   Did you look at any other

4      pharmacies other than the six that you

5      discussed in this report?

6           A.   Definitely.

7           Q.   Were there any others that you

8      are prepared to offer opinions about if

9      you're called to testify at trial other

10     than these six pharmacies?

11          A.   So to be clear, I don't mean to

12     offer opinions about these pharmacies, just

13     how they appear in the data.

14               And, two, not at this time.

15          Q.   You're not a pharmacist, right?

16          A.   That is correct.

17          Q.   You have no expertise in

18     operations of pharmacies, right?

19          A.   That is correct.

20          Q.   As you sit here today, do you

21     have any plans to work on developing

22     opinions about pharmacies in the future?

23          A.   Not at this moment, no.

24          Q.   All right.  Let's turn to the

25     section of your report that discusses the

Highly Confidential - Subject to Further Confidentiality Review

1

2      Rite Aid store, which I believe you

3      referred to as flag pharmacy 6.  That

4      begins on page 79 of your report.

5           A.   I'm there.

6           Q.   All right.  This is a Rite Aid

7      store that is located at 1047 Kenmore

8      Boulevard in Akron, Ohio, right?

9           A.   I believe so.

10          Q.   Was there any reason other than

11     the fact that it was associated with

12     Dr. Harper, in your view, that it was

13     flagged for discussion in your report?

14          A.   I'd have to look at my notes to

15     be for certain.  There might be other

16     reasons, but I don't -- I can't recall them

17     right now.  But, again, it could have been

18     because of the number of prescriptions that

19     it was -- I'm sorry, the number of

20     shipments that it had at its -- I'm not

21     saying that correctly.  I'm sorry.  I've

22     been talking about prescriptions all day.

23     The number of chargebacks that it had or

24     the total number of shipments if we had

25     looked at, like, the ARCOS data, for

Highly Confidential - Subject to Further Confidentiality Review

1

2     example.

3          Q.   All right.  In paragraph 150,

4     which begins on page 79 and goes on to page

5     80, can you read the last sentence that

6     actually appears on page 80?  It starts

7     with the word "Mallinckrodt."

8          A.   "Mallinckrodt was the only

9     defendant labeler to identify the pharmacy

10    as suspicious, placing them on a 2016

11    cutoff pharmacy list."

12         Q.   What is your basis for saying

13    that?

14         A.   I believe there is a citation

15    there.

16         Q.   All right.  You have a citation

17    and a footnote to a particular document; is

18    that right?

19         A.   That's what I understand that to

20    be.

21         Q.   Do you remember what that

22    document is?

23         A.   It's characterized in the

24    paragraph as a "cutoff pharmacy list."

25         Q.   Do you know whose term "cutoff

Highly Confidential - Subject to Further Confidentiality Review

1

2    pharmacy" is?  Is that a Mallinckrodt term?

3        A.   If we're putting it in quotes, it

4    would be Mallinckrodt's, but I'd like to

5    review the document if we want to be

6    precise.

7        Q.   All right.  I think I have the

8    document and I can show it to you.

9             Generally speaking, do you recall

10   what that document was?

11       A.   I'd have to look at it to be

12   certain.

13            MR. LAVELLE:  All right.  Let me

14       mark this as an exhibit.

15            (Keller Exhibit 13, Document

16       produced in native format beginning

17       with Bates-stamp MNK-T1_0001315847,

18       marked for identification, as of this

19       date.)

20   BY MR. LAVELLE:

21       Q.   Ms. Keller, I've put in front of

22   you what we marked for Identification as

23   Exhibit 11.

24            I'll represent to you this is a

25   printout from a document that was produced

Highly Confidential - Subject to Further Confidentiality Review

1

2     in native format.  And the original, as I

3     understand it, is a spreadsheet.

4          A.   Okay.

5          Q.   I will also tell you that it is a

6     spreadsheet that has two tabs.  And I only

7     printed out one of the two tabs.

8          A.   Okay.

9          Q.   And the reason for that, I will

10    tell you, is the second tab has 160,000

11    fields on it and it would fill up hundreds

12    and hundreds of pages.

13              So looking at this tab, do you

14    recognize this document?

15         A.   Yes.  I mean, I don't remember it

16    exactly.  I looked at a lot of data sets

17    through this whole thing, so I can't really

18    recall exactly which ones look familiar and

19    which ones don't.

20         Q.   Do you know how a decision would

21    have been made by your team as to which of

22    the two tabs in a spreadsheet should be

23    used as the tab on which to run analysis?

24              MS. CONROY:  Objection.

25         A.   What's on the other tab?

 1

 2          Q.   All right.  So that's the tab

 3     that is a giant spreadsheet.  And although

 4     I ask the questions here, I will tell you

 5     that there were over 135,000 rows on that

 6     tab.

 7               As you are sitting here,

 8     Ms. Keller, do you believe there was over

 9     135,000 pharmacies on the Mallinckrodt list

10     of cutoff pharmacies?

11          A.   I wouldn't know.

12          Q.   You wouldn't know?

13          A.   I wouldn't know what they put

14     on -- let me say that a little bit -- I

15     wouldn't know exactly how -- to the extent

16     of how many pharmacies Mallinckrodt would

17     cut off or were put on a cutoff list.

18          Q.   Do you see the Rite Aid pharmacy

19     located at 1047 Kenmore Boulevard in Akron,

20     Ohio, on this list that I've put in front

21     of you that we marked as Exhibit 11?

22               MS. CONROY:  13.

23               MR. LAVELLE:  I'm sorry, 13.  My

24          apologies.

25               (Document review.)

1

2          A.   I don't see that pharmacy in

3     Exhibit 13, but I don't know what's on the

4     other tab or what the whole entire document

5     is.

6          Q.   So would you agree with me that

7     if this particular tab that we marked as

8     Exhibit 13 is in fact the cutoff pharmacy

9     list, that that Rite Aid pharmacy is not in

10    it?

11         A.   I would agree that -- and let me

12    do one more run-through to be sure.

13         Q.   Sure.

14              (Document review.)

15         A.   I would say that I do not see

16    Rite Aid in this Exhibit 13.

17         Q.   Have you ever heard of something

18    called a chargeback restriction

19    reinstatement list?

20         A.   No, I have not.

21         Q.   Have you ever seen the email to

22    which this document that we marked as

23    Exhibit 13, the spreadsheet, was attached?

24         A.   Not that I can recall sitting

25    here.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   All right.  Well, let's mark it

3     as an exhibit, and I'll show it to you and

4     you can tell us whether you've seen it

5     before or not.  Thank you.

6              (Keller Exhibit 14, Email chain

7              beginning with email dated 9/23/16 from

8              K. Harper to McKenzie, Bates-stamped

9              MNK-T1_0001315844 through 5846, marked

10             for identification, as of this date.)

11    BY MR. LAVELLE:

12         Q.   Ms. Keller, we've marked as

13    Exhibit 14, a document that's Bates-stamped

14    MNK-T1_0001315844 through 46.  It's an

15    email chain.  And I'll just note for the

16    record that it immediately precedes the

17    Bates number of the document we were

18    looking at just a moment ago which was

19    Exhibit 13.

20             So my question is:  Have you ever

21    seen this document, the one we marked as

22    Exhibit 14, before?

23         A.   This does not look familiar to

24    me.

25         Q.   All right.  Can we just look at

1

2      the second page of this document?  There is

3      an email there from a Karen Harper of

4      Mallinckrodt to Patrick Dudley of Cardinal

5      Health dated Wednesday, March 30, 2016, at

6      2:06 p.m.

7              Do you see that?

8         A.   I'm there, yes.

9         Q.   And the second paragraph,

10     Ms. Harper writes to Mr. Dudley, "For your

11     convenience, I have attached the current

12     spreadsheet of pharmacy chargeback

13     restrictions and reinstatements.

14     (Reinstatements highlighted in green.)"

15              Do you remember ever seeing that

16     before?

17        A.   I do not.

18        Q.   Do you know whether the pharmacy

19     chargeback restrictions and reinstatements

20     list is the list that you intended to refer

21     to as the pharmacy cutoff list in your

22     report?

23        A.   I really couldn't be sure without

24     consulting what we had.

25        Q.   What would you need to look at in

1

2      order to be able to answer that question?

3          A.   I would need to look at the

4      document as it was produced to us and how

5      it appeared.

6          Q.   And do you have notes as well

7      that you would be able to look at?

8          A.   I might.

9          Q.   What kind of notes might you

10     have?

11         A.   They might be notes to myself or

12     notes by my staff.

13         Q.   Now you make this same statement

14     about Mallinckrodt being the only defendant

15     labeler to identify a pharmacy as

16     suspicious putting them on the cutoff

17     pharmacy list with respect to each and

18     every one of these six pharmacies, don't

19     you?

20         A.   I'd have to look.

21         Q.   Well, let's start by looking at

22     paragraph 128 on page 63 of your report.

23     That's the section that refers to the

24     Marc's 23PU pharmacy.

25              (Document review.)

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   Okay.

3          Q.   Do you have that in front of you?

4          A.   I do.  Thank you.

5               (Document review.)

6          A.   Yes, I see that.  Same citation.

7          Q.   And you cite the same document

8     again, right?

9          A.   Yes.

10          Q.   The Marc's 23PU pharmacy isn't in

11     that spreadsheet either, is it?

12          A.   It's not in an exhibit -- I have

13     to look, but it's not in Exhibit 13.

14          Q.   Right.

15          A.   Again, there is a second tab, and

16     I'd have to look at the entire document to

17     be certain.

18          Q.   Turn to paragraph 120 -- I'm

19     sorry, page -- the CVS section here.

20     Paragraph 133 on page 67.

21          A.   Okay.

22          Q.   Again you have that same

23     sentence, do you not, "Mallinckrodt was the

24     only defendant labeler to identify the

25     pharmacy as suspicious, placing them on a

1

2      2016 cutoff pharmacy list," right?

3           A.   Again, the same citation.

4           Q.   And the same citation and the

5      same document?

6           A.   Correct.

7           Q.   All right.  We can go through

8      this process for each of them, but suffice

9      it to say that none of these six pharmacies

10     appear on what we marked as Exhibit 13.

11               So does that suggest to you that

12     you relied on the second tab of whatever

13     that document is?

14          A.   If Exhibit 13 is the first tab

15     and the pharmacies are in the second tab,

16     then logic would be yes.

17          Q.   All right.  And if it turned out

18     that tab 2 was not the cutoff pharmacy list

19     but in fact was a listing of every pharmacy

20     in the United States, that would have been

21     a mistake, right?

22          A.   I'd have the review that to be

23     sure.

24          Q.   You don't have a view as we sit

25     here today as whether or not a tab that had

Highly Confidential - Subject to Further Confidentiality Review

1

2     over 135,000 rows in a spreadsheet could

3     possibly be a cutoff pharmacy list?

4               MS. CONROY:  Objection.

5          A.   Again, I'm not here to talk about

6     what actually was suspicious or not

7     suspicious from the labelers' perspective.

8     So that's outside of my expertise.  I

9     wouldn't have known what would have been a

10    reasonable amount.

11         Q.   All right.  Coming back to the

12    discussion of that Rite Aid pharmacy on

13    page 80, paragraph 151, and I think you

14    said this earlier, that you viewed this as

15    connected to Dr. Harper, this Rite Aid,

16    correct?

17         A.   Yes, I believe there was some

18    documents there that discussed that

19    Rite Aid in connection with Dr. Harper.

20         Q.   Yes.

21              Do you remember what those

22    documents were?  You cite two documents in

23    your footnote there at the bottom of page

24    80.

25         A.   I don't recall them off the top

Highly Confidential - Subject to Further Confidentiality Review

1
2       of my head.
3            Q.   Do you have any recollection of
4       what they were at all?  Were they emails?
5       Were they spreadsheets?  What were they?
6            A.   I'd have to look to be certain.
7            Q.   All right.  You don't have any
8       recollection at all even if --
9            A.   I'm sorry, there's like hundreds
10      of cites and hundreds of thousands of rows
11      of data.
12           Q.   All right.  Well, let me mark
13      that as the next exhibit, next two
14      exhibits, and we can look at them together?
15                (Keller Exhibit 15, Email chain
16                beginning with email dated 10/31/11
17                from Oriente to Nichols, Bates-stamped
18                MCKMMDL006332908 through 2910, marked
19                for identification, as of this date.)
20      BY MR. LAVELLE:
21           Q.   And so Ms. Keller, we marked as
22      Exhibit 15 the document that's
23      Bates-stamped MCKMDL00632908 through 10,
24      which I think is the first document you
25      reference in this footnote; is that right?

1

2          A.    That looks correct.

3          Q.    Do you recognize this document?

4          A.    Yes.

5          Q.    How did you find this document?

6          A.    I don't recall.

7          Q.    Did someone give it to you?

8          A.    I don't recall.  I really don't.

9          Q.    Did you do searches for records

10    through documents in the process of

11    preparing your report?

12         A.    We did.

13         Q.    You say in this report that this

14    ███████████████████████████████████

   ██  ██████████████████████████████████████

   ██  ████████████████████████████████

   ██  ███████████████████████████

18              Do you remember saying that in

19    your report?

20         A.    I'm looking at that statement

21    here.

22         Q.    Right.

23              Who denied that request?

   ██       ██    ████████████████████████

   ██    ████████████████████████████████

Highly Confidential - Subject to Further Confidentiality Review



1

2

3          Q.   All right.  Well, let's take a

4     look at this document that we have in front

5     of you.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   Okay.  That's okay.  I have it

3     here.  I will show it to you now.

4               (Keller Exhibit 16, Email chain

5          beginning with email dated 10/31/11

6          from Lai to Oriente and others,

7          Bates-stamped MCKMDL00626683 through

8          6685, marked for identification, as of

9          this date.)

10    BY MR. LAVELLE:

11         Q.   Ms. Keller, we marked as

12    Exhibit 16, a document Bates-stamped

13    MCKMDL00626683 through 5.

14         A.   Okay.

15         Q.   Would you agree with me that's

16    the second document that's referenced in

17    that footnote of yours?

