1    IN THE UNITED STATES DISTRICT COURT
2     FOR THE NORTHERN DISTRICT OF OHIO
3            EASTERN DIVISION
4              -  -  -
5

IN RE:  NATIONAL          :  HON. DAN A.
6  PRESCRIPTION OPIATE      :  POLSTER
   LITIGATION               :
7                           :
   APPLIES TO ALL CASES     :  NO.
8                           :  1:17-MD-2804
                            :
9

10        - HIGHLY CONFIDENTIAL -

   SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                   -  -  -
12
              May 10, 2019
13
                   -  -  -
14

15         Videotaped deposition of
   PATRICK KELLY, taken pursuant to notice,
16  was held at the offices of Baron & Budd,
   600 New Hampshire Avenue, NW, Washington,
17  D.C., beginning at 8:58 a.m., on the
   above date, before Michelle L. Gray, a
18  Registered Professional Reporter,
   Certified Shorthand Reporter, Certified
19  Realtime Reporter, and Notary Public.
20              -  -  -
21

        GOLKOW LITIGATION SERVICES
22    877.370.3377 ph | 917.591.5672 fax
             deps@golkow.com
23
24

```
 1    APPEARANCES:
 2
      BARON & BUDD, P.C.
 3    BY:  MARK P. PIFKO, ESQ.
      BY:  STERLING CLUFF, ESQ.
 4    Encino Plaza
      15910 Ventura Boulevard
 5    Suite 1600
      Encino, California 91436
 6    (818) 839-2333
      mpifko@baronbudd.com
 7    scluff@baronbudd.com
      Representing the Plaintiffs
 8
 9    BRANSTETTER, STRANCH & JENNINGS, PLLC
      BY:  MICHAEL G. STEWART, ESQ.
10    223 Rosa L. Parks Avenue
      Suite 200
11    Nashville, Tennessee 37203
      (615) 254-8801
12    mstewart@bsjfirm.com
      Representing the Tennessee Plaintiffs
13
14    DAVIS POLK & WARDWELL, LLP
      BY:  BRIAN S. WEINSTEIN, ESQ.
15    BY:  MEREDITH MANNING, ESQ.
      450 Lexington Avenue
16    New York, New York 10017
      (212) 450-3037
17    brian.weinstein@davispolk.com
      Meridith.manning@davispolk.com
18    Representing HDA and the Witness
19
      BARNES & THORNBURG, LLP
20    BY:  WILLIAM E. PADGETT, ESQ.
      11 South Meridian Street
21    Indianapolis, Indiana 46204
      (317) 236-1313
22    william.padgett@btlaw.com
      Representing the Defendant, H.D. Smith
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Cont'd.)
 2
     DECHERT, LLP
 3   BY:  MELANIE MACKAY, ESQ.
     35 West Wacker Drive
 4   Suite 3400
     Chicago, Illinois 60601
 5   (312) 646-5800
     melanie.mackay@dechert.com
 6
            - and -
 7
     DECHERT, LLP
 8   BY:  DANA MARTIN, ESQ.
     35 West Wacker Drive
 9   Suite 3400
     Chicago, Illinois 60601
10   (312) 646-5800
     dana.martin@dechert.com
11   Representing the Defendant, Purdue
     Pharmaceuticals
12
13   REED SMITH, LLP
     BY:  ANNE E. ROLLINS, ESQ.
14   Three Logan Square
     1717 Arch Street, Suite 3100
15   Philadelphia, Pennsylvania 19103
     (215) 851-8226
16   arollins@reedsmith.com
     Representing the Defendant,
17   AmerisourceBergen Drug Corporation
18
     WILLIAMS & CONNOLLY, LLP
19   BY:  JENNIFER G. WICHT, ESQ.
     BY:  KATELYN ADAMS, ESQ.
20   725 12th Street, NW
     Washington, D.C. 20005
21   (202) 434-5148
     jwicht@wc.com
22   kadams@wc.com
     Representing the Defendant, Cardinal
23   Health
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Cont'd.)
 2

 3   ZUCKERMAN SPAEDER, LLP
     BY:  KYLE A. CRAWFORD, ESQ.
     1800 M Street, NW
 4   Suite 1000
     Washington, D.C. 20036
 5   (202) 778-1825
     kcrawford@zuckerman.com
 6   Representing the Defendant, CVS
 7

 8   JONES DAY
     BY:  SERGIO A. TOSTADO, ESQ.
     325 John H. McConnell Boulevard
 9   Suite 600
     Columbus, Ohio 43215
10   (614) 281-3898
     stostado@jonesday.com
11   Representing the Defendant, Walmart
12

13   COVINGTON & BURLING, LLP
     BY:  AMBER M. CHARLES, ESQ.
     850 Tenth Street, NW
14   Suite 586N
     Washington, D.C. 20001
15   (202) 662-5613
     acharles@cov.com
16   Representing the Defendant, McKesson
     Corporation
17

18   MARCUS & SHAPIRA, LLP
     BY:  ELLY HELLER-TOIG, ESQ.
19   One Oxford Centre, 35th Floor
     Pittsburgh, Pennsylvania 15219
20   (412) 338-3990
     ehtoig@marcus-shapira.com
21   Representing the Defendant, HBC
     Service Company
22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:   (Cont'd.)

 2

      ARNOLD PORTER KAYE SCHOLER, LLP
 3    BY:  WREDE SMITH, ESQ.
      601 Massachusetts Avenue, NW
 4    Washington, D.C. 20001
      (202) 942-5000
 5    wrede.smith@arnoldporter.com
      Representing the Defendants, Endo Health
 6    Solutions Endo Pharmaceuticals, Inc.; Par
      Pharmaceutical Companies, Inc. f/k/a Par
 7    Pharmaceutical Holdings, Inc.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    TELEPHONIC/STREAMING APPEARANCES:

 2

 3    GREENE KETCHUM FARRELL BAILEY & TWEEL, LLP
      PAUL T. FARRELL, JR., ESQ.
 4    419 Eleventh Street
      Huntington, West Virginia 25701
 5    (304) 521-4778
      Paul@greeneketchum.com
 6
              - and -
 7

 8    BARON & BUDD, P.C.
      BY:  WILLIAM G. POWERS, ESQ.
      600 New Hampshire Avenue, NW
 9    The Watergate, Suite 10-A
      Washington, D.C. 20037
10    (202) 333-4562
      Wpowers@baronbudd.com
11
              - and -
12

13    BARON & BUDD, P.C.
      BY:  JAY LICHTER, ESQ.
      BY:  JEFFREY LIPINSKI, ESQ.
14    BY:  ALEX SHERMAN, ESQ.
      Encino Plaza
15    15910 Ventura Boulevard
      Suite 1600
16    Encino, California 91436
      (818) 839-2333
17    jlichter@baronbudd.com
      jlipinski@baronbudd.com
18    asherman@baronbudd.com
      Representing the Plaintiffs
19

20    TUCKER ELLIS, LLP
      BY:  ANDREA M. GLINKA PRZYBYSZ, ESQ.
21    233 S. Wacker Drive, Suite 6950
      Chicago, Illinois 60606
22    (312) 624-6322
      andrea.przybysz@tuckerellis.com
23    Representing the Defendant, Janssen and
      Johnson & Johnson
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   TELEPHONIC/STREAMING APPEARANCES:
     (Cont'd.)
 2
 3   FOLEY & LARDNER, LLP
     BY:  GREGORY N. HEINEN, ESQ.
 4   777 East Wisconsin Avenue
     Milwaukee, Wisconsin 53202
 5   (414) 297-5913
     Gheinen@foley.com
 6   Representing Anda Inc.
 7
 8
 9
     LOCKE LORD, LLP
10   BY:  MADELEINE E. BRUNNER, ESQ.
     2200 Ross Avenue
11   Suite 2800
     Dallas, Texas 75201
12   (214) 740.8758
     Maddie.brunner@lockelord.com
13   Representing the Defendant,
     Henry Schein, Inc.
14
15   BAILEY WYANT PLLC
     BY:  HARRISON M. CYRUS, ESQ.
16   500 Virginia Street East
     Suite 600
17   Charleston, West Virginia 25301
     (304) 345-4222
18   Hcyrus@baileywyant.com
     Representing the Defendant, West
19   Virginia Board of Pharmacy
20
21   BARTLIT BECK, LLP
     BY:  LESTER C. HOUTZ, ESQ.
22   1801 Wewatta Street, Suite 1200
     Denver, Colorado 80202
23   (303) 592-3199
     lester.houtz@bartlit-beck.com
24   Representing the Defendant, Walgreens
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   TELEPHONIC/STREAMING APPEARANCES:
     (Cont'd.)
 2

 3

     FOX ROTHSCHILD, LLP
 4   BY:  ZACHARY MARTIN, ESQ.
     2700 Kelly Road
 5   Suite 300
     Warrington, Pennsylvania 18976
 6   (215) 918-3680
     Zmartin@foxrothschild.com
 7   Representing the Defendant, Prescription
     Supply Inc.
 8

 9   ROPES & GRAY LLP
     BY:  GREGORY MALLOY, ESQ.
10   800 Boylston Street
     Boston, Massachusetts 02199
11   (617) 951-7234
     Gregory.malloy@ropesgray.com
12   Representing the Defendant,
     Mallinckrodt
13

14   TUCKER ELLIS, LLP
     BY:  JEFFREY M. WHITESELL, ESQ.
15   950 Main Avenue
     Suite 1100
16   Cleveland, Ohio 44113
     (216) 696-2286
17   Jeffrey.whitesell@tuckerellis.com
     Representing the Defendant, Janssen and
18   Johnson & Johnson
19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:     (Cont'd.)

 2

 3    ALSO PRESENT:

 4

      Elizabeth A. Gallenagh, Esq.
 5    (HDA)

 6

      VIDEO TECHNICIAN:
 7    Dan Holmstock

 8

      LITIGATION TECHNICIAN:
 9    James Beall

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          -   -   -
 2                      I N D E X
 3                          -   -   -
 4

    Testimony of:
 5                               PATRICK KELLY
 6
            By Mr. Pifko                    26
 7
            By Ms. MacKay                   438
 8
 9
10

                            -   -   -
11
                      E X H I B I T S
12
                            -   -   -
13
14    NO.              DESCRIPTION              PAGE
15    HDA
      Kelly-1          Second Amended          32
16                     Notice of Subpoena
                       For Deposition
17
      HDA
18    Kelly-2          E-mail, 10/31/16        35
                       Subject, Chronology
19                     Of HDMA DEA
                       Involvement Updated
20                     10/31/16
                       & Attachment
21                     HDA_MDL_000081363-76
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                        -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    HDA
      Kelly-3          E-mail Thread           50
 7                     5/30/07
                       Subject, Confirmed
 8                     HDMA Conference Call
                       On DEA Issues
 9                     His-MDL-00620224-29
10    HDA
      Kelly-4          E-mail Thread           59
11                     9/26/07
                       Subject, HDMA DEA
12                     Strategy Meeting
                       Availability
13                     CAH_MDL_PRIORPROD_DEA07
                       00877471-73
14
      HDA
15    Kelly-5          E-mail Thread           66
                       10/30/07
16                     Subject, HDMA Board
                       Meeting
17                     HDA_MDL_000213427
18    HDA
      Kelly-6          PowerPoint              72
19                     Slides for Packaging
                       Call 12/10/07
20                     HDA_MDL_000143030
21    HDA
      Kelly-7          Letter, 7/25/07         79
22                     To Rannazzisi
                       CAH_MDL2804_02489197-98
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     -   -   -
 2          E  X  H  I  B  I  T  S   (Cont'd.)
 3                     -   -   -
 4
 5   NO.                DESCRIPTION              PAGE
 6   HDA
     Kelly-8           E-mail Thread            81
 7                     10/28/11
                       Subject, DEA Question
 8                     CAH_MDL2804_02489160
 9   HDA
     Kelly-9           Summary of the DEA       84
10                     HDMA Meeting on
                       Suspicious Orders
11                     Meeting Date
                       9/7/07
12                     CAH_MDL2804_02489199-200
13   HDA
     Kelly-10          E-mail Thread            91
14                     1/2/08
                       Subject, Suspicious
15                     Orders Project
                       HDA_MDL_000151104-19
16
     HDA
17   Kelly-11          NWDA Suspicious          108
                       Order Monitoring
18                     System
                       CAH_MDL2804_02201910-16
19
     HDA
20   Kelly-12          E-mail Thread            119
                       1/10/08
21                     Subject, Suspicious
                       Orders Business Procedures
22                     HDA_MDL_000150198
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -
 2          E X H I B I T S  (Cont'd.)
 3                    -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    HDA
      Kelly-13        E-mail Thread            122
 7                    1/17/08
                      Subject, Rewrite
 8                    HDA_MDL_000139414-15
 9    HDA
      Kelly-14        E-mail Thread            131
10                    2/6/08
                      Subject, HDMA RAC
11                    Conference Call
                      Reminder
12                    HDA_MDL_000213181-82
13    HDA
      Kelly-15        Slide Deck               136
14                    1/31/08
                      Review Anti-Trust
15                    And Anti-Harassment
                      Policies
16                    HDA_MDL_000213212-28
17    HDA
      Kelly-16        Slide Deck               151
18                    Suspicious Orders
                      and Diversion
19                    Prevention
                      HDMA, 1/31/08
20                    Arlington VA
                      HDA_MDL_000213229-40
21

      HDA
22    Kelly-17        E-mail, 2/5/08           160
                      Subject, Follow-up
23                    HDA_MDL_000141125-33
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                        -   -   -
 4
 5     NO.              DESCRIPTION              PAGE
 6     HDA
       Kelly-18         E-mail, 2/6/08           181
 7                      Subject, Discussion
                        Intro
 8                      HDA_MDL_000217851-53
 9     HDA
       Kelly-19         E-mail Thread            186
10                      2/6/08
                        Subject, HDMA RAC
11                      Conference Call Reminder
                        HDA_MDL_000148603-33
12
       HDA
13     Kelly-20         HDMA DEA Suspicious      199
                        Orders
14                      Best Practices
                        GPPC
15                      2/12/08
                        HDA_MDL_000213058-77
16
       HDA
17     Kelly-21         E-mail Thread            210
                        3/4/08
18                      Subject, HDMA RAC
                        Conference Call Reminder
19                      CAH_MDL2804_01521412-69
20     HDA
       Kelly-22         E-mail Thread            215
21                      3/20/08
                        Subject, DEA Strategy
22                      Document and
                        FDA Update
23                      Anda_Opioids_MDL_
                        0000157358-73
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          -   -   -
 2             E X H I B I T S  (Cont'd.)
 3                          -   -   -
 4
 5    NO.              DESCRIPTION           PAGE
 6    HDA
      Kelly-23        Draft Summary of the  231
 7                    DEA-HDMA Meeting
                      4/15/08
 8                    CAH_MDL2804_
                      02489188-90
 9
      HDA
10    Kelly-24        E-mail Thread         242
                      1/7/08
11                    Subject, RAC
                      Vice Chairmanship
12                    HDA_MDL_000156499-01
13    HDA
      Kelly-25        DEA Suspicious        261
14                    Orders:  Recommended
                      Industry Compliance
15                    Guidelines
                      Regional Roundtable
16                    5/7/08
                      HDA_MDL_000213078-88
17
      HDA
18    Kelly-26        DRAFT DEA Comments    263
                      From the 6/4/08
19                    Meeting on Suspicious
                      Orders
20                    CAH_MDL2804_02489191-96
21    HDA
      Kelly-27        HDMA Industry         283
22                    Compliance Guidelines
                      HDS_MDL_00218651-65
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         -   -   -

 2              E X H I B I T S  (Cont'd.)

 3                         -   -   -

 4

 5     NO.              DESCRIPTION              PAGE

 6     HDA
       Kelly-28         Letter, 10/17/08         284
 7                      To Gray from Goggin
                        CAH_MDL2804_02489203
 8
       HDA
 9     Kelly-29         Slide Deck Webinar       287
                        Industry Compliance
10                      Guidelines:  Reporting
                        Suspicious Orders
11                      and Preventing Diversion
                        Of Controlled Substances
12                      11/14/08
                        HDA_MDL_000145918-69
13
       HDA
14     Kelly-30         E-mail Thread            294
                        6/12/13
15                      Subject, For Review
                        RX Drug Abuse/Diversion
16                      One Pager
                        HDA_MDL_000080421-24
17
       HDA
18     Kelly-31         Chronology of            299
                        HDMA/DEA Executive
19                      Committee and
                        Board of Directors'
20                      Drug Abuse
                        1/2/18
21                      HDA_MDL_000155930-47

22

23

24
```

```
 1                        -   -   -
 2           E X H I B I T S  (Cont'd.)
 3                        -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    HDA
      Kelly-32         E-mail Thread            302
 7                     10/1/13
                       Subject, HDMA - Review
 8                     Requested by Thursday
                       10/3 12 Noon Eastern
 9                     HDA_MDL_000081415-16
10    HDA
      Kelly-33         GAO Meeting on DEA       303
11                     Draft TPs 9/20/10
                       HDA_MDL_000139905-10
12
      HDA
13    Kelly-34         E-mail Thread            314
                       4/20/12
14                     Subject, DEA
                       Initiatives
15                     HDA_MDL_000215234-36
16    HDA
      Kelly-35         E-mail Thread            331
17                     12/19/13
                       Subject, Follow-up
18                     HDMA Drug Diversion
                       Task Force
19                     Meeting 12/11/13
                       CAH_MDL2804_01110712-15
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                         -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    HDA
      Kelly-36         E-mail Thread            347
 7                     9/22/14
                       Subject, Manufacturer
 8                     Issue with Imminent
                       Danger Definition
 9                     HDA_MDL_000214864-65
10    HDA
      Kelly-37         E-mail Thread            351
11                     1/15/15
                       Subject, Reintroduction
12                     Of Ensuring Patient
                       Access and Effective
13                     Drug Enforcement Act
                       HDA_MDL_000081283-84
14
      HDA
15    Kelly-38         E-mail Thread            354
                       3/5/15
16                     Subject, Final Letter
                       Of Support for Ensuring
17                     Patient Access and
                       Effective Drug Enforcement
18                     Act of 2015
                       HDA_MDL_000081651-54
19
      HDA
20    Kelly-39         Statement from John      355
                       M. Gray, President and
21                     CEO HDMA
                       4/7/14
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                          -   -   -
 4
 5      NO.              DESCRIPTION              PAGE
 6      HDA
        Kelly-40        E-mail Thread         360
 7                      3/24/14
                        Subject, Coordination
 8                      Call Today?
                        MCKMDL00651560-64
 9
        HDA
10      Kelly-41        E-mail Thread         370
                        5/1/17
11                      Subject, HDA Letters
                        Supportive of Opioid
12                      Approaches in the States
                        HDA_MDL_000214979-82
13
        HDA
14      Kelly-42        E-mail Thread         375
                        8/5/08
15                      Subject, HDMA RAC
                        Conference Call
16                      Reminder
                        CAH_MDL2804_01364288-300
17
        HDA
18      Kelly-43        E-mail Thread         382
                        2/9/12
19                      Subject, New DEA
                        TPs
20                      HDA_MDL_00088099-01
21      HDA
        Kelly-44        E-mail Thread         389
22                      2/23/12
                        Subject, Draft Amicus
23                      Brief Cardinal v Holder
                        HDA_MDL_000215212-33
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                        -   -   -
 4
 5    NO.               DESCRIPTION              PAGE
 6    HDA
      Kelly-45          E-mail Thread           393
 7                      2/27/12
                        Subject, Cardinal's
 8                      Counsel's Comments
                        On Amicus Brief
 9                      HDL_MDL_000215970-73
10    HDA
      Kelly-46          E-mail Thread           398
11                      3/5/12
                        Subject, HDMA Amicus
12                      Brief Cardinal v Holder
                        HDA_MDL_000216300-02
13
      HDA
14    Kelly-47          E-mail Thread           404
                        11/19/15
15                      Subject, Masters Suit
                        Draft Amicus Outline
16                      For Your Consideration
                        HDA_MDL_000219211-13
17
      HDA
18    Kelly-48          E-mail Thread           406
                        1/18/16
19                      Subject, Action Requested
                        HDMA/Masters Amicus Brief
20                      HDA_MDL_000215966-67
21    HDA
      Kelly-49          E-mail Thread           408
22                      4/5/16
                        Subject, Amicus Brief
23                      Files in Masters Case
                        HDA_MDL_000162206-56
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -

 2            E X H I B I T S  (Cont'd.)

 3                        -   -   -

 4

 5    NO.              DESCRIPTION              PAGE

 6    HDA
      Kelly-50      E-mail Thread              412
 7                  10/29/15
                    Subject, HDMA Amicus
 8                  Brief
                    HDA_MDL_000212579-16
 9

      HDA
10    Kelly-51      Letter, 4/27/84            420
                    To Streck from Gitchel
11                  CAH_MDL2804_02201918-20

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -

 2              DEPOSITION SUPPORT INDEX

 3                        -   -   -

 4

 5    Direction to Witness Not to Answer

 6    PAGE    LINE
      None.

 7

 8    Request for Production of Documents

 9    PAGE    LINE
      30      18

10

11    Stipulations

12    PAGE    LINE
      None.

13

14    Questions Marked

15    PAGE    LINE
      429     4

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -

 2            THE VIDEOGRAPHER:  We are

 3     now on the record.  My name is

 4     Daniel Holmstock.  I'm the

 5     videographer for Golkow Litigation

 6     Services.

 7            Today's date is May 10,

 8     2019.  The time on the video

 9     screen is 8:58 a.m.

10            This deposition is being

11     held at the law offices of Baron &

12     Budd at 600 New Hampshire Avenue

13     Northwest, in Washington DC, in

14     the matter of In Re National

15     Prescription Opiate Litigation,

16     pending before the United States

17     District Court for the Northern

18     District of Ohio, Eastern

19     Division, MDL No. 2804.

20            Our deponent today is

21     Mr. Patrick Kelly, testifying in

22     his individual and 30(b)(6)

23     capacity for Healthcare

24     Distribution Alliance.
```

1    Counsel for appearances will

2    be noted on the stenographic

3    record.

4         The court reporter is

5    Michelle Gray who will now

6    administer the oath to the

7    witness.

8              -  -  -

9         ...PATRICK KELLY, having

10   been first duly sworn, was

11   examined and testified as follows:

12             -  -  -

13        MR. PIFKO:  Can we just go

14   around the room so I know who

15   everyone is who's here.  I know

16   we're going to keep -- the

17   reporter said everything would be

18   noted on the record.

19        But if everyone can

20   introduce yourself, your firm, and

21   who you represent.

22        So I'm Mark Pifko from Baron

23   & Budd on behalf of the

24   plaintiffs' executive committee.

Highly Confidential - Subject to Further Confidentiality Review

1     MR. WEINSTEIN:  Brian

2     Weinstein from Davis Polk for HDA

3     and the witness.

4     MS. MANNING:  Meredith

5     Manning from Davis Polk for HDA

6     and the witness.

7     MS. GALLENAGH:  Liz

8     Gallenagh, general counsel for

9     HDA.

10     MR. TOSTADO:  Sergio

11     Tostado, Jones Day, for Walmart.

12     MR. CRAWFORD:  Kyle

13     Crawford, Zuckerman Spaeder, for

14     the CVS defendants.

15     MS. WICHT:  Jennifer Wicht,

16     Williams & Connolly, Cardinal

17     Health.

18     MS. ADAMS:  Katelyn Adams,

19     Williams & Connolly, Cardinal

20     Health.

21     MR. PADGETT:  Bill Padgett,

22     Barns & Thornburg for HD Smith.

23     MS. ROLLINS:  Anne Rollins,

24     Reed Smith, for AmerisourceBergen

1    Drug Incorporation.

2         MS. HELLER-TOIG:  Elly

3    Heller-Toig from Marcus & Shapiro

4    for HBC Service Company.

5         MR. SMITH:  Wrede Smith from

6    Arnold & Porter for the Endo/Par

7    defendants.

8         MR. STEWART:  Mike Stewart,

9    Branstetter, Stranch & Jennings,

10    for the Tennessee case.

11         MS. CHARLES:  Amber Charles,

12    Covington & Burling, for McKesson

13    Corporation.

14         MS. MARTIN:  Dana Martin,

15    Dechert, for Purdue.

16         MS. MACKAY:  Melanie MacKay

17    from Dechert for Purdue.

18         MR. CLUFF:  Sterling Cluff,

19    Baron & Budd.

20              -   -   -

21         EXAMINATION

22              -   -   -

23  BY MR. PIFKO:

24         Q.   All right, Mr. Kelly.  My

1    name is Mark Pifko, as you just heard.

2    We just met for the first time off the

3    record.  I'm going to be asking you some

4    questions today.

5              I'm want to go over some

6    basic things before we get started.

7         A.    Yeah.

8         Q.    First and foremost, you are

9    under oath.  So you understand that your

10   testimony here is under penalty of

11   perjury, right?

12        A.    I do.

13        Q.    Okay.  And that means that

14   you're sworn to tell the truth, and if

15   you are intentionally misleading or

16   dishonest, you could be subject to

17   penalties from the court.  Do you

18   understand that?

19        A.    I understand.

20        Q.    Is there any reason why

21   you're not able to give truthful and

22   accurate testimony today?

23        A.    No.

24        Q.    You've been deposed before,

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2          A.    Yes.

3          Q.    How many times have you been

4    deposed before?

5          A.    Once.

6                MS. MACKAY:  Mark, I'm sorry

7          to interrupt.  Can we just get on

8          the record that an objection from

9          one attorney is good for all?

10               MR. PIFKO:  Yeah, that's

11         actually part of the depo

12         protocol, so we're good on that.

13               MS. MACKAY:  Great, thank

14         you.

15   BY MR. PIFKO:

16         Q.    So, okay, you've been

17   deposed one time before?

18         A.    Correct.

19         Q.    So --

20               MR. HOUTZ:  This is Lester

21         Houtz on the phone from Bartlit

22         Beck for Walgreens.  And I'm

23         hearing the questions fine.  But I

24         cannot hear the answers at all.

Highly Confidential - Subject to Further Confidentiality Review

1          THE VIDEOGRAPHER:  The only

2     way to do that is to speak up.

3          THE WITNESS:  I can speak

4     up.  I'll speak up.

5  BY MR. PIFKO:

6     Q.    All right.  So there's no

7  reason why you can think of that your

8  deposition shouldn't proceed today?

9     A.    No.

10     Q.    Is there any reason why you

11  wouldn't be able to give truthful and

12  accurate testimony today?

13     A.    No.

14     Q.    All right.  I've got some

15  materials here.  I think for the most

16  part I'm going to ask you to confirm some

17  information.  So as long as you're

18  truthful and honest, I think that it is

19  going to be an easy day for you.

20          You said that you were

21  deposed one other time?

22     A.    Yes.

23     Q.    What -- what was that?

24     A.    We were deposed in the

Highly Confidential - Subject to Further Confidentiality Review

1    Montana litigation.

2          Q.     Okay.  Was that -- you were

3    deposed in connection with your role for

4    the HDA?

5          A.     Correct.

6          Q.     And when was that?

7          A.     September.  I forget the

8    exact date.

9          Q.     Okay.  Where did that

10   happen?  Was that here in DC?

11         A.     Here in Washington DC.

12         Q.     Okay.  Was there a

13   transcript of that?

14         A.     I imagine there was.

15         Q.     Okay.  Have you seen the

16   transcript?

17         A.     I have not.

18                MR. PIFKO:  Okay.  We're

19         going to request a copy of that

20         just for potential impeachment

21         purposes.

22                MR. WEINSTEIN:  We can talk

23         about that offline.

24                MR. PIFKO:  Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. PIFKO:

2         Q.    All right.  So you

3    understand that you're here to answer

4    questions and your counsel may object

5    from time to time.  But unless he

6    instructs you not to answer, you're still

7    going to answer the question.

8    Understood?

9         A.    Understood.

10        Q.    Okay.  So you understand

11   that you're here in your individual

12   capacity but you're also here as the

13   official representative of HDA with

14   respect to certain topics, correct?

15        A.    I understand that, yes.

16        Q.    Okay.  And so that means

17   when you answer within those topics,

18   you're answering as if you are the HDA.

19   Do you understand that?

20        A.    I understand that.

21        Q.    Okay.  I'm going to hand you

22   a copy of the notice.

23             (Document marked for

24             identification as Exhibit

Highly Confidential - Subject to Further Confidentiality Review

1          HDA-Kelly-1.)

2     BY MR. PIFKO:

3          Q.    I'm handing you what's

4     marked as Exhibit 1, which is a copy of

5     the notice that brought us here today.

6     Have you seen this before?

7          A.    I have.

8          Q.    When was the first time you

9     saw this?

10         A.    Received it yesterday or the

11    day before in preparation for this.

12         Q.    Okay.  You are aware that

13    there's topics for which you're

14    designated?

15         A.    Yes.

16         Q.    When was the first time that

17    you became aware of the topics for which

18    you're designated?

19         A.    Two days ago in preparation

20    for this.

21         Q.    So the first time that you

22    had seen any of these topics was two days

23    ago?

24         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And I want to turn your

2    attention to -- there's some definitions

3    in the notice, if you can flip a few

4    pages in.  My -- after you get through

5    some of the initial pages, it's marked

6    Page 3.

7    A.    Okay.

8    Q.    Are you there?

9    A.    I am.

10    Q.    It says, "The terms 'you,'

11    'your,' and 'HDA.'"

12         Do you see that under D?

13    A.    I do.

14    Q.    Okay.  That refers to HDA

15    and its predecessor organizations

16    including the Healthcare Distribution

17    Management Association and the National

18    Wholesale Druggists' Association, the

19    Western Wholesale Druggists' Association.

20         Do you see that?

21    A.    I do.

22    Q.    And you understand that when

23    I ask you questions today about you, I'm

24    referring to those entities, okay?

1        A.      Yes.

2              MR. WEINSTEIN:  Mark, I just

3        ask if there are times that you're

4        asking him in his personal

5        capacity, when you say you, if you

6        can make that clear, that would be

7        great.

8              MR. PIFKO:  I think most of

9        the questions today will be

10        30(b)(6).

11   BY MR. PIFKO:

12        Q.      Okay.  So I want to then

13   turn your page -- or turn your attention

14   a few pages in to the topics.  They start

15   on Page 5.

16              Do you see that?

17        A.      I do.

18        Q.      Okay.  Go to Topic 4, which

19   actually is on Page 6.

20              Do you see Topic 4?

21        A.      I do.

22        Q.      Okay.  It's about the

23   industry compliance guidelines, including

24   the development of the guidelines,

1    communications regarding the guidelines

2    and modifications, revisions or changes

3    to the guidelines, and any councils,

4    committee, task force or working groups

5    concerning the guidelines.

6              Do you see that?

7         A.    I do.

8         Q.    Are you prepared to provide

9    testimony on that topic today?

10        A.    To the best -- to the best

11   of my ability, yes.

12        Q.    Okay.

13             MR. CRAWFORD:  Go ahead on

14        the phone again.

15             (Brief interruption.)

16             (Document marked for

17        identification as Exhibit

18        HDA-Kelly-2.)

19   BY MR. PIFKO:

20        Q.    All right.  I'm handing you

21   what's been marked as Exhibit 2, which is

22   a document Bates-labeled

23   HDA_MDL_000081363 to 81376.  Have you

24   seen this before?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I have.

2          Q.     Okay.  This is a document

3    from Anita Ducca to you dated October 31,

4    2016.  Agreed?

5          A.     Yes.

6          Q.     Okay.  Who is Anita Ducca?

7          A.     Anita Ducca is the senior

8    vice president of regulatory affairs for

9    Healthcare Distribution Alliance.

10         Q.     She reports to you?

11         A.     She does.

12         Q.     How long have you been with

13   the HDA?

14         A.     I joined in January of 2011.

15         Q.     The HDA is an organization

16   that acts on behalf of its members,

17   correct?

18         A.     That's correct.

19         Q.     Your members include the,

20   what we refer to in the case as the big

21   three distributors, Cardinal Health,

22   AmerisourceBergen, and McKesson; is that

23   correct?

24         A.     In addition to -- in

Highly Confidential - Subject to Further Confidentiality Review

1    addition to 29 other companies, yes.

2         Q.    Okay.  And you also have

3    manufacturers who are members of the

4    organization, correct?

5         A.    They are in a different

6    membership category, yes.

7         Q.    But they are still members?

8         A.    They are members in a

9    different category.

10        Q.    Okay.  Mallinckrodt is a

11   member?

12        A.    In the affiliate member

13   category I believe so, yes.

14        Q.    Okay.  Purdue?

15        A.    I believe so, in the -- in

16   the affiliate member category.

17        Q.    Janssen and Janssen?

18        A.    Johnson & Johnson?

19        Q.    Sorry.  Janssen -- Janssen

20   or Johnson & Johnson?

21        A.    Yes, I believe in the

22   affiliate member category.

23        Q.    Actavis?

24        A.    Actavis, I believe so in the

1   affiliate member category.

2          Q.    Teva?

3          A.    I believe so.

4          Q.    Endo?

5          A.    I believe so.

6          Q.    Okay.  The HDA doesn't act

7   on it -- on its own, it acts in the

8   interest of its members and on behalf of

9   its members, correct?

10             MR. WEINSTEIN:  Objection.

11        Objection to form.

12             Go ahead.  You've just got

13        to give me a moment to object.

14             THE WITNESS:  Sorry, I'm

15        sorry, I apologize.

16             We act on behalf of our core

17        members which are the distributor

18        members.

19   BY MR. PIFKO:

20        Q.    Okay.  You have a board,

21   correct?

22        A.    We do.

23        Q.    The board membership always

24   includes members from the big three,

1    AmerisourceBergen, McKesson, and Cardinal

2    Health, correct?

3         A.    In addition to the 29 other

4    members, yes.

5         Q.    Okay.  But the board always

6    has somebody from those companies on it?

7         A.    That's correct.

8         Q.    And then there's an

9    executive committee as well, correct?

10        A.    That is correct.

11        Q.    And what's the makeup of the

12   executive committee?

13        A.    The --

14              MR. WEINSTEIN:  Objection to

15        form.

16              THE WITNESS:  The executive

17        committee is seven members, three

18        members from the big three,

19        AmerisourceBergen, McKesson, and

20        Cardinal have a standing position

21        on the executive committee.

22              And then there are four

23        other positions that are other

24        member companies that filter

Highly Confidential - Subject to Further Confidentiality Review

1      through kind of as -- as positions

2      become available, retirement, and

3      companies move on.

4  BY MR. PIFKO:

5      Q.    The HDA doesn't take any

6  action without the approval of either the

7  executive committee or its board,

8  correct?

9          MR. WEINSTEIN:  Objection to

10     form.

11          THE WITNESS:  Again, it

12     depends -- it depends on what you

13     mean by action.  I mean, there are

14     certain things that rise to the

15     level of the board that require

16     their approval of expenditures, et

17     cetera.  But there are day-to-day

18     operations that do not require

19     approval of the board that we

20     undertake on behalf of the

21     membership.

22  BY MR. PIFKO:

23     Q.    Okay.  The HDA is not going

24  to undertake any project or program

1  without approval from its executive

2  committee or the board, correct?

3          MR. WEINSTEIN:  Objection to

4     form.

5          THE WITNESS:  Again, it

6     depends on the scope of the

7     program.  If there's a significant

8     cost or expenditure required, then

9     that would usually rise to the

10    level of the board.  Or the

11    executive committee.

12 BY MR. PIFKO:

13    Q.   The -- the HDA is not going

14 to communicate with a government agency

15 like the DEA without approval from the

16 executive committee or the board,

17 correct?

18          MR. WEINSTEIN:  Objection to

19    form.

20          THE WITNESS:  And again, it

21    depends on the level of

22    communication.  If it's just a

23    follow-up from a call or a

24    response to a request for

```
 1            information, that will not

 2            necessarily rise to the level of

 3            the board approval and engagement.

 4   BY MR. PIFKO:

 5        Q.    Okay.  But if you're going

 6   to launch some sort of detailed

 7   questioning or initiative that requires

 8   communication with the DEA, you're going

 9   to need executive committee approval or

10   board approval, correct?

11            MR. WEINSTEIN:  Objection to

12        form.

13            THE WITNESS:  Again, it

14        depends on the level of -- of

15        interaction with the DEA.

16   BY MR. PIFKO:

17        Q.    How about engaging with

18   members of Congress, is HDA going to

19   reach out to members of Congress without

20   approval from the board or the executive

21   committee?

22            MR. WEINSTEIN:  Objection to

23        form.

24            THE WITNESS:  We engage
```

1    with, I mean, members of Congress

2    on a weekly basis through a

3    variety of fronts depending on

4    committee hearings or fundraisers

5    that we attend from our political

6    action committee.

7         And again, all of those

8    are -- we communicate those to the

9    board, but they are not decisions

10   that need to be made by the board

11   before HDA staff engage.

12 BY MR. PIFKO:

13   Q.   Okay.  So then that was

14 going to be my other question.  When you

15 do communicate and interact with federal

16 agencies or state agencies or members of

17 Congress or any elected officials, you

18 always report back to either the board or

19 the executive committee, correct?

20        MR. WEINSTEIN:  Objection to

21   form.

22        THE WITNESS:  If it's -- if

23   it's relevant for board

24   consideration, yes.

1   BY MR. PIFKO:

2          Q.    Or the executive committee?

3          A.    Or the executive committee.

4          Q.    So going back to Exhibit 2.

5   You -- Ms. Ducca says that "per your

6   request, attached is a chronology of

7   interactions with the DEA."

8          Do you see that?

9          A.    I do.

10         Q.    You requested that she put

11  together a chronology of HDA/DEA

12  interactions in 2016?

13         A.    I don't know that I

14  requested that she put it together.  I

15  know that she had been basically

16  compiling the interactions.

17         Q.    Okay.  So she had been

18  compiling them contemporaneously with as

19  they occurred?

20         A.    Right.

21         Q.    And then you asked her at

22  this point for a copy of what she had

23  prepared?

24         A.    Yes.

1    Q.    The -- what follows after

2    the cover e-mail, this chronology, this

3    is accurate to the best of your

4    knowledge?

5    A.    To the best of my knowledge,

6    yes.  Some of it does take place before I

7    joined the organization.

8    Q.    But you're familiar with

9    these events?

10   A.    I am.

11   Q.    Okay.  And in connection

12   with providing testimony today, you've

13   made yourself familiar with all these

14   events, correct?

15   A.    Yes.

16   Q.    Okay.  We're going to be

17   talking about several of these, starting,

18   as I talked about with Topic 4, the

19   industry compliance guidelines.  You're

20   familiar with those?

21   A.    I am.

22   Q.    And you're familiar with the

23   history of those?

24   A.    Yes.

1        Q.    I want to ask you about a

2  couple items on the timeline on the first

3  page here, on HDA_MDL_00081364.  Are you

4  there?

5        A.    I am.

6        Q.    Okay.  So it says,

7  "Approximately 2005, DEA begins wholesale

8  distributor meetings."

9        Do you see that?

10       A.    I do.

11       Q.    Okay.  And then it's got

12  three other dates on the next entry.  It

13  says, "DEA sends letters on quote

14  'responsibilities of controlled

15  substances distributors' for reporting

16  and preventing diversion to

17  distributors."

18       Do you see that?

19       A.    I do.

20       Q.    Those are what we refer to

21  as the Rannazzisi letters.  Is that a

22  term that you're familiar with?

23       A.    Yes.

24       Q.    Okay.  Do you know who

Highly Confidential - Subject to Further Confidentiality Review

1    Mr. Rannazzisi is?

2           A.     I do.

3           Q.     And who was he?

4           A.     He at the time was the head

5    of the office of diversion control at the

6    Drug Enforcement Administration.

7           Q.     And these are letters that

8    the DEA sent out, executed by

9    Mr. Rannazzisi, informing distributors

10   and members of the pharmaceutical

11   industry of their responsibilities with

12   respect to controlled substances

13   distribution, correct?

14               MR. WEINSTEIN:  Objection to

15        form.

16               THE WITNESS:  That's

17        correct.

18   BY MR. PIFKO:

19          Q.     Okay.  Then you have a,

20   "2007, DEA suspends several wholesale

21   distributor licenses."

22               Do you see that?

23          A.     I do.

24          Q.     Okay.  I know one of those

Highly Confidential - Subject to Further Confidentiality Review

```
 1    was AmerisourceBergen, who entered into a

 2    consent order on June 22nd, 2007.  Are

 3    you -- do you -- are you aware of that?

 4              MS. ROLLINS:  Objection to

 5         form.

 6              THE WITNESS:  I'm aware in

 7         general terms, yes.

 8    BY MR. PIFKO:

 9         Q.    Okay.  Are you aware of

10    other distributors who had their licenses

11    suspended in 2007.

12              MR. CRAWFORD:  Objection to

13         form.

14              THE WITNESS:  Not

15         specifically.

16    BY MR. PIFKO:

17         Q.    So to your knowledge, that's

18    the only one?

19              MR. WEINSTEIN:  Objection to

20         form.

21    BY MR. PIFKO:

22         Q.    The AmerisourceBergen one?

23              MR. WEINSTEIN:  Objection.

24              THE WITNESS:  That I'm aware
```

Highly Confidential - Subject to Further Confidentiality Review

1        of, yes.

2    BY MR. PIFKO:

3        Q.    Okay.  Go to the second page

4    of the chronology, are you there?

5        A.    I am.

6        Q.    Okay.  It says, "Spring

7    2010, press reports of another wholesale

8    distributor registration suspension."

9              Do you see that?

10       A.    I do.

11       Q.    Do you know who -- whose

12   registration was suspended in the spring

13   of 2010?

14       A.    I do not.

15       Q.    But you know some wholesale

16   distributor's registration was

17   suspended --

18       A.    According --

19       Q.    -- at that time?

20       A.    According to this

21   chronology, yes.

22       Q.    Okay.  And you believe this

23   chronology is true and correct?

24       A.    To the best of my knowledge,

1    yes.

2           Q.    I'm handing you what's been

3    marked as Exhibit 3.

4                (Document marked for

5           identification as Exhibit

6           HDA-Kelly-3.)

7    BY MR. PIFKO:

8           Q.    It's an e-mail from Pam

9    Ritter at the HDA dated Wednesday, May

10   30th, 2007, to a whole host members of

11   the pharmaceutical industry.  It's

12   Bates-labeled HSI_MDL_00620224 through

13   228.

14               MR. WEINSTEIN:  You can

15          take -- take a moment.

16   BY MR. PIFKO:

17          Q.    Take a moment to review that

18   and let me know when you're ready.

19               Do you know who Pam Ritter

20   is?

21          A.    Yes.

22          Q.    Who is Pam Ritter?

23          A.    Pam Ritter was the

24   administrative assistant for the

Highly Confidential - Subject to Further Confidentiality Review

1    department -- the government affairs

2    department at HDA.

3         Q.    Okay.  What's the government

4    affairs department?

5         A.    The government affairs

6    department is the department that I run

7    within the organization.  It is the

8    department that houses our regulatory

9    affairs, federal government affairs, and

10   state government affairs teams.

11        Q.    And Pam Ritter stills work

12   at the HDA?

13        A.    She is no longer employed at

14   the HDA.

15        Q.    Okay.  When did she leave?

16        A.    She retired at the end of

17   2018.

18        Q.    So have you -- you're

19   obviously are familiar with something

20   called the regulatory affairs committee?

21        A.    I am, yes.

22        Q.    That's a committee that's

23   within your purview?

24        A.    Yes, it is.

1      Q.    Okay.  That -- that includes

2    some subset of members?

3      A.    Yes, it does.

4      Q.    Okay.  But that -- at all

5    times, that includes AmerisourceBergen,

6    McKesson and Cardinal Health, correct?

7      A.    If they are able to

8    participate, yes.

9      Q.    Okay.  But they're standing

10    members of that committee?

11      A.    They -- yeah, as are the

12    rest of the members of the association,

13    yes.

14      Q.    Okay.  How about

15    manufacturers?  Are manufacturers --

16      A.    No.

17      Q.    -- part of that committee?

18      A.    No.

19      Q.    So there's a thread of

20    e-mails here, but it goes back to one

21    dated May 25th, 2007.

22            Do you see that?

23            It's sent by Ms. Ritter, but

24    the signature on it is from Anita.

Highly Confidential - Subject to Further Confidentiality Review

1        A.     I see it.

2        Q.     Okay.  And it's asking for a

3   telephone call to be held.

4        A.     Yes.

5        Q.     Do you see that?

6        A.     I do.

7        Q.     Okay.  And it says the

8   purpose of the call is -- I'm going to

9   quote here, it says, "At the May 17th --

10   which is 2007.  "At the May 17th

11   executive committee, there was a

12   discussion about recent DEA activities to

13   involve wholesale distributors in efforts

14   to prevent diversion."

15             Do you see that?

16        A.     I do.

17        Q.     Did I read that correctly?

18        A.     Yes.

19        Q.     Okay.  And as a result of

20   what HDA is calling recent DEA activities

21   to involve wholesale distributors in

22   efforts to prevent diversion, the

23   executive committee requested that HDA

24   become involved and come up with some

1    strategies to interact with DEA, correct?

2         A.    Yes.

3         Q.    Okay.  And so it says, "In

4    consultation with our outside counsel, we

5    are looking at covering the following

6    points at such a DEA meeting."

7              Do you see that?

8         A.    I do.

9         Q.    Okay.  It's got Items 1, 2,

10   3.

11             "One, give the DEA an

12   overview of our industry; two, discuss

13   limitations of the industry."  And three,

14   which is in bold, it says, "Provide

15   specific suggestions for efforts that

16   HDMA might offer to work on with the DEA

17   as a means to show good faith and also to

18   direct them to solutions that are

19   feasible for distributors."

20             Do you see that?

21        A.    I do.

22        Q.    And then it says that,

23   during this call that is being requested

24   to be held in early June, it says, "We

Highly Confidential - Subject to Further Confidentiality Review

1    particularly wish to focus on the third

2    item during this planned conference

3    call."

4              Do you see that?

5         A.    I do.

6         Q.    Do you agree with that?

7              MR. WEINSTEIN:  Objection to

8         form.

9              THE WITNESS:  I agree that's

10        what it says.

11   BY MR. PIFKO:

12        Q.    That was a focus of this

13   call that was going to be held in June?

14        A.    I think so.  I'll take it at

15   face value.  This was when I was not in

16   the organization.  But, yes.

17        Q.    Okay.  But you are a

18   30(b)(6) representative for HDA, correct?

19        A.    I am.  I am.  Yes, correct.

20        Q.    Okay.  And then at the

21   bottom here, it says, "I have attached a

22   draft list of possible suggestions."

23              Do you see that?

24        A.    I do.

1    Q.    Okay.  And then if we can --

2    if we turn the page.  We see something

3    headed "Not For External Distribution,

4    Potential Areas For Joint DEA

5    Distribution Industry Focus to Help

6    Prevent Diversion."

7            Do you see that?

8    A.    On which?

9    Q.    It's the fourth page in.

10   A.    Titled "Not For External

11   Distribution"?

12   Q.    Yes.  Are you there?

13   A.    Yeah, yeah, yeah.  I was --

14   okay.  I was reading.  Okay.  I see it.

15   Q.    Okay.  And it says -- so

16   this is the attachment from Ms. Ducca

17   where she says, "I have attached a draft

18   list of possible suggestions."  This is

19   that list.

20   A.    Right.  I see it.

21   Q.    Okay.  So Number 1 is,

22   "Suggest that the distribution industry

23   work together with DEA to establish

24   guide" -- "better guidelines."

1            Do you see that?

2        A.    I do.

3        Q.    And then it's got some

4   sub-bullet points.  Again, it talks

5   about -- it says, "A set of guidelines

6   similar to the HDMA, guidelines for

7   distribution system integrity that would

8   be used to evaluate potential pharmacy

9   customers before entering into agreements

10  to sell controlled substances to them."

11           Do you see that?

12       A.    I do.

13       Q.    Did I read that correctly?

14       A.    Yes.

15       Q.    Okay.  So, these are things

16  that the HDA was considering in response

17  to what -- what she says on the prior

18  page, "This recent DEA activities to

19  involve wholesale distributors in efforts

20  to prevent diversion," correct?

21       A.    Yes.

22       Q.    The third one she says is,

23  "As an extreme step, are the controlled

24  substances good candidates for a

1    restricted distribution program?  The

2    iPledge program is an example.  Although

3    no one is very enthusiastic about such

4    programs, it might be a better

5    alternative than DEA's current efforts.

6    In such a program, pharmacies and

7    prescribers would presumably have to make

8    commitments about their practices and

9    keep specific records, and distributors

10   could not sell to anyone who did not keep

11   these commitments."

12           Do you see that?

13       A.    I do.

14       Q.    So that's an option that was

15   being considered at this time, correct?

16       A.    Yes.

17       Q.    Taking stronger compliance

18   measures is not one of the topics on

19   here, correct?

20           MR. WEINSTEIN:  Objection to

21       form.

22           THE WITNESS:  Not on this

23       page, no.

24   BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you know if that was

2    something that was discussed with the

3    membership at the time?

4              MR. WEINSTEIN:  Objection to

5         form.

6              THE WITNESS:  I do not.

7    BY MR. PIFKO:

8    Q.    So to your knowledge, taking

9    stronger compliance measures was not

10   something that was in consideration in

11   response to this DEA activities, correct?

12             MR. WEINSTEIN:  Objection to

13        form.

14             THE WITNESS:  Again, I don't

15        know what was discussed, whether

16        that was discussed or not.  It's

17        not on this document.

18   BY MR. PIFKO:

19   Q.    Okay.  I'm handing you

20   what's marked as Exhibit 4.

21             (Document marked for

22        identification as Exhibit

23        HDA-Kelly-4.)

24   BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    This is another e-mail from

2    Ms. Ducca.  The subject is HDMA DEA

3    strategy meeting, availability response

4    requested on alternative dates.  It's

5    dated September 26, 2007.  And it's got

6    another e-mail below also from Ms. Ducca

7    dated September 25, 2007.

8         MS. WICHT:  Can you just

9         hold on until we have the

10        document --

11        MR. PIFKO:  Yeah, no

12        problem.  I was just going to -- I

13        was going to read the Bates label.

14        Bates label is

15        CAH_MDL_PRIORPROD_DEA07_00877471

16        through 473.

17   BY MR. PIFKO:

18        Q.    So take a minute to review

19   it and let me know when you're ready.

20        A.    Okay.

21        Q.    All right.  So on the first

22   page here again it's talking about

23   setting up some -- some meetings.

24             On the first page at the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    bottom of her -- Anita Ducca's e-mail,

 2    dated September 25, 2007.

 3              Do you see that?

 4         A.   I do.

 5         Q.   Okay.  She says, "Dear HDMA

 6    committee members."  So, the HDMA

 7    committee members, that includes all

 8    members?

 9              MR. WEINSTEIN:  Objection to

10         form.

11              THE WITNESS:  In this

12         instance it appears to be the

13         regulatory affairs committee and

14         the federal government affairs

15         committee.

16    BY MR. PIFKO:

17         Q.   And it's cc'd to the

18    government public policy committee as

19    well?

20         A.   Government public policy

21    council.

22         Q.   Oh, council.  Okay.

23              Those all include

24    representatives from all the HDA
```

1    distributor members?

2         A.    That participate in those

3    committees, yes.

4         Q.    Okay.  And again, that --

5    those include members from the big three

6    distributors, correct?

7         A.    Yes.

8         Q.    So she says here, "Given the

9    intensity and impact of the Drug

10   Enforcement Administration's recent

11   actions, and the concerns expressed by

12   HDMA's executive committee last week,

13   HDMA recommends developing a

14   comprehensive DEA strategy."

15            Do you see that?

16        A.    I do.

17        Q.    So at this time, the HDA on

18   behalf of its members was developing a

19   comprehensive DEA strategy as a result of

20   what they understood to be an -- intense

21   actions from the DEA; is that correct?

22            MR. WEINSTEIN:  Objection to

23        form.

24            THE WITNESS:  Yes, that is

Highly Confidential - Subject to Further Confidentiality Review

1        correct.

2    BY MR. PIFKO:

3        Q.    And then if you go to the

4    second page of the document, she outlines

5    some of the topics of discussions.

6              Do you see that?

7        A.    I do.

8        Q.    Okay.  So she says, "Our

9    initial thoughts are" -- I'm on the

10   second paragraph at the top there.  Are

11   you with me?

12       A.    Yes, I am.

13       Q.    She says, "Our initial

14   thoughts are to review the major DEA

15   issues."

16             Do you see that?

17       A.    I do.

18       Q.    And then she has in

19   parentheses what those issues are, right?

20       A.    Yes.

21       Q.    And one of them is

22   suspicious orders, correct?

23       A.    Yes.

24       Q.    And then she says, she wants

Highly Confidential - Subject to Further Confidentiality Review

1    to develop a specific policy and

2    positions and supporting information for

3    those issues.

4              Do you see that?

5        A.    Yes.

6        Q.    As well as an overall

7    strategy for identifying solutions.

8              Do you see that?

9        A.    I do.

10       Q.    "We would also

11   comprehensively assess HDMA's role in

12   future DEA interactions."

13             Do you see that?

14       A.    I do.

15       Q.    I said that correctly?

16       A.    Yes, you did.

17       Q.    Okay.  So then she says,

18   "Specific topics could include."  And

19   there are several bullet points here.

20             Do you see that?

21       A.    I do.

22       Q.    So she says, "For suspicious

23   orders," she says, are -- I'm reading the

24   second bullet point.  "Are there

1    alternatives we can propose to DEA, or

2    specific objections we should raise?

3    What supporting information exists?  Can

4    we develop a strategy for DEA's concerns?

5    Who should be involved?"

6              Do you see that?

7         A.    Yes.

8         Q.    So, again, there was a

9    discussion within the HDMA and its

10   members at this time about a strategy for

11   communicating with DEA, correct?

12             A.    Yes.

13        Q.    Another -- the

14   second-to-last bullet point, she has

15   here, she says, "What, if any, legal

16   options do we have to address all of the

17   above?"

18             Do you see that?

19        A.    I do.

20        Q.    So in addition to a DEA

21   strategy, HDMA and its members at this

22   time were also evaluating legal options

23   they might have to address these issues,

24   correct?

Highly Confidential - Subject to Further Confidentiality Review

1                   MR. WEINSTEIN:  Objection to

2           form.

3                   THE WITNESS:  According to

4           this, yes.

5    BY MR. PIFKO:

6           Q.    You don't have any reason to

7    dispute the accuracy of this?

8           A.    I don't.

9                   (Document marked for

10          identification as Exhibit

11          HDA-Kelly-5.)

12   BY MR. PIFKO:

13          Q.    I'm handing you what's

14   marked as Exhibit 5.  It is a single-page

15   e-mail.  It's Bates-labeled

16   HDA_MDL_000213427.  Take a minute to

17   review it and let me know when you're

18   ready.

19          A.    Okay.

20          Q.    There's two e-mails in here,

21   only really one of substance.  The

22   substantive e-mail is from John Gray

23   to -- is it Paul Julian dated Tuesday,

24   October 30th, 2007, and then John Gray

1    forwards that to Scott Melville.

2            Do you see that?

3        A.    I do.

4        Q.    And the subject is HDMA

5    board meeting.

6            Do you see that?

7        A.    Yes.

8        Q.    Okay.  Who's John Gray?

9        A.    John Gray is the president

10   and CEO of HDA.

11       Q.    To your knowledge, how long

12   has he been in that role?

13       A.    Since 2004 I believe, maybe

14   '3.

15       Q.    So at this time, he was

16   president and CEO of HDA?

17       A.    HDMA at the time, yes.

18       Q.    Okay.  And do you know who

19   Paul Julian is?

20       A.    Paul Julian was the board

21   member that was tasked to basically

22   represent McKesson on the HDA Board of

23   Directors.

24       Q.    Okay.  And then John Gray

1   forwards this exchange to Scott Melville.

2           Do you see that?

3        A.    I do.

4        Q.    Do you know who Scott

5   Melville is?

6        A.    I do.

7        Q.    Who is he?

8        A.    Scott Melville was the

9   former head of the government affairs

10  department at HDA.

11       Q.    Is Scott Melville still

12  there?

13       A.    He is not.

14       Q.    So did you take over his

15  position?

16       A.    I did.

17       Q.    And Anita Ducca reported to

18  him at this time?

19       A.    She did.

20       Q.    So John Gray writes to Paul.

21  He says, among other things, if you are

22  -- are you there?

23       A.    I am.

24       Q.    "The DEA issue concerning

1    the recent surge in DEA enforcement

2    around suspicious orders and methadone

3    was moved to the top of the HDMA priority

4    list."

5              Do you see that?

6         A.    I do.

7         Q.    Do you agree that the DEA

8    issue concerning what they call -- he

9    calls a recent surge in enforcement

10   around suspicious order was a top

11   priority of the HDMA at the time?

12        A.    I do.

13        Q.    He says, "The board wants

14   the association" -- that means the HDA,

15   correct?

16        A.    Yes.

17        Q.    -- "to quickly develop a

18   plan to deal with and work with the DEA

19   as necessary."

20              Do you see that?

21        A.    I do.

22        Q.    So there was discussions to

23   develop a plan to deal with the DEA at

24   this time, correct?

1    A.    Yes.

2    Q.    In response to this recent

3 surge in enforcement around suspicious

4 orders, correct?

5    A.    Yes.

6    Q.    Then he says, "Our first

7 step will be to assemble a legal task

8 force of member company attorneys

9 (inhouse or outside counsel) to meet with

10 our staff and discuss a course of action

11 with the DEA."

12         Do you see that?

13    A.    I do.

14    Q.    Then he says, "Is there

15 someone within your McKesson legal team

16 that could participate on this task

17 force?"

18         Do you see that?

19    A.    I do.

20    Q.    Are you aware of whether

21 such a task force was in fact formed?

22    A.    Not specifically.  I know

23 there were subsequent groups that were

24 formed, but I don't know if there was a

Highly Confidential - Subject to Further Confidentiality Review

1    legal task force.  In fact, I'm not aware

2    of a legal task force that was formed

3    specifically for this purpose.

4         Q.    Okay.  Are you aware that

5    either inhouse or outside counsel from

6    HDMA's distributor members participated

7    in discussions about this surge in DEA

8    enforcement around suspicious orders?

9              MR. WEINSTEIN:  Objection to

10        form.

11             THE WITNESS:  Not specific

12        meetings.

13   BY MR. PIFKO:

14        Q.    But you don't have any

15   reason to disagree with this?

16             MR. WEINSTEIN:  Objection to

17        form.

18             THE WITNESS:  I don't.

19   BY MR. PIFKO:

20        Q.    Did Anita Ducca tell you

21   that there was no such group?

22             MR. WEINSTEIN:  Objection to

23        form.

24             THE WITNESS:  She did not.

```
1    BY MR. PIFKO:

2         Q.    Is Anita Ducca the person

3    who would know for sure whether such a

4    group was formed?

5              MR. WEINSTEIN:  Objection to

6         form.

7              THE WITNESS:  I can't say

8         for certain whether she would know

9         or not.

10             (Document marked for

11        identification as Exhibit

12        HDA-Kelly-6.)

13   BY MR. PIFKO:

14        Q.    I'm handing you what's been

15   marked as Exhibit 6.  Exhibit 6 is a

16   PowerPoint presentation Bates-labeled

17   HDA_MDL_000143030 through 043 or 143043.

18             According to the metadata,

19   which is attached on the first page of

20   this document, it was last modified

21   December 10th, 2007, and the file name

22   was slide for -- "Slides for Packaging

23   Call, 12/10/2007."

24             Take a minute to review this
```

1    and let me know when you're ready.

2                   You're of course free to

3    review as much of the document as you see

4    fit, but I'm only going to ask you about

5    a couple pages of it.

6              A.    Okay.

7              Q.    Are you familiar with the

8    format of these slides?  Is that the HDMA

9    logo on the bottom?

10                  MR. WEINSTEIN:  Objection to

11             form.

12                  THE WITNESS:  I -- I am --

13             yes, that is a common slide format

14             that we have used.

15   BY MR. PIFKO:

16             Q.    And when you have these

17   conference calls, sometimes they have

18   webinars or you share the PowerPoint

19   presentations with people and you go

20   through them when you have a call?

21             A.    Sometimes.

22             Q.    Okay.  This is the kind of

23   PowerPoint that you might share with your

24   members during a call?

1              MR. WEINSTEIN:  Objection to

2        form.

3              THE WITNESS:  It could be.

4        I don't know if this specific

5        PowerPoint was shared with members

6        or not.  In fact, I'm not even

7        sure who the author is.  I can't

8        imagine --

9   BY MR. PIFKO:

10       Q.    That was going to my -- be

11  my next question.  Do you know who

12  K. Baskette is?

13       A.    I do not.

14       Q.    This was produced by HDMA,

15  do you have any reason to dispute the

16  authenticity of this document?

17       A.    I do not.

18       Q.    The first slide here says,

19  "Tomorrow's Outcome?"

20             Do you see that?

21       A.    Yes.

22       Q.    "What are the impacts on our

23  members?"

24             Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I do.

2    Q.    "Can we identify common

3    themes and problems?"

4          Do you see that?

5    A.    I do.

6    Q.    And then it says, "Should

7    we," and it's got some bullet points.

8          Do you see that?

9    A.    Yes.

10   Q.    One of them is, "Challenge

11   the DEA."

12         Do you see that?

13   A.    Yes.

14   Q.    At this time in late 2007 in

15   response to this surge in enforcement

16   activity, one of the strategies HDMA and

17   its members were considering was to

18   challenge the DEA, correct?

19         MR. WEINSTEIN:  Objection to

20     form.

21         THE WITNESS:  Yes.

22   BY MR. PIFKO:

23   Q.    It says on the next page,

24   "DEA will be here to describe their

1    expectations."

2              Do you see that?

3         A.    I do.

4         Q.    And it -- it gives some

5    examples of what HDA understands their

6    expectations to be at this time.

7              Do you see that?

8         A.    Yes.

9         Q.    "Know your customer better,"

10   correct?

11        A.    That's what it says.

12        Q.    "Have processes/controls in

13   place to detect suspicious orders,"

14   correct?

15        A.    Yes.

16        Q.    "Stop 'suspicious' order

17   sales" -- underlined -- "before

18   shipment."

19              Do you see that?

20        A.    Yes.

21        Q.    That's correct?

22        A.    Yes.

23        Q.    "Less interested in reports

24   after shipment."

1        Do you see that?

2        A.    Yes.  That's what it says,

3    yes.

4        Q.    Turn to the third page of

5    the document, of the -- the slides.  So

6    it's technically the fourth page of the

7    document.  "Suspicious orders - policy

8    questions" is the heading of the slide.

9            Do you see that?

10       A.    I do.

11       Q.    Halfway down the slide it

12   says, "Should we support DEA's efforts?"

13           Do you see that?

14       A.    Yes.

15       Q.    So there are some questions

16   about whether HDMA and its members were

17   going to support DEA's efforts, correct?

18       A.    Yes.

19           MS. MACKAY:  Object to form.

20           MR. WEINSTEIN:  Objection to

21       form.  Just got to give a second

22       after the question.

23           THE WITNESS:  Oh, I'm sorry.

24   BY MR. PIFKO:

1    Q.    One of the bullet points is,

2  "Develop business practices," which is --

3  business practices is in quote.

4            Do you see that?

5    A.    I do.

6    Q.    Do you now understand what

7  that refers to?

8    A.    I -- I think what it led to,

9  yes.

10    Q.    The industry compliance

11  guidelines, correct?

12    A.    Yes.

13    Q.    And then it says,

14  "Alternatively do we want to challenge

15  DEA's expectations?"

16            Do you see that?

17    A.    Yes.

18    Q.    And that was something else

19  HDMA and its members were considering at

20  this time, correct?

21            MS. MACKAY:  Object to form.

22            THE WITNESS:  Again, I think

23        there was a variety of

24        considerations going on at the

1    time, yes.

2    BY MR. PIFKO:

3        Q.    But this was one of them,

4    correct?

5        A.    According to this, yes.

6        Q.    Again, it says, "What are

7    our legal options?"

8              Do you see that?

9        A.    I do.

10       Q.    So there were some

11   evaluations of what legal strategies can

12   be employed to challenge the DEA's

13   expectations?

14             MR. WEINSTEIN:  Objection to

15        form.

16             THE WITNESS:  Again, I think

17        those considerations were being

18        discussed.

19             (Document marked for

20        identification as Exhibit

21        HDA-Kelly-7.)

22   BY MR. PIFKO:

23       Q.    I'm handing you what's

24   marked as Exhibit 7, it is a two-page

Highly Confidential - Subject to Further Confidentiality Review

1    document.  It's a letter on HDMA

2    letterhead dated July 25, 2007, from

3    Scott Melville.  It's Bates-labeled

4    CAH_MDL2804_02489197, through 198.  Take

5    a minute to review that and let me know

6    when you're done.

7         A.    Okay.

8         Q.    So this is -- this letter

9    Exhibit 7 is HDMA requesting a meeting

10   with DEA to discuss suspicious orders,

11   correct?

12        A.    Correct.

13        Q.    This is -- it's dated

14   July 25, 2007.  That's approximately a

15   month after AmerisourceBergen entered --

16   entered into a consent order with the

17   DEA, correct?

18             MS. ROLLINS:  Objection to

19        form.

20             THE WITNESS:  I'll take -- I

21        don't know the specific date when

22        that consent decree was entered

23        into.  I'm thinking it's in that

24        time frame.

1    BY MR. PIFKO:

2         Q.    Okay.  So you agree it's

3    roughly within that time frame?

4             MR. WEINSTEIN:  Objection to

5         form.

6             THE WITNESS:  I'll agree

7         that it was in that time frame.

8    BY MR. PIFKO:

9         Q.    At the bottom of the first

10   page of the letter, HDMA tells DEA, "Our

11   objective is to find an effective process

12   for the DEA and our members to achieve

13   the common goals of reducing the

14   potential for diversion in a less

15   adversarial environment."

16            Do you see that?

17        A.    I do.

18        Q.    That's what HDMA told DEA at

19   this time, correct?

20        A.    It's in the letter that we

21   sent to DEA, yes.

22            (Document marked for

23        identification as Exhibit

24        HDA-Kelly-8.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. PIFKO:

2         Q.    I'm handing you a single

3    page e-mail from Ms. Ducca marked as

4    Exhibit 8.  It's Bates-labeled

5    CAH_MDL2804_012489160.

6              It's from Ms. Ducca dated

7    October 28, 2011, to Cardinal Health's

8    Robert Giacalone.

9         A.    Giacalone.

10        Q.    Giacalone.

11             Take a minute to review it,

12   and I just have a couple questions about

13   this.

14        A.    Okay.

15        Q.    So in it, Ms. Ducca is

16   explaining the history of some of the

17   negotiations and discussions regarding

18   the industry compliance guidelines,

19   correct?

20        A.    Yes.

21        Q.    Okay.  And you could see

22   from the e-mail there are several

23   attachments, if you look on the header.

24        A.    I see that.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And then she says,

2    there's there -- there were three

3    meetings with DEA on the ICG guidelines,

4    one, April 15, 2008, one June 4, 2008,

5    one in September 2008.

6                Do you see that?

7         A.    I do.

8         Q.    And then she says she

9    attached a summary of the first one.

10                Do you see that?

11                "I've included a summary of

12   the first one."

13        A.    Yes, yes.

14        Q.    And then she says, "Labeled

15   draft since I didn't want it to look

16   final if it ever 'got out.'"

17                Do you see that?

18        A.    I do.

19        Q.    And then she says, "Also,

20   the second meeting consisted of DEA

21   giving us verbal feedback on their review

22   of the draft ICG that we gave them."

23                Do you see that?

24        A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    "This is, therefore, a

2    summary of that feedback."

3            Do you see that?

4    A.    I do.

5    Q.    "Again, we never called it

6    'final' since I was more interested in

7    finishing the ICG than in perfecting a

8    summary."

9            Do you see that?

10   A.    I do.

11   Q.    "For the third meeting I

12   didn't do a summary," she says.

13           Do you see that?

14   A.    I do.

15   Q.    And then she says, "Also

16   included is a summary of a meeting HDMA

17   had with DEA in September of '07 just to

18   ask them what was going on with their

19   meetings with distributors."

20           Do you see that?

21   A.    I do.

22           (Document marked for

23           identification as Exhibit

24           HDA-Kelly-9.)

1    BY MR. PIFKO:

2        Q.    I'm going to hand you some

3    of the attachments, starting with her

4    summary of the September 7th, 2007,

5    meeting with DEA.  Exhibit 9.

6            This is a two-page document,

7    Exhibit 9, Bates-labeled

8    CAH_MDL2804_02489199 through 200.  Take a

9    minute to review this.  And let me know

10   when you're done.

11       A.    Okay.

12       Q.    This was the meeting that

13   was held in response to the request that

14   HDA made on July 25th, 2007, correct?

15   This is a summary of that meeting,

16   correct?

17       A.    I believe so, yes.

18       Q.    Which is referred to in

19   Exhibit 7, right?  That's the letter.

20       A.    Yes.

21       Q.    Okay.

22            MR. WEINSTEIN:  It says

23   July 25, 2008, on the record here.

24   But it's 2007, just to be clear.

1          MR. PIFKO:  Oh, I said that,

2     okay.

3          MR. WEINSTEIN:  Yeah, yeah.

4  BY MR. PIFKO:

5     Q.    So this meeting included,

6  from HDMA, Scott Melville, Anita Ducca,

7  and David Durkin, who's outside counsel

8  for HDA, correct?

9     A.    Correct.

10     Q.    And DEA attendees included

11  Mark Caverly, Cathy Gallagher, Mike

12  Mapes, and Lisa Sullivan, correct?

13     A.    Correct.

14     Q.    So it's got different

15  headings, summary, key takeaways,

16  additional points DEA made included,

17  conclusion, and then HDMA questions and

18  assessment.

19          Do you agree those are the

20  headings she has?

21     A.    I agree.

22     Q.    In her summary section on

23  the first page -- so one of the things

24  that HDA requested in the July 25th,

Highly Confidential - Subject to Further Confidentiality Review

1    2007, letter, Exhibit 7, was to

2    understand the -- what we called the

3    distributor initiative.  And there is

4    some discussion here that Mike Mapes

5    provided about that.

6               Do you see that?

7               MR. WEINSTEIN:  Objection to

8         form.

9               THE WITNESS:  Yes.

10   BY MR. PIFKO:

11        Q.    Okay.  So the summary that

12   Ms. Ducca prepared says that, "Mr. Mapes

13   noted that DEA had met with approximately

14   15 to 20 wholesale distributors one on

15   one.  They had prioritized who to meet

16   with on a combination of wholesale

17   distributor sales volume and tracing back

18   to where they felt the source of products

19   for illicit internet pharmacies were

20   located."

21               Do you see that?

22        A.    I do.

23        Q.    Do you have any reason to

24   dispute that that's what DEA told HDMA

Highly Confidential - Subject to Further Confidentiality Review

1    during this meeting?

2         A.    I do not.

3         Q.    Then she says, key takeaways

4    from the meetings are -- from the meeting

5    were, first bullet point, "DEA's policy

6    was to expect more than just reporting

7    suspicious orders."

8              Do you see that?

9         A.    I do.

10        Q.    Second bullet point, "Simply

11   complying with the 'suspicious orders'

12   regulatory requirement does not mean, in

13   the agency's view, that the registrant is

14   making" -- "maintaining an effective

15   program to detect and prevention

16   diversion."

17             Do you see that?

18        A.    I do.

19        Q.    Did I read that correctly?

20        A.    You did.

21        Q.    Third bullet point, "DEA

22   indicated that they did not have the

23   resources to inspect every pharmacy;

24   therefore, it was important for the

Highly Confidential - Subject to Further Confidentiality Review

1   distributor to 'know their customers.'"

2           Do you see that?

3       A.    I do.

4       Q.    Do you have an -- any reason

5   to dispute that these were key takeaways

6   from the meeting?

7       A.    I do not.

8       Q.    Then she has under her

9   heading additional points DEA made

10  included.

11          Do you see that?

12      A.    Yes.

13      Q.    The second one says, "DEA

14  provided examples of what a

15  distributor" -- "a wholesale distributor

16  should do to 'know their customers' and

17  what to look for."

18          Do you see that?

19      A.    I do.

20      Q.    Do you have any reason to

21  dispute that DEA during this meeting

22  provided examples of what distributors

23  should do to know their customers?

24      A.    I do not.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Going to the second page,

2    second-to-last bullet point at the top of

3    that page, "DEA also indicated that they

4    were not going to make a decision for the

5    wholesale distributor as to when an order

6    was suspicious."

7         Do you see that?

8    A.    I do.

9    Q.    "They feel this is up to the

10   distributor."

11        Do you see that?

12   A.    I do.

13   Q.    Do you have any reason to

14   dispute that this is what DEA told HDMA

15   during this meeting?

16   A.    I do not.

17   Q.    Last bullet point.  "DEA

18   suggested that distributors should check

19   on the pharmacies' prescribing

20   physicians.  They pointed to some states

21   having online systems by which a

22   distributor could check to see if a

23   prescribing physician had a valid DEA

24   registration.  DEA suggested that

1    distributors ask who the doctors are that

2    are prescribing, where the pharmacy is

3    geographically with respect to its

4    prescribing doctors, and the patient

5    population."

6                 Do you see that?

7         A.    I do.

8         Q.    Any reason to dispute that

9    that's something that DEA told HDMA

10   during this meeting?

11        A.    I do not.

12        Q.    And per the normal practice,

13   HDMA would have communicated this

14   information back to its members after the

15   meeting occurred, correct?

16                 MR. WEINSTEIN:  Objection to

17        form.

18                 THE WITNESS:  Correct.

19                 (Document marked for

20        identification as Exhibit

21        HDA-Kelly-10.)

22   BY MR. PIFKO:

23        Q.    I'm handing you what's

24   marked as Exhibit 10.  For the record,

Highly Confidential - Subject to Further Confidentiality Review

1   it's a multiple-page document

2   Bates-labeled HDA_MDL_000151104 through

3   151118.  Take a minute to review

4   Exhibit 10 and let me know when you're

5   ready.

6              MR. WEINSTEIN:  I think I

7         have the last Bates as 119, just

8         for the record.

9              MR. PIFKO:  Oh, I did -- I

10        skipped that.  Sorry.  I didn't

11        see that was there.  Yeah, so it

12        goes through 119.

13             THE WITNESS:  Okay.

14   BY MR. PIFKO:

15        Q.    Are you ready?

16        A.    Yes.

17        Q.    So as we discussed when we

18   looked at Exhibit 3, in response to what

19   HDMA told its members was a recent DEA

20   activities to involve wholesale

21   distributors in efforts to prevent

22   diversion, HDMA and its members were

23   discussing putting together some best

24   practices or guidelines concerning

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious orders, correct?

2         A.    Correct.

3         Q.    And ultimately HDMA and its

4    members decided to move forward with that

5    project, correct?

6         A.    Correct.

7         Q.    If you look back at

8    Exhibit 9, in her summary, Ms. Ducca

9    references that, she says that "DEA

10   provided us with their latest

11   organizational chart," on the first page.

12   I don't know if you see that there.  And

13   explained the responsibilities of each

14   section.

15        A.    Yes.

16        Q.    Okay.  So going to

17   Exhibit 10, this is -- Exhibit 10 is

18   Ms. Ducca on Wednesday, January 2, 2008,

19   sending to a consultant HDMA hired on

20   behalf of its members to put together

21   this best practices, some background

22   information and a scope of work, correct?

23             MR. WEINSTEIN:  Objection to

24        form.

Highly Confidential - Subject to Further Confidentiality Review

1                    THE WITNESS:  Correct.

2    BY MR. PIFKO:

3          Q.    The consultant, his name was

4    Bill Wilson, correct?

5          A.    Yes.

6          Q.    She says, "Dear Bill, please

7    find the information we discussed."

8                Do you see that?

9          A.    I do.

10         Q.    "The last attachment

11   contains" -- "contains the 'scope of

12   work' for the project proposal."

13               Do you see that?

14         A.    I do.

15         Q.    The second page of this

16   document includes the -- this org chart

17   which came from the meeting with DEA,

18   correct?

19         A.    Yeah.  I imagine so, yes.

20         Q.    And then if you turn a few

21   more pages in.  So Ms. Ducca is including

22   some information that she says that --

23   background that this consultant might

24   need for his work, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Correct.

2    Q.    One of them is a

3  September 27, 2006, letter from

4  Mr. Rannazzisi, correct?

5    A.    Correct.

6    Q.    There are several pages that

7  are redacted.  And then the last three

8  pages are the scope of work for this

9  consultant, correct?

10    A.    Yes.

11    Q.    On the first page of the

12  scope of work, which is HDMA --

13  HDA_MDL_000151117, she provides different

14  headings.

15        One of -- the number -- the

16  second heading is "Objectives."

17        Do you see that?

18    A.    I do.

19    Q.    Okay.  And she says, "The

20  purpose of this project is to support

21  HDMA's efforts to aid its members in

22  responding to the drug enforcement

23  distributor initiative by preparing a

24  'model' set of suspicious order business

Highly Confidential - Subject to Further Confidentiality Review

1    practices."

2                    Do you see that?

3            A.      I do.

4            Q.      Do you agree that that was

5    the scope of work for this project?

6            A.      I do at the time.  Yes.

7            Q.      Okay.  So, she says, "The

8    final product will be a document

9    containing the business practices in the

10   form of a white paper that will" --

11                   Do you see that?

12           A.      I do.

13           Q.      And then she's got four

14   letter points here.

15                   Do you see that?

16           A.      I do.

17           Q.      The first one I'm

18   paraphrasing is for -- to serve as a

19   guide for evaluating the suitability of

20   distributor's customers.

21                   Do you see that?

22           A.      I do.

23           Q.      That's correct?

24           A.      Yes.

1    Q.    Okay.

2    A.    Stability and suitability of

3 distributor's customers.

4    Q.    The second goal of this

5 document is Letter B here, "Provide

6 guidance to healthcare distributors on

7 evaluating customer orders for controlled

8 substances to indicate when orders are

9 suspicious."

10        Do you see that?

11   A.    I do.

12   Q.    That's correct?

13   A.    That's what it says.

14   Q.    And that's one of the goals

15 of the final product?

16        MR. WEINSTEIN:  Objection to

17        form.

18        THE WITNESS:  It is my

19        understanding.

20 BY MR. PIFKO:

21   Q.    The third one, Letter C, is,

22 "Define criteria for use by HDMA members

23 that would signal when a customer is

24 placing a suspicious order and whether

1    there should be further evaluation."

2                 Do you see that?

3         A.     I do.

4                 MS. MACKAY:  Object to form.

5    BY MR. PIFKO:

6         Q.     That's correct, that was one

7    of the goals of this white paper?

8         A.     That's what it states here.

9         Q.     Do you have any reason to

10   dispute that was one of the goals?

11        A.     I do not.

12        Q.     Okay.  And then the fourth

13   one is, "Suggest criteria and mechanisms

14   for healthcare distributors to design of

15   a system to stop orders prior to

16   shipment, if/when an order is determined

17   to be suspicious."

18                Do you see that?

19        A.     I do.

20        Q.     That was another goal of

21   this model set of suspicious order

22   business practices, correct?

23        A.     Again, that's what it says

24   here, and I have no reason to dispute it.

1        Q.      So going to the -- the

2    second page of the scope of work.

3    HDA_MDL_001511178.  Are you there?

4        A.      I am.

5        Q.      The heading starts on the

6    prior page, but she says, "Background

7    information and research will include the

8    following components."

9                And then she's got letters A

10   through E.

11               Do you see that?

12       A.      I do.

13       Q.      Okay.  So these are things

14   that the consultant is supposed to do in

15   order to put together these model set of

16   suspicious order business practices,

17   correct?

18       A.      Yes.

19       Q.      Okay.  So one of them is to

20   evaluate DEA regulations and guidance

21   provided to healthcare distributors.

22               Do you see that?

23       A.      I do.

24       Q.      This includes historic

Highly Confidential - Subject to Further Confidentiality Review

1    information, the controlled substances

2    manual, a report to the Department of

3    Justice on suspicious orders for listed

4    chemical handlers, and more recent DEA

5    guidelines -- or guidance such as the

6    2006 Rannazzisi letter, Kyle Wright's

7    presentation to the HDMA.

8              Do you see that?

9    A.    Yes.

10   Q.    Okay.  That was one of the

11   things that this consultant was supposed

12   to look at to prepare these, correct?

13   A.    Yes.

14   Q.    Another thing was, it says,

15   "Obtaining where available copies of HDMA

16   member companies' internal suspicious

17   order business practices."

18             Do you see that?

19   A.    I do.

20   Q.    So one of the things that

21   this consultant was supposed to do was

22   collect the suspicious order business

23   practices from HDMA members, correct?

24             MR. WEINSTEIN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                  MS. MACKAY:  Objection to

3          form.

4                  THE WITNESS:  It says where

5          available, yes.

6    BY MR. PIFKO:

7          Q.    And then it says,

8    "Interviewing at least eight, as many as

9    ten, HDMA member companies."

10                 Do you see that?

11         A.    I do.

12         Q.    And then it's got several

13   bullet points about what the interviews

14   are supposed to include.

15                 Do you see that?

16         A.    I do.

17         Q.    One of them is, "Identify

18   preferences for content of such

19   guidances."

20                 Do you see that?

21         A.    I do.

22         Q.    Another one is, "Define a

23   mechanism for stopping shipments that are

24   suspicious before they are released from

1    a warehouse."

2              Do you see that?

3         A.    I do.

4         Q.    "Identify information that

5    is either nonessential, unsuitable or

6    lacks flexibility to be applicable across

7    HDMA's highly varied membership."

8              Do you see that?

9         A.    I do.

10        Q.    Those were all things that

11   the consultant was supposed to discuss in

12   his interviews with the member companies?

13        A.    That's what this stipulates,

14   yes.

15        Q.    Then another thing he was

16   supposed to consider was, "Input from

17   HDMA's outside counsel."

18             Do you see that?

19        A.    I do.

20        Q.    It says, "HDMA's outside

21   counsel is currently preparing

22   information pertaining to suspicious

23   order business practices."

24             Do you see that?

1     A.    Best practices, yes.

2     Q.    "The information being

3 prepared is based on his experience with

4 HDMA members and DEA expectations and it

5 is anticipated will address some of the

6 conditions that should be built into a

7 set of suspicious order business

8 practices."

9           Do you see that?

10    A.    Yes.

11    Q.    So that's another thing this

12 consultant was supposed to be

13 considering?

14    A.    According to this, yes.

15    Q.    Any reason to dispute that?

16    A.    No.

17    Q.    Letter E is, "Review of

18 previous HDMA guidelines and other

19 HDMA-generated materials pertaining to

20 suspicious orders and related compliance

21 programs."

22          Do you see that?

23    A.    I do.

24    Q.    You're aware that at this

1    time, HDMA had other guidelines for

2    suspicious orders, correct?

3              MR. WEINSTEIN:  Objection to

4         form.

5              THE WITNESS:  I don't know

6         that there were other guidelines

7         for suspicious orders.

8    BY MR. PIFKO:

9         Q.    Okay.  We'll get to that in

10   a minute.  Then it says underneath there,

11   "To the extent possible, the final

12   document should be designed in

13   recognition of the highly varying nature

14   of the wholesale distribution in terms of

15   individual HDMA member size, customer

16   base and needs, physician" -- "physical

17   location, information technology, et

18   cetera."

19              Do you see that?

20        A.    I do.

21        Q.    So you understood that these

22   guidelines were supposed to be adaptable

23   so that they could be implemented by any

24   of HDA's members, correct?

1          MR. WEINSTEIN:  Objection to

2     form.

3          THE WITNESS:  Correct.

4  BY MR. PIFKO:

5     Q.    So then item 4, she has is,

6  project steps, cost and timing.  So the

7  first step is designed to -- she wants

8  the consultant to design the interview

9  instrument.

10          Do you see that?

11     A.    I do.

12     Q.    And then if we turn the

13  page, the next step is contacting HDMA

14  members to request copies of their

15  current suspicious orders business

16  practices.

17          Do you see that?

18     A.    I do.

19     Q.    So we discussed this before.

20  This was Item B as some of the documents

21  that the consultant was supposed to use

22  to develop these, correct?

23     A.    Yes.

24     Q.    And then she says, "HDMA can

1    facilitate this by sending an e-mail to

2    our members making the request."

3                Do you see that?

4        A.    I do.

5        Q.    So you understand that and

6    agree that HDMA was going to request

7    copies of its members' suspicious order

8    business practices so that they could be

9    used for this project, correct?

10               MS. MACKAY:  Objection to

11        form.

12               THE WITNESS:  That's what I

13        understand, yes.

14   BY MR. PIFKO:

15       Q.    And then it says, "Identify

16   an appropriate individual within the

17   company with whom to conduct the

18   interview as described in 3-C above."

19               Do you see that?

20       A.    Yes, I do.

21       Q.    And then conduct the

22   interview, right?

23       A.    Yes.  I see that.

24       Q.    Okay.  And so -- and then

1    Item 3 was to then put pen to paper and

2    draft the guidelines, correct?

3           A.    Item -- yes, Item 3, yes,

4    prepare the draft.

5           Q.    And then she sets a deadline

6    of January 30th so that HDMA staff

7    committees and outside counsel can review

8    them, correct?

9           A.    That's what it says, yes.

10          Q.    And then she says, "There

11   may be some meetings with the government

12   and public policy council which is

13   scheduled for February 12th and 13th, and

14   maybe he needs to participate in those

15   meetings."

16                Do you see that?

17          A.    I do.

18          Q.    And then there's going to

19   be -- they are going to be discussing the

20   draft and obtaining feedback from the

21   committee, correct?

22          A.    That's what it says.

23          Q.    Then to the extent

24   necessary, Items 5 and 6 talk about how

Highly Confidential - Subject to Further Confidentiality Review

1    the consultant might need to make

2    revisions to the draft, agree?

3         A.    Agree.

4              MR. WEINSTEIN:  Mark, is

5         this a good time for a break?

6         We've been going about an hour and

7         a quarter.

8              MR. PIFKO:  Sure.

9              THE VIDEOGRAPHER:  The time

10        is 10:10 a.m.  We are going off

11        the record.

12             (Short break.)

13             THE VIDEOGRAPHER:  The time

14        is 10:24 a.m.  We are back on the

15        record.

16             (Document marked for

17        identification as Exhibit

18        HDA-Kelly-11.)

19   BY MR. PIFKO:

20        Q.    I'm handing you what's

21   marked as Exhibit 11.  For the record,

22   it's a document, a few pages long, with

23   the heading "NWDA Suspicious Order

24   Monitoring System."  It's Bates-labeled

Highly Confidential - Subject to Further Confidentiality Review

1    CAH_MDL2804_02201910 through 1916.

2                  MR. WEINSTEIN:  Is there a

3          date on this document, Mark?

4                  MR. PIFKO:  Not on this one.

5    BY MR. PIFKO:

6          Q.    Take a minute to review this

7    and let me know when you're done.  Before

8    you get mired in the details -- take as

9    much time as you need -- I just want to

10   confirm.

11                 So as we know from the other

12   e-mails and discussion on this best

13   practices guidelines issue, the HDA's

14   predecessor had some sort of other

15   suspicious order monitoring guidelines,

16   correct?

17                 MR. WEINSTEIN:  Objection to

18         form.

19                 MR. PADGETT:  Object to

20         form.

21                 MS. WICHT:  Object to the

22         form.

23                 THE WITNESS:  Again, I've

24         not seen this before.  But I will

Highly Confidential - Subject to Further Confidentiality Review

1          take you at your word, yes.

2    BY MR. PIFKO:

3          Q.    Well, she comments that one

4    of the things in Exhibit 10 that he's

5    supposed to review is the previous HDMA

6    guidelines.

7              Do you recall that?

8              MR. WEINSTEIN:  Where are

9         you referring to, Mark?

10             MR. PIFKO:  On Exhibit 10,

11        in the scope of work Section 3-E.

12        For the record, that's on

13        HDA_MDL_000151118.

14   BY MR. PIFKO:

15         Q.    My question is, you agree

16   there were previous guidelines.  She

17   makes reference to it in the scope of

18   work here, correct?

19         A.    She did make -- I agree she

20   did make a reference to it.  And this is

21   an example of those guidelines, I

22   imagine.  Yes.

23         Q.    To your knowledge, these are

24   dated around the '80s?

Highly Confidential - Subject to Further Confidentiality Review

 1              MR. WEINSTEIN:  Objection to

 2       form.

 3              THE WITNESS:  I have -- I

 4       have no idea when these are dated.

 5  BY MR. PIFKO:

 6       Q.    Okay.  Did you discuss

 7  these, or any prior HDA or its

 8  predecessor entity guidelines in

 9  preparing for depositions with anybody?

10       A.    I have not seen this

11  document before.

12       Q.    Did you undertake any effort

13  to familiarize yourself with HDA's prior

14  suspicious order guidelines in connection

15  with preparing for this deposition?

16       A.    Other than the ICGs, no,

17  nothing.

18       Q.    NWDA is a predecessor name

19  for HDA correct?

20       A.    That's correct.

21       Q.    National Wholesale

22  Druggists' Association, correct?

23       A.    Correct.

24       Q.    Okay.  Do you have any

Highly Confidential - Subject to Further Confidentiality Review

1  reason to dispute that these are

2  guidelines put out on suspicious order

3  monitoring, put out by the NWDA?

4          MR. WEINSTEIN:  Objection to

5      form.

6          THE WITNESS:  I have no

7      reason to dispute that.

8  BY MR. PIFKO:

9      Q.    I want to direct your

10 attention -- well --

11     A.    Can I read them?

12     Q.    Yeah.  Sure I didn't know if

13 you were ready.  I was only going to ask

14 you about a couple pages.

15     A.    Okay.

16     Q.    But take your time to look

17 at it as much as you need.

18     A.    Okay.

19     Q.    You ready?

20     A.    I am.

21     Q.    All right.  First page,

22 Section 1, "Background."  It says it's --

23 "It is the responsibility of the

24 wholesaler to design and operate a system

1    which will disclose to the wholesaler

2    suspicious orders of controlled

3    substances."

4              Do you see that?

5         A.    I do.

6         Q.    Do you have an understanding

7    that that is something that wholesale

8    distributors are required to do?

9              MR. WEINSTEIN:  Objection to

10        form.

11             THE WITNESS:  I do.

12   BY MR. PIFKO:

13        Q.    Then it -- a little bit

14   further down in that paragraph, it says,

15   "The requirement is to monitor individual

16   orders by measuring dosage units within

17   each order and to examine for suspicious

18   volumes.  Special emphasis should be

19   placed on unusual or sudden increases

20   with the volume of invoice lines

21   processed by the average wholesaler.

22   This task becomes increasingly difficult

23   as the number of products and dosage

24   sizes increase."

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2          A.    I do.

3          Q.    Do you understand that this

4    was foundational information for the

5    NWA's -- NWDA's suspicious order

6    monitoring system?

7                MR. WEINSTEIN:  Objection to

8          form and foundation, and objection

9          to scope.

10               THE WITNESS:  Again, I've --

11         I've not seen this document

12         before.

13   BY MR. PIFKO:

14         Q.    Are you aware that your

15   website currently states that the NWA was

16   renamed the Healthcare Distribution

17   Management Association in 2001?

18         A.    I am.

19         Q.    Okay.  So if these are from

20   the NWDA, they would have to be prior to

21   that date for sure, correct?

22         A.    Yes.

23         Q.    It's got a Section 2,

24   "Definition Of Suspicious Orders."  It

Highly Confidential - Subject to Further Confidentiality Review

1    says, "Suspicious orders include orders

2    of unusual size, orders deviating

3    substantially from a normal pattern, and

4    orders of unusual frequency."

5              Do you see that?

6         A.   Yes.

7         Q.   Is that consistent with what

8    your understanding of what is stated in

9    the regulations about the definition of

10   suspicious order?

11        A.   That is all that is stated

12   in -- in the regulations, yes.

13        Q.   I want to -- there's page

14   numbers on the bottom of this document,

15   Page 7, which is 02201916.

16              Tell me when you're there.

17        A.   I'm there.

18        Q.   Okay.  It says, "Single

19   Suspicious Orders," Heading 9.

20              Do you see that, right

21   before summary?

22        A.   I do.

23        Q.   It says, "Single orders of

24   unusual size or deviation must be

Highly Confidential - Subject to Further Confidentiality Review

1    reported immediately."

2              Do you see that?

3         A.    I do.

4         Q.    Is that consistent with your

5    understanding of what's required?

6              MR. WEINSTEIN:  Objection to

7         form, foundation, and scope.  And

8         calls for a legal conclusion.

9              THE WITNESS:  Again, I see

10        what that -- it states.  Again,

11        I'm not an attorney, so I don't

12        know what the individual practice

13        would require.

14   BY MR. PIFKO:

15        Q.    Okay.  Then it says here,

16   "The submission of a monthly printout of

17   after-the-fact sales will not relieve a

18   registrant from the responsibility of

19   reporting these single excessive or

20   suspicious orders."

21              Did I read that correctly?

22        A.    You did.

23        Q.    Then it says, "DEA has

24   interpreted 'orders'" -- the word orders

1    is in quotes -- "to mean prior to

2    shipment."

3              Do you see that?

4         A.    I do.

5         Q.    Did I read that correctly?

6         A.    You did.

7         Q.    So do you understand this to

8    be saying that an order has to be

9    identified before shipping it?

10             MR. WEINSTEIN:  Objection to

11        form, foundation, scope.  And

12        calls for a legal conclusion.

13             THE WITNESS:  Again, I see

14        what it says here on paper.  But

15        again I'm not an attorney.  I'm

16        not exactly sure what the practice

17        would require.

18   BY MR. PIFKO:

19        Q.    Okay.  All I'm asking you is

20   what you understand this document to be

21   saying.  You understand it to be saying

22   that an order needs to be identified and

23   reported prior to shipment.

24             MR. WEINSTEIN:  Mark, he

Highly Confidential - Subject to Further Confidentiality Review

1      said he's never seen this document

2      before.

3            THE WITNESS:  I -- I can

4      read what -- what the document

5      says, yes.

6  BY MR. PIFKO:

7      Q.    Is that -- is that what your

8  understanding of the document is?  That's

9  all I'm asking.

10           MR. WEINSTEIN:  Objection to

11     form.  Objection to scope.

12           He's testified he's never

13     seen this document before.  The

14     document says what it says.

15           THE WITNESS:  Again, the

16     document says what it says and I

17     can read what it says.

18  BY MR. PIFKO:

19     Q.    Okay.  But you have English

20  comprehension.  You understand when you

21  read something, right?

22     A.    I -- I do have English

23  comprehension.

24     Q.    Okay.  So all I'm asking you

Highly Confidential - Subject to Further Confidentiality Review

1    is what you understand this to be saying.

2              MR. WEINSTEIN:  Same

3         objections.

4              THE WITNESS:  I understand

5         it says, verbatim, DEA has

6         interpreted orders to mean prior

7         to shipment.

8    BY MR. PIFKO:

9         Q.    Okay.  And so do you

10   understand that to mean in the context of

11   this other language in the paragraph

12   here, that that means an order has to be

13   reported prior to being shipped?

14             MR. WEINSTEIN:  Objection to

15        form, foundation, scope.  And

16        calls for a legal conclusion.

17             THE WITNESS:  Again, that's

18        what it says.  That's what I would

19        understand it to mean.

20   BY MR. PIFKO:

21        Q.    Okay.

22             (Document marked for

23        identification as Exhibit

24        HDA-Kelly-12.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. PIFKO:

2         Q.    I'm handing you what's

3    marked as Exhibit 12.  It's a single page

4    e-mail.  Bates labeled HDA_MDL_000150198.

5    Take a minute to review that and let me

6    know when you're done.

7         A.    Okay.

8         Q.    So this is from Anita Ducca

9    to Bill Wilson, who is the consultant who

10   is putting together the best practices or

11   industry compliance guidelines, correct?

12        A.    Yes.

13        Q.    Okay.  And this is dated

14   January 10, 2008.

15             Do you see that?

16        A.    Yes.

17        Q.    She says, "Bill, all week we

18   have been contacting our members to

19   request their suspicious order

20   information."

21             Did I read that correctly?

22        A.    You did.

23        Q.    "This is the first of a few

24   e-mails I'll be sending with what we

1    received so far.  This is from our member

2    Henry Schein, Inc."

3                    Do you see that?

4         A.    I do.

5         Q.    So as we discussed, one of

6    the things that the consultant was

7    supposed to do was to obtain copies of

8    the member companies' suspicious order

9    policies and procedures and incorporate

10   information from those into these model

11   guidelines, correct?

12                   MR. WEINSTEIN:  Objection to

13        form.

14                   MS. MACKAY:  Objection to

15        form.

16                   THE WITNESS:  Correct, yes.

17   BY MR. PIFKO:

18        Q.    Okay.  So this confirms that

19   HDA was, in fact, collecting these

20   procedures and sending them to their

21   consultant, correct?

22        A.    Yes, according to this, yes.

23        Q.    Do you have any reason to

24   dispute that that happened?

1     A.     I do not.

2            (Document marked for

3     identification as Exhibit

4     HDA-Kelly-13.)

5  BY MR. PIFKO:

6     Q.     I'm handing you what's

7  marked as Exhibit 13.  It's another

8  single page -- well, there's a tiny bit

9  of language on the second page.

10           MR. WEINSTEIN:  And, Mark, I

11    should just say, to avoid any

12    confusion on the record, there's

13    obviously references throughout to

14    members.  Mr. Kelly is obviously

15    interpreting that when you use

16    that phrase to mean the

17    distributor members.

18           If at any point you are

19    specifically referring to

20    manufacturer members, if you could

21    just make that clear, so that we

22    have a clear record, I would

23    appreciate that.

24  BY MR. PIFKO:

1        Q.    Exhibit 13 is a document

2   Bates-labeled HDA_MDL_000139414 through

3   415.

4                MR. PIFKO:  And, Brian, to

5           be clear, I understand that you're

6           trying to make your record, but

7           you can't be coaching the witness.

8           You can't be saying things like

9           he's never seen this before --

10               MR. WEINSTEIN:  I absolutely

11          can --

12               MR. PIFKO:  You can't be

13          saying things like --

14               MR. WEINSTEIN:  -- when you

15          ask an inappropriate question.

16               MR. PIFKO:  -- here -- here

17          is what the -- he's referring to.

18          You're not being deposed here.

19          Okay?

20               MR. WEINSTEIN:  Mark, if you

21          ask an inappropriate question I'm

22          going to protect the record.

23               MR. PIFKO:  You can -- you

24          can -- no --

Highly Confidential - Subject to Further Confidentiality Review

1          MR. WEINSTEIN:  So ask your

2     question --

3          MR. PIFKO:  -- you can

4     object to form.  You can object

5     for specificity --

6          MR. WEINSTEIN:  I can object

7     when you ask an inappropriate

8     question.

9          MR. PIFKO:  But you can't --

10     those are speaking objections --

11          MR. WEINSTEIN:  Absolutely

12     not.

13          MR. PIFKO:  -- and we're not

14     going to have those.  Okay?

15          MR. WEINSTEIN:  Absolutely

16     not.  I'm very disciplined, and

17     I'll continue to act

18     appropriately.

19  BY MR. PIFKO:

20          Q.    Let me know when you're done

21  reviewing this document.

22          A.    Okay.

23          Q.    So this is from Bill Wilson,

24  the consultant, e-mailing Ms. Ducca on

Highly Confidential - Subject to Further Confidentiality Review

1   January 17, 2008.

2            Do you see that?

3        A.    I do.

4        Q.    The subject is "Rewrite."

5   And here he's sending a draft of the

6   questionnaire.  You recall that that was

7   the first step of his engagement,

8   correct?

9        A.    Yes.

10       Q.    Okay.  Do you have any

11  dispute -- any reason to dispute that

12  this is the first draft or one of the

13  drafts of his questionnaire that he was

14  going to be asking members when he

15  interviewed them?

16            MR. WEINSTEIN:  Objection to

17       form.

18            THE WITNESS:  I have no

19       reason to dispute that this is the

20       first draft.

21  BY MR. PIFKO:

22       Q.    Okay.  And one of the topics

23  that he wants to ask HDMA's members is,

24  he says, "DEA says 'know your customer.'

Highly Confidential - Subject to Further Confidentiality Review

 1    What is your understanding of that

 2    statement and what as a company are you

 3    doing to meet that requirement?"

 4              Do you see that?

 5        A.    I do.

 6        Q.    Okay.  Then there's a bunch

 7    of questions.  He has, "What steps do you

 8    take about adding a new customer?"

 9    Various questions about things people

10    could ask a new customer.

11              Do you see that?

12        A.    I do.

13        Q.    "How do you handle

14    discrepancies if they don't answer the

15    questions or if they leave something

16    blank?"

17              Do you see that?

18        A.    No.

19        Q.    Just below the block of

20    questions about adding a new customer.

21    "Based on information you gather from the

22    potential customer, how do you handle

23    discrepancies in the information" --

24        A.    Okay.  Okay.  You -- all

1  right.  Yes.

2          Q.    That was something else that

3  he was asking?

4              MR. WEINSTEIN:  Objection to

5      form.

6  BY MR. PIFKO:

7          Q.    To the members, correct?

8              MR. WEINSTEIN:  Same

9      objection.

10             THE WITNESS:  Yes.  Again,

11     this is the draft.  So I don't

12     know what the actual final vehicle

13     entailed or not.

14  BY MR. PIFKO:

15         Q.    Okay.  One of the questions

16  is, "Do you feel what you are doing now

17  should be sufficient?"

18             Do you see that?

19         A.    I do.

20         Q.    You understand that that was

21  something that he was asking the members?

22             MR. WEINSTEIN:  Objection to

23     form.

24             THE WITNESS:  Again, whether

Highly Confidential - Subject to Further Confidentiality Review

1        that was in the final.  This is a

2        draft.  And again, I don't know if

3        that was the final.  I know that

4        was here on the paper, but first

5        draft.

6   BY MR. PIFKO:

7        Q.    Okay.  You understand Topic

8   4 is the guidelines and the process of --

9        A.    Correct.

10       Q.    -- gathering them, and that

11  is something that you're designated to

12  testify on about, right?

13       A.    I do.

14       Q.    And you have a duty to be

15  familiar with all the attributes of it,

16  correct?

17            MR. WEINSTEIN:  Objection to

18       form.

19            THE WITNESS:  Of the

20       document -- yes.  Of the ICGs,

21       yes, and the process.

22  BY MR. PIFKO:

23       Q.    Okay.  And the development

24  of them, correct?

1        A.     Correct.

2               MR. WEINSTEIN:  Objection to

3        form.

4    BY MR. PIFKO:

5        Q.     This concerns developing

6    them, correct?

7        A.     It does.  I've not seen this

8    e-mail before.

9        Q.     If you turn to the second

10   page.  Two other questions here, "In

11   building a model for compliance, what

12   steps do you feel are essential to a good

13   compliance program?"

14              Do you see that?

15       A.     I do.

16       Q.     You understand that that was

17   something that was asked of HDA members

18   in connection with this project?

19              MR. WEINSTEIN:  Objection to

20       form.  Foundation.

21              THE WITNESS:  Again, it was

22       part of the initial draft.

23   BY MR. PIFKO:

24       Q.     How about, "In building a

Highly Confidential - Subject to Further Confidentiality Review

1    model for compliance, what steps do you

2    feel you could not do based on your

3    customer base?"

4              Do you see that?

5         A.    I do.

6         Q.    You understand that that was

7    also something that was being discussed

8    with the members in connection with

9    drafting these guidelines?

10             MR. WEINSTEIN:  Objection to

11        form.  Foundation.

12             THE WITNESS:  Again, I think

13        it was part of the first draft,

14        yes.

15   BY MR. PIFKO:

16        Q.    You recall in some of the

17   other discussions that we looked at in

18   the prior exhibits, feasibility of the

19   guidelines and adaptability was a feature

20   that HDMA and its members wanted to

21   include in the guidelines, correct?

22             MR. WEINSTEIN:  Objection to

23        form.

24             THE WITNESS:  Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. PIFKO:

2         Q.    You didn't want to have

3    guidelines that its member companies

4    could not adopt, correct?

5              MR. WEINSTEIN:  Objection to

6         form.  Foundation.

7              THE WITNESS:  Correct.

8              (Document marked for

9         identification as Exhibit

10        HDA-Kelly-14.)

11   BY MR. PIFKO:

12        Q.    I'm handing you what's

13   marked Exhibit 14.  For the record,

14   Exhibit 14 is a two-page document

15   Bates-labeled HDA_MDL_00213181 through

16   82.  Take a minute to review it.  Let me

17   know when you're done.  It's another

18   e-mail from Ms. Ducca, two e-mails from

19   her, one dated Wednesday, February 6,

20   2008, and another one dated the same day,

21   just from an earlier time.

22        A.    Okay.

23        Q.    What do you know about Bill

24   Wilson's background?

1        A.    I have never met Bill

2   Wilson.  He was engaged during a time

3   before I got to the organization.  I

4   understand that he was a consultant with

5   expertise in compliance-related issues.

6   I don't know if he had any specific DEA

7   experience or not.

8        Q.    Looking at Exhibit 14, if

9   you -- you know how you read e-mails on

10  these.  You have to read the back pages,

11  or the earlier pages.

12            So looking at the second

13  page, it's -- this e-mail Ms. Ducca

14  sends, Wednesday, February 6, 2008, and

15  the subject is HDMA RAC conference call

16  reminder.

17            RAC is regulatory affairs

18  committee, correct?

19       A.    That's correct.

20       Q.    And then it says here, "To

21  regulatory affairs committee.

22  Participants in the January 31 HDMA

23  meeting on suspicious order best

24  practices."

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.    I do.

3     Q.    So there was going to be a

4 meeting on February 7th to discuss the

5 revised draft best practices, correct?

6     A.    Yes.

7     Q.    On the -- on the first page

8 of the e-mail she discusses a meeting

9 that occurred on January 31, 2008.  If

10 you look at the attachments on the -- on

11 the header, it says, "Final slides for

12 1/31/08."

13          Do you see that?

14          HDMA.  And then it also

15 says, "HDMA 01/31/08, D. Durkin."

16          Do you see that?

17     A.    I do, yes.

18     Q.    Okay.  You recall that one

19 of the things in the discussions with the

20 consultant was that there was a deadline

21 of January 30th to get a draft of the

22 guidelines?

23     A.    I -- I do recall that, yes.

24     Q.    Okay.  And you agree that

Highly Confidential - Subject to Further Confidentiality Review

1   there was a meeting on January 31, 2008,

2   to discuss the guidelines and various

3   other aspects of it, of the project?

4        A.    Yes.

5        Q.    So looking at this first

6   page of the first e-mail, the top, the

7   more recent one, the second paragraph,

8   she says, "The meeting went very well and

9   we had excellent member input."

10            That's discussing the

11  January 31, 2008, meeting, correct?

12       A.    Yes.

13       Q.    "We discussed DEA's

14  requirements, expectations and recent

15  letters, and discussed the importance and

16  use of a set of best practices and what

17  the next steps will be after they are

18  completed."

19            Do you see that?

20       A.    I do.

21       Q.    Then she says, "I have

22  attached the overhead slides that HDMA

23  and our outside counsel provided at the

24  meeting.  They go through what we said

Highly Confidential - Subject to Further Confidentiality Review

1    about the above."

2             Do you see that?

3        A.    I do.

4        Q.    And then she says, "We also

5    reviewed a draft of best practices that

6    HDMA (a consultant and me) have put

7    together."

8             Do you see that?

9        A.    I do.

10       Q.    So Ms. Ducca and the

11   consultant worked together to put the

12   guidelines together?

13       A.    Yes.

14       Q.    And then they were discussed

15   with the member -- members at this

16   meeting, she says, based on input from

17   members at the meeting.

18             Do you see that?

19       A.    I do.

20       Q.    And then she says, "We

21   prepared a revised draft for additional

22   comment, and that revised draft is

23   attached."

24             Do you see that?

1    A.    I do.

2    Q.    Okay.  And then, as we

3  discussed a moment ago, then there was

4  going to be another call on February 7th

5  to discuss the revised draft.  Agree?

6    A.    Yes.

7    Q.    I'm going to hand you these

8  handouts from the January 31st meeting

9  starting with the first one which is

10  marked as Exhibit 15.

11        (Document marked for

12        identification as Exhibit

13        HDA-Kelly-15.)

14  BY MR. PIFKO:

15    Q.    For the record, it's

16  Bates-labeled HDA_MDL_000213212 through

17  213228.

18        Let me know when you're

19  done.  Again, take as much time as you

20  need to review the document, but I'm only

21  going to ask you about a couple slides.

22    A.    Okay.

23    Q.    Are you ready?

24    A.    I am.

1    Q.    Okay.  The second -- the

2  first page of the Exhibit 15 is just a

3  cover page.  The second page is the

4  agenda for the discussion.

5              Do you see that?

6    A.    Yes.

7    Q.    So review the antitrust and

8  antiharassment policies.

9              Then, background, DEA

10  suspicious order requirements.  And

11  HDMA's best practices, the efforts to

12  date.  Then legal and policy perspective.

13              Then there was going to be a

14  discussion about the potential best

15  practices, questions for attendees.  And

16  then a discussion, allows for member

17  input.  And then discussion of model

18  modifications, areas for further review.

19  And then a discussion of next steps,

20  additional DEA issues.

21              Do you see that?

22    A.    I do.

23    Q.    Do you agree that this was

24  the agenda of this portion of the -- the

1    meeting?

2        A.    I do.

3        Q.    I want to go to the fourth

4    page of the exhibit.  It's got a little

5    bit of a timeline here.  Let me know when

6    you're there.

7        A.    I'm there.

8        Q.    Okay.  So it says, "Best

9    practices identified as a possible

10   solution."

11           This is the solution to the

12   increased DEA enforcement activity as we

13   discussed at the beginning of the

14   deposition, correct?

15           MR. WEINSTEIN:  Objection to

16       form.

17           THE WITNESS:  Yes.

18   BY MR. PIFKO:

19       Q.    Okay.  And so the best

20   practices was identified as a solution on

21   October 16, 2007, during an HDMA-DEA

22   meeting.

23           MR. WEINSTEIN:  Objection to

24       form.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. PIFKO:

2           Q.    Agree?

3           A.    That's -- yeah, that's what

4    it says.  Yes.

5           Q.    Okay.  And it's an HDMA

6    meeting regarding the DEA, right?

7           A.    I believe it might have

8    been -- again, I'm not -- it was a --

9    either a meeting directly with DEA or

10   a -- if we -- is that on the timeline?

11          Q.    That other meeting we talked

12   about with -- with --

13          A.    Yeah, this was with DEA.

14          Q.    Okay.

15          A.    DEA participated in that

16   event.

17          Q.    Okay.  And then there was a

18   recommendation from outside counsel to

19   move forward on December 19, 2007, agree?

20          A.    Yes.

21          Q.    And then there was the

22   request for members' existing best

23   practices on January 3, 2008.  Agree?

24                MR. WEINSTEIN:  Objection to

1     form.

2            THE WITNESS:  Yes.

3     BY MR. PIFKO:

4            Q.    And then the interviews and

5     follow-up requests occurred from

6     January 7th to January 11th.  Agree?

7            A.    Yes.

8            Q.    And then there was a

9     presentation to the pain coalition on

10    January 1st, 2010 -- or, sorry,

11    January 10, 2008.

12           Do you see that?

13           A.    I do.

14           Q.    Do you have an understanding

15    as to why the -- there was a presentation

16    to the pain coalition about the best

17    practices for suspicious orders?

18           A.    My understanding is that was

19    a monthly meeting, that group met fairly

20    regularly.  And we went to apprise them

21    of the fact that we were developing the

22    guidelines for suspicious order

23    monitoring and reporting based on recent

24    DEA actions.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   The pain coalition, that's

2    the Pain Care Forum officially?

3    A.   I believe it's one and the

4    same.

5    Q.   Okay.  And that includes

6    manufacturers in the pharmaceutical

7    industry, correct?

8         MS. MACKAY:  Objection.

9         Foundation.

10        THE WITNESS:  It includes --

11        my understanding, it includes a

12        variety of constituent groups in

13        the supply chain, including

14        patient groups, and manufacturers,

15        and distributors and pharmacies,

16        et cetera.

17   BY MR. PIFKO:

18   Q.   Okay.  But -- so all I'm

19   asking you is the Pain Care Forum

20   includes, among others, manufacturers in

21   the pharmaceutical industry, correct?

22        MS. MACKAY:  Objection.

23        Foundation.

24        THE WITNESS:  That's

1           correct.

2    BY MR. PIFKO:

3         Q.   And the pain coalition, or

4    pain care foundation is specifically

5    focused on pain by its -- by definition,

6    correct?

7            MS. MACKAY:  Objection --

8            MS. ROLLINS:  Objection to

9        form.

10           MS. MACKAY:  Objection.

11        Form.  Foundation.

12           THE WITNESS:  Again, the

13        Pain Care Forum -- Pain Care Forum

14        I think is the official name.

15           Again, issues and policies

16        related to the treatment of

17        individuals with pain, chronic

18        pain, terminal pain.  Those types

19        of things.

20    BY MR. PIFKO:

21         Q.   Treatment of pain?

22           MS. MACKAY:  Objection.

23        Foundation.  Form.

24           THE WITNESS:  Treatment --

Highly Confidential - Subject to Further Confidentiality Review

1    treatment of pain, yes.

2    BY MR. PIFKO:

3         Q.    Pain advocacy?

4              MS. MACKAY:  Same

5         objections.

6              MR. WEINSTEIN:  Objection to

7         form.

8              THE WITNESS:  Not so much

9         advocacy, more of just information

10        about policies that are being

11        discussed.

12   BY MR. PIFKO:

13        Q.    And in connection with your

14   work for the HDA, have you attended a

15   Pain Care Forum meeting?

16        A.    I personally have not.

17        Q.    Have you discussed Pain Care

18   Forum meetings with your colleagues?

19        A.    I am aware of past Pain Care

20   Forum meetings, yes.

21        Q.    You are familiar with the

22   Pain Care Forum and its objectives and

23   its membership based on your role for the

24   HDA?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Again, generally, yes.

2  Not -- I couldn't name specific members

3  other than -- the top of my head.

4        Q.    The HDMA is a member of the

5  Pain Care Forum, correct?

6        A.    We are no longer a member of

7  the Pain Care Forum.

8        Q.    But you were?

9        A.    At one point we were.

10       Q.    When did you stop being a

11  member of the Pain Care Forum?

12       A.    I don't know the specific

13  date.

14       Q.    In the last year?

15       A.    Beyond that.

16       Q.    Two years ago?

17       A.    Again, I don't know the

18  specific date.

19       Q.    Let's do this.  When did you

20  join HDA?

21       A.    2011.

22       Q.    Was HDA a member of the Pain

23  Care Forum when you first joined HDA?

24       A.    I don't know for certain.

1    Q.    Do you remember discussing

2    HDA ceasing to be a member of the Pain

3    Care Forum?

4    A.    Vaguely.

5    Q.    Who did you discuss that

6    with?

7    A.    Again, one of the

8    discussions we have on an annual basis

9    about where we are -- have resources and

10   events and groups we're participating

11   with.

12   Q.    Okay.  In one of these

13   annual meetings you discussed the HDA's

14   involvement with the Pain Care Forum?

15              MS. MACKAY:  Form.

16              MR. WEINSTEIN:  Objection to

17         form.

18              THE WITNESS:  Again, there

19         was a decision made -- I don't

20         know when -- to not participate

21         with the Pain Care Forum any

22         longer.

23   BY MR. PIFKO:

24   Q.    Okay.  Do you know what the

1    basis for that decision was?

2        A.    Just general -- didn't have

3    staffing and resources to continue to

4    send people out to meetings and events.

5        Q.    Okay.  We'll come back to

6    that.  Next slide, Page 5 of Exhibit 15.

7    Are you there?

8        A.    Yes.

9        Q.    It says the desired outcome

10   of the best practices, "Agree upon

11   fundamentals of distribution industry

12   best practices for suspicious orders for

13   government public policy committee

14   review.  Eventually provide to DEA."

15            Do you see that?

16       A.    I do.

17       Q.    Did I read that correctly?

18       A.    You did.

19       Q.    Is that consistent with what

20   your understanding of the desired outcome

21   was?

22            MR. WEINSTEIN:  Objection to

23       form.

24            THE WITNESS:  Yes, at this

Highly Confidential - Subject to Further Confidentiality Review

1    point in time, yes.

2  BY MR. PIFKO:

3    Q.    Another goal of the meeting

4  and this ongoing discussion was to reach

5  agreement among HDA's members on these

6  best practices or guidelines, correct?

7          MR. WEINSTEIN:  Objection to

8      form.

9          THE WITNESS:  Yes.

10  BY MR. PIFKO:

11    Q.    If you go to Page 7 of

12  Exhibit 15.  It's got some bullet points

13  of attributes of the system.  One of them

14  is, "Develop thresholds."

15          Do you see that?

16    A.    Yes.

17    Q.    It says, "Calculate average

18  orders for families."

19          Do you see that?

20    A.    Yes.

21    Q.    "ID orders of unusual size,

22  frequency, pattern"?

23    A.    Yes.

24    Q.    "And stop shipments"?

1        A.      Yes.

2        Q.      Those were all features of

3    the guidelines or best practices that you

4    were working on --

5              MR. WEINSTEIN:  Objection.

6    BY MR. PIFKO:

7        Q.      -- at this time?

8              MR. WEINSTEIN:  Objection to

9        form.

10             THE WITNESS:  Yes.  It's my

11       understanding.

12   BY MR. PIFKO:

13       Q.      If you go to Page 8 of the

14   document.  It talks -- there's another

15   attribute.  It says "shipping" --

16   "shipment decisions."

17             Do you see that?

18       A.      I do.

19       Q.      Four decision options.

20             Do you see that?

21       A.      I do.

22       Q.      So you understood there was

23   going to be various options set out for

24   what someone could do when evaluating a

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious order as far as whether it

2    could be shipped?

3                    MR. WEINSTEIN:  Objection to

4          form.

5                    THE WITNESS:  Again, yes.

6    BY MR. PIFKO:

7          Q.    I want to go to Page 12 of

8    the document.

9                    So then, this discusses some

10   of the next steps.  Ultimately there was

11   going to be a government public policy

12   committee review of the best practices or

13   guidelines on February 12th.  Agree?

14                   MR. WEINSTEIN:  Objection to

15         form.

16                   THE WITNESS:  Yes.

17   BY MR. PIFKO:

18         Q.    Sorry, it's the government

19   public policy council, correct?

20         A.    Correct.

21         Q.    Okay.  Then the executive

22   committee is going to review them on

23   February 22nd, correct?

24         A.    Yes.

1   Q.   And then you're going to

2   request a meeting with the acting DEA

3   administrator, correct?

4        A.   Correct.

5        Q.   And one question had was,

6   "Should the best practices become a

7   regulation?"  Correct?

8        A.   Correct.

9        Q.   That was something that HDA

10  and its members were discussing?

11       A.   Correct.

12            MS. MACKAY:  Objection to

13       form.

14  BY MR. PIFKO:

15       Q.   I'll direct you to Page 17

16  of Exhibit 15.  Another thing that was

17  still being considered at this time was

18  whether HDA and its members would mount

19  to legal challenge to DEA, correct?

20       A.   Yes.

21       Q.   And then it says, "May

22  require extensive justification."

23            Do you see that?

24       A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1            Q.    "For example, DEA changed a

2    30-year reporting requirement to stopping

3    transactions."

4             Do you see that?

5            A.    Yes.

6            Q.    So one of the things that

7    HDA and its members were discussing at

8    this time in response to the DEA's

9    enforcement activity was to mount a legal

10    challenge concerning the reporting

11    requirement and whether it required

12    members to stop transactions?

13             MR. WEINSTEIN:  Objection to

14        form.

15             THE WITNESS:  Yes.

16            (Document marked for

17        identification as Exhibit

18        HDA-Kelly-16.)

19    BY MR PIFKO:

20            Q.    I'm handing you what's

21    marked as Exhibit 16.  For the record,

22    this is another presentation from that

23    meeting.  Bates-labeled HDA_MDL_000213229

24    through 213240.

Highly Confidential - Subject to Further Confidentiality Review

1    One of the things referenced

2    in Ms. Ducca's e-mail, Exhibit 14, was

3    that she's attaching slides from HDMA and

4    the outside counsel.

5    This is the presentation

6    from HDMA's outside counsel at that

7    meeting.  Please review it and let me

8    know when you're ready to discuss.

9    A.    Okay.

10    Q.    The discussion regarding the

11    industry compliance guidelines or best

12    practices was being facilitated through

13    the regulatory affairs committee; is that

14    correct?

15    MR. WEINSTEIN:  Objection to

16    form.

17    THE WITNESS:  Correct.

18    BY MR. PIFKO:

19    Q.    Yes?

20    A.    Yes.

21    Q.    And again that included all

22    of HDA's distributor members, correct?

23    MR. WEINSTEIN:  Objection to

24    form.

1       THE WITNESS:  The ones

2    that -- that participated, yes.

3  BY MR. PIFKO:

4       Q.   And so those members would

5  have been part of the discussion on

6  January 31, 2008, where these were

7  presented, correct?

8       MR. WEINSTEIN:  Objection to

9    form.

10       THE WITNESS:  The ones that

11    participated definitely, yes.

12  BY MR. PIFKO:

13       Q.   And that included the big

14  three who participated, correct?

15       MS. ROLLINS:  Objection to

16    form.

17       THE WITNESS:  Again, I don't

18    have the exact list of

19    participants in front of me, but I

20    would imagine, yes.

21  BY MR. PIFKO:

22       Q.   Because they're -- they're

23  on the regulatory affairs committee,

24  correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes.

2      Q.     Trying to -- so again, as we

3  talked about when I handed you this

4  exhibit, this is from HDA's outside

5  counsel.  It is a presentation entitled,

6  "Suspicious Orders and Diversion

7  Prevention," which was presented at the

8  meeting on January 31st in -- at HDA's

9  offices in Arlington, Virginia, correct?

10     A.     That's my understanding,

11 yes.

12     Q.     If you go to the third page

13 of the document, they are laying out the

14 statutory framework and conditions of

15 registration for -- do you see that here?

16     A.     I do.

17     Q.     Okay.  The second bullet

18 point says, "The first factor in

19 determining the public interest is the

20 maintenance of effective controls against

21 diversion into other than legitimate

22 channels," correct?

23          MR. WEINSTEIN:  Objection to

24     form.  Foundation.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  Yes.  That's

2      what it says.

3  BY MR. PIFKO:

4           Q.    If you go to the one with

5  the Bates number 213234 it says "Prior

6  Experience" on the top.

7           A.    I see it.

8           Q.    It says, under the heading

9  "Prior Experience," "DEA would not tell a

10  distributor if an order is legitimate or

11  not."

12           Do you see that?

13           A.    Yes.

14           Q.    And then it says, "DEA would

15  tell the distributor that it must decide

16  which orders are suspicious and make a

17  sales decision."

18           Do you see that?

19           A.    Yes.

20           Q.    The next slide has got some

21  criteria for suspicious orders.

22           Do you see that?

23           A.    I do.

24           Q.    Seven bullet points,

1    correct?

2            A.    Yes, correct.

3            Q.    And these aren't simply

4    repeating unusual size, pattern or

5    frequency, correct?

6                  MR. WEINSTEIN:  Objection to

7            form.

8                  THE WITNESS:  It goes beyond

9            that.

10   BY MR. PIFKO:

11           Q.    Right.  It elaborates on

12   what that could mean, correct?

13                 MR. WEINSTEIN:  Objection to

14           form.

15                 THE WITNESS:  That's what it

16           says, yes.

17   BY MR. PIFKO:

18           Q.    Quantities of drugs

19   purchased, correct?

20           A.    Correct.

21           Q.    Percentage of controlled

22   versus noncontrolled, correct?

23           A.    That's what it says, yes.

24           Q.    Size of orders, correct?

1    A.    Yes.

2    Q.    Location of customer?

3    A.    Yes.

4    Q.    Different combinations of

5  drugs, correct?

6         MS. ROLLINS:  Objection.

7         MS. MACKAY:  Object to form.

8         MR. WEINSTEIN:  Objection to

9     form.

10         THE WITNESS:  It says only

11     phentermine, hydrocodone, and/or

12     alprazolam.

13  BY MR. PIFKO:

14    Q.    Like if an order is only

15  those things, that potentially could be

16  suspicious.  That's what it's saying

17  here?

18         MR. WEINSTEIN:  Objection to

19     form.  Foundation.

20         THE WITNESS:  I imagine,

21     yes.

22  BY MR. PIFKO:

23    Q.    No established business

24  credit, yes?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.  That's what it says.

2    Q.    Frequent large orders,

3  correct?

4    A.    Yes.

5    Q.    Next slide is headed

6  "Issues."

7          Second bullet point, it

8  says, "Is the failure to report an

9  unusual order a violation if the drug is

10 dispensed for a lawful purpose?"

11         Do you see that?

12   A.    Yes.

13   Q.    So one of the things that

14 was discussed at this meeting was whether

15 it could still be a violation of the

16 regulations in the CSA if you didn't

17 report an unusual order even if it was

18 for a lawful purpose, correct?

19   A.    Again, I think this one was

20 posited as a question.

21   Q.    But my point is, that was

22 something that was being discussed.

23 Whether -- whether that would be a

24 violation or not, that was something

Highly Confidential - Subject to Further Confidentiality Review

1    people were discussing at this meeting?

2                    MR. WEINSTEIN:   Objection to

3          form.

4                    THE WITNESS:   That's -- yes.

5    BY MR. PIFKO:

6          Q.    Another thing discussed, if

7    you go to the slide, 000213238.  Let me

8    know when you're there.

9          A.    "What has changed?"

10         Q.    Yes.

11         A.    Yes.

12         Q.    Second bullet point, it

13   says, "The suspicious nature of the order

14   depends not on pattern of ordering

15   customer, but on patterns of registrant's

16   customer base and patterns throughout the

17   regulated industry."

18                    Do you see that?

19         A.    I do.

20         Q.    That was something else

21   discussed at this meeting?

22         A.    It -- it was.

23         Q.    Also that rigid formulas

24   were -- may be insufficient as well,

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2         A.    That was discussed.

3              (Document marked for

4         identification as Exhibit

5         HDA-Kelly-17.)

6    BY MR. PIFKO:

7         Q.    Handing you what's marked as

8    Exhibit 17.  For the record, it's an

9    e-mail with an attachment.  Bates-labeled

10   HDA_MDL_000141125 through 141133.  This

11   is an e-mail from Mr. Wilson dated

12   Tuesday, February 5, 2008, to Ms. Ducca,

13   attaching a discussion draft of the

14   interim -- industry compliance or best

15   practices guidelines.

16              Take a moment to review this

17   and let me know when you're ready.

18        A.    Okay.

19        Q.    Do you recall one of the

20   attributes of the scope of work that

21   Mr. Wilson was supposed to provide was to

22   draft -- put together an initial draft

23   and then potentially attend meetings and

24   do revisions, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    So he attaches this draft.

3  It says, "Discussion draft for meeting,"

4  as the file name.  Do you see that on the

5  first page?

6    A.    Yes.

7    Q.    And then the following pages

8  are that discussion draft.

9          It says, "Discussion draft,

10  1/31/08."

11          Do you see that?

12    A.    Yes.

13    Q.    So this is the draft that

14  was discussed during that meeting,

15  correct?

16    A.    Yes.

17    Q.    So it's got several

18  features.  Heading 1 is "Know Your

19  Customer."

20          Do you see that?

21    A.    Yes.

22    Q.    It says, "Before opening up

23  a new customer account, it is recommended

24  that the distributor obtain background

Highly Confidential - Subject to Further Confidentiality Review

1    information on the customer and their

2    business, review the information for

3    discrepancies, and where appropriate,

4    verify the information."

5              Do you see that?

6         A.    I do.

7         Q.    And then it says, "The

8    following information is recommended,"

9    and it's got a whole host of information.

10             Do you see that?

11        A.    Yeah.  The following is

12   recommended -- yes, information gathered,

13   yes.

14        Q.    Okay.  At the bottom it

15   says, "Identify high purchasing doctors.

16   Also for pain clinics, identify high

17   writing doctors in the store's area."

18             Do you see that?

19        A.    Right.  And I -- what I

20   don't see here is that appears to be in a

21   different shade of font, whether that was

22   a note or that was part of -- it appears

23   that these are -- there are some notes

24   that are included.  There's like the

1    draft document and then there are notes.

2         Q.    Well, as we discussed, there

3    was a draft and then there was going to

4    be discussion.  We know that from the

5    PowerPoints that we just went over as

6    Exhibits 15 and 16, that there was a

7    discussion of these during the meeting

8    with the members, correct?

9         A.    Yes.

10        Q.    Page 2 of the draft has got

11   some other information.  "Questionnaires

12   must be update periodically especially

13   when new areas are developed for

14   investigation."

15             Do you see that?

16        A.    I do.

17        Q.    That's still under the

18   heading of "know your customer," correct?

19        A.    Yeah, but it also appears to

20   be in a different font or a different

21   shade of font, so...

22        Q.    Okay.  "Whoever completes

23   the investigation must have documented

24   formalized training."

Highly Confidential - Subject to Further Confidentiality Review

1                  Do you see that?

2          A.    I do see that.

3          Q.    "Site visits should be

4    conducted when possible."

5          A.    I see that, yes.

6          Q.    Then it's got a Section 2

7    that is headed "Suspicious Order

8    Monitoring."

9                  Do you see that?

10         A.    I do.

11         Q.    And then it's got a

12   background.   It's got a citation to the

13   regulation.

14                 Do you see that?

15         A.    I do.

16         Q.    And then it's got DEA

17   interpretations.

18                 Do you see that?

19         A.    I do.

20         Q.    And move to the third page,

21   we see what those are, correct?

22         A.    Yes.

23         Q.    There's four discussion

24   points there, correct?

Highly Confidential - Subject to Further Confidentiality Review

1         A.      Yes.

2         Q.      So one of them is, "DEA

3    distinguishes between an order and a

4    sale.  Please note in the above cited

5    regulation there is no mention of a

6    sale."

7                 Do you see that?

8         A.      I do.

9         Q.      Agree?

10                MR. WEINSTEIN:  Objection to

11        form.

12   BY MR. PIFKO:

13        Q.      That's what it says?

14        A.      I agree that's what it says,

15   yes.

16        Q.      "DEA believes that a

17   registrant should be able to determine if

18   an order meets the above description of

19   suspicious when they receive the order,

20   not when they ship it.  This is

21   particularly true for orders of unusual

22   size."

23                Agree?

24                MR. WEINSTEIN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:  That's what it

3          says, yes.

4    BY MR. PIFKO:

5          Q.    Okay.  "DEA has indicated

6    that cutting back on an order and

7    shipping less to avoid the suspicious

8    order definition (or to meet some

9    predetermined ship limit) does not

10   relieve distributors of the

11   responsibility of reporting the order as

12   fitting the suspicious order criteria."

13                   Do you see that?

14         A.    I do.

15         Q.    And Item 4 says, "It is

16   likely that orders deviating

17   substantially from the normal pattern and

18   orders of unusual frequency will only be

19   'discovered by the registrant' after a

20   number of shipments have been made.  DEA

21   expects shipments of such orders to be

22   stopped pending the outcome of an

23   investigation."

24                   Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I do see that.

2      Q.    So you understood this as

3  documented here, were all DEA

4  interpretations of the regulation that's

5  cited above on Page 2 correct?

6      A.    That's --

7            MS. ROLLINS:  Object to the

8       form.

9            THE WITNESS:  That's what I

10       understand.

11  BY MR. PIFKO:

12      Q.    Then on Page 4, under that

13  same heading of suspicious order

14  monitoring, it's got another section,

15  "Develop 'thresholds' for suspicious

16  orders."

17            Do you see that?

18      A.    I do.

19      Q.    Okay.  And then it's got a

20  discussion about how to calculate and

21  develop thresholds.

22            Do you see that?

23      A.    Yes.

24      Q.    Second paragraph says that,

1    "A threshold" -- it says, "Calculate the

2    average single order and the average

3    monthly order per family, per customer,

4    and class of trade.  A minimum of six

5    months' sales history or a maximum of

6    24 months' sales history is recommended."

7              Do you see that?

8         A.    I do.

9         Q.    I read that correctly?

10        A.    You did.

11        Q.    So that's part of what is

12   being recommended for the development of

13   thresholds for suspicious orders,

14   correct?

15             MR. WEINSTEIN:  Objection to

16        form.

17             THE WITNESS:  In this draft,

18        yes.

19   BY MR. PIFKO:

20        Q.    Okay.  Then the next

21   paragraph says, "Also identify orders of

22   unusual size.  It is recommended that

23   distributors follow past DEA criteria.

24   Specifically, DEA has recognized three

1    times the average for Schedule II

2    controlled substances and reportable

3    Schedule III orders as meeting the

4    unusual threshold."

5              Is that correct, that's what

6    it says?

7         A.    Yes.

8         Q.    You understand C-II means

9    Schedule II controlled substance,

10   correct?

11        A.    I do.

12        Q.    That was a feature of this

13   draft of the guidelines, correct?

14        A.    Yes.

15              MS. WICHT:  Object to the

16        form of the question.

17   BY MR. PIFKO:

18        Q.    Then we have Heading 3,

19   "Investigation of suspicious orders,

20   shipment decisions."

21              Do you see that?

22        A.    I do.

23        Q.    First discussion point there

24   it says, "Should a distributor wish to

1    reconsider and ship an order identified

2    as potentially suspicious or part of such

3    an order, it is recommended that he or

4    she conduct an investigation to determine

5    the reasons for the order."

6              Did I read that correct?

7         A.    You did.

8         Q.    And that was part of the

9    discussion of investigation and shipping

10   of potentially suspicious orders,

11   correct?

12        A.    Yes.

13        Q.    Then it says, "Designating

14   an investigator."

15             Do you see that?

16        A.    I do.

17        Q.    And then it says -- I'm

18   paraphrasing -- that the person

19   designated should have suitable

20   experience and background to be able to

21   investigate potential suspicious orders.

22             Do you see that?

23        A.    Yes.

24        Q.    Then it talks about the

Highly Confidential - Subject to Further Confidentiality Review

1    different elements of investigation on

2    Page 5.

3              Do you see that?

4        A.    I do.

5        Q.    One of them is to verify the

6    customer input.

7              Do you see that, at the

8    bottom of that section?

9        A.    Yes.

10        Q.    It says, "For example" -- it

11    says, "If the customer says they called

12    DEA, verify that they actually did so."

13              MR. WEINSTEIN:  Objection to

14        form.

15    BY MR. PIFKO:

16        Q.    Do you see that?

17        A.    I do see that, yes.

18        Q.    So verifying customer input

19    was an attribute -- an attribute of these

20    guidelines at this time, correct?

21              MS. ROLLINS:  Form.

22              MR. WEINSTEIN:  Objection to

23        form.

24              THE WITNESS:  It says "where

1          appropriate" on the first line of

2          that.  Yes, "Verify customer input

3          where appropriate.  For example,"

4          and these are examples.

5     BY MR. PIFKO:

6          Q.    And then there's -- at the

7     bottom of Page 5 it says, "Shipment

8     decisions.  Decisions to ship an order

9     'of interest' should be made by a person

10    specifically authorized to conduct an

11    investigation and release the order."

12              Do you see that?

13         A.    I do see that.

14         Q.    Then it's got, on Page 6,

15    four decision options.  Do you remember

16    when we looked at the slide deck from the

17    January 31st, 2008, meeting it talked

18    about the four decisions on shipment.  Do

19    you remember that?

20         A.    I do.

21         Q.    And so here we have the four

22    decisions on shipment.

23              Do you see that?

24         A.    I do.

1    Q.    Okay.  So one is cancel the

2    order and report; one is investigate,

3    cancel, and report; another one is

4    investigate and ship, don't report; and

5    the other one is investigate, ship, and

6    report.  Agree?

7    A.    That's what it says, yes.

8    Q.    And then there is a note

9    here.  "We need to define the point when

10   the order becomes suspicious."

11   Do you see that?

12   A.    Yes.

13   Q.    Then there is a question

14   here.  It says, "Note:  Do all of the

15   options above meet DEA's regulations?"

16   Number 3:  "May be

17   inconsistent with the regulations, but

18   consistent with DEA's verbal guidance."

19   Do you see that?

20   A.    I do.

21   Q.    And that's saying

22   investigate and ship, but don't report,

23   correct, that's Number 3 is?

24   A.    That's what Number 3 is,

Highly Confidential - Subject to Further Confidentiality Review

1    yes.

2         Q.    There's another section here

3    about filing reports with the DEA.  It

4    talks about a month-end notification.

5    And then it says, "Delete this entire

6    section."

7              Agree?

8         A.    That's what it says, yes.

9         Q.    Okay.  And as we read in the

10   other documents, an order needs to be

11   reported at the time it's identified as

12   being suspicious.  That's consistent with

13   your understanding, correct?

14             MR. WEINSTEIN:  Objection to

15        form, foundation, scope.

16             THE WITNESS:  Again, I am

17        not sure where -- that's my

18        understanding of what they -- was

19        being discussed, yes.

20   BY MR. PIFKO:

21        Q.    That is your understanding

22   of what was being discussed.  I didn't

23   understand your answer.

24        A.    So your question -- if you

Highly Confidential - Subject to Further Confidentiality Review

1    would restate the question?

2         Q.   Yeah, I was -- I was saying

3    if you remember, we looked at some of the

4    other documents and they talk about how

5    you need to report an order at the time

6    you identify it as suspicious.  And this

7    is saying to delete the idea of a monthly

8    notification to DEA.

9              So you agree that that's

10   consistent with the idea that you need to

11   report it when you know it, correct?

12             MR. WEINSTEIN:  Objection to

13        form, foundation, and scope.

14             THE WITNESS:  Again, this

15        has to do with the -- the

16        notification to DEA, month -- on a

17        monthly basis.  I'm not sure that

18        refers directly to the suspicious

19        order, per se.

20   BY MR. PIFKO:

21        Q.   Well, it's under the heading

22   "File Suspicious Order Reports With the

23   DEA," Section 4.

24             Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Right, but this has to do
2  with month-end DEA notification.
3    Q.    Right.  But it's saying to
4  delete the month-end.  We're not going to
5  do that.  Agree?
6         MR. WEINSTEIN:  Objection to
7      form.
8         THE WITNESS:  I don't know
9      that we're not going to do that.
10     It just says delete that section.
11     I don't know what that -- what
12     that meant.
13  BY MR. PIFKO:
14    Q.    Well, the section above
15  says, "Immediate DEA notification."
16         Do you see that?
17    A.    I do see that.
18    Q.    Okay.  And then it's got a
19  section under there, it says, "DEA" -- it
20  says, "To meet the requirement," it says,
21  "When discovered."
22         Do you see that in quotes?
23         MS. CHARLES:  Objection to
24      form.

1                  MR. WEINSTEIN:  Objection to

2        form.

3                  THE WITNESS:  Where -- which

4        section are you in?

5    BY MR. PIFKO:

6        Q.    In the section --

7        A.    Oh yes.  In the top section,

8    yes.

9        Q.    Do you see that?

10       A.    "DEA office is recommending

11   to meet with the requirement to notify

12   when discovered unless DEA provides other

13   direction," yes.

14       Q.    Let's go to Page 7.  There

15   is a Heading 5, "Discussing Training and

16   Standard Operating Procedures."

17                 Do you see that?

18       A.    I do.

19       Q.    And one of the things it

20   says there, at the bottom of that

21   training section is, "Training of

22   associates who are authorized to review,

23   stop, release an order, should be

24   extensive and there should be backup

1    training to cover the times when the

2    primary associate will not be available,

3    i.e., vacations, sick, et cetera?"

4              Did I read that correctly?

5         A.    You did.

6         Q.    And that was an attribute of

7    the -- these best practices or industry

8    compliance guidelines, correct?

9              MR. WEINSTEIN:  Objection to

10             form.

11             THE WITNESS:  I will note --

12             I will note that this is in a

13             different font and I'm not sure if

14             this was part of the final

15             document or not.

16   BY MR. PIFKO:

17        Q.    Okay.  We'll get there.

18             And then it's got additional

19   recommendations.

20             "Note:  Should we also

21   consider including any or all of the

22   following?"

23             Do you see that?

24        A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So some of these other

2    things that are being considered are

3    whether periodic audits should be

4    conducted by the independent auditor,

5    correct?

6         A.    That's what it says, yes.

7         Q.    Should -- should the

8    industry support a customer accreditation

9    program?

10        A.    Accreditation, yes.

11        Q.    Identify an individual as a

12   DEA liaison for reporting suspicious

13   orders; is that correct?

14        A.    That's what it says, yes.

15        Q.    Retain a list of

16   questionable registrants.  Maintain a

17   list of do-not-ship accounts.

18             Do you see that?

19        A.    I do see that.

20        Q.    That was something that was

21   being discussed as being included?

22        A.    Again, different fonts.  But

23   it's part of this document, yes.

24        Q.    Have you seen the final

1    industry compliance guidelines?

2        A.    Yes.

3        Q.    So the document we just

4    discussed, Exhibit 17, it's just the

5    nitty-gritty, the details of the

6    guidelines, correct?

7            MR. WEINSTEIN:  Objection to

8        form.

9            THE WITNESS:  It's labeled

10        as a discussion draft.

11   BY MR. PIFKO:

12       Q.    All I'm getting at is,

13   the -- the final draft has some

14   introductory explanatory language,

15   correct, the background about them,

16   correct, that's not in the discussion

17   draft, right?

18       A.    Yes.  There's addition --

19   and, again, I'm not sure what made it

20   from the discussion draft into the final

21   draft unless I was able to compare them

22   next to one another.

23           MS. CHARLES:  Object to the

24        form of that question.

1   BY MR. PIFKO:

2        Q.    I'm handing you what's

3   marked as Exhibit 18.

4             (Document marked for

5        identification as Exhibit

6        HDA-Kelly-18.)

7   BY MR. PIFKO:

8        Q.    It's a three-page document,

9   Bates labeled HDA_MDL_000217851 through

10  853.

11            Just take a moment to review

12  this and let me know when you're done.

13       A.    Okay.

14       Q.    If you recall from

15  Exhibit 14, we talked about how the

16  consultant and Ms. Ducca worked on the

17  draft, correct?

18       A.    Yes.

19       Q.    And here in Exhibit 18,

20  Mr. Wilson, on February 6, 2008, is

21  sending her what he calls a discussion

22  intro, in the subject of the e-mail.

23            And he says, "Here is the

24  discussion header.  I used the same

1    language you did on the draft.  I will

2    call you tomorrow around 9:00 a.m. your

3    time."

4              Do you see that?

5        A.    Yes.

6        Q.    So he's sending her some

7    language that they discussed together,

8    agree?

9              MR. WEINSTEIN:  Objection to

10        form.

11             THE WITNESS:  Again, yes.

12   BY MR. PIFKO:

13        Q.    And so as we discussed,

14   the -- the final draft has some

15   background language, history, et cetera,

16   correct?

17        A.    It does.

18        Q.    Okay.  And so this is a

19   first draft of that, it says, if you look

20   on the second page, first draft.

21             Do you see that?

22        A.    I see that.

23        Q.    And then it's got a heading

24   history.  And it talks about 1970

Highly Confidential - Subject to Further Confidentiality Review

1    Congress enacted the Controlled

2    Substances Act.

3                Do you see that?

4        A.    Yes.

5        Q.    Okay.  At the bottom of that

6    page there's a section here, it says, "Up

7    until now, DEA has interpreted this

8    section to require distributors to design

9    and operate a system to identify and

10   report suspicious orders, based on the

11   regulation's definition of suspicious."

12               Did I read that correctly?

13       A.    You did.

14       Q.    The next page says,

15   "Recently, and without any due process

16   for rule changes, DEA has expanded the

17   definition of suspicious orders to

18   include those that the registrant may

19   have reason to believe the order will be

20   diverted."

21               Do you see that?

22       A.    I do.

23       Q.    Did I read that correctly?

24       A.    You did.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Then it says, "In three

2  public statements to congressional

3  committees on December 13, 2005; July 26,

4  2006; and September 18, 2007, the DEA

5  administrator has spoken about, quote,

6  the growing problem of diversion and

7  abuse of controlled pharmaceuticals

8  continues to be one of the top priorities

9  of the Drug Enforcement Administration."

10            "We have also used our

11  regulatory authority to take action

12  against DEA registrants found to be in

13  violation of regulatory requirements

14  under the Controlled Substance Act.

15            "Through regulatory

16  authority, DEA has subjected registrants

17  to significant civil fines, licensing

18  restrictions or even suspended

19  registration.  Such civil remedies have

20  proven to be an effective deterrent to

21  potential violators."

22            Did I read that correctly?

23    A.    You did.

24    Q.    And then the last paragraph

1    says, "DEA seems to have taken the

2    position that if the registrant did not

3    know their customer was diverting,

4    they" -- in all caps -- "should have

5    known and have attached severe penalties

6    to not knowing.  That is the purpose of

7    the following discussion points regarding

8    knowing your customer, identifying and

9    reporting suspicious order of controlled

10   substances, and training everyone who

11   comes into contact with controlled

12   substances."

13            Did I read that correctly?

14        A.    You did.

15        Q.    So at this time you agree

16   that it's saying the discussion points,

17   the attributes that we discussed in the

18   prior draft, those are all designed at

19   this idea of addressing the DEA's concern

20   that registrants should know if their

21   customers are diverting controlled

22   substances, correct?

23            MR. WEINSTEIN:  Objection to

24        form, foundation, and scope.

1          THE WITNESS:  That's

2     correct.  That's what I understand

3     it to mean, yes.

4          (Document marked for

5     identification as Exhibit

6     HDA-Kelly-19.)

7  BY MR. PIFKO:

8     Q.   I'm handing you what's

9  marked as Exhibit 19.  This is another

10  e-mail from Ms. Ducca Bates-labeled

11  HDA_MDL_000148603 to 148633.

12          Take a moment to review it.

13  It attaches a revised draft of the

14  document we looked at in Exhibit 17.

15          MR. STEWART:  Can we take a

16     break while he reads the document?

17  BY MR. PIFKO:

18     Q.   I think he's done.

19     A.   Yeah, I was trying to

20  determine what the -- so this is the

21  accepted changes versus --

22     Q.   I'll walk you -- I'll walk

23  you through it here.

24     A.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  So if you'll recall

2  in Exhibit 14, Ms. Ducca talks about

3  scheduling call February 7th to have a

4  further discussion about the guidelines.

5          Do you see that?  Or do you

6  recall that?

7          And then this Exhibit 19 is

8  her sending out attachments for this call

9  that's going to happen on February 7th,

10 agree?

11   A.    Yes.

12   Q.    And what we're seeing here

13 is a red line against the version that we

14 reviewed in Exhibit 17.  That's actually

15 a clean version she attaches, and a red

16 line version.  The red line starts at

17 148619, agree?

18   A.    Yes.

19   Q.    Okay.  So then, you see this

20 draft, it's -- the heading on this draft

21 is Version 8, post 1/31/08.  This is

22 distinguishing that it's after that

23 January 31, 2008, meeting, correct?

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And now this draft has some

2    of the introductory background language

3    that we discussed in Exhibit 18, correct?

4    A.    Yes, with the addition of

5    some additional information.

6    Q.    Right.  So not all of the

7    language that we discussed in Exhibit 18

8    made it into this draft, correct?

9    A.    That's -- yes, from what I

10   could tell.

11   Q.    For example, there was that

12   paragraph, "Up until now DEA has

13   interpreted this section that required

14   distributors to design and operate a

15   system to identify and report suspicious

16   orders."

17   Do you remember that

18   discussion?  That's not in here, correct?

19   A.    What -- what version are you

20   looking at?

21   Q.    If you have -- if you want

22   to open Exhibit 18 up --

23   A.    Okay.  I'm sorry.

24   Q.    -- and compare it to what

Highly Confidential - Subject to Further Confidentiality Review

1    you're seeing in the introduction and

2    history section in Exhibit 19.  That

3    paragraph is not in there, correct?

4         A.    It does not appear to be.

5         Q.    And then the section,

6    "Recently, without any due process for

7    rule changes," that whole paragraph in

8    Exhibit 18 isn't in here either, correct?

9    It's not in Exhibit 19, correct?

10        A.    It does not appear to be.

11        Q.    Okay.  And so let's look at

12   some of the language that's added here

13   from the January 31st, 2008, draft that

14   we reviewed in Exhibit 17.

15             First, in the introduction.

16   Let me know when you're there.

17        A.    We're on the second --

18        Q.    If you want to use the red

19   line, you can, which starts on 148619.

20        A.    Okay.

21        Q.    Are you there?

22        A.    I -- yes.

23        Q.    This allows us to see what's

24   added from the prior draft that was in

Highly Confidential - Subject to Further Confidentiality Review

1    Exhibit 17, agree?

2            A.     Yes.

3            Q.     And so all of this language,

4    the introduction, history, distribution

5    industry, commitment to securing the

6    supply of controlled substances, that's

7    all new, correct?

8            A.     From the version in 17?

9            Q.     Yeah.

10           A.     Exhibit 17?  Yes.

11           Q.     Okay.  And so one of the

12   things in the first paragraph, it says,

13   is that, at the bottom of that first full

14   paragraph, it's talking about these

15   guidelines.  It says, "They have been

16   prepared in recognition of the growing

17   problem of misuse of controlled

18   substances and the key role distributors

19   play within the prescription drug supply

20   chain."

21                  Did I read that correctly?

22           A.     You did.

23           Q.     Okay.  And so is that

24   consistent with what your understanding

Highly Confidential - Subject to Further Confidentiality Review

1    of the background of how these were

2    prepared?

3              MR. WEINSTEIN:  Objection to

4         form.

5              THE WITNESS:  Yes, that's

6         what I understand it to be.

7    BY MR. PIFKO:

8         Q.    And HDMA and its members

9    recognized that there was a growing

10   problem of misuse of controlled

11   substances at this time?

12             MR. WEINSTEIN:  Objection to

13        form.  Foundation.  Scope.

14             THE WITNESS:  That's what we

15        stated here in this introduction.

16   BY MR. PIFKO:

17        Q.    And the role -- and the key

18   role that distributors play within the

19   prescription drug supply chain, correct?

20             MR. WEINSTEIN:  Same

21        objections.

22             THE WITNESS:  Again, it's

23        stated here in the introduction.

24   BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And then in the next

2  paragraph it says, "While drug wholesale

3  distributors, like all nongovernmental

4  entities, do not have investigative

5  powers and resources to guarantee that

6  certain products will not reach illicit

7  or illegal markets, they are uniquely

8  situated to perform due diligence in

9  order to help support the security of the

10  controlled substances distribution

11  system."

12         Did I read that correctly?

13    A.    You did.

14    Q.    That was another thing that

15  HDA and its members recognized at this

16  time, correct?

17         MR. WEINSTEIN:  Objection to

18    form.  Foundation.  Scope.

19         THE WITNESS:  And included

20    it in this introduction, yes.

21  BY MR. PIFKO:

22    Q.    It then says, "Rigorous" --

23  in the next paragraph, "Rigorous due

24  diligence can aid in providing a greater

1   level of assurance that those who

2   purchase controlled substances from

3   wholesale distributors intend them to be

4   used for legitimate and legally

5   acceptable patient needs."

6           Did I read that correctly?

7       A.   You did.

8       Q.   "In other words, with such

9   due diligence, it is possible to reduce

10  the probability that controlled

11  substances will reach locations within

12  the supply chain for which they are not

13  intended."

14          Did I read that correctly?

15      A.   You did.

16      Q.   And so HDMA and its members

17  recognized this to be true at this time

18  as well, correct?

19          MR. WEINSTEIN:  Objection to

20      form, foundation, scope.

21          THE WITNESS:  It's what's

22      stipulated here in this

23      introduction, yes.

24  BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    So let's go to the second

2    page.  There's a heading, "Distribution

3    Industry Commitment to Securing the

4    Supply of Controlled Substances."

5          Do you see that?

6     A.    I do.

7     Q.    It says in that paragraph,

8    partway through the first sentence,

9    "Recent concerns about the potential

10    misuse of controlled substances has

11    elevated their awareness and that of the

12    DEA and the public, to the need for

13    greater rigor in evaluating the purchase

14    orders of such" -- "for such products."

15          Did I read that correctly?

16     A.    Yes.

17          MS. MACKAY:  Object to the

18      form.

19   BY MR. PIFKO:

20     Q.    And the HDA and its members

21    understood that to be true at this time,

22    correct?

23          MR. WEINSTEIN:  Objection to

24      form, foundation, and scope.

1          THE WITNESS:  That's what's

2     stated here in this document, yes.

3  BY MR. PIFKO:

4          Q.    Then in the next paragraph

5  it says, second sentence, "We are

6  confident that implementation of these

7  guidelines will aid in the appropriate

8  distribution of controlled substances to

9  supply chain partners involved in the

10  legitimate dispensing of these important

11  products to patients they serve."

12          Did I read that correctly?

13     A.    You did.

14     Q.    And HDMA and its members

15  understood that to be true at this time,

16  correct?

17          MR. CRAWFORD:  Objection to

18     form.

19          MR. WEINSTEIN:  Objection to

20     form, foundation, and scope.

21          THE WITNESS:  They

22     understood that -- that these were

23     guidelines that could help in

24     addressing prescription drug

1        diversion, yes.

2   BY MR. PIFKO:

3        Q.    And HDMA and its members put

4   this -- this language together, correct?

5              MR. WEINSTEIN:  Objection to

6        form.

7              THE WITNESS:  HDMA and its

8        distributor members, yes.

9   BY MR. PIFKO:

10       Q.    And all the language we've

11  been discussing, correct?

12             MR. WEINSTEIN:  Objection to

13       form.

14             MS. MACKAY:  Foundation.

15             THE WITNESS:  Yes, the

16       language that is before us, that

17       we're looking at is prepared by

18       HDMA and HDMA member companies,

19       distributor member companies.

20  BY MR. PIFKO:

21       Q.    There's another section a

22  few pages in, "Stop Shipments of an Order

23  of Interest."

24             Let me know when you're

1    there.

2            A.    Page 7?  I'm there.

3            Q.    Yeah, okay.  And it's got

4    two options.

5                  Do you see that?

6            A.    I do.

7            Q.    And it's talking about

8    whether, if there's a suspicious order, a

9    distributor should stop the whole order

10   or they could ship a portion of the

11   order.  Do you agree that's what it's

12   discussing.

13                 MS. ROLLINS:  Object to the

14          form.

15                 THE WITNESS:  Where -- where

16          are you reading?

17   BY MR. PIFKO:

18           Q.    Well, there's two options

19   Option 1 stop shipments of the individual

20   drug code product that is an order of

21   interest.

22           A.    I see that, yes.

23           Q.    Or then it's saying

24   Option 2:  "Distributors may ship a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    portion of the entire individual drug

 2    code product that is an order of

 3    interest."

 4              Do you see that?

 5      A.    I do see that, yes.

 6      Q.    So there was a discussion at

 7    this time as to which of those options

 8    was going to be included in this -- into

 9    the final draft, correct?

10              MS. CHARLES:  Objection to

11         form.

12              THE WITNESS:  I don't

13         know -- I don't know what the

14         intention was for including the

15         options, if that was a discussion

16         about including one or the other

17         or leaving both.

18              MR. WEINSTEIN:  Mark, we've

19         been going about an hour and a

20         half.  If there's a good point

21         for --

22              MR. PIFKO:  Yeah, let me

23         just hand him this exhibit.  I'm

24         just going to address that topic
```

1    and then we can take a break.

2         MR. WEINSTEIN:  A few more

3    minutes?

4         THE WITNESS:  Yep.

5         (Document marked for

6    identification as Exhibit

7    HDA-Kelly-20.)

8  BY MR. PIFKO:

9    Q.    I'm handing you what's

10 marked as Exhibit 20.  For the record,

11 it's a document Bates-labeled

12 HDA_MDL_000213058 through 213077.  It's a

13 PowerPoint from the HDA government public

14 policy council dated February 12, 2008,

15 titled, "HDMA-DEA Suspicious Orders 'best

16 Practices.'"

17        Let me know when you are

18 ready.

19    A.    Okay.

20    Q.    So you recall when we first

21 discussed the hiring of Mr. Wilson and

22 the decision that HDMA was going to put

23 out these best practices, that ultimately

24 they have to get approved by the board,

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2         A.    That's correct.

3         Q.    And so this is a meeting

4    that's discussing getting to --

5    ultimately getting to approval of the

6    guidelines, correct?

7         A.    Correct.

8         Q.    And we see on the second

9    page it says agree -- "Goals:  Agree upon

10   final draft of best practices for

11   executive committee review."

12             Do you see that?

13        A.    Yes.

14        Q.    And then it says, "Resolve

15   partial shipment issue."

16             Do you see that?

17        A.    Yes.

18        Q.    And that's the issue we were

19   discussing in Exhibit 19 where there's

20   the two options.  Agree?

21             MS. CHARLES:  Objection to

22        form.

23             THE WITNESS:  Yes.

24   BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Then we see a calendar on

2    Slide 3 that's got the different events.

3    This is consistent with what we've been

4    discussing and your understanding of the

5    process, correct?

6              There was a meeting on

7    January 31, 2008, and we looked at --

8    Exhibit 19 was the revised draft provided

9    to the regulatory affairs committee on

10   February 7th for them to review.  Here

11   it's got the 8th.

12             And then this is -- this

13   meeting on February 12, 2008, for the

14   government public policy council to

15   review?

16        A.    Yes.

17        Q.    Agree?

18        A.    Yes.

19        Q.    Some of these slides are

20   similar to the presentation we saw on --

21   on January 31st that we went over on

22   Exhibit 16, correct?

23             MS. CHARLES:  Object to the

24        form.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  Yeah, I

2      don't -- I don't believe there was

3      a timeline, but yes, similar in

4      scope.  Yes.

5  BY MR. PIFKO:

6      Q.    Discussion of legal -- yeah,

7  there's like just legal discussions about

8  the requirements and the Rannazzisi

9  letters.  Agree?

10      A.    Agree.

11           MS. ROLLINS:  Objection to

12      form.

13  BY MR. PIFKO:

14      Q.    Okay.  So then I want to

15  direct your attention to Slide 11, it's a

16  slide headed "Next Steps."

17           Do you see that?

18      A.    I do.

19      Q.    So second bullet point --

20  well, first bullet point is that the

21  executive committee is going to review

22  them on February 22nd, agree?

23      A.    Yes.

24      Q.    And then another next step

1    is that we're going to continue pharmacy

2    association/pain coalition discussions,

3    agree?

4           A.    That's what it says, yes.

5           Q.    And so there was going to be

6    an effort to continue discussing these

7    with the Pain Care Foundation as we

8    discussed before, correct?

9                 MR. WEINSTEIN:  Objection to

10        form.

11                MS. CHARLES:  Objection to

12        form.

13                MR. WEINSTEIN:  Foundation.

14                THE WITNESS:  That's what it

15        says, yes.

16   BY MR. PIFKO:

17          Q.    Do you have any reason to

18   dispute that it happened?

19          A.    I do not.

20          Q.    Then another next step is

21   going to request a meeting with the DEA

22   acting administrator.  You recall that we

23   discussed that when we first looked at

24   the scope of work for this, correct?

1    A.    Yes.

2    Q.    And then one point of

3  discussion was to request DEA endorsement

4  of the best practices as a safe harbor.

5          Do you see that?

6    A.    I do.

7    Q.    You understood that there

8  was going to be a request to the DEA that

9  if people implemented these, they would

10  have a safe harbor with respect to

11  diversion control compliance?

12          MS. MACKAY:  Objection to

13      form.

14          THE WITNESS:  Again, I

15      think -- I think -- yeah, the

16      concept was to basically broach

17      these as a potential solution to

18      due diligence under the

19      expectations of DEA.  I don't know

20      if we officially requested their

21      endorsement.  We did show them the

22      completed guidelines.

23  BY MR. PIFKO:

24    Q.    In addition to due

1    diligence, know your customer and not

2    shipping suspicious orders, correct?

3             MR. WEINSTEIN:  Objection to

4        form.

5             MS. ROLLINS:  Objection to

6        form.

7             THE WITNESS:  I'm sorry.

8        With --

9    BY MR. PIFKO:

10       Q.   With respect to -- you said,

11   "The concept was basically to broach

12   these as a potential solution to due

13   diligence."  But I'm saying, also know

14   your customer and the idea of not

15   shipping suspicious orders, correct?

16       A.   Right.  That would all be

17   included in due diligence, yes.

18       Q.   Okay.  Slide 16.  It's got

19   some key points from the January 31st

20   meeting.  Are you there?

21       A.   I am.

22       Q.   Okay.  First one is -- it

23   says that, "Implementing the best

24   practices will expand distributors'

Highly Confidential - Subject to Further Confidentiality Review

1    efforts considerably."  And considerably

2    is in italics.

3                   Do you see that?

4          A.    I do.

5          Q.    Okay.  So if you were going

6    to implement these, it would be a

7    considerable effort, correct?

8                   MR. WEINSTEIN:  Objection to

9          form.  Foundation.

10                  THE WITNESS:  It would be --

11         yes.  That's what I understand it

12         to mean.

13   BY MR. PIFKO:

14         Q.    And then it says,

15   "Inevitably impacts customers, may be

16   significant."

17                  Do you see that?

18         A.    I do see that.

19         Q.    So there could be a

20   significant impact on customers from

21   implementing these, correct?

22                  MR. WEINSTEIN:  Objection to

23         form.  Foundation.  Scope.

24                  THE WITNESS:  That's what I

1    understand it to mean, yes.

2  BY MR. PIFKO:

3        Q.    And go to Slide 17.  This is

4  a discussion of that partial shipment

5  option that we looked at that was in the

6  draft in Exhibit 19, agree?

7        A.    Yes.

8        Q.    And so it's got some -- it

9  identifies the issue of what should be

10 done.  And then it's got voting, agree?

11            MS. CHARLES:  Objection to

12        form.

13            THE WITNESS:  That's, I

14        guess, what it appears to have.

15        I'm not sure if that's voting

16        within the regulatory affairs

17        committee.

18 BY MR. PIFKO:

19        Q.    But there's some voting, by

20 some constituent within HDA, correct?

21        A.    This appears to indicate

22 that, yes.

23            MS. CHARLES:  Objection to

24        form.

1    BY MR. PIFKO:

2         Q.    And it says, "If a specific

3    drug code product order is potentially

4    suspicious, should the distributor be

5    able to ship part of the order for that

6    particular product prior to further

7    evaluation?"

8              That's what it says,

9    correct?

10        A.    That's what it says, yes.

11        Q.    And then it says seven are

12   in favor, three opposed, one abstained,

13   and one was absent, agree?

14        A.    That's what it says.

15             MR. WEINSTEIN:  Objection to

16        form.

17   BY MR. PIFKO:

18        Q.    And then it's got pros and

19   cons of adopting that approach, agree?

20        A.    That's what it lists, yes.

21        Q.    One of the pros is it's

22   consistent with the current practice for

23   many distributors, agree?

24             MR. WEINSTEIN:  Objection to

1    form.  Foundation.

2          THE WITNESS:  That's what it

3    says, yes.

4  BY MR. PIFKO:

5          Q.    A con is that DEA

6  correspondence/interpretation is do not

7  support this practice, agree?

8          MR. WEINSTEIN:  Objection to

9       form.

10         THE WITNESS:  That's what it

11      says, yes.

12         MR. PIFKO:  We can take a

13      break.

14         THE VIDEOGRAPHER:  The time

15      is 12:06 p.m.  We are going off

16      the record.

17                -  -  -

18             (Lunch break.)

19                -  -  -

20      A F T E R N O O N   S E S S I O N

21                -  -  -

22         THE VIDEOGRAPHER:  The time

23      is 12:44 p.m.  We are back on the

24      record.

1                    -   -   -

2              EXAMINATION (Cont'd.)

3                    -   -   -

4    BY MR. PIFKO:

5         Q.    I'm handing you what's

6    marked as Exhibit 21.

7              (Document marked for

8              identification as Exhibit

9              HDA-Kelly-21.)

10   BY MR. PIFKO:

11        Q.    It's another series of

12   e-mails from Anita Ducca dated March 4th,

13   2008, attaching another version of the

14   guidelines, Bates-labeled

15   CAH_MDL2804_01521412 through 1469.

16              There's another red line of

17   this draft against the draft that we

18   looked at in Exhibit 19.  I'm not going

19   to ask you any questions about it.  But

20   you can review it.  But in the interest

21   of time, I was just want to direct your

22   attention to the first page of

23   Exhibit 21.

24        A.    That's all we're going to

Highly Confidential - Subject to Further Confidentiality Review

1    be?

2           Q.    Yeah.

3           A.    Do you want me to read the

4    back end of it?

5           Q.    Sure.  I'm not going to ask

6    you about that either.  Just the e-mail

7    on the front.

8           A.    I've read the top sheet.

9           Q.    Okay.  So Exhibit 21 is

10   Anita Ducca sending to the regulatory

11   affairs committee members another draft

12   of the suspicious orders best practices,

13   agree?

14              MR. WEINSTEIN:  Objection to

15         form.

16              THE WITNESS:  Yes.  I think

17         that's -- that's what it entails.

18         And with kind of a changing of the

19         name to the practice guidelines,

20         which was not the final name of

21         the document, but...

22   BY MR. PIFKO:

23         Q.    Right, so she says, "I've

24   attached a copy of the very latest

Highly Confidential - Subject to Further Confidentiality Review

1    version of the draft suspicious order

2    practices.  The executive committee

3    approved these."

4              Do you see that?

5         A.    Yes.

6         Q.    The executive committee

7    approved the draft she attaches in this

8    document, correct?

9         A.    That's what I understand it

10   to mean, yes.

11        Q.    And then it says, "Also, we

12   have made some changes, mostly regarding

13   wording and formatting and included

14   recommendations by our outside counsel

15   and our communications department,

16   including a suggestion to re-name them

17   'recommended practice guidelines.'"

18             Do you see that?

19        A.    I do.

20        Q.    So the outside counsel or

21   communications department recommended

22   that you re-name them?

23        A.    Again, I don't know who

24   recommended exactly renaming them.  I do

1    know that they were vetted with various

2    external groups to determine how they

3    should be named and packaged and

4    presented.

5         Q.   Do you know what other

6    external groups?

7         A.    Other than -- I mean,

8    external groups as far as within the

9    organization.  So our government affairs

10   committees, our communications

11   committees, legal counsel, outside

12   counsel.

13        Q.   And so this says, "Change

14   them to recommended practice guidelines,"

15   but ultimately they ended up being called

16   industry compliance guidelines, correct?

17        A.    Correct.

18        Q.    Do you know if there were

19   any other iterations of what they would

20   be called in between this and the final

21   name?

22        A.    I -- I do not know.  I

23   think -- again, I think the practice -- I

24   mean I think we wanted to stay away from

1    basically establishing anything that said

2    best practices or standards because we

3    are not a standard setting organization.

4              We can't compel our members

5    to, you know, adopt these best practices,

6    per se.  So they are guidelines.  They

7    are voluntary guidelines.

8         Q.    So then, this also talks

9    about how there's going to be a meeting

10   with Mark Caverly.  He's from the DEA,

11   correct?

12        A.    Correct.

13        Q.    And again, this is

14   consistent with the overall strategy that

15   we saw in the earlier documents that was

16   designed in 2007 where you're going to

17   draft these, get industry to all agree on

18   the language, and then have a meeting

19   with DEA to discuss them, correct?

20             MR. WEINSTEIN:  Objection to

21        form.

22             THE WITNESS:  Again, get

23        our -- get our members that were

24        participating in that process to

 1          agree on them.  And then basically

 2          vet them with the DEA to see if

 3          they had any concerns with the

 4          scope of the -- of the guidelines.

 5                (Document marked for

 6          identification as Exhibit

 7          HDA-Kelly-22.)

 8   BY MR. PIFKO:

 9          Q.    I'm handing you what's

10   marked as Exhibit 22.  It's an e-mail

11   from HDA's Kristen Freitas dated

12   Thursday, March 20, 2008.  Due to some

13   sort of way the document was produced,

14   there's a lot of gibberish and blank

15   pages, but the substance can be distilled

16   down to four pages.

17                But for the record, it's

18   Bates-labeled ANDA_OPIOIDS_MDL_0000157358

19   to 157473.

20                For the record, take a

21   minute to review it and let me know when

22   you're done.

23                The substantive discussion

24   starts at 157380, it ends at 83.  I think

Highly Confidential - Subject to Further Confidentiality Review

1    that's where you were.

2         A.    8383?

3         Q.    Yeah.

4         A.    157383?  Okay.

5         Q.    So my first question is, who

6    is Kristen Freitas?

7         A.    Kristen Freitas is currently

8    now the vice president of federal

9    government affairs for HDA, then HDMA.

10   She was then probably a manager or a

11   director.

12        Q.    It says here on her

13   signature on the second page, associate

14   director.

15        A.    Associate director.

16        Q.    What's federal government

17   affairs do?

18        A.    Federal government affairs

19   is tasked primarily with the interface

20   with Congress.  The HDA segment of the

21   government affairs department that deals

22   directly with Congress, anything that

23   happens on the Hill.

24        Q.    Is that a -- something

1    that's under your purview in your current

2    position?

3         A.    It is.

4         Q.    Okay.  So Kristen Freitas

5    reports to you?

6         A.    Up through me, yes.  I'm the

7    head of the department.  She reports

8    directly to our general counsel.

9         Q.    Okay.  So at this time,

10   she's talking about some other aspects of

11   the strategy to, as we talked about in

12   Exhibit 3, address the executive

13   committee's concerns about recent DEA

14   activities to involve wholesale

15   distributors in efforts to prevent

16   diversion.  Agree?

17             MR. WEINSTEIN:  Objection to

18        form.

19             THE WITNESS:  I'm sorry.  So

20        you -- you --

21   BY MR. PIFKO:

22        Q.    This is a furtherance of the

23   overall strategy that we talked about

24   that was starting to be implemented in

1    Exhibit 3, which derives from the

2    executive committee's concerns about

3    recent DEA activities to involve

4    wholesale distributors in efforts to

5    prevent diversion.  Do you agree?

6                MR. WEINSTEIN:  Objection to

7         form.

8                THE WITNESS:  That should --

9         yes.  I would agree it is part of

10        that process.

11   BY MR. PIFKO:

12        Q.    Okay.  So then she says

13   here, "DEA - as we discussed on the

14   federal government affairs committee call

15   on Monday, HDMA staff have developed a

16   confidential draft political strategy to

17   address some of the issues related to DEA

18   and suspicious orders.  As the document

19   states, many of the tactics and messaging

20   hinge on the outcome of the DEA meeting

21   where we will" -- "we will present our

22   recommended industry compliance

23   guideline."

24                Did I read that correctly?

1     A.    You did.

2     Q.    Okay.  So it was understood

3  within HDA and its members that,

4  depending on this meeting where the

5  guidelines were shared with the DEA, that

6  would shape how further strategies were

7  implemented, agree?

8          MR. WEINSTEIN:  Objection to

9     form.  Foundation.

10          THE WITNESS:  I would agree,

11     yes.

12  BY MR. PIFKO:

13     Q.    So then we see, if you go to

14  157380, there's a discussion of various

15  tactics that are going to be part of "the

16  HDMA Hill DEA strategy."

17          Do you see that?

18     A.    I do.

19     Q.    Okay.  Tactic Number 1 is,

20  "Complete and present recommended

21  industry compliance guidelines to DEA

22  general counsel."

23          Do you see that?

24     A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    Okay.  You agree that's the

2  first tactic mentioned here?

3     A.    That is, yes.

4     Q.    And then it says, "Status:

5  Request to be made the week of

6  March 17th."

7          Agree?

8     A.    That's what it says, yes.

9     Q.    And like we just saw in the

10  prior department, "The discussion and

11  outcome of this meeting will be critical

12  in driving all further tactics and

13  messaging."

14          Agree?

15     A.    That's what it says, yes.

16     Q.    Then it says, "Brief House

17  appropriation subcommittee members who

18  participated in the March 12th DEA budget

19  justification hearing.  Seek questions to

20  be asked for the record."

21          Do you see that?

22     A.    Yes.

23     Q.    Do you have an understanding

24  about what that was about?

Highly Confidential - Subject to Further Confidentiality Review

1            A.    Again, I think it had to do

2    with, and the timing of this would have

3    been -- if this is after the -- the

4    hearing.  This was on March 20th.

5                 Again, I think it was

6    basically when FDA or DEA on an annual

7    basis goes before the appropriation

8    committee to discuss their budget, that

9    if there were concerns or questions about

10   their perspective on our guidelines or

11   their suspicious order monitoring

12   tactics, that we provide some feedback to

13   the appropriation members so they could

14   ask for further clarification from the

15   administrator while she was there

16   testifying.

17            Q.    Okay.  And so you drafted,

18   on behalf of your members, potential

19   questions to be asked by members of

20   Congress to ask the DEA, correct?

21                 MR. WEINSTEIN:  Objection to

22        form.

23                 THE WITNESS:  That's what I

24        understand these to be, yes.

1    BY MR. PIFKO:

2        Q.    And that starts on 157382

3    and goes to 383, correct?

4        A.    Correct.

5        Q.    Okay.  Tactic 3 is, "Brief

6    Senate appropriation subcommittee members

7    in advance of DEA budget justification

8    hearing.  Seek commitment to ask

9    questions of DEA administrator."

10            Do you see that?

11       A.    Yes.

12       Q.    Do you have an understanding

13   what that's about?

14       A.    Again, similar to what was

15   done on the House side.  But again maybe

16   those questions were developed for the

17   Senate side, because it appears that this

18   e-mail was sent after the 3/12

19   appropriations committee.

20       Q.    Okay.  So these questions

21   are for senators to ask the DEA?

22       A.    I would deduce that

23   that's -- yes, that's the process.

24       Q.    And that's a common tactic

1  that you use in the organization, is to

2  draft questions for senators or members

3  of Congress to ask DEA if you have

4  concerns?

5         MR. WEINSTEIN:  Objection to

6     form.

7         THE WITNESS:  That is a

8     common practice for a lot of

9     associations that interact with

10     regulatory authorities.

11  BY MR. PIFKO:

12     Q.    Including HDA?

13     A.    In this instance including

14  HDA.

15     Q.    And so when it says, "Brief

16  senate appropriation subcommittees in

17  advance of the hearing," there's also

18  one-on-one meetings that occur with the

19  senators in advance of the hearing?

20         MR. WEINSTEIN:  Objection to

21     form.  Foundation.

22         THE WITNESS:  I would

23     imagine these are primarily

24     meetings with staff,

Highly Confidential - Subject to Further Confidentiality Review

1      staff-to-staff meetings.  Seldom

2      to the member representatives

3      participate in those meetings.  So

4      these are staff briefings.

5  BY MR. PIFKO:

6      Q.   That's where the questions

7  are provided?

8           MR. WEINSTEIN:  Objection to

9      form.  Foundation.

10          THE WITNESS:  Again, that's

11     where I -- if they were provided,

12     again, I don't know what was

13     provided.  This was looking at a

14     draft document of some kind.  I am

15     not sure which specific questions

16     were provided or if any of the

17     questions were provided.

18  BY MR. PIFKO:

19     Q.   Okay.  But in your ordinary

20  practice as part of your lobbying

21  efforts, that's how questions would be

22  provided, you would have your staff

23  members meet with lawmakers' staff

24  members and that's when you would discuss

Highly Confidential - Subject to Further Confidentiality Review

1  your views and provide potential

2  questions?

3          A.    Correct.

4                MR. WEINSTEIN:  Objection to

5          form.

6                THE WITNESS:  Sorry.

7  BY MR. PIFKO:

8          Q.    Go a few more tactics down.

9  Number 6, it says, "Educate and seek

10  advocates for HDMA among pain community

11  who will assist in delivering our message

12  to Hill."

13                Do you see that?

14          A.    I do.

15          Q.    So you were going to, as

16  part of this effort, you were going to

17  also enlist others in the pain community

18  to communicate your message to lawmakers;

19  that's correct?

20                MS. CHARLES:  Objection to

21          form.

22                THE WITNESS:  That's what

23          this indicates.

24  BY MR. PIFKO:

1      Q.    And then it says, "Status,

2   HDMA joined and briefed the Pain Care

3   Forum, an informal coalition of

4   pharmaceutical companies and patient

5   advocacy groups focusing on pain

6   management issues and will follow up upon

7   release of our industry compliance

8   guidelines."

9          Did I read that correctly?

10     A.    You did.

11     Q.    Okay.  And so that confirms

12   HDMA did join the Pain Care Forum,

13   correct?

14     A.    Yes.  In 2008.

15     Q.    And you briefed them on

16   these issues, correct?

17          MS. MACKAY:  Objection to

18      form.

19          THE WITNESS:  Again, this

20      seems to indicate that we briefed

21      them that we were developing the

22      industry compliance guidelines

23      just to give them a heads-up.  And

24      we were indicating to this, we

1          would share our final document

2          when it was developed and

3          released.

4    BY MR. PIFKO:

5          Q.    And then you sought their

6    contribution to also advocate to members

7    on the Hill, correct?

8               MR. WEINSTEIN:  Objection to

9          form.

10              THE WITNESS:  Again I don't

11         know what the specific ask was.

12         This was an informal kind of

13         coalition group, and we were

14         briefing them on what we were

15         doing.  This seems to indicate

16         that we were -- educate and seek

17         advocates for HDMA among pain

18         community who will assist in

19         delivering our message on the

20         Hill.  So yes, it appears that we

21         were asking them to support our

22         industry compliance guidelines.

23   BY MR. PIFKO:

24         Q.    And then Number 8 says,

1    "Identify high-level congressional

2    'champion' who will request a meeting

3    with DEA to discuss concerns with current

4    tactics."

5                    Do you see that?

6         A.    I do.

7         Q.    Do you have an understanding

8    about what that's about?

9         A.    Again, what it says.  So

10   probably ask a member of Congress,

11   possibly a high-level senior ranking

12   official or a ranking member in their

13   party to request a meeting with DEA,

14   possibly a committee chairman of some

15   kind, a relevant committee.

16        Q.    And so at this time HDMA and

17   its members were concerned with the

18   enforcement tactics being used by the

19   DEA, correct?

20                    MR. WEINSTEIN:  Objection to

21        form.

22                    THE WITNESS:  I think -- I

23        think there was concern about the

24        lack of clarity and basically what

1          we were trying to basically convey

2          in some of the questions that were

3          put together.  So we were -- yeah,

4          we were seeking greater clarity

5          from the agency and it was not

6          forthcoming, and so we were

7          requesting that our congressional

8          colleagues possibly request a

9          meeting so we could convey those

10         concerns.

11    BY MR. PIFKO:

12         Q.    When I handed you this

13    document, you read it in its entirety,

14    correct?

15         A.    The document that I'm

16    looking at right now?

17         Q.    Yeah.  We took a moment and

18    you were reading it?

19         A.    Yeah, I read -- yes, the

20    pages that you referenced, yes.

21         Q.    You read the questions --

22    potential Hill questions for DEA, right?

23         A.    I did, yes.

24         Q.    Okay.  And so the thrust of

1    the questions, you know, goes at the end

2    here.  It says, if you look on 157382,

3    "Isn't your initiative overly broad and

4    not focused specifically enough on rogue

5    pharmacies, which in fact make up a

6    miniscule percentage of any legitimate

7    wholesaler's business?"

8                 And then it says, "Clearly,

9    if a customer is known to be diverting

10   prescription drugs and the wholesale

11   distributor continues to supply that

12   customer, a violation of their registrant

13   responsibilities as has occurred.  But my

14   concern here is that your expectations go

15   to a much higher level, asking the

16   wholesaler in essence to be your

17   investigator.  I don't think that's

18   appropriate.  It seems to me at the end

19   of the day that prescription drug abuse

20   is caused by inappropriate prescribing

21   and inappropriate dispensing, neither of

22   which wholesalers are authorized or

23   capable of regulating or enforcing."

24                 Do you see that?

1    A.    I do.

2    Q.    That's a question that you

3 wanted a senator to ask the acting

4 administrator of the DEA, correct?

5    A.    It was -- it was developed

6 here.  Again, I don't know if it was ever

7 requested, a senator or staff or anybody.

8    Q.    But at this stage it's a

9 potential question for some lawmaker to

10 ask the DEA, correct?

11    A.    That's -- yes.  That's the

12 context for this.

13         (Document marked for

14         identification as Exhibit

15         HDA-Kelly-23.)

16 BY MR. PIFKO:

17    Q.    I'm handing you what's

18 marked Exhibit 23.  If you recall,

19 earlier on in Exhibit 8, there was an

20 e-mail from Anita Ducca that attached

21 some of her draft summaries of the

22 various meetings and events that occurred

23 in connection with the industry

24 compliance guidelines and meetings with

1    the DEA.  And this is -- Exhibit 23, is

2    one of those attachments.  She said, if

3    you recall, these were draft summaries of

4    her meetings.

5         A.    Yes.

6         Q.    Okay.  So take a minute to

7    look at Exhibit 23, and -- which is a

8    three-page document, and let me know when

9    you're done.  For the record, the Bates

10   labels are CAH_MDL2804_02489188 through

11   190.

12        A.    Okay.

13        Q.    So this is a summary of the

14   first meeting that HDA had with DEA

15   concerning the industry compliance

16   guidelines, correct?

17        A.    That's correct.

18        Q.    It identifies that attendees

19   here from DEA and from HDMA, correct?

20        A.    It does.

21        Q.    And in addition to HDMA

22   members, it also identifies Richard

23   Cooper from Williams & Connolly as an

24   attendee and David Durkin from Olsson

Highly Confidential - Subject to Further Confidentiality Review

1    Frank law firm as well?

2         A.    It does, yes.

3         Q.    And who is Robert Barnett,

4    is he -- is he from Williams & Connolly

5    as well?

6         A.    Yes.

7         Q.    Okay.  They were outside

8    counsel to HDA at this time?

9         A.    Yes.

10        Q.    Along with David Durkin?

11        A.    That's correct.

12        Q.    Okay.  And so Anita Ducca is

13   there, and Scott Melville, who was your

14   predecessor was there?

15        A.    Yes.

16        Q.    So Ms. Ducca has a meeting

17   summary here.  So it appears that Bob

18   Barnett and Rich Cooper led the

19   introductory remarks in the meeting,

20   agree?

21        A.    Yes.  They led off.

22        Q.    Okay.  So, Bob explained the

23   purpose of the meeting.  He explained --

24   I'm reading from the document -- "the

1    serious concerns among HDMA members

2    regarding DEA's recent actions regarding

3    suspicious orders.  When HDMA first

4    contacted Williams & Connolly regarding

5    possibly challenging DEA, Bob and Rich

6    Cooper recommended an alternative that

7    was based on his prior experience with

8    other clients in similar positions."

9              Do you see that?

10        A.    I do.

11        Q.    Did I read that correctly?

12        A.    You did.

13        Q.    Do you recall that being

14   part of the discussion, that when HDMA

15   first came to Williams & Connolly to

16   potentially challenge DEA, they came up

17   with an alternative idea?

18        A.    Again, I was not at HDA at

19   the time.  But I understand from reading

20   this, reviewing this document, that was

21   the -- that was the initial part of the

22   discussion.

23        Q.    And so Williams & Connolly

24   recommended that, instead of challenging

1   the DEA, that the distributors develop a

2   set of business practices of their own

3   or, as this says, "a type of standard as

4   a better approach to show DEA to the

5   outside world what is intended" -- "that

6   they intend to be part of the solution

7   rather than problem"; is that correct?

8          A.    That's correct.  Those were

9   his words, yes.

10         Q.    And that's what he told DEA

11  at this meeting?

12         A.    I will take it at face value

13  that that's what was explained, yes.

14         Q.    Other points that Bob

15  Barnett made were that "HDMA hoped that

16  DEA would find the guidelines acceptable

17  as a voluntary 'consent decree,' and we

18  hoped to receive some form of imprimatur

19  from you."

20              Agree?

21         A.    That's what it says, yes.

22         Q.    It's noted here, Bob also

23  told DEA, "These guidelines have been

24  adopted and approved by HDMA's board."

Highly Confidential - Subject to Further Confidentiality Review

1    Agree?

2    A.    Which bullet point are you

3    on?

4    Q.    Second to last on the first

5    page.

6    A.    Yes.

7    Q.    But then it was explained

8    that HDMA and its board were open to

9    suggestions from the DEA, correct?

10   A.    That's correct.

11   Q.    And then it says, "If DEA

12   accepted them, you wanted to make some

13   sort of public statement about it,"

14   correct?

15   A.    That's -- yes, that's what

16   it -- that's what it says, yes.

17   Q.    So -- then, we're going to

18   the second page here.  So it says, "After

19   Bob's introductory discussion, he turned

20   the meeting over to Richard Cooper from

21   Williams & Connolly."

22   Agree?

23   A.    Yes.

24   Q.    Okay.  And so Rich is the

Highly Confidential - Subject to Further Confidentiality Review

1    one who had this previous experience with

2    the FDA where they developed standards

3    that were voluntary and eventually became

4    standard practice among the medical

5    research community, and this idea of the

6    industry compliance guidelines was born

7    out of that, agree?

8              MR. WEINSTEIN:  Objection to

9         form.

10             THE WITNESS:  I think that's

11        what's being implied here, yes.

12   BY MR. PIFKO:

13        Q.    And that's what was told to

14   DEA in connection with this meeting,

15   correct?

16             MR. WEINSTEIN:  Objection to

17        form.

18             THE WITNESS:  That's --

19        again, that's what it -- seems to

20        be stipulated here, yes.

21   BY MR. PIFKO:

22        Q.    So a key point, according to

23   Anita's notes is that Rich Cooper from

24   Williams & Connolly made, was that "an

Highly Confidential - Subject to Further Confidentiality Review

1   order and question will be stopped until

2   there was an assessment and found that

3   the order was not suspicious."

4           Agree?

5       A.   Where --

6       Q.   Second paragraph, full

7   paragraph of Page 2.

8       A.   Okay.  Yes.  I see that,

9   yes.

10      Q.   And so then, DEA had a

11  question about "what exactly are you

12  stopping when you stop the order?"

13      A.   Okay.

14      Q.   And that's some discussion

15  about that.

16           Do you see that?

17      A.   Yes.

18      Q.   And so then, Rich Cooper

19  told DEA that "the guidelines indicated

20  that the entire order of the specific

21  product that triggered the threshold

22  should be held and not released."

23           Do you see that?

24      A.   Yes.

1    Q.    And then he also said, "The

2  guidelines expected that the entire order

3  for the drug product in question would be

4  held, even if part of it came under a

5  threshold."

6            Do you see that?

7            MR. WEINSTEIN:  Objection to

8        form.

9            THE WITNESS:  Yes.  Last

10        sentence.

11  BY MR. PIFKO:

12    Q.    Okay.  And so that resolves

13  this partial shipment issue we discussed

14  before the break, agree?

15            MS. ROLLINS:  Objection to

16        form.

17            THE WITNESS:  Again, it

18        seems to indicate that there

19        was -- yes, that was going to be

20        the final recommendation in the --

21        in the guidelines.

22  BY MR. PIFKO:

23    Q.    To pull the entire -- entire

24  order while the drug in question was

Highly Confidential - Subject to Further Confidentiality Review

1    investigated, correct?

2                 MR. WEINSTEIN:  Objection to

3           form.

4                 THE WITNESS:  Again, I think

5           that's, yes, what this seems to

6           entail.

7    BY MR. PIFKO:

8           Q.    So then the meeting was

9    handed over to Scott Melville, your --

10   your predecessor, agree?

11          A.    Yes.

12          Q.    And Scott told the DEA that,

13   if you look in those bullet points, that

14   "HDMA and its members intended to help

15   implement the guidelines by making

16   consultants known to them who could aid

17   in the implementation."

18                Do you see that?

19          A.    I do.

20          Q.    And then he said that "they

21   would discuss it with the Pain Care

22   Forum"?

23          A.    Yes.

24          Q.    And that "HDMA would hold

1   webinars and seminars to educate the

2   members and the customers about the

3   guidelines as well"?

4        A.    Yes.

5        Q.    And Scott also told DEA that

6   "HDA would discuss, explain and encourage

7   acceptance of the guidelines by other

8   trade associations, including

9   manufacturing and pharmacy groups."

10            That's the second bullet

11  point on the page?

12        A.    Yes, yes, yes, yes, yes.

13        Q.    So you agree, a key message

14  that Scott was communicating to DEA here

15  was that HDA was going to work to make

16  sure its members and other participants

17  in the supply chain in the pharmaceutical

18  industry would implement these

19  guidelines, correct?

20            MR. WEINSTEIN:  Objection to

21       form.

22            THE WITNESS:  I think we --

23       we meant to basically educate the

24       rest, that they were available.

Highly Confidential - Subject to Further Confidentiality Review

1          Again, we are not a

2     standards agency, we are not a

3     regulatory authority.  We can't

4     basically make any entity comply

5     with the guidelines.  We were just

6     going to educate as many folks as

7     we could about their existence and

8     make them available.

9  BY MR. PIFKO:

10     Q.    But you told DEA that you

11  wanted to help your members implement the

12  guidelines, correct?

13          MR. WEINSTEIN:  Objection to

14     form.

15          THE WITNESS:  That's -- yes,

16     that's what it -- that's what it

17     says here, yes.

18  BY MR. PIFKO:

19     Q.    Handing you what's marked as

20  Exhibit 24.

21          (Document marked for

22     identification as Exhibit

23     HDA-Kelly-24.)

24  BY MR. PIFKO:

1    Q.    It is a three-page e-mail

2    between HDA and AmerisourceBergen.

3    Bates-labeled HDA_MDL_000156499 through

4    156501.

5         Take a minute to review

6    this, and let me know when you're done.

7         There is some discussion

8    about whether Chris Zimmerman from

9    AmerisourceBergen is going to serve as

10    a -- a chairman of a committee.  I'm not

11    interested in that part of the discussion

12    here.

13    A.    Okay.

14    Q.    This goes back to earlier in

15    the process of developing the industry

16    compliance guidelines or best practices,

17    agree, it's back in early January 2008?

18    A.    Yes.

19    Q.    And this is before this

20    meeting with DEA, correct?

21    A.    It is.

22    Q.    Okay.  And in this e-mail on

23    the first page, 156499, Mr. Zimmerman

24    tells HDA's Anita Ducca, "I think we need

Highly Confidential - Subject to Further Confidentiality Review

1    to discuss the suspicious order project.

2    Since ABC has an agreement with DEA, it

3    does not matter what best practices HDMA

4    develops because ABC must adhere to its

5    written agreement with DEA.  I assume

6    Cardinal will be in the same boat.

7    Therefore, I'm not sure what benefit ABC

8    would receive from this project."

9            Do you see that?

10       A.    I do.

11       Q.    Did I read that correctly?

12       A.    You do.

13       Q.    Okay.  So you agree that at

14    this time Mr. Zimmerman is saying that

15    he's not going to implement any

16    guidelines or best practices, and he

17    assumes Cardinal is not going to either,

18    correct?

19            MS. ROLLINS:  Object to

20       form.

21            MR. WEINSTEIN:  Objection to

22       form.  Foundation.

23            THE WITNESS:  I think what

24       he's implying is that they are

Highly Confidential - Subject to Further Confidentiality Review

1            already under strict adherence to

2            a specific plan with -- directly

3            with the DEA that satisfies their

4            obligations.  But it's specific to

5            those companies individually,

6            therefore, a model plan or

7            guidelines is irrelevant for them.

8 BY MR. PIFKO:

9            Q.    And they have no plan on

10 implementing them at this time, correct?

11            MS. ROLLINS:  Objection to

12            form.

13            MR. WEINSTEIN:  Objection to

14            foundation and form.

15            THE WITNESS:  Because they

16            have their own policies in place.

17 BY MR. PIFKO:

18            Q.    You said here that they have

19 a plan that satisfies the DEA.  Where

20 does it say that it satisfies the DEA?

21            A.    I'm deducing from this

22 document that since ABC has an agreement

23 with DEA, it does not matter what best

24 practices HDMA develops because ABC must

1    adhere to its written agreement with DEA.

2         Q.    What about Cardinal?

3              MR. WEINSTEIN:  Objection to

4         form.

5              MS. CHARLES:  Objection to

6         form.

7    BY MR. PIFKO:

8         Q.    It doesn't say anything like

9    that about Cardinal, does it?

10              MR. WEINSTEIN:  Objection to

11        form.  Foundation.

12              THE WITNESS:  An individual

13        from ABC insinuates that Cardinal

14        may be a similar position due to

15        a -- maybe a consent decree that

16        Cardinal entered into with DEA as

17        well that would be in the same

18        constriction with regard to their

19        practices that ABC is at the time.

20    BY MR. PIFKO:

21        Q.    And so the HDA knew this

22    information before it had the meeting

23    with DEA, correct?

24        A.    Obviously we were apprised

1   that they were basically not going to be

2   of help in developing the guidelines or

3   adopting the guidelines, because they are

4   there are under a separate agreement.

5        Q.    Do you know if

6   AmerisourceBergen ever asked DEA if it

7   could follow the guidelines as an

8   improvement on measures it was already

9   engaged in?

10            MS. ROLLINS:  Objection to

11       form.

12            MR. WEINSTEIN:  Objection to

13       form.  Foundation.

14            THE WITNESS:  I do not.

15  BY MR. PIFKO:

16       Q.    No one ever told you that

17  they had requested anything from DEA as

18  far as being able to implement the

19  industry compliance guidelines?

20            MS. ROLLINS:  Objection to

21       form.

22            THE WITNESS:  That ABC had

23       requested?  Again, I don't know.

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. PIFKO:
 2         Q.    Same question about Cardinal
 3    Health.
 4              MS. CHARLES:  Objection to
 5         form.
 6              THE WITNESS:  Again I don't
 7         know.  I don't know.
 8    BY MR. PIFKO:
 9         Q.    To your knowledge, did any
10    distributor implement the industry
11    compliance guidelines?
12              MR. WEINSTEIN:  Objection to
13         form.  Foundation.
14              THE WITNESS:  Again, I don't
15         know.  They were -- they were
16         guidelines.  Many of the
17         companies, from what I understand,
18         already had various processes in
19         place.  These guidelines were
20         developed to better inform them
21         about expectations within the DEA.
22         And if they -- they could beg and
23         borrow, and again it was meant to
24         be kind of something that could be
```

1    applicable to various size

2    companies and be able to adapt.

3            So again I don't know if

4    anybody adopted the entire

5    document verbatim or not.  And we

6    didn't ask.

7  BY MR. PIFKO:

8        Q.    You don't know if anybody

9  adopted parts of the document either,

10 correct?

11           MR. WEINSTEIN:  Objection to

12       form.

13           THE WITNESS:  We don't.

14 BY MR. PIFKO:

15       Q.    So sitting here today, you

16 don't know, and at no time does HDMA know

17 if any members or other distributors

18 adopted all or part of the industry

19 compliance guidelines, correct?

20           MR. WEINSTEIN:  Objection to

21       form.

22           THE WITNESS:  I don't know,

23       nor did we ask.  And again, I

24       stated before, we are not a

Highly Confidential - Subject to Further Confidentiality Review

1        regulatory authority; we are not a

2        standard-setting body.  We are

3        simply doing our best to inform

4        our members about existing

5        policies.

6   BY MR. PIFKO:

7        Q.    And to your knowledge, no

8   pharmaceutical manufacturer ever adopted

9   the industry compliance guidelines or any

10  portion of them, correct?

11            MR. WEINSTEIN:  Objection to

12       form.

13            MS. MACKAY:  And foundation.

14            THE WITNESS:  And again,

15       they were not -- they were not

16       developed for manufacturers.  They

17       were developed for our core

18       members, the distributor members

19       of HDA.

20  BY MR. PIFKO:

21       Q.    But you did discuss them

22  with the Pain Care Forum, which included

23  manufacturers, correct?

24            MR. WEINSTEIN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

```
 1              form.

 2                   THE WITNESS:  Among many

 3              other groups, yes.  A lot of

 4              pharmacies groups, everybody in

 5              the supply chain.

 6    BY MR. PIFKO:

 7         Q.   Okay.  And just to be

 8    clear -- I think you had the answer, but

 9    I don't think we have a clear record.

10                   To your knowledge, no

11    distributor, manufacturer, or pharmacy

12    has ever implemented the guidelines or

13    any portion of the guidelines, correct?

14                   MR. WEINSTEIN:  Objection to

15              form.  Foundation.

16                   THE WITNESS:  Again, I think

17              every distributor member has their

18              own compliance guidelines that are

19              basically developed and put in

20              place for their company, their

21              specific customer base, et cetera.

22              I don't know that anybody kind of

23              copied the industry compliance

24              guidelines and made it part of
```

Highly Confidential - Subject to Further Confidentiality Review

1           their own protocols and

2           procedures.  I don't know.  Nor

3           did we ask.

4    BY MR. PIFKO:

5           Q.    I want to turn your

6    attention back to Exhibit 2.  Are you

7    there?

8           A.    Yes.  I'm at Exhibit 2.

9           Q.    You want you to go to the

10   page Bates-labeled HDA_MDL_000081366.

11   It's got dates that start with

12   September 30, 2010, to March 2011.

13          Do you see that?

14          A.    Yes.

15          Q.    So on February 25, 2011, it

16   says, "ExComm concurs with government

17   policy" -- government public policy

18   council directive.  Requests review of

19   consistency between the ICG and member

20   practices."

21          Do you see that?

22          A.    Yes.

23          Q.    So HDA did review the

24   consistency of member practices with the

1    ICG --

2                   MR. WEINSTEIN:  Objection to

3            form.

4    BY MR. PIFKO:

5            Q.    -- in February 25th, 2011?

6                   MR. WEINSTEIN:  Objection to

7            form.

8                   THE WITNESS:  No.  I think

9            what we asked was, were the ICGs

10           still relevant.  That was -- we

11           wanted to make sure that our

12           guidelines were still

13           relatively -- we weren't asking

14           whether they were consistent with

15           our -- with basically our

16           guidance.  Were our guidelines

17           still relevant and consistent four

18           years of their publication or

19           three years after the publication.

20   BY MR. PIFKO:

21           Q.    Well, no, it says -- it

22   literally says in the document, "Request

23   review of consistency between the ICG and

24   member practices."

1          A.    Is the ICG current.

2          Q.    Right.  But there's a -- you

3    were reviewing whether there was

4    consistency between the member practices

5    and the ICG, correct?

6                MR. WEINSTEIN:  Are you

7          testifying for the witness or is

8          there a question in there?

9                MR. PIFKO:  I'm asking him a

10         question.

11               THE WITNESS:  Again -- and,

12         again, this is just as a statement

13         in a -- in a chronology here.  I

14         think the -- the request was to

15         basically look at the ICGs and

16         determine based on what they are

17         doing and what's confronting them

18         in that marketplace, at that time,

19         three years after the publication,

20         are they still relevant and are

21         they still current.

22   BY MR. PIFKO:

23         Q.    Right.  But there's a

24   comparison of the ICGs and the member

1  practices at that time, correct?

2          MR. WEINSTEIN:  Objection to

3      form.

4          THE WITNESS:  That we

5      requested the individual member

6      companies to look at our ICGs and

7      compare them with their practices,

8      and let us know if they were still

9      relevant.

10         We did not review individual

11     company member practices.  And nor

12     could we with our antitrust.

13 BY MR. PIFKO:

14     Q.   Well, you did.  You

15 requested the -- the member companies'

16 practices when you developed the industry

17 compliance guidelines.  You've already

18 testified to that, it's all over the

19 documents.

20     A.   We -- we submitted -- we

21 submitted a questionnaire.  We asked them

22 to respond to the questionnaire based on

23 what their practices were.  And again we

24 didn't -- we didn't ask for their

1    practices verbatim.

2         Q.    You did --

3         A.    To the extent that they were

4    comfortable --

5         Q.    Ms. Ducca expressly said she

6    would facilitate that with the

7    consultant.  Are you now --

8              MR. WEINSTEIN:  Objection to

9         form.

10   BY MR. PIFKO:

11        Q.    -- disputing what you said

12   on the record before?

13             MR. WEINSTEIN:  Objection to

14        form.

15             THE WITNESS:  No.  That --

16             MR. WEINSTEIN:

17        Mischaracterizes testimony.

18             THE WITNESS:  I'm not --

19        I'm -- I'm not disputing that at

20        all.

21             The consultant was brought

22        in, developed a questionnaire.

23        The questionnaire was submitted to

24        the membership.  Those that felt

1      comfortable responding to the

2      questionnaire, did.

3            We did not ask for their

4      policies.  We asked them to

5      respond to the questionnaire.  To

6      some extent, it --

7  BY MR. PIFKO:

8            Q.    That's -- that's not --

9  that's not what the document says.  And

10 that's not what you testified to earlier.

11            MR. WEINSTEIN:  Objection to

12      form.  Wait for a question.

13 BY MR. PIFKO:

14            Q.    Remember, that we are under

15 oath here?

16            A.    I do.

17            MR. WEINSTEIN:  Sir, come

18      on, Mark, give me a break.

19            MR. PIFKO:  He's trying to

20      change his testimony.

21            MR. WEINSTEIN:  Give me a

22      break, Mark.  Ask your questions.

23 BY MR. PIFKO:

24            Q.    Exhibit 10 talks about the

1  processes that the consultant's going to

2  use, and it says, "Obtaining where

3  available copies of HDMA member

4  companies' internal suspicious order

5  business practices."  And Anita Ducca

6  said she was going to handle that.

7          And then in Exhibit 12, she

8  says, "We've been contacting our members

9  to request their suspicious order

10  information.  This is the first of a few

11  e-mails I'll be sending you."  She sends

12  the policies from Henry Schein.  It's

13  separate than the -- the interview

14  questionnaire that was discussed.

15          MR. WEINSTEIN:  Just wait

16      for the question.

17  BY MR. PIFKO:

18      Q.    So are you disputing that

19  HDA requested copies of its members'

20  suspicious order practices?

21          MR. WEINSTEIN:  Objection to

22      form.

23          THE WITNESS:  I'm not -- I'm

24      not disputing what was -- what was

1           typed.  I'm not aware that we were

2           receiving verbatim copies of their

3           suspicious order monitoring

4           protocols.

5   BY MR. PIFKO:

6           Q.    That was expressly part of

7   the protocol.

8                 MR. WEINSTEIN:  Objection to

9           form.

10  BY MR. PIFKO:

11          Q.    Are you disputing that?

12                MR. WEINSTEIN:  Objection to

13          form.

14                THE WITNESS:  Again, are you

15          referencing a specific --

16  BY MR. PIFKO:

17          Q.    Yeah.  Exhibit 10 --

18          A.    Exhibit 10.

19          Q.    It says she is going to

20  review the members' suspicious order

21  policies.

22          A.    This is in the -- where are

23  you referring to?

24          Q.    Page 2.

1    MR. WEINSTEIN:  Of

2    Exhibit 10.

3          MR. PIFKO:  3(B).

4          THE WITNESS:  Where

5    available copies of HDMA member

6    copies --

7  BY MR. PIFKO:

8    Q.    "Obtaining where available

9  copies of HDMA member companies' internal

10  suspicious business order practices."

11          Then if you look at Page 3

12  she says, "Contacting HDMA members to, A,

13  request copies of their current

14  suspicious orders business practices.

15  HDMA can facilitate this by sending an

16  e-mail to our members making the

17  request."

18          That's different from the

19  interviews.  C is the interviews.

20          MR. WEINSTEIN:  Objection to

21    form.

22          THE WITNESS:  Again --

23  BY MR. PIFKO:

24    Q.    In Exhibit 12 she sends Bill

Highly Confidential - Subject to Further Confidentiality Review

1    stuff from Henry Schein and says she is

2    sending others.  So --

3             MR. WEINSTEIN:  Objection to

4        form.

5    BY MR. PIFKO:

6        Q.    -- are you disputing that

7    HDA collected suspicious order practices

8    from its members?

9             MR. WEINSTEIN:  Objection to

10       form.

11            THE WITNESS:  I'm not

12       disputing that.

13   BY MR. PIFKO:

14       Q.    Okay.  That's all I'm

15   asking.

16       A.    Again, I don't know what

17   attachments were submitted by Henry

18   Schein.

19       Q.    I'm handing you what's

20   marked as Exhibit 25.

21            (Document marked for

22       identification as Exhibit

23       HDA-Kelly-25.)

24   BY MR. PIFKO:

1     Q.    Exhibit 25 is a document

2  Bates-labeled HDA_MDL_000213079 through

3  213088.  It's a document, PowerPoint

4  presentation entitled, "DEA Suspicious

5  Orders:  Recommended Industry Compliance

6  Guidelines.  Regional round table.  May

7  7, 2008."

8            Take a minute to review

9  this, and let me know when you're done.

10     A.    Okay.

11     Q.    Do you know who this

12  presentation was made to?

13     A.    From what I understand, this

14  was before I joined the organization.

15  There were a series of briefings that we

16  would provide to members that weren't

17  able to travel that much.  Smaller

18  companies that were in different parts of

19  the country.

20            So we would have regional

21  round tables where the smaller companies

22  would be able to get to a central

23  location and we'd come in and update them

24  on key issues.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  So this is an example

2  of updating some of these smaller

3  companies about the industry compliance

4  guidelines and the process that was

5  engaged to develop them and roll them

6  out?

7    A.    That seems to be, yes, what

8  it was.

9    Q.    It's got some summary of DEA

10  reaction on Page 213085 which is

11  consistent with the notes that Ms. Ducca

12  took of the first meeting.  Agree?

13         MS. CHARLES:  Object to

14     form.

15         THE WITNESS:  Yes.

16         (Document marked for

17     identification as Exhibit

18     HDA-Kelly-26.)

19  BY MR. PIFKO:

20    Q.    I'm handing you what's

21  marked as Exhibit 26.  These are

22  Ms. Ducca's notes from the second meeting

23  with DEA on suspicious orders which was

24  attached to Exhibit 8, I believe.

1                  For the record, it's

2    Bates-labeled CAH_MDL2804_02489191

3    through 196.  Take a minute to review

4    this, and let me know when you're done.

5          A.    Okay.

6          Q.    Are you done?  You reviewed

7    this?

8          A.    I reviewed it, yes.

9          Q.    So these are Ms. Ducca's

10   notes of the second meeting with DEA,

11   correct?

12         A.    Yes.

13         Q.    And if you recall, from the

14   notes from the first meeting, one of the

15   comments was that they welcomed DEA's

16   input on the draft that had been shared

17   at the prior meeting, agree?

18         A.    Yes.

19         Q.    And so then, this is DEA

20   providing its comments on the industry

21   compliance guidelines that had been

22   provided to them at the prior meeting,

23   agree?

24                  MR. WEINSTEIN:  Objection to

1          form.

2                    THE WITNESS:  Yes.

3     BY MR. PIFKO:

4          Q.    And it's got the attendees

5     here from DEA, it includes Linden Barber,

6     Cathy Gallagher, Robert Gleason, agree?

7          A.    Yes.

8          Q.    And then from HDMA, we've

9     got Ms. Ducca, Scott Melville.  And

10    you've got outside counsel, Robert

11    Burnett, Richard Cooper, and David

12    Durkin, agree?

13         A.    Yes.

14         Q.    Okay.  So they just go

15    through the draft guidelines that were

16    provided to them, which are the ones that

17    were in Exhibit 21.

18                    So then, it goes through

19    page by page providing thoughts and

20    comments DEA has, agree?

21         A.    Yes, that's what these notes

22    do.

23         Q.    That's what's reflected in

24    Exhibit 26, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Okay.  So one comment DEA

3 has is that, "It's recommended that you

4 add into the outline that once an order

5 is determined to be suspicious, it

6 shouldn't be shipped.  DEA understood

7 that it was in the body of the

8 guidelines, but they wanted to see it

9 upfront in the outline as well."  Agreed?

10         MR. WEINSTEIN:  Objection to

11     form.

12         THE WITNESS:  I'm sorry,

13     where -- where --

14 BY MR. PIFKO:

15    Q.    Page 3.

16    A.    Page 3, I'm sorry.

17    Q.    No I'm on the first page of

18 Exhibit 26.  But I'm looking at the

19 comment from Page 3.

20    A.    Oh, I'm sorry.  Okay, yes.

21    Q.    DEA is just emphasizing that

22 the -- if an order is suspicious, it

23 shouldn't be shipped.  They want that up

24 in the front in the outline, even though

Highly Confidential - Subject to Further Confidentiality Review

1    it's in the body of the document, agreed?

2         A.    That's what this notes says,

3    yes.

4         Q.    The comment for Page 4, Item

5    1B is saying that for a questionnaire

6    that might be to a distributor's

7    customer, DEA wants the industry to be

8    aware that even if you obtain a signed

9    document, that's not going to be a

10   defense; distributors have to do more to

11   identify the legitimacy, agree?

12              MR. WEINSTEIN:  Objection to

13        form.

14              THE WITNESS:  Yes, that's

15        what it says.

16   BY MR. PIFKO:

17        Q.    Turning to the second page.

18   It says, a comment halfway down the page

19   on Page -- the comment for Page 6.

20   There's actually two.  I'm looking at

21   the -- oh, there's actually three.  I'm

22   looking at the second one.  It says,

23   "Several times they" -- which is DEA,

24   "they said that the procedures" --

1    "procedures used by members should be

2    robust and adaptable," agree?

3                MR. WEINSTEIN:  Objection to

4         form.

5                THE WITNESS:  That's what it

6         says.

7    BY MR. PIFKO:

8         Q.    Okay.  And then the longer

9    comment here for Section 2, monitoring on

10   suspicious orders, the second paragraph

11   here, it says, "DEA seemed to think that

12   thresholds focus primarily on volumes and

13   they expressed the view that an exclusive

14   or even principal focus on volumes is

15   inadequate."

16                Do you see that?

17        A.    I do.

18        Q.    Do you agree that that's

19   what DEA told HDMA during this meeting?

20        A.    I have no reason to doubt

21   what's written here.

22        Q.    Okay.  And that's what's

23   written here, correct?

24        A.    That's what's written here.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    "They also want the initial

2    screen of orders to focus on A, patterns

3    of ordering, comparing the present order

4    to, one, past orders from the same

5    customer including whether the frequency

6    of orders is suspicious; two, orders from

7    similar customers; and, three, orders

8    from other establishments of the same

9    type in the locale or region."  Agree?

10   A.    That's what it says.

11   Q.    Okay.  And then they also

12   want the initial screens of orders to

13   focus on combination of controlled

14   substances ordered, agree?

15   A.    That's what it says, yes.

16   Q.    Then going to the third

17   page, at the top, another comment that

18   DEA made here, it says, was that the term

19   "order of interest" did not have legal

20   standing.

21        Do you see that?

22   A.    I do.

23   Q.    Okay.  And that was

24   something that DEA conveyed at this

1    meeting, correct?

2         A.    Again, I'll take it from

3    this, yes, that they did that.

4         Q.    And then it says, "DEA

5    emphasized that orders should not remain

6    in the orders of interest category for

7    lengthy periods."

8              Do you see that?

9         A.    Yes.

10        Q.    "They should be investigated

11   expeditiously and promptly resolved as

12   either suspicious or not suspicious."

13   Agree?

14             MR. WEINSTEIN:  Objection to

15        form.

16             THE WITNESS:  That's what it

17        says, yes.

18   BY MR. PIFKO:

19        Q.    Okay.  Then there's some

20   comments about the language about

21   thresholds that was in the draft industry

22   compliance guidelines.

23             Do you see that section?

24        A.    I do.

1    Q.    Okay.  So the first is that,
2  "DEA thought it might be interpreted to
3  mean excessive volumes only.  And then
4  HDMA responded that their intent was to
5  be broader and to include frequency as a
6  factor."
7           Do you see that?
8    A.    I do.
9    Q.    Okay.  "DEA asked HDA to
10  expand the explanation of thresholds,"
11  agreed?
12   A.    That's what it says, yes.
13   Q.    And then, "DEA asked that
14  the industry compliance guidelines say
15  the drug or drugs that cause an order to
16  be an order of interest should not be
17  shipped where the order is an order of
18  interest."
19           Do you see that?
20   A.    I do.
21   Q.    Okay.  You agree that that
22  was something that the DEA conveyed at
23  this meeting?
24   A.    Again, I have no reason to

Highly Confidential - Subject to Further Confidentiality Review

1   doubt what was stated here on this paper.

2         Q.    And then finally, it says,

3   "DEA suggested that we delete the second

4   paragraph under C, develop thresholds to

5   identify orders of interest."

6               Do you see that?

7         A.    I do.

8         Q.    It says, "DEA has backed

9   away from the standard of three times the

10  monthly overage order for Schedule II and

11  ARCOS-reportable Schedule III products.

12  DEA suggested that we substitute a

13  paragraph based on more recent DEA

14  guidance."

15              Do you see that?

16        A.    I do.

17        Q.    So you understood that DEA

18  was communicating here not to use the

19  three times multiplier, correct?

20              MR. WEINSTEIN:  Objection to

21         form.  Foundation.

22              THE WITNESS:  That seems to

23         be what this indicates, yes.

24  BY MR. PIFKO:

1     Q.    Going to Page 4.  There is

2  some discussion about how to evaluate

3  orders that aren't just of high volume.

4  It says, "They gave the example of an

5  internet pharmacy that might be ordering

6  from multiple distributors and that might

7  not order enough to go over a threshold

8  over a period of time, but could be

9  identified by a pattern of how and when

10  they ordered.

11          "For example, they thought

12  if a pharmacy ordered only every three to

13  four months, but then when they did so,

14  ordered a large volume, that might be a

15  signal the pharmacy was doing business

16  with several distributors and rotating

17  which one they ordered from?"

18          Do you see that?

19     A.    I do.

20     Q.    That was something that was

21  communicated?

22     A.    It's written here.  I have

23  no reason to doubt that that was what was

24  stated.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And then we go to the

2    section on Page 8 in the guidelines,

3    "Stop shipments of an order of interest."

4              Do you see that?

5    A.    I do.

6    Q.    And then it says, "DEA asked

7    us to reemphasize that an order should

8    not be shipped" -- and it's underlined --

9    "if there was reason to believe there was

10    a problem."

11              Do you see that?

12    A.    I do.

13    Q.    So DEA made that point

14    again, correct?

15    A.    Yes.

16              MR. WEINSTEIN:  Objection to

17              form.

18    BY MR. PIFKO:

19    Q.    And then it says, "In fact,

20    they asked us to add in that if one

21    controlled substance in the order could

22    be a problem, then other controlled

23    substances in the order may also be a

24    problem and the distributor should

Highly Confidential - Subject to Further Confidentiality Review

1    consider holding the others."

2             Do you see that?

3        A.    I do.

4        Q.    Did I read that correctly?

5        A.    You did.

6        Q.    It's your understanding that

7    DEA communicated this to HDA in providing

8    comments on the guidelines, correct?

9        A.    I have no reason to doubt

10   what's written here.

11       Q.    They gave an example of an

12   order where the volume of hydrocodone

13   triggered a threshold, but that both

14   hydrocodone and alprazolam were included

15   in the same order.

16            Do you see that?

17       A.    I do.

18       Q.    And then it says, at the

19   bottom of that paragraph, "If one part

20   was suspicious, wouldn't all of it be

21   suspicious?"

22            Do you see that?

23       A.    I do.

24       Q.    Do you agree that that was

1    something communicated at this meeting?

2              MS. CHARLES:  Object to

3         form.

4              MR. WEINSTEIN:  Objection to

5         form.

6              THE WITNESS:  Again, that's

7         written clearly here that that's

8         what they said.

9    BY MR. PIFKO:

10             Q.    Then at the last page --

11   part in that section it says, "DEA's

12   point was that in some circumstances, the

13   connection between that drug and another

14   drug in the order should lead the

15   wholesaler not to ship the other drug as

16   well.  Again, in their view, looking at

17   volume ordered drug by drug is not

18   enough, and basing thresholds solely on

19   volume is not enough.  Even if an order

20   for a drug that does not meet a volume

21   threshold may be suspicious in light of

22   other aspects of the order."

23             Do you see that?

24             MR. WEINSTEIN:  You didn't

1        read the full paragraph.

2   BY MR. PIFKO:

3        Q.    Do you see where I was

4   reading?

5        A.    I did -- I did see where you

6   were reading, yes.

7        Q.    Okay.  You understood that

8   DEA communicated that during this

9   meeting?

10       A.    Again, I have no reason to

11  doubt what's written here.

12       Q.    I want to go to the last

13  page of this document.  The comment from

14  Page 11, "DEA asked us to emphasize that

15  suspicious order must be reported to DEA

16  whether the wholesaler ships or not, and

17  to emphasize that timeliness of notice is

18  very important."

19            Do you see that?

20       A.    I do.

21       Q.    Do you agree that that was

22  something communicated during this

23  meeting?

24       A.    I do.

1    Q.    Then there's some -- a

2    section, "Additional Recommendations."

3              "DEA asked us to further" --

4    "to either expand this bullet or create a

5    new bullet to highlight the distributor's

6    own experience may indicate a need to

7    revise their system for suspicious order

8    monitoring."

9              Do you see that?

10    A.    I do.

11    Q.    So you understood that DEA

12    was saying, based on a distributor's own

13    experience, they might need to make

14    changes or improvements to their system

15    over time?

16              MR. WEINSTEIN:  Objection to

17         form.

18    BY MR. PIFKO:

19    Q.    Correct?

20              MR. WEINSTEIN:  Same

21         objection.

22              THE WITNESS:  That seems to

23         indicate what -- yes, what was

24         said.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. PIFKO:

2         Q.    And then there's additional

3    comments that DEA raised that are

4    provided in bullet points here at the

5    end.  Agree?

6         A.    I see them.

7         Q.    Five of them?

8         A.    Yes.

9         Q.    One is yet another comment

10   that if an order is -- there's concerns

11   or questions, it shouldn't be shipped,

12   agree?

13            MR. WEINSTEIN:  Objection to

14       form.

15            THE WITNESS:  The first

16       bullet point?

17   BY MR. PIFKO:

18        Q.    Yeah.  That's what it says?

19        A.    That's what it says.

20        Q.    They want reports on all

21   orders, even if it's not shipped?

22        A.    On all suspicious orders.

23   Yes.  Bullet Point 2.

24        Q.    Again, a comment about

1    timeliness in Bullet 3, agree?

2         A.    Yes.

3         Q.    And then 4, it says, "DEA

4    wants reports of suspicious orders even

5    if there is some question about the

6    dispenser status as a customer.  For

7    example, if during a background check of

8    a potential customer, the customer

9    indicates that they might be placing

10   orders that could be suspicious, DEA

11   wants to know, even if the pharmacy in

12   question does not become a customer."

13             Agree, that's what it says?

14        A.    That's what it says, yes.

15        Q.    So you understood that DEA

16   communicated that as well during this

17   meeting?

18        A.    Again, I have no reason to

19   doubt what's written here.

20        Q.    Okay.  We know these

21   comments were shared with Cardinal,

22   because we have the e-mail.

23             To your knowledge, in the

24   ordinary course of HDA's processes and

1    procedures, these would -- these would

2    have been shared with other members as

3    well, correct?

4              MR. WEINSTEIN:  Objection to

5         form.

6              MS. WICHT:  Objection to

7         form.

8              THE WITNESS:  Again, I can't

9         say for certain.  This is labeled

10        as a draft.  I'm not sure if it

11        was sent to the RAC or another

12        group, until -- again, all I have

13        is the form in front of me so...

14             I would -- I would imagine

15        so, that usually we sent -- we're

16        usually in the habit of

17        summarizing those meetings and

18        sending them out to the regulatory

19        affairs committee.

20   BY MR. PIFKO:

21        Q.    And as we looked at in one

22   of the other documents, the outcome of

23   these meetings was critical to forming

24   HDA's future strategies, correct?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. WEINSTEIN:  Objection to

2     form.

3          THE WITNESS:  It was -- I

4     mean feedback from the DEA was an

5     important component to finalizing

6     and -- and fine-tuning the ICGs,

7     yes.

8  BY MR. PIFKO:

9     Q.    And developing other

10 strategies.  Remember we looked at that

11 discussion of strategy for the Hill.  It

12 said that the meetings under industry

13 compliance guidelines were going to be

14 key to formulating additional strategies,

15 agreed?

16     A.    Yes.

17     Q.    Okay.  So HDA certainly

18 would have shared the views of DEA to its

19 members after this meeting, agree?

20          MR. WEINSTEIN:  Objection to

21     form.

22          THE WITNESS:  Again, I don't

23     doubt that they did.  I just --

24     I'm looking at a draft document.

1      So again, I don't doubt that

2           this was finalized and the edits

3           made here were incorporated and a

4           final document was submitted to

5           the regulatory affairs committee.

6    BY MR. PIFKO:

7           Q.    And you agree that the

8    members of the regulatory affairs

9    committee would have been interested to

10   know how this DEA meeting turned out,

11   correct?

12          MR. WEINSTEIN:  Objection to

13       form.

14          MS. CHARLES:  Objection.

15       Form.

16          MS. MACKAY:  Objection.

17          MS. ROLLINS:  Foundation.

18          MS. WICHT:  Objection to

19       form.

20          MR. WEINSTEIN:  Foundation.

21          THE WITNESS:  I think -- I

22       think they would be interested,

23       yes.

24   BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I'm handing you what's

2  marked as Exhibit 27.

3             (Document marked for

4        identification as Exhibit

5        HDA-Kelly-27.)

6  BY MR. PIFKO:

7    Q.    You don't need to read this

8  thing in its entirety.  But this is the

9  final guidelines, correct?  You can take

10  a minute to review it.  That's all I want

11  to ask you.

12             For the record, Exhibit 27

13  is a document Bates-labeled

14  HDA_MDL_00218651 through 218665.

15    A.    Yes, I would agree that this

16  is the final version of the industry

17  compliance guidelines.

18             (Document marked for

19        identification as Exhibit

20        HDA-Kelly-28.)

21  BY MR. PIFKO:

22    Q.    I'm handing you what's

23  marked Exhibit 28, single-page document,

24  a letter from the DEA dated October 17,

Highly Confidential - Subject to Further Confidentiality Review

1    2008, Bates-labeled CAH_MDL2804_02489203.

2    Take a minute to review this.  This is a

3    letter HDA received after finalizing the

4    guidelines from DEA, correct?

5         A.    I'm sorry.  Could you

6    restate it?

7         Q.    Take a minute to review it.

8    And let me know when you're done.

9         A.    All right.

10        Q.    Okay.  This is a letter that

11   DEA receive -- or sorry, DEA sent to HDA

12   after the guidelines were completed,

13   correct?

14        A.    That's my understanding,

15   yes.

16        Q.    This is to HDA's president,

17   John Gray?

18        A.    Yes.

19        Q.    Okay.  It says in the first

20   paragraph, second sentence, "The elements

21   set forth in the industry compliance

22   guidelines reporting suspicious orders

23   and preventing diversion of controlled

24   substances are important to sustaining

Highly Confidential - Subject to Further Confidentiality Review

1    effective controls to guard against

2    diversion of controlled substances."

3              You agree that's what it

4    says?

5         A.    That's what it says, yes.

6         Q.    Second paragraph, last

7    sentence, "All distributors must

8    implement processes and procedures to

9    effectively ensure that controlled

10   substances are not diverted to illicit

11   use."

12             Do you agree with me that's

13   what it says?

14        A.    Yes.

15        Q.    Third paragraph, first

16   sentence, "Although diversion control is

17   not a one-size-fits-all effort, companies

18   that implement processes and procedures

19   that effectively accomplish these

20   objectives will do much to ensure that

21   vital controlled substances are not

22   diverted to illegitimate uses."

23             Agree that's what it says?

24        A.    Yes.

1    Q.    When HDA received this, did

2    it send this letter to its members?

3         MS. MACKAY:  Objection to

4         form.

5         THE WITNESS:  I imagine it

6         did.  This is the type of

7         correspondence that we would make

8         available to the members.

9         MR. PIFKO:  We'll take a

10        break after this document.

11        (Document marked for

12        identification as Exhibit

13        HDA-Kelly-29.)

14   BY MR. PIFKO:

15        Q.    Handing you what's been

16   marked as Exhibit 29.  For the record,

17   Exhibit 29 is a webinar slide

18   presentation dated Friday, November 14th,

19   2008.  The title "Industry Compliance

20   Guidelines.  Reporting Suspicious Orders

21   and Preventing Diversion of Controlled

22   Substances."  It's Bates-labeled

23   HDA_MDL_000145918 through 145968.

24        Take a minute to review it.

Highly Confidential - Subject to Further Confidentiality Review

1    I only have a couple of questions about a

2    couple of the slides.

3             A.    Okay.

4             Q.    So you recall in the first

5    meeting with DEA about the industry

6    compliance guidelines on April 15, 2008,

7    one of the thing HDA told DEA that it was

8    going to engage in an educational

9    outreach concerning the guidelines,

10   correct?

11            A.    Correct.

12            Q.    Okay.  Do you understand

13   that to be a part of the educational

14   outreach?

15            A.    I do, yes.

16            Q.    Do you know who this was

17   given to?

18            A.    I do not know.  I have no

19   idea who the participants were.

20            Q.    This is a webinar.  Is it

21   common practice for HDA to provide

22   webinars?

23            A.    Yes.

24            Q.    And it provides webinars to

Highly Confidential - Subject to Further Confidentiality Review

1    its members?

2                MR. CRAWFORD:  Objection to

3         form.

4                THE WITNESS:  Its -- yeah,

5         its core members.  Its distributor

6         members --

7    BY MR. PIFKO:

8         Q.    Okay.

9         A.    -- on technical issues.

10        Q.    So it's HDA's practice to

11   provide webinars to core distributor

12   members, correct?

13        A.    Yes.

14        Q.    And this is a webinar dated

15   Friday, February (sic) 14, 2008, agreed?

16        A.    Yes.

17        Q.    About a month after you got

18   the letter from DEA, Exhibit 28, agree?

19        A.    Yes.

20        Q.    It's got two presentations,

21   one from Ms. Ducca, and one from David

22   Durkin, agree?

23        A.    Yes.

24        Q.    So it's got some background

Highly Confidential - Subject to Further Confidentiality Review

1   about how the guidelines were developed

2   and why they were developed.  If you look

3   at Slide 8, there's a section,

4   history/background.

5          A.    Yes.

6          Q.    Okay.  One of the points of

7   history and background that's provided on

8   Slide 8 is that intensity stepped up, and

9   the DEA sent those three Rannazzisi "Dear

10  Registrant" letters and suspended

11  distributors' registration, agree?

12         A.    Yes.

13         Q.    And that was part of what

14  led to the development of these industry

15  compliance guidelines, correct?

16         A.    Yes.

17         Q.    Then there is -- then next

18  slide, Slide 9 is, what is driving the

19  DEA.  So why -- why is that happening,

20  agree?  Why are we getting these "Dear

21  Registrant" letters and suspension of

22  registrations?

23                MR. WEINSTEIN:  Objection to

24         form.

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  These are,

2         yeah, several criteria that were

3         listed, yes.

4    BY MR. PIFKO:

5         Q.    Okay.  It says prescription

6    drug abuse.  And it talks about increase

7    in prescribing for pain, nonmedical

8    prescription drug use is up 80 percent

9    from 2000.  Am I reading that correct?

10        A.    That's what -- yes.

11        Q.    And there is some discussion

12   about the "Dear Registrant" Rannazzisi

13   letters.  Some of this we've seen in the

14   other presentations, agree?  Such as the

15   October 31, 2008, one?  Or I'm sorry,

16   January 31, 2008, one?

17             MR. WEINSTEIN:  Objection to

18        form.

19             THE WITNESS:  Yes.

20   BY MR. PIFKO:

21        Q.    Then you go to Slide 15.  It

22   tells you the purpose of the industry

23   compliance guidelines and the DEA

24   communications, agree?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. WEINSTEIN:  Objection to

2     form.

3          THE WITNESS:  Yes.

4  BY MR. PIFKO:

5     Q.    So, the purpose -- one of

6  the purposes is to head off further

7  enforcement of regulatory action, agree?

8     A.    That's what it states.

9     Q.    One of them is to

10  demonstrate our members' commitment.

11          Do you see that?

12     A.    Yes.

13     Q.    Another one says to see

14  distributors as part of the solution.

15          Do you see that?

16     A.    Yes.

17     Q.    If you go to Slide 24.  Some

18  additional advice on what's a suspicious

19  order from DEA, agreed?

20     A.    It says, "Anecdotal advice

21  from DEA," yes.

22     Q.    And it's got seven bullet

23  points about criteria that can make an

24  order suspicious, agree?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes there are certain bullet

2  points, yes.

3    Q.    If you go to Page 29, it's

4  got a timeline and set of events of

5  background about the industry compliance

6  guidelines development.

7         Do you see that?

8    A.    I'm sorry.

9    Q.    29?

10    A.    Yes.

11    Q.    Are you there?

12    A.    I'm on Slide 29, yes.

13    Q.    So it says, "The regulatory

14  affairs committee" -- that's the

15  committee that developed them, correct?

16    A.    Yes.

17    Q.    And then they were reviewed

18  by counsel, yes?

19    A.    That's correct.

20    Q.    And then outreach to related

21  interest groups.  That includes the Pain

22  Care Forum, correct?

23    A.    And pharmacy groups, yes,

24  among others, yes.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Then the executive committee

2     approved them, correct?

3          A.    That's correct.

4          Q.    And then there's these DEA

5     meetings that we just discussed, right?

6          A.    Correct.

7          Q.    April 15th, June 4th, and

8     Ms. Ducca said she didn't make minutes of

9     the September 5th one, agreed?

10         A.    Yes.

11         Q.    And then you get the letter

12    on October 23rd that we looked at

13    Exhibit 28?

14         A.    Yes.

15              MR. PIFKO:  We can take a

16         break.

17              THE VIDEOGRAPHER:  The time

18         is 2:12 p.m.  We are going off the

19         record.

20              (Short break.)

21              THE VIDEOGRAPHER:  The time

22         is 2:29 p.m.  We are back on the

23         record.

24              (Document marked for

1      identification as Exhibit

2      HDA-Kelly-30.)

3   BY MR. PIFKO:

4      Q.    I'm handing you what's

5   marked Exhibit 30.  It's an e-mail,

6   two-page e-mail with an attachment,

7   one-page attachment, Bates-labeled

8   HDA_MDL_000080421 through 423.

9            Take a minute to review it

10  and let me know when you're done.

11           Are you ready?

12     A.    Yes.

13     Q.    Are you familiar with this

14  discussion; you were at HDA at this time,

15  correct?

16     A.    I was at HDA at this time,

17  yes.  I am not familiar with this

18  particular e-mail, but I understand the

19  correspondence between the communications

20  department and -- and Anita Ducca.

21     Q.    Okay.  So Farah Qureshi, am

22  I -- am I saying that right?

23     A.    Yes.

24     Q.    She's a communications

1    manager?

2        A.    Yes.

3        Q.    So she is responsible for

4    providing initial drafts of public --

5    public statements that HDA might post?

6        A.    It's --

7            MR. WEINSTEIN:  Objection to

8        form.

9            THE WITNESS:  Primarily just

10       with what goes up onto the

11       internet and what gets -- public

12       facing.  And all the policy

13       documents are developed usually

14       inside the government affairs

15       department.

16   BY MR. PIFKO:

17       Q.    Okay.  So Farrah's job is to

18   draft materials that will be on HDA's

19   website?

20       A.    Yes.  And kind of, you know,

21   position them and pretty them up for the

22   website.

23       Q.    Okay.  So she prepares this

24   one-pager on prescription drug abuse and

Highly Confidential - Subject to Further Confidentiality Review

1  diversion that is attached as the last

2  page of Exhibit 30.  Agree?

3           MR. WEINSTEIN:  Objection to

4      form.

5           THE WITNESS:  Yes.

6  BY MR. PIFKO:

7      Q.    And then Anita Ducca

8  provides some comments in this e-mail

9  dated Wednesday June 12, 2013.  Agree?

10     A.    Yes.

11     Q.    And then she actually

12 attaches the redline that's -- and the

13 redline is what is the second page,

14 agree?

15     A.    Yes, it appears so.

16     Q.    Okay.  So one of Anita's

17 comments is, she says, "Although there

18 are some examples of what our members do,

19 I'm hesitant to include anything like

20 that."

21           You see that in the third

22 paragraph?

23     A.    Yes.

24     Q.    And then she says, "Not all

1  our members are doing what HD Smith

2  does."

3              Do you see that?

4       A.    Yes.

5       Q.    "If DEA sees this, which

6  they are likely to at some point, they

7  may question why all our members aren't

8  doing it."

9              Do you see that?

10      A.    Yes.

11      Q.    "Sort of like how they took

12 our ICG and included it in their legal

13 filing against Walgreens Distribution

14 Center, claiming that there was an

15 industry standard that Walgreens should

16 have known about and been following."

17             Do you see that?

18      A.    I do.

19      Q.    There were some frustration

20 at HDA that DEA had cited the industry

21 compliance guidelines as an industry

22 standard and used them against Walgreens?

23             MR. WEINSTEIN:  Objection to

24        form.

1           THE WITNESS:  I don't know

2       that there was frustration.  I

3       think we were -- we were slightly

4       concerned that a document that was

5       voluntary guidelines was cited in

6       a -- in a proceeding by DEA

7       against a non-HD member or non --

8       at that point still HDMA or HDA at

9       that point.  So that was the

10      concern.

11  BY MR. PIFKO:

12      Q.    I'm handing you what's

13  marked as Exhibit 31.

14           (Document marked for

15      identification as Exhibit

16      HDA-Kelly-31.)

17  BY MR. PIFKO:

18      Q.    This is a chronology of

19  HDMA/HDA executive committee and board of

20  directors' drug abuse and diversion

21  discussions at meetings and conference

22  calls.  It's dated January 2, 2018.

23           It's kind of lengthy.  I

24  just want to point you to a particular

1    passage that's relevant to the suspicion

2    about the industry compliance guidelines

3    on Page 7.

4              And for the record,

5    Exhibit 31 is Bates-labeled

6    HDA_MDL_000155930 through 155946.

7              MR. WEINSTEIN:  47 actually.

8              MR. PIFKO:  47.  Sorry.

9         Thanks.

10   BY MR. PIFKO:

11        Q.   And these notes were

12   prepared by Ms. Ducca.  I want to turn

13   your attention to Page 7.

14              MR. WEINSTEIN:  Was that a

15         question or was that a statement?

16              MR. PIFKO:  No, I'm stating

17         to you.

18              THE WITNESS:  I don't know

19         that these were prepared.  This is

20         a summary of -- of board minutes,

21         I believe.  So it was -- I don't

22         think this was prepared by Anita

23         Ducca.

24   BY MR. PIFKO:

1    Q.    Do you have any reason to

2    dispute that the statements in here are

3    accurate with respect to discussions at

4    the board meetings?

5    A.    No, I have no reason to

6    dispute that.

7    Q.    Okay.  I want to direct you

8    to Page 7 which is HDA_MDL_00015936.  Are

9    you there?

10    A.    Yes.

11    Q.    Second full paragraph, or

12    look at -- second paragraph here.

13    A.    Yep.

14    Q.    Second sentence it says,

15    "DEA has been referring to the industry

16    compliance guidelines on suspicious

17    orders and certain legal documents

18    resulting in the implication that it is

19    an industry standard.  Since these

20    guidelines were never intended to

21    constitute a standard, they have been

22    taken down from the HDMA website at the

23    direction of the government public policy

24    council."

Highly Confidential - Subject to Further Confidentiality Review

1              Did I read that correctly?

2        A.    Yes, you did.

3        Q.    Is that consistent with your

4  understanding of --

5        A.    Yes, it is.

6        Q.    -- why the guidelines were

7  taken down?

8        A.    Yes, it is.

9              (Document marked for

10             identification as Exhibit

11             HDA-Kelly-32.)

12  BY MR. PIFKO:

13       Q.    Handing you what's marked as

14  Exhibit 32.  It's a two-page document

15  Bates-labeled HDA_MDL_00081415 and 416.

16             Take a minute to review this

17  and let me know when you're done.

18       A.    Okay.

19       Q.    I just wanted to direct your

20  attention to second paragraph on the

21  first page.

22             "The regulatory affairs

23  committee and federal government affairs

24  committee told its members that there was

1    some consideration about updating the

2    guidelines, but ultimately it was decided

3    that they would be replaced with a

4    statement to the effect that the industry

5    is very committed to compliance."

6              And there was a draft that

7    was exchanged with members, agree?

8              MR. WEINSTEIN:  Objection to

9         form.

10             THE WITNESS:  Yes, that's

11        what this says.

12   BY MR. PIFKO:

13        Q.    And that's what happened?

14        A.    I don't recall exactly what

15   the process was between the ICGs coming

16   down and a statement going up in its

17   stead.  But again, I have no reason to

18   doubt that this process described here is

19   accurate.

20        Q.    Handing you what's marked as

21   Exhibit 33.

22             (Document marked for

23        identification as Exhibit

24        HDA-Kelly-33.)

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. PIFKO:

2      Q.    For the record Exhibit 33 is

3  a Word document that was -- file name --

4  name GAO Meeting on DEA Draft, TPs,

5  092010.  It's Bates-labeled HDMA -- or

6  sorry, HDA_MDL_000139905 to 000139910.

7  Take a minute to review it and let me

8  know when you're done.

9      A.    Okay.

10     Q.    You done?

11     A.    Yes.

12     Q.    So if you recall, we were

13  looking earlier at a document, that

14  document about the strategy for testimony

15  on the Hill.  Do you recall that?

16     A.    Yes, I do.

17     Q.    And one of the tactics that

18  was discussed there was getting a

19  congressperson to talk to the DEA to

20  address the industry's concerns.  Do you

21  recall that?

22     A.    I do.

23     Q.    Another tactic that HDA was

24  considering was communicating with the

Highly Confidential - Subject to Further Confidentiality Review

1    Government Accountability Office about

2    the -- its concerns about the DEA,

3    correct?

4                    MR. WEINSTEIN:  Objection to

5         form.

6                    THE WITNESS:  I don't know

7         if that was part of that.  I

8         didn't -- was that part of that?

9    BY MR. PIFKO:

10        Q.    Irrespective of that

11   document, I'm just asking you --

12        A.    It is --

13        Q.    -- if that was another

14   tactic that HDA was investigating?

15                   MR. WEINSTEIN:  Objection to

16        form.

17                   THE WITNESS:  Again, we

18        don't have the ability to launch

19        GAO investigations, but we can

20        talk to members of Congress who

21        may think that's a correct course

22        of action.

23   BY MR. PIFKO:

24        Q.    Okay.  And so that was

1    something that HDA was exploring about

2    whether there could be a dialogue with

3    GAO about the industry's concerns about

4    the DEA, correct?

5            MR. WEINSTEIN:  Objection to

6       form.

7            THE WITNESS:  Again I don't

8       know if we -- if we specifically

9       requested that.  I know that this

10       GAO report was requested by

11       members of Congress.

12   BY MR. PIFKO:

13       Q.    Okay.  These are talking

14   points about the industry's concerns that

15   would be presented at the GAO, correct?

16       A.    Correct.

17       Q.    So, this talks about, I'm on

18   the second page of the document.  It

19   first says, "Background on HDMA, who we

20   represent, show the graphic of wholesale

21   distribution we have online, number of

22   members, et cetera."

23       So in connection with the

24   discussion, there would have been a

Highly Confidential - Subject to Further Confidentiality Review

1    discussion about who the members are that

2    are represented by HDA, correct?

3                    MR. WEINSTEIN:  Objection to

4          form.

5                    THE WITNESS:  Yes.

6    BY MR. PIFKO:

7          Q.    And then this identifies

8    recent concerns.  Do you see that

9    discussion in Section 4 here?

10         A.    Yes, I see Section 4.

11         Q.    It says, "Recently DEA has

12   exerted extreme pressure on wholesale

13   distributors to take controlled

14   substances suspicious order

15   responsibilities much further."

16                    Do you see that?

17         A.    I do.

18         Q.    Do you agree that was a

19   concern from HDA and its distributor

20   members?

21                    MR. WEINSTEIN:  Objection to

22         form.

23                    THE WITNESS:  It was.

24   BY MR. PIFKO:

1    Q.    And then it gives bullet

2    points elaborating on that concern,

3    agree?

4    A.    It appears to, yes.

5    Q.    And the first one is, "DEA

6    invited members of the distribution

7    industry, firm by firm to a meeting where

8    DEA point blank told them that they

9    should identify customers who are selling

10   for illicit purposes, e.g., pill mils, or

11   illicit internet pharmacies such as those

12   filling orders without a prescription."

13         Do you see that?

14   A.    I do.

15   Q.    So that was part of the

16   basis for the HDA and its members'

17   concerns about DEA's pressures to take

18   controlled substances order

19   responsibilities further?

20         MS. WICHT:  Objection to

21   form.

22         MR. WEINSTEIN:  Objection to

23   form.

24         THE WITNESS:  Again, that

1            was -- that was an event or a

2            process that DEA had undertaken.

3            I have no reason to doubt that

4            that was part of the pattern of

5            concern.

6     BY MR. PIFKO:

7            Q.    And then another part of

8     that concern was that that action was

9     followed by revoking several

10    registrations in 2007, agreed?

11           A.    That's what is stated, yes.

12           Q.    And then it says, "HDA went

13    to great lengths to seek resolution with

14    DEA."  And then it's got some bullet

15    points.  Some of them are discussing the

16    industry compliance guidelines we just

17    discussed, agree?

18           A.    Yes.

19           Q.    And then in all bold, all

20    caps, it says, "Despite these efforts,

21    DEA has revoked another wholesale

22    distributor registration spring 2010."

23                 Do you see that?

24           A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So the DEA's revoking or

2    suspending registrations, was a

3    significant concern for HDA and its

4    members?

5            MR. WEINSTEIN:  Objection to

6        form.

7            THE WITNESS:  Yes.

8    BY MR. PIFKO:

9    Q.    If you go to the page --

10   they are not numbered here --

11   HDA_MDL_000139907.  There's a heading,

12   "Key Concerns."

13   A.    I see it.

14   Q.    So this summarizes key

15   concerns that HDA and its members had

16   with respect to the DEA's enforcement

17   activities, correct?

18           MR. WEINSTEIN:  Objection to

19       form.

20           THE WITNESS:  Yes, at the

21       time.

22   BY MR. PIFKO:

23   Q.    So one of them is, it says,

24   "It's unreasonable for DEA to expect a

1   distributor to seek information about

2   pharmacies that they are barred from,

3   either through confidential business

4   practices or legal restrictions, e.g.,

5   HIPAA."

6           Do you see that?

7       A.   Yes, I do.

8       Q.   That was a key concern?

9           MS. CHARLES:  Objection to

10          form.

11          THE WITNESS:  Again, this

12          means that they were unreasonable

13          for DEA to expect distributors to

14          get prescribing information that

15          would have been HIPAA protected.

16  BY MR. PIFKO:

17      Q.   And then it says under here,

18  "DEA has asked distributors where

19  pharmacies' prescriptions came from, also

20  to research the pharmacies' customer

21  base.

22          So was that -- that was the

23  basis for that concern?

24      A.   I think that's part of the

Highly Confidential - Subject to Further Confidentiality Review

1    concern, yes.

2         Q.    Then it says, "Even if the

3    distributor does their due diligence

4    regarding a customer, there's no

5    guarantee that the pharmacy will tell the

6    truth."

7              That was another concern?

8         A.    That is -- that is a

9    concern, yes.

10         Q.    Then here it says, again,

11    "DEA used an extreme tactic by suspending

12    a license.  This action is intended for

13    when there is an imminent threat to the

14    public health and safety."

15              Do you see that?

16         A.    Yes.

17         Q.    So again, this tactic of

18    suspending or revoking registrations was

19    a critical concern for HDMA and its

20    members, correct?

21              MR. WEINSTEIN:  Objection to

22         form.

23              THE WITNESS:  Yes.

24    BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

1  Q.   I want to direct your

2  attention back to Exhibit 31, on the

3  first page of it.  Are you there?

4  A.   I am.

5  Q.   There's a note about a

6  conference call with the executive

7  committee on April 6, 2012.

8  Do you see that?

9  A.   Yes.

10  Q.   It says, "President John

11  Gray thanked the executive" -- "thanked

12  the executive committee members for

13  agreeing to participate in a conference

14  call to address recent activity with

15  respect to suspicious order monitoring

16  and the role of healthcare distributors."

17  Do you see that?

18  A.   I do.

19  Q.   And then it says, "HDMA has

20  testified before Congress and prepared an

21  amicus brief for filing with the federal

22  court of appeals in the Cardinal v.

23  Holder litigation."

24  Do you see that?

1    A.    I do.

2    Q.    HDA's members authorized HDA

3 to file that amicus brief in the federal

4 court of appeals, correct?

5    A.    They did.

6    Q.    Okay.  And then it says

7 here, "Chairman Moody and Vice Chairman

8 Neu expressed concern about the trend of

9 recent developments and thought it time

10 for executive committee to review recent

11 events and plot a course going forward."

12         Do you see that?

13    A.    I do.

14    Q.    Okay.  You understand

15 Chairman Moody is from Cardinal?

16    A.    No.  Chairman Moody at the

17 time was Dave Moody from North Carolina

18 Mutual.

19    Q.    Okay.  That is another

20 distributor member?

21    A.    That is.

22    Q.    Okay.  And Chairman Neu was

23 from AmerisourceBergen?

24    A.    Vice Chairman Neu at the

1    time was from AmerisourceBergen, yes.

2          Q.    Vice chairman.

3                (Document marked for

4          identification as Exhibit

5          HDA-Kelly-34.)

6    BY MR. PIFKO:

7          Q.    Handing you what's marked as

8    Exhibit 34.  Take a minute to review that

9    and let me know when you're done.

10         A.    Okay.

11         Q.    To put some time frame

12   context in this, are you aware that on

13   February 6, 2012, the DEA had announced

14   that it suspended the license of Cardinal

15   Health's Lakeland distribution center?

16               MR. WEINSTEIN:  Objection to

17         form.

18               THE WITNESS:  That sounds

19         familiar.

20   BY MR. PIFKO:

21         Q.    Okay.  And so I just read

22   you from Exhibit 31 about the conference

23   call that's a few months later, two

24   months after that happened.  Do you

Highly Confidential - Subject to Further Confidentiality Review

1    recall we just discussed that?

2            A.    Yes.

3            Q.    And so Exhibit 34 says,

4    "After our last conference call on

5    April 6th" -- referring to that

6    conference call, agreed?

7            A.    Yes.  April 20th, yeah.

8            Q.    Okay.  And for the record

9    Exhibit 34 is an e-mail from John Gray

10   dated Friday, April 20, 2012, to Ken

11   Couch, Dale Smith, David Neu, Paul

12   Julian, Mike Kaufmann, David Moody and

13   Ted Scherr, copying Richard Frank from

14   HDA's outside counsel.

15           Agree?

16           A.    Yes.

17           Q.    Sorry, I can't remember if I

18   read the Bates number for this one.

19   00 -- HDA_MDL_00215234 to 236.

20           So at this executive

21   committee conference call, there was

22   concerns raised by the members again

23   about DEA's enforcement activity.  Agree?

24                 MR. WEINSTEIN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:  Yes.

3    BY MR. PIFKO:

4          Q.    And so then, there was a

5    decision that they needed to plot a

6    course going forward as it says in

7    Exhibit 31, agree?

8          A.    Yes, that's what it says.

9          Q.    Okay.  So after that call,

10   John Gray says here that he met with

11   legal counsel Bob Barnett and Richard

12   Cooper from Williams & Connolly in

13   Washington DC, agreed?

14         A.    Yes.

15         Q.    And he comments -- I'm

16   reading from Exhibit 34 -- "Both

17   attorneys were very helpful several years

18   ago in initializing our original meetings

19   with DEA after the first outbreak of

20   ISOs" -- those are suspension orders,

21   correct?

22         A.    Correct.

23         Q.    "Given their experience and

24   knowledge of the political and legal

1    aspects of dealing with DEA, we updated

2    them on the industry's recent concerns

3    with DEA's latest efforts to thwart drug

4    diversion and abuse.  Attached is a brief

5    summary of our discussion and conclusions

6    with several possible courses of action

7    HDMA could take.  The entire list of

8    ideas is not necessarily mutually

9    exclusive, but does represent a wide

10   range of political actions the

11   association and the industry may consider

12   in an effort to alter the present

13   direction DEA is taking with respect to

14   suspicious order monitoring."

15           Did I read that correctly?

16        A.    You -- potential options,

17   actions, not political actions.

18        Q.    Sorry.

19        A.    That's okay.

20        Q.    So these are the same Bob

21   Burnett and Richard Cooper that we saw

22   who were participating in the meetings

23   with DEA with respect to the industry

24   compliance guidelines, correct?

1    A.    Correct.

2    Q.    And then the attached, the

3  following three pages of Exhibit 34 is

4  this document that says, according to the

5  e-mail, it's, "DEA options memorandum,

6  J. Gray edits," do you see that on the

7  first page?  On the header of the e-mail,

8  that's what the attached document is?

9    A.    Yes, yes, yes, yes, yes.

10    Q.    So then it's a memo from

11  Mr. Gray to the HDMA executive committee

12  dated April 20, 2012.  Agree?

13    A.    Yes.

14    Q.    And who is on the executive

15  committee at this time?

16    A.    At this time it is Ken Couch

17  from Smith Drug, Dale Smith from

18  HD Smith, Dave Neu from

19  AmerisourceBergen, Paul Julian from

20  McKesson, Mike Kaufmann from Cardinal,

21  David Moody from North Carolina Mutual

22  and Ted Scherr from Dakota Drug.

23    Q.    And so then this -- the

24  first paragraph says, again, some of the

1    same stuff that's in the e-mail.  And

2    then the second paragraph says,

3    "Mr. Barnett and Mr. Cooper felt that new

4    legislation to specifically address our

5    concerns with DEA was highly unlikely to

6    be successful due to limited momentum in

7    that direction."

8              Do you see that?

9         A.    I do.

10        Q.    You understood that one of

11   the things HDA and its members were

12   considering was new legislation to

13   address the concerns with DEA?

14             MR. WEINSTEIN:  Objection to

15        form.

16             MR. CRAWFORD:  Objection to

17        form.

18             THE WITNESS:  We had -- we

19        had -- again, one of the concerns

20        we had with the provisions that

21        DEA was implementing is that there

22        was no due process.

23             And so we thought that

24        possibly requesting legislative

Highly Confidential - Subject to Further Confidentiality Review

1    process could help at least get

2    some type of notice and comment

3    back and forth with the DEA and

4    maybe securing that.  If we

5    weren't successful in having the

6    DEA do that through their notice

7    and comment process, to maybe

8    request that legislatively.

9  BY MR. PIFKO:

10      Q.    And what specifically would

11  the legislation include?

12          MR. WEINSTEIN:  Objection to

13      form, foundation, scope.

14          THE WITNESS:  Well, again,

15      we did -- we didn't get into

16      specifics of -- of what that

17      legislation -- we never drafted

18      legislation at that point in time.

19          But we were looking at

20      basically their interaction with

21      the registrant community on

22      suspicious orders.

23  BY MR. PIFKO:

24      Q.    Later down the road you

Highly Confidential - Subject to Further Confidentiality Review

1    ultimately did participate in what became

2    the Marino/Blackburn bill, correct?

3          A.    That's correct.

4                MS. WICHT:  Object to the

5          form of the question.

6    BY MR. PIFKO:

7          Q.    Was that an outcrop of this

8    discussion?

9                MR. WEINSTEIN:  Objection to

10         form.

11               THE WITNESS:  Not this

12         specific discussion.

13   BY MR. PIFKO:

14         Q.    Okay.  But it -- it grew

15   from these same concerns about DEA's

16   enforcement action and suspension of

17   licenses, correct?

18               MR. WEINSTEIN:  Objection to

19         form.

20               MS. CHARLES:  Objection.

21   BY MR. PIFKO:

22         Q.    Or registrations, sorry?

23               MR. WEINSTEIN:  Same

24         objection.

Highly Confidential - Subject to Further Confidentiality Review

 1           THE WITNESS:  It was part of

 2      that, yes.

 3  BY MR. PIFKO:

 4      Q.    Okay.  So another thing

 5  Mr. Gray writes in this memo is that

 6  "Paul Barnett and Rich Cooper from

 7  Williams & Connolly felt that the

 8  industry may be better off asserting DEA

 9  actions by taking even stronger

10  compliance measures."

11           Do you see that?

12      A.    Yes.

13      Q.    Did I read that correctly?

14      A.    You did.

15      Q.    Were you part of these

16  discussions?

17      A.    I was in this meeting at

18  Williams & Connolly, yes.

19      Q.    Okay.  And so one of the

20  recommendations they said is that HDA's

21  members could avert action by improving

22  their compliance systems?

23           MR. WEINSTEIN:  Objection to

24      form.

Highly Confidential - Subject to Further Confidentiality Review

1         THE WITNESS:  That's -- I
2      mean, it says that they felt they
3      were better off averting DEA
4      actions by taking even stronger
5      compliance measures.  That's
6      what's written in the memo.
7   BY MR. PIFKO:
8      Q.    And that's what was
9   discussed at the meeting?  You said you
10  were there?
11     A.    I was there, yes.
12     Q.    And that's consistent with
13  what was discussed there?
14     A.    Yes.
15     Q.    Let's go to Page 2 of the
16  attachment, I guess 3 of the document.
17  One of the other potential -- it has
18  other potential actions discussed here.
19         Do you see that?
20     A.    I do.
21     Q.    "Update HDMA industry
22  compliance guidelines."  That was
23  something else that was being discussed
24  at that time?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes.

2      Q.     And we know ultimately from

3 Exhibits 30 and 31 that -- that

4 ultimately the ICGs were replaced with a

5 statement on diversion, rather than

6 updated?

7      A.     Yes.

8      Q.     Another potential action is

9 to re-file the HDMA amicus brief in

10 Cardinal Health v. DEA, do you see that?

11      A.     I do.  In the appellate

12 case.

13      Q.     So are you familiar with the

14 procedure?  Why was there a need to

15 re-file that brief?

16           MR. WEINSTEIN:  Objection to

17      form.  Foundation.

18           THE WITNESS:  Again, I'm not

19      familiar -- I don't know what the

20      discussion was.  That was a

21      discussion with outside counsel

22      about that, and with the board.

23      So I don't -- I don't know what

24      the rationale was for that.

1    BY MR. PIFKO:

2        Q.    Are these notes consistent

3    with your understanding of the

4    discussions that happened at that meeting

5    since you were there?

6            MR. WEINSTEIN:  Objection to

7        form.

8            THE WITNESS:  Yes.

9    BY MR. PIFKO:

10       Q.    Okay.  Another potential

11   action, again going to Page 2 of the

12   notes, is, "Seek guidance from a

13   well-respected public relations firm to

14   improve industry image."

15           This was something else that

16   was considered?

17       A.    Yes.

18       Q.    Did you ever move forward

19   with that option?

20       A.    We did.

21       Q.    And who did you retain?

22       A.    Processwise, after this

23   meeting, we've been through -- we've been

24   engaged with several public relations

1  firm.  But I think this one led to an

2  initial engagement with APCO.

3        Q.    And they developed the

4  crisis playbook, right?

5        A.    That -- yes, that was their

6  development, yes.  I don't know if that's

7  the specific name of it.  But it was --

8        Q.    But you're familiar with

9  that document?

10       A.    Yes, that they developed,

11  yes.

12       Q.    Okay.  Another option here

13  is, "Petition DEA to put their

14  expectations into a regulation."

15             Can you explain what that

16  was?

17       A.    Again, that was -- that was

18  the -- basically the process of -- you

19  know, the letters constituted the only

20  directives that we were getting from DEA

21  at the time, the letter to the

22  registrants.  There was no process for

23  notice and comment in the development of

24  those letters.  They were just basically

Highly Confidential - Subject to Further Confidentiality Review

1  delivered.

2            We thought that if we

3  basically petitioned for a regulation to

4  go through a notice and comment

5  development process where the DEA would

6  basically draft a regulation, they would

7  notice it for public comment, there would

8  be public comment.  They would review the

9  public comments.  They would then

10  consider the public comment and finalize

11  the regulation.

12            But you would at least have

13  a process by which you could provide

14  concerns, suggestions, et cetera to the

15  DEA for the development of that

16  regulation.

17       Q.    Another thing is to develop

18  a legal journal article concerning the

19  ambiguity of DEA expectations and

20  diversion prevention tactics.  That was

21  something else that you discussed?

22       A.    We -- it did, yes.

23       Q.    And it said, "A

24  congressional hearing may be more

Highly Confidential - Subject to Further Confidentiality Review

1    effective in this regard but would

2    unlikely" -- "be unlikely to happen prior

3    to the 2012 elections."

4          A.     That's what it says, yes.

5          Q.     How would you use a

6    congressional hearing to achieve the same

7    things that a legal journal article would

8    achieve?

9          A.     I'm not exactly sure why --

10   why that was typed up that way.  But,

11   again, it was to basically get some of

12   these concerns addressed in an open forum

13   for kind of probative discussion about,

14   you know, concerns we had and maybe

15   suggestions about processes that would

16   kind of more enlist the support of the

17   registrant community in addressing

18   suspicious orders.

19         Q.     Were you involved in

20   subsequent phone discussions or in person

21   discussions with HDA's executive

22   committee after this memo was sent out?

23              MR. WEINSTEIN:  Objection to

24         form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  I don't recall

2      the specific process of what

3      happened after this.  I know that

4      this was something that the

5      executive committee asked us to

6      do.  We did.  We followed up with

7      them.  We probably reported on it

8      at the next executive committee

9      meeting.

10  BY MR. PIFKO:

11      Q.    But do you recall having any

12  discussions with the executive committee

13  members about these options?

14          MR. WEINSTEIN:  Objection to

15      form.

16          THE WITNESS:  No.  Again,

17      not prior to the executive

18      committee meeting.

19  BY MR. PIFKO:

20      Q.    Are you aware that -- of

21  whether any of the executive committee

22  members asked how they could improve

23  their compliance measures consistent with

24  the advice that Bob Barnett and Rich

1    Cooper from Williams & Connolly provided?

2              MR. WEINSTEIN:  Objection to

3         form.  Foundation.  Scope.

4              THE WITNESS:  I'm not aware

5         of any specifics, suggestions or

6         conversations.

7    BY MR. PIFKO:

8         Q.   To your knowledge did any of

9    them ask if there would be any

10   suggestions on how their compliance

11   efforts could be improved?

12             MR. WEINSTEIN:  Objection to

13        form.  Foundation.  Scope.

14             THE WITNESS:  Again, I don't

15        know that anybody asked.  We did

16        provide some suggestions that were

17        provided by Mr. Cooper and

18        Mr. Barnett.  But again, I don't

19        recall.  And the correspondence

20        would have been with Mr. Gray

21        directly anyhow.

22             (Document marked for

23        identification as Exhibit

24        HDA-Kelly-35.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. PIFKO:

2         Q.    I'm handing you what's

3    marked as Exhibit 35.  It's an e-mail

4    from you dated December 19, 2013,

5    Bates-labeled CAH_MDL2804_01110712

6    through 715.

7              Take a moment to review this

8    and let me know when you're done.

9         A.    Okay.

10        Q.    At some point a drug

11   diversion DEA strategy task force was

12   formed, correct?

13        A.    Yes.

14        Q.    Are you familiar with the

15   formation of that task force?

16        A.    I am.

17        Q.    Were you involved in the

18   formation of that task force?

19        A.    We were.  I was.

20        Q.    When was that formed?

21        A.    I want to say in 2013 at

22   some point.  It was a amalgam of a

23   variety of different committees that had

24   been involved.  Regulatory affairs

Highly Confidential - Subject to Further Confidentiality Review

1   committee, federal government affairs

2   committee, individuals, and then to

3   basically brainstorm some suggestions for

4   additional things that we could do to

5   continue to move forward on addressing

6   suspicious orders and improving

7   interaction with the DEA.

8          Q.    So that task force is an

9   outcrop of some of the types of

10  discussions that you had in Exhibit 34?

11         A.    Yeah.  It's not specifically

12  referenced here.  But yeah, it's just an

13  ongoing discussion and dialogue with the

14  membership about what we can do to

15  improve.

16         Q.    Who was on that task force

17  as far as the HDA's distributor members?

18         A.    So if you look at the top,

19  AmerisourceBergen, Cardinal Health,

20  Mutual Drug, Smith Drug, HD Smith, Henry

21  Schein, I think was at one point

22  involved.

23         Q.    McKesson?

24         A.    McKesson, sorry, yes.  And

Highly Confidential - Subject to Further Confidentiality Review

1    then we had a -- after we had engaged

2    APCO at the time there, they came and

3    participated.

4            Q.    And so you had regular

5    meetings with this task force?

6            A.    This -- I believe this task

7    force met once.

8            Q.    Okay.  And so this is a list

9    of action items that came out of the task

10   force meeting?

11           A.    Recommendations, yes.

12           Q.    Okay.  And then the attached

13   document, summary of recommendations?

14           A.    Right.

15           Q.    From December 11, 2013, task

16   force meeting.  That's a summary of the

17   items that the group came up with that

18   you could move forward with?

19               MR. WEINSTEIN:  Objection to

20       form.

21               THE WITNESS:  Yes.

22               Sorry.

23               Yes, with the -- the

24       specific action items highlighted.

1    BY MR. PIFKO:

2          Q.    And you typed this up?

3          A.    I believe I typed the

4    e-mail, and then the notes were kind of

5    probably a shared product of the

6    government affairs staff that

7    participated.

8          Q.    Okay.  But you ultimately

9    sent it out to everybody?

10         A.    I sent it out, yes.

11         Q.    Did you have an official

12   title or role with this task force, like

13   chairman or --

14         A.    No.

15         Q.    -- coordinator?

16         A.    No, there was -- and again

17   it was an ad hoc group of various

18   members.  It was set up to do one thing,

19   and this was the one thing.

20         Q.    So going to the attachment,

21   CAH_MDL2804_01110714.  Are you there?

22         A.    I am.

23         Q.    So Item 2 is, "Address

24   specific challenges and interactions

1    with" -- "with DEA."

2              Do you see that?

3         A.    Yes.

4         Q.    So you have this broken out

5    into different types of communications

6    like one with the media, public

7    officials, another with DEA, and another

8    with a branding campaign; is that

9    correct?

10             MR. WEINSTEIN:  Objection to

11        form.

12             THE WITNESS:  Yeah.

13   BY MR. PIFKO:

14        Q.    Okay.  Sorry, I pointed you

15   to 2, but I want to ask you about 1 for a

16   minute.

17        A.    Okay.

18        Q.    So in 1, there's a

19   discussion about joining with various

20   other industry groups?

21        A.    Mm-hmm.

22        Q.    Is that correct?

23        A.    Yes.

24        Q.    Okay.  What's the Alliance

1    to Prevent Abuse of Medicines?

2         A.    That was a coalition that

3    formed, I want to say in about 2012, to

4    address abuse issues, kind of across the

5    supply chain.  So they had formed -- the

6    American Medical Association, the members

7    that were listed there were participants.

8    Cardinal Health had suggested possibly

9    including HDA as a member, because other

10   associations were involved.

11              THE VIDEOGRAPHER:

12        Mr. Kelly, you keep hitting --

13              THE WITNESS:  I'm sorry.

14   BY MR. PIFKO:

15        Q.    So then Item 2 says,

16   "Address specific challenges and

17   interactions with DEA."

18              Do you see that?

19        A.    I do.

20        Q.    Then it says, "Issue

21   statement of support for Marino/Blackburn

22   legislation when introduced."

23              Do you see that?

24        A.    I do.

1    Q.    Okay.  So that hadn't yet

2    been introduced at this time?

3    A.    I don't know the specific

4    introduction date, but I would deduce

5    from this that obviously it had not.

6    Q.    Okay.  Was the -- that

7    legislation drafted out of the HDMA?

8    A.    No.  I believe

9    Mr. Blackburn -- or I'm sorry, Mr. Marino

10   was moving forward with that issue, had

11   requested feedback from a variety of

12   constituencies, and was in the process of

13   kind of fleshing it out.

14   Q.    When was the first time you

15   became aware of that bill or that

16   legislation?

17   A.    It -- it might have been at

18   this -- at this meeting.  One of our

19   member companies had been contacted by

20   Mr. Marino about participating in the --

21   in the kind of the general drafting

22   process of -- of that bill.  And it was

23   suggested that we -- we work with -- or

24   HDA work with Congressman Marino and

Highly Confidential - Subject to Further Confidentiality Review

1  Congresswoman Blackburn.

2          Q.    Do you know which member

3  company it was?

4          A.    It was Cardinal.

5          Q.    Okay.  So Mr. Marino had

6  reached out to Cardinal and asked them to

7  assist in drafting this bill?

8          A.    That's my understanding.

9          Q.    And then they reached out to

10 you and asked HDA to participate?

11         A.    They did.

12         Q.    And did HDA end up providing

13 any drafting on the bill?

14         A.    We provided feedback on

15 drafts that they -- they would -- that

16 they would basically share drafts with

17 us.  I don't know if it was in advance of

18 the actual introduction.  But they go

19 through iterative processes of kind of

20 taking comments and providing subsequent

21 drafts.  We did participate in that

22 process.

23         Q.    Do you know who -- who

24 specifically at Cardinal did you interact

Highly Confidential - Subject to Further Confidentiality Review

1    with on that issue?

2              MS. WICHT:  Objection to

3         form.

4              THE WITNESS:  Connie

5         Woodburn was the government

6         affairs person for Cardinal at the

7         time.

8    BY MR. PIFKO:

9         Q.    Okay.  But did you interact

10   with anyone else from Cardinal?

11        A.    Not specifically with regard

12   to this.

13        Q.    Okay.  Did -- do you -- do

14   you know, were there other people who

15   maybe you didn't talk to but that would

16   have been copied on e-mails or there are

17   things would have been forwarded from

18   Cardinal with respect to the

19   Marino/Blackburn bill?

20              MS. WICHT:  Objection to

21        form.

22              MR. WEINSTEIN:  Objection to

23        form, foundation, scope.

24              THE WITNESS:  I can't say

Highly Confidential - Subject to Further Confidentiality Review

1           for certain.

2   BY MR. PIFKO:

3           Q.    Do you know if Linden Barber

4   was involved in the Marino/Blackburn

5   bill?

6                 MR. WEINSTEIN:  Same

7           objections.

8                 MS. WICHT:  Object to form.

9                 THE WITNESS:  I don't know

10          initially.  It was a multi-year

11          process.

12  BY MR. PIFKO:

13          Q.    Do you know if any other HDA

14  distributor members were involved in

15  discussions with Marino at that time

16  concerning the bill?

17                MS. WICHT:  Objection to

18          form.

19                MR. WEINSTEIN:  Objection to

20          form, foundation, scope.

21                THE WITNESS:  At that time I

22          do not.

23  BY MR. PIFKO:

24          Q.    How about later?

1              MS. WICHT:  Objection to

2         form.

3              MR. WEINSTEIN:  Same

4         objections.

5              THE WITNESS:  Well, as soon

6         as -- as soon as HDA basically

7         endorsed the -- the initiative, I

8         think the entire membership was

9         supportive of the -- the prospect

10         of that legislation.

11    BY MR. PIFKO:

12         Q.    Okay.  And obviously the

13    entire member -- or the -- the members we

14    just discussed here having been involved

15    with this drug diversion task force all

16    knew about it because it was discussed at

17    this meeting, correct?

18              MR. WEINSTEIN:  Objection to

19         form.

20              MS. WICHT:  Foundation.

21              THE WITNESS:  Correct.

22    BY MR. PIFKO:

23         Q.    So it says here, "This

24    legislation would establish definitions

1    and parameters for specific provisions in

2    the Controlled Substances Act pertaining

3    threats to 'public health and safety' and

4    'imminent danger.'

5              "In addition, this

6    legislation would allow DEA registrants

7    the opportunity to submit a corrective

8    action plan to address specific concerns

9    that could otherwise lead to the

10   suspension or revocation of a

11   registration."

12             Did I read that correctly?

13        A.    You did.

14        Q.    Is that consistent with your

15   understanding about what this bill would

16   do or legislation would do?

17             MR. WEINSTEIN:  Objection to

18        form.

19             THE WITNESS:  It is.  There

20        was another provision ultimately

21        of the bill.  But it was a

22        draft -- a report from the

23        government on the effectiveness of

24        the government's efforts to

1    address prescription drug abuse

2    and diversion.

3 BY MR. PIFKO:

4    Q.    Okay.  So it's your

5 understanding there were changes to the

6 requirements for suspending a

7 registration, and there was another

8 component to the legislation that

9 involved a report?

10    MR. WEINSTEIN:  Objection to

11    form.

12 BY MR. PIFKO:

13    Q.    Is that correct?

14    MR. WEINSTEIN:  Same

15    objection.

16    THE WITNESS:  So, basically

17    the crux of it was to provide a

18    definition for the threshold for

19    immediate suspension orders.

20    Which was not anywhere in law.

21    The immediate -- the immediate --

22    imminent danger was not defined.

23    And so we basically sought to

24    establish a threshold for what

1    constitutes imminent danger.

2    BY MR. PIFKO:

3         Q.    If we go to the next page of

4    your notes.  Another action item that

5    this task force was working on was Item

6    D, "Anticipate and develop responses to

7    Marino/Blackburn opponents"?

8         A.    I see that.

9         Q.    That was something that this

10   task force was working on, correct?

11        A.    Well, again, it wasn't one

12   of the action items.  But it was -- it

13   basically was something that we

14   discussed.  It was, you know, how do

15   we -- how do we explain what this does if

16   people are concerned that it's somehow

17   diminishing the capacity of the DEA.

18        Q.    Item 3 here is, "Engage in

19   initial HDMA public relations branding

20   campaign."

21             Do you see that?

22        A.    I do.

23        Q.    Item C there says, "Utilize

24   material prepared by APCO to begin

Highly Confidential - Subject to Further Confidentiality Review

1    targeted media outreach."

2              Do you see that?

3         A.    I do.

4         Q.    That's the material that

5    includes the crisis playbook, correct?

6              MR. WEINSTEIN:  Objection to

7         form.

8              THE WITNESS:  Again, I'm not

9         exactly sure.  The crisis playbook

10        was never -- it was a draft format

11        that was never released.  It was

12        never published.  It was -- we

13        didn't do anything with it.  But

14        that was a product that APCO did

15        provide us in their initial

16        engagement.

17   BY MR. PIFKO:

18        Q.    Okay.  And you shared that

19   product with the HDA's members, correct?

20             MS. CHARLES:  Objection to

21        form.

22             MR. WEINSTEIN:  Objection to

23        form.

24             THE WITNESS:  Again, I don't

1          recall.  Our communications

2          department handled all that

3          interface with APCO.

4     BY MR. PIFKO:

5          Q.    You wouldn't have any reason

6     to dispute that it was shared with

7     members?

8               MR. WEINSTEIN:  Objection to

9          form.

10              MS. CHARLES:  Objection to

11         form.

12              MS. ROLLINS:  Objection to

13         form.

14              THE WITNESS:  I can't say

15         one way or another.

16    BY MR. PIFKO:

17         Q.    You would agree if it was

18    produced by one of the members in this

19    litigation, it must have been shared with

20    them obviously, right?

21              MR. WEINSTEIN:  Objection to

22         form.

23              THE WITNESS:  Yes.

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. PIFKO:
 2         Q.    I'm handing you what's been
 3    marked Exhibit 36.
 4               (Document marked for
 5               identification as Exhibit
 6               HDA-Kelly-36.)
 7    BY MR. PIFKO:
 8         Q.    Take a moment to review that
 9    and let me know when you're ready.  For
10    the record, it's a single -- two-page
11    document, Bates-labeled HDA_MDL_000214864
12    through 4865.
13         A.    Okay.
14         Q.    This is an e-mail from
15    Kristen Freitas to Linden Barber.
16               Do you see that?
17         A.    I do.
18         Q.    And it says, "Manufacturer
19    issue with imminent danger definition."
20               Do you see that?
21         A.    Yes.
22         Q.    And it says, "We were
23    contacted by a manufacturer that has
24    concerns about the definition of imminent
```

Highly Confidential - Subject to Further Confidentiality Review

1    danger.  This manufacturer has reached

2    out to other manufacturers as well to

3    raise concerns."

4                Do you see that?

5        A.    I do.

6        Q.    Did I read that correctly?

7        A.    You did.

8        Q.    Okay.  And then Kristen is

9    asking Linden to let her know thoughts on

10   the suggestions from these manufacturers,

11   agree?

12       A.    Yes.

13             MR. WEINSTEIN:  Objection to

14       form.

15   BY MR. PIFKO:

16       Q.    Okay.  And the suggested

17   changes from the manufacturer's attorney

18   are provided on the second page of this

19   document, correct?

20       A.    Again, if this was attached

21   to the e-mail, then, yes, I would agree

22   that that includes -- was included in the

23   e-mail.

24       Q.    Okay.  And so, she

1    paraphrases comments from the

2    manufacturer's attorney in her e-mail to

3    Linden Barber.  And she says, "My

4    suggested changes are" -- it basically

5    says that -- sorry, that, "The first

6    comment change could be ignored but the

7    second and third are, in my view,

8    critical to protect the interest of

9    virtually all DEA registrants, not just

10   manufacturers."

11              Do you see that?

12        A.    Yes.

13        Q.    Would you agree that at some

14   point the HDA also started working with

15   manufacturers and members of the Pain

16   Care Forum on the Marino/Blackburn bill?

17              MR. WEINSTEIN:  Objection to

18        form.

19              MS. MACKAY:  And foundation.

20              THE WITNESS:  Again, I don't

21        know that we ever worked with the

22        Pain Care Forum on this bill.  I

23        know that the manufacturers were

24        working with Senator Hatch's

1          office.  And the concerns that

2          were expressing to Senator Hatch

3          we being expressed by Senator

4          Hatch's staff to us.  And we were

5          asked to rectify those concerns

6          moving forward.

7   BY MR. PIFKO:

8          Q.    The legislation from Senator

9   Hatch was the same?

10             MR. WEINSTEIN:  Objection to

11         form.

12             THE WITNESS:  The -- I'm

13         sorry?

14  BY MR. PIFKO:

15         Q.    It's the same legislation,

16  you're dealing with Senator Hatch --

17         A.    It was -- yes, it was -- it

18  was the senate version of the

19  Marino/Blackburn bill, Senate Bill 483,

20  or what became Senate Bill 483.

21             (Document marked for

22         identification as Exhibit

23         HDA-Kelly-37.)

24

```
1    BY MR. PIFKO:

2         Q.    I'm handing you what's

3    marked as Exhibit 37.  It's a two-page

4    document, Bates-labeled HDA_MDL_000081283

5    through 284.

6              Take a minute to review it

7    and let me know when you're done.

8         A.    Okay.

9         Q.    Who is Jewelyn Cosgrove?

10        A.    She works in the federal

11   government affairs department at HDA.

12        Q.    Is she someone that reports

13   to you?

14        A.    She reports to Kristen

15   Freitas.

16        Q.    And she --

17        A.    Ultimately under my

18   department, yes.

19        Q.    Okay.  So she writes to Burt

20   Rosen of Purdue and asks for him to share

21   this with the Pain Care Forum.

22              Do you see that?

23        A.    Yes.

24        Q.    And it's -- the subject is,
```

Highly Confidential - Subject to Further Confidentiality Review

1    "Re-introduction of Ensuring Patient

2    Access and Effective Drug Enforcement

3    Act."  That's the Marino/Blackburn bill,

4    correct?

5         A.    Yes.

6         Q.    Okay.  And he then forwards

7    it to the members of the Pain Care Forum

8    on the first page.

9              Do you see that?

10         A.    I do.

11         Q.    And it's got attachments

12    that are summaries of the bill.

13              Do you see that on the

14    header?

15         A.    I do.

16         Q.    Okay.  Oh, and she then

17    says, "Last year, we worked with a number

18    of you on a letter of support for

19    legislation introduced in the house and

20    senate establishing an enforcement

21    escalation procedure."

22              Do you see that?

23         A.    Yes.

24         Q.    I'm on the second page of

Highly Confidential - Subject to Further Confidentiality Review

1    that.

2           A.    Yes, yes, yes, yes.

3           Q.    "And then for reference the

4    two bills were the Ensuring Patient

5    Access and Effective Drug Enforcement Act

6    in the House, Representatives Marino,

7    Blackburn, Welch, Chu; and the Regulatory

8    Transparency, Patient Access, and

9    Effective Drug Enforcement Act in the

10   Senate from Senators Hatch and

11   Whitehouse."

12          Do you see that?

13          A.    Yes.

14          Q.    And then later on the

15   bottom, "With the process moving quickly,

16   we would like to ask those of you who

17   signed the senate letter of support from

18   patient groups last year to consider

19   supporting the House legislation."

20          Do you see that?

21          A.    I do.

22          Q.    I'm handing you what's

23   marked as Exhibit 38.

24          (Document marked for

Highly Confidential - Subject to Further Confidentiality Review

1    identification as Exhibit

2    HDA-Kelly-38.)

3  BY MR. PIFKO:

4       Q.    Take a moment to review

5  Exhibit 38.  And let me know when you're

6  done.

7            For the record, Exhibit 38

8  is a four-page document Bates-labeled

9  HDA_MDL_000081651 through 81654.

10       A.    Okay.

11       Q.    This just confirms in

12  response to Jewelyn's request that the

13  Pain Care Forum support the bill.  Burt

14  Rosen from Purdue then sends her back the

15  letter signed and -- with their

16  endorsement.  Agree?

17            UNIDENTIFIED LAWYER:

18       Objection.  Form.

19            MR. WEINSTEIN:  Objection to

20       form.

21            MS. MACKAY:  Objection to

22       form.

23            THE WITNESS:  Yes.

24  BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I'm handing you what's

2    marked as Exhibit 39.

3            (Document marked for

4            identification as Exhibit

5            HDA-Kelly-39.)

6    BY MR. PIFKO:

7    Q.    This document is not

8    Bates-labeled.  We printed it from HDA's

9    website.  Take a moment to review it.

10            For the record, it's a

11    document that is identified on the first

12    page as "Statement from John Gray,

13    President and CEO, Healthcare

14    Distribution Management Association For

15    the U.S. House of Representatives Energy

16    and Commerce Committee, Subcommittee on

17    Health," dated April 7, 2014.  It's a

18    five-page document.

19            Have you seen this before?

20    A.    I have.

21    Q.    Did you assist in preparing

22    this testimony?

23    A.    I did.

24    Q.    And this is testimony that

1    Mr. Gray provided for the House of

2    Representatives energy and commerce

3    committee subcommittee on health --

4          A.    It --

5          Q.    -- from April 7, 2014?

6          A.    It is.

7          Q.    These are statements that he

8    made before that committee?

9          A.    This is the written

10   statement.  I don't know how much it

11   deviated from the oral statement.

12         Q.    Okay.  And you participated

13   in -- in writing this?

14         A.    I helped to prepare it, yes.

15         Q.    Okay.  Anyone else?

16         A.    The whole government affairs

17   team.  Probably our communication team as

18   well.

19         Q.    And in this he's discussing,

20   the Marino/Blackburn bill, correct?

21         A.    Yes.

22         Q.    Second sentence, "Thank you

23   for the opportunity to discuss with the

24   subcommittee important legislation

1    introduced by Representatives Blackburn

2    and Marino, the Ensuring Patient Access

3    and Effective Drug Enforcement Act of

4    2014," correct?

5          A.    Yes.

6          Q.    Then the next paragraph,

7    second sentence, he says, "Our industry's

8    primary mission is to operate the safest

9    and most secure and efficient supply

10   chain in the world."

11               Agree with that statement?

12         A.    I do.

13         Q.    "As part of this mission,

14   the pharmaceutical industry is committed

15   to addressing the serious national

16   epidemic of prescription drug abuse."

17               Do you see that?

18         A.    I do.

19               MR. WEINSTEIN:  You missed

20         the word "distribution" in there,

21         you missed.

22               MR. PIFKO:  Sorry.  I'll

23         read it again for the record.

24   BY MR. PIFKO:

```
 1          Q.    To be clear, so Mr. Gray
 2    testified before this committee and said
 3    that "the pharmaceutical distribution
 4    industry is committed to addressing the
 5    serious national epidemic of prescription
 6    drug abuse," correct?
 7          A.    Yes.
 8          Q.    Next paragraph.  Mr. Gray
 9    also told the committee, "HDMA's members
10    are committed to working proactively with
11    DEA," correct?
12          A.    Yes.
13          Q.    Page 2 of the testimony.  He
14    says, "This is one of the reasons" --
15    second full paragraph.  "This is one of
16    the reasons why HDMA supports HR 4069."
17                That's the Marino/Blackburn
18    bill, correct?
19          A.    Yes.
20          Q.    He says this -- he told the
21    committee, "This legislation is a timely
22    and thoughtful approach to addressing the
23    prescription drug epidemic," correct?
24          A.    Yes.
```

1        Q.    And he said, "We will

2   believe it will foster greater

3   collaboration, communication and

4   transparency between" -- "between

5   industry stakeholders and regulators,

6   especially the DEA," correct?

7        A.    Correct.

8        Q.    And then in the next

9   paragraph he talks about establishing a

10  collaborative working relationship with

11  the DEA.

12             Do you see that?

13       A.    Yes.

14       Q.    And he provided that

15  testimony to the subcommittee as well,

16  correct?

17       A.    Yes.

18             (Document marked for

19             identification as Exhibit

20             HDA-Kelly-40.)

21  BY MR. PIFKO:

22       Q.    I'm handing you what's

23  marked as Exhibit 40.  It's an e-mail

24  from you to Ann Berkey of McKesson,

1    dated -- or dated March 24, 2014.

2    Bates-labeled MCKMDL00651560 to 651563.

3              Take a moment to review that

4    and let me know when you're done.

5         A.    Okay.

6         Q.    So, on the first page

7    there's an e-mail here from you to Ann

8    Berkley.  Who is Ann Berkley?

9         A.    Ann Berkey was --

10        Q.    Sorry.

11        A.    -- at the time the head of

12   the government affairs operation at

13   McKesson.

14        Q.    Okay.  And you also reach

15   out to Connie Woodburn and Rita Norton?

16        A.    Right.  The only -- they are

17   the only company government affairs

18   representatives from any of our member

19   companies.

20        Q.    Okay.  So you are reaching

21   out to McKesson, Cardinal, and

22   AmerisourceBergen, correct?

23        A.    Right.

24        Q.    And at the bottom you say,

Highly Confidential - Subject to Further Confidentiality Review

1    "It looks like we have some challenges

2    finding a time that worked for everyone.

3    Can we possibly do a quick call for

4    today?  If not, I can fill everyone in

5    via e-mail regarding a discussion the

6    executive committee had last week on the

7    topic of drug abuse diversion

8    specifically with regard to the

9    Marino/Blackburn legislation."

10           Do you see that?

11       A.    I do.

12       Q.    Okay.  So you sought to

13   update them with -- with respect to a

14   discussion the executive committee had on

15   the Marino/Blackburn legislation,

16   correct?

17       A.    Yes, yes, that's what this

18   indicates.

19       Q.    Okay.  And then in the

20   e-mail on the top, Ann, you write to Ann.

21   She apparently said she was on a plane,

22   and then you write to her and say, about

23   halfway down that e-mail, "John sent a

24   memo, attached."

Highly Confidential - Subject to Further Confidentiality Review

1                     Do you see that?

2          A.      Yes.

3          Q.      "To executive committee

4    members on Friday."

5                     Do you see that?

6          A.      I do.

7          Q.      "Regarding next steps on the

8    Marino/Blackburn legislation."

9                     Do you see that?

10         A.      Yes.

11         Q.      And then you've got the --

12   the memos attached here to this e-mail?

13         A.      Mm-hmm.

14         Q.      It's entitled, "Status of

15   HR 4069."

16                   Yes?

17         A.      Yes.

18         Q.      Who put this memo together?

19   John Gray?

20         A.      It was probably prepared by

21   the government affairs department.

22         Q.      Okay.  Did you have an

23   involvement in putting this together?

24         A.      I don't know that I'd wrote

Highly Confidential - Subject to Further Confidentiality Review

1    it.  But I probably saw before it was

2    submitted to the executive committee.

3              Q.    Okay.  I want to turn your

4    attention to the second page of the memo,

5    third page of Exhibit 40.  There's a

6    heading "DEA."

7                    Do you see that?

8         A.    I do.

9         Q.    "In conversations with

10   numerous HDMA member companies and select

11   Hill staff, as well as Al Santos,

12   recently retired from DEA office of

13   diversion control, it is our

14   understanding that DEA is very concerned

15   with this legislation 'tying the agencies

16   hands' to actively and aggressively

17   address diversion and compliance with the

18   CSA."

19                   Do you see that?

20        A.    I do.

21        Q.    Did I read that correctly?

22        A.    You read it verbatim.

23        Q.    Okay.  It was HDA and its

24   members' understanding that DEA felt that

Highly Confidential - Subject to Further Confidentiality Review

1    this legislation would tie the agency's

2    hand?

3                    MR. WEINSTEIN:  Objection to

4           form.  Foundation.

5                    THE WITNESS:  Yeah, this

6           version -- again, this was two

7           years before the bill was passed,

8           and it was changed multiple times

9           afterwards with their input and

10          feedback.

11                   So initial versions were,

12          yes, opposed by the agency.

13   BY MR. PIFKO:

14          Q.    And then it says,

15   "Essentially, the DEA is categorically

16   opposed to the provisions in the

17   legislation to mandate definitions of

18   imminent danger and consistent with

19   public health and safety."

20                   Do you see that?

21          A.    I do.

22          Q.    It was your understanding

23   that DEA was categorically opposed to

24   those provisions?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. WEINSTEIN:  Objection to

 2         form.

 3              THE WITNESS:  They were --

 4         at the time they were concerned

 5         that providing any definition of

 6         those terms would somehow require

 7         them to satisfy criteria that they

 8         didn't have to meet at that point

 9         in time.

10   BY MR. PIFKO:

11         Q.   And then it says, "They were

12   also categorically opposed to

13   implementing corrective action plans as

14   well."

15              Correct?

16         A.   Yes.

17         Q.   "And they were categorically

18   opposed to force the agency to

19   participate in a stakeholder working

20   group."

21              Correct?

22              MR. WEINSTEIN:  Objection to

23         form.

24              THE WITNESS:  That's what it
```

1          says, yes.

2   BY MR. PIFKO:

3          Q.    Was that your understanding

4   that they were -- they were categorically

5   opposed to that?

6          A.    Again, I --

7                MR. WEINSTEIN:  Objection to

8          form.

9                THE WITNESS:  I don't know

10         what -- what categorically they

11         were more opposed to than not.

12         But they were opposed to

13         essentially most of that --

14  BY MR. PIFKO:

15         Q.    Those future --

16         A.    -- most of those issues,

17  yes.

18         Q.    And the last page of the

19  memo there's some other bullet points.

20  One of them is -- the top one on the last

21  page.  It says, "DEA is adamantly opposed

22  to this legislation and has made their

23  position known to Hill staff as well as

24  to some industry representatives."

1          Do you see that?

2      A.     Yes.

3      Q.     It was your understanding

4  that they were adamantly opposed to

5  legislation at that time?

6      A.     To that version of the bill

7  in 2014, which is two years before the

8  final bill was passed, yes.

9      Q.     Did the final bill have the

10 definition of imminent danger?

11     A.     It did.

12     Q.     Did it have the corrective

13 action plan?

14     A.     It did.

15     Q.     Did it mandate the DEA to

16 participate in a stakeholder working

17 group?

18     A.     It did.

19     Q.     Did it add the "consistent

20 with public health and safety" language?

21     A.     I don't know if the specific

22 language was in there.  I'm happy to look

23 at the final version of the bill and tell

24 you, yes.  And DEA did not oppose the

1    final version of that legislation.

2              MR. WEINSTEIN:  We've been

3         going about an hour.

4              MR. PIFKO:  We'll take a

5         break in about two seconds.

6    BY MR. PIFKO:

7         Q.    I want to turn your

8    attention back to Exhibit 31 to Page 11

9    and 12.  I want to direct you to language

10   on Page 12, but 11 tells you that this

11   was a discussion that occurred at the

12   September 28, 2015, board of directors

13   meeting.  Turn to Page 12.  Tell me when

14   you're ready.

15        A.    Okay.

16        Q.    During this September 28,

17   2015, board of directors meeting,

18   "President Gray noted HDMA executive

19   committee had discussed and agreed to

20   prioritize objectives on prescription

21   drug abuse in the following order:  Item

22   Number 1, exhaust all efforts to secure

23   passage of S.483."

24              Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

 1      A.     On -- which page are you on?

 2      Q.     12.

 3      A.     Oh, yes.  Okay, I see it.

 4      Q.     Did I read that correctly?

 5      A.     "Exhaust all efforts to

 6   secure passage of S.483."  Yes.

 7      Q.     So S.483 is the final

 8   version that got passed?

 9      A.     It was, yes, the bill that

10   got passed by the senate and approved

11   unanimously both -- in both chambers and

12   signed by President Obama.

13             MR. PIFKO:  Okay.  We can

14        take a break.

15             THE VIDEOGRAPHER:  The time

16        is 3:51 p.m.  We are going off the

17        record.

18             (Short break.)

19             THE VIDEOGRAPHER:  The time

20        is 4:11 p.m.  We are back on the

21        record.

22             (Document marked for

23        identification as Exhibit

24        HDA-Kelly-41.)

```
1    BY MR. PIFKO:

2         Q.    I'm handing you what's been

3    marked Exhibit 41.

4              For the record it's a series

5    of e-mails, the recent one dated Monday,

6    May 1st, 2017, from Matt DiLoreto to Beth

7    Mitchell.  Bates-labeled

8    HDA_MDL_000214979 through 214982.

9              On the first page of this

10   document, Beth Mitchell from

11   AmerisourceBergen writes to Matt DiLoreto

12   on Monday, May 1st, 2017.  She says, "Hi,

13   Matt.  Have you been able to find

14   anything?  Any state bills or approaches

15   we have ever been able to say yes, we

16   support this as an effort to address

17   opioid abuse?"

18              Do you see that?

19        A.    I do.

20        Q.    Matt writes back, and says,

21   "Sorry for the delay on this project, but

22   I was really hoping to find something."

23              Do you see that?

24        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And then at the bottom of

2  his e-mail there on the first page, he

3  says, "Bottom line is I talked with both

4  Patrick and Liz, and they cannot recall

5  any time that we openly and publicly

6  supported an opioid abuse prevention

7  measure."

8           Do you see that?

9    A.    I do.

10    Q.    Is that a correct statement?

11    A.    That's not a correct

12  statement.

13    Q.    What opioid abuse prevention

14  measures has HDA supported?

15    A.    A significant number of

16  provisions across the -- I mean, at the

17  state level, it's harder because we're

18  much more -- we have a smaller group, and

19  it's difficult to be kind of proactive at

20  the state level.  We have to be more

21  reactive than not.  So allocating

22  resources at the state level can be a

23  challenge.

24           So we tend to go where we've

1    got the most pressure and allocate

2    resources there.

3              But at the federal level and

4    with the media, we've done a lot of work

5    with coalitions.  We did our practical

6    solutions suggestions.  We worked with

7    various state organizations, NADDI,

8    National Association of Boards of

9    Pharmacy, National Community Pharmacists

10   Association to support initiatives to

11   address prescription drug abuse and

12   diversion with them.

13             Whether or not we were able

14   to support a particular bill in a state,

15   that's going to be probably a little bit

16   more difficult given the resource

17   challenges we have.  But as far as

18   activities and publicly supporting opioid

19   prevention measures, we absolutely have

20   been very involved, very engaged on that

21   issue.

22        Q.   Okay.  But with respect to

23   legislation or bills, is it a true

24   statement that HDA has never publicly

Highly Confidential - Subject to Further Confidentiality Review

1    supported an opioid abuse prevention

2    measure?

3                MR. WEINSTEIN:  Objection to

4         form.

5                THE WITNESS:  I can't --

6         again, one doesn't immediately

7         jump to mind.  That's not to say

8         that there are bills out there

9         that had passed that just maybe we

10        didn't even think were opioid

11        abuse prevention measures.  But

12        I -- I can't -- again, don't --

13        don't have one that I can

14        immediately point to.

15                I can -- you know what, let

16        me clarify that.  There are bills

17        with regard to suspicious order

18        monitoring.  We've been requested

19        to have -- support state

20        regulatory authorities access to

21        suspicious order monitoring and

22        ARCOS data, that we're happy to

23        work with in the State of

24        Virginia, State of West Virginia,

1      State of Tennessee, all requested

2      that we provide opioid

3      distribution information to them.

4      We complied and said as long as,

5      you know, it's duplicative of what

6      we're sending to DEA, we're happy

7      to do that.

8   BY MR. PIFKO:

9      Q.    When you say opioid

10  distribution information, what do you

11  mean?

12     A.    ARCOS data.

13     Q.    Okay.

14     A.    ARCOS data and suspicious

15  order monitoring reports.

16     Q.    Okay.  But that's not any

17  legislation or bills, correct?

18     A.    It's not.

19     Q.    I'm handing you what's

20  marked as Exhibit 42.

21          (Document marked for

22          identification as Exhibit

23          HDA-Kelly-42.)

24  BY MR. PIFKO:

1    Q.    It's another e-mails with

2    agenda and summary of meetings from Anita

3    Ducca back in 2008.  Bates-labeled

4    CAH_MDL2804_01364288 through 300.

5            This is a lengthy document,

6    but I just want to ask you about one

7    provision in here.

8    A.    Is there a specific

9    provision?

10    Q.    Yeah, I was waiting for you

11    to tell me you were ready.

12    A.    Okay.  I'm ready.

13    Q.    So the -- on the first page

14    it's an e-mail from Anita Ducca, another

15    one of her reminders about conference

16    calls.  And she's attaching a summary of

17    a regulatory affairs meeting that

18    occurred on July 17, 2008.  It's five

19    pages in.

20            Do you see that?

21    A.    Yes.

22    Q.    Okay.  Do you have any

23    reason to dispute that these are accurate

24    notes of the meeting?

1          MR. WEINSTEIN:  Objection to

2     form.  Foundation.

3          THE WITNESS:  I do not.  I

4     can't say for certain.  I was not

5     HDA at the time.  But I will take

6     it at face value that they were

7     accurate that they were sent out

8     by Anita.

9  BY MR. PIFKO:

10     Q.    You understand that you --

11  one of your designations here as a

12  30(b)(6) witness for -- for HDA is

13  committee meetings --

14     A.    Yes.

15     Q.    -- concerning opioids and

16  the substance of those meetings, correct?

17          MR. WEINSTEIN:  Objection to

18     form.

19          THE WITNESS:  I do, yes.

20  BY MR. PIFKO:

21     Q.    Okay.  And so you don't have

22  any reason to dispute that these are

23  accurate notes?

24          MR. WEINSTEIN:  Objection to

1           form.

2                   THE WITNESS:  I have no

3           reason to dispute that these are

4           accurate notes.

5     BY MR. PIFKO:

6           Q.    Okay.  So I want to direct

7     your attention to Page 3 of the notes,

8     which is CAH_MDL2804_01364294.  Tell me

9     when you're there.

10          A.    I see it.

11          Q.    Okay.  There's a section

12    here, it says, "Proposed rule on quotas."

13                Do you see that?

14          A.    Yeah.

15          Q.    Okay.  Does DEA participate

16    in these meetings from time to time?

17                MR. WEINSTEIN:  Objection to

18          form.

19                THE WITNESS:  Participate in

20          what meetings?

21    BY MR. PIFKO:

22          Q.    The regulatory affairs

23    meetings.

24          A.    They are invited guests in

Highly Confidential - Subject to Further Confidentiality Review

1    some instances.

2          Q.    Okay.  On the first page of

3    the notes it says, "Four staff members of

4    the DEA join the meeting at approximately

5    9:15.  Mark Caverly explained that since

6    it was an election year, DEA expected a

7    slowdown in new initiatives, and the

8    Office of Management and Budget has told

9    DEA staff not to submit new major

10   rulemakings."

11             Do you see that?

12         A.    No.  What page are you?

13         Q.    First page of the notes.

14   Fifth page of the document.  1364292.

15         A.    Okay.

16         Q.    Do you see that?

17         A.    Four members, yes, okay.

18   I'm -- I'm with you.

19         Q.    So the four members from DEA

20   joined the meeting, correct?

21         A.    Correct.

22         Q.    And then the -- the members

23   of the regulatory affairs committee would

24   have participated as well, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I believe so, yes.

2    Q.    It says, "The agenda and

3  list of attendees and guests are

4  attached"?

5    A.    Okay.

6    Q.    Do you see that, it says

7  that on the first page?

8    A.    Yes.

9    Q.    And then we see that HDA

10  members present, if you go to Page 5 of

11  the notes, 1364296?

12    A.    I do.

13    Q.    Okay.  It's got Steve

14  Reardon from Cardinal, Mark Hartman from

15  Cardinal, Gary Hilliard from McKesson,

16  Steve Mays from AmerisourceBergen.

17            Do you see that?

18    A.    And Mike Shoneff from

19  Valley, and Roger Peters, and Brad Pine

20  and Mike DeBello and Sergio Tejeda.

21    Q.    Okay.  And then it's got the

22  DEA staff that attended as well?

23    A.    Yes.

24    Q.    And HDMA staff, correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes.

2      Q.     Okay.  So going -- sorry,

3  going back to the third page of the

4  notes.  1364294.  Let me know when you're

5  there.

6      A.     I'm there.

7      Q.     It says, "Proposed rule on

8  quotas for Schedule I and Schedule II

9  substances.  DEA discussed the reduction

10  in illicit internet purchases and its

11  impact on decisions on manufacturing

12  quota sizes.  We pointed out the

13  incongruity of DEA's increases in quota

14  sizes and the expectation that

15  distributors will cut back on

16  distribution."

17             Do you see that?

18      A.     I do.

19      Q.     Do you have any reason to

20  dispute that this was discussed at the

21  meeting?

22      A.     I do not.

23      Q.     So to your knowledge, this

24  was discussed at the meeting?

1           MR. WEINSTEIN:  Objection to

2       form.

3           THE WITNESS:  To my

4       knowledge it was discussed at the

5       meeting.

6           (Document marked for

7       identification as Exhibit

8       HDA-Kelly-43.)

9   BY MR. PIFKO:

10      Q.    I'm handing you what's

11  marked as Exhibit 43.  It is a three-page

12  document, Bates-labeled HDA_MDL_000088099

13  through 88101.

14          Take a minute to review this

15  and let me know when you're done.

16      A.    Okay.

17      Q.    You are part of the e-mail

18  at the bottom here from John Parker to a

19  bunch of people including you, do you see

20  that, dated February 8, 2012?

21      A.    Yes.

22      Q.    It says, "New DEA

23  talking" -- "TPs," talking points,

24  correct?

1     A.     Yes.

2     Q.     "Attached are the revised

3 DEA talking points.  I essentially kept

4 one of Cardinal's three bullets with a

5 few modifications."

6            Did I read that correctly?

7     A.     You did.

8     Q.     So HDA worked with members

9 of the executive committee to draft

10 talking points concerning the District

11 Court's TRO against the DEA's suspension

12 order of Cardinal Health Lakeland

13 distribution center, correct?

14            MS. ROLLINS:  Objection to

15      form.

16            MS. WICHT:  Objection.

17            THE WITNESS:  That's what

18      the first bullet point says, yes.

19 BY MR. PIFKO:

20     Q.     And the executive committee

21 worked to draft these; is that correct?

22            MR. WEINSTEIN:  Objection to

23      form.

24            THE WITNESS:  Again, I don't

Highly Confidential - Subject to Further Confidentiality Review

1    think the executive committee

2    drafted them.  I think they were

3    probably shared with the executive

4    committee.  And if they had

5    comments or provided feedback,

6    that was incorporated.

7  BY MR. PIFKO:

8    Q.   Okay.  Well, at the top of

9  this e-mail, John Gray writes to David

10 Neu from AmerisourceBergen, and says,

11 "For our 12:30 call, attached is the

12 latest version based on input from the

13 rest of the executive committee."

14    Do you see that?

15    A.   Yes.

16    Q.   So this has had input from

17 everybody but AmerisourceBergen at this

18 point, correct?

19    MR. WEINSTEIN:  Objection to

20    form.

21    THE WITNESS:  That's what it

22    says, yes.

23 BY MR. PIFKO:

24    Q.   Is that your understanding

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of --
 2          A.    That is my understanding.
 3          Q.    -- what happened?
 4          A.    Again, I don't recall this
 5    particular document.  But I will not
 6    dispute what the e-mail says.
 7          Q.    Do you know if
 8    AmerisourceBergen ultimately approved the
 9    talking points?
10          A.    I do not.
11          Q.    What were these talking
12    points to be used for?
13                MR. WEINSTEIN:  Objection to
14          form.
15                THE WITNESS:  Again, I don't
16          know specifically what these were
17          developed to address.  Possibly
18          media coverage of the case
19          referenced in the first bullet
20          point.
21    BY MR. PIFKO:
22          Q.    In the first bullet point,
23    it says, "HDMA is pleased that the
24    District Court granted the TRO against
```

1    the DEA," correct?

2          A.    That's what it says, yes.

3          Q.    And, "It allows Cardinal

4    Health to resume shipments of controlled

5    substances," correct?  Second bullet

6    point says that?

7          A.    Yes.  That's what it says.

8          Q.    Was this put on HDA's

9    website?

10         A.    I do not know.  It says at

11   the top, this is for internal use only,

12   do not distribute.  So I would imagine it

13   did not make it to --

14         Q.    Okay.  Maybe some other

15   version?  In your experience would

16   something like this be put on their -- on

17   the website?

18               MR. WEINSTEIN:  Objection to

19         form.

20               THE WITNESS:  Again,

21         specific talking points wouldn't

22         be put on the website.  It would

23         be more, you know, kind of

24         policies, papers or statements or

Highly Confidential - Subject to Further Confidentiality Review

1    comments that were submitted.

2    Talking points are generally

3    internal documents for purposes of

4    discussions either on the Hill or

5    with the media.

6  BY MR. PIFKO:

7    Q.    Okay.  So these could have

8  been used by your staff in talking to

9  members of the Hill?

10    A.    They could have been.

11    MS. ROLLINS:  Objection to

12    form.

13  BY MR. PIFKO:

14    Q.    To your knowledge were they

15  used for that?

16    A.    I -- not to my knowledge.  I

17  don't know.  I can't say for certain one

18  way or another.

19    Q.    So sitting here today you

20  don't have any recollection of how these

21  were used?

22    A.    Again, it's 2012.  I don't

23  recall.

24    Q.    I'll have you look back at

1    Exhibit 31.  It looks like this.

2              A.    Yes.

3              Q.    The first entry on February

4    16, 2012 --

5                    (Brief interruption.)

6                    THE VIDEOGRAPHER:  Off the

7            record.  4:29 p.m.

8                    (Brief pause.)

9                    THE VIDEOGRAPHER:  The time

10           is 4:33 p.m.  We are back on the

11           record.

12   BY MR. PIFKO:

13             Q.    All right.  So we're looking

14   at Exhibit 31 at the first entry dated

15   February 16, 2012.

16                   Do you see that?

17             A.    Yes.

18             Q.    So this is a summary of the

19   portions of the executive committee,

20   correct?

21             A.    Yes.

22             Q.    Of the executive committee

23   meeting.  And so it says that HDMA met

24   with DEA staff.  And then at the second

1    part of the entry, it says, "EC" --

2    that's executive committee, correct?

3           A.    That's correct.

4           Q.    -- "asked OFW" -- that's

5    Olsson Frank, the outside counsel,

6    correct?

7           A.    Correct.

8           Q.    -- "to prepare a draft

9    amicus brief in the Cardinal case."

10   Correct?

11          A.    Correct.

12          Q.    So it's your understanding

13   that the executive committee asked HDA's

14   outside counsel to prepare an amicus

15   brief for the Cardinal case in

16   February 2012, correct?

17          A.    That's correct.

18          Q.    I'm handing you what's

19   marked Exhibit 44.

20          (Document marked for

21          identification as Exhibit

22          HDA-Kelly-44.)

23   BY MR. PIFKO:

24          Q.    For the record it's an

1    e-mail from John Gray.  At the top

2    there's some other e-mails.  The top

3    e-mail is dated Thursday, February 23rd,

4    2012.  And the subject is, "Draft Amicus

5    Brief, Cardinal Health v. Holder."

6              It's Bates-labeled

7    HDA_MDL_000215212 through 215233.

8              Take a minute to review that

9    and let me know when you're done.

10         A.    Okay.

11         Q.    So at the bottom of this

12   e-mail, David Durkin is e-mailing to

13   Richard Frank a revised draft of the

14   brief, agree?

15         A.    Yes.

16         Q.    Then, Richard Frank forwards

17   it.  Richard Frank is an attorney at

18   Olsson Frank, correct?

19         A.    Correct.

20         Q.    Outside counsel for HDA,

21   correct?

22         A.    Correct.

23         Q.    Okay.  He forwards the draft

24   amicus brief to John Gray and you and

1    others in HDA, correct?

2          A.    Correct.

3          Q.    And he writes, "HDMA

4    colleagues, attached is the draft amicus

5    brief for your consideration.  The

6    executive committee asked that this be

7    sent to them for approval or objection

8    prior to filing.  We should also run it

9    by Cardinal's counsel."

10          Did I read that correctly?

11          A.    You did.

12          Q.    Okay.  Do you recall

13    receiving that e-mail?

14          A.    I'm obviously here on the

15    addressees.  Yes.

16          Q.    Okay.  And then at the top

17    of this e-mail here, John Gray forwards

18    it to David Moody, and David Neu from

19    AmerisourceBergen correct?

20          A.    Correct.  David Moody was

21    North Carolina Mutual and the chairman of

22    the organization.

23          Q.    Okay.  Is it your

24    understanding that John Gray also

1    forwarded the draft to the other members

2    of the executive committee as well?

3                    MR. WEINSTEIN:  Objection to

4            form.  Foundation.

5                    THE WITNESS:  Again, I would

6            deduce that based on the executive

7            committee request.  But this is

8            sent to the chairman and vice

9            chairman.

10   BY MR. PIFKO:

11           Q.    So he sends it to them and

12   says, "Attached is a draft amicus brief

13   that HDMA could file on behalf of our

14   membership in support of the Cardinal

15   case next week.  I think it's an

16   excellent recitation of our issues with

17   DEA.  However, I fear it may be too

18   aggressive in Section 3 at this point in

19   time."

20                    Do you see that?

21           A.    Yes, I can read that.

22           Q.    Do you recall any

23   discussions about what specifically was

24   too aggressive in Section 3?

1          MR. WEINSTEIN:  Objection to

2     form.

3          THE WITNESS:  I do not

4     recall specific concerns about the

5     aggressive Section 3.

6  BY MR. PIFKO:

7     Q.   John Gray never shared that

8  information with you?

9          MR. WEINSTEIN:  Objection to

10     form.

11          THE WITNESS:  Again, I don't

12     recall.  They may have shared that

13     information, there may have been

14     discussion about it.  I just don't

15     recall.

16  BY MR. PIFKO:

17     Q.   I'm handing you what's been

18  marked Exhibit 45.

19          (Document marked for

20     identification as Exhibit

21     HDA-Kelly-45.)

22  BY MR. PIFKO:

23     Q.   Series of e-mails concerning

24  the same subject to Cardinal v. Holder

1    amicus brief.  It's Bates-labeled

2    HDA_MDL_000215970 through 215973.

3                Take a moment to review this

4    and let me know when you're done.

5         A.    Okay.

6         Q.    You ready?

7                So on the last page of this

8    document, which is the earliest of the

9    e-mail thread, David Durkin, he's outside

10   counsel for HDA, correct?

11        A.    Correct.

12        Q.    He is the one who authored

13   the amicus brief for the Cardinal v.

14   Holder case, correct?

15        A.    Correct.

16        Q.    He's writing to Doug

17   Farquhar -- am I saying that right?

18        A.    Yes.

19        Q.    Doug -- do you know who Doug

20   Farquhar is?

21        A.    I believe he is an attorney

22   at Hyman Phelps.

23        Q.    Okay.  And he was outside

24   counsel for Cardinal Health in the

Highly Confidential - Subject to Further Confidentiality Review

1    underlying litigation, correct?

2         A.    I -- I think so, yes.  I

3    can't recall specifically.

4         Q.    So David Durkin is asking

5    him for thoughts on how to handle the

6    judge in that case on the first page.

7              Do you see that?

8              MR. WEINSTEIN:  Objection to

9         form.

10             MS. WICHT:  Objection to

11        form.

12   BY MR. PIFKO:

13        Q.    Do you agree with that?

14             MR. WEINSTEIN:  Objection to

15        form.

16             THE WITNESS:  I agree that

17        there is a question to Doug about

18        the handling of the case, yes.

19   BY MR. PIFKO:

20        Q.    And handling of how the

21   judge is handling the matter?

22        A.    Yes.

23        Q.    And anything he -- he's

24   asking anything you want me to be aware

Highly Confidential - Subject to Further Confidentiality Review

1    of with regard to how Judge Walton is

2    handling this matter?

3         A.    That's what it says, yes.

4         Q.    Okay.  And Doug Farquhar

5    writes back.  And then there is some

6    subsequent discussions.

7               And then on February 24,

8    2012, Doug writes to David Durkin copying

9    Linden Barber.

10              Do you see that?

11        A.    Yes.

12        Q.    Starts on the first page of

13   the document?

14        A.    Yes, yes, yes, yes.

15        Q.    And he says, "David, Linden

16   Barber and I have reviewed the amicus

17   brief and think it's really quite good.

18   Cardinal Health does, in fact, authorize

19   you to represent that we consent to your

20   motion for leave to file.  We make the

21   following suggestions," and then there's

22   a page of suggestions, and then it goes

23   on to the next page with the suggestions.

24   Agree?

1      A.    I agree.

2      Q.    Linden Barber was inhouse

3   counsel for Cardinal Health at this

4   point?

5            MS. WICHT:  Objection to

6        form.  Foundation.

7            THE WITNESS:  I think Linden

8        at this time was with Quarles &

9        Brady.

10  BY MR. PIFKO:

11     Q.    He was outside counsel for

12  Cardinal at this point, correct -- is

13  that correct?

14     A.    Again, I don't know what his

15  specific role, or relationship was.  But

16  I think he was, yes, at one point in

17  time.  I don't know when that -- when

18  that engagement began.

19     Q.    Okay.  And then you were

20  aware that Cardinal's outside counsel had

21  provided comments on this brief, because

22  then David Durkin forwards this to you

23  with the subject Cardinal's counsel's

24  comments on amicus brief on Monday,

1    February 27, 2012, correct?

2         A.    Yes.

3         Q.    And we -- you know, but I

4    don't know what's there, because it's

5    redacted, correct?

6         A.    I don't recall either, but I

7    see that my name was on the e-mail.

8              (Document marked for

9         identification as Exhibit

10         HDA-Kelly-46.)

11   BY MR. PIFKO:

12        Q.    I'm handing you what's

13   marked as Exhibit 46.  For the record,

14   it's a three-page document Bates-labeled

15   HDA_MDL_000216300 through 216302.

16             The subject is the HDMA

17   amicus brief, Cardinal v. Holder, DC

18   Circuit.  The most recent e-mail is dated

19   March 5, 2012.

20        A.    Okay.

21        Q.    The HDA couldn't have filed

22   this brief unless they got approval from

23   all the members of the executive

24   committee, correct?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. WEINSTEIN:  Objection to

2     form.

3          THE WITNESS:  That's usually

4     the process.  They try to get

5     consensus approval, yes.

6  BY MR. PIFKO:

7     Q.    That's the process here as

8  well?

9     A.    I believe so, yes.

10    Q.    John Gray writes to the

11 members of the executive committee on

12 March 4, 2012.  Do you see that, on the

13 bottom of the first page?

14    A.    Yes.

15    Q.    I have it right that he's

16 writing to the members of the executive

17 committee?

18    A.    At the time, yes.

19    Q.    Okay.  And he's -- and that

20 includes AmerisourceBergen, McKesson, and

21 Cardinal Health, correct?

22    A.    And HD Smith and Dakota Drug

23 and Smith Drug and North Carolina Mutual.

24    Q.    Okay.  And he says, "I

1  apologize for" -- "apologize for

2  interrupting your weekend.  HDMA outside

3  counsel was informed today that the U.S.

4  Court of Appeals in Washington agreed

5  late Friday to stay the district court's

6  ruling last Wednesday lifting the TRO on

7  the DEA's immediate suspension order

8  against Cardinal Health.

9          "As such, HDMA counsel is

10 recommending that HDMA now file the

11 amicus brief prepared after our recent

12 executive committee to set forth HDMA's

13 overall industry concern."

14          Do you see that?

15     A.    I do.

16     Q.    Okay.  Do I have that

17 correct?

18     A.    Yes.

19     Q.    "This draft brief was

20 reviewed by most of you early last week."

21          Do you agree that the

22 members of the executive committee were

23 given the opportunity to review the

24 brief?

1          MS. CHARLES:  Form.

2          THE WITNESS:  If it's stated

3     here that they were given an

4     opportunity to review the brief,

5     yes.

6  BY MR. PIFKO:

7     Q.    And John Gray further

8  states, "I agree with HDMA counsel that

9  this is the best time to file such a

10 brief, to let the appellate court

11 understand the extent of our industry's

12 concerns and frustrations in trying to

13 work with the DEA on suspicious order

14 monitoring."

15          Did I read that correctly?

16    A.    Suspicious ordering

17 monitoring.  But, yes.

18    Q.    "This may be the last chance

19 to address these issues before an

20 appellate bench in this matter.  A

21 favorable decision will establish a

22 useful judicial precedent for all HDMA

23 members to rely upon if necessary."

24          Do you see that?

1        A.    Yes.

2        Q.    Did you have an

3  understanding about what the significance

4  of the rulings were in this case?

5           MR. WEINSTEIN:  Objection to

6        form.

7           THE WITNESS:  I understood

8        the process that kind of launched

9        the -- the need for filing of the

10       amicus, yes.

11  BY MR. PIFKO:

12        Q.    And what -- what was that?

13        A.    Just the process that DEA

14  utilized to issue their suspension order,

15  was what I think we -- we were concerned

16  was vague and, you know, I think

17  illustrated the concerns that the -- the

18  entire industry had with the lack of

19  clarity that the industry had with regard

20  to DEA expectations and their enforcement

21  authorities.

22        Q.    Do you know what the outcome

23  of the matter was?

24           MR. WEINSTEIN:  Objection to

1    scope.

2              THE WITNESS:  In the

3         Cardinal v. Holder case?

4    BY MR. PIFKO:

5         Q.    Yeah.

6         A.    I don't recall initially.

7         Q.    Are you aware that Cardinal

8    Health eventually admitted wrongdoing?

9              MS. WICHT:  Objection to

10        form.

11             MR. WEINSTEIN:  Objection to

12        scope.

13             THE WITNESS:  Again, I --

14        there was resolution of the case.

15        I don't know what the exact

16        details of the resolution were.

17   BY MR. PIFKO:

18        Q.    Did anyone tell you that

19   Cardinal Health had admitted wrongdoing?

20        A.    I think --

21             MR. WEINSTEIN:  Objection to

22        scope.

23             MS. WICHT:  Objection to

24        form.

1          THE WITNESS:  Again, I think

2      at the time I probably was aware

3      that that was the resolution of

4      the case.

5  BY MR. PIFKO:

6      Q.    Okay.

7          (Document marked for

8      identification as Exhibit

9      HDA-Kelly-47.)

10  BY MR. PIFKO:

11      Q.    I'm handing you what's

12  marked as Exhibit 47.

13          For the record, Exhibit 47

14  is an e-mail from John Gray dated

15  November 19th, 2015.  The subject is

16  "Masters suit, draft amicus outline - for

17  your consideration."  It's Bates-labeled

18  HDA_MDL_000219211 through 219213.

19          Take a moment to review it.

20  And let me know when you're done.

21      A.    Okay.

22      Q.    In Exhibit 47, John Gray is

23  sharing an outline of a draft amicus

24  brief or a draft amicus outline for the

Highly Confidential - Subject to Further Confidentiality Review

1    Masters Pharmaceutical case with the

2    executive committee, correct?

3          A.    Yes.

4          Q.    And it's drafted by HDA's

5    inhouse counsel, Ms. Gallenagh?

6                MR. WEINSTEIN:  Objection to

7          form.  Foundation.

8                THE WITNESS:  Yeah, I don't

9          know if this was done by inhouse

10         counsel or outside OFW.

11   BY MR. PIFKO:

12         Q.    Well, it's -- it says --

13   it's got her name on it here.  Do I have

14   that correct?

15         A.    Her name's on the e-mail.

16         Q.    Well, but it says from John

17   Gray and Ms. Gallenagh.

18         A.    Right.

19         Q.    Do you see that?

20         A.    Right, but I don't know who

21   drafted the -- the -- this document.  I

22   don't know if that was done by inhouse or

23   outside counsel.

24         Q.    Ms. Gallenagh is the same

1    counsel that's here today at the

2    deposition?

3           A.    That's correct.

4           Q.    So this outline and summary

5    memo was provided to HDA's executive

6    committee -- committee members on

7    November 19, 2015, correct?

8           A.    Yes.

9           Q.    There was a request that

10   people consider this and provide input on

11   whether to pursue it, correct?

12          A.    That's correct.

13                (Document marked for

14          identification as Exhibit

15          HDA-Kelly-48.)

16   BY MR. PIFKO:

17          Q.    I'm handing you what's

18   marked as Exhibit 48.  Take a minute to

19   review Exhibit 48.  For the record,

20   Exhibit 48 is a two-page document

21   Bates-labeled HDA_MDL_000215966 through

22   67.

23                It's dated from

24   January 2016, and the subject is "Action

Highly Confidential - Subject to Further Confidentiality Review

1    requested - HDMA Masters amicus brief."

2              Let me know when you're

3    ready.

4         A.    Okay.

5         Q.    So in this document,

6    Exhibit 48, John Gray is again e-mailing

7    the executive committee and asking for

8    their approval to move forward with the

9    drafting of the amicus brief in the

10   Masters case, correct?

11        A.    That's correct.

12        Q.    And he notes that they're

13   going to hire someone from Latham &

14   Watkins, and they estimate the cost is

15   going to be about $150,000, correct?

16        A.    Yes.  That's what this

17   states.

18        Q.    Okay.  And he says that he

19   recommends the executive committee

20   approve based on the following and

21   provides five bullet points describing

22   why Mr. Gray believes that the members

23   should approve the proceeding with

24   drafting and ultimately filing the brief,

1    correct?

2          A.    Yes.

3          Q.    And we see here on top of

4    the e-mail that AmerisourceBergen

5    approved that course of action, correct?

6          A.    Yes.

7          Q.    Do you know if the other

8    members approved the filing of the brief?

9                MR. WEINSTEIN:  Objection to

10         form.

11               THE WITNESS:  I don't know.

12         I know -- I think that the brief

13         was filed, so I'd imagine that

14         they did approve the filing of the

15         brief.

16    BY MR. PIFKO:

17         Q.    Again, because they wouldn't

18    file a brief without approval of the

19    executive committee members, correct?

20         A.    That's correct.

21               (Document marked for

22         identification as Exhibit

23         HDA-Kelly-49.)

24    BY MR. PIFKO:

1    Q.    I'm handing you what's

2  marked as Exhibit 49.  Exhibit 49 is a

3  document Bates-labeled HDA_MDL_000162206

4  through 162256.  It's an e-mail from you

5  dated April 5, 2016, to Ruth Miller.

6  Subject is "Amicus brief filed in Masters

7  case."  It attaches the brief and a

8  consent motion.  Let me know when you're

9  done.

10    A.    I agree that's what it

11  includes.

12    Q.    Okay.  That's -- so you say

13  here on the first -- well, first -- this

14  is the final version of the brief that

15  was filed, correct?

16    A.    To the best of my knowledge,

17  yes.

18    Q.    And you're sharing this with

19  Ruth Miller?

20    A.    Yes.

21    Q.    Who is that?

22    A.    Ruth Miller at the time was

23  in our regulatory affairs department.  I

24  believe she was a senior director.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And what was her role in the

2    regulatory affairs department?

3    A.    Her role was primarily in

4    the DEA-related regulatory affairs

5    issues.

6    Q.    What specifically does she

7    do?

8    A.    She would basically review

9    various regulatory documents and

10   interactions with the DEA.

11   Q.    For what purpose?

12   MR. WEINSTEIN:  Objection to

13   form.

14   THE WITNESS:  To represent

15   HDA's interest in front of the

16   agency.

17   BY MR. PIFKO:

18   Q.    You say here, "Long story

19   short, our members felt it was an

20   important opportunity to weigh in as

21   dispassionately as possible with the

22   Court on some of the ambiguities that

23   Masters referenced in their pleadings as

24   well as some of the points that the

1    administrative law judge addressed in her

2    recommendations to overturn the

3    suspension order."

4                  Do you see that?

5         A.    I do.

6         Q.    Were you part of discussions

7    with the members about this brief?

8                  MR. WEINSTEIN:  Objection to

9            form.

10                 THE WITNESS:  Not the

11           details of the brief itself.  That

12           was handled by Latham & Watkins.

13           But I was aware that the brief was

14           being crafted and was going to be

15           submitted.

16   BY MR. PIFKO:

17        Q.    And the members shared their

18   views on the strategy with you, such that

19   you could provide it here to Ms. Miller?

20                 MR. WEINSTEIN:  Objection to

21           form.  Foundation.  Scope.

22                 THE WITNESS:  The members of

23           this instance would have probably

24           been involved to the legal

1          committee, HDA's legal committee

2          and handled there.  So I think

3          they probably did provide feedback

4          to the strategy as it was moving

5          forward.

6    BY MR. PIFKO:

7          Q.    What's your understanding of

8    what the ambiguities were that Masters

9    referenced in their pleadings?

10          MR. WEINSTEIN:  Objection to

11          form.  Scope.  Foundation.  And

12          calls for a legal conclusion.

13          THE WITNESS:  Again, I think

14          some of the ambiguities had to do

15          with the authority that DEA

16          referenced in their action against

17          Masters.

18          (Document marked for

19          identification as Exhibit

20          HDA-Kelly-50.)

21    BY MR. PIFKO:

22          Q.    I'm handing you what's

23    marked Exhibit 50.  For the record,

24    Exhibit 50 is an e-mail attaching another

Highly Confidential - Subject to Further Confidentiality Review

1  amicus brief that was filed in the West

2  Virginia Supreme Court of Appeals.  It's

3  Bates-labeled HDA_MDL_000212579 through

4  212616.

5          A.    Okay.

6          Q.    Are you aware that HDMA

7  filed an amicus brief in the West

8  Virginia State Court litigation against

9  the distributors?

10         A.    I am.

11         Q.    And did the executive

12 committee authorize the filing of that

13 brief?

14         A.    I would think that they

15 would have, yes.

16         Q.    Do you have any reason to

17 believe that they wouldn't have supported

18 it?

19         A.    No.

20               MS. WICHT:  Objection to

21         form.

22 BY MR. PIFKO:

23         Q.    I'm going to turn your

24 attention back to Exhibit 1, the subpoena

1    with the topics.  Are you there?

2         A.    I am.

3         Q.    Okay.  Topic Number 3 is

4    your lobbying activities related to the

5    manufacture, marketing, advertising and

6    distribution of opioids or opioid

7    products.

8              Do you see that?

9         A.    I do.

10         Q.    Do you understand yourself

11    to be -- have been designated to talk

12    about that topic here today?

13         A.    I do.

14         Q.    We talked about Topic 4

15    already.

16              Topic Number 5:  Your

17    advocacy or legal support for any

18    defendant, including but not limited to,

19    amicus curiae briefs or any -- or other

20    legal documents prepared by you in

21    support of any defendant.

22              Do you see that?

23         A.    I do.

24         Q.    Do you understand yourself

1   to be designated to talk on that topic

2   today?

3          A.     I do.

4          Q.     Topic Number 6:  The nature,

5   scope and identity of any conferences,

6   seminars or webinars you have sponsored,

7   promoted or organized where the duty to

8   prevent diversion and identify and report

9   suspicious orders was included among the

10  topics of discussion.

11             Do you see that?

12         A.     I do.

13         Q.     Do you understand yourself

14  to be designated to talk on that topic

15  today?

16         A.     I do.

17         Q.     Topic Number 7:

18  Communications with the DEA or any state

19  or federal government agency regarding

20  the diversion or suspicious orders of

21  opioids or opioid products, including but

22  not limited to, the attendance,

23  participation in, presentations given by

24  the DEA at your conferences, seminars, or

1    webinars regarding advice, direction,

2    guidance or instruction regarding the

3    duty to prevent diversion and identify

4    and report suspicious orders.

5              Do you understand yourself

6    to be designated to talk on that topic

7    today?

8         A.    I do.

9         Q.    Topic Number 8:  Any

10   communications efforts, activities,

11   initiatives or work performed by you

12   regarding quotas set by the DEA,

13   including increases to or maintenance of

14   the quotas.

15             Do you understand yourself

16   to be designated to talk on that topic

17   today?

18        A.    Yes.

19        Q.    The scope -- Topic

20   Number 12:  The scope and nature of any

21   discussions of any council, committee,

22   task force or working group of the HDA

23   concerning opioids.

24             Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I do.

2    Q.    Do you understand yourself

3  to be designated to talk on that topic

4  today?

5    A.    I do.

6    Q.    Topic Number 13:  The scope

7  and nature of any discussions of any

8  council, committee, task force, or

9  working group of the HDA concerning

10  diversion of controlled substances.

11          Do you see that?

12    A.    I do.

13    Q.    Do you understand yourself

14  to be designated to talk on that topic

15  today?

16    A.    I do.

17    Q.    What did you do to prepare

18  to testify on those topics?

19    A.    I met with counsel several

20  days in the last couple days and then

21  previously when we thought this was going

22  to be scheduled earlier, or later in

23  2018.  So probably four or five meetings

24  with counsel and staff.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  I was going to ask

2  you.  Besides counsel, did you meet with

3  any staff members?

4    A.    I did.  I met with Anita

5  Ducca primarily to understand the period

6  of time I was not at HDA.

7    Q.    And did she provide any

8  documents to you?

9    A.    Other than the documents

10  that were produced.

11    Q.    So she provided documents to

12  you that were produced?

13         MR. WEINSTEIN:  Objection to

14    form.

15         THE WITNESS:  No.  Counsel

16    provided the documents.

17  BY MR. PIFKO:

18    Q.    Okay.  So when you

19  understood you were going to be

20  designated to come speak for the HDA at

21  this deposition, counsel provided you

22  with documents that had been produced in

23  the litigation?

24    A.    That's correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And when you met with

2    Ms. Ducca, did we go over any of those

3    documents?

4    A.    We did.

5    Q.    Okay.  Did you review the

6    documents on your own time without

7    anybody?

8    A.    I did not.

9    Q.    Okay.  Who else besides

10   Ms. Ducca from the staff did you meet

11   with?

12   A.    Our general counsel

13   participated in the meetings as well.

14   Q.    Okay.  Anyone else?

15   A.    No.

16   Q.    About how many hours did you

17   meet with Ms. Ducca?

18   A.    Over the course, probably

19   eight -- between eight and ten hours.

20   Q.    And you felt, based on those

21   discussions and the review of documents,

22   that you had adequate understanding to

23   testify on those topics I just read to

24   you?

1    A.    I do.

2         MR. PIFKO:  Okay.  We'll

3    take a break.

4         THE VIDEOGRAPHER:  The time

5    is 5:09 p.m.  We are off the

6    record.

7         (Short break.)

8         THE VIDEOGRAPHER:  The time

9    is 5:25 p.m.  We are back on the

10   record.

11        (Document marked for

12   identification as Exhibit

13   HDA-Kelly-51.)

14 BY MR. PIFKO:

15        Q.    Handing you what's marked as

16 Exhibit 51.

17             And while you are looking --

18 go ahead and take your time to look at

19 that, but then I also want you to pull

20 out Exhibit 11 which goes with

21 Exhibit 51.

22             For the record, Exhibit 51

23 is a three-page document Bates-labeled

24 CAH_MDL2804_02201918 through 1920.

1    A.    11?

2    Q.    Yeah.

3    A.    Document 11?

4    Q.    Okay.  You ready?

5    A.    Yes.

6    Q.    So you recall, when I showed

7  you Document 11 and I asked you if you

8  had an understanding about the date of

9  when the National Wholesale Druggists'

10  Association suspicious order monitoring

11  system, which is Exhibit 11, what the

12  date of that document was, do you recall

13  that discussion?

14    A.    I recall that discussion,

15  yes.

16    Q.    Okay.  Well, Exhibit 51 is a

17  series of letters from the DEA concerning

18  the National Wholesale Druggists'

19  Association's suspicious order monitoring

20  system.  And if you see, the first page

21  of Exhibit 51 is stamped April 27, 1984.

22           Do you see that?

23    A.    I do.

24    Q.    Does that refresh your

1  recollection that Exhibit 11 is from

2  approximately in the early '80s?

3           MR. WEINSTEIN:  Objection to

4      form, foundation, scope.

5           THE WITNESS:  I will --

6      again, I have not seen either of

7      these documents.  I will take it

8      at face value that that was when

9      this document was prepared.

10  BY MR. PIFKO:

11      Q.    Okay.  Well, Exhibit 51 is a

12  letter from Thomas Gitchel, acting chief

13  diversion operations section of the DEA,

14  correct?

15      A.    Yes.

16      Q.    And it's dated April 27,

17  1984, correct?

18      A.    Yes.

19      Q.    And it's to Ronald J.

20  Streck, vice president of government

21  affairs, National Wholesale Druggists'

22  Association.

23           That's a predecessor entity

24  of HDA, correct?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     That's correct.

2          Q.     Do you know who Mr. Streck

3    is?

4          A.     Mr. Streck became at one

5    point the CEO of the NWDA.

6          Q.     Okay.  Do you know around

7    the time that was?

8          A.     I do not know when he --

9    Mr. Gray did succeed him as the CEO.

10         Q.     Okay.  Mr. Gray was

11   immediately after him?

12         A.     Immediately after him, yes.

13         Q.     Okay.  So this document

14   says, the second full paragraph, "The

15   NWDA's draft format for suspicious order

16   monitoring system provides an excellent

17   framework for distributor" --

18   "distributor registrants to design and

19   operate a system to disclose to

20   registrants suspicious orders of

21   controlled substances."

22              Do you see that?

23         A.     I do.

24         Q.     And it says, "Draft format

1    for a suspicious order monitoring

2    system."  And Exhibit 11 says,

3    "Suspicious order monitoring system,"

4    correct?

5           A.    It does.

6           Q.    Okay.  Then on the bottom of

7    that same paragraph, Mr. Gitchel says in

8    the letter to Mr. Streck, "As previously

9    discussed, an after-the-fact computer

10   printout of sales data does not relieve a

11   registrant of its responsibility to

12   report excessive or suspicious orders

13   when discovered."

14              Do you see that?

15          A.    I do.

16          Q.    And then he says, "I'm

17   enclosing a copy of your draft with my

18   pen and ink changes."

19              Do you see that?

20          A.    I do.

21          Q.    Do you agree -- any reason

22   to dispute that the NWDA received this

23   document?

24              MR. WEINSTEIN:  Objection to

1          form.  Foundation.  Scope.

2                   THE WITNESS:  No reason to

3          dispute that they received a pen

4          and ink draft marked-up version.

5   BY MR. PIFKO:

6          Q.    And this letter from DEA,

7   correct?

8                   MR. WEINSTEIN:  Same

9          objections.

10                  THE WITNESS:  No reason to

11         dispute that.

12  BY MR. PIFKO:

13         Q.    Based on your understanding

14  of the HDA and as a designee under Rule

15  30(b)(6), do you believe this would have

16  been provided to HDA's members?

17                  MR. WEINSTEIN:  Objection to

18         form, foundation, and scope.

19                  THE WITNESS:  Again, I don't

20         know what capabilities were back

21         in 1984.  I would imagine it was

22         reported at some point to HDA

23         members.

24  BY MR. PIFKO:

1    Q.    Okay.  In the first

2  paragraph --

3    A.    Or NWDA members.

4    Q.    In the first paragraph he

5  says, "I want to thank" -- "I want to

6  take this opportunity to thank you,

7  Mr. Streck, and then Mr. David Prins,

8  from Twin City Wholesale, and Mr. Robert

9  Bone from Bergen Brunswig for meeting

10  with David Walkup and me on April 13,

11  1984."

12          Do you see that?

13    A.    I do.

14    Q.    So based on this, it appears

15  some of the members in addition to

16  Mr. Streck met with the DEA about the

17  suspicious order monitoring system,

18  correct?

19    A.    It would appear so, yes.

20    Q.    Then the third page of

21  Exhibit 51 is another letter to

22  Mr. Streck from Thomas Gitchel.

23          Do you see that?

24    A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     And it appears to be dated

2     May 16, 1984.

3               Do you see that?

4          A.     I do.

5          Q.     In the letter from

6     Mr. Gitchel, he says at the bottom of the

7     first full paragraph, "However, I want to

8     make it clear that the submission of

9     monthly printout of after-the-fact sales

10    will not relieve a registrant from the

11    responsibility of reporting excessive or

12    suspicious orders.  DEA has interpreted

13    orders to mean prior to shipment."

14              Do you see that?

15         A.     I do.

16         Q.     And that's consistent with

17    the language that we discussed on Page

18    seven of Exhibit 11 where it says, "DEA

19    has interpreted orders to mean prior to

20    shipment."

21              Do you see that?

22         A.     I do.

23         Q.     Do you agree that it's --

24    this DEA letter from 1984 is consistent

Highly Confidential - Subject to Further Confidentiality Review

1  with that language in the NWDA's

2  suspicious order monitoring system?

3              MR. WEINSTEIN:  Objection to

4         form, foundation, and scope.

5              THE WITNESS:  It appears to

6         be the same statement, yes.

7  BY MR. PIFKO:

8         Q.   Do you believe that this May

9  16th, 1984 letter would have been shared

10  with the NWDA's members?

11             MR. WEINSTEIN:  Objection to

12        form, foundation, and scope.

13             THE WITNESS:  Again, I can't

14        say for certain.  I would imagine

15        that it was.  As correspondence

16        like this would technically be

17        shared with the membership.

18  BY MR. PIFKO:

19        Q.   And again, because HDA and

20  its predecessor entities would act on

21  behalf of the members, not for its own

22  interest, correct?

23             MR. WEINSTEIN:  Objection to

24        form, foundation, and scope.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  Most -- yes,

2      as most trade associations do, on

3      behalf of their members.

4          MR. PIFKO:  Okay.  We're

5      going to hold the deposition of

6      HDA open, given some of the

7      prior -- the deposition of Mr. Fri

8      and some issues we can meet and

9      confer about.  We don't have to

10     waste everyone's time.

11         I'm going to turn it over to

12     the Tennessee counsel.

13         MR. WEINSTEIN:  We can speak

14     outside.  I had no notice, and I

15     do not agree that Tennessee can

16     ask questions.  Not after seven

17     hours.

18         MR. STEWART:  It's properly

19     noticed.

20         MR. WEINSTEIN:  It was not

21     noticed to me.  I'm not having my

22     witness testify after seven hours.

23         THE VIDEOGRAPHER:  So we're

24     going to go off the record

1    obviously.  The time is 5:34 p.m.

2    We're going off the record.

3              (Short break.)

4              THE VIDEOGRAPHER:  The time

5    is 5:35 p.m.  We're back on the

6    record.

7              MR. STEWART:  I'll let you

8    speak.

9              My understanding is that

10   after we've been sitting here for

11   hours and hours, and obviously the

12   expectation was that, as with the

13   deposition earlier in the week,

14   that we would take our two hours

15   of testimony.  I'm being told that

16   you are not going to permit the

17   witness to testify today; is that

18   correct?

19             MR. WEINSTEIN:  That's

20   correct, Mike.  So let me explain.

21             On Tuesday in the deposition

22   of Mr. Fri, you approached me,

23   identified who you were.  That was

24   the first that I had ever heard of

1    anything relating to Tennessee.  I

2    had not received any notice of a

3    deposition with respect to

4    Mr. Fri.

5        You then e-mailed it to me

6    on the spot.  I said that's --

7    this is the first I'm hearing of

8    it.  You said, well, we'd like to

9    ask Mr. Fri an hour's worth of

10   questions, and if you'll agree to

11   that, then in exchange we'll agree

12   not to try to depose him in the

13   Tennessee matter.

14       The plaintiffs' deposition

15   of Mr. Fri had only taken a couple

16   of hours or so, he was already

17   there.  I said, under those

18   circumstances I'll agree.

19       I never received any notice

20   for Mr. Kelly to give deposition

21   today in the Tennessee matter.  In

22   fact, when I spoke to you on

23   Tuesday, you said, well, we can

24   either ask our questions today or

1    we can ask our questions Friday,

2    whatever you want.

3         So I had no -- nor did I get

4    any notice that you were going to

5    try to ask Mr. Kelly any

6    questions.  He's been testifying

7    for seven hours.  So I'm not

8    agreeing to have Mr. Kelly

9    testify.

10        We also reserve all rights

11   as we did on Tuesday as to whether

12   Tennessee is entitled to

13   testimony, given my understanding

14   that your investigation relates to

15   manufacturers, which Mr. Kelly and

16   HDA have very limited testimony to

17   give regarding.  So that's my

18   position.

19        MR. STEWART:  That's fine,

20   but the one area we have a factual

21   disagreement, I'm sure in good

22   faith, is that I think if you look

23   back on our statements to each

24   other, where we articulated our

Highly Confidential - Subject to Further Confidentiality Review

1          deal on Tuesday, I never offered

2          to do that testimony on Friday,

3          because obviously that was a

4          different witness.

5               Now, I understood today we'd

6          be doing the same thing, whereby

7          in exchange for not bringing this

8          witness for a full deposition

9          under Tennessee law, that we would

10         take two hours of testimony today.

11              We noticed this deposition

12         the exact same way we noticed the

13         other deposition.

14              And obviously, unlike

15         Tuesday, I mean, you had notice

16         that we were coming.  We've also

17         been sitting here for eight hours.

18         This is the first time that I've

19         heard of this.

20              So to me, what I would do if

21         I were you is, to allow your

22         witness to go forward and testify.

23         I'm happy to make the same

24         agreement whereby if he'll testify

Highly Confidential - Subject to Further Confidentiality Review

1    for two hours, we won't bring him
2    back in this litigation.
3         Obviously, if not, I believe
4    this is properly noticed.  It's
5    potentially sanctionable to not
6    allow him to testify.
7         Also, we may well simply
8    subpoena him for a Tennessee
9    deposition under Tennessee rules.
10   And if we do so, of course, I want
11   to make sure this is clear, under
12   the Tennessee rules, a deposition
13   has no time and it continues from
14   day-to-day.  And we'll just, if we
15   choose to subpoena him, based on
16   this failure today, obviously we
17   won't restrict our time in any
18   way.
19        To me, it would seem to make
20   more sense since we are all
21   sitting here just to go ahead and
22   take the deposition.  But
23   obviously I can't force you to
24   produce your witness other than to

1    provide you a notice which we have

2    done.

3         MR. WEINSTEIN:  You actually

4    haven't, Mike.  I don't have that

5    notice.

6         Did you -- are you telling

7    me that you sent me that notice?

8    Because you have not.

9         MR. STEWART:  Well, I can

10   tell you -- I'm speaking obviously

11   for my law firm.  I don't handle

12   that notice --

13        MR. WEINSTEIN:  Yeah.

14        MR. STEWART:  -- but I just

15   spoke to the person who provides

16   the notices, whose noticed at

17   least 45 depositions in the opioid

18   litigation.  We've never had a

19   problem like this before today.

20        So I think when I tell you

21   that our firm has properly noticed

22   this, I think it's unlikely that

23   after so many depositions with no

24   hiccoughs and no difficulties,

1        that for some reason this

2        deposition proved to be a problem.

3            MR. WEINSTEIN:  Mike, we are

4        a third party.  Never received

5        your first notice until you handed

6        it to me by e-mail when we were

7        standing out in the hall on

8        Tuesday.  Never received a notice

9        with respect to Mr. Kelly.  So

10       we're not changing our position.

11           MR. STEWART:  I understand.

12       Well, I think -- I think that

13       problem that puts us -- gives us

14       is that then our choice, I

15       suppose, is to seek sanctions in

16       our litigation.

17           Or, and as an alternative,

18       or as coupled with that, to just

19       subpoena your witness and come

20       back for a deposition.

21           MR. WEINSTEIN:  Mike --

22           MR. STEWART:  I think the

23       notion that this testimony is not

24       relevant to the Tennessee

```
 1            litigation and to the opioid

 2            crisis in Tennessee has been amply

 3            disproven by the testimony that's

 4            already been taken today.

 5                 But I don't -- it doesn't

 6            sound like we're going to reach an

 7            agreement --

 8                 MR. WEINSTEIN:  Correct.

 9                 MR. STEWART:  -- so I've

10            told you what we're planning to

11            do.  I've informed you.

12                 And it sounds like with that

13            information you're continuing to

14            hold to your position of not

15            allowing us to take questions

16            today; is that correct?

17                 MR. WEINSTEIN:  That's

18            correct.

19                 MR. STEWART:  Okay.  That's

20            unfortunate.  And obviously we'll

21            both just have to take the steps

22            to do what we have to for our

23            clients.

24                 MR. WEINSTEIN:  That's
```

1      correct.

2              THE VIDEOGRAPHER:  Any other

3      statements on the record?  Is that

4      it for today?

5              MS. MACKAY:  I have a few

6      questions.

7              MR. WEINSTEIN:  Go ahead.

8                  -  -  -

9              EXAMINATION

10                 -  -  -

11  BY MS. MACKAY:

12          Q.    My name is Melanie Mackay,

13  I'm from Dechert.  I'm one of the

14  attorneys who represents Purdue.  I just

15  have a few questions for you.  And I'm

16  sorry, they are on my computer, so if I'm

17  looking at my computer screen I'm not

18  ignoring you.  I'm just looking at my

19  questions?

20          A.    Okay.

21          Q.    So Purdue is a manufacturer.

22  And I believe you said earlier that

23  Purdue is an affiliate member; is that

24  correct?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I believe so, yes.

2          Q.     And can you describe what it

3    means to be an affiliate member?

4          A.     So affiliate members at HDA

5    are manufacturers who our member

6    companies are trading partners with.

7    They are not afforded the same membership

8    status as the core members who are the

9    distributor members.  They are not

10   allowed to participate in committees.

11   They can't be on the board.  They are

12   welcome to participate in HDA meetings

13   and external events if they register for

14   those.  But as far as communication

15   internal, particularly in government

16   affairs, we deal strictly with the HDA

17   core members.

18         Q.     Plaintiff's counsel today

19   often used the term "HDA members."  And I

20   just want to clarify how you understand

21   that term.

22                Unless counsel specifically

23   referred to manufacturers, did you

24   understand the term "members" to mean

1 core members?

2      A.   Yes.  I believe we -- did we

3 not stipulate to that early on?  Yes,

4 that's what I'm -- yes, that was my

5 understanding.

6      Q.   Okay.  And again, the core

7 members are distributors?

8      A.   That's correct.

9      Q.   You may have already

10 answered this question for me.  But are

11 manufacturers members of any committees

12 or other groups that fall under the

13 umbrella of the government affairs

14 department?

15      A.   The only -- the only

16 committee within HDA that manufacturers

17 are allowed to participate in is there's

18 a government advisory -- manufacturers

19 government advisory committee that meets

20 twice a year.  And that is essentially an

21 opportunity for us to provide an update

22 on HDA government affairs activities.

23      But that does not meet, it

24 does not meet in person.  We do not

Highly Confidential - Subject to Further Confidentiality Review

1    convene interaction.  We just do an

2    update twice a year.

3           Q.    Did Purdue or any other

4    manufacturer ever serve on the regulatory

5    affairs committee?

6           A.    No.

7           Q.    And I believe you testified

8    earlier that the -- the regulatory

9    affairs committee created the -- HDA's

10   industry compliance guidelines; is that

11   correct?

12          A.    That's -- that's correct.

13          Q.    The industry compliance

14   guidelines are guidelines for

15   distributors; is that right?

16          A.    That's correct.

17          Q.    They are not meant to be

18   implemented by manufacturers?

19          A.    That is correct.

20          Q.    You briefly testified about

21   the drug diversion DEA strategy task

22   force.  Do you recall that?

23          A.    I do.

24          Q.    Did manufacturer members

1    serve on that task force?

2         A.    They did not.

3         Q.    Switching gears back to the

4    industry compliance guidelines, did

5    manufacturers participate in the

6    development and drafting of the industry

7    compliance guidelines?

8         A.    They did not.

9         Q.    Did the Pain Care Forum

10   participate in the development and

11   drafting of the industry compliance

12   guidelines?

13        A.    They did not.

14             MS. MACKAY:  That's the only

15        questions I have for you.  Thank

16        you.

17             MR. WEINSTEIN:  I'd like to

18        designate the transcript as

19        confidential, please.

20             THE VIDEOGRAPHER:  Anybody

21        else?  Okay.  Do you want to close

22        the record?

23             The time is 5:45 p.m., May

24        10, 2019.  We are going off the

1    record.

2          This ends this videotape

3    session.

4          (Excused.)

5          (Deposition concluded at

6    approximately 5:45 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2                    CERTIFICATE

3

4

5            I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.

7

            It was requested before
8  completion of the deposition that the
   witness, PATRICK KELLY, have the
9  opportunity to read and sign the
   deposition transcript.

10

11

12     _Michelle L Gray_____
       MICHELLE L. GRAY,
13     A Registered Professional
       Reporter, Certified Shorthand
14     Reporter, Certified Realtime
       Reporter and Notary Public
15     Dated:  May 13, 2019

16

17

18            (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition

 4    over carefully and make any necessary

 5    corrections.  You should state the reason

 6    in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8              After doing so, please sign

 9    the errata sheet and date it.

10              You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14              It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              -   -   -   -   -   -

                       E R R A T A

 2              -   -   -   -   -   -

 3

 4     PAGE   LINE   CHANGE

 5     _____  _____  _____

 6        REASON:    _____

 7     _____  _____  _____

 8        REASON:    _____

 9     _____  _____  _____

10        REASON:    _____

11     _____  _____  _____

12        REASON:    _____

13     _____  _____  _____

14        REASON:    _____

15     _____  _____  _____

16        REASON:    _____

17     _____  _____  _____

18        REASON:    _____

19     _____  _____  _____

20        REASON:    _____

21     _____  _____  _____

22        REASON:    _____

23     _____  _____  _____

24        REASON:    _____
```

Highly Confidential - Subject to Further Confidentiality Review

1

2               ACKNOWLEDGMENT OF DEPONENT

3

4          I,_____, do

5   hereby certify that I have read the

6   foregoing pages, 1 - 448, and that the

7   same is a correct transcription of the

8   answers given by me to the questions

9   therein propounded, except for the

10  corrections or changes in form or

11  substance, if any, noted in the attached

12  Errata Sheet.

13

14

15

16  _____

17   PATRICK KELLY                      DATE

18

19

20  Subscribed and sworn

    to before me this

21  _____ day of _____, 20_____.

22  My commission expires:_____

23

    _____

24   Notary Public

Highly Confidential - Subject to Further Confidentiality Review

1    LAWYER'S NOTES

2    PAGE   LINE

3    _____  _____   _____

4    _____  _____   _____

5    _____  _____   _____

6    _____  _____   _____

7    _____  _____   _____

8    _____  _____   _____

9    _____  _____   _____

10   _____  _____   _____

11   _____  _____   _____

12   _____  _____   _____

13   _____  _____   _____

14   _____  _____   _____

15   _____  _____   _____

16   _____  _____   _____

17   _____  _____   _____

18   _____  _____   _____

19   _____  _____   _____

20   _____  _____   _____

21   _____  _____   _____

22   _____  _____   _____

23   _____  _____   _____

24   _____  _____   _____