```
 1              THE UNITED STATES DISTRICT COURT

             FOR THE NORTHERN DISTRICT OF OHIO

 2                    EASTERN DIVISION

 3                      -  -  -

 4    IN RE:  NATIONAL     :

      PRESCRIPTION OPIATE :    MDL NO. 2804

 5    LITIGATION          :

      ----------------------------------------

 6                        :    CASE NO.

      THIS DOCUMENT       :    1:17-MD-2804

 7    RELATES TO ALL CASES:    Hon. Dan A. Polster

 8                      -  -  -

 9              Thursday, April 25, 2019

10                      -  -  -

11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12              CONFIDENTIALITY REVIEW

13                      -  -  -

14        Videotaped deposition of DAVID A.

15    KESSLER, M.D. (Day 1), taken pursuant to

16    notice, was held at Baron & Budd, 600 New

17    Hampshire Avenue NW, Floor G, Washington, DC

18    20037, beginning at 9:28 a.m., on the above

19    date, before Lisa V. Feissner, RDR, CRR, Notary

20    Public.

21

22                      -  -  -

23              GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

24                  deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2       LEVIN PAPANTONIO THOMAS MITCHELL
         RAFFERTY & PROCTOR PA
 3       BY: TROY A. RAFFERTY, ESQUIRE
         316 South Baylen Street - Suite 600
 4       Pensacola, Florida 32502
         (850) 435-7163
 5       trafferty@levinlaw.com
         -- Representing Plaintiffs
 6
         SEEGER WEISS LLP
 7       BY: PARVIN K. AMINOLROAYA, ESQUIRE
         BY: KSENIYA LEZHNEV, ESQUIRE
 8       77 Water Street - 8th Floor
         New York, NY 10005
 9       212-584-0700
         paminolroaya@seegerweiss.com
10       klezhnev@seegerweiss.com
         -- Representing Plaintiffs
11
         LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
12       BY: LEXI J. HAZAM, ESQUIRE
         275 Battery Street - 29th Floor
13       San Francisco, CA 94111-3339
         (415) 956-1000
14       lhazam@lchb.com
         -- Representing Plaintiffs
15
         NAPOLI SHKOLNIK PLLC
16       BY: HUNTER J. SHKOLNIK, ESQUIRE
         360 Lexington Avenue - 11th Floor
17       New York, NY 10017
         (844) 230-7676
18       hunter@napolilaw.com
         -- Representing Cuyahoga County Plaintiffs
19
         SPANGENBERG SHIBLEY & LIBER LLP
20       BY: PETER H. WEINBERGER, ESQUIRE
         1001 Lakeside Avenue East - Suite 1700
21       Cleveland, OH 44114-1149
         (216) 600-0114
22       pweinberger@spanglaw.com
         -- Representing Plaintiffs
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Continued)
 2      MOTLEY RICE LLC
        BY: LINDA SINGER, ESQUIRE
 3      (via video stream / realtime stream)
        401 9th St. NW, Suite 1001
 4      Washington, DC 20004
        (202) 386-9626
 5      lsinger@motleyrice.com
        -- Representing Plaintiffs
 6
        BARON & BUDD P.C.
 7      WILLIAM G. POWERS, ESQUIRE
        NOAH RICH, ESQUIRE
 8      (via video stream / realtime stream)
        600 New Hampshire Avenue, NW
 9      The Watergate, Suite 10-A
        Washington, DC 20037
10      (202) 333-4562
        wpowers@baronbudd.com
11      nrich@baronbudd.com
        -- Representing Plaintiffs
12
        SKIKOS, CRAWFORD, SKIKOS & JOSEPH, LLP
13      BY: MARK G. CRAWFORD, ESQUIRE
        (via video stream / realtime stream)
14      One Sansome Street - Suite 2830
        San Francisco, California 94104
15      (415) 546-7300
        mcrawford@skikos.com
16      -- Representing Plaintiffs
17      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
        BY: MATIAS BUSTAMANTE, ESQUIRE
18      (via video stream / realtime stream)
        275 Battery Street - 29th Floor
19      San Francisco, CA 94111
        (415) 956-1000
20      mbustamante@lchb.com
        -- Representing Plaintiffs
21
22
23
24
```

```
 1    APPEARANCES:  (Continued)
 2       MORGAN & MORGAN
         BY: EMILY JEFFCOTT, ESQUIRE
 3       (via video stream / realtime stream)
         700 South Palafox Street - Suite 95
 4       Pensacola, FL 32502
         (850) 316-9074
 5       ejeffcott@forthepeople.com
         -- Representing Plaintiffs
 6
         LEVIN PAPANTONIO THOMAS MITCHELL
 7       RAFFERTY & PROCTOR PA
         BY: NEIL E. McWILLIAMS, ESQUIRE
 8       (via video stream / realtime stream)
         316 South Baylen Street - Suite 600
 9       Pensacola, Florida 32502
         (850) 435-7138
10       nmcwilliams@levinlaw.com
         -- Representing Plaintiffs
11
         DECHERT LLP
12       BY: HOPE S. FREIWALD, ESQUIRE
         Cira Centre
13       2929 Arch Street
         Philadelphia, PA, 19104-2808
14       (215) 994-2514
         hope.freiwald@dechert.com
15          and
         DECHERT LLP
16       ALEJANDRO HERRERA, ESQUIRE
         Three Bryant Park
17       1095 Avenue of the Americas
         New York, NY 10036-6797
18       (212) 698-3500
         alejandro.herrera@dechert.com
19       -- Representing the Purdue Defendants
20       ARNOLD & PORTER KAYE SCHOLER LLP
         BY: JOSHUA M. DAVIS, ESQUIRE
21       BY: JOHN CELLA, ESQUIRE
         601 Massachusetts Avenue, NW
22       Washington, DC 20001-3743
         (202) 942-5743
23       joshua.davis@arnoldporter.com
         john.cella@arnoldporter.com
24       -- Representing the Endo and Par Defendants
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Continued)
 2       KIRKLAND & ELLIS LLP
         BY: JENNIFER LEVY, ESQUIRE
 3       1301 Pennsylvania Avenue, NW
         Washington, DC 20004
 4       (202) 389-5211
         jennifer.levy@kirkland.com
 5           and
         KIRKLAND & ELLIS LLP
 6       BY: MICHAEL LeFEVOUR, ESQUIRE
         300 North LaSalle
 7       Chicago, IL 60654
         (312) 862-3728
 8       michael.lefevour@kirkland.com
         -- Representing the Allergan Defendants
 9
         O'MELVENY & MYERS LLP
10       BY: AMY LAURENDEAU, ESQUIRE
         610 Newport Center Drive
11       17th Floor
         Newport Beach, CA 92660
12       (949) 823-7926
         alaurendeau@omm.com
13           and
         O'MELVENY & MYERS LLP
14       BY: VINCENT S. WEISBAND, ESQUIRE
         Times Square Tower
15       7 Times Square
         New York, NY 10036
16       (212) 326-2228
         vweisband@omm.com
17       -- Representing the Janssen Defendants
18       MORGAN LEWIS & BOCKIUS LLP
         BY: WENDY WEST FEINSTEIN, ESQUIRE
19       One Oxford Centre
         Thirty-Second Floor
20       Pittsburgh, PA 15219-6401
         (410) 560-7455
21       wendy.feinstein@morganlewis.com
         -- Representing the Teva Defendants
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Continued)
 2      MORGAN LEWIS & BOCKIUS LLP
        BY: JOHN P. LAVELLE, JR., ESQUIRE
 3      1701 Market Street
        Philadelphia, PA 19103-2921
 4      (215) 963-4824
        john.lavelle@morganlewis.com
 5      -- Representing the Defendant
           Rite-Aid of Maryland, Inc.
 6
        REED SMITH LLP
 7      BY: STEVEN J. BORANIAN, ESQUIRE
        101 Second Street
 8      Suite 1800
        San Francisco, CA 94105
 9      (415) 659-5980
        sboranian@reedsmith.com
10      -- Representing the Defendant
           AmerisourceBergen Drug Corporation
11
        JONES DAY
12      BY: BRANDY H. RANJAN, ESQUIRE
        325 John H. McConnell Boulevard
13      Suite 600
        Columbus, OH 43215-2673
14      (614) 469-3939
        branjan@jonesday.com
15      -- Representing the Defendant Walmart Inc.,
           f/k/a Wal-Mart Stores, Inc.
16
        ROPES & GRAY LLP
17      BY: RICHARD L. GALLAGHER, ESQUIRE
        Three Embarcadero Center
18      San Francisco, CA 94111-4006
        (415) 706-1033
19      richard.gallagher@ropesgray.com
            and
20      ROPES & GRAY LLP
        BY: CHRISTINE D'AURIA, ESQUIRE
21      Prudential Tower
        800 Boylston Street
22      Boston, MA 02199-3600
        (617) 235-4741
23      christine.dauria@ropesgray.com
        -- Representing the Defendant
24         Mallinckrodt LLC
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Continued)
 2     THE PIORKOWSKI LAW FIRM, PC
       BY: JOSEPH D. PIORKOWSKI, JR., ESQUIRE
 3     1800 K Street, NW
       Suite 1000
 4     Washington, DC 20006
       (202) 223-5535
 5     jpiorkowski@lawdoc1.com
       -- Representing the Defendant
 6        McKesson Corporation
 7     FOX ROTHSCHILD LLP
       BY: ZACHARY MARTIN, ESQUIRE
 8     (via teleconference)
       Stone Manor Corporate Center
 9     2700 Kelly Road
       Suite 300
10     Warrington, PA 18976
       (215) 918-3680
11     zmartin@foxrothschild.com
       -- Representing the Defendant
12        Prescription Supply, Inc.
13     BARTLIT BECK LLP
       BY: SHARON DESH, ESQUIRE
14     (via teleconference)
       54 West Hubbard Street
15     Suite 300
       Chicago, IL 60654
16     (312) 494.4445
       Sharon.Desh@BartlitBeck.com
17     -- Representing the Defendant
          Walgreens
18
       LOCKE LORD LLP
19     BY: SARAH LANCASTER, ESQUIRE
       (via video stream / realtime stream)
20     600 Congress Avenue - Suite 2200
       Austin, TX 78701
21     512-305-4756
       slancaster@lockelord.com
22     -- Representing Defendants Henry
          Schein, Inc., and Henry Schein
23        Medical Systems, Inc.
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    ALSO PRESENT:

 2        CHRIS RITONA, Videographer
          Golkow Litigation Services

 3

          GERARD MAGLASANG, Legal Assistant

 4        SEEGER WEISS LLP

 5

 6    ALSO PRESENT via video stream/realtime stream:

 7        JENNA FORSTER
          Motley Rice LLC

 8

          GRETCHEN KEARNEY

 9        EMMA KABOLI
          Baron & Budd P.C.

10

          SCOTT SIEGEL

11        CHARLES BACHMANN
          Seeger Weiss LLP

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -
 2                 I N D E X
 3                    -  -  -
 4   Testimony of:  DAVID A. KESSLER, M.D.
 5      By Ms. Freiwald              12
        By Mr. Boranian             410
 6      By Mr. Lavelle              412
 7
 8                    -  -  -
 9              E X H I B I T S
10                    -  -  -
     KESSLER
11   EXHIBIT NO.    DESCRIPTION              PAGE
12   1      Expert Report, David Kessler, M.D.   31
13   2      2019.04.23 Dr. David Kessler         91
            Supplemental Reliance List
14
     3      Errata Sheet for the 3.26.2019       93
15          Expert Report of
            David E. Kessler, M.D.
16
     4      Dear Healthcare Professional        320
17          letter from Purdue dated
            July 18, 2001 with attachments
18          PDD1501710124 - 1501710126
            PDD1501610836 - 1501610844
19
     5      OxyContin label                     320
20          Revised: 04/2014
            PPLP003275296 - 003275307
21
     6      OxyContin label                     320
22          Revised: 12/2016
            Reference ID: 4326201
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          -   -   -
 2                     E X H I B I T S
                          (cont'd)
 3
                            -   -   -
 4    KESSLER
      EXHIBIT NO.      DESCRIPTION                    PAGE
 5
      7        Transmittal of Advertisements           320
 6             and Promotional Labeling for
               Drugs for Human Use, dated 7/11/96,
 7             with attachment
               PDD1501603661 - 1501603667
 8
      8        Letter from Woodcock to Blumenthal      350
 9             dated SEP 2008
               re: Docket No. FDA-2004-P-0294
10
      9        Letter from Woodcock to Kolodny         374
11             dated SEP 10 2013
               re: Docket No. FDA-2012-P-0818
12
     10        Letter from DHHS / FDA to               383
13             The Purdue Frederick Company
               dated MAR 13 1996 re: NDA#20-553
14             PPLP000614887 - 000614888
15   11        Dear Healthcare Practitioner            390
               letter from Purdue Pharma L.P.
16             dated January 2003
               PDD8013144610 - 8013144611
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -

 2            DEPOSITION SUPPORT INDEX

 3                      -   -   -

 4  Direction to Witness Not to Answer
    Page Line      Page Line      Page Line
 5    20    15

 6

    Request for Production of Documents
 7  Page Line      Page Line      Page Line
    (None)

 8

 9  Stipulations
    Page Line      Page Line      Page Line
10  12       2

11

    Question Marked
12  Page Line      Page Line      Page Line
    (None)

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                        -  -  -

2            (It is hereby stipulated and agreed

3       by and among counsel that sealing,

4       filing and certification are waived; and

5       that all objections, except as to the

6       form of the question, will be reserved

7       until the time of trial.)

8                        -  -  -

9            VIDEO OPERATOR:  We are now on the

10      record.  My name is Chris Ritona.  I am

11      a videographer for Golkow Litigation

12      Services.

13           Today's date is April 25th, 2019,

14      and the time is approximately 9:28 a.m.

15           This video deposition is being held

16      at Baron & Budd, 600 New Hampshire

17      Avenue NW, The Watergate, Washington,

18      D.C. in the matter of National

19      Prescription Opiate Litigation MDL

20      Number 2804, Case Number 17-MD-2804, for

21      the United States District Court,

22      Northern District of Ohio, Eastern

23      Division.

24           The deponent today is David A.
```

1        Kessler, M.D., and all counsel will be

2        noted upon the stenographic record.

3             The court reporter today is Lisa

4        Feissner, and she will now please swear

5        in the witness.

6             DAVID A. KESSLER, M.D.,

7    having been first duly sworn, was examined and

8    testified as follows:

9                  EXAMINATION

10   BY MS. FREIWALD:

11        Q.   Dr. Kessler, I'm Hope Freiwald.  I

12   represent the Purdue defendants in this

13   litigation, but I'm going to be asking

14   questions on behalf of the defendant group as

15   well this morning in addition to questions with

16   regard to Purdue specifically.  Okay?

17        A.   Good morning.

18        Q.   Good morning.

19             Dr. Kessler, do you stand by your

20   prior statements that FDA bears

21   responsibilities for mistakes made regarding

22   prescription opioids?

23        A.    I don't believe that's an exact

24   quote.  If you can show me my quotes, I'm happy

Highly Confidential - Subject to Further Confidentiality Review

1   to look at them one by one.  That doesn't sound

2   like me, what you just stated.

3        Q.   Do you stand by the principle that

4   the FDA bears some responsibility in the opioid

5   crisis?

6             MR. RAFFERTY:  Object to the form.

7        A.   I think many named parties bear

8   responsibility in the opioid crisis.  You've

9   got to be a little more specific.  It's a very

10  general statement.

11            If you want to talk about specific

12  conduct of FDA, I'm happy to discuss it, but

13  those kind of broad statements are hard to

14  answer in the abstract.

15       Q.   You have stated publicly that the

16  FDA made mistakes with regard to prescription

17  opioids?

18       A.   If you have a foundation, Counsel,

19  for that quote, please show it to me, because

20  I'm not sure I said it exactly that way.

21       Q.   Do you remember if you conveyed

22  that concept?

23       A.   I remember concepts that I

24  conveyed, maybe not every -- maybe not every

Highly Confidential - Subject to Further Confidentiality Review

1    concept over the last 20 years.  But you've got

2    to be specific, Counselor.

3            And just -- I remember -- I'd be

4    happy to tell you what I believe I've said, but

5    if you have specific quotes, I'd be happy to

6    answer them and respond.

7        Q.   Sitting here today, do you believe

8    that the FDA bears responsibility with regard

9    to the opioid crisis?

10       A.   I think, looking back, as some of

11   my colleagues at FDA said, had FDA known

12   certain things, had they known the extent of

13   the marketing that the companies would do, I

14   think FDA would have and should have done

15   things differently.

16           But I don't think -- certainly when

17   I was at the FDA, had no clue to the extent

18   that the companies -- again, I don't want to

19   talk in general terms, but the kind of

20   marketing pushes that your client and others

21   did.

22           And I think if FDA either -- I

23   think the major mistake FDA made was, in

24   essence, it trusted the manufacturers too much.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   So you're saying they had no clue

2   about the marketing at any point in the last

3   almost 20 years?

4      A.   No, that's not --

5           MR. RAFFERTY:  Object to the form.

6      A.   That's not what I said.  What I

7   said were, obviously, your client pled guilty.

8   FDA knew certain things, as that came out of

9   that criminal investigation, at different

10  points in time.

11          Let's talk -- tell me what year.

12  We can talk about what --

13     Q.   You made a broad statement --

14          MR. RAFFERTY:  Let the witness

15          finish, please.

16     A.   Let me give you an example.  Let me

17  give you an example.

18          In 1994, 1993, I confronted an

19  opioid issue when I was at the agency and made

20  certain decisions in changing the label on one

21  product that's at issue here, okay, and tried

22  to narrow the indications after a certain

23  tragedy happened.

24          I had no idea that the company

1    would go ahead and market the compound broadly

2    after that.

3         Q.   Okay.  So "no clue" is your

4    testimony.

5         A.   No, no, no.  No --

6              MR. RAFFERTY:  Objection to form.

7         Q.   Do you stand by your --

8         A.   No, no, no.  Ma'am, that's not

9    correct.  Okay?

10             I don't think the FDA, even to this

11   day, okay, has an understanding of the extent.

12   If you look at the call notes of your client in

13   1996 and 1997 of using these -- I mean, for

14   example, OxyContin --

15        Q.   Sir, I'm going to move to strike.

16   I'm asking a different question.

17        A.    I want to finish my answer.

18             MR. RAFFERTY:  You can move to

19        strike after he finishes his answer.

20        A.   Okay.  Okay.  I don't think FDA, to

21   this day, has a real, full idea of the extent,

22   one, of the marketing.

23             Look at the call notes, as I was

24   saying, in 1996, 1997, of what was going on, of

1    using, for example, OxyContin on junkies in the

2    call notes.  I mean, the FDA has any -- has a

3    concept of that.

4           Now, saying that, I can't tell you

5    what every investigator, what everyone at DOJ

6    over the years knows.

7           But I can certainly tell you, when

8    I was at the agency, the extent of the

9    marketing, the sophistication of the marketing,

10   the aggressive nature of the marketing, none

11   of -- that was not understood, certainly by me.

12       Q.  Do you stand by your prior

13   statements that DEA bears some responsibility?

14          MR. RAFFERTY:  Object to the form.

15       A.  Ma'am, if you have a foundation for

16   that question, I'd like to see it, because I'm

17   not sure I've ever said anything like that.

18          But if you have -- but, again,

19   if you have some statements about DEA that I've

20   said -- I usually don't talk in terms of the

21   DEA, but if you have certain statements, happy

22   to look at that.

23       Q.  Do you stand by prior statements

24   that doctors bear responsibility?

Highly Confidential - Subject to Further Confidentiality Review

 1                  MR. RAFFERTY:  Object to the form.

 2         A.    Again, if you have prior

 3   statements, I'd like to see it so I can

 4   respond.  I'm happy to talk generally, if you'd

 5   like, about that, if you want.

 6         Q.    Sitting here today, you don't

 7   recall your prior statements about doctors

 8   bearing responsibility?

 9         A.    Ma'am, I've been interviewed

10   numerous times on this subject.  I've written

11   editorials on this subject.  I've had numerous

12   conversations on this.

13                I tend to remember my statements

14   pretty vividly, all right, but again, if you

15   have statements, I'd be happy to respond to

16   each and every one of them.

17         Q.    Is it your testimony that in

18   preparation for today's deposition, you did not

19   review your statements in public interviews --

20                MR. RAFFERTY:  Objection.

21         Q.    -- with regard to prescription

22   opioids?

23                MR. RAFFERTY:  Object to the form.

24         A.    Do you have a basis to ask that

1  question?

2       Q.   Sure.

3       A.   Okay.  I've not testified that I

4  have not done that.  You said --

5       Q.   I'm asking a question.  Is it your

6  testimony that in preparation for today's

7  deposition, you did not review your prior

8  public statements with regard to prescription

9  opioids?

10            MR. RAFFERTY:  I think I'm going

11        to -- I'm going to object.  And,

12        actually, I think that starts -- what he

13        did to prepare and how he prepared is

14        work product.

15            So you don't have to answer that

16        question.

17            MS. FREIWALD:  You're instructing

18        him not to answer what he did in

19        preparation for today?

20            MR. RAFFERTY:  I am.  The way you

21        phrased that question, yes.

22       Q.   With regard to preparing for

23  today's deposition, did you review any prior

24  public statements you have given with regard to

Highly Confidential - Subject to Further Confidentiality Review

1  prescription opioids?

2      A.   Maybe not -- it depends what -- the

3  point where I was preparing.

4           I certainly, over the last period

5  of time, have looked, for example, at certain

6  things I have written.  So I have looked at

7  that.  I'm not sure they were done in the last

8  week or so, quote, in preparation for this, but

9  I certainly have looked at some of the

10  statements that I have made.

11     Q.   In the last week or so, have you

12  looked at any of your press statements?

13     A.   I'm not sure I've looked in the

14  last week or so.  I'd have -- I just don't have

15  a recollection exactly.  I remember looking at

16  an editorial.  I think it was a couple of weeks

17  ago.  That's what I recall.

18     Q.   In preparing your written report,

19  did you review any of the interviews you've

20  previously given with regard to prescription

21  opioids?

22     A.   Well, my report was done over a

23  period of time.  It was rather lengthy.  So I

24  actually did interviews during the

Highly Confidential - Subject to Further Confidentiality Review

1    preparation -- during the report.

2          So of course the answer would be

3    "yes" because I actually did some interviews

4    while I was -- I mean, you know, during that --

5    during that year-plus period of time.

6          Q.   I wouldn't consider that reviewing

7    if you gave an interview.

8          I'm asking if you reviewed any of

9    your prior interviews during the period that

10   you were preparing your report.

11         A.   I have -- I remember reading -- the

12   answer is, yes, I remember reading -- because I

13   said one thing that I have written, I asked

14   counsel to try to find.

15         MR. RAFFERTY:  Object to the form.

16         You don't have to discuss your --

17         THE WITNESS:  Okay.

18         MR. RAFFERTY:  -- interactions with

19      counsel, Doctor.

20         Q.   I wasn't calling for that in my

21   question.

22         I was just asking whether, in

23   preparing your report, you reviewed any of your

24   prior press interviews.

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Again, leave aside -- in

2   preparing -- in preparing my report, the answer

3   is, yes, I'm sure I did.

4      Q.    Are any of them attached or noted

5   as reliance materials?

6      A.    I tend not to rely on myself, sort

7   of a loop that one gets into, but --

8      Q.    Do you stand by prior statements

9   that other governmental officials bear

10  responsibility with regard to the opioid

11  crisis?

12         MR. RAFFERTY:  Object to the form.

13     A.    Again, you're putting statements --

14  you're alleging statements that I've made that

15  don't sound like me, and -- I mean, if you want

16  to give me the exact wording, I'd be happy to

17  respond.  That just doesn't sound like me.

18     Q.    Sitting here today, do you believe

19  that different government agencies bear

20  responsibility with regard to prescription

21  opioids?

22     A.    Yes.  I mean, I just -- I told you

23  yes.  I think that there was too much trust of

24  the industry, too much sense that the -- what

1    FDA thought the indication was would be

2    followed.

3                I don't think anybody -- certainly

4    I didn't anticipate that certain companies

5    would drive a truck through the marketing,

6    broaden the indication, and take any fuzziness

7    in the label and using it as a marketing

8    platform.

9                I think there are statements where,

10   after FDA meetings, your client literally

11   celebrated the things that I know were not the

12   way FDA viewed it but were able to get things

13   past the FDA.  So I think that was a mistake.

14               Given how the manufacturers

15   promoted -- again, I want to be careful.  I

16   don't want to use terms too broadly.  I'm happy

17   to talk about specifics.

18               But certainly with regard to your

19   client, given how your client and certainly

20   others promoted it, I think it was a mistake,

21   how -- and FDA could have been -- they could

22   have been stronger.

23          Q.   Other than being -- you used the

24   word "trust."  Other than putting too much

Highly Confidential - Subject to Further Confidentiality Review

1   trust in industry, to use your words, do you

2   believe that other state and governmental

3   agencies bear responsibility?

4          A.   You said state and local or state

5   and government --

6          Q.   Other governmental agencies.  I'll

7   just make it broad.

8          A.   I mean, my expertise, Counselor,

9   is really in FDA.

10         Q.   Okay.

11         A.   So --

12         Q.   So I'll modify my question.  I'll

13  modify my question.

14              Other than putting trust in

15  industry, do you believe that FDA bears

16  responsibility with regard to prescription

17  opioids?

18         A.   There may be --

19              MR. RAFFERTY:  Object to form.

20         A.   There may be specific, you know,

21  instances where we can talk about where I think

22  FDA could have done better.

23              I said one publicly.  FDA approved

24  a super-potent fentanyl compound recently at

1    the request of the Department of Defense.

2              I've had criticisms.  I sort of

3    understand why FDA may have done that.  I

4    probably would have done something else.  I

5    would have done it a different way.

6              But I certainly respect how the

7    agency -- why the agency, because of the

8    Department of Defense, needed to do what it

9    did.

10        Q.   Okay.  We'll talk about specific

11   examples a little bit later.

12             But with regard to doctors, other

13   than trust, do you believe doctors bear

14   responsibility with regard to prescription

15   opioids?

16             MR. RAFFERTY:  Object to the form.

17        A.   As I said, I think -- Counselor, I

18   think a lot of people bear, I mean, some

19   responsibility.  Some more than others.

20             There's obviously -- there's no

21   doubt in my mind -- I mean, if you look, for

22   example, you know, at the documents in the

23   record, it's quite clear that there were

24   individual physicians who were the top decile

1    who were cash, who were prescribing 80s or even

2    160s at a rate that is hard to fathom.

3              So they certainly -- there were

4    doctors who were arrested.  They were -- and

5    again, happy to talk about that.  So they

6    certainly bear responsibility for this.

7              I don't think that the medical

8    profession -- I mean, the extent -- I mean, it

9    is almost breath-taking, the amount of

10   influence that the market -- that I think the

11   defendants collectively had on the medical

12   profession.

13             The sophistication to try to

14   influence medicine I think is almost

15   breath-taking.  I almost said -- and I thought

16   I had seen a lot.

17             And I think to some extent the

18   medical profession, even to this day, doesn't

19   understand, for example, how KOLs are hired and

20   mapped to the extent that they influence

21   doctors and the return on investment is known

22   to the company by the KOLs and how they get --

23   they can track how they change prescribing.

24             I think to this day, the medical

1  profession does not fully understand the

2  influence the promotional activities, certainly

3  in this instance, had on it.

4      Q.   Okay.  We'll talk about that later.

5           It's been over two decades since

6  you left the FDA?

7      A.   You're dating me.  1997.

8      Q.   Okay.  When you were at the FDA,

9  you were never part of the advertising and

10  marketing division, correct?

11     A.   That would probably -- that would

12  probably be incorrect, as stated just

13  generally.

14          Obviously I was in charge of the

15  agency.  I think if you asked, for example, Ann

16  Witt or Lucy Rose, they'd probably say, hey, I

17  was part of it.

18     Q.   You were never within the division?

19     A.   Can I finish my answer, please?

20          I ran the division.  I revitalized

21  the division.  Those directors and people in

22  DDMAC, is what it was called, reported to me

23  directly.  We met.  I think I would be -- fair

24  to say that I was involved.

1          You know, obviously I was doing

2    other things, so I couldn't do anything, but I

3    sort of tried to revitalize that division

4    within CDER.

5          Q.   Sir, it's a simple question.

6          I understand you were Commissioner.

7    And as Commissioner, the buck stopped with you,

8    correct?

9          A.   That's fair.

10         Q.   And you had oversight over all the

11   divisions?

12         A.   You're missing my point.

13         Q.   No.  I want to be clear what my

14   question is.

15         A.   Okay.

16         Q.   Were you ever within the division

17   that was once called DDMAC and is now called

18   OPDP?

19         MR. RAFFERTY:  Object to the form.

20         A.   And I think I --

21         MR. RAFFERTY:  Asked and answered.

22         A.   I think I answered that.  I think

23   if you ask Lucy Rose or Ann Witt, who ran that,

24   they would say that I was pretty tied to that

Highly Confidential - Subject to Further Confidentiality Review

1   division for a period of time.  Certainly not

2   on everything.

3              Obviously if you looked at my

4   organizational chart, it didn't say DDMAC,

5   right.  But I did meet with them, and I did --

6   I put them in as leaders, and they, in

7   essence -- we worked together was probably a

8   best way to characterize it.

9        Q.   There's no org chart that would

10   ever show you as part of DDMAC?

11        A.   It would show me -- as reporting to

12   me.

13        Q.   Okay.  And you started doing

14   litigation work after you left FDA?

15        A.   I use the term "litigation work" --

16   actually, is that correct?

17              I was the expert witness in the

18   Department of -- I'm just trying to think --

19   for the Department of Justice initially.  So I

20   testified there.  I have testified, I think is

21   the right way to say it.

22        Q.   How much money over the last

23   20-some years have you made testifying as a

24   witness for plaintiffs' lawyers?

1    A.   Well, again, for plaintiffs'

2  lawyers, I don't -- I'm not sure.  I testified

3  for certain clients, but -- on certain -- a

4  majority of that is on the plaintiffs' side, a

5  substantial majority.  I've made millions of

6  dollars.

7    Q.   10, 20, 30?

8    A.   I have no idea, but I would not

9  think that it would be that high.  But I have

10  no idea.  I have no idea.

11    Q.   You have no idea how much money

12  you've made over the last ten years?

13    MR. RAFFERTY:  Object to the form.

14    A.   No, I certainly don't have any idea

15  of that.

16    Q.   I want to show you --

17    MS. FREIWALD:  Can I get a --

18    (Exhibit Kessler-1 marked for

19    identification and attached to the

20    transcript.)

21  BY MS. FREIWALD:

22    Q.   Exhibit 1 is your report.  It

23  looked to me like you have a copy of your

24  report with you.  Or do you not?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes, I have a spiral copy.

2    Q.    Okay.  You have some -- are those

3  just tabs that you have in there, or is there

4  something else that you have inside your

5  report?

6    A.    I have a couple of other documents

7  in the back, but this is my report, and these

8  are tabs that are just telling me where certain

9  things are.

10    Q.    Okay.  So --

11    A.    I think it --

12    Q.    -- I have an unbound version of the

13  report, because I thought it would be easier

14  for the court reporter.  We can also give you a

15  bound version if -- it's marked as Exhibit 1 --

16  unless you want to use your version.

17        The version that I have has all of

18  the exhibits and the CV, with the exception of

19  the one that was produced natively.

20        MS. FREIWALD:  And can I get

21        the native -- there's a native exhibit

22        also.

23        MR. RAFFERTY:  It's in the back of

24        that one.

1    Q.   Okay.  So it's in the back of that

2  as well.

3          Do you have your report and your CV

4  and your exhibits, or do you need a copy from

5  me?

6    A.   No, I have it.  Thank you,

7  Counselor.

8          MS. FREIWALD:  Do you need a copy,

9       Troy?

10         MR. RAFFERTY:  That's all right.

11      I've got it.

12   Q.   Now, while you were at FDA, you

13  never formed an opinion, did you, that opioids

14  should not be available and used as indicated?

15   A.   I think the record reflects my view

16  certainly on specific compounds.  If you look

17  at the record and statements to the Hill that

18  were made by the agency -- I'm happy to tell

19  you what my statements were on those opioids.

20   Q.   You never took the position

21  generally that opioids should not be available

22  for the treatment of moderate to severe pain?

23   A.   I took a very specific position

24  with regard to Duragesic that -- if you look at

Highly Confidential - Subject to Further Confidentiality Review

1    a letter to -- for example, to Connie Mack, who

2    is senator of Florida, on Duragesic, I took a

3    very specific position that it was appropriate

4    to use opioids in cancer patients and that

5    there may be, on a very restricted basis,

6    non-cancer patients who might benefit.

7              I can give you the --

8         Q.   That's okay.

9         A.   -- exact terminology if you'd like.

10        Q.   That's okay.  That wasn't my

11   question.

12             My question was, you never took a

13   position generally that opioids should not be

14   approved and used for moderate to severe pain?

15             MR. RAFFERTY:  Object to the form.

16        A.   Yeah, so here's the actual

17   statement to the position of your statement.

18        Q.   I want to ask my question.

19        A.   You can ask your question, and I'm

20   answering it, ma'am.

21             What I've said -- what was said for

22   me -- I mean, what I said, and it was conveyed

23   to Congress, is: Consideration was given to

24   limiting the approved indication for the

1  product to the treatment of pain of malignancy.

2  But it was known that there was a small

3  fraction of chronic pain patients with pain of

4  non-malignant origin who can also potentially

5  benefit from the product.

6           So what I did recognize, right, was

7  that opioids -- I mean, certainly in this

8  case -- should be used with regard to cancer

9  pain, and there -- and that there would be a

10 small fraction of patients who might benefit.

11 That was --

12      Q.   Sir, my question was generally --

13          MR. RAFFERTY:  Let him finish his

14      answer.

15          MS. FREIWALD:  He's not answering

16      my question.

17          MR. RAFFERTY:  He is exactly

18      answering your question, Ms. Freiwald --

19          MS. FREIWALD:  My question was

20      whether --

21          MR. RAFFERTY:  -- and he can -- you

22      cannot stop him.  Let him finish.  If

23      you want to move to strike, move to

24      strike.  But that is a direct -- direct

Highly Confidential - Subject to Further Confidentiality Review

1       answer to your question.

2               MS. FREIWALD:  No.  My question

3       wasn't about Duragesic; it was

4       generally.

5               MR. RAFFERTY:  Yeah.

6       Q.   Generally speaking, did you ever

7   take the position that opioids as a class

8   should not be available for use for moderate to

9   severe pain --

10              MR. RAFFERTY:  Object to the form.

11      A.   So --

12      Q.   -- while at FDA?

13      A.    I didn't make a statement in

14  exactly those terms.

15              The two opioids that I have -- that

16  I dealt and did make statements on -- one, I

17  just told you what was the position.

18              The other one was even in a more

19  restrictive -- I thought it should be

20  available.  It was the predecessor to Actiq.

21  It was Oralet.  And I insisted personally that

22  the agency put very strict controls around that

23  product and, in essence, restricted

24  distribution to certain pharmacists.  So I

Highly Confidential - Subject to Further Confidentiality Review

1   restricted that product.

2          Those are the products that I dealt

3   with.

4       Q.   You never took any position with

5   regard to MS Contin?

6       A.   I don't believe I was involved in

7   MS Contin while I was at the agency.

8       Q.   MS Contin was an approved opioid

9   while you were at the agency, correct?

10      A.   It was approved prior to my being

11   at the agency, and --

12      Q.   And it was approved while you were

13   at the agency.  I don't mean that the --

14      A.   No.

15      Q.   -- approval happened while you were

16   at the agency.  I mean that it was an approved

17   product that was available for prescription

18   while you were the Commissioner of the agency.

19      A.   That's correct.  And I wasn't --

20   just so the record is clear, I was not

21   involved -- I have no recollection of any issue

22   that was brought to me with regard to

23   MS Contin.

24      Q.   And MS Contin was approved and

1    indicated for moderate to severe pain for more

2    than a few days at the time?

3         A.   That was what the label said.  It

4    was generally understood that it would be used

5    for cancer pain.

6         Q.   That's not what the indication was.

7    The indication was for moderate to severe pain

8    for more than a few days?

9         A.   I think if you look at the record

10   and you look at what the intended population

11   was, I think the record would show that the

12   intended population was for cancer patients.

13        Q.   I asked you what the indication

14   was.

15        A.   You can show me the label, and we

16   can read it, but -- my recollection is, you're

17   pretty much right.  But again, the indication

18   subsumes an intended population.  And if you go

19   back and look at the record, I think the

20   intended population of MS Contin was for cancer

21   patients.

22        Q.   Well, the FDA knows how to write an

23   indication for the population -- for the use

24   that it intends to treat, correct?

1    A.   Not -- not if you're -- not if

2  you're going to drive a truck through it.  If

3  you look at -- if you looked, in fact, at

4  specifically the comments by your research

5  center --

6    Q.   I'm asking about MS Contin.

7    MR. RAFFERTY:  Object to the form.

8    Q.   I'm still on MS Contin.

9    A.   I'm answering -- I'm answering your

10  question, ma'am.

11    Q.   I'm still on MS Contin, sir.

12    A.   That's fine.  If I can just finish

13  my question, please.  Let me just please --

14    I don't think the agency fully

15  understood -- I think there was less of an

16  issue with MS Contin, but I think that if you

17  look at the record, the celebrations after the

18  label was written, certainly on MS Contin's

19  successor, on OxyContin, was that it was clear

20  that your company thought that all the

21  promotion -- and you were instructed that all

22  the promotional material would disappear from

23  the labeling, but you celebrated after the

24  label, that, the label contained all the major

1   elements of our long-range marketing plan.

2          Q.   Sir, I promise you we will talk

3   about MS Contin -- I mean, about OxyContin

4   later.  I promise.

5          A.   That's fine, but -- but --

6          Q.   Right now I'm asking you about

7   MS Contin, and I'm also asking you about the

8   FDA's ability to create a label.

9          A.   That --

10         Q.   The --

11         A.   And I've -- I've answered --

12         Q.   You weren't involved in MS Contin,

13  right?

14         A.   But -- but let me --

15         Q.   Sir, no.

16              (Reporter interruption.)

17         Q.   So you gave me your full answer, so

18  now I want to ask you a different question.

19         A.   No, ma'am.  I didn't give you my

20  full answer.

21              You asked me about FDA's ability to

22  write a label, okay?  And FDA's ability to

23  write a label depends on a good-faith

24  understanding of what the manufacturer intends.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.

2    A.   And in this case, what FDA clearly

3  was saying to your client was that OxyContin

4  was supposed to be limited, right, and your

5  client did not listen to that.  So FDA did not

6  write a label, in my opinion, that anticipated

7  how your client would market this drug.

8         And I think the record reflects,

9  when you look at the documents, that -- that

10  the label -- the documents show you walked out

11  of, for example, a 2001 meeting where FDA --

12    Q.   Sir, I have seven hours with you,

13  and I asked you a question about MS Contin --

14    A.   But you're asking me about FDA

15  knowing how to write a label.  FDA worked very

16  hard with your client to write a label, right,

17  and in 2001 restricted OxyContin.  John Jenkins

18  tried his best.

19         They called your client the bad

20  actor.  Your client went out after that meeting

21  and said, we can promote this broadly.  It was

22  completely antithetical to what FDA said and

23  was asking your company to do.

24         So what I'm saying is that FDA

Highly Confidential - Subject to Further Confidentiality Review

1   can't write a label if you're going to drive a

2   truck through it.  There is no -- the English

3   language is not that precise, right, to foresee

4   and was not able to see how this marketing --

5   this marketing avalanche would take the words

6   in the label.

7          Q.   Sir, I have -- my question is, can

8   the FDA write a label, if it wants, that says,

9   "Indicated for cancer pain"?

10         A.   The FDA could write such a label.

11  I could have written that label and changed it

12  in 1994.  I -- I --

13              Because -- and I think this is the

14  issue.  Because the FDA -- I mean, we -- wants

15  to make sure that it doesn't foreclose, in

16  certain small instances, people having access

17  when they desperately need access, right.  I

18  said, beyond cancer pain, there's a small

19  fraction, all right?

20              I mean, it becomes -- there has to

21  be an understanding, right, between a company

22  and the FDA.  When I say that it can be used

23  for cancer and it's useful for a small

24  fraction, it shouldn't be used broadly for back

Highly Confidential - Subject to Further Confidentiality Review

1  pain and osteoarthritis.

2          I could not have written a -- I

3  mean, I probably could have, right, tightened

4  up the label, but I was -- wanted to make sure,

5  in my instance, that it was available for a

6  small fraction of non-cancer.

7          That -- in my wildest dreams, I

8  would never have believed that a company would

9  go out and market it broadly for chronic back

10  pain and osteoarthritis.

11      Q.   Sir, we're just talking about

12  MS Contin now, okay?  You had left the agency

13  after '97.  So let's just stick with MS Contin.

14          You -- the FDA could write a label

15  that said, for cancer pain, or for other

16  specific types of pain, or limit the indication

17  as to duration or dose, or in any other way.

18  The FDA can do that?

19          MR. RAFFERTY:  Object to the form.

20      Q.   I'm not getting to yet whether the

21  FDA should have in the first instance.

22      A.   So the --

23      Q.   They can do that, right?

24      A.   Well, let's discuss this.

Highly Confidential - Subject to Further Confidentiality Review

1              MR. RAFFERTY:  Make sure we let

2      everybody finish.

3         A.   When you say "can do that," at what

4   point in time are you asking about?

5         Q.   I'm not asking -- irrespective of

6   responsibility or who knew what, the FDA has

7   the ability to write a label that is that

8   specific, if they want it to be?

9         A.   So let's be clear.  FDA has -- FDA

10   can at this point in time, before 2007,

11   right -- FDA could hold up a drug, but the

12   label used was -- everyone, I think, would

13   tell -- agree that labeling was a

14   back-and-forth.

15              It is not true that once a drug is

16   on the market, that FDA can just, prior to

17   2007, order a change in the label.  If you look

18   at the labels, most of them are copyrighted.

19   They are -- as my colleague Sandy Kweder said

20   at the agency, it's the company that owns the

21   label.

22         Q.   Is it your testimony that prior to

23   2007, the FDA could not order a company to

24   change the labeling?

Highly Confidential - Subject to Further Confidentiality Review

1          A.   Unilaterally, no.  That is correct.

2    That's why the 2007 Act was put in where FDA

3    had that authority.

4          Obviously, FDA could go to court.

5    It could say it's misbranded.  But it could not

6    say, just go change the label.  It was a

7    negotiation.

8          Q.   So we'll talk about that authority

9    a little bit later.

10          To be clear, in none of the

11    following years did you come forward and

12    publicly critique or recommend any changes in

13    the label with regard to any prescription

14    opioid after reports of Maine in 2000, you

15    didn't come forward and say, we should look at

16    this label differently, did you?

17          A.   I was -- I didn't -- Maine, I --

18    I'm not sure I -- when I knew anything about,

19    quote, Maine.

20          Q.   Okay.  After the --

21          A.   You're talking about --

22          Q.   -- Senate Finance hearing in 2001?

23          A.   I was not making -- I -- I was not

24    studying -- I was not at the agency.  My

Highly Confidential - Subject to Further Confidentiality Review

1    comments at the agency were -- I mean, are on

2    record while I was at the agency.  I read you

3    some of them, and I --

4         Q.    At the time of the black box

5    warning in 2001?

6         A.    I was not necessarily following

7    this at all.

8         Q.    Okay.  Following warning letters in

9    2002 and 2003?

10        A.    I wasn't at the agency, ma'am.

11        Q.    Okay.  So you weren't -- you

12   weren't involved in any of this?

13        A.    I wasn't at the agency, no.

14        Q.    Okay.  So in real time, you weren't

15   looking at the issue in 2007, after there was a

16   public plea agreement?

17             MR. RAFFERTY:  Object to the form.

18        Q.    You weren't involved?

19        A.    No, I was not involved.

20        Q.    Okay.  And in 2008, at the time of

21   Senator Blumenthal's citizen's petition asking

22   for labeling changes, you weren't involved?

23        A.    Not at all.

24        Q.    You didn't have any real-time

Highly Confidential - Subject to Further Confidentiality Review

1    knowledge of these issues?

2              MR. RAFFERTY:  Object to the form.

3         A.   I may have read the newspaper, I

4    may have watched TV, but I was a public

5    citizen -- public citizen watching.

6         Q.   Okay.  And in 2010, at the time of

7    ADF approval, the abuse-deterrent formulation

8    approval, ADF, you -- you weren't -- you

9    weren't engaged in any of these issues

10   real-time?

11             MR. RAFFERTY:  Object to form.

12        A.   So by that time, there were -- I'm

13   just trying to think.

14             I'm a senior advisor at

15   TPG Capital.  I remember my colleague,

16   Sandy Robertson, one of the -- you know, in San

17   Francisco, once had somebody -- had some

18   questions about an ADF product.  People would

19   ask me questions.

20             And I began to get phone calls.

21   I'm trying to think when -- I don't -- I don't

22   have a specific recollection, but my guess,

23   around that time, I'm getting phone calls from

24   press, right?

1      Q.   Okay.

2      A.   I mean, or occasionally here or

3  there, or somebody's asking me an ADF question.

4  I mean, at that point in time it's becoming

5  public health, and so I'm -- you know, I'm

6  getting asked for what I think about certain

7  things.

8      Q.   Were you getting any information

9  from how -- that wasn't public about how the

10  agency was viewing these issues?

11      A.   I'm trying to think.  There

12  would -- there would be an -- I don't think it

13  would be fair to say I was getting things that

14  were not public.

15          I would get a phone call.  I

16  remember Peggy Hamburg would call me every once

17  in a while and ask me advice on certain

18  questions.  I didn't reach in, but she would

19  call me, and opioids may have come up.  I just

20  don't have a -- I'm sure they did.  More

21  likely.  But she would call me for advice.

22      Q.   Sitting here today, can you recall

23  any situation where, as a non-employee of FDA,

24  you gave advice to FDA with regard to

1    abuse-deterrent formulations?

2        A.   I don't have a recollection.  I

3    don't have a recollection of ever doing that.

4        Q.   And you were talking to Dr. Hamburg

5    in the 2010-ish time period?

6        A.   No, I don't -- I think Peggy was

7    Commissioner at that time -- again, I don't

8    want to -- this would be an occasional, every

9    six months or so, she wanted advice --

10       Q.   Fair to say you were not involved

11   in this time period in what the FDA was

12   thinking or how they were processing

13   information internally?

14       A.   Other than what -- other than what

15   they were saying publicly.

16       Q.   Okay.  And would the same thing be

17   true in the 2010-'11 or so time period with

18   regard to the joint REMS?

19       A.   I was not involved.

20       Q.   Okay.  So you weren't --

21       A.   I was not involved from an FDA

22   perspective.  I'm just a public citizen at this

23   point.

24       Q.   Okay.  So you weren't getting -- in

Highly Confidential - Subject to Further Confidentiality Review

1    all this time period, you weren't getting

2    information real-time about how the FDA was

3    processing any of this information, what they

4    were thinking about it, what they knew or

5    didn't know?

6            A.    No, unless it came up in a

7    conversation.  But sitting here today, I just

8    don't -- I just -- it doesn't pop into my head.

9            Q.    Okay.  So from 1997 -- strike that.

10           And I assume the answer would be

11   the same in 2013, at the time of the PROP

12   citizens' petition, you weren't involved -- you

13   didn't have any access to how the FDA was

14   thinking about these issues other than what any

15   public citizen would have?

16           A.    That's correct.

17           Q.    Okay.  And since 2013, you haven't

18   had any access to how the FDA has been thinking

19   about the issues of opioid prescribing, abuse,

20   misuse, other than what you can glean as a

21   public citizen?

22           A.    That probably would not be

23   accurate.

24           Q.    If I exclude what you've looked at

1   in the context of litigation, what aspect of

2   that would not be accurate?

3          A.   Well, I've had conversations for

4   other reasons with people at the agency.

5          Q.   And what would that be?

6          A.   So for example -- I have to refresh

7   my memory exactly.  So I would have -- when I

8   started getting called by a 60 Minutes producer

9   who was doing a piece, and it was a piece that

10  was focusing part on FDA, and they wanted me to

11  go on camera, and I ended up talking with a

12  certain FDA official at the time.

13         Q.   Who did you speak to in advance of

14  the 60 Minutes piece at FDA?

15         A.   I may have spoken to a number of

16  people, but I certainly remember talking --

17  well, I certainly remember talking to

18  Janet Woodcock a number of times.  I know the

19  Commissioner called me to get my views around

20  that time.

21         Q.   What views did you give the

22  Commissioner around that time?

23         A.   What views --

24         Q.   Views.  You just said the

1  Commissioner called you to get your views.  So

2  my question is, what views?

3       A.   Well, he called me to -- he asked

4  me for my views.  We talked -- it was a number

5  of subjects.  We talked about the Department of

6  Defense and their interest in having access to

7  the super-fentanyl on the battlefield.

8            We also talked about really what

9  would need to be done in the -- with regard to

10  the opioid crisis.  And I said I thought there

11  needed to be the equivalent of the truth

12  campaign that we did in tobacco with regard to

13  opioids, I think I told the Commissioner.  And

14  we talked a little bit our generations as

15  medical students and how I was taught -- I

16  mean, I used opioids very sparingly.

17       Q.   So --

18       A.   Can I finish my answer?  Just give

19  me one more second.  I apologize.

20            And he said, you know, he was a

21  medical student several decades after me, and

22  he was taught just the opposite.  And it was

23  really, how can we get to the point of

24  unteaching the medical profession what his

Highly Confidential - Subject to Further Confidentiality Review

1    generation had been taught.  That was the

2    conversation.

3            And then he talked a little

4    about -- we talked about how -- I remember how

5    things in the label -- I remember exactly --

6    even to this day, you know, the fact is that

7    there are not long-term studies, and the label

8    doesn't reflect that.  And even to this day,

9    that label could still be improved.

10       Q.   So just a couple of things.  What

11   generation are you claiming was taught

12   differently from you?

13       A.   Scott talked -- Scott character --

14   I mean, I don't want -- he can speak for

15   himself.  I don't want to speak for him

16   publicly.  But you're asking me a question;

17   I'll answer it.

18            Scott viewed himself as when he

19   went to medical school -- but I assume it was a

20   good 15 years after I did, if not 20 years

21   afterwards.  And we just talked -- we talked

22   about how we were taught very different things.

23       Q.   So you shared your view with

24   Dr. Gottlieb at that time that opioids were

Highly Confidential - Subject to Further Confidentiality Review

1    prescribed too broadly?

2              MR. RAFFERTY:  Object to the form.

3         A.   I don't think -- you're

4    mischaracterizing --

5         Q.   So I'll ask it -- what -- the --

6    the premise for my question was your statement

7    that you were asked your views in a

8    conversation with Dr. Gottlieb with regard to

9    opioids.  So what I want to know is not so much

10   what he told you but what you said to him.

11        A.   I think I -- I think I -- I think I

12   answered that, Counselor.  I told him I thought

13   there needed to be a very significant public

14   campaign of the type that we did post-tobacco.

15   And we talked a little about that.  And then we

16   sort of reminisced about how -- what I was

17   taught and what he was taught, and it was clear

18   that he was saying he was taught very

19   differently than I was taught.

20        Q.   So is it your testimony that at

21   that time, the Commissioner of the FDA had a

22   view that opioids were overprescribed?

23        A.   Oh, I think he clearly -- in his

24   public statements, I think if we go through his

1  public statements, he thinks that the access

2  was -- clearly needed to be restricted.

3         Q.   So that was known at that time?

4              MR. RAFFERTY:  Objection.  Let him

5         finish his answer please, Hope.

6         A.   Well, we're talking relatively

7  recently --

8         Q.   Okay.

9         A.   -- that he thinks that it is a

10  question -- I certainly had a sense that he

11  believed that he was taught to prescribe

12  opioids too broadly.

13        Q.   Okay.  Other than at the time of

14  the 60 Minutes interview, did you have any

15  insight with regard to FDA's thinking about

16  opioids between 1997 and today, other than what

17  a public citizen would have?

18        A.   I may have had conversations.  I'm

19  sure I had conversations over the years.  This

20  was front burner at meetings, at dinners with

21  individuals.

22        Q.   To the extent the FDA was public on

23  a whole bunch of fronts, but you weren't

24  involved in any specific decision with regard

Highly Confidential - Subject to Further Confidentiality Review

1    to any specific product, correct?

2         A.   Absolutely not.  I mean, I -- and I

3    don't sit here speaking for FDA today.  We

4    should be very clear about that.

5         Q.   Okay.  And you don't -- you're not

6    in a position to say what any particular

7    reviewer thought or didn't think in its -- at

8    the time that they were engaging with any

9    company on any issue?

10             MR. RAFFERTY:  Object to the form.

11        A.   I think I probably am --

12        Q.   And --

13        A.   -- a little able to do that.

14        Q.   You weren't there, right?

15        A.   No, but I have had -- no, but I

16   believe I am able to tell you what certain

17   individuals were thinking at the time because

18   I've had conversations and have asked those

19   questions.

20        Q.   Which individuals are those?

21        A.   I've had conversations with

22   Curtis Wright.

23        Q.   And who else?

24        A.   He's probably the only -- I don't

Highly Confidential - Subject to Further Confidentiality Review

1    want to say -- he's the one I recall -- he's

2    the one I could tell you what -- because I've

3    asked him specifically what he was -- again, I

4    don't want to use the words "subjectively

5    thinking," but I can tell you what he told me

6    that his reasons for doing certain things were

7    and how he looked at certain things.

8         Q.    When did you speak with Dr. Wright?

9         A.    I've spoken to Dr. Wright for -- a

10   number of times.  For example, when I was doing

11   the editorials, I wanted to understand certain

12   things.  At the time when I was doing that

13   first -- an editorial in The New York Times --

14   that op-ed, sorry, it's not an editorial --

15   that op-ed piece, I had a number of

16   conversations with Curtis.

17             And I think even before 60 Minutes,

18   when 60 Minutes was asking me certain

19   questions, I wanted to make sure that I was

20   going to be accurate and, again, privately

21   spoke to Dr. Wright.

22        Q.    Is that documented anywhere?

23        A.    I may have certain documentation.

24        Q.    What do you think you have?

1    A.    I'd have to go back and see what I

2    have.

3         Q.    Did you keep notes of those kinds

4    of conversations?

5         A.    It's possible.  It certainly is

6    possible that there may be, in preparation for

7    that.  I just don't recall.

8         Q.    Are you saying there was more than

9    one conversation?

10        A.    Oh, yes.  I've talked to

11   Curtis Wright several times.

12        Q.    And did you speak to Curtis Wright

13   or attempt to speak to Curtis Wright in

14   connection with this report?

15        A.    No.  I spoke to Curtis Wright --

16   nothing to do with this report.  I was being

17   asked certain questions specifically by news

18   organizations and by 60 Minutes, and I wanted

19   to be able to answer for the -- I mean, in

20   essence, I was being put up for the agency.

21   That was the way the producer saw it.  Because

22   the agency didn't want to go on camera.

23        Q.    Did you speak to Dr. Wright with

24   regard to any of the documents that you

Highly Confidential - Subject to Further Confidentiality Review

1    attached to your report?

2         A.    Absolutely not.

3               (Reporter interruption.)

4         Q.    Did you speak to Dr. Wright with

5    regard to any specific approval decision with

6    regard to OxyContin?

7         A.    I did.

8         Q.    And what is -- what is it that you

9    believe that conversation was?

10        A.    So the conversation I had with

11   Curtis, the sum and substance of the 60 Minutes

12   piece was that there was no adequate and

13   well-controlled trials past 14 days.  I think

14   there was some open trials.

15              But 60 Minutes's premise was that

16   there was nothing more -- there was no clinical

17   studies -- adequate and well-controlled

18   clinical studies beyond 14 days.  That was

19   their premise.  They sent me documents to that

20   effect, I believe, I mean, or showed me

21   something, or made certain representations.

22              And I wanted to understand from

23   Curtis, because I was going to have to respond

24   to that, how the agency would -- why would the

Highly Confidential - Subject to Further Confidentiality Review

1    agency approve something, in Curtis' instances,

2    for more than a few days, but then an extended

3    period of time -- oh, and I also spoke to

4    John Jenkins with regard to this question.  And

5    John Jenkins did it for more than a few days --

6    more than a few days, and then it was for an

7    extended period of time.

8          And what I -- what I was being

9    asked -- what I was going to be asked was, how

10    could the agency approve this drug when there

11    weren't adequate and well-controlled clinical

12    studies for more than 14 days?

13          So I posed that question to Curtis

14    directly.

15        Q.   And his answer, as you recall it?

16        A.   So again, he can speak for himself,

17    but his answer was, David, you have to

18    understand, when this application came in, what

19    this was about was -- this was a new delivery

20    form.  So in the 1980s and 1990s, there was new

21    extended release, and this was solely a -- this

22    was a change in delivery form.

23          So my job, saying -- Curtis saying,

24    my job was, I looked at this -- at OxyContin

Highly Confidential - Subject to Further Confidentiality Review

1    q12 and I wanted to know whether it performed

2    and whether it was as safe and effective as the

3    q4 to 6.  So it was, in essence -- I'm going to

4    use a term that's not exactly accurate --

5    bioequivalence, right, did it perform the same?

6              So all I tried to do -- I didn't --

7    I mean, if -- that's what I was trying to do,

8    so I just looked at it to see whether it

9    performed the same.  And that's why I didn't

10   require anything other -- in fact, if anything,

11   I think he would say he required more safety

12   studies than would be required for a

13   bioequivalence study.  He didn't know, I mean,

14   certainly that all of medicine would change on

15   the back of that approval.

16        Q.   And that was consistent with how

17   FDA approached comparable changes in delivery

18   methods at that time?

19             MR. RAFFERTY:  Object to form.

20        A.   I think that would be a fair

21   statement, Counselor.

22        Q.   Okay.  So other than the

23   conversations you've described, is there any

24   conversation that you've had with any reviewer

Highly Confidential - Subject to Further Confidentiality Review

1    at the FDA with regard to how they were looking

2    at the approval or any regulatory change with

3    regard to any of the products that you are

4    commenting on on this litigation?

5         A.    I had a conversation with

6    John Jenkins.

7         Q.    And what was that -- first of all,

8    when was that conversation?

9         A.    Also around the time of 60 Minutes.

10        Q.    Okay.  And what was that

11   conversation?

12        A.    So 60 Minutes -- 60 Minutes was

13   very focused on why the label was changed in

14   2001 from more than a few days to an extended

15   period of time.  They were very focused on that

16   label change.  And they had sent me minutes of

17   a meeting -- several minutes or told me about

18   certain meeting minutes with Cynthia McCormick

19   and with John Jenkins.

20             And 60 Minutes' position was that

21   was a mistake, that the agency should have

22   tightened up that label.  And in fact, it

23   was their view, 60 Minutes, it wasn't a problem

24   with the '96 label; it was a problem with the

Highly Confidential - Subject to Further Confidentiality Review

1    2001 label.  That was the thing focusing on by

2    60 Minutes.

3             So -- and I read the -- or I read

4    the minutes of the meeting with John Jenkins.

5    And I wanted to understand what Jenkins was

6    thinking and what he was saying to your client

7    in 2001.

8             And this is where there was, I

9    think, a very big disconnect.  Jenkins said --

10   I mean, if you look at those minutes and -- I

11   think -- hold on a second.  I may even have --

12   let me just see -- no, no.

13            Jenkins -- I'm interested if anyone

14   has a copy of those 2001 -- I think it was

15   April meeting minutes.

16            Jenkins was very concerned

17   that there -- I mean, the agency was very

18   concerned at that meeting that there was

19   increasing overuse -- overpromotion,

20   inappropriate selling of OxyContin.  I mean, it

21   was very direct.  That was the bad actor

22   statement.

23            But what Jenkins also says in that

24   or in a meeting several months after -- and I'm

1  conflating my dates -- was that he wanted to

2  restrict the label to -- and I may not get this

3  exactly right -- but continuous, around -- to

4  when pain was continuous, around the clock, and

5  was unremittent.  So it would not be arthritis,

6  all right?  I mean, he was trying to narrow the

7  indications, right, where it was -- and he

8  said, David, I was very clear that I was trying

9  to make sure this drug was not to be used for

10  routine osteoarthritis, routine chronic back

11  pain; that basically it would be used third

12  line plus.

13          He didn't quite use those terms,

14  but he was narrowing, he was giving the

15  indications when pain never went away, when it

16  was severe enough that no alternative.  And so

17  that's what Jenkins said to me.

18          And what the sort of disconnect

19  was, was, you see the meeting notes by Purdue

20  after that which said that, we walked out of

21  the meeting and we got a completely broad

22  indication to market for almost anything.

23          It was a complete disconnect.

24      Q.   So the extended-period-of-time

1    language was intended, as you understood from

2    Jenkins, to be a narrowing of the label,

3    correct?

4         A.    That was what he vigorously said to

5    me.

6         Q.    And you have not spoken to anybody

7    at Purdue to know how they viewed that change?

8         A.    So I --

9              MR. RAFFERTY:    Object to the form.

10        Q.    I'm not asking you about what

11   you've read; I just want to know whether you've

12   spoken to anybody at Purdue.

13        A.    No.  But I think the record is very

14   clear and I could find it.

15        Q.    We'll look at that memo later.

16        A.    You --

17        Q.    I know what you're --

18        A.    You know what I'm talking about.

19        Q.    I know exactly what you're talking

20   about, and we can look at it later.

21        A.    Fine.  So no, I --

22        Q.    But I just want to be clear, you

23   have not spoken to anybody at Purdue?

24        A.    No.  I would assume that would be

1    inappropriate.

2              MR. RAFFERTY:  Object to the form.

3         Q.   And you're -- so you're reading

4    from a document about a meeting that you were

5    not at, correct?

6         A.   That's correct.

7         Q.   Okay.  And the person that you've

8    spoken to said that moving the label language

9    from more than a few days to an extended period

10   of time was the agency's effort -- one of the

11   agency's efforts at that time to narrow the

12   indication?

13        A.   Yes, because it did not -- Jenkins

14   viewed it as, he didn't want it to be used for

15   the things that it was going -- that it was

16   being -- chronic back pain and osteoarthritis.

17   That was his goal.

18        Q.   And he didn't want it to be used

19   for people who just had short-term pain,

20   correct?

21             MR. RAFFERTY:  Object to the form.

22        A.   He certainly didn't want -- the

23   extended release was not indicated for acute

24   pain at the time, that's correct.

1          Q.    Okay.  And he was very clear about

2    that.  He did not want it for acute pain.

3          A.    You know, what we should do -- so

4    my memory may be -- if you can give me -- you

5    know exactly the meeting minutes that I'm

6    talking about where -- we should probably have

7    those in front of us to be exact, exactly what

8    he's saying.  But I'm telling you my -- I mean,

9    what he said to me.

10          Q.    Okay.  And we'll talk about that

11    later when we get into more of the

12    Purdue-specific stuff.

13          A.    Sure.

14          Q.    But that was only one aspect of

15    what the FDA did at that time to tighten the

16    label and make the warnings more prominent,

17    correct?

18          A.    Yeah.  I think that would be fair,

19    because at FDA, Tom Abrams said, for example,

20    at that meeting, you know, you've got to

21    convince the world -- you've got to change this

22    perception that you're different than morphine.

23    You're not different than morphine.

24                And I think that was at least the

1  beginning of, quote, "risk maps," as we know

2  that --

3         Q.   Okay.

4         A.   -- even though that term may not

5  have been used.

6         Q.   And there was an understanding at

7  that time by the FDA that the product was being

8  marketed for moderate to severe pain,

9  irrespective of the disease state.

10             MR. RAFFERTY:  Object to the form.

11        A.   I can't -- we'd have to go back and

12  look at that -- sorry.  We'd have to go back

13  and look at that letter so I can be exactly

14  sure.

15        Q.   Well, you --

16        A.   Whatever it says in those meeting

17  minutes I think reflects what FDA's

18  understanding.

19        Q.   Well, you've offered broad opinions

20  about what FDA understood about marketing or

21  not marketing.

22             I want to know, sitting here today,

23  do you remember what FDA understood about the

24  patient populations to whom OxyContin was being

1   marketed in 2001?

2           MR. RAFFERTY:  Object to the form.

3       A.   So in talking, again, to -- Jenkins

4   was there in 2001.  And I certainly recall that

5   those meeting minutes talking about --

6   Cynthia McCormick saying, we don't want this

7   being used for any type of lumbago or -- I

8   mean, I think was her quote.

9           And I think she -- I take it that

10  they had some sense that it was being marketed

11  for that.  But I can't quite tell you -- well,

12  that's not true.  I apologize.  Let me just

13  check one thing, if I may.

14          So we have to look exactly at

15  the --

16      Q.   We'll do that all --

17      A.   Hold on a second.  But what we can

18  do very well is probably make sense to pull --

19  and I have them right behind me -- the DDMAC

20  letters will tell you what FDA was on the

21  record saying.  And I think your client had

22  four -- we can go -- warning letters and we

23  can -- that probably reflects at least some

24  extent what the company knew.

1     Q.    You think Purdue had four warning

2  letters?

3     A.    DDMAC letters?  I can check.

4     Q.    Okay.  Well, we --

5     A.    Let me -- I can check --

6           (Simultaneous speaking.)

7     Q.    No, we'll do that later.

8     A.    I have the book behind me.  I have

9  the letters behind me.

10    Q.    Okay.  I want to talk more

11 generically now.  We'll certainly get to that.

12          But sitting here generally, you

13 would agree, wouldn't you, that at least in

14 2001, the FDA knew that extended release

15 OxyContin was being promoted beyond just cancer

16 patients?

17          MR. RAFFERTY:  Object to the form.

18    A.    I'd want to review the DDMAC

19 letters before I answered that question

20 precisely.

21    Q.    Okay.  You don't know that just

22 from all the work you've done in this case?

23          MR. RAFFERTY:  Object to the form.

24    A.    You're asking me -- I want to be

Highly Confidential - Subject to Further Confidentiality Review

1    precise here exactly what they knew was

2    promoted.  I don't have an internal FDA record,

3    I've not seen, of what they knew exactly when.

4    I don't know, for example, I mean -- I know

5    2007 refers to that time period in -- the

6    criminal information goes back, but I don't

7    know exactly when the federal investigators

8    knew what.  So I apologize.

9         Q.   So internal FDA memos would be one

10   thing that documents what the FDA was talking

11   about and thinking about at the time, correct?

12        A.   Absolutely.  I'm sure the

13   Department of Justice, right -- there was a

14   criminal investigation --

15        Q.   I'm not talking about the criminal

16   investigation.  I'm talking about internal --

17        A.   But that's where the promotion --

18        Q.   I'm talking about what FDA knew.

19   FDA's records of its own communications with

20   not just Purdue but other manufacturers would

21   be -- would be one source of what it knew?

22        A.   Well, I mean, there certainly would

23   be internal FDA documents.

24        Q.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    And the...

2    Q.    DDMAC letters, whether untitled or

3  warning letters, would be another source of

4  information about what FDA knew?

5    A.    Correct.

6    Q.    Discussions about labeling changes

7  would be another potential source of

8  information about what FDA knew?

9    A.    They tend to -- they're very hard

10 to read.  Those back-and-forth label

11 indications don't really give you a sense of --

12 unless there's a comment that is written,

13 rarely, about that, it doesn't give you a lot

14 of what they were thinking.

15    Q.    So somebody who wasn't there at the

16 time can't really fairly interpret them after

17 the fact.  Is that your testimony?

18    A.    No.

19          MR. RAFFERTY:  Object to the form.

20    A.    That's not -- you asked me what FDA

21 was thinking.  No one can do -- no one should

22 be able to tell you what FDA was thinking

23 because that's a subjective state.  I can tell

24 you what the record reflects.

1    Q.   Okay.  So you're not going to

2    testify as to what FDA was thinking if you

3    weren't there.

4              MR. RAFFERTY:  Object to the form.

5        A.   I'm going to answer the questions

6    you ask me the best I can.  I'm certainly not

7    going to -- I would advise you not to ask me

8    what somebody was thinking because that's a

9    subjective state of mind.

10             If you ask me about what the record

11   shows and there's a document, I'm happy to talk

12   about it.

13       Q.   Okay.  So -- but you -- but you're

14   not going to testify to what individuals,

15   reviewers, knew or didn't know unless there's

16   some concrete evidence of that?

17             MR. RAFFERTY:  Object to the form.

18       A.   I'm going to answer questions that

19   are asked fully, based on the evidence that I

20   have.

21       Q.   Okay.  And you're not -- you don't

22   have any special training or knowledge that

23   lets you interpret what somebody was thinking

24   at any point in time?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. RAFFERTY:  Object to the form.

2          A.   I am not a mind reader, and I would

3    never want to do that in any form of testimony.

4    If you ask me a question, I'll try my best to

5    answer it.

6          Q.   And that would be true not just

7    with regard to what FDA was thinking, but it

8    would be true with regard to what anybody at

9    any of the companies were thinking as well?

10          MR. RAFFERTY:  Object to the form.

11          A.   So obviously the word "thinking," I

12    would agree with you.  But I think when there's

13    an objective record -- so I can tell you what

14    is stated, okay --

15          Q.   But you're not going to purport to

16    interpret somebody's intent or their state of

17    mind?

18          MR. RAFFERTY:  Object to the form.

19          A.   I will never go to intent.

20          Q.   Okay.  When were you first

21    contacted in this case?

22          A.   I don't mean to be technical on

23    this.  Define "this case," please.

24          Q.   Well, to offer an opinion with

1  regard to what we're now calling the opioid

2  litigation.

3          A.   So there were -- the reason I'm

4  having some difficulty, Counselor, is, there

5  were some individual cities that I would

6  count -- that perhaps I was consulted with

7  before there was an official MDL.  And they may

8  have been merged, and I apologize, I just don't

9  know all the mergers here.

10          So if you asked me officially with

11  regard to the MDL, my guess is it's over a year

12  ago.  If you asked me about individual cities

13  or counties, it could be a number of years

14  back, and they could be part of the MDL.  So

15  that's why I'm -- I just want to be exact.

16          Q.   Is it your understanding that

17  you're a retained expert for any individual

18  city or county not part of the MDL?

19          THE WITNESS:  Sorry, how do I go

20          down to...

21          Q.   The question was, is it your

22  understanding that you're a retained expert for

23  any individual city or county not part of the

24  MDL?

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.    I'm having a little difficulty with

2      the word "retained expert."  I am trying to

3      think.

4              Q.    Is anybody paying you?

5              A.    No.

6              Q.    Is anybody --

7              A.    Well, maybe some day.

8              Q.    Do you have any written agreements

9      with anybody outside the MDL?

10             MR. RAFFERTY:  Object.  Hang on a

11             second.  Yeah.

12             I've been letting you go a little

13             bit on this.

14             But to the extent you are -- you

15             may be a consultant that is not a

16             retained -- or that is not a disclosed

17             expert witness, I think that is work

18             product on behalf of those particular

19             parties.  And so...

20             Q.    Without getting into who the

21     parties are at this point, do you understand

22     yourself to have an agreement to be an expert

23     for any jurisdiction other than the MDL?

24             A.    I'm not comfortable answering that
```

1    without talking to counsel in any of those

2    matters, just because I am not sure the

3    definition of "an agreement."  So I just -- I

4    would want to talk to counsel before --

5          Q.    Without telling me which any of

6    them were, have you received or reviewed

7    documents at any point prior to when you

8    started reviewing documents for the MDL

9    lawyers?

10              MR. RAFFERTY:  I'm going to object.

11              And you have the right not to

12         answer that question as --

13              MS. FREIWALD:  I don't think you

14         have a right to tell him not to answer

15         that question.

16              MR. RAFFERTY:  I think I have a --

17         Q.   And I'm not asking -- I'm not

18    asking identity of anyone.  I just really want

19    to know how long you've been looking at

20    documents in the context of litigation, how

21    much it goes past a year.

22              MR. RAFFERTY:  And I think --

23         A.   It --

24              MR. RAFFERTY:  -- that's work

1      product.

2          A.   Why don't you guys work it out, and

3    then I can decide.  I mean --

4          Q.   It's not work product.

5          A.   Well, I -- respectfully, I just

6    want would want to talk to counsel in those

7    matters.  To be helpful, I may have signed

8    certain protective orders back a while ago.

9              I don't remember actively looking

10   at documents, okay.  I'm not saying I was never

11   sent anything.  I may -- I think I was sent

12   stuff, but I'm not -- in other matters -- but I

13   would want to -- but I don't think I was

14   actively involved.  I think -- I think it

15   would -- to give you the -- it's really the

16   MDL, where, quote, work was done.

17         Q.   Okay.  And that gets to my

18   question.  It was really when you were retained

19   for the MDL that you started looking at

20   documents, correct?

21         A.   I think that would be a fair

22   statement.  There may have been other documents

23   in the press, other things over the years, but

24   on any serious basis I'm --

1    Q.    In any systematically --

2    A.    What it took to do this, this is

3    from the MDL database.

4    Q.    And this is about a year's worth of

5    work is what you're saying?

6          MR. RAFFERTY:  Object to the form.

7    A.    Don't hold me exactly to it.  It's

8    probably a year plus.

9    Q.    What is it that you're looking at

10   that's in front of you?

11   A.    Notes.  My image sheets.

12   Q.    Is it anything that was produced to

13   us?

14   A.    These are things that I -- these

15   are cut-and-pastes of documents that I make

16   over a period of time on certain subjects.  I

17   don't believe you asked for me to bring

18   anything, but if you wanted to, quote, see my

19   file, for example, here it is.

20   Q.    So it was --

21         MR. RAFFERTY:  Those are

22         documents -- so you know, the documents

23         are all -- only documents that are cited

24         in his report are on his reliance list.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.   So there are several -- and we can

2    count them later, but there are several very

3    large copies.  It looks to me like you have

4    Post-its on them that say things like, General

5    1, General 2.

6        A.   That was really just to organize

7    these because I became even a little

8    overwhelmed with my own sheets.

9        Q.   And there's handwriting on them,

10   and then they also appear in part to be

11   excerpted copies of some documents that I'm

12   assuming were part of the production.

13            MS. FREIWALD:  Is that --

14            MR. RAFFERTY:  That's correct.

15            MS. FREIWALD:  -- a reasonably

16       fair --

17            MR. RAFFERTY:  That's what I --

18            MS. FREIWALD:  -- characterization

19       of those?

20            MR. RAFFERTY:  That's what I --

21       that's what I understood.

22       Q.   And these are things that you're

23   using to assist you in your testimony today?

24       A.   These are things that I have with

Highly Confidential - Subject to Further Confidentiality Review

1    me, and I may -- and I will look at them

2    occasionally if I need to refresh a

3    recollection on a document.

4         Q.   Okay.  So that --

5         A.   As well -- as well as all these

6    binders, as well as binders behind me.

7         Q.   Okay.  So you're waving your hand

8    at a whole bunch of binders.  There have got to

9    be over 20 or more of them.  But it's been

10   represented to me -- they're numbered, so

11   somebody could probably tell me how many there

12   are.

13             MS. FREIWALD:  Do you know, Parvin?

14             MS. AMINOLROAYA:  I don't know off

15        the top of my head.

16             MR. MAGLASANG:  63.

17        Q.   63, I've just been told.  Okay, so

18   there --

19        A.   And some behind --

20        Q.   I'm sorry?

21        A.   And some behind the screen.

22        Q.   So 63-plus binders.  But I've been

23   told that what is in the binders -- and you

24   tell me if I'm wrong or not, please -- are just

Highly Confidential - Subject to Further Confidentiality Review

```
1    paper copies of --

2              MS. FREIWALD:  Is it his entire

3         reliance list, or is it just what's

4         attached -- what's noted in his

5         footnotes?

6         A.   Can I respond to that?

7         Q.   Sure.

8         A.   So in each binder, it is -- each

9    binder has a tab, it has a paragraph number

10   associated with it, and any document that is

11   cited in the document is behind the tab.

12             There -- if there is a quote,

13   how -- part of cite checking, if there's a

14   quote that's in the report, that quote may be

15   flagged just with a little flag.  But that

16   reflects the quote in the -- so I can find the

17   page.

18        Q.   So let me see if I can say this a

19   little more simply.

20             Are these documents the footnoted

21   documents in your report as opposed to

22   everything that's in your reliance materials?

23        A.   That would be correct.  If you add

24   the word "footnoted and body," that would be
```

1    absolutely accurate.

2         Q.   What does that mean, "footnoted and

3    body"?

4         A.   In the body of the report.  I mean,

5    I think everything is in the footnotes.  I

6    don't think there's anything in the body.  But

7    everything is in the footnotes, I would --

8         Q.   Okay.  Okay.  It's something that's

9    actually cited in your report?

10        A.   Well said, ma'am.

11        Q.   Okay.  And I've also been told that

12   these documents are not annotated, that there's

13   no handwriting.

14        A.   So I would never want to say never.

15   You may be able to find a pen scratch.  You may

16   be able to find something circled in there.  Go

17   have -- I mean, I have looked at those things.

18   I may have had a pen in hand.  I tend not to do

19   that.  I tend to scribble on these things.  But

20   I leave it, you know -- I mean, I don't

21   think -- I think -- I think you would -- it

22   would be a rare instance if there would be

23   anything in there.

24        Q.   Okay.

1           MS. FREIWALD:  So we certainly are

2      going to want copies of what Dr. Kessler

3      has brought with him and he's using at

4      the deposition that are the large

5      photocopy documents.  And we'll take a

6      look at the binders and see if we need

7      to get a copy of those are not.  And

8      people can decide.

9      Q.   You stated in your report that the

10 schedules were prepared at your direction.

11     A.   Correct.

12     Q.   You said something like that.  How

13 did that work?

14     A.   So I -- those were done all per my

15 specific directions and under my review, with

16 the exception of one schedule.

17     Q.   And you said that in your report.

18 So what does that mean?  What part of it did

19 you actually do as opposed to having a lawyer

20 or a paralegal or somebody else do it?

21     A.   So the -- what I would do is, I

22 would set out specifically -- I would give

23 specific instructions on what I needed to be

24 searched for and put on either a chart -- this

Highly Confidential - Subject to Further Confidentiality Review

```
1    is all meant to be factual, objective

2    information that is -- should be

3    non-controverted or -- I mean, I'm not

4    sure it's -- nothing is perfect.  I know

5    there's some errors.

6          Q.   So turn to -- just so that we can

7    talk about something concretely, turn to

8    exhibit -- schedule 6.

9          A.   Sure.  Let me just get to it.  So

10   that's the DDMAC.  Yeah.

11         So what I would -- what I asked was

12   basically to -- this is a summary of --

13         MR. RAFFERTY:  I don't think -- I'm

14         just going to object.

15         You don't have to get into

16         conversations that you had with counsel

17         in preparation of anything.

18         MS. FREIWALD:  Well, the --

19         MR. RAFFERTY:  Rule 26 prohibits

20         discussion about conversations that he

21         had with counsel.

22         MS. FREIWALD:  Well, the report

23         says that these were prepared at his

24         direction.  So I'm asking how they were
```

1      prepared.

2          MR. RAFFERTY:  And I think you're

3      entitled to ask a general question, but

4      anything further or going into specifics

5      I don't think is appropriate.  He put it

6      in the report.  That's why I let the

7      questions go the way they have.

8          MS. FREIWALD:  Well, I'm entitled

9      to know how much of this is him and what

10      he did, so that's what I want to know.

11          MR. RAFFERTY:  I don't -- I don't

12      think you -- I don't think you are.  So

13      you can ask, as you have, the general

14      question, and I think he answered it in

15      explanation of what the -- of what the

16      report said.

17      Q.    What is it that you asked for?

18      A.    I asked for -- what I wanted was

19  information in an objective fashion about --

20  for example, in 6, it deals with DDMAC letters

21  and DDMAC statements back and forth.  So if one

22  wanted to talk about -- if you asked me, for

23  example, your question about how many DDMAC

24  letters there were to Purdue or how many notice

Highly Confidential - Subject to Further Confidentiality Review

1    of -- untitled letters, we should be able to go

2    into this and both agree.  And hopefully, after

3    some time, we make sure this is right, we'd be

4    able to answer that question.

5         Q.    So do you --

6         A.    That's the only purpose of this.

7         Q.    Did you use schedule 6 as opposed

8    to the actual letters?

9         A.    No, I have the actual letters.  I

10   just wanted to have a record here, so if -- you

11   know, if we were ever in back-and-forth and we

12   needed to turn to it, I could turn to this and

13   we could --

14        Q.    Why would this be better than the

15   actual letters?

16             MR. RAFFERTY:  Object to the form.

17        A.    Well, because, I mean, it's one

18   place to look rather than -- I may not be --

19   I've been looking at a lot of documents.  I

20   mean, a lot, a lot of documents.  And there are

21   documents all over the place.  And sometimes

22   when you have a chart that lists all the

23   documents in one place, it's a lot easier to

24   understand what we're talking about, is my

Highly Confidential - Subject to Further Confidentiality Review

1    experience.

2         Q.   Sir, how much time do you believe

3    you spent reviewing documents for this case?

4         A.   Tons.

5         Q.   What's "tons"?

6         A.   A lot.

7         Q.   What's "a lot"?

8         A.   Hundreds and hundreds of hours.

9    Well, hundreds and hundreds of hours totally,

10   but I spent a lot of time reviewing documents.

11        Q.   How -- do you have a record of it?

12        A.   Reviewing documents, no.

13        Q.   Do you have a record of total time?

14        A.   I have -- I've not totaled up total

15   time, no.

16        Q.   Do you have a record of how many

17   depositions you actually read?

18        A.   I have -- I have searched -- I --

19   all my -- all the depositions are in a hard

20   drive, and I think it would be fair to say how

21   many did I search, because that tends to be how

22   I use depositions.

23        Q.   Are there any depositions that you

24   read beginning to end or mostly beginning to

1    end?

2          A.    Oh, I'm sure -- I'm sure there were

3    over time.  I'm sure there were.

4          Q.    Did you read Dr. Wright's

5    deposition?

6          A.    Which one?

7          Q.    In the MDL?

8          A.    I may not have read -- I don't

9    remember which one I've read of Curtis's, but I

10   think there was a number of his depositions in

11   matters, and I'm pretty sure I've read some of

12   them.  They're blurring together.  They're in

13   the discovery database.

14         Q.    Okay.  So you don't -- you don't

15   know if you read his testimony in the MDL?

16               MR. RAFFERTY:  Object to the form.

17         A.    No.  I've searched for -- searched

18   for testimony -- his deposition.  I don't want

19   to represent that I read the whole thing.

20         Q.    Did you read Dr. Fishman's

21   testimony in the MDL?

22         A.    I have searched Dr. Fishman's

23   testimony and certain aspects of it, but I

24   don't want to represent that I read the whole

Highly Confidential - Subject to Further Confidentiality Review

1   thing.

2          Q.    Did you read Dr. Haddox's testimony

3   in the MDL?

4          A.    Again, same answer.  I believe I

5   have searched -- I searched the depositions,

6   and that's the way I dealt with the -- because

7   there was numerous depositions in this and

8   other matters.

9          Q.    Did you review the deposition

10  testimony of any sales representatives for any

11  companies in the MDL?

12         A.    Yes.  There were certainly --

13  actually, there are a whole host of sales

14  representative depositions taken among the

15  years --

16         Q.    That was not my question.  My

17  question was in the MDL.

18         A.    I can't at this point sit here and

19  distinguish in my head which ones were prior

20  matters and which ones was this.  But I

21  certainly looked at incentive compensation,

22  where the compensation was tied.  There were

23  depositions that I searched for those matters

24  and those were sales reps.

1      Q.   What is the basis for the

2    supplemental reliance list?

3      A.   I try to be -- things that I looked

4    at or -- things that I looked at subsequent to

5    my report or that I -- I don't know if there's

6    anything that didn't make it onto the original

7    reliance list.  I didn't want to walk in today

8    with just additional stuff.  So I tried to give

9    you that 24, 48 hours before.

10          MS. FREIWALD:  The supplemental

11          reliance list, we'll mark it as

12          Exhibit 2.

13          (Exhibit Kessler-2 marked for

14          identification and attached to the

15          transcript.)

16   BY MS. FREIWALD:

17     Q.   My copy is two-sided.  Are these

18   documents that you did not read or did not

19   review prior to the production of your report?

20     A.   I wouldn't want to -- I mean, these

21   are just Bates numbers.  We'd have to look

22   for -- you'd have to show me the document for

23   me to be accurate for me to tell you when I saw

24   it.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Well, do you know why -- you know,

2    you produce a report that's 300-some pages and

3    reams of documents.  Why are these supplemental

4    materials?

5         MR. RAFFERTY:  Object to form.

6    Q.   Is it because you looked at them

7    after the report?

8         MR. RAFFERTY:  Object to the form.

9    A.   It may -- it may be in a number of

10   instances that I found these in the database

11   when I was searching after the report.  My

12   guess is, that would be the predominant answer

13   to this.

14        There are some documents that are

15   referenced, as you can see, that were -- there

16   was a Bates number that was zero, mistaken, so

17   they had to add those because it referenced the

18   wrong document on the bottom.  But if you're

19   referring to these on the top, these are things

20   that I made sure that I said to counsel, please

21   make sure these are on the reliance list.

22   Q.   Did you create that yourself?

23   A.   These were done -- this was done at

24   my direction.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   And the errata sheet, which I'll

2   mark as Exhibit 3, is that something you did?

3   You went through your report and decided what

4   needed to be fixed?

5           MR. RAFFERTY:  Object to form.

6      A.   In some instances, yes.  Much of

7   this is typographicals.  What I did ask for --

8   again, I'm going to say with the assistance of

9   counsel --

10          THE WITNESS:  And you're going to

11          say, stop.

12     A.   But with the assistance of counsel,

13  I asked for cite checking.  And sometimes when

14  people do cite checking, you find certain

15  mistakes in quotes.  When I asked for things to

16  be highlighted, things get identified as

17  mistakes that are in the report.  So I did ask

18  for people to keep track when they

19  cite-checked.

20          (Exhibit Kessler-3 marked for

21          identification and attached to the

22          transcript.)

23  BY MS. FREIWALD:

24     Q.   Before issuing your report in this

Highly Confidential - Subject to Further Confidentiality Review

1    case focused on six manufacturers, did you do

2    anything to investigate the full scope of

3    mistakes or missed opportunities by any number

4    of other entities?

5              MR. RAFFERTY:  Object to the form,

6         vague.

7         A.    It's a broad question.  Can you be

8    a little more specific?

9         Q.    I meant it to be a broad question.

10             MR. RAFFERTY:  Object to the form.

11             You can answer it if you understand

12        what she's asking.

13             THE WITNESS:  Well, I think I

14        understand what she's --

15        A.    I certainly gave a good -- a good

16   deal of thought to FDA's role in this.  We

17   discussed that initially.  So I did that.  I

18   tried to gain an understanding of -- even

19   though I'm not -- if there's any distributor in

20   the room, I'm not -- I have no opinions on

21   distributors.  You can go take the day off.

22             I try to have some understanding of

23   DEA's role.  The database has distributor

24   information.  I certainly looked at -- for

Highly Confidential - Subject to Further Confidentiality Review

1    example, there are documents from the counties

2    on the database.  Looked at those.

3              So I looked at a broad range of

4    documents.  The scope of the question that I

5    was asked, though, was the manufacturer, so

6    I -- but certainly I think I have some

7    understanding with regard to FDA, certainly

8    with regard to HHS, a limited fashion with

9    regard to how FDA and DEA interacts on

10   legitimate medical need.

11        Q.   Did you -- did you look --

12             MR. RAFFERTY:  Are you finished

13        with your answer, Doctor?  That was a

14        vague question.

15             You said you meant it to be broad

16        and vague.

17        A.   But I will say that I tried in the

18   report to focus on the question that I was

19   asked, which focused on the manufacturers.  But

20   I -- but I did put it in the context -- the

21   broader context, yes.

22        Q.   Were you asked to focus

23   specifically on six manufacturers?

24        A.   I believe that was the -- yes.  I

Highly Confidential - Subject to Further Confidentiality Review

1    believe it was the manufacturers that, quote --

2    actually, let me -- let me take that back.

3            "Manufacturers" is probably not the

4    right term.  I was focused on certain drugs.

5    Sometimes manufacturers change.  So it was

6    really the drugs or which generic drugs.  And I

7    tried to list those.

8            If you -- so certain drugs that I

9    was told were the subject of the MDL and

10   certain drugs that were not the subject of the

11   MDL.

12       Q.   Do you know how many prescription

13   opioids there are that are outside the scope of

14   your report?

15       A.   Are you talking about branded

16   generics or generics or --

17       Q.   Any.

18       A.   I can -- I have charts here

19   available.

20       Q.   Do you -- do you know?  Can you

21   sit -- can you tell me what percentage of the

22   opioids on the market you actually looked at?

23       A.   In what year?

24       Q.   I'm asking if you know, sitting

Highly Confidential - Subject to Further Confidentiality Review

1    here today, when you thought about the claims

2    you're making -- and you make some pretty

3    sweeping claims -- how big a part of the pie do

4    you know you were looking at?

5              MR. RAFFERTY:  Object to the form.

6         A.    I looked at a very big part of the

7    pie.  I went back to the -- I went back -- I

8    looked at a very big part of the pie.

9         Q.    Do you know how many you didn't

10   look at?

11        A.    No, because I -- what I did is I

12   actually went back to the raw materials.

13        Q.    Do you know how many different

14   products you didn't look at?

15        A.    How many different products I

16   didn't look at?  I'd have to look again -- I'd

17   have to understand what class and what you mean

18   by "product."

19        Q.    Did you review the history of

20   hydrocodone products?

21        A.    Did I -- I am not a -- I reviewed

22   some of the history.  And actually, I decided

23   not to put it in the report because the report

24   was getting a little long.  But I did go back

Highly Confidential - Subject to Further Confidentiality Review

1    and review hydrocodone, certainly, products and

2    the codeine products.  I've looked at that

3    history, but it was not part of the subject

4    matter.

5          Q.    It's -- I won't find that

6    discussion in your report, correct?

7          A.    You'll have some -- there's some

8    discussion, very brief, that actually I -- I

9    ended up limiting it to just the very small

10   part in the history.  But I'm happy to discuss

11   the history.

12         Q.    And you didn't look at trends in

13   abuse or misuse of prescription pharmaceuticals

14   outside of the six manufacturers that --

15         A.    Oh, I certainly -- I mean, I can

16   sit here -- if you want to talk about abuse

17   trends, I'm happy to spend the next ten hours

18   talking about abuse --

19         Q.    That's not in your report?

20         A.    Well, but --

21         Q.    That's not in your report, is it?

22         A.    Well, my report -- again, I'm happy

23   to talk about abuse trends.  I'm happy to

24   talk --

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   All I'm asking, is it in your

2   report?

3      A.   You asked me whether I looked at

4   it.

5      Q.   I asked if it was in your report.

6      A.   Okay.  So no.  My report focuses --

7   well, that's not exactly true.  In certain

8   instances there are certain footnotes in my

9   report that go beyond -- for example, in the

10  ADF formulations and what the implications of

11  that for heroin and other compounds.  So there

12  are references to that in my report.

13     Q.   Did you do anything before issuing

14  your report to review internal documents from

15  any entities other than the six companies?

16     A.   Define "entities," please.

17     Q.   Either public or private

18  organizations.

19     A.   So is -- I mean, the --

20          MR. RAFFERTY:  Object to the form.

21     A.   I think it's fair to say, yes, the

22  discovery database that I saw had information

23  on a whole range of third parties from JCAHO to

24  the Robert Wood Johnson Foundation.  I've

Highly Confidential - Subject to Further Confidentiality Review

1    looked at those extensively.  They were

2    provided in discovery.

3              So there's a whole host of entities

4    that were looked at.

5        Q.   Internal documents from DEA?

6        A.   Internal documents from DEA?  I've

7    looked at -- I've looked at some documents from

8    DEA.  I wouldn't think that they're internal

9    necessarily.  They tended to be the more public

10   documents from DEA that I saw or DEA

11   presentations that I -- that I saw.

12       Q.   What about internal documents from

13   any manufacturer not part of who you're looking

14   at?

15       A.   So there were -- there were

16   subsidiaries of your client, for example,

17   Rhodes, others that I looked at in studying the

18   raw materials and the finished products, but

19   they were sort of -- I don't know whether

20   they're separate entities, you would consider

21   them, or they're the same as Purdue.

22             But certainly with Rhodes, I

23   studied Rhodes's manufacture of API.  I've

24   looked at, for example, Noramco,

Highly Confidential - Subject to Further Confidentiality Review

1   Tasmanian Alkaloids.  I mean, if you look at

2   the -- if you look at super poppy and the

3   production of super poppy and your client's

4   buying super poppy and the high alkaloid --

5           Q.   That's not what I asked.  I asked

6   about outside this.

7           A.   Yes.  Well, that's outside.  So

8   that -- if you look at Tasmanian -- the company

9   called Tasmanian Alkaloids that is owned by

10  Noramco that is owned by Johnson -- by

11  Johnson & Johnson, that Tasmanian Alkaloids,

12  for example, fed -- OxyContin would not have

13  been driven without Tasmanian Alkaloids and

14  super poppy.  So I looked at that.  Those were

15  entities maybe other than the six.

16          Q.   So, sir, at the time that you were

17  at FDA, was looking at internal company

18  documents part of anything the agency did?

19          A.   You're using internal company

20  documents?

21          Q.   Yeah, other than -- yes.  You

22  wouldn't look at internal sales and marketing

23  documents, would you?

24          A.   No.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    You wouldn't look at call notes?

2      A.    No.   That is correct.

3      Q.    You --

4      A.    We didn't have access to that.   FDA

5    would love to have access.

6      Q.    FDA doesn't look at draft plans?

7      A.    The FDA doesn't look at marketing

8    plans.   FDA doesn't look at budget plans.   FDA

9    would love to do that.   It doesn't have access

10   to that.

11     Q.    And none of that is within kind of

12   the skill set of the FDA reviewer?

13     A.    Oh.

14     Q.    There's no training or experience

15   that you have at FDA in looking at those kinds

16   of documents and interpreting them?

17           MR. RAFFERTY:   Object to the form.

18     A.    I took marketing in business

19   school.   So I'm well-trained.   I've been on

20   corporate boards where marketing plans get

21   presented all the time.   So I am well-trained

22   in marketing plans.

23           And -- but I can tell -- and the

24   agency certainly understands promotion.   Just

1    because it doesn't have -- the FDA has to play

2    peek-a-boo, in essence.

3           Q.    So the agency understands

4    promotion?

5           A.    Not the -- we could spend the next

6    hour answering that question.

7           Q.    Okay.

8           A.    I mean, not to the extent -- not to

9    the extent and the sophistication that's shown

10   in this record, right.

11          Q.    So --

12          A.    The agency has to look for intended

13   use.  The FDA sometimes in criminal cases may

14   get access, through DOJ and certain subpoenas,

15   to see certain things.  The Office of Criminal

16   Investigations get to see some of this stuff.

17                But FDA is constantly playing

18   peek-a-boo, right, and it's trying to put

19   together a piece because it only has access to

20   certain documents.  But the FDA, as you know,

21   has to figure out a company's intended use.

22                So FDA certainly understands

23   marketing plans from intended use.  It may not

24   be until the criminal stage, but your

1  company -- the industry --

2       Q.   Sir --

3       A.   -- doesn't want to turn those

4  things over to the agency.

5       Q.   Sir, it's not part of what FDA does

6  to interpret draft plans or internal plans, and

7  then -- and opine on them?

8            MR. RAFFERTY:  Object to the form.

9       A.   It certainly does to the Department

10 of Justice when -- in any criminal

11 investigation.

12      Q.   The FDA.

13      A.   I'm talking about the FDA's Office

14 of Criminal Investigations.  I can tell you

15 that FDA's Office of Criminal Investigations

16 will certainly look, check --

17      Q.   It's not what you did?

18           MR. RAFFERTY:  Objection.

19           Let him finish his answer.

20      A.   I set up the Office of Criminal

21 Investigations, right.

22           So the issue of -- FDA has to

23 determine the intended use.  The Act is

24 written -- as the article intended to affect

Highly Confidential - Subject to Further Confidentiality Review

1    the structure or function of the body.

2              FDA knows perfectly well that that

3    intended use comes from the marketing plans,

4    the business plans.  FDA would love to have

5    that.  But the industry doesn't make those

6    available to the FDA, so it's -- FDA has to go

7    find evidence here or there.

8              And then finally, if you're getting

9    into a 2007 event, right, which you got into,

10   then there's subpoena power, and then you could

11   start seeing a bigger picture.

12        Q.   So that would be a time where you

13   could see what the activities were?

14        A.   No.  You can -- you can go -- you

15   can go see these activities when you go to a

16   convention.  You can go see these activities

17   when you go online.  You can go see these

18   activities when you're talking to doctors.

19   What you don't get to see is, for example, the

20   surveys that the companies do of what doctors

21   are told or the extent of the return on the

22   investment from this activity.

23              FDA is perfectly competent and

24   knows how to handle those documents.  It just

1    doesn't get those documents because the

2    industry doesn't turn those over.

3         Q.   It's not part of what you would do

4    in the normal course?

5         A.   No.  FDA certainly looks at

6    intended use and whether the marketing was --

7    it just doesn't get this in all instances, and

8    it doesn't get this until certainly it has

9    subpoena authority.

10        Q.   Okay.  So let's just break this

11   down a little bit.  When a drug is approved,

12   the FDA knows that marketing is going to be

13   part of it, correct?

14        A.   Yes.

15        Q.   And the --

16        A.   Well, no, that's not true.  I mean,

17   they shouldn't -- FDA knows what the company

18   tells it.

19        Q.   FDA knows that most products today

20   that are branded are going to be marketed in

21   some way?

22        A.   FDA assumes that.

23        Q.   Okay.  And that it's going to be

24   marketed consistent with what the regulations

Highly Confidential - Subject to Further Confidentiality Review

1    require, consistent with the product labeling,

2    correct?

3         A.    No.   That's not actually correct.

4              The marketing has to be -- there

5    has to be substantial evidence of

6    adequate and well -- the Act requires that

7    there be substantial evidence based on adequate

8    and well-controlled clinical trials to support

9    the marketing.   Now, sometimes as a surrogate

10   for that we can use the term "label" because

11   it's subsumed that it's sometimes the label.

12             But the actual statute requires

13   substantial evidence of adequate and

14   well-controlled trials.

15        Q.    To support the label, the product

16   label?

17        A.    No, to support the marketing.   The

18   actual marketing --

19        Q.    Are you testifying that the

20   marketing can be outside the bounds of the

21   label?

22             MR. RAFFERTY:   Object to the form.

23        A.    Let me just be very clear.   The

24   marketing -- marketing -- and I am very sure of

Highly Confidential - Subject to Further Confidentiality Review

1    this -- that what FDA requires in any

2    promotional activity is that there be a

3    substantial evidence based on adequate and

4    well-controlled clinical trials to support any

5    promotional activity.

6              Now, in general, that is viewed as

7    the same standard for drug approval.  And in

8    general, if you want to go make a claim, FDA

9    will say, you need two adequate and

10   well-controlled clinical trials that support

11   that claim.

12             But the standard -- if FDA goes

13   into court, right, the standard is not whether

14   it's in the label.  The standard is whether

15   there is adequate and well-controlled clinical

16   trials to support that claim.  That's what has

17   to be shown in court under a misbranding

18   charge.

19        Q.   FDA knows that drugs today are

20   promoted, correct?  Branded products are

21   promoted.

22             MR. RAFFERTY:  Object to the form.

23        A.   That's not true in all instances.

24        Q.   In the overwhelming majority of

Highly Confidential - Subject to Further Confidentiality Review

1    instances that's true.

2         A.   I think that's -- I think that's

3    fair.  That's the reality.  But there are

4    certain drugs that -- there are certain

5    examples where that is not the case.

6         Q.   And they can be promoted to

7    physicians, correct?  FDA knows that?

8         A.   Sure.

9         Q.   And they can be promoted directly

10   to consumers.  That's something else FDA knows?

11        A.   They -- there's certainly -- yes,

12   FDA knows --

13        Q.   And --

14             MR. RAFFERTY:  Hang on.

15        A.   Well, that's a little complicated.

16   It's not -- it's not --

17        Q.   And the FDA knows that there's

18   branded promotion specifically of the product?

19             MR. RAFFERTY:  Object to the form.

20        Q.   Correct?

21        A.   There's branded promotion that --

22   it may not be specific to the product; it may

23   be tied to the product is probably more

24   accurate.  It can be color, form, other things

Highly Confidential - Subject to Further Confidentiality Review

1    that make it branded.  It's not necessarily

2    just the product name.

3         Q.   And there's -- and there's

4    unbranded promotion that doesn't talk about the

5    product specifically?  That's another type of

6    promotion that FDA knows exists and is allowed?

7         A.   Unbranded promotion that is false

8    or misleading is not allowed.

9         Q.   But generally speaking, when FDA

10   approves a drug, they know that companies can

11   engage in both branded promotion and unbranded

12   promotion related to the disease state or --

13   for the drug?

14        A.   That is generally a fair statement,

15   yes.

16        Q.   And FDA will -- when a -- when a

17   drug is approved, FDA actually has to approve

18   the launch-related promotion?

19        A.   Yeah, that may be a little bit an

20   overstatement.  Generally that happens at

21   launch, but sometimes there's material after

22   launch.  And I'm not sure -- it's generally

23   asked, it's required to be submitted as part.

24   I'm not sure it has to be approved under the

Highly Confidential - Subject to Further Confidentiality Review

 1    statute, but there --

 2          Q.   Do you know, sitting here today, if

 3    FDA approved the launch-related promotion for

 4    any or all of the products about which you have

 5    opinions?

 6          A.   Yeah.  I mean, I certainly have

 7    looked at that back-and-forth, for example.

 8    And I would say, for example, your company

 9    submitted certain materials; FDA told your

10    company what it thought; your company fought

11    the FDA; and it -- your company certainly

12    didn't follow what FDA was saying in that -- in

13    that back-and-forth with the FDA.

14          Q.   There can be a back-and-forth

15    between the company and the agency, correct?

16          A.   There's always back-and-forth.

17          Q.   Okay.  And whether it's fighting or

18    negotiating or reasonable disagreement, you

19    can't say what was in people's minds, can you?

20          A.   I can't -- I can't say that, but I

21    can say that it is striking to me, right, with

22    a controlled substance --

23          Q.   Sir, I'm just asking a question.

24          A.   I know you're asking a question.

1        What is striking to me is the

2   extent to which your company opposed and didn't

3   listen to what FDA said.  Curtis Wright was

4   very clear that he didn't want OxyContin to be

5   used as the drug to start with in non-malignant

6   pain.

7        Q.   Sir --

8        A.   That record is clear.  Your company

9   didn't -- opposed that repeatedly, must have

10  come back four or five times if you look at

11  that discussions, and in the end, you know --

12       Q.   Is there any launch-related

13  material in this case that the FDA did not

14  ultimately sign off on?

15       A.   I wouldn't want to use the word

16  "sign off."  I think that certainly there was a

17  positioning of this -- of your -- of your

18  client's product that was against what FDA was

19  telling you.

20       Q.   Did -- do you know, sitting here

21  today, that the FDA, after some back-and-forth,

22  said, we have no further comments on these

23  marketing materials?

24       A.   Yeah, I think at the end -- and

Highly Confidential - Subject to Further Confidentiality Review

 1    it's one -- FDA basically -- again, I wasn't

 2    there exactly.  It seems like FDA gave up after

 3    the nth reiteration on this.  But I --

 4         Q.    So this --

 5         A.    It's hard -- but it was very clear

 6    what FDA was saying.  They did not --

 7         Q.    So they --

 8         A.    They did not want this used except

 9    in very limited indications as for, in essence,

10    step two.  Curtis --

11         Q.    When the FDA says, we have no more

12    comment, on marketing material, at a minimum it

13    shows that they know what those marketing

14    materials are and are not further disagreeing

15    with the use of those marketing materials.

16         A.    Again, knowledge is a subjective

17    state of mind that I don't want to get into.  I

18    can talk --

19         Q.    So you're not prepared to say --

20               MR. RAFFERTY:  Would you please --

21         Q.    -- that if the FDA says, we have no

22    further comments on these marketing materials,

23    that that means, we have no further comments on

24    these marketing materials?

```
 1              MR. RAFFERTY:  Let the record

 2          reflect that constantly, counsel is

 3          interrupting the witness in the middle

 4          of an answer.  And I would ask that she

 5          stop doing that so that he can fully

 6          answer her questions, which, quite

 7          frankly, are mainly very vague and very

 8          open-ended, and he's trying to answer

 9          those questions.

10          Q.   When the FDA says, we have no more

11     comments on marketing materials, you're saying

12     that means something other than, we have no

13     more comments on these marketing materials?

14          A.   Again, you've got to show me

15     exactly FDA's words.

16          Q.   Okay.

17          A.   But I mean, I think you can take --

18     you can take that as what the English

19     language -- I mean, as what it sounds like.

20          Q.   Okay.

21          A.   The question is what these

22     materials are.  If FDA says things prior to

23     that, it means that it has -- you should take

24     into account the comments that were made
```

1    previously.

2         Q.   Okay.  Do you agree that at all

3    times FDA has maintained that prescription

4    opioids can be an important therapeutic option

5    for pain patients?

6              MR. RAFFERTY:  Object to the form.

7         A.   I can tell you, sitting there in

8    1994, I would not have stated it the way you

9    just stated.  I think that is vague.  It's an

10   overstatement.  It's not having fair balance.

11   I think it would be -- I think that statement

12   would be misleading.

13        Q.   Has FDA made that statement?

14             MR. RAFFERTY:  Once again, counsel

15             is interrupting the witness.  Let him

16             finish.

17        A.   I can tell you, when I made the

18   statements and when I instructed the agency to

19   make statements in my name on Duragesic, that

20   that was not -- that would not be the sum and

21   substance of what I said with regard to

22   Duragesic.

23        Q.   FDA as an agency has been on the

24   record saying that?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. RAFFERTY:  Object to the form.

2      A.   If you want to show me a specific

3  comment, quote, I'd be happy to look at it.

4          FDA -- again, I can tell you when I

5  was at the agency, I was very specific.  And as

6  I read you, that what I said was -- I'm happy

7  to read it again, right -- but that opioids, or

8  in that case, Duragesic was important for

9  cancer pain, and it might be useful in some

10  patients.  But I certainly would not want --

11  the import of what we were saying to the public

12  in 1994 was not that statement, nothing that

13  broad.

14      Q.   I --

15      A.   And that's where -- making

16  statements like that, right, without saying

17  that -- I mean, opioids are the -- are probably

18  the most addictive substance.  To make that

19  statement in isolation and not to say that

20  opioids are the most powerful, addictive

21  substance that we have or among the most

22  powerful addictive substances that we have --

23  to make that statement would be irresponsible

24  to say that alone and put a period after that.

1    Q.   Sir, I'm just going to be clear,

2    I'm going to ask you a bunch of questions.

3    They're all going to relate to after you left

4    the FDA and based upon your review of the

5    record, okay?

6        A.   But --

7        Q.   I just --

8        A.   That's fine.  But just so you know,

9    my review of the record -- for example, what

10   I'm telling you in 1994 is part of the record.

11       Q.   Okay.  I'm going to limit my

12   questions, so we're clear, to the time period

13   after you left FDA.  All right?

14       A.   You can limit your question to

15   however you'd like to, of course.

16       Q.   And just so I'm clear, have you

17   seen statements from FDA, not necessarily in

18   isolation, that prescription opioids can be an

19   important therapeutic option for pain patients?

20       A.   You'd have to show me the specific

21   statements.  I've seen a lot of statements and

22   a lot -- there's been a lot of testimony.  It

23   sounds like it may be the first half of a

24   sentence, you know, but I can't believe it's

Highly Confidential - Subject to Further Confidentiality Review

1    the only thing that would be said.

2         Q.   And have you seen statements in

3    your review of materials that FDA has

4    maintained that prescription opioids have a

5    role for patients with both cancer and

6    non-cancer pain?

7         A.   Again, that kind of statement would

8    be a general statement, but it would probably

9    be put in context as -- I mean, for example,

10   again, in certain patients, FDA believes --

11   again, and I should point this out, I mean,

12   sitting here today, there is -- there is no

13   adequate and well-controlled trial for chronic

14   use.  So it's hard to make that statement, but

15   FDA's been going along with this, right, but

16   there are no adequate and well-controlled

17   clinical trials supporting chronic use.

18        Q.   Sir, my question was cancer and

19   non-cancer pain.  FDA has taken the position

20   that prescription opioids have a role for

21   patients with both cancer and non-cancer pain.

22        A.   I said that in 1994, but I didn't

23   say it the way you just said it.

24        Q.   And FDA has taken the position that

1    it would not distinguish between cancer and

2    non-cancer pain --

3          A.    Let me just say --

4          Q.    -- in the indication?

5          A.    Let me just add to the previous

6    question.  That statement, for example, if you

7    go back and look specifically at what your

8    company was told, okay, that would be an -- not

9    only an inartful -- a non -- not artful

10   statement, it would be wrong.

11              FDA was -- your company was told

12   specifically, right, that opioids did not have

13   a role in diseases in non-chronic -- in

14   non-cancer pain for things like back pain and

15   osteoarthritis.  So that -- so that would be an

16   incorrect statement.

17              Now, FDA you can find statements

18   all over that are general boilerplate

19   statements.  But if you look precisely, your

20   company was told that it did not have a role in

21   chronic back pain -- in routine chronic back

22   pain or osteoarthritis.

23         Q.    FDA has never been willing to limit

24   the use of opioids just to cancer pain.

Highly Confidential - Subject to Further Confidentiality Review

1      MR. RAFFERTY:  Object to the form.

2      A.    It certainly did.

3      Q.    Okay.

4      A.    I mean, look at the label for --

5      Q.    All opioids generally?

6      A.    Hold on a second.  Look at the

7  label for Actiq.  It limited it to cancer pain.

8  The company didn't, but FDA did.  So --

9      Q.    So there's some opioids that FDA

10  has specifically limited to cancer pain and

11  then others that -- where it has not been

12  willing to limit it to cancer pain?

13      MR. RAFFERTY:  Object to the form.

14      A.    So if you look historically --

15  remember I told you that I acted on Oralet, and

16  that that product, I put into place very

17  specific REMS on that product.  So that that

18  tradition carried over with that same lollipop.

19      But you are -- it's fair to say

20  that if you look over different periods of

21  time, there are certain inconsistencies,

22  because the manufacturer owns the label, right.

23  There are inconsistencies between these labels.

24      Q.    Sir, the FDA has in some instances

1 limited certain opioids to use in cancer and

2 has been -- and has been public in saying, with

3 regard to many prescription opioids, it will

4 not limit them as to just cancer.

5     A.   I think that that's -- that

6 statement is -- while maybe it's -- one level

7 you can view it as not wrong, it's really

8 misleading --

9     Q.   Okay.

10     A.   -- because FDA was very clear that

11 it was -- it was limiting non-cancer pain too.

12 It was -- FDA wanted and FDA's position,

13 because I -- and I know this -- FDA's always

14 tried to walk a balance to try to make sure

15 that it makes available, right -- I mean, if

16 you have a crushed spine, right, and you don't

17 have cancer, right, but if you have a crushed

18 spine, right, FDA wants to be able to make sure

19 that patient can be taken care of.

20     So the reason why FDA has left this

21 door open a little on non-cancer pain was to

22 take care, as I said, these instances where

23 opioids can play a role, even if there is not

24 clinical trial evidence.  But that exception

1    should not be viewed as -- and should never be

2    viewed as the rule or the way you're stating

3    it.

4              MR. RAFFERTY:  Ms. Freiwald, we've

5         been going for almost two hours.  Can we

6         get to a point where we can take a

7         break?

8              MS. FREIWALD:  Yeah, we can take a

9         break.

10             MR. RAFFERTY:  Thank you.

11             VIDEO OPERATOR:  11:23.  We are off

12        the video record.

13             (Recess from 11:23 p.m. until

14        11:46 p.m.)

15             VIDEO OPERATOR:  11:46, we are on

16        the video record.

17   BY MS. FREIWALD:

18        Q.   Sir, there are regulations that

19   determine what documents a company submits to

20   the FDA as part of the drug approval process,

21   correct?

22        A.   Yes and no.

23        Q.   Would you agree there are

24   regulations that determine what documents --

1    what types of documents the -- a company

2    submits as part of the drug approval process?

3         A.    Yes and no.

4         Q.    Okay.  What is the "no" part?

5         A.    So for example, there are

6    certifications that are made to the agency

7    where a company has to notify the agency of new

8    information, new safety information.  That may

9    take many different forms.  What that document

10   is, what an inspector may ask for, that

11   specific document may not be specified in the

12   regulation.

13        Q.    Categories of documents that are --

14   and I'm asking about prior to drug approval

15   right now, okay?  So prior to drug approval,

16   there are certain types of information that,

17   pursuant to regulation, companies submit to the

18   FDA?

19        A.    So your question had two different

20   components.  You talked about both types of

21   information and then documents.  Can you

22   separate that out?

23        Q.    Well, I'm trying not to get hung

24   up, sir, because we only have a certain amount

1    of time together.  So I'm trying to not get

2    hung up on minutia when I think the spirit of

3    my question is something that I would think, as

4    prior Commissioner of the FDA, you probably

5    understand and we probably don't need to piddle

6    over.

7              So there are regulations that set

8    out the framework for what companies submit as

9    part of the drug approval process?

10             MR. RAFFERTY:  Object to the form,

11        move to strike the preamble.

12        A.   So there --

13        Q.   It's a yes or no question.

14             MR. RAFFERTY:  No, he can answer

15        the question.

16        Q.   It's a yes or no question.  Are

17   there or are there not?

18             MR. RAFFERTY:  No, answer the

19        question as you need to.

20        A.   So I studied this, I've lived this,

21   I've enforced this over 40 years.  There is an

22   iterative process, and the company may -- the

23   FDA may be asking for documents in certain

24   instances or types of information that -- in

1   one company that it may not ask in another

2   company.

3          So it is not -- I mean, the goal,

4   okay, is, I think it would be fair to say, that

5   information that goes towards safety and

6   effectiveness -- very broad, right -- I mean,

7   this is within the purview.  But within that

8   there are thousands of different types of

9   documents, types of information.  So it's

10  just -- it's an iterative process, I think

11  would be an accurate way to say it.

12         Q.   Okay, fine.

13         So as the FDA is reviewing an NDA,

14  an application for approval, there is an

15  iterative process of review.  Is that fair?

16         A.   Yeah.  So I --

17         Q.   Okay.  Is that fair?

18         A.   Let me answer that question.

19         It was fair.  And it was especially

20  fair with regard to the pilot drug division,

21  which was a little bit of an exception from the

22  normal review process.

23         Q.   I'd like to talk about that.  Not

24  right now, but I promise you we will talk about

Highly Confidential - Subject to Further Confidentiality Review

1  it.

2      A.   I look forward.

3      Q.   And as the FDA goes through its

4  review, it can go back to a manufacturer and

5  ask for additional information, correct?

6  That's one thing it can do.  I'm not saying

7  everything, but it's one thing it can do.

8      A.   Yes.

9      Q.   Another thing it can do is tell a

10  manufacturer that it's not satisfied with the

11  quality of a study?

12      A.   Not quite that simple, but in

13  general, I'm sure the general point has

14  validity.

15      Q.   It can go back to a manufacturer

16  and say that it's not satisfied with the

17  quantity of studies that have been submitted?

18      A.   In the end the agency can approve

19  or not approve.  That's really what it can say.

20  It can share that information or not.  But the

21  decision is really under the statute of whether

22  to approve or not approve.

23      Q.   So the agency can say to a

24  manufacturer that the agency believes the data

1    submitted is not sufficient and the drug will

2    not be approved on the strength of the

3    submission as it has it at that time?

4              MR. RAFFERTY:  Object to the form.

5         A.    Not exactly.  I mean, for example,

6    in a number of these instances the drugs were

7    only approved based on -- consistent on certain

8    other things, on certain risk maps the

9    agency -- so it was things to come.

10        Q.    I'm not trying to be exclusive in

11   my question.  I'm -- I'm --

12        A.    I'm just trying to be accurate.

13        Q.    I'm engaging in an iterative

14   process with you.

15        A.    I'm happy to do that.

16        Q.    So just so we're clear, when I say

17   "the agency can," I'm not suggesting that it's

18   the only thing the agency can do; it's just one

19   thing the agency can do.

20              So let's try to tick off a list,

21   and if I've missed some things, you'll tell me,

22   okay?

23        A.    Okay.

24        Q.    So one thing the agency can do is

1   go back to a manufacturer and say, we're not

2   satisfied with the quantity or quality of the

3   data we've seen so far.  We're not going to

4   approve your product.

5         A.    Fair.

6         Q.    Another thing it can do is say,

7   we're not satisfied at this point, but if you

8   would do something additional, we will look at

9   it, and then perhaps we will be able to approve

10  your product.  And they can define what that

11  additional something is.

12        A.    Leave off the last part of your

13  sentence, that we'll approve the product, but

14  they certainly, say, could make suggestions and

15  they would say they would look at it, yes.

16        Q.    Right.  Right.  Well, I said, if

17  they're satisfied.

18        A.    Yes.

19        Q.    Not that they will necessarily

20  approve the product.

21        A.    Yeah, you're saying what the agency

22  would say.  So -- but I'm just saying, the

23  agency will say, if you do so, we'll look at

24  it.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  They don't make any advance

2  promises to a manufacturer that they're going

3  to approve a product.

4    A.    Well said.

5    Q.    And another thing the agency can do

6  is say, we will approve your product but

7  subject to you doing some further work

8  post-approval, correct?

9    A.    Yes.

10    Q.    And that further work can be a

11  requirement of additional studies?

12    A.    Or risk management plans, yes,

13  correct.

14    Q.    Okay.  So I'm just taking it one

15  thing at a time.

16    A.    Correct.

17    Q.    One thing the agency can do is

18  require manufacturers to do additional

19  randomized controlled clinical trials after

20  approval, correct?

21    A.    Certainly under the accelerated

22  approval regulations, that would be correct.

23    Q.    Another thing they can do is

24  require the manufacturer to engage in

1  epidemiological studies after approval?

2      A.   There can be phase 4 commitments.

3      Q.   Another thing they can do is impose

4  additional risk management requirements on the

5  product, correct?

6      A.   Again, today that's true.  That was

7  not true at all times.

8      Q.   Okay, fair enough.  So --

9      A.   I mean, again, simply put, it

10  wasn't -- the authority may have been murky.

11  We did it on Oralet.  The authority became

12  clearer afterwards.

13      Q.   Would you agree with me that as of

14  2001, at least, the FDA had the ability to tell

15  manufacturers that they wanted to see

16  additional risk management programs as part of

17  continued approval of drugs?

18      A.   Going back to drugs that are

19  already on the market or drugs coming to the

20  market?

21      Q.   In this case I'm going to say a

22  drug already on the market.

23      A.   No.  So that becomes -- that's a

24  whole different kettle of fish.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    Would you agree with me -- and I

2    don't want to get too deep into Purdue -- but

3    that as of 2001, the agency said, we're going

4    to want you to take on additional risk

5    management, and that that was going to be part

6    of the obligation?

7       A.    There was a series of advisory

8    committees and a series of back-and-forth over

9    a period of several years around that time

10   period, 2001 and 2002, where those things were

11   discussed, yes.

12      Q.    Are you aware that as of 2001,

13   there were additional risk management

14   commitments?

15      A.    There were risk management

16   commitments beginning -- I'm not sure exactly

17   what they were called -- they were called

18   different things at different points in time,

19   and there were different supplemental things --

20   it was at different points in time.

21      Q.    So today we refer -- "we," the

22   agency, refers to its risk management programs

23   as REMS, correct?

24      A.    That was specifically codified in

Highly Confidential - Subject to Further Confidentiality Review

1    statute.

2         Q.    Correct.  And that's 2009?

3         A.    Fair.

4         Q.    Something like that?  And --

5         A.    It was 2007.  It was FD --

6         Q.    2007?

7         A.    Well, the statute was FDAAA 2007

8    where the agency sought that authority and got

9    that authority specifically.

10        Q.    Okay.  So 12 years ago, the agency

11   had the REMS authority, correct, as REMS?  We

12   started calling it REMS?

13        A.    Correct.

14        Q.    And before that, there were risk

15   management plans that the agency, in

16   circumstances where it thought necessary,

17   required of manufacturers, and they were called

18   risk management plans or something else?

19        A.    Correct.

20        Q.    Substantively, however, the

21   elements of those risk management plans often

22   looked a lot like what the REMS look like

23   today?

24             MR. RAFFERTY:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Yes and no.

2          Q.    Okay.   They had different

3    components.   Is that fair to say?

4          A.    Fair point.

5          Q.    And is it fair to say that the

6    components of those risk management programs

7    could vary drug to drug, depending upon what

8    the agency considered to be the need under

9    particular circumstances?

10         A.    But as you know, there were

11   class-wide REMS, so that -- so that probably

12   is -- again, you can put that in your question

13   somewhere.

14         Q.    I'm using "drug to drug" loosely.

15   So yes, sometimes the specifics the agency

16   might think apply to a broad class of drugs,

17   correct?

18         A.    Right.

19         Q.    And sometimes there would be

20   requirements imposed just on an individual

21   manufacturer, either because the drug wasn't

22   part of a broader class or because the agency

23   perceived there to be intraclass variation?

24              MR. RAFFERTY:   Object to the form.

1     A.    Yes.

2     Q.    Okay.  And even before the formal

3  risk management plans, the FDA functionally, by

4  its ability to not approve a drug, could say to

5  a manufacturer, we're going to require you to

6  do more than just have --

7     A.    I did that specifically in Oralet.

8     Q.    Great.

9           And essentially because the FDA can

10  always just say, we're not approving your drug,

11  the manufacturers are in a situation where, if

12  they -- if they can't give the agency what they

13  want, their drug may not get approved?

14           MR. RAFFERTY:  Object to the form.

15     A.    So you're -- what you're -- what

16  you're mixing up, Counsel, is -- and that's why

17  I asked you whether you're dealing with

18  pre-approval or post-approval, right.  So it --

19     Q.    Let's talk pre-approval for

20  starters.

21     A.    Well, let me just finish my answer

22  just so the record is clear.

23           So as you know, for example, you

24  took me through, your drug was -- your client's

Highly Confidential - Subject to Further Confidentiality Review

1   drug, one of them was approved in '95, '96, and

2   then you talked about REMS in 2001.  So what

3   the agency --

4        Q.   I actually didn't talk about REMS

5   in 2001 because REMS didn't exist.

6        A.   I'm sorry.  You talked about -- I'm

7   sorry.  You talked about risk maps and then we

8   talked about REMS later on, right.

9             But for example, the authority the

10  agency had about not approving, that leverage

11  existed before your drug was approved.  Once

12  your drug -- or anyone's drug is approved, the

13  burden shifts to the agency.

14            And what you will see, again, from

15  counsel and FDA counsel, right, and what you

16  saw here is the ability to say, I'm not going

17  to approve your drug.

18            FDA missed that opportunity.  So

19  the drugs are already on the market.  So the

20  burden then falls to the FDA.

21            So this notion of just, well, we

22  can just say we're not going to approve it,

23  that all-being authority that you just gave to

24  the FDA didn't exist in 2001, et cetera.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   So let's take it in pieces.

2         So prior to approval, you will

3    agree with me that the FDA can say just, no,

4    we're not going to approve your drug, correct?

5    A.   Based on statutory -- it has to --

6    it has to have a statutory basis, a reasonable

7    basis, to do that.

8    Q.   Okay.  After approval, the FDA can

9    say, we're going to engage in a process to look

10   at whether we think you can continue to market

11   your drug, correct?

12   A.   A much higher burden.

13   Q.   Higher burden, but they still have

14   that authority, correct?

15   A.   Well, the FDA could go in and it

16   could affirmatively -- well, understand what

17   would have to happen, right.

18   Q.   They could have a review process?

19   A.   Okay.  I mean, you can have -- you

20   can review as much as you'd like, but the,

21   quote, taking the drug off -- my only point is

22   that taking the drug off the market, right, is

23   not as simple, right, and it is not that kind

24   of threat.  And that's one of the problems

Highly Confidential - Subject to Further Confidentiality Review

1    because FDA feels ham -- somewhat its hands are

2    strung to a much greater extent once a drug is

3    on the market than prior to being on the

4    market.

5         Q.   Not as simple because there needs

6    to be a review process about whether it's the

7    appropriate decision or not?

8         A.   No.  That's -- what FDA knows is,

9    once a drug is on the market, if it's going to

10   require something, right, and it knows it's

11   going to insist on something it has -- FDA

12   doesn't have the authority, for example, to

13   compel, prior to 2007, a change on the label.

14        So it knew that it would have to go

15   in order -- into court and it would have the

16   burden, right, of showing that something -- not

17   was safe, but was unsafe.  And, I mean, it's a

18   much higher -- it's a shifting of the burden

19   post-approval.

20        Q.   Is it your testimony that, prior to

21   2007, the FDA did not have the authority, if it

22   chose, to withdraw approval of a drug?

23        A.   I never testified to that.

24        MR. RAFFERTY:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Because that's true, right?

2    A.   No, I'm sorry.

3    Q.   Even at all times --

4    A.   No.  No.

5    Q.   I just want to be clear on

6  something.

7    A.   FDA can't just withdraw a drug.

8    Q.   It can make a determination that

9  the -- that the -- that the drug cannot

10  continue to be marketed as safe and affected --

11  as safe and effective as labeled?  It can make

12  that determination and compel -- and compel --

13    A.   Only a Court can compel at that

14  point.  So, I mean, that's the problem.

15    Q.   What is the authority for that?

16    A.   I mean, it's 40 years of food and

17  drug law.

18    Q.   Is there a place -- is there a

19  document or a regulation that you can point me

20  to?

21    A.   It's a -- if you read the statute.

22  I mean, the statute is constructed in such a

23  way that gives the agency the authority under

24  505 to approve an application.  If --

1    Q.   And to withdraw --

2         MR. RAFFERTY:  Let him finish the

3    answer.

4    A.   Just so you know, if you want to

5    withdraw an application, there are regs to do

6    that, but the hoops the agency has to go

7    through -- there are hearing processes that are

8    much more extensive post-approval than

9    pre-approval.

10   Q.   Okay.

11        So if you read the statute, the

12   statute is constructed in such a way that gives

13   the agency the authority under 505 to approve

14   an application.  Just so you know, if you want

15   to withdraw an application, there are regs to

16   do that.

17        But there are more hoops?

18   A.   Yeah.  I mean --

19   Q.   Okay.

20   A.   -- you can say there's an imminent

21   hazard, but I have to prove --

22   Q.   But --

23   A.   -- certain things.  I can only --

24   that ability to compel ultimately -- because

Highly Confidential - Subject to Further Confidentiality Review

1    I've been in that situation.  If you want to

2    pull a drug that's already on the market,

3    right, I mean, I can talk to the CEO, but if

4    the CEO says, no, right, that's going to end up

5    in court.

6         Q.   It's more to do, but it can be

7    done, right?  It's within the agency's

8    authority?

9         A.   You can't compel.

10            MR. RAFFERTY:  Objection.

11       Q.   Okay.

12       A.   It doesn't have the authority to

13   compel a manufacturer to do that.

14       Q.   Okay.  Literally to compel.

15            But the agency can go through a

16   process, and there can be a vote and a decision

17   that the drug should no longer be licensed.

18   And the agency has done that, correct?

19       A.   No, no.  There's no such thing as a

20   vote.

21       Q.   It's even done that with regard to

22   pain medications, hasn't it?

23            MR. RAFFERTY:  Object to form.

24       A.   It has -- it has pulled -- it

1    has -- most of these things are done, right,

2    just so you know, a back-and-forth between -- I

3    get on the phone -- I mean, I've been there,

4    right.  I get on the phone with the CEO and I

5    say, I may -- I need you to pull this, right,

6    but I don't have the authority to compel.

7         Q.   Okay.  But you've gotten on the

8    phone with CEOs of pharmaceutical companies and

9    said, I need you to pull your drug.

10        A.   Right.

11        Q.   And you can do that.  And any

12   Commissioner could do that.

13        A.   I can -- the First Amendment right

14   still exists, but I don't have the authority to

15   order that.

16        Q.   And in fact, drugs have been --

17   whether you want to call it recalled or

18   withdrawn --

19        A.   The --

20        Q.   -- from the market -- just let me

21   finish my question -- from the market as a

22   result of a process whereby the FDA makes it

23   clear that that's what it wants to have happen?

24             MR. RAFFERTY:  Object to the form.

1      A.   Yes and no.

2      Q.   Okay.  So -- and in fact --

3      A.   If a company decides to go along,

4  it may say after that phone call -- it may pull

5  the drug.

6      Q.   Or it may take some time.  But

7  eventually it can happen.

8      A.   It certainly -- well, a CEO can

9  stop selling the drug tomorrow.

10     Q.   But the CEO can also stop selling

11  the drug, not because the CEO wants to, but

12  because it's very clear that's where the FDA is

13  headed?

14          MR. RAFFERTY:  Object to the form.

15     A.   The CEO can make any decisions the

16  CEO wants.

17     Q.   In fact, the FDA has done that in

18  the area of pain drugs other than opioids,

19  haven't they?

20     A.   What's "that"?

21     Q.   They have compelled the withdrawal

22  or the removal from the market of pain

23  medications other than opioids.

24     A.   Again, you're using a -- the word

Highly Confidential - Subject to Further Confidentiality Review

1    "compel," and I'm not sure I would agree with

2    the word "compel."  You'd have to look at the

3    actual letter in the -- I mean --

4         Q.   You know, sir, don't you --

5         A.   Hold on a second.

6         Q.   -- that there are --

7              (Simultaneous speaking.)

8              MR. RAFFERTY:  Let him finish his

9         answer, please.

10        A.   Okay.

11        Q.   I'm not going to use "compel" in a

12   technical way.

13        A.   Well, I --

14        Q.   I'm going to use it in a common

15   sense way, because I think we both know that

16   the agency has used its authority, whether --

17   in any number of ways.  People take the FDA

18   pretty darn seriously, don't they?

19             MR. RAFFERTY:  Object to the form.

20        Q.   So if --

21        A.   Some do; some don't.

22        Q.   Well, the FDA has surely used its

23   authority, including with regard to pain

24   medications other than opioids, to effect

Highly Confidential - Subject to Further Confidentiality Review

1    withdrawal of products.

2                MR. RAFFERTY:  Object to the form.

3         A.   Different -- as you know, after

4    2007, different points in time, different

5    statutory authorities were given to the agency.

6         Q.   And in fact, we've talked --  we're

7    going to talk mostly about opioids today, but

8    the agency was quite effective at taking some

9    non-opioid pain medicines off the market in the

10   mid-2000s.  Isn't that true?

11               MR. RAFFERTY:  Object to the form.

12        A.   Can you give me an example of what

13   you're talking about?

14        Q.   Bextra.

15        A.   I'm not here -- I'm not here to

16   talk about specific other compounds.  I get --

17        Q.   You know that Bextra is a Class II,

18   right?

19               MR. RAFFERTY:  There has got to be

20           an end to the interruptions.

21               MS. FREIWALD:  Well, I --

22               MR. RAFFERTY:  No, but there needs

23           to be.

24               MS. FREIWALD:  We have a limited

1    amount of time.

2         MR. RAFFERTY:  That doesn't allow

3    you to interrupt the witness.

4         MS. FREIWALD:  Well, I have a right

5    to get an answer to my question.

6         MR. RAFFERTY:  You're right.  And

7    he is answering your question.

8         MS. FREIWALD:  So he said he

9    doesn't -- he's not going to talk about

10   other opioids, but I -- so I'm going to

11   move on.

12   A.   Class II is not an opioid.

13   Q.   I'm sorry.  He said he's not --

14   he's not going to --

15   A.   I just --

16   Q.   I meant to say you're not going to

17   talk about other products -- other products.  I

18   misspoke.

19        A.   I'm happy to talk about other

20   products.  But if you're making a statement

21   that FDA compelled Bextra, let's put in front

22   of me -- because I want to be exact -- and I'm

23   sorry I'm just -- I may be -- I don't mean to

24   frustrate you if I'm too precise.  But you used

1    the word "compelled," right.

2              The majority of withdrawals that

3    happened in the 2000s, right, were the

4    result -- and I'm pretty sure this was the case

5    with some of the high profile drugs in the

6    early 2000s -- where the company ultimately

7    voluntarily decides to pull the drug.

8              I am not aware of any formal

9    rule-making or administrative hearings that

10   these drugs went to or any court actions where

11   there was an order to compel in the early

12   2000s.

13        Q.   Fair enough.  I'm going to try to

14   find some language where you don't feel like

15   I'm using "compel" in that kind of literal,

16   court-ordered way.  So I'll stipulate to that.

17              I'm -- what I am saying is, there

18   are examples in the 2000s of the FDA actively

19   working to get certain pain medicines off the

20   market, and that happened.

21        A.   Yeah, I'd have to -- I'd want to go

22   back and review the record.  You obviously have

23   Vioxx.  You have Bextra.  There are a number of

24   drugs.  I'd want to review the exact history to

Highly Confidential - Subject to Further Confidentiality Review

1    see whether it's -- whether I would agree with

2    your statement.

3              In general, I can tell you, because

4    I've been there and I've had, again, other

5    counsel, FDA counsel -- it should just be very

6    clear that once a drug is on the market, right,

7    that all-knowing authority that you're trying

8    to give the FDA just doesn't -- it's not the

9    world that exists.

10         Q.   I'm not saying -- I'm not arguing

11   with you as to whether there's a different kind

12   of set of circumstances post-approval from

13   pre-approval.  I will agree with you on that,

14   okay?

15         A.   I think the -- the last one I think

16   the agency --

17         Q.   There's no question.  There's no

18   question pending.  I didn't ask you a question.

19         A.   Okay.

20         Q.   So that's clear on the record.  I'm

21   not trying to say that the world is exactly the

22   same pre-approval as post-approval, okay?

23         A.   Right.

24         Q.   But whether you call it a compelled

1    recall or a voluntary withdrawal or something

2    in between, there are examples of pain

3    medicines coming off the market as a result of

4    FDA scrutiny and pressure, outside of the

5    opioid class.

6            A.   I'd want to go back --

7                 MR. RAFFERTY:  Object to form.

8            A.   The last -- the last one that I

9    remember -- last drug I remember coming off,

10   and people can remind me, was phenformin.  I

11   mean, the authority that the agency had -- and

12   that was not a pain medicine.  But the --

13           Q.   That's not my question.  I asked --

14           A.   No, let me finish.

15           Q.   No.  I have a right --

16           A.   I'll tell you what your question --

17           Q.   Look, sir --

18                MR. RAFFERTY:  He's answering your

19   question.

20                MS. FREIWALD:  No.

21                MR. RAFFERTY:  You asked a very --

22                (Simultaneous speaking.)

23           A.   I'm answering the question.

24           Q.   No, you're not.  No, you're not.  I

Highly Confidential - Subject to Further Confidentiality Review

```
1    asked --

2          A.    The last authority the agency

3    had -- the last --

4          Q.    Sir, with all due respect, I did

5    not ask you about the history or the last thing

6    that they --

7          A.    No, but --

8          Q.    I didn't ask you ---

9          A.    But you used certain standards.

10         Q.    No.  I'm going to read my

11   question --

12               (Simultaneous speaking.)

13         A.    -- like compelled -- go ahead.  You

14   asked about compelled and voluntary.

15         Q.    I'm going to read my question --

16               (Simultaneous speaking.)

17               MR. RAFFERTY:  The court reporter

18         can't take you down.

19               (Reporter interruption.)

20         Q.    Sir, I'm going to read my question

21   back.  And if you are right, then you'll go

22   ahead and answer.  And if I'm right, I'm going

23   to ask you to go ahead and answer consistent

24   with my question.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Whether you call it a compelled
 2    recall or a voluntary withdrawal or something
 3    in between, there are examples of pain
 4    medicines coming off of the market as a result
 5    of FDA scrutiny and pressure, outside of the
 6    opioid class.  That's correct?
 7         A.   No.  I don't think -- the spectrum
 8    that you give, compelled recall or voluntary
 9    withdrawal, if -- I mean, the standard on
10    withdrawal, okay, as I remember the statute --
11    I'd want it in front of me to refresh my
12    memory -- is imminent hazard, right?
13              So that's the standard on
14    compelled -- on your compelled.  It's -- I
15    mean, so that's the kind of standard one would
16    have to -- and I -- and I am -- I know that
17    both Bextra and Vioxx were not done under the
18    imminent hazard authority.  So I would have to
19    go back and review the authority to which
20    you're ascribing and we'd have to determine
21    that.
22              I'm just not prepared -- I mean, I
23    just didn't do my homework to tell you exactly
24    under what authority you're saying FDA, in
```

Highly Confidential - Subject to Further Confidentiality Review

1    essence, pressured or required, or the history.

2    I'm not -- I can't agree with that.

3         Q.   Okay.  Okay.

4              MS. LEVY:  On behalf of the

5         subsequent defendants that are entitled

6         to question this witness on the record,

7         I'm going to object to the continuous,

8         obvious filibustering and request on the

9         record that Dr. Kessler be instructed to

10        please try to keep his answers succinct

11        and direct and responsive to the

12        question asked.

13             I believe we are being prejudiced,

14        for the other defendants who have

15        significant questioning for this

16        witness.  And the failure to be able to

17        get a short, direct answer to a question

18        is materially prejudicing us, and we

19        request from the witness and from

20        counsel that the witness be instructed

21        to please give short and clear answers

22        to the questions.

23             MR. RAFFERTY:  Well, we have a

24        fundamental disagreement as to that, and

```
 1              I disagree wholeheartedly.  I think the

 2              questions are open-ended, vague.  Most

 3              of the time there's no time frame given.

 4              There's all these generic, open

 5              statements being made.  And the witness

 6              has a right to explain why his position

 7              is what it is.

 8                   MS. FREIWALD:  No, sir.  And we

 9              actually just demonstrated that.  The

10              witness was so clearly not answering a

11              question I asked.

12         Q.   So we're going to -- so can we

13    agree that Bextra was a Class II?

14         A.   I believe so.

15         Q.   And can we agree that it was -- it

16    was for pain?  It was a pain medication?

17    That's what Class IIs were.  They're one of the

18    types of medicines that are used for pain.

19         A.   It was a nonsteroidal, yes.

20         Q.   Okay.  It was -- it is one of

21    the -- nonsteroidal anti-inflammatory drugs are

22    one category of drug that is used for pain

23    management, correct?

24         A.   And you have to give me the -- if
```

Highly Confidential - Subject to Further Confidentiality Review

1   you give me the label, we can -- I can be sure

2   that --

3         Q.   Are you really seriously going to

4   tell me that you don't know that NSAIDs are

5   used for pain management?

6         A.   No.  But I just want to be sure

7   that the label doesn't include other things.

8   That's what I wanted to be sure --

9         Q.   I'm not asking you to read the

10  label, sir, here.  I'm asking you just in kind

11  of normal English whether you're prepared to

12  say that you know that NSAIDs are used for pain

13  management?

14        A.   Yes.  But NSAIDS could -- I mean, I

15  just wanted --

16        Q.   That's all I want to know.

17        A.   Yes, among other things.

18        Q.   Okay.  And that was a drug that

19  came off the market in the mid-2000s because

20  there were questions about whether the

21  risk/benefit profile of that drug continued to

22  be sufficient to sustain its continued

23  marketing?

24        A.   I haven't studied that of late, so

1    I can't testify specifically.  I'm happy to go

2    back and do that homework and look at that.

3         Q.  So is it your testimony that,

4    sitting here today, you can't testify to how

5    many times the FDA or under what circumstances

6    the FDA has either compelled or managed to

7    obtain, through some kind of mutual agreement

8    with a company, the withdrawal of a product for

9    pain medicine -- for pain management?

10        A.  So I think I told you, I mean, in

11   my testimony that the one instance where there

12   was a compelling -- where the agency compelled

13   under the imminent hazard authority, that was

14   not for pain management.  And I think I

15   testified that that authority was not used, I

16   believe, in Bextra or others.

17        Q.  And my question was about pain

18   management.

19        A.  So I don't -- I don't --

20        Q.  You don't know?

21        A.  No.  I don't believe that the

22   imminent hazard authority for drug was used to

23   compel withdrawal.  And that's really the

24   authority that one has under the act to compel.

1    Q.   My point, sir, is that drugs have

2  come off the market because the FDA, working

3  with manufacturers through a process, has

4  determined that they shouldn't remain on the

5  market.  And whether you call it voluntary or

6  you call it compelled, that has happened, and

7  it's happened with regard to pain medicines.

8    A.   So I'm not prepared -- I haven't

9  done the homework to know exactly the

10  historical reason and back-and-forth, or the --

11  what was in the minds of the individuals at the

12  times they made the decisions on Bextra or --

13    Q.   Do you know it's generally true

14  that it happened?

15    A.   I'd want to go -- I'd want to go

16  back and review the historical record on

17  exactly why it was done in Bextra.

18    Q.   So when you're giving testimony

19  about whether the FDA could or could not have

20  asked for withdrawal of any opioid product, you

21  don't -- you don't know enough, do you?

22         MR. RAFFERTY:  Object to the form.

23    A.   Are you kidding, ma'am?  Are you

24  being --

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Are you --

2      A.   I don't know enough about what,

3   please?

4      Q.   Let me ask a different question.

5           Is it your testimony that the FDA

6   should have asked for withdrawal of opioid

7   products?

8      A.   I mean, in certain instances it

9   clearly should have.  And -- I mean, I think

10   the record shows that, that in certain

11   instances it should have done that.

12      Q.   Beyond -- those are instances where

13   it did do that?

14           MR. RAFFERTY:  Object to the form.

15      Q.   There are certain opioid products

16   that we know have come off the market?

17      A.   Yes.

18      Q.   I assume you're alluding to those?

19      A.   Yes.

20      Q.   Aside from those instances where

21   opioid products that were licensed actually

22   came off the market at the behest of FDA, are

23   you -- I want to know, are you saying that

24   there are other opioid products that you --

Highly Confidential - Subject to Further Confidentiality Review

1    that it's your opinion should have come off the

2    market?

3            A.   I think -- in certain instances --

4    I mean, for example, the oxymorphones, the

5    super-fentanyls that we talked about earlier,

6    there are certain opioids -- if they -- I think

7    the way to probably phrase it, that if they

8    cannot be -- if they cannot be safely -- if

9    they cannot be appropriately and safely used

10   and marketed, I mean, for the intended

11   populations, that their introduction into

12   interstate commerce puts people at risks.

13           Q.   Is it your testimony that

14   extended-release single-agent oxycodone

15   products should have come off the market?

16           A.   It's a complicated question.

17           Q.   No, it's very simple.  I want --

18   you're offering opinions in this case.

19               I want to know whether it is your

20   opinion that extended-release oxycodone

21   products should have been removed from the

22   market at any point in time up through today?

23               MR. RAFFERTY:  Objection, move to

24           strike the preamble.

Highly Confidential - Subject to Further Confidentiality Review

1          A.    You're asking me specifically

2   oxycodone?

3          Q.    Extended-release oxycodone products

4   is what I'm asking about right now.

5          A.    Right.  So I don't -- I did not

6   favor, in 1994, the removal, I mean, of -- when

7   I was confronted with an opioid, it was a

8   different opioid -- the removal of, for

9   example, the fentanyl patch from the market.

10          Q.    Sir, I'm not asking you about

11   fentanyl patch.

12          A.    But I mean, I'm just --

13          MR. RAFFERTY:  You asked his

14          opinion, and he's giving your opinion.

15          THE WITNESS:  And I offered --

16          MS. FREIWALD:  No, I didn't ask his

17          opinion on --

18          (Simultaneous speaking.)

19          MR. RAFFERTY:  You did.

20          MS. FREIWALD:  Troy, I didn't ask

21          his opinion on any subject he wants to

22          talk about.  I asked his opinion whether

23          extended-release oxycodone products

24          should have come off the market.

1           A.    The -- I am in general -- I took

2    the position back then, in 1994, and I hold it

3    today, that for the risk/benefit equation in

4    cancer, and certainly in some types -- in very

5    limited types of non-cancer pain, right, that

6    the risk/benefit equation, right, would

7    continue justifying that continued marketing.

8                 I do think going forward, in the

9    light of the -- the fact that there's now

10   only -- there is one -- there's one randomized

11   controlled clinical trial for a year that shows

12   no -- that does not demonstrate efficacy, and

13   the fact that the agency doesn't have and has

14   admitted that it doesn't have long-term

15   efficacy -- when I said earlier, I think FDA is

16   going along, in the absence of that evidence,

17   you sit there and you think, how can I justify

18   leaving this on the market, right, because

19   there's not long-term evidence for chronic use

20   for extended-release oxycodone.  So it's a

21   conundrum.

22                 And I think the agency -- certainly

23   when I was at the agency, because you wanted to

24   walk this balance carefully and you don't want

Highly Confidential - Subject to Further Confidentiality Review

1   to upset the apple cart, all right,

2   that you're -- and it's already on the market,

3   you want to be careful.

4           So I think there is a continued use

5   for cancer.  My guess is that that will

6   continue.  My sense is, the evidence is not

7   supporting non-cancer use, I mean, as far as

8   the clinical trials.

9           But I mean, I think that that

10  question is still out as far as the evidence.

11  The evidence is not there.  And I think

12  eventually the agency, depending on that

13  evidence, is going to have to make a hard call,

14  harder than it's wanted to make.

15          But I think for the time being, if

16  you leave it for cancer and some very limited

17  cases for non-cancer, right, and you limit it

18  to short-term, lowest dose, that would be my

19  opinion today.  But I -- but I recognize that

20  I'm going against the traditional standard of

21  having adequate and well-controlled clinical

22  trials because they don't exist.

23      Q.   So just the answer to my question

24  simply is, no, you're not going to offer an

1    opinion that the products -- the

2    extended-release oxycodone products should have

3    been completely pulled from the market at some

4    point in time up through today?

5        A.    I think I just answered that

6    question.

7             MR. RAFFERTY:  Object to the form.

8        Q.    Okay.  So the answer is, you're not

9    going to give that opinion?

10            MR. RAFFERTY:  Object to the form.

11       A.    I would give the opinion -- I would

12   give the answer that I gave to you previously.

13       Q.    I want this -- I want this -- a

14   simple -- I want to know simply, and then we

15   can talk about where you think the lines are.

16   I'm happy to have that conversation with you

17   later about what you think the correct labeling

18   should be and everything else.  And we'll have

19   it, I promise you.

20            But the -- but the simple answer to

21   my question is that you're not going to give an

22   opinion that the products should have at some

23   point in time up through today been completely

24   taken off the market?

Highly Confidential - Subject to Further Confidentiality Review

 1          MR. RAFFERTY:  Object to the form,

 2      asked and answered.

 3      A.    I think I answered your question.

 4      Q.    So that's correct, right?

 5          MR. RAFFERTY:  Object to the form,

 6      asked and answered.

 7      A.    I believe that --

 8      Q.    It's a yes or no question.

 9          MR. RAFFERTY:  It's not a yes or no

10      question.

11          MS. FREIWALD:  It's yes or --

12          MR. RAFFERTY:  He said it's a

13      complicated answer.

14          MS. FREIWALD:  I'm --

15      A.    Let me see if I can get it yes or

16  no.  Let me just see -- let me just try it one

17  more time.  Let me just see the question.

18          I think it would be fair to say

19  that I will not give an opinion that at some

20  point in time up through today, they should be

21  completely taken off the market.

22          But I think I would add into that

23  sentence what I said, right, but I do recognize

24  that, in terms for chronic non-cancer pain,

Highly Confidential - Subject to Further Confidentiality Review

1   there is -- there is a lack of efficacy.  And

2   that gives me pause.

3        Q.   Okay.  So we'll talk about that

4   later.

5             And if I were to ask you the same

6   question for immediate-release oxycodone

7   product, would the answer also be that you're

8   not going to give an opinion that those

9   products should have been taken off the market?

10            MR. RAFFERTY:  Object to the form.

11       A.   I'm not going to venture into that

12   area.  I don't intend to -- sitting here --

13   again, the legal status of those products are

14   complicated because they're DESI products, and

15   it opens a whole can of worms.

16            So I'm not going to get up on the

17   stand and say, IR products should be off the

18   market.  But I think there is a complex answer

19   to that question.

20       Q.   And you've never taken the position

21   that hydrocodone products should come off the

22   market?

23       A.   I have not.

24       Q.   Okay.  And that's not going to be

Highly Confidential - Subject to Further Confidentiality Review

1    an opinion you're offering?

2         A.   I'm not taking -- I don't

3    believe -- I mean, again, these are -- these

4    are very powerful -- I mean, if they cannot be

5    used safely, they do not belong on the market,

6    is the answer.

7         Q.   Not anything that you ever

8    advocated for while you were Commissioner?

9         A.   I dealt with fentanyl when I was

10   Commissioner.

11        Q.   Hydrocodone, I said.

12        A.   But I'm just telling you what I did

13   at -- did do as Commissioner.  I did not do

14   hydrocodone.

15        Q.   Okay.  Now, in terms of the types

16   of documents that the FDA can ask for

17   pre-approval -- I'm going back to the

18   conversation we were having probably 20 minutes

19   ago or more -- is there any situation that you

20   can think of in your long history with the FDA

21   where the FDA has asked a company if it could

22   see marketing plans, sales forecasts, any other

23   kinds of internal e-mail communications about

24   marketing intentions as part of its approval

Highly Confidential - Subject to Further Confidentiality Review

```
 1    process?

 2             MR. RAFFERTY:  Object to the form.

 3         A.   I'm not aware of the agency doing

 4    that, certainly routine.

 5             Actually, that's not true.  That's

 6    not true.  I did it.

 7         Q.   When did you do it?

 8         A.   I did it in -- I did it in Oralet.

 9    I wanted to see the marketing plans.  I'm

10    pretty sure I did it in Oralet.

11         Q.   So in Oralet, prior to approval?

12         A.   Yes.

13         Q.   You asked the company for the

14    marketing plans?

15         A.   Absolutely.

16         Q.   Okay.  And why did you do that?

17         A.   Because I -- because I was worried

18    that a child would die.

19         Q.   I'm not really familiar with

20    Oralet.  Can you give me the five-second

21    version of why that --

22         A.   Predecessor to Actiq.

23         Q.   Okay.

24         A.   Intended for use in children
```

Highly Confidential - Subject to Further Confidentiality Review

1  preoperatively.  Rebranded for use in cancer

2  break-through pain.

3         Q.   Okay.  And so you asked for

4  marketing plans prior to approval.  And did you

5  get them?

6         A.   Yeah.  I insisted -- it was a -- it

7  was a -- it was a -- I mean, I said I would --

8  unless we could control -- actually, I --

9  actually, I think -- I'm sorry.

10             In reflection, I think what we

11  asked for was a commitment that there be no

12  marketing.  There was no promotion.

13         Q.   I just want to make sure I

14  understand your testimony.

15         A.   Right.

16         Q.   Did you ask for marketing plans

17  prior to approval of Oralet?

18         A.   We -- I'm pretty sure we asked for

19  documents that would confirm that there would

20  be no promotion.

21         Q.   Okay.  Do you recall actually

22  seeing or having one of your designees see some

23  type of internal company document?  Or was --

24  is that what you saw?

1      A.   Yeah, so I -- I mean, I saw there,

2  for example -- I think we'd have to go back and

3  look at the record, for example.  It was a

4  ten-hour advisory committee that I was at, and

5  I was insisting that this drug be used in only

6  certain settings and not be widely used.

7      Q.   And were you invoking some specific

8  statutory authority in asking for that

9  marketing information prior to drug approval?

10      A.   Protection of the public health.

11      Q.   What I'm asking -- indulge me if

12  this is a stupid question -- are you -- did you

13  believe that you had authority pursuant to some

14  specific provision of some specific regulation?

15  Or did you just think it was part of kind of a

16  penumbra power that you had in the FDA?

17      A.   Fair question.  I'm not sure I

18  asked counsel specifically the authority.  I

19  felt I had the authority not to approve --

20  to -- the drug was so dangerous that it should

21  not be used unless there was -- it was the

22  predecessor to REMS.

23      Q.   Okay.

24      A.   I mean, it was -- it was --

1    actually, I'm sorry, that's not correct.  I

2    misstated.

3              There was -- there was something

4    called a -- as part of the Accelerated Approval

5    regs, there was the restricted distribution

6    regs.  So we did have the authority under the

7    restricted distribution, and that was to

8    anesthesia and no promotion.  I believe those

9    regs hold, governed -- they were probably in

10   effect by '94.

11        Q.   The gist of what I'm hearing you

12   say, though -- and correct me if I'm wrong --

13   is that you found yourself in a circumstance

14   where you weren't going to get trapped in the

15   minutia of what your authority was if you

16   thought that you needed to ask for something to

17   protect the public interest before a drug was

18   approved.  You were going to ask for it and you

19   did.

20        A.   You can do that a few times in your

21   life before your counsel will tell you you

22   can't do that, right.  I mean, so I'm very

23   respectful.

24              I don't think I was acting

1    extra-statutory or outside of my authority, and

2    no one at that point said it was -- but it

3    was -- so I think I was acting per that.

4    Maybe, you know -- I can't tell you whether

5    my -- whether counsel was -- what they thought

6    at the moment.  I just don't remember.

7            But those are the kind of

8    discussions that we would have, exactly the way

9    you and I are talking now.  I mean, how

10   explicit is that authority?  Is that

11   traditional?

12           And I mean, again, it's not -- the

13   fact that I was so hands-on in Oralet was not

14   traditional, meaning the pre-approval stage.

15       Q.   So -- and I'm -- just to be clear,

16   I'm not in any way suggesting that you were

17   over your authority on that.  I'm simply trying

18   to understand that, when faced with the

19   situation where you thought you needed to do

20   something to protect the public health, as

21   Commissioner of the FDA, you did it if you felt

22   that you had a reasonable basis for doing so.

23       A.   Yeah.  I had to go to law school in

24   order to have that confidence.  Not everybody

1    has that --

2              Q.    Okay.

3              A.    -- confidence to do that.

4              Q.    It's something Commissioners of FDA

5    can do?

6              A.    They have different philosophies,

7    and they have different styles, and there are

8    certain Commissioners who would never make a

9    decision without having counsel sign off on it.

10             I mean, I didn't feel that that

11   was -- I could -- I would discuss it with

12   counsel legally and I'd be able to make my own

13   determination, being respectful of their

14   opinions.

15             Q.    Okay.  But from Commissioner to

16   Commissioner, there are things that the person

17   in charge can decide to do.  It may not be a

18   hundred percent clear what the authority comes

19   from, but it's a broad -- the broad mandate to

20   protect the public health can allow you to do

21   the kinds of things you did in Oralet?

22             A.    That is a -- you know, if you --

23   you can bring in 12 members of the food and

24   drug bar, and they can spend the next four

1  hours discussing that subject.  I can tell you

2  most -- it's not the way the agency

3  traditionally works, right.  You can do that

4  rarely, right.

5          Again, we were, in essence,

6  invoking risk maps or REMS before there were

7  risk maps or REMS.  And we put those things,

8  and the product was not a success.

9          Q.   Okay.  Because you thought it was

10  important.  You did what you did because --

11          A.   It was in the case of a pediatric

12  situation.  But I think other Commissioners

13  would not feel that that would be the right

14  thing to do.

15          Q.   Okay.  So reasonable Commissioners

16  could disagree about what the right thing to do

17  is on a case-by-case basis?

18          A.   Correct.

19          Q.   Okay.  And are there other examples

20  where you have asked for or obtained internal

21  company documents or you know that colleagues

22  of yours have as a condition to approval or

23  post-approval of a drug?

24          A.   Certainly I remember there were

1    certain issues involving -- actually, the one

2    that comes to mind is a device, but it was

3    probably also classified as a drug at certain

4    times where those kind of e-mails and

5    back-and-forth post-approval certainly did come

6    to play.

7            Q.    You mean the agency asked for --

8            A.    The agency got hold of, and it

9    influenced the agency's decision-making.

10           Q.    Okay.  Are you aware of any

11   situation for any of the manufacturers about

12   you have -- about whom you have opinions where

13   the FDA requested internal company documents

14   like you're talking about and they were

15   refused?

16           A.    I'd have to think about the answer

17   to that question.  I mean, the Roth study

18   doesn't quite -- I mean, would that be in that

19   category?

20           Q.    You tell me.

21           A.    The -- when the meta-analysis from

22   your client, is that -- is that in that

23   category?

24           Q.    So I'm talking about what we've

1  been talking about up until now, which would be

2  marketing plans, strategic documents, internal

3  e-mails about business intentions or goals.  I

4  think you mentioned return-on-investment

5  analyses earlier in the deposition.

6          Right now I'm not talking about any

7  scientific studies.

8      A.   FDA --

9      Q.   My question -- specifically my

10  question --

11      A.   I'm not aware of any, sitting here

12  right now.

13      Q.   Okay.  I also want to be clear that

14  we have the same understanding about the rules

15  around promotion.  So is it your testimony that

16  a company can promote a product inconsistent

17  with its FDA-approved label?

18      A.   I wouldn't phrase it that way, no.

19      Q.   Okay.  Is it your testimony that a

20  company is required to promote its product

21  consistent with its FDA-approved label?

22      A.   Again, I think generally, yes, but

23  the -- but the correct answer -- I mean, I

24  think the answer is "yes" to that, but -- the

1    statutory answer, but, again, that -- we

2    discussed this earlier.  It would be based

3    on -- the real issue is, you have to base your

4    promotion on substantial evidence of adequate

5    and well-controlled clinical trials.  And the

6    label isn't a surrogate, but if the label

7    doesn't contain it or you have adequate and

8    well-controlled clinical trials, that's what

9    governs.

10          Q.   Is there any scenario you are aware

11   of where the FDA has said to a company, we're

12   going to approve your product and give you a

13   label for the product, but we don't think you

14   have adequate and well-controlled trials?

15              MR. RAFFERTY:  Object to the form.

16          A.   Where the FDA said that?

17          Q.   Yeah.

18          A.   Well, I mean -- I mean, it said it

19   where?  I don't mean to be difficult here.

20          Q.   Well --

21          A.   But clearly you mean, in this

22   instance, this drug -- your client's drug, I

23   mean, is approved and -- for, in essence,

24   chronic pain.  And the FDA has said, there's

1    not adequate and well-controlled trials

2    demonstrating efficacy for chronic pain.  So

3    that's the conundrum we're in.

4         Q.   Well, I --

5         A.   The FDA has said that, but it

6    still -- it hasn't withdrawn the product.

7         Q.   Well, I'm going to -- I'm going to

8    probably differ with you on exactly what FDA

9    has said on that subject.

10        But can we -- can we agree that it

11   is -- the reason that the label is -- I forget

12   what you said -- a proxy or a surrogate for

13   adequate, well-controlled studies is because

14   you're not going to get a label if you don't

15   have adequate and well-controlled studies?

16        MR. RAFFERTY:  Object to the form,

17        move to strike the preamble.

18        A.   Well, that's wrong.  I mean, there

19   are not -- there are numerous statements.  I'm

20   happy to take them out -- I mean, I've spoken

21   to Califf, I've spoken to Janet.  There is no

22   one who is going to sit and testify and say

23   there -- certainly, I mean, that I'm aware of

24   from FDA that's going to testify that there are

1    adequate and well-controlled clinical trials to

2    support the long-term efficacy for chronic

3    pain.  That doesn't exist.

4         Q.   To support the label for the

5    product?

6         A.   Well, so the label for the product

7    as currently written includes chronic use,

8    right.  That changed over time, I think, right.

9    I mean, what, in 2012, the label went from

10   extended period of time to chronic use.  And

11   there are not adequate and well-controlled

12   clinical trials to support that label.

13            And I don't think there's any

14   disagreement on that.  Certainly if you talk to

15   Dr. Woodcock or Dr. Califf, and certainly the

16   one trial we have, right, the space trial shows

17   no efficacy.  So that's the problem.

18        Q.   Sir, most drugs that are on the

19   market don't have randomized, controlled

20   clinical trials to support use for years and

21   years, most drugs, at the time they're

22   approved, correct?

23            MR. RAFFERTY:  Object to the form.

24        A.   But most drugs have the studies to

1    prove what the intended use is.

2          Q.   Well, no.  Most drugs have studies

3    in a limited population for months or maybe a

4    year or maybe a year and a half, but then

5    people can be on those drugs for five years,

6    ten years, a lifetime.

7               MR. RAFFERTY:  Object to the form.

8          A.   That's fair.  And -- but as you

9    said, that at least you have a year of data or

10   two years of data to support efficacy.  You

11   don't have that here.

12         Q.   Actually, you do have multiple

13   trials that go out years.  They're not all

14   double-blind, but you do have trials that go

15   out years.

16              MR. RAFFERTY:  Object to the form.

17         A.   You don't have adequate and

18   well-controlled trials.  Certainly on approval

19   and even to this day, you don't have adequate

20   and well-controlled clinical trials as defined

21   by the act to support the label.

22         Q.   So the label should have said, you

23   can be on this product for 6 months or 12

24   months?

1          MR. RAFFERTY:  Object to form.

2     Q.    The FDA could have said that.

3     A.    So the label said originally a few

4  days.  You had controlled trials for 14 days.

5     Q.    Well, the FDA asked for the change

6  of -- to an extended period of time.

7     A.    So as -- the FDA asked first for a

8  few days because it wanted to match, I believe,

9  the -- some of the prior pain medicines, and it

10  was trying to make it consistent.

11          FDA tried to narrow it for an

12  extended period of time, and that goes back to

13  the discussion we had earlier.

14     Q.    Okay.  So let me ask the question

15  this way.  Are you aware of any regulation,

16  statute, guidance that says the indication for

17  the drug may be broader than what the company

18  is allowed to promote the drug for?

19          MR. RAFFERTY:  Object to the form.

20     A.    I apologize, I don't understand

21  that question.

22     Q.    Okay.  Is there any -- I probably

23  asked it badly, so I'll try again.

24          Is there any regulation or statute

1    or guidance from the agency or other official

2    writing -- I'm trying to cover the universe on

3    official writings -- that would tell a

4    manufacturer that gets an approval for a drug

5    with a particular indication that,

6    notwithstanding the approved indication, its

7    promotion of the drug has to be more

8    restricted?

9         A.   Well, FDA did that -- FDA did that,

10   in essence, here.

11        Q.   I'm asking as a general rule-making

12   document.

13        A.   When I would -- as a general

14   rule-making document.

15             As a general rule-making document,

16   you have to have adequate and well-controlled

17   clinical trials.  That's the regulation.  And

18   that's the regulation for which you can

19   promote.

20             Here --

21        Q.   It's also the regulation for which

22   you get approval, right?

23        A.   Sure.

24        Q.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    A.   Okay.  Here, those studies didn't

2    exist.  And, I mean, in part you're dealing --

3    because this was bioequivalence, and you go

4    back to the DESI review, and that adds

5    complexity.

6         But here, 2001, both -- I mean,

7    1995, 1996, Dr. Wright saying, not step two,

8    not the one to start with.  2001 we discussed,

9    restricting -- trying to -- Jenkins trying to

10   narrow that.  The language admittedly was

11   fuzzy.

12        Q.   I think you're misunderstanding my

13   question.

14        A.   I'm sorry.

15        Q.   That's fine.  Let me -- I'm going

16   to try to break it up --

17        A.   Sure.

18        Q.   -- into little pieces and see if

19   that's easier.

20        So first of all, just -- if one

21   were to go and say, I want to know generally

22   how the rules work with FDA and try to look at

23   the appropriate regulations and guidance

24   documents, would you find any regulation or

1    guidance document that says a manufacturer

2    should market its product more narrowly than

3    its indicated use?

4         A.   I don't know if there's a -- I

5    don't know if there is a rule, I doubt it,

6    that's -- because it would probably be

7    inappropriate -- I mean, follow what FDA is

8    telling you.  I don't know if there's a rule

9    that says that.

10        Q.   Okay.  So then the next step is, is

11   there any reason -- if FDA wants to impose some

12   marketing restriction on a document -- on a --

13   on a product -- let me strike that and ask it

14   more cleanly.

15             If FDA wants to impose a

16   restriction on the marketing of a product so

17   that the marketing is more limited than the

18   indication might allow, does it have the

19   authority to do that?

20        A.   Once it's on the market, as you see

21   in those minutes and you see FDA, in essence,

22   threatening -- I don't think that's an

23   overstatement -- but FDA -- the authority FDA

24   had, because it threatened and it said, if you

Highly Confidential - Subject to Further Confidentiality Review

1    don't bring this under control, if you don't do

2    that, we're going to be forced to work towards

3    getting your drug off the market.

4           Q.    Okay.  So good.  That's

5    post-approval?

6           A.    That's post-approval.

7           Q.    So post-approval, if a company is

8    marketing a product, even if technically within

9    the boundaries of its indication, but beyond

10   what the FDA thinks is appropriate, the FDA can

11   say, we're going to -- we're not -- we're not

12   okay with your marketing, and if you don't

13   modify, you may not have any marketing at all?

14          A.    Well, they --

15          Q.    May not have any product at all?

16          A.    -- they said that at a certain

17   point.  There was a pretty strong statement,

18   right, probably out of frustration, right.

19          Q.    Okay.

20          A.    But it could probably also send

21   DDMAC letters and go through the DDMAC process.

22                But understand, you have in your

23   question -- the way you set this up is sort

24   of -- I'm not sure I fully agree because you

Highly Confidential - Subject to Further Confidentiality Review

1    said, assume that it's within the indication,

2    but for which FDA says it has to be narrower,

3    so then FDA obviously doesn't think it's within

4    that indication.

5            And I think that's the rub here.

6        Q.   So in 2001 -- I think this is what

7    you're alluding to -- in communications with

8    the FDA with regard to OxyContin, the FDA said,

9    we're going to make changes to the label, and

10   we're looking carefully at the marketing

11   practices, and if we can't get alignment, we

12   have the authority to go as far as removing the

13   product from the market, correct?

14       A.   I'm not sure they said, we're

15   looking at the marketing practices.

16           I think what FDA was looking at was

17   abuse that was going on.  I think that's what

18   the letter said at the time.

19       Q.   So it was trying to get the abuse

20   under control, not necessarily tied to the

21   marketing?

22       A.   We'd have to go -- I mean, again,

23   let's pull the letters when we come back.

24       Q.   We'll do that.

1    A.    All right.

2    Q.    Okay.  So but one -- but your

3    testimony, if I hear you correctly, is that the

4    FDA has authority to restrict marketing if it

5    has concerns about safety issues in the

6    post-marketing period.

7    A.    So maybe --

8    MR. RAFFERTY:  Object to the form.

9    A.    If there is marketing that

10    understates the risk or overstates the benefit,

11    right, or broadens the indication, that's when

12    FDA has specific authority.  So it's not just

13    when it has, quote, safety concerns.

14    Now, you can get into a 505

15    argument, but it's usually understatement of

16    risk, overstatement of benefits, lack of fair

17    balance, broadening.  That tends to be the lens

18    through which the FDA looks at marketing.

19    Q.    Okay.  And it has various tools --

20    and again, I'm going to tick them off, so don't

21    worry that I'm not getting everything this

22    time.  But it can engage in dialogue with the

23    company and try to reach some general

24    understanding?

1    A.   Correct.

2    Q.   Okay.  It can issue what is

3  referred to as an untitled letter with regard

4  to specific marketing activity, correct?

5    A.   It can send a letter, yes.

6    Q.   Okay.  So we refer to an untitled

7  letter as kind of a low-level complaint?

8    A.   Yeah.  The different letters have

9  different titling standards at different points

10  in time in FDA's history.

11    Q.   Okay.  And can we agree that a

12  letter that doesn't have a warning moniker at

13  the top is colloquially or in the industry

14  referred to as an untitled letter, and that's

15  considered kind of the first step in written

16  communication that a company could receive?

17    A.   As a general rule, you're probably

18  within the ballpark, but I would look at the

19  last paragraph more than the title --

20    Q.   Okay.

21    A.   -- and see what FDA is saying you

22  need to do because that will tell you whether

23  they're enforcing it or not.

24    Q.   Okay.  So there are untitled

1  letters and there are untitled letters.

2       A.   Fair point.

3       Q.   Fair point?

4       A.   Fair point.

5       Q.   And some are more strongly worded

6  than others?

7       A.   Fair point.

8       Q.   And some carry more threat than

9  others?

10      A.   More consequence.

11      Q.   And -- but it's a tool that FDA

12  has?

13      A.   Yes, ma'am.

14      Q.   And another tool that FDA has is

15  warning letters?

16      A.   Correct.

17      Q.   Which is another written letter to

18  a company, but this time it says, warning,

19  usually in bold black letters at the top, and

20  it's a way of FDA communicating, we're really

21  super-serious about our concerns here.

22           MR. RAFFERTY:  Object to the form.

23      A.   Super-serious -- yes, I think

24  that's fair.

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.   And it will continue to engage in
2    dialogue with the company about its concerns,
3    correct?
4         A.   That's fair.
5         Q.   Okay.  And is it also fair that FDA
6    may send those letters based on FDA's -- I
7    think you used this term -- net impression of
8    what the promotional materials are saying?
9         A.   No.  What I think I said is, FDA
10   basically -- this peek-a-boo.
11        Q.   No.  In your written report.  I'm
12   pretty sure --
13        A.   Maybe.  Let's see if there's net
14   impression.  I don't remember, but I'm not
15   saying I didn't.  But let me see if I used the
16   word "net impression."  Go ahead.
17        Q.   So what I'm trying to convey --
18        A.   Just looking...
19        Q.   -- is, the way FDA will work when
20   it complains about promotional activities is it
21   will have a view that something has the
22   potential to be misunderstood or is unfair or
23   misleading in some way?
24        A.   I just want to -- so this is
```

Highly Confidential - Subject to Further Confidentiality Review

1    important.  The net impression goes to the

2    presentation of risk impression and uses

3    whether the net impression, as a whole with

4    regard to safety information, minimizes.

5            But I don't think that's what your

6    question was.  When FDA is making these

7    decisions in these letters, right, it has to

8    have specific conduct certainly in a warning

9    letter or an enforcement letter as opposed to

10   maybe a pre-launch letter, right, that there

11   are specific violations.

12       Q.    Okay.  But those specific

13   violations could be something like, we saw a

14   sales aid.  We think it conveys an impression

15   that is false and misleading because of how the

16   prominence of the risk information, the way the

17   people may be smiling or not smiling.  There's

18   all kinds of things that the FDA considers.

19       A.    I think that's well said.  I mean,

20   if you -- if you give an impression that you

21   have improved functionality from a drug and

22   there's no evidence of improved functionality,

23   right, and somebody is sitting there working,

24   the FDA would say, you have to look at the

Highly Confidential - Subject to Further Confidentiality Review

1    piece in its totality.  I think that's what you

2    mean by "net impression."

3         Q.   Okay.

4         A.   Or what's meant by "net

5    impression."

6         Q.   I think that's a better way of

7    saying it.

8              So the FDA has an impression of the

9    piece based on its totality.  It is, though

10   admittedly, subjective, correct?  In many

11   situations it's not like -- it's not as if the

12   FDA has gone out and done a poll and proved

13   that everybody who looks at this piece is going

14   to think that it's misleading.

15        A.   So you're --

16             MR. RAFFERTY:  Object to the form.

17        A.   You're correct, Counselor, and

18   that's why it becomes so difficult.  Because if

19   you're dealing in a post-approval situation and

20   you want to -- and you have to -- and the

21   manufacturer is fighting you, you would have to

22   do exactly like what you said in court.  You'd

23   have to do -- and I've been in this situation

24   where I'd have to do consumer surveys to say --

Highly Confidential - Subject to Further Confidentiality Review

1    what are these -- what's the net impression?

2             If I'm going to say, this piece

3    misbrands it, I'm going to say, I need that

4    consumer survey.

5             So it can't be subjective.  You try

6    to make it as objective as you can.

7        Q.   Yeah.  But the reality is that no

8    company wants to go to court with the FDA over

9    whether they can have a fisherman in their ad

10   or somebody skiing or something like that.

11   Most of the time, the company is either going

12   to make the change that the FDA wants or

13   they're going to engage in dialogue and say, we

14   don't think this is what it was supposed to

15   convey, and there will be -- either the FDA

16   will agree or they won't agree.

17            MR. RAFFERTY:  Object to the form.

18       Q.   And the ad will either get changed

19   or modified in part or not.

20            MR. RAFFERTY:  Same objection.

21       A.   If that were the case, FDA wouldn't

22   need a general counsel's office.

23            I mean, these things -- in many

24   instances you're correct, Counselor.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.

2      A.    I'm not distinguishing -- but there

3  are instances where that -- you see certain ads

4  on TV that you wonder how they can be on TV

5  still.  And it's not that -- not all companies

6  act the same.

7      Q.    But that actually happened here,

8  for example.  So there were some ads that my

9  client had that the FDA didn't like, and the

10  company said, we'll make the change.

11           And then there were some ads and --

12  do you remember that?

13      A.    Yeah -- well, there were certain

14  corrective ads and there was a whole history.

15      Q.    I'm not talking about corrective

16  ads.  I'm just talking about there were a

17  couple of ads in the 2002 time period that the

18  FDA thought were not appropriate in some way.

19  They wrote the company.

20           The company said, we don't

21  necessarily agree with you, but we'll make the

22  change.

23           Do you remember that?

24      A.    I mean, yes.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.   Okay.  And that happens?

2          A.   Again, to your point, right,

3   because that's what FDA can -- FDA is only as

4   good as what it can see.  It's playing

5   peek-a-boo, in essence.

6          Q.   Okay.  We'll get back to that in a

7   minute --

8               MR. RAFFERTY:  Hope, when you --

9          Hope, when you get to a point --

10              MS. FREIWALD:  I'm going to finish

11         out this line, and then I'm happy to

12         take a break.

13              MR. RAFFERTY:  Okay.

14         Q.   And then there were some situations

15  where the FDA said -- just speaking of my

16  company, my client -- we think these ads are

17  not appropriate in various ways, and the

18  company disagreed and wrote to FDA, and FDA

19  said, no, we still think we're right and you're

20  wrong.

21              And ultimately the company did what

22  FDA wanted, correct?

23         A.   In certain instances that -- in

24  certain instances, again, I don't disagree with

1    that.

2         Q.   Okay.  And that's -- that way of

3    operating is not unique to my client, to

4    Purdue; that's something that happens with many

5    companies.  They may receive untitled or

6    warning letters, and there can be disagreement,

7    but in the overwhelming majority of cases, the

8    company finds a way to do what the FDA wants.

9              MR. RAFFERTY:  Object to the form.

10        A.   No.  If the company were doing what

11   FDA wants, your company wouldn't have done --

12   you look at the call notes.

13        Q.   They make the modification that the

14   FDA -- with regard to the issues raised in the

15   letters that the FDA sends, most companies will

16   make the modifications that FDA wants because

17   they're not going to litigate it.

18             MR. RAFFERTY:  Object to the form.

19        A.   When you say "what FDA wants," if

20   FDA catches the company on a specific

21   violation, that's true.

22             But look at -- look at the way

23   your -- no --

24        Q.   I'm just asking about --

1          A.   What FDA wants, you said.  But if

2    you look, for example, at all the

3    representations that your client made, I mean,

4    they are -- I mean, when you read those --

5          Q.   We'll talk about those, I promise

6    we will.

7          A.   But I say -- but let me finish my

8    answer, please, just for a second.

9               When you look at the

10   representations that were made by your company

11   to doctors, there is no way that's what FDA

12   wanted.

13         Q.   Okay.  I'm just talking about, when

14   there is a letter sent with regard to

15   particular conduct or particular marketing

16   materials, the overwhelming majority of

17   instances there is a change on the -- the

18   company makes to meet what the FDA is asking

19   for.

20         A.   You're correct.  When you get

21   pulled over by the policeman for speeding, you

22   will usually comply, right.

23         Q.   Okay.

24         A.   But that doesn't mean you're not

1   going to stop speeding and -- so again, if you

2   get called out in that letter for that specific

3   here, right.  But that was the tip of the

4   iceberg.

5       Q.   Okay.  And the FDA will usually say

6   in those communications, these principles that

7   we're articulating, whatever it -- applying not

8   just to this ad but they apply to other ads

9   going forward?

10      A.   Well, it's not only -- you talk --

11  it should apply to promotion.

12      Q.   To any promotion?

13      A.   And not just any, because there's a

14  distinction there.

15      Q.   Fine.  Fine.

16      A.   You're -- we're dealing with

17  sophisticated companies.  I mean, everyone

18  knows that they're supposed to be -- those

19  principles that we've talked about --

20      Q.   Right.

21      A.   -- should be adhered to.  Don't

22  minimize risk, don't overstate the benefits.  I

23  mean, that's basic stuff.

24      Q.   Right.  But, generally speaking,

Highly Confidential - Subject to Further Confidentiality Review

1    if, for example, the FDA takes issue with how

2    information is presented in a particular

3    marketing piece, the company may say, you know

4    what, we really didn't think this was an issue.

5    We really thought that we showed the fair

6    balance of benefit and risk, but FDA, you

7    don't.  Okay.  It will get changed.

8              And the FDA will say in that

9    situation, and by the way, this applies going

10   forward, correct?

11             MR. RAFFERTY:  Object to form.

12        A.   Yeah --

13        Q.   I mean --

14        A.   -- I think the best answer that was

15   I think ever given I think was given a little

16   while ago on that by your client, I think, who

17   summed it up -- I think Kathe Sackler,

18   Dr. Sackler, summed it up when on -- she said,

19   is it the marketing side of the house that's

20   talking or the scientific side of the house

21   that's talking?

22        Q.   Sir -- sir, I'm not asking a

23   question that has anything to do with that.

24             I'm simply asking, FDA's directives

1   are always -- that the principles that they may

2   articulate when they look at a marketing piece

3   and take an issue, they expect the companies to

4   then apply those same principles to other

5   promotional pieces going forward?

6          A.   Promotional pieces and conduct.

7          Q.   Okay.  And in fact, companies will

8   look at what other -- strike that.

9               So untitled letters, warning

10  letters, those are tools the FDA has.  And

11  there are cases where the FDA also has other

12  types of enforcement authority, correct?

13         A.   Yes.

14         Q.   Okay.  And it uses those -- that

15  enforcement authority from time to time if it's

16  not happy with a company's promotional

17  practices.

18         A.   "Happy" is probably not quite the

19  word, but yes.

20         Q.   If it -- if it feels that the

21  promotional practices are not -- are violative?

22         A.   Fair to say.

23         Q.   Okay.  And the FDA has used over

24  the years the full range of its enforcement

1  capabilities in situations where it has deemed

2  it appropriate to do so?

3        A.   I don't remember -- correct me if

4  I'm wrong -- that they ever withdraw -- I'm

5  asking this rhetorically because I'm trying to

6  think, has FDA ever withdrawn a drug because of

7  violative marketing?  I'm not sure if the FDA

8  has used the full range of tools.

9             So I'd have to go back and think.

10  I can't think of that.

11        Q.   It certainly has used other types

12  of enforcement.

13        A.   Yeah, but I don't think it's used

14  the full ranges of tools.

15        Q.   Okay.  And marketing restrictions

16  can be part of a risk map plan or today a REMS,

17  correct?

18        A.   We'd have to pull the statutory

19  authority, whether it's exactly phrased the way

20  you're phrasing it.

21        Q.   But generally that's right?

22        A.   I'd want to review legally -- I

23  mean, I don't -- let me look at that before I

24  answer that specifically.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  Do you agree with me that

2    generally, REMS programs, since 2007, have

3    allowed the agency to come up with a range of

4    ways in which it can limit activities around a

5    drug or require additional dissemination of

6    risk information around a drug?

7    A.   No, I don't agree.  I think -- I

8    think the REMS has been -- I think everybody

9    would agree -- and in my conversations with

10   people at FDA and some of the -- I think REMS

11   has been pretty ineffective here.

12   Q.   I didn't ask about effectiveness.

13   I just asked whether the REMS programs give the

14   FDA authority to require -- to limit -- impose

15   limits on products or classes of products, or

16   to require additional risk information be

17   disseminated about those products?

18   A.   Yeah, I don't think -- I'd want to

19   go back and just look at the regs because I

20   think the regs and the reality don't give the

21   FDA -- look, for example, just even a

22   physician -- a patient -- the kind of

23   registries that we're talking about, FDA

24   doesn't have the capability.

1          The reason why a lot of this was

2   voluntary was, FDA didn't have the capability

3   to do this.  So it had to do this in this --

4   sort of on a voluntary basis and turned it over

5   to the manufacturer because it really didn't --

6   maybe -- and I'd -- and I'd want to go back and

7   think about this.

8          Maybe theoretically you can argue

9   it has the authority, but in reality, FDA

10  really was -- I mean, I think feeling very

11  impotent on being able to really put in place

12  controls to change back the practice of

13  medicine to where it should be.

14     Q.   I thought you told me that you

15  weren't going to testify as to what anybody

16  felt.

17          MR. RAFFERTY:  Object to the form.

18     A.   I'm answering your question --

19     Q.   I think you --

20     A.   -- the best I can.

21     Q.   Well, you just said that FDA was

22  feeling very impotent.  I thought we agreed we

23  weren't going to testify to --

24          MR. RAFFERTY:  Object to form.

1          A.    That's fair.  I think I can tell

2    you that FDA has stated -- I mean, if you look

3    at the facts -- that FDA doesn't have the

4    resources to conduct, for example, the kind

5    of -- the kinds of real REMS that you would

6    need to change the perception of opioids in

7    this country.  I think it has some tools, but I

8    don't think it has -- I mean, and you see those

9    limitations in how FDA -- what FDA imposed.  It

10   didn't mandate the kinds of registries of

11   doctors, et cetera.

12         Q.    Okay.  I mean, we'll talk --

13               MR. RAFFERTY:  We need to take a

14         break for lunch soon.

15               MS. FREIWALD:  Yeah, I just want to

16         finish out this one question and then --

17               MR. RAFFERTY:  It's been -- okay.

18         Q.    We'll talk about the specifics of

19   the REMS later, I promise, and what was

20   effective or you may -- you may have issue

21   with.

22               But just at a high level, REMS

23   programs can require companies to disseminate

24   additional risk information, correct?

1          A.    Fair.

2          Q.    They can require companies to

3    disseminate additional information about safe

4    use, correct?

5          A.    Yes.

6          Q.    And they can impose limitations on

7    marketing or promotion.

8          A.    Consistent with certain other

9    limitations, you have a whole First

10   Amendment -- I wouldn't want to answer that.

11   Yeah.

12              But as you saw, FDA may have

13   certain authority, but you still have

14   misleading information under the REMS.

15         Q.    Well, we'll talk about that later.

16   But just what the REMS allows them to do.

17              And it also allows for tracking and

18   monitoring and other kinds of programs?

19         A.    Yeah.  Again, but recognize the

20   limitation -- FDA doesn't have the limit --

21   doesn't have the -- the real authority to do

22   that is beyond FDA's scope.

23         Q.    Okay.  But conceptually, that's --

24   those are elements of a potential REMS program.

Highly Confidential - Subject to Further Confidentiality Review

1      A.   We can look -- the regs speak for

2  the regs.

3           MS. FREIWALD:  Okay.  Why don't we

4      take a break.

5           VIDEO OPERATOR:  1:12.  We are off

6      the video record.

7           (Recess from 1:12 p.m. until

8      2:14 p.m.)

9           VIDEO OPERATOR:  2:14, we are on

10     the video record.

11  BY MS. FREIWALD:

12     Q.   Doctor, I'm going to change topics

13  for a minute.  Can I ask you to pull out your

14  CV, which is an exhibit to your report.

15     A.   Sure.

16          And I -- Counsel, I just want to

17  make one sort of clarification at some point

18  just for a minute --

19     Q.   Sure.

20     A.   -- to a prior -- but no rush.

21     Q.   Yeah, we'll get to it later, if

22  that's okay.

23     A.   Perfect.

24     Q.   All right.  So I just -- they are

1    numbered.  Page 11, under Lectureships.

2         A.   Yes.

3         Q.   So you gave a Beth and Richard

4    Sackler lecture at the University of

5    Pennsylvania.  When was that, sir?

6         A.   You know, I went to check, try to

7    find that out.  My guess is -- in the late

8    1990s is my best --

9         Q.   Okay.

10        A.   -- recollection, but I could be

11   off.  I couldn't find anything on the web page.

12        Q.   So does lectureships mean something

13   different from lectures?

14        A.   Yeah.  So a lectureship -- the

15   University -- University of Pennsylvania got an

16   endowed -- I assume an endowed gift, and

17   University of Pennsylvania invited me to give

18   at the University of Pennsylvania a lecture,

19   which I did, which was named this.

20        Q.   And do you remember what the topic

21   of the lecture was?

22        A.   I could be pretty sure -- I could

23   be 99 percent sure.

24        Q.   What's your 99 percent sure?

Highly Confidential - Subject to Further Confidentiality Review

1       A.    It was about tobacco.

2       Q.    Okay.  And so this is an

3    educational program that was endowed by Beth

4    and Richard Sackler?

5       A.    Actually, I don't -- Beth is the

6    graduate.

7       Q.    Okay.  This is the same Sackler

8    family as Purdue, correct?

9       A.    Yes, I believe -- yes --

10      Q.    Okay.

11      A.    -- I have every reason to believe

12   it was.

13      Q.    Okay.  And so the Sacklers endowed

14   an educational lectureship, as others do.  We

15   have the Weinberg Symposium lecture, the Thomas

16   Ferguson lecture, the George E. Altman lecture.

17      A.    Most of whom, I have no idea who

18   they are.

19      Q.    Okay.  And you were given the

20   opportunity to talk about a topic that was of

21   interest to you and of interest to the

22   audience?

23      A.    Maybe not exactly that way.  But,

24   you know, Mr. Sackler, I think, graduated, had

Highly Confidential - Subject to Further Confidentiality Review

1    an interest in some of the social sciences.

2              We'd have to go back and see, if we

3    could pull out the letter, whether it was

4    asking me to talk about something in the social

5    science that was of interest to -- I don't know

6    what the letter from Penn stated.  I apologize.

7         Q.   The point is, you thought it was an

8    educationally valuable thing to do?

9         A.   At the University of Pennsylvania,

10   I gave a lectureship.

11        Q.   Okay.

12        A.   Yes, I have no problems with that.

13        Q.   And you -- and you had free reign

14   in the content of what you talked about?

15        A.   Pennsylvania did not put any --

16   University of Pennsylvania did not put any

17   restrictions.  This was not promotion.  This

18   was not drug-related at all.

19        Q.   Right.

20             And you didn't have any problem

21   with the fact that it was endowed by people who

22   owned a pharmaceutical company.  They weren't

23   controlling your content, right?

24        A.   She -- I don't know what her role

Highly Confidential - Subject to Further Confidentiality Review

1   is.  I think she -- I mean, I don't, you

2   know --

3          Q.   The fact that it was a Sackler

4   lecture didn't make it a bad thing to do, in

5   your mind, did it?

6          A.   Well, I think there's some issues

7   whether I should keep it on.  I hear she's

8   divorced from Richard.  I can make a -- I

9   wanted to leave it on here because it's been on

10  here, and I didn't want to take it off to hide

11  anything.  So I left it on here.

12              We can decide.  Maybe as group, we

13  can take a vote whether I take it off or not.

14  I don't know.

15         Q.   The point is, this is something you

16  actually did --

17         A.   I did.

18         Q.   -- you were willing to do.

19         A.   Yes, I did.  The University of

20  Pennsylvania, it was -- it was the University

21  of -- this was a university-wide lecture.  I

22  was able to talk on tobacco.

23         Q.   And you didn't feel like you were

24  corrupted by the -- by the fact that it came

Highly Confidential - Subject to Further Confidentiality Review

1    through a Sackler-funded program?

2          A.    No, at the time, I did not.

3          Q.    Okay.

4          A.    I mean, I -- absolutely, I had --

5    at the time, I did not feel that way, if we're

6    talking about subjective feelings.

7          Q.    Okay.  And then you also have on

8    your CV reference to FleishmanHillard on

9    page 8, corporate board and advisory --

10         A.    They had a global advisory board.

11         Q.    Okay.  They're a PR firm, right?

12         A.    They are an international PR firm.

13         Q.    And they do PR in the

14   pharmaceutical space?

15         A.    Among others, yes.

16         Q.    Okay.  They -- among other things,

17   they advise companies with regard to promotion

18   of pharmaceutical products?

19         A.    Yeah.  Generally, I'm not -- well,

20   that probably is correct, yes.

21         Q.    Okay.  And what -- what has your

22   role been for the last decade-plus with

23   FleishmanHillard?

24         A.    So where is it --

1    Q.   It was --

2    A.   You know, I --

3    Q.   -- 2003 to 2014.

4    A.   I'm blocking on Paul's last name.

5  This was really a very informal -- where Paul

6  would sometimes call, sometimes ask questions,

7  those kinds of things.

8    Q.   So is Paul, Paul Fleishman or

9  Paul --

10    A.   No.

11    Q.   -- Hillard, or is there is

12  different Paul?

13    A.   No.  There's a different Paul.  And

14  I apologize.  I'm blocking.

15    Q.   Okay.

16    A.   My age is showing.

17    Q.   So --

18    A.   He was running the D.C. office.

19  And this was Panetta, a number of officials.

20    Q.   So you tell me if I'm

21  misunderstanding here, but I'm assuming that

22  FleishmanHillard engaged you at various points

23  in time between 2003 and 2014 because of your

24  FDA expertise to help them with clients that

Highly Confidential - Subject to Further Confidentiality Review

1   they had who interfaced with the FDA or who

2   might have products that are regulated by the

3   FDA.

4        A.   Actually, I -- no, I don't think I

5   got into any client work with FleishmanHillard

6   that I'm aware of.

7        Q.   What did -- what types of work did

8   you do?

9        A.   For Paul -- I mean, I would -- I

10  mean, it was general, very broad kinds of

11  questions.

12            I guess, there was one academic

13  institution -- I'm not sure whether that was a

14  successor to Fleishman or not -- that Paul

15  asked me to come to give a speech on clinical

16  evidence.  It was those kinds of things.

17       Q.   Okay.  Do you know how much money

18  you made working with FleishmanHillard?

19       A.   I have no idea.  I can't say.

20       Q.   Would it be more than $100,000?

21       A.   It's possible.  I just -- I have no

22  recollection.  Over the -- over the collective

23  time period, it's possible.

24       Q.   More than two hundred?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I have no idea.  I could not

2  answer.

3    Q.    Could it be more than a million?

4    A.    Probably not, no.  But I -- but

5  again, I don't have -- I don't think that's the

6  case.

7    Q.    Okay.  Do you -- and do you know

8  how many days a year or whatever you might have

9  devoted?

10   A.    It was very few.  It was really

11  when Paul called and asked.

12   Q.    Could it be as much as a half a

13  million dollars you made with FleishmanHillard

14  over this time period?

15   A.    I told you I don't know, and I

16  just -- I don't know.

17   Q.    Not even a ballpark?

18   A.    I apologize.  I have no idea.

19   Q.    Okay.  Did you talk to

20  FleishmanHillard about any of their work for

21  any pharmaceutical company?

22   A.    No, not that I -- not that I

23  remember.  I may have talked about DTC at a

24  little point, but not for any client or

1    anything else like that.  But it was -- it was

2    at the 30,000-foot level about DTC.  That's the

3    most I remember.

4            Q.    Why would a PR firm want your help?

5                  MR. RAFFERTY:  Object to the form.

6            A.    You'd have to ask them why they

7    would want my help.  The same reason they would

8    want, you know, Leon Panetta and others.  This

9    has to do something with --

10           Q.    You just lost your mic, sir.

11           A.    Oh, I'm sorry.

12                 Fleishman has -- and, again, their

13   motivation is --

14           Q.    Why did you understand that they

15   wanted your help?  I'll rephrase it to take out

16   their motivation.

17           A.    I think he just wanted advice on

18   certain -- he wanted the ability to ask

19   questions, if he had those questions.

20                 THE WITNESS:  I'm sorry.  Am I not?

21                 VIDEO OPERATOR:  You pulled it off

22           again.

23                 THE WITNESS:  I'm sorry.

24           A.    I think he just wanted the ability

1  to ask certain questions and have -- to take

2  advantage, if he ever needed it.  I think

3  that's what they wanted.

4       Q.   Okay.  And again, you could have

5  made as much as a hundred -- as much as

6  $500,000 working for them, and that didn't give

7  you a problem, right?

8            MR. RAFFERTY:  Object to the form.

9       A.   Working for -- for doing on -- this

10  kind of advisory work, I -- I had no problems

11  working for Paul.  I always found -- I didn't

12  see anything wrong there, no.

13       Q.   Okay.  You thought they were a good

14  organization?

15       A.   I certainly wouldn't want to

16  represent that -- this is a huge, huge, huge --

17  this is, in essence, the chairman who I'm

18  interacting with.  I would not want to

19  represent that I would agree with or -- you

20  know, saw or would agree with any -- their kind

21  of promotional stuff.

22       Q.   Your interactions with them, you

23  were -- you found your interactions with them

24  good ones?

1          A.    With Paul, I never found Paul --

2    Paul never raised anything -- any red flag in

3    my --

4          Q.    Okay.

5          A.    -- mind.

6          Q.    Okay.  Now, you also have several

7    corporate boards and compliance committees:

8    Immunocorp, 2011 to the present; TPG, as a

9    senior advisor, 2008 to the present; Aptalis,

10   2011 to 2014; Tokai, 2009 to 2017 as a board

11   member; Google Health Advisory Council;

12   Revolution Health Group, as a medical advisory

13   board; and Perseus, on the advisory board; and

14   then --

15         A.    Perseus.

16         Q.    Perseus.  Sorry.

17               -- and then 2000 to 2003,

18   Perseus-Soros, which I assume is related here.

19               So sir, first of all, in your

20   capacity as the chair of compliance committees,

21   have you ever -- have you ever had any

22   responsibility for a CIA?

23         A.    I -- there was one issue at one

24   point in time with Aptalis.

Highly Confidential - Subject to Further Confidentiality Review

 1           I don't think -- I'd have to go

 2    back and check with -- with counsel.  I don't

 3    recall being involved in any CIA activity.

 4           But there was one legal issue I

 5    remember coming up, but it was years ago.  And

 6    I just apologize.  I don't have a recollection.

 7    I'd have to check with counsel.

 8           Q.   Do you --

 9           A.   Let me say, I don't believe I was

10    ever involved.  Whether the company was ever in

11    any discussions, I don't know that.

12           Q.   Okay.

13           A.   I just can't recall.

14           Q.   Do you know if --

15           MR. LAVELLE:  Excuse me.  I'm sorry

16           to interrupt, but I just got a note from

17           one of the attorneys participating by

18           phone.  They can't hear anything.

19           (A discussion was held off the

20           record.)

21    BY MS. FREIWALD:

22           Q.   Do you know, sitting here today, if

23    Aptalis had a CIA?

24           A.   I can't recall.

1    Q.   Okay.  Have you been responsible

2  for any kind of a leadership role in any

3  CAI-like [sic] agreement, where you -- where

4  you had to shepherd an organization through a

5  change in compliance culture?

6    A.   I'd want to refresh my memory --

7  I'd want to refresh my memory of those facts.

8  Sitting here today, I wouldn't phrase it like

9  that.  It just -- off the top of my mind, I'm

10  just -- the facts are just not clear to me.

11  I'd have to do a little homework.

12    Q.   So I really don't want to nitpick

13  at words with you, so I'm trying to ask the

14  question broadly.

15         Have you played a role, not -- in

16  any way with regard to any kind of compliance

17  revamping in any for-profit company?

18    A.   Sure.  I mean, "revamping" I think

19  is probably a good word.  There are -- you

20  know, in any global company, there are always

21  issues that come up and that had to be handled,

22  and I've been part of that handling, whether

23  they are --

24         I don't think they rose to CIA.

 1    I'd have to go back and review it.  But there

 2    were certainly compliance issues that I was

 3    involved in and responsible for helping lead

 4    the organization at a board level.

 5         Q.   Okay.  And can you tell me, without

 6    getting into details or even what the company

 7    is, what type of revamping you're talking

 8    about?

 9         A.   I mean, you find that, you know,

10    in -- for example, in certain countries -- I

11    mean, I want to be careful, without talking to

12    counsel.  I don't know what's -- I probably

13    should talk to counsel before -- of those

14    companies to know what -- what specific --

15              I mean, you find that there are

16    things that may be out of regulatory compliance

17    that you -- I mean, you know, it's not just a

18    one-off and that you have to bring back into

19    compliance.

20              And I have been involved in --

21    actually, I can think of two episodes.  I

22    wouldn't want to get into details, because I

23    think those are corporate confidential.

24              But I've been involved in at least

1    two times where there are things that -- where

2    compliance would be questioned, and you have to

3    work through those compliance issues.

4          Q.   And have you been involved with

5    regard to any marketed pharmaceutical products

6    where there were issues around the marketing?

7          A.   Marketed pharmaceuticals?  Well,

8    the products are marketed.

9          Q.   On the -- yeah, on the market.

10         A.   They were marketed -- so the

11   products were marketed, and there were

12   compliance issues, yes.

13         Q.   Okay.  And do you know if they were

14   compliance issues that were identified entirely

15   internally or whether they were the subject of

16   discussion with some kind of external

17   regulatory or enforcement body?

18         A.   I recall one of both.

19         Q.   And was there some period of time

20   of oversight that you were involved in?

21         A.   Yes.

22         Q.   And was there some resolution on

23   that?

24         A.   Yes.

1    Q.    And did you feel after that period

2    of resolution that the company was able to go

3    forward in a positive way?

4    A.    That's a little bit of a broad

5    overstatement, right.  Again, you're asking

6    about feelings.

7    Q.    Did you believe, based upon what

8    you had observed and the changes that you had

9    seen put into place, that the company could

10   make changes and could implement them in a good

11   way going forward?

12   A.    I think that would probably be

13   fair.

14   Q.    Okay.  And --

15   A.    I mean, not without some -- you're

16   never completely -- I mean, whenever you're on

17   a board, you never breathe a complete sigh of

18   relief.  Is that fair?

19   Q.    And that's appropriate, correct,

20   because you always have to be vigilant,

21   correct?

22   A.    Right.  And you also -- right.  I

23   think that's fair.

24   Q.    And all companies do, correct?  All

Highly Confidential - Subject to Further Confidentiality Review

1    companies have to --

2          A.   I don't want to speculate for all

3    companies, but --

4          Q.   You wouldn't want to speculate that

5    all companies should be -- should be vigilant

6    with regard to compliance?

7          A.   Should be?

8          Q.   Yeah.

9          A.   Absolutely.

10         Q.   Okay.

11         A.   I'd be happy to agree with that.

12         Q.   Okay.  And -- and I gather that the

13   fact that these companies had -- whatever the

14   companies are.  I'm not pointing to any

15   particular company, because I don't -- I'm not

16   asking you to disclose.

17              The companies that you were

18   involved in that had compliance issues, you

19   were comfortable continuing your association

20   with them?

21         A.   That would be fair.

22         Q.   Okay.  And you were comfortable

23   believing that there was a course of conduct

24   going forward where they could kind of right

1    the -- right the ship?

2         A.    Correct the action.

3         Q.    And did any part of that involve

4    you interfacing with the FDA to ensure that the

5    FDA was satisfied?

6         A.    On those two instances, no.

7         Q.    Did any part of it involve them

8    providing information either to FDA or to some

9    other governmental body with regard to specific

10   changes that were being made?

11        A.    Yes.

12        Q.    And did it involve even changes in

13   documents?  SOPs, for example.

14        A.    One instance, sort of.  The other,

15   I don't think it would be characterized that

16   way.

17        Q.    Did it involve changes in training

18   employees?

19        A.    One -- one likely did.

20        Q.    Did it involve changes in the

21   processes and procedures for the compliance

22   department?

23        A.    One likely did.

24        Q.    Did the organizations have

1    compliance departments prior to them getting

2    into an issue?

3         A.   They had quality departments.

4         Q.   Okay.  And did they --

5         A.   Well, one had a quality department.

6    The other, I'd have to refresh my memory.

7         Q.   Did either/or both of them move to

8    having a compliance department after they had

9    an issue?

10        A.   No.  It remained as a -- it remains

11   as a quality department.

12        Q.   Okay.  And did they go through a

13   period where they were being monitored?

14        A.   By whom?  When you say

15   "monitored" --

16        Q.   By either -- I was thinking at the

17   time by some external body.

18        A.   No.  That was not -- these did not

19   rise to that level.

20        Q.   Okay.  Did they go through some

21   period of internal monitoring?

22        A.   Sure.  I mean, I'd have to review

23   exactly how formal, but certainly nothing -- I

24   mean, there's -- there would be continued

Highly Confidential - Subject to Further Confidentiality Review

1    oversight, would be the proper answer.

2         Q.   Okay.  And was there any time where

3    they -- where your role as -- in a compliance

4    function was specifically tied to your FDA

5    experience?

6              MR. RAFFERTY:  Object to the form.

7         A.   Certainly I -- certainly I, you

8    know, draw upon my FDA experience.  I'm not

9    sure exactly what you mean.

10        Q.   I think I asked the question badly.

11             Did what you needed to do from a

12   compliance standpoint implicate your FDA

13   experience?

14        A.   Sure.  I think that would be fair.

15        Q.   Okay.

16        A.   I mean, I think I relied on my

17   FDA -- my knowledge of FDA regulations.  I

18   think that would be fair.

19        Q.   Okay.  And at the time that you

20   were involved in this, were there any

21   terminations of any personnel who were involved

22   in the issue that led to the compliance --

23        A.   I'd have to go --

24        Q.   -- revamping?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Sorry.

2                I'd have to go back and look at the

3    record.

4          Q.    Did you feel that you could

5    continue to engage with employees who had been

6    there at the time of the problem and still move

7    forward in an appropriate way afterwards?

8          A.    Yeah.  So let me -- let me clarify.

9    In one instance, this had to do with -- I think

10   actually in probably both instances, this had

11   to do with prior leadership and prior ownership

12   of the company that you end up inheriting.

13               So it was basically a different

14   ownership and different -- is my recollection,

15   that these problems existed prior to the

16   existing management or the ownership.

17         Q.    And what about the other one?

18         A.    Well, both problems, I believe --

19   I'd have to check dates -- I think they -- I'm

20   actually sure.  Both pre- -- started -- they

21   were historical problems that basically we

22   uncovered.

23         Q.    Okay.  But did employees stay on --

24   employees who were part of those historical

1  problems stay on and move forward after the fix

2  or the revamping?

3      A.   Well, so I don't think that the --

4  the people that I was dealing with sort of

5  inherited the problem of a prior ownership, I

6  think would be the way to say it.

7      Q.   Okay.  Would you agree with me that

8  the FDA at all times relevant to this case knew

9  that prescription opioids had a potential for

10  abuse and misuse?

11          MR. RAFFERTY:  Object to the form.

12      A.   I think that's probably -- well,

13  whenever you say "the FDA," it's -- you know, I

14  assume you're talking about somebody at FDA.

15  And I think that -- I think the answer would be

16  yes, but maybe not fully to the extent that

17  there was.

18      Q.   Would you agree with me that at all

19  relevant times, FDA understood the Class II

20  opioids had an abuse potential similar to

21  morphine?

22      A.   Yes, I would again agree with you

23  on that, but again, I just -- with the same

24  caveat.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Would you agree that Schedule II

2  controlled substances are defined as substances

3  that have a high potential for abuse which may

4  lead to severe psychological or physical

5  dependence?

6    A.   I think you're reading the schedule

7  correctly, so I would agree.

8    Q.   Would you agree that only -- that

9  the only level higher than Schedule II would be

10 Schedule I, and Schedule I products have no

11 currently accepted medical use in the United

12 States, a lack of accepted safety for use under

13 medical supervision, and a high potential for

14 abuse?

15   A.   Correct.

16   Q.   Would you agree that at all

17 relevant times, FDA knew that extended-release

18 opioids, if crushed or chewed, would not

19 function as extended-release products but would

20 release their drug immediately?

21        MR. RAFFERTY:  Object to the form.

22   A.   I think the people who were focused

23 on opioids would know that.  I'm not sure if,

24 quote, FDA knew that, but I think some people

Highly Confidential - Subject to Further Confidentiality Review

1    at FDA.

2        Q.    FDA reviewers of opioid products

3    would know that?

4        A.    Yeah, I think that -- I think

5    Curtis articulated that early on.  I'm not sure

6    how many others at the time focused on that.

7        Q.    Okay.  Would you agree that FDA

8    knew that extended-release opioids might be

9    crushed or chewed by people accidentally,

10   including elderly people or people with

11   swallowing problems, and that that was

12   something they were concerned about?

13            MR. RAFFERTY:  Object to the form.

14       A.    Yeah, I don't -- I don't remember

15   that.  I don't have -- I couldn't tell you

16   firsthand what the extent of concern was.  I

17   didn't see that, I mean, phrased that way, but

18   I'm not saying that somebody did not.

19       Q.    Okay.  Does it ring any bells to

20   you that the FDA was focused on the potential

21   that people would crush or chew

22   extended-release products in order to

23   facilitate their appropriate use, not to

24   deliberately abuse them, and that they could

1    get into a problem doing that?

2         A.   I didn't have any conversation, and

3    I am -- I'm just blocking on the record talking

4    about that.  I may just -- I just don't have a

5    recollection --

6         Q.   Okay.

7         A.   -- of the record talking about

8    that.  You'd have to go back -- I mean,

9    obviously, there was an early -- FDA --

10        Q.   If you don't remember, that's fine.

11        A.   Well, I do remember certain pieces

12   of this.

13        Q.   Okay.

14        A.   I just want to let you know about

15   what FDA knew about crushing and -- but I'm not

16   sure I fully tie -- have a recollection of

17   tying the crushing to elderly and that

18   discussion.  I'd just have to review the record

19   to double-check that.

20        Q.   Are you aware of FDA understanding

21   that extended-release opioids might be crushed

22   or chewed by abusers?

23             MR. RAFFERTY:  Object to the form.

24        A.   Sort of yes and no.  Mostly yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Right.

2    A.    Mostly yes.  There was some early

3  crushing studies that they -- they were aware

4  of that, and they didn't -- they didn't flag

5  this part of it.  So that's why I'm just -- but

6  Curtis certainly did flag this.

7    Q.    Certainly for most of the timeline

8  that we're talking about, that was something

9  they were aware of?

10    A.    Yeah.  Early on, there wasn't the

11  same focus, because there was the solution

12  pretty easily of some of these products,

13  that -- if I remember the studies by the

14  reviewers -- and they didn't note this.  So

15  that was why I point this out.

16    Q.    Would you agree with me that they

17  understood the potential to crush these

18  products?

19          MR. RAFFERTY:  Object.

20    Q.    They did crush studies, right?

21    A.    There was -- FDA did do a study

22  early on, or there was -- I'm sorry.  I

23  misspoke.  You'd have to pull the study -- the

24  FDA comments.  I don't know if -- FDA may

1    have -- I believe FDA reviewed the study

2    results early on.  I don't believe FDA did the

3    study.  But I could be wrong.

4         Q.    Would you agree with me that FDA at

5    all relevant times knew that opioids carry a

6    risk of respiratory depression?

7              MR. RAFFERTY:  Object to the form.

8         A.    Sure.  I think that would be a fair

9    statement, with all the caveats that I just

10   gave.

11        Q.    And would you agree that FDA at all

12   relevant times knew that patients on opioids

13   may develop tolerance?

14             MR. RAFFERTY:  Object to the form.

15        A.    You know, the easy answer is, sure.

16   I'm just trying to think --

17             I mean, I led the addiction team

18   back in 1990s on certain products, as you know,

19   that were sort of unrelated to what's at issue

20   today.

21             And FDA wasn't -- didn't have a lot

22   of expertise on tolerance.  We looked at NIDA

23   and others.  That's the only reason I'm

24   hesitating.

1    Q.   Okay.  But the general concept of

2  opioid tolerance was certainly known at all

3  times?

4         MR. RAFFERTY:  Object to the form.

5    A.   The word was known, okay?  I mean,

6  I don't think there was the kind of expertise

7  to really understand the full implications of

8  tolerance at the agency.

9    Q.   And was there an understanding that

10  opioids were not the only class of drugs to

11  which people could become tolerant?

12         MR. RAFFERTY:  Object to the form.

13    A.   Again, at a very simple level,

14  there's some truth to your statement.

15         But again, you're dealing with very

16  different -- it would be misleading to say that

17  the tolerance of those other compounds is the

18  tolerance of opioids, because the neural

19  adaptations that would lead to tolerance are

20  very different and the neural pathways are very

21  different.

22         So when you're talking about, did

23  FDA understand this, I don't think so.

24    Q.   Different -- different types of

Highly Confidential - Subject to Further Confidentiality Review

1    drugs, but there are -- opioids are not the

2    only class of drug to which patients can become

3    tolerant?

4         A.   No.  But understand, tolerance is a

5    word -- the need for higher --

6         Q.   Doses.

7         A.   -- doses because of a failed -- but

8    the -- but the mechanism and the neural

9    mechanism by which that occurs can be very

10   different.

11        Q.   Yeah, I'm not --

12        A.   So using the word "tolerance" is

13   sort of an easy word to use in a complex

14   understanding of the biochemistry and the

15   neural adaptations.

16        Q.   Blood pressure medicine, steroids,

17   people can become tolerant to them and over

18   time require higher doses to achieve the same

19   effect?

20        A.   Yes and no.  The neural adaptations

21   are very different.

22        Q.   Okay.  But within those drugs,

23   you -- patients may need higher doses over time

24   to achieve the same effect?

1          A.   No.  Patients -- well, I mean,

2    it's -- the answer is, it's complicated.

3          Q.   So -- and there were data -- strike

4    that.

5               Would you agree that FDA at all

6    relevant times knew that patients on opioids

7    may develop physical dependence?

8               MR. RAFFERTY:  Object to the form.

9          A.   Again, a term that is easily

10   bandied about, but I don't think -- I think

11   very few people at the agency really understood

12   physical dependence and addiction and how they

13   overlap.

14              So I think they would -- they could

15   use the term.  They could repeat the mantras.

16   But I don't think there was a great depth of

17   understanding.

18         Q.   Well, I'm not asking you, sir,

19   whether people had every piece of understanding

20   20-plus years ago, almost a quarter century

21   ago, that they have today.

22              But I am asking you whether the

23   concept of physical dependence to opioids was

24   understood.  Would you agree with me --

1    A.    I don't think --

2    Q.    -- that was known?

3          MR. RAFFERTY:   Object to the form.

4    A.    I mean, not to be argumentative,

5    but I don't think the concept of physical

6    dependence is understood by anybody, even

7    today, fully.  I think there's still scientific

8    questions about that.

9    Q.    And I just said, not fully.  We're

10   talking about almost a quarter century ago,

11   right?

12   A.    Sure.

13   Q.    I mean, just to -- just to be

14   clear.  You know, I would hope we've all

15   learned things over the last quarter century in

16   all kinds of aspects.

17         But dependence was a concept that

18   was known with regard to opioids at all times

19   that are relevant to the approval of the

20   products that you have opinions about?

21         MR. RAFFERTY:   Object to form.

22   A.    "Dependence" was a term that was

23   used.  What was clearly understood were, these

24   were addictive products and powerfully

Highly Confidential - Subject to Further Confidentiality Review

1    addictive products, and there were terms like

2    "dependence" that was used.

3         Q.   I'm not asking about addiction

4    right now.  I'm asking about dependence,

5    physical dependence.

6         A.   I can't -- I mean, these are

7    complicated terms that we could spend hours on.

8    And if you're asking me, then, for people to

9    understand -- if you want to ask me whether FDA

10   understood physical dependence, you have to

11   understand how physical dependence and

12   addiction were related.

13        Q.   Do you agree that there was

14   language with regard to dependence in the

15   labels for these products from the beginning?

16        A.   Correct.  The manufacturers put

17   them in, and FDA allowed them to be in.

18        Q.    Is that your testimony as to how it

19   happened?  Are you -- are you testifying that

20   the manufacturers asked for language about

21   dependence, and FDA said, Okay?

22        A.   No.  What I'm saying is that the

23   label is the manufacturer's and the label is

24   owned by the manufacturer, and I'm saying that

Highly Confidential - Subject to Further Confidentiality Review

1    I don't see FDA striking that language.

2          Q.    Okay.

3          A.    But --

4          Q.    You don't know if the FDA required

5    that language?

6          A.    So I do know that the -- the label

7    was submitted by the company, and I believe

8    that language was in going back to '92 about

9    it, but I think it was the company and

10   Retter's [ph] documents in '92, when he sends

11   them over to the agency, that had that.

12         Q.    Well, I mean, look.  Come on.

13   Let's just -- I will grant you that the first

14   draft of the label will come from companies,

15   but I also don't think that we have to dance

16   around this.

17               The FDA would have expected

18   language about tolerance and dependence in the

19   label, and it was in the label, correct?

20               MR. RAFFERTY:  Object to the form.

21         Move to strike the preamble, the

22         commentary.

23         A.    I don't think -- I don't see any

24   guidance or instructions or class-wide labeling

1    instructions that say that that had to be in.

2    I mean, I don't want to -- let me just finish

3    if I may.

4              I don't know -- we could have a

5    discussion and try to figure out if one just

6    said these were addictive products, right, and

7    the risk of addiction -- I don't know whether

8    FDA -- I'd have to go back and think about it,

9    whether that would be sufficient.

10        Q.   Do you remember what the product

11   said about addiction at the time of initial

12   approval?

13        A.   Which product are you talking

14   about?

15        Q.   Well, any -- any product.  Let's

16   start with OxyContin.

17        A.   Well, it certainly had a -- the

18   Schedule II statement.  This was similar to

19   morphine, right?

20        Q.   Do you remember what else it said

21   about addiction?

22        A.   There were statements on iatrogenic

23   addiction, I believe, in the label, and there

24   was a statement that was a "reason to believe"

Highly Confidential - Subject to Further Confidentiality Review

1 statement in the label.

2      Q.    Just so I'm clear, are you

3 testifying that having language about tolerance

4 and dependence in the label was somehow a bad

5 or misleading thing?

6           MR. RAFFERTY:  Object to the form.

7      A.    I'm not -- I'm saying that to the

8 extent that one can talk about -- to the -- to

9 the extent that one talks and trumpets

10 dependence and tolerance as distinct from

11 addiction and don't -- you can go to higher

12 doses because this is just tolerance or

13 dependence and this is not addiction, I think

14 was very dangerous.

15      Q.    Do you know of any scientific

16 textbook that refuses to draw any distinctions

17 between tolerance, dependence, and addiction?

18      A.    Complete distinctions?  Yes.  I

19 think there's significant writing that talks

20 about -- there may be definitions over time

21 that tries to make distinctions, but there's

22 also considerable literature about overlap

23 between those and how dependence --

24           I mean, in the end of the day,

Highly Confidential - Subject to Further Confidentiality Review

1    certainly when you're dealing with opioids,

2    that dependence, I mean, is likely to be all

3    addiction.

4         Q.   Well, are you saying that you

5    have -- there's no space in which you

6    distinguish between dependence, which can be --

7    which can include a patient who's properly

8    managed and functioning in every way in their

9    life, and addiction and addictive behaviors,

10   dysfunctional addictive behaviors?

11             MR. RAFFERTY:  Object to the form.

12        A.   No, I'm not saying there's no

13   space.

14             I think if you take a hundred -- I

15   mean, my clinical judgment would be, if you

16   take a hundred people and you expose them to

17   your client's product at high doses for a year,

18   you'd probably find some 30, 40 percent likely

19   to be able to stop.

20             You'd probably find another 30-plus

21   percent that are able, after either tapering

22   or -- to have symptoms and have difficulty, and

23   I think you'd probably have 20-plus percent

24   having compulsive behavior.  And so I think

1    there's a continuum between that.

2              Now, whether that is -- you want to

3    call that middle category dependence or you

4    want to call that a continuum on addiction and

5    whether those neural networks are different, we

6    could spend hours.

7         Q.   Is that 20 percent number from a

8    particular source or sources you can cite me

9    to?

10        A.   Those are in discussions I've had

11   with experts over the years.  That's my, you

12   know -- that's my judgment.  That's --

13        Q.   So you're not relying on any

14   particular authority for that?

15        A.   No -- well, I can.  I mean, if you

16   look at -- I'm happy to go through -- there are

17   significant studies on the effect of high

18   doses, and we can go through all of them and --

19        Q.   I'm looking for the 20 percent

20   number.

21        A.   Yeah.

22        Q.   That's a clinical impression or --

23        A.   No --

24        Q.   -- conversation --

Highly Confidential - Subject to Further Confidentiality Review

1          A.    -- but I -- so that came -- I mean,

2    certainly, I mean, from the clinical --

3    clinical experience and from discussions.

4               But if you look at, I think, the

5    literature as a whole, I think -- I'm sure

6    other addiction experts will testify on this --

7    I think that's certainly within the range that

8    you see in a number of studies for people who

9    have been on high dose.

10         Q.   How many patients have you managed

11   on opioids?

12         A.   I've managed a number, but I've --

13   I certainly have --

14         Q.   What's -- what the number?

15         A.   Handfuls, probably, over the years.

16         Q.   Did you ever have a pain practice?

17         A.   No, I -- no, but I've been a

18   hospitalist.  I've been on the wards.

19              But as I said to you, that that

20   number -- I'm sorry.

21         Q.   I mean, you've never had a patient

22   population where you're treating them for pain

23   and you're managing their therapy on a regular

24   basis?

Highly Confidential - Subject to Further Confidentiality Review

1        A.   I certainly have had -- I've had

2   some of the sickest patients, I mean, who have

3   had -- that I've been responsible for who have

4   been in excruciating pain and that I was

5   responsible for their cancers.

6        Q.   Since being at FDA?

7             MR. RAFFERTY:  Object to the form.

8        A.   Certainly after I was on -- after

9   FDA, when I was on the wards.  I mean, not

10  recently.  I've stepped back.  But certainly

11  when I've been on the wards.  I did a lot of

12  adolescent medicine, and I could assure you I

13  did a lot --

14       Q.   When you were on the wards.  When

15  were you on the wards?

16            MR. RAFFERTY:  Please let him

17            finish.  He's being very responsive to

18            your question, and you have interrupted

19            him three or four times in a row.

20       Q.   I certainly don't mean to, but I'm

21  just trying to get the orientation of a date.

22  Because I asked for a date, and I'm very

23  unclear what you're talking about.

24       A.   Right.  So both before and after

Highly Confidential - Subject to Further Confidentiality Review

1    FDA, I was attending hospitalist.  We didn't

2    call it hospitalist back -- but I did a lot of

3    adolescent medicine, and adolescent medicine is

4    a lot of oncology.  So -- and that involved

5    sometimes significant pain patients.

6         Q.   So let's put aside the before FDA,

7    since that was before 1990, and focus just on

8    the after, after '97.  How much of your time

9    have you spent as a hospitalist since 1997?

10        A.   So I stopped probably -- oh, I

11   don't know.  Certainly did it at Yale pretty

12   extensively, maybe did it a month, a year.  I

13   was the attending on the floor.  Did it a

14   little less at UCSF.  But I was pretty actively

15   involved.

16        Q.   Did you ever have a private

17   practice after -- of medicine after getting out

18   of FDA?

19        A.   I never had a private practice

20   before or after.

21        Q.   Okay.  And you never were the

22   primary doctor prescribing prescription opioids

23   for patients on an -- on an outpatient basis?

24        A.   As I said, I was a hospitalist, and

1    any use of opioids, you know, would have been

2    probably morphine at the time, and it was in

3    the sickest of patients.

4         Q.   Okay.  So you were seeing morphine

5    use in the sickest of patients.  And they were

6    all pediatric patients?

7         A.   That would be what I would be

8    taking care of.

9         Q.   Okay.  So --

10        A.   I mean, occasionally you get a --

11   occasionally you get an adult who you followed

12   as a child.  So I just wanted -- so I've taken

13   care of some of those.

14        Q.   Did you look at -- in preparing

15   your report, did you look at NSDA data on rates

16   of misuse of prescription opioids over time or

17   for any period of time?

18        A.   I've looked at some general abuse

19   data, but I have not studied specifically -- I

20   can give you certain abuse trends over time and

21   am happy to discuss that.

22        Q.   Could you -- do you know what the

23   prevalence of non-medical use of prescription

24   opioids is per NSDA data over time?

Highly Confidential - Subject to Further Confidentiality Review

1    A.   I have -- I think I have that.

2    You'd have to give me a minute, if you want me

3    to find it.  I'm happy to do that.

4         Q.   Are you aware that looking over

5    time, from, like, 2002 to 2017, something like

6    that, it's somewhere around 1 percent?

7              MR. RAFFERTY:  Object to the form.

8         A.   The 1 percent misuse?  I'm sorry.

9    I don't understand the 1 percent.

10        Q.   Yeah, non-medical use/misuse

11   prevalence.

12        A.   That only 1 percent of opioids are

13   misused?  Is that what you're saying?

14        Q.   New non-medical use, I think.  Have

15   you seen those numbers?

16        A.   I'm a little confused.  Let me go

17   check.  I mean, I think that I'm -- I'm

18   certainly familiar with the numbers of

19   conversion from prescription drugs by doctors

20   to non-medical use and those, but those are a

21   different set of numbers.

22             And I'm also aware of the surveys

23   of people admitted to residential facilities or

24   for treatment, and the percentage that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    started --

 2              But I certainly am not aware that

 3    only 1 percent of opioids in this country are

 4    misused, by that data.  I'd have to go back and

 5    look.  I find that --

 6         Q.   You've got to give me one second,

 7    because I just lost my microphone.

 8              MS. FREIWALD:  Can we go off the

 9         record for a second.

10              VIDEO OPERATOR:  3:02, we are off

11         the video record.

12              (A discussion was held off the

13         record.)

14              VIDEO OPERATOR:  3:04, we're on the

15         video record.

16    BY MS. FREIWALD:

17         Q.   Sir, would you agree with me that

18    FDA at all relevant times knew that some

19    patients wanting to stop opioid therapy would

20    have to be tapered to avoid symptoms of

21    withdrawal?

22              MR. RAFFERTY:  Object to the form.

23         A.   Again, I don't think it's a

24    complete sentence -- complete thought.
```

Highly Confidential - Subject to Further Confidentiality Review

1          I mean -- but I think there

2     would -- probably correct to say that FDA

3     recognized that some patients would -- should

4     be tapered.  I think that would be correct.

5     Some patients, you know, I mean, could not be

6     tapered and would be addicted, I think would

7     also be part of that sentence.

8          Q.   Okay.  And from your review of the

9     record, would you agree that FDA knew that

10    pseudoaddiction, whether it was called

11    pseudoaddiction or not called that, that -- it

12    was a concept that was described in the

13    literature going back to the '80s, if not

14    before?

15         A.   I think that's the way it was

16    represented to the agency, if I'm correct.  I

17    think it was represented that way, that it was

18    in the literature.

19         Q.   Have you, as part of your report in

20    this case, gone to the literature to see --

21              (Interruption.)

22         Q.   Have you, as part of your report in

23    this case, gone to the literature to see how

24    far back the concept that is now referred to as

Highly Confidential - Subject to Further Confidentiality Review

1   pseudoaddiction was described, whether by the

2   name pseudoaddiction or some other name?

3          A.    The Haddox and Weisman --

4          Q.    Yeah.

5          A.    -- article?  What?  '80-something.

6          Q.    I'm asking a slightly different

7   question --

8          A.    Sure.

9          Q.    -- because I think we can agree

10  what -- the date of the Haddox and Weisman

11  article.  Yeah.  I mean, that's --

12         A.    Sure.

13         Q.    What I'm asking is if you looked to

14  see if prior to that article there were

15  discussions of the concept without using that

16  name.

17         A.    I've tried to look historically to

18  understand that theory.  I've tried to look at

19  that.

20         Q.    Do you have any kind of a

21  bibliography as part of your report that

22  includes the pre-1988 or '89 literature

23  describing the concept?

24         A.    I think you would have to go back

1    and look at the scientific articles.  I believe

2    there were -- there was a -- I did include very

3    significant number of literature of what was

4    known prior to, certainly, '95 that goes back

5    several decades.

6              So if you look at that bibliography

7    on scientific articles, I think there are --

8    there are a significant number of historical

9    articles.

10        Q.   I'm asking a specific question.  If

11   I look at your bibliography, will I find that

12   you pulled articles pre-1989 that discuss what

13   came to be talked about as pseudoaddiction?

14        A.   I think that -- we'd have to go

15   back and double-check, but I would -- I think

16   that's correct, because I think I -- I searched

17   very -- very -- tried to search very carefully

18   the production as on -- and the historical

19   documents, because there are some compilations

20   of that science by your client in certain

21   documents.

22              And I have gone through some

23   400-page compilations of all the -- of all

24   the --

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.

2    A.   -- science that they had access to

3  in the '90s.  So I went through those -- those

4  studies.

5    Q.   So based upon your review, would

6  you agree with me that while the term

7  "pseudoaddiction" may not have been used, the

8  concept was used in the literature prior to

9  1989?

10    A.   I'd have to review that literature

11  before I can answer that question accurately.

12    Q.   Would you agree that for almost the

13  last quarter century, which is what we're

14  talking about in this case, FDA has not been

15  willing to restrict the use of prescription

16  opioids as a class -- there have been some

17  limited exceptions -- to any underlying

18  specific disease state?

19        MR. RAFFERTY:  Object to the form.

20    A.   As a class?  No, I think -- I think

21  you're correct.  I think that if you look,

22  you'll see -- I don't want to say a

23  patchwork -- I think that would be -- but a

24  patchwork of indications and sometimes maybe

Highly Confidential - Subject to Further Confidentiality Review

1    even inconsistencies.  So I don't think there

2    is a class-wide label recommendation.

3          Q.    What I'm asking you is, generally

4    speaking, for the class, they have not been

5    willing to limit the indication to any specific

6    underlying disease --

7                MR. RAFFERTY:  Object to the form.

8          A.    That's --

9          Q.    -- that is the cause of pain?

10         A.    That's -- well, we know that's --

11   we've talked about cancer.  We've talked about

12   Actiq.  We've talked about Oralet.  And those

13   are disease-specific.

14               The agency did not believe that the

15   studies on those -- on the other underlying

16   diseases, such as -- the agency didn't -- I

17   mean, concluded --

18         Q.    Sir --

19         A.    Let me just finish.

20               The agency concluded that there was

21   not substantial evidence to use opioids in

22   those conditions other than cancer.  So there

23   was not substantial evidence to use it in hip

24   or in OA.  I think the record reflects that.

1      Q.   Sir, that's not my question.  I'm

2   just going to ask you to listen to my question.

3   We have limited time here.

4           So I understand there are a couple

5   exceptions that we've talked about.  But as a

6   general matter, the FDA has not been willing to

7   limit prescription opioids, including

8   extended-release prescription opioids, to

9   treatment for any specific underlying disease

10  state?

11          MR. RAFFERTY:  Object to the form.

12     A.   The question to me is confusing,

13  because in order to do that, you need

14  substantial evidence, and substantial evidence

15  doesn't exist with regard to those underlying

16  disease states, according to the agency.

17     Q.   Has the FDA been asked to limit

18  opioid use to certain specific diseases and

19  said no?

20     A.   We can pull up the proposition to

21  see exactly what the request was.  I don't

22  think that was in the proposition.  I think it

23  was dose.  But I'd have to refresh my memory on

24  that.  I don't think that was part of PROP.

1    Q.    Has FDA ever been willing to limit

2    extended-release opioids to cancer pain?

3         A.    I think I testified --

4         Q.    With the exception of the couple --

5    the couple of things you've talked about.

6              MR. RAFFERTY:   Object to the form.

7         Q.    And I'm focusing on the

8    extended-release.

9         A.    So Duragesic was extended-release,

10   and I -- and I read you the statement this

11   morning that I was not willing to limit it just

12   to cancer.  I thought there would be some few

13   patients beyond cancer.

14             But again, your question is

15   somewhat confounding, because it's backwards.

16        Q.    It's actually very -- very simple.

17   There have been requests since 1996 --

18             I'm in the post-you-as-Commissioner

19   time period.

20        A.    Right.

21        Q.    There have been requests, I think

22   we should be able to agree, to limit

23   extended-release opioids to cancer pain, and

24   the FDA has declined, correct?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    You'd have to show me

2    specifically --

3               MR. RAFFERTY:  Object to form.

4          A.    -- what you're referencing to

5    refresh my memory.

6          Q.    The FDA has not been willing to

7    limit the indication for extended-release

8    opioids to any specific number of days, have

9    they?

10              MR. RAFFERTY:  Object to the form.

11         A.    The FDA has stated -- well, with

12   regard --

13         Q.    It's really a yes-or-no thing.

14   They've not been willing to --

15              MR. RAFFERTY:  He's allowed to

16              answer your question.  Asking whether

17              the FDA has been willing to is vague,

18              and it's ambiguous, and he's been

19              answering the question.

20         Q.    They've -- have they -- I asked

21   you, they've done it?  Have they -- have they

22   ever taken the view that that is the correct

23   thing to do?

24         A.    I think the agency in the -- in the

Highly Confidential - Subject to Further Confidentiality Review

1   current label says -- we could get the actual

2   language -- is fewest doses, lowest dose.  I

3   believe that's in the current label.  I may not

4   have the exact words correct.

5           But I don't think FDA, again, in

6   trying to walk this balance, set a threshold.

7   But I think it was -- it's clear that the FDA

8   did adopt the CDC view of, fewest days would be

9   appropriate.

10      Q.   Okay.  So we'll look at that

11  language later.

12          Putting aside the 2017 change,

13  prior to 2017, has the FDA imposed any number

14  of day limits on the use of extended-release

15  opioids?

16      A.   I don't believe the agency has that

17  to -- to impose -- quote, impose that.

18      Q.   My question is, have they at any

19  point come to a conclusion -- through any

20  advisory committee or in response to any

21  citizens' petition or review of any company

22  product, have they come to the decision that

23  the label should be changed in that way?

24      A.   I don't -- I'm not privy.  I

Highly Confidential - Subject to Further Confidentiality Review

1    understand that there are label changes that

2    are under discussion, and I'm not privy right

3    now.

4            I've spoken to the prior -- the

5    now -- Dr. Gottlieb.  I understand there's

6    label changes that are under -- that are being

7    thought about, but I'm not -- I didn't push him

8    on exactly what those were that are being

9    thought about.  So I can't comment.

10       Q.   As far as you know, there's never

11   been a recommendation from any FDA advisory

12   committee that extended-release opioids should

13   be limited in use to a specific number of days?

14       A.   Before -- I can't answer that.  I'd

15   have to go back.  I have the transcripts.  We'd

16   want to search.  I can't tell you there wasn't

17   a recommendation by members of the advisory

18   committee to limit that.  There were a number.

19   I'd have to go back.

20            That question I don't believe was

21   posed to the advisory committee as such, for

22   which there was a vote, but I'd have to go back

23   and check the record.

24       Q.   Sitting here today, as part of your

1  opinion, that's not something you know the

2  answer to?

3       A.   Whether the FDA -- whether an

4  advisory committee member recommended that?

5  I'd have to go back and check.

6       Q.   I didn't say -- I didn't say

7  advisory committee member.

8            Whether an advisory committee ever

9  reached a vote or -- whether in response to a

10  citizens' petition or in any other way, did the

11  FDA ever come forward and come to the

12  conclusion that that was -- that it was

13  appropriate to change the labels for

14  extended-release opioids to limit their use to

15  a certain number of days?

16       A.   My discussions with Dr. Woodcock is

17  that she was not ready to do that over the

18  years because she wanted -- she didn't think

19  there was the science to do that that would

20  create a precise number, that the science was

21  still out.

22            So I -- so I hope that answers your

23  question.

24       Q.   And has the FDA, as the result of

1    any advisory committee --

2         A.    I think -- she been opposed to a

3    hard-and-fast rule, I think would be the better

4    way to say it.

5         I think the agency did agree --

6    there's a strong view that it should be -- you

7    know, we're really talking about least number

8    of days, lowest doses, and get off these drugs

9    as soon as possible.  I think that's the

10   general view.

11        Q.    And I promise, we will look at

12   specific labels when we -- when we are a little

13   later in the deposition.

14        But for now, I'm trying to talk

15   across products.  So trying to not limit myself

16   to one company's label.

17        And you may know things I don't

18   know.  So if I ask the question broadly, I'll

19   hear what your answer is.

20        I want to ask you essentially the

21   same question with regard to maximum MMEs.  Has

22   the FDA, through any advisory committee process

23   or any other internal review process,

24   including, say, review of a citizens petition,

Highly Confidential - Subject to Further Confidentiality Review

1  to your knowledge, ever come to the conclusion

2  that MMEs should be maxed at a certain daily

3  level?

4          A.   So I don't think -- from a

5  regulatory perspective, we certainly have the

6  agency on record saying that they believe there

7  is an association between higher doses and

8  addiction and risks and overdose.

9              We -- but we -- but they refused

10  that -- they didn't know a precise threshold,

11  so they backed away, but they recognized there

12  was an association.  But again, I think they do

13  support the concept of lowest effective dose.

14          Q.   But they've been reluctant to

15  create any hard-and-fast rules?

16          A.   I think that's -- they've been -- I

17  think that -- and I think that's possibly one

18  of the criticisms, is that -- or one of the

19  pluses, depending on your perspective, is

20  Dr. Woodcock has been trying hard to walk this

21  balance.

22              And I think -- I think when the

23  agency looks back and says, yeah, maybe we

24  didn't do things fast enough, these are the

Highly Confidential - Subject to Further Confidentiality Review

1  kinds of questions that it's -- that it's

2  troubled by that it has not acted.

3        Q.   And would it also be true that they

4  have not been willing to write into the label

5  any language about evidence of improved

6  function --

7             MR. RAFFERTY:  Objection.

8        Q.   -- with opioid therapy?

9             MR. RAFFERTY:  Object to the form.

10       A.   They're certainly in many -- again,

11 I know you're prefacing your question broadly,

12 but they certainly have been very clear in the

13 DDMAC letters of a number of your colleagues

14 around the table that there is not substantial

15 evidence on function.

16       Q.   I'm asking a different question.

17 We'll talk about function claims later.

18            I'm asking whether --

19       A.   How many days is this deposition

20 going?

21       Q.   I'm -- I'm asking --

22            MS. LEVY:  Objection.

23       Q.   I'm asking whether they have ever

24 been willing to write into the indication that

1   there should be -- or any prescribing guidance

2   that there should be a requirement of improved

3   function.

4        A.   I'd have to go back and just check

5   the record.  I'm not sure.

6        Q.   Okay.  You mentioned a couple of

7   times, when you were talking about Dr. Woodcock

8   in particular, but I think -- I think

9   generally -- and you'll tell me if what I'm

10  saying is fair or not -- you talked about the

11  FDA trying to strike a balance.

12            And if I hear your testimony right,

13  it sounds to me like what you're saying is

14  the -- as you read the record, the FDA was

15  trying to strike a balance between what was

16  concerns about abuse and misuse and also

17  providing therapy for pain patients who may

18  need the therapy and benefit from it.

19            MR. RAFFERTY:  Object to the form.

20       A.   Yeah, I think the FDA was -- I

21  think the FDA was overwhelmed.

22       Q.   You can't answer the question of

23  whether they were trying to strike the -- if

24  you don't know, just tell me you don't know.

1          A.    I know.  I mean, these are -- I

2    mean, I know.  I think FDA was just

3    overwhelmed.

4          Q.    Where is the evidence of that, sir?

5          A.    The epidemic, ma'am.

6          Q.    So the fact that things -- there is

7    a problem of abuse and misuse is proof that the

8    FDA was overwhelmed?

9               MR. RAFFERTY:  Object to the form.

10         A.    There is this graph, I guess

11   from -- is it Cuyahoga, right.  And I'll just

12   take it, and we can just see if I can do this.

13         Q.    Sir, I'm going to ask you to answer

14   my question.  I just want to know if --

15         A.    Well, I am.

16              So there is this graph, right.

17   Everyone's seen it.  It's Cuyahoga Department

18   of Health.  And it says, Prescription drugs led

19   to a larger overdose epidemic than illicit

20   drugs ever have, right.  And it shows the

21   graph, right.

22              And I think FDA goes back and looks

23   at this -- and I know it -- and goes, how did

24   this happen?

Highly Confidential - Subject to Further Confidentiality Review

1         Q.    That's not my question.

2         A.    And I think -- I think

3    it's over- --

4         Q.    Sir --

5         A.    I think that they are --

6         Q.    I don't usually move to strike, but

7    this is not anywhere in the realm of my

8    question.  It's not even close.  So we're going

9    to -- we're going to go back to my question.

10        A.    Okay.

11        Q.    From your review of the record --

12   you've talked about balance -- what is the

13   balance that was trying to be struck?

14        A.    So the FDA, you know, did -- tried

15   to, I think, repeatedly -- 1996, don't use this

16   for step two; 2001, restrict, narrow the

17   indication; REMS -- risk maps; REMS.  It's

18   trying to bring under control, by the tools

19   that it had, this -- this part of the curve

20   from prescription drugs.  And it can't do it.

21        Q.    So my question again is, what --

22   the balance that you've said was trying to be

23   struck, would you agree with me, in part, was a

24   balance of trying to ensure that these

1    medicines were available for patients who

2    needed them and benefitted from them and trying

3    to limit or reduce rates of abuse and misuse?

4            A.    Right, the addiction that was going

5    on --

6            Q.    Okay.

7            A.    -- in this country.  I think that's

8    a -- that's probably a fair statement.

9            Q.    Okay.  And the balance -- there

10   were people who felt very strongly over time on

11   both sides of that discussion, correct?

12           MR. RAFFERTY:  Object to the form.

13           A.    No, I don't think people are on,

14   quote -- well, I don't know which people you're

15   talking about.  I don't think people are on

16   different -- different sides of this.

17           Q.    Well, let me -- let me --

18           A.    I'm not sure I understand that.

19           Q.    Let me rephrase that.  Nobody's in

20   favor of abuse or misuse, of course, and

21   nobody's in favor of people suffering.

22           But would it be fair to say that

23   there have been multiple opportunities over the

24   years when the FDA has opened this issue for

Highly Confidential - Subject to Further Confidentiality Review

1    public comments and heard from different

2    stakeholder groups?  Yes?

3            MR. RAFFERTY:  Object to the form.

4        A.    A lot of that contrived.

5        Q.    Are you -- do you have evidence

6    that pain patients who came and spoke to the

7    FDA about the importance of their medicine,

8    that that was contrived?

9        A.    I certainly see significant

10   campaigns done by organizations that have been

11   funded by your companies that lobbied very

12   extensively that -- the mantra was --

13       Q.    Sir --

14           MR. RAFFERTY:  No --

15           MS. FREIWALD:  No.  I asked a

16       question about the AdCom.

17           MR. RAFFERTY:  No.  This is in

18       direct response to the question.

19       Q.    I asked the question about at

20   public hearings.

21           Are you testifying that anybody who

22   came and spoke at a public hearing where

23   conflicts of interest were expressed,

24   including, particularly, pain patients, that

Highly Confidential - Subject to Further Confidentiality Review

1    their testimony was contrived --

2              MR. RAFFERTY:  Well, objection.

3         Q.    -- and that you know that for a

4    fact?

5              MR. RAFFERTY:  Objection.

6         Q.    And you're testifying under oath.

7              MR. RAFFERTY:  Objection.

8              Are you asking about particular

9         patients or anybody?  Because you --

10             MS. FREIWALD:  Well, I started out

11        with the patients.  That's actually what

12        I asked --

13             MR. RAFFERTY:  Well, you asked both

14        in this question, anybody that spoke and

15        then patients.

16        Q.    Are you asking -- are you -- are

17   you testifying that you have evidence that

18   you're prepared to give under oath that

19   statements made at public hearings by pain

20   patients were contrived?

21        A.    I'd have to go back and look at the

22   record to that.

23             I certainly see letters that were

24   written by companies or facilitated by

1    companies to doctors to get them to -- to

2    limit -- limit restrictions.

3           Q.   Sir, I could not be more clear.

4    I'm asking about at public hearings, advisory

5    committees, people who got up and told their

6    personal stories and asked to not have their

7    medicines limited.  Are you saying that those

8    statements were contrived?

9           A.   I am not saying that, but I am --

10          Q.   Okay.  That's all I -- that's all I

11   want to know.

12          A.   Well, you're cutting me off, but --

13          Q.   That was my only question.

14          A.   But you cut me off.

15          Q.   Are you testifying that there were

16   any AdComs where people were supposed to

17   disclose conflicts of interest and you know

18   that they did not?

19          A.   I didn't -- I did not have any

20   opinion on that in my report --

21          Q.   And are you aware that non- --

22          A.   -- but I can look at that.

23          Q.   Okay.

24          A.   I mean, I just haven't had time to

Highly Confidential - Subject to Further Confidentiality Review

1  go look at that, but I'd be happy to look at

2  that.

3       Q.   And am I correct that at these

4  Advisory Committee hearings, when people have

5  to disclose their conflicts of interest, they

6  only have to disclose them if they've gotten

7  money from pharmaceutical companies or other

8  corporate entities that might have a stake in

9  this?  Correct?

10      A.   You'd have to -- we'd have to have

11  the rules.  They are complex, the waivers, and

12  what the disclosures have to be, and there's

13  been controversies of what exactly has to be

14  done over the years.

15      Q.   So I mean, just for example, if

16  somebody got up in an AdCom and spoke, they

17  wouldn't have to disclose that they've been a

18  paid expert for plaintiffs' lawyers in opioid

19  litigation?

20      A.   I -- let's look at the regs, and we

21  can -- and the rules and see what requires

22  disclosure.

23      Q.   As the former Commissioner of the

24  FDA, do you know?

1    A.    There's been a lot of controversy

2    about who can -- who has to disclose what.

3    It's not been as tight as it maybe should be,

4    and I'd want to have --

5            Again, if you're asking me exactly

6    what the rules are, I've not looked at them in

7    a while.  I know that there are significant

8    controversies surrounding that.  And again, I'm

9    happy to look at that.

10   Q.    Have the rules changed over time?

11   A.    Yes.  I think that the rules have

12   changed somewhat, to my recollection.  But

13   again, I've not studied that as part of this,

14   so I wouldn't want to testify without doing

15   some more homework on that.  I'm happy to do

16   that.

17   Q.    So sitting here today, just so

18   we're clear, you don't know if there is more

19   disclosure by people who may have commercial

20   ties and thus potentially those conflicts of

21   interest than people who have other kinds of

22   conflicts of interest?  They've done work for

23   plaintiffs' lawyers in litigation, or they have

24   some kind of personal, quote, unquote, axe to

Highly Confidential - Subject to Further Confidentiality Review

 1    grind, or whatever it might be?

 2              MR. RAFFERTY:  Object to the form.

 3         A.   Yeah.  Again, it's a pretty broad

 4    question, and I'm not sure everything is of the

 5    same -- the same -- I think these things pose

 6    different parts of different issues.

 7         Q.   Have you offered -- if I understand

 8    it, you've essentially taken the view in this

 9    case that opioids are appropriate for cancer

10    pain and some acute pain.

11              Am I characterizing your view

12    correctly?

13         A.   Do you want -- do you want to point

14    to the paragraph you're referring to?

15         Q.   I was afraid you were going to ask

16    me to do that.  Let me ask it this way.

17              Have you --

18         A.   Hold on a second.  I lost my mic.

19         Q.   Okay.

20         A.   But I didn't lose my clip.

21              MS. LEVY:  While we're pausing for

22         a moment, can we get the court reporter

23         to tell us how much time --

24              MS. FREIWALD:  Yeah.

Highly Confidential - Subject to Further Confidentiality Review

1     MS. LEVY:  -- we have used on the

2     record, please?

3     VIDEO OPERATOR:  I need to go off

4     the record to do it.

5     MS. FREIWALD:  Okay.  We'll take a

6     break.

7     VIDEO OPERATOR:  3:33, we're off

8     the video record.

9     (Recess from 3:33 p.m. until

10     3:40 p.m.)

11     VIDEO OPERATOR:  3:40, we are on

12     the video record.

13  BY MS. FREIWALD:

14     Q.   I'm going to ask the question a

15  little differently.

16     Are you going to offer an opinion

17  that any specific change to the indication for

18  ER opioids should have been made at any

19  particular period of time?

20     A.   That's such a broad question.  I

21  apologize.  I'm just -- I'm going to answer the

22  question -- let me say this.  I think my

23  opinions are either in the report or my answers

24  to this, so anything I say in the next two

Highly Confidential - Subject to Further Confidentiality Review

```
 1    days.  So depending on how you phrase the

 2    question, I don't want to say no --

 3               I mean, obviously, there were

 4    changes to the label.  So I mean, further

 5    changes to the label, are you asking, beyond --

 6    depends what section of the label you're

 7    asking.

 8         Q.   Indication.

 9         A.   For which drug?

10         Q.   For ER opioid products.

11         A.   You've got to be a little more

12    specific so I can be exact.  If you want to

13    give me the actual opioids.

14         Q.   Let me -- I'll ask you for

15    OxyContin.

16         A.   Could we pull up the -- can I just

17    have the label in front of me, the existing

18    label in front of me?

19         Q.   Well, let's go back --

20         A.   So -- so -- so I can -- I just -- I

21    really want to answer your question, but I just

22    want to have the existing label, because we're

23    talking about a change to the label.  I

24    apologize.
```

1        Q.   Well, I'm not talking about just

2   from 2017 forward.  I'm talking about --

3             I mean, I will represent to you

4   that the -- I think you actually represented to

5   me that the initial label was moderate to

6   severe pain for more than a few days, then it

7   was for an extended period of time, then there

8   were changes in 2013.

9             I just want to know globally -- and

10  I think the question would apply to most of the

11  extended-release products who had comparable

12  indication -- whether you're expecting to offer

13  an opinion that that language should have been

14  changed in some particular way at some prior

15  point in time.

16       A.   So given how the drug was going to

17  be marketed -- given how the drug was marketed,

18  right, I think the label should have been

19  changed, right.

20       Q.   To say what?

21       A.   I think that certainly closer --

22  for example, in 2001 -- certainly closer to

23  2017, and then we can discuss whether 2017 is

24  adequate.

Highly Confidential - Subject to Further Confidentiality Review

1    But I think given how the drug was

2    marketed, making those changes in 2017 and

3    2001, as a follow-up to that meeting, would

4    have been appropriate.

5        Q.   And is that an opinion that you've

6    ever offered at any point in time before

7    litigation?

8            MR. RAFFERTY:  Object to the form.

9        A.   You'd have to -- opinion?  I don't

10   think I've testified before.  I mean, you'd

11   have to go back and look.  I mean, I'd have to

12   refresh what I've said, I mean, in all -- in

13   all statements.  So I'm not -- I haven't given

14   opinions before this.

15       Q.   And have you done anything to test

16   whether -- had the label in 2017 existed in,

17   let's say, 2001, that events would have turned

18   out differently?

19           MR. RAFFERTY:  Object to the form.

20       A.   Yeah, I think that had the label --

21   well, it would depend on your client's conduct,

22   and so I couldn't predict that.

23           But I think that the 2017 label,

24   again, and not allowing -- being clearer about,

1   for example, alternatives and using other drugs

2   first and when not to use this would have

3   reduced -- could have reduced the marketing

4   practices and would have -- and would have

5   changed the number of drugs in interstate

6   commerce.

7         Q.   So do you have any methodology to

8   test that?

9         A.   Yeah.  So if you look at the

10  company documents, there are -- there are --

11  there are documents that talk about

12  specifically return on investment by

13  promotional -- you're moving your head -- I

14  mean, that --

15        Q.   My question is, do you have any

16  methodology to test the notion that the 2017

17  label, if implemented in 2001, would have

18  avoided a problem of abuse and misuse?

19        A.   So we -- so we do see in

20  documents -- I'm happy to go through them --

21  that there were on -- because of certain

22  promotional activities -- or we can discuss

23  whether they were allowed in because of the

24  label -- did result in specific increases in

Highly Confidential - Subject to Further Confidentiality Review

1    prescription numbers.

2           Q.    That's not my question.    My

3    question --

4           A.    That's the methodology.

5                 MR. RAFFERTY:  Objection.  That is

6           exactly your question.

7                 MS. FREIWALD:  No.

8           Q.    The question is --

9                 MR. RAFFERTY:  He just explained

10          his methodology.

11          Q.    -- is there a methodology to test

12   how something almost 20 years later would have

13   done what you say it would have done?

14          A.    We do know -- for example, what we

15   can do is say, had promotional activities been

16   different --

17          Q.    I didn't ask you about promotional

18   activities --

19          A.    Well, but --

20          Q.    -- I asked you about the label.

21          A.    Well, but a label -- that's what --

22   you know, the label would have, hopefully -- if

23   your companies would have followed, then it

24   would have limited some promotional activities

1  which we do know increased number of

2  prescriptions.

3        Q.   Okay.  You haven't done any kind of

4  analysis of how much the 2017 label would have

5  affected events going back to 2001?  I mean,

6  you haven't done some regression analysis or

7  anything like that?

8        A.   No.  But we do know, for example,

9  that the CDC guidelines -- there are documents

10  that that -- that translate --

11             I'll let you get --

12        Q.   I'm listening.

13        A.   We do know there are documents --

14  and I'm happy to show you -- where companies

15  have done an analysis of the CDC guidelines and

16  what that would translate into money lost if

17  those were followed.

18        Q.   Okay.  Other than that, my question

19  is, have you done any kind of a regression

20  analysis or anything --

21        A.   No.

22        Q.   -- that some other person could

23  follow the methodology and say, this is what

24  you did?

1    A.   I reviewed the companies' analyses

2    that do that and look at what the increase in

3    prescriptions were.

4    Q.   And so is it your testimony that

5    the 2017 label is an appropriate label?

6    A.   No, I didn't say that.  I said if

7    you'd give it to me, I'm happy to discuss it

8    with you.  I think it's certainly improved from

9    the 2001 label --

10    Again, which companies' labels?  We

11   just have to be careful.

12    Q.   Okay.

13    A.   I don't want to be talking in the

14   abstract.

15    Q.   Okay.  Do you agree that chronic

16   pain is a serious medical condition?

17    A.   I believe the diseases -- the

18   underlying diseases that may result in pain

19   over a long term are an important medical

20   condition.

21    Q.   You don't believe that the pain

22   itself is an important medical condition?

23    A.   I think -- again, that's a slogan

24   that got us into some trouble in phrasing it

Highly Confidential - Subject to Further Confidentiality Review

1    like that.

2          Q.    Do you think pain is not a real --

3          A.    I didn't say that --

4          Q.    -- problem?

5          A.    I didn't say that at all.  I think

6    pain is a very significant problem, okay?  But

7    I do think that when one talks about pain, one

8    has to recognize that that pain arrives from

9    certain places, and those underlying conditions

10   are the cause of -- just to focus on the

11   pain -- one should focus on the causes of those

12   pain.

13         Q.    Well --

14         A.    But I certainly am strongly, you

15   know -- my whole life, you want to reduce pain

16   and suffering.  There's no question.  But the

17   way to do that is to treat the cause and the

18   etiology of that pain.

19         Q.    That may not be true, right?

20         A.    Of course.

21         Q.    You may be treating the cancer, and

22   somebody may go on and live forever with

23   chronic pain, even though their cancer is under

24   control.

Highly Confidential - Subject to Further Confidentiality Review

1    You may have an amputee, and they

2    function well with a prosthetic, but they have

3    chronic pain.

4    You may have somebody who has

5    sickle cell disease, and they manage their

6    disease, but they have chronic pain.

7    MR. RAFFERTY:  Is there a question?

8    Q.  So your statement --

9    A.  I disagree --

10    Q.  -- is not true, right?

11    MR. RAFFERTY:  Objection.

12    A.  No.  There is an underlying

13    pathophysiology.  I'm happy to discuss it in

14    each one of those instances of what the

15    underlying pathophysiology is that's causing

16    that pain.

17    Q.  So do you --

18    A.  If you --

19    Q.  I just have a question.

20    MR. RAFFERTY:  No, no, no.  Do not

21    interrupt him.

22    A.  That's fine.  Go ahead.

23    Q.  Do you believe there shouldn't be

24    pain medications unless they treat an

1    underlying disease?

2              MR. RAFFERTY:  Objection, misstates

3         his testimony.

4         A.    That's not what I said at all.

5              Understand, I allowed certain pain

6    medicines to continue after there was

7    considerable pressure to limit them.  So I

8    certainly do.

9              But I believe what's important,

10   right, I mean, is the statement that -- I mean,

11   pain -- pain certainly needs to be attended to,

12   but the appropriate treatment of chronic pain

13   is to treat the underlying conditions.

14        Q.    And sometimes you may need to just

15   treat the pain as well, or do you not recognize

16   that?

17        A.    I think treating the pain without

18   looking for the underlying conditions would be

19   reckless.

20        Q.    Okay.  So your testimony is that

21   you don't think it's appropriate to have

22   treatment for pain even if the underlying

23   condition can't be fully treated?

24             MR. RAFFERTY:  Object to the form.

1    Misstates his testimony.

2    A.    No.

3    Q.    Okay.

4    A.    I've spent my life trying -- I

5    mean, I think you have to try to treat the

6    underlying condition and the cause of that

7    pain.  I think that's the goal.

8         You certainly can concomitantly

9    treat the pain, but to treat the pain without

10   treating the underlying condition would be --

11   would be wrong.  And I don't --

12   Q.    Nobody is saying you shouldn't

13   treat somebody for an underlying condition.

14   A.    Sure.

15   Q.    But you would agree that pain may

16   be something that needs to be treated with a --

17   some kind of a medicine that isn't necessarily

18   for the treatment of the underlying condition;

19   it's for the treatment of the pain?

20   A.    Again, we've just spent the last

21   half hour talking about what the indications

22   should be.  So just say, treat the pain -- I

23   mean, it's more complicated than that.  Of

24   course, you want to treat pain.  I'm saying

1    that your statement was a simplification of, I

2    think, what responsible medicine would be.

3         Q.   I didn't ask about responsible

4    medicine generally or what you -- of course,

5    you treat a cancer patient for their cancer,

6    but -- you treat any number of diseases for the

7    underlying disease condition.  I wasn't getting

8    into that.

9              But you don't disagree with the

10   notion that pain should be addressed?  If it

11   can be addressed by curing the disease, great.

12   But if it can't, there's a need for pain

13   therapy.

14             MR. RAFFERTY:  Object to the form.

15        A.   Sure.  But you also have to

16   address -- you have to recognize that it's not

17   just treating the pain.  It's treating the

18   underlying condition --

19        Q.   Sure.

20        A.   -- which is what's -- which is

21   absolutely critical.

22        Q.   Sure.

23             And would you agree that all

24   medications for the treatment of pain have some

1    risks?

2          A.    Sure.

3          Q.    And do you know how many people die

4    of GI bleeds every year?

5          A.    From what cause?

6          Q.    From NSAIDs.

7          A.    I don't have it at the top of my

8    head.

9          Q.    Okay.  And do you know how many

10   people die of hepatic failure from Tylenol?

11         A.    From overdose -- the number of

12   overdoses?  I can look it up and get it to you

13   during the break if you really want to know.

14         Q.    In doing your report, did you do a

15   review of statements pre-1996 with regard to

16   the treatment of pain being important for good

17   medical care, a fundamental human right,

18   anything like that?

19         MR. RAFFERTY:  Object to the form.

20         A.    Again, I looked pretty extensively

21   at the record of doctors and what they were

22   saying about pain.

23         Q.    And would you agree with me that

24   the record of doctors and medical societies

1    reflects that those kinds of statements about

2    the need to treat pain or shortcomings in

3    medical treatment with regard to pain precede

4    1996?

5               MR. RAFFERTY:  Object to the form.

6          A.   Yes.  I think that would be a fair

7    statement.  It's -- and I try to sort this out.

8    It's -- well, yes, let me leave the question --

9          Q.   Okay.

10         A.   -- leave the answer.  There are

11   statements about treating pain.

12              What was pharmaceutical companies

13   and what were doctors and -- sorting that out

14   is a little hard to do, because there's not

15   really a full record there.

16         Q.   But they precede 1996?  They go

17   back?

18         A.   Certainly, MS Contin and other

19   drugs go back.  We talked about Haddox.  We

20   talked about -- I looked at the record.  I've

21   looked at the APS speeches.  I've looked at --

22   I've looked at the record, yes.

23         Q.   And other societies -- the Montreal

24   IASP, did you look at that?

Highly Confidential - Subject to Further Confidentiality Review

1      A.   I've looked at IASP.  I've studied

2   JCAHO.  I have studied a number of different --

3   tried to understand the interconnections.

4           And again, the record, when you go

5   back, is a little skimpy back into the '80s.

6      Q.   But fair to say there are

7   statements about increased importance of

8   treating pain that go back into the '80s and

9   early '90s, correct?

10      A.   Yeah.  I think that -- I think

11   that's correct.  I think where it gets

12   confluted -- where there's a switch is where

13   that statement becomes associated, "and use

14   opioids."  I think that was -- that's the

15   issue.

16      Q.   And there are statements going back

17   prior -- into the '80s and early '90s about

18   doctors being too concerned to prescribe

19   opioids.  There were surveys done and concerns

20   raised at -- by state medical boards about

21   doctors' fears of treating opioids [sic] and

22   not -- not responding to patients enough?

23           MR. RAFFERTY:  Object to the form.

24      A.   The record shows that your company

Highly Confidential - Subject to Further Confidentiality Review

1    did those surveys and recognized that the fear

2    of addiction needed to be overcome to use those

3    drugs.

4          Q.   That wasn't my question, sir.

5               I'm asking, going back into the

6    early '90s, that surveys were done that had

7    nothing to do with any pharmaceutical company

8    that looked at fears among doctors in

9    prescribing drugs.

10         A.   I've seen certain articles or

11   speeches that discuss, but the surveys that I

12   see about -- the specific surveys I see in the

13   record that I was given were done by your

14   company.

15         Q.   What survey is that?

16         A.   I have a whole -- there's a whole

17   bunch of basically focus groups through the

18   1990s that led up to the introduction of

19   OxyContin and the fear of addiction and how

20   that needed to be overcome.

21         Q.   What published survey are you

22   referring to, if you can tell me, that was,

23   quote, unquote, done by my company prior to

24   1996?

1    A.   They were all proprietary, I

2  believe, but there were a whole host of focus

3  groups that your company did.

4    Q.   I'm not talking about advisory

5  boards internal once the product was on the

6  market.  I'm talking about published studies,

7  surveys that you're saying were funded or done

8  by my company.

9    A.   Your company -- I mean, your

10  company did surveys of doctors and focus groups

11  to understand the impediments and barriers to

12  publication -- to prescribing.  Sorry.

13    Q.   When you say, my company, what

14  is -- are you representing that you have

15  evidence that they were sponsored with

16  unrestricted educational grants, or are you

17  saying that they were -- you somehow have

18  evidence -- because it's not in the report --

19  that there were Purdue-done surveys?

20    A.   Your company did a whole bunch of

21  focus groups of doctors -- having third parties

22  do those surveys -- to recognize that addiction

23  was a key element and a barrier to

24  prescription.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Is that in your report somewhere?

2    A.   I'd have to -- the report is 350

3    pages and the reliance list.  I have seen those

4    documents, and you're asking me a question.  I

5    have seen those surveys.

6    Q.   I'm asking a really important

7    question.  You're making a very sweeping

8    statement, and I didn't see that anywhere in

9    your report.

10   A.   I'd have to go back and check.

11   Q.   So I'm going to ask you on a break

12   if you have in your reliance materials evidence

13   of a Purdue-done survey --

14   A.   I might be able to get it on break.

15   I'll be happy to see if I can get it to you by

16   tomorrow morning.

17   Q.   -- pre-1996.

18   A.   I'd have to go check on the date,

19   but there are -- just go into the database and

20   type in "surveys" and "addiction."  There are

21   three or four that are right there in the

22   database.

23   Q.   And that were published and --

24   A.   No.

1      Q.   Okay.  That were published --

2      A.   No.  That were proprietary.

3      Q.   Okay.  I'm not asking about

4  whatever internal.  I'm asking that were put

5  out and part of the medical literature.

6      A.   No.  This was -- this was privately

7  done surveys by your company to decide how to

8  position the company --

9      Q.   Ah, okay.

10     A.   -- to position the product.

11     Q.   So you're talking about marketing

12  information that was --

13     A.   Those are surveys to doctors.

14     Q.   -- that was done to understand

15  doctors' thinking on the issue of prescribing.

16     A.   I thought --

17     Q.   Okay.

18     A.   -- that's what you were talking

19  about.

20     Q.   No, that's not what I'm talking

21  about.

22          I'm talking about surveys that were

23  done not associated with any company that

24  became published that looked at doctors'

1    concerns about prosecution, fear of prescribing

2    opioids even to cancer patients.  Are you

3    familiar with those?

4         A.   I know some of the UW work that was

5    done on that subject back in the early 1990s.

6         Q.   Okay.  Now, in terms of preparing

7    your report, there were a bunch of things I

8    didn't see, and I want to just confirm that I'm

9    right on this.

10        Does not look like you cited the

11   Senate hearings from 2001.  Is that something

12   that you reviewed in terms --

13        MR. RAFFERTY:  Object.

14        Q.   -- of what was known at the time

15   about abuse and misuse of prescription opioids?

16        A.   I'd have to go back and -- again,

17   my reliance list -- I'm familiar with that.

18   I'm familiar with Grassley, I mean, and number

19   of the committees that did work and some of the

20   Senate staff.  And I think I've looked at that.

21   I'd have to double-check my reliance list.

22        Q.   So I mean, just to be -- so you and

23   I are on the same page, one of the things I

24   hear you saying -- correct me if I'm wrong --

Highly Confidential - Subject to Further Confidentiality Review

1    is that the FDA didn't have a full enough

2    appreciation of the potential for misuse or

3    abuse of prescription opioids and therefore

4    didn't do as much as they might have.  That

5    seems to me to be one of yours opinions.

6              MR. RAFFERTY:  Object to the form.

7         A.   No.  Can I -- can I put it in my

8    words?

9         Q.   Sure.

10        A.   So I think that in 1994, I can talk

11   firsthand, right.

12        Q.   I want it succinctly, because we

13   have very limited time here.  So --

14        A.   I understand.  Very succinctly.

15             MR. RAFFERTY:  But answer the

16             question in your own words.

17        A.   In 1994, right, when I worked --

18   when the agency and I narrowed the

19   indication -- or strengthened the indication in

20   the label of one of the opioid products, right,

21   it would be the farthest thing from my mind to

22   have thought the company would, five years

23   later or so, go expand the market to chronic

24   back pain and osteoarthritis.

1           If I had any idea, right, that that

2   was the intended population and they would try

3   to drive a truck through that indication,

4   right, I mean, I -- I'm not sure I would have

5   shut down the product entirely, because again,

6   I'm not in favor of that, but I would have

7   called them in and said, what in the world are

8   you thinking?

9       Q.   Okay.  My question is -- I

10  appreciate that.  My question is a little

11  different.

12          Are you offering an opinion that at

13  no time between 1994 and 2017 or '18 or '19 did

14  the FDA understand how -- the patient types to

15  which the products were being marketed?  It's a

16  very specific question.

17          MR. RAFFERTY:  It's a -- objection.

18      It's a very broad question.

19      Q.   I just want to know, are you -- is

20  it your testimony that at no time between 1994

21  and basically present, the FDA understood the

22  patient types to which the products were being

23  marketed?

24          MR. RAFFERTY:  Same objection.

Highly Confidential - Subject to Further Confidentiality Review

1          A.   "He didn't seem to believe me that

2     OxyContin had no buzz.  Will try on some

3     junkies."

4          Q.   Sir --

5          A.   The FDA had no --

6          Q.   Sir, I'm going to --

7          A.   The FDA had no sense of that

8     patient type that -- that it was being sold to.

9          Q.   Okay.

10         A.   "Stating that he agrees with using

11    oxy for PRN and chronic pain."

12         Q.   Sir --

13         A.   FDA had no understanding that your

14    company was marketing for that.

15         Q.   Sir, you said to osteoarthritis

16    patients, to patients who had all kinds of

17    disease states.

18              MR. RAFFERTY:  Once again --

19         Q.   That's what you --

20              MR. RAFFERTY:  Let the record

21         reflect that once again counsel is

22         interrupting him when she asked a very

23         broad question about what the entire FDA

24         knew over the -- from 1997 until today

Highly Confidential - Subject to Further Confidentiality Review

1          about the patient populations.

2               The doctor is answering your

3          question, and then you interrupt him.

4          That's exactly what's been going on all

5          day.

6          A.   "Using it in lower doses for milder

7     pain."

8          Q.   Okay.

9          A.   I don't think the FDA to this day,

10    right --

11              If you take these call notes, 1996,

12    1997, right, in different ERs -- "Oxy has a

13    street value," dated 1996.

14         Q.   Sir --

15         A.   I don't think FDA has an

16    understanding.  Your company has stated that it

17    did not know about the street value of oxy

18    until 2000, 2001.

19         Q.   Sir --

20         A.   This is 1996.  I don't think FDA

21    has a complete picture to this day.

22         Q.   Sir, did you review the Senate

23    hearings in 2001 to know what was discussed

24    about abuse and misuse?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I'd have to go back and look

2   specifically about that.

3      Q.    Okay.

4      A.    I believe I've looked at those.

5      Q.    Did you look at the AdComs from the

6   early 2000s?

7      A.    Yes.

8      Q.    And would you agree with me that

9   abuse and misuse was discussed?

10     A.    Yes.  And I also -- yes.  And there

11  were statements made of when this was known.

12     Q.    Okay.

13     A.    Okay?  1996 -- there was no

14  statement made that your company knew back to

15  1996.

16     Q.    So we can -- and would you agree

17  with me that there were public meetings held in

18  many years between -- 2002, '03, where issues

19  of abuse and misuse were discussed?

20     A.    Absolutely.

21     Q.    Okay.

22     A.    And that's where the agency's

23  overwhelmed, because the ground has been set,

24  right.  The change in medicine, as your client

1  said, was made already by that time.  By 2001,

2  you changed the practice of medicine.

3          Q.    And there was an IOM report in

4  2010?

5          A.    Yes.

6          Q.    And there were AdComs discussing

7  the REMS in 2010?

8          A.    Yes, which -- and again, let's just

9  put a footnote there, because you said that the

10  REMS give FDA authority over marketing and

11  promotion, and there is nothing in the statute

12  that does that.  I went back at break and

13  checked on that.

14          Q.    And the -- there were citizens'

15  petitions at various times?

16          A.    Yes.

17          Q.    Okay.  And there were discussions

18  about PDMPs and nationalizing PDMPs?

19          A.    There were certainly discussions

20  about that.

21          Q.    Okay.  And the FDA had discussions

22  with the DEA?

23          A.    FDA --

24                MR. RAFFERTY:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1          A.   -- has discussions with DEA, I

2    would say, regularly.  I mean --

3          Q.   And all of those discussions

4    included questions about whether -- what was

5    driving abuse and misuse, whether it was

6    prescribed patients, diversion, drug cartels --

7               MR. RAFFERTY:  Objection.

8          Q.   -- some combination?

9          A.   I think that there -- you know,

10   again, I think the generally accepted fact,

11   right, is that a significant portion --

12   certainly in Ohio and others -- got started on

13   prescription drugs, and there were different

14   phases of the epidemic.

15         Q.   That really wasn't my question.

16              My question was that all these

17   public meetings -- that at all these public

18   meetings, there were discussions at various

19   times about abuse, misuse, what was coming from

20   properly prescribed patients, what was the

21   result of doctors not handling patients

22   correctly, what was the result of abuse, of

23   diversion, what was the result of cartels.

24   Those were all parts of public discussions --

Highly Confidential - Subject to Further Confidentiality Review

1                   MR. RAFFERTY:  Object to the form.

2          Q.    -- correct?

3          A.    There were many public discussions.

4          Q.    Okay.  Now, with regard to

5    Purdue --

6          A.    We're on Purdue-specific?

7          Q.    -- you have cited in your report a

8    whole bunch of call notes and other statements.

9                   Is there anything that you looked

10   at post-2003 or so that is informing your

11   opinions in your report?

12         A.    Yes.

13         Q.    Where -- where are the post-2003 or

14   so call notes in your report?

15         A.    There are PowerPoint --

16                  MR. RAFFERTY:  Object to the form.

17         A.    Sorry, sorry.  You asked me whether

18   there's 2000- -- just -- are you talking

19   about -- just about call notes?

20         Q.    Yeah.  Let's start off with all

21   the -- you have call notes in your report.

22   I --

23         A.    Call notes got scrubbed at a

24   certain point in time.  The industry stopped

Highly Confidential - Subject to Further Confidentiality Review

1    putting down, because of the things that I just

2    read you.  That changed as an industry practice

3    in general.

4              If you want to go where -- the

5    2011, 2012, 2013, the increase -- the continued

6    search for increased ROI, to increase target,

7    there are PowerPoint slides of your company

8    about the promotionally sensitive nature of

9    their detailing of oxy, even when this epidemic

10   is in full bloom.

11        Q.   So I'm going to stop you for a

12   second.

13             Did you actually look at any

14   post-2003 call notes to see what they look like

15   for Purdue?

16             MR. RAFFERTY:  Doctor, this isn't a

17        memory test.  You can look at your

18        report if you want to.

19        A.   Yeah, I mean, I --

20             MR. RAFFERTY:  You can go

21        through the --

22        A.   I looked at -- I looked at a lot of

23   call notes.  I'd have to refresh exactly the

24   cohort that I looked at.  I probably looked at

1    thousands of call notes.

2        Q.   Do you know what the structure or

3    nature of call notes, sitting here today, with

4    Purdue was post-2006, '07 on?

5        A.   I can tell you that --

6        Q.   I want Purdue-specific; I don't

7    want an industry-general answer.

8        A.   I'd have to go back and -- I'd have

9    to go back and look specifically.  The format

10   depends on what -- what I see is different

11   formats, because I've run those formats by

12   different regions of the country.  They are not

13   exactly the same.

14       Q.   Do you know what Purdue did with

15   regard to sales force monitoring and sales

16   force training from 2007 forward?

17       A.   I looked at some of the field --

18   some of the field reports that -- and the

19   ride-alongs.  I looked at some of them.

20       Q.   Did you look at all of the changes

21   in SOPs --

22       A.   You were --

23       Q.   -- or other programs?

24       A.   You had just pleaded guilty, I

Highly Confidential - Subject to Further Confidentiality Review

1  mean, to a criminal charge, so yes, I'm aware

2  of that.  And --

3          Q.   Where are they cited in your

4  report?

5               MR. RAFFERTY:  Don't -- please stop

6          interrupting the witness, Ms. Freiwald.

7          A.   What is?

8          Q.   My question was, did you look at

9  these SOPs?

10              I'm not asking if you were aware

11  that there was a guilty plea.  I'm asking,

12  where in your report do you reference changes

13  that were made in practices and procedures from

14  2007 forward with regard to sales activities?

15         A.   I'm not sure I do.  I have to go --

16  well, I certainly look at the -- what I do

17  reference in the report is actual sales

18  activities, I mean, done corporately.  And

19  those are in the report certainly for 2011,

20  2012, and 2013, and the detailing in those

21  PowerPoint presentations.

22         Q.   There's -- I did not see anything

23  discussing actual calls to doctors in your

24  report -- I might have missed one, but -- in

1    the post-2003 time period.

2           A.    So what --

3           Q.    Does that sound right to you?

4                 MR. RAFFERTY:  Object to the form.

5           A.    No, because -- well, we may be

6    saying the same thing.

7                 If you look at these PowerPoint

8    presentations in 2011, 2012, 2013, of that ilk,

9    it talks about detailing and the promotionally

10   sensitive nature and how there could be an

11   increased number -- return on that investment.

12                And that data is at the aggregate

13   level at that time.  That's not based on call

14   notes.  That's based on your company's -- your

15   client's own analysis.

16          Q.    I want an answer to my question.

17                Is there -- did you do -- do you

18   have anything in your report where you were

19   looking at what was actually reflected in calls

20   to doctors in the post-2007 time period that

21   you can remember?

22                MR. RAFFERTY:  Object to the form.

23          Asked and answered.

24          A.    I remember looking at PowerPoints

Highly Confidential - Subject to Further Confidentiality Review

1    post-2007.

2         Q.   Not call notes?

3         A.   After about a thousand call notes,

4    I stopped looking at call notes.

5         Q.   Okay.  So the record will -- if you

6    looked at them in any detail, you would -- if

7    they're not in your report, they're not in your

8    report, right?

9              MR. RAFFERTY:  Object to the form.

10        A.   Well, there's also my schedules,

11   because -- the schedules have appendices and

12   have a lot of call notes in them.

13             What's sitting here in top of my

14   head, I mean, are that later activity is

15   reflected in the companies' strategic plans

16   and, in essence, their marketing plans.  That's

17   where -- and that was focused on, in essence,

18   calls to doctors.

19        Q.   Okay.  But just, please, to answer

20   my question, when you're looking at call notes,

21   you're looking at that early period before

22   2007?

23             MR. RAFFERTY:  Object to the form.

24        A.   I have to go back and look -- let

1    me just search my report.  Let me search my

2    schedule.  So I don't take time --

3          Q.   Okay.  You can do that when we're

4    on a time break.

5          A.   Time break, and let me get back to

6    you exactly what the call notes --

7               Let me just say that I did ask

8    repeatedly for call notes, and I was getting --

9    I didn't get everything that I had asked for,

10   because I don't -- I think there were

11   tug-of-wars on what was produced.

12         Q.   Okay.  Is there any ad campaign,

13   specific ad campaign, that you take issue with

14   as -- that Purdue had that is contrary to the

15   label from 2007 forward?

16         A.   Ad campaign?  I'd have to go back

17   and check.  I just -- I don't recall.

18         Q.   Is there any ad --

19         A.   I mean, I --

20         Q.   Okay.  Is there any ad campaign or

21   detail piece that you say should have been

22   submitted to FDA, pursuant to a 2253 or

23   otherwise, and was not from 2007 forward?

24         A.   Yeah, I think that the issue is

1    not -- well, the issue is not what's submitted.

2    The issue is what's reviewed and what's brought

3    to the agency.  I give your -- you know, a lot

4    of materials --

5         Q.    I just --

6         A.    -- were submitted.

7         Q.    Okay.  Did you find anything that

8    should have been that wasn't submitted?

9         A.    I'd have to -- sitting here, I

10   don't have a recollection of specific ad

11   campaigns at that --

12        Q.    Okay.

13        A.    -- that date.

14              I do have a recollection of this

15   increase in detailing that was promotionally

16   sensitive, increased the amount of sales.

17        Q.    Is there any particular sales

18   message from 2007 forward that is reflected in

19   any kind of detail aid that you are going to

20   testify was inconsistent with the approved

21   labeling?

22        A.    If it's not in my report -- I'm

23   going to stick to my report.

24        Q.    Okay.  Now, you knew Curtis Wright

1    when he was -- when you were both at FDA?

2        A.    Yes.

3        Q.    Did you consider him a good

4    reviewer?

5        A.    I didn't know Curtis in that

6    capacity.

7        Q.    In what capacity did you know him?

8        A.    I knew Curtis because he dealt with

9    the psychotropic medications.  I asked Curtis

10   to help me on tobacco.  So it was in that

11   context that I intimately associated with

12   Curtis.

13       Q.    Did he do a conscientious job in

14   that work?

15       A.    I find to be a -- at FDA -- I mean,

16   he -- "conscientious" would probably not be the

17   adjective I would use.

18            I think -- I found him a decent --

19   a decent, thoughtful fellow, who -- not that I

20   would agree with him on everything, but who had

21   certain insights.  And I found him to be a --

22   you know, a decent guy and, actually, a very

23   nice guy and an interesting guy.

24       Q.    I'm going to take a wild guess and

1   say that you probably didn't agree with

2   anybody -- with everybody at FDA on -- I said

3   that badly.

4           There's probably nobody at FDA who

5   you ever agreed with a hundred percent of the

6   time?

7           MR. RAFFERTY:  Object to the form.

8      Q.  That's a good thing, right?

9           So when you say you didn't agree

10   with Curtis a hundred percent of the time, that

11   probably isn't that different from other

12   people?

13      A.  No, I don't mean that in a

14   disparaging way.  I mean, but it's not -- I

15   just don't want the record to show that I

16   would -- that I agreed with him on everything.

17   Again, he showed up at my request at certain

18   meetings.  He gave certain insights that I

19   thought were thoughtful.

20      Q.  Okay.  And from -- now, the NDA for

21   OxyContin was actually submitted while you were

22   still at FDA?

23      A.  Correct.

24      Q.  And were you aware of the

Highly Confidential - Subject to Further Confidentiality Review

1    submission?

2         A.    No.

3         Q.    Were you -- did you know who was

4    assigned to the review team?

5         A.    I knew nothing about -- I mean,

6    I've looked.  There is -- there was -- I have

7    no memory -- I think I've even asked Curtis.

8    There's no recollection from anybody, and

9    people will -- I mean, have reminded me.

10             I mean, I was involved in

11   Duragesic.

12        Q.    Okay.  That's fine.

13        A.    I was involved in Oralet.  I was

14   not involved in oxy.

15        Q.    And the decision to proceed as an

16   interactive NDA, that was the agency's; do you

17   know?

18        A.    Boy, that goes back to, actually,

19   pre-me.  That was the philosophy of the pilot

20   review division that under my watch got

21   changed.  Janet changed it in about '95, '96.

22   But that interactive -- that NDA day was a Carl

23   Peck-John Harter special.

24        Q.    Okay.  It wasn't unique to

1    OxyContin or opioids; it was something that

2    existed as an approach of the FDA in some of --

3    at the time?

4         A.   It was.  I mean, there's a --

5    there's a little thesis, a mini-thesis at

6    Harvard, that talks about the pilot review

7    division.

8              I think it would be fair to say

9    that pilot review division was set up by Carl

10   Peck and John Harter as an experimental way to

11   be able to -- I mean, the agency was taking a

12   considerable amount of grief about how long

13   review times were --

14        Q.   Okay.

15        A.   -- et cetera, and it was

16   experimental in that regard.

17        Q.   Okay.  Fair to say the FDA often

18   takes grief about either taking too long or not

19   enough time?

20        A.   You and I can agree on that.

21        Q.   Okay.  And that --

22        A.   So it goes to the territory.

23        Q.   It goes to the territory.  So some

24   people will criticize you for being too slow in

1    approving drugs, and some people will criticize

2    the agency in being too fast?

3         A.   And sometimes they're the same

4    person.

5         Q.   And sometimes those criticisms are

6    all colored by hindsight?

7         A.   That requires for editorial

8    comment, so I'm not going to.

9         Q.   And in your dealings with Curtis

10   while you were at the agency and since, in your

11   review, I assume you have not seen anything

12   that suggests that he was not -- that he was

13   doing anything other than attempting to review

14   the NDA for OxyContin in a conscientious and

15   thorough way?

16              MR. RAFFERTY:  Object to the form.

17        A.   I want to be careful here in

18   answering that question.  What I see -- what I

19   think I see -- I could be wrong on this, but

20   you're -- I mean, I'm addressing -- you're

21   asking, any -- do you really want to ask me

22   "anything"?

23        Q.   I'm asking whether -- whether

24   you're going to offer an opinion that you have

1    some evidence that he didn't try to do a good

2    job.

3         A.   No.  I mean, there's some concerns

4    when you look -- I mean, you know, there are --

5    there are some concerns that I have.  I'm not

6    going to -- my intent is not to blurt out an

7    opinion that's not in my report or put in --

8              But I think there's certain

9    questions just -- that I have, just because

10   you're asking me whether there's anything, but

11   I'm not planning to offer any opinion on that.

12        Q.   Okay.  And as you've -- did you

13   review the NDA for OxyContin beginning to end?

14        A.   I probably spent -- I probably

15   drove counsel nuts trying to get the NDA, go

16   try to do that and get -- I have the entire

17   NDA -- but that, in itself, was a feat -- in

18   PDF format.  I have all the volumes of the NDA.

19             I can tell you that I have reviewed

20   several volumes.  I have not reviewed the

21   entire NDA.  I'm not sure anybody has reviewed

22   the NDA.

23             MS. LEVY:  So another way to say

24        that is "no."

```
 1                MS. FREIWALD:  Yeah --
 2                MS. LEVY:  I would request --
 3                MR. RAFFERTY:  Excuse me, Counsel.
 4                MS. LEVY:  I would like to place an
 5        objection --
 6                MR. RAFFERTY:  Under the
 7        protocol -- no.  Under the protocol --
 8                MS. LEVY:  I request on the
 9        record --
10                MR. RAFFERTY:  No.
11                MS. LEVY:  -- that the witness be
12        instructed to answer the question asked.
13        Again, we are well over five hours into
14        this transcript --
15                MR. RAFFERTY:  That is not my --
16        that is not this witness's fault --
17                (Simultaneous speaking.)
18                MS. LEVY:  We've got these long,
19        rambling answers --
20                MR. RAFFERTY:  This is the way --
21        no.  This is the way --
22                (Reporter interruption.)
23                MR. RAFFERTY:  And under the
24        protocol, there is to be no speaking
```

Highly Confidential - Subject to Further Confidentiality Review

1       objections or no colloquy from counsel.

2       And I'm sorry.

3           MS. LEVY:  So Counsel --

4           MR. RAFFERTY:  If you have an

5       issue, you can bring it up at the break,

6       but quite frankly --

7           MS. LEVY:  I did.  I did bring it

8       up at the break with you.

9           MR. RAFFERTY:  -- the way this --

10          Let me finish, please.

11          The issue is the way the questions

12      are asked.  He has been very responsive

13      to the questions.  If you have an issue

14      with how the deposition is going, I

15      suggest you take it up on that side of

16      the V.

17          MS. LEVY:  So I would like to make

18      a request on the record in the presence

19      of counsel and the witness that the

20      witness please try to do his best to

21      answer the questions that are asked as

22      succinctly as possible.

23          There are six, at least, and

24      possibly more, other defendants in this

Highly Confidential - Subject to Further Confidentiality Review

1      matter that are entitled to time with

2      the witness, and so we would like for

3      this to move more quickly.

4           MR. RAFFERTY:  That is -- and that

5      is a request made to --

6           MS. LEVY:  So when there is a --

7      when there is a possibility of answering

8      a question with a simpler yes or no or I

9      don't know, we would request that you do

10     that.

11          THE WITNESS:  And I'm most

12     respectful of that.

13          MS. LEVY:  Thank you.

14          THE WITNESS:  And I understand the

15     concern --

16          The question was, Did you review

17     the --

18          MS. LEVY:  We don't need to review

19     the question.

20          THE WITNESS:  Hold on a second.

21          MS. LEVY:  That's a request for

22     going forward.

23          THE WITNESS:  I understand.

24          But the questions was, Did you

1    review the NDA?  If I answered that

2    "yes," it may give the impression that I

3    reviewed the whole thing.  If I

4    answered -- I mean, so I have to

5    explain.

6        MS. FREIWALD:  All you have to say

7    is, I reviewed some but not all.

8        MR. RAFFERTY:  There is no

9    instructions by the defense lawyers on

10   how a witness answers a question,

11   period.

12       Now, continue with the questioning,

13   if you have more questions.  We spent

14   six hours today talking about general

15   stuff.  If there's an issue about

16   breaking up the time amongst defendants,

17   resolve it amongst yourselves.

18   BY MS. FREIWALD:

19   Q.   Now, Doctor, you offer an

20   opinion --

21       I'm going to ask you if you would

22   just answer my questions.  We'll try to move

23   through this quickly.

24       You offer an opinion as to -- that

1    the label -- that the promotion of the product

2    did not discuss the risk of tolerance and

3    dependence.

4              A.    Could you just point me to the

5    page, please.

6                    MS. FREIWALD:   You know what?

7              Let's take a five-minute break, and then

8              we'll start.

9                    VIDEO OPERATOR:   4:30, we're off

10             the video record.

11                   (Recess from 4:30 p.m. until

12             4:54 p.m.)

13                   VIDEO OPERATOR:   4:54, we are on

14             the video record.

15   BY MS. FREIWALD:

16             Q.    Okay.   So Doctor, we have very

17   limited time here, because I want to let the

18   lawyers for other companies ask questions, too,

19   so I'm going to try to see if we can do this as

20   efficiently as possible.

21                   As I read your report with regard

22   to Purdue, you have an opinion on page 46 that

23   is, Purdue falsely marketed OxyContin as having

24   a lower potential for abuse as compared to

1    opioid -- as compared to other opioid products.

2             You have an opinion on 56 --

3        A.    Excuse me.  The first one was 46?

4        Q.    Yeah.

5             MR. RAFFERTY:  Do you have a

6        paragraph number?  It might be easier.

7             MS. FREIWALD:  It's the header.

8             MR. RAFFERTY:  Oh, okay.

9        A.    I'm sorry.  I was reading 105.  I

10   apologize.  Okay.  Thank you.

11       Q.    Actually, that should be the second

12   one.

13            On page 40, you have an opinion,

14   Purdue's marketing misleadingly minimized the

15   similarities between OxyContin and morphine.

16       A.    Yes, correct.

17       Q.    And then on page 56, Header C is,

18   Purdue lacked substantial evidence regarding

19   the addictive potential of OxyContin, yet

20   misleadingly claimed that OxyContin was less

21   addictive than competitor opioid products.

22            And then on page 67, you have,

23   Purdue minimized the risks of tolerance and

24   physical dependence that patients could

1    experience with OxyContin.

2              And then on 73, you say, Purdue's

3    marketing minimized the risks of respiratory

4    depression, addiction, and abuse associated

5    with higher doses of OxyContin.

6              And then on page 80, you say, In

7    response to OxyContin not being effective for

8    12 hours, Purdue developed a strategy to

9    increase the total daily OxyContin dose but

10   failed to inform the public, putting patients

11   at risk.

12             And on page 94, you have, Purdue

13   promoted OxyContin for indications that were

14   broader than supported by substantial evidence

15   and for which safety and efficacy were not

16   established.

17        A.   Correct.

18        Q.   Okay?  I'm not saying those are

19   your only opinions, but these seem to be the

20   majority of the headers that I saw, and I'm

21   going to see if we can kind of deal with them

22   in some relatively efficient manner.

23             So you have opinions as to morphine

24   equivalence, tolerance and dependence, risk of

1    addiction, pseudoaddiction, abuse.

2              (Exhibits Kessler-4 through

3         Kessler-7 marked for identification and

4         attached to the transcript.)

5    BY MS. FREIWALD:

6         Q.   And I want to -- and I want to turn

7    your attention -- I've given you a bunch of

8    labels.  Unfortunately, the numbering is not

9    quite in chron order.

10             Number 7 is the '96 label.  That's

11   our mistake.

12        A.   Right.

13        Q.   And then Exhibit 4 is the 2001

14   label with the "Dear Healthcare Provider"

15   letter attached to it.

16             MR. RAFFERTY:  Do you have extra

17        copies for counsel?

18             MS. FREIWALD:  Yeah.  We'll --

19             MR. RAFFERTY:  Thank you.

20             MS. FREIWALD:  I'll certainly put

21        them on the Elmo, too.

22        Q.   2005 is the 2014 letter -- I'm

23   sorry.  Exhibit 5 is the 2014 letter, and

24   Exhibits -- I'm sorry.  It's late in the day.

Highly Confidential - Subject to Further Confidentiality Review

1   Exhibit 5 is the 2014 label --

2          A.   Yes, ma'am.

3          Q.   -- and Exhibit 6 is the 2018 label.

4          A.   Correct.

5          Q.   Okay.  So, sir, turning to the '96

6   label --

7          A.   Yes, ma'am.

8          Q.   -- you would agree with me that

9   from the beginning, the label for OxyContin

10  contained a warning, "may be habit-forming,"

11  correct?

12         A.   That's what the label said at that

13  time.  It got moved into the abuse section.

14         Q.   And there's also a note right here

15  at the top that it's a CII product, correct?

16         A.   Correct.

17         Q.   Okay.  And that means it's a

18  Schedule II product with an abuse -- a high

19  potential for abuse?

20         A.   Correct.

21         Q.   And then the label also contained

22  language -- you seemed to be a little uncertain

23  about this when we talked before -- warning,

24  OxyContin tablets are to be swallowed whole and

1    not to be broken, chewed, or crushed.  Taking

2    broken, chewed, or crushed OxyContin tablets

3    could lead to the rapid release and absorption

4    of a potentially toxic dose of OxyContin.

5            MR. RAFFERTY:  Object to the form.

6        Move to strike the preamble.

7        A.   I was fully aware of that.

8            The things I wasn't sure about was

9    the -- when you added on the elderly.  That's

10   not in -- that was the question --

11       Q.   Okay.

12       A.   -- in my mind.

13       Q.   So there's no dispute that there

14   was all-caps warning language from 1996 that if

15   the product was broken, chewed, or crushed, it

16   could lead to rapid release and absorption of a

17   potentially toxic dose of oxycodone?

18       A.   That's what the label says.

19       Q.   And similarly, there's no dispute

20   that there was language about tolerance and

21   physical dependence from the beginning in the

22   label, correct?

23       A.   Correct.

24       Q.   Tolerance is the need for

1    increasing doses of opioids to maintain a

2    defined effect, such as analgesia.

3              Physical dependence is the

4    occurrence of withdrawal symptoms after abrupt

5    discontinuation of a drug upon administration

6    of antagonist.

7              Physical dependence and tolerance

8    are not unusual during chronic opioid therapy.

9              Correct?

10    A.   Correct.

11    Q.   Significant tolerance should not

12   occur in most of the patients treated with the

13   lowest doses of OxyContin.

14              It should be expected, however,

15   that a fraction of cancer patients will develop

16   some degree of tolerance and require

17   progressively higher doses of OxyContin.

18              Regardless of whether this occurs

19   as a result of increased pain secondary to

20   disease progression or pharmacological

21   tolerance, dosage can usually be increased

22   safely by adjusting the patient's dose to

23   maintain an acceptable balance.

24              The dosage should be selected

Highly Confidential - Subject to Further Confidentiality Review

1    according to the patient's individual analgesic

2    response and ability to tolerate side effects.

3              Correct?

4         A.   You're asking me whether there's

5    substantial evidence or that's what the label

6    says?

7         Q.   That's what the label says.

8         A.   That's what the label says.

9         Q.   Tolerance is the analgesic effect

10   of opioids usually paralleled by tolerance to

11   side effects, except for constipation.

12             So the label contained information

13   about both tolerance and physical dependence at

14   the time?

15        A.   Made the -- it makes those

16   statements as you just read.

17        Q.   Okay.  And is there anything that

18   you say that the company knew that FDA did not

19   know about tolerance and physical dependence

20   that -- at that time?

21        A.   Well, I don't want to -- knowledge,

22   I think, is a little -- I don't want to opine

23   on knowledge.

24        Q.   Okay.  So you're --

1    A.    I mean, there's no substantial

2    evidence for some of that.

3        Q.    You're not offering an opinion that

4    the company had information about tolerance and

5    physical dependence that the FDA did not have?

6        A.    Not -- not specifically.  I think

7    that the -- not that specific sentence, but if

8    you go down later in that paragraph, I would

9    have an opinion.

10       Q.    Okay.  What is it that you're

11   saying there isn't substantial evidence about?

12       A.    Well, this using higher doses to

13   overcome tolerance is not -- there's not

14   substantial evidence that higher doses increase

15   therapeutic efficacy in the case of tolerance.

16   And, in fact, one -- I mean, many addiction

17   experts would say that you want to lower the

18   dose, and that's the appropriate treatment.  So

19   there's not substantial evidence for that.

20            Moreover, what wasn't disclosed to

21   the agency was the game plan to significantly

22   increase the dose beyond what American medicine

23   was using.

24       Q.    This is -- this is a discussion on

1    tolerance and physical dependence.

2         A.   But it also -- it also -- in some

3    ways, the truck through that statement was on

4    higher doses, so it's relevant to the question

5    of whether you treat tolerance with higher

6    doses, because that -- that marketing plan that

7    you see throughout a number of years on higher

8    doses, I mean, got -- I mean, changed medicine.

9         Q.   It says, Tolerance is the need for

10   increasing doses.

11        A.   Right.  But I'm talking about

12   several sentences down.

13        Q.   Okay.  So you're not saying that

14   the company knew something about risk of

15   tolerance or physical dependence at that point

16   in time that the FDA didn't know?

17             MR. RAFFERTY:  Object to the form.

18        A.   I think the company knew that it

19   had a marketing strategy to increase to higher

20   doses than it -- had been used, and I don't

21   think that was disclosed to the agency.

22        Q.   So at this point in time, you have

23   approval of 10 milligrams, 20 milligrams, and

24   40 milligrams, correct?

1    A.    Yes.  You --

2    Q.    Okay.

3    A.    Yes.  And you have -- you have, in

4  essence, in that 40 milligrams the equivalent

5  of 16 Percocets.

6    Q.    Okay.  And that was an approved

7  dosage?

8    A.    Yes, exactly.

9    Q.    And --

10    A.    But --

11    Q.    And it goes on to say, If OxyContin

12  is abruptly discontinued in a physically

13  dependent patient, an abstinence syndrome may

14  occur.

15          Correct?

16    A.    Correct.

17    Q.    So there was not -- the label at

18  that time also talked -- disclosed that

19  patients may experience an adverse effect if

20  the drug is abruptly withdrawn?

21    A.    That's what -- that's what that

22  says.

23    Q.    Okay.  And then under the section,

24  Information For Patient Caregivers, if you go

1  down, it says, Patients should be advised that

2  OxyContin is a potential drug of abuse.  They

3  should protect it from theft, and it should

4  never be given to anyone other than the

5  individual for whom it was prescribed.

6           Correct?

7      A.   Correct.

8      Q.   Okay.  So with this first label,

9  there is discussion about tolerance,

10 dependence, withdrawal, habit formation, and

11 OxyContin being a drug of abuse, correct?

12     A.   Shouldn't have changed American

13 medicine, right?

14     Q.   Okay.

15     A.   Or prescribing habits.

16     Q.   This was -- I'm just -- can we

17 agree that that's all in the label?  Correct?

18     A.   What's in the label, in and of

19 itself, we can get -- except for that higher

20 doses, should not have changed American

21 medicine.

22     Q.   And there's also a discussion of,

23 drug abuse and dependence (addiction).

24           Correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.   Correct.

2    Q.   So I don't -- the record will

3   reflect what it will reflect, but I think that

4   when we were talking, you said you weren't sure

5   that addiction was referenced in the original

6   label.  This takes away the uncertainty on

7   that?

8         MR. RAFFERTY:  Object to the form.

9    A.   No.  I certainly recognize -- if I

10  said that, I misspoke, because I certainly

11  recognize that addiction and, certainly, the

12  terms "abuse liability" that follow in several

13  sentences -- I know these sentences by heart.

14   Q.   Okay.  And it says, under Drug

15  Addiction, Drug dependence, psychological

16  dependence is characterized by a preoccupation

17  with the procurement/hoarding of abusive drugs

18  for non-medicinal purposes.  Drug dependence is

19  treatable utilizing a multidisciplinary

20  approach, but relapse is common.

21        Did I read that correctly?

22   A.   Correct.

23   Q.   Okay.  And then there's language we

24  all know: Iatrogenic addiction to opioids

Highly Confidential - Subject to Further Confidentiality Review

1   legitimately used in the management of pain is

2   very rare.

3            Drug-seeking behavior is very

4   common to addicts.

5            Tolerance and physical dependence

6   in pain patients are not signs of psychological

7   dependence.  Preoccupation with achieving

8   adequate pain control -- pain relief can be

9   appropriate behavior in a patient with poor

10  pain control.

11           Did I read that correctly?

12       A.   Correct.

13       Q.   So in the original '96 label, you

14  have language about addiction, dependence,

15  drug-seeking behavior.  And although not called

16  pseudoaddiction, there is a recognition of the

17  potential for drug-seeking behavior in

18  inadequately treated patients, correct?

19       A.   There is that exact sentence as you

20  read it.

21       Q.   Okay.  And then the label was

22  modified in 2001, correct?

23       A.   Correct.

24       Q.   And we've talked about the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    interactions between the agency and the company

 2    with regard to that label change, correct?

 3         A.    Correct.

 4         Q.    And in fact, what resulted was the

 5    product having a boxed warning?

 6         A.    Among other things.

 7         Q.    And I'm going to ask you to look

 8    first at the letter that accompanied --

 9              MS. FREIWALD:  What am I doing

10         wrong here with the Elmo that I'm --

11         that the corner is kind of --

12              MR. RAFFERTY:  I think you just

13         need to zoom out.

14              VIDEO OPERATOR:  No.  That's up --

15         that's up here.

16              MR. RAFFERTY:  Oh.  Oh, I've got

17         you.

18              MS. FREIWALD:  Oh.  I'm good now?

19         Okay.

20              MR. RAFFERTY:  If you want, I think

21         you can zoom out --

22              MS. FREIWALD:  Yeah.

23              MR. RAFFERTY:  -- and maybe --

24              MS. FREIWALD:  No, I was -- there
```

1          was just --

2               MR. RAFFERTY:  Okay.

3               MS. FREIWALD:  There was stuff

4          hanging over the edge there.

5               MR. RAFFERTY:  Oh.

6               MS. FREIWALD:  That's what I was

7          addressing.

8               MR. RAFFERTY:  Sorry.  I

9          misunderstood.

10              MS. FREIWALD:  So I want everybody

11         to be able to read it --

12              MR. RAFFERTY:  Okay.

13              MS. FREIWALD:  -- so I'll try to

14         keep it readable for folks.  You can

15         tell me if it's not.

16         Q.   So when there -- would you agree

17    with me, sir, that when there are significant

18    label changes, the agency can require that the

19    company send a "Dear Healthcare Provider"

20    letter to give doctors real notice of that

21    label change?

22         A.   Let's edit the word "require."

23    Urge strongly.

24         Q.   Okay.  So they can urge strongly.

1    And companies tend to do what the FDA urges

2    them strongly to do, and in this case --

3          A.   You're -- I mean --

4          Q.   In this case -- I'm not going to

5    quibble with you whether it was required or

6    whether it was simply recommended.  The record

7    will be what it will be on that.

8               But I think we can agree that

9    Purdue did send out a "Dear Healthcare

10   Provider" letter accompanying the 2001 label,

11   correct?

12         A.   Correct.

13              MR. RAFFERTY:  Object to the

14              preamble and the editorial comments at

15              the beginning.

16         Q.   And, in fact, the way these letters

17   come is that there's this label on the very

18   front so that when the doctor gets something in

19   the mail, it says, "Important drug warning,"

20   and they can see right away that that's

21   important information about a product from

22   Purdue, correct?

23         A.   Can be, yes.

24         Q.   And the "Dear Healthcare Provider"

1    letter that accompanied the label in 2001 said,

2    Reports of illegal use, misuse, and diversion

3    of OxyContin tablets from various parts of the

4    country have prompted Purdue Pharma to revise

5    sections of the prescribing information,

6    specifically warnings, including a new box

7    warning, which call attention to the potential

8    for misuse, abuse, and diversion, and

9    indication, which reinforces the appropriate

10   patient population for whom this product is

11   intended.

12          Did I read that correctly?

13   A.    Correctly.

14   Q.    Okay.  And then it goes on to say,

15   OxyContin is a Schedule II opioid agonist and a

16   Schedule II controlled substance.

17          Correct?

18   A.    Correct.

19   Q.    And by the way, in order to

20   prescribe OxyContin or any Schedule II opioid,

21   a doctor needs a special DEA registration,

22   correct?

23   A.    You certainly need DEA

24   registration, and depending on the state, there

Highly Confidential - Subject to Further Confidentiality Review

1   are certain other requirements that States may

2   impose.

3        Q.   Okay.  So if a doctor is

4   prescribing prescription opioids, he or she is

5   taking on an additional level of responsibility

6   and knows that?

7             MR. RAFFERTY:  Object to the form.

8        A.   That was what was changed.

9        Q.   So then it goes on to show the box

10  warning, OxyContin is an opioid agonist and a

11  Schedule II controlled substance with an abuse

12  liability similar to morphine.

13            Did I read that correctly?

14       A.   That's what that says.

15       Q.   So when you say that the product --

16  that Purdue did not advise of an abuse

17  liability similar to morphine, sir, it said it

18  right in the label, correct?

19            MR. RAFFERTY:  Object to the form.

20       A.   Oh, I -- go look at your

21  promotional materials.  Your -- all marketing

22  campaigns were to distinguish and to remove the

23  stigma associated with morphine.  That was a

24  very explicit strategy that was carried out.

Highly Confidential - Subject to Further Confidentiality Review

1    The issue is not the label; the issue is the

2    promotion.

3            Q.   Is there any example that you found

4    from -- any time from 2007 on where the company

5    says that the product has a different abuse

6    potential than morphine?

7            A.   I'd have to check.  There are call

8    notes that -- in my report and in the schedule,

9    and I'd have to go check those call notes.

10           Q.   I think you told me on the break

11   that there were two call notes after 2003.

12           A.   No.  There are actually more in the

13   schedule, and I'd have to review that.

14           Q.   In the report?

15           A.   There are -- there are a handful.

16   I just tried to limit it.  But the schedule is

17   the report, too.

18           Q.   Of the ones you actually discuss in

19   your report, they're all earlier, except for

20   two, and we'll talk about those later.

21           A.   Three.

22                MR. RAFFERTY:  Object --

23           A.   I think there's three.

24           Q.   I think it's two.

Highly Confidential - Subject to Further Confidentiality Review

1        A.   Well, okay.

2        Q.   But anyway --

3             MR. RAFFERTY:  Objection.

4        Q.   We'll look at the page.

5        A.   Fine.

6             MR. RAFFERTY:  The report says what

7   it says.

8        Q.   So you haven't discussed any

9   examples from mid-2000s on of --

10       A.   You --

11            MR. RAFFERTY:  Wait.  Let her

12  finish the question.

13       Q.   -- of any marketing by Purdue which

14  is saying that OxyContin has a different abuse

15  liability than morphine?

16       A.   The stage was set.  Your -- I

17  mean --

18       Q.   Just answer my question.

19       A.   That's correct.  The stage was set.

20       Q.   I'm going to --

21       A.   The change in American medicine

22  happened by 2007 and then was continued by

23  other defendants.

24       Q.   I'm going to just, because we have

1    very limited time, take it as a given that your

2    view of this litigation is that whatever

3    happened from 2003 earlier, doctors couldn't

4    learn anything.

5            Is that your testimony?

6            MR. RAFFERTY:  Object to the form.

7        Misstates his testimony.

8        Q.   Is that your testimony, that

9    doctors were unable to learn from their patient

10   experience, from conferences, from changes in

11   the literature, from changes in the label, from

12   talking to their colleagues, from public

13   AdComs, from citizens' petitions?

14           None of that was capable over

15   15-plus years of educating doctors?

16           MR. RAFFERTY:  Object to the form.

17       A.   No, that's incorrect.  That was,

18   but there was a constant pushback.

19           And if you look at the -- the

20   script or the playbook that your company, along

21   with Abbott, had developed in marketing

22   OxyContin, that was continued along the same

23   lines: lower abuse, less abuse liability --

24   maybe sometimes more subtly, less peaks, less

1    valleys.

2              But that, there was a constant

3    selling of opioid -- prescription opioids under

4    those theories --

5         Q.   So --

6         A.   -- and in marketing plans.

7         Q.   So I have not seen any consistent

8    references in your Purdue report to anything

9    post- early to mid-2000s.

10             MR. RAFFERTY:  Object to the form.

11        A.   No, that's incorrect.  Your company

12   continued to detail this and promote this

13   through sales representatives after this

14   country is in florid epidemic.

15        Q.   I didn't ask you whether they

16   continued to have a sales force and detail

17   that.

18             That's lawful, by the way, right?

19   It's lawful for all of these companies to have

20   had sales forces --

21             MR. RAFFERTY:  Object to the form.

22        Q.   -- for their products?

23        A.   Well, you just read me what you --

24        Q.   Just answer my question, because --

1    I'm going to try and break it down, because

2    we're not communicating here.

3            A.    No, but we're --

4            MR. RAFFERTY:  Enough with the

5        commentary and the edits -- the

6        editorials.

7            Q.    We're --

8            A.    So may -- may I ask you a question?

9    Yes, it was lawful, but after what you just

10   read me -- why in the world would you go out

11   and promote this drug the way you did, in light

12   of what you just read me?

13           Q.    Sir, we're going to break --

14           A.    It makes no sense.

15           Q.    We're going to break this down into

16   pieces, and I just want to know -- I don't want

17   to argue with you today.  I just want to know

18   what you're relying on and what --

19           So first of all, we can agree that

20   Schedule II opioids can be promoted?  There's

21   nothing that says --

22           A.    Why in the --

23           Q.    I -- just answer, sir.

24           A.    Why in the world --

Highly Confidential - Subject to Further Confidentiality Review

1          Q.   Answer --

2          A.   -- would you go promote a

3    Schedule II opioid?

4          Q.   Answer my --

5          A.   It makes no sense.

6          Q.   Answer -- answer my question.

7          A.   Yes.

8          Q.   It is lawful to promote Schedule II

9    opioids, correct?

10         A.   That's correct, but it makes no --

11         Q.   Okay.  So that's --

12         A.   -- but it make no sense.

13         Q.   I'm not asking you --

14         A.   Let me please finish.

15         Q.   -- that opinion.

16         A.   I think I've made -- I think you

17   understand my point.  It makes no sense in the

18   midst of an epidemic to go promote Schedule II

19   opioids.  I've never understood that.

20         Q.   I understand that may be your

21   personal opinion, but it is entirely lawful --

22         A.   It's the opinion of your company --

23         Q.   It is --

24         A.   -- as of -- as of now.

1    Q.   It is -- sir, it's entirely lawful

2    to promote Schedule II opioids, correct?

3    A.   Well, you'll -- I mean, again, I

4    don't want --

5    Q.   It's a yes or no.

6    MR. RAFFERTY:  First of all,

7    objection.

8    Q.   It's lawful?

9    MR. RAFFERTY:  It's been asked and

10    answered.

11    A.   Well, again, I don't want to give

12    any legal opinions.

13    Q.   The regulations that you are

14    familiar with as former Commissioner of the FDA

15    make clear that -- that it's -- you can promote

16    Schedule II opioids?

17    A.   We wouldn't be sitting here if

18    there wasn't a question --

19    Q.   Sir, it's a yes or no.  Do the

20    regulations --

21    MR. RAFFERTY:  Don't interrupt the

22    witness.

23    A.   So it depends on what law you're

24    talking about.  Did you create a public

1    nuisance?  Is that lawful?

2        Q.   Sir, the regulations -- you can

3    either tell me yes, no, or you don't know.

4            Do the regulations allow for the

5    marketing of Schedule II opioids?

6        A.   Which regulations are you referring

7    to?

8        Q.   FDA regulations.

9        A.   FDA regulations do not prohibit the

10   promotion of Schedule II opioids, and that's

11   why -- but FDA is not the only system of

12   consumer protection.

13       Q.   And the -- in fact, they would have

14   allowed direct-to-consumer TV ads, which my

15   client did not use, correct?

16       A.   Your -- the other companies wanted

17   to.  There were --

18       Q.   Sir --

19       A.   Okay.  Hold on a second.

20       Q.   -- it's just a simple question.

21   I'm not asking you what you think should have

22   happened in a different world.

23            I'm just asking, there was no

24   television DTC promotion of OxyContin, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    There was indirect DTC --

2    Q.    I asked you --

3    A.    -- not on television, but you used

4  certain pain groups to do, in essence, DTC.

5    Q.    That is not DTC, sir.

6    A.    It's direct to consumer.

7    Q.    Okay.

8    A.    You did it under disguise.

9    Q.    All right.

10   A.    Of course, it's direct to consumer.

11   Q.    So is it your testimony that the

12 label in 2001 reasonably described the risk of

13 abuse, addiction, misuse?  Yes?

14   A.    Not if the intent -- the intended

15 use was as your company had for the product.

16 The label was not adequate to protect against

17 your company's conduct.

18   Q.    The label as written describes the

19 fact of misuse, abuse, and diversion of

20 OxyContin, correct?

21        MR. RAFFERTY:  Object to the form.

22   A.    I -- I agree with you --

23   Q.    Okay.

24   A.    -- what the label says, but just so

```
1    you -- just so --

2           Q.   Sir --

3           A.   -- so we can be -- maybe make this

4    very short, this --

5                MS. LEVY:  Object to the

6           commentary.

7           Q.   No.  I want to -- I want to ask you

8    questions, and I want to get answers to my

9    questions.

10          A.   Okay.

11               MR. RAFFERTY:  Well, you -- just

12          because you're not getting the answer

13          you want doesn't mean he's not answering

14          your question.

15          Q.   And I don't want to hear the speech

16   about the theory of the case or you stepping in

17   to be a lawyer --

18               MR. RAFFERTY:  Objection.

19          Q.   -- opining about the other theories

20   of the case.  I just --

21               You'll have lots of chance with

22   your own counsel to say what you want to say to

23   a jury one day, but I just want to understand

24   where we agree or where we disagree.  Okay?
```

1              MR. RAFFERTY:  Objection to all the

2         commentary.

3         Q.   So the label in 2001, you will

4    agree with me, discusses reports of misuse,

5    abuse, and diversion of OxyContin?

6         A.   The label says what it says.

7         Q.   Okay.  And it discusses the

8    addiction potential of OxyContin, correct?

9         A.   The label says what it says.

10        Q.   And it says that there's no

11   difference between OxyContin, in terms of abuse

12   potential, and morphine, correct?

13        A.   That's -- that's not the -- well,

14   that's -- you're reading from the letter.

15        Q.   Well, this is just an excerpt of

16   the box warning.

17        A.   I understand, but you're reading

18   from the letter, just so the record --

19        Q.   Well, I can show you the version of

20   it in the label, if you would -- if you would

21   prefer.  I'd be happy to do that.

22        A.   I'm agreeing with you, the label

23   says what it says.

24        Q.   Okay.  And the label talks about

1    not crushing or chewing, correct?

2         A.    Correct.

3         Q.    Okay.  Now -- and I assume that you

4    will also agree with me that the label talks

5    about tolerance and dependence?

6         A.    It says exactly what it says.

7         Q.    And it talks about the potential

8    for drug-seeking behavior, which is -- in

9    patients who are not adequately treated, which

10   may be signs of addiction or may be inadequate

11   treatment, correct?

12        A.    We discussed that earlier.

13        Q.    Okay.  So -- and you're not

14   disputing that the label in 2001 was sent

15   directly to doctors with a cover warning

16   indication, correct?

17        A.    It was sent out.  I'm not going to

18   represent who it was sent out to.

19        Q.    Okay.

20        A.    The evidence can show that.

21        Q.    And you're not going to dispute

22   with me, if I show you the label in 2014, that

23   there continued to be -- that the FDA actually

24   approved higher doses?

1          MR. RAFFERTY:  I don't -- I don't

2      have that.

3          MS. FREIWALD:  I thought I gave

4      you -- Exhibit 5.

5          MR. RAFFERTY:  Oh, sorry.

6      Q.   That the FDA went on and --

7      A.   What label are you showing me?

8      Q.   In 2014.  It actually happened

9  before 2014, but --

10     A.   That's correct.

11     Q.   -- but that higher doses were

12  approved?

13         MR. RAFFERTY:  Exhibit 5, right

14     there in front of you.

15     A.   Well, I mean, and there was also

16  taking a higher dose off the market.

17     Q.   That's the 160.

18     A.   Yes.  I'm just --

19     Q.   Okay.  And that was something the

20  company did; they withdrew the 160-milligram

21  product, correct?

22     A.   I believe with FDA.

23     Q.   Okay.  So that was -- that was an

24  example of, post-approval, the ability to

1    withdraw a product or a dose of a product?

2           MR. RAFFERTY:  Object to the form.

3       A.   A company can do anything it wants

4    after -- the company could stop selling it.

5       Q.   And by the way, will you agree with

6    me as well that there's language in the label

7    and in the prior labels about significant

8    respiratory depression risk?

9       A.   There is.

10      Q.   Okay.  And that goes back to 1996?

11      A.   Correct.

12      Q.   And so you're not disputing that

13   the label had the language about that risk

14   information?

15      A.   I'm not disputing any -- I'm just

16   disputing how it ended up being promoted the

17   way it did with this label the way it was.

18      Q.   And you're not -- I think you had

19   testimony that there was -- that the risk of

20   respiratory depression was downplayed.

21           In fact, the box warning talked

22   about, Serious life-threatening or fatal

23   respiratory depression may occur.  Monitor

24   closely, especially upon initiation or

Highly Confidential - Subject to Further Confidentiality Review

1    following a dose increase.

2              Correct?

3         A.   The promotional campaign to go

4    higher doses, in my opinion, downplayed those

5    risks of overdose.  It was the push toward

6    higher doses that downplayed that, not what was

7    said in the label.

8         Q.   And are you aware, sir -- I don't

9    think it's cited in your report -- that

10   Senator Blumenthal, who was not a senator at

11   that point, wrote to the FDA in 2008 with

12   regard to one of the issues that you have in

13   your report, which is the q12 versus q8 dosing?

14        A.   Correct.

15        Q.   And, in fact, was --

16             MS. FREIWALD:  I'm going to mark

17        this as Exhibit 8.

18             (Exhibit Kessler-8 marked for

19        identification and attached to the

20        transcript.)

21   BY MS. FREIWALD:

22        Q.   And this is the FDA's response to

23   that letter from Richard Blumenthal, who was

24   then the Attorney General in the State of

1    Connecticut, in 2008, correct?

2              And you don't talk about this in

3    your report, do you?

4         A.   I do not talk about this petition

5    because I -- I'm not sure -- I have to

6    review -- I think the senator gets a little

7    wrong the pharmacokinetics, as I remember, when

8    I first read this, and I -- so I found this a

9    little confusing, what his citizens' petition

10   was.

11        Q.   Okay.  And the issue at this time

12   had to do with -- if you look at the

13   discussion, You assert that the incidence of

14   prescribing OxyContin at dosing intervals more

15   frequent than the recommended every 12 hours

16   has risen, at least in part, because of

17   fundamental misunderstanding by healthcare

18   providers of OxyContin's unique drug delivery

19   system; certain patients receiving OxyContin at

20   intervals more frequently -- more frequent than

21   q12 are more at risk of developing side effects

22   and potentially serious adverse reactions

23   because of the pharmacologic action of the

24   drug; and increasing the number of doses beyond

1    the recommended two-per-day increase the

2    potential for diversion of the drug for illicit

3    use and abuse, and -- sorry -- and you request

4    that FDA require Purdue to strengthen the black

5    box warning statement, supplement the

6    information in warning in the label, and issue

7    a "Dear Healthcare Provider" letter.

8             In the alternative, you request

9    that FDA disseminate these warnings through a

10   safety alert/public health advisory.

11            Correct?

12       A.   If you can get -- if you can kindly

13   just give me what Blumenthal was asking the

14   agency specifically to put on the label?

15   Because I just don't have that in front of me.

16       Q.   You didn't discuss this letter that

17   was discussing risks of dosing other than q12,

18   correct, in your report?

19       A.   I don't know whether this is --

20   I've read this.  I don't know if it's cited on

21   my reliance material because this letter --

22   this letter in Blumenthal's -- I mean, don't --

23   actually miss the pharmacokinetic issue and the

24   push toward higher doses.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You have a section in your report

2    where you're talking about q12 dosing.

3         And, in fact, Mr. Blumenthal, as AG

4    of Connecticut, had written to the FDA, and

5    there was a full discussion of q8 versus q12

6    dosing, and the FDA determined not to do

7    anything.

8    A.    You're missing the point,

9    Counselor.  This has nothing -- this is -- this

10   is different than the issue I raised in my

11   report.

12        The fact -- what I raised in my

13   report was the fact that because of the -- as

14   you can see in the clinical trials, the

15   significant use of rescue doses, that did

16   not -- those rescue doses indicated that -- and

17   the pharmacokinetics, if you look at it

18   carefully, indicate that it doesn't work -- the

19   medicine doesn't work for q12 hours and that --

20        The solution that your company came

21   up and didn't tell FDA about and is not

22   reflected in this petition or in FDA's

23   response -- that your marketing plan was,

24   rather than go to q8, right, your company said,

Highly Confidential - Subject to Further Confidentiality Review

1  push the dose higher.  And that -- that exposed

2  people to higher risks of higher doses.  That's

3  what's missing here.

4        Q.   Sir --

5             MS. LEVY:  Objection, long.

6             MR. RAFFERTY:  Good objection.

7        Q.   Sir, you --

8             MR. RAFFERTY:  I mean that

9       sarcastically.

10        Q.   Your opinions about q12 dosing are

11  exactly the opposite of what the concerns were

12  at the time, correct?

13        A.   Because they -- because they didn't

14  have access to what your marketing plan was and

15  what was going on.

16        Q.   And the FDA knew about the use of

17  rescue dosing in clinical trials, correct?

18        A.   They knew that.  They didn't know

19  the push toward higher doses.

20        Q.   And they, in fact, had drugs that

21  were approved, including by you, for rescue

22  dosing, correct?

23        A.   There were drugs approved for

24  rescue dosing, but --

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And rescue dosing is --

2            MR. WEINBERGER:  Can you let him

3      finish his answer?

4            MS. FREIWALD:  That was my only

5      question.

6            MR. WEINBERGER:  But he didn't

7      finish his answer.

8      Q.    There were drugs approved for --

9            MR. WEINBERGER:  He didn't finish

10     his answer.

11           MS. FREIWALD:  I think we have one

12     party --

13           MS. LEVY:  Well, it's totally

14     inappropriate --

15           MS. FREIWALD:  That's totally --

16           MR. WEINBERGER:  But you can

17     question -- but you can -- you can state

18     your objection, even though you're not

19     the questioner?

20           MS. FREIWALD:  All right.  We have

21     limited time here.

22           (Simultaneous speaking.)

23           MR. RAFFERTY:  We have limited

24     time, and there's only one person for

Highly Confidential - Subject to Further Confidentiality Review

1          your side.

2                    MS. LEVY:  I'm not doing it in a

3          yelling and unprofessional manner.

4                    MS. FREIWALD:  Yeah.

5                    MR. WEINBERGER:  You know, don't

6          talk to me about being unprofessional.

7          You did exactly what I just did.

8                    MS. FREIWALD:  This is either going

9          to come from your time, or it's going to

10         stop.

11             Q.    The -- the FDA, whether you -- the

12    FDA certainly had the issue of dosing put in

13    front of it, even if you say in a different

14    context than what your issue was, and it did

15    not believe that there was either a need for

16    more data on q8 or q12 dosing or a problem with

17    q12 dosing?

18                   MR. RAFFERTY:  Object to the form.

19             A.    Your company -- your client --

20    sorry -- recognized the problem and implemented

21    a plan to increase -- to put patients on higher

22    dosing.  That was never disclosed to the FDA.

23    That's what put patients at risk.

24             Q.    Sir, you say "higher dosing" --

Highly Confidential - Subject to Further Confidentiality Review

1          MR. RAFFERTY:  Objection.  Let him

2       finish his answer.  He's addressing the

3       exact question that you asked.

4     Q.   You say "higher" --

5          MR. RAFFERTY:  Finish your answer.

6     A.   If something is not working at q12

7  and your client's sales force was getting

8  repeat complaints, right, about the drug not

9  working at q12, because they were afraid that

10  your competitors, right, would increase their

11  market share because their drugs were q4 to 6,

12  right, and you could no longer have the special

13  characteristic at q12, you -- you strongly --

14  the marketing plan pushed and instructed the

15  sales force.

16          And you see this throughout --

17     Q.   Sir --

18     A.   Can I just finish?

19          You see this throughout the call

20  notes, this push towards, Do not allow doctors

21  to go to q8.  Have them go to higher doses.

22          And the end result of that is the

23  consumption -- one, it was higher doses, higher

24  bonuses.  But it was also higher doses, more

1    drug in distribution; and it was also higher

2    doses that increased the risk of overdose and

3    death.

4        Q.    Sir --

5        A.    And that was never disclosed or in

6    that label; if it doesn't work at q12, do you

7    go to higher doses?

8        Q.    Sir -- sir, you have not cited a

9    single document that indicates that there was

10   any push to doses that were above approved

11   doses.

12       A.    You have --

13       Q.    There's a -- there's a dosage

14   continuum, right?

15             MR. RAFFERTY:  There's a question

16       pending.

17       Q.    There's a dosage continuum, right,

18   10, 20, 40, 60?  You don't -- none of --

19             Just answer my question, then we'll

20   move on.

21             MR. RAFFERTY:  Well, get to the

22       question.

23       Q.    You're not citing to anything that

24   shows a push to doses that were other than

1    approved or that the FDA ever took a position

2    that you couldn't use higher doses?

3        A.    The -- there was -- you're talking

4    about product strength.  There was a push

5    toward higher and higher doses, right, even

6    though --

7        Q.    I just said --

8        A.    And there was certainly multiple

9    tablets that were consumed, okay.  There were

10   patients on extraordinary amounts of MMEs.  And

11   the campaign was higher doses to cover the fact

12   that it didn't work at q12.

13       Q.    Do you -- do you know what

14   percentage of patients --

15           MR. RAFFERTY:  Excuse me.  Once

16       again, let the record reflect that she

17       is interrupting the witness constantly.

18           MS. FREIWALD:  Because he's not

19       answering my --

20           MR. RAFFERTY:  You asked him what

21       he was citing to in regards to this, and

22       he was going through, and in a very

23       concise paragraph, almost shorter than

24       the one that you -- it took you to ask

Highly Confidential - Subject to Further Confidentiality Review

```
1        the question, exactly what he was citing

2        to.

3             MS. FREIWALD:  No, he did not.

4             MR. RAFFERTY:  That's exactly what

5        he did.

6        Q.   Is there -- do you reference, first

7   of all, any data from Ohio on the percentage of

8   patients who were prescribed at any particular

9   dose?

10       A.   I don't believe I do.  I'd have to

11  check.

12       Q.   So when you say "push to higher

13  doses," you don't know whether you're talking

14  about 10 to 20, 20 to 40?

15       A.   Oh, I -- I certainly -- these were

16  talking about -- this is one -- wasn't 10 to

17  20.  These -- when you look at these call notes

18  and you see these --

19       Q.   The call notes are all, we've

20  agreed --

21            MR. RAFFERTY:  Once again --

22       Q.   -- early call notes.

23            MR. RAFFERTY:  Once again, stop

24       interrupting the witness.  You ask him a
```

Highly Confidential - Subject to Further Confidentiality Review

1        question, he's answering it, and then

2        you interrupt him to ask him a different

3        question.

4        Q.   I want to --

5        A.   Can I have a second?

6        Q.   Yeah.

7        A.   Thanks.  Make sure I -- see if I

8   can get you an answer.

9        Q.   The call notes are going to be for

10  pre-2007 with, I think, two exceptions that are

11  not related to this issue.

12            MR. RAFFERTY:  Objection, misstates

13       the prior testimony.

14       A.   So here, for example -- so take

15  Cuyahoga County, call note written.  It says,

16  Saw him at Suburban.  He is still mentioning q8

17  dosing, so it's important to get him very

18  specific with patient types, what they were on,

19  what dose.  He says is not lasting the full q12

20  hours.

21       Q.   Sir, the product was approved as a

22  q12 product, correct?  It would have been

23  improper to promote it as a q8 product?

24       A.   But when -- but when you find

Highly Confidential - Subject to Further Confidentiality Review

1    out --

2            Q.    Just answer the question.

3            A.    It would have been proper to inform

4    the FDA that the product wasn't working and it

5    wasn't designed to work q12.

6                  And you should have informed -- and

7    you certainly should not go to say the

8    solution, when the product doesn't work --

9            Q.    Sir --

10           A.    -- at q12, to increase higher

11   doses.

12           Q.    The fact that a --

13           A.    That was improper.  That was

14   information -- that is safety information that

15   your company had an obligation to change.

16           Q.    Can we -- can we stop for a second?

17                  Would you agree with me that not

18   every patient responds properly at the first

19   dose given?  You start at a low dose, and you

20   see if it works as you go up, correct?

21           A.    No.  Your company had --

22           Q.    Sir, just answer my question.

23                  That's part of what you're supposed

24   to do, start at the lowest possible dose, and

1    for some people it will work, and for some

2    people it won't, and you need to go -- you may

3    need to go up, correct?

4            A.    Perhaps --

5            Q.    Okay.

6            A.    Let me finish the sentence.

7                  Perhaps if you're talking from 5 to

8    10 to 15 to 20.  But when you're pushing

9    patients to 40, to 80, to multiple tablets,

10   to --

11           Q.    Sir --

12           A.    -- sometimes in excess of that --

13           Q.    -- I'm --

14           A.    That is what was going on.

15           Q.    I just want to ask my questions.

16   You can answer.  And I really -- I'm going to

17   strike the colloquy, because we have a limited

18   amount of time here.

19                 MR. RAFFERTY:  Oh, you've already

20           ruled on the strike?

21           Q.    The -- the way it's appropriate, to

22   start a patient at the lowest possible dose,

23   and if it doesn't work, which could mean not

24   providing pain relief for the full 12 hours,

1    titrating to a higher dose to see if it works

2    is an appropriate approach?

3          A.   But when you find -- no.  When you

4    find that your tablets are not working because

5    of --

6          Q.   Just --

7          A.   I can't answer the question.

8          Q.   I want to know if you -- if that is

9    an -- if that is actually a recommended

10   approach, whether -- start low, and if the

11   patient isn't getting relief for the full time

12   period, one thing to do is to try to titrate

13   up?

14         A.   No.  I think that's one of the

15   fallacies, right, that was created in opioid

16   pharmacology.  This notion that you just

17   titrate up, I mean, I think doctors are

18   recognizing -- you talk about learnings.  I

19   think your company had an equal obligation to

20   talk about titrating down.

21         Q.   Okay.  And there was that -- sir,

22   the drug is a q12 drug, it's labeled as a q12

23   drug, and if a patient is not getting relief

24   for the full 12 hours, one appropriate option

1    is to say, titrate up and see if that works.

2    If it doesn't work, then the doctor can decide

3    the drug isn't working.

4         A.   No.  When you learn that a drug is

5    not working q12 hours and that -- you have

6    to -- when it's not working q12 hours, you have

7    to inform the agency that, my product -- I have

8    safety information that this product is not

9    lasting q12 hours.

10             And the solution is not to

11   recommend just going higher and higher to try

12   to cover this tail -- this period of time that

13   you're never going to be able to work.  That's

14   how you get people into serious trouble.

15        Q.   And do you have -- do you have any

16   controlled trial that supports your view that

17   rescue dosing or titrating up led to an

18   increase in adverse events?

19        A.   You certainly have.  I'd be happy

20   to go through the entire literature on the

21   effects of higher dosage and overdose --

22        Q.   Well, I haven't seen that in --

23             MR. RAFFERTY:  Let him finish.  You

24        asked if he had any clinical trials;

Highly Confidential - Subject to Further Confidentiality Review

1    he's answering.

2    Q.    In the second --

3          MR. RAFFERTY:  No.

4          Finish your answer, Doctor.  Finish

5    it.

6    A.    There are a number of papers in a

7    footnote by Musto and others that talk about

8    higher doses.  Number of pages in the

9    bibliography, there is certainly footnotes on

10   higher doses.

11         The evidence, I think, is

12   overwhelming that -- and everybody agrees that

13   there's certainly an increased risk at higher

14   doses.  It was not proper conduct to increase

15   those doses.

16   Q.    If the company had told doctors,

17   Don't use it q12, use it q8, you would be

18   faulting them for that, correct?

19   A.    No.  I would have --

20         MR. RAFFERTY:  Object to the form.

21   A.    -- said that if you learn that

22   your -- your pill -- as your competitors --

23   some of your competitors figured out, right,

24   not true q12 dosing -- just look at the

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacokinetics, look at the clinical trial

2    data -- you have an obligation to go in to the

3    agency, not to expose patients to serious risks

4    of opioids.

5         Q.    There is --

6         A.    This was not something that should

7    have just -- higher doses.  This was about

8    bonuses.  This was about more tablets being

9    sold.  You lost sight --

10         Q.    Sitting here today --

11         A.    You lost sight of --

12         Q.    Sir.

13         A.    -- the fact that these are very

14    dangerous products.

15         Q.    Sir, sitting here today, have you

16    done an analysis of what percentage of patients

17    in Ohio, in the counties at issue, got any

18    particular dose of OxyContin at any particular

19    point in time?

20         A.    What I -- what I tell can you --

21         Q.    It's a simple question.  Have you

22    done the analysis?

23         A.    Yeah, so -- so the -- what I have

24    done, the analysis, is that -- as you know,

1    your company's marketing --

2              Let me finish my answer, please.

3              Your company's marketing plans were

4    national in scope.  So I do have data on 40s,

5    60s, 80s and what -- they were national -- and

6    I've looked at the data, and I see no reason to

7    think -- there's no reason to suspect, because

8    these were -- this was a -- these were national

9    programs --

10             Q.   Do you know --

11             A.   -- that Ohio is anything different.

12             Q.   Nationally, do you know what

13   percentage of patients were taking 40s or less?

14             A.   I can get you that data.  I have it

15   here, but I --

16             Q.   You didn't put it in your report?

17             MR. RAFFERTY:  Object to the form.

18             A.   There's a lot of -- ma'am, at 350

19   pages and a thousand footnotes --

20             Q.   You --

21             A.   -- I put what I could.  But you're

22   asking me questions that --

23             Q.   You're accusing my client of

24   pushing doses --

1         MR. RAFFERTY:  Object to the form.

2         Q.   -- and you didn't put in your

3  report what percentage of patients were

4  actually taking above 20 or 40 milligrams?

5         MR. RAFFERTY:  Object to the form.

6         A.   I put the evidence of your company

7  pushing higher doses.

8         Q.   But you don't actually -- you

9  didn't put any evidence of result, of what

10  percentage of patients were actually taking a

11  particular dose, including for the last ten

12  years.  That's not in your report?

13         A.   I can go back and look.  My report

14  does -- and others will testify on the

15  consequences of the epidemic and what that led

16  to.

17         Q.   And there were discussions with FDA

18  about break-through pain, correct?

19         A.   There were some discussions

20  about -- justifying the clinical trial data --

21         Q.   Right.

22         A.   -- because you couldn't -- the

23  clinical trials didn't support q12.  So it was

24  a cover for why the --

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Sir --

2    A.   It was a cover for why the -- how

3  to get the drug approved.

4    Q.   You told me you weren't going to

5  talk about anybody's intent, that you weren't a

6  mind reader and know what anybody intended.

7    A.   I'm not.

8    Q.   So there was information provided

9  about rescue dosing; there was discussion about

10  rescue dosing, correct?

11    A.   Yes.

12    Q.   There was discussion about

13  percentages of patients who got q12 relief and

14  percentages who did not, correct?

15    A.   Correct.

16    Q.   There was -- there was adverse

17  event reporting on patients who complained or

18  reported not getting relief, or doctors who

19  did, on q8 -- on q12 dosing?

20    A.   I don't think that was fully

21  reflected in the adverse event report.

22    Q.   Did you look?

23    A.   Yes.  I looked at the sales call

24  notes and --

1    Q.    I didn't say sales call notes; I

2  said adverse event reports.

3    A.    No, I understand.  But the sales

4  call notes tell you what the doctors were

5  reporting, and you can trace those through to

6  the adverse event.

7    Q.    They're two entirely different

8  things.

9         MR. RAFFERTY:  Object to the form.

10    Q.    You don't know what went in as an

11  adverse event.

12    A.    No.  No, but -- that's my point

13  exactly.  You do, ma'am.  That's why the sales

14  call note is, in essence, a complaint.  If a

15  doctor reports that's not working at q8, that

16  gives you that information that should trigger

17  a complaint that should trigger an adverse

18  event.

19    Q.    Do you know what --

20         MR. RAFFERTY:  Stop interrupting.

21    Q.    Do you know what -- what got

22  triggered in terms of adverse event reporting

23  in the last ten years by the sales force when a

24  problem about q12 dosing was reported?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I've not studied specifically that

2    question for the last ten years.

3    Q.    Okay.  And so for the last ten

4    years, you haven't looked at what the FDA

5    understood about the post-marketing experience

6    of patients with q12 dosing as reflected in

7    adverse event reporting, correct?

8    A.    Incorrect.

9    Q.    You just said you hadn't studied

10   it.

11   A.    No, I -- but I certainly know

12   what -- you know, I'm sorry.  You asked me what

13   the company's adverse event policy was.  That

14   was the question that I said I had not studied

15   over the last ten years.

16          I certainly know, because I've had

17   discussions.

18   Q.    I didn't ask policies.

19          MR. RAFFERTY:  Please stop

20       interrupting him.

21          MS. FREIWALD:  Well, he's --

22          MR. RAFFERTY:  No.  You -- you

23       asked, and he said --

24          MS. FREIWALD:  -- answering the

1           question based on what I said.  I didn't

2           say that.

3                MR. RAFFERTY:  You said, You just

4           said you hadn't studied it, and he's

5           explaining how he answered the question.

6           A.   I certainly understand FDA's --

7    I've talked to the agency about q12 hour --

8    those questions have come up and --

9           Q.   When did you do that?

10          A.   They were in general conversations

11   that I've had.

12          Q.   With whom?

13          A.   I'd have to go back and try to sort

14   out who that was with.

15          Q.   Okay.  In 2013, there was a

16   citizens' petition filed by PROP, correct?

17          A.   Correct.

18          Q.   And that citizens' petition

19   asked for --

20                MS. FREIWALD:  Do we have copies of

21           it?

22                Because we're slow in time -- short

23           on time here, I'm going to just mark

24           this as Exhibit 9.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Exhibit Kessler-9 marked for

 2         identification and attached to the

 3         transcript.)

 4   BY MS. FREIWALD:

 5         A.    I have PROP in front of me.

 6         Q.    Okay.  And I'll give out other

 7   copies later.  I apologize.  So -- but I think

 8   it's pretty well-known.

 9              There was a request to strike the

10   term "moderate" from the indication, add a

11   maximum daily dose, and add a maximum duration

12   of 90 days.

13              The indication was changed to talk

14   about patients severe enough, correct?

15         A.    2014 --

16         Q.    Yeah.

17         A.    -- a little afterwards.

18         Q.    A little afterwards?

19         A.    That's correct.

20         Q.    But the FDA rejected the idea of

21   adding a maximum daily dose or a maximum

22   duration, correct?

23         A.    FDA's thinking is, I think,

24   discussed later in the letter.
```

1    Q.   Okay.  So the letter sets forth

2  FDA's thinking on these issues, correct?

3    A.   Correct.

4    Q.   And, in fact, the FDA, through

5  today, has not been willing to have a maximum

6  daily dose or a maximum duration of 90 days for

7  continuous use?

8         MR. RAFFERTY:  Object to the form.

9    A.   Yeah.  FDA probably is a little --

10  I mean, on this, I mean -- I mean, that's

11  correct, because it could not identify -- FDA

12  felt it could not identify the threshold.

13        Regrettably, that -- I think that's

14  the wrong burden, because it's not really --

15  FDA shouldn't have the responsibility of

16  identifying that.  The manufacturer should do

17  that.  But FDA did what it did here.

18    Q.   And even today --

19        I think it's -- what is it, 7, the

20  label in 2018 that I gave you?

21        MR. RAFFERTY:  That's the -- 7 is

22        the '96 label.

23    Q.   So it must be 6.  I'm sorry.  It

24  says it right here, Exhibit 6, the 2018 label.

Highly Confidential - Subject to Further Confidentiality Review

1   You can just look at it on the screen, if you

2   want.

3         A.    Thanks, ma'am.  It's here

4   somewhere.

5         Q.    That's fine.

6               OxyContin is indicated for

7   management of pain severe enough to require

8   daily, around-the-clock, long-term opioid

9   treatment and for which alternative treatment

10  options are inadequate in adults and

11  opioid-tolerant pediatric patients 11 years of

12  age and older who are already receiving and

13  tolerating a minimum daily opioid dose of at

14  least 20 milligrams oxycodone orally or its

15  equivalent.

16              Correct?

17              And then it's under the Limitations

18  of Use where they added in 2018 language,

19  Because of the risk of addiction, abuse, and

20  misuse with opioids even at recommended doses

21  and because of the greater risk of overdose and

22  death with extended-release opioid

23  formulations, reserve OxyContin for use in

24  patients for whom alternative treatment options

1    are ineffective, not tolerated, or would be

2    otherwise inadequate to provide sufficient

3    management of pain.

4              Correct?

5        A.   Correct.

6        Q.   Okay.  And even today, it does not

7    limit use of OxyContin to any particular

8    disease state, correct?

9        A.   Because there's no substantial

10   evidence to support that.

11       Q.   And it doesn't limit -- it

12   certainly doesn't limit OxyContin to use in

13   cancer pain, correct?

14       A.   That's correct.

15       Q.   And it doesn't say that it can't be

16   used in any number of underlying disease

17   conditions if the doctor deems the pain severe

18   enough to require daily, around-the-clock,

19   long-term opioid treatment, correct?

20       A.   No.  Keep on reading.

21       Q.   And for which alternative treatment

22   options are inadequate, correct?

23       A.   Correct.  It has to meet all those

24   requirements today.

1    Q.   And, in fact, that was always the

2    case, that it wasn't meant to be a first-line

3    therapy?

4    A.   That was not what your company --

5    that's not what your company's marketing plans

6    reflect.

7    Q.   Well, in fact, it was -- that is

8    how it was discussed.

9    A.   No.  That -- the one to start with

10   and the one to stay with?

11   Q.   As an opioid.  As an opioid.  Not

12   as the first pain medication.

13   A.   You try to push out -- your company

14   pushed out step two, the combinations.  You

15   wanted -- you wanted it both ways.  You wanted

16   it for -- to push out the combinations, and you

17   wanted the severe.  And it was never supposed

18   to be used before -- the combinations, it was

19   never supposed to be used for the PRN.

20   Q.   Do you know what --

21   A.   And it certainty wasn't supposed to

22   be used at the kind of doses that it ended up

23   being used at.

24   Q.   Do you know what percentage of

Highly Confidential - Subject to Further Confidentiality Review

1    patients who used OxyContin were not naive to

2    opioid therapy?

3            A.    I don't think I -- I don't think I

4    know that number.

5            Q.    Okay.  So --

6            A.    Happy to see if I can find it.

7            Q.    In actual practice, you don't know

8    what percentage of patients in the last ten

9    years who took OxyContin actually had taken

10   another opioid first?

11           A.    I don't -- sitting here today, I've

12   not done that analysis.

13           Q.    And sitting here today, do you know

14   what percentage of the market for all opioids

15   OxyContin was at any point in time?

16           A.    Oh, yes.  I have very specific -- I

17   can -- I can if you want to sit --

18           Q.    What was it?

19           A.    I have to get it for you.  I don't

20   have it in my head, but I have it right in

21   front of me.  Just give me a minute, and I will

22   get it for you.

23                 Let me get my -- sorry.

24           Q.    Where is it in your report?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Well, just give me a second,

2    please.

3              So if you look at -- let's just

4    see -- OxyContin, 2009, $3 billion --

5    3 billion?  Yeah, I think so.  2009 --

6          Q.    Sir, I wasn't asking you --

7          A.    -- 46 percent.

8          Q.    You think that OxyContin was

9    46 percent of the market for prescription

10   opioids?

11         A.    It was 46 percent of the

12   extended-release opioid market.

13         Q.    And where are you getting that data

14   from?

15         A.    Mallinckrodt TI-001191114.

16         Q.    Okay.  Do you know if that's ever

17   what the FDA has used as its numbers?

18         A.    I haven't asked -- I have --

19         Q.    Do you know if that's what NSDA --

20   the NSDA uses as its numbers?

21         A.    I have to double-check on -- those

22   are the only --

23         Q.    This is in your report in the

24   Mallinckrodt section?

```
 1              A.    No.   This -- this is cited in a

 2     document that's cited in my report.

 3              Q.    What's the -- what is the Bates

 4     number on the document that you're using?

 5              A.    The page number, you can --

 6              Q.    The Bates number.

 7              MR. RAFFERTY:   He just read it.

 8              A.    Here, you can it put on -- and turn

 9     it over.   One is product sales, and one is

10     prescriptions, so you have a record of it.   If

11     you turn it over, you'll see the --

12              Q.    Is this your -- what is this page?

13              A.    It's a page out of the document.

14              Q.    All right.   All right.   It's

15     just -- I will just read the Bates number,

16     MNK-TI-0001191114.   Okay.

17              A.    And here.   While you're at it,

18     here's your long-acting opioid market prior to

19     2009.   You can have that.

20              Q.    This is -- you just passed me a

21     document that is not Bates numbered but that

22     talks about long-acting total Rx trends?

23              A.    Right.

24              Q.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.    And that's a -- that's a native

2    that I printed out.

3        Q.    Okay.  Do you know what the source

4    of this is?

5        A.    I'm sure it could be searched.

6        Q.    This is not --

7        A.    It's in the database.

8        Q.    This is not market percentage,

9    which was my question.

10       A.    No -- no, but it give -- it

11   gives -- certainly gives you the two major

12   players at that point in time.

13       Q.    I just asked you market percentage.

14       A.    Well, you have that on the other

15   document.

16       Q.    Okay.  And that's what you think

17   the right answer is?

18       A.    No.  I'm telling you what -- I

19   mean, that's the data that I have.  You asked

20   me for data, and I'm giving you the data that I

21   have.

22       Q.    Do you know what topic areas were

23   covered in the launch materials -- what -- what

24   were themes covered or what the launch material

Highly Confidential - Subject to Further Confidentiality Review

1  for OxyContin looked like?

2      A.   I certainly read the launch plans

3  for those.

4      Q.   I mean the sales aid, the visual

5  aids.

6      A.   What I have in my head is the

7  launch plan.  You'd have to refresh -- I'd have

8  to refresh my memory on --

9      Q.   Do you know what --

10      A.   -- on the aid.

11      Q.   You can't remember what the visual

12  looked like or what any of the particular

13  product claims were?

14      A.   What's in my head right now is the

15  launch plan.

16          MS. FREIWALD:  Okay.  And I'm just

17          going to mark as Exhibit 10 a letter

18          from the FDA in March of '96, Bates

19          number PPLP000614887.

20          (Exhibit Kessler-10 marked for

21          identification and attached to the

22          transcript.)

23          MS. FREIWALD:  I'm happy to give

24          you a copy, Troy, later.  I just -- in

Highly Confidential - Subject to Further Confidentiality Review

```
1          the interest of time --
2               MR. RAFFERTY:  Do you have a
3          copy -- I'm sorry.  Do you have a copy
4          of the visual aid?
5               MS. FREIWALD:  I can give it to you
6          later.  I just, in the interest of --
7               MR. RAFFERTY:  I mean for
8          Dr. Kessler.
9               MS. FREIWALD:  In the interest of
10         time, the letter from the FDA --
11              There's something --
12              MR. RAFFERTY:  I think -- well, the
13         thing's coming down, but I think --
14              MS. FREIWALD:  Yeah, it's coming
15         down a little bit.
16              MR. RAFFERTY:  -- per the
17         protocol --
18         Q.   So this letter --
19              MR. RAFFERTY:  Let me just state an
20         objection.
21              I think, per the protocol, if
22         you're going to ask the witness about --
23         about documents, it is incumbent to have
24         copies for the witness and for opposing
```

Highly Confidential - Subject to Further Confidentiality Review

 1          counsel.

 2               MS. FREIWALD:  I'm asking him --

 3               You're right.  I should have a copy

 4          of this for you, and I will give it to

 5          you.

 6    BY MS. FREIWALD:

 7          Q.   But in the interest of time, this

 8    letter is in response to Purdue Frederick's

 9    March 8, '96 request for comments on a revised

10    OxyContin launch visual aid.

11               The Division of Drug Marketing,

12    Advertising, and Communication (DDMAC) has

13    reviewed the visual aid and has no objections

14    as proposed.

15               Did I read that correctly?

16          A.   You did.  You're refreshing my --

17    my memory is coming back.

18               Is this the steps assigned to this

19    visual aid?

20          Q.   So do you -- did you go through --

21          A.   Yes.

22          Q.   -- in your report anywhere a

23    discussion of the communications with FDA

24    around the launch-related materials?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    In detail.

2    Q.    Where is that in your report?

3    A.    I could -- it's certainly the --

4    the back and -- I have -- let me double-check.

5    It's certainly stuff that I reviewed that I

6    have in my head, because I know exactly what

7    Curtis was saying and what was said.  It's

8    certainly in my reliance list, I am sure.

9    Q.    And after -- there was dialogue

10   between the agency and Purdue with regard to

11   the substance of those materials.  You remember

12   that?

13   A.    About four or five back-and-forths.

14   Q.    And the agency required certain

15   changes in those materials; do you recall?

16   A.    No.  What I -- I think would be

17   fair to say was that Curtis said specifically

18   he saw -- he was opposed to the drug being

19   used, in essence, as step two -- let me just

20   finish, please.

21        He was opposed to the drug being

22   used as step two, and I think there was a

23   compromise worked out, if you look at some fine

24   language, about step two in the final visual

1    aid.

2           But that was not what Curtis had

3    asked the company certainly earlier on, but the

4    company kept on coming back.

5           Q.   And there were other issues that

6    were discussed as well in the visual aid beyond

7    just the step two.  Do you remember that?

8           MR. RAFFERTY:  I am going to object

9           to any further questions on documents

10          that you're not willing to provide to --

11          MS. FREIWALD:  I'm asking --

12          MR. RAFFERTY:  Excuse me.  You can,

13          you know --

14          MS. FREIWALD:  There's no speaking

15          objections.  Just object to the form and

16          foundation.

17          MR. RAFFERTY:  No.  I'm going to

18          instruct him not to answer --

19          MS. FREIWALD:  And you don't have

20          to -- well, you don't have the --

21          MR. RAFFERTY:  -- any more

22          questions on documents that you're not

23          going to be, per the protocol, willing

24          to share with the witness.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. FREIWALD:  Oh, for -- you --

 2              MR. RAFFERTY:  "You" what?

 3              MS. FREIWALD:  You don't even want

 4         to go there with me, the number of

 5         depositions I've sat through with

 6         you where you didn't want to put a

 7         document in front of --

 8              MR. RAFFERTY:  You haven't even

 9         been in a deposition here --

10              MS. FREIWALD:  Okay.

11              MR. RAFFERTY:  -- with me.

12         Q.   I'm asking, it's not in your

13    report?

14              MR. RAFFERTY:  Let the record

15         reflect that's not true.

16              MS. FREIWALD:  In other litigation.

17         Q.   The launch-related materials are

18    not discussed in your report, are they?

19         A.   Hold -- hold on one second, please.

20              MR. RAFFERTY:  Here.  Here's a copy

21         of the document, Doctor.

22              THE WITNESS:  Thank you.  Thank

23         you.

24         A.   Here it is.  I'm sorry.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Just give me -- give me a second.

2    Let me just get my -- my computer online.

3    Sorry.  Here it is.

4          So I -- I believe I put together --

5    I mean, let me just -- can I see the material,

6    the --

7          Q.   I'm really just asking, in the body

8    of your report where you're discussing Purdue

9    and the disconnect that you've described

10   between what was in the label and what the FDA

11   knew about the promotion, the launch materials

12   went through several back-and-forths with the

13   agency, correct?

14         A.   And I have that all here, yes.

15         Q.   Okay.  And, ultimately, the agency

16   said that they -- The Division of Drug

17   Marketing, Advertising, and Communication has

18   reviewed the visual aid and has no objections

19   as proposed.

20         Correct?

21         A.   That was what was written at that

22   time.

23         MS. FREIWALD:  Okay.  Let's take a

24         break.

Highly Confidential - Subject to Further Confidentiality Review

1          How much --

2          Let's take a break.  I want to look

3     at the time and see what we're going to

4     do.

5          VIDEO OPERATOR:  6:04, we are off

6     the video record.

7          (Recess from 6:04 p.m. until

8     6:23 p.m.)

9          VIDEO OPERATOR:  6:23, we are on

10     the video record.

11          (Exhibit Kessler-11 marked for

12     identification and attached to the

13     transcript.)

14  BY MS. FREIWALD:

15     Q.   Doctor, you've talked about

16  promotional activities pre-2003 quite a bit.

17          I don't think that your report

18  references the corrective action that Purdue

19  took in conjunction with the FDA following the

20  warning letter in 2003, and I just want to see

21  if we can agree that this is, in fact, that

22  correction letter.  Correct?

23     A.   I would agree with that.

24          MR. RAFFERTY:  Object to the

1          preamble.

2          Q.    And it's Exhibit -- tell me what

3     exhibit I marked it as.

4          A.    11, ma'am.

5          Q.    Exhibit 11.  Thank you.

6                And it states that -- it

7     references, earlier publication of a journal

8     contained advertisement for OxyContin that was

9     the subject of a warning letter from the FDA in

10    January 2003 and that the company was accused

11    of violating certain provisions and that this

12    is a corrective letter.

13               And, consequently, we direct you

14    the safety information, information about

15    risks...

16               And then it includes a copy of

17    the -- of the box warning language, correct?

18         A.    Correct.

19         Q.    And -- and did you look to see how

20    widely this letter was distributed?

21         A.    I didn't -- I don't know exactly

22    how many copies were sent.

23         Q.    And did you also look at the fact

24    that there was corrective advertising that was

run in the same journals where the ads were?

A. I believe I know that.

Q. And do you -- do you know the length of time of that corrective advertising was discussed with the FDA and agreed to with the FDA?

A. It would be, yes.

Q. And nobody at FDA ever thought that the corrective promotion after the 2003 letter was inadequate?

A. Incorrect.

Q. Is there any document you can find where the FDA said, You're not -- you, Purdue, are not engaging in the corrective behavior long enough or broadly enough?

A. Not with reference to that, but I interpreted your question differently.

Q. Okay. And, in fact, there's -- you -- I assume that, sitting here today, you're not able to say how doctors interpreted this corrective ad, how many of them who got this letter even had seen the ad that the FDA had an issue with in the first place?

MR. RAFFERTY: Object to the form.

1        A.    I don't recall seeing recall

2    surveys of doctors on this.

3        Q.    Okay.  And you don't have any data,

4    sitting here today, about how many doctors in

5    January of 2003 who actually saw the ad

6    continued to prescribe OxyContin over the next

7    decade and a half?

8        A.    Correct.

9        Q.    And sitting here today, you don't

10    even have any information about how many

11    doctors who saw the original problematic ad

12    continued to prescribe OxyContin over the next

13    decade and a half?

14        A.    I don't have that analysis.

15        Q.    Okay.  And do you know -- we've

16    spent a lot of time on call notes.  Do you know

17    what percentage of the total calls in Ohio

18    you've excerpted from -- in your report?

19        A.    No, I don't know that.

20    Specifically, I don't.

21        Q.    Okay.

22        A.    They are what they are.

23        Q.    Do you know how many calls that

24    were made from 2007 to 2017 would have

1  delivered messages that were different from the

2  ones that you have in 2000- -- mostly in 2003

3  and earlier?

4       A.   I don't have that quantitative -- I

5  didn't do that kind of -- the quantitative

6  analysis.

7       Q.   And -- and do you know what sales

8  reps were discussing with doctors as label

9  changes were being made about the new labeling

10  language?

11       A.   There are different call notes that

12  say different things.

13            MR. RAFFERTY:  Object to the form.

14       Q.   And did you look at any of the

15  abuse deterrent materials that the company put

16  out starting in 2000 and going up through 2017?

17       A.   Yes.

18            MR. RAFFERTY:  Object to the form.

19       Q.   You don't -- do you cite in the

20  actual body of your report materials such as,

21  Protecting your practice?

22            MR. RAFFERTY:  Object to the form.

23       A.   I'm sorry.  I thought you were

24  talking about abuse-deterrent formulation.

1     Q.    No.

2     A.    I apologize, ma'am.

3     Q.    No.

4     A.    I misinterpreted your question.

5     Q.    Okay.  Did you look, in call notes

6  or otherwise, for how many doctors in Ohio

7  received information from Purdue about,

8  Protecting your practice, or, Protecting your

9  patient from abuse?

10    A.    I saw certain campaigns on that,

11 but I don't have the quantitative information.

12    Q.    And you didn't look at call notes

13 to see how many times those messages were

14 delivered?

15         MR. RAFFERTY:  Object to the form,

16    misstates his testimony.

17    A.    I certainly looked at call notes

18 and read many call notes.

19    Q.    Can you -- can you tell me -- you

20 didn't excerpt any of those call notes in your

21 report?

22    A.    About, Keep the medicine safe?

23    Q.    Yeah.

24    A.    No -- no, I did not, I don't think.

1    Q.   Okay.  Do you --

2    A.   I mean, I've got to go back and

3  check the -- I mean, the -- sorry.  There

4  may -- there may be call notes that are

5  referenced in the schedules that reference

6  that, because there's multiple issues, but I

7  did not track specifically that issue.

8    Q.   Did you track the number of

9  abuse-deterrent prescription pads that were

10  given out for free by Purdue in the counties in

11  Ohio or nationally during this time period?

12    A.   I was aware of that, but I don't

13  have the -- somewhere, there may be a

14  quantitative in some of the reliance, but I

15  don't have that on top of my head.

16    Q.   Did you track the number of

17  educational efforts that were made through

18  the -- what was referred to as the LELE program

19  by Purdue?

20    A.   I did not track that specifically.

21    Q.   Do you know what the LELE program

22  was?

23    A.   I'd have to review that.  Sitting

24  here, I'm -- it's not top of mind.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Did you track the dissemination of

2  information on, Protecting your medicine

3  cabinet that was given to doctors to give to

4  patients about keeping their -- their drugs

5  safe?

6    A.   I didn't track that in any -- I'm

7  aware of those campaigns.  I've seen those

8  slides, those campaigns, those brochures.  I

9  don't have the quantitative information.

10    Q.   Do you know how much money or how

11  many resources the company expended to get that

12  information out to doctors over a decade and a

13  half?

14    A.   I do have specific promotional --

15    Q.   I'm not asking about promotional

16  dollars generally.  I'm asking with regard to

17  those efforts to speak to -- of mitigating

18  abuse.

19    A.   I was going to say, I have specific

20  dollars with regard to specific activities

21  here, if you'd like.  It may be on the list.

22  Just give me -- if you'd like me to give it you

23  to --

24    Q.   If it's -- if you think it's

1    referenced in your material somewhere, then

2    I'll look for it later, because I have very

3    little time.

4         A.   I can give you -- I can just simply

5    give you a Bates number.

6              So if you look at -- look at

7    PPLP003409960, that's the promotional

8    incremental -- those are the activities that

9    are spent, and I'm not sure I see that one

10   broken out in the ROI on those.

11        Q.   Okay.  And do you know how much the

12   company dedicated to assisting with better PDMP

13   programs?

14        A.   I don't --

15        Q.   Did you track those efforts?

16             MR. RAFFERTY:  Which question do

17        you want him to answer?

18        Q.   Did -- did you track in any way,

19   dollars, effort -- I'll ask the question very

20   broadly -- PDMP investments?

21        A.   So I have -- I have -- I didn't

22   track myself, but I do have information on what

23   the company tracked on a number of programs and

24   what the dollar spend was and the incremental

1    total Rx that it yielded to.

2           Q.    Am I going to find anything

3    specifically on PDMP efforts?

4           A.    We'd have to go through the

5    reliance list.  I don't see in this -- I don't

6    see that program specifically, the contribution

7    by promotional challenge.  I don't see that one

8    listed in this chart.

9           Q.    You didn't -- you didn't discuss

10   it?  That would be an effort to reduce abuse

11   and diversion, and you didn't discuss that in

12   your report?

13          MR. RAFFERTY:  Objection to form.

14          A.    Because I'm pretty sure it's in my

15   reliance list, because those activities I'm

16   certainly aware of and I have reviewed.

17          Q.    Do you -- do you know how much the

18   company invested in other means of preventing

19   diversion, whether it's helping track illicit

20   drugs coming in from Mexico, helping with

21   placebo pills, to help law enforcement engage

22   in sting operations?  Did -- did you analyze

23   any of those efforts by the company?

24          A.    I looked at those -- I looked at a

Highly Confidential - Subject to Further Confidentiality Review

1    number of different programs that were focused

2    on that at different points in time, but I

3    don't have a quantitative estimate.

4         Q.   And is there any method that you

5    had for putting that into a matrix for judging

6    what -- how information you thought was

7    misleading was balanced against information the

8    company was putting out about abuse and misuse

9    and proper prescribing and proper monitoring?

10        A.   Yes.

11             MR. RAFFERTY:  Object to form.

12        Q.   What would the -- what is the

13   matrix that you have?

14        A.   You can look at the incremental TRx

15   by promotional activity, and you can see the

16   trends in total number of pills.

17        Q.   So is it your testimony that as

18   long as prescriptions weren't declining, that

19   the -- that doctors weren't understanding the

20   risk?

21             MR. RAFFERTY:  Object to the form.

22        A.   I'm sorry.  I don't understand your

23   question.

24        Q.   I'm -- is it your testimony that if

1    prescriptions weren't declining, that proves

2    that doctors failed to understand the risk?

3              MR. RAFFERTY:  Object to the form.

4         A.    Not exactly.

5         Q.    Well, I'm asking you if there is --

6    you've testified that the label says what it

7    says, and it included information we've gone

8    through about abuse, misuse, addiction,

9    tolerance, et cetera.

10             But you said, if I understand your

11   testimony, It's not about the label; it's about

12   the promotional messages.

13             And I'm asking you, did you do

14   anything to attempt to characterize or weigh

15   the impact of the promotional -- promotional

16   messages against all the efforts that were

17   being made to communicate risk, threat of

18   diversion, threat of misuse, needing to monitor

19   your patient, needing to make sure that you

20   were prescribing for the correct patient,

21   needing to make sure that the patient was

22   guarding their medicines?

23        A.    Yes.

24             MR. RAFFERTY:  Objection.

1    Q.   Where is that --

2         MR. RAFFERTY:  Objection, compound

3    and long.

4    Q.   Where is that in your report?

5    A.   I mean, it's -- the report

6    discusses the increased use for a broadened

7    range of indications.

8    Q.   So is it your testimony that the

9    fact -- that increase in prescription is proof

10   of either wrongdoing or failure to provide

11   information to doctors that was accurate?

12   A.   The use of the drug in

13   indications -- in broad range of indications

14   beyond where it was appropriate shows that

15   those -- those things were not working.

16   Q.   Is it -- what have you done to rule

17   out the possibility that doctors understood the

18   risk but made a decision to prescribe the

19   product?

20        MR. RAFFERTY:  Object to the form.

21   A.   That -- that shift -- if you look

22   somewhere here, if you look at the shift in --

23        Well, because if you look at

24   Purdue's documents itself, you see that the

Highly Confidential - Subject to Further Confidentiality Review

1   increased volume -- and it's quantitated in a

2   number of your client's documents about the

3   promotional sensitivity, and that was not

4   independent of that.

5          The promotion -- this was

6   promotionally sensitive, that increase, and

7   there was a shift.

8          Q.   All products have some promotional

9   sensitivity.  That doesn't prove --

10          MR. RAFFERTY:  Were you done,

11      Doctor?

12          Q.   -- that marketing was improper.

13          So what I want to know is, what

14  have you done -- what methodology have you used

15  that anybody could recreate to say that any

16  increase in prescriptions or continuation of

17  writing of prescriptions was because doctors

18  didn't understand the potential risk profile,

19  as opposed to because they understood it, but

20  they were making a considered decision for

21  their patients?

22          MR. RAFFERTY:  Object to the form.

23          A.   Well, they were making that

24  decision based on promotional sensitivity.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    As opposed -- other than your

2  say-so, how does one prove that?

3            MR. RAFFERTY:  Object to the form.

4      A.    So just give me one second.  Hold

5  on a second.  There is -- hold on a second.

6  Hold on a second.

7      Q.    Sir, I'm looking for --

8      A.    No, no.  I --

9      Q.    -- a methodology.  I'm looking --

10     A.    I said the company's own documents,

11  and I will -- can I give -- I have a sheet her,

12  and I just -- hold on one second.  Let me just

13  see.

14            I mean, there are documents that --

15  and I will find them for you; they're here --

16  that show that the company tracked specifically

17  what increased prescriptions were due to its

18  promotional activity.

19     Q.    Sir, there's -- I understand that.

20  You've made that very clear.

21            But there are hundreds of

22  prescription drugs that are promotionally

23  sensitive.  That doesn't mean that they're

24  being promoted incorrectly.  So what I want to

Highly Confidential - Subject to Further Confidentiality Review

1   know is -- or that doctors misunderstand their

2   risk profile.

3               So what I want to know is what you

4   have done that another expert could reproduce

5   or test that establishes that the continued

6   prescription of the drug is because of a

7   failure to understand the risk/benefit profile.

8               MR. RAFFERTY:  Object to the form.

9        Move to strike the editorial comments.

10       And it's been asked and answered.

11       A.   The company's -- the company's

12  documents -- the company's marketing plans and

13  its -- the company's marketing plans, its

14  marketing budgets, its ROI documents, and its

15  return on investment for that promotion and

16  what those marketing efforts -- as well as the

17  shift.

18               I mean, back -- back in 1980,

19  oxycodone was not a drug of choice.  That

20  shifted after the promotional activity.  I

21  think there's no question, we went from a drug

22  not of choice for chronic use in the medical

23  establishment to one that was.

24       Q.   Do you -- do you agree with me,

Highly Confidential - Subject to Further Confidentiality Review

1   sir, that there are --

2              MR. RAFFERTY:  Were you finished?

3        Q.   -- drugs that were not once

4   prescribed that are now prescribed commonly?

5   This is not the only place where there has been

6   shift in prescribing practices?

7              MR. RAFFERTY:  Object to the form,

8         vague, and overly broad.

9        A.   Yes, but the -- but the --

10       Q.   Yes.  The answer is "yes," right?

11  There have been shifts in prescribing practices

12  with regard to multiple disease states,

13  correct?

14             MR. RAFFERTY:  Answer the question

15        how you want, Doctor.

16       Q.   Yes?

17             MR. RAFFERTY:  Let him finish his

18        answer.

19       A.   There are shifts in time in

20  prescribing, correct.  This shift toward higher

21  doses and changing -- your -- your -- the

22  documents themselves, your company takes

23  credit, I mean, for changing the way pain was

24  treated with opioids.

Highly Confidential - Subject to Further Confidentiality Review

1    We now know that is wrong, that

2    method is wrong.  The current label, right,

3    recognizes that that method was wrong.

4         Q.   One more question.

5         Do you know what happened to

6    prescribing rates for OxyContin after 2010?

7         A.   I'd have to get -- specifically,

8    I'd have to look exactly at which years.  As

9    the abuse-deterrent formulation came on, other

10   drugs took its place.

11        Q.   So when the abuse-deterrent

12   formulation came on, if the record reflects

13   there was a decline, would you -- would you

14   then say -- if you're going to say that

15   increase is a result of improper understanding

16   of the drug, will you say that the decline is a

17   result of proper communication, proper

18   understanding of risk?

19             MR. RAFFERTY:  Object to the form.

20        A.   No.

21             MS. FREIWALD:  Honestly, sir, I've

22        got easily three or four more hours of

23        questions for you because I have not

24        been able to put in front of you most of

Highly Confidential - Subject to Further Confidentiality Review

```
 1         the documents that you put in your

 2         report with regard to my client and I

 3         haven't been able to get answers other

 4         than speeches.

 5              But I've got a whole bunch of

 6         co-defendants, and I don't have a choice

 7         at this point other than to -- other

 8         than to pass the chair.

 9              So I'm going to do that, but I want

10         to be clear on the record that I'm doing

11         that with objection and state that I

12         simply have not had the time to cover

13         even three-quarters of your generic

14         opinions, let alone probably more than

15         about a third of your Purdue opinions.

16              MR. RAFFERTY:  Are you finished?

17         Because that is utterly untrue.

18              And so if we're stating stuff for

19         the record, at one point we took a

20         30-minute break so you could prepare for

21         the deposition.

22              Now, your failure to prepare for

23         depositions --

24              MS. FREIWALD:  Oh, god.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. RAFFERTY:  -- and your failure
 2         to ask the -- and you're asking
 3         open-ended questions.  And if you're
 4         going to ask open-ended questions,
 5         you're going to get an answer.
 6              MS. FREIWALD:  I think --
 7              MR. RAFFERTY:  And I'm sorry that
 8         you didn't like the answer -- excuse me.
 9         Let me -- I let you give your rant.
10              So the fact of the matter is, is
11         that he answered the questions you
12         asked, and when you asked a narrow
13         question, he gave you a narrow answer.
14         When you asked a broad question, he gave
15         you a broad answer.  That's the simple
16         facts, and the record will reflect that.
17              So if -- we spent, you know, a good
18         hour just reading documents.  So you
19         know, if that's how you wanted to spend
20         your time, that's how you spent your
21         time.
22              MS. FREIWALD:  I think the record
23         will speak for itself and, I think, will
24         also speak for the fact that with a
```

Highly Confidential - Subject to Further Confidentiality Review

 1        300-page report and 100 pages of opinion

 2        as to my client alone, two hours of

 3        questioning is plainly inadequate.

 4             MR. RAFFERTY:  Well, that's --

 5             MS. FREIWALD:  So we're going to

 6        pass the witness.

 7             MR. RAFFERTY:  -- that's between --

 8        that's between you and your

 9        co-defendants.

10             MS. FREIWALD:  Okay.

11             MR. RAFFERTY:  The Court gave you

12        14 hours.

13             How much time are we on the record?

14             VIDEO OPERATOR:  That's 21 minutes

15        added to the 6:39.

16             MR. RAFFERTY:  So we're just over

17        seven.

18             All right.  I think, quite frankly,

19        instead of shifting over, if everybody

20        wanted to end at seven, I don't know

21        that it makes a bunch of --

22             MS. FREIWALD:  I think we need to

23        go longer.

24             MR. DAVIS:  Can we go off for just

Highly Confidential - Subject to Further Confidentiality Review

1        one second?

2               MS. LEVY:  Can we go off the

3        record?

4               MR. DAVIS:  We have a -- I have a

5        suggestion.

6               MR. RAFFERTY:  Uh-huh, sure.  I

7        love suggestions.

8               MS. LEVY:  Off the record?

9               VIDEO OPERATOR:  Off the record?

10              MR. RAFFERTY:  Yeah.

11              VIDEO OPERATOR:  6:44, we are off

12       the video record.

13              (A discussion was held off the

14       record.)

15              VIDEO OPERATOR:  6:46, we are on

16       the video record.

17                      EXAMINATION

18  BY MR. BORANIAN:

19       Q.   Steven Boranian for Defendant

20  AmerisourceBergen Drug Corporation, which is a

21  distributor, Dr. Kessler.

22              You said earlier today that you

23  have no opinions with regard to distributors,

24  and that's still true now, correct?

1          A.    Correct.

2          Q.    Now, you've listed the names of all

3    the defendants in this case in your report, I

4    think at paragraph 10.  Is that right?

5          A.    I believe that's correct.

6          Q.    So I have two questions, Doctor.

7                Have you formed any opinions with

8    regard to any of the distributors who are

9    listed as defendants in your report?

10         A.    Nothing that I will give at trial,

11   no.

12         Q.    Well, you predicted my next

13   question, Doctor, which is, do you intend to

14   appear at trial and give opinions with regard

15   to any distributor listed in your report?

16         A.    Whether I appear at trial is simply

17   counsel and the Court.  I -- I --

18               What was the first question?  What

19   was -- what was the full question?  I'm sorry.

20         Q.    The question is, do you intend to

21   appear at trial and offer any opinions with

22   regard to distributors?

23         A.    If I appear at trial, I do not

24   intend to offer any opinions with regard to

Highly Confidential - Subject to Further Confidentiality Review

 1   distributors.

 2              MR. BORANIAN:  Thank you, Doctor.

 3              THE WITNESS:  Thank you, Counselor.

 4              MR. BORANIAN:  I think we can just

 5         stay on the record.

 6              MR. RAFFERTY:  Is that going to be

 7         the same for all the other distributors?

 8         Oh, okay.  I was going to say,

 9         maybe we can just get him to say --

10                   EXAMINATION

11   BY MR. LAVELLE:

12         Q.   Good afternoon, Doctor.  John

13   Lavelle from Morgan, Lewis, and I'm

14   representing Rite Aid -- actually, Rite Aid of

15   Maryland, doing business as the Maryland -- as

16   the Mid-Atlantic Distribution Center.

17              Are you aware that there are a

18   number of pharmacy entities that are named as

19   defendants in this litigation?

20         A.   I am, sir.

21         Q.   And I want to ask you some

22   questions about those pharmacies and

23   specifically about Rite Aid, CVS, Wal-Mart,

24   Walgreens, and Giant Eagle.

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Okay.

2      Q.    Can we refer to those as the retail

3    chain pharmacies?

4      A.    Fair.

5      Q.    Doctor, do you have any opinions,

6    as we sit here today, that you intend to offer

7    with respect to the retail chain pharmacies?

8      A.    At trial, no.

9      Q.    You don't have any in the report

10   that you've served; is that correct?

11     A.    That's correct.

12     Q.    And you don't intend to serve -- to

13   offer any opinions at trial --

14     A.    Correct.

15     Q.    -- concerning any of those retail

16   chain pharmacies?

17     A.    Correct.

18         MR. LAVELLE:  Thank you, Doctor.

19      That's all I have.

20         THE WITNESS:  Thank you, Counselor.

21         MR. RAFFERTY:  That's it?

22         VIDEO OPERATOR:  6:49.  We are off

23      the video record.

24         (Off the record at 6:49 p.m.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T E

 2

 3          I, Lisa V. Feissner, RDR, CRR, CLR,

 4   Notary Public, certify that the foregoing is a

 5   true and accurate transcript of the deposition

 6   of said witness, who was first duly sworn by me

 7   on the date and place hereinbefore set forth.

 8

 9          I further certify that I am neither

10   attorney nor counsel for, nor related to or

11   employed by, any of the parties to the action

12   in which this deposition was taken, and

13   further, that I am not a relative or employee

14   of any attorney or counsel employed in this

15   action, nor am I financially interested in this

16   case.

17

18          Lisa V. Feissner

19          Lisa V. Feissner, RDR, CRR, CLR

            Notary Public

20          Dated: APRIL 29, 2019

21

22          (The foregoing certification of this

     transcript does not apply to any reproduction

23   of the same by any means, unless under the

     direct control and/or supervision of the

24   certifying reporter.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3          Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the appropriate

 6    column on the errata sheet for any change made.

 7          After doing so, please sign the errata

 8    sheet and date it.

 9          You are signing it subject to the

10    changes you have noted on the errata sheet,

11    which will be attached to your deposition.  You

12    must sign in the space provided.  The witness

13    need not be a notary public.  Any competent

14    adult may witness your signature.

15          It is imperative that you return the

16    original errata sheet to the deposing attorney

17    within thirty (30) days of receipt of the

18    deposition transcript by you.  If you fail to

19    do so, the deposition may be deemed to be

20    accurate and may be used in court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    WITNESS NAME:        DAVID A. KESSLER, M.D.

      DEPOSITION DATE:     APRIL 25, 2019

 2

 3                         ERRATA

 4    PAGE LINE   CHANGE                   REASON

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                ACKNOWLEDGMENT OF DEPONENT

2

3          I hereby acknowledge that I have read

4     the foregoing deposition, pages 1 - 414, dated

5     April 25, 2019, and that the same is a true and

6     correct transcription of the answers given by

7     me to the questions propounded, except for the

8     changes, if any, noted on the attached Errata.

9

10

11    SIGNATURE:

                DAVID A. KESSLER, M.D.

12

13    DATE:

14

15

16

17    WITNESSED BY:

18

19    DATE:

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          LAWYER'S NOTES

 2      PAGE   LINE

 3      _____  _____   _____

 4      _____  _____   _____

 5      _____  _____   _____

 6      _____  _____   _____

 7      _____  _____   _____

 8      _____  _____   _____

 9      _____  _____   _____

10      _____  _____   _____

11      _____  _____   _____

12      _____  _____   _____

13      _____  _____   _____

14      _____  _____   _____

15      _____  _____   _____

16      _____  _____   _____

17      _____  _____   _____

18      _____  _____   _____

19      _____  _____   _____

20      _____  _____   _____

21      _____  _____   _____

22      _____  _____   _____

23      _____  _____   _____

24      _____  _____   _____
```