Highly Confidential - Subject to Further Confidentiality Review

1              THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
2                     EASTERN DIVISION

3                       -   -   -

4    IN RE:  NATIONAL     :
     PRESCRIPTION OPIATE :    MDL NO. 2804
5    LITIGATION           :
     ----------------------------------------
6                         :    CASE NO.
     THIS DOCUMENT        :    1:17-MD-2804
7    RELATES TO ALL CASES:    Hon. Dan A. Polster

8                       -   -   -

9                 Friday, April 26, 2019

10                      -   -   -

11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12               CONFIDENTIALITY REVIEW

13                      -   -   -

14        Videotaped deposition of DAVID A.

15   KESSLER, M.D. (Day 2), taken pursuant to

16   notice, was held at Baron & Budd, 600 New

17   Hampshire Avenue NW, Floor G, Washington, DC

18   20037, beginning at 8:07 a.m., on the above

19   date, before Lisa V. Feissner, RDR, CRR, Notary

20   Public.

21

22                      -   -   -

23           GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
24               deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2      LEVIN PAPANTONIO THOMAS MITCHELL
        RAFFERTY & PROCTOR PA
 3      BY: TROY A. RAFFERTY, ESQUIRE
        316 South Baylen Street - Suite 600
 4      Pensacola, Florida 32502
        (850) 435-7163
 5      trafferty@levinlaw.com
        -- Representing Plaintiffs
 6
        SEEGER WEISS LLP
 7      BY: PARVIN K. AMINOLROAYA, ESQUIRE
        BY: KSENIYA LEZHNEV, ESQUIRE
 8      77 Water Street - 8th Floor
        New York, NY 10005
 9      212-584-0700
        paminolroaya@seegerweiss.com
10      klezhnev@seegerweiss.com
        -- Representing Plaintiffs
11
        LIEFF CABRASER HEIMANN & BERNSTEIN
12      BY: LEXI J. HAZAM, ESQUIRE
        275 Battery Street - 29th Floor
13      San Francisco, CA 94111-3339
        (415) 956-1000
14      lhazam@lchb.com
        -- Representing Plaintiffs
15
16      SPANGENBERG SHIBLEY & LIBER LLP
        BY: PETER H. WEINBERGER, ESQUIRE
17      1001 Lakeside Avenue East - Suite 1700
        Cleveland, OH 44114-1149
18      (216) 600-0114
        pweinberger@spanglaw.com
19      -- Representing Plaintiffs
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Continued)
 2      BARON & BUDD P.C.
        NOAH RICH, ESQUIRE
 3      (via video stream / realtime stream)
        600 New Hampshire Avenue, NW
 4      The Watergate, Suite 10-A
        Washington, DC 20037
 5      (202) 333-4562
        nrich@baronbudd.com
 6      -- Representing Plaintiffs
 7      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
        BY: MATIAS BUSTAMANTE, ESQUIRE
 8      (via video stream / realtime stream)
        275 Battery Street - 29th Floor
 9      San Francisco, CA 94111
        (415) 956-1000
10      mbustamante@lchb.com
        -- Representing Plaintiffs
11
        DECHERT LLP
12      BY: HOPE S. FREIWALD, ESQUIRE
        Cira Centre
13      2929 Arch Street
        Philadelphia, PA, 19104-2808
14      (215) 994-2514
        hope.freiwald@dechert.com
15         and
        DECHERT LLP
16      ALEJANDRO HERRERA, ESQUIRE
        Three Bryant Park
17      1095 Avenue of the Americas
        New York, NY 10036-6797
18      (212) 698-3500
        alejandro.herrera@dechert.com
19      -- Representing the Purdue Defendants
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:  (Continued)
 2       ARNOLD & PORTER KAYE SCHOLER LLP
         BY: JOSHUA M. DAVIS, ESQUIRE
 3       601 Massachusetts Avenue, NW
         Washington, DC 20001-3743
 4       (202) 942-5743
         joshua.davis@arnoldporter.com
 5       -- Representing the Endo and Par Defendants
             and
 6       ARNOLD & PORTER KAYE SCHOLER LLP
         BY: JOHN CELLA, ESQUIRE
 7       (via video and realtime stream)
         601 Massachusetts Avenue, NW
 8       Washington, DC 20001-3743
         (202) 942-5743
 9       john.cella@arnoldporter.com
         -- Representing the Endo and Par Defendants
10
11       KIRKLAND & ELLIS LLP
         BY: JENNIFER LEVY, ESQUIRE
12       1301 Pennsylvania Avenue, NW
         Washington, DC 20004
13       (202) 389-5211
         jennifer.levy@kirkland.com
14           and
         KIRKLAND & ELLIS LLP
15       BY: MICHAEL LeFEVOUR, ESQUIRE
         300 North LaSalle
16       Chicago, IL 60654
         (312) 862-3728
17       michael.lefevour@kirkland.com
         -- Representing the Allergan Defendants
18
         MORGAN LEWIS & BOCKIUS LLP
19       BY: WENDY WEST FEINSTEIN, ESQUIRE
         One Oxford Centre
20       Thirty-Second Floor
         Pittsburgh, PA 15219-6401
21       (410) 560-7455
         wendy.feinstein@morganlewis.com
22       -- Representing the Teva Defendants
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:  (Continued)
 2       O'MELVENY & MYERS LLP
         BY: AMY LAURENDEAU, ESQUIRE
 3       610 Newport Center Drive
         17th Floor
 4       Newport Beach, CA 92660
         (949) 823-7926
 5       alaurendeau@omm.com
              and
 6       O'MELVENY & MYERS LLP
         BY: VINCENT S. WEISBAND, ESQUIRE
 7       Times Square Tower
         7 Times Square
 8       New York, NY 10036
         (212) 326-2228
 9       vweisband@omm.com
         -- Representing the Janssen Defendants
10
         MORGAN LEWIS & BOCKIUS LLP
11       BY: JOHN P. LAVELLE, JR., ESQUIRE
         (via video and realtime stream)
12       1701 Market Street
         Philadelphia, PA 19103-2921
13       (215) 963-4824
         john.lavelle@morganlewis.com
14       -- Representing the Defendant
            Rite-Aid of Maryland, Inc.
15
         REED SMITH LLP
16       BY: STEVEN J. BORANIAN, ESQUIRE
         101 Second Street - Suite 1800
17       San Francisco, CA 94105
         (415) 659-5980
18       sboranian@reedsmith.com
              and
19       REED SMITH LLP
         BY: LUKE PORTER, ESQUIRE
20       (via teleconference)
         101 Second Street - Suite 1800
21       San Francisco, CA 94105
         (415) 659-5980
22       lsmith@reedsmith.com
         -- Representing the Defendant
23          AmerisourceBergen Drug Corporation
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Continued)
 2       JONES DAY
         BY: BRANDY H. RANJAN, ESQUIRE
 3       325 John H. McConnell Boulevard
         Suite 600
 4       Columbus, OH 43215-2673
         (614) 469-3939
 5       branjan@jonesday.com
         -- Representing the Defendant Walmart Inc.,
 6          f/k/a Wal-Mart Stores, Inc.
 7       ROPES & GRAY LLP
         BY: RICHARD L. GALLAGHER, ESQUIRE
 8       Three Embarcadero Center
         San Francisco, CA 94111-4006
 9       (415) 706-1033
         richard.gallagher@ropesgray.com
10          and
         ROPES & GRAY LLP
11       BY: CHRISTINE D'AURIA, ESQUIRE
         Prudential Tower
12       800 Boylston Street
         Boston, MA 02199-3600
13       (617) 235-4741
         christine.dauria@ropesgray.com
14       -- Representing the Defendant
            Mallinckrodt LLC
15
         WILLIAMS & CONNOLLY LLP
16       BY: PAUL E. BOEHM, ESQUIRE
         725 Twelfth Street, NW
17       Washington, DC 20005
         (202) 434-5366
18       pboehm@wc.com
         -- Representing the Defendant
19          Cardinal Health, Inc.
         FOX ROTHSCHILD LLP
20       BY: ZACHARY MARTIN, ESQUIRE
         (via teleconference)
21       Stone Manor Corporate Center
         2700 Kelly Road - Suite 300
22       Warrington, PA 18976
         (215) 918-3680
23       zmartin@foxrothschild.com
         -- Representing the Defendant
24          Prescription Supply, Inc.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:  (Continued)
 2       BARTLIT BECK LLP
         BY: SHARON DESH, ESQUIRE
 3       (via teleconference)
         54 West Hubbard Street
 4       Suite 300
         Chicago, IL 60654
 5       (312) 494.4445
         Sharon.Desh@BartlitBeck.com
 6       -- Representing the Defendant
            Walgreens
 7

      ALSO PRESENT:
 8
         CHRIS RITONA, Videographer
 9       Golkow Litigation Services
10       GERARD MAGLASANG, Legal Assistant
         SEEGER WEISS LLP
11

12
      ALSO PRESENT via video stream/realtime stream:
13
         GRETCHEN KEARNEY
14       EMMA KABOLI
         Baron & Budd P.C.
15
         CHARLES BACHMANN
16       Seeger Weiss LLP
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       -  -  -
 2                    I N D E X
 3                       -  -  -
 4   Testimony of:  DAVID A. KESSLER, M.D.
 5        By Mr. Davis                  432
          By Ms. Laurendeau             525
 6        By Mr. Gallagher              633
          By Ms. Feinstein              659
 7        By Ms. Levy                   697
 8
 9                       -  -  -
10                   E X H I B I T S
11                       -  -  -
     KESSLER
12   EXHIBIT NO.     DESCRIPTION                PAGE
13   12      Clinical Development & Education,   456
             1998 Mid-Year Update on Goals &
14           Objectives, Linda A. Kitlinski
             ENDO-OPIOID_MDL-05967764 - 05967774
15
     13      Clinical Development & Education,   461
16           1999 Objectives, Linda A. Kitlinski
             ENDO-OPIOID_MDL-03258200 - 03258202
17
     14      Kessler large-format sheets        466
18           Endo
19   15      Opana ER label                     485
             dated February 2008
20
     16      Opana ER Kit                       489
21           ENDO-CHI_LIT-00541205 - 00541210
22   17      Letter from Skariah to Best        499
             re: NDA #201655
23           Reference ID: 3124026
             ENDO-OR-CID-000768706 - 00768711
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          -   -   -
 2                      E X H I B I T S
                           (cont'd)
 3
                            -   -   -
 4    KESSLER
      EXHIBIT NO.     DESCRIPTION                    PAGE
 5
      18       Letter from Best to CDER               501
 6             dated February 29, 2012
               with attachments
 7             END00590895, END00590891 - 00590894
               END00590896 - 00590897
 8             END00591163 - 00591164
 9    19       Duragesic label                        535
               Revised: 09/2018
10             Reference ID: 4320698
11    20       Letter from Strickland to              547
               The Honorable Connie Mack
12             dated Jan 18 1994
13    21       Duragesic label                        551
               dated August 1990
14
      22       Associated Press article, FDA          556
15             Says Some Doctors Dangerously
               Misusing Potent Painkiller,
16             dated January 18, 1994
17    23       Cumulative Review of Iatrogenic        573
               Addiction Associated with the
18             Use of Transdermal DURAGESIC
               (fentanyl) Patch
19             JAN-MS-02754767 - 02754783
20    24       Warning Letter re: NDA # 19-813        625
               JAN-MS-00291331
21
      25       Kessler large-format sheets            697
22             Janssen - Duragesic
23    26       Kessler large-format sheets            697
               Janssen - Nucynta
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                        -   -   -
2                    E X H I B I T S
                        (cont'd)
3
                         -   -   -
4  KESSLER
   EXHIBIT NO.      DESCRIPTION                    PAGE
5
   27      Kessler large-format sheets             697
6          Super poppy
7  28      Kessler large-format sheets             697
           Payments to Third Parties
8
   29      Kessler large-format sheets             697
9          Actiq
10 30      Kessler large-format sheets             697
           MNK
11
   31      Kessler large-format sheets             697
12         Purdue
13 32      Kessler large-format sheets             697
           General I
14
   33      Kessler large-format sheets             697
15         Market Share
16 34      Kessler large-format sheets             697
           General II
17
   35      Kessler large-format sheets             697
18         Influencing Doctors
19 36      Kessler large-format sheets             697
           Kadian (Actavis)
20
   37      Binder: OPIOIDS, Kessler Expert         697
21         Report, Actavis Section
           Paragraph #494 to #521
22         Binder 1 of 2
23 38      Binder: OPIOIDS, Kessler Expert         697
           Report, Actavis Section
24         Paragraph #522 to # 537
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          -   -   -
 2                      E X H I B I T S
                           (cont'd)
 3
                            -   -   -
 4   KESSLER
     EXHIBIT NO.      DESCRIPTION                   PAGE
 5
     39      Chart re: Kadian (large format)        697
 6
     40      Letter from DHHS / FDA to              710
 7           Collegium Pharmaceutical, Inc.,
             undated, Reference ID: 4219942
 8
     41      FDA Enforcement Statistics             712
 9           Summary, Fiscal Year 2017
10   42      Book: Drugs of Choice, 1980-1981       733
11   43      Graph: U.S. Pain Market $              737
             (contained within Kessler-33)
12
     44      Page 44 of Allergan's Fourth           747
13           Amended Objections and Responses
             to Plaintiffs' Corrected Second
14           Set of Interrogatories
             (contained with Kessler-36)
15
     45      Medical Officer Review,                767
16           NDA#: 20,616 dated Jul 11 1997
17   46      Kadian label, Revised: 09/2018         772
18   47      KADIAN Sales Training Presentation     783
             March 2013
19           ACTAVIS0000564 - 0000603
20   48      KADIAN Sales Training Presentation     785
             February 2013
21           ALLERGAN_MDL_00001525 - 0001570
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -

 2              DEPOSITION SUPPORT INDEX

 3                        -   -   -

 4   Direction to Witness Not to Answer

     Page  Line     Page  Line       Page  Line

 5    654    11     806    1

 6

     Request for Production of Documents

 7   Page  Line      Page  Line       Page  Line

     (None)

 8

 9   Stipulations

     Page  Line      Page  Line       Page  Line

10    432     2

11

     Question Marked

12   Page  Line      Page  Line       Page  Line

      789    10

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -  -  -

 2              (It is hereby stipulated and agreed

 3          by and among counsel that sealing,

 4          filing and certification are waived; and

 5          that all objections, except as to the

 6          form of the question, will be reserved

 7          until the time of trial.)

 8                        -  -  -

 9              VIDEO OPERATOR:  Today's

10          April 26th.  The time is 8:07 a.m., and

11          we are now on the record.

12              This is the continuation of the

13          deposition of David A. Kessler, M.D.,

14          and he has been previously sworn in.

15              You may proceed.

16              MR. DAVIS:  Thank you.

17              DAVID A. KESSLER, M.D.,

18      having been previously duly sworn, was examined

19      and testified as follows:

20                      EXAMINATION

21      BY MR. DAVIS:

22          Q.   Good morning, Dr. Kessler.

23          A.   Good morning, sir.

24          Q.   My name is Josh Davis.  I represent
```

1    Endo and a number of Endo affiliates, including

2    Par Pharmaceuticals.

3              I'm going to ask you some questions

4    generally and a fair number of questions about

5    Endo specifically.

6              Okay?

7         A.   Thank you, sir.

8         Q.   You recall yesterday testifying

9    that you're not a mind reader?

10        A.   Yes.

11        Q.   Do you recall testifying yesterday

12   that you're not going to offer opinions about

13   the intent of authors of particular documents,

14   correct?

15        A.   Not about intent.

16        Q.   Okay.  And is it fair to say that

17   your report with respect to Endo refers to a

18   number of internal Endo documents?

19        A.   Yes.

20        Q.   And it quotes from those documents;

21   is that right?

22        A.   In part, yes.

23        Q.   And that includes internal Endo

24   e-mails?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    And internal Endo marketing

3  strategy documents?

4      A.    Correct.

5      Q.    And so you're not going to offer an

6  opinion about the intent of the authors of

7  those documents; is that right?

8      A.    No.  Just anything that's objective

9  evidence, I will base my opinions on.

10     Q.    Dr. Kessler, while you were at the

11  FDA, did you communicate in writing with other

12  FDA employees?

13     A.    I'm sure.

14     Q.    Did you communicate through

15  internal FDA memoranda?

16     A.    Can I just give a caveat to that?

17  Most of my interactions, just the technology at

18  the time, was probably verbal is my

19  recollection.  I did not do e-mail.  It was not

20  my style to write memos or -- I'm not saying

21  there's not things in my handwriting, but

22  there's certainly orders, there's regulations.

23  The things that I wrote tend to be formal

24  documents.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Certainly you received memoranda

2   for those who reported to you, correct?

3      A.   Of course.  You asked me what I

4   wrote.  My style was not to write a lot except

5   official documents.

6      Q.   You received communications during

7   your time at FDA, correct?

8      A.   Of course, sir.

9      Q.   And those included written

10  communications?

11     A.   Of course, sir.

12     Q.   And did that include e-mail, after

13  e-mail was available to you at the FDA?

14     A.   You know, you're pushing my memory.

15     Q.   Fair.

16     A.   It was '97 when I left.  I think

17  there may be a little, but it's nothing like it

18  was today, sir.

19     Q.   Did you receive internal FDA

20  presentations during your time at FDA?

21     A.   Many of those.  Not only -- I had

22  presentations -- as they say in Washington,

23  briefings about briefings.

24     Q.   Fair.  Is it -- and you'd agree

Highly Confidential - Subject to Further Confidentiality Review

1    that not every internal FDA memoranda that

2    you -- memorandum that you received reflects

3    the final position of FDA, correct?

4                MR. RAFFERTY:  Object to the form.

5         A.    The memorandum reflects what it

6    reflects.

7         Q.    And you would agree that not every

8    memorandum you received at FDA reflects the

9    final position of FDA on the issue described in

10   the memorandum, correct?

11               MR. RAFFERTY:  Object to the form.

12        A.    If you can clarify what you mean by

13   "final position."

14        Q.    Does FDA take final positions on

15   issues?

16        A.    FDA -- there's a legal component to

17   that, right, of what is a final agency action.

18   That's why I'm trying to just be careful.

19   That's a legal term because of -- you know,

20   there's a complexity to final agency action and

21   what that means.

22        Q.    A single memorandum to you would

23   not reflect FDA's position on an issue,

24   correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.   Depends on the memorandum.  It

2    could or it could not.

3    Q.   Well, it would be improper to

4    assume that a single memorandum to you

5    necessarily reflects FDA's final position,

6    correct?

7    A.   If it were a memorandum from the

8    President of the United States, it probably may

9    be the final agency action.  It depends on the

10   memo, sir.

11   Q.   I agree with that.

12        Let's say it's a memorandum from

13   someone several, several layers below you at

14   FDA informing you about a particular issue.  It

15   would be improper to assume that a memorandum

16   of that type reflects FDA's final position on

17   that issue, correct?

18   A.   Not necessarily.

19        MR. RAFFERTY:  Object to the form.

20   A.   It depends.  Happy to explain.

21   Q.   Does every memorandum you received

22   at FDA reflect the final position of FDA?

23   A.   Not necessarily, no.

24   Q.   That's a no, right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Not necessarily.

2    Q.    Dr. Kessler, when FDA approves --

3    you're familiar with what a New Drug

4    Application is?

5    A.    Yes.

6    Q.    And does FDA from time to time

7    approve New Drug Applications?

8    A.    Correct.

9    Q.    And when FDA approves a New Drug

10   Application, that's based on review of that New

11   Drug Application, correct?

12   A.    Correct.

13   Q.    And it's based on review of

14   everything in that New Drug Application,

15   correct?

16   A.    I wouldn't agree with that

17   statement.

18   Q.    FDA -- is it your testimony that

19   FDA approved New Drug Applications without

20   reviewing the complete New Drug Application?

21   A.    FDA does not necessarily review

22   every page out of millions and millions of

23   pages.  That would be folly if you thought FDA

24   had those resources.  I'm happy to explain.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   There's information -- I just want

2    to make sure your testimony is clear.  It's

3    your position that there's information

4    contained in New Drug Applications that FDA

5    ignores?

6         A.   I didn't say that.

7              MR. RAFFERTY:  Object to the form.

8         Q.   Well, you certainly said there's

9    information contained in New Drug Applications

10   that FDA doesn't review, right?

11        A.   That's what -- exactly what I said.

12   I didn't say they ignore it.

13        Q.   What's the difference between not

14   reviewing and ignoring?

15        A.   One is -- one is a -- they're

16   different words, sir.  I mean, they imply

17   different things.  And I'm happy to explain

18   that, if you'd like.  Reviewing -- a

19   reviewer -- let me step back so I can put

20   this -- answer your question more broadly.

21             As you know, when I went to

22   hearings, they would make fun of FDA sometimes,

23   a member of Congress, by just bringing in a New

24   Drug Application to show how vast it is.  It

Highly Confidential - Subject to Further Confidentiality Review

1    would fill this room.

2              The information is available, and

3    when I was there it became electronic, right,

4    so you can search it, right.  You have it

5    available.

6              It's not that you -- there's

7    limited resources.  So FDA can review things.

8    Doesn't -- does not -- ignore, to your point,

9    has a deliberate component, right.  FDA reviews

10   to the best of its resources and its ability

11   and what it thinks is salient.  Doesn't

12   deliberately ignore.  But no one -- no one

13   thinks that every page is reviewed.

14        Q.   Are submissions to FDA of

15   promotional pieces for review as voluminous as

16   New Drug Applications?

17        A.   I don't think so.  I mean,

18   depending on the size of the NDA.  There are

19   short NDAs, and again, what you mean by an NDA.

20   There's a whole range of NDAs.  In general, I

21   would not think so.

22        Q.   And when FDA reviews a promotional

23   piece, it reviews the entire submission,

24   correct?

Highly Confidential - Subject to Further Confidentiality Review

1          A.   I wish.

2               MR. RAFFERTY:  Object to the form.

3          Q.   So again, your position is, when

4    FDA receives a submission of a promotional

5    piece -- launch promotional pieces to review,

6    it doesn't review the entire submission?

7          A.   It depends on the resources the

8    agency has available, and again, what the

9    reviewer thinks is salient.

10         Q.   If FDA had sufficient resources,

11   you would agree that the best course of action

12   would be for FDA to review the entire

13   submission, correct?

14         A.   No.  I would -- would you like me

15   to explain?

16         Q.   The best course -- if resources

17   were not an issue, you don't believe that the

18   best course of action would be for FDA to

19   review the complete submission of a promotional

20   piece?

21              MR. RAFFERTY:  Object to the form.

22         A.   The agency has to focus -- even if

23   it had endless resources, right, the agency has

24   to focus on the public -- what's important for

Highly Confidential - Subject to Further Confidentiality Review

1   the public health and what's important for

2   safety.  Even if you had umpteen resources,

3   right, you focus on what's -- what you think is

4   important, right.  I think that's --

5       Q.   Again, I'm taking resources out of

6   the equation, okay?  FDA has infinite

7   resources.  There's no need to focus.  FDA can

8   look at everything.

9            The best course in that situation

10  would be for FDA to review the complete

11  submission, correct?

12           MR. RAFFERTY:  Object to the form.

13      A.   There aren't enough people -- I

14  mean, there are not enough people, right.  Even

15  if you had unlimited dollars, there's not

16  enough talent, right, to be able to focus on

17  everything, just -- I'm having -- trying to

18  comprehend the universe that you're living in

19  or you're trying to -- making a hypothetical.

20  I apologize.  I just don't understand that.

21      Q.   I'm trying to identify what you

22  believe to be the best-case scenario with

23  respect to -- let's go back to NDAs for a

24  second.  I'm trying to identify the best-case

1  scenario in your mind for review of a New Drug

2  Application.

3              You would agree that the best-case

4  scenario, putting resources aside, would be for

5  FDA to review the entire New Drug Application

6  before it approves that NDA, correct?

7       A.   I would not make that -- I would

8  not testify to -- in those words in front of

9  Congress.  I don't think that would be -- if

10 there's 50 million pages, I don't believe it

11 would -- putting an eyeball against every line

12 of those 50 million pages would be the best

13 scenario.  I think that would be folly to be

14 the basis to review 50 million pages.

15      Q.   Let me make sure this is clear.

16           As the former FDA Commissioner,

17 your position is that the best-case scenario

18 for FDA would not be to review a complete New

19 Drug Application prior to its approval?

20      A.   That's --

21           MR. RAFFERTY:  Object to the form.

22      A.   That's not what I testified.

23 That's not what I said previously.  I'm happy

24 to explain.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Well, if you didn't say that your

2  position is that the best-case scenario for FDA

3  would not be to review a complete New Drug

4  Application prior to its approval, that means

5  that the best-case scenario for FDA would be to

6  review a complete New Drug Application prior to

7  its approval.

8            MR. RAFFERTY:  Object to the form.

9    Q.   It either is or isn't the best-case

10  scenario.

11            MR. RAFFERTY:  Object to the form.

12    A.   It's certainly -- if you want to

13  make a general statement that -- about

14  complete -- reviewing a complete, sure, but

15  that should not be interpreted as an eyeball

16  against every single line.  Just means what you

17  mean by review of complete, sir.

18    Q.   Are you familiar with Percocet,

19  Dr. Kessler?

20    A.   I am.

21    Q.   And Percocet was an approved

22  medication and was on the market when you were

23  the Commissioner at the FDA; is that correct?

24    A.   That is correct.

1    Q.   And you didn't have any direct

2    personal involvement with Percocet when you

3    were the Commissioner at FDA, correct?

4    A.   Not to my knowledge, sir.

5    Q.   With respect to Endo, Dr. Kessler,

6    the opinions you're offering in this litigation

7    are limited to two Endo medications, Percocet

8    and Opana ER, correct?

9    A.   I think that's correct.  I'm just

10   trying to make sure there's nothing on the

11   generic side.  But -- so I just have to put an

12   asterisk to double-check that.  But I think

13   you're correct.

14   Q.   What would you need to do to

15   double-check that?

16   A.   I just want to review the report,

17   because there's -- obviously there's the issue

18   of branded generics, and I just would want to

19   review my report.

20        But I think, in essence, you're

21   correct.  That's certainly what I'm focused on.

22   Q.   If you could at the break confirm

23   that you're correct that the only two Endo

24   products for which you offer an opinion are

1  Percocet and Opana ER, I'd appreciate that.

2      A.   Happy to do that, sir.

3      Q.   You're not offering any opinions

4  with respect to Par Pharmaceutical, are you,

5  Dr. Kessler?

6      A.   So the record can be -- correct.

7  I'm focused on the history -- on drugs.

8  There's a lot of manufacturers.  So only to the

9  extent if there's a drug, Percocet or Opana,

10 so -- corporate histories sometimes get

11 complicated, and I may not be fully cognizant

12 of all corporate history, but -- in general.

13          So we can stay to what drugs I'm

14 issuing an opinion on.  I'm happy to do that.

15 Corporations become complicated in this current

16 world.

17     Q.   Are you familiar with

18 Qualitest Pharmaceuticals?

19     A.   Yes.

20     Q.   Are you offering any opinions with

21 respect to Qualitest?

22     A.   There's nothing, I believe, in my

23 report.  But if you ask me questions, I'm happy

24 to discuss it.

1        Q.   I'd like to talk with you,

2   Dr. Kessler, about your opinions regarding

3   Endo's promotion of Percocet.

4        A.   Yes, sir.

5        Q.   Do you have your Exhibit 1 of your

6   report in front of you?

7        A.   I have my copy, sir.

8        Q.   Your version of your report in

9   front of you?

10        A.   Happy to pull it up.

11        Q.   And just so the record is clear, I

12   think your report has been marked as Exhibit 1

13   already.

14        A.   I'm sure.

15        Q.   We can work both off our own copies

16   here, which may be more efficient.

17        A.   Thank you.

18        Q.   On page 110 of your report --

19        A.   Can I just get there, please.

20        Q.   Uh-huh.

21        A.   Thank you, sir.

22        Q.   Specifically paragraphs 191 and

23   192, please.

24        A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   You offer an opinion regarding

2  Endo's marketing strategy for Percocet,

3  correct?

4    A.   I'm sorry.  I didn't hear your

5  question.

6    Q.   You offer an opinion regarding

7  Endo's marketing strategy for Percocet,

8  correct?

9    A.   Not -- in those paragraphs?  I'm

10  sorry.  I'm confused.

11    Q.   Do you offer an opinion regarding

12  Endo's marketing strategy for Percocet?

13    A.   Yes.  I don't think in that

14  paragraph.  That's what I'm confused.

15    Q.   In paragraphs 191 and 192, you cite

16  to two Endo business and marketing plans,

17  correct?

18    A.   Yes, sir.

19    Q.   And both of those plans are from

20  the year 2002, correct?

21         THE WITNESS:  Gerard, can you do me

22      a favor and just pull the binder for 191

23      and 192, please.

24         Unless you have the documents.

1    Thank you.

2    A.    So the second document is dated

3    April 25th, 2002.  And I would need to go back

4    and check the metadata on one unless I cite it

5    here on 346.  The document I cite in 346, I

6    just have the native, and I don't have a date.

7    I apologize.

8    Q.    Doctor, you're about to lose your

9    microphone.

10    A.    Thank you, sir.

11    Q.    You don't know whether either of

12    those business plans were final business plans,

13    do you?

14    A.    I only know the words on the

15    documents as they're stated.

16    Q.    Yes or no, you don't know whether

17    those two documents are -- those two business

18    plans are final business plans?

19    A.    The documents don't, on the face of

20    them, state one way or the other.

21    Q.    So you don't know whether those are

22    final business plans, correct?

23    A.    The documents don't state one way

24    or the other.

1    Q.    Which means you don't know whether

2    those are final business plans, correct?

3    A.    I only know what the documents

4    state.

5    Q.    And you've said that the documents

6    don't say whether they're final, which means

7    you don't know whether those are final

8    marketing plans?

9         MR. RAFFERTY:  Object to the form,

10        asked and answered.

11   Q.    Correct?

12   A.    I know what the documents state.  I

13   can go back and review them in broader context

14   to get that answer, if you'd like.

15   Q.    Well, you just said the documents

16   don't state whether they're final or not, so

17   reviewing them is not going to give you an

18   answer to the question, right?  You're not

19   going to know the answer to whether or not

20   those documents are final whether you review

21   them again or not, right?

22        MR. RAFFERTY:  Object to the form.

23   A.    That's certainly knowable by

24   reviewing a database.  I review a lot of

Highly Confidential - Subject to Further Confidentiality Review

1   business plans, and I -- you can see from

2   context.  You can see from versions.  There are

3   a lot of ways to determine the answer to your

4   question.  I'm happy to do more research to get

5   the answer to your question.

6           Q.   You've not done that with respect

7   to those two documents, correct?

8           A.   I have read those documents.

9   That's what I've done with regard to those

10  documents.

11          Q.   But not sufficiently to know right

12  now whether those are final marketing plans or

13  not, correct?

14          A.   I have read those documents to

15  determine -- your question of what's sufficient

16  or not, I'd have to do more research to answer

17  your question.

18          Q.   You don't know the answer to my

19  question is what you're saying, right?  You

20  don't know whether those are final documents or

21  not?

22          A.   I only know what those documents

23  say.

24               MR. RAFFERTY:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1            A.    I can't say any more.

2            Q.    This will go a bit more efficiently

3      if you can just give me a straight answer to my

4      question.   These are not complicated questions.

5                  So this is the same problem that we

6      ran into yesterday.   It's the same problem that

7      I believe we're all going to face.   And it's

8      the same problem that's prejudicing both my

9      client and many of the other co-defendants here

10     today.   We're wasting time on answers that are

11     not strictly responsive to the questions that

12     we're asking.

13                 I would appreciate it, Dr. Kessler,

14     if you could give me a succinct, responsive

15     answer to my questions going forward.   That

16     will make things far more efficient and will

17     lessen the prejudice that my client is

18     experiencing with the time that we have

19     available together and will lessen the

20     prejudice to my co-defendants and my colleagues

21     for the time that they have available.   I'd

22     appreciate that.

23                 MR. RAFFERTY:  What we're wasting

24           time on is giving speeches that are

1           inappropriate under the protocol and

2           that are, quite frankly, incorrect.  He

3           has answered succinctly all of your

4           questions so far this morning.  So ask

5           your questions, and he will continue to

6           answer them.

7       Q.   Dr. Kessler, on page -- actually,

8   you know what, sticking with those two business

9   plans, you don't know whether those business

10  plans were ever presented to anyone, do you?

11      A.   I only know what's in these, so

12  obviously right now I'd have to go do more

13  research to see the audience.

14      Q.   See, that's a no.  If you answer

15  that --

16           MR. RAFFERTY:  It's not a no, and

17           you're not going to instruct this

18           witness on how to answer a question,

19           Mr. Davis.  It's not going to happen.

20           Ask him the questions.

21           He just said he would have to go

22           get more research.  You can take

23           whatever you want.  Ask the questions;

24           he'll give you the answer.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MR. DAVIS:  I'm asking whether he
 2       knows it, and when he says, I would have
 3       to go do more research, that is a no.
 4       That means he doesn't know, Troy.
 5            MR. RAFFERTY:  No, the answer is
 6       whatever the answer is that he gives,
 7       Mr. Davis, so --
 8            MR. DAVIS:  I think you've had this
 9       conversation off the record with my
10       co-counsel yesterday.  You saw what
11       Special Master Cohen said during the
12       Eagleman deposition about our
13       entitlement to yes or no answers to
14       questions that call for yes or no
15       answers.  I'm simply asking that
16       Dr. Kessler provide a yes or no answer
17       to yes or no questions.
18            MR. RAFFERTY:  He has given you the
19       answer that you've -- to the questions
20       that you've asked.  And I don't know
21       what context was going on with Eagleman,
22       but I can tell you that Dr. Kessler has
23       been answering and been responsive to
24       everybody's questions.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. DAVIS:  Okay.  Well, I can tell
 2          you if this continues, then we're going
 3          to do our best to get Special Master
 4          Cohen on the phone to give the same
 5          directive that he's given in other
 6          contexts.
 7              MR. RAFFERTY:  I have no problem
 8          with that, and I think a clear reading
 9          of this record will show that
10          Dr. Kessler has been more than
11          responsive.
12          Q.   Dr. Kessler, you don't know to
13     whom, if anyone, those presentations were made,
14     right, the two presentations we've been talking
15     cited in paragraphs -- or referred to in
16     paragraphs 191 and 192 of your report?
17          A.   You're correct, those documents
18     don't reflect that.
19          Q.   And so you don't know that then?
20          A.   I know what -- that's correct.  I
21     know what's on these documents.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13    Q.    Who is Ms. Kitlinski?

14    A.    Just give me one second.  I'd have

15  to go back and double-check exactly her title.

16    Q.    As you sit here today, you don't

17  know who Ms. Kitlinski is, right?

18    A.    I -- I'd have to go back and

19  review.  I don't -- I don't have it at the top

20  of my head.  I don't have it -- let me -- let

21  me just double-check that.  Hold on one second.

22    Q.    What are you using to double-check

23  who Ms. Kitlinski is?

24    A.    I just want to check my report for

Highly Confidential - Subject to Further Confidentiality Review

1   a second, please.

2          Q.   Is Ms. Kitlinski -- was

3   Ms. Kitlinski in 1998 the CEO of Endo?

4          A.   I don't have that in my -- I don't

5   have that in my head right now.

6          Q.   Was Ms. Kitlinski the chairman of

7   the board of directors of Endo at that -- in

8   1998?

9          A.   I don't believe so, but I -- again,

10  let me see if I can --

11         Q.   Was Ms. Kitlinski the president of

12  Endo in 1998?

13         A.   I don't believe so, but again, I

14  don't -- let me just see if I have -- I have a

15  chart of all titles, and I'm just -- just give

16  me a second, if I can see if I can find it.

17  Just give me one more second, please.

18              I don't have the -- actually, I

19  have the deposition.  I can find it.  But I

20  don't --

21         Q.   Do you know whether Ms. Kitlinski

22  was deposed?

23         A.   Yes.

24         Q.   Did you read the entirety of her

Highly Confidential - Subject to Further Confidentiality Review

1    deposition transcript?

2         A.   No, I did not.  I searched -- it

3    was part of my search.

23        Q.   You don't know?

24        A.   I only know what this document

Highly Confidential - Subject to Further Confidentiality Review

1    reflects as far as goals and objectives, and

2    she was an Endo employee.

3          Q.   Okay.  And again, you're not

4    offering any -- any opinion as to what

5    Ms. Kitlinski actually meant by any of the

6    words in this document, correct?

7          A.   The words speak for themselves.

8    I'm not -- I'm not going beyond the words, sir.

9          Q.   You don't know whether

10   Ms. Kitlinski's goals and objectives extended

11   beyond this -- the middle of 1998, correct?

12               MR. RAFFERTY:  Object to the form.

13         A.   I only -- that would be fair.

14   There would be mid-year goals.  Goals usually

15   reflect a period of time.

16         Q.   And this period of time is the

17   middle of 1998, right?

18         A.   That's fair.

19         Q.   Okay.  Dr. Kessler, you're -- you

20   understand that there -- do you understand

21   there's a difference between promotional and

22   non-promotional education?

23         A.   I think I can --

24         Q.   Strike that.  Dr. Kessler, in

Highly Confidential - Subject to Further Confidentiality Review

1  paragraph 194.2 --

2        A.   Let me get there, please.

3        Q.   -- you again -- in support of your

4  opinion that Endo's promotional plans for

5  Percocet included using medical education to

6  market Percocet, you generally cite 1998

7  objectives from Ms. Kessler -- from

8  Ms. Kitlinski?  I apologize.

9        A.   In 194.2?

10       Q.   That's right.  Just so you have it

11  in front of you, I show you what's been marked

12  as Kessler 13.

13            (Exhibit Kessler-13 marked for

14            identification and attached to the

15            transcript.)

16  BY MR. DAVIS:

17       Q.   This is the document cited in

18  paragraph 194.2.

19            MR. RAFFERTY:  Mr. Davis, I think

20       you just misspoke.  You said 1998.

21            MR. DAVIS:  Oh, I'm sorry, 19- --

22            MR. RAFFERTY:  I think you mean

23       1999.

24            MR. DAVIS:  That's right, thank

Highly Confidential - Subject to Further Confidentiality Review

1    you.  1999.

2           Q.   And again, these are

3    Ms. Kitlinski's objectives for 1999, right?

4           MR. RAFFERTY:  Object to the form.

5           A.   Yes.

6           Q.   Okay.  You don't know whether she

7    achieved any of these objectives, do you?

8           A.   I only know these are the

9    objectives, sir.

10          Q.   Okay.  You don't know whether these

11   objectives are the same as Endo's corporate

12   objectives, correct?

13          A.   Give me a second, if I can just

14   review this for a second.

15               These would appear to be consistent

16   with the corporate goals.

17          Q.   What's the basis of your opinion

18   that these are consistent with the corporate

19   goals?

20          A.   I've seen, for example, statements

21   by -- and I have to match up dates -- but, for

22   example, Carol Ammon talking about the

23   corporate strategy of Endo, has said publicly

24   that getting physicians to be acquainted with

1    our products, but more importantly, it's

2    getting physicians who are thought leaders that

3    would not only talk about our products, but

4    would really start to move the whole market

5    towards a change in pain management.  That was

6    articulated as one of the major corporate goals

7    and strategies by I believe the CEO at the

8    time.

9              And certainly in a number of the

10   bullets that I am reviewing on this document,

11   these seem to match up.  I'm happy to go into

12   more detail about some of these bullets if

13   you'd like.

14         Q.   What are you reading from there,

15   Dr. Kessler?

16         A.   That is a transcript of a public

17   statement by Ms. Ammon.

18         Q.   Is that part of your reliance

19   materials?

20         A.   I'm sure -- I'm sure that is in my

21   report at some point.  It's publicly available

22   on YouTube.  You can go watch it.

23         Q.   And that whole sheet that you're

24   looking at, what is that?  Did you prepare that

Highly Confidential - Subject to Further Confidentiality Review

1    yourself?

2         A.   Yes.  This is mine.  I did ask

3    someone to type -- to sit there in front of the

4    YouTube as I was listening to the -- to the

5    video, so that I didn't type that.  This is

6    your document.  This is all my handwriting.

7              MR. DAVIS:  I believe this request

8         was made yesterday.  But to the extent

9         that Dr. Kessler is going to be relying

10        on documents in front of him during the

11        course of his testimony, I think it's

12        improper for him to do that without

13        those documents having been provided to

14        us.

15             MR. RAFFERTY:  I believe they're

16        all on -- they're all on the reliance

17        list.

18             MR. DAVIS:  His handwriting is all

19        on the reliance list?

20             MR. RAFFERTY:  You can get his

21        notes, but there's nothing wrong with

22        him making notes and relying upon it.

23        You can get copies of them.

24             MR. DAVIS:  That's my request, and

1    I think it was made yesterday.  I think

2    it's improper for us not to have them in

3    advance of the deposition.

4        MR. RAFFERTY:  Well, I disagree.

5    He can make whatever notes he wants and

6    bring them in, and you're entitled to

7    have them, but there's no rule that says

8    you can get them, you know, days in

9    advance, his notes, I mean --

10       MR. DAVIS:  Well, we can take up

11   that discussion later on.  But I'll

12   renew the request that we get copies of

13   the notes that Dr. Kessler is relying on

14   during the course of his testimony.

15       MR. RAFFERTY:  You're more than

16   welcome to.

17       MS. FREIWALD:  May we --

18       MR. DAVIS:  I think the request is,

19   correct me if I'm wrong, that we

20   actually mark these notes as an exhibit.

21   I think we've got a sticker here that we

22   can use to do that.  So we can mark at

23   least these right now as Kessler-14.

24       THE WITNESS:  Tell me where you'd

Highly Confidential - Subject to Further Confidentiality Review

1    like me to put it this.

2         MR. DAVIS:  You can put it on a

3    place that's not going to obstruct

4    that --

5         THE WITNESS:  Thank you, sir.

6         MR. RAFFERTY:  You should put it on

7    whatever the front page is.  Oh, there

8    it is.  Okay.

9         (Reporter interruption.)

10        (Exhibit Kessler-14 marked for

11   identification and attached to the

12   transcript.)

13        MS. FREIWALD:  Get the whole stack.

14        MR. DAVIS:  That's the Endo stack.

15   I think maybe when we go on a break, we

16   can sort of figure out marking the whole

17   and we can introduce them in the next

18   one.

19        MS. FREIWALD:  Yes.

20   BY MR. DAVIS:

21        Q.   All right.  So Ms. Ammon's -- the

22   testimony for -- or the commentary from

23   Ms. Ammon that you just read doesn't include

24   every single bullet point here in

Highly Confidential - Subject to Further Confidentiality Review

1    Ms. Kitlinski's 1999 objectives, correct?

2         A.   She doesn't --

3         Q.   Right?

4         A.   Well --

5         Q.   It's a really easy yes or no.

6         A.   Give me a second.  Let me read

7    every bullet point and then answer your

8    question.

9         Q.   Dr. Kessler, look at the quote on

10   the page from Carol Ammon.  Does that look

11   anything like all of the bullet points in the

12   exhibit that you're filibustering and reading

13   right now?

14             MR. RAFFERTY:  There's no

15        filibustering.  You asked him about

16        whether or not the quote is contained in

17        it.  It certainly could be contained as

18        a summary in it.  It could be -- he's

19        got a right to read the document you're

20        asking him about.

21        A.   Let me tell you the question --

22   what I need to determine.  I need to know

23   whether all these -- every bullet here is

24   encompassed by Ms. Ammon's -- that's what I

1    would look to to determine --

2         Q.   That's not my question,

3    Dr. Kessler.

4              MR. RAFFERTY:  That was your

5         question.

6              MR. DAVIS:  It was not my question.

7         Q.   Is every single bullet point in

8    Ms. Kitlinski's 1999 objectives included -- the

9    bullet points included in the quote you read

10   from Ms. Ammon?

11        A.   Is it encompassed -- when you say

12   "included," I'm sorry --

13        Q.   I said "included," "specifically

14   included."  Not "encompassed" but "specifically

15   included."

16        A.   The concept?

17        Q.   No, the specific bullet points.

18   Are these specific bullet points --

19        A.   The exact words?

20        Q.   Yes.  The specific bullet points,

21   are they in that quote from Ms. Ammon?

22        A.   These words are not the exact

23   same --

24        Q.   Thank you.

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.    -- as Ms. Ammon's.

2              MR. WEINBERGER:  There's no reason

3        to get upset.  Everybody can be civil.

4              MR. DAVIS:  Pete, enough.  Why are

5        you here?

6              MR. WEINBERGER:  Why am I here?

7              MR. RAFFERTY:  Wow, are you kidding

8        me?

9              MS. AMINOLROAYA:  Getting

10       (inaudible), Josh.  Can't control

11       yourself.

12             THE WITNESS:  Do me a favor,

13       please.  When counsel is -- call me back

14       in the room when people are not --

15             MR. DAVIS:  We can go off the

16       record if there's any discussion you

17       want to have.

18             THE WITNESS:  Please have this off

19       the record.

20             VIDEO OPERATOR:  8:45, we are off

21       the video record.

22             (Recess from 8:45 a.m. until

23       8:52 a.m.)

24             VIDEO OPERATOR:  8:52, we are on
```

Highly Confidential - Subject to Further Confidentiality Review



1          the video record.

2     BY MR. DAVIS:

Highly Confidential - Subject to Further Confidentiality Review





█

2         A.    Can you give me a copy?  That would

3    be great.

4         Q.    It's on your report.

5               THE WITNESS:  Gerard, can I have my

6         book?

7         Q.    I'm not going to ask you about the

8    substance of the piece --

9         A.    Okay.

10        Q.    -- Dr. Kessler.

11        A.    Thank you.

12        Q.    So you don't know, Dr. Kessler,

13   whether this promotional piece was -- you don't

14   have any evidence that this promotional piece

15   was shown to any prescriber in Cuyahoga or

16   Summit County, Ohio, correct?

17        A.    Sitting here today, I don't -- I

18   don't know the -- the -- it's 200.3?  I just

19   want to see the piece, if I may.

20        Q.    What is looking at the piece,

21   Dr. Kessler, going to tell you about whether it

22   was shown to any doctor in Cuyahoga or Summit

23   County?

24        A.    There's certain piece --

Highly Confidential - Subject to Further Confidentiality Review

```
1          MR. RAFFERTY:  He's entitled to
2      look at the document.
3          MR. DAVIS:  I just asked him a
4      question.
5          MR. RAFFERTY:  I'm objecting
6      because the witness is entitled to look
7      at a document you're asking him about.
8      Q.   What is looking at the promotional
9  piece -- again, Dr. Kessler, what is looking at
10  the promotional piece going to tell you about
11  whether it was shown to any doctor in Cuyahoga
12  or Summit County?
13      A.   I'm interested whether it was a
14  homemade piece or whether it was a national
15  piece, and that could affect my appraisal of
16  that answer.
```

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

2          Q.   And again, you're aware that

3    Opana ER was approved in 2006, correct?

4          A.   That's correct.

5          Q.   So at least this portion of your

6    opinion regarding Endo's marketing strategy for

7    Opana ER is based upon documents created four

8    years before the launch of the product?

9          A.   Let me just check.

10         These -- that's correct with regard

11   to these -- with regard to these paragraphs.

12         Q.   Okay.

13         A.   And Ms. Kitlinski's title is on

14   216.2.  I just didn't remember it.

15         Q.   Again, there you cite e-mail

16   correspondence from Ms. Kitlinski from 2003,

17   correct?

18         A.   That's exactly correct.

19         Q.   And additional correspondence

20   from -- in paragraph 216.5, correspondence from

21   Vin Tormo from 2003, correct?

22         A.   That's exactly what I cite.

23         Q.   And those e-mails were three

24   years -- dated three years prior to the launch

1    of Opana ER, correct?

2          A.    That's exactly when these e-mails

3    are dated.

4          Q.    So at least this portion of your

5    opinion --

6          A.    Hold on a second.  My microphone

7    disappeared.  I apologize.  Sorry.  I

8    apologize.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1    Q.   You've not reviewed all of the

2    correspondence with FDA regarding the removal

3    of Numorphan from the market, have you?

4    A.   I've read some of the history of

5    it.  I wouldn't want to represent that I've

6    looked at everything.  I'm not sure the record

7    has everything.

8    Q.   You weren't at the FDA when

9    Numorphan was withdrawn from the market,

10   correct?

11   A.   I don't believe so.

12   Q.   You can't speak to the specific

13   circumstances regarding the withdrawal of

14   Numorphan from the market, can you?

15   A.   Did you say -- sure.  There was

16   very significant concerns about abuse.  I'm not

17   sure I'm missing -- this was a very highly

18   potent product that was being extensively

19   abused.  One of the most potent compounds known

20   to man.

Highly Confidential - Subject to Further Confidentiality Review



12          Q.    Is your knowledge about the

13  withdrawal of Numorphan based on anything not

14  cited in your report or your reliance

15  materials?

16          A.    Maybe my general knowledge -- my

17  general education.

18          Q.    You're aware, Dr. Kessler, that

19  since its launch in 2006, Opana ER has

20  always -- the label for Opana ER has always

21  contained a black box warning?

22          A.    I believe so, yes, of course.

23          Q.    And the black box warning indicated

24  that Opana ER contained oxymorphone?

1          A.    If you can show me the black box

2    warning.  But of course, it -- I mean, I'm

3    sure -- I just want to make sure what's in the

4    black box warning as opposed to what's next to

5    the black box warning.  But I'm pretty sure

6    that's correct.

7          Q.    Dr. Kessler, I realize the label

8    for Opana, like other opioid products, has

9    changed over time.

10               (Exhibit Kessler-15 marked for

11               identification and attached to the

12               transcript.)

13   BY MR. DAVIS:

14         Q.    I'm showing you what's been marked

15   Kessler-15.  This is the Opana ER -- this is

16   the Opana ER label from 2009.

17         A.    Thank you, sir.

18         Q.    And you can see there that the

19   black box warning reads, Opana ER contains

20   oxymorphone, correct?

21         A.    That's exactly what it says.

22         Q.    With an abuse liability similar to

23   other opioid analgesics, correct?

24         A.    Correct.

1    Q.    Oxymorphone can be abused in a

2  manner similar to other opioid agonists,

3  correct?

4    A.    You read it correctly.

5    Q.    Legal or illicit, correct?

6    A.    Correct.

7    Q.    You're aware that all of Endo's

8  promotional materials for Opana ER contain the

9  black box warning, correct, for Opana ER?

10    MR. RAFFERTY:  Object to the form.

11    A.    I don't -- I don't -- depend on how

12  you define "materials."

13    Q.    You've not reviewed every single

14  Opana ER promotional piece, have you?

15    A.    No.  I don't think any -- no.  I

16  don't think -- I think that would be a fair

17  statement.

18    Q.    In fact, you cite five Opana ER

19  promotional pieces in your report, correct?

20    A.    I'd have to go back and check.  I

21  don't know -- I haven't counted it up.

22    Q.    I can represent to you that there

23  are five Opana ER promotional pieces cited in

24  your report.

1          Are you aware, Dr. Kessler, that

2   there are thousands of Opana ER promotional

3   pieces?

4          A.   I'm sure that -- I'm aware there's

5   numerous ones.  I don't know the exact number.

6          Q.   And of those thousands, you cite

7   only five in your report, correct?

8          A.   I cite what I cite, and I reviewed

9   what's on my reliance list.

Highly Confidential - Subject to Further Confidentiality Review



18      Q.    And doctors' perceptions can be

19  based on any number of things, correct?

20      A.    Yeah, I'm not sure that's exactly

21  correct.  I mean, they certainly can be

22  affected by a number of things.

23      Q.    Doctors get information from places

24  other than pharmaceutical promotional

Highly Confidential - Subject to Further Confidentiality Review

1    marketing, correct?

2              MR. RAFFERTY:  Object to the form.

3         A.    They can.

4         Q.    And they do?

5              MR. RAFFERTY:  Object to the form.

6         A.    Depends.  We don't know in any

7    specific instance.  You'd have to be more

8    specific.



20      Q.   FDA doesn't provide comment on

21 every single piece it reviews, correct?

22      A.   Your point is exactly -- in fact,

23 what you see is, there's umpteen things that

24 are sent in.  FDA doesn't have the resources.

Highly Confidential - Subject to Further Confidentiality Review



1    In fact, at this time, there were very limited
2    resources, and there are only a handful of
3    reviewers.  So that's impossible.

Highly Confidential - Subject to Further Confidentiality Review



20          Q.    Were you the head of DDMAC during

21    your time as head of FDA, Dr. Kessler?

22                MR. RAFFERTY:  Object to the form.

23          This was all gone over.

24                You can answer.

1        A.    DDMAC reported to me.

2        Q.    You weren't the head of DDMAC

3   during your time at FDA, correct?

4              MR. RAFFERTY:  Object to the form.

5        A.    It reported to me.  Depends what

6   you mean by "head."  It had its director.  That

7   director reported to me.  And I was intimately

8   involved with that division.

9        Q.    Your title was never director of

10  DDMAC, was it?

11       A.    I was Commissioner of FDA.

12       Q.    Page 135 of your report,

13  paragraph 224.2, you refer to --

14       A.    I'm sorry.  224.2?

15       Q.    224.2.

16       A.    Yes.

17       Q.    Dr. Kessler, you testified that FDA

18  did not send a warning letter because it lacked

19  resources, correct?

20       A.    I think I testified that it did not

21  send a warning letter, period.  It lacked

22  resources, period.

23             And certainly on coupons, you

24  shouldn't downplay the risk of addiction,

Highly Confidential - Subject to Further Confidentiality Review

1  period.

2       Q.   So you don't know exactly why FDA

3  didn't send a warning letter with respect to

4  that piece or any piece?

5            And when I say "that piece," I mean

6  the promotional piece marked Kessler-16.

7       A.   We don't have a record to answer

8  your question.

9       Q.   Okay.  So anything you say is just

10  a guess about whether a warning letter -- why a

11  warning letter was not sent, correct?

12            MR. RAFFERTY:  Object to the form.

13       A.   No.  It's based on my experience,

14  and I've been there, and I know the resources,

15  and I know the reality.

16       Q.   But specifically, you don't know

17  why FDA did not send a warning letter with

18  respect to any particular piece, correct?

19            MR. RAFFERTY:  Object to the form,

20       asked and answered.

21       A.   Again, the record, I think, doesn't

22  reflect that with regard to this piece.

23       Q.   Or any particular piece that I've

24  put in front of you regarding Opana ER or

Highly Confidential - Subject to Further Confidentiality Review

1  Percocet, correct?

2          A.    I don't think we have the internal

3  FDA record here.

4          Q.    So you don't know exactly why FDA

5  did not send a warning letter or untitled

6  letter regarding any of those pieces I've put

7  in front of you?

8               MR. RAFFERTY:  Object to the form,

9          asked and answered.

10         Q.    The answer is?

11         A.    I believe I answered that question.

12         Q.    When?  Let me ask it again just so

13 the record is clear, because I got an objection

14 and no answer.

15              So you don't know exactly why FDA

16 did not send a warning letter or untitled

17 letter regarding any of the Opana or Percocet

18 pieces I've put in front of you?

19         A.    I don't know exactly why in this

20 instance.

21         Q.    Thank you.

22         A.    But -- I don't know exactly why in

23 this instance.

24              MR. RAFFERTY:  Are you done?

Highly Confidential - Subject to Further Confidentiality Review

1            THE WITNESS:  I'm not.  I could

2       expand.  But I'll be short.

3       Q.   On page 139 of your report,

4  paragraph 231.2 --

5            THE WITNESS:  Gerard, please.

6            MR. RAFFERTY:  I'm sorry.  What

7       paragraph?

8            MR. DAVIS:  231.2.

9            (Reporter interruption.)

10      A.   231.2?

11      Q.   Yes, please.

12      A.   Thank you, sir.  Just give me one

13  second.

14           Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review



9        Q.   And again, you're not aware of Endo

10  ever receiving any untitled letter or -- strike

11  that.

12            I want to talk a little bit,

13  Dr. Kessler, about the promotion of

14  reformulated Opana ER.

15            Are you familiar with reformulated

16  Opana ER?

17        A.   I do.  I am familiar.  Let me just

18  get it.

19        Q.   And in particular, in --

20            MR. RAFFERTY:  I'm sorry.  Are you

21        done with this?

22            MR. DAVIS:  Yes.

23        Q.   Paragraph 159 -- I'm sorry.

24  Paragraph 257 on page 159 of your report,

Highly Confidential - Subject to Further Confidentiality Review

1    Dr. Kessler.

2         A.    Paragraph 257?

3         Q.    Yes.

4               THE WITNESS:  Gerard, please.

5         A.    Yes, sir.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Are you familiar with Dr. Hertz?

2    A.   Sure.  I'm not sure I know her,

3    but --

4    Q.   Who is Dr. Hertz?

5    A.   Sharon Hertz.

6    Q.   And was she employed by the FDA at

7    any point?

8    A.   Yes.

9    Q.   Do you know what her role at FDA

10   was?

11   A.   She was, I believe, division

12   director at one point.

13   Q.   Okay.  And are you aware of

14   Dr. Hertz offering commentary on the

15   appropriateness of promotional comments

16   regarding the design or the intent of an

17   abuse-deterrent product?

18   A.   I'd have to --

19       MR. RAFFERTY:  Object to the form.

20   A.   I'd have to review her entire

21   record or comments.

22       MR. DAVIS:  So I'm going to mark

23       here as Exhibit 18 Endo's submission of

24       its reformulated Opana ER promotional

Highly Confidential - Subject to Further Confidentiality Review

1              materials.

2                   (Exhibit Kessler-18 marked for

3              identification and attached to the

4              transcript.)

5    BY MR. DAVIS:

6         Q.    This is just an excerpt.  We have

7    the complete -- oh, I'm sorry, Dr. Kessler.

8         A.    Thank you.

9         Q.    I have the complete submission, if

10   you think it would be helpful just for context,

11   but it's massive.

12        A.    Yeah, no, this is -- I appreciate

13   that.  Just give me one second, if I can.  Let

14   me just get oriented for a second.  Just give

15   me a second.

16              Sir, you handed me Kessler-18.

17        Q.    Yes.  And I want to point you --

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6         Q.    Okay.  You can set that aside.

7         A.    Can I just give -- I've taken this

8  out of order.  I apologize.  Can I give you

9  this?

10        Q.    We can fix that.

11        A.    I apologize.

12        Q.    That's no problem.

13        Dr. Kessler, your report cites to a

14  number of third-party materials ostensibly

15  funded by Endo, correct?

16        A.   We can -- I'm not sure the word

17  "ostensibly."  We have the funding.  We know

18  funding.  So those are -- so without that word,

19  yes.

20        Q.   Do you know -- did you review any

21  of the grant agreements by which Endo provided

22  the funding you describe in your report?

23        A.   I may have.  I'd have to go back

24  and review specifically.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    If you had, would it have been in

2  your reliance materials?

3      A.    If I relied on it -- I'm looking at

4  a lot of documents on the computer, so I don't

5  want to say the reliance looks at every

6  document that I looked at on the computer.

7  That's impossible.

8          But I was certainly searching for

9  and went through the NIPC, for example,

10  documents on the computer.  But the reliance

11  list should have the things that I'm relying

12  on.

13     Q.    You're familiar with the

14  Accreditation Council for Continuing Medical

15  Education, ACCME?

16     A.    Intimately, and happy to discuss

17  it.

18     Q.    And you're familiar with the ACCME

19  guidelines?

20     A.    And which ones?  What date?  Which

21  ones?

22     Q.    2002.

23     A.    If you want to give me them -- I

24  would appreciate if you'd give me those.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Can we talk about them at a general

2  level?

3        A.    Sure.

4        Q.    Would you agree -- when you said

5  you're intimately familiar with the ACCME --

6        A.    But I'm not familiar with --

7  there's different versions, and there's

8  different points in time in the history of

9  ACCME.

10       Q.    Are you aware of any point from

11  1998 on that the ACCME guidelines controlled --

12  permitted a donor to control the content of

13  continuing -- independent continuing medical

14  education?

15       A.    It's complicated.

16       Q.    Are you aware of any point in time

17  since 1998 where the ACCME guidelines permitted

18  the donor to have control over the content of

19  continuing medical education?

20       A.    Again, I think it's a complicated

21  answer to that question.

22             I think those guidelines, certainly

23  as interpreted -- as pharma did them, there

24  were different extensive control that -- again,

1   we can discuss whether they violated the policy

2   or not.  There's a lot of ways to exert

3   control.

4        Q.   Your report refers to NIPC?

5        A.   Yes.

6        Q.   Okay.  Are you aware of NIPC ever

7   losing ACCME accreditation?

8        A.   Sitting here today, I am not, top

9   of my head.  I don't give that any credence,

10  though.

11       Q.   Your report also refers to the

12  American Pain Society, APS, correct?

13       A.   Yes.

14       Q.   Are you aware of APS ever losing

15  its ACCME accreditation?

16       A.   I'm not.  But again, I don't give

17  that any credence.

18       Q.   Your report refers to AAPM.  You're

19  familiar with that organization?

20       A.   Yes.

21       Q.   That's the American Academy of Pain

22  Management; is that right?

23       A.   Yes, sir.

24       Q.   Okay.  Were you ever aware of AAPM

Highly Confidential - Subject to Further Confidentiality Review

1    ever losing its ACCME accreditation?

2          A.    Same answer.  I'm not, as I sit

3    here.  But again, I don't give it any credence.

4          Q.    Are you familiar with the American

5    Pain Foundation?

6          A.    Yes.

7          Q.    And you refer to that in your

8    report?

9          A.    I do.

10          Q.    Are you aware of APF, the American

11    Pain Foundation, ever losing its ACCME

12    accreditation?

13          A.    It certainly should have.

14          Q.    Did it?

15          A.    I'd have to go back and review the

16    record.

17          Q.    You're not aware of it ever

18    losing --

19          A.    Correct.

20          Q.    -- its ACCME --

21          A.    Correct.

22                It certainty should have.  I think

23    there's no question about that.

24          Q.    I just want to make sure I get this

1   question in before the answer.

2            You're not aware of APF ever losing

3   its ACCME accreditation, correct?

4       A.   That's correct, as I -- as I sit

5   here today, without further research.

6       Q.   Dr. Kessler, I think you testified

7   yesterday that you're not here as an expert in

8   DEA regulations.  Is that right?

9            MR. RAFFERTY:  Object to the form.

10      A.   The Court can determine what I have

11  expertise on, or others can determine what I

12  have expertise.

13           I probably have, you know --

14  certainly, as -- as it relates to DEA/FDA

15  interactions, I probably have a good deal of

16  expertise in that, and probably more so than

17  almost anyone, when comes to FDA/DEA.  I

18  certainly have it.

19           I think it's fair to say -- I

20  certainly hope that others will testify about

21  DEA.  I can help the Court, I mean, on things

22  that I do have expertise that relates to

23  controlled substances and the national

24  strategy, including DEA.

1        Q.   Which doesn't include suspicious

2    order monitoring?

3        A.   Well, there is suspicious order

4    monitoring of manufacturers, sir, that applies

5    to the manufacturers, and I think I'll leave

6    that primarily to others.

7             I certainly wouldn't talk to

8    distributors, but I'm happy to discuss a little

9    with regard to the manufacturers.

10       Q.   You're not an epidemiologist, are

11   you, Dr. Kessler?

12       A.   I'm a professor of epidemiology.

13       Q.   Dr. Kessler, yesterday -- and I

14   don't want to get into the specifics, but

15   yesterday, you referred to two instances where

16   companies with whom you were affiliated

17   addressed things that, I think as you described

18   it, were out of regulatory compliance.

19            Do you recall that testimony?

20       A.   Or potentially, yes.

21       Q.   And you cited to two particular

22   instances, correct?  Do you recall that?

23            Again, I don't need -- I'm not

24   going to ask you about the specifics, but do

1   you recall?

2          A.   Yes, I do.

3          Q.   And you testified that you worked

4   with the company to work through those issues,

5   correct?

6          A.   Yes.

7          Q.   Okay.  And you did so at the board

8   level; is that right?

9          A.   Yes.

10         Q.   Okay.  One of the issues --

11   compliance issues that you worked through was

12   identified externally.

13              Do you recall that?

14         A.   One had an external component.

15         Q.   Fair.

16              And the other was identified

17   internally, correct?

18         A.   Correct.

19              MR. RAFFERTY:  Objection.  This has

20         all been gone over and asked and

21         answered.

22         Q.   And you would agree that it was

23   important for those companies to work through

24   those compliance issues, correct?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Of course.

2        Q.    And to address those compliance

3    issues, correct?

4        A.    Of course.

5        Q.    And would that apply equally to any

6    regulatory compliance issue you, yourself, had

7    identified for those companies?  Correct?

8        A.    Sure.  Individual board members --

9    I'm not sitting there identifying individual

10   issues; I'm at a board level.  So it's a little

11   more complicated than -- you know.

12           I don't want to give you a sense

13   that I'm working as -- I mean, these are --

14   this is privately held -- you're familiar with

15   that -- and I'm on a board.  This is at a board

16   level.

17       Q.    Fair, Dr. Kessler.

18           I'm not suggesting that in your

19   role as a board member, you have a

20   responsibility to monitor, but --

21       A.    There is some monitoring, but I

22   just want to give -- there's a board role, and

23   there's a -- regulatory operations, and those

24   are different.  That was my only point.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    In your role as a board member --

2        A.    Yes.

3        Q.    -- if you become aware of a

4    regulatory compliance issue, you would agree,

5    Dr. Kessler, that it's important for that issue

6    to be addressed, correct?

7        A.    Absolutely.

8        Q.    Okay.  Including at the board

9    level, right?

10        A.    I wouldn't say, if I became aware

11    of an issue, that I would bring it necessarily

12    to the full board.  I may bring it to the

13    compliance committee.  I may bring it to the

14    director of regulatory affairs.  It depends on

15    the seriousness of the matter.

16              MR. DAVIS:  Can we take a

17        five-minute break?  I've got limited

18        time.  I just want to organize it.

19        Really, five minutes, if that's okay.

20              MR. RAFFERTY:  Sure.

21              VIDEO OPERATOR:  9:43, we are off

22        the video record.

23              (Recess from 9:43 a.m. until

24        9:57 a.m.)

Highly Confidential - Subject to Further Confidentiality Review

1        VIDEO OPERATOR:  9:57.  We are on

2    video record.

3  BY MR. DAVIS:

4        Q.   Dr. Kessler, page 121 of your

5  report --

6        A.   Give me a second, please.

7        Q.   Sure.

8             -- heading number 4 --

9        A.   Yes.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

■ ████████████████████████████████████████

■ ████████████████

3          Q.    Is that your complete methodology

4    for determining -- for your opinion that Endo's

5    promotion led to an increase in reports of

6    Percocet abuse?

7               MR. RAFFERTY:  Object to the form.

8          A.    I won't use the word -- that's the

9    general logic train.  It is pretty simple when

10    you study it, but there's obviously -- if you

11    look -- we can discuss the methodology to

12    determine how prescriptions are linked to abuse

13    and how those numbers -- in that methodology,

14    those are in those published studies, and we

15    certainly have a very strong record, I believe,

16    that promotion is -- these drugs are

17    promotionally sensitive.

18          Q.    Are all of those studies that you

19    just described cited in your reliance

20    materials?

21          A.    Sure.  They're not described;

22    they're listed.

23          Q.    Is there anything in your report

24    describing the specific -- the methodology

1    specific to Percocet?

2         A.    Well, the Percocet section

3    certainly deals with the promotional activities

4    and the promotional goals and I believe their

5    sales numbers.  So those things -- that data is

6    in the report.

7         Q.    So your methodology as it relates

8    to Percocet is based on the promotional

9    activities described in your report as it

10    relates to Percocet?

11              MR. RAFFERTY:  Object to the form.

12         A.    So yes.  I think we all have to

13    recognize -- and I'm happy if your client

14    can -- it's somewhat limited because of the

15    dates on Percocet.  But I have -- with the

16    record that I have in front of me that you've

17    produced on Percocet, yes, that's what I based

18    the decision -- that's what I -- that's what I

19    based the logic on and my conclusions.

Highly Confidential - Subject to Further Confidentiality Review

1            MR. RAFFERTY:  Object to the form.

2       A.   That's what it says, yes.

3            MR. RAFFERTY:  I'm sorry.  I

4       thought you -- okay.  I thought you

5       said -- sorry.  I thought you misquoted.

6       You didn't.  That's my fault.

7            MR. DAVIS:  No problem.

8       Q.   If Endo spent half that amount to

9  market Percocet, what would the impact have

10  been on reports of abuse?

11           MR. RAFFERTY:  Object to the form.

12      A.   I have no opinion on that.

13      Q.   You can't tell me what the reports

14  of abuse would have looked like had Endo spent

15  half that amount marketing Percocet, correct?

16      A.   I've not done that analysis, no.

17      Q.   You can't tell me what reports of

18  Percocet would have looked like had Endo spent

19  zero dollars on marketing Percocet from 1999 to

20  2003, correct?

21           MR. RAFFERTY:  Object to the form.

22      A.   Oh, certainly.  I could -- I mean,

23  I could certainly tell you that it would be

24  less.  We know these are promotionally

1  sensitive.  I've not done the quantitative

2  analysis.

3          Q.    You can't tell me how much less?

4          MR. RAFFERTY:  Object to the form.

5          A.    I've not done the quantitative

6  analysis, no.

7          Q.    And the same applies to Opana ER;

8  you've not done any quantitative analysis that

9  links the amount of Endo's marketing budget to

10  specific reports of abuse?

11          A.    So there is some data on Opana that

12  we know that -- if I'm correct -- and I have to

13  go back and look on your ROI from your

14  promotional activities.

15          So the areas of the country that

16  you targeted, right, and the program

17  allocations were direct to the areas of

18  greatest ROI, and I don't think I've done -- I

19  do have some of that -- the program allocations

20  for, for example, Ohio.  But I have not done

21  that specific quantitative analysis.

22          Q.    So had Endo spent half the amount

23  of money it did promoting Opana ER, you can't

24  tell me what the rates of -- how that would

Highly Confidential - Subject to Further Confidentiality Review

1  have impacted the rates of abuse of Opana ER,

2  correct?

3          MR. RAFFERTY:  Object to the form.

4      A.    Well, I think that would be fair

5  because -- I mean, it's possible you could

6  spend half and still have been even more

7  effective.  It depends what you're spending it

8  on.  So again, your question is a pretty

9  general one.

22      Q.    But you can't specifically quantify

23  the relationship between a dollar spent

24  promotionally and reports of abuse, correct?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. RAFFERTY:  Object to the form.

2          A.   I've not done that analysis the way

3    you've stated.

4          Q.   And that analysis is nowhere in

5    your report, correct?

6          A.   Well, if I haven't done it, how

7    could it be in my report?

8          Q.   Dr. Kessler, you're aware that

9    there was a risk map -- Endo put in place a

10   risk map related to Opana ER, correct?

11         A.   The drug would not have been

12   approved without that, correct.  It was a

13   requirement of approval.

14         Q.   To be clear, at that point in time,

15   FDA did not have statutory authority to require

16   a risk map, correct?

17         A.   We could spend a lot of time

18   discussing statutory authority.  It may not

19   have been -- there was not -- there were not

20   REMS, I believe, on the 701.  FDA had the

21   authority to do risk maps, but again, we leave

22   that to lawyers discussing that.

23         Q.   Do you recall a discussion of the

24   ATUs earlier with me, Dr. Kessler?

Highly Confidential - Subject to Further Confidentiality Review

1       A.   You asked me about whether they

2   reflected doctors' perceptions, is what I

3   remember.  And I didn't have the actual

4   document in front of me, so I did it from

5   memory.

6       Q.   And those reports are referenced on

7   page 132 of your report?

8            THE WITNESS:  Gerard, can I just

9        get back --

10      A.   What paragraph are we talking

11  about?  Let me see if I can find the documents

12  that you're talking about.

13      Q.   Specifically paragraph 221.2?

14      A.   Do you have the document that's

15  referenced?  It would be helpful because I'm

16  not sure my notebook has it.

17           MR. RAFFERTY:  221, Gerard.

18      Q.   221.2.

19      A.   I just want to see if I have 437.

20           I don't think I have --

21           THE WITNESS:  Parvin, can you just

22       help me see if I can find this document

23       that's referenced -- that Mr. Davis is

24       referring to?  I just don't -- if you

Highly Confidential - Subject to Further Confidentiality Review

1          have it or can pull it up for me.

2               Q.    Let's try it this way.

▮          ████████████████████████████████████████

▮          ████████████████████████████████████

▮          ██████████████████████████████████████

▮          ████████████████

▮          ██████████████████████████

▮          ████    ██████    ████████████████████████    █

▮          ██████████████████    ████████████████████    ██

▮          ████████████████████████████████████

▮          ████    ████████████████████████████

▮          ██████████████████████████████████████

▮          ████████████████████████████████████████

▮          ████████████████████████████████████████

▮          ████    ██████████████████████████████████████

▮          ██████████████████████    ██████████████████

▮          ████████████████████████

▮          ████    ████████████████████████████

19         question, Dr. Kessler.

20              A.    And I respect that, sir.  I just

21         want to get my answer -- give me a second to

22         answer your question precisely.

23                    So you asked me about materials,

24         correct?  Let me just see your question.  Your

Highly Confidential - Subject to Further Confidentiality Review

1   exact question is, you've not seen it in a

2   promotional piece.

3           What I've seen is reports of sales

4   reps -- it says, Many were persuaded to try it

5   because of rep persistence and information they

6   provided and lower abuse potential.

7           But you're correct.  I've seen

8   that.  I've certainly seen the time X reports

9   in the promotional pieces which talk about

10  time X, which certainly implies lower abuse

11  potential.  So I've seen that.

12      Q.   Let's try it again.

13          You've not seen any Opana ER

14  promotional piece that contains, quote, low

15  abuse potential, close quote, those words

16  exactly as I've just articulated?

17      A.   You're correct.  That's not how

18  your company did it.

19          MR. DAVIS:  Thank you, Dr. Kessler.

20          THE WITNESS:  Thank you, sir, very

21      much.

22          May I ask for a break?  Thank you.

23          MS. LEVY:  I didn't say we would

24      give it to you; I said you may ask.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. RAFFERTY:  Yes, you can take a

2       break.

3          VIDEO OPERATOR:  10:13, we are off

4       the video record.

5          (Recess from 10:13 a.m. until

6       10:25 a.m.)

7          VIDEO OPERATOR:  10:25, we are on

8       the video record.

9          MR. DAVIS:  Dr. Kessler, thanks for

10      your time.  I'm done with my questioning

11      for right now.

12          I do want to reserve the right to

13      conduct additional questioning, and

14      object again for the record that the

15      time allotted to defendants, and

16      including Endo specifically, was

17      insufficient, given the scope and

18      content of your report.

19          THE WITNESS:  Thank you, Mr. Davis,

20      for your questioning.

21          MR. RAFFERTY:  And just for the

22      record, plaintiffs disagree.

23                    EXAMINATION

24    BY MS. LAURENDEAU:

Highly Confidential - Subject to Further Confidentiality Review

1            Q.    Dr. Kessler, I'm Amy Laurendeau.  I

2    represent Janssen Pharmaceuticals.  I'm going

3    to use the time allotted to me to ask you about

4    your numerous opinions regarding Janssen in

5    your report and do the best we can to get

6    through as many as we possibly can in the next

7    few hours.

8            Okay?

9            A.    Yes.

10           Q.    With respect to Janssen, the

11   opinions you're offering are limited to its

12   three opioid products, Duragesic, Nucynta IR,

13   and Nucynta ER, correct?

14           A.    I think that's -- I think that's

15   correct in general with regard to -- I think

16   that's -- with respect to Janssen -- the reason

17   I'm having a little trouble answering that

18   question are some of the facts.

19                Janssen provided, for example, the

20   narcotic for Purdue for OxyContin, and the

21   facts in Janssen's own documents show that it

22   drove the increase in oxycodone.  I don't think

23   that's an opinion; I think that's a fact.

24                So I just think that should be

Highly Confidential - Subject to Further Confidentiality Review

```
 1    on -- that's -- it's clear that, again, from
 2    the documents -- the budget documents in Purdue
 3    and Janssen's own documents from Noramco --
 4    that you developed a super poppy that Purdue
 5    bought and, I think it's fair to say, in
 6    Janssen's own words, enabled oxycodone to --
 7    the extent of oxycodone to be produced.
 8              You also affect a significant
 9    amount of -- you're the number one narcotic raw
10    material distributor in the world, so there are
11    a lot of -- if we're talking about generic
12    oxycodone and others, I have those sales
13    figures.
14              So again, I think you're relatively
15    right with opinions, but I just want to make
16    sure the record reflects that these
17    relationships among defendants are complex and
18    interconnected, and Oxy would never have --
19    OxyContin would never have flourished the way
20    it did but for Janssen.
21         Q.   These aren't issues you intend to
22    testify to at trial, though, are they?
23         A.   I'll answer the questions that I'm
24    asked.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    You haven't said a word about

2   Noramco in your 300-plus page expert report,

3   have you?

4        A.    You're right.   The documents are on

5   my reliance list.

6        Q.    In the 315 pages in which you've

7   listed the facts and opinions to which you

8   testified in this litigation, you haven't said

9   anything about Noramco other than to list it as

10  a defendant, correct?

11       A.    I think -- I mean -- I think that's

12  correct on the report.   But certainly those

13  documents are on my reliance list and things

14  that I've considered.

15       Q.    Are you intending to offer opinions

16  about Noramco and API and Janssen's role with

17  respect to production of API at trial?   Yes or

18  no.   I need to know today.

19       A.    I'm not -- I'm going to answer the

20  questions that I'm asked.   Those are facts.   I

21  don't think I'm going to -- I'm not going to

22  offer any opinions, necessarily.   But those are

23  facts.

24       Q.    Well, I'll tell you that Janssen

```
1   strongly disagrees that those are facts, that
2   everything you say are facts, and so to the
3   extent you intend to testify to those, I need
4   to know.
5           When we allocated time and when we
6   asked for time, there was nothing mentioned
7   about Noramco in the report.  I didn't come
8   here prepared to ask you questions about
9   Noramco.  Noramco is separately represented in
10  the MDL, and counsel for Noramco isn't even
11  here, since you didn't offer opinions about
12  Noramco.
13          So I need to know what you're
14  intending to say about Noramco at trial, so
15  when I go back to the judge or the special
16  master and ask to either have those opinions
17  stricken or for additional time to depose you,
18  we understand what that testimony and opinions
19  is going to look like from your perspective.
20          MR. RAFFERTY:  I'm going to object
21      to the lengthy lecture to the witness,
22      all right.  Just ask your questions and
23      he'll answer them.
24      A.   So I don't have any specific
```

1    opinions on Nor -- I mean, on this, but these

2    are facts that I'm certainly happy to address

3    if I'm asked by plaintiffs or defendants, and

4    these facts are well laid out in the reliance

5    materials.

6              MS. FREIWALD:  As counsel for

7         Purdue, I just want to join in that

8         objection to the extent what you're

9         saying implicates opinions that are

10        nowhere in your report related to

11        Purdue.

12             THE WITNESS:  That's an objection.

13        Q.   You're not intending to testify at

14   trial as a fact witness; you're intending to

15   testify as an expert witness, correct?

16        A.   That's my intent, right.  That's

17   the way I see it.  I do recognize, and I leave

18   this to counsel, and I do this somewhat

19   cautiously -- I don't want to get into -- I

20   mean, the fact is that I was at the agency

21   in '93 and '94, for example, and I did take

22   certain actions on one of your products.

23             So I do have firsthand knowledge.

24   I leave it to you and counsel here and the

Highly Confidential - Subject to Further Confidentiality Review

1    Court.

2              I was retained as an expert

3    witness, and I certainly have been cleared by,

4    as I understand it, by DOJ to testify fully,

5    but I leave it to the Court -- I mean,

6    understand that -- I mean, I leave it to you to

7    characterize me, and I think the best

8    characterization is an expert, but I do want to

9    fully disclose that I am a -- that I do have

10   firsthand knowledge.

11             COUNSEL:  Objection.

12        A.   I'm sorry, I just want to disclose

13   that I was there.  So I just want to make sure

14   that's not in --

15             MR. RAFFERTY:  In the interest of

16        time, I'll be happy to discuss with you

17        what our position is on this on the

18        first break.

19             MS. LAURENDEAU:  About Noramco?

20             MR. RAFFERTY:  Yes.

21             MS. LAURENDEAU:  Okay.  We'll come

22        back to that, if necessary.

23        Q.   You said you've been cleared by DOJ

24   to testify fully.  Is that regarding the work

Highly Confidential - Subject to Further Confidentiality Review

1  that you did on opioids while you were at FDA?

2        A.   I have -- I have -- my

3  understanding is that I have no restrictions on

4  me in testifying at trial about opioids on any

5  of the subject matter in this litigation.

6  That's my understanding.

7        Q.   Has FDA, to your understanding,

8  waived its privilege with respect to the

9  deliberative process pertaining to opioids in

10  connection with your testimony?

11        A.   I would not want to speak for FDA.

12        Q.   Has FDA told you that it's waived

13  its privilege with respect to your testimony?

14        A.   I do not want to speak for FDA.

15  Those kind of questions -- I've not had any

16  discussions with regard to privilege.  I simply

17  asked -- informed HHS, FDA, and DOJ that I was

18  testifying, and I asked in essence whether

19  there was any limitations.

20        Q.   And I think you said yesterday,

21  you're not intending to speak or offer opinions

22  on behalf of FDA; to the extent you're

23  testifying or offering opinions here, they're

24  your own personal views and opinions, correct?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Exactly.  Now -- that's exactly

2    correct.  If you ask me a question that's

3    factually of what was FDA's view in 1994, you

4    know, I can answer that.  I'm speaking for me.

5    I guess I'm speaking for me as former

6    Commissioner.  But I may have knowledge of what

7    I said in 1994 as FDA Commissioner.

8          Q.    Your report cites and quotes

9    several of Janssen's internal company documents

10    as well, doesn't it?

11          A.    Sure.

12          Q.    And just as with some of the other

13    defendants you've testified about earlier in

14    your deposition, you're not intending to offer

15    any opinions in talking about those documents,

16    if you're permitted to do so, about Janssen's

17    motivations, correct?

18          A.    I -- of course not.

19          Q.    You're also not intending to offer

20    any opinions about Janssen's intentions or

21    state of mind to the extent a corporation can

22    have a state of mind, correct?

23          A.    Of course not.

24          Q.    And that includes any testimony you

Highly Confidential - Subject to Further Confidentiality Review

1 might give about information expressed in

2 internal e-mails, business plans, or other

3 Janssen company documents, correct?

4        A.   Let me just see your question.

5             MR. RAFFERTY:  Object to the form.

6        A.   Can you restate the question a

7 little?

8        Q.   Sure.  You're not intending to

9 offer any state of mind or motivation opinions

10 through your testimony about information

11 expressed in Janssen's internal e-mails,

12 business plans, or other company documents,

13 correct?

14        A.   Nothing about subjective intent.

15        Q.   I'm going to ask you some questions

16 about Duragesic, which I know from your prior

17 testimony you have some familiarity with.

18             Duragesic's indicated for the

19 management of chronic pain, correct?

20        A.   Could you -- could we just -- can I

21 trouble you for the label --

22        Q.   Sure.

23        A.   -- just so I have it so we can --

24        Q.   Do you want the initial approval or

1    do you want the current approval?

2         A.   Well said.   Whichever your question

3    is going to refer to.

4         Q.   Okay.   Let's show you both then.

5    Because it's -- you're not sure, as you sit

6    here today, without looking at the Duragesic

7    label whether it's indicated for the management

8    of chronic pain?

9         A.   Duragesic?

10        Q.   Yes.

11        A.   That was not what I indicated it

12   for.   When I was Commissioner, that certainly

13   was not the indication in 1994.

14        Q.   Okay.

15        A.   But I just want -- I want to be

16   precise, ma'am.   It's not my memory of how --

17   what the intended use was.

18              MR. RAFFERTY:   What number is that?

19              MS. LAURENDEAU:   This is Exhibit

20        19.

21              (Reporter interruption.)

22              (Exhibit Kessler-19 marked for

23        identification and attached to the

24        transcript.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. LAURENDEAU:

2        Q.    So Dr. Kessler, if you look under

3    the indications and usage for the --

4            MS. LAURENDEAU:  Can we turn this

5        on, please.

6        A.    Can we just -- can you just help me

7    make sure we agree, this label -- just let me

8    look to the last page, if I can, and see what

9    the date is.  Or actually it's sometimes up

10   here.

11       Q.    In the bottom right-hand corner it

12   says, Revised September 2018.

13       A.    Correct.  Thank you.

14       Q.    Okay.

15       A.    Thank you very much, ma'am.

16       Q.    If you look in the indications and

17   usage, it says, Duragesic is indicated for the

18   management of pain in opioid-tolerant patients

19   severe enough to require daily,

20   around-the-clock, long-term opioid treatment

21   and for which alternative treatment options are

22   inadequate.

23            Is that correct?

24       A.    That is correct.  Not what you

1    asked me prior.  That -- your prior question

2    was incorrect.  And there lies the rub.

3           Q.   Okay.  So you wouldn't describe

4    this as being indicated for the management of

5    chronic pain?

6           A.   Absolutely not.

7           Q.   Okay.  Under dosage and

8    administration --

9           A.   That's not what that -- that's not

10   what the indication is for.

11          Q.   Okay.  Under dosage and

12   administration, it states, To be prescribed

13   only by healthcare providers knowledgeable in

14   use of potent opioids for management of chronic

15   pain.  Correct?

16          A.   That's what dosage and

17   administration says.

18          Q.   Okay.  Do you have your report in

19   front of you, Dr. Kessler?

20          A.   I do, ma'am.

21          Q.   Can you look at paragraph 280 of

22   your report, please.

23          A.   Paragraph 280?

24          Q.   Correct.

1            THE WITNESS:  Gerard, can I get --

2       is Gerard there?  Can I just get -- if

3       there's a document -- no, there's no

4       documents, so hold it.

5       Q.   There's no document; it's just an

6  opinion.

7       A.   Yes.

8       Q.   You state in paragraph 280 of your

9  report, Spurred by Janssen's marketing, use

10  of Duragesic --

11       A.   Just let me get to the actual

12  portion of the paragraph.  Spurred by Janssen's

13  marketing -- yes.

14       Q.   Use of Duragesic did spread beyond

15  the post-operative period and the healthy

16  cancer patient.

17       A.   Yes.

18       Q.   That's your opinion?

19       A.   Oh, no question about that.

20       Q.   Okay.  And you believe that

21  expanded use of Duragesic shouldn't have

22  happened, right?

23       A.   That expanded use to chronic back

24  pain and osteoarthritis beyond those was

1    off-label unless it -- unless there were no

2    alternative options -- whether alternative

3    options were tried first.

4            The problem is, it expanded to

5    those indications without the requirement that

6    other options be tried first.

7        Q.   Okay.  So my question was a little

8    bit different.  You believe that the expansion

9    of Duragesic beyond the post-operative period

10   and the healthy cancer patient should not have

11   occurred, correct?

12       A.   I believe that that's correct, and

13   it shouldn't -- because when you look at what

14   the expansion was, that expansion was not

15   limited to those cases where this -- where the

16   alternative treatments were inadequate.  So the

17   expansion into those conditions without that

18   caveat made much of Duragesic's prescribing

19   off-label.

20       Q.   And so it's your opinion that some

21   expansion beyond the post-operative period and

22   the healthy cancer patient was okay, but the

23   expansion that occurred was too great.  Is that

24   correct?

1    A.   I think generally that is -- it's a

2  pretty general statement.  I think to be

3  specific, that no one should have been

4  prescribed Duragesic -- if I had any idea that

5  it was being expanded the way it was expanded,

6  I would have -- after I did the label, that was

7  off-label I think is the way I would say it.

8    Q.   You believe the expanded use of

9  Duragesic spurred by Janssen's marketing made

10  overdoses and abuse more likely, correct?

11    A.   Absolutely.  No question in my

12  mind.

13    Q.   And the expanded use beyond the

14  post-operative period and the healthy cancer

15  patient made overdose and abuse more likely,

16  correct?

17    A.   Sure.  The more prescription -- the

18  more promotion, certainly promotion off-label,

19  certainly promotion off-label when other

20  alternatives were not tried, were not required

21  to be tried, that put more drug in interstate

22  commerce, and we know that leads to more abuse.

23    Q.   It's within doctors' rights to

24  prescribe any medicines off-label, correct?

1          A.   A doctor in his or her judgment may

2     do off-label.  I wouldn't want to just say it's

3     in doctors' rights.  Certainly under FDA law,

4     that's correct.  There are other implications.

5          Doctors are free, subject to other

6     limitations and standards of care, to do things

7     off-label.  That's always been the case.

8          Q.   FDA certainly doesn't limit doctors

9     from prescribing medicines off-label, correct?

10         A.   Generally, that's correct.  There's

11    certain restricted distribution drugs, but, you

12    know -- and I think -- but those would be rare,

13    I think.

14         Q.   FDA has never restricted doctors

15    from prescribing opioids off-label, has it?

16         A.   Oh, I certainly did in Oralet.

17         Q.   Okay.  Other than Oralet, has FDA

18    ever done anything to restrict doctors from

19    prescribing opioids off-label?

20         A.   The Oralet is the one that comes to

21    my mind.

22         Q.   And given that you did it in

23    Oralet, that's something that FDA can do if it

24    deems it necessary, correct?

Highly Confidential - Subject to Further Confidentiality Review

1          A.   There's something called restricted

2    distribution when compounds are, in essence,

3    ultra-hazardous.

4          Q.   Is that something you as

5    Commissioner of FDA did to restrict the

6    off-label use of Oralet, correct?

7          A.   Yes.

8          Q.   That's not something, to your

9    knowledge, that FDA has done with respect to

10   any other opioid products, correct?

11         A.   I don't, sitting here, recall.  I'd

12   have to -- I don't recall, sitting here.  I

13   don't know the answer to that question.  I'd

14   have to do a little more research.

15         Q.   FDA certainly hasn't placed any

16   restrictions on doctors' prescribing of

17   Duragesic off-label, correct?

18         A.   I think that -- I think that would

19   be a true statement.  I think FDA did,

20   certainly in my statements -- let me just fix

21   my microphone.

22              I wouldn't characterize my

23   statements as restrictions on doctors.  There

24   may be a word -- what's a better word than

Highly Confidential - Subject to Further Confidentiality Review

1  restrictions -- certain caveats to doctors, I

2  think, would be a fair way to characterize what

3  we said back in 1994.

4      Q.   You may have given doctors advice

5  or warnings or precautions about prescribing

6  Duragesic, but you never placed any

7  prescriptions -- or any restrictions on

8  doctors' ability to prescribe Duragesic

9  off-label, correct?

10      A.   That's correct, ma'am.

11      Q.   You also never -- to your

12  knowledge, FDA has never placed any

13  restrictions on doctors' ability to prescribe

14  Nucynta off-label; is that correct?

15      A.   That's correct.

16      Q.   FDA knew, prior to approval of

17  Duragesic, that it would potentially be

18  prescribed by doctors off-label, correct?

19      MR. RAFFERTY:  Object to the form.

20      A.   You want to give me the original

21  label so -- I want to make sure -- I wasn't

22  there on the approval of Duragesic, and you're

23  asking me what FDA knew.  So I just want to

24  look at the original label if you can give me

Highly Confidential - Subject to Further Confidentiality Review

1    that.

2         Q.   I'll come back to it.  That's okay.

3    I have another document I'll show you on that

4    in a bit.

5              Duragesic's approved indication has

6    never been limited to cancer pain, correct?

7         A.   The way you phrase it, I think we

8    discussed this yesterday, that's not the

9    phrasing of the indications.  The indications

10   are as set out in Exhibit 19.  But we certainly

11   were on record with the manufacturer and with

12   the public that we thought that there may be a

13   few instances beyond that.

14             But the understanding -- certainly

15   my understanding was that it was primarily

16   cancer.  But I did not want to restrict it, as

17   you said, just to cancer pain.  But that was

18   not a wholesale opening.

19        Q.   The approved indication was never

20   limited to cancer pain, correct?

21        A.   The approved indication is exactly

22   what it says.

23        Q.   And the approved indication does

24   not say and has never said that it's limited to

1    cancer pain, correct?

2            A.    Correct.  But you also have -- you

3    know, you have FDA statements about

4    interpreting where this should be used.

5            Q.    I understand that.  I'm asking

6    about the approved indication.

7                  The Duragesic approved indication

8    has never stated that it's limited to cancer

9    pain, correct?

10           A.    I answered that question.

11           Q.    I'd like you to answer it again,

12    because I don't think you directly answered the

13    question.

14           A.    Yes.  I mean, the words of the

15    indication are exactly the words of the

16    indication.  And it's not phrased in those

17    terms.  The indication is phrased differently.

18           Q.    Do you think the words of the

19    indication communicate in different words that

20    the indication is limited to cancer pain?

21           A.    I think the words of the

22    indication -- I don't think the indication

23    would preclude all non-cancer pain from any

24    forms of non-cancer pain being used.  So no, I

Highly Confidential - Subject to Further Confidentiality Review

1    think there are some forms of non-cancer pain

2    that the label would allow, but they would have

3    to meet all the requirements of the indication.

4          Q.    Is the word "cancer" anywhere -- is

5    it anywhere in the indication for Duragesic, to

6    your knowledge?

7          A.    No, it is not.

8          Q.    And the FDA could have limited

9    Duragesic's indication to cancer pain, couldn't

10   it have?

11         A.    I had -- I made that decision,

12   ma'am, and I made a decision that, as I think I

13   said yesterday, that it was -- it should be

14   used primarily for cancer pain, but we didn't

15   want to restrict it because we saw there may be

16   some other patients that may fit that

17   definition.  That's exactly what I said and was

18   communicated publicly.

19         Q.    Just to make sure I understand, you

20   specifically made the decision not to limit

21   Duragesic's indication to cancer pain; is that

22   correct?

23         A.    Let me get exactly what decision I

24   made so the record is clear.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Could you note for the record what

2  you're looking at or reading from?

3      A.   I'm reading a 1994 document from my

4  associate, Dennis Strickland.

5      Q.   Would you mind if we attach that to

6  the --

7      A.   You can put a sticker --

8      Q.   -- to the deposition transcript?

9  You can go ahead and read to it, but I'd like

10  to mark it and then take a look at it on a

11  break.

12          (Exhibit Kessler-20 marked for

13          identification and attached to the

14          transcript.)

15  BY MS. LAURENDEAU:

16      Q.   You're reading from Exhibit 20 now,

17  Dr. Kessler?

18      A.   I am, ma'am.  So this talks about

19  the original label, but I mean, I'm reading the

20  fourth paragraph, and halfway down, it says,

21  Consideration was given to limiting the

22  approved indication for the product to the

23  treatment of pain of malignancy, i.e., cancer

24  pain, but it was known that there is a small

Highly Confidential - Subject to Further Confidentiality Review

1 fraction of chronic pain patients with pain of

2 non-malignant origin who can also potentially

3 benefit from the product.

4           That was a statement that was made

5 after my discussions on the compound.

6       Q.   And that was your decision?

7       A.   I wouldn't want to say -- I tended

8 not -- I tended to be a pretty

9 consensus-oriented guy at the agency.  I think

10 others would probably look at it and say it was

11 my decision.

12           But I can tell you it was -- it was

13 certainly done with the CDER.  I would never

14 want to overrule CDER unless I -- there may be

15 rare instances.  I think this was a fair read

16 of a consensus of us, but I -- I think I had a

17 little more voting power maybe.  But that's

18 what the record shows.

19       Q.   You certainly were involved in and

20 agreed with and even had maybe a little more

21 voting power than anyone else with respect to

22 that decision, correct?

23       A.   I stand by that decision, yes.  I

24 think that -- I still think that is probably in

1    this complex world of, you know, strong

2    opioids, others may differ.  I think that

3    that -- I mean, I'm always a little reluctant

4    25 years later, right, I think that's still --

5    those words probably still would be my opinion

6    today.

7         Q.    So if I understand your testimony,

8    you do not regret that decision, correct?

9         A.    Oh, I certainly regret that

10   decision.  I certainly regret that decision.

11        Q.    But you stand by it.  You think you

12   made the best decision at the time, correct?

13        A.    Yeah.  If I had any knowledge of

14   your company's several years later marketing

15   for back pain and osteoarthritis, and being in

16   a competitive war with Purdue over this

17   product, I would -- I would certainly have done

18   something differently.  I just didn't know

19   that.

20        Q.    We talked a bit yesterday about, in

21   2013, the FDA rejected an advisory organization

22   PROP's request to make a distinction between

23   cancer and non-cancer pain in opioid labeling.

24   Do you recall that?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I remember we discuss PROP.  I

2  apologize, I don't remember that specific

3  aspect of discussing it yesterday.

4    Q.    Okay.  Do you recall that in 2013,

5  the FDA specifically declined -- specifically

6  declined a request to make a distinction

7  between cancer and non-cancer pain in opioid

8  labeling?

9    A.    Yeah.  I mean --

10    THE WITNESS:  Gerard, can you just

11    hand me my general -- sorry, I want to

12    have PROP in front of me, ma'am.

13    Q.    I'm just going to move on, because

14  I don't think we have time to get into it.

15    A.    Okay.  That's fine, but I'm

16  happy -- I just want to pull it up so I can

17  know exactly what the PROP said.

18    Q.    Okay.

19    A.    But I think that -- I --

20    THE WITNESS:  Never mind, Gerard.

21    Q.    Duragesic has never been indicated

22  for post-operative pain, has it?

23    A.    That's not what the indication

24  says, correct.

Highly Confidential - Subject to Further Confidentiality Review

1                    (Exhibit Kessler-21 marked for

2             identification and attached to the

3             transcript.)

4     BY MS. LAURENDEAU:

5             Q.    I'm going to show you the original

6     approval for Duragesic.  You just confirmed by

7     looking at Exhibit 19 that Duragesic currently

8     isn't indicated for post-operative pain,

9     correct?

10            A.    That's -- I'm sorry.  That's not

11    what the indication says, correct, in those

12    terms.  It's just the same thing as saying it's

13    indicated for chronic pain.

14            Q.    Well, it currently says -- let's

15    take a look at the contraindications in

16    Exhibit 19 for the current Duragesic label.  Do

17    you have that in front of you?

18            A.    Yes.

19            Q.    It currently says --

20                  MS. LAURENDEAU:  Can we turn this

21            on, please.

22            Q.    Under contraindications -- which

23    means Duragesic is not to be used in these

24    circumstances, correct?

Highly Confidential - Subject to Further Confidentiality Review

1       A.    Exactly, ma'am.

2       Q.    Acute or intermittent pain,

3   post-operative pain, mild pain.  Correct?

4       A.    Correct, that's exactly what it

5   says.

6       Q.    So it's currently contraindicated

7   in post-operative pain, correct?

8       A.    That's exactly what that said.  You

9   asked me what the indications were.  But you're

10  exactly correct.

11      Q.    Okay.  And let's look at what I've

12  marked as Exhibit 21.

13      A.    Thank you.

14      Q.    Which, if you look on the last

15  page, you'll see it's the Duragesic label from

16  August of 1990.

17      A.    Thank you very much, ma'am.

18      Q.    Under indications and uses, it

19  says, Duragesic --

20      A.    I'm sorry, what page are on?

21      Q.    We are on --

22      A.    These old labels, unfortunately the

23  indications are in the wrong place.

24      Q.    It's the actual --

1    A.   I don't mean the wrong place, but

2  FDA didn't get it right.  Indications -- it's

3  sort of bizarre that they're in the middle of

4  the --

5    Q.   It's on the actual third page --

6    A.   Thanks --

7    Q.   -- not counting the pages on the

8  back.

9    A.   Thanks an awful lot, again.

10    Q.   Do you see indications and usage

11  now?

12    A.   I do, yeah.

13    Q.   In the second paragraph,

14  indications and usage, Duragesic is not

15  recommended in the management of post-operative

16  pain, correct?

17    A.   Correct.

18    Q.   So is it your understanding that

19  Duragesic has never been indicated or approved

20  for post-operative pain?

21    A.   Yeah.  It's a little more

22  complicated than that.

23    Q.   Do you think it was ever indicated

24  or approved for post-operative pain?

Highly Confidential - Subject to Further Confidentiality Review

1    A.   I think that what you read me,

2  again, is, it says, Duragesic is not

3  recommended in the management of post-operative

4  pain.  The prior sentence says what it's

5  indicated for.

6         If you changed your question to

7  say, was Duragesic ever recommended for

8  post-operative pain, I would say no.

9    Q.   Would it have been -- would it have

10 ever been appropriate, in your opinion, for

11 Janssen to market Duragesic for acute

12 post-operative pain?

13   A.   No, because we know that that

14 doesn't meet -- it has to meet the indication

15 statement.

16   Q.   Would it have ever been appropriate

17 for Janssen to market Duragesic for use in the

18 post-operative period?

19   A.   I want to think about whether

20 there's ever a case for that.  I just would

21 want to think about that a little.

22   Q.   In January of 1994, I think we

23 talked a bit about the indication in

24 Duragesic's label being updated.  Do you recall

Highly Confidential - Subject to Further Confidentiality Review

1    that?

2          A.    Yes.

3          Q.    That's the label update that you

4    were personally involved with, correct?

5          A.    At that time, yes.  I think that's

6    what the record shows and I -- yes.

7          Q.    You were -- at the time of the 1994

8    Duragesic label change, you were Commissioner

9    of the FDA, correct?

10         A.    Exactly.

11         Q.    You were personally involved in the

12   updated label for Duragesic, correct?

13         A.    Yes.

14         Q.    That was an important issue for

15   you, as Commissioner, to be personally involved

16   with, correct?

17         A.    The issue arose out of a tragedy.

18   So that was what was -- so I think the fair

19   answer to your question would be yes.

20         Q.    What was the reason for the label

21   change?

22         A.    Misuse.

23         Q.    What type of misuse?

24         A.    Death.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Was it -- can you explain any more

2  about the circumstances?  Do you recall?

3      A.    My recollection -- and again, some

4  of this is refreshed based on the record.

5  My -- my recollection was that someone brought

6  to my attention -- I don't know whether someone

7  in the Commissioner's office brought to my

8  attention or I saw firsthand that there was a

9  young man in Florida who had received Duragesic

10  after dental pain, and there were some issues

11  on -- there were some issues with regard to

12  temperature or a heating pad on Duragesic, and

13  he died.

14          And his mother didn't want that

15  death to, I think, go without -- to be in vain.

16  She wanted other people not to incur that same.

17          So I became aware of that, and

18  obviously, as the record shows -- as Exhibit 20

19  shows, I met on that issue, and that issue led

20  to a broader examination of Duragesic at that

21  time.

22          (Exhibit Kessler-22 marked for

23          identification and attached to the

24          transcript.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. LAURENDEAU:

2         Q.    Okay.  I'm going to show you what

3    I've marked as Exhibit 22.  Exhibit 22 is an

4    Associated Press article from January 18th,

5    1994 entitled, FDA Says Some Doctors

6    Dangerously Misusing Potent Painkiller.

7         A.    Just a second.  Show me exactly

8    where you're quoting from.

9         Q.    I'm just reading the title of the

10   article.

11        A.    Thank you.

12              Right, that's the title.

13        Q.    And if you look at the fourth

14   paragraph of the article, you're quoted in this

15   article, correct, or you --

16        A.    That's me.

17        Q.    An interview you gave is quoted in

18   this article?

19        A.    Right.

20        Q.    And the quote is, We are seeing an

21   emerging pattern of misuse, FDA Commissioner

22   David Kessler said in an interview.

23              Did I read that correctly?

24        A.    You read that exactly correctly.

1    Q.   Do you recall believing, as of

2    January 1994, that you were seeing an emerging

3    pattern of misuse with respect to Duragesic?

4    A.   My memory is a little fuzzy, but

5    certainly, that is consistent with my memory.

6    I don't -- I mean, I think that -- I mean, I

7    would urge between this letter and the minutes

8    and the letters to Connie Mack.  I think they

9    reflect what we knew or saw at the time.  I'm

10   not sure I have a lot of memory other than

11   what's in the record.

12   Q.   And you certainly don't dispute, as

13   you sit here today, that as of January 1994,

14   FDA was aware of an emerging pattern of misuse

15   with Duragesic, correct?

16   A.   No, because obviously, this was

17   used in dental pain, and it was not -- you

18   know, we went through that that was misuse,

19   didn't think it should be used in dental pain.

20        I guess we saw four other deaths,

21   right, one in chronic back pain, one in wisdom

22   teeth, one in sickle cell, and one after a

23   nine-year-old with a tonsillectomy.  So that

24   certainly didn't meet the indications as we saw

Highly Confidential - Subject to Further Confidentiality Review

1   it.

2           Q.    These were all situations in which

3   you believed Duragesic was not indicated for

4   use, correct?

5           A.    Yeah.  I want to be a little

6   careful.  I think we found four deaths.  I

7   don't have a record exactly on the prescribing

8   history of those or -- for example, on the

9   sickle cell death, for example.

10              I think generally, I would agree

11  with your -- I would say yes to that.  But

12  again, the record is a little limited on these

13  cases.

14          Q.    Okay.  You thought the upgraded

15  warning for Duragesic in 1994 was sufficient to

16  warn doctors of the risks of Duragesic,

17  correct?

18          A.    I wouldn't agree with the way you

19  framed your question.  I didn't know that it

20  was sufficient -- I mean, I did the best I

21  could, based on what I knew at the time with my

22  colleagues.  Clearly, it wasn't sufficient for

23  marketing practices later on.

24          Q.    Based on the FDA's information it

1    had, which we know included an emerging pattern

2    of misuse and use in unapproved indications,

3    you did the best you could, and the best --

4    what you thought was appropriate at the time

5    was to upgrade and increase the warnings for

6    Duragesic in 1994, correct?

7         A.    I think that's fair.

8         Q.    You were Commissioner of FDA for

9    another three years after the Duragesic label

10   change in 1994, correct?

11        A.    Approximately.

12        Q.    And this remained an important

13   issue for FDA after January of 1994, correct?

14        A.    Sure.  I mean, every drug and every

15   issue of misuse is important.

16              I will tell you that -- I mean,

17   there are other issues after this that occupied

18   my time.  I have no recollection of other

19   interaction on this issue after this.

20        Q.    Well, one of the other things

21   you're quoted as saying in this AP article is,

22   quote, This is one of the more striking

23   examples of where we really need to make sure a

24   medicine is being appropriately used.

Highly Confidential - Subject to Further Confidentiality Review

1      Did I read that correctly?

2      A.    That's exactly what I said.

3      Q.    Okay.  And you believed that to be

4  true as of January 1994, correct?

5      A.    Sure.  Whenever there's a needless

6  death, I took that very seriously.

7      Q.    What steps did you personally take

8  between January of 1994 and February of 1997

9  when you stepped down as Commissioner to ensure

10  that Duragesic was being appropriately used?

11      A.    I don't have any recollection,

12  sitting here, of firsthand knowledge.  You have

13  to look at the record to answer that question.

14  Obviously, there was the label change.  There

15  was the "Dear Doctor."  That's what I was

16  involved in.  And obviously, the public

17  education.  That's what I was involved in.

18      Q.    Nothing happened during the

19  remainder of your tenure at FDA that you recall

20  requiring your personal attention on Duragesic;

21  is that correct?

22      A.    Correct, ma'am.

23      Q.    You certainly expected that the

24  employees working under you at FDA would

Highly Confidential - Subject to Further Confidentiality Review

1  continue to closely monitor whether Duragesic

2  was being appropriately used, though, correct?

3        A.   Sure.  But I think the word "we"

4  here -- I think you're overstating it a little.

5  The "we" I think is a collective "we" in that

6  sentence.  I would have expected the company; I

7  would have expected doctors.  I mean, I was --

8  that "we" is to make sure medicine is being

9  appropriately used, that was as strong a signal

10  as I could give.  It's a pretty strong signal.

11  Maybe I could have given a stronger signal to a

12  company and to the world.

13        So I don't think it's just FDA, but

14  I think it's a fair point that those

15  instructions were -- that was an important

16  statement.

17        Q.   When you said, We really need to

18  make sure Duragesic is being appropriately

19  used, you meant to include FDA as well as other

20  stakeholders, correct?

21        A.   I think everybody would be included

22  in that.  I think the pharmaceutical company

23  obviously has primary responsibility to make

24  sure, certainly to the extent -- to the extent

Highly Confidential - Subject to Further Confidentiality Review

 1    that it's controlling its promotion, yes.

 2           Q.   Okay.  I'd like to direct your

 3    attention --

 4           A.   May I give these to the court

 5    reporter?

 6           Q.   Sure, please.

 7           A.   Thank you very much.

 8                MR. RAFFERTY:  You need to give

 9           yours as well, just the letter.

10                THE WITNESS:  I'm going to give

11           this -- I'm giving over my documents.

12           That's fine.

13           Q.   If you keep it in the yellow, we'll

14    remember that it's yours and make sure you get

15    a copy back.

16           A.   I get it back.  Thank you very

17    much, ma'am.

18           Q.   I'd like to direct your attention

19    to your report starting on paragraph 273.

20           A.   Paragraph 273.

21           Q.   Yes.  And this is where you're

22    talking about Dr. Curtis Wright's --

23                THE WITNESS:  Can I trouble you,

24           Gerard, for that paragraph, please.

1    Q.    So this is where you're talking

2  about Dr. Curtis Wright's medical officer

3  review of the NDA for Duragesic, correct?

4    A.    Correct.

5    Q.    You note that even before reviewing

6  the NDA for Duragesic, Dr. Wright raised

7  concerns with Janssen about diversion of the

8  product, correct?

9    A.    That's exactly what I say.  But let

10  me just go to the document.

11    Q.    I just want to know what you say in

12  your report.  I don't need you to confirm with

13  the document right now.

14    A.    Okay.  Then the report says what it

15  says.

16    Q.    Okay.  And that's your -- based on

17  your review of the document, that's how you

18  summarized it, correct?

19    A.    That's exactly what the report --

20  hold on a second.  Let me just -- yes, that's

21  exactly what the report says.

22    Q.    And that's your report that you

23  prepared, correct?

24    A.    Yes, absolutely.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  And so in this medical

2    officer review of the NDA, Dr. Wright --

3            THE WITNESS:  Parvin, or somebody,

4    can you just find me this medical officer

5    review, please.

6      A.    I'm sorry.  I apologize, ma'am.

7      Q.    And moving on in that

8    paragraph 273, Dr. Wright, at a pre-approval

9    meeting with Janssen, also asked about the

10   potential for extraction of fentanyl from used

11   or unused system and suggested ways to reduce

12   the abuse potential, including incorporation of

13   naloxone.

14     A.    Perfect.

15     Q.    So even prior to approval,

16   Dr. Wright at FDA was also talking about abuse

17   potential for Duragesic, correct?

18     A.    He was.

19     Q.    And in paragraph 275, you note that

20   Dr. Wright noted that once clinicians learned

21   that the system can provide continuous opioid

22   analgesia through the night, the system will be

23   used in a much broader clinical population than

24   intended, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.   I'm sorry.  I was just looking --

2  I'm there, yes.  I'm exactly there.

3    Q.   That's what you state in your

4  report, correct?

5    MR. RAFFERTY:  I'm going to object

6    to the form.  I don't think that was

7    exactly quoted correctly.

8    A.   The quote, as I read it, It is the

9  opinion of the reviewer that once the

10 clinicians learn the TTS fentanyl system can

11 provide continuous opioid analgesia through the

12 night, that the system will be used in a

13 broader clinical population than intended.

14   Q.   That's something you quote

15 Dr. Wright as noting in his medical officer

16 review, correct?

17   A.   I do that.

18   Q.   And that indicates that Dr. Wright

19 understood there was a likelihood that

20 Duragesic would be used off-label at some

21 point, correct?

22   A.   Oh, no.  I mean, again -- there's

23 off-label, and there's off-label, okay.

24   Q.   What's the difference between

1  off-label and off-label?

2         A.   Oh, there's the off-label that may

3  happen from the anesthesiologist.  And Curtis

4  is an ER doc.  He's a toxicologist.  There's a

5  world of difference between the -- there's a

6  world of difference between the

7  anesthesiologist going in the cabinet and using

8  a product inappropriately, as we know that

9  occupational hazard is, and that's off-label,

10  or a doctor, in his or her judgment, making a

11  decision and promotional campaigns to market it

12  broadly for chronic back pain and

13  osteoarthritis.

14         So there's -- I mean, there's the

15  one-offs off-label, which I -- and then there's

16  the campaigns that are used broadly.

17         So I guess the answer to your

18  question is -- what I meant was the extent.

19         Q.   Okay.  But Dr. Wright at least knew

20  that there would potentially be some off-label

21  use in what he says a much broader clinical

22  population than intended, correct?

23         A.   That's exactly what Curtis said.

24         Q.   And Dr. Wright also says, if you

Highly Confidential - Subject to Further Confidentiality Review

1   look at --

2          A.   He put the company on notice, is a

3   fair way to say it.

4          Q.   Okay.  And he was on notice,

5   correct?

6          A.   Sure.  I mean, his knowledge put

7   him -- I don't know what that means.

8          Q.   Well, he knew it was a potential

9   risk, correct?

10         A.   That, I would agree with.

11         Q.   FDA was on notice, correct?

12         A.   FDA -- Curtis had knowledge, I

13   think is the way to say it best.

14         Q.   Curtis worked for FDA, correct?

15         A.   Yes.

16         Q.   He was the medical officer charged

17   with reviewing the NDA for Duragesic, correct?

18         A.   Right.

19         Q.   And do you dispute that if Curtis

20   knew something and included it in his medical

21   officer review, that that's something that FDA

22   knew?

23              MR. RAFFERTY:  Object to the form.

24         A.   I mean, I clearly say Curtis knew

1    this.  There's no question, ma'am, that Curtis

2    knew this.

3         Q.   And you agree FDA knew it, correct?

4         A.   That's a metaphysical question,

5    almost Wittgensteinian in nature.  I will

6    certainly -- it's -- for example, just because

7    we're in Washington, when we say the White

8    House knew, who knows what?  You've got to be

9    careful on those statements.  That's my only

10   issue.

11        I certainly am not taking any issue

12   with the fact that Curtis knew this.  In fact,

13   he said to your company he knew this before he

14   even opened the application because he was

15   sensitized to this because he knew the very

16   strong potency of the product.

17        Q.   Are you familiar with Janssen's

18   efforts to monitor for abuse, misuse, or

19   diversion of Duragesic?

20        A.   I have some familiarity with that.

21   I believe I've seen some documents to that

22   effect.

23        Q.   Did you review the deposition

24   testimony of either Gary Vorsanger or Bruce

1    Moskovitz regarding the abuse, misuse or

2    diversion of the efforts to monitor the abuse,

3    misuse or diversion of Duragesic?

4              MR. RAFFERTY:  Object to the form.

5        A.   I spent more time with Vorsanger, I

6    believe, but I searched both.  But Vorsanger I

7    cite in a deposition, and I believe I've spent

8    more time with that, yes.

9        Q.   Did you evaluate the risk

10   management plan that was implemented for

11   Duragesic in June 2007 years before the

12   class-wide REMS for extended release opioids

13   went into effect?

14       A.   If you can -- can you just give me

15   that risk map so I can just reflect -- refresh

16   my memory on that risk map?

17       Q.   I don't have it in front of me.

18            Do you remember if you reviewed it,

19   as you sit here today?

20       A.   I'd have to go back and check.  I

21   mean, that specific one, I just have to go back

22   and check, ma'am.

23       Q.   Are you aware that Janssen had a

24   risk management plan in place for Duragesic

1    years before the class-wide REMS for extended

2    release opioids went into effect?

3         A.   That was not uncommon for a number

4    of those compounds.

5         Q.   And you knew that Duragesic had a

6    risk management plan implemented years before

7    the class-wide REMS went into effect, correct?

8         A.   Yes, I believe that's correct.

9         Q.   Did you know, pursuant to the

10   Duragesic risk management plan, that Janssen

11   regularly provided FDA with progress reports?

12        A.   That was a part of the risk

13   management -- those are part of the risk

14   management requirements.

15             THE WITNESS:  Can I just have

16        the -- pull the risk map if I'm being

17        asked about it.

18        Q.   I have very limited time, so I'm

19   just asking what you remember as you sit here

20   today, and you can tell me if you think you

21   need to review it to answer, and that's fine,

22   but I don't have time for you to look at them.

23        A.   I just want to be precise exactly.

24             But I am familiar with progress

Highly Confidential - Subject to Further Confidentiality Review

1    reports, and I have seen progress reports.

2         Q.    Okay.  Great.

3               And do you recall that the progress

4    reports generally looked for safety signals or

5    new safety signals with respect to misuse,

6    abuse or diversion of Duragesic?

7         A.    I think there were sections on

8    that, but I want to review before I give you

9    any opinion on that section of the risk map.

10        Q.    In forming your opinions in this

11   case, what, if anything, did you do to measure

12   the rate of abuse, misuse or diversion of

13   Duragesic?

14        A.    I don't -- I did not do any

15   specific analysis on that question.

16        Q.    Are you relying on any analysis by

17   any of the experts in this litigation?

18        A.    I'm not relying on any other

19   experts, but the quantitative aspects of --

20   there are some -- I do have documents that talk

21   about that and the extent of the abuse.

22              I am familiar firsthand with

23   instances of abuse and cases of abuse, but I

24   have not done any specific quantitative

Highly Confidential - Subject to Further Confidentiality Review

1    analysis of that.

2              And I'm issuing no opinion

3    quantitatively on the specific rate of abuse.

4         Q.   Did you review Janssen's cumulative

5    review of iatrogenic addiction associated with

6    the use of the transdermal Duragesic fentanyl

7    patch?

8         A.   You'd have to refresh my memory on

9    that document.

10        Q.   Okay.  I'm going to show it to you.

11             (Exhibit Kessler-23 marked for

12             identification and attached to the

13             transcript.)

14   BY MS. LAURENDEAU:

15        Q.   I'll hand you what I've marked as

16   Exhibit 23.  Exhibit 23 is a document entitled,

17   Cumulative Review of Iatrogenic Addiction

18   Associated With the Use of Transdermal

19   Duragesic Fentanyl Patch.  And it's dated

20   September 8th, 2006.

21             Is this a document you recall

22   reviewing in connection with forming your

23   opinions, Dr. Kessler?

24        A.   At the top of my mind, I don't have

1    any -- I'd have to look at the document.  I'm

2    drawing a blank on this specific one.  I may

3    have.  I've got to go take a look.  I think

4    it's on -- I'm pretty sure it's on my reliance

5    list, but I'd have to go back and check.

6            Q.   Okay.  I will represent to you that

7    I did not see it on your reliance list.  Would

8    you mind checking on a break and letting me

9    know if you see it or if you think I missed it?

10           A.   Yeah.  Let me check my -- I have it

11   on my hard drives, and I have much of -- I have

12   much of the submissions to FDA.  And the

13   question is, is it in any of those FDA

14   submissions.  So I just don't know -- I'd be

15   happy to check and see whether it was part of

16   any of the FDA submissions that are on my

17   reliance list.

18           Q.   I'm going to have you look at

19   page 9 very quickly, and show you that page 9

20   evaluated fentanyl patch's exposure from launch

21   to June of 2005.

22           A.   I'm sorry.  Just show me where

23   you're reading, please.

24           Q.   Table 1.

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Table 1.

2          Q.    Fentanyl patch's exposure from

3     launch to June of 2005.

4          A.    Right.

5          Q.    And the total patient days is over

6     1.6 billion, correct?

7          A.    That's what that says.

8          Q.    And if you look at the results, the

9     results say, the search of scepter [ph]

10    retrieved a total of 117 cases, with a

11    preferred term of dependence, 14 cases, or drug

12    dependence, 103 cases.

13          Do you see that?

14          A.    That's what that says, yes.

15          Q.    If the results of this cumulative

16    review of iatrogenic addiction showed a total

17    of 117 cases combined of dependence and drug

18    dependence in more than 1.6 billion patient

19    years, would you agree with me that that's a

20    low rate of dependence?

21          A.    Yeah, but --

22               MR. WEINBERGER:  Patient days, not

23          patient years.

24               MS. LAURENDEAU:  Patient days.  Let

1    me restate the question.

2         Q.   Would you agree with me that if

3    this report shows a total of 117 cases of

4    dependence in more than 1.6 billion patient

5    days, that that's a low rate of dependence?

6         A.   Your question says, if the report.

7    The report says there are 117 cases out of the

8    1.6 billion.  And I would agree with you that

9    that would be a low number.

10              But I think everybody would agree

11   that on these reporting systems, these are

12   woefully inadequate and pick up only a

13   fraction, if that, of the total number of

14   cases.  They're not that -- these kind of

15   studies are not -- we have this problem with

16   adverse event reporting all the time.

17              So, you know, I would agree with

18   you based on these numbers in this report, as

19   you said, that that would be, you know -- that

20   would come out to the number.  But don't hold

21   your breath that the 117 is accurate.  I'm

22   sorry.

23              The best way to say it is, the 117

24   is clearly significant underreporting.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   So even if the actual cases were

2  ten times what was reported, it would still be

3  a low rate of dependence based on the patient

4  days of exposure, correct?

5    A.   If that was the number that you

6  hypothesized to use, I would agree with you

7  that that would be low.

8    Q.   And you don't know what the actual

9  rate was, but the iatrogenic addiction

10  cumulative review is something that companies

11  and FDA rely on to get a sense of what the

12  actual rate of an adverse event, in this case,

13  dependence, actually is, correct?

14         MR. RAFFERTY:  Object to the form.

15    A.   No.  I think that what you would

16  want to do more accurately is to take a defined

17  cohort of people -- a defined cohort -- and

18  there are studies like this.  And you would

19  want to take a cohort that has the number of

20  people who became addicted from prescriptions,

21  and you'd want to be able to understand what

22  they were treated with.

23         So I wouldn't -- this is hypothesis

24  generating, as they say in the trade.  This

Highly Confidential - Subject to Further Confidentiality Review

1   isn't really scientific evidence.  There are a

2   whole host of studies that I'm willing to give

3   you on iatrogenic addiction.  I mean, again,

4   this is -- I mean, this is what it is.

5        Q.   And this is something that FDA

6   actually asked Janssen to do, correct?

7        A.   Sure.  I mean, this is -- FDA has

8   asked for a whole host of things.  This is sort

9   of an epi study.  But there are a whole host of

10  studies that are being done that I would say

11  are scientifically -- they'd have a

12  scientific -- they have a more rigorous

13  scientific basis than just simply a signal

14  detection.

15       Q.   You said that the actual rate is

16  clearly higher than this.  What is the actual

17  rate?

18       A.   I don't know.  I can tell you

19  that -- I can go through studies about the

20  iatrogenic addiction rate.

21            I think I testified yesterday that

22  if one looked at opioids in general, I was

23  comfortable with about -- you know, from

24  clinical experience, with about 20 percent.

Highly Confidential - Subject to Further Confidentiality Review

1    But again, I'm happy to go through

2  the literature and show you the range within

3  that literature.

4         MS. LAURENDEAU:  Okay.  Let's take

5      a quick break.

6         MR. RAFFERTY:  Okay.

7         VIDEO OPERATOR:  11:27, we are off

8      the video record.

9         (Recess from 11:27 a.m. until

10      11:43 a.m.)

11         VIDEO OPERATOR:  11:43, we are on

12      the video record.

13  BY MS. LAURENDEAU:

14      Q.   Dr. Kessler, can you please turn to

15  paragraph 265 of your report.

16      A.   Yes, ma'am.

17      Q.   In this opinion, you state that,

18  Janssen contributed to the change in the

19  practice of medicine with regards to pain

20  treatment and the concomitant expansion of both

21  the use and abuse of opioids by misleading

22  promotion and marketing that minimized the

23  risks and overstated the benefits of its opioid

24  drugs.

Highly Confidential - Subject to Further Confidentiality Review

1          Did I read that correctly?

2     A.    You did, ma'am.

3     Q.    That's the opinion -- one of the

4  opinions you intend to offer at trial in this

5  case?

6     A.    Yes, that would be fair.

7     Q.    As I read your report, in this

8  opinion, you're really talking about Duragesic

9  and not Nucynta.  Correct?

10          MR. RAFFERTY:  Object to the form.

11     A.    No.

12     Q.    You're talking about both Duragesic

13  and Nucynta?

14     A.    I think the majority of the

15  comments, to be fair, relate to Duragesic, but

16  there are certainly issues with regard to

17  Nucynta.  But I would agree with you that

18  Duragesic has a significant role in the

19  formulation of that opinion.

20     Q.    Is it your opinion that Janssen

21  contributed to the change in the practice of

22  medicine with regards to pain treatment and the

23  concomitant expansion of both the use and abuse

24  of opioids by misleading promotion and

1   marketing of Nucynta that minimized the risks

2   and overstated the benefits of its opioid

3   drugs?

4           A.    Yeah, I think that would be fair.

5           Q.    Okay.  I thought you testified

6   yesterday that the change in the practice of

7   medicine had already occurred at some point in

8   time well before Nucynta was approved.

9                Did I mishear you?

10               MR. RAFFERTY:  Object to the form.

11          A.    Maybe yes and no.  I think what --

12  I think what I said and, hopefully, is

13  reflected in this report -- that activity in

14  the early 2000s, late 1990s set the stage, but

15  I believe that was continued throughout and

16  even after, to the point where --

17               So maybe the question is -- you

18  know, when I use the word "change," maybe I'm

19  not as artful as I should be, but it's the

20  change and that continued change in that

21  perception.

22               So I think that there's an adding

23  on or a perpetuation of that change.  Maybe a

24  more artful -- the change and -- perpetuation,

1    not change, may be a more artful way of saying

2    it.

3              Q.   So you believe that after

4    Nucynta ER was approved in 2011, the practice

5    of medicine with regards to pain treatment

6    changed as a result of some type of misleading

7    promotion or marketing of Nucynta?

8              MR. RAFFERTY:  Object to the form.

9         A.   I think it contributed to the

10   overall perception of how opioids was used, and

11   I think that perception was improper.

12             Q.   That perception existed well before

13   2007 -- or 2011, correct?

14             MR. RAFFERTY:  Object to the form.

15        A.   Well, again, I think it's a

16   question of degree, and I mean, it's a question

17   of collectively, over, really, 20 years of

18   that -- that change in perspective from, again,

19   what we knew in 1980.

20             I think -- it's a perpetuation of

21   that change continued, I think is, again, the

22   best way to say it.

23             Q.   So you think the practice of

24   medicine with regards to pain treatment would

1    be different than it is today if Nucynta had

2    never been approved and marketed?

3              MR. RAFFERTY:  Object to the form.

4         A.   I think the -- I think the -- I'm

5    not arguing on its marketing -- I'm sorry.  I'm

6    not arguing on its approval --

7         Q.   But I'm just saying, assume it was

8    never approved.

9              MR. RAFFERTY:  Excuse me.  He was

10             answering your question.

11             Go ahead, Doctor.

12        A.   I think the -- I think the

13   collective -- I can't quantitate it, but I

14   think the collective perception of opioids as

15   having less abuse potential -- stating, you

16   know, something -- less withdrawal, less GI

17   effects -- I think those things -- and

18   certainly less abuse potential, less

19   withdrawal -- I think those -- that's -- that

20   was a collective -- collectively affected that

21   change in medicine.

22        Q.   And you think the practice of

23   medicine today would be different if Nucynta

24   had not been marketed by Janssen in the ways

1  you take issue with?

2          MR. RAFFERTY:  Object to the form.

3      Q.   That's your opinion?

4          MR. RAFFERTY:  Asked and answered.

5      A.   I think it was -- I think it was a

6  cumulative thing.

7      Q.   And you think the practice of

8  medicine today with regards to pain management

9  would be different if Janssen had not marketed

10  Nucynta in the ways that you take issue with?

11          MR. RAFFERTY:  Object to the form.

12      A.   I think, again, it contributed to

13  this notion of less abuse potential, less

14  withdrawal for strong opioids.  That's what I

15  think.

16      Q.   And you think the practice of

17  medicine with regards to pain management would

18  be different today if Janssen had not marketed

19  Nucynta in the ways that you take issue with,

20  correct?

21          MR. RAFFERTY:  Object to the form.

22      A.   Sure, sure, because people

23  obviously thought they had something, the way

24  your company -- your client, sorry -- marketed

1  this: this had a different withdrawal; this had

2  different tolerability; you could use opioids,

3  but because you have norepinephrine reuptake

4  implications, that you would have opioid

5  sparing.

6           I think that adds to the

7  collective -- the collective way pain was being

8  treated, yes.  That marketing -- that marketing

9  has -- marketing by your company had an effect.

10 We know that.

11      Q.   I want to focus just on Janssen now

12 and not any of the other manufacturers.

13           How would the practice of medicine

14 be different today if Janssen had not marketed

15 Duragesic and Nucynta in the ways you take

16 issue with?

17           MR. RAFFERTY:  Object to the form.

18      A.   Oh, I think Janssen -- I think

19 the -- I can show you, just in general.

20      Q.   I don't want to know what it did; I

21 want to know how the practice of medicine would

22 be different today.

23           MR. RAFFERTY:  Objection.  He's

24           answering your question.

Highly Confidential - Subject to Further Confidentiality Review

1          A.   So I think the practice of

2    medicine -- you go back, you know; you look at

3    how opioids were used.  Back in 1990s, chronic

4    opioids -- I mean, extended-release opioids

5    were not recommended.

6               1980, that drug of choice book that

7    I showed yesterday, if you look at, for

8    example, this picture, you know, is very

9    different than this picture.

10              And what you see is this sense

11   of -- this perception without data that there

12   would be improved functionality, that this can

13   be used in a broad range of indications such as

14   back pain, in osteoarthritis, I don't think

15   would have ever happened -- I'm sorry -- that

16   would not happen to the extent it would happen

17   but for -- but for marketing.

18        Q.   Do you think anything other than

19   manufacturers' misleading promotion and

20   marketing of their opioid products contributed

21   to the increase in opioid prescriptions during

22   the time period you're talking about?

23              MR. RAFFERTY:  Object to the form.

24        A.   I think that the -- if you're

1    asking me about the increase in prescriptions,

2    I think it was the misleading promotion of

3    manufacturers that contributed to the increase

4    of promotion [sic].

5              Your company specifically had

6    probably the most extensive and most

7    sophisticated system that I've seen on

8    measuring return on investment, measuring

9    return on investment on coupons, on detailing,

10   in Ohio, in Akron, in Cleveland East, in

11   Cleveland West, right.

12        Q.   Okay.  I --

13        A.   So there was no --

14        Q.   I understand --

15             MR. RAFFERTY:  Hang on.  He can

16        finish his question.

17        Q.   I have limited time, and you're

18   jumping --

19        A.   Sure.  I'm sorry.  I'm sorry.  I

20   apologize.

21        Q.   You're going astray.

22             MR. RAFFERTY:  You asked --

23        Q.   I'm sorry, but you are going

24   astray.

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. RAFFERTY:  You know, you did
2        not --
3        A.   Go ahead.  I'm sorry.
4              MR. RAFFERTY:  You asked him a very
5        open-ended question.  He can answer.
6              MS. LAURENDEAU:  I asked him --
7              MR. RAFFERTY:  Otherwise, you can
8        withdraw the question.
9              MS. LAURENDEAU:  -- if anything
10       else contributed, and then he started
11       talking about my client's marketing.
12             MR. RAFFERTY:  Are you withdrawing
13       the question?
14             MS. LAURENDEAU:  No --
15             MR. RAFFERTY:  Well, then he's
16       going to finish his question.
17             MS. LAURENDEAU:  -- I'm not
18       withdrawing the question.
19             No, he's not.
20             MR. RAFFERTY:  Yes, he is.
21             MS. LAURENDEAU:  You can object to
22       use of the question later if you want
23       to.
24             MR. RAFFERTY:  Move to strike
```

1    the -- move to strike the question.

2              MS. LAURENDEAU:  Okay, great.

3              MR. RAFFERTY:  Who was ruling

4    yesterday?

5    BY MS. LAURENDEAU:

6         Q.    Did anything other than

7    manufacturers' marketing of their opioid

8    products contribute to the increase in

9    prescriptions, or was that entirely due, in

10   your opinion, to manufacturers' misleading

11   promotion and marketing of their products?

12             MR. RAFFERTY:  Object to the form.

13        A.    I would never want to state that --

14   I think you used the word "anything."  I think

15   there are -- I think that the predominant, the

16   vast, the gravamen, the impetus, the major

17   force, the overwhelming force was the

18   marketing.

19             I mean, I think -- I mean, I do

20   recognize -- and I think I say in this

21   report that I think there were some individual

22   doctors prior to the marketing and promotion

23   that had beliefs that they should be -- they

24   should be used for chronic pain, but I think

Highly Confidential - Subject to Further Confidentiality Review

1    they were few, they were far between, they did

2    not get traction.

3              You know, would they have -- would

4    those have contributed to an increase?  Maybe

5    0.00000001 percent.

6              So when you say "anything," I think

7    there's always things we can talk about, but

8    this was overwhelming.  I mean, this is an --

9        Q.   You're not --

10       A.   This is an epidemic of

11   prescriptions.  Again, you asked me what -- if

12   I'm understanding your question -- what

13   resulted in the increase in prescriptions.  The

14   prescriptions were promotionally sensitive, and

15   that's what drove these prescriptions.

16       Q.   And you think it's the increase in

17   prescriptions that contributed or caused the

18   increased use and abuse of opioids, correct?

19       A.   As Dr. Sackler said, the

20   increase -- which I agree, and Curtis Wright

21   has said -- the increased amount of drug in

22   interstate commerce is going to -- put more

23   drug in interstate commerce, you're going to

24   have more abuse.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   In your opinion, are there any

2  other factors other than the increase in the

3  amount of opioid products in interstate

4  commerce that contributed to the expansion of

5  the use and abuse of opioids?

6      A.   Sure.

7      Q.   What are those other factors?

8      A.   Well, I think we talked about the

9  fact -- I mean, I don't think it's a very big

10  percentage, if you look at the studies, but I

11  think the fact that -- for example, we know

12  that there are bad doctors, there are pill

13  mills, there is -- there are criminals

14  affecting the system.

15          So sure, that's got to have some

16  effect on the abuse other than the increase in

17  the amount of products in interstate commerce

18  that resulted from prescriptions.

19      Q.   Have you done any analysis to

20  attempt to determine the percentage

21  responsibility of bad doctors, pill mills, or

22  other bad actors for the increase in the use

23  and abuse of opioids?

24      A.   I don't have a specific analysis on

1    that.  I do have data -- I mean, you can see

2    it -- and I've looked at specific -- some

3    specific data on how many some -- you know,

4    some of these high-volume docs who get

5    prosecuted, but I have not done any analysis

6    myself of what percentage I can attribute.

7              But my understanding from the data

8    that I've seen, that it's relatively small.

9         Q.   You don't intend to offer any

10   opinions at trial on the appropriate allocation

11   of responsibility between manufacturers'

12   purported misleading promotion and marketing of

13   their products versus bad doctors, pill mills,

14   or bad actors for the use and abuse of opioids,

15   correct?

16             MR. RAFFERTY:  Object to the form.

17        A.    Specific allocations, 22 percent,

18   5 percent, 0.2 percent?  No, I would not, not

19   at all.

20             But I think that there should be no

21   mistake that my opinion is that marketing drove

22   this epidemic and the increase of prescription

23   drugs.  But I don't have a specific

24   quantitative number for that, no.

1    Q.   Your opinion assumes that doctors

2    were actually mislead by -- your opinion in

3    paragraph 265 of your report assumes that

4    doctors were actually misled by Janssen's

5    misleading marketing, correct?

6    A.   Misled?  Sure.  I mean, I guess

7    that's probably correct.  I'm not sure --

8    doctors follow -- I mean, we know --

9         I just have a little problem with

10   maybe the question "assumes that doctors were

11   actually misled," "actually misled."

12   Q.   Well, if they weren't misled by the

13   promotion and marketing that minimized the

14   risks and overstated the benefits of its opioid

15   drugs, then that wouldn't be the cause, as you

16   believe it is, for the expansion of the use and

17   abuse of opioids, correct?

18   A.   Yeah, I think that's well said.  I

19   would agree that -- if you're defining "misled"

20   like that, I would agree that doctors were

21   misled, because we do know -- and your company

22   has -- knows exactly, in exquisite detail, the

23   return on investment and the promotional

24   sensitivity of virtually all its promotional

Highly Confidential - Subject to Further Confidentiality Review

1  activities and measured that exquisitely and

2  with, you know, a great deal of sophistication.

3          And we knew those drove

4  prescriptions, and we know those

5  prescriptions -- I mean, a very significant

6  number of those were done, in essence,

7  off-label.

8          So that was -- I mean, because they

9  didn't -- I mean, it could not be that there

10  were no alternatives for this vast number of

11  prescriptions.

12      Q.   So your opinion assumes doctors

13  were misled by Janssen's marketing that

14  minimized the risks and overstated the benefits

15  of Duragesic and Nucynta, correct?

16      A.   I don't think it assumes anything.

17  I think if you look at the record, if you look

18  at the indication, it is -- the amount of

19  prescribing for chronic back pain and

20  osteoarthritis and the, in fact, back -- the

21  marketing for those clearly shows that that was

22  off-label because it did not have -- that did

23  not include using alternatives showing that

24  alternatives were inadequate.

1    Q.   Is it your opinion that every

2    off-label prescription of Duragesic or Nucynta

3    was a result of misleading promotion and

4    marketing by Janssen?

5    A.   No.  I would never say that all.

6    But just look at your ROI numbers, and you will

7    see the extent and the -- in essence, the real

8    power of your promotional activities for

9    increasing prescribing and, you know -- this

10   was -- I mean, you have a built-in sort of --

11   you want to see the effect of marketing,

12   Duragesic is probably the best example of it.

13   Q.   I understand that you've told me

14   that.  But I'm really going to ask you to

15   try -- I'm running out of time now, and I

16   haven't asked you about 85 pages of your

17   95 pages of report about Duragesic and Nucynta.

18   So I'll ask you -- we understand your views

19   about this, but I'd ask you to just try to

20   please focus on answering my question.

21       MR. RAFFERTY:  Just for the record,

22       he specifically answered your question.

23       He said, no, I would never say that at

24       all.

1    MS. LAURENDEAU:  And then he went

2         on and on and on.

3    Q.   You would agree that at least some

4    doctors who prescribed Duragesic or Nucynta

5    off-label weren't misled by Janssen's

6    marketing, correct?

7         MR. RAFFERTY:  Object to the form.

8    A.   I certainly wouldn't want to say

9    that every single doctor.  But I think that --

10   there are always exceptions, and there are

11   always individual doctors.  But the notion to

12   use this for chronic back pain and

13   osteoarthritis didn't come from any other

14   source other than your marketing.

15   Q.   You would agree that some doctors

16   who prescribed Duragesic and Nucynta off-label

17   were well-informed of the risks all along,

18   correct?

19        MR. RAFFERTY:  Object to the form.

20   A.   Just give me a second to answer

21   that question.

22   Q.   What do you need to look at to

23   answer the question, just for the record?

24   A.   I just want to see what is -- I

Highly Confidential - Subject to Further Confidentiality Review

1   want to see something about the label.  Hold on

2   a second.

3         Q.    I just want to know if you would

4   agree that some doctors were well-informed of

5   the risks of Duragesic and Nucynta all along --

6             MR. RAFFERTY:  Object to the form.

7         Q.    -- when they prescribed it

8   off-label.

9         A.    I think the extent of the -- again,

10  I want it to be precise.  I'd want to look at

11  the certain documents.

12            But in the spirit of time, the

13  extent of the addiction from these compounds

14  over the long-term, I don't think the vast

15  majority of doctors -- the exceptionally vast

16  majority of doctors really understood, in light

17  of this change in American medicine that

18  happened.

19            So I don't think the vast majority

20  of doctors were well-informed about the real --

21  I mean, after these -- I mean, these campaigns

22  that minimized collectively the abuse of these

23  products.  So, I mean, I think -- I'm not

24  saying there's no one who's well-informed, but

Highly Confidential - Subject to Further Confidentiality Review

1    I think it was very small.

2        Q.   You would agree that at least some

3    doctors were well-informed of the risks all

4    along, correct?

5        A.   I am sure that there are a couple

6    who resisted this notion that you could use

7    these drugs safely in these conditions.

8        Q.   You think there are only a couple

9    doctors who were well-informed of the risks of

10   Duragesic and Nucynta but prescribed those

11   products occasionally off-label for certain

12   patients?

13            MR. RAFFERTY:  Object to the form.

14       A.   I do need to find -- so I can be

15   precise.

16       Q.   I'm just going to move on.

17   Withdraw the question.

18            THE WITNESS:  Go off the record for

19       a second.

20            MR. RAFFERTY:  She's moved on,

21       Doctor.

22            THE WITNESS:  Thanks.

23       A.   I just want to be able to answer

24   your question precisely.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.   Do you have an opinion, as you sit

2     here today, of how many doctors who prescribed

3     Duragesic and Nucynta -- what percentage who

4     prescribed Duragesic or Nucynta off-label were

5     misled by Janssen's misleading promotion or

6     marketing?

7               MR. RAFFERTY:  Object to the form,

8          asked and answered.

9               THE WITNESS:  Why don't we go off

10          the record.  I just need to find one

11          document, and I don't want to take your

12          time.

13               MS. LAURENDEAU:  Okay.  We'll go

14          off the record.

15               VIDEO OPERATOR:  12:06, we are off

16          the video record.

17               (Recess from 12:06 p.m. until

18          12:11 p.m.)

19               VIDEO OPERATOR:  12:11, we are on

20          the video record.

21     BY MS. LAURENDEAU:

22          Q.   Dr. Kessler, do you have an answer

23     to the pending question?

24          A.   Yes.  I don't have a -- I have no

1   opinion on a precise percentage of doctors who

2   prescribed Nucynta were misled.  But I think it

3   was a very significant number who were affected

4   by the minimization of the risk of abuse.  I

5   think that change in medicine had a major

6   impact on the profession.

7            Q.    Can you name anyone, as you sit

8   here today, who prescribed Duragesic or Nucynta

9   who was misled by Janssen's promotion and

10  marketing and otherwise would not have

11  prescribed the medicine?

12           MR. RAFFERTY:  Object to the form.

13           A.    Yeah, I'm -- I did not conduct, nor

14  would I think it would be appropriate to do, an

15  anecdotal interview.  That's not -- I mean, I'm

16  basing it on the data that I have seen.

17           Q.    You haven't spoken with anyone,

18  whether in an anecdotal interview, in the

19  course of your professional career, or through

20  any formal survey or otherwise, who indicated

21  to you that he or she prescribed Duragesic or

22  Nucynta as a result of being misled by

23  Janssen's marketing or promotion, correct?

24           MR. RAFFERTY:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I wouldn't rely on the anecdotal

2     kind of comments that are just made to me.  I

3     think that would be inappropriate.

4          Q.    And you're not aware of anyone who

5     fits that description, as you sit here today,

6     are you?

7               MR. RAFFERTY:  Object to the form.

8               THE WITNESS:  Gerard, can I just

9          see General 1, please.

10              MS. LAURENDEAU:  What's General 1?

11              THE WITNESS:  Just my notes,

12         please.  Just the packet of notes.

13              MR. RAFFERTY:  Can I ask a

14         question?

15              MS. LAURENDEAU:  Sure.

16              MR. RAFFERTY:  When you say, you're

17         not aware of anyone, you mean by name?

18              MS. LAURENDEAU:  Any.  Any specific

19         person.  I know he holds the opinion

20         that that's generally true.  I want to

21         know if he has any specific person he

22         knows of who falls into that category.

23         A.    So let me give you a call note that

24    provides evidence in Cuyahoga.  And it ends in

Highly Confidential - Subject to Further Confidentiality Review

1  just 4, and everything prior is Janssen, Ohio

2  ending in 4.

3          Quote, Duragesic for chronic back

4  pain and DJD, degenerative joint disease,

5  believed was only used for cancer patient.

6  Discussed patients on Percs and Vics and how to

7  convert, gave core message of our Duragesic,

8  disc. MS, Oxy.  Said he would choose Duragesic

9  over them.

10         So that's obviously a change.  I

11  can give you the doctor's name here, but I

12  don't think that would be fair.

13      Q.   Was that a doctor in Cuyahoga

14  County, you said?

15      A.   In Cuyahoga County.  I'm just

16  reading from call notes.

17      Q.   What was the date of the call note?

18      A.   4-14-1999.

19          (Reporter interruption.)

20      Q.   And that was a discussion about

21  chronic back pain and DJD, correct?

22      A.   Correct.

23      Q.   That was within the approved

24  indication for Duragesic at that time, correct?

1          A.    Yeah.

2          Q.    No.

3          A.    No.

4          Q.    You think it was only approved for

5    cancer pain?

6          A.    No.

7          Q.    What was it approved for at the

8    date?

9          A.    You could use it in chronic back

10   pain, but you can only use it in chronic back

11   pain when there was no other alternative.  That

12   was the indication.  Continuous, around the

13   clock.  That's the rub, ma'am.

14         Q.    How do you know that patient didn't

15   require continuous, around the clock and hadn't

16   had other medications fail?

17         A.    That's certainly -- you can -- we

18   only know what we see here.  Obviously, this

19   call note says this doctor changed; that

20   Duragesic was for chronic back pain and DJD.

21              You're right in terms of, if this

22   said Duragesic for chronic back pain when no

23   other alternatives and continuous and around

24   the clock.  But if -- you know, if that was the

1   indication that it was being promoted for, it

2   would have said that.

3          Q.   Well, and you don't know what the

4   doctor actually did in response to this

5   information provided by the sales rep, do you?

6          A.   I'm limited to the fact that he

7   says he would choose Duragesic, thought -- over

8   Oxy, as the last sentence.  So I know what he's

9   saying.  He's saying now he will choose that.

10              I do not know, you're correct, what

11  scripts this individual -- but I could run --

12  I'm sure I have that in the IMS if you want to

13  take a look.

14         Q.   You haven't spoken to that doctor,

15  correct?

16         A.   I think that would be

17  inappropriate.  So obviously, I'm relying on

18  the record, correct.

19         Q.   Okay.  And other than this example

20  from call notes, are you aware of any doctors

21  who you believe -- you've given me one

22  example -- prescribed Duragesic or Nucynta and

23  wouldn't otherwise have prescribed it as a

24  result of Janssen's misleading promotion and

Highly Confidential - Subject to Further Confidentiality Review

```
1   marketing?

2           A.    Well --

3                 MR. RAFFERTY:  Object to the form.

4           A.    You certainly have documents -- I'm

5   happy to give you all of them and cite them --

6   that the driving the functionality story versus

7   Oxy, that message --

8           Q.    Rather than --

9                 MR. RAFFERTY:  Objection.

10          Q.    Rather than general messages or

11  general activities, I'm focused on specific

12  doctors right now.

13                Other than the one example you've

14  given me from call notes, are you aware of any

15  instances of any doctors who prescribed

16  Duragesic and Nucynta and otherwise would not

17  have were it not for Janssen's misleading

18  promotion of the products?

19                MR. RAFFERTY:  Objection.  I think

20          it's vague, and that's the problem.

21          It's -- you're saying "instances."

22          A.    I mean, I can tell you -- I can

23  give you -- and the way that your client did

24  this was in the aggregate so that there was --
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   What are you looking at, for the

2    record, please?

3    A.   So I can give you a number of

4    documents.  You want to put those on the --

5    Q.   I just want you to identify what

6    you're looking at, and then I'll decide if

7    we're going to talk about it or not.

8    A.   Okay.  One is called Duragesic

9    E-Detailing Pilot Program.  One is Key Tactics

10   Review.  One is Duragesic -- Duragesic Coupon

11   ROI Analysis NRx and Coupon Data Through 2001.

12   And the Ohio Regional Business Plan 2009.

13   Q.   These are documents that you're

14   relying on for your opinion that Janssen's

15   misleading promotion and marketing of Duragesic

16   or Nucynta caused doctors to prescribe opioids

17   and they otherwise would not have, correct?

18        MR. RAFFERTY:  Object to the form.

19   A.   I'm relying on -- that opinion that

20   you just stated, I'm relying on all the

21   documents that I cite in the report, not just

22   these, just so you understand.

23   Q.   But these documents don't provide

24   any examples of specific doctors who have been

Highly Confidential - Subject to Further Confidentiality Review

1    misled by Janssen's promotion or marketing of

2    Duragesic or Nucynta, correct?

3            A.    I think these doctors provide

4    better evidence than an individual doctor

5    because that's --

6            Q.    That's fine.

7            A.    Let me finish my statement.

8            Q.    We can quibble about that, but --

9            A.    They do.  Because they give you

10   exactly the return on investment from

11   promotion -- various promotional activities.

12   And we know what those promotional

13   activities -- what they were for and how they

14   were misleading.

15               So you have the numbers in

16   aggregate, what the effect is of your

17   promotion, and even in Cuyahoga County and in

18   Summit -- in cities in Cuyahoga and Summit.

19           Q.    But without talking to an

20   individual doctor, you can't testify that any

21   particular doctor was or wasn't misled, can

22   you?

23               MR. RAFFERTY:  Object to the form.

24           Q.    You have to assume that they were?

Highly Confidential - Subject to Further Confidentiality Review

1    A.   No, I'm not assuming anything.

2    What I'm relying on is your company's analysis

3    of how doctors changed their prescribing

4    practices based on the promotional materials

5    that were given and the promotional sales

6    pitches that were given that focused on

7    functionality, et cetera, that we've discussed.

8         Q.   And it's your opinion that those

9    doctors who prescribed Duragesic and Nucynta

10   were misled, correct?

11        A.   Certainly, the campaigns that

12   focused on functionality, on lower abuse that

13   are identified in the report, those campaigns

14   led to the misleading of doctors.

15        Q.   And in order for a doctor to be

16   misled, they had to give more weight to

17   Janssen's marketing than to the product

18   labeling, correct?

19             MR. RAFFERTY:   Object to the form.

20        A.   Janssen's -- Janssen's marketing

21   was so extensive and so sophisticated that it

22   wasn't just, quote, marketing.  So it's not a

23   question of --

24        Q.   Can you answer my question.  Either

1    you agree with me or you disagree with me.

2           A.    I will.

3                 Janssen's -- it's not a question of

4    Janssen's just, quote, marketing.  Janssen got

5    doctors and studied extensively which doctors

6    influenced other doctors.

7                 So it wasn't a question of

8    whether -- you know, some sense of Janssen

9    marketing, but in sort of -- between KOLs and

10   KOL mapping was just exquisitely sensitive.

11   The range from regional advisory boards to the

12   speakers' bureaus, to the E-marketing to

13   doctors, to the alternative channels, to the

14   advocacy groups, to the unbranded publication

15   plans, you knew exactly which KOLs would

16   influence which doctors to prescribe, and your

17   client utilized those KOLs to influence.

18                So it's -- the sophistication of

19   what influenced doctors versus the label, the

20   label had no chance compared to the

21   sophistication that your company utilized to

22   market because you got other doctors in KOLs to

23   talk to those doctors and changed American

24   medicine.

1    Q.   Is it your opinion that these

2   activities you've just described made it

3   impossible for doctors to be aware of the risks

4   of opioid medicines and particularly Duragesic

5   and Nucynta in deciding whether to prescribe

6   them?

7    A.   You infiltrated the medical

8   profession in such a way that it was very hard.

9   You got other doctors to talk -- the most

10  influential, the ones that you said would score

11  five or six on your KOL mappings.  The most

12  influential doctors you got to talk to other

13  doctors to talk about things that changed,

14  again, the practice in regard to opioids.  So

15  it became -- it was overwhelming in nature and

16  highly sophisticated.

17   Q.   Did these activities make it

18  impossible for well-informed doctors to

19  understand the benefits and risks and make

20  appropriate prescribing decisions regarding

21  Duragesic and Nucynta for their patients?

22   A.   Made it impossible.  I would never

23  say anything made it impossible.  That would

24  be -- but do not -- do not underestimate the

1   extent to which you infiltrated American

2   medical practice.

3        Q.   Okay.   In terms of -- you have some

4   opinions in your report about potential

5   direct-to-consumer advertising for Duragesic,

6   starting at paragraph 286.

7             Do you recall that?

8        A.   I do.

9        Q.   Okay.   Did Janssen ever undertake a

10  direct-to-consumer marketing campaign for

11  Duragesic?

12       A.   It decided not to, after it --

13  well, it decided not to do DTC broadcasts.

14  Let's put it that way.

15       Q.   And it's true that after several

16  meetings with FDA, Janssen listened to FDA's

17  concerns and did not undertake a

18  direct-to-consumer advertising campaign for

19  Duragesic, even though FDA didn't prohibit it

20  from doing so, correct?

21       A.   Well, FDA was bound by the First

22  Amendment.   So, you know, that's -- make no

23  mistake that that's what the issue is here.

24  Just so we understand, that's DTC broadcasts.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    There certainly --
 2             Hold on one second.  Let me just
 3    check one --
 4         Q.   It's okay.  I'll move on.  I
 5    understand your question.  You're looking for
 6    something to potentially clarify.
 7             In the context of discussions with
 8    FDA, Janssen informed -- if you look at
 9    paragraph 287 of your report, Janssen informed
10    FDA that it was looking to market Duragesic
11    to back pain and arthritis sufferers, correct?
12         A.   I apologize.  I just have to get my
13    report.  Just give me a second.
14         Q.   In the context of --
15         A.   What paragraph, please?
16             MR. RAFFERTY:  287.
17         Q.   Paragraph 287.
18         A.   Thank you very much.  I'm sorry.
19         Q.   In the context of discussions with
20    FDA about potential direct-to-consumer
21    advertising of Duragesic, Janssen informed the
22    FDA it was looking to market Duragesic to back
23    pain and arthritis sufferers, correct?
24         A.   I'm sorry.  Market Duragesic to
```

Highly Confidential - Subject to Further Confidentiality Review

1    back pain and arthritis sufferers as

2    undertreated.  Is that what you're reading

3    there?

4         Q.   I'm not reading it; I'm summarizing

5    it.

6         A.   Let me just read it, then.

7         Q.   Did you answer --

8         A.   I'm just not done.  I apologize.

9    I'm a slow reader.  I apologize.

10              THE WITNESS:  Can I get the actual

11         document on 287, Gerard, please.

12         Q.   Let me just talk about what you've

13    written about it here.

14         A.   Sure.

15         Q.   So you reviewed the document, and

16    you wrote a summary paragraph in your report,

17    correct?

18         A.   Correct.

19         Q.   And you've described it as saying,

20    Janssen's representative clarified that

21    Janssen's, quote, market research had

22    identified back pain and arthritis sufferers as

23    undertreated and potentially appropriate

24    candidates for Duragesic, correct?

1        A.    That's exactly what the document

2   says.

3        Q.    And DDMAC's representative

4   responded to Janssen and said, quote, this was

5   fine, but the message needs to be clearer that

6   the drug is for severe pain, not your everyday

7   back pain, correct?

8        A.    That's exactly what that says.

9        Q.    And so Janssen informed FDA it was

10  looking to market Duragesic to back pain and

11  arthritis sufferers, correct?

12            MR. RAFFERTY:  Object to the form.

13       A.    At what point in time are you

14  talking about?

15       Q.    I'm talking about in connection

16  with this -- discussions in May of 2000 about

17  Janssen's direct-to-consumer advertising plan

18  for Duragesic.

19       A.    Right.  So again, this is in

20  context to DTC, but obviously, what you

21  intended as part of your -- your NDA.  This is

22  just one conversation that is going on in the

23  context of broadcast.

24       Q.    Right.  And so in the discussions

Highly Confidential - Subject to Further Confidentiality Review

1    pertaining to DTC, Janssen informed FDA one of

2    the things it wanted to advertise to consumers

3    was pertaining to use of Duragesic for

4    arthritis pain and back pain, correct?

5         A.    Correct.

6         Q.    And FDA didn't say, no, you can't

7    do that, did it?  FDA said, this is fine, but

8    the message needs to be clear that the drug is

9    for severe pain, not, quote, your everyday back

10   pain.  That's what FDA said, right?

11        A.    That's what's said in this memo.

12   What FDA -- obviously, what Nancy Ostrove is

13   bound by the label, so you can't take this

14   as --

15        Q.    I'm just talking about what FDA

16   said.

17        A.    We can certainly say in the context

18   of discussing whether you should do DTC, Nancy

19   Ostrove was -- her recollection was that you

20   would target cancer pain, right?

21              It's interesting because that was

22   exactly my recollection at the agency, and that

23   was my sense of what Duragesic was for, that

24   there may be some patients, but they would be

1    few.  And this again, this is the rub.

2                You wanted to market for chronic

3    back pain and arthritis.

4                And FDA -- I said it, and Nancy

5    Ostrove is saying, be careful here.  This is

6    not -- this has to meet those indications in

7    essence on the label, and she's using shorthand

8    and saying, you know, this is not your everyday

9    back pain.  This better be continuous.  This

10   better be continuous; this better be when -- in

11   essence, when there's no other alternatives.

12        Q.   Did the FDA ever send Janssen a

13   warning letter or untitled letter for marketing

14   Duragesic for non-cancer pain?

15        A.   It sent other letters.  I don't

16   believe -- again, the answer is no, because

17   that's not what the label says.  That's not

18   what the indication -- it couldn't send a

19   label [sic].

20        Q.   Right.  So FDA wouldn't send an

21   untitled letter, a warning letter, or take

22   enforcement action against Janssen for

23   marketing Duragesic for non-cancer pain because

24   the label permitted it to do so, right?

Highly Confidential - Subject to Further Confidentiality Review

1     A.    No.   I mean, it would have sent a

2  warning letter, right, if it knew that you were

3  prescribing this -- if you were marketing this

4  for non-continuous, non-around-the-clock,

5  non-cases where other alternatives were not

6  tried first.  I mean, unless that is prominent

7  in your promotion, there should have been a

8  warning letter.  That's what it was indicated.

9          That was the line that I tried to

10  walk.  I tried to give room outside of cancer,

11  right.  But it had to be where there were -- no

12  other alternatives would work.

13     Q.    You knew even when you were

14  Commissioner this was a potential issue,

15  correct, and a fine line to walk?

16     A.    I had no idea you would get into a

17  competitive war with Purdue and open this up to

18  chronic back pain and arthritis and not the

19  most severe, limited cases.

20     Q.    Okay.  I'm going to -- I have

21  limited time left, so I'm going to ask you a

22  few questions about Nucynta.

23     A.    Let me just get some of this out in

24  front of me.  Just give me one second.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   FDA was aware, even before Nucynta

2  was approved, about the growing abuse crisis,

3  correct?

4    A.   I'm sorry, are you saying FDA?

5    Q.   Yes.

6    A.   I think that's fair, of course.

7    Q.   And FDA was concerned about

8  potential for abuse with Nucynta before it was

9  approved, correct?

10    A.   Absolutely.

11    Q.   Are you aware that Janssen

12  submitted all of its promotional materials for

13  Nucynta to DDMAC or OPDP?

14    A.   I'm not going to take issue with

15  it.  The only thing I would say that I -- the

16  record doesn't reflect that that's -- it

17  doesn't mean that FDA reviewed it.

18    Q.   Okay.  Is it your opinion that

19  Janssen -- or that FDA may not have reviewed

20  all of Janssen's promotional materials for

21  Nucynta, even though Janssen provided them?

22    A.   That's usually the practice.  And

23  in the vast majority of promotional materials

24  that get submitted, certainly after launch,

Highly Confidential - Subject to Further Confidentiality Review

1   would not get reviewed.

2           FDA, in certain periods of time,

3   certainly, you know, had a handful of people,

4   maybe four or five, I think the GAO report

5   cited.  It would be impossible for FDA to

6   review everything that was -- FDA could not --

7   I mean, there was a very small fraction that

8   FDA would review of submitted materials.  That

9   differs a little on launch.

10          Q.   Do you know -- you don't know, as

11  you sit here today, whether FDA actually

12  reviewed Janssen's promotional materials for

13  Nucynta, correct?

14          A.   I can see what's in -- in the -- in

15  the record.  I -- top of mind, I don't recall

16  at this moment.

17          Q.   And FDA's never expressed concern

18  with Janssen's marketing materials for Nucynta,

19  has it?

20          A.   So there's a 2011 letter, I

21  believe, if my memory serves me right, that I

22  would need to get in front of me.

23          Q.   That letter pertains to statements

24  made by -- at a conference by one sales rep,

1    correct?

2         A.   You need to show me the letter, but

3    I will take your stipulation, in the spirit of

4    time.  The letter says what the letter says.

5         Q.   FDA never issued a warning letter

6    related to Nucynta marketing materials, did it?

7         A.   It was only that one letter, ma'am.

8         Q.   And that was an untitled letter,

9    correct?

10        A.   Again, I don't have it, but I think

11   you're right.

12        Q.   Okay.  I'm going to ask you -- I

13   guess I'm going to jump back to a few of the

14   letters you talk about from FDA to Janssen

15   regarding Duragesic.

16             THE WITNESS:  Gerard, can I get my

17        notebook that's called DDMAC Janssen,

18        please.

19        Q.   So starting at -- I believe it's

20   paragraph 301 of your report, you talk about

21   warning letters that the FDA issued to Janssen

22   regarding Duragesic.

23        A.   Hold on one second, please.

24   Paragraph 301.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   301 talks about a September 2004

2  warning letter to Janssen regarding a file

3  card, correct?

4    A.   Yes.

5    Q.   And paragraph 304 talks about a

6  March 5th, 1998 DDMAC warning letter to Janssen

7  regarding promotional posters for Duragesic,

8  correct?

9    A.   Yes, ma'am.

10   Q.   That letter was actually an

11 untitled letter, wasn't it?

12   A.   Did I make a mistake on the March

13 5th letter, are you saying?

14   Q.   I believe you did.

15   A.   Okay.  Then I'll take your

16 correction on that 19 -- the letter says what

17 it is.  I take -- I'll take notice on it.

18   Q.   And in paragraph 305, you reference

19 a March 30th, 2000- --

20   A.   Let me just put a footnote.  19 --

21 yeah, let me clarify the answer to that

22 question.  As I said earlier, the issue back at

23 that time, and I have to refresh my memory,

24 don't take the title of the letter as -- at

Highly Confidential - Subject to Further Confidentiality Review

1    different points in FDA's history, we titled

2    these things -- I certainly titled this

3    differently.

4              If you go to the last page on page

5    3 of this 1998 letter, it says, Janssen should

6    immediately suspend all promotional activities,

7    and Janssen should submit a written response on

8    or before March 20th.

9              The general rule in compliance and

10   the general rule in the industry, when you are

11   being -- you should -- and gives you a date to

12   do this, that -- I'm not sure FDA in 1998 made

13   a distinction, but I think it's fair to call

14   this in -- I use a little W in paragraph 304,

15   and I would stand by that, by the nature of

16   this letter and the way it's written.

17             We just went back and forth,

18   although we had warning letters, we had

19   different title letters and different points in

20   time had different policies.

21        Q.   Okay.

22        A.   Clearly it was a warning letter, a

23   little W, warning letter.

24        Q.   Okay.  The -- I'm going to ask you

Highly Confidential - Subject to Further Confidentiality Review

1    some questions about the 2004 warning letter.

2              I guess before I do that, can you

3    look at paragraph 306 where you're offering

4    some opinions about call notes of Janssen sales

5    reps?

6         A.   What are we on, 304?

7         Q.   306.

8         A.   306.  Thanks, ma'am.

9              THE WITNESS:  Can I get my book on

10        306, please.

11        Q.   So in paragraph 306, you state that

12   the call notes of Janssen's sales

13   representatives show that into 2004, they were

14   frequently promoting Duragesic to prescribers

15   for lower back pain and arthritis, correct?

16        A.   Yes.

17        Q.   And for that, footnote 625, you

18   cite 11 calls in 1998, four calls in 1999, one

19   call in 2003, and 11 calls in 2004, correct?

20        A.   That's exactly what I say.  And I

21   also say, see also schedule 11.

22        Q.   And so you cite specifically to 27

23   calls, correct?

24        A.   I had to add them up.  I've got to

Highly Confidential - Subject to Further Confidentiality Review

1  look how many are in the schedule.  I have

2  not -- I mean, I can do that now, but I don't

3  want to take the time.

4      Q.   And these examples are where you

5  say, Frequently promoting Duragesic to

6  prescribers for lower back pain and arthritis,

7  these examples you cite are out of how many

8  calls did Janssen sales reps make to potential

9  Duragesic prescribers during this at least

10  six-year period that's encompassed by your

11  review?

12          MR. RAFFERTY:  Object to the form.

13      A.   I'd have to go check that.  I can

14  go back and check the number of call notes that

15  I had access to.

16      Q.   And you note that some of these

17  calls indicate that sales representatives were

18  also citing to the Milligan and Simpson studies

19  referenced in the sales bulletins noted above

20  in promoting Duragesic for lower back pain,

21  correct?

22      A.   Correct.

23      Q.   And for that you cite one example,

24  correct?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. RAFFERTY:  Object to form.

2     A.    That's what the report states.

3     Q.    Okay.  Are you aware --

4     A.    I don't think there's any question,

5  right.  I think you look at the totality of

6  evidence here, your client was certainly

7  promoting this for chronic back pain.  I mean,

8  the ads themselves show that.

9     Q.    And that was consistent with the

10  indication, correct?

11     A.    No, of course not.

12     Q.    Okay.

13     A.    Chronic back pain, either take

14  Nancy Ostrove or take my -- when there's no

15  other alternative therapy, when it's severe and

16  around the clock, the whole thing was not to do

17  this -- I mean, not to open the door.  That was

18  the change.

19     Q.    Okay.

20          (Exhibit Kessler-24 marked for

21          identification and attached to the

22          transcript.)

23  BY MS. LAURENDEAU:

24     Q.    I'm going to hand you what I'm

1  marking as Exhibit 24.

2          A.    Thanks.

3                MR. RAFFERTY:  What number is this?

4                MS. LAURENDEAU:  24.

5                MR. RAFFERTY:  Thank you.

6          A.    This is the -- this is not the

7  200- -- I'm sorry, I have 1998 here; is that

8  correct?

9          Q.    I gave you the wrong one then,

10  sorry.

11          A.    I'm sorry if I -- I have 200- --

12          Q.    No, I gave you the wrong one.  Let

13  me switch that.

14          A.    Okay, thanks.

15          Q.    Sorry about that.  Here's 2004,

16  Dr. Kessler.

17          A.    Thank you so much, ma'am.

18          Q.    Okay.  So this letter on page 3 is

19  talking about a file card, and it's --

20          A.    Do you want me to just --

21                THE WITNESS:  Parvin, can you just

22          pull up the file card out of here -- or

23          somebody just pull up the -- Lesi -- I'm

24          sorry, I apologize -- just pull up the

Highly Confidential - Subject to Further Confidentiality Review

1           file card so I have that at the same

2           time.

3                   MR. RAFFERTY:   What page are you

4           on?

5                   MS. LAURENDEAU:   Page 3.

6           Q.   Under Conclusions and requested

7    actions, the letter states, The file card makes

8    false or misleading safety claims or

9    unsubstantiated effectiveness claims for

10   Duragesic, correct?

11          A.   I just want to -- yes, that's what

12   it says.

13          Q.   Okay.  And isn't it true that false

14   and misleading is used by the FDA to mean

15   there's no substantial evidence or substantial

16   clinical experience to support the claim?

17          A.   False or misleading can mean a

18   number of things.

19          Q.   And FDA uses false or misleading to

20   mean there's no substantial evidence or

21   substantial clinical experience to support the

22   claim, correct?

23          A.   No.  It's more complicated than

24   that.  False or misleading could be the

Highly Confidential - Subject to Further Confidentiality Review

1   admission of certain facts.  It was the net

2   impression we talked a little about yesterday.

3   So it's more -- substantial evidence is

4   certainly a part, but I wouldn't want to say

5   that false and misleading equals substantial

6   evidence when it's used.

7            I mean, if you don't give a fair

8   balance, for example, that could be -- there

9   are whole things that go into what's misleading

10  and omissions, and it's defined in the regs.

11       Q.   Okay.  As it relates to the safety

12  claims made in the file card, FDA isn't saying

13  here that Janssen provided no evidence to

14  support the safety claims in the file card.

15  It's saying that it shouldn't have relied on

16  the DAWN data to support the claims, correct?

17            MR. RAFFERTY:  Object to the form.

18       A.   Hold on one second.  Just let me

19  see.  You're reading that in the -- hold on one

20  second.

21       Q.   I'm not reading from the document;

22  I'm summarizing the issue.  If you don't

23  remember, that's fine.

24       A.   No, no, no, I remember this.  I

1   just don't remember every single sentence.

2   Just give me one second.

3            This is not just about DAWN data.

4   This is also about claims about functionality,

5   and your company was fully aware that it did

6   not have appropriate data and evidence with

7   regard to functionality.  I think that's also

8   in this letter.

9        Q.   Okay.  If you go through the

10  letter, each of the claims that FDA takes issue

11  with, it says, we're not aware of substantial

12  evidence or substantial clinical experience to

13  support this claim.

14       A.   Certainly that's -- with regard to

15  functionality, your company didn't have that

16  evidence.  That's correct.

17       Q.   Okay.  As it relates to the safety

18  claims, Janssen relied on DAWN data, correct?

19       A.   Well, I -- sometimes these

20  effectiveness claims are safety claims.  But

21  depending on what -- how you're characterizing

22  it, it certainly dealt with DAWN data and the

23  issue of lower reported rates of abuse.  That's

24  what it's relying on for that section.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Well, FDA broke down this warning

2  letter into false or misleading safety claims

3  and unsubstantiated effectiveness claims,

4  correct?

5    A.   But it did not break that down in

6  the conclusions and requested actions that you

7  read me.  It's using false -- it says, False or

8  misleading safety claims and unsubstantiated

9  effectiveness claims.  So again, depending on

10  where you think that false or misleading

11  modifies, it could be both.

12    Q.   Have you reviewed Janssen's

13  response to the 2004 warning letter regarding

14  Duragesic?

15    A.   I may have seen it.  I tend to try

16  to do that.  But I don't have it -- I don't

17  recall, sitting here.

18    Q.   Do you recall that Janssen agreed

19  to remove the file card from its circulation?

20    A.   I believe that's correct.

21    Q.   And Janssen agreed to issue a

22  correction letter?

23    A.   I'm fully aware of that.

24    Q.   Okay.  And FDA didn't take any

1  further action with respect to the claims in

2  the 2004 warning letter, did it?

3      A.   I believe that's correct, after the

4  corrective action was taken.

5      Q.   FDA didn't bring any type of

6  enforcement action against Janssen, did it?

7      A.   It did not.

8          MS. LAURENDEAU:  Okay.  I am

9          unfortunately out of time, so out of

10         respect to my co-defendants and to give

11         them time with you, I obviously, like

12         those who came before me and those who

13         will come after me, would just like to

14         note that I have much, much more that I

15         would like to do with you, and

16         particularly given my conversation with

17         Mr. Rafferty on one of the breaks about

18         testimony you may give regarding

19         Noramco, which essentially he just said

20         you're going to testify to what -- or

21         potentially testify to what you told me,

22         which I understand you view as facts, we

23         view as opinions, and we view as facts

24         and opinions or alleged facts and

Highly Confidential - Subject to Further Confidentiality Review

```
1              opinions that were not in your report
2              and we weren't on fair notice that you
3              were intending to testify as to those
4              subjects.
5                   So we reserve all rights, including
6              the right to ask for the opportunity to
7              continue with the fun and depose you
8              again on another date prior to trial.
9                   THE WITNESS:  Let me say
10             something --
11                  MR. RAFFERTY:  And to just --
12                  THE WITNESS:  Thank you, Counselor.
13             I'm sorry.
14                  MS. LAURENDEAU:  Thank you.
15                  MR. RAFFERTY:  Yeah.  And just for
16             the record, obviously, we disagree with
17             the assessment in terms of the time and,
18             in terms of the assessment, in terms of
19             the issue regarding the super poppy.
20                  I think -- it was disclosed, we
21             believe it's facts, and we'll deal with
22             it later, I guess.
23                  MS. LAURENDEAU:  Thank you,
24             Dr. Kessler.
```

1          THE WITNESS:  Thank you, Counselor.

2          May I take a break?  Actually, we

3      may take a bigger break, right?

4          VIDEO OPERATOR:  12:49, we're off

5      the video record.

6          (Recess from 12:49 p.m. until

7      1:41 p.m.)

8          VIDEO OPERATOR:  1:41, we are on

9      the video record.

10                 EXAMINATION

11  BY MR. GALLAGHER:

12     Q.   Dr. Kessler, good afternoon.  My

13  name is Richard Gallagher, from Ropes & Gray,

14  counsel for Mallinckrodt.

15     A.   Good afternoon, Mr. Gallagher.

16     Q.   Are there any opinions relating to

17  Mallinckrodt that are not set forth in your

18  report about which you intend to testify at

19  trial?

20     A.   No, I don't think so.  I think all

21  my opinions are -- well, either in my report

22  or -- if we stop -- if you want to stop now, I

23  would say the answer is, my report.

24          If you ask me questions, I may have

Highly Confidential - Subject to Further Confidentiality Review

1   opinions, obviously, to your questions that you

2   ask.  So -- but we can discuss those.

3          But again, it's anything that I --

4   in my report or to which I testify with you

5   this afternoon, sir.

6       Q.   Okay.  So sitting here right now, I

7   can be confident that what you've written in

8   your report captures what you intend to testify

9   about at trial with regard to Mallinckrodt; is

10  that correct?

11      A.   Yeah.  I mean, I think the report

12  aims to do the four corners, but there's a lot

13  of material that we may end up talking about.

14  I think there is -- again, I think there is --

15  it doesn't change my opinions.

16          I mean, there's one point that I

17  think is a little factual, but it depends

18  whether you ask me, and I'll be happy to tell

19  you about it.  Your call.  But it's not -- I'm

20  not going to give a different opinion.

21          But documents say certain things,

22  and they're on -- they're on my reliance list,

23  to the extent to which you want me to point

24  them out.  They may not be fully stated in the

1    report.

2         Q.   Do you recall the two branded

3    products from Mallinckrodt that are the subject

4    of your report?

5         A.   Exalgo and Xartemis?  I mean, I've

6    never pronounced it correctly.  I apologize.

7         Q.   I may not have either.

8         A.   Yeah.  So we're both -- we're both

9    in the same boat.

10        Q.   Sitting here right now, do you

11   intend to render opinions at trial on brands

12   other than those two from Mallinckrodt?

13        A.   No.  Well, see, you use the word

14   "brands."  I think that there is the issue of

15   generic oxycodone that I do think is referenced

16   within the scope of my report.  I think, just

17   to -- that's certainly not in the sections on

18   Exalgo and Xartemis --

19             How are we going to refer to it?

20        Q.   Xartemis?

21        A.   Yeah, that's fine.  Thanks.

22             So they're not Exalgo and Xartemis,

23   but there is a section of the report -- to the

24   extent the collective defendants engaged in

1    class-wide opioid promotion, sort of unbranded

2    promotion, that had an effect not only on the

3    brands that we -- Exalgo and Xartemis, but also

4    had an effect on generic oxycodone.

5              So to the extent that in sales,

6    that affected generic oxycodone, that's in the

7    report.

8         Q.   Is there a section of your report

9    that describes this phenomenon?

10        A.   Yes, there is.  It's discussed

11   pretty extensively in the report that much of

12   the unbranded advertise -- sorry -- the

13   unbranded promotion that took place was about

14   opioids, less abuse, pseudoaddiction.  Much of

15   that -- that sort of rose the water level, if

16   you would, for the whole class.

17             So that rising the water level

18   affected not only the name brands but obviously

19   the generics, and your client was a very

20   significant generic manufacturer.

21        Q.   Why don't we go to page 20 of your

22   report.

23        A.   Yes, sir.

24        Q.   Do you see where there's a heading

1    that says, Promotional information needs to be

2    evaluated by the totality of the impression it

3    creates?

4         A.    Exactly.

5         Q.    And you see there's a citation to

6    the FDA's industry guidance?

7         A.    Correct.

8         Q.    Is that the standard you applied to

9    come to a conclusion as to whether promotional

10   materials were misleading or not?

11        A.    That's one of the factors that is

12   used in the evaluation.  This is how you

13   evaluate risk communication specifically in

14   promotional materials.

15             But there are other aspects, such

16   as overstatement of efficacy, understatement --

17   so there are other -- there are other aspects

18   and standards that are also set out in this

19   section that --

20             But when it comes to risk

21   communication, I think that would be fair.

22        Q.    Would it be risk communication to

23   doctors?

24        A.    Depends what the promotion is aimed

Highly Confidential - Subject to Further Confidentiality Review

1    at, I think would be a fairer statement, sir.

2         Q.    Before the break, you talked about

3    the collective impression of doctors and gave

4    testimony about that.  Do you recall?

5         A.    Yes.

6         Q.    You've given a lot of testimony

7    about, in your opinion, promotional activities

8    that you believe were misleading.

9              Who do you believe that those

10   activities or statements misled?  Is it

11   primarily the doctor community?

12        A.    That's a good question.  Let me

13   think for a second, if I may.

14             As it relates to prescribing

15   behavior and that change in prescribing

16   behavior, I think it is -- it's doctors, it

17   would be nurse practitioners, it would be those

18   who had prescribing, you know, responsibility.

19             But I think it changes.  I think

20   it's a little broader.  I think it would be

21   health professionals, I mean, who were -- who

22   receive promotional messages.  So it would be

23   the target audiences of those promotional

24   messages.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.  So when you talked about collective

2   impression that was made by promotional

3   activities, you were talking about a category

4   broader than doctors; is that fair?

5        A.  Well, they certainly -- yes.  I

6   think it's fair to say the promotional messages

7   you see in the campaigns affected pharmacists,

8   nurse practitioners, managed -- you know, a

9   whole range of individuals who are health --

10   who touch the health care system.  I think you

11   see various campaigns directed against

12   different professionals.

13        Q.  Are the professionals that matter

14   in terms of prescriptions the professionals

15   that write prescriptions?

16         MR. RAFFERTY:  Object to the form.

17        A.  Primarily, yes.  As I said

18   yesterday, I'm not getting into -- I'm not

19   going to testify about pharmacists, but you

20   certainly --

21        You know, just answering your

22   question fully, the pharmacists certainly

23   matter when it's -- when we're talking in terms

24   of prescriptions, because they're the ones

Highly Confidential - Subject to Further Confidentiality Review

1    that -- they're professionals who fill those

2    prescriptions.  So they matter, sir.

3          Q.   The heading says that, Promotional

4    information needs to be evaluated by the

5    totality of the impression it creates.

6               Do you see that?

7          A.   Yes.

8          Q.   What does that mean, "the totality

9    of the impression"?

10         A.   So what FDA -- the old DDMAC, you

11   know, the regulations and -- is that you

12   can't -- if you have a number of different

13   components of information, for example, on a

14   sheet, you have to look at the graphics, you

15   would have to look at the audio, you would have

16   to look at the words.

17              If I say, you know, This drug, you

18   know, causes leukemia, and somebody's walking

19   on the beach and the ad -- and the sound is the

20   music and everything, you just have to look at

21   all those -- you should look at all those

22   factors that are absorbed by the -- you know,

23   the person to whom that promotion is aimed at.

24         Q.   Would you also consider the label

1    or materials outside of the promotion being

2    examined?

3              A.    Say that again.  I'm sorry.

4              Q.    Would you also -- in doing this

5    assessment of the totality of the impression,

6    would you look at the label and consider the

7    information conveyed by that?

8              A.    Generally, in DDMAC, you know, you

9    would do this by the -- I mean, I think you

10   would probably consider it, but obviously, a

11   6-point font on the last page is not going to

12   be considered in the impression that the first

13   six pages of a sales aid in 40-point font and

14   color would have.

15              You know, so generally, when one is

16   talking about the material, it's per -- it's

17   per -- what's the best way -- it's per -- per

18   impression, right.

19              So it's the impression of the piece

20   that conveys, and it's usually the aid itself,

21   but I wouldn't want to exclude the label, if

22   it's attached.

23              Q.    You said before the break that you

24   don't believe that the vast majority of doctors

1  were well-informed of the risks in addition to

2  the benefits.

3            Do you remember that testimony?

4       A.   I remember something generally.

5            MR. RAFFERTY:  Object to the form.

6       A.   I don't remember the exact

7  testimony.

8       Q.   You testified, I'll represent to

9  you, that you don't believe that the vast

10  majority of doctors were well informed of the

11  risk in relation to the benefits of certain of

12  certain products.

13            Do you believe that was the case

14  for the two Mallinckrodt products that you've

15  given opinions about?

16       A.   So we can take them separately.  I

17  think there were misleading characteristics

18  of -- that I point out and that were, you know,

19  again, part of this, you know, less peaks,

20  smoother, less -- and what that conveyed with

21  regard to lower abuse potential.

22            So were they really informed of the

23  risk?  So that would diminish their information

24  of the risks.

1        Q.    When you say "they," who are you

2   talking about?

3        A.    No, you had -- the question was,

4   that I'm reading, do you believe that the vast

5   majority of doctors are really informed of the

6   risk of the product really informed of the risk

7   of the product?

8        Q.    So when you --

9        A.    So I'm talking about -- I'm

10   sorry -- about doctors, sir.  So it would be

11   who would be --

12             For example -- I mean, in the

13   paragraphs, I point out that certain graphs

14   give an impression about peaks and troughs, and

15   that sort of implies that it's safer, and that

16   means that you're not fully informed.

17        Q.    So you personally believe that

18   doctors weren't well-informed of the risks from

19   the Mallinckrodt products?

20        A.    I think that the standard -- no,

21   the way I would say it is, there are certain

22   requirements that the information needs not --

23   it's important it not convey misleading

24   information because we know that --

1    The reason we have that sort of

2    requirement is because that -- I mean, it's

3    sort of given that if you're misleading in the

4    ads, doctors are not well-informed.

5    I don't have a survey on

6    particularly -- on each point, but I can tell

7    you that's the reason why the standard is what

8    the standard is.

9    Q.   Why don't you have a survey on each

10   point?

11   A.   Well, because I'm sort of limited

12   to the record.

13   And there are surveys, and in

14   certain manufacturers, I can tell you exactly

15   doctors' perceptions, I can tell you what the

16   return on investment, I can tell you what the

17   effect of this promotional campaign or this

18   promotional element is on the number of

19   prescriptions.  I can even do that to a certain

20   city.

21   But it depends on what the record

22   has, sir.

23   Q.   What surveys have you undertaken

24   with regard to doctors' impressions of

Highly Confidential - Subject to Further Confidentiality Review

1  Mallinckrodt products?

2      A.   I restricted this report to the

3  record.  I've not gone outside of the record.

4  I was not asked to do that, and I've not done

5  that.

6      Q.   Do you have any objective evidence

7  of what doctors believed about Mallinckrodt's

8  products?

9      A.   Sir, let me just -- let me just

10  refresh.  So there are -- for example, you

11  have --

12          With regard to Mallinckrodt and

13  Exalgo specifically, I can tell you what the

14  message recall was at a certain -- at certain

15  points in times based on, you know, certain

16  data.

17          So there are those -- you know, the

18  unaided message recall, whether there was a

19  recall that there was less abuse, misuse,

20  overdose potential.

21          There is some information about

22  what the doctors' recall was after -- sorry --

23  after promotion.

24      Q.   So that's the evidence that you

Highly Confidential - Subject to Further Confidentiality Review

1  have about the collective impression of doctors

2  about Mallinckrodt products?

3             MR. RAFFERTY:  Object to the form.

4        A.   I mean, that is what you have, both

5  the strategy documents and what the message

6  development is and what the recall is.  I mean,

7  that's among what I have.

8             But if you want to measure it, you

9  would measure it by recall, and that's what I

10 have, and I'm limited to what the company has.

11       Q.   Do you have any objective

12 information about doctors' collective

13 impressions of the risks that would arise for

14 Mallinckrodt's products?

15       A.   Only to the extent that in those

16 recall documents, those message recall

17 documents -- minimal, less abuse -- a certain

18 percentage had that impression -- that recall.

19            What was the main message of the --

20 and, again, I'm going to apologize -- is it

21 Covidian [ph] or Covidan [ph] -- of that sales

22 representative conveyed about Exalgo.

23            So we know what their impression

24 was from those message recalls.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   And those collective recalls are

2  all you have on that point; is that correct?

3         MR. RAFFERTY:  Object to the form.

4    A.   I'd want to go back to review my

5  report.  I mean, any information I have is in

6  either my report or in the reliance list.

7    Q.   Did you become aware of a survey of

8  Ohio physicians on opioid prescribing behaviors

9  in connection with your work on this matter?

10   A.   I've become -- I'm not sure.  Top

11 of my head, I just don't have a memory right

12 now.  I've seen certain documents, but I'm not

13 sure I've seen what you're referring to.

14   Q.   When you began work on this matter,

15 did you ask to receive all information which

16 would provide information about how doctors

17 perceived risks from Mallinckrodt's products?

18        MR. RAFFERTY:  Object to the form.

19   A.   No, I didn't ask specifically that.

20 I didn't want to be fed information.  I

21 insisted that the entire database be given to

22 me so -- unencumbered.  I may at certain times

23 have asked for certain things, but I searched

24 the database.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Did you search the database for

2  survey information about doctors' mental

3  impressions?

4      A.   I'm not sure I put those mental

5  impressions in.  I may have used recall

6  messages, other things.  Those kinds of surveys

7  I may have either asked for, but I didn't

8  use -- I don't believe I would have used the

9  word "mental impression."  It's not something

10  that -- it was not the lingo of the recall

11  surveys that I'm used to seeing in the

12  industry.

13      Q.   Do you have any expertise in

14  analyzing how consumers will assess and

15  interpret information that's disclosed to them?

16          MR. RAFFERTY:  Object to the form.

17      A.   Yes.  I mean, I have been -- you

18  know, I had to make the hard call sometimes,

19  and not the only one, but does FDA bring an

20  enforcement action whether something is false

21  or misleading, and, you know, what the evidence

22  one needs if one is going to do a misbranding

23  action.

24          I was the guy who seized orange

1  juice because it was fresh, right.  So I mean,

2  I had to understand exactly that question of

3  how it was perceived.

4          So I mean, I've both taken a

5  marketing course, you know, in business school

6  as well as had to do it on the job.

7      Q.   So you made enforcement decisions

8  at FDA relating to where you had to make

9  judgments about perception of consumers in the

10  market.  Is that fair to say?

11     A.   I think -- I mean, I don't want to

12  say that I did this alone.  I certainly did it

13  with my colleagues at the agency.  But at the

14  end of the day, they go, Kessler, what are you

15  going to do here?  In a number of instances,

16  what do you want me to do?  And I would make

17  the decision.  But that would be rare.

18          I don't want you to think that

19  that's the run-of-the-mill kind of

20  decision-making the agency where the

21  Commissioner is making decisions, but I

22  certainly have made those decisions.

23     Q.   So do you believe that at the FDA,

24  where employees make enforcement decisions,

Highly Confidential - Subject to Further Confidentiality Review

1  that makes them experts on consumer

2  understanding of information?

3       A.   Well, you know you're going to be

4  the named defendant in court, you better be an

5  expert, because if I'm going to take an

6  enforcement action, my name is going to be as

7  the defendant, I mean, or my boss' name is

8  going to be -- the Secretary is going to be

9  named as defendant.  So you learn pretty

10 quickly and pretty thoroughly when you're on

11 the line here.

12            And again, I had some training on

13 marketing.  I've also -- there was a lot of --

14 all of DDMAC really is the question of what's

15 false or misleading, you know.

16            I tried hard to do it the best I

17 could.  I think I learned a lot.  I certainly

18 think I understand it in the context of FDA

19 regulation.  I may not know it in terms of the

20 jolly green giant, right, and -- but I think in

21 terms of FDA-regulated products, I probably

22 understand false or misleading with the best of

23 them.

24       Q.   So you believe your understanding

1    of whether or not doctors receive false and

2    misleading information about Mallinckrodt's

3    products is just as good as if you had

4    undertaken an objective survey to answer that

5    question?

6             A.    No.  It's different information.  I

7    mean, it's different information.  I have the

8    information.  I have -- I can look at a piece

9    and say, it looks false or misleading.  It

10   conveys certain impressions.  Especially when

11   that piece is in context.

12             In this case in Exalgo, when you're

13   talking about peaks and troughs, we know that

14   that -- that those promotional messages ended

15   certain people up, you know, in criminal

16   violation.

17             This was out of a -- I don't know

18   what the right word is -- out of a -- I want to

19   be careful here.  I mean, these messages -- I

20   don't want to say script, I don't want to say

21   playbook -- these messages sort of -- did we

22   that we see early on about lower abuse

23   potential, less peaks, less troughs, that

24   impression, that was a theme, I think, through

Highly Confidential - Subject to Further Confidentiality Review

1     these opioid products, and so it's in the

2     context of that.  This is not just a one-off.

3            I think if I saw your -- saw

4     something just one slide alone, it's one thing.

5     But one slide in the context of these themes

6     where these themes are adjudicated in essence

7     even criminally as misleading, even with their

8     unique aspects, I mean, it's that totality of

9     that evaluation.

10     Q.    What FDA enforcement -- what

11     enforcement -- FDA enforcement actions are you

12     aware of involving Mallinckrodt's two branded

13     products that you opine on?

14            MS. FREIWALD:  Object and move to

15         strike the part of the answer that

16         misrepresents the record.

17     A.    I'm not sure I opine -- everything

18     that I'm opining on with regard to -- is in the

19     report, and I don't believe there is any

20     enforcement action.  I don't have a memory of

21     any enforcement action.

22     Q.    So if the FDA decided not to pursue

23     enforcement action against Mallinckrodt for

24     these two branded products, by your standards,

Highly Confidential - Subject to Further Confidentiality Review

1    should we conclude that there was no

2    misrepresentation in the promotion?

3            A.    Of course not.

4            Q.    How is that consistent with what

5    you told me earlier?

6            A.    Well, first of all, FDA doesn't

7    catch everything.  Limited resources.  I mean,

8    you know, not everybody gets caught for

9    speeding, right.  Just because you don't get

10   cited doesn't mean you're home free and you're

11   not false or misleading.

12           Q.    What have you done to test the

13   FDA's resources and its impact on the ability

14   to bring enforcement actions against

15   Mallinckrodt?

16           A.    I can't tell you anything specific

17   with regard to Mallinckrodt.  I can tell you

18   that the record is full of documents that shows

19   FDA's resources specifically in the DDMAC area.

20   Both the General Accounting Office as well as

21   the Institute of Medicine has studied this

22   extensively with regard to the industry as a

23   whole, and the FDA's resource -- I mean, those

24   reports deal with the totality of resources FDA

1    has to deal with Mallinckrodt and everyone.

2         Q.   When you were doing your work in

3    relation to your opinions on Mallinckrodt, did

4    you ask to see all marketing and promotional

5    materials that Mallinckrodt had made available?

6              MR. RAFFERTY:  Objection, that's

7              work product.  Communications between

8              the expert and the attorney are clearly

9              out of bounds.

10        Q.   Did you?

11             MR. RAFFERTY:  No, do not answer

12             that question.

13             MR. GALLAGHER:  Are you taking the

14             position that there is a work product

15             privilege between counsel and this

16             expert?

17             MR. RAFFERTY:  Yes.

18             MR. GALLAGHER:  And you're

19             instructing him not to answer the

20             question?

21             MR. RAFFERTY:  I am.

22        Q.   Did you think it was important in

23   doing your work to review all promotional

24   materials in the production about Mallinckrodt?

Highly Confidential - Subject to Further Confidentiality Review

1    A.   I thought it was important to have

2    the full database available to me.  I tried to

3    review as many documents as I could, as it was

4    humanly possible within, you know, reasonable

5    time constraints of life.

6            So I did ask for the entire

7    database, but there are millions and millions

8    and millions of pages, that it was just beyond

9    my capability.

10           So I did search.  It was important

11   for me to see the strategies as well as those

12   promotional materials that were -- that was

13   important.  So I tried.  But there's a limit to

14   what I -- I don't -- you can't see every

15   promotional piece.

16    Q.   So it's fair to say that you did

17   not review all of the Mallinckrodt promotional

18   materials, correct?

19           MR. RAFFERTY:  Object to the form.

20    A.   I had access to that.  I wouldn't

21   want to sit here today -- I don't have a

22   recollection of exactly -- I mean, I've looked

23   at thousands and thousands and thousands of

24   documents, including numerous Mallinckrodt

1    documents, and many were promotional materials,

2    but I can't tell you what percentage I looked

3    at or all or -- and I just -- I don't have that

4    memory.

5           Q.    So you don't know?

6           A.    Exactly, sir.

7           Q.    Did you come across Mallinckrodt

8    promotional materials that accurately disclosed

9    the relevant risk relating to the two products

10   about which you opine?

11          A.    I think there are aspects of --

12   there's aspects of the promotional materials

13   that I don't have any objection to.  I think my

14   report points out the ones that I do.  I don't

15   want to say that they're all -- all those

16   statements are misleading, no.  I point out the

17   ones that are misleading.

18          Q.    Why did you not include in your

19   report disclosures that accurately described

20   risks?

21          A.    Well, I can't -- the reports are

22   350 pages.  I tried my best to include as much

23   as I could.  But I can't -- you can't describe

24   everything, Counselor.  I mean, I just --

1    The issue here -- the central issue

2  to me that I focused on were issues of

3  especially abuse liability, this change in

4  medical practice, how we became -- the medical

5  profession ended up prescribing these more

6  loosely and overcoming -- what had to be done

7  to overcome that fear of addiction.  So that's

8  what my report in significant part focuses on.

9    And I think with regard to

10  Mallinckrodt, I talk -- the issues that I deal

11  with are, you know, focus on certainly I think

12  less abuse liability.

13    MR. GALLAGHER:  I have no further

14    questions, Dr. Kessler.

15    For the record, I'm ceding the

16    balance of my time; for the reasons that

17    the parties have discussed throughout

18    this deposition, the manner of the

19    questioning, compressing the time

20    available for all the defendants, so I

21    join and Mallinckrodt joins in the

22    objection relating to them.

23    MR. RAFFERTY:  Plaintiffs take the

24    same position.  No, no, let me rephrase

Highly Confidential - Subject to Further Confidentiality Review

```
1              that.  That might not read right.

2                   Plaintiffs disagree.

3                   MS. LEVY:  And for the record, on

4              behalf of the other defendants who have

5              not yet gone, we dispute the

6              characterization of ceding time.  I

7              think you mean you're passing the

8              witness.  But as we would dispute the

9              division of time, I think that you might

10             have cut into our time, not ceded us

11             extra time.  But we can discuss that.

12                  MR. GALLAGHER:  I don't mean to

13             imply that we are having our time stolen

14             away from us, but that the circumstances

15             are requiring us to share time.

16                  MS. LEVY:  Thank you for

17             clarifying.

18                  MR. GALLAGHER:  Dr. Kessler, thank

19             you.

20                  THE WITNESS:  Thank you, Counselor.

21                  Can I ask who's going next.

22                  MR. GALLAGHER:  Off the record.

23                  VIDEO OPERATOR:  2:13, we are off

24             the video record.
```

1          (Recess from 2:13 p.m. until

2      2:23 p.m.)

3          VIDEO OPERATOR:  2:23, we are on

4      the video record.

5          MS. FEINSTEIN:  Thank you.

6              EXAMINATION

7  BY MS. FEINSTEIN:

8      Q.   Good afternoon, Doctor.  We met

9  briefly before the deposition.  I'll

10  reintroduce myself for the record.  My name is

11  Wendy West Feinstein.  I represent the Teva

12  defendants in this litigation.

13          I'll be asking you some questions,

14  and as we've all noted, we have limited time,

15  so I'd request that you do your best to listen

16  to my questions and answer as concisely as you

17  can, okay?

18      A.   Thank you, ma'am.

19      Q.   Thank you.

20          So before we get started on the

21  substance, I want to understand the scope of

22  your report with respect to my client regarding

23  not only the scope of the products that you're

24  covering, but also the time scope.

Highly Confidential - Subject to Further Confidentiality Review

1          So as I look at your report, I see

2     two products that you reference, Actiq and

3     Fentora; is that right?

4          A.   Yes.

5          Q.   And you render opinions with

6     respect to Actiq and Fentora, but no other Teva

7     or Cephalon products, right?

8          A.   Correct.

9          Q.   Earlier today you mentioned that

10    there are a lot of company changes with many of

11    these organizations, and so you focus more on

12    products than company names; is that right?

13         A.   Well said.

14         Q.   Just to clarify for the record,

15    some of the documents that you reviewed have

16    the Cephalon name on them, right?

17         A.   Correct.

18         Q.   And those relate to Actiq and

19    possibly Fentora; is that right?

20         A.   Yes.

21         Q.   When today, if I use the phrase

22    "Teva," can we understand that to include

23    Cephalon?

24         A.   Thank you.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    And you will agree with me that

2    that --

3          A.    Yes.

4          Q.    -- phrase will cover both?

5          A.    Yes.

6          Q.    Do you also render any opinions

7    with respect to any of the companies that Teva

8    acquired that manufacture generic opioids that

9    are also defendants in this litigation?

10         A.    The only generic oxycodone that I

11   think is in the scope has to do with

12   Mallinckrodt.  There is obviously the issue of

13   generics from Actavis and others, but -- so the

14   answer that I gave to your prior colleague I

15   think would hold across the board here.  And I

16   can just restate it so it's clear.

17              To the extent the opioid

18   manufacturers contributed to a change in the

19   prescribing of opioid -- the class of opioids,

20   that would refer to affect both branded --

21   especially unbranded promotion is going to

22   raise the prescription level of both branded

23   and generics.

24              But that -- that's the -- that's

1    sort of where I -- where I enter an opinion on,

2    that when you do unbranded promotion for a

3    class, and that class is opioids as opposed

4    to -- I'm going to apologize, I'm going to

5    probably use the word "Actiq."

6              Q.    That's fine.

7              A.    But Actiq or Fentora, then it

8    affects all, including the generics, and that

9    is covered in the report.

10             Q.    So just to make sure that I

11   understand your opinion and so that we have it

12   clear on the record, any opinion that you

13   render related to generic opioids would also

14   apply to any branded opioids that are not

15   involved in this litigation but that benefitted

16   from what you have opined is improper unbranded

17   marketing by the defendants in this litigation?

18             A.    I have to admit --

19             MR. RAFFERTY:    Object to the form.

20             A.    -- ma'am, you've just stumped me.

21   My head is spinning.  I apologize.  I just --

22   maybe it's the hour.  I don't know if we're at

23   hour 12 or so, not consecutively, but I just

24   didn't follow.  There are too many unbrandeds

1    and brandeds in there.

2          Q.   So you have no separate opinion

3    with respect to any of the manufacturer

4    defendants or Teva regarding the manufacture of

5    generic opioids, right?

6          MR. RAFFERTY:   Object to the form.

7          A.   There is a section of the report

8    that talks about generic oxycodone of

9    Mallinckrodt.  That is singled out at one

10   paragraph of the report.

11         Q.   Okay.

12         A.   But with that exception, the

13   report -- I think we're saying the same thing.

14         Q.   Okay.

15         A.   We're talking about the class of

16   opioids and recognize that generics are part of

17   that class of opioids.

18         Q.   Fair enough.  Thank you.

19              I also want to clarify, yesterday

20   it came up and then today you mentioned a

21   product that was formerly on the market that

22   was manufactured by Cephalon and a predecessor

23   of Cephalon and Teva, which is Oralet.

24         A.   What was the name?  It started with

1    an A, I believe.  The manufacturer --

2           Q.   Again, I don't have it at the tip

3    of my tongue.

4           A.   The manufacturer started with an A,

5    if I remember.  That was Oralet.  It was a --

6           Q.   Right.

7           A.   It was the predecessor product --

8    maybe I'm using that word incorrectly, but the

9    predecessor product to Actiq.  Same

10   formulation, I believe, essentially different

11   indication.

12          Q.   Different dosing, different

13   indication, not at issue in this litigation,

14   right?

15          A.   Oralet is not.  I've asked.  It is

16   not an indication -- it's not at issue in this

17   case, correct.

18          Q.   And your opinions in your report,

19   which is Exhibit 1, contain no opinions about

20   Oralet or any action of Teva related to Oralet;

21   is that right?

22          A.   That's exactly correct.  The only

23   footnote if I could put there, ma'am, is that

24   it obviously was a part of my FDA experience

Highly Confidential - Subject to Further Confidentiality Review

1    and my dealing with opioids and restricted

2    distribution.

3              So it may be a factual issue, but

4    no opinion with regard to the Oralet --

5    companies on Oralet not at issue here, other

6    than factually how -- I mean, how I handled

7    opioids.

8         Q.   Your involvement factually and your

9    involvement recommending a limitation of no

10   marketing for Oralet, correct?

11        A.   Correct.

12        Q.   So --

13        A.   Among other things.

14        Q.   -- you give -- but you're not

15   opining that Oralet is a part of this case?

16        A.   It is not, to my understanding.

17        Q.   Your opinions related to Actiq and

18   Fentora appear to me in your report to be

19   limited in time.  Is that right?

20        A.   I would -- the way I would phrase

21   it, if this is helpful, I think they're limited

22   to two real issues.  And to those issues, we

23   can decide what time frame.  But one really is

24   off-label indication, and the second is failure

1    to comply with the risk maps.

2              So those are the two sort of

3    issues, and then we can discuss the conduct and

4    the evidence under those two time periods.

5         Q.   So before we get to the substance,

6    let's talk first about Actiq or Actiq.  It can

7    be pronounced either way, I think.  I'll

8    probably say Actiq, but I think --

9         A.   No, you're right.  It's your

10   client, and I --

11        Q.   So with respect to Actiq, you've

12   got two opinions; is that right?  And feel free

13   to look at your report.  The first one I see on

14   page 254, which is, you opine that Teva

15   marketed Actiq for non-malignant pain for which

16   safety had not been established by substantial

17   evidence.

18        A.   That's a heading, and I believe

19   it's carried forward exactly -- maybe not

20   exactly in those words, but almost identical in

21   paragraph 474.

22        Q.   Right.  And 474 sort of summarizes

23   the paragraphs that precede it.  And you

24   summarize in paragraph 474 of Exhibit 1, In my

1    opinion, Teva marketed Actiq for non-cancer

2    pain, an indication that lacks substantial

3    evidence to support safety.

4              Correct?

5         A.   Exactly.

6         Q.   So that's your first opinion about

7    Actiq, right?

8         A.   Yes.

9         Q.   The marketing materials that you

10   refer to in your report all pre-date -- or are

11   all dated 2006 or earlier; is that right?

12        A.   I'll take your -- not to waste your

13   time, I think that is correct.

14        Q.   Do you have any opinions regarding

15   the marketing of Actiq after 2006?

16        A.   I'd have to go back and look at the

17   reliance list and look to answer your question

18   precisely, but you can base -- I mean, I think

19   it's fair to say that what's in the report and

20   the evidence in the report is what I will focus

21   on, unless there's something in the reliance

22   list that I've missed.

23        Q.   Are you aware that Teva ceased

24   marketing of Actiq in 2006 when Fentora was

Highly Confidential - Subject to Further Confidentiality Review

1    approved?

2         A.   I think I do recall that.

3         Q.   So does that help you confirm for

4    me that your marketing opinions relate to

5    marketing from 2006 or earlier?

6         A.   I think that would be correct.

7         Q.   At all times that Actiq was

8    marketed, it was identified and characterized

9    as a CII product; is that right?

10        A.   Of course.

11        Q.   At all times that Actiq was

12   marketed, it was subject to a risk management

13   program; is that right?

14        A.   Yes.  It would not have been

15   approved but for that.

16        Q.   And your second opinion relates to

17   the risk management program -- your second

18   opinion related to Actiq.  Is that right?

19        A.   The second opinion --

20        Q.   And we can see it just continuing

21   actually in your report.

22        A.   Yes.  I mean, I think that -- well,

23   I think that that deals with off-label

24   marketing in general, and the audits and the

Highly Confidential - Subject to Further Confidentiality Review

1    requirements under that.

2        Q.    And if I could direct your

3    attention, sir, please, to Exhibit 1, the

4    section --

5        A.    Exhibit 1, my report.

6        Q.    Which is your report, yes, sorry.

7    Sorry.  I'm referring to it by the exhibit for

8    the record, but let's call it your report.

9        A.    Sure.

10       Q.    Your report, the opinion regarding

11   the marketing of Actiq begins in paragraph 475

12   and continues through paragraph 482, which is

13   on page 260.

14       A.    That's the marketing as it failed

15   to comply with the risk management strategies.

16       Q.    Right.

17       A.    And what was done -- yes.  And let

18   me know if you want me to pull those documents.

19       Q.    Yeah, and if at any point you need

20   to refer to the document --

21           THE WITNESS:  Gerard, can you just

22       give me the notebook kindly that begins

23       475 so I can have it and hold it,

24       please.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.   So the risk management program that

2   you noted a moment ago is a part of the

3   approval process -- part of the approval for

4   Actiq, correct?

5        A.   Yes, certainly that's correct.

6        Q.   And understanding that you don't

7   have the -- any of the versions of the risk

8   management program in front of you, do you

9   recall whether that risk management -- strike

10  that.

11            Do you recall that the Actiq risk

12  management program required Teva to report

13  quarterly to the FDA about certain things?

14       A.   There was surveillance and

15  monitoring to determine the effectiveness, I

16  mean, of -- and I think it's exactly to provide

17  a quarterly report to FDA compiled from all

18  data collected by the methods described under

19  the surveillance and monitoring programs and

20  intervention, and it will describe and provide

21  data on any concerns of off-label usage.

22       Q.   As a part of rendering your

23  opinions regarding Teva's compliance with the

24  Actiq risk management program, did you review

Highly Confidential - Subject to Further Confidentiality Review

1    all of the quarterly reports that were

2    submitted by it to the FDA?

3         A.   I'm sitting here today, I'm -- to

4    be honest, I'm drawing a blank.  I'd have to go

5    back and just review the quarterly -- well, I'd

6    have to go back and review that.

7         Q.   You're not rendering an opinion

8    that Teva failed to comply with its quarterly

9    reporting obligations; is that right?

10        A.   No.  I think my opinion, if I can

11   be precise, it was contrary to the key -- the

12   marketing was contrary to the key messages in

13   the FDA-mandated risk map.

14        Q.   Do you recall -- strike that.

15             Did you see in your review of

16   materials regarding Actiq any findings or

17   determinations by the FDA that Teva failed to

18   comply with the risk management program for

19   Actiq?

20        A.   No.  I'd have to go back and

21   obviously look at the enforcement action that

22   was -- I mean, I have it -- I'd have to go back

23   and do some more homework.  I don't -- I don't

24   want to testify one way or the other on that.

1    I just don't know.

2         Q.   You recall that the quarterly

3    reports that Teva submitted regarding Actiq

4    included reports of adverse events for

5    off-label use, right?

6         A.   I believe I do have some

7    familiarity with that, yes.

8         Q.   Is it your expectation that because

9    that was a part of the quarterly report, that

10   FDA understood that Actiq would be used in

11   off-label -- in an off-label manner?

12        A.   I wouldn't say it that way.

13        Q.   Is it your understanding because

14   there was an off-label component to the

15   quarterly report that the FDA understood that

16   there may be off-label use by physicians of

17   Actiq?

18        A.   Yeah, I'm not sure that that's -- I

19   mean, I think FDA was concerned about off-label

20   from the beginning, independent of the

21   quarterly reports.  That's my only point.

22        Q.   And you're not aware of any

23   marketing that occurred of Actiq -- strike

24   that.

1        You're not aware of any marketing

2   that Teva did of Actiq after 2006, correct?

3        A.    No.   Exactly the evidence in my

4   report.

5        Q.    Thank you.  You are not issuing any

6   opinion in this litigation related to the

7   adequacy of the label for Actiq, are you?

8        A.    Not -- not -- no.  I think the

9   answer to that question would be no.  I would

10   just want to reserve the ability to read the

11   label.

12        I mean, I issue no opinion on that.

13   We've discussed other inadequacies in general

14   in information.  So there may be a sentence

15   here or there in the label that may be relevant

16   to our conversation, but I've issued no opinion

17   and will not issue an opinion that that label

18   was inadequate.

19        Q.    In your opinion section of your

20   report regarding Actiq, you refer to internal

21   marketing documents, and we've -- you've

22   discussed at length with some of my

23   co-defendants your ability to kind of interpret

24   internal marketing plans.

1              Do you recall that testimony?

2       A.    Yes.

3       Q.    Have you reviewed and relied upon

4   any outward-facing external marketing documents

5   that you believe failed to comply with the

6   Actiq risk management obligation?

7       A.    So I mean, I do have -- and I cite

8   it -- I do have certainly call notes that are

9   cited somewhere on reliance or not.  Those are

10  outwardly facing.  And I think that -- I mean,

11  they are pretty blatant when they come to

12  off-label marketing.  So I think the call notes

13  are what come to mind --

14      Q.    Did you --

15      A.    -- right now.

16      Q.    Did you review any marketing pieces

17  or leave-behinds related to Actiq that were --

18  that were used by either detail reps or anyone

19  at Teva that failed to comply with the risk

20  management profile?

21      A.    No.  What I was able to find --

22  what I was able to find and focusing on were

23  more the strategy documents, obviously the

24  documents that came out of the criminal -- what

1   of the enforcement action.  And the actual

2   interactions between sales reps and doctors.

3          Q.   And the enforcement action that

4   you're referring to, is that the 2008 plea

5   agreement and the corporate integrity agreement

6   in 2008?

7          A.   Both, yes.

8          Q.   Okay.  And so we can agree that as

9   you testified a few moments ago, that the

10  actions that you are critical of related to

11  Actiq all pre-dated certainly the enforcement

12  action in 2008, but based on the documents

13  you've reviewed, were 2006 or earlier, correct?

14         A.   I think that's -- that's fair.

15  Again, I think that would be fair.

16         Q.   Do you know -- strike that.

17              Can you identify any physician in

18  Summit or Cuyahoga County who was misled by any

19  of the marketing of Actiq?

20              MR. RAFFERTY:  Object to the form.

21         A.   So sitting here today, I cannot

22  specifically.  I would need to -- I mean, I've

23  searched the -- I have the call notes, and I'm

24  not sure -- I didn't search specifically for

1    Cuyahoga and Summit.  I have dozens of call

2    notes here.  But I would have to go search

3    these specifically for Cuyahoga and Summit and

4    would be happy to do that --

5         Q.   And in --

6         A.    -- in order to answer your

7    question.

8         Q.   For purposes of your report, you

9    didn't identify any specific physicians who, in

10   2006 or earlier, were misled by any marketing

11   effort by Teva related to Actiq?

12        A.   Well, I mean, we do -- we do have

13   call notes where this -- which do have

14   physician names and sales representative names,

15   and that those certainly show the drug is being

16   promoted for things like a migraine and low

17   back pain.

18        Q.   But, sir --

19        A.   And those have names associated,

20   and I can give you those names.

21        Q.   Those notes are not notes from the

22   physicians demonstrating that they were misled

23   though, right?

24        A.   You're correct, ma'am.  Those are

Highly Confidential - Subject to Further Confidentiality Review

1    notes from -- well, those are representations

2    by the sales rep.

3         Q.   Can you identify any inappropriate

4    or improper prescriptions of Actiq that were

5    written in Cuyahoga or Summit County based on

6    any statements made by Teva?

7         A.   Sitting here --

8              MR. RAFFERTY:  Object to the form.

9         A.   Sitting here right now, I cannot.

10   I would have to go back and -- I think the way

11   we would do this is, I would look at the call

12   notes specifically for Cuyahoga and Summit and

13   see what the representations are as we

14   discussed earlier, for example, of the doctors

15   in those call notes and whether they said they

16   would change.  I don't have that evidence

17   today.

18        Q.   And how would you identify from the

19   call note an improper prescription?

20        A.   Well, when a call note as we saw

21   before says, discussed -- for example, it says,

22   discussed -- and I'm not saying this happened

23   in Teva, we'd have to look at the call notes,

24   but as I talked about earlier in certain call

Highly Confidential - Subject to Further Confidentiality Review

1    notes, if it says, Discussed chronic back pain,

2    discussed migraine; doctor says, I'm going to

3    prescribe for this; doctor says he or she is

4    going to prescribe for this, again, that

5    doesn't tell you what the actual outcome is.  I

6    understand that.  But it takes you pretty

7    close, and we saw that earlier.

8         Q.   Isn't it true --

9         A.   Can I just add one point to that?

10   We do know -- we do have call notes outside of

11   Cuyahoga and Summit, and we do have testimony

12   that, in essence, what happened in Cuyahoga --

13   what happened nationally happened in Cuyahoga

14   and Summit.

15        Q.   But right now you can't point me to

16   any improper prescriptions written in Summit or

17   Cuyahoga County as a result of alleged improper

18   marketing by Teva?

19        A.   You're exactly correct.  I'd have

20   to search these call notes for that.

21        Q.   And isn't it true, sir, to

22   determine whether any prescription is improper,

23   you would have to look at the circumstances

24   surrounding that prescription, the information

Highly Confidential - Subject to Further Confidentiality Review

1  in that patient's file, the interaction with

2  the physician, and actually talk with the

3  physician?

4       A.   You're conflating something again.

5  It's late.  Whether the promotion was off-label

6  and resulted in a prescription, I mean, that

7  you may or may not be able to determine from

8  the call note.

9            I mean, obviously if the call note

10  said, as we said, you know, discussed migraine

11  and chronic back pain, and doctor says, I'm

12  going to start prescribing for chronic back

13  pain and migraine in that call note --

14       Q.   My question is different.  My

15  question is not what the call notes show.  My

16  question is whether you can determine that a

17  prescription is improper without looking at the

18  patient's medical history, the patient's

19  medical condition, and talking with the

20  physician about that physician's decision to

21  prescribe?

22       A.   I'm sorry, I misunderstood.

23            With regard to improper

24  prescribing, I think you're correct.  With

Highly Confidential - Subject to Further Confidentiality Review

1    regard to improper promotion, I think -- and

2    its effect on promotion, you can determine that

3    from the documents.

4         Q.   Sir, is it your opinion that any

5    prescriptions written before 2006 for Actiq

6    were improper?

7         A.   All prescriptions for Actiq were

8    improper before 2006?

9         Q.   Right.

10        A.   Could you just give me the label

11   again?  I mean, I'd like to see the label

12   before I answer that question.

13        Q.   Well, it's actually a question that

14   I don't think you need to see the label.  I

15   asked, is it your opinion that any

16   prescriptions written before 2006 -- so when

17   you opined that this improper marketing was

18   going on -- were any prescriptions written in

19   that time period improper?

20        A.   I need to see the --

21             MR. RAFFERTY:  Object to the form.

22        A.   I need to see the label.

23        Q.   Why do you need to see the label to

24   answer that?

```
1          A.   Because I want to see precisely

2    what the limitations of use says, and that

3    could inform me on -- you used the word

4    "proper," and I just want to be precise.

5               So I'd want to -- in certain

6    instances, FDA --

7          Q.   Well, I don't --

8          A.    -- for example, in Oralet, the

9    predecessor, if you were using Oralet out of

10   the constraints that we set for Oralet, so I

11   just want to be precise and I just --

12         Q.   Sir, respectfully, I don't have

13   time to show you the label right now.  My

14   question is simple.  Either yes or no, all of

15   them were improper or all of them were not.

16   And then we can go through and talk about the

17   categories of those which you have opined are

18   improper and those which are not.

19              MR. RAFFERTY:  Okay.  I'm going to

20              state an objection.  I think there's

21              been some confusion, because I believe

22              you've used the words "any" and "all" at

23              different times, and so --

24              MS. FEINSTEIN:  Thank you, Counsel.
```

Highly Confidential - Subject to Further Confidentiality Review

1          MR. RAFFERTY:  -- I think, and if I

2     could just -- two seconds -- and I think

3     it's not yes or no, and I don't think

4     it's appropriate to instruct the witness

5     on how to answer the question.  It could

6     be that he can't answer the question

7     without reviewing the documents, which

8     he has a right to do.

9          MS. FEINSTEIN:  Let me try again.

10     Q.    So, sir, you've opined -- it's your

11  opinion that Teva engaged in improper marketing

12  of Actiq --

13     A.    For off-label use.

14     Q.    -- for off-label use before 2006,

15  right?

16     A.    Correct.

17     Q.    In that time frame, you would agree

18  with me that physicians could write off-label

19  prescriptions, right?

20          MR. RAFFERTY:  Object to the form,

21     asked and answered.

22     A.    Just give me one more second before

23  I answer that question.

24     Q.    And if you can just tell us for the

1   record what you're referring to.

2         A.   I'm looking at the various label

3   changes and the black box warnings.  So I'm

4   just getting -- because unlike many drugs,

5   this, as I remember, has certain admonitions to

6   doctors.  That's unusual.  So there's an added

7   level of scrutiny here with regard to Actiq.

8         Q.   And you're referring to the

9   schedule in your report that has sections --

10  excerpts of the label?

11        A.   Yes.

12        Q.   Okay.

13        A.   So, for example, it says -- just so

14  you know why I want to be careful, it says,

15  Physicians and other health care providers must

16  become familiar with the important warnings in

17  this label.

18        Q.   Right.

19        A.   So that's -- it's very rare that

20  there's an admonition that says, Physicians

21  must become aware of that in a label.

22        Q.   And so, sir, is it your opinion

23  that all prescriptions written off-label for

24  Actiq were improper?

Highly Confidential - Subject to Further Confidentiality Review

 1              MS. FEINSTEIN:  Can we go off the
 2         record while he's reviewing this?  Let's
 3         go off the record.
 4              VIDEO OPERATOR:  2:52, we are off
 5         the video record.
 6              (A discussion was held off the
 7         record.)
 8              VIDEO OPERATOR:  2:53, we are on
 9         the video record.
10    BY MS. FEINSTEIN:
11         Q.   Can you answer my question now?
12         A.   I don't want to -- my opinion, and
13    I don't want to give a legal opinion, so I'll
14    use a little L, you know, I don't think it is
15    unlawful or violative, and again, I don't want
16    to get -- for a physician to prescribe
17    off-label.  There are two -- but there is a --
18         Q.   Okay.  Well, that answers my
19    question, sir, and we're really tight on time,
20    and I don't mean to cut you off.
21         A.   I understand, but there are two
22    things in this label that are unique when it
23    says it's indicated only --
24         Q.   Thank you.

1          A.    -- and physicians must -- it would

2     go towards that question.

3          Q.    Thank you.  Thank you, and I don't

4     mean to rush you.  We're just all very tight.

5          A.    I understand.

6          Q.    So I'd like to now move to Fentora

7     and your opinions about Fentora which follow --

8     there's just one opinion actually regarding

9     Fentora in your report.  And it --

10         A.    Just give me the paragraph, please.

11         Q.    Sure.  The opinions start in

12    paragraph 483, which is on 260, and continue to

13    493, which is on page 262 of Exhibit 1, which

14    is your report.

15         A.    Right.

16         Q.    And paragraph 493 reads, In my

17    opinion, Teva promoted Fentora for

18    non-malignant pain, which lacks substantial

19    evidence to support safety.

20               Correct?

21         A.    Correct.

22         Q.    It appears to me, based on the

23    materials --

24         A.    Sorry, that -- you read that,

1  that's paragraph -- I'm blocking.  What

2  paragraph did you just read?

3       Q.   493.

4       A.   493, I'm sorry.  I just haven't

5  finished -- yes, ma'am.

6       Q.   Sure.  It appears to me from

7  looking at your report that the materials you

8  relied on in reaching that opinion relate to

9  actions from 2008 forward.  Is that right?

10       A.   You know, I'm looking at the 2005

11  marketing plan in front of me, so I'd have to

12  look at -- in fact, that's cited in here also

13  on 489, the 2005 marketing plan.

14       Q.   So 2008, it appears to me that from

15  2008 -- I'm sorry, I misspoke.

16            2008 back, so anything from 2008 to

17  earlier is the activity that you're critical of

18  with respect to Fentora; is that right?

19       A.   That's the evidence.  That and

20  anything in my reliance list would support the

21  evidence to this, yes.

22       Q.   Do you have any opinion that

23  Fentora was improperly marketed by Teva in 2009

24  or forward?

1          A.    I think you can trust my sense

2    to -- what's in the report is the evidence that

3    I have.  I'd want to double-check my reliance

4    list, but my guess is that it will be what's in

5    the report.

6               I also have a sheet in front of me

7    if you want to take a look.  I don't think --

8    I'd have to check the dates of these documents,

9    but during that --

10         Q.    I'm sorry.  And that those are

11   internal documents, you referred to again some

12   internal marketing documents in the body of

13   your report, right?

14         A.    Yes.  So yes.  Well, I mean, body

15   or reliance list.  I apologize, I'm not sure.

16   They're on my list.

17         Q.    The document that you are looking

18   at right now is in your big packet that we are

19   going to mark.  These are your kind of working

20   set of materials, and it's clipped with a

21   binder clip, and we're going to mark that as an

22   exhibit following the deposition, right?

23         A.    Fine.

24         Q.    But that's what you're looking at,

1    for clarity?

2         A.    Exactly.  Take this report, take

3    this page, and I think you can feel comfortable

4    that that's the -- that's what supports my

5    opinion.

6         Q.    Perfect.  Thank you.  That was

7    going to be my question, so I appreciate that.

8              Doctor, you're not aware of any

9    marketing statements made by Teva in Cuyahoga

10   or Summit County, specific marketing statements

11   that were false or misleading, are you?

12             MR. RAFFERTY:  Object to the form.

13        A.    I think the answer to that would be

14   no, but the campaigns and the testimony is

15   there was -- this was national in scope on

16   break-through pain.  So there's no reason to

17   think that -- or there's no evidence to say it

18   was any different there.

19        Q.    And sitting here today, Doctor,

20   same question that I asked you a few moments

21   ago regarding Actiq, can you identify any

22   providers in Cuyahoga or Summit County who were

23   misled by any statements by Teva related to

24   Fentora?

1          MR. RAFFERTY:  Object to the form.

2     A.    Sitting here right now, I cannot.

3     Q.    Can you identify any inappropriate

4  or improper prescriptions of Fentora that were

5  written in Cuyahoga or Summit County based on

6  false statements made by Teva?

7          MR. RAFFERTY:  Object to the form.

8     A.    I do have -- you can look at these

9  documents, and these are based on recall of

10  messages, and we'd have to dig down and see

11  where exactly these -- this recall was done in

12  this document to answer your question fully.

13          Because this clearly tells you what

14  the impact the recall was of those messages

15  that were off-label, and we see that -- again,

16  I think this was done nationally, and we'd have

17  to look -- again, this was nationally marketed.

18  So I'd just have to look -- we'd have to look

19  at the calls that were made.

20     Q.    You can't identify any

21  inappropriate or improper prescriptions,

22  sitting here today right now, that were written

23  for Fentora in Cuyahoga or Summit County based

24  on false statements made by Teva?

1              MR. RAFFERTY:  Object to the form.

2         A.    You're talking about the

3    prescriptions itself --

4         Q.    Yeah.

5         A.    -- or the calls itself?

6         Q.    The prescriptions.

7         A.    Of Fentora?  No, I cannot.  I can

8    talk about -- I mean, I can talk about overall

9    physician national recall.  That's all I can

10   do.

11        Q.    Your report also refers to certain

12   funding provided by Teva to a couple of

13   organizations.

14        A.    Do me a favor.  Can I just get -- I

15   just need to switch my documents out.  Do you

16   want to go off the record for a second?

17             MS. FEINSTEIN:  Sure.

18             THE WITNESS:  Just go off the

19        record.  Preserve your time.

20             VIDEO OPERATOR:  2:59, we are off

21        the video record.

22             (A discussion was held off the

23        record.)

24             VIDEO OPERATOR:  3:02, we are on

Highly Confidential - Subject to Further Confidentiality Review

1          the video record.

2    BY MS. FEINSTEIN:

3          Q.   Doctor, I'd like to refer you to

4    paragraph 582.4 of your report, which is

5    Exhibit 1.

6               That paragraph refers to payments

7    made by Teva to the American --

8          A.   582 point --

9          Q.   4.

10         A.   Yes.

11         Q.   -- payments made by Teva to the

12   American Pain Society over the time period 2009

13   to 2013 --

14         A.   Correct.

15         Q.   -- in the amount of $218,000,

16   correct?

17         A.   Correct.

18         Q.   Is it your opinion, sir, that those

19   payments were inappropriate or improper?

20         A.   I think they contributed to the

21   overall view of opioids.  I don't think that

22   they were illegal, but I think they contributed

23   to the overview of opioids.

24         Q.   Do you know whether any of those

Highly Confidential - Subject to Further Confidentiality Review

1    payments were made as a part of any risk

2    management obligations on the part of the

3    company?

4           A.   I need to open my notebook, and I

5    don't want to do that under the time

6    constraints.

7                So I'd be happy -- so the answer

8    is, sitting here, I'd have to check that

9    question.

10          Q.   If payments were made as a part of

11   a risk management program, would that change

12   your view of whether those were appropriate

13   payments or not?

14          A.   Not if the risk management program

15   was misleading.  And as we know from the

16   record, risk management programs did talk about

17   pseudoaddiction or less addictive risk.  So

18   that, again, contributed to this change in

19   culture, so that's part of the problem.

20          Q.   Referring you now to paragraph

21   610.3 of your report --

22          A.   Is there rule that once we get to

23   the 600s, we can't go backwards?

24          Q.   No, unfortunately.

Highly Confidential - Subject to Further Confidentiality Review

1           So this paragraph refers to a

2    contribution by Teva in the amount of $130,000

3    to the Federation of State Medical Boards.

4           Do you see that?

5    A.    Yes.

6    Q.    And you referred to this as a grant

7    to support the distribution of responsible

8    opioid prescribing, correct?

9    A.    Yes.

10   Q.    Is it your opinion, sir, that that

11   payment was improper?

12   A.    I don't think it's illegal, but I

13   think if you go to paragraph 611, you see that

14   those statements that came out of that

15   organization were misleading.

16           So I wouldn't want to say that

17   money was illegal, but it did contribute to

18   that change in understanding of opioids, which

19   was misleading.

20   Q.    But the payment itself was not

21   improper?

22   A.    Well, I used the word "illegal."  I

23   mean, I think it -- it certainly -- it would

24   have been better not to contribute to these

1    organizations that misled the public.

2          Q.   And you didn't review any of the

3    underlying agreements or contracts related to

4    either of those payments with Teva and those

5    organizations, right?

6          A.   I may have.  I have to go back and

7    look at the reliance list.

8          Q.   Sir, just a couple of other quick

9    questions, and then I've got to pass the baton.

10              You are not providing -- strike

11   that.

12              You're aware of the TIRF REMS

13   program?

14         A.   Yes.

15         Q.   You know that that program applies

16   to Fentora and Actiq, right?

17         A.   Absolutely.

18              And a lot of controversy about that

19   program.

20         Q.   Are you -- you're not rendering any

21   opinion in this litigation about TIRF REMS, are

22   you?

23         A.   Other than they are inadequate.  I

24   think you can stop there.

1    Q.   You have not provided any opinion

2    regarding Teva's compliance with TIRF REMS,

3    have you?

4    A.   Only what's -- only within the

5    report.  They're certainly inadequate to do the

6    job.  I think that would be my only --

7    Q.   It's your view that the TIRF REMS

8    program is inadequate to do its job; is that

9    right?

10    A.   I think the record is pretty clear

11    on that and the recent advisory committees and

12    testimony.

13    Q.   But you don't have an opinion in

14    your report, Exhibit 1, about TIRF REMS and

15    Teva's products?

16    A.   You asked me a question, and I gave

17    you an answer.  I mean, I -- but I -- I mean,

18    that's why I answered it.  But I'm not going to

19    disagree with you.  I mean -- I mean, what's in

20    the report is in the report.

21    Q.   Sir, are there any opinions that

22    you hold regarding Teva that are not in your

23    report but that you plan to testify about at

24    trial?

```
1           A.   I would only -- anything -- if you
2    can change your question to include anything in
3    the report and what we just discussed today, I
4    would say I have no intent to go beyond what we
5    talked about today and what's in the report.
6           MS. FEINSTEIN:  Excellent.  Thank
7       you, sir.
8           With that, I am just going to note
9       on the record -- I am going to pass the
10      witness, but I will note on the record
11      Teva's objection to the amount of time
12      that all defendants collectively were
13      allowed to conduct this deposition
14      that -- regarding an expert who rendered
15      extensive opinions about many companies,
16      and sharing this limited time is
17      inadequate, from our opinion.
18          So with that, thank you, Doctor.
19      Appreciate it, and we'll go off the
20      record.
21          MR. RAFFERTY:  Wait, wait.
22          Plaintiffs continue to disagree.
23          VIDEO OPERATOR:  3:08, we are off
24      the video record.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    (Recess from 3:08 p.m. until

2            3:25 p.m.)

3                    (Exhibits Kessler-25 through

4            Kessler-39 marked for identification and

5            attached to the transcript.)

6                    VIDEO OPERATOR:  3:25, we are on

7            the video record.

8                            EXAMINATION

9    BY MS. LEVY:

10           Q.   Good afternoon, Dr. Kessler.  My

11   name is Jennifer Levy, and I am counsel for the

12   Allergan defendants in this case.  I appreciate

13   your patience in hanging with all of us over

14   this two-day period.  I really do.

15                    I would like to pick up with

16   where -- the questioning just before the break

17   that counsel for Teva had asked you with

18   respect to your opinions on what prescriptions

19   were tainted by unlawful marketing and what

20   prescriptions weren't, and I would like to ask

21   you specifically with respect to the opioid

22   Kadian.

23                    If I represent to you, Dr. Kessler,

24   that there were 14,908 Kadian prescriptions in
```

Highly Confidential - Subject to Further Confidentiality Review

1    Cuyahoga and Summit County over the period of

2    time that that product has been on my client's

3    watch, you would agree with me that some

4    portion of those prescriptions were legitimate

5    prescriptions for patients who needed the

6    product, correct?

7         A.   I think that would be fair.

8         Q.   And in your view, to the extent

9    there were any physicians that prescribed some

10   of those 14,908 prescriptions who were misled

11   by improper marketing, those prescriptions

12   would not be appropriate prescriptions, in your

13   view; is that correct?

14        A.   If they were misled -- and we had,

15   you know, an extended back-and-forth; is there

16   any possibility that they would be still

17   appropriate, because they weren't misled.  But

18   once they were misled, it comes pretty close.

19             So I think that's a fair -- we had

20   this discussion a little while earlier, and I

21   stand by that, I think is probably the best way

22   to say it.

23        Q.   It's possible -- it's possible, I

24   suppose, for a prescriber to be misled for a

Highly Confidential - Subject to Further Confidentiality Review

1   period of time and then unmisled.  Do you agree

2   that that's a possibility?

3        A.   Yeah, that's -- in essence, those

4   are the kinds of things that I was referring

5   to.

6        Q.   Okay.

7        A.   That was --

8        Q.   So in order to tell --

9             I'm sorry.  I did not mean to cut

10  you off.

11            In order to tell if a prescription

12  in a particular jurisdiction is legitimate, you

13  would need to know if the prescriber was misled

14  or if the prescriber wasn't misled, right?

15            MR. RAFFERTY:  Object to the form.

16       A.   I think there's a number of

17  methodologies that I talked about over the last

18  day and a half that --

19            If there's an ROI that has been

20  calculated on certain promotional activities

21  and you know those promotional activities had

22  misleading -- and you know what increased

23  number of prescriptions that promotional

24  activity led to, I think that's one methodology

1    that we talked about.

2           Obviously, there are others, as

3    you're alluding to.

4           Q.   I think I understand you to say, if

5    there is evidence that a particular misleading

6    promotional activity is linked directly to an

7    increase in prescribing, you can assume that

8    that increase is -- results in prescriptions

9    that are not legitimate and lawful.  Correct?

10          A.   "Lawful" -- take "lawful" out

11   because -- but it would be inappropriate -- it

12   would be -- it would be a contribution of

13   inappropriate prescribing.

14          Q.   Okay.  And you haven't made any

15   attempt to quantify for the opioid Kadian what

16   percentage of the prescriptions in Cuyahoga and

17   Summit County were lawful versus unlawful or

18   legitimate versus illegitimate?  You haven't

19   made an attempt to do that, have you?

20          MR. RAFFERTY:  Object to the form.

21          A.   Correct.

22          Q.   And you haven't made an attempt to

23   do that for any of the opioids that are the

24   subject of your report.  You haven't made an

Highly Confidential - Subject to Further Confidentiality Review

1    attempt to quantify percentages of -- what

2    percent were legitimate prescriptions and what

3    percent weren't.  That's not -- you haven't

4    done any of that, have you?

5          A.   I've not done --

6               MR. RAFFERTY:  Object to the form.

7          A.   I don't think that's exactly my

8    testimony here over the last day and a half.  I

9    think there were documents -- happy to pull

10   them, again -- that show what the ROI was with

11   regard to other manufacturers.  I don't see

12   that with regard to documents I've seen in

13   Kadian.  I don't have those ROI documents that

14   I'm aware of from Kadian.

15         Q.   And your report addresses Actavis

16   and Kadian on pages 263 through 276; is that

17   right?

18         A.   Yes.

19         Q.   Okay.  And are those the only

20   opinions that you intend to offer in the trial

21   of this case with respect to Actavis?

22         A.   If you stopped right now and you

23   passed the baton, the answer to that question

24   would be yes.

Highly Confidential - Subject to Further Confidentiality Review

1        If you ask me other questions, you

2   know, I may give you certain opinions based on

3   what you ask me.  But my intent right now would

4   be to stop right here.

5        Q.   Okay.  That's fair.

6        So if I'm understanding you

7   correctly, the opinions in that section of your

8   report plus whatever we talk about today are

9   the opinions that you intend to give at trial

10  with respect to Actavis; is that right?

11       A.   Well said, Counselor.

12       Q.   And I take it, by extension, that

13  you don't intend to offer any opinions with

14  respect to products that Actavis may have

15  marketed or sold that are not addressed in your

16  report; is that correct?

17       A.   So the only -- the only caveat to

18  that, Counselor, is one that I think I made

19  early in the day twice, both to Mallinckrodt

20  and I believe to Teva, is, we know Actavis

21  sold -- its predecessors sold oxycodone ER for

22  a period of time in a generic form, I believe,

23  and to the extent that the general statement

24  about the manufacturers contributing to

Highly Confidential - Subject to Further Confidentiality Review

1    increasing that water level, as I testified,

2    would apply to both the generics and the brand.

3         Q.   So let's talk -- I'm going to

4    place-hold that to talk more about in a moment.

5              But with that exception, other than

6    that exception, you don't have any other

7    products or opinions aside from what we talk

8    about today that you intend to testify about at

9    trial; is that correct?

10        A.   Correct.

11        Q.   Okay.  Now, let's do some marking.

12   We put a sticker on your pile in front of you.

13   And can you do me a favor and tell me what

14   exhibit number that is.

15        A.   36, ma'am.

16        Q.   What is Exhibit 36?

17        A.   36 was simply, I asked -- what

18   this -- what this whole thing is?

19        Q.   Yes.

20        A.   Sort of my brain on paper.

21        Q.   So let me see if you would agree

22   with my characterization.

23             Is this your file as it relates to

24   Actavis?

1        A.    Well, there's binders.  There's

2    bigger sheets than even these.  There's -- so

3    there's a number of different things here.  But

4    I am -- if you'll -- it's not the entire file,

5    but I think maybe it's -- it represents

6    documents that I've cut and pasted or notes or

7    markings that I have made over a period of time

8    and inartfully -- and tried to tape onto paper

9    or write onto paper.

10       Q.    Give me just one minute.

11             Okay, Dr. Kessler.  Exhibit 36,

12   which looks to me to be your notes and some

13   important documents that you've pulled out in

14   your opinion with respect to Actavis.

15             Is that a fair characterization?

16       A.    Yes, ma'am.

17       Q.    Okay.  In addition to that, you

18   have another extremely large document in front

19   of you that is marked Exhibit what?

20       A.    39.

21       Q.    What is Exhibit 39?

22       A.    So 39 is just a visual, in essence,

23   of the paragraphs in my report that I attempted

24   to put together by categories.

1              So it talks about low abuse

2    potential, less addiction, pseudoaddiction,

3    overstatement of benefits, overstatement of

4    other benefits.  So it uses those headings as

5    they apply to all the manufacturers, and then

6    these are just simply the paragraphs under the

7    report under those headings.

8              So it's an attempt to see things

9    visually that I may not -- all in one sheet

10   that just -- you know, it's just a visual

11   mapping.

12        Q.   It's how you organize the evidence

13   that you've found for particular defendants?

14        A.   It was a way of looking -- trying

15   to understand -- trying to see things in

16   just -- see things in a little different -- in

17   different categories.

18        Q.   In addition to 36 and 39, I have in

19   front of me two binders that are labeled

20   Number 9, Actavis, both of them, and they have

21   different paragraph numbers.  We've marked

22   these as Exhibit 37 and 38.

23              Are you familiar with these?

24        A.   I'm very familiar with those.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    These are the documents in your

2     reliance materials that relate to Actavis,

3     correct?

4          A.    No.

5          Q.    What are these?

6          A.    So those are the documents that are

7     cited in -- so if you turn to a paragraph,

8     you'll see a paragraph number, and that

9     corresponds to this paragraph.  And if there's

10    a footnote, it is a cite from that paragraph,

11    that cite would be in that paragraph.  And if

12    there's a quote, that's what the flags are that

13    you see sticking out are the quotes.

14          But that doesn't necessarily --

15    these don't print out everything on the

16    reliance list.

17          Q.    So this is an appendix,

18    essentially, to your report, everything cited

19    in your report?

20          A.    I've given you an appendix.  I've

21    given you schedules.  I would hate to call it

22    an appendix because I hope I don't have to

23    carry these around for the rest of my life.  So

24    I wouldn't give them any more official status

1    other than wanting to have these documents

2    available.

3              As you saw me earlier, people asked

4    me about a question about a paragraph, and I

5    wanted not to just to read my report, but

6    wanted to see the document that was cited in

7    that.  So I opened those binders.  That's the

8    purpose.

9         Q.   If I wanted to know the entire

10   universe of your reliance materials that relate

11   to Actavis, I would need to have the documents

12   that are in the big chart that is marked as

13   Exhibit 39, the pile in front of you that's

14   marked as Exhibit 36, these two documents, 37

15   and 38, and what else?

16             MR. RAFFERTY:  Object to the form.

17             Go ahead.  I won't interfere.

18        A.   You would need to take the reliance

19   list, create PDFs of the reliance -- have PDFs

20   of the reliance list and -- what was your

21   question?  With regard to Actavis?  Is that

22   what you specifically -- you would probably

23   have to search the reliance list in addition to

24   these documents.

1    Q.   And did you read everything in all

2    of these binders?

3    A.   I'm not going to -- I don't mean to

4    be facetious.  Define "read."

5    Q.   Lay your eyes on it, just lay your

6    eyes on everything in the binders, just start

7    with that.

8    A.   I laid my eyes on a lot of things,

9    yes.  I'm not sure that I've studied every -- I

10   certainly have not studied every page, but I

11   certainly have laid my eyes on a lot of these

12   pages, but I don't want to represent that every

13   page got the same kind of -- every word got

14   read.

15   Q.   Okay.  I want to talk to you more

16   about those documents, but for a minute, I want

17   to go back to your report and start with

18   something I read in paragraph 6 where you

19   state, I am a senior advisor to TPG Capital, a

20   leading global private equity firm which owns

21   pharmaceutical and biomedical companies.

22        Do you recall that in your report?

23   A.   Yes, ma'am.

24   Q.   Are you paid by TPG to be a senior

Highly Confidential - Subject to Further Confidentiality Review

1    advisor?

2         A.   Yes.

3         Q.   How are you paid?

4         A.   Well, really two ways.  I think

5    there's some retainer that's relatively small,

6    and then there are TPG companies that I sit on

7    the boards of.  And those companies -- by

8    sitting on the boards, I'm paid by those

9    companies.

10        Q.   Do you have stock in TPG?

11        A.   No.

12        Q.   And do you have stock in any of the

13   companies in TPG?

14        A.   I have stock in the companies that

15   are owned, yes.  I believe that's correct.

16   Those are privately held shares.

17        Q.   Okay.  One of the companies that

18   TPG owns is Collegium; is that correct?

19        A.   Not a company that I've worked on.

20        Q.   You don't know, one way or the

21   other, whether --

22        A.   Sorry.  I don't --

23        Q.   -- TPG owns Collegium?

24        A.   I know the ones I've worked on.  I

 1    don't know that.

 2           Q.    I'm not asking if you've worked on

 3    it.  I just want to know if you know whether

 4    TPG owns Collegium.

 5           A.    I don't.

 6                 (Exhibit Kessler-40 marked for

 7           identification and attached to the

 8           transcript.)

 9    BY MS. LEVY:

10           Q.    I'm going to show you what I've

11    just marked as Kessler Exhibit 40.

12                 I'll ask you, Dr. Kessler, if

13    you've seen this document before or are

14    familiar with its contents.

15           A.    Sitting here today, I have no

16    recollection of this.  I don't -- I don't

17    believe I've seen this document.

18           Q.    Okay.  No one's ever told you that

19    Collegium Pharmaceuticals received this warning

20    letter from the FDA?

21           A.    No.  I'm not involved.  Absolutely

22    not.

23           Q.    That's new news to you?

24           A.    Absolutely.  I'm not involved.

Highly Confidential - Subject to Further Confidentiality Review

1    Never seen this before.

2         Q.   Does the fact that a company gets a

3    warning letter, does that automatically mean

4    the company has done something wrong?

5         A.   Pretty much.  I mean -- well, let's

6    look at the warning letter.

7         Q.   Before we look at that one, I mean,

8    in general.  If you know a company got a

9    warning letter, can you be sure that it did

10   something wrong, in your opinion?

11        A.   Ma'am --

12             MR. RAFFERTY:  Object to the form.

13        A.   As you know, there's warning

14   letters, and there's warning letters.  And I

15   would want to -- there are warning letters that

16   say that there's -- FDA considers it a

17   violation of the act and will cite a specific

18   statutory section, and that -- so that, I

19   think, gives you -- depends what the letter

20   says is the answer.

21        Q.   Fair point.

22             I bet you will agree with me that

23   the FDA keeps enforcement statistics on its

24   website.

1          You're familiar with that, right?

2     A.    I am.

3     Q.    And, in fact, you can click on the

4  FDA website and see summaries by year of those

5  FDA statistics, correct?

6     A.    Yeah.

7          (Exhibit Kessler-41 marked for

8          identification and attached to the

9          transcript.)

10 BY MS. LEVY:

11    Q.    I'm going to show you what's been

12 marked as Kessler Exhibit 41.

13         I will represent to you,

14 Dr. Kessler, that this is a chart that we

15 copied from the FDA website or pulled

16 substantively from the FDA website.

17         Are you familiar with statistics

18 that look like this from the FDA website?

19    A.    In general, yes.

20    Q.    Under the Kessler FDA, were

21 statistics like this kept?

22    A.    I assume so.  I can't visualize

23 them, as I sit here.  But I think that's fair.

24 I think it's a practice that goes back decades.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   The left-hand column of Exhibit 41

2    says Enforcement Type, and the right-hand

3    column says Count.

4         Do you see that?

5    A.   I do.

6    Q.   I will represent to you that we

7    pulled Exhibit 41 for 2017.

8         Will you agree with me,

9    Dr. Kessler, that the actions on the left-hand

10   side under Enforcement Type, these are actions

11   that the FDA can take or cause to be taken

12   directly or indirectly, correct?

13   A.   I assume you're referring to

14   injunctions and going into court, et cetera.

15   Is that what you mean by "indirectly"?

16   Q.   Mm-hmm.

17   A.   Yeah.  I think if we understand

18   that, I think that's -- there are steps to

19   each -- different steps to each one of these.

20   Some of these, for example, recalled are --

21   they may be voluntary recalls.  So be careful

22   on whether FDA took that step or the

23   manufacturer took that step.  So there's

24   nuances to these.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   And that's why I said "directly or
 2   indirectly."
 3               These are things that can happen
 4   when the FDA sees a problem, right?
 5          A.   Or when a manufacturer sees a
 6   problem, they can do a recall.  I'm not sure we
 7   would say that all recall products are -- I
 8   mean, they get reported ultimately -- should
 9   get reported to the FDA.  The manufacturer may
10   see them first.
11          Q.   Assuming that I represent to you
12   that I copied these correctly from the FDA
13   website, you understand the count on the
14   right-hand side to be the number of times that
15   the FDA took such an action in 2017?  Is that
16   how you would read that?
17               MR. RAFFERTY:  I'm going to object
18          just because I don't know where -- I
19          haven't had a chance to corroborate
20          where it came from.  So I'm just going
21          to object since there's no FDA cite or
22          anything --
23               MS. LEVY:  Sure.  That's exactly
24          why I asked the question the way I did.
```

1    A.   You're asking me -- I'm sorry.  The

2    question was --

3         Q.   What does the count mean on the

4    right-hand side?

5         A.   I would think the number of actions

6    under each.  It's a lot of warning letters, but

7    I'm not -- you know, I'm sure you took it off

8    right.  15,000 warning letters seems like a lot

9    of warning letters in one year.

10        I'm not sure -- I'm sure you did

11   this accurately, and I'll take any

12   representations you make, Counselor.

13        Q.   In your own experience, warning

14   letters are a common thing that the FDA does,

15   correct?

16        A.   Common, you know, I mean, they

17   are -- they are something that the FDA does.

18        Q.   Okay.  And recalled products are

19   also common.  Here we see in 2017, there's --

20   9,199 is the count for recalled products, and

21   2,945 is recall events.

22        Do you see that?

23        A.   Yeah.  Yes, I see this.

24        Q.   It's not uncommon to have recalled

1    products and recall events, is it?

2            MR. RAFFERTY:  Object to the form

3        in terms of not defining what "products"

4        or "events" are.

5        Q.   You can answer.

6        A.   I would phrase it, it's not

7    unusual.  You've got to look at the denominator

8    to see what's common here.  It's not unusual to

9    see recalled products.

10           MR. RAFFERTY:  What exhibit was

11       that?

12           THE WITNESS:  41.

13       Q.   I have in front of you -- I think I

14   marked the Collegium warning letter at -- as

15   Exhibit 40.

16           Can you pull that one back up.

17       A.   Yeah.

18       Q.   Is Collegium a drug company that

19   you believe has contributed to the opioid

20   crisis?

21       A.   I have not, you know -- there may

22   be one or two issues over, I don't know, the

23   last -- since 2008 that -- where I may have

24   discussed with colleagues ADT formulation or

1    something like that, as I think I talked about

2    earlier.

3              But save for that, I have no --

4    I've not studied Collegium.  I'm happy to do

5    that, if you'd like.  I just -- I have -- but

6    for those two conversations, really one on

7    ADT -- the one conversation I remember on an

8    ADT product, I have no knowledge of anything

9    about this.  I don't know who Mr. West is.  I'm

10   just not involved with it.

11        Q.   For purposes of this litigation,

12   you have not been asked to study Collegium's

13   responsibility, have you?

14        A.   It was not one of the

15   manufacturers -- is it a defendant?  I

16   wasn't -- maybe it's on my list.  I don't know

17   if it's on my list.  I listed all the

18   defendants.  It's in my report.

19             But I was asked specifically to --

20   by plaintiffs -- they gave they the scope.

21   They gave me the list.  I didn't change that in

22   any way.

23        Q.   Got it.

24             So what you did for purposes of

1    this litigation was to study the defendants

2    that are the subject of your report, and that's

3    it?

4            A.   If you look at the beginning of the

5    report in the first section, I think the last

6    several paragraphs or paragraph on just scope,

7    I asked specifically for what the scope was,

8    and I addressed myself, after it was determined

9    what the scope was, to those question.

10           Q.   Did you make any effort to

11   determine how many other drug companies had

12   conduct that contributed to the concerns you

13   have about opioids?

14           MR. RAFFERTY:  Object to the form.

15           A.   I will tell you that I was sort of

16   exhausted after just doing these, to be honest,

17   right.  I mean, this is -- the scope that was

18   given to me is vast.

19           I will tell you that in -- I mean,

20   I did study the database broadly.

21           Q.   What database?

22           A.   Well, the production database.

23   Okay.

24           Q.   By "the production database," you

Highly Confidential - Subject to Further Confidentiality Review

1    mean the documents produced in this case?

2         A.   Yes.

3         Q.   By these defendants?

4         A.   Well, again, there were third

5    parties, et cetera.  I mean, don't ask me to

6    define -- I mean, the database are the

7    defendants.

8              So I did look at that -- that sort

9    of broadly.  But there are other drugs that we

10   talked about earlier where I didn't spend a lot

11   of time because they were not the subject.

12             I mean, my impression and my sense

13   was that the major drugs that contributed to

14   the epidemic were drugs that are identified in

15   the report.  That was my impression, and that's

16   my sense.

17        Q.   But you didn't do anything to see

18   if that was true?  You didn't look at any other

19   drug companies other than the ones that are in

20   the seven in your report?  You didn't

21   look at -- I'm sorry -- the six in your report?

22             MR. RAFFERTY:  Object to the form.

23        Q.   You either did or you didn't.  You

24   examined the six in your report, and you

Highly Confidential - Subject to Further Confidentiality Review

1  studied those until you were complete with

2  that?

3          A.   I did.

4          Q.   But did you study any others --

5          A.   Yes, I did.

6          Q.   -- other than the six?

7               MR. RAFFERTY:  Object to the form.

8          Q.   Just name -- without going into

9  what you did, name the other drug companies

10 that you studied.

11         A.   Abbott.

12         Q.   Who else besides Abbott did you

13 study?

14         A.   Abbott's the one that comes to

15 mind.

16         Q.   Is that the only one?

17         A.   I'd have to go back and look.

18 That's the one that comes to mind.

19         Q.   When you studied Abbott's conduct,

20 did you conclude that Abbott had responsibility

21 for the opioid crisis?

22         A.   I think so.

23         Q.   Okay.

24         A.   I mean, it -- so the record is

Highly Confidential - Subject to Further Confidentiality Review

1  clear, I mean, it was basically -- it

2  co-promoted oxycodone with Purdue.  So there

3  was a joint licensing agreement.  So I think

4  it's fair to say that those marketing plans of

5  Purdue carried over to Abbott.  It was a joint

6  venture of sorts.

7        Q.   Now, you mentioned, I believe,

8  earlier that you did not study Collegium,

9  right?

10       A.   No.  I'm not sure that -- no, the

11 answer is, I did not.

12       Q.   Okay.  And as you sit here today,

13 do you have an opinion on whether Collegium

14 contributed to the opioid crisis?

15            MR. RAFFERTY:  Object to the form.

16       Q.   It's a yes, no, or I don't know.

17       A.   I haven't studied it.  So I can

18 tell you I have no opinion.

19       Q.   Okay.  And how many total drug

20 manufacturers are there that manufactured and

21 marketed opioids in this country?

22       A.   I have documents on market share

23 that I'd be happy --

24       Q.   Roughly.  What's the rough number

1    of companies?

2           A.    I'd want to look at the charts that

3    I have before I give you an answer.

4           Q.    Do you know if it's dozens?

5           A.    I have -- I have the market share.

6    There are -- I wouldn't want to hazard a guess

7    at this time.  I do have the documents.  If you

8    want me to look at them, I'd be happy to give

9    you the numbers.

10          Q.    We may want to do that, but for the

11   moment, you'll agree with me that there are

12   many, many drug manufacturers that you did not

13   study to determine whether they had

14   responsibility for the opioid crisis.  Is that

15   fair?

16          MR. RAFFERTY:  Object to the form.

17          A.    No.  I think it's fair to say that

18   I studied the major -- without a doubt, the

19   major brand name companies.

20          Q.    And how did you determine the major

21   brand name companies, or did you just study

22   what you were asked to study by counsel?

23          A.    No.  If you look at those market

24   shares and you look at certainly the extended

Highly Confidential - Subject to Further Confidentiality Review

 1    release and you look at the competitors, it's

 2    very easy -- when you look at Purdue's market

 3    plans, they talk about who the competitors are.

 4    I showed, for example, the Mallinckrodt graph

 5    yesterday that showed the Purdue market share.

 6            So you can quite easily, based on

 7    the record, see what the percent market shares

 8    are and who's competing against whom.  Purdue

 9    was competing against Kadian early on.  You see

10    that in the documents.

11            Q.   Are you finished?

12            MS. FREIWALD:  Objection, move to

13            strike.  It mischaracterizes the facts

14            in this case.

15    BY MS. LEVY:

16            Q.   I'm going to ask a pretty simple

17    question.

18            You've identified six manufacturers

19    in your report, and today you've identified

20    Abbott.

21            Is there any other drug company

22    whose conduct you studied to determine if they

23    had contribution for the opioid crisis?  Any

24    others other than those seven?

1          A.    Yes.

2          Q.    What other company?

3          A.    Well, I think I talked about --

4    well, I talked about Rhodes.

5          Q.    Okay.  And did you conclude that

6    Rhodes does or does not have responsibility for

7    the opioid crisis?

8          A.    I think Rhodes is owned by Purdue.

9    I think the answer is complicated.

10         Q.    You can't say one way or the other?

11               MR. RAFFERTY:  Object to the form.

12         A.    Well, Rhodes is -- Rhodes, at

13   different times, is making API.  Noramco is

14   making bulk.  Tasmanian Alkaloids.  I've

15   studied all those.

16               They certainly feed in, right, to

17   the -- without Tasmanian Alkaloids, but for,

18   you wouldn't have supply the way we had supply.

19               So again, I think it's fair to say

20   it's complicated, and I studied those, yes.

21         Q.    Let's talk about drug companies

22   that have no affiliation with any defendant in

23   this room.

24               How many of those did you study,

1    aside from Abbott, to determine if they had

2    contribution for the opioid crisis?  Just a

3    number.  How many?

4            A.    I studied -- well, there's Abbott.

5            Q.    Just a number.

6            A.    Without any affiliation?

7            Q.    Without affiliation to these

8    defendants.

9            A.    So Abbott has an affiliation -- I

10   just want to understand your question -- to

11   Purdue.  Is that your question?

12           Q.    Without any affiliation, is my

13   question.

14                 Let me redo the question --

15           A.    How are you defining "affiliation"?

16           Q.    -- just so we're clear.

17                 MR. RAFFERTY:  He can ask an

18           explanation of the question if he

19           doesn't understand it, Counsel, and

20           that's what he was doing.

21           Q.    Here's the question.  How many drug

22   companies with no affiliation to defendants in

23   this room did you study aside from Abbott to

24   determine if they had contribution for the

1   opioid crisis?  How many?  Just the number.

2           A.   So I've looked at data -- for

3   example, for Amneal, Mylan, Qualitest, Roxane,

4   Sandoz, Watson -- which, I guess, is, you know,

5   related to you, so I take that back --

6   Rhodes -- when you look at the contributions on

7   the generic side.

8               So, I mean, I've looked at -- I've

9   looked at the market share and how those are

10  spread out, and I've tried to study somewhat

11  the flow between -- from the raw materials in

12  the poppy fields to the API manufacturer to the

13  brand to the generics.

14              This is all very highly

15  interconnected, because, I mean, for example,

16  Rhodes is on my list, but Rhodes -- rather,

17  Watson, are connected to you.

18              So I think that the fact is, I am

19  very comfortable that the manufacturers

20  identified in the report did the bulk of the --

21  the vast, vast, vast majority of the promotion.

22              And I think it's basically shown

23  when you look at the competitive landscape and

24  the documents, again, in the record.  The

Highly Confidential - Subject to Further Confidentiality Review

1    competitive landscape is such that the

2    defendants that were identified make me

3    comfortable that it's the bulk of the promotion

4    that is happening.

5            Q.    So those other drug companies that

6    you just named are not responsible in any way

7    for the opioid situation we're in?  Is that

8    your -- are they responsible or not

9    responsible?  Which is it?

10           MR. RAFFERTY:  Object to the form.

11           A.    So --

12           Q.    I'd like to ask you, before you

13    answer, to give me a short answer to this

14    question.

15           The drug companies you referenced

16    in your last answer, are they -- do they have

17    responsibility, have no responsibility, or

18    somewhere in between?

19           MR. RAFFERTY:  If you can --

20           Q.    I don't need an explanation.

21           MR. RAFFERTY:  If you can answer

22           the question the way she's directing you

23           to, which is inappropriate -- if you can

24           answer it, then you can answer it.  But

Highly Confidential - Subject to Further Confidentiality Review

1          you don't need to be instructed to what

2          your options are.

3          A.   I don't see the record -- I mean,

4    in the record, in what I've looked, I don't see

5    the extent of the change in medical practice by

6    these companies that were effected by the

7    evidence in this report.

8          Q.   And you -- I think in your last

9    answer, you said, "the vast, vast, vast

10   majority of promotion" was done by the

11   defendants in this case.

12          Have you studied the quantity of

13   promotion?  Have you studied the number or

14   the -- number of details or the quantity of

15   promotion?

16          A.   Oh, yeah.  I mean, I have looked at

17   sales force volumes.  I have looked at, I mean,

18   a whole lost of statistics.  There's a

19   Schedule, I think, 8 that has the promotional

20   details.  So I have looked at that, yes.

21          Q.   And what percentage of promotion is

22   the vast, vast majority?  What percentage is

23   that?

24          A.   I don't have -- I'd want to add it

Highly Confidential - Subject to Further Confidentiality Review

1  up to give you a precise number.  I wouldn't

2  want to be precise right now.

3        Q.   Okay.  So for my client, Actavis,

4  what percentage of the promotion do you assign

5  to my client?

6        A.   So I didn't -- as I said, I don't

7  want to give a percentage.  I think that at the

8  peak, you had 50 sales reps, if my numbers are

9  right.  I'd want to check.  Others, I think --

10 you know, again, I'd want to -- I haven't given

11 a precise number, but I think that can give you

12 a sense of -- sense of the scope of --

13       Q.   So I'm not really interested in

14 just a commentary as to what you learned about

15 what we did.

16            I really want to know the

17 methodology that you used to determine the

18 amount of promotion per defendant.  So what

19 process did you go through to make your

20 determinations about that?

21       A.   I don't think the report gives you

22 an exact quantitative aspect.  It doesn't

23 allocate responsibility between those

24 defendants.

1          If you'd like, I'd be happy to

2    give -- if you define "responsibility" for me,

3    I'd be happy to give you my opinion, but I

4    didn't give a precise quantitative aspect.

5          Q.   So what I really want is the

6    opinions you're going to give at trial.  At

7    some other time, we can talk about your other

8    opinions, because I do find that interesting,

9    too.  But I'm interested in the opinions that

10   you plan to give at trial.

11          Do you plan to give at trial

12   opinions quantifying the amount of promotion

13   done by any particular defendant?

14          A.   To the extent that that information

15   is in my report and in my schedules, I'm happy

16   to testify.  There are dollar numbers and sales

17   numbers and promotional numbers that are

18   identified in my report, and I'd be happy to

19   give you opinions based on those facts, right.

20   But I'm not going to -- I don't intend to go

21   outside of the report.

22          Q.   So the things that would matter to

23   you in determining the impact of a particular

24   drug company's promotion, some of the things

1    that you would consider would be the number of

2    representatives.  That matters to you, doesn't

3    it?

4         A.   Sure.

5         Q.   And it matters to you the type of

6    interaction that the representatives were

7    having with prescribers.  That would be

8    relevant to your opinion, right?

9         A.   Well --

10        Q.   The content of what was being said.

11        A.   Well said.

12             I mean, it's -- I mean, as you see,

13   the report talks about the corporate messaging.

14   It doesn't rely on just the numbers, but it's

15   the corporate messaging.

16             I mean, again, the range of

17   activities in promotion, I can probably -- in

18   one of these charts, you'll see, you know,

19   probably a list of 16, 17 highly sophisticated

20   methods to influence doctors -- KOLs, KOL

21   mapping, E-detailing, KOL channels -- each one

22   measured, each one having -- looking for the

23   return.  So that there's not just one factor

24   that goes into it.

Highly Confidential - Subject to Further Confidentiality Review

1            That's why the report tries to look

2    at the -- I mean, the range of promotional

3    activities.  It's not just this individual

4    detail.

5         Q.   It matters also when in time the

6    promotional activity occurred.  That's also

7    relevant to your views, isn't it?

8         A.   Yes, I think -- I think that's

9    fair.

10            I think we talked earlier about the

11    initial sort of -- the initial promotion by

12    Purdue, the -- what was -- you see what was

13    going on with Kadian in the late '90s, early

14    2000s with Purdue, and then you certainly see

15    other companies jumping in, trying to compete

16    and expand the market after that time period.

17            So I do think there are different

18    stages of this, so I do think timing is

19    important.

20         Q.   You've a couple times in this

21    deposition talked about a shift in prescribing

22    practices, and earlier in your deposition, you

23    said, at some time after the 1980s, there was a

24    shift in prescribing practices.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Can you be more specific about when
 2    that shift occurred?
 3         A.   Yeah.  Well, I can give you time
 4    points.
 5         Q.   Sure.
 6         A.   Okay?  So if you look at the --
 7    sort of the state of medical practice, okay, on
 8    oxy --
 9         Q.   For the record, can you put a
10    sticker on that book that you're looking at,
11    please?
12         A.   Do I get it back?
13         Q.   Yeah, just -- and we can say for
14    the record the pages that you're referring to
15    so we don't have to copy the whole book.
16         A.   So, I mean, this is --
17         Q.   What page number are you referring
18    to?
19              (Exhibit Kessler-42 marked for
20         identification and attached to the
21         transcript.)
22              (Reporter interruption.)
23              MS. LEVY:  I'm sorry.
24    BY MS. LEVY:
```

1    Q.   That is Exhibit 43 [sic].  It is

2  marking a book in front of Dr. Kessler that is

3  entitled what, sir?

4    A.   1980 Drugs of Choice 1981.  I guess

5  between 1980 and 1981.

6         It's -- actually, the title page is

7  Drugs of Choice 1980-1981, Walter -- Dr. Walter

8  Modell.

9    Q.   So my question to you is, when --

10  when, just an answer in years -- did the shift

11  in prescribing practices that you've described

12  in your deposition -- when did that occur?

13    A.   So, I mean, I think that the shift,

14  as this book talks about -- it says that, We

15  find that the risk of addiction greater than

16  that -- and it's talking about oxycodone, for

17  example -- We find the risk of addiction

18  greater than that attributed to morphine...

19         And it ends up, Oxycodone is best

20  considered as an orally-active morphine and

21  should not be dispensed as freely as if it were

22  a codeine.

23         And it concludes, Oxycodone,

24  although useful, cannot be recommended as a

1    drug of choice.

2              And so I think that was generally

3    the practice in the 1980s, and I think -- I

4    think in these documents and in market share,

5    you can see the very -- the rise in the number

6    of prescriptions over time, both with OxyContin

7    and Duragesic and that that increase, which is

8    pretty dramatic -- I guess between 1998 and

9    1999 is where it starts, and you can see it

10   for, I mean, other trends.

11             So you have to plot the trend data,

12   but I think that this sort of long-acting

13   opioids or, certainly, the extended-release

14   opioids, you see that there is -- I guess from

15   1998 to 2004 -- and this is not a full year,

16   but you see this -- the market increased.

17             So I think the fact is, I'm going

18   even earlier, 1980s.  I mean, this stuff was

19   not viewed as drugs of choice, more addictive

20   than morphine.

21             And then this continues to take

22   off, and you -- I have charts elsewhere that go

23   even further.  And as our share of voice

24   increases, as this promotion increases, these

Highly Confidential - Subject to Further Confidentiality Review

 1   drugs -- Opana ER does as well, for example.

 2             So what you see is just graphic,

 3   but I think the answer is the -- that sort of

 4   tipping point, probably around '99, 2001, but

 5   continued to grow.

 6        Q.   So let me see if I can do this from

 7   across the table, and if I can't, I may come

 8   sit beside you.

 9             But I want the record to be clear

10   about what you're looking at, so let's mark for

11   the record another one of your --

12        A.   It's already marked.

13             MR. RAFFERTY:  It's already marked.

14             MS. LEVY:  Oh.

15        Q.   Kessler Number 33, which has the

16   marking that you put on it, Market Share, this

17   is your market share pile?  Is that a fair way

18   to call it?  This is your market share module?

19   How do you -- how do you refer to it?

20        A.   There's some market share.  There's

21   other market share in the report and the

22   reliance list, but these are just some of the

23   cut-and-paste.  I don't want to represent these

24   are the only ones.  There are many documents

1    cited in the report.

2           Q.   I would like to give Exhibit 33 a

3    name, so what do you want to call it?

4           A.   Let's call it market share.

5           Q.   Okay.  So --

6           A.   Market share papers.

7           Q.   Your market share papers, as

8    reflected in Exhibit 33 --

9                I believe when you gave your

10   testimony -- I'm going to turn, if you don't

11   mind, to a chart that I want to ask you some

12   questions about.

13               MS. LEVY:  So I want to put a

14          sticker on -- another sticker -- I'll

15          call it Exhibit Kessler-43, which I

16          would like to also mark for -- just this

17          page.

18               (Exhibit Kessler-43 marked for

19          identification and attached to the

20          transcript.)

21   BY MS. LEVY:

22          Q.   This says -- 2003 Total Market,

23   12.12 Billion, is the title of the graph.

24               Are you with me?

1      A.   Yes.  Actually, I think it's

2  probably -- the graph is probably U.S. Pain

3  Market, title.  But this -- you can call the

4  title anything you want.

5      Q.   The single page we're referring to

6  as "2003," I just want to understand the

7  testimony that you gave a minute ago about

8  this.  This charts 1998 through what point in

9  time?  2004?

10     A.   2004 is not a complete year.

11 That's an expected year, I believe.

12     Q.   Okay.  And is this an illustration

13 of the shift in prescribing that we were

14 talking about?

15     A.   It certainly is a shift in the

16 increase.  So you start with the red, which is

17 long-acting opioids, I mean, as a -- as a

18 group, right.  So you have $783 million in '98

19 growing, in the red, to $3.5 billion.

20          And you also have some increase in

21 short-acting opioids, going from about 970 to

22 double.

23          So you have -- on the one hand, you

24 have about a five-fold increase in long-acting

1    opioids and a doubling in short-acting opioids.

2            Now, I just want to -- there are

3    other graphs that I have over extended periods

4    of time, but we picked out -- I mean, you asked

5    me for a question, and I think this does

6    correspond to some of the growth.

7            But, I mean, to be fair, we

8    probably should have in front of us and pull up

9    the growth over several decades.  And I think

10   you would see where -- where there was sort of

11   a tipping point, where the growth started to

12   accelerate.  So it's that greater acceleration.

13       Q.   What is the dip in 2004?

14       A.   That's just not a full year.  So

15   if you --

16       Q.   I see.

17       A.   If you had a full year --

18       Q.   It's a partial year?

19       A.   It's a partial year.  So that's

20   why -- if you did a full year, I can assure

21   you, it would be -- the growth is substantial.

22       Q.   Has the shift in prescribing --

23   well, when you talk about -- when you said

24   earlier in the deposition -- I wrote down these

1   words -- "shift in prescribing" -- those were

2   the three words I wrote down -- shift from what

3   to what?

4           A.   Well, I mean, you can -- you can do

5   that, I mean, just in total number of scripts,

6   right, for the opioid class.  I mean -- or even

7   the pain -- I think for the opioid class.

8   Let's stay with that.  And I think you can look

9   at the increase in either total -- total

10  prescriptions, total sales volume.

11          I think that was the -- that growth

12  and that acceleration of that growth from

13  basically -- you know, we can get the numbers

14  from the 1980s, but I think this reflects the

15  fact that if it's not a drug of choice,

16  right --

17          I mean, there was -- there were a

18  combination, and there may have been an IR

19  product.  Put a question mark around that.

20          But you would look at -- the sales

21  volume was relatively small, and then there was

22  a continued growth in increasing the number of

23  prescriptions.  That's what I mean by a "change

24  in medical practice," how doctors actually

Highly Confidential - Subject to Further Confidentiality Review

1    prescribe.

2         Q.    In your view, is all of the

3    increased growth due to drug company misconduct

4    or only part of the increased growth?  Is it

5    all of it that can be attributable to bad

6    conduct or just a part of the increased growth?

7         A.    Let me think about the answer to

8    that question.

9         Q.    I really just want a succinct

10   answer.  I don't want to know why you think

11   that; I just want to know if all of the growth

12   or part of the growth is due to misconduct.

13        A.    I think the growth is due to the

14   marketing and promotion.  I would never -- I

15   think it would be foolhardy to say all the

16   growth in every instance.  I wouldn't want to

17   testify to that.

18             But this growth happened because of

19   marketing and promotion.  And that change in

20   prescribing, it was due to the perception of

21   opioids and the campaign to change prescribing.

22        Q.    Did the -- did the growth at some

23   point start to recede?

24        A.    Yes.

```
1        Q.   When?  Not a long commentary, just
2   when?
3        A.   I would need the graphs into the
4   teen years, and it would depend by manufacturer
5   and by generic.  So it's a little complicated.
6             My sense is -- I mean, I'd want to
7   have the graphs in front of me before --
8   certainly for certain manufacturers, it
9   receded.  There were changes that were made,
10  and -- but I'd want the data in front of me
11  before I'd give you an opinion on that
12  question.
13       Q.   So my question was, Did the growth
14  at some point start to recede?  Your answer
15  was, Yes.
16            Then I asked you just to tell me
17  when.  Is your answer to that, I don't know?
18            MR. RAFFERTY:  Object to the form.
19       A.   I can't be precise here, in part,
20  because --
21       Q.   Is your answer, I don't know?
22       A.   No, no.  Well --
23       Q.   I know you don't like to say that.
24  I just want to know if you -- do you know, or
```

1    don't you know?  Answer that.

2              MR. RAFFERTY:  That's not -- that's

3         not the only two options.

4              Answer the question as best you

5         can, or tell her you can't answer it.

6         A.   So we have to be a little more

7    precise in just -- we're talking about the

8    growth of what?  The pain market?  The

9    long-acting opioid market?  The short-acting

10   opioid market?  The opioid market?  I mean, all

11   those are different questions.

12             OxyContin, Kadian, those are all --

13   would be -- have different answers, and we

14   really would need -- I need the data in front

15   of me to thoughtfully and accurately answer

16   those questions.

17        Q.   Let's talk about Kadian.  When did

18   the Kadian market recede?

19        A.   You get more than everyone else,

20   right?

21        Q.   Let me see if you can answer my

22   question.

23        A.   Sure.  Sorry.

24        Q.   When did the market for Kadian

Highly Confidential - Subject to Further Confidentiality Review

```
 1    recede?  What year?
 2         A.   So let me just look at my --
 3         Q.   And the answer is either a year or
 4    you don't know the answer to the question.
 5              MR. RAFFERTY:  No.
 6              Or you need to look at something in
 7         order to get the answer.
 8              MS. LEVY:  Right.  I don't want --
 9              MR. RAFFERTY:  There is a lot of
10         different answers.
11              MS. LEVY:  I want a succinct answer
12         to this question.
13              MR. RAFFERTY:  But you don't get to
14         dictate what that answer is.
15              MS. LEVY:  Sure don't.  But I do
16         get to dictate that it's succinct.
17              MR. RAFFERTY:  No, you don't.
18         That's what the judge is for, the
19         special master.  You don't get to rule.
20              MS. LEVY:  Indeed.
21         A.   I don't have the graph -- I don't
22    have the graph in front of me.  I have data of
23    what its market share was in 2011 and 2016.  I
24    have representations.  And those are very
```

1   small, and there was a -- there was a decrease

2   from 2011 to 2016.

3       Q.   So as you sit here right now with

4   what you have in front of you, when did the

5   market for Kadian recede?

6            I just want a -- I just want -- and

7   if you don't know, you can say the words "I

8   don't know."

9            MR. RAFFERTY:  Object to the form.

10      A.   I don't have the graph -- I don't

11  have the graph --

12      Q.   Okay.

13      A.   Hold on a second.  Is that true?

14           So if you look, for example, in

15  Summit County, I think you see a receding

16  around 2012 to 20- -- 2012, 2014.

17           If you look at Cuyahoga, you see,

18  again, there's a receding between 2011 and

19  2012.

20           You see that in Cleveland, and you

21  see that in Akron, and you see that in Ohio,

22  generally.  So I think -- I think -- I think it

23  would be fair to say --

24           I don't -- the data I'm looking at

1    as of right now is only between 2009 and 2017,

2    so don't hold me to years before.  I would want

3    to see that data.

4             But I think it would be fair to

5    say, if there were an inflection point in a

6    rate of acceleration, it would be 2012.

7        Q.   I'm sorry.  I didn't understand

8    that answer.

9             In 2012, did the market for Kadian

10   increase or decrease?

11       A.   It decreased.  It you -- you asked

12   for the rate of -- rate of deceleration.

13       Q.   I didn't ask for any rates.

14            I just asked, did the market

15   increase or decrease?

16       A.   You said -- you said, when did it

17   decline?

18       Q.   Mm-hmm.  A year.  What year?

19            MR. RAFFERTY:  Objection.  He's

20        answered the question.

21       A.   So if you want to look at -- I can

22   give you specifically -- we can -- we can put

23   it up.

24            You know, in Ohio -- let's just

Highly Confidential - Subject to Further Confidentiality Review

1  take Ohio -- it was 20 -- 2009, it was 27,000.

2  2010, it was 25,000.  In 2011, it was 26,000.

3  It was relative- -- those numbers are

4  relatively consistent.

5           In 2012, it was 5,792.  2013,

6  2,692.  2014, 1,063.  2015, 556.  2016, 450.

7  2017, 365.

8           I can give you those numbers

9  nationally.  I can give you Summit.  I can give

10  you Akron.  So -- you have this document.

11        Q.   Let's stick that on --

12        A.   Sure.

13        Q.   -- 44.

14           So for the record -- so the record

15  is clear, the numbers that Dr. Kessler was

16  reading is coming from the page that we're

17  going to now mark as Exhibit 44.

18           (Exhibit Kessler-44 marked for

19           identification and attached to the

20           transcript.)

21  BY MS. LEVY:

22        Q.   And when you were reading those

23  numbers, I assume, Doctor, you're referring to

24  numbers of prescriptions?

1        A.    So this is --

2        Q.    Just is it the number of

3    prescriptions or something different?

4        A.    Let me -- let me just read the

5    caption so I can be accurate.  It is the total

6    number of Kadian prescriptions that I just gave

7    you.

8        Q.    So is it your view that Kadian

9    should be taken off the market?  Yes or no?

10            MR. RAFFERTY:  If you can answer it

11        that way.

12        A.    I've given no such opinion.

13        Q.    I didn't ask you if you've given an

14    opinion.

15            I'm asking you if it is your

16    opinion, as you sit here today, that Kadian

17    should be taken off the market, or, No, I don't

18    think Kadian should be taken off the market.

19            MR. RAFFERTY:  Or you can't answer

20        the question as she has stated it yes or

21        no.

22        A.    I've not -- I've not given an

23    opinion on that, ma'am, so I would have to

24    think about that.

Highly Confidential - Subject to Further Confidentiality Review

1    I have no -- no opinion on that.

2    My guess is, you know -- my guess is, after I

3    thought about it, I would probably come out and

4    say I'm not opposed to products being on the

5    market if their marketing is well-controlled.

6    Q.   Kadian came on the market during

7    the Kessler administration; is that correct?

8    A.   Came on in 1996.

9    Q.   Kadian came on the market during

10   the Kessler administration; is that correct?

11   A.   Yes.

12   Q.   Now, the FDA -- Kadian came on the

13   market pursuant to the FDA's normal approval

14   process for pharmaceuticals, right?

15   A.   I wasn't involved in Kadian.   I

16   know it was approved in July of '96.   I have no

17   reason to believe there was -- there was

18   anything that was -- that was different with

19   regard to that approval process.

20   Q.   Kadian's NDA application was

21   accompanied by clinical studies, correct?

22   A.   Let me -- I'd have to review --

23   Q.   Do you know if Kadian's NDA

24   included clinical studies?  Do you know?

Highly Confidential - Subject to Further Confidentiality Review

1            A.    Yes.

2            Q.    Did it include clinical studies?

3    Yes or no?

4            A.    I have to go back and look.  My

5    memory is fading at the moment.  If you'll give

6    me a couple of minutes, I can tell you exactly.

7    I'd have to refresh my memory of what those

8    clinical studies were, because I'm just fading

9    at the moment.  But I'm happy to -- if you give

10   me two minutes, I can double-check that.

11           Q.    Did you read the clinical

12   studies -- have you at any point in time read

13   the clinical studies that accompanied the

14   Kadian NDA?

15           A.    I'm sure I -- I'm sure I looked at

16   the basis for the approval at some point, but

17   right now, I'm a little vague, and I'd have to

18   review that.

19           Q.    As you sit here right now, before

20   looking at anything, you don't remember

21   anything about those studies, do you?

22                 MR. RAFFERTY:  Object to the form.

23           A.    I'm fading on those studies, to be

24   honest.  I don't -- I don't have a recollection

1    of those studies.  I'd have to refresh my

2    memory.

3         Q.   Okay.  Do you have any reason to

4    believe that the -- that CDER, under your

5    administration, didn't do its job when it

6    reviewed the Kadian NDA?  Do you have any

7    reason to believe it didn't do what it was

8    supposed to do?

9         A.   No.

10        Q.   And you've said -- you've said

11   before that you have a great deal of confidence

12   in the FDA, right?

13        A.   I said a lot of things about the

14   FDA.

15             MR. RAFFERTY:  Object to the form.

16        A.   I'm not sure if I've used exactly

17   those words.  I mean, if you have a quote and

18   wanted to give it to me --

19        Q.   Well --

20        A.   I've said a lot of things about the

21   FDA.

22        Q.   Let's not worry about what you've

23   said in the past.

24             As you sit here today, tell me if

Highly Confidential - Subject to Further Confidentiality Review

1    those statements are true or false.

2              The FDA is the most important

3    consumer protection agency in the world.  True

4    for false?

5         A.   If you don't care what I've said in

6    the past, why quote me?  You're quoting me.

7              In the past, I have said that.

8         Q.   Okay.  I'm going to see if you can

9    answer this question that I'm asking you.  This

10   is going to be really easy for you.

11             MR. RAFFERTY:  Object to the

12        commentary.

13        Q.   This is true or false?  The FDA is

14   the most important consumer protection agency

15   in the world.  Is that true or false?

16             MR. RAFFERTY:  Object to the time

17        frame.

18        Q.   I don't want to know what you've

19   said in the past, what you think you've said in

20   the past, what you might have said in the past.

21             I want to know, as you sit here

22   today, do you agree that the FDA is the most

23   important consumer protection agency in the

24   world?

Highly Confidential - Subject to Further Confidentiality Review

1               MR. RAFFERTY:  Object to the form.

2        A.   I would agree with that.

3        Q.   Okay.  You always have and continue

4   to have every reason to trust the judgment of

5   officials of the FDA; is that correct?

6               MR. RAFFERTY:  Object to the form.

7        A.   I wouldn't -- sitting here today, I

8   wouldn't say it like that.

9        Q.   Okay.

10       A.   I said I have enormous respect for

11  the people who work at the agency, but like any

12  other organization that has 10,000 people,

13  there are people whose judgment I would trust

14  with my life, and there are -- like any

15  organization, there are clunkers.

16              And so I would not make a blanket

17  statement across the board.  I have enormous

18  respect.

19       Q.   Janet Woodcock, the head of CDER,

20  you would put her in the category of someone

21  you have enormous respect for?

22       A.   I appointed Janet.

23       Q.   That's not the question I asked.

24              Do you have enormous respect for

1  Janet Woodcock?

2         A.   Respect?  Sure.  I appointed her.

3  I picked her out.  She was a, you know,

4  three-level medical reviewer, and I made her

5  the head of the center ten years ahead of when

6  she was supposed to be.  I have enormous

7  respect.

8             Do I agree -- I have enormous

9  respect for her contribution to service, to her

10  integrity.  Has she made mistakes?  Absolutely.

11  Do I disagree with her?  Absolutely.  Have we

12  had conversations like that?  Absolutely.

13             I defended Janet Woodcock, I mean,

14  you know, pretty vigorously because I thought

15  people at the agency should get defended in

16  certain circumstances.

17         Q.   What about Carl Peck?  Would you

18  say the same about him?

19         A.   Carl Peck, you have to love.  Carl

20  Peck -- I would trust Carl Peck with

21  pharmacokinetics because he sees

22  pharmacokinetics in everything.  And I think he

23  contributed and we worked mightily together.

24             Do I agree with him on everything?

Highly Confidential - Subject to Further Confidentiality Review

1    Absolutely not.  Do I think every question can

2    be answered by a PK analysis?  Absolutely not.

3    Did he make a mistake on pilot drug, et cetera?

4    We could spend hours talking.  But I love Carl

5    Peck, and enormous respect for Janet.

6              Q.    The FDA has the highest safety and

7    efficacy studies in the world, right?

8              A.    Studies in the world, no.  FDA

9    doesn't do studies.  The manufacturers does the

10   studies.  So I'm not sure what that -- the

11   question means.

12             Q.    The doctors and scientists at FDA

13   are as smart and talented as any you've ever

14   seen; is that right, sir?

15             MR. RAFFERTY:  Object to the form.

16             A.    That's exactly the kind of

17   statement that I made earlier.  If you're

18   asking me, there are those who are very

19   talented, and there are those who are clunkers,

20   and there are those who could earn umpteen

21   dollars times their salary on the outside and

22   are pure gold, and there are others who make

23   mistakes.  And even those who you trust

24   sometimes make mistakes.  And we all do that.

1     Q.   Do you agree that the United States

2     food and drug laws have the highest safety and

3     efficacy standards in the world?

4          MR. RAFFERTY:  Object to the form.

5     A.   I did at a point in time.

6     Q.   Do you agree now, as you sit here

7     today?

8     A.   I think in certain areas, we may be

9     being usurped by certain of the European -- in

10    certain areas.  I think that was probably true

11    at a point in time, but I have some concerns in

12    certain areas.

13    Q.   If a company gets a warning letter

14    and the company wanted to be a model citizen,

15    one thing it would do -- the first thing it

16    would do is immediately stop using the

17    offending promotional materials.  That's one

18    thing you would want to see a company that got

19    a warning letter do, correct?

20    A.   Sure.  But I think there would be

21    something you'd want to do first.

22    Q.   Another thing you would want a

23    company to do when it gets a warning letter

24    from the FDA about promotional materials is to

1    work with the FDA to formulate a corrective

2    action plan, right?

3          A.    Sure.  But I would think there

4    would be something even more important.

5          Q.    What first?  What would one want to

6    do first?

7          A.    You'd want to look and see not just

8    what this promotional material was or what your

9    corrective action plan, you would want to

10   understand the corporate strategy or the

11   corporate culture that contributed to that

12   warning letter, and you would want to make sure

13   you would change that corporate culture or that

14   corporate strategy rather than just discarding

15   X piece of paper or coming up with a plan.

16   That's what I think it is more important when

17   you got a warning letter.

18         Q.    So if you're advising a company as

19   to how to be a model citizen and do the right

20   thing when you get a warning letter, you need

21   to figure out why the statement got in and

22   correct that as a matter of corporate conduct?

23   Is that what you're saying?

24         A.    Sure.  But you'd have to ask

Highly Confidential - Subject to Further Confidentiality Review

1    yourself -- there's a term -- and I'm not a big

2    fan of it, the term.  It's a little bit of a

3    slogan, but it's a culture of compliance.  And

4    is there anything in that culture of compliance

5    that is off, that begat that warning letter.

6         Q.    You'd also want to work with the

7    FDA and create a corrective action plan that

8    was effective, correct?  Yes or no?

9         A.    Sure, yes.

10        Q.    And you are aware that Actavis got

11   a warning letter with respect to Kadian.

12   That's something that you talk about in your

13   report, right?

14        A.    2010, I believe, yes.

15        Q.    And, in fact, Actavis did

16   immediately stop using the materials.  You're

17   aware of that?

18        A.    I am.

19        Q.    And Actavis also worked with the

20   FDA to create a corrective action plan,

21   correct?

22        A.    Correct.

23        Q.    And you are aware that the FDA

24   agreed with and said it appreciated the

1    corrective action plan, correct?  Are you aware

2    of that?

3         A.   I'm not sure the word

4    "appreciated," but I'll take your stipulation

5    to that.  I don't recall, but I'll -- I'm sure

6    the FDA said something akin to that.

7         Q.   And part of the corrective action

8    plan was to send Dear Healthcare Professional

9    letters to every physician who had received the

10   projects materials.

11             Are you aware of that?

12        A.   Correct.

13        Q.   In addition, part of the corrective

14   action plan was to send additional letters out

15   to consumers, correct?

16        A.   Correct.

17        Q.   Okay.  And you don't have any

18   reason to believe that the FDA was dissatisfied

19   with that corrective action plan, do you?

20        A.   Correct.

21        Q.   Okay.  There was no enforcement

22   action or any further action taken on Kadian by

23   the FDA at any point in time after that,

24   correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.   Correct.  And we see the decrease

2  in numbers and eventually the decrease in

3  promotion, et cetera, that followed shortly,

4  and we see this inflection point in Kadian's

5  sales.

6    Q.   Do you believe that Actavis did the

7  right thing when it got its warning letter?

8    A.   I have no reason to doubt that.

9    Q.   Okay.  There's another document

10  that you cited in your report in paragraph 520

11  that you take issue with for Actavis.

12    A.   If I can find my report.

13    Q.   Your report is buried in my pile,

14  too.  Let's look together.

15    A.   520?

16    Q.   I think that's correct.  Let me

17  turn to it.

18         MS. LEVY:  There's a request for a

19       break.  Let's go off the record.

20         THE WITNESS:  I think 520 raises

21       some questions.

22         MS. LEVY:  Hang on a second.

23         Let's go off the record.

24         VIDEO OPERATOR:  4:40 p.m., we're

Highly Confidential - Subject to Further Confidentiality Review

1    off the video record.

2         (Recess from 4:40 p.m. until

3    4:53 p.m.)

4         VIDEO OPERATOR:  4:53, we're on the

5    video record.

6    BY MS. LEVY:

7         Q.  Doctor, you once referred to the

8    FDA processes as being the gold standard for

9    drug approval.

10        Do you still have that opinion

11   today?

12        A.  I think so.

13        Q.  How many opioids were approved in

14   the Kessler administration?

15        A.  I don't know -- I mean, the ones

16   obvious -- there were approved -- let me just

17   do it in my head.  Duragesic was approved

18   before me.

19        There were two.  There was Kadian,

20   and as far as brand name drugs, Kadian and

21   Duragesic -- I'm sorry -- Kadian and Oxy were

22   done during that seven-year period.  I'd have

23   to look and see how many on the generic side.

24        Q.  Do you know the number of

Highly Confidential - Subject to Further Confidentiality Review

1    opioids -- just do you know the number of

2    opioids that were approved during the Kessler

3    administration?

4         A.    I can tell you NDAs.

5         Q.    How many?  Number only.

6         A.    I believe there were two NDAs.

7         Q.    How many ANDAs?

8         A.    I don't have that number.

9         Q.    You don't know?

10        A.    I don't know.

11        Q.    The FDA continues to approve opioid

12   products on an ongoing basis, correct?  Let

13   me -- I worded that poorly.

14             The FDA continues to approve new

15   opioid products on an ongoing basis, continuing

16   through today, right?

17             MR. RAFFERTY:  Object to the form.

18        A.    There's an issue with regard to

19   that in my conversations with the Commissioner,

20   but the way the statute is written, there's

21   some discussion of whether that needs to be

22   changed.

23        Q.    Not my question.

24             The FDA continues to approve

1  opioids, this year has even approved opioids,

2  correct?

3       A.   This year, it would be fair.  But

4  when you say "continued," you're implying into

5  the future, and I'm just saying there is an

6  issue about that.

7       Q.   Okay.  The FDA approved new opioids

8  in 2015, '16, '17, '18 and '19, correct?

9       A.   And some to great criticism.

10       Q.   No doubt that the FDA has been

11  criticized widely by some folks for doing so.

12            But it continues to approve these

13  products, correct?

14       A.   Including me.

15            MR. RAFFERTY:  Object to the form.

16       Q.   And there have been a number of

17  citizens' petitions and other requests to the

18  FDA to make changes and to make -- to take

19  certain actions with respect to opioids on the

20  market.

21            You're aware of those, right?

22            MR. RAFFERTY:  Objection.

23       A.   We've discussed those in the past

24  two days.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And you disagree with the FDA's

2  opinions and outcomes in responding to those

3  petitions?  You disagree with the FDA in that,

4  right?

5           MR. RAFFERTY:  Object to the form.

6    A.    I don't think that's a fair

7  statement.  That's not my testimony.  If you

8  want to show me a specific sentence in FDA, I

9  can tell you what I would agree with and what I

10  disagree.  I won't make a blanket statement --

11    Q.    That's fair.

12    A.    -- that I agree or I disagree.

13    Q.    And I believe we established this

14  earlier in the record, but just in case.

15           You are not giving testimony or

16  speaking for the FDA, correct?

17    A.    That's correct.

18    Q.    You haven't been employed by the

19  food -- by the Health and Human Services

20  Department since the -- 21 years; is that

21  right?

22    A.    You can do the math at this hour.

23  But I would certainly -- it's very important,

24  underscore it, put an asterisk, put an

1    exclamation point.  I'm in no official

2    capacity.  Sometimes I get put on television

3    because they're not -- sometimes I get put on

4    television because the agency is not speaking.

5    But I have no official capacity.

6           Q.   Okay.  There are plenty of things

7    that you disagree with the FDA on, right?

8           A.   Things I agree with them and things

9    I disagree with them.

10          Q.   Okay.  Now, the -- one of the

11   things you believe is that Kadian should not be

12   prescribed for chronic pain, right?  Or is that

13   an overstatement?

14          A.   So I think if you did that, if you

15   just left it that way, I think that would be

16   inaccurate.

17          Q.   Okay.  Do you have any -- strike

18   that.

19               Kadian was approved by the FDA in

20   1996 for use in patients with chronic moderate

21   to severe pain who require repeated dosing with

22   a potent opioid analgesic, correct?

23          A.   I thought it said continuous,

24   around-the-clock.  Do you want to just give

1    me -- maybe I'm misreading.

2         Q.    Let me -- let me read you --

3         A.    Just give me the indication.  I can

4    pull it.  Let me pull it.

5         Q.    I just want to ask -- I'm asking --

6    we're going to do that in a minute, but listen

7    to this specific question, and I would like to

8    know if you agree or disagree.

9         A.    Okay.  I'm just pulling the label

10   so I can be exact.  But go ahead.  I'm

11   listening, ma'am.  I don't want to delay.

12        Q.    No.  Take your time.  Do what you

13   need to do.  Put the label in front of you.

14              And for the record, are you looking

15   at your report?

16        A.    Just looking at the schedules that

17   have the labels, and I'm looking specifically

18   for Kadian and multiple changes, and let's just

19   look at the indications section -- I'm just

20   trying to get the indications section --

21   interactions with alcohol -- go ahead.  Just

22   read me the indications section, or read me

23   whatever you want.

24        Q.    So no, that's not my question,

1    actually.  I want to wait until you can pay

2    attention to the question I'm going to ask you.

3              A.    Sure.  And I apologize.  I'm just

4    trying to pull the labeling.

5              Q.    Would you like to see the Kadian

6    current label?

7              A.    I'd love to see it in 1996.  That's

8    what I -- and I apologize --

9              Q.    I'm going to give you just another

10   minute, and then I'm going to move on with my

11   question.

12             A.    Keep going on, please.

13             Q.    Okay.  I'm going to say a

14   statement, and I want to know if you agree.

15   And here is the statement:  Kadian was approved

16   by the FDA in 1996 for use in patients with

17   chronic moderate to severe pain who require

18   repeated dosing with a potent opioid analgesic.

19                   That's true, right?

20             A.    No, I'd want to see the label

21   before I'd answer that question.

22                   (Exhibit Kessler-45 marked for

23             identification and attached to the

24             transcript.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. LEVY:

2         Q.   Let's mark -- let me hand you what

3    I've marked as Kessler Exhibit 45.

4         A.   Thank you very much, ma'am.

5         Q.   Okay.  And this is a document dated

6    July 11th, 1997.  You see in the top right-hand

7    corner?

8              THE WITNESS:  Can I ask someone

9         just get me the Kadian label, the

10        approved label, please?  Yeah, thank

11        you.

12        A.   I see this.

13        Q.   Okay.  And you recognize the

14   letterhead on this document as FDA Center For

15   Drug Evaluation and Research.  You recognize

16   that letterhead?

17        A.   I know that letterhead.

18        Q.   And the Center For Drug Evaluation

19   and Research is often referred to as CDER,

20   right?

21        A.   Correct.

22        Q.   CDER's understanding on July 11th,

23   1997 was that Kadian was approved by the FDA in

24   1996 for use in patients with chronic, moderate

Highly Confidential - Subject to Further Confidentiality Review

1    to severe pain that require repeated dosing

2    with a potent opioid analgesic.

3              Do you agree with that?

4         A.   You've got to show me the label and

5    I can answer that question.

6         Q.   Okay.  In --

7         A.   This is a medical officer's review.

8    We don't know whether that's shorthand.  We

9    don't know at what point in time.

10             Just somebody show me the label.

11   This shouldn't be a hard question to answer.

12   The answer to your question is exactly what it

13   says in the approved label.

14             And I'm sorry, I just can't pull it

15   up at this moment in time.

16        Q.   Is it okay to prescribe Kadian to

17   patients with chronic pain?

18             MR. RAFFERTY:  Object to the form.

19        A.   Can I see the label and I'll be --

20   I'm not going to answer --

21        Q.   You can't answer that without

22   seeing the label?

23        A.   I want to see the label, yes.  I

24   want to see the label.

1    Q.   Without seeing the label, can you

2    answer this question:  Is it okay to prescribe

3    Kadian to patients with chronic pain?

4    A.   Again, either show me the label or

5    I can't answer the question.  I don't want to

6    guess.  My understanding is that there was

7    around-the-clock, extended, continuous, and

8    those things are in the label.

9         But I don't have -- my memory is

10   fading and I'm just -- the courtesy of please

11   show me the label and I can answer that

12   question, or I can't answer the question.

13   Q.   Let me point you back to Exhibit

14   45.  You'll certainly agree with me that CDER

15   believed that Kadian was approved for patients

16   with chronic pain.  That was CDER's statement,

17   right?

18        MR. RAFFERTY:  Object to the form.

19   Q.   Yes or no?  Did you hear my

20   question, Dr. Kessler?

21   A.   I heard your question.

22   Q.   Okay.  What was my question?

23   A.   Your question -- let me point you

24   to Exhibit 45; you'll certainly agree with me

Highly Confidential - Subject to Further Confidentiality Review

1    that CDER believed that Kadian was approved for

2    patients with chronic pain.  That was CDER's

3    statement.

4              The label I have is Kadian capsules

5    approved for use in the introduction is an

6    extended-release oral formulation of morphine

7    indicated for the management to moderate or

8    severe pain when a continuous, around-the-clock

9    analgesic is needed for an extended period of

10   time.

11             That's what I remember.  So if we

12   can -- and that's from an FDA document.  But

13   let's -- if someone gets me the label, I can --

14   we can be exact.  I mean, I would think --

15        Q.   Keep going.

16        A.   I would think after I spoke on

17   Duragesic, I mean, and an extended release

18   morphine several years later, that some of that

19   would be --

20        Q.   You see what I've highlighted in

21   Exhibit 45?

22        A.   Yes.

23        Q.   Is CDER correct or incorrect, or

24   you don't know?  Which is it?

1          A.   If this does not correspond to the

2    label, this is incorrect.

3          Q.   And you don't know whether it does

4    or doesn't?

5               MR. RAFFERTY:  Object to the form.

6          Let the record reflect counsel refuses

7          to show him the label.

8          A.   Okay.  I have to be precise here.

9    If you can show me the label and what it's

10   approved for in 1996, I can be exact.  That's

11   my only request.

12              (Exhibit Kessler-46 marked for

13         identification and attached to the

14         transcript.)

15   BY MS. LEVY:

16         Q.   So I'm going to show you what's

17   marked as Exhibit 46.

18         A.   Thank you so much.

19         Q.   And I'm going to give you -- I'm

20   going to ask you to take a look at that

21   document and tell me -- the question is this.

22   Do you --

23         A.   Can we just establish the date of

24   this, kindly?

1    Q.    Look on the front page, bottom

2  left.  It's the current Kadian label.

3    A.    Correct.

4    Q.    My question to you is: Do you have

5  any problems with this label?

6         MR. RAFFERTY:  Object to the form,

7         overly broad.

8    Q.    Yes or no?  That's all I want to

9  know.

10   A.    Yes.

11   Q.    Okay.  This label is no good, in

12 your view?

13        MR. RAFFERTY:  Object to the form.

14   A.    I didn't say that.  I just said --

15 you asked me if I have problems with that.  The

16 problem is, this talks about a drug being

17 indicated for long-term opioid treatment and

18 extended release treatment.

19        Again, there's good parts of this

20 label, around the clock, and for which

21 alternative treatment options are inadequate.

22        The problem is, is it didn't

23 disclose that there's not adequate and

24 well-controlled trials that support that

Highly Confidential - Subject to Further Confidentiality Review

1    indication.

2            So this is -- in that case, you

3    would want to -- I mean, if I were Commissioner

4    at the time, I would say, we can make that

5    statement, right.  I mean, I would probably

6    want to emphasize cancer as I did in '94, maybe

7    in a rare small incidence beyond that, but I

8    would want to put in this that there was not

9    adequate and well-controlled clinical trials to

10   support this, but we're doing it anyway.

11       Q.   Okay.  So the Kessler that's here

12   for litigation believes that the label is not

13   supported by adequate and well-controlled

14   trials.  Is that a fair statement?

15           MR. RAFFERTY:  Objection to the

16       characterization.

17       Q.   Yes or no?

18       A.   So Dr. Gottlieb, Dr. Califf,

19   Dr. Woodcock all believe -- all have stated,

20   right, that there is not adequate and

21   well-controlled clinical trials to support

22   long-term use for opioids.  That is not a

23   litigation position.  If you look --

24       Q.   That's your opinion in this

```
1   litigation, right?

2          A.   Well --

3          Q.   That is your opinion today in this

4   litigation?

5               MR. RAFFERTY:  Objection.

6               Don't interrupt him.  If you're

7          going to characterize something as

8          "litigation Kessler," then he has a

9          right to respond to it.

10         Q.   And is it your opinion --

11         A.   Can I --

12         Q.   -- that this label --

13         A.   I need to finish my answer.

14         Q.   -- just yes or no, is your label --

15         A.   I need to finish my answer.

16         Q.   Okay.  Go ahead.

17              MR. RAFFERTY:  You don't have to

18         answer anything yes or no just because

19         she tells you to.

20         A.   I'm trying to -- I would like to --

21         Q.   I'd like for you to give me a

22   succinct answer.  Is that label flawed?

23         A.   Yes, that label is -- but please,

24   this is so important, okay.  The randomized
```

1    adequately controlled trial that we have, the

2    space trial, there's only one, shows no

3    efficacy benefit from long-term opioids.

4    That's the one we have.  There are others that

5    are in the works.

6              Making an indication without

7    adequate and well-controlled clinical trials by

8    definition is flawed.

9              Sometimes you do flawed things when

10   you're in a corner, right.  Things -- there's

11   been a practice in place for 20 years.  You

12   just don't want to hurt anyone.  You want to

13   leave the door open beyond cancer pain, right.

14   Because when you're at FDA, right, you realize

15   that somebody may, because of your action, jump

16   out of a window if you deprive them -- and you

17   lose sleep on that, right, so you're very

18   careful on what you do.

19             But that is a flawed statement

20   because it is contrary to the adequate and

21   well-controlled scientific evidence.  That is

22   not a litigation position.  That is the fact.

23        Q.   Okay.  So can you fix it for me,

24   please.  Take that pen that I just put in front

Highly Confidential - Subject to Further Confidentiality Review

1    of you and fix that label.

2            MR. RAFFERTY:  Objection.  He

3         doesn't have to do that.

4    Q.    Yeah.  Can you do that?

5            MR. RAFFERTY:  No, he doesn't.  He

6         doesn't have to draw anything.

7    A.    I can give you certain

8    recommendations.  I mean, I have no opinion on

9    that.  But I would give you certain elements --

10   Q.    Now, you either can or can't.

11   That's what I want to know.  Are you able to

12   take --

13   A.    I can give you --

14   Q.    Just a minute.  It's a yes or no

15   question.  Can you do this: Can you take that

16   pen and just fix the Kadian label?  Is that a

17   thing you could do?

18   A.    I could do that if you want to

19   spend the next maybe hour and my thinking about

20   it, and I can give you the elements -- I

21   probably couldn't give it to you as artfully

22   done, but let me give you the elements that I

23   think have to be in this label.

24   Q.    I just wanted to know if it's

Highly Confidential - Subject to Further Confidentiality Review

1  something that can be done.  So you disagree

2  that this is an appropriate label.  You

3  disagree that this label is not appropriate?

4         A.   I don't think --

5         Q.   It is not appropriate --

6              MR. RAFFERTY:  Objection to the --

7         quit cutting the witness off.

8              MS. LEVY:  Stop talking over me.

9              MR. RAFFERTY:  No, I'm not --

10             MS. LEVY:  You have plenty of time

11        to object.

12             MR. RAFFERTY:  No.

13        Q.   In your view, Dr. Kessler, this

14  label is flawed.  That's your testimony?

15             MR. RAFFERTY:  Object --

16        Q.   Simple as that, right?

17             MR. RAFFERTY:  Object to the form.

18        A.   I think what I testified to a

19  couple of minutes ago is, there were some good

20  aspects of this label, right, but there was

21  still need for improvement in this label that

22  reflects the current -- the science of this and

23  could more appropriately further protect the

24  public health.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   You don't think -- do you think

2    opioids are appropriate to use for long-term

3    pain?  Do you think that, as you sit here

4    today?

5              MR. RAFFERTY:  Object to the form.

6    Q.   Are they appropriate?  I'm not

7    asking about anything else other than your

8    opinion as to whether they're appropriate.

9              MR. RAFFERTY:  Object to the form.

10    Q.   Yes or no?

11              MR. RAFFERTY:  Object to the form.

12              And you don't have to answer yes or

13         no.

14    A.   I think a physician in his or her

15    judgment, recognizing that there is not

16    adequate and well-controlled trials to support

17    that decision for safety and effectiveness,

18    after -- in either cancer pain -- in certain

19    types of cancer pain or in some rare instances

20    of non-cancer pain, maybe as third line, maybe

21    as fourth line, but I would use them sparingly

22    in light of the fact that there is not adequate

23    and well-controlled clinical trials.

24              But if your back's against the

Highly Confidential - Subject to Further Confidentiality Review

1    wall, you know, we all do what we have to do.

2         Q.   Have you ever taken opioids?

3              MR. RAFFERTY:  Objection.

4              Do not answer that question.

5              That is wholly inappropriate, and

6         you know it.

7         Q.   You've prescribed opioids

8    certainly, right?  I think you told us that

9    yesterday.

10             MR. RAFFERTY:  Mark that part of

11        the transcript for me, please.

12        Q.   Have you?

13        A.   Yes.  I --

14             MR. RAFFERTY:  That is an abusive

15        question.

16        A.   I have either prescribed morphine

17   in the oncology wards.  I may have prescribed

18   certain combination products, not for its pain

19   effect, but for its antitussive effect, for its

20   central nervous effect in certain neurological

21   antitussive episodes.

22             But I think -- I mean, I do it, you

23   know, I probably -- you can count on a hand or

24   two hands the number of times I've written in

Highly Confidential - Subject to Further Confidentiality Review

1   my career -- I've been a hospitalist, so maybe,

2   you know, the service may have prescribed when

3   I'm the attending, but I -- it's very

4   occasional.

5          Q.   And I think we established this

6   earlier in your testimony.  You were a

7   pediatrician; is that right?

8          A.   Still am a pediatrician.

9          Q.   And you are not an oncologist, are

10  you?

11         A.   I did a lot of oncology.  I spent

12  an enormous amount of time because I was the

13  attending --

14         Q.   Are you an oncologist?

15         A.   No, I'm not, but I do a lot of --

16  when you're the hospitalist on the adolescent

17  floor, the floor is filled with --

18         Q.   Sure.  That wasn't my question.

19         A.   But I did --

20         Q.   Are you an oncologist?

21         A.   No, but I've done a lot of

22  pediatric oncology.

23         Q.   Sure.  And you told us yesterday on

24  the area of your expertise that you took a

Highly Confidential - Subject to Further Confidentiality Review

1    marketing class.  You don't have a degree in

2    marketing, do you?  Do you have a degree?  It's

3    a very easy question.

4           A.    It's not an easy question.

5           Q.    Okay.  Do you have a degree, yes or

6    no?

7           A.    Well --

8           Q.    Or you can't answer it?

9           A.    No, I can answer it.  I mean, so I

10   did --

11          Q.    Stop.  If you can't answer it with

12   a yes or no --

13          A.    I did -- I did --

14          Q.    Can you answer it with a yes or no?

15          A.    I have something called an advanced

16   professional certificate from the NYU Stern

17   School of Management.  They keep on asking me

18   for donations.  They think I'm a graduate, but

19   I only did deliberately the first year, the

20   basic courses in business school -- and that

21   included market --

22          Q.    You don't have a degree.

23          A.    I have an advanced --

24          Q.    That's not a degree.

Highly Confidential - Subject to Further Confidentiality Review

1         A.    I'll let others characterize the

2    degree.  Believe me, I'm trying to give away

3    degrees at this point.  I have enough degrees.

4         Q.    And do you have consider yourself

5    to be an expert in marketing?

6         A.    I think I have -- when it comes

7    to --

8         Q.    Yes or no?

9              MR. RAFFERTY:  No, it's not a yes

10             or no question.  It's not.

11        Q.    Let's back up.  Can you answer this

12   question with a yes or no?

13        A.    With regard to drug marketing --

14        Q.    You do think you're an expert?

15             MR. RAFFERTY:  Quit cutting off the

16             witness.

17        Q.    Yes or no?

18        A.    Yes.

19        Q.    Okay.  That's all I wanted to know.

20   And I don't even want to know why.

21             All right.  Let's take a look at a

22   document that I'm marking as Exhibit 47.

23             (Exhibit Kessler-47 marked for

24             identification and attached to the

1          transcript.)

2     BY MS. LEVY:

3          Q.    Exhibit 47 --

4          A.    Yeah.

5          Q.    -- this is a document that you have

6     cited in paragraph 389.2 in your report,

7     correct?

8          A.    There's three documents that I've

9     cited.  I think there's a -- if you can hand me

10    the February document there's --

11                MR. WEINBERGER:  Can I interrupt

12          for just a second?

13                Counsel, let me refer you to the

14          rules of the Northern District of Ohio

15          Federal Court, 30.1, Decorum:  Opposing

16          counsel and the deponent must be treated

17          with civility and respect.  Ordinarily

18          the deponent must be permitted to

19          complete an answer without

20          interruption --

21                MS. LEVY:  Pete, you can cut this

22          out.  You are now filibustering and

23          wasting time on purpose.

24                MR. WEINBERGER:  Let me finish.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  -- by counsel --
 2            MS. LEVY:  I'm not going to allow
 3       you to waste my -- we're going to add
 4       time --
 5            MR. WEINBERGER:  You can add time.
 6            MS. LEVY:  -- on this record --
 7            MR. WEINBERGER:  You can add time.
 8            MS. LEVY:  -- for as much time as
 9       you take reading rules to me.
10            MR. WEINBERGER:  Stop talking over
11       me.  30 seconds.  I am asking you, as an
12       Officer of the Court, to follow the
13       rules and to act with civility towards
14       this witness.
15            Absent that, we will take this up
16       with the Court.
17            (Exhibit Kesslery-48 marked for
18       identification and attached to the
19       transcript.)
20  BY MS. LEVY:
21       Q.   I'm going to hand you what has been
22  marked as 47, and you also have --
23       A.   Let's go to the paragraph number.
24       Q.   47 and 48 you have in front of you.
```

Highly Confidential - Subject to Further Confidentiality Review

1        MR. RAFFERTY:  I think she's

2     talking about exhibits, not the report.

3        THE WITNESS:  Yeah.

4     A.   But these are cited in 520, is that

5  what it is?

6     Q.   389.

7     A.   389, paragraph 520.

8     Q.   Yeah.  I have very limited

9  questions.

10     A.   Sure.

11     Q.   So I want to be clear and

12  transparent with you, Doctor.

13     A.   Sure.

14     Q.   I do not believe that I'm getting

15  succinct questions, so I reserve every right to

16  go to the special master and ask for extra time

17  with you.

18        I'm going to ask you really careful

19  questions and see if you can answer just what I

20  ask and nothing more.  Can we try our best to

21  do that going forward?

22     A.   I would love to get out of here --

23     Q.   Okay.  So --

24     A.   -- as much as you would.

1          (Reporter interruption.)

2          Q.    Okay.  Let's talk about the

3     document that I just put in front of you that's

4     Exhibit 47.

5          A.    Yes, ma'am.

6          Q.    Okay.  You cite that this

7     document -- in your report, do you cite that --

8     this document in your report, sir?

9          A.    I do.

10         Q.    Okay.  You can see and will agree

11    with me that this is a draft document?  Do

12    you -- can you see that?

13         A.    I see there's handwriting on

14    this -- I see there's handwriting on this

15    document.  I don't see the word "draft," but

16    feel free to point it to me.

17         Q.    Okay.  Let's ask a different

18    question.  Do you know if this is a draft or a

19    final document?

20         A.    I don't know the answer to that --

21    I don't see the word "draft" on it.  I do see a

22    handwriting.  And last night I noticed

23    something in this, so I may be able to

24    anticipate your question.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Do you know if this document that

2  we are looking at together was ever used?  Do

3  you know the answer to that?

4    A.   I don't know.

5    Q.   Okay.

6    A.   I don't know the answer to this.

7         And to make life a little easier, I

8  did see last night, in pulling this, that

9  there's some handwriting changes with peaks and

10 valleys -- I mean, this does not look -- this

11 looks like a final presentation in February.

12 This has this crossed out.  And my report

13 should reflect that.

14   Q.   Okay.  Let's pick up what's marked

15 as Exhibit 8 -- 48, I'm sorry.  Do you know if

16 Exhibit 48 is a draft document or final

17 document?  Do you know?

18        MS. AMINOLROAYA:  Can you identify

19 the document, Counsel?

20        MS. LEVY:  I'm sorry.  I just

21   handed it to counsel.

22   Q.   Do you know the answer to that

23 question?

24   A.   I can only tell you that it is not

1  marked "draft," and companies tend not to do

2  presentations that -- where it's not -- I mean,

3  my experience is, you mark things "draft."

4       Q.   So you assume that it's a final?

5       A.   No.  My testimony is, it's not

6  marked "draft."  I see "draft" nowhere on this

7  document.  I see a different version in March

8  23rd.

9         I have questions about the March

10  23rd document because I do see handwritings.  I

11  don't see that same handwritings here.

12       Q.   Do you know if Exhibit 48 is a

13  draft or final?  Do you know that?

14       A.   I know it doesn't say "draft."

15       Q.   I'm going to point your attention

16  just to the Bates number on the bottom

17  left-hand corner.

18       A.   We're in 48?

19       Q.   In 48.

20       A.   Yeah.

21       Q.   That's labeled 1554.  Do you see

22  that?

23       A.   Yes.

24       Q.   What does it say under --

1       A.    1554.

2       Q.    What does it say there?

3       A.    It says, insert picture of dosing

4  guide.

5       Q.    Does that indicate to you, Doctor,

6  that this is a draft document and not a final?

7       A.    No.  It depends how it's

8  constructed.  I wouldn't want to give any

9  opinion on that.

10       Q.    Okay.  So you don't know?

11       A.    I would not give any opinion on

12  that based on that paragraph.

13       Q.    Okay.  And now let's look further

14  at 1527 in the same document of Exhibit 48,

15  1527.  This is two pages in.

16       A.    Yes.

17       Q.    What does that slide say?

18       A.    Pain slides, insert summary slides

19  from Marion's deck.

20       Q.    Now that you've looked at that,

21  doesn't it look to you, sir, like this is a

22  draft document, not a final document?

23       A.    I think it's possible.  I mean, I

24  think that raises some questions.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  Now, there's a difference in
2  marketing that results in new prescriptions and
3  marketing that results in substitution of a
4  product.  Do you agree with that?
5    A.   Yes, and you can see that kind of
6  analysis in certain companies' documents, yes.
7    Q.   Okay.  Not all marketing has the
8  impact of having new patients get opioids.  You
9  would agree with that, right?
10    A.   Correct.
11    Q.   It's a simple question.
12    A.   I said --
13    THE WITNESS:  Gerard, can I just
14  see General 1, please.
15    Q.   Do you agree with the statement
16  that not all opioid marketing would result in
17  new patients getting opioids?  Do you agree
18  with that?  Simple question.
19    A.   I think it would be fair to say
20  there is a time where companies are trying to
21  get market share away from something, and a --
22  can I get -- I'm sorry -- influence on doctors.
23    I think there's both.  There's new
24  market share -- I mean, there's substitution,

1    and I think those things are tracked.

2            I didn't see it from Actavis.  But

3    I think those things are tracked in a number of

4    documents with a good deal of specificity that

5    I have seen.

6            So for example, you can have in

7    OxyContin continuing Rx's and new to brand and

8    new starts and switches.

9            So here you have what's called new

10   starts, which would be 36.7, and switches,

11   which would be substitution, so both can go on.

12       Q.   Without looking at the transcript,

13   what was my question to you?

14            MR. RAFFERTY:  Objection.

15            You don't have to answer that.

16       Q.   Do you remember what I asked you?

17            MR. RAFFERTY:  You do not have to

18       answer that.

19            If you've got a question for the

20       witness, ask the question.

21       Q.   Do you remember the question I just

22   asked?

23       A.   Please, let's go on.

24            MR. RAFFERTY:  It's not a memory

1     test.  Read the question back to --

2          Q.   So you told us yesterday another --

3     you gave us -- well, strike that.

4               One of the things -- one of the

5     things we asked you about yesterday, Doctor,

6     was your payment for your work in this case.

7               I wrote down in my notes that you

8     told us yesterday that you had made millions of

9     dollars in testifying in lawsuits.  Do you

10    recall that testimony?

11         A.   Two points I'm not sure I'm

12    tracking.  You're asking me for my payment for

13    work in this case, and that I've made millions

14    of dollars.  Those things were unrelated

15    questions.

16         Q.   Okay.  So I was unclear -- I was

17    unclear yesterday, so let me ask you some

18    questions to clear that up.

19               How much have you been paid for

20    your work in this case?

21               How much have you --

22               (Reporter interruption.)

23         A.   I'm sorry, I apologize --

24         Q.   How much have you charged for your

Highly Confidential - Subject to Further Confidentiality Review

```
 1    work?

 2          A.    (Nonverbal response.)

 3                (Reporter interruption.)

 4                MR. RAFFERTY:  You have to say

 5          "zero."

 6                THE WITNESS:  Zero.

 7          Q.    How much --

 8          A.    Let me just make sure I'm

 9    reading -- listening to your questions -- your

10    exact questions.

11                How much have you been paid?

12                I've been paid zero in this case.

13          Q.    How much have you billed for your

14    time and your work in this case?

15          A.    "This case" being the MDL?

16          Q.    Yes.

17          A.    Zero.

18          Q.    Are you working for free in the

19    MDL?

20          A.    No.

21          Q.    It's just you haven't submitted

22    your invoices yet?

23          A.    Fair.

24          Q.    So you estimated yesterday that you
```

1  had spent hundreds and hundreds of hours.  Is

2  that correct?

3       A.   Fair.

4       Q.   Okay.  But you can't say more

5  specifically than that?

6       A.   I have not added it up.

7       Q.   You have kept track of it somewhere

8  though; is that correct?

9       A.   There are numbers on -- you know,

10 they're on scribbled papers, yes.

11      Q.   So you could look that up and get

12 that information to us?

13      A.   I'm sure at a certain point, you

14 know, those -- I'm sure when invoices get done,

15 whatever agreement you have, whatever the rules

16 are, I leave it to counsel to work out these

17 things.

18      Q.   And now, going to your income for

19 testimony in litigation in total -- not just in

20 this case, all litigation -- I think that was

21 what you said you had made millions of dollars

22 doing that.  Is that correct?

23      A.   Over a ten-year period, correct.

24      Q.   And can you be more specific than

Highly Confidential - Subject to Further Confidentiality Review

1    that?  Do you know how many millions of

2    dollars?

3            A.    No.

4            Q.    You haven't kept track of that?

5            A.    No.  You have to ask -- I don't do

6    the finances.

7                  I know it's certainly millions.  I

8    think that would be accurate.  I don't know

9    exactly.  Over a ten-year period.

10           Q.    And is it over $10 million?

11           A.    I wouldn't want to hazard a guess.

12           Q.    You genuinely don't know?

13           A.    I genuinely don't know.  I've not

14   added it up, what the total is.

15           Q.    Your current billing rate is a

16   thousand dollars an hour; is that correct?

17           A.    Yep.

18                 MS. LEVY:  All right.  I'd like to

19           take a short break to figure out how to

20           use my last minutes.  If we want to, we

21           can just stay right here.

22                 VIDEO OPERATOR:  5:29, we are off

23           the video record.

24                 (Recess from 5:29 p.m. until

Highly Confidential - Subject to Further Confidentiality Review

1            5:54 p.m.)

2            VIDEO OPERATOR:  5:54, we are on

3       the video record.

4  BY MS. LEVY:

5       Q.   Thank you, Dr. Kessler.  We have

6  just a few number of minutes and a lot of

7  defendants, so I appreciate your patience while

8  we try to figure out how to allocate our last

9  little bit of time.

10           The first thing I want to clear up

11  for the record is administrative with respect

12  to Exhibit 42.

13           Can you tell us for the record --

14  so we don't have to copy the whole book -- what

15  pages of Exhibit 42 that you referred to

16  earlier in this deposition?

17       A.   I believe they are tabbed, ma'am,

18  and the pages include 219 and 220.

19       Q.   Okay.  You understand that Actavis

20  did not acquire Kadian until December of 2008?

21  You know that, right?

22       A.   Correct.

23       Q.   So any documents with respect to

24  Kadian prior to 2008 are not Actavis documents.

1    You understand that, right?

2        A.    Are not Actavis documents?   I

3    believe Alpharma owned it until 2008.   So that

4    would be correct.   That would be correct.

5        Q.    You anticipated my next question.

6            And is it your position, sir, that

7    Alpharma is responsible for inappropriate

8    marketing with respect to Kadian?

9            MR. RAFFERTY:   Object to the form.

10       A.    I didn't sort out -- don't take the

11   manufacturer too seriously.   I don't mean that.

12   I don't mean to diminish -- look at the drug

13   and the date.   The documents may be --

14   Kadian -- even sometimes something is labeled

15   Allergan.   It can be used sometimes --

16   sometimes certain manufacturers appropriate

17   certain sales promotional materials when they

18   acquire -- it's complicated.

19           So just look at the drug and the

20   documents and whoever the manufacturer is -- is

21   at the time of the document that I have

22   referenced is what I mean in the report.   I'm

23   drawing no legal conclusion about if I buy a

24   company, do I buy what I'm responsible for.   I

1    leave that to other -- to the lawyers and

2    others to sort out.  I'm not sorting out

3    relative responsibilities when a company

4    acquires another -- when a company acquires a

5    drug.

6            Q.   You're planning to offer an opinion

7    that the marketing of Kadian had some impact on

8    the opioid crisis, right?

9            A.   Yes.  I mean, and use the evidence

10   there regardless of the manufacturer.

11           And again, I'm just referring to

12   this as a general rule in the report because

13   there is a number, for example, of Cephalon we

14   saw being acquired by Teva.  So they may be

15   Cephalon; they may be Teva; they may be

16   Teva/Cephalon.  Just focus on the drug.

17           Q.   You made no effort to sort out what

18   part of the marketing problems were

19   attributable to Actavis versus Alpharma, did

20   you?

21           MR. RAFFERTY:  Object to the form.

22           A.   Correct.

23           Q.   Okay.  Thank you.

24           And so on a relative basis, you

Highly Confidential - Subject to Further Confidentiality Review

1  don't believe that the problems you saw with

2  the marketing of Kadian on a relative basis

3  were that big of a problem, honestly, do you?

4           MR. RAFFERTY:  Object to the form.

5      A.   I think when -- I think there are

6  other promotional campaigns that had a much

7  greater impact than Kadian's.

8      Q.   One of the things that I was left

9  scratching my head on -- well, place-hold that.

10          You understand that the FDA tracks

11  prescription data, right?

12     A.   FDA buys data that tracks

13  prescription data.

14     Q.   You're exactly right.

15          You understand that FDA purchases

16  data in order to be able to track

17  prescriptions, right?

18     A.   Correct.

19     Q.   And it does, in fact, use the data

20  that it purchases for that purpose?  You know

21  that?

22          MR. RAFFERTY:  Object to the form.

23     A.   It can for different purposes.

24     Q.   And the FDA, from the Kessler

1    administration all the way to today, has taken

2    some actions and made changes with respect to

3    its views on opioids?  Is that a fair statement

4    in general?

5          A.    Correct.

6          Q.    Is there any action taken by the

7    FDA, any specific action, that you believe it

8    took that it couldn't have taken earlier?

9                MR. RAFFERTY:  Object to the form.

10         A.    I don't understand the question.

11   Sorry.

12         Q.    The institution of the REMS

13   protocols, FDA could have done that earlier,

14   right?

15         A.    It did risk maps earlier.  The 2007

16   statute gave it specific authority -- the FDA

17   2007 gave the FDA authority, for example, to

18   order safety studies.  Only recent legislation,

19   the Cures Act, gave FDA authority to require

20   efficacy data to compel it once a drug is on

21   the market.

22         Q.    Couldn't have done it any earlier,

23   in your view?  Could not have?

24                MR. RAFFERTY:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1      A.   It's a legal question --

2      Q.   You don't know?

3           MR. RAFFERTY:  Object to the form

4      and the interruption of the witness

5      again.

6      Q.   Do you know?

7           MR. RAFFERTY:  Which question do

8      you want him to ask [sic]?

9      Q.   I want to ask if he knows if the

10     FDA -- just a yes or no, if you know.  I don't

11     want to know what it is.  I just want to know,

12     does Dr. David Kessler --

13     A.   I can answer your question.

14     Q.   -- know the answer to this

15     question?

16     A.   Yes.

17          MR. RAFFERTY:  And if he can give

18     the answer.

19     Q.   Could the FDA -- does Dr. David

20     Kessler know this?  Could the FDA have acted

21     earlier?  Does he know the answer?

22          MR. RAFFERTY:  Object to the form.

23     A.   I'm requiring on the long-term

24     efficacy study, not a safety study.  I can tell

1   you that FDA's position, in talking to

2   Dr. Gottlieb and in the Cures Act was that FDA

3   required congressional statutory authority.

4        Q.   So it could not have acted earlier?

5        A.   That was FDA's position of late in

6   talking to the Commissioner of what he stated.

7        Q.   Could the FDA have requested label

8   changes or changes in indications to various

9   opioids a long time ago, if it wanted to?

10            MR. RAFFERTY:  Object to the form.

11       Q.   Could have done that, right?

12       A.   Certainly it could have.  It can

13   always request, correct.

14       Q.   And another thing that left me

15   scratching my head is -- because I'm going to

16   wonder this -- is it true that you do not know

17   how much money you made last year?

18            MR. RAFFERTY:  Object to the form,

19            asked and answered.

20       A.   I do not know how much money I

21   made.  I can tell you my wife does the

22   finances.

23       Q.   Do you have to sign your tax

24   return?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    For last year?

2          Q.    2018.

3          A.    Yes, I filed.  I signed the form

4     that asked for an extension.  I've seen no tax

5     returns.

6          Q.    What about 2017?

7                MR. RAFFERTY:  I'm going to object.

8          And quite frankly --

9                MS. LEVY:  You're welcome to

10         object.

11               MR. RAFFERTY:  -- this is getting

12         harassing, and if it continues, we're

13         going to just instruct him not to

14         answer.

15               MS. LEVY:  You're welcome to do

16         that.

17               MR. RAFFERTY:  He's not going to

18         talk about how much money he makes --

19         Q.    Dr. Kessler --

20               MR. RAFFERTY:  -- overall because

21         that's not relevant under Rule 26, as

22         counsel well knows.

23         Q.    What are your sources of income

24    aside from the income that you're getting from

1  testifying?

2        MR. RAFFERTY:  Objection.

3      Q.   What other sources of income do you

4  have?

5        MR. RAFFERTY:  You don't have to

6        answer that question, Doctor.

7      A.   I'm happy to answer that question,

8  unless counsel instructs me otherwise.

9      Q.   What are they?

10     A.   I'm happy to.

11        I have a number of different

12  sources of income.  I have book royalties and

13  book contracts.  I told you about private

14  equity.  I have academic salary.  I have

15  consulting.

16     Q.   And you truly don't have any idea

17  how much money you make annually?

18        MR. RAFFERTY:  It's done.  The last

19        question was asked.

20     Q.   You have no idea?

21        MR. RAFFERTY:  You don't have to

22        answer any more questions, Doctor.

23        MS. LEVY:  Are you instructing the

24        witness not to answer that question?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. RAFFERTY:  I am, because it's

2     been harassing.

3          MS. LEVY:  Okay.

4          VIDEO OPERATOR:  6:03, we are off

5     the video record.

6          MS. LEVY:  Hang on.  We're not

7     going off the record.

8          We are leaving this transcript open

9     both so the witness can answer this

10     question; in addition, I have a great

11     number of questions still for this

12     witness.  Other counsel in this room

13     also have additional questions.

14          We are going to request -- reserve

15     every right to request additional time

16     with you, Dr. Kessler.  So we may be

17     seeing you again.

18          Anybody else have anything else

19     you'd like to put on the record?

20          MR. RAFFERTY:  Yes.  That is that

21     we gave -- Dr. Kessler gave 14 hours per

22     the instructions, was cooperative,

23     answered all of the questions, many of

24     which were irrelevant, harassing, and

1          quite frankly, ethically questionable

2          about his own medical care.  And so

3          y'all do whatever you want.

4               And the other thing is, these will

5          go with the court reporter, and the

6          originals will come back to Dr. Kessler.

7          Any originals that are being copied will

8          come back to Dr. Kessler.

9               MS. LEVY:  Hang on.  Everybody in

10         turn.

11              MS. FREIWALD:  I don't care whether

12         I do it or somebody else does it.  But

13         by my count, there were 11 of these

14         large spreadsheet files.  Somebody can

15         confirm if that's correct or not.  Some

16         were marked General.

17              And please, Dr. Kessler, if you

18         think I'm mischaracterizing it, just say

19         because I'm trying to create a record

20         here.

21              Some are more general; some were

22         specific to different clients.  I saw --

23         give me one second here.

24              It looked to me like there were a

Highly Confidential - Subject to Further Confidentiality Review

```
 1        couple that were Janssen.  One was
 2        called super poppy; one Purdue; MNK;
 3        Actiq; Payments to Parties.  And then
 4        there was another set that were Market
 5        Share, Influencing Doctors, General 1
 6        and 2.
 7            And we're going to ask the court
 8        reporter to put an exhibit sticker on
 9        each one of those following after
10        whatever our last exhibit number is.
11            COURT REPORTER:  These have already
12        been marked.
13            MS. FREIWALD:  Okay.  So the court
14        reporter will keep track of them by
15        number, and she'll make the copies and
16        then get the originals back to
17        Dr. Kessler.  That's fine.
18            COURT REPORTER:  Anything else for
19        the record?
20            MR. RAFFERTY:  Nothing from the
21        plaintiffs.
22            THE WITNESS:  Thank you, sir, very
23        much.
24            Thank you, ma'am.
```

Highly Confidential - Subject to Further Confidentiality Review

1                    VIDEO OPERATOR:  6:06 p.m., we are

2            off the video record.

3                    (Off the record at 6:06 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T E

 2

 3         I, Lisa V. Feissner, RDR, CRR, CLR,

 4    Notary Public, certify that the foregoing is a

 5    true and accurate transcript of the deposition

 6    of said witness, who was first duly sworn by me

 7    on the date and place hereinbefore set forth.

 8

 9         I further certify that I am neither

10    attorney nor counsel for, nor related to or

11    employed by, any of the parties to the action

12    in which this deposition was taken, and

13    further, that I am not a relative or employee

14    of any attorney or counsel employed in this

15    action, nor am I financially interested in this

16    case.

17

18         Lisa V. Feissner

19         Lisa V. Feissner, RDR, CRR, CLR

           Notary Public

20         Dated: April 30, 2019

21

22         (The foregoing certification of this

      transcript does not apply to any reproduction

23    of the same by any means, unless under the

      direct control and/or supervision of the

24    certifying reporter.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              INSTRUCTIONS TO WITNESS

2

3         Please read your deposition over

4    carefully and make any necessary corrections.

5    You should state the reason in the appropriate

6    column on the errata sheet for any change made.

7         After doing so, please sign the errata

8    sheet and date it.

9         You are signing it subject to the

10   changes you have noted on the errata sheet,

11   which will be attached to your deposition.  You

12   must sign in the space provided.  The witness

13   need not be a notary public.  Any competent

14   adult may witness your signature.

15        It is imperative that you return the

16   original errata sheet to the deposing attorney

17   within thirty (30) days of receipt of the

18   deposition transcript by you.  If you fail to

19   do so, the deposition may be deemed to be

20   accurate and may be used in court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    WITNESS NAME:       DAVID A. KESSLER, M.D.

      DEPOSITION DATE:    APRIL 26, 2019

 2

 3                      ERRATA

 4    PAGE LINE   CHANGE                 REASON

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3         I hereby acknowledge that I have read

 4    the foregoing deposition, pages 420 - 809,

 5    dated April 26, 2019, and that the same is a

 6    true and correct transcription of the answers

 7    given by me to the questions propounded, except

 8    for the changes, if any, noted on the attached

 9    Errata.

10

11

12    SIGNATURE:

              DAVID A. KESSLER, M.D.

13

14    DATE:

15

16

17

18    WITNESSED BY:

19

20    DATE:

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       LAWYER'S NOTES

 2      PAGE   LINE

 3      _____  _____  _____

 4      _____  _____  _____

 5      _____  _____  _____

 6      _____  _____  _____

 7      _____  _____  _____

 8      _____  _____  _____

 9      _____  _____  _____

10      _____  _____  _____

11      _____  _____  _____

12      _____  _____  _____

13      _____  _____  _____

14      _____  _____  _____

15      _____  _____  _____

16      _____  _____  _____

17      _____  _____  _____

18      _____  _____  _____

19      _____  _____  _____

20      _____  _____  _____

21      _____  _____  _____

22      _____  _____  _____

23      _____  _____  _____

24      _____  _____  _____
```