1      IN THE UNITED STATES DISTRICT COURT
2       FOR THE NORTHERN DISTRICT OF OHIO
3              EASTERN DIVISION
4                 - - -
5

IN RE:  NATIONAL          :  HON. DAN A.
6  PRESCRIPTION OPIATE       :  POLSTER
   LITIGATION                :
7                            :
   APPLIES TO ALL CASES      :  NO.
8                            :  1:17-MD-2804
                             :
9

           - HIGHLY CONFIDENTIAL -
10
   SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
12                 - - -
13            April 29, 2019
14                 - - -
15
16            Videotaped deposition of
   KATHERINE KEYES, Ph.D., taken pursuant to
17 notice, was held at the law offices of
   Lieff Cabraser, LLP, 250 Hudson Street,
18 New York, New York beginning at 9:08
   a.m., on the above date, before Michelle
19 L. Gray, a Registered Professional
   Reporter, Certified Shorthand Reporter,
20 Certified Realtime Reporter, and Notary
   Public.
21
                   - - -
22

         GOLKOW LITIGATION SERVICES
23    877.370.3377 ph | 917.591.5672 fax
               deps@golkow.com
24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2

      WEITZ & LUXENBERG, P.C.
 3    BY:  ELLEN RELKIN, ESQ.
      700 Broadway, 5th Floor
 4    New York, New York 10013
      (212) 558-5500
 5    erelkin@weitzlux.com
 6          - and -
 7    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
      BY:  PAULINA DO AMARAL, ESQ.
 8    250 Hudson Street, 8th Floor
      New York, New York 10013
 9    (212) 355-9500
      pdoamaral@lchb.com
10    Representing the MDL Plaintiffs
11

      NAPOLI SHKOLNIK, PLLC
12    BY:  HUNTER SHKOLNIK, ESQ.
      360 Lexington Avenue, 11th Floor
13    New York, New York  10017
      (212) 397-1000
14    Hunter@NapoliLaw.com
15          - and -
16    NAPOLI SHKOLNIK, PLLC
      BY:  JOSEPH L. CIACCIO, ESQ.
17    400 Broadhollow Road, Suite 305
      Melville, New York 11747
18    (631) 224-1133
      Jciaccio@NapoliLaw.com
19    Representing the Plaintiff, Cuyahoga
      County
20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Cont'd.)
 2

     ZUCKERMAN SPAEDER, LLP
 3   BY:  STEVEN N. HERMAN, ESQ.
     BY:  JASON B. ACTON, ESQ.
 4   1800 M. Street NW, Suite 1000
     Washington, D.C. 20036
 5   (202) 778-1883
     sherman@zuckerman.com
 6   jacton@zuckerman.com
     Representing the Defendant, CVS
 7

 8   COVINGTON & BURLING, LLP
     BY:  SONYA D. WINNER, ESQ.
 9   Salesforce Tower
     415 Mission Street
10   San Francisco, California 94105
     (415) 591-7072
11   Swinner@cov.com
12         - and -
13   COVINGTON & BURLING, LLP
     BY:  MICHA NANDARAJ GALLO, ESQ.
14   620 Eighth Avenue
     New York, New York 10018
15   (202) 841-1000
     mnandarajgallo@cov.com
16   Representing the Defendant, McKesson
     Corporation
17

18   ROPES & GRAY LLP
     BY:  ANDREW O'CONNOR, ESQ.
19   BY:  ELISSA REIDY USPENSKY, ESQ.
     800 Boylston Street
20   Boston, Massachusetts 02199
     (617) 951-7234
21   andrew.o'connor@ropesgray.com
     elissa.uspensky@ropesgray.com
22   Representing the Defendant, Mallinckrodt
23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:  (Cont'd.)
 2

      KIRKLAND & ELLIS, LLP
 3    BY:  TIMOTHY W. KNAPP, ESQ.
      300 North LaSalle Street
 4    Chicago, Illinois 60654
      (312) 862-2595
 5    timothy.knapp@kirkland.com
      Representing the Defendant, Allergan
 6    Finance
 7

      ARNOLD & PORTER KAYE SCHOLER, LLP
 8    BY:  ALLISON B. RUMSEY, ESQ.
      601 Massachusetts Avenue, NW
 9    Washington, D.C. 20001
      (202) 942-5095
10    allison.rumsey@arnoldporter.com
      Representing the Defendants, Endo Health
11    Solutions Endo Pharmaceuticals, Inc.; Par
      Pharmaceutical Companies, Inc. f/k/a Par
12    Pharmaceutical Holdings, Inc.
13

      REED SMITH, LLP
14    BY:  BRIAN T. HIMMEL, ESQ.
      Reed Smith Centre
15    225 Fifth Avenue
      Suite 1200
16    Pittsburgh, Pennsylvania 15222
      (412) 288-4058
17    Bhimmel@reedsmith.com
      Representing the Defendant,
18    AmerisourceBergen
19

      JONES DAY
20    BY:  CHRISTOPHER M. McLAUGHLIN, ESQ.
      North Point
21    901 Lakeside Avenue
      Cleveland, Ohio 44114
22    (216) 586-3939
      Cmmclaughlin@jonesday.com
23    Representing the Defendant, Walmart
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:  (Cont'd.)
 2
 3    BARTLIT BECK, LLP
      BY:  KASPAR J. STOFFELMAYR, ESQ.
 4    54 West Hubbard Street
      Chicago, Illinois 60654
 5    (312) 494-4440
      kaspar.stoffelmayr@bartlit-beck.com
 6    Representing the Defendant, Walgreens
 7
      DECHERT, LLP
 8    BY:  DEBRA D. O'GORMAN, ESQ.
      1095 Avenue of the Americas
 9    New York, New York 10036
      (212) 698-3500
10    Debra.ogorman@dechert.com
      Representing the Defendant, Purdue
11    Pharmaceuticals
12
      MARCUS & SHAPIRA, LLP
13    BY:  ERIN GIBSON ALLEN, ESQ.
      One Oxford Centre, 35th Floor
14    Pittsburgh, Pennsylvania 15219
      (412) 338-3990
15    Allen@marcus-shapira.com
      Representing the Defendant, HBC
16    Service Company
17
      MORGAN LEWIS & BOCKIUS LLP
18    BY:  ELIZABETH I. BUECHNER, ESQ.
      101 Park Avenue
19    New York, New York 10178
      (212) 309-6769
20    Elizabeth.buechner@morganlewis.com
      Representing the Defendant, Rite Aid of
21    Maryland
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:   (Cont'd.)

 2

      O'MELVENY & MYERS, LLP
 3    BY:  VINCENT S. WEISBAND, ESQ.
      Times Square Tower
 4    7 Times Square
      New York, New York 10036
 5    (212) 326-2000
      Vweisband@omm.com
 6    Representing the Defendants, Janssen
      and Johnson & Johnson
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1    TELEPHONIC/STREAMING APPEARANCES:
 2

      MORGAN, LEWIS & BOCKIUS, LLP
 3    BY:  BRUNO REATEGUI, ESQ.
      200 S. Biscayne Boulevard
 4    Suite 5300
      Miami, Florida 33131
 5    (305) 415-3421
      bruno.reategui@morganlewis.com
 6    Representing the Defendants, Teva
      Pharmaceuticals, Inc. Cephalon Inc,
 7    Watson Laboratories, Actavis LLC, Actavis
      Pharma, Inc.
 8
 9    BARNES & THORNBURG, LLP
      BY:  ALEJANDRA REICHARD, ESQ.
10    11 South Meridian Street
      Indianapolis, Indiana 46204
11    (317) 236-1313
      Alejandra.reichard@btlaw.com
12    Representing the Defendant, H.D. Smith
13

      LOCKE LORD, LLP
14    BY:  SARAH LANCASTER, ESQ.
      600 Congress Avenue, Suite 2200
15    Austin, Texas 78701
      (512) 305-4756
16    Slancaster@lockelord.com
      Representing the Defendant,
17    Henry Schein, Inc.
18

      BAILEY WYANT, PLLC
19    BY:  MICHAEL W. TAYLOR, ESQ.
      500 Virginia Street East
20    Suite 600
      Charleston, West Virginia 25301
21    (304) 345-4222
      mtaylor@baileywyant.com
22    Representing the Defendant, West
      Virginia Board of Pharmacy
23
24
```

```
 1    TELEPHONIC/STREAMING APPEARANCES:
      (Cont'd.)
 2

 3

      COVINGTON & BURLING, LLP
 4    BY:  DELBERT TRAN, ESQ.
      Salesforce Tower
 5    415 Mission Street
      San Francisco, California 94105
 6    (415) 591-7072
      Dtran@cov.com
 7    Representing the Defendant, McKesson
      Corporation
 8

 9

10    ALSO PRESENT:
11    Anne Bertram - Paralegal
      (Lieff)
12

      Eliana Epstein, MPH
13    (Weitz)
14

15    VIDEO TECHNICIAN:
16    Henry Marte
17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                       -   -   -
2                   I N D E X
3                       -   -   -
4
    Testimony of:
5
                    KATHERINE KEYES, Ph.D.
6
7   By Mr. Herman                        15
8   By Ms. Winner                        357
9   By Mr. O'Connor                      454
10
11
                        -   -   -
12
                E X H I B I T S
13
                        -   -   -
14
15  NO.            DESCRIPTION           PAGE
16  Keyes-1        Expert Report of      34
                   Katherine Keyes
17                 3/24/19
18  Keyes-2        Exhibit A             50
                   Supplemental
19                 Materials Considered
                   List
20
    Keyes-3        SAMHSA The            150
21                 CBHSQ Report
                   How People Obtain
22                 The Prescription
                   Pain Relievers They
23                 Misuse
                   (Lipari)
24
```

```
 1                       -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                       -   -   -
 4
 5     NO.              DESCRIPTION            PAGE
 6     Keyes-4         ICD-10 Version 2016    188
                       X40
 7
       Keyes-5         The Evolution of       208
 8                     the Opiate/Opioid
                       Crisis in Cuyahoga
 9                     County
                       (Gilson)
10
       Keyes-6         How Increasing         228
11                     Medical Access to
                       Opioids Contributes to
12                     the Opioid Epidemic
                       April 2017
13                     (Powell)
14     Keyes-7         The Epidemiologic      237
                       Association Between
15                     Opioid Prescribing
                       Nonmedical Use, and
16                     Emergency Visits
                       (Wisniewski)
17
       Keyes-8         The Changing Face of   273
18                     Heroin Use in the US
                       (Cicero)
19
       Keyes-9         Initiation into        289
20                     Prescription Opioid
                       Misuse Among Young
21                     Injection Drug Users
                       (Lankenau)
22
23
24
```

```
 1                        -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                        -   -   -
 4
```

```
 5   NO.              DESCRIPTION            PAGE
 6   Keyes-10         Injection and Sexual   292
                      HIV/HCV Risk Behaviors
 7                    Associated with Nonmedical
                      Use of Prescription Opioids
 8                    (Mateu-Gelabert)
 9   Keyes-11         Relationship Between   301
                      Nonmedical Prescription-
10                    Opioid Use and Heroin
                      Use
11                    (Compton)
12   Keyes-12         Associations of        314
                      Nonmedical Pain
13                    Reliever Use and
                      Initiation of Heroin
14                    Use in the United
                      States
15                    (Muhuri)
16   Keyes-13         Mortality Among        391
                      Regular or
17                    Dependent Users of
                      Heroin and Other Opioids
18                    (Degenhardt)
19   Keyes-14         Suboxone Pilot         428
                      Agencies
20                    ADM Board
21   Keyes-15         Assessing Need for     441
                      Medication-Assisted
22                    Treatment for Opiate-
                      Dependent Prison Inmates
23                    (Albizu-Garcia)
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                     -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    Keyes-16         The AFCARS Report        449
                       Preliminary FY
 7                     2017 Estimates
 8    Keyes-17         The Promotion and        459
                       Marketing of OxyContin
 9                     Commercial Triumph
                       Public Health Tragedy
10                     (Van Zee)
11    Keyes-18         JAMA June 2018           466
                       Association of
12                     Pharmaceutical Industry
                       Marketing of Opioid
13                     Products to Physicians
                       With Subsequent
14                     Opioid Prescribing
15    Keyes-19         BMJ Open                 472
                       Interactions Between
16                     Physicians and the
                       Pharmaceutical Industry
17                     Generally and Sales
                       Representatives
18                     (Fickweiler)
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2            DEPOSITION SUPPORT INDEX

 3                    -   -   -

 4

 5   Direction to Witness Not to Answer

 6   PAGE    LINE
     25      19

 7

 8   Request for Production of Documents

 9   PAGE    LINE
     None.

10

11   Stipulations

12   PAGE    LINE
     None.

13

14   Questions Marked

15   PAGE    LINE
     None.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1          THE VIDEOGRAPHER:  We are

2     now on the record.  My name is

3     Henry Marte, I am a videographer

4     with Golkow Litigation Services.

5          Today's date is April 29,

6     2019.  And the time is 9:08 a.m.

7          This videotaped deposition

8     is being held at 250 Hudson

9     Street, New York, New York, in the

10    matter of National Prescription

11    opiate litigation.

12         The deponent today is

13    Dr. Katherine Keyes.

14         All appearances are noted on

15    the stenographic record.

16         The court reporter please

17    administer the oath to the

18    witness.

19              -   -   -

20         ... KATHERINE KEYES, Ph.D.,

21    having been first duly sworn, was

22    examined and testified as follows:

23              -   -   -

24         EXAMINATION

Highly Confidential - Subject to Further Confidentiality Review

1                          -  -  -

2     BY MR. HERMAN:

3          Q.     Professor Keyes, my name is

4     Steve Herman, I represent CVS Rx Services

5     Incorporated and CVS Indiana LLC.  I

6     introduced myself briefly to you before

7     we got started, but nice to meet you on

8     the record?

9          A.     Nice to meet you.

10         Q.     Professor Keyes, you

11    understand that you're testifying under

12    oath today and that you're sworn to tell

13    the truth?

14         A.     Yes.

15         Q.     Great.  Before we get going,

16    I just thought it would be good to go

17    over some sort of the rules of the road

18    here.

19         A.     Okay.

20         Q.     And as we're doing right

21    now, I'll ask you questions and I'll

22    expect you to answer truthfully and

23    completely.  Okay?

24         A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

1  Q.  Okay.  Any reason you can

2  think of that you won't be able to answer

3  my question fully and accurately today?

4  A.  No.

5  Q.  As you know there's a court

6  reporter here, she's going to be taking

7  down everything we say.  So if you could

8  answer audibly, saying yes and no rather

9  than mm-hmm or nodding your head.  Do

10  you -- do you understand?

11  A.  Yes.

12  Q.  Great.  Perfect.

13  And as we're doing well

14  right now I think, we'll take turns

15  speaking and I'll ask my question and

16  hopefully you'll wait and then I'll wait

17  for you to finish your answer?

18  A.  Yes.

19  Q.  And from time to time your

20  counsel, who I take it is sitting next to

21  you, may object, but unless your counsel

22  instructs you not to answer, you're

23  obligated to answer the question once

24  your counsel has made an objection on the

Highly Confidential - Subject to Further Confidentiality Review

1  record.  Okay?

2          A.    Okay.

3          Q.    And if you don't understand

4  one of my questions, please just let me

5  know and I'll try to rephrase it so you

6  can understand the question I'm asking.

7          A.    Okay.

8          Q.    And if I ask a question and

9  you give an answer, I'll take that as you

10  understanding my question.

11          A.    Okay.

12          Q.    And if at any time you need

13  a break, let me know and once we're done

14  with the question that's pending, we'll

15  try to take a break.

16          A.    I apologize in advance, I

17  have a cold, so if you don't understand

18  any of my responses I'll try to repeat

19  it.

20          Q.    Okay.  Appreciate that.

21  It's that time of year when the weather

22  changes.

23          A.    Yes.

24          Q.    Professor Keyes, have -- the

Highly Confidential - Subject to Further Confidentiality Review

1    materials that were provided with your

2    expert report say you've never testified

3    as expert at trial or by deposition in

4    the previous five -- four years; is that

5    correct?

6             A.    That's correct.

7             Q.    Prior to this case have you

8    been hired to serve as an expert in

9    connection with any litigation?

10            A.    No.

11            Q.    Okay.  What did you do to

12   prepare for this deposition?

13            A.    I wrote my expert report and

14   subsequent to that I reviewed it with the

15   attorneys.

16            Q.    And did you meet with your

17   attorneys?  When you say you reviewed it

18   with your attorneys, did you meet with

19   your attorneys to review your expert

20   report?

21            A.    Yes.

22            Q.    Okay.  And how many times

23   did you meet with your attorneys?

24            A.    Probably three to -- three

1  times, around.

2      Q.    Okay.  And do you recall

3  when the first time was?

4      A.    After writing the report?

5      Q.    The first time you met with

6  your attorneys after writing the report

7  to prepare for this deposition.

8      A.    I don't recall the date

9  specifically.  But it was, you know,

10 some -- sometime in the last month.

11     Q.    Okay.  And about how long

12 did you meet with your attorneys that

13 first time?

14     A.    About two to three hours.

15 Three hours.

16     Q.    And when you -- and who was

17 present at that meeting?

18     A.    Joe was present.  Ann

19 Ritter.  Don Arbitblit was on the phone.

20 There might have been several others.

21     Q.    And besides reviewing your

22 expert report, did you look at any other

23 documents at that meeting?

24     A.    There -- there have been

Highly Confidential - Subject to Further Confidentiality Review

1    several documents that, you know, that

2    have been circulated, that I think have

3    been filed with amendments that I've

4    looked at.  But nothing other than what's

5    been disclosed.  There were several other

6    documents.  New -- new papers that came

7    out, things like that.

8         Q.   Do you recall what those

9    papers were?

10        A.   I think that they've been --

11   there was I think a New England Journal

12   article that was --

13        Q.   Okay.  Are you thinking --

14        A.   -- came out subsequent to

15   the filing of the report.

16        Q.   Okay.  The two New England

17   Journal articles that were disclosed as

18   additional materials --

19        A.   Yes.

20        Q.   -- that you considered?

21        A.   Yes.

22        Q.   And you -- that was at the

23   first meeting.

24             At the second meeting, how

Highly Confidential - Subject to Further Confidentiality Review

1    long did you meet with your attorneys?

2          A.     Probably about the same,

3    three hours.  Two to three hours.

4          Q.     And same group of attorneys?

5          A.     No.  Ellen was there.  And

6    Paula was there at that second meeting.

7    And several others, maybe.

8          Q.     And besides your report, did

9    you look at any other documents at that

10   meeting?

11         A.     I don't think at that

12   meeting I looked at other documents.

13         Q.     Okay.  And at --

14         A.     Well, there were several

15   depositions related to, that -- that

16   Paula had sent me after that meeting,

17   from Summit and Cuyahoga County

18   testimony.

19         Q.     Okay.  Are those additional

20   depositions that were disclosed on the

21   supplemental list of --

22         A.     Yes.

23         Q.     -- materials considered?

24         A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And at the third meeting,

2    how long was that third meeting?

3    A.    About the same, maybe three

4    to four hours at that point.

5    Q.    And do you recall when that

6    meeting was?

7    A.    That was yesterday.

8    Q.    And besides your expert

9    report, did you review any other

10   documents at that meeting?

11   A.    No.

12   Q.    And which attorneys were

13   present at that meeting?

14   A.    Ellen, Paula.  Joe was on

15   the phone.  Don was on the phone.

16   Q.    Besides those meetings, did

17   you have any phone calls to prepare for

18   your deposition?

19   A.    I've had --

20   MS. RELKIN:  You can answer.

21   THE WITNESS:  I've had

22   several phone -- I mean early --

23   just kind of to set up the

24   meetings I guess, with Ann and --

Highly Confidential - Subject to Further Confidentiality Review

1      and Don Arbitblit.  But not of any

2      substantial length.

3  BY MR. HERMAN:

4      Q.    They were logistical

5  meetings, not substantive?  Or logistical

6  phone calls and not --

7      A.    I would consider them as

8  such.

9      Q.    Okay.  And you didn't

10  discuss substance during those calls?

11      A.    There might have been

12  several, you know, small substantive

13  points that were discussed.  I don't want

14  to say categorically that no substance

15  was discussed.  But they were not

16  substantive preparational meetings.

17      Q.    Okay.  And besides those

18  three meetings where you prepared with

19  your attorneys, did you speak with anyone

20  else in preparation for your deposition?

21      A.    No.

22      Q.    Did you review any expert

23  reports?

24      A.    I reviewed the -- well, they

Highly Confidential - Subject to Further Confidentiality Review

1    are not -- I reviewed the depositions

2    that were sent to me.

3          Q.    Okay.  And those were sent

4    to you by -- who did you say?

5          A.    Paula.

6          Q.    Paula.

7                And besides what we've

8    discussed, the review of your expert

9    report, the review of the depositions,

10   and the review of those two New England

11   Journal of Medicine articles, did you do

12   anything else to prepare for this

13   deposition?

14         A.    I reviewed my report and,

15   that's -- I think that is the summary of

16   it.

17         Q.    Professor Keyes, when did

18   you first become aware of the opioid

19   litigation?

20         A.    When did I first become

21   aware of the -- of which opioid

22   litigation?

23         Q.    Well, when did -- let me ask

24   a different question.  How did you come

Highly Confidential - Subject to Further Confidentiality Review

1    to be retained in this case as an expert?

2         A.    I was retained in December

3    of 2018 by Ann Ritter's office.

4         Q.    And was Ann Ritter's office

5    the first person to reach out to you?

6         A.    I had been in communication

7    prior to that with Paul Farrell, who I

8    did some consulting work for.

9         Q.    And what was the nature of

10   the consulting work that you did --

11        MS. RELKIN:  Objection.

12   BY MR. HERMAN:

13        Q.    -- for Paul Farrell?

14        MS. RELKIN:  Objection.

15        It's consulting work.  It's not

16        related to her report.

17   BY MR. HERMAN:

18        Q.    You can answer it.

19        MS. RELKIN:  I'm going to

20        instruct you not to answer.

21   BY MR. HERMAN:

22        Q.    Okay.  Are you going to take

23   your counsel's instruction?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. SHKOLNIK:  On behalf of

2     Cuyahoga County, I'll note an

3     objection.  This witness is not

4     represented by any of the

5     plaintiffs' attorneys here, and

6     you keep saying "your attorneys".

7     If you're referring to the MDL

8     attorneys or Cuyahoga's attorneys,

9     please so state that.

10          That's my objection for the

11     record going forward.

12  BY MR. HERMAN:

13     Q.    Professor Keyes, are you

14  represented by any attorneys here?

15     A.    I don't know what that

16  means.  Can you -- can you give me a

17  definition of what that means?

18     Q.    Who retained you to serve as

19  an expert in this case?

20     A.    Ann Ritter's office.

21     Q.    Okay.  And you were retained

22  to serve as an expert in -- for Cuyahoga

23  County?

24     A.    I was -- I was retained for

Highly Confidential - Subject to Further Confidentiality Review

1    this case.  I don't know if it was

2    specific to a county, one county or the

3    other.  It was for the case.

4           Q.    Do you understand that this

5    case is -- the two cases at issue in

6    Track 1 are Cuyahoga County and Summit

7    County?

8           A.    Yes, I understand that.

9           Q.    Okay.  And you're serving as

10   an expert for Cuyahoga County?

11          A.    I'm serving as an expert

12   for -- I was -- my report covers both

13   counties.

14          Q.    At the time that you

15   accepted the engagement, what did you

16   understand your responsibilities to be?

17          A.    To write an expert report, a

18   Track 1 report, regarding a number of

19   different issues related to the

20   epidemiology of opioid use disorders and

21   overdose with regard to the opioid

22   epidemic.

23          Q.    And were you given specific

24   topics to cover?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Yeah.

2        Q.     What were those topics?

3        A.     They're covered in the

4    report.  They ranged from kind of the

5    scope of the problem of the opioid

6    epidemic, the opioid use disorder, kind

7    of more accurate estimates of opioid use

8    disorders following medical use and what

9    had previously been reported in some of

10   the materials from defendants, the

11   connection between opioid -- prescription

12   opioid use and heroin use, different

13   abatement policies, different abatement

14   plans that have efficacy in the

15   epidemiological literature, the burden of

16   overdose in Summit and Cuyahoga County,

17   neonatal abstinence syndrome in the two

18   counties, as well as nationally, as well

19   as a range of other issues.

20       Q.     You mentioned that you were

21   assigned to come up with more accurate

22   estimates of opioid use disorder.  Did

23   you understand that to be your

24   assignment?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. RELKIN:  Objection to

2      form.

3          THE WITNESS:  So what I

4      reviewed, to be more specific, was

5      the evidence regarding opioid use

6      disorder following medical use of

7      opioids in the literature.

8  BY MR. HERMAN:

9      Q.    Okay.  And were you asked to

10  come up with a more accurate estimate?

11      A.    I was asked to review the

12  literature.

13          MS. RELKIN:  Objection.

14  BY MR. HERMAN:

15      Q.    How much time have you spent

16  working on this case to date?

17      A.    I don't know the specific --

18  are you asking for a specific number of

19  hours?

20      Q.    Yes, please.

21      A.    I would have to estimate.  I

22  don't know off the top of my head.  But I

23  would estimate that at this point I

24  probably have spent 50 to 60 hours.

1    Maybe more.  70.

2            Q.    So somewhere between 50 and

3    70 hours?

4            A.    That is my estimate.  But I

5    can -- if a more accurate estimate is

6    required, I can go to my records.

7            Q.    Okay.  And how much time did

8    you spend writing your report?

9            A.    It's a long -- it's a long

10   report.  I spent probably -- probably

11   about 50 of those hours writing -- 40 to

12   50 hours spent writing the report.

13           Q.    Did anyone else besides

14   counsel assist you in preparation of your

15   report?

16           MS. RELKIN:  Objection to

17           form.

18           THE WITNESS:  I have a

19           research assistant, Caroline

20           Rutherford, who helped with the

21           references, managing the reference

22           software.  She also generated the

23           figures using the publicly

24           available CDC WONDER data on the

Highly Confidential - Subject to Further Confidentiality Review

1       rates of drug overdose in the --

2       in Summit and Cuyahoga County and

3       nationally.  And so she assisted

4       again with administrative matters

5       in figure generation.

6              There was also a doctoral

7       student at Columbia University who

8       was working with me who very early

9       on sent me some literature.  But

10      it was largely literature I

11      already had, and he then got busy

12      with his dissertation and didn't

13      do any more work with it.

14             But I wrote the report on my

15      own.

16   BY MR. HERMAN:

17      Q.   And after -- did you say

18   your student was named -- I'm sorry, was

19   it Caroline?

20      A.   Caroline is -- she is also

21   my student.  She -- but she's also my

22   full-time employee.  She's a master --

23   she is getting her master's in data

24   science at Columbia University.  Her name

1    is Caroline Rutherford.

2         Q.    And after Ms. Rutherford

3    generated those figures for you, did you

4    check her work?

5         A.    Yes.

6         Q.    Okay.  And you said that you

7    wrote your report.  Did anyone provide

8    you with an outline for your report?

9         A.    No.

10        Q.    Are you the original drafter

11   of everything in your report?

12        A.    Yes.

13             MS. RELKIN:  I'm going to

14        object.  You're going beyond, I

15        mean, Rule 26.  But it's fine.

16   BY MR. HERMAN:

17        Q.    Are you the original drafter

18   of everything in your report?

19        A.    Yes.

20        Q.    Did anyone provide you with

21   language to include in your report?

22        A.    No.

23        Q.    Did you personally review

24   every study cited in your report?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Did you personally review

3 everything listed as materials that you

4 considered?

5    A.    I'm sorry.  Say the question

6 again.

7    Q.    Did you personally review

8 everything listed as materials that you

9 considered both on -- in your report and

10 in the supplemental list?

11    A.    Yes.

12    Q.    Did you carefully review

13 your report before submitting it?

14    A.    Yes, I did.

15    Q.    Besides preparation for this

16 deposition and preparing your report,

17 have you spent time on any other matters

18 connected to this case?

19        MS. RELKIN:  Objection to

20    form.  Objection.

21        THE WITNESS:  Say the

22    question again.

23 BY MR. HERMAN:

24    Q.    Besides preparing for the

Highly Confidential - Subject to Further Confidentiality Review

1    deposition, I think we talked about three

2    meetings that were --

3            A.    Yeah.

4            Q.    -- two to three hours each.

5    I think the last one you said was four

6    hours actually.  And preparing your

7    report which you spent -- said you spent

8    40 to 50 hours on, have you spent time on

9    anything else?

10           A.    No.

11                 MS. RELKIN:  And note my

12           objection.

13   BY MR. HERMAN:

14           Q.    I'm going to hand you what

15   we've previously marked as Exhibit 1

16   which is your expert report.

17                 (Document marked for

18           identification as Exhibit

19           Keyes-1.)

20   BY MR. HERMAN:

21           Q.    And I'm also going to hand

22   you a binder, I thought it might be more

23   manageable to flip the binder.

24           A.    Thank you.

Highly Confidential - Subject to Further Confidentiality Review

1          Oh, so this is the same

2  thing.

3          Q.    Yes, I just thought rather

4  than flipping something with the clip, it

5  might be easier with the binder.

6          A.    Okay.

7          Q.    Professor Keyes, I just want

8  to quickly just go through your report at

9  a high level.  If you could turn to

10  Page 2.  And Roman numeral II is -- has a

11  heading "Opinions," correct?

12          A.    Yes.

13          Q.    And on Page 2 to 3 under

14  that heading "Opinions," there are 11

15  bullet points.  And the 11 bullet

16  points -- I'm sorry, are there 11 bullet

17  points?

18          A.    I'm sorry, I have to count

19  them again.

20          MS. RELKIN:  Do you want her

21      to count?

22          THE WITNESS:  11.

23  BY MR. HERMAN:

24          Q.    Okay.  And those bullet

1    points contain the opinions that you

2    intend to offer in this case?

3         A.    Yes.

4         Q.    Do you intend to offer any

5    opinions besides those listed in the 11

6    bullet points?

7         A.    No.

8              MS. RELKIN:  Just,

9         objection.  Obviously her entire

10        report.

11             THE WITNESS:  Yeah, I mean

12        the rest of -- the report contains

13        all my opinions.  This is a

14        summary of them.  If there are

15        other opinions in the report, they

16        are my opinions.

17             These are -- this is a

18        summary of what is in the report.

19        But should there be other opinions

20        in the report, they are my

21        opinions.

22   BY MR. HERMAN:

23        Q.    But the report contains the

24   sum total of your opinions?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Yes.

2       Q.      Do you intend to -- okay.

3               In -- in reaching the

4  opinions in this case, were you asked to

5  make any assumptions?

6       A.      Can you give me an example.

7       Q.      Well, did your lawyers ask

8  you to assume any facts?

9               MS. RELKIN:  Objection to

10          form.

11              MR. SHKOLNIK:  Objection.

12              MS. RELKIN:  Counsel, you've

13          already been instructed about the

14          "your lawyers."

15              You can say lawyers for the

16          plaintiffs.

17              MR. HERMAN:  Sorry.  Sorry.

18  BY MR. HERMAN:

19      Q.      The lawyers -- did the

20  lawyers for the plaintiffs ask you to

21  make any assumptions in forming your

22  opinions?

23      A.      Not to my knowledge.

24      Q.      Did you make any assumptions

Highly Confidential - Subject to Further Confidentiality Review

1    in forming your opinions?

2              MS. RELKIN:  Objection to

3         form.

4              THE WITNESS:  I don't know

5         what you mean by assumptions.

6    BY MR. HERMAN:

7         Q.    Did you assume any facts?

8         A.    Could you give me an

9    example?  I don't -- I don't know what

10   that means.

11        Q.    Okay.  Well, did you rely

12   on -- all -- are all your opinions based

13   on the literature and material that you

14   reviewed?

15        A.    My opinions are based on the

16   epidemiological literature that I

17   reviewed.

18        Q.    Okay.  And not something

19   that was provided to you outside those

20   materials?

21        A.    Anything that is referenced

22   in the report are materials that I

23   draw -- drew upon to form my opinions.

24        Q.    Okay.  And -- and nothing

1    else?  You didn't rely on other materials

2    or other facts outside of those studies

3    to form your opinions?

4          A.    I -- I have a Ph.D. in

5    epidemiology.  I relied on my expertise

6    more broadly.  But the actual opinions

7    are based on the scientific literature.

8    But I come to it with a large set of

9    skills formed with my degrees.

10         Q.    Okay.  Did you rely on the

11   opinions of any other plaintiffs' experts

12   in forming your opinions?

13         A.    No.

14         Q.    If you could turn to

15   Page 41.  And Pages 41 to 50 contain a

16   list of the references cited in your

17   report; is that correct?

18         A.    Yes.

19         Q.    Okay.  And those are the

20   materials that support your opinions?

21         A.    These are the materials that

22   I cited in the report, yes.

23         Q.    And that you relied on for

24   your opinions?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Are you relying on materials

3    that are not cited in the body of your

4    report listed on Pages 41 to 50 to

5    support your opinions?

6    A.    Again, I mean, I think --

7    MS. RELKIN:  Objection.

8    THE WITNESS:  -- that I --

9    the opinions that I draw on, when

10    they are based in scientific

11    literature, that scientific

12    literature is cited.

13    I also bring an ability to

14    evaluate scientific literature

15    through my expertise in

16    epidemiology.  So not every -- you

17    know, I've written two textbooks

18    on epidemiological methods.  I

19    know this literature and other

20    literature and epidemiological

21    methods very well.  And so the

22    facts that I draw on for the

23    opinions in this report are based

24    on the scientific literature that

1          I cite.  But I come to the table

2          with a broad range of

3          methodological skills to evaluate

4          scientific literature.

5   BY MR. HERMAN:

6          Q.    Okay.  I -- I understand

7   you're bringing some experience and that

8   that's what you're alluding to.  And I'm

9   not trying to discount that.

10         What I'm trying to ask you,

11  and I think you've answered it, is that

12  the facts and the opinions you have in

13  your report rely on the materials that

14  you've cited in your report and your

15  experience?

16         A.    That's correct.

17         Q.    And at Page 50 that's a copy

18  of your CV?

19         A.    And I think that starts on

20  Page 51.  Well, page 50 is still the

21  references, so the next page starts my

22  CV.

23         Q.    I apologize.  51, and that

24  goes for a while.  And that's your CV.

Highly Confidential - Subject to Further Confidentiality Review

1    Is that an up-to-date CV?

2          A.    No.   That was prepared on

3    December 18, 2018.

4          Q.    Okay.  So the notation at

5    the bottom, last updated 3/25/2019 is

6    incorrect?

7          A.    I'd have to double-check

8    that.  I'm not sure.  Given those

9    discrepant dates exactly when it was

10   updated.

11         Q.    Did you not do the updating?

12         A.    I'm sure I did the updating.

13   I'm just not sure why those two dates are

14   discrepant, so I'd have to look at that.

15         Q.    Do you have a more recent

16   CV?

17         A.    I -- I have -- I can send a

18   more recent CV if that -- I mean, it

19   would just be a longer list of

20   publications probably.

21         Q.    Well, I will -- I'd ask that

22   you provide us with a more up-to-date CV.

23         A.    Absolutely.

24         Q.    And then after your CV is a

Highly Confidential - Subject to Further Confidentiality Review

1    list of publications from 2009 to 2019?

2          A.    Yes.

3          Q.    And based on your answer in

4    my last question, I assume that is no

5    longer an up-to-date list?

6          A.    There might be several more

7    publications since the time this was

8    submitted.  It was several months ago.

9    And I'm prolific.

10         Q.    As you said you'll provide

11   that.

12         A.    Sure.

13         Q.    Okay.  And then if we turn a

14   few pages further.  There is a chart

15   that's called "Keyes Considered"?

16         A.    Yes.

17         Q.    Okay.  And that's the list

18   of materials that you considered that was

19   provided with your report?

20         A.    Yes.

21         Q.    Okay.  And what role, if

22   any, did the materials considered play in

23   formulating your opinions?

24         A.    They were papers that I --

1  papers or other sources that I read

2  and -- and I evaluated them for whether

3  they formed the basis for my opinions.

4       Q.    Okay.  And the ones that you

5  decided that form the basis are the ones

6  that you cited as references?

7       A.    Say that again.

8       MS. RELKIN:  Objection to

9      form.

10  BY MR. HERMAN:

11       Q.    Not every material on your

12  list of materials considered is cited as

13  a reference in your report?

14       A.    Right.

15       Q.    So my question is, you said

16  you reviewed all the materials

17  considered, and then you selected from

18  those the ones that supported your

19  opinion.

20       A.    I wouldn't -- I wouldn't

21  phrase it in that way.  I would say that

22  I reviewed a body of evidence and the

23  evidence that was germane to the topic at

24  hand is what is cited.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And that's -- the

2  cited materials is what you relied on for

3  your opinions?

4            MS. RELKIN:  Objection.

5            THE WITNESS:  The cited --

6        can you rephrase that.

7  BY MR. HERMAN:

8    Q.    The materials cited in your

9  report are the ones that you relied on

10  for your opinions?

11    A.    Yes.

12    Q.    And in the materials

13  considered, there's a list of five

14  depositions.  It's, I believe, on the

15  second-to-last page.  How did you figure

16  out which depositions to look at?

17            MS. RELKIN:  Objection to

18        form.

19            THE WITNESS:  These were

20        provided to me.

21  BY MR. HERMAN:

22    Q.    Did you ask for all the

23  depositions in the case?

24            MS. RELKIN:  Objection.

1                    THE WITNESS:  I have not.

2           No, I have -- I'm sure there's

3           many, many depositions.  I have

4           not asked for all the depositions.

5    BY MR. HERMAN:

6           Q.    These are ones that were

7    selected to you by plaintiffs' counsel?

8           A.    These were materials that

9    were provided to me because they were

10   germane to the -- to the topic.

11          Q.    They were provided to you by

12   plaintiff's counsel?

13          A.    Yes.

14          Q.    And did you have any input

15   into what depositions the plaintiff's

16   counsel decided to provide you?

17                MS. RELKIN:  Objection to

18          form.

19                THE WITNESS:  There was no

20          discussion of the broader range of

21          the universe of depositions.  So

22          these were particular depositions

23          that they thought would be useful

24          in allowing me to understand what

Highly Confidential - Subject to Further Confidentiality Review

1    was going on at the county level.

2    BY MR. HERMAN:

3        Q.    Did you read each of these

4    five depositions in its entirety?

5        A.    I reviewed them.  You know,

6    to say I read them, you know, I reviewed

7    them to the extent that they were useful

8    in formulating an understanding of what

9    was going on in the counties.

10       Q.    Did you -- did you read them

11   in their entirety?

12            MS. RELKIN:  Objection to

13       form.

14            THE WITNESS:  For the

15       most -- I read them.  I don't --

16       yeah.  The majority of them I

17       looked at, I saw whether they were

18       useful in formulating my

19       understanding of what was

20       happening in the counties.  Some

21       were more useful than others.  I

22       wouldn't say that I read every

23       single one cover to cover in its

24       entirety because some I think were

1      more useful than others.

2  BY MR. HERMAN:

3      Q.    Did anyone point you to

4  specific portions of the depositions?

5      A.    No.

6      Q.    Okay.  And then you've got,

7  on the next page, a list of 20 documents

8  produced in the litigation.

9      A.    Mm-hmm.

10     Q.    Do you know how many

11  documents have been produced in the

12  litigation?

13     A.    No.

14     Q.    How did you figure out what

15  documents to look at?

16         MS. RELKIN:  Objection to

17     form.

18         THE WITNESS:  These were the

19     list of documents that were made

20     available to me.

21  BY MR. HERMAN:

22     Q.    And when you say made

23  available to you, do you mean provided to

24  you by plaintiffs' counsel?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Yes.

2          Q.      Are you aware that none of

3    the documents on this list were

4    provided -- were produced by defendants

5    in this case?

6          A.      Am I -- sorry say that

7    again.

8          Q.      Are you aware none of the

9    documents on this list were produced by

10   defendants in this case?

11         A.      I was not privy to the

12   source, the -- which documents were

13   produced by whom.

14         Q.      Did you conduct any

15   interviews before preparing your report?

16         A.      Interviews?

17         Q.      Interviews of, for example,

18   individuals who work for Cuyahoga County?

19         A.      No.

20         Q.      Did you -- you didn't

21   conduct any interviews?

22         A.      I did not conduct

23   interviews.

24         Q.      Okay.  Did you ask to?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    You know, I'm an

2  epidemiologist.  I study population

3  aggregate data.  I don't -- that's not

4  within the scope of what this report

5  entails.

6    Q.    So the answer is that you

7  didn't ask to speak to anyone?

8    A.    The answer is that, as an

9  epidemiologist, you know, I don't do

10  interviews with individuals.  I study

11  population level trends.

12    MR. HERMAN:  Can I have the

13    supplemental list.

14    (Document marked for

15    identification as Exhibit

16    Keyes-2.)

17  BY MR. HERMAN:

18    Q.    I'm handing you what's been

19  marked as Exhibit 2, which is a

20  supplemental list of materials that was

21  provided to us by plaintiffs' counsel.  I

22  believe on April 23rd, 2019.

23    And, Professor Keyes, a few

24  times you've referenced additional

Highly Confidential - Subject to Further Confidentiality Review

1  materials that you reviewed after

2  preparing your report.  Is this a

3  complete list of the materials?

4          A.     To my knowledge, yes.

5          Q.     And I think you said that

6  the transcripts that were reviewed on --

7  that are listed here were provided to you

8  by plaintiffs' counsel?

9          A.     I'm sorry.  Say that -- the

10 transcripts that were --

11         Q.     The five deposition

12 transcripts that are listed on the

13 supplemental materials considered list.

14         A.     The four?  I think it's

15 four.

16         Q.     I apologize.  Four.  The

17 four deposition transcripts were provided

18 to you by plaintiffs' counsel?

19         A.     Yes.

20         Q.     When did you prepare your

21 report?

22         A.     I began preparing it around

23 January of 2019.  And worked on it

24 through around March when it was

Highly Confidential - Subject to Further Confidentiality Review

1    submitted.

2         Q.    Is there any reason that you

3    didn't review these depositions before

4    submitting your report?

5         A.    Is there -- what do you mean

6    by reason?

7         Q.    Well, they're all -- they're

8    all dated prior to the submission of your

9    report, correct?

10        A.    Yes.

11        Q.    And so they were available

12   to you at the time that you submitted

13   your report?

14             MS. RELKIN:  Objection to

15        form.

16             THE WITNESS:  Yes.  You

17        know, my report is on the

18        epidemiological evidence.  I

19        mostly relied on the peer-reviewed

20        literature and the grey literature

21        that I cite in the report.  I

22        didn't rely on transcripts.

23   BY MR. HERMAN:

24             Q.    And then there are two New

Highly Confidential - Subject to Further Confidentiality Review

1    England Journal medical -- of Medicine

2    articles?

3         A.    Mm-hmm.

4         Q.    And how did you locate those

5    articles?

6         A.    I'm an avid reader of the

7    scientific literature.  And so as a

8    scientist, I regularly read the journals.

9         Q.    And so you just found them

10   after you submitted your report while you

11   were reading The New England Journal of

12   Medicine?

13            MS. RELKIN:  Objection.

14            THE WITNESS:  I regularly

15        read The New England Journal of

16        Medicine.  I think these came up

17        in my -- in my -- the regular

18        course of my scientific practice.

19   BY MR. HERMAN:

20        Q.    Okay.  What role, if any,

21   did the materials listed on your

22   supplemental list play in formulating

23   your opinions in this case?

24        A.    These materials didn't

Highly Confidential - Subject to Further Confidentiality Review

1    change any of the opinions in the -- in

2    the statement.

3            Q.    Going back to your report.

4    On Pages 4 to 10 of your report, those

5    are all under the heading at Roman

6    numeral Number III, "Methodology"?

7            A.    Mm-hmm, yes.

8            Q.    And this is a section of the

9    report where you lay out your methodology

10   that you used to form your opinions?

11           A.    Yes.

12           Q.    Does this section describe

13   how you assembled and reviewed the

14   materials discussed in your report?

15           A.    That begins on Page 8.

16           Q.    Under the heading A.3?

17           A.    Yes.

18           Q.    And A.3.1 is the literature

19   review search strategy?

20           A.    Yes.

21           Q.    And did you conduct a --

22   excuse me.  Did you conduct a systematic

23   review to reach your opinions in this

24   case?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     I conducted a critical

2   review, including searching the

3   literature for topics that were germane

4   to the opinions that I was -- the -- the

5   topics that I was asked to review.

6        Q.     And what -- what is the

7   difference between a critical review and

8   a systematic review?

9             MS. RELKIN:  Objection to

10        form.

11             THE WITNESS:  I don't --

12        what I did in -- as a search

13        strategy is that I reviewed the

14        literature, including searching

15        PubMed as I've described here.

16        And then from that literature

17        search found additional articles

18        using standard practices that are

19        used in literature reviews that

20        are published in the peer-reviewed

21        literature.  I didn't do anything

22        different than I do in -- in

23        peer-reviewed literature.

24   BY MR. HERMAN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  In your academic

2   work, how long does it take you to do a

3   literature review that you're submitting

4   for publication?

5            MS. RELKIN:  Objection to

6        form.  Overbroad.

7            THE WITNESS:  It depends on

8        the topic.

9   BY MR. HERMAN:

10   Q.   Okay.  How long would it

11   typically take you to do a literature

12   review on -- that you were going to

13   submit to -- for publication on the

14   topics that you covered in your report?

15            MS. RELKIN:  Objection to

16        form.

17            THE WITNESS:  It would

18        depend on the scope of the paper.

19        I couldn't -- I couldn't provide

20        one single answer to that

21        question.

22   BY MR. HERMAN:

23   Q.   Okay.  Well, on average, how

24   long does it take you to do a literature

Highly Confidential - Subject to Further Confidentiality Review

1    review in your academic work?

2                MS. RELKIN:  Objection.

3                THE WITNESS:  Again, it

4          really depends on the topic, the

5          scope, the collaborators.  It's

6          not -- I don't think that there's

7          a single average time that I could

8          cite.

9    BY MR. HERMAN:

10        Q.    Are you aware that there are

11   studies on how long it takes typically to

12   do a literature review?

13               MS. RELKIN:  Objection.

14               THE WITNESS:  I would have

15         to review those studies for their

16         rigor.

17   BY MR. HERMAN:

18        Q.    When conducting a literature

19   review, is it standard practice to

20   disclose the criteria for inclusion and

21   exclusion of studies?

22               MS. RELKIN:  Objection.

23         Overbroad.

24               THE WITNESS:  It depends on

Highly Confidential - Subject to Further Confidentiality Review

1         the nature and scope of the

2         literature review.

3    BY MR. HERMAN:

4         Q.    When you're typically

5    writing -- in your academic work, would

6    you submit a paper that relied on

7    literature review without a description

8    of the inclusion and exclusion criteria?

9         A.    Again, it depends on what

10   type of literature review you're

11   conducting.  If it's a critical narrative

12   review, sometimes that's included.

13   Sometimes it's not.  It's standard

14   practice in the peer-reviewed literature

15   to use the methodology that I used in

16   reviewing this literature.

17        Q.    You would agree with me that

18   most of the studies that you reference in

19   your report include inclusion/exclusion

20   criteria when they're doing a literature

21   review?

22             MS. RELKIN:  Objection.

23        Overbroad.

24             THE WITNESS:  I would have

Highly Confidential - Subject to Further Confidentiality Review

1          to go through each one of the
2          articles that I cited.  So I
3          couldn't agree or disagree without
4          reviewing them.
5     BY MR. HERMAN:
6          Q.   You don't agree that it's
7     standard practice to include inclusion
8     and exclusion criteria in a literature
9     review?
10         MS. RELKIN:  Objection to
11         form.  Overbroad.
12         THE WITNESS:  It depends on
13         what type of literature review
14         that is conducted.  So no, I
15         wouldn't agree with that.
16    BY MR. HERMAN:
17         Q.   Okay.  Well, what type of
18    literature review would you include
19    inclusion/exclusion criteria?
20         A.   A literature review that --
21    that included them.
22         Q.   Well, you said it depends on
23    the type.  So what type would you include
24    it for?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    You know, I -- I don't think

2    that I would be comfortable saying

3    there's one specific type of literature

4    review.  If you look in the scientific

5    literature, there's all kinds of

6    different ways of doing literature

7    searches and literature reviews.  Some

8    have specific inclusion/exclusion

9    criteria.  Others are more critical

10   reviews based on the topic.

11        Q.    Does your list of materials

12   consider -- list every article that you

13   located in your searches?

14             MS. RELKIN:  Objection to

15        form.

16             THE WITNESS:  I'm sorry.

17        Say that question again.

18   BY MR. HERMAN:

19        Q.    Did your list of materials

20   considered include every article that you

21   located in your searches?

22             MS. RELKIN:  Objection to

23        form.

24             THE WITNESS:  You know, I --

Highly Confidential - Subject to Further Confidentiality Review

1    I have 15 years of expertise in

2    studying opioid use disorders and

3    I'm -- over the years, you know, I

4    have developed that expertise

5    through my epidemiological work.

6        So I cite in here all of the

7    articles that I reviewed to form

8    the opinions.  But those were --

9    you know, my expertise in opioid

10   use disorders, including my

11   expertise in these literatures was

12   formed over 15 years.

13   BY MR. HERMAN:

14       Q.    I understand what is cited

15   in your report, but does your list of

16   materials considered include a list of

17   every article that you located in the

18   searches you ran?

19       A.    Again, I -- to answer that

20   question, I can -- I -- I point to the --

21   the material that I cited in the report

22   as the material that is germane to the

23   topic.  It was developed over a long

24   period of time of developing the

Highly Confidential - Subject to Further Confidentiality Review

1    expertise in the topic.

2        Q.    Materials that you decided

3    were germane to the topics?

4            MS. RELKIN:  Objection to

5        form.

6            THE WITNESS:  Materials that

7        as an expert in this area, I have

8        the expertise to locate as germane

9        to the topic.

10   BY MR. HERMAN:

11       Q.    Okay.  But they are

12   materials that you personally decided

13   were germane to the topic?

14       A.    I think that in my -- in my

15   statement I have the levels of evidence

16   that I considered.

17            So I think that that is

18   outlined in Section A.3.2.

19       Q.    Yeah.  Professor Keyes, I'm

20   going to ask you to just try to

21   concentrate on the question that I'm

22   asking.

23            So my first question is:

24   Does the list of materials considered

Highly Confidential - Subject to Further Confidentiality Review

1    include every article that you located in

2    your searches?

3              MS. RELKIN:  Objection to

4         form.  Asked and answered.

5              THE WITNESS:  I believe I've

6         answered the question.

7    BY MR. HERMAN:

8         Q.    I don't believe you have.

9    So it may be my mistake, but I'm going to

10   ask you to do it again.

11             Does the list of materials

12   considered include every article that you

13   located in your searches?

14             MS. RELKIN:  Objection to

15        form.

16             THE WITNESS:  So again, what

17        I have cited in this report are

18        the articles that are specifically

19        germane to the topics.  They were

20        formed over a long period of time

21        given my expertise.

22             Anything that I considered

23        to form the opinions that I did

24        not cite in the report are in the

Highly Confidential - Subject to Further Confidentiality Review

1           materials considered.

2    BY MR. HERMAN:

3           Q.    Okay.

4           A.    I'm a -- you know, I read

5    the scientific journals.  I'm the editor

6    of three journals.  I --

7           Q.    Yes.

8           A.    There's thousands of

9    articles on opioid use disorders.

10          Q.    I understand that.  But you

11   decided what you believed was germane,

12   and that's what you referenced, correct?

13          A.    I used --

14                MS. RELKIN:  Just objection

15          to form.  Argumentive.

16                THE WITNESS:  -- my

17          expertise to cite the literature

18          that forms the opinions.

19   BY MR. HERMAN:

20          Q.    Okay.  But if I wanted to go

21   back and evaluate what you decided was

22   not germane, would I have the ability to

23   do that?

24          A.    I don't understand the

1    question.

2          Q.     Well, the reason I'm

3    asking -- and I'm going to ask it again.

4    Does the list of materials considered

5    include every article that you located in

6    your searches?

7                 MS. RELKIN:  Objection to

8          form.

9                 THE WITNESS:  I believe that

10         I've answered the question.

11   BY MR. HERMAN:

12         Q.     Is the answer to my question

13   yes or no?

14         A.     So as I've stated --

15         Q.     No, no, no.  Hold on.  I

16   don't mean to interrupt you --

17                MS. RELKIN:  You just

18         interrupted her.

19                MR. CIACCIO:  You can't stop

20         the witness.

21                MR. HERMAN:  She's not

22         answering the question.

23                MR. CIACCIO:  I don't care.

24         Let her answer the question.

Highly Confidential - Subject to Further Confidentiality Review

1    MS. WINNER:  Counsel, I

2    think there needs to be -- I

3    shouldn't be speaking, but you

4    shouldn't be speaking either.  I

5    think we need to have one lawyer

6    defending this witness.

7    MR. SHKOLNIK:  Cuyahoga

8    County is allowed to -- Cuyahoga

9    County is allowed to speak at

10   these depositions.

11   MS. RELKIN:  You did

12   interrupt her.

13   MS. WINNER:  We have three

14   so far.

15   MR. SHKOLNIK:  I'll stop --

16   let Joe do the talking for

17   Cuyahoga County.

18   BY MR. HERMAN:

19   Q.    You have a list of materials

20   considered, right?

21   A.    Yes.

22   Q.    Is every article that you

23   located in your searches on that list?

24   MS. RELKIN:  Objection to

1      form as to "located in your

2      searches."

3                  THE WITNESS:  Again, I -- I

4      have outlined in this report what

5      my search strategy was in order to

6      form these opinions.  The

7      materials that I reviewed that I

8      felt were informative to forming

9      my opinions are cited in the

10     report.  Everything else is in the

11     materials considered.

12  BY MR. HERMAN:

13          Q.    Okay.  So every article that

14  you reviewed is listed in the materials

15  considered?

16          A.    You know, again, I -- I

17  have -- I think what I've outlined here

18  is my approach to doing this review,

19  which is consistent with how I have done

20  peer-reviewed literature searches in the

21  published literature.

22          Q.    But isn't the reason for

23  listing -- including a list of materials

24  that you've included or excluded, so

Highly Confidential - Subject to Further Confidentiality Review

1    someone who is going back and looking at

2    the work that you did can evaluate what

3    criteria you applied to include or

4    exclude material?

5              MS. RELKIN:  Objection to

6         form.

7              THE WITNESS:  There are some

8         literature reviews that use that

9         strategy.  There are others that

10        are in the medical literature that

11        don't use that strategy.  And

12        those include critical reviews by

13        experts.

14   BY MR. HERMAN:

15        Q.   Would I, as a non-expert, be

16   able to go back and look at the list that

17   you provided and determine what you

18   decided was not germane to your opinions?

19             MS. RELKIN:  Objection to

20        form.

21             THE WITNESS:  I can't answer

22        that question for you.

23   BY MR. HERMAN:

24        Q.   Well, is there a list

Highly Confidential - Subject to Further Confidentiality Review

1    somewhere that -- does the list of

2    materials include everything that you

3    reviewed to decide whether something was

4    germane or not germane?

5         A.    So what I -- if -- if you

6    read my Section A.3, I think it clearly

7    lays out the methodology that I used as

8    an expert in this topic to form the

9    opinions that I formed.  And that

10   included citing literature that was

11   relevant to the topics that I discussed.

12        Q.    And did you keep a record of

13   the searches that you ran?

14        A.    Again, I would point you to

15   Section A.3 where I review the

16   methodology that I used for the evidence.

17   I was asked to review a wide range of

18   topics.  So there's not one set of search

19   terms that's going to be applicable to

20   both medication-assisted treatment and

21   heroin use after prescription opioid use.

22        Q.    Did you keep a record of the

23   search terms that you used?

24             MS. RELKIN:  Objection.

1          Asked and answered.

2                  THE WITNESS:  In Section

3          A.3, I review the methodology that

4          I used.  It included doing

5          searches on PubMed, but then also

6          a much more expansive review of

7          the literature based on my

8          expertise using papers that are

9          germane to the topics.

10   BY MR. HERMAN:

11          Q.    Would the methodology that

12   you lay out in Section A.3, allow someone

13   to replicate what you did?

14                  MS. RELKIN:  Objection to

15          form.  Asked and answered.

16                  THE WITNESS:  Yeah, I feel

17          like I've answered the question.

18          This is a -- this is a critical

19          review of the literature based on

20          my expertise.

21   BY MR. HERMAN:

22          Q.    That wasn't my question.  My

23   question was, does the methodology you

24   lay out in Section A.3 allow someone to

Highly Confidential - Subject to Further Confidentiality Review

1   replicate what you did?

2          MS. RELKIN:  Objection.

3          THE WITNESS:  If they had

4      the same level of expertise, I

5      would assume that the same person

6      in reviewing the medical

7      literature would develop the same

8      conclusions if that's the

9      question.

10  BY MR. HERMAN:

11     Q.   Wouldn't they need to know

12  the search terms you used?

13     A.   Again, what I have done --

14         MS. RELKIN:  Objection.

15      Argumentive.

16         THE WITNESS:  -- in this

17      report is a critical review of the

18      literature based on my expertise.

19  BY MR. HERMAN:

20     Q.   To repeat what you did, your

21  methodology, wouldn't someone need to

22  know the search terms?

23         MS. RELKIN:  Objection.

24      Asked and answered.  Argumentive.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  I -- so what

2        I've done and laid out in Section

3        A.3 is that what I performed was a

4        critical review of the literature

5        based on my expertise.  That

6        included searching the topics on

7        PubMed and including a wide

8        variety of other literatures that

9        I then identified.

10  BY MR. HERMAN:

11        Q.    Professor Keyes, I feel like

12  we're missing each other here.  Because

13  my question is, without the search terms

14  would someone applying the methodology

15  that you used in A.3 be able to replicate

16  what you did?

17           MS. RELKIN:  Objection.

18        Counsel, this is like the tenth

19        time that you've asked the

20        question.

21           MR. HERMAN:  First off --

22           MS. RELKIN:  She's answered

23        it.

24           MR. HERMAN:  She has not

Highly Confidential - Subject to Further Confidentiality Review

1    answered it.

2         MS. RELKIN:  She's answered

3    it.

4         MR. HERMAN:  If she keeps

5    being evasive, we're going to need

6    a second day.  So, I mean, I'm

7    asking the question.  I'd like an

8    answer to my question.

9         MS. RELKIN:  If you want to

10   waste your time asking the same

11   question ten times because you

12   don't like the answer, that's your

13   choice.

14        MS. DO AMARAL:  There won't

15   be a second day.

16        THE WITNESS:  So in Section

17   A.3.1 I outline my literature

18   search strategy.  I cannot speak

19   to what someone else who was

20   undergoing the same tasks that I

21   was asked to do -- I don't -- it's

22   a hypothetical question that I

23   don't -- I've outlined my strategy

24   here.

```
 1    BY MR. HERMAN:

 2          Q.    Okay.  But they wouldn't

 3    know what you decided was germane or not

 4    germane?

 5                MS. RELKIN:  Objection.

 6    BY MR. HERMAN:

 7          Q.    Right?

 8          A.    So I have outlined here how

 9    I decided what was germane and not

10    germane based on my expertise.

11          Q.    Okay.  You ran PubMed --

12    searches in PubMed, right?

13          A.    Yes.

14          Q.    Are there other databases

15    commonly used in literature reviews?

16                MS. RELKIN:  Objection.

17                THE WITNESS:  There are

18          other search engines that are

19          available.

20    BY MR. HERMAN:

21          Q.    EMBASE?

22          A.    Again, there are other

23    search engines that are available.

24          Q.    Is EMBASE one of those
```

1    search engines?

2         A.    I do not use -- I don't

3    regularly use EMBASE.

4         Q.    Cochrane?

5         A.    Cochrane is a search engine.

6         Q.    Okay.  Why did you limit

7    your search to PubMeds?

8         A.    I think PubMed is a

9    comprehensive resource for peer-reviewed

10   literature.  It's commonly used in my

11   field.  Most peer-reviewed publications

12   of the 250 or so that I've published have

13   been based on literature searches in

14   PubMed.

15        Q.    Did you locate -- did you

16   locate all the articles that you relied

17   on in your expert report personally?

18        A.    Did I locate personally all

19   of the articles?

20             MS. RELKIN:  Objection.

21             THE WITNESS:  I reviewed

22        every single article that is cited

23        in this report.  And it was based

24        on literature searches that I did.

Highly Confidential - Subject to Further Confidentiality Review

1          As I mentioned, I have a

2          research assistant, Caroline

3          Rutherford, who helped me gather

4          references.  I also had a doctoral

5          student, David Fink, who provided

6          me with some references early on.

7          But I personally reviewed every

8          paper that was cited.

9     BY MR. HERMAN:

10         Q.    Were any of the papers cited

11    provided by counsel?

12         A.    I -- my literature -- my

13    literature search was very comprehensive,

14    and so there was discussion of papers,

15    but there was no influence of counsel.

16         Q.    Did any --

17         MS. RELKIN:  I'm just going

18         to counsel you not to discuss what

19         you spoke to counsel about.

20    BY MR. HERMAN:

21         Q.    Yeah, I'm not asking you for

22    the substance of conversation.  But did

23    plaintiffs' counsel provide you with

24    articles that you relied on in your

1    expert report?

2                    MS. RELKIN:  Objection.

3                    THE WITNESS:  To my

4          knowledge, the literature that I

5          gathered was based on my

6          discussions with other -- my --

7          the two people that I cite on --

8          in the paper, in the report.

9    BY MR. HERMAN:

10          Q.    Were they all located from

11    searches in PubMed?

12          A.    And then reviewing the

13    articles themselves, and their reference

14    lists and kind of expanding from there.

15          Q.    Okay.  What's a hypothesis?

16          A.    What is a hypothesis?

17    That's a really good question.  So a

18    hypothesis is a statement about a

19    prediction about the way in which

20    something operates.

21          Q.    Okay.  Before deciding a

22    hypothesis is correct, is it important to

23    consider alternative hypotheses?

24                    MS. RELKIN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1    form.  Overbroad.  But you can

2    answer it.

3                THE WITNESS:  So -- in terms

4    of the scientific method?  The

5    more -- the general scientific

6    method?  So usually we present a

7    hypothesis and then we test that

8    hypothesis against an alternative.

9  BY MR. HERMAN:

10       Q.    Before deciding your

11  hypothesis is correct, you need to rule

12  out alternative hypotheses?

13                MS. RELKIN:  Objection to

14    form.  Overbroad.

15                THE WITNESS:  Yeah, I mean I

16    wouldn't say that that's

17    explicitly the entirety of the

18    scientific method.  But hypotheses

19    are tested in science.

20  BY MR. HERMAN:

21       Q.    Okay.  And before deciding

22  your hypothesis is correct, do you need

23  to rule out alternative hypotheses?

24                MS. RELKIN:  Same objection.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  It depends on

2     the hypothesis.

3   BY MR. HERMAN:

4          Q.    What do you mean by that?

5          A.    I mean, there's -- you know,

6   in -- I think you can -- there's many

7   philosophers of science, including Popper

8   and Kuhn, who evaluate the broad range in

9   which scientific hypotheses are developed

10  and evaluated.  And certainly alternative

11  hypotheses and evaluating them are part

12  of the scientific process.

13         Q.    In your academic work before

14  you decide a hypothesis is correct, do

15  you rule out alternative hypotheses?

16         A.    There's a broad range of

17  hypotheses that are tested in science,

18  and of course considering alternative

19  hypothesis is always an important part of

20  that method.

21         Q.    Professor Keyes, in your

22  report you define prescription opioids as

23  medications indicated for the control of

24  moderate and severe -- severe pain,

1    correct?

2         A.    On Page 4 I say,

3    "Prescription opioids are medications

4    indicated for the control of moderate to

5    severe pain and include natural opioid

6    analgesics."  And -- and then I define

7    some of them.

8         Q.    What does it mean for a

9    medication to be indicated for the

10   control of moderate to severe pain?

11        A.    I think what I meant in that

12   section is what prescription opioids are

13   predominately used for in medical

14   practice.

15        Q.    They are understood as

16   beneficial for moderate to severe pain?

17        A.    I --

18             MS. RELKIN:  Objection to

19        form.

20             THE WITNESS:  I think that

21        there's controversy around that

22        statement.  But I'm saying what

23        they are used for.

24   BY MR. HERMAN:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  Have -- have you

2  yourself written articles that say

3  prescription opioids have medical

4  benefits?

5      A.    I have written that in

6  articles in the past.

7      Q.    You define medical use of

8  prescription opioids to refer to the use

9  of prescription opioids based on a

10 physician prescription and used as

11 directed by physician, correct?

12            MR. CIACCIO:  If you're

13       going to cite from the report, can

14       you just give a page number so --

15            MR. HERMAN:  I was just

16       asking the question, but --

17            MR. CIACCIO:  But if you're

18       going to cite, you should tell the

19       witness what page you are citing

20       from.

21            THE WITNESS:  Yes, I say

22       medical use of prescription

23       opioids as -- that I will refer to

24       it in the report as "use of

Highly Confidential - Subject to Further Confidentiality Review

1      prescription opioids based on a

2      physician prescription and use as

3      directed by a physician."

4  BY MR. HERMAN:

5          Q.    You'd agree that the only

6  legal way to get prescription opioids is

7  to go to a licensed prescriber and obtain

8  a prescription, correct?

9                MS. RELKIN:  Objection to

10         form.

11                THE WITNESS:  Only legal way

12         to get prescription opioids is to

13         go to a licensed prescriber.

14                Yes.

15  BY MR. HERMAN:

16         Q.    You would agree that a

17  prescriber is only supposed to write

18  prescriptions for legitimate medical

19  reasons, correct?

20                MS. RELKIN:  Objection.

21                THE WITNESS:  I think that

22         prescribers are prescribing based

23         on a set of information that they

24         are given.  And that oftentimes

1    that the risks of opioids were

2    overstated.  The risk of

3    prescription opioids were

4    overstated.

5         And so I think that

6    physicians are in a difficult

7    position when they are trying to

8    write prescriptions for legitimate

9    medical reasons.

10        MR. HERMAN:  Counsel, I'm

11   not sure it's appropriate for you

12   to point to the screen and guide

13   the witness.

14        MS. RELKIN:  I think it's

15   clear that she misstated when she

16   said the risks of opioids, that --

17   that that was a misstatement.

18        MR. HERMAN:  Well, that's

19   fine.  I mean, you can correct

20   that later if you feel a need to.

21   BY MR. HERMAN:

22        Q.   My question again is, you'd

23   agree that a prescriber is only supposed

24   to write a prescription for legitimate

Highly Confidential - Subject to Further Confidentiality Review

 1    medical reasons?

 2              MS. RELKIN:  Objection to

 3         form.

 4              THE WITNESS:  I would have

 5         to know what you mean by

 6         legitimate medical reasons.

 7    BY MR. HERMAN:

 8         Q.   Well, is a prescriber

 9    supposed to write a prescription for

10    reasons other than legitimate medical

11    reasons?

12              MS. RELKIN:  Objection.

13              THE WITNESS:  I would say in

14         general I think that there has

15         been misinformation to physicians

16         about what the legitimate medical

17         reasons are.  And so I can't

18         say -- I can't make a blanket

19         statement about what physicians

20         should and should not be

21         prescribing based on that.

22    BY MR. HERMAN:

23         Q.   Is it your belief that

24    prescribers were writing prescriptions

Highly Confidential - Subject to Further Confidentiality Review

¹ for reasons they understood to be

² illegitimate medical reasons?

³          MS. RELKIN:  Objection.

⁴     Overbroad.

⁵          THE WITNESS:  That's not

⁶     what I said.

⁷ BY MR. HERMAN:

⁸     Q.    Well, are prescribers only

⁹ supposed to write prescriptions for

¹⁰ legitimate medical reasons?

¹¹     A.    You know, again, I think

¹² that that statement relies on the

¹³ information that the physician has about

¹⁴ the risks and benefits.

¹⁵     Q.    I'm asking you a different

¹⁶ question.  I'm asking you, are

¹⁷ prescribers supposed to write

¹⁸ prescriptions for legitimate medical

¹⁹ reasons?

²⁰          MS. RELKIN:  Objection.

²¹          THE WITNESS:  Are you making

²²     a blanket statement of all

²³     prescribers, of all prescriptions,

²⁴     and all physicians?

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. HERMAN:

2         Q.    I'm asking you a question

3    about what prescribers are supposed to

4    do.

5              Are prescribers supposed to

6    write prescriptions for legitimate

7    medical reasons?

8              MS. RELKIN:  Objection.

9         Overbroad.

10             THE WITNESS:  You know, I

11        think prescribers make decisions

12        based on the information that they

13        have available to them.

14   BY MR. HERMAN:

15        Q.    And it's their belief based

16   on the information that they have

17   available to them that they're writing

18   prescriptions for legitimate medical

19   reasons?

20             MS. RELKIN:  Objection.

21        Overbroad.

22             THE WITNESS:  I wouldn't --

23        I wouldn't speak to every single

24        physician for every single

Highly Confidential - Subject to Further Confidentiality Review

1        prescription.

2   BY MR. HERMAN:

3        Q.    Are you offering an opinion

4   that doctors should not be able to

5   prescribe prescription opioids?

6        A.    I'm sorry.  I don't

7   understand the question.

8              Am I offering an opinion

9   that doctors should not be able to

10  prescribe prescription opioids?  Can you

11  point in the report where I've indicated

12  that?

13       Q.    I'm just -- I'm asking you

14  the question.  It's not -- it's just a

15  question.  Are you offering an opinion

16  that doctors should not be able to

17  prescribe prescription opioids?

18       A.    That is not stated in my

19  report.

20       Q.    Not everything has to be

21  stated in your report.  I'm asking you --

22       A.    I'm relying on my report

23  though.

24       Q.    Are you offering an opinion

1    in your -- are you offering an opinion

2    that doctors should not be able to

3    prescribe prescription opioids?

4          A.     That opinion, I would ask

5    where in the report that I've stated

6    that.

7          Q.     So is the answer to my

8    question no?

9               MS. RELKIN:  It's a

10         preposterous question.

11              THE WITNESS:  I haven't --

12              MS. RELKIN:  Badgering the

13         witness.

14   BY MR. HERMAN:

15         Q.     You're not offering an

16   opinion that a doctor should not be able

17   to exercise his or her medical judgment

18   in deciding appropriate treatment for a

19   patient?

20              MS. RELKIN:  Objection to

21         form.  Overbroad.

22              THE WITNESS:  What I've

23         stated in the report, and I think

24         the epidemiological evidence is

```
 1              available to support, is that the

 2              oversupply of opioids in the

 3              United States in the last 15 years

 4              is -- part of the reason that

 5              occurred is that the risks of

 6              prescription opioids were

 7              understated.  That's what I got

 8              wrong earlier.  I'm sorry.

 9    BY MR. HERMAN:

10         Q.    Okay.  But again --

11         A.    And so --

12              MS. RELKIN:  She's still

13              answering.

14              MR. HERMAN:  I apologize.

15              THE WITNESS:  And so your

16              question is, doctors -- am I

17              offering the opinion that doctors

18              should not be able to exercise

19              their medical judgment?

20              I'm offering the opinion

21              that doctors were not provided

22              with sufficient information with

23              which to make medical judgments in

24              all cases.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. HERMAN:

2          Q.    But are you offering an

3    opinion that, today, doctors shouldn't be

4    able to prescribe prescription opioids?

5                MS. RELKIN:  Objection to

6          form.

7                THE WITNESS:  Again, I've

8          answered that question.

9    BY MR. HERMAN:

10         Q.    And what was your answer

11   again?

12               MS. RELKIN:  Objection.

13               THE WITNESS:  I'm sure it's

14         available in the --

15   BY MR. HERMAN:

16         Q.    Humor me and just answer my

17   question, please.

18         A.    I'm sorry.  Can you restate

19   the question?

20         Q.    Are you offering an opinion

21   that doctors should not be able to

22   prescribe prescription opioids?

23               MS. RELKIN:  Objection.

24               THE WITNESS:  Am I offering
```

Highly Confidential - Subject to Further Confidentiality Review

1    an opinion that doctors should not

2    be able to prescribe prescription

3    opioids?  I don't -- I don't see

4    where in the report that opinion

5    is stated.

6  BY MR. HERMAN:

7    Q.    Are you offering an opinion

8  that any prescription written for a

9  prescription opioid in Cuyahoga County

10 was written for a reason other than a

11 legitimate medical need?

12         MS. RELKIN:  Objection.

13    Overbroad.

14         THE WITNESS:  I'm sorry.

15    Can you -- are you offering an

16    opinion that any prescription

17    written for a prescription opioid

18    in Cuyahoga County was written for

19    a reason other than a legitimate

20    medical need?

21         I don't -- I would not make

22    blanket statements about all

23    prescriptions written in Cuyahoga

24    County.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. HERMAN:

2       Q.    Are you aware of any

3  prescription written in Cuyahoga County

4  that was written for other than a

5  legitimate medical need?

6            MS. RELKIN:  Objection to

7       form.

8            THE WITNESS:  Again, I would

9       not make blanket statements about

10      all prescriptions written in

11      Cuyahoga County.  That's not the

12      basis of my opinion.

13 BY MR. HERMAN:

14      Q.    Are you aware of any

15 prescription in Cuyahoga County that was

16 written for a reason other than a

17 legitimate medical need?

18      A.    Again, I relied on

19 epidemiological evidence.  It's at the

20 population level and applied to the

21 population totals in Cuyahoga County.

22 That's not what the epidemiologic

23 evidence is offered to support or refute.

24      Q.    Professor Keyes, are you

Highly Confidential - Subject to Further Confidentiality Review

1    aware of any prescription that -- for a

2    prescription opioid in Cuyahoga County

3    that was written for a reason other than

4    a legitimate medical need?

5                MS. RELKIN:  Objection.

6          Asked and answered.  Argumentive.

7          She's answered the question.

8          Let's move on.

9    BY MR. HERMAN:

10         Q.    Please answer my question.

11         A.    I think I've answered the

12   question that that is not the purpose and

13   scope of what I am doing in an

14   epidemiological analysis of the topics in

15   this report.

16         Q.    I understand that is not in

17   your report, but I'm asking you the

18   question.  Are you aware, Professor

19   Keyes, of any prescription written in

20   Cuyahoga County for a reason other than a

21   legitimate medical need?

22               MS. RELKIN:  Same objection.

23               THE WITNESS:  Again, this is

24         not within the scope of the report

Highly Confidential - Subject to Further Confidentiality Review

1    that I wrote.

2    BY MR. HERMAN:

3         Q.    Yeah, but my question is a

4    yes or no question.  Are you aware,

5    Professor Keyes, of a prescription for a

6    prescription opioid in Cuyahoga County

7    written for a reason other than a

8    legitimate medical need?

9              MS. RELKIN:  Objection.

10             You've asked this at least five

11             times.  She's answered it.  She is

12             an epidemiologist --

13             MR. HERMAN:  She's not --

14             MS. RELKIN:  -- she doesn't

15             look at individuals.

16   BY MR. HERMAN:

17        Q.    Yes or no.  Are you aware?

18        A.    The epidemiological evidence

19   that I reviewed is about populations.

20   And I applied it to the specific counties

21   that we are discussing today and I

22   applied it to the broader scientific

23   literature and epidemiology.  And that's

24   what I've done in the report.

1    Q.    So is the answer that you're

2  not aware of a prescription --

3    A.    The answer is that the

4  epidemiology -- what I've been asked to

5  consider is the epidemiology.

6    Q.    So are you not -- are you

7  aware of a prescription written in

8  Cuyahoga County for a prescription opioid

9  for a reason other than legitimate

10  medical need?

11        MS. RELKIN:  Objection.

12        Asked and answered.  Now we are

13        like at eight, the eighth time

14        you've asked that question.  Move

15        on.  You are badgering.

16        THE WITNESS:  My

17        epidemiological analysis is about

18        population level trends, the risk

19        factors and the specific trends of

20        opioid-related harm in the

21        counties and that is what I

22        covered in the report.

23  BY MR. HERMAN:

24    Q.    Would you agree that your

Highly Confidential - Subject to Further Confidentiality Review

1  definition of medical use also highlights

2  that for prescription opioids to be used

3  medically, the patient must use the

4  medications as prescribed?

5           MS. RELKIN:  Objection to

6       form.

7           THE WITNESS:  My definition

8       that I used in the report for

9       medical use of prescription

10      opioids was medical use will refer

11      to use of prescription opioids

12      based on a physician prescription

13      and use as directed by a

14      physician.

15  BY MR. HERMAN:

16      Q.    And so medical use, to use a

17  prescription, medically you have to use

18  it as prescribed by the physician?

19      A.    The definition that I use is

20  use as directed by a physician.

21      Q.    Do most people who are

22  prescribed opioids develop an opioid use

23  disorder?

24           MS. RELKIN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

```
 1            form.
 2                 THE WITNESS:  So that is
 3            reviewed, the evidence underlying
 4            that statement is reviewed in
 5            Section B.2 from Page 12 to 16.
 6      BY MR. HERMAN:
 7            Q.    Section B.2 reviews --
 8            A.    No, I'm sorry.  Page 11 to
 9      16.
10                 So I think the answer to
11      that question is -- is that if you look
12      at the epidemiological evidence regarding
13      the rates of opioid use disorder after
14      medical use of opioids, the available
15      epidemiological evidence indicates that
16      there is generally a dose-response
17      relationship, and that in terms of opioid
18      use disorder from mild to severe, it's
19      about 21 to 29 percent and opioid use
20      disorder for moderate to severe is about
21      8 to 12 percent.  And there's a number
22      of --
23            Q.    Per -- per --
24            A.    -- meta-analyses and reviews
```

Highly Confidential - Subject to Further Confidentiality Review

1    and additional papers that came on after

2    those reviews that would support those

3    figures.

4         Q.    Professor Keyes, I

5    understand you want to go to your report.

6    But Section B.2 looks at studies related

7    to chronic patients, right?

8         A.    I would need to go back

9    and -- and review all of the -- there's a

10   number of different meta-analyses in this

11   report.  And so in order to answer

12   whether every single study always

13   included chronic patients I would need to

14   go back and look which I'm happy to do.

15        Q.    Okay.  My question is a

16   little more general though, than I think

17   that B.2 speaks to.  So I'm going to ask

18   it again.

19             Do most people who are

20   prescribed opioids develop an opioid use

21   disorder?

22             MS. RELKIN:  Objection.

23             MR. CIACCIO:  Objection to

24        form.

Highly Confidential - Subject to Further Confidentiality Review

1    THE WITNESS:  Again, I think

2    that that evidence -- I -- I think

3    the epidemiological evidence that

4    answers that question is provided

5    in this section.  And I think the

6    epidemiological evidence indicates

7    that there is risk of opioid use

8    disorder that follows a

9    dose-response pattern for both

10   acute and long-term prescriptions.

11 BY MR. HERMAN:

12   Q.    Professor Keyes, I'm going

13 to ask you to please listen to my

14 question.

15      Do most people who are

16 prescribed opioids develop an opioid use

17 disorder?

18      MS. RELKIN:  Objection to

19   form.

20      THE WITNESS:  And the answer

21   is that there's a body of

22   epidemiological evidence that

23   underlies the answer to that

24   question, which is comprehensively

Highly Confidential - Subject to Further Confidentiality Review

1          cited in the report, and that

2          available reviews and

3          meta-analyses indicate that 21 to

4          29 percent, on average of

5          individuals, will develop mild to

6          severe opioid use disorder and

7          that's coming from the 38 studies

8          published in Vowles 2015.  And

9          it's supported by additional

10          evidence that's cited after the

11          Vowles paper came out.  And that

12          8 to 12 percent will develop

13          opioid -- opioid use disorder from

14          moderate to severe.

15               That is my answer.

16     BY MR. HERMAN:

17          Q.    Professor Keyes, you would

18     agree with me that the figure that you

19     keep referring to, Figure 1 on Page 13,

20     has a heading that says "Estimate of

21     Misuse, Abuse, and Addiction of Opioids

22     Among Chronic Pain Patients," right?

23          A.    That is the Vowles review,

24     but there is additional evidence that's

1  cited in the report from other

2  epidemiological studies as well.

3      Q.    Okay.  But the percentages

4  that you were giving me right now come

5  from studies that looked at chronic pain

6  patients, correct?

7      A.    Again, I would need to

8  review the other studies that are cited

9  in the report.  There's a broad range of

10 studies, not just the Vowles review.  And

11 the evidence is pretty consistent across

12 those studies.  So I would need to -- you

13 know, if there's 200 references, I would

14 need to specifically pinpoint every

15 single patient population that was

16 evaluated.

17     Q.    So -- I'm going to ask my

18 question again.  Do most people who are

19 prescribed opioids develop an opioid use

20 disorder?

21     A.    I think my answer is the

22 same.

23         MS. RELKIN:  Note my

24     objection.  Asked and answered.

Highly Confidential - Subject to Further Confidentiality Review

1          Form.

2     BY MR. HERMAN:

3          Q.     Is -- is your answer yes or

4     no to that question?

5          A.     My answer is that there's a

6     body of epidemiological evidence that is

7     cited in the report that speaks to the

8     answer to that question in a broad range

9     of patient populations.

10         Q.     Okay.  On Page 4 of your

11    report you include a definition of

12    nonmedical use of prescription opioids,

13    correct?

14         A.     Yes.

15         Q.     And you define nonmedical

16    use as referring to both using

17    prescription opioids more often or longer

18    than prescribed or use of prescription

19    opioids without a prescription, right?

20         A.     That's the definition that I

21    give.

22         Q.     Okay.  And that definition

23    would include a mom who was prescribed a

24    prescription opioid for a broken leg and

Highly Confidential - Subject to Further Confidentiality Review

1  giving the leftover pills from your

2  prescription to her son when he sprains

3  his ankle?

4          MS. RELKIN:  Objection.

5          THE WITNESS:  That

6      definition referred to all

7      nonmedical use which includes

8      using more often or longer than

9      prescribed or use of prescription

10     opioids without a prescription.

11         So in your example, unless

12     the -- it depends on whether the

13     son with the broken ankle went to

14     a licensed provider.

15 BY MR. HERMAN:

16     Q.    And so if the mom gave the

17 son pills from a prescription that she

18 previously had, the son's use of those

19 prescriptions would be nonmedical use?

20     A.    That would be covered under

21 this definition of nonmedical use.

22     Q.    Okay.  And a college kid who

23 gets a prescription, shares with a

24 friend, that's nonmedical use?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     You know, I think I've been

2     clear about the definition.  So use of a

3     prescription opioid more often or longer

4     than prescribed or use of prescription

5     opioids without a prescription.  So any

6     use of prescription opioids without a

7     prescription would fall under that

8     category.

9          Q.     And also if you used a

10    prescription in a different way than the

11    doctor prescribed, correct?

12              MS. RELKIN:  Objection to

13         form.

14              THE WITNESS:  Again, the

15         definition is both using

16         prescription opioids more often or

17         longer than prescribed or use of

18         prescription opioids without a

19         prescription.

20    BY MR. HERMAN:

21          Q.     So if someone got a

22    prescription and they were in a lot of

23    pain and they took more than directed,

24    that would be nonmedical use, correct?

1             MS. RELKIN:  Objection to

2        form.

3             THE WITNESS:  So the

4        definition includes more often or

5        longer than prescribed.

6    BY MR. HERMAN:

7        Q.    So the answer to my question

8    is yes?

9        A.    Yeah, under this definition

10   using more often or longer than

11   prescribed is covered under nonmedical

12   use.

13       Q.    Are there different types of

14   prescription opioids?

15       A.    Yes.

16       Q.    The term "prescription

17   opioid" describes a wide range of

18   products, correct?

19            MS. RELKIN:  Objection to

20       form.

21            THE WITNESS:  Yes.

22   BY MR. HERMAN:

23       Q.    There are differences in

24   dosages?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     Differences in indication?

3          A.     So I've listed here under

4    the definition of prescription opioids,

5    the prescription opioids that I

6    considered in the report, and they have

7    different dosages and are used for

8    different types of conditions.

9          Q.     Some are long-acting?

10         A.     That's correct.

11         Q.     Some are immediate release?

12         A.     That's correct.

13         Q.     Some are combination

14   products?

15         A.     There are a wide range of

16   opioid products.

17         Q.     There are illicit opioids?

18         A.     I'm sorry?

19         MS. RELKIN:  Objection to

20         form.

21   BY MR. HERMAN:

22         Q.     Are there illicit opioids?

23         A.     Are there illicit opioids in

24   the world?

Highly Confidential - Subject to Further Confidentiality Review

1  Q.    Yes.

2  A.    Yes, there are illicit

3  opioids.

4  Q.    Heroin?

5  A.    Heroin is, in the United

6  States, an illicit opioid.

7  Q.    Illicit fentanyl?

8  A.    There is fentanyl that is

9  both provided by physician prescription,

10  and there's also fentanyl that is

11  illicitly manufactured and sold.

12  Q.    The defendants in this case

13  don't manufacture illicit opioids, right?

14  MS. RELKIN:  Objection to

15  form.

16  THE WITNESS:  I would have

17  to see the list of defendants in

18  the case.

19  BY MR. HERMAN:

20  Q.    You are not aware of whether

21  the defendants in this case manufacture

22  illicit opioids?

23  A.    So what I maintain in the

24  report is that the oversupply of

Highly Confidential - Subject to Further Confidentiality Review

1    prescription opioids in the United States

2    that was due to understating the risks of

3    opioids to the medical community and the

4    general public at large created a system

5    in which diversion could occur and which,

6    you know, there was a large market for

7    the use of broad range of prescription

8    opioids for nonmedical uses and that

9    approximately 80 percent of individuals

10   who transition to the illicit opioids

11   that you state, began with prescription

12   opioids.  So that's the opinion that's

13   stated in the report.

14           Q.   Okay.  And we'll get to

15   those opinions.  But do defendants in

16   this case manufacture illicit opioids?

17              MS. RELKIN:  Objection to

18       form.

19              THE WITNESS:  So --

20              MS. RELKIN:  You can answer.

21              THE WITNESS:  In terms of

22       what the defendants in this case

23       do and do not manufacture, some of

24       them don't manufacture anything.

1          And so...

2    BY MR. HERMAN:

3          Q.    Okay.  Do any of them

4    manufacture illicit opioids?

5          A.    Well, yes.

6                MS. RELKIN:  Objection to

7          form.

8                THE WITNESS:  In some way,

9          because the prescription opioids

10         that were manufactured were used

11         illicitly.

12   BY MR. HERMAN:

13         Q.    Okay.  And why don't we --

14   maybe it will help with the terminology

15   to define some stuff.  I'm going to treat

16   prescription opioids as -- as licit.  And

17   I understand that when they're used

18   nonmedically or without a prescription,

19   that's, in your opinion, improper.  But

20   I'm going to separate those from things

21   like heroin and illicit fentanyl, which

22   I'm going to refer to as illicit opioids.

23   Can we agree on that terminology?

24                MS. RELKIN:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  I don't agree

2      with that.  I don't agree with

3      that terminology.

4           I mean, I guess my question

5      is, when you're talking about the

6      illicitness of substances, are you

7      talking about the user?

8  BY MR. HERMAN:

9      Q.    I'm talking about the type.

10  So heroin --

11      A.    I mean, there's prescription

12  opioids that are illicitly manufactured

13  as well.  So I don't think that that

14  definition can be broadly applied.

15      Q.    Okay.  Would it be all right

16  with you if I referred to nonsteroidal

17  antiinflammatory drugs as you do in your

18  report as NSAIDs?

19      A.    Yes.

20           MR. HERMAN:  How long have

21      we been going?

22           Why don't -- why don't we

23      take a break?

24           THE VIDEOGRAPHER:  The time

Highly Confidential - Subject to Further Confidentiality Review

1        is 10:19 a.m. Off the record.

2              (Short break.)

3              THE VIDEOGRAPHER:  The time

4        is 10:35 a.m.  Back on the record.

5   BY MR. HERMAN:

6        Q.    Professor Keyes, on -- I'm

7   going to direct you to Page 10 of your

8   report.  At the very bottom of Page 10,

9   the last sentence that starts on Page 10

10  and goes onto 11, you wrote, "The supply

11  of opioids was driven by a multitude of

12  factors, including direct marketing to

13  physicians using data that was

14  underestimated (sic) use disorder risks

15  in patients."

16             Correct?

17       A.    That's what I wrote.

18       Q.    Did you conduct a critical

19  literature review regarding what caused

20  opioid prescribing to increase?

21       A.    What I document --

22             MS. RELKIN:  Form.

23             THE WITNESS:  -- in the

24       report is the epidemiological

Highly Confidential - Subject to Further Confidentiality Review

1    evidence for the increase in

2    prescribing.  And I'm sorry,

3    what's the second question?  Did

4    I --

5  BY MR. HERMAN:

6        Q.    I think there was only one

7  question --

8        A.    Okay.

9        Q.    -- if you could listen.

10       Did you conduct a critical

11 literature review regarding what caused

12 opioid prescribing to increase?

13            MS. RELKIN:  Objection to

14       form.

15            THE WITNESS:  The -- what

16       the report indicates is that

17       prescribing did increase, and

18       those increases were associated

19       with harm.  I think what I say in

20       the report, that there are a

21       multitude of factors that have

22       been documented in the

23       epidemiological literature to

24       contribute to that.  But the

Highly Confidential - Subject to Further Confidentiality Review

1    critical literature review of

2    every factor is not -- there's no

3    section in the report on that.

4 BY MR. HERMAN:

5    Q.    Okay.  Let's start at the

6 first part.  Did you conduct a critical

7 literature review about the causes --

8 what caused opioid prescribing to

9 increase?

10    MS. RELKIN:  Objection.

11    Asked and answered.

12    THE WITNESS:  So what --

13    there's two parts to that

14    question, right.  So one part is

15    the literature review that I

16    conducted, which I think we've

17    discussed.  And the second is what

18    is covered in the report.

19    And what is covered in the

20    report is listed across each of

21    these headings.  And so there is

22    literature on factors that were

23    associated with increases in

24    prescribing, and to the extent

Highly Confidential - Subject to Further Confidentiality Review

1    that that's in the epidemiological

2    literature, it is in the report.

3  BY MR. HERMAN:

4    Q.    I -- I don't think my

5  question had two parts.  I just asked,

6  did you conduct a literature review

7  regarding causes of the increase in

8  opioid prescribing?

9         MS. RELKIN:  Objection to

10        form.  Asked and answered.

11        THE WITNESS:  So again, I

12        conducted a literature review in

13        the -- throughout the report.

14        And with regard to causes of

15        why opioid prescribing increased,

16        there is epidemiological evidence

17        that is cited in the report about

18        causes of the increase in

19        prescribing.

20 BY MR. HERMAN:

21    Q.    But you didn't conduct a

22 specific literature review directed at

23 determining the causes of --

24        MS. RELKIN:  Objection.

1              THE WITNESS:  I reviewed the

2         literature throughout the report.

3    BY MR. HERMAN:

4         Q.    Okay.  So is the answer to

5    my question, no, I did not conduct a

6    review of literature regarding causes of

7    the increase in opioid prescribing?

8              MS. RELKIN:  Objection to

9         form.

10             THE WITNESS:  So I think

11        what I said in the report is that

12        the causes of the opioid epidemic,

13        they are -- were multifactorial.

14        And throughout the report I speak

15        to the multifactorial nature of

16        those causes across a number of

17        different actors.

18   BY MR. HERMAN:

19        Q.    Okay.  And in the sentence

20   that begins on Page 10 and goes onto 11,

21   you mention that there were a multitude

22   of causes, correct?

23        A.    That's correct.

24        Q.    And what were the multitude

Highly Confidential - Subject to Further Confidentiality Review

1    of factors that drove the supply of

2    prescription opioids?

3              A.    So in describing the

4    multitude of factors that drove the

5    supply of prescription opioids, I rely on

6    the epidemiological literature, and I

7    think that is cited here.  I'll point you

8    to a couple different places where I

9    review the evidence with regard to direct

10   marketing to physicians is in --

11             Q.    Professor Keyes, I'm going

12   to let you finish, but that's not my

13   question.

14             A.    So I'm trying to answer the

15   question.  There -- you want to know the

16   multitude of factors, and so I reviewed

17   that evidence for the report and it's

18   cited in a number of different places.

19   And so to answer the question, I was

20   going to point you to the places that

21   it's cited.

22             Q.    Okay.  Go ahead.

23             A.    Okay.  Okay.  So the direct

24   marketing and payments to physicians is

1  cited -- let's see.  On Page 22.  The

2  paragraph that starts "pharmaceutical

3  company marketing to physicians" is where

4  the evidence regarding marketing and

5  payments and associated -- there's a

6  number of citations that indicate that it

7  increased the opioid supply.  That's

8  cited here.

9       Q.    And does that discuss the

10  multitude of causes?

11       A.    So that's among the causes.

12  And in terms of -- I'm sorry --

13       Q.    You -- you only discuss what

14  you believe to be information about the

15  marketing to physicians, correct?

16       A.    No, there's other --

17            MS. RELKIN:  Objection.

18            THE WITNESS:  Yeah, no,

19        that's -- that's incorrect.

20        There's other evidence that's

21        cited throughout here as well, in

22        terms of, you know, the increase

23        in -- the increase in the actual

24        supply.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. HERMAN:
 2         Q.    Okay.  So other than
 3    marketing, what are the other factors in
 4    the multitude of factors that drove the
 5    supply of prescription opioids?
 6              MS. RELKIN:  Objection to
 7         form.
 8              THE WITNESS:  I think what
 9         I've cited in this report is the
10         number of products that were
11         developed.
12    BY MR. HERMAN:
13         Q.    So --
14         A.    The number of opioid
15    prescription products that were
16    developed.  It's cited in that very
17    paragraph.
18              So there was a number of
19    products that were developed and they
20    were marketed and the supply increased.
21         Q.    Okay.  So you've named two
22    factors now.  What are the other factors
23    that make up the multitude of factors?
24         A.    So then, I have another
```

1   section in the report that I'll point you

2   to that goes into other factors as well.

3   Hold on a second.

4           So Section B.8, Page 27, the

5   uptake of diverted opioids is not random

6   but part of a complex system that

7   involved community level economic

8   conditions.  Discusses how -- looked at

9   prescription opioid-related distribution

10  and mortality with that was heterogenous

11  across the United States with respect to

12  economic conditions as well.  So I would

13  say that would be the third part of the

14  multitude of factors.

15          Q.    So economic conditions is a

16  factor that --

17          A.    Explains a small portion of

18  the county level variance in

19  distribution.

20          Q.    Okay.  And what about desire

21  to address the undertreatment of pain?

22          MS. RELKIN:  Objection to

23      form.

24          THE WITNESS:  I have --

Highly Confidential - Subject to Further Confidentiality Review

1    there's -- again, what I cite in

2    this report is the epidemiological

3    evidence.  And while -- I'm -- I'm

4    just -- that's not part of the

5    epidemiological evidence that has

6    a strong evidence base.

7  BY MR. HERMAN:

8    Q.   So you don't believe that

9  the desire to address the undertreatment

10  of pain was a factor that drove the

11  supply of prescription opioids?

12    MS. RELKIN:  Objection to

13    form.

14    THE WITNESS:  I believe that

15    what I cited in this report is the

16    strongest available

17    epidemiological evidence that

18    addresses population level

19    patterns and the desire to treat

20    undertreated pain.  It's not among

21    the -- the epidemiological studies

22    that brought evidence to bear on

23    the issue.

24  BY MR. HERMAN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What about patient

2  satisfaction surveys, were they one of

3  the factors that drove the supply of

4  prescription opioids?

5              MS. RELKIN:  Objection to

6         form.

7              THE WITNESS:  Again, I --

8         what I cited in this report is, I

9         think, the epidemiological

10        evidence for the increase in

11        product distribution, sales, and

12        marketing, as well as heterogenous

13        supply across areas with different

14        economic conditions.

15  BY MR. HERMAN:

16    Q.    What about changes to the

17  practice of medicine?

18    A.    What about it?  What's the

19  question?

20    Q.    Time constraints.  Do you

21  think that time constraints on doctors

22  was a factor that drove the supply of

23  prescription opioids?

24              MS. RELKIN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1            form.

2                    THE WITNESS:  So again I --

3            I think I've been pretty clear

4            about what's in the report in

5            terms of the factors that I

6            evaluated in the epidemiological

7            literature.  These are the studies

8            that I relied on to form my

9            opinions.

10     BY MR. HERMAN:

11            Q.    What about the overall

12     increase in the use of all prescription

13     medications?

14            A.    Again, what I -- what I

15     cited in the -- in the epidemiological

16     literature are the factors that are in

17     the report.

18            Q.    And did you -- again, did

19     you go out and look for epidemiological

20     literature that discussed causes of the

21     opioid -- increase in opioid supply?

22                    MS. RELKIN:  Objection to

23            form.

24                    THE WITNESS:  I can keep an

Highly Confidential - Subject to Further Confidentiality Review

1      open mind with respect to levels

2      of evidence and sources of

3      evidence and where they are drawn

4      from.

5  BY MR. HERMAN:

6      Q.    Did you run searches

7  specifically to look at the causes of

8  factors that -- excuse me.  Let me

9  rephrase that question.

10          Did you run searches

11  specifically to look at the factors that

12  drove the increase in supply of

13  prescription opioids?

14          MS. RELKIN:  Objection to

15      form.

16          THE WITNESS:  That already

17      was asked.  And, again, I think I

18      did a literature review and the

19      topics of the literature review

20      are listed in the report.

21  BY MR. HERMAN:

22      Q.    So is the answer to my

23  question, no, you did not specifically

24  run searches to look at what factors

Highly Confidential - Subject to Further Confidentiality Review

1    drove the increase in supply of

2    prescription opioids?

3         A.    What I reviewed in the

4    report was the epidemiological literature

5    around the causes of the opioid epidemic

6    and so, in doing so, I reviewed

7    literature from a wide variety of

8    epidemiological studies.

9         Q.    And, again, did you

10   specifically look for literature that

11   addressed the causes of the increase in

12   supply of prescription opioids?

13             MS. RELKIN:  Objection to

14        form.

15             THE WITNESS:  I've cited a

16        number of epidemiological studies

17        that have examined the causes of

18        the increase in supply in the

19        report.

20   BY MR. HERMAN:

21        Q.    Professor Keyes, I would ask

22   that you listen to the question that I'm

23   asking.

24        A.    Okay.

1         Q.    And I asked, did you

2  specifically look for literature that

3  addressed the causes of the increase in

4  supply of prescription opioids?

5         A.    I think I've --

6         MS. RELKIN:  Objection.

7         THE WITNESS:  -- addressed

8        that in the report.  I

9        specifically looked at the body of

10       literature that I was asked to

11       evaluate.  And within that

12       literature there are a number of

13       epidemiological studies that

14       examine oversupply of opioids as

15       the product of marketing and

16       payments to physicians as one

17       component.

18        The increase in the number

19       of products is another component,

20       and heterogenous distribution

21       across economic regions.  Excuse

22       me.

23  BY MR. HERMAN:

24        Q.    Okay.  And you're not aware

1  of literature that discusses the

2  undertreatment of pain as a factor that

3  drove the supply of prescription opioids?

4          MS. RELKIN:  Objection to

5      form.

6          THE WITNESS:  What I said in

7      the report is the epidemiological

8      evidence.

9  BY MR. HERMAN:

10     Q.    And you're not aware of

11 literature that discusses the increase in

12 use of all prescription medications as a

13 factor that drove the increase in supply

14 of prescription opioids?

15     A.    The increase in the supply

16 of opioids was -- I cite in the report

17 what the increases in the supply of

18 opioids was.  And my report covers the

19 increase in supply of opioids.

20     Q.    Okay.  All right.  I'm going

21 to ask you to flip to Page 3.  The first

22 bullet on that page, it's your opinion

23 that the expansion of nonmedical

24 prescription opioid use would not have

Highly Confidential - Subject to Further Confidentiality Review

1    occurred without the widespread

2    availability of prescription opioids that

3    were originally dispensed for medical

4    uses, often in greater quantities and

5    doses than needed, leaving a surplus of

6    opioids that could be diverted for

7    nonmedical uses, correct?

8            A.    That's what's written, yes.

9            Q.    And that's your opinion?

10           A.    Yes.

11           Q.    And when you say that

12   prescription opioids were dispensed for

13   medical uses, what do you mean?

14           A.    Okay.  So I say here the

15   expansion of nonmedical prescription

16   opioid use would not have occurred

17   without the widespread availability that

18   were originally dispensed for medical

19   uses.  So these were prescriptions

20   obtained by a doctor or a dentist or

21   other licensed provider.

22           Q.    Legitimate prescriptions for

23   medical use -- let me rephrase that

24   question.  What you're saying in this

Highly Confidential - Subject to Further Confidentiality Review

1  bullet point is that increases in supply

2  due to legitimate prescriptions for

3  medical use created the opportunity for

4  diversion?

5      A.    I said they're dispensed for

6  medical use.

7      Q.    Okay.  Let me just finish my

8  question.  Let's try to get on the same

9  page.

10          You're saying in this bullet

11  that the increase in supply due to

12  legitimate prescriptions for medical use

13  created the opportunity for diversion?

14          MS. RELKIN:  Objection to

15      form.

16          THE WITNESS:  That's not

17      what the bullet point says.

18  BY MR. HERMAN:

19      Q.    Okay.  That's not a fair

20  summary, that the increase in supply due

21  to legitimate prescriptions for medical

22  use created the opportunity for

23  diversion?

24      A.    That's not a summary of what

Highly Confidential - Subject to Further Confidentiality Review

1    my opinion is.  I think the summary of my

2    opinion is in the bullet.  The expansion

3    of nonmedical prescription opioid use

4    would not have occurred without the

5    widespread availability of prescription

6    opioids that were originally dispensed

7    for medical uses.

8         Q.    Okay.  So the increase in

9    supply is caused by legitimate

10   prescriptions for medical use, correct?

11             MS. RELKIN:  Objection to

12        form.

13             THE WITNESS:  So, right,

14        I -- I say they are dispensed for

15        medical use.  And I think we've

16        covered that the legitimacy of the

17        dispensing is based on a set of --

18        of criteria that were -- materials

19        that were provided to physicians

20        that underestimated the risk.  And

21        I want to correct earlier when I

22        said overestimated.  That was

23        overestimated benefits.  And I

24        was -- hadn't had enough tea yet.

```
 1    BY MR. HERMAN:

 2          Q.    Okay.  But the doctors,

 3    based on the information available to

 4    them were writing the prescriptions for

 5    legitimate --

 6          A.    They were dispensed for

 7    medical uses.

 8          Q.    Okay.  And that increase in

 9    supply of prescription opioids for

10    medical uses created the opportunity for

11    diversion?

12          A.    And left a surplus of

13    opioids that could be diverted for

14    nonmedical uses.

15          Q.    Let's just step back for a

16    moment and discuss how people obtain a

17    prescription for medical use.  Okay?

18                To legally obtain a

19    prescription opioid, a person needs to

20    meet with the prescriber, correct?

21                MS. RELKIN:  Objection to

22          form.

23                THE WITNESS:  It -- I mean,

24          regulations on face-to-face
```

Highly Confidential - Subject to Further Confidentiality Review

1    contact with a physician have

2    changed over time.

3  BY MR. HERMAN:

4         Q.    When people get a

5  prescription opioid, are they supposed to

6  meet face to face with their doctor?

7         A.    I'm not a medical doctor.  I

8  don't -- so I would focus on the

9  epidemiological evidence.

10        Q.    Okay.  Let's just talk about

11 prescriptions generally.

12              When you go to get a

13 prescription, do you meet face to face

14 with your doctor?

15              MR. CIACCIO:  Objection.

16              MS. RELKIN:  Objection to

17        form.

18              MR. CIACCIO:  She shouldn't

19        have to answer questions about her

20        practice.  You said you go to your

21        doctor.  If you want to rephrase

22        it, but asking her her practice

23        when she sees a doctor and what

24        prescriptions she --

Highly Confidential - Subject to Further Confidentiality Review

1    THE WITNESS:  There's a wide

2    range of ways that people obtain

3    prescriptions.

4    MR. CIACCIO:  Well, I'm just

5    saying, don't ask her what she

6    does when she sees a doctor.

7    MR. HERMAN:  Got it.  Thank

8    you.

9  BY MR. HERMAN:

10    Q.    Professor Keyes, is it your

11  conclusion that doctor shopping was rare?

12    MS. RELKIN:  Objection to

13    form.

14    THE WITNESS:  So I address

15    that point in the report.  And I

16    would just want to point you to

17    that section to be comprehensive.

18  BY MR. HERMAN:

19    Q.    On Page 18.

20    A.    Well, I address it in a

21  number of different epidemiological

22  studies that have examined that issue.

23    Q.    But on Page 18.

24    MS. RELKIN:  She's

Highly Confidential - Subject to Further Confidentiality Review

1       answering.

2   BY MR. HERMAN:

3       Q.    All right.  Go ahead.

4       A.    Yeah, so on Page 18 I state,

5   "A small proportion of individuals using

6   opioids chronically receive prescriptions

7   from multiple providers and pharmacies

8   and have been characterized as doctor

9   shoppers or opioid shoppers."

10          There's a study in 2014 that

11  provides some evidence as to the

12  commonality or rareness of that practice.

13  That's McDonald and Carlson.  And it was

14  concluded in that study, it remained rare

15  across states with a mean of .7 per

16  thousand individuals.

17      Q.    So is your answer yes, I

18  concluded that doctor shopping was rare?

19      A.    I concluded that -- what I

20  stated in the report, that the

21  epidemiological evidence indicates that

22  doctor shopping was a relatively rare

23  contribution to the overall distribution

24  and prescribing of opioids.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And is that your opinion

2    with respect to Summit County?

3    A.    With regard to Summit

4    County, I have not --

5             MS. RELKIN:  Objection to

6             form.

7             THE WITNESS:  -- the study

8             did not examine Summit County in

9             particular.

10            And so when thinking about

11            how to generalize those studies

12            across many counties there's a

13            number of different considerations

14            that we could keep in mind.

15            So all of the data I have on

16            Summit County I've cited in the

17            report in the latter section.

18   BY MR. HERMAN:

19   Q.    Okay.  Is it your opinion

20   that pill mills do not explain in any

21   significant way the expansion of opioid

22   prescribing and opioid-related harms in

23   the U.S.?

24   A.    That is also cited in this

Highly Confidential - Subject to Further Confidentiality Review

1 section.  And I cite evidence here that
2 indicates that there are some specialties
3 of medicine that have more concentrated
4 prescription practice.  But actually if
5 you look at almost every specialty,
6 including general practitioners, that
7 there was an increase in opioid
8 prescriptions.
9 So based on that evidence,
10 you know, well, certainly there were
11 rogue prescribers, there was just a
12 general increase across all prescribers,
13 across the broad majority of prescribers.
14 Q.    But is it your opinion that
15 pill mills do not explain in any
16 significant way the expansion of opioid
17 prescribing and opioid-related harms in
18 the United States?
19 MS. RELKIN:  Objection to
20 form.  Asked and answered.
21 THE WITNESS:  Yeah, again, I
22 would point -- my -- my answer to
23 that is that the epidemiological
24 evidence indicates that there were

1        rogue prescribers and pill mills.

2        But that the entirety of the

3        distribution, an increase in

4        opioid supply, places those rogue

5        prescribers at a minority of the

6        distribution.

7  BY MR. HERMAN:

8        Q.   Okay.  And that's helpful, I

9  think.  You're drawing a distinction

10  between rogue prescribers and prescribers

11  engaged in medical practice?

12        MS. RELKIN:  Objection to

13        form.

14        THE WITNESS:  So there's

15        been a number of different

16        definitions, I guess, of these

17        sort of like rogue prescribers and

18        pill mills in the -- in the

19        available literature.  And so I

20        think, as they have been

21        described, you know, prescribers

22        that are engaging in illegal trade

23        for opioids would be a separate

24        category than general medical,

Highly Confidential - Subject to Further Confidentiality Review

1    general medical practice.

2    BY MR. HERMAN:

3        Q.    Okay.  And -- and I think to

4    help me going forward.  That's what I'm

5    trying to get at, sort of the distinction

6    between people who were pill -- rogue

7    prescribers engaged in prescribing for

8    illegitimate means, that's -- that's the

9    rogue prescribers you're talking about in

10   this paragraph, correct?

11       A.    No.  I mean, again I -- I

12   wouldn't say that all prescriptions for

13   illegitimate means are from rogue

14   prescribers.  I guess that's where I

15   disagree with that characterization.  But

16   I do believe there are rogue prescribers.

17   I mean, I think there's evidence to

18   indicate that there are rogue

19   prescribers.

20       Q.    Okay.  But in this paragraph

21   and in your report, you're saying that

22   rogue prescribers did not contribute in a

23   significant way to expansion of opioid

24   prescribing and opioid-related harms in

1    the United States?

2        A.    What I'm saying in the

3    report is that if you look at the overall

4    increase in the opioid supply and

5    distribution across all specialties of

6    medical practice, there are certainly

7    specialties that have a more concentrated

8    set of prescription practices.  Then

9    there are also pill mills, rogue

10   prescribers.

11           But if you look at the

12   overall increase in the prescription

13   opioid distribution, it cannot be

14   accounted for by a small number of --

15   relatively small number of rogue

16   prescribers in comparison to the overall

17   increase.

18       Q.    What it's accounted for

19   is -- what -- what accounts for it --

20   I -- I think I understand what you're

21   saying.

22           The overall prescribing,

23   increase in supply is accounted for by

24   prescribers engaged in the practice of

Highly Confidential - Subject to Further Confidentiality Review

1    medicine, like general practitioners,

2    correct?

3              MS. RELKIN:  Objection to

4         form.

5              THE WITNESS:  That's not

6         exactly what I said.  I -- I think

7         what I've stated in the opinion is

8         that the overall supply and

9         distribution and -- of opioids

10        increased -- the -- the amount of

11        the increase crossed a wide

12        variety of medical specialties.

13        And so, rogue prescribers and pill

14        mills that are explicitly

15        characterized as such account for

16        a small proportion of the

17        increase.  That's my opinion.

18   BY MR. HERMAN:

19        Q.   Okay.  And the increase in

20   medical supply of prescription opioids is

21   what spawned what you've described as the

22   opioid epidemic?

23        A.    I'm sorry, can you restate

24   the question?

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Just going back.  It might

2    be helpful to go back to Bullet 3.

3    A.    Okay.

4    Q.    What you're saying is the

5    increase in medical supply of

6    prescription opioids is what spawned what

7    you've described as the opioid epidemic?

8    A.    I said that the expansion of

9    nonmedical use would not have occurred

10   without that increase in the opioid

11   supply dispensed for medical use.

12   Q.    Okay.  And so if I'm

13   understanding you correctly, it's your

14   opinion that prescriptions written for

15   medical use were the significant cause of

16   the increase in opioid supply and in

17   turn -- and in turn, the opioid epidemic?

18   A.    I'm sorry, I'm just going to

19   read this again.

20          MS. RELKIN:  Objection to

21      form.

22          THE WITNESS:  I'm going to

23      read it back to make sure I

24      understand the question.

1      "It is your opinion that

2      prescriptions written for medical

3      use were the significant cause of

4      the increase in opioid supply and

5      in turn the opioid epidemic."

6           Again, I think what I've --

7      what I've documented in the report

8      is that doctors and other medical

9      professionals were dispensing

10     opioids, were misinformed about

11     the risks and benefits of those

12     medications.  So to say that

13     prescriptions written for medical

14     use were the significant cause of

15     the increase in the opioid supply

16     I think is too simplistic for what

17     generated the opioid epidemic.

18  BY MR. HERMAN:

19     Q.   And -- but what I -- when

20  you say these doctors were misinformed --

21  strike that.

22          The doctors who were

23  dispensing the prescription opioids

24  believed they were giving them to their

Highly Confidential - Subject to Further Confidentiality Review

1   patients for legitimate medical needs,

2   correct?

3                  MS. RELKIN:  Objection to

4          form.  Overbroad.

5                  THE WITNESS:  I can't speak

6          to every doctor who wrote a

7          prescription for an opioid.  And

8          what they believed and what they

9          didn't.

10  BY MR. HERMAN:

11      Q.    They believed that they were

12  writing the prescription for medical

13  uses?

14                 MS. RELKIN:  Objection.

15                 THE WITNESS:  Again, I -- I

16         can't speak for every doctor.

17  BY MR. HERMAN:

18      Q.    In Bullet 3 though, aren't

19  you saying that prescription opioids that

20  were originally dispensed for medical

21  uses, so --

22      A.    What I say in Bullet 3 is

23  that the expansion of nonmedical

24  prescription opioid use would not have

Highly Confidential - Subject to Further Confidentiality Review

1    occurred without the widespread

2    availability of prescription opioids that

3    were originally dispensed for medical

4    uses.

5           Q.    And when you say dispensed,

6    you mean prescribed by doctors, correct?

7           A.    So I say -- I think what I

8    say here is just dispensed for medical

9    uses, whoever the prescriber is.

10          Q.    When you -- when you use the

11   word dispensed, what do you mean?

12          A.    I mean when they are

13   prescribed for medical use.

14          Q.    If you could go to Page 17.

15   I just want to ask you a couple more

16   questions about Page 18.

17          A.    18 or 17?

18          Q.    18.

19          A.    18.

20          Q.    Professor Keyes, do you

21   believe that doctor shopping -- let me

22   rephrase that question.

23                Professor Keyes, is it your

24   opinion that doctor shopping was not a

Highly Confidential - Subject to Further Confidentiality Review

1    significant cause of what you have

2    described as the opioid crisis?

3                    MS. RELKIN:  Objection to

4            form.

5                    THE WITNESS:  I feel like

6            we've addressed this.  I think

7            Citation Number 48, we can go

8            through the data that's used in

9            that study.  But that study in

10           particular concluded that doctor

11           shopping is associated with the

12           overall prevalence of opioid

13           prescribing, but that overall it

14           remained rare across states.

15                   So there is an overall

16           increase across all these

17           different sectors, and that

18           overall increase -- and there's a

19           minority of that overall increase

20           that's due to doctor shopping.

21    BY MR. HERMAN:

22           Q.    Okay.  And is the same true

23    that there's a minority of the increase

24    in the overall opioid supply that is due

1    to rogue prescribers?

2            A.    I'm sorry.  I'm going to

3    have to read that again.

4                 MS. RELKIN:  Object to form.

5                 THE WITNESS:  And is the

6            same true that minority of the

7            increase of the overall opioid

8            supply that is due to rogue

9            prescribers?

10           So again, I would point to

11           References 48 and 49 which I think

12           speak to that topic that have

13           concluded that you know --

14           Reference 49, for example, that

15           prescribing of opioids increased

16           across many specialties in

17           medicine.

18           So you know, a small number

19           of high-volume prescribing

20           facilities did not cause the

21           opioid epidemic.  It was broader

22           in scope.

23   BY MR. HERMAN:

24           Q.    Okay.  And on Page 17,

Highly Confidential - Subject to Further Confidentiality Review

1    second paragraph you wrote, "Data on the

2    diversion of opioids are drawn from a

3    variety of sources.  All data sources

4    have found that prescription opioid

5    diversion is common, especially unused

6    prescriptions that were over prescribed

7    to family and friends of nonmedical

8    users."  Correct?

9         A.    That is what is written.

10        Q.    And is that what you're

11   discussing in the third bullet point of

12   your opinions when you say that medical

13   prescriptions in greater doses and

14   quantities than necessary created a

15   surplus prescription opioid -- surplus of

16   prescription opioids that could be

17   diverted for nonmedical uses?

18        A.    I'm discussing the whole

19   section.  The entire section that begins

20   on Page 16 with B.3.

21             So it's -- that's a number

22   of different studies that are cited in

23   the overall section, and that's one

24   sentence.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Do the studies that you cite

2    consistently show that the largest

3    percentage of nonmedical users obtain

4    their prescription opioids from family

5    and friends?

6                    MS. RELKIN:  Objection to

7               form.

8                    THE WITNESS:  So there's a

9               number of different studies that

10              have examined sources of

11              prescription opioids among

12              nonmedical users.

13                   And I would point -- so

14              there's a number of different

15              references that I cite in here.

16                   In that paragraph, I'm

17              mostly talking about the

18              prescriptions that are obtained

19              from friends or family, which

20              again is driven by the oversupply.

21                   In the next paragraph, I

22              also talk about the number of

23              nonmedical users who -- the

24              studies that demonstrate the high

1    proportion of nonmedical users

2    that do obtain their opioids from

3    legitimate prescribers.

4        So there's -- there's

5    multiple sources of nonmedical

6    prescription opioids.  Some is

7    from family and friends due to

8    oversupply.  Some are from medical

9    prescriptions that may have begun

10   with a medical condition and

11   continued on to nonmedical use.

12   There's a number of different ways

13   that people begin their nonmedical

14   opioid using -- use.

15 BY MR. HERMAN:

16       Q.    Professor Keyes, do you

17 agree, though, that the studies that you

18 cite consistently show that the largest

19 percentage of nonmedical users obtain

20 their prescription opioids from family

21 and friends?

22       MS. RELKIN:  Objection to

23   form.

24       THE WITNESS:  No.  I don't.

Highly Confidential - Subject to Further Confidentiality Review

1    That's not what is cited in this

2    opinion.

3         For example, if you look at

4    Shei 2015, among individuals of

5    opioid abuse or dependence, 79.9

6    had at least one claim for a

7    prescription opioid prior to their

8    diagnosis.  So there's a number of

9    different studies with a number of

10   different study designs and a

11   number of different populations.

12        And in that you'll find

13   heterogenous plethora of estimates

14   of the sources of nonmedical

15   prescription opioids.

16   BY MR. HERMAN:

17        Q.    And so let me --

18        A.    Cicero and colleagues 2011

19   is another example.  They found that

20   50 percent of almost 2,000 individuals in

21   treatment for opioid dependence reported

22   that doctors were among the various

23   methods for obtaining opioids.

24        Q.    Okay.  Let's look at what

```
1    I'm going to mark as Exhibit 3.
2                (Document marked for
3           identification as Exhibit
4           Keyes-3.)
5                MS. RELKIN:  Take as much
6           time as you need to review it.
7    BY MR. HERMAN:
8           Q.    And Professor Keyes, this is
9    one of the sources that you cite in
10   Section B.3 of your report, correct?
11          A.    I'm just going to find
12   the -- do you know what number citation
13   it is in my report?
14          Q.    I believe it is 41.
15          A.    I would just like to find
16   the section where it is cited.  So this
17   is 41, "Data from the National Household
18   Survey on Drug Use and Health from
19   2013-2014 indicate that among nonmedical
20   opioid users interview, 50.5 percent
21   report from a friend or relative."
22          Q.    And so, Professor Keyes,
23   before you read me your whole report --
24          A.    That's all right.
```

1    Q.    -- I'm going to ask you some

2  questions about the exhibit.

3          If I could ask you to turn

4  to Page 2, please.

5          Okay.  And Figure 1 shows

6  sources of prescription pain relievers

7  for the most recent nonmedical use among

8  past year users age 12 and older,

9  correct?

10    A.    I'm going to need a moment

11  to review the -- I mean, I have 200

12  citations in my -- I just need a minute

13  to read what I'm talking about.  Okay.

14    Q.    Okay.  And as you just read

15  from your report, this figure shows that

16  50 percent -- 50.5 percent obtained from

17  a friend or relative for free?

18    A.    So what --

19          MS. RELKIN:  Objection.

20          THE WITNESS:  -- is

21      documented in Figure 1, just so

22      we're clear about what these data

23      show, is among those who misuse

24      prescription pain relievers, as

Highly Confidential - Subject to Further Confidentiality Review

1    they refer to it in the study,

2    they were identified where the

3    prescription pain relievers they

4    had most recently misused.  That

5    is not their total -- sum total of

6    misuse.  But what this article is

7    specifically talking about is

8    where they most recently misused.

9    And yes, the 50.5 percent most

10   recently misused from a friend or

11   relative for free.

12  BY MR. HERMAN:

13       Q.    And another 11 percent

14  bought from a friend or relative?

15       A.    So in terms of documenting

16  the modal sources of most recent

17  nonmedical use, 50.5 were from a relative

18  for free, 22.1 percent were from one

19  doctor, and then the next lowest

20  percentage is bought from a friend or

21  relative, 11 percent.

22       Q.    And then after that is took

23  from a friend or relative without asking,

24  and that was 4.4 percent?

1        A.    That's correct.

2        Q.    And then bought from drug

3   dealer or other stranger, 4.8 percent?

4        A.    Mm-hmm.

5        Q.    Okay.  And then from more

6   than one doctor, that's 3.1 percent?

7        A.    That's what's listed here.

8        Q.    Okay.  And so at least based

9   on this information in this study, it's

10  consistent with what I said before that

11  not the majority of people obtain at

12  least their most recent prescription

13  opioid that they use for nonmedical

14  reason from a family member or friend?

15            MS. RELKIN:  Objection to

16        form.

17            THE WITNESS:  What this

18        study assessed is among

19        nonmedical -- nonmedical

20        prescription pain -- pain reliever

21        users, the source that they most

22        recently misused.  It does not

23        describe the totality of all of

24        the sources that they ever

Highly Confidential - Subject to Further Confidentiality Review

1          received a nonmedical prescription

2          opioid from, and with that caveat,

3          from 2013 to 2014, what Figure 1

4          shows is that among nonmedical

5          prescription opioid users in this

6          sample, the most recent

7          prescription opioid misuse was

8          50.5 percent from a friend or

9          relative for free.

10   BY MR. HERMAN:

11          Q.    And on Page 17 of your

12   report you write, "Given that close to

13   98 million Americans received

14   prescription pain relievers each year,

15   much larger number than the estimated

16   12.5 million who use opioids

17   nonmedically, the contribution of

18   diversion through sources such as friends

19   and family for nonmedical use as a small

20   portion of the overall expansion of the

21   opioid supply and result in

22   opioid-related harm."

23              In the first part of that

24   sentence, you're saying that a lot more

1  people are prescribed opioids and use

2  them medically than the number of people

3  who use prescriptions nonmedically,

4  correct?

5       A.    I say 98 percent --

6  98 million Americans receive prescription

7  pain relievers and that's a larger number

8  than the 12.5 million who use

9  nonmedically, correct.

10      Q.    Okay.  And in the second

11 part of the sentence is your point that

12 diversion involves a much smaller portion

13 of the prescription opioid supply than

14 medical use of prescription opioids?

15      A.    I'm sorry, I have to read

16 that again.

17            In the second part of the

18 sentence your point, diversion involves a

19 smaller proportion of the opioid supply

20 than medical use of prescription opioids.

21            MS. RELKIN:  Objection.

22            THE WITNESS:  No, that's not

23      what the sentence says.  It says

24            that the contribution of diversion

Highly Confidential - Subject to Further Confidentiality Review

1       through sources such as family and

2       friends for nonmedical use is a

3       small proportion of the overall

4       expansion in the supply.

5  BY MR. HERMAN:

6       Q.    Okay.  Okay.  Can we turn to

7  Page 16.  And at the -- in the last

8  sentence on Page 16 that goes onto

9  Page 17, what do you mean when you say

10  prescription opioids are diverted from

11  medical facilities?

12       A.    Okay.  Hold on one second.

13  So this is Section B.3, "Opioids were

14  diverted and used by individuals with

15  opioid use disorder for nonmedical use."

16       So then, I have -- I

17  reviewed evidence for opioid use disorder

18  after medical use, "however an additional

19  consequence of the increased supply was

20  opioid diversion.  That is, the evidence

21  shows that prescription opioids are

22  diverted from the supply chain from

23  medical facilities and pharmacies for

24  sale to the black market for distribution

Highly Confidential - Subject to Further Confidentiality Review

1    and sale for nonmedical uses."

2                So -- I'm sorry, I just

3    needed to orient myself to what it says.

4         Q.      Take your time.

5         A.      So then the question is what

6    did I mean by medical facilities?

7         Q.      What do you mean when you

8    say that prescription opioids are

9    diverted from medical facilities?

10        A.      I was speaking there broadly

11   to the definition of diversion that I

12   gave on Page 5.  I'm sorry.  Diversion is

13   defined on page 6.

14                "Diversion of opioids has

15   been defined in various ways."

16                I use a broader definition

17   of diversion which is consistent with

18   numerous other scholars.  Opioids that

19   are diverted from the intended recipient

20   is what I use as the definition of

21   diversion.  So diversion from the supply

22   chain from medical facilities would be

23   any use of opioids that was not among

24   their intended recipient.

1     Q.   Are you aware of diversion

2   from any specific pharmacy in Cuyahoga

3   County?

4              MS. RELKIN:  Objection.

5        Form.

6              THE WITNESS:  I was asked to

7         do an epidemiological review of

8         the evidence that I was -- that I

9         cite in the report.

10  BY MR. HERMAN:

11       Q.   So is the answer no, you're

12  not aware of any diversion from any

13  specific pharmacy in Cuyahoga County?

14             MS. RELKIN:  Objection.

15             THE WITNESS:  My report is

16        on the epidemiological evidence

17        for the opioid epidemic.

18  BY MR. HERMAN:

19       Q.   Are you aware of diversion

20  from any specific pharmacy in Summit

21  County?

22             MS. RELKIN:  Same objection.

23             THE WITNESS:  So I have data

24        on the Cuyahoga and Summit County

1    in terms of population totals.

2    But in -- in epidemiological scope

3    of the opioid epidemic is a

4    population level aggregate data

5    summary of what occurred in the

6    United States, and to the degree

7    that I have data that I can speak

8    to the counties in terms of

9    overdose risk, in terms of needs

10   assessments, I have included those

11   data in this report.

12   BY MR. HERMAN:

13   Q.    So you are not aware of

14   diversion from any specific pharmacy in

15   Summit County?

16   MS. RELKIN:  Objection to

17   form.  And asked and answered.

18   THE WITNESS:  I'm an

19   epidemiologist, and what is

20   included in this report is the

21   epidemiology of opioid use

22   disorder and the broad range of

23   topics that I was asked to cover

24   in this report.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. HERMAN:

2         Q.    Okay.  Professor Keyes, I'd

3    ask that you answer the questions that

4    I'm actually asking.  So I'm going to ask

5    it one more time.

6              So are you aware of

7    diversion from any specific pharmacy in

8    Summit County?

9         A.    Again, I would point to what

10   I was asked to cover in my report, which

11   is aggregate level data on the opioid

12   epidemic.

13        Q.    What's your understanding of

14   the supply chain for prescription

15   opioids?

16        A.    Can you be more specific in

17   terms --

18        Q.    Well, you wrote, "The

19   evidence shows that prescription opioids

20   are diverted from the supply chain."  So

21   I'm asking you what is your understanding

22   of the supply chain as you used it in

23   that sentence.

24        A.    So the way I use supply

Highly Confidential - Subject to Further Confidentiality Review

1    chain in that sentence was any point

2    along the -- the route that an opioid

3    would take to a user.  The -- the

4    specific ins and outs of the supply chain

5    are not part of the epidemiological body

6    of evidence that I reviewed.

7          Q.    What's your evidence that

8    shows that prescription opioids are

9    diverted from the supply chain for sale

10   to the black market?

11              MS. RELKIN:  Objection to

12         form.

13              THE WITNESS:  So I would

14         point to -- I mean we can use the

15         exhibit that you provided to me or

16         we can use the other studies that

17         I cited in the report, that form

18         the basis of that opinion which

19         are about where users obtain their

20         opioids.  And many of them are

21         obtained from -- not many, but a

22         portion are obtained from the

23         black market.  And the ways in

24         which opioids get to the black

Highly Confidential - Subject to Further Confidentiality Review

1    market have been documented in

2    those references as well.

3 BY MR. HERMAN:

4    Q.    Are any of the categories

5 listed on Figure 1 in Exhibit 3, part of

6 the supply chain?

7    A.    I would say all of them are

8 part of the supply chain.

9    Q.    Friends and family are part

10 of the supply chain?

11    A.    The friends and family were

12 supplied with opioids.

13    Q.    Are they -- so you're --

14 you're defining the supply chain to

15 include the person that actually receives

16 the prescription?

17    A.    I think my use of that

18 statement in that sentence referred to an

19 overall understanding of the way in which

20 opioids are routed to users.

21    Q.    So are you saying that the

22 diversion occurs within the supply chain

23 or after the prescription opioids leave

24 the supply chain?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. RELKIN:  Objection to

2     form.

3          THE WITNESS:  I think what

4     I've cited in this section is what

5     the epidemiology of diversion,

6     which I have defined on again

7     Page 4, I think Page 4, as use

8     other than the intended recipient,

9     right?

10          So based on that definition,

11     I have reviewed in this section

12     the epidemiological studies that

13     document how diversion occurs.

14     And that's based on a number of

15     different sources.

16          And the way in which

17     individuals receive opioids to use

18     nonmedically come from a

19     heterogenous group of sources, as

20     is written on Page 17.

21   BY MR. HERMAN:

22          Q.    How do you define

23   oversupply?

24          A.    I just want to refer to my

1  definitions to see if there is a

2  definition of oversupply.  I don't

3  believe that there is in the definitions

4  section.

5              When I refer to oversupply

6  based on how it is used in the scientific

7  literature -- and I just want to pause to

8  make sure I get the scientific literature

9  correct on this -- or my understanding of

10  the scientific literature.

11              Typically, oversupply is

12  used in epidemiological studies to refer

13  to more supply than is necessary.

14        Q.    Can you quantify oversupply?

15              MS. RELKIN:  Objection.

16              THE WITNESS:  Quantify it in

17        terms of?

18  BY MR. HERMAN:

19        Q.    Let me ask it this way.

20  Would it be 90 percent less prescription

21  opioids?

22              MS. RELKIN:  Objection to

23        form.

24              THE WITNESS:  So when we

1    evaluate the epidemiological

2    literature, what we are evaluating

3    is the multitude of factors, as

4    we've discussed, that contribute

5    to the increase in a particular

6    health outcome.  So attributing

7    percentages to one factor versus

8    another negates the way in which

9    the factors interact with each

10    other:  So that's not what the

11    epidemiological literature that

12    I've assessed would allow in terms

13    of a percentage.

14  BY MR. HERMAN:

15    Q.    So you can't say how much

16  the oversupply --

17         MS. RELKIN:  Objection.

18         THE WITNESS:  That's not

19    what I said.  What I said is that

20    that's not what the

21    epidemiological literature -- what

22    the epidemiological literature

23    indicates is that there was an

24    interaction of factors across

1       multiple different levels that all

2       contributed to more opioids

3       available than were medically

4       necessary.  And I think there's

5       ample epidemiological evidence to

6       support that statement.  Because

7       of the interaction among all the

8       different actors that form that

9       system, attributing a specific

10      percentage is not what the

11      epidemiological literature is

12      designed to produce.

13  BY MR. HERMAN:

14      Q.   What are the actors that

15  form the system that -- are you referring

16  to?

17      A.   Can you be more specific?

18      Q.   Well, you said interaction

19  among all the actors that form the

20  system.  What are the actors that form

21  the system?

22      A.   So I think I have kind of --

23  that's what the entire report is about,

24  you know.  It --

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Can you name the actors that

2  form the system?

3    A.    I think -- they are

4  mentioned throughout the report.  I mean

5  there's not a -- it's a --

6    Q.    Well, I'm just asking you

7  sitting here today, can you tell me the

8  actors that form the system?

9          MS. RELKIN:  Objection to

10         form.

11         THE WITNESS:  That's what

12         the entire -- the entire report

13         lists all of the -- not even all

14         of -- a large component of the

15         individuals who contributed, or

16         the individuals, the institutions,

17         and the other factors that

18         contributed to the epidemic.  So I

19         think it's that's what -- that's

20         what the report is about, is --

21  BY MR. HERMAN:

22         Q.    Can you just tell me who the

23  actors are that you're speaking about?

24         A.    Do you want to go page by

1    page?  I mean, we can --

2         Q.    I'd prefer if you could -- I

3    mean, you spent all this time --

4         A.    It's not a two-minute

5    answer.  It's like a 30-minute answer.

6    But we can --

7         Q.    Well, I'm just asking for a

8    name, a list of the people, the actors.

9         A.    Right.  Again --

10         MS. RELKIN:  Form.

11         THE WITNESS:  -- we can go

12    page by page.  It's a --

13    BY MR. HERMAN:

14         Q.    I'm not asking -- but

15    sitting here today, from memory, you

16    can't tell me who the actors --

17         A.    I could.  It's just --

18         MS. RELKIN:  Objection.

19    Argumentive.

20         THE WITNESS:  Right.  It's

21    a --

22    BY MR. HERMAN:

23         Q.    Okay.  I'm going to direct

24    you to Page 18 above B.4.

Highly Confidential - Subject to Further Confidentiality Review

1          Before we get to that, are

2   you aware that the DEA sets quotas for

3   the production of prescription opioids?

4          MS. RELKIN:  Objection to

5       form.

6          THE WITNESS:  I am familiar

7       with the way that that system has

8       evolved over time in terms of the

9       DEA's involvement.  But my

10      particular area of expertise is

11      not in DEA enforcement.

12  BY MR. HERMAN:

13      Q.    Okay.  So are you aware that

14  DEA sets quotas for the production of

15  prescription opioids?

16          MS. RELKIN:  Objection to

17      form.

18          THE WITNESS:  I'm generally

19      aware of the DEA's involvement.

20      But I don't have any particular

21      expertise on DEA's regulations and

22      enforcement.

23  BY MR. HERMAN:

24      Q.    Are you aware each

```
 1    manufacturer is provided a specific
 2    quota?
 3              MS. RELKIN:  Objection to
 4         form.
 5              THE WITNESS:  Can you say
 6         that again.
 7    BY MR. HERMAN:
 8         Q.    Are you aware each
 9    manufacturer is provided a specific
10    quota?
11              MS. RELKIN:  Same objection.
12              THE WITNESS:  Again, I'm
13         generally familiar with the --
14         that the DEA has some regulations
15         and enforcement, but I was not
16         asked to review specific
17         manufacturers' quotas and
18         whether -- the validity of them.
19         So I'm generally aware that there
20         are DEA regulations and
21         enforcement that involve
22         manufacturers, and I -- I have not
23         been asked to review the specifics
24         of each manufacturer.
```

1    BY MR. HERMAN:

2         Q.    Okay.  And going to Page 18,

3    what do you mean when you say that

4    diversion is especially problematic and

5    well documented among end users?

6         A.    Can you point me to that?

7         Q.    It's the last paragraph

8    right above the start of Section B.4?

9         A.    "So in summary, diversion of

10   opioids has been fueled by their

11   oversupply, occurs all along the supply

12   chain, and is especially problematic and

13   well documented among end users, that is,

14   among individuals with nonmedical use or

15   opioid use disorder who report that

16   friends and family members serve as

17   sources of their opioids."

18              So I think what I have in

19   that section relatively well documents

20   that there's a substantial portion of

21   nonmedical opioid use that occurs due to

22   family and friends trading supply due to

23   their oversupply.

24         Q.    The medical oversupply that

1    we talked about earlier?

2         A.    Given that there are more

3    prescription opioids available than are

4    needed, it facilitates a diversion market

5    in which friends and family trade

6    prescription opioids.

7         Q.    And I just want to make sure

8    we're on the same page.  When you say

9    more than are needed, we're referring to

10   the more than are needed for the medical

11   use that they were originally prescribed

12   for?

13        A.    I'm not speaking to each

14   individual prescription.  I'm saying

15   overall, what the epidemiology shows is

16   that there was an exponential increase in

17   the supply of opioids that created an

18   oversupply than what is medically needed

19   at a population level.

20        Q.    Okay.  And --

21        A.    And at a population level

22   you can also document that individuals

23   receive prescription opioids from family

24   and friends across all of these sources.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And as you opined in

2    the third bullet that we looked at, the

3    oversupply was created by prescribing for

4    medical uses.

5    A.    So let's just go back to the

6    third bullet.  What I said in here is

7    that the expansion would not have

8    occurred without the widespread

9    availability of prescription opioids

10   originally dispensed for medical uses.

11            MR. HERMAN:  I'm at a place

12        where I could take a break.  I'm

13        not quite sure.

14            Why don't we take a break?

15        I think we've been another --

16            MS. DO AMARAL:  I don't

17        think we've even gone an hour.

18            MR. HERMAN:  Oh, well, my

19        mistake then.

20            THE VIDEOGRAPHER:  So I'm --

21        I'm taking just the overall count.

22            The time is 11:31 a.m.  Off

23        the record.

24            (Short break.)

1          THE VIDEOGRAPHER:  We are

2          back on the record.  The time is

3          11:47 a.m.

4    BY MR. HERMAN:

5          Q.    Professor Keyes, your

6    opinion is that there's a correlation

7    between rates of prescription opioid

8    supply for medical use and increase in

9    overdose deaths, right?

10         A.    Let me see, is that one of

11   the 11 bullet points?  Or no?  I don't

12   think that's one of the 11 bullet points.

13   I just want to make sure I'm finding it

14   in the report accurately.

15         Q.    Well, right now I'm just

16   asking you --

17         A.    So I think the

18   epidemiological evidence relates to --

19   you said -- I think there's one part of

20   what you -- let me just read it back, I'm

21   sorry.

22              There's a correlation

23   between rates of prescription opioid

24   supply for medical use.

Highly Confidential - Subject to Further Confidentiality Review

1    And that's what I don't
2    think the literature differentiates, they
3    look at just the overall distribution of
4    opioids.
5        Q.    Well, I direct your
6    attention to the fourth bullet on Page 3.
7    Doesn't it discuss a correlation between
8    overdoses, and I'm quoting here, "with
9    the rates of prescription opioids supply
10   for medical use"?
11       A.    I'm sorry, this is the
12   fourth bullet?  Oh, prescription opioid
13   overdose increased exponentially.  Use
14   increase strongly correlate with rates of
15   prescription opioid supply for medical
16   use.
17            Yes, that is what the report
18   says.  I think I will qualify that and
19   say that I -- I think the studies that I
20   cite in that section relate to the
21   prescription opioid supply.
22       Q.    Okay.
23       A.    So I would just qualify that
24   a little bit.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Did -- did you write this as

2  your opinion in your report --

3    A.    I wrote it, but -- but now

4  talking it through I think I would --

5  based on the available literature, I

6  would say the supply.

7    Q.    Okay.  And is the support

8  for this opinion found in Section B.5 of

9  your report?

10    A.    B.5.

11        MS. RELKIN:  What page is

12    it?

13        MR. HERMAN:  Page 20.

14        THE WITNESS:  It's Page 21

15    is where the paragraph starts the

16    empirical literature demonstrates

17    an association between the opioid

18    supply and the increase in

19    prescription opioid deaths.

20  BY MR. HERMAN:

21    Q.    Okay.  And so is your -- the

22  support for your opinion about the

23  correlation between the rate of

24  prescription opioid supply and overdose

Highly Confidential - Subject to Further Confidentiality Review

1    deaths found in Section B.5 of your

2    report?

3            A.    Yes.

4            Q.    Okay.  Are you relying on

5    any materials not cited in Section B.5 of

6    your report?

7            A.    The materials that I cited

8    form the opinion -- form the basis of my

9    opinion.

10           Q.    Professor Keyes, did you

11   examine whether there's a correlation

12   between the supply of prescription

13   opioids for medical use in Cuyahoga

14   County and overdose deaths in Cuyahoga

15   County?

16                 MS. RELKIN:  Objection to

17           form.

18                 THE WITNESS:  So the data

19           that are drawn on for specifically

20           Paulozzi and Ryan focus on state

21           level data.  And so it looks at

22           the correlation between opioid

23           prescribing across states.  And

24           opioid dispensing in each state

1    with drug poisoning deaths per

2    100,000.

3         So because these are looking

4    at larger geographic areas,

5    there's no variation within

6    county, right.  So within any

7    particular -- you have to look

8    across states and counties in

9    order to observe enough variation

10   to conduct a statistical analysis.

11        So within any particular

12   county, you don't have the

13   geographic variation in

14   prescribing in order to answer the

15   research question.

16   BY MR. HERMAN:

17        Q.   Well, I -- I don't think I

18   was asking about variation in

19   prescribing.  I was asking, did you

20   examine whether there was a correlation

21   between the supply of prescription

22   opioids for medical use in Cuyahoga

23   County and overdose deaths in Cuyahoga

24   County?

1              MS. RELKIN:  Objection to

2        form.

3              THE WITNESS:  Right.  And so

4        I guess what I'm saying is the way

5        this research question has been

6        approached in the studies that I

7        am looking at here, they rely --

8        you have to have that

9        geographic -- so I guess my

10       question would be within the

11       county where would you find

12       variation in order to assess the

13       correlation?

14  BY MR. HERMAN:

15       Q.   Well, so you didn't look at

16  any county-specific data in your analysis

17  about whether the prescription opioid

18  supply corresponds with overdoses?

19              MS. RELKIN:  Objection to

20       form.

21              THE WITNESS:  The -- what I

22       would say is that the research

23       question itself necessitates an

24       examination across geographic

1    levels.

2  BY MR. HERMAN:

3        Q.    And your answer would be the

4  same for data for Summit County?

5        A.    Yes.

6        Q.    On Page 23 and in Figures 3,

7  4 and 5, so Page 23 to 24, you compare

8  overdose rates in Summit County and

9  Cuyahoga County against national

10  averages, right?

11        A.    Yes.

12        Q.    Did you consider making a

13  comparison against areas with similar

14  demographics?

15              MS. RELKIN:  Objection to

16        form.

17              THE WITNESS:  You know, what

18        we wanted to -- what I wanted to

19        convey in these figures is how

20        much higher the overdose -- or how

21        different the overdose death rates

22        are in these two counties compared

23        to the nation.  The type of

24        analysis that you're talking about

1     would probably be for a causal --

2     a causal risk factor analysis.

3     And this just descriptively

4     demonstrates the differences in

5     overdose.

6  BY MR. HERMAN:

7     Q.    Okay.  And you didn't do a

8  causal risk factor analysis?

9     A.    So what Figures 3, 4, and 5

10 are is a description --

11         MS. RELKIN:  Form.

12         THE WITNESS:  -- of overdose

13    death rates across time.  That's

14    all -- it's just -- it's the

15    descriptive epidemiology which is

16    a typical surveillance activity

17    that is produced by CDC and

18    multiple other organizations.

19    This is standard for describing a

20    public health problem.

21 BY MR. HERMAN:

22    Q.    Did you consider comparing

23 the overdose rate in Summit County

24 against areas of the country with similar

1    supplies of prescription opioids?

2              MS. RELKIN:  Objection to

3         form.

4              THE WITNESS:  Were -- were

5         the research question to

6         necessitate that type of analysis,

7         that would -- would have been the

8         analysis that I did.  However, the

9         research question that I was

10        asking in Figures 3, 4, and 5 was,

11        what is the overdose death rate in

12        these counties and how does it

13        compare to the national average.

14   BY MR. HERMAN:

15        Q.   So you didn't consider

16   comparing the counties to areas of the

17   country with similar supplies of

18   prescription opioids?

19             MS. RELKIN:  Objection.

20             THE WITNESS:  So the

21        research questions that I was

22        asking in Figures 3, 4, and 5 is,

23        what is the drug overdose death

24        rate in these counties and how

Highly Confidential - Subject to Further Confidentiality Review

1      does it compare to national

2      averages.

3            So consideration of other

4      types of analyses would not have

5      addressed the research question

6      that I asked.

7  BY MR. HERMAN:

8      Q.    How did you come up with

9  that research question?

10           MS. RELKIN:  Objection to

11      form.

12           THE WITNESS:  I was -- how

13      did I come up -- I wanted to

14      document what the surveillance

15      trend showed for the two counties

16      that are under consideration.

17  BY MR. HERMAN:

18      Q.    But you decided the best

19  comparison was against the national

20  average?

21           MS. RELKIN:  Objection to

22      form.

23           THE WITNESS:  So this is a

24      descriptive analysis of what the

Highly Confidential - Subject to Further Confidentiality Review

1          overdose death rates are in the

2          two counties under consideration,

3          and the national average.

4              If it was a different type

5          of research question, perhaps

6          other comparison groups could also

7          be brought in.  But this was a

8          descriptive analysis just to

9          document the overall trends over

10         time.

11  BY MR. HERMAN:

12         Q.   On Page 20 of your report

13  around the middle of the first paragraph

14  in Section B.5, you wrote, "Heroin and

15  synthetic opioids began an exponential

16  increase after 2010, and overdose rates

17  due to heroin and synthetic opioids

18  continue to climb."  Correct?

19         A.   That is what is written.

20         Q.   Okay.  And that's what the

21  data that you looked at shows?

22         A.   So there are a number of

23  different -- that's not what it shows on

24  those figures.  But there are other

Highly Confidential - Subject to Further Confidentiality Review

1   references with regard to specific causes

2   of death.

3           So I just -- are we moving

4   away from the figures?

5       Q.    Well, I'm just asking you

6   about the sentence, that the data

7   supported the sentence that you wrote?

8       A.    I'm sorry.  So is the

9   question what data support this

10  statement?

11      Q.    I'm asking you, you believe

12  your statement that "heroin and synthetic

13  opioids began an exponential increase

14  after 2010, and overdose rates due to

15  heroin and synthetic opioids continued to

16  climb" is supported by data that you

17  reviewed?

18      A.    Yes.

19      Q.    And I'm going to ask you to

20  flip to Page 23.  To put together Figures

21  3, 4, and 5, you looked at data from the

22  national vital statistics surveillance

23  system to look at death rates from 2000

24  through 2017?

Highly Confidential - Subject to Further Confidentiality Review

1     A.     Yes.

2     Q.     Okay.  And you looked at

3  drug rates for all drug-related deaths

4  from 2000 through 2017?

5     A.     So it depends on the figure,

6  what outcome that is --

7     Q.     Let's start with Figure 3.

8     A.     Figure 3 is all drugs.

9     Q.     Okay.  Death rates for all

10  drug-related deaths?

11     A.     Yep.

12     Q.     And Figure 4 is death rates

13  for all opioid deaths from 2000 through

14  2017?

15     A.     Yes.

16     Q.     And Figure 5, which is on

17  Page 25 is overdose death rates for

18  pharmaceutical opioids from --

19     A.     So, yeah, that's for deaths

20  that had a T code designation of a

21  pharmaceutical opioid.

22     Q.     And under each figure you

23  list the ICD codes that you used to pull

24  data for that figure?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    So for example, for all drug

3    chart, Figure 5, the ICD codes that you

4    used to pull the data X40 to 44, X60 to

5    65, X85, Y10 to Y14, and contributing

6    causes T36 to 50?

7              MS. RELKIN:  Objection to

8         form.

9              THE WITNESS:  That -- that

10        is what is written in the

11        footnote.

12             MR. CIACCIO:  X64.  I think

13        you said 65 by accident.

14             MR. HERMAN:  Thank you.

15             MR. CIACCIO:  Just for the

16        record.

17   BY MR. HERMAN:

18        Q.    In each chart, you used the

19   same ICD codes for underlying causes,

20   right?

21        A.    Let me just confirm.

22             Yes.

23        Q.    X40 to 44 which are the ICD

24   code -- X40 to 44 are the ICD codes for

1    the different types of accidental

2    poisoning?

3            A.    I would need to review

4    the -- I mean, off the top of my head, I

5    don't remember what X42 stands for.

6            Q.    Do you know if you included

7    accidental poisonings as an underlying

8    cause?

9            A.    I would need to review what

10   the -- what the ICD codes are.

11           Q.    Okay.

12                 (Document marked for

13           identification as Exhibit

14           Keyes-4.)

15   BY MR. HERMAN:

16           Q.    We marked as Exhibit 4 which

17   is a printout of ICD codes.

18           A.    Okay.  Can I write on this

19   or no?

20                 MS. RELKIN:  It's an

21           exhibit.  If you want to write --

22   BY MR. HERMAN:

23           Q.    Okay.  So if you look at the

24   first page, the left column you'll see

1  that X40 to 44 is all accidental

2  poisonings, correct?

3         A.    Can you just give me a

4  moment to review it?  So X40 to 44

5  includes accidental poisoning by an

6  exposure to non-opioid analgesics, et

7  cetera.  X41 is accidental poisoning by

8  an exposure to antiepileptic, sedative,

9  hypnotic, et cetera.

10        Q.    So they're all accidental

11 poisoning, all categories of accidental

12 poisoning?

13        A.    There are other categories

14 of accidental poisoning in the X section

15 that were not used.

16        Q.    Yes.  But you used X40 to

17 44, which are all categories of

18 accidental poisoning?

19        A.    Yes.

20        Q.    Okay.  And then if you flip

21 to the next page.  X60 to 64 are ICD

22 codes for different types of intentional

23 self-poisoning?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   And those are codes for

2   suicide, right?

3    A.   These are intentional

4   self-harm.

5    Q.   So suicide or short of

6   suicide, but intentionally afflicted on

7   oneself?

8    A.   I would just go with -- I

9   mean, the ICD code is for intentional

10  self-harm.

11   Q.   If you flip to the next

12  page, X85 is assault by drugs,

13  medicaments, and biological substances?

14   A.   Yes.

15   Q.   And if you flip to the next

16  page, Y10 to 14 are ICD codes for

17  different types of poisoning?

18   A.   Yes.

19   Q.   And the thing that changes

20  in the ICD codes that you're using in

21  Figures 3, 4, and 5, are the codes -- the

22  T code for contributing causes, right?

23   A.   Yes.

24   Q.   Okay.  And so Figure 3 uses

1   T36 to 50, which captures all the drugs

2   that can be contributing causes?

3                    MS. RELKIN:  Form.

4                    (Brief interruption.)

5                    THE WITNESS:  T36 to 50

6           includes a number of different

7           drugs that can be contributing

8           causes.

9   BY MR. HERMAN:

10          Q.    But as represented in the

11  head of your chart, it's all the drugs

12  that can be contributing causes?

13          A.    These are the drugs for

14  which there are T codes in T36 to 50.

15          Q.    And Figure 4 uses T codes

16  T40.0, T40.1, T40.2 and T40.3 and T40.4,

17  correct?

18          A.    Yes.

19          Q.    And T40.0 is opium?

20          A.    Yes.

21          Q.    And T40.1 is heroin?

22          A.    Yes.

23          Q.    T40.2 is other opioid?

24          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    T40.3 is methadone?

2    A.    Correct.

3    Q.    T40.4 is other synthetic

4  narcotics?

5    A.    Mm-hmm.

6    Q.    And T40.4 includes fentanyl,

7  right?

8    A.    There's some variation in

9  how fentanyl has been recorded over time

10  based on who is recording the death

11  certificate.  Fentanyl, when it's

12  recorded in the T codes, would be

13  recorded in T40.4, I believe.

14    Q.    And that wouldn't

15  differentiate between prescribed fentanyl

16  and illicit fentanyl, would it?

17    A.    No.

18    Q.    And T40 would also include

19  carfentanil?

20    A.    Again, it's a similar issue.

21  I just don't -- I want to make it clear,

22  as I have in this report in numerous

23  places, that there is variation in how

24  the T codes are used across

1    jurisdictions.  And there's a number of

2    different sources of that variation.

3                So to the extent that the T

4    codes captured that substance in an

5    overdose or in a poisoning, then it would

6    be captured in T40.4.

7         Q.    Okay.  And does that mean

8    that if someone overdosed on

9    methamphetamine laced with fentanyl, that

10   it would be coded as T40.4?

11               MS. RELKIN:  Objection to

12          form.

13               THE WITNESS:  So there is

14          some literature around this and I

15          believe I've cited it in the

16          report.  And I can't speak to

17          all -- all overdoses, what would

18          be recorded on the T codes.

19   BY MR. HERMAN:

20        Q.    Okay.  But it's possible

21   that if an overdose -- if someone

22   overdosed on methamphetamine laced with

23   fentanyl, that it would be coded with

24   T40.4?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. RELKIN:  Objection to

2     form.

3          THE WITNESS:  Again, I -- I

4     don't want to speak to all

5     possibilities.

6  BY MR. HERMAN:

7     Q.    I'm not asking --

8     A.    It depends on who is --

9     Q.    Go ahead.

10          I -- I'm asking you is it

11  possible that if someone overdosed on

12  methamphetamine laced with fentanyl that

13  it would be coded with T40.4?

14          MS. RELKIN:  Objection to

15     form.  Calls for speculation.

16          THE WITNESS:  Yeah, I --

17     that's a speculation that I don't

18     want to make --

19  BY MR. HERMAN:

20     Q.    You don't know --

21     A.    I don't have an opinion on

22  that.

23     Q.    You don't know one way or

24  another if it's possible?

1    A.    It -- the T codes are used

2  in heterogenous ways across

3  jurisdictions.  So what every single

4  jurisdiction does with their T codes and

5  how they code their poisonings is not

6  something that I can speak to in

7  generalities.

8    Q.    Okay.  But in the

9  hypothetical that I gave you that

10  methamphetamine laced with fentanyl, if

11  someone -- the medical examiner viewed it

12  as -- fentanyl as a contributing cause to

13  that overdose, it's possible they would

14  code it with T40.4?

15    A.    Again, I don't want to speak

16  to specific medical examiners.  I don't

17  want to speak for them.  I don't --

18  medical examiners and coroners use the

19  T codes differently.  So I can't speak to

20  the possibility of that.

21    Q.    Cocaine-related deaths have

22  been increasing in Cuyahoga County,

23  right?

24    A.    I think there is one paper

Highly Confidential - Subject to Further Confidentiality Review

1       in Cuyahoga County from the medical

2       examiner that looked at specific causes

3       of overdose increases.  And to properly

4       answer your question, I'd like to look at

5       that paper.  Is that --

6               Q.      That's okay.  We'll get to

7       that.

8               But you don't -- you don't

9       recall sitting here today whether cocaine

10      overdoses are increasing in Cuyahoga

11      County?

12              MS. RELKIN:  Objection.

13              THE WITNESS:  Again, I cite

14          it in the report and I would like

15          to look at the paper in order to

16          provide you an accurate answer.

17      BY MR. HERMAN:

18              Q.      Okay.  We'll come back to

19      it.

20              MS. RELKIN:  She has papers

21          right here --

22              MR. HERMAN:  That's okay.

23          We'll --

24              MS. RELKIN:  -- to answer

1      your question.

2           MR. HERMAN:  We'll come back

3      to it.

4  BY MR. HERMAN:

5      Q.    If you're looking at

6  Figure 3, which is overdose death rates

7  for all drugs Cuyahoga County-- for all

8  drugs, I'm sorry, Cuyahoga County is

9  close to national average from 2000 to

10  2009, right?

11      A.    Can I be honest with you?

12  This is in black and white and I can't

13  see the colors.

14      Q.    Oh.  I apologize.

15      A.    Can I use this one?

16      Q.    Yes, please.

17      A.    Okay.  So now I'm sorry, can

18  you ask it again?

19      Q.    Yeah.  If you look at

20  Figure 3, which is overdose death rates

21  for all drugs, Cuyahoga County is close

22  to the national average from 2000 to

23  2009, right?

24      A.    So I review this in the

Highly Confidential - Subject to Further Confidentiality Review

1    section, I -- I -- there were a number of

2    years in which it was greater than the

3    national average.

4         Q.    Well, that -- that's not my

5    question.  From -- and -- from 2000 to

6    2009, Cuyahoga was close to the national

7    average, correct?

8         A.    I wouldn't say that that's

9    an accurate statement.

10        Q.    You wouldn't say that it's

11   close to national average from 2000 to

12   2009?

13        A.    I'll tell you what the exact

14   numbers are.

15             Compared to the national

16   average, pharmaceutical opioid --

17   pharmaceutical opioid deaths were 1.51

18   times higher in Cuyahoga County than in

19   the nation as a whole in 2000.  So that's

20   just one example.

21        Q.    Well, I -- I appreciate that

22   example.

23        A.    So it -- I wouldn't -- I --

24   I wouldn't say it's similar.

```
 1           Q.    I'm directing your attention
 2    to Figure 3.  And --
 3           A.    Oh I'm sorry, that was
 4    Figure 4.
 5              MS. RELKIN:  And let -- let
 6           me just note my objection that you
 7           gave the witness the binder saying
 8           it's easier to use, and the binder
 9           is black and white.  The actual
10           exhibit is color.  So let's --
11              MR. HERMAN:  It certainly
12           was not my intention.  Someone
13           printed it in black and white.  I
14           was trying to be helpful to the
15           witness.  And I'm happy you were
16           able to hand her a color copy.  We
17           certainly would have provided her
18           one.
19              MS. RELKIN:  From now on
20           don't use the binder.  Use the
21           exhibit.
22              MR. HERMAN:  Okay.
23              MS. RELKIN:  That should be
24           that one going forward.
```

BY MR. HERMAN:

     Q.    All right.  So looking at Figure 3, you wouldn't say that from 2009 -- from 2000 to 2009, that Cuyahoga County is close to the national average for overdose rates for all drugs?

     A.    No.  I think it's higher in 2000, 2001, 2002.  Slightly lower in 2003.  Slightly higher in 2004.  Quite a bit higher in 2006.  I would say it's similar in 2007.  It's higher in 2008.

     Q.    You -- you'd agree that some years it's above, some years it's below?

     MS. RELKIN:  Objection to form.  Overbroad.

     THE WITNESS:  I would say that it -- there are one, two, three, four, five, six, seven -- of the years that you asked me to review, there are seven years in which it's above.

     There is one year in which it's below, and one in which it's similar.

```
 1   BY MR. HERMAN:

 2        Q.    Okay.  You -- you only see

 3   one year where it's below?  It's not

 4   below in 2003 --

 5        A.    2003 --

 6        Q.    -- 2009 as well?

 7        A.    Oh, I'm -- would you -- you

 8   were asking me to be inclusive of 2009?

 9        Q.    Yes, through 2009.

10        A.    So if I -- I -- if I'm

11   inclusive of 2009, then it's two.

12        Q.    Okay.  And Cuyahoga begins

13   to be steadily above the national average

14   starting in 2010, right?

15        A.    I think they were steadily

16   above the national average prior to 2009

17   as well.

18        Q.    But there's a significant --

19   the increase -- the trend up on a

20   continuous path begins in 2010?

21        A.    So, I mean, the most

22   accurate statement that I can make is

23   that after 2010 there is no year in which

24   it is below the national average.
```

1      Q.    And that's due to cocaine

2   and heroin overdoses, right?

3      A.    So again, I can --

4          MS. RELKIN:  Objection to

5      form.

6          THE WITNESS:  There is a

7      report from the medical examiner

8      in Cuyahoga County that we could

9      pull out to examine -- look at

10     this issue.

11          What I've stated in the

12     report, I think more germane to

13     your question, is that we know

14     from the available epidemiological

15     evidence that 80 percent -- up --

16     more -- upwards of 80 percent, and

17     perhaps more than 80 percent of

18     people who use heroin, especially

19     in recent years, began their

20     opioid-using careers with

21     prescription opioids.

22          I also have data cited here

23     that many heroin users also use

24     prescription opioids while they

1    are using heroin.

2  BY MR. HERMAN:

3        Q.    Well, let's go to Figure 5.

4            MS. RELKIN:  So you don't

5       want her to pull the literature

6       she was referring to, the data?

7            MR. HERMAN:  I'm fine right

8       now.

9  BY MR. HERMAN:

10       Q.    So Figure 5 has the T codes

11  for heroin and opium removed, correct?

12       A.    I'm sorry, I'm just going to

13  compare it to the ICD-10.  So there's a

14  pen mark on here.  And I can't -- this is

15  T40.4.  So this is T40.2, 3, and 4, which

16  includes other opioids, methadone, and

17  other synthetic narcotics.

18       Q.    And this chart no longer

19  includes heroin and opium, correct?

20       A.    It no longer includes T

21  codes 40.0 and 40.1, correct.

22       Q.    Okay.  And with the removal

23  of the T code for heroin, does Cuyahoga

24  stay closer to the national average at or

1    below the national average until it

2    undergoes a significant spike in 2015?

3              MS. RELKIN:  Objection to

4         form.

5              THE WITNESS:  So in 2000 --

6         one, two, three, four -- and

7         through 2009 -- so inclusive of

8         2009, prior to 2009 there are four

9         years in which Cuyahoga is above

10        the national average in terms of

11        overdose.

12             And then one, two,

13        three years in which I would say

14        that it is roughly approximate to

15        the national average.  No, I'm

16        sorry, four years I would say it's

17        roughly above the national

18        average, which by the way is

19        increasing across that time.  I

20        mean, it should be noted since

21        2013 we had we've had to change

22        the Y axis for these overdose

23        deaths.

24   BY MR. HERMAN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Let me -- me ask you the

2  question a little differently.

3              Comparing Figure 4 to Figure

4  5, does that comparison suggest to you

5  that the increase in overdose deaths

6  starting in 2010 was due to heroin?

7              MS. RELKIN:  Objection to

8         form.

9              THE WITNESS:  Let me just

10         read the question again.

11              Comparing Figure 4 to Figure

12         5, does that comparison suggest to

13         you that the increase in overdose

14         deaths starting in 2010 was due to

15         heroin?

16              I haven't done an analysis

17         specifically of that question.  So

18         I wouldn't speculate.

19  BY MR. HERMAN:

20    Q.    You can't figure that out by

21  comparing Figure 4 to Figure 5 and the

22  differences --

23              MS. RELKIN:  Objection.

24  BY MR. HERMAN:

1      Q.     -- in the T codes?

2             MS. RELKIN:  Objection to

3       form.

4             THE WITNESS:  No I would

5       need to do a statistical analysis

6       of that.

7  BY MR. HERMAN:

8      Q.    Okay.  And do you believe

9  that the spike that occurs in Cuyahoga

10  County in 2015 is due to fentanyl?

11            MS. RELKIN:  Objection to

12       form.

13            THE WITNESS:  So, again, we

14       have the data from Cuyahoga County

15       medical examiner in this box that

16       I could produce, where they have

17       actually answered that question.

18       I can --

19  BY MR. HERMAN:

20      Q.    We're going to look at that

21  in a second.  But you can't figure that

22  out from these charts?

23            MS. RELKIN:  Objection to

24       form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  I would rely

2          on the medical examiner from that

3          county who's evaluated that very

4          question rather than make

5          assumptions about what's in the

6          figures.

7     BY MR. HERMAN:

8          Q.    And does a comparison from

9     Figure 4 to Figure 5 suggest to you that

10    fentanyl is a cause of the increase in

11    overdose deaths that begins in 2013 for

12    Summit County?

13         MS. RELKIN:  Objection to

14         form.

15         THE WITNESS:  I think I've

16         answered the question that there's

17         a number of T codes that are

18         included.  And the data from

19         Cuyahoga County on carfentanil

20         deaths is in the box.  And so I

21         can -- and maybe you have it as an

22         exhibit that we can look at.

23    BY MR. HERMAN:

24         Q.    That's a good point.  You

1    think that it might be due to carfentanil

2    instead of fentanyl --

3              A.    I believe --

4              Q.    -- in Summit County?

5              A.    -- the data is in the box.

6    We can look at it.

7              Q.    We'll do that.

8                    (Document marked for

9              identification as Exhibit

10             Keyes-5.)

11   BY MR. HERMAN:

12             Q.    I'm handing you what's been

13   marked as Exhibit 5.  I believe this

14   is --

15             A.    Yeah.

16             Q.    -- some of the data you've

17   wanted to look at?

18             A.    Yes.

19             Q.    Okay.  So I direct your

20   attention to Page 43.

21             A.    Okay.

22             Q.    Okay.  And so if we look at

23   Page 43, the blue line is all opioids not

24   including fentanyl, correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes.

2      Q.     And that's a category that

3  would include prescription opioids?

4      A.     I need to go to their

5  methodology where they cite what ICD

6  codes they used for that designation.

7  Let's see if they have it in their

8  methods.

9           So I don't see here where

10  they've listed T codes for that specific

11  category -- I mean, I'm sorry, ICD codes

12  for that specific category, all opioids

13  not including fentanyl.  I can't speak to

14  what ICD codes were included.

15      Q.     Okay.  Is there --

16      A.     It says -- the paper writes

17  "all opioids, not including fentanyl."

18      Q.     And is there another

19  category captured on this chart that you

20  believe is prescription opioids?

21      A.     Again, without the

22  methodology that was used, I don't want

23  to speak to -- I can tell you what the

24  paper says.  I just --

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And I should say, this is

2   data for overdoses in Cuyahoga County

3   from 2006 to 2016.

4      A.    2016 has an asterisk by it.

5   So 2016 cases are projected from third

6   quarter data.  So I wouldn't -- I would

7   just make that qualification that it's

8   through 2016 third quarter with respect

9   to the data.

10      Q.    And -- but this is the data

11   that you used in your report for the

12   comparison of the rise in total overdose

13   mortality in Cuyahoga County, has

14   increased from 250 in 2006 to 608 in

15   2016?

16      A.    Yes.  This is the paper that

17   I cited.

18      Q.    And if we look at the blue

19   line -- I'm sorry.

20           If we look at the green

21   line, that is overdoses from cocaine?

22      A.    What the authors write is

23   that these are the cocaine overdoses.

24      Q.    And the black line is

1    heroin?

2          A.    Again, that's what the

3    authors write.

4          Q.    And the red line is

5    fentanyl?

6          A.    That is what the authors

7    write.

8          Q.    Okay.  Does this confirm for

9    you that the increase in overdose deaths

10   shown on Figure 5 of your report in 2015

11   is due to fentanyl?

12              MS. RELKIN:  Objection to

13         form.  Overbroad.

14              THE WITNESS:  So in Figure

15         5, I document that, based on the

16         national vital statistics data

17         that the overdose rate in Cuyahoga

18         is about -- is at about 35 per

19         100,000.  And that's 2015.

20              And here, based on the

21         data -- again, I would need to do

22         a statistical analysis to actually

23         compare what causes of death

24         contributed.  But based on my

1    reading of this in 2015, compared

2    to 2013, there are increases in

3    what they describe as

4    fentanyl-related deaths, yes.

5  BY MR. HERMAN:

6        Q.    And assuming that the blue

7  line is a category that includes

8  prescription opioids, the number of

9  overdose deaths attributed on the

10 Cuyahoga data to prescription opioids has

11 remained relatively flat from 2006 to

12 2016?

13            MS. RELKIN:  Objection.

14            THE WITNESS:  Well, I think

15       that that's -- I think it should

16       be qualified in that it's not

17       clear from this whether -- whether

18       there was prescription opioids in

19       the toxicology of individuals who

20       died from fentanyl overdoses.

21            So we don't know based on

22       this what the entire lifetime

23       history of drug use of the

24       individuals who overdosed was.

Highly Confidential - Subject to Further Confidentiality Review

1            So these increases in

2            fentanyl deaths could have come

3            from prescription opioids or other

4            sources of drugs.

5    BY MR. HERMAN:

6            Q.    The cause of --

7            A.    You're saying the all

8    opioids line has gone down.  And you said

9    that that includes prescription opioids.

10            And I'm saying that I don't

11    think that the data show that.

12            Q.    Well, I'm asking you, I mean

13    in 2006, the overdose deaths in Cuyahoga

14    County that the medical examiner said

15    were due to all opioids not including

16    fentanyl was 81, correct?

17            A.    Let me -- let me just read

18    the question back.

19            "In 2006 the overdose deaths

20    in Cuyahoga County that the medical

21    examiner said were due to all opioids not

22    including fentanyl was 81."  Yes, that's

23    correct.

24            Q.    And in 2015, the number of

1    deaths that the county medical examiner

2    said were due to all opioids not

3    including fentanyl were 80?

4         A.    That is what is written in

5    the paper.

6         Q.    And in 2016, the number that

7    the county medical examiner attributed to

8    all opioids not including fentanyl for

9    overdose deaths was 89?

10        MS. RELKIN:  Objection to

11        form.

12        THE WITNESS:  Again, that is

13        projected from third quarter data,

14        so I just want to make sure that

15        asterisk is noted.  You don't -- I

16        don't think this paper provides a

17        final count.

18        And again, there is -- we

19        don't know the ICD codes that were

20        used in this analysis.  Based on

21        what the authors of this paper

22        wrote, they wrote that all

23        opioids, not including fentanyl, a

24        projected number for 2016, was 89.

Highly Confidential - Subject to Further Confidentiality Review

1           But again, that doesn't

2       assess the lifetime history and

3       toxicology of the decedent at the

4       time of the death.

5   BY MR. HERMAN:

6       Q.    You don't know that, right?

7       A.    Don't know?

8       Q.    Your point is that you don't

9   know all the toxicology.

10      A.    I don't understand the

11  question.

12      Q.    Well, you're saying that

13  doesn't assess the lifetime history and

14  toxicology of the decedent at the time of

15  death.

16           And your point is that you

17  don't have that information, you don't

18  know that information?

19           MS. RELKIN:  Objection to

20      form.

21           THE WITNESS:  What I am

22      saying is that if the idea is that

23      prescription opioid death didn't

24      increase across this time, I don't

Highly Confidential - Subject to Further Confidentiality Review

1    think these data speak to that

2    issue, which I think is what the

3    question is.

4  BY MR. HERMAN:

5    Q.    Okay.  You would agree with

6  me that from 2015 to 2016, fentanyl

7  deaths went from 92 to 34, or to 394?

8    A.    In 2015 the number of deaths

9  that were characterized by the medical

10  examiner as due to fentanyl -- I just --

11  hold on.  I just want to read the methods

12  again.  I'm sorry, I just want to make

13  sure I get this...

14    I want to -- okay.  So just

15  so we can have a consensus about the

16  methods.

17    So this analysis involved

18  deaths that were unnatural, suspicious,

19  or involved sudden unexpected death of a

20  person in apparent good health.

21    Autopsy doesn't seem to have

22  been done on all cases.  Is that correct?

23  Suspected drug-related deaths with little

24  or no medical intervention are

Highly Confidential - Subject to Further Confidentiality Review

1  transported to the mortuary for full

2  autopsy.  Death after hospitalization

3  with adequate evaluation may be viewed

4  with no autopsy.

5              And so then they did

6  toxicological testing on admission

7  samples.

8              I just want to -- so this

9  doesn't involve T codes.  So I want to --

10  I'm not -- this is on the toxicological

11  testing.  I want to make sure that that

12  is accurate.

13        Q.    Professor Keyes --

14        A.    Back to your question about

15  the fentanyl.

16              So it looks like of those

17  toxicological tests that were performed

18  on those who died who were -- had deaths

19  that were unnatural, suspicious or

20  involved a sudden unexpected death in

21  apparent good health, the medical

22  examiner identified fentanyl in 92 cases

23  in 2015 and 394 in -- projected in 2016.

24        Q.    And, Professor Keyes, you

Highly Confidential - Subject to Further Confidentiality Review

1    use these statistics for a comparison of

2    total overdose mortality in Cuyahoga

3    County from 2006 to 2016, correct?

4          A.    250 in 2006 and 608 in 2016,

5    that's correct.

6                I also talk in that section

7    about the specific increase from 2015 to

8    2016, again noting that, you know, the

9    majority of the increase in total

10   overdose deaths is due to that increase

11   in fentanyl and heroin, which would be in

12   about 80 percent of cases, perhaps more,

13   secondary to the use of prescription

14   opioids.

15         Q.    Did you look at any data

16   specific to Cuyahoga County to confirm

17   that 80 percent --

18         A.    I -- to that -- I -- that is

19   an issue that is -- is -- I thought about

20   a lot.

21               And the data sources that

22   are used to describe the proportion of

23   individuals, especially in recent years

24   that use heroin come from a wide variety

Highly Confidential - Subject to Further Confidentiality Review

1  of heterogenous populations and converge

2  on similar estimates.  If it were a small

3  number of studies in a select group of

4  people that probably weren't similar to

5  a -- you know, heterogenous group of

6  heroin users, I would be more qualified.

7  But given the number of studies, I think

8  in -- I think I reviewed 16, but I can

9  check -- and given their geographic

10  sample selection and other types of

11  characteristics, I think it is the -- the

12  level with which the data are consistent

13  would lend itself to a scientific

14  decision that there is good evidence of

15  generalizability.

16      Q.   Did you look at data

17  specific to Summit County?

18      A.   Data on?

19           MS. RELKIN:  Objection to

20      form.

21           THE WITNESS:  The heroin

22      users?

23  BY MR. HERMAN:

24      Q.   Data on the 80 percent

Highly Confidential - Subject to Further Confidentiality Review

```
1    figure that you're using, to support the

2    80 percent figure that you're using?

3           A.    Again, I just explained the

4    methodology that I used.  I -- I -- in

5    terms of the epidemiological evidence

6    that I reviewed, I have not found a study

7    that assessed heroin users specific to

8    those areas.  That being said, there's a

9    wide variety of studies in many different

10   areas, in many different patient and

11   street user and treatment populations and

12   general populations, and the results are

13   consistent.

14          Q.    Okay.  And the many studies

15   you're speaking to are the ones you

16   discuss in Section B.7 of your report?

17          A.    Let's just be specific.

18   Yes.  16 studies.

19          Q.    Okay.  And when -- earlier

20   you said you didn't look at data for

21   those areas, those areas were Summit and

22   Cuyahoga County specifically?

23          A.    I'm sorry, can you be

24   specific?
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   I believe you said, "I

2  didn't look at data specific to those

3  areas."  And I'm just asking, when you

4  use the term "those areas," were you

5  referring that you didn't look at data

6  about the 80 percent figure specifically

7  for Cuyahoga and Summit County?

8           MS. RELKIN:  Objection to

9        form.

10          THE WITNESS:  So to my

11       knowledge, there is no existing

12       epidemiological study in the

13       evidence base that specifically

14       interviews heroin users in those

15       specific counties.

16          However, of the studies that

17       I reviewed, there was a broad

18       range of populations.  So I --

19       based on my scientific assessment,

20       there would be generalizability to

21       other areas.

22          MR. HERMAN:  Do people want

23       to break for lunch?  I can go for

24       a little longer --

 1              MS. DO AMARAL:  Why don't

 2        you go for a while.

 3              MS. RELKIN:  Go for a little

 4        longer.

 5              MS. DO AMARAL:  We've only

 6        been going 45 minutes.

 7              MR. HERMAN:  Sure.

 8    BY MR. HERMAN:

 9        Q.    Professor Keyes, did you

10    conduct a search for articles related to

11    a relationship between the supply of

12    opioids and overdoses?

13              THE WITNESS:  Did you

14        conduct a search?

15              MS. RELKIN:  Objection to

16        form.

17    BY MR. HERMAN:

18        Q.    Strike that.  Let me

19    rephrase the question.

20              Did you conduct a search for

21    articles related to a relationship

22    between the supply of prescription

23    opioids and overdoses?

24        A.    Okay.  I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review

1      "Did you conduct a search

2  for articles related to a relationship

3  between the supply of prescription

4  opioids and overdoses?"

5                MS. RELKIN:  Form.

6                THE WITNESS:  Those articles

7      are cited on page --

8  BY MR. HERMAN:

9      Q.    The -- the articles that you

10 located are discussed in Section B.5 on

11 that topic.

12     A.    Is it B.5?

13           I believe it starts on

14 Page 21.  "The empirical literature

15 demonstrates an association between the

16 opioid supply and increase in

17 prescription opioid deaths."

18           Those were the articles that

19 form the basis of my opinion.

20     Q.    And the articles discussed

21 in Section B.5 looked at a correlation

22 between prescription opioids and over

23 death -- overdose deaths, right?

24                MS. RELKIN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1        form.

2               THE WITNESS:  Can we go

3        through each study?

4    BY MR. HERMAN:

5        Q.    You don't recall whether the

6    articles --

7        A.    So there's a number of

8    different studies.  Some are -- some are

9    quasi-experimental, which I think are a

10   different level of evidence.  So

11   there's -- there's a broad range of

12   studies with a number of different study

13   designs in heterogenous populations.

14       Q.    Okay.  Can you point me to

15   an article that goes beyond showing a

16   correlation between prescription opioids

17   and overdose deaths?

18              MS. RELKIN:  Objection to

19       form.

20              THE WITNESS:  Can you define

21       what you mean by "correlation."

22       Because --

23   BY MR. HERMAN:

24       Q.    Well, I'm using --

Highly Confidential - Subject to Further Confidentiality Review

1     A.    -- randomized controlled

2  trials also show correlations.

3     Q.    I'm using the terminology

4  that you used, which was that there's a

5  correlation with rates of prescription

6  opioids supplied for medical use with

7  overdose deaths.

8          MS. DO AMARAL:  Counsel,

9      what page, please?

10          MR. HERMAN:  Page 3.

11          THE WITNESS:  So are you

12      referring to "and these increases

13      strongly correlate with rates of

14      prescription opioid supply"?  Is

15      that --

16  BY MR. HERMAN:

17     Q.    Yeah, I mean --

18     A.    -- the quote you mean?

19     Q.    -- you've described it as a

20  correlation.  Are you --

21     A.    I mean, all associations are

22  correlations.  So -- but is that

23  specifically what you're referring to,

24  "Prescription opioid overdose increased

Highly Confidential - Subject to Further Confidentiality Review

1    exponentially in the United States in the

2    past 20 years, and these increases

3    strongly correlate with rates of

4    prescription opioid supply for medical

5    use, both in terms of geographic

6    variation and supply as well as

7    year-to-year variation"?  Is that -- I

8    just want to make sure I'm on the right

9    bullet point.

10          Q.    Yes.   That's where I got the

11   prescription.

12          A.    Right.   So I said in both

13   observational and quasi-experimental

14   studies.   So the quasi-experimental

15   study -- I can go through the

16   observational evidence as well.   But the

17   quasi-experimental study in particular

18   was Powell 2015.

19               What is useful about that

20   particular study is that they used the

21   changes in the Medicare prescription drug

22   benefit program in 2006.   And what makes

23   that quasi-experimental is that there's

24   nothing about the characteristics of the

Highly Confidential - Subject to Further Confidentiality Review

1    users that would have changed Medicare.

2    That that was an exogenous source of

3    variation.  And so oftentimes in

4    epidemiology, we try to find these

5    sources of variation that are exogenous

6    in order to build the evidence base.

7              So what they did is -- and

8    that study from 1999 through 2016, they

9    looked at the Medicare expansion and how

10   that affected the opioid supply.

11        Q.    I'm going to let you

12   continue.  But I don't think you're

13   answering my question anymore.

14        A.    Okay.  So what is --

15              MS. RELKIN:  You

16        interrupt -- you did interrupt her

17        answer.  So she was answering your

18        question.

19              THE WITNESS:  Your question

20        was whether there was a

21        correlation between the opioid

22        supply and --

23   BY MR. HERMAN:

24        Q.    Whether the articles that

Highly Confidential - Subject to Further Confidentiality Review

1  you used show a correlation between the

2  opioid supply --

3          A.    So then I'm answering the

4  question.

5          Q.    Why don't we just -- I'll

6  hand you that study, which I marked as

7  Exhibit 6.

8              MS. RELKIN:  You didn't

9          complete --

10              THE WITNESS:  Do you want me

11          to --

12              MS. RELKIN:  Can she please

13          complete her answer?

14              (Document marked for

15          identification as Exhibit

16          Keyes-6.)

17  BY MR. HERMAN:

18          Q.    You can finish your answer.

19          A.    Okay.  I would, one, take a

20  step back and describe what I mean by

21  correlation, which is an association

22  between an exposure and an outcome in a

23  study.

24              Powell 2015 used a

Highly Confidential - Subject to Further Confidentiality Review

1    quasi-experimental design using the

2    source of exogenous variation, which was

3    the Medicare prescription drug benefit

4    Part D.

5              The patient -- the

6    population that was examined for the

7    study was individuals over 65 years old.

8    The increase in the opioid supply was

9    documented based on ARCOS data, which we

10   can get into if you'd like to.

11             And they looked at drug

12   overdose deaths.  So for both

13   prescription deaths and for treatment

14   admissions, there was evidence that the

15   increase in the opioid supply was

16   associated with deaths and treatment

17   admissions.

18        Q.    And let's just -- if you

19   look at Page five of that study.  They

20   found a strong positive relationship

21   between elderly share and the growth in

22   prescription opioids distributed at the

23   state level?

24        A.    So if you want me to speak

Highly Confidential - Subject to Further Confidentiality Review

1    to that particular sentence, I just need

2    to orient myself to the study.  Can I

3    take a minute and -- thank you.

4         Q.    Do you --

5         A.    I'm not allowed to underline

6    on this, right?

7              MS. RELKIN:  Do you want to

8         work off mine?

9              THE WITNESS:  Do you mind if

10        I work --

11   BY MR. HERMAN:

12        Q.    Professor Keyes, I mean, you

13   just gave me a long recitation about what

14   the study was about.

15              Do you -- do you not recall?

16        A.    You're asking about one

17   sentence in the introduction.  And so --

18              MS. RELKIN:  You can go

19        through mine.

20   BY MR. HERMAN:

21        Q.    I'm asking you --

22        A.    You're asking about a

23   sentence in the introduction that says

24   that there's a strong positive

1    relationship between elderly share and

2    the growth of prescription of opioids

3    distributed at the state level?

4         Q.    Does that mean more people

5    over 65 -- that the more people over 65

6    in the state, the higher the amount of

7    prescription opioids in that state?

8         A.    I'm going to have to take a

9    step back and review the previous

10   paragraph.

11        So what this paper shows --

12   I mean, the previous paragraph suggests

13   that they provide the first causal

14   evidence that increasing prescription

15   opioid access escalates substance abuse

16   and mortality for populations not

17   directly gaining medical access to these

18   drugs.

19        That particular sentence

20   does refer to the relationship between

21   elderly share and growth in prescription

22   opioids and I believe -- and we can

23   confirm that that was part of the

24   modeling that was done.

1            So the conclusions from the

2    paper are not dependent on that

3    relationship.

4            Q.    But the more -- doesn't that

5    study -- didn't the study find that the

6    more people over 65 in the state, the

7    higher the amount of prescription opioids

8    in the state?

9            A.    I don't believe that's what

10   the study -- the specific comparisons

11   that were done.

12           Q.    That's not what it means

13   when they say, "We find a strong

14   causative relationship between elderly

15   share and the growth in prescription

16   opioids distributed at the state level"?

17           A.    So maybe we can go through

18   each table.

19           Q.    Well, I prefer not to do

20   that.  Do you --

21           A.    I don't --

22                 MS. RELKIN:  Object to form.

23                 THE WITNESS:  But that's

24           the -- that what the study -- the

Highly Confidential - Subject to Further Confidentiality Review

1          focus -- the focus of the study is

2          the causal relationship between

3          prescription opioid access and

4          substance abuse and mortality.  So

5          part of evaluating that is

6          evaluating things like the

7          positive relationship between

8          elderly share and growth in

9          prescription opioids.

10              But that's not the

11         conclusion of the paper.  That's

12         not the --

13    BY MR. HERMAN:

14         Q.    What the study was

15    theorizing, right, is that older people

16    were prescribed opiates for medical

17    reasons pursuant to Part D of Medicare,

18    and that created the opportunity for, as

19    they termed it, spillover for nonmedical

20    use, right?

21         A.    I'm just going to read your

22    question.

23              MS. RELKIN:  Objection to

24         form.

1          THE WITNESS:  What the study

2      was theorizing is that older

3      people were prescribed opioids for

4      medical reasons pursuant to Part D

5      of Medicare and that created the

6      opportunity for, as they termed

7      it, spillover into nonmedical use.

8          I don't believe that's what

9      these comparisons are.

10         They're exploiting the

11     changes in Medicare Part D by

12     state to look at the relationship

13     between opioid supply and

14     treatment admissions and overdose.

15  BY MR. HERMAN:

16     Q.    And the -- what they were

17  looking at is Medicare Part D which is

18  for people over the age of 65, right?

19     A.    Yeah, the population that

20  they were looking at was people over 65.

21     Q.    And the more people over 65

22  in the state, the higher the opioid

23  supply for medical use?

24     A.    Again, I don't think that

Highly Confidential - Subject to Further Confidentiality Review

1   that was the mean comparison and

2   statistical model that was conducted by

3   the authors.  I mean, in Formula 1, they

4   are looking at the opioid-related

5   distribution, abuse or mortality for

6   states across time.  And there is a

7   number of different vector of time

8   varying covariates, including the time

9   varying measure of elderly share.

10          Q.    On Page 6, did they state,

11  "Extrapolating our results to the full

12  time series are evidence that suggest

13  that 73 percent of dramatic growth in

14  opioid-related overdose deaths can be

15  attributed to spillovers resulting from

16  increased medical access"?

17          A.    That is one sentence in --

18  that builds their overall argument.  But

19  again I would point to the actual

20  comparisons that were done in the results

21  section.

22          Q.    Their overall argument that

23  increased access to opioids for people

24  over the age of 65 through medical --

1    through Medicare Part D, provided the

2    opportunity for diversion from pills

3    prescribed for medical reasons?

4         A.    So they -- I'm just going to

5    quote the authors in terms of how they

6    describe the results to make sure that --

7    so the authors describe the results as

8    they interpret their estimates as -- this

9    is on Page 25.  "We interpret our

10   estimates as spillovers resulting from

11   the implementation of Part D and more

12   generally from increased medical access

13   to opioids.  We find that overdoses

14   increase among a population that does not

15   directly gain medical access to these

16   drugs."

17              So that's their

18   interpretation.

19        Q.    Right.  And the people who

20   don't directly gain medical access are

21   the spillover effect, right?

22        A.    I just want to be really

23   clear about how they are defining

24   spillover.

Highly Confidential - Subject to Further Confidentiality Review

1       Do you know the first time

2   in -- in the article that that term is

3   used?

4       Q.    I believe it's the sentence

5   that I read to you on Page 6, but --

6   and -- "extrapolating our results to the

7   full time series, our evidence suggests

8   that 73 percent of the dramatic growth in

9   opioid-related overdose deaths can be

10  attributed to spillover resulting from

11  increased medical access."

12      A.    Yeah, I think that is the

13  first time it is used.  They don't

14  specifically define spillover.  So I

15  can't speak to what their definition was

16  in this study.

17      Q.    You can't tell from that

18  quote what they mean by spillover?

19      A.    No.

20          (Document marked for

21          identification as Exhibit

22          Keyes-7.)

23  BY MR. HERMAN:

24      Q.    I'll hand you what I've

Highly Confidential - Subject to Further Confidentiality Review

1   marked as Exhibit 7.

2          This is another article,

3   "The Epidemiological Association Between

4   Opioid Prescribing and Nonmedical Use and

5   Emergency Department Visits," that you

6   cited in Section B.5 of your report.

7          A.    Yes.  That's what --

8   Page 21, the last paragraph.

9          Q.    And this study looked at

10  correlation, correct?

11         A.    So again I'm just going to

12  ask what you mean by correlation.  All

13  statistical models are estimating the

14  relationship between an independent

15  variable and an outcome variable.

16         Q.    Okay.  So --

17         A.    So they are assessing the

18  relationship between an independent

19  variable and an outcome variable just

20  like any study.

21         Q.    Okay.  And they were looking

22  at correlation between certain types of

23  prescription opioids and nonmedical use?

24         A.    Okay.  Hold on a second.  So

Highly Confidential - Subject to Further Confidentiality Review

1　this study utilizes four national

2　datasets and looks at the correlation

3　between prescribing self-reported

4　nonmedical use, drug-induced and

5　drug-related E.D. visits for hydrocodone,

6　oxycodone and morphine.

7　　　　　　So I wouldn't agree that

8　they are only looking at the correlation

9　between certain types of prescription

10　opioids and nonmedical use.  They are

11　also looking at drug-induced and

12　drug-related E.D. visits.

13　　　Q.　　That was going to be my next

14　question.  So...

15　　　A.　　Okay.

16　　　Q.　　Thank you though.

17　Appreciate it.

18　　　　　　If you turn to the

19　limitations on Page 8.  And the sentence:

20　"By its very nature, secondary data

21　analysis and the tests of association

22　utilized are not conducive to

23　establishing cause-and-effect

24　relationships."

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see -- do you see
2   where I just read?
3          A.    Yes.  Again, I -- I put
4   together a body of evidence here that I
5   think shows the relationship in a number
6   of different studies and a number of
7   different datasets.  One study is really
8   never enough to conclude that there's a
9   causal relationship.  But as the evidence
10  builds from different types of study
11  designs, I think the weight of the
12  scientific evidence becomes more clear.
13          So I just want to point that
14  out.  In terms of this particular study,
15  they were looking at, you know,
16  correlations across these different
17  datasets.  But it's presented in the
18  report as a body of evidence, a broader
19  body of evidence.
20          Q.    But at least with respect to
21  this report, they said that the analysis
22  and the tests of association utilized are
23  not conducive to establishing
24  cause-and-effect relationships, right?

1          MS. RELKIN:  Objection to

2      form.

3          THE WITNESS:  In this

4      particular study, the methodology

5      that was used examines

6      correlations between prescribing

7      and these different outcomes.  If

8      this were the only study that were

9      ever done on the opioid supply, I

10      think there would be a limited

11      case for a causal relationship.

12          However, there is a body of

13      evidence that I think builds the

14      case more concretely.

15  BY MR. HERMAN:

16      Q.    And in the conclusion

17  section they also said, "To determine if

18  the association observed in this study

19  between increased supply as a result of

20  prescribing and increased problems

21  manifested by nonmedical use and

22  drug-induced and drug-related E.D. visits

23  represent an actual cause-and-effect

24  relationship, different study methodology

1   is warranted"?

2          MS. RELKIN:  Are you asking

3      her does it say that?

4          THE WITNESS:  What was the

5      question?

6   BY MR. HERMAN:

7      Q.    Yeah.  I asked, did -- in

8   the conclusion, did they say --

9      A.    So again, I think that this

10  study is presented in a body of evidence.

11  So this particular study looks at

12  correlations.  But there are a number of

13  other studies that again look at the same

14  relationship in different study designs

15  and different populations using different

16  methodology.  And so I think while this

17  particular study looks at one set of

18  correlations, when presented overall with

19  the other weight of the evidence, I think

20  the evidence is more strong that there is

21  a causal relationship between the supply

22  of opioids and opioid-related harm.

23      Q.    Are DAWN recorded E.D.

24  visits limited to cases of overdose?

1    A.    Are DAWN recorded E.D.

2    visits related -- so the Drug Abuse

3    Warning Network is medical record and

4    toxicology screening data.  So there's

5    other data that are also included in

6    DAWN.

7         Q.    Beyond just overdoses?

8         A.    Based on my knowledge, yes.

9         Q.    A drug-related emergency

10   department visit means that someone

11   documented the prescription opioid as a

12   contributing factor to the emergency

13   department visit, right?

14        A.    They don't say here in their

15   methodology -- oh, here we go hold on a

16   second.  The DAWN dataset.

17             So yes, they included in

18   this particular study the number of E.D.

19   drug episodes per year, which mention a

20   hydrocodone, oxycodone, or

21   morphine-containing product.

22        Q.    Are there lots of reasons

23   that a prescription opioid might be

24   mentioned with respect to an emergency

1    department visit?

2              MS. RELKIN:  Objection to

3         form.

4              THE WITNESS:  I can't speak

5         to all emergency departments.

6    BY MR. HERMAN:

7         Q.    Well, do you know one way or

8    another if there are lots of reasons that

9    a prescription opioid might be documented

10   with regard to emergency department

11   visit?

12             MS. RELKIN:  Objection to

13        form.

14             THE WITNESS:  I -- I --

15        again, I don't know -- the

16        methodology for this particular

17        study doesn't cite, it is any

18        mention of these medications.  So

19        the reasons that any one

20        particular hospital might list

21        them are not within the purview of

22        the scope of what I reviewed in

23        the epidemiological evidence.

24             MR. HERMAN:  Shall we break

Highly Confidential - Subject to Further Confidentiality Review

1    for lunch?

2              MS. DO AMARAL:  Sounds good.

3              THE VIDEOGRAPHER:  Okay.

4    Remove your microphones, please.

5    The time is 12:53 p.m.  Off the

6    record.

7                   -  -  -

8              (Lunch break.)

9                   -  -  -

10    A F T E R N O O N   S E S S I O N

11                   -  -  -

12              THE VIDEOGRAPHER:  All

13    right.  We are back on the record.

14    The time is 1:32 p.m.

15                   -  -  -

16              EXAMINATION (Cont'd.)

17                   -  -  -

18  BY MR. HERMAN:

19         Q.    Professor Keyes, would you

20  be able to provide me a list of the

21  search terms that you used in PubMed?

22         A.    So I think we've been over

23  this.  I think the methodology that I

24  used is stated in this report.  I used a

Highly Confidential - Subject to Further Confidentiality Review

1    variety of different searches for each of

2    the different topics that are included in

3    this -- in the expert report.

4           Q.    I understand the methodology

5    that's listed there, but you would agree

6    that it doesn't list the search terms,

7    right?

8           A.    I would agree that the

9    particular search terms for every single

10   section are not listed in the report.

11          Q.    And so my question is --

12   well, are any of the search terms listed

13   in the report?

14          A.    Again, I have -- I think

15   I've been clear about the methodology

16   that I used, which is well accepted in

17   the peer-reviewed literature.  It was

18   not -- it did not include a list of

19   search terms.  I've done many literature

20   reviews that are published in the

21   literature.  Some of them have included

22   search terms, some of them have not.

23   This one in particular did not because of

24   the scope of what I was asked to review

Highly Confidential - Subject to Further Confidentiality Review

1    was heterogenous and wasn't warranted for

2    the topic.

3           Q.    Okay.  So I understand that

4    you covered heterogenous topics.  But

5    would you be able to provide me with a

6    list of the search terms that you used?

7           A.    I think what I've described

8    in here is the methodology that I used,

9    which was a critical review of the

10   literature.  I did not include in here

11   every single search term that I reviewed

12   in terms of -- in every single section.

13          Q.    There are no search terms in

14   any sections, right?

15          A.    I didn't include search

16   terms.  Again, that is a common practice

17   in the epidemiological literature for

18   literature reviews.  Some include

19   specific search terms; some don't.  This

20   is standard practice in the field.

21   There's nothing that is against the

22   scientific practice that I participate in

23   in this review.

24          Q.    I understand that.  So is

1    the answer no, you wouldn't be able to

2    provide me with a list of search terms?

3            MS. RELKIN:  Objection.

4        Asked and answered.

5            THE WITNESS:  I think that

6            the question is a misunderstanding

7            of the methodology that I used for

8            this review.

9    BY MR. HERMAN:

10           Q.    Professor Keyes, you opined

11   that prescription opioid use is causally

12   related to subsequent heroin use, right?

13           A.    Let me find the specific --

14   so I say prescription opioid use is also

15   causally related to subsequent heroin

16   use.

17           Q.    Okay.  And that's your

18   opinion?

19           A.    Yes.

20           Q.    Did you rely on the studies

21   discussed in Section B.7 of your report

22   to reach that conclusion?

23           A.    Yeah.  Section B.7 is the

24   section on the causal relationship

1    between prescription opioid use and

2    heroin use.

3           Q.    Okay.  And so your opinion

4    relied -- excuse me.  Strike that.

5                Your opinion that

6    prescription opioid use is causally

7    related to subsequent heroin use relies

8    on the studies discussed in Section B.7?

9                MS. RELKIN:  Objection to

10           form.

11                THE WITNESS:  Let me just

12           read the question again.  Your

13           opinion that prescription opioid

14           use is causally related to

15           subsequent heroin use relies on

16           studies discussed in Section B.7.

17                Section B.7 is where I

18           provide an overview of the

19           evidence that formed my opinion,

20           yes.

21    BY MR. HERMAN:

22           Q.    And is there any evidence

23    that formed your opinion that's not

24    discussed in Section B.7?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    The evidence that formed my

2    opinion was discussed in B.7.

3    Q.    You haven't done any studies

4    on whether there is a causal connection

5    between prescription opioid use and

6    heroin use?

7    A.    My expertise is in

8    epidemiology, and part of that expertise

9    is in evaluating the literature, which I

10   do as part of my routine epidemiological

11   work, and that forms the opinion that I

12   made.

13   Q.    You relied on a set of

14   observational descriptive studies

15   conducted by others?

16   A.    Can you define what you mean

17   by observational and descriptive?

18   Q.    Well, would you describe the

19   studies that you relied on differently

20   than as observational and descriptive

21   studies?

22   A.    I just want to make sure

23   that the terminology we're using is

24   consistent.

Highly Confidential - Subject to Further Confidentiality Review

1          So let's see.  Let me just

2   go through the studies that I cited.  So

3   these studies were observational as

4   opposed to experimental.  There's no --

5   been no study where individuals have been

6   randomized to high levels of prescription

7   opioids and observed to see whether there

8   is subsequent transition to heroin use.

9          These - the data cited in

10  this section rely on observations of

11  individuals who use prescription opioids

12  and use heroin.

13       Q.    Which studies -- I'm not

14  asking for a description of the studies,

15  just names -- were the most important to

16  your analysis?

17       A.    The studies that I found

18  particularly compelling, one is cited in

19  Figure 2, I believe it is.  Figure 2 is

20  "The fitted hazard ratios of heroin

21  initiation associated with prior

22  non-medical prescription opioid use by

23  age of non-medical prescription opioid

24  use initiation."

Highly Confidential - Subject to Further Confidentiality Review

1           And then there were two

2    others that I would particularly point to

3    as -- I mean, I think the body of

4    evidence speaks for itself.  And, you

5    know, if I were to pick up particular

6    studies, I think Muhuri et al., Reference

7    97, also used the National Household

8    Survey on Drug Use and Health, I think

9    provides a high level of evidence.

10           I think the Cicero study

11   that I prescribe in the previous

12   paragraph.  And I -- I mean, frankly all

13   of the studies are -- together form the

14   evidence base.

15           There's another one that's

16   really good.  That's not to say that the

17   other studies that I'm not highlighting

18   here are flawed in any way.  It's just --

19   oh, Banerjee, et al., 2016.

20           I think those studies I

21   would particularly highlight.  But,

22   again, I think all of the studies formed

23   an evidence base that together make a

24   very compelling case.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And the studies that you

2  discuss in B.7 of your report looked at

3  whether an association exists between

4  nonmedical use of prescription opioids

5  and heroin use?

6      A.    No, that's not the case.  I

7  believe some of the studies that were

8  cited don't differentiate between

9  nonmedical and medical use.

10     Q.    Okay.  Are your aware of a

11  study that has established an association

12  between medical use of prescription

13  opioids and heroin?

14     A.    We can go through each of

15  the studies.

16     Q.    Well, I'm just asking you.

17  Do you recall a study that established an

18  association between medical use of

19  prescription opioids and heroin?

20     A.    I mean, the question itself,

21  you know, there's an established

22  association between medical use and

23  nonmedical use.

24          So these -- for example, the

Highly Confidential - Subject to Further Confidentiality Review

1    studies in the National Household Survey

2    of Drug Use and Health specifically

3    queries nonmedical use of prescription

4    opioids.  But that doesn't -- that

5    doesn't mean nonmedical use only in

6    individuals in the National Household

7    Survey and Drug Use and Health can be

8    using medically.  And further, there's a

9    lot more data that I cited in this report

10   about the connection between medical use

11   and subsequent nonmedical use in the

12   earlier section.

13           So I think on balance I

14   would feel confident in saying that

15   prescription opioid use, regardless of

16   the origination of the source, is

17   causally associated with heroin use.

18       Q.    Are you familiar with the

19   percentage of people who use prescription

20   opioids in accordance with their

21   prescriptions who later use heroin?

22           MS. RELKIN:  Objection to

23       form.

24           THE WITNESS:  I'm just going

Highly Confidential - Subject to Further Confidentiality Review

1        to read the question out loud

2        again.

3            "Are you familiar with the

4        percentage of people who use

5        prescription opioids in accordance

6        with their prescriptions who later

7        use heroin?"

8            So the studies that are

9        cited in this -- in this section

10       in particular, report a wide range

11       of, you know, we can go through

12       each of the different 16 studies

13       that I have reviewed.

14           A lot of those studies are

15       among heroin users.  And so

16       they -- people are reporting on

17       their past histories of nonmedical

18       and/or medical use.

19  BY MR. HERMAN:

20        Q.   I'm asking you a more

21  specific question.  Are you familiar with

22  the percentage of people who use

23  prescription opioids in accordance with

24  their prescription who later use heroin?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. RELKIN:  Do you want her
 2         to go through her studies, the
 3         studies cited, to address that?
 4              THE WITNESS:  Yeah,
 5         that's --
 6              MR. HERMAN:  No, I want her
 7         to answer my question.  Is she
 8         familiar with...
 9              THE WITNESS:  I think we
10         need to go to the evidence base in
11         order to answer that question.
12    BY MR. HERMAN:
13         Q.   You can't -- you can't
14    answer that question?
15         A.   There -- there are 16
16    studies that are cited in this section.
17         Q.   Okay.
18         A.   Shall I get the --
19         Q.   No.
20         A.   Okay.
21         Q.   Do you agree that
22    prescription opioid use is not necessary
23    for the initiation of heroin use?
24         A.   Do you agree with...
```

Highly Confidential - Subject to Further Confidentiality Review

1          So this question, I think,

2     gets to the concept of risk factors which

3     is what I outlined in -- in the beginning

4     of the report in terms of how we define

5     risk factors in terms of causal

6     associations in epidemiology.

7               MS. RELKIN:  Objection to

8          form.

9               THE WITNESS:  So a lot of

10          risk factors are what we call

11          unnecessary insufficient causes.

12          So while certainly there are

13          heroin users that didn't start

14          with prescription opioids,

15          prescription opioid increases

16          the -- prescription opioid use

17          increases the risk of subsequent

18          transition to heroin use.

19     BY MR. HERMAN:

20          Q.    But you agree that

21     prescription opioid use is not necessary

22     for the initiation of heroin use?

23          A.    Again, the -- I would

24     point --

Highly Confidential - Subject to Further Confidentiality Review

1          MS. RELKIN:  Objection to

2     form.

3          THE WITNESS:  -- to the

4     concept of a risk factor.  And so

5     it increases the risk, and it is

6     not necessary.  Just like smoking

7     increases the risk of lung cancer,

8     but there's a lot of lung cancer

9     cases of individuals who didn't

10    smoke.  It doesn't make cigarettes

11    any less of a cause.

12 BY MR. HERMAN:

13    Q.    Do you agree that

14 prescription opioid use is not sufficient

15 for the initiation of heroin use?

16         MS. RELKIN:  Objection to

17    form.

18         THE WITNESS:  This also

19    points to the concept of risk

20    factors.  Just like there's many

21    smokers who never develop lung

22    cancer doesn't make smoking any

23    less of a cause.  There are many

24    risk factors in epidemiology that

Highly Confidential - Subject to Further Confidentiality Review

1    are in and of themselves

2    insufficient and unnecessary.  But

3    the evidence is clear that they

4    are causally related to outcomes

5    of interest.  And I would put

6    prescription opioids in that

7    category.

8  BY MR. HERMAN:

9       Q.    Do any of the articles that

10  you cite conclude that there is a causal

11  relationship between prescription opioid

12  use and heroin use?

13      A.    So, you know, I think in

14  developing an evidence base, this is how

15  science often progresses, is that you

16  build a body of work around a

17  different -- around a particular topic.

18           So it -- again, if -- if

19  any -- if it was just one of these

20  studies that suggested a relationship

21  between prescription opioid use and

22  heroin use, I think the evidence base

23  would be much less clear.

24           But given the weight of the

Highly Confidential - Subject to Further Confidentiality Review

1    evidence that is described in that

2    section, I think my scientific opinion is

3    that there is a causal relationship

4    between prescription opioid use and

5    heroin use.

6            And it's not based on any

7    one particular study.  It's based on

8    the -- the weight of the evidence.

9        Q.    But you would agree that

10   none of the articles that you cite

11   conclude that there is a causal

12   relationship between prescription opioid

13   use and heroin use?

14           MS. RELKIN:  Objection to

15        form.

16           THE WITNESS:  So what I

17        would agree with is that someone

18        trained in epidemiology who is

19        evaluating the evidence, would

20        conclude that there is a causal

21        relationship between prescription

22        opioid use and heroin use.  Any

23        one particular study doesn't make

24        that case, it's the body of

Highly Confidential - Subject to Further Confidentiality Review

1          evidence.

2     BY MR. HERMAN:

3          Q.     And none of the studies that

4     you cite conclude that there is a causal

5     relationship between prescription opioid

6     use and heroin use, correct?

7                 MS. RELKIN:  Objection to

8          form.

9                 THE WITNESS:  Again, I -- I

10         think any one particular study is

11         not sufficient to make that kind

12         of claim.  What can make a claim

13         is the body of evidence that is

14         evaluated.

15                And so I evaluated the body

16         of evidence and made -- came to

17         the conclusion that there is a

18         causal relationship.

19    BY MR. HERMAN:

20         Q.     You agree that only a small

21    portion -- a small portion of people who

22    use prescription opioids later use

23    heroin?

24                MS. RELKIN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                 THE WITNESS:  Prescription

3          opioid use increases the risk of

4          subsequent transition to heroin

5          use.  Heroin use is relatively

6          rare in the population.

7          Prescription opioid use is

8          relatively common.  So because of

9          those two things, you know,

10         that -- that underlies the concept

11         of risk factors.  That relatively

12         common exposures can influence

13         relatively rare outcomes.

14    BY MR. HERMAN:

15         Q.    But you agree that it's a

16    rare outcome that a prescription opioid

17    user later uses heroin?

18         A.    I wouldn't say it's a --

19                MS. RELKIN:  Objection.

20         Asked and answered.

21                THE WITNESS:  Well, I --

22         I -- what I would qualify that

23         with is the data on the number of

24         heroin users there are in the

1          United States, which is provided

2          in -- I'm sure it's in that

3          section.

4                So as of 2010, available

5          estimates were that there's

6          1.5 million individuals in the

7          U.S. using heroin at least four

8          times a month or more.  And so

9          there's probably even more heroin

10         users that are using less than

11         four times per month.  It's just

12         that prescription opioid use is

13         more common than that.

14   BY MR. HERMAN:

15         Q.    I don't think that answered

16   my question.

17                My question was, but you

18   agree that it's a rare outcome that a

19   prescription opioid user later uses

20   heroin?

21                MS. RELKIN:  Objection to

22         form.

23                THE WITNESS:  I would have

24         to qualify that statement by what

Highly Confidential - Subject to Further Confidentiality Review

1        you mean by rare.  I mean the

2        orders of magnitude of the

3        increase in risk that I cite in

4        this paper are -- indicate that

5        there -- there is a much higher

6        risk of transitioning to heroin

7        use given that you've used a

8        prescription opioid.

9              Heroin use overall in the

10        general population is 1.5 million.

11        Perhaps slightly more if you count

12        less than four times per month.

13              So as a general health

14        outcome, prescription opioid use

15        is more common than heroin use.

16        So the statement that it is rare

17        to transition, I don't think is

18        accurate.

19    BY MR. HERMAN:

20        Q.    Do you agree that the

21    absolute risk of transitioning to heroin

22    given prescription opioid use is relative

23    live small?

24        A.    That is a statement that I

Highly Confidential - Subject to Further Confidentiality Review

1    wrote in my report.

2           Q.    Okay.  So you'll agree with

3    that?

4           A.    I would agree with the

5    statement that I wrote in my report which

6    is -- hold on.  Let me just pull it up to

7    make sure that I'm describing the method

8    appropriately.

9                 Can you point to the page

10   number, please?

11          Q.    Page 27.

12          A.    Okay.

13          Q.    And I'm asking you --

14          A.    A small proportion of

15   individuals who use prescription

16   opioids progress to heroin use.  That's

17   correct.

18                There is -- prescription

19   opioid use is much more common than

20   heroin use.  So in order to explain the

21   increase in heroin use, only a small

22   proportion of opioid users need to

23   transition in order to explain that

24   increase.  That's the context for the

Highly Confidential - Subject to Further Confidentiality Review

1    statement.

2              I mean, the next sentence

3    gives you some indication that

4    individuals who use prescription opioids

5    are approximately seven times larger than

6    the number of individuals who use heroin.

7    So it only takes a small number of users

8    transitioning to create the opioid

9    epidemic that we observed in the last

10   several years.

11        Q.   Are you familiar with

12   analysis that shows that individuals who

13   use prescription opioids nonmedically to

14   self-medicate pain are less likely to

15   later use heroin?

16        A.    Are you familiar with the

17   analysis -- this is one particular

18   analysis?

19        Q.    I'm sorry.  Are you familiar

20   with analysis that shows that individuals

21   who use prescription opioids nonmedically

22   to self-medicate pain are less likely to

23   later use heroin?

24              MS. RELKIN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

```
 1              form.

 2                   THE WITNESS:  Less likely

 3              than whom?

 4   BY MR. HERMAN:

 5        Q.    Less likely than individuals

 6   who are using prescription opioids

 7   nonmedically to get high?

 8        A.    I would have to look at the

 9   methodology of the analysis, because I

10   don't understand what self-medicate pain

11   specifically means and how that's

12   measured.  Okay.  Do you have an analysis

13   that you can provide?

14        Q.    No.  I'm just asking, you're

15   not familiar with analysis that shows

16   that people that are --

17        A.    I don't --

18        Q.    -- that use prescription

19   opioids nonmedically to self-medicate

20   pain are less likely to later use heroin?

21        A.    Again, I don't -- I don't

22   understand the comparison group.  I don't

23   know what self-medicate pain means in

24   that circumstance.  So if there's
```

1    something to look at, I can look at it.

2    But nothing that I evaluated in this body

3    of work has -- looks at self-medicating

4    pain in that way.

5         Q.    Are individuals who

6    frequently use prescription opioids

7    nonmedically for the high the most likely

8    to later use heroin?

9              MS. RELKIN:  Objection to

10        form.

11             THE WITNESS:  Can you define

12        what you mean by "for the high"?

13   BY MR. HERMAN:

14        Q.    For the euphoric feeling.

15        A.    I would have to, again,

16   based on the epidemiological evidence

17   that I reviewed and my personal knowledge

18   about the literature on motivation to use

19   all kinds of drugs, including

20   prescription opioids, the whole concept

21   of euphoria is really difficult to

22   measure in the medical literature and in

23   the nonmedical prescription opioid

24   literature.

Highly Confidential - Subject to Further Confidentiality Review

1          So to make that kind of

2    claim, you would need strong data, and I

3    would need to see data that made that

4    kind of claim in order to evaluate that

5    statement.

6          Q.    Would you agree that

7    individuals who frequently use

8    prescription opioids nonmedically are

9    more likely to later use heroin?

10          MS. RELKIN:  Objection to

11          form.

12          THE WITNESS:  So that

13          evidence, evidence regarding that

14          question is in the report,

15          including that there is a

16          dose-response relationship between

17          the frequency of prescription

18          opioid use and the risk of

19          transition to heroin use.

20          So I would say -- I'm sorry.

21          You said prescription opioid

22          nonmedically.

23          So the data that's used to

24          make that statement, for example,

Highly Confidential - Subject to Further Confidentiality Review

1          in the National Household Survey

2          on Drug Use and Health, they

3          specifically query nonmedical use,

4          but I doesn't exclude medical

5          users.

6               So I would not agree with

7          your statement that individuals

8          who frequently use prescription

9          opioids non-medically are more

10         likely to later use heroin.

11              I would say that the body of

12         literature indicates that people

13         who use prescription opioids

14         frequently are more likely to

15         transition to heroin than people

16         who use prescription opioids

17         non-frequently --

18    BY MR. HERMAN:

19         Q.    And it's your testimony

20    that --

21         A.    -- infrequently.

22         Q.    -- that the body of

23    literature that you looked at went beyond

24    nonmedical use of prescription opioids?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I think that the available
2    literature that I have assessed in this
3    report indicates that a substantial
4    portion of nonmedical users -- and I
5    think I've cited some of the studies
6    already in this deposition, received
7    legitimate prescriptions from providers
8    at some point so a differentiation
9    between someone who's only ever used
10   opioids nonmedically and someone who used
11   both medically and nonmedically, I think,
12   is not -- we're not separating out people
13   who've only used opioids nonmedically.
14   The vast majority of individuals who use
15   opioids nonmedically obtain a
16   prescription at some point.
17        Q.    But do you recall any of the
18   studies that you looked at that
19   specifically look at medical use of
20   prescription opioids?
21        A.    So again I can pull out the
22   studies because a lot of the studies
23   include assessments of heroin users
24   who've -- the percentages who have

Highly Confidential - Subject to Further Confidentiality Review

1   received prescription opioids from a

2   doctor.

3           Q.    All right.  Heroin use was

4   prevalent in the 1960s and 1970s, right?

5                 MS. RELKIN:  Objection to

6           form.

7                 THE WITNESS:  What do you

8           mean by prevalent?  I have from

9           the '60s and '70s that the number

10          of individuals using heroin in the

11          U.S. was approximately 100,000.

12  BY MR. HERMAN:

13          Q.    And do you recall that the

14  Cicero article that you cite discusses

15  that among persons who began opioid use

16  in the 1960s, more than 80 percent

17  reported that their first opioid was

18  heroin?

19          A.    I'm going to have to pull

20  the article out to --

21          Q.    Okay.  Why don't we mark it.

22          A.    84 is not in here.  Cicero

23  is 86, right?

24          Q.    I'm going to hand you a

Highly Confidential - Subject to Further Confidentiality Review

```
1    copy.
2           A.    Okay.
3           Q.    We'll mark it.
4                 (Document marked for
5           identification as Exhibit
6           Keyes-8.)
7    BY MR. HERMAN:
8           Q.    I'm handing you the Cicero
9    article that's been marked as Exhibit 8.
10          A.    And so there's a sentence in
11   here to evaluate?
12          Q.    Yeah.  Under results.
13   "Respondents who began using heroin in
14   the 1960s were predominately young men
15   whose first opioid abuse was heroin."
16          A.    I can't read the results
17   section in this copy.  I can pull up my
18   version.  But this is all fuzzy.
19          Q.    Why don't you pull your
20   version, but it's actually on the front
21   page.
22                MS. RELKIN:  She wants to --
23                THE WITNESS:  Well, the
24          abstract is one thing --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. RELKIN:  She wants to be
 2        sure.
 3              THE WITNESS:  -- but I'd
 4        like to go to the results.
 5              Let me just make sure this
 6        is the same article.
 7              Okay.  So you had a comment
 8        on the results section of the
 9        abstract?
10  BY MR. HERMAN:
11        Q.    Yes.
12        A.    Respondents who began using
13  heroin in the 1960s...
14              Okay.  So these are data
15  from the -- from the sample called SKIP,
16  survey of Key Informants Patients
17  program.
18              So this is 150 publicly and
19  privately funded treatment centers.
20              And so this is individuals
21  who met DSM-IV criteria for substance
22  abuse of the primary drug of prescription
23  opioids or heroin.
24              And so I'm just trying to
```

Highly Confidential - Subject to Further Confidentiality Review

1    see how they ask this question.

2            Okay.  So the SKIP

3    respondents were asked to identify the

4    opioid most frequently used in the last

5    month, how often they abuse, what age

6    they began abusing regularly.

7            Okay.  So now the question

8    is, among those who started using in the

9    1960s, the percentage of the

10   heroin-dependent sample that used heroin

11   first was 80 compared to -- a little over

12   80 compared to 20.  That's correct.

13       Q.    Professor Keyes, you said

14   this was one of the studies that you

15   relied on, right?

16       A.    Yes.

17       Q.    And, Professor Keyes, you

18   were an author on an article that was

19   published in January of 2018?

20       A.    Wait, can we -- I'm sorry.

21   I didn't realize that we were leaving

22   this paper.  I just want to comment that

23   the percentage of individuals who use

24   prescription opioids before heroin

Highly Confidential - Subject to Further Confidentiality Review

1    increased with every single decade

2    commensurate with the increase in the

3    prescription opioid supply, from 1980 to

4    1990, to 2000.  So I think that focusing

5    only on the 1960 cohort obfuscates the

6    point of the analysis, which is that

7    there was an increase in the percentage

8    who used prescription opioids first among

9    that heroin dependent sample.

10           Q.    Well, I appreciate that.

11           A.    So I want to make sure that

12   that's clear.

13           Q.    Now, in the abstract on --

14   well, on Page 26 of your report you said

15   that this study shows that 85 percent of

16   heroin users began with prescription

17   opioids in 2010, and 78 percent -- or I'm

18   sorry.  85 percent in 2000 and 78 percent

19   in 2010, right?

20           A.    So I say, "From the 1990s

21   on, as the supply of opioids increased,

22   so too did the proportion of individuals

23   who used heroin who began opioids use

24   with prescription opioids."  And then I

Highly Confidential - Subject to Further Confidentiality Review

1    listed the percentages in Cicero for each

2    of the decades.

3            Q.    And if you want to set that

4    article aside.

5                  You were an author on an

6    article that was published in

7    January 2018 that stated that the

8    incidence of heroin use among those who

9    were naive to prescription opioids had

10   increased.  Do you recall that?

11           A.    I need to know which paper

12   you're talking about.  I publish a lot of

13   papers.

14           Q.    You don't recall being an

15   author on a paper that --

16           A.    I would like to see the

17   paper and the context in which that

18   statement was made.

19           Q.    Well, I'm just asking you if

20   you recall writing a paper that the

21   incident of heroin --

22           A.    I -- I --

23           Q.    -- use among --

24           A.    Unless I understand the

1    context of the statement, I'm -- I need

2    to see the paper.

3         Q.    Are you aware of literature

4    that shows that the incidence of heroin

5    use among those who were naive to

6    prescription opioids has increased?

7         A.    Heroin use has increased

8    among -- and there's certainly more of an

9    increase among -- and there's numerous

10   papers, I think I cite Compton in here in

11   particular, that show that heroin use has

12   increased more among prescription opioid

13   users.

14        Q.    Well, that wasn't my

15   question.

16             I'm asking you, are you

17   aware of literature that shows that the

18   incidence of heroin use among those who

19   were naive to prescription opioids has

20   increased?

21        A.    Again, I don't think you can

22   evaluate that statement without the

23   entire context, which is that heroin use

24   has gone up overall, and more so among

Highly Confidential - Subject to Further Confidentiality Review

1  those who use prescription opioids.

2       Q.    Okay.  Well, just listen to

3  my question.  Are you aware of literature

4  that says that the incidence of heroin

5  use among those who are naive to

6  prescription opioids has increased?

7       A.    I think I've answered the

8  question.

9       Q.    You've certainly given me

10  your view --

11       MS. RELKIN:  There's more

12       than -- if you want to show her --

13  BY MR. HERMAN:

14       Q.    -- but I'm asking you

15  whether you are aware of literature that

16  shows that the incidence of heroin use

17  among those who are naive to prescription

18  opioids has increased.

19       A.    The incidence of heroin use

20  has increased among both prescription

21  opioid users and individuals who have

22  never used prescription opioids, has

23  increased more among prescription opioid

24  users.  Heroin use overall has gone up.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    I'm asking you -- maybe I

2   should rephrase my question.

3           Are you aware that the

4   percentage of individuals using heroin --

5   or excuse me.  Are you aware that the

6   percentage of heroin users who are opioid

7   naive to prescription opioids has

8   increased?

9           MS. RELKIN:  Objection to

10          form.

11          THE WITNESS:  My assessment

12          of the epidemiological literature

13          is that heroin use overall has

14          increased across groups of

15          individuals who have both used and

16          haven't used prescription opioids,

17          and it's gone up more among people

18          who use prescription opioids.

19   BY MR. HERMAN:

20     Q.    Are you aware that Cicero

21   reported in the 2018 article that

22   described heroin use as a first opioid --

23   that described how heroin use as a first

24   opioid grew from 8.7 percent in 2005 to

Highly Confidential - Subject to Further Confidentiality Review

1    almost 31.6 percent at 2016 --

2         A.    I need to see the article.

3         Q.    You are not aware of that

4    article?

5         A.    I -- I need to evaluate the

6    article in order to know -- I don't know

7    the -- the facts and figures in Cicero

8    2018 off the top of my head.

9         Q.    But you believe that

10   Cicero's -- this article was a reliable

11   source that you used?

12             MS. RELKIN:  Objection to

13        form.

14             THE WITNESS:  I'm not going

15        to make a statement about a paper

16        that I don't have in front of me.

17   BY MR. HERMAN:

18        Q.    Did you consider the fact

19   that the incidence of heroin use among

20   those who are naive to prescription

21   opioids is increasing in your causal

22   analysis?

23        A.    So risk factor epidemiology

24   has a frame for evaluating the causal

Highly Confidential - Subject to Further Confidentiality Review

1 relationships between exposures and

2 outcomes. Oftentimes includes

3 assessments of factors that are neither

4 necessary nor sufficient.

5 So again to use the smoking

6 in lung cancer example, because I think

7 we can all agree that smoking causes lung

8 cancer. There are people who have lung

9 cancer who have never smoked. That

10 doesn't preclude cigarette smoking from

11 being a cause of lung cancer.

12 Similarly, there are people

13 who -- who use heroin who might never

14 have used a prescription opioid. That

15 doesn't make prescription opioids any

16 less of a cause.

17 Q. Wouldn't it change your

18 80 percent figure?

19 MS. RELKIN: Objection to

20 form.

21 THE WITNESS: Can you

22 describe your methodology for

23 that?

24 BY MR. HERMAN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Well, if more people were

2    using heroin as their opioid of first

3    use, wouldn't the percentage of people --

4    A.    I need to see the paper in

5    front of me in order to evaluate that

6    statement.

7    Q.    Let me finish my question

8    please.

9    If you're starting with, as

10   you report, that 80 percent of people

11   transition from heroin -- from

12   prescription opioids to heroin --

13   A.    That's not -- sorry.  You

14   can continue.  But I disagree with that.

15   Q.    Okay.

16   -- wouldn't you -- wouldn't

17   the percentage of people who are using

18   heroin as their first opioid matter to

19   that calculation?

20   A.    Those are two different

21   research questions.

22   Q.    Okay.

23   Can I ask you to flip to

24   Page 3.  And on Page 3 you say, in the

Highly Confidential - Subject to Further Confidentiality Review

1    second -- sorry, the third bullet, that

2    approximately 80 percent of heroin users

3    in the last two decades used prescription

4    opioids before heroin use?

5            A.    That's what it says.

6            Q.    Okay.  And can you flip back

7    to Page 26.  And if you look at the

8    second paragraph, the first sentence, you

9    say, "The available data consistently

10   shows that approximately 70 to 80 percent

11   of individuals who used heroin in the

12   last 20 years started their opioid use

13   with prescription opioids."

14                Do you see that?

15           A.    Yes.

16           Q.    Okay.  Are you using

17   approximately 80 percent for your

18   opinion, or 70 to 80 percent?

19                MS. RELKIN:  Objection to

20           form.

21                THE WITNESS:  I would defer

22           to what is actually in the report,

23           the 70 to 80 percent.

24   BY MR. HERMAN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.

2    A.    It's closer to 80 percent

3  across the studies, but I think the more

4  conservative evaluation of the literature

5  would be 70 to 80.

6    Q.    Okay.  And what's the

7  20-year time period that you're looking

8  at?

9    A.    I would say that the

10  majority of the literature that I

11  evaluated was 1990 to now.  So the past

12  two plus decades.

13    Q.    Okay.  So the time period

14  you're looking at goes from 1990 to the

15  present?

16         MS. RELKIN:  Objection to

17     form.

18         THE WITNESS:  Probably late

19     1990s to the present.  That's the

20     last 20 years.  We are in 2018.

21     So late 1990s to the present.

22  BY MR. HERMAN:

23    Q.    You opine that the abuse of

24  prescription opioids is causally tied to

Highly Confidential - Subject to Further Confidentiality Review

1    the increase in the supply of

2    prescription opioids, right?

3         A.    You opine that the abuse of

4    prescription opioids is causally tied to

5    the increase of supply -- yes, that is

6    correct.

7         Q.    What, if anything, did you

8    do to investigate trends in the supply of

9    nonprescription illicit opioids?

10              MS. RELKIN:  Objection to

11         form.

12              THE WITNESS:  So the

13         available epidemiological

14         literature that I have

15         predominately uses opioid

16         distribution data as an exposure.

17              The data on supply of other

18         kinds of opioids is more difficult

19         to collect, because it is a black

20         market.

21    BY MR. HERMAN:

22         Q.    Are you aware of changes in

23    the quantity of heroin in the United

24    States?

```
 1              A.    I'm aware that there are --

 2                    MS. RELKIN:  Objection to

 3         form.

 4                    THE WITNESS:  -- data -- I

 5         am aware that there have been

 6         attempts to evaluate.

 7   BY MR. HERMAN:

 8         Q.    Are you aware that the

 9   supply of heroin has increased in the

10   United States?

11         A.    I would need to see the

12   source of data that you're using to make

13   that statement.

14         Q.    Okay.  Not something that

15   you looked into?

16                    MS. RELKIN:  Objection to

17         form.

18                    THE WITNESS:  If you have a

19         specific document that I should

20         evaluate, I would be happy to

21         evaluate.  What I've done here is

22         looked at the epidemiological

23         literature.  If there's a

24         different source that's not in the
```

Highly Confidential - Subject to Further Confidentiality Review

1      epidemiological literature that I

2      reviewed, I cannot speak to it

3      unless I see the document.

4  BY MR. HERMAN:

5      Q.    Are you aware whether the

6  distribution network for heroin in the

7  United States has become more widespread?

8      A.    I would need to see the

9  document that you're using or source of

10  data.

11      Q.    Are you aware whether the

12  price of heroin in the United States has

13  decreased?

14          MS. RELKIN:  Objection to

15      form.

16          THE WITNESS:  Did -- I mean,

17      what data provide that assessment?

18      Because I reviewed the

19      epidemiological literature.

20  BY MR. HERMAN:

21      Q.    I'm just asking if you're

22  aware.  Are you aware one way or the

23  other if the price of heroin in the

24  United States has decreased?

1    A.    There are data sources that

2    attempt to evaluate that position, but

3    there's a lot of measurement error in

4    trying to assess price.  So I would need

5    to see, if someone were to make that

6    statement, I would need to see the source

7    of data in order to evaluate whether it's

8    epidemiologically rigorous.

9              (Document marked for

10         identification as Exhibit

11         Keyes-9.)

12   BY MR. HERMAN:

13   Q.    I'm handing you what's been

14   marked as Keyes Exhibit 9.  It's a

15   Lankenau study that you reference in your

16   report.

17   A.    Yes.

18   Q.    Okay.  And this study looked

19   at 50 injection drug users who had used

20   prescription drugs at least three times

21   in the past three months; is that

22   correct?

23             I'll direct your attention

24   to the first page, "Methods:  Those young

1    IDUs who misused a prescription" --

2          A.    Yeah, I -- I just want to

3    read it in the actual methods section

4    because sometimes things can be over

5    simplified in an abstract.  So study

6    eligibility was based on three criteria:

7    Aged 16 to 25, misused a prescription

8    drug at least three times in the past

9    three months, and had injected a drug

10   within the past three months.

11          Q.    Okay.

12          A.    So those are the three

13   eligibility criteria.

14          Q.    So the requirements for

15   being in the study were an age

16   requirement, right?

17          A.    16 to 25 years old.

18          Q.    The second requirement was

19   that you had used a prescription drug

20   three times in the past three months,

21   correct?

22          A.    Yes.

23          Q.    And the third requirement

24   was that you were an injection drug user?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    You had injected a drug

2  within the past three months.

3    Q.    Wouldn't you expect to find

4  a higher number of individuals who used

5  prescription drugs before heroin use in a

6  population that required both

7  prescription drug use three times in the

8  past month and injection users?

9         MS. RELKIN:  Objection to

10        form.

11        THE WITNESS:  I mean, this

12        is why we do research because we

13        don't know what we expect to find

14        before we do the research.  And so

15        this particular paper is evaluated

16        within a larger body of

17        literature.  So what you expect

18        is -- you have to do the research

19        in order to determine what you

20        would expect.

21  BY MR. HERMAN:

22    Q.    You don't think that the

23  selection criteria made it more likely

24  that you would find people who were using

1   both prescription drugs and who were

2   heroin users?

3               MS. RELKIN:  Objection to

4        form.

5               THE WITNESS:  I think I've

6        answered the question.

7   BY MR. HERMAN:

8        Q.    I'm handing you Keyes

9   Exhibit 10.

10              (Document marked for

11       identification as Exhibit

12       Keyes-10.)

13  BY MR. HERMAN:

14       Q.    Which is the Mateu-Gelabert

15  study that you referenced in your report.

16  And if I could direct your attention to

17  the methods description on Page 3.

18       A.    Yes.

19       Q.    And this is a study that

20  involved 46 New York young adults who

21  engaged in nonmedical prescription drug

22  use, right?

23       A.    Prescription opioid use.

24       Q.    Prescription opioid use.

1          And half the participants

2    were referred by service providers,

3    including an outreach program for young

4    injectors, right?

5          A.    Drug treatment programs, an

6    outreach program for young injectors, key

7    informants or other research projects are

8    the sources.

9          Q.    Okay.  And so you'd agree

10   some unknown percentage of this

11   population was recruited from a service

12   provider program for young injectors?

13         A.    I would agree that there

14   were five sources of data selection.

15   They were drug treatment programs, an

16   outreach program for young injectors, key

17   informants, other research projects, and

18   the remaining other participants were

19   recruited via chain referral from other

20   participants.

21         Q.    Okay.  And chain referral

22   means that some of the people who had

23   been recruited referred other people?

24         A.    That's typically what chain

Highly Confidential - Subject to Further Confidentiality Review

1    referral refers to.

2         Q.    Okay.  You would agree that

3    there were studies that you discussed in

4    your report that show a lower percentage

5    of heroin users use prescription opioids

6    before heroin than the 70 to 80 percent

7    figure that you use, right?

8              MS. RELKIN:  Objection to

9         form.

10             THE WITNESS:  You would

11        agree that there were studies that

12        you discussed in your report that

13        show a lower percentage.

14             If there is a particular

15        study that I should --

16   BY MR. HERMAN:

17        Q.    Well, for example you

18   discuss the Pollini study, correct?

19        A.    Which reference number?

20        Q.    Well, I'll refer you to Page

21   26 of your report.  You say, "Pollini, et

22   al., studied 123 individuals who injected

23   heroin, documenting a 39.8 percent

24   reported prescription opioid use prior to

1    heroin use."

2          A.     I'm going to get the paper.

3          Q.     That's not what you wrote in

4    your report.

5          A.     This is what I wrote in the

6    report, but if you are asking me a

7    question about the paper, I want to see

8    the paper before I answer the question.

9          Q.     Okay.  You don't recall

10   whether there were studies that show a

11   lower percentage of heroin users who used

12   prescription opioids before heroin in the

13   70 to 80 percent figure that you're

14   using?

15         A.     So I'm going to look at this

16   study.

17         Q.     Well, before you do that,

18   I'm just asking if you recall.

19         A.     I'm sorry.  What was the

20   question?

21                You don't recall whether

22   there were studies that show a lower

23   percentage of users who use prescription

24   opioids before heroin.

Highly Confidential - Subject to Further Confidentiality Review

1    You know, there's 200

2  citations in this report.  If I'm being

3  asked a specific question about a piece

4  of evidence, I'd like to review the

5  material before answering the question.

6         Q.    You've talked several times

7  today about how persuasive those 16

8  studies were that you reviewed, right?

9         A.    I said that there was a body

10  of evidence and that that body of

11  evidence together made a compelling case.

12         Q.    And you carefully reviewed

13  those 16 studies?

14         A.    I reviewed the 16 studies.

15         Q.    Okay.

16         A.    Do you want immediate to

17  read this paper and talk about the

18  figure?  39.8 percent?

19         Q.    Go ahead.

20         I direct you -- I believe --

21  you can look through it.  But I believe

22  it's on Page 180 -- 178.  It's where it

23  discussed the results.

24         A.    Okay.  So this paper needs

Highly Confidential - Subject to Further Confidentiality Review

1  to be a bit qualified because as you will

2  read in the methods section, the question

3  that was asked was, "Before you began

4  using heroin, were you hooked on

5  prescription-type opioids?

6            "Those who answered

7  affirmatively were then asked, 'Which

8  prescription-type opioids were you hooked

9  on?'"

10            So those are the measures

11  that we're looking at.

12            And then in the results

13  section --

14       Q.    Well, I'll direct you to

15  this -- the conclusion.  The

16  conclusion --

17       A.    No, I would like to look at

18  the results.  I'm sorry, I'm -- I just

19  want to see where these numbers are

20  coming from before drawing a conclusion.

21       Q.    Well, why don't I read you

22  the conclusion while you do that.  It

23  says, "In this" --

24            MS. RELKIN:  Well, she

Highly Confidential - Subject to Further Confidentiality Review

1    can't -- she has to -- she's

2    reading, she can't listen.

3         So let her read it and then

4    you can ask your question.

5         THE WITNESS:  Okay.  I'm

6    just trying to find this

7    30 percent.

8         Okay.  So they defined these

9    groups as "characteristics of

10   heroin injectors who responded

11   affirmatively to the question

12   about being hooked on

13   prescription-type opioid use."

14        So the 39.8 percent cited in

15   the report is individuals who

16   injected heroin who are first

17   hooked on prescription-type

18   opioids.

19        So it's not necessarily

20   germane to individuals who started

21   using opioids, prescription

22   opioids for their opioid using

23   career.

24   BY MR. HERMAN:

Highly Confidential - Subject to Further Confidentiality Review

 1          Q.    But you'd agree with me that

 2    the conclusion states, "In this study of

 3    young heroin IDUs in San Diego,

 4    California, we found that 40 percent

 5    reported problematic use of prescription

 6    type opioids prior to initiating heroin

 7    use.  Similar proportions of prior

 8    problematic prescription-type opioid use

 9    have been reported in studies of young

10    heroin IDUs in Portland, Oregon,

11    47 percent, and Seattle, Washington,

12    44 percent."

13          A.    So I think these are two

14    different research questions.  One

15    research question is about individuals

16    who are using the -- the proportion who

17    used prescription opioids prior to

18    heroin.  I think these studies speak to a

19    different research question, which is the

20    proportion who were hooked on

21    prescription opioids prior to heroin.

22                And I would need to look at

23    References 12 and 13 to make statements

24    about those particular studies.  I'm only

1   speaking to this Pollini article.

2            References 12 and 13 are

3   another Pollini article that was not a

4   peer-reviewed paper.  It was a late

5   breaker abstract at CPDD from the same

6   sample.  It looks like.  I would have to

7   look at it again to make -- be sure.

8            And then the other one is

9   also not a peer-reviewed paper.  It is a

10  paper called "Drug Abuse Trends in the

11  Seattle King County Area 2009," that was

12  in the proceedings of a working group.

13           So I don't know that I can

14  really make conclusions about those

15  percentages based on an abstract in a

16  working group paper.

17       Q.    Okay.  But you would agree

18  with me that there are studies in papers

19  that report lower percentages of --

20       A.    No, I would not agree.

21       Q.    Okay.  Do you think William

22  Compton is a well-regarded researcher?

23           MS. RELKIN:  Objection to

24       form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. HERMAN:

 2         Q.     I'm sorry, Wilson Compton.

 3         A.     I was going to say, William

 4    Compton.

 5         Q.     My dad's named William.

 6         A.     Wilson Compton has published

 7    in the peer-reviewed literature.  In

 8    order to establish the validity of any

 9    one particular paper that Wilson Compton

10    participated in I would need to evaluate

11    it on a case-by-case basis.

12         Q.     He is the deputy director of

13    the National Institute of Drug Abuse of

14    the National Institute of Health?

15         A.     That's correct.  Based on my

16    current knowledge.

17         Q.     Okay.  I'm going to hand you

18    an article by Wilson Compton that you

19    referenced in your report.  It's been

20    marked as Keyes Exhibit 11.

21              (Document marked for

22         identification as Exhibit

23         Keyes-11.)

24    BY MR. HERMAN:
```

1    Q.    And I direct your attention

2  to Page 156.  And under the heading

3  "Heroin Use Among People Who Use

4  Prescription Opioids Nonmedically."

5          This article states that

6  "studies that address the patterns of

7  heroin use in nonmedical users of

8  prescription opioids are mostly

9  observational and descriptive, i.e.,

10 nonexperimental, thus conclusions about

11 cause and effect are uncertain."

12          Do you see that?

13    A.    That is what is written

14 here.

15    Q.    Do you disagree with

16 Dr. Compton's conclusions about the

17 ability to draw conclusions about cause

18 and effect from observational descriptive

19 studies he reviewed?

20          MS. RELKIN:  Objection to

21     form.

22          THE WITNESS:  We make causal

23     conclusions about observational

24     data in epidemiology frequently.

Highly Confidential - Subject to Further Confidentiality Review

1  You have to build an evidence

2  base.  No one particular study

3  from observational data allows you

4  to make a cause/effect conclusion

5  concretely, but when you build an

6  evidence base -- again, I would

7  point to smoking and lung cancer

8  for which there was never an

9  experimental study.

10 BY MR. HERMAN:

11  Q.   Okay.  Do you disagree with

12 Dr. Compton's conclusions about his

13 ability to draw a conclusion about cause

14 and effect from observational

15 descriptive -- observational descriptive

16 studies that he reviewed?

17  MS. RELKIN:  Objection to

18  form.  Are you talking about

19  conclusions from the top of the

20  paragraph or the bottom of the

21  paragraph?

22  MR. HERMAN:  I'm talking

23  about the sentence that I -- that

24  we -- two sentences that we read

1     and agreed at the top of the

2     paragraph.

3          THE WITNESS:  You know,

4     again, I think the evidence base

5     overall for this particular topic

6     is quite consistent in showing a

7     positive association, which is

8     what Compton states in that

9     paragraph.  And that we use those

10    kinds of data in observational

11    epidemiology when we're drawing

12    conclusions.

13  BY MR. HERMAN:

14       Q.   If you were writing for a

15  professional journal would you draw a

16  conclusion about causality from the

17  observational descriptive studies that

18  Dr. Compton looked at?

19          MS. RELKIN:  Objection to

20    form.

21          THE WITNESS:  So I do write

22    for professional journals.  And I

23    have evaluated the literature in

24    this report.  And I would draw the

Highly Confidential - Subject to Further Confidentiality Review

1      conclusion in any forum, that the

2      available literature is consistent

3      with a causal association.

4           I mean, even Wilson Compton

5      in this sentence said that, "It's

6      highly suggestive and plausible

7      given their common pharmacologic

8      principles."

9           I think I would go a step

10      further given that we now have

11      three more years of data since

12      this was published.

13  BY MR. HERMAN:

14      Q.    So you disagree with his

15  conclusion that -- his statement that

16  conclusions about cause and effect are

17  uncertain?

18      A.    I would agree with his

19  conclusion that there is a positive

20  association, that it's highly suggestive

21  and plausible.  And that given the

22  additional three years of publications

23  that I reviewed here, that there's

24  consistent evidence for a causal

Highly Confidential - Subject to Further Confidentiality Review

1  association between prescription opioid

2  use and heroin use.

3          MS. RELKIN:  Counsel, are

4      you directing to the conclusion

5      section where the conclusions

6      actually are?

7          MR. HERMAN:  No.  I asked

8      the questions that I asked.

9          MS. RELKIN:  You referred to

10     a conclusion which was not in the

11     conclusion section, just for the

12     record.

13  BY MR. HERMAN:

14     Q.   It says, "Thus, conclusions

15  about cause and effect are uncertain."

16         You would agree with that,

17  right?  That's what it says there.  Uses

18  the word "conclusion"?

19     A.   Here in this paragraph, it

20  is written, "Thus, conclusions about

21  cause and effect are uncertain."

22         In the conclusions section,

23  it says that prescription opioids are a

24  strong risk factor for heroin use.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    And at the bottom of that

2   first column, he discusses a study that

3   found an Ohio 50 percent of persons 18 to

4   33 years of age who had recently begun

5   using heroin reported having abused

6   opioids, primarily OxyContin, before

7   initiating heroin use?

8        A.    So I need to see the study.

9        Q.    I'm just asking you if

10  that's what he reported at the bottom of

11  this first column onto the second column.

12              MS. RELKIN:  If you are --

13              THE WITNESS:  If you're

14         asking me what is written, I think

15         we can all agree what is written.

16         If you want me to look at the

17         study, I believe I cited it in my

18         report, and I can look at the

19         study and provide you with an

20         assessment of what that study

21         shows.

22  BY MR. HERMAN:

23        Q.    And the percentage in that

24  study was less than the 80 percent that

Highly Confidential - Subject to Further Confidentiality Review

1  you used in your report?

2      A.    I have to go to the study.

3      Q.    Well, 50 percent is less

4  than 80 percent, right?

5      A.    I'm going to pull the study

6  out.

7      Q.    Well, I'm asking you a

8  different question now.  Is 50 percent

9  less than 80 percent?

10      A.    I'm not going to answer the

11  question without -- it's comparing apples

12  and oranges.

13      Q.    I'm just asking you a

14  numerical principle, is 50 percent less

15  than 80 percent?

16          MS. RELKIN:  Objection,

17      Counsel.  This is argumentive and

18      silly.

19          THE WITNESS:  So Siegal is

20      "Probable Relationship Between

21      Opioid Abuse and Heroin Use"?  So

22      that is Reference Number 96 in my

23      report.  I'll just pull that out.

24  BY MR. HERMAN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    That's okay.  I'm not asking

2   you questions about that report right

3   now.  Thank you.

4    A.    Well, I would like to answer

5   the question.

6    Q.    Well, I've got limited time,

7   and I'd like to ask my questions, please.

8         If you could look at Table 1

9   of the Compton study.  And in your paper

10   you discuss --

11    A.    I'm sorry.  Table 1.

12    Q.    Table 1 on Page 158.  And in

13   your report, the Page 26, you discuss how

14   heroin use has increased from 138 percent

15   from 2002 to 2004?

16    A.    Hold on a second.  I need to

17   find the place in the report where that

18   is.

19    Q.    It is on Page 26, middle of

20   the first paragraph.

21    A.    Okay.  "Among individuals

22   who use prescription opioids, heroin has

23   increased by 138 percent from 2002 to

24   2004 and 2011 to 2013 and the connection

1    is particularly strong among young

2    adults."  That is the statement that I

3    make in the report.

4         Q.    Okay.  And if you turn back

5    to Table 1, Table 1 of the Compton study,

6    that shows that cocaine use had increased

7    by 87.3 percent.

8         A.    I'm sorry, that's not

9    accurate.  They're looking at the

10   percentage change in rates of heroin use

11   among the row defined user; is that

12   correct?  So you said rates of cocaine

13   use have increased?  I don't think that

14   is what that shows.  Let me go to the --

15               MS. RELKIN:  Table 1.

16               THE WITNESS:  Table 1.

17               MS. RELKIN:  Isn't that

18         this?

19               MS. WINNER:  Excuse me,

20         Counsel.

21               MS. RELKIN:  She's looking

22         at the wrong thing.  If you want

23         her --

24               THE WITNESS:  Are you

1          looking at Figure 1?

2               MS. RELKIN:  He's referring

3          at Table 1.  I'm trying to help.

4               MR. HERMAN:  I'm looking at

5          Table 1 of the Compton report.

6               MS. RELKIN:  She's looking

7          at Figure 1.  Okay.  Nothing

8          improper to try to have her look

9          at -- to be on the same page.

10              MR. HERMAN:  We're on the

11         same page.  Thank you for...

12              THE WITNESS:  Okay.  So

13         Table 1 is the annual average

14         rates of heroin use during the

15         previous year.  According to the

16         substance use characteristic and

17         time period in the United States

18         from 2002 to 2013.

19              You made the statement that

20         they're describing changes in

21         cocaine use.  But I believe these

22         are increases in heroin use among

23         the row defined users.

24    BY MR. HERMAN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Yes.  Among individuals who

2    used cocaine in the past year, heroin had

3    increased 87.3 percent, right?

4    A.    I think this goes back to

5    the topic that we were discussing earlier

6    in that heroin use has increased among a

7    whole broad swath of the population.

8    According to Table 1, the group in which

9    heroin use has increased the most --

10    Q.    That's not my question,

11    right?  I asked about --

12    MS. RELKIN:  She's answering

13    your question.

14    MR. HERMAN:  That is not an

15    answer to my question.

16    MS. RELKIN:  You cut her

17    off.  You cut her off.

18    MR. HERMAN:  I mean, this

19    is -- I mean, she's got to answer

20    the questions that I'm asking.

21    MS. RELKIN:  You don't know

22    where -- what the rest of her

23    sentence was going to be because

24    you cut her off.

Highly Confidential - Subject to Further Confidentiality Review

1    MR. HERMAN:  All right.  I

2    mean, many of the answers today

3    have been very nonresponsive.  But

4    please.

5    MS. RELKIN:  Do you remember

6    where -- what the question was?

7    THE WITNESS:  Can you ask

8    your question again?

9  BY MR. HERMAN:

10    Q.    Among individuals who had

11  used cocaine in the past year, heroin use

12  increased 87.3 percent, right?

13    MS. RELKIN:  From what time

14    period, Counsel?

15    MR. HERMAN:  2002 to 2004 to

16    2011 to 2013.

17    THE WITNESS:  Again, that

18    one data point is in an entire

19    table.  Heroin use increased among

20    binge users, marijuana users,

21    cocaine users, and nonmedical use

22    of other psychotherapeutic agents

23    in the previous year.

24    The group that it increased

1    the most was nonmedical use of

2    prescription opioids in the

3    previous year.

4         (Document marked for

5    identification as Exhibit

6    Keyes-12.)

7    BY MR. HERMAN:

8         Q.   I'm handing you what's been

9    marked as Keyes Exhibit 12 which is the

10   Murray study referenced in your report

11   that you spoke about earlier.

12        I direct your attention to

13   Page 3.  The full paragraph -- first full

14   paragraph where it says, "In the field of

15   substance abuse there are also theories

16   of common vulnerability, suggesting that

17   drug use is part of a general répétiteur

18   of risky behavior.  This explanatory

19   model presumes that there are no

20   significant differences within the group

21   of illicit drug users and that the

22   selection of different drugs to consume

23   is largely a function of environmental

24   factors such as opportunity to use a

1   given drug."  Do you see that?

2          A.    Can you give me a minute to

3   just read it --

4          Q.    Sure.

5          A.    -- on my own.

6                Yes.

7          Q.    Are you familiar with the

8   common vulnerability theory?

9          A.    I am.

10         Q.    Did you consider that in

11  assessing your causal analysis?

12         A.    Yes.

13         Q.    Okay.  How so?

14         A.    I, you know, there's

15  substantial decades of epidemiological

16  research on drug use that indicates that

17  there are individual characteristics,

18  including heritability, that predispose

19  some people to be more likely to be

20  addicted versus others.

21                However, supply,

22  availability, price, and the opportunity

23  to use determine not only the overall

24  population percentage, but what drugs

1    will be used by a particular person.

2         Q.    And would you agree with me

3    that prior substance abuse is a -- is a

4    risk factor for heroin use?

5              MS. RELKIN:  Objection to

6         form.

7              THE WITNESS:  I think that

8         there are a whole range of risk

9         factors for drug use, abuse, and

10        addiction that range from

11        molecular to societal.

12   BY MR. HERMAN:

13        Q.    Is prior substance abuse a

14   risk factor for nonmedical prescription

15   opioid use?

16        A.    Can you be more specific of

17   what you mean by "prior substance abuse"?

18   Are you referring to a DSM category or?

19        Q.    Well, I'm asking if someone

20   has a substance abuse issue, does that

21   put them more at risk for nonmedical use

22   of prescription opioids?

23        A.    Do you mean -- what do you

24   mean by substance abuse issue?

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    A diagnosed -- well, if

2   someone had previously used cocaine

3   regularly to get high, would they be more

4   at risk for nonmedical use of

5   prescription opioids?

6              MS. RELKIN:  Objection to

7         form.

8              THE WITNESS:  I would have

9         to see a particular study that

10        evaluated that issue.

11  BY MR. HERMAN:

12       Q.    Okay.  Can I ask you to turn

13  to Page 14 and to look at Table 6.  It's

14  a table at the top of Page 14.

15             MS. RELKIN:  Of Exhibit 12?

16             MR. HERMAN:  Yes.  Of the

17        Murray study.

18             THE WITNESS:  So table -- it

19        gets cut off at the end of

20        Page 13, right?  That --

21  BY MR. HERMAN:

22       Q.    Yeah.  And I think it's --

23  the back is on page --

24       A.    Okay.  I just want to make

Highly Confidential - Subject to Further Confidentiality Review

1   sure I read the title.

2        Q.    Okay.  And this table shows

3   somewhere between 69.7 percent and

4   73.9 percent of people who were

5   nonmedical users of prescription opioids

6   previously abused some other illicit

7   substance, right?

8        A.    I'm sorry.  I'll just need

9   to take a minute.

10       Q.    I'll direct your attention

11  to the -- the data that's the third row

12  of numbers down in the table.

13       A.    Okay.  Okay.  "So percentage

14  distribution of past year nonmedical pain

15  reliever use among individuals 12 to 49

16  at risk for initiation of nonmedical pain

17  and were used by prior illicit drug use

18  status..."

19            So this looks -- this

20  stratifies the data, the data on past

21  year nonmedical pain reliever use among

22  people in a specific age by prior heroin

23  use status.  Among individuals who did

24  not use heroin prior to NMPR, which

1    stands for nonmedical pain reliever?

2    Let's just double-check that.

3                    Nonmedical prescription pain

4    reliever.

5                    So among those who did not

6    use heroin prior to their nonmedical

7    prescription pain reliever use, in 2002

8    to 2004, 73.9 percent had used another

9    illicit drug prior to their nonmedical

10   prescription opioid use.

11                   And the overall, from 2002

12   to 2011, 71.5 -- 71.8 percent had used

13   another -- one thing I would like to

14   actually clarify though.  Do you see

15   what's in Footnote 2?  So other illicit

16   drugs includes marijuana, hashish,

17   cocaine including crack, hallucinogens

18   and inhalents.

19        Q.    Okay.  Thank you for that

20   clarification.  Would -- would you

21   interpret this data as showing that

22   people who are drug users seek out

23   prescription opioids for nonmedical use?

24                   MS. RELKIN:  Objection to

1    form.

2         THE WITNESS:  That's not --

3    that is not how I would interpret

4    these data.  I think that there is

5    evidence epidemiologically that

6    there is a -- that individuals --

7    it's not a causal analysis of the

8    other illicit drug use, the

9    percentage that -- that's

10   described here, in terms of the

11   risk of nonmedical prescription

12   pain reliever use.

13   BY MR. HERMAN:

14        Q.   The percentages of what --

15        A.   So you're asking me if I

16   would interpret this data as saying that

17   people who are drug users seek out

18   prescription opioids.  And I don't see

19   that statement supported in this work.

20   That's a different question than what is

21   asked here.

22        What is asked here is just

23   the percentage of people who used another

24   illicit drug for their nonmedical

Highly Confidential - Subject to Further Confidentiality Review

1    prescription opioid use.  There's no

2    comparison group.  There's no assessment

3    of drug seeking.

4         Q.    There's just a percentage of

5    what they used first, that's the issue?

6         A.    That is other illicit drug

7    use prior to nonmedical prescription pain

8    reliever use.  And you're asking whether

9    that's evidence that people who are drug

10   users seek out prescription opioids.  And

11   I don't -- that's not evaluated in this

12   table.

13        Q.    Would you agree that other

14   illicit drug use is a risk factor for

15   nonmedical prescription opioid use?

16             MS. RELKIN:  Objection to

17        form.

18             THE WITNESS:  Is there a

19        particular paper that you want me

20        to evaluate?

21   BY MR. HERMAN:

22        Q.    Well, have you evaluated

23   that?

24        A.    As I have said throughout

Highly Confidential - Subject to Further Confidentiality Review

1   this report, there are a number of

2   studies that have examined things like

3   prior drug use as an -- in terms of

4   associations with prescription opioid

5   use.  Regardless of prior drug use, the

6   supply of prescription opioids increased

7   the use of prescription opioids and the

8   diversion of prescription opioids in the

9   population.  So the fact that there are

10  individual level vulnerabilities that

11  predict who uses and who doesn't, doesn't

12  explain the overall increase in the

13  supply that occurred rapidly.  We didn't

14  have that many more individuals in a very

15  short period of time who had high

16  propensity to be addicted to drugs.  The

17  supply is the thing that changed.

18        Q.    Could the individual level

19  risk factors predict who goes on to use

20  heroin from prescription drugs?

21              MS. RELKIN:  Objection to

22        form.

23              THE WITNESS:  I'm sorry.

24        What -- could you rephrase the

1       question?

2    BY MR. HERMAN:

3       Q.    Let me -- let me ask you

4    differently maybe.

5            If someone uses cocaine

6    regularly, then uses nonmedical

7    prescription opioids and then uses

8    heroin, would you say that the nonmedical

9    prescription opioid use caused the heroin

10   use?

11           MS. RELKIN:  Objection to

12       form.

13           THE WITNESS:  So what we do

14       epidemiologically is not evaluate

15       individual cases.  What we look at

16       is population level patterns.  And

17       what the population level patterns

18       indicate is that even if you

19       control for a prior drug use,

20       there is an increase in the risk

21       of transition to heroin use given

22       the use of prescription opioids at

23       a population level.

24   BY MR. HERMAN:

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    A number of the studies that

2   you rely on though just looked at what

3   opioid was the opioid of first use,

4   right?

5        A.    I looked at a wide range of

6   studies.  Again, I built an evidence base

7   across studies of different design,

8   population type --

9        Q.    But you would agree with me

10  for example, that Cicero just looked at

11  the first opioid of use, right?

12       A.    Which Cicero paper?

13       Q.    Well, the only one that you

14  cited in your report.

15       A.    I believe I cited a number

16  of Cicero papers.  I could be --

17       Q.    I believe -- well, I believe

18  you only cited one --

19       A.    He might have been co-author

20  on other papers that I cited.

21       Q.    Oh.  Well, that -- that may

22  be fair.  But the one we looked at

23  earlier, you would agree that it looked

24  at what was the opioid of first use.

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Let me just pull out the

2     paper.  This is the "Changing Face of

3     Heroin Use."

4                 Okay.  So this is Cicero

5     2014.  "Survey of Key Informants

6     Patients."  And so your question is?

7          Q.     Well, the Cicero report that

8     you -- it looked at what was opioid of

9     first use, right?

10          A.     So the Cicero paper was one

11     of a number of papers that I cited in

12     that section as building the evidence

13     base for the causal relationship.

14                 This particular study used a

15     patient -- not a patient population.  A

16     population of participants that met

17     DSM-IV criteria for substance abuse with

18     the primary drug of an opioid,

19     prescription drug, or heroin and asked

20     them the decade of first use for each of

21     those drugs, yes.

22          Q.     In your report you state

23     that numerous factors predict transition

24     from prescription opioid use to heroin

Highly Confidential - Subject to Further Confidentiality Review

1  use including individual level and

2  community level characteristics, right?

3       A.    Can you point to the section

4  of the report where that's stated?

5       Q.    Yes.  Page 27, around the

6  middle of the first paragraph.

7       A.    Numerous factors predict

8  transition from prescription opioids

9  to... including individual level and

10 community level characteristics.

11            That is what is written.

12      Q.    What do you mean by

13 transition?

14      A.    In that sentence what I'm

15 specifically referring to is the increase

16 in risk for heroin use, given first use

17 of prescription opioids.

18      Q.    You say numerous factors.

19 So what are the numerous factors that

20 predict transition from prescription

21 opioid use to heroin use?

22      A.    So I would point to a number

23 of studies that have examined individual

24 level factors.  I would like to pull up

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Cerdá.  Let me just see what number it
 2   is.
 3             I'm going to need to find
 4   it.  If you know what number Cerdá, is I
 5   can pull it up.
 6        Q.    Well, can you think of any
 7   of the numerous factors that --
 8        A.    I just want to be accurate
 9   in my answer.  And so I would like to
10   pull up the paper that looked at
11   individual level factors.
12        Q.    You don't know what you
13   meant when you wrote "numerous factors
14   predict transition"?
15             MS. RELKIN:  Objection to
16        form.
17             THE WITNESS:  I know what I
18        meant.  I want to look up the
19        paper.
20   BY MR. HERMAN:
21        Q.    Can you just tell me what
22   you meant at the time?
23        A.    88.
24        Q.    All right.  Why don't we --
```

Highly Confidential - Subject to Further Confidentiality Review

1    okay.

2          A.    So the characteristics that

3    were evaluated in the Cerdá paper

4    included sex, age, race, ethnicity, age

5    of initiation of nonmedical use

6    prescription opioids, prior use of drugs,

7    alcohol, household income, residence, and

8    year.

9          Q.    Okay.  Thank you.

10         A.    And I can tell you what each

11   of them are associated with.

12         Q.    No, that's okay.  I was just

13   looking at the factors that you were

14   thinking of.

15               You've written about

16   availability proneness theory, correct?

17         A.    I wouldn't call it --

18               MS. RELKIN:  Objection to

19         form.

20               THE WITNESS:  --

21         availability proneness theory.

22         But I've -- it's most often

23         referred to in the literature as

24         availability theory.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. HERMAN:

2         Q.    Have you written a paper

3    that used the terminology of "available

4    proneness theory"?

5         A.    Different terms are used in

6    the literature.  What's most often used

7    is availability theory.  But I've heard

8    it referred to as availability proneness

9    as well.

10        Q.    And --

11        A.    I wrote about it in this

12   report as availability theory.

13        Q.    Okay.  And in the paper that

14   I'm thinking of, you defined it as -- or

15   the paper -- you were one of the

16   authors -- defined it as, "Availability

17   proneness theory of drug use posits that

18   drug use occurs when individuals who are

19   prone to using are exposed to high

20   availability."

21        A.    I would need to see the

22   paper.

23        Q.    Okay.  You don't -- you

24   don't recall that?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    One sentence in a paper

2  needs to be placed into context.  And so

3  to respond to the statement about what I

4  meant by that statement, I need to see

5  the context in which it was written.

6    Q.    Well, do you disagree with

7  that definition of availability

8  proneness?

9    A.    I'd have to see the paper to

10  see what the statement was referring to

11  specifically.

12    MS. RELKIN:  Counsel, can

13    you please provide her with the

14    paper, so she can answer the

15    question.

16    MR. HERMAN:  I'm asking her

17    if she disagrees with that

18    definition.  If she can't answer,

19    that's fine.

20  BY MR. HERMAN:

21    Q.    You would agree that in many

22  of the studies that you discussed a

23  frequent reason given for using heroin is

24  price and availability, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    So --

2          MS. RELKIN:  Objection to

3    form.

4          THE WITNESS:  -- there are

5    some studies that looked at that

6    specific issue.

7          Okay.  So this is I think

8    Reference 87.  Is that Compton?

9    That's Compton.  In my statement I

10   write, reasons cited for the

11   transition to heroin use given

12   prescription opioids use based on

13   the research cited above is most

14   often cost and convenience

15   reasons.  Prescription opioids are

16   more expensive to obtain illegally

17   than heroin and difficult to get

18   in some geographic areas.

19  BY MR. HERMAN:

20        Q.    Isn't one alternative

21  hypothesis that some people who engage in

22  nonmedical use of prescription opioids

23  switched to other opiates when those

24  became cheaper or more readily available?

1           MS. RELKIN:  Objection to

2      form.

3           THE WITNESS:  Isn't one

4      alternative --

5  BY MR. HERMAN:

6      Q.    I'm not --

7      A.    So I don't see what -- okay.

8  So I'm saying here, reasons cited for the

9  transition to heroin use given

10 prescription opioids use based on the

11 research cited above is most often cost

12 and convenience.

13          And your question is, is it

14 an alternative hypothesis that some

15 people who engage in nonmedical use of

16 prescription opioids switched to other

17 opioids when those became cheaper or -- I

18 mean, I cite cost and convenience.  I'm

19 wondering what -- how -- what's the

20 alternative that you're proposing.

21     Q.    Okay.  So -- okay.  So maybe

22 we are in agreement then.

23     A.    I would disagree with the

24 statement that the transition to heroin

1    use is restricted to nonmedical users of

2    prescription opioids.

3         Q.    You discuss prescription

4    opioids being causally related to heroin

5    use.  Did you look at any particular type

6    of prescription opioid?

7         A.    The available literature

8    that I cite in this section looks at a

9    wide range of opioid products.

10        Q.    What's your best support in

11   the data for concluding that the use of

12   hydrocodone, acetaminophen combination

13   products specifically, cause an increase

14   in heroin use?

15             MS. RELKIN:  Objection to

16        form.

17             THE WITNESS:  I'm sorry.

18        Where in the -- where in the

19        witness statement are you?

20   BY MR. HERMAN:

21        Q.    I'm not referring to your

22   report.  I'm asking you a question.  At

23   trial are you only going to be able to

24   read from your report?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I would like to -- well, I
2  wrote the report.  And so if you're
3  asking me a specific question, I want to
4  make sure I have all the data available
5  because there's over 200 references in
6  it.
7    Q.    Do you recall any data that
8  supports the conclusion that the use of
9  hydrocodone/acetaminophen combination
10 products specifically cause an increase
11 in heroin use?
12   A.    Is there a specific study
13 that you're referring to?  I mean, the
14 studies that I cite in this report cite a
15 lot -- a broad range of products.
16   Q.    Okay.
17   A.    I mean, OxyContin is
18 specifically mentioned.
19        If there's a specific study
20 that I can look at for you, I can give
21 you an answer.
22   Q.    That's okay.  She can't...
23   A.    My take on the
24 epidemiological literature is that

1    there's a broad range of products that

2    are mentioned in these studies.

3              THE WITNESS:  Can we take a

4         break?

5              MR. HERMAN:  Sure.

6              MS. RELKIN:  Yeah.

7              THE VIDEOGRAPHER:  All

8         right.  Remove your microphones.

9         The time is 2:54 p.m.  Off the

10        record.

11             (Short break.)

12             THE VIDEOGRAPHER:  All

13        right.  We are back on the record.

14        The time is 3:10 p.m.

15             MR. HERMAN:  Before we get

16        started again, I just want to

17        state on the record that we're

18        going to reserve our right to seek

19        more time or strike the witness.

20        Our ability to effectively examine

21        this witness has been prejudiced

22        today by her repeating back

23        questions, not directly answering

24        questions.  Special Master Cohen

Highly Confidential - Subject to Further Confidentiality Review

1    ruled last week that we're

2    entitled to straightforward

3    answers to our question.  We

4    certainly haven't received those

5    today.

6         And so for those reasons,

7    among others, in the evasiveness

8    of the answers and taking up time,

9    we are going to reserve our right

10   to seek more time or strike the

11   witness.

12        MS. RELKIN:  We vigorously

13   oppose your characterization.  The

14   witness has been forthright.  Some

15   of your questions are quite

16   challenging to answer.  And she's

17   been responsive.

18   BY MR. HERMAN:

19        Q.    Professor Keyes, you've said

20   a couple times today that prior

21   prescription opioids use is a risk factor

22   for later heroin use, right?

23        A.    I've said that the

24   epidemiological literature indicates that

Highly Confidential - Subject to Further Confidentiality Review

1    prescription opioid use is a risk factor

2    for heroin use.

3              Q.    Can you identify any other

4    risk factors for heroin use?

5              A.    There are a number of

6    different risk factors for heroin use.

7    Would you like me to -- to cite a

8    specific study or just based on my

9    general background knowledge, or...

10             Q.    Well, I'd like you to just

11   tell me what the risk factors for heroin

12   use are.

13             A.    I mean, I -- so there is a

14   number of different risk factors for all

15   kinds of illicit and licit drug use.  For

16   heroin use in particular, there's

17   demographic risk factors, for example

18   male sex is something I cite in the

19   report as a risk factor for heroin use.

20   There's other demographic risk factors.

21   Behavioral risk factors.  Supply risk

22   factors.  Environmental risk factors.

23                   Usually through a kind of

24   macro social lens we examine risk factors

Highly Confidential - Subject to Further Confidentiality Review

1    for substance use from a number of

2    different levels, from both molecular,

3    cellular, genetic, up through societal

4    level.

5         Q.    Professor Keyes, you opine

6    in your report that since approximately

7    2013, prescription opioid use is also

8    causally related to the increase in

9    synthetic opioid morbidity and mortality

10   since prescription opioids precede the

11   transition to heroin, including heroin

12   contamination with fentanyl, right?

13        A.    So I'm -- I think you're

14   specifically referring to Page 3 in which

15   I state "because the heroin supply has

16   been contaminated with high potency

17   synthetic opioids, for example fentanyl.

18   Since approximately 2013 prescription

19   opioid use is also causally related to

20   the increase in synthetic morbidity and

21   mortality."

22        Q.    Okay.  And is the support

23   for that conclusion also contained in

24   Section B.7 of your report?

Highly Confidential - Subject to Further Confidentiality Review

1          I direct you to the last

2    paragraph on Page 27, the last paragraph

3    of Section B.7 on Page 27.

4          A.    So the citations that I use

5    in that paragraph are, one, that we know

6    that fentanyl is more potent than heroin

7    and other synthetic opioids as well.

8    Fentanyl is an example.

9              And also that fentanyl and

10   other high potency opioids have been

11   adulterating the supply of heroin and

12   illicitly manufactured prescription

13   opioids.

14             So -- so because the heroin

15   supply has been adulterated with high

16   potency synthetic opioids, and because

17   I've established that prescription opioid

18   use is a cause of heroin use, then

19   prescription opioid use then is a cause

20   of fentanyl use.

21         Q.    Okay.  And I just want to

22   make sure I understand sort of your

23   analysis.

24             First, in Section B.7 you

Highly Confidential - Subject to Further Confidentiality Review

1    discuss literature that you believe shows

2    there is a causal relationship between

3    prescription opioid use and heroin use,

4    right?

5         A.    "You discuss literature you

6    believe shows there is a causal

7    relationship between prescription opioids

8    use and heroin use."

9              Yes, that's correct.

10        Q.    Okay.  And then you note

11   that available evidence indicates that

12   fentanyl and other high potent opioids

13   have been adulterating the supply of both

14   heroin and illicit -- illicitly

15   manufactured prescription opioids, right?

16        A.    That's correct.

17        Q.    What do you mean when you

18   say adulterated?

19        A.    I'm -- I'm not sure if I

20   have that in the definitions section.

21             Typically in the literature,

22   the term "adulterated" means that it is

23   mixed together with.

24        Q.    Okay.  And the third step in

Highly Confidential - Subject to Further Confidentiality Review

1    your analysis is you state that "due to

2    the adulteration, people who intend to

3    obtain heroin or illicitly manufactured

4    opioids may unintentionally expose

5    themselves to fentanyl," right?

6            A.    Can I just find where that

7    statement is to make sure that it's not

8    qualified with something I want to

9    qualify it with?

10           Q.    Yes.  It is towards the

11   middle of the last paragraph on Page 27.

12           A.    The -- the middle of the

13   last paragraph before B.8?

14           Q.    Yes.

15           A.    Okay.  Excuse me.

16               Given the evidence of

17   prescription opioid use is causally

18   related to heroin use -- okay.  I see

19   what you're saying.

20               Indeed individuals...

21   potentially exposed to fentanyl and risk

22   of overdose and death.

23               Yes, that is what I wrote.

24           Q.    Okay.  So that's the third

1  step in your analysis, right?

2      A.    I'm sorry, can you repeat

3  Steps 1 and 2?

4          Step 1 is prescription

5  opioid use is causally related to heroin

6  use.

7          Step 2 is heroin use is

8  adulterated with high potency synthetic

9  opioids.

10         Step 3 is individuals who

11  use heroin may be potentially exposed to

12  high potency synthetic opioids.

13     Q.    Yes.  And -- and the last

14  step is you conclude that because some of

15  the studies show that available estimates

16  indicate that 80 percent of individuals

17  who use heroin begin their opioid use

18  using trajectories with prescription

19  opioids, you estimate that approximately

20  80 percent of fentanyl-involved deaths

21  are attributable to prescription opioids?

22     A.    Yes.

23     Q.    Okay.  And you refer to the

24  80 percent of fentanyl-involved deaths

Highly Confidential - Subject to Further Confidentiality Review

1  that you attribute to prescription

2  opioids as an estimate, right?

3       A.    Yes, it is an estimate.

4       Q.    What have you done to verify

5  your estimate that approximately

6  80 percent of fentanyl-involved deaths

7  are attributable to prescription opioid

8  use?

9       A.    I think what I have done to

10  evaluate that percentage is outlined in

11  the methodology that I used to develop

12  this report.

13            What I did, I reviewed the

14  literature on the association between

15  prescription opioid use and heroin use.

16  And I also reviewed the literature on

17  heroin use and heroin-involved fentanyl

18  deaths that are in the report.

19       Q.    Did you review any articles

20  that discuss a causal relationship

21  between prescription opioids and

22  fentanyl?

23       A.    So what I reviewed in the

24  report is the relationship between

Highly Confidential - Subject to Further Confidentiality Review

1    prescription opioid use and heroin use.

2    And there is also epidemiological

3    evidence that I have cited in this report

4    that indicates that in the last three

5    years, heroin use has been adulterated

6    with high potency synthetic opioids.

7    Therefore, if individuals are using

8    heroin, they are potentially exposed to

9    fentanyl.

10         Q.    Did you review any articles

11   that state that 80 percent of

12   fentanyl-involved deaths are attributable

13   to prescription opioids?

14         A.    Did you review any articles

15   that state that 80 percent of fentanyl --

16   I'm sorry.  This is incorrect.

17         Q.    Let me repeat the question.

18   Did you review any articles that state

19   that 80 percent of fentanyl-involved

20   deaths are attributable to prescription

21   opioids?

22         A.    So that estimate is based on

23   the literature review that I did.  That

24   is based on the literature involving

1   prescription opioids use prior to heroin

2   use and the adulteration of the heroin

3   supplied with high potency, synthetic

4   opioids.  So that is the estimate that I

5   derive from my expert opinion.

6           Q.    But no article that you

7   reviewed actually states that 80 percent

8   of fentanyl-involved deaths are

9   attributable to prescription opioids,

10  right?

11          A.    The available literature, I

12  think, is robust in the percentage of

13  heroin users that begin with prescription

14  opioids, especially in recent decades.

15              And in the last three years,

16  there has been adulteration of the heroin

17  supply with fentanyl.  So I think it is a

18  reasonable conclusion to draw that

19  heroin-involved, fentanyl-involved deaths

20  that began with -- that are causally

21  related to prescription opioids would be

22  included in the assessment of the

23  literature that I did.

24          Q.    Okay.  But my specific

Highly Confidential - Subject to Further Confidentiality Review

1  question was, did any article that you

2  reviewed state that 80 percent of

3  fentanyl-involved deaths are attributable

4  to prescription opioids?

5      A.    That statement that I made

6  was based on the literature that I

7  reviewed, about the proportion of heroin

8  users that begin with prescription

9  opioids.  Given that in the last three

10  years, the heroin supply has been

11  adulterated with fentanyl, it has caused

12  an increase in overdose deaths.

13          The conclusion that I drew

14  from my review of the literature and my

15  expertise in epidemiology is that I

16  estimate that 80 percent of the fentanyl

17  deaths are due to prescription opioids.

18      Q.    But that's an estimate,

19  right?

20      A.    Everything in epidemiology

21  is estimated from data.

22      Q.    Have you heard of fentanyl

23  being used with non-opioid drugs?

24      A.    Have I heard of it?  So

1    there's literature cited in here about

2    fentanyl being used in other drugs.

3            Q.    Cocaine?

4            A.    I believe there is

5    literature cited in here about

6    fentanyl-adulterated cocaine.

7            Q.    Marijuana?

8            A.    I would have to go to the

9    specific cite to know the percentage for

10   marijuana.  I don't know that it is -- I

11   don't know off the top of my head what

12   the specifics with regard to marijuana

13   and fentanyl are.  But I can find the

14   citation.

15           Q.    Methamphetamine?

16           A.    Again, I would -- I would

17   have to look for the citation.  I believe

18   it's Rudd from the CDC.  So I can --

19           Q.    Well, I'm just asking, have

20   you heard of fentanyl being used with

21   methamphetamine?

22           MS. RELKIN:  Objection to

23           form.

24   BY MR. HERMAN:

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    I'm not asking you for a

2     percentage.  Are you aware of data that

3     shows that fentanyl --

4          A.    I will -- I know that the

5     CDC has evaluated decedents that have

6     toxicological reports.  So we can look at

7     those data if that would be --

8          Q.    Well, sitting here today, do

9     you recall seeing data that shows

10     fentanyl --

11          A.    I don't see how that's

12     germane to the issue of the proportion of

13     fentanyl deaths that are due to

14     prescription opioids, because the

15     specific figure that I cite is about

16     heroin users.  And so the fact that there

17     may be individuals who also use fentanyl

18     in other drugs and die from it, doesn't

19     change the estimate of 80 percent of

20     heroin users started with prescription

21     opioids.

22                So, yes, there are other

23     people who are also dying from fentanyl.

24          Q.    You're opining about the

Highly Confidential - Subject to Further Confidentiality Review

1  percentage of fentanyl deaths that

2  involve heroin, correct?

3          A.    The specific statement that

4  I make -- let's see.

5          Q.    You estimate that

6  approximately 80 percent of fentanyl

7  involved deaths are attributable to

8  prescription opioid use, right?

9          A.    So can you point me to the

10  specific page number?

11          Q.    Well --

12          A.    27?

13          Q.    Yes.  The last sentence.

14          A.    So it's 80 percent of those

15  who are using heroin.

16          Q.    So -- but what you wrote is

17  that 80 percent --

18          A.    That's what I wrote.  "In

19  terms of the magnitude and scope of the

20  relationship, given that available

21  estimates indicate that 80 percent of

22  individuals who use heroin" -- I'm

23  specifically referring to heroin users.

24  So other people also use fentanyl and die

Highly Confidential - Subject to Further Confidentiality Review

1    from it.

2           Q.    And if, for example,

3    50 percent of fentanyl-involved deaths

4    are attributable to cocaine mixed with

5    fentanyl, your estimate would be

6    incorrect?

7           A.    No, it would not be

8    incorrect.  It would be a different

9    research question entirely, right?

10   Again, I'm talking about among heroin

11   users, approximately 80 percent, based on

12   the studies that I cite, began their

13   opioid using careers with prescription

14   opioids.

15              So to the extent that heroin

16   use is adulterated with fentanyl, I would

17   estimate that approximately 80 percent of

18   heroin and fentanyl-related deaths are

19   due to prescription opioids.  There might

20   be more deaths due to fentanyl that are

21   outside that particular estimate.  But

22   that doesn't change this estimate in the

23   report.

24              Q.    That's not what you wrote

Highly Confidential - Subject to Further Confidentiality Review

1  though, right?  You wrote, "I estimate

2  that approximately 80 percent of

3  fentanyl-involved deaths are attributable

4  to prescription opioids."

5      A.    I think it's clear from the

6  first part of the sentence that I was

7  referring to 80 percent of the

8  individuals who use heroin.  So the

9  second part of the sentence has to be

10  read with the first part of the sentence.

11      Q.    Okay.  So you're saying that

12  80 percent of heroin users -- I guess I'm

13  not following the linkage to fentanyl

14  deaths.  What percentage of

15  fentanyl-related deaths are you

16  estimating are due to prescription drugs?

17      A.    That's a different question

18  than the one that I outlined in this

19  paragraph.  So we would need to take all

20  of the fentanyl deaths and understand all

21  of the toxicology reports that are

22  involved in all the fentanyl deaths in

23  order to come up with that number, which

24  I can do.

1    Q.    So --

2    A.    But that's not what this

3    sentence is referring to.

4    Q.    I want to make sure I

5    understand, because I'm not sure I do.

6          What are you -- what do you

7    believe you're saying in this sentence?

8    A.    I believe what I'm saying in

9    this sentence is that the epidemiological

10   evidence has indicated that approximately

11   80 percent of heroin users begin their

12   opioid using careers with prescription

13   opioids use.  To the extent that heroin

14   use in the last three years has been

15   adulterated with fentanyl, approximately

16   80 percent of those deaths would be due

17   to prescription opioids.

18   Q.    And what deaths are we

19   talking about?

20   A.    The heroin deaths that are

21   adulterated with the fentanyl supply.

22   Q.    Okay.  Have you submitted

23   your estimate to any publications?

24   A.    I have not.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you have to do additional

2    work to verify your estimation before

3    submitting it for publication?

4              MS. RELKIN:  Objection to

5         form.  Assumes facts not in

6         evidence.

7              THE WITNESS:  I'm sorry.

8         Can you ask the question again.

9    BY MR. HERMAN:

10    Q.    Would you have to do

11    additional work to verify your estimate

12    before submitting it for publication?

13    A.    I would be perfectly happy

14    to submit this for peer-reviewed

15    publication.

16    Q.    You'd accept this estimate

17    for publication in the journal of drug

18    and alcohol dependence where you're an

19    associate editor?

20    A.    I haven't submitted it for

21    publication, so I don't want to speculate

22    on where I would submit it for

23    publication.  But I am an associate

24    editor of Drug and Alcohol Dependence.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And --

2    A.    That's one among many

3  journals that I could publish the

4  literature review that I've done here.

5    Q.    You could publish this

6  80 percent fentanyl estimate in a

7  journal?

8    A.    I haven't published it.  If

9  I were to write this for publication, I

10  would need a research question.  You

11  know, that one number is not sufficient

12  for a peer-reviewed publication.  But in

13  the context of a publication, I would

14  have no problem submitting this for peer

15  review.

16    Q.    Did you look at data at

17  any -- well, strike that.

18         Did you look at any

19  statistics from Cuyahoga County to see if

20  the data supported your estimate?

21         MS. RELKIN:  Objection to

22         form.

23         THE WITNESS:  Which

24         statistics in particular are you

Highly Confidential - Subject to Further Confidentiality Review

1    referring to?

2    BY MR. HERMAN:

3         Q.    Well, your estimate that

4    approximately 80 percent of

5    fentanyl-involved deaths are attributable

6    to prescription opioid use?

7         A.    So I think this gets back to

8    an earlier question about the Cuyahoga

9    County data.  In that as far as I'm

10   aware, there is no publication that has

11   listed the proportion of heroin users in

12   Cuyahoga who began their opioid using

13   careers with -- with prescription

14   opioids.  However, given the diversity of

15   studies that I've cited in that section

16   with diverse populations, I -- I think

17   the generalizability of the estimate is

18   more sound across geographic location.

19        Q.    Did you ask anyone if there

20   was any data available from Cuyahoga

21   County that would allow you to attempt to

22   verify your estimate?

23        A.    If there's any data on -- on

24   the number of heroin users in Cuyahoga

1  County?  Is that the question?  What

2  data -- what data?

3       Q.    That approximately

4  80 percent of fentanyl-involved deaths

5  are attributable to prescription opioid

6  use.

7       A.    And -- and so the question

8  is, did I ask anyone -- as -- as I said,

9  as far as I know, there's no published

10 studies on the opioid use history of

11 heroin users in the county.  I've cited a

12 number of -- of population sizes about

13 Cuyahoga and Summit County in the report.

14      Q.    Did you ask if there was any

15 data available to attempt to verify your

16 estimate?

17           MS. RELKIN:  Objection to

18      form.  Asked and answered.

19           THE WITNESS:  I have -- I

20      have outlined what my criteria

21      were in the report.  I -- I don't

22      have any additional information on

23      that topic.

24           MR. HERMAN:  All right.  I'm

Highly Confidential - Subject to Further Confidentiality Review

 1          going to go off the record for a

 2          second.

 3                   THE VIDEOGRAPHER:  Okay.

 4          The time is 3:30 p.m.  Off the

 5          record.

 6                   (Brief pause.)

 7                   THE VIDEOGRAPHER:  Okay.

 8          The time is 3:31 p.m.  Back on the

 9          record.

10                        -   -   -

11                   EXAMINATION

12                        -   -   -

13  BY MS. WINNER:

14          Q.    Good afternoon, Professor

15  Keyes.  My name is Sonya Winner.  I

16  represent McKesson in this case, and I'm

17  here to ask you some additional

18  questions.  Hopefully not repeating

19  anything.

20                   Before we get started, I --

21  I know you're not feeling very well

22  today.  And I just want to make sure

23  that -- it's already been a long day, are

24  you feeling up to continuing for the --

1      A.    I'm feeling up to

2   continuing, thank you.

3          Q.    Okay.  And are you on any --

4   any cold medications or anything that you

5   are concerned might have been interfering

6   with your ability to testify today?

7               MS. RELKIN:  Objection.

8               THE WITNESS:  I'm -- I am

9          not concerned with my ability to

10          testify today.

11   BY MS. WINNER:

12          Q.    Okay.  A question that I

13   like to ask experts and I don't think

14   you've been asked today is whether you,

15   as you're sitting here today, have any

16   corrections that you'd like to make to

17   your report.

18               Is there anything that you

19   discovered in your recent review that

20   you'd want to change or correct or

21   anything like that?

22          A.    I noticed a few typos when I

23   was reading over that were -- I would

24   want to correct.

Highly Confidential - Subject to Further Confidentiality Review

1                    Other than those typos, you

2     know, the -- the literature is -- is

3     quite rapid in this area.  So I know that

4     there's two papers that we subsequently

5     disclosed and I would evaluate those to

6     see whether they should be included.  And

7     then I would -- you know, any literature

8     that's come out since then I would update

9     my literature search.

10          Q.    Is there any -- are there

11    any other corrections that you would make

12    as you sit here today?

13          A.    None that come to mind.

14          Q.    Now, one of the -- the major

15    things that you do in your everyday work

16    is to prepare papers for publication in

17    peer-reviewed journals, correct?

18          A.    That is one thing that we

19    do, but it's --

20          Q.    One of many things?

21          A.    One of many things that we

22    do is write papers for publication.

23          Q.    Okay.  Now, when you're

24    doing that, if you're presenting an

1   analysis that relies on data or other

2   information, am I correct that you -- you

3   carefully source that information and

4   identify your sources in the paper,

5   correct?

6          A.     I'm sorry, can -- I -- I

7   just need to read the question.

8              When I'm presenting an

9   analysis that relies on data or other

10  information, I carefully source that

11  information.

12             Can you give me an example?

13  I'm citing the literature.  I -- I looked

14  at the literature that I'm citing.

15         Q.     If you have a statement for

16  example, that 14 percent of the

17  population has a certain characteristic,

18  you would want to include some kind of

19  citation for that, correct?

20             MS. RELKIN:  Objection to

21         form.  Overbroad.

22             THE WITNESS:  We cite

23         literature in our peer-reviewed

24         publications that we feel at the

1          time are available evidence

2          regarding that -- those statements

3          that we make if they are relying

4          on prior literature.

5     BY MS. WINNER:

6          Q.    And you -- before you cite

7     something, you review the source that

8     you're citing to make sure you feel

9     comfortable in citing it, correct?

10         A.    Every attempt is made -- you

11    know, I'm a -- I have 250 publications.

12    I'm a co-author on many.  I am a first

13    author on many.

14               You know, I -- I don't

15    look -- I don't personally look at every

16    single citation that is in every single

17    one of those 250 papers.  But I do, to

18    the best of my ability, when I'm reading

19    a paper, I read it with the citation list

20    and do my best to make sure that things

21    are cited, again, at the time.

22               Things change, science

23    progresses.  So what was an appropriate

24    citation at one point could become an

Highly Confidential - Subject to Further Confidentiality Review

1    inappropriate citation at another point.

2    But I do --

3         Q.     Because --

4         A.     -- I do my very best as a

5    scientist.

6         Q.     Now, when you were doing the

7    work -- your work in preparing your

8    report in this case, did you feel that

9    that work was entitled to the same level

10   of rigor and care that you would have put

11   into preparing a peer-reviewed journal

12   article?

13        A.     I mean again, I had some

14   typos.  But aside from the typos, I -- I

15   used the same methodology that I use when

16   I'm preparing a literature review.

17        Q.     And were you equally careful

18   in the work you did?

19        A.     I -- I am always the same

20   level of carefulness in my work.  I

21   applied the same level of rigor in all my

22   work.

23        Q.     What -- a couple times

24   earlier today you used the word

Highly Confidential - Subject to Further Confidentiality Review

1    heterogenous.  I don' know, I'm not sure

2    I'm pronouncing that --

3         A.    Heterogenous.

4         Q.    Heterogenous.  Missing a

5    vowel.

6               Can you define for us what

7    that term means to you as an

8    epidemiologist?

9         A.    When we use the term

10   "heterogenous" in epidemiology, we mean

11   literally different.

12              So it's used in many

13   different ways -- many heterogenous ways

14   I would say.  And just refers to

15   differences.

16        Q.    And it's -- is the opposite

17   of heterogenous, homogenous?

18        A.    That's correct.

19        Q.    Now, I'd like to ask you

20   about Section C of your report which I

21   think starts on Page 30.  Are you with

22   me?

23        A.    Mm-hmm.

24        Q.    And in this section you say,

Highly Confidential - Subject to Further Confidentiality Review

1    and I direct your attention to the second

2    paragraph of Section C where you say that

3    you'll focus on the evidence for a

4    three-point abatement plan.

5              Do you see that?

6         A.    I say, "These policies" --

7    "programs and policies will not be

8    reviewed in my report" -- referring to

9    prescription drug monitoring programs and

10   other drug disposal facilities,

11   et cetera.  "Rather, I will focus on the

12   evidence for a three-point abatement

13   plan."

14        Q.    Okay.

15        A.    So I just want to be clear

16   that that was -- and as I state, other

17   programs and policies have also been

18   implemented.  My focus on these aspects

19   is intended to be illustrative, not

20   exhaustive.  So I'm not proposing

21   intending that these three policies and

22   programs are exhaustive of everything

23   that should be done.

24        Q.    No, completely understood.

1  My question is, first of all, very basic.

2  What do you mean by the word "abatement"

3  there?

4       A.   What I was referring to with

5  the word "abatement" in that sentence was

6  efforts to reduce opioid use disorder and

7  overdose, morbidity, and mortality.

8       Q.   And you focus in your report

9  on the three points, medication-assisted

10  treatment, MAT.  Is that called MAT

11  sometimes or --

12       A.   Sometimes it's called MAT.

13       Q.   What do you call it?

14       A.   I call it MAT usually.

15       Q.   Okay.  Medication-assisted

16  treatment, harm reduction through

17  naloxone availability, and synthetic

18  opioid testing and warning systems.

19  Those are the three you focus on,

20  correct?

21       A.   Those are three that I focus

22  on.  That's correct.

23       Q.   Why did you select those

24  three specific interventions to discuss

1    in your report?

2           A.    So as I mentioned in the

3    report, there are other programs and

4    policies that counties have -- have

5    developed, have considered.  I think

6    there's different levels of evidence for

7    them.  I felt that these three in

8    particular had a solid evidence base

9    for -- again, not exhaustive.  But these

10   three are three really solid ways to

11   reduce opioid use disorder and morbidity

12   and mortality that have evidence

13   associated with them.

14          Q.    Did you think that these

15   three were the ones that had the best

16   evidence bases that you were aware of?

17          A.    I would --

18                MS. RELKIN:  Objection to

19          form.

20                You can answer.

21                THE WITNESS:  I -- I was not

22          asked to evaluate the best

23          policies and programs.  I was

24          asked to -- my approach to this

1       report was to outline the evidence

2       for three solid programs that had

3       a strong evidence base.

4   BY MS. WINNER:

5       Q.     My question is --

6       A.     I'm not sure what the best

7   means.  Can you --

8       Q.     Well, the best evidence I

9   think, is actually, what I asked you.

10  Were those the ones that you thought had

11  the best evidence?

12      A.     Not necessarily.  I think

13  there's a combination of factors that one

14  needs to use and that we use in public

15  health when choosing what programs and

16  policies to highlight in these types of

17  contexts.  One is the level of evidence.

18  Another is the anticipated impact.

19          So I think, you know, among

20  other reasons that one would focus on

21  particular policies, I thought these

22  three had both a solid evidence base and,

23  specific to the counties, there was

24  enough information to suggest that there

Highly Confidential - Subject to Further Confidentiality Review

1    would be an impact on the epidemic.

2         Q.    Were there any other reasons

3    other than the ones you just described

4    why you selected these three?

5         A.    I would say that evidence

6    and impact were the -- the main reasons.

7         Q.    Okay.  Now, I'm pretty sure

8    I know the answer to this question, but

9    I'm going to ask it anyway.

10             In evaluating these measures

11   did you -- did your analysis

12   differentiate in any way between

13   abatement measures that are needed for

14   harms that can be traced back to

15   prescription opioids versus those that

16   are attributable solely to people whose

17   abuse of heroin or other illicit opioids

18   has nothing to do with prescription

19   opioids?

20             MS. RELKIN:  Objection to

21        form.

22             You can answer if you can.

23             THE WITNESS:  The case that

24        I make in this report is that the

Highly Confidential - Subject to Further Confidentiality Review

1     increase in the supply of

2     prescription opioids under -- was

3     an underlying factor for the

4     development of additional opioid

5     epidemics, including the heroin

6     epidemic creating a market,

7     increasing the risk among users.

8     And so, I would attribute -- in

9     terms of the overall opioid

10    epidemic, I don't see how one in a

11    public health sense would

12    differentiate between those two.

13  BY MS. WINNER:

14       Q.    So you don't think that

15  that's something that would be practical

16  to do, to try to differentiate between

17  those two categories?

18       A.    That's not what I said.  I

19  don't think one -- I think that these

20  epidemics are so intertwined in terms of

21  their underlying causation, that it's not

22  only -- the practicality of it is not the

23  key aspect.  It's the level of evidence

24  for causation.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Now, remedial measures that

2    are taken to address the kinds of

3    problems that you've identified in your

4    report are today taken by a variety of

5    different actors, correct?

6              MS. RELKIN:  Objection to

7         form.

8              THE WITNESS:  I don't know

9         what you mean.  Can you define

10        remedial measures?

11   BY MS. WINNER:

12        Q.    Well, you identify three,

13   MAT --

14        A.    So but -- I'm sorry.  Can

15   you define remediation, what you mean by

16   that word.

17        Q.    Well, let me change the word

18   if that's giving you a problem.

19   Abatement measures, does that make you

20   feel more comfortable?

21        A.    Sure.  The three policies

22   and programs that I talk about.

23        Q.    Yes.  The kinds of programs

24   that you talk about are undertaken in the

Highly Confidential - Subject to Further Confidentiality Review

1   world by a variety of different actors,

2   correct?

3          A.    Can you describe what you

4   mean by actors.

5                MS. RELKIN:  Objection to

6          form.  Overbroad.

7   BY MS. WINNER:

8          Q.    Well, for example there are

9   some things that the federal government

10  implements and pays for, correct?

11         A.    Can you give me an example?

12  I can't --

13         Q.    You're not aware of any?

14  Are you aware of anything in these

15  categories that the federal government

16  pays for?

17         A.    I need -- I need some

18  specifics in terms of what exactly you're

19  referring to in order to answer that

20  question.

21         Q.    Are you aware of federal

22  funding for MAT, for example?

23         A.    There are reimbursement

24  programs for different levels of

Highly Confidential - Subject to Further Confidentiality Review

1    treatment that vary across a wide variety

2    of contexts.

3         Q.    And that would include MAT,

4    correct?

5         A.    So as I've said, I am not

6    sure what you mean by federal funding.

7    There is federal funding for health

8    insurance that is included in what I've

9    outlined here.

10        Q.    So federally funded health

11   insurance pays for some of these

12   measures, correct?

13        A.    It depends on the -- on the

14   context.

15        Q.    Have you ever heard of

16   grants that are made available to local

17   governments to pay for MAT?

18        A.    Again, I would need to see

19   some specifics on a particular type of

20   grant.  Certainly there are a number of

21   programs that are available to help

22   individuals who are unfortunately

23   addicted to opioids.

24        Q.    And there's some things that

Highly Confidential - Subject to Further Confidentiality Review

1    are -- some abatement measures that are

2    undertaken at the state level, correct?

3         A.    I think that there are a

4    broad range of institutions that can

5    participate in reversing the opioid

6    epidemic.  What currently occurs in terms

7    of the participation of institutions to

8    reduce the impact of the opioid epidemic

9    and what could possibly occur, -- what

10   I'm addressing here is the evidence for

11   these programs for their ability to

12   reduce the opioid epidemic, and that's

13   what's in the report.

14        Q.    Okay.  So would it -- based

15   on what you just said, would it be fair

16   to say that what you've done in your

17   analysis, is try to identify needs

18   without necessarily evaluating who would

19   actually satisfy those needs?

20        A.    I think what I was asked to

21   do --

22             MS. RELKIN:  Objection to

23        form.

24             THE WITNESS:  As an

Highly Confidential - Subject to Further Confidentiality Review

1        epidemiologist, is to evaluate the

2        epidemiological evidence for

3        procedures, policies, and programs

4        that could reduce the opioid

5        epidemic.  And that's what I did

6        in the report.

7   BY MS. WINNER:

8        Q.    Did you do any analysis that

9   took into account who would be delivering

10  the services that you refer to?

11       A.    Again, what -- perhaps it's

12  important that I clarify what

13  epidemiology is.  And there's a section

14  in the beginning of the report where I

15  outline what I did in terms of this

16  report and what epidemiological evidence

17  provides for public health evaluation.

18  And so what I did in this report was an

19  aggregate population level analysis of

20  the effectiveness and the potential

21  impact of these programs.

22       Q.    Okay.  So you did not

23  attempt to figure out -- it wouldn't be

24  part of your job as an epidemiologist to

Highly Confidential - Subject to Further Confidentiality Review

1  tell us who would be delivering naloxone

2  or -- or who would be providing a MAT

3  to analysis?

4      A.    I don't want to make broad

5  statements about things that are never or

6  always part of an epidemiologist's job or

7  my job in particular.  What I can speak

8  to is that what I evaluated in this

9  report is that these three programs along

10  with, you know, other programs as well,

11  have the potential to save lives, like

12  actual people's lives.

13          And so how they are

14  delivered, I think, is an additionally

15  important question.  But the fact that

16  there are thousands of individuals that

17  we could save right now is more what I'm

18  focused on in terms of public health.

19      Q.    Well, I just want to make

20  sure, and we can move on, if -- if I

21  shouldn't be asking you about this.  I

22  want to be sure that -- that I'm clear

23  that you were focusing on whether these

24  were good -- these are good things to

1    have, you know, if you don't mind the

2    shorthand -- and I can try to use your

3    words.

4              But they are -- they can be

5    effective programs, as opposed to whether

6    these are things that Cuyahoga County

7    government should be providing to people

8    specifically as opposed --

9         A.    So I -- that's not what I

10   said.  What I said was what I did in the

11   report was evaluate these programs in

12   terms of the potential, in terms of

13   the -- the epidemiological evidence base

14   for efficacy and impact.

15        Q.    Okay.  So your focus is on

16   efficacy and impact, not on the details

17   of implementation, correct?

18        A.    Again, I -- I would point to

19   the report itself in terms of what I did.

20   I think it's very clearly stated that

21   what I did was -- was provide the

22   evidence from the epidemiological

23   literature about the effectiveness of

24   these programs, and that I also provided

Highly Confidential - Subject to Further Confidentiality Review

1    for each of the programs my estimation of

2    the number of users that would benefit

3    them in each of the counties.  That's

4    what's in the report.

5         Q.    Well, let's look, just as an

6    example, Page 38 to 39 of your report

7    where you talk about naloxone

8    distribution.  Am I pronouncing that

9    correctly?

10        A.    Naloxone, yes.

11        Q.    Naloxone.

12              You have a Section F.5.1

13   that talks about naloxone distribution

14   needs in Cuyahoga County and Summit

15   County, correct?

16        A.    Yes, that's correct.

17        Q.    By the way, I notice that

18   your report switches on Page 35 to 36

19   from numbering that starts with C to

20   suddenly numbering that starts with F.

21   Is there some reason for that?

22        A.    That was a typo.

23        Q.    Okay.  Just wanted to make

24   sure.

1        All right.  So in Section F,

2    this is one of the -- section -- the

3    prior -- prior section you talk about --

4    generally about the efficacy of naloxone

5    distribution.  And then in Section F.5.1

6    you go on to talk about the need

7    specifically in Cuyahoga County and

8    Summit County, correct?

9        A.    So the first part of

10   Section F.5 provides an evidence base for

11   the efficacy of naloxone in reversing

12   potential failed consequences of an

13   overdose.  And also, in addition to that,

14   the evidence base that -- that providing

15   expanded access to naloxone also reduces

16   overdose events.  So it's really two

17   different statements.

18       Q.    But -- but that said, where

19   you talk specifically about the -- trying

20   to quantify needs in Cuyahoga County and

21   Summit County for naloxone, that's

22   Section F.5.1, correct?

23       A.    That's correct.

24       Q.    Okay.  So -- and then you

Highly Confidential - Subject to Further Confidentiality Review

1   talk about, in that section, you give --

2   you make a number of different

3   observations about -- about the numbers

4   and the needs for naloxone.

5           But I want to focus just on

6   the first instance, in the last

7   paragraph, which is about naloxone

8   administration kits in Cuyahoga County,

9   correct?

10      A.    Okay.

11      Q.    And in there you say, a

12  couple sentences down -- third sentence I

13  think.  This is in -- "This is in

14  addition to medical first responders such

15  as EMS who are trained to administer

16  naloxone, available data indicate that in

17  2018 Cuyahoga County EMS administered

18  naloxone at least 4,353 times."

19          And then you go on with the

20  parenthetical about that.  I'm -- I'm

21  focused on this 4,353 number.

22          Does Cuyahoga County

23  actually have EMS services at the county

24  level?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      This statement was based on

2   data that was provided to me.

3       Q.      By whom?

4       A.      By the counsel.

5       Q.      Okay.  So -- by counsel, you

6   mean plaintiffs' counsel, not your

7   counsel.  We know that.

8       A.      That's right.

9       Q.      Yes.  Okay.

10              So this came from

11  plaintiffs' counsel, correct?

12      A.      Yes.

13      Q.      Okay.  So am I correct that

14  you don't actually know yourself whether

15  Cuyahoga County provides EMS services?

16      A.      I evaluated the -- the

17  statement based on what was sent to me.

18      Q.      Were you assuming, based

19  on -- on the information that was

20  provided to you by counsel, that Cuyahoga

21  County itself was, in fact, providing EMS

22  services?

23      A.      Again, I think what I have

24  in the report is pretty clear.  You know,

Highly Confidential - Subject to Further Confidentiality Review

¹  I was sent information -- I asked for

²  information about, you know, providing an

³  estimate of the potential impact in the

⁴  county and that's the information that

⁵  was provided to me.  And that's what's in

⁶  the report.

⁷         Q.     So are you purporting

⁸  here -- I don't want to use the word

⁹  purporting.  That isn't --

¹⁰             MS. RELKIN:  Objection to

¹¹         form.

¹²  BY MS. WINNER:

¹³         Q.     I don't -- that -- are you

¹⁴  intending here to provide an opinion

¹⁵  about the naloxone needs that exist for

¹⁶  EMS in the city of Cleveland?

¹⁷         A.     What I provided was the

¹⁸  information that was given to me about

¹⁹  the number of administered naloxone

²⁰  distribution based on the information

²¹  that I was sent.

²²         Q.     My question though, are you

²³  offering any opinions through this report

²⁴  about abatement needs in the city of

Highly Confidential - Subject to Further Confidentiality Review

1    Cleveland, to be provided for by the city

2    of Cleveland?

3         A.    My understanding is the city

4    of Cleveland is in Cuyahoga County; is

5    that correct?

6         Q.    That -- last I knew, yes.

7         A.    So I would say that that is

8    covered under the estimates that I have

9    provided.

10        Q.    If it were demonstrated to

11   you that Cuyahoga County, in fact, does

12   not provide EMS services, would that have

13   any impact on the opinions that you

14   provide in this paragraph?

15        A.    I mean, you know, let's --

16   I'm -- I'm -- I keep an open mind to all

17   available evidence.  I think the point

18   that I was making in this paragraph is

19   that naloxone is a really important

20   program to reduce overdose.  And however

21   it is distributed is how it should be

22   distributed.  So if there is new

23   information that I could use, my opinion

24   would not change.  Just that distributing

Highly Confidential - Subject to Further Confidentiality Review

1  naloxone is an important thing to do in

2  Cuyahoga County.

3  　　　　Q.　　Well, you have basically two

4  sets of opinions about naloxone in -- in

5  this report.

6  　　　　　　One set of opinions is about

7  whether naloxone is a good and important

8  thing to have out there.  The other set

9  of opinions is about specific numbers,

10 and so I'm trying to focus on your

11 opinions about specific numbers.

12 　　　　　　And so my question is:

13 If -- if -- leaving aside the question of

14 whether, you know it is important for

15 naloxone to be available in the

16 community, would your opinion about the

17 specific needs of Cuyahoga County be

18 affected if you knew that Cuyahoga County

19 does not provide EMS services?

20 　　　　　　MS. RELKIN:  Objection to

21 　　　form.  Compound.

22 　　　　　　THE WITNESS:  Again, I think

23 　　　I would -- I would respond to that

24 　　　by saying what I intended to

Highly Confidential - Subject to Further Confidentiality Review

1      convey in that paragraph was some

2      assessment of the overall amount

3      of distribution of naloxone that

4      should occur.

5          If there are -- if new

6      information comes to light about

7      specific EMS services, you know,

8      that estimate could be revised.

9      But it doesn't change the overall.

10         That's one sentence in the

11     overall paragraph about the

12     estimated number of naloxone

13     administration kits that I would

14     estimate would be necessary.

15         So, sure, of course, I keep

16     an open mind.  If new information

17     is available, I obviously want to

18     present the most accurate picture

19     that I can.  But I think the

20     opinion that I have doesn't

21     change.

22  BY MS. WINNER:

23     Q.   Do you distinguish in your

24  opinion -- is there a difference in

1    your -- let me start that again.

2                Is there a difference in

3    your view between the amount of naloxone

4    that is needed within Cuyahoga County as

5    opposed to the amount that is needed by

6    Cuyahoga County as a government entity?

7                MS. RELKIN:  Objection to

8         form.

9                THE WITNESS:  I need more

10        information on your

11        differentiation.

12   BY MS. WINNER:

13        Q.    So you can't answer my

14   question without more information?

15        A.    I don't understand your

16   question.

17        Q.    Okay.  Let me ask you about

18   your section about Summit County.

19                You have a similar

20   paragraph, discussing naloxone

21   administration kits in Summit County on

22   the next page, correct?

23        A.    Mm-hmm.

24        Q.    And do you know -- and that

Highly Confidential - Subject to Further Confidentiality Review

 1    includes, among other things -- there are

 2    other things in here.  But one of the

 3    things that's in there is you have an

 4    estimate of the amount of naloxone that

 5    is needed for EMS in Summit County,

 6    correct?

 7          A.    So what I have in here is,

 8    "Data are not currently available to me

 9    regarding the total number of first

10    responders in Summit County; however, the

11    Akron Fire Department has a current work

12    force of approximately 354 individuals,

13    and there are 14 EMS/paramedics," and I

14    have a citation that was provided to me.

15                "Available data indicate

16    that in 2018 Summit County EMS

17    administered naloxone at least 1,562

18    times.  This is likely an underestimate

19    because 81.8 percent of EMS agencies

20    reported."

21          Q.    Is there such a thing as

22    Summit County EMS?

23          A.    Again, I don't -- this is

24    the information that was provided to me.

Highly Confidential - Subject to Further Confidentiality Review

1    If new information comes to light, it

2    doesn't change my opinion that naloxone

3    is very much needed in communities that

4    have a high burden of opioid overdose.

5            Q.    You say this was information

6    that was provided to you.  Again, was it

7    provided to you by plaintiffs' counsel?

8            A.    That's correct.

9            Q.    You -- in what you just

10   read, there's a reference to the Akron

11   Fire Department.

12           A.    Yes.  The Akron Fire

13   Department has a current --

14           Q.    I don't need you to read it

15   again.  Is the Akron Fire Department an

16   agency of the Summit County government?

17           A.    This is the information that

18   was provided to me.  I can -- we can go

19   to Reference 195 and look at the

20   information.

21              I asked plaintiffs' counsel

22   for information on these different

23   workforce numbers.  And these are the

24   numbers that I relied on.  Should new

Highly Confidential - Subject to Further Confidentiality Review

1   information come to light, again, the

2   opinion is the opinion.  I think

3   providing an estimate for these specific

4   counties is -- is what I was endeavoring

5   to do in these paragraphs.

6          Q.    Do you know whether the

7   Akron Fire Department carries naloxone

8   today?

9          A.    That information was not

10  provided to me.

11         Q.    If -- well, I assume the

12  answer is going to be the same.  But let

13  me just ask it.

14                Assuming that the Akron Fire

15  Department does carry naloxone, do you

16  know who pays for it?

17         A.    In the -- I'm sorry, this

18  pen is really leaking.

19                In the information that was

20  provided to me, the source of funding for

21  each individual naloxone kit was not

22  included.

23         Q.    Now, in Section C.3 of your

24  report -- let's go back.  It starts on

Highly Confidential - Subject to Further Confidentiality Review

1  Page 32.  You provide estimates of the

2  numbers of persons in each of these two

3  counties who were currently living with

4  opioid use disorder, correct?  I'll

5  direct you to the last paragraph on Page

6  32, the first sentence.

7       A.    Yes.  "While the number of

8  individuals currently living with opioid

9  use disorder in Cuyahoga and Summit

10 Counties is unknown, I can provide an

11 estimate of the number, given number the

12 overdose deaths."

13      Q.    And you -- is the estimate

14 that you then -- and we'll walk through

15 this.  But is the estimate that you then

16 go on to provide intended to be

17 specifically an estimate of the number of

18 individuals in each county who is

19 currently living with opioid use

20 disorder?

21      A.    Depend -- so the paper that

22 I relied onto make that assessment looked

23 at individuals who were dependent or

24 regular users of opioids.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    Is that the same thing as

2  people who have opioid use disorder?

3     A.    So this is the information

4  that I thought was important to gather an

5  estimate of the number of individuals who

6  would be in need of these services.

7     Q.    But my question is --

8     A.    It would be inclusive of

9  opioid use disorder.

10     Q.    But is opioid use disorder

11  the same thing as being a dependent or

12  regular user of opioid?

13     A.    So the Degenhardt, et al.,

14  2011 paper did not is assess opioid use

15  disorder.  The Degenhardt paper assessed

16  dependent or regular users of opioids.

17  And I used that paper to provide an

18  estimate of the number of individuals in

19  those counties who would be in need of

20  these services, and would include

21  individuals living with opioid use

22  disorder.

23     Q.    Is it limited to people who

24  have opioid use disorder or is it

Highly Confidential - Subject to Further Confidentiality Review

1   broader?

2           A.      The estimate is individuals

3   who are dependent or regular users of

4   opioids.

5           Q.      Is that likely to be

6   broader, narrower, or the same as the

7   population of people with opioid use

8   disorder?

9           A.      Let's see.  Individuals who

10  are dependent, so -- and regular users of

11  opioids.  I would estimate that it's

12  largely similar.

13          Q.      How similar?  Do you have a

14  confidence interval or anything like that

15  for that?

16          A.      I would need to do a

17  statistical analysis for that.

18          Q.      Okay.  I'd like to show you

19  what's been previously marked as

20  Exhibit 13 to your deposition, which I'm

21  hoping is the article that you're talking

22  about.

23                  (Document marked for

24          identification as Exhibit

Highly Confidential - Subject to Further Confidentiality Review

1        Keyes-13.)

2   BY MS. WINNER:

3        Q.    And is Exhibit 13 in fact

4   the article that you referred to a second

5   ago as the one that you relied upon for

6   this calculation?

7        A.    So this article, just to be

8   clear, is a random effect meta-analysis

9   for the mortality, the crude and

10  standardized mortality rates for

11  individuals who are dependent or regular

12  users of opioids.

13       Q.    Okay.

14       A.    And I relied on it for this

15  assessment.

16       Q.    Okay.  And this is -- this

17  is the article that you cite in this

18  section of your report?  I think it's --

19       A.    I cite this article in this

20  section of the report.

21       Q.    And it is, I think, just for

22  the record, this is Reference 151.

23       A.    Let me just double-check

24  that.

1      Q.    Sure.

2      A.    Yes, it is Reference 151.

3      Q.    What you pulled out of this

4   report, am I correct -- well, first of

5   all, let's just talk about what this is.

6           This is a -- and I don't

7   want to go into every detail of it.  But

8   generally this is a review of multiple

9   studies that evaluates their results on

10  the subject of mortality, correct?

11          A.    So the outcomes reported

12  here are two outcomes.  One is the crude

13  mortality rate.  And one is the

14  standardized mortality rate for specific

15  causes of death across studies that used

16  inclusion criteria -- I'm sorry, that

17  used exclusion criteria that included not

18  reporting heroin or opioid users,

19  opioid-related mortality, or not reported

20  research data or case studies.

21          So that is what the design

22  was, was a multiple search strategy to

23  find studies that assessed mortality

24  among regular and dependent users of

Highly Confidential - Subject to Further Confidentiality Review

1    opioids.

2         Q.    And that is what is

3    identified under aims in the first

4    sentence of the abstract on the first

5    page, correct?

6         A.    So the aims that are listed

7    in the abstract are broader than just

8    mortality among dependent or regular

9    users of opioids across regions.  They

10   also list according to specific causes

11   and related to demographic and clinical

12   variables.

13        Q.    Now, the aims for this

14   review did not include developing a

15   methodology for calculating the size of

16   drug user population, based on overdose

17   numbers, is it?

18        A.    This specific article is an

19   article that provides a meta-analytic

20   estimate of the association between

21   dependent and regular use of opioids and

22   mortality as well as specific causes of

23   death.

24        Q.    Is that your complete answer

Highly Confidential - Subject to Further Confidentiality Review

1    to my question?

2         A.    Is that -- does that not

3    answer your question?

4         Q.    Well, my question was, the

5    aims for the review did not include

6    developing a methodology for calculating

7    the size of drug user population based on

8    overdose numbers.

9         A.    I can show you what the aims

10   of the study are.  I used the study in my

11   estimation in the -- the report that I

12   developed.

13        Q.    We'll talk in a minute about

14   what you did.  I'm -- my first question

15   is what was the -- well, whether that was

16   the purpose of this particular study.

17        A.    The purpose of this

18   particular study was to provide a

19   meta-analytic estimate of the association

20   between regular and dependent use of

21   opioids and mortality as well as all

22   specific mortality.

23        Q.    If you turn to Page 45 of

24   Exhibit 13.  The second column, first

1  full paragraph.

2          The second sentence here

3  says, "Pooled estimates suggested that

4  overdose-related mortality was the most

5  common specific cause at 0.65 deaths per

6  100 PY."  And there's a confidence

7  interval after that.

8          And then the sentence go

9  on -- goes on to talk about TMRs for

10  other -- for other things.

11          Is the -- the first portion

12  of that sentence that I just read, is --

13  was -- is that your source for the .65

14  deaths per 100 PY that you use in your

15  report?

16      A.    There's also a confidence

17  interval from .55 to .75.

18      Q.    Yes.

19      A.    Just to note that.

20      Q.    But -- but am I -- have I

21  identified the -- the place in this, in

22  Exhibit 13 where you got those numbers?

23      A.    That's correct.

24      Q.    So is this saying that there

1    were -- well, first of all, when it talks

2    to -- when it says pooled estimates, is

3    that talking about aggregating the

4    results from all of the studies that are

5    addressed in this analysis?

6          A.    So the methodology for

7    pooling, I believe, is described in the

8    methods section.

9              So it's a little broader

10   than just aggregating.

11         Q.    Well, let me -- let me ask

12   it a different way.  Maybe -- maybe this

13   will make it a little easier.

14             This .65 is not derived from

15   any single study that's addressed in this

16   analysis, it's -- it's drawn from a

17   broader pool of studies, correct?

18         A.    So that's what meta-analysis

19   does.  And I -- it's outlined in the

20   definition of my report.

21             We rely on meta-analyses

22   as -- you know, when there are a number

23   of studies that have been conducted on a

24   similar issue, you know, we might think

Highly Confidential - Subject to Further Confidentiality Review

1  that any one particular study, you might

2  be over or slightly under due to random

3  error or, you know, any number of

4  different reasons.  And so in a

5  meta-analysis, what you do is take all

6  the studies on a particular topic and

7  then provide a summary estimate of them.

8  That is the intention of the analysis.

9        Q.    And -- and you would

10  consider this an epidemiological -- I can

11  never pronounce that word.  You are

12  obviously used to it.

13            For your field, this is an

14  epidemiological study, or analysis, or

15  review, or whatever the word would be?

16  This is in your -- this comes from your

17  field, this particular paper here?

18        A.    I guess my question is, what

19  do you mean by my field?

20        Q.    Well, you are an

21  epidemiologist, correct?

22        A.    I am an epidemiologist, yes.

23        Q.    And -- and is this a paper

24  from epidemiology?

1    A.    I would say that this paper

2  uses epidemiological studies in order

3  to -- you know, meta-analysis is used --

4  a lot -- I wouldn't claim it for

5  epidemiology.  But this particular paper

6  uses epidemiological data.

7    Q.    So this -- am I correct

8  that, that what this paper is finding is

9  that there were .65 deaths per 100 person

10 years during which the subjects of the

11 studies were observed?

12    A.    I'm sorry, I'm just going to

13 go to the place where that is written.

14          Can you point again to the

15 page number?

16    Q.    Sure.  Page -- it's -- we're

17 on Page 45.

18    A.    Sorry.

19          Okay.  So what this study

20 said in the results section is that

21 "pooled estimates suggested that overdose

22 related mortality was the most common

23 specific cause at .65 deaths per 100,000

24 person years."

1       So your question is?

2       Q.    I'm just trying to translate

3  that into more everyday English.  Does

4  that mean that --

5       A.    If 100 people were observed

6  for one year, you would expect there to

7  be .65 overdose deaths.

8       Q.    Thank you.  That's helpful.

9            And that is the -- that .65

10 figure is the number that you then went

11 on to use to apply to overdose statistics

12 to estimate the populations in each of

13 those -- these who had counties overdose

14 related --

15      A.    I used that as a -- and its

16 related confidence interval, to provide

17 an estimate of the number of dependent or

18 regular users of heroin -- I mean of

19 opioids.

20      Q.    Now, the -- who are the --

21 the subjects of these studies?  Is -- and

22 I'm not asking you to list them all.  Am

23 I correct that they are described in the

24 tables that -- the table that starts, I

Highly Confidential - Subject to Further Confidentiality Review

1    guess it's on Page 35, Table 1?

2         A.    Okay.  So Table 1 is

3    included... studies investigating all

4    cause mortality.

5              And so table 2 then is

6    cohorts purporting proportion of deaths

7    due to AIDS, overdose, suicide, and

8    traumatic causes of death.

9         Q.    I'm -- I'm more focused on

10   the nature of the -- I think it's the

11   nature of the sample column.

12             No, who -- who were the

13   people who were in these studies?

14             MS. RELKIN:  Objection.

15        Form.  Overbroad.

16             There's multiple studies.

17        Do you want her to go through each

18        one?

19   BY MS. WINNER:

20        Q.    Do you see on Table 1

21   there's a column that says nature of

22   sample?

23        A.    So -- yeah, you know, again,

24   I -- you really should look at Table 2,

Highly Confidential - Subject to Further Confidentiality Review

1    because that's where --

2         Q.    Okay.

3         A.    -- the overdose deaths are

4    provided.

5         Q.    Well, no, I -- my question

6    is different.  I -- I am trying to

7    focus -- and again, without focusing on

8    any particular study, is there any place

9    in here where we can see who the people

10   were in the studies.  Were they heroin

11   users, were they injecting heroin users,

12   were they -- were they users of all

13   drugs?

14        A.    So do you want me to go

15   through each one?

16        Q.    No, I don't want you to go

17   through each one.  I want to know, is

18   there someplace that we can look that up?

19   Is there -- is that in Table 1?

20        A.    So it -- Table 1 lists the

21   publication near the region, the country,

22   the year, the nature of the sample.

23             However, I just want to

24   point out that the -- the studies that

Highly Confidential - Subject to Further Confidentiality Review

1  were actually used for the overdose

2  estimate are in Table 2.

3         Q.    Understood.  But Table 2

4  doesn't separately list -- describe the

5  population of the -- of the subjects in

6  each of the studies, does it?

7         A.    No, it does not.

8         Q.    Now, am I correct that

9  this -- Exhibit 13 is the only source

10  that you cite for this .65 per 100 and

11  confidence interval in your -- in your

12  report?

13         A.    Well, that's a bit of a

14  simplification because the -- the paper

15  itself is a meta-analysis.  So I was

16  relying on the -- the evidence that was

17  used to meta-analyze that source.

18         Q.    But you were relying on the

19  meta-analysis, not on any of the

20  individual analyses that -- that are in

21  the underlying studies, correct?

22         A.    That's correct.

23         Q.    Now, your report in this

24  case does not cite any literature in

Highly Confidential - Subject to Further Confidentiality Review

1    which this .65 statistic has been used

2    for the purpose of estimating the size of

3    an opioid dependent population, have you?

4          A.    So --

5                MS. RELKIN:  Objection to

6          form.

7                THE WITNESS:  -- what I

8          provided in the report was not

9          only my estimate based on -- on

10         using this meta-analysis, but also

11         what -- comparing it to the

12         National Household Survey on Drug

13         Use and Health, which is on

14         Page 33.

15   BY MS. WINNER:

16         Q.    Now that's a different --

17   I'm asking you a different question.

18         A.    Okay.

19         Q.    My question is, do you cite

20   any literature where anybody else has

21   used this .65 number out of Exhibit 13

22   for the purpose you use it for in this

23   report?

24         A.    I think my report is very

Highly Confidential - Subject to Further Confidentiality Review

1    clear about what my methodology was in

2    using that estimate.  The use of

3    estimates is a very standard practice in

4    the epidemiological literature.  And to

5    extract a population size based on

6    published estimates is a methodology

7    that's commonly used in epidemiology.

8              So the methodology itself is

9    something that is something that I have

10   expertise in and that is commonly used in

11   the peer-reviewed literature.

12             Q.    My question was a little

13   different.  My question was, is there

14   anybody else who has ever used this,

15   Exhibit 13, this particular number that

16   you took out of Exhibit 13, for the

17   purpose of estimating the size of an

18   opioid dependent population?

19             MS. RELKIN:  Objection to

20        form.

21             THE WITNESS:  I think I've

22        answered the question.  I've

23        outlined in my report how I use

24        the estimate.  I have outlined in

Highly Confidential - Subject to Further Confidentiality Review

1       the report the way the methodology

2       is used.  The methodology that I

3       used is standard practice in the

4       epidemiological literature.

5               As far as any one particular

6       study that has used this estimate

7       in and of itself, I don't have a

8       specific citation in the report.

9       But it is a standard way to

10      evaluate population sizes in the

11      epidemiological literature.

12  BY MS. WINNER:

13      Q.    Okay.  But I want to follow

14  up on what you just said.  You don't have

15  a specific -- I don't have a specific

16  citation in the report, but it is a

17  standard way to evaluate population sizes

18  in the epidemiological literature.

19              I just want to focus -- when

20  you say it is a standard way, are you

21  talking about --

22      A.    I'm talking about the method

23  and not this particular number.

24      Q.    Got it.

Highly Confidential - Subject to Further Confidentiality Review

1           MS. DO AMARAL:  Counsel, is

2      it a good time for us to take a

3      break?

4           MS. WINNER:  Sure, no

5      problem.

6           THE VIDEOGRAPHER:  The time

7      is 4:18 p.m.  Going off the

8      record.

9           (Short break.)

10          THE VIDEOGRAPHER:  The time

11     is 4:32 p.m.  Back on the record.

12 BY MS. WINNER:

13     Q.    Okay.  Before the break, we

14 were discussing the calculations you did

15 in Section C.3 of your report.

16     A.    Yes.

17     Q.    Correct?

18          And am I correct that you

19 took this .65 per 100 person-year number,

20 and you then applied that to the overdose

21 deaths in 2013 in each of the two

22 counties to estimate the opioid dependent

23 or regular user population in each

24 county?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    That's correct.

2      Q.    And the overdose death

3 statistics from those counties that you

4 used included all drug overdoses, not

5 just opioid overdoses, correct?

6      A.    So just to be clear, that

7 is -- the reason for that is because the

8 Degenhardt meta-analysis looked at all

9 drug overdose deaths among regular or

10 dependent users.  And so to provide a

11 comparable analysis, I needed to use all

12 drug overdose deaths in the counties.

13      Q.    But those were all drug

14 overdose -- okay.  Strike that.

15          Let me try to streamline

16 this a little bit.  Let's go back to

17 Degenhardt.  Is that an appropriate way

18 to refer to Exhibit 13.  If you would

19 turn back to the abstract.  Near the

20 bottom there is a sentence that reads, "A

21 multi-variable regressions found the

22 following predictors of mortality rates:

23 Country of origin, the proportion of

24 sample injecting, the extent to which

1  populations were recruited from an entire

2  country versus sub-national, and year of

3  publication."

4          Did I read that correctly?

5      A.    You read that statement

6  correctly.  I'd like to go just to the

7  methods section to make sure that --

8  because sometimes in abstracts it's an

9  oversimplification of what was done.

10     Q.    Okay.  Is there something

11 inconsistent?  I assume you studied this

12 study fairly carefully before you used

13 it.

14     A.    I did study -- I did study

15 it carefully, but with over 200

16 citations, I just want to be sure that we

17 don't abstract something from an abstract

18 that is defined more carefully in the

19 paper itself.

20          Okay.  So on page 43, I

21 think they provide more information on

22 study covariates.  So the proportion of

23 the sample injecting was included in the

24 covariate as a continuous variable at a

Highly Confidential - Subject to Further Confidentiality Review

1    bivariable level.  Study is conducted in

2    countries low and middle income.  Low

3    case ascertainment.  High percentage of

4    sample injecting.

5          So yes.

6          Q.    All right.  Then there's a

7    section called "Limitations" on Page --

8    starting on Page 46.  I've seen a section

9    entitled "Limitations" in a number of the

10   studies that you've cited.  Is that a

11   common section to include in an article

12   like this?

13         A.    Yes.

14         Q.    And what is the author

15   generally -- what is the purpose of a

16   Limitations section in a paper like this?

17         A.    Generally, in

18   epidemiological studies, the purpose of a

19   limitations section is to provide the

20   reader with any additional information

21   that would aid in their interpretation of

22   the paper and to provide an opportunity

23   for the author to provide additional

24   information on the robustness of their

1  results to any particular limitation of

2  the methods, data source, et cetera.

3         Q.    Well, the first paragraph

4  under limitations here says that, "The

5  studies reviewed here differed

6  considerably.  The length of follow-up of

7  the cohorts ranged from one to 36 years.

8  This is problematic, because drug use can

9  change over time period, and this can

10 affect mortality rates."

11              I'll stop there.

12              Do you think that that is an

13 accurate statement of a limitation of

14 this review?

15        A.    I would say that -- I would

16 say that that is an accurate limitation

17 of the review.  But again, applying it in

18 the way that I did in the report, I think

19 you provide a confidence interval around

20 the estimate.  You know, that's the best

21 available estimate for the rate of the

22 standardized mortality ratio for a

23 dependent user.

24              So I think that even though

```
 1    there is heterogeneity, to use that word
 2    again, there are differences in the
 3    length of follow-up of the cohorts from
 4    one to 36 years.
 5              When you meta-analyze
 6    something, you're aggregating across all
 7    of that.
 8         Q.    Sometimes when you aggregate
 9    over a heterogenous set of data, you can
10    gloss over variations, meaningful
11    variations within the data, correct?
12              MS. RELKIN:  Objection to
13         form.
14              THE WITNESS:  So anytime we
15         provide, you know, this is what
16         epidemiology does.  We provide
17         aggregate estimates of risk.  We
18         don't provide estimates at the
19         individual level.  So we're always
20         aggregating to provide an
21         assessment of risk factors.
22              You know, the overdose
23         deaths in the counties are also an
24         aggregate of a lot of individuals.
```

1    BY MS. WINNER:

2         Q.    But aggregation can be --

3    the reason heterogeneity is identified as

4    a limitation here, is because, or at

5    least in part because aggregate -- it

6    means that aggregation can yield results

7    that are less meaningful?

8         A.    I don't necessarily think

9    that that is -- it really depends on what

10   the research question you're asking is

11   and what you're using those data for, in

12   terms of the meaningfulness of

13   aggregation.  Sometimes we want an

14   aggregate estimate of the average risk of

15   a certain outcome across the heterogenous

16   subgroups that make up that average risk.

17        Q.    Have mortality rates from

18   overdose deaths in the drug using

19   population changed over time?

20        A.    Over what time period

21   specifically?

22        Q.    Over any time period over

23   the last 20 years?

24        A.    So specifically in the last,

1   you know, three years since 2013,

2   mortality rates have increased.

3           Q.    And did mortality rates

4   change in the time period before the last

5   three years?

6           A.    The mortality rates, the

7   overall population mortality rate due to

8   overdose has changed.  Is your question

9   about changes over -- can you be specific

10  about the population with which you're

11  asking the question.

12          Q.    Okay.  That's a fair

13  question.  Let's start with the overall

14  population mortality rate has changed

15  over time, has it not?

16          A.    The overall population

17  mortality rate of --

18          Q.    For overdose?

19          A.    For overdose has increased.

20          Q.    Has the overall mortality

21  rate varied over time before the past

22  three years among opioid users?

23          A.    You know, I would have to go

24  to meta-analysis in order to answer that

1   question.

2           You're asking about the

3   United States?

4       Q.    Yes.

5       A.    So let's see if there are

6   U.S. studies --

7       Q.    Well, let me just ask, is

8   that something you've looked at before I

9   asked you that question just now?

10          A.    What the variation over

11  time -- so what I used as a meta-analysis

12  that pooled data across a number of

13  different studies.  To the extent that

14  there are U.S. studies involved in that

15  particular estimate, I don't believe that

16  there are, but I would like to just

17  confirm.

18          So the meta-analysis used

19  three different studies from North

20  America, from the United -- no, I'm

21  sorry, four different studies -- I

22  apologize again.  No, that's from Canada.

23          So there are a number of

24  studies cited in here.  One is based in

```
 1   California.  One is based in Albuquerque.

 2   One is among Vietnam veterans.  And

 3   overall it does not provide data on

 4   whether the overdose rate among those

 5   different populations have changed over

 6   time.

 7            So as far as I know, you

 8   know, the -- the overdose rate among

 9   regular or dependent users of opioids in

10   the United States has not been

11   systematically investigated.

12        Q.    Now, you do however have an

13   opinion that the mortality rate has

14   changed in the past three years because

15   of the fentanyl problem?

16        A.    The population mortality

17   rate has.

18        Q.    The population mortality.

19            Is that also true of the --

20   the opioid using population mortality

21   rate?

22            MS. RELKIN:  Objection to

23        form.

24            THE WITNESS:  So I'm sorry,
```

Highly Confidential - Subject to Further Confidentiality Review

1          your question is whether there is

2          available data on the overdose

3          rate from fentanyl among opioid

4          users?

5     BY MS. WINNER:

6          Q.    Let me -- let me -- let me

7     take a step back and ask a different

8     question.

9               If the -- some opioids, if

10    abused, are more lethal than others,

11    correct?

12         A.    It depends on the amount,

13    the dose, and the duration of use.

14         Q.    But -- but in terms of --

15         A.    I wouldn't make -- I just --

16    I wouldn't make a blanket statement about

17    products and their overdose potential.

18         Q.    Well, do you believe, based

19    on the data you've seen that illicitly

20    manufactured and sold fentanyl that's

21    used to adulterate heroin and cocaine and

22    other drugs, is -- contributes to more

23    overdose deaths than abuse of Vicodin for

24    example?

Highly Confidential - Subject to Further Confidentiality Review

1    MS. RELKIN:  Objection to

2    form.  You can answer.

3    THE WITNESS:  What I can

4    say, with respect to the

5    epidemiological data that is

6    available that I have reviewed, is

7    that there has been an increase in

8    fentanyl associated overdose

9    deaths.

10    Your second question is

11    whether there are more deaths than

12    Vicodin deaths?

13  BY MS. WINNER:

14    Q.   Is it more dangerous for a

15  person, to you, based on the

16  epidemiological evidence, if there is

17  any, is it more risky to use heroin that

18  may be laced with fentanyl, than it is to

19  use Vicodin?

20    A.   It would depend on the dose

21  of -- of each substance that was used.

22    Q.   So you are not aware of any

23  general epidemiological evaluation that

24  is made about the -- the aggregate

Highly Confidential - Subject to Further Confidentiality Review

1    riskiness of one opioid versus another?

2           A.    No.   That's not what I'm

3    saying.  What I'm saying is that the

4    aggregate riskiness of all opioids is

5    dependent on the dose and duration, and

6    the potency of the opioid differs across

7    product.

8           So I wouldn't make a

9    comparison between one or the other

10   without knowing what potency, dose and

11   duration are used.

12          Q.    And is that something that

13   then has to be evaluated at the

14   individual level rather than at a

15   population level?

16          MS. RELKIN:  Objection to

17          form.

18          THE WITNESS:  The -- so the

19          question is at a population level,

20          could you -- could one evaluate

21          the overdose risk of various

22          opioid products at -- at various

23          levels of dose, duration, and

24          potency?

 1    BY MS. WINNER:

 2         Q.    Yes.

 3         A.    Yes, you --

 4         Q.    Has that been done?

 5         A.    I know of a number of

 6    studies that have looked at the

 7    relationship between dose of a number

 8    different products in overdose risk that

 9    I've cited in the report.  I don't know

10    of any that specifically compared to

11    other opioid -- to fentanyl-related

12    products.

13         Q.    Do you know of any studies

14    that -- that took into account for

15    example, risks associated with taking a

16    street drug that -- that you can't be

17    sure of the dosage or the purity of, as

18    opposed to a pill that you know what

19    the -- how much you're taking?

20              MS. RELKIN:  Objection to

21         form.

22              THE WITNESS:  So the

23         question is, is there -- can you

24         ask the question -- I don't quite

Highly Confidential - Subject to Further Confidentiality Review

1        understand what you're asking.

2        Are street drugs more dangerous

3        than --

4   BY MS. WINNER:

5        Q.    Are street -- are street

6   drugs like heroin more dangerous than,

7   you know, a bottle of -- of pills from a

8   pharmacy?

9        A.    I don't --

10       Q.    If abused.

11       A.    I think comparing those two

12  would be apples and oranges, because

13  physicians were misinformed about the

14  risks of harms associated with

15  prescribing prescription opioids.

16            So yes, when you're using

17  drugs that are bought and sold on the

18  street, there might be more -- there may

19  be more variation with respect to purity.

20       Q.    Well, and one of the

21  variations in purity is that some of it

22  is adulterated with illicit fentanyl,

23  correct, for heroin?

24       A.    Well, for prescription

Highly Confidential - Subject to Further Confidentiality Review

1    opioids as well.

2        Q.    What -- do you have any

3    statistics on the percentage of

4    prescription opioids that people buy

5    thinking they are buying a prescription

6    opioid that is -- that's adulterated with

7    fentanyl?

8        A.    So there is a study that has

9    examined this.  And I cite it in the

10   report that I can pull out for you.

11       Q.    Can you just tell me the

12   section?  We don't need to -- if you can

13   just cite it to me, I can go look it up

14   later.

15       A.    Yeah, let's see.  I believe

16   it is in the overdose section.  I believe

17   the CDC has put out a publication on that

18   topic.

19            If I can point you to the

20   exact.  I believe that Reference 62 has

21   that information.

22       Q.    Okay.  Thank you.

23       A.    I can confirm.

24       Q.    I -- like my colleague, I

1    have limited time.  So let's go onto

2    something else.

3                You were asked a number of

4    questions earlier about Figures 3, 4 and

5    5 in your report.  Do you recall that?

6                I'm sure you recall that,

7    that wasn't that long ago.

8         A.    I do recall that.

9         Q.    I just have a -- a quick

10   follow-up question on that.

11               Let's just focus on -- well,

12   any of them.  But they all end in 2017,

13   correct?

14        A.    Yes.

15        Q.    Did you review statistics of

16   overdose death rates in these two

17   counties in 2018?

18        A.    At the time that we put

19   these figures together the publicly

20   released data was included up until 2017,

21   and we used the publicly available county

22   level data for this report.

23        Q.    Have you reviewed that data

24   since then?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I have not gone back to the

2  data since then.

3    Q.    Have you seen information

4  indicating that overdoses in Cuyahoga

5  County were down by more than 20 percent

6  from 2017 to 2018?

7    A.    As I -- as I said I have not

8  reviewed the 2018 data to my knowledge.

9  I did review -- the CDC put out a

10  publication, I think preliminary data on

11  2018, but did not put it out at the

12  county level.  So we can look at -- I

13  mean, what -- what is available is the

14  overall national statistics.  But the

15  county level data, I would need to see --

16  to evaluate the validity of that

17  statement, I would need to see the data.

18    Q.    I'm not asking you to take

19  my word for it.

20          Let's look at Page 34 of

21  your report.  Wait a minute.  I'm in the

22  wrong section.

23          Where is this?

24          Here it is.  I found it.

Highly Confidential - Subject to Further Confidentiality Review

1    Okay.  Page 34.  I am on the right page.

2    In the section near the top on Summit

3    County, do you see that?  There's a

4    paragraph on Summit County?

5         A.    Yes.

6         Q.    The last sentence of that

7    section says, "Available data in Summit

8    County indicates that MAT utilization is

9    not currently adequate for abatement and

10   treatment of those in need.  Available

11   data indicate that there were 2,072

12   individuals receiving MAT in Summit

13   County."

14             Do you see that?

15        A.    Yes.

16        Q.    Did I read it correctly?

17        A.    Yes.

18        Q.    Now, what is -- the number

19   2,072 is lower than the number that you

20   come up with as the -- the population

21   size for Summit County, the relevant

22   population size for Summit County,

23   correct?

24        A.    So using the anticipated

1   death rate of .65 per 100,000

2   person-years, I estimate the total size

3   at 11,538.

4          Q.     Is there anything other than

5   the difference in those two numbers that

6   you rely on in stating that available

7   data in Summit County indicates that MAT

8   utilization is not currently adequate for

9   abatement?

10         A.     That is the data that I

11  relied on.  The comparison of those two

12  numbers, in order to -- again, the

13  overall picture to paint in that

14  paragraph is that there's a large number

15  of people who are suffering who are in

16  need of additional attention.

17         Q.     Now, you refer in that

18  sentence to MAT utilization, correct?

19  You say MAT utilization is not currently

20  adequate, correct?

21         A.     MAT utilization is the

22  phrase that I use.

23         Q.     Yes.  To say that MAT

24  utilization is not adequate is not

1    necessarily the same thing as saying MAT

2    resources are not adequate, correct?

3          A.    The data that were provided

4    to me were the number of individuals

5    receiving MAT in Summit County.  And so

6    that is what I used to make that

7    statement.

8          Q.    Do you know how many people

9    the MAT resources in Summit County that

10   exist today would be able to accommodate?

11         A.    Those -- I have not seen

12   those data.

13         Q.    Now, your reference for, at

14   the end of that sentence, is -- I assume

15   it's your reference for the 2,072 number,

16   is Reference 158.  Can you tell me what

17   Reference 158 is?

18         A.    Smith, D., County of Summit

19   Alcohol, Drug and Addiction and Mental

20   Health Services Board.

21         Q.    What is that?

22         A.    I would need to pull the

23   reference in order to --

24         Q.    By all means.

Highly Confidential - Subject to Further Confidentiality Review

1       A.      158.

2               So reference 158 includes --

3       Q.      I'd like to mark that as an

4  exhibit.  This was something that was

5  completely unidentifiable from the

6  referenced cites.  So I have no idea what

7  it is.  So can we mark this as an

8  exhibit.

9               MS. RELKIN:  Do you want us

10              to make a copy?  Do you want to

11              move to another question, and

12              we'll come back to it.

13              MS. WINNER:  Sure.  Let's

14              put the sticker on it.

15              (Document marked for

16              identification as Exhibit

17              Keyes-14.)

18  BY MS. WINNER:

19      Q.      And Exhibit 14, just so

20  we're clear in case we run out of time

21  before we get back to it.  Exhibit 14 is

22  the Reference 158?

23      A.      That is Reference 158.

24      Q.      And that's where you got

1  that 2,072 number from?

2       A.    I believe so.  I would --

3  I'll review it again when it comes back.

4       Q.    Okay.  Do you know -- well,

5  is it a part -- was it any part of your

6  analysis to evaluate whether the grant

7  funding and insurance funding that is

8  currently available in Cuyahoga County

9  and Summit Counties are sufficient to

10  cover the cost of the amount of MAT

11  that's needed?

12       A.    So what I have in the report

13  is the assessment of the total population

14  who would be in need of services.  I do

15  not have information on grant funding.  I

16  would point out that if there are more

17  spots available than people who need

18  them, then additional resources should be

19  placed into getting those people into

20  treatment.

21       Q.    Now, it is not in fact

22  possible to get everybody into treatment,

23  correct?

24            MS. RELKIN:  Objection to

1            form.

2                  THE WITNESS:  I don't want

3            to speculate about the

4            possibilities of getting

5            individuals into treatment.

6     BY MS. WINNER:

7            Q.    Well, are you aware that

8     some people who are offered treatment

9     refuse it?

10           A.    I do know that some people

11    who are offered treatment refuse it.

12           Q.    And the law does not

13    allow -- typically allow people to be

14    forced into treatment against their will,

15    does it?

16           A.    That's correct.

17                 MS. RELKIN:  Objection.

18    BY MS. WINNER:

19           Q.    So even if there is a need

20    for more people to get MAT than are

21    currently getting it, that doesn't

22    necessarily mean that more MAT resources

23    are needed?

24                 MS. RELKIN:  Objection to

1      form, misstates --

2           THE WITNESS:  So that's not

3      what I'm evaluating in the report.

4      So what I'm evaluating in the

5      report is the total number of

6      people based on the criteria that

7      I've written out that I think

8      could benefit.  There is a body of

9      literature that one could bring to

10     bear on motivation to change.

11     Some of the harm reduction

12     techniques that I've outlined in

13     here are actually facilitators for

14     doing that.  And so I think

15     that -- I don't want to speculate

16     about who is and who isn't forced

17     to treatment, when there's

18     resources that could be provided

19     to save the lives of the

20     individuals in these counties.

21  BY MS. WINNER:

22       Q.   Now, are you offering an

23  opinion based on your analysis that all

24  individuals who have opioid use disorders

Highly Confidential - Subject to Further Confidentiality Review

1    should be prescribed medication-assisted

2    treatment?

3            A.    That is not what is written

4    in my analysis.

5            Q.    And is that your opinion?

6            A.    Is it my opinion that all --

7            Q.    All --

8            A.    -- people -- say that again.

9            Q.    With opioid use disorder

10   should be given medication-assisted

11   treatment?

12           A.    I think what I've outlined

13   in this report is that there's a wide

14   range of treatment options.  I don't want

15   to make any recommendation for any

16   individual patient.  I'm looking at

17   population level data.

18           Q.    Have you done any estimate

19   of what percentage of the overall

20   population in these counties, medication

21   assisted treatment, would be suitable

22   for?

23                 MS. RELKIN:  Objection to

24           form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  So again, what

2      I'm providing in this report is an

3      overall assessment of the

4      population of individuals who

5      would benefit from recovery from

6      regular dependent use of opioids.

7          Any one particular patient

8      and their suitability is not what

9      I'm looking at in the report.  It

10     is the overall population level.

11  BY MS. WINNER:

12         Q.    Okay.  But you've given us

13  the pop -- the total pop -- your estimate

14  of the total population of people with

15  opioid use disorder.  I think it's

16  actually, an estimate of people who

17  have -- who are dependent or regular

18  users of opioids, correct?

19         A.    That's correct.

20         Q.    And then you've said that

21  MAT is suitable for at least some people,

22  correct?

23         MS. RELKIN:  Objection.

24         THE WITNESS:  So what I say

Highly Confidential - Subject to Further Confidentiality Review

```
 1            in the report with respect to
 2            suitability is -- I say, I would
 3            estimate that the total size of
 4            dependent or regular users of
 5            opioids is between 45,343 and
 6            52,307 and that this is the number
 7            of individuals who are in need of
 8            MAT access, not suitability.
 9   BY MS. WINNER:
10            Q.    Okay.  So you're saying
11   these are people who should have access
12   to MAT if it's suitable for them?
13                 MS. RELKIN:  Objection to
14            form.
15                 THE WITNESS:  I would say
16            that each patient -- what I said
17            is they should have access to MAT
18            services and that whether someone
19            is suitable or not suitable for
20            MAT is a different research
21            question that I'm not evaluating
22            in that section.
23   BY MS. WINNER:
24            Q.    Are you suggesting that
```

Highly Confidential - Subject to Further Confidentiality Review

1    investments should be made in a larger

2    capacity for MAT services than are

3    actually needed in the community?

4              MS. RELKIN:  Objection to

5         form.

6              THE WITNESS:  What I'm

7         saying is that I'm providing an

8         estimate of the total size of

9         regular or dependent users that

10        may be in need of MAT access.

11   BY MS. WINNER:

12        Q.    But not everybody in that

13   population is, in fact, going to be

14   suitable for that --

15        A.    I don't have that

16   information.  I am not evaluating that

17   question.

18        Q.    Now, just to close this off.

19   Am I correct that you have not evaluated

20   who actually delivers MAT services in

21   Summit County or Cuyahoga County?

22        A.    What I provided --

23              MS. RELKIN:  Objection.

24        Asked and answered.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  What I
 2        provided in the report is an
 3        assessment of the overall MAT
 4        access.  The overall size of the
 5        dependent or regular user of
 6        opioids in the counties based on
 7        the methodology I described.
 8   BY MS. WINNER:
 9        Q.    But my question is have you
10   evaluated who actually delivers MAT in
11   these counties.
12        A.    That information is not
13   available -- was not available to me.
14        Q.    Now, you go on then to talk
15   about certain specific populations,
16   pregnant women, people involved in the
17   child welfare system, and -- and jail
18   inmates, correct?
19        A.    Yes.
20        Q.    Are all of those
21   subpopulations included in the numbers
22   for the county of -- of people that you
23   say should have access to MAT?
24        A.    Yes.  That -- that would be
```

Highly Confidential - Subject to Further Confidentiality Review

1    inclusive.

2         Q.    Okay.  So it's not -- I

3    forget what the numbers are.  But if

4    it's -- it -- it's not -- you don't take

5    the numbers from Section C.3 and then add

6    additional numbers for those other

7    populations?

8              MS. RELKIN:  Objection to

9         form.

10             THE WITNESS:  I don't

11        believe I did that in the report.

12   BY MS. WINNER:

13        Q.    Okay.  I just want to make

14   sure that that's not what you're

15   suggesting.  Okay.

16             MS. DO AMARAL:  And,

17        Counsel, just so you know, we have

18        copies of that document whenever

19        you're ready.

20             MS. WINNER:  Okay.  Great.

21        Thanks.

22   BY MS. WINNER:

23        Q.    I was just handed the copies

24   that counsel was so kind to make for

Highly Confidential - Subject to Further Confidentiality Review

1    Exhibit 14.  Do you know what Exhibit 14

2    is?

3            A.    Exhibit 14 is what we're

4    looking at?

5            Q.    Yes.

6            A.    So what this is is a report

7    from Suboxone pilot agencies and AOB

8    agencies that evaluates MAT.

9            Q.    You say it's a report, what

10   makes you say it's a report?

11              MS. RELKIN:  Objection to

12           form.

13              THE WITNESS:  I suppose

14           because it provides information to

15           a group.

16   BY MS. WINNER:

17           Q.    Would you agree with me that

18   this looks like a set of PowerPoint

19   slides?

20           A.    There are also tables as

21   well.

22           Q.    Do you know who actually

23   authored this document?

24           A.    I assume that it was the

Highly Confidential - Subject to Further Confidentiality Review

1   individuals involved in these agencies.

2          Q.     But you don't know?

3          A.     There is not a list of

4   authors.

5          Q.     Was -- did anybody tell you

6   anything about this document when they

7   gave it to you?

8          A.     It -- it was provided to me

9   based on the informational requests that

10  I made.

11         Q.     To counsel?

12         A.     To counsel.

13         Q.     And -- so you don't know

14  anything about what the -- other than

15  what you read in this document, you don't

16  know anything that would allow you to

17  evaluate the accuracy or the reliability

18  of the data?

19         A.     I think what I tried to do

20  in the report is to provide an overall

21  sense of the burden of the -- of the

22  opioid epidemic in these counties with

23  the information that I had available to

24  me, and I tried to convey the level of

Highly Confidential - Subject to Further Confidentiality Review

1   need that there was in the counties,

2   based on the information that I had.

3           If -- if there's additional

4   information that can shed light on the

5   burden of the overdose crisis in these

6   counties, then, you know, I'd be happy to

7   consider it.

8       Q.    So if the -- if the number

9   that you derived from Exhibit 13 --

10  Exhibit 14 is wrong, you would adjust the

11  calculation that you based on it?

12      A.    I'm always open to new

13  information and better information if it

14  comes to light.

15      Q.    Let's talk a little bit

16  about what you said -- what -- your

17  section on jail populations.

18          And that's C.4.1, correct,

19  of your report, starting on Page 34?

20      A.    Yes.

21      Q.    And it says, the first

22  sentence says, "Individuals in jails and

23  prisons are more likely to have" -- is

24  the word "to" missing?

1    A.    Yes.

2    Q.    Okay.

3          -- "more likely to have

4  opioid use disorders than individuals in

5  the general population by a factor of at

6  least 15 to 1."

7              Where does this 15 to 1 come

8  from?

9    A.    So we can pull out

10 References 58 and 59.

11   Q.    Okay.  I'll show you 58.

12 We'll mark 58.  I'm going to tell you --

13 okay.  I think this is 58.

14           (Document marked for

15           identification as Exhibit

16           Keyes-15.)

17 BY MS. WINNER:

18   Q.    I would like to show you

19 what's been marked as Exhibit 15.

20 "Assessing Need for Medication-Assisted

21 Treatment For Opiate-Dependent Prison

22 Inmates."

23           There's two copies there, I

24 think.

1    Is this your Reference 58?

2    A.    Yes, it is.

3    Q.    And is this a study that was

4  done in Puerto Rico, evaluating needs

5  assessment for the Department of

6  Corrections and Rehabilitation in Puerto

7  Rico?

8    A.    So this study was used to

9  guide planning for an expansion of drug

10  treatment services in correctional

11  facilities, and need -- and it was a

12  needs assessment conducted at the

13  Department of Correction and

14  Rehabilitation of Puerto Rico.

15    Q.    I think that's what I just

16  said.

17    A.    I just wanted to confirm.

18    Q.    Okay.  And there is no

19  analysis or data in this study -- there

20  is no analysis of data in this study

21  taken from any place other than Puerto

22  Rico, is there?

23    A.    In the results section of

24  this study?  The -- the study was

1  conducted in Puerto Rico.

2       Q.    Evaluating data gathered in

3  Puerto Rico, correct?

4       A.    If I can just confirm that.

5  So the population for the study consisted

6  of 10,849 sentenced inmates midyear 2004,

7  determined from statistical data provided

8  by the DCR.  So, yes.

9       Q.    Now, did -- did you do any

10 evaluation to determine whether the

11 population that was evaluated in Puerto

12 Rico could be appropriated --

13 appropriately extrapolated to the jail

14 populations in Summit and Cuyahoga

15 County --

16      A.    So I cited --

17      Q.    Let me just --

18      A.    I'm sorry, you should --

19 yes, finish your question.

20      Q.    So we'll talk about the

21 other -- your other citation in a minute.

22           But did you do any

23 evaluation to determine whether the study

24 from Puerto Rico could be proper --

Highly Confidential - Subject to Further Confidentiality Review

1    appropriately extrapolated to the jail

2    populations in Summit and Cuyahoga

3    Counties?

4                    MS. RELKIN:  Objection to

5            form.  You can answer.

6                    THE WITNESS:  So, similar to

7            other sections in this report, I

8            cited the available data I had on

9            the overall population level

10           research.

11                   You know, it didn't state

12           that this is the -- necessarily

13           the factor in those specific

14           counties, per se, in that

15           particular sentence.

16                   I cited this study, as well

17           as another one, in order to make

18           that overall assessment of the

19           broader literature.

20   BY MS. WINNER:

21           Q.    Do you know -- and I don't

22   want to take the time going through your

23   Reference 59.  That's on me.  I don't

24   think that 15 to 1 ratio is in there.  It

1   either it is or it isn't.  But did you --

2   is there any other source that you relied

3   on for this 15 to 1 ratio, other than

4   those two sources?

5           MS. RELKIN:  Objection to

6       form.

7           THE WITNESS:  Can I just

8       review Reference 59?

9   BY MS. WINNER:

10      Q.    I don't want to take the

11  time to do that.  I'm asking you, is

12  there anything that you relied on other

13  than 58 and 59?

14      A.    So I just want to point out

15  that Reference 59 is not -- includes a

16  broader review of the literature.  And so

17  there are other references in reference

18  59.  So there's the Puerto Rico study and

19  this study, which is a special

20  communication which is not an original

21  investigation.  So it encompasses -- I

22  would need to read it more carefully.

23  But it encompasses a broader range of

24  data sources.

1    Q.    Did you obtain access to any

2    data about the incidence of opioid use

3    disorder specifically in the jails in

4    Summit or Cuyahoga?

5    A.    I did not have access to

6    that information.

7    Q.    Did you -- do you know what

8    treatment services have actually been

9    made available to inmates in those jails?

10    A.    I don't think I expressed an

11    opinion about treatment services and

12    whether or not they were available.  My

13    point in Section C.4.2 of the report is

14    that I can infer MAT sources from being

15    high demand, not what the current level

16    of access would be.

17    Q.    Do you believe that the --

18    that there are benefits of providing

19    treatment services to inmates who have

20    opioid use disorder?

21    A.    Do I believe there are

22    benefits of providing treatments -- yes.

23    I believe that there are benefits.

24    Q.    Do you believe that there

Highly Confidential - Subject to Further Confidentiality Review

1 have likely been inmates with opioid use

2 disorder in Cuyahoga County jails before

3 today?

4     A.    I don't want to speculate

5 about data that I don't have access to.

6     Q.    Well, is your 15 to 1 ratio

7 that you offer, is that something that's

8 a 2019 number? Or is that something that

9 you think has at least some applicability

10 generally going back in time?

11     A.    So the Puerto Rico study

12 that you mentioned, the data collection

13 was in 2004. And for the citations that

14 are in this special communication, I

15 would need to look at the specific

16 references to tell you what year the data

17 were collected.

18     Q.    Do you believe that

19 opioid -- excuse me. Do you believe that

20 inmates with opioid use disorder should

21 have had access to treatment?

22         MS. RELKIN: Objection to

23     form.

24 BY MS. WINNER:

1          Q.    Before today?

2                MS. RELKIN:  Objection.

3          Beyond her scope.

4                THE WITNESS:  That's -- I'm

5          not evaluating the actual receipt

6          of services.  The opinions that I

7          have in Section C.4.2 is my

8          estimate based on my review of the

9          literature, is that there would be

10         a high need for services.

11    BY MS. WINNER:

12         Q.    Turning then to your

13    discussion of pregnant women.  And we

14    don't have a lot of time to talk.  So I

15    just have a few questions about that.

16               And do you know what MAT

17    resources are currently available in

18    Summit County for pregnant women?

19         A.    So again what I did in the

20    scope of this report is to estimate, you

21    know, the potential need for services,

22    rather than what services are actually

23    available.

24         Q.    And would the same -- would

1   you give me the same answer if I asked

2   you about Cuyahoga County?

3        A.    So, I mean in my report is

4   what the information that was available

5   to me is, which is the number of infants

6   diagnosed with neonatal abstinence

7   syndrome and what I can infer from that

8   is that, you know, at a minimum there's

9   137 women in Cuyahoga who would be in

10  need of services in their pregnancies,

11  noting that it's probably an

12  underestimate.

13       Q.    Few quick questions about

14  the child welfare system section which is

15  C.4.3 on Page 35.

16            (Document marked for

17       identification as Exhibit

18       Keyes-16.)

19  BY MS. WINNER:

20       Q.    I'd like to show you what we

21  marked as Exhibit 16 to your deposition.

22  Sorry, I'm not very good at tossing

23  exhibits.

24            MS. DO AMARAL:  Counsel,

Highly Confidential - Subject to Further Confidentiality Review

1    just before you move on,

2    Exhibit 15 has some highlighting

3    in it.  Is there any significance

4    to that?

5              MS. WINNER:  I have no idea.

6              MS. DO AMARAL:  Okay.  Just

7    checking.  It's just not something

8    that we discussed.

9              MS. WINNER:  No, we did not.

10   And it --

11             MS. DO AMARAL:  No problem.

12             MS. WINNER:  Thank you.

13   BY MS. WINNER:

14        Q.   First sentence of C.4.3 in

15   your report says that an estimated

16   442,995 children were in the foster care

17   system in the U.S. as of 2017.  And of

18   the 269,690 who entered the system in

19   2017, 39.3 percent of those cases were

20   due to parental substance abuse disorder.

21   And then you cite Reference 171.

22        A.   Yes.

23        Q.   And is that --

24             MS. WINNER:  What exhibit

Highly Confidential - Subject to Further Confidentiality Review

1        number is this?

2    BY MS. WINNER:

3        Q.    Is that Exhibit 16?  Is that

4    the reference --

5        A.    Exhibit 16 is Reference 171.

6        Q.    Okay.  And can you tell me

7    where that 39.3 percent figure is to be

8    found in this exhibit?

9        A.    So if you look at the second

10    page -- oh, wait.  So this is entering

11    the Foster care system as of 2017.  So in

12    2017, drug abuse of the parent was

13    36 percent of the circumstances for the

14    child's removal.  2 percent was the drug

15    abuse of the child.  Oh, but I have here

16    parental.

17        Q.    Yes.

18        A.    My apologies.  And is 2016

19    here as well?  I can provide you with an

20    updated citation that would include 2016.

21    I'm assuming that I averaged the two.

22    But --

23        Q.    All right.  If you would --

24        A.    -- 36 is, you know, close.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Turn to Page 36 where you

2    provide specific discussion of Cuyahoga

3    and Summit Counties in Section F.4.4.

4            Do you see that?

5      A.     Yes.

6      Q.     And you provide a statistics

7    in the first sentence for Cuyahoga

8    County.  You then again -- you again

9    refer to Reference 171.

10           Do you see that?

11     A.     I do see that.

12     Q.     And can you tell me where

13   the Cuyahoga County numbers are in

14   Exhibit 171 -- in Reference 171,

15   Exhibit 16?

16     A.     That might be a typo.  And

17   we can provide you with an updated

18   reference.  I would have to go back and

19   look at the footnotes.  I mean, it's not

20   in what you provided to me here.

21     Q.     And if you look at the first

22   sentence on the paragraph, next paragraph

23   on Summit County.  It again -- it

24   provides a number for Summit County, and

Highly Confidential - Subject to Further Confidentiality Review

1    again cites the same reference, correct?

2         A.    We can provide you with an

3    updated citation, because I agree with

4    you it's not here.

5         Q.    Okay.

6         A.    We were able to provide

7    those numbers, so we can update that.

8         Q.    On your opinions -- again,

9    I'm running out of time.  Let me just ask

10   this real fast, about -- you also provide

11   some numbers about naloxone needs and

12   fentanyl test strips.

13             My single question about

14   both of those is, am I correct that,

15   again, you're only attempting to identify

16   needs and not evaluating what is

17   currently available in the counties for

18   these things?

19        A.    So in neither section do

20   I -- I don't think I spoke to the current

21   availabilities in the counties.  It was

22   really an assessment of the public health

23   need in the counties.

24             MS. WINNER:  Let's go off

Highly Confidential - Subject to Further Confidentiality Review

1    the record.

2              THE VIDEOGRAPHER:  All

3    right.  The time is 5:18 p.m.  Off

4    the record.

5              (Short break.)

6              THE VIDEOGRAPHER:  The time

7    is 5:22 p.m.  Back on the record.

8                   -  -  -

9              EXAMINATION

10                  -  -  -

11   BY MR. O'CONNOR:

12        Q.    Professor Keyes, I'm Andrew

13   O'Connor, I represent one of the

14   manufacturers in the case.  I'm going to

15   be asking you some questions on their

16   behalf.

17             In connection with preparing

18   your report, did you review any marketing

19   material used by opioid manufacturers?

20        A.    So, I reviewed what is cited

21   in my report.  This includes a number of

22   different papers in the peer-reviewed

23   literature that go over the marketing

24   materials from --

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Other than what you've cited

2   in the report, did you review any

3   marketing materials or studies --

4      A.    Everything that I reviewed

5   has been provided.  I'm familiar, as part

6   of my expertise in opioid use disorders,

7   more broadly with marketing materials

8   that were used.

9      Q.    And what marketing materials

10  are you familiar with through that

11  experience?

12     A.    The only market -- the only

13  materials that I cite in the report that

14  I rely on for the opinions that I made,

15  are the materials that are evaluated in

16  the peer-reviewed literature, that

17  overview the -- the evidence that was

18  used to market prescription --

19     Q.    Are you relying on any other

20  peer-reviewed materials other than what

21  you've cited in the report?

22            MS. RELKIN:  For that

23       opinion?

24  BY MR. O'CONNOR:

Highly Confidential - Subject to Further Confidentiality Review

1        Q.     For that point?

2        A.     I'm -- I'm not -- I just --

3    I'm sorry, I just want to understand the

4    question.  Am I relying on any other

5    peer-reviewed materials for which --

6    which point specifically?

7        Q.     For -- for any opinion on

8    marketing use -- marketing materials used

9    by opioid manufacturers.

10       A.     I'm relying on the material

11   the -- to form the opinions, the material

12   that I relied on is the material that is

13   cited in this report.

14       Q.     Okay.  So just to be clear,

15   did you review any of the actual primary

16   source material, which is to say, the

17   material -- the marketing materials

18   themselves in writing your report?

19       A.     So the --

20              MS. RELKIN:  Objection to

21       form.

22              THE WITNESS:  -- material

23       that I relied on to write my

24       report included a broad range of

Highly Confidential - Subject to Further Confidentiality Review

1          peer-reviewed literature, articles

2          that evaluate evidence that was

3          used in marketing materials.

4               More broadly, given 15 years

5          of studying opioid use disorders,

6          I'm familiar with marketing

7          materials that were used.  There

8          was no marketing material that I

9          relied on to form the opinion that

10         is in this report.

11    BY MR. O'CONNOR:

12         Q.    In 15 years what marketing

13    materials related to pharmaceutical

14    opioids did you review?

15         A.    There has been voluminous

16    evidence, as I cite here, regarding

17    distribution, sales and marketing of

18    opioids.

19         Q.    Does any of the evidence

20    you're referring to relate to any

21    manufacturing defendants in this case?

22               MS. RELKIN:  Objection to

23         form.

24               You mean specific?  Is that

1    what you said?

2         THE WITNESS:  Does any of

3    the evidence that I'm referring to

4    relate to any manufacturing -- I

5    think the evidence that I've

6    provided in this report relates to

7    manufacturers of opioids.

8    BY MR. O'CONNOR:

9         Q.    Professor Keyes, who are the

10   manufacturing defendants in this case?

11        A.    There's a broad range of

12   manufacturing defendants in the case.

13   You know, I'm not -- I know that Purdue,

14   Janssen, Teva, a number of other

15   manufacturers are involved.

16        Q.    Can you name any other

17   manufacturers as you sit here today?

18        A.    I would have to go back to

19   my materials.  You know, I think it's all

20   cited in the complaint.  The -- the

21   opinions that I derived at for this

22   report are not specific to any particular

23   manufacturer unless I cite a specific

24   product in the report.  So all of the

1   opinions that I've arrived at are about

2   the overall emergence of an opioid

3   epidemic in the United States.

4          Q.    In connection with Purdue,

5   did you review any Purdue marketing

6   materials yourself?

7          A.    In connection with Purdue?

8   So what I've cited -- I -- I think I've

9   answered the question.  What I've cited

10  in the -- in the report is the

11  peer-reviewed literature that evaluates

12  the evidence that was used for marketing

13  materials.

14         Q.    I'm going to mark an exhibit

15  that you cite in your report.

16             (Document marked for

17         identification as Exhibit

18         Keyes-17.)

19  BY MR. O'CONNOR:

20         Q.    It's a study by Art Van Zee.

21  It's marked Exhibit 17.

22         A.    Can you tell me which

23  citation number it is in the report?

24         Q.    I believe it's 15.

Highly Confidential - Subject to Further Confidentiality Review

1      Do you know who Art Van Zee

2  is?

3      A.    Sorry, I'm just trying to

4  find the specific place I reference that.

5  Do you know what page it's on?

6           So I -- the use of that

7  article is for the statement, "From 1997

8  to 2002, prescriptions for OxyContin for

9  noncancer pain increased from

10  approximately 670,000 in 1997 to" -- "to

11  about 6.2 million in 2002.  Prescriptions

12  for cancer pain also increased about

13  fourfold across the same period."

14      Q.    Back to my question.  Do you

15  know who Art Van Zee is?

16      A.    Do I know him personally?

17      Q.    Do you know who -- who he is

18  generally?

19      A.    According to the article, he

20  is an M.D., and he is affiliated with

21  Stone Mountain Health Services.

22      Q.    Other than what you're

23  reading right now, are you familiar with

24  his credentials?

1          A.    I'm not aware of other

2    articles by Art Van Zee that I relied on

3    for the opinions in this report.

4          Q.    To your knowledge, is he an

5    epidemiologist?

6          A.    I have not evaluated his

7    training.

8          Q.    Does he have any expertise

9    related to the marketing of prescription

10   opioids?

11              MS. RELKIN:  Objection.

12              THE WITNESS:  That's not

13         information that was -- I think

14         the statement in the -- where I

15         cite his work is based on what is

16         written here.  I don't think it --

17              I'm sorry, your question

18         was:  Do I have any knowledge of

19         his expertise related to the

20         marketing of prescription opioids?

21         I'm not sure how that relates to

22         the statement that "OxyContin for

23         noncancer pain increased from

24         approximately 670,000 to

Highly Confidential - Subject to Further Confidentiality Review

1    6.2 million."

2    BY MR. O'CONNOR:

3        Q.    Okay.  Let's look at a

4    different portion of your report.  On

5    Page 11 near the top you discuss direct

6    marketing to physicians using the data

7    that underestimated opioid use disorder

8    risks in patients.

9            What direct marketing to

10   physicians were you referring to in that

11   statement in your report?

12       A.    I was citing the evidence

13   that is in the peer-reviewed journal that

14   the studies on opioid use disorder risk

15   among noncancer pain patients

16   underestimated risk.

17       Q.    And which studies -- or

18   which marketing materials, rather, are

19   cited in those materials?

20       A.    So there are a number of

21   studies that have looked at marketing --

22   marketing and other materials as -- as

23   part of the assessment of the overall

24   burden of the emergence of the epidemic

Highly Confidential - Subject to Further Confidentiality Review

1    that I cited in my peer-reviewed

2    literature.

3         Q.    How did --

4         A.    In an epidemiologic report,

5    you know, we rely on the -- on the

6    evidence based on the methodology that I

7    cited in the beginning.

8         Q.    Other than the Van Zee

9    paper, can you point me to any other

10   papers that you cite that deal with

11   whether marketing materials used with

12   physicians underestimated the risks of

13   opioids?

14        A.    Sure.  I would point to the

15   Hadland article.

16        Q.    Okay.

17        A.    Let me find that for you.

18        Q.    I think I can help you out.

19        A.    Do you have a copy --

20        Q.    Well, first, which Hadland

21   article?  There are a few I believe.

22        A.    So on Page 22, I cite

23   Reference 15.  I'll just pull that up.

24   So that's the Van Zee article in talking

1    about -- that the risk of disorder, harm,

2    and diversion was underestimated.

3             Q.    That's your Citation 15?

4             A.    That's my Citation 15.

5             Q.    And that -- that's just one

6    article, right, the Van Zee article?

7             A.    And so -- right.  And so

8    then Reference 17, "Pharmaceutical

9    Company Marketing to Physicians is

10   Extensive in the United States."  That's

11   based on DeJong et al., 2016.  Would you

12   like to go over that one?

13            Q.    No, I just want to --

14            A.    Do you want to go to

15   Hadland?

16            Q.    I want to focus just for

17   another moment on the Van Zee, since

18   that's the only one that's cited for the

19   proposition --

20            A.    No, no, that's not the only

21   one that's cited.

22            Q.    I'm sorry.  Is there another

23   one that's cited for the proposition that

24   sources underestimated the risk of opoid

1    use disorder?

2         A.    That's an introductory

3    sentence for a whole paragraph of

4    evidence, the summation of which support

5    the statement.  So I'm not relying on any

6    one particular source.

7         Q.    Okay.  In Footnote 15, you

8    cite Van Zee.  That study relates only to

9    the marketing of OxyContin, correct?

10        A.    Again, I'm not relying on

11   that source solely to provide all of the

12   evidence for the marketing of

13   pharmaceuticals and the underestimation

14   of risk.  I will agree with you that this

15   particular paper focuses on the promotion

16   and marketing of OxyContin.  But there

17   are other studies that I relied on.

18        Q.    Okay.  Thank you.  When you

19   say other studies, are you referring to

20   Hadland?

21        A.    I'm referring to the other

22   studies in this paragraph.  There may be

23   other studies in the report as well.  But

24   we can focus on these to start.

1     Q.    So let me show you what's

2  marked as Exhibit 18, which is an article

3  by Hadland.

4           (Document marked for

5        identification as Exhibit

6        Keyes-18.)

7  BY MR. O'CONNOR:

8     Q.    Called "Association of

9  Pharmaceutical Industry Marketing of

10 Opioid Products to Physicians With

11 Subsequent Opioid Prescribing"?

12    A.    So I just want to confirm

13 that this is the correct citation.

14          Yes.

15    Q.    Did you review this article

16 by Dr. Hadland before you cited it in

17 your report?

18    A.    What do you mean by

19 "review"?

20    Q.    Did you read the study

21 before you cited it in your report?

22    A.    I read the study.

23    Q.    And you made the decision to

24 cite it, correct?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     That's correct.

2          Q.     Okay.  I'd like to direct

3     your attention to the first sentence of

4     the first paragraph -- I'm sorry, the

5     second paragraph.  It says,

6     "Pharmaceutical industry marketing to

7     physicians is widespread, but it is

8     unclear whether the marketing of opioids

9     influences prescribing."

10              Do you agree with that

11    statement?

12         A.     So I believe that's the

13    topic of the paper.

14         Q.     Do you agree with that

15    statement?

16         A.      I would agree that that

17    statement was used to set up the

18    rationale for the analysis that we are

19    looking at.  So I -- that is the topic

20    that the investigators sought to

21    investigate in their studies.  So

22    abstracting that one sentence is an

23    inaccurate representation of what the

24    findings of the study were.

1    Q.    So I'm sorry.  Do you agree

2  or disagree with that statement?

3            MS. RELKIN:  Objection.

4       Asked and answered.

5            THE WITNESS:  I've answered

6       the question.  That --

7  BY MR. O'CONNOR:

8       Q.    I've asked it.  You haven't

9  answered it.

10      A.    So in a scientific paper

11 when you write an introduction, the way

12 you set it up is to assess, you know,

13 what's known in the literature, what some

14 gaps in the literature are.

15            This particular sentence is

16 setting up what is the analysis that was

17 done.

18            He also cites in that paper

19 another paper, "Industry Payments to

20 Physicians For Opioid Products 2013 to

21 2015" which I think also provides

22 evidence.

23      Q.    Okay.  Can you show me in

24 this article where, if anywhere, it

Highly Confidential - Subject to Further Confidentiality Review

1    suggest that the risks of opioids were

2    understated?

3            A.    That is not the purpose of

4    this article.  I have reviewed a

5    different body of evidence to support

6    that opinion.

7            Q.    Okay.  And what body of

8    evidence is that?

9            A.    That is in Section B.2.

10           Q.    Does -- Section B.2 deals

11   with your assessment of the risks of

12   opioids, correct?

13           A.    Section B.2 is a review of

14   the literature on opioid use disorder and

15   related consequences among medical users

16   of opioids.

17           Q.    But B.2 is -- does not deal

18   with what opioid manufacturers said in

19   their marketing materials, does it?

20           A.    That is cited in other work.

21           Q.    Okay.  Because what you just

22   said -- go to B.2.  And now where should

23   I go to find the section that says --

24           A.    You're making two different

1    statements.

2              MS. RELKIN:  Objection to

3         form.

4    BY MR. O'CONNOR:

5         Q.    What I'm asking is simply,

6    direct me to the part of the report that

7    provides support for the statement that

8    opioid marketing materials understated

9    the risks of opioids.

10        A.    So I would say that there's

11   two different sections that evaluate that

12   statement.  One is Section B.2.  And in

13   section B.2, I provide an overview of a

14   number of different studies that have

15   estimated opioid use disorder and related

16   consequences among medical users of

17   opioids.

18              And then in several other

19   sections of the report, I also cite the

20   peer-reviewed literature on the

21   association between the marketing of

22   opioid products with risk.

23        Q.    Okay.  I'd like to direct

24   your attention to Page 11 of your report,

1    which we were just looking at a moment

2    ago.

3              You state that evidence

4    shows that pharmaceutical marketing of

5    prescription drugs increases prescribers'

6    likelihood of prescribing the marketed

7    drug in the future.

8         A.    I just need to find that

9    section.

10        Q.    It's near the top.  The last

11   sentence --

12        A.    "Evidence shows that

13   pharmaceutical marketing of prescription

14   drugs increases the prescribers

15   likelihood of prescribing."

16        Q.    And you cite Sources 16 and

17   17.

18              And 16 is a study by

19   Dr. Fickweiler.  Did I get that right?

20        A.    Yes.

21        Q.    Did you read the study by

22   Dr. Fickweiler before you cited it?

23        A.    I'm just going to pull the

24   study out.

Highly Confidential - Subject to Further Confidentiality Review

1              (Document marked for

2         identification as Exhibit

3         Keyes-19.)

4    BY MR. O'CONNOR:

5         Q.    Here.  I've marked it as

6    Exhibit 19.

7         A.    Okay.  So this is a study --

8    this is a review study.  It looks at the

9    interaction between physicians and

10   pharmaceutical industry, including sales

11   representatives, on their impact on

12   physicians attitudes and prescribing

13   habits.

14        Q.    Okay.  And you cited this

15   study in connection with your statement

16   on Page 11?

17        A.    Yes.

18        Q.    I'll direct your attention

19   to the second line of the second column.

20   It says, "However, the evidence

21   determining whether pharmaceutical

22   industry and PSRs'," which here means

23   pharmaceutical sales representatives,

24   "interaction influence physicians is

1    divided and contradictory."

2              Do you agree that the

3    evidence determining whether

4    pharmaceutical industry interactions

5    influence physicians, is, quote, "divided

6    and contradictory"?

7              MS. RELKIN:  Objection to

8         form.

9              THE WITNESS:  Again, this is

10         an introduction of a scientific

11         paper.  The purpose of an

12         introduction is to set up what's

13         known, not known, and the gaps in

14         the literature.

15              So that's not the conclusion

16         or the results of this analysis.

17         So I cited it in the paper, in my

18         report, based on its results, and

19         not for a statement in the

20         introduction that's setting up why

21         the study was conducted.

22    BY MR. O'CONNOR:

23         Q.   So would you agree that as

24    of the writing of this introduction that

1    the evidence determining whether

2    pharmaceutical industry interactions

3    influence physicians was divided and

4    contradictory?

5         A.    I would need to look at the

6    specific citation, 17, 18, 19 through 22

7    and 23 through 26 to make a designation

8    about whether or not I agree with that

9    particular characterization.  It's

10   typically -- it's typical in the

11   scientific literature that we set up what

12   the gaps in the literature are.  And so

13   these studies would need to be looked at

14   one by one.

15        Q.    Did this -- did this study

16   by Dr. Fickweiler resolve any divided and

17   contradictory evidence on this question?

18             MS. RELKIN:  Objection to

19        form.

20             THE WITNESS:  So I believe

21        it's cited both this study and

22        another study with respect to that

23        statement.  I'm sorry.  I can't

24        find it.

1              What this paper evaluated is

2         an entire review of the

3         literature.  So it provides a

4         synthesis of those gaps and

5         limitations.

6    BY MR. O'CONNOR:

7         Q.    Okay.  And this study was

8    in -- was published in 2017, correct?

9         A.    Yes, it was published in

10   2017.

11        Q.    If you go back to

12   Exhibit 18, which is the Hadland article.

13        A.    Oh sorry.  This is the

14   Hadland.

15             MS. RELKIN:  One of the

16        Hadland.

17   BY MR. O'CONNOR:

18        Q.    One of the Hadland articles.

19   The one that we looked at earlier.  This

20   was published in June of 2018, the next

21   year, correct?

22        A.    Both of these, yes.  It was

23   published in 2018.

24        Q.    And at this point, at least

Highly Confidential - Subject to Further Confidentiality Review

1      according to the introduction, it was

2      still unclear whether marketing of

3      opioids influenced prescribing, correct?

4              MS. RELKIN:  Objection to

5          form.

6              THE WITNESS:  I -- I feel

7          that I've answered the question.

8          This is a -- what's standardly

9          done in introduction to scientific

10         papers is a setup of the actual

11         results that were going to be

12         presented in the papers.  In order

13         to determine what the actual

14         strength of the evidence is for

15         pharmaceutical marketing of

16         opioids and whether it influenced

17         prescribing, we would need to go

18         into each one of these studies.  I

19         wouldn't -- I don't think you can

20         make a generalization about what's

21         known in the world or to whom,

22         based on one sentence in an

23         introduction section.

24     BY MR. O'CONNOR:

Highly Confidential - Subject to Further Confidentiality Review

1   Q.   In connection with preparing

2   your report, did you examine what factors

3   influence physicians' prescribing

4   decisions?

5           MS. RELKIN:  Objection.

6           THE WITNESS:  Did I examine

7       what factors influence physicians'

8       prescribing decisions?  I believe

9       I've cited a number of studies

10      with respect to that question in

11      this report.

12  BY MR. O'CONNOR:

13      Q.   Which studies are those?

14      A.   The studies that are in

15  front of you are among them.

16      Q.   Any others come to mind that

17  go to that point?

18      A.   Yeah, there are a number of

19  studies that are in Section B.2 that also

20  evaluate different aspects of -- again, I

21  look at aggregate level data.  And so

22  there are a number of studies in B.2 that

23  look at different risk metrics for how

24  physicians prescribe.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    Fair to say you didn't

2    consider any studies outside of the ones

3    cited in your report, correct?

4     A.    I believe you've been

5    provided with all the material that I

6    evaluated to make my opinions.

7     Q.    Okay.  In considering -- or

8    in writing your report, did you consider

9    whether -- what physicians learn in

10   medical school impacts their prescribing

11   decision with respect to opioids?

12    A.    Where physicians were in

13   medical school or what --

14    Q.    Did you consider whether

15   what physicians learned in medical school

16   impacted their decisions to write

17   opioids?

18    A.    So I do epidemiological

19   literature review and data analysis.  It

20   is at a population level.  And the

21   population level data indicates that

22   often what physicians were told, they

23   were misinformed about the risks and

24   benefits of opioids.

1    Q.    And were they -- who were

2  they told by?

3    A.    The available literature

4  that I have cited in this report points

5  to materials that were received by the

6  manufacturers.

7    Q.    Okay.  And so in forming

8  your opinion, you didn't consider what

9  physicians learned in medical school, did

10  you?

11    A.    People that teach in medical

12  school are also physicians.  So they

13  are -- they are not developing their --

14  what they teach de novo.

15    Q.    And in forming your opinion,

16  you didn't consider whether formularies

17  or third-party payor guidelines could

18  affect physicians' prescribing decisions,

19  did you?

20        MS. RELKIN:  Objection to

21        form.

22        THE WITNESS:  Can you give

23        me an example of formularies and

24        third-party payor guidelines?

1    BY MR. O'CONNOR:

2         Q.    Well, did you consider the

3    extent to which whether a prescription is

4    covered by an insurance company would

5    affect a physician's prescribing

6    decisions?

7         A.    Again, I'm looking at

8    aggregate data with respect to individual

9    level and population level factors that

10   influence variation and risk.  So whether

11   or not a prescription is covered by an

12   insurance company, whether that affects

13   the physician's decision is going to be

14   dependent on a lot of factors.  And

15   doesn't change what's in the published

16   literature regarding the misinformation

17   on the risks of opioids.

18        Q.    And that literature you're

19   referring to doesn't take into account

20   the question of formulary coverage, does

21   it?

22        A.    Your question is whether

23   every single one of these papers takes

24   into account the question of formulary

1  coverage?

2      Q.    Does any of them?

3      A.    That's a question about

4  confounding.  And so in order to evaluate

5  whether formulary coverage is

6  confounding, the estimates that are in

7  this study, we would need to look at the

8  definition of confounding, which I've

9  provided in the report.

10      Q.    And none of those studies

11  that are sitting in front of you address

12  this question of whether something like

13  formulary coverage influences prescribing

14  decisions, correct?

15      A.    I would need to look at the

16  studies.

17          MR. O'CONNOR:  Let's go

18      ahead and take a break.

19          THE VIDEOGRAPHER:  The time

20      is 5:47 p.m.  Off the record.

21          (Short break.)

22          THE VIDEOGRAPHER:  We are

23      back on the record.  The time is

24      5:53 p.m.

1    BY MR. O'CONNOR:

2        Q.    Professor Keyes, I'm going

3    to direct you to Page 20 of your report.

4    In the first sentence of the last

5    paragraph, it says, "There have been

6    rapid increases in opioid overdose death

7    due to heroin and synthetic opioids."

8            When you say synthetic

9    opioids, does that include fentanyl?

10       A.    Yes.

11       Q.    And when you talk about

12   fentanyl in your report, does that mean

13   legally manufactured fentanyl or

14   illegally manufactured fentanyl?

15           MS. RELKIN:  Objection to

16       form.

17           THE WITNESS:  So the

18       specific data that I cite is

19       regarding the overdose deaths

20       based on the T codes.  And I don't

21       think there's a separation between

22       illegal and legal.

23   BY MR. O'CONNOR:

24       Q.    So when we see fentanyl in

Highly Confidential - Subject to Further Confidentiality Review

1    the report, it's not distinguishing

2    between legally manufactured fentanyl and

3    illegally manufactured fentanyl?

4        A.    It depends on the statement.

5    I don't want to make a blanket statement

6    about the report.

7        Q.    With respect to opioid

8    overdose deaths, as you sit here today,

9    do you know which proportion of those

10   that involve fentanyl involved illicitly

11   made fentanyl versus legally manufactured

12   fentanyl?

13       A.    So you're asking a question

14   about Reference 64 I believe.  And

15   Reference 64 -- let me check my source --

16   is, yes, the Hedegaard -- the CDC report

17   on drug overdose deaths in the United

18   States from 1999 to 2017.  Those data

19   report the -- the T codes that are

20   designated on the death certificate for

21   each death.  And those do not separate

22   out illegal from legal.

23       Q.    And with respect to opioid

24   overdose deaths generally, outside the

Highly Confidential - Subject to Further Confidentiality Review

1  context of that one article, are you

2  familiar with the proportion of deaths

3  that are attributable to illegally

4  manufactured fentanyl?

5       A.    The available data on opioid

6  overdose deaths in the United States are

7  largely drawn from the National Vital

8  Statistics Service, which provides the

9  most reliable information on death

10 certificates and does not designate

11 between those two.

12      Q.    And so there is no way from

13 that information to distinguish between

14 legally made and illegally made fentanyl,

15 correct?

16      A.    Not based on the death

17 records, no.

18           MR. O'CONNOR:  All right.

19      That's all I have.

20           But for the reasons my

21      colleague stated earlier, we're

22      reserving our right to keep this

23      deposition open and to continue it

24      or move to strike the witness

Highly Confidential - Subject to Further Confidentiality Review

1    because of our inability to ask

2    other questions we wanted to,

3    given the answers the witness

4    provided today.

5         MS. DO AMARAL:  You have two

6    minutes.  If you've got any

7    questions, ask them now.

8         MR. CIACCIO:  If you have

9    any questions, ask it, you have

10   two minutes.

11        MR. O'CONNOR:  I'll ask two

12   minutes of questions.

13   BY MR. O'CONNOR:

14        Q.    So are you familiar with

15   generic opioids?

16        A.    What do you mean by

17   familiar?

18        Q.    Do you know the difference

19   between branded opioids and generic

20   opioids?

21        A.    The -- the literature that I

22   assessed in this report is on the overall

23   opioid epidemic.  When there was a

24   specific opioid that was mentioned in

Highly Confidential - Subject to Further Confidentiality Review

1    that literature, I -- I've cited it in

2    this report.

3         Q.    Do you know that generic

4    opioids aren't promoted to doctors in the

5    same way that branded opioids are?

6         A.    I would need to see the

7    documentation.  That's not something that

8    was covered in my report.  So I would not

9    agree with the statement that I had not

10   evaluated the literature on.

11        Q.    Well, if that statement were

12   true, would it change your opinions about

13   whether manufacturers of those products

14   contributed to opioid prescribing?

15             MS. RELKIN:  Objection to

16        form.

17             THE WITNESS:  I -- what I

18        did in this report is an overview

19        of the literature on what is known

20        about the emergence of the opioid

21        epidemic.  I would always keep an

22        open mind to new information.  But

23        you have not given me any

24        information with which to evaluate

1    whether my mind would be changed

2    or not based on that information.

3  BY MR. O'CONNOR:

4        Q.    Well, I'm asking you to

5  assume that a particular product was not

6  promoted to physicians.

7        A.    That's -- the -- that

8  assumption is not what happened.  So I

9  evaluated what happened.

10       Q.    Well, I think you said a

11 moment ago you were open to learning new

12 information.  And I -- I'm saying, if you

13 learned that a particular product was not

14 promoted to doctors, would that change

15 your opinion?

16            MS. RELKIN:  Objection.

17            THE WITNESS:  I -- I am not

18       agreeing with that assumption,

19       based on the literature that I

20       reviewed, and the literature that

21       is cited in this report.  I don't

22       have any evidence with which to

23       agree with that assumption and the

24       premise of the question.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. O'CONNOR:

2         Q.    And I understand you don't

3    agree with the assumption.  But I'm

4    saying, if you learned that new

5    information you say you're open to and

6    what I said was correct, does that change

7    your opinion?

8              MS. RELKIN:  Objection to

9         form.

10             THE WITNESS:  I haven't

11        learned any new information.

12             MR. CIACCIO:  That's two

13        minutes.

14             MR. O'CONNOR:  Okay.  For

15        all the reasons we already talked

16        about, we reserve our rights.

17        Thank you.  Thank you for your

18        time.

19             MS. RELKIN:  No questions.

20             THE VIDEOGRAPHER:  Off the

21        record.  Okay.  The time is

22        5:58 p.m.  Going off the record.

23             MR. REATEGUE:  Bruno

24        Reategue, for the Teva defendants,

Highly Confidential - Subject to Further Confidentiality Review

1           I'd like to put a due process

2       violation on the record for not

3       being able to ask questions in a

4       meaningful way.  Thank you.

5               (Excused.)

6               (Deposition concluded at

7       approximately 5:58 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2                   CERTIFICATE

3

4

5          I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.

7

           It was requested before
8  completion of the deposition that the
   witness, KATHERINE KEYES, Ph.D. have the
9  opportunity to read and sign the
   deposition transcript.

10

11

12     _Michelle L. Gray_____
   MICHELLE L. GRAY,
13 A Registered Professional
   Reporter, Certified Shorthand
14 Reporter, Certified Realtime
   Reporter and Notary Public
15 Dated:  May 2, 2019

16

17

18          (The foregoing certification
19 of this transcript does not apply to any
20 reproduction of the same by any means,
21 unless under the direct control and/or
22 supervision of the certifying reporter.)

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition

 4    over carefully and make any necessary

 5    corrections.  You should state the reason

 6    in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8              After doing so, please sign

 9    the errata sheet and date it.

10              You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14              It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1            -   -   -   -   -   -

              E R R A T A

2            -   -   -   -   -   -

3

4    PAGE   LINE   CHANGE

5    _____  _____  _____

6        REASON: _____

7    _____  _____  _____

8        REASON: _____

9    _____  _____  _____

10       REASON: _____

11   _____  _____  _____

12       REASON: _____

13   _____  _____  _____

14       REASON: _____

15   _____  _____  _____

16       REASON: _____

17   _____  _____  _____

18       REASON: _____

19   _____  _____  _____

20       REASON: _____

21   _____  _____  _____

22       REASON: _____

23   _____  _____  _____

24       REASON: _____

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2            ACKNOWLEDGMENT OF DEPONENT

 3

 4            I,_____, do

 5    hereby certify that I have read the

 6    foregoing pages, 1 - 494, and that the

 7    same is a correct transcription of the

 8    answers given by me to the questions

 9    therein propounded, except for the

10    corrections or changes in form or

11    substance, if any, noted in the attached

12    Errata Sheet.

13

14

15    _____

16     KATHERINE KEYES, Ph.D.           DATE

17

18

19    Subscribed and sworn
      to before me this

20    _____ day of _____, 20____.

21    My commission expires:_____

22

      _____

23    Notary Public

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    LAWYER'S NOTES

 2     PAGE   LINE

 3     _____  _____   _____

 4     _____  _____   _____

 5     _____  _____   _____

 6     _____  _____   _____

 7     _____  _____   _____

 8     _____  _____   _____

 9     _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____
```