1

1               IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
2                       EASTERN DIVISION


3

IN RE:  NATIONAL PRESCRIPTION    ) No. 17-md-2804
4  OPIATE LITIGATION               )
                                  )
5  APPLIES TO ALL CASES            ) Hon. Dan A. Polster
                                  )
6

7

8

9

10

                VIDEO DEPOSITION OF SANDRA KINSEY
11
                        June 7, 2019
12                       9:05 a.m.


13

        *HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
14               CONFIDENTIAL REVIEW*

15

16

17

18      Reporter:  John Arndt, CSR, CCR, RDR, CRR
                   CSR No. 084-004605
19                 CCR No. 1186

20

21

22

23

24

2

1               DEPOSITION OF SANDRA KINSEY produced,
    sworn, and examined on June 7, 2019, at Marcus &
2   Shapira LLP, One Oxford Centre, 35th Floor, in the City
    of Pittsburgh, State of Pennsylvania, before John
3   Arndt, a Certified Shorthand Reporter and Certified
    Court Reporter.

4

5                    APPEARANCES OF COUNSEL

6
    On Behalf of Plaintiffs:
7           Levin, Papantonio, Thomas, Mitchell, Rafferty &
            Proctor, P.A.
8           316 South Baylen Street, Suite 600
            Pensacola, FL  32502
9           (850) 435-7043
            BY:   MR. BRANDON L. BOGLE
10                bbogle@levinlaw.com

11  On Behalf of HBC Services and the witness:
            Marcus & Shapira LLP
12          301 Grant Street
            Pittsburgh, PA  15219
13          (412) 471-3490
            BY:   MR. ROBERT M. BARNES
14                rbarnes@marcus-shapira.com
                  MR. JOSHUA A. KOBRIN
15                kobrin@marcus-shapira.com

16  On Behalf of Walmart:
            Jones Day
17          77 West Wacker Drive
            Chicago, IL  60601
18          (312) 269-4335
            BY:   MS. TARA A. FUMERTON
19                tfumerton@jonesday.com

20  On Behalf of Johnson & Johnson and Janssen:
            O'Melveny & Myers LLP
21          Two Embarcadero Center, 28th Floor
            San Francisco, CA  94111
22          (415) 984-8700
            BY:   MR. DANIEL H. LEIGH
23                dleigh@omm.com
                  (present via videoconference)

24

3

```
 1              APPEARANCES OF COUNSEL (CONTINUED)

 2
    On Behalf of Purdue Pharma:
 3          Dechert LLP
            1095 Avenue of the Americas
 4          New York, NY  10036
            (212) 698-3599
 5          BY:   MS. SHARON TURRET
                  sharon.turret@dechert.com
 6                (present via videoconference)

 7  On Behalf of AmerisourceBergen:
            Reed Smith LLP
 8          1301 K Street, Suite 1000
            Washington, DC  20005
 9          (202) 414-9286
            BY:   MS. LINDSAY A. DeFRANCESCO
10                ldefrancesco@reedsmith.com
                  (present via videoconference)
11
    On Behalf of Allergan Finance, LLC:
12          Kirkland & Ellis LLP
            300 North LaSalle
13          Chicago, IL  60654
            (312) 862-2000
14          BY:   MR. ZACHARY A. CIULLO
                  zac.ciullo@kirkland.com
15                (present via videoconference)

16
    On Behalf of Discount Drug Mart:
17          Cavitch, Familo & Durkin Co. LPA
            1300 East 9th Street
18          Cleveland, OH  44114
            (216) 621-7860
19          BY:   MR. ERIC J. WEISS
                  (present via videoconference)
20
    On Behalf of Walgreens:
21          Bartlit Beck LLP
            54 West Hubbard Street
22          Chicago, IL  60654
            (312) 494-4410
23          BY:   MR. BRIAN C. SWANSON
                  brian.swanson@bartlitbeck.com
24                (present via videoconference)
```

4

1              APPEARANCES OF COUNSEL (CONTINUED)

2

         Bailey & Wyant, PLLC
3        500 Virginia Street East, Suite 600
         Charleston, WV  25301
4        (304) 345-4222
         BY:   MR. MICHAEL W. TAYLOR
5              mtaylor@baileywyant.com
               (present via videoconference)
6

7   Also present:  Jacob Arndt, videographer
                   Ian Eberle
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

5

1                    INDEX OF INTERROGATION

2    Examination by Mr. Bogle                 Page 8
     Examination by Mr. Barnes                Page 205
3    Examination by Mr. Bogle                 Page 244
     Examination by Mr. Barnes                Page 255
4

5                      INDEX OF EXHIBITS

6

     Exhibit Kinsey-001                       Page 12
7    (Expert report)

8    Exhibit Kinsey-002                       Page 12
     (Amended expert report)
9
     Exhibit Kinsey-003                       Page 13
10   (Errata to expert report)

11   Exhibit Kinsey-004                       Page 20
     (Notice of deposition)
12
     Exhibit Kinsey-005                       Page 21
13   (Additional documents reviewed)

14   Exhibit Kinsey-006                       Page 23
     (Invoices)
15
                    (Exhibits are attached.)
16

17

18

19

20

21

22

23

24

6

1             THE VIDEOGRAPHER:  We are now on the

2    record.  My name is Jacob Arndt.  I'm a videographer

3    representing Golkow Litigation Services.  Today's date

4    is June 7th, 2019, and the time is 9:05 AM.

5             This video deposition is being held in

6    Pittsburgh, Pennsylvania, in re National Prescription

7    Opiate Litigation for the United States District Court

8    for the Northern District of Ohio, Eastern Division.

9    The deponent is Sandra Kinsey.

10            Counsel, please identify yourselves.

11            MR. BOGLE:  Brandon Bogle on behalf of the

12   plaintiffs.

13            MR. BARNES:  Robert Barnes, Marcus &

14   Shapira, for HBC Service Company and the witness,

15   Sandra Kinsey.

16            MR. KOBRIN:  Joshua Kobrin of Marcus &

17   Shapira.  I'm also representing HBC Service Company and

18   the witness.

19            MS. FUMERTON:  Tara Fumerton from Jones

20   Day representing Walmart.

21            MR. BARNES:  Ian, you want to --

22            MR. EBERLE:  Ian Eberle at Marcus &

23   Shapira.

24            MR. BARNES:  Ian is a first-year law

```
1    student.

2                 MR. BOGLE:  Hey, Ian.  Nice to meet you,

3    man.

4                 MR. BARNES:  He wants to see how these

5    things happen, and if he sticks in law school after

6    this deposition, that will be a plus.

7                 THE VIDEOGRAPHER:  Anybody on the phone?

8                 MR. BOGLE:  You want the phone stuff?

9                 THE REPORTER:  Would you like to announce

10   your appearances on the record on the phone?

11                MR. LEIGH:  Daniel Leigh from O'Melveny &

12   Myers on behalf of Janssen defendants.

13                MS. TURRET:  Sharon Turret from Dechert on

14   behalf of Purdue.

15                MS. DeFRANCESCO:  Lindsay DeFrancesco from

16   Reed Smith on behalf of AmerisourceBergen Drug

17   Corporation.

18                MR. CIULLO:  Zac Ciullo from Kirkland &

19   Ellis on behalf of Allergan Finance LLC.

20                MR. WEISS:  Eric Weiss from Cavitch,

21   Familo & Durkin on behalf of defendant Discount Drug

22   Mart.

23                THE VIDEOGRAPHER:  The court reporter is

24   John Arndt and will now swear in the witness.
```

8

1

2          The witness, SANDRA KINSEY, first having been

3     duly sworn, testified as follows:

4                         EXAMINATION

5     BY MR. BOGLE:

6          Q.    Good morning.

7          A.    Good morning.

8          Q.    My name is Brandon Bogle.  I'm going to be

9     asking you some questions today regarding your report

10    that you submitted in the opioid litigation.  Can I get

11    your full name first, please?

12         A.    Sandra Kinsey.

13         Q.    And I understand you've had your

14    deposition taken before, but I just want to go through

15    an abbreviated sort of set of rules here, hopefully

16    make things go a little smoother today.

17              So I'm going to ask you questions.  I'd

18    ask that before you start your answer you wait till I

19    finish my question, even if you think you might know

20    where I'm going with the question.  That will make the

21    transcript a little clearer and help ensure that you're

22    answering the right question.  Is that fair?

23         A.    Sure.

24         Q.    And I'll try to do the same for you.  I

1    will try not to ask any questions until you're done

2    with your answer.  I'm sure I'll mess that up a few

3    times, but that's certainly my ambition.

4              The only other thing that I wanted to

5    mention, if you don't hear or understand a question

6    that I ask, feel free to ask me to repeat or rephrase.

7    Otherwise I'm going to assume that -- if you answer the

8    question that you understood it.  Is that fair?

9         A.    Yes.

10        Q.    Where are you currently employed?

11        A.    I work for Kinsey Partners.

12        Q.    And do you own that business?

13        A.    I do that business.

14        Q.    And you opened that business in 2014; is

15   that right?

16        A.    I did, and if I may, I also work for

17   Highlands Oncology.  I do have an employment with them.

18        Q.    What do you do with Highlands Oncology?

19        A.    I'm a clinical pharmacist.

20        Q.    Do you see patients?

21        A.    I do.

22        Q.    How many days a week do you work with

23   Highlands Oncology?

24        A.    It's roughly one day a week.  I strictly

1    do relief work.

2         Q.    When you say relief work, what does that

3    mean?

4         A.    I help fill in when people have a day off,

5    when they need assistance by another pharmacist to fill

6    in a shift.  So I roughly on average -- I've been

7    working a little bit more lately because they've lost a

8    pharmacist, but roughly it's about one day a week.

9         Q.    And when you work one day a week, are they

10   usually full sort of eight-to-10-hour days, or are they

11   half days, or what are they --

12        A.    They're full eight-to-10-hour days.

13        Q.    When did you start working for Highlands

14   Oncology?

15        A.    March.

16        Q.    Of this year?

17        A.    Yes.

18        Q.    What made you decide to start working for

19   them?

20        A.    Well, I've been working as a relief

21   pharmacist for several years since I left Walmart, and

22   Highlands needed a relief pharmacist.  My other relief

23   work, I bill through my company as a 1099, as a

24   contractor, and Highlands preferred to hire me as an

1    employee instead.

2         Q.    Where is Highlands located?

3         A.    Rogers, Arkansas.

4         Q.    And sort of as the name implies, I

5    understand they would treat predominantly cancer

6    patients?

7         A.    Predominantly, yes.

8         Q.    Where have you done relief work for other

9    than Highlands Oncology?

10        A.    I've worked for Talley Pharmacy in

11   Centerton, Arkansas, Teasley Drug in Gravette,

12   Arkansas, Smith Drug in Gentry, Arkansas, Jepson Drug

13   in Siloam Springs.  I do relief work.  I know these

14   independent pharmacists, and so when they need a day

15   off, I'm happy to go help.

16        Q.    And for these four other pharmacies you've

17   listed, have you seen patients in that context as well?

18        A.    Yes.

19        Q.    Are there any sort of specialties for any

20   of those four pharmacies as far as patients they serve?

21        A.    Not really.  Talley Pharmacy did have a

22   compounding business, so I saw a lot of females for

23   hormones, but they have since -- the owner has since

24   sold that pharmacy to a small chain.

12

1          Q.    Any of the other of the three you've

2     listed have any sort of specialty as far as patients

3     they see?

4          A.    No, they're just general retail.

5          Q.    Okay.  I'm going to hand you what I'm

6     marking here as Kinsey Exhibit 1, which is the expert

7     report that you served initially in this case.

8                    [Exhibit Kinsey-001 marked for

9                    identification.]

10         Q.    And as Exhibit 2, I'm going to mark your

11    amended expert report.  Here you go.

12                   [Exhibit Kinsey-002 marked for

13                   identification.]

14         A.    Thank you.

15         Q.    And the amended expert report that I

16    handed you here was served this Monday.  Does that

17    sound accurate to you?

18         A.    Yes.

19         Q.    And what prompted you to do an amended

20    report?

21         A.    Further review.  After I submitted the

22    report, I went back through and -- like you do with

23    normal edits and continued to find things that I felt

24    needed further clarification for the record.  I found

                                                                    13

1   some typos, that kind of stuff.

2        Q.    I'm going to hand you now what I'm marking

3   as Exhibit 3 to your deposition.

4              [Exhibit Kinsey-003 marked for

5              identification.]

6        Q.    And Exhibit 3 is entitled errata to May

7   10, 2019, expert report of Sandy K.B. Kinsey, R.Ph,

8   MBA.  Do you see that?

9        A.    Yes.  Sorry.

10       Q.    And what is the purpose of this errata?

11       A.    It was to document the changes between the

12  initial report and the amended report.

13       Q.    So all of the changes on the amended

14  report -- would those be captured on this errata?

15       A.    I believe they're all on here, yes.

16       Q.    Is there anything as you sit here today

17  that you're aware of that -- as far as changes go from

18  the initial report to the amended report that are not

19  captured on this errata?

20       A.    No, I believe they're all in here.

21       Q.    So between the initial expert report and

22  the amended report, which are Exhibits 1 and 2, do

23  those reports include all the opinions you intend to

24  offer in this case?

1      A.    They include the opinions that I have

2   concluded to date and that I felt were most applicable

3   to this particular case.

4      Q.    So are there any additional opinions you

5   intend to offer that are not captured in those reports?

6      A.    I mean, I'm not going to limit my

7   opinions, but the ones that I feel are most important

8   are included in my report.

9      Q.    Well, I'm entitled to know what opinions

10  you're going to offer.  That's one of the purposes of

11  the deposition today.  So I'm trying to get a sense of

12  what that is and whether I can find those in the four

13  corners of those reports.

14     A.    So for that purpose, then yes, these are

15  the opinions that I intend to offer up to today.

16     Q.    Are you currently working on anything

17  related to this case that you intend to supplement your

18  reports with?

19     A.    I don't believe so.  Not at this time.

20         MR. BARNES:  And for the record, we do

21  reserve -- as plaintiffs have done, we reserve the

22  right to supplement her report for information learned

23  after the dates of her report.

24  BY MR. BOGLE:

1       Q.    I want to go on Exhibit 3 to the third

2    page.  So for Exhibits H and I on this page, you

3    deleted references to those documents which had a stamp

4    that said Analysis Group, Inc.; correct?

5       A.    Yes.

6       Q.    Why did you remove those references?

7       A.    Just formatting.

8       Q.    Were those exhibits created by Analysis

9    Group, Inc.?

10      A.    They were.  Under my direction.

11      Q.    Who did you work with at Analysis Group to

12   create those exhibits?

13      A.    There were three people, and I apologize;

14   I only know their first names.  David, David, and

15   Vandella (ph).

16      Q.    Had you worked with these individuals

17   before working on this case?

18      A.    I have not.

19      Q.    How did you come to work with them here?

20      A.    They are a consulting group that was hired

21   by Marcus & Shapira to help crunch some of the data

22   involved in this case so that I could better draw my

23   opinions.

24      Q.    Did you specifically ask for another group

 1   to be brought in to assist you in crunching these

 2   numbers, as you say?

 3        A.    I did ask for some help, but Marcus &

 4   Shapira were the ones that actually brought them in as

 5   consultants.

 6        Q.    Could you have done the data analysis in

 7   this case without assistance from a third party?

 8        A.    No, probably not.  Given the time, maybe,

 9   but I would have preferred to rely on a consulting

10   group.

11        Q.    Are you relying on the Analysis Group or

12   any work that they've done for any opinions you're

13   reaching here today?

14        A.    When you say rely -- I mean, all of the

15   opinions are mine.  The information that they provided

16   just substantiate my opinions.

17        Q.    Are there any opinions you could not have

18   reached on your own without the assistance of Analysis

19   Group, Inc.?

20        A.    No.

21        Q.    So the references to Analysis Group, Inc.,

22   were removed on Exhibits H and I.  Did they assist you

23   in creating any other exhibits in your report?

24        A.    Yes.

1       Q.    Which ones?

2       A.    The majority of the charts associated with

3  anything that had to do with the data crunching and

4  looking at Dr. McCann's data and Giant Eagle data they

5  helped with.

6       Q.    Can you give me a list of the exhibits

7  that they assisted you on?

8       A.    Sure.  It would be Exhibit D, E, F, G, H,

9  I, J, M, N, O, P, and Q.

10      Q.    Do you have a background in statistics?

11      A.    No.

12      Q.    Do you hold yourself out as an expert in

13  statistics?

14      A.    I'm not an expert in statistics, but I've

15  evaluated plenty of datasets.

16      Q.    Have you ever testified as an expert on a

17  matter related to statistical analyses?

18      A.    No.

19      Q.    What specifically did you ask the

20  individuals at AGI to do to assist you here?  What were

21  your directions to them?

22      A.    You know, it was really around as I was

23  drawing my opinions and thinking about the data.  I

24  mean, it was -- it's brought up in my report as I was

1    drawing my conclusions I wanted to look at the data to

2    ensure that it substantiated the conclusions that I was

3    coming to, and I wanted help with graphs and charts and

4    illustrations.

5        Q.    Did you reach the conclusions outlined in

6    your report before AGI was brought in to assist in

7    running data?

8        A.    Some of them, yes.

9        Q.    Which ones had you not -- which opinions

10   had you not concluded in your mind prior to AGI being

11   consulted?

12       A.    Well, I mean, that's a broad question.  I

13   can give -- I certainly can give you an example.  So

14   one of the conclusions that I talk about in McCann's

15   data is some of the duplicate transactions that he had

16   in his dataset.  I didn't see those based off of a

17   broad scan of his report.  That information was

18   discovered as AGI began digging into his dataset.

19       Q.    Anything else that comes to mind as far as

20   things that you had not reached a conclusion on or you

21   had not noticed in reviewing the reports that AGI

22   brought to your attention?

23       A.    There are such things as we go through the

24   exhibits with dates and times in which he is flagging

19

1    orders in which HBC was not distributing, so some of

2    the errors in his data AGI discovered and pointed out

3    to me.

4         Q.    The he -- you're referring to Dr. McCann?

5         A.    I'm sorry.  Yes.

6         Q.    So if, for example, AGI created Exhibits H

7    and I, why remove the reference to them in the actual

8    documents?

9         A.    Personal preference.

10        Q.    Why was that your preference?

11        A.    Because I wanted them to look like all the

12   other reports.

13        Q.    When you say all the other reports, what

14   are you referring to?

15        A.    The other exhibits.

16        Q.    The other exhibits in your report?

17        A.    The other exhibits in my report didn't

18   have their stamp on it, so I was just from a formatting

19   perspective wanting it to look nice.

20             MR. KOBRIN:  This is Joshua Kobrin.

21   Counsel also wanted to put the same confidential

22   subject to protective order stamp on it.  I think it

23   might have been slightly different in the initial

24   report.  I think it only said confidential.

1    BY MR. BOGLE:

2         Q.    Are there any corrections to your current

3    amended report that was served on Monday that you'd

4    like to make at this time?

5         A.    No.

6         Q.    All right.  I'm going to hand you Exhibit

7    4, which is your deposition notice.

8                   [Exhibit Kinsey-004 marked for

9                   identification.]

10                  MR. BARNES:  Thanks.

11   BY MR. BOGLE:

12        Q.    Have you seen this notice prior to today?

13        A.    I don't think so.

14        Q.    If we can go to the third page of the

15   document, Exhibit A.  You see there there are three

16   things that we've requested be produced prior to or at

17   the deposition.  I want to kind of go through these

18   with you.

19              Number 1 says all documents or other

20   materials you reviewed since the date of your report

21   that you have not specifically identified in your

22   report in preparation for your expected testimony.  You

23   see that?

24        A.    Yes.

21

1          Q.    And yesterday I did receive what I'm going

2     to mark as Exhibit 5 to your deposition.  There you go.

3                [Exhibit Kinsey-005 marked for

4                identification.]

5          Q.    If you see, Exhibit 5 is titled additional

6     documents reviewed by Sandra Kinsey.  Do you see that?

7          A.    Yes.

8          Q.    Was Exhibit 5 created in response to the

9     Document Request Number 1 in Exhibit A of the

10    deposition notice that I just reviewed with you?

11         A.    Yes.

12         Q.    And the documents listed in Exhibit 5 --

13    when did you review these?

14         A.    This week.

15         Q.    What days this week?

16         A.    Tuesday and Wednesday.

17         Q.    For what purpose did you review these

18    documents?

19         A.    Further education and preparation for this

20    deposition.

21         Q.    Did you ask for these specific materials,

22    or were they provided to you by counsel at their

23    request?

24         A.    They were provided by counsel.

1        Q.    Do you intend to offer any new opinions

2    based on the documents listed in Exhibit 5?

3        A.    No.

4        Q.    How do these documents impact your

5    existing opinions?

6        A.    They don't.  Other than to reinforce my

7    current opinions.

8        Q.    Which current opinions do they reinforce?

9        A.    Most of them.

10        Q.    Any specific opinions you could tell me?

11        A.    No.

12        Q.    Had you asked AGI to run any additional

13    calculations based on the second supplemental expert

14    report of Craig McCann?

15        A.    I think we did one, yes.

16        Q.    You did one based on the second

17    supplemental report?

18        A.    I'm confused.  Ask your question again.

19        Q.    Yeah.  So Exhibit 5 --

20        A.    Okay.

21        Q.     -- one of the documents you list --

22        A.    Uh-huh.

23        Q.     -- is the second supplemental expert

24    report of Craig McCann.

23

1          A.    Oh.

2          Q.    And my question was did you ask AGI to run

3    any additional calculations based on anything contained

4    in that report?

5          A.    No, I did not.  I'm sorry.  I

6    misunderstood you.

7          Q.    That's all right.  All right.  Let's go

8    back to the deposition notice, Exhibit 4.  The second

9    request there is for an itemization of hours spent and

10   compensation paid or to be paid for your work in this

11   matter and your staff's work in this matter, including

12   all invoices you have submitted to counsel.

13              Do you see that?

14         A.    Yes.

15         Q.    And I'm going to hand you what I'm marking

16   as Exhibit 6 to your deposition, which are a copy of

17   the invoices that I received yesterday.

18              [Exhibit Kinsey-006 marked for

19              identification.]

20         Q.    Are the invoices I provided to you as

21   Exhibit 6 intended to be responsive to our Request

22   Number 2 here on the deposition notice?

23         A.    Yes.

24         Q.    Request Number 3 in Exhibit A asks for a

24

1   copy of your most current and accurate CV as of the

2   date of your deposition.  Do you see that?

3       A.   Yes.

4       Q.   I know you provided a CV in your initial

5   report and in your amended report.  Is that CV current

6   and up-to-date and accurate?

7       A.   Yes.

8       Q.   What did you do to prepare for your

9   deposition today?

10          MR. BARNES:  Objection to the extent it

11  seeks to invade privileged communications.  So you can

12  answer generally without getting into discussions with

13  counsel.

14      A.   Preparing for the deposition was rereading

15  my expert report, getting comfortable speaking with

16  counsel, the general things you do to get ready for a

17  deposition.

18  BY MR. BOGLE:

19      Q.   How much time did you spend preparing for

20  your deposition?

21      A.   A couple of days.

22      Q.   How many hours?

23      A.   Roughly 20.

24      Q.   Over which days?

25

1          A.    So let me change that.  I did a little bit

2     of work last week, so roughly 30 hours, maybe, a day or

3     so last week, and then two days this week.

4          Q.    Did you meet with any attorneys for this

5     preparation?

6          A.    I did.

7          Q.    Which ones?

8          A.    Bob Barnes and Josh Kobrin.

9          Q.    Did you meet with any counsel --

10         A.    And Scott Livings -- that was Scott

11    Livingston; right?  Yeah, Scott Livingston, I believe.

12    Sorry.  You can ask him.

13              MR. BARNES:  He's a partner of mine.

14    BY MR. BOGLE:

15         Q.    Okay.  Anybody else that you met with for

16    these preparation sessions?

17         A.    Not attorneys, no.

18         Q.    Any non-attorneys that you met with during

19    these preparation sessions?

20         A.    I had conference calls with the folks at

21    AGI.

22         Q.    The same three folks you gave me earlier?

23         A.    Yes.

24         Q.    What did you discuss with the AGI folks?

26

1              MR. BARNES:  Excuse me.  I'm going to

2     object and instruct the witness not to answer to the

3     extent it has anything to do with the preparation of

4     any draft report.

5          A.    We --

6              MR. BOGLE:  But AGI is not an expert in

7     this case.  They're not -- they haven't offered any

8     expert reports.  It's like any other third party.

9              MR. BARNES:  I'm talking about her expert

10    report.

11             MR. BOGLE:  She's speaking to a third

12    party, not her counsel.  I don't think this is

13    protected.

14             MR. BARNES:  She's speaking to a

15    consulting expert who are data analysis experts.  To

16    the extent she had any discussions about the

17    preparation of any draft report, it's not permissible.

18    BY MR. BOGLE:

19         Q.    So the discussions for deposition

20    preparation were after your report was submitted;

21    correct?

22         A.    Yes.

23         Q.    So what did you discuss?

24         A.    Well, we did some --

1          MR. BARNES:  Hold on.

2          MR. KOBRIN:  Some of it is before the

3    amended report was submitted, just to clarify.

4          MR. BARNES:  Be clear -- first give him

5    the dates of the conversations and then secondly, to

6    the extent it related to the preparation of any draft

7    report, including any amended report, do not divulge

8    that information.

9          A.    Fair enough.  So we discussed the

10   conversations that I had that were related to preparing

11   for the deposition.  They helped me with just mock

12   questions for the deposition and helping me to prepare.

13   BY MR. BOGLE:

14         Q.    Did they provide those mock questions to

15   you orally or in writing?

16         A.    It was just -- they were just asking

17   questions via conference call.

18         Q.    What sort of questions did they ask you?

19         A.    They were just prepping me, helping to

20   prep me for the deposition.

21         Q.    Do you recall anything they asked you?

22         A.    They were asking questions about the

23   report.  We were role-playing.

24         Q.    What specifically did they ask you?

28

```
 1          A.    Again, just questions about the depo --

 2    about the report and certain things that potentially

 3    you would ask.

 4          Q.    Did they question you on any of the

 5    exhibits that they helped you create?

 6          A.    They did.

 7          Q.    Which ones?

 8          A.    We dis -- well, they had questions about

 9    several of them.  At this point I can't recall

10    specifically.

11          Q.    Which individual was asking you questions?

12    Or was it all three?

13          A.    I believe it was just one.  It's hard to

14    tell.  It was via conference call.

15          Q.    Do you know which person was asking you

16    questions?

17          A.    It was one of the males, so it was either

18    David or David.

19          Q.    Was anybody else on these calls with you

20    other than you and the folks at AGI?

21          A.    Counsel, Josh, was on the phone.

22                MR. BARNES:  And for that reason, I'm

23    instructing you not to answer any further questions

24    with respect to these phone calls.
```

1    BY MR. BOGLE:

2         Q.    Was counsel asking you questions as

3    well -- mock questions?  I'm not asking you what the

4    questions are.  I'm just asking if he asked you

5    questions -- mock questions.

6              MR. BARNES:  I really think this is

7    invading privilege, so I'm going to instruct the

8    witness not to answer.

9    BY MR. BOGLE:

10        Q.    Have you met with any counsel other than

11   those representing HBC related to your work in this

12   case?

13        A.    No.

14        Q.    Did you create any outlines or notes to

15   assist you in the deposition today?

16        A.    No.

17        Q.    Did you bring anything with you to the

18   deposition today?

19        A.    No.

20        Q.    And we don't need to hash all this out

21   now, but we're going to likely be requesting a

22   deposition for the individuals at AGI related to their

23   work with Ms. Kinsey.  So we could talk about that

24   later, but -- and I also think that we're entitled to

30

```
1    ask a lot of these questions that you're instructing

2    her not to answer related to their work.

3              MR. KOBRIN:  On what basis --

4              MR. BOGLE:  So we'll reserve on that -- I

5    don't think it's privileged.

6              MR. KOBRIN:  On what basis would you be

7    seeking a deposition?

8              MR. BOGLE:  For their work in creating

9    this report.

10             MR. BARNES:  You believe you have a right

11   to depose consulting experts who assisted testifying

12   experts?  Is that what you're saying?

13             MR. BOGLE:  Yeah, that actually created

14   exhibits that she's relying on for her opinions?

15   Absolutely.

16             MR. BARNES:  We disagree.

17             MR. BOGLE:  Okay.

18   BY MR. BOGLE:

19        Q.   Prior to your work in --

20             MR. BARNES:  You're going to have a lot of

21   depositions if you go down that road.

22   BY MR. BOGLE:

23        Q.   Prior to your work in this case, have you

24   ever done any consulting or litigation work for HBC?
```

1   A. No.

2   Q. Had you ever heard of HBC prior to your

3 work in this case?

4   A. No.

5   Q. Prior to your work in this case, had you

6 ever done any consulting or litigation work related to

7 any opioid product?

8   A. No.  Oh.  Yes.

9   Q. What did you do?

10   A. I provided some subject matter expertise

11 to Amneal Pharmaceuticals on Suboxone.

12   Q. What was the nature of the expertise you

13 provided them?

14   A. Retail pharmacy practice.

15   Q. What specifically did you tell them?

16   A. I mean, that's a long conversation with

17 them, and it's also under protective order, but in

18 general it was about the drug and how pharmacy practice

19 works with respect to drug substitution between brands

20 and generics.

21   Q. Did you advise them in any way regarding

22 suspicious order monitoring?

23   A. No.

24   Q. Did you advise them in any way related to

32

1    anti-diversion efforts?

2         A.    No.

3         Q.    Is this related to an ongoing litigation?

4         A.    No.

5         Q.    Was it in a consulting capacity?

6         A.    Yes.

7         Q.    Have you ever published anything related

8    to opioids?

9         A.    No.

10        Q.    Have you ever conducted a risk-benefit

11   analysis for a patient contemplating taking opioids?

12             MR. BARNES:  Objection to the form.

13   Vague.

14        A.    I mean, when you -- so what do you mean by

15   risk-benefit analysis?

16   BY MR. BOGLE:

17        Q.    Meaning did you ever discuss with a

18   patient the risks and benefits of opioids for a patient

19   who was contemplating taking --

20        A.    Yes.

21        Q.    How many times?

22        A.    Several.

23        Q.    How recently?

24        A.    Tuesday.

33

1          Q.    And what did you tell the patient?

2          A.    A lot of what is in the patient

3    information sheets that are included in my exhibit --

4    or included in my report.

