Highly Confidential - Subject to Further Confidentiality Review

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

```
IN RE:  NATIONAL      :  MDL NO. 2804
PRESCRIPTION OPIATE :
LITIGATION           :
---------------------------------------
                     :  CASE NO.
THIS DOCUMENT        :  1:17-MD-2804
RELATES TO ALL CASES:
                     :  Hon. Dan A.
                     :  Polster
```

- - -

Tuesday, January 15, 2019

- - -

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of
LINDA KITLINSKI, taken pursuant to
notice, was held at Golkow Litigation
Services, One Liberty Place, 1650 Market
Street, Suite 5150, Philadelphia,
Pennsylvania 19103, beginning at 9:05
a.m., on the above date, before Amanda
Dee Maslynsky-Miller, a Certified
Realtime Reporter.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 2

```
1   APPEARANCES:
2
3     SEEGER WEISS, LLP
      BY:  PARVIN K  AMINOLROAYA, ESQUIRE
4     BY:  DAVID R BUCHANAN, ESQUIRE
        CHARLES BACHMANN, PARALEGAL
5     77 Water Street
      8th Floor
6     New York, New York 10005
      (212) 584-0700
7     Paminolroaya@seegerweiss com
      Dbuchanan@seegerweiss com
8     CBachmann@seegerweiss com
      Representing the Plaintiffs
9
10
11
      BRANSTETTER, STRANCH & JENNINGS, PLLC
12    BY:  JOE P  LENISKI JR , ESQUIRE
      223 Rosa L  Parks Avenue
13    Suite 200
      Nashville, Tennessee 37203
14    (877) 369-0267
      Joeyl@bsjfirm com
15    Representing the Staubus Plaintiffs
16
17
18    ARNOLD & PORTER KAYE SCHOLER LLP
      BY:  JOSHUA M  DAVIS, ESQUIRE
19    BY:  JOHN CELLA, ESQUIRE
      601 Massachusetts Ave, NW
20    Washington, DC 20001
      (202) 942-5000
21    Joshua davis@arnoldporter com
      John cella@arnoldporter com
22    Representing the Defendant,
      Endo Pharmaceuticals, Endo Health,
23    and Par Pharmaceuticals
24
```

Page 3

```
1   APPEARANCES:  (Continued)
2
3     PIETRAGALLO GORDON ALFANO BOSICK &
      RASPANTI, LLP
4     BY: ASHLEY KENNY, ESQUIRE
      1818 Market Street
5     Suite 3402
      Philadelphia, Pennsylvania 19103
6     (215) 320-6200
      Representing the Defendant,
7     Cardinal Health, Inc.
8
9
10    JONES DAY
      BY:  TAYLOR A. GOODSPEED, ESQUIRE
11    555 California Street
      26th Floor
12    San Francisco, California 94104
      (415) 626-3939
13    Tgoodspeed@jonesday.com
      Representing the Defendant,
14    Walmart
15
16    VIA TELEPHONE/LIVESTREAM:
17
18    REED SMITH, LLP
      BY:  MOLLY Q. CAMPBELL, ESQUIRE
19    1301 K Street, N.W.
      Suite 1000 - East Tower
20    Washington, D.C., 20005
      (202) 414-9200
21    Mqcampbell@reedsmith.com
      Representing the Defendant,
22    AmerisourceBergen Drug Corporation
23
24
```

Page 4

```
1   APPEARANCES: (Continued)
2
      VIA TELEPHONE/LIVESTREAM:
3
4
5     FOX ROTHSCHILD, LLP
      BY:  ADAM BUSLER, ESQUIRE
6     1301 Atlantic Avenue
      Midtown Building, Suite 400
7     Atlantic City New Jersey 08401
      (609) 348-4515
8     Abusler@foxrothschild.com
      Representing the Defendant,
9     Validus Pharmaceuticals LLC
10
11
      ALSO PRESENT:
12    David Lane, Videographer
      Mike Kunys, Trial Technician
13    Jobina Jones-McDonnell, Endo Pharmaceuticals
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
1         - - -
2       I N D E X
3         - - -
4
5   Testimony of: LINDA KITLINSKI
6     By Ms  Aminolroaya
      By Mr  Buchanan
7     By Mr  Davis
8
9         - - -
10
11      E X H I B I T S
11        - - -
12
      NO      DESCRIPTION      PAGE
12
      Endo-Kitlinski
13    Exhibit-1  ENDO-OPIOID_MDL-05967764-
        774              56
14
      Endo-Kitlinski
15    Exhibit-2  ENDO-OPIOID_MDL-03258200-
        202              68
16
      Endo-Kitlinski
17    Exhibit-3  ENDO-OPIOID_MDL-02344002,
        With attachment      73
18
      Endo-Kitlinski
19    Exhibit-4  ENDO-OPIOID_MDL-06234663   77
20    Endo-Kitlinski
      Exhibit-5  ENDO-OPIOID_MDL-01139611,
21      With attachment      80
22    Endo-Kitlinski
      Exhibit-6  ENDO-OPIOID_MDL-04869680-
23      682              98
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

```
 1              - - -
 2          E X H I B I T S
 3              - - -
 4    NO.      DESCRIPTION          PAGE
 5    Endo-Kitlinski
      Exhibit-7  ENDO-OPIOID_MDL-02002513-
 6        514, with attachment      104
 7    Endo-Kitlinski
      Exhibit-8  END00000923-989      114
 8
      Endo-Kitlinski
 9    Exhibit-9  ENDO-CHI_LIT-00543668-673  125
10    Endo-Kitlinski
      Exhibit-10  ENDO-OPIOID_MDL-03388209-
11        210, with attachment      133
12    Endo-Kitlinski
      Exhibit-11  ENDO-OPIOID_MDL-02261843-
13        845                147
14    Endo-Kitlinski
      Exhibit-12  KP360-OHIOMDL-000605-626  160
15
      Endo-Kitlinski
16    Exhibit-13  ENDO-OPIOID_MDL-02206602-
          606                162
17
      Endo-Kitlinski
18    Exhibit-14  ARGOFF006513-515      170
19    Endo-Kitlinski
      Exhibit-15  KP360_OHIOMDL_000050938-
20        1097              175
21    Endo-Kitlinski
      Exhibit-16  ENDO-OPIOID_MDL-06233891-
22        909                595
23    Endo-Kitlinski
      Exhibit-17  MDL_KP360_000000002,
24        With attachment        184
```

Page 8

```
 1              - - -
 2          E X H I B I T S
 3              - - -
 4    NO.      DESCRIPTION          PAGE
 5    Endo-Kitlinski
      Exhibit-27  KP360-OHIOMDL-000241-
 6        244                241
 7    Endo-Kitlinski
      Exhibit-28  ENDO-OPIOID_MDL-01928285-
 8        286                244
 9    Endo-Kitlinski
      Exhibit-29  ENDO-OPIOID_MDL-01656768-
10        777                250
11    Endo-Kitlinski
      Exhibit-30  END00154834-856      256
12
      Endo-Kitlinski
13    Exhibit-31  No Bates
          Maps; National Center for
14        Health Statistics      263
15    Endo-Kitlinski
      Exhibit-32  END00661357-359      271
16
      Endo-Kitlinski
17    Exhibit-33  ENDO-OR-CID-00754369
          (Starting Bates, Compilation
18        Exhibit)            279
19    Endo-Kitlinski
      Exhibit-34  END00735362
20        Clawed Back          284
21    Endo-Kitlinski
      Exhibit-35  ENDO-OPIOID_MDL-06234029-
22        037                301
23    Endo-Kitlinski
      Exhibit-36  CHI_000435580-597      304
24
```

Page 7

```
 1              - - -
 2          E X H I B I T S
 3              - - -
 4    NO      DESCRIPTION          PAGE
 5    Endo-Kitlinski
      Exhibit-18  END00152457-473      188
 6
      Endo-Kitlinski
 7    Exhibit-19  No Bates
          Endo Payment to NIPC,
 8        2003-2012          192
 9    Endo-Kitlinski
      Exhibit-20  KP360_OHIOMDL_000003707  199
10
      Endo-Kitlinski
11    Exhibit-21  No Bates
          Demonstrative        199
12
      Endo-Kitlinski
13    Exhibit-22  KP360_OHIOMDL_000003328-
          329                200
14
      Endo-Kitlinski
15    Exhibit-23  KP360_OHIOMDL_00009569  210
16    Endo-Kitlinski
      Exhibit-24  No Bates
17        The Effectiveness and Risks
          Of Long-Term Opioid Treatment
18        Of Chronic Pain; Agency for
          Healthcare Research and
19        Quality            223
20    Endo-Kitlinski
      Exhibit-25  ENDO-OPIOID_MDL-01605952-
21        958                235
22    Endo-Kitlinski
      Exhibit-26  ENDO-OPIOID_MDL-02002702-
23        703, with attachment      238
24
```

Page 9

```
 1              - - -
 2          E X H I B I T S
 3              - - -
 4    NO      DESCRIPTION          PAGE
 5    Endo-Kitlinski
      Exhibit-37  ENDO-OPIOID_MDL-
 6        01652584-58628251-254    307
 7    Endo-Kitlinski
      Exhibit-38  JAN-MS-00925641-643
 8        With attachment        316
 9    Endo-Kitlinski
      Exhibit-39  ENDO-OPIOID_MDL-01928251  324
10
      Endo-Kitlinski
11    Exhibit-40  ENDO-OPIOID_MDL-05968029-
          075                332
12
      Endo-Kitlinski
13    Exhibit-41  No Bates
          American Pain Society;
14        2017 Elizabeth Narcessian
          Award for Outstanding
15        Educational Achievements in
          The Field of Pain        339
16
      Endo-Kitlinski
17    Exhibit-42  PKY181215547-749      342
18    Endo-Kitlinski
      Exhibit-43  END00051370-443      349
19
      Endo-Kitlinski
20    Exhibit-44  No Bates
          Demonstrative        359
21
      Endo-Kitlinski
22    Exhibit-45  ENDO-CHI_LIT-00241435-436,
          With attachment        366
23
24
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 10

```
 1              - - -
 2           E X H I B I T S
 3              - - -
 4   NO        DESCRIPTION         PAGE
 5   Endo-Kitlinski
     Exhibit-46  ENDO-OPIOID_MDL_DEPONENT-
 6     000015904-16398      379
 7   Endo-Kitlinski
     Exhibit-47  Hard drive      421
 8
 9   Endo-Kitlinski
     Exhibit-48  ENDO-OPIOID_MDL-04908487-
       488, with attachment      426
10
     Endo-Kitlinski
11   Exhibit-49  No Bates
           Amended Subpoena to Testify
12         At a Deposition in a
           Civil Action      432
13
14   Endo-Kitlinski
     Exhibit-50  ENDO-OPIOID_MDL-01769386-
       592      495
15
     Endo-Kitlinski
16   Exhibit-51  ENDO-OPIOID_MDL-02343835,
       With attachment      594
17
     Endo-Kitlinski
18   Exhibit-52  ENDO-OPIOID_MDL_DEPONENT
       000000184-189      617
19
20
21
22
23
24
```

Page 11

```
 1              - - -
 2      DEPOSITION SUPPORT INDEX
 3              - - -
 4
 5   Direction to Witness Not to Answer
 6   Page Line   Page Line    Page Line
 7   284    11
 8
 9
10   Request for Production of Documents
11   Page Line   Page Line    Page Line
12   None
13
14
15   Stipulations
16   Page Line   Page Line    Page Line
17   12     1
18
19
20   Question Marked
21   Page Line   Page Line    Page Line
22   None
23
24
```

Page 12

```
 1              - - -
 2        (It is hereby stipulated and
 3   agreed by and among counsel that
 4   sealing, filing and certification
 5   are waived; and that all
 6   objections, except as to the form
 7   of the question, will be reserved
 8   until the time of trial.)
 9              - - -
10        VIDEO TECHNICIAN:  We're now
11   on the record.  My name is David
12   Lane, the videographer for Golkow
13   Litigation Services.  Today's date
14   is January 15th, 2019.  Our time
15   is 9:05 a.m.
16        This deposition is taking
17   place in Philadelphia,
18   Pennsylvania, in the matter of
19   National Prescription Opiate
20   Litigation, MDL.  The deponent
21   today is Linda Kitlinski.  Our
22   counsel will be noted on the
23   stenographic record.  Our court
24   reporter today is Amanda Miller
```

Page 13

```
 1   and will now swear in the witness.
 2              - - -
 3        LINDA KITLINSKI, after
 4   having been duly sworn, was
 5   examined and testified as follows:
 6              - - -
 7        VIDEO TECHNICIAN:  Please
 8   begin.
 9              - - -
10           EXAMINATION
11              - - -
12   BY MS. AMINOLROAYA:
13        Q.   Good morning, Ms. Kitlinski.
14   We met a few moments ago off the record.
15   My name is Parvin Aminolroaya, and I
16   represent some of the plaintiffs in the
17   opioid litigation.
18           Would you please state your
19   name for the record?
20        A.   Linda Ann Kitlinski.
21        Q.   And have you ever been
22   deposed before, Ms. Kitlinski?
23        A.   No, I have not.
24        Q.   So I'm just going to go over
```

4  (Pages 10 to 13)

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1   a few ground rules.  Your counsel may
2   have gone over them, but I want to make
3   sure we're on the same page.
4            If you don't understand a
5   question, please tell me.  And I will be
6   asking a lot of questions throughout the
7   day, there may be times when I don't
8   succeed in asking a question that you
9   understand.  Just let me know.
10  Otherwise, the record will reflect that
11  the question was understood.
12           I'll ask you to answer with
13  a verbal yes or no.  Please don't nod or
14  shake your head.  The court reporter
15  should be able to take down what we're
16  saying.
17           And in the course of normal
18  conversation, sometimes you can
19  anticipate what I'm saying so you may
20  know the answer before I even finish the
21  question.  But for purposes of having a
22  clean record, please wait until I finish
23  my question before giving your answer.
24  And I'll remind you of that if it seems

Page 15

1   like we're talking over each other during
2   the deposition.
3            We can take a break whenever
4   you need, just let me know.  The only
5   thing I would ask is that if there's a
6   question pending, you answer the
7   question.
8            Do you understand these
9   instructions?
10       A.   Yes, I do.
11       Q.   And do you understand that
12  you're under oath as if you were in a
13  court of law before Judge Polster in
14  Ohio?
15       A.   Yes, I do.
16       Q.   And if you don't know an
17  answer to a question or can't recall,
18  just let me know.  But please don't
19  guess.  However, we are entitled to your
20  best recollection.
21            Is there anything we should
22  know that would prevent you from
23  testifying truthfully and to the best of
24  your ability today?

Page 16

1        A.   No.
2            VIDEO TECHNICIAN:  Going off
3   the record.  9:08 a.m.
4              - - -
5            (Whereupon, a brief recess
6   was taken.)
7              - - -
8            VIDEO TECHNICIAN:  We're
9   back on record at 9:10 a.m.
10  BY MS. AMINOLROAYA:
11       Q.   We just took a short break
12  to handle a small technical issue.  We're
13  back on the record.
14            Ms. Kitlinski, what did you
15  do to prepare for your testimony today?
16       A.   I read the subpoena
17  documents thoroughly.  I went through my
18  files, gathered up the requisite
19  materials that were referenced in there,
20  provided those to counsel.  Met with
21  counsel on three occasions for a few
22  hours.  And I'm here today.
23       Q.   And when did you first
24  receive a subpoena?

Page 17

1        A.   I'm going to say it was in
2   October.  That's a guess.  It was prior
3   to the first week of November, I know
4   that, but I don't know the exact date.
5        Q.   And what did you do to
6   undertake the thorough search you just
7   described in response to the subpoena?
8        A.   Well, I went through my
9   personal -- first of all, the documents
10  that I had in my possession were
11  subsequent to my employment from Endo.  I
12  had turned everything in, you know, when
13  I retired, or during subsequent -- I
14  mean, during the orders that they had in
15  place prior to that time.
16           So I went through my
17  materials.  And I extracted anything that
18  had anything to do with opioids or the
19  other criteria that were listed in the
20  subpoena.
21           I did a key word search, and
22  I have on my -- on my computer the -- any
23  of the documents that -- as well as on my
24  laptop, on my thumb drive, I have one

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  thumb drive that I have used since
2  leaving Endo, and that's where I have
3  looked for those documents.
4      Q.   What search terms did you
5  use?
6      A.   Anything related to opioids,
7  you know -- they were listed in your
8  document there, opioids, oxymorphone,
9  Opana, REMS.
10     Q.   And where on your computer
11 did you search?
12     A.   I searched my desktop, and I
13 searched in my -- in my folders.  And I
14 searched the thumb drive that I use.  I
15 also searched in through my e-mails.  The
16 majority of my e-mails were, shall I say,
17 a combination of junk mail that you get
18 from, you know, people soliciting your
19 participation in things not related to
20 this case, you know, just regular,
21 everyday coupons and that type of thing.
22         The other e-mails in my
23 files were copied to the folks at the
24 REMS, now Syneos, previously Campbell

Page 19

1  Alliance/inVentiv.  And the conjoint
2  committee members who participate in the
3  REMS, again, they are also copied on the
4  Syneos/inVentiv documents since they're
5  in attendance at that meeting and take
6  minutes.
7      Q.   And when did you run the
8  search in your e-mail?
9      A.   Between the time I received
10 the subpoena and the time that I
11 prepared -- presented the documents to
12 counsel this past week.
13         I also made a copy of the
14 relevant -- because I have a -- we have a
15 family medical situation that we've been
16 dealing with for about five years, and
17 because I don't have a formal job, I
18 don't work for a company any longer, I
19 had that single thumb drive that I used
20 for, you know, family personal, medical,
21 business, as well as anything that was
22 relating to my consulting work on the
23 REMS.
24         So I pulled off anything

Page 20

1  that was not related to the subpoena and
2  this case, retained those family
3  documents.
4      Q.   So just to clarify, you
5  searched the thumb drive?
6      A.   Yes.
7      Q.   And you applied the search
8  terms that were identified in plaintiffs'
9  subpoena?
10     A.   Yes.
11     Q.   And you turned those
12 documents over to your counsel?
13     A.   Yes.
14     Q.   And turning to your
15 e-mails --
16     A.   Excuse me, just to clarify.
17     Q.   Thank you.
18     A.   I turned some paper
19 documents, which came from my files, over
20 to counsel.  And I turned the thumb drive
21 that did not have my family information
22 but had the information related to the --
23 to this case.
24     Q.   And what kinds of documents

Page 21

1  were on the thumb drive?
2      A.   Oh, they were things like
3  the minutes from the -- from the REMS
4  meetings, the agenda, the participants.
5  They would circulate the minutes for
6  comments to make sure that they reflected
7  accurately what people who participated
8  heard.
9          It contained the -- I
10 believe there was a copy of the
11 MedBiquitous REMS specs on there, which
12 was another element of the REMs.
13     Q.   I'm sorry, I think I missed
14 the word you said before "REMS."
15     A.   MedBiquitous.  It's the
16 Johns Hopkins organization that does the
17 metrics for the REMS.
18     Q.   Any other categories of
19 documents on the thumb drive?
20     A.   Those are -- that's the
21 majority of them.
22         And there may have been, for
23 example, like, if I was going to a
24 conference and, for REMS or the FDA,

6 (Pages 18 to 21)

Page 22

1    let's say the FDA public meeting, I would
2    have printed out a copy at that -- you
3    know, at that time, of the agenda and any
4    attachments, and afterwards I might have
5    had a copy of it retained on the thumb
6    drive or the directions to the, you know,
7    meeting and things like that.
8         Q.   And you talked about running
9    the search on the thumb drive.
10        Can you give us a better
11   sense of when you ran the search?  You
12   said it was between October and this
13   week, and January, correct?
14        MR. DAVIS:  Objection to
15   form.
16        MS. AMINOLROAYA:  You can
17   answer.
18        MR. DAVIS:  You can go
19   ahead.
20   BY MS. AMINOLROAYA:
21        Q.   Unless your counsel
22   instructs you not to answer a question,
23   and that shouldn't occur very
24   frequently --

Page 23

1         A.   Sure.
2         Q.   -- you can answer the
3    questions.
4         A.   Sure.
5         Again, I focused on -- well,
6    I initially started with the paper files,
7    and I did that in the end of October and
8    finished it up this month.  Originally,
9    the subpoena said that the deposition
10   would be held in November, but because of
11   my dad's medical situation, I appreciated
12   the flexibility in being able to do it
13   this month instead.  So I had begun some
14   things and finished them up this month.
15        And the computer, you know,
16   looking through the documents on my -- in
17   my files on the thumb drive, that was in
18   January.
19        Q.   And did you provide any
20   documents to your counsel before January?
21        A.   No, I did not.
22        Q.   Documents that were on the
23   thumb drive or on your computer, were
24   those provided to counsel before January?

