# EXHIBIT 100 – A

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF OHIO
 3                    EASTERN DIVISION
 4                      -   -   -
 5    IN RE:  NATIONAL    :  MDL NO. 2804
      PRESCRIPTION OPIATE :
 6    LITIGATION          :
      ----------------------------------------
 7                        :  CASE NO.
      THIS DOCUMENT       :  1:17-MD-2804
 8    RELATES TO ALL CASES:
                          :  Hon. Dan A.
 9                        :  Polster
10                      -   -   -
            Tuesday, November 27, 2018
11                      -   -   -
12    HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
              CONFIDENTIALITY REVIEW
13
                        -   -   -
14
                 Videotaped deposition of
15    KEVIN KREUTZER, taken pursuant to notice,
      was held at the law offices of Reed Smith
16    LLP, Three Logan Square, 1717 Arch
      Street, Suite 3100, Philadelphia,
17    Pennsylvania 19103, beginning at 9:34
      a.m., on the above date, before Amanda
18    Dee Maslynsky-Miller, a Certified
      Realtime Reporter.
19
                        -   -   -
20
21
22
23          GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
24              deps@golkow.com
```

Page 2

APPEARANCES:

BARON & BUDD, P.C.
BY:  WILLIAM POWERS, ESQUIRE
600 New Hampshire Avenue, N.W.
Washington, D.C.
(202) 333-4562
Wpowers@baronbudd.com
- and -

BY: STERLING CLUFF, ESQUIRE
15910 Ventura Boulevard
Suite 1600
Encino, California 91436
(818) 839-2333
scluff@baronbudd.com
Representing the Plaintiffs

REED SMITH, LLP
BY:  ROBERT A. NICHOLAS, ESQUIRE
BY:  JOSEPH J. MAHADY, ESQUIRE
BY:  SAMANTHA L. ROCCHINO, ESQUIRE
Three Logan Square
1717 Arch Street
Philadelphia, Pennsylvania 19103
(215) 851-8100
Rnicholas@reedsmith.com
Jmahady@reedsmith.com
Srocchino@reedsmith.com
Representing the Defendant,
Amerisource Bergen Drug
Corporation

Page 3

APPEARANCES:  (Continued)

WILLIAMS & CONNOLLY, LLP
BY:  MIRANDA PETERSEN, ESQUIRE
725 Twelfth Street, N.W.
Washington, DC  20005
(202) 434-5000
mpetersen@wc.com
Representing the Defendant,
Cardinal Health

COVINGTON & BURLING LLP
BY:  KEVIN KELLY, ESQUIRE
850 Tenth Street, NW
Suite 856N
Washington, DC 20001
(202) 662-5000
kkelly@cov.com
Representing the Defendant,
McKesson Corporation

JONES DAY
BY:  SARAH G. CONWAY, ESQUIRE
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
(213) 489-3939
sgconway@jonesday.com
Representing the Defendant,
Walmart

Page 4

APPEARANCES: (Continued)
VIA TELEPHONE/LIVESTREAM:

BARTLIT BECK LLP
By:  SHARON DESH, ESQUIRE
Courthouse Place
54 West Hubbard Street, Suite 300
Chicago, Illinois 60654
(312) 494-4400
Sharon.desh@bartlit-beck.com
Representing the Defendant,
Walgreens

PELINI CAMPBELL & WILLIAMS, LLC
BY:  ERIC J. WILLIAMS, ESQUIRE
8040 Cleveland Avenue NW
Suite 400
North Canton, Ohio 44720
(330) 305-6400
ejwilliams@pelini-law.com
Representing the Defendant,
Prescription Supply, Inc.

FOX ROTHSCHILD LLP
BY:  JACOB S. PERSKIE, ESQUIRE
1301 Atlantic Avenue
Midtown Building, Suite 400
Atlantic City New Jersey 08401
(609) 348-4515
Jperskie@foxrothschild.com
Representing the Defendant,
Validus Pharmaceuticals

Page 5

APPEARANCES: (Continued)
VIA TELEPHONE/LIVESTREAM:

MORGAN, LEWIS & BOCKIUS LLP
BY:  JONATHAN E. MAIER, ESQUIRE
1111 Pennsylvania Ave. NW
Washington, DC 20004
(202) 739-3000
Jonathan.maier@morganlewis.com
Representing the Defendant,
Teva Pharmaceuticals, Inc.,
Cephalon, Inc., Watson
Laboratories, Actavis LLC, and
Actavis Pharma, Inc

ALLEGAERT BERGER & VOGEL LLP
BY:  JOHN S. CRAIG, ESQUIRE
111 Broadway, 20th Floor
New York, New York 10006
(212) 616-7075
Representing the Defendant,
Rochester Drug Cooperative

BARON & BUDD, P.C.
BY:  JAY LICHTER, ESQUIRE
GRETCHEN KEARNEY, OFFICE MANAGER
15910 Ventura Boulevard
Suite 1600
Encino, California 91436
(818) 839-2333
Jlichter@baronbudd.com
Representing the Plaintiffs

Page 6

1 APPEARANCES: (Continued)
2 VIA TELEPHONE/LIVESTREAM:
3
4 MARCUS & SHAPIRA, LLP
   BY: PAUL M. MANNIX, ESQUIRE
5 One Oxford Centre
   35th Floor
6 Pittsburgh, Pennsylvania 15219
   (412) 471-3490
7 Pmannix@marcus-shapira.com
   Representing the Defendant,
8 HBC Company
9
10 CLARK MICHIE LLP
   BY: CHRISTOPHER J. MICHIE, ESQUIRE
11 103 Carnegie Center, Suite 300
   Princeton, New Jersey 08540
12 (609) 423-2143
   Chris.michie@clarkmichie.com
13 Representing the Defendant,
   Pernix Therapeutics Holdings, Inc.
14
15
16 REED SMITH, LLP
   BY: ANNE E. ROLLINS, ESQUIRE
17 Three Logan Square
   1717 Arch Street
18 Philadelphia, Pennsylvania 19103
   (215) 851-8100
19 Arollins@reedsmith.com
   Representing the Defendant,
20 Amerisource Bergen Drug
   Corporation
21
22
   ALSO PRESENT:
23 Devyn Mulholland, Videographer
   Zach Posen, Trial Technician
24 Christopher Casalenuovo, AmerisourceBergen

Page 7

1        - - -
2      I N D E X
3        - - -
4
   Testimony of: KEVIN KREUTZER
5
6 By Mr. Cluff          11
7
8        - - -
9      E X H I B I T S
10       - - -
11
   NO.      DESCRIPTION        PAGE
12
   AmerisourceBergen-Kreutzer
13 Exhibit-1  ABDC_MDL_00304391-392   164
14 AmerisourceBergen-Kreutzer
   Exhibit-2  ABDC_MDL_00154441-443   176
15
   AmerisourceBergen-Kreutzer
16 Exhibit-3  Teva_MDL_A_(0)233-1299-320 223
17 AmerisourceBergen-Kreutzer
   Exhibit-4  Teva_MDL_A_(0)233-1346-348 250
18
   AmerisourceBergen-Kreutzer
19 Exhibit-5  Teva_MDL_A_(0)233-1426-428 274
20 AmerisourceBergen-Kreutzer
   Exhibit-6  ABDC_MDL_0045077      304
21
   AmerisourceBergen-Kreutzer
22 Exhibit-7  ABCD_MDL_0045075      306
23
24

Page 8

1
2        - - -
3      E X H I B I T S
4        - - -
5 NO.      DESCRIPTION        PAGE
6 AmerisourceBergen-Kreutzer
   Exhibit-8  ABDC_MDL_00045076     314
7
8 AmerisourceBergen-Kreutzer
   Exhibit-9  ABDC_MDL_00047572     361
9 AmerisourceBergen-Kreutzer
   Exhibit-10  ABDC_MDL_00151471-472   369
10
11 AmerisourceBergen-Kreutzer
   Exhibit-11  ABDC_MDL_00178337     374
12 AmerisourceBergen-Kreutzer
   Exhibit-12  ABDC_MDL_00168122 and
13        ABDC_MDL_00168127-134   388
14
15
16
17
18
19
20
21
22
23
24

Page 9

1        - - -
2   DEPOSITION SUPPORT INDEX
3        - - -
4
5 Direction to Witness Not to Answer
6 Page Line   Page Line   Page Line
7 None
8
9
10 Request for Production of Documents
11 Page Line   Page Line   Page Line
12 None
13
14
15 Stipulations
16 Page Line   Page Line   Page Line
17 10   1
18
19
20 Question Marked
21 Page Line   Page Line   Page Line
22 None
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1       - - -

2       (It is hereby stipulated and
3   agreed by and among counsel that
4   sealing, filing and certification
5   are waived; and that all
6   objections, except as to the form
7   of the question, will be reserved
8   until the time of trial.)

9       - - -

10      VIDEO TECHNICIAN:  We are
11  now on the record.  My name is
12  Devyn Mulholland, I'm a
13  videographer for Golkow Litigation
14  Services.  Today's date is
15  November 27, 2018.  The time is
16  9:34 a.m.

17      This video deposition is
18  being held in Philadelphia,
19  Pennsylvania, in the matter of
20  National Prescription Opiate
21  Litigation.  The deponent is Kevin
22  Kreutzer.

23      Counsel will be noted on the
24  stenographic record.  The court

Page 11

1   reporter is Amanda Miller and will
2   now swear in the witness.

3       - - -

4       KEVIN KREUTZER, after having
5   been duly sworn, was examined and
6   testified as follows:

7       - - -

8       EXAMINATION

9       - - -

10  BY MR. CLUFF:

11      Q.   Good morning, Mr. Kreutzer.
12  As I explained earlier, my name is
13  Sterling Cluff, I work at a law firm
14  called Baron and Budd, and we represent
15  the Track 1 plaintiffs in the national
16  opiate litigation.  And I'll be taking
17  your deposition today.

18      To start off, could you just
19  spell your first and last name for the
20  record, so we have a clear record of
21  that, please?

22      A.   Sure.  It's K-E-V-I-N.  Last
23  name is K-R-E-U-T-Z-E-R.

24      Q.   And have you ever had your

Page 12

1   deposition taken before?

2       A.   I have not.

3       Q.   I'm sure that your esteemed
4   lawyers have explained sort of the
5   deposition protocols for you, so I'm
6   going to skip some of the admonitions.

7       But just remind you that
8   you're under oath, so we need to get
9   truthful answers from you.

10      And also remind you not to
11  disclose any attorney-client privilege,
12  and that if you feel like you need to
13  discuss with your lawyers about a
14  privilege, we can make arrangements for
15  that.

16      In addition to that, we're
17  entitled to your best recollection.  If
18  you don't recall, you can tell me that.
19  And I'd also caution you not to guess at
20  an answer.  If you don't know, just let
21  me know.

22      Does that all make sense?

23      A.   Yes.

24      Q.   So how long have you worked

Page 13

1   for AmerisourceBergen?

2       A.   Since 2007, so going on 11
3   years.

4       Q.   Has your employment with
5   AmerisourceBergen been continuous since
6   2007?

7       A.   It has not.

8       Q.   When you began with
9   Amerisource -- well, when you joined the
10  company in 2007, was it AmerisourceBergen
11  or was it some previous entity that
12  merged into AmerisourceBergen?

13      A.   It was AmerisourceBergen.

14      Q.   And what was your title at
15  the time that you joined
16  AmerisourceBergen?

17      A.   I believe my title was
18  collections associate.

19      Q.   And do you recall what month
20  in 2007 you started with Amerisource?

21      A.   It was April.

22      Q.   And you believe your title
23  at that time was collections associate?

24      A.   Yes.

Page 14

1  Q.  Do you recall how long you
2  held that position?
3      A.  Approximately a year
4  and-a-half.
5      Q.  So that would have been
6  until approximately the middle of 2009?
7      A.  I believe so, yes.
8      Q.  And after you were a
9  collections associate, do you recall what
10  your next position with AmerisourceBergen
11  was?
12     A.  Yes.  It was diversion
13  control specialist.
14     Q.  And to the best of your
15  recollection, you would have assumed that
16  position in -- some time in 2009?
17     A.  Yes.
18     Q.  What position did you -- did
19  your position ever change at
20  AmerisourceBergen after you became a
21  diversion control specialist?
22     A.  I received a promotion last
23  year to diversion control investigator.
24     Q.  So that would have been

Page 15

1  2017?
2      A.  Yes.
3      Q.  So between 2009 and 2017,
4  leaving out the time when you were
5  employed elsewhere, you were a diversion
6  control specialist?
7      A.  Yes.
8      Q.  And what department did you
9  work in as a diversion control
10  specialist?
11     A.  It was corporate security
12  and regulatory affairs.
13     Q.  And did you report to anyone
14  in that department?
15     A.  Yes.
16     Q.  Who was that?
17     A.  Ed Hazewski.
18     Q.  Was it Mr. Hazewski for the
19  entire time you were a diversion control
20  specialist?
21     A.  No, it was not.
22     Q.  Who else did you report to?
23     A.  Eric Cherveny.
24     Q.  Do you recall when you began

Page 16

1  reporting to Mr. Cherveny?
2      A.  I believe it was 2015.
3      Q.  At the time you're
4  reporting -- at the time that that change
5  occurred, do you recall why you began
6  reporting to Mr. Cherveny instead of Mr.
7  Hazewski?
8      A.  I do not.
9      Q.  Was there any change in your
10  responsibilities after you began
11  reporting to Mr. Cherveny?
12     A.  No.
13     Q.  To fast-forward to the
14  change to a diversion control
15  investigator, did you report to anybody
16  in that role?
17     A.  I'm sorry, could you ask
18  that again?
19     Q.  Sure.  No problem.
20         When you were promoted to a
21  diversion control investigator, prior to
22  that time, were you still reporting to
23  Mr. Cherveny?
24     A.  Yes.

Page 17

1      Q.  And after you were promoted,
2  did you continue to report to Mr.
3  Cherveny?
4      A.  Yes.
5      Q.  Was there any change in your
6  job responsibilities when you became a
7  diversion control investigator?
8      A.  No.  They were pretty much
9  the same.
10     Q.  You said there was a brief
11  interruption in your employment with
12  AmerisourceBergen.
13         What happened there?
14     A.  I applied for a position for
15  Teva Pharmaceuticals.
16     Q.  When was that?
17     A.  I started January 7th, I
18  believe, of 2012.
19     Q.  That's a pretty specific
20  date.
21         Is there some reason why
22  that date stands out to you?
23     A.  I just remember the date.
24     Q.  What prompted the

Page 18

1  application to Teva Pharmaceuticals?
2      A.   It was a brand-new position
3  for the company.
4      Q.   And why did you want to
5  apply for that brand-new position?
6      A.   I thought my skill set
7  matched the job requirements.
8      Q.   What was the -- do you
9  recall what the title of the position you
10 applied for was?
11     A.   I believe it was diversion
12 operations manager.
13     Q.   And it was your
14 understanding -- or was it your
15 understanding, at the time, that Teva
16 Pharmaceuticals had never had a diversion
17 operations manager before?
18     A.   That was my understanding.
19     Q.   During the interview process
20 with Teva, did you form an understanding
21 as to why Teva Pharmaceuticals was
22 creating this new position?
23     A.   No.
24     Q.   Did you ask?

Page 19

1      A.   I'm sure I did, but I don't
2  remember the questions that I asked.
3      Q.   And so looking back today,
4  you don't recall if you learned why Teva
5  was creating this new position?
6      A.   I don't know the specifics.
7  I don't recall the specifics.
8      Q.   You said you started on
9  January 7th, 2012.
10         Do you recall when you would
11 have filled out the application, or when
12 you began the application process?
13     A.   I'm not exactly sure.  Maybe
14 September or October of 2012, or maybe
15 that was 2011.
16     Q.   Do you recall who you met
17 with at Teva Pharmaceuticals about this
18 new position?
19     A.   Yes.  Colleen McGinn.
20     Q.   And who is she?
21     A.   She was my director that I
22 would be reporting to.
23     Q.   Do you recall her -- the
24 title of her position?

Page 20

1      A.   No.  No, I don't.
2      Q.   If later we showed you some
3  documents between -- e-mail
4  correspondence between you and Ms.
5  McGinn, do you think it would refresh
6  your recollection about her title and her
7  position?
8      A.   Perhaps.
9      Q.   Do you recall, when you
10 worked at Teva Pharmaceuticals,
11 exchanging e-mail correspondence with Ms.
12 McGinn?
13     A.   Yes.
14     Q.   Did you report directly to
15 her at the time?
16     A.   I did.
17     Q.   So in January 2012, you
18 joined Teva Pharmaceuticals.
19         And, if I recall correctly,
20 you were applying for the division
21 operations manager -- or diversion
22 operations manager position, correct?
23     A.   Yes.
24     Q.   And did you succeed in

Page 21

1  securing that position?
2      A.   I did.
3      Q.   And when you began working
4  for Teva Pharmaceuticals, was your job
5  title the same one that you applied for?
6      A.   Yes.
7      Q.   How long were you employed
8  with Teva Pharmaceuticals?
9      A.   Three months.
10     Q.   Did you say three months?
11     A.   Yes.
12     Q.   What happened -- what
13 happened when you left Teva
14 Pharmaceuticals?  Did you go -- what
15 happened with your job -- those are all
16 bad questions.
17         What did you do after those
18 three months?
19     A.   What did I do after those
20 three months?
21     Q.   Yes.
22     A.   I went back to
23 AmerisourceBergen.
24     Q.   So is it your recollection,

Page 22

1 then, that you rejoined AmerisourceBergen
2 in the middle of 2012?
3     A.   Yes.  Towards the end of
4 April 2012 -- or, no, I'm sorry.  2013 --
5 yes, 2012.
6     Q.   2012.
7     A.   Yes.
8     Q.   Is it possible that you
9 worked at Teva for a year and three
10 months instead of just three months?
11     A.   No.
12     Q.   No.
13          Is there a reason why you
14 were considering that possibly you had
15 worked there until 2013?
16     A.   Just mixing up the dates.
17     Q.   Certainly.
18          So the jobs we've talked
19 about today, between AmerisourceBergen
20 and Teva Pharmaceuticals, is that
21 fully -- have we fully discussed all of
22 the positions you've had with
23 AmerisourceBergen and Teva
24 Pharmaceuticals?

Page 23

1     A.   Yes.
2     Q.   Prior to joining
3 AmerisourceBergen in 2007, were you
4 employed?
5     A.   Yes.
6     Q.   Where were you employed?
7     A.   Wyeth Pharmaceuticals.
8     Q.   What is Wyeth?
9     A.   Wyeth Pharmaceuticals was a
10 manufacturer of pharmaceutical products.
11 However, they've been sold off and now
12 part of Pfizer.
13     Q.   What was your responsibility
14 there, or what was your position?
15     A.   I worked for Wyeth
16 Pharmaceuticals for 14 years.  I had many
17 different positions there.
18     Q.   What's the -- what's the job
19 title -- the earliest job title you can
20 recall?
21     A.   Back in 1992, I was a
22 security officer.
23     Q.   How long did you hold that
24 position?

Page 24

1     A.   Approximately a year.
2     Q.   And then did your title
3 change at that point?
4     A.   I applied for another
5 position in the packaging department.
6     Q.   So you applied internally
7 with --
8     A.   Internally.
9     Q.   -- Wyeth?
10     A.   Yes.
11     Q.   One thing we should just
12 point out again, and we haven't had a
13 problem with it yet, but we shouldn't
14 talk over each other, to the best of our
15 ability.  So I'll do my best to let you
16 finish all of your answers.
17          The only reason is we have
18 to let the court reporter get everything
19 that we're saying, so.
20     A.   Sure.
21     Q.   I'm reminding myself, just
22 as much as I'm reminding you.  Thank you.
23          What was the job title that
24 you applied for in the packaging

Page 25

1 department at Wyeth?
2     A.   I don't know the exact
3 title.  It was packaging operator.  I'm
4 not exactly sure.  I don't remember --
5 recall.
6     Q.   And how long did you hold
7 that position?
8     A.   Approximately a year
9 and-a-half.
10     Q.   And then what happened?
11     A.   And then that department was
12 outsourced to Puerto Rico.
13     Q.   Did you go to Puerto Rico?
14     A.   I did not.
15     Q.   Sorry to hear that.
16          What did you do instead?
17     A.   I applied for another
18 position internally in the accounts
19 receivable department.
20     Q.   And do you recall what that
21 position was?
22     A.   Accounts receivable
23 representative.
24     Q.   And how long did you hold

Page 26

1 that position?
2     A.   This is only an
3 approximation.  I received a couple
4 promotions in that department.  Maybe two
5 years, three years tops.
6     Q.   So you were in the accounts
7 receivable department for approximately
8 two years, but you had some promotions?
9     A.   Yes.
10    Q.   Do you recall what those
11 promotions were?
12    A.   It was just a level up, from
13 a rep 1 to a rep 2.
14    Q.   Would your job
15 responsibilities essentially have stayed
16 the same between rep 1 and rep 2?
17    A.   Pretty much so, yes.
18    Q.   And what happened after --
19 after the accounts receivable department?
20    A.   Then I applied for a
21 position in the credit department, credit
22 and collections.
23    Q.   Is that the name of the
24 department or is that --

Page 27

1     A.   Yes.
2     Q.   -- the position?
3     A.   Of the department.
4     Q.   And what was your title
5 there?
6     A.   Initially, it was a credit
7 correspondent.
8     Q.   How long did you hold that
9 position?
10    A.   I'm not exactly sure.  Maybe
11 three years.
12    Q.   And what happened after
13 those three years?
14    A.   And then I received a
15 promotion to a credit analyst.
16    Q.   How long were you a credit
17 analyst?
18    A.   Until the day I left the
19 department.  Well, the department was
20 outsourced, in 2006.  Or 2007, I'm sorry.
21    Q.   And 2007 is when you joined
22 AmerisourceBergen?
23    A.   Yes.
24    Q.   And is the outsourcing of

Page 28

1 that credit and collections department,
2 is that the reason you applied to
3 AmerisourceBergen?
4     A.   Yes.  They closed the entire
5 department, and that was outsourced to
6 India.
7     Q.   Did you hold any other
8 positions when you were with Wyeth
9 Pharmaceuticals?
10    A.   No.
11    Q.   Do you know when Wyeth
12 Pharmaceuticals was merged into or
13 acquired by Pfizer?
14    A.   I'm not sure of the exact
15 year.
16    Q.   I want to start back at the
17 beginning with your job history at Wyeth
18 to kind of understand some of your roles
19 and responsibilities.
20         So I believe you said you
21 started in approximately 1992 there,
22 "there" being Wyeth, as a security
23 officer?
24    A.   Correct.

Page 29

1     Q.   What was your -- what were
2 your responsibilities as a security
3 officer?
4     A.   I conducted rounds of the
5 facility.  I also greeted everybody as
6 they walked into the building.  I
7 inspected packages as they left the
8 building and conducted some
9 investigations involving theft.
10    Q.   So aside from the
11 investigations involving theft, it sounds
12 like the majority of your responsibility
13 as a security officer was, essentially,
14 to be a security guard, right?
15    A.   Pretty much, yes.
16    Q.   You said -- you referred to
17 the facility.
18         What was the facility?
19    A.   The manufacturing site, the
20 building.  We had, actually, three
21 buildings.
22    Q.   Were you a security officer
23 responsible for all three?
24    A.   For all three.

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1  Q. How did that work out? Let
2 me be more specific.
3      So were you assigned to
4 patrol all three at one time, or some
5 days you were assigned to one facility
6 and other days another facility?
7  A. I was pretty much assigned
8 to all three.
9  Q. So when you were conducting
10 rounds, you would patrol all three
11 facilities?
12  A. Yes.
13  Q. Was there a central desk
14 where people would come in and out of to
15 get into the three facilities?
16  A. Yes.
17  Q. What kind of pharmaceutical
18 products do you recall that Wyeth
19 manufactured?
20  A. Prevnar. There was birth
21 control pills. Penicillin. Those are
22 the three that I recollect the most.
23  Q. Do you recall if Wyeth
24 Pharmaceuticals manufactured any Schedule

Page 31

1 II or Schedule III controlled substances?
2  A. I don't recall.
3  Q. Are you familiar with what a
4 Schedule II controlled substance is?
5  A. Yes.
6  Q. And are you familiar with
7 what a Schedule III controlled substance
8 is?
9  A. Yes, in basic -- yeah.
10  Q. So did you understand, at
11 the time you worked at Wyeth
12 Pharmaceuticals, what Schedule II or III
13 controlled substances were?
14  A. No.
15  Q. So if Wyeth had been
16 manufacturing them, you wouldn't have
17 known about it?
18      MR. NICHOLAS: Object to
19 form.
20      Go ahead.
21      THE WITNESS: I may not
22 have.
23 BY MR. CLUFF:
24  Q. So it's possible -- well,

Page 32

1 would you agree with me that it's
2 possible Wyeth manufactured controlled
3 substances, you just may not have been
4 aware of it?
5  A. They may have and I'm just
6 not aware.
7  Q. Do you recall if, as a
8 security officer, you received any
9 training about controlled substances?
10  A. No, I did not.
11  Q. Did you have any other
12 responsibilities aside from, you know,
13 conducting the rounds and conducting the
14 investigations at Wyeth as a security
15 officer?
16  A. I don't recall any
17 additional responsibilities.
18  Q. When you mentioned
19 conducting investigations, I believe you
20 referred to it as conducting
21 investigations about theft.
22      Is that accurate?
23  A. Correct.
24  Q. What was your understanding

Page 33

1 of that responsibility as a security
2 officer?
3  A. It was involving theft of
4 personnel, associates that had items
5 stolen from their desks or offices.
6  Q. Are you referring to
7 personal items?
8  A. Personal items, yes.
9  Q. So you were not
10 investigating thefts of any of the drugs
11 that Wyeth manufactured?
12  A. No.
13  Q. When you worked at Wyeth
14 Pharmaceuticals as a security
15 investigator, did you receive any
16 training about diversion?
17  A. I did not.
18  Q. I should have asked this
19 question first.
20      Are you familiar with the
21 concept of diversion?
22  A. Yes.
23  Q. But at the time you worked
24 at Wyeth, you did not receive any

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 training about it?
2     A. I did not.
3     Q. Understood.
4        How about suspicious orders;
5 were you familiar with the term
6 "suspicious orders" when you worked at
7 Wyeth?
8     A. No.
9     Q. You didn't receive any
10 training about suspicious orders at
11 Wyeth?
12     A. I did not.
13     Q. You said after about a year
14 as a security officer you applied
15 internally for a job with the packaging
16 department?
17     A. Yes.
18     Q. And your best recollection
19 is that you assumed a position that you
20 referred to as a packing operator,
21 correct?
22     A. Correct.
23     Q. Would that have been within
24 the same facilities where you were a

Page 35

1 security officer?
2     A. Yes.
3     Q. And what were your
4 responsibilities as a packing officer --
5 or operator, excuse me?
6     A. I was packaging, I think it
7 was mostly birth control pills. And I
8 was also a machine operator there as
9 well, all in the same department.
10     Q. And the department you're
11 referring to is the packaging department?
12     A. Packaging, yes.
13     Q. What's the procedure like
14 for packaging drugs at Wyeth, or was it
15 like, excuse me?
16     MR. NICHOLAS: Object to
17     form.
18     THE WITNESS: It was just
19     ensuring they were color-coded
20     pills in different rows, and we
21     had to ensure that the pills were
22     not cracked or missing, to that
23     extent.
24 BY MR. CLUFF:

Page 36

1     Q. So as a packing operator,
2 you were ensuring that the pills were
3 placed into their individual packages
4 correctly?
5     Blister packs, yes.
6     Q. Did you, as a packing
7 operator, ever have any responsibility
8 for taking individual packaging and
9 putting them into a larger shipment?
10     A. Yes.
11     Q. What was that process like?
12     A. It was -- it was a belt,
13 belt-fed line, and we would collect the
14 blister packs and place them in the box.
15 And then once that box was full, wrap it
16 up and put it on a pallet.
17     Q. So, essentially, an assembly
18 line of packages coming to you that
19 you're going to pack into a larger box?
20     A. Yes.
21     Q. Did you, as part of the
22 individual packaging and the larger
23 shipment packaging, get any training
24 about security related to the manufacture

Page 37

1 of drugs or controlled substances?
2     A. No, I don't believe so.
3     Q. You mentioned the birth
4 control pills.
5     Did you ever have
6 responsibility for packaging any other
7 kinds of products that Wyeth
8 manufactured?
9     A. Penicillin.
10     Q. Did you get any training
11 about security related to packaging
12 penicillin?
13     A. No, I don't believe I did.
14     Q. And what was your other job
15 responsibility as a packaging operator?
16     A. I was also a machine
17 operator there as well.
18     Q. And what was involved in
19 being a machine operator?
20     A. Just ensuring that there
21 were pills in the hopper so they could be
22 fed into blister packs and sent down the
23 line.
24     Q. What's a hopper?

Page 38

1    A.   It's a pill hopper.  It's
2  like a circular -- a cylinder-type object
3  and all the pills are in there and they
4  are fed into the blister packs and made.
5    Q.   So it's a large piece of
6  machinery --
7    A.   Yes.
8    Q.   -- that pills come into; is
9  that right?
10    A.   Yes.
11    Q.   And then the pills go
12  through the machine and into the blister
13  packs?
14    A.   Correct.  And sent down the
15  line, which is belt-fed.
16    Q.   And the line out of the bell
17  feed -- or belt feed goes to the people
18  packaging?
19    A.   Yes.  So there will be
20  approximately three people on each side
21  checking the blister packs.
22    Q.   And that was, like you said,
23  to make sure that they weren't cracked or
24  they had been packaged appropriately?

Page 39

1    A.   Correct.
2    Q.   Did you have any other job
3  responsibilities within the packing
4  department that we haven't discussed?
5    A.   I believe that's it.
6    Q.   And you worked in the
7  packing department for approximately a
8  year and-a-half, right?
9    A.   Approximately a year
10  and-a-half, two years.
11    Q.   Before the packing
12  department was outsourced to Puerto Rico,
13  had you considered leaving that
14  department for another department in
15  Wyeth?
16    A.   I may have, but I don't
17  recall.
18    Q.   So, then, the outsourcing to
19  Puerto Rico, was that the primary reason
20  why you left the packing department?
21    A.   I believe so, yes.
22    Q.   So after the packing
23  department was outsourced, you went to
24  the accounts receivable department, and

Page 40

1  your best recollection was that you took
2  on a role that you described as rep 1; is
3  that right?
4    A.   Correct.
5    Q.   And what was your job
6  responsibility in the accounts receivable
7  department?
8    A.   We would receive invoices
9  and -- I believe we would receive mail
10  from the customers with invoices and
11  checks where they were paying for their
12  products.
13    Q.   And so what were you doing
14  with the invoices and the checks that you
15  received?
16    A.   Entering them into the
17  system.
18    Q.   What system was that?
19    A.   It was a mainframe system.
20    Q.   Was this essentially like a
21  data entry job?
22    A.   It was data entry and
23  ensuring that the customers were paying
24  for their invoices.  I vaguely remember

Page 41

1  the details of this position, since it
2  was so long ago.
3    Q.   Did you have any
4  responsibility for pills within the
5  accounts receivable department?
6    A.   No.
7    Q.   Did you get any training
8  about security while you were in the
9  accounts receivable department?
10    A.   No.
11    Q.   Did you receive any training
12  about diversion when you were in the
13  accounts receivable department?
14    A.   No.
15    Q.   Did you receive any training
16  about suspicious orders when you were in
17  the accounts receivable department?
18    A.   No.
19    Q.   Just circling back to the
20  packing department again, did you receive
21  any training about security when you
22  worked in the packing department?
23    A.   No.
24    Q.   How about diversion?

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    A.   No.
2    Q.   Suspicious orders?
3    A.   No.
4    Q.   And so back to the accounts
5  receivable, you received a couple of
6  promotions, you said, while you were in
7  accounts receivable; is that right?
8    A.   Yes.
9    Q.   And I think you referred to
10 those as moving from rep 1 to rep 2; is
11 that right?
12   A.   Yes.
13   Q.   And were your job
14 responsibilities essentially the same the
15 entire time you were in that department?
16   A.   I believe they increased
17 where -- from what I remember, is that I
18 was entering -- it was a cash
19 application, where I was entering the
20 payments of the invoices that the
21 customers made to their accounts.
22   Q.   And that's a job
23 responsibility you assumed when you
24 became a rep 2?

Page 43

1    A.   Yes.
2    Q.   And, again, there the
3  responsibility was mainly ensuring the
4  customers were paying their bills?
5    A.   Correct.
6    Q.   Did you have any
7  responsibility with looking at order
8  forms when you were in the accounts
9  receivable department?
10   A.   I don't recall.
11   Q.   Is it possible that you did
12 have responsibility for that and just
13 don't recall it?
14   A.   I just don't recall.
15   Q.   Do you remember the
16 approximate years, not the number of
17 years, but, like, the calendar years that
18 you were in the accounts receivable
19 department?
20   A.   I would only be guessing.
21   Q.   Was it in -- by your best
22 estimate, would it have been in the late
23 '90s or early 2000s?
24   A.   I was thinking maybe mid to

Page 44

1  late '90s.
2    Q.   And then after the accounts
3  receivable department, you told me that
4  you moved to the credit and collections
5  department; is that accurate?
6    A.   Yes.
7    Q.   Do you recall what prompted
8  that application?
9    A.   It was -- I was just looking
10 to further my career in the company by
11 applying for the position.
12   Q.   How did you feel like that
13 would have furthered your career at that
14 point?
15   A.   It would give me the
16 opportunity to work more on computers.
17   Q.   So at that time, was Wyeth's
18 business operation primarily by paper?
19   A.   It was a mix.
20   Q.   What was your job title in
21 the credit and collections department?
22   A.   Credit correspondent,
23 initially.
24   Q.   And what was your

Page 45

1  responsibility as a credit correspondent?
2    A.   I would have area
3  responsibility, a region within the
4  country, to follow up on customers'
5  invoices where they were past due.
6    Q.   So does the word "credit"
7  and "credit correspondent" refer to the
8  fact that you had credited these
9  customers and not been paid yet?
10   A.   Yes.  They received the
11 products and we have not yet received
12 payment.
13   Q.   And how long were you a
14 credit correspondent?
15   A.   I just don't remember how
16 long.  Two to three years, maybe.
17   Q.   And then at that point, you
18 were promoted to a credit analyst,
19 correct?
20   A.   Yes.  I went back to school
21 and I received my Associate's Degree, and
22 I received that promotion.  And I was
23 continuing on in my education.
24   Q.   So prior to this time when

Page 46

1 you received your Associate's Degree, you
2 had not completed a degree after high
3 school?
4     A.   I attended college, but I
5 did not fully complete college at that
6 point.
7     Q.   Do you remember when you
8 received your Associate's Degree?
9     A.   I believe it was 2003.
10     Q.   And what was your degree in?
11     A.   It was just general studies.
12     Q.   And where did you get it
13 from?
14     A.   University of Phoenix.
15     Q.   Prior to getting the degree
16 from the University of Phoenix, did you
17 attend college classes, you said?
18     A.   I did.
19     Q.   Do you recall where that
20 was?
21     A.   Yes.  Community College of
22 Beaver County.
23     Q.   Forgive my lack of knowledge
24 about the local area, is Beaver County in

Page 47

1 Pennsylvania?
2     A.   It's Western PA, outside of
3 Pittsburgh.
4     Q.   And what was the name of the
5 community college?
6     A.   Community College of Beaver
7 County.
8     Q.   Were you a full-time student
9 there or part-time student?
10     A.   I believe I was part time.
11     Q.   Do you recall how long you
12 were enrolled?
13     A.   I believe it was three
14 years, two and-a-half to three years.
15     Q.   Do you recall the general
16 time period you were enrolled?
17     A.   It was from '84 to '86.
18     Q.   And do you recall what you
19 studied?
20     A.   Air traffic control.
21     Q.   Was there any particular
22 reason why you didn't complete that
23 course of study?
24     A.   I decided it was not for me.

Page 48

1     Q.   And what did you do -- were
2 you working at the time?
3     A.   I was working, yes.
4     Q.   So what prompted you to go
5 back to school to get the Associate's
6 Degree when you were in the credit and
7 collections department?
8     A.   I just realized that in
9 order for me to have a better life, I
10 needed to go back to school and have more
11 career opportunities.
12     Q.   Were the classes you took at
13 the University of Phoenix, were they
14 tailored to helping improve your ability
15 to conduct your -- or to fulfill your job
16 responsibilities as a credit analyst?
17     A.   It certainly helped.
18     Q.   What were your job
19 responsibilities as a credit analyst?
20     A.   They were similar to the
21 duties of a credit correspondent, but I
22 had larger accounts to manage.
23     Q.   When you discussed the
24 responsibilities as a credit

Page 49

1 correspondent, I think you mentioned that
2 you had a region you were responsible
3 for?
4     A.   Yes.
5     Q.   When you were a credit
6 analyst, were you also responsible for a
7 region?
8     A.   Yes.
9     Q.   But the accounts were
10 larger?
11     A.   The accounts were larger
12 accounts, meaning wholesaler accounts.
13     Q.   What's a wholesaler account?
14     A.   A wholesaler account would
15 be, for instance, AmerisourceBergen,
16 McKesson, Cardinal, one of those.
17     Q.   When you worked at Wyeth, do
18 you recall which wholesaler accounts you
19 were responsible for?
20     A.   I also -- I do remember
21 being in charge of the DOD account, as
22 well as -- I was either in charge of the
23 McKesson account or I helped out on the
24 McKesson account, I don't recall which.

Page 50

1  Q.   Any other wholesalers you
2  can recall?
3      A.   No.
4      Q.   So you didn't work with
5  AmerisourceBergen?
6      A.   I did not.
7      Q.   You didn't work with
8  Cardinal Health?
9      A.   I don't believe so.
10     Q.   How about HD Smith?
11     A.   No.
12     Q.   Bellco?
13     A.   No.
14     Q.   And just so the record is
15 clear, is it you do not recall working
16 for those wholesalers -- with those
17 wholesalers or you're telling me you did
18 not?
19     A.   I don't believe I have
20 worked with those wholesalers.
21     Q.   Understood.  Thank you.
22         And even though you assumed
23 larger accounts, was the responsibility
24 still to work with those accounts to make

Page 51

1  sure they paid their invoices?
2      A.   Paid their invoices.  And if
3  there were any deductions that they took,
4  I had to help resolve those situations in
5  working with the account.
6      Q.   You mentioned they took
7  deductions --
8      A.   Meaning the accounts.
9      Q.   So the accounts would have
10 been the wholesalers or the DOD or any of
11 the smaller accounts that you worked
12 with?
13     A.   That's correct.
14     Q.   What form of deductions
15 would they have been taking on their
16 invoices?
17     A.   It could have been any form;
18 it could have been a 2 percent discount
19 that we offered if they paid their
20 invoice ahead of time or any other
21 reason.
22     Q.   Do you know if Wyeth ever
23 offered discounts to wholesalers if the
24 volume of their purchasing from Wyeth was

Page 52

1  higher?
2      A.   I don't recall that.
3      Q.   Do you recall if Wyeth ever
4  offered discounts to wholesalers for
5  receiving chargeback data?
6      A.   I don't recall that either.
7      Q.   Do you understand that term,
8  "chargeback data"?
9      A.   No, I really don't, because
10 I wasn't part of that, that area.
11     Q.   Just for clarity, are you
12 telling me that at the time you worked at
13 Wyeth you would not have understood what
14 chargeback data is?
15     A.   That is correct.  Because I
16 believe that was a separate department
17 that I wasn't involved in.
18     Q.   And then currently do you
19 have an understanding of what chargeback
20 data is?
21     A.   I really do not.  I don't
22 understand the full definition.
23     Q.   Do you recall who you --
24 what individuals you would have worked

Page 53

1  with at McKesson when you were a credit
2  analyst?
3      A.   No.
4      Q.   Do you recall what
5  department you would have been working
6  with at McKesson?
7      A.   I don't recall the specific
8  department.
9      Q.   So eventually this credit
10 department at Wyeth was outsourced to
11 India, correct?
12     A.   Correct.
13     Q.   And your recollection was
14 that was approximately 2006 or 2007?
15     A.   That was 2007.
16     Q.   When did you apply -- or do
17 you recall when you applied for the
18 position at AmerisourceBergen?
19     A.   I don't recall exactly when
20 I applied, but I know the day that I had
21 the interview for AmerisourceBergen.
22     Q.   You recall the date when you
23 had the interview?
24     A.   It was literally three days

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1 after I was let go from Wyeth
2 Pharmaceuticals.
3      Q.    What day was that?
4      A.    That was -- I believe that
5 was March 30th of 2007.
6      Q.    And is that the day you were
7 let go or the date of the interview?
8      A.    That was the date I was let
9 go, the whole department was let go.
10      Q.    And so you would have
11 interviewed approximately three days
12 later?
13      A.    Yes.
14      Q.    And do you recall who you
15 met with when you interviewed?
16      A.    Yes.  His name was Harry
17 Chamberlain.
18      Q.    Do you recall his job
19 position?
20      A.    I don't know -- I don't
21 remember his exact title, but he was the
22 director of, maybe, collections.
23      Q.    Would he have been the
24 person to whom you reported in the

Page 55

1 collections department when you worked at
2 Amerisource?
3      A.    Initially, yes.
4      Q.    Did you report to somebody
5 else when you were a collections
6 associate at Amerisource?
7      A.    I did.
8      Q.    Who was that?
9      A.    Her name was Ann Marie
10 Duran.
11      Q.    Do you recall her job
12 position?
13      A.    Similar to Harry's.
14      Q.    Essentially, a director of
15 that collections department?
16      A.    Yes.
17      Q.    When we went through your
18 employment history at AmerisourceBergen,
19 I think you said your best recollection
20 was that your title in that collections
21 department was a collections associate?
22      A.    In credit collections, it
23 was initially credit correspondent and
24 then a credit analyst.

Page 56

1      Q.    At AmerisourceBergen?
2      A.    Oh, I'm sorry.  I was going
3 back to Wyeth.
4          At AmerisourceBergen, I
5 believe it was collections associate,
6 yes.
7      Q.    And was that in the
8 collections department --
9      A.    Yes.
10      Q.    -- or did it have a
11 different name?
12      A.    I don't recall it had a
13 different name.
14      Q.    And how long were you a
15 collections associate in the collections
16 department?
17      A.    Approximately a year
18 and-a-half.
19      Q.    And what were your job
20 responsibilities?
21      A.    I was in charge of the
22 similar duties that I had at Wyeth
23 Pharmaceuticals, ensuring customers were
24 paying their invoices on time.

Page 57

1      Q.    Anything else?
2      A.    Running statements for
3 customers, monthly statements.
4      Q.    What does that mean?
5      A.    I believe it was the 1st of
6 the month, we would run statements of, I
7 believe, it was customers' purchases.
8      Q.    What was the purpose of
9 running statements of purchases for
10 customers?
11      A.    Those customers would
12 request statements from us on a monthly
13 basis.
14      Q.    Do you recall why they would
15 request those statements?
16      A.    I do not.
17      Q.    In your work as a
18 collections associate, did you ever, as
19 part of your responsibilities, have to
20 review order forms from
21 AmerisourceBergen's customers?
22      A.    I do not recall.
23          But going back to Wyeth
24 Pharmaceuticals, I did review customer

