Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF OHIO

 2                      EASTERN DIVISION

 3

    ------------------------   )

 4   IN RE: NATIONAL           ) MDL No. 2804

     PRESCRIPTION OPIATE       )

 5   LITIGATION                ) Case No.

    ------------------------   ) 1:17-MD-2804

 6                             )

     THIS DOCUMENT RELATES TO  ) Hon. Dan A. Polster

 7   ALL CASES                 )

    ------------------------   )

 8

 9                  HIGHLY CONFIDENTIAL

10       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

11

12              VIDEOTAPED DEPOSITION OF

13                 MARGARET KYLE, Ph.D.

14                    June 5, 2019

15

16                 Chicago, Illinois

17

18

19

20

21

22            GOLKOW LITIGATION SERVICES

        877.370.3377 ph | 917.591.5672 fax

23                 deps@golkow.com

24
```

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4    The videotaped deposition of MARGARET KYLE, Ph.D.,

5    called by the Plaintiffs for examination, taken

6    pursuant to the Federal Rules of Civil Procedure of

7    the United States District Courts pertaining to the

8    taking of depositions, taken before CORINNE T.

9    MARUT, C.S.R. No. 84-1968, Registered Professional

10   Reporter and a Certified Shorthand Reporter of the

11   State of Illinois, at the offices of Kirkland &

12   Ellis LLP, Suite 700, 300 North LaSalle Street,

13   Chicago, Illinois, on June 5, 2019, commencing at

14   9:13 a.m.

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2      ON BEHALF OF THE PLAINTIFFS:
 3         LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
           250 Hudson Street, 8th Floor
 4         New York, New York  10013-1413
           212-355-9500
 5         BY:  RACHEL GEMAN, ESQ.
                rgeman@lchb.com
 6
 7         LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
           275 Battery Street, 29th Floor
 8         San Francisco, California  94111-3339
           415-956-1000
 9         BY:  VALERIE COMENENCIA ORTIZ, ESQ.
                vcomenenciaortiz@lchb.com
10
11
12      ON BEHALF OF ALLERGAN PLC and
        ALLERGAN FINANCE, LLC:
13
           KIRKLAND & ELLIS LLP
14         300 North LaSalle Street
           Chicago, Illinois  60654
15         312-862-3429
           BY:  DONNA WELCH, ESQ.
16              dwelch@kirkland.com
                TIMOTHY W. KNAPP, ESQ.
17              timothy.knapp@kirkland.com
18
19      ON BEHALF OF PURDUE PHARMA, L.P.,
        PURDUE PHARMA, INC. and THE PURDUE FREDERICK
20      COMPANY, INC.:
21         DECHERT LLP
           35 West Wacker Drive, Suite 3400
22         Chicago, Illinois  60601
           312-646-5800
23         BY:  ALISON COONEY, ESQ.
                alison.cooney@dechert.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (Continued):
 2     ON BEHALF OF JOHNSON & JOHNSON and
       JANSSEN PHARMACEUTICALS, INC.:
 3
           O'MELVENY & MYERS LLP
 4         Two Embarcadero Center, 28th Floor
           San Francisco, California  94111
 5         415-984-8700
           BY:  DANIEL LEIGH, ESQ.
 6             dleigh@omm.com
                  (via telephone and livestream)
 7
 8
 9     ON BEHALF OF McKESSON CORPORATION:
10         COVINGTON & BURLING LLP
           The New York Times Building
11         620 Eighth Avenue
           New York, New York  10018-1405
12         212-841-1104
           BY:  FATMATA S. KABIA, ESQ.
13             fkabia@cov.com
                  (a.m. session)
14
15         COVINGTON & BURLING LLP
           3000 El Camino Real
16         5 Palo Alto Square, 10th Floor
           Palo Alto, California 94306-2112
17         650-632-4700
           BY:  MEGAN L. RODGERS, ESQ.
18             mrodgers@cov.com
                  (p.m. session - via
19                 telephonic communication)
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued):

 2      ON BEHALF OF WALMART:

 3          JONES DAY

            555 South Flower Street, 50th Floor

 4          Los Angeles, California  90071

            213-489-3939

 5          BY:  CLAIRE E. CASTLES, ESQ.

                ccastles@jonesday.com

 6

 7

 8

 9    VIDEOTAPED BY:  ANTHONY MICHELETTO

10

11    REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    I N D E X
 2   MARGARET KYLE, Ph.D.              EXAMINATION
 3       BY MS. GEMAN.................    8
 4
 5
                   E X H I B I T S
 6
     ALLERGAN-KYLE EXHIBIT              MARKED FOR ID
 7
     No. 1    Plaintiff's Notice of Oral      10
 8            Videotaped Expert Deposition
              of Margaret Kyle
 9
     No. 2    Document, "Defense Experts      34
10            Disclosed on May 10, 2019"
11   No. 3    List of Plaintiffs' experts     46
12   No. 4    Four invoices                   53
13   No. 5    Spreadsheet, "Bates White       56
              invoiced transactions for work
14            performed at the direction of
              Professor Margaret Kyle"
15
     No. 6    Expert Report of Professor      64
16            Margaret K. Kyle, May 10, 2019
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

1          THE VIDEOGRAPHER:  We are now on the record.

2   My name is Anthony Micheletto.  I'm a videographer

3   for Golkow Litigation Services.

4               Today's date is June 5, 2019.  The time

5   is 9:13 a.m., as indicated on the video screen.

6               This video deposition is being held in

7   Chicago, Illinois in the matter of In Re National

8   Prescription Opiate Litigation, in the

9   United States District Court for the Northern

10  District of Ohio, Eastern Division.

11              Our witness is Margaret Kyle.

12              Will counsel please identify yourselves

13  for the video record.

14      MS. GEMAN:  Good morning.  Rachel Geman.  I

15  represent the Plaintiffs in this action.  I'm from

16  the firm of Lieff Cabraser Heimann & Bernstein.

17      MS. COMENENCIA ORTIZ:  Good morning.  Valerie

18  Comenencia Ortiz also representing the Plaintiffs

19  with Lieff Cabraser.

20      MS. WELCH:  Donna Welch with Kirkland & Ellis

21  for Allergan and the witness.

22      MR. KNAPP:  Tim Knapp of Kirkland on behalf of

23  Allergan Plc and Allergan Finance.

24      MS. COONEY:  Alison Cooney from Dechert on

1    behalf of Purdue Pharma.

2        MS. CASTLES:  Claire Castles with Jones Day on

3    behalf of Walmart.

4        MS. KABIA:  Fatmata Kabia from Covington &

5    Burling on behalf of McKesson.

6        THE REPORTER:  Counsel on the phone.

7        MR. LEIGH:  Daniel Leigh from O'Melveny &

8    Myers on behalf of Janssen Defendants.

9                (WHEREUPON, the witness was duly

10                sworn.)

11                MARGARET KYLE, Ph.D.,

12   called as a witness herein, having been first duly

13   sworn, was examined and testified as follows:

14                EXAMINATION

15   BY MS. GEMAN:

16       Q.   Good morning.  My name is Rachel Geman.

17   We met briefly off the record.

18            Do you prefer to be addressed as

19   Dr. Kyle, Professor Kyle, something else?

20       A.   Margaret.

21       Q.   Margaret.

22       A.   That's easiest.

23       Q.   What is your address?

24       A.   My home address?

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I'd love your home and business.

2    A.    Okay.  My home address is 38 Bis, B-i-s,

3    Rue, R-u-e, Henri, H-e-n-r-i, Barbusse,

4    B-a-r-b-u-s-s-e, in Paris.

5    Q.    And is there a --

6    A.    A zip code.

7    Q.    -- a zip code or an arrondissement?

8    A.    Yes.

9    Q.    All right.

10   A.    Yes.  It's the -- 75005 is the postal

11   code.

12   Q.    Okay.  And do you have an address in the

13   U.S.?

14   A.    I am resident in France.  So, I have a

15   voter registration address in the U.S. because I

16   still am allowed to vote.

17   Q.    Understood.  And what is your business

18   address?

19   A.    It is MINES ParisTech is the

20   institution.  M-I-N-E-S.  ParisTech is

21   P-a-r-i-s-T-e-c-h.  And it is 60 Boulevard,

22   B-o-u-l-e-v-a-r-d, St. Michel, S-t, M-i-c-h-e-l.

23   And its postal code is 75006, also in Paris.

24   Q.    And I guess someone above my pay grade

Highly Confidential - Subject to Further Confidentiality Review

1   can explain why we're not in Paris right now.

2              Have you been deposed before?

3      A.    No, I have not.

4      Q.    And I'm just going to ask.  So,

5   throughout the day I'm going to be handing you some

6   documents that are marked as exhibits.  There

7   aren't that many.  And the first such exhibit that

8   I'm going to hand you is called Plaintiffs' Notice

9   of Oral Videotaped Expert Deposition of Margaret

10  Kyle.

11              (WHEREUPON, Allergan-Kyle Deposition

12               Exhibit No. 1 was marked for

13               identification:  Plaintiff's Notice

14               of Oral Videotaped Expert

15               Deposition of Margaret Kyle.)

16  BY THE WITNESS:

17      A.    Thank you.

18  BY MS. GEMAN:

19      Q.    Have you seen this document before?

20      A.    Yes, I have.

21      Q.    And you understand you're here pursuant

22  to this Notice?

23      A.    Yes, that's my understanding.

24      Q.    Have you ever been a party to a lawsuit,

Highly Confidential - Subject to Further Confidentiality Review

1    meaning the Plaintiff or the Defendant?

2         A.    No, I have not.

3         Q.    Have you ever been a party to an

4    arbitration proceeding or something that maybe

5    wasn't in a court but which somebody brought a

6    claim?

7         A.    It's been a while.  I was hit by a car

8    in 2002, and there was a settlement with the driver

9    of the car who hit me.

10        Q.    That was in the U.S.?

11        A.    That was in Pennsylvania.

12        Q.    I see.  And you were the Plaintiff?

13        A.    Yes.  I was the victim.

14        Q.    I hope you're okay now.

15              And have you ever been retained as an

16   expert in litigation?

17        A.    Prior to this case, I was retained as an

18   expert for another case.  It was more than five

19   years ago.  And ultimately that case settled before

20   I submitted an expert report.

21        Q.    So, you had been retained as a

22   testifying expert, but the settlement obviated the

23   need for you to submit your report?

24        A.    That's my understanding, yes.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    On whose behalf were you retained?

2     A.    On behalf of 3M.

3     Q.    And what was the nature of the lawsuit?

4     A.    It concerned -- I'm actually -- I'm not

5   sure that I'm allowed to speak about the details at

6   this point.

7     Q.    Well, so I'm -- just to be clear, I'm

8   not asking you about the terms of any confidential

9   settlement.  I'm just asking -- well, first of all,

10  was it a class action?

11    A.    No, it was not.

12    Q.    Was it an individual sued 3M?

13    A.    No.

14    Q.    Okay.

15    A.    It -- okay.

16    Q.    Was 3M the Plaintiff or the Defendant?

17    A.    The Defendant.

18    Q.    Okay.  And who was the Plaintiff?

19    A.    Meda Pharmaceutical, M-e-d-a.

20    Q.    And do you know where that lawsuit was

21  brought before it was ultimately settled?

22    A.    It was in the U.S., but I don't remember

23  which district.

24    Q.    It was a federal district?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I don't remember.  I believe so.  I

 2   don't remember.

 3        Q.    Which law firm retained you?

 4        A.    That I also can't remember.

 5        Q.    Was it any of the law firms in this

 6   room, if you recall?

 7        A.    It doesn't ring a bell.

 8        Q.    Okay.  And about how many years ago was

 9   that?

10        A.    Seven, eight, something like this.

11        Q.    And how did you come to be retained as

12   an expert in that case?

13        A.    I believe that my name was offered by

14   another economist to an economic consulting firm

15   that was looking for someone with expertise on

16   European markets specifically.

17        Q.    What was the name of that consulting

18   firm?

19        A.    Brattle.

20        Q.    So, it was The Brattle Group?

21        A.    That's right.

22        Q.    Do you have any affiliation with The

23   Brattle Group at this point?

24        A.    No, I did not.
```

1      Q.     Did you have any formal affiliation with

2   them at the time?

3      A.     No.

4      Q.     And have you ever been a consultant in a

5   litigation?

6      A.     No.

7      Q.     Have you ever given testimony to any

8   regulatory or governmental body in any country?

9      A.     No, I have not.

10      Q.     So, you haven't testified before

11   Congress?

12      A.     No.

13      Q.     Or before a Grand Jury?

14      A.     No.

15      Q.     Or before -- I understand the general

16   subsumes the specific.  But just you haven't

17   testified before the FDA or the CDC?

18      A.     No, I have not.

19      Q.     So, since this is your maiden voyage and

20   I am sure you are very well prepared, I just want

21   to go over some basic rules.

22             You understand that you're testifying

23   under oath?

24      A.     Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Are you taking any medications that

2  could impact your ability to testify truthfully?

3      A.    I am not.

4      Q.    And if I ask you a question that you

5  don't understand, obviously you're free to say,

6  "I don't understand that," and ask me to clarify

7  it.

8           If you answer the question, the

9  inference will be that you've understood it.  Do

10  you understand that?

11      A.    Yes, I do.

12      Q.    We'll be taking a break every hour or

13  so; but if you need a break, please just ask for

14  one.  The only thing I would ask is that if a

15  question is pending, that you answer the question

16  before taking a break.  Is that all right?

17      A.    I understand.

18      Q.    And you're doing a very good job of

19  this, but we always ask folks to verbalize,

20  articulate their answers rather than gesticulating

21  just because it creates a clearer record.

22           Is that all right?

23      A.    That's fine.  Thank you.

24      Q.    All right.  And how did you prepare for

Highly Confidential - Subject to Further Confidentiality Review

 1    this deposition?

 2         A.    I reread my own report and those of the

 3    Plaintiff economic experts.  I reviewed some other

 4    documents with my team at Bates White, and I spent

 5    the last couple of days getting advice on how to

 6    answer questions here at Kirkland.

 7         Q.    And starting with the prep sessions at

 8    Kirkland, about how many hours did you meet total

 9    with the Kirkland lawyers?

10         A.    About ten hours this week.

11         Q.    Any time before that?

12         A.    Two weeks ago.  Probably about the same.

13         Q.    With which lawyers did you meet?

14         A.    With this -- for this week I met with

15    Donna Welch, Tim Knapp.  Yesterday there was a bit

16    of participation or -- sorry -- two days ago there

17    was a bit of participation from Zach whose surname

18    I've now forgotten.  And Carl Knapp.  No, it's Tim

19    Knapp.  Carl, starts with a P maybe.  No.  I should

20    stop guessing.

21         Q.    No worries.  Okay.  Carl.

22         A.    Two weeks ago it was primarily Maria

23    Rivera.

24         Q.    And was anybody other than those

1   attorneys meeting -- were anybody other than those

2   attorneys meeting with you during those meetings at

3   Kirkland & Ellis this week and two weeks ago?

4        A.    Some members of my team from Bates White

5   were also present.

6        Q.    Which one?

7        A.    Scott Weishaar, Josh Waizer and not --

8   not this week, but in the past, Angela Pazzaglia.

9        Q.    And you had mentioned that you

10  separately met with your team at Bates White?

11       A.    That's right.

12       Q.    Was it with those same three

13  individuals?

14       A.    They were present.  There were -- there

15  were also several others, in particular the team of

16  people who had been doing a lot of the data work.

17  So, we re-reviewed all of the code and the data

18  sources together to make sure that it was clear to

19  me that my instructions had been followed.

20       Q.    Was it the first time you were seeing

21  any of that data code?

22       A.    Some of it was -- was new to me in that

23  it concerned a lot of the very early stage

24  processing, which I was not integrally involved in

Highly Confidential - Subject to Further Confidentiality Review

1    because there was no need for a lot of input from

2    me on some of those data processing decisions.  But

3    other -- other output certainly I had seen

4    throughout the last few months.

5        Q.    Did you agree with all the

6    decision-making on the early stage processing?

7        A.    Yes.  Wherever there was any -- any

8    opportunity to -- where there was any gray area I

9    should say, the team had a good protocol, so they

10   would always do it two or three ways to make sure

11   that the results were not sensitive to an

12   assumption about how to allocate zip codes to a

13   county, for example.

14       Q.    And who there made the decision about

15   which of the two or three ways or maybe four ways,

16   if there was an approach and then two or three

17   alternatives, was the one that went into the

18   processing?

19       A.    I don't know that I could name one

20   individual who was responsible.  They work together

21   in a war room.  I think there is -- it's a

22   collaborative process.  There is a lot of

23   discussion back and forth about what their

24   experience has been in the past about how best to

 1    handle these kinds of issues.

 2              In some cases also after we received the

 3    data from the Plaintiffs, we could see what

 4    decisions the Plaintiffs had made and so often we

 5    were replicating those and testing sensitivity of

 6    those assumptions.

 7       Q.    And you mentioned that you reviewed, in

 8    addition to your own report, the Plaintiffs'

 9    economic experts.  By that did you mean the same

10    ones that you mentioned in your report?

11       A.    Yes.  So, specifically the report of

12    Professor Rosenthal, the report of Professor

13    Cutler, the two reports of Professor McGuire and

14    the report of Professor Gruber.

15       Q.    Any other materials you reviewed in

16    preparation?

17       A.    Let's see.  I think I briefly skimmed

18    some of the DEA expert reports but very, very

19    rapidly, the deposition testimony of the economic

20    experts.  It's possible that I looked at other

21    documents, but I can't remember them as I sit here

22    now.

23       Q.    Sure.  And the DEA expert reports that

24    you reviewed, were those ones that you had

Highly Confidential - Subject to Further Confidentiality Review

```
 1    previously looked at?

 2         A.    Yes.  They would be in the "Materials

 3    Considered" list.

 4         Q.    Have you submitted an invoice for your

 5    work in May of this year?

 6         A.    No, I have not.

 7         Q.    Have you prepared an invoice for that

 8    work?

 9         A.    Not yet, no.

10         Q.    Can you tell me about how many hours you

11    worked in May?

12         A.    My guess would be around 80.

13         Q.    And in June?

14         A.    Around 15.

15         Q.    So -- okay.  And when were you retained

16    in this matter?

17         A.    In May 2018.

18         Q.    How did you come to be retained?

19         A.    Initially I was contacted by someone at

20    Bates White asking me if I was interested in acting

21    as an expert witness, confirming that I had no

22    potential conflicts.  Then at the time I was

23    teaching a course at Northwestern here in Chicago

24    or outside Chicago.  So, I was asked to meet with
```

1    some lawyers at Kirkland; and several weeks after

2    that, they asked if I was willing to do this.

3         Q.    Who was the individual at Bates White?

4         A.    Scott Weishaar.

5         Q.    What is his title or role at Bates

6    White?

7         A.    I believe he is a partner at Bates

8    White.

9         Q.    Did you know him previous to his

10   reaching out to you?

11        A.    We had met I believe at a life sciences

12   symposium that Bates White runs every year, and I

13   know many other economists at Bates White.

14        Q.    That was in 2017?

15        A.    When we first met?

16        Q.    Yes.

17        A.    It could have been 2016.  It could have

18   been 2017.

19        Q.    And you mentioned you know a number of

20   the economists at Bates White.  In what capacity do

21   you know them?

22        A.    In some cases they were in academia

23   before moving to Bates White.  So, academia is a

24   small world.  At least academic -- the world of

1    academic economists is fairly small.  So, I had met

2    them in their prior lives.

3              In other cases, again, even though they

4    are not academics, they often participate in a lot

5    of academic conferences.  So, for example, they

6    would organize a panel to discuss a pressing policy

7    issue, and so I had met them in these kinds of --

8    these kinds of fora.

9        Q.    It's funny that you say the world of

10   academic economists is very small.  I feel like

11   everybody majors in economics and the world of

12   academic economics is quite large.

13             Do you have sort of a subfield of

14   academic economics that you were thinking of or

15   that you consider yourself to be part of?

16       A.    Well, there is a lot of undergraduate

17   majors.  There is not that many Ph.D.s.

18             So, particularly in the world of people

19   who do work on the economics of pharmaceutical

20   markets, there are not that many of us.  I suspect

21   it was probably difficult to find enough experts

22   for this case because there are quite a few

23   Defendants.

24             More generally, I also work on

Highly Confidential - Subject to Further Confidentiality Review

1    intellectual property and innovation.  That also is

2    a relatively small community of people.  I work on

3    competition issues.  So, there are different --

4    different little worlds, some of which overlap, in

5    which I participate.

6        Q.    And would you agree that your sort of

7    essential expertise is in innovation, productivity

8    and competition?

9        MS. WELCH:  Objection to form.

10   BY THE WITNESS:

11       A.    Those are among my areas of expertise.

12   I consider myself specifically an expert on

13   pharmaceutical markets, including innovation, but

14   also behavior on the product market.

15   BY MS. GEMAN:

16       Q.    Behavior on the product market?

17       A.    Yes.  So, as opposed to the process of

18   research and development, I have also examined in a

19   number of different papers their competitive

20   behavior once a product has completed its R & D

21   development process and received regulatory

22   approval.

23       Q.    And that would be in the category of

24   competition?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Competition, yes.  Health policy,

2  regulation of pharmaceuticals.  These are all areas

3  that my research touches on.

4      Q.    Do you consider yourself an expert in

5  the regulation of pharmaceuticals?

6      A.    In certain aspects of the regulation of

7  pharmaceuticals, yes.  So, I would not describe

8  myself as an expert on the details of compliance,

9  but this is a highly regulated industry, so it's

10 impossible to be an expert in it without having a

11 pretty good understanding of the regulations that

12 the industry faces.

13     Q.    Which aspects of pharmaceutical

14 regulation do you consider yourself an expert in?

15     A.    The process of receiving regulatory

16 approval or marketing authorization.  In Europe

17 there are a lot of other sort of specific issues.

18 So, the process of negotiating price and

19 reimbursement with different governments and their

20 health technology assessments, for example, their

21 compliance with laws regarding removement of goods

22 in Europe.  That's a big issue, and it might start

23 to become one here in the U.S. as well.

24          Negotiating with payors in general.

1    It's -- that's not necessarily highly regulated,

2    but there are certainly some aspects of it that

3    it's important to pay attention to what the law is.

4        Q.    Do you consider yourself an expert in

5    the marketing and branding of pharmaceuticals in

6    the U.S.?

7        A.    I have written papers on the marketing

8    and branding of pharmaceuticals in the U.S.  So, I

9    would not be an expert in -- for example, I would

10   never advise a drug firm on how to come up with a

11   sexy product name or brand name or what kind of

12   content works best in a direct-to-consumer

13   advertisement.

14            I am not that kind of marketing expert,

15   but I have done a lot of work to understand how

16   detailing affects outcomes in the U.S. in

17   particular and other kinds of communication with --

18   with the physician and consumer community.

19       Q.    And those -- or the fruits of that

20   research are reflected in your CV, is that correct?

