Page 1

 1              IN THE UNITED STATES COURT

 2              NORTHERN DISTRICT OF OHIO

 3                 EASTERN DIVISION

 4              ~~~~~~~~~~~~~~~~~~~~

 5   IN RE:  NATIONAL PRESCRIPTION

 6   OPIATE LITIGATION              MDL No. 2804

 7                                  Case No. 17-md-2804

 8                                  Judge Dan Polster

 9   This document relates to:

10   The County of Summit, Ohio, et al., v.

11   Purdue Pharma L.P., et al.,

12   Case No. 1:18-OP-45090 (N.D. Ohio)

13

14

15

16        VIDEOTAPED DEPOSITION OF MOLLY LECKLER

17           November 19, 2018, at 10:00 a.m.

18                 Cleveland, Ohio

19

20

21

22

23   Reported by:

24   Anne E. Vosburgh, CSR-6804

25   Job No. 3113667

Page 2

```
 1            -oOo-
 2
 3        On November 19, 2018, commencing at
 4   approximately 10:00 a.m., the deposition of
 5   Molly Leckler, taken by Counsel for the
 6   Defendants, was held at the offices of Climaco
 7   Wilcox Peca Tarantino & Garofoli LPA,
 8   55 Public Square, Suite 1950, Cleveland, Ohio,
 9   before and stenographically reported by
10   Anne E. Vosburgh, Certified Shorthand
11   Reporter No. 6804, Registered Professional
12   Reporter, Certified Realtime Reporter, and
13   Notary Public.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1  APPEARANCES:
 2
 3  On behalf of Cuyahoga County and the
 4  Witness:
 5     Napoli Shkolnik PLLC
 6     400 Broadhollow Road, Suite 305
 7     Melville, NY   11747
 8     631.224.1133
 9     By:  Salvatore C. Badala, Esq.
10        sbadala@napolilaw.com
11     By:  Hunter J. Shkolnik, Esq.
12        hshkolnik@napolilaw.com
13  and
14     Kaufman & Company LLC
15     1001 Lakeside Avenue Suite 1710
16     Cleveland, OH 44114
17     216.912.5516
18     By:  Robin M. Wilson, Esq.
19        robin.wilson@kaufman-company.com
20
21
22
23
24
25
```

Page 4

```
 1  Appearances, continued:
 2
 3  On behalf of Walmart Inc. F/K/A Wal-Mart
 4  Stores, Inc.:
 5     Jones Day
 6     325 John H. McConnell Boulevard, Suite 600
 7     Columbus, Ohio 43215
 8     614.281.3618
 9     By:  Casteel E. Borsay, Esq.
10        cborsay@jonesday.com
11
12
13  On behalf of CVS Indiana LLC and
14  CVS Rx Services Inc.:
15     ZUCKERMAN SPAEDER
16     1800 M Street NW, Suite 1000
17     Washington, DC 20036-5807
18     202.778.1823
19     By:  Anthony Ruiz, Esq.
20        aruiz.zuckerman.com
21
22
23
24
25
```

Page 5

```
 1  Appearances, continued:
 2
 3  On behalf of Endo Health Solutions, Inc.,
 4  Endo Pharmaceuticals Inc., Par Pharmaceutical, Inc.,
 5  and Par Pharmaceutical Companies, Inc.,
 6  (FKA Par Pharmaceutical Holdings, Inc.)
 7     BAKER HOSTETLER
 8     601 Massachusetts Ave, N.W.
 9     Washington, D.C. 20001-3743
10     202.942.5150
11     By:  Carole S. Rendon, Esq.
12        crendon@bakerlaw.com
13     By:  Tera N. Coleman, Esq.
14        tcoleman@bakerlaw.com
15
16  On behalf of Distributor Defendant
17  McKesson Corporation, Co-Liaison Counsel
18  for the Distributor Defendants:
19     Covington & Burling LLP
20     One City Center
21     850 Tenth Street, NW
22     Washington, DC  20001-4956
23     202.662.6000
24     By:  Amber Charles, Esq.
25        acharles@cov.com
```

2 (Pages 2 - 5)

Page 6

1  Appearances, continued:
2
3  On behalf of Prescription Supply, Inc.:
4      Pelini, Campbell & Williams
5      Bretton Commons, Suite 400
6      8040 Cleveland Avenue NW
7      North Canton, Ohio 44720
8      330.305.6400
9  By: Gianna M. Calzola-Helmick, Esq.
10         giannac@pelini-law.com
11
12
13 On behalf of Teva Pharmaceutical
14 Industries Ltd.:
15     Morgan, Lewis, & Bockius, LLC
16     1111 Pennsylvania Ave NW
17     Washington, DC 20004
18     202.739.9000
19 By:  Jonathan York (via telephone)
20
21
22
23
24
25

Page 8

1  Appearances, continued:
2
3  ALSO PRESENT:
4      Jim Torok, Legal Videographer
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1  Appearances, continued:
2
3  On behalf of AmerisourceBergen Drug Corporation:
4      Reed Smith LLP
5      1301 K Street, N.W.
6      Suite 1000 - East Tower
7      Washington, D.C. 20005
8      202.414.9200
9  By:  Samantha L. Rocchino, Esq.
10        Srocchino@reedsmith.com
11
12 On behalf of Cardinal Health:
13     Williams & Connolly
14     725 Twelfth Street, N.W.
15     Washington, D.C. 20005
16     202.434.5421
17 By:  Monika Isia Jasiewicz, Esq.
18        ijasiewicz@wc.com
19
20 On behalf of HBC Service Company:
21     Marcus & Shapira LLP
22     One Oxford Centre, 35th Floor
23     Pittsburgh, Pennsylvania 15219
24 By:  Elly Heller-Toig
25        ehtoig@marcus-shapira.com

Page 9

1              I N D E X
2
3  WITNESS:  MOLLY LECKLER
4
5      ---------- EXAMINATIONS ----------
6  Examination by Mr. Ruiz            17
7  Examination by Ms. Rendon          248
8  Examination by Ms. Charles         332
9  Examination by Mr. Badala          384
10 Re-Examination by Ms. Rendon          397
11
12
13
14     ---------- OCCURRENCES ----------
15                  Page  Line
16 Standing objection placed      256    17
17
18
19
20
21
22
23
24
25

3 (Pages 6 - 9)

Page 10

1     ---------- EXHIBITS ----------
2 NUMBER          DESCRIPTION          PAGE
3 Exhibit 1  Cuyahoga County Court of Common     34
4          Pleas Drug Court Program,
5          Participant Handbook, Bates
6          CUYAH_011015215 through
7          CUYAH_011015216
8 Exhibit 2  Drug Court Advisory Board Meeting   128
9          Minutes, Bates CUYAH_000117415
10         through CUYAH_000117420
11 Exhibit 3  Email chain, RE: Cuyahoga County   155
12         Enhanced Opiate Dependency
13         Services - T1023875, Bates
14         CUYAH_002045311 through
15         CUYAH_002045312
16 Exhibit 4  Email, RE: Next Opiate Task Force  161
17         Meeting Tuesday July 22 Cuyahoga
18         County Board of Health, Bates
19         CUYAH_001621485 to
20         CUYAH_001621487
21 Exhibit 5  Email chain, Fwd: FY2013 - May     165
22         2013 Treatment Expenditure
23         Summary Report, Bates
24         CLEVE_000367329 through
25         CLEVE_000367330

Page 11

1 (Exhibits, continued.)
2
3 Exhibit 6  Email chain, RE: Meeting about     172
4          terminating Drug Court MOU with
5          Municipal Court, Bates
6          CUYAH_003359808 through
7          CUYAH_003359809
8 Exhibit 7  Drug Court Advisory Board Meeting   179
9          Minutes, November 12, 2015, Bates
10         CUYAH_002049703 through
11         CUYAH_002049705
12 Exhibit 8  Email, Next Task Force Meeting,    194
13         Bates CLEVE_000166587
14 Exhibit 9  Cuyahoga County Poison Death       200
15         Review Committee Meeting Minutes,
16         May 28, 2013, Bates
17         CUYAH_001432160 through
18         CUYAH_001432162
19 Exhibit 10  Cuyahoga County Poison Death      208
20         Review Committee Meeting Minutes,
21         June 25, 2013, Bates Numbers
22         CUYAH_001897420 through
23         CUYAH_001897422
24
25

Page 12

1 (Exhibits, continued.)
2
3 Exhibit 11  Email chain, "FW: Carfentanil:     218
4          Medical Examiner's Public Health
5          Warning, Bates CUYAH_001621535
6          through CUYAH_001621537
7 Exhibit 12  Email, Fentanyl Cut Heroin, Bates  220
8          CUYAH_002015681
9 Exhibit 13  Email chain, RE: Update from Dr.   228
10         Gilson, Bates CUYAH_002048206
11         through CUYAH_002048210
12 Exhibit 14  Email with article: Elyria man    246
13         charged with distribution of
14         heroin and fentanyl, including
15         fentanyl that caused the death of
16         an Elyria resident, Bates
17         SUMMIT_00912771 through
18         SUMMIT_00912773
19 Exhibit 15  Cuyahoga County Common Pleas      256
20         Court, Case Information, Bates
21         CUYAH_002040381 through
22         CUYAH_002040408
23 Exhibit 16  Email chain, RE: Drug Court,      274
24         Bates CUYAH_010715371 through
25         010715372

Page 13

1 (Exhibits, continued.)
2
3 Exhibit 17  Email chain, Vivitrol Jail Shots,   282
4          Bates CUYAH_002051005 through
5          CUYAH_002051007
6 Exhibit 18  Advisory Board Meeting Minutes,    290
7          2/18/16, Bates CUYAH_000117444
8          through 000117449
9 Exhibit 19  Spreadsheet, native document,     304
10         Bates CUYAH_001714460
11 Exhibit 20  Site Visit Report, T1025925, June  311
12         15 - 17, 2016, Bates
13         CUYAH_002040764 through 002040838
14 Exhibit 21  Plaintiffs' First Amended         345
15         Responses and Objections to
16         Distributor Defendants' Third Set
17         of Interrogatories
18 Exhibit 22  Supplemental Responses and        354
19         Objections to Distributor
20         Defendants' Interrogatory No. 18
21         Pursuant to Special Master
22         Cohen's October 23, 2018, Order
23
24
25

4 (Pages 10 - 13)

Page 14

1  (Exhibits, continued.)
2
3  Exhibit 23  Email chain, RE: FY2014 - August     365
4       2014 Treatment Expenditure
5       Summary Report, Bates
6       CUYAH_003352707 through
7       CUYAH_003352711
8  Exhibit 24  Email with attachment, FY2014 -     372
9       October 2014 MAT and COMBINED
10      Treatment Expenditure Report,
11      Bates CUYAH_002045070 through
12      CUYAH_002045080
13
14          (Exhibits attached.)
15
16
17
18
19
20
21
22
23
24
25

Page 15

1          Cleveland, Ohio
2       November 19, 2018, 10:00 a.m.
3          ---------------
4           PROCEEDINGS
5          ---------------
6       THE VIDEOGRAPHER:  We are on the
7   record.  Today's date is November 19th,
8   2018.  The time is approximately
9   10:03 a.m.
10      We are here to take the videotaped
11  deposition of Molly Leckler in the case
12  of National Prescription Opiate
13  Litigation, to be heard in the United
14  States District Court, Northern District
15  of Ohio, Eastern Division, Case No.
16  17-MD-2804.
17      If counsel will please state their
18  appearances for the record.
19      MR. BADALA:  Salvatore Badala for
20  the Plaintiff, Cuyahoga County.
21      MS. WILSON:  Robin Wilson for the
22  Plaintiff, Cuyahoga County.
23      MR. RUIZ:  Anthony Ruiz from
24  Zuckerman Spaeder on behalf of CVS
25  Indiana LLC and CVS Rx Services Inc.

Page 16

1       MS. CHARLES:  Amber Charles of
2   Covington & Burling on behalf of
3   McKesson Corporation.
4       MS. RENDON:  Good morning.
5   Carole Rendon from Baker Hostetler on
6   behalf of the Endo Defendants.
7       MS. BORSAY:  Casteel Borsay from
8   Jones Day on behalf of Walmart.
9       MS. COLEMAN:  Tera Coleman, Baker
10  Hostetler, on behalf of the Endo
11  Defendants.
12      MS. CALZOLA:  Gianna Calzola from
13  Pelini, Campbill & Williams, on behalf
14  of Prescription Supply Inc.
15      THE VIDEOGRAPHER:  People on the
16  phone?
17      MS. HELLER-TOIG:  Elly Heller-Toig
18  from Marcus & Shapira for HBC Service
19  Company.
20      MS. JASIEWICZ:  This is
21  Isia Jasiewicz, from Williams & Connolly
22  LLC, on behalf of Cardinal Health.
23      MR. YORK:  This is Jonathan York
24  from Morgan, Lewis & Bockius on behalf
25  of Teva.

Page 17

1       MS. ROCCHINO:  Samantha Rocchino
2       from Reed Smith LLP for
3       AmerisourceBergen Drug Corporation.
4   MOLLY LECKLER,
5       having been called as a witness, was
6       duly sworn to testify to the truth by
7       an authorized notary public and
8       testified as follows.
9              ---
10         EXAMINATION
11  BY MR. RUIZ:
12      Q.   Good morning, Ms. Leckler.
13      A.   Good morning.
14      Q.   My name is Anthony Ruiz, and I
15  represent CVS Indiana LLC and CVS Rx
16  Services, Inc.
17      Could you please state and spell
18  your name for the record.
19      A.   Molly Leckler, M-o-l-l-y,
20  L-e-c-k-l-e-r.
21      Q.   And could you also state your
22  address?
23      A.   9881 Bentley Drive, North
24  Royalton, Ohio 44133.
25      Q.   And you understand that you're

5 (Pages 14 - 17)

Page 18

1 testifying under oath today?
2     A.   I do.
3     Q.   Okay.
4         Your testimony has the same effect
5 as if you were testifying under oath in
6 court.
7             Is there any reason you cannot
8 give complete and truthful testimony today?
9     A.   No.
10    Q.   Okay.
11        And where are you currently
12 employed?
13    A.   I am currently employed with Cuya
14 County Court of Common Pleas.
15    Q.   And what do you do with the Court
16 of Common Pleas?
17    A.   I am the coordinator of the Cuya
18 County Drug Court Program and Recovery Court
19 program.
20    Q.   Let's start with the Drug Court
21 program.  Do you know when it started?
22    A.   Yes.
23    Q.   When did it start?
24    A.   It started in May of 2009.
25    Q.   And what about the Recovery Court?

Page 19

1     A.   The Recovery Court program
2 planning started in 2014.
3     Q.   You said the planning started in
4 2014?
5     A.   Correct.
6     Q.   And when did it become -- if the
7 word is "operational"?
8     A.   Sure.  2015.
9     Q.   And when did you first start
10 working for the Drug Court?
11    A.   I started working with Cleveland
12 Drug Court in 2006.  I reviewed all of the
13 felony cases that came across from arrests
14 from Cleveland, reviewed those cases for
15 eligibility for the Cleveland Drug Court
16 program.
17        Those cases were then dropped down
18 to misdemeanors so they could participate in
19 the Cleveland Drug Court program, which is a
20 misdemeanor court here in Cuya County.
21        And then we started planning to
22 expand to add a county program to treat more
23 felony cases.
24    Q.   And the county program started in
25 2009?

Page 20

1     A.   Correct.
2     Q.   And did you start working for the
3 County Drug Court program when it started in
4 2009?
5     A.   Correct.
6     Q.   And before you worked for the
7 Cleveland Drug Court in 2006, what did you
8 do?
9     A.   When I worked for Cleveland Drug
10 Court?
11    Q.   Before you worked for Cleveland
12 Drug Court.
13    A.   I was hired with the courts in
14 2004.  And for two years I worked in bail
15 investigation, so I was in the county jail
16 every day reviewing eligibility for
17 decreasing bonds, interviewing those that
18 were a capias, that were about to go for a
19 bond hearing, and made recommendations to the
20 court.
21    Q.   Okay.
22        Now, I want to talk about the
23 Cuyahoga County Drug Court.
24        Can you give us a sense of where
25 the Drug Court falls in the overall

Page 21

1 Cuyahoga County court system?
2     A.   Where we fall in the whole court
3 system?
4     Q.   Yeah.  In the -- essentially,
5 could you give me a sense of the
6 organizational structure?
7     A.   Sure.
8         So the County Drug Court program
9 is a certified specialty docket by the
10 Ohio Supreme Court that was started to take
11 cases F3, F4, and 5, that were
12 probation-eligible cases for those that
13 suffer from addiction.  We have a couple
14 different tracks in that program.
15        We have a diversionary track and
16 we have a non-diversionary track.  A
17 diversionary track means that those only have
18 one prior felony conviction, and they're
19 eligible for diversion when they successfully
20 complete the program.
21        Our non-diversionary track
22 defendants are those that have more than one,
23 but three or less prior felony convictions.
24 And they still get all of the benefits of the
25 services in Drug Court, however their cases

6 (Pages 18 - 21)

Page 22

1 are not expunged when they complete the
2 program.
3 So we are under, you know, the
4 Common Pleas, however, we are a specialty
5 docket, one of three. I oversee two
6 specialty dockets with the court.
7 Q. So what does that mean exactly?
8 What is a specialty docket?
9 A. So a specialty docket follows the
10 ten key components for Drug Court standards.
11 We operate a lot different than the regular
12 courtrooms in the Common Pleas Court.
13 We have a team. And part of that
14 team is the coordinator, the judge, the
15 prosecutor, the public defender, case
16 managers, and probation officers.
17 So we have to be certified through
18 the Ohio Supreme Court to operate, and we
19 applied for certification. We applied for
20 re-certification, I believe, last year, and
21 were awarded. So it's just very different
22 than the regular case process for felony
23 cases.
24 Q. And you just said that you were
25 awarded re-certification last year?

Page 23

1 A. Correct.
2 Q. Prior to last year, when was the
3 last time that you were certified?
4 A. Three years prior. It typically
5 lasts three years, however, Recovery Court
6 has been recertified within those three-years
7 time because it was newer court. So they
8 wanted to re-review, which is just kind of
9 their standard procedure.
10 Q. And had it been certified in --
11 2018, so 2015 --
12 A. Correct.
13 Q. -- right around?
14 A. Yeah, it was around there.
15 Q. And then was it certified before
16 2015?
17 A. No. It was a new certification
18 process the Ohio Supreme Court developed.
19 Q. Okay.
20 A. I think they did that just to make
21 sure that -- adhere that most of the
22 specialty dockets were following a model.
23 Q. Okay.
24 And what is that -- strike that.
25 What do you submit to the Ohio

Page 24

1 Supreme Court for certification and
2 re-certification?
3 A. I submit numerous documentations,
4 one being a participation agreement, another
5 being a participation handbook, another being
6 a program description.
7 I also submit a documentation of
8 the list of our advisory board, staff
9 members, and there's a lot of local rules as
10 well. There's a lot of back and forth.
11 When they have new standards, you
12 have to change those documentations. Once
13 those documentations are approved, then they
14 set up a site visit.
15 A site visit, it's -- the Supreme
16 Court comes out to your court. They observe
17 your staffing. They observe your docket
18 hearings to make sure that you're following
19 the model.
20 And then your court is recommended
21 in front of the committee. And they then
22 either award your certification or do not.
23 Q. Do you know what criteria are used
24 to determine whether you're certified or
25 recertified?

Page 25

1 A. There's a list of standards.
2 Q. Okay.
3 And do you know what those are?
4 A. I do not know them all by memory.
5 However, they're easily accessible by the
6 web.
7 Q. And you mentioned earlier that the
8 Drug Court is assessed against a model. What
9 is -- what's that model that you're
10 mentioning?
11 A. Okay. So there's a lot of
12 different things, having a team, having a
13 non-adversarial approach, having immediate
14 and graduated sanctions, having the judge
15 lead that team.
16 Q. Is that model -- is there a model
17 Drug Court, or is there a model document out
18 there that describes -- that you're referring
19 to as the model --
20 A. Sure.
21 Q. -- against which drug courts are
22 evaluated?
23 MR. BADALA: Objection to form.
24 BY MR. RUIZ:
25 Q. You can answer.

7 (Pages 22 - 25)

Page 26

1    A.   Sure.
2        There is SAMSHA, which --
3    Substance Abuse Mental Health Agencies, which
4    is a federal entity agency that puts out the
5    standards that they prefer that the rest of
6    the country follow.
7    Q.   And what is SAMSHA?
8    A.   Substance Abuse Mental Health
9    Agencies.
10   Q.   Is that a federal agency?
11   A.   Correct.
12   Q.   Now, let's talk specifically about
13   the Cuyahoga Drug Court that you worked at.
14       Walk me through how you get -- I'm
15   not sure what the word -- would you use
16   clients, patients?  What's the word that you
17   would use?
18   A.   I typically use clients.
19   Q.   Could you walk me through how you
20   get clients for the Drug Court?
21   A.   We receive clients numerous ways.
22   It could be someone that is already on
23   community-controlled supervision or
24   probation.  It could be when a judge reviews
25   a presentence investigation.  It could be

Page 27

1    when the case is initially being charged for
2    the prosecutor's office, or it could also be
3    defense counsel or public defender.
4        I have received cases where loved
5    once have called and asked if I could review
6    their loved one's case for eligibility.
7    Q.   Is there one way in which more
8    cases are referred than others?
9    A.   I do not know the exact number,
10   but I would estimate that a majority of the
11   cases are actually referred by the
12   prosecutor's office.
13   Q.   And what do you know about the
14   referral process within the prosecutor's
15   office?
16   A.   I have a prosecutor right on our
17   team, so he reviews all the cases that come
18   across that are initially charged either from
19   suburban or from the Cleveland cases.
20       So he's able to review all those
21   cases and really kind of see if initially
22   looking at a case, that a -- someone may be
23   eligible for Drug Court.
24   Q.   And the prosecutor is -- is he
25   employed with the Court of Common Pleas or

Page 28

1    with a different department?
2        MR. BADALA:  Objection to form.
3        You can answer.
4        THE WITNESS:  Okay.
5        He is employed by the Cuya
6        County's prosecutor's office.
7    BY MR. RUIZ:
8    Q.   And just so that you know,
9    throughout the deposition, your counsel may
10   object to some of my questions.  Unless he
11   directs you not to answer, you can go ahead
12   and answer.
13   A.   Understood.
14   Q.   So when the prosecutor is
15   evaluating cases to refer to Drug Court, do
16   you know what criteria the prosecutor is
17   using?
18   A.   Yes.  We have a local rule.
19   Q.   And can you tell me what criteria
20   the prosecutor uses?
21   A.   So non-violent, non-sexual cases,
22   F3s, F4s, F5s that are probational.
23   Q.   So he -- the prosecutor, or
24   whoever else is referring the case to you, is
25   doing that initial screening?

Page 29

1    A.   Correct.
2    Q.   Okay.
3        And is that based -- well, let me
4    strike that.
5        After that is referred -- after
6    this person is referred to you, what happens
7    next?
8    A.   What happens next is I assign a
9    probation officer to do an eligibility
10   review.
11   Q.   Okay.
12       So what does that entail?
13   A.   That entails running a CCH to make
14   sure that they have three or less prior
15   felony convictions.
16       It entails the probation officer
17   either going into the jail to interview the
18   clients, or having them report to the office
19   if they are out on bail.
20       That probation officer goes
21   through numerous questions, sees, you know,
22   where the client is at, maybe quickly looks
23   at some immediate needs.
24       That probation officer then refers
25   for a drug and alcohol assessment.

8 (Pages 26 - 29)

Page 30

1 And then after the assessment, the
2 probation officer goes back and is
3 consistently involved in seeing the client,
4 reviews with them what a potential case plan
5 will look like, and then has that client sign
6 the participation agreement.
7 Q. Okay.
8 A. That probation officer will then
9 contact me and let me know when a case is
10 ready to go forward. Or if they deny the
11 program or if they are not eligible, that
12 probation officer will then write a status to
13 the current assigned judge to let them know
14 what the end result is.
15 Q. I believe you used an acronym in
16 part of that answer, a CCH?
17 A. Correct.
18 Q. What is that?
19 A. It's basically like a background
20 check, criminal background check.
21 Q. And next you said that you assign
22 a probation officer to interview the client,
23 either in jail or if they're out on bail,
24 wherever they are.
25 What does that interview entail?

Page 31

1 A. The interview entails the
2 beginning of developments of a relationship,
3 basically explains to them, you know, what we
4 are, what the Drug Court program is. Starts
5 about -- like, you know, what led you here?
6 What led to you being arrested?
7 Q. And is that history given solely
8 by the client, or are there other people that
9 are interviewed?
10 MR. BADALA: Objection to form.
11 BY MR. RUIZ:
12 Q. You can answer.
13 A. So sometimes it can be just the
14 client. If they already are involved in any
15 treatment agencies, the probation officer may
16 have them sign a release so that we can
17 obtain other information so that we can work
18 collaboratively.
19 Q. And part of what you said is that
20 they are -- the probation officer is asking
21 what led you here; what led you to being
22 arrested.
23 What's the purpose of gathering
24 that information?
25 MR. BADALA: Objection to form.

Page 32

1 THE WITNESS: So, basically, it's
2 very important to understand -- meet the
3 client where they're at currently.
4 So if they've had previous
5 treatment episodes, or if this is the
6 first time they've ever been arrested,
7 or their first time maybe trying to get
8 sober -- maybe it's their first attempt
9 wanting to get sober, or maybe it could
10 be that they've tried numerous times.
11 So it's very important to develop
12 that initial relationship because that
13 probation officer then supervises that
14 person for the next, at a minimum, 12
15 months.
16 BY MR. RUIZ:
17 Q. Okay.
18 And you said that next the
19 probation officer will refer the client for
20 drug and alcohol assessment?
21 A. Correct.
22 Q. And what does that entail?
23 A. So the drug and alcohol assessment
24 determines what the client is using and also
25 what the recommended level of care is.

Page 33

1 Q. Okay.
2 And who does the actual
3 assessment?
4 A. Treatment Alternative Street
5 Crime, which is the case management agency
6 that services the court.
7 Q. And is that sometimes referred to
8 as TASC?
9 A. Correct.
10 Q. And is TASC a part of the Cuyahoga
11 Court of Common Pleas?
12 MR. BADALA: Objection to form.
13 BY MR. RUIZ:
14 Q. If you know.
15 A. Yes. They work under the
16 Corrections Planning Board, which is under
17 the umbrella of the courts.
18 Q. And so they are court employees?
19 A. Correct.
20 Q. Okay. And if you know --
21 (Interruption in proceedings.)
22 THE REPORTER: Can we take a quick
23 break?
24 MR. RUIZ: Sure.
25 THE VIDEOGRAPHER: We are off the

9 (Pages 30 - 33)

1    record, 10:23.
2         (Recess taken.)
3         THE VIDEOGRAPHER:  We're back on
4    the record, 10:35.
5         Back off the record, 10:36.
6         (Pause.)
7         THE VIDEOGRAPHER:  We're back on
8    the record, 10:42.
9         (Recess taken.)
10        THE VIDEOGRAPHER:  We're back on
11   the record, 10:35.
12        Back off the record, 10:36.
13        (Pause.)
14        THE VIDEOGRAPHER:  We're back on
15   the record, 10:42.
16   BY MR. RUIZ:
17       Q.   Hi, Ms. Leckler.
18       A.   Hello.
19       Q.   I would like to show you what's
20   been marked as Leckler Exhibit 1, Bates
21   Number CUYAH_011015215.
22        (Cuyahoga County Court of Common
23        Pleas Drug Court Program,
24        Participant Handbook, Bates
25        CUYAH_011015215 through

1        CUYAH_011015216, marked as
2        Deposition Exhibit 1.)
3    BY MR. RUIZ:
4        Q.   You can take a minute to look
5    through it, if you would like.
6        A.   Okay.
7        Q.   Do you recognize this document?
8        A.   Yes.
9        Q.   And what is this document?
10       A.   This document is the participation
11   handbook.  So it is given to the client when
12   we review them for eligibility for Drug
13   Court.
14       Q.   And is this the handbook that you
15   would submit as part of the certification
16   process with the Ohio Supreme Court?
17       A.   That is correct.
18       Q.   Okay.
19        If you could look, at the bottom
20   right-hand corner are what are called Bates
21   numbers of the document.  If you look at the
22   page ending in 217.
23        And, actually, if you look at the
24   page before that, it says -- about two-thirds
25   of the way down, it says "Eligibility."

1        Do you see that?
2        A.   Yes.
3        Q.   And this is the eligibility for
4    the entry into the Cuyahoga County Drug Court
5    program?
6        A.   Yes.
7        Q.   And it says that the Cuyahoga
8    County Drug Court program is a voluntary
9    program for those who want to change the
10   cycle of addiction.
11        So when a client is referred to
12   the Drug Court by the prosecutor or defense
13   counsel, or however they get to you, have
14   they expressed a willingness to be a part of
15   the Drug Court program before that referral
16   or is that evaluated later?
17        MR. BADALA:  Objection to form.
18        THE WITNESS:  Sometimes.
19   BY MR. RUIZ:
20       Q.   Sometimes it's before?
21       A.   Sometimes, but I'm not there, so I
22   can't say absolutely.
23       Q.   Well, let's look at the next page,
24   which ends at 217.  And near the top, the
25   second bullet there says:

1        "Eligibility reviews are a
2        two-part process, a record check, and
3        then, if eligible, a TASC assessment
4        to determine drug dependence."
5        Do you see that?
6        A.   Yes.
7        Q.   And the record check is the CCH
8    check that you mentioned earlier?
9        A.   Correct.
10       Q.   And then the TASC assessment is
11   the second part that we were talking about
12   just before the break; is that right?
13       A.   Correct.
14       Q.   And what do you know about -- what
15   does that drug dependence assessment entail?
16       A.   It entails history of drug use and
17   family history.  It entails a DSM diagnosis,
18   as stated here.  It entails current physical
19   health needs.
20        It entails children, how many
21   children someone has.  It entails if they
22   have a GED or high school diploma.  It
23   entails how many treatment episodes they've
24   had previously.
25       Q.   And is all of that information

Page 38

1  gathered from the client themselves?
2      A.   Mostly.  It also entails other --
3  for example, like I said before, if somebody
4  is currently involved in a treatment agency,
5  that client will sign a release of
6  information and the assessor will then obtain
7  information from that agency, whether it be
8  substance abuse or mental health.
9      Q.   Okay.
10          And you said one of the things
11  that is assessed is history of drug use; is
12  that right?
13      A.   That is correct.
14      Q.   And is there a time period for
15  which you're gathering information?  Is it
16  drug use in the last three years, five years?
17  Or is it as far back as --
18          MR. BADALA:  Objection to form.
19          THE WITNESS:  It's a lifetime.
20  BY MR. RUIZ:
21      Q.   And is that provided by the
22  client?
23      A.   Yes.
24      Q.   And is anything done to verify
25  that information that is provided by the

Page 39

1  client?
2      A.   The only thing that's verified by
3  the client is if they are out on bail, there
4  could be some drug tests on record.
5      Q.   Okay.
6          And what level of detail, if you
7  know, is gathered about prior drug use?
8          MR. BADALA:  Objection to form.
9          THE WITNESS:  How they started,
10      how much their current use is, if they
11      needed to use more to get the same high,
12      what form they use, how they use.
13  BY MR. RUIZ:
14      Q.   What do you mean by "what form
15  they use"?
16      A.   If they use pills, they snort
17  pills, or if they inject pills.
18      Q.   Is any effort made to determine
19  how they acquire drugs?
20          MR. BADALA:  Objection to form.
21          THE WITNESS:  I don't know.
22  BY MR. RUIZ:
23      Q.   Turning back to the document, that
24  same second bullet near the top says:
25          "Drug Court is set up to treat

Page 40

1      drug-dependent individuals, those
2      meeting criteria from the DSM-IV for
3      drug dependence and is not
4      appropriate for those merely abusing
5      drugs."
6      A.   Yes.
7      Q.   To your knowledge, what's the
8  difference between someone who is drug
9  dependent and someone who is merely abusing
10  drugs?
11          MR. BADALA:  Objection to form.
12          THE WITNESS:  I am not a licensed
13      independent social worker so therefore I
14      cannot make particular diagnoses in an
15      individual, if that makes sense.
16  BY MR. RUIZ:
17      Q.   I totally get that, but if you
18  have an understanding, what's the difference
19  between someone who is drug dependent and
20  someone who abuses drugs?
21          MR. BADALA:  Objection to form.
22          THE WITNESS:  So this
23      participation agreement is also done for
24      the previous version of the DSM
25      diagnoses, so they clinically do not use

Page 41

1      "drug dependent" any longer.  It is now
2      referred to as mild, moderate, and
3      severe diagnoses.
4          So we wouldn't use that
5      terminology any longer.  We do, however,
6      look at cases that are moderate and
7      severe diagnoses because it's a very
8      strict program and it's designed to
9      treat those that have a significant
10      problem with pills.
11  BY MR. RUIZ:
12      Q.   So if you -- I'm hearing you
13  right, someone who has a mild diagnosis is
14  ineligible for Drug Court?
15      A.   That is correct.  I work for a
16  court that has other diversionary programs,
17  so we will at times request to the court that
18  they review the case for eligibility for
19  those other programs that are more designed,
20  less intense.
21      Q.   And to your knowledge, is it
22  possible for individuals to use drugs without
23  developing any kind of use disorder?
24          MR. BADALA:  Objection to form.
25          THE WITNESS:  I don't know.

11 (Pages 38 - 41)

Page 42

1  BY MR. RUIZ:
2      Q.   The employees at TASC who do the
3  drug-dependence assessment, what occupation
4  are they?
5          MR. BADALA:  Objection to form.
6  BY MR. RUIZ:
7      Q.   If you know.
8      A.   What occupation?
9      Q.   Are they social workers?  Are they
10  doctors?  Are they something else?
11      A.   They are social workers, and
12  there's different levels.
13      Q.   And what are those different
14  levels?
15      A.   So you have a licensed social
16  worker, and you have those that also have
17  obtained a chemical dependence lead
18  counselor's license, and then you have those
19  that have an independent license, and those
20  are the individuals that can make clinical
21  recommendations per the DSM Manual.
22          So, for example, if someone that
23  works for TASC that is just a licensed social
24  worker goes in and does an assessment, that
25  assessment has to be signed off by an

Page 43

1  independent licensed individual in order to
2  make recommendations in the state of Ohio.
3      Q.   So we've talked about the referral
4  process.  After the referral, there's a
5  screening for background and drug dependence;
6  is that right?
7      A.   There's a screening.  The second
8  part is now -- not dependence, like we said.
9  Now it's to determine the level of substance
10  use.
11      Q.   Right.  Okay.
12          What happens after those -- after
13  the assessment and the initial screening?
14      A.   Like I stated before, the
15  probation officer will then go over what a
16  potential case plan will look like, and they
17  will have the client sign a participation
18  agreement to make sure that they understand
19  what the rules of the Drug Court program will
20  be.
21          And then they will email me to say
22  this case is ready to go forward.  And then I
23  will do what I need to do on my end to get
24  the case ready.
25      Q.   And what's that?  What would you

Page 44

1  do on your end?
2      A.   So every case needs to be
3  administratively transferred over to the
4  specialty docket judge.  So, therefore, I
5  would request to the administrative and
6  presiding judge that the case has been
7  reviewed, deemed eligible, and request that
8  it be transferred to the specialty docket
9  judge.
10      Q.   And who is the -- talking just for
11  Drug Court, the specialty docket judge is
12  Judge Matia?  Is that how you say his name?
13      A.   It's actually Judge David T.
14  Matia.
15      Q.   Matia.  Thank you.
16      A.   Yes.  People do that often.
17      Q.   I will try to keep that straight
18  throughout the day.
19          And everything that we've talked
20  about so far, is that process the same for
21  the Recovery Court?
22      A.   That is correct.
23      Q.   Okay.
24          And which judge oversees the
25  Recovery Court?

Page 45

1      A.   Judge Joan Synenberg.
2      Q.   And is there a -- after you have
3  transferred the docket, is there anything
4  else that happens before formal acceptance
5  into the program?
6      A.   At times, there could be some more
7  discussion with the defense counsel.  They
8  are informed when the case has been deemed
9  eligible.  And then I put them on the next
10  scheduled docket that we have scheduled.  And
11  we typically have three dockets a month, both
12  in the morning and the afternoon.
13          And then on Recovery Court side,
14  same deal, three dockets a month, just in the
15  morning time.  So that entails me then going
16  and obtaining the criminal file from the
17  current assigned judge, and then just some
18  paperwork.
19      Q.   And when you say there are three
20  dockets a month, that's -- there are three
21  essentially hearing dates?
22      A.   Correct.
23      Q.   And what goes on at those
24  hearings?
25      A.   There's a lot that goes on in

12 (Pages 42 - 45)

1  those hearings. So they're called status
2  review hearings. And, on average, we see
3  about 30 cases per docket session.
4      We have cases that will go in
5  front of the judge for just a compliance
6  hearing, meaning that the client is doing
7  very well. They are going to their meetings,
8  they're going to treatment, they're testing
9  negative, they are participating.
10      So part of the standards is that
11  the judge have that one-on-one interaction
12  with the client, an average of three minutes.
13  And we have violation hearings. So,
14  therefore, you would have some clients that
15  tested positive, failed to show, failed to go
16  to group. And then we also, in that session,
17  we have cases that will be formally accepted
18  into the program.
19      So, depending on where the case
20  process is, they could plead and be
21  sentenced. We could just welcome them into
22  the program if they're already on community
23  control supervision. So a lot of things.
24      Q. And who determines whether a
25  client will be formally accepted into the

1  Drug Court program?
2      A. So the judge has the final
3  discretion to accept or deny a case.
4      Q. And once a client is accepted into
5  the program, is there an initial court
6  hearing that happens?
7      A. Yes.
8      Q. And you talked a little bit about
9  what goes on generally at the docket
10  hearings. But for someone who -- this is
11  their first time into the program, they've
12  just been admitted, what goes on at that
13  first status hearing?
14      A. So like I said, it depends on
15  where their case process is, if it's pre-plea
16  or post disposition. So if it's pre-plea,
17  then they will plead to the case and they
18  will be sentenced. And if they are already
19  on community control supervision, depending
20  on if the previous court held them in
21  violation, if they're referred to the program
22  at a violation.
23      So it just depends on what
24  happened prior, what exactly the criminal
25  proceedings would look like.

1      Q. Do you know what portion of Drug
2  Court participants are -- enter the program
3  pre-plea versus post plea?
4      A. I do not have the exact number. I
5  would say majority.
6      Q. Do you think it's more than
7  75 percent?
8          MR. BADALA: Objection to form.
9          THE WITNESS: I don't know the
10     number. I'm sorry.
11  BY MR. RUIZ:
12      Q. Okay.
13          If you turn to the page that has
14  Bates Number 218 at the bottom, under
15  "Supervision and treatment requirements," it
16  lists a number of requirements in bullet form
17  there.
18          And one of them is -- it's about
19  three-quarters of the way down the bullets on
20  the page. And it says that Drug Court
21  participants are required to pay court fines,
22  restitution, if applicable, and supervision
23  fees.
24          Do you see that?
25      A. Yes.

1      Q. Okay.
2          And how are the court fines -- are
3  the court fines set by statute or rule?
4          MR. BADALA: Objection to form.
5          THE WITNESS: It depends. Most of
6     the court fines are what happened prior
7     to their case coming to us.
8  BY MR. RUIZ:
9      Q. So they don't continue to accrue
10  court fines or fees?
11      A. No. And the great thing about
12  Drug Court is as long as you are doing what
13  you're supposed to and you're in what we call
14  the honor box, meaning doing well, you get to
15  sit like where a jury would sit in a
16  courtroom. They receive an incentive in the
17  sense that we deduct $20 off their court
18  costs. And that's a way for us to provide
19  more incentive to stay on the right track.
20      Q. And what about restitution? Is
21  that restitution that is ordered as part of
22  their -- the disposition of the case?
23          MR. BADALA: Objection to form.
24          THE WITNESS: Restitution is
25     determined by the prosecutor. The

Page 50

1 client is aware of that, and that's
2 something that defense counsel discusses
3 with the client.
4 BY MR. RUIZ:
5 Q. Do you have any knowledge of to
6 whom that restitution is paid?
7 A. It's always stated on the record.
8 And it's in the journal entry.
9 Q. Does restitution ever get paid to
10 the court?
11 A. The restitution gets paid to --
12 they submit their restitution to the
13 probation department, which is underneath the
14 court, and then is then provided to the
15 victim.
16 Q. In the -- in the case in which
17 someone is arrested for a drug crime, do you
18 know if there's ever an instance in which
19 someone is ordered to pay restitution to the
20 court system or to the Drug Court program?
21 MR. BADALA: Objection to form.
22 THE WITNESS: I don't know.
23 Typically drug cases do not have
24 restitution. Those are theft and
25 robbery cases.

Page 51

1 BY MR. RUIZ:
2 Q. Okay.
3 And you said that for clients that
4 are in the honor box, they get $20 off their
5 court costs?
6 A. That is correct.
7 Q. How often does -- assuming that
8 the client is -- stays in the honor box, how
9 often is the $20 deducted?
10 A. Every time they're in court. So
11 it depends on what phase they're in.
12 Q. Because during different phases,
13 they might be coming to court more often or
14 less often?
15 MR. BADALA: Objection to form.
16 THE WITNESS: That is correct.
17 BY MR. RUIZ:
18 Q. And earlier I asked you about the
19 number of participants that enter the program
20 pre-plea versus post plea. Is that recorded
21 anywhere?
22 A. It's in our criminal dockets. So,
23 yes.
24 Q. Is there any way -- is there
25 anywhere where that information is kept in an

Page 52

1 aggregated form?
2 MR. BADALA: Objection to form.
3 THE WITNESS: I don't know.
4 BY MR. RUIZ:
5 Q. Do you have any idea what the
6 average court costs are per person?
7 MR. BADALA: Objection to form.
8 THE WITNESS: I don't know. I
9 know that majority of cases do not have
10 much court costs when they graduate.
11 BY MR. RUIZ:
12 Q. And is there a maximum deduction
13 that they can achieve?
14 A. Is there a maximum deduction that
15 they can attain, meaning like is there -- do
16 we like only allow them $100 maximum to get
17 deducted?
18 Q. Right.
19 A. No.
20 Q. So they can go all the way to
21 zero?
22 A. That is correct.
23 Q. As a client is going through the
24 process and has a background check done, a
25 drug-dependence assessment, or -- I'm sorry.

Page 53

1 What is it called now instead of a
2 drug-dependence assessment?
3 A. They just don't use the word
4 "dependence." They use diagnoses. So either
5 mild, moderate, or severe.
6 Q. So a drug diagnosis assessment, is
7 that information -- where is that information
8 kept?
9 MR. BADALA: Objection to form.
10 THE WITNESS: The information or
11 the assessment?
12 BY MR. RUIZ:
13 Q. If I wanted to look at a record of
14 the assessment for a Drug Court client, where
15 would I go to find it?
16 A. You would not be able to.
17 Q. Why not?
18 A. Because of HIPAA.
19 Q. So assuming HIPAA was not an
20 issue, where would you go to find that
21 document?
22 A. You would have to go to the TASC
23 department who did the assessment.
24 Q. And so you don't have a copy of
25 that, as Drug Court coordinator, in your

14 (Pages 50 - 53)

1    files anywhere?

2        A.    Absolutely.

3        Q.    I'm sorry.  Absolutely you do or

4    you do not?

5        A.    Absolutely I do.

6        Q.    Okay.

7            So you have access to that file as

8    well?

9        A.    Absolutely.

10        Q.    And for any given client, what

11    other information are you keeping -- either

12    electronically or in hard copy -- about that

13    patient throughout the program?

14        MR. BADALA:  Objection to form.

15        THE WITNESS:  What kind of

16    information am I keeping document-wise?

17    BY MR. RUIZ:

18        Q.    Yes.

19        A.    Progress reports, progress reports

20    given by the case manager, progress reports

21    given by the probation officer, record of

22    drug tests, releases of information, maybe a

23    mental health assessment if they need mental

24    health linkage.

25        Q.    And do you keep that information

1    after a client has graduated from the

2    program?

3        A.    Yes.

4        Q.    And how long do you keep that

5    information?

6        A.    Forever.

7        Q.    So you haven't destroyed or

8    deleted files of clients that have graduated

9    from the program?

10        MR. BADALA:  Objection, form.

11        THE WITNESS:  No.

12    BY MR. RUIZ:

13        Q.    At some point a treatment plan is

14    created for the client; is that right?

15        A.    That is correct.

16        Q.    And how is that created?

17        A.    A treatment plan is created by the

18    case manager.  And treatment plans are

19    created with the client.

20        Q.    And the case manager is the TASC

21    case manager; is that right?

22        A.    Correct.

23        Q.    And how many different TASC case

24    managers are there?

25        A.    Which docket?

1        Q.    Let's start with Drug Court.

2        A.    Okay.  So in Drug Court, in our

3    morning docket, we have two case managers.

4    In the afternoon docket, we have one.

5        Q.    And how many clients do they

6    manage at a given time?

7        A.    They manage about 40 cases at any

8    given time.

9        Q.    Okay.

10        A.    Our afternoon docket generally is

11    a little bit -- a little bit more of a

12    strenuous -- they have a little bit more

13    cases.  That's all opiate abuse cases.

14        Q.    And the -- so it's three separate

15    people, the three case managers?

16        A.    That is correct.

17        Q.    Switching over to the Recovery

18    Court, how many case managers are there?

19        A.    We have two.

20        Q.    And how many clients do each of

21    those case managers serve?

22        A.    Those also have about 40 cases

23    each.

24        Q.    Now, in terms of the treatment

25    plan -- what are the different treatment

1    options that the Drug Court program offers?

2        A.    Do you mean like level of

3    treatment, like where they go for treatment,

4    like residential or IOP, which is intensive

5    outpatient treatment, and then there would be

6    non-intensive outpatient treatment.

7        Q.    Well, let me back up, actually.

8            When a treatment plan is

9    developed, what is part of that plan?

10        MR. BADALA:  Objection, form.

11        THE WITNESS:  Part of that plan is

12    what form of treatment they're going to

13    start.

14    BY MR. RUIZ:

15        Q.    What do you mean by that?

16        A.    So there's different levels of

17    treatment.  So one could go into residential

18    treatment, one could go into intensive

19    outpatient treatment, and one could go into

20    outpatient treatment.  So that would be a

21    part of the case plan.

22        Q.    Okay.

23        A.    Also, any other needs that need to

24    be addressed, anywhere from going to take,

25    you know, HIV testing to linkage with mental

Page 58

1  health counseling.  So there's a lot of
2  services that is -- that a client may
3  participate in, and it changes as different
4  goals are met.
5      Q.   And for the different treatment
6  options that you have, how do those get
7  fulfilled?  Do you have contracts with
8  providers, treatment providers?
9      A.   Yes.
10     Q.   And what are the different
11  treatment providers that you have contracts
12  with?
13     A.   We have treatment -- contracts
14  with numerous providers:  Catholic Charities,
15  Community Assessment & Treatment Services,
16  Stella Maris, and with TASC itself that runs
17  some intensive outpatient treatment groups.
18     Q.   And how is it determined where a
19  client goes?
20     A.   So -- a lot of different things:
21  Where they've been previously, what needs
22  they have, medication-assisted treatment
23  recommendations, and some other things.
24     Q.   Okay.
25          And what is medication-assisted

Page 59

1  treatment?
2      A.   Medication-assisted treatment is
3  basically -- just kind of like it says,
4  basically those that want to participate in
5  medication to help them deal with their
6  opiate use.
7          So, for example, Vivitrol,
8  Subutex, methadone.
9      Q.   And you said -- what you just said
10  was that you could use medically-assisted
11  treatment for people that have -- that use
12  opioids, opiates; is that right?
13     A.   That is correct.
14     Q.   Are there also clients within the
15  Drug Court program that are admitted for
16  non-opiate-related diagnoses?
17          MR. BADALA:  Objection to form.
18          THE WITNESS:  Yes.
19  BY MR. RUIZ:
20     Q.   And do you have a sense of what
21  percentage of Drug Court program participants
22  are -- have opiate versus non-opiate
23  diagnoses?
24     A.   I can give you an estimate, and
25  it's about 85 percent are opiate.

Page 60

1      Q.   And is that for the Drug Court?
2      A.   That is correct.  The Recovery
3  Court is all opiate.  The afternoon docket is
4  all opiate.  So just that morning docket.
5          We also have those that have
6  opiate-use disorder.  However, keep in mind,
7  Recovery Court is just opiate.  The afternoon
8  docket is just opiate.
9      Q.   So when you say "opiate," I want
10  to make sure that we're talking about the
11  same things.
12          What is an opiate, to your
13  knowledge?
14     A.   To my knowledge, an opiate is a
15  painkiller.
16     Q.   Okay.
17          And what is the basis for your
18  knowledge about opioids?
19     A.   I've attended training, both local
20  and -- about every other year, I attend
21  training, the NADCP, which is National
22  Association of Drug Court Professionals.
23     Q.   And what kind of trainings have
24  you attended?
25     A.   All different kinds.

Page 61

1      Q.   The trainings that you have
2  attended, are they for a specific license
3  that you have, or just in connection with
4  your position in the Drug Court?
5          MR. BADALA:  Objection to form.
6          THE WITNESS:  It's just connection
7     with the profession that I work with.
8  BY MR. RUIZ:
9      Q.   And these trainings that you go
10  to, are they related to substance abuse,
11  generally?
12          MR. BADALA:  Objection to form.
13          THE WITNESS:  Mostly.
14  BY MR. RUIZ:
15     Q.   Are any of them specific to
16  opiates or opioids?
17          MR. BADALA:  Objection to form.
18          THE WITNESS:  Yes.
19  BY MR. RUIZ:
20     Q.   And can you recall any of them
21  that were specific to opiates?
22     A.   Yes.  I attend different
23  presentations that courts may do -- what
24  they're doing to treat opiate use, from the
25  initial -- like an Opiate 101 to the

16 (Pages 58 - 61)

Page 62

1    innovative programs that other things --
2    services that other programs have done, how
3    they started expanding their services, and
4    different things that they've done to monitor
5    those that suffer from opiate-use disorder.
6        Q.   What's the most recent one that
7    you can remember that you've attended?
8        A.   So last month -- well, yeah, last
9    month.  The Ohio Supreme Court puts on a
10   specialized docket conference.  So I attended
11   that conference.
12       Q.   And how did that relate to
13   opiates?
14       A.   I had the opportunity to witness
15   Summit County's presentation.
16       Q.   And Summit County made a
17   presentation.  What was their presentation
18   about?
19       A.   So they presented on -- they have
20   a drug therapy dog.  They also have
21   collaboration with their local YMCA.  So it
22   was just kind of a neat conversation with
23   them to see what they're doing.
24           Also, with their forms of
25   medication as to treatment, what they use,

Page 63

1    their different treatment options that they
2    have.
3        Q.   Prior to the conference that you
4    went to last month, what's the most recent
5    one that you can remember that you attended
6    relating to opioids?
7        A.   I don't remember.
8        Q.   How many would you say that you
9    have attended relating to opioids?
10           MR. BADALA:  Objection, form.
11           THE WITNESS:  I don't know.
12   BY MR. RUIZ:
13       Q.   Would you say it's more than five?
14           MR. BADALA:  Objection to form.
15           THE WITNESS:  I don't know.
16   BY MR. RUIZ:
17       Q.   Do you -- when you attend these
18   conferences or trainings, do you get written
19   materials?
20       A.   Yes.
21       Q.   Do you keep those materials?
22       A.   Yes.
23       Q.   Do you also sometimes get
24   materials electronically?
25       A.   I may at times -- like, for

Page 64

1    example, the specialized docket conference, I
2    was unable to attend some other training that
3    was going on in the same session.  So you can
4    go onto the website and obtain their
5    PowerPoints.
6        Q.   Is it ever the case where
7    conference or training materials are provided
8    to you electronically to download to your
9    computer?
10           MR. BADALA:  Objection, form.
11           THE WITNESS:  Anyone can.
12   BY MR. RUIZ:
13       Q.   Would you have copies of those
14   trainings on your computer?
15           MR. BADALA:  Objection to form.
16           THE WITNESS:  Yes.
17   BY MR. RUIZ:
18       Q.   Okay.
19           Can you give me an example of an
20   opioid?
21       A.   An example of an opioid.
22   Percocet, OxyContin, Vicodin.  Also heroin,
23   fentanyl.  Those are just some examples.
24       Q.   Drugs like cocaine,
25   methamphetamine, marijuana, Xanax, Adderall,

Page 65

1    those aren't opioids, to your knowledge,
2    right?
3            MR. BADALA:  Objection, form.
4            THE WITNESS:  That is correct.
5    BY MR. RUIZ:
6        Q.   And you understand that some
7    opioids have legitimate medical purposes?
8            MR. BADALA:  Objection to form.
9            THE WITNESS:  I don't know.
10   BY MR. RUIZ:
11       Q.   You don't know?
12       A.   I don't know.  I'm not a doctor.
13   I don't know.
14       Q.   Well, do you know that opioids are
15   sometimes prescribed to individuals?
16           MR. BADALA:  Objection, form.
17           THE WITNESS:  Yes.  I know that
18       opioids are prescribed to those -- to
19       people.
20   BY MR. RUIZ:
21       Q.   And do you know that opioids --
22   certain opioids have been approved by the
23   FDA?
24           MR. BADALA:  Objection, form.
25           THE WITNESS:  I do not.  I'm not a

17 (Pages 62 - 65)

Page 66

1    physician.
2    BY MR. RUIZ:
3        Q.   Do you know that the DEA regulates
4    opioids?
5            MR. BADALA:  Objection, form.
6            THE WITNESS:  I do not.  I do not
7        work for the DEA.  I just work in the
8        Drug Court.  So I just work with what
9        happens after those have substance-abuse
10       disorders, including opiates.
11   BY MR. RUIZ:
12       Q.   I know you don't work for the DEA.
13   I'm just wondering if you know that the DEA
14   regulates opioids.
15           MR. BADALA:  Objection, form.
16           THE WITNESS:  No, I do not.
17           MR. RUIZ:  Okay.
18           MR. BADALA:  Is it a good time to
19       take a five-minute break?  We've been
20       going about an hour.
21           MR. RUIZ:  Yeah.
22           THE VIDEOGRAPHER:  Off the record.
23       11:25.
24           (Recess taken.)
25           THE VIDEOGRAPHER:  We're back on

Page 67

1    the record.  11:38.
2    BY MR. RUIZ:
3        Q.   Ms. Leckler, I asked you earlier
4    if you knew that some opioids have legitimate
5    medical uses, and you said you're not a
6    doctor.  But you know that some opioids are
7    legal, right?
8            MR. BADALA:  Objection to form.
9            THE WITNESS:  I know that some
10       opiates are legal?
11   BY MR. RUIZ:
12       Q.   Yes.  That's my question.
13           MR. BADALA:  Same objection.
14           THE WITNESS:  Rephrase it?
15   BY MR. RUIZ:
16       Q.   Do you know that it is possible
17   for a person to legally get an opioid?
18           MR. BADALA:  Objection to form.
19           THE WITNESS:  Yes.
20   BY MR. RUIZ:
21       Q.   What do you know about the
22   circumstances under which someone could
23   legally obtain an opioid?
24           MR. BADALA:  Objection to form.
25           THE WITNESS:  Meaning they would

Page 68

1    obtain a prescription from a physician.
2    BY MR. RUIZ:
3        Q.   Okay.
4            So they obtain a prescription from
5    a physician and then what?
6            MR. BADALA:  Objection to form.
7            THE WITNESS:  Then I don't know.
8    BY MR. RUIZ:
9        Q.   Okay.
10           And you don't know how opioids are
11   regulated at the federal level?
12           MR. BADALA:  Objection to form.
13           THE WITNESS:  I do not.
14   BY MR. RUIZ:
15       Q.   Do you know anything about how
16   they're regulated at the state level?
17       A.   I do not.
18       Q.   You're not familiar with how the
19   Ohio Board of Pharmacy regulates opioids?
20           MR. BADALA:  Objection to form.
21           THE WITNESS:  I do not.
22   BY MR. RUIZ:
23       Q.   Okay.
24           You understand that some opioids
25   can be obtained by prescription and others

Page 69

1    cannot?  Do you know that?
2            MR. BADALA:  Objection to form.
3            THE WITNESS:  Do I understand that
4        some opiates can be -- opioids can be
5        obtained by prescription and some
6        cannot?
7    BY MR. RUIZ:
8        Q.   Right.
9            MR. BADALA:  Same objection.
10           THE WITNESS:  Yes.
11   BY MR. RUIZ:
12       Q.   For instance, Vicodin, you could
13   obtain a prescription for Vicodin?
14           MR. BADALA:  Objection to form.
15           THE WITNESS:  Someone could.
16   BY MR. RUIZ:
17       Q.   Someone could?
18       A.   Yes.
19       Q.   But no one can obtain a
20   prescription for heroin?
21       A.   That is correct.
22       Q.   But those are both opioids?
23       A.   That is correct.
24       Q.   Right.  Okay.
25           Now, for prescription opioids, do

18 (Pages 66 - 69)

Page 70

1  you have any understanding of how those drugs
2  make their way from a manufacturer to a
3  patient?
4      A.   I do not.
5      Q.   Okay.
6          So you don't know -- do you know
7  that manufacturers make opioids?
8          MR. BADALA:  Objection to form.
9          THE WITNESS:  I do not.
10  BY MR. RUIZ:
11      Q.   Do you know that certain
12  distributors distribute opioids?
13          MR. BADALA:  Objection to form.
14          THE WITNESS:  I do not.
15  BY MR. RUIZ:
16      Q.   But you do know that doctors can
17  prescribe opioids?
18      A.   Yes.
19      Q.   Do you know that pharmacies can
20  dispense opioids?
21          MR. BADALA:  Objection to form.
22          THE WITNESS:  Yes.
23  BY MR. RUIZ:
24      Q.   Okay.
25          Do you know that insurance can

Page 71

1  reimburse for opioid prescriptions?
2          MR. BADALA:  Objection to form.
3          THE WITNESS:  I do not.
4  BY MR. RUIZ:
5      Q.   Do you know if Medicaid reimburses
6  for opioid prescriptions?
7          MR. BADALA:  Objection to form.
8          THE WITNESS:  I do not.
9  BY MR. RUIZ:
10      Q.   Or if they cover opioid
11  prescriptions?
12          MR. BADALA:  Objection to form.
13          THE WITNESS:  I do not.
14  BY MR. RUIZ:
15      Q.   You said that a person might be
16  able to obtain a prescription for an opioid
17  from a physician.
18          Do you know who else a person
19  might be able to obtain a prescription for an
20  opioid from?
21          MR. BADALA:  Objection to form.
22          THE WITNESS:  I do not.
23  BY MR. RUIZ:
24      Q.   Would you agree that a prescriber
25  is the one who determines whether a given

Page 72

1  medicine is appropriate for a patient?
2          MR. BADALA:  Objection to form.
3          THE WITNESS:  I do not.  Like I
4  said before, I am not a physician.  I do
5  not know.
6  BY MR. RUIZ:
7      Q.   I'm not asking if you're a
8  physician.  I'm not asking for your medical
9  opinion.  I'm just asking for your opinion as
10  someone who works in the Drug Court for
11  almost ten years --
12      A.   Uh-huh.
13      Q.   -- and has a lot of knowledge
14  around substance abuse and has gone to
15  opioid-specific trainings.
16          Do you agree that a prescriber is
17  the one who determines whether a medication
18  is appropriate for someone or not?
19          MR. BADALA:  Objection to form.
20          Asked and answered.
21          THE WITNESS:  I don't know.
22  BY MR. RUIZ:
23      Q.   Do you know whether it's up to the
24  prescriber to weigh the risks and benefits of
25  a particular medication for a patient?

Page 73

1          MR. BADALA:  Objection to form.
2          THE WITNESS:  I do not know.
3  BY MR. RUIZ:
4      Q.   A prescriber is usually going to
5  know a patient's medical history, right?
6          MR. BADALA:  Objection to form.
7          THE WITNESS:  I have no idea.
8  BY MR. RUIZ:
9      Q.   Well, you've had experience with
10  doctors before?
11          MR. BADALA:  Is that a question?
12          MR. RUIZ:  Yeah.
13  BY MR. RUIZ:
14      Q.   Have you had experience with
15  doctors before?
16          MR. BADALA:  You don't have to
17  disclose your medical history.
18          MR. RUIZ:  I'm not asking her to
19  disclose her medical history.
20          MR. BADALA:  I'm just making it
21  clear.
22          THE WITNESS:  Have I been to the
23  doctor before?
24  BY MR. RUIZ:
25      Q.   Yes.

19 (Pages 70 - 73)

Page 74

1    A.   Yes, I've been to the doctor
2  before.
3    Q.   And do you give medical history
4  when you do that?
5    A.   Sometimes.
6    Q.   Do you give family history, family
7  medical history?
8    A.   I guess.
9    Q.   Sometimes?
10    A.   Yes.
11    Q.   Okay.
12    And do you know that prescription
13  medications come with instructions?
14    MR. BADALA:  Objection to form.
15    THE WITNESS:  I do not know.
16  BY MR. RUIZ:
17    Q.   You don't know if prescription
18  medications come with instructions?
19    MR. BADALA:  Objection to form.
20    THE WITNESS:  I do not know.
21  BY MR. RUIZ:
22    Q.   Do you know if they come with
23  warnings?
24    MR. BADALA:  Objection to form.
25    THE WITNESS:  I do not know.

Page 75

1  BY MR. RUIZ:
2    Q.   Have you ever looked at a
3  prescription medication before?
4    MR. BADALA:  Objection to form.
5    Are we talking about opioids?  I'm
6  confused now.
7    MR. RUIZ:  No.  I'm just talking
8  about prescription medications in
9  general.
10    THE WITNESS:  Have I ever read
11  instructions on prescription
12  medications?  Is that what you're
13  asking?
14  BY MR. RUIZ:
15    Q.   No.  I'm asking if you've ever
16  looked at, for instance, a bottle of
17  prescription drugs.  It doesn't have to be
18  opioids.
19    A.   Yes.  I have looked at a bottle
20  of -- a prescription.
21    Q.   Did that bottle have instructions?
22    A.   Yes.
23    Q.   Did it have warnings?
24    A.   I don't know.
25    Q.   Okay.

Page 76

1    You don't know if prescription
2  opioids have -- come with instructions?
3    MR. BADALA:  Objection to form.
4    THE WITNESS:  Yes.  They would
5  come with instructions.
6  BY MR. RUIZ:
7    Q.   Okay.
8    And when a medication comes with
9  instructions, it's up to the patient to
10  follow those instructions, right?
11    MR. BADALA:  Objection to form.
12    THE WITNESS:  I don't know.
13  BY MR. RUIZ:
14    Q.   Okay.
15    And if a prescription is written
16  for a patient, it's written for that
17  particular patient, right?
18    MR. BADALA:  Objection to form.
19    THE WITNESS:  I guess, yes.
20  BY MR. RUIZ:
21    Q.   If a doctor writes you a
22  prescription, you're not supposed to share
23  that with a family member or a friend?
24    MR. BADALA:  Objection to form.
25    THE WITNESS:  That is correct.

Page 77

1  BY MR. RUIZ:
2    Q.   Okay.
3    And, in fact, someone taking a
4  prescription medication that they have not
5  been prescribed is illegal, right?
6    MR. BADALA:  Objection to form.
7    THE WITNESS:  That is correct.
8  BY MR. RUIZ:
9    Q.   Okay.
10    And is that a form of diversion?
11    MR. BADALA:  Objection to form.
12    THE WITNESS:  I don't know what
13  the term is called.
14  BY MR. RUIZ:
15    Q.   Are you familiar with the term
16  "diversion"?
17    A.   I'm familiar with the term of
18  diversion.  It's used a lot in the courtroom
19  when it's talking about expunging and not
20  expunging cases.
21    Q.   Are you familiar with the term
22  "diversion" as it relates to drug use?
23    MR. BADALA:  Objection to form.
24    THE WITNESS:  No.
25

20 (Pages 74 - 77)

Page 78

1  BY MR. RUIZ:
2     Q.  So you have never heard the term
3  "diverted drug"?
4     A.  I have heard it, but I do not
5  understand the definition.
6     Q.  Okay.
7       Do you agree that once -- that
8  someone might have a valid prescription for
9  an opioid and then choose to sell it on the
10  street?
11       MR. BADALA:  Objection to form.
12       THE WITNESS:  Say it again?  I'm
13    sorry.
14  BY MR. RUIZ:
15     Q.  Do you agree that someone might
16  have a valid prescription for an opioid and
17  then can choose to sell it on the street?
18       MR. BADALA:  Objection to form.
19       THE WITNESS:  I don't know.
20  BY MR. RUIZ:
21     Q.  Have you ever heard of that
22  happening?
23     A.  Yes.  Narcotics do have a street
24  value.  All drugs have a street value.
25     Q.  Have you heard of prescription

Page 79

1  opioids being stolen from hospitals?
2       MR. BADALA:  Objection to form.
3       THE WITNESS:  I don't know.
4  BY MR. RUIZ:
5     Q.  Being stolen from medicine
6  cabinets?
7       MR. BADALA:  Objection to form.
8       THE WITNESS:  I don't know.
9  BY MR. RUIZ:
10     Q.  You haven't heard any stories of
11  people doing that?
12       MR. BADALA:  Objection to form.
13       THE WITNESS:  Me personally, in
14    the Drug Court program, I see a lot of
15    cases where one was prescribed opiates
16    and then they needed more of it.
17    Usually it could lead to them being
18    arrested, which is when they would come
19    across my desk.  So -- if that helps.
20  BY MR. RUIZ:
21     Q.  Well, let's walk through that.
22       When they are arrested, have you
23  ever encountered someone who was arrested for
24  taking a prescription opioid that they were
25  prescribed by a doctor?

Page 80

1       MR. BADALA:  Objection to form.
2       THE WITNESS:  Say that again?  I'm
3    sorry.
4  BY MR. RUIZ:
5     Q.  Have you ever encountered a client
6  who was arrested for taking a prescription
7  opioid that was prescribed by a doctor?
8     A.  Have I ever taken a case of
9  someone that was taking a prescription that
10  they were described [sic] for?
11     Q.  That they were prescribed by a
12  doctor.
13     A.  Well, yes.
14     Q.  So they were -- tell me about
15  that.
16     A.  So, for example, I see a lot of
17  clients that were in a car accident, had
18  dental work, had surgery, they were
19  prescribed opiates, and they've continued to
20  use it well after it was ongoingly being
21  prescribed.  A lot of times you see cases
22  that, unfortunately, start using heroin.
23       I can give you a specific example,
24  if you would like.
25     Q.  So that's actually a different

Page 81

1  scenario than what I'm asking about.
2     A.  Okay.
3     Q.  What you just described is someone
4  who at one point had a prescription and then
5  somewhere along the way that prescription
6  ended, and they continued taking opioids.
7     A.  Well, a number of things can
8  happen.  Drug use -- to get that ceiling
9  effect, it could be -- also, a lot of times
10  what happens is that prescription medication,
11  you're not hitting that ceiling effect.  So
12  you're going to want to look to more of it or
13  to what's more strong.
14     Q.  So, again, that's not my question,
15  though.  My question is has anyone ever come
16  into the Drug Court program because they were
17  arrested for taking prescription medication
18  that they had a valid prescription for?
19       MR. BADALA:  Objection to form.
20       THE WITNESS:  Well, no.  No.
21  BY MR. RUIZ:
22     Q.  And after -- strike that.
23       You realize that some people
24  take -- might take a prescription opioid from
25  a family member's medicine cabinet?

21 (Pages 78 - 81)

Page 82

1           MR. BADALA:  Objection to form.
2           THE WITNESS:  Am I aware that
3      those may take other loved one's
4      prescription medication?
5  BY MR. RUIZ:
6      Q.   Yes.  Have you heard of that
7  before?
8      A.   Yes.
9      Q.   Have you heard of family members
10  giving their legally prescribed drugs to
11  someone else who was not the prescribed
12  patient?
13          MR. BADALA:  Objection to form.
14          THE WITNESS:  Yes.
15  BY MR. RUIZ:
16      Q.   And that would be illegal, right?
17          MR. BADALA:  Objection to form.
18          THE WITNESS:  Yes.
19  BY MR. RUIZ:
20      Q.   Let's talk about illegal opioids,
21  like heroin.
22          Do you have an understanding about
23  how heroin gets from a manufacturer, a maker,
24  to an ultimate drug user?
25          MR. BADALA:  Objection to form.

Page 83

1           THE WITNESS:  No, I do not.
2  BY MR. RUIZ:
3      Q.   Okay.
4           Have you heard of -- you have no
5  knowledge about how illegal drugs make their
6  way into Cuyahoga County?
7           MR. BADALA:  Objection to form.
8           THE WITNESS:  Not an absolute of
9      the exact track, no.  I do not.
10  BY MR. RUIZ:
11      Q.   Tell me what you know.
12      A.   Well, I would assume that if I did
13  know and that if we did know, that they would
14  be able to do something more about that.  So,
15  no, I cannot even begin to try to follow what
16  happens on the streets.
17      Q.   Do you have any sense where
18  illegal drugs -- where illegal heroin in
19  Cuyahoga County is coming from?
20          MR. BADALA:  Objection to form.
21          THE WITNESS:  I do not.
22  BY MR. RUIZ:
23      Q.   Have you read about it in the
24  news?
25          MR. BADALA:  Objection to form.

Page 84

1           THE WITNESS:  I've read some
2      headlines.  However, it looks like a lot
3      of assumptions.  So, just like you,
4      sometimes you see things come across in
5      the papers, but I do not know how the
6      volume of drugs come into Cuyahoga
7      County.
8  BY MR. RUIZ:
9      Q.   Have you heard of illegal drugs
10  making their way via Mexican drug cartels?
11          MR. BADALA:  Objection to form.
12          THE WITNESS:  I do not.  Like I
13      said, I don't -- I don't work on the law
14      enforcement side.  So, unfortunately, I
15      do not know how that all occurs.  What I
16      do deal with is what happens after,
17      and -- after somebody has been arrested.
18      So that part, I can -- I can answer.
19  BY MR. RUIZ:
20      Q.   And so you just haven't heard that
21  before?
22          MR. BADALA:  Objection to form.
23          THE WITNESS:  Yes.  I've heard of
24      that.  I have seen headlines of that.
25      However, it's not -- it does not -- it's

Page 85

1  not my expertise.
2           And, like I said, I deal with
3      what -- I have enough on my plate with
4      what happens after to worry about what
5      happens before.
6  BY MR. RUIZ:
7      Q.   What about illegal fentanyl coming
8  from China?
9           MR. BADALA:  Objection to form.
10          THE WITNESS:  I've heard of
11      illegal fentanyl coming from China.  I
12      do -- like I said before, I have a lot
13      of cases where, you know, those may have
14      overdosed previously, so --
15  BY MR. RUIZ:
16      Q.   Okay.
17          Have you ever heard of counterfeit
18  opioids before?
19      A.   Have I ever heard of counterfeit
20  opioids?  No, I have not.  I've heard of
21  counterfeit money.
22      Q.   So you've never heard of pills
23  being sold on the street as one form of
24  opioid and they're really another?
25          MR. BADALA:  Objection to form.

22 (Pages 82 - 85)

1        THE WITNESS:  I have never heard
2    it called counterfeit.
3    BY MR. RUIZ:
4        Q.   What have you heard it called?
5        A.   Just drugs.
6        Q.   A little bit earlier I asked you
7    some questions about, during the intake
8    process for clients coming into Drug Court,
9    part of what you get is a drug history.
10       What does TASC do, if anything, to
11   your knowledge, to verify the information
12   that they get about a person's past drug use?
13       MR. BADALA:  Objection to form.
14       THE WITNESS:  Like I said
15   previously, they would verify by way of
16   drug testing.  So if the person is out
17   on bail, drug testing is a perfect way
18   to determine if what the client is
19   saying is true.
20       If the client is in jail,
21   unfortunately, we don't have a lot of
22   drug history.
23   BY MR. RUIZ:
24       Q.   That only tells you their -- what
25   their current use is, right?

1        A.   They could have had a previous
2    assessment with TASC, had some experience
3    with the criminal justice system previously.
4    So, you know, they could -- could have had a
5    previous assessment with TASC for a previous
6    case.  Because, like I said, we do take three
7    or less prior felony convictions.
8        So -- so it would be great if they
9    had some other collateral information to see
10   where the client progressed.  But that's not
11   always -- that's not always the case.
12       Q.   So let's say that someone enters
13   your program and they say, "I have been using
14   drugs for the past ten years, and I started
15   with drug X."
16       Is there anything that's done to
17   verify that information, the genesis
18   information?
19       MR. BADALA:  Objection to form.
20       THE WITNESS:  No.  I mean, how
21   could you?
22   BY MR. RUIZ:
23       Q.   It's just the client's word?
24       A.   Yeah.  How could you?
25       Q.   Okay.

1        Let's say that someone says they
2    started with prescription drugs.  Do you know
3    if anything is done to verify that?
4        A.   Say if somebody started with
5    prescription drugs, is there any way to
6    verify that?
7        Q.   Not is there any way to verify it,
8    but does the Drug Court program do anything
9    to verify that?
10       MR. BADALA:  Objection to form.
11       THE WITNESS:  If somebody is
12   currently being prescribed narcotics,
13   you may -- no.  Previously?
14   BY MR. RUIZ:
15       Q.   Yes.
16       A.   No.
17       Q.   When we're talking about drug
18   history, what level of detail are you
19   getting?  Is it just, "I started with
20   prescription drugs," or is it, "I took
21   Percocet," or what kind of detail are we
22   talking about?
23       MR. BADALA:  Objection to form.
24       THE WITNESS:  So in speaking with
25   clients, a large number of them started

1    with prescription opiates, prescription
2    painkillers.  By the time they get to
3    me, it doesn't matter if they're using
4    heroin or if they're using prescription
5    medication, because we will treat them
6    the same.
7        So the case plan will be the same.
8    Their overdose level would be the same.
9    Their detox needs to be the same.  Their
10   necessity for residential treatment
11   would be the same.
12       So we receive a lot of clients
13   that started by way of prescription
14   medication.  However, we're bombarded
15   right now with what to do with the
16   number of clients that we have and where
17   we're going to put them.
18   BY MR. RUIZ:
19       Q.   Now, when you say that they
20   started with prescription medication, you
21   know that because that's what they told you
22   in the drug assessment?
23       A.   That is correct.
24       Q.   But as part of that assessment,
25   you don't verify that they ever had a legal

Page 90

1 prescription?
2     MR. BADALA:  Objection to form.
3     THE WITNESS:  So I'm going to
4 backtrack a little bit, just so that I
5 can clearly understand where you're
6 coming from.
7     When you're talking about the
8 assessment, you're talking more about a
9 diagnoses.
10 BY MR. RUIZ:
11   Q.   Uh-huh.
12   A.   If you're talking about community
13 supervision, you're talking on the probation
14 side.  In reference to the probation side,
15 one, as long as the case is of a drug case,
16 we could run an OARRS report to determine the
17 last time -- and I haven't -- I'm trying to
18 remember if it's a year -- I believe it's a
19 year long -- I can look back to the previous
20 year to see how many painkillers they were
21 prescribed.
22     So -- but clinically, when they do
23 the diagnoses, no, that person does not have
24 the authority to run that OARRS report.
25   Q.   Okay.

Page 91

1   A.   So when you're doing eligibility,
2 remember, we're talking about a couple
3 different process.  We're talking about the
4 assessment and then we're also talking about
5 developing that relationship, probation side,
6 verifying, a little bit more validating a lot
7 of the information.  So if we could just, you
8 know, make sure that we're keeping it
9 separate.
10   Q.   During the community supervision
11 part, under what circumstances would you --
12 well, let me back up.  I want to make sure
13 that I understood you correctly.
14     So during community supervision,
15 you might do an OARRS report on the client?
16   A.   Yes.
17   Q.   Under what situations?
18   A.   If a client came into the office
19 and said, "I went to the ER.  I hurt my
20 back," the PO could request an OARRS report
21 to make sure that that client did not obtain
22 prescription.
23   Q.   Wait.  I want to make sure.  So if
24 a client comes in and says that they've hurt
25 their back after they're already in the

Page 92

1 program?  Is that what you're describing?
2   A.   Yes.
3   Q.   And so the -- so then that is
4 being reported so that that person does not
5 receive a prescription opioid if they already
6 have an opioid disorder?
7   A.   Hence the community supervision,
8 yes.
9   Q.   Right.  Okay.  I understand now.
10   A.   Okay.
11   Q.   But other than in that situation,
12 is there ever any instance in which the Drug
13 Court is seeking to verify past drug history
14 of a client?
15     MR. BADALA:  Objection to form.
16     THE WITNESS:  Say it again.
17 BY MR. RUIZ:
18   Q.   Other than the situation in which
19 a client is hurt and possibly will be
20 prescribed medication, is there ever an
21 instance in which the Drug Court seeks to
22 look back at a client's prior drug history?
23   A.   Yes.
24   Q.   What are those instances?
25   A.   To see what kind of other

Page 93

1 prescriptions that someone might have
2 obtained.  For example, gabapentin is very
3 commonly abused by our clients; however, it
4 costs a lot of money to monitor via drug
5 tests.  So probation officers could request
6 an OARRS report to verify previous
7 prescriptions for gabapentin and also monitor
8 to make sure no new prescriptions were
9 obtained.
10   Q.   Okay.
11     But when someone tells you, tells
12 the Drug Court, that "My substance-abuse
13 problems started with prescription drugs," do
14 you do anything to verify whether that is
15 true?
16     MR. BADALA:  Objection to form.
17     THE WITNESS:  Not in all cases,
18 no.
19 BY MR. RUIZ:
20   Q.   But in some cases you might?
21 Okay.
22     In the cases where you might do
23 that -- what are the situations in which you
24 might do that?
25   A.   It would have to be really recent.

24 (Pages 90 - 93)

Page 94

1  Like I said, before --
2      Q.   Because you just got access
3  to OARRS recently, right?
4      A.   No.  Because not everything would
5  show up on an OARRS report in somebody's
6  history.
7      Q.   Explain that to me.
8      A.   So OARRS wasn't always existing.
9      Q.   What's your understanding as to
10  when OARRS started?
11      A.   I do not know the exact date.  All
12  I know is that it wasn't always in existence
13  and it was not always able for the criminal
14  justice side to attain access.
15      Q.   And when did -- who in the Drug
16  Court team has access to OARRS?
17      A.   No one.
18      Q.   So when you are running OARRS
19  reports, who is doing that?
20      A.   We make a request to a probation
21  supervisor.
22      Q.   And a probation supervisor is not
23  considered part of the Drug Court team?
24      A.   That is correct.  It's not.
25      Q.   So do you have a sense of any

Page 95

1  other people in the probation office that
2  have access to OARRS?
3      A.   I do not.
4      Q.   Do you know when the probation --
5  was it a supervisor?
6      A.   Correct.
7      Q.   Do you know when the probation
8  supervisor first got access to OARRS?
9      A.   I do not.
10      Q.   Can you recall the first time that
11  you asked for OARRS information?
12      A.   I cannot give you the exact date,
13  no.
14      Q.   Can you give me a year?
15      A.   I don't know.
16      Q.   Was it in 2017?
17      A.   I don't know.
18      Q.   You don't know if it was prior to
19  that?
20          MR. BADALA:  Objection to form.
21          THE WITNESS:  I don't.
22  BY MR. RUIZ:
23      Q.   Okay.
24          In the instances in which you --
25  let me back up.

Page 96

1          If an OARRS report is run, are you
2  given -- is the Drug Court given a copy of
3  the report?
4      A.   If we requested the report, we
5  would get the report.
6      Q.   And would that report be put in
7  that client's file somewhere?
8      A.   Correct.
9      Q.   And so you would have a copy of
10  that report even today?
11      A.   Correct.
12      Q.   In the instances in which a report
13  is run and you can see a client's drug
14  history through OARRS, is there anything
15  further done with that information?
16      A.   No.
17      Q.   Do you ever try to find out if,
18  for instance, someone who had a prescription
19  used that prescription as directed?
20      A.   No.
21      Q.   If you -- do you do anything to
22  find out whether that person lied to get a
23  prescription?
24          MR. BADALA:  Objection to form.
25          THE WITNESS:  No.

Page 97

1  BY MR. RUIZ:
2      Q.   Are your clients sometimes
3  diagnosed as having multiple drug-use
4  disorders?
5      A.   Yes.
6      Q.   How common is that?
7          MR. BADALA:  Objection to form.
8          THE WITNESS:  I don't know.
9  BY MR. RUIZ:
10      Q.   Would you say more than
11  50 percent?
12          MR. BADALA:  Objection to form.
13          THE WITNESS:  I cannot give you an
14  exact number.  I don't know.
15  BY MR. RUIZ:
16      Q.   Do you think it's more than
17  25 percent?
18          MR. BADALA:  Objection to form.
19          THE WITNESS:  I don't know.
20  BY MR. RUIZ:
21      Q.   Are clients often -- are clients
22  diagnosed with mental health diagnoses?
23          MR. BADALA:  Objection to form.
24          THE WITNESS:  No.  The TASC
25  department does not do mental health

25 (Pages 94 - 97)

1  diagnoses.
2  BY MR. RUIZ:
3      Q.   What about as part of Recovery
4  Court?
5      A.   That is correct.  TASC does not do
6  mental health diagnoses.
7      Q.   So how does the mental health
8  diagnoses work?  Who does that?
9      A.   So the program will refer to
10  outside agencies.  If the client appears to
11  have some severe cognitive situation, we can
12  refer them to the court psychiatric clinic
13  for an IQ test.  And if a client has
14  auditory/visual hallucinations, we could also
15  refer them to the court psychiatric clinic
16  that will do a full mental health assessment
17  on that individual.
18          The Common Pleas Court has a
19  Mental Health Court as well.  So we have --
20  in addition to our specialty dockets, we also
21  have Mental Health Court, so --
22      Q.   Right.  And apologies if you told
23  me this before.  The Recovery Court actually
24  deals with clients who have a combination of
25  opioid dependence and a mental health

1  diagnosis; is that right?
2      A.   That is not correct, no.
3      Q.   Would you correct that for me?
4      A.   Yes.  So they have substance use,
5  opiate.  They have to have an opiate-use
6  disorder.  And they have to have a --
7  currently right now, the Recovery Court is
8  handling cases that deal with sexual
9  exploitation and human trafficking.
10          When we started, Recovery Court
11  was all substances and it was also
12  trauma-related mental health issues.
13  However, we were overflowing with cases, so
14  we actually had to narrow down the target
15  population a little bit, even more specific,
16  because the court could not handle -- with
17  what we had, handle those cases.
18      Q.   And when a client is referred to
19  the Drug or Recovery Court, is it sometimes
20  that a client will be referred to the Drug
21  Court and then it's determined that it's more
22  appropriate for that person to be in the
23  Recovery Court?
24      A.   Yes.  That has happened.  A lot of
25  times with trauma, specifically with sexual

1  trauma, sometimes that doesn't come out until
2  later, especially when you're dealing with
3  young female clients.  Sometimes, you know,
4  they're very good at protecting themselves.
5          So, yes, we have had cases in
6  which someone was in the regular Drug Court
7  side, and then we did an updated assessment
8  and determined that the client would be more
9  appropriate for Recovery Court.
10          And that case has also happened
11  when we've had individuals in Drug Court that
12  have absconded, which means taken off from
13  the program.
14          And some incident has occurred
15  where there was some sexual exploitation that
16  occurred.  And then so we would transfer that
17  case to Recovery Court.
18      Q.   And as part of the evaluation of
19  clients who are entering either the Drug
20  Court or the Recovery Court, are there some
21  who are rejected from that court -- from
22  either court before they enter?
23      A.   Yes, if they're not eligible by
24  way of record check, and if they're not
25  eligible by the second part that we had

1  described before.
2      Q.   Are those the only reasons why
3  someone might be rejected?
4      A.   Someone could be rejected if they
5  lived far outside the county, and basically
6  you're setting them up for failure, so we'll
7  try to come up with a different solution.  A
8  lot of times the courtrooms will contact
9  where they live at, that court, and see if
10  they can participate in some form of
11  diversion program out there.
12      Q.   Are there any other reasons that a
13  potential client might be rejected from the
14  Drug Court program?
15      A.   Other than the client denying to
16  participate?
17      Q.   Because ultimately, enrollment is
18  voluntary for the client, correct?
19      A.   Absolutely.
20      Q.   I just had a quick question about
21  the OARRS reports that the probation
22  supervisor runs.
23      A.   Okay.
24      Q.   Are you able to tell us
25  approximately how many OARRS reports have

26 (Pages 98 - 101)

Page 102

1 been run this year?
2          MR. BADALA:  Objection to form.
3          THE WITNESS:  No.
4 BY MR. RUIZ:
5      Q.   Do you think it's more than five?
6          MR. BADALA:  Objection to form.
7          THE WITNESS:  I cannot determine
8      the number because not all OARRS reports
9      are directly -- sometimes they will stay
10     in the probation file.  They don't come
11     to me unless something alarming.
12 BY MR. RUIZ:
13     Q.   Fair enough.  How many have you
14 seen?
15         MR. BADALA:  Objection to form.
16         THE WITNESS:  I have no idea.
17 BY MR. RUIZ:
18     Q.   Do you think you've seen more than
19 five this year?
20         MR. BADALA:  Objection to form.
21         THE WITNESS:  I don't know.
22 BY MR. RUIZ:
23     Q.   Have you seen any this month?
24     A.   I don't think so.
25     Q.   What about last month?

Page 103

1      A.   I believe so, yes.  We had one
2 case that I looked at an OARRS report for.
3      Q.   So you think you've seen -- are
4 there any others that you think you saw in
5 October?
6      A.   No.
7      Q.   And you said that the Recovery
8 Court requires -- one of the requirements of
9 the Recovery Court is an opiate diagnosis; is
10 that right?
11     A.   That is correct.
12     Q.   And why is that?
13     A.   Unfortunately, that was because
14 the majority of the cases, that's what we
15 get.
16     Q.   How is the Recovery Court funded?
17     A.   How is the Recovery Court funded?
18     Q.   Yes.
19     A.   Numerous ways.
20     Q.   Tell me the different ways.
21     A.   So we, as a court, apply for
22 federal funding that is provided to the
23 county.  We apply for state funding that is
24 provided to the county.  We have our local
25 ADAMHS board that has allocated money to the

Page 104

1 county specifically for Recovery Court.  So
2 it's just some of the ways.
3      Q.   And do any of those grants require
4 that the Recovery Court deal with opiate
5 diagnoses?
6          MR. BADALA:  Objection to form.
7          THE WITNESS:  No.  They do
8      recommend that you allocate certain
9      funding to help treat with the opiate
10     epidemic.
11         Do you want me to explain that?
12 BY MR. RUIZ:
13     Q.   No.  We'll come back to it.
14         How long does the Drug Court
15 program last?
16     A.   Average of 14 months.
17     Q.   And eventually, at some point,
18 clients graduate?
19     A.   That is correct.
20     Q.   And what happens to the -- how is
21 Drug Court involved with clients after they
22 graduate?
23     A.   So this is really unique and kind
24 of cool.  So we have a fantastic alumni
25 program called Project 180.  And so our

Page 105

1 participants kind of change things up a
2 little bit.  So this participation agreement
3 is our older version; however, we mandated
4 that our Project 180 -- that clients attend a
5 Project 180 session each phase.
6          And what the Project 180 is, is
7 it's Drug Court alumni that have graduated
8 that are doing very well in the community.
9 They are in the community doing great work.
10 They volunteer at a lot of the detox centers.
11 They go out and speak when requested.  They
12 go organized bowling.  They organize all
13 these like fantastic events, sober events,
14 for anyone participating in Drug Court or
15 Recovery Court, and they do a lot of things
16 for the community.
17         September is National Recovery
18 Month, so they had this fantastic event that
19 occurred in Lakewood called "Light up the
20 Night for Recovery," and they had over 600
21 people that showed up.  They had guest
22 speakers.
23         They had these balloons, luminaire
24 balloons, that after the guest speakers got
25 done, we went over to the Lakewood Soltice

27 (Pages 102 - 105)

Page 106

1    Steps and let off balloons into the air.  And
2    that was for anyone that has overdosed or any
3    family that's currently going through this.
4            They also had a "Recovery's Got
5    Talent."  If you're familiar with America's
6    Got Talent, it's similar to that, and they
7    had 11 performers that performed different
8    acts like acoustic guitar, singing,
9    hula-hoop.  This one individual was some --
10   he was -- it's not like -- it's kind of like
11   a form of karate, which was really, really
12   cool.  They asked me to be a judge.  It was
13   just fantastic.
14           So that is one of the biggest
15   things, that those that graduate from the
16   program that are also still involved.  A lot
17   of that alumni also come to court and offer
18   their assistance, whether it be peer support,
19   and just a place for the current participants
20   to kind of discuss, you know, their
21   struggles.
22           So we're really lucky.  It's like
23   one of the -- from talking with other states,
24   we have -- it's really, really great.
25       Q.   Does the Drug Court contribute any

Page 107

1    money to Project 180?
2        A.   No.
3        Q.   And are all the events that you
4    described there, those are all under the
5    Project 180 umbrella?
6        A.   Correct.
7        Q.   And how do you keep track of
8    graduates over time?
9            MR. BADALA:  Objection to form.
10           THE WITNESS:  You would do
11       recidivism studies.
12   BY MR. RUIZ:
13       Q.   And what do those entail?
14       A.   A recidivism study is when you
15   would run a record check and determine if
16   that person recidivated, basically picked up
17   a new offense.
18       Q.   Aside from that, do you also -- it
19   sounds like there's an alumni network, things
20   like that.  Do you do any sort of informal or
21   less formal tracking of where people are, how
22   they're doing?
23       A.   No.  That would be a case study
24   and just very difficult to do.
25       Q.   Even not as a case study, do you

Page 108

1    just keep a list of contact information and
2    what people are doing, if they're employed,
3    not employed, if they've moved away, anything
4    like that?
5            MR. BADALA:  Objection to form.
6            THE WITNESS:  No.
7    BY MR. RUIZ:
8        Q.   How many participants can the Drug
9    Court have at any given time?
10       A.   So we have about 150 on the Drug
11   Court side, estimated, and we have estimated
12   about, on Recovery side, anywhere from 90 to
13   120, and that fluctuates just depending on
14   when a graduation class has occurred.
15       Q.   And the Recovery Court started --
16   its first operational year was 2015?
17       A.   That's correct.
18       Q.   Has that number, 90 to 120, been
19   fairly constant over the last three years?
20       A.   Yes.  We had to almost -- we had
21   to close our doors.
22       Q.   When was that?
23       A.   Last year we had to stop taking
24   cases because we had too many and our staff
25   couldn't handle.  We initially got to that

Page 109

1    point previously -- I do not recall the exact
2    year, and then we, as a court, realized that
3    there's more need, so we added an additional
4    probation staff and we added an additional
5    case manager.  And they have been going
6    pretty steady.
7            We're always trying to ask for
8    more money, ask for more staff, because that
9    means we can take in more clients and treat
10   more individuals.
11       Q.   And when you say you're asking for
12   more money and more staff, who are you making
13   that request to?
14       A.   I have a conversation a lot of
15   times with the Corrections Planning Board,
16   which is our grant writer.  And they're
17   probably pretty much involved with more of
18   the higher-ups, with the courts and the
19   county.
20       Q.   And so this new case manager and
21   the additional probation staff, how many
22   people are on probation that have been hired?
23       A.   I'm sorry.  How many people have
24   they hired?
25       Q.   Yeah.  If I heard you correctly,

28 (Pages 106 - 109)

1  there's one new case manager that was hired,
2  and then I believe you just said "new
3  probation staff." I'm trying to figure out
4  how many people.
5      A.  A new, so there was one new case
6  manager and one new probation officer,
7  because they kind of go hand in hand with
8  supervising. So we just kind of ate that
9  cost. We didn't apply for additional grant
10  funding. We just really tried to do our
11  best.
12     Q.  So when you say you "ate that
13  cost," where is that money coming from?
14     A.  Meaning that we -- I don't really
15  know necessarily how they got the funds. But
16  I know that the Corrections Planning Board --
17  a lot of times they look at it as like
18  applying for outside grant funding. Our
19  Corrections Planning Board applies requests
20  for local funding right through our county or
21  other agencies, so --
22     Q.  So I want to understand. The
23  funds that were used to pay for the case
24  manager and the probation officer, were those
25  grant funds that were used to pay?

1      A.  I don't know necessarily.
2      Q.  Who would know?
3      A.  The court would know.
4      Q.  Well, if we wanted to ask a
5  specific person, which person should we go
6  to?
7      A.  Marty Murphy, who heads the
8  Corrections Planning Board. And I'm blanking
9  on her name, but she handles the financial
10  side of the court, so possibly her.
11     Q.  And you said the Drug Court can
12  handle up to 150 clients?
13     A.  Each docket or individually?
14     Q.  I think you said total. But is
15  that right?
16     A.  Around that, yes.
17     Q.  Do you have a sense of how that
18  has changed over time?
19     A.  Yes.
20     Q.  How has that changed since 2009?
21     A.  So we applied for additional
22  funding to add another judge. We applied for
23  additional funding to just treat opiate use,
24  so a whole 'nother docket. We are constantly
25  having conversations with the court about a

1  need to add additional specialty docket
2  judges, possibly another me, because I
3  oversee three dockets, so --
4      Q.  The question was a little bit more
5  specific.
6      A.  Okay.
7      Q.  Just thinking back to 2009 and
8  then sort of marching through the years, what
9  is the cap of the number of clients that the
10  Drug Court has been able to serve? How has
11  that changed over those years?
12        MR. BADALA:  Objection to form.
13        THE WITNESS:  Why are we doing
14  2009? Because that's when I started
15  working there?
16  BY MR. RUIZ:
17     Q.  Isn't that when the County Drug
18  Court started?
19     A.  Okay. So say your question again.
20     Q.  Let's just narrow it.
21        In 2009, do you know how many
22  clients you were able to serve, not how many
23  you actually did, but what your maximum
24  capacity was?
25        MR. BADALA:  Objection to form.

1        THE WITNESS:  I do not.
2  BY MR. RUIZ:
3      Q.  Do you know how many clients you
4  actually did serve?
5      A.  They have it in record, yes.
6      Q.  But you don't know off the top of
7  your head?
8      A.  No, I don't. I'm sorry.
9        THE VIDEOGRAPHER:  Is this a good
10  time to break?
11        (Discussion held.)
12        THE VIDEOGRAPHER:  We're off the
13  record, 12:30.
14        (Recess taken.)
15  -----------------------
16        AFTERNOON SESSION
17  -----------------------
18        THE VIDEOGRAPHER:  We're back on
19  the record. 1:07.
20  BY MR. RUIZ:
21     Q.  All right, Ms. Leckler. We were
22  talking about the number of participants in
23  the Drug Court program.
24        Currently, up to 150 participants
25  in the Drug Court program; is that right?

29 (Pages 110 - 113)

Page 114

1      A.   Give or take, yes.
2      Q.   Do you recall if it's been -- if
3  that has been a fairly steady number over the
4  prior nine years of the program?
5          MR. BADALA:  Objection to form.
6          THE WITNESS:  It has steadily
7      increased.
8  BY MR. RUIZ:
9      Q.   Okay.
10         Do you have a sense for what that
11  number was in 2009?
12         MR. BADALA:  Objection to form.
13         THE WITNESS:  I do not have the
14      exact figure.
15  BY MR. RUIZ:
16      Q.   Can you provide an estimate?
17      A.   That was so many years ago, I
18  don't know.
19      Q.   Has it doubled, do you think?
20         MR. BADALA:  Objection to form.
21         THE WITNESS:  I know that it has
22      steadily increased due to the fact that
23      we've steadily added more staff to help
24      combat the intakes.
25

Page 115

1  BY MR. RUIZ:
2      Q.   But you don't have a sense of
3  whether it's -- in 2009, it was greater than
4  the 75 people in passing?
5          MR. BADALA:  Objection to form.
6          THE WITNESS:  I don't.
7  BY MR. RUIZ:
8      Q.   What's your understanding of why
9  the Drug Court was started in 2009?
10      A.   My understanding of why Drug Court
11  was started in 2009 was that Cleveland Drug
12  Court had functioned for a number of years,
13  and the county really needed that program on
14  their end.
15         (Interruption in proceedings.)
16         MR. RUIZ:  This is quite the day.
17  BY MR. RUIZ:
18      Q.   So I believe I asked you why the
19  Drug Court had been started in 2009, and you
20  said that you had had experience in Cleveland
21  with their Drug Court, and it was then
22  expanded through -- through the creation of
23  the Cuyahoga Drug Court.
24         Is that more or less right?
25      A.   Yes.  Yes.  We needed this

Page 116

1  specialty docket on our end.
2      Q.   And was there something specific
3  that Cuyahoga was seeing that made them
4  believe they needed a specialty docket at the
5  county level?
6          MR. BADALA:  Objection to form.
7          THE WITNESS:  I don't know.
8  BY MR. RUIZ:
9      Q.   Do you know why they -- why
10  Cuyahoga didn't have a Drug Court program
11  earlier?
12         MR. BADALA:  Objection to form.
13         THE WITNESS:  I know that -- the
14      discussions of many years ago, starting
15      a Drug Court program, and why the county
16      initially turned it away.
17  BY MR. RUIZ:
18      Q.   Why is that?
19      A.   That was just more of
20  administration.  I think that, from my
21  understanding, and hearing those that worked
22  at the court prior to me, there was an
23  understanding of being more tough on crime,
24  especially on the felony level.  That's kind
25  of definitely changed over the years.  And

Page 117

1  being smart -- more smart on crime.
2      Q.   When you were working at the
3  Cleveland Drug Court, do you recall any
4  particular kinds of drugs that were more
5  prevalent than others in terms of your
6  clients?
7          MR. BADALA:  Objection to form.
8          THE WITNESS:  Yes.
9  BY MR. RUIZ:
10      Q.   What were they?
11      A.   Back then, it was primarily crack
12  cocaine.
13      Q.   Okay.  Any others?
14      A.   We had a number of marijuana cases
15  because it was a misdemeanor court.
16      Q.   What about the Cuyahoga Drug Court
17  in 2009?  Was there a dDrug Court that was
18  more prevalent than others?
19         MR. BADALA:  Objection to form.
20         THE WITNESS:  I can't say which
21      one was more dominant in 2009.
22  BY MR. RUIZ:
23      Q.   Do you remember prescription drugs
24  being discussed around that time?
25         MR. BADALA:  Objection to form.

30 (Pages 114 - 117)

1    THE WITNESS:  I do not.
2  BY MR. RUIZ:
3    Q.   If you could turn your attention
4  back to Exhibit 1.
5    A.   Okay.
6    Q.   And if you look at the page
7  numbers at the bottom, 219.
8    A.   Okay.
9    Q.   I want to just run through --
10  you've used the term "Drug Court team" a few
11  times today.  I want to nail down what
12  exactly that means.
13    A.   Okay.
14    Q.   When you use the term "Drug Court
15  team," is that the same as -- the same people
16  that are on the Drug Court staff on this page
17  and the next page?
18    A.   That is correct.
19    Q.   And how many probation officers --
20  we'll start all the way at the top.  There's
21  two judges?  Between Drug Court and Recovery
22  Court, there are two judges?
23    A.   Yes.
24    Q.   How many probation officers?
25    A.   Across both Recovery Court and

1  Drug Court?
2    Q.   Yes.  Let's actually split them
3  up.
4    A.   Okay.
5    Q.   So how many are on Drug Court?
6    A.   So on Drug Court in the morning
7  docket, there's two.  And in the afternoon,
8  there's one.
9    Q.   For Recovery?
10    A.   For Recovery Court, there is two.
11    Q.   Okay.  And those probation
12  officers, are they court employees?  Do you
13  know?
14    A.   Yes.
15    Q.   They are court employees?
16    A.   Yes.
17    Q.   Do you know whether they're -- are
18  they salary?
19    A.   Yes.
20    Q.   Do you know whether their salaries
21  are paid from the Cuyahoga County general
22  fund or whether they are paid from grant
23  funding?
24    MR. BADALA:  Objection to form.
25    THE WITNESS:  I do not.

1  BY MR. RUIZ:
2    Q.   Would Mr. Murphy be the right
3  person to talk to?
4    A.   He may.  I'm not sure.
5    Q.   But you don't know who the right
6  person to talk to is?
7    A.   I don't.
8    Q.   Okay.
9    These five probation officers, are
10  they dedicated solely to Drug Court-related
11  work, or do they also have other clients?
12    A.   Solely Drug Court.
13    Q.   Can we turn to the next page.
14  There's a TASC case manager.
15    Do you see that?
16    A.   Yes.
17    Q.   And how many TASC case managers
18  are there for the Drug Court?
19    A.   Three.
20    Q.   And how many for the Recovery
21  Court?
22    A.   Two.
23    And to also clarify, there's one
24  other TASC person that is involved, and
25  that's our assessment specialist.

1    Q.   Okay.
2    And is that the person we were
3  talking about earlier that does the DSM-5
4  diagnoses?
5    A.   That is correct.
6    Q.   Okay.
7    I believe we were saying earlier
8  that -- I believe you testified earlier that
9  the TASC employees are employees of the
10  court; is that right?
11    A.   That is correct.
12    Q.   Do you know if they are salaried
13  employees?
14    A.   Yes.
15    Q.   And what about the TASC assessment
16  specialist, is that person a salaried
17  employee as well?
18    A.   Yes.
19    Q.   Do you know whether the TASC
20  personnel are paid through general revenue
21  funding or grant funding?
22    MR. BADALA:  Objection to form.
23    THE WITNESS:  I do not.
24  BY MR. RUIZ:
25    Q.   Do you know who we should talk to

31 (Pages 118 - 121)

1    to get the answer to that question?
2        A.   I would start with Marty Murphy.
3        Q.   The next category there is
4    "Treatment provider"?
5        A.   Yes.
6        Q.   You gave us a number of
7    organizations that the Drug Court partners
8    with to provide treatment; is that right?
9        A.   Yes.
10       Q.   And are any of those treatment
11   providers employees of the court system?
12       A.   No.
13       Q.   Okay.
14            Do you know whether any of the
15   services that those treatment providers
16   provide are paid for with Cuyahoga County
17   general fund dollars?
18       A.   I do not.
19       Q.   Okay.
20            Would Mr. Murphy be the right
21   person to talk to for that?
22       A.   You could start there.  Also,
23   treatment centers in Cuyahoga County, local
24   ADAMHS Board provides funds to a lot of the
25   treatment centers.  So they may be.  I just

1    don't know.
2        Q.   Is there anyone else within the
3    Drug Court -- sorry -- just within the court
4    system who we could talk to to determine how
5    the funding flows?
6        A.   I'm not sure.  I don't know.
7        Q.   Up next is the prosecutor.
8        A.   Okay.
9        Q.   And I think we established earlier
10   that the prosecutor is not a court employee,
11   but is a part of a different agency within
12   the Cuyahoga government?
13       A.   The Cuyahoga County Prosecutor's
14   Office.
15       Q.   Yes.  How many prosecutors are
16   involved in Drug Court?
17       A.   One that is directly on the
18   staffing team.  And there's a number of -- he
19   has a number of supervisors.
20       Q.   Okay.
21            The next person on the staff team
22   is defense counsel?
23       A.   Correct.
24       Q.   Is that always a public defender?
25       A.   No, it is not.

1        Q.   About how often is it not a public
2    defender?
3            MR. BADALA:  Objection to form.
4            THE WITNESS:  Rarely.
5    BY MR. RUIZ:
6        Q.   Rarely, okay.
7            And is the public defender's
8    office a part of the Cuyahoga County court
9    system?
10       A.   They work for the Cuyahoga County
11   Public Defender's Office.  We initially just
12   had one, and we in the past year and a half
13   added an additional public defender to just
14   work on the Recovery Court side.  And we have
15   another public defender that works on the
16   Drug Court side, both morning and afternoon.
17       Q.   So they are not considered court
18   employees, to your knowledge?
19       A.   No.  They work for the Cuyahoga
20   County Public Defender's Office.
21       Q.   Do you know how the funding for
22   the Cuyahoga County Public Defender's
23   Office -- where it comes from?
24       A.   I do not.
25       Q.   Okay.

1            Do you know who would be the right
2    person to talk to about that?
3        A.   I do not.
4        Q.   Then if you turn the page over,
5    the last one is "Coordinator"?
6        A.   Yes.
7        Q.   And that's you?
8        A.   That is me.
9        Q.   Do you spend 100 percent of your
10   time as a court employee on the Drug and
11   Recovery Court?
12       A.   Yes.
13       Q.   Okay.  And are you a salaried
14   employee?
15       A.   Yes.
16       Q.   And do you know if your salary is
17   paid through grant funds or the general
18   revenue fund?
19            MR. BADALA:  Objection, form.
20            THE WITNESS:  I do not.
21   BY MR. RUIZ:
22       Q.   Do you know who we could talk to
23   to find that out?
24       A.   I would start with the same as
25   previously.

32 (Pages 122 - 125)

Page 126

1      Q.   Mr. Murphy?
2      A.   And then work to the court
3  administration, yes.
4      Q.   Okay.
5           Now, if you look at the page that
6  ends in 222?
7      A.   Okay.
8      Q.   And it says -- near the top there,
9  it says, "Drug Court phases."
10          And I believe you mentioned
11  earlier there are five phases in the program;
12  is that right?
13     A.   Yes.
14     Q.   Could you just take a look through
15  these really quick and then let me know if
16  this is still true today?
17     A.   Sure.
18     Q.   Is it?
19     A.   Oh, I'm sorry.  I thought you were
20  saying you were going to go through.
21          It is -- there are some changes.
22  Like I said previously, we added the Project
23  180.  More specifically, we added Project 180
24  as a requirement in phase 2, 3, and 4.
25     Q.   Okay.

Page 127

1      A.   Mostly, in --
2      Q.   Go ahead.
3      A.   Mostly, in general, it's pretty
4  much the same thing.
5      Q.   And the Project 180 requirements
6  are to attend Project 180 events.  Is that --
7      A.   Correct.
8      Q.   And if we could turn back to
9  page 218 -- I actually forgot to ask you
10  about one of these.
11          Do you remember that I asked you
12  about court fines and restitution?
13     A.   Yes.
14     Q.   The third thing on that bullet is
15  supervision fees.
16     A.   Yes.
17     Q.   And what are supervision fees?
18     A.   Supervision fees are $20 per
19  month.  And it's for the duration that you're
20  on community controlled supervision for.
21          So if somebody, for example,
22  completes the program in 13 months, they only
23  pay 20 per month.  If they complete it in 14
24  months, 16 months, it will coincide with
25  that.

Page 128

1      Q.   And do you know where that money
2  goes when they pay it?
3      A.   It goes to the probation
4  department.
5      Q.   Okay.  Great.
6           You can put that aside.
7      A.   Okay.
8      Q.   Ms. Leckler, earlier you mentioned
9  a Drug Court Advisory Board.
10          Could you tell us what that is?
11     A.   It's just that it's an advisory
12  board that meets quarterly, sometimes just
13  three times a year, that advises the Drug
14  Court program.  It talks about their
15  progress.  It talks about what additional
16  funds we need.  Sometimes we may vote on --
17  on starting something.
18          MR. RUIZ:  Okay.  Let's show you
19  what's been marked as Leckler Exhibit 2.
20          (Drug Court Advisory Board Meeting
21          Minutes, Bates CUYAH_000117415
22          through CUYAH_000117420, marked as
23          Deposition Exhibit 2.)
24          THE WITNESS:  I have short arms.
25          MR. BADALA:  I don't have much

Page 129

1  longer arms.
2           MR. RUIZ:  Yeah, between the two
3  of us --
4           MR. BADALA:  It wasn't going to
5  work.
6  BY MR. RUIZ:
7      Q.   It's CUYAH_000117415.
8      A.   Okay.
9      Q.   And you see there at the top, it's
10  dated October 31st, 2014?
11     A.   Yes.
12     Q.   Does the advisory board still meet
13  today?
14     A.   Yes.
15     Q.   And how often does it meet?
16     A.   It meets right before a Drug Court
17  graduation, which is three times a year.
18     Q.   And can you remember when the Drug
19  Court Advisory Board meetings first began?
20     A.   I cannot give the exact date, no.
21     Q.   Was it sometime after -- well, let
22  me ask it this way.  Did they begin when the
23  Drug Court program started in 2009?
24     A.   I don't know.
25          And I will say that initially,

33 (Pages 126 - 129)

Page 130

1  when the county program started, instead of
2  recreating the wheel, we collaborated with
3  Cleveland Municipal Court.  Therefore, a lot
4  of times it was the same.  We met
5  collaboratively together, until we have
6  consistently grown and decided to develop our
7  own advisory board.
8      Q.  Do you remember when that was,
9  when you created your own advisory board?
10     A.  I don't.
11     Q.  Now, you see there's a list of
12 attendees at this meeting?
13     A.  Yes.
14     Q.  If we could just run through them
15 really quick.
16        Who is John Lewis?
17     A.  He is the chairman -- the chair of
18 the advisory board.
19     Q.  Does he have any other role in the
20 Drug Court?
21     A.  No.
22     Q.  What's his day job?
23     A.  He is a businessman.
24     Q.  Do you know how he got the role of
25 chairman?

Page 131

1      A.  I know that he is just involved in
2  the community and helping other agencies on
3  other advisory boards for treatment centers
4  and things like that.  I believe he's in
5  recovery as well.
6      Q.  Okay.
7         Then we have the two judges and
8  you.  And then there's Bill Kelly.  Who is
9  Bill Kelly?
10     A.  Bill Kelly is our public defender.
11     Q.  Okay.  What about Gail Long?
12     A.  She's a community person, somebody
13 in the community.
14     Q.  And are these meetings open to the
15 public?
16     A.  Yes.  I guess -- yeah.
17     Q.  Okay.  What about Stanley Miller?
18     A.  I forget what Stanley Miller's
19 title is.
20     Q.  Does he work for the court?
21     A.  He does not work for the court.
22     Q.  Let me ask it this way, then:  Are
23 there any other attendees listed here who are
24 court employees?
25     A.  Yes.

Page 132

1      Q.  Who are they?
2      A.  Bradie Williams was a former TASC
3  supervisor.
4      Q.  Okay.
5      A.  Karin Kistemaker was a former TASC
6  case manager.  Martin Murphy works for the
7  Corrections Planning Board.
8      Q.  And that's the Mr. Murphy we've
9  been talking about?
10     A.  That's the one.
11        Sarah McGuire is a former employee
12 of TASC.  Diane Jackson is a secretary to
13 Judge David T. Matia.  Lawrence Acton is the
14 staff attorney to Judge Joan Synenberg.
15 Laura DePompei is the former bailiff to
16 Judge Joan Synenberg.  Brian Murphy was the
17 former prosecutor in the Drug Court program.
18 And Teresa Egan works for TASC and myself.
19     Q.  Got it.
20        So we said that -- we previously
21 said that the TASC employees are salaried,
22 right?
23     A.  That is correct.
24     Q.  Okay.
25        Do you know whether

Page 133

1  Judge Synenberg's staff attorney is salary or
2  not?
3      A.  I don't know.
4      Q.  And I believe you said Laura
5  DePompei was the court reporter -- is that
6  what you said?
7      A.  No, the bailiff.
8      Q.  Bailiff.  Sorry.
9      A.  That's fine.
10     Q.  Do you know if she's a --
11     A.  Yes.
12     Q.  -- salaried employee?
13     A.  Yes.
14     Q.  Okay.
15        Did you get any extra pay for
16 being a part of the Drug Court Advisory
17 Board?
18     A.  No.
19     Q.  Do you know if any of the other
20 cDrug Court employees got any extra pay?
21     A.  No.
22     Q.  And I see right here is Dr. Tom
23 Gilson.  Who is that?
24     A.  Dr. Tom Gilson is our medical --
25 the County Medical Examiner.

34 (Pages 130 - 133)

Page 134

1      Q.   Do you trust his judgment on
2   opioid-related issues?
3          MR. BADALA:  Objection to form.
4          THE WITNESS:  Yes.
5   BY MR. RUIZ:
6      Q.   If you look to the third box down,
7   there's discussion about pill drop boxes?
8      A.   Yes.
9      Q.   The first bullet there says:
10          "Miguel Caraballo reviewed that
11          10,000 pounds of pills have been
12          retrieved from the drop boxes so far
13          in 2014."
14          And then two bullets after that,
15          it says:  "Ten more boxes are being
16          purchased."
17          Were you involved at all in the
18   purchase of drug drop boxes?
19      A.   Me personally?
20      Q.   Yeah.
21      A.   No.
22      Q.   Do you know if members of the
23   court are involved in this program?
24          MR. BADALA:  Objection to form.
25          THE WITNESS:  Yes.

Page 135

1   BY MR. RUIZ:
2      Q.   Who would that be?
3      A.   It says right here, Judge Matia.
4   Judge Matia was instrumental in the drop box
5   program here in Cuyahoga County.
6      Q.   And when you say that, what did he
7   do exactly?
8      A.   So basically he met with all the
9   law enforcement agencies to ensure that they
10   installed boxes across the county.
11      Q.   Did the Cuyahoga County Court of
12   Common Pleas -- are they involved in the
13   purchase of the drop boxes at all?
14          MR. BADALA:  Objection to form.
15          THE WITNESS:  I don't know.
16   BY MR. RUIZ:
17      Q.   Do you know if they paid for them?
18      A.   I don't know.
19      Q.   Who would be the right person to
20   ask for that?
21      A.   Well, I would start with Marty
22   Murphy.  I would also start with whomever has
23   the drop boxes at their facilities.
24      Q.   We've touched on this a little bit
25   so far today, but I want to get into it in a

Page 136

1   little bit more detail, which is how the Drug
2   Court is actually funded.
3          You've said there are different
4   grants that fund the Drug Court; is that
5   right?
6      A.   Yes.
7      Q.   What are the main ones that you
8   can recall?
9          MR. BADALA:  Objection to form.
10          THE WITNESS:  I would say -- the
11   largest sum, or the main sum?
12   BY MR. RUIZ:
13      Q.   Let's say the largest.
14      A.   So since we are certified
15   specialty docket, we were eligible to apply
16   for ATP funds, which means Addiction
17   Treatment Program funds, that OMHAS had
18   distributed across the state, OMHAS being the
19   statewide kind of ADAMHS Board, as you would
20   understand.  Those are just to treat those
21   with opiate addiction.
22          We can use those funds to help pay
23   for treatment, to help pay for pretty much
24   everything but medication not pertaining to
25   medication-assisted treatment.

Page 137

1      Q.   And why can't you use it for
2   medication-assisted treatment?
3      A.   We can use it for
4   medication-assisted treatment, everything but
5   the medication-assisted treatment.
6      Q.   Got it.  I misunderstood.
7          What other grant sources do you
8   have?
9      A.   So we apply for federal funds if
10   we are eligible through SAMHSA.  They are
11   called CSAP grants.  And we have a very great
12   staff of grant writers.  And we apply.
13   Sometimes we get them, sometimes we don't.
14      Q.   Who tracks all of the funding for
15   the Drug Courts?
16      A.   Mostly the Corrections Planning
17   Board.
18      Q.   Is there a person in particular?
19      A.   Marty Murphy.
20      Q.   Marty Murphy.
21          Do you have any idea how it's
22   tracked?
23      A.   I do not.
24      Q.   Does the Drug Court bill Medicaid
25   for any costs that the Drug Court incurs?

35 (Pages 134 - 137)

Page 138

1    A.   Drug Court TASC case managers do
2  bill Medicaid.
3    Q.   And what do you know about that?
4    A.   I do not know much.
5    Q.   Do you know the -- do you know
6  what kind of services they bill for?
7    A.   I don't.  I just know they call it
8  "billable services."
9    Q.   And who would be the right person
10 to talk to about that?
11   A.   You want me to say the name again?
12   Q.   Yeah.
13   A.   Marty Murphy.
14   Q.   I was wondering maybe because it
15 was TASC, it might be someone different.
16   A.   No.  Because, remember, he
17 oversees.
18   Q.   Right.  Okay.
19      Do some of your clients have
20 insurance, private insurance?
21      MR. BADALA:  Objection to form.
22      THE WITNESS:  Yes.
23 BY MR. RUIZ:
24   Q.   Does the Drug Court bill insurance
25 when it can for any costs that it incurs?

Page 139

1    A.   When you say "the Drug Court," do
2  you mean like the probation time and drug
3  testing and things like that, or what -- you
4  have to be -- be more specific.  We have to
5  be more specific, because there's different
6  services that sustain the project that you
7  don't -- you can't bill for.  So --
8    Q.   If I can back up.
9    A.   Okay.
10   Q.   Just generally, are there any
11 costs that are incurred by the Drug Court
12 program that you might bill?  I'm not asking
13 what they are.  Just are there some costs
14 that the Drug Court might incur that you
15 would bill to insurance?
16      MR. BADALA:  Objection to form.
17      THE WITNESS:  I don't know.
18 BY MR. RUIZ:
19   Q.   Okay.  Well, go ahead.
20   A.   So if someone went and needed a
21 mental health assessment, you know, it might
22 be covered by their private insurance.  I
23 don't -- you know, so I don't know -- when
24 they're involved in the program, there are
25 some other things that clients may

Page 140

1  participate in -- does that makes sense? --
2  that we don't bill for.
3    Q.   If there's a service that the Drug
4  Court provides and they wanted to see if the
5  person's insurance -- so let me maybe back
6  this up.
7       Do you -- for testing or some kind
8  of assessment, things like that, would you
9  bill the client?  Do you send the client a
10 bill for any services that are rendered?
11      MR. BADALA:  Objection to form.
12      THE WITNESS:  No.
13 BY MR. RUIZ:
14   Q.   How would you go about finding
15 whether that person's insurance might cover
16 some of the services?
17   A.   It's way beyond my pay grade.  I
18 don't know.  I don't know.
19   Q.   And who would handle that?
20   A.   Well, I would start with Marty
21 Murphy.  Medicaid is a bit ever evolving, so
22 there's sometimes -- there's changes always
23 made to it as well, so --
24   Q.   Okay.  I'm not talking about
25 Medicaid, though.  I'm talking about --

Page 141

1    A.   Private insurances?
2    Q.   -- a person's insurance they might
3  have through their employer or through the
4  Exchange.
5    A.   Okay.  So usually with private
6  insurance, it doesn't cover much.  We
7  usually -- we pay for -- the county pays for
8  their residential stay.
9    Q.   And when you say the county pays,
10 is that paid for from the court budget or is
11 that through grant funding?
12   A.   All.
13   Q.   All?
14   A.   Uh-huh.
15   Q.   And do you know, is the
16 Corrections Planning Board the one that keeps
17 track of how all of those payments flow?
18   A.   Yes, and also the local ADAMHS
19 Board.
20   Q.   And actually, earlier I asked you
21 whether the Drug Court bills Medicaid for any
22 costs, and you mentioned TASC case managers
23 will bill Medicaid sometimes.
24      Is there anything else that the
25 Drug Court might bill Medicaid for?

36 (Pages 138 - 141)

Page 142

1    A.   So I'm trying to understand your
2  question, because -- so, for example, if
3  somebody goes to a treatment agency and they
4  are eligible for Medicaid dollars, that
5  treatment agency may bill for Medicaid.  They
6  also may bill us if they're not on Medicaid.
7        Does that make sense?  So --
8    Q.   So let me just make sure that I
9  understand.
10       If a client is -- during, for
11  instance, a residential treatment program,
12  that program may bill Medicaid directly, or
13  if they cannot do that, they may bill the
14  Drug Court and ask for payment that way?
15  I believe that's what you just
16  said, but correct me if I'm wrong.
17       MR. BADALA:  Objection to form.
18       THE WITNESS:  Yes.
19  BY MR. RUIZ:
20   Q.   Okay.
21       And earlier you said there was a
22  financial administrative assistant at the
23  court whose name you cannot remember?
24   A.   Yes.
25   Q.   Is her name Doreen Mittinger?

Page 143

1    A.   No.
2    Q.   No?  Okay.
3    A.   Doreen works for TASC.
4    Q.   Okay.
5        So let's look back at the exhibit.
6  And if you look at the next page, which is
7  416 at the bottom?
8    A.   Okay.
9    Q.   In the second box, the first
10  bullet, it's talking about money given from
11  the ADAMHS Board.
12       And what is the ADAMHS Board?
13   A.   The ADAMHS Board basically is --
14  I'm trying to remember all of what each
15  letter stands for, so --
16   Q.   Don't worry about that.
17   A.   Okay.
18   Q.   So just generally, what do they
19  do?
20   A.   Just basically, the ADAMHS Board
21  is primarily where most of the funding for
22  Drug Court is funneled through.  It's a
23  county agency.  And they also monitor and
24  distribute funds to the treatment agencies,
25  to the detox facilities.  They may allocate

Page 144

1  funds towards certain projects, whether it be
2  Project Dawn, some of -- they work with the
3  hospitals.  They do a lot of things.
4        If someone is in need of services,
5  if you contact your ADAMHS Board, they can
6  connect you to that -- whatever service it is
7  that you need.
8    Q.   Okay.
9        If you look at the second bullet
10  there near the bottom, it says:
11       "The ADAMHS Board provides
12       $325,000 a year to Drug Court, and
13       that is shared between the county and
14       the Municipal Drug Court."
15   A.   Uh-huh.
16   Q.   Is that still true today?
17   A.   That is.
18   Q.   And what's the relationship
19  between the Municipal Drug Court and the
20  County Drug Court?
21   A.   The relationship is they both fall
22  under the umbrella of Cuyahoga County.  So
23  therefore, we share funds.  Because the
24  ADAMHS Board cannot, you know, allocate
25  X amount here and X amount there when their

Page 145

1  end goal is just to treat as many clients as
2  possible.
3        Like I stated before, we used to
4  share the same advisory board.  They kind of
5  go hand-in-hand in the sense that the biggest
6  difference is they deal with misdemeanor
7  offenses, where we deal with adult felony
8  offenses.  They are their own certified Drug
9  Court, though.
10   Q.   Other than ADAMHS Board funding,
11  are there other resources that are shared
12  between the two courts?
13   A.   Not that I'm aware of.  I'm sure
14  that they use -- they refer clients to like
15  Project Dawn and things like that, but --
16   Q.   When the ADAMHS Board gives
17  funding to the two courts, does it specify
18  how much is for each court, or how does that
19  work?
20   A.   No.
21   Q.   So how does it work in terms of
22  who gets what portion of the funding?
23   A.   Just whatever.  When there's a
24  need, demand, then there's a ...
25   Q.   When there's a demand, when you

37 (Pages 142 - 145)

Page 146

1  want to use some of the funds, for instance,
2  what is the process like to use those funds?
3          MR. BADALA:  Objection to form.
4          THE WITNESS:  More specifically,
5      how the bills are submitted, that
6      would --
7  BY MR. RUIZ:
8      Q.   Let me back that up.
9          I'm trying to get at the
10  coordination between the two courts.
11     A.   Yes.
12     Q.   So you have a big pot of money
13  between the two of you.
14     A.   Yes.
15     Q.   How do you -- how does someone
16  say, "I need this much.  I don't need this
17  much"?  How does that work out?
18     A.   The ADAMHS Board just distributes
19  the money.  So any invoices that come in, the
20  ADAMHS Board pays it out.  Also, the
21  Corrections Planning Board oversees the
22  accounting of that.  So, therefore, that
23  would -- they kind of oversee it, if that's
24  what you mean.
25     Q.   And when the ADAMHS Board provides

Page 147

1  this funding, it's not like they're giving
2  you a check for the total amount.  Instead,
3  you're telling them, we've spent this much
4  and then they reimburse you?  Is that how it
5  works?
6      A.   Absolutely, yeah.
7      Q.   Okay.
8      A.   There's a lot of funds, though,
9  that -- I -- not everything is billed through
10  the ADAMHS Board.
11     Q.   Yeah.  I totally get that.
12     A.   Okay.
13     Q.   But just in terms of how you
14  access the money, it's not the ADAMHS Board
15  gives you the money first and then you go
16  spend it.
17     A.   Yeah.
18     Q.   It flows in the opposite
19  direction?
20     A.   Yeah.  It's a contract.  And then
21  the ADAMHS Board has contracts with the
22  agencies on it, MOUs with the courts, with
23  the Corrections Planning Board and the
24  treatment agencies.
25     Q.   Okay.

Page 148

1      A.   So they go -- you know, in-county,
2  they have to go after -- what is it called?
3  -- the IRB, I believe, or something like
4  that, where you cannot just like -- you
5  cannot just be a company and say, "Hey, I'm
6  going to provide services."  It has to go
7  through a process.
8      Q.   Got it.  The very next bullet
9  says:
10         "Most clients need IOP with a
11     residential support."
12     A.   Uh-huh.
13     Q.   Is that intensive outpatient
14  procedure?
15     A.   No.  It's with residential
16  support, meaning they live at the facility.
17     Q.   What does IOP stand for?
18     A.   Intensive outpatient treatment.
19     Q.   And then it says:
20         "And one creative way to pay for
21     treatment was to pay for the beds
22     with state money, and then IOP
23     treatment is paid for with Drug Court
24     money."
25         What is that -- can you explain

Page 149

1  that sentence for me?
2          MR. BADALA:  Objection to form.
3          THE WITNESS:  So the state has
4      halfway-house beds.  And if -- I do not
5      know the specific numbers, but if
6      someone scores an X amount number on
7      their Ohio Risk Assessment, then they're
8      eligible to pay for funds through state
9      beds, meaning halfway-house beds.
10     There's only a few agencies that have
11     halfway-house beds.
12  BY MR. RUIZ:
13     Q.   And then what is Drug Court money?
14  What is that referring to?
15     A.   What is Drug Court money?  It
16  could mean a few things.  But whatever funds,
17  that's over at the ADAMHS Board for Drug
18  Court.
19     Q.   Okay.
20         So it could be ADAMHS Board
21  funding or -- is it possible that it's
22  referring to grant funding?
23     A.   Correct.
24     Q.   Okay.  Then the next bullet says:
25         "New funding was received to

38 (Pages 146 - 149)

Page 150

1    expand Drug Court to a new docket and
2    target a specific population
3    (substance use in mental
4    health/trauma)."
5        That's a reference to the Recovery
6    Court?
7        A.    Correct.
8        Q.    If you could turn to page 418.
9    And it's the fourth bullet on the top box.
10    It says:
11        "Gail Long inquired if Drug Court
12        is on sound financial footing.  The
13        new SAMHSA grant will pay for new
14        staff.
15        "Martin Murphy indicated that the
16        state biennium budget allowed for all
17        supreme court certified specialty
18        courts.  Every court is given the
19        cost of 65 percent of a TASC case
20        manager."
21        What does that mean, "Every court
22    is given the cost of 65 percent of a TASC
23    case manager"?
24        MR. BADALA:  Objection to form.
25        THE WITNESS:  The state allowed

Page 151

1    certified specialty dockets to request
2    to assist the courts with paying for
3    staff members that are bombarded with
4    treating these clients and not having a
5    means to pay for that staff.
6        Unfortunately, it would -- did not
7    pay for a full staff member.  As you
8    see, it's 65 percent.  And we already
9    had one case manager and needed to add
10    an additional one.  So that was just a
11    little tiny chunk that helped the bigger
12    picture.
13    BY MR. RUIZ:
14        Q.    So what this is describing, it
15    says, "State funds" --
16        A.    Uh-huh.
17        Q.    -- "are being used to pay for up
18    to 65 percent of a TASC case manager" for the
19    Drug Court; is that right?
20        A.    Correct.
21        Q.    Okay.
22        A.    Yes.  So it's only a little chunk
23    of one person's salary.
24        Q.    Well, more than half of the
25    person's salary?

Page 152

1        A.    Yeah, but only one person.
2        Q.    Right.  There are --
3        A.    Two.
4        Q.    Okay.
5        A.    And it's interesting when you look
6    at salaries, because fringe and benefits
7    also, as well, because there's salary and
8    employee.
9        Q.    Okay.
10        If you look on the very next page,
11    this is talking about the Drug Court
12    expansion, the Recovery Court.  And the first
13    full -- sorry, the second full bullet there
14    says:
15        "Funding is 1.2 million, which
16        includes 300,000 from DJA to pay for
17        court staff.  And the SAMHSA portion
18        will pay for treatment at Matt Talbot
19        and Stella Maris.  Additionally,
20        180,000 will come from the ADAMHS
21        Board."
22        So this is funding specifically
23    for the Recovery Court?
24        A.    That is correct.
25        Q.    And Matt Talbot and Stella -- is

Page 153

1    it Maris or Maris?
2        A.    Correct, Maris.
3        Q.    Are treatment providers?
4        A.    Correct.
5        Q.    So at least a portion of this, it
6    looks like, is being used to pay for court
7    staff?
8        A.    Correct.
9        Q.    For the Recovery Court?
10        A.    Correct.
11        Q.    Okay.
12        And then a portion is used for the
13    treatment providers through the process that
14    we were talking about earlier, where the
15    treatment providers will contract with the
16    Drug Court and then you can then pay for
17    services for the clients; is that right?
18        A.    Correct.
19        Q.    Okay.
20        The very next box, the top bullet,
21    says, "Graduation will be held on 11/06."
22        A.    Uh-huh.
23        Q.    And the next bullet says:
24        "There will be 16 graduates,
25        which is a smaller class than usual,

Page 154

1     but it has some amazing people
2     graduating."
3         This was in 2014.  Do you have a
4   sense of what a more usual class size was?
5     A.    Usually, on average, we have at
6   least 20.
7     Q.    And there's three graduations a
8   year?
9     A.    Correct.
10    Q.    And are they roughly the same
11  size?
12    A.    So -- no.  And if I can explain
13  the reason why, it's because we didn't always
14  have that added afternoon docket, so our
15  graduation classes are significantly
16  increasing.  We just graduated 29 last
17  month -- I believe it was 29.  But we hit our
18  400 mark of graduates that we've had since we
19  started.
20    Q.    And I think maybe I phrased the
21  question badly.  My question was if you have
22  about 20 graduates in a session, is it
23  usually pretty evenly distributed among the
24  three graduations a year?
25    A.    No, because we are ongoingly

Page 155

1   expanding.  Therefore, you have more
2   graduates.  That's what I'm trying to say.
3     Q.    Got it.
4         And when did that expansion happen
5   for the afternoon docket?
6     A.    The expansion happened the end of
7   2016.  I don't know the exact year.
8     Q.    But so at the time of this
9   document in 2014, there were just the two
10  Drug Court dockets?
11    A.    There was Drug Court and Recovery
12  Court had just started, yeah.
13    Q.    And so for the Drug Court, there
14  was just the two -- I believe you referred to
15  them as dockets, didn't you?
16    A.    Yes.
17    Q.    And -- because the afternoon
18  docket hadn't started yet?
19    A.    Correct.
20        (Email chain, RE: Cuyahoga County
21        Enhanced Opiate Dependency
22        Services - T1023875, Bates
23        CUYAH_002045311 through
24        CUYAH_002045312, marked as
25        Deposition Exhibit 3.)

Page 156

1   BY MR. RUIZ:
2     Q.    I'm showing you what has been
3   marked as Exhibit 3.  It is CUYAH_002045311.
4   I'll give you a second to look it over.
5         Okay.
6         This is an email.  You're copied
7   on this email.
8         Do you see that?
9     A.    Yes.
10    Q.    Who is Maria Nemec?
11    A.    Maria Nemec is the chief of the
12  Kent County Probation Department.
13    Q.    And if you could turn to the back.
14    A.    Okay.
15    Q.    All set?
16    A.    I believe so.
17    Q.    So this is an email from
18  Mr. Murphy.  And he's talking about an audit
19  that was done of the court system, right?
20    A.    That is correct.
21    Q.    And it looks like the audit was
22  done in relation to the BJA/SAMHSA grant?
23    A.    Correct.
24    Q.    And that's the grant related to
25  the Recovery Court?

Page 157

1     A.    That is correct.
2     Q.    And it looks like, the last
3   sentence of the first paragraph, it says:
4         "This audit resulted in an
5         adjustment to this grant in the
6         amount of $19,634.58."
7         So it looks like they found some
8   more money as a result of the audit?
9         MR. BADALA:  Objection to form.
10        THE WITNESS:  No.  It sounds like
11  the $19,634.58 was as a result of some
12  funds that could have been billed to
13  Medicaid.
14        So, unfortunately, out of all that
15  money, only $19,000 could have been
16  billed for Medicaid.
17  BY MR. RUIZ:
18    Q.    Right.  But -- so that is -- that
19  is $19,000 that you can now go spend, right,
20  because you can bill it to Medicaid?
21        MR. BADALA:  Objection to form.
22        THE WITNESS:  Yes.
23  BY MR. RUIZ:
24    Q.    Are you done?
25    A.    No.  I was going to explain

40 (Pages 154 - 157)

Page 158

1  something else, but it's okay.
2      Q.   How often do these audits take
3  place? Do you know?
4      A.   I don't.
5      Q.   If you look at the second
6  paragraph, about the middle of the way, it
7  says:
8          "We would now like to request a
9      no-cost extension for an additional
10     six months due to the results in this
11     audit."
12         What does that mean, to request a
13  no-cost extension?
14         MR. BADALA:  Objection to form.
15         THE WITNESS:  So basically a
16  no-cost extension is that they will
17  allow you to utilize your funds that
18  were not spent in the allocated time
19  frame.
20         It's very tricky running federal
21  grants, because if I have from January 1
22  until December 30th of a year, and say,
23  for example, they give you 300,000, and
24  they want you to enroll 60 clients, are
25  you going to enroll 60 clients in the

Page 159

1  first month? No.  You're going to
2  consistently enroll them.
3          So therefore, what happens is
4  you're enrolling clients in December,
5  you need the funds to treat those
6  clients because you enrolled those
7  clients.  So a lot of times you have to
8  do a no-cost extension.  It's very, very
9  common.
10  BY MR. RUIZ:
11     Q.   And that no-cost extension allows
12  you to essentially use the funds beyond the
13  original deadline?
14     A.   Absolutely.
15     Q.   Now, the very next sentence says:
16         "We understand the importance of
17      utilizing Medicaid as a primary
18      source and spending all of the local
19      and federal dollars for only those
20      clients that are not eligible for
21      Medicaid or for services not paid for
22      by Medicaid."
23         So is there -- when you're looking
24  to pay for Drug Court costs, am I right that
25  there's essentially a hierarchy of where you

Page 160

1  go to get the money?
2          MR. BADALA:  Objection to form.
3          THE WITNESS:  I wouldn't say a
4  hierarchy.  I think there's a rule that
5  you should pay for Medicaid funding and
6  then other funding deemed necessary.
7  BY MR. RUIZ:
8      Q.   Okay.
9          And within the other -- so let's
10  say you've exhausted what you can pay for
11  through Medicaid.  Within the other federal
12  and state dollars that you might have access
13  to, is there any kind of hierarchy to how you
14  access those dollars?
15         MR. BADALA:  Objection to form.
16         THE WITNESS:  I don't know.
17  Exhausted?
18  BY MR. RUIZ:
19     Q.   Well, let's say you have
20  determined everything that you can bill to
21  Medicaid and you have other -- you have
22  left-over dollars of things that need to be
23  reimbursed or paid for that you cannot bill
24  Medicaid for.  How do you determine which of
25  the several grants that you have to seek

Page 161

1  payment?
2          MR. BADALA:  Objection to form.
3          THE WITNESS:  It depends on the
4  service.
5  BY MR. RUIZ:
6      Q.   Explain that.
7      A.   So SAMHSA CSAP funding, for
8  example, in reference to this email, will not
9  pay for sober living.
10         We utilize sober living many, many
11  times, over and over again.
12     Q.   So there might be conditions on
13  certain grants that will allow you to bill
14  for certain services but not others?
15     A.   Absolutely.
16     Q.   Okay.  You can put that to the
17  side.
18         (Email, RE: Next Opiate Task Force
19      Meeting Tuesday July 22 Cuyahoga
20      County Board of Health, Bates
21      CUYAH_001621485 to
22      CUYAH_001621487, marked as
23      Deposition Exhibit 4.)
24  BY MR. RUIZ:
25     Q.   I'm showing you what has been

41 (Pages 158 - 161)

Page 162

1    marked as Leckler Exhibit 4, CUYAH_001621485,
2    and the email from you is -- the email at the
3    top is from you. But I'm actually interested
4    in the article that starts near the bottom.
5        A.  Yes.
6        Q.  And if you look near the bottom of
7    the first page, it says:
8            "The legislation introduced in
9        Congress Thursday aims to set up a
10       five-year demonstration project that
11       removes a decades-old Medicaid rule
12       barring reimbursement to treatment
13       facilities with more than 16 patient
14       beds."
15       Do you see that?  Do you see what
16   I read?
17       A.  Yes.  It was at the bottom?
18       Q.  Yes.
19       A.  Yes.
20       Q.  And are you familiar with that
21   Medicaid rule?
22       A.  I am.
23       Q.  And how has that rule impacted
24   Drug Court's ability to fulfill its mission?
25           MR. BADALA:  Objection to form.

Page 163

1           THE WITNESS:  It has resulted in
2        longer waits for residential beds. And
3        it obviously limits the number of people
4        that can be in a residential treatment
5        facility at one time.
6    BY MR. RUIZ:
7        Q.  Does it make your job more
8    difficult?
9           MR. BADALA:  Objection to form.
10          THE WITNESS:  I don't know.
11   BY MR. RUIZ:
12       Q.  Do you think it's made addiction
13   problems worse in the County because patients
14   cannot get the treatment that they need?
15          MR. BADALA:  Objection to form.
16          THE WITNESS:  No.
17   BY MR. RUIZ:
18       Q.  You don't think it's had any
19   effect?
20          MR. BADALA:  Objection to form.
21          THE WITNESS:  I think that what's
22       had an effect on Drug Court, more
23       specifically, is the frequent treatment
24       experiences that clients have in Drug
25       Court.

Page 164

1    BY MR. RUIZ:
2        Q.  What do you mean by that?
3        A.  Meaning they have multiple
4    treatment experiences while in the program.
5        Q.  But you don't think the fact that
6    it's -- you don't think it would make Drug
7    Court easier if Medicaid reimbursed
8    for -- strike that.
9            Let's look at the sentence at the
10   top of the next page, which is 486.  It says:
11           "The 1965 rule has left millions
12       of addicts across the country waiting
13       in line for treatment, sometimes with
14       fatal results."
15       Do you agree with that?
16          MR. BADALA:  Objection to form.
17          THE WITNESS:  I don't know.
18   BY MR. RUIZ:
19       Q.  You don't know if it's had any
20   effect on how Drug Court operates or the
21   number of patients you're able to see or the
22   amount of treatment you're able to provide?
23          MR. BADALA:  Objection to form.
24       It's the fourth time you're asking the
25       same question.

Page 165

1           THE WITNESS:  She's a politician.
2    BY MR. RUIZ:
3        Q.  Okay.
4            Well, if you look at the top of
5    your email, you say, "This is something we've
6    been hoping for."
7        A.  Yes.
8        Q.  Why were you hoping for it?
9        A.  I would like to see the community
10   create more residential beds.
11       Q.  Because that would be helpful,
12   right?
13       A.  For the community.
14          MR. BADALA:  Objection to form.
15   BY MR. RUIZ:
16       Q.  Okay.
17          You can put that to the side.
18          I'm handing you what's been marked
19   as Leckler Exhibit 5.
20          (Email chain, Fwd: FY2013 - May
21       2013 Treatment Expenditure Summary
22       Report, Bates CLEVE_000367329
23       through CLEVE_000367330, marked as
24       Deposition Exhibit 5.)
25

42 (Pages 162 - 165)

Page 166

1    BY MR. RUIZ:
2        Q.    If you look near the bottom,
3    there's an email from you on July 3rd, 2014,
4    at 1:34 p.m.
5            Do you see that?
6        A.    Correct.
7        Q.    And you say, "Please bring
8    Greg Popovich and Judge Fuerst" --
9        A.    Correct.
10       Q.    -- "up to date on the increase in
11   funding being used by Cleveland Municipal
12   Court.  They expressed concern at our
13   previous meeting last month."
14           Who is Greg Popovich?
15       A.    Greg Popovich is the deputy court
16   administrator for the Common Pleas Court.
17       Q.    And Judge Fuerst, what is his
18   involvement in -- is it a him or her?
19       A.    It's a her.
20       Q.    Her.
21           What is her involvement in Drug
22   Court?
23       A.    She's the former administrative
24   and presiding judge of the Common Pleas
25   Court.

Page 167

1        Q.    Okay.
2            And when you say -- do you recall
3    this email at all?
4        A.    I do.
5        Q.    And when you are writing, "Please
6    bring them up to date on the funding being
7    used by Cleveland Municipal Court," what do
8    you recall about that?
9        A.    What do I recall about that?  A
10   number of things.  One, since we started
11   County, obviously, we have numerous felony
12   cases.
13           Cleveland Drug Court has also
14   expanded in the sense that they took in --
15   they called it a suburban grant expansion.
16   So basically they took in other suburban
17   cases under their jurisdiction to allow them
18   to participate in the Cleveland Drug Court.
19           Initially when they started that,
20   they were using shared funds, our funds, so
21   therefore decreasing the funds available
22   potentially for our clients.  So I brought
23   that to the attention of the court
24   administration.
25       Q.    Got it.

Page 168

1            Was it inappropriate that they
2    were doing that or was it something else?
3            MR. BADALA:  Objection to form.
4    BY MR. RUIZ:
5        Q.    Why were you bringing it to their
6    attention?
7        A.    Because it's a fact.  That's part
8    of my job.
9        Q.    Well, what about it made you think
10   it was important enough to bring to their
11   attention?
12           MR. BADALA:  Objection to form.
13           THE WITNESS:  Because it's a
14   shared budget, and therefore, if they're
15   going to expand and take in other cases
16   out of their jurisdiction, then
17   collaboratively, we need to be aware of
18   and kept informed, because, like I said,
19   that's shared funds.
20   BY MR. RUIZ:
21       Q.    And is that part of what you think
22   is -- so if you look right above your email,
23   there's an email from Daniel -- how do you
24   say that last name?
25       A.    Peterca.

Page 169

1        Q.    Peterca?
2        A.    Yes.
3        Q.    That would have been maybe my
4    fourth guess.
5            Who is Daniel Peterca?
6        A.    So he no longer works for the
7    court.  He was a former manager of -- as it
8    says right there in the email -- pretrial
9    services.
10       Q.    And what role would he play in the
11   funding of Cleveland Municipal Court and the
12   Common Pleas Drug Court?
13       A.    He was on the advisory board.
14       Q.    Okay.
15       A.    He also was one of my -- my boss.
16   My position used to be allocated for
17   Cleveland Municipal.  There's a number of
18   ways why he is involved.
19       Q.    And if you look in the second
20   sentence of what Mr. Peterca writes, he says:
21       "Russell Brown indicated that he
22       would be meeting with Greg to discuss
23       the Drug Court collaboration issues.
24       Among the issues is the continued
25       disproportioned utilization of ADAMHS

43 (Pages 166 - 169)

Page 170

1    Board funding for IOP with
2    residential support by Cleveland
3    Municipal Courts, Drug Court."
4        So this is what we were just
5    talking about, which is that the funding that
6    comes from the ADAMHS Board, that goes to
7    both the Cuyahoga Drug Court and the
8    Cleveland Municipal Court; is that right?
9        A.   That is correct.
10       Q.   Have there been any issues with
11   the Cleveland Drug Court since?
12           MR. BADALA:  Objection to form.
13           THE WITNESS:  Elaborate on
14       "issues."
15   BY MR. RUIZ:
16       Q.   Have you had problems with how
17   they are using shared fundings since?
18           MR. BADALA:  Objection to form.
19           THE WITNESS:  No.  Not that I
20       know, no.
21   BY MR. RUIZ:
22       Q.   How did this get resolved?
23           MR. BADALA:  Objection to form.
24           THE WITNESS:  Cleveland Drug Court
25       was no longer allowed to use shared

Page 171

1    funds to treat cases out of their
2    jurisdiction.
3    BY MR. RUIZ:
4        Q.   So they're only allowed to use
5    ADAMHS Board funding for Cleveland residents;
6    is that right?
7        A.   Cleveland cases, not residents.
8        Q.   Thank you.  That's an important
9    distinction.
10       And who keeps track of that to
11   make sure they're doing that?
12           MR. BADALA:  Objection to form.
13           THE WITNESS:  The Corrections
14       Planning Board, the ADAMHS Board.
15   BY MR. RUIZ:
16       Q.   Okay.
17           MR. BADALA:  We've been going a
18       little bit over an hour.  A good time to
19       take a five-minute break?
20           MR. RUIZ:  Yeah.
21           THE VIDEOGRAPHER:  Off the record,
22       2:20.
23           (Recess taken.)
24           THE VIDEOGRAPHER:  We're back on
25       the record.  2:32.

Page 172

1    BY MR. RUIZ:
2        Q.   All right, Ms. Leckler.  You said
3    that the Cleveland Municipal Court stopped
4    accessing ADAMHS Board money for cases
5    outside of Cleveland.
6        Since they have stopped doing
7    that, what proportion of the ADAMHS Board
8    funds do they use?
9        A.   I don't know exactly, off the top
10   of my head.  I don't know.
11       Q.   Do you know if it's close to
12   50/50?
13       A.   I don't.
14       Q.   Would Mr. Murphy be the right
15   person to ask about that?
16       A.   He may be.
17       Q.   I'll show you what's been marked
18   as Leckler Exhibit 6.
19       A.   Thank you.
20       Q.   And that is CUYAH_003359808.
21           (Email chain, RE: Meeting about
22           terminating Drug Court MOU with
23           Municipal Court, Bates
24           CUYAH_003359808 through
25           CUYAH_003359809, marked as

Page 173

1            Deposition Exhibit 6.)
2    BY MR. RUIZ:
3        Q.   This is an email from Mr. Murphy
4    to you, among others, on October 7th, 2014.
5        Are you all set?
6        A.   Yes.
7        Q.   If you look at the back, it is at
8    the top of the page there, it's an email from
9    the Judge.  And he says:
10           "I would like to schedule a
11           meeting where we will discuss the
12           reasons behind our recent failure to
13           obtain a SAMHSA grant."
14       Do you remember that at all?
15       A.   I do.
16       Q.   And what was the SAMHSA grant that
17   you guys did not get?
18       A.   The SAMHSA grant was a grant
19   for -- I do not recall the specific scope of
20   the project, but it was similar to the scope
21   that is here, described here.
22       Q.   Described here, and that's in the
23   next email related to the Cleveland Municipal
24   Court?
25       A.   Yeah.  And it's basically just

44 (Pages 170 - 173)

Page 174

1    a -- let's see, expansion -- yeah.  Expand --
2    it's an expansion grant.
3        Q.    And do you remember why you didn't
4    win the grant?
5        A.    Yes.
6        Q.    Why?
7        A.    So a lot of times with federal
8    grants, they're allocated across the country
9    to those communities that are in desperate
10   need.
11           Fortunately -- unfortunately for
12   us, we have two Drug Court programs in
13   Cuyahoga County, so sometimes we have to
14   compete against each other for the same pot
15   of money.
16           They're all county monies.  This
17   community is really good at getting those
18   federal funds, because we have a desperate
19   need for those funds.  Therefore, time and
20   time again, we are able to obtain outside
21   federal funding because we as a community can
22   demonstrate the need for these funds in our
23   county.
24       Q.    And so the Cleveland Municipal
25   Court won the grant that you did not win?

Page 175

1        A.    Correct.
2        Q.    Got it.
3        A.    Correct.
4        Q.    And when it won that grant, that
5    was for the Cleveland Municipal Court's use
6    only; it's not like they were going to share
7    those funds with you, right?
8        MR. BADALA:  Objection to form.
9        THE VIDEOGRAPHER:  Off the record,
10   2:37.
11       (Interruption in proceedings.)
12       THE VIDEOGRAPHER:  We're back on
13   the record, 2:38.
14       MR. RUIZ:  Would you mind reading
15   the question back?
16       (Record read as requested.)
17       THE WITNESS:  Both.
18           You can see right here, as it's
19   stated, that "The Cleveland Municipal
20   Court, in partnership with the four
21   suburban municipal courts located in
22   Northeast Ohio and the Cuyahoga County
23   Court of Common Pleas proposes the
24   greater Cleveland Drug Court
25   Medication-Assisted Treatment Project."

Page 176

1        So as you see, there's a
2    collaboration.  So, therefore, it was
3    not just for Cleveland Municipal Court
4    funds' clients.
5    BY MR. RUIZ:
6        Q.    So I'm trying to understand.  Did
7    Cuyahoga apply for this grant in partnership
8    with Cleveland?
9        A.    We applied for separate funding.
10       Q.    And then you also applied in
11   partnership with them here?
12       A.    Since we collaborate with the
13   ADAMHS Board funds, we didn't necessarily --
14   we weren't part of the planning phases of
15   running this grant, but the grant was written
16   for both clients.
17       Q.    Now I understand.  Okay.  Thank
18   you.
19           Looking back up at the email, the
20   judge writes:
21           "After our discussion, we may
22   wish to formally terminate our Drug
23   Court MOU with Cleveland Municipal
24   Court."
25           Do you recall why he wanted to

Page 177

1    terminate the MOU?
2        MR. BADALA:  Objection to form.
3        THE WITNESS:  If you look at when
4    that email was sent, it was sent on
5    October 7, 2015.
6        The funding was from 2014 to 2017.
7    So he was learning about how much funds
8    after the fact, a year in.
9    BY MR. RUIZ:
10       Q.    So the funds had been awarded, but
11   Cuyahoga County didn't find out that these
12   funds were here until a year later?
13       MR. BADALA:  Objection to form.
14       THE WITNESS:  I believe around --
15   that's correct.
16   BY MR. RUIZ:
17       Q.    And so Cuyahoga County Drug Court
18   didn't use any of those funds in that first
19   year because you didn't know about them?
20       MR. BADALA:  Objection to form.
21       THE WITNESS:  Correct.  It's still
22   Cuyahoga County.  It's in Cleveland.
23   It's Cuyahoga County.
24   BY MR. RUIZ:
25       Q.    Right.  But your Drug Court wasn't

45 (Pages 174 - 177)

Page 178

1    using them?
2        A.    So -- it's hard to describe this.
3    So since it's all county monies, if you apply
4    for federal funding, it kind of comes through
5    the county.  You have the ADAMHS Board
6    funding, which is county monies.  So even if
7    you obtain outside federal funds, it's
8    still -- do you understand? -- still coming
9    through county monies.
10       So if money is coming from here or
11   there and it's taken away from over there,
12   it's still coming through the county.  So it
13   kind of -- it's hard to describe the pots of
14   monies.
15       Q.    Yeah.  And I think I am trying
16   to --
17       MR. BADALA:  Were you done?  I'm
18   sorry.
19       THE WITNESS:  No.  I wasn't done.
20   BY MR. RUIZ:
21       Q.    Sorry.
22       A.    So there was a coordinator that
23   worked for Cleveland Municipal Courts that
24   did not have very good managerial skills.  He
25   was very difficult to collaborate with.  So

Page 179

1    there's a couple things -- meanings behind
2    this.  And one could be the Judge just -- he
3    had had enough.
4        Q.    Because -- had enough of what?
5        A.    Of dealing with that coordinator.
6        Q.    Did that make it more difficult to
7    access funds for Cuyahoga?
8        A.    No.
9        Q.    Did -- I believe you said earlier
10   that Cuyahoga still works with the Cleveland
11   Municipal Court.  So you did not terminate
12   the MOU?
13       A.    No.
14       Q.    Do you remember why you -- why you
15   decided to keep that MOU in place?
16       A.    Because collaboration gives you
17   more justification when you're going after
18   funding.  You know, you have to do what's
19   good for the community and, in the end, help
20   more clients.
21       Q.    And what was the name of the
22   person who was the Drug Court coordinator for
23   Cleveland?
24       A.    His name was Darryl Jackson.
25       (Drug Court Advisory Board Meeting

Page 180

1    Minutes, November 12, 2015, Bates
2    CUYAH_002049703 through
3    CUYAH_002049705, marked as
4    Deposition Exhibit 7.)
5        MR. RUIZ:  CUYAH_002049703.
6    BY MR. RUIZ:
7        Q.    These are Drug Court Advisory
8    Board meeting minutes from November 12, 2015.
9        A.    (Reviewing document.)
10       Q.    Are you done looking through that
11   document?
12       A.    Yes.
13       Q.    If you look at the second box,
14   there's a discussion of funding.
15       A.    Uh-huh.
16       Q.    And the second bullet there says:
17       "Recently $60,000 was provided by
18   the ADAMHS Board for a treatment
19   shortfall for CATS.  CATS wouldn't
20   accept new clients without a
21   contract.  However, this funding from
22   the ADAMHS Board allowed them to
23   continue to take clients.
24       "Corrections Planning Board may
25   need to augment what has been

Page 181

1    provided to last until the end of the
2    year ($5,000 to $10,000 may be the
3    shortfall).  This could be covered by
4    Smart Ohio funding."
5        Is this -- let me back up.
6        When it says "CATS wouldn't accept
7    new clients without a contract," what does
8    that mean?
9        A.    Ran out of money.
10       Q.    I guess I'm trying to understand
11   how the contract works with them.
12       A.    So it says right here, the
13   contract, so the Cuyahoga County Drug Court
14   received 225 -- that's the contract -- for
15   CATS in 2015.  We were awarded more in 2014.
16       So we had received less funding in
17   2015.  We had to stop taking in clients.  We
18   had to stop referring for treatment.  It was
19   very unfortunate.
20       Unfortunately, the Smart Ohio
21   funding -- Smart Ohio funding -- and Marty
22   can correctly answer that a little bit more
23   in specifics.  The Smart Ohio money is
24   another batch of funding that was created by
25   the state to help pay for the overwhelming

46 (Pages 178 - 181)

1   communities and probation departments that
2   are dealing with opiate epidemic.
3       You could only have a client
4   utilize Smart Ohio funding if they had
5   violated.  So, therefore, that funding was
6   only utilized if an individual had an opioid
7   disorder and had already failed out of
8   treatment once and had already violated once.
9   So if they were still alive, then we were
10   able to get them back into funding.  We were
11   also able to utilize that funding to pay for
12   some treatment and some sober housing money.
13      So that funding isn't necessarily
14   a guarantee, because you also -- like I said,
15   that client would have had to violate
16   probation, would have had to have relapsed.
17      Q.   How often does that happen?
18      A.   I don't know.  I don't know the
19   exact number.
20      Q.   Do you have a sense of what
21   percentage of clients end up relapsing while
22   they're in the program?
23          MR. BADALA:  Objection to form.
24          THE WITNESS:  I do not have the
25      exact figure.

1   BY MR. RUIZ:
2       Q.   Can you provide an estimate?
3          MR. BADALA:  Objection to form.
4          THE WITNESS:  I cannot.
5   BY MR. RUIZ:
6       Q.   Do you know if it's less than
7   50 percent?
8          MR. BADALA:  Objection to form.
9          THE WITNESS:  I don't know.
10   BY MR. RUIZ:
11      Q.   If you look to the next page, the
12   top bullet there says, "In August, both
13   courts applied for funding for the Addiction
14   Treatment Program."
15      That is the ATP program that you
16   referenced earlier?
17      A.   Uh-huh.
18      Q.   It says, "Both county courts were
19   awarded, as was the Municipal Drug Court."
20      When it says "Both county courts,"
21   that's the Drug Court and the Recovery Court?
22      A.   That is correct.
23      Q.   And then if you look near the
24   bottom, the third bullet from the bottom.
25      A.   Uh-huh.

1       Q.   It says:
2       "Deaths due to fentanyl has
3       exploded.  Fentanyl is 30 to 40 times
4       more powerful than heroin."
5       A.   Uh-huh.
6       Q.   Do you have a recollection of a
7   spike in deaths related to fentanyl in
8   Cuyahoga County?
9          MR. BADALA:  Objection to form.
10          THE WITNESS:  I have a
11      recollection.  I do not have a specific
12      date.
13   BY MR. RUIZ:
14      Q.   Do you remember around what year,
15   what month?
16          MR. BADALA:  Objection to form.
17          THE WITNESS:  I do not.
18   BY MR. RUIZ:
19      Q.   Earlier we were talking about
20   clients that relapse.  You said you weren't
21   sure of the exact figures.
22      A.   Uh-huh.
23      Q.   Is that information tracked?
24          MR. BADALA:  Objection, form.
25          THE WITNESS:  Yes.

1   BY MR. RUIZ:
2       Q.   By whom?
3       A.   By me.
4       Q.   And so how do you track that
5   information?
6       A.   I just track if they had a
7   noncompliance, not what it was.
8       Q.   And where do you keep that
9   information?
10      A.   In a database.
11      Q.   What other information do you
12   track along -- is that -- do you track that
13   information in a spreadsheet?  Is it a Word
14   document?  What kind of document is it?
15          MR. BADALA:  Objection to form.
16          THE WITNESS:  It is both.
17   BY MR. RUIZ:
18      Q.   So walk me through, then, what
19   kind of things you're tracking.
20      A.   So anytime somebody violates in
21   the program, a status report is written.
22   That status report will explain the
23   violation, but also how many times they have
24   previously violated.
25      Is that what you're asking?

47 (Pages 182 - 185)

Page 186

```
 1      Q.   Uh-huh.
 2      A.   Then we have an ongoing client
 3  progress report that's provided to the Judge
 4  that has that information on it. It might
 5  not necessarily have the details of the
 6  violation, just the number.
 7           You can kind of see -- for
 8  example, Joe might have violated three months
 9  ago. He was in court for a PBH as opposed to
10  a status review hearing.
11      Q.   And that information that's
12  provided to the Judge, is that a new document
13  each time or are you updating the old
14  document?
15           MR. BADALA: Objection to form.
16           THE WITNESS: Updating.
17  BY MR. RUIZ:
18      Q.   And what's the name of this
19  database where you keep this information?
20      A.   Excel.
21      Q.   Do you know where the Excel
22  spreadsheet is saved?
23      A.   Yes.
24      Q.   Where?
25      A.   On the S drive.
```

Page 187

```
 1      Q.   And what's the S drive?
 2      A.   Shared drive.
 3      Q.   And so this is on the court's
 4  shared drive?
 5      A.   That is correct.
 6      Q.   If you look on the last page of
 7  the document, under "Other business," it
 8  says:
 9           "Rep. Nickie J. Antonio said that
10       the state will be accepting 'capital
11       requests.' If there are any capital
12       concerns, please see her."
13           Do you recall the Drug Court
14  asking the state for more money through the
15  budgeting process?
16      A.   Yes. That's what the ATP funds
17  were.
18      Q.   The ATP funds are through the
19  budget and not through a grant?
20      A.   I'm sorry. You have to rephrase.
21      Q.   Is the ATP a grant that the
22  Cuyahoga County court won?
23      A.   Yes. It's state money, though.
24  You said "state," so that's why --
25      Q.   Got it. What I'm trying to
```

Page 188

```
 1  understand is if these capital requests are
 2  something that are different from, for
 3  instance, ATP or other grants that you apply
 4  for.
 5      A.   I honestly do not know what
 6  capital request is.
 7      Q.   Okay. Do you know who we should
 8  ask for that information?
 9      A.   I do not.
10      Q.   Do you recall when the afternoon
11  docket for the Drug Court first started, what
12  year?
13      A.   The end of 2016, I believe.
14      Q.   And do you recall what allowed the
15  Drug Court to expand the docket? Did you
16  receive a grant?
17           MR. BADALA: Objection to form.
18           THE WITNESS: What allowed us? We
19       demonstrated the need in Cuyahoga
20       County, so we were awarded the project.
21  BY MR. RUIZ:
22      Q.   So the Cuyahoga County Drug Court
23  was able to expand its services because it
24  won an award, a grant award?
25      A.   It's weird when you say "won an
```

Page 189

```
 1  award" because --
 2      Q.   They received funding through a
 3  grant?
 4      A.   Thank you, yes. Yes.
 5      Q.   Okay.
 6      A.   We demonstrated a need.
 7  Therefore, we got the funding.
 8      Q.   Is the Drug Court evaluated at all
 9  for whether it's successful?
10           MR. BADALA: Objection to form.
11           THE WITNESS: Yes.
12  BY MR. RUIZ:
13      Q.   Do you have to do any kind of
14  evaluations as part of grant renewal?
15      A.   Yes.
16      Q.   Who is involved in the evaluation
17  process from the Drug Court?
18      A.   You would have to be more
19  specific. If you are talking about
20  evaluations of a certain grant funding --
21      Q.   Let me ask it a different way.
22      A.   Okay.
23      Q.   What are the different things --
24  strike that.
25           How do you measure whether -- how
```

48 (Pages 186 - 189)

Page 190

1    does the Drug Court measure whether it's
2    successful at achieving its mission?
3           MR. BADALA:  Objection to form.
4           THE WITNESS:  Recidivism studies.
5    BY MR. RUIZ:
6       Q.   And how often do you do those?
7       A.   Not as often as we would like.
8       Q.   Do you have a sense of how often
9    you do them?
10      A.   We have done two, one of which
11   I've reviewed the report.  Another they're in
12   the process of doing right now.
13      Q.   The one that has already been
14   completed, when was that done?
15      A.   That was done on -- I believe it
16   was the first three to four years of the
17   project.  Recidivism studies, you need to
18   look three years out.  So therefore, you
19   couldn't look at the data until the time had
20   passed.
21           So recidivism studies also have to
22   look at your unsuccessfuls.  So, for example,
23   if a participant had violated numerous times
24   and went to prison, that recidivism study
25   does not count until they were back into the

Page 191

1    community to get a good recidivism rate.
2       Q.   Is there anything else the
3    Cuyahoga County Drug Court does to measure
4    whether it is successfully treating its
5    client?
6           MR. BADALA:  Objection to form.
7           THE WITNESS:  Yes.
8    BY MR. RUIZ:
9       Q.   What else do you do?
10      A.   So part of CSAP grants, federal
11   funds, that the County is awarded these
12   monies, the County has to take a huge chunk
13   of that money and allocate it to hire an
14   outside evaluator.  That outside evaluator
15   receives -- I believe it's 20 percent and/or
16   65,000 per year of that project.
17           So, for example, if you receive
18   SAMHSA fundings of 325 per year, 65 of that,
19   take it off and just give it to the
20   evaluator.
21           That evaluator does a -- it's
22   called a GPRA.  They do an initial intake on
23   an individual.  They are also required to do
24   a follow-up one in six months and at
25   discharge.  So that is basically what they

Page 192

1    are paid for.
2           They also evaluate the progress of
3    the program with particularly that project
4    itself, making sure you're complying with the
5    goals and objectives.
6           It's a big chunk of money.  But,
7    unfortunately, part of the SAMHSA monies,
8    what the county has to is hire that
9    evaluator.  So that's one indication of how
10   we have an evaluator.
11           The SAMHSA government also has now
12   started doing an on-site evaluation.  We have
13   gone through three of them, two on Recovery
14   Court side and one on Drug Court side.
15           And that process entails a --
16   basically a national expert that will come
17   out to your program and basically spend the
18   week with you.  They will go to your
19   staffings.  They will sit down one-on-one
20   with each staff member.
21           They will go out to the treatment
22   agencies.  They make sure that you're
23   adhering to the goals and standards and they
24   also make recommendations on how to make your
25   program better.

Page 193

1       Q.   I want to move away from your core
2    Drug Court activities and explore some other
3    opioid-related activities that you might be
4    involved in.
5       A.   Okay.
6       Q.   Are you familiar with the Cuyahoga
7    County Opiate Task Force?
8       A.   I am.
9       Q.   And are you involved in it?
10      A.   I am.
11      Q.   In what capacity?
12      A.   I have not attended, I believe,
13   the past four meetings.  However, I have
14   attended the meetings.  I have presented and
15   I have gained knowledge from other agencies
16   and what they're doing.
17      Q.   When did you first start
18   participating?
19      A.   I do not recall.
20      Q.   Do you remember the year?
21      A.   I don't.
22      Q.   Do you know if you were involved
23   at the beginning of the task force?
24           MR. BADALA:  Objection to form.
25           THE WITNESS:  I was involved

49 (Pages 190 - 193)

Page 194

1    somewhat towards the beginning, I
2    believe.
3    BY MR. RUIZ:
4        Q.   Let's see if we can refresh your
5    memory.
6            THE VIDEOGRAPHER:  May I change
7    tape while you're doing that?
8            MR. RUIZ:  Yes.
9            THE VIDEOGRAPHER:  Thank you.  We
10    are off the record at 3:05.
11            (Recess taken.)
12            THE VIDEOGRAPHER:  We're back on
13    the record, 3:07.
14    BY MR. RUIZ:
15        Q.   I'm handing you what's been marked
16    as Leckler Exhibit 8.
17            (Email, Next Task Force Meeting,
18            Bates CLEVE_000166587, marked as
19            Deposition Exhibit 8.)
20            THE WITNESS:  Thank you.
21    BY MR. RUIZ:
22        Q.   And that is CLEVE_000166587.
23            And you see this is a
24    September 17th, 2013, email from
25    Vince Caraffi to a number of people?

Page 195

1            And do you see near the bottom
2    there, all the way on the right-hand side,
3    you're listed as a recipient?  Do you see
4    that?
5        A.   Yes.
6        Q.   Okay.
7            So fair to say, at least as early
8    as 2013, September 2013, you were a part of
9    the task force?
10        A.   When you say "a part of the task
11    force," do you mean attending the meetings?
12        Q.   Yes.
13        A.   Not necessarily.
14        Q.   Okay.
15        A.   Only I get a lot of emails.  I, a
16    lot of time, am kept informed of things via
17    email.  So it doesn't mean that I was
18    necessarily there.
19            I just don't want to tell you that
20    I was there when I cannot recall the exact
21    year that I started to participate in the
22    Opiate Task Force.
23        Q.   Okay.
24            So you're saying it's possible
25    that perhaps you were receiving emails

Page 196

1    related to the task force before you actually
2    became involved?
3        A.   It's very much possible.  A lot of
4    times, my boss may keep me informed of things
5    and then usually they sometimes hand things
6    off to me.
7        Q.   Okay.
8        A.   This being one of them.
9        Q.   Got it.
10            Was Judge Matia -- do you know if
11    he was participating in the task force around
12    this time?
13        A.   Again, I see his email on here, so
14    I'm assuming.  But I cannot say for sure if
15    he was physically at the meetings or not.
16        Q.   Okay.
17            You see the third science in the
18    email?  It says:
19            "Since 2010 our local coalition
20            has been very successful at
21            implementing local initiatives to
22            address this epidemic of opioid
23            abuse."
24        A.   Yes.
25        Q.   Is it fair to say that as of at

Page 197

1    least 2010, Cuyahoga County knew there was a
2    problem with opioid abuse?
3            MR. BADALA:  Objection to form.
4            THE WITNESS:  I don't know.  I
5        didn't write the email.
6    BY MR. RUIZ:
7        Q.   Well, let's think about your
8    experience.  You were seeing a number of
9    people through the Drug Court who had drug
10    abuse disorders.
11            Do you remember, around the time,
12    2009/2010, whether opioids were a problem?
13            MR. BADALA:  Objection to form.
14            THE WITNESS:  Can you rephrase?
15        Do you mean a problem or an epidemic?
16    BY MR. RUIZ:
17        Q.   Well, let's start with problem.
18    Did you think it was a problem?
19            MR. BADALA:  Objection to the
20        form.
21            THE WITNESS:  All drug use is a
22        problem.
23    BY MR. RUIZ:
24        Q.   Did you think it was a bigger
25    problem than other drugs?

50 (Pages 194 - 197)

Page 198

1        MR. BADALA:  Objection to form.
2        THE WITNESS:  I don't know.
3    BY MR. RUIZ:
4        Q.    Okay.
5              Were you also involved in the
6    Cuyahoga County Poison Death Review
7    Committee?
8        A.    I was.
9        Q.    Are you still involved?
10       A.    It no longer exists.
11       Q.    It doesn't exist anymore.  When
12   did it stop?
13       A.    I do not know.
14       Q.    Do you know when it started?
15       A.    I do not.
16       Q.    What is the Poison Death Review
17   Committee?  Or what was it, rather?
18       A.    The Poison Death Review Committee
19   was a group of individuals, myself included,
20   that looked over -- I'm trying to remember
21   the exact start date, which I do not know
22   exact start date.
23             It involved Dr. Delos Reyes
24   from -- on behalf of the ADAMHS Board,
25   myself, Sheriff's Department, Dr. Gilson.

Page 199

1              We sat around a table and we had
2    the unfortunate duty of overlooking every
3    single accidental overdose that occurred in
4    Cuyahoga County that year.
5        Q.    And when you would look at those
6    overdoses, what was the purpose?
7        A.    The purpose was to see if that
8    individual had any court involvement, to see
9    what their profession was.
10             Unfortunately, some of the
11   discussions of the cases went into some
12   horrific detail of how the body was found.
13             We tried to identify if
14   Project Dawn could have helped, if something
15   we could have done more could have helped.
16             They also tried to indicate if
17   that individual had any involvement with any
18   treatment agencies.
19             It was once a month, and it was a
20   very difficult two hours that I would spend
21   once a month.
22       Q.    And how is it that you became
23   involved in the committee?
24       A.    The probation department and the
25   court asked me to, to represent the court.

Page 200

1        Q.    Were you representing the Drug
2    Court or --
3        A.    Not just --
4        Q.    -- the court --
5        A.    Correct.
6        Q.    -- as a larger institution?
7        A.    Correct.
8              So when we would get a list of
9    individuals who had overdosed in Cuya County,
10   I would have a week or so to review all those
11   cases and see if they had any criminal
12   justice involvement.  Yeah.
13             (Cuyahoga County Poison Death
14             Review Committee Meeting Minutes,
15             May 28, 2013, Bates
16             CUYAH_001432160 through
17             CUYAH_001432162, marked as
18             Deposition Exhibit 9.)
19   BY MR. RUIZ:
20       Q.    I'm going to show you what's been
21   marked as Leckler Exhibit 9.
22       A.    Thank you.
23       Q.    This is CUYAH_001432160.
24       A.    Uh-huh.
25       Q.    And it looks like these are

Page 201

1    meeting minutes from one of the review
2    committee meetings.  And this says May 28th,
3    2013.
4              I know you said you don't remember
5    exactly when they started or when they
6    finished.
7        A.    Uh-huh.
8        Q.    Do you remember about how many
9    years you met?
10       A.    I believe it was -- that I was
11   just involved, it was like a year, 12 months.
12   So as of what years it elapsed over ...
13             I know that these are really small
14   numbers though.
15       Q.    So you think you were involved for
16   about a year?
17       A.    Yes.
18       Q.    After you stopped -- did your
19   involvement stop when the committee stopped
20   meeting?
21       A.    Did my involvement stop when the
22   committee stopped meeting?
23       Q.    Yes.
24       A.    Yeah.  I don't know if they met
25   without me.

51 (Pages 198 - 201)

1    Q.   So it's possible the committee
2  kept on --
3        So why did you stop attending the
4  review committee?
5    A.   They had gathered a number of data
6  and it was -- I don't know.
7    Q.   You just know at one point you
8  stopped attending, but you're not sure if the
9  meetings --
10    A.   Uh-huh.
11    Q.   -- stopped?  Okay.
12        If you look first under "Opening
13  Discussion and Update," it says "OARRS site
14  approval," on the very first page.  "Claire
15  and Aaron have applied for investigator
16  access."
17        We talked a little bit about OARRS
18  earlier.
19    A.   Uh-huh.
20    Q.   Claire and Aaron were both from
21  the Cuyahoga County Medical Examiner's
22  Office, is that right --
23    A.   Claire --
24    Q.   -- based on what it says up there?
25    A.   Yes.

1    Q.   Do you know what investigator
2  access is?
3    A.   I do not.
4    Q.   Do you know what kind of
5  information the Cuyahoga County Medical
6  Examiner's office could get from OARRS?
7        MR. BADALA:  Objection to form.
8        THE WITNESS:  I do not.
9  BY MR. RUIZ:
10    Q.   Do you know if they used OARRS
11  information in these committee meetings?
12    A.   I do not.
13        I remember -- I recall them
14  discussing obtaining access, and us
15  discussing that not all medications are
16  reported through the OARRS, unfortunately.
17    Q.   Okay.
18        You have seen OARRS reports
19  because the probation supervisor can access
20  OARRS for your clients; is that right?
21    A.   That is correct.
22    Q.   When those reports are
23  run -- strike that.
24        Do you know if an OARRS report
25  tells you which distributor distributed a

1  specific drug that person obtained?
2        MR. BADALA:  Objection to form.
3        THE WITNESS:  I do not know.
4  BY MR. RUIZ:
5    Q.   Do you know if it can tell you who
6  manufactured that drug?
7    A.   I do not know.
8    Q.   You said earlier that OARRS
9  doesn't have -- it doesn't capture all drugs,
10  right?  That's your understanding?
11        MR. BADALA:  Objection to form.
12        THE WITNESS:  Yes.
13  BY MR. RUIZ:
14    Q.   But do you know -- it captures all
15  prescription drugs, right?
16    A.   Not necessarily.
17    Q.   Which ones are you aware of that
18  it does not?
19    A.   If somebody is a vet, it didn't go
20  through OARRS, so --
21    Q.   Explain that to me.
22    A.   So they're their own entity, so it
23  didn't go through OARRS.
24    Q.   So if a vet is prescribing
25  medication for an animal?  Is that what

1  you're saying?
2    A.   No, like a military person.
3    Q.   Oh, vet.  Oh, I'm sorry.
4    A.   Yes.  Yes.
5    Q.   I thought you were saying
6  veterinarian.
7    A.   But if you want to get to that,
8  you are correct with the vet as well.
9    Q.   Thank you for clarifying that.
10    A.   You're welcome.
11    Q.   I would have been thinking you
12  were talking about veterinarians for the rest
13  of the day.
14    A.   That too, but --
15    Q.   So you're saying that if a veteran
16  obtained a prescription through the VA, that
17  that might not be recorded in OARRS?
18    A.   Yes.  So my knowledge of the OARRS
19  is when we started utilizing OARRS, the
20  veterans did not utilize OARRS.
21    Q.   Got it, okay.
22        Other than that situation, the
23  OARRS system covers all prescription
24  medications, right?
25        MR. BADALA:  Objection to form.

52 (Pages 202 - 205)

Page 206

1       THE WITNESS:  No.
2   BY MR. RUIZ:
3       Q.   Can you give me another example?
4       A.   You described it, a veterinarian.
5       Q.   Sure, okay.
6           If you look on page 162, under
7   "Intervention and Education," it says:
8           "Real prevention opportunities,
9       athletes, coaches, trainers in high
10      schools, local colleges, sports med
11      doctors."
12      A.   Yes.
13      Q.   Do you recall discussion around
14  these prevention opportunities?
15      A.   Yes.
16      Q.   And why did the group think these
17  were real prevention opportunities?
18          MR. BADALA:  Objection, form.
19          THE WITNESS:  Because I have a
20      number of clients that -- started by
21      prescription medication, prescription
22      pain pills by an injury that happened in
23      high school or in college, and then they
24      land across my desk.
25

Page 207

1   BY MR. RUIZ:
2       Q.   But as we discussed before, the
3   only way that you know that is because the
4   client tells you that's what happened, right?
5       A.   Yes.
6       Q.   You haven't done anything to
7   verify whether that's actually how they
8   became addicted to drugs?
9           MR. BADALA:  Objection to form.
10          THE WITNESS:  Yes.
11  BY MR. RUIZ:
12      Q.   Okay.
13          When you were talking about
14  veterans using OARRS, it's not the veterans
15  themselves that you were talking about,
16  right, it's the VA?
17      A.   That is correct.  Somebody from
18  the community just can't run an OARRS report.
19      Q.   Right.  But if a veteran went to
20  go see a private doctor, or if they went to a
21  hospital, then there might be an OARRS
22  report.
23          MR. BADALA:  Objection to form.
24  BY MR. RUIZ:
25      Q.   You don't know?

Page 208

1       A.   I don't know.
2       Q.   Okay.
3           (Cuyahoga County Poison Death
4           Review Committee Meeting Minutes,
5           June 25, 2013, Bates
6           CUYAH_001897420 through
7           CUYAH_001897422, marked as
8           Deposition Exhibit 10.)
9   BY MR. RUIZ:
10      Q.   I'll show you what's been marked
11  as Leckler Exhibit 10.
12          MR. BADALA:  Thanks.
13          THE WITNESS:  Thank you.
14  BY MR. RUIZ:
15      Q.   And this is a copy of meeting
16  minutes from the Poison Death Review
17  Committee from June 25th, 2013.
18          Have you seen that?
19      A.   Yes.
20      Q.   About two-thirds of the way down
21  the page it says:
22          "OARRS, 2012 cases.  102 of 160
23      cases had OARRS file."
24          Does this refresh your
25  recollection that they were using OARRS data

Page 209

1   at these meetings?
2           MR. BADALA:  Objection, form.
3           THE WITNESS:  Yes.
4   BY MR. RUIZ:
5       Q.   It says, "102 of 160 cases
6   had OARRS file."  So you were looking at --
7   does 160 cases mean 160 deaths?
8       A.   Yes.
9       Q.   And of those 160 deaths, you're
10  only able to track 75 of which had
11  prescriptions for opiates at some point,
12  right?
13          MR. BADALA:  Objection to form.
14          THE WITNESS:  It says that there.
15  BY MR. RUIZ:
16      Q.   And if you look further down, it
17  says:
18          "Data conclusions and possible
19      recommendations.  Likely accessing
20      legal prescriptions while abusing
21      heroin."
22          Now, when you are coming to
23  that --
24          If a person is using heroin, do
25  you think it's likely that a doctor is going

53 (Pages 206 - 209)

1  to give them a prescription for opioids?
2      MR. BADALA:  Objection to form.
3      THE WITNESS:  I have no idea.
4  BY MR. RUIZ:
5    Q.   You have no idea?
6    A.   I have no idea.
7    Q.   Do you think if they tell their
8  doctor that they're using heroin, that a
9  doctor might write them a prescription for
10  opioids?
11      MR. BADALA:  Objection to form.
12      THE WITNESS:  I have no idea.
13  BY MR. RUIZ:
14    Q.   Let's assume that that happens.
15  Let's assume that there are people -- and by
16  that, I'm -- strike that.
17      Let's assume that there are people
18  that are using heroin and also getting
19  prescriptions for opioids.  Would a
20  pharmaceutical company that manufactures
21  prescription opioids know that that person is
22  using heroin?
23      MR. BADALA:  Objection to form.
24      THE WITNESS:  I don't know.
25

1  BY MR. RUIZ:
2    Q.   They wouldn't, right?
3      MR. BADALA:  Objection to form.
4      THE WITNESS:  I don't know.
5  BY MR. RUIZ:
6    Q.   What about a distributor that then
7  sends that drug to a pharmacy?
8      MR. BADALA:  Objection to form.
9      THE WITNESS:  I don't know.
10  BY MR. RUIZ:
11    Q.   Right under that, it says:
12      "Work on the pipeline flow of
13      prescription opiates.  UH only system
14      with prescribing guidelines for
15      opiate pain pills."
16      What is -- do you know what UH is?
17    A.   University Hospitals.
18    Q.   University Hospitals.
19      Does that mean that other
20  hospitals didn't have prescribing guidelines?
21      MR. BADALA:  Objection to form.
22      THE WITNESS:  I do not know what
23  their prescription guidelines were.
24  BY MR. RUIZ:
25    Q.   Well, I'm not asking you what they

1  were.
2      I'm asking if it was discussed,
3  the fact that other hospitals do not have
4  guidelines.
5      MR. BADALA:  Objection to form.
6      THE WITNESS:  I do not know.  I do
7  not work for the hospitals.
8  BY MR. RUIZ:
9    Q.   Fair to say, when it says the
10  University Hospital is the only system with
11  prescribing guidelines, it means the other
12  ones don't have them?
13      MR. BADALA:  Objection to form.
14  Misstates the document.
15      THE WITNESS:  I don't know, just
16  because it -- I don't know.
17  BY MR. RUIZ:
18    Q.   If you turn to the page 421 at the
19  bottom, about two-thirds of the way down,
20  under "Intervention and education."  It says:
21      "Other treatment drugs,
22      hydrocodone, Diazepam, et cetera, no
23      prescription should be needed after
24      six months.  Needs counseling
25      intervention.  Problem with

1      continuation and willingness to
2      dispense beyond six months."
3      What is that -- to your knowledge,
4  what is that saying?
5      MR. BADALA:  Objection to form.
6      THE WITNESS:  I don't know.  I did
7  not do -- I did not write the minutes
8  for this meeting.
9  BY MR. RUIZ:
10    Q.   Do you remember this being
11  discussed?
12    A.   I do not.
13    Q.   Do you recall any discussions
14  about the need to limit dispensing of
15  opioids?
16      MR. BADALA:  Objection to form.
17      THE WITNESS:  I do not.
18  BY MR. RUIZ:
19    Q.   Do you have any opinion about how
20  long someone should be able to obtain a
21  prescription for opioids?
22      MR. BADALA:  Objection to form.
23      THE WITNESS:  I am not a
24  physician.  I run the County Drug Court
25  program.

Page 214

1    I have not had any medical
2    background, therefore, I cannot -- just
3    like I'm not an attorney, I can't give
4    legal advice. I have no idea.
5    BY MR. RUIZ:
6    Q.   So you don't have an opinion then?
7         THE WITNESS:  I do not.
8         MR. RUIZ:  Okay. Has it been
9    almost an hour?
10        MR. BADALA:  Yeah, I think so.
11        MR. RUIZ:  Do you want to take a
12   five-minute break?
13        MR. BADALA:  Yeah.
14        THE VIDEOGRAPHER:  Off the record,
15   3:30.
16        (Recess taken.)
17        THE VIDEOGRAPHER:  We're back on
18   the record, 3:49.
19   BY MR. RUIZ:
20   Q.   Ms. Leckler, you said that when
21   you were working for the Cleveland Municipal
22   Court, that one of the more common drug
23   diagnoses or maybe -- I'll take that back,
24   one of the more common drugs that you saw
25   abused was crack cocaine.

Page 215

1    Do you remember that?
2    A.   Yes.
3    Q.   Is crack cocaine still a problem
4    in Cuyahoga?
5         MR. BADALA:  Objection to form.
6         THE WITNESS:  I don't know.
7    BY MR. RUIZ:
8    Q.   You don't know?
9    What about power cocaine?
10        MR. BADALA:  Objection to form.
11        THE WITNESS:  I don't know.
12   BY MR. RUIZ:
13   Q.   Have you ever known a time when
14   meth was a health problem in Cuyahoga County?
15        MR. BADALA:  Objection to form.
16        THE WITNESS:  I do not.
17   BY MR. RUIZ:
18   Q.   You can't recall a time when there
19   was a problem with meth in the county?
20        MR. BADALA:  Objection to form.
21        THE WITNESS:  No.
22   BY MR. RUIZ:
23   Q.   What about heroin? Can you recall
24   a time when heroin was a problem in the
25   county?

Page 216

1         MR. BADALA:  Objection to form.
2         THE WITNESS:  I work with those
3    that use heroin.
4    BY MR. RUIZ:
5    Q.   Do you think it's a problem in the
6    county right now?
7         MR. BADALA:  Objection to form.
8         THE WITNESS:  A majority of the
9    cases that I have started with
10   prescription medication and moved on to
11   heroin, or still do both.
12        So what I see in our program,
13   Recovery Court and Drug Court, yes.
14   BY MR. RUIZ:
15   Q.   What about fentanyl?
16   A.   What about fentanyl?
17   Q.   Do you see clients in Cuyahoga
18   Drug Court who use or have used fentanyl?
19        MR. BADALA:  Objection to form.
20        THE WITNESS:  I don't know because
21   most of the clients do not know that
22   they're using fentanyl.
23   BY MR. RUIZ:
24   Q.   And why do they not know that
25   they're using fentanyl?

Page 217

1    A.   I don't know.
2    Q.   Have you heard anything about why
3    that might be?
4    A.   Have I heard anything of -- that
5    it -- that they're using fentanyl?
6    Q.   Why they might be using fentanyl
7    without knowing it.
8    A.   I just know that a lot of them,
9    when you talk about their prior overdoses,
10   they say that they didn't know that they were
11   using -- what they were using.
12   Q.   And what about carfentanil? Have
13   you encountered any clients who have used or
14   do use carfentanil?
15        MR. BADALA:  Objection to form.
16        THE WITNESS:  I don't know because
17   I do not test for it.
18   BY MR. RUIZ:
19   Q.   Just to be clear, when you're
20   using the word "opiate" today, you're
21   including heroin use and fentanyl use and
22   carfentanil use, right?
23   A.   Typically when I use the word
24   "opiates," I'm referring to prescription pain
25   medications.  When I use the word "opioids,"

55 (Pages 214 - 217)

Page 218

1  that's when I'm referring to both of the
2  classes of drugs together.
3      Q.   Okay.
4      Do you know when prescription
5  opioids first entered the market?
6      MR. BADALA:  Objection to form.
7      THE WITNESS:  I do not.
8  BY MR. RUIZ:
9      Q.   Do you know that Percocet and
10  Vicodin have been available since the 1970s?
11      MR. BADALA:  Objection to form.
12      THE WITNESS:  I did not.
13  BY MR. RUIZ:
14      Q.   Do you know if there was a problem
15  with prescription drug abuse in the 1970s?
16      MR. BADALA:  Objection to form.
17      THE WITNESS:  I have no idea.
18      (Email chain, "FW: Carfentanil:
19      Medical Examiner's Public Health
20      Warning, Bates CUYAH_001621535
21      through CUYAH_001621537, marked as
22      Deposition Exhibit 11.)
23  BY MR. RUIZ:
24      Q.   I'll show you what's been marked
25  as Leckler Exhibit 11.

Page 219

1      If you look at the bottom of the
2  first page, it's a public health warning from
3  the medical examiner.  It says:
4      "Cuyahoga County Medical
5      Examiner, Dr. Thomas Gilson, issued a
6      public health warning today
7      indicating that the Regional Science
8      Forensic Laboratory has detected
9      carfentanil.
10      "Carfentanil is a large animal
11      sedative 100 times more deadly than
12      fentanyl and 2500 times more than
13      heroin, is deemed unsafe for human
14      use, and is a clear and present
15      danger to the community.  Deaths due
16      to heroin, fentanyl and now possibly
17      carfentanil continue to accelerate
18      out of control."
19      Does Dr. Gilson -- does that
20  sentence -- in that last sentence, "Deaths
21  due to heroin, fentanyl and now possibly
22  carfentanil continue to accelerate out of
23  control," does Dr. Gilson mention
24  prescription opiates anywhere in that
25  sentence?

Page 220

1      MR. BADALA:  Objection to form.
2      THE WITNESS:  Second page?
3  BY MR. RUIZ:
4      Q.   Yeah.
5      A.   No.
6      Q.   And if you look at the next
7  paragraph, the second sentence:
8      "The detection of carfentanil
9      here is a very disturbing development
10      in the ongoing illegal opiate
11      crisis."
12      Do you see that?
13      A.   Yes.
14      Q.   Do you agree with Dr. Gilson that
15  the opiate crisis is a -- is one of illegal
16  opiates?
17      MR. BADALA:  Objection to form.
18      THE WITNESS:  I do not have an
19      opinion.
20  BY MR. RUIZ:
21      Q.   Okay.
22      I'll show you what's been marked
23  as Leckler Exhibit 12.  That's the cover
24  email and then the attachment.
25      (Email, Fentanyl Cut Heroin, Bates

Page 221

1      CUYAH_002015681, marked as
2      Deposition Exhibit 12.)
3      MR. BADALA:  Okay.  Thanks.
4      MR. RUIZ:  The cover email is
5      002015681.
6  BY MR. RUIZ:
7      Q.   And you see -- you received this
8  email?  Do you see your name on there?
9      A.   I do.
10      Q.   And the subject is "Fentanyl cut
11  heroin."  Have you heard of that before?
12      A.   Yes.
13      Q.   And what do you understand that to
14  be?
15      A.   Heroin processed with fentanyl.
16      Q.   And do you have any understanding
17  of why that's significant?
18      MR. BADALA:  Objection to form.
19      THE WITNESS:  Say that again.
20      Sorry.
21  BY MR. RUIZ:
22      Q.   Let me say it this way, if someone
23  is going out to buy heroin and that heroin
24  actually has fentanyl in it, it's more
25  potent, right?

56 (Pages 218 - 221)

1          MR. BADALA:  Objection to form.
2          THE WITNESS:  Yes.
3    BY MR. RUIZ:
4      Q.   It might increase their likelihood
5    of overdosing?
6          MR. BADALA:  Objection to form.
7          THE WITNESS:  I guess there's a
8    lot of factors that it would depend on.
9    BY MR. RUIZ:
10     Q.    Right.  But I think we just saw in
11   the last exhibit Dr. Gilson was saying
12   carfentanil is 100 times more deadly than
13   fentanyl and 25 times more deadly than
14   heroin.
15         So fentanyl is more powerful and
16   more deadly than heroin, right?
17         MR. BADALA:  Objection to form.
18         THE WITNESS:  According to
19   Dr. Gilson, yes.
20   BY MR. RUIZ:
21     Q.    Right.  And so, because it's more
22   powerful, it could lead to more overdoses,
23   especially if someone is taking it not
24   knowing that there's any fentanyl in the drug
25   they're taking?

1          MR. BADALA:  Objection to form.
2          THE WITNESS:  It could.
3    BY MR. RUIZ:
4      Q.   It could?
5      A.   Uh-huh.
6      Q.   Let's look at the attachment,
7    which is the next page.
8      A.   Uh-huh.
9      Q.   It says:
10         "Unintentional drug overdose
11       deaths reach historic high second
12       year in a row.  Fentanyl-cut heroin,
13       a likely major contributor."
14         And I just want to look at the
15   last sentence in the first paragraph.  It
16   says:
17         "Participants throughout OSAM
18       regions also cited dealers switching
19       from other drug sales to the more
20       profitable sale of heroin, along with
21       cocaine users switching to heroin due
22       to the poor quality of cocaine."
23     A.   Uh-huh.
24     Q.    Do you agree that if a cocaine
25   user switches to heroin, they might become

1    addicted to opioids?
2          MR. BADALA:  Objection to form.
3          THE WITNESS:  I missed the exact
4    paragraph, so let me start at the
5    beginning.
6    BY MR. RUIZ:
7      Q.   Yeah.  It's the first paragraph --
8      A.   Okay. So --
9          "The availability of heroin has
10       increased during the past six months.
11       And every region with the
12       consumption -- exception of Toledo.
13       Participants consistently attributed
14       the increase in heroin use to the
15       reformulation of popular prescription
16       opioids such as OxyContin which has
17       made some prescription opioids more
18       difficult to abuse.  the crushable
19       pills increasingly more expensive and
20       difficult to obtain.
21         "Participants throughout OSAM
22       regions also cited dealers switching
23       from other drug sales to the more
24       profitable sale of heroin, along with
25       cocaine users switching to heroin,

1        due to the poor quality of cocaine."
2      Q.    So my question was, if a cocaine
3    user switches to heroin, could they then
4    become addicted to opioids?
5          MR. BADALA:  Objection to form.
6          THE WITNESS:  I don't know.
7    BY MR. RUIZ:
8      Q.    Because you -- you don't know
9    because you're not trained in substance abuse
10   and addiction?
11         MR. BADALA:  Objection to form.
12         THE WITNESS:  I don't know because
13   I cannot -- in my lane, I cannot say
14   that a cocaine user can then switch to
15   another substance and become addicted to
16   that.  I cannot say absolutely that that
17   would occur.
18   BY MR. RUIZ:
19     Q.   I'm not saying that it would
20   happen every time.  I'm just saying that it's
21   something that could happen, right?
22         MR. BADALA:  Objection to form.
23         THE WITNESS:  I don't know.
24   That's me assuming, and I -- I don't
25   know.

57 (Pages 222 - 225)

BY MR. RUIZ:
1    Q.    Okay.
2         Earlier today you talked about --
3    you can put that exhibit aside.
4         Earlier today you talked about
5    clients that you have that have started --
6    that they started with prescription
7    opioids and later on moved to heroin or other
8    illegal substances; is that right?
9         MR. BADALA:  Objection to form.
10        THE WITNESS:  Yes.
11   BY MR. RUIZ:
12   Q.    Do you have a sense of --
13        Well, let me start with a baseline
14   question.
15        People who use cocaine, do you
16   think that a hundred percent of them have
17   started with a prescription opioid?
18   A.    No.
19   Q.    So it is possible for someone to
20   have a heroin addiction without ever having
21   used a prescription opioid?
22        MR. BADALA:  Objection to form.
23        THE WITNESS:  That is correct.
24        And I can say that in court -- we

1    have a lot of visitors that come to
2    court and we have at times had our
3    clients raise their hand if they suffer
4    from opiate use.  And we have the
5    majority of the court raise their hands.
6         The judge will then ask them to
7    please keep their hand raised if you
8    started from a prescription, and half of
9    them still have their hands raised.
10   BY MR. RUIZ:
11   Q.    So in your experience --
12   A.    It's just -- yeah.  It's not like
13   a statistically-ran study, it's just to
14   demonstrate at that point in time what we
15   currently have in the courtroom.
16   Q.    Well, I want to make sure that
17   we're using the right words here because I
18   thought earlier you said, when you used the
19   word "opiate," that you were talking just
20   about prescriptions, right?
21   A.    Yes.
22   Q.    But in what you just told me, you
23   said that the judge asks for people to raise
24   their hand who have an opiate addiction, and
25   then to keep their hands raised if that

1    addiction began with a prescription.
2    A.    If I did, I'm sorry.  I meant to
3    say opioids.
4    Q.    You mean to say -- okay.
5    A.    Thank you.
6    Q.    I just wanted to make sure that
7    we're --
8    A.    No, it's okay.
9    Q.    Got it.  Okay.
10        Let's take a look at Leckler
11   Exhibit 13.
12        (Email chain, RE: Update from
13        Dr. Gilson, Bates CUYAH_002048206
14        through CUYAH_002048210, marked as
15        Deposition Exhibit 13.)
16        THE WITNESS:  (Reviewing
17   document.)
18   BY MR. RUIZ:
19   Q.    All set?
20   A.    All set.
21   Q.    Let's start on what's page 209,
22   which is the beginning of the first in time
23   email.
24        If you look up at the top, it's
25   "Update from Dr. Gilson."

1         If you look a couple pages before
2    that, it's a very long distribution list, but
3    it's actually from Vince Caraffi.
4    A.    Yes.
5    Q.    Okay.  He says:
6         "Good morning.  Please review the
7         citation below, sent on behalf of
8         Dr. Gilson.  At the April task force
9         meeting, Tom indicated local data was
10        showing an increased trend in the
11        number of overdose fatalities from
12        heroin, fentanyl, with no history of
13        overprescribing pain medication."
14        So that is consistent with what
15   you were saying earlier in which some portion
16   of heroin users might never have -- might not
17   have started with prescription opioids,
18   right?
19        MR. BADALA:  Objection to form.
20        THE WITNESS:  Correct.
21   BY MR. RUIZ:
22   Q.    If you look below that, there's
23   a -- what appears to be a brief synopsis of a
24   study that was done.
25        And Vince Caraffi writes:

58 (Pages 226 - 229)

Page 230

1      "This article supports
2   Dr. Gilson's thoughts and should be
3   included in future prevention
4   messaging."
5          And if you look on the next page,
6   it says that -- under "Results," the second
7   sentence --
8      A.   Uh-huh.
9      Q.   (Reading.)
10         "The use of commonly prescribed
11      opioids, oxycodone and hydrocodone,
12      dropped from 42.4 percent and 42.3
13      percent of opioid initiators,
14      respectively, to 24.1 percent and
15      27.8 percent in 2015, such that
16      heroin as an initiating opioid was
17      now more frequently endorsed than
18      prescription opioid analgesics."
19         Do you see that?
20      A.   I do.
21      Q.   And that seems to back up what
22   you've seen anecdotally, and what Dr. Gilson
23   has seen anecdotally, which is that there are
24   people who are -- who have opioid addictions
25   for whom heroin is the first opioid that they

Page 231

1   use?
2          MR. BADALA:  Objection to form.
3          THE WITNESS:  Yes.  However, it's
4      2015.
5   BY MR. RUIZ:
6      Q.   Right.  So at the time of 2015, is
7   what I'm saying.
8      A.   Which is weird because the email
9   was sent on 2017.
10     Q.   It might be that the study was --
11     A.   Yeah, old.
12     Q.   -- completed --
13     A.   Old.  Okay.
14     Q.   But this is something that
15   Dr. Gilson is seeing -- his email is --
16         He's sending this along saying the
17   local data in 2017, right?
18     A.   Okay, so --
19         MR. BADALA:  Objection to form.
20         THE WITNESS:  I didn't write the
21      email.  I see where it says, "Update
22      from Dr. Gilson."  However, the email is
23      from Vince Caraffi, so I'm just
24      confused.
25

Page 232

1   BY MR. RUIZ:
2      Q.   Right.
3          If you look at the beginning of
4   the email --
5      A.   Yes.
6      Q.   -- Vince Caraffi says:
7          "Please review the citation below
8      sent on behalf of Dr. Gilson.  At the
9      April task force meeting, Tom" --
10         Meaning Tom Gilson, right?
11     A.   Uh-huh.
12     Q.   -- "indicated local data was showing
13      an increasing trend in the number of
14      overdose fatalities from
15      heroin/fentanyl with no history of
16      overprescribing of pain medication."
17     A.   Okay.
18         MR. BADALA:  Objection to form.
19         THE WITNESS:  A few things.  I do
20      not recall fully reading this email,
21      number 1.
22         Number 2, I'm wondering why he
23      sent this when the study was 2015, and
24      he says "recent study."  That's where
25      I'm confused.

Page 233

1          What do you want me to respond to?
2   Because I did not write this email.
3   BY MR. RUIZ:
4      Q.   What I'm asking you is, is this
5   consistent with your experience in the Drug
6   Court that not everyone who has an opioid
7   addiction started with prescription opiates?
8          MR. BADALA:  Objection to form.
9      Misstates prior testimony.
10         THE WITNESS:  Yes.  As I stated
11      previously, not all of the clients that
12      I have that suffer from opioid use
13      resulted in a hundred percent
14      from-prescription medication.
15   BY MR. RUIZ:
16     Q.   And, in fact, what Dr. Gilson
17   appears to be saying is that there's an
18   increasing trend in people who have no
19   history of overprescribing of pain
20   medication, right?
21         MR. BADALA:  Objection to form.
22   BY MR. RUIZ:
23     Q.   Among those who have overdosed.
24         MR. BADALA:  Objection to form.
25         THE WITNESS:  I'm not Dr. Gilson.

59 (Pages 230 - 233)

Page 234

1    BY MR. RUIZ:
2        Q.   Well --
3        A.   You would have to ask Dr. Gilson.
4        Q.   Okay.
5        A.   Yeah.  Because it's a 2017 email
6    from a 2015 study.
7        Q.   Well, you said that you trusted
8    Dr. Gilson earlier, right?
9            MR. BADALA:  Objection to form.
10           THE WITNESS:  Yes.
11   BY MR. RUIZ:
12       Q.   So if he said it, you're going to
13   take his word for it?
14           MR. BADALA:  Objection to form.
15           THE WITNESS:  Yes.  I'm going to
16   believe Dr. Gilson, with the statistics
17   that he puts out on his medical
18   examiner's office.
19           However, this email is coming from
20   Vince Caraffi on behalf of Dr. Gilson.
21   I can't speak -- I wasn't there, so I
22   don't know.
23   BY MR. RUIZ:
24       Q.   Well, was --
25       A.   Again --

Page 235

1        Q.   Go ahead.
2        A.   And, again, I would refer back to
3    why we are talking about 2017 with a study
4    from 2015.
5        Q.   Let's look at page 207.
6            And if you look there, above all
7    the email addresses --
8        A.   Yes.
9        Q.   -- from Thomas Tallman.
10           Who is Mr. Tallman?
11       A.   It's Dr. Tallman.
12       Q.   Dr. Tallman.
13       A.   He is the medical director in the
14   Cuyahoga County Jail.
15       Q.   Why does he have a MetroHealth
16   email address?
17       A.   Because the --
18           MR. BADALA:  Objection to form.
19           THE WITNESS:  Because MetroHealth
20   oversees the medical in the jail.
21   BY MR. RUIZ:
22       Q.   Okay.
23           And Dr. Tallman says:
24           "I can also add that a
25           significant number of inmates I have

Page 236

1    screened for Vivitrol MAT did NOT
2    have a h/o" --
3            Which means history of?
4            MR. BADALA:  Objection to form.
5            THE WITNESS:  Yes.  But he also
6    says, "It is a small sample size."
7    BY MR. RUIZ:
8        Q.   I know.  I'm going to finish
9    reading.
10       A.   Thank you.
11   Q.       -- "did not have a history of opioid
12           addiction following a Rx for
13           Percocet, OxyContin, et cetera.
14           "It's a small sample size, but
15           out of approximately 150 patients, a
16           majority began using opioids just for
17           recreational purposes."
18           So with the caveat that it's a
19   small sample size, Dr. Tallman seems to be
20   agreeing with Dr. Gilson, right?
21           MR. BADALA:  Objection to form.
22           THE WITNESS:  I have no idea what
23   kind of assessment Dr. Tallman does in
24   the jail.
25

Page 237

1    BY MR. RUIZ:
2        Q.   Well, I'm not asking what kind of
3    assessment he does.  I'm asking whether it
4    seems like he's agreeing with what Dr. Gilson
5    is saying?
6            MR. BADALA:  Objection to form.
7            THE WITNESS:  I don't know.  I'm
8    not Dr. Tallman.  You would have to ask
9    him.
10   BY MR. RUIZ:
11       Q.   If we go all the way to the front,
12   Lou Lamarca, who is the clinical director at
13   Community Assessment and Treatment Services,
14   which is -- also we've referred to as CATS
15   today; is that right?
16       A.   That is correct.
17       Q.   He seems to also be agreeing.  He
18   says:
19           "This is consistent with what we
20           are seeing as well.  It is rare for
21           one of our clients to have started
22           with a medically-necessary opioid
23           Rx."
24           So we've seen Mr. Lamarca,
25   Dr. Tallman, Dr. Gilson, and the study.  Does

60 (Pages 234 - 237)

Page 238

1    it seem fair that a portion of people who
2    have opioid addiction never started with a
3    prescription?
4         MR. BADALA:  Objection to form.
5         THE WITNESS:  I can speak on my
6    behalf.  I cannot speak on Lou Lamarca's
7    behalf.
8         The clients that I have there
9    represent a very small population of
10   community assessment services.  They
11   have over 100 beds on the male side and
12   about 65 on the female side, so I cannot
13   speak on his behalf.
14   BY MR. RUIZ:
15       Q.   Does it seem like he's agreeing
16   with Dr. Tallman and Dr. Gilson?
17        MR. BADALA:  Objection to form.
18        THE WITNESS:  It's not for me to
19   comment.
20   BY MR. RUIZ:
21       Q.   You just don't know?
22        MR. BADALA:  Objection to form.
23        THE WITNESS:  I don't know.
24   BY MR. RUIZ:
25       Q.   Okay.

Page 239

1         I want to back up and just quickly
2    run through your education.
3         After high school, could you just
4    run through what formal education you've had.
5        A.   I obtained my bachelor's degree
6    from Kent State University.
7        Q.   And what was your degree in?
8        A.   Psychology.
9        Q.   Have you had any postgraduate
10   education?
11       A.   I've had some classes in the
12   public administration field at CSU.  I
13   started to go back for my master's degree,
14   but then I became the coordinator and I could
15   not juggle being a mom, going back to school,
16   and having a full-time job, all together.
17       Q.   And so you've not completed the
18   master's program?
19       A.   I have not.
20       Q.   Do you have any licenses?
21       A.   No, I do not.
22       Q.   Do you have any certifications?
23       A.   I am Gain certified.
24       Q.   And what is that?
25       A.   A Gain-certified assessor means

Page 240

1    Global Appraiser of Individual Needs.
2         It is an assessment that assesses
3    a person's level of care and what their
4    substance abuse need is.
5        Q.   And what was the process for
6    getting that certification?
7        A.   So I had to travel to Normal,
8    Illinois, for five days and go through
9    training, and then do mock assessments that
10   were recorded and taped and audited by a
11   specialist.
12        And then I had to come back to the
13   office and do that in the office as well and
14   submit audiotapes, and do the same thing to
15   obtain my Gain certification.
16        So I also -- at one time when I
17   was a probation officer, I did a lot of
18   motivational interview training to be an
19   expert on motivational interviewing.
20       Q.   Any other certifications?
21       A.   No.
22       Q.   Have you received any training
23   related to law enforcement?
24       A.   I've had defensive tactics, pepper
25   spray training, if that counts.

Page 241

1        Q.   Anything else?
2        A.   No.
3        Q.   What about training related to
4    medicine?
5        A.   No.
6        Q.   Related to pharmacy?
7        A.   No.
8        Q.   What did you do to prepare for
9    today's deposition?
10       A.   I met with my attorneys.
11       Q.   How many times did you meet?
12       A.   Once.
13       Q.   For how long?
14       A.   About three hours.
15       Q.   And which attorneys did you meet
16   with?
17       A.   I met with him and Mr. Gallucci.
18       Q.   Was there anyone in the room who
19   was not an attorney or not employed by
20   Mr. Badala's law firm?
21       A.   No.
22        MR. BADALA:  I like the sound of
23   "Mr. Badala's law firm."
24   BY MR. RUIZ:
25       Q.   Did you review any documents?

61 (Pages 238 - 241)

Page 242

1    A.   Yes.
2    Q.   What kind of documents?
3         MR. BADALA:  I'm just going to
4    object and instruct you not to
5    disclose the documents that you were shown.
6    BY MR. RUIZ:
7    Q.   Did you review the complaint in
8    this case?
9    A.   No.
10   Q.   You haven't seen it?
11   A.   No.
12   Q.   Did you review any of the
13   interrogatories in this case?
14        MR. BADALA:  Are we saying ever,
15   or during the prep?  Because if it's --
16   you're asking during the prep, I'm going
17   to instruct her not to answer.
18        THE WITNESS:  I don't even know
19   what it means, so --
20   BY MR. RUIZ:
21   Q.   Okay.
22        Did you speak with anyone at the
23   courthouse about your deposition today?
24   A.   I let my assistant know that I
25   would be out of the office.

Page 243

1    Q.   Anyone else?
2    A.   I let Judge Matia know that I
3    would be out of the office.
4    Q.   Did you talk to anyone about the
5    substance of this deposition at all?
6    A.   No.
7    Q.   Did you do any research?
8    A.   No.
9    Q.   So you didn't look at the
10   complaint.
11        What do you know about this
12   lawsuit?
13        MR. BADALA:  Objection to form.
14        THE WITNESS:  What do I know about
15   the lawsuit?
16        My understanding of the lawsuit is
17   that the county is suing the
18   pharmaceutical companies for damages
19   that have occurred here in Cuya County.
20   BY MR. RUIZ:
21   Q.   Were you involved at all in the
22   lawsuit before it was filed?
23   A.   No.
24   Q.   Were you asked to provide any
25   information for the complaint?

Page 244

1    A.   Was I asked to provide any
2    information for the complaint?  Yes.
3    Q.   Did you?
4    A.   Yes.
5    Q.   Were you asked to provide any
6    information in response to interrogatories?
7    A.   Again, can you tell me what
8    "interrogatories" means?
9    Q.   I'm guessing probably not, but
10   anyway --
11   A.   Okay.
12   Q.   Interrogatories are questions
13   posed to the parties, written questions posed
14   to the parties from the other side.
15   A.   Okay.  So ask me again.
16   Q.   Were you asked to provide any
17   information to respond to interrogatories?
18   A.   Can you ask it a different way?
19   Q.   It's okay.
20   A.   Okay.
21   Q.   Do you know whether doctors are
22   defendants in this case?
23   A.   I do not know.
24   Q.   Do you think they should be?
25        MR. BADALA:  Objection to form.

Page 245

1        THE WITNESS:  It's not my opinion.
2    BY MR. RUIZ:
3    Q.   What's not your opinion?
4    A.   I do not have an opinion on it.
5    Q.   You don't know have an opinion.
6    A.   No.
7    Q.   Okay.
8        You don't know if they played any
9    role in opioid abuse?
10        MR. BADALA:  Objection to form.
11        THE WITNESS:  I do not.  I don't
12   know what their role played.
13   BY MR. RUIZ:
14   Q.   Have you heard of the term "pill
15   mill"?
16   A.   I've heard of it.
17   Q.   And what do you know -- what is a
18   pill mill?
19   A.   I don't know.
20   Q.   Do you know whether any drug
21   dealers are defendants in this litigation?
22        MR. BADALA:  Objection to form.
23        THE WITNESS:  I have no idea.
24   BY MR. RUIZ:
25   Q.   Do you think they should be?

62 (Pages 242 - 245)

Page 246

1    MR. BADALA:  Objection to form.
2    THE WITNESS:  I have no opinion.
3    (Email with article:  Elyria man
4    charged with distribution of
5    heroin and fentanyl, including
6    fentanyl that caused the death of
7    an Elyria resident, Bates
8    SUMMIT_00912771 through
9    SUMMIT_00912773, marked as
10    Deposition Exhibit 14.)
11   BY MR. RUIZ:
12    Q.   I'm showing you what's been marked
13   as Leckler Exhibit 14, Bates Number
14   SUMMIT_00912771.
15    If you look at the -- I'll start
16   at the top.  This is the second email in
17   time -- sorry, the first email in time is
18   from Vince Caraffi.
19    Do you see that?
20    A.   Yes.
21    Q.   April 9th, 2014.
22    And if you look on the next page,
23   he writes:
24    "Heroin and fentanyl charges were
25    just unsealed five minutes ago

Page 247

1    against" --
2    And how do you pronounce that?  Is
3   it Elyria?
4    A.   Elyria, yes.
5   Q.   -- "against an Elyria man charging
6    him with selling fentanyl that
7    caused the death of an Elyria
8    woman."
9    And that's a press release.
10   Do you think someone like the
11  defendant here should be a part of this
12  lawsuit?
13    MR. BADALA:  Objection to form.
14    THE WITNESS:  I have no idea.
15   BY MR. RUIZ:
16    Q.   If you look at the first in time
17  email, the latest email --
18    A.   Okay.
19    Q.   -- from Doug Smith -- Dr. Doug
20  Smith to Vince Caraffi, he writes:
21    "Interesting.  Hopefully a new
22    approach that will help decrease the
23    amount of heroin on the street."
24    Do you agree that holding drug
25  dealers accountable would help decrease the

Page 248

1   amount of heroin on the street?
2    MR. BADALA:  Objection to form.
3    THE WITNESS:  I have no opinion,
4   and I have no idea who Dr. Smith is.
5    MR. RUIZ:  Okay.
6    We can take a short break?
7    THE VIDEOGRAPHER:  Off the record.
8   4:30.
9    (Recess taken.)
10    THE VIDEOGRAPHER:  We're back on
11  the record, 4:41.
12    MR. RUIZ:  And I have no further
13  questions.  I'll pass the witness.
14    THE VIDEOGRAPHER:  We're off the
15  record.  4:42.
16    (Pause.)
17    THE VIDEOGRAPHER:  We're back on
18  the record.  4:43.
19    ---
20    EXAMINATION
21   BY MS. RENDON:
22    Q.   So good afternoon, Ms. Leckler.
23  My name is Carole Rendon.  And as I mentioned
24  this morning, I represent the Endo defendants
25  in this litigation.  And so I'm just going to

Page 249

1   ask you a few additional questions.
2    And I'd just ask, as you have been
3   doing today, if you don't understand a
4   question that I've asked, please say so and I
5   will try to rephrase it, okay?
6    A.   Okay.
7    Q.   During the course of the day today
8   you've been using the word "opiate" and the
9   word "opioid," correct?
10    A.   Correct.
11    Q.   And I understand that, you know,
12  you have your own sort of personal definition
13  of what those two things mean.  But I'm
14  wondering, for example, the Cuyahoga County
15  Opiate Task Force, its work is not limited to
16  prescription drugs, is it?
17    MR. BADALA:  Objection to form.
18    THE WITNESS:  No.
19    MR. BADALA:  I'm sorry, I just
20  want to put one thing on the record
21  before we still continue.
22    If you could just put a standing
23  objection regarding Ms. Rendon
24  questioning a Cuyahoga witness.  We've
25  exchanged some letters on this before.

63 (Pages 246 - 249)

Page 250

```
1        We don't have to get into it any
2    further, but if you could just put a
3    standing objection.
4    BY MS. RENDON:
5        Q.   You've also talked about the fact
6    that in Recovery Court, a hundred percent of
7    the clients have an opiate addiction; is that
8    correct?
9        A.   They have an opioid.
10        Q.   They have an opioid addiction.
11        And with respect to the Drug
12    Court, just so I can make sure that I
13    understand, if you said that 85 percent of
14    the people in Drug Court have an opiate
15    addiction, you misspoke; you meant opioid?
16        A.   That is correct.
17        Q.   So we would basically have to go
18    back through every single question that was
19    asked and answered to figure out when you
20    said opiate, if you meant only prescription
21    drugs, or if you meant both prescription and
22    illegal drugs; is that correct?
23        A.   Okay.
24        MR. BADALA:  Objection to form.
25
```

Page 251

```
1        THE WITNESS:  Okay.  I'm ready.
2    BY MS. RENDON:
3        Q.   I think it would take us an
4    awfully long time to do that.
5        But I think maybe what we'll do is
6    we'll take a break at some point and maybe
7    pull out a dozen or so questions and make
8    sure that we can go back, because I think
9    there has been a significant amount of
10    confusion today on the record on that issue.
11        You talked about one of the
12    judges, I believe it was Judge Matia in
13    Drug Court, asking the participants to raise
14    their hand if they're addicted to an opiate
15    or an opioid?
16        MR. BADALA:  Objection to form.
17    Asked and answered.
18        THE WITNESS:  I believe I said
19    "we."  I didn't say Judge Matia.  I said
20    "Judge Matia would then ask..."  But I
21    said "we."  "We would ask."
22    BY MS. RENDON:
23        Q.   "We would ask" what?
24        A.   We would ask clients to raise
25    their hand if they suffered from opioid use.
```

Page 252

```
1        Q.   And you said that the majority
2    would raise their hand; is that correct?
3        A.   That is correct.
4        Q.   And then the follow-up question
5    from Judge Matia would be what?
6        A.   Would be, "Keep your hand raised
7    if you started by way of prescription
8    medication."
9        Q.   And is there a third question
10    that's asked after those people keep their
11    hand up, or is that the end of the
12    questioning?
13        A.   That is the end of the question.
14        Q.   So Judge Matia doesn't ask, "Keep
15    your hand up if that prescription was given
16    to you for a medically necessary purpose by a
17    legitimate doctor"?
18        MR. BADALA:  Objection to form.
19        THE WITNESS:  No, it does -- no,
20    we do not.
21    BY MS. RENDON:
22        Q.   And nobody asks them to keep their
23    hands in the air if they took a legitimate,
24    medically-necessary prescription as
25    prescribed?
```

Page 253

```
1        MR. BADALA:  Objection to form.
2        THE WITNESS:  I'm sorry.  Say that
3    again.
4    BY MS. RENDON:
5        Q.   And nobody also asked the
6    follow-up question to keep their hand in the
7    air if they took a medically-necessary,
8    legitimate prescription, only as directed?
9        MR. BADALA:  Objection to form.
10        THE WITNESS:  No.
11    BY MS. RENDON:
12        Q.   So the only question is, "Was it a
13    prescription?"  Is that right?
14        MR. BADALA:  Objection to form.
15        THE WITNESS:  Yes.
16    BY MS. RENDON:
17        Q.   Does anybody ask the participants
18    when they have their hand in the air whether
19    they got those prescription opioids from a
20    drug dealer as opposed to a doctor?
21        A.   Say that again.
22        (The reporter read back where
23    requested.)
24        MR. BADALA:  Objection to form.
25        THE WITNESS:  No.  Because, like I
```

64 (Pages 250 - 253)

1     said, we stop at the last question.
2  BY MS. RENDON:
3     Q.   So there's no delving into the
4  source of the prescription medication,
5  correct?
6         MR. BADALA:  Objection to form.
7         THE WITNESS:  No.
8  BY MS. RENDON:
9     Q.   Do you have any information as to
10  what type of prescription drugs those
11  individuals who still have their hand in the
12  air were taking?
13     A.   Do I have any information in
14  reference to the types of drugs --
15     Q.   Yeah.
16     A.   -- that were being prescribed?
17     Q.   So does the judge ask, "Keep your
18  hand in the air if you started by using
19  Percocet"?  "Keep your hand in the air if you
20  started by using Vicodin"?
21     A.   No.  Because, again, I said that
22  the last question is where it ends.
23     Q.   And you indicated earlier in your
24  testimony here today that 85 percent of the
25  participants in Drug Court have an opioid use

1  disorder; is that right?
2     A.   That is correct.
3     Q.   Where do you get that number from?
4     A.   An assessment.
5     Q.   Which assessment?
6     A.   The clinical assessment, the
7  second part of the eligibility process that
8  we discussed earlier.
9     Q.   So I'm glad you said that because
10  I'm obviously not being clear on my question.
11         How do you come to the
12  number "85" percent"?
13         What statistical analysis did you
14  do that allows you to say that it's
15  85 percent, as opposed to 87 percent, as
16  opposed to 62 percent?
17         MR. BADALA:  Objection to form.
18         THE WITNESS:  The gentleman had
19     asked me, would I say.  And when I think
20     of "would I say," that gives an
21     estimate.
22         So I said estimately[sic],
23     85 percent of the participants we have
24     in Drug Court are diagnosed with opioid
25     use disorder.

1  BY MS. RENDON:
2     Q.   But that's just a ballpark figure?
3     A.   That is correct.
4     Q.   But you could determine an exact
5  number if you wanted to; is that correct?
6         MR. BADALA:  Objection to form.
7         THE WITNESS:  Absolutely.
8  BY MS. RENDON:
9     Q.   And how would you go about doing
10  that?
11     A.   I would look at all the
12  assessments that we have done.
13     Q.   And when you looked at all of the
14  assessments that you had done, how would you
15  make the determination as to how many of the
16  Drug Court participants have an opioid use
17  disorder?
18     A.   In the DSM diagnosis, there is
19  codes, so you could look at the codes.
20     Q.   In the assessment form, you could
21  look at the DSM code; is that correct?
22     A.   That is correct.
23         (Cuyahoga County Common Pleas
24         Court, Case Information, Bates
25         CUYAH_002040381 through

1         CUYAH_002040408, marked as
2         Deposition Exhibit 15.)
3  BY MS. RENDON:
4     Q.   I'm showing you what's been marked
5  as Exhibit 15 for your deposition.  And as
6  you'll see at the bottom, it has a Bates
7  number, Cuyahoga 002040381 through 2040408.
8         Is that the assessment form that
9  you've been referring to?  Is that an example
10  of an assessment form?
11     A.   This is an assessment, in front of
12  me.
13     Q.   And the DSM code that you're
14  referring to, is that on page 1 under the
15  DSM-5 diagnostic codes?
16     A.   I'm sorry.  I'm a little taken
17  back because it is an assessment with a
18  client's name on it.
19     Q.   So don't refer to the client's
20  name.  I didn't --
21     A.   Okay.
22     Q.   -- refer to the client's name.
23         I just handed --
24     A.   Okay.
25     Q.   -- you a document that was

65 (Pages 254 - 257)

Page 258

1    produced by Cuyahoga County to us in this
2    litigation.
3        A.   Okay.
4        Q.   It's not our document.  It's your
5    document.
6        A.   Okay.
7        Q.   So I have no need for the
8    individual's name.
9            But do you see on the first page
10   where it says "Diagnostic Codes," is that
11   what you're referring to?
12       A.   Yes, ma'am, that is correct.
13       Q.   So this particular individual was
14   diagnosed with an opioid use disorder, a
15   cannabis use disorder, and a stimulant use
16   disorder; is that correct?
17       A.   This client is -- "opioid use
18   disorder" -- you always kind of want to say
19   "severe."  "Cannabis use disorder, severe.
20   Stimulant use disorder, mild."
21       Q.   So this particular individual has
22   a severe disorder that involves more than one
23   drug?
24       A.   That is correct.
25       Q.   Both an opioid and cannabis?

Page 259

1        A.   That is correct.
2        Q.   Do you know what opioid is
3    involved with this particular individual?
4        A.   I would have to read through the
5    assessment.
6        Q.   Because you can't tell, because
7    whether it's prescription drugs or, for
8    example, heroin, it's the same code; is that
9    right?
10       A.   It is the same code.  It is the
11   same form of treatment.
12       Q.   And so there's no way to just, by
13   looking at the code, figure out whether or
14   not somebody has ever used, let alone, abused
15   a prescription drug; is that right?
16       A.   From the assessment, that is
17   correct.
18       Q.   So let me draw your attention to
19   the page, it's page 3.  The Bates Number at
20   the bottom is 2040383.
21           And I'll direct your attention to
22   the first paragraph -- no, second -- first
23   sentence of the second full paragraph.
24           And do you see there where it
25   says, "The client states that he first used

Page 260

1    heroin at age 16 and first used prescription
2    opiates at age 17"?
3            Did I read that correctly?
4        A.   You did.
5        Q.   And so with this particular
6    individual, he didn't -- or she didn't start
7    with a prescription opioid, their first drug
8    of abuse was heroin; is that correct?
9            MR. BADALA:  Objection to form.
10           THE WITNESS:  Their first drug of
11   use -- I would have to look at the other
12   diagnoses and see -- the other DSM.
13           I believe it says here that he
14   started using marijuana at the age of
15   13.  And I'd have to read through to
16   determine the cocaine, what age that
17   started.
18           So if you talk about substance
19   use, I would have to look at all the
20   substance use, since he uses multiple
21   substances.
22   BY MS. RENDON:
23       Q.   So based on this, it appears that
24   he started using marijuana at age 13 --
25       A.   Let me read the cocaine.  I didn't

Page 261

1    read the cocaine.
2        Q.   Okay.
3        A.   (Reviewing document.)
4            That is correct.  It does --
5        Q.   And when did he report that he
6    started using cocaine?
7        A.   At the age of 14.
8        Q.   And heroin?
9        A.   At the age of 16.
10       Q.   And prescription drugs?
11       A.   At the age of 17.
12       Q.   And so if you were going to do the
13   analysis that we were talking about, you
14   would have to take every one of these
15   assessments that had that diagnostic code for
16   opioid use disorder and read through it to
17   find out if the individual first used a
18   prescription opioid or first used an illegal
19   opioid; is that correct?
20       A.   I'm sorry.  You said a lot in one
21   sentence.  Can you please say that again?
22       Q.   Sure.
23           To do the statistical analysis
24   that we were talking about, to get you to an
25   exact number of Drug Court participants who

66 (Pages 258 - 261)

Page 262

1  began with the misuse or use of a
2  prescription opioid, you would have to not
3  look at the DSM code; you would have to pull
4  everyone who has a diagnostic code for opioid
5  use disorder, correct?
6      A.   That is correct.
7      Q.   And then you would have to read
8  through every one of those assessments, like
9  we just did with Exhibit 15, to see whether
10  the first drug that they used was heroin or
11  prescription drugs, correct?
12      A.   That is correct.
13      Q.   Or to see if they ever even used
14  prescription drugs?
15      A.   That is correct.
16      Q.   How would you know, for example,
17  with the individual whose assessment is
18  Exhibit 15, whether the prescription opiates
19  that this individual used were given to him
20  by a doctor for a legitimate medical need?
21      MR. BADALA:   Objection to form.
22      THE WITNESS:   I would have to read
23   through the assessment and see if
24   there's any indication.
25

Page 263

1  BY MS. RENDON:
2      Q.   So go ahead and take a second to
3  do that.
4      A.   Do you want me to read it out
5  loud?
6      Q.   No.
7      A.   (Reviewing document.)
8        Okay.  Go ahead with the question.
9      Q.   Is there any indication in this
10  individual's assessment that the prescription
11  opioids he reported using were given to him
12  by a medical doctor for a legitimate medical
13  purpose?
14      MR. BADALA:   Objection to form.
15      THE WITNESS:   I would have to read
16   through the whole assessment.
17  BY MS. RENDON:
18      Q.   In the section that talks about
19  the diagnosis for opioid use disorder, is
20  there any indication of that fact?
21      MR. BADALA:   Objection to form.
22      THE WITNESS:   No, there is not.
23  BY MS. RENDON:
24      Q.   Isn't another way to determine
25  whether or not this individual received a

Page 264

1  prescription for opioids, as opposed to
2  obtaining them illegally, to check the OARRS
3  database?
4      A.   If it was properly entered into
5  the OARRS, yes.
6      Q.   And as you understand it, the
7  OARRS database is supposed to contain all
8  prescription opioids when prescribed by a
9  medical doctor, correct?
10      MR. BADALA:   Objection to form.
11      THE WITNESS:   I believe so.
12  BY MS. RENDON:
13      Q.   And also when prescribed by other
14  medical professionals -- excuse me -- who
15  have a DEA registration and are authorized to
16  prescribe opioids, right?
17        It's not just medical doctors;
18  dentists, for example, can prescribe opioids?
19      MR. BADALA:   Objection to form.
20      THE WITNESS:   You would have to
21   say it again, I'm sorry.
22        Sorry, you said the DEA --
23  BY MS. RENDON:
24      Q.   So you understand that in order to
25  prescribe an opioid or other controlled

Page 265

1  substance, you have to be licensed and
2  registered with the DEA in order to do that?
3      MR. BADALA:   Objection to form.
4      THE WITNESS:   I do not know.
5  BY MS. RENDON:
6      Q.   You know that if you checked
7  the OARRS database, you would be able to put
8  this individual's name in the database and
9  see whether or not there was a legitimate
10  prescription for an opioid listed anywhere in
11  that database, correct?
12      MR. BADALA:   Objection to form.
13      MS. RENDON:   Can I ask what was
14   the problem with the form of that
15   question?
16      MR. BADALA:   It's vague and
17   ambiguous, the words, "medically
18   necessary."  She's already testified.
19   Foundation, she's not a doctor.  I can
20   keep going.
21      MS. RENDON:   Okay.  So I'm just
22   using the terminology from the
23   complaint.
24      MR. BADALA:   Well, it's not her
25   words.  She didn't draft the complaint,

67 (Pages 262 - 265)

Page 266

1    so we can keep going through it.
2        MS. RENDON:  She apparently hasn't
3    even read the complaint.
4    BY MS. RENDON:
5        Q.   So, Ms. Leckler, let me put it
6    this way.  You understand that in the OARRS
7    database you can check to see whether or not
8    somebody received a prescription for opioids,
9    correct?
10       A.   Carole, this individual is 21,
11   so -- I believe he said he started using
12   prescriptions at 17.  So I cannot answer that
13   because I do not know how far back the OARRS
14   report goes, so I do not know.
15       Q.   You do know that there is
16   information that you can obtain in the OARRS
17   database regarding prescription opioids,
18   correct?
19       MR. BADALA:  Objection to form.
20       THE WITNESS:  Yes.
21   BY MS. RENDON:
22       Q.   And if anybody had checked
23   the OARRS database with respect to this
24   individual, it would be in this assessment,
25   correct?

Page 267

1        MR. BADALA:  Objection to form.
2        THE WITNESS:  No.  Because, like I
3    said, the TASC case managers do not have
4    authority to do an OARRS report.
5        I had stated before that is in the
6    second part process, and that's done by
7    the probation staff.
8        And I do not know -- I'm not an
9    OARRS expert.  I do not know how far
10   back it goes, so I don't know if we
11   would be able to look back and see that
12   when he started using opiates at the age
13   of 17, if it would come up in an OARRS
14   report.  I'm sorry.  I do not know that
15   answer.
16   BY MS. RENDON:
17       Q.   And that's true for the entire
18   population of the Drug Court; isn't that
19   correct?
20       MR. BADALA:  Objection to form.
21       THE WITNESS:  I don't know.  I do
22   not know because I'm not an OARRS
23   expert.
24   BY MS. RENDON:
25       Q.   No.  So that's what I'm saying.

Page 268

1        When you say 85 percent of the
2    people in the Drug Court have an opioid use
3    disorder; and, of that group, some subset you
4    believe used a prescription opioid, you have
5    no idea of that universe of Drug Court
6    participants, how many of them had a
7    prescription for an opioid, correct?
8        MR. BADALA:  Objection to form.
9        THE WITNESS:  That is correct.
10   BY MS. RENDON:
11       Q.   You have no idea what percentage
12   of them never had a legitimate prescription,
13   they just bought them from a dealer on the
14   street, right?
15       MR. BADALA:  Objection, form.
16       THE WITNESS:  I have no idea.
17   BY MS. RENDON:
18       Q.   And you have no idea how many of
19   them just took them out of their parents'
20   medicine cabinet?
21       A.   I have no idea, no.
22       Q.   So that universe of people in the
23   Drug Court who have an opioid use disorder
24   that had some connection to a prescription
25   opioid, you would have to do a lot of work to

Page 269

1    figure out how many of those people ever had
2    a prescription for an opioid, correct?
3        MR. BADALA:  Objection to form.
4        THE WITNESS:  The universe of
5    people?  I don't know.
6    BY MS. RENDON:
7        Q.   How would you go about determining
8    how many current clients in the Drug Court
9    ever had a legitimate prescription for an
10   opioid?
11       MR. BADALA:  Objection to form.
12       THE WITNESS:  How would I
13   determine if any individuals currently
14   in the Drug Court program have ever
15   legitimately had a prescription for
16   narcotics?
17       It would be impossible because the
18   OARRS didn't always exist.  If I had an
19   individual that was 51 years old, it
20   would be impossible for me to, for a
21   fact, determine if they had ever been
22   given prescription narcotics.
23   BY MS. RENDON:
24       Q.   So there's literally no way to
25   figure out the answer to that question; is

68 (Pages 266 - 269)

Page 270

1  that right?
2       MR. BADALA:  Objection to form.
3       THE WITNESS:  There's no way for
4  me to figure out the answer to that
5  question.
6  BY MS. RENDON:
7       Q.   Are you aware of anybody else who
8  would have the ability to figure out the
9  answer to that question?
10      A.   I am not.
11      Q.   You were shown not too long ago
12 Exhibit 13, which I think is still in front
13 of you.  It's an email chain from
14 October 10th of 2017.
15      If you could pull that back out
16 again.
17      MR. BADALA:  What exhibit?
18      MS. RENDON:  13.
19      A.   This is the email from Lou Lamarca
20 again?
21      Q.   Correct.  You work with
22 Lou Lamarca, correct?
23      A.   Yes.
24      Q.   Did you ever contact him and
25 question his statement in this email that "it

Page 271

1  is rare for one of our clients to have
2  started with a medically-necessary opioid
3  prescription"?
4       MR. BADALA:  Objection to form.
5       THE WITNESS:  No.
6  BY MS. RENDON:
7       Q.   Did you ever have any conversation
8  with Mr. Lamarca about his statement in this
9  email?
10      A.   I did not.
11      Q.   Did you ever tell him that your
12 understanding of the population of the Drug
13 Court was inconsistent with what he said here
14 in this email?
15      A.   I did not.
16      Q.   The prior email in the email chain
17 came from Tom Tallman, who you also work
18 with, correct?
19      A.   It's Dr. Tallman.
20      Q.   Dr. Tallman.
21      A.   Yes.
22      Q.   I said "Tom Tallman."  That's his
23 first name, right?
24      A.   That is correct.
25      Q.   Did you ever contact Dr. Tallman

Page 272

1  and discuss with him the statement in his
2  email that, "Although it's a small sample
3  size, out of approximately 150 patients" --
4  that he saw -- "a majority began using
5  opioids just for recreational purposes"?
6       A.   I did not.
7       And, Carole, I don't recall
8  reading this email when it came across my
9  email feed.
10      Q.   And that's fine.
11      A.   Okay.
12      Q.   I'm just asking if you ever had
13 any conversation with him about it.
14      Did you ever contact him to let
15 him know that this was inconsistent with your
16 understanding of the population of the
17 Drug Court?
18      A.   I did not.
19      Q.   And the Drug Court size is about
20 the same size as the population that
21 Dr. Tallman was looking at, about 150 people?
22      A.   I did not write it.  I do not
23 know.
24      Q.   No.  I'm just asking you -- not
25 about the email.  Assuming that his statement

Page 273

1  is accurate, that his sample size was 150,
2  that's similar in size to the number of
3  clients in the Drug Court, correct?
4       A.   In the Drug Court program, around
5  about, yes.
6       Q.   That's all I was asking, those are
7  two similar sizes of people?
8       A.   Two similar numbers, yes.
9  Coincidentally, yes.
10      Q.   And then, lastly, the email that
11 started this email chain from Mr. Caraffi.
12      Did you ever have a conversation
13 with Mr. Caraffi about this email and the
14 study that he forwarded onto this group?
15      A.   No.  Because like I said, I do not
16 recall reading through this email.
17      Q.   And did you ever have a
18 conversation with Mr. Caraffi in which you
19 discussed with him the fact that you thought
20 a much higher percentage of the population of
21 the Drug Court population may have started
22 with prescription opioids than is reflected
23 in this email chain?
24      A.   I did not.
25      Q.   Did you ever have a conversation

69 (Pages 270 - 273)

Page 274

1   with Dr. Gilson about that?
2       A.   I did not.
3       Q.   We spent a lot of time today
4   talking about sort of the Drug Court and when
5   it started and how it's developed over time.
6           You were there on day one; is that
7   right?
8       A.   That is correct.
9       Q.   In fact, you were there before day
10  one, because you were working for the
11  Cleveland Drug Court before the county even
12  had its own Drug Court?
13      A.   I was not -- I was there in
14  County's day one, not Cleveland's.  No.
15      Q.   No.  But, I mean, you were
16  involved in a Drug Court program in the
17  county, that being the City of Cleveland's
18  Drug Court program, before the county even
19  had its own county-wide Drug Court?
20      A.   That is correct.
21          (Email chain, RE: Drug Court,
22          Bates CUYAH_010715371 through
23          010715372, marked as Deposition
24          Exhibit 16.)
25

Page 275

1   BY MS. RENDON:
2       Q.   I'm showing you what has been
3   marked as Exhibit 16 for your deposition.
4   And this is another email chain.
5           At the bottom, it bears the Bates
6   stamp CUYAH_010715371, and the backside is
7   15372.  And I'm going to just direct your
8   attention to the front side of this email
9   chain.
10          You've already identified who
11  Greg Popovich is.  You've already identified
12  who Dan Peterca is, correct?
13      A.   That is correct.
14      Q.   And those are the same
15  Greg Popovich and Dan Peterca in this email
16  chain?
17      A.   I believe so.
18      Q.   And there is an indication in the
19  email that's on the bottom half of the front
20  side of this email that there's going to be
21  an application for SAMHSA Drug Court funding;
22  is that right?
23          Do you see that?  "The folks
24  copied on this email" --
25      A.   Yes.  I'm sorry.

Page 276

1       Q.   -- "and I met this morning to
2   review our options to respond to our SAMHSA
3   Drug Court award."
4       A.   Yeah, I'm sorry.  I was still
5   reading it.
6       Q.   Oh, I apologize.  Tell me when
7   you're ready.
8       A.   And you want me to read the last
9   paragraph?
10      Q.   No.  I was just going to ask you a
11  question about the email at the bottom --
12  right here at the bottom of the first page.
13      A.   Okay.  Let me read it through then
14  first.
15      Q.   Okay.
16      A.   (Reviewing document.)  Okay.
17      Q.   Okay.
18          So that email is dated
19  October 25th of 2010; is that correct?
20      A.   That is correct.
21      Q.   And Dan Peterca indicated that, in
22  the Drug Court award:
23          "We explain that in the last six
24          months, the felony Drug Court has
25          seen a dramatic rise in candidates

Page 277

1   with a heroin and opiate diagnoses."
2           It's not grammatically correct,
3   but I read it exactly as it's there, correct?
4       A.   That is correct.
5       Q.   And the felony Drug Court is the
6   County Drug Court?
7       A.   That is correct.
8       Q.   And that's the court where you're
9   the administrator?
10      A.   I'm the coordinator, correct.
11      Q.   Coordinator.
12          And so, as the coordinator of the
13  felony Drug Court in October of 2010, is your
14  memory consistent with what Mr. Peterca wrote
15  in this email at that time that in the prior
16  six months, the felony Drug Court had seen a
17  dramatic rise in candidates with a heroin and
18  opiate diagnosis?
19          MR. BADALA:  Objection to form.
20          THE WITNESS:  Yes.
21  BY MS. RENDON:
22      Q.   And at if top of this email chain,
23  there's an email from Greg Popovich, same
24  day, just a little later in the day, in which
25  he replies and says:

70 (Pages 274 - 277)

1      "Thanks Dan!  Focus on
2   heroin/opiate users and providing
3   medications/treatment is a good
4   change."
5         Do you see that?
6      A.   Yes, I do.
7      Q.   And, again, as the coordinator of
8   the felony Drug Court program, do you -- is
9   that consistent with your view of the felony
10  Drug Court in October of 2010?
11     A.   Yes.
12     Q.   We also talked a little bit today
13  about medically-assisted treatment.
14        What is your understanding of
15  medically-assisted treatment, if you have
16  one?
17     A.   Well, I'm not a doctor, but we use
18  medication-assisted treatment in our
19  programs.
20     Q.   And as the coordinator of the Drug
21  Court, have you seen the medically-assisted
22  treatment to be effective or ineffective with
23  your client base?
24        MR. BADALA:  Objection to form.
25        THE WITNESS:  I am still waiting

1   for the overall ATP evaluation to be
2   determined, so I cannot say the impact
3   that it has had on the program yet.
4        I do know that is the SAMHSA
5   evidence-based standard.
6   BY MS. RENDON:
7      Q.   What is the SAMHSA evidence-based
8   standard?
9      A.   So basically the SAMHSA, Substance
10  Abuse and Mental Health agencies, has
11  recommended practices, and that is one of
12  their recommendations, that their
13  evidence-based model is that those do much
14  better when they have treatment, support, and
15  medication, as opposed to just treatment and
16  support, or one of those three things.
17     Q.   And Judge Matia was in favor of
18  inmates getting Vivitrol in the jail before
19  they were released, was he not?
20        MR. BADALA:  Objection to form.
21        THE WITNESS:  Both Judge Matia and
22     Judge Synenberg were both, yes.
23  BY MS. RENDON:
24     Q.   And you know that because you were
25  in meetings when they expressed that opinion;

1   is that correct?
2      A.   That is correct.
3      Q.   There was some delay in the
4   county's ability to actually get Vivitrol for
5   jail inmates; is that right?
6      A.   There has been a delay to get
7   medication-assisted treatment across the
8   county, in general, not just in the county
9   jail.
10     Q.   Why is that?
11     A.   So I don't really necessarily have
12  a definition of why.  It appears, in my
13  conversations with those that work for
14  different agencies, is they are very 12-step,
15  community-based, very old school way of
16  treatment.
17        So it has taken a lot of
18  education.  It's taken a lot of training for
19  the community to understand what's going on,
20  why our ERs are flooded, why there's a
21  significant increase in overdoses every year,
22  and what they're dealing with on their
23  treatment episodes of those, not just Drug
24  Court related, why they keep coming back to
25  treatment.

1        I could go on and on.
2      Q.   So there's a lack of education is
3   one of the big problems; is that right?
4      A.   There's a lack in education.
5   There also was a lack of buy-in.
6        I think sometimes when you start
7   something new, it can be a little scary,
8   so -- I can talk a lot about it, only because
9   I have worked for so many years on trying to,
10  you know, help the agencies, help everyone
11  figure out what we can do to combat what's
12  going on.
13     Q.   And medically-assisted treatment
14  is one of those things that could be done to
15  combat what's going on; is that correct?
16        MR. BADALA:  Objection to form.
17        THE WITNESS:  It's the standard.
18  BY MS. RENDON:
19     Q.   It's the evidence-based standard?
20     A.   That is correct.
21     Q.   And so if it was more readily
22  available, more people could get more
23  effective treatment; is that correct?
24        MR. BADALA:  Objection to form.
25        THE WITNESS:  If it's more readily

71 (Pages 278 - 281)

Page 282

available, yes.
BY MS. RENDON:
Q. And that's why both Judge Synenberg and Judge Matia wanted people leaving the jail to be able to get Vivitrol as the first step in medically-assisted treatment; is that right?
A. There is one medication. They also recommended Suboxone or subutex.
Q. But a medically-assisted --
A. A medically --
Q. -- treatment was very important to them?
A. That is correct.
(Email chain, Vivitrol Jail Shots, Bates CUYAH_002051005 through CUYAH_002051007, marked as Deposition Exhibit 17.)
BY MS. RENDON:
Q. I'm going to show you what has been marked as Exhibit 17 for your deposition. It's an email chain.
First of all, it's Bates-stamped CUYAH_002051005 through 1007.
A. Okay.

Page 283

Q. And just directing your attention, first, to the email on the very first page, the last email on the string because they always go backwards in chronological order.
A. Uh-huh.
Q. It's dated 5/3/2016.
Do you see that, at the very top of that first page?
A. I do.
Q. And do you see that you were copied on that email chain?
A. I do.
Q. Do you have any reason to believe you didn't receive the email?
A. No.
Q. Do you recall this particular email?
A. Let me read through it.
Q. Okay.
A. (Reviewing document.)
So this email is something that happened after we started. This email is in regards to after the jail medication-assisted treatment program that Judge Matia and I started with the jail.

Page 284

Q. Well, if you would look at the email on the first page, the one at the top, the latest -- the last one in the string.
A. Uh-huh.
Q. And just let me know if I'm reading this correctly.
This is an email from Judge David Matia to Dr. Tallman, correct?
A. Uh-huh.
Q. You have to say "yes" or "no" for the record.
A. Yes, sorry.
Q. And you were copied on this email, correct?
A. Yes.
Q. And in the second paragraph, Judge Matia writes:
"I am finding it difficult to remain patient regarding our rollout of Vivitrol. Many jails around the state have been using it. I know that Butler County and Lucas County both have programs.
"Also, I spoke with Dr. Jerry about your concerns, and he indicated that he would be glad to speak with you about a planned protocol."

Page 285

Do you see that?
A. I do.
Q. And then in the very last phrase on the next paragraph, Judge Matia writes:
"Cuyahoga County is far behind other areas in the state in its adoption of MAT."
Did I read that correctly?
A. That is correct.
Q. And so does that refresh your recollection that the Vivitrol program in the jail had not yet begun as of the date of this email? It had been announced, but not yet implemented.
A. Well, we had been working on it.
If you refer to, I believe it's stated later on in the email. I believe -- yeah. So it is the second paragraph:
"Molly Leckler and myself have met with Dr. Tallman of Metro Hospital in the County Jail. He is working on a protocol."
Basically we had already started

Page 286

1  implementing that we needed to do to start
2  the program.
3      Q.   But you hadn't yet started giving
4  inmates Vivitrol at this point, had you?
5      A.   No.
6      Q.   Do you know when that program
7  actually started, where inmates were actually
8  receiving Vivitrol?
9      A.   I do not recall the exact date.
10     Q.   Do you know what year?
11     A.   I do not.
12     Q.   Is there a document that you would
13  have that would allow you to determine that?
14     A.   There would be invoices from
15  MetroHealth Medical Center, so, yes.
16     Q.   And to whom would those invoices
17  be addressed?
18     A.   They would be addressed to the
19  county, because they were paid for by county
20  moneys.
21     Q.   So if we could find those
22  invoices, we could find when the Vivitrol was
23  actually starting to be administered to the
24  patients in the jail; is that right?
25     A.   Absolutely.

Page 287

1      Q.   And does that continue to this
2  day?
3      A.   Thankfully, yes.
4      Q.   And do you agree with
5  Judge Matia's assessment that
6  medication-assisted treatment is a vital tool
7  in the fight against addiction?
8      A.   It's his opinion, not mine.
9      Q.   I wasn't asking if that was your
10  opinion. I mean, I understand that -- you're
11  saying that that is not your opinion? You
12  disagree with him?
13     A.   I don't know if I would word it
14  like that. That's his words, not mine.
15         I'm sorry. I should have phrased
16  it that way.
17     Q.   Do you, yourself, as both the
18  coordinator of the Drug Court and the
19  Recovery Court, think that medically-assisted
20  treatment is an important tool in treating
21  people with an opioid use disorder?
22         MR. BADALA: Objection to form.
23         THE WITNESS: It is one of the
24     important tools.
25

Page 288

1  BY MS. RENDON:
2      Q.   And as you said, it is part of the
3  evidence-based practice that SAMHSA supports?
4      A.   Again, it is one of the important
5  tools that SAMHSA recommends.
6      Q.   We had a conversation earlier
7  about the IMD exclusion and the limit on the
8  number of treatment beds that a facility can
9  have.
10         Do you recall that?
11     A.   I do.
12     Q.   And is it your testimony that
13  eliminating the IMD exclusion was not
14  important?
15         MR. BADALA: Objection to form.
16  BY MS. RENDON:
17     Q.   Here's what I'm trying to figure
18  out.
19     A.   Thank you.
20     Q.   I'll just ask you straight up.
21         So the IMD exclusion was in place.
22  And you were at a lot of meetings where
23  people were talking about it; is that right?
24         MR. BADALA: Objection to form.
25         THE WITNESS: Yes. I believe I

Page 289

1  was at meetings.
2      I believe we talked about it at
3  the Opiate Task Force. We talked about
4  it at the advisory board. It is
5  something that I know that Judge Matia
6  had expressed concern.
7      I was not a part of the other task
8  force, but I'm sure -- I don't know. I
9  know it's something that Judge Matia was
10  discussing with a lot of partners.
11  BY MS. RENDON:
12     Q.   When you say "the other task
13  force," to which task force are you
14  referring?
15     A.   There's another task force that I
16  was not a part of.
17     Q.   And do you know the name of that
18  task force?
19     A.   I believe that's the one that you
20  were involved in, the US Attorney's --
21     Q.   Are you referring to the
22  US Attorney's --
23     A.   Correct.
24     Q.   -- Heroin and Opioid Task Force?
25     A.   Correct.

73 (Pages 286 - 289)

Page 290

1     Q.    So you were not involved in that
2  at all?
3     A.    I was not.
4     I know that Judge Matia always
5  came to my office after he was done with that
6  task force.
7     Q.    And -- but you were at meetings in
8  your own advisory board and the Cuyahoga
9  County Opiate Task Force where the issue of
10 the IMD exclusion was being discussed; is
11 that correct?
12    A.    That is correct.
13    Q.    And are you aware that a number of
14 individuals involved in the advisory board
15 were working on legislation to try to repeal
16 that IMD exclusion?
17    A.    I do not know.
18        (Advisory Board Meeting Minutes,
19        2/18/16, Bates CUYAH_000117444
20        through 000117449, marked as
21        Deposition Exhibit 18.)
22 BY MR. RUIZ:
23    Q.    Let me show you Exhibit 18.
24        These are advisory board minutes
25 from February 18th of 2016.  And they bear

Page 291

1  Bates Number CUYAH_000117444 through 117449.
2        And without making you read the
3  entire set of minutes --
4     A.    Thank you.
5     Q.    -- those are -- that's the form of
6  the minutes of the advisory board that you're
7  accustomed to seeing, correct?
8     A.    Yes.
9     Q.    And if you look at the very first
10 page where it says "members present," you're
11 listed.  Is that right?
12    A.    Yes.
13    Q.    So do you have any reason to
14 believe you were not at this meeting?
15    A.    I have reason to believe I was at
16 the meeting.  I do at times step out of the
17 meeting.
18        There is about 150 people that
19 show up about an hour after this meeting and
20 I do have to coordinate the graduation.  So
21 sometimes I do have to step out of the
22 meeting.
23    Q.    But you also receive copies of the
24 minutes after the meeting as a member of the
25 advisory board; is that correct?

Page 292

1     A.    I typically receive copies of the
2  minutes about a week before the next
3  scheduled meeting.
4     Q.    So directing your attention to the
5  second page, bears Bates Number 117445.
6     A.    Uh-huh.
7     Q.    There is a description of a
8  discussion regarding the IMD exclusion on
9  that second page.
10        Do you see that?
11    A.    I do.
12    Q.    And there are questions
13 surrounding how the IMD is impacting access
14 to treatment because the need is outweighing
15 available beds.
16        Do you see that statement?
17    A.    Yes.  This was a presentation by
18 Ed Stockhausen, and he presented like an IMD
19 101 about what it is, what it does.
20    Q.    And you recall that presentation?
21    A.    I do.
22    Q.    So you have -- now looking at
23 this, you have reason --
24    A.    Yes.
25    Q.    -- to believe you were in the room

Page 293

1  when this discussion was taking place; is
2  that right?
3     A.    Yes.  Because I organized the --
4  his laptop to connect to the, you know,
5  projector.
6     Q.    So he could show a PowerPoint?
7     A.    That is correct.
8     Q.    And directing your attention to a
9  statement -- the second to the last statement
10 at the bottom of that page.  It says:
11        "Judge Matia stated the Drug
12        Court is fighting for treatment beds
13        because there is not enough."
14        Did I read that correctly?
15    A.    That is correct.
16    Q.    And does that comport with your
17 memory of what Judge Matia was doing in
18 February of 2016?
19        MR. BADALA:  Objection to form.
20        THE WITNESS:  I'm not Judge Matia,
21 so I don't know exactly what he was
22 doing.
23        Are you asking at this meeting
24 what did he say?
25

74 (Pages 290 - 293)

BY MS. RENDON:

Q.   No.

I'm asking you, in or around February of 2016 -- because you were working with Judge Matia as the coordinator of the Drug Court.  Was he, in fact -- was the Drug Court, not Judge Matia, but was the Drug Court, as he stated, fighting for treatment beds because there is not enough?

A.   That is correct.

Q.   And more treatment beds are important because a lot of people need inpatient treatment; is that right?

A.   Yes.  However, there's many different types of treatment beds.

Q.   And so the treatment beds that the Drug Court was fighting for in February of 2016, what type of treatment beds were those?

A.   All beds.

Q.   And by all beds, what do you mean?

A.   I mean, beds at CATS, beds at Stella, beds at some of our community peer-run facilities, like the Lantern, Absolute House, Ed Keating Center, Jean Marie.

Q.   So both inpatient and intensive outpatient?

A.   They're all inpatient, but just different types of beds.

Q.   Okay.

And more beds would be helpful because then more people who needed inpatient treatment could get that kind of treatment; is that correct?

MR. BADALA:  Objection to form.

THE WITNESS:  I don't know.

BY MS. RENDON:

Q.   Well, why was the Drug Court fighting for more beds?

A.   Because we want more beds for the community, not just for Drug Court.

Q.   More beds for the community to do what with?

A.   Hopefully people will fill them up.

Q.   What people?

A.   People that are addicted.

Q.   And so I go back to my question.

You were fighting for more treatment beds --

A.   Uh-huh.

Q.   -- because you needed -- because having treatment available is important to help people who have an opioid use disorder; is that correct?

MR. BADALA:  Objection to form.

THE WITNESS:  That is correct.

BY MS. RENDON:

Q.   And so if the county had more treatment beds available, more people could be effectively treated; is that right?

MR. BADALA:  Objection to form.

THE WITNESS:  That's just one part.

BY MS. RENDON:

Q.   But it is a part?

A.   It is a part.

Q.   That's all I'm asking.

A.   Okay.

Q.   I'm not suggesting by my question that it's the total solution to the problem.

A.   Perfect.

Q.   But it's something you were fighting for because it was important?

MR. BADALA:  Objection to form.

THE WITNESS:  It was something that Judge Matia, on behalf of the Drug Court program, was pushing.  I personally did not go out into the community and speak about the IMD role.

BY MS. RENDON:

Q.   I didn't suggest you were.

A.   Okay.

Q.   Did you disagree with the fact that Judge Matia was pushing for more treatment beds on behalf of the Drug Court?

A.   I never disagree with my boss.

Q.   I'm not asking whether you did so out loud.

But internally, did you think he was wrong, or did you think he needed more treatment beds?  You were the program -- you are the program coordinator.

A.   No.

Q.   No what?

A.   No.  I did not disagree with him.

THE VIDEOGRAPHER:  Can I change media?

MS. RENDON:  Sure.

THE VIDEOGRAPHER:  Off record,

Page 298

1     5:31.
2          (Recess taken, 5:31 p.m. through
3     5:38 p.m.)
4          THE VIDEOGRAPHER:  Back on the
5     record.  5:38.
6     BY MS. RENDON:
7     Q.   Going back to the question I asked
8     you earlier about opiate and opioid and when
9     you were using them today.  And doing this,
10    obviously, without having the transcript in
11    front of us, you talked earlier today about a
12    Smart Ohio money grant.
13         Do you remember that question?
14    A.   I do.
15    Q.   And was that grant limited to
16    prescription opioids or was that for all
17    opioids?
18    A.   That was for all opioids.
19    Q.   So if you referred to it and used
20    the term "opiate," that would have been a
21    misstatement, you really meant opioids; is
22    that right?
23         MR. BADALA:  Objection to form.
24         THE WITNESS:  That is correct.
25

Page 299

1     BY MS. RENDON:
2     Q.   And the same is true -- you talked
3     about an expansion of the Drug Court to an
4     additional afternoon session.
5          Do you recall that testimony?
6     A.   Yes.
7     Q.   And the people in that afternoon
8     session, that expansion was because there
9     were more people with an opioid-use disorder;
10    is that correct?
11    A.   That is correct.
12         (Interruption in proceedings.)
13    BY MS. RENDON:
14    Q.   So, again, if you were talking
15    about that afternoon Drug Court session and
16    using the word "opiate," that would have been
17    a misstatement.  You meant opioids; is that
18    right?
19         MR. BADALA:  Objection to form.
20         THE WITNESS:  That is correct,
21    like we stated previously.
22    BY MS. RENDON:
23    Q.   So let me just ask you straight
24    out.  The afternoon Drug Court session, is
25    that for -- is that limited to people with a

Page 300

1     use disorder that only involves prescription
2     opioids?
3     A.   No.
4     Q.   And is the Smart Ohio money grant
5     limited only to helping people who have a use
6     disorder associated with prescription
7     opioids?
8     A.   No.
9     Q.   You talked about the
10    Recovery Court being exclusively for people
11    with an opioid-use disorder; is that correct?
12    A.   That is correct.
13    Q.   And, again, by that we mean
14    illicit opioids, like heroin and fentanyl, or
15    it could be a prescription opioid like
16    Vicodin, correct?
17    A.   Again, yes.
18    Q.   And it could be Vicodin that the
19    person got as a result of a prescription from
20    a doctor or that they purchased from a drug
21    dealer on the street?
22         MR. BADALA:  Objection to form.
23         THE WITNESS:  That is correct.
24    BY MS. RENDON:
25    Q.   So all of those different types of

Page 301

1     access to opioids are contained -- are
2     contained in the group of people who have an
3     opioid-use disorder who are in Recovery
4     Court; is that right?
5     A.   Like we stated previously, yes.
6     Q.   When did Recovery Court become
7     limited to just people with an opioid-use
8     disorder?
9     A.   It was our most recent grant that
10    the county obtained.
11    Q.   And approximately when was that?
12    A.   That was the end of last year.
13    Q.   So anybody who entered Recovery
14    Court in 2018 should have an opioid-use
15    disorder; is that right?
16    A.   I'm trying to recall the exact --
17    I do not recall the exact month.
18    Q.   But at some point in 2018, the
19    Recovery Court should be limited to people
20    who have an opioid-use disorder; is that
21    correct?
22    A.   That is correct.
23    Q.   Was it that same grant that also
24    restricted the clients in the Recovery Court
25    to people who were involved in either human

76 (Pages 298 - 301)

Page 302

1　trafficking or commercial sex trafficking?
2　　　　MR. BADALA: Objection, form.
3　　　　THE WITNESS: I'm sorry. You said
4　　　excluded them?
5　BY MS. RENDON:
6　　　Q. So you indicated that Recovery
7　Court as a result of this grant is now
8　limited to people with an opioid-use disorder
9　and that they've suffered from some other
10　type of trauma, correct?
11　　　A. That is correct.
12　　　Q. My memory was that you described
13　that as human trafficking, but maybe I'm
14　wrong.
15　　　　MR. BADALA: Objection to form.
16　　　　THE WITNESS: You're not entirely
17　　　correct. I described it as sexual
18　　　exploitation and human trafficking.
19　BY MS. RENDON:
20　　　Q. So the people in Recovery Court
21　today either were involved in sexual
22　exploitation or human trafficking and have an
23　opioid-use disorder?
24　　　A. That is correct.
25　　　Q. And that transition happened at

Page 303

1　some point in 2018?
2　　　A. That is correct.
3　　　Q. Before that, there were more
4　people who were eligible for Recovery Court?
5　　　　MR. BADALA: Objection to form.
6　　　　THE WITNESS: There were more
7　　　people that were eligible?
8　BY MS. RENDON:
9　　　Q. So you could be eligible for
10　Recovery Court before this grant went into
11　place even if you hadn't been a victim of
12　sexual exploitation or human trafficking,
13　correct?
14　　　A. That is correct.
15　　　Q. You also talked earlier today
16　about a spreadsheet. And I don't think this
17　is the spreadsheet that you were talking
18　about, but it is a spreadsheet that was
19　produced by the County.
20　　　And unlike some of the other
21　documents that you've seen, this was produced
22　in its native format, so only the first page
23　has a Bates number, which is
24　CUYAHOGA_001714460. And the rest of what has
25　been marked as Exhibit 19 does not have any

Page 304

1　Bates numbers on it. But that's because that
2　was the way it was produced to us by the
3　County.
4　　　　(Spreadsheet, native document,
5　　　Bates CUYAH_001714460, marked as
6　　　Deposition Exhibit 19.)
7　BY MS. RENDON:
8　　　Q. So take a minute and take a look
9　at that spreadsheet, if you would.
10　　　And I'm not going to ask you to
11　read every single line, but just look through
12　it and tell me if you recognize what it is.
13　　　A. Thank you.
14　　　Yes, I --
15　　　　MR. BADALA: It hasn't been
16　　　expanded to show all the information
17　　　within it?
18　　　　MS. RENDON: We don't have paper
19　　　large enough to do that. So I'm going
20　　　to ask her some very specific questions
21　　　about the fields that we can see.
22　BY MS. RENDON:
23　　　Q. But do you recognize this as being
24　the spreadsheet of participants of
25　Recovery Court in Cuyahoga County?

Page 305

1　　　A. I do.
2　　　Q. I'm going to direct your attention
3　to just the very last page. And, again,
4　because of the way it was produced, there's
5　no Bates number on the last page, but it's
6　the last page of your Exhibit 19.
7　　　And at the top, the very first
8　date at the top is 1/3/2018.
9　　　Do you see that?
10　　　A. Yes.
11　　　Q. And the last one at the bottom is
12　June 11 of 2018.
13　　　Do you see that?
14　　　A. I do.
15　　　Q. And I don't want you to identify
16　any of the people whose names are on here,
17　but you recognize that these are current
18　Recovery Court clients, correct?
19　　　A. Let me see if it determines on
20　here which court.
21　　　Q. Well, I'll represent to you that
22　we have a separate spreadsheet that's Drug
23　Court, which I can give to you if you'd like
24　to see that one. It's much longer.
25　　　A. Yes, if it expands out. I'm just

77 (Pages 302 - 305)

Page 306

1  trying to see.  I thought that there was
2  another row that indicates which court they
3  go to.
4      Q.   It's a tab at the bottom of the
5  Excel program that tells you.
6      A.   Okay.
7      Q.   But also, I think on some of
8  them --
9      A.   Does this --
10     Q.   Do you not recognize the names of
11  the clients that will allow you to determine,
12  as you're sitting here today, whether this is
13  Recovery Court or Drug Court, if you look at
14  the column with the names of the people?
15     A.   It is.  However, there's -- not
16  everyone that's on this list was admitted.
17     Q.   So you believe these are people
18  who were assessed?
19     A.   That is correct.
20     Q.   Is there a way to tell on the
21  spreadsheet whether or not they were
22  admitted, or is that just something that you
23  know, yourself?
24     A.   I'm looking -- for example, if you
25  look down where it says 2/26/2018 and

Page 307

1  3/1/2018 --
2      Q.   Uh-huh, I see that.
3      A.   You can see, "Office showed."  You
4  tab over, you see "Closed, other.  Client
5  has" --
6      Q.   Okay.
7      A.   I believe that there's some other
8  indication determining that the client was
9  not admitted -- formally admitted into the
10  program or did not receive services.
11     Q.   So if it says "Case management,"
12  does that mean they were admitted?
13     A.   Case management?
14     Q.   If you look at the line
15  immediately above the one that you just
16  pointed out, that same column, the person
17  immediately above it, it says "Case
18  management" in that same column where you
19  read, "Closed, other."
20     A.   Okay.  Ask me the question again.
21     Q.   So you just pointed out a line of
22  a person where, in the far left-hand column,
23  it was 2/26, and then 3/01, right?
24     A.   Yes.
25     Q.   And when you followed it across,

Page 308

1  you said they were not admitted to the
2  program because it says "closed."  And I'm
3  asking you to look just one person above
4  that.
5      A.   Uh-huh.
6      Q.   And that one in that same column,
7  it says "Case management."  And my only
8  question is does that mean that person was
9  admitted into the Recovery Court program?
10     A.   I do know that individual, and I
11  do know that she was admitted.
12     Q.   Okay.
13          And immediately above that, it
14  says "Eligible pending court."
15          Do you know that individual and do
16  you know whether or not that person was
17  admitted?
18     A.   I do know that individual, and
19  that individual was admitted previously, and
20  as you see here, it says, "No treatment
21  recommended."  It's just -- that's a bad
22  example.
23     Q.   So I picked a bad one?
24     A.   Yes.
25     Q.   Okay.

Page 309

1          Look down at the far left-hand
2  column, 3/27/18.  And then the second column,
3  4/3/18.  Do you know that person?
4      A.   3/27, yes.
5      Q.   And was that person admitted into
6  the Recovery Court?
7      A.   No.
8      Q.   And looking down, two down from
9  that, where it also says "Eligible pending
10  court" --
11     A.   I'm sorry, Carole.  Do you want me
12  to state he was admitted into Drug Court?
13     Q.   That's fine.
14     A.   Okay.
15     Q.   So further down from there,
16  4/5/18, 4/16/18, was that person admitted
17  into Drug Court -- admitted into
18  Recovery Court?
19     A.   No.  That individual was admitted
20  into Drug Court.
21     Q.   Do you know why these individuals
22  would be on a spreadsheet that is identified
23  as being the Recovery Court spreadsheet?
24     A.   Because it's all individuals that
25  are being assessed.

78 (Pages 306 - 309)

Page 310

1      Q.   So this is anybody assessed for
2   Recovery Court, whether they're admitted or
3   not?
4      A.   Yes.  This indicates all
5   individuals, Drug Court afternoon docket and
6   Recovery Court.
7      Q.   Okay.  So I don't want to spend
8   all day doing this.  Just start with 4/9/18.
9           Look down and tell me if there's
10  anybody in that list who is in
11  Recovery Court, just the last group of folks.
12     A.   Angel Barbich, I believe.
13     Q.   Anybody else in that bottom group
14  who you recall as being in Recovery Court?
15          And you can do it by date number
16  rather than by name.
17     A.   Yeah.  I'm trying to recall.
18  Sometimes when I see all their names, because
19  I'm in all the courts, it's --
20     Q.   You don't remember?
21     A.   I have to look at my other sheets.
22     Q.   So this leads me to believe we
23  actually need that other spreadsheet that you
24  were talking about that I don't believe has
25  been produced.

Page 311

1      A.   We had so many.  Yeah.
2      Q.   So we'll deal with that with
3   counsel after the fact.  We were hoping that
4   this was that spreadsheet, but it's clearly
5   not.
6      A.   Okay.
7      Q.   And I just wanted to make sure.  I
8   thought I asked you this, but maybe I didn't.
9           The Recovery Court, when you say
10  it's now limited to people with an opioid-use
11  disorder, you mean it could be somebody who
12  is using heroin and never had a prescription;
13  it could be somebody who at one point had a
14  prescription; it could be somebody who never
15  had a legal prescription, correct?
16          MR. BADALA:  Objection to form.
17          THE WITNESS:  That is correct, as
18  we stated previously.
19  BY MS. RENDON:
20     Q.   I'm going to show you what's been
21  marked as Exhibit 20 for your deposition.
22          (Site Visit Report, T1025925, June
23          15 - 17, 2016, Bates
24          CUYAH_002040764 through 002040838,
25          marked as Deposition Exhibit 20.)

Page 312

1   BY MS. RENDON:
2      Q.   It is Bates-stamped
3   CUYAHOGA_002040764, all the way through
4   2040838.  I am not going to ask you to read
5   this entire document.  I'm just going to ask
6   you if you know what it is.
7      A.   Okay.  I do.
8      Q.   And what is it?
9      A.   So this document is the site visit
10  report conducted by Helen Herberts and -- I'm
11  sorry, I forget the other individual's name.
12  This is in reference to the site visit that
13  SAMHSA had done on our previous
14  Recovery Court grant.
15     Q.   And you received a copy of this
16  when it was done?
17     A.   I did.
18     Q.   Did you review it?
19     A.   Mostly.
20     Q.   And this is a site visit for the
21  Recovery Court, not the Drug Court?
22     A.   That is correct.
23     Q.   I want to just direct your
24  attention to Bates stamp number 002040812 at
25  the bottom right hand.  Can you turn to that

Page 313

1   page?
2           And in particular, there's a
3   section entitled, "Chapter 9:  Effectiveness
4   Evaluation."
5           Do you see that?
6      A.   Yes.
7      Q.   And it says in the second full
8   paragraph:
9           "The Recovery Court coordinator
10          collects data needed for the overall
11          Recovery Court program, Ohio Supreme
12          Court, and federal data needed for
13          funding opportunities."
14          And it says, "The data collected
15  is reviewed quarterly and directly reflects
16  the Recovery Court's goals and objectives."
17          Do you see that reflected there?
18     A.   I do.
19     Q.   Is that an accurate description of
20  what you do as the Recovery Court
21  coordinator?
22     A.   I do a lot.  That's just a little
23  part.
24     Q.   So this is one part of your
25  responsibilities, correct?

79 (Pages 310 - 313)

1      A.    One little part.
2      Q.    And when they say "Recovery Court
3   coordinator," that's just you, Ms. Leckler.
4   There's nobody else?
5      A.    It's just me.  I do have staff
6   that assists me, though.
7      Q.    It says right here in the same
8   chapter on effectiveness, "The Recovery Court
9   collects the following information," and then
10  there are a whole number of bullet points
11  that actually continue on to the back of the
12  next page.
13     A.    Uh-huh.
14     Q.    Take a look at those.  And my
15  question to you is simply do you, in fact,
16  collect all of that information?
17           MR. BADALA:  Objection to form.
18           THE WITNESS:  I try to.
19  BY MS. RENDON:
20     Q.    So to the best of your ability,
21  all of the information referenced in the
22  bullet points on 40812 and 40813 are
23  collected?
24     A.    I try to.
25     Q.    You do your best?

1      A.    I do my best with the staff that I
2   have.
3      Q.    It's an important part of your
4   job?
5           MR. BADALA:  Objection to form.
6           THE WITNESS:  Yes.
7   BY MS. RENDON:
8      Q.    Where -- if I wanted to find this
9   information, where would I look?
10     A.    Which information would you like
11  to know?
12     Q.    So it's not all housed in one
13  place?
14     A.    A majority of it is, yes.
15     Q.    So tell me where the majority of
16  the information would be located if I wanted
17  to see it?
18     A.    We have a spreadsheet on the S
19  drive that my assistant enters data when the
20  staff releases the information, which is why
21  I said I try and do my best.
22     Q.    And in addition to the spreadsheet
23  on the S drive, where else would the data be
24  located?
25     A.    If we have any missing data, with

1   TASC.  Some of the reports are done by TASC.
2      Q.    So TASC would have some of this
3   information as well?
4      A.    They may, yes.
5      Q.    Would you have copies of the
6   information that TASC has compiled in your
7   office?
8      A.    No.
9      Q.    Were you ever asked to put
10  together documents or other information that
11  might be responsive or relevant to the
12  lawsuit?
13     A.    Yes.
14     Q.    You were asked to gather relevant
15  information; is that right?
16     A.    Gather?  I think I was asked to
17  send what I had.
18     Q.    Can you describe for me what it is
19  that you sent?
20     A.    I do not recall exactly.  It was a
21  while ago.  I believe that it was about
22  diagnoses, meaning about what substance use
23  our clients have.
24     Q.    Do you recall approximately when
25  you were asked to gather and provide that

1   information?
2      A.    I don't.
3      Q.    Do you recall ever receiving a
4   document informing you that you couldn't
5   destroy any documents that might be relevant
6   to the litigation?
7      A.    I do.  It was a while ago.  I do
8   not recall the exact date when I received it.
9      Q.    Did you get that by email or in a
10  hard-copy form?
11     A.    I believe it was by email.
12     Q.    Have you abided by those
13  instructions?
14     A.    Yes.
15     Q.    The spreadsheet on the S drive,
16  does it still exist?
17     A.    Yes.
18     Q.    Did you print it out and give it
19  to anybody when you were collecting relevant
20  information?
21           MR. BADALA:  Objection to form.
22           THE WITNESS:  I don't remember if
23      that was the exact document.
24  BY MS. RENDON:
25     Q.    Do you have any recollection of

80 (Pages 314 - 317)

Page 318

1   providing that spreadsheet to anybody in
2   connection with this litigation?
3        MR. BADALA:  Objection to form.
4        THE WITNESS:  I remember providing
5   a documentation.  I do not remember the
6   exact documentation.
7   BY MS. RENDON:
8        Q.  Can you describe to me what it
9   looks like?  And I'm asking because we
10  haven't seen it.  So I want to go back before
11  I, you know, make a request for its
12  production and make sure we don't have it.
13       So that's why I was asking, if you
14  had printed it out, if you had given it to
15  somebody, if you had made the database
16  available to somebody, that would help us
17  figure out whether or not we have it.  But
18  you don't remember one way or another; is
19  that correct?
20       A.  I don't remember.  I do not recall
21  the specifics of it.
22       Q.  Can you describe for me what it
23  looks like and what it contains?
24       A.  I know that it was an Excel sheet,
25  because the majority of the data that I have

Page 319

1   is in Excel sheets.
2        Q.  Do you know how far back it goes?
3        A.  I do not.
4        Q.  Do you know what the columns are?
5        A.  I do not.
6        Q.  Can you access it yourself?
7        A.  If I knew the exact document you
8   were referring to, yes, I could.
9        Q.  The exact document I'm referring
10  to is the spreadsheet on the S drive that you
11  were describing as being the place where the
12  majority of this information is housed.
13       A.  Yes.
14       Q.  What is the file name for that
15  spreadsheet?
16       A.  I believe it's "Cuyahoga County
17  Master."
18       Q.  And in addition to you, who else
19  has access to that spreadsheet?
20       A.  My assistant.
21       Q.  And his or her name is?
22       A.  Joan Gottermeyer.
23       Q.  Could you spell her last name for
24  me?
25       A.  G-o-t-t-e-r-m-e-y-e-r.

Page 320

1        Q.  And was she also advised of the
2   obligation not to alter or destroy any
3   information relevant to the litigation?
4        MR. BADALA:  Objection to form.
5        THE WITNESS:  I don't know.
6   BY MS. RENDON:
7        Q.  Did you -- when you received that
8   email communication advising you to maintain
9   documentation associated with the litigation,
10  did you share that with her?
11       A.  I do not remember.  I know that
12  she does not destroy any data.
13       Q.  Do you have -- have you done
14  anything to make sure that the Cuyahoga
15  County Master spreadsheet has not been
16  altered or deleted?
17       A.  That only her and I can edit the
18  data.
19       Q.  But you didn't do anything to tell
20  her not to edit the data, did you?
21       MR. BADALA:  Objection, form.
22  Misstates her testimony.
23       THE WITNESS:  No.
24  BY MS. RENDON:
25       Q.  I just want to ask you a couple

Page 321

1   questions about -- just in general, about
2   your work as the coordinator of the Drug
3   Court.
4        Do you work with anybody from the
5   Cleveland Division of Police on a regular
6   basis?
7        A.  No.
8        Q.  What about with the DEA?
9        A.  No.
10       Q.  FBI?
11       A.  No.
12       Q.  Ohio State Patrol?
13       A.  No.
14       Q.  Is there anybody in law
15  enforcement who you're coordinating with to
16  find out, for example, trends in what they're
17  seeing on the street from a law enforcement
18  perspective?
19       MR. BADALA:  Objection to form.
20       THE WITNESS:  No.
21  BY MS. RENDON:
22       Q.  Is there anyone in law enforcement
23  to whom you're providing information about
24  what you're seeing in Drug Court or Recovery
25  Court that might be useful to them in their

81 (Pages 318 - 321)

Page 322

1   function as law enforcement officers?
2       MR. BADALA:  Objection to form.
3       THE WITNESS:  No.  If there is
4   somebody from the law enforcement entity
5   that is at the advisory board or at the
6   Opiate Task Force, obviously, if we
7   would have had a conversation about
8   that.  I cannot recall a specific
9   conversation.
10  BY MS. RENDON:
11      Q.   Is there any mechanism in place
12  today for you to either provide -- let's
13  start it this way --
14      A.   Okay.
15      Q.   -- so I don't get an objection as
16  to form.
17          Is there any mechanism in place
18  for you to provide information to any member
19  of law enforcement about trends that you're
20  seeing in the Drug Court or Recovery Court?
21      MR. BADALA:  Objection to form.
22      THE WITNESS:  No.
23  BY MS. RENDON:
24      Q.   Have you provided such information
25  to anybody in law enforcement?

Page 323

1       A.   I do not recall providing any
2   information about the trends in Drug Court.
3       Q.   And the same thing in the reverse.
4   Is there any mechanism in place for you to
5   receive information from law enforcement with
6   respect to the trends that they're seeing
7   that could be relevant to either Drug Court
8   or Recovery Court?
9       MR. BADALA:  Objection to form.
10      THE WITNESS:  No.
11  BY MS. RENDON:
12      Q.   Have you received any such
13  information from members of law enforcement?
14      A.   I cannot say with an absolute
15  because, obviously, I -- that other email, I
16  received it, but I didn't review it line by
17  line.
18      Q.   Do you have any recollection of
19  receiving any information from anybody in law
20  enforcement relevant to trends that they were
21  seeing with respect to drug use in Cuyahoga
22  County?
23      MR. BADALA:  Objection to form.
24      THE WITNESS:  I do not.
25

Page 324

1   BY MS. RENDON:
2       Q.   Do you work on a regular basis
3   with the City of Cleveland Drug Court?
4       A.   No.
5       Q.   There's no coordination between
6   the two drug courts?
7       A.   No.
8       Q.   What about with the Drug Court in
9   Summit County?  Is there any interaction
10  between you and your counterpart at the Drug
11  Court in Summit County?
12      A.   I see them when I go to national
13  trainings through the airplane to a SAMHSA
14  grantee meeting with the coordinator from
15  Summit County.
16          And I obtain -- I witnessed their
17  presentation at the -- like I stated before,
18  at the opiate -- at the specialized docket
19  conference last month.
20      Q.   Is there any routine communication
21  between you and your counterpart at the
22  Summit County Drug Court?
23      MR. BADALA:  Objection to form.
24      THE WITNESS:  No.
25

Page 325

1   BY MS. RENDON:
2       Q.   You're not in regular
3   communication either by phone or email?
4       A.   No.
5       Q.   What about with the Akron City
6   Drug Court?  Are you in regular communication
7   with anybody involved in the Akron City Drug
8   Court?
9       MR. BADALA:  Objection to form.
10      THE WITNESS:  No.
11  BY MS. RENDON:
12      Q.   Have you ever shared any
13  information, lessons learned from the
14  Cuyahoga County Drug Court or Recovery Court
15  with the coordinator of the City of Akron
16  Drug Court?
17      A.   No.
18      Q.   Same question with respect to the
19  coordinator of the Summit County Drug Court.
20      A.   What were you asking me if we had
21  discussed?
22      Q.   Have you ever picked up the phone
23  and called the coordinator of the
24  Summit County Drug Task Force to say, "We
25  just" -- "This is what we're doing in

Page 326

1    Recovery Court.  We just made this change to
2    only opioids and people with" -- "who have
3    been involved in sexual exploitation and
4    human trafficking," as an example?
5        A.   The task force, you said?
6        Q.   No, the Summit County --
7        A.   The Summit --
8        Q.   I'm trying to find out if you
9    share information on a regular basis with the
10   coordinator of the Summit County Drug Court.
11       A.   No.
12       Q.   Do you share information on a
13   regular basis with the coordinator of the
14   City of Cleveland Drug Court?
15       A.   No.
16       Q.   Are you involved in events out in
17   the community related to either Drug Court or
18   Recovery Court?
19       A.   Yes.
20       Q.   What types of events?
21       A.   I attended Project 180 event.  I
22   attended -- I'm trying to remember the name.
23   Community Assessment and Treatment Services
24   had a gratitude night.  I attended that.
25            I'm so busy.  I'm trying to

Page 327

1    remember -- to recall previous information.
2    But, yeah, if there's something --
3        Q.   Do you keep track of your time
4    when you attend those types of events?
5        A.   I do not get time for it.  It's on
6    my own time.
7        Q.   That wasn't my question.  Do you
8    keep track --
9        A.   So, no.
10       Q.   -- of your time?
11       A.   No.
12       Q.   Do you keep a calendar that
13   records meetings, whether they be task force
14   meetings or Project 180 meetings that you're
15   attending?
16       A.   I have an iPhone calendar.  So at
17   times, most of my events are in there.
18       Q.   And when you were gathering up
19   information relevant to the litigation, did
20   you go through your calendar to see if there
21   were specific meetings that related to, for
22   example, the Cuyahoga County Opiate Task
23   Force that would be relevant to the
24   litigation?
25       A.   No.

Page 328

1        Q.   Did you search for any relevant
2    information in your calendar?
3        A.   No.
4        Q.   Do you also have a hard-copy
5    calendar or just the iPhone calendar?
6        A.   Just the iPhone calendar that's
7    synced to my Outlook.  So it's all on my
8    desktop.
9        Q.   So it's also on your desktop at
10   work?
11       A.   Correct.
12       Q.   So in addition to it being on your
13   -- is that a personal phone or a county
14   phone?
15       A.   It's a personal phone.
16       Q.   But all of these meetings exist in
17   an Outlook calendar on your desktop computer?
18       A.   That is correct.
19            I also invite Judge Matia and my
20   assistant to my calendar so that everyone
21   knows where I am.
22       Q.   You indicated earlier that you had
23   provided some information for the complaint;
24   is that correct?
25       A.   I provided information?

Page 329

1        Q.   Did I hear that correct earlier,
2    that you provided information for the
3    complaint in this litigation?
4        A.   Yes.  You had asked me about
5    documentation.  I provided documentation.
6        Q.   So the information you provided
7    for the complaint was just the documentation
8    that you described earlier today?
9        A.   Yes.  I had a conversation on the
10   phone.
11       Q.   And in addition to the documents
12   that you provided for the complaint, did you
13   collect any other documents, either from the
14   S drive or anyplace else?
15       A.   I do not recall the specific
16   documentation that I provided.
17       Q.   So to the best of your memory, it
18   was assessments, is that -- am I correct?
19       A.   Yeah.
20            MR. BADALA:  Objection to form.
21            THE WITNESS:  Yes.  That's what's
22       in the exhibit, yes.
23   BY MS. RENDON:
24       Q.   Like the assessment form that we
25   looked at?

83 (Pages 326 - 329)

Page 330

1    A.   That is correct.
2    Q.   You collected and provided those?
3    A.   Yes.
4    Q.   And just so I make sure that I'm
5  clear, you don't recall any other documents
6  other than the assessments that you collected
7  and provided?
8    A.   I do not remember, no.
9    Q.   Did you do a search of your
10  desktop computer to see if there was anything
11  else on your desktop computer that was
12  relevant to gather and provide it?
13    A.   Did I search -- when would I have
14  searched -- did I search my computer to see
15  if there was any information relevant --
16    Q.   To the litigation.  When you were
17  collecting the assessments to provide
18  those --
19    A.   Okay.
20    Q.   -- did you search your desktop
21  computer to see if there were other documents
22  on your desktop computer that were relevant
23  that should be provided?
24    A.   No.
25    Q.   What about your email?  Did you

Page 331

1  search through your email?
2    MR. BADALA:  Objection to form.
3    THE WITNESS:  I did not.
4  BY MS. RENDON:
5    Q.   Did you look for any hard-copy
6  documents in your office?
7    A.   I did not.
8    MS. RENDON:  So I don't have
9  any -- myself, personally, I don't have
10  any further questions at this time.
11    I do want to make sure that I'm
12  clear on the record that I think this
13  spreadsheet is important and relevant.
14  As far as I know, we don't have it.
15    So I'm going to state for the
16  record that we're going to hold open Ms.
17  Leckler's deposition so that we can ask
18  her questions about that spreadsheet
19  when it's produced.
20    MR. BADALA:  I believe it has been
21  produced.  But we'll have to go back.
22    MS. RENDON:  Yeah.  If you can go
23  back --
24    MR. BADALA:  You're talking about
25  14 million pages, but I'm sure we can

Page 332

1  probably figure it out.
2    MS. RENDON:  Yeah.  If you can go
3  back and find us the Bates numbers, that
4  would be extraordinarily helpful.
5    MR. BADALA:  Yes.  Just send us a
6  request and we'll take a look at it.
7    MS. RENDON:  But if that has not
8  been produced, I'm just reserving that
9  right.
10    MR. BADALA:  Are all the
11  defendants done with their questions?
12    MS. RENDON:  No.
13    MS. CHARLES:  I have a few.
14    THE VIDEOGRAPHER:  Off the record
15  at 6:11.
16    (Pause in proceedings.)
17    THE VIDEOGRAPHER:  We're back on
18  the record, 6:12.
19    ---
20    EXAMINATION
21  BY MS. CHARLES:
22    Q.   Ms. Leckler, as you may recall, my
23  name is Amber Charles.  I represent McKesson
24  Corporation.
25    I know it's been a long day, so

Page 333

1  I'll do my best to not be repetitive of my
2  colleagues, but I have a few more questions.
3    A.   Okay.
4    Q.   And like with my colleagues
5  earlier, I'll ask that if you don't
6  understand one of my questions, to please let
7  me know so that I can rephrase it.
8    Is that fair?
9    A.   Fair.
10    Q.   Great.
11    And if you do not ask for
12  clarification, I will presume that you
13  understood my question.
14    Is that fair?
15    A.   Fair.
16    Q.   Great.
17    In your experience as the
18  administrator of the Cuyahoga Drug Court,
19  does the Drug Court have an annual budget?
20    A.   No.
21    Q.   Does the Drug Court have any sort
22  of operating budget, whether annual or other?
23    MR. BADALA:  Objection to form.
24    THE WITNESS:  Yes.
25

84 (Pages 330 - 333)

BY MS. CHARLES:

1  Q. What is the form of the Drug
2  Court's budget?
3  A. So we have monies that's used to
4  staff -- to staff personnel. We have monies
5  that is used for treatment. We have monies
6  that is used for drug testing.
7  And it's just very difficult to do
8  a proposed annual budget. For example, when
9  legislation changes, sometimes our budget can
10 change.
11 Q. So when you state that it's very
12 difficult to do a proposed annual budget,
13 does that mean you do not do a proposed
14 budget for the Cuyahoga County Drug Court?
15 MR. BADALA: Objection to form.
16 THE WITNESS: That is correct. I
17 do not do.
18 BY MS. CHARLES:
19 Q. Does anybody else at the Cuyahoga
20 Drug Court prepare a proposed budget?
21 A. I don't know.
22 Q. In your nearly ten years of
23 experience at the Cuyahoga Drug Court, have
24 you ever referred to a budget document?

1  A. Yes.
2  Q. What budget document have you
3  referred to?
4  A. I have referred to the balances of
5  money that the county has for treatment. I
6  have referred to budgets that we may have to
7  add staff. A number of things.
8  Q. What things?
9  A. So try to look at what we could
10 use. We need money for sober living. We
11 need money to expand our drug-testing
12 capabilities. I had touched on a little bit
13 before about the use of gabapentin.
14 We are trying to figure out how we
15 could obtain more funds to expand our drug
16 testing. We would like to add more staff.
17 We would like to add more community
18 supervision.
19 We would like to add more staff in
20 the sense of community supervision, so more
21 law enforcement. We would like to expand and
22 add an additional judge. We would like to
23 expand and add another person like myself.
24 I can go on and on and on of the
25 needs that we have.

1  Q. Sure. And thank you for that.
2  My question was not about the
3  needs that you have. My question was about
4  whether there is an existing budget document.
5  So is there a document to which
6  you refer when you are determining what money
7  is currently available in the Cuyahoga Drug
8  Court?
9  A. Yes. So I can refer to the ATP
10 funds, Addiction Treatment Project funds, and
11 the balance of that -- of those -- of that
12 budget. I can refer to our SAMHSA grants,
13 which is the county monies. I can refer to
14 the ADAMHS Board budget.
15 Q. Anything else?
16 A. No.
17 Q. So you identified three documents
18 that you had referenced: ATP funds, the
19 balance of the ATP funds, the SAMHSA grants,
20 and the ADAMHS Board budget, if we could go
21 through those one by one.
22 ATP funds refer to funds from the
23 State of Ohio, correct?
24 A. That is correct. That is money --
25 it's county money. So it is with the ADAMHS

1  Board.
2  Q. When you say it is county money,
3  what do you mean by "county money"?
4  A. Meaning that it's for the County
5  Drug Court, the County Recovery Court, and
6  the Cleveland Municipal Court, which is in
7  Cuyahoga County. The money is held with
8  the -- our county ADAMHS Board. So
9  therefore, that money cannot be used to treat
10 someone in Summit County or --
11 Q. Sure. So I understand that it is
12 held with the county ADAMHS Board, but ATP
13 funds come from the State of Ohio, correct?
14 A. That is correct.
15 Q. So when you say they are county
16 monies, you do not mean to suggest that they
17 come out of the county budget?
18 A. I guess.
19 Q. They are funds, in other words,
20 the State of Ohio has given to Cuyahoga
21 County?
22 A. That was awarded. We had to
23 demonstrate a need.
24 Q. So they are funds that the State
25 of Ohio has awarded to Cuyahoga County?

85 (Pages 334 - 337)

Page 338

1    A.   Yes.
2    Q.   The next thing you identified
3  was -- oh, I'm sorry.
4        Is there a physical document that
5  shows the ATP funds, the balance?
6    A.   You would have to check with the
7  ADAMHS Board on the current balance.
8    Q.   So there's no physical document
9  held by the Drug Court that has the current
10  balance of ATP funds?
11    A.   That is correct.
12    Q.   The next item you referred to is
13  the SAMHSA grants.  You also referred to
14  SAMHSA grants as county moneys.
15        But SAMHSA is a federal government
16  program, correct?
17    A.   That is correct.
18    Q.   So when you say "county monies,"
19  are you again suggesting that SAMHSA grants
20  are held by the ADAMHS Board?
21    A.   Yes.  Most of our money is
22  funneled through the ADAMHS Board.  It was
23  awarded to Cuyahoga County because we
24  demonstrated a significant need for those
25  funds.

Page 339

1    Q.   So the federal government awarded
2  money to Cuyahoga County based on a
3  significant need, and that money is held or
4  administered by the ADAMHS Board.
5        Is that fair?
6    A.   That is correct.
7    Q.   But, again, the money is not
8  actually from Cuyahoga County.  It is not
9  from the Cuyahoga County budget?
10        MR. BADALA: Objection to form.
11        THE WITNESS:  That is correct.
12  BY MS. CHARLES:
13    Q.   The last thing you identified is
14  the ADAMHS Board budget.
15    A.   Uh-huh.
16    Q.   Is the ADAMHS Board budget
17  comprised of the first two things you
18  identified, the ATP funds and the SAMHSA
19  grants, or are there other monies in the
20  ADAMHS Board budget?
21    A.   There is other money in the ADAMHS
22  Board budget.
23    Q.   What is the other money in the
24  ADAMHS Board budget?
25    A.   I believe we referenced it in a

Page 340

1  previous email documentation.  I'm not sure
2  what number, but there is a balance of funds
3  at the ADAMHS Board that they allocate to
4  assist Drug Court clients.
5        And it is just for treatment.  It
6  does not handle drug testing.  It does not
7  handle staff.  It does not handle my
8  position, bus tickets.  It does not handle
9  sober housing.
10    Q.   And is that money that you're
11  referring to in the ADAMHS Board budget from
12  Cuyahoga County or is it again from the state
13  or federal governments?
14    A.   It is from Cuyahoga County.
15    Q.   For the year of 2018, do you know
16  what the amount in the ADAMHS Board budget
17  for the --
18    A.   I do not.
19    Q.   Do you know anyone at the Drug
20  Court that would have that information, of
21  the amount in the ADAMHS Board budget from
22  Cuyahoga County?
23    A.   We could go directly to the ADAMHS
24  Board.
25    Q.   When we first started speaking

Page 341

1  today, you testified there were three blocks
2  of money.  You said money that's used in
3  staffing, money that's used for treatment,
4  and money that's used for drug testing.
5        Are those sorts of blocks of money
6  encompassed in the funds we just talked
7  about, the ATP funds, the SAMHSA funds, and
8  the ADAMHS Board budget, or are there other
9  funding sources?
10    A.   No.  I believe the way that --
11  what is the question?
12    Q.   So when I first asked you if there
13  was a budget, you said there are monies that
14  are used for staffing, monies that are used
15  for treatment, and monies that are used for
16  drug testing.
17        Then we continued speaking and you
18  identified three funds, the ATP, the SAMHSA,
19  and the ADAMHS Board.
20        I'm asking, are there also
21  separate monies used for staffing treatment
22  and drug testing or are you referring to the
23  same buckets of money?
24        MR. BADALA: Objection to form.
25        THE WITNESS: I'm not an expert on

86 (Pages 338 - 341)

Page 342

1    all the financial sustainability of the
2    project.  The SAMHSA award money just
3    covers a small portion of staff.
4    Therefore, the courts, the county, pays
5    for the additional staff member we have
6    on Recovery Court.  They pay for the
7    staff we have on the morning docket.  I
8    do not know the specifics of where each
9    dollar comes from.
10   BY MS. CHARLES:
11       Q.   To the best of your knowledge, are
12   there any other sources of funds beyond the
13   three you have previously identified, ATP
14   funds, SAMHSA funds, and the ADAMHS Board?
15       A.   I do not know.
16       Q.   So to the best of your knowledge,
17   those are the three sources of funding?
18       A.   That is the three sources of
19   funding that I most am involved in.
20       Q.   Okay.
21            So are there any other sources of
22   funding that you are less involved in but are
23   aware of?
24       A.   Yes.  Obviously, as I previously
25   stated, the SAMHSA grant does not cover all

Page 343

1    of the staff, does not cover my position.  It
2    does not cover drug testing.  It does not
3    cover sober living.
4        Q.   So what does cover those costs
5    that you just identified?
6        A.   It depends on which funding source
7    we're talking about.
8        Q.   Respectfully, that's what I'm
9    asking you.  Which funding sources are
10   available to cover those costs?
11       A.   The only funds that we have, for
12   example, that can cover sober living, is ATP
13   funds, but ATP funds are only for opioid-use
14   disorders.
15            So, for example, in County Drug
16   Court, of the clients that we have that have
17   a stimulant disorder, we cannot utilize ATP
18   funds for, which means -- which is one of the
19   many reasons why we have a lot of different
20   funding sources.
21       Q.   Do you receive any funding
22   directly from Cuyahoga County as part of the
23   annual or biannual budget process?
24            MR. BADALA:  Objection to form.
25            THE WITNESS:  Yes.  We talked

Page 344

1    about it previously.  It's the ADAMHS
2    Board money that is allocated for Drug
3    Court clients and Recovery Court
4    clients.
5    BY MS. CHARLES:
6        Q.   The ADAMHS Board money is
7    allocated through ADAMHS, which is a separate
8    board, correct?
9        A.   Yes.  It's county -- county money.
10       Q.   Do you receive any money as a
11   direct appropriation from the Cuyahoga County
12   in their annual budget?
13            MR. BADALA:  Objection to form.
14            THE WITNESS:  I do not know.
15   BY MS. CHARLES:
16       Q.   So to the best of your knowledge,
17   the only county money that the Drug Court
18   utilizes is money that is funneled through
19   ADAMHS Board?
20            MR. BADALA:  Objection to form.
21            THE WITNESS:  I don't know.
22   BY MS. CHARLES:
23       Q.   Well, ma'am, I'm just asking you
24   for your knowledge.
25            So to the best of your knowledge,

Page 345

1    do you receive any other money from Cuyahoga
2    County other than what is funneled through
3    the ADAMHS Board?
4            MR. BADALA:  Objection to form.
5    You're asking the same question three
6    times.
7            THE WITNESS:  And I don't know.
8    I'm not the financial expert.  I
9    apologize.
10   BY MS. CHARLES:
11       Q.   Who is the financial expert?
12       A.   So you would have to speak with
13   the court financial physical person.  I said
14   previously, I do not recall her name.
15            Marty Murphy may also be another
16   source.
17            MS. CHARLES:  Okay.  I'll mark
18   what has been identified as Leckler 21.
19            (Plaintiffs' First Amended
20            Responses and Objections to
21            Distributor Defendants' Third Set
22            of Interrogatories, marked as
23            Deposition Exhibit 21.)
24            THE WITNESS:  Thank you.
25

87 (Pages 342 - 345)

Page 346

BY MS. CHARLES:

Q.   Ms. Leckler, what I have shown here as Exhibit 21 is Plaintiffs', The County of Cuyahoga, Ohio, and the State of Ohio, Ex Rel. Prosecuting Attorney of Cuyahoga County, First Amendment Responses and Objections to Distributor Defendants' Third Set of Interrogatories.

Do you see that on the title page of this document?

A.   I'm sorry.  You talk so fast. Plaintiffs of the Cuyahoga County -- yes, in bold there?

Q.   Yes.

A.   Yes.

Q.   Please take a moment to look through the document, if you like, but I will direct your attention to page 15.

MR. BADALA:  You know there's been an updated Interrogatory 18 response, right?

MS. CHARLES:  Yes, I do.  Thank you.

THE WITNESS:  There's that word again.

Page 347

BY MS. CHARLES:

Q.   Are you familiar with this document?

A.   I am not.

Q.   Did you provide any information in order to prepare this document?

A.   I do not know.

Q.   Are you aware or have you heard that anyone else at the Drug Court provided information used in the preparation of this document?

A.   No, I am not.

Q.   Okay.  I'll direct your attention to page 23.

And, actually, I apologize.  I skipped ahead a little bit.  Flip back to page 15 for me.

A.   Okay.

Q.   Interrogatory Number 18 -- and I will submit to you, "interrogatory" just means that it's a question one party in a litigation gets to ask the other party.

A.   Okay.

Q.   Interrogatory Number 18 says:

"Specify each category of injury,

Page 348

e.g., increased cost of law enforcement, fire, emergency services, et cetera, for which you claim damages in the litigation and provide a computation of damages for each category of injury alleged."

Did I read that correctly?

MR. BADALA:  And can I put a standing objection that this interrogatory has been updated, but for some reason we're going back to an older version.

BY MS. CHARLES:

Q.   Did I read that correctly?

A.   Yes.

Q.   Now if you'll flip to page 23, please.

The fourth bullet point from the top -- from the bottom, do you see, "Cost associated with increased burden on Plaintiff's Drug Court"?

A.   That is correct.

Q.   Are you aware of an increased cost on Plaintiff's Drug Court due to the alleged opioid epidemic that is subject to this

Page 349

lawsuit?

A.   Yes, I am.

Q.   What increased cost?

A.   Like I said -- stated today, we started in May of 2009.  We have expanded to add a whole 'nother judge, one additional -- initially probation officer, one initially case manager.

As a result of a site visit, as was previously stated -- I know we weren't questioned about it -- one of the recommendations were to add additional staff to help with the magnitude of services that needs to be delivered for those clients.  We added an additional probation officer.  We added an additional case manager.

We still have a high need here in Cuyahoga County.  So, therefore, we added -- Judge Matia voluntarily added -- volunteered to take on another additional docket.  That additional docket meant an additional probation officer, meant an additional case manager, an additional drug testing, and additional clients per year.

And we are always looking to

Page 350

1  expand.  I have meetings with Corrections
2  Planning Board about adding another judge so
3  that we can -- the court can service more
4  clients.
5      Q.  Of all the asserted costs you
6  just --
7      MR. BADALA:  Were you done?
8      THE WITNESS:  I mean, I could go
9  on and on.  So I guess we -- how far do
10  you want me to go?
11      MR. BADALA:  Well, the question is
12  pretty open-ended, so as far as you want
13  to go.
14      THE WITNESS:  Yeah.  I can keep
15  going.
16      So the cost of staff is huge.  We
17  need additional staff to -- the process
18  has lengthened in the sense that the
19  majority of the clients that we have
20  come, referral-wise, through the county
21  jail.
22      So, therefore, it takes a little
23  bit more time to process an eligibility
24  case.  If somebody is in the county jail
25  at times, then when they're out in the

Page 351

1  community, those individuals obviously
2  have a lot of questions.  So a lot of
3  times the probation staff may go into
4  the county jail numerous times on one
5  case to explain the process, explain
6  what's going to happen.
7      We are in discussion of adding
8  additional staff to help alleviate the
9  --
10  BY MS. CHARLES:
11      Q.  Ma'am, I'll stop you there.
12  Because I think adding additional staff is
13  not a cost that you've already incurred.  Is
14  that fair?
15      A.  Oh, okay.
16      Q.  The discussion about adding
17  additional -- I had asked you what costs you
18  believe you've incurred that are damages in
19  this litigation.
20      A.  Okay.
21      Q.  It sounds like you're talking
22  about --
23      A.  I'm sorry.  I was trying to
24  demonstrate the staff that we had already
25  expanded.

Page 352

1      MR. BADALA:  I'm going to object.
2  That wasn't the question.  You said what
3  costs are associated.  You didn't say
4  what did you incur.  That wasn't the
5  question.  So you just changed the
6  question.
7      MS. CHARLES:  No, sir, I did not.
8  The entire thing is about damages.
9      MR. BADALA:  Can we go back and
10  read the question?
11      MS. CHARLES:  You know, why don't
12  we just move on.  We have limited time.
13  I'll move on from this exhibit.
14      MR. BADALA:  You're cutting off
15  her testimony.  I'm not going to allow
16  that to happen.  Can we go back and read
17  the question?
18      MS. CHARLES:  Sir, you're trying
19  to waste the remainder of our time.
20  It's not appropriate.
21      MR. BADALA:  I'm not wasting time.
22  I've been cooperative with everyone with
23  time today, so don't even accuse me of
24  wasting time.
25      We're going to go back and read

Page 353

1  the question.  You just changed your
2  question.  So we're going to read it
3  back.  Maybe you're right.  Let's see
4  what you said.
5      (The reporter read back where
6      requested.)
7      MR. BADALA:  I don't see anything
8  about incurred.  You changed it to
9  whatever you actually incurred.
10      MS. CHARLES:  Let's just move on.
11      MR. BADALA:  So are you done with
12  your answer?
13      THE WITNESS:  I can be.
14      MR. BADALA:  Are you done?  It
15  doesn't matter what she's telling you.
16      THE WITNESS:  I could talk for
17  half the evening about needs, so --
18      MR. BADALA:  Well, if you want to
19  continue, you can continue with more.
20      THE WITNESS:  So back to the
21  initial question, what costs have we
22  incurred, we incurred the staff, as I
23  have stated, which equaled additional
24  clients, which equaled treatment funds,
25  drug testing, things like that.

89 (Pages 350 - 353)

Page 354

1  BY MS. CHARLES:
2      Q.   Thank you.
3          Can you quantify the costs that
4  you just identified, the staff, the drug
5  testing, and the additional patients?  Can
6  you quantify a dollar amount of those costs?
7          MR. BADALA:  Objection to form.
8          THE WITNESS:  I could not.  But
9      someone that's better with numbers,
10     figures, could.
11 BY MS. CHARLES:
12     Q.   Could you tell me what percent of
13 those costs were funded by Cuyahoga County as
14 opposed to a state or federal grant?
15         MR. BADALA:  Objection to form.
16         THE WITNESS:  I could not.
17         MS. CHARLES:  I'm going to mark
18 what has been identified as Leckler 22.
19         (Supplemental Responses and
20         Objections to Distributor
21         Defendants' Interrogatory No. 18
22         Pursuant to Special Master Cohen's
23         October 23, 2018, Order, marked as
24         Deposition Exhibit 22.)
25

Page 355

1  BY MS. CHARLES:
2      Q.   And as your counsel previously
3  stated, this is an updated version of the
4  interrogatories you just reviewed.
5      A.   Okay.
6      Q.   And I will direct your attention
7  to page 7 -- or page 6.  I'm sorry.
8          At the top of page 6, there's an
9  interrogatory titled "Number 18" that asks
10 plaintiffs to specify each category of injury
11 for which you claim damages in the litigation
12 and provide a computation of damages for each
13 category of injury alleged.
14         Do you see that?
15     A.   I do.
16     Q.   And if you turn to page 7, there's
17 a bullet point at the bottom of the page that
18 says:
19         "Past damages related to
20         department costs, including the
21         Alcohol, Drug Addiction, and Mental
22         Health Services Board of Cuyahoga
23         County,  Children and Family
24         Services, Prosecutor, Public
25         Defender, Court of Common Pleas" --

Page 356

1          And then it goes on to name
2  several others.
3          Do you see that?
4      A.   I do.
5      Q.   If you could please turn to
6  page 9.
7          Do you see your name at the bottom
8  of the page?
9      A.   I do.
10     Q.   And you see that "Plaintiffs
11 identify the following persons with knowledge
12 of such damages," and then the list includes
13 your name?
14     A.   Yes.
15     Q.   Do you have any knowledge of the
16 quantifiable amount of damages due to past
17 department costs incurred by the Court of
18 Common Pleas?
19         MR. BADALA:  Objection to form.
20         THE WITNESS:  I do not.
21 BY MS. CHARLES:
22     Q.   Sure.  If you could kindly look at
23 this list of names.  And it continues on to
24 page 10.
25     A.   Okay.

Page 357

1      Q.   You previously testified that
2  there was a financial expert who dealt with
3  most of the financial administration at the
4  Court of Common Pleas; is that correct?
5      A.   I believe we talked specifically
6  about Marty Murphy with specific funds, not
7  for the whole Court of Common Pleas, but --
8      Q.   And I believe you identified
9  another individual who you believed had
10 financial knowledge, but you did not recall
11 her name; is that correct?
12     A.   That is correct.
13     Q.   Do you see her name on this list
14 of individuals?
15     A.   I don't know.  I don't recall her
16 name.
17     Q.   So none of these names trigger a
18 recollection that that is the position she
19 holds?
20     A.   I just know her face.
21         MR. BADALA:  Do you have another
22     exhibit tab?  I actually wrote on the
23     one, thinking it was my copy.
24         (Discussion held.)
25

90 (Pages 354 - 357)

Page 358

1 BY MS. CHARLES:
2     Q.    You've previously testified today
3 that you administer two specialty dockets at
4 the Court of Common Pleas; is that correct?
5     A.    Two specialized dockets, yes.
6     Q.    Are there any other specialized
7 dockets at the Court of Common Pleas?
8     A.    Yes.
9     Q.    Are there nonspecialized or
10 general dockets at the Court of Common Pleas?
11    A.    Yes.
12    Q.    Do you have a sense as to the
13 overall percentage of cases in the Court of
14 Common Pleas that are in your two specialized
15 dockets?
16    A.    I'm sorry.  Say that again?
17    Q.    Do your two specialized dockets
18 make up a majority of cases in the Court of
19 Common Pleas?
20    A.    No.
21    Q.    Do they make up less than
22 40 percent of cases in the Court of Common
23 Pleas?
24          MR. BADALA:  Objection to form.
25          THE WITNESS:  I do not know the

Page 359

1 exact figure.
2 BY MS. CHARLES:
3     Q.    If you had to estimate, would you
4 say less than 30 percent?
5          MR. BADALA:  Objection to form.
6          THE WITNESS:  I don't know.
7 BY MS. CHARLES:
8     Q.    You have no estimate of the
9 overall percentage of the Court of Common
10 Pleas' docket that is made up of your
11 specialized court dockets?
12          MR. BADALA:  Objection to form.
13          THE WITNESS:  I do not.
14 BY MS. CHARLES:
15    Q.    Have you ever reviewed a budget
16 for the Court of Common Pleas as a whole?
17    A.    No.
18    Q.    Do you have any input into
19 drafting a budget request to Cuyahoga County
20 for the Court of Common Pleas?
21    A.    No.
22    Q.    Have you ever reviewed
23 appropriation from the Cuyahoga County budget
24 for the Court of Common Pleas?
25    A.    Appropriation?

Page 360

1     Q.    Are you aware of the Court of
2 Common Pleas receiving money from Cuyahoga
3 County as part of the annual budget process?
4     A.    I am not.
5     Q.    Going back to the Drug Court, you
6 previously testified as to Smart Ohio funds;
7 is that correct?
8     A.    That is correct.
9     Q.    And Smart Ohio funds are funds
10 provided by the State of Ohio?
11    A.    I believe it is the state.  I'm
12 trying to recall if it was necessarily state
13 funds.
14    Q.    Does the Court of Common -- or
15 does the Drug Court receive any grants from
16 the Ohio Supreme Court?
17    A.    No.
18    Q.    I'd like to speak a little bit
19 more about SAMHSA funding.
20          When the court opened in 2009, did
21 you receive a SAMHSA grant?
22    A.    I do not recall the exact year
23 that the Court of Common Pleas received a
24 SAMHSA grant.  I worked in the Drug Court
25 program from the beginning.  However, I

Page 361

1 became the coordinator later on in that year.
2     Q.    Do you have any understanding of
3 how the Drug Court was funded in 2009?
4     A.    I do not.
5     Q.    Did the Drug Court have a SAMHSA
6 grant in 2010?
7     A.    The Drug Court program had a
8 SAMHSA grant in the earlier parts; I just do
9 not recall the exact date that the allocation
10 of the grant was awarded.
11    Q.    When you say "the earlier parts,"
12 are you referring to the first few years of
13 the Drug Court operation?
14    A.    I'm referring to the first three
15 to five years, yes.
16    Q.    Did the Drug Court receive ATP
17 funding during the first three to five years
18 of its operation?
19    A.    No.
20    Q.    Did the Drug Court receive Smart
21 Ohio funding during the first three to five
22 years of its operation?
23    A.    No.
24    Q.    Moving on to 2012, was there a
25 SAMHSA grant in place to fund the Drug

91 (Pages 358 - 361)

Page 362

1  Court's activities?
2      A.   I do not remember.
3      Q.   The year of 2013, do you recall if
4  there was a SAMHSA grant in place?
5      A.   I do not remember.
6      Q.   If I wanted to identify a way to
7  see exactly what funding was in place each
8  year, is there a document or is there a place
9  I could go to see the historical funding for
10  the Court of Common Pleas?
11          MR. BADALA:  Objection to form.
12          THE WITNESS:  Yes.  And you could
13      also look at the SAMHSA website under
14      grants.gov.  It is a public record that
15      you can go on there and see, across the
16      whole country, specific courts that are
17      awarded funds.  You can also see the
18      specific grants that are allocated to
19      specific courts.
20  BY MS. CHARLES:
21      Q.   When you say "specific grants
22  allocated to specific courts," for SAMHSA
23  funding that is shared with the Cleveland
24  Municipal Court, is there a particular
25  division that SAMHSA requires or is it

Page 363

1  divided between the two courts as you see
2  fit?
3      A.   No.  What I meant was specific
4  courts in reference to, if there's family
5  courts, there's adult drug courts, there's
6  juvenile courts.  So that's what I meant when
7  I said "specific courts," meaning you can go
8  onto SAMHSA's website and see how much money
9  that SAMHSA has allocated out to specific
10  courts, not just our court.
11      Q.   But would the SAMHSA website be
12  able to tell me exactly how much the
13  Cuyahoga -- the Drug Court, your Drug Court
14  received, as compared to the Cleveland
15  Municipal Court if it was a shared SAMHSA
16  grant?
17      A.   I guess you could calculate it up
18  and figure that out.
19      Q.   How would I calculate that up
20  based on the SAMHSA website information?  Do
21  you know?
22      A.   You could go on the SAMHSA
23  website, look at previous grants awarded, and
24  you would have to look specifically to grants
25  called CSAP grants.  I do not remember what

Page 364

1  that means.
2          You could look for however many
3  years you want to go back, and you could
4  scroll through and see if you see Cleveland
5  Drug Court on that website.  You could also
6  scroll through and see if you see Cuyahoga
7  County Court of Common Pleas on that, and you
8  could add up the figures.
9      Q.   Is there a document that's
10  maintained by the Drug Court that would show
11  all of its historic funding?
12      A.   Yes.  We have -- the court has
13  annual reports, and those are all archived on
14  the Cuyahoga County Common Pleas website.
15      Q.   Other than annual reports, is
16  there any budget document that would show --
17  that is maintained by the Drug Court to show
18  its historical funding?
19      A.   I believe so.  We always are proud
20  of the grants that we are able to obtain.  So
21  it is always usually described in all of the
22  annual reports.
23      Q.   Other than the annual reports, is
24  there any budget document or source of
25  historical funding information for the Drug

Page 365

1  Court?
2      A.   Yes, there is.  The Corrections
3  Planning Board that documents the balance of
4  funds, and that is Marty Murphy, TASC.
5          MS. CHARLES:  I'm going to mark
6      what is now Leckler 23.
7          (Email chain, RE: FY2014 - August
8      2014 Treatment Expenditure Summary
9      Report, Bates CUYAH_003352707
10      through CUYAH_003352711, marked as
11      Deposition Exhibit 23.)
12  BY MS. CHARLES:
13      Q.   I've just handed you what's been
14  marked as Exhibit 23.  It bears the Bates
15  stamp CUYAH_00335270 [sic].  And the top
16  document is from Judge Matia, dated
17  October 22nd, 2014.
18          Do you see that?
19      A.   Yes.
20      Q.   I'll give you a moment to look
21  through this document.  And when you've had
22  time to look through, can you tell me if you
23  recognize this email chain.
24      A.   (Reviewing document.)
25          2014 -- it's an August 2014

Page 366

1   treatment expenditure summary report.
2           (Inaudibly reviewing document.)
3       Q.   Do you recognize this email
4   exchange?
5       A.   I do, because Judge Matia was big
6   on changing the name of Drug Court and he was
7   very jealous that Judge Synenberg got
8   Recovery Court's name.
9       Q.   If you can turn to the page that
10  ends in 2710.  Do you see a document or an
11  email from you dated October 17th, 2014?
12      A.   Yes.
13      Q.   And you write:
14          "Drug Court will end this year
15      with a balance of unused funds."
16          Do you see that?
17      A.   I do.
18      Q.   You say:
19          "Please note the huge drop in IOP
20      with residential support on Cleveland
21      Municipal side from the month of
22      March/April 2014 to May of 2014.
23      This was a $7,000 drop.  I am
24      concerned as to why this happened."
25          Do you see that?

Page 367

1       A.   I do.
2       Q.   Then you write:
3          "I would hate to lose money for
4      next year and our court be penalized
5      for aggressively applying and
6      securing federal funds."
7       A.   That's correct.
8       Q.   By this email did you mean that
9   state funds were going unused because of the
10  amount of federal funding that the drug
11  courts had received?
12          MR. BADALA:  Objection to form.
13          THE WITNESS:  No.
14  BY MS. CHARLES:
15      Q.   Why were you concerned about
16  losing money for the next year due to
17  aggressively applying and securing federal
18  funds?
19      A.   So what I was referring to is,
20  like I stated previous, we have a great team
21  of individuals that can take a look at a need
22  in our current court system and apply for
23  federal funds.
24          This is my question to some staff
25  to address that there was a balance at the

Page 368

1   ADAMHS Board money, the county money that's
2   allocated for Drug Court.
3          Like I stated previously, that's
4   why it's very difficult to allocate per year
5   the balance of funding and to make a
6   necessary budget for me personally, because
7   we are -- that money, that ADAMHS Board
8   money, like I stated previously, is shared by
9   Cleveland Municipal as well.
10          So not a specific X amount of
11  money is allocated for county, not a specific
12  X amount is allocated for Cleveland, because
13  Cleveland is under the umbrella of the county
14  as well.
15          This is my concern, because I
16  always have a very difficult time to --
17  figuring out how much money we have, because
18  that equals how many clients we can take in.
19          This is also in regards to
20  possibly a question in regards to did
21  Cleveland Municipal obtain some other federal
22  funding that they're utilizing right now and
23  they're not using the county ADAMHS Board,
24  which is why we saw a significant drop in
25  money.

Page 369

1       Q.   You stated:
2          "I would hate to lose money for
3      next year."
4       A.   Yes.
5       Q.   What money were you afraid of
6   losing?
7       A.   The county money.
8       Q.   You were concerned that you would
9   lose the county money unless it was spent; is
10  that correct?
11      A.   That is correct.
12      Q.   And that is because if the county
13  money went unspent, the county would realize
14  it over-budgeted the drug courts; is that
15  correct?
16          MR. BADALA:  Objection to form.
17          THE WITNESS:  No, not that it had
18      over-budgeted, but that we had
19      aggressively looked for alternative
20      funding to treat participants.
21  BY MS. CHARLES:
22      Q.   So based on your aggressive
23  looking -- looks for alternative funding, you
24  were able to fund many of the Drug Court's
25  operations through non-county money?

93 (Pages 366 - 369)

Page 370

1       MR. BADALA: Objection to form.
2       THE WITNESS: Because it's all
3   county money. So whether it comes from
4   federal funding outside or it comes from
5   the county money -- what's your
6   question? I'm sorry.
7   BY MS. CHARLES:
8       Q.   You were afraid of losing ADAMHS
9   fund money because you had been able to
10  aggressively secure SAMHSA or ATP or other
11  federal and state funds that covered most of
12  the cost, leaving you with a balance,
13  correct?
14      MR. BADALA: Objection to form.
15      THE WITNESS: That is correct.
16  BY MS. CHARLES:
17      Q.   If you turn to the next page back,
18  it ends in 2709. You write in response to an
19  email from Maria Nemec, who, if you'll turn
20  back to the next page, says:
21          "Can we do a budget adjustment
22      and put it towards training?"
23      You write:
24          "That could use up some money,
25      but we will actually have a huge

Page 371

1   balance."
2       Is that correct?
3       MR. BADALA: Objection to form.
4       THE WITNESS: I'm sorry. I have
5   to -- I have to read the previous one.
6   I'm sorry.
7   BY MS. CHARLES:
8       Q.   That's okay.
9       A.   (Inaudibly reviewing document.)
10          "The ADAMHS Board funds will
11      additionally pick up the clients
12      previously funded by MAT for
13      residential IOP, non-IOP" -- which
14      means non-intensive -- "of
15      approximately 26,000 per month based
16      on this year's average cost."
17      Q.   Ma'am, the question I had asked
18  was do you see that on October 17, 2014, at
19  1:32 p.m., you write, "That could use up some
20  money, but we will actually have a huge
21  balance"?
22      MR. BADALA: Objection to form.
23  BY MS. CHARLES:
24      Q.   Do you see that on the document?
25      A.   I do. But I'm just trying to

Page 372

1   understand the entire --
2       Q.   Do you recall in 2014 that there
3   was a surplus of funding for the Drug Court?
4       A.   I know that we aggressively
5   obtained federal fundings both from Cleveland
6   and county, which is why we had a leftover
7   budget.
8       Q.   Okay.
9       A.   And also, there was discussion
10  that our ADAMHS Board funding was going to be
11  decreased as well, so --
12      Q.   Do you have an understanding of
13  what the surplus budget was at the end of
14  fiscal year 2014?
15      A.   I do not remember.
16          (Email with attachment, FY2014 -
17          October 2014 MAT and COMBINED
18          Treatment Expenditure Report,
19          Bates CUYAH_002045070 through
20          CUYAH_002045080, marked as
21          Deposition Exhibit 24.)
22  BY MS. CHARLES:
23      Q.   Ms. Leckler, I have just handed
24  you what is marked as Exhibit 24. It is
25  Bates stamped CUYAH_002045070.

Page 373

1       It is a -- the top email is from a
2   Doreen Mittinger, and it was sent on
3   December 17th, 2014.
4       Do you see that?
5       A.   I do.
6       Q.   And Ms. Mittinger writes:
7          "Attached is the October 2014 MAT
8      and Combined Treatment Expenditure
9      Report."
10          The next page starts the
11  attachment.
12          Do you recognize this attachment?
13      A.   Yes.
14      Q.   I'll direct your attention to the
15  page that ends in 5078.
16          Do you see that page?
17      A.   Sorry.
18      Q.   It ends in Bates stamp 5078. It
19  is titled "Combined Treatment Summary FY2014
20  October."
21      A.   Yes.
22      Q.   I'll direct your attention to the
23  bottom of the page. There is a table that
24  I'm going to read from left to right:
25          "Funding stream. Beginning

94 (Pages 370 - 373)

Page 374

1    balance for FY2014.  Remaining
2    balance as of 10/31/2014."
3        Do you see that?
4    A.  Yes.
5    Q.  Okay.
6        And under "Remaining balance for
7    10/31/2014," do you see a remaining balance
8    of $215,602.83?
9    A.  Remaining balance, yes.
10       And then I see -- combined
11   funding, Medicaid adjustment, remaining
12   balance.  I see it.  I just don't fully
13   understand it.
14   Q.  Okay.
15       You testified earlier that certain
16   expenses may be incurred, and then Medicaid
17   reimburses those expenses, correct?
18   A.  That's correct.
19   Q.  So this document has a remaining
20   balance of $175,671.02, and then it shows a
21   Medicaid adjustment of $39,931.81.  And then
22   the last line has a total of $215,602.83.
23       Is it fair to assume that the
24   Medicaid adjustment is a reimbursement from
25   Medicaid --

Page 375

1        MR. BADALA:  Objection to form.
2    BY MS. CHARLES:
3    Q.  -- that increased your total
4    remaining balance?
5        MR. BADALA:  Objection to form.
6        THE WITNESS:  I did not create the
7    document, so --
8    BY MS. CHARLES:
9    Q.  Sure.
10   A.  -- for specific questions, you
11   would have to ask Doreen Mittinger.
12   Q.  Can you agree with me that under
13   "Remaining balance," the total is $215,602,
14   with two months left in fiscal year 2014?
15       MR. BADALA:  Objection to form.
16       THE WITNESS:  I cannot.  I didn't
17   create the document.
18   BY MS. CHARLES:
19   Q.  You cannot agree with me that
20   that's the number on the page here?
21       MR. BADALA:  Objection to form.
22       THE WITNESS:  I see a number,
23   $215,602.83.
24   BY MS. CHARLES:
25   Q.  And do you see, two rows to the

Page 376

1    left, the words "Remaining balance"?
2        MR. BADALA:  Objection to form.
3        THE WITNESS:  Yes.  And I see to
4    the right, "No current treatment
5    funding."
6    BY MS. CHARLES:
7    Q.  Ma'am, you testified earlier that
8    for a certain amount of time, the
9    municipal -- the Cleveland Municipal Court
10   did something called a suburb expansion.
11       Do you recall that testimony?
12   A.  Yes.
13   Q.  By "suburb expansion," did you
14   mean that they were providing services to
15   individuals outside the City of Cleveland?
16   A.  Yes.  I believe I referred the
17   term as "suburban expansion."
18   Q.  Thank you.
19       By "suburban expansion," did they
20   service individuals outside of Cuyahoga
21   County?
22   A.  I do not work in the courts, so I
23   cannot say "yes" or "no."
24   Q.  Does the Cuyahoga County Drug
25   Court service any individuals that reside

Page 377

1    outside of Cuyahoga County?
2    A.  Yes, we do.
3    Q.  How many individuals currently
4    enrolled in the Drug Court reside outside of
5    Cuyahoga County?
6    A.  I do not know the exact figure.
7    Q.  Have you ever conducted any
8    assessment of the money spent by the Cuyahoga
9    County Drug Court to provide services to
10   non-Cuyahoga County residents?
11       MR. BADALA:  Objection, form.
12       THE WITNESS:  I have not.
13   BY MS. CHARLES:
14   Q.  When individuals are enrolled in
15   the court who do not reside in Cuyahoga
16   County, is there any notation in their
17   records that the amount spent on them needs
18   to be somehow recorded as a -- are they --
19   sorry.  Strike that.
20       When individuals who reside
21   outside of Cuyahoga County are enrolled in
22   the Drug Court, is there any notation in
23   their records that they reside outside of
24   Cuyahoga County?
25   A.  We note their address.

95 (Pages 374 - 377)

Page 378

1    Q.   When they are provided services,
2  is there any notation in the summary of costs
3  provided or services provided that it is for
4  a non-county -- or a resident outside of
5  Cuyahoga County?
6         MR. BADALA:  Objection to form.
7         THE WITNESS:  I do not know
8    because I do not submit invoice
9    requests.
10  BY MS. CHARLES:
11   Q.   Is there a document maintained by
12  the Cuyahoga County Drug Court that shows all
13  expenses incurred in the fiscal year?
14        MR. BADALA:  Objection to form.
15        THE WITNESS:  I don't know.
16  BY MS. CHARLES:
17   Q.   When costs are incurred by the
18  Cuyahoga County Drug Court, are they
19  recorded -- are they linked to a specific
20  patient?
21        MR. BADALA:  Objection to form.
22        THE WITNESS:  I don't know.
23  BY MS. CHARLES:
24   Q.   Have you ever reviewed an invoice
25  that is submitted to the ADAMHS Board for

Page 379

1  services -- services provided by the Cuyahoga
2  County Drug Court?
3    A.   Yes.
4    Q.   Did that invoice provide specific
5  patient names or other identifying
6  information for which patients had received
7  that care?
8    A.   Yes.
9    Q.   Did the invoice provide any
10  indication as to what substance abuse
11  disorder those individuals were suffering
12  from?
13   A.   I do not know.
14   Q.   Are you aware of any way to look
15  at the total expenses incurred for the
16  Cuyahoga County Drug Court and identify how
17  much of it was spent only for opioid-related
18  substance abuse disorder?
19   A.   I could not calculate it, but I'm
20  sure someone could.
21   Q.   What makes you sure someone could?
22   A.   I am not a statistician.
23   Q.   Sure.  Well, when you testified --
24   A.   I had just gotten the bachelor's
25  degree with math, so it was not -- although I

Page 380

1  enjoyed the class, it was not my expertise.
2    Q.   Right.  When you say you're sure
3  someone could, what is your basis of
4  knowledge to testify?
5    A.   Okay.  So someone could -- any
6  person that has any interaction with the
7  local ADAMHS Board, meaning the county paying
8  for any services, it's in reference to a
9  number.
10        That number could be followed.
11  You could pull how much money was spent on
12  that individual over, I'm assuming, X number
13  of years.  I don't know how far their records
14  go.
15        So that would indicate how many
16  times they went into treatment and were
17  serviced only by an ADAMHS Board funding
18  place.  It would be, like I stated before,
19  not all treatment agencies are funded by the
20  ADAMHS Board.
21        There's a lot of -- a number of
22  peer-recovery houses that individuals
23  utilize.  I stated previously, the examples
24  of those are Ed Keating Center, the Lantern,
25  the Absolute House, Jean Marie.  Those are

Page 381

1  non-profits.  Those facilities raise their
2  own funds and help those individuals get into
3  treatment.
4        So there is a way you could
5  calculate that.  I just personally could not
6  do that.
7        There's also the drug testing that
8  can be placed a price as -- on.  On average,
9  clients are testing numerous times per week.
10  The staff used to supervise those clients.
11  I --
12   Q.   So, ma'am, I understand you've
13  just spoken about some funds extended by some
14  private caregivers and also some funds that
15  ADAMHS Board reviews and allocates.
16        For Cuyahoga County Drug Court,
17  are you aware of any document that would
18  allow you to track the number -- the total
19  expenses incurred for services to clients
20  with opioid substance abuse disorder?
21        MR. BADALA:  Objection to form.
22        THE WITNESS:  Am I aware of any
23   document.  It would have to be
24   documents.
25

96 (Pages 378 - 381)

Page 382

1    BY MS. CHARLES:
2        Q.   Okay.
3        A.   I could not do that.
4        Q.   When you say "documents," what
5    documents?
6        A.   Like I stated before --
7        Q.   And I don't want to cut you off,
8    but just staying right with the Drug Court.
9    So I think before we talked about ADAMHS
10   Board and other individuals, but within the
11   Drug Court.
12       A.   Yes.
13            So, for example, an individual
14   could go to Care Alliance for mental health
15   counseling.  That is a county public health
16   agency, so you would have to obtain the --
17   what that agency spent on services delivered
18   to that individual.
19       Q.   Individuals who go to Care
20   Alliance are not only being treated for
21   opioid substance abuse disorder, right?  It's
22   anyone who needs a mental health assessment?
23            MR. BADALA:  Objection to form.
24            THE WITNESS:  You said Drug Court.
25   So we do have Drug Court clients that go

Page 383

1    to Care Alliance.  So that's what I was
2        referring to.
3    BY MS. CHARLES:
4        Q.    Does the Drug Court track its
5    expenses divided by the certain type of
6    substance abuse disorder?
7            MR. BADALA:  Objection to form.
8            THE WITNESS:  I don't know.  No.
9    BY MS. CHARLES:
10       Q.    You're not aware of any way for
11   the Drug Court to say, for instance,
12   10 percent of our budget was spent on people
13   with heroin addiction?
14           MR. BADALA:  Objection to form.
15           THE WITNESS:  I personally cannot.
16   BY MS. CHARLES:
17       Q.    Based on your experience in Drug
18   Court, do you have an idea of the annual
19   cost, the average cost to treat a client in
20   Drug Court for a year?
21       A.    I do not.
22       Q.    Do you have any understanding of
23   whether a year of treatment in Drug Court is
24   more or less expensive than a year of
25   incarceration?

Page 384

1        A.   I do not.
2        Q.   Do you ever -- in any of your
3    trainings that you've attended, have you ever
4    received information about whether Drug Court
5    is more or less expensive than incarceration?
6        A.   I do not remember.
7            MR. BADALA:  Counsel, I think your
8    seven hours is up.  We're past your
9    time.  So we're going to take a
10   five-minute break, because I may have
11   some questions.
12           THE VIDEOGRAPHER:  We're off the
13   record, 7:07.
14           (Recess taken.)
15           THE VIDEOGRAPHER:  We're back on
16   the record.  7:18.
17           ---
18           EXAMINATION
19   BY MR. BADALA:
20       Q.   Okay, Ms. Leckler.  I know you've
21   been here for over nine hours, but I just
22   wanted to follow up on some questions you
23   were asked earlier today.
24           Could you go to Exhibit 13.
25       A.   Okay.

Page 385

1        Q.   Just pull that out of the pile?
2            Just let me know when you have it.
3        A.   Yes.  I have it.
4        Q.   And that's the beginning Bates
5    Number 2048206?
6        A.   Yes.
7        Q.   Can you flip to the last page of
8    that document, which ends in -- let me get
9    this right -- 2048210?
10       A.   Okay.
11       Q.   Now, I know Ms. Rendon and
12   Mr. Ruiz asked you several questions about
13   this document.  I'm just going to read you
14   something that neither one read earlier
15   today.
16           Do you see the "Conclusion"
17   section?
18       A.   I do.
19       Q.   Can you read that first sentence
20   into the record.
21       A.   "Our data document that as the
22   most commonly prescribed opioids, hydrocodone
23   and oxycodone became less accessible due to
24   supply-side interventions."
25           Go on?

97 (Pages 382 - 385)

Page 386

1    Q.   Yes.
2    A.   "The use of heroin as an
3  initiating opioid has grown at an alarming
4  rate."
5    Q.   That's all.
6    A.   Okay.
7    Q.   Just put that to the side for a
8  moment.
9         Let me ask you this question: Do
10  you believe there currently is an opioid
11  epidemic in Cuyahoga County?
12         MS. CHARLES: Objection, form.
13         MS. RENDON: Objection.
14         MR. BADALA: What's the basis for
15  the objection?  And how many people are
16  objecting?  Are you the first?  What's
17  the basis for your objection?
18         MS. CHARLES: I think she was
19  first, but --
20         MR. BADALA: What's the basis for
21  your objection?
22         MS. CHARLES: Vague and ambiguous.
23         MR. BADALA: What's vague?
24         MS. CHARLES: Opioid epidemic,
25  current belief.  She can answer.

Page 387

1         MR. BADALA: Those are the words
2  used by your counsel today, so move to
3  strike the objection.
4         MS. CHARLES: Okay.  I'm just
5  making the objection for the record.
6  BY MR. BADALA:
7    Q.   Okay.  I'm going to reask you
8  again.
9         Do you believe there currently is
10  an opioid epidemic in Cuyahoga County?
11         MS. CHARLES: Objection, form.
12         MR. BADALA: Move to strike the
13  objection.
14         THE WITNESS: Can I answer?
15         MR. BADALA: Yes.
16         THE WITNESS: Yes.
17  BY MR. BADALA:
18    Q.   When did you first come to know
19  that there is an opioid epidemic in Cuyahoga
20  County?
21         MS. RENDON: Objection, form.
22         MR. BADALA: What's your basis?
23         MS. RENDON: I would like the
24  witness to define what "opioid epidemic"
25  is.

Page 388

1         MR. BADALA: Is that not a term?
2         MS. RENDON: I'll ask her that on
3  cross-examination.  I'm making an
4  objection for the record, Sal, just like
5  you did all day long.
6         Objection to the form of the
7  question.  Vague.  Lacking foundation.
8         MR. BADALA: Move to strike the
9  objection.
10         MS. RENDON: You cannot move to
11  strike the objection.  The objection is
12  for the record, Sal. That's how it
13  works.
14         MR. BADALA: Yes, you can, if you
15  cannot provide a basis.
16         MS. RENDON: I did.  Let me make
17  it clear, because apparently you didn't
18  hear.  The basis is vague and lack of
19  foundation.
20         MR. BADALA: What's vague?
21         MS. RENDON: The terminology
22  "opioid epidemic," undefined, is vague
23  and lacking in foundation.
24         MR. BADALA: Hold on.  Was that
25  not a term used by you all day today?

Page 389

1         MS. RENDON: Not used by me all
2  day today, Sal.
3         MR. BADALA: Did you use it at
4  least once?
5         MS. RENDON: I don't know.
6         MR. BADALA: Come on.
7  BY MR. BADALA:
8    Q.   Do you believe -- I'm sorry.
9         When did you first learn --
10         MS. RENDON: Objection stands.
11  BY MR. BADALA:
12    Q.   When did you first come to learn
13  there is an opioid epidemic in Cuyahoga
14  County?
15         MS. RENDON: Objection.
16         THE WITNESS: Am I allowed to
17  answer?
18  BY MR. BADALA:
19    Q.   Yes.
20    A.   There was -- it was declared an
21  opioid epidemic by the county.  I also saw
22  the president declare an opioid epidemic.  By
23  "president," I mean Trump.
24    Q.   What year was that?
25    A.   I don't know.

98 (Pages 386 - 389)

Page 390

1    Q.   Was it in 2017?
2    A.   I know it was -- I do not know the
3    exact date.
4    Q.   Do you know if it was within the
5    last year?
6        MS. CHARLES:  Objection, form.
7        THE WITNESS:  I don't know.
8    BY MR. BADALA:
9    Q.   Now, if you could turn to
10   Exhibit 16.  Just let me know when you have
11   that document.
12   A.   Okay.
13   Q.   And do you recall being asked
14   questions about this document?
15   A.   I do.
16   Q.   Okay.
17       And specifically, this document
18   stated that there was a rise in candidates
19   with heroin and opioid diagnoses.
20       Do you see that?
21   A.   Yes.
22   Q.   At that time, when you received
23   this document in 2010, did you know that
24   there was an opioid epidemic in Cuyahoga
25   County?

Page 391

1        MS. CHARLES:  Objection, form.
2        MS. RENDON:  Objection.
3        THE WITNESS:  I did not.
4    BY MR. BADALA:
5    Q.   If you could turn to Exhibit 22.
6    A.   Okay.
7    Q.   Okay.  And this was Cuyahoga
8    County's responses and objections to
9    Interrogatory 18.
10   Do you recall being asked
11   questions about this document?
12   A.   I do.
13   Q.   And Ms. Charles --
14       MR. BADALA:  I'm sorry, is that
15   your last name?
16       MS. CHARLES:  That is my name.
17   BY MR. BADALA:
18   Q.   And Ms. Charles asked you if you
19   have knowledge about quantifying these
20   damages.
21       Do you recall that?
22   A.   Yes.
23   Q.   Now, that's not what the
24   interrogatory asks.
25       Are you a person with knowledge

Page 392

1    about such damages to the Cuyahoga County
2    Drug Court and Recovery Court?
3        MS. CHARLES:  Objection, form.
4        THE WITNESS:  Yes.
5    BY MR. BADALA:
6    Q.   Tell me about those damages.
7    A.   The court had to expand to assist
8    and treat additional clients.  We've expanded
9    by adding two additional dockets.  We've
10   expanded by adding additional treatment
11   funds.  We've expanded by adding additional
12   drug testing.
13       We've expanded by adding
14   additional staff.  That staff includes case
15   management, probation staff, drug testing,
16   treatment, whether it be residential, IOP or
17   non-IOP, bus tickets.
18       Medication-assisted treatment is
19   another huge one.  We added an additional
20   docket to specifically deal with those of
21   opioid disorder.  And if they would like to
22   participate in any forms of
23   medication-assisted treatment.
24       We developed the jail
25   medication-assisted treatment program to

Page 393

1    hopefully assist those individuals before
2    they go to treatment so that they can receive
3    medication-assisted treatment while they're
4    in the jail before they go into treatment.
5    Q.   Is that all?
6    A.   I'm sure I'm forgetting some,
7    but -- I guess I could go on and on.
8        Sober housing.  I believe I didn't
9    touch on that again.  Sober housing is
10   consistently used by both programs.
11   Q.   What socioeconomic groups are
12   affected by the opioid epidemic in Cuyahoga
13   County?
14       MS. CHARLES:  Objection, form.
15       THE WITNESS:  All.
16   BY MR. BADALA:
17   Q.   I'm sorry.  You said "all"?
18   A.   I said "all."
19   Q.   Do you recall testifying earlier
20   that you were familiar with Ms. Rendon prior
21   to the deposition?
22   A.   I do.
23       MS. CHARLES:  Objection, misstates
24   prior testimony.
25       MS. RENDON:  Objection as to

99 (Pages 390 - 393)

Page 394

1    relevance.
2    BY MR. BADALA:
3        Q.   I'm sorry.  Did I misstate your
4    prior testimony?
5           MS. RENDON:  Mr. Badala, this has
6       been an issue that has been discussed
7       with counsel in letters.  This is not an
8       appropriate subject matter for this
9       witness or any witness' deposition.  So
10      I object on that basis as well.
11          MS. CHARLES:  And it misstates the
12      prior testimony.
13   BY MR. BADALA:
14       Q.   Ms. Leckler, did I misstate your
15   prior testimony?
16       A.   No.
17          MS. CHARLES:  I'm happy to tell
18      you how.
19          MR. BADALA:  You're not testifying
20      today.
21          MS. CHARLES:  Okay.
22   BY MR. BADALA:
23       Q.   Where do you recall seeing
24   Ms. Rendon's name prior to today?
25       A.   I've heard of Ms. Rendon's name in

Page 395

1    regards to the US Attorney's Task Force,
2    opiate group.
3           I've heard her name in discussions
4    with -- that Judge Synenberg has stated when
5    she describes the --
6           MS. RENDON:  Objection, move to
7       strike.  Irrelevant.  Hearsay.
8           MR. BADALA:  I'm sorry, did you
9       finish?
10          MS. RENDON:  Whatever
11      Judge Synenberg had to say about me has
12      nothing to do with this litigation,
13      Mr. Badala.
14   BY MR. BADALA:
15       Q.   Can you finish your answer?
16       A.   When Judge Synenberg is discussing
17   the collaborations of the other committees
18   that she is involved in, she has stated
19   Carole Rendon's name in regards to the US
20   Attorney's Opiate Task Force.
21       Q.   And the task force that you're
22   referring to, the US Attorney's Task Force,
23   do you know if any Cuyahoga County employees
24   attended those meetings?
25          MS. RENDON:  Objection.

Page 396

1           THE WITNESS:  I do.
2           MR. BADALA:  Okay.  I have no
3    further questions.
4           MS. RENDON:  I do.
5           MR. BADALA:  Well, you used your
6    seven hours.
7           MS. RENDON:  No.  Pursuant to the
8    deposition protocol, we get a minute per
9    minute on your recross.
10          MR. BADALA:  Can you show me that
11   section?
12          MS. RENDON:  Sure.
13          MR. BADALA:  Can you just tell me
14   how much time we spent on --
15          THE VIDEOGRAPHER:  Ten minutes.
16          MR. BADALA:  Ten minutes?  Okay.
17      I don't think it really addresses
18      the seven hours.  I'll allow it, but I'm
19      just going to state my objection.
20          MS. CHARLES:  This has been
21      happening in the depositions you've
22      taken of our witnesses for weeks.
23          MR. BADALA:  So if I could just
24      state my objection to counsel asking
25      questions after already having seven

Page 397

1    hours.
2           ---
3           RE-EXAMINATION
4    BY MS. RENDON:
5        Q.   Ms. Leckler, can you get out
6    Exhibit 13?
7        A.   Yes.
8           MS. RENDON:  I'm ready when you
9       are.
10          THE VIDEOGRAPHER:  We're rolling.
11   BY MS. RENDON:
12       Q.   Ms. Leckler, you were just asked
13   some questions about Exhibit 13.  And in
14   particular, your counsel read into the record
15   a sentence on page 8210.
16          What does "heroin as an initiating
17   opioid" mean to you?
18          MR. BADALA:  Just for the record,
19      I didn't read it into the record.
20          THE WITNESS:  I don't know.  I
21      didn't -- I didn't write it.
22   BY MS. RENDON:
23       Q.   So you don't know what it means
24   that heroin is an initiating opioid?
25       A.   I don't absolutely know, no.

100 (Pages 394 - 397)

Page 398

1    Q.   Do you know that the word
2   "initiating" means beginning or starting?
3        MR. BADALA:  Objection to form.
4        THE WITNESS:  I do.
5   BY MS. RENDON:
6    Q.   Is heroin sometimes the first
7   opioid that a drug user uses?
8        MR. BADALA:  Objection to form.
9        THE WITNESS:  According to this
10       documentation, it is stating that.
11  BY MS. RENDON:
12   Q.   You indicated that there was a
13  time when an opioid epidemic was declared; is
14  that correct?
15   A.   That is correct.
16   Q.   And, Ms. Leckler, is that when the
17  opioid epidemic began in Cuyahoga County?
18   A.   I do not know.
19   Q.   So you have no idea when the
20  opioid epidemic started?
21       MR. BADALA:  Objection to form.
22       THE WITNESS:  I do not know.
23  BY MS. RENDON:
24   Q.   Do you have any idea when the
25  opioid epidemic started?

Page 399

1        MR. BADALA:  Objection to form.
2        THE WITNESS:  I know when it was
3        declared an opioid epidemic by the
4        County and by the president.
5   BY MS. RENDON:
6    Q.   But you don't know if that was
7   actually the beginning date, correct?
8        MR. BADALA:  Objection to form.
9        THE WITNESS:  I do not.
10  BY MS. RENDON:
11   Q.   What is the opioid epidemic in
12  Cuyahoga County?
13   A.   What is the opioid epidemic in
14  Cuyahoga County?  The opioid epidemic in
15  Cuyahoga County is referring to the overdoses
16  that are occurring in Cuyahoga County, the
17  interaction by the EMS and EMT dealing with
18  the opioid epidemic, the effect that it has
19  caused to the Drug Court program.
20       That effect has caused us to look
21  to expand the program by adding additional
22  dockets, additional --
23   Q.   I'm not asking the effect of the
24  opioid epidemic.  I asked you to tell me --
25  to define the opioid epidemic.  What is the

Page 400

1   opioid epidemic in Cuyahoga County?
2        MR. BADALA:  You can finish your
3        answer.
4        THE WITNESS:  Okay.  I'm sorry.  I
5        thought I was.
6        MR. BADALA:  Yes.
7   BY MS. RENDON:
8    Q.   Putting aside all of the costs,
9   which we've talked about endlessly.  I'm not
10  asking you the cost.  I'm asking you what is
11  your definition of the opioid epidemic in
12  Cuyahoga County?  What is it?
13       MR. BADALA:  Objection, asked and
14       answered.  And counsel has cut off the
15       witness, even though she is responding
16       to the question.
17       THE WITNESS:  Yes.  So the opioid
18       epidemic was declared as a result of the
19       ongoing increasingly accidental
20       overdoses that occurred here in Cuyahoga
21       County.
22       It is an epidemic because of the
23       effects that it has caused to the staff,
24       myself included, that work with this,
25       like I said before, the EMT, the ER -- I

Page 401

1        could go on and on and on, the secondary
2        trauma that it has caused to both our
3        staff and to the EMT.
4   BY MS. RENDON:
5    Q.   And by "opioid," we mean all types
6   of opioids, illegal drugs, legal
7   prescriptions, and prescription drugs that
8   are purchased illegally, correct?
9        MR. BADALA:  Objection to form.
10       THE WITNESS:  Yes.  As we stated
11       many times before, that is what we are
12       including.
13  BY MS. RENDON:
14   Q.   It's an opioid epidemic, not an
15  opiate epidemic, correct?
16   A.   Yes.  That is correct.
17   Q.   And, Ms. Leckler, although I think
18  all of these questions are completely
19  irrelevant, have we ever met before?
20   A.   No.  I've heard your name at
21  numerous occasions.
22   Q.   Have we ever attended a meeting
23  together?
24   A.   We may have.  You look familiar.
25   Q.   Do you have any idea how many

101 (Pages 398 - 401)

1  people attended the US Attorney's Heroin and
2  Opiate Task Force?
3      A.   I do not.  I was able to see some
4  of the footage of the meeting on a feed at
5  one time.
6      Q.   But you have no idea how many
7  people were there?
8      A.   I couldn't.  I could only see part
9  of the table.
10      Q.   Are you aware of any unique
11  knowledge that I have with respect to
12  anything having to do with this litigation?
13          MR. BADALA:  Objection to form.
14          THE WITNESS:  I know that you have
15      spoken with my bosses.
16  BY MS. RENDON:
17      Q.   Do you have any idea what I talked
18  to them about?
19      A.   I do not.
20      Q.   Were you present for any of those
21  conversations?
22      A.   I was not.
23          MS. RENDON:  Thank you.  We're off
24      the record.
25          MR. BADALA:  We can stay on the

1  record for a second.
2          I know Ms. Rendon had an objection
3      that it wasn't relevant.  Obviously, her
4      follow-up does show that it is relevant
5      to this litigation.
6          MS. RENDON:  It is not relevant.
7      I made it clear that it was not
8      relevant.  I wanted to get your client's
9      information with respect to that, Mr.
10      Badala.
11          That is why these matters are
12      supposed to be handled by counsel
13      through letters and conversations.  I
14      have an open dialogue about it, and it's
15      not a matter that is supposed to be on
16      the record.
17          MR. BADALA:  So if you could just
18      let me finish before being cut off.
19      Obviously, it has become relevant due to
20      the follow-up that was done by
21      Ms. Rendon.
22          MS. RENDON:  I disagree.  Off the
23      record.
24          THE VIDEOGRAPHER:  We're off the
25      record, 7:36.

1          (Time noted: 7:36 p.m.)

2          Whereupon, counsel was requested to give
3  instruction regarding the witness's review of
4  the transcript pursuant to the Civil Rules.

7              SIGNATURE:
8      Transcript review was requested pursuant
9  to the applicable Rules of Civil Procedure.

11              TRANSCRIPT DELIVERY:
12      Counsel was requested to give instruction
13  regarding delivery date of transcript.

102 (Pages 402 - 405)

Page 406

1      C E R T I F I C A T E

2

3      I, ANNE E. VOSBURGH, Certified Shorthand

4      Reporter, Registered Professional Reporter,

5      Certified Realtime Reporter, and Notary

6      Public, hereby certify:

7      That MOLLY LECKLER was duly sworn by me,

8      an authorized Notary Public, and that this

9      deposition is a true and correct record of the

10     testimony given by such witness to the best of

11     my knowledge and ability.

12     I further certify that I am not related

13     to any of the parties to this action and that

14     I am in no way interested in the outcome of

15     this matter.

16     In witness whereof, I have hereunto set

17     my hand this day, November 26, 2018.

18

19     _Anne E Vosburgh_

20     Anne E. Vosburgh, CSR-6804, RPR, CRR

21

22

23

24

25

---

Page 407

1              Veritext Legal Solutions
               1100 Superior Ave
2              Suite 1820
               Cleveland, Ohio 44114
3              Phone: 216-523-1313
4
       November 26, 2018
5
       To: Salvatore C. Badala
6
       Case Name: In Re: National Prescription Opiate Litigation v.
7
       Veritext Reference Number: 3113667
8
       Witness:  Molly Leckler      Deposition Date:  11/19/2018
9
10     Dear Sir/Madam:
11
       The deposition transcript taken in the above-referenced
12
       matter, with the reading and signing having not been
13
       expressly waived, has been completed and is available
14
       for review and signature.  Please call our office to
15
       make arrangements for a convenient location to
16
       accomplish this or if you prefer a certified transcript
17
       can be purchased.
18
19     If the errata is not returned within thirty days of your
20     receipt of this letter, the reading and signing will be
21     deemed waived.
22
23     Sincerely,
24     Production Department
25
       NO NOTARY REQUIRED IN CA

---

Page 408

1              DEPOSITION REVIEW
               CERTIFICATION OF WITNESS
2
       ASSIGNMENT REFERENCE NO: 3113667
3      CASE NAME: In Re: National Prescription Opiate Litigation v.
       DATE OF DEPOSITION: 11/19/2018
4      WITNESS' NAME: Molly Leckler
5      In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
6      my testimony or it has been read to me.
7      I have made no changes to the testimony
       as transcribed by the court reporter.
8
9      Date _____      Molly Leckler
10     Sworn to and subscribed before me, a
       Notary Public in and for the State and County,
11     the referenced witness did personally appear
       and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
       Statement; and
14     Their execution of this Statement is of
       their free act and deed.
15
       I have affixed my name and official seal
16
       this _____ day of _____, 20____.
17
18     _____
       Notary Public
19
       _____
       Commission Expiration Date
20
21
22
23
24
25

---

Page 409

1              DEPOSITION REVIEW
               CERTIFICATION OF WITNESS
2
       ASSIGNMENT REFERENCE NO: 3113667
3      CASE NAME: In Re: National Prescription Opiate Litigation v.
       DATE OF DEPOSITION: 11/19/2018
4      WITNESS' NAME: Molly Leckler
5      In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
6      my testimony or it has been read to me.
7      I have listed my changes on the attached
       Errata Sheet, listing page and line numbers as
8      well as the reason(s) for the change(s).
9      I request that these changes be entered
       as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11     as this Certificate, and request and authorize
       that both be appended to the transcript of my
12     testimony and be incorporated therein.
13     Date _____      Molly Leckler
14
       Sworn to and subscribed before me, a
15     Notary Public in and for the State and County,
       the referenced witness did personally appear
16     and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18     in the appended Errata Sheet;
       They signed the foregoing Sworn
19     Statement; and
       Their execution of this Statement is of
20     their free act and deed.
21     I have affixed my name and official seal
22     this _____ day of _____, 20____.
23
       _____
       Notary Public
24
       _____
25     Commission Expiration Date

103 (Pages 406 - 409)

Page 410

1       ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2       ASSIGNMENT NO: 11/19/2018
3   PAGE/LINE(S) /      CHANGE      /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19

    _____  _____
20  Date            Molly Leckler
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
    Notary Public
24
    _____
25  Commission Expiration Date

| & |
|---|
| **&** 2:7 3:14 5:19 6:4,15 7:13,21 16:2,13,18,21,24 58:15 |

| 0 |
|---|
| **000117415** 10:9 128:21 129:7 |
| **000117420** 10:10 128:22 |
| **000117444** 13:7 290:19 291:1 |
| **000117449** 13:8 290:20 |
| **000166587** 11:13 194:18,22 |
| **000367329** 10:24 165:22 |
| **000367330** 10:25 165:23 |
| **001432160** 11:17 200:16,23 |
| **001432162** 11:18 200:17 |
| **001621485** 10:19 161:21 162:1 |
| **001621487** 10:20 161:22 |
| **001621535** 12:5 218:20 |
| **001621537** 12:6 218:21 |
| **001714460** 13:10 303:24 304:5 |
| **001897420** 11:22 208:6 |
| **001897422** 11:23 208:7 |
| **002015681** 12:8 221:1,5 |

**002040381** 12:21 256:25 257:7
**002040408** 12:22 257:1
**002040764** 13:13 311:24 312:3
**002040812** 312:24
**002040838** 13:13 311:24
**002045070** 14:11 372:19,25
**002045080** 14:12 372:20
**002045311** 10:14 155:23 156:3
**002045312** 10:15 155:24
**002048206** 12:10 228:13
**002048210** 12:11 228:14
**002049703** 11:10 180:2,5
**002049705** 11:11 180:3
**002051005** 13:4 282:16,24
**002051007** 13:5 282:17
**00335270** 365:15
**00335 2707** 14:6 365:9
**003352711** 14:7 365:10
**003359808** 11:6 172:20,24
**003359809** 11:7 172:25
**00912771** 12:17 246:8,14

**00912773** 12:18 246:9
**010715371** 12:24 274:22 275:6
**010715372** 12:25 274:23
**011015215** 10:6 34:21,25
**011015216** 10:7 35:1

| 1 |
|---|
| **1** 10:3 34:20 35:2 118:4 158:21 232:21 257:14 |
| **1.2** 152:15 |
| **1/3/2018** 305:8 |
| **10** 11:19 208:8,11 356:24 383:12 |
| **10,000** 134:11 181:2 |
| **10/31/2014** 374:2 374:7 |
| **100** 52:16 125:9 219:11 222:12 238:11 |
| **1000** 4:16 7:6 |
| **1001** 3:15 |
| **1007** 282:24 |
| **101** 61:25 292:19 |
| **102** 208:22 209:5 |
| **10:00** 1:17 2:4 15:2 |
| **10:03** 15:9 |
| **10:23** 34:1 |
| **10:35** 34:4,11 |
| **10:36** 34:5,12 |
| **10:42** 34:8,15 |
| **10th** 270:14 |
| **11** 12:3 106:7 218:22,25 305:12 |

**11/06** 153:21
**11/19/2018** 407:8 408:3 409:3 410:2
**1100** 407:1
**1111** 6:16
**117445** 292:5
**117449** 291:1
**11747** 3:7
**11:25** 66:23
**11:38** 67:1
**12** 11:9 12:7 32:14 180:1,8 201:11 220:23 221:2 280:14
**120** 108:13,18
**128** 10:8
**12:30** 113:13
**13** 12:9 127:22 228:11,15 260:15 260:24 270:12,18 384:24 397:6,13
**1301** 7:5
**13334** 406:19
**14** 12:12 104:16 127:23 246:10,13 261:7 331:25
**15** 12:19 13:12 257:2,5 262:9,18 311:23 346:18 347:17
**150** 108:10 111:12 113:24 236:15 272:3,21 273:1 291:18
**15219** 7:23
**15372** 275:7
**155** 10:11
**16** 12:23 127:24 153:24 162:13 260:1 261:9 274:24 275:3

390:10
**160** 208:22 209:5,7
209:7,9
**161** 10:16
**162** 206:6
**165** 10:21
**17** 1:7 9:6,16 13:3
13:12 15:16 260:2
261:11 266:12
267:13 282:18,21
311:23 371:18
**1710** 3:15
**172** 11:3
**175,671.02** 374:20
**179** 11:8
**17th** 194:24
366:11 373:3
**18** 13:6,20 290:21
290:23 346:20
347:19,24 354:21
355:9 391:9
**180** 104:25 105:4,5
105:6 107:1,5
126:23,23 127:5,6
326:21 327:14
**180,000** 152:20
**1800** 4:16
**1820** 407:2
**18th** 290:25
**19** 1:17 2:3 13:9
15:2 303:25 304:6
305:6
**19,000** 157:15,19
**19,634.58** 157:11
**19,634.58.** 157:6
**194** 11:12
**1950** 2:8
**1965** 164:11
**1970s** 218:10,15
**19th** 15:7

**1:07** 113:19
**1:18** 1:12
**1:32** 371:19
**1:34** 166:4

**2**

**2** 10:8 126:24
128:19,23 232:22
**2/18/16** 13:7
290:19
**2/26** 307:23
**2/26/2018** 306:25
**20** 13:11 49:17
51:4,9 127:18,23
154:6,22 191:15
311:21,25 408:16
409:22 410:22
**200** 11:14
**20001-3743** 5:9
**20001-4956** 5:22
**20004** 6:17
**20005** 7:7,15
**20036-5807** 4:17
**2004** 20:14
**2006** 19:12 20:7
**2009** 18:24 19:25
20:4 111:20 112:7
112:14,21 114:11
115:3,9,11,19
117:17,21 129:23
349:5 360:20
361:3
**2009/2010** 197:12
**2010** 196:19 197:1
276:19 277:13
278:10 361:6
390:23
**2012** 208:22
361:24
**2013** 10:22 11:16
11:21 165:21
194:24 195:8,8

200:15 201:3
208:5,17 362:3
**2014** 14:4,9 19:2,4
129:10 134:13
154:3 155:9 166:3
173:4 177:6
181:15 246:21
365:8,17,25,25
366:11,22,22
371:18 372:2,14
372:17 373:3,7
375:14
**2015** 11:9 19:8
23:11,16 108:16
177:5 180:1,8
181:15,17 230:15
231:4,6 232:23
234:6 235:4
**2016** 13:12 155:7
188:13 290:25
293:18 294:4,18
311:23
**2017** 95:16 177:6
231:9,17 234:5
235:3 270:14
390:1
**2018** 1:17 2:3
13:22 15:2,8
23:11 301:14,18
303:1 305:12
340:15 354:23
406:17 407:4
**202.414.9200** 7:8
**202.434.5421** 7:16
**202.662.6000** 5:23
**202.739.9000** 6:18
**202.778.1823** 4:18
**202.942.5150** 5:10
**2040383** 259:20
**2040408** 257:7

**2040838** 312:4
**2048206** 385:5
**2048210** 385:9
**207** 235:5
**208** 11:19
**209** 228:21
**21** 13:14 266:10
345:18,23 346:3
**215,602** 375:13
**215,602.83** 374:8
**215,602.83.** 374:22
375:23
**216-523-1313**
407:3
**216.912.5516** 3:17
**217** 35:22 36:24
**218** 12:3 48:14
127:9
**219** 118:7
**22** 10:17 13:18
161:19 354:18,24
391:5
**220** 12:7
**222** 126:6
**225** 181:14
**228** 12:9
**22nd** 365:17
**23** 13:22 14:3
347:14 348:16
354:23 365:6,11
365:14
**24** 14:8 372:21,24
**24.1** 230:14
**246** 12:12
**248** 9:7
**25** 11:21 97:17
208:5 222:13
**2500** 219:12
**256** 9:16 12:19
**25th** 208:17
276:19

**[26 - absolute]**                                    Page 3

**26**   406:17 407:4
**26,000**   371:15
**27.8**   230:15
**2709**   370:18
**2710**   366:10
**274**   12:23
**28**   11:16 200:15
**2804**   1:6,7 15:16
**282**   13:3
**28th**   201:2
**29**   154:16,17
**290**   13:6
**2:20**   171:22
**2:32**   171:25
**2:37**   175:10
**2:38**   175:13

**3**

**3**   10:11 126:24
   155:25 156:3
   259:19
**3/01**   307:23
**3/1/2018**   307:1
**3/27**   309:4
**3/27/18**   309:2
**30**   46:3 184:3
   359:4
**300,000**   152:16
   158:23
**304**   13:9
**305**   3:6
**30th**   158:22
**311**   13:11
**3113667**   1:25
   407:7 408:2 409:2
**31st**   129:10
**325**   4:6 191:18
**325,000**   144:12
**330.305.6400**   6:8
**332**   9:8
**34**   10:3

**345**   13:14
**354**   13:18
**35th**   7:22
**365**   14:3
**372**   14:8
**384**   9:9
**39,931.81.**   374:21
**397**   9:10
**3:05**   194:10
**3:07**   194:13
**3:30**   214:15
**3:49**   214:18
**3rd**   166:3

**4**

**4**   10:16 126:24
   161:23 162:1
**4/16/18**   309:16
**4/3/18**   309:3
**4/5/18**   309:16
**4/9/18**   310:8
**40**   56:7,22 184:3
   358:22
**400**   3:6 6:5 154:18
**40812**   314:22
**40813**   314:22
**416**   143:7
**418**   150:8
**42.3**   230:12
**42.4**   230:12
**421**   212:18
**43215**   4:7
**44114**   3:16 407:2
**44133**   17:24
**44720**   6:7
**45090**   1:12
**486**   164:10
**4:30**   248:8
**4:41**   248:11
**4:42**   248:15
**4:43**   248:18

**5**

**5**   10:21 21:11
   121:3 165:19,24
   257:15
**5,000**   181:2
**5/3/2016**   283:6
**50**   97:11 183:7
**50/50**   172:12
**5078**   373:15,18
**51**   269:19
**55**   2:8
**5:31**   298:1,2
**5:38**   298:3,5

**6**

**6**   11:3 172:18
   173:1 355:7,8
**60**   158:24,25
**60,000**   180:17
**600**   4:6 105:20
**601**   5:8
**614.281.3618**   4:8
**62**   255:16
**631.224.1133**   3:8
**65**   150:19,22 151:8
   151:18 191:18
   238:12
**65,000**   191:16
**6804**   1:24 2:11
   406:20
**6:11**   332:15
**6:12**   332:18

**7**

**7**   11:8 177:5 180:4
   355:7,16
**7,000**   366:23
**725**   7:14
**75**   48:7 115:4
   209:10
**7:07**   384:13

**7:18**   384:16
**7:36**   403:25 404:1
**7th**   173:4

**8**

**8**   11:12 194:16,19
**8040**   6:6
**8210**   397:15
**85**   59:25 250:13
   254:24 255:12,15
   255:23 268:1
**850**   5:21
**87**   255:15

**9**

**9**   11:14 200:18,21
   313:3 356:6
**90**   108:12,18
**9881**   17:23
**9th**   246:21

**a**

**a.m.**   1:17 2:4 15:2
   15:9
**aaron**   202:15,20
**abided**   317:12
**ability**   162:24
   270:8 280:4
   314:20 406:11
**able**   27:20 53:16
   71:16,19 83:14
   94:13 101:24
   112:10,22 164:21
   164:22 174:20
   182:10,11 188:23
   209:10 213:20
   265:7 267:11
   282:5 363:12
   364:20 369:24
   370:9 402:3
**absconded**   100:12
**absolute**   83:8
   294:24 323:14

380:25

**absolutely** 36:22
54:2,3,5,9 101:19
147:6 159:14
161:15 225:16
256:7 286:25
397:25

**abuse** 26:3,8 38:8
56:13 61:10 66:9
72:14 93:12
196:23 197:2,10
218:15 224:18
225:9 240:4 245:9
260:8 279:10
379:10,18 381:20
382:21 383:6

**abused** 93:3
214:25 259:14

**abuses** 40:20

**abusing** 40:4,9
209:20

**accelerate** 219:17
219:22

**accept** 47:3 180:20
181:6

**acceptance** 45:4

**accepted** 46:17,25
47:4

**accepting** 187:10

**access** 54:7 94:2
94:14,16 95:2,8
147:14 160:12,14
179:7 202:16
203:2,14,19
292:13 301:1
319:6,19

**accessible** 25:5
385:23

**accessing** 172:4
209:19

**accident** 80:17

**accidental** 199:3
400:19

**accomplish** 407:16

**accountable**
247:25

**accounting** 146:22

**accrue** 49:9

**accurate** 273:1
313:19

**accuse** 352:23

**accustomed** 291:7

**acharles** 5:25

**achieve** 52:13

**achieving** 190:2

**acknowledge**
408:11 409:16

**acoustic** 106:8

**acquire** 39:19

**acronym** 30:15

**act** 408:14 409:20

**action** 406:13

**activities** 193:2,3
362:1

**acton** 132:13

**acts** 106:8

**actual** 33:2

**adamhs** 103:25
122:24 136:19
141:18 143:11,12
143:13,20 144:5
144:11,24 145:10
145:16 146:18,20
146:25 147:10,14
147:21 149:17,20
152:20 169:25
170:6 171:5,14
172:4,7 176:13
178:5 180:18,22
198:24 336:14,20
336:25 337:8,12

338:7,20,22 339:4
339:14,16,20,21
339:24 340:3,11
340:16,21,23
341:8,19 342:14
344:1,6,7,19 345:3
368:1,7,23 370:8
371:10 372:10
378:25 380:7,17
380:20 381:15
382:9

**add** 19:22 111:22
112:1 151:9
235:24 335:7,16
335:17,19,22,23
349:6,12 364:8

**added** 109:3,4
114:23 124:13
126:22,23 154:14
349:15,16,18,19
392:19

**adderall** 64:25

**addicted** 207:8
224:1 225:4,15
251:14 295:22

**addiction** 21:13
36:10 136:16,21
163:12 183:13
225:10 226:21
227:24 228:1
233:7 236:12
238:2 250:7,10,15
287:7 336:10
355:21 383:13

**addictions** 230:24

**addicts** 164:12

**adding** 350:2
351:7,12,16 392:9
392:10,11,13
399:21

**addition** 98:20
315:22 319:18
328:12 329:11

**additional** 109:3,4
109:21 110:9
111:21,23 112:1
124:13 128:15
151:10 158:9
249:1 299:4
335:22 342:5
349:6,12,15,16,20
349:21,21,22,23
349:24 350:17
351:8,12,17
353:23 354:5
392:8,9,10,11,14
392:19 399:21,22

**additionally**
152:19 371:11

**address** 17:22
196:22 235:16
367:25 377:25

**addressed** 57:24
286:17,18

**addresses** 235:7
396:17

**adhere** 23:21

**adhering** 192:23

**adjustment** 157:5
370:21 374:11,21
374:24

**administer** 358:3

**administered**
286:23 339:4

**administration**
116:20 126:3
167:24 239:12
357:3

**administrative**
44:5 142:22
166:23

**administratively**
44:3
**administrator**
166:16 277:9
333:18
**admitted** 47:12
59:15 306:16,22
307:9,9,12 308:1,9
308:11,17,19
309:5,12,16,17,19
310:2
**adoption** 285:9
**adult** 145:7 363:5
**adversarial** 25:13
**advice** 214:4
**advised** 320:1
**advises** 128:13
**advising** 320:8
**advisory** 10:8 11:8
13:6 24:8 128:9
128:11,20 129:12
129:19 130:7,9,18
131:3 133:16
145:4 169:13
179:25 180:7
289:4 290:8,14,18
290:24 291:6,25
322:5
**affixed** 408:15
409:21
**afraid** 369:5 370:8
**afternoon** 45:12
56:4,10 60:3,7
113:16 119:7
124:16 154:14
155:5,17 188:10
248:22 299:4,7,15
299:24 310:5
**age** 260:1,2,14,16
260:24 261:7,9,11
267:12

**agencies** 26:3,9
31:15 98:10
110:21 131:2
135:9 143:24
147:22,24 149:10
192:22 193:15
199:18 279:10
280:14 281:10
380:19
**agency** 26:4,10
33:5 38:4,7
123:11 142:3,5
143:23 382:16,17
**aggregated** 52:1
**aggressive** 369:22
**aggressively** 367:5
367:17 369:19
370:10 372:4
**ago** 114:17 116:14
186:9 246:25
270:11 316:21
317:7
**agree** 71:24 72:16
78:7,15 164:15
220:14 223:24
247:24 287:4
375:12,19
**agreeing** 236:20
237:4,17 238:15
**agreement** 24:4
30:6 40:23 43:18
105:2
**ahead** 28:11 127:2
139:19 235:1
263:2,8 347:16
**aims** 162:9
**air** 106:1 252:23
253:7,18 254:12
254:18,19
**airplane** 324:13

**akron** 325:5,7,15
**al** 1:10,11
**alarming** 102:11
386:3
**alcohol** 29:25
32:20,23 355:21
**alive** 182:9
**alleged** 348:6,24
355:13
**allegedly** 226:7
**alleviate** 351:8
**alliance** 382:14,20
383:1
**allocate** 104:8
143:25 144:24
191:13 340:3
368:4
**allocated** 103:25
158:18 169:16
174:8 344:2,7
362:18,22 363:9
368:2,11,12
**allocates** 381:15
**allocation** 361:9
**allow** 52:16
158:17 161:13
167:17 286:13
306:11 352:15
381:18 396:18
**allowed** 150:16,25
170:25 171:4
180:22 188:14,18
389:16
**allows** 159:11
255:14
**alter** 320:2
**altered** 320:16
**alternative** 33:4
369:19,23
**alumni** 104:24
105:7 106:17

107:19
**amazing** 154:1
**amber** 5:24 16:1
332:23
**ambiguous** 265:17
386:22
**amended** 13:14
345:19
**amendment** 346:6
**america's** 106:5
**amerisourceberg...**
7:3 17:3
**amount** 144:25,25
147:2 149:6 157:6
164:22 247:23
248:1 251:9
340:16,21 354:6
356:16 367:10
368:10,12 376:8
377:17
**analgesics** 230:18
**analysis** 255:13
261:13,23
**anecdotally**
230:22,23
**angel** 310:12
**animal** 204:25
219:10
**anne** 1:24 2:10
406:3,20
**announced** 285:15
**annual** 333:19,22
334:9,13 343:23
344:12 360:3
364:13,15,22,23
383:18
**answer** 25:25 28:3
28:11,12 30:16
31:12 84:18 122:1
181:22 242:17
266:12 267:15

[answer - assistant]                                                                                   Page 6

| | | | |
|---|---|---|---|
| 269:25 270:4,9 | 176:10 183:13 | aruiz.zuckerman... | asserted  350:5 |
| 353:12 386:25 | 202:15 | 4:20 | assessed  25:8 |
| 387:14 389:17 | applies  110:19 | aside  107:18 128:6 | 38:11 306:18 |
| 395:15 400:3 | apply  103:21,23 | 226:4 400:8 | 309:25 310:1 |
| answered  72:20 | 110:9 136:15 | asked  27:5 51:18 | assesses  240:2 |
| 250:19 251:17 | 137:9,12 176:7 | 67:3 72:20 86:6 | assessment  29:25 |
| 400:14 | 178:3 188:3 | 95:11 106:12 | 30:1 32:20,23 |
| anthony  4:19 | 367:22 | 115:18 127:11 | 33:3 37:3,10,15 |
| 15:23 17:14 | applying  110:18 | 141:20 199:25 | 42:3,24,25 43:13 |
| antonio  187:9 | 367:5,17 | 243:24 244:1,5,16 | 52:25 53:2,6,11,14 |
| anybody  253:17 | appraiser  240:1 | 249:4 250:19 | 53:23 54:23 58:15 |
| 266:22 270:7 | approach  25:13 | 251:17 252:10 | 87:2,5 89:22,24 |
| 301:13 310:1,10 | 247:22 | 253:5 255:19 | 90:8 91:4 98:16 |
| 310:13 317:19 | appropriate  40:4 | 298:7 311:8 316:9 | 100:7 120:25 |
| 318:1 321:4,14 | 72:1,18 99:22 | 316:14,16,25 | 121:15 139:21 |
| 322:25 323:19 | 100:9 352:20 | 329:4 341:12 | 140:8 149:7 |
| 325:7 334:20 | 394:8 | 351:17 371:17 | 236:23 237:3,13 |
| anymore  198:11 | appropriation | 384:23 385:12 | 238:10 240:2 |
| anyplace  329:14 | 344:11 359:23,25 | 390:13 391:10,18 | 255:4,5,6 256:20 |
| anytime  185:20 | approval  202:14 | 397:12 399:24 | 257:8,10,11,17 |
| anyway  244:10 | approved  24:13 | 400:13 | 259:5,16 262:17 |
| apologies  98:22 | 65:22 | asking  31:20 72:7 | 262:23 263:10,16 |
| apologize  276:6 | approximately  2:4 | 72:8,9 73:18 | 266:24 287:5 |
| 345:9 347:15 | 15:8 101:25 | 75:13,15 81:1 | 326:23 329:24 |
| apparently  266:2 | 236:15 272:3 | 109:11 139:12 | 377:8 382:22 |
| 388:17 | 301:11 316:24 | 164:24 185:25 | assessments  240:9 |
| appear  408:11 | 371:15 | 187:14 211:25 | 256:12,14 261:15 |
| 409:15 | april  229:8 232:9 | 212:2 233:4 237:2 | 262:8 329:18 |
| appearances  3:1 | 246:21 366:22 | 237:3 242:16 | 330:6,17 |
| 4:1 5:1 6:1 7:1 8:1 | archived  364:13 | 251:13 272:12,24 | assessor  38:6 |
| 15:18 | areas  285:8 | 273:6 287:9 | 239:25 |
| appears  98:10 | arms  128:24 129:1 | 293:23 294:3 | assign  29:8 30:21 |
| 229:23 233:17 | arrangements | 296:18 297:13 | assigned  30:13 |
| 260:23 280:12 | 407:15 | 308:3 318:9,13 | 45:17 |
| appended  409:11 | arrested  31:6,22 | 325:20 341:20 | assignment  408:2 |
| 409:18 | 32:6 50:17 79:18 | 343:9 344:23 | 409:2 410:2 |
| applicable  48:22 | 79:22,23 80:6 | 345:5 396:24 | assist  151:2 340:4 |
| 405:9 | 81:17 84:17 | 399:23 400:10,10 | 392:7 393:1 |
| application  275:21 | arrests  19:13 | asks  227:23 | assistance  106:18 |
| applied  22:19,19 | article  12:12 162:4 | 252:22 355:9 | assistant  142:22 |
| 111:21,22 176:9 | 230:1 246:3 | 391:24 | 242:24 315:19 |

319:20 328:20
assisted  58:22,25
59:2,10 136:25
137:2,4,5 175:25
278:13,15,18,21
280:7 281:13
282:6,10 283:23
287:6,19 392:18
392:23,25 393:3
assists  314:6
associated  300:6
320:9 348:20
352:3
association  60:22
assume  83:12
210:14,15,17
374:23
assuming  51:7
53:19 196:14
225:24 272:25
380:12
assumptions  84:3
ate  110:8,12
athletes  206:9
atp  136:16 183:15
187:16,18,21
188:3 279:1 336:9
336:18,19,22
337:12 338:5,10
339:18 341:7,18
342:13 343:12,13
343:17 361:16
370:10
attached  14:14
373:7 409:7
attachment  14:8
220:24 223:6
372:16 373:11,12
attain  52:15 94:14
attempt  32:8

attend  60:20 61:22
63:17 64:2 105:4
127:6 327:4
attended  60:19,24
61:2 62:7,10 63:5
63:9 193:12,14
326:21,22,24
384:3 395:24
401:22 402:1
attendees  130:12
131:23
attending  195:11
202:3,8 327:15
attention  118:3
167:23 168:6,11
259:18,21 275:8
283:1 292:4 293:8
305:2 312:24
346:18 347:13
355:6 373:14,22
attorney  132:14
133:1 214:3
241:19 346:5
attorney's  289:20
289:22 395:1,20
395:22 402:1
attorneys  241:10
241:15
attributed  224:13
audiotapes  240:14
audit  156:18,21
157:4,8 158:11
audited  240:10
auditory  98:14
audits  158:2
augment  180:25
august  14:3
183:12 365:7,25
authority  90:24
267:4

authorize  409:11
authorized  17:7
264:15 406:8
availability  224:9
available  167:21
218:10 281:22
282:1 292:15
296:3,10 318:16
336:7 343:10
407:13
ave  5:8 6:16 407:1
avenue  3:15 6:6
average  46:2,12
52:6 104:16 154:5
371:16 381:8
383:19
award  24:22
188:24,24 189:1
276:3,22 342:2
awarded  22:21,25
177:10 181:15
183:19 188:20
191:11 337:22,25
338:23 339:1
361:10 362:17
363:23
aware  50:1 82:2
145:13 168:17
204:17 270:7
290:13 342:23
347:8 348:23
360:1 379:14
381:17,22 383:10
402:10
awfully  251:4

**b**

bachelor's  239:5
379:24
back  24:10 30:2
34:3,5,7,10,12,14
38:17 39:23 57:7

66:25 90:19 91:12
91:20,25 92:22
95:25 104:13
112:7 113:18
117:11 118:4
127:8 139:8 140:5
143:5 146:8
156:13 171:24
173:7 175:12,15
176:19 181:5
182:10 190:25
194:12 214:17,23
230:21 235:2
239:1,13,15
240:7 248:10,17
250:18 251:8
253:22 257:17
266:13 267:10,11
270:15 280:24
295:23 298:4,7
314:11 318:10
319:2 331:21,23
332:3,17 347:16
348:11 352:9,16
352:25 353:3,5,20
360:5 364:3
370:17,20 384:15
background  30:19
30:20 43:5 52:24
214:2
backside  275:6
backtrack  90:4
backwards  283:4
bad  308:21,23
badala  3:9 9:9
15:19,19 25:23
28:2 31:10,25
33:12 36:17 38:18
39:8,20 40:11,21
41:24 42:5 48:8
49:4,23 50:21

**[badala - based]**

51:15 52:2,7 53:9
54:14 55:10 57:10
59:17 61:5,12,17
63:10,14 64:10,15
65:3,8,16,24 66:5
66:15,18 67:8,13
67:18,24 68:6,12
68:20 69:2,9,14
70:8,13,21 71:2,7
71:12,21 72:2,19
73:1,6,11,16,20
74:14,19,24 75:4
76:3,11,18,24 77:6
77:11,23 78:11,18
79:2,7,12 80:1
81:19 82:1,13,17
82:25 83:7,20,25
84:11,22 85:9,25
86:13 87:19 88:10
88:23 90:2 92:15
93:16 95:20 96:24
97:7,12,18,23
102:2,6,15,20
104:6 107:9 108:5
112:12,25 114:5
114:12,20 115:5
116:6,12 117:7,19
117:25 119:24
121:22 124:3
125:19 128:25
129:4 134:3,24
135:14 136:9
138:21 139:16
140:11 142:17
146:3 149:2
150:24 157:9,21
158:14 160:2,15
161:2 162:25
163:9,15,20
164:16,23 165:14
168:3,12 170:12

170:18,23 171:12
171:17 175:8
177:2,13,20
178:17 182:23
183:3,8 184:9,16
184:24 185:15
186:15 188:17
189:10 190:3
191:6 193:24
197:3,13,19 198:1
203:7 204:2,11
205:25 206:18
207:9,23 208:12
209:2,13 210:2,11
210:23 211:3,8,21
212:5,13 213:5,16
213:22 214:10,13
215:5,10,15,20
216:1,7,19 217:15
218:6,11,16 220:1
220:17 221:3,18
222:1,6,17 223:1
224:2 225:5,11,22
226:10,23 229:19
231:2,19 232:18
233:8,21,24 234:9
234:14 235:18
236:4,21 237:6
238:4,17,22
241:22 242:3,14
243:13 244:25
245:10,22 246:1
247:13 248:2
249:17,19 250:24
251:16 252:18
253:1,9,14,24
254:6 255:17
256:6 260:9
262:21 263:14,21
264:10,19 265:3
265:12,16,24

266:19 267:1,20
268:8,15 269:3,11
270:2,17 271:4
277:19 278:24
279:20 281:16,24
287:22 288:15,24
293:19 295:10
296:6,12,25
298:23 299:19
300:22 302:2,15
303:5 304:15
311:16 314:17
315:5 317:21
318:3 320:4,21
321:19 322:2,21
323:9,23 324:23
325:9 329:20
331:2,20,24 332:5
332:10 333:23
334:16 339:10
341:24 343:24
344:13,20 345:4
346:19 348:8
350:7,11 352:1,9
352:14,21 353:7
353:11,14,18
354:7,15 356:19
357:21 358:24
359:5,12 362:11
367:12 369:16
370:1,14 371:3,22
375:1,5,15,21
376:2 377:11
378:6,14,21
381:21 382:23
383:7,14 384:7,19
386:14,20,23
387:1,6,12,15,17
387:22 388:1,8,14
388:20,24 389:3,6
389:7,11,18 390:8

391:4,14,17 392:5
393:16 394:2,5,13
394:19,22 395:8
395:13,14 396:2,5
396:10,13,16,23
397:18 398:3,8,21
399:1,8 400:2,6,13
401:9 402:13,25
403:10,17 407:5
**badala's**  241:20
241:23
**badly**  154:21
**bail**  20:14 29:19
30:23 39:3 86:17
**bailiff**  132:15
133:7,8
**baker**  5:7 16:5,9
**bakerlaw.com**
5:12,14
**balance**  336:11,19
338:5,7,10 340:2
365:3 366:15
367:25 368:5
370:12 371:1,21
374:1,2,6,7,9,12
374:20 375:4,13
376:1
**balances**  335:4
**balloons**  105:23
105:24 106:1
**ballpark**  256:2
**barbich**  310:12
**barring**  162:12
**base**  278:23
**based**  29:3 202:24
260:23 279:5,7,13
280:15 281:19
288:3 339:2
363:20 369:22
371:15 383:17

| | | | |
|---|---|---|---|
| **baseline** 226:14 | **beds** 148:21 149:4 | 194:2 201:10 | 139:7,12,15 140:2 |
| **basically** 30:19 | 149:9,9,11 162:14 | 234:16 251:12,18 | 140:9,10 141:23 |
| 31:3 32:1 59:3,4 | 163:2 165:10 | 260:13 264:11 | 141:25 142:5,6,12 |
| 101:5 107:16 | 238:11 288:8 | 266:11 268:4 | 142:13 157:20 |
| 135:8 143:13,20 | 292:15 293:12 | 275:17 283:13 | 160:20,23 161:13 |
| 158:15 167:16 | 294:9,11,15,16,18 | 285:18,19 288:25 | **billable** 138:8 |
| 173:25 191:25 | 294:19,20,21,21 | 289:2,19 291:14 | **billed** 147:9 |
| 192:16,17 250:17 | 294:22 295:4,6,14 | 291:15 292:25 | 157:12,16 |
| 279:9 285:25 | 295:15,17,25 | 306:17 307:7 | **bills** 141:21 146:5 |
| **basis** 60:17 321:6 | 296:10 297:11,17 | 310:12,22,24 | **bit** 47:8 56:11,11 |
| 324:2 326:9,13 | **began** 129:19 | 316:21 317:11 | 56:12 86:6 90:4 |
| 380:3 386:14,17 | 228:1 236:16 | 319:16 331:20 | 91:6 99:15 105:2 |
| 386:20 387:22 | 262:1 272:4 | 339:25 341:10 | 112:4 135:24 |
| 388:15,18 394:10 | 398:17 | 351:18 357:5,8 | 136:1 140:21 |
| **batch** 181:24 | **beginning** 31:2 | 360:11 364:19 | 171:18 181:22 |
| **bates** 10:5,9,13,18 | 193:23 194:1 | 376:16 386:10 | 202:17 278:12 |
| 10:23 11:5,9,13,16 | 224:5 228:22 | 387:9 389:8 393:8 | 335:12 347:16 |
| 11:21 12:5,7,10,16 | 232:3 360:25 | **believed** 357:9 | 350:23 360:18 |
| 12:20,24 13:4,7,10 | 373:25 385:4 | **benefits** 21:24 | **bja** 156:22 |
| 13:12 14:5,11 | 398:2 399:7 | 72:24 152:6 | **blanking** 111:8 |
| 34:20,24 35:20 | **begun** 285:14 | **bentley** 17:23 | **blocks** 341:1,5 |
| 48:14 128:21 | **behalf** 3:3 4:3,13 | **best** 110:11 314:20 | **board** 10:8,18 |
| 155:22 161:20 | 5:3,16 6:3,13 7:3 | 314:25 315:1,21 | 11:8 13:6 24:8 |
| 165:22 172:23 | 7:12,20 15:24 | 329:17 333:1 | 33:16 68:19 |
| 180:1 194:18 | 16:2,6,8,10,13,22 | 342:11,16 344:16 | 103:25 109:15 |
| 200:15 208:5 | 16:24 198:24 | 344:25 406:10 | 110:16,19 111:8 |
| 218:20 220:25 | 229:7 232:8 | **better** 192:25 | 122:24 128:9,12 |
| 228:13 246:7,13 | 234:20 238:6,7,13 | 279:14 354:9 | 128:20 129:12,19 |
| 256:24 257:6 | 297:2,11 | **beyond** 140:17 | 130:7,9,18 132:7 |
| 259:19 274:22 | **belief** 386:25 | 159:12 213:2 | 133:17 136:19 |
| 275:5 282:16,23 | **believe** 22:20 | 342:12 | 137:17 141:16,19 |
| 290:19 291:1 | 30:15 90:18 103:1 | **biannual** 343:23 | 143:11,12,13,20 |
| 292:5 303:23 | 110:2 115:18 | **biennium** 150:16 | 144:5,11,24 145:4 |
| 304:1,5 305:5 | 116:4 121:7,8 | **big** 146:12 192:6 | 145:10,16 146:18 |
| 311:23 312:2,24 | 126:10 131:4 | 281:3 366:5 | 146:20,21,25 |
| 332:3 363:9,14 | 133:4 142:15 | **bigger** 151:11 | 147:10,14,21,23 |
| 372:19,25 373:18 | 148:3 154:17 | 197:24 | 149:17,20 152:21 |
| 385:4 | 155:14 156:16 | **biggest** 106:14 | 161:20 169:13 |
| **bear** 290:25 | 177:14 179:9 | 145:5 | 170:1,6 171:5,14 |
| **bears** 275:5 292:5 | 188:13 190:15 | **bill** 131:8,9,10 | 171:14 172:4,7 |
| 365:14 | 191:15 193:12 | 137:24 138:2,6,24 | 176:13 178:5 |

179:25 180:8,18
180:22,24 198:24
289:4 290:8,14,18
290:24 291:6,25
322:5 336:14,20
337:1,8,12 338:7
338:20,22 339:4
339:14,16,20,22
339:24 340:3,11
340:16,21,24
341:8,19 342:14
344:2,6,8,19 345:3
350:2 355:22
365:3 368:1,7,23
371:10 372:10
378:25 380:7,17
380:20 381:15
382:10
**boards**  131:3
**bockius**  6:15
   16:24
**body**  199:12
**bold**  346:13
**bombarded**  89:14
   151:3
**bond**  20:19
**bonds**  20:17
**borsay**  4:9 16:7,7
**boss**  169:15 196:4
   297:12
**bosses**  402:15
**bottle**  75:16,19,21
**bottom**  35:19
   48:14 118:7 143:7
   144:10 162:4,6,17
   166:2 183:24,24
   195:1 212:19
   219:1 257:6
   259:20 275:5,19
   276:11,12 293:10
   305:11 306:4

310:13 312:25
348:19 355:17
356:7 373:23
**bought**  268:13
**boulevard**  4:6
**bowling**  105:12
**box**  49:14 51:4,8
   134:6 135:4 143:9
   150:9 153:20
   180:13
**boxes**  134:7,12,15
   134:18 135:10,13
   135:23
**bradie**  132:2
**break**  33:23 37:12
   66:19 113:10
   171:19 214:12
   248:6 251:6
   384:10
**bretton**  6:5
**brian**  132:16
**brief**  229:23
**bring**  166:7 167:6
   168:10
**bringing**  168:5
**broadhollow**  3:6
**brought**  167:22
**brown**  169:21
**buckets**  341:23
**budget**  141:10
   150:16 168:14
   187:19 333:19,22
   334:3,9,10,13,15
   334:21,25 335:2
   336:4,12,14,20
   337:17 339:9,14
   339:16,20,22,24
   340:11,16,21
   341:8,13 343:23
   344:12 359:15,19
   359:23 360:3

364:16,24 368:6
370:21 372:7,13
383:12
**budgeted**  369:14
   369:18
**budgeting**  187:15
**budgets**  335:6
**bullet**  36:25 39:24
   48:16 127:14
   134:9 143:10
   144:9 148:8
   149:24 150:9
   152:13 153:20,23
   180:16 183:12,24
   314:10,22 348:18
   355:17
**bullets**  48:19
   134:14
**burden**  348:20
**burling**  5:19 16:2
**bus**  340:8 392:17
**business**  187:7
**businessman**
   130:23
**busy**  326:25
**butler**  284:22
**buy**  221:23 281:5

**c**

**c**  3:9 17:20 406:1,1
   407:5
**ca**  407:25
**cabinet**  81:25
   268:20
**cabinets**  79:6
**calculate**  363:17
   363:19 379:19
   381:5
**calendar**  327:12
   327:16,20 328:2,5
   328:5,6,17,20

**call**  49:13 138:7
   407:14
**called**  17:5 27:5
   35:20 46:1 53:1
   77:13 86:2,4
   104:25 105:19
   137:11 148:2
   167:15 191:22
   325:23 363:25
   376:10
**calzola**  6:9 16:12
   16:12
**campbell**  6:4
**campbill**  16:13
**candidates**  276:25
   277:17 390:18
**cannabis**  258:15
   258:19,25
**canton**  6:7
**cap**  112:9
**capabilities**
   335:12
**capacity**  112:24
   193:11
**capias**  20:18
**capital**  187:10,11
   188:1,6
**capture**  204:9
**captures**  204:14
**car**  80:17
**caraballo**  134:10
**caraffi**  194:25
   229:3,25 231:23
   232:6 234:20
   246:18 247:20
   273:11,13,18
**cardinal**  7:12
   16:22
**care**  32:25 240:3
   379:7 382:14,19
   383:1

[caregivers - check]                                                Page 11

**caregivers** 381:14
**carfentanil** 12:3
  217:12,14,22
  218:18 219:9,10
  219:17,22 220:8
  222:12
**carole** 5:11 16:5
  248:23 266:10
  272:7 309:11
  395:19
**cartels** 84:10
**case** 1:7,12 12:20
  15:11,15 22:15,22
  27:1,6,22 28:24
  30:4,9 33:5 41:18
  43:16,22,24 44:2,6
  45:8 46:19 47:3
  47:15,17 49:7,22
  50:16 54:20 55:18
  55:20,21,23 56:3
  56:15,18,21 57:21
  64:6 80:8 87:6,11
  89:7 90:15,15
  100:10,17 103:2
  107:23,25 109:5
  109:20 110:1,5,23
  120:14,17 132:6
  138:1 141:22
  150:19,23 151:9
  151:18 242:8,13
  244:22 256:24
  267:3 307:11,13
  307:17 308:7
  349:8,16,22
  350:24 351:5
  392:14 407:6
  408:3 409:3
**cases** 19:13,14,17
  19:23 21:11,12,25
  22:23 27:4,8,11,17
  27:19,21 28:15,21

  41:6 46:3,4,17
  50:23,25 52:9
  56:7,13,13,22
  77:20 79:15 80:21
  85:13 93:17,20,22
  99:8,13,17 100:5
  103:14 108:24
  117:14 167:12,17
  168:15 171:1,7
  172:4 199:11
  200:11 208:22,23
  209:5,7 216:9
  358:13,18,22
**casteel** 4:9 16:7
**category** 122:3
  347:25 348:6
  355:10,13
**catholic** 58:14
**cats** 180:19,19
  181:6,15 237:14
  294:21
**caused** 12:15
  246:6 247:7
  399:19,20 400:23
  401:2
**caveat** 236:18
**cborsay** 4:10
**cch** 29:13 30:16
  37:7
**cdrug** 133:20
**ceiling** 81:8,11
**center** 5:20 286:15
  294:24 380:24
**centers** 105:10
  122:23,25 131:3
**centre** 7:22
**certain** 65:22
  70:11 104:8 144:1
  161:13,14 189:20
  374:15 376:8
  383:5

**certificate** 409:11
**certification** 22:19
  22:20,25 23:17
  24:1,2,22 35:15
  240:6,15 408:1
  409:1
**certifications**
  239:22 240:20
**certified** 2:10,12
  21:9 22:17 23:3
  23:10,15 24:24
  136:14 145:8
  150:17 151:1
  239:23,25 406:3,5
  407:16
**certify** 406:6,12
**cetera** 212:22
  236:13 348:3
**chain** 10:11,21
  11:3 12:3,9,23
  13:3 14:3 155:20
  165:20 172:21
  218:18 228:12
  270:13 271:16
  273:11,23 274:21
  275:4,9,16 277:22
  282:15,22 283:11
  365:7,23
**chair** 130:17
**chairman** 130:17
  130:25
**change** 24:12 36:9
  105:1 194:6 278:4
  297:22 326:1
  334:11 409:8
  410:3
**changed** 111:18
  111:20 112:11
  116:25 352:5
  353:1,8

**changes** 58:3
  126:21 140:22
  334:10 408:7
  409:7,9
**changing** 366:6
**chapter** 313:3
  314:8
**charged** 12:13
  27:1,18 246:4
**charges** 246:24
**charging** 247:5
**charities** 58:14
**charles** 5:24 9:8
  16:1,1 332:13,21
  332:23 334:1,19
  339:12 342:10
  344:5,15,22
  345:10,17 346:1
  346:22 347:1
  348:13 351:10
  352:7,11,18
  353:10 354:1,11
  354:17 355:1
  356:21 358:1
  359:2,7,14 362:20
  365:5,12 367:14
  369:21 370:7,16
  371:7,23 372:22
  375:2,8,18,24
  376:6 377:13
  378:10,16,23
  382:1 383:3,9,16
  386:12,18,22,24
  387:4,11 390:6
  391:1,13,16,18
  392:3 393:14,23
  394:11,17,21
  396:20
**check** 30:20,20
  37:2,7,8 52:24
  100:24 107:15

147:2 264:2 266:7
338:6
**checked** 265:6
266:22
**chemical** 42:17
**chief** 156:11
**children** 37:20,21
355:23
**china** 85:8,11
**choose** 78:9,17
**chronological**
283:4
**chunk** 151:11,22
191:12 192:6
**circumstances**
67:22 91:11
**citation** 229:7
232:7
**cited** 223:18
224:22
**city** 5:20 274:17
324:3 325:5,7,15
326:14 376:15
**civil** 405:4,9 408:5
409:5
**claim** 348:4
355:11
**claire** 202:14,20
202:23
**clarification**
333:12
**clarify** 120:23
**clarifying** 205:9
**class** 108:14
153:25 154:4
380:1
**classes** 154:15
218:2 239:11
**clear** 73:21 217:19
219:14 255:10
330:5 331:12

388:17 403:7
**clearly** 90:5 311:4
**cleve** 10:24,25
11:13 165:22,23
194:18,22
**cleveland** 1:18 2:8
3:16 6:6 15:1
19:11,14,15,19
20:7,9,11 27:19
115:11,20 117:3
130:3 166:11
167:7,13,18
169:11,17 170:2,8
170:11,24 171:5,7
172:3,5 173:23
174:24 175:5,19
175:24 176:3,8,23
177:22 178:23
179:10,23 214:21
274:11 321:5
324:3 326:14
337:6 362:23
363:14 364:4
366:20 368:9,12
368:13,21 372:5
376:9,15 407:2
**cleveland's** 274:14
274:17
**client** 29:22 30:3,5
30:22 31:8,14
32:3,19,24 35:11
36:11 38:1,5,22
39:1,3 43:17 46:6
46:12,25 47:4
50:1,3 51:8 52:23
53:14 54:10 55:1
55:14,19 58:2,19
80:5 86:18,20
87:10 91:15,18,21
91:24 92:14,19
98:10,13 99:18,20

100:8 101:13,15
101:18 140:9,9
142:10 182:3,15
186:2 191:5 207:4
258:17 259:25
278:23 307:4,8
383:19
**client's** 87:23
92:22 96:7,13
257:18,19,22
403:8
**clients** 26:16,18,20
26:21 29:18 46:14
51:3 55:8 56:5,20
59:14 80:17 86:8
88:25 89:12,16
93:3 97:2,21,21
98:24 100:3,19
104:18,21 105:4
109:9 111:12
112:9,22 113:3
117:6 120:11
138:19 139:25
145:1,14 148:10
151:4 153:17
158:24,25 159:4,6
159:7,20 163:24
167:22 176:4,16
179:20 180:20,23
181:7,17 182:21
184:20 203:20
206:20 216:17,21
217:13 226:6
227:3 233:11
237:21 238:8
250:7 251:24
269:8 271:1 273:3
301:24 305:18
306:11 316:23
340:4 343:16
344:3,4 349:14,24

350:4,19 353:24
368:18 371:11
381:9,10,19
382:25 392:8
**climaco** 2:6
**clinic** 98:12,15
**clinical** 42:20
237:12 255:6
**clinically** 40:25
90:22
**close** 108:21
172:11
**closed** 307:4,19
308:2
**coaches** 206:9
**coalition** 196:19
**cocaine** 64:24
117:12 214:25
215:3,9 223:21,22
223:24 224:25
225:1,2,14 226:16
260:16,25 261:1,6
**code** 256:21
257:13 259:8,10
259:13 261:15
262:3,4
**codes** 256:19,19
257:15 258:10
**cognitive** 98:11
**cohen's** 13:22
354:22
**coincide** 127:24
**coincidentally**
273:9
**coleman** 5:13 16:9
16:9
**collaborate** 176:12
178:25
**collaborated**
130:2

**collaboration**
62:21 169:23
176:2 179:16
**collaborations**
395:17
**collaboratively**
31:18 130:5
168:17
**collateral** 87:9
**colleagues** 333:2,4
**collect** 314:16
329:13
**collected** 313:14
314:23 330:2,6
**collecting** 317:19
330:17
**collects** 313:10
314:9
**college** 206:23
**colleges** 206:10
**columbus** 4:7
**column** 306:14
307:16,18,22
308:6 309:2,2
**columns** 319:4
**combat** 114:24
281:11,15
**combination**
98:24
**combined** 14:9
372:17 373:8,19
374:10
**come** 27:17 74:13
74:18,22 76:2,5
79:18 81:15 84:4
84:6 100:1 101:7
102:10 104:13
106:17 146:19
152:20 192:16
227:1 240:12
255:11 267:13

337:13,17 350:20
387:18 389:6,12
**comes** 24:16 76:8
91:24 124:23
170:6 178:4 342:9
370:3,4
**coming** 49:7 51:13
83:19 85:7,11
86:8 90:6 110:13
178:8,10,12
209:22 234:19
280:24
**commencing** 2:3
**comment** 238:19
**commercial** 302:1
**commission**
408:19 409:25
410:25
**committee** 11:15
11:20 24:21 198:7
198:17,18 199:23
200:14 201:2,19
201:22 202:1,4
203:11 208:4,17
**committees**
395:17
**common** 10:3
12:19 18:14,16
22:4,12 27:25
33:11 34:22 97:6
98:18 135:12
159:9 166:16,24
169:12 175:23
214:22,24 256:23
355:25 356:18
357:4,7 358:4,7,10
358:14,19,22
359:9,16,20,24
360:2,14,23
362:10 364:7,14

**commonly** 93:3
230:10 385:22
**commons** 6:5
**communication**
320:8 324:20
325:3,6
**communities**
174:9 182:1
**community** 26:23
46:22 47:19 58:15
90:12 91:10,14
92:7 105:8,9,16
127:20 131:2,12
131:13 165:9,13
174:17,21 179:19
191:1 207:18
219:15 237:13
238:10 280:15,19
294:22 295:16,17
297:5 326:17,23
335:17,20 351:1
**companies** 5:5
243:18
**company** 3:14
7:20 16:19 148:5
210:20
**company.com**
3:19
**compared** 363:14
**compete** 174:14
**compiled** 316:6
**complaint** 242:7
243:10,25 244:2
265:23,25 266:3
328:23 329:3,7,12
**complete** 18:8
21:20 22:1 127:23
**completed** 190:14
231:12 239:17
407:13

**completely** 401:18
**completes** 127:22
**compliance** 46:5
**complying** 192:4
**components** 22:10
**comport** 293:16
**comprised** 339:17
**computation**
348:5 355:12
**computer** 64:9,14
328:17 330:10,11
330:14,21,22
**concern** 166:12
289:6 368:15
**concerned** 366:24
367:15 369:8
**concerns** 187:12
284:25
**conclusion** 385:16
**conclusions**
209:18
**conditions** 161:12
**conducted** 312:10
377:7
**conference** 62:10
62:11 63:3 64:1,7
324:19
**conferences** 63:18
**confused** 75:6
231:24 232:25
**confusion** 251:10
**congress** 162:9
**connect** 144:6
293:4
**connection** 61:3,6
268:24 318:2
**connolly** 7:13
16:21
**considered** 94:23
124:17

**consistent** 229:14
233:5 237:19
277:14 278:9
**consistently** 30:3
130:6 159:2
224:13 393:10
**constant** 108:19
**constantly** 111:24
**consumption**
224:12
**contact** 30:9 101:8
108:1 144:5
270:24 271:25
272:14
**contain** 264:7
**contained** 301:1,2
**contains** 318:23
**continuation**
213:1
**continue** 49:9
180:23 219:17,22
249:21 287:1
314:11 353:19,19
**continued** 4:1 5:1
6:1 7:1 8:1 11:1
12:1 13:1 14:1
80:19 81:6 169:24
341:17
**continues** 356:23
**contract** 147:20
153:15 180:21
181:7,11,13,14
**contracts** 58:7,11
58:13 147:21
**contribute** 106:25
**contributor**
223:13
**control** 46:23
47:19 219:18,23
**controlled** 26:23
127:20 264:25

**convenient** 407:15
**conversation**
62:22 109:14
271:7 272:13
273:12,18,25
288:6 322:7,9
329:9
**conversations**
111:25 280:13
402:21 403:13
**conviction** 21:18
**convictions** 21:23
29:15 87:7
**cool** 104:24 106:12
**cooperative**
352:22
**coordinate** 291:20
**coordinating**
321:15
**coordination**
146:10 324:5
**coordinator** 18:17
22:14 53:25 125:5
178:22 179:5,22
239:14 277:10,11
277:12 278:7,20
287:18 294:5
297:18 313:9,21
314:3 321:2
324:14 325:15,19
325:23 326:10,13
361:1
**copied** 156:6
275:24 283:11
284:13
**copies** 64:13
291:23 292:1
316:5
**copy** 53:24 54:12
96:2,9 208:15
312:15 317:10

328:4 331:5
357:23
**core** 193:1
**corner** 35:20
**corporation** 5:17
7:3 16:3 17:3
332:24
**correct** 19:5 20:1
20:5 23:1,12
26:11 29:1 30:17
32:21 33:9,19
35:17 37:9,13
38:13 41:15 44:22
45:22 51:6,16
52:22 55:15,22
56:16 59:13 60:2
65:4 69:21,23
76:25 77:7 89:23
94:24 95:6 96:8
96:11 98:5 99:2,3
101:18 103:11
104:19 107:6
108:17 118:18
121:5,11 123:23
127:7 132:23
142:16 149:23
150:7 151:20
152:24 153:2,4,8
153:10,18 154:9
155:19 156:20,23
157:1 166:6,9
170:9 175:1,3
177:15,21 183:22
187:5 200:5,7
203:21 205:8
207:17 226:24
229:20 237:16
249:9,10 250:8,16
250:22 252:2,3
254:5 255:2 256:3
256:5,21,22

258:12,16,24
259:1,17 260:8
261:4,19 262:5,6
262:11,12,15
264:9 265:11
266:9,18,25
267:19 268:7,9
269:2 270:21,22
271:18,24 273:3
274:8,20 275:12
275:13 276:19,20
277:2,3,4,7,10
280:1,2 281:15,20
281:23 282:14
284:8,14 285:11
289:23,25 290:11
290:12 291:7,25
293:7,15 294:10
295:9 296:5,7
298:24 299:10,11
299:20 300:11,12
300:16,23 301:21
301:22 302:10,11
302:17,24 303:2
303:13,14 305:18
306:19 311:15,17
312:22 313:25
318:19 328:11,18
328:24 329:1,18
330:1 334:17
336:23,24 337:13
337:14 338:11,16
338:17 339:6,11
344:8 348:22
357:4,11,12 358:4
360:7,8 367:7
369:10,11,15
370:13,15 371:2
374:17,18 398:14
398:15 399:7
401:8,15,16 406:9

[corrections - court]                                                      Page 15

corrections   33:16
109:15 110:16,19
111:8 132:7
137:16 141:16
146:21 147:23
171:13 180:24
350:1 365:2
409:17
correctly   91:13
109:25 181:22
260:3 284:6
285:10 293:14
348:7,14
cost   110:9,13
150:19,22 158:9
158:13,16 159:8
159:11 348:1,19
348:23 349:3
350:16 351:13
370:12 371:16
383:19,19 400:10
costs   49:18 51:5
52:6,10 93:4
137:25 138:25
139:11,13 141:22
159:24 343:4,10
350:5 351:17
352:3 353:21
354:3,6,13 355:20
356:17 378:2,17
400:8
counsel   2:5 5:17
15:17 27:3 28:9
36:13 45:7 50:2
123:22 311:3
355:2 384:7 387:2
394:7 396:24
397:14 400:14
403:12 405:2,13
counseling   58:1
212:24 382:15

counselor's   42:18
count   190:25
counterfeit   85:17
85:19,21 86:2
counterpart
324:10,21
country   26:6
164:12 174:8
362:16
counts   240:25
county   1:10 3:3
10:3,11,18 11:14
11:19 12:19 15:20
15:22 18:14,18
19:20,22,24 20:3
20:15,23 21:1,8
34:22 36:4,8
62:16 83:6,19
84:7 101:5 103:23
103:24 104:1
109:19 110:20
112:17 115:13
116:5,15 119:21
122:16,23 123:13
124:8,10,20,22
130:1 133:25
135:5,10,11 141:7
141:9 143:23
144:13,20,22
148:1 155:20
156:12 161:20
163:13 167:11
174:13,16,23
175:22 177:11,17
177:22,23 178:3,5
178:6,9,12 181:13
183:18,20 184:8
187:22 188:20,22
191:3,11,12 192:8
193:7 197:1 198:6
199:4 200:9,13

202:21 203:5
208:3 213:24
215:14,19,25
216:6 219:4
235:14 243:17,19
249:14 256:23
258:1 274:11,17
274:18,19 277:6
280:8,8 284:22,22
285:7,23 286:19
286:19 290:9
296:9 301:10
303:19 304:3,25
319:16 320:15
323:22 324:9,11
324:15,22 325:14
325:19,24 326:6
326:10 327:22
328:13 334:15
335:5 336:13,25
337:2,3,4,5,7,8,10
337:12,15,17,21
337:25 338:14,18
338:23 339:2,8,9
340:12,14,22
342:4 343:15,22
344:9,9,11,17
345:2 346:3,5,12
349:18 350:20,24
351:4 354:13
355:23 359:19,23
360:3 364:7,14
368:1,11,13,23
369:7,9,12,13,25
370:3,5 372:6
376:21,24 377:1,5
377:9,10,16,21,24
378:4,5,12,18
379:2,16 380:7
381:16 382:15
386:11 387:10,20

389:14,21 390:25
392:1 393:13
395:23 398:17
399:4,12,14,15,16
400:1,12,21
408:10 409:15
county's   28:6
62:15 274:14
280:4 391:8
couple   21:13 91:2
179:1 229:1
320:25
course   249:7
court   1:1 10:3,4,8
11:4,5,8 12:20,23
15:14 18:6,14,15
18:18,18,20,25
19:1,10,12,15,19
19:20 20:3,7,10,12
20:20,23,25 21:1,2
21:8,10,25 22:6,10
22:12,18 23:5,7,18
24:1,16,16,20 25:8
25:17 26:13,20
27:23,25 28:15
31:4 33:6,11,18
34:22,23 35:13,16
36:4,8,12,15 39:25
41:14,16,17 43:19
44:11,21,25 45:13
47:1,5,20 48:2,20
48:21 49:2,3,6,10
49:12,17 50:10,14
50:20,20 51:5,10
51:13 52:6,10
53:14,25 56:1,2,18
57:1 59:15,21
60:1,3,7,22 61:4
62:9 66:8 72:10
79:14 81:16 86:8
88:8 92:13,21

[court - covered]

93:12 94:16,23
96:2 98:4,12,15,18
98:19,21,23 99:7
99:10,16,19,21,23
100:6,9,11,17,20
100:20,21,22
101:9,14 103:8,9
103:16,17,21
104:1,4,14,21
105:7,14,15
106:17,25 108:9
108:11,15 109:2
111:3,10,11,25
112:10,18 113:23
113:25 115:9,10
115:12,19,21,23
116:10,15,22
117:3,15,16,17
118:10,14,16,21
118:22,25 119:1,5
119:6,10,12,15
120:10,12,18,21
121:10 122:7,11
123:3,3,10,16
124:8,14,16,17
125:10,11 126:2,9
127:12 128:9,14
128:20 129:16,19
129:23 130:3,20
131:20,21,24
132:17 133:5,16
133:20 134:23
135:11 136:2,4
137:24,25 138:1
138:24 139:1,11
139:14 140:4
141:10,21,25
142:14,23 143:22
144:12,14,19,20
145:9,18 148:23
149:13,15,18

150:1,6,11,17,18
150:21 151:19
152:11,12,17,23
153:6,9,16 155:10
155:11,12,13
156:19,25 159:24
163:22,25 164:7
164:20 166:12,15
166:16,22,25
167:7,13,18,23
169:7,11,12,23
170:3,7,8,11,24
172:3,22,23
173:24 174:12,25
175:20,23,24
176:3,23,24
177:17,25 179:11
179:22,25 180:7
181:13 183:19,21
183:21 186:9
187:13,22 188:11
188:15,22 189:8
189:17 190:1
191:3 192:14,14
193:2 197:9 199:8
199:25,25 200:2,4
213:24 214:22
216:13,13,18
226:25 227:2,5
233:6 250:6,12,14
251:13 254:25
255:24 256:16,24
261:25 267:18
268:2,5,23 269:8
269:14 271:13
272:17,19 273:3,4
273:21 274:4,11
274:12,16,18,19
274:21 275:21
276:3,22,24 277:5
277:6,8,13,16

278:8,10,21
280:24 287:18,19
293:12 294:6,7,8
294:17 295:13,16
297:3,11 299:3,15
299:24 300:10
301:4,6,14,19,24
302:7,20 303:4,10
304:25 305:18,20
305:23 306:2,13
306:13 308:9,14
309:6,10,12,17,18
309:20,23 310:2,5
310:6,11,14 311:9
312:14,21,21
313:9,11,12,20
314:2,8 321:3,24
321:25 322:20,20
323:2,7,8 324:3,8
324:11,22 325:6,8
325:14,14,16,19
326:1,10,14,17,18
333:18,19,21
334:15,21,24
336:8 337:5,5,6
338:9 340:4,20
342:6 343:16
344:3,3,17 345:13
347:9 348:21,24
350:3 355:25
356:17 357:4,7
358:4,7,10,13,18
358:22 359:9,11
359:16,20,24
360:1,5,14,15,16
360:20,23,24
361:3,5,7,13,16,20
362:10,24 363:10
363:13,13,15
364:5,7,10,12,17
365:1 366:6,14

367:4,22 368:2
372:3 376:9,25
377:4,9,15,22
378:12,18 379:2
379:16 381:16
382:8,11,24,25
383:4,11,18,20,23
384:4 392:2,2,7
399:19 408:7
**court's** 162:24
175:5 187:3
313:16 334:3
362:1 366:8
369:24
**courthouse** 242:23
**courtroom** 49:16
77:18 227:15
**courtrooms** 22:12
101:8
**courts** 20:13 25:21
33:17 61:23
109:18 137:15
145:12,17 146:10
147:22 150:18
151:2 170:3
175:21 178:23
183:13,18,20
310:19 324:6
342:4 362:16,19
362:22 363:1,4,5,5
363:6,7,10 367:11
369:14 376:22
**cov.com** 5:25
**cover** 71:10
140:15 141:6
220:23 221:4
342:25 343:1,2,3,4
343:10,12
**covered** 139:22
181:3 370:11

[covers - date]

**covers** 205:23 342:3

**covington** 5:19 16:2

**crack** 117:11 214:25 215:3

**create** 165:10 375:6,17

**created** 55:14,16 55:17,19 130:9 181:24

**creation** 115:22

**creative** 148:20

**crendon** 5:12

**crime** 33:5 50:17 116:23 117:1

**criminal** 30:20 45:16 47:24 51:22 87:3 94:13 200:11

**crisis** 220:11,15

**criteria** 24:23 28:16,19 40:2

**cross** 388:3

**crr** 406:20

**crushable** 224:18

**csap** 137:11 161:7 191:10 363:25

**csr** 1:24 406:20

**csu** 239:12

**current** 30:13 37:18 39:10 45:17 86:25 106:19 269:8 305:17 338:7,9 367:22 376:4 386:25

**currently** 18:11,13 32:3 38:4 88:12 99:7 106:3 113:24 227:15 269:13 336:7 377:3 386:10 387:9

**cut** 12:7 220:25 221:10 223:12 382:7 400:14 403:18

**cutting** 352:14

**cuya** 18:13,17 19:20 28:5 200:9 243:19

**cuyah** 10:6,7,9,10 10:14,15,19,20 11:6,7,10,11,17,18 11:22,23 12:5,6,8 12:10,11,21,22,24 13:4,5,7,10,13 14:6,7,11,12 34:21 34:25 35:1 128:21 128:22 129:7 155:23,24 156:3 161:21,22 162:1 172:20,24,25 180:2,3,5 200:16 200:17,23 208:6,7 218:20,21 221:1 228:13,14 256:25 257:1 274:22 275:6 282:16,17 282:24 290:19 291:1 304:5 311:24 365:9,10 365:15 372:19,20 372:25

**cuyahoga** 3:3 10:3 10:11,17 11:14,19 12:19 15:20,22 20:23 21:1 26:13 33:10 34:22 36:4 36:7 83:6,19 84:6 115:23 116:3,10 117:16 119:21 122:16,23 123:12 123:13 124:8,10

124:19,22 135:5 135:11 144:22 155:20 161:19 170:7 174:13 175:22 176:7 177:11,17,22,23 179:7,10 181:13 184:8 187:22 188:19,22 191:3 193:6 197:1 198:6 199:4 200:13 202:21 203:5 208:3 215:4,14 216:17 219:4 235:14 249:14,24 256:23 257:7 258:1 285:7 290:8 303:24 304:25 312:3 319:16 320:14 323:21 325:14 327:22 333:18 334:15,20 334:24 336:7 337:7,20,25 338:23 339:2,8,9 340:12,14,22 343:22 344:11 345:1 346:4,5,12 349:18 354:13 355:22 359:19,23 360:2 363:13 364:6,14 376:20 376:24 377:1,5,8 377:10,15,21,24 378:5,12,18 379:1 379:16 381:16 386:11 387:10,19 389:13 390:24 391:7 392:1 393:12 395:23 398:17 399:12,14

399:15,16 400:1 400:12,20

**cvs** 4:13,14 15:24 15:25 17:15,15

**cycle** 36:10

---

**d**

**d** 9:1

**d.c.** 5:9 7:7,15

**damages** 243:18 348:4,5 351:18 352:8 355:11,12 355:19 356:12,16 391:20 392:1,6

**dan** 1:8 275:12,15 276:21 278:1

**danger** 219:15

**daniel** 168:23 169:5

**darryl** 179:24

**data** 190:19 202:5 208:25 209:18 229:9 231:17 232:12 313:10,12 313:14 315:19,23 315:25 318:25 320:12,18,20 385:21

**database** 185:10 186:19 264:3,7 265:7,8,11 266:7 266:17,23 318:15

**date** 15:7 94:11 95:12 129:20 166:10 167:6 184:12 198:21,22 285:14 286:9 305:8 310:15 317:8 361:9 390:3 399:7 405:14 407:8 408:3,9,19 409:3,13,25

410:20,25
**dated** 129:10
 276:18 283:6
 365:16 366:11
**dates** 45:21
**david** 44:13
 132:13 284:8
**dawn** 144:2
 145:15 199:14
**day** 4:5 16:8 20:16
 44:18 115:16
 130:22 205:13
 249:7 274:6,9,14
 277:24,24 287:2
 310:8 332:25
 388:5,25 389:2
 406:17 408:16
 409:22 410:22
**days** 240:8 407:19
**dc** 4:17 5:22 6:17
**ddrug** 117:17
**dea** 66:3,7,12,13
 264:15,22 265:2
 321:8
**deadline** 159:13
**deadly** 219:11
 222:12,13,16
**deal** 45:14 59:5
 84:16 85:2 99:8
 104:4 145:6,7
 311:2 392:20
**dealer** 253:20
 268:13 300:21
**dealers** 223:18
 224:22 245:21
 247:25
**dealing** 100:2
 179:5 182:2
 280:22 399:17
**deals** 98:24

**dealt** 357:2
**dear** 407:10
**death** 11:14,19
 12:15 198:6,16,18
 200:13 208:3,16
 246:6 247:7
**deaths** 184:2,7
 209:7,9 219:15,20
 223:11
**decades** 162:11
**december** 158:22
 159:4 373:3
**decided** 130:6
 179:15
**declare** 389:22
**declared** 389:20
 398:13 399:3
 400:18
**decrease** 247:22
 247:25
**decreased** 372:11
**decreasing** 20:17
 167:21
**dedicated** 120:10
**deduct** 49:17
**deducted** 51:9
 52:17
**deduction** 52:12
 52:14
**deed** 408:14
 409:20
**deemed** 44:7 45:8
 160:6 219:13
 407:21
**defendant** 5:16
 247:11
**defendants** 2:6
 5:18 13:16,20
 16:6,11 21:22
 244:22 245:21
 248:24 332:11

345:21 346:7
 354:21
**defender** 22:15
 27:3 123:24 124:2
 124:13,15 131:10
 355:25
**defender's** 124:7
 124:11,20,22
**defense** 27:3 36:12
 45:7 50:2 123:22
**defensive** 240:24
**define** 387:24
 399:25
**definitely** 116:25
**definition** 78:5
 249:12 280:12
 400:11
**degree** 239:5,7,13
 379:25
**delay** 280:3,6
**deleted** 55:8
 320:16
**delivered** 349:14
 382:17
**delivery** 405:12,14
**delos** 198:23
**delving** 254:3
**demand** 145:24,25
**demonstrate**
 174:22 227:14
 337:23 351:24
**demonstrated**
 188:19 189:6
 338:24
**demonstration**
 162:10
**dental** 80:18
**dentists** 264:18
**deny** 30:10 47:3
**denying** 101:15

**department** 28:1
 50:13 53:23 97:25
 128:4 156:12
 198:25 199:24
 355:20 356:17
 407:24
**departments**
 182:1
**depend** 222:8
**dependence** 37:4
 37:15 40:3 42:3
 42:17 43:5,8
 52:25 53:2,4
 98:25
**dependency** 10:12
 155:21
**dependent** 40:1,9
 40:19 41:1
**depending** 46:19
 47:19 108:13
**depends** 47:14,23
 49:5 51:11 161:3
 343:6
**depompei** 132:15
 133:5
**deposition** 1:16
 2:4 15:11 28:9
 35:2 128:23
 155:25 161:23
 165:24 173:1
 180:4 194:19
 200:18 208:8
 218:22 221:2
 228:15 241:9
 242:23 243:5
 246:10 257:2,5
 274:23 275:3
 282:18,22 290:21
 304:6 311:21,25
 331:17 345:23
 354:24 365:11

372:21 393:21
394:9 396:8 406:9
407:8,11 408:1,3
409:1,3
**depositions**  396:21
**deputy**  166:15
**describe**  178:2,13
316:18 318:8,22
**described**  80:10
81:3 101:1 107:4
173:21,22 206:4
302:12,17 329:8
364:21
**describes**  25:18
395:5
**describing**  92:1
151:14 319:11
**description**  10:2
24:6 292:7 313:19
**designed**  41:8,19
**desk**  79:19 206:24
**desktop**  328:8,9
328:17 330:10,11
330:20,22
**desperate**  174:9
174:18
**destroy**  317:5
320:2,12
**destroyed**  55:7
**detail**  39:6 88:18
88:21 136:1
199:12
**details**  186:5
**detected**  219:8
**detection**  220:8
**determination**
256:15
**determine**  24:24
37:4 39:18 43:9
86:18 90:16 102:7
107:15 123:4

160:24 256:4
260:16 263:24
269:13,21 286:13
306:11
**determined**  49:25
58:18 99:21 100:8
160:20 279:2
**determines**  32:24
46:24 71:25 72:17
305:19
**determining**  269:7
307:8 336:6
**detox**  89:9 105:10
143:25
**develop**  32:11
130:6
**developed**  23:18
57:9 274:5 392:24
**developing**  41:23
91:5
**development**
220:9
**developments**
31:2
**diagnosed**  97:3,22
255:24 258:14
**diagnoses**  40:14
40:25 41:3,7 53:4
59:16,23 90:9,23
97:22 98:1,6,8
104:5 121:4
214:23 260:12
277:1 316:22
390:19
**diagnosis**  37:17
41:13 53:6 99:1
103:9 256:18
263:19 277:18
**diagnostic**  257:15
258:10 261:15
262:4

**dialogue**  403:14
**diane**  132:12
**diazepam**  212:22
**difference**  40:8,18
145:6
**different**  21:14
22:11,21 25:12
28:1 42:12,13
51:12 55:23 56:25
57:16 58:3,5,10,20
60:25 61:22 62:4
63:1 80:25 91:3
101:7 103:20
106:7 123:11
136:3 138:15
139:5 188:2
189:21,23 244:18
280:14 294:15
295:4 300:25
343:19
**difficult**  107:24
163:8 178:25
179:6 199:20
224:18,20 284:18
334:8,13 368:4,16
**diploma**  37:22
**direct**  259:21
275:7 305:2
312:23 344:11
346:18 347:13
355:6 373:14,22
**directed**  96:19
253:8
**directing**  283:1
292:4 293:8
**direction**  147:19
**directly**  102:9
123:17 142:12
313:15 340:23
343:22

**director**  235:13
237:12
**directs**  28:11
**disability**  98:11
**disagree**  287:12
297:9,12,21
403:22
**discharge**  191:25
**disclose**  73:17,19
242:4
**discretion**  47:3
**discuss**  106:20
169:22 173:11
272:1
**discussed**  117:24
207:2 212:2
213:11 255:8
273:19 290:10
325:21 394:6
**discusses**  50:2
**discussing**  203:14
203:15 289:10
395:16
**discussion**  45:7
113:11 134:7
176:21 180:14
202:13 206:13
292:8 293:1 351:7
351:16 357:24
372:9
**discussions**  116:14
199:11 213:13
395:3
**disorder**  41:23
60:6 62:5 92:6
99:6 182:7 255:1
255:25 256:17
258:14,15,16,18
258:19,20,22
261:16 262:5
263:19 268:3,23

287:21 296:4
299:9 300:1,6,11
301:3,8,15,20
302:8,23 311:11
343:17 379:11,18
381:20 382:21
383:6 392:21
**disorders**  66:10
97:4 197:10
343:14
**dispense**  70:20
213:2
**dispensing**  213:14
**disposition**  47:16
49:22
**disproportioned**
169:25
**distinction**  171:9
**distribute**  70:12
143:24
**distributed**  136:18
154:23 203:25
**distributes**  146:18
**distribution**  12:13
229:2 246:4
**distributor**  5:16
5:18 13:16,19
203:25 211:6
345:21 346:7
354:20
**distributors**  70:12
**district**  1:2 15:14
15:14
**disturbing**  220:9
**diversion**  21:19
77:10,16,18,22
101:11
**diversionary**
21:15,16,17,21
41:16

**diverted**  78:3
**divided**  363:1
383:5
**division**  1:3 15:15
321:5 362:25
**dja**  152:16
**docket**  21:9 22:5,8
22:9 24:17 44:4,8
44:11 45:3,10
46:3 47:9 55:25
56:3,4,10 60:3,4,8
62:10 64:1 111:13
111:24 112:1
116:1,4 119:7
136:15 150:1
154:14 155:5,18
188:11,15 310:5
324:18 342:7
349:20,21 359:10
392:20
**dockets**  22:6 23:22
45:11,14,20 51:22
98:20 112:3 151:1
155:10,15 358:3,5
358:7,10,15,17
359:11 392:9
399:22
**doctor**  65:12 67:6
73:23 74:1 76:21
79:25 80:7,12
207:20 209:25
210:8,9 252:17
253:20 262:20
263:12 264:9
265:19 278:17
300:20
**doctors**  42:10
70:16 73:10,15
206:11 244:21
264:17

**document**  1:9 13:9
25:17 35:7,9,10,21
39:23 53:21 54:16
155:9 180:9,11
185:14,14 186:12
186:14 187:7
212:14 228:17
257:25 258:4,5
261:3 263:7
276:16 283:20
286:12 304:4
312:5,9 317:4,23
319:7,9 334:25
335:2 336:4,5
338:4,8 346:10,17
347:3,6,11 362:8
364:9,16,24
365:16,21,24
366:2,10 371:9,24
374:19 375:7,17
378:11 381:17,23
385:8,13,21
390:11,14,17,23
391:11
**documentation**
24:7 318:5,6
320:9 329:5,5,7,16
340:1 398:10
**documentations**
24:3,12,13
**documents**  241:25
242:2,5 303:21
316:10 317:5
329:11,13 330:5
330:21 331:6
336:17 365:3
381:24 382:4,5
**dog**  62:20
**doing**  28:25 46:6
49:12,14 61:24
62:23 79:11 91:1

94:19 105:8,9
107:22 108:2
112:13 168:2
171:11 172:6
190:12 192:12
193:16 194:7
249:3 256:9
293:17,22 298:9
310:8 325:25
**dollar**  342:9 354:6
**dollars**  122:17
142:4 159:19
160:12,14,22
**dominant**  117:21
**doors**  108:21
**doreen**  142:25
143:3 373:2
375:11
**doubled**  114:19
**doug**  247:19,19
**download**  64:8
**dozen**  251:7
**dr**  12:9 133:22,24
198:23,25 219:5
219:19,23 220:14
222:11,19 228:13
228:25 229:8
230:2,22 231:15
231:22 232:8
233:16,25 234:3,8
234:16,20 235:11
235:12,23 236:19
236:20,23 237:4,8
237:25,25 238:16
238:16 247:19
248:4 271:19,20
271:25 272:21
274:1 284:8,24
285:22
**draft**  265:25

**drafting** 359:19

**dramatic** 276:25
277:17

**draw** 259:18

**drive** 17:23 186:25
187:1,2,4 315:19
315:23 317:15
319:10 329:14

**drop** 134:7,12,18
135:4,13,23
366:19,23 368:24

**dropped** 19:17
230:12

**drug** 7:3 10:4,8
11:4,8 12:23 17:3
18:18,20 19:10,12
19:15,19 20:3,7,9
20:12,23,25 21:8
21:25 22:10 25:8
25:17,21 26:13,20
27:23 28:15 29:25
31:4 32:20,23
34:23 35:12 36:4
36:8,12,15 37:4,15
37:16 38:11,16
39:4,7,25 40:1,3,8
40:19 41:1,14
42:3 43:5,19
44:11 47:1 48:1
48:20 49:12 50:17
50:20,23 52:25
53:2,6,14,25 54:22
56:1,2 57:1 59:15
59:21 60:1,22
61:4 62:20 66:8
72:10 77:22 78:3
79:14 81:8,16
82:24 84:10 86:8
86:9,12,16,17,22
87:15 88:8,17
89:22 90:15 92:12

92:13,21,22 93:4
93:12 94:15,23
96:2,13 97:3
99:19,20 100:6,11
100:19 101:14
104:14,21 105:7
105:14 106:25
108:8,10 111:11
112:10,17 113:23
113:25 115:9,10
115:11,19,21,23
116:10,15 117:3
117:16 118:10,14
118:16,21 119:1,5
119:6 120:10,12
120:18 122:7
123:3,16 124:16
125:10 126:9
128:9,13,20
129:16,18,23
130:20 132:17
133:16 134:18
136:1,4 137:15,24
137:25 138:1,24
139:1,2,11,14
140:3 141:21,25
142:14 143:22
144:12,14,19,20
145:8 148:23
149:13,15,17
150:1,11 151:19
152:11 153:16
155:10,11,13
159:24 162:24
163:22,24 164:6
164:20 166:21
167:13,18 169:12
169:23 170:3,7,11
170:24 172:22
174:12 175:24
176:22 177:17,25

179:22,25 180:7
181:13 183:19,21
187:13 188:11,15
188:22 189:8,17
190:1 191:3
192:14 193:2
197:9,9,21 200:1
204:1,6 211:7
213:24 214:22
216:13,18 218:15
222:24 223:10,19
224:23 233:5
245:20 247:24
250:11,14 251:13
253:20 254:25
255:24 256:16
258:23 259:15
260:7,10 261:25
262:10 267:18
268:2,5,23 269:8
269:14 271:12
272:17,19 273:3,4
273:21 274:4,11
274:12,16,18,19
274:21 275:21
276:3,22,24 277:5
277:6,13,16 278:8
278:10,20 280:23
287:18 293:11
294:6,7,8,17
295:13,16 297:2
297:11 299:3,15
299:24 300:20
305:22 306:13
309:12,17,20
310:5 312:21
321:2,24 322:20
323:2,7,21 324:3,6
324:8,10,22 325:6
325:7,14,16,19,24
326:10,14,17

333:18,19,21
334:2,7,15,21,24
335:11,15 336:7
337:5 338:9 340:4
340:6,19 341:4,16
341:22 343:2,15
344:2,17 347:9
348:21,24 349:23
353:25 354:4
355:21 360:5,15
360:24 361:3,5,7
361:13,16,20,25
363:5,13,13 364:5
364:10,17,25
366:6,14 367:10
368:2 369:14,24
372:3 376:24
377:4,9,22 378:12
378:18 379:2,16
381:7,16 382:8,11
382:24,25 383:4
383:11,17,20,23
384:4 392:2,12,15
398:7 399:19

**drugs** 39:19 40:5
40:10,20 41:22
64:24 70:1 75:17
78:24 82:10 83:5
83:18 84:6,9 86:5
87:14 88:2,5,20
93:13 117:4,23
197:25 204:9,15
207:8 212:21
214:24 218:2
249:16 250:21,22
254:10,14 259:7
261:10 262:11,14
401:6,7

**dsm** 37:17 40:2,24
42:21 121:3
256:18,21 257:13

257:15 260:12
262:3
**due**  114:22 158:10
184:2 219:15,21
223:21 225:1
348:24 356:16
367:16 385:23
403:19
**duly**  17:6 406:7
**duration**  127:19
**duty**  199:2

**e**

**e**  1:24 2:10 4:9 9:1
17:20,20 319:25
319:25,25 406:1,1
406:3,20
**e.g.**  348:1
**earlier**  25:7 37:8
51:18 67:3 86:6
116:11 121:3,7,8
123:9 126:11
128:8 141:20
142:21 153:14
179:9 183:16
184:19 202:18
204:8 226:3,5
227:18 229:15
234:8 254:23
255:8 288:6 298:8
298:11 303:15
328:22 329:1,8
333:5 361:8,11
374:15 376:7
384:23 385:14
393:19
**early**  195:7
**easier**  164:7
**easily**  25:5
**east**  7:6
**eastern**  1:3 15:15

**ed**  292:18 294:24
380:24
**edit**  320:17,20
**education**  206:7
212:20 239:2,4,10
280:18 281:2,4
**effect**  18:4 81:9,11
163:19,22 164:20
399:18,20,23
**effective**  278:22
281:23
**effectively**  296:11
**effectiveness**
313:3 314:8
**effects**  400:23
**effort**  39:18
**egan**  132:18
**ehtoig**  7:25
**either**  24:22 27:18
29:17 30:23 53:4
54:11 100:19,22
301:25 302:21
322:12 323:7
325:3 326:17
329:13
**elaborate**  170:13
**elapsed**  201:12
**electronically**
54:12 63:24 64:8
**eligibility**  19:15
20:16 27:6 29:9
35:12,25 36:3
37:1 41:18 91:1
255:7 350:23
**eligible**  21:12,19
27:23 30:11 37:3
44:7 45:9 100:23
100:25 136:15
137:10 142:4
149:8 159:20
303:4,7,9 308:14

309:9
**eliminating**
288:13
**elly**  7:24 16:17
**elyria**  12:12,16
246:3,7 247:3,4,5
247:7
**email**  10:11,16,21
11:3,12 12:3,7,9
12:12,23 13:3
14:3,8 43:21
155:20 156:6,7,17
161:8,18 162:2,2
165:5,20 166:3
167:3 168:22,23
169:8 172:21
173:3,8,23 176:19
177:4 194:17,24
195:17 196:13,18
197:5 218:18
220:24,25 221:4,8
228:12,23 231:8
231:15,21,22
232:4,20 233:2
234:5,19 235:7,16
246:3,16,17
247:17,17 270:13
270:19,25 271:9
271:14,16,16
272:2,8,9,25
273:10,11,13,16
273:23 274:21
275:4,8,15,19,20
275:24 276:11,18
277:15,22,23
282:15,22 283:2,3
283:11,14,17,21
283:22 284:2,7,13
285:15,19 317:9
317:11 320:8
323:15 325:3

330:25 331:1
340:1 365:7,23
366:3,11 367:8
370:19 372:16
373:1
**emails**  195:15,25
**emergency**  348:2
**employed**  18:12
18:13 27:25 28:5
108:2,3 241:19
**employee**  121:17
123:10 125:10,14
132:11 133:12
152:8
**employees**  33:18
42:2 119:12,15
121:9,9,13 122:11
124:18 131:24
132:21 133:20
395:23
**employer**  141:3
**ems**  399:17
**emt**  399:17 400:25
401:3
**encompassed**
341:6
**encountered**  79:23
80:5 217:13
**ended**  81:6 350:12
**endlessly**  400:9
**endo**  5:3,4 16:6,10
248:24
**endorsed**  230:17
**ends**  36:24 126:6
254:22 366:10
370:18 373:15,18
385:8
**enforcement**
84:14 135:9
240:23 321:15,17
321:22 322:1,4,19

322:25 323:5,13
323:20 335:21
348:2
**enhanced** 10:12
155:21
**enjoyed** 380:1
**enroll** 158:24,25
159:2
**enrolled** 159:6
377:4,14,21
**enrolling** 159:4
**enrollment** 101:17
**ensure** 135:9
**entail** 29:12 30:25
32:22 37:15
107:13
**entails** 29:13,16
31:1 37:16,17,18
37:20,21,23 38:2
45:15 192:15
**enter** 48:2 51:19
100:22
**entered** 218:5
264:4 301:13
409:9
**entering** 100:19
**enters** 87:12
315:19
**entire** 267:17
291:3 312:5 352:8
372:1 408:5 409:5
**entirely** 302:16
**entitled** 313:3
**entity** 26:4 204:22
322:4
**entry** 36:4 50:8
**epidemic** 104:10
182:2 196:22
197:15 348:25
386:11,24 387:10
387:19,24 388:22

389:13,21,22
390:24 393:12
398:13,17,20,25
399:3,11,13,14,18
399:24,25 400:1
400:11,18,22
401:14,15
**episodes** 32:5
37:23 280:23
**equaled** 353:23,24
**equals** 368:18
**er** 91:19 400:25
**errata** 407:19
409:7,10,18 410:1
**ers** 280:20
**especially** 100:2
116:24 222:23
**esq** 3:9,11,18 4:9
4:19 5:11,13,24
6:9 7:9,17
**essentially** 21:4
45:21 159:12,25
**established** 123:9
**estimate** 27:10
59:24 114:16
183:2 255:21
359:3,8
**estimated** 108:11
108:11
**estimately** 255:22
**et** 1:10,11 212:22
236:13 348:3
**evaluate** 192:2
**evaluated** 25:22
36:16 189:8
**evaluating** 28:15
**evaluation** 100:18
189:16 192:12
279:1 313:4
**evaluations**
189:14,20

**evaluator** 191:14
191:14,20,21
192:9,10
**evening** 353:17
**evenly** 154:23
**event** 105:18
326:21
**events** 105:13,13
107:3 127:6
326:16,20 327:4
327:17
**eventually** 104:17
**evidence** 279:5,7
279:13 281:19
288:3
**evolving** 140:21
**ex** 346:4
**exact** 27:9 48:4
83:9 94:11 95:12
97:14 109:1
114:14 129:20
155:7 182:19,25
184:21 195:20
198:21,22 224:3
256:4 261:25
286:9 301:16,17
317:8,23 318:6
319:7,9 359:1
360:22 361:9
377:6 390:3
**exactly** 22:7 47:24
118:12 135:7
172:9 201:5 277:3
293:21 316:20
362:7 363:12
**examination** 9:6,7
9:8,9,10 17:10
248:20 332:20
384:18 388:3
397:3

**examinations** 9:5
**examiner** 133:25
219:3,5
**examiner's** 12:4
202:21 203:6
218:19 234:18
**example** 38:3
42:22 59:7 64:1
64:19,21 80:16,23
93:2 127:21 142:2
158:23 161:8
186:8 190:22
191:17 206:3
249:14 257:9
259:8 262:16
264:18 306:24
308:22 321:16
326:4 327:22
334:9 343:12,15
382:13
**examples** 64:23
380:23
**excel** 186:20,21
306:5 318:24
319:1
**exception** 224:12
**exchange** 141:4
366:4
**exchanged** 249:25
**excluded** 302:4
**exclusion** 288:7,13
288:21 290:10,16
292:8
**exclusively** 300:10
**excuse** 264:14
**executed** 409:10
**execution** 408:14
409:19
**exhausted** 160:10
160:17

exhibit  10:3,8,11
  10:16,21 11:3,8,12
  11:14,19 12:3,7,9
  12:12,19,23 13:3,6
  13:9,11,14,18 14:3
  14:8 34:20 35:2
  118:4 128:19,23
  143:5 155:25
  156:3 161:23
  162:1 165:19,24
  172:18 173:1
  180:4 194:16,19
  200:18,21 208:8
  208:11 218:22,25
  220:23 221:2
  222:11 226:4
  228:11,15 246:10
  246:13 257:2,5
  262:9,18 270:12
  270:17 274:24
  275:3 282:18,21
  290:21,23 303:25
  304:6 305:6
  311:21,25 329:22
  345:23 346:3
  352:13 354:24
  357:22 365:11,14
  372:21,24 384:24
  390:10 391:5
  397:6,13
exhibits  10:1 11:1
  12:1 13:1 14:1,14
exist  198:11
  269:18 317:16
  328:16
existence  94:12
existing  94:8
  336:4
exists  198:10
expand  19:22
  150:1 168:15

174:1 188:15,23
  335:11,15,21,23
  350:1 392:7
  399:21
expanded  115:22
  167:14 304:16
  349:5 351:25
  392:8,10,11,13
expanding  62:3
  155:1
expands  305:25
expansion  152:12
  155:4,6 167:15
  174:1,2 299:3,8
  376:10,13,17,19
expenditure  10:22
  14:4,10 165:21
  365:8 366:1
  372:18 373:8
expenses  374:16
  374:17 378:13
  379:15 381:19
  383:5
expensive  224:19
  383:24 384:5
experience  73:9
  73:14 87:2 115:20
  197:8 227:11
  233:5 333:17
  334:24 383:17
experiences
  163:24 164:4
expert  192:16
  240:19 267:9,23
  341:25 345:8,11
  357:2
expertise  85:1
  380:1
expiration  408:19
  409:25 410:25

explain  94:7
  104:11 148:25
  154:12 157:25
  161:6 185:22
  204:21 276:23
  351:5,5
explains  31:3
exploded  184:3
exploitation  99:9
  100:15 302:18,22
  303:12 326:3
explore  193:2
expressed  36:14
  166:12 279:25
  289:6
expressly  407:13
expunged  22:1
expunging  77:19
  77:20
extended  381:13
extension  158:9,13
  158:16 159:8,11
extra  133:15,20
extraordinarily
  332:4

**f**

f  4:3 406:1
f3  21:11
f3s  28:22
f4  21:11
f4s  28:22
f5s  28:22
face  357:20
facilities  135:23
  143:25 162:13
  294:23 381:1
facility  148:16
  163:5 288:8
fact  77:3 114:22
  164:5 168:7 177:8
  212:3 233:16

250:5 263:20
  269:21 273:19
  274:9 294:6 297:9
  311:3 314:15
factors  222:8
failed  46:15,15
  182:7
failure  101:6
  173:12
fair  102:13 195:7
  196:25 212:9
  238:1 333:8,9,14
  333:15 339:5
  351:14 374:23
fairly  108:19
  114:3
fall  21:2 144:21
falls  20:25
familiar  68:18
  77:15,17,21 106:5
  162:20 193:6
  347:2 393:20
  401:24
family  37:17 74:6
  74:6 76:23 81:25
  82:9 106:3 355:23
  363:4
fantastic  104:24
  105:13,18 106:13
far  38:17 44:20
  101:5 134:12
  135:25 266:13
  267:9 285:7
  307:22 309:1
  319:2 331:14
  350:9,12 380:13
fast  346:11
fatal  164:14
fatalities  229:11
  232:14

**favor** 279:17
**fbi** 321:10
**fda** 65:23
**february** 290:25
293:18 294:4,17
**federal** 26:4,10
68:11 103:22
137:9 158:20
159:19 160:11
174:7,18,21 178:4
178:7 191:10
313:12 338:15
339:1 340:13
354:14 367:6,10
367:17,23 368:21
370:4,11 372:5
**feed** 272:9 402:4
**fees** 48:23 49:10
127:15,17,18
**felony** 19:13,23
21:18,23 22:22
29:15 87:7 116:24
145:7 167:11
276:24 277:5,13
277:16 278:8,9
**female** 100:3
238:12
**fentanyl** 12:7,14
12:15 64:23 85:7
85:11 184:2,3,7
216:15,16,18,22
216:25 217:5,6,21
219:12,16,21
220:25 221:10,15
221:24 222:13,15
222:24 223:12
229:12 232:15
246:5,6,24 247:6
300:14
**field** 239:12

**fields** 304:21
**fight** 287:7
**fighting** 293:12
294:8,17 295:14
295:24 296:24
**figure** 110:3
114:14 182:25
250:19 256:2
259:13 269:1,25
270:4,8 281:11
288:17 318:17
332:1 335:14
359:1 363:18
377:6
**figures** 184:21
354:10 364:8
**figuring** 368:17
**file** 45:16 54:7
96:7 102:10
208:23 209:6
319:14
**filed** 243:22
**files** 54:1 55:8
**fill** 295:19
**final** 47:2
**financial** 111:9
142:22 150:12
342:1 345:8,11,13
357:2,3,10
**find** 53:15,20
96:17,22 125:23
177:11 261:17
286:21,22 315:8
321:16 326:8
332:3
**finding** 140:14
284:18
**fine** 133:9 272:10
309:13
**fines** 48:21 49:2,3
49:6,10 127:12

**finish** 236:8 395:9
395:15 400:2
403:18
**finished** 201:6
**fire** 348:2
**firm** 241:20,23
**first** 13:14 19:9
32:6,7,8 47:11,13
95:8,10 108:16
129:19 134:9
143:9 147:15
152:12 157:3
159:1 162:7
177:18 188:11
190:16 193:17
202:12,14 218:5
219:2 223:15
224:7 228:22
230:25 246:17
247:16 258:9
259:22,22,25
260:1,7,10 261:17
261:18 262:10
271:23 276:12,14
282:6,23 283:2,2,8
284:2 291:9
303:22 305:7
339:17 340:25
341:12 345:19
346:6 361:12,14
361:17,21 385:19
386:16,19 387:18
389:9,12 398:6
**fiscal** 372:14
375:14 378:13
**fit** 363:2
**five** 38:16 63:13
66:19 102:5,19
120:9 126:11
162:10 171:19
214:12 240:8

246:25 361:15,17
361:21 384:10
**fka** 5:6
**flip** 347:16 348:16
385:7
**flooded** 280:20
**floor** 7:22
**flow** 141:17
211:12
**flows** 123:5 147:18
**fluctuates** 108:13
**focus** 278:1
**folks** 275:23
310:11
**follow** 26:6 76:10
83:15 191:24
252:4 253:6
384:22 403:4,20
**followed** 307:25
380:10
**following** 23:22
24:18 236:12
314:9 356:11
**follows** 17:8 22:9
**footage** 402:4
**footing** 150:12
**force** 10:16 11:12
161:18 193:7,23
194:17 195:9,11
195:22 196:1,11
229:8 232:9
249:15 289:3,8,13
289:13,15,18,24
290:6,9 322:6
325:24 326:5
327:13,23 395:1
395:20,21,22
402:2
**foregoing** 408:13
409:18

**forensic** 219:8
**forever** 55:6
**forget** 131:18
312:11
**forgetting** 393:6
**forgot** 127:9
**form** 25:23 28:2
31:10,25 33:12
36:17 38:18 39:8
39:12,14,20 40:11
40:21 41:24 42:5
48:8,16 49:4,23
50:21 51:15 52:1
52:2,7 53:9 54:14
55:10 57:10,12
59:17 61:5,12,17
63:10,14 64:10,15
65:3,8,16,24 66:5
66:15 67:8,18,24
68:6,12,20 69:2,14
70:8,13,21 71:2,7
71:12,21 72:2,19
73:1,6 74:14,19,24
75:4 76:3,11,18,24
77:6,10,11,23
78:11,18 79:2,7,12
80:1 81:19 82:1
82:13,17,25 83:7
83:20,25 84:11,22
85:9,23,25 86:13
87:19 88:10,23
90:2 92:15 93:16
95:20 96:24 97:7
97:12,18,23
101:10 102:2,6,15
102:20 104:6
106:11 107:9
108:5 112:12,25
114:5,12,20 115:5
116:6,12 117:7,19
117:25 119:24

121:22 124:3
125:19 134:3,24
135:14 136:9
138:21 139:16
140:11 142:17
146:3 149:2
150:24 157:9,21
158:14 160:2,15
161:2 162:25
163:9,15,20
164:16,23 165:14
168:3,12 170:12
170:18,23 171:12
175:8 177:2,13,20
182:23 183:3,8
184:9,16,24
185:15 186:15
188:17 189:10
190:3 191:6
193:24 197:3,13
197:20 198:1
203:7 204:2,11
205:25 206:18
207:9,23 209:2,13
210:2,11,23 211:3
211:8,21 212:5,13
213:5,16,22 215:5
215:10,15,20
216:1,7,19 217:15
218:6,11,16 220:1
220:17 221:18
222:1,6,17 223:1
224:2 225:5,11,22
226:10,23 229:19
231:2,19 232:18
233:8,21,24 234:9
234:14 235:18
236:4,21 237:6
238:4,17,22
243:13 244:25
245:10,22 246:1

247:13 248:2
249:17 250:24
251:16 252:18
253:1,9,14,24
254:6 255:17
256:6,20 257:8,10
259:11 260:9
262:21 263:14,21
264:10,19 265:3
265:12,14 266:19
267:1,20 268:8,15
269:3,11 270:2
271:4 277:19
278:24 279:20
281:16,24 287:22
288:15,24 291:5
293:19 295:10
296:6,12,25
298:23 299:19
300:22 302:2,15
303:5 311:16
314:17 315:5
317:10,21 318:3
320:4,21 321:19
322:2,16,21 323:9
323:23 324:23
325:9 329:20,24
331:2 333:23
334:2,16 339:10
341:24 343:24
344:13,20 345:4
354:7,15 356:19
358:24 359:5,12
362:11 367:12
369:16 370:1,14
371:3,22 375:1,5
375:15,21 376:2
377:11 378:6,14
378:21 381:21
382:23 383:7,14
386:12 387:11,21

388:6 390:6 391:1
392:3 393:14
398:3,8,21 399:1,8
401:9 402:13
**formal** 45:4
107:21 239:4
**formally** 46:17,25
176:22 307:9
**format** 303:22
**former** 132:2,5,11
132:15,17 166:23
169:7
**forms** 62:24
392:22
**forth** 24:10
**fortunately**
174:11
**forward** 30:10
43:22
**forwarded** 273:14
**found** 157:7
199:12
**foundation** 265:19
388:7,19,23
**four** 175:20
190:16 193:13
**fourth** 150:9
164:24 169:4
348:18
**frame** 158:19
**free** 408:14 409:20
**frequent** 163:23
**frequently** 230:17
**friend** 76:23
**fringe** 152:6
**front** 24:21 46:5
237:11 257:11
270:12 275:8,19
298:11
**fuerst** 166:8,17

**fulfill** 162:24
**fulfilled** 58:7
**full** 98:16 151:7
  152:13,13 239:16
  259:23 313:7
**fully** 232:20
  374:12
**function** 322:1
**functioned** 115:12
**fund** 119:22
  122:17 125:18
  136:4 361:25
  369:24 370:9
**funded** 103:16,17
  136:2 354:13
  361:3 371:12
  380:19
**funding** 103:22,23
  104:9 110:10,18
  110:20 111:22,23
  119:23 121:21,21
  123:5 124:21
  137:14 141:11
  143:21 145:10,17
  145:22 147:1
  149:21,22,25
  152:15,22 160:5,6
  161:7 166:11
  167:6 169:11
  170:1,5 171:5
  174:21 176:9
  177:6 178:4,6
  179:18 180:14,21
  181:4,16,21,21,24
  182:4,5,10,11,13
  183:13 189:2,7,20
  275:21 313:13
  341:9 342:17,19
  342:22 343:6,9,20
  343:21 360:19
  361:17,21 362:7,9

362:23 364:11,18
364:25 367:10
368:5,22 369:20
369:23 370:4
372:3,10 373:25
374:11 376:5
380:17
**fundings** 170:17
  191:18 372:5
**funds** 110:15,23
  110:25 122:24
  125:17 128:16
  136:16,17,22
  137:9 143:24
  144:1,23 146:1,2
  147:8 149:8,16
  151:15 157:12
  158:17 159:5,12
  167:20,20,21
  168:19 171:1
  172:8 174:18,19
  174:22 175:7
  176:4,13 177:7,10
  177:12,18 178:7
  179:7 187:16,18
  191:11 335:15
  336:10,10,18,19
  336:22,22 337:13
  337:19,24 338:5
  338:10,25 339:18
  340:2 341:6,7,7,18
  342:12,14,14
  343:11,13,13,18
  353:24 357:6
  360:6,9,9,13
  362:17 365:4
  366:15 367:6,9,18
  367:23 370:11
  371:10 381:2,13
  381:14 392:11

**funneled** 143:22
  338:22 344:18
  345:2
**further** 96:15
  209:16 248:12
  250:2 309:15
  331:10 396:3
  406:12
**future** 230:3
**fw** 12:3 218:18
**fwd** 10:21 165:20
**fy2013** 10:21
  165:20
**fy2014** 14:3,8
  365:7 372:16
  373:19 374:1

**g**

**g** 319:25
**gabapentin** 93:2,7
  335:13
**gail** 131:11 150:11
**gain** 239:23,25
  240:15
**gained** 193:15
**gallucci** 241:17
**garofoli** 2:7
**gather** 316:14,16
  316:25 330:12
**gathered** 38:1
  39:7 202:5
**gathering** 31:23
  38:15 327:18
**ged** 37:22
**general** 75:9
  119:21 121:20
  122:17 125:17
  127:3 280:8 321:1
  358:10
**generally** 47:9
  56:10 61:11
  139:10 143:18

**genesis** 87:17
**gentleman** 255:18
**getting** 88:19
  174:17 210:18
  240:6 279:18
**gianna** 6:9 16:12
**giannac** 6:10
**gilson** 12:10
  133:23,24 198:25
  219:5,19,23
  220:14 222:11,19
  228:13,25 229:8
  230:22 231:15,22
  232:8,10 233:16
  233:25 234:3,8,16
  234:20 236:20
  237:4,25 238:16
  274:1
**gilson's** 230:2
**give** 18:8 20:24
  21:5 59:24 64:19
  74:3,6 80:23
  95:12,14 97:13
  114:1 129:20
  156:4 158:23
  191:19 206:3
  210:1 214:3
  305:23 317:18
  365:20 405:2,13
**given** 31:7 35:11
  54:10,20,21 56:6,8
  71:25 96:2,2
  108:9 143:10
  150:18,22 252:15
  262:19 263:11
  269:22 318:14
  337:20 406:10
**gives** 145:16
  147:15 179:16
  255:20

giving  82:10 147:1
286:3
glad  255:9 285:1
global  240:1
go  20:18 28:11
30:10 43:15,22
46:4,15 52:20
53:15,20,22 57:3
57:17,18,19 61:9
64:4 105:11,12
110:7 111:5
126:20 127:2
139:19 140:14
145:5 147:15
148:1,2,6 157:19
160:1 192:18,21
204:19,23 207:20
235:1 237:11
239:13 240:8
250:17 251:8
256:9 263:2,8
269:7 281:1 283:4
295:23 297:4
306:3 318:10
324:12 327:20
331:21,22 332:2
335:24 336:20
340:23 350:8,10
350:13 351:3
352:9,16,25 362:9
362:15 363:7,22
364:3 380:14
382:14,19,25
384:24 385:25
393:2,4,7 401:1
goal  145:1
goals  58:4 192:5
192:23 313:16
goes  29:20 30:2
42:24 45:23,25
47:9,12 58:19

128:2,3 142:3
170:6 266:14
267:10 319:2
356:1
going  29:17 45:15
46:7,8 52:23
57:12,24 64:3
66:20 73:4 81:12
89:17 90:3 106:3
109:5 126:20
129:4 148:6
157:25 158:25
159:1 168:15
171:17 175:6
179:17 200:20
209:25 221:23
234:12,15 236:8
239:15 242:3,16
248:25 261:12
265:20 266:1
275:7,20 276:10
280:19 281:12,15
282:20 298:7
304:10,19 305:2
311:20 312:4,5
331:15,16 348:11
350:15 351:6
352:1,15,25 353:2
354:17 360:5
365:5 367:9
372:10 373:24
384:9 385:13
387:7 396:19
good  16:4 17:12
17:13 66:18 100:4
113:9 171:18
174:17 178:24
179:19 191:1
229:6 248:22
278:3

gotten  379:24
gottermeyer
319:22
government
123:12 192:11
338:15 339:1
governments
340:13
gpra  191:22
grade  140:17
graduate  52:10
104:18,22 106:15
graduated  25:14
55:1,8 105:7
154:16
graduates  107:8
153:24 154:18,22
155:2
graduating  154:2
graduation  108:14
129:17 153:21
154:15 291:20
graduations  154:7
154:24
grammatically
277:2
grant  109:16
110:9,18,25
119:22 121:21
125:17 137:7,12
141:11 149:22
150:13 156:22,24
157:5 167:15
173:13,16,18,18
174:2,4,25 175:4
176:7,15,15
187:19,21 188:16
188:24 189:3,14
189:20 298:12,15
300:4 301:9,23
302:7 303:10

312:14 342:25
354:14 360:21,24
361:6,8,10,25
362:4 363:16
grantee  324:14
grants  104:3 136:4
137:11 158:21
160:25 161:13
174:8 188:3
191:10 336:12,19
338:13,14,19
339:19 360:15
362:18,21 363:23
363:24,25 364:20
grants.gov.  362:14
gratitude  326:24
great  49:11 87:8
105:9 106:24
128:5 137:11
333:10,16 367:20
greater  115:3
175:24
greg  166:8,14,15
169:22 275:11,15
277:23
group  46:16
198:19 206:16
268:3 273:14
301:2 310:11,13
395:2
groups  58:17
393:11
grown  130:6 386:3
guarantee  182:14
guess  74:8 76:19
131:16 169:4
181:10 222:7
337:18 350:9
363:17 393:7
guessing  244:9

**guest** 105:21,24
**guidelines** 211:14
  211:20,23 212:4
  212:11
**guitar** 106:8
**guys** 173:17

**h**

**h** 4:6 236:2
**half** 124:12 151:24
  227:8 275:19
  353:17
**halfway** 149:4,9
  149:11
**hallucinations**
  98:14
**hand** 35:20 110:7
  110:7 145:5,5
  195:2 196:5 227:3
  227:7,24 251:14
  251:25 252:2,6,11
  252:15 253:6,18
  254:11,18,19
  307:22 309:1
  312:25 406:17
**handbook** 10:5
  24:5 34:24 35:11
  35:14
**handed** 257:23
  365:13 372:23
**handing** 165:18
  194:15
**handle** 99:16,17
  108:25 111:12
  140:19 340:6,7,8
**handled** 403:12
**handles** 111:9
**handling** 99:8
**hands** 227:5,9,25
  252:23
**happen** 81:8 155:4
  182:17 225:20,21

351:6 352:16
**happened** 47:24
  49:6 99:24 100:10
  155:6 206:22
  207:4 283:22
  302:25 366:24
**happening** 78:22
  396:21
**happens** 29:6,8
  43:12 45:4 47:6
  66:9 81:10 83:16
  84:16 85:4,5
  104:20 159:3
  210:14
**happy** 394:17
**hard** 54:12 178:2
  178:13 317:10
  328:4 331:5
**hate** 367:3 369:2
**hbc** 7:20 16:18
**head** 113:7 172:10
**headlines** 84:2,24
**heads** 111:7
**health** 5:3 7:12
  10:18 12:4 16:22
  26:3,8 37:19 38:8
  54:23,24 58:1
  97:22,25 98:6,7,16
  98:19,21,25 99:12
  139:21 150:4
  161:20 215:14
  218:19 219:2,6
  279:10 355:22
  382:14,15,22
**hear** 329:1 388:18
**heard** 15:13 78:2,4
  78:21,25 79:10
  82:6,9 83:4 84:9
  84:20,23 85:10,17
  85:19,20,22 86:1,4
  109:25 217:2,4

221:11 245:14,16
  347:8 394:25
  395:3 401:20
**hearing** 20:19
  41:12 45:21 46:6
  47:6,13 116:21
  186:10
**hearings** 24:18
  45:24 46:1,2,13
  47:10
**hearsay** 395:7
**held** 2:6 47:20
  113:11 153:21
  337:7,12 338:9,20
  339:3 357:24
**helen** 312:10
**heller** 7:24 16:17
  16:17
**hello** 34:18
**helmick** 6:9
**help** 59:5 104:9
  114:23 136:22,23
  179:19 181:25
  247:22,25 281:10
  281:10 296:4
  318:16 349:13
  351:8 381:2
**helped** 151:11
  199:14,15
**helpful** 165:11
  295:6 332:4
**helping** 131:2
  300:5
**helps** 79:19
**herberts** 312:10
**hereunto** 406:16
**heroin** 12:7,14
  64:22 69:20 80:22
  82:21,23 83:18
  89:4 184:4 209:21
  209:24 210:8,18

210:22 215:23,24
  216:3,11 217:21
  219:13,16,21
  220:25 221:11,15
  221:23,23 222:14
  222:16 223:12,20
  223:21,25 224:9
  224:14,24,25
  225:3 226:8,21
  229:12,16 230:16
  230:25 232:15
  246:5,24 247:23
  248:1 259:8 260:1
  260:8 261:8
  262:10 277:1,17
  278:2 289:24
  300:14 311:12
  383:13 386:2
  390:19 397:16,24
  398:6 402:1
**hey** 148:5
**hi** 34:17
**hierarchy** 159:25
  160:4,13
**high** 37:22 39:11
  206:9,23 223:11
  239:3 349:17
**higher** 109:18
  273:20
**hipaa** 53:18,19
**hire** 191:13 192:8
**hired** 20:13
  109:22,24 110:1
**historic** 223:11
  364:11
**historical** 362:9
  364:18,25
**history** 31:7 37:16
  37:17 38:11 73:5
  73:17,19 74:3,6,7
  86:9,22 88:18

92:13,22 94:6
96:14 229:12
232:15 233:19
236:3,11
**hit** 154:17
**hitting** 81:11
**hiv** 57:25
**hold** 331:16
388:24
**holding** 247:24
**holdings** 5:6
**holds** 357:19
**honestly** 188:5
**honor** 49:14 51:4
51:8
**hoop** 106:9
**hopefully** 247:21
295:19 393:1
**hoping** 165:6,8
311:3
**horrific** 199:12
**hospital** 207:21
212:10 285:23
**hospitals** 79:1
144:3 211:17,18
211:20 212:3,7
**hostetler** 5:7 16:5
16:10
**hour** 66:20 171:18
214:9 291:19
396:18
**hours** 199:20
241:14 384:8,21
396:6 397:1
**house** 149:4,9,11
294:24 380:25
**housed** 315:12
319:12
**houses** 380:22
**housing** 182:12
340:9 393:8,9

**hshkolnik** 3:12
**huge** 191:12
350:16 366:19
370:25 371:20
392:19
**huh** 72:12 90:11
141:14 144:15
148:12 151:16
153:22 180:15
183:17,25 184:5
184:22 186:1
200:24 201:7
202:10,19 223:5,8
223:23 230:8
232:11 283:5
284:4,9 292:6
296:1 307:2 308:5
314:13 339:15
**hula** 106:9
**human** 99:9
219:13 301:25
302:13,18,22
303:12 326:4
**hundred** 226:17
233:13 250:6
**hunter** 3:11
**hurt** 91:19,24
92:19
**hydrocodone**
212:22 230:11
385:22

**i**

**idea** 52:5 73:7
102:16 137:21
210:3,5,6,12 214:4
218:17 236:22
245:23 247:14
248:4 268:5,11,16
268:18,21 383:18
398:19,24 401:25
402:6,17

**identified** 275:10
275:11 309:22
336:17 338:2
339:13,18 341:18
342:13 343:5
345:18 354:4,18
357:8
**identify** 199:13
305:15 356:11
362:6 379:16
**identifying** 379:5
**ijasiewicz** 7:18
**illegal** 77:5 82:16
82:20 83:5,18,18
84:9 85:7,11
220:10,15 226:9
250:22 261:18
401:6
**illegally** 264:2
401:8
**illicit** 300:14
**illinois** 240:8
**imd** 288:7,13,21
290:10,16 292:8
292:13,18 297:5
**immediate** 25:13
29:23
**immediately**
307:15,17 308:13
**impact** 279:2
**impacted** 162:23
**impacting** 292:13
**implemented**
285:16
**implementing**
196:21 286:1
**importance**
159:16
**important** 32:2,11
168:10 171:8
282:12 287:20,24

288:4,14 294:12
296:3,24 315:3
331:13
**impossible** 269:17
269:20
**inappropriate**
168:1
**inaudibly** 366:2
371:9
**incarceration**
383:25 384:5
**incentive** 49:16,19
**incident** 100:14
**included** 198:19
230:3 400:24
**includes** 152:16
356:12 392:14
**including** 12:14
66:10 217:21
246:5 355:20
401:12
**inconsistent**
271:13 272:15
**incorporated**
409:12
**increase** 166:10
222:4 224:14
280:21
**increased** 114:7
114:22 224:10
229:10 348:1,20
348:23 349:3
375:3
**increasing** 154:16
232:13 233:18
**increasingly**
224:19 400:19
**incur** 139:14
352:4
**incurred** 139:11
351:13,18 353:8,9

353:22,22 356:17
374:16 378:13,17
379:15 381:19
**incurs**  137:25
138:25
**independent**  40:13
42:19 43:1
**indiana**  4:13 15:25
17:15
**indicate**  199:16
380:15
**indicated**  150:15
169:21 229:9
232:12 254:23
276:21 284:25
302:6 328:22
398:12
**indicates**  306:2
310:4
**indicating**  219:7
**indication**  192:9
262:24 263:9,20
275:18 307:8
379:10
**individual**  40:15
43:1 98:17 106:9
182:6 191:23
199:8,17 240:1
258:13,21 259:3
260:6 261:17
262:17,19 263:25
266:10,24 269:19
308:10,15,18,19
309:19 357:9
380:12 382:13,18
**individual's**  258:8
263:10 265:8
312:11
**individually**
111:13

**individuals**  40:1
41:22 42:20 65:15
100:11 109:10
198:19 200:9
254:11 269:13
290:14 309:21,24
310:5 351:1
357:14 367:21
376:15,20,25
377:3,14,20
379:11 380:22
381:2 382:10,19
393:1
**industries**  6:14
**ineffective**  278:22
**ineligible**  41:14
**informal**  107:20
**information**  12:20
31:17,24 37:25
38:6,7,15,25 51:25
53:7,7,10 54:11,16
54:22,25 55:5
86:11 87:9,17,18
91:7 95:11 96:15
108:1 184:23
185:5,9,11,13
186:4,11,19 188:8
203:5,11 243:25
244:2,6,17 254:9
254:13 256:24
266:16 304:16
314:9,16,21 315:9
315:10,16,20
316:3,6,10,15
317:1,20 319:12
320:3 321:23
322:18,24 323:2,5
323:13,19 325:13
326:9,12 327:1,19
328:2,23,25 329:2
329:6 330:15

340:20 347:5,10
363:20 364:25
379:6 384:4 403:9
**informed**  45:8
168:18 195:16
196:4
**informing**  317:4
**initial**  28:25 32:12
43:13 47:5 61:25
191:22 353:21
**initially**  27:1,18
27:21 108:25
116:16 124:11
129:25 167:19
349:7,7
**initiating**  230:16
386:3 397:16,24
398:2
**initiatives**  196:21
**initiators**  230:13
**inject**  39:17
**injury**  206:22
347:25 348:6
355:10,13
**inmates**  235:25
279:18 280:5
286:4,7
**innovative**  62:1
**inpatient**  294:13
295:1,3,7
**input**  359:18
**inquired**  150:11
**installed**  135:10
**instance**  50:18
69:12 75:16 92:12
92:21 96:18
142:11 146:1
188:3 383:11
**instances**  92:24
95:24 96:12

**institution**  200:6
**instruct**  242:4,17
**instruction**  405:3
405:13
**instructions**  74:13
74:18 75:11,21
76:2,5,9,10 317:13
**instrumental**
135:4
**insurance**  70:25
138:20,20,24
139:15,22 140:5
140:15 141:2,6
**insurances**  141:1
**intake**  86:7 191:22
**intakes**  114:24
**intense**  41:20
**intensive**  57:4,6,18
58:17 148:13,18
295:1 371:14
**interaction**  46:11
324:9 380:6
399:17
**interested**  162:3
406:14
**interesting**  152:5
247:21
**internally**  297:15
**interrogatories**
13:17 242:13
244:6,8,12,17
345:22 346:8
355:4
**interrogatory**
13:20 346:20
347:19,20,24
348:10 354:21
355:9 391:9,24
**interruption**  33:21
115:15 175:11
299:12

intervention  206:7
212:20,25
interventions
385:24
interview  29:17
30:22,25 31:1
240:18
interviewed  31:9
interviewing
20:17 240:19
introduced  162:8
investigation
20:15 26:25
investigator
202:15 203:1
invite  328:19
invoice  378:8,24
379:4,9
invoices  146:19
286:14,16,22
involved  30:3
31:14 38:4 104:21
106:16 109:17
120:24 123:16
131:1 134:17,23
135:12 139:24
169:18 189:16
193:4,9,22,25
196:2 198:5,9,23
199:23 201:11,15
243:21 259:3
274:16 289:20
290:1,14 301:25
302:21 325:7
326:3,16 342:19
342:22 395:18
involvement
166:18,21 199:8
199:17 200:12
201:19,21

involves  258:22
300:1
iop  57:4 148:10,17
148:22 170:1
366:19 371:13,13
392:16,17
iphone  327:16
328:5,6
iq  98:13
irb  148:3
irrelevant  395:7
401:19
isia  7:17 16:21
issue  53:20 251:10
290:9 394:6
issued  219:5
issues  99:12 134:2
169:23,24 170:10
170:14
item  338:12
iv  40:2

**j**

j  3:11 187:9
jackson  132:12
179:24
jail  13:3 20:15
29:17 30:23 86:20
235:14,20 236:24
279:18 280:5,9
282:5,15 283:23
283:25 285:14,23
286:24 350:21,24
351:4 392:24
393:4
jails  284:20
january  158:21
jasiewicz  7:17
16:20,21
jealous  366:7
jean  294:25
380:25

jerry  284:24
jim  8:4
joan  45:1 132:14
132:16 319:22
job  1:25 130:22
163:7 168:8
239:16 315:4
joe  186:8
john  4:6 130:16
jonathan  6:19
16:23
jones  4:5 16:8
jonesday.com
4:10
journal  50:8
judge  1:8 22:14
25:14 26:24 30:13
44:4,6,9,11,12,13
44:24 45:1,17
46:5,11 47:2
106:12 111:22
132:13,14,16
133:1 135:3,4
166:8,17,24 173:9
176:20 179:2
186:3,12 196:10
227:6,23 243:2
251:12,19,20
252:5,14 254:17
279:17,21,22
282:4,4 283:24
284:8,17 285:6
287:5 289:5,9
290:4 293:11,17
293:20 294:5,7
297:2,10 328:19
335:22 349:6,19
350:2 365:16
366:5,7 395:4,11
395:16

judges  112:2
118:21,22 131:7
251:12
judgment  134:1
juggle  239:15
july  10:17 161:19
166:3
june  11:21 13:11
208:5,17 305:12
311:22
jurisdiction
167:17 168:16
171:2
jury  49:15
justice  87:3 94:14
200:12
justification
179:17
juvenile  363:6

**k**

k  4:3 7:5 17:20
karate  106:11
karin  132:5
kaufman  3:14,19
keating  294:24
380:24
keep  44:17 54:25
55:4 60:6 63:21
107:7 108:1
179:15 185:8
186:19 196:4
227:7,25 252:6,10
252:14,22 253:6
254:17,19 265:20
266:1 280:24
327:3,8,12 350:14
keeping  54:11,16
91:8
keeps  141:16
171:10

**kelly** 131:8,9,10
**kent** 156:12 239:6
**kept** 51:25 53:8
  168:18 195:16
  202:2
**key** 22:10
**kind** 23:8 27:21
  41:23 54:15 59:3
  60:23 62:22 88:21
  92:25 104:23
  105:1 106:10,20
  110:7,8 116:24
  140:7 145:4
  146:23 160:13
  178:4,13 185:14
  185:19 186:7
  189:13 203:4
  236:23 237:2
  242:2 258:18
  295:8
**kindly** 356:22
**kinds** 60:25 117:4
**kistemaker** 132:5
**knew** 67:4 197:1
  319:7
**know** 18:21 22:3
  24:23 25:3,4 27:9
  27:13 28:8,16
  29:21 30:9,13
  31:3,5 33:14,20
  37:14 39:7,21
  41:25 42:7 48:1,9
  50:18,22 52:3,8,9
  57:25 63:11,15
  65:9,11,12,13,14
  65:17,21 66:3,12
  66:13 67:6,9,16,21
  68:7,10,15 69:1
  70:6,6,11,16,19,25
  71:5,18 72:5,21,23

73:2,5 74:12,15,17
74:20,22,25 75:24
76:1,12 77:12
78:19 79:3,8
83:11,13,13 84:5
84:15 85:13 87:4
88:2 89:21 91:8
94:11,12 95:4,7,15
95:17,18 97:8,14
97:19 100:3
102:21 106:20
110:15,16 111:1,2
111:3 112:21
113:3,6 114:18,21
116:7,9,13 119:13
119:17,20 120:5
121:12,19,25
122:14 123:1,6
124:21 125:1,16
125:22 126:15
128:1 129:24
130:24 131:1
132:25 133:3,10
133:19 134:22
135:15,17,18
138:3,4,5,5,7
139:17,21,23,23
140:18,18 141:15
144:24 148:1
149:5 155:7 158:3
160:16 163:10
164:17,19 170:20
172:9,10,11
177:19 179:18
182:18,18 183:6,9
186:21 188:5,7
193:22 196:10
197:4 198:2,13,14
198:21 201:4,13
201:24 202:6,7
203:1,4,10,24

204:3,5,7,14 207:3
207:25 208:1
210:21,24 211:4,9
211:16,22 212:6
212:15,16 213:6
215:6,8,11 216:20
216:21,24 217:1,8
217:10,16 218:4,9
218:14 225:6,8,12
225:23,25 234:22
236:8 237:7
238:21,23 242:18
242:24 243:2,11
243:14 244:21,23
245:5,8,12,17,19
245:20 249:11
259:2 262:16
265:4,6 266:13,14
266:15 267:8,9,10
267:14,21,22
269:5 272:15,23
279:4,24 281:10
284:5,21 286:6,10
287:13 289:5,8,9
289:17 290:4,17
293:4,21 295:11
306:23 308:10,11
308:15,16,18
309:3,21 312:6
315:11 318:11,24
319:2,4 320:5,11
331:14 332:25
333:7 334:22
340:15,19 342:8
342:15 344:14,21
345:7 346:19
347:7 349:10
352:11 357:15,20
358:25 359:6
363:21 372:4
377:6 378:7,15,22

379:13 380:13
383:8 384:20
385:2,11 387:18
389:5,25 390:2,2,4
390:7,10,23
395:23 397:20,23
397:25 398:1,18
398:22 399:2,6
402:14 403:2
**knowing** 217:7
  222:24
**knowledge** 40:7
  41:21 50:5 60:13
  60:14,18 65:1
  72:13 83:5 86:11
  124:18 193:15
  205:18 213:3
  342:11,16 344:16
  344:24,25 356:11
  356:15 357:10
  380:4 391:19,25
  402:11 406:11
**known** 215:13
**knows** 328:21

**l**

**l** 7:9 17:19,20
  17:20
**l.p.** 1:11
**laboratory** 219:8
**lack** 281:2,4,5
  388:18
**lacking** 388:7,23
**lakeside** 3:15
**lakewood** 105:19
  105:25
**lamarca** 237:12,24
  270:19,22 271:8
**lamarca's** 238:6
**land** 206:24
**lane** 225:13

**lantern**  294:23
  380:24
**laptop**  293:4
**large**  88:25 219:10
  304:19
**larger**  200:6
**largest**  136:11,13
**lastly**  273:10
**lasts**  23:5
**latest**  247:17
  284:3
**laura**  132:15
  133:4
**law**  84:13 135:9
  240:23 241:20,23
  321:14,17,22
  322:1,4,19,25
  323:5,13,19
  335:21 348:1
**law.com**  6:10
**lawrence**  132:13
**lawsuit**  243:12,15
  243:16,22 247:12
  316:12 349:1
**lead**  25:15 42:17
  79:17 222:22
**leads**  310:22
**learn**  389:9,12
**learned**  325:13
**learning**  177:7
**leaving**  282:5
  370:12
**leckler**  1:16 2:5
  9:3 15:11 17:4,12
  17:19 34:17,20
  67:3 113:21 128:8
  128:19 162:1
  165:19 172:2,18
  194:16 200:21
  208:11 214:20
  218:25 220:23

228:10 246:13
  248:22 266:5
  285:21 314:3
  332:22 345:18
  346:2 354:18
  365:6 372:23
  384:20 394:14
  397:5,12 398:16
  401:17 406:7
  407:8 408:4,9
  409:4,13 410:20
**leckler's**  331:17
**led**  31:5,6,21,21
**left**  160:22 164:11
  307:22 309:1
  373:24 375:14
  376:1
**leftover**  372:6
**legal**  8:4 67:7,10
  89:25 209:20
  214:4 311:15
  401:6 407:1 410:1
**legally**  67:17,23
  82:10
**legislation**  162:8
  290:15 334:10
**legitimate**  65:7
  67:4 252:17,23
  253:8 262:20
  263:12 265:9
  268:12 269:9
**legitimately**
  269:15
**lengthened**  350:18
**lessons**  325:13
**letter**  143:15
  407:20
**letters**  249:25
  394:7 403:13
**level**  32:25 39:6
  43:9 57:2 68:11

68:16 88:18 89:8
  116:5,24 240:3
**levels**  42:12,14
  57:16
**lewis**  6:15 16:24
  130:16
**liaison**  5:17
**license**  42:18,19
  61:2
**licensed**  40:12
  42:15,23 43:1
  265:1
**licenses**  239:20
**lied**  96:22
**lifetime**  38:19
**light**  105:19
**likelihood**  222:4
**limit**  213:14 288:7
**limited**  249:15
  298:15 299:25
  300:5 301:7,19
  302:8 311:10
  352:12
**limits**  163:3
**line**  9:15 164:13
  304:11 307:14,21
  323:16,17 374:22
  409:7 410:3
**linkage**  54:24
  57:25
**linked**  378:19
**list**  24:8 25:1
  108:1 130:11
  200:8 229:2
  306:16 310:10
  356:12,23 357:13
**listed**  131:23
  195:3 265:10
  291:11 409:7,17
**listing**  409:7

**lists**  48:16
**literally**  269:24
**litigation**  1:6
  15:13 245:21
  248:25 258:2
  317:6 318:2 320:3
  320:9 327:19,24
  329:3 330:16
  347:22 348:4
  351:19 355:11
  395:12 402:12
  403:5 407:6 408:3
  409:3
**little**  47:8 56:11,11
  56:12 86:6 90:4
  91:6 99:15 105:2
  112:4 135:24
  136:1 151:11,22
  171:18 181:22
  202:17 257:16
  277:24 278:12
  281:7 313:22
  314:1 335:12
  347:16 350:22
  360:18
**live**  101:9 148:16
**lived**  101:5
**living**  161:9,10
  335:10 343:3,12
**llc**  3:14 4:13 6:15
  15:25 16:22 17:15
**llp**  5:19 7:4,21
  17:2
**local**  24:9 28:18
  60:19 62:21
  103:24 110:20
  122:23 141:18
  159:18 196:19,21
  206:10 229:9
  231:17 232:12
  380:7

**located** 175:21 315:16,24
**location** 407:15
**long** 49:12 55:4 90:15,19 104:14 131:11 150:11 213:20 229:2 241:13 251:4 270:11 332:25 388:5
**longer** 41:1,5 129:1 163:2 169:6 170:25 198:10 305:24
**look** 30:5 35:4,19 35:21,23 36:23 41:6 43:16 47:25 53:13 81:12 90:19 92:22 110:17 118:6 126:5,14 134:6 143:5,6 144:9 152:5,10 156:4 158:5 162:6 164:9 165:4 166:2 168:22 169:19 173:7 177:3 180:13 183:11,23 187:6 190:18,19 190:22 199:5 202:12 206:6 209:16 219:1 220:6 223:6,14 228:10,24 229:1 229:22 230:5 232:3 235:5,6 243:9 246:15,22 247:16 256:11,19 256:21 260:11,19 262:3 267:11 284:1 291:9 304:8 304:11 306:13,25

307:14 308:3 309:1 310:9,21 314:14 315:9 331:5 332:6 335:9 346:16 356:22 362:13 363:23,24 364:2 365:20,22 367:21 379:14 399:20 401:24
**looked** 75:2,16,19 103:2 198:20 256:13 329:25 369:19
**looking** 27:22 159:23 176:19 180:10 209:6 259:13 272:21 292:22 306:24 309:8 349:25 369:23
**looks** 29:22 84:2 153:6 156:21 157:2,7 200:25 318:9,23 369:23
**lose** 367:3 369:2,9
**losing** 367:16 369:6 370:8
**lot** 22:11 24:9,10 25:11 45:25 46:23 58:1,20 72:13 77:18 79:14 80:16 80:21 81:9 84:2 85:12 86:21 89:12 91:6 93:4 99:24 101:8 105:10,15 106:16 109:14 110:17 122:24 130:3 144:3 147:8 159:7 174:7 195:15,16 196:3 217:8 222:8 227:1

240:17 261:20 268:25 274:3 280:17,18 281:8 288:22 289:10 294:12 313:22 343:19 351:2,2 380:21
**lou** 237:12 238:6 270:19,22
**loud** 263:5 297:14
**loved** 27:4,6 82:3
**lpa** 2:7
**lucas** 284:22
**lucky** 106:22
**luminaire** 105:23

## m

**m** 3:18 4:16 6:9 17:19 319:25
**ma'am** 258:12 344:23 351:11 371:17 376:7 381:12
**madam** 407:10
**magnitude** 349:13
**main** 136:7,11
**maintain** 320:8
**maintained** 364:10,17 378:11
**major** 223:13
**majority** 27:10 48:5 52:9 103:14 216:8 227:5 236:16 252:1 272:4 315:14,15 318:25 319:12 350:19 358:18
**maker** 82:23
**making** 73:20 84:10 109:12 192:4 291:2 387:5 388:3

**male** 238:11
**man** 12:12 246:3 247:5
**manage** 56:6,7
**management** 33:5 307:11,13,18 308:7 392:15
**manager** 54:20 55:18,20,21 109:5 109:20 110:1,6,24 120:14 132:6 150:20,23 151:9 151:18 169:7 349:8,16,23
**managerial** 178:24
**managers** 22:16 55:24 56:3,15,18 56:21 120:17 138:1 141:22 267:3
**mandated** 105:3
**manual** 42:21
**manufactured** 204:6
**manufacturer** 70:2 82:23
**manufacturers** 70:7
**manufactures** 210:20
**march** 366:22
**marching** 112:8
**marcus** 7:21,25 16:18
**maria** 156:10,11 370:19
**marie** 294:25 380:25
**marijuana** 64:25 117:14 260:14,24

maris 58:16
152:19 153:1,1,2
mark 154:18
345:17 354:17
365:5
marked 34:20
35:1 128:19,22
155:24 156:3
161:22 162:1
165:18,23 172:17
172:25 180:3
194:15,18 200:17
200:21 208:7,10
218:21,24 220:22
221:1 228:14
246:9,12 257:1,4
274:23 275:3
282:17,21 290:20
303:25 304:5
311:21,25 345:22
354:23 365:10,14
372:20,24
market 218:5
mart 4:3
martin 132:6
150:15
marty 111:7 122:2
135:21 137:19,20
138:13 140:20
181:21 345:15
357:6 365:4
massachusetts 5:8
master 13:21
319:17 320:15
354:22
master's 239:13
239:18
mat 14:9 236:1
285:9 371:12
372:17 373:7

materials 63:19,21
63:24 64:7
math 379:25
matia 44:12,14,15
132:13 135:3,4
196:10 243:2
251:12,19,20
252:5,14 279:17
279:21 282:4
283:24 284:8,17
285:6 289:5,9
290:4 293:11,17
293:20 294:5,7
297:2,10 328:19
349:19 365:16
366:5
matia's 287:5
matt 152:18,25
matter 89:3
353:15 394:8
403:15 406:15
407:12
matters 403:11
maximum 52:12
52:14,16 112:23
mcconnell 4:6
mcguire 132:11
mckesson 5:17
16:3 332:23
md 1:7 15:16
mdl 1:6
mean 22:7 39:14
57:2,15 87:20
139:2 146:24
149:16 150:21
158:12 164:2
181:8 195:11,17
197:15 209:7
211:19 228:4
249:13 274:15
287:10 294:20,21

300:13 307:12
308:8 311:11
334:14 337:3,16
350:8 367:8
376:14 389:23
397:17 401:5
meaning 46:6
49:14 52:15 67:25
110:14 148:16
149:9 164:3
232:10 316:22
337:4 363:7 380:7
meanings 179:1
means 21:17
100:12 109:9
118:12 136:16
151:5 212:11
236:3 239:25
242:19 244:8
343:18 347:21
364:1 371:14
397:23 398:2
meant 228:2
250:15,20,21
298:21 299:17
349:21,22 363:3,6
measure 189:25
190:1 191:3
mechanism
322:11,17 323:4
med 206:10
media 297:23
medicaid 71:5
137:24 138:2
140:21,25 141:21
141:23,25 142:4,5
142:6,12 157:13
157:16,20 159:17
159:21,22 160:5
160:11,21,24
162:11,21 164:7

374:11,16,21,24
374:25
medical 12:4 65:7
67:5 72:8 73:5,17
73:19 74:3,7
133:24,25 202:21
203:5 214:1
218:19 219:3,4
234:17 235:13,20
262:20 263:12,12
264:9,14,17
286:15
medically 59:10
237:22 252:16,24
253:7 265:17
271:2 278:13,15
278:21 281:13
282:6,10,11
287:19
medication 58:22
58:25 59:2,5
62:25 72:17,25
75:3 76:8 77:4
81:10,17 82:4
89:5,14,20 92:20
136:24,25 137:2,4
137:5 175:25
204:25 206:21
216:10 229:13
232:16 233:14,20
252:8 254:4
278:18 279:15
280:7 282:8
283:23 287:6
392:18,23,25
393:3
medications 74:13
74:18 75:8,12
203:15 205:24
217:25 278:3

**medicine** 72:1
79:5 81:25 241:4
268:20
**meet** 32:2 129:12
129:15 241:11,15
**meeting** 10:8,17
11:3,8,12,15,20
13:6 40:2 128:20
130:12 161:19
166:13 169:22
172:21 173:11
179:25 180:8
194:17 200:14
201:1,20,22 208:4
208:15 213:8
229:9 232:9
290:18 291:14,16
291:17,19,22,24
292:3 293:23
324:14 401:22
402:4
**meetings** 46:7
129:19 131:14
193:13,14 195:11
196:15 201:2
202:9 203:11
209:1 279:25
288:22 289:1
290:7 327:13,14
327:14,21 328:16
350:1 395:24
**meets** 128:12
129:16
**melville** 3:7
**member** 76:23
151:7 192:20
291:24 322:18
342:5
**member's** 81:25
**members** 24:9
82:9 134:22 151:3

291:10 323:13
**memory** 25:4
194:5 277:14
293:17 302:12
329:17
**mental** 26:3,8 38:8
54:23,23 57:25
97:22,25 98:6,7,16
98:19,21,25 99:12
139:21 150:3
279:10 355:21
382:14,22
**mention** 219:23
**mentioned** 25:7
37:8 126:10 128:8
141:22 248:23
**mentioning** 25:10
**merely** 40:4,9
**messaging** 230:4
**met** 58:4 130:4
135:8 201:9,24
241:10,17 276:1
285:22 401:19
**meth** 215:14,19
**methadone** 59:8
**methamphetamine**
64:25
**metro** 285:22
**metrohealth**
235:15,19 286:15
**mexican** 84:10
**middle** 158:6
**midwest** 410:1
**miguel** 134:10
**mild** 41:2,13 53:5
258:20
**military** 205:2
**mill** 245:15,18
**miller** 131:17
**miller's** 131:18

**million** 152:15
331:25
**millions** 164:11
**mind** 60:6 175:14
**mine** 287:8,14
**minimum** 32:14
**minute** 35:4 66:19
171:19 214:12
304:8 384:10
396:8,9
**minutes** 10:9 11:9
11:15,20 13:6
46:12 128:21
180:1,8 200:14
201:1 208:4,16
213:7 246:25
290:18,24 291:3,6
291:24 292:2
396:15,16
**misdemeanor**
19:20 117:15
145:6
**misdemeanors**
19:18
**missed** 224:3
**missing** 315:25
**mission** 162:24
190:2
**misspoke** 250:15
**misstate** 394:3,14
**misstatement**
298:21 299:17
**misstates** 212:14
233:9 320:22
393:23 394:11
**misunderstood**
137:6
**misuse** 262:1
**mittinger** 142:25
373:2,6 375:11

**mock** 240:9
**model** 23:22 24:19
25:8,9,16,16,17,19
279:13
**moderate** 41:2,6
53:5
**molly** 1:16 2:5 9:3
15:11 17:4,19
285:21 406:7
407:8 408:4,9
409:4,13 410:20
**mom** 239:15
**moment** 346:16
365:20 386:8
**money** 85:21 93:4
103:25 107:1
109:8,12 110:13
128:1 143:10
146:12,19 147:14
147:15 148:22,24
149:13,15 157:8
157:15 160:1
172:4 174:15
178:10 181:9,23
182:12 187:14,23
191:13 192:6
298:12 300:4
335:5,10,11 336:6
336:24,25 337:2,3
337:7,9 338:21
339:2,3,7,21,23
340:10 341:2,2,3,4
341:5,23 342:2
344:2,6,9,10,17,18
345:1 360:2 363:8
367:3,16 368:1,1,7
368:8,11,17,25
369:2,5,7,9,13,25
370:3,5,9,24
371:20 377:8
380:11

| | | | |
|---|---|---|---|
| **moneys** 286:20 | **mous** 147:22 | 186:18 221:8 | 195:13,18 204:16 |
| 338:14 | **move** 193:1 | 248:23 257:18,20 | 280:11 360:12 |
| **monies** 174:16 | 352:12,13 353:10 | 257:22 258:8 | **necessary** 160:6 |
| 178:3,6,9,14 | 387:2,12 388:8,10 | 265:8 271:23 | 237:22 252:16,24 |
| 191:12 192:7 | 395:6 | 289:17 310:16 | 253:7 265:18 |
| 334:4,5,6 336:13 | **moved** 108:3 | 312:11 319:14,21 | 271:2 368:6 |
| 337:16 338:18 | 216:10 226:8 | 319:23 326:22 | **necessity** 89:10 |
| 339:19 341:13,14 | **moving** 361:24 | 332:23 345:14 | **need** 43:23 54:23 |
| 341:15,21 | **multiple** 97:3 | 356:1,7,13 357:11 | 57:23 109:3 112:1 |
| **monika** 7:17 | 164:3 260:20 | 357:13,16 366:6,8 | 128:16 144:4,7 |
| **monitor** 62:4 93:4 | **municipal** 11:5 | 391:15,16 394:24 | 145:24 146:16,16 |
| 93:7 143:23 | 130:3 144:14,19 | 394:25 395:3,19 | 148:10 159:5 |
| **month** 45:11,14,20 | 166:11 167:7 | 401:20 407:6 | 160:22 163:14 |
| 62:8,9 63:4 | 169:11,17 170:3,8 | 408:3,4,15 409:3,4 | 168:17 174:10,19 |
| 102:23,25 105:18 | 172:3,23 173:23 | 409:21 | 174:22 180:25 |
| 127:19,23 154:17 | 174:24 175:5,19 | **names** 305:16 | 188:19 189:6 |
| 159:1 166:13 | 175:21 176:3,23 | 306:10,14 310:18 | 190:17 213:14 |
| 184:15 199:19,21 | 178:23 179:11 | 356:23 357:17 | 240:4 258:7 |
| 301:17 324:19 | 183:19 214:21 | 379:5 | 262:20 292:14 |
| 366:21 371:15 | 337:6 362:24 | **napoli** 3:5 | 294:12 310:23 |
| **months** 32:15 | 363:15 366:21 | **napolilaw.com** | 335:10,11 337:23 |
| 104:16 127:22,24 | 368:9,21 376:9,9 | 3:10,12 | 338:24 339:3 |
| 127:24 158:10 | **murphy** 111:7 | **narcotics** 78:23 | 349:17 350:17 |
| 186:8 191:24 | 120:2 122:2,20 | 88:12 269:16,22 | 367:21 |
| 201:11 212:24 | 126:1 132:6,8,16 | **narrow** 99:14 | **needed** 39:11 |
| 213:2 224:10 | 135:22 137:19,20 | 112:20 | 79:16 115:13,25 |
| 276:24 277:16 | 138:13 140:21 | **national** 1:5 15:12 | 116:4 139:20 |
| 375:14 | 150:15 156:18 | 60:21 105:17 | 151:9 212:23 |
| **morgan** 6:15 | 172:14 173:3 | 192:16 324:12 | 286:1 295:7 296:2 |
| 16:24 | 345:15 357:6 | 407:6 408:3 409:3 | 297:16 313:10,12 |
| **morning** 16:4 | 365:4 | **native** 13:9 303:22 | **needs** 29:23 37:19 |
| 17:12,13 45:12,15 | | 304:4 | 44:2 57:23 58:21 |
| 56:3 60:4 119:6 | **n** | **near** 36:24 39:24 | 89:9 212:24 240:1 |
| 124:16 229:6 | | 126:8 144:10 | 335:25 336:3 |
| 248:24 276:1 | **n** 5:13 9:1 | 162:4,6 166:2 | 349:14 353:17 |
| 342:7 | **n.d.** 1:12 | 183:23 195:1 | 377:17 382:22 |
| **motivational** | **n.w.** 5:8 7:5,14 | **nearly** 334:23 | **negative** 46:9 |
| 240:18,19 | **nadcp** 60:21 | **neat** 62:22 | **neither** 385:14 |
| **mou** 11:4 172:22 | **nail** 118:11 | **necessarily** 110:15 | **nemec** 156:10,11 |
| 176:23 177:1 | **name** 17:14,18 | 111:1 176:13 | 370:19 |
| 179:12,15 | 44:12 111:9 | 182:13 186:5 | |
| | 138:11 142:23,25 | | |
| | 168:24 179:21,24 | | |

network 107:19
never 78:2 85:22
  86:1 229:16 238:2
  268:12 297:12
  311:12,14
new 23:17 24:11
  93:8 107:17
  109:20 110:1,2,5,5
  110:6 149:25
  150:1,13,13
  180:20 181:7
  186:12 247:21
  281:7
newer 23:7
news 83:24
nickie 187:9
night 105:20
  326:24
nine 114:4 384:21
non 21:16,21
  25:13 28:21,21
  57:6 59:16,22
  369:25 371:13,14
  377:10 378:4
  381:1 392:17
noncompliance
  185:7
nonspecialized
  358:9
normal 240:7
north 6:7 17:23
northeast 175:22
northern 1:2
  15:14
notary 2:13 17:7
  406:5,8 407:25
  408:10,18 409:15
  409:23 410:23
notation 377:16
  377:22 378:2

note 366:19
  377:25
noted 404:1
nother 111:24
  349:6
november 1:17
  2:3 11:9 15:2,7
  180:1,8 406:17
  407:4
number 10:2 27:9
  34:21 48:4,10,14
  48:16 51:19 81:7
  88:25 89:16 97:14
  102:8 108:18
  112:9 113:22
  114:3,11 115:12
  117:14 122:6
  123:18,19 149:6
  163:3 164:21
  167:10 169:17
  182:19 186:6
  194:25 197:8
  202:5 206:20
  229:11 232:13,21
  232:22 235:25
  246:13 255:3,12
  256:5 257:7
  259:19 261:25
  273:2 288:8
  290:13 291:1
  292:5 303:23
  305:5 310:15
  312:24 314:10
  335:7 340:2
  347:19,24 355:9
  375:20,22 380:9
  380:10,12,21
  381:18 385:5
  407:7
numbers 11:21
  35:21 118:7 149:5

201:14 273:8
  304:1 332:3 354:9
  409:7
numerous 24:3
  26:21 29:21 32:10
  58:14 103:19
  167:11 190:23
  351:4 381:9
  401:21
nw 4:16 5:21 6:6
  6:16
ny 3:7

o

o 17:19 236:2
  319:25
oarrs 90:16,24
  91:15,20 93:6
  94:3,5,8,10,16,18
  95:2,8,11 96:1,14
  101:21,25 102:8
  103:2 202:13,17
  203:6,10,16,18,20
  203:24 204:8,20
  204:23 205:17,18
  205:19,20,23
  207:14,18,21
  208:22,23,25
  209:6 264:2,5,7
  265:7 266:6,13,16
  266:23 267:4,9,13
  267:22 269:18
oath 18:1,5
object 28:10 242:4
  352:1 394:10
objecting 386:16
objection 9:16
  25:23 28:2 31:10
  31:25 33:12 36:17
  38:18 39:8,20
  40:11,21 41:24
  42:5 48:8 49:4,23

50:21 51:15 52:2
  52:7 53:9 54:14
  55:10 57:10 59:17
  61:5,12,17 63:10
  63:14 64:10,15
  65:3,8,16,24 66:5
  66:15 67:8,13,18
  67:24 68:6,12,20
  69:2,9,14 70:8,13
  70:21 71:2,7,12,21
  72:2,19 73:1,6
  74:14,19,24 75:4
  76:3,11,18,24 77:6
  77:11,23 78:11,18
  79:2,7,12 80:1
  81:19 82:1,13,17
  82:25 83:7,20,25
  84:11,22 85:9,25
  86:13 87:19 88:10
  88:23 90:2 92:15
  93:16 95:20 96:24
  97:7,12,18,23
  102:2,6,15,20
  104:6 107:9 108:5
  112:12,25 114:5
  114:12,20 115:5
  116:6,12 117:7,19
  117:25 119:24
  121:22 124:3
  125:19 134:3,24
  135:14 136:9
  138:21 139:16
  140:11 142:17
  146:3 149:2
  150:24 157:9,21
  158:14 160:2,15
  161:2 162:25
  163:9,15,20
  164:16,23 165:14
  168:3,12 170:12
  170:18,23 171:12

175:8 177:2,13,20
182:23 183:3,8
184:9,16,24
185:15 186:15
188:17 189:10
190:3 191:6
193:24 197:3,13
197:19 198:1
203:7 204:2,11
205:25 206:18
207:9,23 209:2,13
210:2,11,23 211:3
211:8,21 212:5,13
213:5,16,22 215:5
215:10,15,20
216:1,7,19 217:15
218:6,11,16 220:1
220:17 221:18
222:1,6,17 223:1
224:2 225:5,11,22
226:10,23 229:19
231:2,19 232:18
233:8,21,24 234:9
234:14 235:18
236:4,21 237:6
238:4,17,22
243:13 244:25
245:10,22 246:1
247:13 248:2
249:17,23 250:3
250:24 251:16
252:18 253:1,9,14
253:24 254:6
255:17 256:6
260:9 262:21
263:14,21 264:10
264:19 265:3,12
266:19 267:1,20
268:8,15 269:3,11
270:2 271:4
277:19 278:24

279:20 281:16,24
287:22 288:15,24
293:19 295:10
296:6,12,25
298:23 299:19
300:22 302:2,15
303:5 311:16
314:17 315:5
317:21 318:3
320:4,21 321:19
322:2,15,21 323:9
323:23 324:23
325:9 329:20
331:2 333:23
334:16 339:10
341:24 343:24
344:13,20 345:4
348:9 354:7,15
356:19 358:24
359:5,12 362:11
367:12 369:16
370:1,14 371:3,22
375:1,5,15,21
376:2 377:11
378:6,14,21
381:21 382:23
383:7,14 386:12
386:13,15,17,21
387:3,5,11,13,21
388:4,6,9,11,11
389:10,15 390:6
391:1,2 392:3
393:14,23,25
395:6,25 396:19
396:24 398:3,8,21
399:1,8 400:13
401:9 402:13
403:2
**objections**   13:15
   13:19 345:20
   346:6 354:20

391:8
**objectives**   192:5
   313:16
**obligation**   320:2
**observe**   24:16,17
**obtain**   31:17 38:6
   64:4 67:23 68:1,4
   69:13,19 71:16,19
   91:21 173:13
   174:20 178:7
   213:20 224:20
   240:15 266:16
   324:16 335:15
   364:20 368:21
   382:16
**obtained**   42:17
   68:25 69:5 93:2,9
   204:1 205:16
   239:5 301:10
   372:5
**obtaining**   45:16
   203:14 264:2
**obviously**   163:3
   167:11 255:10
   298:10 322:6
   323:15 342:24
   351:1 403:3,19
**occasions**   401:21
**occupation**   42:3,8
**occur**   225:17
**occurred**   100:14
   100:16 105:19
   108:14 199:3
   243:19 400:20
**occurrences**   9:14
**occurring**   399:16
**occurs**   84:15
**october**   13:22 14:9
   103:5 129:10
   173:4 177:5
   270:14 276:19

277:13 278:10
   354:23 365:17
   366:11 371:18
   372:17 373:7,20
**offense**   107:17
**offenses**   145:7,8
**offer**   106:17
**offers**   57:1
**office**   27:2,12,15
   28:6 29:18 91:18
   95:1 123:14 124:8
   124:11,20,23
   202:22 203:6
   234:18 240:13,13
   242:25 243:3
   290:5 307:3 316:7
   331:6 407:14
**officer**   29:9,16,20
   29:24 30:2,8,12,22
   31:15,20 32:13,19
   43:15 54:21 110:6
   110:24 240:17
   349:7,15,22
**officers**   22:16 93:5
   118:19,24 119:12
   120:9 322:1
**offices**   2:6
**official**   408:15
   409:21
**oh**   3:16 126:19
   205:3,3 276:6
   338:3 351:15
**ohio**   1:2,10,12,18
   2:8 4:7 6:7 15:1
   15:15 17:24 21:10
   22:18 23:18,25
   35:16 43:2 62:9
   68:19 149:7
   175:22 181:4,20
   181:21,23 182:4
   298:12 300:4

313:11 321:12
336:23 337:13,20
337:25 346:4,4
360:6,9,10,16
361:21 407:2
**okay** 18:3,10
20:21 23:19,23
25:2,11 28:4 29:2
29:11 30:7 32:17
33:1,20 35:6,18
38:9 39:5 43:11
44:23 48:12 49:1
51:2 54:6 56:2,9
57:22 58:24 60:16
64:18 66:17 68:3
68:9,23 69:24
70:5,24 74:11
75:25 76:7,14
77:2,9 78:6 81:2
83:3 85:16 87:25
90:25 92:9,10
93:10,21 95:23
101:23 112:6,19
114:9 117:13
118:5,8,13 119:4
119:11 120:8
121:1,6 122:13,19
123:8,20 124:6,25
125:13 126:4,7,25
128:5,7,18 129:8
131:6,11,17 132:4
132:24 133:14
138:18 139:9,19
140:24 141:5
142:20 143:2,4,8
143:17 144:8
147:7,12,25
149:19,24 151:21
152:4,9 153:11,19
156:5,14 158:1
160:8 161:16

165:3,16 167:1
169:14 171:16
176:17 188:7
189:5,22 193:5
195:6,14,23 196:7
196:16 198:4
202:11 203:17
205:21 206:5
207:12 208:2
214:8 218:3
220:21 221:3
224:8 226:2 228:4
228:8,9 229:5
231:13,18 232:17
234:4 235:22
238:25 242:21
244:11,15,19,20
245:7 247:18
248:5 249:5,6
250:23 251:1
257:21,24 258:3,6
261:2 263:8
265:21 272:11
276:13,15,16,17
282:25 283:19
295:5 296:19
297:8 306:6 307:6
307:20 308:12,25
309:14 310:7
311:6 312:7
322:14 330:19
333:3 342:20
345:17 347:13,18
347:23 351:15,20
355:5 356:25
371:8 372:8 374:5
374:14 380:5
382:2 384:20,25
385:10 386:6
387:4,7 390:12,16
391:6,7 394:21

396:2,16 400:4
**old** 162:11 186:13
231:11,13 269:19
280:15
**older** 105:3 348:11
**omhas** 136:17,18
**once** 24:12 27:5
47:4 78:7 182:8,8
199:19,21 241:12
389:4
**one's** 27:6 82:3
**ones** 136:7 204:17
212:12
**ongoing** 186:2
220:10 400:19
**ongoingly** 80:20
154:25
**ooo** 2:1
**op** 1:12
**open** 131:14
331:16 350:12
403:14
**opened** 360:20
**opening** 202:12
**operate** 22:11,18
**operates** 164:20
**operating** 333:22
**operation** 361:13
361:18,22
**operational** 19:7
108:16
**operations** 369:25
**opiate** 1:6 10:12
10:16 15:12 56:13
59:6,16,22,22,25
60:3,4,6,7,8,9,12
60:14 61:24,25
62:5 99:5,5 103:9
104:4,9 111:23
136:21 155:21
161:18 182:2

193:7 195:22
211:15 217:20
220:10,15 227:4
227:19,24 249:8
249:15 250:7,14
250:20 251:14
277:1,18 278:2
289:3 290:9 298:8
298:20 299:16
322:6 324:18
327:22 395:2,20
401:15 402:2
407:6 408:3 409:3
**opiates** 59:12
61:16,21 62:13
66:10 67:10 69:4
79:15 80:19 89:1
209:11 211:13
217:24 219:24
220:16 233:7
260:2 262:18
267:12
**opinion** 72:9,9
213:19 214:6
220:19 245:1,3,4,5
246:2 248:3
279:25 287:8,10
287:11
**opioid** 64:20,21
67:17,23 71:1,6,10
71:16,20 72:15
78:9,16 79:24
80:7 81:24 85:24
92:5,6 98:25
134:2 182:6 193:3
196:22 197:2
226:18,22 230:13
230:16,18,24,25
233:6,12 236:11
237:22 238:2
245:9 249:9 250:9

250:10,15 251:15
251:25 254:25
255:24 256:16
258:14,17,25
259:2 260:7
261:16,18,19
262:2,4 263:19
264:25 265:10
268:2,4,7,23,25
269:2,10 271:2
287:21 289:24
296:4 298:8 299:9
300:11,15 301:3,7
301:14,20 302:8
302:23 311:10
343:13 348:25
379:17 381:20
382:21 386:3,10
386:24 387:10,19
387:24 388:22
389:13,21,22
390:19,24 392:21
393:12 397:17,24
398:7,13,17,20,25
399:3,11,13,14,18
399:24,25 400:1
400:11,17 401:5
401:14
**opioids** 59:12
60:18 61:16 63:6
63:9 65:1,7,14,18
65:21,22 66:4,14
67:4,6 68:10,19,24
69:4,22,25 70:7,12
70:17,20 75:5,18
76:2 79:1 81:6
82:20 85:18,20
197:12 210:1,10
210:19,21 213:15
213:21 217:25
218:5 224:1,16,17

225:4 226:8 228:3
229:17 230:11
236:16 253:19
263:11 264:1,8,16
264:18 266:8,17
272:5 273:22
298:16,17,18,21
299:17 300:2,7,14
301:1 326:2
385:22 401:6
**opportunities**
206:8,14,17
313:13
**opportunity** 62:14
**opposed** 186:9
253:20 255:15,16
264:1 279:15
354:14
**opposite** 147:18
**options** 57:1 58:6
63:1 276:2
**order** 13:22 43:1
264:24 265:2
283:4 347:6
354:23
**ordered** 49:21
50:19
**organizational**
21:6
**organizations**
122:7
**organize** 105:12
**organized** 105:12
293:3
**original** 159:13
**osam** 223:17
224:21
**outcome** 406:14
**outlook** 328:7,17
**outpatient** 57:5,6
57:19,20 58:17

148:13,18 295:2
**outside** 98:10
101:5 110:18
172:5 174:20
178:7 191:14,14
370:4 376:15,20
377:1,4,21,23
378:4
**outweighing**
292:14
**overall** 20:25
279:1 313:10
358:13 359:9
**overdose** 89:8
199:3 223:10
229:11 232:14
**overdosed** 85:14
106:2 200:9
233:23
**overdoses** 199:6
217:9 222:22
280:21 399:15
400:20
**overdosing** 222:5
**overflowing** 99:13
**overlooking** 199:2
**overprescribing**
229:13 232:16
233:19
**oversee** 22:5 112:3
146:23
**oversees** 44:24
138:17 146:21
235:20
**overwhelming**
181:25
**oxford** 7:22
**oxycodone** 230:11
385:23
**oxycontin** 64:22
224:16 236:13

**p**

**p.m.** 166:4 298:2,3
371:19 404:1
**page** 9:15 10:2
35:22,24 36:23
48:13,20 118:6,16
118:17 120:13
125:4 126:5 127:9
143:6 150:8
152:10 162:7
164:10 173:8
183:11 187:6
202:14 206:6
208:21 212:18
219:2 220:2 223:7
228:21 230:5
235:5 246:22
257:14 258:9
259:19,19 276:12
283:2,8 284:2
291:10 292:5,9
293:10 303:22
305:3,5,6 313:1
314:12 346:9,18
347:14,17 348:16
355:7,7,8,16,17
356:6,8,24 366:9
370:17,20 373:10
373:15,16,23
375:20 385:7
397:15 409:7
410:3
**pages** 229:1
331:25
**paid** 50:6,9,11
119:21,22 121:20
122:16 125:17
135:17 141:10
148:23 159:21
160:23 192:1
286:19

**pain** 206:22
211:15 217:24
229:13 232:16
233:19
**painkiller** 60:15
**painkillers** 89:2
90:20
**paper** 304:18
**papers** 84:5
**paperwork** 45:18
**par** 5:4,5,6
**paragraph** 157:3
158:6 220:7
223:15 224:4,7
259:22,23 276:9
284:16 285:6,20
313:8
**parents** 268:19
**part** 22:13 30:16
31:19 33:10 35:15
36:14 37:2,11
43:8 46:10 49:21
57:9,11,21 84:18
86:9 89:24 91:11
94:23 98:3 100:18
100:25 123:11
124:8 133:16
168:7,21 176:14
189:14 191:10
192:7 195:8,10
247:11 255:7
267:6 288:2 289:7
289:16 296:14,16
296:17 313:23,24
314:1 315:3
343:22 360:3
402:8 409:9
**participant** 10:5
34:24 190:23
**participants** 48:2
48:21 51:19 59:21

105:1 106:19
108:8 113:22,24
223:17 224:13,21
251:13 253:17
254:25 255:23
256:16 261:25
268:6 304:24
369:20
**participate** 19:18
58:3 59:4 101:10
101:16 140:1
167:18 195:21
392:22
**participating** 46:9
105:14 193:18
196:11
**participation** 24:4
24:5 30:6 35:10
40:23 43:17 105:2
**particular** 40:14
72:25 76:17 117:4
137:18 258:13,21
259:3 260:5
283:16 313:2
362:24 397:14
**particularly** 192:3
**parties** 244:13,14
406:13
**partners** 122:7
289:10
**partnership**
175:20 176:7,11
**parts** 361:8,11
**party** 347:21,22
**pass** 248:13
**passed** 190:20
**passing** 115:4
**patient** 54:13 70:3
72:1,25 76:9,16,17
82:12 162:13
284:19 378:20

379:5
**patient's** 73:5
**patients** 26:16
163:13 164:21
236:15 272:3
286:24 354:5
379:6
**patrol** 321:12
**pause** 34:6,13
248:16 332:16
**pay** 48:21 50:19
110:23,25 127:23
128:2 133:15,20
136:22,23 140:17
141:7 148:20,21
149:8 150:13
151:5,7,17 152:16
152:18 153:6,16
159:24 160:5,10
161:9 181:25
182:11 342:6
**paying** 151:2
380:7
**payment** 142:14
161:1
**payments** 141:17
**pays** 141:7,9
146:20 342:4
**pbh** 186:9
**peca** 2:7
**peer** 106:18
294:23 380:22
**pelini** 6:4,10 16:13
**penalized** 367:4
**pending** 308:14
309:9
**pennsylvania** 6:16
7:23
**people** 16:15 31:8
44:16 56:15 59:11
65:19 79:11 81:23

95:1 105:21
107:21 108:2
109:22,23 110:4
115:4 118:15
154:1 163:3
194:25 197:9
210:15,17 226:16
227:23 230:24
233:18 238:1
250:14 252:10
268:2,22 269:1,5
272:21 273:7
281:22 282:4
287:21 288:23
291:18 294:12
295:7,19,21,22
296:4,10 299:7,9
299:25 300:5,10
301:2,7,19,25
302:8,20 303:4,7
305:16 306:14,17
311:10 326:2
383:12 386:15
402:1,7
**pepper** 240:24
**percent** 48:7 59:25
97:11,17 125:9
150:19,22 151:8
151:18 183:7
191:15 226:17
230:12,13,14,15
233:13 250:6,13
254:24 255:12,15
255:15,16,23
268:1 354:12
358:22 359:4
383:12
**percentage** 59:21
182:21 268:11
273:20 358:13
359:9

Page 44

percocet 64:22
88:21 218:9
236:13 254:19
perfect 86:17
296:22
performed 106:7
performers 106:7
period 38:14
person 29:6 32:14
52:6 67:17 71:15
71:18 86:16 90:23
92:4 96:22 99:22
107:16 111:5,5
120:3,6,24 121:2
121:16 122:21
123:21 125:2
131:12 135:19
137:18 138:9
152:1 172:15
179:22 204:1
205:2 209:24
210:21 300:19
307:16,22 308:3,8
308:16 309:3,5,16
335:23 345:13
380:6 391:25
person's 86:12
140:5,15 141:2
151:23,25 240:3
personal 249:12
328:13,15
personally 79:13
134:19 297:4
331:9 368:6 381:5
383:15 408:11
409:15
personnel 121:20
334:5
persons 356:11
perspective
321:18

pertaining 136:24
peterca 168:25
169:1,5,20 275:12
275:15 276:21
277:14
pharma 1:11
pharmaceutical
5:4,5,6 6:13
210:20 243:18
pharmaceuticals
5:4
pharmacies 70:19
pharmacy 68:19
211:7 241:6
phase 51:11 105:5
126:24
phases 51:12
126:9,11 176:14
phone 16:16 325:3
325:22 328:13,14
328:15 329:10
407:3
phrase 285:5
phrased 154:20
287:15
physical 37:18
338:4,8 345:13
physically 196:15
physician 66:1
68:1,5 71:17 72:4
72:8 213:24
pick 371:11
picked 107:16
308:23 325:22
picture 151:12
pile 385:1
pill 134:7 245:14
245:18
pills 39:16,17,17
41:10 85:22
134:11 206:22

211:15 224:19
pipeline 211:12
pittsburgh 7:23
place 106:19 158:3
179:15 288:21
293:1 303:11
315:13 319:11
322:11,17 323:4
361:25 362:4,7,8
380:18
placed 9:16 381:8
plaintiff 15:20,22
plaintiff's 348:21
348:24
plaintiffs 13:14
345:19 346:3,12
355:10 356:10
plan 30:4 43:16
55:13,17 56:25
57:8,9,11,21 89:7
planned 285:2
planning 19:2,3,21
33:16 109:15
110:16,19 111:8
132:7 137:16
141:16 146:21
147:23 171:14
176:14 180:24
350:2 365:3
plans 55:18
plate 85:3
play 169:10
played 245:8,12
plea 47:15,16 48:3
48:3 51:20,20
plead 46:20 47:17
pleas 10:4 12:19
18:14,16 22:4,12
27:25 33:11 34:23
98:18 135:12
166:16,24 169:12

175:23 256:23
355:25 356:18
357:4,7 358:4,7,10
358:14,19,23
359:10,16,20,24
360:2,23 362:10
364:7,14
please 15:17 17:17
166:7 167:5
187:12 227:7
229:6 232:7 249:4
261:21 333:6
346:16 348:17
356:5 366:19
407:14
pllc 3:5
po 91:20
point 55:13 81:4
104:17 109:1
202:7 209:11
227:14 251:6
286:4 301:18
303:1 311:13
348:18 355:17
pointed 307:16,21
points 314:10,22
poison 11:14,19
198:6,16,18
200:13 208:3,16
police 321:5
politician 165:1
polster 1:8
poor 223:22 225:1
popovich 166:8,14
166:15 275:11,15
277:23
popular 224:15
population 99:15
150:2 238:9
267:18 271:12
272:16,20 273:20

273:21

**portion** 48:1
145:22 152:17
153:5,12 229:15
238:1 342:3

**posed** 244:13,13

**position** 61:4
169:16 340:8
343:1 357:18

**positive** 46:15

**possible** 41:22
67:16 145:2
149:21 195:24
196:3 202:1
209:18 226:20

**possibly** 92:19
111:10 112:2
219:16,21 368:20

**post** 47:16 48:3
51:20

**postgraduate**
239:9

**pot** 146:12 174:14

**potent** 221:25

**potential** 30:4
43:16 101:13

**potentially** 167:22

**pots** 178:13

**pounds** 134:11

**power** 215:9

**powerful** 184:4
222:15,22

**powerpoint** 293:6

**powerpoints** 64:5

**practice** 288:3

**practices** 279:11

**pre** 47:15,16 48:3
51:20

**prefer** 26:5 407:16

**prep** 242:15,16

**preparation**
347:10

**prepare** 241:8
334:21 347:6

**prescribe** 70:17
264:16,18,25

**prescribed** 65:15
65:18 77:5 79:15
79:25 80:7,11,19
80:21 82:10,11
88:12 90:21 92:20
230:10 252:25
254:16 264:8,13
385:22

**prescriber** 71:24
72:16,24 73:4

**prescribing**
204:24 211:14,20
212:11

**prescription** 1:5
6:3 15:12 16:14
68:1,4,25 69:5,13
69:20,25 71:16,19
74:12,17 75:3,8,11
75:17,20 76:1,15
76:22 77:4 78:8
78:16,25 79:24
80:6,9 81:4,5,10
81:17,18,24 82:4
88:2,5,20 89:1,1,4
89:13,20 90:1
91:22 92:5 93:13
96:18,19,23
117:23 204:15
205:16,23 206:21
206:21 210:1,9,21
211:13,23 212:23
213:21 216:10
217:24 218:4,15
219:24 224:15,17
226:7,18,22 227:8

228:1 229:17
230:18 233:7,14
238:3 249:16
250:20,21 252:7
252:15,24 253:8
253:13,19 254:4
254:10 259:7,15
260:1,7 261:10,18
262:2,11,14,18
263:10 264:1,8
265:10 266:8,17
268:4,7,12,24
269:2,9,15,22
271:3 273:22
298:16 300:1,6,15
300:19 311:12,14
311:15 401:7
407:6 408:3 409:3

**prescriptions** 71:1
71:6,11 93:1,7,8
209:11,20 210:19
227:20 266:12
401:7

**present** 8:3 219:14
291:10 402:20

**presentation**
62:15,17,17
292:17,20 324:17

**presentations**
61:23

**presented** 62:19
193:14 292:18

**presentence** 26:25

**president** 389:22
389:23 399:4

**presiding** 44:6
166:24

**press** 247:9

**presume** 333:12

**pretrial** 169:8

**pretty** 109:6,17
127:3 136:23
154:23 350:12

**prevalent** 117:5
117:18

**prevention** 206:8
206:14,17 230:3

**previous** 32:4
40:24 47:20 87:1
87:5,5 90:19 93:6
166:13 312:13
327:1 340:1
363:23 367:20
371:5

**previously** 37:24
58:21 85:14 86:15
87:3 88:13 109:1
125:25 126:22
132:20 185:24
233:11 299:21
301:5 308:19
311:18 342:13,24
344:1 345:14
349:10 355:2
357:1 358:2 360:6
368:3,8 371:12
380:23

**price** 381:8

**primarily** 117:11
143:21

**primary** 159:17

**print** 317:18

**printed** 318:14

**prior** 21:18,23
23:2,4 29:14 39:7
47:24 49:6 63:3
87:7 92:22 95:18
114:4 116:22
217:9 233:9
271:16 277:15
393:20,24 394:4

**[prior - provided]**

394:12,15,24
**prison** 190:24
**private** 138:20
  139:22 141:1,5
  207:20 381:14
**probably** 109:17
  244:9 332:1
**probation** 21:12
  22:16 26:24 29:9
  29:16,20,24 30:2,8
  30:12,22 31:15,20
  32:13,19 43:15
  50:13 54:21 90:13
  90:14 91:5 93:5
  94:20,22 95:1,4,7
  101:21 102:10
  109:4,21,22 110:3
  110:6,24 118:19
  118:24 119:11
  120:9 128:3 139:2
  156:12 182:1,16
  199:24 203:19
  240:17 267:7
  349:7,15,22 351:3
  392:15
**probational** 28:22
**problem** 41:10
  197:2,12,15,17,18
  197:22,25 212:25
  215:3,14,19,24
  216:5 218:14
  265:14 296:21
**problems** 93:13
  163:13 170:16
  281:3
**procedure** 23:9
  148:14 405:9
  408:5 409:5
**proceedings** 15:4
  33:21 47:25
  115:15 175:11

299:12 332:16
**process** 22:22
  23:18 27:14 35:16
  37:2 43:4 44:20
  46:20 47:15 52:24
  86:8 91:3 146:2
  148:7 153:13
  187:15 189:17
  190:12 192:15
  240:5 255:7 267:6
  343:23 350:17,23
  351:5 360:3
**processed** 221:15
**produced** 258:1
  303:19,21 304:2
  305:4 310:25
  331:19,21 332:8
**production** 318:12
  407:24
**profession** 61:7
  199:9
**professional** 2:11
  406:4
**professionals**
  60:22 264:14
**profitable** 223:20
  224:24
**profits** 381:1
**program** 10:4
  18:18,19,21 19:1
  19:16,19,22,24
  20:3 21:8,14,20
  22:2 24:6 30:11
  31:4 34:23 36:5,8
  36:9,15 41:8
  43:19 45:5 46:18
  46:22 47:1,5,11,21
  48:2 50:20 51:19
  54:13 55:2,9 57:1
  59:15,21 79:14
  81:16 87:13 88:8

92:1 98:9 100:13
  101:11,14 104:15
  104:25 106:16
  113:23,25 114:4
  115:13 116:10,15
  126:11 127:22
  128:14 129:23
  130:1 132:17
  134:23 135:5
  136:17 139:12,24
  142:11,12 164:4
  182:22 183:14,15
  185:21 192:3,17
  192:25 213:25
  216:12 239:18
  269:14 273:4
  274:16,18 278:8
  279:3 283:24
  285:13 286:2,6
  297:3,17,18 306:5
  307:10 308:2,9
  313:11 338:16
  360:25 361:7
  392:25 399:19,21
**programs** 41:16
  41:19 62:1,2
  174:12 278:19
  284:23 393:10
**progress** 54:19,19
  54:20 128:15
  186:3 192:2
**progressed** 87:10
**project** 104:25
  105:4,5,6 107:1,5
  126:22,23 127:5,6
  139:6 144:2
  145:15 162:10
  173:20 175:25
  188:20 190:17
  191:16 192:3
  199:14 326:21

327:14 336:10
  342:2
**projector** 293:5
**projects** 144:1
**pronounce** 247:2
**properly** 264:4
**proportion** 172:7
**proposed** 334:9,13
  334:14,21
**proposes** 175:23
**prosecuting** 346:5
**prosecutor** 22:15
  27:16,24 28:14,16
  28:20,23 36:12
  49:25 123:7,10
  132:17 355:24
**prosecutor's** 27:2
  27:12,14 28:6
  123:13
**prosecutors**
  123:15
**protecting** 100:4
**protocol** 285:2,24
  396:8
**proud** 364:19
**provide** 49:18
  114:16 122:8,16
  148:6 164:22
  183:2 243:24
  244:1,5,16 316:25
  322:12,18 330:12
  330:17 347:5
  348:5 355:12
  377:9 379:4,9
  388:15
**provided** 38:21,25
  50:14 64:7 103:22
  103:24 180:17
  181:1 186:3,12
  322:24 328:23,25
  329:2,5,6,12,16

[provided - really]

Page 47

330:2,7,23 347:9
360:10 378:1,3,3
379:1
**provider** 122:4
**providers** 58:8,8
58:11,14 122:11
122:15 153:3,13
153:15
**provides** 122:24
140:4 144:11
146:25
**providing** 278:2
318:1,4 321:23
323:1 376:14
**psychiatric** 98:12
98:15
**psychology** 239:8
**public** 2:8,13 12:4
17:7 22:15 27:3
123:24 124:1,7,11
124:13,15,20,22
131:10,15 218:19
219:2,6 239:12
355:24 362:14
382:15 406:6,8
408:10,18 409:15
409:23 410:23
**pull** 251:7 262:3
270:15 380:11
385:1
**purchase** 134:18
135:13
**purchased** 134:16
300:20 401:8
407:17
**purdue** 1:11
**purpose** 31:23
199:6,7 252:16
263:13
**purposes** 65:7
236:17 272:5

**pursuant** 13:21
354:22 396:7
405:4,8
**pushing** 297:3,10
**put** 45:9 89:17
96:6 128:6 161:16
165:17 226:4
249:20,22 250:2
265:7 266:5 316:9
348:8 370:22
386:7
**puts** 26:4 62:9
234:17
**putting** 400:8

**q**

**quality** 223:22
225:1
**quantifiable**
356:16
**quantify** 354:3,6
**quantifying**
391:19
**quarterly** 128:12
313:15
**quarters** 48:19
**question** 67:12
73:11 81:14,15
101:20 112:4,19
122:1 142:2
154:21,21 164:25
175:15 225:2
226:15 249:4
250:18 252:4,9,13
253:6,12 254:1,22
255:10 263:8
265:15 269:25
270:5,9,25 276:11
295:23 296:20
298:7,13 307:20
308:8 314:15
325:18 327:7

333:13 336:2,3
341:11 345:5
347:21 350:11
352:2,5,6,10,17
353:1,2,21 367:24
368:20 370:6
371:17 386:9
388:7 400:16
**questioned** 349:11
**questioning**
249:24 252:12
**questions** 28:10
29:21 86:7 244:12
244:13 248:13
249:1 251:7
292:12 304:20
321:1 331:10,18
332:11 333:2,6
351:2 375:10
384:11,22 385:12
390:14 391:11
396:3,25 397:13
401:18
**quick** 33:22
101:20 126:15
130:15
**quickly** 29:22
239:1
**quite** 115:16

**r**

**r** 17:20 319:25,25
406:1
**raise** 227:3,5,23
251:13,24 252:2
381:1
**raised** 227:7,9,25
252:6
**ran** 181:9 227:13
**rare** 237:20 271:1
**rarely** 124:4,6

**rate** 191:1 386:4
**reach** 223:11
**read** 75:10 83:23
84:1 162:16
175:16 253:22
259:4 260:3,15,25
261:1,16 262:7,22
263:4,15 266:3
276:8,13 277:3
283:18 285:10
291:2 293:14
304:11 307:19
312:4 348:7,14
352:10,16,25
353:2,5 371:5
373:24 385:13,14
385:19 397:14,19
408:5,6,12 409:5,6
409:17
**readily** 281:21,25
**reading** 175:14
230:9 232:20
236:9 272:8
273:16 276:5
284:6 407:12,20
**ready** 30:10 43:22
43:24 251:1 276:7
397:8
**real** 206:8,17
**realize** 81:23
369:13
**realized** 109:2
**really** 27:21 85:24
93:25 104:23
106:11,11,22,24
106:24 110:10,14
115:13 126:15
130:15 174:17
201:13 280:11
298:21 396:17

**realtime** 2:12 406:5

**reask** 387:7

**reason** 18:7 154:13 283:13 291:13,15 292:23 348:11 409:8 410:3

**reasons** 101:2,12 173:12 343:19

**recall** 61:20 95:10 109:1 114:2 117:3 136:8 167:2,8,9 173:19 176:25 187:13 188:10,14 193:19 195:20 203:13 206:13 213:13 215:18,23 232:20 272:7 273:16 283:16 286:9 288:10 292:20 299:5 301:16,17 310:14 310:17 316:20,24 317:3,8 318:20 322:8 323:1 327:1 329:15 330:5 332:22 345:14 357:10,15 360:12 360:22 361:9 362:3 372:2 376:11 390:13 391:10,21 393:19 394:23

**receipt** 407:20

**receive** 26:21 49:16 89:12 92:5 188:16 191:17 283:14 291:23 292:1 307:10 323:5 343:21

344:10 345:1 360:15,21 361:16 361:20 393:2

**received** 27:4 149:25 181:14,16 189:2 221:7 240:22 263:25 266:8 312:15 317:8 320:7 323:12,16 360:23 363:14 367:11 379:6 384:4 390:22

**receives** 191:15

**receiving** 195:25 286:8 317:3 323:19 360:2

**recertified** 23:6 24:25

**recess** 34:2,9 66:24 113:14 171:23 194:11 214:16 248:9 298:2 384:14

**recidivated** 107:16

**recidivism** 107:11 107:14 190:4,17 190:21,24 191:1

**recipient** 195:3

**recognize** 35:7 304:12,23 305:17 306:10 365:23 366:3 373:12

**recollection** 184:6 184:11 208:25 285:13 317:25 323:18 357:18

**recommend** 104:8

**recommendations** 20:19 42:21 43:2 58:23 192:24

209:19 279:12 349:12

**recommended** 24:20 32:25 279:11 282:9 308:21

**recommends** 288:5

**record** 15:7,18 17:18 34:1,4,5,8 34:11,12,15 37:2,7 39:4 50:7 53:13 54:21 66:22 67:1 100:24 107:15 113:5,13,19 171:21,25 175:9 175:13,16 194:10 194:13 214:14,18 248:7,11,15,18 249:20 251:10 284:11 297:25 298:5 331:12,16 332:14,18 362:14 384:13,16 385:20 387:5 388:4,12 397:14,18,19 402:24 403:1,16 403:23,25 406:9 409:9

**recorded** 51:20 205:17 240:10 377:18 378:19

**records** 327:13 377:17,23 380:13

**recovery** 18:18,25 19:1 23:5 44:21 44:25 45:13 56:17 60:2,7 98:3,23 99:7,10,19,23 100:9,17,20 103:7 103:9,16,17 104:1

104:4 105:15,17 105:20 108:12,15 118:21,25 119:9 119:10 120:20 124:14 125:11 131:5 150:5 152:12,23 153:9 155:11 156:25 183:21 192:13 216:13 250:6 287:19 300:10 301:3,6,13,19,24 302:6,20 303:4,10 304:25 305:18 306:13 308:9 309:6,18,23 310:2 310:6,11,14 311:9 312:14,21 313:9 313:11,16,20 314:2,8 321:24 322:20 323:8 325:14 326:1,18 337:5 342:6 344:3 366:8 380:22 392:2

**recovery's** 106:4

**recreating** 130:2

**recreational** 236:17 272:5

**recross** 396:9

**reed** 7:4 17:2

**reedsmith.com** 7:10

**refer** 28:15 32:19 98:9,12,15 145:14 235:2 257:19,22 285:18 336:6,9,12 336:13,22

**reference** 90:14 150:5 161:8 254:14 312:12

363:4 380:8 407:7
408:2 409:2
**referenced** 183:16
314:21 336:18
339:25 407:11
408:11 409:15
**referral** 27:14
36:15 43:3,4
350:20
**referred** 27:8,11
29:5,6 33:7 36:11
41:2 47:21 99:18
99:20 155:14
237:14 298:19
334:25 335:3,4,6
338:12,13 376:16
**referring** 25:18
28:24 149:14,22
181:18 217:24
218:1 257:9,14
258:11 289:14,21
319:8,9 340:11
341:22 361:12,14
367:19 383:2
395:22 399:15
**refers** 29:24
**reflected** 273:22
313:17
**reflects** 313:15
**reformulation**
224:15
**refresh** 194:4
208:24 285:12
**regarding** 249:23
266:17 284:19
292:8 405:3,14
**regards** 283:23
368:19,20 395:1
395:19
**region** 224:11

**regional** 219:7
**regions** 223:18
224:22
**registered** 2:11
265:2 406:4
**registration**
264:15
**regular** 22:11,22
100:6 321:5 324:2
325:2,6 326:9,13
**regulated** 68:11
68:16
**regulates** 66:3,14
68:19
**reimburse** 71:1
147:4
**reimbursed**
160:23 164:7
**reimbursement**
162:12 374:24
**reimburses** 71:5
374:17
**rejected** 100:21
101:3,4,13
**rel** 346:5
**relapse** 184:20
**relapsed** 182:16
**relapsing** 182:21
**relate** 62:12
**related** 59:16
61:10 99:12
120:10 134:2
156:24 173:23
184:7 193:3 196:1
240:23 241:3,6
280:24 326:17
327:21 355:19
379:17 406:12
**relates** 1:9 77:22
**relating** 63:6,9

**relation** 156:22
**relationship** 31:2
32:12 91:5 144:18
144:21
**release** 31:16 38:5
247:9
**released** 279:19
**releases** 54:22
315:20
**relevance** 394:1
**relevant** 316:11,14
317:5,19 320:3
323:7,20 327:19
327:23 328:1
330:12,15,22
331:13 403:3,4,6,8
403:19
**remain** 284:19
**remainder** 352:19
**remaining** 374:1,6
374:7,9,11,19
375:4,13 376:1
**remember** 62:7
63:5,7 90:18 91:2
117:23 127:11
129:18 130:8
138:16 142:23
143:14 173:14
174:3 179:14
184:14 193:20
197:11 198:20
201:4,8 203:13
213:10 215:1
298:13 310:20
317:22 318:4,5,18
318:20 320:11
326:22 327:1
330:8 362:2,5
363:25 372:15
384:6

**removes** 162:11
**rendered** 140:10
**rendon** 5:11 9:7
9:10 16:4,5
248:21,23 249:23
250:4 251:2,22
252:21 253:4,11
253:16 254:2,8
256:1,8 257:3
260:22 263:1,17
263:23 264:12,23
265:5,13,21 266:2
266:4,21 267:16
267:24 268:10,17
269:6,23 270:6,18
271:6 275:1
277:21 279:6,23
281:18 282:2,19
288:1,16 289:11
294:1 295:12
296:8,15 297:6,24
298:6 299:1,13,22
300:24 302:5,19
303:8 304:7,18,22
311:19 312:1
314:19 315:7
317:24 318:7
320:6,24 321:21
322:10,23 323:11
324:1 325:1,11
329:23 331:4,8,22
332:2,7,12 385:11
386:13 387:21,23
388:2,10,16,21
389:1,5,10,15
391:2 393:20,25
394:5 395:6,10,25
396:4,7,12 397:4,8
397:11,22 398:5
398:11,23 399:5
399:10 400:7

401:4,13 402:16
402:23 403:2,6,21
403:22
**rendon's** 394:24
394:25 395:19
**renewal** 189:14
**rep** 187:9
**repeal** 290:15
**repetitive** 333:1
**rephrase** 67:14
187:20 197:14
249:5 333:7
**replies** 277:25
**report** 10:23 13:11
14:5,10 29:18
90:16,24 91:15,20
93:6 94:5 96:1,3,4
96:5,6,10,12 103:2
165:22 185:21,22
186:3 190:11
203:24 207:18,22
261:5 266:14
267:4,14 311:22
312:10 365:9
366:1 372:18
373:9
**reported** 1:23 2:9
92:4 203:16
263:11
**reporter** 2:11,12
2:12 33:22 133:5
253:22 353:5
406:4,4,5 408:7
**reports** 54:19,19
54:20 94:19
101:21,25 102:8
203:18,22 316:1
364:13,15,22,23
**represent** 17:15
199:25 238:9
248:24 305:21

332:23
**representing**
200:1
**request** 41:17 44:5
44:7 91:20 93:5
94:20 109:13
151:1 158:8,12
188:6 318:11
332:6 359:19
409:9,11
**requested** 96:4
105:11 175:16
253:23 353:6
405:2,8,13
**requests** 110:19
187:11 188:1
378:9
**require** 104:3
**required** 48:21
191:23 407:25
**requirement**
126:24
**requirements**
48:15,16 103:8
127:5
**requires** 103:8
362:25
**research** 243:7
**reserving** 332:8
**reside** 376:25
377:4,15,20,23
**resident** 12:16
246:7 378:4
**residential** 57:4,17
89:10 141:8
142:11 148:11,15
163:2,4 165:10
170:2 366:20
371:13 392:16
**residents** 171:5,7
377:10

**resolved** 170:22
**resources** 145:11
**respect** 250:11
266:23 323:6,21
325:18 402:11
403:9
**respectfully** 343:8
**respectively**
230:14
**respond** 233:1
244:17 276:2
**responding** 400:15
**response** 244:6
346:20 370:18
**responses** 13:15
13:18 345:20
346:6 354:19
391:8
**responsibilities**
313:25
**responsive** 316:11
**rest** 26:5 205:12
303:24
**restitution** 48:22
49:20,21,24 50:6,9
50:11,12,19,24
127:12
**restricted** 301:24
**result** 30:14 157:8
157:11 300:19
302:7 349:9
400:18
**resulted** 157:4
163:1 233:13
**results** 158:10
164:14 230:6
**retrieved** 134:12
**returned** 407:19
**revenue** 121:20
125:18

**reverse** 323:3
**review** 11:15,20
23:8 27:5,20
29:10 35:12 41:18
46:2 186:10 198:6
198:16,18 200:10
200:14 201:1
202:4 208:4,16
229:6 232:7
241:25 242:7,12
276:2 312:18
323:16 405:3,8
407:14 408:1
409:1
**reviewed** 19:12,14
44:7 134:10
190:11 313:15
355:4 359:15,22
378:24
**reviewing** 20:16
180:9 228:16
261:3 263:7
276:16 283:20
365:24 366:2
371:9
**reviews** 26:24
27:17 30:4 37:1
381:15
**reyes** 198:23
**right** 23:13 27:16
35:20 37:12 38:12
41:13 43:6,11
49:19 52:18 55:14
55:21 59:12 65:2
67:7 69:8,24 73:5
76:10,17 77:5
82:16 86:25 89:15
92:9 94:3 98:22
99:1,7 103:10
110:20 111:15
113:21,25 115:24

120:2,5 121:10
122:8,20 125:1
126:12 129:16
132:22 133:22
135:3,19 136:5
138:9,18 151:19
152:2 153:17
156:19 157:18,19
159:24 165:12
168:22 169:8
170:8 171:6 172:2
172:14 175:7,18
177:25 181:12
190:12 195:2
202:22 203:20
204:10,15 205:24
207:4,16,19
209:12 211:2,11
216:6 217:22
221:25 222:10,16
222:21 225:21
226:9 227:17,20
229:18 231:6,17
232:2,10 233:20
234:8 236:20
237:15 253:13
255:1 259:9,15
264:16 268:14
270:1 271:23
274:7 275:22
276:12 280:5
281:3 282:7
286:24 288:23
291:11 293:2
294:13 296:11
298:22 299:18
301:4,15 307:23
312:25 314:7
316:15 332:9
346:21 353:3
368:22 373:24

376:4 380:2 382:8
382:21 385:9
**rise**  276:25 277:17
390:18
**risk**  149:7
**risks**  72:24
**road**  3:6
**robbery**  50:25
**robin**  3:18 15:21
**robin.wilson**  3:19
**rocchino**  7:9 17:1
17:1
**role**  130:19,24
169:10 245:9,12
297:5
**rolling**  397:10
**rollout**  284:19
**room**  241:18
292:25
**roughly**  154:10
**routine**  324:20
**row**  223:12 306:2
**rows**  375:25
**royalton**  17:24
**rpr**  406:20
**ruiz**  4:19 9:6 15:23
15:23 17:11,14
25:24 28:7 31:11
32:16 33:13,24
34:16 35:3 36:19
38:20 39:13,22
40:16 41:11 42:1
42:6 48:11 49:8
50:4 51:1,17 52:4
52:11 53:12 54:17
55:12 57:14 59:19
61:8,14,19 63:12
63:16 64:12,17
65:5,10,20 66:2,11
66:17,21 67:2,11
67:15,20 68:2,8,14

68:22 69:7,11,16
70:10,15,23 71:4,9
71:14,23 72:6,22
73:3,8,12,13,18,24
74:16,21 75:1,7,14
76:6,13,20 77:1,8
77:14 78:1,14,20
79:4,9,20 80:4
81:21 82:5,15,19
83:2,10,22 84:8,19
85:6,15 86:3,23
87:22 88:14 89:18
90:10 92:17 93:19
95:22 97:1,9,15,20
98:2 102:4,12,17
102:22 104:12
107:12 108:7
112:16 113:2,20
114:8,15 115:1,7
115:16,17 116:8
116:17 117:9,22
118:2 120:1
121:24 124:5
125:21 128:18
129:2,6 134:5
135:1,16 136:12
138:23 139:18
140:13 142:19
146:7 149:12
151:13 156:1
157:17,23 159:10
160:7,18 161:5,24
163:6,11,17 164:1
164:18 165:2,15
166:1 168:4,20
170:15,21 171:3
171:15,20 172:1
173:2 175:14
176:5 177:9,16,24
178:20 180:5,6
183:1,5,10 184:13

184:18 185:1,17
186:17 188:21
189:12 190:5
191:8 194:3,8,14
194:21 197:6,16
197:23 198:3
200:19 203:9
204:4,13 206:2
207:1,11,24 208:9
208:14 209:4,15
210:4,13 211:1,5
211:10,24 212:8
212:17 213:9,18
214:5,8,11,19
215:7,12,17,22
216:4,14,23
217:18 218:8,13
218:23 220:3,20
221:4,6,21 222:3,9
222:20 223:3
224:6 225:7,18
226:1,12 227:10
228:18 229:21
231:5 232:1 233:3
233:15,22 234:1
234:11,23 235:21
236:7 237:1,10
238:14,20,24
241:24 242:6,20
243:20 245:2,13
245:24 246:11
247:15 248:5,12
290:22 385:12
**rule**  28:18 49:3
160:4 162:11,21
162:23 164:11
**rules**  24:9 43:19
405:4,9 408:5
409:5
**run**  90:16,24 96:1
96:13 102:1

107:15 118:9
130:14 203:23
207:18 213:24
239:2,4 294:23
**running**  29:13
94:18 158:20
176:15
**runs**  58:16 101:22
**russell**  169:21
**rx**  4:14 15:25
17:15 236:12
237:23

**s**

**s**  5:11 186:25
187:1 315:18,23
317:15 319:10
329:14 409:8,8
410:3
**sal**  388:4,12 389:2
**salaried**  121:12,16
125:13 132:21
133:12
**salaries**  119:20
152:6
**salary**  119:18
125:16 133:1
151:23,25 152:7
**sale**  223:20 224:24
**sales**  223:19
224:23
**salvatore**  3:9
15:19 407:5
**samantha**  7:9 17:1
**samhsa**  137:10
150:13 152:17
156:22 161:7
173:13,16,18
191:18 192:7,11
275:21 276:2
279:4,7,9 288:3,5
312:13 324:13

336:12,19 338:13
338:14,15,19
339:18 341:7,18
342:2,14,25
360:19,21,24
361:5,8,25 362:4
362:13,22,25
363:9,11,15,20,22
370:10
**samhsa's**  363:8
**sample**  236:6,14
236:19 272:2
273:1
**samsha**  26:2,7
**sanctions**  25:14
**sarah**  132:11
**sat**  199:1
**saved**  186:22
**saw**  103:4 214:24
222:10 272:4
368:24 389:21
**saying**  86:19 121:7
126:20 195:24
205:1,5,15 213:4
222:11 225:19,20
229:15 231:7,16
233:17 237:5
242:14 267:25
287:11
**says**  35:24,25 36:7
36:25 39:24 48:20
59:3 88:1 91:24
126:8,9 134:9,15
135:3 144:10
148:9,19 149:24
150:10 151:15
152:14 153:21,23
157:3 158:7
159:15 162:7
164:10 169:8,20
173:9 180:16

181:6,12 183:12
183:18,20 184:1
187:8 196:18
201:2 202:13,24
206:7 208:21
209:5,14,17
211:11 212:9,20
219:3 223:9,16
229:5 230:6
231:21 232:6,24
235:23 236:6
237:18 258:10
259:25 260:13
277:25 291:10
293:10 306:25
307:11,17 308:2,7
308:14,20 309:9
313:7,14 314:7
347:24 355:18
370:20
**sbadala**  3:10
**scary**  281:7
**scenario**  81:1
**schedule**  173:10
**scheduled**  45:10
45:10 292:3
**school**  37:22
206:23 239:3,15
280:15
**schools**  206:10
**science**  196:17
219:7
**scope**  173:19,20
**scores**  149:6
**screened**  236:1
**screening**  28:25
43:5,7,13
**scroll**  364:4,6
**seal**  408:15 409:21
**search**  328:1
330:9,13,14,20

331:1
**searched**  330:14
**second**  36:25
37:11 39:24 43:7
100:25 143:9
144:9 152:13
156:4 158:5
169:19 180:13,16
220:2,7 223:11
230:6 246:16
255:7 259:22,23
263:2 267:6
284:16 285:20
292:5,9 293:9
309:2 313:7 403:1
**secondary**  401:1
**secretary**  132:12
**section**  263:18
313:3 385:17
396:11
**secure**  370:10
**securing**  367:6,17
**sedative**  219:11
**see**  27:21 36:1
37:5 46:2 48:24
62:23 79:14 80:16
80:21 84:4 87:9
90:20 92:25 96:13
101:9 120:15
129:9 130:11
133:22 140:4
151:8 156:8
162:15,15 164:21
165:9 166:5 174:1
175:18 176:1
186:7 187:12
194:4,23 195:1,3
196:13,17 199:7,8
200:11 207:20
216:12,17 220:12
221:7,8 230:19

**[see - shown]**

231:21 246:19
257:6 258:9
259:24 260:12
262:9,13,23 265:9
266:7 267:11
275:23 278:5
283:7,10 285:3
292:10,16 304:21
305:9,13,19,24
306:1 307:2,3,4
308:20 310:18
313:5,17 315:17
324:12 327:20
330:10,14,21
346:9 348:19
353:3,7 355:14
356:3,7,10 357:13
362:7,9,15,17
363:1,8 364:4,4,6
364:6 365:18
366:10,16,25
371:18,24 373:4
373:16 374:3,7,10
374:12 375:22,25
376:3 385:16
390:20 402:3,8
**seeing**  30:3 116:3
197:8 231:15
237:20 291:7
321:17,24 322:20
323:6,21 394:23
**seek**  160:25
**seeking**  92:13
**seeks**  92:21
**seen**  84:24 102:14
102:18,23 103:3
203:18 208:18
230:22,23 237:24
242:10 276:25
277:16 278:21
303:21 318:10

**sees**  29:21
**sell**  78:9,17
**selling**  247:6
**send**  140:9 316:17
332:5
**sending**  231:16
**sends**  211:7
**sense**  20:24 21:5
40:15 49:17 59:20
83:17 94:25
111:17 114:10
115:2 140:1 142:7
145:5 154:4
167:14 182:20
190:8 226:13
335:20 350:18
358:12
**sent**  177:4,4 229:7
231:9 232:8,23
316:19 373:2
**sentence**  149:1
157:3 159:15
164:9 169:20
219:20,20,25
220:7 223:15
230:7 259:23
261:21 385:19
397:15
**sentenced**  46:21
47:18
**separate**  56:14
91:9 176:9 305:22
341:21 344:7
**september**  105:17
194:24 195:8
**serve**  56:21 112:10
112:22 113:4
**service**  7:20 16:18
140:3 144:6 161:4
350:3 376:20,25

**serviced**  380:17
**services**  4:14
10:13 15:25 17:16
21:25 33:6 58:2
58:15 62:2,3
122:15 138:6,8
139:6 140:10,16
144:4 148:6
153:17 155:22
159:21 161:14
169:9 188:23
237:13 238:10
307:10 326:23
348:3 349:13
355:22,24 376:14
377:9 378:1,3
379:1,1 380:8
381:19 382:17
**session**  46:3,16
64:3 105:5 113:16
154:22 299:4,8,15
299:24
**set**  13:16 24:14
39:25 49:3 156:15
162:9 173:5
228:19,20 291:3
345:21 346:7
406:16
**setting**  101:6
**seven**  384:8 396:6
396:18,25
**severe**  41:3,7 53:5
98:11 258:19,19
258:22
**sex**  302:1
**sexual**  28:21 99:8
99:25 100:15
302:17,21 303:12
326:3
**shapira**  7:21 16:18

**shapira.com**  7:25
**share**  76:22
144:23 145:4
175:6 320:10
326:9,12
**shared**  144:13
145:11 167:20
168:14,19 170:17
170:25 187:2,4
325:12 362:23
363:15 368:8
**sheet**  318:24 409:7
409:10,18 410:1
**sheets**  310:21
319:1
**sheriff's**  198:25
**shkolnik**  3:5,11
**short**  128:24 248:6
**shortfall**  180:19
181:3
**shorthand**  2:10
406:3
**shots**  13:3 282:15
**show**  34:19 46:15
94:5 128:18
172:17 200:20
208:10 218:24
220:22 282:20
290:23 291:19
293:6 304:16
311:20 364:10,16
364:17 396:10
403:4
**showed**  105:21
307:3
**showing**  156:2
161:25 229:10
232:12 246:12
257:4 275:2
**shown**  242:5
270:11 346:2

[shows - specific]

**shows** 338:5
374:20 378:12
**sic** 80:10 255:22
365:15
**side** 45:13 84:14
90:14,14 91:5
94:14 100:7
108:11,12 111:10
124:14,16 161:17
165:17 192:14,14
195:2 238:11,12
244:14 275:8,20
366:21 385:24
386:7
**sign** 30:5 31:16
38:5 43:17
**signature** 405:7
406:19 407:14
**signed** 42:25
408:13 409:18
**significant** 41:9
221:17 235:25
251:9 280:21
338:24 339:3
368:24
**significantly**
154:15
**signing** 407:12,20
**similar** 106:6
173:20 273:2,7,8
**simply** 314:15
**sincerely** 407:23
**singing** 106:8
**single** 199:3
250:18 304:11
**sir** 352:7,18
407:10
**sit** 49:15,15 192:19
**site** 13:11 24:14,15
192:12 202:13
311:22 312:9,12

312:20 349:9
**sitting** 306:12
**situation** 92:11,18
205:22
**situations** 91:17
93:23
**six** 158:10 191:24
212:24 213:2
224:10 276:23
277:16
**size** 154:4,11
236:6,14,19 272:3
272:19,20 273:1,2
**sizes** 273:7
**skills** 178:24
**skipped** 347:16
**small** 201:13
236:6,14,19 238:9
272:2 342:3
**smaller** 153:25
**smart** 117:1,1
181:4,20,21,23
182:4 298:12
300:4 360:6,9
361:20
**smith** 7:4 17:2
247:19,20 248:4
**snort** 39:16
**sober** 32:8,9
105:13 161:9,10
182:12 335:10
340:9 343:3,12
393:8,9
**social** 40:13 42:9
42:11,15,23
**socioeconomic**
393:11
**sold** 85:23
**solely** 31:7 120:10
120:12

**soltice** 105:25
**solution** 101:7
296:21
**solutions** 5:3
407:1 410:1
**somebody** 38:3
84:17 88:4,11
127:21 131:12
142:3 185:20
204:19 207:17
259:14 266:8
311:11,13,14
318:15,16 322:4
350:24
**somebody's** 94:5
**somewhat** 194:1
**sorry** 48:10 52:25
54:3 78:13 80:3
109:23 113:8
123:3 126:19
133:8 152:13
178:18,21 187:20
205:3 221:20
228:2 246:17
249:19 253:2
257:16 261:20
264:21,22 267:14
275:25 276:4
284:12 287:15
302:3 309:11
312:11 338:3
346:11 351:23
355:7 358:16
370:6 371:4,6
373:17 377:19
389:8 391:14
393:17 394:3
395:8 400:4
**sort** 107:20 112:8
249:12 274:4
333:21

**sorts** 341:5
**sound** 150:12
241:22
**sounds** 107:19
157:10 351:21
**source** 159:18
254:4 343:6
345:16 364:24
**sources** 137:7
341:9 342:12,17
342:18,21 343:9
343:20
**spaeder** 4:15
15:24
**speak** 105:11
234:21 238:5,6,13
242:22 285:1
297:5 345:12
360:18
**speakers** 105:22
105:24
**speaking** 88:24
340:25 341:17
**special** 13:21
354:22
**specialist** 120:25
121:16 240:11
**specialized** 62:10
64:1 324:18 358:5
358:6,14,17
359:11
**specialty** 21:9 22:4
22:6,8,9 23:22
44:4,8,11 98:20
112:1 116:1,4
136:15 150:17
151:1 358:3
**specific** 61:2,15,21
72:15 80:23 99:15
111:5 112:5 116:2
139:4,5 149:5

150:2 173:19
184:11 189:19
204:1 304:20
322:8 327:21
329:15 357:6
362:16,18,19,21
362:22 363:3,7,9
368:10,11 375:10
378:19 379:4
**specifically** 26:12
99:25 104:1
126:23 146:4
152:22 163:23
357:5 363:24
390:17 392:20
**specifics** 181:23
318:21 342:8
**specify** 145:17
347:25 355:10
**spell** 17:17 319:23
**spend** 125:9
147:16 157:19
192:17 199:20
310:7
**spending** 159:18
**spent** 147:3
158:18 274:3
369:9 377:8,17
379:17 380:11
382:17 383:12
396:14
**spike** 184:7
**split** 119:2
**spoke** 284:24
**spoken** 381:13
402:15
**sports** 206:10
**spray** 240:25
**spreadsheet** 13:9
185:13 186:22
303:16,17,18

304:4,9,24 305:22
306:21 309:22,23
310:23 311:4
315:18,22 317:15
318:1 319:10,15
319:19 320:15
331:13,18
**square** 2:8
**srocchino** 7:10
**staff** 24:8 108:24
109:4,8,12,21
110:3 114:23
118:16 123:21
132:14 133:1
137:12 150:14
151:3,5,7 152:17
153:7 192:20
267:7 314:5 315:1
315:20 334:5,5
335:7,16,19 340:7
342:3,5,7 343:1
349:12 350:16,17
351:3,8,12,24
353:22 354:4
367:24 381:10
392:14,14,15
400:23 401:3
**staffing** 24:17
123:18 341:3,14
341:21
**staffings** 192:19
**stamp** 275:6
312:24 365:15
373:18
**stamped** 282:23
312:2 372:25
**stand** 148:17
**standard** 23:9
279:5,8 281:17,19
**standards** 22:10
24:11 25:1 26:5

46:10 192:23
**standing** 9:16
249:22 250:3
348:9
**stands** 143:15
389:10
**stanley** 131:17,18
**start** 18:20,23 19:9
20:2 56:1 57:13
80:22 118:20
122:2,22 125:24
135:21,22 140:20
193:17 197:17
198:21,22 224:4
226:14 228:21
246:15 260:6
281:6 286:1 310:8
322:13
**started** 18:21,24
19:2,3,11,21,24
20:3 21:10 39:9
62:3 87:14 88:2,4
88:19,25 89:13,20
93:13 94:10 99:10
108:15 112:14,18
115:9,11,19
129:23 130:1
154:19 155:12,18
167:10,19 188:11
192:12 195:21
198:14 201:5
205:19 206:20
216:9 226:6,7,18
227:8 229:17
233:7 237:21
238:2 239:13
252:7 254:18,20
260:14,17,24
261:6 266:11
267:12 271:2
273:11,21 274:5

283:22,25 285:25
286:3,7 340:25
349:5 398:20,25
**starting** 116:14
128:17 286:23
398:2
**starts** 31:4 162:4
373:10
**state** 15:17 17:17
17:21 43:2 68:16
103:23 136:18
148:22 149:3,8
150:16,25 151:15
160:12 181:25
187:10,14,23,24
239:6 284:21
285:8 309:12
321:12 331:15
334:12 336:23
337:13,20,24
340:12 346:4
354:14 360:10,11
360:12 367:9
370:11 396:19,24
408:10 409:15
**stated** 37:18 43:14
50:7 145:3 175:19
233:10 267:5
285:19 293:11
294:8 299:21
301:5 311:18
324:17 342:25
349:4,10 353:23
355:3 367:20
368:3,8 369:1
380:18,23 382:6
390:18 395:4,18
401:10
**statement** 270:25
271:8 272:1,25
292:16 293:9,9

**[statement - supreme]**

408:13,14 409:19
409:19
**states**   1:1 15:14
106:23 259:25
**statewide**   136:19
**stating**   398:10
**statistical**   255:13
261:23
**statistically**
227:13
**statistician**   379:22
**statistics**   234:16
**status**   30:12 46:1
47:13 185:21,22
186:10
**statute**   49:3
**stay**   49:19 102:9
141:8 402:25
**staying**   382:8
**stays**   51:8
**steadily**   114:6,22
114:23
**steady**   109:6 114:3
**stella**   58:16 152:19
152:25 294:22
**stenographically**
2:9
**step**   280:14 282:6
291:16,21
**steps**   106:1
**stimulant**   258:15
258:20 343:17
**stockhausen**
292:18
**stolen**   79:1,5
**stop**   108:23
181:17,18 198:12
201:19,21 202:3
254:1 351:11
**stopped**   172:3,6
201:18,19,22

202:8,11
**stores**   4:4
**stories**   79:10
**straight**   44:17
288:20 299:23
**stream**   373:25
**street**   4:16 5:21
7:5,14 33:4 78:10
78:17,23,24 85:23
247:23 248:1
268:14 300:21
321:17
**streets**   83:16
**strenuous**   56:12
**strict**   41:8
**strike**   23:24 29:4
81:22 164:8
189:24 203:23
210:16 377:19
387:3,12 388:8,11
395:7
**string**   283:3 284:3
**strong**   81:13
**structure**   21:6
**struggles**   106:21
**studies**   107:11
190:4,17,21
**study**   107:14,23
107:25 190:24
227:13 229:24
231:10 232:23,24
234:6 235:3
237:25 273:14
**subject**   221:10
348:25 394:8
**submit**   23:25 24:3
24:7 35:15 50:12
240:14 347:20
378:8
**submitted**   146:5
378:25

**suboxone**   282:9
**subscribed**   408:10
409:14 410:21
**subset**   268:3
**substance**   26:3,8
38:8 43:9 61:10
66:9 72:14 93:12
99:4 150:3 225:9
225:15 240:4
243:5 260:18,20
265:1 279:9
316:22 379:10,18
381:20 382:21
383:6
**substances**   99:11
226:9 260:21
**suburb**   376:10,13
**suburban**   27:19
167:15,16 175:21
376:17,19
**subutex**   59:8
282:9
**successful**   189:9
190:2 196:20
**successfully**   21:19
191:4
**suffer**   21:13 62:5
227:3 233:12
**suffered**   251:25
302:9
**suffering**   379:11
**suggest**   297:7
337:16
**suggesting**   296:20
338:19
**suing**   243:17
**suite**   2:8 3:6,15
4:6,16 6:5 7:6
407:2
**sum**   136:11,11

**summary**   10:23
14:5 165:21 365:8
366:1 373:19
378:2
**summit**   1:10 12:17
12:18 62:15,16
246:8,9,14 324:9
324:11,15,22
325:19,24 326:6,7
326:10 337:10
**superior**   407:1
**supervise**   381:10
**supervises**   32:13
**supervising**   110:8
**supervision**   26:23
46:23 47:19 48:15
48:22 90:13 91:10
91:14 92:7 127:15
127:17,18,20
335:18,20
**supervisor**   94:21
94:22 95:5,8
101:22 132:3
203:19
**supervisors**
123:19
**supplemental**
13:18 354:19
**supply**   6:3 16:14
385:24
**support**   106:18
148:11,16 170:2
279:14,16 366:20
**supports**   230:1
288:3
**supposed**   49:13
76:22 264:7
403:12,15
**supreme**   21:10
22:18 23:18 24:1
24:15 35:16 62:9

150:17 313:11
360:16
**sure**  19:8 21:7
23:21 24:18 25:20
26:1,15 29:14
33:24 43:18 60:10
91:8,12,21,23 93:8
120:4 123:6
126:17 142:8
145:13 171:11
184:21 192:4,22
196:14 202:8
206:5 227:16
228:6 250:12
251:8 261:22
289:8 297:24
311:7 318:12
320:14 330:4
331:11,25 336:1
337:11 340:1
356:22 375:9
379:20,21,23
380:2 393:6
396:12
**surgery**  80:18
**surplus**  372:3,13
**surrounding**
292:13
**sustain**  139:6
**sustainability**
342:1
**switch**  225:14
**switches**  223:25
225:3
**switching**  56:17
223:18,21 224:22
224:25
**sworn**  17:6 406:7
408:10,13 409:14
409:18 410:21

**synced**  328:7
**synenberg**  45:1
132:14,16 279:22
282:4 366:7 395:4
395:11,16
**synenberg's**  133:1
**synopsis**  229:23
**system**  21:1,3
50:20 87:3 122:11
123:4 124:9
156:19 205:23
211:13 212:10
367:22

**t**

**t**  44:13 132:13
319:25,25 406:1,1
**t1023875**  10:13
155:22
**t1025925**  13:11
311:22
**tab**  306:4 307:4
357:22
**table**  199:1 373:23
402:9
**tactics**  240:24
**take**  15:10 21:10
33:22 35:4 57:24
66:19 81:24,24
82:3 87:6 109:9
114:1 126:14
158:2 168:15
171:19 180:23
191:12,19 214:11
214:23 228:10
234:13 248:6
251:3,6 261:14
263:2 304:8,8
314:14 332:6
346:16 349:20
367:21 368:18
384:9

**taken**  2:5 34:2,9
66:24 80:8 100:12
113:14 171:23
178:11 194:11
214:16 248:9
257:16 280:17,18
298:2 384:14
396:22 407:11
**takes**  350:22
**talbot**  152:18,25
**talent**  106:5,6
**talk**  20:22 26:12
82:20 120:3,6
121:25 122:21
123:4 125:2,22
138:10 217:9
243:4 260:18
281:8 346:11
353:16
**talked**  43:3 44:19
47:8 202:17 226:3
226:5 250:5
251:11 278:12
289:2,3 298:11
299:2 300:9
303:15 341:6
343:25 357:5
382:9 400:9
402:17
**talking**  37:11
44:10 60:10 75:5
75:7 77:19 88:17
88:22 90:7,8,12,13
91:2,3,4 106:23
113:22 121:3
132:9 140:24,25
143:10 152:11
153:14 156:18
170:5 184:19
189:19 205:12
207:13,15 227:19

235:3 261:13,24
274:4 288:23
299:14 303:17
310:24 331:24
343:7 351:21
**talks**  128:14,15
263:18
**tallman**  235:9,10
235:11,12,23
236:19,23 237:8
237:25 238:16
271:17,19,20,22
271:25 272:21
284:8 285:22
**tape**  194:7
**taped**  240:10
**tarantino**  2:7
**target**  99:14 150:2
**tasc**  33:8,10 37:3
37:10 42:2,23
53:22 55:20,23
58:16 86:10 87:2
87:5 97:24 98:5
120:14,17,24
121:9,15,19 132:2
132:5,12,18,21
138:1,15 141:22
143:3 150:19,22
151:18 267:3
316:1,1,2,6 365:4
**task**  10:16 11:12
161:18 193:7,23
194:17 195:9,10
195:22 196:1,11
229:8 232:9
249:15 289:3,7,12
289:13,15,18,24
290:6,9 322:6
325:24 326:5
327:13,22 395:1
395:20,21,22

402:2
tcoleman   5:14
team   22:13,14
    25:12,15 27:17
    94:16,23 118:10
    118:15 123:18,21
    367:22
telephone   6:19
tell   28:19 80:14
    83:11 101:24
    103:20 128:10
    195:19 204:5
    210:7 244:7 259:6
    271:11 276:6
    304:12 306:20
    310:9 315:15
    320:19 354:12
    363:12 365:22
    392:6 394:17
    396:13 399:24
telling   147:3
    353:15
tells   86:24 93:11
    93:11 203:25
    207:4 306:5
ten   22:10 72:11
    87:14 134:15
    334:23 396:15,16
tenth   5:21
tera   5:13 16:9
teresa   132:18
term   77:13,15,17
    77:21 78:2 118:10
    118:14 245:14
    298:20 376:17
    388:1,25
terminate   176:22
    177:1 179:11
terminating   11:4
    172:22

terminology   41:5
    265:22 388:21
terms   56:24 117:5
    145:21 147:13
test   98:13 217:17
tested   46:15
testified   17:8
    121:8 265:18
    341:1 357:1 358:2
    360:6 374:15
    376:7 379:23
testify   17:6 380:4
testifying   18:1,5
    393:19 394:19
testimony   18:4,8
    233:9 254:24
    288:12 299:5
    320:22 352:15
    376:11 393:24
    394:4,12,15
    406:10 408:6,7
    409:6,9,12
testing   46:8 57:25
    86:16,17 139:3
    140:7 334:7
    335:11,16 340:6
    341:4,16,22 343:2
    349:23 353:25
    354:5 381:7,9
    392:12,15
tests   39:4 54:22
    93:5
teva   6:13 16:25
thank   44:15 171:8
    172:19 176:17
    189:4 194:9,20
    200:22 205:9
    208:13 228:5
    236:10 288:19
    291:4 304:13
    336:1 345:24

346:22 354:2
    376:18 402:23
thankfully   287:3
thanks   208:12
    221:3 278:1
theft   50:24
therapy   62:20
thing   39:2 49:11
    127:4,14 240:14
    249:20 323:3
    338:2 339:13
    352:8
things   25:12 38:10
    46:23 58:20,23
    60:11 62:1,4 81:7
    84:4 105:1,15
    106:15 107:19
    131:4 139:3,25
    140:8 144:3
    145:15 149:16
    160:22 167:10
    179:1 185:19
    189:23 195:16
    196:4,5 232:19
    249:13 279:16
    281:14 335:7,8
    339:17 353:25
think   23:20 48:6
    97:16 102:5,18,24
    103:3,4 111:14
    114:19 116:20
    123:9 154:20
    160:4 163:12,18
    163:21 164:5,6
    168:9,21 178:15
    197:7,18,24
    201:15 206:16
    209:25 210:7
    214:10 216:5
    222:10 226:17
    244:24 245:25

247:10 251:3,5,8
    255:19 270:12
    281:6 287:19
    297:15,16 303:16
    306:7 316:16
    331:12 351:12
    382:9 384:7
    386:18 396:17
    401:17
thinking   112:7
    205:11 357:23
third   13:16 127:14
    134:6 183:24
    196:17 252:9
    345:21 346:7
thirds   35:24
    208:20 212:19
thirty   407:19
thomas   219:5
    235:9
thought   126:19
    205:5 227:18
    273:19 306:1
    311:8 400:5
thoughts   230:2
three   21:23 22:5
    23:4,5,6 29:14
    38:16 45:11,14,19
    45:20 46:12 48:19
    56:14,15 87:6
    108:19 112:3
    120:19 128:13
    129:17 154:7,24
    186:8 190:16,18
    192:13 241:14
    279:16 336:17
    341:1,18 342:13
    342:17,18 345:5
    361:14,17,21
thursday   162:9

**tickets**  340:8
  392:17
**time**  15:8 23:3,7
  32:6,7 38:14
  45:15 47:11 51:10
  56:6,8 66:18 89:2
  90:17 95:10 107:8
  108:9 111:18
  113:10 117:24
  125:10 139:2
  155:8 158:18
  163:5 164:24
  171:18 174:19,20
  186:13 190:19
  195:16 196:12
  197:11 215:13,18
  215:24 225:20
  227:14 228:22
  231:6 239:16
  240:16 246:17,17
  247:16 251:4
  274:3,5 277:15
  327:3,5,6,10
  331:10 350:23
  352:12,19,21,23
  352:24 365:22
  368:16 376:8
  384:9 390:22
  396:14 398:13
  402:5 404:1
**times**  32:10 41:17
  45:6 63:25 80:21
  81:9 99:25 101:8
  109:15 110:17
  118:11 128:13
  129:17 130:4
  159:7 161:11
  174:7 184:3
  185:23 190:23
  196:4 219:11,12
  222:12,13 227:2

  241:11 291:16
  327:17 345:6
  350:25 351:3,4
  380:16 381:9
  401:11
**tiny**  151:11
**title**  131:19 346:9
**titled**  355:9 373:19
**today**  18:1,8 96:10
  118:11 126:16
  129:13 135:25
  144:16 217:20
  219:6 226:3,5
  237:15 242:23
  249:3,7 251:10
  254:24 274:3
  278:12 298:9,11
  302:21 303:15
  306:12 322:12
  329:8 341:1 349:4
  352:23 358:2
  384:23 385:15
  387:2 388:25
  389:2 394:20,24
**today's**  15:7 241:9
**toig**  7:24 16:17,17
**told**  89:21 98:22
  227:22
**toledo**  224:12
**tom**  133:22,24
  229:9 232:9,10
  271:17,22
**tool**  287:6,20
**tools**  287:24 288:5
**top**  36:24 39:24
  113:6 118:20
  126:8 129:9 150:9
  153:20 162:3
  164:10 165:4
  172:9 173:8
  183:12 228:24

  246:16 277:22
  283:7 284:2 305:7
  305:8 348:19
  355:8 365:15
  373:1
**torok**  8:4
**total**  111:14 147:2
  296:21 374:22
  375:3,13 379:15
  381:18
**totally**  40:17
  147:11
**touch**  393:9
**touched**  135:24
  335:12
**tough**  116:23
**tower**  7:6
**track**  21:15,16,17
  21:21 49:19 83:9
  107:7 141:17
  171:10 185:4,6,12
  185:12 209:10
  327:3,8 381:18
  383:4
**tracked**  137:22
  184:23
**tracking**  107:21
  185:19
**tracks**  21:14
  137:14
**trafficking**  99:9
  302:1,1,13,18,22
  303:12 326:4
**trained**  225:9
**trainers**  206:9
**training**  60:19,21
  64:2,7 240:9,18,22
  240:25 241:3
  280:18 370:22
**trainings**  60:23
  61:1,9 63:18

  64:14 72:15
  324:13 384:3
**transcribed**  408:7
**transcript**  298:10
  405:4,8,12,14
  407:11,16 408:5
  408:12 409:5,11
  409:17
**transfer**  100:16
**transferred**  44:3,8
  45:3
**transition**  302:25
**trauma**  99:12,25
  100:1 150:4
  302:10 401:2
**travel**  240:7
**treat**  19:22 39:25
  41:9 61:24 89:5
  104:9 109:9
  111:23 136:20
  145:1 159:5 171:1
  337:9 369:20
  383:19 392:8
**treated**  296:11
  382:20
**treating**  151:4
  191:4 287:20
**treatment**  10:22
  14:4,10 31:15
  32:5 33:4 37:23
  38:4 46:8 48:15
  55:13,17,18 56:24
  56:25 57:3,3,5,6,8
  57:12,17,18,19,20
  58:5,8,11,13,15,17
  58:22 59:1,2,11
  62:25 63:1 89:10
  122:4,8,10,15,23
  122:25 131:3
  136:17,23,25
  137:2,4,5 142:3,5

[treatment - unintentional]                                                                 Page 60

142:11 143:24
147:24 148:18,21
148:23 152:18
153:3,13,15
162:12 163:4,14
163:23 164:4,13
164:22 165:21
175:25 180:18
181:18 182:8,12
183:14 192:21
199:18 212:21
237:13 259:11
278:3,13,15,18,22
279:14,15 280:7
280:16,23,25
281:13,23 282:7
282:12 283:24
287:6,20 288:8
292:14 293:12
294:9,11,13,15,16
294:18 295:8,8,25
296:3,10 297:11
297:17 308:20
326:23 334:6
335:5 336:10
340:5 341:3,15,21
353:24 365:8
366:1 372:18
373:8,19 376:4
380:16,19 381:3
383:23 392:10,16
392:18,23,25
393:2,3,4
**trend**  229:10
232:13 233:18
**trends**  321:16
322:19 323:2,6,20
**tricky**  158:20
**tried**  32:10 110:10
199:13,16

**trigger**  357:17
**true**  86:19 93:15
126:16 144:16
267:17 299:2
406:9
**trump**  389:23
**trust**  134:1
**trusted**  234:7
**truth**  17:6
**truthful**  18:8
**try**  44:17 83:15
96:17 101:7 249:5
290:15 314:18,24
315:21 335:9
**trying**  32:7 90:17
109:7 110:3 142:1
143:14 146:9
155:2 176:6
178:15 181:10
187:25 198:20
281:9 288:17
301:16 306:1
310:17 326:8,22
326:25 335:14
351:23 352:18
360:12 371:25
**tuesday**  10:17
161:19
**turn**  48:13 118:3
120:13 125:4
127:8 150:8
156:13 212:18
312:25 355:16
356:5 366:9
370:17,19 390:9
391:5
**turned**  116:16
**turning**  39:23
**twelfth**  7:14
**two**  20:14 22:5
35:24 37:2 56:3

56:19 118:21,22
119:7,10 120:22
129:2 131:7
134:14 145:12,17
146:10,13 152:3
155:9,14 174:12
190:10 192:13
199:20 208:20
212:19 249:13
273:7,8 309:8
324:6 339:17
358:3,5,14,17
363:1 375:14,25
392:9
**type**  254:10
294:18 302:10
383:5
**types**  254:14
294:15 295:4
300:25 326:20
327:4 401:5
**typically**  23:4
26:18 45:11 50:23
217:23 292:1

**u**

**uh**  72:12 90:11
141:14 144:15
148:12 151:16
153:22 180:15
183:17,25 184:5
184:22 186:1
200:24 201:7
202:10,19 211:13
211:16 223:5,8,23
230:8 232:11
283:5 284:4,9
292:6 296:1 307:2
308:5 314:13
339:15
**ultimate**  82:24

**ultimately**  101:17
**umbrella**  33:17
107:5 144:22
368:13
**unable**  64:2
**undefined**  388:22
**underneath**  50:13
**understand**  17:25
32:2 43:18 65:6
68:24 69:3 78:5
90:5 92:9 110:22
136:20 142:1,9
159:16 176:6,17
178:8 181:10
188:1 221:13
249:3,11 250:13
264:6,24 266:6
280:19 287:10
333:6 337:11
372:1 374:13
381:12
**understanding**
40:18 70:1 82:22
94:9 115:8,10
116:21,23 204:10
221:16 243:16
271:12 272:16
278:14 361:2
372:12 383:22
**understood**  28:13
91:13 333:13
**unfortunate**
181:19 199:2
**unfortunately**
80:22 84:14 86:21
103:13 151:6
157:14 174:11
181:20 192:7
199:10 203:16
**unintentional**
223:10

**unique** 104:23
402:10
**united** 1:1 15:13
**universe** 268:5,22
269:4
**university** 211:17
211:18 212:10
239:6
**unsafe** 219:13
**unsealed** 246:25
**unspent** 369:13
**unsuccessfuls**
190:22
**unused** 366:15
367:9
**update** 12:9
202:13 228:12,25
231:21
**updated** 100:7
346:20 348:10
355:3
**updating** 186:13
186:16
**ups** 109:18
**use** 26:15,17,18
37:16 38:11,16
39:7,10,11,12,12
39:15,16 40:25
41:4,22,23 43:10
53:3,4 59:6,10,11
60:6 61:24 62:5
62:25 77:22 80:20
81:8 86:12,25
97:3 99:4,5
111:23 118:14
136:22 137:1,3
145:14 146:1,2
150:3 159:12
170:25 171:4
172:8 175:5
177:18 197:21

216:3,18 217:14
217:21,21,22,23
217:25 219:14
224:14 226:16
227:4 230:10
231:1 233:12
251:25 254:25
255:25 256:16
258:14,15,15,17
258:19,20 260:11
260:19,20 261:16
262:1,5 263:19
268:2,23 278:17
287:21 296:4
299:9 300:1,5,11
301:3,7,14,20
302:8,23 311:10
316:22 323:21
335:10,13 343:13
370:24 371:19
386:2 389:3
**useful** 321:25
**user** 82:24 223:25
225:3,14 398:7
**users** 223:21
224:25 229:16
278:2
**uses** 28:20 67:5
260:20 398:7
**usual** 153:25
154:4
**usually** 73:4 79:17
141:5,7 154:5,23
196:5 364:21
**utilization** 169:25
**utilize** 158:17
161:10 182:4,11
205:20 343:17
380:23
**utilized** 182:6

**utilizes** 344:18
**utilizing** 159:17
205:19 368:22

**v**

**v** 1:10 407:6 408:3
409:3
**va** 205:16 207:16
**vague** 265:16
386:22,23 388:7
388:18,20,22
**valid** 78:8,16
81:18
**validating** 91:6
**value** 78:24,24
**verified** 39:2
**verify** 38:24 86:11
86:15 87:17 88:3
88:6,7,9 89:25
92:13 93:6,14
207:7
**verifying** 91:6
**veritext** 407:1,7
410:1
**version** 40:24
105:3 348:12
355:3
**versus** 48:3 51:20
59:22
**vet** 204:19,24
205:3,8
**veteran** 205:15
207:19
**veterans** 205:20
207:14,14
**veterinarian** 205:6
206:4
**veterinarians**
205:12
**vicodin** 64:22
69:12,13 218:10
254:20 300:16,18

**victim** 50:15
303:11
**videographer** 8:4
15:6 16:15 33:25
34:3,7,10,14 66:22
66:25 113:9,12,18
171:21,24 175:9
175:12 194:6,9,12
214:14,17 248:7
248:10,14,17
297:22,25 298:4
332:14,17 384:12
384:15 396:15
397:10 403:24
**videotaped** 1:16
15:10
**view** 278:9
**vince** 194:25 229:3
229:25 231:23
232:6 234:20
246:18 247:20
**violate** 182:15
**violated** 182:5,8
185:24 186:8
190:23
**violates** 185:20
**violation** 46:13
47:21,22 185:23
186:6
**violent** 28:21
**visit** 13:11 24:14
24:15 311:22
312:9,12,20 349:9
**visitors** 227:1
**visual** 98:14
**vital** 287:6
**vivitrol** 13:3 59:7
236:1 279:18
280:4 282:5,15
284:20 285:13
286:4,8,22

| | | | |
|---|---|---|---|
| **volume** 84:6 | 256:5 282:4 311:7 | **we've** 43:3 44:19 | **witness** 3:4 9:3 |
| **voluntarily** 349:19 | 315:8,16 362:6 | 66:19 100:11 | 17:5 28:4 32:1 |
| **voluntary** 36:8 | 384:22 403:8 | 114:23 132:8 | 36:18 38:19 39:9 |
| 101:18 | **wanting** 32:9 | 135:24 147:3 | 39:21 40:12,22 |
| **volunteer** 105:10 | **warning** 12:5 | 154:18 165:5 | 41:25 48:9 49:5 |
| **volunteered** | 218:20 219:2,6 | 171:17 237:14,24 | 49:24 50:22 51:16 |
| 349:19 | **warnings** 74:23 | 249:24 392:8,9,11 | 52:3,8 53:10 |
| **vosburgh** 1:24 | 75:23 | 392:13 400:9 | 54:15 55:11 57:11 |
| 2:10 406:3,20 | **washington** 4:17 | **web** 25:6 | 59:18 61:6,13,18 |
| **vote** 128:16 | 5:9,22 6:17 7:7,15 | **website** 64:4 | 62:14 63:11,15 |
| **w** | **waste** 352:19 | 362:13 363:8,11 | 64:11,16 65:4,9,17 |
| | **wasting** 352:21,24 | 363:20,23 364:5 | 65:25 66:6,16 |
| **wait** 91:23 | **way** 27:7 35:25 | 364:14 | 67:9,14,19,25 68:7 |
| **waiting** 164:12 | 48:19 49:18 51:24 | **week** 192:18 | 68:13,21 69:3,10 |
| 278:25 | 52:20 70:2 81:5 | 200:10 292:2 | 69:15 70:9,14,22 |
| **waits** 163:2 | 83:6 84:10 86:15 | 381:9 | 71:3,8,13,22 72:3 |
| **waived** 407:13,21 | 86:17 88:5,7 | **weeks** 396:22 | 72:21 73:2,7,22 |
| **wal** 4:3 | 89:13 100:24 | **weigh** 72:24 | 74:15,20,25 75:10 |
| **walk** 26:14,19 | 118:20 129:22 | **weird** 188:25 | 76:4,12,19,25 77:7 |
| 79:21 185:18 | 131:22 140:17 | 231:8 | 77:12,24 78:12,19 |
| **walmart** 4:3 16:8 | 142:14 148:20 | **welcome** 46:21 | 79:3,8,13 80:2 |
| **want** 20:22 36:9 | 158:6 189:21 | 205:10 | 81:20 82:2,14,18 |
| 59:4 60:9 81:12 | 195:2 207:3 | **went** 63:4 91:19 | 83:1,8,21 84:1,12 |
| 91:12,23 104:11 | 208:20 212:19 | 105:25 139:20 | 84:23 85:10 86:1 |
| 110:22 118:9,11 | 221:22 237:11 | 190:24 199:11 | 86:14 87:20 88:11 |
| 135:25 138:11 | 244:18 252:7 | 207:19,20 303:10 | 88:24 90:3 92:16 |
| 146:1 158:24 | 259:12 263:24 | 369:13 380:16 | 93:17 95:21 96:25 |
| 193:1 195:19 | 266:6 269:24 | **wheel** 130:2 | 97:8,13,19,24 |
| 205:7 214:11 | 270:3 280:15 | **whereof** 406:16 | 102:3,7,16,21 |
| 223:14 227:16 | 287:16 304:2 | **wide** 274:19 | 104:7 107:10 |
| 233:1 239:1 | 305:4 306:20 | **wilcox** 2:7 | 108:6 112:13 |
| 249:20 258:18 | 312:3 318:18 | **williams** 6:4 7:13 | 113:1 114:6,13,21 |
| 263:4 276:8 | 322:13 341:10 | 16:13,21 132:2 | 115:6 116:7,13 |
| 295:15 305:15 | 362:6 379:14 | **willingness** 36:14 | 117:8,20 118:1 |
| 309:11 310:7 | 381:4 383:10 | 213:1 | 119:25 121:23 |
| 312:23 318:10 | 406:14 | **wilson** 3:18 15:21 | 124:4 125:20 |
| 320:25 331:11 | **ways** 26:21 103:19 | 15:21 | 128:24 134:4,25 |
| 350:10,12 353:18 | 103:20 104:2 | **win** 174:4,25 | 135:15 136:10 |
| 364:3 382:7 | 169:18 | **wise** 54:16 350:20 | 138:22 139:17 |
| **wanted** 23:8 53:13 | **wc.com** 7:18 | **wish** 176:22 | 140:12 142:18 |
| 111:4 140:4 | | | 146:4 149:3 |
| 176:25 228:6 | | | |

[witness - wrote]                                                    Page 63

| | | | |
|---|---|---|---|
| 150:25 157:10,22 | 256:7 260:10 | 400:4,15,17 | **worked** 20:6,9,11 |
| 158:15 160:3,16 | 262:22 263:15,22 | 401:10 402:14 | 20:14 26:13 |
| 161:3 163:1,10,16 | 264:11,20 265:4 | 406:10,16 407:8 | 116:21 178:23 |
| 163:21 164:17 | 266:20 267:2,21 | 408:1,4,11 409:1,4 | 281:9 360:24 |
| 165:1 168:13 | 268:9,16 269:4,12 | 409:15 | **worker** 40:13 |
| 170:13,19,24 | 270:3 271:5 | **witness's** 405:3 | 42:16,24 |
| 171:13 175:17 | 277:20 278:25 | **witnessed** 324:16 | **workers** 42:9,11 |
| 177:3,14,21 | 279:21 281:17,25 | **witnesses** 396:22 | **working** 19:10,11 |
| 178:19 182:24 | 287:23 288:25 | **woman** 247:8 | 20:2 112:15 117:2 |
| 183:4,9 184:10,17 | 293:20 295:11 | **won** 174:25 175:4 | 214:21 274:10 |
| 184:25 185:16 | 296:7,13 297:1 | 187:22 188:24,25 | 285:17,24 290:15 |
| 186:16 188:18 | 298:24 299:20 | **wondering** 66:13 | 294:4 |
| 189:11 190:4 | 300:23 302:3,16 | 138:14 232:22 | **works** 42:23 72:10 |
| 191:7 193:25 | 303:6 311:17 | 249:14 | 124:15 132:6,18 |
| 194:20 197:4,14 | 314:18 315:6 | **word** 19:7 26:15 | 143:3 147:5 169:6 |
| 197:21 198:2 | 317:22 318:4 | 26:16 53:3 87:23 | 179:10 181:11 |
| 203:8 204:3,12 | 320:5,23 321:20 | 185:13 217:20,23 | 388:13 |
| 206:1,19 207:10 | 322:3,22 323:10 | 217:25 227:19 | **worry** 85:4 143:16 |
| 208:13 209:3,14 | 323:24 324:24 | 234:13 249:8,9 | **worse** 163:13 |
| 210:3,12,24 211:4 | 325:10 329:21 | 287:13 299:16 | **write** 30:12 197:5 |
| 211:9,22 212:6,15 | 331:3 333:24 | 346:24 398:1 | 210:9 213:7 |
| 213:6,17,23 214:7 | 334:17 339:11 | **words** 227:17 | 231:20 233:2 |
| 215:6,11,16,21 | 341:25 343:25 | 265:17,25 287:14 | 272:22 366:13 |
| 216:2,8,20 217:16 | 344:14,21 345:7 | 337:19 376:1 | 367:2 370:18,23 |
| 218:7,12,17 220:2 | 345:24 346:24 | 387:1 | 371:19 397:21 |
| 220:18 221:19 | 350:8,14 353:13 | **work** 31:17 33:15 | **writer** 109:16 |
| 222:2,7,18 223:2 | 353:16,20 354:8 | 41:15 61:7 66:7,7 | **writers** 137:12 |
| 224:3 225:6,12,23 | 354:16 356:20 | 66:8,12 80:18 | **writes** 76:21 |
| 226:11,24 228:16 | 358:25 359:6,13 | 84:13 98:8 105:9 | 169:20 176:20 |
| 229:20 231:3,20 | 362:12 367:13 | 120:11 124:10,14 | 229:25 246:23 |
| 232:19 233:10,25 | 369:17 370:2,15 | 124:19 126:2 | 247:20 284:17 |
| 234:10,15 235:19 | 371:4 375:6,16,22 | 129:5 131:20,21 | 285:6 373:6 |
| 236:5,22 237:7 | 376:3 377:12 | 144:2 145:19,21 | **writing** 167:5 |
| 238:5,18,23 | 378:7,15,22 | 146:17 211:12 | **written** 63:18 |
| 242:18 243:14 | 381:22 382:24 | 212:7 216:2 | 76:15,16 176:15 |
| 245:1,11,23 246:2 | 383:8,15 387:14 | 249:15 268:25 | 185:21 244:13 |
| 247:14 248:3,13 | 387:16,24 389:16 | 270:21 271:17 | **wrong** 142:16 |
| 249:18,24 251:1 | 390:7 391:3 392:4 | 280:13 321:2,4 | 297:16 302:14 |
| 251:18 252:19 | 393:15 394:9,9 | 324:2 328:10 | **wrote** 277:14 |
| 253:2,10,15,25 | 396:1 397:20 | 376:22 400:24 | 357:22 |
| 254:7 255:18 | 398:4,9,22 399:2,9 | | |

Veritext Legal Solutions

**[x - zuckerman]**

| x |
|---|
| **x**   9:1 87:15 144:25 |
| 144:25 149:6 |
| 368:10,12 380:12 |
| **xanax**   64:25 |

| y |
|---|
| **y**   17:19 319:25 |
| **yeah**   21:4 23:14 |
| 62:8 66:21 73:12 |
| 87:24 109:25 |
| 129:2 131:16 |
| 134:20 138:12 |
| 147:6,11,17,20 |
| 152:1 155:12 |
| 171:20 173:25 |
| 174:1 178:15 |
| 200:12 201:24 |
| 214:10,13 220:4 |
| 224:7 227:12 |
| 231:11 234:5 |
| 254:15 276:4 |
| 285:20 310:17 |
| 311:1 327:2 |
| 329:19 331:22 |
| 332:2 350:14 |
| **year**   22:20,25 23:2 |
| 60:20 90:18,19,20 |
| 95:14 102:1,19 |
| 108:16,23 109:2 |
| 124:12 128:13 |
| 129:17 144:12 |
| 154:8,24 155:7 |
| 158:22 162:10 |
| 177:8,12,19 181:2 |
| 184:14 188:12 |
| 191:16,18 193:20 |
| 195:21 199:4 |
| 201:11,16 223:12 |
| 280:21 286:10 |
| 301:12 340:15 |

349:24 360:22
361:1 362:3,8
366:14 367:4,16
368:4 369:3
372:14 375:14
378:13 383:20,23
383:24 389:24
390:5
**year's**   371:16
**years**   20:14 23:4,5
23:6 38:16,16
72:11 87:14
108:19 112:8,11
114:4,17 115:12
116:14,25 190:16
190:18 201:9,12
269:19 281:9
334:23 361:12,15
361:17,22 364:3
380:13
**ymca**   62:21
**york**   6:19 16:23
16:23
**young**   100:3

| z |
|---|
| **zero**   52:21 |
| **zuckerman**   4:15 |
| 15:24 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.