18         A.   That is what we cite, yes.

19         Q.   █████████    ████████████

██    █████████████    █████████████

██    ██████████████████

██    ████████████████████████

██    ████████████████████████

██    ████████████████

██    █████████

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

████   ████████████████████████████   ████████████

████   ██████████████████████████████

4          Q.   Okay.  You reference also the

5     deposition of Sophia Lai Novack in that

6     same footnote, right?

7          A.   I do.

8          Q.   Did you read that?

9          A.   You'd have to refresh my memory.

10    I read or skimmed a lot of depositions.

11         Q.   Do you remember as you sit here

12    today whether Ms. Novack was actually shown

13    a copy of either of those documents?

14         A.   That, I don't know.

15         Q.   How did you pick Ms. Novak's

16    deposition to cite here?

17         A.   I don't recall specifically, but

18    I -- it might have been suggested to me.

19         Q.   By whom?

20         A.   An attorney.

21         Q.   Ms. Singer, perhaps?

22         A.   That, I don't recall.

23         Q.   If it wasn't Ms. Singer, who else

24    could it have been?

25         A.   I don't remember all the

1

2      attorneys.  I worked with several, so I

3      don't recall the names, but I could look.

4          Q.   Were you given access to a

5      database of depositions?

6          A.   If they were in Relativity, then

7      yes.

8          Q.   Do you remember as you sit here

9      whether you were given access to

10     depositions as part of that Relativity

11     database or not?

12         A.   I definitely know I searched for

13     some of the depositions somewhere that were

14     in here.

15         Q.   With respect to Dr. Harper, you

16     described that he surrendered his license

17     in May of 2012, right?  I think you say

18     that in paragraph 104 of this report on

19     page 46.

20         A.   Sorry, say again.  What

21     paragraph?

22         Q.   Paragraph 104, which is on page

23     46.

24         A.   Thank you.

25              (Document review.)

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.    Correct.

3          Q.    And you also say that he pled

4    guilty to drug-trafficking charges in 2014.

5    You say that in paragraph 105.

6          A.    That appears to be so.

7          Q.    Where did you get that

8    information?

9          A.    That must be from the press

10   release that we read online.

11         Q.    Are you aware that the

12   deposition's been taken in this place of

13   the detective who was the lead investigator

14   on Dr. Harper's investigation?

15         A.    Am I aware that there have been

16   depositions taken?  No.

17         Q.    Have you ever heard of the name

18   Detective Patrick Leonard?

19         A.    No.

20         Q.    Are you aware that he was the

21   lead detective on the Harper investigation?

22         A.    No.

23         Q.    Are you aware that his deposition

24   was taken in this case?

25         A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   Are you aware that he testified

3      that he was given a tip by a pharmacist

4      working at the Rite Aid pharmacy on Kenmore

5      Avenue in Akron over a year before

6      Dr. Harper had to surrender his license?

7      Were you aware of that?

8          A.   As I said, I didn't read the

9      deposition, so I wouldn't be aware of

10     anything that was in it.

11         Q.   Were you aware that tips were

12     provided to law enforcement officials by

13     other pharmacies in addition to that

14     Rite Aid pharmacy that you flagged in this

15     report?

16         A.   No, that would be outside of my

17     expertise.  And, again, I didn't read his

18     deposition, so I wouldn't know.

19         Q.   So no one told you, for example,

20     that CVS also flagged Dr. Harper over a

21     year before his license was revoked?

22         A.   I was not told that, no.

23         Q.   Did anyone tell you that

24     Walgreens also flagged Dr. Harper and

25     complained about him to law enforcement

1

2      over a year before his license was revoked?

3            A.   No, again outside of what I would

4      have been told or looked at in this report.

5            Q.   Did anyone tell you that Giant

6      Eagle, a supermarket chain which operates

7      pharmacies, also complained about

8      Dr. Harper to local law enforcement

9      officials over a year before his license

10     was revoked?

11           A.   No, as it was outside of the

12     scope of this report.

13           Q.   And I suppose no one told you

14     that another local pharmacy, Ritzman

15     Pharmacy, also complained about Dr. Harper

16     to local law enforcement officials over a

17     year before his license was revoked?

18           A.   Same answer.  Again, it would be

19     outside of the scope, so I was not told

20     that, no.

21           Q.   So when you say in your report

22     that this Rite Aid pharmacy was associated

23     with Dr. Harper, you're not referring to

24     the fact that this Rite Aid pharmacy

25     provided a tip to local law enforcement

Highly Confidential - Subject to Further Confidentiality Review

1

2      officials that were actually important in

3      starting the investigation against him; is

4      that right?

5              MS. CONROY:  Objection.

6          A.   So when I say this Rite Aid was

7      associated, you know, it's the documents

8      that we cite there.  Again, as far as what

9      was actually done by labelers or pharmacies

10      in the course of actual due diligence or on

11      the ground, as we were saying earlier in

12      the day, enforcement actions, that would be

13      outside of the scope of my expertise or

14      report.

15          Q.   It's outside of your expertise.

16      It's also outside of your knowledge, right?

17          A.   I think that would be correct to

18      say, that I... I think that would be

19      correct to say.

20          Q.   Thank you, Ms. Keller.  That is

21      all I have.

22          A.   Thank you.

23              THE VIDEOGRAPHER:  The time is

24      4:27 p.m.  We are off the record.

25              (Recess is taken.)

Highly Confidential - Subject to Further Confidentiality Review

1

2          THE VIDEOGRAPHER:  The time is

3     4:42 p.m.  We are back on the record.

4     EXAMINATION BY

5     MS. O'GORMAN:

6          Q.   Good afternoon, Ms. Keller.  My

7     name is Debra O'Gorman.  I represent Purdue

8     defendants, and I have just a few questions

9     for you this afternoon.

10          If you could take a look at

11     Exhibit 5, your expert report, page 89.

12     And I'll refer you to the references to 867

13     data.

14          A.   I'm there.

15          Q.   And you said you had 867 data

16     only for Purdue; is that correct?

17          A.   Correct.

18          Q.   And what is 867 data?

19          A.   I think we addressed this earlier

20     today, and it's my intention to state the

21     same answer.  But I understand it to be

22     data that labelers have that tracks the,

23     their products.

24          Q.   Do you recall the time period

25     covered by Purdue's 867 data?

Highly Confidential - Subject to Further Confidentiality Review

1

2      A.   Yes.  I would have that here.

3           On page 59, table 34, after

4      processing, that would be from 2009 to

5      2018.  That was the data that was provided

6      to me.

7      Q.   And you mentioned in your report

8      that you had 3,572 files of 867 data.

9           Do you recall that?

10     A.   Yes.  I'd have to go back to the

11     methodology, but I believe it was produced

12     in more than 3,000 files.

13     Q.   And what did you do, if anything,

14     to combine those files?

15     A.   Sure.

16          So you can see on page 90,

17     paragraph Z, we had 3,572 files of five

18     different schemas.  So they were all

19     without column headers, from what I

20     understand, but I could be wrong in stating

21     that because it doesn't -- I'm sorry, one

22     of them did not have a schema, but they had

23     different schema lengths, and so those were

24     then appended to one another based off of

25     the columns in common.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   So you combined those files and

3     then used that to run your analysis?

4          A.   That's correct.

5          Q.   Okay.  If I can refer you to page

6     20 of your expert report, you reference

7     there certain Purdue algorithms.

8          A.   Correct.

9          Q.   And what is algorithm?

10         A.   It can mean anything to anybody,

11    to be honest.  The term has been somewhat

12    polluted recently to mean anything.  A lot

13    of companies like to say they have this

14    fancy algorithm to predict X, Y and Z, but

15    as far as this, we interpreted an algorithm

16    to mean an operating procedure or something

17    that was documented as to be done by the

18    labeler.

19         Q.   And what, if anything, did you do

20    to try to replicate Purdue's algorithms for

21    your report?

22         A.   Those would be in the addendum.

23         Q.   So for your initial report, you

24    didn't do anything to replicate Purdue's

25    algorithms?

1

2          A.    Correct.  I think the one that we

3     mention here, there was not enough

4     information to be able to implement it

5     accurately, but we do in the addendum.

6          Q.    Okay.  And in the addendum, you

7     add five metrics that you obtained from

8     Purdue documents; is that correct?

9          A.    Without counting them, but, yes,

10    we implement a number of --

11         Q.    And those are on pages 26 and 30

12    of your supplemental report, correct?

13         A.    Yes.  I see one, two that were

14    manufactured to prescriber.  And then one,

15    two, three that were manufactured to

16    pharmacy metrics.

17         Q.    Do you recall if these metrics

18    were identified by you or somebody on your

19    team?

20         A.    They were identified by me or

21    somebody on my team.

22         Q.    And do you know how they were

23    identified?

24         A.    I believe one I found out after

25    filing the report because I was reading a

Highly Confidential - Subject to Further Confidentiality Review

1

2     different deposition that -- or document

3     that referenced a set of the metrics.

4             And then in looking for a

5     definition of chargeback, we found the

6     other metrics.

7         Q.   Okay.

8             MS. O'GORMAN:  Can you mark this

9         as the next exhibit.

10            (Keller Exhibit 17, Purdue Pharma

11        L.P. document Bates-stamped

12        PDD1503450011 through 0024, marked for

13        identification, as of this date.)

14    BY MS. O'GORMAN:

15        Q.   We marked as Exhibit 17 a

16    document Bates-stamped PDD1503450011.

17            Is this one of the documents that

18    you used to identify Purdue metrics?

19        A.   Let me be for certain.

20        Q.   I believe it's referenced on page

21    26 of your expert report in one of the

22    footnotes, although you use the Bates

23    number ending in 12, which is the second

24    page of the document.

25        A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   Was this document available to

3     you at the time you prepared your initial

4     report?

5          A.   If it was cited in the report,

6     then it was.  But as I said earlier in my

7     testimony, that I believe we received the

8     document a little bit too soon to filing to

9     be able to implement these metrics.

10         Q.   And it looks like numbers 2 and 4

11    on page that ends in 12 of this report were

12    implemented by you in your addendum as

13    Purdue metrics; is that right?

14         A.   Correct.

15         Q.   And you did not apply the other

16    criteria identified in this document,

17    correct?

18              MS. CONROY:  Objection.

19         A.   So, for example, the cash

20    prescriptions, I don't --

21              (Interruption.)

22              THE VIDEOGRAPHER:  The time is

23    4:48 p.m.  We are now off the record.

24              (Recess is taken.)

25              THE VIDEOGRAPHER:  The time is

Highly Confidential - Subject to Further Confidentiality Review

1

2          4:50 p.m.  We are back on the record.

3     BY MS. O'GORMAN:

4          Q.   So before we had an unintended

5     break, you were telling me about or I asked

6     you about the application of other criteria

7     in this Purdue document.

8          A.   Yes.

9               So as far as implementing other

10    or speaking about other SOMS programs, no,

11    that would be outside of expertise.

12              But as you can see on the

13    document, there could be considered a

14    metric on point 3 where it talks about cash

15    prescriptions as an example.

16              I was not provided with data

17    about the number of cash prescriptions as

18    part of total prescriptions.  I didn't have

19    that type of data.  And I think I even note

20    that in my limitations.

21         Q.   Okay.  And you see that the

22    numbers 3, 4, 5, and 6 on this document are

23    various steps that would be taken.

24              Do you see those there?

25         A.   Sure.  I see those steps.  Sorry.

Highly Confidential - Subject to Further Confidentiality Review

1

2      I didn't mean to be flippant.

3          Q.   And do you know whether any

4      action was taken in conforming with those

5      steps in connection with any orders that

6      you flagged under this metric?

7          A.   That would be outside of the, my

8      expertise.

9               (Keller Exhibit 18, Document

10              produced natively, Bates-stamped

11              PPLP004449246, marked for

12              identification, as of this date.)

13     BY MS. O'GORMAN:

14         Q.   We marked as Exhibit 18 a

15     document numbered PPLP004449246.

16              Do you recognize this document as

17     one from which you obtained Purdue metrics?

18         A.   I do.  I found it.

19         Q.   And on the fifth page of that

20     document, there is a list of additional

21     metrics to identify pharmacies for review.

22              Do you see that there on the

23     bottom page?

24         A.   Yes.

25         Q.   And is this where you obtained

Highly Confidential - Subject to Further Confidentiality Review

1

2      the Purdue metrics that you've included in

3      your supplemental addendum?

4              A.    Yes.   I think the ones that we

5      implement are from that 2010 to 2012 period

6      because those are the ones that we felt

7      that we could, we had enough information

8      to -- hang on to make sure.

9                   (Document review.)

10             Q.    I believe it's in the 2012 to

11     2015 -- ^ ck speaker

12             A.    That's --

13             Q.    -- time period?

14             A.    I misspoke when I said 2010 to

15     2012.  Her correction of 2012 to 2015.

16             Q.    And how did you come to select

17     these metrics?

18             A.    So as we went through, if there

19     was something that we felt that could

20     create a flag or a metric, then we could.

21     And so these specifically say metric No. 1,

22     metric No. 2 and metric No. 3, so that is

23     why we chose those.

24             Q.    And these are listed here as

25     additional metrics.

Highly Confidential - Subject to Further Confidentiality Review

1

2             Do you see that in the title?

3        A.    Yes.

4        Q.    Does that suggest to you that

5    these are in addition to other metrics that

6    were being applied?

7        A.    I don't really know what else --

8    I don't really understand or really weighed

9    the considerations of the other documents.

10   I just saw some metrics that I attempted to

11   implement here.

12       Q.    And do you see that these metrics

13   require or contemplate that there will be a

14   review when metrics might be triggered, the

15   last two bullet points under that same

16   section?

17       A.    I do see those statements on this

18   document.

19       Q.    And you have no knowledge of any

20   review that would have been done by Purdue

21   in connection with any orders that might

22   have been flagged under your application of

23   the metrics; is that correct?

24       A.    Correct.  I would not speak to

25   the actual on-the-ground due diligence or

Highly Confidential - Subject to Further Confidentiality Review

1

2      what was done in real life.