5          Q.    How long was your conversation with that

6    patient?

7          A.    Roughly five minutes.

8          Q.    And did you ultimately offer an opinion as

9    to whether that patient should or should not take the

10   opioid product?

11              MR. BARNES:  I'm going to object.  We're

12   here for her expert opinion in this case, not with

13   respect to what she may have advised the patient.

14              MR. BOGLE:  I'm entitled to know about her

15   knowledge related to opioids.  This is clearly

16   relevant.

17              MR. BARNES:  And now you're asking her

18   about an opinion given to a patient?

19              MR. BOGLE:  Yeah.

20              MR. BARNES:  That's totally unrelated to

21   the case?

22              MR. BOGLE:  It's not totally unrelated.

23   It goes to her knowledge of opioids.

24              MR. BARNES:  It's totally unrelated.

34

1    BY MR. BOGLE:

2         Q.    It's about opioids.  You can answer.

3         A.    Will you ask the question again, please?

4         Q.    Sure.  Did you ultimately offer an opinion

5    as to whether or not that patient should or should not

6    take the opioid product?

7              MR. BARNES:  Same objection.

8              MS. FUMERTON:  This is Tara Fumerton.  I'm

9    just going to add in an objection that I disagree that

10   you can ask any question that relates to an opioid, so

11   again, to the scope of the question, I join in

12   counsel's objection.

13   BY MR. BOGLE:

14        Q.    Okay.  You can answer.

15        A.    Will you ask the question again, please?

16        Q.    Sure.  Did you offer an opinion to that

17   patient as to whether or not they should take the

18   opioid product?

19        A.    No.

20        Q.    Did they ask for your opinion in that

21   regard?

22        A.    No.

23        Q.    Do you recall telling them anything about

24   opioids other than what's contained in the medical

35

1    information sheet?

2          A.    No.

3          Q.    Have you ever offered a recommendation to

4    a patient to take or not take an opioid product?

5          A.    Yes.

6          Q.    In what capacity?

7          A.    As a pharmacist.

8          Q.    And what was your recommendation?

9          A.    I mean, I make multiple recommendations to

10   support a physician's diagnosis and treatment plan.

11         Q.    So did you recommend they take the product

12   or not?

13         A.    I recommend they follow the prescriber's

14   treatment plan.

15         Q.    Have you ever personally made the decision

16   to refuse to fill an opioid prescription?

17         A.    Yes.

18         Q.    How many times?

19         A.    Several.

20         Q.    Under what circumstances?

21         A.    What do you mean by under what

22   circumstances?

23         Q.    Why did you refuse?

24         A.    I was uncomfortable with the prescription.

1    The physician asked me to tear the prescription up.

2    There's a num -- that's a couple of reasons why I would

3    not fill a prescription.

4         Q.    When you say you were uncomfortable with a

5    prescription, what made you uncomfortable?

6         A.    Sometimes when you can't get a hold of the

7    physician and you're looking at the prescription itself

8    and you disagree with the quantity or the directions or

9    the frequency in which a patient is being prescribed or

10   receiving the medication, I would make the judgment

11   decision not to fill it.

12        Q.    And can you tell me -- you said several

13   times that you made a recommendation or that you

14   decided not to fill an opioid prescription.  Can you

15   give me more detail on how many times that's occurred?

16        A.    No.

17        Q.    You don't have any more detail other than

18   several?

19        A.    It happens quite frequently.  Patients

20   don't realize the last time they picked up their

21   prescription and so they come back in to pick up their

22   next prescription, and you just tell them I can't fill

23   it today but I can fill it in three days or I can fill

24   it in four days.  Working for an oncology clinic, I

1    have that conversation frequently.

2          Q.    Specific to opioids?

3          A.    Specific to opioids.  But it also happens

4    with other drugs.  It's not limited to opioids.

5          Q.    Have you ever designed a suspicious order

6    monitoring program for controlled substances?

7          A.    What do you mean by suspicious order

8    monitoring program?

9          Q.    Are you unclear on what that term means as

10   it relates to controlled substances?

11         A.    No, I'm trying to understand what elements

12   of that that you're getting at.

13         Q.    I'm just asking generally whether you've

14   designed a suspicious order monitoring program for

15   controlled substances.

16              MR. BARNES:  And she's asked you to

17   explain what you mean by that term.

18   BY MR. BOGLE:

19         Q.    What do you mean by that term?

20         A.    I'm not asking the question.

21         Q.    I get to ask the questions.

22         A.    I understand --

23         Q.    So --

24         A.     -- but I'm seeking clarity.

38

1      Q.    How do you define a suspicious order

2   monitoring program as it relates to controlled

3   substances?

4      A.    I mean, it's a multifaceted system that is

5   defined by the Controlled Substances Act.

6      Q.    What are the facets of that system -- of

7   those systems?

8      A.    I mean, reading the Controlled Substances

9   Act, it is -- it has a number of security requirements,

10  storage requirements, all aimed to protect against

11  theft and diversion, of which a suspicious order

12  monitoring system is a small part.

13     Q.    Have you ever designed any component of a

14  suspicious order monitoring system for controlled

15  substances?

16          MR. BARNES:  You mean as she has defined

17  it?

18          MR. BOGLE:  Sure.

19     A.    I have assisted in developing operational

20  policies and procedures to protect against theft and

21  diversion, yes.

22  BY MR. BOGLE:

23     Q.    What types of operational procedures?

24     A.    Everything from inventory management,

```
 1    counting and back-counting procedures, location and
 2    safety parameters for opioids -- those kinds of things.
 3           Q.    When you say safety parameters for
 4    opioids, what do you mean?
 5           A.    Where to store them in the pharmacy, what
 6    types of cabinets, vaults, safes that are used.
 7           Q.    Have you ever designed a system to flag
 8    suspicious orders of controlled substances?
 9           A.    Flag electronically?
10           Q.    Sure.
11           A.    No.
12           Q.    How about manually?
13           A.    That's a hard question to answer, because
14    as a pharmacist, part of our pharmacy practice is to
15    scrutinize every controlled substance prescription,
16    particularly around opioids, so teaching and training
17    is part of my job and part of my experience, and
18    teaching pharmacists how to identify questions within a
19    prescription was part of my job and continues to be
20    part of my practice.
21           Q.    Have you ever drafted written procedures
22    for how to detect suspicious controlled substances
23    orders?
24           A.    I don't recall.
```

1        Q.   Have you ever designed a suspicious order

2   monitoring program for a pharmaceutical distributor?

3        A.   No.

4        Q.   Have you ever designed a suspicious order

5   monitoring program for a pharmaceutical manufacturer?

6        A.   No.

7        MR. BARNES:  Just for clarity, I'm not

8   sure you both are on the same page in terms of

9   suspicious order monitoring.  You gave a definition and

10   he won't give you his definition, so I'd want to make

11   sure that you're not adopting some definition that has

12   been unexplained to you.

13        A.   So I will amend the -- or I will change my

14   answer about the distributor.  I have been involved,

15   again, with a suspicious order monitoring program as

16   it's defined very broadly, including the security

17   requirements and all of the things that an organization

18   will do regarding theft and diversion prevention.

19   BY MR. BOGLE:

20        Q.   For what distributor?

21        A.   I've worked on things for Walmart, for --

22   for Walmart.

23        Q.   What components of Walmart's suspicious

24   order monitoring program for controlled substances did

41

1  you design?

2      MS. FUMERTON:  I object to the form of the

3  question and the specifics of going to a fact

4  deposition effectively of her time at Walmart.

5  BY MR. BOGLE:

6      Q.  You can answer.

7      MS. FUMERTON:  I think in broad strokes

8  she can talk about her experience, but beyond that,

9  it's inappropriate.

10      MR. BOGLE:  Okay.  So you guys aren't

11  allowed to make speaking objections.  So I hear you,

12  but you're not allowed to make speaking objections.

13  BY MR. BOGLE:

14      Q.  So you can answer the question.

15      A.  Part of my job at Walmart was to work on

16  operations.  I was a pharmacist there.  Part of the

17  operations, part of the distribution, everything from

18  being a pharmacist to an executive.  I worked on a

19  number of different facets at Walmart over my 17-year

20  career that worked on different programs, policies, and

21  procedures to prevent theft and diversion.

22      Q.  What components of Walmart's suspicious

23  order monitoring program for controlled substances did

24  you design?

42

1          MS. FUMERTON:  Objection to form.

2          MR. BARNES:  Now, hold on.  Yeah.  I'm

3   going to instruct the witness you can testify generally

4   about your experience and background, but you're not

5   going to convert this into a fact deposition of

6   Walmart.

7          MR. BOGLE:  I'm entitled to know about her

8   expertise in this area.

9          MR. BARNES:  And that's all you're

10  entitled to, and I'm instructing her do not get into

11  details about Walmart's policies, Walmart's

12  decision-making, anything like that.  What your

13  experience and duties were generally is fine.

14  BY MR. BOGLE:

15      Q.   What components of Walmart's suspicious

16  order monitoring program did you design?

17          MR. BARNES:  Same instruction.

18          MS. FUMERTON:  Object to form.  Outside

19  the scope.

20      A.   Again, in general, I was responsible as

21  part of the operational leadership team for general

22  policies and procedures regarding prevention of theft

23  and diversion.

24  BY MR. BOGLE:

43

```
 1          Q.    Did you design any of those policies or

 2    procedures?  Did you write any of them?

 3          A.    I don't recall.

 4          Q.    Were you responsible at Walmart for

 5    creating a manual or automated system to flag

 6    suspicious orders of controlled substances?

 7          A.    An elec -- are you asking me about an

 8    electronic system?

 9          Q.    I believe my question was manual or

10    automated.

11          A.    As part of standard operating procedures,

12    every pharmacist is involved in prevention of theft and

13    diversion, so manual procedures in my opinion include

14    every time a pharmacist scrutinizes a prescription,

15    it's part of a suspicious order monitoring program.

16          Q.    My question is whether you created any

17    such system, not whether you operated under one.

18          A.    To me the system includes all the policies

19    and procedures that begin at store level and flow all

20    the way through to the distribution, so so far as I

21    have created manuals or operational procedures that

22    begin at the pharmacy level, that's what I'm referring

23    to.

24          Q.    But have you created any manual or
```

44

1    automated system to flag suspicious orders of

2    controlled substances while at Walmart?

3              MS. FUMERTON:  Objection.  Form.  And I

4    think needs clarification at the distribution or the

5    pharmacy level.

6              MR. BOGLE:  Either.  I'm asking either

7    right now.

8              MR. BARNES:  And what do you mean by

9    create?

10             MR. BOGLE:  Design.  And you don't get to

11   ask questions either, so --

12       A.    So --

13             MR. BARNES:  I don't take instructions

14   from you, by the way, and won't, so you can end that

15   little practice.

16       A.    So I will answer again.  My opinion is

17   that a suspicious order monitoring program to prevent

18   theft and diversion is multifaceted and begins as a

19   pharmacist scrutinizes the prescription all the way

20   through the operational process until the order is then

21   fulfilled by the distribution centers.

22   BY MR. BOGLE:

23       Q.    Did you ever create an automated system to

24   flag suspicious orders of controlled substances while

45

```
 1    at Walmart?

 2          A.    No.

 3          Q.    And did you ever draft any written

 4    policies while at Walmart that were specifically aimed

 5    at detecting suspicious orders at the distribution

 6    level?

 7                MS. FUMERTON:  Objection.  Form.  Outside

 8    the scope.

 9          A.    Will you ask that question again, please?

10    BY MR. BOGLE:

11          Q.    Did you ever draft any written policies

12    while at Walmart that were specifically aimed at

13    detecting suspicious orders of controlled substances at

14    the distribution center level?

15          A.    No.

16          Q.    Have you ever designed a program that was

17    designed to block suspicious orders of controlled

18    substances?

19          A.    No.

20                MR. BARNES:  Same objection.  Make sure

21    you're on the same -- you're using the same terms.

22    BY MR. BOGLE:

23          Q.    Outside the context of this litigation,

24    has HBC ever retained you to evaluate its suspicious
```

46

1     order monitoring program for controlled substances?

2          A.     No.

3          Q.     Have you ever been retained as an expert

4     or a consultant to evaluate a suspicious order

5     monitoring program for controlled substances for a

6     company?

7          A.     No.

8          Q.     From 1992 to present, has all of your

9     financial compensation from an employment perspective

10    come from companies that sell pharmaceutical products?

11              MS. FUMERTON:  Objection.  Form.

12         A.     No.

13    BY MR. BOGLE:

14         Q.     What aspect of your compensation during

15    that time period has not come from those companies?

16         A.     Well, I've worked for companies that

17    aren't involved in pharmaceuticals.

18         Q.     Which ones?

19         A.     Well, I worked for RediClinic, which is

20    in -- which is a medical clinic.  And I have some

21    consulting contracts that do not involve

22    pharmaceuticals.

23         Q.     And what companies are those for?

24         A.     I don't have a complete list of all of my

47

 1    clients as an executive consultant.

 2        Q.    From 1992 to present, what percentage of

 3    your income related to employment has come from

 4    companies selling pharmaceutical products?

 5            MR. BARNES:  I'm going to object to form.

 6    And where is this 1992 date coming from?  Is that just

 7    a random date you selected?

 8            MR. BOGLE:  Why does it matter where it

 9    came from?

10            MR. BARNES:  It matters because there's a

11    thing called relevance, so --

12    BY MR. BOGLE:

13        Q.    You can answer my question.

14            MR. BARNES:  No.  Don't answer the

15    question beyond the last 10 years.  I don't see where

16    you get this relevance with 1992.

17            MR. BOGLE:  You're instructing her not to

18    answer beyond the last 10 years?

19            MR. BARNES:  Yes.  Yes.  Yes.

20            MR. BOGLE:  Based on what?

21            MR. BARNES:  Based upon the same

22    randomness that you picked 1992 out of the air.

23            MR. BOGLE:  So you -- based on relevance

24    you're telling her not to answer a question?

48

1           MR. BARNES:  I'm telling you where -- I

2     asked you where 1992 came from and you wouldn't tell

3     me, so --

4           MR. BOGLE:  I just want to make sure I

5     understand the basis for your instruction.  It's based

6     on your view that it's not relevant?

7           MR. BARNES:  Do you even remember 26 years

8     ago?

9           MR. BOGLE:  No, no, no, no, no, no, no.

10    You don't get to ask her questions.  No, no, no, no,

11    no.  That's now how this works.

12          MR. BARNES:  Actually, I do.

13          MR. BOGLE:  No, no, no.

14          MR. BARNES:  When you're done I will ask

15    her questions.

16          MR. BOGLE:  That's fine.  I'm not done.

17    BY MR. BOGLE:

18        Q.   From 1992 to present, what percentage of

19    your income has come from companies selling

20    pharmaceutical products?

21          MR. BARNES:  Object to form.  Lack of

22    relevance.

23        A.   I can't recall.

24    BY MR. BOGLE:

1        Q.    Any approximation whatsoever?

2        A.    I would have to spend some time looking at

3   it.

4        Q.    Okay.  Well, how about -- let's take your

5   counsel's date, for example, then.  Over the last 10

6   years, what percentage of your income has come from

7   companies selling pharmaceutical products?

8        A.    I don't know.  I'd have to look at it.  I

9   don't keep those percentages in my head.

10       Q.    What about the last five years?

11       A.    Again, same answer.  I don't know unless I

12   look.

13       Q.    How about the last two years?

14       A.    I would have to look.  Otherwise I'm

15   speculating as a percent and I'm not going to

16   speculate.

17       Q.    Within the last 12 months?

18       A.    I'm not going to speculate what percentage

19   of my income.

20       Q.    Over the last 12 months you don't know

21   what percentage of your income has come from --

22       A.    Off the top of my head, no.  I haven't

23   done the math.

24       Q.    You have no idea what that number is?

1          A.    I'm not going to speculate.

2          Q.    That wasn't my question.  You have no idea

3     what that number is; is that true?

4          A.    I'm not going to guess.

5          Q.    That's not an answer to my question.

6                MR. BARNES:  All right.  I think this is

7     enough.  Let's move on.

8     BY MR. BOGLE:

9          Q.    My question was do you have no idea what

10    that number is over the last 12 months?

11               MR. BARNES:  And she's asked and answered

12    it three times.

13               MR. BOGLE:  No, she hasn't.

14               MR. BARNES:  Let's move on.

15         A.    I'm not going to guess.

16    BY MR. BOGLE:

17         Q.    So it would be a guess in your regard in

18    the last 12 months?

19         A.    Yes, if you're looking for a percentage

20    number, I would have to guess.

21         Q.    When were you first contacted to conduct

22    work in this case?

23         A.    I believe it was December, January time

24    frame.

1          Q.     December 2018, January 2019?

2          A.     Yes, it was in January of 2019.

3          Q.     Who contacted you?

4          A.     Bob Barnes with Marcus & Shapira.

5          Q.     Were you advertising for your expert

6     services at that point in time?

7          A.     Define advertising for me.

8          Q.     Yeah.  Were you using any sort of

9     third-party service to put out in the public sphere

10    that you were an expert witness?

11         A.     I am listed on a website, but it's a we --

12    but it's a -- I don't know what you call it.  It's --

13    I'm listed on a website, but it's something -- but just

14    as -- and it has my r sum  out there.

15         Q.     What's the website?

16         A.     Well, it's like LinkedIn but for pharmacy

17    law.

18         Q.     What's the name of the website?

19         A.     I believe it's American Society of

20    Pharmacy Law, and it's a membership-based service that

21    I pay for.

22         Q.     How much do you pay for that?

23         A.     I don't know.

24         Q.     Do you advertise your expert services in

1    any other fashion presently?

2         A.    Not that I can recall.

3         Q.    Have you ever advertised for your expert

4    services in any fashion other than the website you've

5    given me?

6         A.    No, not that I recall.

7         Q.    When did you start looking at documents in

8    this case?

9         A.    In January of 2019.

10        Q.    If we go to Exhibit 6, which is your

11   invoices.  You have those?

12        A.    Yes.

13        Q.    The first date listed for document review

14   is February 7th, 2019.  Is that accurate, or should it

15   be January?

16        A.    That's accurate for my invoice, yes.

17        Q.    Is that not accurate as to the actual work

18   you did?

19        A.    There were -- to prepare for my meeting

20   with Bob in January when I came in for my initial

21   discussions, he did give me some initial documents to

22   review and to make sure that I had no conflicts.

23        Q.    What documents did you get before you were

24   retained?

53

1          A.    I don't know exactly.  He gave me the

2    initial complaint, I believe, to review to familiarize

3    myself with the companies and the people involved in

4    the case to make sure that I was qualified to render an

5    opinion and that I didn't have any conflicts.

6          Q.    Anything else beyond that before you were

7    retained?

8          A.    I don't re -- I don't recall.

9          Q.    What were you asked to do in this case?

10         A.    I was asked to explain and talk about

11   typical pharmacy practices regarding prescriptions,

12   supply chain and distribution involving

13   self-distributors and the relationship between the

14   pharmacy, the corporate office, and the distributors

15   themselves, and then to take a look at Giant Eagle's

16   controls and render an opinion whether or not they were

17   in compliance with the Controlled Substances Act.

18         Q.    Have you ever been retained as an expert

19   in a case and reviewed the materials and ultimately

20   concluded that you couldn't offer the opinions you were

21   being asked to offer?

22         A.    No.  But I don't get involved in a case if

23   I can't stand by my opinions.

24         Q.    Yeah, so what I asked you was have you

54

1    ever been retained as an expert in a case, ultimately

2    reviewed the materials, and concluded that you couldn't

3    offer the opinions you were being asked to offer?

4            A.    No.

5            Q.    Your work in the opioid litigation -- is

6    it specific to the trial case involving Summit and

7    Cuyahoga Counties, or is it broader than that?

8            A.    Right now it's just Summit and Cuyahoga

9    County.

10           Q.    Have you been retained for any other

11   opioid cases beyond those involving Summit and

12   Cuyahoga?

13           A.    No.

14           Q.    Have you ever practiced as a pharmacist in

15   either Summit or Cuyahoga County, Ohio?

16           A.    No.

17           Q.    Now, the hours that you've listed on the

18   invoices marked as Exhibit 6 -- are those hours

19   complete and accurate from the time you started working

20   on the case through May 31st, 2019?

21           A.    Yes.

22           Q.    And how many hours have you worked from

23   June 1st to the present on this case?

24           A.    Roughly 40.

1          Q.    And those 40 hours would be paid at the

2    rate of $500 an hour; is that right?

3          A.    Yes.

4          Q.    So once you are paid for those hours, you

5    will have been paid approximately $154,000 in this

6    case?  Does that sound right to you?

7          A.    Yes.

8          Q.    And per your invoices, Exhibit 6, it notes

9    you started writing the expert report on April 29th.

10   That's on the fourth page of the invoices.  Do you see

11   that?

12         A.    I do.

13         Q.    Is that accurate?

14         A.    Well, I began drafting the outline earlier

15   than that.

16         Q.    But actually drafting the report itself

17   began April 29th, 2019; is that true?

18         A.    I mean, to me it all runs together between

19   the outline and the report, but yes, the actual

20   verbiage for the report began that last week in April.

21         Q.    And there's an entry here on April 15th --

22   April 15th to 19th, 2019, again on that same page, the

23   last entry there says review and respond to Pharmacy

24   Times article, one hour.  Do you see that?

56

1          A.    Yes.

2          Q.    What does that relate to?

3          A.    Counsel sent me an article in Pharmacy

4   Times that dealt with -- I believe it was shortages of

5   opioids in the market.

6          Q.    And when you say respond to, what sort of

7   response did you provide to that article?

8          A.    Oh, it was around DEA -- I'm trying to

9   remember what that article was about, but it was just

10  convers -- it was just a response back to counsel

11  agreeing with the article and adding additional

12  commentary.

13         Q.    Did you provide any sort of published

14  response to that article?

15         A.    What do you -- no.

16         Q.    Are you currently conducting any work on

17  this case that's not referenced in your initial or

18  amended reports?

19         A.    No.

20         Q.    Did you draft your expert reports

21  yourself?

22         A.    Yes.

23         Q.    Are there any portions of your reports

24  that you did not personally draft?

1      A.    There were some paragraphs that were added

2   or were offered by the Analysis Group, but all of it

3   was reviewed, edited, and amended by me to reflect my

4   opinions.

5      Q.    What paragraphs came from Analysis Group?

6   Can you point me to where those are in your report?

7      A.    The paragraphs would be the ones around

8   some of the exhibits.

9      Q.    And take whatever time you need.  Just let

10   me know.

11      A.    Okay.

12           MR. BARNES:  Brandon, we've been going

13   about an hour, and whenever you're at a good breaking

14   point, I think we'll --

15           MR. BOGLE:  As soon as she answers this

16   question, I'm fine to stop for a break.

17      A.    So the first one would be F.1.

18      Q.    Can you give me a Page Number for your

19   report?

20      A.    Page 26.  Actually, probably Page 27.

21           MR. BARNES:  You're looking at Exhibit 2,

22   the amended report?

23      A.    I am.  I'm sorry.  Yes.  So -- and when I

24   say they offered information, it's because of the data

58

1    that they came out, they would give me a paragraph and

2    I would take that paragraph and edit it and make sure

3    that it flowed within the report and reflected my

4    opinions.  So they provided the substantiation for the

5    opinions that I was drawing.

6    BY MR. BOGLE:

7        Q.    Which paragraphs are you referring to on

8    Page 27?

9        A.    72.  74.  76.  78.  Paragraph 144, Page

10   50.  Paragraph 145, Page 51.  Paragraph 147.  148.

11            So for clarity, because I'm struggling

12   with this -- so that I can answer your question

13   correctly -- having discussions with them based on the

14   information that I wanted to put in my report, they

15   transcribed or they may have written some paragraphs,

16   but it was all based on my language or my ideas, so I'm

17   struggling answering what exactly it is that you want.

18       Q.    That's what I'm asking you.

19       A.    And I'm asking you for clarity.

20       Q.    I'm asking you if they wrote any

21   paragraphs or provided any paragraphs to you that are

22   reflected in any way, shape, or form in your report.

23       A.    Okay.  And again, all of this is --

24   they're all my ideas and I edited and reviewed

1    everything, so it's hard for me -- it's not their idea,

2    it's my idea, and they may have typed it as we were

3    talking on the phone, so that's why it's hard for me to

4    answer this question, because they're my ideas and they

5    just happened to transcribe them and then forward them

6    to me.

7              So if I didn't say it, it would be 149,

8    150, 151, and this would continue through -- it's --

9    163.  Continue through 163.  I'm sorry.

10         Q.    151 through 163?

11         A.    Yes.  And then there are parts of 164 to

12   167.

13         Q.    What parts?

14         A.    I can't recall at this time.  Again, it

15   was a -- because I edited.  They would have sent a

16   statement or two, and then I put other language in

17   there to make up the entire paragraph.

18              As I said, I'm struggling to answer your

19   question because I don't feel as though they wrote the

20   report.  I wrote the report.  They just gave me some

21   sentences here and there.

22         Q.    Anything after Paragraph 167?

23         A.    No.

24              MR. BOGLE:  Okay.  We can take a break.

 1                THE VIDEOGRAPHER:  We are going off the

 2   record at 10:15 AM.

 3                [A brief recess was taken.]

 4                THE VIDEOGRAPHER:  We are back on the

 5   record at 10:36 AM.

 6   BY MR. BOGLE:

 7        Q.    Ms. Kinsey, to follow up on where we left

 8   off, do you have an understanding as to the process

 9   that AGI followed to create any of the exhibits they

10   were responsible for creating in your report?

11        A.    I don't understand your question.

12        Q.    You want me to repeat or rephrase?

13        A.    Rephrase.

14        Q.    Okay.  Do you have an understanding as to

15   the methodology that AGI employed to create any of the

16   exhibits that they created in your report?

17        A.    So I'm con -- I don't understand your

18   question as far as methodology.  They -- I mean, they

19   crunched the data for me.

20        Q.    Okay.  Do you know what process they

21   followed to do so, sort of walking me through the

22   process of what data they used, how they utilized it,

23   how they crunched the numbers?  That's what I'm asking.

24        A.    Yes.  That should all be in my papers that

1    were sent over.

2         Q.    Okay.  So for example, if we go to Exhibit

3    G in your amended report.  I believe this is one of the

4    exhibits that you said that AGI was responsible for

5    creating; right?

6         A.    Yes.

7         Q.    Can you walk me through the process of how

8    they created this exhibit?

9         A.    I don't understand the process you're

10   talking about.  They crunched the data, and then they

11   took the data and they created a chart.

12        Q.    What data did they crunch for this

13   exhibit?

14        A.    It's listed under the sources.

15        Q.    So what data is that, though?

16        A.    It's the data that was supplied in the

17   case as part of discovery.

18        Q.    So under Sources A, for example, what data

19   is that?

20        A.    I would have to pull that exact -- so it's

21   going to be the DEA quota information as well as the

22   HCP distribution information.

23        Q.    And for sources under B, for example, it

24   talks about the quota history for selected substances

62

1    from the DEA.  Do you see that?

2         A.    Yes.

3         Q.    Is it your understanding that the quotas

4    that are created by the DEA are for distributors to

5    track their distribution of opioids?

6         A.    No.  Quotas are created by the DEA for

7    manufacturers.

8         Q.    So has there ever been a quota created for

9    HBC, for example, for any opioid product by the DEA?

10        A.    No.

11        Q.    Going back to your invoices, Exhibit 6.

12   You have that?

13        A.    I do.

14        Q.    On the first page for February 12th and

15   13th, one of the things you have listed is an interview

16   with Rick Shaheen, security manager at Giant Eagle.  Do

17   you see that?

18        A.    Yes.

19        Q.    So he is a -- based on this, a current

20   employee of Giant Eagle; is that right?

21        A.    Yes.

22        Q.    And what did you discuss with him?

23        A.    It was really a conversation -- I was on

24   the phone, so it was a conversation between Bob and

63

```
 1    Rick, and we were just discussing the --
 2              MR. BARNES:  Hold on.  If it involved
 3    counsel, I'm instructing you not to answer.
 4    BY MR. BOGLE:
 5         Q.    Is Mr. Shaheen a lawyer, to your
 6    understanding?
 7         A.    No.
 8         Q.    Did your discussion with Mr. Shaheen
 9    impact in any way the opinions you're offering in this
10    case?
11         A.    No.
12         Q.    So you didn't utilize anything that he
13    told you in reaching any of your opinions?  Is that
14    your testimony?
15         A.    Correct.
16         Q.    Did you talk to anybody else at Giant
17    Eagle about your work in this case?
18         A.    I spoke a little bit with Jim Tsipakis.
19         Q.    Say that name again.
20         A.    Jim Tsipakis.
21         Q.    And what did you talk to him about?
22         A.    He was in my initial meeting when I came
23    in and we were discussing pieces of the case to
24    determine whether or not I was qualified to be their
```

64

1    expert witness.

2         Q.    Did he provide you any information about

3    HBC's suspicious order monitoring program over time?

4              MR. BARNES:  Anything related to that

5    meeting is privileged, but you can answer anything

6    outside that meeting.

7         A.    Not -- most of what I got from Jim came

8    from his deposition.

9    BY MR. BOGLE:

10        Q.    Anybody from Giant Eagle ever given you

11   information about Giant Eagle or HBC's suspicious order

12   monitoring programs?

13        A.    Not outside the depositions that I've

14   read.

15        Q.    Have you talked to anybody else at Giant

16   Eagle or HBC other than the two we've talked about?

17        A.    I can't recall.  I don't know if -- there

18   may have been -- their internal counsel may have been

19   there that same day.  I can't recall.

20        Q.    Is your understanding that Jim Tsipakis is

21   an attorney?

22        A.    No, he's not.

23        Q.    Was the conversation involving him prior

24   to you being retained as an expert in this case?

1       A.    Yes.

2       Q.    And since you had not been retained at

3  that point, that's before you had started writing your

4  report; right?

5       A.    Correct.

6       Q.    So I'll ask again.  What did you talk

7  about with Mr. Tsipakis?

8            MR. BARNES:  If it was in the presence of

9  counsel for HBC, I instruct you not to answer.

10            MR. BOGLE:  Despite the fact that she's

11  not operating as an ex -- in an expert capacity and she

12  wasn't writing a report?

13            MR. BARNES:  We're entitled to meet with

14  experts.