Page 24

1         A.   I provided all of the
2    documents to counsel in January.
3         I also provided the one
4    notebook that I had during that time
5    period after, you know, 2016 until the
6    present, until the end of this past year.
7    And I provided that notebook to counsel.
8         Q.   And -- thank you.
9         You mentioned your e-mails,
10   that you searched your e-mails as well
11   and you applied the search terms in
12   plaintiffs' subpoena to your e-mails.
13        What's your e-mail address?
14        A.   LindaKitlinski@gmail.com.
15   I'm sorry, Linda A, there's another A in
16   there.
17        Q.   And how long have you
18   maintained this e-mail address?
19        A.   That's been my e-mail
20   address since I retired from Endo, so the
21   middle of May 2014.
22        Q.   And to be clear, you did not
23   have this Gmail e-mail address before May
24   of 2014; is that right?

Page 25

1         A.   I had a Gmail address, I
2    never used it.  It was -- it was Linda
3    Kitlinski, there was no A in it.  And so
4    it was inactive, and that's why, when I
5    tried to establish one, I had to include
6    the initial A, because it said that it
7    was already assigned to someone.  But I
8    couldn't remember my password, so --
9         Q.   Understood.  That happens.
10        And were there any other
11   e-mails you maintained besides the Linda
12   Kitlinski Gmail account?
13        A.   Not since leaving Endo.
14   Endo had my, you know, Endo e-mail
15   address.  But since leaving the company,
16   no.
17        Q.   And while you were at Endo,
18   were there any other personal e-mail
19   addresses you maintained?
20        A.   No.  I had just one e-mail
21   address, and that was my Endo address.
22        Q.   And you used that for all
23   communications?
24        A.   Yes, I did.

7 (Pages 22 to 25)

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    Q.  Including personal
2  communications?
3    A.  I did.  I know it was
4  perhaps not the best practice, but it was
5  just a reality that our lives were so
6  inextricably linked with work, and I had
7  little ███████████████████████tions.
8  ████████████████████
9  ████████████████████████
10  ██████████████
11  ██████████████
12  ██████████████████
13  ██████████████████
14  ██████████████████████
15  ████████████████
16  ██████████████████████
17  ██████████████████████████
18  ██████████████████████
19  ██████████████████████
20  ████████████████████████
21  ████████████████████
22  ████████████████████████
23  ██████████████████████
24  ██████████████████████████

Page 27

1  ████████████████████████████
2  ████████████████████████
3  ██████████████████████████
4  ████████████████████████
5  ██████████████████████
6  ██████████████████████
7  ████████████████████████
8  ████████████████████
9  ████████████████████████
10  ████████████████
11  ████████████████████
12  ██████████████████████
13  ████████████████████
14  ██████████████████████
15  ████████████████████
16  ████████████████████
17  ████████████████████
18  ██████████████████████
19  ██████████████████
20  ████████████████████████
21  ████████████████████████
22  ██████████████████████████
23  ████████████████████████
24  ████████████████████████

Page 28

1    Since th t time, however, I
2  ████████████████████████
3  ████████████████████████████
4  ████████████████████████
5  ██████████████████████████
6  ██████████████████████████
7  ████████████████████████████
8  ████████████████
9    Q.  You mentioned earlier that
10  Campbell Alliance was the PMO for REMS.
11    What is PMO?
12    A.  Project management office.
13    Q.  What do they do for REMS?
14    A.  They execute all of the
15  project -- and I should -- I should state
16  that this is my understanding as of 2016
17  when I last worked with them in that
18  formal capacity.
19    They were responsible for
20  conducting the meetings, scheduling the
21  subteam meetings, taking minutes of the
22  meetings, retaining the records for
23  the -- for the REMS.  Any number of
24  operational aspects of the REMS itself,

Page 29

1  since there were a group of, you know,
2  25-plus companies at that time.
3    So they served as the
4  logistical and operational arm of the
5  RPC, the REMS program companies.
6    Q.  And during your consultancy
7  with Campbell Alliance, did you use your
8  Linda A. Kitlinski Gmail for
9  communications related to this work?
10    A.  Yes.  Again, I used my Endo
11  address for communications with Campbell
12  Alliance, because they were -- I don't
13  recall when they came on board exactly,
14  it was early on in the REMS, so I was
15  communicating with them via my Endo
16  e-mail address until I retired from Endo.
17  And then during the consulting period, I
18  worked with the Gmail address.
19    Q.  And what types of
20  communications would be -- would you
21  typically send from your Gmail address
22  related to your consultancy for Campbell
23  Alli████████████████████████████████
24

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 30

```
 1
 2
 3
 4     .
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 32

```
 1   th t's the type of documents th t   and
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 31

```
 1   proposals, the scoring cards, that were
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 33

```
 1          Q.   While you were working   t
 2
 3
 4
 5
 6   back to, let's say, 2009.  And I don't
 7   know the dates here, but she did work for
 8   Pfizer at one point in time.  She worked
 9   for Purdue.  She worked for Pernix.  And
10   there was one other small company,
11   Horizon Pharmaceuticals, which was not an
12   opioid company.
13          Q.   Did you ever communicate
14   with individuals at ACCME?
15          A.   Yes.  That was a large part
16   of -- I mentioned to you the Conjoint
17   Committee on Continuing Education, that
18   working group.  I perhaps should have
19   explained what that was.
20              That is an organization of
21   approximately 25 to 26 national
22   accrediting bodies, including the ACCME,
23   and including the national professional
24   organizations that accredit education for
```

9  (Pages  30  to  33)

Highly Confidential - Subject to Further Confidentiality Review



Page 34

1 nurses, pharmacists, physicians,
2 dentists, et cetera.
3        So ACCME was one of the
4 accreditors with whom, you know, the CE
5 subteam at RPC communicated regularly.
6        Q.  And if you were
7 communicating with an individual at
8 ACCME, that would be -- you would send an
9 e-mail from your Gmail to that individual
10 at ACCME?
11        A.  I would bet that there were
12 maybe one or two e-mails, again, from my
13 Gmail address.  Because all of our
14 communications with the ACCME, the vast
15 majority occurred during the context of
16 when we were developing the REMS or in a
17 meeting that Syneos and the RPC would
18 have been involved with.
19        So the -- to my knowledge,
20 there were two direct e-mails to ACCME,
21 and they were regarding participation in
22 a meeting that was coming up that we were
23 both supposed to be speaking at.  So it
24 was not -- and/or, you know, coordinating

Page 35

1 participation in a conference, like at
2 the FDA public meeting type things.
3        Q.  Did you ever communicate
4 with individuals from the Council of
5 Medical Specialty Societies?
6        A.  Yes.  Dr. Kahn, Norm Kahn
7 and Heidi Lapka are the -- Dr. Kahn is
8 the head of the Council of Medical
9 Professional Societies.  Heidi Lapka is
10 the executive director.  And they were
11 the organization that was the convener
12 for the Conjoint Committee on Continuing
13 Education that I referred to a little
14 while ago.
15        And to just put that in
16 perspective, the CMSS, the Council of
17 Medical Specialty Societies, represents
18 650, 750 clinicians from across the U.S.
19 in all medical specialties.
20        Q.  And when you would
21 communicate with individuals from CMSS,
22 you would do this using your Gmail
23 account?
24        A.  If it was --

Page 36

1        MR. DAVIS:  Object to form.
2 Go ahead.
3        THE WITNESS:  If it was
4 after 2016, yes.  I'm sorry, if
5 was -- yes, if it was after 2016.
6 And also on occasion, in between
7 that period of time when I was
8 retired from Endo but not yet a
9 consultant for Campbell.
10        Because I left Endo in the
11 middle of May of 2014, and then my
12 consulting agreement started in,
13 like, October or so of that year.
14 BY MS. AMINOLROAYA:
15
16
17
18
19
20
21
22
23
24

Page 37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

10  (Pages 34 to 37)

Highly Confidential - Subject to Further Confidentiality Review



Page 38

Page 40

```
 1    Pennsylvania, a small town in
 2    Northeastern PA, and graduated from Penn
 3    State University in 1977, with a degree
 4    in business administration.
 5         I'm proud to say I
 6    maintained my dean's list average that
 7    whole time and attended there on a
 8    scholarship.
 9         I stayed in the local area
10    subsequent to my graduation for about
11    three years, due to family medical
12    situations.
13         Q.   And what did you do after
14    you graduated from Penn State?
15         A.   I worked, as I said, in the
16    local area there.  My mom was ill, so I
17    worked as a manager for a local retail
18    department store.
19         Q.   And how long did you do
20    that?
21         A.   For three years.
22         Q.   And what did you do after
23    that?
24         A.   I relocated to Harrisburg in
```

Page 39

Page 41

```
 1    1980.
 2         During the time of helping
 3    my mom to navigate through her condition,
 4    I became really interested in
 5    pharmaceuticals, and education in
 6    particular.  My mom's godchild was a
 7    pharmacist, training at Duquesne.  She
 8    stayed with us during the summers, and
 9    she had a very positive influence on me.
10         And then again, seeing the
11    turnaround in my mom, once she was able
12    to be treated adequately, I was really --
13    my interest was piqued by
14    pharmaceuticals.
15         So where I lived, there were
16    no pharmaceutical companies nor
17    opportunities for really advancing in
18    that area.  So I relocated to Harrisburg,
19    which was close enough to be available
20    for Mom if she needed me, but yet a
21    little bit of an area for better
22    opportunities.
23         I worked first for Marriott
24    and then Kaiser Roth as I was
```

```
14             you review any
15    deposition transcripts in preparation for
16    your testimony today?
17         A.   I did not.
18         Q.   I believe you answered this
19    earlier, have you ever been deposed
20    before?
21         A.   No, I have not.
22         Q.   Tell us about your
23    education, Ms. Kitlinski.
24         A.   I grew up in Hazleton,
```

Highly Confidential - Subject to Further Confidentiality Review



Page 42

1  identifying, through an employment
2  agency, an opportunity to get into
3  pharmaceuticals.
4          I joined Schering
5  Pharmaceuticals ophthalmic division, and
6  that was in 1984.  And I stayed with
7  Schering until 1986, when I joined DuPont
8  Pharmaceuticals, which was the parent
9  company for Endo.
10      Q.   And what did you do at
11  Schering?
12      A.   At Schering, I was the
13  regional representative for their contact
14  lenses and ophthalmic solutions.
15      Q.   Is that a sales -- a sales
16  position?
17      A.   It was sales related, yes.
18      Q.   And what did you do as a
19  regional representative for Schering?
20      A.   I would be in touch with the
21  ophthalmologists and the optometrists in
22  the area.  Wesley-Jessen was the research
23  arm of the company that had developed the
24  first soft contact lenses.  And so my job

Page 43

1  was to explain the different types of
2  contact lenses and ophthalmic solutions
3  that were available to optometrists and
4  ophthalmologists.
5      Q.   And was your compensation
6  related -- did you receive --
7      A.   A salary.  It was a salaried
8  position.
9      Q.   Thank you.
10          Did you receive any
11  incentive compensation?
12      A.   You know, it was a really
13  long time ago, and I don't recall.
14      Q.   And then in 1986 you went to
15  DuPont; is that correct?
16      A.   Let's see.
17          Yes, 1986, I went to DuPont.
18  And the -- as I said, that was the parent
19  company for Endo.
20          While I was at DuPont, I
21  served in various capacities.  I was
22  there from '86 until '97.  And so I
23  served in the capacity as a regional
24  trainer.  I served in the capacity as a

Page 44

1  clinical liaison.  Over the course of the
2  years they called them different things,
3  clinical liaisons, medical science
4  liaisons, basically, field-based medical
5  people.
6          I served as a senior
7  clinical liaison and then manager of the
8  clinical liaisons during my time there at
9  DuPont.
10          In 1980, DuPont entered into
11  a joint venture with Merck
12  Pharmaceuticals.  And so the company name
13  changed from DuPont Pharma to DuPont
14  Merck Pharmaceuticals.
15          And at DuPont Merck, my
16  responsibilities were an associate
17  director -- in an associate director
18  capacity there.
19
20
21
22
23
24

Page 45

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Golkow Litigation Services - 877.370.DEPS



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 62

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 64

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 63

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 65

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 67

```
 1          MR. DAVIS:  Parvin, it's
 2    been about an hour.  I don't know
 3    if you want to go into that one or
 4    take a break now.  I don't know
 5    how much you have.
 6          MS. AMINOLROAYA:  No, that's
 7    fine.  Let's take a break.
 8          VIDEO TECHNICIAN:  Going off
 9    the record.  The time is 10:07
10    a.m.
11          - - -
12          (Whereupon, a brief recess
13    was taken.)
14          - - -
15          VIDEO TECHNICIAN:  We are
16    back on the record.  The time is
17    10:20 a.m.
18    BY MS. AMINOLROAYA:
19       Q.   Welcome back, Ms. Kitlinski.
20    We just took a short break.  We're back
21    on the record.
22          I'm going to hand you what's
23    being marked as Exhibit-2.
24          - - -
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 78

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 80

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 79

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 81

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19        THE WITNESS:  Excuse me, is
20   there a box of tissues nearby
21   anywhere?
22        - - -
23        (Whereupon, a discussion off
24   the record occurred.)
```

21  (Pages 78 to 81)

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 90

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 92

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 91

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 93

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 110

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 112

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 111

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 113

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20   for just one second, Parvin?
21        VIDEO TECHNICIAN:  Going off
22   the record.  11:20 a m.
23              - - -
24        (Whereupon, a brief recess
```

Page 114

```
1        was taken.)
2           - - -
3           VIDEO TECHNICIAN:  We're
4    back on the record at 11:38 a.m.
5    BY MS. AMINOLROAYA:
6       Q.   Welcome back, Ms. Kitlinski.
7       A.   Thank you.
8       Q.   We just took a short break.
9           MS. AMINOLROAYA:  I'm
10   handing you what's been marked as
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```



Page 116

Page 115

Page 117

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 122

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 124

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17    MS. AMINOLROAYA:  I'm
18    handing you what's been marked as
19
20
21
22
23
24

Page 123

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 125

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 147

```
 1    strike the entire answer.
 2         1274, please.  I'm handing
 3    you what's been marked as
 4    Exhibit-1274.
 5            - - -
 6         (Whereupon, Endo-Kitlinski
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 162

23    MR. DAVIS:  Do you know if
24    the original document as produced

Page 163

1    had this highlighting?
2        MS. AMINOLROAYA:  Is that
3    the only highlight you see in the
4    document?
5        MR. DAVIS:  I see some -- we
6    can go off if you want -- I see
7    the first e-mail where you just
8    read, I think I see some --
9        MS. AMINOLROAYA:  Sure, we
10    can go off the record.
11        VIDEO TECHNICIAN:  Going off
12    the record.  12:28 p m.
13        - - -
14        (Whereupon, a discussion off
15    the record occurred.)
16        - - -
17        VIDEO TECHNICIAN:  Back on
18    record.  12:28 p.m.
19    BY MS. AMINOLROAYA:
20    Q.    Welcome back.
21        We have a highlighted copy,
22    we gave you and counsel a highlighted
23    copy of Exhibit-13, I believe.  And we'll
24    replace this highlighted copy with the

Page 164

1    version that was produced to us in the
2    production --
3        A.    Sure.
4        Q.    -- after the deposition.

Page 165

Highly Confidential - Subject to Further Confidentiality Review



Page 166

| 1 |
| 2 |
| 3 |
| 4 |
| 5 |
| 6 |
| 7 |
| 8 |
| 9 |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |

Page 168

Page 167

Page 169

9      MS. AMINOLROAYA:  Move to
10   strike everything after "yes."
11      Can we get a copy of E1403?
12      MR. DAVIS:  How much do you
13   have with this one, Parvin?  It's
14   been about an hour, it's 12:30.
15   I'm happy to go a little bit
16   longer if you only have a bit.
17   But if it's longer than that, then
18   we should break.
19      MS. AMINOLROAYA:  Let's do
20   at -- a few more exhibits.
21      I'm handing you what's been
22   marked as Exhibit-1403.  This is

Highly Confidential - Subject to Further Confidentiality Review



Page 170

14       May I just have a minute to
15   read this, please?
16       Q.   Sure.
17           And I can tell you we're
18   going to look at the top of Page 2 and
19   Page 1.
20       A.   Okay.
21           MS. AMINOLROAYA:  We can
22   take a break for lunch now.
23           VIDEO TECHNICIAN:  Going off
24   the record.  12:36 p m.