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1 orders for customers.
2    Q.   In what role at Wyeth were
3 you reviewing invoices from -- or
4 purchase orders from customers?
5    A.   It was based on their credit
6 standing with us.
7    Q.   What position did you hold
8 at Wyeth when you were reviewing the
9 order forms from customers?
10    A.   It was the credit analyst
11 role.
12    Q.   And you said "it was based
13 on their credit standing with us."
14      What does that mean?
15    A.   I don't fully recollect the
16 details of that, but it was based on
17 their payment history with Wyeth
18 Pharmaceuticals.
19    Q.   So the purpose for you
20 looking at an order form from a customer
21 would be to analyze their payment history
22 and credit standing with Wyeth?
23    A.   Correct.
24    Q.   So not to look at what they

Page 59

1 were ordering; is that right?
2    A.   I do remember looking at
3 what they were ordering. But, again, it
4 was based on their credit history.
5    Q.   And do you recall looking at
6 any customer order forms when you worked
7 as a collections associate at
8 AmerisourceBergen?
9    A.   I do not remember.
10    Q.   When you were a collections
11 associate at AmerisourceBergen, did you
12 have an understanding of what diversion
13 was?
14    A.   At that time, no.
15    Q.   And at that time, when you
16 were a collections associate at
17 AmerisourceBergen, did you have an
18 understanding of what a suspicious order
19 is, or was?
20    A.   No.
21    Q.   When you were a collections
22 associate at AmerisourceBergen, did you
23 ever receive any training about security
24 around controlled substances?

Page 60

1    A.   For which role? For which
2 position?
3    Q.   When you were a collection
4 associate at AmerisourceBergen.
5    A.   No.
6    Q.   Did you receive any training
7 about diversion?
8    A.   No.
9    Q.   Did you receive any training
10 about suspicious orders?
11    A.   No.
12    Q.   Did you have any
13 responsibility for monitoring for
14 diversion when you were a collections
15 associate?
16    A.   No.
17    Q.   Did you have any
18 responsibility for identifying suspicious
19 orders when you were a collections
20 associate?
21    A.   No.
22    Q.   Just to make sure I
23 understand, no training and no
24 responsibility, correct?

Page 61

1    A.   For that role, yes, correct.
2    Q.   So after working at
3 AmerisourceBergen as a collections
4 associate for approximately a year
5 and-a-half to two years, you moved into
6 the position of a diversion control
7 specialist?
8    A.   Correct.
9    Q.   Do you recall what prompted
10 that change in your employment?
11    A.   Just like other roles that I
12 have had over my career, just looking to
13 further my knowledge in a different job
14 position.
15    Q.   Did you apply for that
16 position?
17    A.   I did.
18    Q.   What was the application
19 process like?
20    A.   It was filling out an
21 application form online.
22    Q.   When you say "online," do
23 you mean on the Internet?
24    A.   Inner-company web.

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1 Q. So like an AmerisourceBergen
2 intranet?
3 A. Yes.
4 Q. Do you recall what the
5 application was like?
6 A. I do not.
7 Q. Do you recall any
8 qualifications that AmerisourceBergen
9 wanted applicants to have for that
10 position?
11 A. I don't recall.
12 Q. Do you recall if there were
13 any educational requirements?
14 A. I do not.
15 Q. Do you recall if there were
16 any experience requirements?
17 A. I do not recall.
18 Q. Was there an interview
19 process for the diversion control
20 specialist position?
21 A. There was.
22 Q. What was the interview
23 process like?
24 A. It was meeting with Ed

Page 63

1 Hazewski.
2 Q. Anybody else?
3 A. And I also met with Chris
4 Zimmerman.
5 Q. Did you meet with Ed and
6 Chris together or separately?
7 A. Separately.
8 Q. Were those meetings on the
9 same day or subsequent days?
10 A. Same day.
11 Q. Were there any other
12 interviews besides with Ed and Chris?
13 A. I don't believe so, no.
14 Q. Do you recall, at the time,
15 what Ed Hazewski's position was?
16 A. I believe it was diversion
17 control manager.
18 Q. Do you have -- did you have
19 an understanding, at the time, of why you
20 were meeting with Ed for that position?
21 A. To apply for the position.
22 Q. Was he going to be your
23 direct supervisor in that position?
24 A. He would be.

Page 64

1 Q. Do you understand why you
2 were meeting with Chris Zimmerman?
3 A. Yes.
4 Q. Why was that?
5 A. My understanding is that Ed
6 wanted a second opinion, so he asked
7 Chris Zimmerman to also interview me.
8 Q. Do you know if
9 AmerisourceBergen posted this diversion
10 control specialist job outside of
11 AmerisourceBergen?
12 A. I do not know.
13 Q. Did you -- did you, at any
14 time after you interviewed for that
15 position, learn whether AmerisourceBergen
16 was hiring people from outside of the
17 company?
18 A. I do not recall.
19 Q. During the interviews with
20 Ed -- or the interview with Ed, did they
21 ask you about your educational
22 background?
23 A. He may have, but I don't
24 remember.

Page 65

1 Q. Do you recall if it was a
2 concern that you did not have more than
3 an Associate's Degree?
4 A. I do have more than an
5 Associate's Degree.
6 Q. Sorry. Please forgive me.
7 Can you -- let's back up
8 right there, and you can tell me, what
9 further education have you received after
10 the Associate's Degree?
11 A. I completed my Bachelor's
12 Degree in 2006.
13 Q. So you completed your
14 Bachelor's Degree before applying for the
15 diversion control job?
16 A. Yes.
17 Q. And what is your Bachelor's
18 Degree in?
19 A. Management.
20 Q. Any particular kind of
21 management?
22 A. No. It was management.
23 Q. And where did you complete
24 your Bachelor's Degree?

Page 66

1    A.   University of Phoenix.  And
2  I also took one class towards my
3  Master's.
4    Q.   What was that class?
5    A.   That, I don't remember.
6    Q.   Do you recall what
7  institution you took it through?
8    A.   University of Phoenix.
9    Q.   What were you intending to
10 get a Master's in?
11   A.   Business.
12   Q.   Would that have been like a
13 Master's in business administration or
14 business management?
15   A.   Something like that, yes.
16   Q.   Is there any particular
17 reason why you didn't complete your
18 Master's?
19   A.   No particular reason.
20   Q.   Going back to the interview
21 with Mr. Hazewski, did he ever ask you
22 questions about your experience with
23 controlled substances?
24   A.   I don't recall that

Page 67

1  question.
2    Q.   Did he ask you any questions
3  about your experience with diversion or
4  monitoring for diversion?
5    A.   I don't recall.
6    Q.   Do you recall if Mr.
7  Hazewski asked you any questions about
8  your experience with suspicious orders or
9  monitoring for suspicious orders?
10   A.   No.  But we did discuss the
11 nature of the position.
12   Q.   What was that discussion
13 like?
14   A.   It was just he was telling
15 me about the role of the position that
16 I'm applying for.
17   Q.   What did he tell you about
18 the role?
19   A.   That I would be reviewing
20 orders of interest.
21   Q.   Did he use the word "order
22 of interest" or did he use the word
23 "suspicious orders"?
24   A.   I don't recall.

Page 68

1    Q.   Do you recall if he may have
2  used the word "excessive purchase
3  orders"?
4    A.   That, I don't remember.
5    Q.   The word "order of
6  interest," do you recall him using that
7  word, or is that a word you're using
8  today --
9    A.   That's --
10   Q.   -- to describe --
11   A.   Sorry.
12   Q.   Is that a word you're using
13 today to describe the subject you
14 discussed back then?
15   A.   Yes.
16   Q.   But it's not the words that
17 he would have used back then?
18       MR. NICHOLAS:  Object to
19 form.
20       Go ahead.
21       THE WITNESS:  Possibly.
22 BY MR. CLUFF:
23   Q.   Was there anything else that
24 he told you about the role of diversion

Page 69

1  control specialist?
2    A.   I do recall talking about
3  spreadsheets.
4    Q.   What about spreadsheets?
5    A.   Just my knowledge of working
6  with Excel.
7    Q.   Did you have a working
8  knowledge of Excel?
9    A.   I had a basic understanding.
10   Q.   What did he tell you about
11 working with spreadsheets in this new
12 role as a diversion control specialist?
13   A.   I don't recall the details.
14   Q.   But he told you you would
15 essentially need to work with Excel
16 spreadsheets?
17   A.   Right.
18   Q.   We discussed your work at
19 Wyeth in pretty substantial detail, and I
20 think we agreed that you did not have any
21 experience or training at Wyeth about
22 diversion or suspicious order monitoring;
23 is that right?
24   A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    Q.   Did that topic come up
2  during your interview with Mr. Hazewski?
3    A.   My recollection is that I
4  did inform him that I did review orders
5  when I was a credit analyst at Wyeth.
6    Q.   When you were at Wyeth and
7  you reviewed orders, it was to make sure
8  that Wyeth was getting paid, correct?
9    A.   When I was reviewing orders,
10 those -- the decision-making was based on
11 their credit risk with the company.
12   Q.   So what was the purpose of
13 the review of the orders at Wyeth?
14   A.   My understanding is that it
15 was to review those orders; if the
16 credit -- if the customer had a bad
17 credit history with Wyeth
18 Pharmaceuticals, that those orders would
19 not be released.  That's my recollection.
20   Q.   So when you reviewed orders
21 at Wyeth, you were not reviewing them to
22 determine whether or not they were
23 suspicious?
24   A.   I believe so.

Page 71

1    Q.   But that is the role you
2  were going to take on at
3  AmerisourceBergen as a diversion control
4  specialist, correct?
5    A.   Correct.
6    Q.   Did Mr. Hazewski express any
7  concern that you did not have any
8  experience reviewing orders to determine
9  whether or not they were suspicious?
10   A.   I don't recall.
11   Q.   Do you recall if Mr.
12 Hazewski was looking for somebody with
13 experience in reviewing orders for -- to
14 determine whether or not they were
15 suspicious?
16   A.   He didn't inform me, no.
17   Q.   Do you know why
18 AmerisourceBergen was hiring additional
19 diversion control specialists at that
20 time in 2007?
21   A.   I don't know the specific
22 reasons.
23   Q.   I said 2007, that was
24 incorrect.

Page 72

1        I think you applied for that
2  position in 2009, correct?
3    A.   Correct.
4    Q.   I'll just re-ask the
5  question so it's clear.
6        Did you have an
7  understanding of why AmerisourceBergen
8  was hiring more division -- diversion
9  control specialists in 2009?
10   A.   I don't recall.
11   Q.   When you met with Mr.
12 Zimmerman, do you recall what kind of
13 questions he asked you?
14   A.   No.
15   Q.   Did you talk about your
16 education?
17   A.   I don't recall the substance
18 that we --
19   Q.   Do you recall --
20   A.   -- the subjects we talked
21 about.
22   Q.   Do you recall if you talked
23 with Mr. Zimmerman about your experience
24 monitoring for suspicious orders?

Page 73

1    A.   I don't recall.
2    Q.   Do you recall if he had any
3  concern that you did not have any prior
4  experience monitoring for suspicious
5  orders?
6    A.   No, I do not.
7    Q.   What happened after you met
8  with Mr. Hazewski and Mr. Zimmerman?
9    A.   I believe within
10 approximately a week I was informed by
11 human resources that I was being offered
12 the position.
13   Q.   So it was a one-day
14 interview process, and then you were
15 hired a week later?
16   A.   Yes.
17   Q.   Do you recall how long after
18 you were informed by HR that you assumed
19 your new responsibilities as a diversion
20 control specialist?
21   A.   I believe it was two weeks.
22   Q.   Did you receive any training
23 before you started your new job?
24   A.   I trained when I started my

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 new job.
2     Q.   What happened in the two
3 weeks between when HR let you know you
4 were getting the job and you started the
5 job?
6     A.   I had to put in my two
7 weeks' notice with my position.
8     Q.   And then you essentially
9 just wrapped up that position and started
10 the new one?
11     A.   Yes.
12     Q.   And you said you trained on
13 the job, correct?
14     A.   Yes.
15     Q.   What was that training like?
16     A.   The training was going over
17 customer orders with Ed.
18     Q.   Did you ever, like, receive
19 any written materials or policies and
20 procedures or PowerPoints?
21     A.   I'm sure there were, but I
22 just don't -- just don't recall at the
23 moment.
24     Q.   What you do recall is sort

Page 75

1 of hands-on training directly with Ed
2 Hazewski?
3     A.   That is correct.
4     Q.   And you said you recall
5 looking at customer orders.
6          How would you have done
7 that?
8     A.   I would look at those orders
9 individually through the system that we
10 were using.
11     Q.   So that we can kind of
12 understand what the training process was
13 like, I'd like to back up and understand
14 what the order process was like from your
15 viewpoint.
16          So AmerisourceBergen has
17 customers, correct?
18     A.   Yes.
19     Q.   And there's some way that
20 they place orders with AmerisourceBergen?
21     A.   Yes.
22     Q.   What was your understanding,
23 in 2009, as a diversion control
24 specialist, of how customers placed

Page 76

1 orders with AmerisourceBergen?
2     A.   My understanding at the time
3 is that the customers would place orders
4 through -- I believe it was CSOS and 222
5 forms.
6     Q.   What is CSOS?
7     A.   CSOS is controlled substance
8 ordering system.
9     Q.   And what's a 222 form?
10     A.   A 222 form is a DEA form
11 that has the customer's name, DEA
12 license, as well as the items that
13 they're ordering.
14     Q.   Is the CSOS system just an
15 electronic form of the 222 form?
16     A.   It is.
17     Q.   So it has all the same
18 information that a 222 form would have?
19     A.   My understanding is that
20 yes, that is correct.
21     Q.   And is it your recollection
22 that in 2009 the CSOS system was already
23 operational?
24     A.   I don't recall.

Page 77

1     Q.   But at some time it did
2 become --
3     A.   Yes.
4     Q.   When you were training on
5 the job with Ed Hazewski, do you recall
6 if you looked at 222 forms?
7     A.   We did not.  The 222 forms
8 go through the distribution centers.
9     Q.   So a customer would fill out
10 a 222 form and send it to the
11 distribution center?
12     A.   Yes.
13     Q.   And then how would -- how
14 would the order come to you and Ed
15 Hazewski for review?
16     A.   I don't recall the actual
17 steps.
18     Q.   So, then, what were you
19 reviewing when you were working with Ed
20 Hazewski to start your training for this
21 new job?
22     A.   It was all the customer
23 orders that were currently in the system
24 to be reviewed.

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    Q.   Do you recall if you were
2  looking at them in an Excel spreadsheet,
3  or some other form?
4    A.   No, I don't recall.
5    Q.   What were you looking for,
6  or what was Ed Hazewski showing you to
7  look for when you were training?
8    A.   My recollection is that we
9  were looking at the product that they
10  were ordering, as well as the quantity
11  that they were ordering.
12    Q.   And what were you trying to
13  determine when you were looking at the
14  product and the quantity?
15    A.   To see if they were ordering
16  within their current purchase history.
17    Q.   When you were training with
18  Ed, did he ever explain the concept of
19  diversion to you?
20    A.   Yes.
21    Q.   What did he explain?
22    A.   It was where the -- any
23  pharmaceutical products being diverted to
24  another individual for illicit purposes.

Page 79

1    Q.   You used the word "diverted"
2  to help define diversion, and I'm okay
3  with that.
4        But I'm just trying to
5  understand, like, what does diversion
6  mean?  Does that mean it's going out of
7  the regular supply chain?
8    A.   Supply chain, yes.
9    Q.   Did Ed tell you why the word
10  "diversion" mattered in your diversion
11  specialist role?
12    A.   He may have, but I just
13  don't recall.
14    Q.   What was your understanding
15  of why diversion was important in your --
16  in your role?
17    A.   My understanding, at the
18  time, was that pharmacies who were
19  ordering -- licensed pharmacies that are
20  ordering products are receiving those
21  products and not sending them to any
22  other individual for illicit purposes;
23  that they are only supposed to go to the
24  patient who has the prescription.

Page 80

1    Q.   Was it your role to help
2  AmerisourceBergen prevent diversion?
3        MR. NICHOLAS:  Object to
4    form.
5        THE WITNESS:  Can you ask
6    that question again?
7  BY MR. CLUFF:
8    Q.   Sure.  I'll ask it two
9  different ways.
10        When you became a diversion
11  control specialist, did you understand
12  that your job was to help
13  AmerisourceBergen prevent diversion?
14    A.   No.
15    Q.   AmerisourceBergen doesn't
16  want to prevent diversion?
17        MR. NICHOLAS:  Object to the
18    form.
19        THE WITNESS:  I didn't say
20    that.
21  BY MR. CLUFF:
22    Q.   I'm asking.
23    A.   We have a system in place
24  that detects orders of interest, and

Page 81

1  those orders of interest are reviewed
2  based on the current systems that we have
3  in place.
4    Q.   When you started as a
5  diversion control specialist, did anybody
6  discuss the Controlled Substances Act
7  with you?
8    A.   I don't recall.
9    Q.   Would anybody have discussed
10  the regulations that AmerisourceBergen
11  obtains -- scratch that.
12        Did anybody discuss
13  regulations that AmerisourceBergen has to
14  comply with in relation to wholesale
15  distribution?
16    A.   Yes.
17    Q.   What did they tell you about
18  those regulations?
19    A.   It was a DEA 21 CFR FDA
20  regulation.
21    Q.   And that was explained to
22  you when you started training for a
23  diversion control specialist job?
24    A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    Q.   What did they explain to you
2  about 21 CFR regulations?
3    A.   Well, they showed me the
4  regulation.
5    Q.   Which ones?
6    A.   It was the 21 CFR.  I don't
7  recall the exact number.
8    Q.   What did they tell you about
9  those regulations?
10    A.   It was regarding that
11  suppliers have to have an order
12  monitoring system in place that detects
13  orders of unusual quantities, frequencies
14  and pattern.
15    Q.   Did they explain to you what
16  a suspicious order was when you started
17  as a diversion control specialist?
18    A.   I don't recall.
19    Q.   In your time working for
20  AmerisourceBergen, has anybody explained
21  to you what a suspicious order is?
22    A.   Yes.
23    Q.   What is it?
24    A.   A suspicious order is

Page 83

1  initially an order of interest, but after
2  investigation, it is then determined
3  whether that order is suspicious or not.
4    If it is suspicious, that
5  order is rejected and reported to the
6  DEA.
7    Q.   Is that your understanding
8  of a suspicious order today?  Let me make
9  my question a little more clear.
10    Do you know whether this DEA
11  21 CFR regulation defines a suspicious
12  order?
13    A.   Yes.
14    Q.   Do you know what the
15  regulations define a suspicious order to
16  be?
17    MR. NICHOLAS:  Object to
18    form.
19    THE WITNESS:  I did state
20    that earlier.
21  BY MR. CLUFF:
22    Q.   What is the definition of a
23  suspicious order in the CFR?
24    MR. NICHOLAS:  Same

Page 84

1  objection.
2    Go ahead.
3    THE WITNESS:  That is a
4  wholesaler needs to have a system
5  in place that monitors orders of
6  unusual size, frequency and
7  pattern.
8  BY MR. CLUFF:
9    Q.   So would you agree with me,
10  then, that the CFR defines a suspicious
11  order as one of unusual size, frequency
12  and pattern?
13    MR. NICHOLAS:  Object to the
14    form.
15    THE WITNESS:  To an extent,
16    yes, from what I recollect.
17  BY MR. CLUFF:
18    Q.   How does AmerisourceBergen
19  define an order of interest?
20    MR. NICHOLAS:  Object to the
21    form.  He's not --
22  BY MR. CLUFF:
23    Q.   Based on your --
24    MR. NICHOLAS:  He's not

Page 85

1  here --
2    MR. CLUFF:  I'm sorry, Bob,
3  I didn't mean to talk over your
4  objection.
5    MR. NICHOLAS:  I was going
6  to say, object to the form.  This
7  is not a 30(b)(6) deposition.
8    Go ahead.
9  BY MR. CLUFF:
10    Q.   You've worked with
11  AmerisourceBergen for a number of years,
12  correct?
13    A.   Yes.
14    Q.   And you were responsible --
15  well, your position was a diversion
16  control specialist?
17    A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review



Page 86

21  Q.   So, essentially, orders of
22  interest, in your experience at
23  AmerisourceBergen, match the definition
24  of suspicious order in the Code of

Page 87

1  Regulations?
2      MR. NICHOLAS:  Object to the
3  form.
4      THE WITNESS:  It's a system
5  we have in place for orders of
6  interest that we investigate
7  individually to determine if that
8  order is suspicious or not.
9  BY MR. CLUFF:

Page 88

21  BY MR. CLUFF:
22      Q.   And we discussed earlier
23  that the Code of Federal Regulations
24  defines suspicious orders as orders of

Page 89

1  unusual size, frequency and pattern,
2  correct?
3      MR. NICHOLAS:  Object to the
4  form.
5      THE WITNESS:  Yes.
6  BY MR. CLUFF:

Highly Confidential - Subject to Further Confidentiality Review



Page 90

17 BY MR. CLUFF:
18    Q.   And that's the same way that
19 the Code of Federal Regulations defines a
20 suspicious order, right?
21        MR. NICHOLAS:  Object to the
22    form.
23        THE WITNESS:  It's not
24    necessarily a suspicious order,

Page 91

1    it's an order of interest.
2 BY MR. CLUFF:
3    Q.   Does the word "order of
4 interest" appear anywhere in the Code of
5 Federal Regulations that you're aware of?
6        MR. NICHOLAS:  Well, object
7    to form.  He's not a lawyer.  He
8    hasn't read the entire --
9        THE WITNESS:  No.
10        MR. NICHOLAS:  -- statute.
11        But go ahead.
12 BY MR. CLUFF:

Page 92

7    Q.   Do you recall ever being
8 trained about what an order of interest
9 is?
10    A.   Yes.
11    Q.   Do you recall when that was?
12    A.   I do not recall the year.
13    Q.   If you were to estimate,
14 would you say it was before or after you
15 worked at Teva?
16    A.   I don't recall.
17    Q.   When you were training with
18 Ed Hazewski after you started this
19 position, was he training you about
20 suspicious orders?
21    A.   He was training me on order
22 review.

Page 93

6    Q.   So essentially the same
7 definition of a suspicious order that we
8 talked about in the Code of Federal
9 Regulations?
10        MR. NICHOLAS:  Object to the
11    form.
12        Go ahead.
13        THE WITNESS:  Just orders of
14    unusual size, quantity and
15    frequency, yes.
16 BY MR. CLUFF:

Highly Confidential - Subject to Further Confidentiality Review



Page 94

17    A.    Yes.
18    Q.    Why were you reviewing
19 orders to determine whether they were
20 suspicious?
21    A.    That was part of the
22 training that Ed indicated to me.
23    Q.    Is there any other reason?
24    A.    And also it's part of the

Page 95

1 DEA regulation.
2    Q.    Did Mr. Hazewski explain,
3 during your training, that wholesalers
4 like AmerisourceBergen have a regulatory
5 requirement that they maintain a system
6 to prevent diversion?
7        MR. NICHOLAS:  Object to the
8    form.
9        THE WITNESS:  Could you ask
10    that question again, please?
11 BY MR. CLUFF:
12    Q.    Sure.
13        While you were training for
14 this new position as a diversion control
15 specialist, did Mr. Hazewski explain to
16 you that wholesalers like
17 AmerisourceBergen have a regulatory
18 requirement to maintain a system to
19 prevent diversion?
20        MR. NICHOLAS:  Object to the
21    form.
22        THE WITNESS:  No.
23 BY MR. CLUFF:
24    Q.    Has Mr. Hazewski ever

Page 96

1 explained to you that AmerisourceBergen
2 has a regulatory obligation to maintain a
3 system to prevent diversion?
4        MR. NICHOLAS:  Same
5    objection.
6        THE WITNESS:  He indicated
7    to me that we need to have a
8    system in place that monitors
9    orders of unusual size, pattern
10    and frequency.
11 BY MR. CLUFF:
12    Q.    Did he ever tell you why?
13    A.    I'm sure he has, but I don't
14 recall the discussion.
15        MR. NICHOLAS:  Sterling, I
16    don't want to break your flow
17    here, but it's been an hour
18    and-a-half.
19        MR. CLUFF:  I was looking at
20    that.  I just have a couple more,
21    and then we'll break.
22 BY MR. CLUFF:
23    Q.    In your work as a diversion
24 control specialist over the years, did

Page 97

1 you ever form an understanding of why
2 AmerisourceBergen is required to maintain
3 a system to monitor orders of unusual
4 size, pattern and frequency?
5    A.    Yes.
6    Q.    And what is that?
7    A.    Because it's part of the DEA
8 requirement that we have a system in
9 place.
10    Q.    A system in place to do
11 what?
12    A.    To monitor customer orders.
13    Q.    Have you ever formed an
14 understanding that AmerisourceBergen has
15 a regulatory requirement to maintain a
16 system to prevent diversion?
17        MR. NICHOLAS:  Object to the
18    form.
19        THE WITNESS:  I'm not aware
20    of that.
21        MR. CLUFF:  Let's go ahead
22    and take a break.
23        VIDEO TECHNICIAN:  We're off
24    the record at 10:56 a.m.

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1           - - -
2           (Whereupon, a brief recess
3      was taken.)
4           - - -
5           VIDEO TECHNICIAN:  We're
6      back on the record at 11:11 a.m.
7      BY MR. CLUFF:
8      Q.   All right.  Mr. Kreutzer,
9      we're back on the record, so we'll
10     continue your deposition.
11          You understand that you're
12     still under oath?
13     A.   Yes.
14     Q.   When we broke we were, I
15     believe, talking about training for the
16     position you took on as a diversion
17     control specialist at AmerisourceBergen.
18          Do you recall that?
19     A.   Yes.
20     Q.   Do you recall how long you
21     and Mr. Hazewski trained together for
22     before you started operating without
23     supervision?
24     A.   I do not, no.

Page 99

1      Q.   If you were to estimate,
2      would you say it was less than a month?
3      A.   I do not know.
4      Q.   Was it less than two weeks?
5      A.   I don't recall.
6      Q.   Just so we're clear, you
7      have absolutely no recollection of how
8      long you were trained for?
9      A.   Not specific time frame, no.
10     Q.   Did you train with anybody
11     else aside from Mr. Hazewski?
12     A.   I did.  I trained with Scott
13     Kirsh.
14     Q.   Who is Scott Kirsh?
15     A.   Scott Kirsh was -- I believe
16     he also reported to Ed Hazewski at one
17     time, prior to me coming on board.
18     Q.   Do you recall what his job
19     title was?
20     A.   I believe his -- I believe
21     he was working for Bruce Gundi.  But he
22     was filling in with Ed to also help me
23     train for the position.  So he had a dual
24     role at one point.

Page 100

1      Q.   What was the dual role?
2      A.   So he would help me review
3      orders throughout the day and also he had
4      his other job to do, reporting to Bruce
5      Gundi.  That's my recollection.
6      Q.   What work was he doing when
7      he reported to Bruce Gundi, did you know?
8      A.   It was investigations not
9      related to order monitoring.
10     Q.   We were talking about some
11     of the substantive training that you
12     received, and you mentioned reading the
13     Code of Federal Regulations.
14          I believe you referred to it
15     as DEA 21 CFR; is that right?
16     A.   Yes.
17     Q.   As part of your training,
18     did you ever read 21 USC Section 823?
19     A.   I don't recall.
20     Q.   In your work as a diversion
21     control specialist with
22     AmerisourceBergen, have you ever read 21
23     USC 823?
24     A.   I don't recall the specific

Page 101

1      regulation number.
2      Q.   How about when you worked
3      for Teva Pharmaceuticals, did you ever
4      read 21 USC 823?
5      A.   I don't -- I don't remember
6      the specific regulation number.
7      Q.   Have you ever reviewed the
8      regulation or statute that governs
9      registration to manufacture or distribute
10     controlled substances?
11     A.   I don't recall.
12     Q.   Do you know if there is a
13     regulation or statute that governs
14     registrations to manufacture or
15     distribute controlled substances?
16     A.   I don't recall.
17     Q.   Do you not recall today
18     whether or not there is a regulation, or
19     is it that you never knew when you worked
20     at Teva or ABC -- excuse me,
21     AmerisourceBergen, if there was a statute
22     or regulation that governs registrations?
23          MR. NICHOLAS:  Object to the
24     form.

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  THE WITNESS: I'm sure there
2  is, I just don't recall at the
3  moment.
4  BY MR. CLUFF:
5  Q.  Is that something you would
6  have been familiar with some earlier
7  point in time?
8  MR. NICHOLAS: Same
9  objection.
10  THE WITNESS: I just don't
11  recall.
12  BY MR. CLUFF:
13  Q.  Are you aware that
14  AmerisourceBergen is required to maintain
15  a registration to distribute controlled
16  substances?
17  A.  Yes.
18  Q.  Do you know who issues that
19  registration?
20  A.  The DEA.
21  Q.  Are you aware that
22  manufacturers, like Teva, are required to
23  maintain a registration to manufacture
24  controlled substances?

Page 103

1  A.  I'm not sure.
2  Q.  When you worked at Teva, did
3  anybody discuss maintaining registration
4  to manufacture controlled substances?
5  A.  I don't believe so.
6  Q.  You never received any
7  training on Teva's registration to
8  manufacture controlled substances?
9  A.  I don't recall.
10  Q.  Going back to
11  AmerisourceBergen's registration to
12  distribute controlled substances, are you
13  aware of any of the requirements to
14  maintain -- to obtain a registration to
15  distribute controlled substances?
16  MR. NICHOLAS: Object to the
17  form.
18  THE WITNESS: I don't
19  recall.
20  BY MR. CLUFF:
21  Q.  Your job position at
22  AmerisourceBergen, for the majority of
23  your time there, was diversion control
24  specialist, correct?

Page 104

1  A.  Correct.
2  Q.  Are you aware, through your
3  work as a diversion control specialist,
4  whether maintaining effective controls
5  against diversion is a requirement in
6  obtaining a registration to distribute
7  controlled substances?
8  MR. NICHOLAS: Object to the
9  form.
10  THE WITNESS: I don't
11  recollect.
12  BY MR. CLUFF:
13  Q.  Have you ever received any
14  training about the maintenance of
15  effective controls against diversion,
16  while you've been employed by
17  AmerisourceBergen?
18  A.  I don't recall.
19  Q.  When you worked at Teva
20  under Colleen McGinn, did you ever
21  receive any training about the
22  maintenance of effective controls against
23  diversion?
24  A.  I don't recall.

Page 105

1  Q.  Do you recall if
2  AmerisourceBergen conducted training
3  about the maintenance of effective
4  controls against diversion?
5  A.  I don't recall.
6  Q.  Is it possible, then, that
7  AmerisourceBergen did not provide
8  training about the maintenance of
9  effective controls against diversion?
10  MR. NICHOLAS: Object to the
11  form.
12  THE WITNESS: I just don't
13  recall.
14  BY MR. CLUFF:
15  Q.  How about at Teva, do you
16  recall if Teva ever offered training
17  about the maintenance of effective
18  controls against diversion?
19  A.  I don't recall.
20  MR. MAIER: Object to form.
21  BY MR. CLUFF:
22  Q.  Do you know if
23  AmerisourceBergen maintains effective
24  controls against diversion?

Page 106

1    MR. NICHOLAS:  Object to the
2  form.
3    Go ahead.
4    THE WITNESS:  I'm assuming
5  yes, we do.
6  BY MR. CLUFF:
7    Q.   What is your assumption
8  based on?
9    A.   That we have a system in
10  place that identifies orders of interest.
11    Q.   Earlier I asked you if you
12  had ever received any training about the
13  maintenance of effective controls against
14  diversion, and you said you don't recall
15  receiving any training; is that right?
16    MR. NICHOLAS:  Object to the
17  form.
18    THE WITNESS:  Can you
19  rephrase the question?
20  BY MR. CLUFF:
21    Q.   I'll re-ask the question,
22  but I'm not going to rephrase it.
23    We discussed earlier
24  training about the maintenance of

Page 107

1  effective controls against diversion
2  while you worked at AmerisourceBergen.
3    And you said that you do not
4  recall receiving any training; is that
5  correct?
6    MR. NICHOLAS:  Object to the
7    form.  And I'll object to the
8    refusal to rephrase the question
9    at the witness's request.
10    Go ahead.
11    THE WITNESS:  We have a
12    system in place that identifies
13    orders of interest for unusual
14    size, frequency and pattern.
15  BY MR. CLUFF:
16    Q.   I appreciate that answer.
17  That's not -- that's not the question I
18  was asking, so let me try and get back to
19  the question I was asking.
20    Do you recall that we
21  previously discussed whether or not you,
22  at AmerisourceBergen, received training
23  about the maintenance of effective
24  controls against diversion?

Page 108

1    MR. NICHOLAS:  Object to the
2  form.
3  BY MR. CLUFF:
4    Q.   Do you recall that?
5    MR. NICHOLAS:  Object to the
6    form.
7    THE WITNESS:  I don't
8    recall.
9  BY MR. CLUFF:
10    Q.   You don't recall receiving
11  training, or you don't recall the
12  question?
13    MR. NICHOLAS:  I think the
14    question is confusing.  I will
15    object to the form, to the series
16    of questions that's confusing.
17    THE WITNESS:  I don't
18    recall.
19  BY MR. CLUFF:
20    Q.   Do you recall receiving
21  training at AmerisourceBergen regarding
22  the maintenance of effective controls
23  against diversion?
24    MR. NICHOLAS:  Same

Page 109

1  objection.
2    THE WITNESS:  Yes.
3  BY MR. CLUFF:
4    Q.   You do recall receiving
5  training?  What training --
6    A.   I recall receiving training
7  that identifies orders of interest.
8    Q.   When do you recall receiving
9  training about orders of interest?
10    A.   Throughout my career at
11  AmerisourceBergen.
12    Q.   When did the words "orders
13  of interest" start getting used at
14  AmerisourceBergen?
15    A.   I don't recall that.
16    Q.   Is it your recollection that
17  in 2009, when you became a diversion
18  control specialist, Mr. Hazewski trained
19  you about identifying orders of interest?
20    A.   I don't remember.
21    Q.   Do you recall Mr. Hazewski
22  using the words "orders of interest" in
23  2009 when he trained you?
24    A.   No, I do not.

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1  Q.  Do you recall him using the
2  words "suspicious orders"?
3  A.  No, I do not.
4  Q.  Do you recall him using the
5  words "excessive orders"?
6  A.  No.
7  Q.  What did he tell you you
8  were looking for in the orders you
9  reviewed when he was training you?
10  MR. NICHOLAS:  Object to the
11  form.
12  THE WITNESS:  Orders of
13  unusual size, quantity and
14  frequency.
15  BY MR. CLUFF:
16  Q.  And we discussed earlier
17  that that is the definition of a
18  suspicious order in the Code of Federal
19  Regulations, right?
20  MR. NICHOLAS:  Object to the
21  form.
22  Go ahead.
23  THE WITNESS:  I didn't say
24  that.  I said we have a system in

Page 111

1  place that identifies orders of
2  unusual -- of unusual size,
3  quantity and frequency.
4  BY MR. CLUFF:
5  Q.  Do you recall what the
6  definition of a suspicious order is in
7  the Code of Federal Regulations?
8  A.  Yes.
9  Q.  What is it?
10  A.  It's what I just stated.
11  Q.  Orders of unusual size,
12  quantity and frequency?
13  A.  Yes.  Pattern.
14  Q.  And that's what Mr. Hazewski
15  was training you to look for?
16  A.  He was training me to
17  identify orders of interest that need to
18  be reviewed individually to determine if
19  the order is suspicious or not.
20  Q.  So I just asked you if he
21  ever used the words "orders of interest"
22  when he was training you, and you told me
23  that you do not recall.
24  A.  That term, I do not recall.

Page 112

1  Q.  So your recollection today
2  is that you were being trained to
3  identify orders of interest?
4  MR. NICHOLAS:  Object to the
5  form.  I believe the questions are
6  confusing.
7  THE WITNESS:  That is my
8  term that I'm using.  I don't
9  recall Ed's term that he used in
10  2009.
11  BY MR. CLUFF:
12  Q.  When you were training with
13  Ed and with Scott, did either of them
14  discuss with you the obligation or
15  regulatory requirement that a wholesale
16  distributor has to maintain effective
17  controls against diversion of controlled
18  substances?
19  A.  I don't recall that
20  discussion.
21  Q.  Your title was diversion
22  control specialist, correct?
23  A.  Yes.
24  Q.  Don't you think it would

Page 113

1  have been important, as a diversion
2  control specialist, to be trained on
3  diversion control?
4  MR. NICHOLAS:  Object to the
5  form.  Just argumentative.
6  THE WITNESS:  I most likely
7  was trained, I just don't recall.
8  BY MR. CLUFF:
9  Q.  What would that training
10  have looked like, if it had occurred?
11  MR. NICHOLAS:  Object to the
12  form.
13  THE WITNESS:  It was
14  hands-on training.
15  BY MR. CLUFF:
16  Q.  And that was -- sorry, go
17  ahead.  I didn't mean to interrupt you.
18  A.  As well as, I believe, we
19  also had PowerPoint trainings at
20  presentations that were conducted.  And
21  we also conducted weekly meetings.
22  Q.  Do you recall who would have
23  given the PowerPoint presentations?
24  A.  I do not.

Page 114

1 Q. What were the weekly
2 meetings you guys had?
3 A. Weekly meetings consisted of
4 anything new that is happening in our
5 department, any pharmacy visits that were
6 being conducted, as well as any orders
7 that the investigators wanted to discuss,
8 or any other information the
9 investigators wanted to discuss on a
10 variety of subjects.
11 Q. Who attended the weekly
12 meetings?
13 A. Well, at the time when I
14 initially started, it was myself, Ed. I
15 believe it was Scott Kirsh, Ed. And then
16 soon afterward Joe Tomkiewicz was hired,
17 as well as Dave Britemyer.
18 Q. Kirsh, you mentioned, was --
19 he had a dual role helping you monitor
20 the -- review the customer orders?
21 A. Initially, yes.
22 Q. And working investigations
23 with Bruce Gundi?
24 A. Yes, that's my recollection.

Page 115

1 Q. These names, Tomkiewicz and
2 Britemyer, do you recall their positions?
3 A. Yes. Joe was a diversion
4 control -- I believe his title was
5 investigator.
6 Q. And that's Joe Tomkiewicz?
7 A. Yes.
8 Q. And how about Dave
9 Britemyer?
10 A. Dave Britemyer was an intern
11 for AmerisourceBergen. So he was working
12 during the summer months, and then he was
13 hired full time.
14 Q. So we talked about the
15 training on reviewing customer orders.
16 When you went into
17 autonomous mode without training, what
18 were your responsibilities as a diversion
19 control specialist?
20 A. To review orders or overall?
21 Q. Overall.
22 A. Overall. I conducted due
23 diligence reviews for new customer
24 accounts that want to do business with

Page 116

1 AmerisourceBergen, as well as reviewing
2 orders of interest and any other duties
3 as assigned.
4 Q. You said "orders of
5 interest."
6 Was that a part of the scope
7 of your job responsibility in 2009?
8 A. To review customer orders,
9 yes.
10 Q. But you're using orders of
11 interest today to refer to the work you
12 did back then?
13 A. That's correct.
14 Q. And they were not referred
15 to as orders of interest in 2009,
16 correct?
17 MR. NICHOLAS: Object to the
18 form.
19 THE WITNESS: I do not know
20 what they were called back then.
21 BY MR. CLUFF:
22 Q. The reason I'm asking is
23 because we get to different time periods
24 during your work history, and I'm just

Page 117

1 trying to make sure that I understand the
2 correct words to use for the work you
3 were doing at the time.
4 So if there was a word that
5 you used in 2009, I'd like us to use that
6 when we talk about the 2009 time period.
7 And my understanding is that you don't
8 recall?
9 A. I don't recall the term that
10 I used. Maybe other investigators used a
11 different term, I don't know.
12 Q. So I don't want to put words
13 in your mouth, but I want you to
14 understand that I'm going to refer to
15 those as customer orders in 2009, then.
16 A. Okay.
17 Q. Because you did not --
18 you've told me you do not recall using
19 the words "orders of interest" in 2009.
20 Does that make sense?
21 A. Yes, I understand.
22 Q. So in 2009, I think you
23 described to me three job
24 responsibilities.

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1    One was doing customer -- or
2  conducting due diligence on new customer
3  accounts; is that right?
4    A.   As well as overall
5  customers, yes.
6    Q.   Is there a difference
7  between the due diligence on new
8  customers and what you just referred to
9  as overall customers?
10    A.   It's just reviewing customer
11  accounts throughout the month.
12    Q.   Is new customer due
13  diligence sometimes referred to as NCDD?
14    A.   Correct.
15    Q.   I've also heard the term
16  existing customer due diligence.
17    Is that ECDD?
18    A.   That's CDD.
19    Q.   CDD, without the E, okay.
20    A.   Correct.
21    Q.   And were you responsible for
22  both new and existing customer due
23  diligence?
24    A.   Yes.

Page 119

1    Q.   Are you familiar with the
2  term 590, Form 590?
3    A.   I am.
4    Q.   What is a Form 590?
5    A.   Form 590 is a pharmacy
6  questionnaire.
7    Q.   Is that a new customer due
8  diligence form?
9    A.   It's a part of it, yes.
10  Meaning that -- yes, it is a new customer
11  that would complete that form.
12    Q.   What's a Form 595?  Do you
13  know what that is?
14    A.   Form 595 is a new customer
15  due diligence, it's a checklist.
16    Q.   So it's a part of the due
17  diligence process?
18    A.   Process, yes.
19    Q.   But it's different than the
20  590?
21    A.   Correct.
22    Q.   In addition to new customer
23  and existing customer due diligence, you
24  mentioned reviewing customer orders,

Page 120

1  correct?
2    A.   Yes.
3    Q.   And then I think the third
4  category is sort of like special projects
5  by assignment?
6    A.   Yes.
7    Q.   Did you have a geographic
8  area that you were responsible for
9  reviewing customer orders in or from?
10    A.   I was covering, I believe it
11  was -- back then, it could have been the
12  East and South.  It's a little different
13  now.  But at the time, I think it was
14  East and South I was covering.
15    Q.   Did your geographic area of
16  responsibility for customer orders change
17  over time?
18    A.   It has.
19    Q.   And how did it change?
20    A.   It changed where I was now
21  covering just the North and East regions.