21       A.    Yes, it is.

22       Q.    So, we will get to that in a minute.

23            And are you presently affiliated with

24   any -- strike that.

```
 1              Are you -- do you have any formal

 2   affiliation with Bates White?

 3        A.   No, I do not.

 4        Q.   Do you receive any income from Bates

 5   White?

 6        A.   No, I do not.

 7        Q.   So, you don't have any sort of share of

 8   their billings in this matter?

 9        A.   No.

10        Q.   Do you have any formal affiliation with

11   any sort of litigation consulting group?

12        A.   No, I do not.

13        Q.   What is the Analysis Group?

14        A.   It is another economic consulting group.

15        Q.   Do you have an affiliation with that

16   group?

17        A.   I believe I'm listed as one of their

18   academic experts, but I have never received money

19   from the Analysis Group.  I have not worked on a

20   case with them or they have never supported me on a

21   case.

22        Q.   So, you understand you are listed as an

23   affiliated expert with the Analysis Group?

24        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    Okay.  How did you come to be an

2    affiliated expert with the Analysis Group?

3     A.    Again, it's a fairly small community of

4    academic economists with expertise in some areas.

5    The Analysis Group and another consulting firm

6    called Cornerstone recently opened offices in

7    Europe and were particularly keen to connect with

8    academics working in Europe.

9          So, both of them have contacted me about

10   interest in future cases.  I have not worked with

11   either one of them on any specific case.

12    Q.    And are you presently an expert in any

13   litigation other than this one for which you have,

14   to your knowledge, not yet been disclosed?

15    A.    No, I am not.

16    Q.    So, you're not working on any litigation

17   other than this one?

18    A.    That's correct.

19    Q.    Do you advertise for expert services?

20    A.    No, I do not.

21    Q.    And do you know if you've gotten any

22   sort of intakes or calls as a result of your

23   appearing on the Analysis Group's page as an

24   affiliated expert?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      I have never been contacted directly by

2   someone seeking expert services.  I've been

3   contacted by the Analysis Group and others

4   occasionally when a case comes up where they think

5   my expertise might be pertinent.

6               In the last few months, I've explained

7   that I was occupied with this case and therefore

8   was not interested in becoming an expert for

9   anything else.

10      Q.      And who retained you?

11      A.      Allergan.

12      Q.      And do all your opinions in this matter

13  relate to your work for Allergan?

14      MS. WELCH:  Objection to form.

15  BY MS. GEMAN:

16      Q.      I can reask the question.

17              Allergan was the entity that formally

18  retained you.  Do you consider yourself to be

19  working only on behalf of Allergan or Allergan plus

20  other marketers?

21      A.      I consider myself providing expertise

22  on -- for a set of assignment questions that came

23  from Allergan.

24      Q.      Do you see yourself providing expertise

Highly Confidential - Subject to Further Confidentiality Review

1    for any pharmaceutical company other than Allergan?

2         A.    In this case?

3         Q.    Yes.

4         A.    No.

5         Q.    In any other case?

6         A.    No.  I'm not retained in any other case.

7    But if you ask me have I had conversations with

8    pharmaceutical firms about, for example, dealing

9    with HTAs in Europe, then I have had informal

10   conversations about that.

11             But I am not -- I have not been retained

12   as a consultant in any formal relationship, and I'm

13   not compensated for any of those conversations.

14        Q.    With which companies have you had these

15   formal -- I'm sorry -- informal conversations?

16        A.    So, for example, Pfizer.  That's the one

17   that springs to mind.

18        Q.    And you've been given some grants from

19   Pfizer, is that correct?

20        A.    I have received some grants from Pfizer

21   in the past, yes.

22        Q.    About how much money total in grants

23   from Pfizer?

24        A.    Pfizer funded a project that I shared

Highly Confidential - Subject to Further Confidentiality Review

1    with Pierre Dubois at the University of Toulouse

2    several years ago.  I believe the money went to

3    Toulouse, and Pierre and I benefited from that

4    indirectly.

5              Pfizer is also a sponsor of a chair at

6    MINES ParisTech.  It's one of five sponsors of that

7    chair.  And so that does not fund specific papers.

8    It funds a body or generally academic work looking

9    at particularly the effect of changes in trade

10   policy and intellectual property on access to

11   drugs.  And that's about 50,000 euros per year.

12        Q.    So, is that about $62,000?

13        A.    It's a little less than that.

14        Q.    A little less than that.  Okay.  Can you

15   tell me how much that is?

16        A.    I don't remember what the exchange rate

17   is right now.

18        Q.    I think it's 1.13.  Does that sound

19   about right?

20        A.    Something like that.

21        Q.    All right.  And how many euros or

22   dollars did Pfizer give to the grant that you

23   mentioned previously?

24        A.    At Toulouse, I believe it was 50,000

1   also.

2       Q.    And is your contact at Kirkland & Ellis

3   generally Donna Welch?

4       A.    I don't have a lot of contact with

5   Kirkland & Ellis directly.  The only thing -- the

6   only direct contact is submitting my invoices

7   through Kirkland & Ellis because they understand

8   how to use the system and I don't.

9       Q.    Fair enough.  Have you had any dealings

10  with Kirkland & Ellis previous to this case?

11      A.    No.

12      Q.    Had you had any dealings with -- well,

13  we can go one by one -- O'Melveny & Myers previous

14  to this case?

15      A.    I'm sorry.  Is that a law firm?

16      Q.    It is.

17      A.    No, I have not.

18      Q.    Okay.  What about Jones Day?

19      A.    Not to my recollection, no.

20      Q.    What about Covington Burling?

21      A.    No.

22      Q.    What about -- not going to leave you

23  out.  What about Dechert?

24      A.    Not to my knowledge.  But I should --

Highly Confidential - Subject to Further Confidentiality Review

1    can I add a caveat here?

2         Q.    Of course.  You can always add a caveat.

3         A.    When Cornerstone and Analysis Group

4    opened their offices in Europe, they asked me to

5    essentially accompany them on visits to various law

6    firms to explain their services as economic

7    consultants, and so we visited several law firms.

8    I'm not very good with names.  So, I just don't

9    remember which -- which firms I visited.

10             So, it had nothing to do with this case.

11   There was never any kind of formal arrangement.  It

12   was just a discussion about current issues in

13   competition policy.

14        Q.    And were you paid for that work?

15        A.    No, I was not.

16        Q.    Were you hoping that you would be

17   considered for future expert or consulting work in

18   connection with having made those relationships?

19        A.    That was one reason to be included, yes.

20        Q.    With whom at Cornerstone and/or Analysis

21   did you make these visits?

22        A.    I won't remember the entire set of

23   people who accompanied me on these visits.  My

24   primary contact at Cornerstone is one of my former

1   professors named Peter Davis, and the primary

2   contact at Analysis Group was -- let's see --

3   Pierre Cremieux, C-r-e-m-i-e-u-x.

4        Q.    Were there other academic experts who

5   accompanied you on those visits?

6        A.    No, not on those visits, no.

7        Q.    Have you done other work for Cornerstone

8   and Analysis Group in Europe?

9        MS. WELCH:  Objection to form.

10  BY THE WITNESS:

11       A.    Let's see.  I have been asked to, for

12  example, act as a member of a panel to discuss

13  competition issues that come up in the

14  pharmaceutical industry.  Some of those panels are

15  organized or sponsored by consulting firms, and so

16  I'm not paid for that.

17            But it's, again, an opportunity to meet

18  lawyers, to discuss with people who are working in

19  this area, to -- for me it's interesting to learn

20  about what they find to be interesting issues and

21  challenges in this space.

22  BY MS. GEMAN:

23       Q.    Have you interacted with any consulting

24  group other than Bates White in connection with

1   your work on this case?

2       A.    No, I have not.

3       Q.    And have you interacted with any of the

4   Defendants' other experts in your work on this

5   case?

6       A.    I have not had any substantive

7   discussions with the other Defendants, no.

8       Q.    Have you spoken with any of them in the

9   period of May 2018 to the present?  And I'm not

10  asking you to do a memory test.  I'm going to give

11  you what's been marked as Exhibit 2, which is

12  "Defense Experts Disclosed on May 10, 2019."

13              (WHEREUPON, Allergan-Kyle Deposition

14               Exhibit No. 2 was marked for

15               identification:  Document, "Defense

16               Experts Disclosed on May 10,

17               2019.")

18  BY MS. GEMAN:

19      Q.    If you could, just take a minute to look

20  at that document.

21              Have you seen that document before?

22      A.    No, I have not.

23      Q.    Okay.  Margaret, which of these

24  individuals, other than yourself, do you know

Highly Confidential - Subject to Further Confidentiality Review

```
 1    personally?

 2        A.    Okay.  Do I know personally.

 3              Craig Garthwaite, Henry Grabowski, Iain

 4    Cockburn, Sean Nicholson.

 5              That's the set I know personally.

 6        Q.    And how do you know those individuals?

 7        A.    So, again, it's a small world of

 8    academic economists working in this space.

 9              But, more specifically, Craig Garthwaite

10    is a professor at the Kellogg School, Northwestern

11    University, and he runs the health management

12    program there.  I might be getting the title of

13    their program wrong.  But he runs a program within

14    the MBA program specific to the healthcare sector.

15    And, so, in the past I have acted as a visiting

16    professor there, so I know him because I offer a

17    course in that program.

18              Henry Grabowski was a colleague of mine

19    when I was at Duke University.  I was there between

20    2004 and 2006.  And we have a few papers together.

21              Iain Cockburn is a professor at Boston

22    University.  He was there when I was a student at

23    MIT.  And we also have a paper together.

24        Q.    And those papers are listed in your CV,
```

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2         A.    They are, yes.

3               Sean Nicholson was an editor of a volume

4    in which I have a paper.

5               And, again, all of these people are

6    colleagues in the more global sense.  I see them at

7    conferences on a regular basis.

8         Q.    Did you know before just now that they

9    were or they are experts in this case?

10        A.    My team at Bates White had told me some

11   of these names, but I have not seen the complete

12   list prior to this point.

13        Q.    Had they told you those particular five

14   names, any of those particular five names?

15        A.    Yes, they had.

16        Q.    In what context did Bates White identify

17   other experts in this case?

18        A.    We had a general discussion after all of

19   the expert reports were submitted, and so they

20   identified -- they named these names.

21        Q.    So, during the time you were preparing

22   your report, did you know the identity of any of

23   the other defense experts?

24        A.    I did not know any other defense experts

Highly Confidential - Subject to Further Confidentiality Review

1    while I was preparing the report.  None of the

2    economic experts.  I knew some of the names of

3    other Allergan experts because there are points

4    where I would refer to what I was told to expect in

5    their reports.

6         Q.    Told by whom?

7         A.    By Bates White primarily or counsel.

8         Q.    Did you receive any written materials

9    that described what the opinions of the other

10   Allergan experts was slated to be?

11        A.    No.

12        Q.    Did you have -- sorry.

13              How much time did you spend speaking

14   with Bates White about the other Allergan experts'

15   opinions?

16        A.    Less than 15 minutes.  I believe it

17   would come up in, for example, a discussion about

18   quantifying untreated pain or figuring out is it

19   possible to develop some clinical guidelines to

20   establish whether a prescription was appropriate or

21   not.

22              And I understood that, for example,

23   Dr. Warfield said -- suggested there should be no

24   bright lines like that.  It was that kind of --

Highly Confidential - Subject to Further Confidentiality Review

1  that kind of substance.

2  Q.    Do you have any personal experience or

3  expertise in the development of such clinical

4  guidelines?

5  A.    No.

6  Q.    Do you have any personal experience in

7  attempting to quantify undertreated or untreated

8  pain or, for that matter, any untreated or

9  undertreated condition?

10  MS. WELCH:  Objection to form.

11  BY THE WITNESS:

12  A.    No, I have no -- I'm not a medical

13  doctor.

14  BY MS. GEMAN:

15  Q.    But my question is a little bit

16  different.  I appreciate your answer.

17         But have you ever purported to quantify

18  untreated or undertreated medical conditions,

19  including, but not limited to, pain?

20  A.    I have not attempted to quantify that

21  specifically.  It's a topic that comes up in my

22  research particularly in developing countries.

23  There's concern about access to treatment.

24         So -- so, certainly in the past I have

1   tried to find proxies for undertreated conditions.

2   Those proxies are standard WHO kinds of measures

3   for burden of disease or prevalence.

4       Q.    Are you offering any opinions about the

5   existence or extent of untreated pain in this

6   context?

7       A.    No, I am not.

8       Q.    So, do you have any basis to sort of

9   agree or disagree with Dr. Warfield's -- actually,

10   strike that.  Separate question.

11       Do you have any background or experience

12   that enables you as an expert to agree or disagree

13   with Dr. Warfield's opinions?

14       A.    No.

15       Q.    Did you speak with Steven Lieberman

16   during your preparation of your report?

17       A.    No, I did not.

18       Q.    Jonathan Macey?

19       A.    No, I did not.

20       Q.    Carl Peck?

21       A.    No, I did not.

22       Q.    Carol Warfield?

23       A.    No, I did not.

24       Q.    Subsequent to the completion of your own

Highly Confidential - Subject to Further Confidentiality Review

1  report, did you read their expert reports?

2       A.    No.

3       Q.    Have you read any --

4       A.    Actually.  Sorry.  Of the Allergan

5  reports, I have read Carol Warfield's and the

6  Lieberman report.

7       Q.    What other, if any, expert reports have

8  you read subsequent to the completion of your own

9  report?

10       A.    I don't believe I have read --

11  subsequent to the completion of my report, I have

12  not read any of the other defense expert reports

13  outside of the two that I just named for Allergan.

14       Q.    And subsequent to the completion of your

15  report, including the appendix on materials

16  considered, have you reviewed any other documents

17  in relation to this case in addition to those two

18  reports?

19       A.    Not that I can recall, no.

20       Q.    And are you relying on the reports of

21  Lieberman and Warfield?

22       A.    No, I'm not.  Not explicitly.  Again, I

23  cite points that I understood they would be making

24  in a couple of spots in my report.  My opinions are

Highly Confidential - Subject to Further Confidentiality Review

 1  not -- are not really reliant on them, but I point

 2  to their expertise in a couple of places.

 3      Q.    This is going a little bit out of order.

 4            But what assumptions were you given by

 5  counsel to use in preparing your report?

 6      A.    Can you be a bit more specific?

 7      Q.    Sure.  So, one piece of information that

 8  you didn't know directly or through your own

 9  expertise was the two pieces of information you

10  just described in connection with undertreated pain

11  and the clinical guidelines, correct?

12      A.    That's right.  And none of my analyses

13  depend on that definition.

14      Q.    What other pieces of information or

15  assumptions were you given by counsel that you used

16  in writing your report?

17      MS. WELCH:  Objection to form.

18  BY THE WITNESS:

19      A.    So, may I look at some of the text in my

20  report?

21  BY MS. GEMAN:

22      Q.    Yeah.  To be clear, I'm not asking about

23  what documents they gave you.  I'm just asking if

24  they gave you any general assumptions on which you

```
 1    relied in writing your report.

 2         A.    The only area where I think that there

 3    was a discussion about -- and it wasn't necessarily

 4    assumptions, but there was some discussion with

 5    counsel, what concerned the timeline of some of

 6    these products, so who owned what, because

 7    Allergan's corporate history is rather complicated.

 8         Q.    And you mention that in a footnote in

 9    your report.

10         A.    Yes, yes.

11         Q.    Okay.  Have you met any of the

12    Plaintiffs' experts whose work you cite and/or

13    criticize in your own report?

14         A.    Yes, I have.

15         Q.    Which ones?

16         A.    I have never met Professor Rosenthal.  I

17    have met Professors Cutler and Gruber and McGuire.

18         Q.    In what context?

19         A.    Professor Gruber was on the faculty at

20    MIT when I was a graduate student there.  Professor

21    Cutler was on the faculty at Harvard when I was a

22    student at MIT.

23              And there is a lot of joint seminars,

24    et cetera, between the two, the two institutions.
```

Highly Confidential - Subject to Further Confidentiality Review

1    They are both affiliates at the National Bureau of

2    Economic Research where I had a desk while I was a

3    graduate student.

4              Professor McGuire was the editor of the

5    Handbook of Health Economics in which I have a

6    chapter.

7        Q.    Do you consider them all experts in

8    health economics?

9        A.    Yes.

10       Q.    Do you consider them all well respected?

11       MS. WELCH:  Objection to form.

12   BY THE WITNESS:

13       A.    I think they've all made important

14   contributions in academic work.  My report focuses

15   on flaws in their expert reports.  But I have great

16   respect for all of the individuals, of course.

17   BY MS. GEMAN:

18       Q.    Do you consider them well respected in

19   the academic community?

20       MS. WELCH:  Objection to form.

21   BY THE WITNESS:

22       A.    I can't say what the rest of the

23   profession thinks.  I would say their current

24   affiliations probably speak for themselves.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. GEMAN:

 2        Q.    What did they say, those affiliations?

 3        A.    Well, they are professors at Harvard and

 4   MIT.

 5        Q.    You have mentioned a few times that it's

 6   sort of a small world.  Do you have any opinion as

 7   to whether they are considered well-respected

 8   academics within that small world that you keep

 9   mentioning?

10        MS. WELCH:  Objection to form.

11   BY THE WITNESS:

12        A.    Certainly I think that David Cutler and

13   Jonathan Gruber are considered very prominent

14   public economists or health economists.

15             Professors McGuire and Rosenthal work in

16   a slightly different sphere than I do for the most

17   part because they are both at Harvard Medical

18   School I believe and so they publish in health

19   policy journals.

20             Their concentration of publications is

21   more geared towards health policy rather than

22   economics.  So, it's a -- that's a slightly

23   different world.  There is some overlap, but it's a

24   slightly different world.
```

1   BY MS. GEMAN:

2      Q.   Have you ever published in a health

3   policy journal?

4      A.   Yes, I have.

5      Q.   Okay.  Which ones?

6      A.   May I look at my CV --

7      Q.   Sure.

8      A.   -- to remind myself of the names?

9          Value in Health, Health Affairs, Health

10  Services Research, Globalization and Health, Health

11  Policy and Planning.

12       And as far as book chapters that are

13  specific to health economics, I have a chapter in

14  the Handbook of Economics of the Biopharmaceutical

15  Industry and another chapter in the handbook of

16  Health Economics Volume 2 and another chapter in

17  the Elsevier Encyclopedia of Health Economics.

18      Q.   I'm sorry.  Remind me.  Had you -- you

19  said you hadn't met Meredith Rosenthal.

20       Had you been familiar with her work

21  prior to this case?

22      A.   I can't recall specific citations that I

23  have made to her work.  That doesn't mean that

24  there isn't one somewhere in one of the papers here

Highly Confidential - Subject to Further Confidentiality Review

1    somewhere.  If there is, it would be probably

2    papers from the early 2000s, but...

3         Q.    And regardless of whether you cited her

4    work or felt there was enough overlap in your areas

5    to warrant consider citing her work, have you --

6    are you generally familiar with her work?

7         A.    Frankly, no.

8         Q.    And what I'm going to show you is what's

9    been marked as Exhibit 3, and it's a list of

10   Plaintiffs' experts that frankly I just put

11   together.  It's bespoken.  If there is any mistakes

12   on it, it's entirely inadvertent.  And let me give

13   your counsel a copy.

14                    (WHEREUPON, Allergan-Kyle Deposition

15                     Exhibit No. 3 was marked for

16                     identification:  List of

17                     Plaintiffs' experts.)

18   BY MS. GEMAN:

19        Q.    And I'm going to assume you have not

20   seen this document before.

21        A.    I have not.

22        Q.    All right.  Have you -- other than the

23   individuals you mentioned, namely, Drs. Cutler,

24   Gruber and McGuire, have you met any of these

Highly Confidential - Subject to Further Confidentiality Review

1    individuals?

2         A.    Not to my knowledge, no.

3         Q.    And had you heard of -- again, excluding

4    those three and also excluding Dr. Rosenthal of

5    whom we've spoken, had you heard of any of these

6    individuals before this case?

7         A.    I knew of David Kessler, yes.

8         Q.    And what did you know about him?

9         A.    That he was a -- is a former FDA

10   commissioner.

11        Q.    And had you -- have you read his -- or

12   strike that.

13              Have you ever -- had you ever interacted

14   with Dr. Kessler?

15        A.    No, I've never met Dr. Kessler.

16        Q.    And, to your knowledge, did Bates White

17   have communications with Defendants' experts other

18   than yourself?

19        A.    I believe that they were also providing

20   some support for Mr. Lieberman, Dr. Lieberman.

21        Q.    And what is the source of their

22   knowledge about the scope of other experts' work,

23   if you know?

24        MS. WELCH:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY THE WITNESS:

 2         A.    I have no idea.

 3    BY MS. GEMAN:

 4         Q.    So, when they talked to you about this

 5    is what this one is going to say, this is what that

 6    one is going to say, do you know how they got their

 7    information?

 8         A.    I have no idea.

 9         Q.    Were they relying on any notes or

10    drafts, to your knowledge?

11         A.    I have no idea.

12         Q.    And do you know if the personnel at

13    Bates White had communications with the shops that

14    were supporting the other of Defendants' experts?

15         A.    I don't know -- I know that they had

16    some issues in replicating some of the Rosenthal

17    and Cutler analyses.  So, I'm sure that there was

18    some exchange with the support teams for those

19    reports in order to understand what was going on

20    with the data.  But as far as I know, that's the

21    extent of it.

22         Q.    And did you see any of those

23    communications?

24         A.    No, I did not.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And was the Bates White team located in

 2   the U.S.?

 3        A.    Yes, they're located in Washington.

 4        Q.    Now, earlier in this deposition you

 5   mentioned I think at least three people you worked

 6   with at Bates White:  Angela Pazzaglia, Scott

 7   Weishaar.  Is that how you pronounce it?

 8        A.    He is going to laugh because I've been

 9   trying to ensure that I have the correct

10   pronunciation of everyone's name and I am sure that

11   I'll guess wrong.

12              I believe it's Weishaar.

13        Q.    Oh, Weishaar.  And Josh Waizer?

14        A.    I think it's Waizer.

15        Q.    Waizer.  Other than those three, who

16   were the other team members at Bates White with

17   whom you worked on this report?

18        A.    I'm not sure that I can provide an

19   exhaustive list because, frankly, it was -- it was

20   a large team and I'm bad with -- frankly, I'm bad

21   with names.

22        Q.    That's understandable.

23        A.    So I can provide a few of them.

24        Q.    Sure.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    But I'm sure it's not exhaustive.

2              Dave Lorenz.  Lauren.  I can't remember

3   her surname.

4        Q.    Trusheim?

5        A.    It's possible.

6        Q.    Okay.

7        A.    Tom.

8        Q.    Thomas Levin?

9        A.    It's possible.  Sorry.  I consider

10  myself lucky if I can match the first name to the

11  face most of the time.

12             There was a Gabe on the team.

13       Q.    Okay.  So, you mentioned before that

14  Scott is a partner, is that right, to your

15  knowledge?

16       A.    That's my understanding.

17       Q.    Does he have a Ph.D.?

18       A.    No, he does not.

19       Q.    Do you know what his highest degree is?

20       A.    I'm not sure.

21       Q.    And Josh Waizer, do you know what his

22  degree is?

23       A.    I believe it's a Bachelor's, but I -- he

24  might have a Master's.  I don't know.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    In economics?

 2          A.    I don't know.

 3          Q.    What about Angela Pazzaglia?

 4          A.    Angela does have a Ph.D.

 5          Q.    In what field?

 6          A.    It is not economics.  It's something in

 7    the hard sciences, the real sciences.  But I don't

 8    remember specifically.

 9          Q.    And Grant Hou, was he a member of your

10    team or she?

11          A.    I'm not remembering a face to match to

12    that.  But, again, that doesn't -- that doesn't

13    mean that he or she wasn't working on the team.

14          Q.    David Lorenz?

15          A.    Yes.

16          Q.    He has a Ph.D.?

17          A.    He was on the team.  I don't think he

18    has a Ph.D.

19          Q.    Do you know what his area is?

20          A.    No.

21          Q.    Michael Brown?

22          A.    I don't know.

23          Q.    Gabe Fernandez?

24          A.    I don't know.  I don't -- to my
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    knowledge, those names are probably the more junior

 2    people on the team and it's unlikely that they have

 3    Ph.D.s.  But I can't say that for certain.

 4         Q.    All right.  And I guess what I'm asking

 5    for each of those folks is if you know what degree

 6    they do have even if it's not a Ph.D., like do they

 7    have a Bachelor's or Master's?

 8         A.    I never asked for their CVs or had a

 9    discussion about our educational backgrounds.

10         Q.    And what about Lauren?

11         A.    Same.  I don't know.

12         Q.    Thomas?

13         A.    I do not know.

14         Q.    Who was Rachel Piemonte?

15         A.    I don't know.

16         Q.    Who was Samuel Sherman?

17         A.    Again, I remember that he helped me with

18    my iPad at some point, but I don't know exactly

19    what his -- what his degrees are in.

20         Q.    Therefore, he was the most valuable one,

21    right?

22               All right.  And have you seen the

23    invoices of Bates White?

24         A.    No, I have not.
```

1    Q.    All right.  So, what I'm going to

2  introduce now is what was produced by your counsel

3  last night as your invoices and that's Exhibit 4.

4              (WHEREUPON, Allergan-Kyle Deposition

5              Exhibit No. 4 was marked for

6              identification:  Four invoices.)

7  BY MS. GEMAN:

8    Q.    Do you recognize what's been marked as

9  Exhibit 4?

10    A.    Yes.

11    Q.    And are these the invoices you gave

12  directly to Kirkland?

13    A.    Yes.

14    Q.    And you mentioned earlier that you had

15  not yet prepared and submitted invoices for

16  April and June.  I'm sorry.  I beg your pardon.

17  For May and June.

18    A.    That's correct.

19    Q.    And that the -- and that the hours

20  between May and June were about 95, is that right?

21    A.    That's my best guess.

22    Q.    Sure.  And before that you worked about

23  110 hours.  Does that sound about right?

24    A.    That's probably ballpark although I

Highly Confidential - Subject to Further Confidentiality Review

```
 1    could sit here and add it up now if you like.

 2         Q.    No.  It's not a good use of your time.

 3    It's okay.  But let me know if you think these

 4    invoices are accurate.

 5         A.    Yes, they're -- that's why they're

 6    invoices.

 7         Q.    All right.  And your rate is 650 euros

 8    per hour?

 9         A.    Yes.

10         Q.    And that's about more than $700, about

11    $730?

12         A.    Again, I -- we can use an iPhone to do

13    the conversion, but I haven't done it this week.

14         Q.    Let's get Samuel Sherman.

15               How did you come to your rate?

16         A.    Through discussions with other

17    colleagues who had acted as expert witnesses in the

18    past.

19         Q.    Do you use a different rate for, for

20    example, travel or depositions?

21         A.    No.

22         Q.    Do you have a day rate?

23         A.    No.

24         Q.    Do you have a trial rate?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.      No.

2        Q.      We would ask that in advance of trial

3    you please supplement this production of invoices.

4                By the way, are you aware there is a

5    trial in this case?

6        A.      Yes.

7        Q.      Okay.  When is it?

8        A.      I believe it's scheduled for October.

9        Q.      Are you planning to attend?

10       A.      I leave that up to counsel.

11       Q.      Okay.  And same answer for whether

12   you're planning to testify?

13       A.      Yes.

14       Q.      And have you prepared any demonstratives

15   for trial?

16       A.      No.

17       Q.      Do you know if Bates White has?

18       A.      No.  No, I do not know.

19       Q.      And have you ever done any work for

20   Allergan or its predecessors or affiliates before

21   this case?