3           Q.   And am I also correct that you're

4      not suggesting that the DEA required any of

5      these metrics that you've identified?

6                MS. CONROY:  Objection.

7           A.   Correct.  That would be outside

8      of my expertise.

9           Q.   And you're not offering an

10     opinion on the real-world results or the

11     application of any of these metrics; is

12     that correct?

13          A.   That would be correct.

14          Q.   Now we've talked earlier at your

15     deposition about the IQVIA data set that

16     you utilized for your review.

17               Do you recall that testimony?

18          A.   Yes, I remember speaking about

19     IQVIA.

20          Q.   And that was the Allergan data

21     set that you reviewed, correct?

22          A.   Correct.

23          Q.   Do you have any familiarity with

24     what information Purdue received from IQVIA

25     or IMS at any point in time?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   I did review some documents.

3          Q.   And what do you recall about

4     those documents?

5          A.   So I have, in my other reliance

6     materials that I brought with me this

7     morning, documents that cite Purdue's

8     purchases of IQVIA data from several years

9     over the past, at least into the '90s.  I

10    don't remember at what point those start.

11         Q.   Do you know what data

12    specifically Purdue purchased from IQVIA

13    for particular years?

14         A.   Xponent.

15         Q.   Do you know whether Purdue

16    received information related to all opioids

17    or only its own products at any given point

18    in time?

19         A.   I'd have to consult the document

20    to be certain.

21         Q.   Do you have any expertise in

22    pharmaceutical marketing?

23         A.   I do not.

24         Q.   Have you ever worked for a

25    pharmaceutical company?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   I have not.

3          Q.   Have you ever been present for a

4     sales call by a pharmaceutical

5     representative?

6          A.   No.

7          Q.   Do you have any expertise in the

8     purpose for which sales calls are made?

9          A.   I do not.

10         Q.   Is it correct, then, that you

11    have no familiarity with the educational

12    component of sales calls by pharmaceutical

13    representatives?

14         A.   That would be outside of my

15    expertise.

16         Q.   Have you ever reviewed call notes

17    for a pharmaceutical company?

18         A.   I have.

19              MS. CONROY:  In any --

20              THE WITNESS:  Oh, sorry.

21              MS. CONROY:  In any litigation?

22              MS. O'GORMAN:  Ever.

23              MS. CONROY:  Yeah, okay.

24    BY MS. O'GORMAN:

25         Q.   In what situation have you

1

2      reviewed call notes?

3          A.   So I think we cite to a few call

4      notes in this document.

5          Q.   And do you consider yourself to

6      have any expertise in the interpretation of

7      call notes?

8          A.   No.

9          Q.   Have you reviewed any of the

10     other expert -- any of the defense expert

11     reports that have been submitted in this

12     matter?

13         A.   Yes.

14         Q.   Do you know which ones you

15     reviewed?

16         A.   Bell, Buthusiem, I might be

17     saying it wrong, to be honest with you.  We

18     already talked about that.

19         Q.   Any others?

20         A.   That is all.

21         Q.   Do you recall reading a report by

22     Iain Cockburn?

23         A.   No.

24         Q.   If you can take a look at your

25     initial expert report, page 16, tables 1

Highly Confidential - Subject to Further Confidentiality Review

1

2     and 2.

3          A.   Sure.  I am there.

4          Q.   And what was Purdue's market

5     share in the relevant counties by

6     prescription as listed in tables 1 and 2?

7          A.   3.3 in table 1 in terms of total

8     county percentage and 3.7 -- for Summit

9     County, I should say.  And 3.7 for

10    prescriptions in Cuyahoga County.

11         Q.   Is that information that you

12    calculated?

13         A.   That would be through a SQL

14    script, yes.

15              MS. O'GORMAN:  I have no further

16         questions.  Thank you.

17              THE VIDEOGRAPHER:  The time is

18         4:59 p.m.  We are now off the record.

19              (Recess is taken.)

20              THE VIDEOGRAPHER:  The time is

21         5:00 p.m.  We are now back on the

22         record.

23    FURTHER EXAMINATION BY

24    MS. LEVY:

25         Q.   Ms. Keller, I am Jenny Levy

Highly Confidential - Subject to Further Confidentiality Review

1

2      again.  I have what I think should be a

3      really quick follow-up question based on

4      your responses to the questioning by the

5      last three lawyers who have been

6      questioning you.

7                A couple times in your answer you

8      keep referring to the Allergan data.

9                Do you remember the answers that

10     I'm referring to?

11          A.   Yes, I think so.

12          Q.   And when you refer to the

13     Allergan data, you're referring to the body

14     of data from IQVIA XPONENT database,

15     correct?

16          A.   That's correct.  It's actually

17     cited in this exhibit that you just handed

18     me, I believe.

19          Q.   A couple of your answers make it

20     seem to me as if you are under the

21     impression that Allergan, the business, has

22     always had that data.

23                Is that the impression that

24     you're under?

25          A.   That, I wouldn't know for

Highly Confidential - Subject to Further Confidentiality Review

1

2      certain, but they did produce data for the

3      entire time period '97 and 2017.

4              (Keller Exhibit 19, Letter on

5          Kirkland & Ellis letterhead dated

6          8/31/18 from Welch to Donna Welch to

7          the Plaintiffs' Executive Committee,

8          not Bates-stamped, marked for

9          identification, as of this date.)

10     BY MS. LEVY:

11         Q.   Okay.  I'm going to show you what

12     has been marked as Exhibit 19.  We just put

13     that in front of you.

14         A.   Thank you.

15         Q.   I assume that you have not seen

16     this document before right now.

17              Am I right about that?

18         A.   That is correct.

19         Q.   Okay.  This is a document from --

20     on Kirkland & Ellis letterhead.  That is --

21     I'll represent to you that is the law firm

22     we're in right now.  It's my law firm.  And

23     this is a letter from my partner Donna

24     Welch to the Plaintiffs' Executive

25     Committee.

Highly Confidential - Subject to Further Confidentiality Review

1

2              Do you see that?

3         A.   I do see that.

4         Q.   And do you know what the

5    Plaintiff's Executive Committee is?

6         A.   I do not know what that is.

7         Q.   Okay.  And you look at the second

8    page of Exhibit 19 on the back, when you

9    see the list of the cc's on this

10   document --

11             (Document review.)

12        Q.   -- and you see in that list of

13   cc's you see among other lawyers, Linda

14   Singer's name, second to the last?

15        A.   I do.

16        Q.   Do you recognize any of the other

17   lawyers on that cc list?

18        A.   Tom Egler.

19        Q.   Is he one of the lawyers that you

20   interacted with in preparation with your

21   opinions in this case?

22        A.   Not particularly, no.

23        Q.   How do you recognize that name

24   then?

25        A.   He was the one that I remembered

1

2     knowing to ask -- or his name came up, I

3     guess is more correct to say, in getting

4     the IQVIA data.

5         Q.   So if you turn back over to the

6     front page of Exhibit 19, in the second

7     bolded section that's labeled "IQVIA Data,"

8     are you with me?

9         A.   I'm there.

10        Q.   In that paragraph it says, "On

11    August 10th, 2018, Allergan Finance

12    produced data from IQVIA's XPONENT and

13    XPONENT PLANTRAK products related to

14    prescriptions of opioids from 1997 to the

15    present."

16             And there is a cite there that

17    says, "See Allergan MDL02485011."

18             Do you see that?

19        A.   I do.

20        Q.   If you turn in your report to

21    page 28 and you look at footnote 81, that's

22    the same data set that you cite in your

23    report as the Allergan data, correct?

24        A.   Give me one second.  Sorry.

25             (Document review.)

Highly Confidential - Subject to Further Confidentiality Review

```
1

2          A.   That is correct.

3          Q.   Okay.  And then this letter goes

4    on to say, "As stated in the statement of

5    work we are producing today, this data was

6    purchased by Allergan for the first time on

7    May 15th, 2018.  Allergan Finance and its

8    predecessor companies did not have this

9    data prior to the purchase."

10              Do you see that?

11         A.   I do.

12         Q.   Did any of the lawyers that you

13   worked with in this case tell you that

14   Allergan did not in fact have this data

15   prior to the purchase?

16         A.   It was not made aware to me that

17   they had purchased the data for this, as

18   it's stated here.

19         Q.   And my question is slightly

20   different.

21              Did any of the lawyers in this

22   case tell you that Allergan did not have it

23   prior to the purchase?

24         A.   No, that was not told to me that

25   Allergan did not have access to the data
```

Highly Confidential - Subject to Further Confidentiality Review

1

2      prior to the purchase.

3            MS. LEVY:  I'm going to pass you

4         along to someone else.  Thank you.

5            THE WITNESS:  Thank you.

6            THE VIDEOGRAPHER:  The time is

7         5:05 p.m.  We are going off the record.

8            (Recess is taken.)

9            THE VIDEOGRAPHER:  The time is

10        5:07 p.m.  We are on the record.

11     EXAMINATION BY

12     MR. HAMMOUD:

13        Q.   Good afternoon, Ms. Keller.  My

14     name is Adam Hammoud.  I'm an attorney from

15     Morgan Lewis, and I represent Teva

16     Pharmaceuticals USA Inc., Cephalon, Inc.

17     and Actavis, LLC, which I will collectively

18     refer to as the Teva defendants, if that's

19     all right.

20        A.   Great to meet you.

21        Q.   Good to meet you.

22             Could you explain what national

23     drug codes are?

24        A.   Sure.

25             A National Drug Code is an NDC.

Highly Confidential - Subject to Further Confidentiality Review

1

2    I think somewhere in one of my reliance

3    materials, it breaks down what the

4    components of an NDC are, the first few

5    being an identifier for the labeler and the

6    rest about the package.

7        Q.   Okay.  And you talked about this

8    a little bit earlier, but can you explain

9    the process that you followed for assigning

10   national drug codes to specific labelers?

11       A.   Sure.

12            So the first few digits, I can't

13   remember if it's four or five, I would have

14   to look at the breakdown of it, is for the

15   labeler itself.

16            And I don't recall for this

17   particular litigation -- or for this

18   particular assignment needing to assign

19   labelers to NDC codes, because they either

20   came to me through the ARCOS data or they

21   were through the IQVIA processing file.

22       Q.   And so your testimony is you

23   either retrieved the national drug codes

24   and assigned them to labelers based on what

25   was available to you in the ARCOS data or

Highly Confidential - Subject to Further Confidentiality Review

1

2    the IQVIA data; is that correct?

3        A.    Sorry.  Let me state that more

4    clearly.

5            The ARCOS data as it came to me

6    for this report was processed by McCann.

7    And McCann, I believe, already had taken

8    those steps.  So to the extent that he had

9    done that, that was done.

10       Q.   And so you're relying on some of

11   the work that McCann performed on the ARCOS

12   data, correct?

13       A.    That would be correct.

14       Q.   Okay.  And how did you account

15   for any changes in the NDC or the National

16   Drug Code ownership by the labelers that

17   resulted from, for example, acquisitions

18   among the labelers?

19       A.    Sure.  I think we discussed this

20   a little bit earlier.

21           So, for example, the ARCOS file,

22   I think the -- and I'm guessing at how

23   McCann processed it, so you would have to

24   take his testimony and his methodology as

25   how he actually did it.  But if I were him,

1

2      what you would do is take the NDC labeler

3      file from the FDA and then match it based

4      off of the first four.  And so that data

5      set is available at a snapshot in time.

6              And then for the IQVIA data, that

7      came with a processing file, so it has

8      nothing to do with NDCs, but the IQVIA

9      unique identifier for each drug and then

10     match those across.

11         Q.   Okay.  And if you turn to page 85

12     of your report.

13              (Witness complies.)

14         Q.   You can turn to page 87.  And

15     look at table 77 for me.

16              In table 77, you identify Actavis

17     Pharma, Inc., Allergan, Inc., Cephalon,

18     Inc. and Watson Pharma, Inc. as part of the

19     labeler named group under Teva; is that

20     correct?

21         A.   Are we looking at table 77?

22         Q.   Yes.

23         A.   So I see Allergan, Teva, and Teva

24     and another Teva.

25         Q.   So you see Allergan, Teva CNS,

1

2      Teva Parenteral and Med and Teva

3      Pharmaceuticals assigned to Teva, correct?

4           A.   I do see that.

5           Q.   And then if you turn back to page

6      85 briefly, here is where you see Teva as

7      the labeler named group for Teva

8      Pharmaceuticals USA, Actavis Pharma, Inc.,

9      Allergan, Inc., Cephalon, Inc. and Watson

10     Pharma, Inc.; is that correct?

11          A.   That is correct.

12          Q.   Does that mean that all the NDCs,

13     the national drug codes assigned to Teva

14     Pharmaceuticals USA, Inc., Actavis Pharma,

15     Inc., Allergan, Inc., Cephalon, Inc.,

16     Watson Pharma, Inc. in that table and in

17     your analysis were included in the

18     transactions that were flagged for Teva's

19     products?

20          A.   Correct.  All of the products

21     underneath each one of these, so Teva,

22     Actavis, Allergan, Cephalon, and Watson

23     were all grouped under Teva.

24          Q.   And was that for all points in

25     time?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   Yes.

3          Q.   All right.  And if you turn

4     briefly to page 28, footnote 79, here in

5     this footnote, it says, "Teva acquired the

6     Actavis/Watson generic pharmaceutical

7     business from Allergan in 2016, and those

8     entities are currently operating under the

9     Teva SOMS system.  Prior to 2016, the

10    Actavis/Watson operated under Allergan's

11    SOMS system."

12              Did I read that correctly?

13         A.   You did.

14         Q.   And is that your testimony today,

15    do you believe that to be truthful that,

16    excuse me, that Teva acquired the Actavis

17    and Watson generic pharmaceutical business

18    from Allergan in 2016?

19         A.   As it states in my report, yes.

20         Q.   What I'm trying to understand is

21    where you got the -- what support you have

22    that Teva acquired Allergan, Inc.

23         A.   What support I have that Teva

24    acquired Allergan?