15            MR. BOGLE:  Okay.  I'm just making sure I

16  understand your objections when we raise it later.

17  Okay, so you're instructing her not to answer, though?

18            MR. BARNES:  Did you get that?  Is that

19  already on the record?  Okay.

20            THE REPORTER:  I mean, it's right there --

21  whatever you said.

22            MR. BARNES:  Okay.

23            MR. BOGLE:  I'm just making sure you are.

24            MR. BARNES:  Yes.  Yes.

66

```
1              MR. BOGLE:  Okay.

2    BY MR. BOGLE:

3         Q.   Have you spoken to anyone employed by

4    GERx?

5         A.   No.

6         Q.   Have you ever been retained by Marcus &

7    Shapira other than in this case?

8         A.   No.

9         Q.   And your rate for expert work in this case

10   is $500 per hour; is that right?

11        A.   Correct.

12        Q.   Is that for all work, or does that differ

13   depending on what type of work you're doing in the

14   case?

15        A.   It's for all work.

16        Q.   For example, to make it clear, if you

17   testify in trial, is it $500 an hour for that too?

18        A.   Yes, it's a standard rate.

19        Q.   Is $500 the same -- $500 an hour the same

20   rate you've used for all expert work since 2014?

21        A.   Yes.  May -- possibly.  I may have made a

22   change a couple of -- about a year-and-a-half ago.  I

23   can't recall.

24        Q.   So prior to a year-and-a-half ago, do you
```

67

1    think you were charging more or less than $500 an hour?

2           A.    It's the standard rate.  It's what I've

3    been using, yes.

4           Q.    So just to make sure I understand.  Prior

5    to a year-and-a-half ago, you did not change your rate?

6           A.    I have not changed my -- I don't believe I

7    have changed my rate.

8           Q.    The invoices we looked at as Exhibit 6 --

9    did you create these?

10          A.    Yes.

11          Q.    Do you have anybody else that works for

12   you at Kinsey Partners?

13          A.    I have two people, yes.

14          Q.    What do they do?

15          A.    They are just administrative.  They help

16   run errands, clean my office, those things.

17          Q.    Anybody that would assist you doing any

18   substantive expert work?

19          A.    No.

20          Q.    Since you formed Kinsey Partners in 2014,

21   what percentage of your income has come from work for

22   pharmaceutical manufacturers, distributors, or

23   pharmacies?

24          A.    Will you just -- will you read that

68

1    question again, please?

2         Q.    Sure.  Since you formed Kinsey Partners in

3    2014, what percentage of your income has come from work

4    for pharmaceutical manufacturers, distributors, or

5    pharmacies?

6         A.    Or pharm -- I would say almost 100

7    percent.

8         Q.    Of that almost 100 percent, how much is

9    related to expert litigation work like this?

10        A.    Maybe 30 to 40 percent.

11        Q.    And the remainder would be consulting; is

12   that right?

13        A.    Well, consulting and working as a

14   pharmacist, yes.

15        Q.    What percentage of your income since 2014

16   has come from working as a pharmacist?

17        A.    I don't know.  I haven't done the math.

18        Q.    Well, for example, in 2018, approximately

19   how much did you make dollar-wise working as a

20   pharmacist?

21        A.    I don't know.  I'd have to look.  In 2018?

22        Q.    Yeah.

23        A.    Maybe $50,000.

24        Q.    Dollar-wise, how much have you made since

69

```
 1   2014 from your work with pharmaceutical manufacturers,
 2   distributors, or pharmacies, total?
 3        A.   Oh.  Since when?
 4        Q.   Since you formed Kinsey Partners in 2014.
 5             MS. FUMERTON:  Objection.  Form.
 6        A.   I don't know.  This is a math test.  I
 7   would have to speculate --
 8             MR. BARNES:  Don't speculate.
 9        A.    -- and I know you don't want me to do
10   that.
11             MR. BARNES:  Don't speculate.
12   BY MR. BOGLE:
13        Q.   You don't know?
14        A.   I don't know.
15        Q.   How about in 2018?  Same question.
16        A.   Again, almost 100 percent.
17        Q.   I'm asking dollar figure, not percentage.
18        A.   Oh, dollar figure.  Roughly,
19   approximately, just last year, 350, maybe.
20        Q.   And in 2018, how much did you make dollar
21   figure-wise for work not done for a pharmaceutical
22   manufacturer, distributor, or pharmacy?
23        A.   I'm sorry.  Which date?  Twenty nine --
24        Q.   2018.  I'm just sticking with 2018.
```

1        A.    Oh, 2018?

2        Q.    Right.  That's what I asked you in the

3   prior question, so --

4        A.    I'm sorry.  It would all have been for a

5   pharmacy or pharmacy manufacturer -- or pharmaceutical

6   manufacturer or another manufacturer.

7        Q.    Do you have any stock ownership in a

8   pharmaceutical manufacturer presently?

9        A.    Not directly.  I don't know what it's in

10  my mutual funds, but direct stock ownership, no.

11       Q.    Do you have any stock ownership presently

12  in any pharmaceutical distributor?

13       A.    Not a specific pharmaceutical distributor,

14  no.  I have stock in Walmart, and so much as they are a

15  pharmaceutical distributor, then I will disclose that.

16       Q.    What's the current value of your stock in

17  Walmart?

18       A.    I don't know.

19       Q.    Do you have any stocks in any other

20  pharmacies that are publicly traded other than Walmart?

21       A.    Not directly, no.

22       Q.    When you say not directly, I want to make

23  sure I know what that means.

24       A.    Well, if they're in mutual funds.  I'm not

71

```
 1    a finance guy, so I don't know what's in the mutual

 2    funds.

 3           Q.    Since you opened Kinsey Partners in 2014,

 4    have you served as a paid consultant for any

 5    pharmaceutical distributor outside of your work in this

 6    case?

 7           A.    Yes.

 8           Q.    Which one?

 9           A.    Anda and AmerisourceBergen.

10           Q.    What was the nature of your work with

11    Anda?

12           A.    It was responding to RFPs for retailers,

13    so working on contracts.

14           Q.    What was the nature of your work with ABC?

15           A.    ABC has -- gosh, we've done a couple of

16    different things, from inventory management to OTC,

17    over-the-counter sets within their Good Neighbor

18    Pharmacy division.

19           Q.    Have you done any work related to

20    suspicious order monitoring for controlled substances

21    for ABC?

22           A.    No.

23           Q.    Since you opened Kinsey Partners in 2014,

24    have you assisted any pharmaceutical manufacturer in
```

1    patenting any products?

2           A.    No.

3           Q.    Have you served as a key opinion leader

4    for any pharmaceutical manufacturer or distributor or

5    pharmacy since 2014?

6                 MR. BARNES:  Object to form.  Do you know

7    what key opinion leader means?

8           A.    I mean, there's a number of -- I would ask

9    you to clarify what you mean by key opinion leader.

10   BY MR. BOGLE:

11          Q.    Have you been retained to sit on any

12   boards or any meeting groups for any pharmacy,

13   distributor, or manufacturer to provide your opinions?

14          A.    No.

15          Q.    I want to go to your testimony list in

16   your report -- the amended report, which I think is --

17   let's see what the exhibit is on that.  Exhibit B, it

18   appears.  Are you there?

19          A.    Yes.

20          Q.    Exhibit B is titled litigation support for

21   Sandra K.B. Kinsey.  Do you see that?

22          A.    Yes.

23          Q.    Do you view yourself as providing

24   litigation support in this case?

1       A.    Yes.

2       Q.    And you give a description of each case

3   starting on this page and carrying over for the next

4   two-and-a-half pages for each case you've worked on

5   during this time frame; right?

6       A.    Yes.

7       Q.    Now, for the -- each case you provide a

8   description of the nature of cases except for -- strike

9   that.  You see there's a section that says nature of

10  cases for each litigation?

11      A.    Yes.

12      Q.    And there's a description after nature of

13  cases that provides the type of case and then a

14  description of the case.

15           For example, if you look at the J & J

16  talcum powder litigation, you say plaintiff alleges

17  progressive lung disease, cancer, and other serious

18  diseases are caused by inhalation of asbestos fibers

19  from exposure to defendants' products.  Do you see

20  that?

21      A.    Yes.

22      Q.    You don't provide that kind of description

23  for the opioid litigation, though, do you?

24      A.    No.

74

1          Q.    Is there a reason why that's the only case

2     you don't provide that kind of narrative description

3     for?

4          A.    No.

5          Q.    If you were to write one, what would it

6     be?

7          A.    I don't know.  I'd have to think about it.

8          Q.    And the cases on this list for these three

9     pages go back to 2016; right?

10         A.    Yes.

11         Q.    Prior to 2016, had you served in an expert

12    capacity in any case?

13         A.    Not as an expert, no.

14         Q.    So in what capacity did you work in a

15    litigation setting prior to 2016, if not as an expert?

16         A.    I --

17              MR. BARNES:  Object to form.  She didn't

18    say that.

19         A.    I worked as a 30(b)6 for Walmart back in

20    my Walmart days.

21    BY MR. BOGLE:

22         Q.    Okay.  Any other sworn testimony that you

23    provided prior to 2016?

24         A.    No.

1          Q.    And from 2016 to present, is this a

2   complete list of cases in which you provided litigation

3   support or expert witness work?

4          A.    Yes.

5          Q.    How many times have you testified in a

6   deposition?

7          A.    I believe it's eight.  I think that's what

8   I put in my -- eight.

9          Q.    What page are you on?

10         A.    Four.

11         Q.    You note here eight depositions and

12  testimony in four trials; right?

13         A.    Correct.

14         Q.    And for -- let's start with the

15  depositions.  Each of the depositions -- were those --

16  was that testimony offered on behalf of a corporation?

17         A.    Yes.

18         Q.    For each of the trials, was that testimony

19  offered on behalf of a corporation?

20         A.    Yes.

21         Q.    So what we found on Pages 4 and 5 --

22  that's a complete list of your deposition and trial

23  testimony; is that true?

24         A.    Yes.

76

1          Q.    Other than the 30(b)6?  I'm sorry.

2          A.    Yes.

3          Q.    I'll grant you that.  Which four trials

4    did you testify in?

5          A.    Concordia versus Winder, GlaxoSmithKline

6    versus Glenmark.  Testify or deposition?

7          Q.    I'm asking about trial.  You list --

8          A.    Okay.  I --

9          Q.    You say you testified in four trials.

10   That's what I'm asking you -- which four?

11         A.    Right.  That's what I'm trying to recall.

12   So Valeant and ECI, Winder, Glaxo, and Teva.  I can't

13   remember the fourth one.  Oh, the Concordia case was

14   two trials.  We had a PI hearing and then an actual

15   trial.

16         Q.    Any others?

17         A.    No.

18         Q.    Are there any other cases where you

19   submitted an expert report but did not actually end up

20   testifying in any capacity?

21         A.    Yes.

22         Q.    What case is that, or cases?

23         A.    So some of these cases are still pending.

24   I lost my CV.  So I submitted an expert report in

77

1    GlaxoSmithKline versus Glenmark.

2        Q.   Can you tell me where you're at?

3        A.   I'm in my CV.  When you look at my

4    complete listing.

5        Q.   So in your CV --

6        A.   Page 2.

7        MR. BARNES:  Of Exhibit B?  Is that what

8    you're referring to?

9        A.   Oh, I'm sorry.  Yes.  Exhibit B, Page 2.

10   BY MR. BOGLE:

11       Q.   Oh, so not your C -- the litigation

12   support exhibit?

13       A.   The litigation support.  I'm sorry.

14       Q.   Can you start over then, because I lost

15   where you were at?

16       A.   No problem.  So if you want to start on --

17   let's start on Page --

18       Q.   Let's do this.  Stop there.

19       A.   Okay.

20       Q.   Let me repeat the question and we'll start

21   over with the question.

22       A.   Okay.  All right.

23       Q.   That's probably the best way to do this.

24   My question was are there any other cases where you

78

1    submitted an expert report but have not actually

2    offered any sort of testimony?

3         A.    And testimony, do you mean by being

4    deposed?  I'm not an attorney, so --

5         Q.    Any sworn testimony where you were put

6    under oath.

7         A.    Okay.  Fair enough.  So starting on Page

8    1, Concordia versus Lazarus.  James Jah versus

9    Glenmark.  GlaxoSmithKline versus Glenmark.  And I

10   believe that's it.

11        Q.    So going then back to the listing in

12   Exhibit B of cases there, the J & J talcum powder

13   litigation -- what are the nature of the opinions

14   you're offering in that case?

15        A.    It's around a retailer's standard

16   processes regarding testing of branded OTC products.

17        Q.    And what company are you testifying on

18   behalf of?

19        A.    It is in gen -- it will be different

20   companies, but it will generally be retailers and

21   distributors of the OTC products.

22        Q.    And it looks like Barnes & Thornburg is

23   the firm that retained you there?

24        A.    Correct.

1          Q.     Are you offering any opinions in that case

2     that the retailers acted inappropriately in any

3     fashion?

4          A.     No.

5          Q.     And how much approximately have you been

6     paid for your work in that case?

7          A.     Well, it's a number of different cases,

8     and --

9          Q.     That litigation, then.  Let me rephrase

10    it.

11         A.     I --

12         Q.     How much have you been paid to date for

13    your work in that litigation -- the J & J talcum powder

14    litigation?

15         A.     Roughly $7,000 or $8,000.

16         Q.     That case is still pending; right?

17         A.     Oh, it's multiple cases.

18         Q.     Those cases are still pending; right?

19         A.     Some of them I believe have been settled

20    or canceled or -- some of them are pending.

21         Q.     Going then to the Heartland Medical LLC

22    versus Express Scripts case -- what are the nature of

23    the opinions you're offering in that case?

24         A.     It was around diabetic testing supplies

1    and whether or not a pharmacy can adequately track all

2    the way through the supply chain where the product came

3    from.

4         Q.    And who were you testifying for in that

5    case?

6         A.    On behalf of Heartland Medical.

7         Q.    And are you offering any opinions that

8    Heartland Medical acted inappropriately in any way in

9    that case?

10        A.    No.

11        Q.    And how much have you been paid for that

12   case so far?

13        A.    I don't know.  Sitting here today, I don't

14   know.

15        Q.    More than $50,000?

16        A.    No.

17        Q.    More than $20,000?

18        A.    No.

19        Q.    You have no approximation other than not

20   more than $20,000?

21        A.    It's -- it was a small engagement.  That's

22   what I can tell you.  I would have to go back and look

23   at the invoices to understand.

24        Q.    The Concordia Pharmaceuticals, Inc.,

81

1    versus Lazarus case -- what are the nature of the

2    opinions you're offering there?

3        A.    It's around pharmacy practice regarding

4    DESI drugs, the buying practices -- the general buying

5    practices of retailers and drug substitution.

6        Q.    Which company are you testifying for

7    there?

8        A.    On behalf of Lazarus.

9        Q.    Are you testifying in that case that

10   Lazarus acted inappropriately in any way?

11       A.    No.

12       Q.    And how much have you been paid for your

13   work in that case?

14       A.    Again, I'd have to go back and pull the

15   invoices.  Less than 20.

16       Q.    The Valeant versus ECI and Virtus

17   Pharmaceuticals case -- what are the nature of the

18   opinions you're offering there?

19       A.    It will be pharmacy practice, buying --

20   the buying practices, procurement and supply chain and

21   drug substitution regarding DESI drugs.

22       Q.    When you say DESI drugs, what does that

23   mean?

24       A.    It's a different kind of drug that doesn't

82

```
 1    necessarily have an NDA, and so when the generic comes

 2    to market, the ability for a pharmacist to substitute

 3    isn't -- doesn't follow the normal pathway.

 4          Q.    And in that case, the Valeant

 5    Pharmaceuticals versus ECI and Virtus case, who are you

 6    testifying on behalf of?

 7          A.    On behalf of ECI Pharmaceuticals and

 8    Virtus Pharmaceuticals.

 9          Q.    Are you testifying in that case that

10    either of those companies acted inappropriately in any

11    way?

12          A.    No.

13          Q.    And how much have you been paid for your

14    work in that case?

15          A.    This one I don't recall.

16          Q.    At all?

17          A.    I am -- I would be uncomfortable giving

18    you a number.

19          Q.    The James Jah versus Glenmark Generics and

20    others case there -- what are the nature of the

21    opinions you're offering there?

22          A.    This was around the requirement of a

23    pharmacist to counsel or warn a patient about a side

24    effect.
```

83

1      Q.    What was the side effect?

2      A.    This particular individual had a severe

3   allergic reaction to a drug.

4      Q.    And who are you testifying for in that

5   case?

6      A.    It was AmerisourceBergen.

7      Q.    And are you testifying in that case that

8   AmerisourceBergen did anything inappropriately?

9      A.    No.

10     Q.    How much have you been paid for your work

11  in that case?

12     A.    Less than $10,000.

13     Q.    Takeda Pharmaceuticals versus West-Ward

14  and Hikma -- what are the nature of the opinions you're

15  offering there?

16     A.    It's all around pharmacy practice, drug

17  substitution, and the typical buying practices of

18  retail pharmacies.

19     Q.    Who were you testifying for there?

20     A.    On behalf of West-Ward and Hikma.

21     Q.    Are you testifying or have you testified

22  that either of those companies acted inappropriately in

23  any way?

24     A.    No.

84

1          Q.    And how much have you been paid for your

2    work in that case?

3          A.    I don't know.  I didn't review those

4    invoices.

5          Q.    Do you have any approximation at all?

6          A.    I don't.

7          Q.    Concordia Pharmaceuticals versus Winder

8    Labs and Steve Pressman.  What are the nature of the

9    opinions you're offering there?

10          A.    It's around pharmacy practices, typical

11    buying and supply chain distribution, and drug

12    substitution.

13          Q.    Who are you testifying for?

14          A.    On behalf of Winder Labs and Steven

15    Pressman.

16          Q.    Have you offered any opinions that either

17    of those -- or that company or individual acted

18    inappropriately in any way?

19          A.    No.

20          Q.    How much have you been paid for your work

21    in that case?

22          A.    I don't recall.

23          Q.    GlaxoSmithKline versus Teva.  What are the

24    name of the opinions you were offering in that case?

85

1          A.     Pharmacy practice, drug substitution, and

2     typical buying and purchasing patterns of pharmacy and

3     drug supply chain.

4          Q.     Who were you testifying for there?

5          A.     On behalf of Teva Pharmaceuticals.

6          Q.     Have you testified or will you testify

7     that Teva acted inappropriately in any way?

8          A.     No.

9          Q.     How much have you paid -- how much have

10    you been paid for your work on that case?

11         A.     I don't recall.

12         Q.     Any approximation?

13         A.     No.

14         Q.     GlaxoSmithKline versus Glenmark.  What are

15    the nature of the opinions in that case?

16         A.     Pharmacy practice, drug substitution,

17    supply chain management, typical buying practices.

18         Q.     Who were you testifying for there?

19         A.     Glenmark Pharmaceuticals.

20         Q.     Are you testifying or have you testified

21    that Glenmark has acted inappropriately in any way?

22         A.     No.

23         Q.     How much have you been paid for your work

24    in that case?

86

```
 1              A.    I don't recall.

 2              Q.    Amneal Pharmaceuticals versus

 3     Reckitt Benckiser Pharmaceuticals and Idivior --

 4     Idivior.  I probably said that wrong.  What are the

 5     nature of the opinions you're offering there?

 6              A.    Was around drug substitution and typical

 7     buying practices, supply chain and distribution.

 8              Q.    Who were you testifying for in that case?

 9              A.    Amneal.

10              Q.    And did you testify or have you testified

11     that Amneal acted inappropriately in any way?

12              A.    No.

13              Q.    How much have you been paid for your work

14     in that case?

15              A.    I don't recall, but it was less -- it was

16     minimal.

17              Q.    And what do you mean by minimal?

18              A.    I don't recall.

19              Q.    And then there's another entry for

20     Concordia Pharmaceuticals versus Winder Labs and Steven

21     Pressman.  Is that a different case than -- it looks

22     like the same case number as the one we just looked at

23     a few cases ago.

24              A.    It's the same case, but there's a
```

87

```
 1    counterclaim.

 2          Q.    Did you provide more than one report in

 3    that case?

 4          A.    I have, yes.

 5          Q.    So as to this report for the 2016 injury

 6    you've got here, what are the nature of the opinions

 7    you're offering there?

 8          A.    Pharmacy practice, drug substitution, and

 9    the typical ordering practices for a supply chain and

10    distribution.

11          Q.    And I assume, but I want to be sure --

12    you're working for Winder Labs and Steven Pressman

13    there again?

14          A.    Yes.

15          Q.    And have you testified or will you testify

16    they acted inappropriately in any way?

17          A.    No.

18          Q.    And the last one you have listed here is

19    on the next page, URL Pharma, Inc., versus Reckitt

20    Benckiser, Inc.  What are the nature of the opinions

21    you're offering there?

22          A.    I did some analysis.  It wasn't -- I did

23    some analysis for them regarding typical substitution

24    when a new generic comes to market.
```

1       Q.    And who were you working for there?

2       A.    Reckitt Benckiser.

3       Q.    And what do they do?

4       A.    They're a manufacturer.

5       Q.    And did you testify that Reckitt Benckiser

6 did anything inappropriate?

7       A.    Again, I did an analysis, so it wasn't --

8 I wasn't really rendering an opinion other than to give

9 them an analysis.

10      Q.    Did your analysis reach any conclusions

11 that they had acted inappropriately in any way?

12      A.    No.

13      Q.    How much were you paid for your work in

14 that case?

15      A.    I don't recall.

16      Q.    Have you ever testified before Congress?

17      A.    No.

18      Q.    Have you ever testified before a grand

19 jury?

20      A.    No.

21      Q.    Have you ever given a sworn statement or

22 sworn testimony to the FDA?

23      A.    No.

24      Q.    Have you ever given a sworn statement or

89

1    sworn testimony to the DEA?

2         A.    No.

3         Q.    Have you ever given a sworn statement or

4    sworn testimony to the CDC?

5         A.    No.

6         Q.    Have you ever given a sworn statement or

7    sworn testimony to any regulatory body?

8         A.    Not that I can recall.

9         Q.    And I understand from your report that you

10   reviewed the Controlled Substances Act as part of your

11   work in this case; is that right?

12        A.    Yes.

13        Q.    Had you reviewed that act in its entirety

14   prior to your work in this litigation?

15        A.    At some point in time in my training and

16   education, I believe I have.

17        Q.    Where at?  Training and education for what

18   company?

19        A.    Well, no, I would say training and

20   education as a pharmacist, that we would have studied

21   the Controlled Substances Act -- definitely pieces of

22   it -- in pharmacy school, and then I'm sure I reviewed

23   it at some point in time during my time at Walmart in

24   the various positions that I held.

90

1          Q.    Do you recall how long it had been since

2     you had reviewed it prior to your work in this case?

3          A.    No.

4          Q.    Can you go to Page 47 of your expert

5     report, the amended version?

6                You say there in Paragraph 137 the DEA is

7     overly ambiguous on what a suspicious order monitoring,

8     SOM, system entails and does not approve or otherwise

9     endorse any specific system for reporting suspicious

10    orders, accepting both manual and technology enabled

11    programs for the safety of controlled substances as

12    long as the policies and procedures meet the

13    regulations.

14                Do you see that?

15         A.    Yes.

16         Q.    What did you mean here by overly ambiguous

17    in this regard?

18         A.    Well, in my opinion, the DEA does not

19    specify specifically what a distributor needs to do as

20    part of the suspicious order monitoring system.  They

21    specifically are purposely ambiguous, saying that each

22    organization needs to design and develop a system that

23    is consistent with and specific to their type of

24    business.

 1          Q.    Do you intend to testify the DEA has a

 2    duty to be more specific in this regard?

 3          A.    No.

 4          Q.    Do you think the DEA has acted

 5    inappropriately in not providing more detail in this

 6    regard?

 7          A.    No.  No.

 8          Q.    And would you agree that as to the

 9    construct of a suspicious order monitoring program for

10    each individual company, that that company is in a

11    better position to determine what type of program works

12    for them than the DEA is?

13                MS. FUMERTON:  Objection.  Form.

14          A.    I don't know -- I think it is smart of the

15    DEA to understand that everybody's business is

16    different, and that it's also smart of the DEA to be --

17    not specifically clarify, because technology changes,

18    business policies and programs change.

19                And so I respect the fact that they're not

20    specific, they are overly ambiguous, so that companies

21    can design programs that specifically match their type

22    of business, size, market.

23    BY MR. BOGLE:

24          Q.    Okay.  Are you done?

92

1          A.     Yes.   Thank you.

2          Q.     Yeah.   Looked like you were still

3     thinking; I just wanted to be sure.

4              So the next paragraph, Paragraph 138, you

5     say Giant Eagle complies with all regulations and

6     actively maintains a complex SOM system of integrated

7     controls that has been part of their standard operating

8     procedures for decades.

9              Do you see that?

10         A.     Yes.

11         Q.     So when you reference, just so I'm clear,

12    Giant Eagle here, are you talking about them as one and

13    the same with HBC or different in this paragraph?

14         A.     I'm representing Giant Eagle as an entity

15    when I speak to their SOM system.

16         Q.     Okay.   Let me ask it a little different

17    way to make sure we're clear.   The statement I just

18    read from Paragraph 138, are you meaning that to

19    include the SOM systems over time for HBC?

20         A.     Yes, I'm including those systems as well.

21         Q.     So when you referenced standard operating

22    procedures here, which standard operating procedures

23    are you referring to?   Is there somewhere you could

24    point me to what you looked at?

1          A.     Well, within Giant Eagle again.   Their SOM

2     system as they define it is integrated controls that

3     includes the pharmacy, the distributor, as well as

4     their corporate office.

5               So their policies and procedures to

6     prevent theft and diversion are all of the operational

7     activities that occur within those three entities, or I

8     should say within the one entity but within those three

9     distinct groups.

10         Q.    So in formulating the statement you wrote

11    in Paragraph 138 here, did you review any specific

12    standard operating procedures?

13         A.    I reviewed sworn testimony and I looked at

14    exhibits -- and along with that and my knowledge of

15    pharmacy practice and the laws that govern pharmacy and

16    pharmacists and state boards of pharmacy.  So it's all

17    included.

18         Q.    Yeah, so I'm just trying to figure out

19    what specific procedures you looked at.  So am I safe

20    to take from that answer that any specific standard

21    operating procedures that you reviewed -- when I mean

22    specific, specific to Giant Eagle or HBC -- would be

23    located in the deposition transcripts in your reliance

24    materials or the exhibits thereto?

94

```
 1            A.    The things specifics to Giant Eagle, yes.

 2            Q.    Are any of the standard operating

 3    procedures you reviewed for Giant Eagle or HBC specific

 4    to compliance with the Controlled Substances Act?

 5            A.    There is information in the depositions,

 6    yes.

 7            Q.    When you say information, are you

 8    referring to specific standard operating procedures?

 9            A.    I mean, I get -- there's -- and I

10    apologize if I'm confused, but as people are speaking

11    to the different policies and procedures, some of them

12    are written, some of them are unwritten.  It just goes

13    towards their general practices that all combine to

14    make up their suspicious order monitoring system.

15            Q.    At what point in time did HBC first have a

16    written policy concerning compliance with the

17    Controlled Substances Act?

18            A.    I don't recall.  I don't know.  I know

19    there is a date -- I believe -- there's a date that's

20    been thrown out there, the first piece of paper that

21    they were able to find with regards to discovery, but

22    that these operational procedures existed long before

23    then.

24            Q.    In written form?
```

95

1          A.     We don't know.  I know that as part of

2     discovery, which was what came out in the testimony,

3     that as part of discovery they were only able to find

4     beginning on a certain date, but that people have

5     testified that these operational procedures existed

6     long before then.

7          Q.     Have you been able to find any written

8     standard operating procedures related to Controlled

9     Substances Act compliance other than what was discussed

10    in the depositions?

11         A.     I only reviewed what was in the

12    depositions.

13         Q.     Do you agree there's an ongoing opioid

14    epidemic in this country?

15         A.     I would agree that, yes.

16         Q.     And do you agree that opioid diversion is

17    a cause of that epidemic?

18         A.     The opioid epidemic is -- it has a number

19    of components associated with it.  I don't believe that

20    it stems from the closed-loop controlled system of

21    legitimate prescriptions.

22         Q.     Do you think that opioid diversion is a

23    cause of the epidemic?

24              MS. FUMERTON:  Object to form.

96

1              MR. BARNES:  Asked and answered also.

2         A.    Again, I don't believe that when there's

3    sworn testimony that 99.9 percent of prescriptions are

4    written legit -- for legitimate reasons and dispensed

5    appropriately, I don't believe the remaining has

6    contributed to the opioid crisis.

7    BY MR. BOGLE:

8         Q.    You referenced 99.9 percent of

9    prescriptions being legitimate.  Have you seen any sort

10   of underlying data or statistical analysis to support

11   that finding?

12        A.    No, it was as part of the sworn testimony

13   of high-ranking individuals within the U.S.

14        Q.    Okay, but have you seen any actual data to

15   support that?

16        A.    Not directly, no.

17        Q.    Are you aware of any data indirectly to

18   support that?

19        A.    Well, I'm sure he has some information.  I

20   mean, if they're saying it, I'm certain he has some

21   information to back it up.

22        Q.    Have you seen anything in the public

23   sphere or any private documents that you reviewed that

24   show that that data is accurate?

97

1        A.    Again, I'm relying on other people within

2   the industry, other respectable and credible

3   individuals within the industry, to relay that

4   information accurately.

5        Q.    Okay, but you're not aware of any data

6   that supports that yourself?

7        A.    Again, I believe that these individuals

8   that are speaking and testifying in court and using

9   this information have data to back up their statements.

10       Q.    Okay, but I don't think that's what I

11  asked you.  I'm asking if you're aware of any data that

12  supports the statement.

13       A.    I myself have not seen any data.  I rely

14  on the fact that they are using data to support their

15  statements.

16       Q.    Let's take a look at your CV real quick,

17  in the amended report, which I think is Exhibit A to

18  the report.

19             Is this a CV that you prepared yourself?

20       A.    Yes.

21       Q.    When did you prepare it or last update it?

22       A.    Probably, well, March.  March or April of

23  this year.

24       Q.    Is this the same CV that you use for

1    non-litigation work?

2         A.    Yes.

3         Q.    Has the DEA ever retained you to assist it

4    in evaluating any issue?