Page 171

1           - - -
2       (Whereupon, a luncheon
3   recess was taken.)
4           - - -
5       VIDEO TECHNICIAN:  Back on
6   record at 1:24 p.m.
7   BY MS. AMINOLROAYA:
8       Q.   Welcome back, Ms. Kitlinski.
9   We just took a break for lunch, and we're
10   back on the record.
11           You understand that you're
12   under oath?
13       A.   Yes.
14       Q.   Turning your attention back

Page 172

Page 173

Highly Confidential - Subject to Further Confidentiality Review



Page 174

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17    form.
18         MS. AMINOLROAYA:  Can I have
19    1306, please?
20         VIDEO TECHNICIAN:  Going off
21    the record.  1:27 p.m.
22              - - -
23         (Whereupon, a brief recess
24    was taken.)
```

Page 176

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 175

```
 1              - - -
 2         VIDEO TECHNICIAN:  Back on
 3    the record at 1:29 p.m.
 4         MS. AMINOLROAYA:  Ms.
 5    Kitlinski, I'm handing you what's
 6    been marked as Exhibit-15.  This
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 177

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20         Q.   And Opana ER was launched in
21    the summer of 2006; is that correct?
22         A.   I recall it was 2006.  I'm
23    sorry, I don't recall when -- when during
24    the course of the year.
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 178

Q.   That's fine.  2006 is fine.

Page 180

Page 179

Page 181

Highly Confidential - Subject to Further Confidentiality Review

Page 182

Page 184

Page 183

```
 7    that?
 8        Q.    You can do it with your
 9    counsel.
10        THE WITNESS:  I was just
11    going to say --
12        MR. DAVIS:  We can talk
13    about that later.
14        MS. AMINOLROAYA:  1313,
15    please.  We're skipping one
16    exhibit, 16, and going on to 17.
17    We added that sticker to another
18    document we're not using.
19        Exhibit-17 is
20    MDL_KP360_000000002.  It's E1313.
21            - - -
22        (Whereupon, Endo-Kitlinski
```

Page 185

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 190

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 192

```
1       MR. DAVIS:  Do you have
2   copies, please?
3       MS. AMINOLROAYA:  And if you
4   could just hand me back that
5   document for a moment, I'm going
6   to add an exhibit number to this.
7              - - -
8       (Whereupon, Endo-Kitlinski
9   Exhibit-19, No Bates, Endo Payment
10  to NIPC, 2003-2012, was marked for
11  identification.)
12             - - -
13      MS. AMINOLROAYA:  For the
14
15
16
17
18
19
20
21
22
23
24
```

Page 191

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 193

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

49  (Pages 190 to 193)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS



Page 202

Page 204

Page 203

```
 1    will use the Elmo.  So I'd just
 2    like -- to help us keep track of a
 3    few things for the rest of the
 4    afternoon, we're going to use the
 5    Elmo.  Hopefully, I can figure
 6    this out.
 7        And I'll hand you a copy of
 8    it as well, but you'll be able to
 9    see it on the Elmo.
10        We'll mark this as --
11        MR. DAVIS:  Another copy,
12    please.
13        MS. AMINOLROAYA:  We'll turn
14    back to that in a moment.
15    BY MS. AMINOLROAYA:
16
17
18
19
20
21
22
23
24
```

Page 205

```
 1    BY MS. AMINOLROAYA:
 2
 3
 4
 5
 6
 7
 8
 9        He received payments,
10    correct?
11        A.   Yes.  Indirect has been
12    taken away.  I was wondering what that
13    meant.
14        Q.   We can put indirect back.
15        A.   No, no.  I thought you were
16    right taking it away, because I was going
17    to say I didn't know what indirect meant.
18        Q.   Taking indirect away, as you
19    suggested.
20        And these programs were a
21    couple of hours, correct?
22        A.   Correct.
23        Q.   So I'll spare the -- I'd
24    like to listen to one of them, I'll spare
```

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1    the jury from listening to the full
2    presentation, but we'll play a portion of
3    Dr. Argoff and Dr. Ford's presentation at
4    one of the NIPC dinners, Advances in
5    Opioid Analgesia, Maximizing Benefit and
6    Minimizing Risks.
7        MR. DAVIS:  You're going to
8    play a recording of the --
9        MS. AMINOLROAYA:  CME, yes.
10       MR. DAVIS:  And you're just
11   going to play a portion of it, not
12   the entire thing?
13       MS. AMINOLROAYA:  Yes.
14       MR. DAVIS:  Are you going to
15   ask Ms. Kitlinski questions about
16   the portions you're about to play?
17       MS. AMINOLROAYA:  Yes.
18       MR. DAVIS:  I'm going to
19   object to Ms. Kitlinski answering
20   any questions about the portion of
21   a dinner dialogue, without
22   listening to the entire thing.
23   That's the same as showing her
24   about one page of a ten-page

Page 207

1    document.  She's got to have the
2    whole thing for the full context.
3        MR. BUCHANAN:  I disagree,
4    counsel.  Ms. Kitlinski attended
5    hours and hours of meetings.
6    She's not being asked for
7    everything that happened in hours
8    and hours of meetings.
9        MR. DAVIS:  I don't know
10   what she's going to be asked about
11   and I don't know what the context
12   of what you're about to play is.
13       MR. BUCHANAN:  You're
14   objection is noted.
15       MR. DAVIS:  I don't know
16   what -- I'm not going to let Ms.
17   Kitlinski -- can we go off the
18   record for a second?
19       MR. BUCHANAN:  No, it should
20   be on the record.
21       MS. AMINOLROAYA:  It should
22   be on the record.
23       MR. DAVIS:  I'd like to talk
24   to my client about this, if I may.

Page 208

1    And that's not going to be on the
2    record.  So let's go off for a
3    second, please.
4        MR. BUCHANAN:  Who's your
5    client?  You work for Endo, not
6    for Ms. Kitlinski.
7        MR. DAVIS:  I do work for
8    Ms. Kitlinski as well.
9        But let's -- we're going to
10   go off the record for this
11   conversation.
12       VIDEO TECHNICIAN:  Going off
13   the record.  The time is 2:02 p.m.
14           - - -
15       (Whereupon, a brief recess
16   was taken.)
17           - - -
18       VIDEO TECHNICIAN:  We're
19   back on record.  The time is 2:06
20   p.m.
21       MR. DAVIS:  So prior to any
22   questioning about the excerpt or
23   snippet of whatever recording you
24   intend to play, I just want to

Page 209

1    lodge an objection for the record.
2        We're going to permit Ms.
3    Kitlinski to answer questions, but
4    we think it's highly inappropriate
5    to be asking her questions about
6    just portions of some recording
7    that you're representing was a
8    recording from NIPC, some dinner
9    dialogue.  It's no different than
10   asking her about a single page of
11   a ten-page document without
12   letting her review the entire
13   document.
14       So we think all of these
15   questions about this recording are
16   inappropriate, are objectionable.
17   But we're going to permit Ms.
18   Kitlinski to answer.
19   BY MS. AMINOLROAYA:
20
21
22
23
24

53 (Pages 206 to 209)

Highly Confidential - Subject to Further Confidentiality Review

Page 210

Page 212

```
 8        A.   Thank you.
 9             All right.  I finished
10   reading that.
11             MS. AMINOLROAYA:  The trial
12   tech will play an excerpt of this
13   dinner dialogue for us.
14             (Whereupon, a video
15   recording was played.)
16             MR. DAVIS:  Can you provide
17   a time stamp, please, Mr. Trial
18   Tech?
19             MS. AMINOLROAYA:  The first
20   portion is from 0 to 14 seconds.
21             TRIAL TECHNICIAN:  This next
22   portion will be from 1 minute and
23   10 seconds to 1 minute and 18
24   seconds.
```

Page 211

Page 213

```
 1             (Whereupon, the video
 2   recording was played.)
 3             - - -
 4             MS. AMINOLROAYA:  The next
 5   portion of the tape is -- I'm
 6   sorry, go ahead, you have it.
 7             MR. KUNYS:  The third
 8   portion is from 3 minutes and 40
 9   seconds to 3 minutes and 50
10   seconds.
11             (Whereupon, the video
12   recording was played.)
13             MR. KUNYS:  And the fourth
14   portion is from 17 minutes and 45
15   seconds to 18 minutes and two
16   seconds.
17             (Whereupon, a video
18   recording was played.)
19   BY MS. AMINOLROAYA:
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 222



10      MS. AMINOLROAYA:  Can I get
11  1304, please?
12      I'm handing you what's been
13  marked as Exhibit-24.  It's E770.
14  This is the evidence
15  report/technology assessment,
16  Number 218, The Effectiveness and
17  Risks of Long-Term Opioid
18  Treatment and Chronic Pain.
19  Prepared by The Agency for
20  Healthcare Research and Quality.
21      - - -
22      (Whereupon, Endo-Kitlinski
23  Exhibit-24, No Bates, The
24  Effectiveness and Risks of

Page 223

1  Long-Term Opioid Treatment of
2  Chronic Pain; Agency for
3  Healthcare Research and
4  Quality, was marked for
5  identification.)
6      MR. DAVIS:  Just for the
7  record, this doesn't appear to
8  have a Bates number on it.
9      MS. AMINOLROAYA:  Correct.
10  BY MS. AMINOLROAYA:
11      Q.   Ms. Kitlinski, are you
12  familiar with The Agency for Healthcare
13  Research and Quality, known as AHRQ?
14      A.   I'm familiar with that
15  organization.  And I'm familiar,
16  generally, with this document.  But I
17  haven't read it in detail.
18      Q.   Okay.  Let's turn to Page 33
19  of the document -- actually, before we do
20  that, let's turn to Page 9 at the top,
21  770.9.
22      It says, The Effectiveness
23  and Risks of Long-Term Opioid Treatment
24  of Chronic Pain.  Structured abstract.

Page 224

1  Objectives.  Chronic pain is common and
2  use of long-term opioid therapy for
3  chronic pain has increased dramatically.
4  This report reviews the current evidence
5  on effectiveness and harms of opioid
6  therapy for chronic pain, focusing on
7  long-term (longer than one year)
8  outcomes.
9      And to orient us, I should
10  have mentioned this before, the bottom of
11  Page 2 contains the date of September
12  2014.  And this was prepared for the
13  Agency for Healthcare Research and
14  Quality, U.S. Department of Health and
15  Human Services, prepared by Pacific
16  Northwest Evidence-Based Practice Center,
17  Oregon Health and Science University.
18      Did I read that correctly?
19      A.   Yes.
20      Q.   Now turning to Page 9.
21      And the objective there, did
22  I read that correctly before?
23      I can read it one more time.
24  It says, Chronic pain is common and use

Page 225

1  of long-term opioid therapy for chronic
2  pain has increased dramatically.  This
3  report reviews the current evidence on
4  effectiveness and harms of opioid therapy
5  for chronic pain, focusing on long-term
6  (longer than one year) outcomes.
7      Did I read that correctly?
8      A.   Yes.
9      Q.   Turning to Page 33 of the
10  document.
11      It says, Discussion, key
12  findings and strength of evidence.
13  Second paragraph states, For
14  effectiveness and comparative
15  effectiveness, we identified no studies
16  of long-term opioid therapy in patients
17  with chronic pain versus no opioid
18  therapy or nonopioid alternative
19  therapies that evaluated outcomes at one
20  year or longer.  No studies examined how
21  effectiveness varies based on various
22  factors, including type of pain and pain
23  characteristics.
24      Did I read that correctly?

Page 226

```
 1          A.   Yes, you read that excerpt
 2   correctly.
 3          Q.   And if we drop down to the
 4   first sentence of the last paragraph --
 5          A.   Is there any reason we're
 6   kind of skipping around, as opposed to
 7   being able to read the -- since this is
 8   the key findings and strength of
 9   evidence, being able to read the entirety
10   of it?
11          Q.   Sure.  You can read whatever
12   you'd like with your counsel.
13          The last paragraph of this
14   page, the first sentence states, No study
15   assessed the risk of abuse, addiction or
16   related outcomes associated with
17   long-term opioid therapy use versus
18   placebo or no opioid therapy.
19          Did I read that correctly?
20          MR. DAVIS:  If you'd like to
21   take time to read the context, you
22   may.
23          THE WITNESS:  I'd like to
24   read these two pages, at least.
```

Page 227

```
 1   BY MS. AMINOLROAYA:
 2          Q.   Sure.  Would you just answer
 3   my last question, if I read that last
 4   sentence correctly?
 5          A.   Yes, you did read the words
 6   correctly.
 7          Q.   Thank you.
 8          A.   Thank you.
 9          Yeah, I'd like to just read
10   the opening statement of this document
11   and then the key --
12          Q.   Sure.
13          A.   -- key findings there.
14          Q.   Ms. Kitlinski, this is a
15   very long document and I --
16          A.   No, I was just reading, as I
17   said, the abstract and the results up
18   front, as well as the key findings and
19   summary of the strength of the evidence
20   here.
21          Q.   Sure.  So I'll tell you my
22   question.
23          A.   Okay.  Great.
24
```

Page 228

Page 229

Highly Confidential - Subject to Further Confidentiality Review



Page 230

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 232

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 231

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 233

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21          MR. DAVIS:  It's been about
22   an hour.  Why don't we take
23   another quick break?  Five minutes
24   or so.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1      THE WITNESS:  That would be
2  great.
3      MS. AMINOLROAYA:  That's
4  fine.
5      VIDEO TECHNICIAN:  Going off
6  the record.  The time is 2:32 p.m.
7          - - -
8      (Whereupon, a brief recess
9  was taken.)
10          - - -
11      VIDEO TECHNICIAN:  Back on
12  record at 2:48 p.m.
13  BY MS. AMINOLROAYA:
14      Q.   Ms. Kitlinski, welcome back.
15  We just took a short break.
16      A.   Thank you.
17      Q.   And you had just testified
18  that you recalled the newsletter that
19  NIPC put out, correct?
20      A.   Yes, I said that I do recall
21  there was a newsletter.  I did not
22  recall -- you mentioned the title of it,
23  and I don't know that.
24      MS. AMINOLROAYA:  I'm

Page 236

1      Q.   And if you turn to Page 4 of
2  the document with me, you'll see a page
3  entitled, Key Terms for Opioid
4  Analgesics.
5      And if you look in the
6  right-hand column there, you see the term
7  pseudoaddiction.  It says,
8  Pseudoaddiction refers to behaviors that
9  might seem aberrant, but actually
10  indicate inadequate treatment of pain.
11  The behaviors resolve when the pain
12  medication is increased and appropriate
13  analgesia is obtained.
14      Did I read that correctly?
15      A.   Yes.
16      Q.   So the NIPC management
17  newsletters were -- included key terms
18  for opioid such as pseudoaddiction?
19      MR. DAVIS:  Objection to
20  form.
21      THE WITNESS:  The key terms
22  that they included -- as you can
23  see up front, the first one was
24  addiction.  So that was put in

Page 235

1  handing you what's been marked
2  Exhibit-25.  It's
3  ENDO-OPIOID_MDL-01605952.  It's
4  E690.
5          - - -
6      (Whereupon, Endo-Kitlinski
7  Exhibit-25,
8  ENDO-OPIOID_MDL-01605952-958, was
9  marked for identification.)
10          - - -
11  BY MS. AMINOLROAYA:
12      Q.   This is --
13      A.   Pain Management Today.
14      Q.   -- Pain Management Today.
15      It sounds like you recognize
16  it?
17      A.   Yes.  Now I do.
18      Q.   Great.  And is the faculty
19  advisor here Dr. Argoff?
20      A.   Correct.
21      Q.   And this is -- you can see
22  the copyright date is 2001, correct?
23  Just below Dr. Argoff's photo.
24      A.   Yes.

Page 237

1  appropriate context.
2      And then physical
3  dependence, tolerance and
4  pseudoaddiction.
5      MS. AMINOLROAYA: 304,
6  please.
7  BY MS. AMINOLROAYA:
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

60  (Pages 234 to 237)

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 262

16    marking -- I'm handing you what's
17    been marked as Exhibit-31, E772.
18        - - -
19        (Whereupon, Endo-Kitlinski
20    Exhibit-31, No Bates, Maps;
21    National Center for Health
22    Statistics, was marked for
23    identification.)
24        - - -

Page 263

1    BY MS. AMINOLROAYA:
2        Q.    You can see at the bottom of
3    the document -- the source of this is the
4    National Center for Health Statistics,
5    National Vital Statistic System,
6    mortality data, and it provides a link
7    there to the CDC.gov.

22    document.  And I may use the Elmo for
23    this.
24

Page 264

12        Q.    2001 is early 2000s, right?
13        A.    Yes.
14        Q.    So we're looking at the 2001
15    page of the CDC document here, National
16    Center for Health Statistics.
17        And it's a -- you can see on
18    the right what it's including, or what
19    the map is depicting.  Estimated
20    age-adjusted death rate per 100,000.  And
21    this is -- the suggested citation for
22    this document is -- lists a number of
23    authors.  And it says, Drug poisoning
24    mortality, the United States, 1996 to

Page 265

1    2016, National Center for Health
2    Statistics.
3        This is reflecting adjusted
4    age related to death for drug appointing
5    mortality.
6        And you would agree that the
7    chart goes from blue, and then the number
8    of deaths go up as the colors change to
9    yellow, for example, and red?
10        A.    So just a question, because
11    I'm not familiar with this -- and I know
12    you usually ask me if that was correct --
13    it was 1999, not '96.
14        Q.    Thank you for that
15    correction.
16        A.    Not a big issue.  I just
17    wanted to, since I'm testifying, be
18    accurate.
19        So I don't -- I'm not
20    familiar with this chart, and I do not
21    understand the -- so while it says that
22    the source is the National Center for
23    Health Statistics, National Vital
24    Statistics System, mortality data, and it

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1  refers further to drug poisoning
2  mortality, it doesn't specify what drugs
3  we're talking about.
4         Are these all drugs?  Are
5  these opioids?  Are these prescription
6  opioids?  Are they -- does it include
7  barbiturates, for example?  I just don't
8  know what this is.
9      Q.   So let's compare the 2001
10  map to the 2012 map.
11         Would you agree there is a
12  lot of blue in the 2001 map?
13      A.   Yes.
14         MR. DAVIS:  Objection to
15  form.
16  BY MS. AMINOLROAYA:
17      Q.   And do you see less blue in
18  the 2012 map?
19         MR. DAVIS:  Objection to
20  form.
21  BY MS. AMINOLROAYA:
22      Q.   Page 14.
23      A.   And you asked me do I see
24  less --

Page 267

1      Q.   Do you see less of the color
2  blue in the 2012 map?
3         MR. DAVIS:  Objection to
4  form.
5         THE WITNESS:  Again, there
6  is -- there is less blue on this
7  map.  But I don't -- still don't
8  understand particularly what
9  the -- what it is we're talking
10  about here, what mortality data,
11  what drug poisoning mortality data
12  we're referencing.
13  BY MS. AMINOLROAYA:
14      Q.   And the color bar on the
15  right side here tells us that yellow
16  means deaths are up from 2 to 14 per
17  100,000 people.  And red means that
18  deaths are up from 2, for blue, to 26 or
19  more per 100,000 people, correct?
20         MR. DAVIS:  Objection to
21  form.
22         THE WITNESS:  Well, again, I
23  can see what the legend on the map
24  states, estimated age-adjusted

Page 268

1  death rate per 100,000.
2         But we don't know death rate
3  from what.
4  BY MS. AMINOLROAYA:
5      Q.   And do you see more yellow
6  and more orange and more red in 2012?
7         MR. DAVIS:  Objection to
8  form.
9         THE WITNESS:  Well, strictly
10  from a color perspective, the map
11  from 2001 has more blue on it and
12  less red and yellow, as you just
13  stated, than the map from 2012.
14         But, again, what that refers
15  to and what the data is, is not
16  clear from this.  And I'm not
17  familiar with it, so I don't want
18  to speculate.
19  BY MS. AMINOLROAYA:
20      Q.   And that's the same time you
21  were running the NIPC program, correct?
22         MR. DAVIS:  Objection to
23  form.
24         THE WITNESS:  The NIPC

Page 269

1  program was being conducted on
2  appropriate pain management, which
3  included opioids but was not 100
4  percent focused on opioids.  It
5  included neuropathic pain and
6  chronic pain.  And it did occur
7  during that time period.
8  BY MS. AMINOLROAYA:
9      Q.   Thank you.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 282

Page 284

12 I'm going to instruct you not to
13 answer my questions on this
14 document that we're going to claw
15 back as attorney work product.
16     This is information that was
17 gathered at the request of
18 attorneys in responding to the
19 Senate Finance Committee.  So I'm
20 going to instruct you not to
21 answer any questions about that.
22 And I'd like to claw this document
23 back, if we could.  Exhibit-34,
24 just so the record is clear.

Page 283

Page 285

1     MR. BUCHANAN:  Counsel, can
2 you just state more specific
3 reasons?  I don't have it in front
4 of me.  Are counsel identified?
5     MR. DAVIS:  Counsel are not
6 identified by it.  But I was
7 counsel, and I know what -- who
8 was directing these individuals to
9 collect this information and the
10 purposes for which that
11 information was being collected.
12     And the fact that it was
13 counsel directing these
14 individuals to collect this
15 information protects it from
16 disclosure because of the work
17 product protection.
18     MS. AMINOLROAYA:  This
19 information was disclosed in your
20 June 15th disclosure to the Senate
21 Finance Committee.
22     MR. DAVIS:  It was, indeed.
23 And you have that information
24 there, and the information that

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    was disclosed is fine.  But the
2    information as collected by these
3    individuals specifically here, I
4    don't know if there are
5    differences, but this was
6    information provided -- collected
7    by these individuals and provided
8    to attorneys so the attorneys
9    could provide legal advice to the
10   company, and is, therefore, work
11   product.
12        MR. BUCHANAN:  I'm not sure
13   how it couldn't be a waiver, if it
14   was provided to the Senate as you
15   just said.
16        MR. DAVIS:  I mean, if it's
17   exactly the same as what we
18   provided to the Senate, perhaps.
19        But I don't want to sit
20   here -- we can sit here and go
21   through it if you want.  I don't
22   know if this is exactly what we
23   provided to the Senate or if there
24   are any changes.

Page 288

1        MS. AMINOLROAYA:  She
2    testified before --
3        MR. DAVIS:  Ms. Kitlinski's
4    work collecting the information
5    that was provided to the Senate
6    Finance Committee was directed by
7    attorneys, provided to attorneys
8    so they could provide legal advice
9    to the company.
10        MS. AMINOLROAYA:  That's the
11   same as Ms. Kitlinski gathering
12   documents subject to advice that
13   she needed to respond to a
14   subpoena.
15        MR. DAVIS:  You asked the
16   specifics of what she was
17   gathering.  That's not the same as
18   her gathering documents to respond
19   to a subpoena.
20        I don't think she -- that
21   wasn't done so we could provide
22   legal advice to the company.  That
23   was done to be responsive to the
24   subpoena you sent her.

Page 287

1        MR. BUCHANAN:  I'm sure we
2    can take a break in a moment.
3    Maybe you can just take a look at
4    it, so we don't have to needlessly
5    have a privilege challenge.  It
6    might not be that controversial.
7        We'll agree it's not a
8    subject matter.
9        MR. DAVIS:  What's that?
10        MR. BUCHANAN:  We'll agree
11   that examination on this would not
12   be a broader waiver.
13        MR. DAVIS:  Fair.  I'll take
14   a look at it when we're on a
15   break.
16   BY MS. AMINOLROAYA:
17        Q.   So, Ms. Kitlinski, you had
18   responsibility for identifying some of
19   the information that went into the Senate
20   Finance Committee?
21        MR. DAVIS:  I'm going to
22   object to that as well as
23   protected by the work product
24   protection.

Page 289

1    BY MS. AMINOLROAYA:
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

73 (Pages 286 to 289)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 302

Page 304

1  rarely cause addiction.  Morphine and
2  similar pain medications called opioids
3  can be highly effective for certain
4  conditions.  Unless you have a history of
5  substance abuse, there is little risk of
6  addiction when these medications are
7  properly prescribed by a doctor and taken
8  as directed.
9       Did I read that correctly?
10      A.   Yes, that's what it states
11  here.
12      Q.   And this was the material
13  that was put out by the American Pain
14  Foundation, correct?
15      A.   Again, what is the date on
16  this?  Do you have that here somewhere?

Page 303

14      please.  I'm handing you what's
15  been marked as Exhibit-36.  This
16  is CHI_0004335580, and it's E1337.
17           - - -
18      (Whereupon, Endo-Kitlinski
19  Exhibit-36, CHI_000435580-597, was
20  marked for identification.)
21           - - -
22  BY MS. AMINOLROAYA:
23      Q.   And if we go to Page 9 of
24  the document, it states, Pain medications

Page 305

14  strike everything after the
15  word -- well, move to strike that
16  entire answer.
17      MR. DAVIS:  We've been going
18  over an hour.  Can we take a quick
19  break?
20      MS. AMINOLROAYA:  Sure.
21      VIDEO TECHNICIAN:  Going off
22  the record.  The time is 3:58 p.m.
23           - - -
24      (Whereupon, a brief recess



Page 306