22    Q.   Are those two separate
23  regions, North and East, or --
24    A.   Yes, yes.

Page 121

1    Q.   -- or is it Northeast?
2    A.   Yes, they are two separate
3  regions.
4    Q.   Before you became a
5  diversion control specialist in 2009, do
6  you know who was responsible for
7  reviewing customer orders out of the
8  South region?
9    A.   I do not.
10    Q.   Do you know who the
11  diversion control specialists were that
12  were employed prior to your joining in
13  2009?
14    A.   That would have been Ed
15  Hazewski and Scott Kirsh, I believe.  And
16  there may have been others that I don't
17  remember their names, but they weren't
18  there when I started.
19    Q.   So there may have been some
20  others that worked as diversion control
21  specialists before you started in 2009?
22    A.   Yes, yes.
23    Q.   And you just can't remember
24  their names?

Highly Confidential - Subject to Further Confidentiality Review



Page 122

1    A.   I don't remember their
2  names, but I know there were others.
3    Q.   And so prior to you becoming
4  a diversion control specialist, Ed and
5  Scott Kirsh would have been the two
6  persons primarily responsible for
7  reviewing customer orders?
8    A.   As well as the other
9  individuals.
10    Q.   The people you can't
11  remember?
12    A.   I just -- that I can't
13  remember.
14    Q.   Yeah, I'm just trying to
15  understand the world of individuals.
16  Okay.
17         When you were conducting new
18  customer and existing customer due
19  diligence, did you consider that to be an
20  investigation?
21    A.   It was part of our due
22  diligence process.

Highly Confidential - Subject To Further Confidentiality Review



Page 126

16   Q.   As a diversion control
17  specialist, did you ever discuss upward
18  trends, to use your phrase, with any
19  other wholesale distributors?
20   A.   Discuss that information
21  with other wholesalers?
22   Q.   Yes.
23   A.   No, we have not.  Not that
24  I'm -- not that I'm aware of.

Page 127

1    Q.   Do you know if any other
2  employees at AmerisourceBergen ever
3  discussed trends in distribution with any
4  other wholesale distributors?
5    A.   Not that I'm aware of.
6    Q.   Do you know if -- or have
7  you personally spoken to employees from
8  any manufacturers about trends in
9  controlled substance distribution?
10   A.   No, I have not.
11   Q.   You said you reported to Ed
12  Hazewski, correct?
13   A.   Yes.
14   Q.   Do you know if Ed Hazewski
15  ever had meetings with or discussions
16  with employees from any manufacturers
17  about trends in wholesale distribution?
18   A.   I'm not aware of any
19  discussion.
20   Q.   If Mr. Hazewski had learned
21  about a specific trend in wholesale
22  distribution from another distributor or
23  from a manufacturer, is that information
24  that he would have communicated to you?

Page 128

1    MR. NICHOLAS:  Object to the
2  form.
3    THE WITNESS:  He may have, I
4  don't know.
5  BY MR. CLUFF:

Page 129

21   Q.   In 2009, when you became a
22  diversion control specialist, were you
23  aware of AmerisourceBergen's suspicious
24  order monitoring policies and procedures?



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 146

Page 147

Page 148

Page 149

Highly Confidential - Subject to Further Confidentiality Review

Page 150

[redacted]

4    Q.   Okay.  So going back to the
5  distribution center, after an order is
6  sent from the distribution center to the
7  CSRA group, would you have been the
8  person, as a diversion control
9  specialist, to review that order?
10    A.   I would be one of them, yes.
11    Q.   And what -- and that would
12  be when you were reviewing an order to
13  determine whether it was of unusual
14  frequency, size and pattern; is that
15  right?
16    A.   It would be an order of
17  interest.  That --
18    Q.   I'm talking -- let me
19  correct myself.
20         Prior to 2015, when an order
21  came to your desk, that is when you would
22  begin the process of reviewing that order
23  to determine if it was of unusual size,
24  frequency or pattern?

Page 151

1    A.   Yes.
2    Q.   Did you do anything else
3  with orders during that review process?
4    A.   Prior to --
5    Q.   2015.
6    A.   If there were -- if I had
7  any questions regarding a customer's
8  order, I would reach out to our
9  pharmacist who is on staff.
10    Q.   Who was the pharmacist prior
11  to 2015?
12    A.   It would be Sharon Hartman.
13    Q.   Do you know when she joined
14  the company?
15    A.   I do not know the specific
16  year, but I believe she was on staff in
17  2015.
18    Q.   If I suggested that she
19  joined the company in 2014, would that
20  sound accurate to you?
21         MR. NICHOLAS:  Objection.
22    Lack of foundation.
23         Go ahead.
24         THE WITNESS:  Possibly.

Page 152

1  BY MR. CLUFF:
2    Q.   Do you know if there was a
3  pharmacist on staff at AmerisourceBergen
4  prior to Ms. Hartman joining the company?
5    A.   I believe Joe Tomkiewicz
6  also had some pharmacy background.
7    Q.   What was his pharmacy
8  background, if you recall?
9    A.   I don't recall.
10    Q.   So prior to Ms. Hartman
11  joining the company in 2014, if you had a
12  question that warranted a pharmacist's
13  input, who would you ask about that?
14    A.   Prior to that, I don't
15  believe we had any other pharmacists on
16  staff, other than Joe.  I would contact
17  Ed Hazewski.
18    Q.   And he's who you would ask
19  questions about customer orders where you
20  needed additional input?
21    A.   Yes.  And, also, we had the
22  sales force also contact the customer at
23  that time.
24    Q.   So if you had a question

Page 153

1  about an order that was presented to you
2  for review, you would ask the sales force
3  sometimes for --
4    A.   Sometimes the sales force.
5    Q.   And then they would contact
6  the customer?
7         MR. NICHOLAS:  Let him
8    finish.
9         THE WITNESS:  No, no.  I'm
10    sorry you --
11  BY MR. CLUFF:
12    Q.   I didn't mean to talk over
13  you.  If you have more of an answer,
14  please give it.
15    A.   In addition to the sales
16  force reaching out to the customer, we
17  also had the distribution center manager
18  reach out to the customer as well.
19    Q.   So just to kind of
20  understand.  If there was a question that
21  you had about an order that you couldn't
22  resolve yourself, prior to 2014, a little
23  confusing now, because that's prior to
24  Ms. Hartman joining, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    A.   Yes.
2    Q.   You would talk to Mr.
3 Hazewski?
4    A.   Yes.
5    Q.   You could reach out to the
6 sales force, who would talk to the
7 customer?
8    A.   Yes.
9    Q.   Or you could reach out to
10 the distribution center manager, who
11 maybe also would talk to the customer?
12   A.   Correct.
13   Q.   Did you ever talk to
14 customers yourself?
15   A.   Prior to that time, I don't
16 believe I have.
17   Q.   Have you ever talked to
18 customers after that time?
19   A.   Yes.
20   Q.   When you had questions, what
21 kind of responses would you get back from
22 customers?
23       MR. NICHOLAS:  Object to the
24   form.

Page 155

1       Go ahead.
2       THE WITNESS:  If I called
3    them myself?
4 BY MR. CLUFF:
5    Q.   You know, that's a good
6 point.
7       Let's talk about the before
8 2014 time period.  What kinds of
9 questions would you have for, like, the
10 sales force and the distribution center
11 manager to get information from customers
12 about?
13   A.   I would ask them the reason
14 why this pharmacy is placing a larger
15 order than they typically place.
16   Q.   And what kinds of responses
17 would you get?
18   A.   I would get a response where
19 it could be any number of reasons.  A
20 pharmacy had a robbery, they're trying to
21 replenish their inventory.  There's a
22 pharmacy that closed down the street.
23 There's product that's going to be in
24 short demand.

Page 156

1       It could be any number of
2 reasons.
3    Q.   If a pharmacy was robbed,
4 would you continue shipping to that
5 pharmacy?
6       MR. NICHOLAS:  Object to the
7    form.
8       THE WITNESS:  If our
9    pharmacy was robbed, yes, after we
10   got a DEA Form 106 and a police
11   report.
12 BY MR. CLUFF:
13   Q.   Were there ever any factors
14 that you would uncover during reviewing
15 an order that warranted additional due
16 diligence, prior to 2015?
17       MR. NICHOLAS:  Object to the
18   form.
19       THE WITNESS:  I'm sure there
20   has been, but I just don't
21   recollect right now.
22 BY MR. CLUFF:
23   Q.   Based on your working
24 experience, what are some factors that

Page 157

1 you would identify as requiring
2 additional due diligence?
3    A.   Currently?
4    Q.   Yes.
5    A.   I would see if we have any
6 information on the customer in our Matter
7 Management System, if we have a Form 590
8 on file for the customer, and any other
9 information that we have.
10   Q.   The information management
11 system you mentioned, is that Lawtrac?
12   A.   Lawtrac is gone.  We have
13 Matter Management System now and NetDocs.
14   Q.   Is Matter Management System
15 abbreviated MMS?
16   A.   Yes.
17   Q.   And then what was the last
18 one you mentioned?
19   A.   NetDocs.
20   Q.   What is NetDocs?
21   A.   NetDocs took the replacement
22 of Lawtrac.  So any information that was
23 previously in Lawtrac should now be in
24 NetDocs.

Page 158

1    Q.   When you were reviewing an
2  order, I think you said that some of the
3  information you would look at would be,
4  you know, a Form 590, you would look at
5  the Lawtrac information, correct?
6    A.   Yes.
7    Q.   And how did those sources of
8  information inform your review of a
9  customer order that had passed the
10 distribution center?
11   A.   Well, each order is reviewed
12 individually.  So it's really the
13 totality of the circumstances, whatever
14 information we have on file to make a
15 sound decision whether to release or
16 reject and report that order.
17   Q.   Are you familiar with the
18 Form 590 project?
19   A.   I am.
20   Q.   What was the Form 590
21 project?
22   A.   The Form 590 project is a
23 listing of all the pharmacies, or all the
24 accounts that ABC services, for which we

Page 159

1  did not or could not find a Form 590 for.
2    Q.   Do you recall if the Form
3  590 project also included missing Lawtrac
4  information?
5    A.   I do not.
6    Q.   If an order was presented to
7  you for review and the Form 590 was
8  missing, would you have been able to do
9  an accurate review of that customer's
10 order?
11   A.   Yes.
12   Q.   How so?
13   A.   Based on the systems that we
14 have in place, we can make a decision, as
15 well as personnel we have on staff to
16 make a decision whether to release or
17 report that order, or just reject that
18 order.
19   Q.   Was the Form 590 a required
20 document at AmerisourceBergen?
21      MR. NICHOLAS:  Object to the
22   form.
23      THE WITNESS:  For new
24   customer onboardings, yes.

Page 160

1  BY MR. CLUFF:
2    Q.   So if a 590 was missing from
3  a customer's file, that would reflect a
4  gap in AmerisourceBergen's policies,
5  correct?
6      MR. NICHOLAS:  Object to the
7   form.
8      THE WITNESS:  No, not a gap.
9   Just a form could have been lost.
10 BY MR. CLUFF:
11   Q.   What about if you received
12 an order from a customer to review and
13 the Lawtrac information was missing or
14 incomplete, could you do an effective
15 review of that customer's order without
16 the Lawtrac information?
17   A.   Yes.
18   Q.   How so?
19   A.   Based on the systems that we
20 have in place.
21   Q.   So you testified that you
22 believe you could do an effective review
23 of an order without a 590, with a missing
24 or incomplete Lawtrac information, and

Page 161

1  both times you said you could do this
2  based on the systems you have in place.
3      Wasn't the 590 and the
4  Lawtrac part of the system that
5  AmerisourceBergen had in place to review
6  orders?
7      MR. NICHOLAS:  Object to the
8   form.
9      THE WITNESS:  To review
10   orders?  Can you ask that question
11   again, or rephrase it?
12 BY MR. CLUFF:
13   Q.   Yes.
14      So the 590 and the Lawtrac
15 information, were they a part of
16 AmerisourceBergen's suspicious order
17 monitoring system?
18   A.   It was just a piece of it.
19   Q.   Is that the same system that
20 you would have relied on to review orders
21 once they were presented to you from the
22 distribution center?
23   A.   It's just a piece of the
24 process that we would look for, yes.

Page 162

1    Q.   But the piece -- but the
2  process you were using was missing
3  pieces, correct?
4        MR. NICHOLAS:  Object to the
5    form.
6        THE WITNESS:  Not
7    necessarily missing pieces.
8    Again, we have systems in place
9    that review all orders
10   individually.  So we can make a
11   sound decision with the systems
12   that we have in place.
13 BY MR. CLUFF:
14   Q.   But the systems that you
15 have in place were missing things like
16 Form 590s and Lawtrac information, right?
17       MR. NICHOLAS:  Object to the
18   form.
19       THE WITNESS:  If we had any
20   missing 590s, we would request
21   them to get completed.
22 BY MR. CLUFF:
23   Q.   Are you familiar with the
24 progress that AmerisourceBergen has made

Page 163

1  in updating the Form 590s that were
2  missing?
3    A.   Yes.
4    Q.   How complete is it?
5    A.   I'm not sure of the
6  percentage that it's completed.  But it's
7  a work in progress.
8    Q.   So it's not completed,
9  right?
10   A.   It's not fully completed,
11 no.
12   Q.   Do you know when
13 AmerisourceBergen first identified that
14 there was a problem with missing Form 590
15 information?
16       MR. NICHOLAS:  Object to the
17   form.
18       THE WITNESS:  I don't know
19   the specific time frame, no.
20 BY MR. CLUFF:
21   Q.   Was it before or after 2015,
22 do you think?
23       MR. NICHOLAS:  Same
24   objection.

Page 164

1        THE WITNESS:  I don't know.
2  BY MR. CLUFF:
3    Q.   I'm going to hand you a copy
4  of an exhibit, we're going to mark it as
5  1 to your deposition.
6        - - -
7        (Whereupon,
8        AmerisourceBergen-Kreutzer
9        Exhibit-1, ABDC_MDL_00304391-392,
10       was marked for identification.)
11       - - -
12 BY MR. CLUFF:
13   Q.   This is a document produced
14 by AmerisourceBergen.  It's Bates stamped
15 ABDC_MDL_00304391 to 392.
16       I'll hand you the top copy,
17 which is the exhibit copy, and you can
18 hand the rest down to your counsel.
19       So just so you're aware, I
20 want to start with the bottom e-mail that
21 starts on 304391 on the bottom of the
22 first page.
23       You can review the whole
24 document, I'm just letting you know

Page 165

1  that's where I want to start.
2        Do you know who Richard --
3  I'm sorry, go ahead.
4    A.   Could you hold on for one
5  second.
6    Q.   Sure.  I thought you were
7  done.  My fault.
8    A.   I'm not finished.
9    Q.   Turning to the second page,
10 which ends in 392, the numbers on the
11 bottom.
12       You see at the very top of
13 the page it says, Below is the text from
14 the initial e-mail regarding the project.
15       And the next paragraph down
16 says, We have been asked by the CSRA
17 diversion control team to assist them
18 with the collection of updated
19 documentation for a substantial number of
20 customers.
21       Did I get that right?
22   A.   Yes.
23   Q.   And was it your
24 understanding, at this time, that the 590

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1 project was to be filling out new Form
2 590s for an identified list of customers?
3     A. Yes. Yes, that was my
4 understanding.
5     Q. Looking down at the heading
6 that says, Next steps. It says, Due to
7 the high number of customers that will
8 need validation, we have broken the list
9 into two groups, CPA customers and
10 non-CPA.
11     What does the abbreviation
12 CPA stand for?
13     A. I don't remember right now.
14     Q. Looking in the body of that
15 paragraph underneath, where it says,
16 Beginning January 11th, do you see it
17 says, The 590 forms -- it's in bold in
18 the middle -- should be completed in
19 their entirety and all responses must be
20 legible. After each account is
21 completed, please submit the
22 documentation to customer maintenance.
23     What is customer
24 maintenance?

Page 167

1     A. Customer maintenance is a
2 group that does all the gathering of data
3 for a new prospective account, including
4 Form 590s and photos.
5     Q. Is that a sales function?
6     A. No, it's not a sales
7 function.
8     Q. What department does that
9 group operate under?
10     A. It's just a -- it's a
11 separate department from my department,
12 as well as sales.
13     Q. And they were responsible
14 for gathering customer information?
15     A. Yeah, for new -- for
16 onboarding new customers.
17     Q. Did they have any
18 responsibility for existing customers?
19     A. No. They would -- they would --
20 in this example, they would forward any
21 completed 590s for new and existing
22 customers to the CSRA team to review.
23     Q. Okay. And so after people
24 were filling out these new 590s as part

Page 168

1 of the 590 project, CSRA was reviewing
2 them?
3     A. Yes.
4     Q. In the next sentence down,
5 it says, CM will then add the
6 documentation to their system and forward
7 to the CSRA OMP group.
8     What is the CSRA OMP group?
9     A. That's the corporate
10 security regulatory affairs order
11 monitoring program group.
12     Q. Who is in that group?
13     A. Myself.
14     Q. Are you the only member?
15     A. No. Let me clarify.
16     It's myself, Carol Sherman
17 Hines, Emily Coldren, Sara Cressman,
18 Nikki Seckinger, Teresa Javier.
19     And that's primarily the
20 ones that would review 590s.
21     Q. And are all the members of
22 the CSRA OMP group, are you diversion
23 control specialists and investigators?
24     A. Yes.

Page 169

1     Q. Flip back to the first page
2 for me. This e-mail at the bottom was
3 sent by a person named Richard Dominico.
4     Do you see that?
5     A. I do.
6     Q. Do you know who Richard
7 Dominico is?
8     A. Other than his signature,
9 he's a district director.
10     Q. Do you know would -- what is
11 community and specialty pharmacy in the
12 signature block? Do you know what that
13 connotes?
14     A. That's his title, where he
15 oversees the customers within that
16 segment.
17     Q. So is he a customer services
18 or sales kind of a person?
19     A. He's a sales director.
20     Q. So would he have been
21 sending this e-mail, then, to sales
22 associates?
23     A. His reports, yes.
24     Q. Looking back at the second

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1  page, there is a bold heading that says,
2  Note.
3        Do you see that?
4      A.  Yeah, I do.
5      Q.  The first bullet point says,
6  This documentation project should be done
7  within the normal scope of your routing.
8  The priority is still the financial
9  performance of your assignment.
10       Did I read that correctly?
11     A.  Yes.
12     Q.  So despite the fact that
13  AmerisourceBergen was missing 590s for
14  what Mr. Dominico referred to as a
15  substantial number of customers, he is
16  telling sales associates that financial
17  performance is more important?
18       MR. NICHOLAS:  Object to the
19       form.
20       THE WITNESS:  I can't
21       comment.  I'm not a part of that
22       e-mail.
23  BY MR. CLUFF:
24     Q.  But you would agree that

Page 171

1  that's the words he's using, right, the
2  priority is still the financial
3  performance of your assignment?
4        MR. NICHOLAS:  Object to the
5        form.
6        THE WITNESS:  I can't agree,
7        other than what's typed here.
8  BY MR. CLUFF:
9      Q.  Who is -- turning back to
10  the first page, Marsha Widrick, if I'm
11  saying that correctly?  It's the second
12  e-mail on the page.
13     A.  Marsha Widrick, she's one of
14  the sales associates that reports to
15  Richard Dominico.
16     Q.  Do you know why she was
17  forwarding you this e-mail?
18     A.  I do not.  It appears there
19  was some accounts that were listed, and
20  she was just indicating to me that she'll
21  be sending out more requests over the
22  next couple of weeks.  And she wanted to
23  know, is there a better address to send
24  them to.

Page 172

1      Q.  Do you recognize this
2  address that she references, the CSRA
3  validation project?
4      A.  Yes.
5      Q.  What was that?
6      A.  CSRA validation project is a
7  term that we use for the assignment.
8  It's not an e-mail address, which she
9  thought it was.
10     Q.  So your group used the term
11  CSRA validation project synonymously with
12  590 form project or validation --
13     A.  That's the title of the
14  spreadsheet, yes.
15     Q.  Going back to Richard
16  Dominico's e-mail, he says, To date as a
17  company, only 10 percent of the overall
18  customer list has been completed.
19       Does that refresh your
20  recollection about how complete the
21  project was, at least as it existed in
22  July 2017?
23     A.  No.
24     Q.  It does not?

Page 173

1        Do you have any reason to
2  dispute that the 590 project was more
3  complete than 10 percent as of July 2017?
4        MR. NICHOLAS:  Object to the
5        form.
6        THE WITNESS:  I don't recall
7        this specific -- this specific
8        e-mail from Richard.
9  BY MR. CLUFF:
10     Q.  But you would agree with me
11  that AmerisourceBergen was essentially
12  conducting due diligence on customer
13  orders while missing Form 590s, correct?
14       MR. NICHOLAS:  Object to the
15       form.
16       THE WITNESS:  We conduct due
17       diligence on all our customers at
18       all times.
19  BY MR. CLUFF:
20     Q.  But according to the Form
21  590 project, some of that due diligence
22  was missing?
23       MR. NICHOLAS:  Object to the
24       form.

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1    THE WITNESS:  Some of those
2    590s were missing.
3    BY MR. CLUFF:
4        Q.    Whose responsibility would
5    it have been to ensure that due diligence
6    was being completed fully during the
7    customer onboarding process?
8        MR. NICHOLAS:  Object to the
9    form.
10       THE WITNESS:  Part of the
11   process is customers submit a Form
12   590 and photos.
13   BY MR. CLUFF:
14       Q.    Do customers submit that
15   directly to AmerisourceBergen, or do they
16   submit it to some representative in the
17   company?
18       A.    The potential customer works
19   with the sales representative, and, in
20   turn, then sends it into the customer
21   maintenance group for their review.
22       Q.    And then what does the
23   customer maintenance group do with it?
24       A.    Then once they determine

Page 175

1    that it is complete, then they will send
2    it up to the CSRA OMP group for review.
3        Q.    What does the CSRA OMP group
4    do with it?
5        A.    We review all the
6    information on the 590 to ensure all the
7    information is complete.  And we conduct
8    due diligence on the licenses, as well as
9    the doctors.
10       Q.    Is that process that you
11   just described, has that been the same
12   since 2009 all the way until the present
13   day?
14       A.    The form has changed over
15   the years, it has evolved.  So I don't
16   recollect what information was on the
17   initial 590.
18       Q.    I appreciate that
19   differentiation.
20       So the form has changed, but
21   has the process of submitting, reviewing
22   and approving a form, has that changed?
23       A.    No.
24       Q.    I want to hand you another

Page 176

1    set of documents that you can pass down
2    to your counsel for me.  We'll mark this
3    as Kreutzer Exhibit-2.
4        - - -
5        (Whereupon,
6        AmerisourceBergen-Kreutzer
7        Exhibit-2, ABDC_MDL_00154441-443,
8        was marked for identification.)
9        - - -
10   BY MR. CLUFF:
11       Q.    It's an e-mail with an
12   attachment, it is ABDC_MDL_00154441.  The
13   attachment begins at 442 and continues
14   through 443.
15       MR. CLUFF:  You keep the one
16       with the numbers on it and pass
17       the rest down.
18   BY MR. CLUFF:
19       Q.    So I just want to give you a
20   couple of notes about this, Mr. Kreutzer.
21       MR. NICHOLAS:  You take that
22       one.
23   BY MR. CLUFF:
24       Q.    If you look at the top of

Page 177

1    this e-mail, just for reference, you'll
2    notice that it's from Eric Cherveny to
3    you, Kevin Kreutzer.  The subject is,
4    Openin -- which I assume is supposed to
5    be opening -- Lawtrac matters.
6        And if you look at the
7    attachments line, it says OMP Lawtrac
8    review-due diligence notes.  If you flip
9    the page, you'll see there's a subject,
10   OMP Lawtrac review/due diligence notes.
11       These documents were
12   produced as a parent e-mail and
13   attachment, so they go together.  You can
14   review them.  Thanks.
15       A.    Okay.
16       Q.    Do you recall receiving this
17   e-mail from Eric Cherveny?
18       A.    I do not.
19       Q.    But you would agree that it
20   is addressed to you, correct?
21       A.    Yes.
22       Q.    I want to start in the
23   middle of the e-mail.  You'll see those
24   headings, Date, Description, Update,

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1 Source, Name.
2       MR. CLUFF:  Can you blow
3    that whole section up, Zach?
4 BY MR. CLUFF:
5    Q.   You can look up here, too,
6 if it's easier for you, Mr. Kreutzer,
7 whichever you prefer.
8       But I'm curious, this
9 description here, this, I'll call it a
10 box, for a lack of a better word, is that
11 an example of an entry that would have
12 been in a customer's Lawtrac file?
13    A.   It could have been.
14    Q.   Where would this kind of a
15 description be entered if it wasn't in
16 Lawtrac?
17    A.   Well, it's referring to the
18 content.  But at that time, it would have
19 been entered in Lawtrac.
20    Q.   And this kind of
21 information, where would it be recorded
22 now?
23    A.   In MMS, Matter Management
24 System.

Page 179

1    Q.   I want to point your
2 attention to the very last sentence in
3 that block.  It says, Related documents
4 are attached.
5       From reading the text in
6 that box, do you have any understanding
7 of what related documents would have been
8 attached?
9    A.   According to the
10 description, it would be the Form 590 and
11 photos.
12    Q.   So if you were to hand me a
13 copy of a Lawtrac file, it would have,
14 I'm guessing, a series of entries like
15 this on a sheet, correct?
16    A.   At a minimum, yes.
17    Q.   And then it would also have
18 documents included with it?
19    A.   Yes.
20    Q.   And I understand that this
21 information would have existed
22 electronically on Lawtrac, which is
23 different than, like, handing me a file.
24       But was there a way to

Page 180

1 export a Lawtrac file from the Lawtrac
2 database?
3    A.   It wasn't always electronic
4 in Lawtrac.  It was also in paper form
5 when I first started.
6    Q.   So in 2009, the Lawtrac
7 information existed on paper?
8    A.   It existed on paper.  And
9 all the documents, all the due diligence,
10 was included in a manilla folder entitled
11 as such.
12    Q.   Do you know where that would
13 have been housed or kept?
14    A.   It would have been kept in
15 the file cabinets in our office.
16    Q.   Which office?
17    A.   In the sales corporate
18 security/regulatory affairs office.
19    Q.   Do you know where that was
20 located?  Is it in Philadelphia, or --
21    A.   It's in Chesterbrook,
22 Pennsylvania, headquarters.
23    Q.   Do you know if those records
24 were kept, or were they destroyed ever?

Page 181

1    A.   They were moved around
2 after -- I'm not sure of the time frame,
3 a couple of years, they were moved off
4 site to Iron Mountain.
5    Q.   What's Iron Mountain?
6    A.   Iron Mountain is a storage
7 facility.
8    Q.   Do you have any
9 understanding of whether or not those
10 records are still kept at Iron Mountain?
11    A.   I do not.  I don't believe
12 they are.
13    Q.   Do you -- you said you don't
14 believe they are.
15       Is that because you have any
16 understanding about them being moved
17 somewhere else, or you just don't know if
18 they're there?
19    A.   I don't know if they're
20 there.
21    Q.   At some point were the paper
22 documents migrated to an electronic
23 format?
24    A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1  Q.  Do you recall when that
2  happened?
3  A.  I don't recall the exact
4  year.
5  Q.  Do you think it was before
6  or after 2009?
7  A.  It was after 2009.
8  Q.  It was before 2015, though,
9  presumably?
10  A.  Yes.  Approximately 2010,
11  '11.
12  Q.  What was the procedure for
13  taking the paper files and converting
14  them to an electronic format?
15  A.  I'm not following you there.
16  Q.  Sure.  Let me rephrase that.
17  Do you know if all of the
18  paper files were converted to electronic
19  format to be recorded in an electronic
20  version of Lawtrac?
21  A.  Yes, I believe they were.
22  Q.  The paper files that
23  eventually were stored at Eagle Mountain,
24  do you know how far back those records

Page 183

1  went?
2  A.  I don't know.  They went
3  back a number of years.
4  Q.  So you started in diversion
5  control in 2009.
6  Do you think they went back
7  five or ten years, if you have an
8  understanding?
9  A.  I don't know.
10  Q.  You could not comment, okay.
11  That's fine.
12  MR. NICHOLAS:  Sterling, I'm
13  not going to stop you in
14  midstream, but it's 12:30.  So
15  it's been an hour and-a-half.  If
16  it's going to be a long time --
17  MR. CLUFF:  Let's just
18  finish with this document and
19  we'll move on.
20  BY MR. CLUFF:
21  Q.  I just want to go back to
22  the substance of Eric's e-mail to you, so
23  starting with the first line, where it
24  says, Kevin, per policy.  He says, It's

Page 184

1  against CSRA policy to close your own due
2  diligence.
3  What does it mean to close
4  due diligence?
5  A.  I believe this is right when
6  Eric started.  And so we were using the
7  Lawtrac system.  And at that time, I
8  believe we were closing our own matters.
9  Q.  What did it mean to close a
10  matter, though?
11  A.  Meaning that all the due
12  diligence has been conducted and
13  everything is in the file.  Just because
14  it's closed doesn't mean it can't be
15  reviewed.
16  Q.  What kind of due diligence
17  would you have been conducting in this
18  kind of an instance?  Is it, like, new
19  customer due diligence?  Existing
20  customer order monitoring due diligence?
21  Can you tell?
22  MR. NICHOLAS:  Object to the
23  form.
24  THE WITNESS:  According to

Page 185

1  the description here, as requested
2  Form 590 and photos from -- I'm
3  not sure what that acronym stands
4  for, but he's in sales, for an
5  existing ABC retail pharmacy
6  located in Brandon, Missouri, or
7  Mississippi.
8  BY MR. CLUFF:
9  Q.  So that would have been
10  existing customer due diligence?
11  A.  Yes.
12  Q.  And at least at that time,
13  Mr. Cherveny believed that it was against
14  policy to close your own due diligence,
15  right?
16  MR. NICHOLAS:  Object to the
17  form.
18  Go ahead.
19  THE WITNESS:  Yes.
20  BY MR. CLUFF:
21  Q.  Continuing, he says, I need
22  to be able to review each due diligence
23  matter before closing.  Also, per my
24  memo, the 595 was not properly completed

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1 in this matter.
2     Can you tell from the
3 substance of his e-mail to you what was
4 improperly completed on the 595?
5     A.  I do not know, other than
6 what he indicates here.
7     Q.  Okay.  His closing sentence
8 of this e-mail is, Also, ensure a 595 is
9 included in all DD.
10     Does that stand for due
11 diligence?
12     A.  It does.
13     Q.  So he wants it included in
14 all due diligence matters?
15     A.  Yes.
16     Q.  So if a 595 was missing,
17 that would have indicated a gap in the
18 due diligence process, right?
19     MR. NICHOLAS:  Object to the
20 form.
21     THE WITNESS:  Not a gap.
22 It's just it's missing.
23 BY MR. CLUFF:
24     Q.  So missing information.

Page 187

1     MR. NICHOLAS:  Object to the
2 form.
3 BY MR. CLUFF:
4     Q.  I want you to turn the page
5 to the memo that Mr. Cherveny referenced
6 in his e-mail and that he attached.
7     He says that upon review of
8 due diligence matters, he observed some
9 areas that he wanted to comment on.
10     Do you recall having any
11 conversations with Mr. Cherveny about his
12 comments about due diligence in 2015?
13     A.  I do not.
14     Q.  Was new customer and
15 existing customer due diligence something
16 that you discussed with Mr. Cherveny as a
17 general part of your job
18 responsibilities?
19     A.  I don't personally recall
20 responding to him.
21     Q.  Look at the first bold
22 heading.  It says, Lawtrac matters.
23     The next heading down is,
24 Number 1, Naming matters.  He points out,

Page 188

1 in the first sentence, that, All new
2 customer due diligence and existing
3 customer due diligence and threshold
4 review matters should be named
5 consistently in Lawtrac.
6     And then the last sentences
7 say, Please pay special attention to the
8 misspelling point.  This causes havoc
9 when trying to pull up a customer file.
10     Did you ever experience
11 having problems finding customer
12 information in Lawtrac because of
13 misspellings or incomplete files?
14     A.  No, I don't recall that.
15     Q.  If a customer's due
16 diligence was incorrectly named, though,
17 and you went to go search for it, would
18 you have been able to find it as part of
19 your due diligence process?
20     A.  Most likely, yes.  Because I
21 could research it by DEA license.
22     Q.  What did you think Mr.
23 Cherveny was referring to when he
24 referenced misnaming of files causing

Page 189

1 havoc in customer files?
2     MR. NICHOLAS:  Object to the
3 form.  Lack of foundation.
4     THE WITNESS:  It appears
5 he's just ensuring that we're all
6 on the same page and naming the
7 matters the same across the board.
8 BY MR. CLUFF:

Highly Confidential - Subject to Further Confidentiality Review



Page 190

Page 191

Page 192

18  BY MR. CLUFF:
19      Q.   Does this refresh your
20  recollection at all about when the Form
21  590 problem was first identified?
22      A.   No, it does --
23          MR. NICHOLAS:  Object to the
24  form.

Page 193

1          THE WITNESS:  No, it does
2      not.
3  BY MR. CLUFF:
4      Q.   But the accuracy and
5  completeness of information on the Form
6  590 was at least something that you were
7  discussing in the CSRA department as
8  early as February of 2015, correct?
9          MR. NICHOLAS:  Object to the
10     form.
11         THE WITNESS:  It could have
12     been.
13  BY MR. CLUFF:
14      Q.   I want you to look at the
15  second-to-last paragraph on the third
16  page, which ends in 443.
17          The paragraph that starts, I
18  don't want to send the wrong message.
19          He says, in the
20  second-to-last sentence, It's very
21  important that we be consistent and
22  detail oriented with all of our due
23  diligence records.
24          MR. NICHOLAS:  You don't

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1      want to read the first two
2      sentences to him?
3          MR. CLUFF:  Sure, Bob.
4   BY MR. CLUFF:
5        Q.   For the most part, the
6   matters I reviewed here were very clear
7   and complete.
8         Then he continues, It's very
9   important that we be consistent and
10   detail oriented with all of our due
11   diligence records.  Taking these steps
12   will help to preserve the integrity and
13   contribute to the overall success of our
14   OMP program.
15        Did I read that accurately?
16       A.   Yes.



Page 196

Page 195

Page 197

5         MR. CLUFF:  Let's go off the
6   record, and we'll break for lunch.
7         VIDEO TECHNICIAN:  Off the
8   record at 12:41 p.m.
9          - - -
10       (Whereupon, a luncheon
11   recess was taken.)
12          - - -
13         VIDEO TECHNICIAN:  We're
14   back on the record at 1:35 p.m.
15         MR. CLUFF:  Is counsel for
16   Teva on the phone?
17         MR. MAIER:  Yes.
18         MR. CLUFF:  I wanted to give
19   you a heads up that I'm going to
20   ask Mr. Kreutzer about some
21   Teva-produced documents, all of
22   which he is either an author or
23   recipient of.
24        I'm going to lay some

Highly Confidential - Subject to Further Confidentiality Review



Page 198

1 foundation to establish that he
2 worked through the scope of these
3 e-mails and documents, but I
4 wanted to give you the list now so
5 you can look at them. I don't
6 anticipate that you'll have an
7 objection, because he's an author.
8 But do you want to write these
9 down really quick?
10     MR. MAIER: Yes, that would
11 be great. Thank you.
12     MR. CLUFF: So all of these
13 have the same Teva_MDL-A prefix,
14 I'll just give you the number of
15 the lead document.
16     The first one is 0233-1299.
17     MR. MAIER: Okay.
18     MR. CLUFF: The second one
19 is 06441441.
20     MR. MAIER: I'm sorry, can
21 you repeat that one?
22     MR. CLUFF: Yeah. It's
23 06441441.
24     MR. MAIER: Okay.

Page 199

1     MR. CLUFF: The next one is
2 0233-1346.
3     MR. MAIER: Okay.
4     MR. CLUFF: After that, it's
5 0233-1426.
6     And we included the
7 attachments to all of those, if
8 they had one. I think they all
9 did. And if they had multiple
10 attachments, we did our best to
11 make sure they were all included.
12     MR. MAIER: Okay.
13     MR. CLUFF: So take a look.
14 Just wanted you to be aware so
15 there weren't any surprises or,
16 you know, problems with them.
17     But as I said, I'm going to
18 lay a foundation and he's the
19 author on all of those.
20     MR. MAIER: Okay.
21 BY MR. CLUFF:
22     Q.   So, Mr. Kreutzer, we're back
23 on the record again. As before, you're
24 still under oath.

Page 200

1     So earlier we talked about

22     A.   No, I do not.
23     Q.   And I understand that there
24 is a privilege being asserted on some of

Page 201

1 the work that FTI did in 2015 for
2 AmerisourceBergen. I just want to remind
3 you of that. So don't testify to
4 anything that you learned from your
5 lawyers about those parameters.
6     And your lawyer is free to
7 interpose an objection, but I just wanted
8 to all be clear that I have some
9 questions about your understanding, but I
10 don't want attorney communications.

Highly Confidential - Subject to Further Confidentiality Review



Page 202

Page 204

Page 203

Page 205

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 210

Page 212

as opposed to a
24 threshold review?

Page 211

Page 213

Highly Confidential - Subject To Further Confidentiality Review



Page 218

■ ▌▌▌▌▌▌▌▌▌

2     Q.   Okay. All right. We
3 previously discussed that you briefly
4 worked at Teva, correct?
5     A.   Yes.
6     Q.   And that you worked under
7 Colleen McGinn; is that right?
8     A.   Yes.
9     Q.   In fact, I think you
10 testified that she actually interviewed
11 you for the job?
12     A.   Correct.
13     Q.   Did you -- do you recall
14 interviewing with anybody else during the
15 time you worked at Teva, or before you
16 got the job at Teva?
17     A.   I do believe I met with two
18 other individuals.
19     Q.   Who were they?
20     A.   Mike Edwards, I believe.
21 And there was an individual in customer
22 service, the manager there that I
23 interviewed with, which I cannot remember
24 her name.

Page 219

1     Q.   Who was Mike Edwards?
2     A.   He was just another person
3 that reported to Colleen. I don't
4 remember his title.
5     Q.   I may have asked this
6 already, and if I did, I apologize.
7      But do you recall what
8 Colleen McGinn's title was?
9     A.   I don't know exactly.
10 Diversion operations director. I know
11 she had a director title.
12     Q.   Do you recall if she was the
13 head of DEA compliance?
14     A.   Yes.
15     Q.   So she would have been the
16 director of DEA compliance?
17     A.   Correct.
18     Q.   Do you recall working with
19 Colleen McGinn on developing Teva's
20 suspicious order monitoring program?
21     A.   I do.
22      MR. MAIER: Object to form.
23 BY MR. CLUFF:
24     Q.   What do you recall about the

Page 220

1 work you did with Colleen McGinn on
2 developing the suspicious order
3 monitoring program for Teva?
4     A.   She had wanted me to work
5 with the IT group internally, as well as
6 an individual outside the company, for
7 which they had a system already in place.
8 I believe they were the developers of a
9 new -- of this system. And she had
10 wanted me to work with him.
11     Q.   Do you recall his name?
12     A.   I believe it was Bob
13 Williamson.
14     Q.   Do you recall what company
15 he worked for?
16     A.   Buzzeo, I believe.
17     Q.   And is that the company that
18 you recall that had a system that they
19 could roll out with Teva?
20     A.   Yes.
21     Q.   Do you recall having
22 meetings with Bob Williamson?
23     A.   Yes. At least once.
24     Q.   As part of the work you did

Page 221

1 for Colleen McGinn, did you have
2 meetings, or at least prepare for
3 meetings, with Mallinckrodt?
4      MR. MAIER: Object to form.
5      THE WITNESS: I believe we
6     did meet Mallinckrodt in person.
7 BY MR. CLUFF:
8     Q.   Do you recall scheduling
9 meetings with the big four distributors?
10     A.   Yes.
11      MR. MAIER: Object to form.
12 BY MR. CLUFF:
13     Q.   Do you have a recollection,
14 at the time you worked at Teva, who the
15 big four distributors were?
16     A.   I know it was ABC, McKesson,
17 Cardinal. And I'm not sure if the fourth
18 was Morris -- it might have been Morris
19 Dickson or HD Smith, one of the two.
20     Q.   As part of your work for
21 Colleen McGinn, do you recall ever
22 putting together SOM, or suspicious order
23 monitoring, training programs or
24 presentations?

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1   A.   I had -- I had presented
2  three presentations, yes.
3   Q.   And what were those
4  presentations about?
5   A.   It was the -- I believe Bob
6  Williamson helped me develop the
7  presentation.  It was about the current
8  issues with the opioid crisis and some
9  other stats.
10   Q.   And who did you give those
11  presentations to?
12   A.   One was to Colleen's group.
13  Another was the customer service group.
14  And then one I gave to the customer
15  service manager individually.
16   Q.   And Colleen's group was the
17  DEA compliance group?
18   A.   Yes.
19   Q.   At Teva, based on your work
20  there, do you recall that customer
21  service was responsible for a portion of
22  Teva's suspicious order monitoring
23  program?
24   MR. MAIER:  Object to the

Page 223

1  form.
2   THE WITNESS:  A small part,
3  yes.
4  BY MR. CLUFF:
5   Q.   Is that why you would have
6  been presenting to that group about
7  suspicious order monitoring?
8   A.   Perhaps.
9   Q.   Okay.
10   MR. MAIER:  Object to form.
11  BY MR. CLUFF:
12   Q.   I'll hand you a copy of what
13  we'll mark as Number 3.
14   - - -
15   (Whereupon,
16  AmerisourceBergen-Kreutzer
17  Exhibit-3,
18  Teva_MDL_A_(0)233-1299-320, was
19  marked for identification.)
20   - - -
21   MR. CLUFF:  For counsel on
22  the phone, this is the first Teva
23  document that I mentioned.  It's
24  Teva_MDL_A_(0)233-1299.  There's