22       A.      No.

23       Q.      Do you own stock in Allergan in your own

24   name?

```
 1        A.    If I do, it's through an index fund.

 2   So, I have no idea.

 3        Q.    Right.  No, I'm asking about in your own

 4   name.

 5        A.    No.

 6        Q.    May I ask if you're married or

 7   partnered?

 8        A.    I am married.

 9        Q.    Okay.  Does your spouse or partner own

10   or does your spouse, I guess, own stock in

11   Allergan?

12        A.    Again, not in his name, certainly.

13        Q.    Do you or your husband own stock in your

14   own names in any pharma company that you're aware

15   of?

16        A.    No.

17        Q.    Okay.  So, what I'm going to show you as

18   Allergan Exhibit 5 are "Bates White invoiced

19   transactions for work performed at the direction of

20   Professor Margaret Kyle."

21                  (WHEREUPON, Allergan-Kyle Deposition

22                   Exhibit No. 5 was marked for

23                   identification:  Spreadsheet,

24                   "Bates White invoiced transactions
```

Highly Confidential - Subject to Further Confidentiality Review

1                    for work performed at the direction

2                    of Professor Margaret Kyle.")

3    BY MS. GEMAN:

4         Q.    Have you seen that document before?

5         A.    No.

6         Q.    All right.  Do you have any knowledge

7    about how Bates White invoiced Kirkland & Ellis?

8         A.    No.

9         Q.    Okay.

10        MS. GEMAN:  So, I guess, Counsel, we can talk

11   about this off the record, but we would -- and we

12   appreciate the Excel that you sent this morning.  I

13   assume this -- Bates White didn't just hand you

14   guys the Excel, that they had actual invoices.  And

15   so we would just -- they just handed you this

16   Excel?

17        MS. WELCH:  We should talk about it off the

18   record.

19        MS. GEMAN:  Sure.  Just for the point on the

20   record, we -- we would request actual invoices and

21   if you represent that there are none, then there

22   are none, but...

23   BY MS. GEMAN:

24        Q.    And do you have a sense of how many

Highly Confidential - Subject to Further Confidentiality Review

1  hours Bates White worked on this project?

2      A.    No, I do not.

3      Q.    Would it surprise you to hear it's more

4  than 1,400?

5      A.    No.  They did a tremendous amount of

6  data processing at the beginning in particular.

7  They have been a great support team, and I'm sure

8  it took a lot of time.

9      Q.    And did some combination of those

10 personnel write your report or portions of it?

11     A.    They participated at some points in the

12 drafting of the report, but the report -- that's --

13 it's my report.

14     Q.    But you didn't literally write every

15 word of your report?

16     A.    I did not myself write every single word

17 of the report.  I -- but I directed everything that

18 was in the report.

19     Q.    Are there any sections you wrote

20 yourself?

21     A.    I can give you a list of sections where

22 I think there was -- there was limited input from

23 others.  So, Section 1.A on my qualifications,

24 Section II.A on the economics of pharmaceutical

Highly Confidential - Subject to Further Confidentiality Review

1    promotion.

2              And to be honest, I suspect that I had

3    the first draft of the summary of opinions, but

4    that the -- it was an iterative process working

5    through what's the best order in which to present

6    these, these opinions, how best to phrase certain

7    points.

8              Again, this was my first expert report,

9    so I certainly relied on a team that had experience

10   writing these reports in the past to help me

11   understand the appropriate structure to adapt the

12   language to the audience for a court rather than

13   for a set of academic economists.

14             They helped a lot with basic things like

15   formatting because I hate Microsoft Word.  So, I

16   was happy to have them do all the work on the

17   footnotes, et cetera.

18        Q.    But they did much more than the

19   footnotes, right?  They actually wrote certain

20   sections or at least their billing identifies the

21   sections that they wrote?

22        A.    So, just as an example, they certainly

23   did the charts, and with the charts they would

24   often draft language describing what's in the

Highly Confidential - Subject to Further Confidentiality Review

1   charts.  And then I would take over, and we would

2   have an iterative process going back and forth

3   about how best to present -- how best to describe

4   the chart and make the points that we -- that I

5   wanted to make.

6            Certainly, there were times where we

7   would have a discussion, talk about the broad

8   outlines of the report, and I would say can you --

9   can the team start working on the language for this

10  section following a discussion about its content.

11  Yes.

12       Q.   So, to the extent that there's entries

13  that from the Bates White personnel about drafting

14  sections of your report, you have no high level

15  reason to think they're inaccurate?

16       A.   No.

17       Q.   Do you feel the next time you do an

18  expert report you'll be well positioned to write

19  more of it yourself?

20       MS. WELCH:  Objection to form,

21  mischaracterizes.

22  BY MS. GEMAN:

23       Q.   I'm sorry.  When your counsel objects,

24  she's not instructing you not to answer.

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Actually, my experience from this

2   suggests that -- I'll give you -- I'll give you

3   some economic speak.

4      Q.     Okay.

5      A.     There is an optimal division of labor.

6   So, I was very happy that the team at Bates White

7   was willing to take on the data processing, as an

8   example.  So that's work that way back in the day,

9   particularly when I was a graduate student, I did a

10  lot of that work.  For many of my academic papers,

11  I've done a lot of that work.

12             I was happy that there was a team that

13  could -- that I could trust to do that work for me

14  and not bill at my rates and not allocate all of my

15  time to writing this expert report and in

16  particular handling tasks like that as important

17  inputs into the report.

18             And I would say, you know, again, in

19  terms of I was very happy to have a discussion

20  about the content of each section that is in the

21  report, but to have somebody else do an additional

22  draft of the language, I thought that was an

23  optimal division of labor.  It was still my work.

24  They did this at my direction.  These are my

Highly Confidential - Subject to Further Confidentiality Review

1    opinions.

2           But just as I work on academic papers

3    with co-authors, it's a collaborative process.

4    Even if my name is on an academic paper, I don't

5    claim that I have written -- that I was the source

6    of every single word in the document.

7        Q.    Do you consider them co-authors of your

8    report?

9        A.    No.  I consider that the support team

10   that worked at my direction.

11       Q.    And do you feel -- and keeping in mind I

12   was asking about the writing versus the, you know,

13   data work.

14           Do you feel that this experience would

15   make you better able to write your own report the

16   next time you do an expert report?

17       MS. WELCH:  Objection to form,

18   mischaracterizes her testimony.

19   BY THE WITNESS:

20       A.    I feel that the next time I write an

21   expert report, having written one already, I will

22   have a better sense of how a report should be

23   structured, the order in which things should be

24   presented, the kinds of arguments that should be

Highly Confidential - Subject to Further Confidentiality Review

1    made, the kind of exhibits that would be included.

2              So, I expect, yes, it will be easier the

3    next time I wrote an expert report, if I write --

4    if I do.

5    BY MS. GEMAN:

6         Q.    And would you like to do future expert

7    reports?

8         A.    I found it a very interesting process.

9    I would say it probably depends on the case and

10   specific circumstances.

11        Q.    And do you think you would plan to

12   actually write, literally write more of the report

13   yourself the next time or?

14        MS. WELCH:  Objection to form,

15   mischaracterizes her testimony.

16   BY THE WITNESS:

17        A.    As I said, every word in this report is

18   something that I have been through over and over

19   again.  I change language in some cases that was

20   initially drafted by members of my team.  They

21   would occasionally suggest changes to some of the

22   language that I first drafted.  I view that as work

23   product.  That's how we exchanged -- we exchanged

24   information, and that's how the report evolved.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            For me it's hard to say -- it's more

 2   than 100 pages long.  It went through many, many

 3   drafts.  I can't say how much of this report -- how

 4   many of the words were first written by me in the

 5   word processor, that doesn't really have any

 6   meaning to me here.

 7   BY MS. GEMAN:

 8       Q.    Okay.  I would like to introduce your

 9   report as Exhibit 6, please.

10                 (WHEREUPON, Allergan-Kyle Deposition

11                 Exhibit No. 6 was marked for

12                 identification:  Expert Report of

13                 Professor Margaret K. Kyle, May 10,

14                 2019.)

15       MS. GEMAN:  We have been going about an hour.

16   Is this a good time for you for a quick break?

17       THE WITNESS:  Yes.

18       MS. GEMAN:  Is that okay with you?

19       MS. WELCH:  That's fine.

20       THE VIDEOGRAPHER:  We are off the record at

21   10:16 a.m.

22                 (WHEREUPON, a recess was had

23                 from 10:16 to 10:31 a.m.)

24       THE VIDEOGRAPHER:  We are back on the record
```

Highly Confidential - Subject to Further Confidentiality Review

 1   at 10:31 a.m.

 2   BY MS. GEMAN:

 3        Q.    Margaret, I just wanted to circle back

 4   to your visits to the law firms in Paris that you

 5   were --

 6        A.    I didn't actually visit any law firms in

 7   Paris.

 8        Q.    Oh.  So, when you testified earlier

 9   about meeting with law firms and that you were with

10   a group that included certain personnel from

11   consulting organizations that had recently opened

12   offices in Paris, to what were you referring?

13        A.    Actually, they've opened offices in

14   Europe and more specifically London and Brussels.

15   Analysis Group does have a small team now in Paris.

16   But the meetings with lawyers took place in London

17   and in Brussels.

18        Q.    So, you actually traveled to attend

19   those meetings?

20        A.    Yes.

21        Q.    How many did you attend?

22        A.    How many meetings with lawyers?

23        Q.    Yes.

24        A.    Between six and eight I would guess.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Was it all the same trip, London and

2  then Brussels or Brussels and then London, or was

3  it two separate trips?

4    A.    In the case of Cornerstone, it was all

5  one trip over two days.

6    Q.    In London?

7    A.    No, there are direct train connections

8  between London and Brussels.  So, I went to London.

9  There was a day in London and then the next morning

10  we went to Brussels.

11    Q.    I see.

12    A.    And with Analysis Group, I believe for

13  that I was just in London.  I know they were going

14  to Brussels the next day, but I couldn't fit it

15  into my schedule.

16    Q.    Did you visit the same law firms with

17  Analysis Group that you had visited with

18  Cornerstone?

19    A.    I think there was at least one that --

20  that was in common.  But, again, I'm not very good

21  with names and, frankly, all of the law offices

22  start to look the same.

23    Q.    Did you have to take time off from work

24  to do these trips?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Well, I'm an academic, so I don't have

2   set hours for the most part.  It was a term when I

3   had no teaching obligations, so I was obviously not

4   in my office during those two days.

5      Q.     Which semester was this?

6      A.     I don't remember.

7      Q.     Sorry.  Did you visit these law firms

8   within the last year?

9      A.     Yes, last fall for Analysis Group and

10  the year before for Cornerstone.

11     Q.     So, it was fall of 2018 for Analysis

12  Group that you went to London?

13     A.     Yes.  That's to the best of my

14  recollection.  I have to check my calendar.

15     Q.     And it was spring 2018 that you went to

16  London and Brussels with Cornerstone?

17     A.     I don't remember the month.

18     Q.     It was -- okay.  But it was in early

19  2018?

20     A.     I believe it was around September or

21  October of 2017.

22     Q.     It was before you got retained in this

23  case?

24     A.     Yes.

 1      Q.     And how long was each meeting

 2   approximately?

 3      A.     One hour.

 4      Q.     Who paid for your travel?

 5      A.     Cornerstone and Analysis Group.

 6      Q.     And have you stayed in touch with any of

 7   the individuals with whom you met on those trips to

 8   London and Brussels?

 9      A.     Do you mean the lawyers at these firms?

10      Q.     Sure.

11      A.     Have I stayed in touch.  I am not in

12   regular contact with any of them.  I believe I

13   probably received a couple of LinkedIn invitations,

14   and I've crossed paths with some of them at

15   conferences in Brussels and in London on

16   competition policy.

17      Q.     And have you -- have you affirmatively

18   reached out to any of them to sort of check in or

19   say hello?

20      A.     No.

21      Q.     And is it understood that if those law

22   firms reach out to Cornerstone or Analysis that as

23   a result of those meetings that you're the person

24   that Cornerstone or Analysis would reach out to in

Highly Confidential - Subject to Further Confidentiality Review

1   turn if you were an appropriate expert for whatever

2   the subject was?

3       MS. WELCH:  Objection to form.

4   BY THE WITNESS:

5       A.    That's not my understanding.  I know

6   that both consulting firms, like all other economic

7   consulting firms, like to cultivate a set of

8   experts because there is often issues of

9   availability or having the appropriate expertise.

10          So, no, there is no assumption that I

11  have -- that I would be the first at the top of

12  anyone's list.

13  BY MS. GEMAN:

14      Q.    Well, I guess I can rephrase it, then.

15          Are you one of the experts that they're

16  cultivating, to use your word?

17      A.    Yes.

18      Q.    And do the law firms that you met with

19  represent pharmaceutical clients?

20      A.    I don't have a list of their clients.

21      Q.    But do you have a general understanding

22  that they represent a lot of pharmaceutical

23  clients?

24      MS. WELCH:  Objection to form, foundation.

```
 1    BY THE WITNESS:

 2        A.    My understanding was that they were

 3    interested in having these informal meetings with

 4    companies like Cornerstone and Analysis Group in

 5    part because they anticipated having some need of

 6    expertise on cases involving something related to

 7    the pharmaceutical industry.

 8            But I have no idea who their specific

 9    clients are, if they are current clients or

10    potential future clients.  I just don't have that

11    information.

12    BY MS. GEMAN:

13        Q.    But it's your general understanding that

14    they were interested in either that they did

15    represent or would represent hopefully in the

16    future pharmaceutical clients?

17        A.    I don't necessarily know that they are

18    pharmaceutical clients, but that they had some

19    interest in understanding or having a discussion

20    about current issues in competition policy related

21    to pharmaceuticals.

22        Q.    Did the names of any pharma companies

23    arise during any of those meetings?

24        A.    Not to my recollection, no.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    What -- did you prepare any materials

2   for those meetings like PowerPoints or?

3      A.    Yes.  We had a brief presentation

4   talking about excessive pricing and pay for delay,

5   if I recall correctly.

6      Q.    Are you referring to the Hatch-Waxman

7   Act issues?

8      A.    So, that's an American policy.

9      Q.    Sure.

10      A.    There have been pay for delay cases in

11   Europe as well.  So, yes, they are similar,

12   although there is no paragraph 4 equivalent in

13   Europe.

14      Q.    And was it your understanding that the

15   law firms represented any generic manufacturers or

16   had an interest in representing generic

17   manufacturers?

18      MS. WELCH:  Objection to form, foundation.

19   BY THE WITNESS:

20      A.    Again, I did not discuss specific

21   clients or potential clients that these law firms

22   represented.

23   BY MS. GEMAN:

24      Q.    Do you know if Cornerstone or Analysis

Highly Confidential - Subject to Further Confidentiality Review

 1   ever visited pharmaceutical companies to discuss

 2   the sort of services they can provide or any -- or

 3   the same sort of issues you were addressing at the

 4   law firms?

 5        MS. WELCH:  Objection to form, foundation.

 6   BY THE WITNESS:

 7        A.    I don't know with whom either company

 8   has met.  I know I have been contacted in a couple

 9   of cases where they were interacting with law firms

10   about a specific case and we had a discussion about

11   working as a potential expert; and as I said, I

12   explained that I had already been retained in this

13   case and did not want to take on any other work.

14   BY MS. GEMAN:

15        Q.    Are you going to -- strike that.

16            So, if you could please turn to

17   Appendix A of your report, which is your curriculum

18   vitae.

19            And you can take a minute to flip

20   through it if you need to, but I'd like to know if

21   it's complete.

22        A.    So, there is one additional chapter

23   which has -- which is forthcoming which was

24   accepted last week, which is not listed here.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      So, you would add to A.4.b?

2       A.      That's right.

3       Q.      What is that chapter?

4       A.      It is forthcoming in an NBER volume on

5    innovation policy and the economy, and I can't

6    remember now the exact title but something about

7    the alignment of innovation policy and social value

8    in pharmaceuticals.

9       Q.      And did you write that pursuant to a

10   grant?

11      A.      No.

12      Q.      Other than that addition, is this

13   complete?

14      A.      There are other sections that one could

15   include, such as prior Ph.D. students or current

16   Ph.D. students.  I think it was decided that that

17   wasn't pertinent to this case.  So, that's not part

18   of the CV that's included here.

19      Q.      So, did you make this CV for this case?

20      A.      I provided a copy of my CV to the Bates

21   White team, and they put it in this format.

22      Q.      I see.  Is your actual CV in English or

23   French?

24      A.      English.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Do you have one in French?

2        A.    I have created one in the past when

3   applying for a French grant, but I don't keep it on

4   my website.

5        Q.    So, do you have a copy of your own CV,

6   the one that you provided to Bates White?

7        MS. WELCH:  Objection to form.

8   BY THE WITNESS:

9        A.    Do I have a copy with it -- of it with

10   me now?

11   BY MS. GEMAN:

12       Q.    Yes.

13       A.    No.

14       Q.    Were you asked to bring a copy of it?

15       A.    No.

16       MS. GEMAN:  We would ask for production of

17   that document, please.

18   BY MS. GEMAN:

19       Q.    Do you have a copy of that on your

20   computer?

21       A.    Yes.

22       Q.    And when you say your website, do you

23   mean your academic website or a Wiki page or

24   something else?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes.  I have both an academic website

2   through the school where I'm employed and a

3   personal website which has essentially the same

4   information.

5      Q.     And what's the address of your personal

6   website?

7      A.     MargaretKyle.net.

8      Q.     And that website has your -- the CV that

9   is the one that you gave to Bates White to --

10     A.     I would have to check on whether I've

11  updated it recently, but it would be approximately

12  the same.  There would be no substantive change.

13     Q.     And when was the last time you prepared

14  a CV in French?

15     A.     Probably four years ago, and it was

16  probably an abbreviated CV again because it was

17  for -- it was part of a grant application.

18     Q.     Is there any information that would be

19  on it that isn't on the English one that's on

20  MargaretKyle.net?

21     A.     No.

22     Q.     Any other CVs that you use?

23     A.     No.

24     Q.     And who at Bates White prepared what's

Golkow Litigation Services                    Page 75

Highly Confidential - Subject to Further Confidentiality Review

1    been marked as or what is Appendix A?

2        A.    I don't remember the name of the person

3    who converted the pdf document to Word.

4        Q.    Is that your understanding of all that

5    they did, convert pdf to Word, or were there

6    substantive changes?

7        A.    As I said, the only substantive change

8    is that I think in one of my CVs I usually list

9    Ph.D. students, and I don't see that here because

10   it's -- it didn't seem particularly pertinent.

11            I noticed one victim of auto-correct at

12   some point, but I think for the most part it looks

13   like it was just an attempt to do copy-paste from

14   pdf into Word.

15       Q.    What is the victim of auto-correct?

16       A.    It is under A.6.  So, about

17   three-quarters of the way down the page where I

18   list a project that I did for the Department for

19   International Development.  The title was a "Survey

20   on Pharmaceutical Product Diversion," not

21   "Division," "From Low-Income to High-Income

22   Settings."

23       Q.    Any other changes to your CV that you'd

24   like to make other than fixing that and the

1    addition of the forthcoming NBER book chapter?

2        A.    Sure.  The other change, which, again,

3    looks like just a formatting issue, is on page A.6,

4    at the bottom there where the last word is "Case."

5              I think someone hit a carriage return,

6    which separated Case Western University -- Case

7    Western Reserve University from that case.

8        Q.    Okay.  Anything else?

9        A.    That's all I've seen so far.

10        Q.    And in addition to requesting production

11    of your -- of your CV, we would ask that in advance

12    of trial that you produce an updated CV, if there

13    is one.

14        A.    Okay.  That's fine.

15        Q.    Thank you.  And you received your

16    Bachelor of Science in economics or in another

17    field?

18        A.    Technically the major was called policy

19    analysis.

20        Q.    And did you get a Master's as well as a

21    Ph.D., or was it sort of part of the Ph.D. program?

22        A.    It was part of the Ph.D. program.  So,

23    MIT did not grant a separate Master's Degree.  One

24    would only have a Master's if one exited the Ph.D.

1  program without a dissertation.

2      Q.    Who was your adviser?

3      A.    My primary adviser was Scott Stern.

4      Q.    Did you have another one?

5      A.    My committee included Ernie Berndt,

6  Richard Schmalensee and Rebecca Henderson.

7      Q.    And what was your dissertation?

8      A.    It was "Essays on the Economics of

9  Innovation" I believe is the title.  Something like

10  that.  Three chapters on innovation.

11      Q.    And what specifically did it look at?

12      A.    There were two papers concerning

13  pharmaceuticals, specifically product launch, and

14  one paper on the laser printer industry.

15      Q.    Which products in the pharma industry?

16      A.    It was an examination of the launch of

17  new chemical entities as of 2000, 1999 or 2000,

18  internationally.  So, I looked at launch decisions

19  around the world.

20      Q.    What do you mean by "new chemical

21  entities"?

22      A.    I mean that, in general, at least in the

23  economics of pharmaceutical space, we distinguish

24  between new or novel drugs, which are formerly new

Highly Confidential - Subject to Further Confidentiality Review

 1    chemical entities or now new biologic entities, to

 2    distinguish them from new versions of existing

 3    products where the molecule has been known and used

 4    for a long time and generic products which are

 5    approved under a different regulatory mechanisms.

 6         Q.    So, which category would like an isomer

 7    go in?

 8         A.    An isomer which is an isomer of an

 9    existing product?  That would not be a new chemical

10    entity.

11         Q.    And, so, which -- which new drugs were

12    you looking at?

13         A.    All of the new drugs that had been

14    brought to -- introduced in at least one country

15    between I think my earliest was 1980 and the latest

16    was 1999 or 2000.

17         Q.    So, would that include like SSRIs?

18         A.    Yes, it would include some of the SSRIs.

19         Q.    Did it include any opioids?

20         A.    I don't believe so because I don't think

21    that any of them qualified as new chemical

22    entities, but it's been a long time since I looked

23    at that list of drugs.

24         Q.    Have you ever studied any of the opioids

Highly Confidential - Subject to Further Confidentiality Review

1    other than in connection with this report?

2         A.    No, I have not.

3         MS. WELCH:  Objection to form.

4    BY MS. GEMAN:

5         Q.    And certainly a Ph.D. is plenty of a

6    degree, but do you have any other degrees other

7    than your B.S. and your Ph.D.?

8         A.    No, that's it.

9         Q.    Okay.  And you are not a pharmacologist,

10   correct?

11        A.    That is correct.

12        Q.    Or a criminologist?

13        A.    That is correct.

14        Q.    Or an epidemiologist?

15        A.    That is correct.

16        Q.    Do you have any expertise in pain

17   management?

18        A.    No, I do not.

19        Q.    Do you have any education in any of

20   those fields that I just mentioned?

21        A.    No.

22        Q.    And have you taught -- you taught health

23   policy at Duke in 2011 and '12, is that right?

24        A.    I taught a course on pharmaceutical

Highly Confidential - Subject to Further Confidentiality Review

1    strategy with two others at Duke in 2011.

2        Q.    Strategy for marketing or?

3        A.    That was certainly a topic that was

4    covered.

5        Q.    Have you taught health economics since

6    that time?

7        A.    I have not done a full semester course

8    on health economics.  I do a couple of lectures for

9    a specific set of students at MINES ParisTech where

10   I cover -- I have a unit on innovation policy, and

11   I have another unit on health policy.

12       Q.    So, the innovation policy relates to

13   competition and new drug development in the main,

14   is that right?

15       A.    No.  For that specific course, it's

16   innovation policy more generally.

17       Q.    Not limited to pharma?

18       A.    No.

19       Q.    And I'm sorry.  The second category you

20   said was?

21       A.    Health economics and health policy.

22       Q.    And what are the subtopics that you

23   teach?

24       A.    I go through, for example, information

Highly Confidential - Subject to Further Confidentiality Review

1    asymmetries in health markets and why that leads to

2    regulation of many aspects of health markets.

3            I go through a lot of examples of how

4    regulatory interventions work and sometimes the

5    unintended consequences of such regulatory

6    interventions.

7            I obviously do a fair bit on insurance

8    and the differences between single-payor systems

9    and a more American style of system.  Different

10   intermediaries, these sorts of things.  It's meant

11   to be a broad overview of health economics.

12       Q.    And when you say "information

13   asymmetries," between who and whom or who and who?

14   Who and whom I think.

15       A.    Well, there are many.  So, in -- just as

16   one example, as a patient I don't have access to

17   treatments myself.  I am not able to buy many

18   treatments myself directly because it's perceived

19   or the concern is that as a patient I don't have

20   sufficient information to know which treatment is

21   most appropriate.

22            So, for that reason, we have a physician

23   who acts as a gatekeeper who acts as an expert and

24   hopefully acts as a good agent for the patients he

1    sees.

2            There are other examples of information

3    asymmetry concerning quality of products or

4    services.

5            So, a hospital might have private

6    information about the quality of the service it

7    provides relative to a consumer out there in the

8    market and similarly a pharmaceutical firm probably

9    has better information about the quality of its

10   products than a typical consumer would.

11           And this is why these markets are highly

12   regulated, in order to try to reduce these kind --

13   the consequences of these information asymmetries.

14       Q.   And have you ever studied the extent to

15   which pharmaceutical marketing impacts patients'

16   own opinions about their own treatment, you know,

17   their likelihood to go to a doctor and say, "Hey, I

18   want some Humira too," or, you know, "Hey, I want

19   this drug too."  I'm using those obviously as

20   examples, not as exclusive examples.

21       MS. WELCH:  Objection to form.

22   BY MS. GEMAN:

23       Q.   Do you understand my question?

24       A.   I have reviewed papers that look at

Highly Confidential - Subject to Further Confidentiality Review

1    things like direct-to-consumer advertising and its

2    effect on patient compliance or patients'

3    willingness to go see a doctor.  But I have not

4    done such studies myself, no.