25              I think as we were stating

Highly Confidential - Subject to Further Confidentiality Review

1

2      earlier, that there is a document, and I

3      would be happy to provide it if it's not

4      part of our reliance materials.

5           Q.   Okay.  But you're not sure one

6      way or the other if Teva, in fact, acquired

7      Allergan, right?

8           A.   I'm not an expert in corporate

9      acquisition, no.

10          Q.   No worries.

11               Back to national drug codes.

12               Did you distinguish any of the

13     national drug codes for generic

14     opioid-containing products various national

15     drug codes for branded opioid-containing

16     products?  Did you make any -- did you

17     distinguish between generic and branded

18     products in any way?

19          A.   Not for this, no.

20          Q.   Okay.  And were the national drug

21     codes pulled from the IQVIA data that you

22     received, I guess, that was produced by

23     Allergan but that you received through

24     plaintiff's counsel?

25          A.   So just to clarify.  ARCOS have

Highly Confidential - Subject to Further Confidentiality Review

1

2      NDCs.  Chargebacks generally have NDCs.

3      But the IQVIA data does not contain a NDC.

4      It has its own unique identifier, and it's

5      impossible to know what that NDC --

6          Q.   Okay.

7          A.   -- what corresponding NDC is

8      there.  They have their own little number.

9          Q.   Understood.

10              So you obtained that NDC from

11     chargebacks in ARCOS data; is that correct?

12         A.   Yes, there were NDCs and

13     chargebacks in ARCOS.

14         Q.   Did you remove any national drug

15     codes during your analysis?

16         A.   Sure.

17         Q.   And I guess you can -- if you

18     need to refer to it, in page 94 of your

19     report, paragraph 170, you start to talk

20     about that a little bit.

21              Do you recall the process you

22     followed for removing those national drug

23     codes?

24         A.   So there's a few things I think

25     that are being conflated here.

1

2          So this section here is talking

3     about chargebacks, and it's cleaning

4     steps that were taken -- so paragraph 170

5     is talking about the steps to process the

6     chargeback data.  If you want to ask me

7     about the NDC codes and specifically which

8     ones weren't included or included in the

9     analysis, I think I talk about that earlier

10    in a different paragraph of the report.

11         Q.   Okay.  Even with respect to the

12    chargeback data, you said there were

13    invalid NDCs.  That NDC values were

14    identified that could not be validated by

15    DEA, FDA or CMBS data sources; is that

16    correct?

17         A.   That is correct.  I looked to see

18    if I could match -- so when we received the

19    data, some of the NDCs were just either cut

20    off, incomplete, mispadded.  So NDCs need

21    to be padded to a 9, 10 or 11-digit format

22    following a certain formatting structure.

23    And if any one of those combinations of

24    formatting didn't match what would have

25    been a valid NDC in any of the files that I

1

2     searched, and I tried very hard to try to

3     find a match for these files because I

4     didn't want to exclude data, then they

5     would have been excluded.

6                So, you know, an example, and I

7     remember seeing it, would be an NDC code of

8     just straight zeroes.  Zero, zero, zero,

9     zero, zero.  That would not have been

10    included.

11         Q.   Okay.  Thank you.

12                Turning now to suspicious order

13    monitoring analytics and programs, are you

14    familiar with Cephalon, Inc.?

15         A.   To the extent that its name

16    appears in the data, but not much beyond

17    that.

18         Q.   Did you review any documents

19    regarding Cephalon's suspicious order

20    monitoring program?

21         A.   I don't believe that we have a

22    Cephalon flag.  And I don't remember,

23    sitting here right now, reviewing any

24    documents about their program.

25         Q.   So you did not review any

Highly Confidential - Subject to Further Confidentiality Review

 1

 2     documents regarding Cephalon's

 3     investigation of any transactions or orders

 4     that it may have flagged, correct?

 5          MS. CONROY:  Objection.

 6     A.   Correct.  That would be outside

 7     of my scope, too.

 8     Q.   Turn to paragraph 69.

 9     A.   I'm sorry, paragraph 69, not

10     page?

11     Q.   Yes.  It's on page 21.  Sorry.

12     A.   I am there.

13     Q.   Okay.  Did you review any

14     documents regarding Teva's SORDS of one

15     system?

16     A.   Yes.

17     Q.   So I see here --

18     A.   I'm sorry, SORDS I?

19     Q.   Yes.  Here in paragraph 69 you

20     say, "Teva's SOMS system (referred to as

21     SORDS II) was in effect from approximately

22     2012 to 2015, when it was replaced by a

23     system called DefOps," D-e-f, O-p-s.

24     A.   So SORDS I, I recall maybe

25     briefly seeing some documentation on it,

Highly Confidential - Subject to Further Confidentiality Review

 1

 2     but I think mostly -- I'm thinking most

 3     clearly about the ones that are referenced

 4     here.

 5          Q.   Okay.  And so you did not attempt

 6     to apply any algorithms from Teva's SORDS I

 7     program to any of the data, correct?

 8          A.   Correct.  If they're not here,

 9     then we didn't apply them.  But we could if

10     asked.

11          Q.   And did you review any documents

12     regarding Teva's DefOps system?

13          A.   Yes.

14          Q.   And I think you referenced them

15     in paragraph 70 if you want to look at

16     that.

17          A.   Thank you.

18               (Document review.)

19          Q.   You did not apply the algorithm

20     used by Teva's DefOps system to any of the

21     data discussed in your report, correct?

22          A.   I'd have to look at the document,

23     I'm sorry, I'm getting a little fuzzy

24     today.  But it appears, yes, we did not

25     implement it because it was not -- we

1

2      weren't able to programmatically implement

3      it.

4           Q.   Okay.  And you're aware that the

5      DefOps program, as you state here, went

6      into effect in 2015; is that right?

7           A.   That is what it states here.  And

8      I believe there's transcripts that state

9      that.

10          Q.   But you did -- but you did apply

11     the algorithm used by Teva's SORDS II

12     system, that right, correct?

13          A.   That appears to be correct.

14          Q.   Okay.  And you gathered

15     information about that algorithm through a

16     review of something called the Buzzeo -- or

17     what you referred to as the Buzzeo/Cegedim

18     compliance report in paragraph 69; is that

19     correct?

20          A.   That is what we cite, yes.

21          Q.   Okay.  Did you review any

22     documents besides the Buzzeo/Cegedim

23     compliance report to gather information

24     about Teva's SORDS II system?

25          A.   If they're cited here, I'd have

Highly Confidential - Subject to Further Confidentiality Review

1

2      to look at which Bates numbers applies to

3      which document.

4          Q.    But you don't recall reviewing

5      any other documents besides the Cegedim,

6      the Buzzeo/Cegedim compliance report?

7          A.    If I did, they're in my reliance,

8      but not that I can recall sitting here and

9      talking to you.

10         Q.    In paragraph 69, you state that

11     your report or your report states that

12     "Under the SORDS II program, orders by NDC

13     that were more than three standard

14     deviations above the customer's consents

15     monthly mean were flagged by Teva."

16             Do you see that?

17         A.    I do.

18         Q.    About halfway down that

19     paragraph, you note that "Any order that is

20     in excess of the three standard deviations

21     above the mean is pended for further

22     investigation."

23             Do you see that?

24         A.    Yes, I see that quote.  It's in

25     quotes.

Highly Confidential - Subject to Further Confidentiality Review

1

2      Q.   "And that the monthly mean was

3   refreshed periodically."

4           Do you see that as well?

5      A.   I do see that.

6      Q.   Which you understood to mean that

7   "The mean and standard deviation were

8   calculated approximately twice per year

9   using the most recent six months of data."

10          Do you see that?

11     A.   I do see that.

12     Q.   When you say "six months of

13  data," what data are you referring to?

14     A.   So that would be the chargeback

15  data that it would be applied to.

16     Q.   And so your understanding is that

17  the system, excuse me, that the monthly

18  mean was refreshed periodically and that

19  the mean and standard deviation were

20  calculated approximately twice per year

21  using the most recent six months of

22  chargeback data?

23     A.   So we applied it to the

24  chargeback data.  And so when we're making

25  this assumption, we're assuming that the

Highly Confidential - Subject to Further Confidentiality Review

1

2     most recent six months, so let's say we're

3     doing the report on -- let's make it easy

4     on myself -- on February would be like

5     January and then the preceding six months

6     to that.  And then that block would be

7     refreshed to include the next six months.

8          Q.   Okay.  Did you review any orders

9     that Teva had received?

10         A.   Any orders that Teva had

11     received...

12              Not unless they appeared in the

13     chargeback data.

14         Q.   And did you review any data that

15     Teva had about its orders that was

16     available to Teva at the time the orders

17     were made?

18         A.   No.  That would be outside of

19     this report.

20         Q.   Did you determine whether the

21     Teva transactions flagged by your various

22     metrics, by various metrics in your report

23     were also flagged by the Teva defendants'

24     SOM systems?

25              MS. CONROY:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   I would not know.

3          Q.   Did you look to see if those

4     transactions were flagged by those systems?

5               MS. CONROY:  Objection.

6          A.   Again, I wouldn't know.  It was

7     not asked of me.

8          Q.   And so you did not review any

9     documents regarding investigations of

10    pended orders in those systems; is that

11    accurate?

12         A.   Not that I can recall.  That

13    would have been outside of my expertise to

14    review those.

15         Q.   I know we discussed this a little

16    bit before, but I want to make it clear for

17    the record.

18              On page 9 of your report, in

19    paragraph 22, you say that "The report

20    focuses specifically and exclusively on

21    manufacturers' anti-diversion and

22    suspicious order monitoring programs,"

23    correct?

24         A.   Correct, it does state those

25    words.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   And is that what you were

3     endeavoring to offer an opinion on, the

4     suspicious order monitoring programs?

5               MS. CONROY:  Objection.

6          A.   No.  I think as we stated

7     earlier, and it's my intention to answer

8     this the same as I have before, but I was

9     asked to apply the known compliance metrics

10    to labelers' data including chargebacks and

11    IQVIA data.

12         Q.   Okay.  So you're not offering any

13    opinions today that the Teva defendants

14    failed to flag a potentially suspicious

15    order, correct?

16         A.   Correct.

17              MS. CONROY:  Objection.

18         A.   Outside of my scope.

19         Q.   Similarly, you're not offering

20    any opinions today or in your report that

21    the Teva defendants failed to detect and

22    report a suspicious order, correct?

23         A.   Correct.  That would be outside

24    of my expertise.

25              MR. HAMMOUD:  All right.  That's

Highly Confidential - Subject to Further Confidentiality Review

 1

 2          all the questions I have.  Thank you

 3          very much for your time.

 4                THE WITNESS:  Thank you.

 5                THE VIDEOGRAPHER:  The time is

 6          5:25 p.m.  We are now off the record.

 7                (Recess is taken.)

 8                (Keller Exhibit 20, Report of

 9          Edward J. Buthusiem of Berkeley

10          Research Group, not Bates-stamped,

11          marked for identification, as of this

12          date.)

13                THE VIDEOGRAPHER:  The time is

14          5:27 p.m.  We are back on the record.

15   EXAMINATION BY

16   MR. GOLDSTEIN:

17          Q.   Good afternoon, Ms. Keller.  My

18   name is Josh Goldstein with the law firm of

19   Ropes & Gray.  I represent Mallinckrodt,

20   LLC.

21                I've placed in front of you

22   what's been marked as Exhibit 20.

23                Do you recognize that document?

24          A.   I do.

25          Q.   Have you reviewed that document?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   I have.

3          Q.   And for the record, what is that

4     document?

5          A.   It is a report by Edward

6     Buthusiem, I'm not sure if I'm saying that

7     correctly.

8          Q.   We can go with your pronunciation

9     for the first -- for today's deposition.

10              And when did you first review it?

11         A.   I would say either in late May or

12    early June.

13         Q.   Do you recall for how long you

14    reviewed it?

15         A.   How long did it take me to read

16    it?

17         Q.   Sure.

18         A.   For as long as it takes to read.

19    I don't know, maybe an hour it takes to

20    read.

21         Q.   Were you asked to offer any

22    opinions based on Mr. Buthusiem's report?

23         A.   No.

24         Q.   Do you intend to offer an opinion

25    at trial regarding his report?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.    I'm not certain.

3          Q.    Have you conducted any additional

4     analysis as a result of your review of

5     Mr. Buthusiem's report?

6          A.    Yes.

7          Q.    Could you describe that, please?

8          A.    I reviewed his work and our work

9     as well.

10         Q.    And when you say his work and

11    your work, could you elaborate?

12         A.    The examples that he cites in his

13    report.

14         Q.    Did you review the materials --

15    strike that.

16               Did you just review the report

17    that's been placed in front of you or did

18    you review materials he relied on?

19         A.    I also reviewed his reliance.

20         Q.    I think this is probably

21    encompassed in what I've already asked, but

22    if I'm understanding you correctly, you

23    don't intend to supplement your report as a

24    result of your review of his report?

25         A.    Not that I'm aware of at this

Highly Confidential - Subject to Further Confidentiality Review

1

2      time.

3            Q.    Okay.   Did you form a general

4      impression of his report?

5            A.    No.

6            Q.    Do you recall generally the main

7      points that Mr. Buthusiem makes in his

8      report?

9            A.    I do.

10           Q.    What are they?

11           A.    He discusses chargebacks to a

12     great degree and then discusses some of our

13     processing of the data.  I would say not

14     even processing, more our analysis of the

15     data.  And then I would say a third piece

16     would be to describe how Mallinckrodt's --

17     I don't know how to word this

18     appropriately, forgive me, it's getting

19     late in the day -- to describe how

20     Mallinckrodt views using its different data

21     sets available to them, to the labeler.

22     I'm sorry if that's not clear.

23           Q.    I think I understand you.

24                 Which data sets are you referring

25     to in particular?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   Specifically he brings up a sales

3     data set that I thought was interesting to

4     review.

5          Q.   Sorry to go back to this, but

6     when you -- have you reviewed his report

7     since the initial time that you reviewed it

8     in late May or early June?