5         A.    No.

6         Q.    Has the FDA ever retained you to assist it

7    in evaluating any issue?

8         A.    No.

9         Q.    Has any other regulatory body hired you to

10   evaluate it in assisting (sic) any issue?

11        A.    No.

12        Q.    Are you a member of any professional

13   organizations currently?

14        A.    Yes.

15        Q.    Which ones?

16        A.    The American Society of Pharmacy Law, the

17   American Pharmacists Association, the Arkansas Pharmacy

18   Association, and the American Society of Healthcare

19   Professionals, I believe it is, and the Healthcare

20   Businesswomen's Association.

21        Q.    Are there any other professional

22   organizations you've been a member of in the last five

23   years that you're not presently a member of?

24        A.    I don't believe so.

1    Q.    Are all of the materials that you relied

2  on to form your opinions in this case found in your

3  materials considered list and your additional materials

4  considered list?

5    A.    Yes.

6    Q.    Were you granted access to any document

7  databases to do any searches on production documents in

8  this case?

9    A.    No.

10    Q.    Let's go to Exhibit C of your amended

11  report, which is the list of materials reviewed or

12  considered.  The first section you have there are

13  pleadings and materials related to pleadings.

14         Do you see that?

15    A.    Yes.

16    Q.    And did you specifically select these

17  pleadings to review?

18    A.    No.

19    Q.    Did you ask for any specific pleadings?

20    A.    No.

21    Q.    How did you come about getting these

22  pleadings, then?

23    A.    They were e-mailed to me by counsel.

24    Q.    The next section is expert reports,

100

1    including exhibits therein.

2            Do you see that?

3        A.    Yes.

4        Q.    And did you specifically select these

5    experts to review -- expert reports to review?

6        A.    No.

7        Q.    How did you come to get these specific

8    list of reports?

9        A.    They were e-mailed to me by counsel.

10       Q.    So that selection was made by them as far

11   as what to send you?

12       A.    Yes.

13       Q.    Is the same true for the expert reports

14   and depositions that you list in your additional

15   documents reviewed, which is Exhibit 5?

16       A.    Yes.

17       Q.    And going back to the list in your amended

18   exhibit -- or amended expert report, you have

19   depositions, including exhibits therein, as well.

20            Did you specifically select those

21   depositions to review?

22       A.    No.

23       Q.    Were those given to you by counsel at

24   their choosing?

1          A.     Yes.

2          Q.     And for the expert reports and

3     depositions, the reference to exhibits -- did you look

4     at all the exhibits to both the reports and depositions

5     that are cited here?

6          A.     The ones that -- I would have scanned them

7     or looked at them as part of my reading of these

8     documents.

9          Q.     Now, the expert reports, for example,

10    listed in your amended report and the additional

11    documents considered -- did you review those reports in

12    their entirety?

13         A.     For the most part I did, yes.

14         Q.     Are there any that stand out to you that

15    you did not review in their entirety?

16         A.     There were times that I just skipped to

17    certain sections that I felt were most applicable to

18    HBC.

19         Q.     What sections would you have focused on?

20         A.     Well, I would have scanned over things

21    that related to manufacturers, potentially other

22    distributors in the case.  So I would skip certain

23    sections that didn't necessarily pertain to Giant Eagle

24    and HBC.

102

1       Q.    The depositions that you reviewed in this

2   case -- did you review the depositions in their

3   entirety?

4       A.    I scanned them, yes.

5       Q.    When you say scanned them, what do you

6   mean?

7       A.    Well, for the most part I read them.  Did

8   I read them word-for-word?  No.  Would I skip certain

9   sections?  Yes.

10      Q.    Now, on the expert reports that you list

11  here in your amended expert report -- strike that.

12            For the expert reports that you reviewed

13  as part of your amended expert report listing here, do

14  you intend to offer any specific criticisms of those

15  experts outside of what's listed in your report

16  currently?

17      A.    As of today's date, no, I don't intend

18  outside of what I've already done, but it doesn't mean

19  that I won't later on.

20      Q.    Do you have any present intention of doing

21  so?

22      A.    Not at this time.

23      Q.    And from my review of your report and

24  amended report, the only expert listed here that you

```
1    provide criticisms of is Craig McCann; is that right?

2         A.    Yes.

3         Q.    Going back to the materials considered

4    list, you've got websites, articles, and other online

5    materials.  Do you see that?

6         A.    Yes.

7         Q.    Are these materials that you specifically

8    reviewed for your work in this litigation?

9         A.    Yes.

10        Q.    Are there any of these materials -- these

11   list of 39 here -- that you had reviewed prior to your

12   work in this case?

13        A.    Yes.

14        Q.    Which ones?

15        A.    I don't know.

16        Q.    Do you know of any of these in this list

17   of 39 that you definitely had not reviewed prior to

18   your work in this case?

19        A.    So for -- and I don't know that I can give

20   you a complete list without spending time scanning.

21   For example, Number 30 -- I have seen that prior to

22   writing this expert report.

23        Q.    You said you had seen that?

24        A.    I have seen it, yes, because I've used
```

1    that before.

2         Q.    30, you said?

3         A.    Uh-huh.  But there aren't many of them

4    that are like that.  I would have to -- that's the

5    first one that comes to mind.

6         Q.    Were these 39 documents here on this

7    list -- were these pulled through your independent

8    research?

9         A.    Yes.

10        Q.    We'll just look at a couple of these for

11   example.  The Number 4 on your list, article lead

12   author Rosenblum.

13        A.    Uh-huh.

14        Q.    Had you read that article prior to your

15   work in this case?

16        A.    No.

17        Q.    Did you pull that article yourself, or was

18   it provided to you?

19        A.    No, I pulled that.

20        Q.    Number 2, the article lead author Bondell.

21   Had you reviewed that article prior to your work in

22   this case?

23        A.    No.

24        Q.    Did you pull that, or was it provided to

1    you?

2         A.    I pulled it.

3         Q.    What process did you use to search for

4    these medical journal articles, like Number 2 and

5    Number 4?

6         A.    Google.

7         Q.    Are there any medical journal articles

8    that you reviewed for your work in this case but didn't

9    include on this list?

10        A.    Yes.

11        Q.    Is there a reason why you didn't include

12   those on your list?

13        A.    Because they didn't help in forming my

14   opinions.

15        Q.    Have you created any demonstrative

16   exhibits that you plan to use at trial, outside of

17   what's contained in your report?

18        A.    No.  Doesn't mean that I won't, but I

19   don't have -- I haven't done it yet.

20             MR. BOGLE:  Let's take a five-minute

21   restroom break real quick.  I'm going to reset, move on

22   to a different subject.

23             MR. BARNES:  Okay.

24             THE VIDEOGRAPHER:  We are going off the

1    record at 11:35 AM.

2              [A brief recess was taken.]

3              THE VIDEOGRAPHER:  We are back on the

4    record at 11:58 AM.

5    BY MR. BOGLE:

6         Q.   Before we broke, I asked you if you had

7    created any demonstrative exhibits for trial, and I

8    believe you said not at this time.  Is that right?

9         A.   Yes.

10        Q.   Are there any that you plan to create but

11   have not started working on yet?

12        A.   I don't know.  I mean, until it gets down

13   when we get to trial and we determine what my testimony

14   is going to be and whether or not other demonstratives

15   are needed, I don't know how to -- I just don't know

16   right now.

17        Q.   Do you intend to testify as to what

18   patient populations should appropriately take opioids?

19        A.   No.

20        Q.   Let's go back to your amended expert

21   report.  And I'm on Page 6, please.  So I'm under

22   summary of expert opinions there.

23             And for A, you say as a board licensed

24   pharmacist with over 25 years of experience, I find

1    that opioids are effective and essential drugs for pain

2    management when used appropriately.

3              Do you see that?

4         A.    Yes.

5         Q.    What are you relying on to support that

6    conclusion as to the efficacy of opioids?

7         A.    Well -- first of all, they're safe and

8    effective because they were approved by the FDA and

9    granted both NDAs and ANDAs.  So we know they're safe,

10   we know they're effective.

11             And given my 25 years of experience as a

12   pharmacist, I can vouch for the fact that there are

13   thousands and thousands of patients that have taken

14   them and they work for them.

15        Q.    Have you conducted any sort of systematic

16   analysis of those patients as to the efficacy they

17   received?

18        A.    No, I don't need to.  Again, the drug was

19   proven safe and effective by the FDA.

20        Q.    So as to this opinion here as to opioids

21   being effective and essential drugs, outside of your

22   experience as a pharmacist that you've just referenced

23   and it being approved by the FDA, is there anything

24   else you intend to rely on for that statement?

1      A.    Well, it's my years of experience.  It's

2   the data that shows that it's constantly being

3   prescribed.  It is the materials that I have reviewed

4   and it's referenced to them being in evidence-based

5   protocols.  I mean, it's a multitude of information

6   that points to the fact that these drugs are effective.

7      Q.    What as far as stuff that you've cited to

8   are you talking about that you're referring to on this

9   point?

10      A.    Well, when you think about the World

11   Health Organization and their analgesic ladder, when

12   you read about the information from other key opinions

13   leaders and the testimony in this case speaks to the

14   efficacy of these drugs to treat pain.

15      Q.    The testimony from who?

16      A.    There are other experts in this case that

17   have testified to the effectiveness of these drugs.

18      Q.    Which ones have you reviewed on that

19   point?

20      A.    I just recently re -- read it on the

21   additional documents reviewed.  It was either Hughes or

22   Dombrowski, and I apologize, I can't recall which

23   one.

24      Q.    So you're relying on either one of those

1    two individuals considering the efficacy of the drug as

2    well?

3            A.    It just goes to further supporting my

4    opinion.  There was lots of information that I reviewed

5    that I looked at on the internet that is going to

6    support this.

7            Q.    Like what?

8            A.    Other articles, things that other

9    physicians and key opinion leaders have brought forth.

10           Q.    Anything outside of what's in your

11   materials considered list as far as articles go?

12           A.    I mean, I looked at -- as I said before, I

13   looked at a lot of articles, but they didn't

14   necessarily add to or change my opinion.

15           Q.    But are there any medical journal articles

16   you intend to rely on for this point outside of what's

17   listed in your materials considered?

18           A.    Not at this point, no.

19           Q.    And the WHO analgesic ladder you're

20   referring to related to treatment of cancer patients;

21   right?

22           A.    It was originally developed to treat

23   cancer patients and then has been supplemented to

24   actually work outside work on noncancer pain, and

1    they've even supplemented it to look at acute pain.

2         Q.    The WHO has supplemented it?

3         A.    The other -- no, key opinion leaders have

4    supplemented it.

5         Q.    So the next sentence under A in your

6    summary of expert opinions says the vast majority of

7    opioid prescriptions are written for legitimate reasons

8    and consumed by patients according to prescribers'

9    directions without undue or long-lasting harm to the

10   patient.

11            Do you see that?

12        A.    Yes.

13        Q.    What are you specifically relying on to

14   support that statement?

15        A.    Again, it's 25 years of experience, my

16   training as a pharmacist, the fact that the products

17   are approved by the FDA and continue to remain in

18   market, opinions of physicians and other key opinion

19   leaders in the market, as well as the information

20   provided in testimony.

21            I believe -- and I don't want to mess up

22   his name -- Rannazzisi speaks to the legitimacy of the

23   prescriptions and how many prescriptions are actually

24   written for legitimate reasons.

111

1      Q.    So you're citing to the Rannazzisi -- is

2  that the Deposition Exhibit 8 you're talking about

3  here?

4      A.    Yes, his information in general.  That's

5  Exhibit 8.  There are other things that I have

6  reviewed, but you're asking me -- I've read so much

7  material, it's hard for me to specifically point to the

8  exact place that I got the information, outside of what

9  I've already cited.

10     Q.    Have you undertaken any quantitative

11  analysis as to how many patients legitimately use

12  opioids?

13     A.    I have not, no.

14     Q.    Have you done any quantitative analysis as

15  to how many patients consume opioids according to their

16  prescriber's directions?

17     A.    No.

18     Q.    Have you done any quantitative analysis as

19  to how many patients consume opioids without undue or

20  long-lasting harm to themselves?

21     A.    I haven't done any specific analysis

22  because my experience tells me and the number of

23  patients that I have treated tells me that these are

24  safe, they're effective products, and when they're used

112

```
 1    appropriately they will not cause long-lasting harm to

 2    the patient.

 3          Q.    So for that point you're relying on your

 4    experience; is that true?

 5          A.    My experience, working as a pharmacist,

 6    working with physicians, the articles that I have read,

 7    my training, and the endorsements by the FDA.

 8          Q.    Have you seen any FDA endorsements to the

 9    point of majority of patients taking opioids do so

10    without undue or long-lasting harm?

11          A.    Well, just the fact that the FDA has

12    granted them a new drug application or an abbreviated

13    new drug application -- the FDA controls what drugs are

14    available in market for sale, and the fact that the FDA

15    leaves these products in market signals to all health

16    care providers that these products have been proven

17    both safe and effective.

18          Q.    So you're relying on FDA approval for the

19    point of the vast majority of patients taking the drugs

20    without undue or long-lasting harm?  Am I understanding

21    you right?

22          A.    What I'm saying is the fact that the FDA

23    approves these products for safety and efficacy means

24    that when taken appropriately they are safe.  That is
```

1    what the FDA is telling the health care community.

2         Q.    What are the appropriate ways to take

3    opioids?

4         A.    Per your physician's instructions.

5         Q.    Any other?

6         A.    Well, I am not a physician, so it is -- as

7    a prescriber, you have the relationship with the

8    patient to determine their level of pain, their

9    tolerance, any side effects, any systemic issues with

10   their kidneys and liver.

11              So it is the -- the relationship exists

12   between the prescriber and the patient to determine

13   what is appropriate for them and the amount of pain

14   that they are experiencing.

15        Q.    Under B there, you say patients are

16   increasingly aware of the benefits and risks of pain

17   medications, including opioids.

18              Do you see that?

19        A.    Yes.

20        Q.    What are you relying on for that

21   statement?

22        A.    Just general information as a pharmacist,

23   the things that you read in the media.  There is a lot

24   of information now bubbling up about opioids and the

114

1    terms that have been used between opioid crisis and

2    opioid epidemic.

3              People have -- they're increasingly aware,

4    they're extremely sensitive to these types of drugs,

5    and when they're prescribed they have lots of

6    questions, and we supply them with information.

7         Q.    Have you undertaken any formal analysis as

8    to patient awareness on the risks or benefits of

9    opioids?

10        A.    No formal analysis, no.

11        Q.    Under C there, the second sentence, you

12   say if pain is not resolved or is expected to be

13   moderate to severe intensity, evidence-based treatment

14   protocols recommend opioid/acetaminophen combination

15   products.

16             Do you see that?

17        A.    Yes.

18        Q.    And you cite to an article by Bondell.  Do

19   you see that there?

20        A.    Yes.

21        Q.    Any other articles you intend to rely on

22   for that point?

23        A.    Well, this is also where the World Health

24   Organization's analgesic ladder comes in.

1      Q.    As to cancer patients?

2      A.    Again, it -- yes, it was originally

3  created for cancer patients, but then has been amended

4  or has been widely accepted to be amended to include

5  noncancer patients.

6      Q.    What do you rely on to say it's been

7  widely accepted in that regard?

8      A.    The fact that it's been published in

9  several different countries that -- and it's part of

10  the article, the review articles that these doctors are

11  referring back to.

12      Q.    Do you consider the fact that the WHO

13  hasn't modified the analgesic ladder as being important

14  at all to that opinion?

15      A.    I just think that -- can you -- will you

16  ask that question again, please?

17      Q.    Sure.  Do you consider the fact that the

18  WHO has not modified their own analgesic ladder in the

19  way you're describing as being important or not to that

20  opinion?

21      A.    I don't think so.  I think a lot of times

22  a protocol is adopted for a particular situation, and

23  then that adoption gets expanded and applied to other

24  situations where -- and it becomes widely acceptable.

1          Q.    So is there anything else you intend to

2     rely on for the statement I just read here, that if

3     pain is not resolved or is expected to be moderate to

4     severe intensity, evidence-based treatment protocols

5     recommend opioid/acetaminophen combination products?

6          A.    Not at this time.

7          Q.    If you can go to the next page, Page 7 of

8     your report.  Are you there?

9          A.    Uh-huh.

10          Q.    Oh, okay.  You're already -- I'm looking

11     at F.  You say there as part of the prescription

12     filling process, a pharmacist often communicates with

13     prescribers regarding an opioid prescription to discuss

14     the drug, strength, dose, or frequency of utilization

15     for a specific patient.

16               Do you see that?

17          A.    Yes.

18          Q.    Do you intend to specify -- or strike

19     that.

20               Do you intend to testify specifically

21     about any interaction between anyone at Giant Eagle and

22     any specific patient in this regard?

23          A.    No.  Wait, let me ask the question again.

24     I mean, I have read testimony that says that they have

1    also done this.  So besides me doing it as a pharmacist

2    and recognizing the fact that it is part of our

3    standard practice as a pharmacist, there is testimony

4    from Giant Eagle employees that they also engage in

5    this behavior.

6         Q.    Okay.  I think my question was specific to

7    whether you intend to testify about any specific

8    interaction between a Giant Eagle pharmacist or other

9    employee and a patient in this regard.

10        A.    Not a specific employee or a specific

11   patient, no.

12        Q.    If you go to Page 8 of your report.  And

13   under G about two-thirds of the way down through G

14   where it says the DEA has left it.

15        A.    Uh-huh.

16        Q.    Do you see that sentence?

17        A.    Yes.

18        Q.    It says the DEA has left it substantially

19   to the discretion of each registrant to design and

20   operate its system to comply with the security

21   requirement, and such system must be able to disclose

22   suspicious orders when discovered, and then you cite to

23   the regulation.

24             Do you see that?

118

1      A.    Yes.

2      Q.    What is your understanding of how long a

3  registrant has to report a suspicious order after it's

4  discovered?

5      A.    So the registrant needs to report it

6  immediately after it has determined that it is

7  suspicious.

8      Q.    The -- strike that.

9            Are you aware of any substantive changes

10  to the Controlled Substances Act since 1970?

11      A.    Not that I can recall, no.

12      Q.    If you go to H on that same page, you say

13  captive self-distributors for prescription products

14  fulfill orders that will replenish shelf stock for

15  items that have already been dispensed.

16            You see that sentence?

17      A.    Yes.

18      Q.    What is your understanding of Giant

19  Eagle's policy as to when they order opioid products in

20  relationship to how much they have left on their shelf?

21      A.    Ask that question again.

22      Q.    Yeah.  What is your understanding of Giant

23  Eagle's policy as to when they order opioid products in

24  relationship to how much of that product they have left

1    on their shelf?

2          A.    Well, the way the system works, if that's

3    what you're asking me, is -- the process is that when a

4    prescription is dispensed, the inventory is

5    automatically decremented from their prescription

6    management system, and then at the end of the day all

7    of the orders are aggregated and that ends up what gets

8    ordered then from the distributor.

9          Q.    And you're talking about Giant Eagle

10   specifically?

11         A.    I'm talking about Giant Eagle

12   specifically.

13         Q.    So for example, if there are 10 bottles of

14   opioid acetaminophen combination products that they

15   have, they sell one bottle, the next day they would

16   replenish with another bottle?  Is that what you're

17   saying?

18         A.    More than likely, yes, because it's

19   done -- it's an automated process, and they

20   determine -- they can do min/max shelf quantities.

21   There are different things that they can do within the

22   inventory system to hold a certain amount of product on

23   the shelf in order to accommodate the fluctuations in

24   volume, but in general what happens is you sell a

120

```
 1    bottle, you order a bottle.
 2           Q.    And how long has that specific process
 3    been in place at Giant Eagle?
 4           A.    For years.
 5           Q.    Do you have any more specific --
 6           A.    Several years.  Decades.
 7           Q.    Decades?  Okay.
 8                 The next sentence, you say therefore
 9    artificially limiting order quantities, preventing
10    shipments, and delaying orders unnecessarily can
11    interrupt patient care and cause further harm.
12                 Do you see that?
13           A.    Yes.
14           Q.    You would agree that any necessary
15    interruption, though, would be appropriate; right?
16                 MR. BARNES:  Objection to form.  Vague.
17           A.    I'm struggling to answer that question
18    because a necessary interruption -- could it cause
19    patient harm?  If you interrupt an order, could it
20    cause patient harm?  Yes.
21    BY MR. BOGLE:
22           Q.    But would it be necessary to do so if that
23    order was suspicious?
24                 MR. BARNES:  Object to form.  Vague again.
```

121

1          A.    If the order is suspicious, one needs to

2    determine why it's suspicious and we're going to --

3    this definition of suspicious.  The -- it needs -- what

4    needs to be determined is whether or not if the product

5    is released -- anyway, if it's determined that it is

6    suspicious, then the order will be stopped.

7    BY MR. BOGLE:

8          Q.    And it necessarily should be; right?

9          A.    If it is determined to be suspicious, it

10   will be stopped.

11         Q.    And my question was a little different.

12   It should be under the Controlled Substances Act;

13   right?

14         A.    Well --

15               MS. FUMERTON:  Objection.  Form.  Calls

16   for a legal conclusion.

17         A.    If it's a suspicious order it will be

18   stopped.  I mean, one -- is it necessary to be stopped?

19   Again, as a patient responsibility what I'm going to

20   tell you is that if it's suspicious it will be stopped.

21   BY MR. BOGLE:

22         Q.    And just to address the objection and make

23   sure I understand it, are you not testifying about what

24   the Controlled Substances Act requires as it pertains

122

1    to suspicious order monitoring?  Is that not part of

2    your testimony?

3         A.    No, I'm speaking -- I am testifying to the

4    suspicious order monitoring system at Giant Eagle.

5         Q.    And whether or not that complies with the

6    Controlled Substances Act; right?

7         A.    Correct.

8         Q.    On the next page -- I'm looking at I --

9    the second sentence there says recognizing the complex

10   differences to the core organization, Giant Eagle built

11   a pharmacy infrastructure that is separate from its

12   main grocery business in order to focus on patient

13   care, prescription delivery and cost, supply chain,

14   regulatory compliance, training, and other

15   health-related business services.

16             Do you see that?

17        A.    Yes.

18        Q.    This separate infrastructure -- what are

19   you relying on to say that that separate pharmacy

20   infrastructure was created for the purpose of -- one of

21   its purposes being regulatory compliance?

22        A.    Well, based on the testimony that I read

23   and looking at the org charts that I saw, you can

24   determine that they have a separate legal

```
 1    infrastructure -- or not separate legal -- separate

 2    pharmacy infrastructure that is different from their

 3    broader business, and they created this infrastructure

 4    in order to concentrate on the areas that are

 5    different -- that are unique to pharmacy that are

 6    different from the rest of their grocery business.

 7            Q.    What documentary evidence do you intend to

 8    rely on to support that this infrastructure was created

 9    and one of its purposes for -- is for regulatory

10    compliance.  You mentioned org charts.  Anything else?

11            A.    It's what's in the testimony that I read.

12            Q.    So testimony, org charts.  Anything else?

13            A.    No.

14            Q.    Anybody's testimony in specific you're

15    relying on for that point?

16            A.    I can't recall at this time.  It was

17    mentioned several times.

18            Q.    Going down to J, the second sentence

19    there, you say because of the heightened sensitivity

20    concerning controlled substances and opioids in

21    particular, additional parameters are engaged that

22    exceed regulatory minimums.

23                  Do you see that?

24            A.    Yes.
```

1       Q.    And you're talking about Giant Eagle or

2 HBC specifically here; right?

3       A.    Yes.

4       Q.    And what specific parameters are you

5 referring to here that exceed regulatory minimums?

6       A.    There are different operating policies and

7 procedures that are not required -- they're not

8 required legally.  For example, the quantity and the

9 number of times that they do an inventory count, within

10 HBC itself they're actually doing inventory counts five

11 times a day.  They do them at the beginning of a shift;

12 they do it at break; they do it at lunch; they do it in

13 the afternoon break, and they do it before they leave.

14 That far exceeds any regulatory parameters.

15          The store level, same thing.  They do

16 controlled substance inventory counts specific around

17 opioids doing back counts, monthly narcotic orders,

18 those -- where they're actively looking at the accuracy

19 of their inventory on a much more consistent and

20 constant basis than what the law requires.

21       Q.    Any other parameters that you intend to

22 testify about other than what you mentioned here as far

23 as inventory counts?

24       A.    Those are the ones that come to mind right

1    now.

2             Well, I mean, and I can mention -- I mean,

3    as we sit here, I can mention things.  Security

4    controls with cameras and guards.  They have redundant

5    security between what belongs in the pharmacy,

6    including the box that Giant Eagle sits in.

7             So I mean, it's a repet -- I mean, it goes

8    on and on.  It's not just the inventory counts, but as

9    I sit here today, those are the two that come to mind

10   easiest.

11        Q.   And these security controls you're

12   referencing -- that's an attempt to prevent theft from

13   the distribution center or the pharmacy itself; right?

14        A.   It's both.  Theft and diversion, yes.

15        Q.   Right.  So from people, either the

16   employees or somebody coming into a pharmacy taking the

17   medications; right?

18        A.   That -- yes.

19        Q.   Stealing them?

20        A.   But it's also to ensure that operational

21   procedures are being followed.  They're not

22   specifically to look at theft.  They're to monitor the

23   entire operations and ensure that they have a closed

24   supply chain and a closed loop of distribution.

126

1          Q.    What security controls do you intend to

2     testify are specifically aimed at ensuring that

3     suspicious orders are properly flagged and blocked?

4               MR. BARNES:  Just so we're clear, are you

5     asking her other than what's in her report, or --

6               MR. BOGLE:  No, I'm asking generally.

7               MR. BARNES:  So if you need to refer to

8     your report to answer the question, feel free.

9          A.    Right.  So ask your question again.

10    BY MR. BOGLE:

11         Q.    What security controls do you intend to

12    testify are specifically aimed at ensuring that

13    suspicious orders for opioids are flagged and blocked?

14         A.    Everything that I've put in my report.

15    When you look at GE's different security and the

16    different pieces that they have in place when it comes

17    to security and the systems that they use, the

18    operational procedures they employ, the people that

19    they have hired and they employ, it all works together

20    as part of their process for suspicious order

21    monitoring.

22         Q.    Is there a specific written policy or

23    procedure that you intend to rely on to support the

24    notion that -- strike that.

127

```
 1              Is there a specific policy or procedure
 2   that you intend to rely on, written policy or procedure
 3   you intend to rely on, to support the notion that Giant
 4   Eagle or HBC exceeds regulatory minimums as it pertains
 5   to detecting suspicious opioid orders?
 6              MR. BARNES:  Objection.  Asked and
 7   answered several times now.
 8         A.    Again, I don't believe that a single
 9   policy or a single procedure can adequately describe
10   the suspicious order monitoring system that exists at
11   Giant Eagle.
12   BY MR. BOGLE:
13         Q.    Is there a set of policies or procedures
14   you're relying on in that regard?
15         A.    It is a -- it's part of the general
16   business practices as a pharmacy, as a pharmacist.
17   It's -- as I've said in my report, it's a complex
18   integrated system that involves the stores, the
19   distribution center, and the corporate office.
20         Q.    Right, and I'm focusing on a specific area
21   of that, which is -- are written policies and
22   procedures.  I'm just trying to ascertain in this
23   deposition what written policies or procedures you
24   intend to rely on to say that Giant Eagle or HBC has
```

128

```
1    exceeded regulatory minimums as it applies to

2    suspicious order monitoring for controlled substances.

3           A.    And I understand you're trying to --

4    you're asking me about specific written documentation.

5           Q.    Right.

6           A.    And I can't -- I'm not going to rely on

7    specific written documentation when I have reviewed all

8    of this information and I understand how the process

9    works.  I'm not going to rely on -- on a vast complex

10   program, to rely on a document or a set of documents.

11          Q.    Is it important to you from your

12   perspective for there to be written policies and

13   procedures documenting what should be done to detect

14   suspicious orders of controlled substances?

15          A.    So there are certain things that need to

16   be put in writing, and as systems have evolved and the

17   business acumen has evolved, things that -- policies,

18   procedures, typical pharmacy practices have more and

19   more been written down.

20                Does it all have to be in writing?  No, it

21   doesn't.  It comes from years of training, schooling,

22   expertise, and years in the industry to know that these

23   policies and procedures and the things that you follow

24   all contribute to the prevention of theft and diversion
```

1    of opioids.

2         Q.    What aspects of suspicious order

3    monitoring programs should be put in writing?

4         A.    That's up to the organization.  I'm not

5    going to make that determination of what needs to be in

6    writing or not in writing.  I'm also not an attorney.

7         Q.    Has anyone ever asked you or consulted

8    with you as to what sort of policies and procedures

9    should be put in writing for their company as it

10   pertains to suspicious order monitoring?

11        A.    No.

12        Q.    You say under K on Page 9, the first

13   sentence, Giant Eagle is and always has been compliant

14   with the Controlled Substances Act.

15             Do you see that?

16        A.    Yes.

17        Q.    First of all, you say has always been.

18   What was your review period for this case?  How far

19   back did you go to make this assessment?

20        A.    I have been relying on the testimony of

21   the other Giant Eagle employees in this particular

22   case, reading their sworn statements and testimony.

23        Q.    So -- but do you have any time parameters

24   in mind based on that?  You're saying has always been

130

 1    compliant.  Are you saying since 1970, when the

 2    Controlled Substances Act was implemented, or some

 3    other time?  I'm just trying to get a sense of what

 4    that means.

 5         A.    Right.  So I'm relying on the sworn

 6    testimony of other Giant Eagle employees that have said

 7    that they are in compliance.

 8         Q.    Did you undertake your own assessment

 9    outside of the review of their testimony on that point?

10         A.    My review would be current and existing,

11    so based on their testimony and what I understand in

12    the industry and through my experience, I have

13    determined that yes, they are currently -- they are in

14    compliance.

15         Q.    So outside of your review of the

16    deposition testimony and your general experience as a

17    pharmacist, what else are you relying on specifically

18    as to HBC to say that they have always been compliant

19    with the Controlled Substances Act?

20         A.    Well, you also have to look at the fact

21    that they've been licensed; they are licensed and

22    inspected by the DEA, they are licensed and inspected

23    by the state boards of pharmacies, and by having those

24    licenses, each of those governing boards are consenting

131

1    to the fact that they are in compliance and they can

2    continue to dispense such products and they have never

3    been -- they're not -- so they've never been cited by

4    the DEA with any type of deficiency.