```
 1        was taken.)
 2            - - -
 3            VIDEO TECHNICIAN:  We are
 4        back on the record.  The time is
 5        4:16 p.m.
 6        BY MS. AMINOLROAYA:
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 308

Page 307

Page 309

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 338

```
20        Q.   You're not a doctor, right,
21   Ms. Kitlinski?
22        A.   No, I'm not.
23             MS. AMINOLROAYA:  I'm
24        handing you what's been marked as
```

Page 339

```
 1   E1300.
 2             - - -
 3        (Whereupon, Endo-Kitlinski
 4   Exhibit-41, No Bates, American
 5   Pain Society; 2017 Elizabeth
 6   Narcessian Award for Outstanding
 7   Educational Achievements in the
 8   Field of Pain, was marked for
 9   identification.)
10             - - -
11   BY MS. AMINOLROAYA:
12        Q.   In fact, you won an award
13   for your work with the American Pain
14   Society residents program; is that
15   correct?
16        A.   I won an award for
17   innovation in pain education.  That
18   was -- that is awarded annually by the
19   American Pain Society to someone who they
20   believe has made a contribution, a
21   valuable contribution, to the field of
22   pain assessment and management.
23        Q.   I'm handing you E1300.
24        It's a printout from the
```

Page 340

```
 1   American Pain Society's website entitled,
 2   2017 Elizabeth Narcessian Award For
 3   Outstanding Educational Achievements in
 4   the Field of Pain.  And we have a picture
 5   of you there.
 6        A.   Yes.
 7        Q.   And the third -- the third
 8   paragraph there states, Ms. Kitlinski is
 9   a strong proponent of utilizing
10   innovative partnerships/learning
11   approaches.  She was instrumental in
12   establishing APS's interdisciplinary
13   fundamentals of pain management course,
14   which has provided over 1,150
15   residents/fellows with mentored exposure
16   to the annual scientific meeting and a
17   solid foundation for continued learning
18   on pain assessment/management.
19             Did I read that correctly?
20        A.   Yes.
```

Page 341

```
24        A.   No, I don't recall that we
```

Highly Confidential - Subject to Further Confidentiality Review



Page 342

```
 1    looked at the document, quite frankly.
 2         Q.    We'll get that for you in a
 3    moment.
 4         MS. AMINOLROAYA:  I'm
 5    handing you what has been marked
 6    as Exhibit-42.  This is
 7    PKY181215547.  And it's E1406.
 8          - - -
 9         (Whereupon, Endo-Kitlinski
10    Exhibit-42, PKY181215547-749, was
11    marked for identification.)
12          - - -
13         THE WITNESS:  Thank you.
14         Yes, we definitely did not
15    look at this.
16    BY MS. AMINOLROAYA:
17         Q.    Oh, no, this was not the
18    document I was referring to, sorry.
19    We're pulling it up.
20         And this document is the
21    Guideline for the Management of Pain in
22    Osteoarthritis, Rheumatoid Arthritis and
23    Juvenile Chronic Arthritis, second
24    edition.
```

Page 343

```
 1         And you can see at the
 2    bottom there the American Pain Society
 3    logo, correct?
 4         A.    Yes.  I was just looking to
 5    see what the date was on there, but I
 6    have not found that yet, just as a frame
 7    of reference.
 8         2002, okay, I see it.  Thank
 9    you.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 344

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11    guideline from the American Pain Society;
12    is that correct?
13         A.    This is one of the
14    guidelines that they produce, yes.
15         Q.    And if you look at Page 14
16    of the document, is Endo Pharmaceuticals
17    a source of financial support for these
18    guidelines?
19         A.    Yes, along with multiple
20    other organizations, that's correct.
21         Q.    Okay.  So let's identify
22    some of them.
23         Is Purdue another supporter
24    of the guidelines?
```

Page 345

```
 1         A.    Their name is listed here,
 2    yes.
 3         Q.    And do you see Janssen's
 4    name?
 5         A.    Yes.
 6         Q.    So you weren't alone in
 7    supporting these guidelines, correct, Ms.
 8    Kitlinski?
 9         MR. DAVIS:  Objection to
10    form.
11         THE WITNESS:  The whole
12    point of guideline projects is to
13    get the broadest support from
14    the -- not just pharmaceutical
15    industry, but groups like Hoechst
16    Foundation and the Faulding
17    Laboratories, so that the
18    guidelines are appropriately
19    funded.
20    BY MS. AMINOLROAYA:
21         Q.    I'm going to add here to our
22    chart, Ms. Kitlinski, Purdue and Janssen
23    as supporters of the American Pain
24    Society.
```

87 (Pages 342 to 345)

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 358

17    MS. AMINOLROAYA:  We'll add
18  an exhibit number to this, this is
19  Exhibit-44.
20        - - -
21    (Whereupon, Endo-Kitlinski
22  Exhibit-44, No Bates,
23  Demonstrative, was marked for
24  identification.)

Page 359

1        - - -
2    (Whereupon, Endo-Kitlinski
3  Exhibit-21, No Bates,
4  Demonstrative, was marked for
5  identification.)
6        - - -
7  BY MS. AMINOLROAYA:

Page 360

4    take a break?
5    VIDEO TECHNICIAN:  Going off
6  the record.  The time is 5:13 p.m.
7        - - -
8    (Whereupon, a brief recess
9  was taken.)
10        - - -
11    VIDEO TECHNICIAN:  We're
12  back on the record at 5:39 p.m.
13  BY MS. AMINOLROAYA:
14    Q.    Ms. Kitlinski, turning your
15  attention back to Exhibit-33.
16    A.    Thank you.

Page 361

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 378

Page 380

Page 379

Page 381

```
13        Q.   Okay.  Turn to Page -- it
14   looks like we lost our E numbers on this
15   page, because it's a darker document.  It
16   ends in 16042.
17             MR. DAVIS:  042?
18             MS. AMINOLROAYA:  Yes.
19             - - -
20             (Whereupon, a discussion off
21   the record occurred.)
22             - - -
23   BY MS. AMINOLROAYA:
24        Q.   And if we look at 16042, the
```

Highly Confidential - Subject to Further Confidentiality Review



Page 382

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 384

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 383

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 385

```
 1
 2          MS. AMINOLROAYA:  My
 3    colleague, Mr. Buchanan, has some
 4    questions for you.
 5          VIDEO TECHNICIAN:  Going off
 6    the record.  The time is 6:01 p.m.
 7              - - -
 8          (Whereupon, a discussion off
 9    the record occurred.)
10              - - -
11          VIDEO TECHNICIAN:  We're
12    back on the record at 6:02 p m.
13              - - -
14          EXAMINATION
15              - - -
16    BY MR. BUCHANAN:
17       Q.   Ms. Kitlinski, I know it's
18    been a long day.  I hope you can bear
19    with me.  I have about 30 minutes' worth
20    of questions, at most.
21          My name is Dave Buchanan, I
22    represent other plaintiffs.  And I want
23    to go over a few areas and ask you a few
24    different points, okay?
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 418

Page 420

```
19    E04204, for our internal
20    reference.  What's the exhibit
21    number for the record?
22        This is Exhibit-47.
23        - - -
24        (Whereupon, Endo-Kitlinski
```

Page 419

Page 421

```
1    Exhibit-47, Hard drive, was marked
2    for identification.)
3        - - -
4        MR. BUCHANAN:  Could you
5    play it now, please?
6        - - -
7        (Whereupon, a video
8    recording was played.)
9        - - -
10   BY MR. BUCHANAN:
11       Q.   I want to pause on that for
12   a moment.
```

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS



Page 434

Page 436

```
1                                    1         - - -
2                                    2    VIDEO TECHNICIAN:  We're
3                                    3  back on the record at 6:50 p.m.
4                                    4         - - -
5                                    5    EXAMINATION
6                                    6         - - -
7                                    7  BY MR. LENISKI:
8                                    8    Q.  Good evening, Ms. Kitlinski.
9                                    9  My name is Joe Leniski, no relation --
10                                   10   A.  Good evening.
11                                   11   Q.  -- at least I know of.
12                                   12       And I represent district
13                                   13  attorneys and children born with AES in
14                                   14  the state of Tennessee.  I'll be asking
15                                   15  you questions about my state and some of
16                                   16  the things going on there that you may
17                                   17  have been involved with.
18                                   18       MR. LENISKI:  Before we get
19                                   19  going, I want to note for the
20                                   20  record that the Tennessee
21                                   21  plaintiffs are taking these
22                                   22  depositions while reserving all of
23                                   23  our rights, due to our standing
24                                   24  objection to the cross-notices in
```

Page 435

Page 437

```
1                                    1  the MDL and as a result of
2                                    2  production failures under the
3                                    3  standing MDL order and lack of
4                                    4  sufficient notice.
5                                    5       And we also object because
6                                    6  in Tennessee there are no time
7                                    7  limits to depositions.
8                                    8       So, with that objection,
9                                    9  we'll proceed.
10                                   10       MR. DAVIS:  If I may, just
11                                   11  because we dispute, obviously,
12                                   12  there's been any production
13                                   13  failures or notice failures.
14                                   14       We also think that, sitting
15                                   15  here in Pennsylvania deposing Ms.
16                                   16  Kitlinski, it would be the
17                                   17  Pennsylvania rules that would
18      MR. BUCHANAN:  I appreciate  18  apply, nonetheless.
19  your indulgence, counsel.        19       But please go ahead.
20      VIDEO TECHNICIAN:  Going off 20  BY MR. LENISKI:
21  the record.  The time is 6:35 p.m. 21   Q.  Ms. Kitlinski, before your
22         - - -                     22  deposition, we asked Endo's attorneys to
23      (Whereupon, a brief recess   23
24  was taken.)                      24
```

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review





Page 474

Page 476