Page 224

1  an attachment to this e-mail that
2  is titled, Teva relaunch.zip.
3   I've included those
4  documents with the e-mail, to the
5  best of my ability.  Some of them
6  have a designation, file produced
7  natively.  The total document runs
8  through 02331320.
9  BY MR. CLUFF:
10   Q.   Mr. Kreutzer, this is a
11  longer document.  I'm not going to ask
12  you questions about every page.
13   So rather than us waste your
14  time with you going through every page of
15  it, which you're free to do if you
16  desire, what I was going to propose is
17  that I point to you the places in the
18  document where I'd like to discuss with
19  you.  And then when we get there, if you
20  feel like you need to review that page or
21  that piece of this document, you can let
22  me know, and we can give you a minute or
23  two off the record to do that.
24   Does that sound like a

Page 225

1  workable proposal?
2   A.   That's fair.
3   Q.   Thank you.
4   Let's start on the first
5  page, which is the e-mail from Robert
6  Williamson.  If you look up at the top
7  there, it's from Robert Williamson to
8  you, Colleen McGinn and LeRoy Simoes.
9  I'm probably not saying that right.
10   Why don't you go ahead and
11  review this cover e-mail?
12   A.   Okay.  Good.
13   Q.   So I want to look at the
14  first full paragraph there under the good
15  morning salutation.
16   So the person writing the
17  e-mail is Robert Williamson.  I believe
18  you referred to him as Bob.  Is it okay
19  if I refer to him as Bob?
20   A.   Sure.
21   Q.   Not to be confused with your
22  esteemed lawyer here.
23   He says, I've attached some
24  documents that we previously worked on.

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1  Do you recall if the "we" he
2 was discussing was Buzzeo and Teva, or if
3 he meant just employees at Teva?
4  A.  I'm not sure.
5  Q.  He continues and says that,
6 These documents may be useful for this
7 morning's call.  If not, they surely will
8 be when he comes to meet with you --
9 "you" being Kevin.
10  Do you see that?
11  A.  Yes.
12  Q.  So without requiring you to
13 review all these documents, do you recall
14 having calls with employees from Buzzeo
15 about suspicious order monitoring?
16  A.  I do recall speaking with
17 Bob.  But I don't remember much about
18 those calls.
19  Q.  Do you recall having a
20 meeting with him some time in late
21 January or early February of 2013?
22  A.  We did meet.
23  Q.  What was the substance of
24 that meeting?

Page 227

1  A.  I don't remember
2 specifically.  I really don't remember
3 the content.
4  Q.  Okay.  I mean, as a general
5 matter, do you recall why you and Colleen
6 were meeting with Buzzeo during this time
7 period?
8  MR. MAIER:  Object to form.
9  THE WITNESS:  Yes.  My
10  understanding is that we were
11  trying to develop an SOM program,
12  or a system, or a more enhanced
13  system than they currently had.
14 BY MR. CLUFF:
15  Q.  Was it your understanding
16 that Teva did not have a well-developed
17 SOM system in 2013?
18  MR. MAIER:  Object to form.
19  THE WITNESS:  No, I don't
20  believe that.  I know they had a
21  system in place, but I believe we
22  were trying to enhance that
23  system.
24 BY MR. CLUFF:

Page 228

1  Q.  Why were you trying to
2 enhance it?
3  A.  Just like with any system,
4 you're always trying to enhance the
5 system as it goes on.
6  Q.  In 2013 -- actually, I
7 believe we discussed earlier the time
8 period during which you worked at Teva,
9 and I think you said that you joined that
10 company in 2012 and you worked there for
11 three months.
12  Looking at the date in this
13 e-mail, which is January 2013, does that
14 refresh your recollection about how long
15 you would have worked at Teva?
16  A.  It does.
17  Q.  So is it possible that you
18 worked until the middle of 2013 instead
19 of middle of 2012?
20  A.  I started January 7th, as I
21 indicated previously, but I may have said
22 2012.  So it was 2013 until April 1st,
23 2013.
24  Q.  So your recollection is that

Page 229

1 you started in January 2013 instead of
2 2012?
3  A.  That is correct.
4  Q.  Understood.
5  And so you would have worked
6 until approximately April of 2013?
7  A.  April 1st.
8  Q.  Okay.  Understood.
9  In the months that you
10 worked at Teva, do you think you
11 developed a pretty good working
12 understanding of Teva's suspicious order
13 monitoring system?
14  MR. MAIER:  Object to form.
15  THE WITNESS:  I felt like I
16  had a good understanding of their
17  system in place.
18 BY MR. CLUFF:
19  Q.  Did you feel like it was a
20 robust system?
21  MR. MAIER:  Object to form.
22  THE WITNESS:  I felt like it
23  was a good system that they had.
24 BY MR. CLUFF:

Highly Confidential - Subject to Further Confidentiality Review



Page 230

1    Q.   Did you feel like it was
2  complying with all of the rules and
3  regulations for manufacturing controlled
4  substances?
5          MR. MAIER:  Object to form.
6          THE WITNESS:  I believe so.
7  BY MR. CLUFF:
8    Q.   I want you to turn back with
9  me ten pages back.  There is -- one of
10  the attachments is a document, it
11  should -- my copy is in color, I'm not
12  sure if yours is.
13          But at the top it says,
14  Cegedim relationship management
15  compliance solutions powered by Buzzeo
16  PDMA.  I believe that's a two-page
17  attachment.
18          Do you want to look at that
19  and familiarize yourself with it?  I have
20  a few questions for you.
21          MR. MAHADY:  13087?
22          MR. CLUFF:  I think that's
23  right.  The copy I printed for
24  myself doesn't have the Bates

Page 231

1    number.
2          We have it down here, 1308.
3          THE WITNESS:  Just 1308 and
4    1309 to look at?
5          MR. CLUFF:  Yes.
6          THE WITNESS:  Okay.
7  BY MR. CLUFF:
8    Q.   So the title of this
9  document, you can see at the top, is,
10  Teva Accounts, quote, Red Flags, closed
11  quote.
12          Do you have any recollection
13  of what this document was that Buzzeo
14  attached to its cover e-mail for you?
15    A.   I do not recollect this
16  document.
17    Q.   Do you have any reason to
18  dispute that this is a true and accurate
19  copy of a document that was provided to
20  Teva, or to you while you were employed
21  at Teva?
22    A.   I have no reason to doubt
23  that.
24    Q.   Are you familiar with the

Page 232

1  concept -- or what -- the term that is in
2  quotes there, red flags?
3          MR. MAIER:  Object to form.
4          THE WITNESS:  Yes.
5  BY MR. CLUFF:
6    Q.   What are red flags?
7    A.   Red flags may be situations
8  where -- a situation where you would need
9  to take a closer look at.
10    Q.   And why would you be taking
11  a closer look at them?
12    A.   I can only address what's in
13  this document.  And these are the red
14  flags that are addressed in this
15  document.

Page 233

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1    Q.   Do you see here that Buzzeo
2  identified a large percentage of
3  controlled substances versus NCS as a red
4  flag?
5    A.   Yes.
6    Q.   You disagree with that
7  statement?
8    A.   No, I don't disagree.
9    Q.   What about going down one
10  more on the list, DEA compliance issues.
11       Do you see that Buzzeo
12  identified DEA compliance issues as a red
13  flag that Teva should be looking at?
14    A.   Right.
15    Q.   Are you aware that
16  AmerisourceBergen had its registration
17  suspended in 2007?
18    A.   Yes.
19    Q.   Would you qualify that as a
20  DEA compliance issue?
21       MR. NICHOLAS:  Object to the
22    form.  Lack of foundation.
23       THE WITNESS:  Not
24    necessarily.

Page 235

1  BY MR. CLUFF:
2    Q.   So in your opinion as a
3  diversion control specialist, having
4  worked at AmerisourceBergen, losing a DEA
5  registration -- let me clarify -- having
6  a DEA registration suspended is not a DEA
7  compliance issue?
8       MR. NICHOLAS:  Object to the
9    form.  Lack of foundation.
10       THE WITNESS:  It could be,
11    based on the results of why the
12    registration was suspended.
13  BY MR. CLUFF:
14    Q.   In your work in diversion
15  control since approximately 2009, are you
16  aware that Cardinal Health and McKesson
17  also, at various points, had their
18  registrations suspended?
19       MR. KELLY:  Objection.
20    Form.
21       THE WITNESS:  I believe so.
22  BY MR. CLUFF:
23    Q.   Would you qualify those as
24  DEA compliance issues?

Page 236

1       MR. NICHOLAS:  Object to the
2    form.
3       THE WITNESS:  Could be.
4  BY MR. CLUFF:
5    Q.   Was Teva currently
6  monitoring for DEA compliance issues
7  before they received this red flags list
8  from Buzzeo?
9       MR. MAIER:  Objection.  Form
10    and foundation.
11       THE WITNESS:  That, I don't
12    know.
13  BY MR. CLUFF:
14    Q.   Let's move down the list
15  three more.  It says, Lack of suspicious
16  order monitoring system.
17       Are you aware of any Teva
18  customers that lacked a suspicious order
19  monitoring system?
20    A.   I am not.
21    Q.   At the time that you
22  received this information from Buzzeo,
23  are you aware if Teva was monitoring for
24  suspicious order monitoring systems by

Page 237

1  its customers?
2    A.   I believe they were.
3    Q.   How about the next one down,
4  Threshold-based suspicious order
5  monitoring system.
6       Do you see that that's a red
7  flag that Buzzeo identified for Teva?
8    A.   Yes.
16    Q.   Would you agree that based
17  on this list, that should have been a red
18  flag to Teva?
19    A.   No, I do not agree.
20       MR. MAIER:  Objection.
21    Form.
22  BY MR. CLUFF:
23    Q.   But do you agree that Buzzeo
24  identified it as a red flag for Teva?

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1    MR. NICHOLAS:  Object to the
2  form.  Lack of foundation.
3    THE WITNESS:  I don't agree
4  with that.
5  BY MR. CLUFF:
6    Q.   Buzzeo was hired by Teva,
7  though, to help improve Teva's suspicious
8  order monitoring system, correct?
9    MR. NICHOLAS:  Objection.
10  Form.  Foundation.
11    MR. MAIER:  Object to form.
12    THE WITNESS:  Yes.
13  BY MR. CLUFF:
14    Q.   But you disagree with their
15  recommendations regarding red flag
16  monitoring?
17    MR. NICHOLAS:  Objection to
18  the form.  Lack of foundation.
19    THE WITNESS:  I don't know
20  what discussions took place, other
21  than the document in front of me.
22  There may have been additional
23  discussions and/or documents that
24  may not be here.

Page 239

1  BY MR. CLUFF:
2    Q.   That was actually my next
3  question.
4    Do you know whether Teva
5  adopted this list of red flags for their
6  suspicious order monitoring system?
7    A.   I do not.
8    Q.   So you're unaware whether
9  Teva decided to monitor its customers for
10  threshold-based systems?
11    A.   I do not know.
12    Q.   Do you see the next one down
13  on the list is, Customer due diligence
14  deficiencies?
15    A.   Yes.
16    Q.   We previously talked about
17  the problems with the Form 590 validation
18  project.
19    Would you agree that Teva
20  is -- excuse me, Buzzeo is identifying to
21  Teva due diligence deficiencies like the
22  590 project as a red flag?
23    MR. NICHOLAS:  Object to the
24  form.

Page 240

1    MR. MAIER:  Objection.
2  Foundation.
3    MR. NICHOLAS:  Object to
4  form and foundation.
5    THE WITNESS:  I don't agree
6  with that.
7  BY MR. CLUFF:
8    Q.   Do you not agree that it is
9  a red flag, is what you're saying?
10    A.   I don't agree that it's a
11  red flag.
12    Q.   But do you see that Buzzeo
13  recommends it as a red flag?
14    A.   I do see that.
15    Q.   Do you know whether Teva
16  adopted that portion of the list as part
17  of its suspicious order monitoring
18  system?
19    A.   I do not know.  And I don't
20  recall this document.
21    Q.   Do you see the next major
22  heading down at the bottom of that first
23  page says, Downstream?
24    A.   Yes.

Page 241

1    Q.   What does that refer to?
2    MR. MAIER:  Objection.  Form
3  and foundation.
4    THE WITNESS:  I'd have to
5  read over this.
6    I'm not sure exactly what
7  that refers to.
8  BY MR. CLUFF:
9    Q.   Does it possibly -- based on
10  your understanding of Teva's business
11  model, does it possibly refer to
12  suspicious order monitoring of downstream
13  customers like pharmacies?
14    MR. MAIER:  Object to form
15  and foundation.
16    THE WITNESS:  I don't know.
17  There's not enough information
18  here for me to make a decision.
19  BY MR. CLUFF:
20    Q.   We talked about three issues
21  on this list, DEA compliance issues,
22  threshold-based suspicious order
23  monitoring system, and customer due
24  diligence deficiencies.  I think that's

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1 Number 2, 6 and 7 on the list.
2    A.   Yes.
3    Q.   And you said you disagreed
4 that those are red flags.
5        Why do you feel that those
6 are not red flags?
7        MR. NICHOLAS:  Object to the
8    form.
9        MR. MAIER:  Objection.
10       THE WITNESS:  I don't agree,
11   because, first, I don't recall
12   this document; and, second, there
13   may have been changes made to this
14   document that I'm unaware of.
15 BY MR. CLUFF:
16   Q.   I guess my question is a
17 little bit different.  I'm not asking you
18 whether Teva actually adopted these
19 recommendations.
20       What I was asking is, you
21 know, for example, do you think that a
22 DEA compliance issue with one of Teva's
23 customers should have been a red flag to
24 Teva?

Page 243

1        MR. MAIER:  Objection.
2    Form.
3        THE WITNESS:  It could be,
4    based on the circumstances.
5 BY MR. CLUFF:
6    Q.   How about a threshold-based
7 suspicious order monitoring system, do
8 you feel that that should have been a red
9 flag to Teva about its customers?
10       MR. MAIER:  Objection.
11   Form.
12       MR. NICHOLAS:  Same
13   objection.  And lack of
14   foundation.
15       THE WITNESS:  I don't think
16   so.
17 BY MR. CLUFF:
18   Q.   Why not?
19   A.   I don't think so because
20 just because an account has a
21 threshold -- or a supplier has a
22 threshold-based system doesn't mean that
23 the customers are aware of those
24 thresholds.

Page 244

1    Q.   How about customer due
2 diligence deficiencies, do you agree that
3 that should be a red flag for Teva about
4 its customers?
5        MR. MAIER:  Objection.  Form
6    and foundation.
7        MR. NICHOLAS:  Same.
8        THE WITNESS:  It could be,
9    based on the circumstances.
10 BY MR. CLUFF:
11   Q.   I want to point out one
12 more.  It says, Distribution to brokers
13 and/or buying groups.
14       Do you understand what a
15 pharmacy buying group is?
16   A.   We do have pharmacy buying
17 groups, but I'm not really familiar with
18 the complete definition.
19   Q.   But AmerisourceBergen does
20 distribute to buying groups?
21   A.   Correct.
22   Q.   What about distribution to
23 repackagers and relabelers, do you know
24 what repackagers and relabelers are?

Page 245

1    A.   I don't recall any customers
2 offhand.
3    Q.   Do you know if
4 AmerisourceBergen distributes to
5 repackagers or relabelers?
6    A.   I can't think of one
7 customer at the moment.
8    Q.   Does AmerisourceBergen, the
9 parent company, have any other business
10 segments that might qualify as
11 repackagers or relabelers, based on your
12 understanding of those terms?
13       MR. NICHOLAS:  Object to the
14   form.  Lack of foundation.
15       THE WITNESS:  I just don't
16   know.  I don't know those
17   customers.
18 BY MR. CLUFF:
19   Q.   The last term on this list
20 is suspicious activity, on the first
21 page, just above downstream.
22       Do you see that?
23   A.   Yes.
24   Q.   Do you know what suspicious

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1 activity Buzzeo might have been referring
2 to with that --
3         MR. MAIER: Objection. Lack
4     of foundation.
5 BY MR. CLUFF:
6     Q.   -- with that bullet?
7     A.   I do not.
8     Q.   If you turn two pages back
9 in the document, the Bates number is
10 ending in 1310. The top heading is,
11 Compliance solutions powered by Buzzeo
12 PDMA. It looks like that document is
13 four pages long, and ends at 1313.
14         I can tell you, I have just
15 a couple of questions for you and they
16 are about the comment boxes that appear
17 in the right-hand margin, which are on
18 the second and third page.
19         So you can review that
20 document, but that's the -- that's where
21 I'm going to focus.
22     A.   Okay.
23     Q.   Do you have any
24 understanding of what this document is?

Page 247

1     A.   Just other than the title.
2     Q.   What does the title indicate
3 to you?
4     A.   SOM SOP template. So I'm
5 assuming it's suspicious order monitoring
6 standard operating procedures.
7     Q.   And would these be a
8 template that Buzzeo was providing to
9 Teva as part of its suspicious order
10 monitoring policies?
11         MR. MAIER: Objection.
12     Foundation.
13         THE WITNESS: I don't -- I
14     don't remember this document.
15 BY MR. CLUFF:
16     Q.   Turning to the second page,
17 which is 1311, there's a Paragraph Number
18 4 that says, Responsibility.
19         And under that, in bold
20 italics, it says, DEA compliance,
21 question mark. DEA compliance and
22 customer service, question mark.
23         And I'll note that there is
24 a comment box that pops out from service,

Page 248

1 with a dotted line. It says, Comment,
2 bracket, RB1, closed bracket.
3         Do you know what RB would
4 have stood for?
5     A.   I do not.
6     Q.   And the comment says, What
7 about limiting responsibility to DEA
8 compliance?
9         Do you know what that refers
10 to?
11     A.   No. I don't recall this
12 document.
13     Q.   Let's flip to the next page,
14 which ends in 1312.
15         Looking at Paragraph 8,
16 Clearing an order from suspicion.
17 Subparagraph 8.2 says, All orders will be
18 initially investigated by customer
19 service representatives.
20         And there's another comment
21 box, again, RB2.
22         Does that refresh your
23 recollection about who RB2 might be?
24     A.   No. I don't know who RB is.

Page 249

1     Q.   And then there are three
2 questions there. Should this only be in
3 this department? What about DEA
4 compliance? Should they have primary
5 role?
6         Do you have any
7 understanding about what those questions
8 are about?
9     A.   No.
10     Q.   Do you have any recollection
11 of a discussion at Teva about whether
12 customer service versus DEA compliance
13 should have responsibility for suspicious
14 order policies and procedures?
15         MR. MAIER: Objection.
16     Form.
17         THE WITNESS: I don't recall
18     a discussion being made.
19 BY MR. CLUFF:
20     Q.   Do you recall who had
21 primary responsibility for things like
22 suspicious order monitoring and clearing
23 suspicious orders?
24     A.   I know I reviewed them when

Page 250

1  I was in that role.
2      Q.   And what were you reviewing
3  them for at the time?
4      A.   According to the documents,
5  for pended orders, I was reviewing for a
6  pattern and if a drug was pended before.
7      Q.   What does it mean to be
8  pended?
9      A.   I'm assuming that means when
10 the order goes into review status.
11         - - -
12     (Whereupon,
13 AmerisourceBergen-Kreutzer
14 Exhibit-4,
15 Teva_MDL_A_(0)233-1346-348, was
16 marked for identification.)
17         - - -
18     MR. CLUFF:  I put a sticker
19 on my copy so -- I'll give you the
20 next document, which we marked as
21 4.
22     For those on the phone, this
23 is Teva_MDL_A_(0)233-1346.  It has
24 an attachment which begins at 1347

Page 251

1  and continues to 1348.
2  BY MR. CLUFF:
3      Q.   This is a short document,
4  Mr. Kreutzer, so go ahead and familiarize
5  yourself with it.
6      A.   Okay.
7      Q.   Starting at the top, this is
8  an e-mail you wrote to Colleen McGinn,
9  February 4, 2013.  Subject:  Questions
10 for Mallinckrodt, with the attachment
11 Mallinckrodt February 7.
12     And you write, Thanks, I was
13 working on it -- I was actually working
14 on it so they were in a more organized
15 manner.
16     Do you recall receiving and
17 sending this e-mail to Colleen?
18     A.   I do not.
19     Q.   Do you have any reason to
20 dispute that this is a true and accurate
21 copy of an e-mail that you received from
22 Colleen and then replied to?
23     A.   No.
24     Q.   Looking at the attachment

Page 252

1  that starts on (0)2331347, have you ever
2  seen that document before?
3      A.   I don't recall this
4  document.
5      Q.   Do you recall preparing it
6  at all?
7      A.   I don't recall preparing it
8  either.
9      Q.   But do you generally recall
10 preparing for a meeting with Mallinckrodt
11 in February of 2013?
12     A.   I do, but I don't remember
13 the content, what information we were
14 preparing for our visit.
15     Q.   Do you have any reason to
16 dispute that this is a true and correct
17 copy of an e-mail that you -- I mean, a
18 document that you and Colleen McGinn
19 worked on together in February of 2014?
20     A.   No, I don't.
21     Q.   The subject matter of this
22 e-mail is, Questions for Mallinckrodt.
23     Do you see that at the top?
24     A.   Yes.

Page 253

1      Q.   And then turning to the
2  title of the attachment, it says,
3  Mallinckrodt, February 7, 2013 visit-SOM
4  program.
5      A.   Yes.
6      Q.   Would this, then, reflect
7  questions Teva was going to ask
8  Mallinckrodt in a meeting about its SOM
9  program?
10     A.   Yes, I believe so.
11     Q.   Do you recall whether, in
12 2013, Teva was coordinating the
13 enhancements to its suspicious order
14 monitoring program with Mallinckrodt?
15     A.   I don't recall that.
16     Q.   Based on this e-mail and the
17 questions here that are attached to that
18 e-mail, do you have any understanding
19 that Teva was coordinating its suspicious
20 order monitoring program with
21 Mallinckrodt?
22     A.   No, I don't.
23     MR. MAIER:  Form.
24 Foundation.

Highly Confidential - Subject to Further Confidentiality Review

Page 254

BY MR. CLUFF:

Q.   What about an understanding of enhancing its program in coordination with Mallinckrodt?

A.   I don't recall that.

Q.   Do you recognize the name Jack Crowley?

A.   I don't remember his name. Where do you see his name?

Q.   It's a name I have in my head that I was curious if you understand.

Do you know if Colleen McGinn talked to anybody at any other manufacturers about Buzzeo or suspicious order monitoring?

A.   No, I don't.

MR. MAIER:  Objection. Foundation.

BY MR. CLUFF:

Q.   In the work that you did with Colleen on enhancing Teva's suspicious order monitoring program, did you communicate with anybody from any

Page 255

other manufacturers?

A.   AmerisourceBergen.

Q.   That's a distributor though, right?

A.   I'm sorry.  I misunderstood the question.

You said manufacturers?

Q.   Yes.

A.   I did conduct an audit of Cardinal's program.

Q.   That's also a distributor, right?

A.   Yes.  I'm sorry.

Q.   So did you personally meet with anybody from a manufacturer like Purdue or Actavis or Endo --

A.   I have not, no.

Q.   You did mention, though, that you met -- you conducted an audit of Cardinal Health.

What was that?

A.   They were providing me a PowerPoint presentation of their order monitoring program.

Page 256

Q.   Do you recall what time frame that was?

A.   I do not, but it was within my 90 days between January and end of March.

Q.   And you mentioned AmerisourceBergen, what about -- can you tell me what happened with AmerisourceBergen?

A.   Conducted an audit.  It was a questionnaire that we presented to Ed Hazewski.  I was with Bob Mallinckrodt -- not Bob Mallinckrodt, Bob Williamson on my visit with Ed.

Q.   And that's Bob Williamson from Buzzeo?

A.   That is correct.

Q.   So together you conducted an audit, using a questionnaire, of Amerisource's programs?

A.   Correct.

Q.   Did you -- going back to this attachment, the Mallinckrodt February -- Mallinckrodt February 7, 2013

Page 257

visit, did you go -- do you know if this meeting happened between Teva and Mallinckrodt on February 7th?

A.   It did.

Q.   Did you attend the meeting?

A.   I did.

Q.   So you're aware of these questions that were asked to Mallinckrodt by Teva?

A.   I'm sure we did use these questions as part of our visit, but I don't remember their responses.

Q.   Do you recall if these questions were asked to Mallinckrodt because Teva was looking for advice on how to structure its own SOM program?

MR. MAIER:  Objection. Form.

THE WITNESS:  No, I don't know that.

BY MR. CLUFF:

Q.   Do you have any reason to dispute that Teva was asking for guidance on establishing an SOM program?

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1     A.   Teva was looking to enhance
2 their order monitoring program.
3     Q.   And was this meeting part of
4 the effort to enhance the program?
5     A.   I don't know.
6     Q.   Okay.  Do you have any
7 recollection of why this meeting happened
8 with Mallinckrodt?
9     A.   I do not remember.
10     Q.   Looking under the category
11 general there, it's underlined at the
12 top.
13         The first question is, Can
14 you describe the SOM program you have in
15 place?
16         Would you agree here that
17 Teva was asking Mallinckrodt to describe
18 its SOM program?
19     A.   Yes.
20     Q.   The next question down is,
21 How did you roll out your program to
22 customers?
23         Is that correct?
24     A.   Yes.

Page 259

1     Q.   Moving down a few it says,
2 Have you had any pushback?
3         Do you recall if
4 Mallinckrodt described any pushback about
5 its SOM program?
6     A.   I do not remember.
7     Q.   The next one down is, How do
8 you handle noncompliance issues?
9         Do you recall if
10 Mallinckrodt discussed any noncompliance
11 issues?
12     A.   No, I do not.
13     Q.   And then what about the last
14 bullet point there, it says, What kind of
15 training did you perform?  Customer
16 service?  SOM employees?
17         Do you recall discussing
18 that?
19     A.   No, I don't.
20     Q.   Under customer due
21 diligence, do you see that?  It's the
22 second underlined heading.
23     A.   Yes.
24     Q.   And you recall that this was

Page 260

1 occurring in February 2013?  I think the
2 question is, Do you have a risk analysis
3 of customers that are less of a threat
4 than others?
5         And there's a bullet point
6 there, For example, AmerisourceBergen,
7 Cardinal and McKesson, less than a threat
8 than a small distributor and retail
9 pharmacy chain.
10         Is that right?  Did I read
11 it accurately?
12     A.   That is correct, yes.
13     Q.   In February of 2013, were
14 you aware that AmerisourceBergen,
15 Cardinal and McKesson had all, at various
16 times, had their registrations to
17 distribute controlled substances
18 suspended?
19         MR. KELLY:  Object to the
20 form.
21         MR. NICHOLAS:  Object to the
22 form.  And foundation.
23         THE WITNESS:  I don't recall
24 the suppliers having their

Page 261

1 licenses suspended.
2 BY MR. CLUFF:
3     Q.   You don't recall that these
4 suppliers had their licenses suspended?
5         MR. NICHOLAS:  Object to the
6 form.
7         THE WITNESS:  I do not
8 recall.
9 BY MR. CLUFF:
10     Q.   If you knew at the time, in
11 2013, that Amerisource, Cardinal and
12 McKesson had all had their licenses
13 suspended, would you have classified them
14 as a lower threat than smaller
15 distributors?
16         MR. NICHOLAS:  Object to the
17 form.
18         Go ahead.
19         THE WITNESS:  I don't
20 recall.
21 BY MR. CLUFF:
22     Q.   There's a note here about
23 retail pharmacy chains.
24         What companies come to mind

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1  as examples of retail pharmacy chains?
2       MR. NICHOLAS:  Object to the
3  form.
4       THE WITNESS:  I don't
5  remember the pharmacy chains that
6  Teva serviced.
7  BY MR. CLUFF:
8    Q.   I'm asking just your general
9  recollection, who would be -- like,
10  qualify as a pharmacy chain?
11    A.   Rite Aid.  Walgreens.
12    Q.   CVS?
13    A.   CVS, perhaps.
14    Q.   How about Walmart?
15    A.   Walmart.
16    Q.   Were you aware that any of
17  the retail pharmacy chains, prior to
18  2013, had paid fines to the DEA for not
19  fulfilling their regulatory obligations
20  under the Controlled Substances Act?
21       MR. MAIER:  Object to form.
22       MR. NICHOLAS:  Foundation
23  and form.
24       THE WITNESS:  I don't recall

Page 263

1    the certain pharmacies and chains,
2    no.
3  BY MR. CLUFF:
4    Q.   If you had been aware, in
5  2013, that retail pharmacy chains had
6  paid fines for failing to fulfill their
7  duties under the CSA, would you have
8  classified them as lower risk than other
9  distributors?
10       MR. NICHOLAS:  Object to the
11  form.
12       THE WITNESS:  I don't know.
13    I would have to discuss that with
14    the management team.
15  BY MR. CLUFF:
16    Q.   Moving down the document,
17  there's an outline -- an underlined
18  heading that says, Order review.
19       It says, Teva's SOM program
20  is based on two standard deviations above
21  the average.
22       Is that an accurate
23  statement?
24       MR. NICHOLAS:  Objection.

Page 264

1       Form and foundation.
2       THE WITNESS:  According to
3  what's on the form that's in front
4  of me.
5  BY MR. CLUFF:
6    Q.   Skipping down two bullet
7  points, it says, How do you determine how
8  high a threshold should be?  Do you make
9  a threshold adjustment if warranted?  How
10  is that done?
11       Would you agree here that
12  Teva is asking Mallinckrodt here for
13  advice on setting thresholds and
14  adjusting them?
15       MR. MAIER:  Object to form.
16       THE WITNESS:  I don't recall
17    the discussions that were
18    discussed with Mallinckrodt.
19  BY MR. CLUFF:
20    Q.   But at least this document
21  reflects that it was a topic that Teva
22  wanted to discuss with Mallinckrodt,
23  right?
24    A.   It was a question that was

Page 265

1  posed on the form.
2    Q.   If you move to the next
3  page, which ends in 1348, I'm interested
4  in the top two bullet points there.
5       The first one, How do you
6  determine if a customer exceeded their
7  threshold?  Do you release orders that
8  are over the thresholds?
9       Would you agree that Teva
10  wanted to seek Mallinckrodt's advice on
11  customers exceeding thresholds?
12    A.   I don't recall that
13  discussion.
14    Q.   But that's what the document
15  indicates, correct?
16    A.   That's what the document
17  indicates.  And I don't recall if we
18  discussed that, or what the results of
19  the question was.
20    Q.   The next one down says, What
21  actions do you take if customers are
22  exceeding your threshold?
23       Do you recall what actions
24  Teva took if customers exceeded

Page 266

1  thresholds?
2      A.   I do not.
3      Q.   Do you recall if Teva
4  discussed this with Mallinckrodt?
5      A.   I do not.
6          MR. MAIER:  Objection.  Form
7  and foundation.
8  BY MR. CLUFF:
9      Q.   Let's go down to DEA
10 interaction.  The first line says, Have
11 you reported any orders deemed, quote,
12 suspicious to DEA?
13         Do you recall if Teva was
14 identifying suspicious orders to the DEA
15 in 2013?
16     A.   Yes.
17     Q.   They were?
18     A.   Yes.
19     Q.   Okay.
20     A.   I reported it myself.
21     Q.   Do you recall if Teva asked
22 Mallinckrodt whether they were reporting
23 suspicious orders to the DEA?
24         MR. MAIER:  Objection.

Page 267

1      Form.
2          THE WITNESS:  I'm sorry,
3      could you ask that question again,
4      please?
5  BY MR. CLUFF:
6      Q.   Sure.
7          Do you recall if
8  Mallinckrodt -- if Teva asked
9  Mallinckrodt whether they reported
10 suspicious orders to the DEA?
11     A.   I don't recall that.
12     Q.   All right.  Let's look at
13 the next underline, it's chargeback data.
14         Do you recall we previously
15 today discussed chargeback data in
16 general?
17         MR. NICHOLAS:  Object to the
18     form.
19         THE WITNESS:  In general,
20     yes.
21 BY MR. CLUFF:
22     Q.   It's not a quiz, I was just
23 trying to refresh that we had talked
24 about it.

Page 268

1      A.   Understood.
2      Q.   Does this little paragraph
3  here add any understanding or refresh
4  your recollection at all about what
5  chargeback data is or how it's used?
6      A.   I don't remember that.
7          MR. NICHOLAS:  Sterling, if
8  we're on to the next -- another
9  document, I'd like to take a
10 break.
11         MR. CLUFF:  Is there a
12 reason you would like to take a
13 break?
14         MR. NICHOLAS:  I need a
15 break.
16         MR. CLUFF:  Yeah, let's take
17 a break.
18         VIDEO TECHNICIAN:  Off the
19 record at 2:41 p.m.
20         - - -
21 (Whereupon, a brief recess
22 was taken.)
23         - - -
24         VIDEO TECHNICIAN:  We're

Page 269

1      back on the record at 2:56 p.m.
2  BY MR. CLUFF:
3      Q.   Mr. Kreutzer, you testified
4  that you only worked for Teva for
5  approximately 90 days?
6      A.   Yes.
7      Q.   How come you decided to
8  leave Teva after only 90 days?
9      A.   I was let go.
10     Q.   Can you share the reason why
11 you were let go?
12     A.   Sure.  I was let go because
13 Colleen felt that I wasn't doing the job
14 up to par, I guess.
15     Q.   Did she express what part of
16 the job you were not doing up to par?
17     A.   She felt like I needed more
18 assistance than I should have had.  She
19 was not -- she wasn't directly on site at
20 all times, she was off site at another
21 location.  So I was by myself on the job,
22 for the most part.
23     Q.   Was there a specific part of
24 your job parameters or job description

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1 where she felt that -- where she
2 identified that your performance was
3 lacking?
4     A.   One issue was that I took it
5 upon myself to contact a customer
6 directly regarding an order that was
7 pended.  But I was previously told that
8 if I had any questions of any customers
9 that I had to go through customer
10 service, and then customer service would
11 then contact the customer with my
12 questions and then relay the answers back
13 to customer service, and then back to me.
14     Q.   And so the problem was that
15 if you contacted the customer directly?
16     A.   Yes.
17     Q.   Was that the straw that
18 broke the camel's back, so to speak?
19         MR. MAIER:  Object to form.
20         THE WITNESS:  I think it was
21     a good part of it.
22 BY MR. CLUFF:
23     Q.   Was there any other -- any
24 other specific information that was

Page 271

1 conveyed to you about what Colleen
2 perceived that you had not done
3 adequately enough?
4     A.   Well, I don't recall the
5 real specifics.  But I had felt that the
6 job duties that were listed for the
7 assignment were above what I -- above my
8 current experience level at the time, and
9 I indicated that to her on my departure.
10     Q.   So it was -- I'm trying to
11 understand.
12         Was it your belief at the
13 time that they were requiring more of you
14 than they had advertised during the
15 interview process?
16     A.   That was my feelings.
17     Q.   Did you feel like you got
18 adequate training to fulfill your job
19 responsibilities when you worked at Teva?
20         MR. MAIER:  Object to form.
21         THE WITNESS:  I mean, I felt
22     like I did have training, but
23     there wasn't a current department
24     that I worked in.  I was literally

Page 272

1     by myself.
2         It was a new role for the
3     company, so I had to figure
4     everything out for myself, as far
5     as contact people, and anything
6     else for that matter.
7 BY MR. CLUFF:
8     Q.   Did you feel like you
9 were -- that you did not have enough
10 resources to do the job that Teva was
11 asking you to do?
12     A.   I was supposed to have a
13 person to -- that was going to report to
14 me when I first received the position.
15 And then that position was taken away,
16 prior to my starting with the company.
17         But other than that, my role
18 was to mainly work with IT, as well as
19 customer service for any customer
20 inquiries that I had.
21     Q.   And was your role at Teva
22 essentially the same role that you had
23 had at AmerisourceBergen, that being sort
24 of customer order monitoring and

Page 273

1 diversion control?
2     A.   It was.  But it was also a
3 role to enhance their current SOM program
4 and to develop policies and procedures.
5     Q.   How did you feel about the
6 quality of the employees you worked with
7 at Teva?  Did you feel like they were
8 qualified to do their jobs?
9         MR. MAIER:  Objection.
10         THE WITNESS:  I do.
11 BY MR. CLUFF:
12     Q.   You mentioned that you felt
13 like Teva expected more from you than
14 they advertised in the interview.
15         Do you feel like Teva
16 expected more out of its other employees
17 than they really were qualified to give?
18     A.   That, I don't know.
19         MR. MAIER:  Form.
20     Foundation.
21         MR. CLUFF:  I want to show
22     you a document.  This is produced
23     by Teva.  It's
24     Teva_MDL_A_(0)233-1426.  That's

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1  the e-mail with an attachment.
2  The attachment begins
3  Teva_MDL_A_(0)233-1428.  It's a
4  natively produced Bates number --
5  excuse me, it's a natively
6  produced PowerPoint, so it all has
7  the same Bates number.
8      And we'll mark it as Number
9  5.
10      - - -
11      (Whereupon,
12  AmerisourceBergen-Kreutzer
13  Exhibit-5,
14  Teva_MDL_A_(0)233-1426-428, was
15  marked for identification.)
16      - - -
17      MR. CLUFF:  I'm going to
18  have some questions for you about
19  specific slides.  But why don't
20  you go ahead and review just the
21  cover e-mail to start?
22      MR. MAHADY:  Sterling, if
23  you know, did the attachment have
24  confidentiality designations?

Page 275

1      MR. CLUFF:  I'm unaware.
2  But if we want to treat it, for
3  purposes of the deposition, as
4  confidential, since the cover
5  e-mail is confidential, I'm okay
6  with that.  But I'll defer to
7  Teva's lawyer on this one.
8      Do you know if this
9  PowerPoint would have had a
10  confidentiality designation?
11      MR. MAIER:  I believe it
12  would have.  I'm not sure what
13  form you're dealing with --
14      MR. CLUFF:  Sure.
15      MR. MAIER:  -- you know,
16  what format, so I would request
17  that we would treat it that way.
18      MR. CLUFF:  We'll lodge that
19  on the record that this document
20  will be treated as confidential.
21  BY MR. CLUFF:
22      Q.  Did you have a chance to
23  review the e-mail, Mr. Kreutzer?
24      A.  Not quite yet.

Page 276

1      Q.  Did you say something?
2      A.  Not quite yet.
3      MR. CLUFF:  My colleague,
4  Will Powers, here who is next to
5  me at the depo, looked in the
6  Relativity database and this
7  document, the attachment is
8  designated as confidential.  So we
9  can all agree on that.
10      THE WITNESS:  Okay.
11  BY MR. CLUFF:
12      Q.  Let's start with your e-mail
13  to Colleen McGinn on March 15th.  It's at
14  the bottom of the second page, or middle
15  of the second page.
16      It looks like you asked
17  Colleen to take a look at this
18  PowerPoint, and you describe it as a
19  PowerPoint that Bob came up with.
20      Would that have been Bob
21  Williamson?
22      A.  Yes.
23      Q.  And it says, in the next
24  sentence, When we met the other day -- is

Page 277

1  that you and Colleen would have met?
2      A.  Where do you see that
3  e-mail?
4      Q.  The same e-mail.  The next
5  sentence says, When we met the other day,
6  you wanted to have a couple slides from
7  Bob that had information regarding fines,
8  et cetera.
9      I was curious if the "we"
10  referred to you and Colleen?
11      MR. MAHADY:  The second
12  page.
13      MR. CLUFF:  Thanks, Joe.
14      THE WITNESS:  I think what I
15  was referring to is -- it was
16  possibly Bob, but I'm not sure.
17  BY MR. CLUFF:
18      Q.  In either event, you said,
19  Those slides are now in the presentation,
20  Slides 10, 11 and 12.
21      So those would have been
22  slides that Colleen asked you to include?
23      A.  Yes.
24      Q.  So moving to the very bottom

Page 278

1 of the first page, the e-mail from
2 Colleen to you, it continues on to the
3 second page.
4　　　Would you agree with me it
5 looks like she has some comments about
6 the slides?  Does that seem accurate?
7　　A.　Yes.
8　　Q.　At the end of that e-mail,
9 it says, You may want to add something in
10 here about evaluating chargeback data in
11 the future.
12　　　Correct?
13　　A.　Yes.
14　　Q.　And then let's skip up two
15 e-mails, and you essentially told her,
16 you know, Slide 23 has the facets and
17 Slide 37 mentioned the bullet points
18 about chargeback data.
19　　　And she says she wants you
20 to put in some more information about
21 chargeback data, right?
22　　A.　Yes.
23　　Q.　So that would be Slide 28,
24 according to your first e-mail?

Page 279

1　　A.　Correct.
2　　Q.　All right.  When you were
3 reviewing the document that I handed you
4 as Exhibit-5, did you flip through the
5 PowerPoint?
6　　A.　I didn't flip through it
7 yet.
8　　Q.　Does it look familiar to
9 you?
10　　A.　Vaguely.
11　　Q.　And it appeared, based on
12 your first e-mail, this was something
13 that Bob may have drafted initially but
14 then you had some interaction with
15 working on it, correct?
16　　A.　Correct.
17　　Q.　Okay.  Can you turn to Slide
18 8?  It will have an 8 in the bottom
19 right-hand corner.
20　　　MR. CLUFF:  So the lawyers
21　　on the phone are aware, when I
22　　created this exhibit from the
23　　production, as I said, this
24　　attachment was produced in its

Page 280

1 native format.  So we printed it
2 as a PDF so that the slide appears
3 in the top half of the page and
4 any speakers notes would have
5 appeared on the bottom half of the
6 page.
7　　　And we also formatted the
8 footer so that it would reflect
9 the Bates number and a page
10 number, just so that it's -- for
11 ease of reference for the witness
12 to look through.  We didn't make
13 any other -- we didn't make any
14 changes to the substance of the
15 document.
16 BY MR. CLUFF:
17　　Q.　Did you look at Page 8?
18　　A.　I did, yes.
19　　Q.　Do you see there, DEA
20 statement is the heading?
21　　A.　Yes.
22　　Q.　So there it says, DEA has
23 and will continue to pursue criminal,
24 administrative and civil actions against

Page 281

1 registrants who fail to comply with all
2 aspects of the CSA and its implementing
3 requirements -- or regulations as
4 required.  More recent actions include,
5 but are not limited to, actions against
6 wholesale distributors, such as Harvard
7 Drugs, KeySource, CVS, Cardinal,
8 McKesson, Southwood and Sunrise.
9　　　Are you aware of any
10 enforcement actions against any of those
11 distributors?
12　　A.　Nothing in particular.
13　　Q.　We previously talked about
14 the red flags that Buzzeo provided to
15 Teva.  And I believe one of them said
16 something about the major distributors
17 like Cardinal, McKesson and Amerisource
18 not being a risk.
19　　　Would you agree that, based
20 on this DEA statement regarding the
21 enforcement actions against Cardinal and
22 McKesson, that they were maybe a higher
23 risk than some other distributors?
24　　　MR. KELLY:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

Page 282