5        Q.    Would it be the same answer referring to

6    studies on how advertising to doctors or general

7    advertising even if it's not DTC impacts patients?

8        A.    Patient health outcomes.

9        Q.    Sorry.  Not patients -- patients' own

10   desired use of drugs or statements of opinions

11   about their own treatment and so forth.

12       MS. WELCH:  Objection to form.

13   BY THE WITNESS:

14       A.    No, I don't think I've done any study

15   like that.

16   BY MS. GEMAN:

17       Q.    Have you studied the relationship

18   between pharma marketing and patients' health

19   outcomes?

20       A.    Only in this report.

21       Q.    Okay.  Do you consider that you did

22   study that affirmatively in this report?

23       A.    I consider that I attempted to test the

24   Plaintiffs' allegation that pharmaceutical

 1    marketing led directly to harm as measured by

 2    mortality, and I did not find a relationship.

 3         Q.    Are you opining that there is no

 4    relationship between the pharma marketing and

 5    patient harm or are you opining that Plaintiffs

 6    failed to find such a link?

 7         A.    I am opining that, for example, in

 8    Section V.B that I was unable to establish a

 9    relationship between Allergan detailing during the

10    relevant time period and mortality at the county

11    level, which for me is the best measure of harm.

12         Q.    What are the other measures of harm that

13    you looked at?

14         A.    That's the one that I had at the county

15    level.  So, that's what I looked at.

16         Q.    Did you look at any other measures of

17    harm?

18         A.    No.

19         Q.    Are you opining that Allergan's conduct

20    caused no harm in these counties in Ohio?

21         A.    I'm opining that there is no statistical

22    relationship between the extent of Allergan

23    detailing and mortality in these counties.

24         Q.    But my question was a little bit

1    different.

2         Are you opining that Allergan's

3    marketing caused no harm in these two counties in

4    Ohio, Summit and -- how do you pronounce the other

5    one?  How are you taught to pronounce it?

6         A.    Cuyahoga.  I don't know.

7         Q.    Okay.  Fair enough.

8         Are you aware that Allergan's conduct

9    caused no harm in Summit and Cuyahoga?

10        A.    I'm opining that I could not find a

11   statistical relationship between Allergan marketing

12   and opioid mortality.

13        Q.    I appreciate that answer to a separate

14   question, but I'm asking you a slightly different

15   question, which is:  Are you, Margaret Kyle,

16   Dr. Margaret Kyle, opining that there is no

17   connection between Allergan's marketing and harm

18   in -- experienced by Summit and Cuyahoga Counties?

19        MS. WELCH:  Objection to form, asked and

20   answered.

21   BY THE WITNESS:

22        A.    I'm opining that I could not find a

23   relationship that the Plaintiffs alleged between

24   Allergan detailing and mortality.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. GEMAN:

 2       Q.    So, unless your counsel instructs you

 3   not to answer, you have to answer the question that

 4   I asked.  And the jury I think would be interested

 5   in your answer.

 6             So, what I'm asking again is a slightly

 7   different question, which is:  Are you opining that

 8   there is no harm caused by Allergan's conduct in

 9   these two counties in Ohio?

10       MS. WELCH:  Objection to form, asked and

11   answered.

12   BY THE WITNESS:

13       A.    What I've tried to do is test to the

14   best of my ability with the data that I had

15   available the specific allegations -- the causal

16   chain that Plaintiffs have asserted.

17             And that causal chain starts with

18   marketing, then goes to shipments, then goes to

19   mortality, and the estimates on the effect of

20   mortality that Professor Cutler generates are then

21   used as inputs for all of the other harms.

22             So, my point is that if I cannot

23   establish the causality between detailing and

24   shipments or mortality, that the rest of the
```

1    Plaintiff allegations which hinge on that

2    relationship are not relevant for me to test any

3    further.

4    BY MS. GEMAN:

5        Q.    Is there a reason why you won't answer

6    my question?

7        A.    Well, because I didn't run a regression

8    of every potential kind of harm in these counties

9    because I didn't have data on those kinds of

10   outcomes.

11           Again, I'm trying to follow what the

12   Plaintiffs have done, and what I'm saying is that I

13   can't find -- I can't establish the causation that

14   the Plaintiffs have alleged in the case of

15   Allergan.

16       Q.    Do you feel that or do you have any

17   opinions on whether the marketing Defendants in

18   this case caused any harm in these counties in

19   Ohio?

20       A.    I focused only on Allergan.  So, I can't

21   say anything about the other marketing Defendants.

22       Q.    Do you have -- you consider yourself

23   agnostic as to whether the behavior of the pharma

24   marketing caused any harm?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I did not --

2          MS. WELCH:  Objection to form.

3     BY THE WITNESS:

4          A.    I did not have data with which to test

5     that specific allegation, and the scope of my

6     assignment was restricted to Allergan.

7     BY MS. GEMAN:

8          Q.    And have you ever -- I realize I

9     mischaracterized the class you taught at Duke as a

10    health policy class, and you corrected me to

11    explain it was a class in pharmaceutical strategy.

12          Have you ever taught a course in health

13    economics?

14          A.    So, as I said, at Ecole des Mines, I

15    taught -- I wouldn't call it a full course, but I

16    have done some lectures on health economics.

17          Q.    Have you taught a course on health

18    policy, a full course?

19          A.    No.

20          Q.    And how did you come to be a professor

21    at MINES?

22          A.    MINES ParisTech.

23          Q.    MINES ParisTech.

24          A.    Well, it's a long and complicated story,

1    but I suppose the shortest answer is that my

2    husband is French.

3         Q.    Is he an academic as well?

4         A.    Yes, he is.

5         Q.    Do you have tenure?

6         A.    Yes.

7         Q.    And how many courses did you teach this

8    academic year?

9         A.    This academic year.  I taught one course

10   at the Master's level and the other component of my

11   teaching is not -- not a formal lecture.  It's

12   essentially supervision of a group of students.

13              So, I went to China with them to help

14   them in a study of the pharmaceutical sector in

15   China and supervised the -- their report on that

16   sector afterwards, and now they're doing

17   internships and they have to do sort of small

18   thesis about their internship.  And I supervise

19   those theses as well.

20        Q.    And you said you were not teaching in

21   the fall of 2018, correct?

22        A.    I was teaching a course which was

23   compressed into a very short time period, so I was

24   not teaching week to week.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    When was the last time you taught an
 2   undergraduate course week to week?
 3        A.    An undergraduate course.  2003.
 4        Q.    And what is your -- how are you
 5   compensated at your University?
 6        A.    I have a salary as a full professor in
 7   economics.
 8        Q.    And is it more or less than the
 9   approximately 160,000 that you've made so far on
10   this, you know -- billed or will be earning on work
11   on this case?
12        A.    I haven't calculated what the after-tax
13   net will be from this case.  Tax rates there are
14   rather high.
15        Q.    Yes.
16        A.    I'm guessing that it will probably end
17   up being about the same.  Post-tax in both cases.
18        Q.    So, it's fair to say that at least for
19   the last couple years, about half your income is
20   from this work for Allergan and half is from your
21   work as a tenured faculty member?
22        MS. WELCH:  Objection to form.
23   BY THE WITNESS:
24        A.    So, I have received income from other
```

Highly Confidential - Subject to Further Confidentiality Review

1   sources.  So, for example, at Ecole des Mines there

2   are chairs that are sponsored by various parties.

3   And depending on work, either supervision of Ph.D.

4   students or research, I can receive honoraria from

5   those chairs.  That's been some income over the

6   last few years.

7   BY MS. GEMAN:

8        Q.    Okay.  And how much does that move the

9   needle in the 50/50 ratio?

10       A.    That total can be between 20 and 40,000

11  euros pre-tax.

12             Yes.  So there are random other sources

13  of income that come up, for example, doing referee

14  reports.  Occasionally when I speak at a conference

15  I receive an honorarium.  These kinds of -- these

16  kinds of sources of income as well.

17       Q.    So, what is your estimate about income

18  from this work for Allergan and then income from

19  all those other three sources combined, your

20  salary, your -- the miscellaneous additional work

21  through the University and then other honoraria?

22       A.    Again, I haven't figured out the

23  post-tax implications of all of it.  My guess is

24  for 2019, which is the bulk of the invoicing for

Highly Confidential - Subject to Further Confidentiality Review

 1    this case, it will end up being something around --

 2    the Allergan work will end up being around

 3    one-third.

 4         Q.    And you've taught at Kellogg since 2014?

 5         A.    Yes.  With the exception of this year

 6    because I was working on this case.  So, I elected

 7    not to teach this term.

 8         Q.    And do you typically teach one class per

 9    year at Kellogg?

10         A.    Yes, that's right.

11         Q.    When?  Which, summer semester, fall

12    semester?  Which?

13         A.    I can't remember if they call it spring

14    or summer.  I think it's called the spring

15    semester.  Spring in Chicago is always difficult to

16    pin down.

17         Q.    Yeah.

18         A.    But it's -- it usually takes place in

19    April and May.

20         Q.    So it's over two months?

21         A.    It's a five-week course.

22         Q.    I see.  For which population of

23    students?

24         A.    MBA students.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And what's the course that you

2  teach?

3    A.    Pharmaceutical Strategy.

4    Q.    Do your students sort of go on to work

5  in pharma companies or hedge funds that invest in

6  pharma companies or do you have any sense of what

7  happens to these students?

8    A.    There is usually between 60 and 80

9  students.  So, I have no idea what happens to all

10  of them.  I should say a couple of them usually

11  come from some other non-MBA program, so they are

12  getting a Master's in biotechnology but want to

13  understand something about the market and their

14  career outcomes similarly are quite varied.

15    Q.    Got it.  And I would ask you please to

16  turn to your publications in refereed publications

17  which is Section A.4.a, as well as your book

18  chapters, A.4.b, which we have modified to include

19  the NBER forthcoming document, I guess as well as

20  A.4.c and A.4.d, which are your working papers and

21  work in progress.

22          Do you see these few pages of your CV?

23    A.    Yes, I do.

24    Q.    Okay.  And what do you mean by "working

Highly Confidential - Subject to Further Confidentiality Review

```
 1    paper"?  I know that's not your phrase, but what
 2    does it mean?
 3         A.    It means that there is a draft of the
 4    paper that can be circulated, presented at
 5    conferences, presented in seminars, but that has
 6    not yet been accepted for publication.
 7         Q.    Okay.  And it's sort of in the course of
 8    being?
 9         A.    That's right.
10         Q.    All right.  And work in progress is a
11    paper that hasn't even -- or that's not yet at the
12    point where you want to circulate it?
13         A.    That's correct.
14         Q.    Okay.  So, you are working on these sort
15    of five papers at once in A.4.d?
16         A.    Yes.
17         Q.    So, looking at these -- looking at A.4
18    generally, which is the "Research" section, which
19    of these papers do you consider to directly pertain
20    to issues in this case?
21         MS. WELCH:  Objection; form.
22    BY THE WITNESS:
23         A.    I would say the two that are most
24    directly relevant concern marketing of prescription
```

1  drugs in the U.S.  So, one is in the Journal of Law

2  and Economics.  That's at the top of page A-2.

3  BY MS. GEMAN:

4      Q.    "Deregulating Direct-to-Consumer

5  Marketing of Prescription Drugs:  Effects on

6  Prescription and Over-the-Counter Sales"?

7      A.    That's right.

8      Q.    Okay.

9      A.    And the other is a book chapter, so this

10  is close to the bottom of page A-3, and that one is

11  titled "The Long Shadow of Patent Expiration:  Do

12  Prescription to OTC Switches Provide an Afterlife?"

13     Q.    And how is that paper or book chapter --

14  excuse me -- relevant to the issues in this case?

15     A.    So, both the paper in the Journal of Law

16  and Economics and this book chapter use data which

17  is similar to that employed by Professor Rosenthal

18  in her expert report in that they're -- they're

19  using data from what was once known as IMS, which

20  is now known as IQVIA Health, on prescription sales

21  and marketing.

22     Q.    But other than using -- I mean, that

23  data source is used for many, many, many purposes,

24  right?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      The marketing in particular is less

2   widely employed, but the -- there are some

3   similarities between the regression specification

4   in those papers and in Professor Rosenthal's

5   report.

6        Q.      What are those similarities?

7                I want to use the word you used.  Right.

8                What are those similarities between the

9   regression specifications that you were referring

10  to?

11       A.      In that marketing is an independent

12  variable explaining an outcome, a market outcome.

13  So, in the papers that I co-authored, the market

14  outcome was market share of individual products

15  involved.  In Professor Rosenthal's report, the

16  market outcome is total MMEs at the national level.

17       Q.      And you used a hedonic regression to

18  study this in your paper?

19       A.      No, there is not a hedonic regression.

20       Q.      Is there a multiple regression?

21       A.      Yes, there is.

22       Q.      Can you explain the difference?

23       A.      A hedonic regression usually refers

24  specifically to explaining price.  So, the

1  dependent variable would be the price of a product,

2  and the explanatory variables or the independent

3  variables would be characteristics of the product,

4  so things like the number of side effects or the

5  number of adverse interactions or its branded

6  status, these kinds of -- these kinds of variables

7  that we think would influence its final price.

8      Q.    Any other similarities?

9      A.    Other than, again, it's looking at what

10  is the effect of marketing on an outcome, that

11  seems like the most direct similarity.

12          In my other papers I'm often looking for

13  causal effects, and so there are issues of dealing

14  with endogeneity and appropriate units of

15  measurement, et cetera.

16          So, there is still relevance in my other

17  work, but those are the -- those are the two that I

18  think have the closest relationship with the

19  Plaintiff reports.

20      Q.    And --

21      A.    With the Rosenthal report.

22      Q.    And in the deregulating

23  direct-to-consumer marketing paper, what sort of

24  regression were you employing, if any?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.  So, there is a regression.  And to

2    refresh my memory, if you have a copy of the paper,

3    I can make sure that I speak accurately about the

4    specification.

5        Q.    I may, but if I do, I don't have copies

6    of it.  So, I don't think we can introduce it as an

7    exhibit.

8              Just for purpose of refreshing your

9    recollection, I will show you, per your request, I

10    will show you "Deregulating Direct-to-consumer

11    Market of Prescription Drugs:  Effects on

12    Prescription and Over-the-counter Product Sales,"

13    Journal of Law and Economics, October 2002, by the

14    University of Chicago.

15        A.    Okay.  So, the regression specification

16    that we used in that paper was the log of the

17    market share on the over-the-counter side of the

18    market as a function of order of entry and

19    over-the-counter advertising, and the

20    over-the-counter advertising -- well -- yeah.  Both

21    over-the-counter advertising as well as

22    prescription advertising.

23        Q.    What --

24        A.    And --

1    Q.    Go ahead.

2    A.    And the way that advertising enters that

3  regression is as a stock that depreciates over

4  time.

5    Q.    What do you mean by "order of entry"?

6    A.    Oh.  I mean this regression is at the

7  product level.  So, it's the national market.  But

8  there is one observation for each time period for

9  each of the anti-ulcer products that we studied

10  here.

11        And each of those products entered in a

12  specific order.  So, the first to the market would

13  be order of entry 1.  The fourth entrant was order

14  of entry 4.

15    Q.    And why did you use the log of the

16  market share?

17    A.    That's a standard transformation in

18  economics, in econometrics.

19    Q.    Thank you.

20        And have you ever published on

21  stationarity as distinct from testing for

22  stationarity?

23    A.    No, I have never written a paper that

24  focuses specifically on stationarity.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What about time series?

2    A.    No.

3    Q.    And are you aware that you have a

4    You Tube video?

5    A.    No.

6    Q.    Okay.  I guess you gave comments to the

7    WIPO?

8    A.    I gave a seminar at the WIPO, yes.

9    Q.    Right.  And there is a video I guess of

10   about a seven-minute presentation.

11   A.    Okay.

12   Q.    You should watch it.

13         And are you -- and in that I guess those

14   remarks -- well, let me ask you this.  What is the

15   WIPO?

16   A.    The World Intellectual Property

17   Organization.

18   Q.    Are you -- is it something where there

19   is member states?

20   A.    It is -- yes.

21   Q.    Who have signed --

22   A.    It's an international organization.

23   Q.    Member states are those who have agreed

24   to certain treaties and so forth?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     That's right.

2          Q.     Okay.  And have you given presentations

3     or the WIPO?

4          A.     I presented a research paper at their

5     invitation.

6          Q.     Okay.  And that's listed in here?

7          A.     Yes.

8          Q.     And when would you say you first learned

9     of the opioid crisis in the U.S.?

10          A.     I don't have a specific date in mind or

11     even a vague date in mind.

12          Q.     Is it something that before you were

13     retained in this case you were sort of following as

14     a citizen, you know, or as a consumer as opposed to

15     as an economics expert?

16          A.     So, certainly I had read articles in the

17     popular press covering the opioid deaths.  I was

18     interested in it a little bit as an academic

19     because I have a project ongoing on overuse of

20     antibiotics, and so I was a little bit curious

21     about whether there were commonalities there.

22          Q.     Are there?

23          A.     I haven't established yet.

24          Q.     What is the product -- I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review

1    Strike that.

2           What is the project you were working on

3    in connection with the overuse of antibiotics or if

4    you want to just point me to where in your CV it's

5    reflected.

6        A.    Sure.  There is a research contract

7    from -- it's a grant from the equivalent of the NSF

8    in France.

9        Q.    Is that CNRS?

10       A.    No.  It is the ANR and so the project is

11   on the "Economics of Antibiotics."

12       Q.    Can you point me to the page you're

13   looking at.

14       A.    Sure.  Page A-8.

15       Q.    Oh, it's this first one.

16       A.    Yes.

17       Q.    Oh, ANR.  And that is not CNRS?

18       A.    That's right.

19       Q.    So, this is not -- is this state-funded

20   research?

21       A.    Yes, it is.

22       Q.    I see.  And are you looking in that

23   project at the role of pharmaceutical marketing in

24   the prescription of antibiotics?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Unfortunately, we don't have data on

2    pharmaceutical marketing in the countries that

3    we're focusing on, which are European.

4    Q.    Okay.  And which antibiotics are you

5    looking at?

6    A.    All of them that are on the market.

7    Q.    Like Cubicin?

8    A.    There are different classes of

9    antibiotics.  They have different resistance rates.

10   I will butcher the pronunciation of their product

11   names.

12   Q.    Okay.  And why did you think there might

13   be commonalities?

14   A.    I think in both markets there is concern

15   about overuse or inappropriate use of the products.

16         So, in the case of antibiotics, the

17   concern is that well-meaning doctors write too many

18   prescriptions for antibiotics.  Patients don't

19   necessarily use them as directed.  And that

20   combination, using antibiotics where they're not

21   appropriate or not taking them as directed, has led

22   to problems of increased resistance to these

23   products, making them less effective and putting us

24   at risk for big public health issues down the road.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     And have you studied the reasons why

2    doctors are overprescribing?

3      A.     That's the subject of the project, yes.

4      Q.     And have you looked at that subject in

5    the U.S.?

6      A.     I have not.

7      Q.     And in terms of your invited talks, do

8    you have a list of what subjects you spoke on?

9      A.     No, I don't have that list.

10     Q.     Okay.  You have looked at the biassing

11   or potentially biassing effect of financial ties

12   between pharma and FDA advisory committee members,

13   is that right?

14     A.     That's right.

15     Q.     And what prompted your interest in that

16   subject?

17     A.     In part it was my Ph.D. student.  She

18   was my Ph.D. student.  She is now an assistant

19   professor who is the co-author on that paper.  So,

20   her dissertation looked a lot at information

21   problems in markets.

22            And, so, we were interested -- she came

23   to me with the idea that we look at something on

24   biased advice in this particular context.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              The advantage here is that there is

 2    relatively public information about these advisory

 3    committees.  So, what we have spent a lot of time

 4    doing is going through the transcripts of the

 5    advisory committee meetings to record how

 6    individuals voted and then try to identify the

 7    financial ties of each of those individuals to --

 8    to the pharmaceutical industry and then we have a

 9    structural model that tries to disentangle how much

10    of their voting is explained by a pro-industry bias

11    versus greater expertise.

12        Q.    And you found a little bit of both?

13        A.    Yes.

14        Q.    And who was the student or now professor

15    that you're working with?

16        A.    Fanny Camara.

17        Q.    And that's resulted in one paper thus

18    far?

19        A.    That's right.

20        Q.    All right.  And what was the nature of

21    the model that you used?

22        A.    It builds on a model of Supreme Court

23    Justice voting, a paper published in the AER a few

24    years before we started this project.
```

1          So, again, what we -- what we try to

2   model is a vote by each of the experts controlling

3   for lots of the expert characteristics that we can

4   observe, such as how many degrees they have, what

5   their medical specialty is, how much experience

6   they have on these FDA meeting -- these FDA

7   advisory committees, how many publications they

8   have.  We have all sorts of data that we try to

9   collect.

10       Q.    And does that kind of modeling have a

11   name?

12       A.    It's a structural model of voting.

13       Q.    But I guess I would ask which

14   statistical tools do you employ?

15       A.    Maximum likelihood.

16       Q.    And is that sort of a species of a

17   larger genus, if you understand?  Like what sort of

18   category of statistical modeling is maximum

19   likelihood modeling in?

20       A.    I'm not sure that I completely

21   understand your question.

22       Q.    Sure.  Would you say that's -- and I'm

23   just saying these as examples.  I actually have no

24   idea because you're the expert.

Highly Confidential - Subject to Further Confidentiality Review

1          Are they Bayesian models?  Are they

2  multiple regression models?  Are they -- would you

3  put them in sort of a larger category of analysis?

4      A.    The underlying model that we use in that

5  paper does allow experts to Bayesian update their

6  beliefs about whether a drug should be approved or

7  not.

8          It is not -- when people say multiple

9  regression, I think often they mean a linear

10  regression.  It is not a linear model.  But there

11  are multiple explanatory variables.  So, it is

12  multiple in that sense.

13      Q.    Would you call it a residual analysis?

14      A.    No.

15      Q.    Have you ever employed residual

16  analysis?

17      A.    As a diagnostic, yes.  But I haven't --

18  it hasn't been the main focus of any paper.

19      Q.    In which papers have you employed

20  residual analysis?

21      A.    It's sort of the standard data analysis

22  that one does in preparing a regression to ensure

23  that the important assumptions necessary for a

24  model to be valid are actually holding in that

1    context.

2         Q.    Okay.  And have you studied the impact

3    of financial ties or benefits from pharma on any

4    sort of subject other than advisory committee

5    members of the FDA?

6         A.    No, that's the only one we've looked at

7    so far.

8         Q.    Do you know what KOLs are?

9         A.    Yes.  Key Opinion Leaders.

10        Q.    Did you know what they were before this

11   case?

12        A.    I had heard of them, yes.

13        Q.    Had you heard of them in context with

14   your work or just sort of generally?

15        A.    Just generally.

16        Q.    And in your work in this case have you

17   made any attempt to study the impact of, you know,

18   financial ties or benefits more broadly in

19   connection with the opioid crisis?

20        A.    No, I have not.  In part, because my

21   understanding was that for the products that I was

22   focused on in this report, Allergan had not engaged

23   any Key Opinion Leaders.

24        Q.    And you mention that some of your

1  understanding of what marketing Allergan did or

2  didn't do came directly from counsel, correct?

3      A.    Actually, for the most part it came from

4  the depositions of Allergan expert -- or Allergan

5  witnesses.

6      Q.    Can you look at paragraph 46 of your

7  report, please.  I beg your pardon.  Oh, yeah.  No,

8  no.  46.

9          Do you see the first sentence says, "My

10  understanding, informed by counsel" --

11      A.    I'm sorry.  I went to page 46.

12      Q.    I'm sorry.  Paragraph 46.

13          Do you see there that the first sentence

14  of that paragraph references what you were informed

15  of by counsel?

16      A.    The sentence reads that "My

17  understanding, informed by counsel and review of

18  documents, Plaintiffs' complaints, discovery

19  responses, witness testimony and expert reports."

20          So, that was, as I said, my recollection

21  is that most of -- most of my statements were the

22  result of having read the Plaintiff or -- sorry --

23  the Allergan witness depositions.  And then, yes,

24  there were times when I would try to confirm with

1  counsel that in fact no Key Opinion Leaders had

2  been engaged, that there was no evidence of that.

3      Q.    What parts of your report reflect facts

4  that you were informed of by counsel as distinct

5  from having learned through these reviewing

6  documents and other materials?

7      MS. WELCH:  Objection to form.

8  BY THE WITNESS:

9      A.    The only area where I think that

10  that's -- where that's true is in understanding

11  which products to focus on, so who owned what

12  products.  So, those are listed, that's discussed

13  in paragraph 43.

14  BY MS. GEMAN:

15      Q.    Okay.  We talked earlier about whether

16  you had testified for or in front of any U.S.

17  government agency.

18          Have you ever -- my separate question

19  now is have you ever worked for any U.S. government

20  agency?

21      A.    I was a research assistant at the

22  Federal Reserve Board after college.

23      Q.    And that was referenced in your CV I

24  believe?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     I think so, yes.

2      Q.     It was.  Okay.

3             And if we could just go back to your CV

4      for a minute, please, and look at page A-9.

5      MS. WELCH:  CV you said.

6      MS. GEMAN:  Yes.

7      BY MS. GEMAN:

8      Q.     What is PhRMA?

9      A.     It is the trade association for branded

10     pharmaceutical firms in the U.S.

11     Q.     And Allergan is a member, is that right?

12     A.     I have -- probably.  I haven't looked at

13     their membership list.

14     Q.     How much in grants have you gotten from

15     PhRMA?

16     A.     That's the only one that I recall.  It

17     was a long time ago because I was still at Duke.

18     So, that means more than ten years ago.  I think it

19     was something like $10,000.

20     Q.     How would you characterize the expertise

21     you bring to this case?

22     A.     I'm an expert in the economics of the

23     pharmaceutical industry.

24     Q.     Let's look at the materials considered,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    which is Appendix B.

 2              Now, the first sentence reads,

 3    "I incorporate by reference all materials cited in

 4    my expert report."

 5              So, that leads me to ask.  Are there

 6    materials that you considered that are not listed

 7    in Appendix B?

 8         A.    No.  This is meant to be a list as

 9    complete as possible about materials that I

10    considered.

11         Q.    All right.  And the first section is

12    "Data."  Is this list complete?

13         A.    To the best of my knowledge, yes.

14         Q.    Did you review Gruber's backup data?

15         A.    I did not personally review that data.

16    It was my team at Bates White.

17         Q.    Who at Bates White reviewed that data?

18         A.    I'm not sure that I know all of the

19    individuals involved.  In particular, I don't know

20    who -- who did whose data.  I don't know who

21    focused on the Rosenthal backup data versus the

22    McGuire backup data versus the Gruber data.

23         Q.    But you personally looked at the

24    Rosenthal, Cutler and McGuire and McCann backup
```

1    data?