9          A.   Yes.

10          Q.   Did you review it in preparation

11     for the deposition today?

12          A.   Yes.

13          Q.   Do you remember the last time you

14     reviewed it?

15          A.   Last night.

16          Q.   Now of the three key points that

17     you just identified, or I don't think you

18     used the word "key," but the three main

19     points, I believe is what my question asked

20     for, do you disagree with any of the points

21     that Mr. Buthusiem made?

22          A.   I do.  I think that -- I do.

23     I'll just leave it at that.

24          Q.   Okay.  Could can you elaborate?

25          A.   I think he misunderstood our

Highly Confidential - Subject to Further Confidentiality Review

1

2      report and what we were trying to do.

3          Q.   And what do you mean by that?

4      What makes you think he misunderstood the

5      report?

6          A.   So he takes to task that we

7      incorrectly include some orders in our

8      analysis.

9               What I stated and intended to do

10     was to provide examples of chargeback

11     requests that included NDCs that were part

12     of peculiar orders.

13         Q.   I think maybe -- strike that.

14              So I'd like to kind of walk

15     through some of the statements in his

16     report and maybe sort of hone in on where

17     the disagreements might be.

18         A.   Sure.

19         Q.   So just generally speaking, what

20     is your understanding of the purpose of

21     chargeback data?

22         A.   As I think I state in the report,

23     it helps protect the labeler from -- well,

24     actually, let me make sure I state it

25     right.  I got it right here.

Highly Confidential - Subject to Further Confidentiality Review

1

2          (Document review.)

3     A.     "Submitted by the distributors to

4     labelers to protect distributors from

5     profit loss when drugs are sold at" -- "to

6     a buyer at less than the distributor paid

7     for them."

8     Q.     Did you understand it to be a

9     type of financial reconciliation mechanism?

10    A.     If you want to call it that.

11    Q.     You wouldn't take issue with that

12    characterization?

13    A.     Yeah, I understand it to be like

14    maybe like in an colloquial term, a rebate

15    or something like that.  Maybe that --

16    that's probably not the right word to use,

17    especially in pharmaceuticals because I

18    think that means something different there,

19    but it's helped kind of make somebody

20    whole.  I think I've heard that phrase

21    used.

22    Q.     Understood.

23           So let me frame it this way and

24    see if you agree or disagree?

25           Is it fair to say that

Highly Confidential - Subject to Further Confidentiality Review

1

2      distributors provide chargeback data to

3      manufacturers in order to be compensated

4      for the difference between the price a

5      distributor sells the product to a pharmacy

6      and the price that the distributor paid the

7      manufacturer for that product?

8              MS. CONROY:  Objection.

9      A.    I think that's in the same realm

10     of what I mean to say in 33 but, sure, the

11     definition is what it is.

12     Q.    So just to be clear, you don't

13     take issue with the definition I just

14     provided?

15             MS. CONROY:  Objection.

16     A.    I wouldn't know exactly the

17     correct definition of a chargeback.  That's

18     not my area of expertise.  But it sounds

19     good to me sitting here.

20     Q.    Do you have an understanding of

21     whether manufacturers purchase chargeback

22     data from distributors or whether that data

23     is provided to manufacturers by

24     distributors?

25     A.    I mean, it depends on how you

Highly Confidential - Subject to Further Confidentiality Review

1

2      define the word "purchase," but I don't

3      really know how they come to get, but I

4      know that they have that data.

5           Q.   So you're not aware one way or

6      the other whether manufacturers purchase

7      chargeback data from distributors?

8                MS. CONROY:  Objection.

9           A.   Yes, that would be outside of my

10     expertise of how they came to get the data.

11     I just know what I was given.

12          Q.   Now a chargeback request is

13     submitted by the distributor to a

14     manufacturer after the distributor has

15     already shipped the order to the pharmacy

16     or whatever the downstream customer is; is

17     that right?

18          A.   I don't know for certain because

19     I'm not an expert in chargebacks.

20          Q.   Is that consistent with your

21     understanding of how chargebacks work?

22          A.   I would think so, yes.

23          Q.   And a chargeback request is only

24     submitted by a distributor to a

25     manufacturer for sales that a distributor

Highly Confidential - Subject to Further Confidentiality Review

1

2      made to a distributor's customer; is that

3      fair to say?

4          A.   I think that's fair to say.

5          Q.   And of sales that a distributor

6      makes to a distributor's customer, not

7      every sale is eligible for a chargeback

8      with respect to the manufacturer; is that

9      right?

10         A.   Yes, I think we state that in our

11     report that some percentage, depending on

12     the labeler, are submitted for chargebacks

13     and some are not.

14         Q.   Apologies.  I think you might

15     have testified to this already, but a

16     manufacturer only has chargeback data for

17     sales to a distributor of the

18     manufacturer's own product.  Is that your

19     understanding?

20         A.   Generally, that's my

21     understanding.  I do remember seeing, and

22     it may have been an invalid NDC code issue,

23     some crossover between labelers where NDCs

24     of one labeler were in another labeler's

25     chargeback request.  But they were very,

Highly Confidential - Subject to Further Confidentiality Review

1

2      very tiny, and I assumed that it was just

3      an error in the data.

4           Q.   Okay.  Understood.

5                And that is true regardless of --

6      strike that.

7                That's true even in situations

8      where a company is selling its own generic

9      product of another manufacturer's branded

10     products?  Is that your understanding?

11          A.   Help me get a better question.

12          Q.   Sure.

13               Do you have an understanding of

14     the difference between a generic

15     manufacturer and a branded manufacturer?

16          A.   I understand that some drugs are

17     generic and some drugs are brand name, yes.

18          Q.   And what is your -- can you

19     describe that understanding?

20          A.   I mean, I don't really -- I don't

21     have expertise or deep knowledge in what

22     goes in behind that, but I understand that

23     when I match it to an FDA file, some have a

24     brand name B next to them and some drugs,

25     NDCs, have a G for generic.  I don't know

Highly Confidential - Subject to Further Confidentiality Review

1

2      if that's actually how it shows up in the

3      data, but in simplest terms, that's -- I do

4      understand that there's be a distinction

5      between the two.

6           Q.   Okay.  And so as far as you know,

7      the manufacturer of a generic product only

8      gets chargeback data for that product;

9      doesn't get chargeback data from any other

10     manufacturer?

11               MS. CONROY:  Objection.

12          A.   I would say in the data that I

13     saw and used, I only saw manufacturer's own

14     data.  And it generally reflected the NDC

15     codes that I understood them to label based

16     off of the labeler mappings from FDA and

17     DEA.

18          Q.   Okay.  I'd like to ask you to

19     turn to paragraph 13 of Mr. Buthusiem's

20     report.  It's on page 5.

21               (Witness complies.)

22          Q.   And what I'd like to do is walk

23     through some of the statements in this

24     report.

25               So the first sentence,

Highly Confidential - Subject to Further Confidentiality Review

1

2     Mr. Buthusiem writes, "Across the

3     pharmaceutical industry, chargeback

4     requests from distributors to manufacturers

5     do not indicate what specific product

6     inventory, i.e. which particular bottles or

7     packages, the distributor used to fulfill

8     the sale to the downstream registrant."

9          Do you see that?

10     A.   I do.

11     Q.   Do you agree with that statement?

12     A.   I really wouldn't know.  It's

13     outside of my expertise.

14     Q.   So you have no reason to disagree

15     with that statement?

16     A.   I wouldn't have the expertise to

17     agree or disagree.

18     Q.   Okay.  Skipping down to the

19     sentence in the middle of the paragraph

20     that starts "As such," do you see that?

21     A.   I do.

22     Q.   And the underlying portion reads.

23     "The manufacturer cannot use chargeback

24     data to trace a downstream sale back to the

25     specific original direct manufacturer to

1

2      distributor sale or sales."

3               Do you see that?

4          A.   I do see that.

5          Q.   And do you agree with that

6      statement?

7          A.   I do not.

8          Q.   Which part do you disagree with?

9          A.   Which part?  I'm sorry.  Ask me a

10     different question or --

11         Q.   Sure.

12              What do you disagree with about

13     that statement?

14         A.   So I believe in my report we do

15     trace the chargeback data back to the --

16     for a second.

17              So he refers to sales data.  I

18     didn't review sales data.  So I actually

19     couldn't be certain if you could trace a

20     chargeback back to sales data.

21              What I had available to me was

22     chargeback data and peculiar order data.

23         Q.   Just so the record is clear, what

24     sales data are you referring to that

25     Mr. Buthusiem reviewed that you said you

Highly Confidential - Subject to Further Confidentiality Review

1

2      didn't review?

3            A.    There is a cite here.  The direct

4      sales transaction, 1998 to -- that's in

5      footnote 9, MNKT1_0007897646.

6            Q.    Okay.  And that's data that you

7      did not review in connection with your

8      report?

9            A.    That is correct.

10           Q.    And have you reviewed it since --

11     have you ever reviewed that data?

12           A.    I have.

13           Q.    You reviewed it after you

14     prepared your report?

15           A.    I did.

16           Q.    So now that that data has been

17     made available to you, does it change your

18     opinions at all that you offer in your

19     expert report?

20           A.    I'm really not sure at this time.

21     I haven't fully completed my analysis.

22           Q.    Is it fair to say you're in the

23     process of making that determination?

24           A.    I don't know if I will or will

25     not.  I just don't know.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   But have you begun that analysis?

3          A.   I would say I've reviewed the

4     data sources that he has used and used his

5     report, and that's where we are right now.

6          Q.   At this time, do you have any

7     reason to disagree with -- strike that.

8               At this time, are there any

9     opinions that you intend to offer based on

10    your review of the direct sales data?

11         A.   I do not plan to offer opinions

12    today on the direct sales data or -- and I

13    don't know if I will.

14              MR. GOLDSTEIN:  I'm just going to

15         note for the record that defendants

16         will reserve all rights in connection

17         with any late-disclosed opinions,

18         particularly those opinions that

19         respond to Mr. Buthusiem's report.

20    BY MR. GOLDSTEIN:

21         Q.   Bear with me one second.

22         A.   Take your time.

23         Q.   So you testified just now that

24    you couldn't be certain if it's possible to

25    trace a chargeback to the -- trace a

Highly Confidential - Subject to Further Confidentiality Review

1

2      chargeback from the sale from the

3      manufacturer to a distributor and then from

4      a distributor to the distributor's

5      downstream customer.

6              Do you recall that?

7          A.   So I think what I was saying is

8      because I haven't fully reviewed the sales

9      data, I don't know what would be possible.

10     So that was -- I think I started making a

11     statement but needed to clarify that.

12     Because I haven't used this direct sales

13     data and done this analysis, I don't know

14     the answer.

15         Q.   Okay.  At this point, you're not

16     aware of any information in the direct

17     sales data that would enable you to trace a

18     manufacturer's sale to a distributor, to

19     then a distributor's sale to a downstream

20     customer?

21         A.   I'm really not prepared to answer

22     that either way right now.

23         Q.   So I was just asking if you're

24     aware of any information at this point.

25         A.   I just -- I've reviewed the file

Highly Confidential - Subject to Further Confidentiality Review

1

2    fairly quickly.  I'm just really not

3    prepared to say what's in the file or what

4    data points are there or what would be

5    possible to review.  So I just am not

6    comfortable with saying one way or the

7    other what is possible or not possible.

8         Q.  Oh, I understand.  I think my

9    question is a little different.

10        It's simply, at this point in

11   time sitting here today, if you are aware

12   of any information that would enable you to

13   trace manufacture's sale to a distributor,

14   trace that order from the manufacturer to

15   the distributor to the downstream customer?

16        A.  So, again, the data that I used

17   in my report was peculiar orders and

18   chargebacks.  The data that's mentioned

19   here that I've only briefly reviewed is

20   sales.  So I can't offer an opinion or a

21   statement at this time about sales.

22        Q.  So what I'm trying to understand

23   is that based on your review thus far,

24   understanding that it's incomplete review

25   of the Mallinckrodt direct sales data, if

Highly Confidential - Subject to Further Confidentiality Review

1

2      there's any information that you've come

3      across to date that would enable you to

4      trace the manufacturer's sale to a

5      distributor, to then the sale by the

6      distributor to a downstream customer?

7              MS. CONROY:  Objection.  Apart

8          from her report?

9              MR. GOLDSTEIN:  Based on her

10          review of the Mallinckrodt direct sales

11          data, which is --

12             MS. CONROY:  That's what you're

13          your question is about, the

14          Mallinckrodt direct --

15             MR. GOLDSTEIN:  Correct.

16             MS. CONROY:  Okay.  Why don't you

17          ask it again, then.

18             MR. GOLDSTEIN:  Correct.

19             MS. CONROY:  That's what's

20          confusing.

21             MR. GOLDSTEIN:  Right.  So I

22          understand the testimony to be that

23          Ms. Keller can't say whether the direct

24          sales data that Mr. Buthusiem reviewed

25          would enable or would not enable

Highly Confidential - Subject to Further Confidentiality Review

1

2          someone to trace the order all the way

3          from the manufacturer to the downstream

4          customer.  And so that's where I'm

5          going with that.

6               MS. CONROY:  Okay.

7     BY MR. GOLDSTEIN:

8          Q.   So would you like me to repeat

9     the question?

10         A.   Yes, please.

11         Q.   So based on your review thus far

12    of the Mallinckrodt direct sales data that

13    Mr. Buthusiem cites in his report, do you

14    have any -- are you aware of any

15    information in that data that would enable

16    you to trace a sale from a manufacturer, to

17    a distributor, to then the downstream

18    customer?

19         A.   I mean, again, that is a very

20    long chain that you've outlined here.  I

21    would need to fully review it to make -- to

22    make an actual assertation.

23              I mean, if there's NDC codes in

24    there, that's where we would start.  But

25    beyond that, I don't -- I'm not prepared to

Highly Confidential - Subject to Further Confidentiality Review

1

2      talk about that right now.

3           Q.   So I think I've asked this

4      question about five times.

5                All I'm asking is what you're

6      aware of today, not what you could ever

7      possibly be aware of at some future point

8      down the road.