5         So given the governing boards that govern

6    our practice of pharmacy and the distributors, one can

7    rely on the fact that these government agencies, the

8    licensing boards, are giving them the license to

9    continue practicing and to continue distributing in

10   every store and from the distribution centers.

11        Q.   So is it your testimony that our jury in

12   this case can rely on the fact that HBC and Giant Eagle

13   have been licensed, and that's enough for them to

14   support a conclusion that they haven't been involved in

15   any diversionary activities?

16        A.   I believe it's a combination of

17   information, but yes, licensing speaks a lot.  We are

18   licensed.  They have come in.  They have licensed the

19   facility, HBC in specifics.  They came in and they do a

20   preinspection, making sure that all the security

21   requirements are being met.  They come back in before

22   they even allow them to start distributing.  They come

23   back in again after six months.

24        These are accredited -- these are state --

132

```
 1    I don't even know the word for it, but these are

 2    licensing bodies that come in and are telling everybody

 3    that these facilities, these pharmacies, the

 4    professionals that are working in the pharmacies, are

 5    all licensed and have the credibility, the education,

 6    the authority.  They're meeting all of the licensing

 7    requirements, they're following the state laws, they

 8    can continue -- they can begin and continue

 9    distributing and dispensing these particular products.

10         Q.    Have you reviewed any audits or

11    inspections by any licensing authority as to HBC?

12         A.    Personally I have not reviewed, but based

13    on the testimony that I read, I understand that the DEA

14    has not sanctioned HBC for any reason.

15         Q.    But I just want to make sure I'm

16    understanding.  You have not reviewed any actual

17    licensing audits or inspections yourself; true?

18         A.    That is correct.

19         Q.    Have you reviewed any internal audits or

20    inspections done by ABC on itself as to its suspicious

21    order monitoring practices?

22         A.    Done by ABC?

23         Q.    I should have said HBC.  Sorry.

24         A.    Oh.  And I have not --
```

1        Q.      -- I may have said ABC.  I meant HBC.

2        A.      That's all right.  I did not -- I have not

3    reviewed any audits.  I am going strictly off of the

4    testimony that says that they have had no deficits.

5        Q.      So outside of what we've just discussed

6    here, anything else you're relying on for the

7    conclusion that Giant Eagle is and has always been

8    compliant with the Controlled Substances Act?

9        A.      For now -- that's the answer to my

10   question, or to your question for now, that those are

11   the things that I'm going to be relying on.

12       Q.      If you can go to Page 10 of your report.

13   I'm looking at Paragraph 18.  You say opioids have been

14   regarded for millennia as among the most effective

15   drugs for the treatment of pain.

16               Do you see that?

17       A.      Yes.

18       Q.      And then you cite to an article by

19   Rosenblum; right?

20       A.      Yes.

21       Q.      Any other articles or documentation you

22   intend to rely on for this point?

23       A.      No.  Other than -- and if I -- I'm going

24   to add to that.  Other than the fact, again, that these

1    are FDA-approved products.

2        Q.    So the fact that they're FDA-approved and

3    the article you've cited to here.  Anything else?

4        A.    For this particular -- no, that is what I

5    relied upon.  And my experience and my training and all

6    of the other things that we've already spoken of.

7        Q.    From a documentation perspective, though,

8    anything else?

9        A.    From a documentation perspective, that is

10   it.

11       Q.    If you can go to Page 14 of your report.

12   I'm looking at Paragraph 30 that starts on that page.

13   It says -- let's see.  One, two, three -- I think four

14   sentences in there where it says although the increase.

15            Do you see that?

16       A.    Uh-huh.

17       Q.    Is that a yes?

18       A.    Yes.  I'm sorry.

19       Q.    Although the increase in prescription drug

20   abuse is likely to be multifactorial, it is likely to

21   reflect in part changes in available drug formulations

22   and prescribing practices of opioid medication.

23            Do you see that?

24       A.    Yes.

135

1       Q.    What are you specifically relying on from

2    a documentation perspective to support that statement?

3       A.    The -- it's my general knowledge of the

4    industry being a pharmacist, my years of training.  I

5    mean, I work with this all the time.  Being in the --

6    working at the oncology clinic and really looking at

7    opioids and understanding the changes in the

8    prescriptions that are being filled -- being written,

9    being filled, and how the prescriptions are changing

10   due to the different formulations and restrictions by

11   the insurers and what they're requiring.

12       Q.    Anything from a documentation perspective

13   you're relying on for this?

14            MR. BARNES:  Object to form.  When you say

15   documentation, are you talking about her whole body of

16   knowledge and experience, or documentation in this

17   case?

18            MR. BOGLE:  Well, knowledge and experience

19   are not documents.

20            MR. BARNES:  Well they can be.  You go to

21   a professional education seminar, you read an outline.

22   BY MR. BOGLE:

23       Q.    Okay.  You got any outlines that you're

24   relying on from a seminar?

1          MR. BARNES:   That you can remember.

2          A.    I mean, not that I can remember, but

3     again, this is -- I didn't cite everything.  To me

4     things that are common knowledge or are consistent in

5     the industry, I didn't feel it necessary to completely

6     cite every statement in my report, so maybe that's an

7     error based on an author, but I didn't feel like I

8     needed to cite every statement I made in my report.

9     BY MR. BOGLE:

10         Q.    I'm not calling you out.  I just have a

11    right to ask you --

12         A.    Sure.

13         Q.    -- what you're relying on to support

14    anything that you're saying.

15         A.    And again, I have read and reviewed a

16    number of articles through all of my training.  To me

17    this is common knowledge that virtually any pharmacist

18    could tell you, any physician could tell you, that the

19    prescribing habits of opioids are changing drastically.

20         Q.    Have you seen the rate of addiction to

21    opioids being one factor in the changing of prescribing

22    practices?

23         A.    I --

24              MR. BARNES:  Object to form.  I don't --

137

```
 1    if you know what he means by addiction.
 2         A.    And again, there's a lot of discussion
 3    between addiction versus physical dependence.  What I
 4    will tell you is that everybody is concerned.
 5    Pharmacists are concerned.  Doctors are concerned.
 6    They're changing their prescribing patterns because of
 7    the concern of addiction, of physical dependence, but
 8    also because of diversion and what's happening to these
 9    products once they leave the closed distribution loop
10    and what happens to the products afterwards.
11    BY MR. BOGLE:
12         Q.    As a practicing pharmacist, do you
13    specifically have concerns about the rate of addiction
14    with opioids as being a reason that they should be
15    prescribed less?
16              MR. BARNES:  Same objection.
17         A.    And I don't -- I have not seen any
18    evidence that talks about the quantity or the number of
19    prescriptions related -- and how that can cause
20    addiction.  It's not necessarily quantified.  Yes,
21    what's quantified is the number of people that have
22    died, have moved into heroin, have done other things
23    with the illicit opioids that are on the market.
24              But in general, the information that I
```

1    have seen and the data that I have reviewed and seen

2    talks about the fact that the deaths and the opioid

3    epidemic aren't necessarily caused by prescription

4    opioids that are taken according to prescriber

5    direction.

6    BY MR. BOGLE:

7         Q.    Do you intend to testify that opioids do

8    not pose the risk of addiction?

9         A.    No.  The FDA, by classifying most opioids

10   as either a III or a II, as a controlled substance III

11   or II, have blatantly come out and said that there is a

12   risk of abuse and addiction.

13        Q.    Do you believe at all times that opioids

14   have been on the market and available for public

15   consumption, that patients should be aware that opioids

16   pose a risk of addiction?

17             MR. BARNES:  Objection.  Way beyond the

18   scope of her report.  What time period are you talking

19   about?

20             MR. BOGLE:  I think I said at all times

21   opioids have been on the market.

22             MR. BARNES:  At all times opioids have

23   been on the market.  Do you know what time period he's

24   referring to?

```
 1          A.    I don't.  What I will tell you that as a

 2    pharmacist, from 1990 until present we have had an

 3    obligation to consult with patients and to speak to

 4    them about their medication and to ensure that they're

 5    knowledgeable and aware of what the products are and

 6    what risks they pose.

 7    BY MR. BOGLE:

 8          Q.    My question was, do you believe at all

 9    times that opioids have been on the market and

10    available for public consumption, that patients should

11    be made aware that opioids pose a risk of addiction?

12               MS. FUMERTON:  Object to form.

13               MR. BARNES:  Yeah, same objection to form.

14    Also, it sounds like you're asking for a legal

15    analysis.

16               MR. BOGLE:  I'm not.

17    BY MR. BOGLE:

18          Q.    Go ahead.

19          A.    Well, and I can speak to as long as I've

20    been in practice, and the fact that the FDA has come

21    out and said that these are controlled substances and

22    by the nature of them being controlled substances they

23    have potential for abuse is the information that is

24    readily available to anybody.
```

140

1    Q.    So do you intend to testify that the

2    average patient just by way of the fact that it's a

3    controlled substance should know that it's addictive?

4         MR. BARNES:  Object to form.  Vague.  I

5    don't know what you mean by average, but --

6    A.    And I don't know if they should know.

7    There is a growing -- they will know, and they're going

8    to -- as they take it, they're going to be made aware

9    of it.

10   BY MR. BOGLE:

11   Q.    Should they know that before they become

12   addicted to them?

13        MR. BARNES:  Same objection.

14   A.    Again, it's not a matter of addiction.

15   You asked me whether or not the patient should know --

16   would they know that they're taking it, not necessarily

17   are they addicted to it.

18   BY MR. BOGLE:

19   Q.    No, I asked you whether they should know

20   that it poses a risk of addiction.

21        MR. BARNES:  Same objection.  Beyond the

22   scope of her report.

23   A.    Again, it's not my -- I'm not here to talk

24   about addiction and physical dependence.

141

BY MR. BOGLE:

1

2      Q.    If you go to Page 21 of your report.  On

3  Paragraph 53, you say Giant Eagle Pharmacy experienced

4  rapid growth beginning in 2008 and peaking in 2012

5  after new store growth slowed.

6           Do you see that?

7      A.    Yes.

8      Q.    What prompted the rapid growth beginning

9  in 2008 for Giant Eagle?

10     A.    It was -- they were building new stores.

11     Q.    What -- or if you know, what prompted the

12  need for these new stores?

13     A.    Well, it's just growth of the general

14  business, so they're growing their business, they're

15  growing the company in total.  So when you build a new

16  store typically there's a pharmacy that's going to be

17  located within that particular store.  So as they had

18  growth.  There was also an extreme amount of growth in

19  overall prescriptions within the entire industry during

20  that time period.

21     Q.    But companies grow for a reason, and I'm

22  asking you do you know why Giant Eagle Pharmacies grew

23  beginning in 2008?  I understand that they did grow.  I

24  got that from your report.  I'm asking you why.  Do you

1    know why?

2            MR. BARNES:  Asked and answered.

3        A.    Because they had more customers coming to

4    them.

5    BY MR. BOGLE:

6        Q.    Do you know if the growth was specific to

7    any drug or class of drugs?

8        A.    I know that they grew more rapidly in

9    their non-controlled substances than they did in their

10   controlled substances.

11       Q.    Based on what?  What did you look at to

12   determine that?

13       A.    When we looked at the data, and I actually

14   have some reports that speak to that.

15       Q.    Specific to Summit and Cuyahoga County?

16       A.    Specific to Summit and Cuyahoga County.

17       Q.    Can you point me to which ones show the

18   growth -- the disproportionate growth for Summit and

19   Cuyahoga County, non-controlled versus controlled?

20       A.    Well, you can look at over those years.

21   So for example -- where's the spot?  So just as an

22   example, if you look at Exhibit M.

23       Q.    Okay.

24   ████████████████████████████████████████

143



1

2

3

4

5

6

7

8          Q.    Did you run any assessment like this for

9   opioids specifically?

10         A.    I did not for opioids specifically.  This

11  is strictly on controlled substances.

12         Q.    Any other exhibits that you intend to rely

13  on here for the point specific to Summit and Cuyahoga

14  County -- there was disproportionate growth of controls

15  versus non-controls?

16         A.    Well, I mean, there's -- I've got

17  another -- there's another exhibit here on Barberton,

18  and when you look at, say, Exhibit Q, and you can see

19  Barberton in general, you can see growth in their total

20  prescriptions, whereas their non -- or their controlled

21  prescriptions actually are flat to declining.

22         Q.    Okay.  Any others?

23         A.    I mean, there are other conclusions that I

24  can draw based on these exhibits, but that's how I

144

1   rely -- that's how I got to that conclusion.  Those are

2   two examples.

3          Q.    Have you done any specific assessment for

4   any Summit or Cuyahoga County pharmacies as to the rate

5   of growth of non-controlled substances versus the rate

6   of growth for opioid sales?

7          A.    If you look at Exhibit -- I think it's I.

8          MR. BARNES:  I have it in color if you

9   want.

10         A.    Oh, that wasn't the one I was thinking of.

11  I was thinking of the ones that are specific to the

12  opioids and the at-issue drugs.

13         So specifically, yeah, if you look at

14  Exhibit J, this is a specific comparison of all of the

15  opioids -- the three opioids that appear in Giant

16  Eagle's top 100 drugs as determined by IMS, and you can

17  see -- now, this is a market share comparison, but you

18  can see their comparison, that they under-index -- when

19  you look at their non-controlled substances they

20  actually under-index in these at-issue substances.

21  BY MR. BOGLE:

22         Q.    And this is looking at Giant Eagle stores

23  across the board, right, not for any specific county or

24  city or geographic region?

1      A.    That is correct.  This is much -- this is

2  broader, yes.

3      Q.    And the top 100 prescription drugs listed

4  here -- who came up with that list?

5      A.    IMS.

6      Q.    Where'd you get the IMS data?

7      A.    This particular data came as part of the

8  discovery.  It just came up as part of the discovery.

9  IMS data what I'm used to using for evaluation of

10  market share, so this is the drug data -- or not the

11  drug.  This is the database that I'm used to using and

12  so this is the information that was brought up as part

13  of discovery.

14      Q.    So under Note 2 here in Exhibit J you list

15  four specific opioid products that were assessed;

16  right?

17      A.    It's three.

18      Q.    Yeah, I'm sorry.  I'm sorry, no, it's --

19  okay.  Am I reading this wrong?  You say HYCD/APAP.

20  That's one?

21      A.    One.

22      Q.    Oxycodone/APAP.  That's two; right?

23      A.    Correct.

24      Q.    Oxycodone/HCL.  That's three; right?

```
 1          A.    Correct.

 2          Q.    Four is APAP/CD; right?

 3          A.    Oh, you have the ol -- you don't have the

 4    amended.

 5          Q.    Oh, I do.  I'm sorry.  I'm looking at the

 6    wrong one.

 7          A.    That's okay.

 8          Q.    All right.  Let me start that over then.

 9          A.    Okay.

10          Q.    Thank you for telling me that.

11          A.    You're welcome.

12          Q.    Okay.  I stand corrected.  And in Note 3

13    you do have three drugs listed here.  Why did you

14    remove the fourth one?

15          A.    So we debated, because one, it's not -- it

16    is an opioid but it is not a drug that is at issue in

17    this particular case, so we didn't want to confuse the

18    only way -- then we would include all opioids, and then

19    you're involving some C-IIIs, some C-IVs, so we felt it

20    better to actually look at and limit the drugs that we

21    analyze to the ones that are involved in this case.

22          Q.    So you removed APAP/CD; right?

23          A.    Correct.

24          Q.    What does that stand for?
```

147

1    A. It's Tylenol with codeine.

2    Q. And what was the basis for saying that's

3 not at issue here?

4    A. It is -- it's not a C-II product, and it's

5 not part of the hydrocodone family that started as a

6 C-III and was moved to a C-II.

7    Q. So the three drugs you looked at here that

8 appear on the top 100 list -- do you know what numbers

9 they appeared on the top 100?

10    A. I don't recall.  I'd have -- you'd have to

11 look at the reliance materials.

12    Q. I didn't see that they were numerically

13 broken out.  I see them listed here and but I don't see

14 them numerically broken out as to where they fit on the

15 top 100.

16    A. Right.  They would be in the sources.

17 They would have them in the sources if you look at the

18 reliance materials and the sources themselves.

19    Q. So you're saying in the materials you

20 produced I can glean what numbers these -- meaning was

21 HYCD/APAP Number 2 on the list?

22    A. That is correct.

23    Q. I can determine that?

24    A. Off the Excel spreadsheet, yeah.

148

```
 1          Q.    Let's go back to Page 24 of your report.
 2     In Number 63, Paragraph 63, you talk about various
 3     types of training that was conducted; right?
 4          A.    Yes.
 5          Q.    Did you review any specific training
 6     materials that were provided to HBC employees?
 7          A.    I did not.
 8          Q.    Did you assess what percentage of
 9     employees actually received training related to
10     controlled substance diversion at HBC?
11          A.    I did not.
12          Q.    On Page 25 of your report -- I'll get
13     there.
14          A.    Can I ask that we go maybe 10, 15 more
15     minutes?  I'm going to need a break.
16               MR. BARNES:  Okay.  It's 12:53.
17               MR. KOBRIN:  Should we break for lunch?
18               MR. BARNES:  Yeah, let's see what --
19          A.    Before you start that question, I'm just
20     letting you know.
21               MR. BOGLE:  Yeah, I understand.  If you
22     want to break for lunch that's your prerogative.
23     That's your --
24               MR. BARNES:  Yeah, we've gone over an
```

1    hour -- well, almost an hour.  How about we break

2    around 1:00?

3            MR. BOGLE:  That's fine.  Whatever you all

4    want to do.

5    BY MR. BOGLE:

6        Q.    Okay, so I think I was at Page 25.

7        A.    Yes.

8        Q.    You make a reference in Paragraph 67.  The

9    first sentence actually says like most pharmacies with

10   self-distribution capabilities, the drug warehouse and

11   its distribution capabilities are a strategic asset and

12   advantage for the organization that improves,

13   visibility, tracking, and overall management of drug

14   inventory.  Do you see that?

15       A.    Yes.

16       Q.    What do you mean by improves visibility?

17       A.    The organization, because they are

18   purchasing product, they can see the product as it

19   enters the warehouse, as it flows through the supply

20   chain, and as it resides on the pharmacy shelf.

21       Q.    And from a visibility perspective,

22   wouldn't it also be true that they can see, for

23   example, which doctors are writing the prescriptions

24   that are being filled?

150

1          A.     Oh.

2                 MS. FUMERTON:  Objection to form.

3          A.     It's -- so I don't know whether or not

4     Giant Eagle has that capability or not.

5     BY MR. BOGLE:

6          Q.     Is that something -- it's not something

7     you looked at?

8          A.     By doctor?  No.

9          Q.     Right.  Do you know whether that's

10    something that HBC ever assessed as part of its

11    suspicious order monitoring program -- an assessment

12    of, for example, what percentages of prescriptions came

13    from specific doctors?

14         A.     I don't know that HBC specifically would

15    have seen those things, no.  It may have been reports

16    or part of investigations that were conducted through

17    the stores, the PDLs, and the home office.

18         Q.     Did you see any sort of investigations or

19    reports like that, though, at any level?

20         A.     There was -- there were some testimony and

21    some exhibits to the fact that they did look at certain

22    prescribers, yes.

23         Q.     Was there any sort of specified report

24    that was run at any regular interval along those lines?

1        A.    Based on prescribers and based on the

2    testimony that I read I don't know that there was any

3    concentration itself on regular reports based on

4    prescribers.

5              MR. BARNES:  If this is a good break

6    point -- you seem to be pausing -- we don't need to

7    wait two more minutes to 1:00, but --

8              MR. BOGLE:  That's fine.  I don't care.

9    That's fine.

10             THE VIDEOGRAPHER:  Okay.  We are going off

11   the record at 12:56 PM.

12             [A recess was taken.]

13             THE VIDEOGRAPHER:  We are back on the

14   record at 2:01 PM.

15   BY MR. BOGLE:

16        Q.    Okay.  I want to go back to something I

17   unfortunately skipped over when I was going through

18   this.  If we could go back to your amended report, and

19   specifically want to look at the materials considered

20   list, which is Exhibit C.  And I want to go to the last

21   page of that list.

22             On that page you've got a list of 16

23   internal production documents.  Do you see that?

24        A.    Yes.

152

```
1          Q.    Did you specifically select those
2    documents?
3          A.    Yes, I believe so.
4          Q.    How did you select them?
5          A.    I used them in -- I mean, by reading the
6    testimony and going through the depositions.  I used
7    that -- I found them that way.
8          Q.    So you pulled these documents from
9    deposition exhibits?
10         A.    Yes.
11         Q.    All 16 of them?
12         A.    I believe so.
13         Q.    Is there a reason why you only pulled
14   these 16 exhibits from the depositions and not other
15   exhibits?
16         A.    What other exhibits?
17         Q.    Is it your understanding that there are
18   only 16 exhibits used in all the depositions you
19   reviewed?
20         A.    Oh, no.  I just used those because those
21   were the ones that I used to help form my opinions.
22         Q.    So these are the 16 documents from the
23   depositions that you've relied on to form your
24   opinions?  Am I understanding you right?
```

```
 1        A.    Well, I used all of them -- I used all the

 2   testimony, all the documents.  They all helped me form

 3   my opinion.  But these are the ones that I used for a

 4   specific purpose.

 5        Q.    What purpose was that?

 6        A.    To further document my citations.

 7        Q.    Okay.  I guess I'm just still a little

 8   confused as to why these 16 were selected above the

 9   other deposition exhibits.  Can you help explain that

10   for me?

11        A.    Just what I felt needed to be highlighted

12   because I used them specifically in my report.

13        Q.    So would it be fair to say you viewed

14   these as the 16 most important documents -- internal

15   documents to your opinions?

16        A.    No, they're just the ones that I happened

17   to use that I felt like I needed to highlight so I

18   could cite and document.

19        Q.    So you're saying all of these are actual

20   cited in the report itself?

21        A.    I don't know if all of them are.  I mean,

22   it was just a way for -- right or wrong, it was a way

23   for me as I wrote my report, those were the ones that I

24   felt like I needed to include.
```

1          MR. BARNES:  Do you want to show her any

2    of these document to refresh her memory?

3          MR. BOGLE:  I'm just asking.  I don't

4    think --

5          A.   And I'm trying to give you a good answer.

6    BY MR. BOGLE:

7          Q.   Okay.  Were any documents -- internal

8    documents provided to you by counsel that were not

9    specifically requested by you?

10          A.   I mean, they gave me -- I didn't

11    request -- I guess I don't understand your question.  I

12    didn't really -- they provided me documents, yes,

13    and -- but -- and these documents were contained in

14    those documents.  I don't understand your question.

15          Q.    In the documents that were provided to you

16    by counsel?

17          A.   Yes.

18          Q.   Let's go back to Page 27 of your report.

19    You say in Paragraph 74 the volume of HCPs distributed

20    by HBC/GERx generally track below quotas set by the

21    DEA, and you say see Exhibit G; right?

22          A.   Yes.

23          Q.   Then you say the data shows that

24    distribution of hydrocodone combination products from

155

1    HBC was below the expected amount on an MME basis

2    between 2012 and 2017 when indexed to the DEA quota for

3    hydrocodone products starting in 2010.

4              Do you see that?

5         A.   Yes.

6         Q.   What was the process you used here to

7    determine the expected amount of HCPs that HBC should

8    be distributing over this time frame?

9         A.   Well, the report doesn't have anything to

10   do with an expected amount.  It is strictly a

11   comparison between the DEA quotas and what was actually

12   shipped.

13        Q.   Well, you say this was below the expected

14   amount on an MME basis.  Do you see that?

15        A.   I understand.  So to clarify my answer,

16   the idea in this particular exhibit is to show that the

17   DEA -- even though the DEA was increasing quotas, an

18   expectation would be for HBC to also increase their

19   shipments.

20             The DEA is increasing the quotas in

21   response to an increase in prescriptions in the

22   marketplace, so an expected outcome would be for HBC

23   then in turn to have an increase in shipments of HCPs

24   to coincide with the quota, but in reality what we

1    actually found was that HBC had a reduction in the HCP

2    shipments.

3          Q.    Would you expect there to be an increase

4    in all Giant Eagle Pharmacies based on increases in DEA

5    quotas?

6          A.    It's really looking at an average overall,

7    that if the DEA nationwide is -- if the DEA nationwide

8    is raising their quotas as a result of an increase in

9    prescriptions and an increase in demand for the

10   product, that a reasonable expectation is that in

11   general every pharmacy could also have that same type

12   of increase.

13              So it's very much a generalization when

14   you talk about what could be expected.  In general you

15   would expect if the DEA says there's a higher demand

16   for product and there's more prescriptions, then in

17   general the pharmacies are going to rise at that same

18   rate, which is why the DEA increased their quota to

19   begin with, but what we actually found with Giant Eagle

20   is that the amount of HCP shipments declined.

21         Q.    The DEA quotas are done on a nationwide

22   basis; right?

23         A.    That is correct.

24         Q.    So you've compared the nationwide

1    increases to the HCP distribution just in Cuyahoga and

2    Summit Counties; right?

3          A.    Correct.  But the distribution in those --

4    the number of prescriptions involved in Cuyahoga and

5    Summit Counties is included in the DEA's quotas.

6          Q.    Well, so is every other county in the

7    country; right?

8          A.    Sure.

9          Q.    And so what basis do you have to say that

10   the Summit and Cuyahoga County prescriptions

11   necessarily should increase at the same level as a

12   national quota?

13         A.    I didn't.  I made a generalization that

14   said one could expect that nationwide if the DEA says

15   look, we're increasing the quota overall nationwide

16   because in general the amount of prescriptions is

17   increasing and it's increasing overall nationwide -- so

18   if you were at parity -- if you're a pharmacy and

19   you're at parity, you would expect then that if the DEA

20   is saying that nationwide the number of prescriptions

21   is going up, that you as a pharmacy chain would also

22   have your prescriptions go up as well, but what we

23   actually found when we looked at the data is that Giant

24   Eagle's prescriptions went down be -- and therefore the

1   shipments out of HBC went down as well.

2       Q.   Why was this indexed to MME?

3       A.   That's the way the data was -- because

4   that's how the FDA does it.  They do it based off of an

5   MME basis because it's done through API or active

6   pharmaceutical ingredient.

7       Q.   Is this one of the exhibits, Exhibit G,

8   that AGI created?

9       A.   They designed this particular chart, yes,

10   on my direction.

11       Q.   Do you understand that DEA quotas are

12   meant to indicate how much should actually be

13   distributed of a specific product?

14       A.   DEA quotas are actually for manufacturers.

15   They're not meant for distributors; they're meant for

16   manufacturers.  But DEA quotas, the rise of quotas, is

17   in response to an increase in the demand for these

18   particular products.  And the amount of API that the

19   DEA allows to be distributed to manufacturers or given

20   to manufacturers for their manufacturing capabilities

21   is in response to the demand by patients.

22       Q.   But DEA quotas are not specific to any

23   specific distributor as far as how much the DEA saying

24   distributor HBC, this is how much we think you should

1    be able to legitimately distribute as far as a specific

2    product; right?

3          A.    That is correct.  The DEA determines how

4    much API should be given to the manufacturers and to

5    research facilities.

6          Q.    And further down on Page 27, Paragraph 76,

7    the second sentence you say the ratio of controlled

8    substance prescriptions to total prescriptions

9    dispensed for all Giant Eagle Pharmacies in Summit and

10   Cuyahoga Counties during the relevant time period was

11   less than 10 percent, and then you cite to Exhibit H.

12          You see that?

13          A.    Yes.

14          Q.    Do you have the complete list of

15   controlled substances that went into this calculation?

16          A.    It is in the Excel spreadsheet.  Let me

17   think.  I believe that particular spreadsheet -- I'd

18   have to go back and look, but I believe Giant Eagle

19   actually named the controlled substances -- not named,

20   but indicated which were controls and non-controls.

21          Q.    In the source data you provided?

22          A.    In the source data.

23          Q.    Did you crosscheck the controlled

24   substance list from the source data against any list

1    you might have?

2         A.    No, I did not.

3         Q.    On Page 28 of your report -- I'm looking

4    at the last sentence on Paragraph 79.  You say during

5    the relevant time period, the share of prescriptions

6    for controlled substances dispensed by Giant Eagle

7    Pharmacies declined steadily, indicating that the

8    pharmacies were exercising effective controls to

9    prevent diversion of prescription opioids.

10             Do you see that?

11        A.    Yes.

12        Q.    What's the relevant time period you're

13   talking about here?

14        A.    From 2009 through 2018.

15        Q.    Did you run any specific assessment for

16   opioids along these lines?

17        A.    So the -- what do you -- for all opioids,

18   or the at-issue?  I mean, you can see from the exhibits

19   which analyses were done and which drugs were

20   contained.

21        Q.    Yeah, I'm asking for 2009 to 2018, did you

22   look at -- did you assess whether the opioid

23   dispensation by Giant Eagle Pharmacies declined

24   steadily?

1          A.     And I'd have to recall.  I think most of

2    it was done -- other than that one report that I did

3    with at-issue drugs, most of the other ones are based

4    off of controls in general, or specific only to

5    hydrocodone.

6          Q.     So over this time frame of 2009 to 2018,

7    do you know whether HCP sales at Giant Eagle Pharmacies

8    steadily declined?

9          A.     Can you ask that question again?

10         Q.     Sure.  Over the time frame you've listed

11   here, 2009 to 2018, do you know whether HCP sales at

12   Giant Eagle Pharmacies steadily declined?

13         A.     I don't think I know specific to HCP, no.

14   For the -- give me just a second.

15              No, not specific to HCP.

16         Q.     What are you relying on specifically to

17   conclude that the decline of controlled substances

18   sales over this time period or dispensation over this

19   time period necessarily means effective controls

20   against diversion for being exercised?

21         A.     Well, because the pharmacies were growing,

22   they were not filling -- as the growth of the pharmacy

23   occurred or as the total prescriptions occurred, the

24   amount of controlled substances were going down,

1    therefore indicating a couple of different things.

2              One is that they weren't just

3    inadvertently filling controlled substances.  Their

4    controls were in place; they were following their

5    controlled substance manual, so they were only filling

6    prescriptions by legitimate prescribers.  They weren't

7    targeting or being attracted by drug-seekers because

8    that type of patient wasn't the kind of patient that

9    was seeking Giant Eagle or using Giant Eagle to fill

10   their prescriptions.