```
 1        MR. LENISKI:  I have no more
 2  questions at this time.
 3        VIDEO TECHNICIAN:  Going off
 4  the record.  The time is 7:23 p.m.
 5        - - -
 6        (Whereupon, a brief recess
 7  was taken.)
 8        - - -
 9        VIDEO TECHNICIAN:  We're
10  back on the record at 7:26 p.m.
11        - - -
12        EXAMINATION
13        - - -
14  BY MR. DAVIS:
15     Q.   Ms. Kitlinski, we're getting
16  close.  I've just got a few more
17  questions for you that I hope will
18  clarify some of the things that you
19  testified to a bit earlier today.
```

Page 475

Page 477

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 494

Page 496

1  particular version is the September 2008
2  quarterly RiskMAP update report, which
3  covered the period from April 1st of 2008
4  to June 30th of 2008.
5        And this was produced within
6  Endo and provided to the FDA to apprise
7  them of our progress on these topics.
8  And if there are -- also to identify any
9  issues that might have arisen since the
10  last risk management -- RiskMAP report.
11     Q.   Did this Exhibit-50 here,
12  the RiskMAP update report from September
13  3rd, 2008, relate only to the -- I guess,
14  what is that, the second quarter of 2008?
15     A.   Yes.  Period covering April
16  1st to June 30th.
17     Q.   Did Endo ever submit any
18  other RiskMAP update reports to FDA?
19     A.   Yes, on a quarterly basis.
20     Q.   Did these RiskMAP update
21  reports generally follow the same format?
22     A.   We had a template, which we
23  had worked out with -- you know, again,
24  with the first submission to the agency

Page 495

1     Q.   Ms. Kitlinski, I'd like to
2  show you what's been marked as
3  Exhibit-50, please.
4     A.   Thank you.
5            - - -
6        (Whereupon, Endo-Kitlinski
7        Exhibit-50,
8        ENDO-OPIOID_MDL-01769386-592, was
9        marked for identification.)
10            - - -
11     MR. DAVIS:  John, do you
12  have a copy to hand down?  Oh,
13  yeah, we did this dance before,
14  didn't we?
15  BY MR. DAVIS:
16     Q.   So, Ms. Kitlinski, the
17  document that's been marked Exhibit-50
18  bears the Bates number
19  ENDO-OPIOID_MDL-01769386.
20        Are you familiar with this
21  document, Ms. Kitlinski?
22     A.   Yes.
23     Q.   What is this document?
24     A.   This is the -- this

Page 497

1  so that it was uniform for them to follow
2  along, and also so that we were very
3  clear on who was -- you know, what fell
4  under what section, who was responsible
5  for that section and where new
6  information on that could appear.
7     Q.   Did these RiskMAP update
8  reports contain information regarding the
9  continuing education that Endo supported
10  during the quarter covered by each
11  particular report?
12     A.   Yes.
13        And, also, if new things
14  were initiated.  So it might have been
15  that the activity was -- occurred then,
16  or it might be that, let's say, they were
17  developing new curriculum for one that
18  would occur in the future.
19     Q.   Ms. Kitlinski, did FDA ever
20  provide any feedback to Endo in response
21  to its description of continuing
22  education in the quarterly RiskMAP update
23  reports?
24        MS. AMINOLROAYA:  Objection

Highly Confidential - Subject to Further Confidentiality Review

Page 498

1    to form.  You're asking, sorry, if
2    FDA provided feedback in the
3    RiskMAPs that Endo submitted?
4        MR. DAVIS:  Let me ask it
5    again.
6    BY MR. DAVIS:
7        Q.   Ms. Kitlinski, did Endo ever
8    provide any feedback -- did FDA -- I'll
9    get it right.
10       A.   Three times is the charm.
11       Q.   Ms. Kitlinski, did FDA ever
12   provide Endo with feedback regarding the
13   information that Endo provided in its
14   quarterly RiskMAP update reports
15   regarding the continuing education -- the
16   independent education that Endo
17   supported?
18       A.   Not --
19       MS. AMINOLROAYA:  Objection.
20       THE WITNESS:  Not to my
21   knowledge, with the exception of
22   making the comment that it was,
23   you know, a good, comprehensive
24   program.  And, in fact, I can't

Page 499

1    recall if it was Doug
2    Throckmartin, or someone who was
3    associated with the development of
4    the REMS, had referred to our
5    educational -- our RiskMAP as one
6    that was very thorough.
7        And so I took that as a
8    compliment.
9    BY MR. DAVIS:
10       Q.   Did FDA ever say that the
11   education that Endo was supporting was
12   not balanced?
13       A.   No.  Absolutely --
14       MS. AMINOLROAYA:  Objection
15   to form.
16   BY MR. DAVIS:
17       Q.   Did Endo ever -- or did FDA
18   ever tell Endo that the education -- the
19   independent education that it was
20   supporting was biased in any way?
21       MS. AMINOLROAYA:  Objection
22   to form.
23       THE WITNESS:  No.
24   BY MR. DAVIS:

Page 500

1        Q.   Did FDA ever tell Endo that
2    the education it was supporting minimized
3    the risks of abuse or misuse of opioids?
4        MS. AMINOLROAYA:  Same
5    objection.
6        THE WITNESS:  No.
7    BY MR. DAVIS:
8        Q.   Did FDA ever tell Endo that
9    the education it supported minimized the
10   risk of addiction associated with
11   opioids?
12       MS. AMINOLROAYA:  Object to
13   form.
14       THE WITNESS:  No.
15   BY MR. DAVIS:
16       Q.   Did FDA ever tell Endo that
17   the education it supported minimized the
18   risk of overdose associated with opioids?
19       A.   No.
20       MS. AMINOLROAYA:  Objection.
21   BY MR. DAVIS:
22       Q.   Does this -- does
23   Exhibit-50, the RiskMAP report from
24   September 3rd, 2008, Ms. Kitlinski,

Page 501

1    contain information regarding the
2    education supported by Endo during that
3    quarter?
4        A.   Yes, it does.
5        Q.   Can you describe for me
6    generally the types of education Endo
7    supported, the independent education Endo
8    supported during the second quarter of
9    2008, please?
10       A.   Yes.  And if you look, I'll
11   just -- rather than flipping through the
12   report, I'll just work from the table of
13   contents here.
14       You can see that it's broken
15   into several sections under education.
16   Number one, the professional education
17   initiatives.  Again, those are the
18   independent education initiatives that
19   were supported through unrestricted
20   educational grants.
21       You'll see, then, there's
22   patient and -- and under that section, we
23   already discussed NIPC, so folks are
24   familiar with that.

126 (Pages 498 to 501)

Highly Confidential - Subject to Further Confidentiality Review

Page 502

1    We talked about the I-med --
2  we didn't call it I-med, but it was the
3  NIDA, National Institute on Drug Abuse,
4  activity that was being coordinated by
5  Penn State College of Medicine and NIDA.
6    We talked about many of the
7  collaborative efforts with the
8  professional societies to have
9  educational activities at their annual
10  conferences.
11    We talked about the
12  residents/physician in training
13  initiative.
14    We spoke about painEDU,
15  which was the Inflexxion website, and
16  manual for clinicians.
17    And then we spoke about the
18  ACPE, accredited pharmacy education
19  monographs.
20    I think it's interesting you
21  asked me about the evolution of things.
22  In my capacity, one of my
23  responsibilities at DuPont Merck was
24  actually -- we were an accredited ACPE

Page 503

1  provider, so my activities there did
2  involve directly working with the faculty
3  and developing pharmacy education
4  modules, maintaining the accreditation
5  documents for that.  And being, you know,
6  in industry, you were ultra sure that you
7  were not only adhering but, you know,
8  exceeding those standards.
9    So I had -- I know there was
10  one area where someone was asking about a
11  pharmacy monograph and the fact that we
12  were, you know, being involved with that.
13  And that was perfectly acceptable.
14    We talked about the opioid
15  handbooks; the principles of analgesic
16  use; supporting the purchase of
17  evidence-based guidelines.
18    And then risk management
19  information and tools for clinicians --
20  I'll just refresh my memory on what
21  specifically that was that we hadn't
22  already talked about.
23    Oh, this was -- this was
24  actually not an independent educational

Page 504

1  activity.  This was the Promise
2  initiative, which was an Endo-developed
3  activity for education.
4    So that was the professional
5  education.
6    The patient and family
7  education consisted of, we've talked
8  about the Understanding Your Pain
9  brochure.  There was one on the -- that
10  was not in this section, on pain rating,
11  pain assessment inventory.
12    So when you're going to your
13  physician, how you can, you know, capture
14  on the pain scale what your pain rating
15  was, where the source of your pain was,
16  descriptors for the pain.
17    And then the Pain Action
18  website, which had materials that could
19  be downloaded, similar to those tear-pads
20  that we were discussing for the state of
21  Tennessee, you know, helping to educate
22  families and caregivers on safe use and
23  safe storage principles.
24    And then beyond that, the

Page 505

1  other area that we supported through
2  educational grants was the development of
3  psychometrically validated tools to help
4  assess patients who were being considered
5  for opioid therapy, that would be the
6  SOAPP tool, or who were already on opioid
7  therapy to manage them and to assure that
8  their risks were mitigated; so that was
9  SOAPP and CON.
10    So those were the types of
11  activities that were in our RiskMAP.
12    Q.   In addition to listing all
13  of those educational activities in the
14  table of contents, does this RiskMAP
15  report from September of 2008 contain any
16  further information about those
17  educational activities?
18    A.   It has a summary for each of
19  those.  I mean, in the purposes of time,
20  I just gave you my one-word CliffsNote
21  version of it.
22    But each of those areas
23  would have a paragraph, two paragraphs or
24  longer, describing what was relative for

127  (Pages 502 to 505)

Highly Confidential - Subject to Further Confidentiality Review

Page 506

1 that quarter.
2 Q. Did you review other
3 quarterly RiskMAP update reports, other
4 than this one from September 2008, Ms.
5 Kitlinski?
6 MS. AMINOLROAYA: Objection
7 to the form.
8 THE WITNESS: I --
9 MS. AMINOLROAYA: Can we
10 specify what time period the
11 question relates to?
12 MR. DAVIS: During the
13 course of the RiskMAP.
14 THE WITNESS: Yes. We would
15 do this on a quarterly basis. So
16 once a quarter I would prepare my
17 sections, I would submit it to the
18 regulatory team. They would
19 incorporate the other sections
20 from the other departments and
21 produce the final version like
22 we're looking at here.
23 BY MR. DAVIS:
24 Q. Did the other RiskMAP,

Page 507

1 quarterly RiskMAP reports that you
2 reviewed, contain a similar number of
3 educational activities?
4 A. Yes. We are always
5 committed to a very robust risk
6 mitigation strategy. That's why we
7 developed this in the first place.
8 That's why we did it, even though it
9 wasn't required.
10 Q. Did FDA ever respond to any
11 of the quarterly RiskMAP update
12 reports -- let me ask a better question.
13 In response to any of the
14 RiskMAP update reports, did FDA ever ask
15 Endo to support different educational
16 activities?
17 A. No. We did not --
18 MS. AMINOLROAYA: Object to
19 form.
20 THE WITNESS: Until the REMS
21 came out, in which case that
22 applied to not just Endo, but the
23 REMS, you know, applied to
24 everyone.

Page 508

1 BY MR. DAVIS:
2 Q. In response to any of the
3 quarterly RiskMAP update reports, did FDA
4 ever tell Endo to stop supporting any
5 particular educational activity?
6 A. No.
7 MS. AMINOLROAYA: Objection
8 to form.
9 BY MR. DAVIS:
10 Q. Ms. Kitlinski, does the --
11 did the RiskMAP -- I know you talked to
12 this a second ago -- you can set that
13 aside if you'd like.
14 Does the Opana ER -- did the
15 Opana ER RiskMAP cover other areas beyond
16 independent education?
17 A. Yes.
18 Q. Did you have responsibility
19 for those areas?
20 A. No, I did not.
21 Q. Were there others at Endo
22 that had responsibility for those areas?
23 A. Yes. So the individuals in
24 each department would produce their

Page 509

1 section of the report, and it would be
2 compiled by the regulatory department.
3 Q. Do you know whether -- and,
4 Ms. Kitlinski, you just referenced the
5 REMS.
6 A. Yes.
7 Q. Did Endo -- did the REMS --
8 were you referring to the
9 extended-release long-acting opioid REMS?
10 A. Yes, that's correct.
11 Q. And does -- I'll just refer
12 to that as the REMS for now.
13 A. Yes.
14 Q. Did the REMS contain an
15 educational component?
16 A. Yes, it did. They call it
17 training in the REMS language, but we
18 worked through that with them so they
19 understood it was education and we
20 understood it was training, and we used
21 the words, you know, education/training.
22 Q. Did Endo continue to support
23 independent education following the
24 implementation of the REMS?

128 (Pages 506 to 509)

Highly Confidential - Subject to Further Confidentiality Review

Page 510

1   MS. AMINOLROAYA:  Objection
2 to form.
3   THE WITNESS:  We did for a
4 period of time.  And then there
5 were concerns that by -- so I'll
6 step back for a second.
7   The REMS, besides requiring
8 education, established goals of
9 how many -- they called them
10 completers, how many clinicians
11 needed to have completed training,
12 their word, on the full blueprint
13 in order to count towards the REMS
14 goals.
15   So the FDA had very strict
16 goals of what was required within,
17 you know, the first year of the
18 REMS being available and the
19 second year, et cetera.
20   And because of the length of
21 the -- the length of the
22 blueprint, which, therefore,
23 dictated the length of the CE
24 activities, many of them were

Page 512

1 confusion that if you were a
2 practicing clinician and you
3 participated in this activity that
4 was three hours long and talked
5 about the safer use of opioids,
6 you would have considered that you
7 can -- completed, you know,
8 appropriate education on opioids.
9 You would not be likely to
10 sit through another three hours of
11 REMS-compliant training.
12   And so that was one of the
13 big things we learned up front was
14 clinicians don't know or care what
15 REMS means; if you talk about safe
16 use of opioids, they'll be
17 interested in that.  If you say
18 you should go to this because it's
19 an FDA REMS-mandated activity,
20 they probably care less.
21   So we tried to not dilute
22 the pool of physicians and
23 clinicians who were willing to,
24 you know, participate in the REMS

Page 511

1 three hours long, two and-a-half
2 hours, three hours, even a little
3 bit longer than that.  There
4 was -- you know, clinicians are
5 busy and, again, were not
6 necessarily standing in line to
7 give up three or four hours of
8 their time to participate in an
9 educational activity, albeit CE
10 accredited, and albeit one of key
11 importance.
12   So what we realized after
13 the first year was that we were
14 potentially -- because there was a
15 lot of -- if there was other
16 opioid education, so, for example,
17 NIDA, I remember having a
18 discussion with NIDA, who had done
19 a Medscape activity talking about
20 the responsible use of opioid
21 analgesics, and it was three hours
22 long, again, which was similar to
23 the REMS.
24   So there was a lot of

Page 513

1 education, because that was
2 mandatory for us because we had
3 goals that we had to meet.
4   And so while we were trying
5 to do the right thing by offering
6 greater diversity of education, it
7 became apparent that that was
8 having a potential negative effect
9 on people participating on the
10 REMS.
11 BY MR. DAVIS:
12   Q. At that point, did Endo
13 continue to support independent education
14 through its participation in REMS?
15   A. Yes, we did.
16   Q. Did FDA -- were you aware of
17 whether the REMS consortium shared any
18 information with FDA?
19   A. With regards to the progress
20 on the REMS, is that what you're
21 referring to?
22   Q. I'm specifically talking
23 about the content of the education
24 supported by the REMS consortium.

Highly Confidential - Subject to Further Confidentiality Review

Page 514

1          MS. AMINOLROAYA:  Objection
2     to form.
3          THE WITNESS:  So the RPC,
4     the REMS program companies,
5     provided a -- again, a report, a
6     periodic report to the FDA, the
7     first ones were shorter periods of
8     time, the others were, you know,
9     24, 36 months, et cetera, advising
10    them of the progress, in terms of
11    the metrics, the REMS metrics,
12    where we stood with regard to the
13    goals they had determined, where
14    we stood with regards to the
15    evaluations, you know, we were
16    talking about the fact that
17    education -- accredited education
18    needs to have a metric for
19    determining whether you've
20    accomplished -- whether the CE
21    provider has accomplished the
22    goals they set out to do.
23         So all of that information
24    was communicated periodically in a

Page 515

1     very lengthy report to the FDA.
2     BY MR. DAVIS:
3          Q.   Did the FDA ever provide
4     direction to the REMS program companies
5     about the types of independent education
6     those companies should be supporting
7     through their participation in REMS?
8          A.   No.  They were part of the
9     discussions of what the intent was.  And
10    it was emphasized that it was to reach a
11    broad audience of especially primary care
12    providers.
13         They knew how, in fact, we
14    had sent the request for proposal, the
15    draft, to them in advance of putting it
16    out there to the CE community to make
17    sure that they knew what we were asking
18    for and to make sure that it was aligned
19    with their expectations.
20         And they received reports
21    from the REMS companies, for example,
22    after each grant cycle saying, these are
23    the grants that have been -- have been
24    approved.  Part of the REMS was the

Page 516

1     requirement to have a realtime website
2     that would list -- and it was searchable,
3     if you were a primary care physician in
4     Pennsylvania and you were looking to
5     participate in a REMS education activity,
6     you would be able to do a keyword search
7     and find either live or online activities
8     that were, you know, aligned with your
9     interests.
10         So the FDA received regular
11    updates on that as well.
12         Q.   Ms. Kitlinski, did Endo
13    exercise any control over the content of
14    the independent education it supported
15    through the RiskMAP?
16         MS. AMINOLROAYA:  Objection
17    to form.
18         THE WITNESS:  Through the --
19    through the RiskMAP?
20    BY MR. DAVIS:
21         Q.   Yes.
22         A.   Again, Endo did not
23    contribute -- control, exert influence or
24    control the content because, ultimately,

Page 517

1     that resided with the CE provider and
2     with the faculty and the program
3     development team.
4          I do say, as I said before,
5     in the early days, when appropriate and
6     compliant with the guidelines, when
7     asked, we did provide input on broad
8     topics, potential faculty who were -- who
9     were therapeutic experts or a courtesy
10    medical review for looking for medical
11    accuracy regarding our information.
12         Q.   In those early days, would
13    Endo provide specific content related to
14    the broad topics it had offered?
15         A.   No.
16         Q.   Did Endo exert any control
17    over the content of the independent
18    education supported through REMS?
19         MS. AMINOLROAYA:  Objection
20    to form.
21         THE WITNESS:  No.  And
22    the -- again, I'll preface this,
23    since this whole REMS was a little
24    bit of a different -- sort of a

Highly Confidential - Subject to Further Confidentiality Review

Page 518

1   different animal, part of the REMS
2   blueprint, which FDA did require
3   each company to submit, was --
4   Section 6 of the REMS blueprint
5   was product-specific information
6   on each of the ERLA opioid REMS
7   products.
8       So, for example, for Endo,
9   Opana ER, we were required to
10  submit a one-page summary of
11  contraindications, warning,
12  dosage, any particular risk issues
13  that were in the labeling so that
14  if a clinician was going to
15  prescribe any one of the ERLA
16  opioids, they could look at
17  Section 6 and they could know what
18  the sort of relevant issues were
19  for that particular drug, as
20  opposed to for the class.
21      And so that we were asked to
22  provide -- our regulatory and our
23  R&D teams provided that to the
24  FDA.  The FDA, again, made sure

Page 519

1   that it was appropriately vetted
2   through their own internal
3   organization and consistent with
4   the labeling, and also that it was
5   vetted through the DHHS, HHS,
6   NIDA, SAMSA folks who were also
7   reviewing everything.
8       So, again, that was the work
9   product of the FDA, which was what
10  the blueprint was, but we did have
11  that -- that responsibility to
12  present that one-page synopsis on
13  our particular products.
14  BY MR. DAVIS:
15      Q.   Separate and apart from that
16  one-page synopsis, did Endo exert any
17  control over the independent education
18  supported through REMS?
19      A.   No.
20          MS. AMINOLROAYA:  Objection
21  to form.
22  BY MR. DAVIS:
23      Q.   Ms. Kitlinski, I'd like to
24  ask you about a few of the documents that

Page 520

1   you went through during the course of
2   plaintiffs' examination.
3       Can we start with
4   Exhibit-35, please?  And this is, again,
5   just for the record, Bates labeled
6   ENDO-OPIOID_MDL-06234029.
7       Do you recall discussion of
8   this document, Ms. Kitlinski?
9       A.   Yes.
10      Q.   And what is this document?
11      A.   This was a -- an update from
12  the American Pain Foundation to Endo
13  about its -- when John Giglio took over
14  the responsibilities there, the overview
15  of the American Pain Foundation, what
16  some of their recent accomplishments
17  were, where they were heading in the
18  future.
19      Q.   Do you recall questions
20  about Endo's support for the recent APF
21  accomplishments described in this
22  document?
23      A.   I do, yes.
24      Q.   And do you see that sentence

Page 521

1   on the second page of this document?
2       A.   With support -- Page 2 here,
3   With support from Endo?
4       Q.   Yes.
5       A.   Yes.
6       Q.   Was Endo the only funder of
7   APF's recent accomplishments?
8       A.   No.  As I pointed out when
9   we were going through the brochure itself
10  as well, there were many other funders,
11  both industry and nonindustry supporters.
12      Q.   Do you recall plaintiffs'
13  counsel asking you about the patient
14  education materials described on Page 3
15  of the document?
16      A.   Yes.
17      Q.   Were those patient education
18  materials the only recent APF
19  accomplishments described in this letter?
20      A.   No.  As you can see, there
21  were at least a page of accomplishments,
22  talking about education, as well as their
23  work in the field of pain management and
24  advocacy.

131  (Pages 518 to 521)

Highly Confidential - Subject to Further Confidentiality Review

Page 522

1    Q.   You just said "pain
2  management" there, Ms. Kitlinski.
3        Does that mean opioids?
4    A.   Opioids are one element of
5  pain management.  But what American Pain
6  Foundation, and all of the other national
7  pain organizations, are committed to,
8  unless it was a specific one like the
9  Varicella Zoster Foundation, which was
10  only associated with that particular area
11  of pain, but for the majority, the
12  American Chronic Pain Association, the
13  National Pain Foundation, the ACPA, all
14  of the professional organizations, their
15  goal was much broader.  It was for
16  correct and appropriate assessment of
17  patients, assuring that patients were
18  able to describe their needs to their
19  clinicians, assuring that clinicians had
20  access to a broad spectrum of analgesic
21  modalities, whether they be
22  pharmacologic, nonpharmacologic, you
23  know, combination, multimodal therapies,
24  all of those.

Page 523

1        So that's what pain
2  management is when I use that term.  And
3  certainly opioids is one element of that.
4    Q.   But just one element, right?
5    A.   Yes.  And certainly not the
6  first element.  All of the -- I know that
7  there were some sentences or bullet
8  points that pointed out today about
9  opioids and, perhaps, someone might have
10  mistakenly believed that that was the
11  first alternative that was recommended in
12  all of these educational materials,
13  whether they were independent or
14  otherwise.
15        And, indeed, without
16  exception, they all indicated that opioid
17  should be used when other modalities have
18  failed to provide sufficient pain relief
19  or when there are untoward issues which
20  necessitated adding an opioid or
21  considering adding an opioid.
22        And, again, in all
23  instances, the education emphasized the
24  need, right from the get-go, of having an

Page 524

1  exit strategy so that the patient
2  understood this was a trial.
3    Q.   Let's look at one of the
4  patient education materials referred to
5  in this APF document.  It's Exhibit-36.
6  And that bears the Bates number
7  CHI000435580.
8        Do you recall discussing
9  this document with plaintiffs' counsel,
10  Ms. Kitlinski?
11    A.   Yes.
12    Q.   And what is this document?
13    A.   Again, this is a,
14  quote/unquote, pain action guide, a
15  brochure that was developed by the
16  American Pain Foundation talking about
17  the -- again, pain in general, as we've
18  been discussing all day, that there are
19  two concomitant public health situations.
20  One is chronic pain and the other is the
21  public health situation associated with
22  abuse and misuse of opioid analgesics.
23        This was to give information
24  to patients that they could discuss with

Page 525

1  their families and their caregivers.
2  Sort of simple lay language like, what
3  can I do?  Talk to your doctor and nurse
4  about pain.  It's a common medical
5  problem that requires attention, so you
6  shouldn't be ashamed to talk about it.
7  Tell your doctor or nurse where it hurts
8  so they can help localize it.  Describe
9  how much your pain hurts.  So it was
10  practical, lay language that could be
11  utilized.
12        And resources.  Keep a pain
13  diary.  You know, use a pain rating
14  scale.  That type of thing.
15    Q.   Do you recall plaintiffs
16  asking you questions about this document?
17    A.   I recall us -- I recall us
18  talking about the document.  And I know
19  that we asked at least one question on
20  it.
21    Q.   How many pages is this
22  document?
23    A.   It looks like 14.
24    Q.   How many pages did

132  (Pages 522 to 525)

Highly Confidential - Subject to Further Confidentiality Review

Page 526

1    plaintiffs ask you about?
2         A.   I believe it was one point
3    on one page.
4         Q.   Okay.  They did not ask you
5    about the whole document, did they?
6         A.   No.
7         Q.   They did not ask you about
8    anything other than this one point on
9    Page 6, correct?
10        A.   Yes, that's correct.
11        Q.   Okay.  They didn't ask you
12   about, for example, on Page 10,
13   suggestions to ask your doctor or nurse
14   about nondrug, nonsurgical treatments,
15   did they?
16        A.   No.
17        Q.   Did they ask you questions
18   about the suggestion that a patient ask
19   their doctor or nurse about ways to relax
20   and cope with pain?
21        A.   No.
22        Q.   Okay.  You can set that one
23   aside.
24             Let's look at Exhibit-40,

Page 527

1    please.  And this exhibit bears the Bates
2    number ENDO-OPIOID_MDL-05968029.
3         Ms. Kitlinski, do you recall
4    this document?
5         A.   Yes.  This was part of the
6    syllabus from the American Pain Society
7    residents course.
8         Q.   Let's flip to the primer and
9    the syllabus.
10             Just ballpark, how many
11   pages is this syllabus?
12        A.   It looked about 50 pages,
13   printouts.
14        Q.   And many of the pages
15   contain -- do many of the pages contain
16   more than one slide?
17        A.   There are generally three
18   slides, three up on each page; so 150
19   slides, approximately.
20        Q.   Do you recall how many of
21   these slides plaintiffs asked you about?
22        A.   I do not, but I believe it
23   was a limited number.
24        Q.   Do you recall plaintiffs

Page 528

1    asking you about any slide other than the
2    top slide on the page that bears the
3    Bates number ending 8066?
4         A.   No, I do not.  It was -- the
5    pseudoaddiction was the only point that
6    they raised out of this.
7         Q.   Did they -- did plaintiffs
8    ask you about, if you flip to the
9    beginning, about the agenda for the
10   fundamentals of pain management program?
11        A.   No.
12        Q.   Do all of the sessions
13   described over the several days of this
14   program relate to opioids?
15        A.   Not by a long shot, no.
16             There is one session on pain
17   pharmacology -- well, first of all, to
18   take a step back.  It's not even that
19   there are -- the whole sessions relate to
20   pharmacologic therapy.  It talks about
21   assessment and physical exam and taking a
22   history.
23             And then there is one
24   session on pain pharmacology presented by

Page 529

1    Dr. Barry Kohl, after the pain
2    pharmacology of nonopioid analgesics is
3    presented by Dr. Argoff.
4             There is also, on the second
5    day, the assessment and management of
6    aberrant behaviors associated with
7    analgesic use.
8             So those are the only --
9    unless I'm missing, my guess here, the
10   only opioid-related courses.  And
11   methadone, I'm sorry, the devil is in the
12   details, sort of discussing the dosing
13   challenges and the very variable and
14   extended half-life of that drug.
15        Q.   Did plaintiffs ask you about
16   any of the nonopioid-related sessions for
17   the fundamentals of pain management
18   section?
19        A.   No.
20        Q.   Did they ask you about any
21   of the other many slides contained in
22   this document, other than the one that we
23   just referenced?
24        A.   No.

Highly Confidential - Subject to Further Confidentiality Review

Page 530

1        Q.   You can set that one aside,
2    Ms. Kitlinski.
3            I'd like you to look at
4    Exhibit-42, please, if you would.  This
5    document bears a number of Bates numbers,
6    but I'll go with the one at the bottom,
7    which is, I think, the one cited in the
8    record thus far, which is PYK181215547.
9            Do you recall this document,
10   Ms. Kitlinski?
11       A.   Yes.
12       Q.   What is this document?
13       A.   This is the guideline for
14   osteoarthritis, rheumatoid arthritis and
15   juvenile chronic arthritis that was
16   developed by the American Pain Society in
17   2002.
18       Q.   And did plaintiffs ask you
19   about any of the content of this
20   document?
21       A.   I don't believe so.  We read
22   it up -- and we were talking about it --
23   about guidelines, but I don't believe
24   that we actually delved into any of the

Page 531

1    content here.
2        Q.   And does -- do these
3    guidelines address topics other than
4    opioids?
5        A.   Yes, very much so.  Again,
6    pain assessment and the overview of the
7    pathophysiology associated with these
8    various disease -- arthritic types of
9    diseases.
10           Certainly, the, you know,
11   first line therapy for OA is -- are not
12   opioids; Tylenol, NSAIDs, et cetera.  So
13   this goes through the -- goes through the
14   analgesics component here, starting on
15   Page 54, talking about analgesics,
16   acetaminophen, nonsteroidals, topical
17   agents, hyaluronic acid, et cetera,
18   DMARDs.
19           And then there is, it looks
20   like, three pages on opioids, the first
21   of which is addiction, physical
22   dependence and tolerance.  One page on
23   the effectiveness and use of opioids.
24   And then one page on opioid dosing.

Page 532

1    Tramadol is an atypical agent, but could
2    be characterized as an opioid as well.
3    So there might be four pages there.
4        Q.   And how many pages is this
5    guideline?
6        A.   It looks to be about 131,
7    plus the appendices and index.
8        Q.   And was this an APS
9    guideline?
10       A.   Yes.
11       Q.   When I say "APS," do you
12   understand me to mean the American Pain
13   Society?
14       A.   The American Pain Society,
15   yes.
16       Q.   And do you have an
17   understanding of the American Pain
18   Society's objectives?
19           MS. AMINOLROAYA:  Objection
20       to form.
21           THE WITNESS:  Well, I
22       believe they -- they lay it out
23       here in the preface, which is
24       intending -- they convened an

Page 533

1    arthritis pain management panel
2    over the course of two years, with
3    all of the top therapeutic experts
4    in rheumatology, and they worked
5    with -- and orthopedic surgeons as
6    well, and developed this
7    interdisciplinary panel of experts
8    who were -- then provided the
9    recommendations for this
10   guideline.
11           So that it incorporated all
12   of the -- not just pain
13   specialists, but all the
14   specialists who manage arthritic
15   pain.
16   BY MR. DAVIS:
17       Q.   You can set that aside, Ms.
18   Kitlinski.
19           Will you look at Exhibit-43,
20   please?  And this bears the Bates number
21   END00051370.
22           Do you recall this document,
23   Ms. Kitlinski?
24       A.   Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review

Page 534

1      Q.   What is this document?
2      A.   This is the handbook
3   entitled, Responsible Opioid Prescribing,
4   a Physician's Guide, that was authored by
5   Scott Fishman, Dr. Scott Fishman, and
6   distributed -- made available through the
7   Federation of State Medical Boards.
8      Q.   How many pages is this
9   document, Ms. Kitlinski?
10      A.   It looks to be about 125
11   pages.
12      Q.   Do you recall plaintiffs
13   asking you questions about this document?
14      A.   We did look at one point in
15   here.
16      Q.   Do you recall how many pages
17   they asked you questions about?
18      A.   I know it was at least one.
19   I'm sorry, I don't.
20      Q.   Okay.  Let's look at Page
21   28, please, of the actual book copy, not
22   the number up top, sorry.
23      A.   That's all right.
24      Q.   Do you recall -- do you see

Page 535

1   the --
2      A.   Oh, yes.
3      Q.   -- do you recall plaintiffs
4   asking you about any other section of
5   this book besides that one paragraph on
6   Page 28?
7      A.   No.  It was about patient --
8   about clinicians being sued for not
9   treating pain aggressively.
10      Q.   Will you look at Page 5 of
11   the book, please, Ms. Kitlinski?
12      A.   Page 1 of the actual book,
13   Page 5 of --
14      Q.   I'm sorry, I'm going by the
15   book numbers.  So it's the page that
16   reads, Introduction, pharmacovigilance
17   and good medicine.
18      A.   Got it.  Yes.
19      Q.   Are you familiar with the
20   language on this page?
21      A.   Yes.
22      Q.   Does this language speak to
23   important public health trends?
24      A.   Yes, it does.

Page 536

1      Q.   And what are those public --
2   important public health trends described
3   by this book?
4      A.   Well, this is a really, I
5   think, appropriate way of depicting here
6   the twin serpents in the caduceus,
7   right?  So you've got the public health
8   trend of the shifting patterns of drug
9   abuse from illicit to prescription drugs,
10   a notable rise in diversion and
11   nonmedical use of opioid pain
12   medications, and then on the flip side of
13   it, the attention that pain in general,
14   chronic pain, is often undertreated or
15   undiagnosed.
16      And so it's, as the author
17   puts it, the perfect storm, if you will,
18   of clinicians needing to manage those
19   dual public health crises in a reasonable
20   way.
21      Q.   Does this language recognize
22   the risk associated with opioid
23   analgesics?
24      MS. AMINOLROAYA:  Objection

Page 537

1   to form.
2      THE WITNESS:  Absolutely.
3   BY MR. DAVIS:
4      Q.   And what does it say about
5   the risk of opioid analgesics?
6      A.   Again, it goes into the fact
7   that, you know, clinicians need to be
8   sensitive to and knowledgeable about
9   pharmacovigilance and risk management.
10      It says the combination of
11   the potential of therapeutic benefit but
12   the high risk associated with opioid
13   analgesics leaves them no alternative but
14   to become more sophisticated risk
15   managers in their patients.
16      Q.   Did plaintiffs --
17      A.   And so -- and it states
18   explicitly that, we cannot ignore the
19   potential risks associated with the use
20   of controlled substance, including
21   addiction, and that managing risk is
22   something that clinicians do in their
23   everyday clinical practice.
24      Q.   Did plaintiffs ask you any

135  (Pages 534 to 537)

Highly Confidential - Subject to Further Confidentiality Review

Page 538

1    questions about that language?
2         A.   No.
3         Q.   Ms. Kitlinski, we're close.
4    We're close.  I know you've been sitting
5    here for a long time.
6         A.   And I -- may I just make one
7    additional comment?
8         Q.   Please.  Please.
9         A.   One of the -- I think the
10   greatest impact of this particular tool
11   was in the foreword, which was authored
12   by James Thompson, who was the president
13   of the Federation of State Medical
14   Boards, and his comment here that says,
15   you know, Patients in pain who rely on
16   opioids for analgesia deserve access to
17   safe and effective medication; to deprive
18   them of this pain relief certainly does
19   them harm.  Yet, these same
20   life-restoring medications carry the
21   potential to do grave harm to patients
22   who may be at risk for addiction and
23   abuse.  Significant quantities of
24   prescription opioids are diverted into

Page 539

1    the illegal black market that puts
2    millions of nonmedical, quote,
3    recreational users at risk of addiction
4    and death, many of them young adults and
5    teenagers.  While very few
6    clinicians/physicians are complicit in
7    this criminal diversion and there are no
8    proven methods from preventing patients
9    from deceptively acquiring prescriptions,
10   but the fact that some patients will
11   deceive a physician in order to obtain
12   prescription opioids for nonmedical use
13   requires us to be vigilant when
14   prescribing these potent and potentially