```
 1   form.
 2         MR. MAIER:  Object to form
 3   and foundation.
 4         MR. NICHOLAS:  Join.
 5         THE WITNESS:  No, I can't
 6   agree.
 7   BY MR. CLUFF:
 8     Q.   Why would you disagree with
 9   that statement?
10     A.   Why?  Because I don't know
11   who input this document and where it came
12   from and what other discussions were
13   discussed on this PowerPoint and if any
14   changes were made.
15     Q.   As a general matter, having
16   worked in suspicious order monitoring and
17   diversion control since 2009, do you have
18   an opinion about whether a company who
19   had their -- or who was subject to a DEA
20   enforcement action would be high risk
21   versus low risk?
22         MR. NICHOLAS:  Object to the
23   form.  Lack of foundation.
24         THE WITNESS:  No.
```

Page 283

```
 1         MR. MAIER:  Same objection.
 2         THE WITNESS:  No, I don't
 3   have an opinion.
 4   BY MR. CLUFF:
 5     Q.   Looking at that first line
 6   of the DEA statement slide, it says, DEA
 7   has and will --
 8         MR. CLUFF:  Can you
 9   underline this, Zach, so he can
10   see where I'm pointing to?
11   BY MR. CLUFF:
12     Q.   DEA has and will continue to
13   pursue criminal, administrative and civil
14   actions against registrants.
15         Are you aware of what --
16   that a violation of a CSA can result in
17   criminal action against a registrant?
18         MR. MAIER:  Objection to
19   foundation.
20         MR. NICHOLAS:  Same
21   objection.  Form and foundation.
22         THE WITNESS:  I'm only aware
23   of what's highlighted in front of
24   me.
```

Page 284