2         A.    By looking at data, do you mean did I

3    open those files?

4         Q.    You say you considered those materials.

5    So, what do you mean?

6         A.    Well, they're inputs into my analysis or

7    my team ran sensitivity checks on their analyses

8    and that informed the report.

9         Q.    Did you look at any of the files -- did

10   you look at any of the backup data for the four

11   experts you mention in this list?

12        A.    I did not touch the data.  It was on a

13   secure server.  It was handled by the set of people

14   who knew where everything was who kept things

15   organized and clean, and that was their

16   responsibility.  I didn't touch it myself.

17        Q.    Did you have access to that server?

18        A.    If I had requested access, yes.  I think

19   the exception probably was to the mortality data

20   because I didn't sign an agreement to have the

21   right to use that data until fairly late in the

22   process.

23        Q.    All right.  And is there a reason

24   Gruber, the Gruber data is not listed here?

Highly Confidential - Subject to Further Confidentiality Review

 1        A.     I don't comment very much on the Gruber

 2   report, and we didn't do any kinds of sensitivity

 3   checks of his analyses.  He provided more of a high

 4   level overview of the markets and it wasn't

 5   directly pertinent to the analyses that I wanted to

 6   do for Allergan.

 7        Q.     So, just to be clear, did anybody look

 8   at his data?

 9        A.     I don't know if anyone looked at his

10   data.

11        Q.     Okay.

12        A.     I'm sure they had access to it, but I

13   don't know the -- I don't know.

14        Q.     Okay.  And how did you select the

15   depositions that you reviewed?

16        A.     The depositions from the Allergan

17   experts were suggested to me by counsel as being

18   the ones most pertinent to understanding Allergan's

19   marketing strategy.  So, that would be the Altier

20   report -- or deposition, the Snyder deposition, the

21   Boothe deposition and the Leitch deposition.

22        Q.     Did you read those depositions cover to

23   cover?

24        A.     I skimmed them at least cover to cover.

Highly Confidential - Subject to Further Confidentiality Review

1   There are certainly some sections that I focused on

2   more intensively.

3       Q.    How were those sections made available

4   to you?

5       A.    I'm not sure I understand the question.

6       Q.    I will ask a more general question.

7             How did you get these transcripts?  Were

8   they, you know, e-mailed to you?  Was there a file

9   given to you?

10      A.    Bates White had created a folder for me

11  with the relevant materials on a secure server at

12  their offices in Washington, so I connected via

13  this secure server.  It was set up in a way where I

14  could not download anything or print anything

15  myself to make sure that we respected all of the

16  confidentiality limits.

17      Q.    Did anybody provide you with a summary

18  or selected pages or any other sort of crosswalk to

19  the depositions to facilitate your review?

20      A.    For those depositions, I don't believe

21  so.  For some of the other -- for the economics

22  depositions, I read them closely myself.  I believe

23  for the Perri deposition, one of the Bates White

24  team members who had read it closely then directed

Highly Confidential - Subject to Further Confidentiality Review

```
 1    me to specific sections.

 2        Q.    Just so I am clear, is the Perri

 3    deposition the only one where you were directed to

 4    specific sections?

 5        A.    That's my recollection.  I'm sure

 6    that -- I know that at other points as we were --

 7    as I was drafting the report, that a couple of the

 8    team members who had read all of these depositions

 9    and other expert reports very closely would --

10    would point me to supporting statements or

11    statements that were informative about a point that

12    we were making.

13        Q.    Were those in writing?

14        A.    Either -- so, no, not in writing.

15              In general, our information exchange

16    took place through conference calls where we would

17    share screens and look at documents together or in

18    the -- in the draft of the report, a comment would

19    be added to suggest that I look at pages X and Y of

20    another document.

21        Q.    Did you ever look for contrary

22    information?

23        A.    I myself always searched for any mention

24    of Allergan or the Allergan products regardless of
```

1    whether my team had directed me to them.

2         Q.    But did you look expressly for contrary

3    information?

4         MS. WELCH:  Objection to form.

5    BY THE WITNESS:

6         A.    So, I read these depositions.  I read

7    the other reports.  If I saw information that was

8    perhaps less helpful to Allergan, I certainly took

9    note that there was -- that that information

10   existed.

11            But I don't know what search terms I

12   would use other than looking for Allergan, Actavis,

13   Norco, Kadian.

14   BY MS. GEMAN:

15        Q.    What did you see that was not as --

16   perhaps less helpful to Allergan?

17        A.    I can't recall specific statements that

18   I thought, oh, that really worries me.  There was

19   obviously, as I discuss in the report, the

20   corrective action, the FDA warning letter and

21   corrective action.

22        Q.    Did you look at their return on

23   investment materials?

24        A.    Are you referring to the marketing

Highly Confidential - Subject to Further Confidentiality Review

1   documents where there was a claim from a marketing

2   firm that there would be a return on investment?

3       Q.    No, I'm referring to anything that you

4   would consider return on investment materials.

5       MS. WELCH:  Objection; form.

6   BY MS. GEMAN:

7       Q.    By Allergan or for Allergan.

8       MS. WELCH:  Same objection.

9   BY THE WITNESS:

10      A.    I looked at documents that were

11  referenced in the depositions that referred to some

12  kind of PowerPoint or report generated by an

13  outside marketing company suggesting there was a

14  high return on investment from doing detailing.

15  BY MS. GEMAN:

16      Q.    And did you -- you seem -- there is some

17  skepticism in your voice.  Do you have a skepticism

18  about these outside marketing firms?

19      A.    Well, I think it's obviously in their

20  interest to claim that there is a high return on

21  their services.  So, I take that with a grain of

22  salt.

23      Q.    Did you believe -- did you separately

24  study any ROI for Allergan?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I did not calculate specifically an ROI,

2    although in my analysis I look at actually what

3    happened after a physician was visited by an

4    Allergan detailer and so I can get a sense of what

5    the return is.  I didn't calculate a precise

6    number.

7         But for the physicians that I focused on

8    in the two bellwether counties here, out of the 41

9    that I could identify, only two of them had an

10   increase in Kadian prescribing.  The others either

11   held roughly steady or fell.  So, I infer from that

12   that the return on investment was not high.

13   Q.    So, how do you square that with what

14   Allergan itself or its marketing personnel found?

15   MS. WELCH:  Objection; form.

16   BY THE WITNESS:

17   A.    I don't think that they actually

18   calculated a realized return on investment.  They

19   had documents suggesting that investment would

20   yield these big benefits, but I don't -- I don't

21   recall seeing any calculation ex-post that that --

22   that those forecasts were accurate.

23   BY MS. GEMAN:

24   Q.    And did you ask for those documents, any

1  ex-post documents, to be shown to you if they

2  existed?

3       A.    No, I did not specifically ask for

4  ex-post documents.

5       Q.    And how did you select the documents

6  that are listed in Section B.3?

7       A.    Again, not every single one of things is

8  cited.  These are materials considered.  These were

9  materials that were provided to Bates White and to

10  myself and so I list them here.

11       Q.    What was the criteria for their

12  provision?  Why these documents and not others?

13       A.    To the best of my knowledge, I provided

14  everything -- I listed everything to which I was

15  given access.

16       Q.    No.  But my question is a little more

17  fundamental, which is what is the criteria for why

18  you were given access to these documents?  Are

19  these documents you requested?  Are these documents

20  someone else decided would be germane to your

21  report?  Why these documents in the whole universe

22  of documents?

23       A.    So, most of these documents refer to

24  marketing activities, and that's why they were

Highly Confidential - Subject to Further Confidentiality Review

1    provided to me, because a lot of the focus of my

2    report obviously concerns marketing.

3         Q.    Did you ask for all marketing documents?

4         A.    Yes.  I was provided with every -- with

5    all the marketing documents, all the marketing data

6    that Allergan had available.

7         Q.    Okay.  And were you able to query the

8    database that contains these documents?

9         A.    I'm not sure what you mean by that.

10        Q.    Do you have an understanding of whether

11   there's a sort of database that holds the documents

12   produced in this litigation?

13        A.    All of these documents were made

14   available to me in a folder on a secure server.

15   So, I had access to them.  I didn't need to do a

16   database query to access them because they are

17   pdf's and Excel files.

18        Q.    They were made available to you in pdf?

19        A.    Many of them here are pdf documents,

20   yes.

21        Q.    And do you know who put together --

22   well, strike that.

23              So, the -- what are the documents -- if

24   you look on page B-25 and B-26, what are the MULTI

Highly Confidential - Subject to Further Confidentiality Review

```
 1    documents?

 2         A.    I don't recall specifically.

 3         Q.    What are the SHC documents?

 4         A.    I don't recall specifically.

 5         Q.    What are the PPLPC documents?

 6         A.    I don't recall specifically.

 7         Q.    Did you look at documents from other

 8    Defendants?

 9         A.    No.

10         Q.    And are you offering any opinions on the

11    efficacy of the marketing of any of the other

12    marketing Defendants other than Allergan?

13         MS. WELCH:  Objection to form.

14    BY THE WITNESS:

15         A.    No, I am not.

16    BY MS. GEMAN:

17         Q.    And how did you determine which case

18    law, expert litigation and publicly available

19    documents to review?

20         A.    So, you're on?

21         Q.    I'm on pages B-2 and B-3 through B-7.

22         A.    So, of what's cited here, obviously some

23    of these documents are specific to this litigation.

24    So, that seemed -- that seemed relevant.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Some of the others the Bates White team
 2   was familiar with and pointed me to.
 3              Of the publicly available documents, the
 4   academic literature includes papers that I was
 5   either already familiar with or identified in the
 6   course of looking for relevant work.
 7         Q.    Did you look for relevant work?
 8         A.    Yes, I did.
 9         Q.    Okay.  So, how did you look for relevant
10   work?
11         A.    I did a standard literature search.  I
12   also looked at presentations.  I tried to look at
13   conference presentations from the last couple of
14   years to make sure that I picked up recent working
15   papers that were not in journals at this point.
16         Q.    And what criteria did you use to look
17   for those?
18         A.    You mean what search strings did I use?
19         Q.    Sure.
20         A.    Opioids, opiates, effective marketing.
21   It depends on which subject area we're talking
22   about.  In many cases I would start with one paper
23   that seemed relevant and I would look at the
24   references cited by that paper, and that would lead
```

Highly Confidential - Subject to Further Confidentiality Review

1   me to another set of papers.

2       Q.    And, so, you described materials

3   considered.  That's what this appendix is, right?

4       A.    Yes.

5       Q.    Are you drawing a distinction between

6   materials considered and materials relied on?

7       A.    Perhaps you can explain to me if there

8   is a legal difference in how I should answer that

9   question.

10      Q.    Well, I mean, did you rely on all these

11  documents in forming your opinions?

12      A.    They were considered.  I am not sure

13  each one -- that I can then point to each document

14  and say that was specifically pertinent to this

15  statement.  I wouldn't be able to make that

16  mapping.

17      Q.    Okay.  Are there any documents here that

18  you're sure you did not rely on?

19      A.    I can't say with certainty that I did

20  not rely on any of these documents.  What I'm

21  trying to explain is that I can't make a mapping of

22  this specific document led into this specific

23  analysis.

24      Q.    Okay.  And you have a separate appendix,

Highly Confidential - Subject to Further Confidentiality Review

1  Appendix D, on sensitivities, "Alternate

2  sensitivities of Rosenthal models"?

3      A.    That's right.

4      Q.    Have you provided all the alternates

5  that you looked at?

6      A.    No.  I'm sure that we -- in fact, I know

7  that we tried other depreciation rates, just to

8  take an example.  So, this was not an exhaustive

9  list of all the sensitivities.  It was meant to

10  demonstrate that the model -- that her

11  specification is quite sensitive.

12      Q.    And did you look at sensitivities of any

13  of the other experts?

14      A.    Yes.  So, as I've described in Section

15  VI.F, I look at the sensitivity of Professor

16  Cutler's analysis to changing his unit from

17  shipments derived from the ARCOS data to

18  prescriptions as used by Rosenthal.

19      Q.    And is there a reason you didn't put

20  forth the alternatives?

21      A.    Well, I include them here.

22      Q.    Okay.  I mean, I guess I'm saying is

23  there a reason you didn't make a separate appendix?

24  Why did you call out the Rosenthal?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Ah.  Because that is the model that --

2  that we did the most testing of.

3      Q.    Okay.

4      A.    And my view is that because that's the

5  critical input to every report that follows, to all

6  of the calculations that follow, that this was the

7  one that it was worthwhile spending the most time

8  verifying and so that's what we -- we have included

9  a lot of these analysis -- of these sensitivities

10  or alternative analyses to demonstrate that there

11  was -- there was a lot to worry about in her

12  estimate.

13      MS. GEMAN:  I think we have been going just

14  over an hour.  Do you want to take a break?

15      MS. WELCH:  Sounds good.

16      MS. GEMAN:  How do we -- it might be too early

17  for lunch, but how have you guys been doing it?

18          We can go off the record.  I'm sorry.

19      THE VIDEOGRAPHER:  We are off the record at

20  11:44 a.m.

21              (WHEREUPON, a recess was had

22              from 11:44 a.m. to 12:03 p.m.)

23      THE VIDEOGRAPHER:  We are back on the record

24  at 12:03 p.m.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. GEMAN:

2         Q.    So, if I could ask you to please turn

3    again to Exhibit 6, which is your report, and if

4    you could please confirm that that is your

5    signature on page 135.

6         A.    Yes.

7         Q.    And we talked about this a bit at the

8    beginning of the day, but in case anything has

9    refreshed your recollection.

10             In addition to the two Defendant -- two

11   or three Defendant expert reports you mentioned,

12   have you read any materials since May 10th about

13   this case that you had not previously read?

14        A.    No.

15        Q.    And does this report, your May 10

16   report, reflect a full and complete statement of

17   the opinions you intend to offer in this matter?

18        A.    I have, I believe, at the start reserved

19   the right to issue supplemental reports depending

20   on the availability of additional information or

21   new information and specifically a supplemental

22   report concerning Dr. McCann's allocation of

23   products to Allergan.

24        Q.    So, are you still working on Dr. -- your

Highly Confidential - Subject to Further Confidentiality Review

```
 1    response to Dr. McCann?

 2         MS. WELCH:  Objection to form.

 3    BY THE WITNESS:

 4         A.    My team is working on that analysis now.

 5    I have not drafted anything or even made a final

 6    decision as to whether to submit a supplemental

 7    report.

 8    BY MS. GEMAN:

 9         Q.    And what will you base that decision on?

10         A.    Whether it looks like there are gross

11    errors in the results.

12         Q.    And other than sort of reserving your

13    right to render additional opinions about

14    Dr. McCann, does this reflect a full and complete

15    statement of your opinions in this matter?

16         A.    As of May 10 or as of now, June 5.  But,

17    again, I've reserved my right to make modifications

18    if there is new information or new materials that

19    come out.

20         Q.    And have you currently been tasked with

21    doing any work in this case by your client?

22         A.    Beyond appearing here for the

23    deposition?

24         Q.    Yes.
```

1      A.     No.  So, as I said, my team is reviewing

2   the McCann materials.  So, it is possible that I

3   will work on a supplemental report after we have

4   finished here today, this week.  But I have not

5   been doing anything other than preparing for this

6   deposition since submitting the report.

7      Q.     And you're not intending to submit any

8   additional opinions about any other aspect of your

9   report, correct?

10      A.     Again, I have reserved the right if new

11   information becomes available or new materials

12   become available.

13      Q.     Do you have any corrections to be made

14   to your report?

15      A.     I have a couple of minor corrections,

16   yes.

17             So, on the top of page 17, the second

18   bullet point, the last statement should read,

19   "Today, Allergan owns Norco but contracts with Teva

20   Pharmaceuticals, Inc. to manufacture Norco and

21   contracts with UPS SCS, Inc. to distribute," and it

22   should read "Norco" rather than "Kadian on its

23   behalf."

24             Another correction is on page 31, in

1     paragraph 68, there is a statement that begins,

2     "Similarly, Percocet is a combination," and it's

3     written here "hydrocodone and ibuprofen," and that

4     should be "oxycodone and acetaminophen."

5        Q.     Tylenol, in other words?

6        A.     Tylenol is the brand name for

7     acetaminophen.

8        Q.     Yes, I know.

9        A.     And one other correction. Figures 10

10    and 11 on pages 43 and 44. The title for Figure 11

11    corresponds to Figure 10 and vice versa.

12         And the only other issue I spotted, I

13    don't think it's material, is that when I give the

14    acronym for OARRS, the Ohio Automated Rx Reporting

15    System, sometimes there is an extra "Reporting"

16    provided in parentheses, so it says OARRS and then

17    Ohio Reporting Rx Reporting System. It's just a

18    mistake in describing the acronym.

19        Q.     It's like when someone says a VAT tax or

20    something.

21        A.     I'm not sure what happened.

22        Q.     Okay. Any other -- now, do you consider

23    any of these changes material?

24        A.     No, I do not. I think for clarity

Highly Confidential - Subject to Further Confidentiality Review

1   Figures 10 and 11, that was important to explain.

2   The others are just factual misstatements but not

3   especially important for the formation of any

4   opinion.

5        Q.    And if you do discover inaccuracies, we

6   would appreciate if you provide those to us in

7   advance of trial.

8        A.    Of course.

9        Q.    And if you could please read the first

10  sentence of paragraph 5.

11       A.    "I have been asked by counsel for

12  Defendant Allergan to determine whether and to what

13  extent Allergan's promotion of its prescription

14  opioid products caused harm to Plaintiffs Cuyahoga

15  and Summit counties."

16       Q.    And how do you define "harm"?

17       A.    I've used the primary measure employed

18  by the Plaintiffs, which is mortality.

19       Q.    And you're not making any opinions on

20  any other forms of harm to the counties, correct?

21       MS. WELCH:  Objection to form.

22  BY THE WITNESS:

23       A.    So, as I explained earlier, the approach

24  that the Plaintiffs have taken is that they try to

Highly Confidential - Subject to Further Confidentiality Review

1  establish this causal link, causal chain between

2  detailing and marketing, shipments and then

3  shipments and mortality.  And based on the

4  mortality estimates, they use that to allocate

5  harm, all these other kinds of harms that one might

6  image to be linked to opioids.

7          So, I stopped at mortality mainly

8  because I was focused on the causal links between

9  detailing, shipments and that clear measure of

10  harm.  That's what Professor Cutler identified as

11  the best measure of harm in this context.

12  BY MS. GEMAN:

13     Q.    And you say you stopped mainly because

14  that's what the Plaintiffs did.  What are the other

15  reasons you defined harm by mortality?

16     A.    That was the preferred measure stated by

17  Professor Cutler.

18     Q.    Did -- and, again, just because the jury

19  is going to want a more direct answer, are you

20  making any opinions about any other kinds of harm?

21     MS. WELCH:  Objection to form, asked and

22  answered.

23  BY THE WITNESS:

24     A.    So, because the estimates of the other

1   kinds of harm are linked to the estimate for

2   effects on mortality, for me it was sufficient to

3   show that in the case of Allergan it was -- I could

4   not find a causal link between Allergan's detailing

5   activities and mortality.  That's why I stopped

6   there.

7   BY MS. GEMAN:

8       Q.    Okay.  And you were also asked to

9   evaluate the opinions offered by four of

10  Plaintiffs' expert economists, correct?

11      A.    That's right.

12      Q.    Are you -- and you also reviewed the

13  expert reports of Dr. McCann and Ms. Keller,

14  correct?

15      A.    That's right.

16      Q.    Are you evaluating their reports for any

17  purpose other than evaluating whether in your view

18  they correctly identified transactions associated

19  with Allergan products?

20      A.    No.  That's my focus.

21      Q.    What is Dr. McCann's area of expertise?

22      A.    These two were both focused on diversion

23  of products; and as I understand it, their areas of

24  expertise are supply chains and the DEA.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      And do you have any knowledge about

2   those areas?

3        A.      I have superficial knowledge of those

4   areas.  But my area of expertise, my scope is

5   outside that.

6        Q.      You have no expert knowledge in those

7   areas?

8        A.      That's right.  That's why I am not

9   opining on them.

10       Q.      And you also reviewed a number of other

11  reports by Plaintiffs' experts, correct?

12       A.      Yes, I looked at some of their medical

13  experts as well.

14       Q.      And for what -- strike that.

15              Did you -- are you offering any opinions

16  about those reports?

17       A.      No, I am not.

18       Q.      You're not offering any criticisms about

19  those reports?

20       A.      No, I am not.

21       Q.      You have no opinions about the

22  methodology in those reports?

23       A.      No, I do not.

24       Q.      Do you have any expertise in the areas

1    that were the subject of those reports?

2         A.    No, I do not.

3         Q.    Okay.  And with respect to the

4    economists, Gruber, Rosenthal, Cutler and McGuire,

5    have you stated all of your criticisms in this

6    report?

7         A.    I stated the criticisms that I thought

8    were most pertinent.  I'm -- I can't rule out that

9    there are other criticisms that I might -- that I

10   might have overlooked at some point, but these -- I

11   tried to summarize to the best of my ability the

12   problems that seemed most important for this

13   analysis.

14        Q.    So, are you saying that this report is

15   not a full statement of the opinions you intend to

16   render about these four economists?

17        A.    I have summarized here everything that

18   is pertinent in their reports to my report.

19        Q.    Okay.  So, you understand you're not

20   just going to show up at trial and say, "Oh, by the

21   way, I also have all these other issues that I

22   haven't previously told anyone about"?

23        A.    That's right.

24        Q.    Okay.  And just a quick question about

Highly Confidential - Subject to Further Confidentiality Review

1    Ms. Keller.  Do you have any opinion about the

2    compliance metrics that she used in her report?

3         A.    That I -- I have not focused on that at

4    all.  My focus was on the expert economists.

5         Q.    And have you ever had occasion to try to

6    identify specific drug transactions from data in

7    your past work?

8         A.    I have not worked with the ARCOS data in

9    the past, no.

10         Q.    What about with other data sources that

11    would permit the identification of specific

12    transactions?

13         A.    I cannot recall a data source that

14    provided detail at the level of transactions during

15    the supply chain, no.

16         Q.    And are you offering any opinions about

17    the distributors' either adherence to or derogation

18    of their duties to monitor?

19         A.    No.

20         Q.    Did you have any understanding of the

21    distributors' duties before this litigation?

22         A.    Only at a very superficial level.

23         Q.    And did you speak with anybody at

24    Allergan in connection with preparing your report?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    No, I did not.

2    Q.    Do you know if the Bates White personnel

3  spoke with anyone at Allergan in connection with

4  preparing their report?

5    A.    I don't know with whom they spoke, no.

6    Q.    But do you know that they spoke with

7  anyone?

8    A.    I don't believe that they did, but I

9  can't answer -- I don't have a complete accounting

10  of everything that went on at Bates White.

11    Q.    And have you met with counsel for

12  Allergan?  I'm not asking for any content.

13    A.    Beyond the counsel that I've already

14  listed here?

15    Q.    Sorry.  Yes.  You have talked about how

16  you have met with outside counsel.

17    A.    Yes.

18    Q.    Have you met with any in-house counsel?

19    A.    No, I have not.

20    Q.    And, so, you summarize your opinions in

21  Section I.E of your report, which goes from

22  paragraphs 23 through 30, is that correct?

23    A.    Yes.

24    Q.    So, what I would like to make sure that

1   the jury understands and that I understand is the

2   bases of each of these opinions.  So, let's start

3   with paragraphs -- let's start with paragraph 23.

4       A.    Okay.

5       Q.    So, can you describe the basis for the

6   opinions set forth here in paragraph 23.

7       A.    Sure.  Much of that is covered in

8   Section VI of the report.  So, let me start with

9   the model employed by Professor Rosenthal.

10          The first major issue that I identified

11  was that her data have a stationarity problem.  So,

12  the issue here is that she is regressing national

13  sales on total marketing, so it aggregated over all

14  products for every month at the national level.

15          And the problem here is that these are

16  both time series, moving largely in the same

17  direction; and in situations like this, it can be

18  very difficult to identify a causal effect.