9                So as far as, as you sit here

10     today what you're aware of and not aware

11     of, it sounds like you're not aware of any

12     information that would enable you to trace

13     an order from a manufacturer, to a

14     distributor, to the downstream customer?

15               MS. CONROY:  Objection.

16          A.   I'm not going to say aware or not

17     aware because I haven't fully reviewed the

18     data set.  If you want to pull it out, I'd

19     be happy to look at it right now, but I

20     don't remember what column headers are in

21     there.  I don't know what fields are in

22     there.  I just -- those are things that I

23     would need to know to be aware or not aware

24     and I just -- I would be happy to look at

25     it right now if you want to pull it up on a

Highly Confidential - Subject to Further Confidentiality Review

1

2      computer, but...

3          Q.   Sitting here today, you don't

4      recall if you're aware or not of whether

5      there is any information in that direct

6      sales data that would change your analysis?

7          A.   So sitting here, I do not have

8      the familiarity with the data set that

9      would allow me to answer the question

10     either way, that I am aware or unaware,

11     because I would just have to look at the

12     data set more closely to be able to answer

13     the full question of being able to trace

14     from here to here to here.

15         Q.   Okay.  Well, let me move on and

16     ask a slightly different question.  I think

17     everyone is growing weary of that one.

18             If you turn to your report,

19     paragraph 158.  It's on page 84.

20         A.   Yes.

21         Q.   And there, you reference roughly

22     2,900, I think if you look at table 74,

23     it's 2,860 peculiar orders, or to be clear,

24     orders that Mallinckrodt had deemed

25     peculiar based on its own monitoring system

Highly Confidential - Subject to Further Confidentiality Review

1

2     that involved distributors that shipped the

3     same opioid product purchased in a peculiar

4     transaction to buyers in either Summit

5     County or Cuyahoga County within 30 days.

6            Do you see that reflected in your

7     report?

8        A.   I do.

9        Q.   Okay.  And so my question is,

10    sitting here today, based on whatever

11    you've reviewed to date, can you state with

12    100 percent certainty that any of those

13    2,860 orders that are referenced in table

14    74 were shipped themselves into Cuyahoga or

15    Summit County?

16       A.   So the question is -- can you

17    state it a little bit more succinctly for

18    me?

19       Q.   Sure.  Let me try again.

20            Can you state with 100 percent

21    certainty that any of the 2,860 orders that

22    are identified in table 74 -- you see those

23    orders that I'm talking about?

24       A.   I do.

25       Q.   Okay.  If any of those orders

Highly Confidential - Subject to Further Confidentiality Review

1

2    were definitively shipped into Cuyahoga or

3    Summit County as opposed to shipped

4    somewhere else?

5        A.   So those orders contained an NDC

6    product that was deemed peculiar at some

7    point by Mallinckrodt in the previous 30

8    days that went to a Summit or Cuyahoga

9    County buyer.

10       Q.   So your testimony sitting here

11   today is that you can definitively trace

12   the orders that were placed by a

13   distributor to Mallinckrodt, these 2,860

14   orders, that Mallinckrodt -- let me back

15   up.

16            Mallinckrodt, your understanding

17   is that Mallinckrodt shipped those orders

18   to various distributors, correct?

19       A.   So you've got two points in

20   there.  That Mallinckrodt shipped to those

21   distributors or -- I'm sorry, I just don't

22   really follow your question.

23       Q.   I'll start over.  That's fine.

24            So the 2,860 peculiar orders that

25   are identified in table 74, your

Highly Confidential - Subject to Further Confidentiality Review

1

2     understanding is that those orders were

3     placed by a distributor to Mallinckrodt,

4     correct?

5          A.   Yes.

6          Q.   And as far as you know,

7     Mallinckrodt shipped those orders to

8     various distributors, correct?

9          A.   I would -- yes, I think because

10    these are peculiar orders.  So at some

11    point, yes, I would assume that that --

12    they were deemed peculiar so -- I don't --

13    let me state this more completely.  And I'm

14    sorry, my brain is getting fuzzy.

15              They appear in the peculiar order

16    data for Mallinckrodt, and these are the

17    distributors that are in that data.

18              Whether or not those were

19    actually shipped or unshipped, I couldn't

20    answer as to whether, whether that

21    happened.

22         Q.   So I guess now I'm a little

23    confused.  I thought that your report is --

24    in your report, I thought you're saying

25    that these are orders that were shipped

Highly Confidential - Subject to Further Confidentiality Review

1

2      into Cuyahoga or Summit County; is that

3      right?

4            A.   So that's the chargeback

5      component.  We looked at chargeback data

6      and peculiar order data.

7            Q.   Okay.

8            A.   So to the extent that a

9      chargeback existed, one has to make the

10     assumption that it made it there, that the

11     product made it there.

12           Q.   Well, let me follow up with

13     something you said.

14                Are you aware of any

15     identification code or any data contained

16     within chargeback data, the peculiar order

17     data, or any other data that links a

18     peculiar order and a chargeback?

19           A.   Well, yes.

20           Q.   What data is that?

21           A.   So I mean, we'd have to consult

22     how we did this in the code, but there's --

23     you would need the NDC code of the

24     products, as well as the distributor that

25     that product went through.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   Okay.  So let me go back to my --

3     go back a couple of questions which is, as

4     far as you know, the way the supply chain

5     works is, distributor places an order with

6     a manufacturer, we established that.  The

7     manufacturer ships the order to the

8     distributor?

9          A.   Yes.

10         Q.   Okay.  So once the distributor

11    has obtained the order, the distributor has

12    inventory of that product, whatever product

13    was contained in that order.

14              Is that your understanding?

15         A.   I think I've seen data that

16    reflects what you're trying to say, yeah.

17         Q.   Do you have an understanding

18    of -- I guess I should put it this way:  Do

19    you have an understanding of how an order

20    placed by a distributor to a manufacturer

21    ends up -- well, strike that.

22              Do you have an understanding of

23    how the 2,860 orders that you identify in

24    table 74 were shipped into Cuyahoga or

25    Summit County as you have opined?

Highly Confidential - Subject to Further Confidentiality Review

1

2          MS. CONROY:  Objection.

3     A.   How they were shipped, like what

4     was the method that they arrived in Summit

5     County?

6     Q.   Yes.  They were shipped there by

7     a distributor into Summit or Cuyahoga

8     County.

9          Is that your opinion?

10    A.   I guess I don't really understand

11    the question.  I'm sorry if I'm -- I'm not

12    trying to be obstinate.  I just don't

13    understand.  Are you asking me -- I just

14    don't understand quite what you're asking

15    me.

16    Q.   What I'm getting at is that, once

17    a, once product is shipped -- I'll start

18    over.

19         Do you have an understanding of

20    whether distributors that receive products

21    from manufacturers typically hold inventory

22    of the product that they are purchasing

23    beyond the single order that was purchased?

24    A.   I have no expertise in what the

25    inventory practices are of distributors.

Highly Confidential - Subject to Further Confidentiality Review

1

2       Q.   So you don't know if, for

3    example, if a distributor purchases --

4    places an order with Mallinckrodt for one

5    of its products, you don't know if -- and

6    Mallinckrodt ships it to that distributor,

7    the product that was purchased, you don't

8    know if the distributor would have other of

9    Mallinckrodt's products already in its

10   inventory at the time it places that order?

11      A.   Correct.  I'm not an expert in

12   supply chain, nor am I an expert in

13   distributor LIFO or any of their practices

14   there, nor do I -- you had another point in

15   there, but, no, that would be outside of my

16   expertise.  Actually, nor was I given data

17   on those practices.

18      Q.   Okay.  And if a distributor at

19   the time it placed an order that the

20   distributor deemed -- that that -- strike

21   that.

22           If a distributor in its inventory

23   had product from Mallinckrodt that was

24   purchased via multiple orders --

25           Are you with me so far?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   Yeah.

3          Q.   Okay.  If that was the case, do

4    you have an understanding of whether it

5    would be possible for Mallinckrodt to

6    determine whether any -- or whether

7    chargeback data provided to Mallinckrodt

8    would reflect whether any product that's

9    ultimately shipped into Cuyahoga or Summit

10   County is from a particular order that was

11   placed to Mallinckrodt?

12         A.   I'm sorry, I'm rereading your

13   question here to make sure I understand.

14         Q.   Take your time.

15              MS. CONROY:  Object to the

16         question.

17         A.   I just don't... I don't really

18   know how to answer this question because

19   I've got chargeback data, correct, but as

20   we've discussed, I haven't reviewed the

21   sales data, and I have peculiar orders

22   data.

23              But I think all of that is a

24   little bit mixed together in this question,

25   so I'm not quite sure what you're trying to

Highly Confidential - Subject to Further Confidentiality Review

1

2      ask me.  And I'm sorry, it might be that

3      it's late in the day.

4           Q.   Well, let's say a distributor has

5      two orders in its inventory worth of the

6      same -- the same Mallinckrodt products,

7      okay?

8           A.   Okay.  Let's go with that.  This

9      is good.

10          Q.   One order has been deemed by

11     Mallinckrodt to be peculiar.

12          A.   Okay.

13          Q.   The other has not.

14          A.   Okay.

15          Q.   The distributor then ships some

16     portion of its inventory of that

17     Mallinckrodt product into -- to a pharmacy

18     located in Cuyahoga or Summit County, okay?

19          A.   Okay.

20          Q.   Are you aware of any way to

21     determine, for Mallinckrodt to determine

22     through the use of chargeback data whether

23     any of the product that was shipped into

24     Cuyahoga or Summit County was part of what

25     had been flagged as peculiar?

1

2      A.   Well, yes.  I think that's what

3  we do in our analysis where that -- some of

4  the -- so an order of an NDC product that

5  was ultimately shipped to Summit or

6  Cuyahoga County resulted in a chargeback

7  request within the next 30 days.

8      Q.   But you, sitting here today,

9  can't say with certainty whether the

10  chargeback request that was sent was for

11  product that was flagged as peculiar or it

12  was from other product that was in the

13  distributor's inventory that was not

14  flagged as peculiar?

15          MS. CONROY:  Objection.

16      A.   So because there was many

17  products shipped after which it was being

18  deemed peculiar to a distributor, you're

19  saying because you continued shipments

20  after they were deemed peculiar, that

21  that -- you're trying to ask me if that

22  deems it impossible to trace a chargeback?

23      Q.   No.  I'm asking if the

24  distributor requests a chargeback from

25  Mallinckrodt -- strike that.  Let me move

Highly Confidential - Subject to Further Confidentiality Review

1

2      on.

3              You selected a 30-day cutoff as

4      part of your analysis of Mallinckrodt's

5      peculiar orders?

6          A.    Sure.

7          Q.    How did you determine that as the

8      window of time?

9          A.    So in reviewing the SOMS

10     documentation, many algorithms reflected a

11     30-day lookback.  It seemed an appropriate

12     lookback period.  And also looking at

13     chargeback requests, some companies, I'm

14     sorry, some distributors submitted them,

15     what appeared to be maybe on weekly basis,

16     some on a daily basis, some on monthly

17     basis.  It was all over the place.  So the

18     30 days was chosen based off of those

19     factors.

20         Q.    Okay.  And without consideration

21     of any distributors's inventory management

22     practices, correct?

23         A.    As I stated earlier, I'm not an

24     expert in inventory management, nor did I

25     review those types of documents.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   Okay.  So the answer is, yes,

3     that is correct, that you did not consider

4     distributors's inventory management

5     practices when setting the 30-day cutoff?

6          A.   I would consider inventory

7     management practices to be out of my

8     expertise.  And so the 30-day cutoff was

9     based off of our review of other documents.

10          Q.   Okay.  Now if you turn to page 8

11     of Mr. Buthusiem report.  You recall that

12     Mr. Buthusiem states that some of the --

13     you made some errors with respect to the

14     code in your report.

15               Do you recall that?

16          A.   I do recall reading that.

17          Q.   And have you gone back and looked

18     at whether those errors in fact occurred?

19          A.   I think he's just

20     misunderstanding what we tried to do in the

21     report.

22          Q.   And how so?

23          A.   We show orders that contained NDC

24     products that were deemed in a peculiar

25     report -- that were deemed peculiar.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   And is that true even if --

3     strike that.

4               Is it your testimony that all of

5     the 2,860 peculiar orders had involved

6     situations where the distributor who made

7     the chargeback request was the same as the

8     distributor who placed the peculiar order?

9          A.   I think the 2,860 peculiar orders

10    that we identified involved different

11    distributors, not just one.

12         Q.   Right.

13              What I'm saying is, for any --

14    let's just pick one of those 2,860 peculiar

15    orders.

16              For that order, are you aware of

17    situations in which of those 2,860 orders,

18    any one of them individually, the

19    distributor who placed -- who made the

20    chargeback request was different from the

21    distributor who was identified as having

22    placed a peculiar order?

23         A.   So for us -- to appear in this

24    list, they had to have of shipped -- this

25    list contains orders that were traced to

Highly Confidential - Subject to Further Confidentiality Review

1

2     Summit and Cuyahoga after which an NDC

3     product within that order was deemed

4     peculiar.

5          Q.   Would you have included in your

6     list of 2,860 orders any order in which the

7     distributor who placed the chargeback

8     request to Mallinckrodt was different from

9     the distributor who was identified as

10    having placed a peculiar order initially

11    from Mallinckrodt?

12         A.   I mean, there's lots going into

13    that calculation, whether or not it was in

14    the 30 days of the same order, if it was on

15    the same day, if it was the same

16    distributor, if it was the same NDC code.

17    There is a lot that goes into that

18    analysis.

19         Q.   But your analysis attempts to

20    link peculiar order placed by distributor

21    to Mallinckrodt with a chargeback request

22    that was provided by a distributor to

23    Mallinckrodt reflecting an order that was

24    shipped into Summit or Cuyahoga; is that

25    right?

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   So, yes, to the extent that the

3     chargeback reflects the shipment and the

4     peculiar order is the other half of the

5     equation, yes.  I'm not trying to state

6     that the peculiar orders were shipped.