11       Q.    Which you're basing those conclusions just

12   based on the fact that the numbers went down; right?

13   Is there any other data you're considering to reach

14   that conclusion?

15       A.    Well, I mean, all of the review.  When you

16   think of all of the testimony that has been given in

17   this case, when you think about the controls, my review

18   of that testimony in comparison to my experience and

19   the industry standards as I know them, continuing

20   education and other industry-type meetings -- I mean,

21   it's a whole wealth of information that I take into

22   account when I draw these conclusions.

23       Q.    But a decline in controlled substances

24   sales by itself does not necessarily mean that

163

```
 1    effective controls against diversion are being

 2    exercised, does it?

 3         A.    It means that some of them are, yes,

 4    because they're not -- one, you don't have the

 5    drug-seekers.  It will go through -- if people know

 6    that you're willy-nilly filling prescriptions and

 7    you're not scrutinizing prescriptions, that information

 8    will get out and people will come pouring in.

 9         Q.    So you're saying -- but -- so you're

10    saying that you can look just at the decline in

11    controlled substance sales and necessarily conclude

12    that effective controls against diversions related

13    specifically to opioids exist?

14         A.    Yes, I can make that conclusion.

15         Q.    And you're basing that on the fact that

16    you think that drug seekers would know if it was easy

17    to get opioids from these pharmacies and the numbers

18    would go up?

19              MR. BARNES:  Objection.  That misstates

20    her former testimony.

21         A.    And like I've said before, it's a

22    combination of products.  The reason -- or a

23    combination of information.  The reason that it's going

24    down is because they are following effective controls
```

164

1   and therefore the amount of prescriptions are not going

2   up.

3   BY MR. BOGLE:

4        Q.   So in your mind, is it inconceivable for

5   there to be any reason why controlled substances sales

6   would go down in a situation where effective controls

7   do not exist?

8        A.   I don't understand your question.

9        Q.   Can you conceive of any situation where

10  controlled substances sales would go down in a

11  situation where effective controls do not exist?

12            MR. BARNES:  Objection.  Calls for

13  speculation.

14       A.   Yeah, I mean, I could dream something up,

15  but I'm not here to -- I mean, that's not something I'm

16  here to think about.  I didn't actually think about it.

17  BY MR. BOGLE:

18       Q.   And you also did not look at whether the

19  opioid prescriptions actually declined during this time

20  period either; right?

21       A.   I did not specifically look at opioids,

22  no, in totality.

23       Q.   Or HCP specifically; right?

24       A.   Correct.

165

1     Q.    We can go to Page 34 of your report.

2     A.    I'm sorry.  34?

3     Q.    34.  Yes, ma'am.

4           You say -- it's a carryover paragraph,

5     Paragraph 96.  You say however, a pharmacist may at any

6     time exercise their professional judgment and refuse to

7     fill a prescription that appears fraudulent, outside

8     the scope of practice, or not in accordance with

9     standard treatment guidelines.

10          Do you see that?

11    A.    Yes.

12    Q.    Did you assess in this case whether any

13    Giant Eagle pharmacist refused to fill any opioid

14    prescriptions in Summit or Cuyahoga County?

15    A.    I did read about that in the depositions,

16    yes.

17    Q.    Which deposition?

18    A.    I'm not going to -- I can't recall whose

19    deposition it was, but I know it was -- there were a

20    couple of them, and I can't recall the gentleman's

21    name.

22    Q.    So outside of reading depositions, did you

23    do any analysis of your own on this issue?

24    A.    Well, my analysis overall is I know that

```
 1    it happens.  It's happened -- I mean, I'm a practicing

 2    pharmacist of over 25 years, so I know that it occurs;

 3    I know that it happens.  I didn't necessarily need to

 4    do an analysis.  It's part of the daily

 5    responsibilities of a pharmacist to scrutinize every

 6    controlled substance prescription, and they're given

 7    the authority then to refuse to fill it if need be.

 8         Q.    No, I understand that.  I'm just asking

 9    whether you specifically analyzed whether any Giant

10    Eagle pharmacies in Summit or Cuyahoga refused to fill

11    opioid prescriptions.

12         A.    My analysis came from the materials that I

13    read.

14         Q.    The depositions?

15         A.    The depositions that said that they had

16    the authority to do so and in fact exercised that

17    judgment.

18         Q.    Are you aware of any specific numbers as

19    to how many times that occurred from 2009 to 2018?

20         A.    No, I am not.  I believe the statement on

21    the record says frequently or many or it happens.

22         Q.    If we can go to Page 42 of your report.

23               [Discussion off the record.]

24               MR. BARNES:  What paragraph are you going
```

1   to?

2              MR.  BOGLE:   123.

3   BY MR. BOGLE:

4       Q.    If you look on Paragraph 123, the third

5   sentence says Giant Eagle is highly focused on

6   preventing theft and diversion by in many cases

7   exceeding expectations related to federal and state

8   guidelines.

9              Do you see that?

10      A.    Yes.

11      Q.    When it comes to suspicious order

12  monitoring for controlled substances, would this go

13  back to your testimony earlier about you relying on

14  inventory counts and security controls to support this

15  statement?

16             MR.  BARNES:   Objection.  Misstates her

17  prior testimony, but --

18      A.    So I'm confused by your question.  Can

19  you --

20  BY MR. BOGLE:

21      Q.    Sure.  I'll reask -- I'll ask it a

22  different way.

23      A.    Okay.

24      Q.    What are you specifically from a document

168

```
 1   perspective relying on to say that Giant Eagle is
 2   highly focused on preventing theft and diversion by in
 3   many cases exceeding expectations related to federal
 4   and state guidelines?  What documents are you going to
 5   rely on for that?
 6        A.   So the -- I'm relying on, gosh, all of the
 7   documents that I've read.  And I mean, there's a number
 8   of documents where they are talking about the different
 9   things that they did to exceed expectations.  Just like
10   I have prior talked about with the inventory counts,
11   with the security controls.  I mean, there are a number
12   of different areas where that occurred specific to
13   Giant Eagle.
14        Q.   Okay.  So what else?  You've talked about
15   inventory counts and security controls.  I mean, this
16   is pretty central to the case.  I'd like to know what
17   else you're going to come in and say.
18        A.   Well, all of their controls.  Some of them
19   are in accordance with state guidelines and some of
20   them exceed those state guidelines.
21        Q.   What controls specific to preventing
22   diversion of controlled substances are you referring
23   to?
24        A.   All of them.
```

169

```
 1          Q.    You say all of them.  What -- can you give
 2    me some sort of explanation of what that means?
 3          A.    Well, all of Giant Eagle's controls when
 4    it comes to -- I mean, they write a controlled
 5    substance manual for the pharmacist.  That was not
 6    required by state law.  There are a number of different
 7    things that Giant Eagle did both at the store level
 8    within their warehouses using automation for picking of
 9    their products within the warehouse.  Exercising the
10    different security controls with guards and breaks and
11    counts.
12                I mean, there's a number of different
13    things.  As I sit here today I can't give you an
14    exhaustive list.
15          Q.    The CSA manual that you referenced -- when
16    was that first created?
17          A.    Oh, I don't remember.  The -- you mean the
18    controlled substance manual that Giant Eagle authored?
19          Q.    Yeah.
20          A.    At this time I can't recall.
21          Q.    The automation you mentioned -- is that at
22    the distribution center level?  Is that what you're
23    talking about?
24          A.    Yes.
```

1      Q.   When did that begin -- automation for

2  their drugs?

3      A.   I don't have their dates.  I don't have

4  the dates memorized.

5      Q.   Let's go to Page 44 of your report.

6  You've got some bullet points on this page referring to

7  physical security controls.  Do you see those?

8      A.   I do.

9        MR. BARNES:  Those begin on Page 43, by

10  the way.

11        MR. BOGLE:  Okay.

12        MR. BARNES:  Just -- he's looking at a

13  one-page --

14  BY MR. BOGLE:

15      Q.   You see there the next-to-last bullet

16  point says order specialists to monitor store orders

17  for accuracy and appropriateness and any deviations

18  from typical ordering patterns?

19        Do you see that?

20      A.   I do.

21      Q.   When did that process go into effect?

22      A.   I'm not sure.  I don't know that the dates

23  were specified in the deposition.

24      Q.   Are you aware of what procedure that these

171

1    order specialists would follow to determine if orders

2    were accurate and appropriate?

3         A.    So order specialists are -- they refer to

4    a number of different people.  Again, this information

5    came from this deposition, from Mr. Durr's deposition,

6    who is keenly aware of the different controls,

7    policies, and procedures that they have in place at the

8    distribution center.

9         Q.    Okay.  I'm just asking if you know.  I'm

10   asking if you know what procedure was followed by the

11   order specialists?

12        A.    Well, the order specialists are -- I

13   believe -- at some point in time he refers to them as

14   pickers, so these order specialists are limited.

15   There's only a few of them, and they are aware of the

16   general picking practices for each and every store,

17   that they would readily recognize and be able to see if

18   a store was requesting a quantity outside what was

19   normal for their particular stores.

20        Q.    Are you aware of any specific written

21   procedure these order specialists follow to do their

22   job?

23        A.    I'm not aware of anything written, no.

24        Q.    Are you aware of any specific training

1    these people would have undertaken to do their job?

2        A.    Well, I mean, their training and their --

3    would be documented in their job descriptions.  So when

4    you look at their job descriptions, when you look --

5    that will include the different training, the different

6    education, how they were taught to do their job, is

7    specific to what they are doing and the things that --

8    and how it plays into the prevention of theft and

9    diversion.

10        Q.    Did you look at any of the job

11    descriptions for order specialists?

12        A.    No, I didn't need to, because I understand

13    what that role is and essentially what they do.

14        Q.    Do you have a sense then as to what

15    specific training they received?

16        A.    Well, they've -- they're part of the job

17    that allows them to be a picker, and as they pick with

18    time they understand what the patterns and the

19    frequency and the quantities are for standard orders

20    for standard stores.

21        Q.    Do you know what a new picker -- what they

22    would be trained on before they would start doing their

23    job?

24        A.    They would be trained according to Giant

173

1    Eagle's -- whatever their training protocol is.

2         Q.    And what is that?  Have you seen that?

3         A.    I have not specifically seen their

4    training protocol, no.

5         Q.    You reference Giant Eagle's controlled

6    substance dispensing guidelines.  Do you recall

7    discussing that in your report?

8         A.    Yes.

9         Q.    When did those first go into use?

10        A.    I don't know.  I can't recall.

11        Q.    Do you know who they were distributed

12   to -- what class of employees?

13        A.    I believe it was distributed to the

14   stores.

15        Q.    To the pharmacies?

16        A.    I believe so.

17        Q.    Have you reviewed those guidelines?

18        A.    I have not reviewed the guidelines, no,

19   but based on my experience and based on the information

20   that I have read, it's a guideline that helps the

21   pharmacists and pharmacy technicians develop red flags

22   and to be able to detect certain prescriptions that

23   potentially could be illegitimate.

24        Q.    And you're basing that on what people in

1  depositions have said about the guidelines?  Is that

2  true?

3  　　　　A.　　It's what's said about the guidelines and

4  what -- an assumption that I'm making of what's in

5  those guidelines, because they're standard pharmacy

6  practice guidelines that most pharmacists are going to

7  follow, and Giant Eagle chose to ensure that they were

8  more specific about the guidelines that they wanted

9  their pharmacists and their pharmacy technicians to

10  follow concerning controlled substances.

11  　　　　Q.　　Go to Page 46 of your report, please, on

12  Paragraph 130.  The second sentence, you say if issues

13  are detected or questions raised the order will be

14  suspended until management finds a resolution.

15  　　　　　　　Do you see that?

16  　　　　A.　　Correct.

17  　　　　Q.　　Did you assess whether HBC suspended any

18  opioid orders for Summit or Cuyahoga County pharmacies

19  at any point in time?

20  　　　　A.　　For Summit and Cuyahoga?

21  　　　　Q.　　Right.

22  　　　　A.　　I know that there were some that were

23  suspended.  As far as I know they weren't in those two

24  counties.

1     Q.    Have you seen any written guidelines for

2   warehouse employees to follow to determine whether they

3   should suspend a controlled substance order?

4     A.    There is some information in the

5   depositions that talks about the different triggers and

6   the different guidelines for when to suspend an order,

7   so yes, there is information in the testimony.

8     Q.    Have you actually read the guidelines

9   themselves, or just the testimony talking about the

10  guidelines?

11    A.    I've read most of the exhibits that refer

12  to -- as best as I can recall that refer to those

13  guidelines throughout the years.  There have been --

14  there's multiple exhibits in different depositions and

15  at different periods of time.

16    Q.    Just so I understand, you're saying if

17  they were marked as an exhibit to a deposition in your

18  reliance materials you would have reviewed it?

19    A.    Yeah, for the most part I reviewed all of

20  them, yes.

21    Q.    And you have a specific recollection of

22  reviewing these warehouse guidelines in one of the

23  exhibits to the deposition?

24    A.    I have specific recollection of reviewing

1    how orders -- yes, how orders would be reviewed and

2    suspended.

3         Q.    Do you have a recollection of how that

4    process worked under the guidelines?

5         A.    Well, it's based on certain triggers of --

6    Giant Eagle today -- the trigger that they're currently

7    using at the warehouse is based off of an electronic

8    system.  Prior to that you would have orders that would

9    be suspended.  The order specialist may find an error

10   based off of unusual-sized frequency or pattern in

11   which they would hold an order until they could get a

12   hold of somebody that would further clarify and then

13   they would either fix the order or they would let it go

14   through based on the information they would get after

15   that.

16        Q.    Have you reviewed any specific algorithm

17   that's been used to flag suspicious orders?

18        A.    I've reviewed several of them.

19        Q.    For HBC specifically?

20        A.    Well, we've looked at all of McCann's

21   methodologies and how those have applied, and then I

22   also have a general understanding of the thresholds

23   that Giant Eagle uses.

24        Q.    When did Giant Eagle start utilizing

177

1   thresholds for suspicious order monitoring?

2          A.    I believe the date was -- I can't

3   remember.  I'd have to look it up.  And what I'm

4   referring to, just to be clear, is their electronic

5   system of thresholds; right?  That's what you asked me

6   for?  I'm sorry.

7          Q.    I did, yeah.

8          A.    Yeah.

9          Q.    Was there a manual threshold system at

10  some time before that?

11         A.    I don't -- no, there wasn't a manual.

12  They've had -- they have had different reports that

13  have been running for years, and those reports have

14  evolved in order to flag and define different

15  thresholds.  There isn't a single threshold system that

16  can be deployed that effectively -- that can

17  effectively identify a true suspicious order.  So using

18  a threshold-type system is -- it's one of the tools

19  that Giant Eagle employs, and they've been using a

20  threshold system for several years, and it has evolved

21  as their technology has evolved.

22         Q.    So if you go to Page 49 of your report.

23  In Paragraph 141 you reference a monthly threshold

24  system starting in 2013.

1          A.     There you go.

2          Q.     Is that what you're referring to?

3          A.     Yeah.  Told you I had to look it up.

4          Q.     So that's what you're referring to when

5     you talk about the automated thresholds; right?

6          A.     These are the automated reporting.

7          Q.     Right.  So beginning in 2013, when an

8     order was flagged using this system, would that order

9     be blocked?

10         A.     This one in 2013, the order itself, it was

11    only flagged for needing further investigation.  It

12    doesn't mean that the order was actually suspicious; it

13    just is a trigger that is flipped so that somebody can

14    do further investigation.

15         Q.     Right.  So while that investigation was

16    ongoing using the system -- starting with the one in

17    2013 that -- this monthly system that you're talking

18    about here -- first of all, what sort of employee would

19    be tasked to do that investigation?

20         A.     Well, the employee -- the employee that

21    was tasked sort of -- the information would be brought

22    to the attention of the pharmacy district leader, which

23    by the way I believe in most cases is also a

24    pharmacist, and they're the ones that are the

1    operational supervisor for the store level.

2         Q.    Do you know if the pharmacy district

3    leader covering Summit and Cuyahoga Counties was a

4    pharmacist?

5         A.    Yes.

6         Q.    And who was that?

7         A.    I've read so many reports.  I cannot

8    recall his name.

9         Q.    So while that investigation was ongoing by

10   the pharmacy district leader, what would happen to the

11   order using -- under the 2013 system?

12        A.    Well, in 2013, again, it was a flag, but

13   in 2013, that order would continue to go through.

14   However, because Giant Eagle is a captive

15   self-distributor, at any time if they had a concern

16   about an order they could certainly stop it and/or

17   quarantine the product.

18        Q.    Did you assess whether that was actually

19   done in any situation, where an order was flagged under

20   the system from 2013, it went on through, and it was

21   pulled back later, quarantined or stopped?

22        A.    I believe there was an order or two.  I

23   may have my time frames -- but I believe there were a

24   couple of orders.  However, it was not -- it may even

180

```
 1    have been outside these two counties, but there are --

 2    these are some of the questions that I asked as I was

 3    looking at their controls.

 4         Q.   So are you aware of any orders under this

 5    monthly ordering threshold system in 2013 from Summit

 6    and Cuyahoga Counties that you can cite to or you

 7    intend to cite to that were held or stopped after they

 8    were flagged?

 9         A.   I don't intend to call anything out as a

10    specific example in the 2013 time frame.

11         Q.   In the -- you reference in Paragraph 141

12    the threshold system advanced to daily thresholds based

13    on independent store dynamics, but that part you don't

14    have a date.  Do you know when that occurred?

15         A.   I believe that was after they opened GERx

16    because that was the advancement in technology.

17         Q.   Do you intend to testify that the

18    technology employed by GERx was not available in 2013?

19         A.   It wasn't available to Giant Eagle, no.

20         Q.   How do you know that?

21         A.   Because it was under development.

22         Q.   Have you assessed whether similar

23    technological systems were already being used by other

24    distributors in 2013?
```

1        A.     No, I have not.

2        Q.     You can go to Page 50 of your report.  In

3   Paragraph 144, a few sentences from the bottom, there's

4   a sentence that says furthermore, such threshold-based.

5        A.     Uh-huh.

6        Q.     Do you see that sentence?

7        A.     Yes.

8        Q.     You say furthermore, such threshold-based

9   methods are neither an effective nor a rational means

10  to detect diversion of controlled substances for

11  shipments between divisions of the same company.

12             Do you see that?

13       A.     Yes.

14       Q.     So do you intend to testify that the

15  thresholds are not effective method to detect

16  suspicious orders?

17       A.     Yes, thre -- so threshold meth --

18  thresholds and establishing a threshold system is only

19  a tool.  It cannot be used in isolation to determine

20  whether an order is suspicious or not.

21       Q.     But once an order is flagged using a

22  threshold, what you should go next is doing due

23  diligence to confirm or refute whether it's actually

24  suspicious; true?

182

1          A.     Again, the threshold is a tool and how you

2    design the tool.  Every threshold system that you use

3    has fatal flaws, and you need to understand those

4    flaws, and by understanding those flaws based on the

5    nature of your business you can determine then whether

6    or not an order that is flagged needs further

7    investigation or not.

8          Q.     So it's your opinion then that just

9    because an order is flagged it doesn't necessarily

10   require further due diligence?

11         A.     I'm not saying it doesn't require further

12   due diligence.  What I'm saying is somebody makes --

13   needs to then make a determination whether or not it

14   requires further due diligence.

15         Q.     So it needs to be looked at at the very

16   least; right?

17         A.     That is correct.

18         Q.     What are the fatal flaws with HBC's

19   threshold system that they employed in 2013?

20         A.     Oh.  Well, the threshold system that they

21   had in 2013 -- it flagged orders.  It was an average --

22   they used an average.  They used a nation -- not

23   nationwide, but their company average, and it was

24   aggregated through the entire month.

1                   So what you got is as you were reaching

2       your threshold potentially -- as you were reaching your

3       threshold you didn't hit those thresholds ever until

4       the end of the month, so it was more of a look back and

5       be able to see stores that were constantly -- or not

6       constantly, but if they were exceeding certain

7       thresholds, that somebody could keep an eye on them.

8            Q.    We can go to Page 64 of your report.  You

9       say in the bullet point there starting with despite

10      implementing -- do you see that?

11           A.    Uh-huh.

12           Q.    It says despite implementing a threshold

13      system to monitor for suspicious orders there was no

14      change in the number of suspicious orders validating

15      that existing policies and procedures were sufficient

16      to prevent theft and diversion.

17                 Do you see that?

18           A.    Yes.

19           Q.    You agree this conclusion assumes that the

20      threshold system that was implemented was adequate;

21      right?

22           A.    No, what I'm assuming what is adequate and

23      even more than adequate are Giant Eagle's policies,

24      procedures, and controls regarding theft and diversion,

184

1    and that the threshold system was -- it was a redundant

2    tool that they added because that seemed to be where

3    the industry going -- where the industry was going and

4    what the expectations were in the industry, and all it

5    proved is that Giant Eagle had sufficient controls to

6    prevent theft and diversion.

7         Q.    But in order for the threshold system to

8    prove that, you would have to assume that it in and of

9    itself was an adequate system; right?  Otherwise it

10   can't validate anything.

11        A.    Right, and -- well, but based on -- but

12   even as technology advanced and their systems became

13   more sophisticated, nothing changed.  They didn't

14   identify even -- they didn't identify more.  So yes,

15   they may have used a rudimentary threshold system in

16   2013 that was the best thing available to them at the

17   time, but even as technology advanced and they took

18   advantage of more advanced software and more

19   complicated algorithms, the outcome was the same, which

20   is that no suspi -- or limited suspicious orders, very

21   little suspicious orders were identified, and therefore

22   you can conclude and I have concluded that their

23   controls are sufficient.

24        Q.    I didn't see an analysis in your report as

185

1   to the number of suspicious orders flagged over time

2   using these different systems.  Have you conducted such

3   an analysis?

4        A.   Based on all of the information that I

5   have read, there haven't been any.  There's been a

6   couple and they have been outside these two counties.

7        Q.   Have you independently verified that

8   outside of review of the depositions?

9        A.   I haven't needed to do that because --

10        Q.   I'm just asking if you have.

11        A.   I have not.  I have not because I didn't

12   feel like I needed to.  There are people that -- within

13   the organization that have validated all of this

14   information.

15        Q.   But you didn't undertake any assessment of

16   that on your own outside of reviewing the transcripts;

17   right?

18        A.   I didn't feel like I needed to.

19        Q.   So that's a no; right?

20        A.   I didn't feel like I needed to.

21        Q.   I'm just asking if you did or you didn't.

22        A.   I didn't feel like I needed to.

23        MR. BARNES:  Okay.

24   BY MR. BOGLE:

186

1        Q.    But you didn't; right?

2             MR. BARNES:  Objection.  Asked and

3  answered.  Let's move on.

4             MR. BOGLE:  She hasn't come close to

5  answering the question and you know that.

6             MR. BARNES:  Let's move on.

7  BY MR. BOGLE:

8        Q.    You didn't do it, did you?

9        A.    I didn't have to.

10       Q.    You didn't feel like you had to?

11       A.    I didn't have to.

12            MR. BARNES:  This is five times now.

13  Let's move on.

14  BY MR. BOGLE:

15       Q.    On the last bullet point here on Page 64

16  you say in the second sentence the DEA believes that

17  Giant Eagle provides effective controls and procedures

18  by inspecting their stores and distribution center

19  regularly and issuing licenses to operate.

20          You see that?

21       A.    Yes.

22       Q.    Do you intend to testify on behalf of the

23  DEA as to what they specifically believe?

24       A.    No.

187

1       Q.    And you say a similar thing about the

2  state board of pharmacy for Ohio and other state boards

3  of pharmacy.  I mean, do you intend to come and testify

4  that you know what individuals at these regulatory

5  bodies think?

6       A.    What I'm testifying to is the fact that

7  these regulatory bodies are issuing licenses to

8  operate.  Before they can issue those licenses to

9  operate, they have rules and regulations that need to

10 be followed that need to be proven to be followed, and

11 these regulatory agencies, they do unannounced audits

12 and visits and checks to continually make sure that

13 Giant Eagle is in compliance with rules and

14 regulations.  If Giant Eagle was outside compliance or

15 had failures in their controls, they no longer would

16 issue these licenses.

17      Q.    So outside of the granting of the

18 licenses, do you intend to testify as to what any

19 people in these regulatory bodies think or what the

20 regulatory bodies think of them collectively?

21           MR. BARNES:  Asked and answered, but go

22 ahead.

23      A.    Again, I don't work for these regulatory

24 bodies, but the fact that they are issuing these

188

1    licenses means that they believe that effective

2    controls would take place -- effective controls were in

3    place or they wouldn't continue to give them licenses

4    to operate.

5    BY MR. BOGLE:

6         Q.    Are you basing that on any discussion with

7    anybody at these regulatory bodies?

8         A.    No.

9         Q.    Are you basing that on anything outside of

10   the fact that they have continued to license them?

11        A.    I mean, when you look and you understand

12   what the licenses mean and you understand that they

13   audit and they check and they go through and inspect

14   what they expect, one can draw a logical conclusion

15   that they approve their policies, procedures, and

16   controls.

17        Q.    I'm just asking if you're relying on

18   anything outside of the fact that they've continued to

19   license them to support the opinion you're offering in

20   this bullet point.

21        A.    Yeah, they --

22        Q.    It's a simple question.

23        A.    Right, but they license and they inspect

24   them.  It's a simple answer.

189

1          Q.     Have you reviewed any of the inspections?

2          A.     I have not personally reviewed the

3     inspections.  I have reviewed the testimony of the

4     people that have reviewed the inspections.

5          Q.     So you've talked about licensing and

6     inspections.  Anything else you're relying on for this

7     conclusion about these people's internal beliefs?

8          A.     With regard to the DEA and the state

9     board --

10               MR. BARNES:  Object to the form of the

11    question.  Sorry.

12         A.     With regard to the DEA and the state

13    board?  Is that -- what's your question?

14    BY MR. BOGLE:

15         Q.     Uh-huh.  Yeah.

16         A.     What's your question?

17         Q.     You mentioned inspections and licensing.

18    Is there anything else that you intend to rely on to

19    support the conclusion in this bullet point as to the

20    beliefs of these state or federal regulatory bodies?

21         A.     Just those two points, that they license

22    and they inspect them.

23         Q.     Thank you.

24               If you can go to Page 58 of your report.

190

```
 1    You see there's a footnote there at the bottom of the

 2    page that says my review of Dr. McCann's -- of

 3    extensive reliance materials is ongoing and I may

 4    supplement my opinions as a result.

 5              Do you see that?

 6         A.   Yes.

 7         Q.   Have you at this point completed your

 8    review of Dr. McCann's reliance materials?

 9         A.   For the particular conclusions that I have

10    drawn, yes.

11         Q.   Is there anything else in his reliance

12    materials that you think you need to see to draw any

13    additional conclusions?

14         A.   Not at this time, no.

15         Q.   On Page 59, Paragraph 159, the second

16    sentence, you say although as of today I have not been

17    able to evaluate the basis for the thresholds Dr.

18    McCann uses in his maximum daily dosage units approach,

19    I note that the results of this approach are absurd.

20              Do you see that?

21         A.   Yes.

22         Q.   Have you been able to evaluate the basis

23    for those thresholds as of today?

24         A.   No, I have not.
```

1          Q.    Are you actively trying to do so?

2          A.    Not at this time.

3          Q.    If we go to Page 52 of your report.  I'm

4     on Paragraph 147.  The third sentence you say yet

5     another fatal flaw that spans his transactions analyses

6     is that Dr. McCann is using unproven, nonstandard,

7     unprincipled methodologies that are void of research

8     and application of widely-accepted professional

9     principles.

10              Do you see that?

11         A.    Yes.

12         Q.    Is that a sentence that you drafted or one

13    that came initially from AGI?

14         A.    Well, I mean, it's information that was

15    part of our discussions.  I mean, we talked about each

16    one of these.  So did they transcribe my language?

17    Possibly, yes.

18         Q.    And what is your basis to say that his

19    transactions analyses are unproven, nonstandard,

20    unprincipled methodologies?  What are you relying on to

21    support that?

22         A.    Well, one, so he doesn't cite anything.

23    He doesn't cite why he chose those methodologies.  The

24    methodologies aren't proven.  There is no proof in the

192

```
 1    industry.  There is no industry standard.  Everybody is

 2    still playing with threshold and threshold systems and

 3    how best to identify and flag.

 4              So they're not proven.  They're not

 5    standard.  He doesn't describe any principals that he

 6    follows with regard to these methodologies and he

 7    doesn't point out any of his own flaws.  He just says

 8    here it is.

 9         Q.    What sort of transaction analysis would

10    you conduct to do the review that he did?

11         A.    And as I've stated earlier, a

12    threshold-type system has flaws.  It doesn't matter

13    which one you pick.  You're going to have flaws.

14    The --

15         Q.    So even using a non-threshold-based

16    analysis, how would you do it?

17         A.    I don't --

18         Q.    To do the kind of analysis he did as far

19    as the number of suspicious orders?

20              MR. BARNES:  Objection.  Outside the scope

21    of the report.  She provides criticisms of Dr. McCann's

22    approaches.  She's not here to tell him how he should

23    have done his job.

24              MR. BOGLE:  Well, she can say that.
```

1          A.    Right.  So I'm not here to tell Dr. McCann

2     how to do his report, and I'm not -- yeah, I'm not here

3     to do that.  What I can tell you is the methodologies

4     that he chose have flaws.

5     BY MR. BOGLE:

6          Q.    Okay, so my question is if you were doing

7     this sort of analysis, what methodology would you

8     choose?

9          A.    But I'm not here to provide that analysis.

10    That's beyond the scope of what I was asked to do.

11         Q.    Do you think you're qualified to do that?

12         A.    To come up with a methodology?

13         Q.    Correct.

14         A.    It's not something I would engage in, no.

15         Q.    And if we can look at -- further down on

16    Page 52.  The last two sentences say -- on Paragraph

17    147.  I'm sorry.

18              Finally, in all five of Dr. McCann's

19    approaches, Dr. McCann flags all transactions

20    subsequent to the first flagged transaction.  This

21    means that he automatically impugns all subsequent

22    transactions without an analysis of the fundamental

23    properties of the transaction -- transactions, thereby

24    abandoning whatever modicum of professional principle

194

1    might have supported his approach.