15   abusable medications.
16        So, again, very strong,
17   emphatic statement of the recognized risk
18   and the need to really accelerate
19   awareness of that.
20        Q.   Do you agree with that?
21        A.   Absolutely.
22        Q.   Was it your understanding,
23   during your time at Endo, that the
24   company agreed with that language?

Page 540

1         A.   Yes.
2         Q.   Ms. Kitlinski, we saw a few
3    documents earlier today that contained
4    the phrase -- it might have just been two
5    documents, contained the phrase "ROI."
6         Do you recall those?
7         A.   Yes.
8         Q.   Do you have an understanding
9    as to what ROI is generally?
10        A.   Well, I understand what ROI
11   generally is in the noneducation field.
12   It's the ability to determine what the
13   return on investment is for a given
14   initiative.
15        Q.   Did Endo ever conduct any
16   return on investment with respect to any
17   of its opioid -- any of the
18   opioid-related independent education it
19   supported?
20        A.   No.  It would be
21   inappropriate to do so.
22        And, you know, return on --
23   ROI is not the same as discussing a
24   return on education, in terms of, you

Page 541

1    know, were you able to have clinicians be
2    attracted to the program and participate
3    because it's good, quality education,
4    it's CE accredited, it's, you know,
5    addressing educational gaps and needs
6    that they have.
7         Q.   Do you recall, Ms.
8    Kitlinski, discussing with plaintiffs
9    their characterization of the amount of
10   money that Endo had paid to these
11   third-party organizations?
12        A.   Yes.
13        Q.   Do you recall plaintiffs
14   asking you whether Endo had paid millions
15   of dollars to certain organizations?
16        A.   Yes.
17        Q.   Did -- did those
18   organizations retain that money?
19        A.   No.  And as I tried to point
20   out on a few occasions, the educational
21   grant that is provided by Endo to any
22   professional society, CE provider, or
23   other third-party organization, is to
24   cover the entire execution of that

Highly Confidential - Subject to Further Confidentiality Review

Page 542

1    educational activity.
2           So that would include things
3    like any associated pass-through
4    expenses, which is -- the majority of an
5    educational grant would be, for example,
6    for -- if it was at a conference, for the
7    audio/visual materials and the setup and
8    the equipment and the personnel; for
9    the -- if there was a food function
10   associated, you know, with the activity,
11   the pass-through expenses for that.
12          The faculty honoraria, the
13   faculty travel expenses, the faculty --
14   you know, if there were -- well, not
15   if -- the development costs for taking
16   the material that the faculty provides
17   and putting it into an appropriate
18   format, a formatted presentation, for
19   example.  Developing the enduring
20   materials, printing or posting to the
21   website.
22          So all of those pass-through
23   expenses are netted -- are not part of
24   the actual grant that is retained by the

Page 543

1    recipient.  They would be retaining the
2    portion that -- of a -- whatever their
3    services were involved with time or the
4    fee for the activity.  But --
5           MS. AMINOLROAYA:
6    Objection -- sorry.
7           THE WITNESS:  Sorry.
8           MS. AMINOLROAYA:  Objection
9    to form.  Foundation.
10          MR. DAVIS:  Is that an
11   objection to the question?
12          MS. AMINOLROAYA:  It was an
13   objection to the question, yes.
14          MR. DAVIS:  A little late.
15          MS. AMINOLROAYA:  It's on
16   the record.
17   BY MR. DAVIS:
18      Q.   Ms. Kitlinski, do you recall
19   Exhibit-44?
20      A.   Yes.
21      Q.   Had you ever seen Exhibit-44
22   before today?
23      A.   No.  It was developed while
24   we were here today.  I hadn't seen the

Page 544

1    template either, but I'm just saying
2    the --
3       Q.   Does Exhibit-44 contain
4    handwriting?
5       A.   Yes.  Printing.
6       Q.   Is any of this handwriting
7    on Exhibit-44 yours?
8       A.   No.
9       Q.   Is any of this handwriting a
10   direct quote of your testimony here
11   today?
12      A.   No.
13      Q.   How about Exhibit-21, do you
14   recall Exhibit-21?
15      A.   Could you scoot that over a
16   little closer?  Thanks.
17          Yes, I recall that.
18      Q.   Had you ever seen Exhibit-21
19   before today?
20      A.   No.
21      Q.   Does Exhibit-21 contain
22   handwriting today -- on it?  I'm sorry.
23      A.   Yes.
24      Q.   Is that your handwriting?

Page 545

1       A.   No.
2       Q.   Whose handwriting appears on
3    Exhibit-21?
4       A.   It's plaintiffs' counsel.
5       Q.   And how about Exhibit-44,
6    whose handwriting is on Exhibit-44?
7       A.   Once again, plaintiffs'
8    counsel.
9       Q.   And is Exhibit-21, does that
10   handwriting contain a direct quote from
11   your testimony today?
12      A.   No.  I was asked what I saw
13   on certain reports, and I pointed out the
14   limitations of what I could attest to of
15   my own knowledge and what was there.
16      Q.   Okay.
17          MR. DAVIS:  For the record,
18   we object to the introduction of
19   these exhibits -- these documents
20   as exhibits.  They were created
21   today.  They contain
22   mischaracterizations of Ms.
23   Kitlinski's testimony and
24   constitute inappropriate and

Page 546

1    improper demonstratives.
2         MS. AMINOLROAYA:  It's
3    several hours later.
4         MR. DAVIS:  One second.
5    Thank you, Ms. Kitlinski.
6         THE WITNESS:  Thank you.
7         VIDEO TECHNICIAN:  Going off
8    the record.  The time is 8:33 p.m.
9         - - -
10        (Whereupon, a brief recess
11   was taken.)
12        - - -
13        VIDEO TECHNICIAN:  We're
14   back on the record at 8:57 p.m.
15        - - -
16        EXAMINATION
17        - - -
18   BY MS. AMINOLROAYA:
19        Q.   Ms. Kitlinski, do you recall
20   a discussion you had with your counsel
21   regarding why Endo supported independent
22   education?
23        A.   Yes.
24        Q.   Can you please look at

Page 547

1    Exhibit-3?
2         And this is CD&E's 2000
3    plan.  Page 3, it's called The Critical
4    Connection -- or is entitled, The
5    Critical Connection for Success in 2000
6    and Beyond.
7         Do you see that on Page 3?
8         A.   Yes.
9         Q.   And let's look at Page 4.  I
10   overlooked this imagery before.
11        And what's depicted here is
12   someone is planting seeds, correct?
13        MR. DAVIS:  Objection to
14   form.
15        THE WITNESS:  Yes, it is
16   a -- it's a depiction of someone
17   sowing -- hoeing a row and
18   planting seeds and watering it.
19   BY MS. AMINOLROAYA:
20        Q.   All right.  And watering,
21   and then what do we have in the last
22   imagery here, the last image?
23        A.   Plants.
24        Q.   Plants, right.

Page 548

1         So this was CD&E's plan, in
2    2000, to sow the field, plant seeds and
3    then water, and then have growth as a
4    result of that, right?
5         MR. DAVIS:  Objection to
6    form.
7         THE WITNESS:  The
8    characterization of the images is
9    not consistent.  So, for example,
10   one of the responsibilities of the
11   clinical liaison team is to go out
12   into the field, so this is the
13   field, you know, that's the
14   context there, and to identify,
15   you know, what the processes are
16   that are in place to identify any
17   issues, which is, you know, sort
18   of the picking up the stones
19   there, if you will, in the second
20   part of the graphic, to be able to
21   identify, shall we say, issues or
22   concerns, like, for example, in
23   the opioid field about the things
24   we've been discussing all day

Page 549

1    about public health issues,
2    patient safety issues.
3         And then to -- in terms of
4    the watering, if you will, to be
5    able to identify what resources
6    are needed to address those issues
7    once the stones have been picked
8    out of the field.  And to provide
9    care, show that the company is a
10   caring company in that therapeutic
11   area.
12        And at the end of the day,
13   you should have a successful, new
14   therapeutic area that you're
15   involved with.
16   BY MS. AMINOLROAYA:
17        Q.   Do you see stones, Ms.
18   Kitlinski?  I don't see any stones, and
19   we don't have to spend time on this.
20        A.   The second -- the second
21   image.  But that's fine.
22        Q.   It looks like someone is
23   dropping something on the ground.
24        But what you described is

138  (Pages 546 to 549)

Highly Confidential - Subject to Further Confidentiality Review

Page 550

1    not what we see on Page 5, right?  What
2    we see on Page 5 is, on the left-hand
3    side, we see relationships, peer
4    influence and information.
5            So relationships, you
6    described some relationships that you
7    developed today with therapeutic experts
8    or key opinion leaders.
9            Peer influence, is that how
10   peer influence occurs?  When experts in
11   the field speak to other doctors at
12   continuing medical education programs?
13           MR. DAVIS:  Objection to
14   form.
15           THE WITNESS:  It's when
16   peer-to-peer exchange, scientific
17   exchange, goes on, and what one
18   therapeutic expert is aware of is
19   conveyed to his colleagues.
20   BY MS. AMINOLROAYA:
21       Q.   And information, right?
22   Information about opioids?
23       A.   Information about --
24           MR. DAVIS:  Objection to

Page 551

1    form.
2            THE WITNESS:  Information
3    about the therapeutic area,
4    information about the risks,
5    information about the appropriate
6    assessment tools.
7            As we said, that whole gamut
8    of information is appropriate.
9    BY MS. AMINOLROAYA:
10       Q.   Right.  And the output of
11   that, at least based on what I see on
12   Page 5, is one, Competitive advantage for
13   Endo.
14           Did I read that correctly?
15       A.   Yes.
16       Q.   And two is, Expanded use of
17   current and future products.
18           Did I read that correctly?
19       A.   Yes.
20           And I think I've made no --
21   I've been very transparent about the fact
22   that I think Endo is a company that has a
23   competitive edge, advantage, in how they
24   approach their -- their business, as

Page 552

1    opposed to some other companies.
2            So it's not surprising that
3    we would want to continue that, in having
4    a competitive advantage in the pain
5    management area.
6            MS. AMINOLROAYA:  Move to
7    strike after the word "yes."
8    BY MS. AMINOLROAYA:
9        Q.   And on Page 8, we see
10   intense -- key issues for Endo in 2000
11   was intense competition for key advocates
12   and influentials, right?
13           So these were the
14   individuals who delivered your pain
15   education, correct?
16           MR. DAVIS:  Objection to
17   form.
18   BY MS. AMINOLROAYA:
19       Q.   The second bullet there
20   states, If we don't utilize, Purdue,
21   Parke-Davis, Abbott, Janssen will.
22           Did I read that correctly?
23       A.   Yes.
24           But if you see in that

Page 553

1    bullet point there, where it says,
2    Visiting faculty.  Visiting faculty is
3    the promotional speakers bureau, that's
4    not independent education faculty.
5    Publications, again, that's not
6    independent education.  Phase IV is
7    always a necessity, product specific.
8    And advisory boards, again, do not fall
9    under the purview of independent
10   education.
11           So when we're talking about
12   advocates, that's the context of that,
13   and influentials, as opposed to
14   therapeutic experts.  So just to clarify
15   that.
16       Q.   And if Endo could gain --
17   could win over these -- these therapeutic
18   experts and key opinion leaders, it would
19   give it the competitive advantage, right,
20   that you discussed here on Page 5 of this
21   presentation, and also provide expanded
22   use of current and future products,
23   correct?
24           MR. DAVIS:  Objection to

139  (Pages 550 to 553)

Highly Confidential - Subject to Further Confidentiality Review

Page 554

1    form.
2        THE WITNESS:  Certainly, if
3    we had the -- if we had
4    therapeutic experts who were
5    knowledgeable about our data, who
6    were knowledgeable about our --
7    the Phase IV studies and the
8    additional research that we were
9    planning, that would give us a
10   competitive advantage.
11       Having them participate on
12   advisory boards and provide
13   unfiltered feedback to us so that
14   we, as a company, could adjust or
15   make any modifications to our plan
16   that they suggested, that would
17   definitely be a competitive
18   advantage, yes.
19   BY MS. AMINOLROAYA:
20   Q.    And on Page 13, CD&E
21   strategy, part of this sowing, planting
22   and watering strategy, was, Leverage
23   strategic alliances and relationships to
24   expand utilization of current product

Page 555

1    line.
2        Did I read that correctly?
3        MR. DAVIS:  Objection to
4    form.
5        THE WITNESS:  Yes, that's
6    what the slide says.
7        Just to correct you, though,
8    it was hoeing, not sowing.  But
9    that's okay.
10   BY MS. AMINOLROAYA:
11   Q.    Thank you.
12   A.    You're welcome.
13       And, again, I don't want to
14   keep reiterating this, but just to keep
15   in mind the time frame here of 2000, you
16   know, early in the company's development,
17   not consistent with what the current
18   division of responsibilities would be.
19   Q.    And on Page 13, another
20   strategy that CD&E listed here was -- the
21   last bullet under leveraging strategic
22   alliances is, Support and develop
23   initiatives that combat opiophobia.
24       And that was important, Ms.

Page 556

1    Kitlinski, because initiatives that
2    combat opiophobia would allow doctors to
3    write more prescriptions, correct?
4        MR. DAVIS:  Objection to
5    form.
6        THE WITNESS:  No.  As we --
7    we had this discussion earlier
8    when you asked that same question.
9        As I mentioned, opiophobia
10   is not the healthy respect and
11   fear of the potential -- the
12   potential abuse, misuse,
13   addiction, overdose aspects that
14   are associated with opioids.
15       It's the unwillingness to
16   consider that as a -- an
17   therapeutic option for patients.
18   And also that if they don't
19   utilize the medications
20   appropriately, you could actually
21   have the exact opposite effect of
22   what you were just referring to a
23   moment ago.
24   BY MS. AMINOLROAYA:

Page 557

1    Q.    Well, the jury can conclude
2    what opiophobia means.
3        But in 2001 --
4    A.    Sure.
5    Q.    -- you would agree that
6    doctors had a fear of opioids in the wake
7    of what was going on with Purdue and
8    OxyContin?
9        MR. DAVIS:  Objection to
10   form.
11       THE WITNESS:  Again, I will
12   just state that my recollection of
13   timing is, you know, not -- not
14   firm, because I don't have
15   documents to refer back to.  I do
16   know that in the early 2000s there
17   were issues of opioid abuse and
18   misuse.
19       But I think it was not fair
20   to characterize it as opiophobia,
21   so much as the people utilizing
22   these drugs in ways that were not
23   appropriate and were not intended
24   in the labeling and approved by

Highly Confidential - Subject to Further Confidentiality Review

Page 558

1        the FDA.
2    BY MS. AMINOLROAYA:
3        Q.    And so you don't recall when
4    Purdue's problems with OxyContin first
5    surfaced in the news?
6        MR. DAVIS:  Objection to
7    form.
8        THE WITNESS:  As I -- as I
9    stated, I recall that it was in
10   the early 2000s.  Without a frame
11   of reference to look back at, I
12   don't, I'm sorry.
13   BY MS. AMINOLROAYA:
14       Q.    You had a very good memory
15   during Mr. Davis's examination.  I will
16   note that.
17       A.    Mr. Davis was examining me
18   about the aspects of my job relating to
19   educational specifics that I had written,
20   the elements for that RiskMAP.  So I have
21   a very clear recollection of that, as I
22   did for when you were asking me about
23   education-related things as well.
24       Q.    And yet another tactic on

Page 559

1    Page 16 of the document is to establish
2    pain management as a priority with PCPs.
3        And this was another tactic
4    towards the goal of gaining -- that CD&E
5    had in the year 2000 of sowing,
6    watering -- or, excuse me, hoeing,
7    planting seeds and watering in order to
8    obtain growth in the opioids market,
9    correct?
10       MR. DAVIS:  Objection to
11   form.
12       THE WITNESS:  No.  This was
13   referring to the fact that primary
14   care physicians -- that the data
15   was suggesting that primary care
16   physicians were responsible for
17   managing the great majority of
18   patients with pain, especially as
19   the healthcare system evolved and
20   visits to specialists became more
21   costly and less accessible for
22   patients.
23       So it was recognizing that
24   internal medicine specialists,

Page 560

1    family physicians, and other
2    primary care folks were critical
3    to the appropriate pain management
4    and that they did not have
5    education on that, short of one
6    hour during their -- during their
7    training programs.
8    BY MS. AMINOLROAYA:
9        Q.    And if we look at Exhibit-2,
10   the CD&E objectives that we just
11   discussed for clinical development and
12   education objectives at Endo, had the
13   objective of expanding use of current and
14   future products.
15       And that's not the only time
16   we saw that, Ms. Kitlinski.  We also saw
17   that goal in Exhibit-2, for example.
18   Number 3 in your 1999 objectives stated,
19   Maximize corporate return on current
20   product lines and seek support for new
21   product initiatives, correct?
22       MR. DAVIS:  Objection to
23   form.
24       THE WITNESS:  Correct.  And

Page 561

1    as we discussed, again, at this
2    time, in this early stage of the
3    company's development, the focus
4    was not on independent education,
5    it was on -- as a company,
6    everyone had -- your colleague
7    commented on the EBITDA term,
8    which is certainly not one that I
9    would have grasped myself.
10       So there were certain
11   initiatives that the entire
12   company had to embrace as a new
13   startup company.
14       And, again, the education
15   that we're talking about here
16   focused on educational
17   initiatives, working with the
18   professional organizations.  And
19   the patient organizations were
20   not -- were not separate and apart
21   from the responsibilities at that
22   time.
23   BY MS. AMINOLROAYA:
24       Q.    And this --

Highly Confidential - Subject to Further Confidentiality Review

Page 562

1      A.   So I believe -- may I just
2   ask -- never mind.  It's probably not
3   appropriate.  I can't ask a question, I'm
4   sorry.
5      Q.   I'm sorry, it's not.
6      A.   Okay.
7      Q.   And if we turn to
8   Exhibit-5 -- are you familiar with the
9   IMS data, Ms. Kitlinski?
10         MR. DAVIS:  How about you
11  wait until she has the document?
12         THE WITNESS:  I know what
13  IMS data is.  I don't know,
14  like -- I don't see it.
15         I understand that that's
16  how, for example, the FDA
17  determined how many
18  extended-release, ER --
19  extended-release and long-acting
20  opioids were being prescribed at
21  the time that they put the REMS in
22  place and how many -- how many
23  prescribers, I should say, not
24  opioids, and that's how they

Page 563

1   determined their goals for what
2   the REMS education should
3   encompass.
4         So I'm familiar with what
5   IMS data is.
6   BY MS. AMINOLROAYA:
7      Q.   Thank you.
8         So turning to Page --
9   Exhibit-5, and we looked at this earlier,
10  regarding Percocet.
11         You had involvement with
12  Percocet, correct?
13         MR. DAVIS:  Objection to
14  form.
15  BY MS. AMINOLROAYA:
16     Q.   And your 1999 objectives
17  included working with the sales and
18  marketing team to successfully launch
19  Percocet, correct?
20         MR. DAVIS:  Objection to
21  form.
22         THE WITNESS:  Excuse me one
23  second until I take a look at this
24  again.  1999.

Page 564

1         Yes, the same -- again, once
2   again, what we just spoke to, in a
3   young company like that, everyone
4   was all hands on board bringing
5   their -- their aspects to the
6   table of what they can contribute
7   to the launch.
8   BY MS. AMINOLROAYA:
9      Q.   All right.  And let's turn
10  to Page 14 of Exhibit-5.
11         And Page 14 here, it
12  states --
13     A.   Yes, I have it.  I was just
14  looking back to see whose presentation
15  this was.  Okay.  I got it.
16     Q.   We looked at this earlier.
17  This was, Endo Commercial Capabilities
18  Overview by Jeremy Goldberg.  We
19  identified that the metadata for this
20  document placed this document as a 2005
21  document.
22     A.   Yes.  And this particular
23  slide, though, that you're talking about,
24  14, was not Jeremy Goldberg's.  He was in

Page 565

1   the corporate development.
2         But it was, rather, Mark
3   Gossett, who was the senior vice
4   president of the commercial business.
5      Q.   Okay.  Thank you.
6      A.   Sure.
7      Q.   And Page 14, Endo describes
8   itself as, The company that Percocet
9   built.
10         Did I read that correctly?
11     A.   That's what Mark Gossett
12  described it as in this slide.
13     Q.   Do you have reason to
14  dispute that?
15         MR. DAVIS:  Objection to
16  form.
17         THE WITNESS:  I personally
18  think that Endo is a pain
19  management company that was
20  started by Carol Ammon and her
21  colleagues.
22         But, again, he's a marketing
23  guy, and that's what he's focused
24  on.

Page 566

1    BY MS. AMINOLROAYA:
2        Q.   And does the second bullet
3    under Percocet state, Endo grew from $40
4    million to $214 million by 2003?
5        A.   That is what Mr. Gossett
6    says on his slide, yes.
7        Q.   And so the CD&E strategy to
8    grow sales and grow the market for
9    Percocet, it worked, Ms. Kitlinski,
10   correct?
11       MR. DAVIS:  Objection to
12   form.
13       THE WITNESS:  The company's
14   strategy to launch new forms of
15   Percocet that were more
16   available -- I'm sorry, more
17   appropriate, including, as we had
18   talked earlier about Percolone,
19   which was -- did not have the
20   acetaminophen component of that,
21   that contributed towards this.
22       What the CD&E contribution
23   was, I don't know how you would --
24   how you would gauge that.

Page 567

1    BY MS. AMINOLROAYA:
2        Q.   But the CD&E, as a member,
3    you were the director of CD&E, and this
4    was your strategy in 1999, right?
5        This was your objective, to
6    grow the market for Percocet?
7        MR. DAVIS:  Objection to
8    form.
9    BY MS. AMINOLROAYA:
10       Q.   And six years later, we see
11   that Percocet sales quintupled, from $40
12   million to $214 million -- I'm sorry, not
13   even six years later.
14       Four years later Percocet
15   sales quintupled from $40 million to $214
16   million and Percocet becomes the gold
17   standard in pain management.
18       Approximately 77 percent of
19   prescriptions for Oxycodone with
20   acetaminophen are written as Percocet; is
21   that correct?
22       MR. DAVIS:  Objection to
23   form.
24       THE WITNESS:  I don't know

Page 568

1    if that's correct or not.  That's
2    Mr. Gossett's representation of
3    the data.
4    BY MS. AMINOLROAYA:
5        Q.   If this data is, in fact,
6    correct, this would mean that the --
7    withdrawn.  Let's move on.
8        Earlier you testified -- do
9    you recall offering testimony about
10   ACCME?
11       A.   ACCME?
12       Q.   Yes.
13       A.   Yes.
14       Q.   And you said that anyone --
15   or separate from your testimony from
16   ACCME, but you said anyone can lodge a
17   complaint to a CME-accrediting
18   organization.
19       Do you recall that
20   testimony?
21       MR. DAVIS:  Objection to
22   form.
23       THE WITNESS:  Yes.
24   BY MS. AMINOLROAYA:

Page 569

1        Q.   And did Endo ever lodge such
2    a complaint?
3        MR. DAVIS:  Objection to
4    form.
5        THE WITNESS:  No.  You did
6    ask me that question and I -- as
7    did your previous -- your
8    colleague, and I indicated that I
9    was not aware of that.
10   BY MS. AMINOLROAYA:
11       Q.   Let's go to Exhibit-43.
12       Do you recall Mr. Davis
13   asking you some questions about
14   responsible opioid prescribing?
15       MR. DAVIS:  Let's wait until
16   she has it in front of her,
17   please.
18   BY MS. AMINOLROAYA:
19       Q.   My question doesn't have to
20   do with the document yet.
21       Do you recall the line of
22   questioning?
23       A.   The Federation of the State
24   Medical Board, Fishman book, is that what

Page 570

1    you're referring to?
2        Q.   Yes.
3        A.   Yes.
4        Q.   And I believe the concern in
5    this line of questioning was that not
6    enough pages from the book were covered.
7            And you may or may not know,
8    Mrs. Kitlinski, we have limited time and
9    we have to move along.  We only have
10   seven hours.
11           There's certainly more
12   content in here that we could cover with
13   you.  And we can look at one more example
14   to address your concern.  It's here on
15   Page 36 of the document.
16       A.   36 up --
17       Q.   Yes.  423.36.
18       A.   -- the actual -- okay.
19       Q.   And I'm only going to read
20   the first sentence, for time and for all
21   of our sakes.
22       A.   Sure.
23       Q.   It says, Beware the
24   distinction between pseudoaddiction and

Page 571

1    addiction.
2        A.   Yes.  We brought that up in
3    the past discussion.
4        Q.   We actually covered more
5    than one page --
6        A.   Yes.  And that's why I said
7    I wasn't sure how many pages, but --
8        Q.   Okay.  You said we had not
9    covered a lot of it, so I wanted to make
10   sure we give it some more attention.
11       A.   Absolutely.
12           And my concern was not so
13   much the number of pages, but just an
14   isolation -- you know, the focus on a
15   bullet point such as this as opposed to
16   the general gestalt of the book, which
17   was that addiction and abuse and misuse
18   and overdose are serious societal issues
19   that need to be addressed.
20       Q.   Another complaint that was
21   discussed during the examination was that
22   we didn't look at particular pages in the
23   2002 Guideline for the Management of Pain
24   and Osteoarthritis, Rheumatoid Arthritis,

Page 572

1    second edition by the APS.
2            And this was Exhibit -- 12?
3    That doesn't sound right.
4            MR. DAVIS:  42.
5    BY MS. AMINOLROAYA:
6        Q.   42.
7            So let's look at some of
8    these pages.
9        A.   Sure.
10       Q.   Page 95.  And under,
11   Addiction, physical dependence and
12   tolerance, if you look at the third
13   paragraph under that subheading, it
14   states, The prevalence of addiction among
15   patients who do not have a previously
16   existing substance abuse disorder is low.
17           Did I read that correctly?
18       A.   Yes, you did.
19       Q.   All right.  And following
20   that it says, Weissman and Haddox, 1989,
21   noted that patients who are given doses
22   of opioids that are inadequate to relieve
23   their pain or whose opioid dose is
24   discontinued abruptly or tapered too

Page 573

1    rapidly may develop characteristics that
2    resemble addiction, which they termed
3    iatrogenic pseudoaddiction.
4            And the last sentence there
5    states, Requests for these specific
6    medications and doses should not be
7    interpreted as necessarily indicating
8    drug-seeking behavior.
9            Did I read that correctly?
10       A.   Yes.  It was just the
11   intervening section -- sentence there
12   that put it into context that, Because
13   patients are often knowledgeable about
14   their medications and doses that have
15   worked in the past, requests for these
16   medications and doses should not be
17   interpreted as -- necessarily as
18   drug-seeking behavior.
19       Q.   Right.  And this paragraph
20   frames this in terms of pseudoaddiction,
21   correct?
22       A.   Yes.
23       Q.   And it relies on the
24   Weissman and Haddox article from 1989,

Highly Confidential - Subject to Further Confidentiality Review

Page 574

1    correct?
2        A.   Correct.
3            MR. DAVIS:  Objection to
4    form.
5    BY MS. AMINOLROAYA:
6        Q.   And if we go to Page 97 of
7    the document, we see here, in the
8    beginning of the third full paragraph --
9    or we can go to the top paragraph here.
10           It says, Furthermore,
11   decades of clinical experience and
12   studies conducted in patients with
13   chronic malignant pain due to a variety
14   of causes have demonstrated clearly the
15   usefulness of opioids in the management
16   of a variety of chronic nonmalignant pain
17   types.
18           Did I read that correctly?
19       A.   Yes.
20       Q.   And we read earlier the
21   evidence study stating that opioids have
22   not been studied for longer than --
23   long-term efficacy studies have not been
24   conducted for opioids, correct?

Page 575

1            MR. DAVIS:  Objection to
2    form.
3            THE WITNESS:  Are you
4    referring to here, where it says,
5    There is some evidence of a
6    positive risk-to-benefit ratio in
7    the use of certain opioids for
8    people with moderate to severe
9    pain?
10   BY MS. AMINOLROAYA:
11       Q.   No.  I'm referring to the
12   sentence I just read.
13           Were you with me?
14       A.   No, I'm sorry.  I was not.
15       Q.   Let's look back up at the
16   top.
17       A.   I read the -- I did follow
18   you there at the top, and I said yes.
19           But then I thought you asked
20   me about something else.
21       Q.   Yes.  So I said earlier we
22   looked at an evidence study that was
23   prepared by a governmental agency -- and
24   I'm forgetting the acronym right now.

Page 576

1        A.   AHRQ.
2        Q.   AHRQ, thank you.
3            And based on the evidence
4    study that was prepared for that agency,
5    the document stated that long-term
6    studies have not been conducted on the
7    efficacy of opioids, correct?
8            MR. DAVIS:  Objection to
9    form.
10           THE WITNESS:  That was
11   the -- again, it was a very
12   lengthy document, and we just
13   looked at a few select items.  And
14   I'm not saying we should have
15   looked at the whole thing.
16           But I did not read that full
17   document, and so my comments on
18   that were just what I said, that
19   because of the requirements that
20   the FDA puts forth for chronic
21   opioids to be approved, that's
22   what had been studied and that my
23   colleagues in clinical
24   development, for example, could

Page 577

1    speak more appropriately to the
2    current -- the current studies
3    that are being conducted to
4    address that question.
5            Because, indeed, it has been
6    raised that there is not only
7    insufficient long-term evidence
8    with regards to the benefits, but
9    also the risks.  And so both of
10   those are being pursued as we
11   speak.
12   BY MS. AMINOLROAYA:
13       Q.   And does FDA prevent a
14   company like Endo from conducting a study
15   on the long-term safety and efficacy of
16   opioids?
17           MR. DAVIS:  Objection to
18   form.
19           THE WITNESS:  No.
20   BY MS. AMINOLROAYA:
21       Q.   Do any FDA regulations
22   prevent Endo from conducting such a
23   study?
24           MR. DAVIS:  Objection to

145 (Pages 574 to 577)

Highly Confidential - Subject to Further Confidentiality Review

Page 578

1    form.
2         THE WITNESS: I'm not the
3    expert on regulatory issues or
4    clinical development issues. So I
5    would suggest that you would raise
6    that question with my colleagues.
7    BY MS. AMINOLROAYA:
8         Q. But you mentioned the FDA,
9    Ms. Kitlinski.
10        A. Yes.
11        Q. -- correct?
12        You said that the studies
13   were limited because of FDA, right?
14        A. No. I said the studies were
15   limited because that is the requirements
16   that the FDA has to obtain approval of a
17   new chronic --
18        Q. I think we're saying the
19   same thing.
20        A. Okay. We are on the same
21   page.
22        Q. So there are certain studies
23   that a company may conduct to obtain FDA
24   approval.

Page 579

1         Does anything prevent a
2    company from conducting further studies?
3         A. No.
4         MR. DAVIS: Objection to
5    form.
6         THE WITNESS: As is what
7    Endo is doing.
8    BY MS. AMINOLROAYA:
9         Q. And Endo had not
10   conducted -- has not conducted those
11   studies in the past, correct?
12        MR. DAVIS: Objection to
13   form.
14        THE WITNESS: They have
15   conducted longer studies, but
16   these are long -- you know, longer
17   yet than the originals.
18        And, again, I'm not the
19   expert on what length of studies
20   we have conducted at Endo. So
21   when you folks speak to the
22   clinical development -- I'm sorry,
23   to the R&D people, they would be
24   able to apprise you of that.

Page 580

1    BY MS. AMINOLROAYA:
2         Q. And here on Page 97, going
3    down to the third paragraph, it states,
4    Evidence supports the use of Oxycodone
5    for moderate to severe pain that has not
6    responded to other treatments.
7         Is that correct?
8         MR. DAVIS: Objection to
9    form.
10        THE WITNESS: Yes. And
11   that's the case for, again,
12   positioning opioid, not -- opioids
13   not as a first-line agent, as I
14   said when we spoke about this.
15   BY MS. AMINOLROAYA:
16        Q. And Endo sold generic
17   Oxycodone, correct?
18        A. Endo had a -- several
19   generic opioids and Oxycodone, I believe,
20   certainly, at one point in time we did.
21   I don't know if we still do.
22        Q. And generic -- and Endo sold
23   generic OxyContin after the publishing of
24   these guidelines in 2002, correct?

Page 581

1         MR. DAVIS: Objection to
2    form.
3         THE WITNESS: I don't know
4    the answer to that question.
5    BY MS. AMINOLROAYA:
6         Q. Okay.
7         A. Because OxyContin was a
8    different formulation than -- this is
9    just saying generic Oxycodone, which is
10   the active ingredient, for example, in
11   Percocet. It's not an extended-release
12   formulation of that.
13        Q. Right. And you discussed
14   some of your significant responsibilities
15   with the RiskMAP.
16        Do you recall there being a
17   RiskMAP for generic OxyContin during the
18   time period that Endo sold it?
19        MR. DAVIS: Object to form.
20        THE WITNESS: Again, I don't
21   recall there being a discussion,
22   because I don't recall that I was
23   there when Endo sold it, if,
24   indeed, they did. So I don't

146 (Pages 578 to 581)

Page 582

1          know.
2     BY MS. AMINOLROAYA:
3          Q.    So you recall the RiskMAP
4     for Opana ER, but you don't recall the
5     RiskMAP for generic OxyContin?
6          A.    The RiskMAP for --
7               MR. DAVIS:  Object to form.
8               THE WITNESS:  The RiskMAP
9          for generic -- I'm sorry, for
10         Opana ER was negotiated and put in
11         place with the FDA while I was
12         responsible for that.  So, yes, I
13         definitely recall that.  I was
14         involved in it.
15    BY MS. AMINOLROAYA:
16         Q.    You don't recall a RiskMAP
17    for generic Oxycodone or generic
18    OxyContin?
19              MR. DAVIS:  Objection to
20         form.
21              THE WITNESS:  As I said, I
22         don't even recall if we sold that
23         drug.
24    BY MS. AMINOLROAYA:

Page 583

1          Q.    Convenient.
2          A.    No.  Just the fact that the
3     generic formulations change, literally,
4     from month to month and year to year, and
5     that was quite a number of years ago.
6          Q.    And another -- let's turn
7     back to Exhibit-40.
8               Another complaint that was
9     lodged about our review of the APS
10    residents course was also that we didn't
11    cover enough pages here.
12              Turning to Page 34 of the
13    document, the second slide on this page
14    mentions, Screener and opioid assessment
15    for patients in pain, or SOAPP.
16              You're familiar with SOAPP,
17    Ms. Kitlinski?
18         A.    Yes.
19         Q.    And this relates to opioids,
20    right?
21              So this addresses your
22    concern that we weren't addressing slides
23    that had to do with opioids.
24              And, here, SOAPP is included

Page 584

1     in one of these slides.  It's a
2     self-administered form -- excuse me, it's
3     a fourteen-item self-administered form
4     capturing the primary determinants of
5     aberrant drug-related behavior.
6               Did I read that correctly?
7          A.    I'm sorry, I was assisting
8     to locate an item.
9               A fourteen-item
10    self-administered form capturing the
11    primary determinants of aberrant
12    drug-related behavior, yes.
13         Q.    And this was something that
14    was -- that Endo suggested to doctors
15    could be used to manage the risks of
16    addiction, correct?
17              MR. DAVIS:  Objection to
18         form.
19              THE WITNESS:  The SOAPP tool
20         was the -- if you recall earlier,
21         we talked about psychometrically
22         validated tools that were
23         supported by funding from NIDA or
24         from NIH, and that Endo also

Page 585

1          provided some educational grant
2          support towards.
3               So this was a tool that was
4          developed -- and I don't recall if
5          it was NIDA or NIH, but it was
6          funding from them.  And then Endo
7          provided educational -- additional
8          educational grants so that the
9          beta -- the beta version of it,
10         once they received the feedback
11         from clinicians as to what would
12         work in their practice on a
13         day-to-day basis, they were able
14         to modify that so it could be
15         practical and inserted into their
16         patient care.
17    BY MS. AMINOLROAYA:
18         Q.    And I think my question was,
19    SOAPP was something that Endo suggested
20    to doctors could be used to manage the
21    risks of addiction; is that right?
22              MR. DAVIS:  Objection to
23         form.
24              THE WITNESS:  SOAPP was part

147  (Pages 582 to 585)

Highly Confidential - Subject to Further Confidentiality Review

Page 586