```
 1   BY MR. CLUFF:
 2     Q.   Based on what's in front of
 3   you, would you agree that violation of
 4   the CSA could subject the registrant to
 5   criminal action?
 6         MR. NICHOLAS:  Object to the
 7   form.  And foundation.
 8         MR. MAIER:  Same objection.
 9         THE WITNESS:  It depends on
10   the circumstances.
11   BY MR. CLUFF:
12     Q.   But it's definitely a
13   possibility, right?
14         MR. NICHOLAS:  Object to the
15   form.
16         MR. MAIER:  Same objection.
17         THE WITNESS:  I wouldn't say
18   it's definitely a possibility, but
19   it's a possibility.
20   BY MR. CLUFF:
21     Q.   Looking back at the second
22   page of this document, which is your
23   e-mail to Colleen, you informed her that
24   you added Slides 10, 11 and 12, right?
```

Page 285

```
 1         Do you see that there in the
 2   first paragraph of your e-mail at the
 3   bottom?
 4         The next page.
 5     A.   Yes.
 6     Q.   In the PowerPoint, let's go
 7   to those slides, 10, 11 and 12.
 8         I want to focus on Number
 9   11, if you're there.  Go ahead and read
10   that for me.
11     A.   Okay.
12     Q.   So a little sidebar, your
13   lawyers and I had -- we noted that
14   Colleen appears to have deleted and maybe
15   changed some slides.  So the original 10,
16   11 and 12 might not be the same 10, 11
17   and 12 that you're looking at here.
18         So I'll ask you, looking at
19   Number 11, is this a slide that you
20   recall having drafted?
21     A.   I don't recall this slide.
22     Q.   Looking at the top, it says,
23   Distributor and manufacturer initiative
24   program.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1  Do you see that?
2  A.  Yes.
3  Q.  Are you familiar with the
4  concept of a distributor initiative or a
5  manufacturer initiative program?
6  A.  I am not.
7  Q.  Looking at the first point
8  it says, Established in 2005 to remind
9  DEA registrants of regulatory obligation
10 to maintain effective controls against
11 diversion.
12  Do you see that?
13  A.  Yes.
14  Q.  Earlier we talked about
15 whether you might have received training
16 at AmerisourceBergen, as a diversion
17 control specialist, about effective
18 controls against diversion.
19  Having read this paragraph
20 here, do you have any recollection about
21 receiving training on effective controls
22 against diversion?
23  A.  At Teva?
24  Q.  AmerisourceBergen.

Page 287

1  A.  At AmerisourceBergen.
2  I don't recall the specific
3  training that I received, but I did
4  receive training.
5  Q.  Looking down at the next
6  bold bullet point, it states that, The
7  stated goal of the program is to cut off
8  the source of supply to these (rogue pain
9  clinics, physicians and pharmacies)
10 through effective due diligence and
11 suspicious order recording.
12  Do you have any
13 understanding of that being the goal of
14 the distributor and manufacturer
15 initiatives?
16  A.  I did not.
17  Q.  Did you understand, as a
18 diversion control specialist at
19 AmerisourceBergen, that part of your
20 responsibility was to maintain effective
21 controls against diversion?
22  MR. NICHOLAS:  Object to the
23  form.
24  THE WITNESS:  No, I am not.