19          So, there is a specific test that

20  typically an economist would run when using time

21  series data like this to verify the stationarity of

22  the underlying data series.  And, in fact, I ran

23  that test, and it provided evidence that there is a

24  stationarity issue here.

1    Q.    And have you ever become familiar in the

2    economic literature with situations in which

3    stationarity does not cause a spurious

4    relationship?

5         MS. WELCH:  Objection to form.

6    BY THE WITNESS:

7    A.    I am not aware of a regression where

8    there is a stationarity problem that does not cause

9    a spurious relationship or that does not have the

10   risk of a spurious relationship, more precisely.

11   BY MS. GEMAN:

12   Q.    All right.  Well, what is the

13   difference?

14   A.    Basically we can try and rule out risks

15   of spurious relationships, but we can never -- it's

16   never possible to say with absolute 100% certainty

17   that the relationship doesn't exist.

18   Q.    And you criticize Dr. Rosenthal for

19   using national sales data?

20   A.    That's correct.  Well, there is specific

21   issues.  It's not just that it's national sales

22   data.  It's that the sales data have been

23   aggregated across all products, which removes

24   potentially interesting and important sources of

Highly Confidential - Subject to Further Confidentiality Review

1    heterogeneity.

2           And because that -- the use of an

3    aggregate model like this means that Professor

4    Rosenthal is relying purely on time series

5    variation to identify the causal effect of

6    detailing on sales, she runs into this problem of

7    it being very difficult to identify such a causal

8    relationship.

9        Q.    And what are the -- what are the

10   benefits of statistical aggregation?

11       A.    Frankly, in this case I don't see any

12   benefits from statistical aggregation because I

13   think the underlying heterogeneity is important for

14   understanding differences between the Defendants,

15   between the products, between the timing of when

16   different marketing programs were introduced.

17          There are other issues with moving to

18   the aggregate level when one then wants to take the

19   aggregate estimate and apply it to a more micro

20   level, such as a county.

21       Q.    But my question was what are the

22   benefits of statistical aggregation?

23       A.    Again, I do not see a benefit of

24   aggregating in this context.  Sometimes we have no

Highly Confidential - Subject to Further Confidentiality Review

```
1    choice because aggregate data is all that exists

2    and sometimes the underlying sources of

3    heterogeneity that we're aggregating over are not

4    interesting or useful.

5         Q.    And it's more than that, though, right?

6    I mean, what happens if you disaggregate data too

7    much to power and significance?

8         MS. WELCH:  Objection to form.

9    BY THE WITNESS:

10        A.    To statistical power and statistical

11   significance, in general, you're going to have

12   greater power and greater statistical significance

13   when you don't aggregate because you will have more

14   observations and more sources of variation with

15   which to identify effects.

16   BY MS. GEMAN:

17        Q.    Can you explain the basis of your

18   statement that you have more observations when you

19   don't aggregate?

20        A.    So, by definition, aggregation means

21   that you're summing over a set of observations, a

22   set of smaller units.  If instead the analysis is

23   conducted at the level of the smaller unit, you

24   have more observations.  And in general more
```

Highly Confidential - Subject to Further Confidentiality Review

 1   observations help in statistical analysis.

 2        Q.    So, you would agree, then, that if the

 3   disaggregated units have small numbers of

 4   observations, then that is not helpful in

 5   statistical analysis?

 6        MS. WELCH:  Objection to form.

 7   BY THE WITNESS:

 8        A.    I don't think that's what I stated.  My

 9   statement is that in aggregating across units of

10   observations, one loses observations by definition.

11   If I start with ten micro units and I aggregate

12   across them to one observation, I have lost

13   observations and I've potentially lost information.

14            And that makes statistical analysis more

15   difficult because in general statistical

16   significance depends on the number of observations

17   and the ability to use underlying variation in the

18   data to identify effects.

19   BY MS. GEMAN:

20        Q.    But you understand that if you -- if the

21   disaggregated units have many fewer observations,

22   then you're depriving the data of significance,

23   right?

24        A.    No, I don't think that's an accurate

1    statement.

2        Q.    Do you know if that's a conclusion that

3    courts have drawn when looking at statistics?

4        A.    I have not looked at court decisions

5    weighing in on statistics.  What I can say is that

6    certainly economists prefer in general to work with

7    data at a more micro level rather than losing

8    observations or losing information through

9    aggregation.

10            And the only reason that I -- that I

11   usually see that done is if there is a concern

12   about too much random noise at the very, very micro

13   unit.

14            However, I don't think that that's a

15   valid concern in this case because much of the

16   analysis that the Plaintiffs do is at the county

17   level, and I see no reason why the start of the

18   analysis should be at the national level rather

19   than at the county level.

20       Q.    So, your opinion is that the data should

21   be analyzed separately by county or in the

22   aggregate with counties as a control or something

23   else or counties as a variable or something else?

24       A.    My opinion is that because eventually --

1    along the chain of causality that the Plaintiffs

2    have alleged there is a relationship at -- they

3    allege that there is a relationship between county

4    level shipments and county level harm, that it

5    makes more sense to start with county level

6    detailing at the beginning because that exploits

7    not just variation in detailing over time in order

8    to identify the effect of detailing on sales, but

9    also differences across counties in the extent of

10   detailing.  So that cross-sectional variation

11   provides more statistical identification.

12        Q.    Okay.  And did you consider -- strike

13   that.

14             So, we went off on a sort of tangent

15   about aggregation.

16             Were you done describing the bases of

17   your opinions as set forth in paragraph 23?

18        A.    No.

19        Q.    Okay.

20        A.    So, that is my first criticism of the --

21   of Professor Rosenthal's model, that this

22   stationarity issue is a very serious one.

23             And when I do the standard corrections

24   for -- for this problem, I do that first by doing

Highly Confidential - Subject to Further Confidentiality Review

1   what's called a first differences model and next by

2   taking logs.

3          So, both of these data transformations

4   are ways that we eliminate the stationarity problem

5   in the data.  And then I rerun her analysis,

6   keeping everything else the same except for making

7   these two different data transformations.

8          And when I do that in the first

9   differences model, there is no statistical

10  significance in the regression results between the

11  stock of marketing and sales.  So, that's, again,

12  that's a core estimate for her.  And the

13  statistical significance falls apart when this

14  correction is made.

15         In the other sensitivity check, so the

16  other transformation using log-logs, the

17  coefficients are statistically significant but the

18  calculation of the impact of Defendant promotion on

19  MMEs drops to less than 3%.

20         So, it's a much smaller estimated effect

21  with making -- after making that change.

22     Q.    So, it's statistically significant but

23  in your view it's not practically significant?

24     A.    It's certainly much smaller in

1    magnitude.  And I also want to make clear that I

2    don't view that as the only problem with this

3    model.

4              So, I'm just pointing out that her

5    estimate is not robust to making these necessary

6    changes to address stationarity, not because I

7    think that these are necessarily valid estimates

8    either.

9         Q.    Sorry.  But you've -- just so the record

10   is clear, the answer to the question is you agree

11   that the results were indeed statistically

12   significant?

13        A.    In the sensitivity analysis where I use

14   a log-log model, the coefficients that result are

15   statistically significant.  They imply a much, much

16   smaller percentage of Defendant promotion on MMEs.

17             But, again, I don't want to affirm that

18   these are the correct estimates of the relationship

19   between detailing and sales.

20        Q.    But just stated more clearly to sort of

21   fill in what the coefficients are, in your log-log

22   model -- and, by the way, that's a common model, is

23   that correct?

24        A.    That's a standard transformation of data

Highly Confidential - Subject to Further Confidentiality Review

1   to deal with stationarity issues.

2       Q.    So, you found a statistically

3   significant relationship between Defendant's

4   promotion on the one hand and what on the other?

5       A.    Without making any other of the changes

6   to the model that I think are necessary in order to

7   provide some confidence in establishing a causal

8   relationship between detailing and sales, then,

9   yes, that is the result.  That's why I have

10  included the table here.

11          But, again, I want to make it very clear

12  that I do not affirm that I think this is a correct

13  estimate either.

14      MS. GEMAN:  Move to strike as non-responsive

15  everything after "Yes, that is the result."

16  BY MS. GEMAN:

17      Q.    Okay.  Any other bases of your opinions

18  in paragraph 23?

19      A.    Yes.  Another issue in the model that

20  Professor Rosenthal has used is that she has

21  ignored the endogeneity of detailing on sales.

22      Q.    So, let me ask you a question about

23  that.

24          There is -- you understand, I think,

Highly Confidential - Subject to Further Confidentiality Review

1    that the relationship of promotion to sales is

2    studied all the time?

3         MS. WELCH:  Objection to form.

4    BY THE WITNESS:

5         A.    You mean in the academic literature, is

6    there a large literature on the relationship

7    between detailing and sales?  Yes, I understand

8    that.

9    BY MS. GEMAN:

10        Q.    And so describe -- I didn't mean to cut

11   you off.  You were saying that the basis for your

12   opinion in paragraph 23 is you believe

13   Dr. Rosenthal's models, I don't know if you mean

14   both her models, but at least one has, in your

15   view, endogeneity bias?

16        A.    Yes.  The direct model, which relates

17   detailing to sales, has an endogeneity problem.

18        Q.    And do you think that what you as

19   Allergan's expert consider the stationarity problem

20   applies to both of Dr. Rosenthal's models?

21        A.    No.  It applies to the direct model,

22   which relies purely on time series variation.

23        Q.    So, to be clear, you are not issuing a

24   criticism that Dr. Rosenthal's indirect model has a

1    stationarity problem?

2        A.    That's correct.  I have not stated in my

3    report that there is a stationery problem with the

4    indirect model.  I have other criticisms of that

5    model, but it isn't stationarity.

6        Q.    Okay.  So, going back to endogeneity,

7    which model do you think has this problem?

8        A.    Again, the direct model, because just to

9    be clear, the indirect model does not -- is by

10   definition indirect.  So, there is no detailing in

11   the indirect model.

12           So, when I refer to the endogeneity of

13   detailing and sales, I refer to a specification in

14   which detailing appears as an explanatory variable.

15       Q.    I understand.  But that's -- that is, in

16   your view, the only source of endogeneity bias,

17   correct?

18       A.    That's the one that -- that I'd like

19   to -- in terms of endogeneity of sales and

20   detailing, that exists in the direct model.

21       Q.    Well, hang on.  That is the only

22   endogeneity issue that you identify in your report.

23   Are you now offering new opinions?

24       A.    So, to be more precise, the indirect

Highly Confidential - Subject to Further Confidentiality Review

1    model has an omitted variable problem, which is

2    related to endogeneity.

3         Q.    Okay.  We can talk about that.

4               So, do you have any other bases for your

5    opinions in paragraph 23?

6         A.    Yes.  So, in addition to the endogeneity

7    issue, my criticism is that Professor Rosenthal has

8    introduced enough flexibility into the direct model

9    that it is essentially too flexible.  It's capable

10   of fitting many time series that move together

11   without having any economic justification for that

12   relationship.

13              And, so, I specifically experimented

14   with using her approach to explain sunspots, and I

15   could show that using that level of flexibility in

16   the direct model also produces what she would -- if

17   you take her model seriously, would be a causal

18   relationship between detailing and sunspots.

19              And that's to illustrates that this is a

20   problem.  The model is essentially -- has too much

21   flexibility to establish this relationship.

22        Q.    So, you agree with the economic

23   justification that she has or you disagree with the

24   economic justifications that she has?

1      A.      She doesn't have very many economic

2    justifications.

3      Q.      Okay.  But she has them and you disagree

4    with them.  Is that fair?

5      A.      So, to the extent that she introduced

6    economic justifications for model C, for example,

7    so this is where she includes a number of events

8    that she explains could influence sales of opioids

9    during this time period, even she agrees that the

10   results on the coefficients that she obtains from

11   including those events don't make a lot of economic

12   sense, which again suggests that there are problems

13   with the model.

14           I don't disagree with her hypotheses

15   that, for example, changing the guidelines would

16   have an effect on sales.  My concern is that she

17   doesn't obtain the coefficients that she expects,

18   and the rest of the coefficients move around

19   sufficiently that it throws the entire model into

20   doubt.

21     Q.      Do you think you're better situated to

22   opine on the economic justifications that she

23   offers than she is?  Do you think you have sort of

24   greater knowledge or background?

1     A.     So, again, I don't disagree with her

2  ex-ante hypotheses about, for example, the

3  different events or the effect of price on sales.

4  On that we agree.

5          My issue is that her model then

6  generates estimates which are inconsistent with

7  that economic -- the economic hypotheses that

8  underlie them, which for me creates some

9  credibility issues with the model.  It suggests

10  that this isn't the right model.

11     Q.     What is the right model?

12     A.     That, I have provided some evidence

13  about the relationship between Allergan detailing,

14  shipments and mortality elsewhere in the report.

15          Frankly, I don't think that using

16  aggregate data and the approach taken here has --

17  even if I do all of these other fixes, I still

18  think we're left with a problem of too little

19  information to work with.

20     Q.     How would you study the effect of

21  Allergan, Allergan's detailing of opioids on sales?

22     A.     So, I did that.  I did it very directly

23  by trying to relate Allergan detailing at the

24  county level to shipments and to mortality.

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.    And those were your -- some of those
2    were the sort of merely descriptive statistics,
3    right?
4         A.    No, there are regressions as well.  This
5    is in Section V.B.
6         Q.    Let's just go one at a time.
7               The first -- the first few of those were
8    merely descriptive statistics, correct?
9         A.    I show some figures, too, to make the
10   point visually but then I also have regression
11   analyses.
12        Q.    Okay.  But talking about the figures
13   that you claim make the point.
14        A.    Okay.
15        Q.    There is no inferential statistics in
16   those, correct?
17        A.    No.  It's to illustrate a relation --
18   that there is no obvious relationship apparent in
19   the data, and then I go on to verify that with
20   regression analyses.
21        Q.    And would those regression -- you
22   describe -- have you accurately described all the
23   specifications of those -- I believe you did a --
24   you put a yearly dummy, right, every -- for between
```

Highly Confidential - Subject to Further Confidentiality Review

1    2009 and 2012.  Maybe you can point me to the page.

2    I think we're talking about the same thing.

3          A.    Sure.  I'm looking at page 71.

4          Q.    Okay.  Thank you.

5                Does footnote 224 completely and

6    accurately describe the analysis that you did as

7    in -- underlying the, I guess, graphs or figures

8    that are listed as Figure 28?

9          A.    It accurately describes the results from

10   all of the sensitivity analyses that we did.  The

11   ones that I specifically list here are some subset

12   of all that were tried.

13               So, just as an example, we tried with

14   zero percent depreciation and a depreciation --

15   depreciated stock using 5% annual depreciation.

16               It's -- I don't recall exactly how many

17   other specifications we ran with alternative

18   depreciation rates.  But since they all pointed in

19   the same direction, I didn't see -- consider it

20   necessary to list every single one here.

21         Q.    Are they in your backup?

22         A.    Yes.  Well, are the regressions

23   themselves in the backup?  No.  But the data is

24   available for anyone to run such sensitivity checks

Highly Confidential - Subject to Further Confidentiality Review

1   if they're worried about it.

2       Q.    Does the backup contain all the model

3   specifications that you employed, someone could

4   easily replicate your analysis?

5       A.    Someone could easily replicate the

6   analysis, yes.

7       Q.    And who chose these particular outputs

8   for Figure 28?  Who at Bates White?

9       A.    Oh, I chose the outputs.

10      Q.    You chose these outputs.  And you chose

11  these out of how many?

12      A.    So, we had data on detailing for 2009

13  through 2013 I believe.  So, it was a question of

14  choosing which year.  And we settled on 2010

15  because that was the first full year of Allergan

16  detailing I believe.

17          I think, if I recall correctly, somebody

18  on the team at Bates White generated the figures

19  for every year and they all looked about the same.

20  So, it didn't seem necessary to add to the number

21  of figures here.

22      Q.    Okay.  Back to paragraph 23.  Anything

23  else about the bases for your opinions in paragraph

24  23?

Highly Confidential - Subject to Further Confidentiality Review

1     A.    So, I've talked about stationarity.

2   I've talked about endogeneity.  I have talked about

3   some of the issues with aggregation.

4           There was also an issue with the price

5   index that Professor Rosenthal used.  So, making a

6   correction to her price index also altered the

7   results that one obtains in a way that calls into

8   question the reliability of the model.

9     Q.    So, is the -- now, this is leading into

10   another of your criticisms.

11           But you're referring to Dr. Rosenthal's

12   model about the collective marketing, is that

13   correct?

14     A.    Her -- her direct model of aggregate

15   detailing and aggregate shipments or aggregate

16   sales.

17     Q.    Now, is this criticism or is this basis

18   of your criticism in connection with the price

19   index applicable to both of her models?

20     A.    I'm trying to remember now the details

21   of her indirect model.

22           No.  It only pertains to the direct

23   model because she does not actually include a

24   measure of price in the indirect model, if I recall

Highly Confidential - Subject to Further Confidentiality Review

1    correctly, because in the indirect model she's

2    relying on cross-sectional variation across

3    counties and she wouldn't have county-specific

4    prices in order to include there.

5         Q.    Okay.  Any other bases for paragraph 23?

6         A.    Yes.  I can go into more details about

7    the issues of having too much flexibility built

8    into the model, but the fact that she allows the

9    model to determine these turning points in sales

10   without any economic justification for those

11   specific turning points is one issue.

12              The way that she's introduced the

13   splines for different effects in different time

14   periods is also not the standard way that an

15   economist would do this.

16              I've mentioned the price index issue.

17              More generally, again, in a model that

18   uses only time series variation, it's very

19   difficult to include lots of other controls, things

20   that would also be changed -- potentially driving

21   sales of opioids, so, things like variation across

22   counties in the extent of prescription drug

23   coverage or -- or all sorts of other

24   characteristics at an even more micro level.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I mean, all sorts of characteristics at

2    an even more micro level.  Are you opining that

3    there are material omitted variables in

4    Dr. Rosenthal's direct model or is your concern

5    about so-called omitted variable bias focused only

6    on the indirect model?

7    A.    Well, both.  In particular, the direct

8    model.  The issue is that she -- that it's not

9    possible to include a lot of other control

10   variables in a dataset that has only time series

11   variation.

12   Q.    What I'm -- what I'm asking you is where

13   in this report do you set forth the specific

14   variables that you think are omitted, not just all

15   the variables out there like the color of shirts

16   that people were wearing in the county.  I mean,

17   things that matter.

18   A.    So, by the way, I'm not the only person

19   to identify those as potential effects.  They're

20   also listed by Plaintiff experts as potential -- as

21   potentially important omitted variables in their

22   reports.  But let me just identify where.

23   Q.    No, but I'm asking you.

24   A.    So, one important class of omitted

1  variables is physician characteristics, just to

2  take one example.

3          So, there is a large literature

4  explaining that physician characteristics can be

5  more important than detailing in understanding

6  sales, and it's impossible for Professor Rosenthal

7  to include any kind of control for physician

8  characteristics when she aggregates up to this

9  level.  That's one example.

10     Q.    And just to be clear, I want to make

11  sure that you've listed everything that you claim

12  is a material omitted variable in your report.

13     A.    I don't think that I would claim to have

14  listed an exhaustive set of omitted variables.

15  I've identified a number of factors which is --

16  factors identified by the existing literature as

17  well as factors that even the Plaintiffs list as

18  potentially important in understanding opioid

19  sales.

20     Q.    So, are you intending to revise and make

21  new opinions about allegedly new omitted variables

22  that you have sort of just come up with?

23     A.    Just to be clear, it's not -- I didn't

24  view it as my responsibility to come up with an

1    exhaustive list of omitted variables.

2            The presence of any omitted variables

3    that bias the signs of the coefficients and

4    therefore the validity of the results that

5    Professor Rosenthal is providing and which are

6    being used as inputs into the other expert reports,

7    that's enough for me.

8        Q.    So, if -- if you have a disagreement

9    about whether an omitted variable is material,

10   you're sort of assuming that your view is correct,

11   that you didn't need to sort -- that you didn't

12   sort of need to go beyond that?

13       A.    Well, I couldn't go beyond it using the

14   data that she was using.

15           Again, my criticism is that the model

16   that Professor Rosenthal used here at an aggregate

17   level using only time series variation masks -- it

18   is not possible with such a limited dataset to

19   include the controls and account for these other

20   omitted factors in a way that would fix her model.

21           So, that's -- my criticism is that the

22   model itself is so deeply flawed that it's not even

23   possible to include -- I can't say, oh, she should

24   have put this into that model.  It wouldn't be

Highly Confidential - Subject to Further Confidentiality Review

 1    possible because the model itself has so many

 2    issues.

 3          I'm saying if one moved to a different

 4    model at a more disaggregate level, so, for

 5    example, at the county level, it would be possible

 6    to include many more controls that would reduce the

 7    risk of omitted variable bias.

 8       Q.    Any other bases for paragraph 23?

 9       A.    Yes.  Again, a lot of -- a lot of what I

10    am about to say is related to the issues of omitted

11    variables or failure to consider potentially other

12    confounding factors.

13          But as evidence for why that might be

14    important, I describe, for example, the fact that

15    opioid prescriptions and non-opioid prescriptions

16    are increasing at roughly the same rate throughout

17    most of the time period here.  It's only after 2010

18    or so that they diverge because opioids start to

19    fall.

20          And, so, the fact that Professor

21    Rosenthal's model puts everything on Defendant

22    detailing to explain this increase in sales is

23    troubling because one could run the same kind of

24    model using non-opioid prescriptions and also find

1  a statistical relationship between opioid detailing

2  and non-opioid sales.

3          And the fact that that statistical

4  relationship exists suggests that something else

5  has been left out as in there is some other common

6  factor which is driving both opioid sales as well

7  as non-opioid sales.

8          So, I'm not just pulling out of thin air

9  some -- the color of a T-shirt wasn't included in

10  this regression so we can't trust the results.  I

11  have tried in my report at various points to

12  suggest other factors that other -- that the

13  literature in general has identified as important,

14  but also some statistical justification for that.

15          So, I've mentioned the price index.

16          So, my other criticisms particularly of

17  the follow-on analyses, because they rely on the

18  estimate from Professor Rosenthal on this causal

19  effect of detailing, for me that's the fatal flaw.

20          Again, there are a lot of omitted

21  variable concerns that I would have there as well.

22          And then, again, I'm going to -- I'll

23  come back to the analysis that I did in V.B, which

24  is my best effort to directly test the Plaintiff

Highly Confidential - Subject to Further Confidentiality Review

1   hypotheses, which is detailing leads to shipments

2   and shipments lead to harm as measured by

3   mortality; and the fact that I cannot find this

4   relationship for Allergan detailing and shipments

5   or mortality feeds into my criticism of the

6   approach generally that they have taken.

7        Q.    Did you find a relationship between the

8   detailing of any pharma company and shipments or

9   mortality?

10       A.    I did not test for that.

11       Q.    Okay.  So, you're not opining that there

12  isn't such a relationship for others?

13       A.    That's right.  I only had the data

14  available for Allergan that I could map to the

15  county level, and so that's the relationship --

16  that was the scope of my assignment and that was

17  the data that I had available.

18       Q.    And are all the criticisms you have of

19  Gruber, Cutler and McGuire set forth in your

20  report?

21       A.    There is one that we haven't discussed

22  yet, which is the sensitivity of Professor Cutler's

23  estimates to a change in how -- and whether we use

24  shipments or prescriptions as well.

 1              Would you like to discuss that?

 2       Q.    Well, if you could -- if that is a basis

 3   for one of your opinions in 23, then go ahead.

 4       A.    Yes.

 5       Q.    We'll also go through the others.  This

 6   isn't -- and to the extent that it's the same

 7   basis, you don't have to repeat it.  But we'll go

 8   through all your opinions.

 9       A.    Okay.  So, again, what I'm doing here is

10   trying to replicate what the Plaintiffs have done

11   without necessarily stating that I think this is

12   the right model.

13              I'm merely demonstrating that the

14   approaches that they have taken are very sensitive

15   to changes -- small changes in specification or

16   small changes in data.

17              So, in the case of Professor Cutler's

18   analysis of shipments on mortality, he actually

19   states in his deposition that he would prefer to do

20   this analysis not with shipments but, rather, with

21   prescriptions.

22              And I agree with him, that makes more

23   sense given that he is using as an input the

24   estimate provided by Professor Rosenthal.  And her

1   analysis is not about shipments.  Her analysis --

2   her direct analysis is not about shipments.  It is

3   about sales or prescriptions.

4           So, I reran exactly the same thing that

5   Professor Cutler did, changing only shipments into

6   prescriptions at the county level, and that change

7   results in a substantial reduction of his

8   estimated percent impact on mortality.

9           So, again, I'm not opining that these

10  estimates in Figure 50 are affirmatively those that

11  I believe in.  I'm just trying to demonstrate that

12  his specification also is quite sensitive to

13  changes in inputs.

14      Q.    And even that change didn't eliminate

15  his impact on mortality, correct?

16      A.    No, it reduces it a lot.  Again, I'm not

17  opining that this is the right estimate either.

18      Q.    And all of your analysis about in

19  connection with -- strike that.

20          All of your what you're calling

21  sensitivity analysis for Professor Cutler's work is

22  in your backup and in your report?

23      A.    Yes, it is.

24      Q.    Okay.  Any other bases for paragraph 23?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Again, as I've mentioned, I think we'll

2   keep coming back over and over to the issues of

3   confounding factors that were not considered and

4   omitted variables, but I don't need to go through

5   those 20 times.

6      Q.     Okay.  So, let's turn to paragraph 24.

7           Are there any bases for your opinions in

8   paragraph 24 that you have not already touched on?

9      A.     Well, I think we have touched on it, but

10  I'll just be -- I will try to be as explicit as

11  possible here.

12          Because of the aggregate approach taken,

13  it is not possible in the Plaintiff models to

14  identify the impact of any specific Defendant.

15          And, so, since my concern in this report

16  is the effect of Allergan's activities on harm, for

17  me this is an issue, because there are for all

18  sorts of reasons that I describe here, there are

19  reasons to believe that Allergan's effects might be

20  different from others in the industry.

21     Q.     And you state in your report your

22  disagreement with how Professor Rosenthal addressed

23  that issue of whether she has spoken about specific

24  marketers, is that correct?

Highly Confidential - Subject to Further Confidentiality Review

1     A.    Well, she's quite explicit that she does

2   not consider specific marketers.  She estimates an

3   average effect and applies it -- applies that

4   average to all -- all manufacturers.

5         And what I'm trying to argue is that

6   that average is not appropriate for Allergan.

7     Q.    Okay.  That's pretty straightforward.

8         Any other bases for the opinions in

9   paragraph 24 that you haven't already touched on?

10    A.    Well, similarly, the analysis done by

11  Professor Cutler makes no attempt to distinguish

12  between the different manufacturers.  So, there

13  is -- there is nothing in the Plaintiff analysis

14  that ties specific manufacturers to harm.

15        So, what I've tried to do here is

16  establish that that link does not exist in the case

17  of Allergan.

18    Q.    Any other bases for paragraph 24 or

19  should we move on to paragraph 25?

20    MS. WELCH:  Counsel, before you do that --

21  BY THE WITNESS:

22    A.    Yes.

23    MS. WELCH:  -- it's 1 o'clock.

24    MS. GEMAN:  Oh.

Highly Confidential - Subject to Further Confidentiality Review

1          MS. WELCH:  So, I would suggest if you're done

2     with 24, that it's probably a good time for a lunch

3     break.

4          MS. GEMAN:  That's fine with me if it's fine

5     with the witness.

6          MR. KNAPP:  Did we get through all of the

7     bases for paragraph 24?

8          THE WITNESS:  Yes, I think we can stop there.

9          MS. GEMAN:  So, let's go off the record.

10         MS. WELCH:  Okay.

11         THE VIDEOGRAPHER:  We are off the record at

12    12:59 p.m.

13                    (WHEREUPON, a recess was had

14                     from 12:59 to 1:47 p.m.)

15         THE VIDEOGRAPHER:  We are back on the record

16    at 1:47 p.m.

17    BY MS. GEMAN:

18         Q.    Good afternoon.

19         A.    Good afternoon.

20         Q.    Do you know that you're still under

21    oath?

22         A.    I do.

23         Q.    Thank you.  Can we discuss the bases of

24    your opinions in 25 and 26.  And specifically if

Highly Confidential - Subject to Further Confidentiality Review

1   there is a basis that you have not already

2   identified, if you could please identify it now.

3       A.    Okay.  So, the opinion that I am

4   expressing in 25 and 26 relates to really the

5   appropriateness of assigning a calculation that is

6   an average of or that purports to be an average of

7   the effect of manufacturer detailing on sales to

8   this specific company.

9            So, there are a variety of reasons why I

10  don't think that that is an appropriate application

11  of the average.

12           So, in particular, Allergan is a very

13  small player in this market.  So, if we start just

14  by looking at their share of MMEs overall as well

15  as in these two counties.

16           So, I have these presented in Figures

17  12, 13 and 14.

18           You can see that Norco you can't even

19  identify because its sales were so small in

20  Cuyahoga County and in Summit and nationally.  And

21  Kadian, you see just a little bit in 2009, 2010,

22  2011.  But it's clearly a very, very small part of

23  the entire market, whether we're looking at these

24  counties or we're looking at it nationally.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And the nationally is Figure 14,

2   correct?

3      A.    That's right.  That's right.

4      Q.    And who decided the different ways to

5   present this data nationally and by county?

6      A.    I made the decision.  I thought it was

7   appropriate since this case begins with a focus on

8   these two counties in Ohio that I would show the

9   figures for those two counties but also show

10  whether there was any important difference that we

11  observe in those two counties versus the national

12  averages or the national level outcomes here.

13          So, you can see that there is a little

14  bit of difference in the pattern of opioid sales

15  overall in these two counties.  So, it's a little

16  bit lower in Summit than it is in Cuyahoga, for

17  example.  So, I think it is worthwhile looking at

18  differences across these geographic regions.

19          But in whether I'm talking nationally or

20  I'm talking in these specific counties, Allergan is

21  a very, very small presence in the market.

22     Q.    And just to be clear, when did Kadian

23  and Norco come on the market?

24     A.    So, I want to make sure that I answer

Highly Confidential - Subject to Further Confidentiality Review

1    that accurately.  So I will go to where I describe

2    the history of these products.

3              So, in Section II.B I explain my

4    understanding of the ownership of these products.

5              And I should say I'm going to focus

6    mainly on Kadian and Norco because these were the

7    two for which I understand there are specific

8    allegations against Allergan.

9              So, beginning with Kadian, Kadian is an

10   extended release version of morphine sulfate, and

11   it was acquired by what was then Actavis at the end

12   of 2008.  So, I'm focusing on Allergan's ownership

13   of Kadian starting at that point.

14             Norco is an older drug.  It's

15   hydrocodone.  It was approved under an ANDA, so it

16   was not a new chemical entity when it was first

17   introduced onto the market and it's been -- so, it

18   was present in the -- in the mid-1990s.

19        Q.    So, for Figures 12, 13 and 14, there is

20   no relevance for the years before 2009 for Kadian,

21   correct?

22        A.    That's right.

23        Q.    So, why are they -- why are these

24   figures here?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Again, to illustrate graphically that

2    Allergan has a very, very small presence in this

3    market.

4    Q.    But it's not surprising that it had

5    zero percent before 2009 because it didn't exist?

6    A.    It was owned by a different firm.

7    Q.    And do you -- do you include data for

8    Kadian for the period of its ownership by Actavis?

9    A.    That is the period of its ownership by

10   Actavis.  Actavis purchased the product at the end

11   of 2008.

12   Q.    I'm sorry.  It was not a clear question.

13         Was any Kadian sold by anybody before

14   late 2008?

15   A.    Yes, a different firm owned the product

16   at that point.

17   Q.    And did you have -- do you have the data

18   for those sales?

19   A.    Yes, I do.

20   Q.    Okay.  And that's -- those are reflected

21   in these charts?

22   A.    They are -- they are reflected in the

23   total sales of opioids but not broken out

24   separately in yellow for the years that Allergan

1    did not own the product.

2        Q.    I see.  So, we don't know whether the

3    size of the yellow bar would be the same size,

4    smaller or larger than what we see for 2009 through

5    2011?

6        A.    My recollection is that Kadian never had

7    a very large market presence.  But, again, I

8    focused only on Allergan's responsibility, and that

9    started at the end of 2008.

10       Q.    So, we don't know whether the size of

11   the yellow bar would be the same, smaller or larger

12   than what we see of 2009 through '11, is that

13   correct?

14       A.    That is correct.

15       Q.    And Norco is in blue, right?  It's

16   page 49.

17       A.    Sorry.

18       Q.    That's okay.

19       A.    Gotten lost with all of my figures.

20             Yes, it's in blue.

21       Q.    And is it -- your counsel will say calls

22   for speculation.  But is it that my eyes are so bad

23   that I seem only to see a blue in 2001?

24       A.    Your eyes are better than mine.  I don't

Highly Confidential - Subject to Further Confidentiality Review

1    even see it there.

2         Q.    Okay.

3         A.    So, I think I also have tables that

4    break out the market shares.  Yes.  So, Figure 6,

5    Figure 7 and Figure 8 give the -- give the actual

6    amounts.

7         Q.    Okay.  And same question for the period

8    before 2000 -- well, strike that.

9              When did Allergan start selling Norco,

10   which, as you say, is an older drug?

11        A.    I don't remember its exact approval

12   date.  I remember that it was approved under an

13   ANDA, so it's been -- it is a version of an old

14   drug.  I have sales data starting in 1997 here.

15             So, you can see it was -- it was on the

16   market in -- as of 1997, but, again, with very low

17   sales, both in the two bellwether counties as well

18   as in the U.S. overall.

19        Q.    So, we don't know what sort of the blue

20   lines would look like for the period before 2009,

21   is that correct?

22        A.    The blue line is Norco.

23        Q.    Yes.

24        A.    I have that in there before 2009.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    I see.  Okay.  Starting in '97?

2        A.    Starting in '97, yes.

3        Q.    Okay.  So, sorry.  You were saying that

4   one basis for your opinion in paragraphs 25 and 26

5   is your opinion that Allergan and its predecessors

6   were a small player?

7        A.    Yes.  And in addition to that, their

8   presence on the -- in terms of detailing is also

9   quite small.

10            So, for example, in Figure 3, I provide

11   the breakdown of detailing contacts for these two

12   products, for Norco and Kadian, compared to the

13   Defendant and non-Defendant detailing going on in

14   the same year.  And you can see that in terms of

15   the share of marketing activities, it's also very,

16   very small for these two products.

17        Q.    And you did not study the effect of the

18   promotion of one opioid on the sale of the others,

19   correct?

20        A.    In some of my specifications, in

21   particular where I'm looking at the county level

22   and the relationship between Allergan details at

23   the county level and shipments of opioids at the

24   county level, that's a way of accounting for any
```