7          Q.   Let me ask it this way:

8     Paragraph 158 of your report, you say, "I

9     identified around 2,900 peculiar orders

10    that involved distributors that shipped the

11    same opioid product purchased in the

12    peculiar transaction to buyers in either

13    Summit or Cuyahoga County within 30 days."

14              Okay?

15         A.   I state that.

16         Q.   Okay.  And the next sentence

17    says, "With chargeback data, Mallinckrodt

18    was able to see where a peculiar orders

19    went."

20              Do you see that?

21         A.   I state that as well, yes.

22         Q.   Okay.  So in order for -- in

23    order to be included in one of these 2,860

24    peculiar orders, it would, by definition,

25    need to be an order that was placed by a

Highly Confidential - Subject to Further Confidentiality Review

1

2     distributor to manufacturer or that was

3     deemed peculiar by Mallinckrodt and then

4     the same distributor submitted a chargeback

5     request to Mallinckrodt for what you're

6     saying reflects that same order, right?

7          A.   It's just it's complicated,

8     right, because we're looking at the time

9     periods and NDC codes.

10         Q.   I really don't think it's that

11    complicated.  I think it's a simple

12    question that you have a distributor where

13    you're saying the distributor, the same

14    distributor placed an order from

15    Mallinckrodt, shipped it into Cuyahoga or

16    Summit County and then submitted a

17    chargeback request to Mallinckrodt.

18              So all I'm asking is, is it, by

19    definition, the same distributor that

20    placed the order and submitted the

21    chargeback request?

22              That's a simple "yes" or "no"

23    question.

24         A.   Yes.  I think our code would

25    reflect that.

Highly Confidential - Subject to Further Confidentiality Review

1

2     Q.   Okay.  And so if your code

3     reflected -- in there was an error in your

4     code whereby you had a distributor, whereby

5     you had different distributors, that would

6     be an error in your code?

7          If there was a different

8     distributor who placed the order and

9     submitted the chargeback request, that

10    could not be for the same order?

11    A.   I think the code shows that it

12    has a 30-day window, an order that contains

13    the NDC product through that distributor.

14    Q.   The same distributor?

15    A.   I would think so, yes.

16    Q.   Okay.  And if there was an order

17    where it wasn't the same distributor, that

18    would reflect an error in your code?

19         MS. CONROY:  Objection.

20    A.   I would have to look at the full

21    facts behind that before I'd say whether or

22    not it would.

23    Q.   It should not have been included

24    in the 2,860 peculiar orders in table 74?

25         MS. CONROY:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1

2          A.   I would like to look at the order

3     before making an assertation as to whether

4     or not it would be an error or not.

5          Q.   It's possible that an order

6     placed by a distributor and then a

7     chargeback request submitted by a different

8     distributor could be the same order

9     reflected in these 2,860 in table 74?

10          A.   I mean, I'm not going to talk

11     about what's possible and not possible

12     without looking at the data.

13               MR. GOLDSTEIN:  I'll pass the

14          witness.  I'll reserve my rights.  I

15          don't think I've gotten responsive

16          answers to my questions.

17               THE VIDEOGRAPHER:  The time is

18          6:12 p.m.  We are now off the record.

19               (Recess is taken.)

20               THE VIDEOGRAPHER:  The time is

21          6:17 p.m.  We are back on the record.

22     EXAMINATION BY

23     MR. HYNES:

24          Q.   Good evening, Ms. Keller.  My

25     name is Paul Hynes.  I represent CVS

Highly Confidential - Subject to Further Confidentiality Review

1

2      Indiana, LLC and CVS RX Services, Inc.

3              I just have a few questions about

4      Section L of your report where you address

5      certain pharmacies.

6              So if you want to turn to those

7      pages, that would be helpful?

8          A.   Sure.

9          Q.   I want to first turn your

10     attention to paragraph 127 on page 63.

11         A.   I am there.

12         Q.   In the first sentence, you say

13     "The section that follows analyzes

14     suspicious pharmacies about which labelers

15     could have known and reported."

16             Do you see that?

17         A.   I do.

18         Q.   Okay.  What do you mean by

19     "suspicious pharmacies"?

20         A.   So I think I had been asked this

21     question before, and I intend to answer it

22     the same way as before, but when I say

23     "suspicious," I mean they've triggered the

24     compliance metrics that we applied to the

25     data.

Highly Confidential - Subject to Further Confidentiality Review

1

2      Q.   Okay.  So you're not saying that

3   any labeler had an obligation to report

4   those pharmacies to the DEA?

5      A.   That would be outside of my

6   expertise.

7      Q.   Okay.  Do you intend to offer an

8   opinion at trial that these pharmacies were

9   suspicious?

10      A.   Not beyond how I've defined

11   "suspicious" here today.

12      Q.   Okay.  So your opinion about

13   these pharmacies at trial would be limited

14   to the fact that they had orders that hit

15   on one of the compliance metrics that you

16   were asked to use?

17      A.   That would be a correct

18   characterization.

19      Q.   Okay.  Thank you.

20           In reviewing the orders placed by

21   these pharmacies or the shipments made to

22   them, did you consider whether there were

23   any legitimate reasons to explain their

24   purchasing or ordering habits?

25      A.   That would be outside of my

Highly Confidential - Subject to Further Confidentiality Review

 1

 2    expertise.

 3         Q.   Okay.  So you didn't consider the

 4    location of the pharmacies?

 5         A.   That would be outside of what I

 6    was asked to do.

 7         Q.   Okay.  Did you consider whether

 8    they're located near any medical

 9    facilities?

10         A.   I think there is one pharmacy

11    where we show -- I think for -- in the New

12    Choice one, we show another pharmacy,

13    Cleveland Clinic, to demonstrate those that

14    are near medical facilities.  But beyond

15    that example, I don't have any others.

16    That would be outside of my --

17         Q.   Did you consider whether the CVS

18    pharmacy at 8000 Euclid Avenue is located

19    near the Cleveland Clinic's main campus?

20         A.   Yeah, that would be outside of my

21    expertise.

22         Q.   Okay.  So beyond I think it was

23    the Church's pharmacy you mentioned, you

24    didn't consider whether any of the other

25    pharmacies in Section L of your report were

Highly Confidential - Subject to Further Confidentiality Review

1

2     located near any medical facilities; is

3     that correct?

4          A.   So I think you said Church's.

5          Q.   I may have gotten it wrong?

6          A.   It's in the New Choice section --

7          Q.   New Choice.

8          A.   -- on 74 and 75.

9          Q.   Okay.  So besides the New Choice

10    Pharmacy, you didn't consider whether any

11    of the other pharmacies were located near a

12    medical facility?

13         A.   Correct.  That was not part of

14    the assignment.

15         Q.   And you didn't consider the

16    population density of the area surrounding

17    the pharmacies?

18         A.   Correct.  That was not part of

19    the assignment.

20         Q.   So none of the pharmacies you

21    considered that?

22         A.   Correct.  That was not part

23    assignment.

24         Q.   And just to confirm, you didn't

25    visit any of the pharmacies, did you?

1

2          A.   That's correct, I did not visit.

3     That was not asked of me.

4          Q.   And you've testified today that

5     you considered manufacturer chargeback data

6     related to these pharmacies, correct?

7          A.   That is correct.

8          Q.   Okay.  And you've also testified

9     that that data is incomplete.

10              Is that also correct?

11         A.   I don't recall saying

12    "incomplete."

13         Q.   Okay.

14         A.   I would say that it -- because

15    the data that I had was a full data set, so

16    it's not to say that it's incomplete.

17              I think if -- maybe what you're

18    referencing is the testimony that it

19    reflects only a certain percentage of the

20    total shipments or the total, yeah, the

21    total shipments or sales made to a county.

22         Q.   It doesn't cover all shipments

23    made to each of these pharmacies?

24         A.   Correct.  I think I characterized

25    that in my report.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   And did you also consider the

3    ARCOS data that showed shipments to these

4    stores?

5          A.   I want to make sure that -- yes,

6    we did.  I think it's shown throughout the

7    report.

8          Q.   And just to confirm, that data,

9    though, only covers shipments of certain

10   prescription opioids?

11         A.   Correct.  That data produced to

12   us had 14 drug codes.  I believe only 12

13   were included.

14         Q.   So it didn't have all controlled

15   substances?

16         A.   Correct.  It had 12 drug codes.

17   The two that weren't included were

18   methadone and buprenorphine.

19         Q.   In paragraph 42 on page 14 of

20   your report, if you want to turn to that

21   real quick.

22         A.   Sorry.

23         Q.   Take your time.

24         A.   I'm getting cold fingers.  All

25   right.  Here we are.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   The last sentence of paragraph 42

3     states, "Several monitoring programs

4     developed by manufacturers and distributors

5     relied on the percentage of controlled

6     substances to non-controlled substances as

7     a metric."

8               Do you see that?

9          A.   I do.

10         Q.   Okay.  Did you consider that

11    metric in analyzing any shipments made to

12    the pharmacies in Section L of your report?

13         A.   I would not have been able to.

14         Q.   Why not?

15         A.   Because I was not given access to

16    the full sales data for a pharmacy.

17         Q.   Did you ask for access to the

18    full sales data?

19         A.   I've asked for it and I don't

20    believe that it exists or -- I've asked for

21    it, I should say.

22         Q.   Okay.  And what was the response?

23         A.   And I was told that we didn't

24    have that.

25         Q.   Okay.  So you're not aware that

Highly Confidential - Subject to Further Confidentiality Review

1

2    CVS and Cardinal have produced complete

3    shipment data for the CVS pharmacy at 8000

4    Euclid Avenue?

5        A.   I was not provided with that

6    data.

7        Q.   Okay.  And did you consider the

8    expert report of Sonya Kwon where she

9    quantified the percentage of controlled and

10    non-controlled substances that were shipped

11    to the CVS at 8000 Euclid Avenue?

12        A.   I have not read that report or am

13    I familiar with it.

14        Q.   Okay.  In analyzing these

15    pharmacies, did you consider whether there

16    was any regulatory or law enforcement

17    action taken against any of the?

18        A.   That would be outside of the

19    scope of the report.

20        Q.   And did you consider whether

21    there was any regulatory, law enforcement

22    or disciplinary action taken against any

23    pharmacists who worked on those stores?

24        A.   Again, that would be outside of

25    the scope of the report.

1

2      Q.   Okay.  And did you determine

3   whether any prescription opioids shipped to

4   these pharmacies were diverted?

5      A.   Again, that would be outside of

6   the scope of this report.

7      Q.   Okay.  So just so we can button

8   this all up, you considered chargeback data

9   and ARCOS data related to these stores and

10  that's it?

11     A.   And also Purdue's 867.

12     Q.   Okay.  And Purdue's 867, and that

13  is the extent of the data that you

14  considered related to these stores?

15     A.   With the exception of helper

16  files to help clean them up, whether it's

17  an NDC code or MMEs.  But as far as data

18  concerning those stores and the

19  transactions about them, then, yes.

20     Q.   But that's helper files to help

21  clean up that data, right?

22     A.   Correct.

23     Q.   And you didn't look at any due

24  diligence files that Cardinal or McKesson

25  or CVS produced related to these stores?