2              Do you see that?

3        A.    I do.

4        Q.    Did this language here come from AGI?

5        A.    Oh, no.  It was mine.

6        Q.    And then let me ask you.  As far as this

7    specific component that you're criticizing, what

8    methodology or principles are you relying on to say

9    that subsequent transactions should not be flagged if a

10   suspicious order is not investigated?

11       A.    So understanding that when a pharmacy

12   places an order, it's for replenishment of a product,

13   and you cannot then say that every order from that

14   point forward should be considered suspicious, because

15   they're placing orders based on prescriptions that have

16   been filled, that have been filled and have gone out

17   the door.

18              So to take an analysis threshold, what

19   have you, and say just because this very first order

20   needs to be flagged and everything after that should be

21   flagged as well is absurd.

22       Q.    What process would you undertake if a

23   suspicious order was flagged but not investigated as to

24   the subsequent orders?

```
1              MR. BARNES:  Same --

2     BY MR. BOGLE:

3         Q.   That same product.

4              MR. BARNES:  Same objection as prior.

5     Outside the scope of her report.

6         A.   Exactly.  I'm not here to determine the

7     best way to do it.  I was here and I was asked to

8     determine whether or not Giant Eagle was in compliance.

9     BY MR. BOGLE:

10        Q.   But I'm just talking about a specific

11    component of what you're talking about in your report,

12    and I'm asking if you -- strike that.

13             What process would you undertake or would

14    you think is a reasonable process to undertake to

15    assess whether subsequent orders are suspicious of the

16    same product if a prior order has been flagged and not

17    investigated?

18             MR. BARNES:  Objection.  Same objection --

19    BY MR. BOGLE:

20        Q.   If you don't know, that's fine.

21        A.   It's not that I don't know or I don't have

22    or cannot form opinions.  What I'm saying in my report

23    is that the way Dr. McCann approached it is

24    inappropriate.
```

1        Q.    Any order that is flagged by a threshold

2    system as suspicious should be investigated; right?

3        A.    No.

4        Q.    No?

5        A.    Which we've already talked about before.

6    Just because a threshold system may highlight an order

7    that somebody needs to look at doesn't -- the threshold

8    system is not saying this order is suspicious.  A

9    threshold system only flags an order for somebody to

10   look at.

11       Q.    How do you distinguish between looking at

12   an order and investigating an order?  I guess I'm not

13   following the distinction.

14       A.    Well, to me an investigation is something

15   that is more formalized.  When you look at an order and

16   you understand the flaws of the tool that you're using

17   and you understand the normal pattern, frequency, and

18   order size of the store in which that order belongs to,

19   somebody makes a decision whether or not that order can

20   continue.  The threshold system is only a tool.

21       Q.    So if a order is flagged using a threshold

22   system, what should a person do in looking at that

23   order to determine whether it's suspicious or not?

24       A.    So that particular person would look at

1    the -- like I said, would look at the information, just

2    like what Giant Eagle said.  They look at the

3    information, they understand their stores -- they know

4    their customers, they understand their stores, and they

5    make the determination whether or not that is a false

6    positive.

7           Q.    Well, what specifically would you look at?

8           A.    Just like the DEA has given guidance.

9    You're looking at the unusual size, frequency, and

10   pattern for that particular product for that store.

11          Q.    But how would you make that assessment?

12          A.    Through knowledge and experience and

13   knowing your customer.  The DEA says you have to know

14   your customer, and Giant Eagle knows their customers

15   better than most because they're their pharmacies.

16   They're owned by their own company.

17          Q.    Have you seen any written investigations

18   done by anyone at HBC or Giant Eagle as to flagged

19   suspicious opioid orders?

20          A.    I recall testimony that investigations

21   have been done, but I just -- I recall written

22   testimony that the process has worked and

23   investigations have been completed.

24          Q.    But have you reviewed any of the written

 1    investigations that have been done, if they've been

 2    done at all?

 3          A.    Well, I know that there have been

 4    investigations done because it's in the sworn

 5    testimony, and so insofar as they provided the

 6    information in the sworn testimony, that would have

 7    been what I reviewed.

 8          Q.    So did you go back behind that then and

 9    look at the actual investigation that was conducted to

10    assess whether you thought it was an appropriate

11    investigation?

12                MR. BARNES:  You mean in addition to the

13    depositions?

14                MR. BOGLE:  Yeah.

15                MR. BARNES:  Like the exhibits?

16    BY MR. BOGLE:

17          Q.    Did you look at anything to say -- did you

18    look at any specific investigation to say I think this

19    is a good investigation or a bad investigation as to a

20    specific order?

21          A.    No, my job was to evaluate their controls,

22    not to follow up on whether or not there was an

23    investigation or not.  I needed to look at their

24    controls, their policies and their procedures, and to

199

1   assess whether or not they were in compliance with the

2   Controlled Substances Act.  That's what I was tasked

3   with.

4          Q.   Well, isn't part of the process of having

5   controls doing investigations on orders that may be

6   suspicious?

7          A.   That would be part of their controls, yes,

8   but it doesn't mean that I necessarily had to go in and

9   look specifically at an investigation.  I just had to

10  make sure that their controls were in place and that

11  they were in compliance.

12         Q.   But you made that compliance determination

13  without looking at what they actually did to

14  investigate; right?

15              MR. BARNES:  Objection.  That misstates

16  her testimony.

17  BY MR. BOGLE:

18         Q.   If it misstates it, let me know.

19         A.   I made the compliance -- the opinion based

20  on their compliance, based on the stated testimony of

21  the Giant Eagle employees.

22         Q.   If you can go to Page 62 of your report.

23  And I'm on Paragraph 164 where you say plaintiffs

24  identified 30 HBC orders that they claim are

200

1    suspicious.  I understand from counsel for HBC that

2    Giant Eagle determined that none of these orders were

3    suspicious based on a thorough investigation of the

4    associated prescriptions.  My review of these orders,

5    including the size and frequency of other orders during

6    the relevant periods, did not identify a suspicious

7    pattern.

8              Do you see that?

9        A.    I do.

10        Q.    Walk me through the process that you went

11   through here to determine that these orders were not

12   suspicious.

13        A.    Well, all of these orders came out of the

14   Barberton store, so we did a full analysis of the

15   Barberton store on my direction so that I could go in

16   and look.  So although I didn't necessarily look at

17   these 30 orders, I did a full analysis on the Barberton

18   store to understand their ordering, frequency,

19   quantity, and pattern.

20        Q.    And what did you look at in that regard?

21        A.    The -- I looked at the orders shipped from

22   HBC to the Barberton store, as well as the number of

23   controlled prescriptions filled by the Barberton store.

24        Q.    Did you run any calculations as far as

1  percentages, controlled versus non-controlled or opioid

2  versus non-controlled?

3      A.    We looked at -- I created the three

4  exhibits specific to Barberton that would look at

5  quantity -- oh, and the Barberton -- that stuff is in

6  the other -- my other exhibit.

7          So yes, if we you look at where we

8  specifically call -- give me just a second.  So

9  specifically from -- on Exhibit H, if you look at the

10  time period from November 9th to May of 2018, the

11  Barberton store -- their controlled prescriptions

12  versus total prescriptions were 13.9 percent.

13      Q.    And how long did it take you, by the way,

14  to do your investigation of these 30 orders?

15      A.    Again, I --

16      Q.    How much time did you spend?

17      A.    And again, like I said, I didn't

18  personally review all of those 30 orders.  I reviewed

19  all of the shipments.  So I didn't look at those 30

20  orders in Barberton.  I reviewed all of the shipments

21  from HBC to Barberton.

22      Q.    How long did that process take you?

23      A.    Well, it was a matter of crunching the

24  data.  I asked Giant Eagle for the data.  They provided

1    the data.  I had the assistance of the Analysis Group

2    to crunch the data.

3          Q.    That we see in Exhibit H?

4          A.    That you see in -- well, you see in

5    Exhibit H, but then specifically to the Barberton store

6    you see in O, P, and Q.

7          Q.    So beyond having the AGI folks crunch

8    these numbers, is there anything else that you did to

9    look at this store?

10         A.    To get to what conclusion?  My conclusion

11   is that there's nothing --

12         Q.    The conclusions in here?

13         A.    Yeah, my conclusion is that there was

14   nothing suspicious as defined by the Controlled

15   Substances Act that happened at the Barberton store.

16         Q.    Right.  I'm asking what you specifically

17   looked at to reach that conclusion.  You've told me

18   that AGI ran some numbers for you.  I'm asking if

19   anything else was done by you.

20         A.    I crunched -- we just looked at the data

21   to determine whether or not there were orders of

22   unusual size, frequency, or pattern.

23         Q.    Do you know how much time AGI spent

24   creating the numbers specifically for Barberton?

1          A.     I don't.

2          Q.     Did you review the numbers with them to

3     assist you in reaching your conclusions as to

4     Barberton?

5          A.     Well, I asked for the numbers.  These are

6     the things that I wanted to see as my -- because of my

7     analysis on this store because it was showing up in all

8     of -- in a lot of the depositions.

9          Q.     Yeah, I'm just asking if you reviewed the

10    numbers with them --

11         A.     Yeah.

12         Q.      -- to assist you in reaching your

13    conclusions.

14         A.     Yes, I did.

15         Q.     You reference in Paragraph 165 that

16    Barberton pharmacy is across the street from Akron's

17    Children Hospital and within one mile of Summa Health

18    System Barberton campus.

19              Do you see that?

20         A.     I do.

21         Q.     Did you specifically assess how many of

22    the orders for the numbers that were crunched came from

23    either of those two facilities?

24         A.     Well, HBC doesn't send orders based on

204

```
 1    prescriptions.  I don't -- I guess I don't understand

 2    your question.

 3         Q.    Right, but Giant Eagle, when they fill a

 4    prescription, they know what doctor it comes from;

 5    right?

 6         A.    Yes.

 7         Q.    That's all in the prescription; right?

 8         A.    Yes.

 9         Q.    So I'm asking you did you utilize any of

10    Giant Eagle's data to determine how many prescriptions

11    that fall within the data that you crunched came from

12    doctors at either of these two facilities?

13         A.    No, I didn't -- no, I didn't.

14         Q.    Do you have any present plans to attend

15    trial in October in this case?

16         A.    I guess that's up to counsel.

17         Q.    I'm going to ask -- I'm just asking if you

18    personally made any plans.

19         A.    Not at this time, no.

20         Q.    Do you know when the trial is set for?

21         A.    No.

22               MR. BOGLE:  Let's take five minutes.  I

23    want to look at my notes real quick.  I may be done.

24               THE VIDEOGRAPHER:  We are going off the
```

1    record at 3:10 PM.

2                   [A brief recess was taken.]

3                   THE VIDEOGRAPHER:  We are back on the

4    record at 3:30 PM.

5                   MR. BOGLE:  Thank you for your time.  I

6    have no further questions at this point.  Okay?

7                          EXAMINATION

8    BY MR. BARNES:

9         Q.    Good afternoon, Ms. Kinsey.

10                  You were asked a lot of questions today

11   about various aspects of your report, various

12   footnotes, various exhibits, et cetera, and documents

13   and things you may have relied upon.

14                  I just want to ask you generally with

15   respect to the -- all of the opinions that you're

16   providing as stated in your report, what are they

17   generally based upon.

18                  MR. BOGLE:  Object to form.

19        A.    So my entire report is based off of my

20   over 25 years of experience, 30 years of experience in

21   pharmacy, 25 practicing as a pharmacist, my years as an

22   executive in different companies all related to health

23   care and pharmaceuticals, continuing education,

24   training, conferences where I meet with colleagues,

206

```
1    conversations with manufacturers learning and teaching

2    me about the industry, as well as specifically for

3    Giant Eagle the things that I read in this report.  All

4    of the testimony, testimony from former DEA agents,

5    testimony from Giant Eagle employees.  So it's an

6    abundance of information and training, experience, and

7    materials.

8    BY MR. BARNES:

9         Q.    You were asked a lot of questions about

10   Exhibit B to your report, which is your chronology of

11   your litigation support engagements going back to 2016.

12        A.    Yes.

13        Q.    Do you recall those questions?

14        A.    Yes.

15        Q.    Now, have you been approved as an expert

16   witness in multiple cases?

17        A.    Yes, I --

18              MR. BOGLE:  Object to form.

19        A.    Yes, I have.

20   BY MR. BARNES:

21        Q.    Have you been disapproved or excluded as

22   an expert witness because you weren't qualified?

23              MR. BOGLE:  Object to form.

24        A.    No.
```

207

1   BY MR. BARNES:

2        Q.    The consulting engagements that counsel

3   discussed with you -- he was asked -- he asked

4   questions about who you represented in that case or who

5   you were an expert for.  Do you remember those

6   questions?

7        A.    Yes.

8        Q.    Did you -- have you been an expert

9   testifying against pharmaceutical companies?

10       A.    Yes.

11       Q.    How many times?

12       A.    In all of these cases.  I have worked for

13  a pharmaceutical company.  I shouldn't say all, but

14  all -- there's a couple of them that I haven't.  But in

15  the majority of my case I have testified -- I have been

16  an expert witness for a pharmaceutical company in a

17  case that is against another pharmaceutical company.

18       Q.    I see.

19             Exhibit C to your report is a list of

20  materials reviewed or considered.  Did you intend this

21  to be the only documents that you rely upon to form

22  your opinions, or is it some other -- what is this

23  listing?

24       A.    Exhibit C is not exhaustive.  Exhibit C

1    is -- it's a list of documents that I used to form my

2    opinions that I cited as part of my opinions, but I

3    reviewed much more information that is on here, not to

4    mention the information that comes from all of my

5    training and conferences that I have attended.

6                So that list is not an exhaustive list of

7    everything that I depended upon to form my opinions.

8    It's just a limited amount of documents that I used to

9    cite and to draw some major points of my conclusions.

10               Q.   With respect to the concept of theft and

11   diversion which is touched upon in your report at

12   multiple points, have you had industry experience and

13   pharmacy experience -- as a pharmacist and as an

14   executive in the industry have you dealt with theft and

15   diversion throughout all of that experience?

16               MR. BOGLE:  Object to form.

17               A.   Yes, I have dealt with theft and diversion

18   since pharmacy school.

19   BY MR. BARNES:

20               Q.   And do you feel that your education,

21   training, and experience is sufficient for the opinions

22   that you have advanced in this case?

23               MR. BOGLE:  Object to form.

24               A.   Absolutely.

1    BY MR. BARNES:

2           Q.     And does that include your conclusions in

3    this case that Giant Eagle and its warehouse HBC and

4    GERx complied with the Controlled Substances Act,

5    including the security requirement which requires

6    effective controls against theft and diversion?

7           A.     That is correct.

8           Q.     You at one point in questioning by

9    counsel -- you've testified several times about AGI's

10   role in this case, and I just want the record to be

11   clear.  The opinions that you're advancing -- are they

12   your opinions or are they opinions suggested by AGI in

13   any way?

14                 MR. BOGLE:  Object to form.

15          A.     I wrote the report.  This is my report.

16   They're my opinions.  I wrote the report.  AGI was only

17   there to crunch the data at my direction to make sure

18   that I could further substantiate and illustrate some

19   of my opinions and to provide actual numbers to the

20   opinions that I was drawing.

21   BY MR. BARNES:

22          Q.     You at one point indicated that AGI

23   provided the substantiation for your opinions.  What

24   did you mean by that?

1       A.    Well, they did the data-crunching for me

2  so that I could be more specific in giving my opinion

3  so that I had numbers that could back up the general

4  opinions that I was drawing and concluding from my

5  analysis of Giant Eagle's operations.

6       Q.    Did you feel -- sitting here today, do you

7  feel like you were not given any information or

8  documents or testimony that you needed to form your

9  opinions?

10            MR. BOGLE:  Object to form.

11       A.    I was given plenty of information that

12  educated me about the case that helped me derive my

13  opinions, so I believe I was given everything that I

14  needed, and there wasn't anything that I needed to see

15  further.

16  BY MR. BARNES:

17       Q.    You were asked a lot of questions about

18  your compensation.  You remember that?

19       A.    I do.

20       Q.    Do you derive some of your compensation

21  from working actively as a pharmacist?

22       A.    I do.

23       Q.    Do you derive other compensation outside

24  of consulting -- or legal -- from consulting

211

1    engagements that are listed in your report or

2    otherwise?

3         A.    I do.

4         Q.    There was some testimony about this ratio,

5    I'll call it, of controlled substances versus

6    non-controlled substances.  Do you recall that

7    testimony?

8         A.    Yes.

9         Q.    And in fact, your report contained some

10   exhibits that you went through that analyzed HBC's --

11   I'll call it the controlled substance ratio.  What is

12   the significance of that ratio, and is it something

13   that you came up with?

14              MR. BOGLE:  Object to form.

15        A.    So there has been DEA testimony in this

16   case that the DEA has come out and said that a normal

17   or an average ratio for controlled prescriptions to

18   non -- to total prescriptions is about an 80-20 mix, so

19   about 20 percent would be considered average or normal.

20              So I wanted to make sure that where Giant

21   Eagle was in that particular ratio, where the DEA agent

22   talks about whether or not there's a red flag, and what

23   I found is that Giant Eagle is well below where the DEA

24   would place any flag as far as the number of controlled

212

1    prescriptions being dispensed by the organization.

2    BY MR. BARNES:

3         Q.    And is that why you asked AGI to help you

4    crunch data, to make that analysis?

5              MR. BOGLE:  Object to form.

6         A.    That is correct, because I wanted to see

7    the information and in fact see it by store within some

8    in Cuyahoga County.

9    BY MR. BARNES:

10        Q.    And using the DEA's own 80-20 test, you

11   said that HBC never approached the 20 percent amount

12   that the DEA said you should look at?

13             MR. BOGLE:  Object to form.

14        A.    That is correct.  Based on the exhibit --

15   I would have to go back, but I believe it's about 9.8

16   percent.  So as an organization, where the DEA said

17   they wouldn't even consider a red flag until it was

18   around -- until it was over 20-ish percent, Giant Eagle

19   is well below that.

20   BY MR. BARNES:

21        Q.    For the time period at issue?

22        A.    For the time period at issue from November

23   2009 to 2018 in the Summit and Cuyahoga Counties.

24        Q.    What exhibit are you looking at?

213

```
 1            A.    I'm sorry.  I'm looking at Exhibit H.

 2            Q.    You found it faster than I did.  And these

 3      are for so -- specific stores, all of the stores in

 4      Summit and Cuyahoga Counties?

 5            A.    That is correct.

 6            Q.    From November of 2009 to May of 2018?

 7            A.    That is correct.

 8            Q.    And is that time period related to when

 9      HBC and/or GERx distributed controlled substances?

10            A.    Yes.

11            Q.    And overall it's about less than half of

12      what the DEA said would be a problematic ratio?

13                  MR. BOGLE:  Object to form.

14            A.    Yes.

15      BY MR. BARNES:

16            Q.    There were a few exhibits in your report

17      that were not gone over, and I would like to draw your

18      attention, for example, to Exhibit D as in dog.

19      What -- can you tell us what that exhibit shows?

20      ████████████████████████████████████████

21      ███████████████████████████████████████████████

22      ███████████████████████████████████████

23      ██████████████████████████████████████████

24      ███████████████████████████████████████
```

214

6          Q.    Why did you want to know that?

7          A.    Because it's tiny.  It's minuscule.  So

8    when you think of the entire market that is involved in

9    Summit and Cuyahoga Counties, the amount of MMEs that

10   HBC is responsible for is minuscule.

11         Q.    Is that also shown in Exhibit E?  The

12   other way.

13         A.    Yes.  Then when you break it out, both

14   Exhibit E and Exhibit F, you can see the same thing.

15   It's broken out per capita and broken out into the

16   individual counties, so you can actually see the flow

17   of shipments -- you can actually see the market share

18   per capita in E and F, and then down in the lower

19   right-hand corner you can see the minuscule amount that

20   is actually distributed by HBC and GERx, including the

21   time frame from 2014 to 2016 where they distributed

22   zero.

23         Q.    And why was that?  Why did they distribute

24   zero in that time frame?

215

1       A.    Because they closed the HBC facility and

2  then opened GERx, and so it was during that time frame

3  that you're not going to see any shipments based from

4  Giant Eagle organization.

5       Q.    Thank you.  You were asked some questions

6  about the DEA, and there was something in your report

7  about their overly ambiguous guidance.  Do you recall

8  that testimony?

9       A.    It was -- yes, I do.  With regards to the

10  Controlled Substances Act and the direction that they

11  were given or lack of specifics that they were

12  providing as it relates to the suspicious order

13  monitoring system.

14       Q.    As part of your testimony and your

15  report -- is it based upon your experience in that time

16  frame -- and by time frame I'm talking about roughly

17  2000 to 2009.  Were you practicing in the industry or

18  practicing as a pharmacist during that period of time?

19       A.    Yes, I was.

20       Q.    And were you familiar with industry's

21  attempts to get guidance from the DEA?

22            MR. BOGLE:  Object to form.

23       A.    That is correct, yes.

24  BY MR. BARNES:

1          Q.    And are you familiar with whether or not

2     the DEA would provide such guidance?

3               MR. BOGLE:  Object to form.

4          A.    The DEA would talk around the subject but

5     would never necessarily put in specifics.  They would

6     never endorse a specific system or a specific

7     methodology.

8     BY MR. BARNES:

9          Q.    And so was industry required to just come

10    up with whatever they thought was appropriate?

11              MR. BOGLE:  Object to form.

12         A.    Industry was directed to design and

13    develop a system that is unique and specific to their

14    business, so something that Giant Eagle would develop

15    should look and would look completely different than

16    something that CVS would develop because they're

17    different organizations, they're a captive

18    self-distributor.  They have different businesses,

19    different areas of operation.

20              And so the DEA being overly ambiguous

21    required these organizations to cater and to uniquely

22    design something specific for their business.

23    BY MR. BARNES:

24         Q.    In that same testimony you were asked if

217

1    companies were in a better position to determine what

2    systems they were going to use.  Do you recall that

3    testimony?

4         A.    I do.  The most important thing here --

5    because the other thing the DEA came out and said is --

6    they actually termed something called know your

7    customer.  In fact, there are experts that talk about

8    knowing your customers being extremely important in

9    your suspicious order monitoring program, and the

10   unique advantage that Giant Eagle has is they know

11   their customer because their customer is their own

12   organization.

13              Their stores are following all of Giant

14   Eagle's controls.  They are Giant Eagle's employees.

15   So having this captive self-distribution and this

16   closed loop of supply chain makes them unique in being

17   able to design a program that is specific to their

18   business.

19        Q.    But in terms of who's in a better position

20   to design systems -- are you familiar with the ARCOS

21   database?

22        A.    I am familiar with ARCOS.

23        Q.    And who maintains and manages that

24   database?

218

1          A.     Well, the DEA does.

2          Q.     And what are the inputs into that

3   database, based upon your experience?

4          A.     Well, the DEA gets to see the -- the

5   interesting part is Giant Eagle can see the flow of

6   merchandise that is specific to Giant Eagle.  The DEA

7   can see the flow of merchandise nationwide that

8   every -- so the only thing Giant Eagle can see is what

9   is within Giant Eagle's control.

10               The DEA can see everything.  So through

11  the ARCOS database they get to see every shipment to

12  through wholesaler from every manufacturer.  It's a

13  huge database that the DEA can look and examine and see

14  what is actually going on nationwide, or it can be

15  completely narrowed down to a specific pharmacy.

16         Q.     So in terms of access to data to analyze

17  what's going on in the country regarding controlled

18  substances as between the DEA and manufacturers or

19  distributors or pharmacies, who has the better

20  information?

21               MR. BOGLE:  Object to form.

22         A.     Well, the DEA's information is more

23  comprehensive.  They have entirely more information and

24  it is extremely more comprehensive for them to be in a

219

1    better position to see the actual flow if they want to

2    see what's happening nationwide.

3    BY MR. BARNES:

4        Q.    And would that include specific product

5    flow, or say opioid flows to specific pharmacies

6    anywhere in the country?

7        A.    Yes.

8        Q.    And who was responsible for enforcing the

9    Controlled Substances Act?

10             MR. BOGLE:  Object to form.

11   BY MR. BARNES:

12       Q.    And who has the enforcement powers of

13   arrest and criminal investigations and civil

14   enforcement, things of that nature?

15             MR. BOGLE:  I'll just object as it exceeds

16   the scope of the report and my exam.

17       A.    The DEA.

18   BY MR. BARNES:

19       Q.    There were some questioning concerning --

20   I think the number was 99 percent of the prescriptions

21   written in the country being legitimate, if I -- I was

22   writing as fast as I could while you were testifying.

23             Do you recall that testimony?

24       A.    I do.

220

1          Q.    Is that something that you made up, or is

2     that coming from somebody with knowledge?

3               MR. BOGLE:  Object to form.

4          A.    It actually came from multiple people I

5     believe I cited in two different places, and the number

6     that's been thrown around or has been testified to is

7     between 99.9 percent and 99.5 percent.

8               I believe I pulled it out of Prevoznik's

9     report, but it was said by multiple people, and it

10    indicates -- and what the conclusion that is being

11    drawn from the documents is that there's a very, very

12    small fraction of prescribers and prescriptions that

13    are being written for illegitimate reasons.

14    BY MR. BARNES:

15         Q.    I'm going to show you what was marked as

16    Rannazzisi Exhibit 8.

17         A.    Does this have to be marked?

18         Q.    I want to direct your attention to Page 76

19    and specifically down near the bottom, the last piece

20    of testimony of Mr. Rannazzisi, who I believe was the

21    head of the DEA diversion division when he gave this

22    testimony in 2014.  If he it wasn't actively at the

23    time, he had very recently been.

24               Do you recognize him, for example, as the

1   author of the dear registrant letters from 2007 -- 2006

2   and 2007?

3          A.    I do yes.

4                MR. BOGLE:  Object to form.

5   BY MR. BARNES:

6          Q.    Would you read into the record Mr.

7   Rannazzisi's two sentences here in his Congressional

8   testimony on April 29th of 2014?

9          A.    Mr. Rannazzisi says, quote, I think that

10  if you were talking about 99.5 percent of the

11  prescribers, no, they are not overprescribing, but our

12  focus is in rogue pain clinics and rogue doctors who

13  are overprescribing.  Actually, they are prescribing

14  illegally.  They are not overprescribing.  They are

15  illegally prescribing.

16         Q.    So does that comport with your 25 years'

17  experience in the industry and more particularly your

18  experience as a pharmacist, that the vast majority,

19  upwards of 99.5 percent of doctors, were legitimately

20  prescribing opioids for legitimate patients with

21  legitimate needs?

22                MR. BOGLE:  Object to form.

23         A.    Yes, that is correct.  It is consistent

24  with my practice as a pharmacist, as an executive, and

1   my 25 years in the industry.

2   BY MR. BARNES:

3        Q.    There was also -- and I think you also

4   cited to this.  I want to direct your attention to the

5   DEA witness Prevoznik, Exhibit 15.  And this was used

6   in the Prevoznik deposition on Page 32.  Mr. Patterson,

7   who was the acting administrator of the DEA, May 8th of

8   2018, in testimony before Congress.  Would you read in

9   the last two sentences of his testimony at the top of

10  Page 32?

11       A.    Mr. Patterson says, quote, I look at the

12  vast majority of doctors.  99.99 percent are all trying

13  to do right by their patients, so I think the key is to

14  again keep working on it -- educational process.

15       Q.    Again, is that consistent with your

16  industry experience, including as a practicing

17  pharmacist for the last two-and-a-half decades?

18            MR. BOGLE:  Object to form.

19       A.    Yes, it is consistent with my practice and

20  my experience.

21  BY MR. BARNES:

22       Q.    And would you expect DEA officials who

23  have access to the ARCOS database and who have vast law

24  enforcement powers across the entire country would know

 1    these statistics and not be speaking of these

 2    statistics without having an adequate basis for them?

 3              MR. BOGLE:  Object to form.

 4        A.    Yes.

 5    BY MR. BARNES:

 6        Q.    Have you ever turned down an engagement

 7    asked of you because you couldn't provide the opinion

 8    that was being requested?

 9        A.    Yes.

10        Q.    You were asked a bunch of questions about

11    opioids being an effective pain management drug.  Do

12    you recall that?

13        A.    Yes.

14        Q.    Have you actually -- and you testified

15    generally about the FDA and NDAs and ANDAs and -- et

16    cetera.  Have you actually seen this in practice as a

17    pharmacist?

18              MR. BOGLE:  Object to form.

19    BY MR. BARNES:

20        Q.    Opioids being an effective pain management

21    tool for doctors?

22        A.    Yes.

23              MR. BOGLE:  Object to form.

24    BY MR. BARNES:

224

1          Q.    Have you seen any trends in the

2     availability of opioids and the effects it has on

3     patients?

4                 MR. BOGLE:  Object to form.  Exceeds the

5     scope of my exam or her report.

6          A.    Yes, I have seen prescribing patterns

7     change.  I've also seen what happens when certain

8     opioids, certain strengths are no longer available in

9     market and how those shortages affect patient care, as

10    well as the ordering patterns of stores.

11    BY MR. BARNES:

12         Q.    And how do they affect patient care?

13         A.    Well, it --

14                MR. BOGLE:  Object to form.

15         A.    It sends the patient scrambling.  If -- I

16    can tell you specific -- just as a specific example

17    earlier this year, morphine 15 milligram was

18    unavailable, and if that was what the patient needed,

19    your choice was either to change the drug, or

20    unfortunately we were forced to give the patient and

21    the doctor had to write for a stronger amount and ask

22    the patient to cut it in half because the product

23    was -- the product that they needed was no longer

24    available.

225

1          So it sends the different trends, it sends

2     the prescribing habits, and it sends the ordering

3     process out of balance.  When certain products are no

4     longer available, then you can see some blips or

5     disparities.

6     BY MR. BARNES:

7          Q.    Is there a patient care aspect to

8     suspicious order monitoring?

9               MR. BOGLE:  Object to form.

10         A.    There is.  The pharmacy organization --

11    the pharmacy itself.  Let's start there.

12              Pharmacists are trained to take care of

13    their patients, and you can't take care of your

14    patients if you don't have product on the shelf.  So

15    you have an obligation as a pharmacist to carry the

16    products that your patient base needs, and when you

17    can't get those products from your wholesaler, it's

18    devastating, and you can no longer take care of your

19    patient, and therefore you have to tell your patient to

20    go somewhere else.