```
1    of the independent educational
2    activities.  And so this is --
3    this is not Endo suggesting SOAPP,
4    this is the APS residents course.
5          It's not that Endo did not,
6    you know, speak to the value of
7    SOAPP.  I didn't mean to imply
8    that.  But I just want to be clear
9    that this was the faculty for the
10   program.
11         And we did, indeed -- and we
12   did, indeed, recognize the value
13   of SOAPP, because the FDA, NIH and
14   NIDA had acknowledged its
15   importance by virtue of the fact
16   that they supported ongoing
17   research with it and utilized it
18   as one of the tools that they --
19   when they were conducting their
20   evaluations.
21   BY MS. AMINOLROAYA:
22   Q.   When did FDA support
23   research of SOAPP?
24   A.   FDA did not.  NIDA or NIH
```

Page 587

```
1    did, yes.
2    Q.   And SOAPP was part of the
3    RiskMAP for Opana ER, correct?
4    A.   Yes.
5    Q.   However, when the evidence
6    report was prepared for AHRQ -- if you
7    turn to Exhibit-24.
8    A.   I'm sorry, I missed what
9    page you said.
10   Q.   So let's go to Page 90 of
11   the document.
12         I can assure you there's
13   more discussion of SOAPP in here.  I'm
14   going to point you to one to move us
15   along.
16   A.   Sure.
17   Q.   So here on Page 90, the key
18   question in 4B is, In patients with
19   chronic pain, what is the effectiveness
20   of use of risk prediction instruments on
21   outcomes related to overdose, addiction,
22   abuse or misuse?
23         Did I read that correctly?
24   A.   Yes.
```

Page 588