Page 288

1 BY MR. CLUFF:
2  Q.  Did you have an
3 understanding, as a diversion control
4 specialist at AmerisourceBergen, that
5 part of the way to maintain effective
6 controls against diversion was through
7 effective due diligence?
8  A.  I'm aware of effective due
9 diligence, yes.
10  Q.  Was it a part of -- strike
11 that.
12  How about suspicious order
13 reporting, was that a part of
14 AmerisourceBergen's efforts to maintain
15 effective controls against diversion?
16  MR. NICHOLAS:  Object to the
17  form.
18  Go ahead.
19  THE WITNESS:  Can you ask
20  that question -- rephrase that
21  question?
22 BY MR. CLUFF:
23  Q.  Was suspicious order
24 reporting a part of AmerisourceBergen's

Page 289

1 efforts to maintain effective controls
2 against diversion?
3  MR. NICHOLAS:  Objection.
4  Because I think you just reread
5  it.  You didn't rephrase it.
6  MR. CLUFF:  I took a few
7  words out.
8 BY MR. CLUFF:
9  Q.  Did my question make sense
10 to you?
11  A.  Not really.
12  Q.  As a diversion control
13 specialist, did you understand that
14 AmerisourceBergen had a duty to identify
15 and report suspicious orders?
16  A.  I do understand that.
17  Q.  Did you understand that that
18 duty arose from the regulatory obligation
19 to maintain effective controls against
20 diversion?
21  MR. NICHOLAS:  Object to the
22  form.
23  Go ahead.
24  THE WITNESS:  According to

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1    the CFR.
2  BY MR. CLUFF:
3      Q.   Can you move forward to
4  Slide Number 15, please?  I have some
5  just general questions before we get into
6  the slide.
7          Before you became the
8  diversion control specialist at
9  AmerisourceBergen -- well, in your work
10  as a diversion control specialist at
11  AmerisourceBergen, did you become
12  familiar with AmerisourceBergen's
13  suspicious order monitoring and reporting
14  policy before 2009?
15      A.   Before I was hired in the
16  department?
17      Q.   Yes.  Did you have an
18  understanding of what it was before you
19  were hired?
20      A.   No, I did not.
21      Q.   Do you know if
22  AmerisourceBergen has always reported
23  suspicious orders to the DEA?
24      A.   As far as I know, we have.

Page 291

1      Q.   Are you aware that prior to
2  2007 -- or aware if, prior to 2007,
3  AmerisourceBergen reported excessive
4  purchases after it identified them as
5  such?
6      A.   I'm not aware of that.
7      Q.   I want to point your
8  attention to the very last bullet point
9  there.
10          It says, Registrants who
11  routinely report suspicious orders yet
12  fill those orders are failing to maintain
13  effective controls against diversion.
14          Do you see that?
15      A.   I do.
16      Q.   Do you have any
17  understanding of what that means?
18      A.   No.  Because I feel like
19  that's a vague statement.
20      Q.   Do you know if, at this
21  time, Teva was shipping orders that it
22  reported as suspicious?
23          MR. MAIER:  Objection.  Form
24  and foundation.

Page 292

1          THE WITNESS:  No, I do not.
2  BY MR. CLUFF:
3      Q.   Do you have any
4  understanding about whether
5  AmerisourceBergen shipped orders that it
6  deemed were suspicious prior to 2015?
7      A.   Could you ask that again,
8  please?
9      Q.   Sure.  So I think -- I used
10  2015, because we talked about there was a
11  change from thresholds to parameters in
12  2015.
13      A.   Correct.
14      Q.   In your work as a diversion
15  control specialist prior to 2015, are you
16  aware of AmerisourceBergen shipping
17  orders that were deemed suspicious?
18      A.   No, I am not.
19      Q.   If that happened, would you
20  agree that it was a failure to maintain
21  effective controls against diversion?
22          MR. NICHOLAS:  Object to the
23  form.
24          THE WITNESS:  No, I do not

Page 293

1  agree.
2  BY MR. CLUFF:
3      Q.   So your opinion is, based on
4  your work as a diversion control
5  specialist, that if AmerisourceBergen
6  shipped an order that it deemed was
7  suspicious, that would not be a failure
8  to maintain effective controls against
9  diversion?
10          MR. NICHOLAS:  Object to the
11  form.
12          THE WITNESS:  We would not
13  ship a suspicious order.  We would
14  reject it and report it.
15  BY MR. CLUFF:
16      Q.   What happens if it's shipped
17  after it's identified as suspicious?
18          MR. NICHOLAS:  Object to the
19  form.
20          THE WITNESS:  I don't think
21  we can ship a suspicious order.
22  Our system won't allow it.
23  BY MR. CLUFF:
24      Q.   Take a look with me at Slide

Highly Confidential - Subject to Further Confidentiality Review

Page 294

20. You can go ahead and read that if
you'd like to.

A.   Okay.

Q.   So you see there it says,
System challenges and responses?

A.   Yes.

Q.   And the major heading at the
top is, Common SOM pitfalls?

A.   Yes.

Q.   Do you see there in bold
where it says, quote, Threshold, quote,
based systems are not sufficient?

A.   Yes.

Q.   This document, based on its
attachment to this e-mail, was drafted in
2013, correct?

A.   It was included in the
document, yes.  It came from 2007, it
appears.

Q.   The PowerPoint comes from
2007?

A.   The slide.  Well, the DEA
memorandum.

Q.   Right, yeah.  Okay.  Thank

Page 295

you.  I was going to get to that.

You see at the bottom there,
where it says this comment about a
threshold sytem not being sufficient
comes from a December 27, 2007 DEA
memorandum?

A.   Yes.



BY MR. CLUFF:

Q.   So you disagree with the
DEA's memorandum?

Page 296

MR. NICHOLAS:  Objection.
Objection to the form.

THE WITNESS:  I agree with
the system we currently had in
place at the time.

BY MR. CLUFF:

Q.   So you would agree with the
system you had in place at the time
instead of the December 2007 DEA
memorandum?

MR. NICHOLAS:  Object to the
form.  You're asking him about a
document that he doesn't remember
that is quoting something that he
hasn't said he's even seen.

I'll object to the form.

THE WITNESS:  I don't -- as
Bob stated, I don't remember this
document and this slide.

MR. CLUFF:  Hold on.

THE WITNESS:  Sorry.

MR. CLUFF:  Bob, that's a
clear example of you coaching this
witness and influencing his

Page 297

testimony.  I'm not going to make
a big deal about it, because we've
had a pretty collegial deposition
today.

But I'd like to request that
that not happen again, please.

MR. NICHOLAS:  Well, now --

MR. CLUFF:  I'm going to let
you finish.  But all I want to say
is, we've had this out before,
there's no reason for any of us to
get upset about it.  But
objection, form; objection,
foundation.  You know the proper
basis for an objection.  You
influenced his testimony, and he
just used your objection to answer
my question.  And that's not
proper.

MR. NICHOLAS:  Well, all
I'll say in response is that I
disagree with your
characterization of my objection
and his response.

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1    If I think your
2  questions are unfair, I'm going to
3  say I think it's unfair.
4    Now you can proceed.
5  BY MR. CLUFF:
6    Q.   Mr. Kreutzer, your attorney
7  is entitled to object.  But I'm also
8  entitled to an answer to my question.
9  His objection is not a proper basis for
10  you to give me an answer based on his
11  objection.
12    So let's look at this
13  document again.  Quote, Threshold, closed
14  quote, based systems are not sufficient.
15    Is that right?
16    A.   That's what it states.
17    Q.   Looking down at the bottom
18  section of this document, you identified
19  that this comes from a December 2007 DEA
20  memorandum, correct?
21    MR. NICHOLAS:  Object to the
22  form.
23    THE WITNESS:  Yes.
24    MR. NICHOLAS:  And

Page 299

1  foundation.
2  BY MR. CLUFF:
3    Q.   Now, do you see the bullet
4  point that immediately precedes that,
5  that says, Do not meet the regulations?
6    A.   That's what it states right
7  there.

15    Q.   I just have one more slide
16  here to talk to you about.  Let me find
17  it.
18    I previously asked you if
19  Teva reported suspicious orders to the
20  DEA.
21    Do you remember that?
22    A.   Yes.
23    Q.   Look at Slide 38 for me.
24    And I just would point out

Page 300

1  to you, the top portion of the slide
2  says, Improving our processes and target
3  dates; is that right?
4    A.   Yes.
5    Q.   Based on looking at this
6  document, do you believe that this would
7  have been Teva identifying processes that
8  needed to be improved?
9    A.   It appears to be.
10    Q.   Looking at the first bullet
11  point on that list of things that Teva
12  identified needed to be improved, would
13  you agree with me that it says, Began
14  reporting suspicious orders to the DEA?
15    A.   Yes.
16    Q.   So prior to February 2013,
17  Teva did not report suspicious orders to
18  the DEA?
19    A.   That, I don't know.
20    MR. MAIER:  Objection.
21  Form.
22  BY MR. CLUFF:
23    Q.   Do you have any reason to
24  disagree with this slide?

Page 301

1    A.   I can only -- I can only
2  read what's in front of me.  I don't know
3  if any orders were reported prior to --
4  from February 2013.
5    Q.   Based on the time when you
6  worked at Teva, which I believe you said
7  was January to April 1st, 2013, were you
8  aware that Teva reported suspicious
9  orders prior to February 2013?
10    A.   I am not.
11    MR. MAIER:  Object to form
12  and foundation.
13  BY MR. CLUFF:
14    Q.   Midway down the list there,
15  there's another bullet point that says,
16  Developing SOPs (targeted 03/13).
17    Was it your understanding,
18  based on your work at Teva, that Teva did
19  not have in operation standard operating
20  procedures prior to March of 2013?
21    MR. MAIER:  Objection.
22  Form.
23    THE WITNESS:  No, I believe
24  they did have some standard

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1 operating procedures. But I don't
2 remember which ones they were.
3 BY MR. CLUFF:
4 Q. Okay. Do you have any
5 understanding of why they would have been
6 developing SOPs, then, in 2013?
7 MR. MAIER: Objection.
8 Foundation.
9 THE WITNESS: It may have
10 been further enhancing those SOPs,
11 but I'm not sure.
12 BY MR. CLUFF:
13 Q. Okay. All right. That's
14 all I have for this document.
15 In your work at
16 AmerisourceBergen, I think you testified
17 that you worked with spreadsheets a lot;
18 is that right?
19 MR. NICHOLAS: Object to the
20 form.
21 THE WITNESS: We do work
22 with spreadsheets, yes.
23 BY MR. CLUFF:
24 Q. And that your work with

Page 303

1 spreadsheets was partly to review
2 customer orders when they came up from
3 the distribution centers, correct?
4 A. Which time frame are we
5 referring to?
6 Q. Between 2009 and 2015.
7 A. Yes.
8 Q. Did you ever have occasion
9 to review spreadsheets that reflected
10 orders that were reported to the DEA?
11 A. I don't recall that.
12 Q. Did you have occasion to
13 review spreadsheets that reflected CSRA
14 comments for shipments between 2007 and
15 2012?
16 A. I don't recall that.
17 Q. Did you have occasion to
18 review a history report of all shipments,
19 a spreadsheet that catalogued that
20 information?
21 A. I don't recall.
22 Q. Do you think if I showed you
23 a copy of some of those spreadsheets they
24 would refresh your recollection?

Page 304

1 A. Perhaps.
2 Q. Give me one second, and I'll
3 grab these from my little box back here.
4 The first one I want to hand
5 to you is a document produced by
6 AmerisourceBergen, Bates stamped
7 ABDC_MDL_0045077.
8 I will apologize in advance
9 that these spreadsheets are very hard to
10 get onto one page. I've tried my best to
11 do that for you.
12 - - -
13 (Whereupon,
14 AmerisourceBergen-Kreutzer
15 Exhibit-6, ABDC_MDL_0045077, was
16 marked for identification.)
17 - - -
18 MR. CLUFF: We should
19 probably all use the blow-up on
20 the screen to the best of our
21 ability.
22 MR. MAHADY: Sterling, these
23 spreadsheets, can we agree to
24 treat them confidential?

Page 305

1 MR. CLUFF: Yes, all three.
2 So I'm going to be using 45077,
3 45075 and 45076, and all three
4 will be treated as confidential.
5 BY MR. CLUFF:
6 Q. These are excerpts of
7 voluminous records. They have been
8 selected to identify a single pharmacy,
9 which is Acme Pharmacy Number 30, which
10 is located in Stow, which is within --
11 off the top of my head, I can't remember
12 if it's Cuyahoga or Summit County, but
13 it's definitely a CT 1 jurisdiction.
14 Looking up on the top left
15 corner --
16 MR. CLUFF: Can you blow
17 this up, Zach, top left corner?
18 BY MR. CLUFF:
19 Q. -- it says, Reported to DEA,
20 report for all Ohio customers from
21 1/1/2007 to 12/31/2012.
22 Is that a spreadsheet that
23 you would have any familiarity with?
24 A. I don't remember this

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1 spreadsheet.
2    Q.   Set that aside for just a
3 second, then.  That's okay.
4        I'd like to also hand you
5 another document.  It's a native file we
6 converted to PDF.  It is Bates marked
7 ABDC_MDL_0045075.  I ask that this also
8 be treated as confidential.
9            - - -
10       (Whereupon,
11       AmerisourceBergen-Kreutzer
12       Exhibit-7, ABCD_MDL_0045075, was
13       marked for identification.)
14           - - -
15       MR. CLUFF:  Zach, please
16       blow up the top left corner there
17       so we can all read the heading.
18 BY MR. CLUFF:
19    Q.   You can see, Mr. Kreutzer,
20 that this document is -- at least the
21 heading there at the top left is, CSRA
22 comments report for all Ohio customers
23 from 1/1/2007 to 12/31/2012.
24       Do you see that?

Page 307

1    A.   Yes.
2    Q.   Is this a report that you
3 have any familiarity with?
4    A.   I do not.
5    Q.   But you worked in the CSRA
6 department, correct?
7    A.   I did.
8    Q.   Okay.  And so you would have
9 reviewed orders, as part of your work in
10 the CSRA department, to determine if they
11 could be approved or had to be cancelled,
12 correct?
13    A.   Correct.
14       MR. CLUFF:  Zach, can you
15       remove that blow-up, please?  And
16       then over to the right, there is a
17       column that says, User ID.  And
18       next to it there's another column
19       that says, Action taken.
20       Can you blow those up,
21       please?
22 BY MR. CLUFF:
23    Q.   Looking on the screen in
24 front of you, Mr. Kreutzer, do you see

Page 308

1 where it says, User ID, in the top left
2 corner?
3    A.   Yes.
4    Q.   And underneath that is your
5 first initial and last name, K. Kreutzer?
6    A.   Yes.
7    Q.   So based on your work as a
8 diversion control specialist in the CSRA
9 department, and looking at this document,
10 does it reflect decisions that would have
11 been made by employees of
12 AmerisourceBergen, including yourself,
13 regarding customer orders?
14       MR. NICHOLAS:  Objection.
15       Form and foundation.
16       THE WITNESS:  Can you ask
17       that question again?
18 BY MR. CLUFF:
19    Q.   Sure.
20       I'm trying to understand
21 what this document is.  And I see that
22 it's got your first initial and your last
23 name on it.  And that it has a column
24 entitled, Action taken.

Page 309

1       And I'm trying to
2 understand, you know, based on the
3 heading, CSRA comments report, and some
4 of the information that's contained in
5 the document, what's reflected in here.
6       And the question is, does
7 this contain a record of customer orders
8 that would have been reviewed by
9 AmerisourceBergen employees, specifically
10 in the CSRA department, to determine
11 whether or not they could be, you know,
12 released or cancelled?
13    A.   I believe so, yes.
14    Q.   Have you ever seen a report
15 like this before?
16    A.   I don't recall this
17 document.



Page 310

Page 312

1 here on the screen, which you can
2 also see in front of you, because
3 I forgot to bring my magnifying
4 glass for you today.
5 BY MR. CLUFF:

Page 311

2    Q.   Earlier you testified that
3 if an order was reported to the DEA as
4 suspicious, it was not shipped, correct?
5    A.   Yes.
6    Q.   So looking back at, I
7 believe it's Number 6, which is 45077.
8       MR. CLUFF:  And then blow up
9 that top left corner, again, Zach.
10       MR. NICHOLAS:  Can you just
11 hold up while we catch up to you
12 here?
13       MR. CLUFF:  Sure.  I'm
14 sorry.
15       MR. NICHOLAS:  Which
16 document are we in?
17       MR. CLUFF:  It's Exhibit
18 Number 6.  It's one of the big
19 spreadsheets.  And down in the
20 bottom left corner -- bottom right
21 corner, it should have an Exhibit
22 6 tab on it.
23       And then I asked Zach to
24 blow up and highlight the heading

Page 313

Highly Confidential - Subject to Further Confidentiality Review



**Page 314**

4   Q.   All right.  Let's -- I want
5  to hand you one more.
6         MR. CLUFF:  Zach, this will
7    be Number 43.
8         It's another Excel native
9    spreadsheet that was produced by
10   AmerisourceBergen that we'll treat
11   as confidential.  It is
12   ABDC_MDL_00045076, and we'll mark
13   it as Exhibit-8.
14            - - -
15         (Whereupon,
16   AmerisourceBergen-Kreutzer
17   Exhibit-8, ABDC_MDL_00045076, was
18   marked for identification.)
19            - - -
20         MR. CLUFF:  Zach, can you
21   blow up the top left corner of
22   that document?
23  BY MR. CLUFF:
24   Q.   It says, History report

**Page 315**

1  requested for all Ohio customers from
2  1/1/2007 to 12/31/2012.
3         Do you see that, Mr.
4  Kreutzer?
5   A.   Yes, I do.
6   Q.   Do you have any
7  understanding about whether this document
8  would reflect all shipments by
9  AmerisourceBergen to customers in Ohio
10  between 2007 and 2012?
11        MR. NICHOLAS:  Object to the
12    form.  And lack of foundation.
13        THE WITNESS:  I don't know.
14  BY MR. CLUFF:
15   Q.   You were responsible for
16  reviewing customer orders while you were
17  a diversion control specialist, correct?
18   A.   Correct.
19   Q.   Just looking at this
20  document, we'll start on the left, it
21  says, Division, DEA, at the top heading.
22        Would that be
23  AmerisourceBergen's DEA number?  Or do
24  you know whose that would be?

**Page 316**

1   A.   I believe that is
2  AmerisourceBergen's Columbus distribution
3  center's DEA, but I'm not 100 percent
4  certain.

16   Q.   Then the next column over is
17  a shipping address, Line 1, that appears
18  to be just a street address for the
19  pharmacy, right?
20   A.   Yes.
21   Q.   Next column is -- I was
22  reading it without abbreviating it.
23        Do you want me to read the
24  abbreviation so it's clear?  Or if I --

**Page 317**

1   A.   No.
2         MR. NICHOLAS:  In this case,
3    it's okay.
4  BY MR. CLUFF:
5   Q.   So the next column over,
6  based on what I'm reading, looks like
7  shipping address, city name?
8   A.   Yes.
9   Q.   Which would be the city this
10  pharmacy is located in.
11        And then the next column is
12  ship address, state code.
13        Here it looks like it's
14  Ohio, correct?
15   A.   Right.
16   Q.   Next column over is shipping
17  address, zip 5, probably code again.
18        The zip code the pharmacy is
19  listed in?
20   A.   Yes.
21   Q.   Customer PO number.
22        Would that stand for
23  purchase order number?
24   A.   Yes.



| Page 318 | Page 320 |
|---|---|

**Page 318**

1     Q.   We looked at the DEA -- the
2 reported to DEA spreadsheet, which is
3 Exhibit-6, and we talked about that
4 column -- that spreadsheet had a column
5 called purchase order number as well,
6 correct?
7     A.   Yes.
8     Q.   Moving to the right, again,
9 we see customer DEA is the next column,
10 and that would be this pharmacy
11 customer's DEA number, right?
12     A.   Correct.
13     Q.   The next column over is,
14 Customer chain ID.
15     Do you have any idea about
16 what a customer chain ID number is?
17     A.   Since that is a -- appears
18 to be a retail pharmacy chain, Acme, I
19 believe that's the chain ID number
20 associated with this particular customer.
21     Q.   Okay. So chain pharmacies
22 had an additional ID aside from their
23 AmerisourceBergen customer ID?
24     A.   I don't recall.

**Page 320**

20     Q.   Moving to the right one
21 more, it says, Order date.
22     That would have been just
23 the order -- or the date for this order
24 that we're looking at, right?

**Page 319**

1     Q.   Understood.
2     The next column over, it's
3 kind of wrapped over, but it says,
4 Customer DEA TY.
5     Do you know what that stands
6 for? Could it refer to type?
7     A.   I believe so, yes.
8     Q.   So what would the R1
9 designation refer to?
10     A.   I'm not sure. I don't
11 recall.
12     Q.   Does it have any relation to
13 retail chains?
14     A.   I am not sure.
15     Q.   The next column over is,
16 Customer size. And on the first four
17 lines, there is an M and after that, the
18 designation changes to L.
19     Do you know what is
20 identified in that column?
21     A.   What the letters stand for?
22     Q.   Yes.
23     A.   That would be medium and
24 large.

**Page 321**

1     A.   Yes.
2     Q.   And the quantity ordered,
3 how does AmerisourceBergen measure
4 quantities? So I see there at the top it
5 says 49 is the quantity ordered.
6     Does that mean 49 pills were
7 ordered?
8     A.   That just seems like an odd
9 number to -- for an order quantity.
10 Usually, they would be in even numbers.
11     Q.   But what I'm trying to
12 figure out is, were they ordering 49
13 batches of 100 pills?
14     A.   It could be 49 bottles of
15 whatever they're ordering.
16     Q.   How many bottles -- how many
17 pills would be in a bottle?
18     A.   It varies. It could be 100
19 dosage units. It could be 500. It could
20 be 1,000.
21     Q.   I want to go over two -- two
22 columns that say item family and item
23 description.
24     Would these columns tell us

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1 what family of drug and the description
2 of what was being ordered?
3     A.   Yes.
4     Q.   So morphine solid would be a
5 solid form of a morphine pill?
6     A.   Yes.
7     Q.   And then what would a
8 morphine sulfate be, or morphine SULF?
9     A.   That's just the brand name
10 or generic name.
11     Q.   Okay.  Scrolling over, there
12 is an item schedule column.
13         Under that, it says, C-II?
14     A.   Yes.
15     Q.   So is that the class of drug
16 that would have been ordered?
17     A.   Yes.
18     Q.   And the next column over is
19 DC, with a number 10 under it.
20         Can you tell me what that
21 number is?
22     A.   That's the Columbus DC
23 number.
24     Q.   Okay.  The next column over

Page 323

1 is user ID.  If you go five down, it
2 says, AREDFOX.
3         Would that be somebody
4 else's first initial and last name
5 combined, or do you know what that --
6 what those letters designated?
7     A.   I don't know what that
8 designates.  I don't know who that is.
9     Q.   If you keep moving down that
10 column, there's a field that reads,
11 DRC1213.
12         Do you know what that
13 designates?
14     A.   I do not.
15     Q.   Did AmerisourceBergen
16 employees such as yourself have IDs that
17 they sometimes used in addition to their
18 names or initials?
19     A.   We had user IDs, numbers.
20     Q.   So this DRC1213, could that
21 be somebody's user ID?
22     MR. NICHOLAS:  Object to the
23 form.
24     THE WITNESS:  I'm not sure.

Page 324

1 BY MR. CLUFF:
2     Q.   If you go to the next
3 column, it says, Release code.
4         And then midway down on the
5 screen, there is an abbreviation, IN.
6         Do you know what that stands
7 for?
8     A.   I do not.
9     Q.   Could it potentially stand
10 for investigation?
11     MR. NICHOLAS:  Object to the
12 form.
13     THE WITNESS:  It may, but
14 I'm not sure.
15 BY MR. CLUFF:
16     Q.   Scrolling down, do you see
17 that there is an abbreviation, AC?
18     A.   Yes.
19     Q.   Do you know what that stands
20 for?
21     A.   I do not.
22     Q.   Could it perhaps stand for
23 approved by a CSRA?
24     MR. NICHOLAS:  Same

Page 325

1     objection.
2     THE WITNESS:  That's what
3     the comments state.
4 BY MR. CLUFF:
5     Q.   So is it reasonable to
6 assume that means approved by CSRA?
7     MR. NICHOLAS:  Object to the
8     form.
9     THE WITNESS:  For this
10     particular item, yes.
11 BY MR. CLUFF:
12     Q.   I want you to look for me
13 again at Exhibit Number 6, which is the
14 first spreadsheet I handed you that is
15 45077.
16         Do you see that?  In the
17 middle --
18     MR. CLUFF:  Zach, could you
19     blow up the middle of the document
20     for me where we can see the
21     customer purchase order number
22     through to the item description?
23 BY MR. CLUFF:
24     Q.   Starting in the middle of

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1 that page, Mr. Kreutzer, do you see where
2 it says --
3         MR. CLUFF:  Can you pull
4     that to -- I need to see the
5     purchase order number, Zach.  It's
6     to your left.
7 BY MR. CLUFF:
8     Q.   So the purchase order number
9 says, CES112610.
10         Do you see that?
11     A.   Yes.
12     Q.   And there are four lines
13 there?
14     A.   Yes.
15     Q.   Okay.  Keep that in front of
16 you, just kind of hold it, put your
17 finger on that.  And then go back to
18 Exhibit Number 8, and go to Page 7.
19         And at the bottom third of
20 the page, you'll see midway down, in the
21 customer purchase order number column,
22 that CES112610 begins.
23         MR. CLUFF:  That's the wrong
24     one, Zach.

Page 327

1 BY MR. CLUFF:
2     Q.   Can you see on your page,
3 Mr. Kreutzer --
4     A.   I cannot.  I can't read
5 this.
6     Q.   That probably makes a lot of
7 us.
8     A.   I mean, I can read it on the
9 monitor in front of me.
10         MR. CLUFF:  Keep going down,
11     Zach.  To the very bottom of your
12     screen right now, Zach.  Right
13     there.
14         And then drag it to your
15     left, Zach.
16 BY MR. CLUFF:
17     Q.   So do you see the order
18 number there, Mr. Hazewski?
19         MR. NICHOLAS:  You mean Mr.
20     Kreutzer?
21 BY MR. CLUFF:
22     Q.   I'm sorry.  Yes.  Mr.
23 Kreutzer.
24         Is that the same number we

Page 328

1 were looking at in the DEA report,
2 CES112610?
3     A.   Yes.
4     Q.   If you scroll to the right,
5 to the column that has the release codes
6 in it, if you -- if you look down at the
7 bottom of that order, there is a code
8 that says, AC.
9         Would that mean that this
10 report -- this order was approved for
11 shipment by the CSRA?
12     A.   I don't see any information.
13         MR. NICHOLAS:  I don't see
14     it either, I'm sorry.
15         MR. CLUFF:  Do this for me,
16     Zach, do you see the first
17     CES112610?
18 BY MR. CLUFF:
19     Q.   Can you see it now on there,
20 Mr. Kreutzer?
21     A.   I'm sorry, what are we
22 looking at?
23     Q.   Can you see the highlighted
24 portion --

Page 329

1     A.   Yes, yes.
2     Q.   So if you -- all the way to
3 the left of your screen, you'll see a
4 list of order numbers.  And Zach has
5 highlighted one that says 112610 up
6 there.
7     A.   Yes.
8     Q.   There's also one that
9 precedes that, that's not highlighted
10 yet.
11         But if you travel down that
12 number, you see that the order number
13 remains the same all the way until he
14 gets to the bottom row that's
15 highlighted, correct?
16     A.   Correct.
17     Q.   And if you drag the
18 highlighted portion all the way over to
19 the end where we have those codes, you'll
20 see that they start out as IN codes and
21 then end as AC codes.
22         MR. MAHADY:  Hold on a
23     second.  I think you need to
24     take -- do you want the witness

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1    to leave so we can talk about
2    this?  I don't want to --
3         MR. CLUFF:  Step out for a
4    second, Mr. Kreutzer.  Give us --
5         MR. NICHOLAS:  Go out and
6    we'll talk about this so we don't
7    influence your testimony.
8         THE WITNESS:  You want me to
9    leave?
10        MR. CLUFF:  Just for a
11   minute.
12        VIDEO TECHNICIAN:  Off the
13   record at 3:51 p.m.
14            - - -
15        (Whereupon, a brief recess
16   was taken.)
17            - - -
18        VIDEO TECHNICIAN:  We're
19   back on the record at 4:11 p.m.
20        MR. CLUFF:  Mr. Kreutzer,
21   we're back on the record.
22        But before we start back
23   with you, your lawyers and I
24   discussed some of these

Page 331

1    spreadsheets that we were asking
2    you questions about, and we've
3    come to an understanding about
4    them.  So I'm going to do what's
5    called make a record of our
6    discussion.
7         I understand that you have
8    not been privy to any discussions
9    about these spreadsheets, so I'm
10   not going to ask you any questions
11   about discussions you had in the
12   hallway.
13        So during the break, counsel
14   for AmerisourceBergen and I met
15   and conferred about what has
16   previously been identified during
17   this deposition as Exhibits 6, 7
18   and 8.  Specifically, I was
19   informed, and this is something
20   that was disclosed during document
21   production, so it was not a
22   surprise, although it was
23   re-uncovered again today during
24   the deposition, that the document

Page 332

1    marked as Exhibit-6, which is
2    Bates number ABDC_MDL_00045077,
3    along with the documents
4    identified as Exhibits-7 and 8,
5    are not traditionally kept in this
6    format during AmerisourceBergen's
7    regular course of business.
8         And that during the creation
9    of Exhibit-6, there was, I
10   believe, what we have mutually
11   referred to as a data collection
12   error, or a data collection
13   malfunction that resulted in
14   inaccuracies in ABDC_MDL_00045077,
15   specifically that this document
16   may reflect orders being reported
17   to the DEA that were not actually
18   reported to the DEA.
19        We understand, as
20   plaintiffs, that these documents,
21   Exhibits-6, 7 and 8, were
22   reproduced after the data
23   malfunction was discovered and
24   that subsequently produced

Page 333

1    versions of these documents
2    contain more correct data.
3         So for the purposes of this
4    deposition, I will no longer be
5    relying on Exhibit-6 for further
6    questioning.  We discussed that I
7    do have some limited questions
8    regarding Exhibits-7 and 8, but
9    that the data malfunctions in
10   Exhibit-6 do not pervade
11   Exhibits-7 and 8.
12        And with that, I think I'll
13   turn it over to counsel for
14   AmerisourceBergen to correct me if
15   I'm wrong.
16        MR. MAHADY:  That is fine.
17   The only thing I'll add is that
18   the subsequently produced version
19   of Exhibit-6 was limited in scope
20   to Summit and Cuyahoga and not
21   Ohio.
22        MR. CLUFF:  Understood.
23        MR. MAHADY:  But counsel's
24   representations accurately reflect

Highly Confidential - Subject to Further Confidentiality Review

**Page 334**

1 our understanding of the issue.
2 And we'll meet and confer with
3 counsel following the deposition.
4 BY MR. CLUFF:
5 Q. So with that understanding,
6 Mr. Kreutzer, we'll pick back up with you
7 and remind you that you're under oath
8 again.
9 I'll turn back to Exhibit-7
10 which is ABDC_MDL_450705.
11 Do you have that in front of
12 you?
13 A. I do.
14 Q. I'd like you to look at this
15 document, because we previously looked at
16 the user ID column, and we noted that
17 your -- the first initial of your first
18 name and your last name are in that
19 column.
20 MR. CLUFF: I'm going to ask
21 Zach to blow up and highlight, so
22 we can all see the headings,
23 starting with customer purchase
24 order number all the way to action

**Page 335**

1 taken.
2 So we're continuing to
3 action taken. Unfortunately,
4 these spreadsheets are rather
5 unwieldy.
6 BY MR. CLUFF:
7 Q. So you can see on the very
8 left, highlighted, we've got purchase
9 order number. And then on the right,
10 we've got action taken.
11 If you see under user ID,
12 it's got your name, K. Kreutzer.
13 I guess I should ask you.
14 Does that reflect that you were the
15 person who would have been taking action
16 on these?
17 MR. NICHOLAS: Are you able
18 to blow these up any more or not?
19 MR. CLUFF: Yeah. Zach, can
20 you try and just blow up the user
21 ID and action taken column so we
22 can see it?
23 BY MR. CLUFF:
24 Q. Do you see that, Mr.