Highly Confidential - Subject to Further Confidentiality Review

1   kind of effect of Allergan detailing on sales of

2   other products.

3         Q.    I'm sorry.  I was asking the converse

4   question.

5               You did not study the effect of the

6   promotion by a marketer of one opioid on the sale

7   of the others like, for example, the effect of

8   Purdue and Teva's efforts on other opioid sales?

9         MS. WELCH:  Objection to form.

10  BY THE WITNESS:

11        A.    Again, I focused on Allergan's detailing

12  activities.

13  BY MS. GEMAN:

14        Q.    So, the answer to my question is you did

15  not study that effect, correct?

16        A.    I studied that effect for Allergan.

17        Q.    Again, the question is, did you study

18  the effect of the promotion by a marketer of one

19  opioid, such as Purdue, on the sale of opioids by

20  other producers?

21        MS. WELCH:  Objection to form, asked and

22  answered.

23  BY THE WITNESS:

24        A.    So, again, when I run a regression of

Highly Confidential - Subject to Further Confidentiality Review

1   Allergan detailing, so that's one manufacturer's

2   marketing, on shipments of all opioids in that

3   county, I am in fact looking at the effect of one

4   manufacturer's detailing on sales of their own but

5   also other manufacturers' products.

6   BY MS. GEMAN:

7       Q.    Did you study the effect of promotion

8   by, for example, Purdue or Teva on sales of

9   Allergan opioids?

10      A.    No.  Again, I focused on Allergan's

11  detailing efforts and the effects of Allergan's

12  detailing efforts.

13      Q.    Any other bases for 25 and 26 that you

14  have not already mentioned?

15      A.    Yes.  Let me remind myself.

16            So, I talked about Figure 3.  I'd also

17  like to draw your attention to Figure 4.

18            So, this is what Professor Rosenthal's

19  depreciated detailing stock, which, by the way,

20  really isn't a depreciated detailing stock because

21  she has this very strange estimate of an

22  appreciation rate rather than a depreciation rate

23  of marketing.

24            But you can see here the difference

Highly Confidential - Subject to Further Confidentiality Review

1    between what she calculates for the entire market

2    and what that stock would be if Kadian and Norco

3    were excluded.

4              And the fact that you don't see much of

5    a difference in those two lines means that it's

6    very, very difficult to identify -- to attribute

7    any of the causal effect that she's claiming to

8    these two products.

9        Q.    Okay.

10       A.    In Figure 5, I show the difference

11   between Alpharma detailing efforts and Kadian

12   detailing efforts.  When Kadian took -- when

13   Allergan took ownership in 2009, you see a

14   substantial reduction in the efforts to detail this

15   product.

16             So, again, this is a very small product.

17   It has a very small share of detailing.  It has a

18   very small share of the market.  And even within

19   this -- within this, when Allergan took ownership,

20   its detailing presence further fell.

21             So, other evidence that the efforts of

22   Allergan did not materially expand the total market

23   for opioids have to do with the timing of when that

24   marketing took place.  This is true for Norco as

1    well.

2        Q.    And with respect to Figure 5, can you

3    explain the -- what you're looking at with the X

4    and Y axes here?

5        A.    Yes.  So, on the left hand axis I've

6    plotted MMEs.  So, think of this as sales.  On the

7    right hand axis, I've plotted detailing contacts.

8            So, this is the measure that Professor

9    Rosenthal is using a proxy for.  And although I

10   used here the Kadian-specific call note data that

11   Allergan produced, at least for the detailing

12   contacts after -- sorry.  No.  I take that back.

13           This is based on Professor Rosenthal's

14   data.  There is a sort of strange observation in

15   2017 because the IMS data records some detailing

16   contacts for Kadian although the call notes do not.

17       Q.    I mean, you understand that the pharma

18   companies sort of stopped keeping call notes at

19   some point generally, right?

20       MS. WELCH:  Objection to form.

21   BY THE WITNESS:

22       A.    I understand that I was provided call

23   notes by Allergan that allowed me to do a very

24   detail county-specific analysis of their detailing

1    efforts.

2    BY MS. GEMAN:

3        Q.    No, but I guess what I'm asking is, did

4    you take into account the fact that many pharma

5    companies either because -- for various reasons we

6    need not go into, but various pharma companies have

7    jettisoned call notes?  Do you understand that?

8        MS. WELCH:  Objection to form.

9    BY THE WITNESS:

10       A.    I can't speak to the decisions of these

11   individual companies, although I don't see how that

12   impacts the analysis that I've presented here.

13   BY MS. GEMAN:

14       Q.    So, how does the -- I guess what's

15   puzzling to me about this figure is -- oh, I see.

16           So, the right hand is the detailing

17   contacts?

18       A.    That's right.

19       Q.    So that the detailing contacts is

20   reflected by the yellow and black lines?

21       A.    That's correct.

22       Q.    Correct?  Okay.  And the MMEs are the

23   other line.

24           So, did you compare the Alpharma Kadian

1    detailing to that of the other manufacturing

2    companies?

3         A.    Compare in what sense?

4         Q.    Compare the number of detailing contacts

5    of Alpharma for its opioid relative to the

6    equivalent numbers of other pharma companies for

7    their opioids?

8         A.    No, I did not do a

9    manufacturer-by-manufacturer specific breakdown of

10   detailing other than to pull apart Kadian and

11   Allergan products.

12        Q.    Do you have any opinion or are you

13   offering any opinion on Alpharma's share of opioid

14   marketing relative to any other manufacturers?

15        A.    I'm not offering an opinion on the

16   relative shares of any manufacturers outside of

17   Allergan.

18        Q.    So, the answer is no?

19        A.    The answer is I haven't done that

20   calculation.  It's in Professor Rosenthal's data.

21   So, that's a statistic that someone could easily

22   calculate.  But it was not -- my interest in this

23   report was focused on Allergan.

24        Q.    And you didn't consider or is it fair to

Highly Confidential - Subject to Further Confidentiality Review

1    say that you didn't consider the marketing of

2    Alpharma to be relevant to your opinions?

3         A.    That's correct.  I focused on the effect

4    of Allergan's behavior.

5         Q.    Okay.  Any other bases for paragraphs 25

6    and 26?

7         A.    Okay.  So, what the point that I was

8    trying to make actually with Figure 5 is that when

9    you see this solid black line, which is increasing

10   from 1993 up through 2010 or 2011 or so, so that's

11   total sales of opioids going up over time, and then

12   you see where Allergan is detailing Kadian, so in

13   what time period, the point that I'd like to make

14   here is that Allergan is detailing Kadian when the

15   market is already at its peak.

16            So, it's not -- it's very unlikely that

17   Allergan is expanding the market at this point.

18   The market is already at its maximum.  And the

19   additional details from Allergan are not adding

20   additional sales to the market.

21            Instead, what's likely to be happening

22   here is that to some extent, to the extent that

23   Kadian detailing is at all successful and I can

24   talk about whether that's true later on, it's

1  successful in stealing share away from other

2  products, not in expanding the entire market.

3      Q.    And did you analyze the call notes to

4  ascertain or to cross-check diversion -- not

5  diversion.  I'm sorry -- substitution?

6      MS. WELCH:  Objection to form.

7  BY THE WITNESS:

8      A.    I don't think that such information

9  would be available in the call notes.  The call

10  notes record that a sales representative visited a

11  physician and occasionally provided some

12  information about the content of that visit

13  although not -- not in a very comprehensive way.

14          So, to observe what happens with that

15  physician, one would need a different data source

16  tracking the physician's prescribing behavior.  But

17  the call notes would not have that.

18  BY MS. GEMAN:

19      Q.    Have you ever seen call notes before

20  this case?

21      A.    No.

22      Q.    Have you -- did you seek out any

23  physician recall surveys or other sources to

24  support your guess or hypothesis about substitution

```
 1    versus new prescriptions?

 2        MS. WELCH:  Object.

 3    BY THE WITNESS:

 4        A.    No, I relied on the data that I've

 5    described here.

 6    BY MS. GEMAN:

 7        Q.    Okay.  Any other bases for your opinions

 8    in 25 and 26?

 9        A.    Sure.  So, I just told you about Kadian.

10    I can also tell you about Norco.

11              So, detailing of Norco stopped pretty

12    early on, and Norco's sales began to decline in

13    around 2000.  That happened when Norco was -- sales

14    were declining.  That happened during a period of

15    substantial growth in overall opioids.

16              So, again, it's not -- from these

17    patterns, this suggests that Allergan, Allergan

18    products are not contributing to an increase in

19    opioid sales because Norco sales are going down

20    when the rest of the market is going up.

21        Q.    And you're looking at figure?

22        A.    I'm looking at paragraph 89.

23        Q.    Any other bases to the opinions in 25

24    and 26?
```

1    A.    Yes.  So, as I describe largely in

2    Section II.C, this is a more qualitative assessment

3    because there wasn't -- I didn't always have a lot

4    of data to work with here.

5         But the qualitative assessment that I

6    can provide is that the kind of marketing that

7    Allergan was doing particularly for Kadian was

8    fairly limited.  It was restricted to detailing and

9    a little bit of telemarketing.  It did not include

10   a lot of the other activities that Plaintiffs have

11   identified as sources of harm or unlawful.

12        So, the nature of Allergan's marketing

13   was quite different than that at least alleged by

14   Plaintiffs to be the case for other manufacturers.

15   Q.    So, for example, Plaintiffs talked about

16   the use of KOLs?

17   A.    That's right.

18   Q.    Do you have an opinion as to whether

19   it's been efficacious for pharmaceutical

20   manufacturers to essentially utilize and pay KOLs?

21   A.    I don't have an opinion on that.  That

22   wasn't something I could analyze in this report.

23   Q.    So, are you basically assuming that --

24   would you agree that for the absence of or for the

Highly Confidential - Subject to Further Confidentiality Review

1    purported absence of such activities by Allergan to

2    be relevant, those other activities would have to

3    be efficacious, correct?

4         A.    As I understand it, that's the Plaintiff

5    allegation.

6         Q.    So, you are accepting that allegation

7    for purpose of your statement?

8         A.    I'm saying that if Plaintiffs establish

9    that this marketing is unlawful and effective, it

10   doesn't apply to Allergan because Allergan did not

11   engage in those activities.

12        Q.    But you're making an affirmative

13   statement that you believe Allergan was detailing

14   or marketing generally less than the other

15   companies, correct?

16        A.    Certainly their share of total detailing

17   was quite small.

18        Q.    So, is it your opinion that Allergan's

19   failure to employ these other marketing channels

20   negatively affected the sales of their products?

21        MS. WELCH:  Objection to form.

22   BY THE WITNESS:

23        A.    I've offered no opinion on that

24   relationship.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. GEMAN:

2        Q.    All right.  Any other bases or do you

3    want to move on to paragraph 27?

4        A.    Well, the only other point that I would

5    make related to paragraph 26 is the fact that much

6    of the 85% of the Allergan detailing of Kadian

7    occurred after Allergan had received a warning

8    letter from the FDA and taken corrective action.

9            So, since the FDA approved their

10   marketing materials in response to that warning

11   letter, I would say 85% of the detailing contacts

12   here seem unlikely to be unlawful because they were

13   done under the -- with the approval of the FDA.

14       Q.    And is it your testimony that the other

15   15% were unlawful?

16       A.    I can't offer an opinion about that.  I

17   know what the FDA's concerns were.  I can see that

18   Allergan made an effort to respond to those

19   concerns and that the FDA accepted those responses.

20       Q.    So, is your testimony that you're

21   confident the 85% were lawful but you can't say at

22   all whether the 15% were unlawful?

23       A.    I can't comment on whether any of it was

24   lawful because I'm not a compliance expert of that

Highly Confidential - Subject to Further Confidentiality Review

1    sort.

2              What I can say is 85% of it occurred

3    with the approval -- the express approval of the

4    FDA.

5         Q.    And did you make any attempt to study

6    the impact of the 15% that was we could say

7    unlawful or that the FDA had warned about on the

8    prescription patterns subsequent to the warning

9    letter?

10        MS. WELCH:  Objection to form.

11   BY THE WITNESS:

12        A.    At some point we did -- with my team we

13   worked on some exploratory analysis to see whether

14   there was any kind of difference, and there isn't

15   much data to work with because there was only 15%

16   of the details occurring before the warning letter.

17   So, we couldn't really say anything particular --

18   we couldn't really say anything.

19              What I also have done is look at

20   prescriber level behavior, and I've provided some

21   charts.  So, for example, starting with Figure 16,

22   17 and 18 and in the backup materials I provide the

23   corresponding chart for all of the physicians that

24   I could identify having received a Kadian detail in

1  these two counties and so I show you their

2  prescribing patterns before they received a detail

3  and after they received a detail, and in almost

4  every case there was either no change or a decline

5  in their prescribing.

6  BY MS. GEMAN:

7      Q.    And did you produce in your backup the

8  analysis you did to test the impact of the unlawful

9  or pre-warning letter marketing on subsequent

10  prescriptions?

11     A.    No.

12     MS. WELCH:  Objection to form.

13     MS. GEMAN:  Okay.  Can you produce that or we

14  would request the production of that.

15  BY MS. GEMAN:

16     Q.    Okay.  Any other bases for 25 and 26 or

17  do you want to tell us if there are bases for

18  paragraph 27 that you have not already touched on?

19     A.    That's all that's occurring to me right

20  now.  It's possible I will remember something else

21  later.

22     Q.    What about paragraph 28.  Do you have

23  any bases for your opinions in 28 that you have not

24  already testified to?

Highly Confidential - Subject to Further Confidentiality Review

1    I think we covered this, but obviously

2    take the time you need to read the opinions and

3    advise.

4        A.    I've already made some of these points

5    about Kadian and Norco specifically and the

6    patterns of their sales versus the rest of the

7    market.

8            I've also mentioned qualitative evidence

9    on the objectives of Allergan marketing.  I think

10   that's covered more in other -- well, in

11   depositions from Allergan experts.

12           But my understanding of their marketing

13   strategy was that they expected to lose share over

14   time.  They expected prescribing to go down.  And

15   their goal was to maintain share.

16           And that is not consistent with efforts

17   to expand the total market.  Instead, they were

18   targeting physicians who were already prescribing

19   opioids and in particular either -- normally

20   already prescribing Kadian or very similar products

21   like Avinza, and that's where they focus their

22   effort.  They weren't targeting physicians who had

23   not previously been prescribing a lot of opioids.

24           So, to the extent that their detailing

Highly Confidential - Subject to Further Confidentiality Review

 1   worked in terms of increasing prescriptions of

 2   Kadian, it almost certainly took prescription away

 3   from some other product.  So, again, it's not

 4   contributing to the total -- it's not adding to

 5   total sales in opioids.

 6        Q.    Well, that's your assumption.  You

 7   acknowledged you haven't demonstrated that,

 8   correct?

 9        A.    I've demonstrated -- well, that's what

10   Plaintiffs say was their objection and I have

11   demonstrated that, for example, with the

12   prescribers that I could identify in these two

13   counties, I see no increase.

14        Q.    Oh.  Was that the end of your answer?

15        A.    Sorry.  I think I'm repeating myself.

16              So, out of the 41 prescribers that I

17   could identify as having received an Allergan

18   detail, these were all already physicians who had

19   been prescribing opioids in the past.  In general,

20   for 39 out of 41, I don't see an increase in their

21   prescribing of Kadian.

22              And if I look at their other prescribing

23   patterns, it just doesn't look like this is

24   consistent with the story of Allergan sends a

Highly Confidential - Subject to Further Confidentiality Review

1   detail to a doctor and all of a sudden this doctor

2   starts writing lots of prescriptions and at very

3   high levels of MMEs, et cetera.

4        Q.    So, I just want you to point me to where

5   in your report you think you have demonstrated

6   versus assumed that Kadian detailing took

7   prescription away from other products?

8        A.    Again, what I've shown is that when

9   Kadian sales were increasing, the market was

10  already at its maximum.  So, there was nowhere to

11  go.

12              When Kadian sales increase, if the total

13  in the market is either holding steady or falling,

14  then that -- those sales going to Kadian must be

15  coming from something else.