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2          A.   Correct.  That would be outside
 3     of the scope here.
 4          Q.   Okay.
 5               MR. HYNES:  I have no further
 6          questions.  Thank you very much.
 7               THE WITNESS:  Thank you.
 8               THE VIDEOGRAPHER:  The time is
 9          6:26 p.m.  We are now off the record.
10               (Recess is taken.)
11               THE VIDEOGRAPHER:  The time is
12          6:27 p.m.  We are back on the record.
13     EXAMINATION BY
14     MS. PERSIO:
15          Q.   Hi, Ms. Keller.  Thank you for
16     being here today.
17          A.   Thanks for having me.
18          Q.   My name is Joanna Persio.  I
19     represent the Endo and the Par defendants
20     in this litigation.  I have just a few
21     questions for you.
22               I think I know the answers to
23     these, so hopefully I will be brief.  I
24     know it's been a long day so far.
25               Is it correct that you haven't
```

Highly Confidential - Subject to Further Confidentiality Review

1

2    done any analysis as to whether any of the

3    Endo orders identified in your report as

4    being flagged by the various compliance

5    metrics that you have applied were or were

6    not actually investigated or reviewed by

7    Endo?

8        A.    That is correct.  That would be

9    outside of the scope of the report.

10       Q.    And you also didn't do that

11   analysis for any of the Par orders that are

12   identified in your report; is that correct?

13       A.    That is correct.  I didn't review

14   due diligence records or anything like

15   that.  That would be outside of the scope

16   of the report.

17       Q.    And the answer would be the same

18   for the entity that you referred to as

19   Qualitest; in your report, you didn't do

20   any review or identification of whether or

21   not those orders that you flagged for

22   Qualitest were actually investigated by the

23   entity you referred to as Qualitest?

24       A.    Correct.

25       Q.    So you have no basis to say

Highly Confidential - Subject to Further Confidentiality Review

1

2      whether or not Endo or Par or Qualitest in

3      fact flagged or investigated any of the

4      orders that you flag for those entities in

5      your report; is that right?

6            MS. CONROY:  Objection.

7       A.   Yes.  That would be outside of my

8      expertise.  I didn't review that.

9       Q.   And you also couldn't say whether

10     any of the orders for Endo or Par or

11     Qualitest were or were not legitimate

12     orders that should have been shipped after

13     an investigation?

14            MS. CONROY:  Objection.

15      A.   Correct.  That would be outside

16     of the scope.

17      Q.   And you can't say if there are

18     any specific prescriptions for an Endo, Par

19     or Qualitest opioid medication that were or

20     were not legitimate?

21            MS. CONROY:  Objection.

22      A.   Correct.  That would not be my

23     area of expertise.

24      Q.   And you're not offering in your

25     report or planning to offer any opinion as

Highly Confidential - Subject to Further Confidentiality Review

1

2      to whether or not Endo's investigations of

3      any orders or any prescribers who are

4      flagged in your report were or were not

5      sufficient; is that right?

6           A.   Correct.  I am not an expert in

7      that.

8           Q.   And you're also not offering or

9      planning to offer an opinion as to whether

10     or not any Par's investigations of the

11     orders or prescribers flagged in your

12     report were sufficient?

13          A.   Correct.

14          Q.   I assume the answer is the same

15     for the entity you referred to as

16     Qualitest?

17          A.   Correct.

18          Q.   And you also can't offer any

19     opinion as to whether or not Endo could

20     have in fact stopped any of the orders

21     flagged by the application of your

22     compliance metrics or stopped any

23     particular prescriptions in the real world;

24     is that right?

25               MS. CONROY:  Objection.

1

2          A.    Correct.   That is outside of my

3     expertise and scope.

4          Q.    And you can't offer an opinion as

5     to whether or not Endo should have stopped

6     any of those orders or prescriptions; is

7     that right?

8               MS. CONROY:   Objection.

9          A.    Correct.

10          Q.    And you also can't comment on

11     those things for Par or Qualitest, correct?

12               MS. CONROY:   Objection.

13          A.    Correct.   All that I can talk to

14     about what could have been done using the

15     known compliance metrics by -- applied to

16     the labeler's own data.

17          Q.    But you're not offering any

18     opinion as to whether or not what was

19     actually done was adequate or appropriate;

20     is that right?

21          A.    Correct.

22               MS. PERSIO:   I have no further

23          questions.   Thank you.

24               THE WITNESS:   Thank you.

25               THE VIDEOGRAPHER:   The time is

Highly Confidential - Subject to Further Confidentiality Review

1

2        6:31 p.m.  We are now off the record.

3            (Discussion off the record.)

4            THE VIDEOGRAPHER:  Time is

5        6:32 p.m.  We are back on the record.

6    FURTHER EXAMINATION BY

7    MR. GOLDSTEIN:

8        Q.   Hi, again, Ms. Keller.  I'm back

9    for the remaining five minutes of the

10   deposition today.

11           Can you turn back to Exhibit 20,

12   please.  And specifically that's

13   Mr. Buthusiem's report, and specifically

14   paragraph 13.

15       A.   Sure.

16       Q.   If you look at the second

17   sentence of that paragraph, it says, "The

18   distributor's inventory is comprised of

19   product purchased over the course of

20   multiple orders placed with the

21   manufacturer."

22           Do you have any reason to

23   disagree with that statement?

24       A.   I don't have any reason to

25   disagree with what he has stated, but

Highly Confidential - Subject to Further Confidentiality Review

1

2     that's what's stated here.

3          Q.   Okay.  The next sentence says,

4     "The chargeback data submitted with respect

5     to any eligible distributor to downstream

6     registrant sale does not delineate which

7     specific distributor to manufacturer order

8     relates to the chargeback."

9               Do you have any reason to

10    disagree with that statement?

11              (Document review.)

12         A.   I don't understand what the word

13    "eligible" means, so I don't really know if

14    I can agree or disagree with this.

15              And it's also referencing sales

16    data that, again, we've discussed earlier

17    that I haven't reviewed fully.

18         Q.   So let me break that up.  I'll

19    represent to you that eligible distributor

20    to downstream registrant sale simply means

21    a sale for which a chargeback was issued.

22         A.   Sure.

23         Q.   A chargeback eligible sale.

24              Okay.  Does that make sense?

25         A.   Sure.

Highly Confidential - Subject to Further Confidentiality Review

1

2        Q.   Okay.  Now based on the data that

3    you've reviewed to date and as you sit here

4    today, do you have any reason to disagree

5    with the sentence that I just read?

6        A.   And I just assume that there is

7    an order number, an order ID in both data

8    sets, is there?

9        Q.   You assume that there is an order

10    ID in both sets of what?

11        A.   Of both the chargeback data and

12    the sales data.

13        Q.   That is the same order ID, is

14    that what you're saying?

15        A.   I would think that that exists.

16        Q.   Okay.  And so if that is the

17    case -- sorry.  If that is not the case,

18    then you would not be able to delineate

19    which specific distributor to manufacturer

20    order relates to the chargeback?

21        A.   I mean, I'd have to look at the

22    data sets again to see whether or not I

23    could trace it or not.  Again, you're

24    asking me look at data I haven't fully

25    reviewed.

1

2          Q.   I'm only asking you about

3     chargeback -- so let me only ask you about

4     chargeback data for the moment.

5          A.   Okay.

6          Q.   Do you know if chargeback data

7     anywhere reflects which product in

8     circumstances where, as discussed in the

9     sentence immediately prior, where

10     distributor's inventory is comprised of

11     product purchased over the course of

12     multiple orders, okay?

13          A.   Okay.  I don't know that there is

14     a question there, though.

15          Q.   Are you with me so far?

16          A.   Yes.

17          Q.   You understand the situation I'm

18     talking about is a situation where a

19     distributor's inventory includes product --

20     is comprised of product purchased over the

21     course of multiple orders placed with the

22     same manufacturer?

23          A.   Yes.  I think maybe let's go back

24     to our example from earlier where you had

25     the two orders.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   Sure?

3          A.   Okay.

4          Q.   Chargeback data is submitted for

5     one of those orders.

6          A.   Sure.

7          Q.   Are you aware of any information

8     in the chargeback data that identifies

9     which order of the two orders in the

10    distributor's inventory that chargeback

11    data pertains to?

12         A.   So the -- I will say what I know

13    that exits in the chargeback data.  I can't

14    talk about the inventory system of the

15    distributor.

16              The chargeback has an NDC number,

17    the distributor that shipped it or that

18    submitted it, I should say, to be most

19    correct, as well as an order number and a

20    date.

21         Q.   And is it your understanding that

22    the NDC code that's included pertains to

23    the product that's being shipped?

24         A.   I would understand the NDC to be

25    the product, yes.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   And not a particular order that's

3     being shipped?

4          A.   I think you could characterize

5     the NDC is part of a larger order.

6          Q.   I'm not sure I follow.

7               The NDC relates to the type of

8     product that's being shipped?

9          A.   So I have seen the data, have an

10    order number, let's say one, two, three,

11    four, five, have as part of it, and this is

12    a hypothetical, but I've seen real examples

13    of the data, an order for -- the same order

14    number also have oxycodone, morphine and a

15    hydrocodone product as part of that whole

16    order.

17         Q.   And that's all under the same NDC

18    code?

19         A.   No, different NDC codes folded

20    underneath one order.

21         Q.   Okay.  But understood the NDC

22    order only pertains to the product that's

23    being shipped?

24         A.   Yes.  I think we've talked about

25    that.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   Okay.

3               MR. GOLDSTEIN:  Can I ask one

4          more question?  Thank you.

5               MR. LEDLIE:  Sure.

6     BY MR. GOLDSTEIN:

7          Q.   So if you turn to figure 1 in

8     Mr. Buthusiem's report, it's right under

9     paragraph 24.

10         A.   Yup.

11         Q.   Have you reviewed this figure

12    before?

13         A.   I've seen it before.

14         Q.   Sorry.  That wasn't my one final

15    question.

16              (Laughter.)

17         Q.   Do you see it reflected in that

18    table that there is a Mallinckrodt peculiar

19    order and a Mallinckrodt chargeback record?

20              Do you see that?

21         A.   I see those two records on this

22    document, yes.

23         Q.   And do you see that the order

24    numbers are different?

25         A.   I do see that.

Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.   And what do you take that to

3    mean?

4          A.   I mean what I assume, there are

5    two different systems that have two

6    different numbering.

7          Q.   And so this is my last question.

8               Assuming that there are two

9    different systems with two different

10   numbering, it would not be possible to

11   trace a peculiar order to -- that is to

12   product that is shipped into Cuyahoga or

13   Summit County and is subsequently the

14   source of a chargeback request?

15              MS. CONROY:  Objection.

16         A.   I don't agree with that.

17         Q.   Why not?

18         A.   Because our report traces

19   peculiar orders and chargebacks.

20         Q.   So based on the substance of

21   what's in your report today, you disagree

22   with that statement?

23         A.   Yes, I disagree with that

24   statement based off of my findings in my

25   report.

Highly Confidential - Subject to Further Confidentiality Review

```
1

2              MR. GOLDSTEIN:  Okay.  Thank you.

3              THE WITNESS:  Thanks.

4              THE VIDEOGRAPHER:  The time is

5        6:41 p.m.

6              (Time noted:  6:41 p.m.)

7

8

9

10              _____.

11              LACEY R. KELLER

12

13

14     Subscribed and sworn to before me

15     this   day of        2019.

16

17     _____

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2                 C E R T I F I C A T E

 3

 4     STATE OF NEW YORK       )

 5                        : ss.

 6     COUNTY OF WESTCHESTER   )

 7

 8            I, ANNETTE ARLEQUIN, a Notary

 9         Public within and for the State of New

10         York, do hereby certify:

11            That LACEY R. KELLER, whose

12         deposition is hereinbefore set forth,

13         was duly sworn by me, and that the

14         transcript of such depositions is a

15         true record of the testimony given by

16         such witness.

17            I further certify that I am not

18         related to any of the parties to this

19         action by blood or marriage; and that I

20         am in no way interested in the outcome

21         of this matter.

22            IN WITNESS WHEREOF, I have hereunto

23         set my hand this 14th day of June, 2019.

24         _____

25            ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2                        I N D E X

 3

 4     WITNESS                              PAGE

 5

 6     LACEY R. KELLER

 7      MS. LEVY                            12, 314

 8      MS. LUCAS                           203

 9      MS. DEAN                            263

10      MR. LAVELLE                         270

11      MS. O'GORMAN                        300

12      MR. HAMMOUD                         320

13      MR. GOLDSTEIN                       338, 392

14      MR. HYNES                           377

15      MS. PERSIO                          387

16

17        I N D E X   O F   E X H I B I T S

18     DESCRIPTION                          PAGE

19

       Keller Exhibit 1, Track 1              15
20     Defendants' Second Amended Notice
       of Oral Videotaped Deposition of
21     Lacey R. Keller

22

       Keller Exhibit 2, List of              17
23     documents that respond to request
       1 in Exhibit A on Exhibit 1

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2      I N D E X   O F   E X H I B I T S(Cont'd.)
 3    DESCRIPTION                              PAGE
 4    Keller Exhibit 3, Gryphon                 19
      Strategies Invoice dated 5/30/19,
 5    Bates-stamped
      OPIOIDMDL_KELLER_000036 through
 6    35
 7
      Keller Exhibit 4, Resume of Lacey        30
 8    R. Keller, not Bates-stamped
 9
      Keller Exhibit 5, Expert Analysis        60
10    of Lacey R. Keller, not
      Bates-stamped
11
12    Keller Exhibit 6, Spreadsheet,          136
      not Bates-stamped
13
14    Keller Exhibit 7, Expert Analysis       157
      - Addendum: Lacey R. Keller
15
16    Keller Exhibit 8, "Corrections to       179
      Expert Analysis," prepared by
17    Lacey R. Keller, not
      Bates-stamped,
18
19    Keller Exhibit 9, Word document         184
      prepared by Keller, not
20    Bates-stamped,
21
      Keller Exhibit 10, Expert               237
22    Analysis - Errata Sheet: Lacey R.
      Keller, not Bates-stamped,
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2     I N D E X   O F   E X H I B I T S(Cont'd.)
 3    DESCRIPTION                           PAGE
 4    Keller Exhibit 11, Press release       241
      entitled "FDA reports quality
 5    problems for data provided by the
      firm IQVIA that were used to
 6    inform estimates for some
      controlled substances"
 7
 8    Keller Exhibit 12, Report on           249
      Script.SQL, not Bates-stamped
 9
10    Keller Exhibit 13, Document            277
      produced in native format
11    beginning with Bates-stamp
      MNK-T1_0001315847
12
13    Keller Exhibit 14, Email chain         281
      beginning with email dated
14    9/23/16 from K. Harper to
      McKenzie, Bates-stamped
15    MNK-T1_0001315844 through 5846
16
      Keller Exhibit 15, Email chain         287
17    beginning with email dated
      10/31/11 from Oriente to Nichols,
18    Bates-stamped MCKMMDL006332908
      through 2910
19
20    Keller Exhibit 16, Email chain         292
      beginning with email dated
21    10/31/11 from Lai to Oriente and
      others, Bates-stamped
22    MCKMDL00626683 through 6685
23
      Keller Exhibit 17, Purdue Pharma       304
24    L.P. document Bates-stamped
      PDD1503450011 through 0024
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2        I N D E X   O F   E X H I B I T S(Cont'd.)

 3     DESCRIPTION                              PAGE

 4     Keller Exhibit 18, Document              307
       produced natively, Bates-stamped
 5     PPLP004449246

 6
       Keller Exhibit 19, Letter on            316
 7     Kirkland & Ellis letterhead dated
       8/31/18 from Welch to Donna Welch
 8     to the Plaintiffs' Executive
       Committee, not Bates-stamped
 9
10     Keller Exhibit 20, Report of            338
       Edward J. Buthusiem of Berkeley
11     Research Group, not Bates-stamped

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2              ERRATA SHEET FOR THE TRANSCRIPT OF:
 3      CASE NAME:  OPIOID LITIGATION
 4      DATE:       JUNE 13, 2019
 5      DEPONENT:   LACEY R. KELLER - CONFIDENTIAL
 6      Pg.  Ln.   Now Reads    Should Read    Reason
 7      ___  ___  _____   _____   _____
 8      ___  ___  _____   _____   _____
 9      ___  ___  _____   _____   _____
10      ___  ___  _____   _____   _____
11      ___  ___  _____   _____   _____
12      ___  ___  _____   _____   _____
13      ___  ___  _____   _____   _____
14      ___  ___  _____   _____   _____
15      ___  ___  _____   _____   _____
16      ___  ___  _____   _____   _____
17
18                        _____
19                        LACEY R. KELLER
20      SUBSCRIBED AND SWORN BEFORE ME
21      THIS____DAY OF_____  2019.
22
23      _____
24      (Notary Public)
25      MY COMMISSION EXPIRES:_____
```