21              So it's important that whatever suspicious

22    order monitoring threshold, program, and all of the

23    different tools that you use -- the things that you put

24    together need to follow the law, and you need to be

```
 1    compliant, but you also have to remember patient care

 2    so that you don't unnecessarily slow things down or

 3    disrupt access that can cause further ramifications

 4    down the line, which includes further harm to the

 5    patient.

 6    BY MR. BARNES:

 7         Q.    So if I'm interesting you correctly, that

 8    part of this analysis about suspicious orders is -- is

 9    your testimony that you have to take into account the

10    legitimate needs of patients?

11              MR. BOGLE:  Object to form.

12         A.    Yes.  You can't just stop an order because

13    it's flagged by a system, because by stopping that

14    order that drug is not getting to the store and

15    therefore the store then can't fill prescriptions.

16    BY MR. BARNES:

17         Q.    You know Dr. McCann -- he had like five

18    different ways of playing with the numbers in terms of

19    how many suspicious orders, and do you recall one of

20    his methodologies would have identified upwards of 80

21    to 90 percent of every order ever input by everybody as

22    suspicious?  Does that make any sense to you

23    whatsoever?

24              MR. BOGLE:  Object to form.
```

227

1      A.    No, it makes absolutely no sense.  His

2  methodologies were full of flaws.

3  BY MR. BARNES:

4      Q.    Are you aware of the DEA being required to

5  consider patient needs and making sure there was an

6  adequate supply getting to the patients as part of

7  their regulatory obligations?

8            MR. BOGLE:  Object to form.

9      A.    The DEA's regular -- and where I would

10  apply this is in their quotas, as the DEA is

11  determining how quotas are formed and what they should

12  be used for.  The DEA's obligation is to make sure that

13  there is enough product in market to meet the needs and

14  the demand of the patients.

15  BY MR. BARNES:

16      Q.    You provided a lot of testimony and your

17  report specifically addresses HBC and the GERx

18  warehouse at Giant Eagle?

19      A.    Yes.

20      Q.    And you've -- I don't want to go over

21  everything, but you've opined that Giant Eagle has met

22  the Controlled Substances Act in many different ways

23  and in some ways exceeded the requirements of that act?

24      A.    Yes.

228

1          Q.     And does that cover the time period in

2     which HBC and GERx were actually distributing

3     controlled substances?

4          A.     Yes.

5          Q.     And that began when; do you know?

6          A.     In 2009.

7          Q.     When you talked about the suspicious order

8     monitoring, were you limiting your testimony in any way

9     to so-called threshold systems that use formulas or

10    algorithms?

11              MR. BOGLE:  Object to form.

12         A.     No, as I've stated before, threshold

13    systems are only a tool to be used as potentially --

14    you don't even have to use it.  It's not even required

15    by law, but you can use a threshold-type system as a

16    tool in your toolbox as it relates to a suspicious

17    order monitoring program.

18    BY MR. BARNES:

19         Q.     You were asked some questions about being

20    licensed and what that means.  I just want to follow up

21    with a few questions.  Were you testifying that simply

22    having a license meant you were in compliance, or

23    something else?

24              MR. BOGLE:  Object to form.

229

```
 1          A.    By having a license, the regulatory

 2     authority has said that you have controls, policies,

 3     and procedures in place they find legally relevant to

 4     rules and regulations that they have created and

 5     they're enforcing.

 6     BY MR. BARNES:

 7          Q.    And you talked a little bit about

 8     preinspection -- preinspections by the DEA.  And by

 9     pre, I mean before you start distributing, another

10     inspection right after you start distributing, and then

11     periodic inspections throughout the time you are

12     distributing -- is that -- am I summarizing your

13     testimony correctly?

14               MR. BOGLE:  Object to form.

15          A.    Yes.

16     BY MR. BARNES:

17          Q.    Now are those inspections rigorous or are

18     they flimsy or somewhere in between?

19               MR. BOGLE:  Object to form.

20          A.    No, those inspections are extremely

21     rigorous, and they give full feedback whether or not

22     you're meeting their expectations of what needs to

23     occur.

24     BY MR. BARNES:
```

230

1          Q.    Does it include a review of suspicious

2    order monitoring systems?

3          A.    It does.

4               MR. BOGLE:  Object to form.

5    BY MR. BARNES:

6          Q.    Does it include a review of inventory

7    management systems?

8          A.    It does.

9          Q.    Does it include a detailed review of

10   transactions within your systems to make sure controls

11   are in place and working?

12              MR. BOGLE:  Object to form.

13         A.    Yes.

14   BY MR. BARNES:

15         Q.    And did you see testimony in the record

16   for the Giant Eagle depositions that HBC and GERx were

17   subjected to pre-inspections, post-inspections, and

18   audits -- periodic audits?

19         A.    Yes, I did see that testimony.

20         Q.    And did you also see the testimony that

21   the DEA never once suggested that Giant Eagle was not

22   in compliance?

23              MR. BOGLE:  Object to form.

24         A.    The DEA did not find any deficiencies.

231

1  BY MR. BARNES:

2      Q.    And is that an important factor for you

3  when you made the evaluations you did in this case and

4  came to the conclusions that you did?

5      A.    Absolutely, yes.

6      Q.    You were asked some questions about

7  training -- training at Giant Eagle.  Do you recall any

8  deposition testimony about so-called CBT,

9  computer-based training?

10     A.    I do, yes.

11     Q.    And do you recall specifically the Walt

12  Durr and Greg Carlson depositions talking about

13  training?

14         MR. BOGLE:  Object to form.

15     A.    Yes, they went -- they spoke of the

16  different training modalities from computer-based

17  training to even having trainers.  Their PDLs often

18  gave little mini training seminars or on-the-job

19  training, so it was constant education on the policies,

20  procedures, and controls that Giant Eagle wanted them

21  to follow.

22  BY MR. BARNES:

23     Q.    Is that pretty standard in the industry in

24  your experience -- that type of training?

232

1          A.    The training using computer-based

2    learning, yes, and also using field management.  That's

3    pretty standard, yes.

4          Q.    You were asked some questions about

5    whether you particularly focused upon opioids or

6    hydrocodone-containing products and compared them to

7    other information.  Do you remember those questionings

8    or those questions?

9          A.    Maybe.

10         Q.    I could be a little bit --

11         A.    Which one are you going to?

12         Q.    Well, I'm just trying to see if you can

13   generally recall analyses in the McCann report where he

14   compared hydrocodone shipments by HBC over time.  Do

15   you recall that?

16         A.    Yes, I do.

17         Q.    And what do you recall he was doing with

18   that information?

19         A.    Well, he was comparing it -- in some cases

20   he was comparing it to DEA quotas.  In other cases he

21   was just showing the hydrocodone shipments, all of

22   which were -- again, based on my report, were -- they

23   don't track the way the quotas track and they continue

24   to show that the shipments out of HBC continue to

233

1      decline.

2          Q.    What did you take from that?  What does

3      that mean to you?

4          A.    It means that the -- those type of

5      patients, although their prescription volume was steady

6      or slightly declined from 2012 forward, you actually

7      saw a further decline in their controlled substances,

8      which tells you a lot about the patient that is coming

9      to Giant Eagle.

10              This is not the drug-seeking patient.

11     This isn't the patient that comes in and only gets a

12     prescription for hydrocodone.  These are the patients

13     that are coming in for diabetes, for their blood

14     pressure, for their stomach issues, and they're not

15     over-indexing or they're not attracting the patient

16     strictly seeking hydrocodone.

17         Q.    You were asked some questions about -- I

18     can't even read my own writing here.

19              Are you aware of any requirements by the

20     DEA to keep records of due diligence on flagged orders.

21              MR. BOGLE:  Objection.

22     BY MR. BARNES:

23         Q.    Or suspicious orders?

24              MR. BOGLE:  Exceeds the scope of her

234

1    report and my exam.

2         A.    No, there's nothing in the Controlled

3    Substances Act that say that any type of written or

4    investigations -- that any type of written reports need

5    to be kept for any type of time period.

6    BY MR. BARNES:

7         Q.    I just deciphered my handwriting, and I

8    realized what it said.

9              You were asked some questions about

10   pharmacists refusing prescriptions.  Do you recall

11   those questions?

12        A.    Yes.

13        Q.    Now, when a pharmacist refuses to fill a

14   prescription, is there a record of that in some way in

15   your experience?

16        A.    No, there's not.  There's really no way --

17   if it's a new patient to the pharmacy, there is no

18   record created unless we even fill a prescription.  So

19   there's no way to electronically create a record or

20   document that type of interaction because no

21   prescription has been filled.

22             If it's a prescription of an existing

23   client or an existing patient, those types of notes and

24   documentation doubtfully are put in the record.  More

235

1    often than not -- it usually depends on what happens

2    with the prescription.  If the prescriber says hold it

3    for a couple of days and you can fill it in two days,

4    then that's what we do.  If the prescriber says throw

5    it away then we rip it up and we throw it away.

6          Q.    Okay.  You were asked some questions about

7    what specific controls; in fact, the questioning was --

8    you said several times all the controls and you were

9    asked, well, give me an example, and you referred to

10   the controlled substance manual and various controls at

11   the store and warehouse.

12              Would you look at Pages 43 and 44 of your

13   report?  And specifically Paragraph 125.

14              These bullet points that are highlighted

15   here -- what are they?

16         A.    These are physical -- they're security

17   controls to prevent theft and diversion at Giant Eagle.

18         Q.    And they continue onto the middle of Page

19   44 -- they include things like limited personnel access

20   to controlled substances, Vocollect software

21   application and hardware, Manhattan software

22   application, order specialist, threshold reports,

23   inventory counting at point of receipt and reserve

24   slots for outbound product counting before the business

236

1    day starts, when it ends, during breaks, security

2    cameras, video surveillance, guards.

3              Are those the types of controls, when you

4    said all controls, that you had in mind?

5              MR. BOGLE:  Object to form.

6         A.   Yes, this is an illustrative list of some

7    of the things that Giant Eagle that is not necessarily

8    required by law, but Giant Eagle chooses to engage in

9    these activities in order to protect their business and

10   to prevent against theft and diversion.

11   BY MR. BARNES:

12        Q.   You reference a couple of times in your

13   testimony the Durr deposition.  Do you remember Walt

14   Durr being deposed and being specifically asked a lot

15   of questions about controls and policies and procedures

16   at the HBC warehouse?

17        A.   Yes.

18        Q.   And do you recall the exhibits to that

19   deposition included numerous policies and procedures?

20   He also testified to oral policies and procedures.  Do

21   you recall that testimony?

22             MR. BOGLE:  Object to form.

23        A.   Yes.

24   BY MR. BARNES:

237

```
 1          Q.    Is that part of the information you relied

 2    upon in your report when talking about written policies

 3    and procedures and controls followed by Giant Eagle?

 4               MR. BOGLE:  Object to form.

 5    BY MR. BARNES:

 6          Q.    And specifically the HBC warehouse?

 7               MR. BOGLE:  Object to form.

 8          A.    Yes.

 9    BY MR. BARNES:

10          Q.    You were asked a question about a

11    so-called fatal flaw you said is inherent in every

12    threshold system?

13          A.    Yes.

14          Q.    And you specifically were asked if there

15    were -- was it -- fatal flaw in HBC's system and you

16    provided an answer that related to the -- they use an

17    average company-wide aggregate per month?

18          A.    Yes.

19          Q.    Despite that flaw, does that change

20    your -- or even in light of that flaw, does that change

21    your opinion in any way, that Giant Eagle's controls

22    met and exceeded the Controlled Substances Act

23    requirement?

24               MR. BOGLE:  Object to form.
```

238

```
 1            A.     Well, what it led me to believe is even
 2     though Giant Eagle established that tool and began
 3     using that tool, because it didn't identify any
 4     suspicious orders, that the current controls, policies,
 5     and procedures that Giant Eagle had in place were more
 6     than adequate; that they were preventing theft and
 7     diversion.
 8     BY MR. BARNES:
 9            Q.     Did you identify any fatal flaws in the
10     McCann methodology?
11            A.     Several.
12            Q.     What were the biggest ones?
13                   MR. BOGLE:  Object to form.
14            A.     Well, and it depends on which one you're
15     looking at.  His first methodology, he was using a
16     six-month average, and although it was store-specific,
17     the six-month average took into account -- failed to
18     take into account any growth of a particular store, so
19     inevitably what you found out is that your largest
20     stores that had any type of growth within the period
21     were always showing up and every order was then showing
22     up on his report.  Other times he was using averages.
23                   Again, the biggest thing I had a problem
24     with was the fact that even when he flagged an order he
```

1    would then flag every subsequent order, which just

2    basically blew up his entire report to where it was no

3    longer usable.

4    BY MR. BARNES:

5         Q.    In your experience in the industry and

6    your experience as a pharmacist, does that have any

7    semblance of reality, that if an order is suspicious

8    that every subsequent order is also suspicious?

9              MR. BOGLE:  Object to form.

10        A.    No, because what we've already discussed

11   is a tool like a threshold monitoring -- like a

12   threshold report -- that type of tool cannot determine

13   whether an order is suspicious.  It can't.

14             It is just a report.  It's a report that

15   has flaws in it.  It can -- red flag.  It can create

16   triggers for somebody to go look.  But a report cannot

17   determine whether or not an order is suspicious.

18   BY MR. BARNES:

19        Q.    Did any of the McCann methodologies

20   attempt to tailor any of the methods to a specific

21   organization or defendant?

22             MR. BOGLE:  Object to form.

23        A.    No, he used all five methodologies across

24   a number of different defendants, not taking into

```
1    account their specific business models.

2    BY MR. BARNES:

3         Q.    And you may have testified to this

4    already, but the DEA regulations and guidance that

5    you've seen -- are you supposed to tailor it to each

6    organization?

7         A.    Yes, the DEA has encouraged the design and

8    the development of systems specific to a -- specific to

9    an organization.  It's the reason that they were overly

10   ambiguous about the direction that they created, is

11   because they wanted to put the onus back on the

12   organizations to tailor a suspicious order-monitoring

13   program that was unique to their business.

14        Q.    You used the term captive self-distributor

15   in your report and in your testimony today?

16        A.    I did, yes.

17        Q.    Is that -- in terms of Giant Eagle, is

18   that a significant factor for you that they were only

19   distributing to themselves?

20             MR. BOGLE:  Object to form.

21        A.    Yes.  So it's important -- and the DEA has

22   come out and said that knowing your customer is vitally

23   important to the prevention of theft and diversion, and

24   the fact that Giant Eagle is a captive self-distributor
```

241

```
 1    means it's a completely tight and controlled

 2    distribution loop because they know their customer.

 3    Their customer is their own pharmacy.

 4            Giant Eagle is a relatively small

 5    organization with 227 pharmacies.  Therefore they

 6    should design a program that is unique to them and

 7    unique to their circumstances and take into account the

 8    fact that they are their own self-distributor and they

 9    own the merchandise from the time in which the

10    manufacturer delivers it to the time in which they

11    dispense it to the patient.

12    BY MR. BARNES:

13        Q.    You were asked some questions about HBC's

14    investigations of flagged orders.  Do you recall that?

15        A.    Yes.

16        Q.    Do you recall in the deposition

17    testimony the Giant Eagle witnesses being questioned

18    about specific investigations that were conducted?

19            MR. BOGLE:  Object to form.

20        A.    Yes, I remember the testimony that there

21    were orders that were flagged as part of their

22    threshold systems and that these conversations and

23    these investigations took place.

24    BY MR. BARNES:
```

242

1          Q.    You were asked some questions about the

2    Barberton store being close to the Akron hospital and

3    other facilities.  This was in connection with

4    Paragraph 165 of your report.

5               At the end of Paragraph 165, you state

6    that the Barberton pharmacy is across -- is across the

7    street from the Akron Children's Hospital and within

8    one mile of the Summa Health System Barberton campus.

9               Is that last entity -- is that a hospital?

10   A.    Yes.

11   Q.    And what is the significance of a pharmacy

12   being very close to two hospitals?

13              MR. BOGLE:  Object to form.

14   A.    Well, it goes to the size of the pharmacy.

15   Again, I chose to highlight, I chose to dig in deep on

16   the Barberton store because plaintiffs often pointed

17   out in their discovery that the Barberton store was one

18   that Giant Eagle needed to pay attention to.

19              So I wanted to do a deep dive into

20   Barberton, and what you come to find out -- Barberton

21   is one of their -- is one of Giant Eagle's busiest

22   stores and part of the reason why it's one of the

23   busiest stores is because it is located very close to

24   large hospital systems.

1              It will also -- and it would signify to me

2      that not only would their prescription volume be

3      higher, but potentially they would have a higher

4      percentage of controlled substances because patients

5      are fulfilling their discharge meds at these local

6      stores.

7              And so being around a hospital, you would

8      essentially see a higher percentage of controlled

9      substances in order to take care of these patients

10     right after they have had some sort of surgical

11     procedure.

12     BY MR. BARNES:

13         Q.    Did the McCann analysis in any of his

14     methodologies attempt to take into account

15     store-specific facts like this, like where the store

16     was located and whether or not it was next to one or

17     two hospitals or pain clinics or things of that nature?

18              MR. BOGLE:  Object to form.

19         A.    No, the McCann report didn't take into

20     account any specifics about any store, which like I

21     said is a flaw with most threshold systems.

22     BY MR. BARNES:

23         Q.    In your experience as a pharmacist and in

24     the industry, have you seen that effect, that

244

```
 1   pharmacies right across the street from hospitals or

 2   down the block from another hospital will see these

 3   types of prescriptions on a more frequent basis?

 4           MR. BOGLE:  Object to form.

 5       A.    Absolutely, which is why the DEA comes

 6   through and says that you need to know your customer.

 7           MR. BARNES:  I've got nothing further.

 8                   EXAMINATION

 9   BY MR. BOGLE:

10       Q.    Yeah, so a few follow-up questions.

11           Exhibit C to your report, your materials

12   considered, I think you said was not exhaustive.  Is

13   that right?

14       A.    Correct.

15       Q.    What are you missing?  Because we're

16   entitled to know what you're relying on.

17       A.    Well, again, a lot of the materials that I

18   looked at and considered were just Google searches

19   where I would pop into a document, I would read a

20   little bit, and I would pop out.  I have materials

21   from -- and remembrance of materials from conferences

22   and different training and continuing education.

23       Q.    And you're relying on those materials to

24   form your opinions?
```

245

1          A.     It's part of my experience, so as part of

2     my experience and my expertise, to the extent that I

3     understand those documents and I've been exposed to

4     them, they would help in forming my opinions.

5          Q.     So Exhibit C asks for a list of materials

6     reviewed or considered -- materials.  I'm asking do you

7     have any other materials.  I'm not asking about your

8     experience; I'm asking about materials.  Do you have

9     any other materials that you intend to rely upon or

10    have considered that you have not listed here?  I'm

11    allowed to know that.

12         A.     So by materials do you mean pieces of

13    paper?  I mean, I've described to you what I consider

14    to be the information that I relied upon in forming my

15    opinions.

16         Q.     So the federal rules require you to list

17    out this information.  I'm asking to know what it is.

18    And I'm not asking about your experience.  I'm asking

19    about yes, documentary information.

20         A.     I understand, but what -- and my answer to

21    you is that my opinions are based off my knowledge of

22    the industry and my experience and that when I formed

23    these opinion it is based on all of those materials,

24    all of that information that I understand and that I

1    have been exposed to.

2         Q.    So do you intend to provide additional

3    materials considered after this deposition?

4              MR. BARNES:  I'm going to object.  She's

5    not required to produce every document she's ever seen

6    as a professional since pharmacy school.

7              MR. BOGLE:  That's not what I -- that's

8    not the question I'm asking her and you know that.

9              MR. BARNES:  No, and what I --

10             MR. BOGLE:  That's silly.  That's not what

11   I'm asking her.

12             MR. BARNES:  Why don't you ask her -- why

13   don't you get to the point?

14             MR. BOGLE:  I already have five times.

15   She didn't answer my question.

16             MR. BARNES:  No, you're asking in a way

17   that's confusing her.  Why don't you ask her -- I'm not

18   even going to suggest a question.

19             MR. BOGLE:  Yeah, seriously.  I've asked

20   her a very straightforward question.

21   BY MR. BOGLE:

22        Q.    Are there any additional materials that

23   you have reviewed for this case or have considered that

24   are not included in Exhibit C?  It's a very

247

1    straightforward question?

2           A.    It's not, because you asked me about

3    materials and there are several things that -- there

4    are several things that I've looked at that's been part

5    of my experience and my years in the industry.

6           Q.    So you're not willing to provide us a

7    complete list of the materials you've considered?  Is

8    that what I should take away from this?

9           A.    I don't know how to.

10                MR. BARNES:  You mean for purposes of --

11                MR. BOGLE:  Okay.  She doesn't know how

12    to.  All right.  No, I'm moving on.  She doesn't know

13    how to.  She's answered the question.

14                MR. BARNES:  No.  I'll ask --

15          A.    Okay.

16   BY MR. BOGLE:

17          Q.    Can diversion occur when controlled

18   substances purchases are less than 20 percent of

19   overall purchases?

20                MR. BARNES:  Objection.  Calls for

21   speculation.

22          A.    Yeah, I'm not going to speculate.

23   BY MR. BOGLE:

24          Q.    You don't know?

248

1          A.    No, I'm not going to speculate.

2          Q.    I'm not asking you to speculate.  I'm

3    asking you do you know if diversion can occur when

4    controlled substances are less than 20 percent of

5    overall purchases?  Do you know or do you not know?

6                MR. BARNES:  Same objection.

7          A.    And I will draw a conclusion that says

8    that when you've got 99.9 of prescription for

9    legitimate use and none of those prescriptions --

10   there's been no evidence that shows that those

11   prescriptions lead to diversion.

12               MR. BOGLE:  Move to strike as

13   nonresponsive.

14   BY MR. BOGLE:

15         Q.    That's not even close to my question.  I'm

16   asking you whether diversion can occur if controlled

17   substances purchases are less than 20 percent of the

18   overall purchases.

19               MR. BARNES:  Object to form.  It's vague.

20   Diversion where?  In the closed system or outside the

21   closed system?

22   BY MR. BOGLE:

23         Q.    You can answer my question.

24         A.    Well, and I'm trying to -- I'm not -- I'm

249

1  trying to answer your question.

2        Q.    You just answered a bunch of questions

3  from your counsel on this in a very straightforward

4  manner.  I'm asking you one follow-up question and you

5  can't answer it.  Is that right?

6        A.    No, that's incorrect.  I'm not -- I'm

7  trying to answer your question as best as I understand

8  it.

9        Q.    I'll ask it again.

10              Is it possible for diversion to occur --

11  I'll even add with opioids -- if controlled substances

12  purchases are less than 20 percent of overall

13  purchases?

14              MR. BARNES:  Object to form.

15  BY MR. BOGLE:

16        Q.    Is that possible?

17        A.    Diversion can occur at any time, yes.

18        Q.    Now, the Rannazzisi testimony that you

19  were shown here today -- did you review any other parts

20  of his deposition, or did you just review this Exhibit

21  8?

22        A.    No, I was -- I'm trying to remember.  I

23  think the Exhibit 8 -- I may have seen other --

24              MR. KOBRIN:  You can check your documents

250

1   if you want.

2          A.    Oh, that's right.

3                 Yeah, it would have been -- so that

4   particular one, it was strictly that exhibit.

5   BY MR. BOGLE:

6          Q.    So this testimony from Exhibit 8 to his

7   deposition -- your counsel spent a fair amount of time

8   going over this with you.  Were you shown any

9   underlying data supporting this 99.5 percent number by

10  your counsel?

11         A.    I didn't ask for any data.  The fact that

12  you had the head of the DEA giving this information and

13  testifying in front of Congress leads me to believe --

14  or you would assume that the information was

15  trustworthy and backed up by data.

16                MR. BOGLE:  Move to strike as

17  nonresponsive.

18  BY MR. BOGLE:

19         Q.    Were you shown any data by your counsel?

20         A.    No.

21         Q.    Yes or no?  And did you read this

22  testimony in your preparation of your report to be a

23  mathematical fact that 99.5 percent of prescribers are

24  not overprescribing?  Did you read that and take away

251

 1    that that's a mathematical fact?

 2              MR. BARNES:  Object to form.

 3         A.    I read it that it was a relied-upon fact,

 4    yes.

 5    BY MR. BOGLE:

 6         Q.    A mathematically-confirmed fact?

 7         A.    If he said it.  He testified to it.  So

 8    yes, he should have backup to say that that is -- if

 9    he's going to give those kinds of numbers, then he

10    should have backup, and he would be in the best

11    position to know.

12         Q.    Not you; right?

13         A.    Not me.  That is correct.

14         Q.    And the 99.9 percent number from Mr.

15    Patterson -- same thing.  Were you shown any underlying

16    data even when your counsel went through this to

17    support that?

18         A.    No.

19         Q.    And are you relying on that testimony to

20    be a mathematically-proven fact?

21         A.    I'm relying on that testimony to be true

22    based on the people that are revealing the information.

23         Q.    Did you review the remainder of the

24    testimony to get the surrounding context for what was

1    being discussed here with Mr. Patterson?

2          A.    I did look at some of the beginning and

3    the end, yes.

4          Q.    Did you review all this testimony?

5          A.    I did not.

6          Q.    You said that you previously turned down

7    engagements to be an expert.  Do you recall that?

8          A.    Yes.

9          Q.    How many times?

10         A.    Handful.

11         Q.    Do you have any better information than

12   that?

13         A.    Less than maybe five.  I mean, I talked to

14   attorneys -- I mean, you're asking.  It's a crazy

15   question.  They call, they say do you know anything

16   about this we say yes, you get a little more

17   information, you say yeah, I'm not ready to go there

18   yet.

19         Q.    You say it's a crazy question.  It's a

20   question you were just asked by your counsel.

21         A.    Right.  And my answer -- he asked if I've

22   ever turned any down and I said yes and you want to

23   know how many.

24         Q.    Right.

253

1          A.     And my question -- my response to you is

2    it's hard for me to quantify because sometimes it's

3    just a question.  They will call, they say can you help

4    us do X, Y, and Z, and I evaluate the position that

5    they want to take and I decide yes or no, I want to be

6    involved.

7          Q.     Has a company ever given you their

8    internal data and documents and then you ultimately

9    conclude that you can't help them?

10         A.     No, I've never got even that close.

11         Q.     Right.  So you're talking about turning

12   down an engagement sort of with the first phone call

13   and they say can you help us with X, Y, and Z and you

14   say no; right?

15         A.     There have been some that have been after

16   panel interviews and -- where we're getting deeper into

17   the substance of the case.

18         Q.     During those panel interviews, were you

19   ever shown any deposition testimony or internal

20   documents?

21         A.     No.

22         Q.     You talked about DEA inspections.  Have

23   you ever participated in a DEA inspection?

24         A.     No.

254

```
 1              Q.    Ever been present for a DEA inspection?

 2              A.    No.

 3              Q.    And as to the Barberton pharmacy, you

 4    talked about that quite a bit.  Did you analyze what

 5    percentage of prescriptions came from the two medical

 6    facilities you listed there in your report?

 7              A.    No, that information is hard to get to.

 8              Q.    Did you try to get it?

 9              A.    We -- I think we discussed it at one

10    point, but it's too hard to get to.

11              Q.    Did you determine it was too hard to get

12    to?

13              A.    No, it just -- it was based on my

14    knowledge of the industry and how the reporting of

15    these -- of prescription information is we determined

16    that we didn't -- we weren't going to need that

17    information and it wasn't necessarily going to bolster

18    my opinion anyway.

19              Q.    But your opinion is that being close in

20    proximity to these facilities matters; right?

21              A.    That's correct.

22              Q.    It only matters if there's actually a

23    significant number of prescriptions coming from the

24    facilities; right?
```

1          A.    Yeah, but based on my experience and my

2     work both as a pharmacist and as an executive, I can

3     make the conclusion because that is normal trends that

4     would also occur at this particular location.

5          Q.    But you're assuming that to be true in

6     this case as to Barberton; right?

7          A.    I am making that assumption, yes.

8               MR. BOGLE:  Okay.  I don't have anything

9     further.

10                    EXAMINATION

11    BY MR. BARNES:

12         Q.    Just one follow-up.  This Exhibit C.

13              Have you listed in this Exhibit C all of

14    the documents that are specific to this engagement that

15    you are relying upon to form your opinions?

16              THE WITNESS:  Yes.

17              MR. BARNES:  Nothing further.

18              THE VIDEOGRAPHER:  Okay.  We are going off

19    the record at 4:29 PM.

20

21                    [SIGNATURE RESERVED.]

22

23

24

256

                      C E R T I F I C A T E

          I, JOHN ARNDT, a Certified Shorthand

Reporter and Certified Court Reporter, do hereby

certify that prior to the commencement of the

examination, SANDRA KINSEY was sworn by me to testify

the truth, the whole truth and nothing but the truth.

          I DO FURTHER CERTIFY that the foregoing is a

true and accurate transcript of the proceedings as

taken stenographically by and before me at the time,

place and on the date hereinbefore set forth.

          I DO FURTHER CERTIFY that I am neither a

relative nor employee nor attorney nor counsel of any

of the parties to this action, and that I am neither a

relative nor employee of such attorney or counsel, and

that I am not financially interested in this action.


                     _____

                     JOHN ARNDT, CSR, CCR, RDR, CRR

                     CSR No. 084-004605

                     CCR No. 1186

257

1

2          I, SANDRA KINSEY, the witness herein,

3    having read the foregoing testimony of the pages of

4    this deposition, do hereby certify it to be a true and

5    correct transcript, subject to the corrections, if any,

6    shown on the attached page.

7

8

9

10                          _____

11                          SANDRA KINSEY

12

13

14   Sworn and subscribed to before me,

15   This _____ day of _____, 201_.

16

17

18   _____

19          Notary Public

20

21

22

23

24

258

1                    DEPOSITION ERRATA SHEET

2

3      Page No._____Line No._____Change to:_____

4      _____

5      Reason for change:_____

6      Page No._____Line No._____Change to:_____

7      _____

8      Reason for change:_____

9      Page No._____Line No._____Change to:_____

10     _____

11     Reason for change:_____

12     Page No._____Line No._____Change to:_____

13     _____

14     Reason for change:_____

15     Page No._____Line No._____Change to:_____

16     _____

17     Reason for change:_____

18     Page No._____Line No._____Change to:_____

19     _____

20     Reason for change:_____

21

22     SIGNATURE:_____DATE:_____

23                    SANDRA KINSEY

24