```
1    Q.   And the key point is, No
2    study evaluated the effectiveness of risk
3    prediction instruments for reducing
4    outcomes related to overdose, addiction,
5    abuse or misuse.  SOE:  Insufficient.
6          Did I read that correctly?
7    A.   Yes.
8          And I just wanted to see
9    what this citation here, 113 and 14 is
10   that they're citing, because it seems at
11   odds with the fact that they're saying
12   there was no study, and yet they have a
13   citation.
14         So just give me one moment
15   to look what they --
16   Q.   Well, we can look at --
17   let's look at Question 4A on Page 86.
18   A.   Okay.
19   Q.   Key Question 4A is, In
20   patients with chronic pain being
21   considered --
22   A.   Excuse me just one second
23   here.  I'm just trying to get to that
24   page.
```

Page 589

```
1          46, you said?
2          4A, okay.  I have it.
3    That's on Page 41.
4    Q.   In patients with chronic
5    pain being considered for long-term
6    opioid therapy, what is the accuracy of
7    instruments for predicting risk of opioid
8    overdose, addiction, abuse or misuse?
9          Did I read that correctly?
10   A.   Yes.
11   Q.   And the first point there
12   is, Three studies (one fair quality, two
13   poor quality) evaluated the opioid risk
14   tool, ORT, using a cutoff of more than or
15   equal to 4.  Estimates of diagnostic
16   accuracy were inconsistent, precluding
17   reliable conclusions.
18         Did I read that correctly?
19   A.   Yes.
20   Q.   And let's go to the next
21   bullet, because that one addresses SOAPP.
22         It says, Two studies
23   evaluated the screening and opioid
24   assessment for patients with pain (SOAPP)
```

Highly Confidential - Subject to Further Confidentiality Review

Page 590

1  Version 1 instrument.  In one fair
2  quality study, based on a cutoff score of
3  more than or equal to 8, sensitivity was
4  .68.
5           And we can go over all these
6  details.
7           But we see in the next
8  bullet, it states, One poor quality
9  study -- and it goes on to describe that.
10          The third bullet also
11 references one poor quality study.
12          And the last bullet there
13 references one poor quality study.
14          Is that correct?
15      A.   That's what it says, yes.
16          And I do want to point out
17 that, again, the bullet point above here
18 is talking about SOAPP, Version 1, which
19 we -- you know, which we referred to
20 briefly a moment ago, that that was the
21 first iteration that NIH and/or NIDA or
22 HHS supported, and that it was
23 subsequently revised.
24          So I don't know that the --

Page 591

1  I don't know that they have that included
2  in here.  This is certainly a recent
3  publication.
4      Q.   Yes.  This is 2014.
5           So if these tools of --
6  studies had not shown efficacy for these
7  studies in 2014 -- excuse me, for these
8  risk prediction instruments in 2014, had
9  they done that before then?
10          MR. DAVIS:  Objection to
11 form.
12          THE WITNESS:  And I think
13 the question here is, as it states
14 all throughout this section and
15 through the title of this
16 document, is the -- documenting
17 the risks of long-term opioid --
18 of documenting the risks and
19 effectiveness of long-term opioid
20 therapy.
21          And the SOAPP instrument
22 hasn't been used in any -- as any
23 of these others for that point,
24 you know, DIRE or ORT, have not

Page 592

1  been used in any long-term studies
2  because those long-term studies
3  are just beginning to go on, as we
4  talked about a short while ago.
5  BY MS. AMINOLROAYA:

Page 593



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 614

Page 616

```
 1   just ask that you show the
 2   courtesy --
 3        MS. AMINOLROAYA:  It's 10:00
 4   p m., and we're doing our best.
 5   I'm sure you can appreciate that.
 6        MR. DAVIS:  That doesn't
 7   change the clarity of the CMOs.
 8        Take a look.
 9        MS. AMINOLROAYA:  And the
10   document is available on the
11   screen, and the trial tech can --
12   will flip to the page that we're
13   looking at.
14        - - -
15        (Whereupon, Endo-Kitlinski
16   Exhibit-52,
17   ENDO-OPIOID_MDL_DEPONENT
18   000000184-189, was marked for
19   identification.)
20        - - -
21   BY MS. AMINOLROAYA:
22
23
24
```

Page 615

Page 617

```
 9        MS. AMINOLROAYA:  We're
10   marking Exhibit-52.  And I
11   apologize, it's 10:00 p.m. in the
12   evening, we were able to get one
13   copy of this document, which I'm
14   going to give you.
15        The trial tech is also going
16   to pull up a copy on the screens,
17   and we'll give this to the court
18   reporter.  And we'll provide you
19   with a copy.
20        MR. DAVIS:  I think the
21   requirements for providing
22   opposing counsel with exhibits is
23   pretty darn clear.
24        But we can go ahead here and
```

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 622

1

2

3

4          MR. DAVIS:  Objection to the
5     form.  That's all the time we
6     have.
7          MS. AMINOLROAYA:  How much
8     time do I have left?
9          VIDEO TECHNICIAN:  That was
10    one hour --
11         MR. DAVIS:  Okay.  You're
12    done.
13         MS. AMINOLROAYA:  I just
14    have one more question with this,
15    if counsel would indulge me.
16         MR. DAVIS:  We gave Dave
17    five extra minutes --
18         MS. AMINOLROAYA:  I just
19    have literally one more
20    question --
21         MR. DAVIS:  You're done.
22         MS. AMINOLROAYA:  -- that
23    will take 60 seconds.
24         MR. DAVIS:  Thank you.

Page 623

1          MS. AMINOLROAYA:  It will
2     take 60 seconds.
3          MR. DAVIS:  We're off the
4     record.  We're done.
5          VIDEO TECHNICIAN:  This ends
6     today's deposition.  We're going
7     off the record at 10:04 p.m.
8             - - -
9          (Whereupon, the deposition
10    concluded at 10:04 p.m.)
11            - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 624

1               CERTIFICATE
2
3
4          I HEREBY CERTIFY that the
5     witness was duly sworn by me and that the
6     deposition is a true record of the
7     testimony given by the witness.
8
9
10
              Amanda Maslynsky-Miller
11            Certified Realtime Reporter
              Dated:  January 16, 2018
12
13
14
15
16
17         (The foregoing certification
18    of this transcript does not apply to any
19    reproduction of the same by any means,
20    unless under the direct control and/or
21    supervision of the certifying reporter.)
22
23
24

Page 625

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition
4     over carefully and make any necessary
5     corrections.  You should state the reason
6     in the appropriate space on the errata
7     sheet for any corrections that are made.
8          After doing so, please sign
9     the errata sheet and date it.
10         You are signing same subject
11    to the changes you have noted on the
12    errata sheet, which will be attached to
13    your deposition.
14         It is imperative that you
15    return the original errata sheet to the
16    deposing attorney within thirty (30) days
17    of receipt of the deposition transcript
18    by you.  If you fail to do so, the
19    deposition transcript may be deemed to be
20    accurate and may be used in court.
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 626

```
 1        ------
          E R R A T A
 2        ------
 3    PAGE  LINE  CHANGE/REASON
 4    ____  ____  _____
 5    ____  ____  _____
 6    ____  ____  _____
 7    ____  ____  _____
 8    ____  ____  _____
 9    ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24    ____  ____  _____
```

Page 628

```
 1          LAWYER'S NOTES
 2    PAGE  LINE
 3    ____  ____  _____
 4    ____  ____  _____
 5    ____  ____  _____
 6    ____  ____  _____
 7    ____  ____  _____
 8    ____  ____  _____
 9    ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24    ____  ____  _____
```

Page 627

```
 1    ACKNOWLEDGMENT OF DEPONENT
 2
 3        I,_____, do
      hereby certify that I have read the
 4    foregoing pages,  1 - 624, and that the
      same is a correct transcription of the
 5    answers given by me to the questions
      therein propounded, except for the
 6    corrections or changes in form or
      substance, if any, noted in the attached
      Errata Sheet.
 7
 8    _____
      LINDA KITLINSKI        DATE
 9
10
      Subscribed and sworn
11    to before me this
      _____ day of _____, 20____.
12
      My commission expires:_____
13
14    _____
      Notary Public
15
16
17
18
19
20
21
22
23
24
```