**Page 336**

1 Kreutzer?
2 A. I do, yes.
3 Q. Okay. So in your role as a
4 diversion control specialist, you would
5 have reviewed customer orders that hit
6 OMP, correct?
7 A. Correct.

**Page 337**

10 Q. Okay. And if you look at
11 the column that says, Action taken.
12 Under there, we see two -- on the screen
13 in front of you, we see two different
14 entries. One is, Approved for
15 processing.
16 What would you have been
17 referring to if you entered approved for
18 processing as the action taken on an
19 order that hit OMP for review?
20 A. I'm not exactly sure,
21 because I don't remember using -- I don't
22 know if the action taken notes is
23 automatic or we have to enter those notes
24 manually.

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1     This is going back eight
2 years. I don't know other than what
3 information is on the screen here.
4     Q.   Were you looking at the
5 heading column, action name, where it
6 says, Auto and manual/auto?
7     A.   Yes.
8     Q.   Do you have any
9 understanding of what an auto action name
10 would be?
11     A.   I do not.
12     Q.   And do you have any
13 understanding of what a manual/auto
14 action would be?
15     A.   I do not.
16     Q.   Okay. Going back to the
17 action taken column, do you see where it
18 says, Closed, notify compliant customer?
19     A.   Right.
20     Q.   When you compare that to
21 approved for processing, do you know what
22 either of those terms means, approved for
23 processing or closed, notify compliant
24 customer?

Page 339

1     A.   I do not.
2     Q.   Based on your work as a
3 diversion control specialist, could
4 either of those terms mean that this
5 order was approved for shipment?
6     MR. NICHOLAS: Object to the
7 form.
8     But go ahead.
9     THE WITNESS: I can't
10 acknowledge that.
11 BY MR. CLUFF:
12     Q.   Okay. But did you have any
13 understanding about what kind of terms
14 you used, pre-2015, to denote an order
15 that was approved for shipment?
16     A.   These notes listed here, I
17 don't remember using these notes.
18     Q.   Okay. Sure. Can you look
19 at Exhibit Number 8? That's the heavier
20 of the two spreadsheets, or the thicker
21 of the two. It's the one with 45076 at
22 the top.
23     I'm going to have them
24 highlight a portion of this for you, so

Page 340

1 you and I can talk about it.
2     The heading on this
3 spreadsheet is, History of all Ohio
4 reports.
5     And during the break, I'll
6 just make one further clarification, it
7 was represented that this document is a
8 complete list of all orders for Ohio that
9 went into OMP review. So I'll make that
10 representation to you, just to kind of
11 clear it up.
12     MR. MAHADY: We'll just add
13 that it's been filtered by
14 plaintiffs.

19     Zach, can you highlight all
20 the way over to where it has the
21 notes in the column after IN?
22 BY MR. CLUFF:
23     Q.   So, Mr. Kreutzer, I had our
24 tech here blow up a portion of this

Page 341

1 spreadsheet so we can look at it.
2     I will represent to you that
3 at the very left of your screen is the
4 customer purchase order number. You can
5 see that reflected there.
6     And then to the very far
7 right is a heading called, Column 1. And
8 immediately to the left of that, the
9 heading is, Release code.
10     I want to focus on the
11 headings with -- the two columns to the
12 very far right, the release codes and
13 then the comment.
14     So in the middle of your
15 screen on the right, there's a release
16 code that says, AC. We previously talked
17 about this one. And in the comment, it
18 says, Approved by CSRA per Ed
19 Hazewski/Kevin Kreutzer.
20     Reviewing the release code
21 with the comment together, do you have an
22 understanding of what the code AC stands
23 for?
24     A.   I do not.

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1   Q.   Looking at comment 1, it
2 says, Approved by CSRA per Ed
3 Hazewski/Kevin Kreutzer.
4         Do you know if that means
5 this order could have been released for
6 shipment?
7   A.   According to the comment
8 section, it says the order was approved.
9   Q.   Does that mean it was
10 approved for shipment to the customer?
11   A.   I assume so, yes.
12   Q.   If you come down into the
13 highlighted -- the big block highlighted
14 portion, to the very far left of your
15 screen, the purchase order number is
16 CES042110.
17         Do you see that?
18   A.   Yes.
19   Q.   And over to the far right in
20 the comments section, there is a note
21 that is repeated in pairs a number of
22 times.  And it says, Retail oxycodone,
23 63.8 percent -- I believe it's a
24 percentage -- over.

Page 343

1         The quality of the copy is a
2 little bad, I apologize.  It's clearer in
3 the printout, if you look at that.
4         Do you see where that is?
5   A.   I do.
6   Q.   Do you have any
7 understanding, reading this document,
8 what that comment signifies?
9   A.   According to the release
10 code, it says IN.  So I don't know if
11 that order was approved or rejected.
12   Q.   I'm going to get to that
13 question in a second.
14         I'm trying to understand
15 what retail oxycodone 63.89 percent over
16 means.
17   A.   It could mean -- it's a
18 retail pharmacy, oxycodone drug family,
19 and the 63.89 percent over.
20   Q.   So that would have been --
21 I'm sorry, I didn't mean to interrupt
22 you.
23   A.   I'm assuming that's -- I'm
24 not really sure what that means.  It

Page 344

1 could be over threshold, but I'm not
2 certain.
3   Q.   Okay.  Do you have anything
4 else that it would be besides over
5 threshold?
6   A.   Not that I can think of.
7   Q.   I want to scroll down to the
8 next page and stay with this order
9 number, which is CES042210.  Zach is
10 going to --
11         MR. CLUFF:  Blow it up for
12     us real big, Zach.
13 BY MR. CLUFF:
14   Q.   So do you see in the top
15 left corner there of the highlighted
16 block there is the customer order number,
17 which is CES042210?
18   A.   Yes.
19   Q.   That's the same order number
20 we were looking at the previous screen?
21   A.   Yes.
22   Q.   And if you go over to the
23 far right, there's the release code and
24 the comment 1.  The release code is for

Page 345

1 the top -- I can't count how many lines
2 that is, but the release code is AC, and
3 the comment is, Approved per Edward -- or
4 Ed Hazewski.
5         Is that --
6   A.   Yes.
7   Q.   Would that mean that this
8 order was approved for processing and
9 shipment to the customer?
10   A.   It appears so.
11   Q.   What kind of due diligence
12 or investigation would have been
13 conducted before an order like this was
14 approved by Ed Hazewski?
15   A.   I don't know.  I don't know
16 who actually approved this order.
17   Q.   Do you have any reason to
18 believe this was not approved by Ed
19 Hazewski?
20   A.   Other than the notes say
21 otherwise.
22   Q.   If you look at the order
23 date, it looks like it goes year, month
24 and day, which would be 2010/04/22.



Page 346

```
1        At that point, you had been
2  working as a diversion control specialist
3  for over a year, correct?
4        A.   I thought I came in to the
5  company in September of 2009, so
6  approximately, maybe six --
7        Q.   Six months?
8        A.   -- six months or so.
9        Q.   During the six months prior
10 to this order that we're looking at, had
11 you had experience investigating orders
12 that went into OMP for review?
13       A.   Yes.
```

Page 347

Page 348

```
9        MR. NICHOLAS:  Object to the
10 form.
11       THE WITNESS:  Yes.
12 BY MR. CLUFF:
13       Q.   Was there a policy or
14 procedure document that described to you
15 what a detailed investigation included?
16       A.   I don't recall that
17 document.
```

Page 349

Highly Confidential - Subject to Further Confidentiality Review

Page 350

2   Q.   So, then, this note in the
3 comments, Approved per Ed Hazewski, is
4 that an example of documentation of a
5 detailed investigation?
6   A.   I don't know.
7   Q.   This is one of the areas --
8 I'm sorry, I didn't mean to interrupt
9 you.
10  A.   I don't know.  There may be
11 other documentation elsewhere that I'm
12 not aware of.
13  Q.   But this is one area where
14 you said detailed documentation would
15 exist?
16  A.   It could, yes.
17  Q.   And you said also it might
18 be in Lawtrac?
19  A.   Yes.
20  Q.   So if a customer's order
21 hit -- or went into OMP for review and
22 there was a detailed investigation
23 carried out about that order, that would
24 be in Lawtrac, right?

Page 351

1   A.   It could be, yes.
2   Q.   Would there be documentation
3 associated with that review?
4   A.   Like I said, it all depends
5 on the review, yes.
6   Q.   Were there ever any e-mails
7 generated that documented the findings of
8 these detailed investigations about OMP
9 review?
10      MR. NICHOLAS:  Object to the
11  form.
12      THE WITNESS:  I don't know.
13 BY MR. CLUFF:
14  Q.   Do you recall receiving
15 e-mails from an e-mail address
16 ABC-notification@AmerisourceBergen
17 regarding orders in OMP review?
18  A.   No, I don't recall.
19  Q.   You previously testified
20 there were a couple of places where
21 documentation about investigations like
22 this could be stored.
23      But was there a standard
24 place where it would have been stored?

Page 352

1      MR. NICHOLAS:  Object to the
2  form.
3      THE WITNESS:  At that time,
4  I believe it would be either
5  Lawtrac or the system itself.
6 BY MR. CLUFF:
7   Q.   "The system itself" would
8 be?
9   A.   This system that we see in
10 front of us.
11  Q.   The system that generated
12 the spreadsheet?
13  A.   Yeah, this -- yeah, exactly.
14  Q.   And it would have been
15 recorded in this comments field?
16  A.   Yes.
17      MR. NICHOLAS:  Object to the
18  form.
19      Go ahead.
20 BY MR. CLUFF:
21  Q.   And just so I understand,
22 the system that you're referring to, you
23 didn't enter into an Excel spreadsheet
24 and manually make these notes, right?

Page 353

1   A.   Not into a spreadsheet, no.
2   Q.   You would have been working
3 with sort of a computer program that had
4 fields for you to work in?
5   A.   I'm not sure I follow you.
6   Q.   Like, when you order
7 something online, there are fields for
8 you to enter information into, like your
9 name and your address and your credit
10 card number?
11  A.   Yes.
12  Q.   So did you work with a
13 computer program that had fields similar
14 to that for you to put information into
15 when you were investigating an order?
16  A.   In that system that we used
17 in 2010, I believe there was a note
18 section where we could have put notes in.
19      MR. CLUFF:  Let's take a
20  break.  I think I have maybe one
21  more topic that I want to cover,
22  but then we'll probably wrap up.
23  I know people have flights they
24  want to catch, down at the end of

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1 the table.
2        VIDEO TECHNICIAN:  Off the
3 record at 4:31 p.m.
4           - - -
5        (Whereupon, a brief recess
6 was taken.)
7           - - -
8        VIDEO TECHNICIAN:  We are
9 back on the record at 4:41 p.m.
10 BY MR. CLUFF:
11     Q.    Mr. Kreutzer, we're back on
12 the record and you're still under oath.
13 I'll do my best to get you out of here
14 quickly, if your lawyers don't have
15 further questions on you.  So lean on
16 them, and get us all home.

Page 355

8     Q.    Was there ever a push or an
9 incentive to increase the rates at which
10 DC associates were releasing
11 low-to-medium drug families?
12     A.    We had a spreadsheet of all
13 the participation rates of all the
14 distribution centers, as far as
15 adjudicating low- and medium-risk drug
16 families.
17     Q.    Forgive my lay
18 understanding.
19        What is a participation
20 rate?
21     A.    Participation rate would be
22 the adjudication rate, let me clarify.
23     Q.    And is that adjudication
24 rate calculated by taking the total

Page 356

1 number of orders that come in for DC
2 review and comparing it to the number
3 that were escalated for CSRA interview?
4     A.    Yes, for low- and
5 medium-risk drug families.
6     Q.    Do you -- you're familiar
7 with the concept of a Schedule II drug
8 and a Schedule III drug?
9     A.    Yes.
10     Q.    Schedule I drug?
11     A.    Yes.
12     Q.    What is your understanding
13 of the different schedules?
14     A.    Schedule I has no legitimate
15 medical use; Schedule II is products that
16 are prone to high risk for diversion; and
17 Schedule III is just a lower risk of
18 those drugs that are a potential for
19 diversion.
20     Q.    Who classifies drugs as
21 Schedule I, II or III?
22     A.    The DEA.
23     Q.    AmerisourceBergen does not
24 ship Schedule I drugs, correct?

Page 357

1     A.    I don't believe so, no.
2     Q.    But AmerisourceBergen does
3 ship Schedule II and Schedule III drugs,
4 correct?
5     A.    Yes.
6     Q.    We've previously talked, and
7 you've mentioned low-, medium- and
8 high-risk drug families.
9     A.    Yes.
10     Q.    Were there ever any other
11 categories besides low, medium and high?
12     A.    I don't believe so.
13     Q.    Do you know if Schedule II
14 drugs were classified as medium risk by
15 AmerisourceBergen?
16     A.    There may have been.  But
17 over the years, we have moved drug
18 families from low to medium, medium to
19 high and high to medium.  So it's -- we
20 do an annual refresh every year.
21     Q.    Just so I understand the
22 parallels here, though, you described a
23 Schedule II drug as a high risk for
24 diversion, correct?

Highly Confidential - Subject to Further Confidentiality Review



Page 358

1    A.   Yes.
2    Q.   What was -- what was the
3 high-risk category?  How did
4 AmerisourceBergen define high risk?
5        MR. NICHOLAS:  Object to the
6    form.
7        Go ahead.
8        THE WITNESS:  I believe just
9    as the explanation that I
10    provided, drug families that are
11    prone to diversion.
12 BY MR. CLUFF:
13    Q.   And so Schedule IIs had a
14 high risk for diversion.
15        But if I understand it
16 correctly, you testified that at some
17 points in time AmerisourceBergen
18 categorized Schedule IIs as medium risk;
19 is that right?
20    A.   I don't believe that.  What
21 my explanation is, is that we've always
22 had drug families that are in a high-risk
23 category.  And we -- as well as medium
24 and low.

Page 359

1        But over time and in review
2 with management and our pharmacist on
3 staff, we determined that some risks may
4 be -- needed to be switched from medium
5 to high, for instance.
6    Q.   I understand that.  Thank
7 you.
8        So I guess my question is
9 maybe a little bit more specific.
10        If Schedule II drugs have
11 been determined by the DEA to have a high
12 risk of diversion, has AmerisourceBergen
13 always categorized Schedule II drugs as a
14 high-risk drug family, or have they ever
15 been categorized as medium risk?
16        MR. NICHOLAS:  Object to the
17    form.
18        THE WITNESS:  I don't recall
19    them ever being medium risk.
20 BY MR. CLUFF:

Page 360

24    Q.   I'll hand you another

Page 361

1 document.  We're going to mark this as
2 Exhibit 9.  This is ABDC_MDL_00047572.
3        - - -
4        (Whereupon,
5        AmerisourceBergen-Kreutzer
6        Exhibit-9, ABDC_MDL_00047572, was
7        marked for identification.)
8        - - -
9 BY MR. CLUFF:
10    Q.   There were some Excel
11 spreadsheets attached to that document.
12 I elected not to include them and save
13 the paper.  I just have a couple quick
14 questions on this, Mr. Kreutzer.
15        MR. NICHOLAS:  Just give him
16    a moment.
17 BY MR. CLUFF:
18    Q.   Sure.  I'll just let you
19 know my questions are going to be about
20 the first paragraph.  So if you want to
21 focus your analysis there, that would
22 help.
23        MR. NICHOLAS:  Read the
24    whole document anyway.

Highly Confidential - Subject to Further Confidentiality Review



Page 362

1      MR. CLUFF:  Do you want to
2  go home or not, Bob?  We'll be
3  here all night reading documents.
4      MR. NICHOLAS:  I think
5  reading seven more lines is not
6  going to make the difference
7  between going home tonight or not.
8      MR. CLUFF:  Bob, I respect
9  you, but I'll respectfully
10  disagree.
11      THE WITNESS:  Okay.
12  BY MR. CLUFF:
13      Q.    So looking at this first
14  paragraph -- well, actually, let's do
15  this.
16      So from the -- in the top of
17  the e-mail, you see there's a "from"
18  line.  It's from unknown.  Do you have
19  any idea who this kind of e-mail would
20  come from?
21      A.   I've never seen that before.
22      Q.   Well, first time for
23  everything for all of us, I guess.
24      In the "to" category, you

Page 363

1  see there are a number of individuals,
2  one of whom is yourself, right?
3      A.   Yes.
4      Q.   And then you see the subject
5  is, Discussion-report review, weekly OMP
6  field report performance.
7      A.   Yes.
8      Q.   Was your department having
9  weekly meetings regarding the OMP
10  performance of distribution centers?
11      A.   We were.
12      Q.   And were you also discussing
13  performance of, like, CSRA individuals,
14  as far as OMP review goes?
15      A.   I believe this particular
16  e-mail is pertaining to the DC
17  associates.
18      Q.   Understood.

Page 364

Page 365

Highly Confidential - Subject to Further Confidentiality Review



Page 366

Page 368

19    Q.    Let's hand you the next
20  document.  This is going to be marked as
21  Number 10.
22         - - -
23       (Whereupon,
24  AmerisourceBergen-Kreutzer

Page 367

Page 369

1    Exhibit-10, ABDC_MDL_00151471-472,
2   was marked for identification.)
3          - - -
4      MR. CLUFF:  It is
5   ABDC_MDL_00151471.  It's a
6   two-page document ending in
7   151472.
8       THE WITNESS:  Okay.
9  BY MR. CLUFF:
10     Q.    At the top, this is an
11  e-mail from Eric Cherveny to Greg
12  Hamilton, with a cc to you.
13       Do you know who Greg
14  Hamilton was?
15     A.    Greg Hamilton is the CSRA
16  distribution center manager for Columbus.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 374

Page 376

Page 375

Page 377

Highly Confidential - Subject to Further Confidentiality Review



Page 378

Page 380

Page 379

Page 381



Highly Confidential - Subject to Further Confidentiality Review



Page 386

13    Q.    What's a listed chemical?
14    A.    A listed chemical is
15 pseudoephedrine products.
16    Q.    How do you abbreviate that
17 term?
18    A.    Listed chemical?  LC.
19    Q.    Did AmerisourceBergen have
20 different policies and procedures for
21 suspicious orders for listed chemicals
22 than they did for, for example, like
23 opioids or controlled substances?
24    A.    I don't recall.

Page 387

1         MR. CLUFF:  Why don't we
2    mutually take a break.  You guys
3    can go see if you have any further
4    questions.  I'll confer with Will.
5    And we'll come back in five
6    minutes.
7         VIDEO TECHNICIAN:  Off the
8    record at 5:11 p.m.
9              -  -  -
10        (Whereupon, a brief recess
11   was taken.)
12             -  -  -
13        VIDEO TECHNICIAN:  We're
14   back on the record at 5:19 p.m.
15 BY MR. CLUFF:
16   Q.    Mr. Kreutzer, we're back on
17 the record for the last few questions
18 that I have for you, and then I'll turn
19 it over to your counsel to talk.
20        I want to hand you -- excuse
21 me.  I'm going to hand you a copy of a
22 document that was produced by
23 AmerisourceBergen.  It's
24 ABDC_MDL_00168122, which is an e-mail

Page 388

1 that contains a number of attachments.
2 I've included one attachment with the
3 document that begins at ABDC_MDL_00168127
4 and goes to 168134.  I'll hand you this
5 one.
6              -  -  -
7         (Whereupon,
8    AmerisourceBergen-Kreutzer
9    Exhibit-12, ABDC_MDL_00168122 and
10   ABDC_MDL_00168127-134, was marked
11   for identification.)
12             -  -  -
13 BY MR. CLUFF:
14   Q.    I'm not going to ask you any
15 detailed questions about this document at
16 all. I'd like you to just look at it.
17        You do not appear to have
18 received this document.  But we have
19 discussed today, at length, Lawtrac

24        Do you see that?

Page 389

1    A.    Give me a second.
2         MR. NICHOLAS:  I don't see
3    that.  Where --
4         MR. CLUFF:  The cover page,
5    the e-mail, the attachments.
6         MR. NICHOLAS:  Where it says
7    attachments, okay.  Sorry.
8         MR. CLUFF:  I misspoke.
9 BY MR. CLUFF:
10   Q.    I was just trying to
11 indicate that this e-mail contained
12 Lawtrac matter texts as attachments.
13        And then if you'll flip to
14 the next page, which has
15 ABDC_MDL_00168127, if you look at the top
16 of the page in the middle of the
17 document, there is some text that says,

Highly Confidential - Subject to Further Confidentiality Review

Page 390

1 Q. And then look down at the
2 bottom of the page, where it says, Text
3 records.
4     Do you see that?
5 A. Yes.
6 Q. We previously talked, in one
7 of these exhibits, about what you and I
8 kind of referred to as a text box, and
9 you said that might have been
10 documentation that would have been
11 included in Lawtrac.
12     Would that -- that
13 information that we talked about earlier,
14 would that have been under the text
15 records section of these Lawtrac reports?
16 A. Yes.
17 Q. So if I were looking at a
18 Lawtrac report, text records is where I
19 would find the records of investigations
20 or information about ABC's relationship
21 with a customer?
22 A. Correct.
23 Q. Okay. Can you tell me, in
24 looking at this document, where I would

Page 391

1 be able to locate or identify the
2 documents that were associated with this
3 Lawtrac file?
4     MR. NICHOLAS: Object to the
5     form.
6     THE WITNESS: It's been
7     quite a while since I used this
8     system. I believe in the
9     documents and files column on
10     168129.
11 BY MR. CLUFF:
12 Q. Let me redirect you to
13 168127.
14     In the upper right-hand
15 corner, there's an underlined piece of
16 text that says, Main matter screen. And
17 there are text boxes underneath that.
18     Do you see that?
19 A. Yes.
20 Q. And one of them says,
21 Documents and files.
22 A. Yes.
23 Q. Is that the same as the one
24 you were looking at on 129?

Page 392

1 A. Yes, that is correct.
2 Q. So those text boxes, would
3 those have been what I'll refer to as a
4 hyperlink that I could have clicked and
5 it would have taken me to other
6 information?
7     MR. MAHADY: The text box is
8     on the right side of the document?
9     MR. CLUFF: Yes.
10     THE WITNESS: I'm not sure.
11 BY MR. CLUFF:
12 Q. Okay. Did you use Lawtrac
13 matters like this in your work?
14 A. I did.
15 Q. Okay. And I'm not trying to
16 catch you in anything. I'm trying to
17 just understand how you would have used
18 this system.

Page 393

22 BY MR. CLUFF:
23 Q. That may be true. I will
24 just represent to you that this is how

Highly Confidential - Subject to Further Confidentiality Review

Page 394

1 the document was produced to me.
2         And I'm just trying to
3 figure out where you would click in this
4 document that is a reflection of a
5 computer program to get to the documents?
6     A.   There would be documents
7 posted here that you would be able to
8 click on.
9     Q.   When you're saying "here,"
10 can you tell me what page you're looking
11 at?
12     A.   I would -- I believe it
13 would be under the linked matters.
14     Q.   What page is that?
15     A.   Page 2 of 3.
16     Q.   I'm sorry?
17     A.   168128.
18     Q.   Okay.  So in the middle of
19 the page?
20     A.   It would be in,
21 approximately, that field.
22     Q.   And is there anywhere else
23 in this Lawtrac file where you would have
24 been able to access records from?

Page 395

1     A.   No.  It would likely be in
2 this file.
3     Q.   Okay.  Go to
4 ABDC_MDL_00168129.  In the middle of the
5 page, there is a date, 06/09/14.  It
6 says, Status.  Then, Update, 06/09/14,
7 source name, in-house staff, Kevin
8 Kreutzer.
9         Do you see that?
10     A.   I do.

20     Q.   Would there have been
21 documentation attached to this?
22     A.   Yes, there would be.
23     Q.   So that's the last sentence
24 of that paragraph, it says, Form 590 and

Page 396

1 photos are attached?
2     A.   Correct.
3         MR. CLUFF:  That's all I
4 have.
5         That's all I've got, just in
6 case you guys didn't hear me.
7         MR. NICHOLAS:  I have no
8 questions.
9         VIDEO TECHNICIAN:  This
10 concludes today's deposition.  The
11 time is 5:28 p.m.  We are off the
12 record.
13         - - -
14         (Whereupon, the deposition
15 concluded at 5:28 p.m.)
16         - - -
17
18
19
20
21
22
23
24

Page 397

1         CERTIFICATE
2
3
4         I HEREBY CERTIFY that the
5 witness was duly sworn by me and that the
6 deposition is a true record of the
7 testimony given by the witness.
8
9
10
        Amanda Maslynsky-Miller
11         Certified Realtime Reporter
        Dated:  November 28, 2018
12
13
14
15
16
17         (The foregoing certification
18 of this transcript does not apply to any
19 reproduction of the same by any means,
20 unless under the direct control and/or
21 supervision of the certifying reporter.)
22
23
24

Page 398

## INSTRUCTIONS TO WITNESS

1
2
3       Please read your deposition
4 over carefully and make any necessary
5 corrections.  You should state the reason
6 in the appropriate space on the errata
7 sheet for any corrections that are made.
8       After doing so, please sign
9 the errata sheet and date it.
10      You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14      It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you.  If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.
21
22
23
24

Page 400

## ACKNOWLEDGMENT OF DEPONENT

1
2       I,_____, do
3 hereby certify that I have read the
foregoing pages,  1 - 396, and that the
4 same is a correct transcription of the
answers given by me to the questions
5 therein propounded, except for the
corrections or changes in form or
6 substance, if any, noted in the attached
Errata Sheet.
7
8
_____
KEVIN KREUTZER          DATE
9
10
Subscribed and sworn
11 to before me this
_____ day of _____, 20____.
12
My commission expires:_____
13
14
_____
Notary Public
15
16
17
18
19
20
21
22
23
24

Page 399

1       - - - - - -
        E R R A T A
2       - - - - - -
3 PAGE  LINE  CHANGE/REASON
4 _____ ____ _____
5 _____ ____ _____
6 _____ ____ _____
7 _____ ____ _____
8 _____ ____ _____
9 _____ ____ _____
10 _____ ____ _____
11 _____ ____ _____
12 _____ ____ _____
13 _____ ____ _____
14 _____ ____ _____
15 _____ ____ _____
16 _____ ____ _____
17 _____ ____ _____
18 _____ ____ _____
19 _____ ____ _____
20 _____ ____ _____
21 _____ ____ _____
22 _____ ____ _____
23 _____ ____ _____
24 _____ ____ _____

Page 401

1       LAWYER'S NOTES
2 PAGE  LINE
3 _____ ____ _____
4 _____ ____ _____
5 _____ ____ _____
6 _____ ____ _____
7 _____ ____ _____
8 _____ ____ _____
9 _____ ____ _____
10 _____ ____ _____
11 _____ ____ _____
12 _____ ____ _____
13 _____ ____ _____
14 _____ ____ _____
15 _____ ____ _____
16 _____ ____ _____
17 _____ ____ _____
18 _____ ____ _____
19 _____ ____ _____
20 _____ ____ _____
21 _____ ____ _____
22 _____ ____ _____
23 _____ ____ _____
24 _____ ____ _____