16       Q.    So, you're inferring from that.  You

17  have not --

18       A.    I'm inferring from the patterns that I

19  observe in the data.

20       Q.    You haven't demonstrated -- you

21  acknowledge you haven't demonstrated that directly,

22  correct?

23       A.    I did not look at specific substitution

24  between opioid products.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    So, you have no data-informed opinions

 2   about substitution --

 3        MS. WELCH:  Objection.

 4   BY MS. GEMAN:

 5        Q.    -- between opioid products, correct?

 6        MS. WELCH:  Objection.

 7   BY THE WITNESS:

 8        A.    Again, what I've shown is that when the

 9   increase of Kadian sales is present, there is not

10   an overall increase in the market.

11             So, just logically, that incremental

12   sale of Kadian is not a new sale to the market.

13   It's coming from something else.

14   BY MS. GEMAN:

15        Q.    Is that in your view an expert opinion

16   resulting from an application of your expertise or

17   is that, in your view, sort of a common sense

18   opinion?

19        A.    I don't think a lot of statistical

20   sophistication is necessary to draw that conclusion

21   from the patterns in the data.

22        Q.    So, that's basically a common sense

23   conclusion, not a conclusion that has required an

24   application of expertise, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          MS. WELCH:  Objection to form.

 2   BY THE WITNESS:

 3          A.    My expertise is in combining many

 4   different data sources, looking at the patterns

 5   that one can see in the data and doing the best

 6   that one can to establish causality or evidence

 7   consistent with a hypothesis.

 8                What I'm trying to explain is that the

 9   hypothesis of the Plaintiffs is that detailing led

10   to incremental sales of opioids and those sales led

11   to harm.

12                In the case of Kadian, that detailing

13   did not appear to change sales of Kadian very much.

14   Sales of Kadian did not appear -- were not

15   occurring at a time when the overall market was

16   growing.

17                So, those sales of Kadian must be coming

18   from some other existing opioid and, therefore, the

19   Plaintiffs do not have evidence to suggest that

20   Allergan detailing led to an expansion of the

21   opioid market --

22   BY MS. GEMAN:

23          Q.    But again --

24          A.    -- or harm.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    -- you haven't -- just you have not

2    studied substitution?

3    A.    I have studied substitution indirectly

4    in several ways.  So, I've presented the figures.

5    And, again, I will come back to the regressions

6    that I did of the effect of Kadian detailing on

7    shipments at the county level where I see that

8    shipments at the county level are not statistically

9    and positively related to Allergan detailing at the

10   county level, which, again, suggests that Allergan

11   detailing did not expand the market and also did

12   not cause harm.

13        So, if the market did not expand, then

14   whatever sales had to be from existing sales.  It's

15   just reallocation of market shares.  It's not --

16   the pie is not growing at that point.

17   Q.    How many counties did you look at again?

18   A.    I looked at the 404 large counties that

19   Professor Cutler used.

20   Q.    And what was the range of numbers of

21   observations you were able to look at in those 404?

22   A.    So, there are 404 counties and there

23   would be one observation for each year that I

24   observe Kadian detailing in the data.  So, 2009

1    through 2012.

2        Q.    So, in a sense each -- so, in a sense

3    you made separate cells for county and for year,

4    correct?

5        A.    The structure of the dataset is a

6    county-year observation.

7        Q.    Okay.

8        A.    It's the same as in Professor Cutler's

9    analysis.

10       Q.    And did you -- did you do counties over

11   the four-year time period?

12       A.    Yes.  So, I looked at 2009 through 2012

13   or '13.

14       Q.    Different question.  Did you do any

15   analysis where each county was one cell and a year

16   was a control versus a separate cell?

17       A.    I don't think I'm understanding your

18   question.

19       Q.    Sure.  So, one way to do the analysis

20   would say you have 404 counties and you have four

21   years and each sort of cell is a country-year

22   combination, right?

23            Another way to do an analysis would be

24   to look at 404 counties and for each one look at

1    the four-year time period.

2         A.    To me, that sounds like the same thing.

3    So, I have 404 counties.  I can look at just one

4    year of data.  That's essentially what I have done

5    in the charts that -- let's see.  It's Figure 25.

6    Right.  So, that gives you 2010.

7              One observation for each county, lined

8    up in the order of opioid shipments per day, MMEs

9    per capita per day.  And below I have the

10   corresponding figure of Allergan details per capita

11   for each of those 404 counties.

12             So, I think what you're asking me is did

13   I run a regression year by year using this cross

14   section of counties.  That would be --

15        Q.    That could be one --

16        A.    Well, that would be one cell per county.

17        Q.    Correct.

18        A.    Right?

19        Q.    Well, that would be -- I think that

20   would be one -- yes, that would be one cell per

21   county.  And that analysis was run and is in your

22   backup?

23        A.    I don't recall running the county level

24   analysis year by year in part because I could see

Highly Confidential - Subject to Further Confidentiality Review

1  it from these charts, which are year by year, and

2  as well because it's in general useful to exploit

3  both cross-sectional variation as well as time

4  series variation.  And that was the appropriate

5  specification.

6      Q.    And did you run the year level analysis

7  county by county?

8      A.    No, I did not.  In a way, that's

9  accounted for in the regressions that I've run

10  because I have county-fixed effects, so I'm looking

11  at changes over time within each county.  But I

12  didn't run 404 individual regressions.

13      Q.    Any other -- actually, give me one

14  second, please.  I had a question I wanted to ask

15  you, but it's gone right out of my head.

16          As they used to say when there were

17  phones, if it's important, they will call back.  If

18  it's important, my brain will feed it to me again.

19  Sorry about that.

20          So, do you have any other bases for your

21  opinions in paragraphs 27 or 28?  I know we have

22  already moved off 27, but I want to just make sure.

23      A.    Well, let me just reiterate that

24  Professor Rosenthal states over and over that all

1    she cares about is market expansion.

2              So, what I've tried to demonstrate is

3    that there is no market expansion that can be

4    easily attributed to Allergan marketing efforts.

5              So, I think it's an inappropriate

6    assumption to then take an estimate across all

7    manufacturers across all years when there are

8    different marketing strategies, there is different

9    rates of growth in the market overall.

10             During some periods it's entirely

11   possible that additional marketing efforts led to

12   market expansion, but for Allergan products, that's

13   not what I see in the data.

14        Q.   Why would Allergan detail doctors who

15   are already prescribing Kadian and Norco?

16        A.   I can tell you what they stated in

17   depositions or I can give you an economic argument

18   for why that's the case.  Which one would you

19   prefer?

20        Q.   I'll take both.

21        A.   So, they stated in their depositions,

22   the various Allergan witnesses stated that their

23   goal was to maintain share and that they wanted to

24   target their loyalists, their Kadian loyalists, so

1  those who are already familiar with the product,

2  who had experience with the product, to encourage

3  them to continue to prescribe because they expected

4  sales to decline.

5      Q.    And to continue to prescribe to new

6  patients?

7      A.    I didn't say that, no.

8      Q.    Well, is that your assumption?

9      A.    Well, at some level we don't want -- as

10  I understand the appropriate use of opioids, you

11  would not want Kadian to -- Allergan to encourage

12  doctors to keep a patient, old patients, on Kadian

13  forever.

14          So, it's true that the appropriate use

15  of Kadian might be several months, but probably we

16  shouldn't see it over ten years.  That I would view

17  as more problematic.

18          But as doctors see new patients, they

19  present with different characteristics, with

20  different medical needs.  And so, yes, some of them

21  are new patients, but the -- but the -- so, it has

22  to be a new prescription in that sense.

23          But it's not a doctor who all of a

24  sudden converts, converts his prescribing to

Highly Confidential - Subject to Further Confidentiality Review

1    massive prescribing of Kadian.

2       Q.    But, again, Allergan wanted the doctors

3    to keep prescribing Kadian to new patients,

4    correct?

5       A.    Every firm that's doing marketing wants

6    sales -- wants marketing to affect sales.

7             So, yes, a detailing visit was done with

8    the goal of encouraging the prescription of Kadian

9    as opposed to Avinza or MS Contin or some other

10   opioid.

11      Q.    And did you do any analysis of how much

12   of the consistency of prescriptions was a function

13   of the doctor having new patients to prescribe it

14   to or having very long-term prescriptions of extant

15   patients?

16      A.    Yes.  I have some charts that speak to

17   that.

18            So, in Figure 19 I show the percentage

19   of patients who saw the doctors in the counties

20   where I'm focused where I could identify physicians

21   who had been detailed at least once by Allergan in

22   these two counties.  This is page 58.

23            So, what I'm showing here is there's a

24   bar for each physician and in parentheses is the

Highly Confidential - Subject to Further Confidentiality Review

1   number of Kadian patients.  And on the vertical

2   axis here, you have the percent of patients that

3   this -- that each of these doctors saw who did not

4   receive Kadian.

5          So, most of them saw patients without

6   prescribing Kadian.  So, this suggests that they

7   weren't prescribing a lot of Kadian to new

8   patients.  They were only prescribing Kadian in

9   rare cases where they considered it hopefully

10  clinically appropriate.

11         In Figure 20, I show that when these

12  patients were prescribed Kadian, most of the time

13  they had been started on a different opioid

14  product.  So, Kadian was what doctors might switch

15  to depending on a patient's needs, specific

16  clinical indications, et cetera.

17         But, again, it's not consistent with the

18  idea that a doctor received a detail from Allergan

19  and all of a sudden started writing lots and lots

20  prescriptions for Kadian.  And, in particular, if

21  they were writing a prescription for opioids, they

22  would start with something else first.

23     Q.    All right.  Other bases for your

24  opinions in paragraphs 28 or 27?

Highly Confidential - Subject to Further Confidentiality Review

1          Actually, I'm sorry.  Can I just ask you

2   a question about Figure 20.

3          Which -- do you recall what kind of

4   doctor Dr. Akhtar-Zaidi is?

5      A.    No.

6      Q.    Okay.  Any other bases for your opinions

7   in 27 and 28?  And, if not, can you identify the

8   bases of your opinions in paragraph 29 that you

9   have not already identified?

10      A.    My opinion in paragraph 29 is backed up

11   with the analysis that I described now a few times

12   where I tried to more directly test the

13   relationship between county level detailing of

14   Kadian, county level shipments and county level

15   mortality.  So, graphically that was Figures 25

16   through 28.

17          And the regression analysis is

18   essentially a panel study of those 404 counties

19   looking -- experimenting with different ways of

20   including detailing efforts on -- as an explanatory

21   variable to verify the robustness of the results.

22      Q.    And we talked about those figures a

23   couple hours ago, correct?

24      A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  And any other bases of your

2   opinion in -- as set forth in paragraph 29 other

3   than what you've identified?

4      A.    No.  That's -- that's the key.

5      Q.    Okay.

6      A.    The key source of that opinion.

7      Q.    All right.  And can you please read the

8   first sentence of paragraph 30.

9      A.    "In Sections III through IV, I establish

10   that Plaintiffs' economic experts have failed to

11   demonstrate that any harm was caused by Allergan."

12      Q.    And that's -- is that basically your

13   upshot?

14      A.    I'm not sure what you mean by "upshot."

15      Q.    Is that basically your summary opinion?

16      A.    Yes.  I guess if I were doing a

17   PowerPoint slide for an MBA class, I would say this

18   is one of the key take-aways, that there's been no

19   direct link between Allergan's activities and

20   mortality.

21      Q.    What do you think is the relevance to

22   your opinions, if any, of the FDA warning letter?

23      MS. WELCH:  Objection to form.

24   BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

1          A.     My focus in this report is on the

2     outcomes, so what are the effects that I can

3     observe of the marketing.

4               So, I don't form an opinion on whether

5     it was lawful marketing or unlawful marketing.  I'm

6     just looking at the impact, what can I say about

7     the effects.

8     BY MS. GEMAN:

9          Q.     So, my question was a little bit

10    different.

11              What do you think is the relevance to

12    your opinions, if any, of the FDA warning letter?

13    Is it irrelevant to your opinions?

14         A.     It's irrelevant in the sense that what

15    I'm focused on is the outcome and so if the FDA

16    warning letter is an indicator of whether something

17    is lawful or not or problematic or not, that

18    doesn't -- it doesn't directly enter into my

19    analysis because, as the Plaintiffs do, I don't

20    distinguish between lawful and unlawful marketing.

21    I'm just looking at what the effect is.

22         Q.     And was the FDA warning letter relevant

23    to any of the data analysis?  Strike that.

24              Other than what we've already talked

Highly Confidential - Subject to Further Confidentiality Review

 1    about, did you consider the FDA letter relevant or

 2    informative of any of your critiques of Plaintiffs'

 3    models?

 4        MS. WELCH:  Objection to form.

 5    BY THE WITNESS:

 6        A.    One of my overarching critiques of

 7    particularly Professor Rosenthal's model is that

 8    she is applying an average effect of detailing to

 9    Allergan, which I think is inappropriate.

10              So, an example of this -- again, this

11    isn't a statistical analysis that I'm about to

12    describe.  But, for example, if qualitatively we

13    think that the response to the warning letter

14    through the corrective action, which involved

15    several months of sending the sales force out to

16    physician offices, to remove material that the FDA

17    was worried about, to leave behind letters that

18    explained with FDA-approved language about the

19    risks and benefits of Kadian, you might think that

20    that kind of corrective action would not be

21    expected to increase Kadian sales.

22              It shows up as detailing in Professor

23    Rosenthal's data.  It shows up as detailing visits

24    in my data as well.  And I guess I'm not that

1  surprised that I don't see a big impact of Kadian

2  detailing when so much of it involves corrective

3  action.

4           But that's not a statistical analysis.

5  That's just saying to the extent that I know

6  anything about the content of these detailing

7  visits, they suggest -- the content is unlikely to

8  be market-expanding.

9  BY MS. GEMAN:

10     Q.    And what do you mean by corrective

11  action?

12     A.    I mean -- let's see.  I describe what

13  the corrective action was following the FDA warning

14  letter.

15     Q.    Do you understand that corrective action

16  to have been voluntary?

17     MR. KNAPP:  I don't think the witness had

18  finished her answer to the last question.

19  BY MS. GEMAN:

20     Q.    Oh.  Had you finished the answer?

21     A.    No, I was going to point --

22     Q.    Go ahead.

23     A.    -- to where I describe the corrective

24  action in the report.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            So, Allergan received a warning letter

 2    from the FDA on February 18 of 2010 and the next

 3    day, as I understand it, informed its sales force

 4    that they should cease all marketing.

 5            During that time Allergan worked with

 6    the FDA to agree on language included in a letter

 7    sent to -- left in all of the physician offices

 8    where physicians who had potentially received this

 9    marketing that the FDA was worried about, that was

10    the corrective action was to remove any material

11    that the FDA had been worried about and to leave

12    behind other information.

13        MS. GEMAN:  Can we take a quick break?

14        MS. WELCH:  Sure.

15        THE VIDEOGRAPHER:  We are off the record at

16    2:40 p.m.

17                    (WHEREUPON, a recess was had

18                     from 2:40 to 3:04 p.m.)

19        THE VIDEOGRAPHER:  We are back on the record

20    at 3:04 p.m.

21        THE REPORTER:  Counsel on the phone, can we

22    have everybody re-identify themselves for the

23    afternoon session.

24        MS. WELCH:  And, again, counsel and
```

Highly Confidential - Subject to Further Confidentiality Review

1    non-counsel.

2         THE REPORTER:  Anybody on the phone, counsel,

3    non-counsel.

4         MS. RODGERS:  Hi.  This is Megan Rodgers with

5    Covington & Burling for McKesson.

6         THE REPORTER:  Anyone else?

7         MR. LEIGH:  This is Daniel Leigh from

8    O'Melveny.  I'm on the line.

9         THE REPORTER:  Okay.

10   BY MS. GEMAN:

11        Q.   Margaret, would you be so kind to turn

12   back to your presentations, which are Section A.4.e

13   of your Exhibit A.  I'm sorry.  Your Appendix A.

14             And because we don't have a list of the

15   topics on which you presented, would you be able to

16   identify at which seminars or presentations you

17   prepared papers and/or gave talks on topics that

18   you consider relevant to this case.

19        A.   Honestly, nothing occurs to me in

20   particular because I don't have a paper on opioids.

21   So, I certainly haven't presented or opined in any

22   public fora on that.

23             And even papers directly concerning

24   marketing, that would have been back in 2001 or

```
 1    2002; and I believe that my co-authors presented

 2    those papers.  I don't recall having done so

 3    myself.  So, all of the talks from that period of

 4    time were about different papers.

 5         Q.    And what are the kind of general themes

 6    about the talks that you've given?

 7         A.    In general, they're going to be

 8    presentations, research seminars related to

 9    specific papers that I've listed in my CV.

10         Q.    Relating to competition and innovation

11    and the subjects we were discussing earlier today?

12         A.    In general, an academic seminar would be

13    about a specific paper, and that's the bulk of what

14    I have listed here.

15              I have not included, for example,

16    every -- every panel discussion where there was

17    nothing that I presented and it was just an

18    open-ended discussion about various topics.

19              But I have never participated in any

20    such panel where opioids was a focus.

21         Q.    And even if opioids was not a focus,

22    have you participated in any panel in which the

23    effect of pharmaceutical marketing on sales was a

24    focus?
```

Highly Confidential - Subject to Further Confidentiality Review

 1      A.    Not that I can recall, no.

 2      Q.    Have you ever created a damage model?

 3      MS. WELCH:  Objection to form.

 4   BY THE WITNESS:

 5      A.    No, I've never been retained as an

 6   expert witness in order to do that kind of

 7   assessment or -- yeah.

 8          The only time that it came up, as I

 9   mentioned before, I was retained once before as an

10   expert.  The other side was alleging damages.  I

11   was preparing to rebut that, but I did not develop

12   a damages model myself.

13   BY MS. GEMAN:

14      Q.    That was the 3M matter?

15      A.    That's right.

16      Q.    And what -- what was the allegation by

17   the Plaintiffs?

18      A.    That the Plaintiffs had purchased a

19   product portfolio from 3M, a portfolio of

20   pharmaceutical products in Europe.  One of -- one

21   of the more important products then went through a

22   price review in France and experienced a

23   substantial price cut from the French government,

24   and the allegation was that that possibility had

Highly Confidential - Subject to Further Confidentiality Review

1    not been adequately represented.

2         Q.    Have you ever in any context, meaning as

3    a research paper or as a teaching exercise, ever

4    quantified the harm from conduct by a

5    pharmaceutical company?

6         A.    No, I can't recall any specific

7    estimation like that.

8         Q.    Have you ever attempted to quantify the

9    harm from any sort of misconduct by any type of

10   company?

11        A.    I think it depends on how one wants to

12   define harm.  So, I've certainly looked at what is

13   the implication for the availability of a product

14   as a result of pharmaceutical launch strategies,

15   for example.

16             And, so, if one interprets the lack of

17   availability of a product as harm, which some might

18   do, then, yes, that's been an element of some

19   papers I've written.

20             But it has not been described in a legal

21   sense as this is the -- this is a quantum of harm

22   that I can specifically attribute to this

23   particular action.

24        Q.    Have you -- in those instances when you

Highly Confidential - Subject to Further Confidentiality Review

 1    looked at the availability of a product on -- well,

 2    strike that.

 3              Have you ever looked at the impact of

 4    the inavailability of a product?

 5        A.    In terms of tying that to some health

 6    outcome, for example?  No, I have not.

 7        Q.    Okay.  What about an analysis of any

 8    harm to any sort of public entity or municipality

 9    from the conduct of a corporation?

10        A.    No.  Not that I can recall.

11        Q.    What do you plan on doing for this case

12    between now and trial?

13        A.    So, as I've noted in the beginning of my

14    report, should new material or information become

15    available, it's possible that I would have to

16    revise or issue a supplemental report if my

17    opinions changed as a consequence of those

18    materials or that -- or that information.

19              We've already discussed the possibility

20    of a supplemental report specific to the allocation

21    of products by Dr. McCann.

22              To be honest, I've been focused on

23    preparing for this deposition and have not given a

24    lot of thought to what I'll be doing this summer.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Have you been asked to do anything by

2   counsel?

3      A.      Not to date, no.

4      Q.      And where will you be in October?  Would

5   you typically be in Paris?

6      A.      I live in Paris.  So, by default that's

7   where I am, yes.

8      Q.      Are you teaching this fall?

9      A.      I will teach a 30-hour course which

10  takes place over a one-week period towards the end

11  of November.  And as I mentioned, some of my

12  teaching obligations, it's not formal lecturing, I

13  do a lot of work with individual students or with a

14  group of students.  So, that is ongoing throughout

15  the term.

16     Q.      Do you believe that there is information

17  that you do not have that would either strengthen

18  or weaken your opinions?

19     A.      There is always the possibility of

20  obtaining more detailed data that would allow a

21  more refined analysis.

22     Q.      And are you actively seeking that data?

23     A.      My understanding is that a request for

24  detailed claims data has been made.  My team has

1    received some, but at this point it seems too

2    incomplete for us to do much serious analysis.

3         Q.    Received from whom?

4         A.    From the Plaintiffs.

5         Q.    And have you been asked to do any

6    analysis of that data?

7         A.    It was something that we considered in

8    preparing this report.  Unfortunately, it didn't --

9    some of it we received quite late and it was

10   incomplete.  So, it ended up not being an element

11   in this report.

12        Q.    Were there any documents or testimony

13   that you requested but were not provided with?

14        A.    No.

15        Q.    And do you feel there is anything more

16   you need to review to support your opinions?

17        A.    Again, I would be thrilled to have more

18   detailed data in order to analyze at a more nuanced

19   level the link between any kind of Allergan

20   behavior and the outcomes that the Plaintiffs are

21   worried about or alleging.

22        MS. GEMAN:  I appreciate your time today.  I

23   pass it to your -- I pass it, meaning this

24   deposition and the questioning, to your counsel.

Highly Confidential - Subject to Further Confidentiality Review

1      MS. WELCH:  We have nothing.

2      MS. CASTLES:  Nothing.

3      MS. COONEY:  No questions.

4      THE VIDEOGRAPHER:  Okay.  We are off the

5  record at 3:16 p.m.  This concludes the videotaped

6  deposition of Margaret Kyle.

7                (Time Noted:  3:16 p.m.)

8             FURTHER DEPONENT SAITH NAUGHT.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

     I, CORINNE T. MARUT, C.S.R. No. 84-1968,

2  Registered Professional Reporter and Certified
Shorthand Reporter, do hereby certify:

3        That previous to the commencement of the
examination of the witness, the witness was duly

4  sworn to testify the whole truth concerning the
matters herein;

5        That the foregoing deposition transcript
was reported stenographically by me, was thereafter

6  reduced to typewriting under my personal direction
and constitutes a true record of the testimony

7  given and the proceedings had;
        That the said deposition was taken

8  before me at the time and place specified;
        That the reading and signing by the

9  witness of the deposition transcript was agreed
upon as stated herein;

10        That I am not a relative or employee or
attorney or counsel, nor a relative or employee of

11  such attorney or counsel for any of the parties
hereto, nor interested directly or indirectly in

12  the outcome of this action.

13

           *Corinne T Marut*
           _____

14     CORINNE T. MARUT, Certified Reporter

15

        (The foregoing certification of this

16  transcript does not apply to any
reproduction of the same by any means, unless under

17  the direct control and/or supervision of the
certifying reporter.)

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4     carefully and make any necessary corrections.  You

 5     should state the reason in the appropriate space on

 6     the errata sheet for any corrections that are made.

 7                  After doing so, please sign the errata

 8     sheet and date it.

 9                  You are signing same subject to the

10     changes you have noted on the errata sheet, which

11     will be attached to your deposition.

12                  It is imperative that you return the

13     original errata sheet to the deposing attorney

14     within thirty (30) days of receipt of the

15     deposition transcript by you.  If you fail to do

16     so, the deposition transcript may be deemed to be

17     accurate and may be used in court.

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -   -   -   -

                          E  R  R  A  T  A

 2                    -   -   -   -   -   -

 3

 4     PAGE   LINE   CHANGE

 5     _____  _____   _____

 6                    REASON:  _____

 7     _____  _____   _____

 8                    REASON:  _____

 9     _____  _____   _____

10                    REASON:  _____

11     _____  _____   _____

12                    REASON:  _____

13     _____  _____   _____

14                    REASON:  _____

15     _____  _____   _____

16                    REASON:  _____

17     _____  _____   _____

18                    REASON:  _____

19     _____  _____   _____

20                    REASON:  _____

21     _____  _____   _____

22                    REASON:  _____

23     _____  _____   _____

24                    REASON:  _____
```

Highly Confidential - Subject to Further Confidentiality Review

1

2                        ACKNOWLEDGMENT OF DEPONENT

3

4               I, MARGARET KYLE, Ph.D., do hereby

5    certify under oath that I have read the foregoing

6    pages, and that the same is a correct transcription

7    of the answers given by me to the questions therein

8    propounded, except for the corrections or changes

9    in form or substance, if any, noted in the attached

10   Errata Sheet.

11

12

13        _____

14        MARGARET KYLE, Ph.D.              DATE

15

16

17   Subscribed and sworn
     to before me this

18   _____ day of _____, 20____.

19   My commission expires:_____

20
     _____ Notary Public

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2     PAGE   LINE

 3     _____  _____   _____

 4     _____  _____   _____

 5     _____  _____   _____

 6     _____  _____   _____

 7     _____  _____   _____

 8     _____  _____   _____

 9     _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____
```