Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION

 3

   IN RE: NATIONAL        )
 4 PRESCRIPTION           )  MDL No. 2804
   OPIATE LITIGATION      )
 5 _____      )  Case No.
                          )  1:17-MD-2804
 6                        )

   THIS DOCUMENT RELATES  )  Hon. Dan A.
 7 TO ALL CASES           )  Polster
 8
               WEDNESDAY, APRIL 24, 2019
 9
      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10          CONFIDENTIALITY REVIEW
11                 - - -
12         Videotaped deposition of Anna
13 Lembke, M.D., held at the offices of Lieff
14 Cabraser Heimann & Bernstein, LLP, 275
15 Battery Street, 29th floor, San Francisco,
16 California, commencing at 8:07 a.m., on the
17 above date, before Carrie A. Campbell,
18 Registered Diplomate Reporter and Certified
19 Realtime Reporter.
20
21
22                 - - -
23
24        GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
25
```

---

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A P P E A R A N C E S :
 2
 3 LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
   BY:  DONALD C. ARBITBLIT
 4       darbitblit@lchb.com
         ABBY R. WOLF
 5       awolf@lchb.com
   275 Battery Street, 29th Floor
 6 San Francisco, California  94111
   (415) 956-1000
 7
 8     and

 9 BY:  PAULINA DO AMARAL
        Pdoamaral@lchb.com
10 250 Hudson Street, Eighth Floor
   New York, New York  10013
11 (212) 355-9500
12
   ROBBINS GELLER RUDMAN & DOWD LLP
13 BY:  AELISH MAROEBAIG
        aelishb@rgrdlaw.com
14 1 Montgomery Street, Suite 1800
   San Francisco, California 94104
15 (415) 393-1500
   Counsel for Plaintiffs
16
17
18 WILLIAMS & CONNOLLY LLP
   BY:  MATTHEW P. MOONEY
19       mmooney@wc.com
   725 Twelfth Street, N.W.
20 Washington, DC 20005
   (202) 434-5331
21 Counsel for Cardinal Health, Inc.
22
23
24
25
```

---

Highly Confidential - Subject to Further Confidentiality Review

```
 1
   BARTLIT BECK LLP
 2 BY:  SHARON DESH
        sharon.desh@bartlit-beck.com
 3       (VIA TELECONFERENCE)
   54 West Hubbard Street, Suite 300
 4 Chicago, Illinois  60654
   (312) 494-4400
 5 Counsel for Walgreens
 6
 7
   COVINGTON & BURLING LLP
 8 BY:  SONYA D. WINNER
        swinner@cov.com
 9 415 Mission Street
   San Francisco, California  94105
10 (415) 591-6000
11     and
12 SHOOK, HARDY & BACON, LLP
   BY:  MICHELLE M. FUJIMOTO
13      mfujimoto@shb.com
   5 Park Plaza, Suite 1600
14 Irvine, California  92614
   (949) 475-1500
15 Counsel for McKesson Corporation
16
17
   REED SMITH LLP
18 BY:  MICHAEL J. SALIMBENE, PharmD
        msalimbene@reedsmith.com
19 Three Logan Square
   1717 Arch Street, Suite 3100
20 Philadelphia, Pennsylvania 19103
   (215) 851-8100
21 Counsel for AmerisourceBergen
22
23
24
25
```

---

Highly Confidential - Subject to Further Confidentiality Review

```
 1 JONES DAY
   BY:  CHRISTOPHER LOVRIEN
 2       cjlovrien@jonesday.com
   555 South Flower Street, 15th Floor
 3 Los Angeles, California  90071
   (213) 489-3939
 4 Counsel for Walmart
 5
 6
   LOCKE LORD LLP
 7 BY:  LAUREN M. FINCHER
        lauren.fincher@lockelord.com
 8       (VIA TELECONFERENCE)
   600 Congress Avenue, Suite 2200
 9 Austin, Texas 78701
   (512) 305-4700
10 Counsel for Henry Schein, Inc., and
   Henry Schein Medical Systems, Inc.
11
12
13 ROPES & GRAY, LLP
   BY:  ROCKY C. TSAI
14      rocky.tsai@ropesgray.com
   3 Embarcadero Center
15 San Francisco, California  94111
   (415) 315-6300
16
17     and

   BY:  LEON KOTLYAR
18      Leon.Kotlyar@ropesgray.com
   1211 Avenue of the Americas
19 New York, New York  10036-8704
   (212) 596-9000
20 Counsel for Mallinckrodt
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        ARNOLD & PORTER SCHOLER LLP
          BY:  ANGELA R. VICARI
 2             Angela.Vicari@arnoldporter.com
          250 West 55th Street
 3        New York, New York  10019
          (212) 836-7568
 4        Counsel for Endo Pharmaceuticals
               Inc., and Endo Health Solutions Inc.
 5
 6
 7        MORGAN, LEWIS & BOCKIUS LLP
          BY:  PAMELA HOLLY
 8             pamela.holly@morganlewis.com
               (VIA TELECONFERENCE)
 9        101 Park Avenue
          New York, New York 10178-0060
10        (212) 309-6000
          Counsel for Teva Pharmaceuticals
11        USA, Inc., Cephalon, Inc., Watson
          Laboratories, Inc., Actavis LLC,
12        Actavis Pharma, Inc., f/k/a Watson
          Pharma, Inc.
13
14
15        MORGAN, LEWIS & BOCKIUS LLP
          BY:  JOHN P. LAVELLE, JR.
16             john.lavelle@morganlewis.com
          1701 Market Street
17        Philadelphia, Pennsylvania 19103-2921
          (215) 963-5000
18        Counsel for Rite Aid
19
20
          KIRKLAND & ELLIS LLP
21        BY:  KARL STAMPFL
               karl.stampfl@kirkland.com
22        300 North Lasalle
          Chicago, Illinois  60654
23        (312) 862-2595
          Counsel for Allergan Finance, LLC
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        O'MELVENY & MYERS LLP
          BY:  HOUMAN EHSAN, M.D.
 2             hehsan@omm.com
          400 South Hope Street, 18th Floor
 3        Los Angeles, California 90071
          (213) 430-6326
 4        Counsel for Janssen
 5
 6
          DECHERT LLP
 7        BY:  JONATHAN S. TAM
               jonathan.tam@dechert.com
 8        One Bush Street, Suite 1600
          San Francisco, California  94104
 9        (415) 262-4500
          Counsel for Purdue Pharma
10
11
12        VIDEOGRAPHER:
               DAVID KIM,
13             Golkow Litigation Services
14
                          -  -  -
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INDEX
 2                                        PAGE
 3   APPEARANCES.................................   2
 4   EXAMINATIONS
 5    BY MR. TSAI.............................   12
 6    BY MR. LAVELLE..........................  260
 7    BY MR. MOONEY...........................  272
 8    BY MR. EHSAN............................  288
 9    BY MR. TAM..............................  318
10    BY MR. STAMPFL..........................  352
11    BY MS. VICARI...........................  371
12    BY MS. HOLLY............................  392
13
14              EXHIBITS
15   No.    Description                     Page
16   Lembke 1   Expert Report, Anna Lembke,    40
               M.D., March 25, 2019
17
     Lembke 2   "A prospective study of        54
18             nonmedical use of prescription
               opioids during adolescence and
19             subsequent substance use
               disorder symptoms in early
20             midlife," McCabe, et al.
21   Lembke 3   "The Role of Opioids          104
               Prescription in Incident Opioid
22             Abuse and Dependence Among
               Individuals with Chronic
23             Non-Cancer Pain:  The Role of
               Opioid Prescription," Edlund, et
24             al.
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Lembke 4   "Pain Management and The Opioid  107
               Epidemic, Balancing Societal and
 2             Individual Benefits and Risks of
               Prescription Opioid Use,"
 3             Committee on Pain Management and
               Regulatory Strategies to Address
 4             Prescription Opioid Abuse,"
               Bonnie, et al.
 5   Lembke 5   "Associations of Nonmedical Pain  112
               Reliever Use and Initiation of
 6             Heroin Use in the United
               States," Muhuri, et al.
 7
 8   Lembke 6   "Relationship between Nonmedical  121
               Prescription-Opioid Use and
 9             Heroin Use," Compton, et al.
10   Lembke 7   "Drug Dealer, MD, How Doctors    132
               Were Duped, Patients Got Hooked
11             and Why It's So Hard to Stop,"
               Lembke
12
     Lembke 8   "Rising morbidity and mortality  169
13             in midlife among white,
               non-Hispanic Americans in the
14             21st century," Case and Deaton
15   Lembke 9   Transcript of April 2018 KQED    173
               Forum with Michael Krasny,
16             Medical Community Divided On
               Medicare's Policy to Shorten
17             High-Dose Opioid Prescriptions,
               Live Guest Appearance"
18
     Lembke 10  Transcript of TED Talk with Anna  185
19             Lembke, Drug Dealer, M.D.
20   Lembke 11  Attorney General Session Makes   224
               Multiple Major Announcement as
21             the Justice Department Continues
               to Combat the Opioid Crisis,
22             Cleveland, OH - Wednesday,
               August 22, 2018
23
     Lembke 12  Handwritten notes of Anna        233
24             Lembke, MD
25
```

| 1 | Lembke 13 | Anna Lembke, MD Report, Appendix I | 242 |
| 3 | Lembke 14 | Opioids in Acute Pain Management, MNK-T1_0000529044 - MNK-T1_0000529126 | 246 |
| 5 | Lembke 15 | Covidien Train-the-Trainer, CARES Alliance Education Module, MNK-T1_00001279950 | 250 |
| 7 | Lembke 16 | Welcome to Your Exalgo Patient Identifier, MNK-T1_000062641 - MNK-T1_000062669 | 255 |
| 10 | Lembke 17 | Appendix I.C | 287 |
| 10 | Lembke 18 | Information about Duragesic (fentanyl transdermal system) CII, JAN-MS-00890573 - JAN-MS-00890575 | 289 |
| 13 | Lembke 19 | File Provide Natively, Duragesic Pain Specialist Overview JAN-MS-00302787 | 292 |
| 15 | Lembke 20 | Duragesic (fentanyl transdermal patch) label, JAN-MS-00780844 - JAN-MS-00780888 | 306 |
| 18 | Lembke 21 | PageVault webpage capture "Consumer Updates > A Guide to Safe Use of Pain Medicine" | 314 |
| 20 | Lembke 22 | Pain & Policy Studies Group October 5, 2006 letter to Dr. Miller, PPLPC017000049352 | 349 |
| 22 | Lembke 23 | Anna Lembke, MD, Report, Exhibit B, List of Materials Considered | 352 |
| 24 | Lembke 24 | Third Amended Complaint and Jury Demand | 361 |

---

| 1 | Lembke 25 | Kadian Learning Systems, Alpharma, Inc., ALLERGAN_MDL_01052119 - ALLERGAN_MDL_01052465 | 369 |

4    (Exhibits attached to the deposition.)

---

1            VIDEOGRAPHER:  We are now on
2    the record.  My name is David Kim.
3    I'm a videographer for Golkow
4    Litigation Services.
5            Today's date is April 24, 2019,
6    and the time is 8:07 a.m.
7            This video deposition is being
8    held in San Francisco, California, in
9    the matter of National Prescription
10    Opiate Litigation, MDL Number 2804 for
11    the US District Court, the Northern
12    District of Ohio, Eastern Division.
13            The deponent is Anna Lembke.
14            Counsel will be noted on the
15    stenographic record.
16            The court reporter is Carrie
17    Campbell and will now swear in the
18    witness.
19
20            ANNA LEMBKE, M.D.,
21    of lawful age, having been first duly sworn
22    to tell the truth, the whole truth and
23    nothing but the truth, deposes and says on
24    behalf of the Defendants, as follows:
25

---

1            DIRECT EXAMINATION
2    QUESTIONS BY MR. TSAI:
3        Q.    Good morning.
4        A.    Good morning.
5        Q.    Diving right in, to begin with,
6    I just wanted to confirm, are you board
7    certified in anesthesiology, pain medicine or
8    hospice or palliative medicine?
9        A.    No.
10        Q.    Can you explain to the jury
11    what it means to be board certified in a
12    specialized type of medical practice?
13        A.    To be board certified in a
14    specialized type of medical practice means to
15    have received a certain level of training and
16    sat for an exam and passed that exam such
17    that you receive the certification of that
18    specialty.
19        Q.    And can you explain to the
20    jury, what does it mean to complete a
21    residence or a fellowship in a specialized
22    field of medical practice?
23        A.    To complete a residency or
24    fellowship in a specialized field of medical
25    practice means to have spent a certain amount

1  of time devoted to specifically studying that
2  specialty.
3     Q.    Have you completed any
4  residencies or fellowships in anesthesiology,
5  pain medicine or hospice and palliative
6  medicine?
7     A.    No, I have not.
8     Q.    In an article you wrote, you
9  described yourself as an academic
10 psychiatrist.
11        Do you recall writing that
12 article on your CV?
13        MR. ARBITBLIT:  Do you have a
14        copy of it, Counsel?
15        MR. TSAI:  I do not.  It's
16        listed on her CV.
17 QUESTIONS BY MR. TSAI:
18    Q.    Do you recall authoring an
19 article called "A Friday in the Life of a
20 Academic Psychiatrist"?
21    A.    Yes, I do.
22    Q.    And that was in the journal
23 called Academic Psychiatry?
24    A.    Yes.
25    Q.    Is it accurate to say that you

1  would hold yourself out as a psychiatrist as
2  opposed to a pain management physician or an
3  anesthesiologist?
4        MR. ARBITBLIT:  Object to form.
5        THE WITNESS:  I would disagree
6        with that statement because I do hold
7        myself out as having expertise in the
8        field of pain management, but not
9        anesthesiology, per se.
10 QUESTIONS BY MR. TSAI:
11    Q.    How many hours have you spent
12 treating patients in palliative care, for
13 example, for their individual pain needs?
14    A.    I have not worked in a
15 palliative care setting.
16    Q.    How many patients have you
17 diagnosed with chronic pain as another
18 example?
19    A.    I have diagnosed many patients
20 with chronic pain over the years.  I've been
21 in practice for more than 20 years, seen
22 approximately 40,000 patients over my career.
23 I couldn't tell the exact number that I've
24 diagnosed with chronic pain, but if I had to
25 put a ballpark estimate, I would say

1  something on the order of 50 percent of my
2  patients have some kind of chronic pain
3  diagnosis.
4     Q.    What is the total number of
5  patients you've treated for their individual
6  pain needs as opposed to addiction associated
7  with surgeries or cancer?
8        MR. ARBITBLIT:  Object to form.
9        THE WITNESS:  It's difficulty
10        for me to put an exact number on that.
11        The majority of patients that I treat
12        for their pain needs also have some
13        sort of co-occurring mental health
14        disorder, but pain is a priority in
15        the overall treatment plan of those
16        patients.
17 QUESTIONS BY MR. TSAI:
18    Q.    So just to be clear, in your
19 practice, you engage in primary diagnoses of
20 patients who are complaining of pain and
21 deciding how to treat their pain needs?
22        MR. ARBITBLIT:  Objection.
23        THE WITNESS:  Yes.
24 QUESTIONS BY MR. TSAI:
25    Q.    What is the total number of

1  peer-reviewed research studies or articles
2  you've authored in the field of
3  anesthesiology, pain medicine or hospice and
4  palliative medicine?
5     A.    I've authored two peer-reviewed
6  articles in pain medicine journals, but I
7  have written more broadly on the issue of
8  pain vis-à-vis the opioid epidemic, and so
9  that more broad area would include more of my
10 publications.
11    Q.    And focusing on the two
12 articles in Pain Medicine journals, what were
13 the subject matters of those two articles?
14    A.    The subject matter of those two
15 articles in Pain Medicine journals had to do
16 with perioperative management of opioid
17 agonist treatments such as buprenorphine and
18 methadone.
19    Q.    Who retained you as a
20 testifying witness in this case?
21    A.    Lieff Cabraser Heimann &
22 Bernstein.
23    Q.    And do you know who they
24 represent?
25    A.    They represent the MDL.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Can you be more specific?
 2        A.    They represent the plaintiffs
 3   in this case.
 4        Q.    And who are the plaintiffs in
 5   this case?
 6        A.    The plaintiffs are the counties
 7   and other entities who have been harmed as a
 8   result of the opioid epidemic.
 9        Q.    Which counties?
10        A.    There are too many counties
11   to -- I guess the bellwether counties would
12   be Cuyahoga and Summit Counties in Ohio.
13        Q.    Have you ever prescribed opioid
14   medications?
15        A.    Yes.
16        Q.    Since when?
17        A.    I prescribe opioid medications
18   on a weekly basis.
19        Q.    So when did you start
20   prescribing opioid medications?
21        A.    Since I obtained a DEA license.
22        Q.    And when was that?
23        A.    That was in 2000, 2001.
24        Q.    Approximately how many patients
25   do you believe you've prescribed opioid
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   medications to?
 2        A.    It's difficult for me to put a
 3   number on that.  I've been prescribing opioid
 4   medications since I became a practicing
 5   physician, and in recent years, I prescribed
 6   more opioid medication in the treatment of
 7   opioid use disorder.
 8        Q.    Other than opioid use disorder,
 9   have you prescribed opioid medications for
10   any other condition or indication?
11        A.    Yes, I have.  In the general
12   practice of medicine through my career, I
13   have prescribed other opioid medications.
14        Q.    What conditions or indications?
15        A.    Typically pain conditions.
16        Q.    When you prescribe opioid
17   medications to your patients, do you weigh
18   the risks and benefits based on your
19   individual patients' medical histories and
20   conditions?
21        A.    Yes, of course.
22        Q.    Do you have any degrees in
23   epidemiology?
24        A.    No.
25        Q.    Can you explain to the jury
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   what epidemiology means?
 2        A.    Epidemiology is the study of
 3   the progression of disease through a
 4   population.
 5        Q.    Did you yourself actually
 6   conduct any of the epidemiological research
 7   cited in your report regarding factors
 8   associated with the opioid crisis?
 9        A.    Yes, I did.
10        Q.    And can you explain what
11   research you conducted?
12        A.    I conducted research regarding
13   who was prescribing opioids in this country
14   as well as who is prescribing buprenorphine
15   for the treatment of opioid use disorder,
16   which is relevant to the opioid epidemic more
17   broadly.
18        Q.    And what was the information
19   upon which you conducted your research?
20        A.    It was based on Medicare -- a
21   Medicare database from 2013.
22        Q.    Did you calculate or formulate
23   any of your own regression models or
24   statistical analyses in this case?
25        A.    No, I did not.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  Other than the Medicare
 2   database, did you conduct any of your own
 3   epidemiological analysis of any data in this
 4   case specific to the -- strike that.
 5              Other than the Medicare
 6   database, did you conduct any original
 7   epidemiological analysis of any data in this
 8   case?
 9        A.    Yes, I did.
10        Q.    What data?
11        A.    Qualitative data that I
12   collected in preparation for writing my book,
13   "Drug Dealer, MD:  How Doctors Were Duped,
14   Patients Got Hooked, and Why It's So Hard to
15   Stop."
16        Q.    And what do you mean by
17   qualitative data in connection with writing
18   your book?
19        A.    Interviews that I conducted
20   with patients and health care providers in an
21   attempt to understand the progression of the
22   opioid epidemic in our population.
23        Q.    Okay.  And other than
24   conducting interviews in connection with
25   writing your book, did you conduct any
```

Highly Confidential - Subject to Further Confidentiality Review

1  quantitative analysis in connection with
2  that?
3      A.    No.
4      Q.    If you were asked to design an
5  epidemiological study and statistically
6  analyze the data results for submission to a
7  peer-reviewed journal, would you ask for
8  help, or would you do that all by yourself?
9          MR. ARBITBLIT:  Objection.
10  Compound.
11  QUESTIONS BY MR. TSAI:
12      Q.    You can answer.
13      A.    So I don't hold myself out as a
14  biostatistician.  I work with others who have
15  expertise in that area and together we
16  collaboratively think about the important
17  questions and interpret the data, so I would
18  be intimately involved in that process, but I
19  would not be conducting the statistical
20  analysis by myself.
21      Q.    What is the total amount of
22  peer-reviewed research studies or articles
23  you've authored in the field of epidemiology?
24      A.    I feel like I answered that
25  question before.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    What is your answer?
2          MR. ARBITBLIT:  Object.  Asked
3  and answered.
4          THE WITNESS:  I feel I answered
5  that before.
6  QUESTIONS BY MR. TSAI:
7      Q.    What is your answer?
8          MR. ARBITBLIT:  You really want
9  to do that?  You want to make her go
10  back and scroll and find the answer
11  she gave you when you asked her about
12  that before?
13  QUESTIONS BY MR. TSAI:
14      Q.    I'm just wondering what do you
15  consider to be an epidemiological study that
16  you have authored?
17      A.    Well, epidemiologic --
18  epidemiology is the study of progression of a
19  disease in a population, and I have spent the
20  last approximately 20 years studying the
21  progression of the disease of opioid
22  dependence and addiction in the population.
23  And I've written widely about that and I have
24  numerous publications, which are in my CV,
25  and I have my book "Drug Dealer, MD:  How

Highly Confidential - Subject to Further Confidentiality Review

1  Doctors Were Duped, Patients Got Hooked, and
2  Why It's So Hard to Stop."
3          MR. TSAI:  I'll respectfully
4  move to strike.
5  QUESTIONS BY MR. TSAI:
6      Q.    I'll ask you, have you
7  conducted or designed any controlled
8  epidemiological studies yourself?
9      A.    I did answer that question.
10      Q.    And what is your answer?
11      A.    Well, I already --
12          MR. ARBITBLIT:  It's a
13  different question.
14          THE WITNESS:  It's a
15  different --
16          MR. ARBITBLIT:  It's a
17  different question.
18          THE WITNESS:  Okay.  So I have
19  published two articles on prescribing
20  of opioids in this country, which is
21  relevant to the problem of the spread
22  of the opioid epidemic in this
23  country.
24  QUESTIONS BY MR. TSAI:
25      Q.    And in those two articles that

Highly Confidential - Subject to Further Confidentiality Review

1  you singled out, did you conduct any kind of
2  regression analysis or statistical
3  significance calculation, multi-variant
4  analysis, or were they more qualitative?
5          MR. ARBITBLIT:  Objection.
6  Compound.
7          THE WITNESS:  So those were
8  quantitative analyses, which I did in
9  collaboration with my biostatistician
10  coauthors.
11  QUESTIONS BY MR. TSAI:
12      Q.    Okay.  And your coauthors who
13  were in the field of biostatistics, were they
14  the ones who conducted the quantitative
15  analysis?
16      A.    My coauthors are not
17  exclusively in the field of biostatistics,
18  but one of the coauthors has expertise in
19  that area and did the quantitative analysis.
20      Q.    So you yourself did not do the
21  quantitative analysis?
22      A.    That is correct.
23      Q.    Have you ever taught any
24  courses in the field of epidemiology?
25      A.    I teach on a regular basis to

```
 1   medical students, residents and practicing
 2   physicians on the spread of the opioid
 3   epidemic in the United States, and in that
 4   sense I have taught courses on epidemiology,
 5   yes.
 6       Q.    Other than that qualitative
 7   sense, do you teach any courses in the field
 8   of epidemiology, per se?
 9           MR. ARBITBLIT:  Objection.
10       Argumentative.  Asked and answered.
11           THE WITNESS:  I feel like I
12       gave you an answer to that question.
13   QUESTIONS BY MR. TSAI:
14       Q.    Have you ever worked or
15   consulted for the FDA?
16       A.    No.
17       Q.    What is the FDA?
18       A.    The FDA is an entity that's
19   involved with approving drugs for medical
20   use.
21       Q.    Do you have any experience
22   working on the submission of any NDA to the
23   FDA?
24       A.    No.
25       Q.    Do you have any experience
```

```
 1   working on the submission of any ANDA to the
 2   FDA?
 3       A.    No.
 4       Q.    What is an NDA?
 5       A.    I don't know.
 6       Q.    What is an ANDA?
 7       A.    I don't know.
 8       Q.    Have you ever worked on the
 9   submission -- do you have any experience
10   working on the submission of any prescription
11   medication marketing materials to the FDA for
12   government approval?
13       A.    I served on the research
14   advisory panel of California where we
15   reviewed studies that were being conducted in
16   the state of California on using various
17   investigative pharmaceuticals and my role was
18   to assess the safety of those studies.  And
19   so in that sense I have reviewed numerous
20   studies in the process of companies seeking
21   FDA approval for their drug.
22       Q.    And what was the connection in
23   that panel to any company's marketing
24   material?
25       A.     Well, it wasn't marketing
```

```
 1   material, per se.
 2       Q.    Do you have any experience
 3   regarding FDA regulations that govern
 4   pharmaceutical marketing?
 5       A.    No.
 6       Q.    Have you ever treated any
 7   person in Cuyahoga or Summit Counties for
 8   opioid addiction?
 9       A.    No.
10       Q.    Have you ever treated any
11   patients in Cuyahoga or Summit Counties for
12   any medical condition related to opioids?
13       A.    No.
14       Q.    Have you ever been to Summit
15   County?
16       A.    No, but I have been to Cuyahoga
17   County.
18       Q.    Are you able to identify any
19   particular individuals whose opioid addiction
20   or overdose led to costs incurred by Cuyahoga
21   or Summit Counties?
22           MR. ARBITBLIT:  Object to form.
23           THE WITNESS:  I am able to -- I
24       have analyzed the CDC data from Ohio,
25           including Summit and Cuyahoga
```

```
 1           Counties, and so I can speak to the
 2           issue of the opioid epidemic in those
 3           counties.
 4   QUESTIONS BY MR. TSAI:
 5       Q.    Is the CDC data that you are
 6   referring to specific to any particular
 7   individuals residing in those counties that
 8   allows you to identify their medical
 9   condition or the circumstances of their
10   opioid use?
11           MR. ARBITBLIT:  Object to form.
12           THE WITNESS:  The CDC data is
13       looking at individuals in aggregate,
14       not any one individual that I could
15       identify.
16   QUESTIONS BY MR. TSAI:
17       Q.    Have you ever asked for or been
18   provided any information specific to Cuyahoga
19   or Summit Counties regarding individual
20   persons whose addiction the counties contend
21   led to costs in this case?
22           MR. ARBITBLIT:  I'll instruct
23       you not to answer as to that question
24       because it involves the
25       attorney-expert privilege.
```

## Page 29

```
 1              Don't answer.
 2   QUESTIONS BY MR. TSAI:
 3        Q.    Let me rephrase it.
 4              Have you ever reviewed any
 5   information specific to Cuyahoga or Summit
 6   Counties regarding any actual individuals
 7   whose opioid addiction the counties contend
 8   led to the costs that they're seeking in this
 9   case?
10        A.    Well, I have reviewed
11   information specific to Cuyahoga and Summit
12   Counties regarding individuals living in
13   those counties broadly speaking as an
14   aggregate, not any one individual.  I haven't
15   personally treated any one individual living
16   in those counties.
17        Q.    Well, let me ask it this way:
18   Do you have any basis to tell us whether for
19   any individual in Cuyahoga and Summit
20   Counties whose opioid addiction or overdose
21   allegedly led the counties to incur expenses,
22   the clinical context of their opioid use?
23              MR. ARBITBLIT:  Object to form.
24              THE WITNESS:  Yes, I believe
25        that I do.
```

## Page 30

```
 1   QUESTIONS BY MR. TSAI:
 2        Q.    How so?
 3        A.    Well, the opioid epidemic is an
 4   epidemic that has affected every region
 5   across the United States.  I have deeply
 6   studied the factors contributing to the
 7   epidemic, and it's very clear that Cuyahoga
 8   and Summit Counties are -- have been involved
 9   and have been deeply affected and harmed by
10   the opioid epidemic and so the individual
11   harm that has come to people living in those
12   counties is included in the work that I have
13   done more broadly to understand the opioid
14   epidemic.
15              MR. TSAI:  I'll respectfully
16        move to strike.
17   QUESTIONS BY MR. TSAI:
18        Q.    I'm asking about particular
19   individuals who experienced opioid addiction
20   or opioid use disorder and reside in Cuyahoga
21   and Summit Counties.
22              Can you identify any single
23   individual and tell us, for example, the
24   severity of their pain?
25              MR. ARBITBLIT:  Object to form.
```

## Page 31

```
 1              THE WITNESS:  I have not
 2         treated an individual in Cuyahoga
 3         County, but I feel that that does not
 4         preclude me from speaking to the
 5         problem of opioid addiction and
 6         overdose deaths in those counties.
 7   QUESTIONS BY MR. TSAI:
 8        Q.    Putting aside the fact that you
 9   haven't treated any individual in Cuyahoga or
10   Summit Counties, can you -- do you have a
11   basis based upon any -- anything that you've
12   written, any works that you've done, to
13   identify for any actual individual with
14   opioid use disorder residing in those
15   counties the severity of that individual's
16   pain?
17              MR. ARBITBLIT:  Object to form.
18         Asked and answered.
19              THE WITNESS:  I feel like I've
20         answered this question.
21   QUESTIONS BY MR. TSAI:
22        Q.    Is the answer no?
23              MR. ARBITBLIT:  Object to form.
24              THE WITNESS:  The answer is
25         yes.
```

## Page 32

```
 1   QUESTIONS BY MR. TSAI:
 2        Q.    The answer -- okay.  Then if
 3   the answer is yes, tell me -- give me a
 4   specific example of an individual resident in
 5   Cuyahoga and Summit County with opioid use
 6   disorder and tell me the circumstances and
 7   the extent of their pain condition at the
 8   time they used opioids?
 9              MR. ARBITBLIT:  Object to form.
10              THE WITNESS:  The circumstances
11         of individuals in Summit and Cuyahoga
12         Counties mirror the circumstances of
13         individuals across the United States
14         vis-à-vis the opioid epidemic.  There
15         are patterns that have been replicated
16         that apply to those individuals.
17              I have not personally treated
18         an individual in Cuyahoga or Summit
19         County, but I still believe that I can
20         speak to and have an opinion on the
21         problem of opioid addiction, overdose
22         deaths of individuals in those
23         counties.
24   QUESTIONS BY MR. TSAI:
25        Q.    So to be clear, your assumption
```

Highly Confidential - Subject to Further Confidentiality Review

1  that there are similar circumstances is not
2  based on any treatment of any actual
3  individual, correct?
4        MR. ARBITBLIT:  Object to form.
5  Argumentative.  Asked and answered.
6        She's answered the question
7  five different ways, and you've asked
8  it five different ways.  It's the same
9  question.
10        MR. TSAI:  She hasn't answered.
11        MR. ARBITBLIT:  I disagree.
12        THE WITNESS:  Yeah, I think
13  I've answered it.
14  QUESTIONS BY MR. TSAI:
15        Q.    What is the basis of your
16  assumption that any particular case of opioid
17  use disorder of a resident of Cuyahoga and
18  Summit Counties is, as you say, similar to
19  patterns that you refer to?
20        MR. ARBITBLIT:  Objection.
21  Argumentative.
22        THE WITNESS:  I've treated many
23  individuals with opioid use disorders
24  over many years.  The natural history
25  and progression of the disease of

Highly Confidential - Subject to Further Confidentiality Review

1        addiction is similar in every
2        individual that I have treated.
3              I have no basis to believe that
4        that would be any different for the
5        individuals in Cuyahoga and Summit
6        Counties.
7  QUESTIONS BY MR. TSAI:
8        Q.    Did you review a single medical
9  record related to an individual in Cuyahoga
10  and Summit County?
11        MR. ARBITBLIT:  Asked and
12        answered.
13              She's told you she has not
14        reviewed them, Counsel.  You keep
15        asking the same question.
16  QUESTIONS BY MR. TSAI:
17        Q.    So the answer is you have not
18  reviewed any medical records related to
19  actual individuals in Cuyahoga and Summit
20  Counties?
21        A.    I have not reviewed any
22  individual medical record.
23        Q.    So, therefore, you don't have a
24  basis to say that any individual with opioid
25  use disorder in Cuyahoga and Summit Counties

Highly Confidential - Subject to Further Confidentiality Review

1  had a prior or current pattern of substance
2  abuse disorder?
3        MR. ARBITBLIT:  Objection.
4  Asked and answered.  Argumentative.
5        THE WITNESS:  I disagree.
6  QUESTIONS BY MR. TSAI:
7        Q.    Then what is your basis?
8        MR. ARBITBLIT:  Let's move on.
9  If you keep asking this question, we
10  can always call the discovery master.
11        MR. TSAI:  You can feel free --
12  we can go off the record --
13        MR. ARBITBLIT:  You're going to
14  waste your time and keep asking the
15  same question.  It's your clock.
16              If you have anything else to
17  say about it, you can.
18        THE WITNESS:  I don't have
19        anything else to say.
20  QUESTIONS BY MR. TSAI:
21        Q.    What is your basis to
22  extrapolate to the conclusion that any
23  particular individual with opioid use
24  disorder in Cuyahoga and Summit Counties did
25  or did not have a co-occurring or preexisting

Highly Confidential - Subject to Further Confidentiality Review

1  mental illness or medical condition?
2        MR. ARBITBLIT:  Object to form.
3  Asked and answered.
4        THE WITNESS:  I don't have
5        another answer.
6  QUESTIONS BY MR. TSAI:
7        Q.    Are you able to identify any
8  particular doctors who prescribed opioid
9  medications to individuals in Cuyahoga and
10  Summit Counties?
11        A.    When you say "identify," do you
12  mean you want me to produce specific names?
13        Q.    Yes.
14              Are you able to -- that's what
15  I mean by identify, yes.
16        A.    Okay.  No.
17        Q.    Did you review any materials
18  that would give you a basis for you to
19  analyze or opine about what led any doctor to
20  prescribe an opioid medication to their
21  patients in Cuyahoga and Summit Counties?
22        MR. ARBITBLIT:  Object to form.
23        THE WITNESS:  Yes.
24  QUESTIONS BY MR. TSAI:
25        Q.    Okay.  What materials do you

Highly Confidential - Subject to Further Confidentiality Review

```
1   have in mind?
2        A.    I have in mind the misleading
3   messaging that was put forward by the
4   defendants to persuade doctors to prescribe
5   opioids for minor and chronic pain conditions
6   in the absence of evidence to do so.
7        Q.    Okay.  And is that also on an
8   aggregate basis?
9        A.    Yes.
10       Q.    So can you identify a single
11  doctor in Cuyahoga and Summit Counties who
12  relied on a particular statement of any
13  defendant in deciding to treat his or her
14  patient with prescription opioid medications?
15            MR. ARBITBLIT:  Object to form.
16            THE WITNESS:  I can identify
17        such doctors, but not by name because
18        I don't know their names.  They're
19        individuals that I met when I was
20        giving talks to educate physicians in
21        the state of Ohio who reported to me
22        as part of that teaching that I was
23        doing that they had prescribed opioids
24        in ways that they regretted, and that
25        they did so because of the misleading
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        messaging put forward by the
2        pharmaceutical opioid industry.
3   QUESTIONS BY MR. TSAI:
4        Q.    Okay.  And when you say "giving
5   talks to educate physicians in Ohio," what
6   are you referring to?
7        A.    I'm going to look at my report.
8        Q.    And I believe we've premarked
9   your report as Exhibit 1.
10       A.    So in April of 2018, I was the
11  keynote speaker at Star Trauma Recovery
12  Center at Ohio State University Medical
13  School in Columbus, Ohio, where I spoke on
14  the opioid epidemic.
15            Also in February 2019, I was
16  the keynote speaker at an Ohio State
17  University interprofessional summit in
18  Columbus, Ohio, where I spoke on the issue of
19  the opioid epidemic.
20       Q.    And the conversations that you
21  referred to with doctors in connection with
22  these speeches, did you memorialize them in
23  any way?
24       A.    What do you mean by
25  "memorialize"?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Do you have any written records
2   of them?
3        A.    No.
4        Q.    Staying with your report, you
5   have a term called the "Tsunami Effect,"
6   capital T, capital E.  And this is on page 88
7   of your report.
8             Is the Tsunami Effect a
9   description of an outcome, or is it a causal
10  model with predictive power?
11            MR. ARBITBLIT:  Object to form.
12        Compound.
13            THE WITNESS:  The Tsunami
14        Effect is a way of describing the
15        impact of flooding our society with
16        huge numbers of opioid pills leading
17        to the harm of individuals, not just
18        because they themselves had received
19        an opioid prescription, but because
20        they then had access to opioids
21        through somebody else's prescription.
22            So kind of a flooding metaphor.
23        An example would be for a teenager who
24        decides to take his or her
25        grandmother's pills in experimentation
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        and is subsequently harmed as a result
2        of taking those pills.
3   QUESTIONS BY MR. TSAI:
4        Q.    So in that example, the
5   teenager is a person who has not been
6   prescribed that particular opioid medication,
7   correct?
8        A.    In that particular example,
9   yes.
10            MR. ARBITBLIT:  Wait for the
11        question before you answer.
12  QUESTIONS BY MR. TSAI:
13       Q.    And in that example, the
14  teenager has not been evaluated or advised by
15  a physician, correct?
16       A.    In that example, that's
17  correct.
18       Q.    Does the Tsunami Effect predict
19  what individuals in particular cities and
20  counties will become addicted to or overdose
21  from opioids?
22       A.    I would like to refer to my
23  report for a moment.
24       Q.    Do you have that?
25            (Lembke Exhibit 1 marked for
```

```
 1            identification.)
 2   QUESTIONS BY MR. TSAI:
 3        Q.    Let's go ahead and mark the
 4   report as Exhibit 1.
 5        A.    Sorry, I'm looking for that
 6   particular article that I reviewed.
 7              Can you repeat the question?
 8        Q.    Sure.
 9              Let me say -- ask you this in a
10   different way, but let me back up.
11              Have you ever published the
12   Tsunami Effect theory in any peer-reviewed,
13   scientific journal?
14        A.    Well, my book was published by
15   Johns Hopkins University Press, and it went
16   through a peer-review process.  And although
17   I don't believe that I used the term "the
18   Tsunami Effect" in my book, I do discuss the
19   more general principle of the problem of
20   increased access to opioid medication being
21   the major cause of this epidemic, not just
22   for individuals directly prescribed the
23   opioid, but for all those individuals who
24   have increased access as a result of that
25   prescription.
```

```
 1        Q.    Your book, "Drug Dealer, MD,"
 2   is not a peer-reviewed, scientific journal,
 3   correct?
 4              MR. ARBITBLIT:  Object to form.
 5              THE WITNESS:  My book was
 6        published by an academic press, a very
 7        esteemed one, Johns Hopkins University
 8        Press, and it went through a
 9        peer-review process prior to
10        publication, and in that sense stands
11        out as distinct from, for example, a
12        trade book.
13   QUESTIONS BY MR. TSAI:
14        Q.    Is it your statement that the
15   peer-review process for publication of your
16   book is the same as a peer-review process to
17   get an article published in a scientific
18   journal?
19        A.    Yes.
20        Q.    Other than your book, have you
21   published in any peer-reviewed, scientific
22   journal regarding the Tsunami Effect?
23        A.    No.
24        Q.    Have you ever tested the
25   Tsunami Effect theory to quantify what
```

```
 1   persons ultimately addicted to opioids were
 2   individuals whose initial exposure was via a
 3   medically appropriate prescription of an
 4   opioid medication for a legitimate pain
 5   condition?
 6              MR. ARBITBLIT:  Object to form.
 7              THE WITNESS:  I have not done
 8        the research to quantify that.  I have
 9        done the research, the qualitative
10        research, on that.
11              And further, I would say that
12        others have done research showing that
13        there's a very intimate link between
14        the nonmedical use of opioid pain
15        pills and the subsequent development
16        of addiction and the medical use of
17        opioid pain pills.
18              So those are all intertwined,
19        and I think that has been established
20        in the literature, and it's also in my
21        report.
22   QUESTIONS BY MR. TSAI:
23        Q.    And an example of a nonmedical
24   use of opioid pain medications is using an
25   opioid, knowing that you're not the person
```

```
 1   who was prescribed the medication; is that
 2   correct?
 3        A.    No.
 4        Q.    Oh, is an example of a
 5   nonmedical use of opioid pain pills to
 6   deliberately get a high as opposed to treat
 7   the pain condition?
 8        A.    No, not exclusively.
 9        Q.    Is that one example of a
10   nonmedical use of opioids as you've referred
11   to it?
12        A.    That is one example.
13        Q.    Does the Tsunami Effect include
14   within its scope individuals who deliberately
15   misused a prescription opioid medication
16   knowing that the medication was not
17   prescribed to them?
18        A.    Yes.
19        Q.    Does the Tsunami Effect include
20   within its scope individuals who deliberately
21   misused a prescription opioid medication
22   knowing they were using it in violation of
23   the medication's warning label?
24              For example, crushing a pill in
25   order to snort the powder they made to get a
```

```
 1   high?
 2              MR. ARBITBLIT:  Object to form.
 3              THE WITNESS:  I very much doubt
 4       that the warning label came into
 5       consideration in that context when
 6       you're dealing with a teenager who is
 7       experimenting, who has access to that
 8       pill because it was prescribed to a
 9       relative and so readily available.
10   QUESTIONS BY MR. TSAI:
11       Q.   So just to be clear,
12   individuals who deliberately misuse an
13   opioid, for example, crushing it, snorting
14   it, injecting, in order to get a high, those
15   are included in your Tsunami Effect?
16       A.   Yes.
17       Q.   Have you ever tested the
18   Tsunami Effect to rule out the inclusion of
19   individuals who deliberately committed a
20   crime in obtaining and using opioids?
21              MR. ARBITBLIT:  Object to form.
22              THE WITNESS:  The Tsunami
23       Effect isn't really about whether or
24       not that individual committed a crime.
25              The Tsunami Effect is really
```

```
 1       trying to capture the very real
 2       phenomenon of flooding in our society
 3       of opioid medication as a result of
 4       misleading messaging by the defendants
 5       that led to the use of those opioids
 6       in minor and chronic pain conditions
 7       and then made them readily accessible,
 8       not just to people who were prescribed
 9       opioids, but even those not being
10       prescribed opioids.
11   QUESTIONS BY MR. TSAI:
12       Q.   And to be clear about the scope
13   of this phenomenon, as you call it, does the
14   Tsunami Effect include within its scope
15   individuals who deliberately committed a
16   crime in obtaining and using opioids?
17              MR. ARBITBLIT:  Object to form.
18              THE WITNESS:  Yes.
19   QUESTIONS BY MR. TSAI:
20       Q.   And just in going back to our
21   discussion about your practice of prescribing
22   opioid medications to your patients, can you
23   name the opioid medications that you have
24   prescribed over the course of your career?
25       A.   I have prescribed opioids,
```

```
 1   Schedule II opioids, over the course of my
 2   career, probably every one that you could
 3   imagine in the course of inpatient treatment.
 4              And I can't specifically name
 5       them because I can't recollect the specific
 6       instances.
 7              In recent years, especially
 8       practicing as an outpatient provider, I
 9       primarily prescribe buprenorphine-naloxone in
10       the use of opioid use disorder.
11       Q.   Have you prescribed oxycodone?
12       A.   Not to my recollection in
13   certain years.  There may have been instances
14   when I temporarily took over that
15   prescription in the case of a patient that I
16   inherited in an effort to help them taper off
17   of that medication, but normally I would not
18   do that.
19              Normally I would collaborate
20       with my pain colleague and advise them how to
21       help that patient taper down to a safer dose
22       or come off the medication, oxycodone, all
23       together.
24       Q.   And when you refer to a pain
25   colleague that you would collaborate with,
```

```
 1   what are you referring to?
 2       A.   Well, I have a courtesy
 3   appointment at Stanford University School of
 4   Medicine in the department of pain.  Those
 5   courtesy appointments are given out in
 6   recognition of my expertise in the treatment
 7   of pain.  I see patients within the Stanford
 8   University School of Medicine Pain Clinic.
 9   In that context, I regularly collaborate with
10   my pain colleagues around complex patients.
11   We have interdisciplinary team treatment
12   meetings where we will discuss those patients
13   in collaboration to try to come together to
14   find the best treatment plan.
15              I also frequently communicate
16   with my pain colleagues using the electronic
17   medical records system and by telephone as we
18   collaborate together to come up with the best
19   treatment plan for our patients with pain.
20       Q.   Are there any particular
21   branded opioid medications that you can
22   recall prescribing?
23       A.   No.
24       Q.   Do you recall prescribing
25   hydromorphone?
```

1    A.    I think I already answered that
2  question.
3    Q.    What was your answer?  I don't
4  recall.
5    A.    I don't recall any specific
6  pain medications that I prescribed outside of
7  the buprenorphine-naloxone that I now
8  prescribe regularly in my outpatient
9  practice.
10    Q.    Do you have any experience or
11  expertise in regard to the prescription drug
12  supply chain?
13        MR. ARBITBLIT:  Object to form.
14        THE WITNESS:  I am aware of the
15      role of the distributors in this case.
16      I have read the complaint.  I do
17      acknowledge their contribution to the
18      opioid epidemic, in particular the
19      flooding of pills in small towns that
20      should have alerted them to a problem,
21      which they did not take action on.
22        MR. TSAI:  Respectfully move to
23      strike that answer.
24  QUESTIONS BY MR. TSAI:
25    Q.    Have you ever worked for a

1  pharmaceutical company or consulted for one?
2    A.    No.
3    Q.    Do you have any experience or
4  expertise regarding the setting of DEA quotas
5  for prescription opioid medications?
6    A.    I'm aware of DEA quotas.  I'm
7  aware of the discussion around them vis-à-vis
8  the opioid epidemic.
9    Q.    Do you agree that the
10  defendants in this case are part of the legal
11  prescription medicine manufacturing and
12  supply business?
13        MR. ARBITBLIT:  Object to form.
14        THE WITNESS:  I guess I'm
15      not -- I don't really understand the
16      question.
17  QUESTIONS BY MR. TSAI:
18    Q.    The defendants in this case are
19  making and selling legally approved,
20  government-regulated medicines?
21        MR. ARBITBLIT:  Is that a
22      question or a statement?
23  QUESTIONS BY MR. TSAI:
24    Q.    Do you agree?
25    A.    Is that a question or a

1  statement?
2    Q.    I said, do you agree with that?
3    A.    Could you rephrase the
4  question?
5    Q.    The defendants in the case are
6  making and selling legally approved,
7  government-regulated medicines; is that
8  correct?
9    A.    Well, I guess I would object to
10  the form of the question, especially the
11  government-regulated medicine part.  I think
12  that the defendants in this case have also
13  had a major responsibility in that process of
14  regulation.
15    Q.    Do you have any basis to say
16  that defendants are selling medicines that
17  are not legally approved?
18        MR. ARBITBLIT:  Object to form.
19        THE WITNESS:  Yes, the
20      medicines are legally approved.
21  QUESTIONS BY MR. TSAI:
22    Q.    Do you agree that there are
23  multiple steps between a prescription opioid
24  medication being approved by the government
25  on the one hand and the effects, the

1  phenomenon that you call the Tsunami Effect?
2        MR. ARBITBLIT:  Object to form.
3        THE WITNESS:  I guess I would
4      want to know what multiple steps
5      you're referring to.
6  QUESTIONS BY MR. TSAI:
7    Q.    Well, as you envisioned the
8  Tsunami Effect, do you agree that for any of
9  the prescription opioid medications that you
10  refer to in your report -- first, it has to
11  be submitted for FDA approval?
12    A.    Yes.
13    Q.    And are you familiar with what
14  requirements must be met in order for the
15  government to approve a prescription opioid
16  medication as safe and effective?
17    A.    I am familiar, but I have not
18  been asked to opine on that aspect of the
19  case.
20    Q.    And in addition to approval by
21  the Food and Drug Administration as safe and
22  effective, do you agree that opioid
23  medications must be approved by the DEA for
24  manufacturing and sale?
25    A.    Yes.

```
 1    Q.    Okay.  And then once an opioid
 2  medication pill is made, what is your
 3  understanding of how it makes its way to an
 4  actual individual in Cuyahoga and Summit
 5  Counties for use?
 6         MR. ARBITBLIT:  Object to form.
 7         THE WITNESS:  Well, there's the
 8     production part, and then there's the
 9     distribution part where it's then
10     transported to a pharmacy, and then
11     the pharmacy is the dispensing agent
12     for that pill.
13  QUESTIONS BY MR. TSAI:
14    Q.    And before any individual in
15  Cuyahoga and Summit Counties can obtain an
16  opioid, they need to get a prescription from
17  a doctor, correct?
18         MR. ARBITBLIT:  Object to form.
19         THE WITNESS:  Yes.
20  QUESTIONS BY MR. TSAI:
21    Q.    Okay.  So if we could discuss
22  one of the articles that you cite in your
23  study.
24         MR. TSAI:  Can we have Tab 3,
25     the McCabe study?
```

```
 1  QUESTIONS BY MR. TSAI:
 2    Q.    And, Dr. Lembke, you cited this
 3  on page 40 of your report.
 4         Are you familiar -- do you
 5  recall citing the McCabe prospective study?
 6         (Lembke Exhibit 2 marked for
 7     identification.)
 8         MR. ARBITBLIT:  Is this
 9     Exhibit 2?
10         MR. TSAI:  Yes, the exhibit
11     next in order, Exhibit 2.
12         MR. ARBITBLIT:  Thank you.
13         THE WITNESS:  Are you sure it's
14     page 40?  I think it's 39.
15  QUESTIONS BY MR. TSAI:
16    Q.    So the McCabe study uses the
17  term "NMUPO".
18         Do you recall that?
19    A.    Yes.
20    Q.    And what does the term "NMUPO"
21  mean?
22    A.    Nonmedical use of prescription
23  opioids.
24    Q.    So one example of NMUPO would
25  mean that the individual who is taking and
```

```
 1  ingesting the opioid was not the person who
 2  was supposed to use the prescription
 3  medicine; do you agree?
 4    A.    That's -- that is how they
 5  defined it in this paper, yes.
 6    Q.    So an example is a teenager
 7  goes into a friend of a friend's house or a
 8  neighbor's house and takes leftover
 9  prescription opioid pills that have been
10  prescribed to that friend of a friend or
11  neighbor but not to the teenager, correct?
12    A.    Yes.
13    Q.    Another example of NMUPO is
14  that the individual who was supposed to
15  receive the prescription for the opioid
16  medication misused it for a nonmedical
17  purpose to get high instead of to treat a
18  legitimate pain condition, correct?
19    A.    Can I see the article?
20    Q.    It's --
21    A.    So I'm seeing their definition
22  of nonmedical use of prescription opioids as,
23  quote, "taking any narcotics other than
24  heroin on your own, that is, without a doctor
25  telling you to take them."
```

```
 1    Q.    And in your understanding of a
 2  misuse of an opioid medication, does that
 3  include taking an opioid medication for
 4  longer periods or in higher doses or
 5  different doses than the doctor instructed
 6  you to?
 7    A.    Yes.
 8    Q.    So if you could turn to
 9  page 379 of Exhibit 2, the McCabe article,
10  and if you could look at the right-hand
11  column, you see the Section 3, results?
12    A.    Uh-huh.
13    Q.    And if you could look at the
14  second paragraph, it says, "Among adolescents
15  who engaged in past-year NMUPO, approximately
16  95 percent also used other substances and the
17  majority simultaneously co-ingested
18  prescription opioids with other substances,
19  55.2 percent."
20         Do you see that?
21    A.    Yes, I do.
22    Q.    What is your understanding of
23  what "other substances" means?
24    A.    Substances in the medical
25  literature typically refers to any potential
```

Highly Confidential - Subject to Further Confidentiality Review

1  addictive substance.

2  Q.  So looking at that finding and

3  the 95 percent number, am I correct that

4  means that virtually all of the individuals

5  who were found to be nonmedical prescription

6  opioid users were also using other addictive

7  substances, things like alcohol and

8  marijuana?

9  A.  Yes, that's what this sentence

10  means.

11  Q.  And it's not surprising that

12  folks who used lots of different drugs when

13  they were teenagers had drug problems,

14  including opioid addiction, alcohol addiction

15  and marijuana addiction, when they were

16  adults; do you agree?

17  MR. ARBITBLIT:  Object to form.

18  THE WITNESS:  So 90 percent of

19  adolescents who use some sort of

20  addictive substances -- substance

21  during their teenager years do not go

22  on to become persons with addiction.

23  It's about 10 to 15 percent of those

24  individuals will develop a substance

25  use disorder.

Highly Confidential - Subject to Further Confidentiality Review

1  My point being that adolescence

2  is a time of experimentation where

3  many young people will try a variety

4  of substances.  So it's not

5  particularly surprising that these

6  individuals have experimented with

7  whatever substances were readily

8  available to them.  As another aspect

9  of adolescent addiction, that

10  adolescents have more barriers, cost

11  barriers, transportation barriers,

12  than adults who use substances, and so

13  they will typically use substances

14  that are readily available to them.

15  So this is not a surprise to

16  me.  This is what I'm trying to say.

17  QUESTIONS BY MR. TSAI:

18  Q.  And if you turn to page 381,

19  progressing and tracking how these teenagers,

20  who, as you were saying, are experimenting

21  with things that are available like alcohol

22  and marijuana, if you look at 381 and you see

23  3.2?

24  A.  Yes, I do.

25  Q.  And the second paragraph, I'll

Highly Confidential - Subject to Further Confidentiality Review

1  read the first sentence.  It says, "We found

2  that adolescents who engaged in simultaneous

3  co-ingestion of NMUPO and other drugs had

4  significantly greater odds of AUD, CUD, ODUD

5  and any SUD symptoms at age 35 relative to

6  those with had no history of NMUPO during

7  adolescence."

8  Do you see that?

9  A.  Yes, I do.

10  Q.  Okay.  And AUD stands for

11  alcohol use disorder?

12  A.  That's correct.

13  Q.  CUD stands for cannabis use

14  disorder?

15  A.  Yes.

16  Q.  And that's marijuana addiction?

17  A.  That's correct.

18  Q.  ODUD stands for what?

19  A.  Other drug use disorder.

20  Q.  And SUD stands for what?

21  A.  Substance use disorder.

22  Q.  And substance use disorder

23  would be the aggregate and all-encompassing

24  category of addictive substances?

25  A.  That's right.

Highly Confidential - Subject to Further Confidentiality Review

1  Q.  So is it -- it's not surprising

2  that folks who use prescription opioids --

3  well, strike that.

4  Then if you can go down to the

5  one, two, three, four -- fifth paragraph of

6  3.2, the authors state another finding, and

7  I'll read it, the first sentence.

8  "Adolescents who indicated medical use

9  without a history of NMUPO did not differ

10  from adolescents with no history of medical

11  use of prescription opioids or NMUPO in the

12  odds of AUD, CUD, ODUD and any SUD symptoms."

13  Do you see that?

14  A.  Yes, I do.

15  Q.  And when they say "medical

16  use," am I right to read that as the opposite

17  of NMUPO?

18  Medical use is the opposite of

19  nonmedical use of prescription opioids?

20  A.  That's fair.

21  Q.  So am I reading this finding

22  correctly that it's not surprising that folks

23  who use prescription opioids following

24  doctor's orders and as they were supposed to

25  when teenagers did not tend to have drug

1  problems when they were adults?

2      A.    I wouldn't interpret it that

3  way, necessarily, no.

4      Q.    Well, doesn't it say that

5  adolescents with medical use of prescription

6  opioids who had no history of nonmedical use

7  were as unlikely to have opioid addiction

8  problems as folks who had never used

9  prescription opioids at all when they were

10  younger?

11          MR. ARBITBLIT:  Object to form.

12          THE WITNESS:  This statement

13  doesn't necessarily mean that those

14  who are exposed to an opioid medically

15  are not at risk for developing

16  addiction.  There's good evidence to

17  show that even individuals exposed to

18  an opioid medically are at increased

19  risk for developing an opioid use

20  disorder, specifically an article

21  which I cite in my report on page 40

22  by Schroeder, et al., shows that even

23  very limited exposure in persons age

24  16 to 25 years old who received an

25  initial opioid prescription from a

1  dentist, approximately 6 percent of

2  them were later diagnosed with an

3  opioid use disorder within a year.

4          My point being that there is a

5  risk with exposure to medical use of

6  opioids, not just to nonmedical use of

7  opioids.

8          MR. ARBITBLIT:  And Federal

9  Rule 106, Rule of Completeness,

10  Counsel, page 378 of the article

11  you're reading from states exactly

12  this, "Medical use of prescription

13  opioids during adolescence is

14  associated with greater odds of

15  subsequent prescription opioid

16  misuse," citing Harbaugh 2018, McCabe,

17  2013, and '16, and Mlech, 2015.

18          MR. TSAI:  I object to

19  counsel's testimony.

20          MR. ARBITBLIT:  It's not

21  testimony.  It's the Rule of

22  Completeness, Counsel.  You should be

23  familiar with it.

24          MR. TSAI:  The --

25

1  QUESTIONS BY MR. TSAI:

2      Q.    So putting aside absolute risk,

3  and we'll talk about risk later on, but what

4  is your -- this is a finding comparing

5  likelihood of addictive substance use

6  disorder in two groups, correct, adolescents

7  who had medical use of prescription opioids,

8  no history of nonmedical use or abuse, and

9  adolescents who never took prescription

10  opioids, correct?

11          Am I reading that correct?

12          MR. ARBITBLIT:  Object to form.

13          THE WITNESS:  So to me, this --

14  that statement that you just read is

15  good evidence for the Tsunami Effect.

16  That basically because there has been

17  increased access to opioids, including

18  for teenagers, that has subsequently

19  increased their risk of going on to

20  develop some kind of substance use

21  problem.

22          MR. TSAI:  I move to strike.

23  QUESTIONS BY MR. TSAI:

24      Q.    What is your -- what is the --

25  the meaning of the finding that adolescents

1  who indicated medical use without a history

2  of NMUPO did not differ from adolescents when

3  no history of medical use of prescription

4  opioids or NMUPO in the odds of substance use

5  disorders?

6          Can you tell the jury what that

7  means, in your opinion?

8      A.    That means comparing the risk

9  in those two populations, they had similar

10  risk.

11      Q.    So I wanted to ask you --

12  turning back to Exhibit 1, which is your

13  report, on page 89, you talk about

14  hepatitis C, HIV and other infectious

15  diseases.

16          Have you reviewed any data to

17  reliably rule out the likelihood that cases

18  of hepatitis C, HIV or other infectious

19  diseases were caused by actions independent

20  from opioid use?

21      A.    No.

22      Q.    And actions independent of

23  opioid use that are associated or that cause

24  infectious diseases like HIV and hepatitis C

25  include risky sexual conduct, for example; do

1    you agree?

2        A.    Yes.

3        Q.    Have you reviewed any data to

4    reliably rule out the likelihood that cases

5    of hepatitis C, HIV or other infectious

6    diseases you refer to existed prior to any

7    opioid addiction or opioid abuse?

8        A.    No.

9        Q.    Do you have any -- did you

10   conduct any analysis, or do you have any

11   basis to quantify what percentage of cases of

12   hepatitis C, HIV and other infectious

13   diseases that you refer to were caused by

14   reasons that had nothing to do with opioid

15   use?

16       A.    No.

17       Q.    And just to be clear, opioid

18   use disorder and addiction are not

19   contagious, infectious diseases, correct?

20       A.    I would sort of disagree with

21   that.

22       Q.    Is there a pathogen?  Is there

23   an opioid use pathogen?

24            MR. ARBITBLIT:  Let her finish

25       her answer.

1            THE WITNESS:  There is not a

2        pathogen, per se, but the way that

3        opioid use disorder has spread through

4        the population is quite similar in

5        pattern to the way that infectious

6        diseases spread through close

7        contacts.

8    QUESTIONS BY MR. TSAI:

9        Q.    If I touch someone who has

10   opioid use disorder, do I get opioid use

11   disorder?

12       A.    No, but you also don't get HIV.

13       Q.    If I receive a blood

14   transfusion from someone with opioid use

15   disorder, do I get opioid use disorder?

16       A.    No.

17            MR. ARBITBLIT:  Counsel, we've

18       been going just a over an hour.

19            Is it time for a little break?

20            MR. TSAI:  Sure.  Off the

21       record, please.

22            VIDEOGRAPHER:  We're going off

23       the record, and the time is 9:11 a.m.

24        (Off the record at 9:11 a.m.)

25            VIDEOGRAPHER:  We are now going

1        back on the record, and the time is

2        9:23 a.m.

3    QUESTIONS BY MR. TSAI:

4        Q.    And just one quick note:  In

5    most depositions, we don't have this handy

6    LiveNote screen, and I've noticed that you've

7    been hearing my questions but also reading.

8            If I could ask you just to

9    listen to my questions.  If you need

10   clarification, you can certainly look, but

11   this does -- if you kind of double up, it

12   does take up more time.

13            MR. ARBITBLIT:  I'll instruct

14       you to pay no attention to that.  You

15       look at the screen.  The questions are

16       complex.  It's serious litigation.

17            Do what you need to do to

18       understand the question.

19   QUESTIONS BY MR. TSAI:

20       Q.    So --

21            MR. ARBITBLIT:  That's why the

22       screen's here.

23   QUESTIONS BY MR. TSAI:

24       Q.    -- let me turn to the second

25   capitalized term in your report, "Dependence

1    Effect," capital D, capital E, and there you

2    refer to individuals who become dependent on

3    opioids independent of addiction.

4            That's how you defined

5    Dependence Effect.

6            What is opioid dependence, in

7    your words, independent of addiction?  What

8    does that mean?

9        A.    So that distinction has become

10   important with the new criteria for

11   diagnosing a substance use disorder with the

12   DSM-V, which -- the DSM-V was a departure

13   from the DSM-IV in the sense that prior to

14   the DSM-V, the criteria of physiologic

15   tolerance and withdrawal counted toward a

16   diagnosis of addiction.

17            But with the evolution to the

18   DSM-V, that no longer counted under the

19   specific circumstances of a patient receiving

20   an opioid from a medical doctor and

21   developing tolerance and withdrawal as a

22   result of taking that medication, that

23   opioid, under a prescription as prescribed,

24   which de facto made it more difficult,

25   created a higher threshold, essentially, for

1  diagnosing addiction with the DSM-V, but was
2  a way of recognizing that the physiologic
3  adaptation to opioids occurs in patients
4  taking opioids with a medical -- with a
5  medical prescription.
6           And so the DSM-V was an attempt
7  to distinguish between those individuals who
8  developed physiologic dependence under the
9  care of a doctor versus those individuals who
10 developed physiologic dependence, probably
11 also in many instances under the care of a
12 doctor, but also had these other behavioral
13 components that we use to signify the problem
14 of addiction.
15          Does that answer your question?
16     Q.   So do you agree with the
17 changes that were implemented in DSM-V's
18 diagnostic criteria for opioid use disorder?
19     A.   I accept those changes.  I
20 think that those -- that the physiologic
21 dependence, so the neurobiological changes
22 that occur in the brain as a result of
23 physical dependence on the opioid, can't be
24 distinguished necessarily from the
25 neurobiological changes that happen in the

1  brain as a result of this concept of
2  addiction, ala DSM-V criteria.  But I
3  appreciate that a distinct social construct
4  was necessary to subclassify those
5  individuals who developed physiological
6  dependence under the care of a doctor.
7           I actually don't agree with the
8  DSM-V criteria in the sense that it raised
9  the bar for physicians to be able to diagnose
10 the problem of opioid addiction.  It's that
11 much harder to do.
12          And that, along with the
13 pseudoaddiction representation that was put
14 forward by the defendants, has essentially
15 made it nearly impossible to diagnose opioid
16 use disorder addiction in the population of
17 patients who become addicted through a
18 doctor's prescription, which is a sizeable
19 population.
20     Q.   So under the prior definition
21 of opioid use disorder, under DSM-IV, it was
22 easier to diagnose and classify individuals
23 as opioid addicts; is that right?
24          MR. ARBITBLIT:  Object to form.
25          THE WITNESS:  Well, we don't

1         like to use the term "addicts,"
2         because it's pejorative.
3              I would say, yes, it has become
4         more difficult to diagnose opioid use
5         disorder with the DSM-V nomenclature
6         for those individuals who become
7         addicted to opioids through a doctor's
8         prescription.
9  QUESTIONS BY MR. TSAI:
10     Q.   So put simply:  More people
11 would be considered a person with opioid use
12 disorder under the prior definition than
13 under the updated definition?
14          MR. ARBITBLIT:  Object to form.
15          THE WITNESS:  I believe so,
16     yes.
17 QUESTIONS BY MR. TSAI:
18     Q.   So an example is:  I have
19 kidney stones, I'm prescribed opioid
20 medications by my doctor.  I say "I need more
21 than the originally prescribed dose to
22 relieve my pain."  I complete my course under
23 the supervision of the doctor, and when I go
24 off, I experience withdrawal symptoms.
25          Under the prior framework,

1  DSM-IV, would I be classified as having
2  opioid use disorder?
3          MR. ARBITBLIT:  Object to form.
4     Incomplete hypothetical.
5          THE WITNESS:  It's hard for me
6     to make that determination based on
7     the limited example that you gave, but
8     according to DSM-IV criteria, if you
9     had both physical tolerance and
10    withdrawal, then that met a low
11    threshold criteria for having an
12    opioid dependence problem.
13 QUESTIONS BY MR. TSAI:
14     Q.   And you agree that tolerance
15 and withdrawal are common among all users of
16 prescription medications, not just opioid
17 medications?
18          MR. ARBITBLIT:  Object to form.
19          THE WITNESS:  I disagree with
20    that.  I think that opioids stand
21    apart in terms of the degree to which
22    there's tolerance, so I think
23    tolerance is more common with opioids.
24         I think the dependence syndrome
25    is more severe.  The withdrawal is

1    more excruciating for many
2    individuals.
3         So I think opioids are distinct
4    in that regard.
5    QUESTIONS BY MR. TSAI:
6         Q.    Well, putting aside qualitative
7    degrees or extent or severity, the phenomenon
8    of tolerance, the phenomenon of withdrawal,
9    you do see that, for example, in
10   antidepressants like Paxil; is that right?
11        MR. ARBITBLIT:  Object to form.
12        THE WITNESS:  The phenomenon of
13        tolerance and withdrawal is seen in
14        other addictive scheduled drugs.  It's
15        not as severe as in the case of
16        opioids.
17        I would disagree that that
18        exact same phenomenon occurs with
19        antidepressants.  There is something
20        called a discontinuation syndrome.
21        I've seen it rarely in my career.  And
22        it's certainly not nearly as
23        debilitating as the opioid withdraw --
24        as what we see with opioid withdraw.
25        Not even in the same universe.

1    QUESTIONS BY MR. TSAI:
2         Q.    And discontinuation phenomenon,
3    that is, when a person using an
4    antidepressant is going off of it, is
5    tapering off or down?
6         A.    That's right.
7         Q.    And they experience withdrawal?
8         MR. ARBITBLIT:  Object to form.
9         THE WITNESS:  They experience
10        some physical symptoms associated with
11        that taper process.
12   QUESTIONS BY MR. TSAI:
13        Q.    So am I right that
14   individuals -- some individuals classified as
15   having an opioid use disorder under the prior
16   DSM-IV framework would not be deemed to have
17   an opioid use disorder under the current
18   updated definition?
19        A.    That's correct.
20        Q.    Okay.  And so in tieing your
21   Dependence Effect phenomenon to dependence as
22   opposed to addiction, that's a broader net;
23   am I right?
24        A.    Yes.
25        Q.    It's more permissive?

1         MR. ARBITBLIT:  Object to form.
2         THE WITNESS:  What do you mean
3         by "permissive"?
4    QUESTIONS BY MR. TSAI:
5         Q.    Well, you said lower bar, upper
6    bar.
7         So let me get -- it's a lower
8    bar to be considered dependent in your view
9    as opposed to addicted?
10        A.    I would say the criteria are
11   different.  I don't think I would use lower
12   bar versus higher bar.  They're now
13   categorized as distinct and separate
14   phenomenon.
15        The point of describing the
16   Dependence Effect is to communicate that
17   there are more than 10 million people in this
18   country who have taken opioids as prescribed
19   and become physically dependent and that
20   that's a very serious and morbid physical
21   condition, that being dependent on opioids is
22   not some kind of benign or easily reversible
23   phenomenon.
24        Q.    Does prescribing or dispensing
25   of opioid medications always lead to

1    dependence?
2         MR. ARBITBLIT:  Object to form.
3         THE WITNESS:  Almost always,
4         yes.
5    QUESTIONS BY MR. TSAI:
6         Q.    Does it inevitably lead to
7    dependence?
8         A.    In the vast majority of cases,
9    yes.
10        Q.    Does it immediately and
11   automatically lead to dependence?
12        MR. ARBITBLIT:  Object to form.
13        THE WITNESS:  Not immediately.
14        It takes people varying degrees of
15        time.  Some people become dependent
16        within a matter of days to weeks.
17        Other people can go much
18        longer, but in the vast majority of
19        cases, people who take opioids daily
20        for an extended period of time become
21        physically dependent on those opioids,
22        such that they need more and more to
23        get the same effect.  And when they
24        reduce their dose or stop taking them
25        for some reason, they experience

1    withdrawal.
2         And in many cases the
3    withdrawal is excruciating and very
4    debilitating.
5    QUESTIONS BY MR. TSAI:
6         Q.    Have you reviewed any
7    information or conducted any analysis to
8    quantify what individuals in the counties,
9    Cuyahoga and Summit Counties, became opioid
10   dependent?
11        MR. ARBITBLIT:  Object to form.
12        THE WITNESS:  Is this getting
13   back to what we talked about before,
14   this question?
15   QUESTIONS BY MR. TSAI:
16        Q.    I don't think I asked about
17   opioid dependence.
18        A.    Okay.  Can you say the question
19   again?
20        Q.    Have you reviewed any
21   information or conducted any analysis to
22   quantify what individuals in the counties,
23   Cuyahoga and Summit Counties, became opioid
24   dependent?
25        MR. ARBITBLIT:  Object to form.

1         THE WITNESS:  No.  No.
2    QUESTIONS BY MR. TSAI:
3         Q.    Can the Dependence Effect
4    phenomenon predict what individuals in what
5    particular cities or counties will become
6    addicted to or overdose from opioids?
7         A.    Yes.
8         Q.    How so?
9         A.    People who are dependent on
10   opioids are at increased risk to suffer from
11   overdose from those opioids, even separate
12   from being diagnosed from opioids, and I can
13   explain that physiology, if you would like.
14        It's also true that people who
15   are opioid dependent are at very high risk to
16   go on to meet DSM-V criteria for opioid
17   addiction.
18        Q.    Well, let me ask it from this
19   angle.
20        Have you ever tested the
21   Dependence Effect phenomenon to, for example,
22   rule out the inclusion of individuals who
23   deliberately committed a crime in obtaining
24   and using opioids?
25        MR. ARBITBLIT:  Object to form.

1         THE WITNESS:  I don't
2    understand your question.
3    QUESTIONS BY MR. TSAI:
4         Q.    Have you ever tested the
5    Dependence Effect phenomenon -- well, let me
6    ask it this way.
7         Does the Dependence Effect
8    include within its scope individuals who
9    deliberately committed a crime in obtaining
10   and using opioids?
11        MR. ARBITBLIT:  Object to form.
12        THE WITNESS:  Yes.
13   QUESTIONS BY MR. TSAI:
14        Q.    Does the Dependence Effect
15   include within its scope individuals who
16   deliberately misused a prescription opioid
17   medication knowing that medication was not
18   prescribed to him or her?
19        A.    The Dependence Effect would
20   include anybody who has become
21   physiologically dependent on opioids.
22        Q.    And that would include
23   individuals residing in Cuyahoga and Summit
24   Counties whose exposure to opioids was via
25   opioids that were not prescribed to them?

1         A.    Yes.
2         Q.    Okay.  Does the Dependence
3    Effect include within its scope individuals
4    who deliberately misused an opioid medication
5    knowing that they were not using it for its
6    intended indication; for example, crushing
7    it, snorting it for a high, for euphoria,
8    instead of to treat an indicated pain
9    condition?
10        A.    Yes.
11        Q.    So the third of your triagrid
12   {phonetic} is the Gateway Effect, capital G,
13   capital E.
14        So in -- on page 86 of your
15   report, Exhibit 1, you describe the Gateway
16   Effect as -- you say, "The trajectory to
17   addiction begins with exposure."  Is that
18   right?
19        A.    That's right.
20        Q.    Okay.  So have you ever
21   tested -- well -- actually, strike that.
22        I wanted to ask one more
23   question about the Dependence Effect.
24        Have you ever published the
25   theory of the Dependence Effect in any

```
 1   peer-reviewed, scientific journal?
 2        A.    I haven't -- I haven't -- I
 3   haven't specifically used that terminology,
 4   but in the JAMA article that we published on
 5   buprenorphine prescribing, we do talk about
 6   the exposure and the millions of people
 7   exposed to opioids through a medical
 8   prescription, the vast majority of whom
 9   probably are opioid dependent.
10        Q.    And have you specifically used
11   the terminology of the Tsunami Effect,
12   capital T, capital E, in any peer-reviewed
13   scientific journal?
14        A.    No.
15        Q.    Have you ever tested the
16   Gateway Effect, going to the third leg, to
17   quantify what percentage of persons
18   ultimately addicted to illegal heroin, or
19   fentanyl, were individuals who started out
20   purely with no substance abuse history and
21   whose initial exposure was via a medically
22   appropriate prescription of an opioid
23   medication?
24             MR. ARBITBLIT:  Object to form.
25             THE WITNESS:  Are you asking me
```

```
 1        if I've personally done that
 2        quantitative research?
 3   QUESTIONS BY MR. TSAI:
 4        Q.    Yes.
 5        A.    I have not.
 6        Q.    Have you ever used the specific
 7   terminology of the Gateway Effect and
 8   published that observation in any
 9   peer-reviewed scientific journal?
10        A.    No.
11        Q.    Have you ever tested the
12   Gateway Effect phenomenon to rule out the
13   inclusion of individuals who deliberately
14   committed a crime in obtaining and using
15   opioids?
16        A.    I wouldn't rule out those
17   individuals.
18        Q.    Okay.  So the Gateway Effect,
19   as you envision it, as you define it, does
20   include within its scope persons, including
21   persons in Cuyahoga and Summit County, who
22   deliberately committed a crime in obtaining
23   and using opioids?
24        A.    Yes.
25        Q.    Does the Gateway Effect include
```

```
 1   within its scope individuals who deliberately
 2   misused a prescription opioid medication
 3   knowing that medication was not prescribed to
 4   them?
 5        A.    Yes.
 6        Q.    Does the Gateway Effect include
 7   within its scope individuals who deliberately
 8   misused a prescription opioid medication
 9   knowing it -- knowing that they were using it
10   contrary to its intended indication and
11   approved indication, for example, to get a
12   high instead of treating pain?
13        A.    So I would like to go back and
14   amend what I said previously about the
15   Gateway Effect and refer to my report, which
16   on page 86, specifically says that the
17   Gateway Effect describes those individuals
18   who became exposed and addicted, including
19   individuals who turned from prescription
20   opioids to illicit sources of opioids such as
21   heroin.
22             So what I'm -- the group I'm
23   referring to in the Gateway Effect is, in
24   fact, those individuals who started with a
25   medical prescription and then became addicted
```

```
 1   through that medical prescription, as
 2   distinct from the Tsunami Effect, which is
 3   those individuals who -- which includes those
 4   individuals who used an opioid not
 5   necessarily prescribed to them.
 6        Q.    Okay.  So the -- you know, the
 7   beginning bound of the set of individuals
 8   that you define as within the Gateway Effect
 9   are those individuals who received a
10   prescription directly from a doctor?
11        A.    Yes, and thank you for allowing
12   me the opportunity to clarify that.
13        Q.    So the Gateway theory posits a
14   particular direction of events:  First,
15   prescription opioids prescribed by a doctor,
16   and then later illegal heroin or street
17   fentanyl addiction; is that right?
18        A.    Not necessarily.
19             So that individual -- so you're
20   right in the sense that it posits an
21   individual who began with a prescription of
22   an opioid from a doctor, but it -- and it
23   could include those individuals who then turn
24   to illicit sources of heroin, but it also
25   includes those individuals who become
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    addicted in an ongoing matter -- manner using
 2    the opioids prescribed by that doctor.
 3         Q.    Have you ever tested whether
 4    the Gateway Effect is confounded by
 5    individuals who had already used heroin
 6    before prescription opioid medications?
 7              MR. ARBITBLIT:  Object to form.
 8              THE WITNESS:  Well, that's
 9         something that the McCabe article
10         looked at, and I think one of the
11         salient findings there is it's really
12         the combined effect of access to
13         nonmedical opioids, plus medical use,
14         that confers risk.  It's not one or
15         the other in isolation, and both of
16         those individual groups can become
17         addicted.
18              So people can get addicted
19         entirely through a medical
20         prescription and not engage in
21         nonmedical use.  They can engage in
22         nonmedical use and then also be
23         exposed medically; thus compounding
24         their risk.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. TSAI:
 2         Q.    So you would rely on the McCabe
 3    study's findings in regard to those groups
 4    that you mentioned?
 5              MR. ARBITBLIT:  Object to form.
 6              THE WITNESS:  No, I'm not
 7         relying on the McCabe study findings.
 8         As I said before, I've done my own
 9         qualitative research, and I've also --
10         I have vast experiential knowledge of
11         this problem from the many patients
12         I've treated in almost, you know, two
13         decades.
14              So I have seen the pattern of
15         opioid addiction as it has occurred in
16         those individuals.
17    QUESTIONS BY MR. TSAI:
18         Q.    Does the Gateway Effect include
19    within its scope individuals who had first
20    used heroin before they used prescription
21    opioids?
22         A.    No.
23         Q.    And how would you know for a
24    particular person in Cuyahoga or Summit
25    County with opioid use disorder that medical
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    history, that sequence?
 2              MR. ARBITBLIT:  Object to form.
 3              THE WITNESS:  There are good
 4         national data that have surveyed
 5         individuals asking them about which --
 6         individuals who have become addicted
 7         to opioids, asking them which opioid
 8         they started with, and over 80 percent
 9         of individuals report that they
10         started with a prescription opioid.
11    QUESTIONS BY MR. TSAI:
12         Q.    And those -- that statistic
13    includes nonmedical use of prescription
14    opioids?
15         A.    Yes, it does, but it also
16    includes medical use of prescription opioids.
17         Q.    Have you ever tested whether
18    the Gateway Effect is confounded by
19    individuals who had already deliberately
20    misused or abused other drugs before any
21    medical opioid prescription?
22         A.    There are those cases, and I
23    have treated those individuals, and to me
24    that doesn't mitigate the problem of
25    addiction through an opioid prescription.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              So, for example, I've had many
 2         patients who were in recovery from an
 3         addiction to something else, who then got
 4         exposed to an opioid through a medical
 5         prescription and became addicted to that
 6         opioid or relapsed to their other substance
 7         who otherwise, I believe, would not have done
 8         so were it not for the unnecessary exposure
 9         to that opioid through a medical
10         prescription.
11         Q.    And individuals with a history
12    of substance abuse, and certainly a history
13    of diagnosed substance use disorder, are at a
14    higher risk of substance abuse disorder; do
15    you agree?
16              MR. ARBITBLIT:  Object to form.
17              THE WITNESS:  We do know based
18         on retrospective, epidemiologic
19         studies that patients with a personal
20         history of substance use disorder are
21         at increased risk to develop an opioid
22         addiction through a medical
23         prescription of opioids, yes.
24    QUESTIONS BY MR. TSAI:
25         Q.    So you would agree that for
```

```
 1   individuals who reside in Cuyahoga and Summit
 2   County with opioid use disorder, an important
 3   piece of information to know is their history
 4   of substance abuse disorder and substance use
 5   history?
 6       MR. ARBITBLIT:  Object to form.
 7       THE WITNESS:  I don't really
 8   consider that that important a piece
 9   of history.
10   QUESTIONS BY MR. TSAI:
11       Q.   So despite testifying that
12   epidemiology shows that patients with a
13   personal history of substance use disorder
14   are at an increased risk to develop an opioid
15   addiction through a medical prescription of
16   opioids, you wouldn't want to know whether
17   any particular individual in Cuyahoga and
18   Summit Counties had such a personal history
19   of substance abuse disorder?
20       MR. ARBITBLIT:  Object to form.
21   Argumentative.
22       THE WITNESS:  To me what's much
23   more relevant is that they're
24   currently addicted to opioids.  I
25   don't consider their past history to
```

```
 1       inform that problem.
 2       Furthermore, we know that many
 3   people without a past history of
 4   addiction can get addicted to opioids
 5   through a doctor's prescription.
 6   QUESTIONS BY MR. TSAI:
 7       Q.   Okay.  And since your opinion
 8   isn't -- individual's personal history of
 9   substance use disorder is not information
10   that you would need to know, you did not
11   review any such information for any actual
12   individual with opioid use disorder in
13   Cuyahoga and Summit County; am I right?
14       MR. ARBITBLIT:  Object to form.
15   Object to the preface.
16       THE WITNESS:  I did not review
17   any individual patient's history.
18   QUESTIONS BY MR. TSAI:
19       Q.   So based upon your clinical
20   experience, can you walk us through the steps
21   between a person receiving a prescription
22   from a doctor for an opioid medication and
23   the ultimate outcome of going out to a street
24   dealer and seeking illegal, nonprescribed,
25   nonregulated heroin or fentanyl?
```

```
 1       How does that -- how does the
 2   Gateway Effect play out in your mind from
 3   prescription to going out into a street
 4   dealer?
 5       MR. ARBITBLIT:  Object to form.
 6   Vague.  Compound.
 7       THE WITNESS:  An individual
 8   presents in a medical clinic with pain
 9   and is prescribed opioids by that
10   doctor.
11       The doctor has been misled by
12   false promotional statements on the
13   part of defendants to believe that
14   there are benefits to the use of
15   opioids used long term in the
16   treatment of pain, despite the absence
17   of evidence for that.  And that doctor
18   has also been told that the risks are
19   very small for addiction as long as
20   that individual is being prescribed
21   opioids for a pain condition.
22       So that well-intentioned and
23   compassionate doctor, who is trying to
24   do the right thing, will continue that
25   opioid prescription and even increase
```

```
 1       the dose over time as that patient
 2       inevitably develops tolerance.
 3       That doctor, furthermore,
 4       having been misled by the defendants
 5       to believe that no dose is too high,
 6       will continue to escalate that dose
 7       over months to years until that
 8       patient is at dangerously high doses
 9       of opioids and at risk for all kinds
10       of morbidity and mortality, including
11       the risk of addiction.
12       And eventually that individual,
13       who is on very high doses of opioids,
14       has neurologic changes in their brain
15       such that if they -- they begin to
16       experience withdrawal often between
17       doses, so intradose withdrawal.
18       They have the sensation that
19       was validated by their doctor, but
20       which is probably not the case, that
21       the -- they need the opioids to treat
22       their pain when, in fact, taking the
23       opioids is most likely just treating
24       withdrawal from the last dose, but the
25       physiology and the pain of withdrawal
```

```
 1          drives that individual to then become
 2          very preoccupied with their pain, very
 3          preoccupied with the opioids, spending
 4          more and more time at the doctor's
 5          office with pain complaints, reporting
 6          that the opioids are no longer
 7          working, because they don't work in
 8          most cases for chronic pain.
 9               And again, the compassionate
10          doctor, being told that no dose is too
11          high, continues to escalate until that
12          individual is at a very, very high
13          dose, and that individual spends
14          almost all of their time possibly
15          going to the emergency room to try to
16          get more opioids to help with their
17          worsened pain and their withdrawal and
18          their tolerance, to the point that
19          that individual has developed a
20          full-blown opioid addiction within the
21          context of medical care.
22               Now, should it happen that at
23          some point that doctor retires or that
24          doctor gets ill and can't treat that
25          person anymore or that individual
```

```
 1          moves to another region or the doctor
 2          moves to another region and then that
 3          individual can no longer obtain the
 4          opioids through the prescription of
 5          that -- of that doctor, then sometimes
 6          individuals will look to alternative
 7          and illicit sources of opioids.  And
 8          to their mind -- in their mind, they
 9          are treating their pain when they have
10          also developed an opioid use disorder.
11     QUESTIONS BY MR. TSAI:
12          Q.   Do you agree with -- let me
13     know if you agree or disagree with this.
14               When individuals become
15     addicted to an opioid, they remain human
16     beings?
17          A.   Of course I agree with that.
18          Q.   And true or false, an
19     opioid-addicted person is just a mindless
20     zombie?
21               MR. ARBITBLIT:  Object to form.
22               THE WITNESS:  I don't even know
23          how -- that's really offensive, and I
24          don't even know how to respond to
25          that.
```

```
 1     QUESTIONS BY MR. TSAI:
 2          Q.   So you disagree with that
 3     statement?
 4               MR. ARBITBLIT:  Object to form.
 5               THE WITNESS:  I disagree with
 6          that statement.
 7     QUESTIONS BY MR. TSAI:
 8          Q.   So at the end of the day, do
 9     you agree that a person who leaves his or her
10     house, goes to the bad part of town, turns to
11     a street drug dealer to buy illegal heroin
12     has assumed an extraordinary risk?
13               MR. ARBITBLIT:  Object to form.
14               THE WITNESS:  I would
15          respectfully say that I would like to
16          take the time to educate you about the
17          disease of addiction, because I don't
18          think you understand it; that people
19          with addiction lose voluntary control
20          over their ability to choose or not
21          choose to use that substance; that
22          they're driven by an intense
23          physiologic need for the substance due
24          to the neurobiological changes,
25          essentially the brain damage incurred
```

```
 1          by exposure to that substance.
 2     QUESTIONS BY MR. TSAI:
 3          Q.   Do you agree that a person who
 4     leaves his house, goes to the bad part of
 5     town, seeks out a drug dealer and buys
 6     illegal heroin, has decided to break the law?
 7               MR. ARBITBLIT:  Object to form.
 8               THE WITNESS:  No, not at all.
 9          In fact, I don't think there's the
10          capacity for decision-making anymore
11          for that individual.
12               That individual is driven by
13          their disease.  The lying, cheating,
14          stealing and illegal activity that
15          comes with addiction are symptoms of
16          the disease of addiction.
17     QUESTIONS BY MR. TSAI:
18          Q.   So for an individual who has
19     been charged with, say, a heroin-related drug
20     crime, do you believe in your opinion that
21     they have a defense, just to say, "Well, I've
22     received a prescription opioid medication"?
23               MR. ARBITBLIT:  Objection.
24          Calls for a legal conclusion.
25               THE WITNESS:  That's very
```

1         hypothetical.  I would really want to

2         know the details of that specific

3         scenario.

4 QUESTIONS BY MR. TSAI:

5     Q.   Okay.

6     A.   So someone charged with a

7 heroin crime could include a bunch of

8 different types of heroin-related crimes.

9     Q.   Okay.  So you agree that the

10 circumstances matter; the circumstances of an

11 individual's use or abuse of heroin do matter

12 in determining his or her fault?

13         MR. ARBITBLIT:  Object to form.

14         Calls for a legal conclusion.

15         THE WITNESS:  I don't really

16         understand the question.

17 QUESTIONS BY MR. TSAI:

18     Q.   Okay.  Do you believe if a

19 criminal defendant who was charged in

20 Cuyahoga and Summit County with a heroin drug

21 crime took the stand and said, "You know,

22 according to the Gateway theory, I'm really

23 not at fault; it's the prescription drug

24 companies," do you think that that was --

25 that's an acceptable defense?

---

1         MR. ARBITBLIT:  Object to form.

2         Calls for speculation for a legal

3         conclusion.

4         THE WITNESS:  I believe that if

5         that individual has the disease of

6         addiction, it mitigates any fault they

7         might have in some kind of criminal

8         litigation that they're involved in.

9 QUESTIONS BY MR. TSAI:

10     Q.   Okay.  And then the extent of,

11 in your view, the mitigation of their fault,

12 what would it depend on?

13         MR. ARBITBLIT:  Object to form.

14         THE WITNESS:  Well, it would

15         depend on -- I mean, it would -- it

16         would involve many factors.  It would

17         depend on the severity of their

18         disease of addiction.  It would depend

19         on the severity of the crime itself.

20         So there would be lots of

21         mitigating factors.

22 QUESTIONS BY MR. TSAI:

23     Q.   All right.  And for any

24 individuals in Cuyahoga and Summit Counties,

25 have you reviewed information about the

---

1 severity of their opioid-related,

2 heroin-related crimes, fentanyl-related

3 crimes or the degree of their opioid use

4 disorder?

5     A.   Not for specific individuals.

6     Q.   Okay.  So you use the term

7 "intervention" many times in your report.

8     A.   Okay.

9     Q.   Do you agree that there are

10 many points of intervention for someone using

11 prescription opioid medications in terms of

12 catching, monitoring the symptom of addiction

13 after they start using the medication?

14         MR. ARBITBLIT:  Object to form.

15         THE WITNESS:  Who would be the

16         person doing the intervention?

17 QUESTIONS BY MR. TSAI:

18     Q.   Well, let me give you an

19 example.

20         So do you agree that if a

21 person using prescription opioid medications

22 herself notices signs of addiction, craving,

23 for example, she can tell her doctor?

24     A.   I disagree that that would

25 happen in the real world because patients who

---

1 become addicted are commonly unaware of

2 becoming addicted.  That's often the way

3 mental illness works in general, not just for

4 addiction but other mental illnesses as well.

5 Because the diseased organ is the brain, we

6 lose self-awareness and an ability to

7 objectively see ourselves.

8         So in the real world, it would

9 be unusual for a patient to present and say

10 to her doctor, "I'm having craving."

11         Also I would I would argue that

12 that term "craving" is a very loaded term.

13 It's very stigmatized.  It's in the same

14 bucket as the term you used earlier

15 "addicts," and patients would typically not

16 use stigmatizing terms to refer to

17 themselves, especially in a medical context.

18         I would also say that patients

19 who are becoming addicted through a doctor's

20 prescription have a very strong narrative

21 around treating their pain.  So they do not

22 experience craving the way that somebody who

23 self-identifies as addiction might talk about

24 craving.  What they experience is physical

25 pain.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Well, let's talk about someone
2  around a person with opioid use disorder.
3       Do you agree that if a
4  coworker, a parent, a sibling, a friend,
5  other family members notice, they can
6  intervene?
7       MR. ARBITBLIT:  Object to form.
8       THE WITNESS:  When you say
9  "they can intervene," can you give an
10  example of something that they might
11  do?
12  QUESTIONS BY MR. TSAI:
13    Q.   Sure.
14       If they notice signs and
15  symptoms of opioid addiction, can they --
16  you'd agree they can go to the person taking
17  the opioids and say, "I think you have a
18  problem, we should do something about it"?
19    A.   Yes, they could do that.
20    Q.   You've seen that happen?
21    A.   Yes, I have.
22    Q.   Okay.  And in your report, this
23  is on page 95, you say, "Addiction treatment
24  should be offered within every hospital,
25  clinic, emergency room, jail and drug court,

Highly Confidential - Subject to Further Confidentiality Review

1  et cetera, across America.  Meeting patients
2  where they are has become a mantra for the
3  field."
4       So do you agree that in the
5  lifecycle of opioid use disorder, there are
6  many meetings points, many touch points,
7  where opioid use disorder can be noticed, can
8  be caught and can be treated?
9       MR. ARBITBLIT:  Object to form.
10       THE WITNESS:  As applies to
11  this case of the opioid epidemic, I
12  think it has been and continues to be
13  extremely difficult to intervene,
14  especially in the context of the
15  patient with pain being prescribed
16  opioids by a compassionate doctor and
17  a misinformed doctor to treat their
18  pain.
19       Because even as the disease of
20  addiction evolves in that context, the
21  patient doesn't recognize that he or
22  she is becoming addicted, and the
23  doctor who has been miseducated due to
24  false promotions on the part of
25  defendants doesn't appreciate that

Highly Confidential - Subject to Further Confidentiality Review

1  patients are at high risk for
2  addiction, even in the context of
3  being treated for their pain.
4       So it makes it extremely
5  difficult to intervene in that context
6  compared to, for example, if that
7  person is using heroin that they got
8  on the street corner.
9  QUESTIONS BY MR. TSAI:
10    Q.   Is one important factor in the
11  extent or the rate of opioid use disorder the
12  number of times folks you, know, family,
13  friends, doctors, nurses, try to or do
14  intervene to bring the person into treatment?
15       MR. ARBITBLIT:  Object to form.
16       THE WITNESS:  I don't
17  understand your question.
18  QUESTIONS BY MR. TSAI:
19    Q.   Is that an important factor --
20       MR. ARBITBLIT:  Objection.
21  QUESTIONS BY MR. TSAI:
22    Q.   -- the number of times that
23  people try to intervene to stop or to treat
24  the progression into opioid use disorder?
25       MR. ARBITBLIT:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1       THE WITNESS:  An important
2  factor for what?
3  QUESTIONS BY MR. TSAI:
4    Q.   For the rate of ultimate opioid
5  use disorder or the --
6       MR. ARBITBLIT:  Object to form.
7  Incomplete hypothetical.
8       THE WITNESS:  I guess I'm
9  not -- I'm still not understanding the
10  question.  I'm sorry.
11  QUESTIONS BY MR. TSAI:
12    Q.   Well, do you agree that there
13  are many touch points where intervention
14  could have an effect on someone with opioid
15  use disorder?
16       MR. ARBITBLIT:  Object to form.
17       THE WITNESS:  I'm always
18  hopeful that there are points where we
19  could intervene and help a person with
20  opioid use disorder.  That's -- my
21  entire professional life is dedicated
22  toward helping people with addiction.
23       (Lembke Exhibit 3 marked for
24  identification.)
25

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. TSAI:
2        Q.    So if we could get Tab 5, and
3    this will be Exhibit 3.  This is the Edlund
4    study.  I would like to ask you a few
5    questions about that.
6            So just turning your attention
7    to page 5 of the Edlund study?
8        A.    Oh, page 5?  Okay.
9        Q.    This is one of the articles
10   that you cite in your report, correct?
11       A.    Yes.
12       Q.    Okay.  If you look under
13   Results, the first paragraph, and then the
14   third sentence I'll read.
15            It says, "When opioids were
16   prescribed, low dose/acute use, 15.9 percent
17   of total sample, and medium dose/acute use,
18   14.7 of total sample, were by far the most
19   common types of opioid use, and high
20   dose/chronic use was the least common,
21   0.1 percent of the total sample."
22            Do you see that?
23       A.    Yes, I do.
24       Q.    Okay.  Any reason to disagree
25   with that finding?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    No.
2        Q.    And then if you look at the
3    next paragraph, the last sentence, they
4    actually break that down and translate that
5    into actual individuals that were part of the
6    study.
7            So am I reading this right that
8    out of the 568,640 persons in this study
9    sample, only 23 used opioids in high doses
10   for more than 91 days?
11           MR. ARBITBLIT:  Misstates the
12       record.
13           You're just reading it wrong,
14       Counsel.
15           THE WITNESS:  It says 23 out of
16       378 are high dose.
17   QUESTIONS BY MR. TSAI:
18       Q.    So counting the number of
19   individuals in the sample who were in the
20   high dose/chronic subset, that's 23; am I
21   reading that right?
22           MR. ARBITBLIT:  That's the
23       number with opioid use disorder,
24       Counsel, not the number who used it.
25

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. TSAI:
2        Q.    Oh, so it's even smaller.  So
3    23 is the number of persons studied in the
4    sample in the high dose/chronic subset who
5    were found to have opioid use disorder.
6            Am I reading that right?
7        A.    That's right, yes.
8        Q.    Okay.
9            MR. TSAI:  So can we get Tab 6,
10       please?
11           (Lembke Exhibit 4 marked for
12       identification.)
13   QUESTIONS BY MR. TSAI:
14       Q.    So exhibit next in order --
15           MR. ARBITBLIT:  Before you move
16       on, Counsel, for completeness, the
17       odds ratio for those in that category
18       was 122.45, reading from page 5, the
19       last sentence at the bottom paragraph,
20       "For high dose/chronic odds ratio
21       equals 122.45, 95 percent confidence
22       interval, 72.79 to 205.99, P value,
23       0.001."
24           MR. TSAI:  For the record, I
25       object to counsel's testimony.  Again,

Highly Confidential - Subject to Further Confidentiality Review

1    this is taking up time.  It's
2    inappropriate.
3            MR. ARBITBLIT:  It's not
4    inappropriate.  It's allowed under
5    Rule 106.  Read it and tell me if you
6    disagree after you've read it.
7            MR. TSAI:  I think it's not
8    allowed under the deposition protocol,
9    and I'll reserve rights.  This is the
10   second time it's happened, so...
11   QUESTIONS BY MR. TSAI:
12       Q.    So exhibit next in order is the
13   National Academy of Sciences Engineering and
14   Medicine study that you cited in your report.
15           You refer to it as the NASEM?
16       A.    Uh-huh.
17       Q.    Or NASEM study?
18       A.    Yes.
19       Q.    All right.  This is a big
20   report, but I can -- we'll certainly focus
21   you on a particular page, which is -- if you
22   could turn to page -- it's Bates stamped
23   MDL_EXP_0003335.  It's internal page 210 if
24   that makes it easier.
25           MR. ARBITBLIT:  Are you giving

```
 1        copies?
 2            THE WITNESS:  33 --
 3    QUESTIONS BY MR. TSAI:
 4        Q.    Yeah, it's probably easier to
 5    go to the internal page number, which is 210,
 6    which is on the top, and the Bates number on
 7    the bottom is 3335.
 8        A.    Yeah.
 9            Okay.
10        Q.    So if you could look at the
11    last paragraph on that page, I'll read it.
12    It says, "It is important to acknowledge that
13    an overwhelming majority of people who use
14    prescription opioids do not continue to use
15    them chronically," and it has a citation to
16    Shah, et al., 2017, "and so are not at risk
17    of switching to heroin."
18            Do you see that?
19        A.    Uh-huh.
20        Q.    Do you have any basis to
21    disagree with that statement?
22            Well, first of all, do you
23    agree with that statement?
24        A.    I guess I would be curious to
25    know what they -- how they quantified or
```

```
 1    defined "overwhelming majority."
 2        Q.    Did you undertake any
 3    quantitative analysis of the data underlying
 4    this NASEM study that you've cited?
 5        A.    Give me a moment.
 6            So according to Mojtabai, et
 7    al., which is in my report on page 11, I'll
 8    read, quote, "Of all opioid users in 2013 and
 9    2014, 79.4 percent were long-term users
10    compared with 45.1 percent in 1999 to 2000."
11            And then I go on to say in my
12    own words, "The increase in long-term use is
13    important because increased duration of use
14    is also directly correlated with risk of
15    addiction," at which point I cite the Edlund
16    study, which you've given me here.
17        Q.    Okay.  Have you reviewed any of
18    the data or conducted any of your own
19    analysis of the information that underlies
20    the NASEM conclusion that the overwhelming
21    majority of people who use prescription
22    opioids do not continue to use them
23    chronically and so are not at risk of
24    switching --
25        A.    Based on --
```

```
 1        Q.    -- to using heroin?
 2        A.    Yeah.  Based on my review of
 3    the literature, I would disagree with that
 4    statement, and I cited one article for you
 5    that's in my report.  So I disagree with that
 6    statement.
 7        Q.    And do you have a basis based
 8    upon what the authors of the -- what the
 9    National Academy of Sciences Engineering and
10    Medicine in 2017 base their conclusion on?
11            MR. ARBITBLIT:  Objection.
12        Speculation.
13            THE WITNESS:  I did not
14        exhaustively review which articles
15        they reviewed to form this conclusion,
16        but I have read over 400 articles in
17        forming my opinion, and my opinion
18        disagrees with that statement there.
19    QUESTIONS BY MR. TSAI:
20        Q.    So you -- it's fair to say that
21    the National Academy of Sciences and
22    Engineering and Medicine, their view of the
23    Gate -- what you call the Gateway phenomenon
24    is that the minority of people using
25    prescription opioids are at risk of switching
```

```
 1    over to illegal street heroin?
 2        A.    As I've stated in my report, I
 3    believe that somewhere between 8 and
 4    40 percent of individuals who are prescribed
 5    an opioid for a medical condition go on to
 6    develop an opioid use disorder.
 7            That opioid use disorder may
 8    include individuals who continue with the
 9    prescription opioid and individuals who
10    switched to heroin.
11            So, again, over --
12    quote/unquote "overwhelming majority," no, I
13    would -- I guess I would want to review that
14    Shah article and read it in more depth.
15            MR. TSAI:  Tab 7, please.
16            (Lembke Exhibit 5 marked for
17        identification.)
18    QUESTIONS BY MR. TSAI:
19        Q.    So next exhibit in order is the
20    Muhuri article that you cite in your report.
21    I would like to ask you a few questions about
22    that.
23            So if you could turn to the
24    first page of the Muhuri article that's been
25    handed to you, and I first want to ask
```

Highly Confidential - Subject to Further Confidentiality Review

1    about -- turn your attention to the abstract.
2         Do you see the abstract in the
3    black box on page 1?
4    A.    Yes, I do.  I'm just trying to
5    find it in my report.
6    Q.    It's on page 85 --
7    A.    Great.  Thank you.
8    Q.    -- of your report.
9         So I'll just read this
10   conclusion of the authors of the Muhuri
11   article that you cite.  They state, "However
12   the vast majority of NMPR users have not
13   progressed to heroin use.  Only 3.6 percent
14   of NMPR initiates had initiated heroin use
15   within the five-year period following first
16   NMPR use."
17        Do you see that?
18   A.    Yes, I do.
19   Q.    And what is NM -- NMPR is
20   nonmedical pain relief?
21   A.    Reliever.
22   Q.    Reliever?
23   A.    Yeah.
24   Q.    Okay.  So just focusing on
25   individuals who had used the opioid

Highly Confidential - Subject to Further Confidentiality Review

1    medications they were prescribed for
2    nonmedical reasons such as getting a high,
3    the majority of folks who used prescription
4    opioids nonmedically were found not to
5    progress to heroin use.
6         Is that -- am I reading that
7    finding correctly?
8         MR. ARBITBLIT:  Object to form.
9         THE WITNESS:  Yes.
10   QUESTIONS BY MR. TSAI:
11   Q.    Okay.  And do you agree with
12   this finding?
13        MR. ARBITBLIT:  Object to form.
14        THE WITNESS:  Yes, I do with
15   this finding, but I think one of the
16   major points of the Muhuri article are
17   that 80 percent of persons who began
18   using heroin started with a
19   prescription opioid.
20        Also, I would say that
21   although --
22   QUESTIONS BY MR. TSAI:
23   Q.    And that 80 percent figure --
24        MR. ARBITBLIT:  Let her finish.
25   Don't interrupt.  Part of the

Highly Confidential - Subject to Further Confidentiality Review

1         protocol.
2         THE WITNESS:  It's okay.
3    QUESTIONS BY MR. TSAI:
4    Q.    Great.
5         So the 80 percent figure, this
6    is on page 85 of your report, those are
7    persons, individuals, who had used
8    prescription opioids nonmedically before
9    initiating illegal heroin use, correct?
10   A.    Yes, but I object to your
11   example, if I'm allowed to object, or --
12   Q.    You're not allowed to object.
13   A.    Oh, I'm not allowed to?
14        MR. ARBITBLIT:  She's allowed
15   to finish her answer.
16        MR. TSAI:  The lawyers are --
17        MR. ARBITBLIT:  She's allowed
18   to finish her answer.
19        THE WITNESS:  Yes.  So every
20   time you've mentioned nonmedical use
21   of prescription opioids, you've used
22   as the example to get high, and I
23   would say that the vast -- or a large
24   percentage, in my experience and based
25   on my research, are not, in fact,

Highly Confidential - Subject to Further Confidentiality Review

1         using the prescription opioid to get
2         high.
3         There are many forms of misuse,
4         for example, taking more than a doctor
5         prescribed in order to relieve pain.
6         So I just wanted to say that.
7    QUESTIONS BY MR. TSAI:
8    Q.    If you could then turn to
9    page 14 of the Muhuri article, and that's the
10   internal page 14 of 15.  The Bates number at
11   the bottom is -- ends in 6042.
12        And do you see the section
13   called "Discussion" on that page?
14   A.    Yes.
15   Q.    Okay.  So if you go down to the
16   third from the last sentence, I'll read it.
17   "Although the findings indicate that NMPR
18   use," again, that's nonmedical pain reliever
19   use, "is a common step on the pathway to
20   heroin initiation, most NMPR users do not
21   progress to heroin use."
22        Do you see that?
23   A.    Yes.
24   Q.    Okay.  And do you have any
25   basis to disagree with that finding?

```
1        A.     No.
2        Q.     And they use the term it's "a
3  common step on the pathway to heroin use."
4               What are the other steps on the
5  pathway to heroin initiation, other than
6  beginning with opioid -- prescription
7  opioids?
8        A.     Well, I would say that this
9  specifically speaks to nonmedical use of
10 prescription opioids, and I think medical use
11 of prescription opioids is also a common
12 pathway to heroin addiction.
13              So there are many people who
14 take their opioids just as prescribed and get
15 addicted in that process.
16       Q.     Any other pathways to heroin
17 addiction?
18       A.     Yes.  There are people who
19 obtain heroin as their first opioid, but it's
20 much less common than folks who start with a
21 prescription opioid.
22       Q.     So am I stating this conclusion
23 correctly, that the finding of the Muhuri
24 article that you cite is that the majority of
25 prescription opioid nonmedical users actually
```

```
1  do not walk through the gateway to illegal
2  heroin?
3               MR. ARBITBLIT:  Object to form.
4  QUESTIONS BY MR. TSAI:
5        Q.     They turn away or otherwise
6  take another path?
7        A.     That is what it says here, yes.
8        Q.     Okay.  So then going back to
9  page 1, the first page of the Muhuri article,
10 in the introduction section, if you look down
11 to the second paragraph, the authors observe
12 that this progression from opioid --
13 prescription opioid medications to illegal
14 heroin may result simply because heroin may
15 be cheaper or easier for them to get in some
16 locations.
17              Do you see that?
18       A.     Is that here on this first
19 page?
20       Q.     Yeah.  It's the first page --
21 I'm sorry, I have a different -- right.
22 Sorry.
23              It is the second page of your
24 exhibit.  The Bates number ends in 6028, and
25 it's the first full paragraph on that page.
```

```
1  It says, "This progression may result simply
2  because heroin may be cheaper or easier for
3  them to get in some locations."
4               Do you see that?
5        A.     Yes.
6        Q.     Okay.  Do you have any -- did
7  you review any information or do any analysis
8  to determine whether this reason for switched
9  to illegal heroin, that it's cheaper or
10 easier to get, whether that applied --
11 applies in Cuyahoga or in Summit Counties?
12       A.     No.
13       Q.     Okay.
14              MR. TSAI:  Could we get Tab 8,
15 please?
16              MR. ARBITBLIT:  Okay.  Counsel,
17 I don't want to have a disagreement
18 with you about this, but I don't see
19 in our summary of the protocol
20 anything that would overrule Federal
21 Rule 106.
22              If you have something that you
23 think prevents from me reading for the
24 Rule of Completeness, I would like to
25 know specifically what it is.
```

```
1               I don't want to do this to
2  cause animosity.  I do think, based on
3  my own experience and the rule itself,
4  that anything that in fairness should
5  be read with the same document as
6  you've brought in to evidence should
7  be read, and that's what the Rule of
8  Completeness, Federal Rule 106 says.
9               If you have something that you
10 think specifically overrules that rule
11 in our deposition protocol, please let
12 me know what it is.  Otherwise, I'm
13 going to do it again, and I don't want
14 to do it again and have a fight with
15 you.  That's not my purpose.
16              MR. TSAI:  We have a limited
17 time on the record.  Suffice it to
18 say, I disagree.
19              MR. ARBITBLIT:  You can
20 disagree, and you can reserve your
21 rights, but I'm just going to read one
22 sentence from the same Muhuri article
23 that says, "There are many plausible
24 explanations for this finding,
25 including the Gateway theory of drug
```

Highly Confidential - Subject to Further Confidentiality Review

1    use, that posits that the use of some
2    drugs may expose individuals to a
3    repertoire of biological and
4    behavioral factors that could
5    influence their future use of other
6    drugs."
7            And that's at MDL_EXP_0006043,
8    and you can reserve whatever rights
9    you feel you have.  But I'm trying to
10   do this expeditiously.  I think I've
11   taken up a total of about two minutes
12   of your time.
13           MR. TSAI:  And not only do I
14   reserve rights, I very much object to
15   counsel's eating up the time on the
16   record with his testimony and
17   colloquy, which is prohibited under
18   the deposition protocol expressly, so
19   I want to move on.
20           Can we get Tab 8, please?
21           (Lembke Exhibit 6 marked for
22   identification.)
23   QUESTIONS BY MR. TSAI:
24   Q.      So I want to talk about the
25   Compton article that you cite in your report.

Highly Confidential - Subject to Further Confidentiality Review

1    This will be exhibit next in order.
2            MR. TSAI:  Let's get that
3    tabbed with the exhibit number.
4    QUESTIONS BY MR. TSAI:
5    Q.      So if you could turn to
6    page 160 of the Compton article.  This is a
7    New England Journal of Medicine article that
8    you've cited in your report.  And then do you
9    see under the right-hand column the section
10   "Conclusions"?
11   A.      Yeah.
12   Q.      The second sentence, I'll read
13   it.  The authors says, "Yet although the
14   majority of current heroin users report
15   having used prescription opioids nonmedically
16   before they initiated heroin use, heroin use
17   among people who use prescription opioids for
18   nonmedical reasons is rare, and the
19   transition to heroin use appears to occur at
20   a low rate."
21           Do you see that?
22   A.      Uh-huh, I do.
23   Q.      Do you have any reason to
24   disagree with this finding in the New England
25   Journal of Medicine?

Highly Confidential - Subject to Further Confidentiality Review

1    A.      I don't.
2    Q.      Okay.  So there was an
3    interesting statement that caught my eye in
4    your report.  It was page 58.  You say,
5    "Contrary to what defendants claimed, opioid
6    painkillers are as addictive as heroin
7    purchased on a street corner, even when being
8    prescribed by a doctor for a legitimate pain
9    condition because the prescription opioids
10   have the same addictive effects on the
11   neurocircuitry of the brain."
12           Do you recall that?
13   A.      Yes.
14   Q.      The equivalent statement that
15   you made, I just want to test the boundaries
16   of that statement.
17           Do you agree that illegal
18   street heroin or fentanyl, for that matter,
19   is not clinically tested by the US FDA?
20           MR. ARBITBLIT:  Object to form.
21           THE WITNESS:  Well, fentanyl is
22   available in prescription form, so I
23   guess, what do you mean by "clinically
24   tested"?
25

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. TSAI:
2    Q.      I'm talking about illegal
3    street heroin where you go out to the corner
4    drug dealer and get illegal fentanyl that has
5    been synthetically manufactured by the
6    criminal gang in China, let's say.
7            Illegal street heroin and
8    fentanyl, they are not clinically tested by
9    the FDA, unlike prescription opioid
10   medications, correct?
11   A.      That's correct, but can I --
12   fine, uh-huh.
13   Q.      Do you agree that illegal
14   street heroin or illegal street fentanyl sold
15   by drug dealers on the street is not approved
16   by the FDA?  It's not approved by the
17   government?
18   A.      I would say that both of those
19   molecules, both heroin and fentanyl -- well,
20   fentanyl -- a form of fentanyl is approved by
21   the FDA and prescribed, and heroin is just
22   morphine with two acetyl groups added.
23           So the point I was trying to
24   make in my report is that when you consider
25   the way that these prescription opioids act

1  on the brain compared to illicit opioids,
2  you're dealing with identical substances, and
3  that was the point that I was trying to make
4  with that statement.
5      Q.    But if we're not just talking
6  about organic chemistry or pharmacology, you
7  agree that it's a very different context --
8  illegal street heroin or fentanyl is not
9  manufactured in a government-approved,
10 government-audited and inspected facility,
11 agree?
12          MR. ARBITBLIT:  Object to form.
13     Compound.
14          THE WITNESS:  Street heroin or
15     let's say street fentanyl could, in
16     fact, include versions of fentanyl
17     that have been FDA approved, if they
18     were diverted from that -- from a
19     legitimate source.
20 QUESTIONS BY MR. TSAI:
21     Q.    And when you say "diverted,"
22 that means someone along the chain that -- it
23 gets into the hands of a drug dealer on the
24 street has committed a crime?
25     A.    Yes.

---

1      Q.    Okay.  And illegal street
2  heroin and fentanyl, it may be adulterated in
3  who knows what ways by the dealer, correct?
4          MR. ARBITBLIT:  Object to form.
5          THE WITNESS:  Yes, that's true.
6  QUESTIONS BY MR. TSAI:
7      Q.    And when someone goes out into
8  the street, goes to a dealer and pays for
9  illegal street heroin or fentanyl, what they
10 get is not accompanied by a detailed warning
11 label or information about the risks and
12 benefits, correct, of that substance?
13     A.    Yes, but that individual may
14 believe that they understand the risks and
15 benefits, for example, of fentanyl because
16 they have received it with a prescription.
17 And so they may come with that assumption to
18 the use of that illicit substance, you
19 know -- they're not just diverted pills but
20 also counterfeit pills.
21          So we have a whole population
22 of individuals who have received opioids
23 through a medical prescription who think that
24 they understand the effect of that opioid on
25 their body, and then if they get an

---

1  adulterated version of that on the street,
2  that puts them at very high risk as a result
3  of their having received it with a medical
4  prescription.
5      Q.    And have you reviewed any
6  information or have any basis to say that
7  that scenario that you've just outlined
8  occurred with any specific individual in
9  Cuyahoga or Summit County?
10     A.    No, but that situation is
11 occurring nationally, and I believe that
12 Summit and Cuyahoga County have not been
13 excluded from that phenomenon.
14     Q.    Okay.  And when someone goes
15 out and buys illegal street heroin or
16 fentanyl on the street, that's not prescribed
17 by a doctor, not monitored by a health care
18 provider, agree?
19     A.    I agree.
20     Q.    Okay.  So in all those ways,
21 you agree that prescription opioid
22 medications are not equivalent to street
23 heroin or street fentanyl, agree?
24     A.    Yes.
25     Q.    Okay.  And I just want to

---

1  explore your reasoning a little bit more.
2          If prescription opioids and
3  heroin are essentially equivalent in terms of
4  strength and potency at a cellular level,
5  that means that people who start on
6  prescription opioids and then turn to heroin,
7  they're not doing that in order to get a
8  stronger high; is that correct?
9          If they're equal in potency; is
10 that correct?
11          MR. ARBITBLIT:  Object to form.
12          THE WITNESS:  It would really
13     depend on the particular individual.
14     I would say that there are instances
15     in which that individual is not
16     looking for a stronger opioid but just
17     looking for an opioid to keep them
18     from going into painful withdrawal
19     when they can no longer get their
20     prescription opioid as their prior
21     source.
22          But it's also true that in the
23     natural disease of addiction involves
24     seeking out more potent forms over
25     time, and that's not to get high.

```
 1          That's to essentially avoid the
 2      debilitating pain of withdrawal.
 3          So again, I mean, you've
 4      characterized this phenomenon
 5      repeatedly as individuals going out to
 6      get high as if this is some kind of
 7      game or pleasure-seeking for them.
 8          These individuals have a
 9      disease of addiction, and it's not fun
10      for them.  They're trying to stave off
11      the pain of withdrawal.
12  QUESTIONS BY MR. TSAI:
13      Q.    It is a big step to go out and
14  take the risks of obtaining unregulated,
15  illegal street heroin and fentanyl, correct?
16          MR. ARBITBLIT:  Object to form.
17          THE WITNESS:  It is a big step,
18      and it speaks to the severity of their
19      suffering, that they're willing to
20      take that step.
21  QUESTIONS BY MR. TSAI:
22      Q.    And in determining how and
23  whether the Gateway Effect applies in a
24  particular individual who takes that step, it
25  does depend on the individual circumstances,
```

```
 1  you agree?
 2          MR. ARBITBLIT:  Object to form.
 3          THE WITNESS:  What do you mean?
 4  QUESTIONS BY MR. TSAI:
 5      Q.    It depends on the severity of
 6  their particular condition?
 7          MR. ARBITBLIT:  Object to form.
 8          THE WITNESS:  There would be so
 9      many variables involved in that.
10  QUESTIONS BY MR. TSAI:
11      Q.    So if prescription opioids and
12  illegal heroin in your view are equal in
13  cellular potency and strength, then am I
14  right that what would trigger what you call
15  the Gateway Effect is the limitation, some
16  limitation, in the availability of
17  prescription opioids?
18      A.    No.
19      Q.    Okay.  So is that one reason?
20  Is that one, say, pathway that accounts for
21  the Gateway Effect?
22      A.    The limitation of prescription
23  opioids?
24      Q.    Yes.
25      A.    That is theoretically possible,
```

```
 1  and anecdotally people have reported that,
 2  but I don't think there's a lot of data yet
 3  to show that that's the case.
 4          So, for example, in states
 5  where limits have been set on opioid
 6  prescribing, the result in those states has
 7  been actually a decrease in opioid --
 8  prescription opioid-related overdose deaths.
 9          There's some question as to
10  whether in those states there may be an
11  increase in heroin-related overdose deaths
12  because individuals can no longer get their
13  prescription opioids, but I think that the
14  jury is still out on exactly what that
15  pathway is.
16      Q.    Okay.  So you can't offer a
17  conclusive opinion as to reliably rule out
18  that that is a common pathway that accounts
19  for the Gateway Effect, that being the
20  limitation of availability of prescription
21  opioids from a doctor?
22          MR. ARBITBLIT:  Object to form.
23  QUESTIONS BY MR. TSAI:
24      Q.    Correct?
25          MR. ARBITBLIT:  Object to form.
```

```
 1          THE WITNESS:  I guess I would
 2      say I would need to know the specifics
 3      of the case.
 4  QUESTIONS BY MR. TSAI:
 5      Q.    Okay.
 6          MR. ARBITBLIT:  If you're ready
 7      to move on, we've been going over an
 8      hour, but if you're on same topic,
 9      please complete what you're going
10      through.
11          MR. TSAI:  So if I could -- can
12      we do Tab 2?
13          (Lembke Exhibit 7 marked for
14      identification.)
15  QUESTIONS BY MR. TSAI:
16      Q.    So I'll come back to this, this
17  is your book --
18      A.    Yes.
19      Q.    "Drug Dealer MD."  This is
20  exhibit next in order.
21          And I wanted to ask you if you
22  could turn to -- it is internal page 109.
23  And I'll also give you the Bates number.  The
24  Bates number ends in 5643.
25          So if you look above the
```

```
 1   heading "opioid refugees," there's a
 2   paragraph there, and let me just read,
 3   starting with the second to the last
 4   sentence.
 5             "However, the relationship
 6   between doctors' prescribing patterns and the
 7   initiation of heroin use remains unclear."
 8             Do you see that?
 9        A.   Uh-hmm.
10        Q.   Is that still your opinion?
11        A.   So, that was my opinion when I
12   wrote this because there was insufficient
13   evidence, but actually, where is that on
14   here?  Because, you know, I completed this in
15   2014, and it takes two years until it
16   actually comes out.
17             And at the time that I wrote
18   this, I believed that -- what I was
19   specifically referring to there was whether
20   or not limits on opioid prescribing would
21   drive people to heroin use.  So that's what I
22   meant with that statement.
23        Q.   And are you -- is it still your
24   position that it is -- you can't offer a
25   conclusive opinion on that question?
```

```
 1             MR. ARBITBLIT:  Object to form.
 2   QUESTIONS BY MR. TSAI:
 3        Q.   That relationship?
 4        A.   I think that now I would say
 5   that my opinion has changed vis-à-vis this
 6   particular statement in the sense that this
 7   is a very general statement, that "the
 8   relationship between doctors' prescribing
 9   patterns and the initiation of heroin use
10   remains unclear" because there's not a wealth
11   of evidence I've reviewed showing there's a
12   clear link between receiving an opioid
13   prescription with a doctor and being at
14   higher risk for progressing to heroin use.
15        Q.   And does that evidence include
16   the studies that we went over just now, the
17   NASEM, the Muhuri, the Compton?
18        A.   Yes.
19        Q.   Okay.  So going back to
20   Compton -- do you have that article, the
21   Compton article?
22        A.   Yeah.
23        Q.   If you could turn to page 156
24   of that article.
25             So in the left-hand column it's
```

```
 1   above that heading "Break."  The heading
 2   says, "Heroin use among people who use
 3   prescription opioids nonmedically."
 4             The sentence right before that,
 5   I'll read it, it says, "Finally, these
 6   differential properties and effects are
 7   likely to interact with interindividual
 8   variability in powerful complex and in
 9   completely predictable ways so that some
10   persons who abuse prescription opioids could
11   find heroin less rewarding than prescription
12   opioids similarly rewarding or even more
13   rewarding."
14             Do you see that?
15        A.   Yes, I do.
16        Q.   And do you agree with that
17   statement?
18        A.   I do.
19        Q.   All right.  For any individuals
20   in Cuyahoga and Summit Counties with opioid
21   use disorder, did you review any information
22   or have any other basis to say whether their,
23   as the New England Journal of Medicine put
24   it, individual variability was such that they
25   found heroin less similarly or more rewarding
```

```
 1   than prescription opioids?
 2        A.   I did not review individual
 3   cases.
 4        Q.   Okay.  And if we could turn to
 5   the next page, 157, of the Compton article,
 6   and the right-hand column, there they give
 7   statistics that compare heroin use to use of
 8   other substances.
 9             So am I reading this correctly,
10   that heroin use over the period that was
11   studied in the -- in this NEJM article also
12   increased upon nonmedical users of
13   stimulants?
14        A.   Yes, you're reading it
15   correctly.
16        Q.   And what are examples of
17   stimulants?
18        A.   Stimulants -- nicotine is a
19   stimulant.  Methamphetamine is a stimulant.
20   Cocaine is a stimulant.
21        Q.   And during the same time
22   period, heroin use also increased among users
23   of tranquilizers, sedatives, cocaine,
24   marijuana and alcohol, correct?
25        A.   Yes.
```

```
1        Q.    Okay.  And the next page, 158,
2   if you look at this first full paragraph, the
3   first sentence, the authors conclude that, "A
4   key factor underlying the recent increases in
5   rates of heroin use and overdose may be the
6   low cost and high purity of heroin."
7             Do you see that?
8        A.    I do.
9        Q.    And so am I reading that
10  correctly that the finding is that for --
11  when some persons who abuse prescription
12  opioids then subsequently initiate heroin
13  use, the cost and availability of heroin on
14  the street are primary factors in that
15  process?
16       A.    To me that statement needs to
17  be put in the larger context of increased
18  exposure to heroin through a medical
19  prescription and subsequent development of
20  opioid addiction to medical heroin --
21  medical opioids, that then put all of those
22  individuals at increased risk to progress to
23  heroin use.
24            So I think that that statement,
25  as I read their intention, is that in the
```

```
1   broader context of the Tsunami Effect and the
2   Gateway Effect, that then these price points
3   will impact what opioid people will use after
4   they've already become addicted.
5        Q.    Do you have any basis to
6   disagree with the statement that when some
7   persons who abuse prescription opioids
8   initiate heroin use, it is cost and
9   availability of heroin that are primary
10  factors in this process, that specific
11  conclusion?
12       A.    Where is that statement?  Is
13  that something else you're reading, or is
14  that just your summary of --
15       Q.    It is right at the bottom of
16  that same page you're looking at.
17       A.    Okay.
18       Q.    And it says, "Multiple studies
19  have examined why some persons who abuse" --
20  "multiple studies that have examined why some
21  persons who abuse prescription opioids
22  initiate heroin use indicate that the cost
23  and availability of heroin were primary
24  factors in this process."
25            Do you see that sentence?
```

```
1        A.    Uh-huh.
2        Q.    Do you have any basis to
3   disagree with those studies or that
4   conclusion?
5        A.    I don't, except that I would
6   add that the appetite for opioids generally
7   in the population began with increased
8   exposure to opioids through medical
9   prescribing.
10       Q.    Okay.
11       A.    And that was more of a factor
12  than later price points.  That's my opinion.
13       Q.    Well, if you look up one
14  paragraph above that, it's above the heading
15  "Break" on page 158, the New England Journal
16  of Medicine concludes, and I'll read it, "In
17  the context of marked increases in the rate
18  of heroin use, it is important to note that
19  only a small percentage of nonmedical users
20  of prescription opioids initiate heroin use."
21            Do you see that?
22       A.    Uh-huh.
23       Q.    And they go on to cite the
24  Muhuri study that we discussed that found a
25  rate of 3.6 percent of nonmedical
```

```
1   prescription opioid users that then turn to
2   heroin use.
3             Do you see that?
4        A.    Uh-huh.
5        Q.    And they also cite the Jones
6   study, which has a similarly low number,
7   4.2 percent, of persons who had used
8   prescription opioids nonmedically then turn
9   to heroin use.
10            Do you see that?
11       A.    (No response.)
12       Q.    And do you have any basis to
13  disagree with those data?
14       A.    I'm not disagreeing with those
15  data, but I think it would be important to
16  look at actual numbers, not just percentages,
17  because when looking at actual numbers of
18  people who are using opioids nonmedically who
19  progress to heroin use, it gets to be very
20  high numbers.
21       Q.    Okay.  And Compton talks about
22  the aggregate big picture.  So at the very
23  bottom of that same paragraph, the NEJM
24  article states, "Yet taken in total, the
25  available data suggests that nonmedical
```

```
1    prescription opioid use is neither necessary
2    nor sufficient for the initiation of heroin
3    use and that other factors are contributing
4    to the increase in the rate of heroin use and
5    related mortality."
6              Do you agree with that
7    statement?
8              MR. ARBITBLIT:  Object to form.
9              THE WITNESS:  I would say that
10        I agree that it's neither necessary
11        nor sufficient, but it has been a huge
12        factor in the last two decades, three
13        decades, among individuals who use
14        heroin as evidenced by survey studies
15        showing that 80 percent of people who
16        use heroin began with a prescription
17        opioid.
18   QUESTIONS BY MR. TSAI:
19        Q.    And they use that nonmedically,
20   that figure?
21             MR. ARBITBLIT:  Object to form.
22   QUESTIONS BY MR. TSAI:
23        Q.    Correct?
24        A.    Let me look at that.
25             My reading of that article is
```

```
1    that it wasn't just individuals who had used
2    prescription opioids nonmedically.  It was --
3    also included individuals who had received an
4    opioid through a medical prescription.
5         Q.    And if that was the case, that
6    is what you would have stated in your report,
7    if it encompassed both medical use,
8    appropriate medical use, and nonmedical use?
9              MR. ARBITBLIT:  Object to form.
10             THE WITNESS:  Give me a moment.
11        Let me find it in my report.
12             MR. TSAI:  Can we go off the
13        record while the witness is looking
14        through?
15             VIDEOGRAPHER:  Okay.  Should
16        we?
17             MR. ARBITBLIT:  Yes.
18             VIDEOGRAPHER:  We're now going
19        off the record, and the time is
20        10:47 a.m.
21        (Off the record at 10:47 a.m.)
22             VIDEOGRAPHER:  We are now going
23        back on the record, and the time is
24        10:49 a.m.
25
```

```
1    QUESTIONS BY MR. TSAI:
2         Q.    So we talked about necessary
3    and sufficient in the Compton article.
4              So am I right that not
5    sufficient -- "nonmedical prescription opioid
6    use is not sufficient for the initiation of
7    heroin use."
8              What that means is that not
9    every person who engages in nonmedical
10   prescription opioid use turns or -- turns to
11   or becomes addicted to illegal heroin.
12             That's what "not sufficient"
13   means, agree?
14        A.    Yes, I agree.
15        Q.    And "not necessary," in this
16   context of this finding, means that
17   individuals who become -- who develop an
18   addiction to or overdose from illegal heroin
19   can and are driven to heroin due to reasons
20   that are different from prior use of
21   prescription opioids, agree?
22             MR. ARBITBLIT:  Object to form.
23             THE WITNESS:  Let me read the
24        last part of this.
25             When you say "are driven to
```

```
1         heroin use due to reasons that are
2         different from prior use of
3         prescription opioids," can you explain
4         that, what you mean by that?
5    QUESTIONS BY MR. TSAI:
6         Q.    Sure.
7              The Compton article expressly
8    refers to other factors that are contributing
9    to the increase in the rate of heroin use and
10   related mortality.
11             So do you acknowledge and agree
12        that there are factors other than
13   prescription opioid use that are contributing
14   to the Gateway Effect increase in the rate of
15   heroin use and related mortality?
16        A.    Yes, I do.
17             Can I go back to something
18   earlier?  Just the -- I did find the article
19   in my report, the Cicero article.
20        Q.    Actually, I think the way this
21   works is Don can do redirect at the end.
22        A.    Okay.
23        Q.    And I'm sure he'll pick up on
24   that.
25             So let me ask again:  They use
```

```
 1    the term "it is not necessary."
 2            So "not necessary" means that
 3    individuals who are addicted to or overdose
 4    from illegal heroin can develop that
 5    condition, that outcome, because of reasons
 6    that are different from prior use of
 7    prescription opioids?
 8        A.    I guess I'm struggling a little
 9    bit with your phrasing of "reasons that are
10    different," and I know you tried to define
11    that, but I think it's -- when I hear reasons
12    that are different, I want to make sure that
13    I'm, you know, answering precisely.
14            It seems like you're implying
15    that somehow those people are different or
16    their lives are different or their -- there's
17    something fundamentally different about them,
18    and I wouldn't agree with that.
19            I would say that, you know, the
20    disease of addiction and how it progresses in
21    a human being is really pretty similar across
22    the board.  There aren't really shocking
23    differences independent of what the substance
24    is.
25        Q.    Well, you agree that the
```

```
 1    outcome of heroin use, taking that as the end
 2    point, prescription opioid use is not
 3    necessary for that to occur?
 4        A.    Yes, I agree with that.
 5        Q.    Okay.  And you agree that
 6    there's not a straight line, one-to-one
 7    relationship between individuals who are
 8    prescribed opioid medications on the one hand
 9    and individuals who are addicted to illegal
10    street heroin and fentanyl?
11        A.    I would disagree with that.
12        Q.    Isn't that what the Compton
13    article says, though?
14            MR. ARBITBLIT:  Object to form.
15            THE WITNESS:  No.  So what you
16        said is would you "agree that there is
17        not a straight line, one-to-one
18        relationship between individuals who
19        are prescribed opioid medications on
20        the one hand and individuals who are
21        addicted to illegal street heroin and
22        fentanyl."
23            And I would say that there is a
24        straight line between individuals who
25        are prescribed opioid medications and
```

```
 1        those who get addicted to illegal
 2        street heroin and fentanyl.
 3            It's not the only path, but
 4        there is a very clear path between
 5        those things.
 6    QUESTIONS BY MR. TSAI:
 7        Q.    Okay.  Well, could you turn
 8    back to the Edlund article?  And page 7 of
 9    this.  So it's the last full paragraph on
10    page 7 of the Edlund article, I believe.
11            And the second sentence says,
12    "In particular, pathways to OUDs may involve
13    several steps, moving from low dose/acute
14    dose to high dose/chronic use."
15            Do you see that?
16        A.    Yes, I do.
17        Q.    Do you agree that there, an
18    individual, who ultimately develops an opioid
19    use disorder with respect to illegal heroin,
20    takes many steps to get to that outcome?
21            MR. ARBITBLIT:  Object to form.
22            THE WITNESS:  What I would say
23        to that is that one of the most
24        salient findings in the Edlund article
25        is that the biggest predictor of
```

```
 1        developing an opioid use disorder was
 2        dose and duration of the opioid far
 3        exceeding risks related to personal
 4        past history of substance use or
 5        co-occurring mental illness.
 6            So that to me is a powerful
 7        finding because it says that although
 8        people are different and they have
 9        different life factors, that what
10        really predicted progression -- what
11        really predicts progression among
12        patients treated for chronic pain with
13        an opioid is how high their dose is
14        and how long they're prescribed it.
15    QUESTIONS BY MR. TSAI:
16        Q.    Well, if you could turn to the
17    next page of Edlund, page 8.
18            So the second full sentence at
19    the top of the page, it states, "Evidence to
20    date suggests this is largely a
21    self-selection process by the patients where
22    most patients started on opioid therapy
23    choose not to continue on to chronic use."
24            Do you see that?
25        A.    Uh-huh.
```

1    Q.    So just taking a step back:  Do
2 you agree that individuals who are taking
3 prescription opioid medications are still
4 capable of making choices, including, as
5 Edlund observes, choosing not to continue on
6 to chronic use?
7         MR. ARBITBLIT:  Object to form.
8         THE WITNESS:  I think the use
9    of the term in this sentence
10   "self-selection" is a poor choice of
11   words because people who develop the
12   disease of addiction do lose
13   volitional control over their choices,
14   such that they do actually, in many
15   instances, lack capacity to choose to
16   continue or not continue with their
17   opioid.
18 QUESTIONS BY MR. TSAI:
19   Q.    So do you disagree with the
20 authors of this study that you cite in using
21 the word "choose"?
22        MR. ARBITBLIT:  Object to form.
23        THE WITNESS:  No.
24        I agree with the authors of
25    this study, but if you want to focus

1    on this one particular sentence, I
2    disagree with the language that they
3    have used in this sentence to describe
4    the process of progressing to
5    addictive use in the context of
6    receiving an opioid prescription from
7    a doctor.
8 QUESTIONS BY MR. TSAI:
9    Q.    Addiction is a disease that
10 takes time to manifest and develop; do you
11 agree?
12   A.    In most cases, yes.  Not in
13 all, but in most cases.
14   Q.    And can we agree that not every
15 person who takes a prescription opioid
16 medication immediately becomes addicted?
17   A.    Yes, I agree with that.
18   Q.    And we can agree that not every
19 person who takes a prescription opioid
20 medication inevitably becomes addicted?
21   A.    It would really depend on which
22 definition of addiction you're using.
23        If you're using the DSM-IV
24 definition that includes physiologic
25 dependence, then I think the vast majority

1 will inevitably become physiologic dependent
2 on that opioid, and using the old
3 nomenclature, they would meet criteria for
4 opioid addiction.
5    Q.    Is it your opinion that if any
6 person develops a dependence on a
7 prescription opioid, then it's game over;
8 they're dependent for the rest of their
9 lives?
10        MR. ARBITBLIT:  Object to form.
11        THE WITNESS:  Well, I would
12   hate to say "game over," you know, in
13   any clinical context.  And they are
14   dependent until they get off and
15   recover their original state, assuming
16   that they're able to do that.  In many
17   cases, they're not able to do that.
18 QUESTIONS BY MR. TSAI:
19   Q.    So to the extent an individual
20 using prescription opioids starts on a path
21 to tolerance, dependence or opioid usage
22 disorder, that can be reversed; you agree?
23   A.    Yes, I do.
24        MR. TSAI:  Okay.  Let's take a
25   break.

1         MR. ARBITBLIT:  Okay.  Well,
2    before we take a break, under Rule 106
3    which says that "if a party introduces
4    all or a part of a writing or recorded
5    statement, an adverse party may
6    require the introduction at that time
7    of any other part or any other writing
8    or recorded statement that in fairness
9    ought to be considered at the same
10   time."
11        I'm not aware of anything in
12   the protocol that would overrule the
13   federal rules, and I haven't been
14   advised of such at this deposition.
15        And from the Compton study that
16   counsel introduced at page 155, I will
17   introduce the following under
18   Rule 106.  "Heroin is
19   pharmacologically similar to
20   prescription opioids.  All these drugs
21   produce their action through
22   endogenous opioid systems that
23   regulate a wide range of functions
24   through three major types of G protein
25   coupled receptors, mu, delta and

```
 1        kappa, with particularly potent
 2        agonist activity at the mu receptor
 3        and weak activity at the delta and
 4        kappa receptors."
 5            At page 156, just above the
 6        sentence that counsel read, the
 7        following appears, "Several
 8        prescription opioids such as
 9        hydromorphone, fentanyl, morphine and
10        oxycodone have a potential for abuse
11        that is similar to and in some cases
12        even higher than the potential for
13        abuse with heroin."
14            At page 157 of the same
15        article, "A recent study with data
16        through 2013 showed that prescription
17        opioid abuse or dependence was
18        associated with the likelihood of
19        heroin abuse or dependence that was 40
20        times as great as the likelihood with
21        no prescription opioid abuse or
22        dependence even after accounting for
23        sociodemographic, geographic and other
24        substance abuse or dependence
25        characteristics.
```

```
 1            "These studies suggest a clear
 2        link between nonmedical use of
 3        prescription opioids and heroin use,
 4        especially among persons with
 5        frequent, nonmedical use, or those
 6        with prescription opioid abuse or
 7        dependence."
 8            And finally, at page 158, "Of
 9        note, given the large number of
10        nonmedical users, even a small
11        percentage who initiate heroin use
12        translates into several hundred
13        thousand new heroin users."
14            We can take a break.
15            MR. TSAI:  This is absolutely
16        abuse of process, and it -- I think
17        collectively we've been in dozens of
18        these.  This has never occurred
19        before, Don.
20            Will you agree to give me a
21        minute-for-minute allocation?
22            MR. ARBITBLIT:  Yes,
23        absolutely, and I would ask the court
24        reporter -- I offered that during the
25        break.  The court reporter can add up
```

```
 1        whatever time I've used.  You can have
 2        minute-for-minute increase to your
 3        time, but Rule 106 is not abuse, and I
 4        object strongly to that
 5        characterization.
 6            MR. TSAI:  Let's go off the
 7        record.
 8            MR. STAMPFL:  I would also like
 9        to say on behalf of Allergan
10        defendants that I think this is
11        improper, but plaintiffs have waived
12        any right to object to this practice
13        during the depositions of defendants'
14        experts.  Thank you.
15            VIDEOGRAPHER:  Okay.  We are
16        now going off the record, and the time
17        is 11:02 a.m.
18        (Off the record at 11:02 a.m.)
19            VIDEOGRAPHER:  We are now going
20        back on the record, and the time is
21        11:18 a.m.
22    QUESTIONS BY MR. TSAI:
23        Q.    So you acknowledge in your
24    report that there are patients with moderate
25    to severe chronic pain and co-occurring
```

```
 1    mental health disorders:  Depression,
 2    anxiety, PTSD.
 3        Do you recall that?
 4        A.    Yes.
 5        Q.    And co-occurring,
 6    co-occurrence, means these individuals have
 7    mental health disorders like depression or
 8    anxiety or PTSD while also having the disease
 9    of opioid use disorder?
10        A.    Yes.  Another way that --
11    because of the opioid epidemic, when we use
12    the term "co-occurrence," we're often also
13    using chronic pain as part of a co-occurring
14    addict -- disorder with the disease of
15    addiction.
16        Q.    Have you done any analysis or
17    have any other basis to quantify the
18    percentage of people with opioid use disorder
19    in Cuyahoga and Summit Counties who have
20    co-occurring mental health disorders like
21    depression, anxiety, PTSD?
22        A.    I haven't done that analysis
23    specific to Cuyahoga County.  There are
24    others who have done that analysis in other
25    populations.
```

1    Q.    Have you done any analysis or

2  have any other basis to reliably rule out the

3  likelihood that individuals in Cuyahoga and

4  Summit Counties with opioid use disorder had

5  mental health disorders prior to opioid use

6  disorder?

7          MR. ARBITBLIT:  Object to form.

8          THE WITNESS:  No.

9  QUESTIONS BY MR. TSAI:

10    Q.    If an individual who has a

11  co-occurring mental health disorder, along

12  with an opioid use disorder, along with

13  chronic pain, commits suicide, let's say, how

14  do you untangle and determine whether the

15  suicide was due to the mental health

16  disorder, the opioid use disorder or the

17  pain?

18          MR. ARBITBLIT:  Object to form.

19      Incomplete hypothetical.

20          There's a question pending.

21          THE WITNESS:  Yes, I'm sorry.

22      I'm thinking.

23          MR. ARBITBLIT:  Okay.  Sorry.

24          THE WITNESS:  No, that's okay.

25          So suicide and opioid use

1      disorder and chronic pain have a

2  complex relationship in which each one

3  can exacerbate -- each condition can

4  exacerbate the other.

5          And the individual

6  circumstances of the death would -- I

7  would need the data on the individual

8  circumstances of the death to be able

9  to determine specifically -- well, to

10  be able to try to assess to the best

11  of my ability what was the reason for

12  the death or what were the

13  circumstances leading up to that

14  death.

15          But -- I guess I'll just leave

16  it at that time.

17  QUESTIONS BY MR. TSAI:

18    Q.    And have you reviewed any

19  information about, as you call it, the

20  individual circumstances of any such deaths,

21  the reason -- the context with respect to any

22  opioid-related deaths in Cuyahoga and Summit

23  Counties?

24    A.    Well, I have reviewed the

25  prescribing rates of opioids based off CDC

1  data in those counties, and I know that rates

2  of prescribing are -- in a given county or in

3  a given geographic region correlate with risk

4  of opioid use disorder and opioid-related

5  deaths in that reason -- in that region and

6  are likely causative.

7          So in that sense I have

8  reviewed some data.

9          MR. TSAI:  I'll move to strike

10      that answer.

11  QUESTIONS BY MR. TSAI:

12    Q.    The aggregate prescribing rates

13  of opioids, does that give you any

14  information about the individual

15  circumstances, to use your term, of any

16  opioid-related deaths?

17          MR. ARBITBLIT:  Object to form.

18          THE WITNESS:  I do believe that

19      the aggregate prescribing in that

20      county is a risk factor for

21      individuals living in that county as

22      to whether they will die by overdose

23      death.

24  QUESTIONS BY MR. TSAI:

25    Q.    And do you agree that the

1  co-occurrence or the preexisting existence of

2  mental health disorders such as depression,

3  anxiety, PTSD, trauma, is also a risk factor

4  for individuals as to whether they will die

5  by opioid-related death?

6    A.    It's not as important a risk

7  factor as access to opioids as described by

8  the Edlund study and decided in my report

9  which finds that dose and duration of opioids

10  is the most important risk factor and more

11  important than individual factors such as

12  co-occurring mental illness.

13    Q.    You agree that the Edlund study

14  described that individuals with a preexisting

15  mental health disorder had higher rates of

16  opioid use disorder than individuals with no

17  mental health disorder?

18          Are you familiar with that --

19  you agree with that --

20          MR. ARBITBLIT:  Objection.

21  QUESTIONS BY MR. TSAI:

22    Q.    -- trend?

23          MR. ARBITBLIT:  Object to form.

24          THE WITNESS:  Yes.

25

```
 1    QUESTIONS BY MR. TSAI:
 2        Q.    Okay.  And similarly,
 3    individuals with two preexisting mental
 4    health disorders have higher rates of opioid
 5    use disorder than individuals with one mental
 6    health disorder; do you agree?
 7        A.    I haven't seen data on two
 8    versus one mental health disorder, so I --
 9        Q.    You didn't review that in the
10    Edlund study?
11        A.    Was it in the Edlund study?
12        Q.    I believe so, but I'll move on.
13        A.    Uh-huh.
14        Q.    Have you conducted any
15    analysis, quantitative analysis, or have any
16    other basis to reliably rule out that the
17    co-occurrence of the preexisting presence of
18    depression, anxiety, trauma or other mental
19    illness was an important contributing factor
20    leading to opioid addiction and mortality in
21    Cuyahoga and Summit Counties?
22        MR. ARBITBLIT:  Object to form.
23        THE WITNESS:  I feel like I
24    already answered this question.
25
```

```
 1    QUESTIONS BY MR. TSAI:
 2        Q.    So it should be quite easy for
 3    you to answer it.
 4        Have you?
 5        A.    I think I did already answer
 6    it, just in terms of, on what basis.
 7        Q.    So am I right that your answer
 8    to this question is the aggregate prescribing
 9    rates, this is what you would point to?
10        MR. ARBITBLIT:  Object to form.
11    QUESTIONS BY MR. TSAI:
12        Q.    What does the aggregate
13    prescribing rates have to do with the
14    co-occurrence of mental illness?
15        A.    I'm trying to figure out the
16    question.
17        Could you rephrase the
18    question?
19        Q.    Do you have any basis to
20    reliably rule out that the preexisting
21    presence or the co-occurrence of mental
22    illness among individuals in Cuyahoga and
23    Summit County who had opioid use disorder,
24    opioid use overdose, do you have -- have you
25    done any analysis, do you have any basis to
```

```
 1    rule out that mental illness was an important
 2    contributing factor to those outcomes?
 3        MR. ARBITBLIT:  Object to form.
 4        THE WITNESS:  So mental illness
 5        increases risk of addiction.  Mental
 6        illness increases risk of having
 7        chronic pain.  But the risk conferred
 8        by mental illness is not as great as
 9        the risk conferred by access to those
10        drugs.
11    QUESTIONS BY MR. TSAI:
12        Q.    And are you willing to offer
13    the opinion to conclusively say that no
14    individuals in Cuyahoga and Summit County
15    with opioid use disorder or overdose had a
16    mental illness co-occurring or preexisting?
17        MR. ARBITBLIT:  Object to form.
18    QUESTIONS BY MR. TSAI:
19        Q.    Would that be speculation on
20    your part, or do you have a basis to make
21    that opinion?
22        MR. ARBITBLIT:  Object to form.
23        Misstates the testimony.
24        THE WITNESS:  Could you
25        rephrase the question, because you
```

```
 1        used a double negative, so it's a
 2        little hard for me to track?  I'm
 3        sorry.
 4    QUESTIONS BY MR. TSAI:
 5        Q.    Well, is it your opinion that
 6    none of the individuals in Cuyahoga and
 7    Summit County who had opioid use disorder or
 8    an opioid use-related overdose had
 9    significant preexisting or co-occurring
10    mental illness?
11        A.    That is not my opinion.
12        Q.    Okay.  Do you agree that
13    suicide rates are elevated, just isolating
14    individuals with chronic pain, especially
15    when there's a sense of hopelessness about
16    treating that pain?
17        MR. ARBITBLIT:  Object to form.
18        THE WITNESS:  Sorry.  I can't
19        speak to the sense of hopelessness
20        part, linking it to chronic pain.  It
21        is true that when people experience a
22        sense of hopelessness, that can
23        sometimes lead them to consider ending
24        their lives.  And it makes sense to me
25        that individuals with chronic pain
```

```
 1        would have elevated suicide rates, but
 2        I think the interplay between opioid
 3        therapy for pain, hopelessness,
 4        depression and suicide are complex
 5        because opioids themselves can
 6        contribute to depression and
 7        suicidality.
 8             So it's very hard to tease
 9        apart what part of that is due to a
10        separate depressive disorder and what
11        part of that may actually be an
12        opioid-induced depressive disorder.
13   QUESTIONS BY MR. TSAI:
14        Q.    And what would you need to
15   review and analyze to be able to tease apart
16   those complex layers of confounding factors?
17             MR. ARBITBLIT:  Object to form.
18             THE WITNESS:  Those are hard to
19        tease apart, even in clinical care.
20                  Typically what we use is some
21        kind of lifetime timeline to try to
22        look at when the mood disorder began
23        and when the opioids were started, but
24        even that is not necessarily
25        sufficient since opioids can worsen
```

```
 1        mood.
 2   QUESTIONS BY MR. TSAI:
 3        Q.    And we're talking about
 4   co-occurring mental illness.  Let's talk
 5   about past history of substance use disorder.
 6             Do you agree that past history
 7   of substance use disorder is a
 8   well-established risk factor for opioid use
 9   disorder?
10        A.    Yes.
11        Q.    And let me just give an
12   example.
13             Edlund found that about half of
14   opioid overdose deaths involved another drug,
15   most commonly benzodiazepines.
16             Do you agree with that
17   observation?
18             MR. ARBITBLIT:  Object to form.
19             THE WITNESS:  I agree that a
20        large percentage of opioid overdose
21        deaths involve another drug, commonly
22        a sedative like a benzodiazepine.
23   QUESTIONS BY MR. TSAI:
24        Q.    And can you give some examples
25   of benzodiazepines?
```

```
 1        A.    Sure:  Valium, Klonopin, Xanax,
 2   Ativan, Librium.
 3        Q.    And you talk about a large
 4   percentage of opioid-related overdoses
 5   involve an individual that, to put it
 6   bluntly, has another addictive substance in
 7   their system.
 8             What do you mean by a large
 9   percentage?  Can you be more specific?
10        A.    Two-thirds of deaths involving
11   a benzodiazepine also involve an opioid
12   prescription.
13        Q.    And if you could turn to your
14   book, "Drug Dealer, MD," and page 146, the
15   internal page number of your book, and the
16   Bates number for that ends in 5680.
17        A.    Uh-huh.
18        Q.    It's the first full paragraph.
19   It says, "Today, doctors' prescription for
20   benzodiazepines continue to rise and are a
21   major culprit in the epidemic of prescription
22   overdose deaths plaguing this country.
23   Nonetheless, benzodiazepines are relatively
24   ignored in the national discussion on rising
25   rates of addiction."
```

```
 1             Is that still your belief?
 2        A.    Yes.
 3        Q.    And have you done any work or
 4   analysis to quantify to what extent
 5   benzodiazepines are, as you say, a major
 6   culprit in the epidemic of prescription
 7   overdose deaths plaguing this country?
 8        A.    So I published an article in
 9   the New England Journal of Medicine talking
10   about the benzodiazepine problem.  The
11   article was not based on my own analysis, but
12   was a review of published literature and some
13   summative interpretations of how to
14   intervene.
15             And based on other
16   publications, we found a seven-time increased
17   mortality involved benzodiazepines between
18   late 1990s and 2016, two-thirds of which also
19   involved an opioid.
20        Q.    And did you, in connection with
21   this article, dig into or quantify whether
22   the benzodiazepine use occurred before or
23   after the prescription opioid use?
24        A.    No.
25        Q.    So in your report on page 89,
```

```
 1    you say, "Economic downturn and the E-flux of
 2    manufacturing jobs in towns across America in
 3    the last 30 years have contributed to
 4    so-called deaths of despair, early mortality
 5    in middle-aged, non-Hispanic whites due
 6    primarily to drug overdose."
 7              Do you remember that passage?
 8    A.    What page?
 9    Q.    I believe it's page 89 of your
10    report, Exhibit 1, subsection B, and you cite
11    to the Case, Deaton study.
12              Do you recall that?
13    A.    Yes.
14              MR. TSAI:  So can we get
15    Tab 18?
16    A.    Oh, yeah.  I found it.
17         (Lembke Exhibit 8 marked for
18         identification.)
19    QUESTIONS BY MR. TSAI:
20    Q.    Okay.  So if you could turn
21    to -- the first page of the Case, Deaton
22    article, this has a broad conclusion that
23    "from 1999 to 2013, there was an increase in
24    mortality among middle-aged, white,
25    non-Hispanic Americans from all causes."
```

```
 1              Is that right?
 2    A.    That's correct.
 3    Q.    And in the introduction, the
 4    bold introductory section, this Case, Deaton
 5    study concluded that "these increased
 6    mortality was due to various factors,
 7    including drug and alcohol poisonings,
 8    suicide, chronic liver disease and
 9    cirrhosis."
10              Is that right?
11    A.    Yes.
12    Q.    And second to the last -- just
13    to be clear, do opioids cause deterioration
14    or chronic liver disease or cirrhosis?
15    A.    Not typically.
16    Q.    Okay.  And is it fair to say
17    that those drivers of the increased mortality
18    noted in the study were likely due to alcohol
19    use disorder or alcoholism colloquially?
20    A.    Yes.
21    Q.    Okay.  And in your report, you
22    acknowledge and agree that, quote/unquote,
23    "economic disadvantage is a contributing
24    factor to opioid-related mortality risk."
25              Is that correct?
```

```
 1    A.    I would agree that it is one
 2    factor, but I also cited the Ruhm study,
 3    arguing that economic disadvantage
 4    contributes only 10 to 20 percent of
 5    mortality risk attributable to opioids,
 6    whereas the larger share of risk is due to
 7    the supply of opioids in a given geographic
 8    region.
 9    Q.    Okay.  And have you conducted
10    any quantitative analysis of your own to
11    quantify the specific contribution of
12    economic disadvantage to opioid-related
13    mortality risk?
14    A.    No.
15    Q.    Do you have a model or an
16    analytical framework to untangle any costs
17    related to any such preexisting social and
18    economic problems versus any conduct by any
19    defendant with respect to Cuyahoga and Summit
20    Counties?
21              MR. ARBITBLIT:  Object to form.
22              THE WITNESS:  I think that the
23         Ruhm study could be used to inform a
24         model with respect to the risk
25         incurred by the supply of opioids
```

```
 1         versus economic disadvantage.
 2    QUESTIONS BY MR. TSAI:
 3    Q.    Have you in this case yourself
 4    done any work to rule out the likelihood that
 5    social and economic problems preexisting in
 6    the counties were an important contributing
 7    factor to observe opioid use disorder and
 8    mortality?
 9              MR. ARBITBLIT:  Object to form.
10              THE WITNESS:  I have stated in
11         my report that economic factors were a
12         factor, but not the most important
13         factor.
14              The most important factor is
15         the supply of opioids in that county.
16         That is my opinion.
17    QUESTIONS BY MR. TSAI:
18    Q.    And your opinion regarding the
19    relative degree of contribution of social and
20    economic problems, economic disadvantage,
21    versus any conduct by the defendants, is that
22    based on grappling with any county-specific
23    data, or is it only based on the Ruhm study
24    that you cited?
25              MR. ARBITBLIT:  Object to form.
```

```
 1            THE WITNESS:  It's based on my
 2       reading of the literature, not just
 3       this particular study, but also other
 4       studies showing that the amount of
 5       opioid prescribing in a given
 6       geographic region is the biggest
 7       predictor of opioid use disorder and
 8       opioid overdose in that region.
 9            MR. TSAI:  Okay.  Can we do tab
10       27?
11            (Lembke Exhibit 9 marked for
12       identification.)
13  QUESTIONS BY MR. TSAI:
14       Q.    So I would like to dig down
15  into the actual ground floor circumstances of
16  how folks get prescribed opioid medications.
17            So do you recall that last year
18  you gave a live interview on KQED with
19  Michael Krasny for a program entitled
20  "Medical Community Divided on Medicare's
21  Policy to Shorten High-Dose Opioid
22  Prescriptions"?
23       A.    Yes, I do.
24       Q.    Okay.  And the exhibit that
25  we've just put in front of you, does this
```

```
 1  appear to be a true and correct transcript of
 2  that interview that you participated in?
 3       A.    Yes, it does.
 4       Q.    Okay.  And if you turn to
 5  page 8, they may have misspelled your name,
 6  but the Anna Lembke referred to, that's you?
 7       A.    Which page?
 8       Q.    It's page 8 of this exhibit.
 9       A.    Yes.
10       Q.    Okay.  So if you could turn to
11  page 22 of the exhibit, and I'll start with
12  line 2 of that page.  I'll just read it.
13            You stated --
14       A.    I'm sorry.
15       Q.    Oh, sure.
16       A.    I have two sets of page numbers
17  here.  Is this page 7, parentheses 22 to 25?
18       Q.    That's correct.
19       A.    Okay.
20       Q.    And it's split up into
21  quadrants.  So it's the left-hand quadrant,
22  page 22.
23       A.    Yeah.
24       Q.    And you stated, "While it's a
25  very complicated connection that I do address
```

```
 1  in my book, it's hard to kind of put it into
 2  a sound bite, but in general, you know,
 3  people who are suffering from poverty,
 4  unemployment, low education, are also people
 5  who are known to be at higher risk for
 6  addiction.
 7            "It's also true that this is a
 8  population that has turn towards disability
 9  payments as a way to make ends meet, and in
10  order to, you know, justify the sick role and
11  get disability payments.  Many of these
12  individuals have been forced to take certain
13  type of medications because taking a
14  medication can legitimize the sick role.  So
15  it's a complex web."
16            Do you see that?
17       A.    Yes, I do.
18       Q.    What is "justifying the sick
19  role"?  What does that mean?
20       A.    Well, that's a term that goes
21  back to Talcott Parsons, who identified
22  social roles that people adopt, and anybody
23  who participates in the health care system
24  and views themselves as a, quote/unquote,
25  patient is someone who has adopted the sick
```

```
 1  role.
 2       Q.    Okay.  In your opinion -- is it
 3  still your opinion that certain individuals
 4  who have turned to disability payments are
 5  being forced to take certain types of
 6  medications to justify the sick role?
 7       A.    So this is part of -- this is
 8  an excerpt from, as I state here, a much more
 9  complicated issue that I address more
10  thoroughly in my book regarding how
11  disability can sometimes consciously or
12  otherwise encourage people living in poverty
13  to adopt the sick role as a way to get
14  disability payments.
15            And in order to legitimize the
16  sick role, they have to participate in that
17  health care system, and in the '90s and early
18  aughts and through today, it turns out
19  participating in the health care system as a
20  pain patient was actually dangerous because
21  that -- the risk of being exposed
22  unnecessarily to opioids was and continues to
23  be very high, and exposure to opioids is one
24  of the major risk factors for addiction.
25       Q.    So you use the term "forced to
```

```
 1   take certain types of medications."  Who in
 2   your opinion is forcing these individuals to
 3   take opioid medications to justify what
 4   you've called the sick role?
 5            MR. ARBITBLIT:  Object to form.
 6   QUESTIONS BY MR. TSAI:
 7        Q.   How does that mechanism work?
 8        A.   The individuals are being
 9   forced by economic circumstance.
10        Q.   And this phenomenon of being
11   forced by their individual economic
12   circumstance to take certain medications to
13   justify the sick role, have you reviewed any
14   data specific to Cuyahoga or Summit Counties
15   to determine whether that phenomenon occurred
16   in the counties?
17        A.   Nationally we've seen a huge
18   increase in the number of people going on to
19   disability for chronic pain conditions.  For
20   example, Social Security Disability insurance
21   today, there are more than 8 million people
22   enrolled in Social Security Disability
23   insurance, primarily for chronic pain
24   conditions.
25            So I believe that I can
```

```
 1   extrapolate that to include Cuyahoga and
 2   Summit Counties, that there are individuals
 3   there who -- with chronic conditions who have
 4   gone on disability.
 5        Q.   Have you done the exercise of
 6   extrapolate specifically to Cuyahoga and
 7   Summit Counties?
 8        A.   Do you mean a quantitative
 9   analysis?
10        Q.   Yes.
11        A.   No.
12        Q.   Is it your opinion that
13   defendants have any role in structuring or
14   implementing the Social Security Disability
15   network?
16            MR. ARBITBLIT:  Object to form.
17            THE WITNESS:  I think
18        defendants have had a major role in
19        the narrative around how chronic pain
20        should be treated for patients who are
21        participating in the health care
22        system.  And as a result, patients
23        have been endangered because of being
24        exposed to dangerous -- the dangerous
25        substance that is opioids.
```

```
 1   QUESTIONS BY MR. TSAI:
 2        Q.   Though, that's kind of
 3   confusing to me.  The narrative is -- it's a
 4   very broad term.
 5        A.   Uh-huh.
 6        Q.   Can you point to any specific
 7   instance where any conduct by a defendant
 8   caused an individual within the disability
 9   payment network, for example, Social Security
10   Disability, to have been forced to take their
11   particular opioid medication?
12            MR. ARBITBLIT:  Object to form.
13            THE WITNESS:  So I think
14        defendants have been involved in the
15        change, the cultural change, in our
16        conceptualization of pain and have
17        created a climate in which doctors
18        have been forced to treat pain with
19        opioids, such that individuals who are
20        on disability and get care for their
21        chronic pain are at increased risk to
22        be exposed to opioids.
23   QUESTIONS BY MR. TSAI:
24        Q.   So you talked about climate,
25   the culture and narrative.
```

```
 1            These are all pretty
 2   qualitative, would you agree?
 3            MR. ARBITBLIT:  Object to form.
 4            THE WITNESS:  Yes.
 5   QUESTIONS BY MR. TSAI:
 6        Q.   Can you point to a specific
 7   instance, act, that fits the scenario that
 8   you've outlined?
 9            MR. ARBITBLIT:  Object to form.
10            THE WITNESS:  Yeah.
11        So in my report, I talk about
12        the Wisconsin Pain and Policy Study
13        Group, and I provide evidence that
14        the -- that industry funded the Pain &
15        Policy Study Group, defendants funded
16        the Pain & Policy Study Group, over a
17        period of many years.
18            And the Pain & Policy Study
19        Group, in turn, carried out programs
20        that benefitted the industry, not only
21        by increasing access to opioids and
22        limiting regulatory scrutinary {sic},
23        but also changing the culture around
24        pain treatment and identifying a model
25        in which doctors feared retribution if
```

1      they didn't use opioids to treat pain.

2  QUESTIONS BY MR. TSAI:

3      Q.    Can you point to any instance

4  where anyone providing funds had a role in

5  the design and conduct of the specific study

6  or program that you're referring to?

7          MR. ARBITBLIT:  Object to form.

8          THE WITNESS:  On October 9,

9      2002, Joranson wrote to Mr. Kaiko, a

10     Purdue representative, quote, "For the

11     past several years, without your

12     support, some of the progress reported

13     below would not have been possible,"

14     end quote.

15  QUESTIONS BY MR. TSAI:

16     Q.    And in your view is that

17  designing and conducting the study?

18         MR. ARBITBLIT:  Object to form.

19         THE WITNESS:  It's not a study

20     they're referring to.  It's the model

21     policy rolled out by the Pain & Policy

22     Study Group, which had enormous

23     influence in the way that pain was

24     treated and is still treated today --

25

1  QUESTIONS BY MR. TSAI:

2      Q.    So --

3      A.    -- including creating a culture

4  and a climate in which physicians felt

5  required to use opioids to treat pain, and

6  that if they were not using opioids, they

7  were undertreating pain.

8      Q.    Can you point to any instance

9  where any person funding was

10  involved in the preparation, review or

11  approval of this model policy?

12         MR. ARBITBLIT:  Object to form.

13         THE WITNESS:  So there was a

14     book that was published called

15     "Responsible Opioid Prescribing,"

16     which listed as its funders Purdue

17     Pharma, Endo, Janssen and Cephalon.

18         And that book was widely

19     promoted and disseminated by the Pain

20     & Policy Study Group, and then

21     subsequently by the Federation of

22     State Medical Boards and contributed

23     to this change in culture.

24  QUESTIONS BY MR. TSAI:

25     Q.    Okay.  So it sounds like you're

1  going back to funding, but I'm asking about

2  the specific content authoring, editing.

3          MR. ARBITBLIT:  Object to form.

4  QUESTIONS BY MR. TSAI:

5      Q.    Can you point to an example

6  that shows that?

7          MR. ARBITBLIT:  Object to form.

8          THE WITNESS:  Can you repeat

9      your question?  I don't think I fully

10     understand it.

11  QUESTIONS BY MR. TSAI:

12     Q.    So you've said that the

13  promotion was by PROP, correct?

14         MR. ARBITBLIT:  Object.

15     Misstates the record.

16         THE WITNESS:  No.

17  QUESTIONS BY MR. TSAI:

18     Q.    It was widely dissembled --

19         MR. ARBITBLIT:  PROP was not in

20     the question.  It was EESG, Counsel.

21         THE WITNESS:  Pain & Policy

22     Study Group.

23  QUESTIONS BY MR. TSAI:

24     Q.    Okay.  That group.  So I'm

25  asking about the control, the authoring, the

1  editing of any specific content or analysis.

2          Other than funding, can you

3  give me any example that supports your

4  opinion about this culture or narrative or

5  climate?

6          MR. ARBITBLIT:  Object to form.

7          THE WITNESS:  The funding is

8      really what made it possible for the

9      Pain & Policy Study Group to roll out

10     this new paradigm around pain

11     treatment.

12         They're not the only group that

13     collaborated with the opioid

14     pharmaceutical industry in this

15     endeavor.

16         Also the Joint Commission was

17     involved in that process, and they

18     actually received content that was

19     created by Purdue Pharma.  That was

20     then disseminated to hospitals who

21     were trying to make Joint Commission

22     accreditation.  They used videos

23     produced by Purdue.  They used

24     documents created by Purdue in order

25     to change the paradigm around opioid

1  prescribing, including promoting
2  opioid -- including promoting pain as
3  the fifth vital sign.
4       There are also other examples
5  in my report where consultants for the
6  defendants were involved in research
7  studies that were also
8  misrepresentations of the evidence or
9  used the evidence in a way that
10  misrepresented the real science.
11  QUESTIONS BY MR. TSAI:
12       Q.    And those are examples that
13  you've set forth in your report?
14       A.    Yes.
15            (Lembke Exhibit 10 marked for
16       identification.)
17  QUESTIONS BY MR. TSAI:
18       Q.    Okay.  Hand you next in order.
19            So do you recall that you gave
20  a TEDx Talk in 2017?
21       A.    Yes.
22       Q.    And does the exhibit I've
23  handed you appear to be a true and correct
24  transcript of your TEDx Talk?
25       A.    Yes.

1            MR. ARBITBLIT:  Counsel, it's
2  complete?  Counsel, are you
3  representing that it's a complete
4  transcript or an excerpt?
5            MR. TSAI:  This is a complete
6  transcript.  I know you're a big fan
7  of completeness.
8            MR. ARBITBLIT:  Yes, I am, and
9  I'm not apologizing for it, so if you
10  want to refrain from colloquy, please
11  do.
12  QUESTIONS BY MR. TSAI:
13       Q.    Is the "Dr. Lembke" referred to
14  here you?
15       A.    Yes.
16       Q.    So if you could turn to page 3,
17  and I'll start with line 4, and I'll read it.
18            "But the truth is that big
19  pharma existed well before this public health
20  crisis.  And frankly the term 'quack' dates
21  back to the 17th Century, so the question is:
22  Why this drug and why now?  To really be able
23  to understand this problem, we have to
24  recognize that this current opioid epidemic
25  is a symptom of a faltering health care

1  system and a culture that has demonized
2  pain."
3            Do you see that?
4       A.    Yes, I do.
5       Q.    And what do you mean when you
6  say "to really be able to understand this
7  problem, we have to recognize that this
8  current opioid epidemic is a symptom of a
9  faltering health care system and a culture
10  that has demonized pain"?
11       A.    What I mean is that the
12  defendants have leveraged those problems in
13  the delivery of health care today in order to
14  meet their own agenda, which was a profit
15  agenda.
16            So there are other factors that
17  have contributed, but the primary factor is
18  the role of the defendants in this case, and
19  I would say that the defendants are
20  additionally to blame because of their
21  deliberate and for-profit misrepresentation
22  of the evidence, whereas health care
23  providers were unwitting accomplices.
24       Q.    And presumably you would have
25  stated that in this talk, outlining the major

1  contributing forces driving the opioid
2  epidemic?
3            MR. ARBITBLIT:  Object to form.
4            THE WITNESS:  I had ten minutes
5       in this TED Talk, and so I didn't
6       cover everything that I believe or
7       everything that's in my book.
8  QUESTIONS BY MR. TSAI:
9       Q.    So because you had a limited
10  time, just like we do here, you had to
11  prioritize; is that right?
12            MR. ARBITBLIT:  Object to form.
13            THE WITNESS:  As I stated just
14       above there in line 3, "Big pharma
15       really is to blame."
16  QUESTIONS BY MR. TSAI:
17       Q.    Well, you also state that, "In
18  order to understand what caused this
19  epidemic, we need to be aware of three
20  invisible forces inside of the health care
21  system that are driving this problem."
22            Do you see that?
23       A.    Yes, I do.
24            MR. ARBITBLIT:  Object to form.
25       Argumentative.

```
1    QUESTIONS BY MR. TSAI:
2        Q.    Is that -- those are your
3    words?
4        A.    Yes.
5        Q.    Okay.  Is that still your
6    opinion?
7        A.    Yes, but as I stated very
8    clearly in my report, although there are
9    other factors and other players in the opioid
10   epidemic, the pharmaceutical opioid industry
11   is the major driving factor and primarily
12   responsible and basically took advantage of
13   the other players as unwitting accomplices in
14   their deliberate manipulation of the paradigm
15   around pain treatment.
16       Q.    Well, let's see what you said.
17   You enumerated the three forces
18   that you say are driving this problem?
19             Do you see that?  So can we go
20   through those?
21             Is it your opinion still, as
22   you stated in your talk in 2017, that the
23   current opioid crisis is caused by, quote,
24   "the industrialization of medicine or the
25   Toyota-zation of medicine"?
```

```
1              MR. ARBITBLIT:  Object to form.
2        Misstates the record.
3              THE WITNESS:  Yes, and I also
4        mentioned that in my report, but
5        again, importantly, the defendants
6        basically took advantage of the
7        fractured health care industry in
8        order to misrepresent the evidence for
9        their own gain.
10   QUESTIONS BY MR. TSAI:
11       Q.    Well, can you tell the jury
12   when you coined the term "Toyota-zation of
13   medicine," or "industrialization of
14   medicine," what do you have in mind by that?
15             What does that mean?
16       A.    What I mean by that is the way
17   in which doctors now no longer work in
18   physician-owned practice.  The majority of
19   doctors now work for large, integrated health
20   care centers, so they're essentially salaried
21   employees, which means that they're required
22   to practice medicine according to certain
23   preordained protocols and algorithms.
24             They have much less autonomy
25   than they've ever had before.  There's
```

```
1    enormous pressure on them to make sure that
2    patients are satisfied with their care, and
3    all of that has -- there's also pressure on
4    doctors to see patients more quickly, to get
5    them in and out faster.
6        Q.    All right.  So --
7        A.    And there's also pressures from
8    the Joint Commission to meet certain quality
9    measure standards.
10             So the bottom line is that
11   doctors today have much less autonomy than
12   they had previously and are required to
13   practice medicine in ways mandated by, for
14   example, Joint Commission quality measures.
15       Q.    So they mandate to practice
16   medicine according to certain preordained
17   protocols and algorithms?
18       A.    Yeah.
19       Q.    Who is responsible for
20   formulating those protocols and algorithms?
21       A.    I believe that the defendants
22   had a major and driving role in influencing
23   those protocols in the treatment of pain.
24       Q.    Do others have a role in
25   implementing or formulating the protocols and
```

```
1    algorithms you refer to?
2              When a doctor -- say in your
3    example, a doctor says, "Here's this
4    preordained algorithm that's forcing me to
5    practice in a certain way," where is he or
6    she hearing that from?
7              MR. ARBITBLIT:  Object to form.
8    QUESTIONS BY MR. TSAI:
9        Q.    Where is it from?
10             MR. ARBITBLIT:  Object to form.
11             THE WITNESS:  They're hearing
12        that from continuing medical education
13        courses that, for example, I was
14        mandated to attend in 2001 when
15        legislation was passed in the state of
16        California mandating every physician
17        to attend a pain medicine course in
18        order to maintain their license.
19             And at that course, I
20        distinctly remember being taught many
21        of the myths regarding opioid
22        prescribing, information that's not
23        based on science, about the benefits
24        of the use of opioids and chronic pain
25        and the low risk of addiction as long
```

```
1        as that individual has pain being
2        prescribed opioids by a doctor.  And
3        we know none of that is true.  That's
4        just one of many examples, continuing
5        medical education courses.
6             Another important example is
7        the Joint Commission that accredits
8        hospitals.  They have an enormous
9        influence on how we practice medicine
10       today.  We know as physicians that we
11       have to meet Joint Commission
12       standards, and the Joint Commission
13       made assessing pain a quality measure
14       in 2001 using material obtained by
15       Purdue Pharma, that they then sold to
16       hospitals, so that hospitals could
17       meet Joint Commission requirements.
18            Doctors also get that
19       information from the literature that
20       they read, peer-reviewed articles, and
21       many of those articles were misused
22       essentially as promotional material
23       with authors that were either
24       consultants for pharma or with a study
25       that was supported by pharma.
```

```
1            So those are the types of
2        things I'm talking about.
3    QUESTIONS BY MR. TSAI:
4        Q.    What about hospital
5    administrators, do they have an important
6    role in ordaining and mandating protocols and
7    algorithms as you've referred to?
8        A.    Hospital administrators have an
9    important role in that, but, again, any role
10   that they played, I believe, was as unwitting
11   accomplices in the deliberate
12   misrepresentation of the benefits of opioids
13   and their risks by the defendants.
14       Q.    Third-party payers, health
15   insurance companies, they have an important
16   role in ordaining the mandates and the
17   protocols and the algorithms within the
18   industrialized medicine system that you
19   referred to?
20       A.    Yes, they do.
21       Q.    Okay.  And when you say that,
22   you know, there's a doctor, he or she feels
23   enormous pressure to make -- satisfy his or
24   her patients, get them quickly out, having
25   industrial line, like an assembly line, who
```

```
1    is that pressure coming from?
2             MR. ARBITBLIT:  Object to form.
3             THE WITNESS:  That pressure
4        comes from the patients themselves and
5        the desire of the doctor to do a good
6        job, and usually people who go into
7        medicine are people who want to have
8        quality relationships with their
9        patients and feel like they help their
10       patients.  But there are also
11       institutional pressures on doctors to
12       have good doctor/patient satisfaction
13       surveys.
14            And there's also importantly
15       patients' expectations around what
16       they expect the doctor will provide to
17       them when they see that doctor.
18            And because of the defendants'
19       actions, patients came to expect that
20       when they had pain, they should get an
21       opioid from their doctor.  And we do
22       know that there are data showing that
23       when patients' expectations are not
24       met, they're more likely to rate that
25       doctor poorly.
```

```
1            So there was overall enormous
2        pressure on doctors and on the system
3        to prescribe opioids even for minor
4        and chronic pain conditions in the
5        absence of evidence because that
6        evidence was misrepresented to all of
7        these various parties by the
8        defendants.
9    QUESTIONS BY MR. TSAI:
10       Q.    Have you done any analysis --
11   do you have any other basis to reliably rule
12   out the likelihood that there are these
13   pressures on prescribing doctors following
14   protocols and algorithms that came from
15   sources that had nothing to do with
16   defendants?
17            MR. ARBITBLIT:  Object to form.
18            THE WITNESS:  I have the lived
19       experience.  I got my degree in
20       medicine in the early 1990s, and I
21       lived through these, you know, past
22       two and a half decades, and I
23       personally felt the pressures from
24       entities like the Joint Commission in
25       order to practice in a certain way.
```

1    QUESTIONS BY MR. TSAI:

2         Q.   And have you done any

3    quantitative analysis to tease out, let's

4    say, the role of hospital administrators, or

5    the role of third-party payers, in any

6    specific opioid prescribing decision of any

7    doctor in Cuyahoga and Summit County?

8              MR. ARBITBLIT:  Object to form.

9              THE WITNESS:  No.

10   QUESTIONS BY MR. TSAI:

11        Q.   So moving on, just briefly, you

12   talked about the CME that you attended.  It

13   was back in 2001.

14        A.   Yes.

15        Q.   So after attending that CME,

16   you didn't suddenly lose your independent

17   medical judgment, right?

18             You still had your own

19   independent medical judgment, you agree?

20        A.   CME courses have an enormous

21   influence on the information that doctors

22   acquire on which to base their medical

23   judgment.

24             So I didn't lose my medical

25   judgment, but I can only make judgment based

1    on the information that I have and the

2    misrepresentation at that CME and others like

3    it across the country.

4         Q.   And you invoke your personal

5    experience?

6         A.   Yes.

7         Q.   So you didn't forget all of

8    your prior medical education and training

9    after leaving that -- how long was that

10   session?  One hour?  Day long?

11        A.   (Witness nods head.)

12             MR. ARBITBLIT:  Objection.

13   QUESTIONS BY MR. TSAI:

14        Q.   Did you forget your medical

15   education and training?

16             MR. ARBITBLIT:  Object to form.

17             THE WITNESS:  Could you specify

18        what medical education and training

19        you're referring to?

20   QUESTIONS BY MR. TSAI:

21        Q.   Yeah.  Your medical school,

22   your residency, your fellowship, all of your

23   experience in the clinical setting, did the

24   CME make you forget all of that?

25             MR. ARBITBLIT:  Object to form.

1              THE WITNESS:  I didn't forget

2         it, but medicine is a discipline in

3         which we must keep up with the science

4         as it evolves, and a very busy

5         clinician, including myself, does not

6         have the time to read every single

7         peer-reviewed article and dig into who

8         funded it or whether or not they

9         accurately represented their

10        information.

11             So we rely on continuing

12        medical education courses in order to

13        acquire that knowledge.  So when I

14        went to that continuing medical

15        education course, I acquired a body of

16        knowledge that was not, in fact, based

17        in the evidence, that then influenced

18        my practice going forward and that of

19        my colleagues.

20   QUESTIONS BY MR. TSAI:

21        Q.   And to pick up on what you

22   said, you have to keep up -- science evolves,

23   medicine evolves.

24             So that's how medicine works,

25   right?  You have to make the best decisions

1    that you can based on the scientific evidence

2    that's available --

3              MR. ARBITBLIT:  Object to form.

4    QUESTIONS BY MR. TSAI:

5         Q.   -- at the time of prescription;

6    do you agree with that?

7              MR. ARBITBLIT:  Object to form.

8              THE WITNESS:  As long as the

9         science is being accurately

10        represented.

11   QUESTIONS BY MR. TSAI:

12        Q.   All right.  So going back to

13   your TED Talk, if you could turn to page 5 of

14   that transcript?

15        A.   Yeah.

16        Q.   So starting on page 11, you

17   say --

18        A.   Page 5 or page 11?

19        Q.   Sorry, starting on page --

20   line 11 of page 5, you say, "The second big

21   invisible force driving this opioid epidemic

22   is the medicalization of poverty."

23             Do you see that?

24        A.   Yes.

25        Q.   Is it your opinion now that a

```
 1   big driver of the opioid epidemic is the
 2   medicalization of poverty as you stated here
 3   in 2017?
 4        A.    It's my opinion that the
 5   medicalization of poverty is a factor in the
 6   opioid epidemic, but not as big a factor as
 7   supply.
 8        Q.    Okay.  And have you done any
 9   analysis to quantify the relative
10   significance of the contributions of the
11   factor of medicalization of poverty, to use
12   your words, and prescription opioid supply?
13             MR. ARBITBLIT:  Object to form.
14             THE WITNESS:  I have not
15        personally done that analysis, but
16        there are others who I cite in my
17        report who talk about, again, as I've
18        answered in a previous question,
19        economic factors not being the primary
20        driver, and that supply of opioids in
21        a given region being the primary
22        driver of opioid use disorder and
23        opioid overdose in that region.
24   QUESTIONS BY MR. TSAI:
25        Q.    So at this time what percentage
```

```
 1   or extent would you ascribe the contribution
 2   of medicalization of poverty to the opioid
 3   crisis?
 4             MR. ARBITBLIT:  Object to form.
 5             THE WITNESS:  It's hard for me
 6        to put a percentage on it.  I would
 7        only say that the misrepresentation of
 8        the evidence has been the primary
 9        driver in the opioid epidemic.
10             In other words, the actions of
11        the defendants have been the primary
12        driver.
13   QUESTIONS BY MR. TSAI:
14        Q.    Okay.  But you can't say for
15   any actual prescription of an opioid that the
16   medicalization of poverty factor was not an
17   important contributing factor to that
18   decision?
19             MR. ARBITBLIT:  Object to form.
20   QUESTIONS BY MR. TSAI:
21        Q.    Is that right?
22             MR. ARBITBLIT:  Object to form.
23             THE WITNESS:  So can you
24        rephrase?
25             I'm sorry, there's a lot of
```

```
 1        double negatives, so it's hard for me
 2        to track.
 3   QUESTIONS BY MR. TSAI:
 4        Q.    Let me put it this way.  Can
 5   you reliably rule out the scenario that there
 6   were prescriptions, or even a lot of
 7   prescriptions, of opioid medications to
 8   residents of Cuyahoga and Summit Counties
 9   that were significantly influenced or driven,
10   as you've used, by this phenomenon of
11   medicalization of poverty?
12             MR. ARBITBLIT:  Object to form.
13             THE WITNESS:  I would -- I
14        can't reliably rule that out.  I would
15        say that that may be a factor for
16        individuals in those counties, but
17        it's not the primary driver.
18             MR. ARBITBLIT:  Can we take a
19        lunch break now?  It's 12:15.
20             MR. TSAI:  Sure.
21             VIDEOGRAPHER:  Okay.  We're now
22        going off the record, and the time is
23        12:15.
24        (Off the record at 12:15 p.m.)
25             VIDEOGRAPHER:  We are now going
```

```
 1        back on the record, and the time is
 2        12:53 p.m.
 3   QUESTIONS BY MR. TSAI:
 4        Q.    Good afternoon.
 5        A.    Good afternoon.
 6        Q.    Just one background question.
 7             When were you retained in this
 8   case?
 9        A.    I was retained in January 2018.
10        Q.    Do you agree that doctors are
11   trained to use their independent medical
12   judgment in making treatment or prescribing
13   decisions for their individual patients?
14             MR. ARBITBLIT:  Object to form.
15             THE WITNESS:  I think that
16        doctors today are -- the training
17        around exercising their individual
18        medical judgment is much less of an
19        emphasis than it was, say, 30 or
20        40 years ago.  I think there's much
21        more emphasis now on practicing what's
22        called evidence-based medicine.
23        That's a social movement that began in
24        the 1980s.
25             So there's enormous emphasis in
```

```
 1          medical training now on basing your
 2          treatment decisions on what the
 3          evidence shows.
 4     QUESTIONS BY MR. TSAI:
 5          Q.     In your opinion, do doctors
 6     have a duty, an obligation, professionally,
 7     to use their independent medical judgment in
 8     making decisions for treatment or prescribing
 9     based on their evaluation of their patients'
10     medical condition?
11               MR. ARBITBLIT:  Object to form.
12               THE WITNESS:  I think
13          exercising independent medical
14          judgment can be a good thing, if it's
15          informed by quality evidence, but if
16          independent decision-making is based
17          on a misrepresentation of the
18          evidence, that is a situation in which
19          that independent judgment does not
20          lead to good outcomes.
21     QUESTIONS BY MR. TSAI:
22          Q.     Have you reviewed the product
23     warning and labeling information for any of
24     the defendants' products in this case?
25          A.     Yes.
```

```
 1          Q.     Okay.  So you would agree that
 2     the risks of addiction and overdose with
 3     respect to prescription opioids were clearly
 4     disclosed, right upfront, in a black box,
 5     front page, in bold letters for a doctor to
 6     see?
 7               MR. ARBITBLIT:  Object to form.
 8               THE WITNESS:  Are you talking
 9          about the black box warnings
10          specifically, when you say "in a black
11          box"?
12     QUESTIONS BY MR. TSAI:
13          Q.     Yes.
14               Have you reviewed the black box
15     opioid addiction and overdose warnings for
16     defendants' prescription opioids?
17          A.     Yes.
18          Q.     And so you agree that a doctor
19     practicing in Cuyahoga and Summit Counties
20     would have to try not to see the black box
21     warning about addiction and overdose risks to
22     be unaware of it?
23               MR. ARBITBLIT:  Object to form.
24          Argumentative.
25               THE WITNESS:  Maybe you could
```

```
 1          rephrase the question.
 2     QUESTIONS BY MR. TSAI:
 3          Q.     A doctor practicing in Cuyahoga
 4     and Summit Counties would have readily
 5     available in a black box on the front page of
 6     the product warning information the
 7     information warning about the risks of opioid
 8     addiction and abuse; do you agree?
 9               MR. ARBITBLIT:  Object to form.
10               THE WITNESS:  I would agree
11          that the labeling -- that some of the
12          labels at various points in time
13          included warnings about addiction, but
14          not the extent of the risk of
15          addiction, which I think would be very
16          important to include, especially given
17          the false messaging on the part of
18          defendants about the very low risk of
19          addiction to opioids prescribed for a
20          medical condition.
21     QUESTIONS BY MR. TSAI:
22          Q.     In your opinion, were the
23     warnings about the extent of risk of
24     addiction in the product warning information
25     that was approved by the US FDA inadequate?
```

```
 1               MR. ARBITBLIT:  Object to form.
 2               THE WITNESS:  I think that
 3          physicians were not adequately
 4          informed about the risks of addiction
 5          in prescribing of opioids.
 6               To be adequately informed,
 7          simply knowing that there is a risk is
 8          insufficient.  They would also need to
 9          know about the extent of the risk.
10     QUESTIONS BY MR. TSAI:
11          Q.     Do you disagree with the FDA's
12     approval of prescription opioid medications
13     accompanied by those warnings?
14               MR. ARBITBLIT:  Object to form.
15               THE WITNESS:  So you're asking
16          me -- I'm sorry, maybe you can
17          rephrase the question, because I'm not
18          fully understanding your question.
19     QUESTIONS BY MR. TSAI:
20          Q.     Sure.
21               It sounds like you believe that
22     the FDA-approved warning information that
23     accompanied prescription opioids and were
24     provided to doctors was inadequate.
25               Is that your opinion?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. ARBITBLIT:  Object to form.
 2              THE WITNESS:  It's my opinion
 3       that to be fully informed about the
 4       risks of addiction to opioids, there
 5       should be included that -- the extent
 6       of the risk.
 7  QUESTIONS BY MR. TSAI:
 8       Q.     And do you believe that the
 9  warning that that, in fact,
10  accompanied prescription opioid medications
11  made and sold by the defendants and approved
12  by the FDA did not fully inform doctors of
13  that?
14              MR. ARBITBLIT:  Object to form.
15              THE WITNESS:  So I have not
16       been asked specifically to offer an
17       opinion on the role of the FDA.
18              My understanding is that other
19       experts will give testimony on that.
20              So my focus is not on that in
21       my report.
22  QUESTIONS BY MR. TSAI:
23       Q.     So you're not going to be
24  offering an opinion at trial telling the jury
25  that you think doctors weren't adequately
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1  informed by the information that they
 2  received in the FDA-approved warning labels
 3  that accompany prescription opioid
 4  medications; is that correct?
 5              MR. ARBITBLIT:  Objection.
 6       Objection.  Argumentative.  Misstates
 7       the record.
 8              THE WITNESS:  Could you
 9       rephrase the question?
10  QUESTIONS BY MR. TSAI:
11       Q.     You're not going to be offering
12  an opinion at trial telling the jury that you
13  think doctors weren't adequately informed by
14  the information that they received in the
15  FDA-approved warning labels that accompanied
16  prescription opioid medications; is that
17  correct?
18              MR. ARBITBLIT:  Objection.
19       Argumentative.  Misstates the record.
20              THE WITNESS:  Well, what I
21       would be testifying to a jury is that
22       there are many avenues by which
23       physicians get information about the
24       risks of a particular medicine that
25       they're prescribing, that the FDA
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       warning label is one source of
 2       information, but there are many other
 3       sources, which I refer to in my
 4       report, including continuing medical
 5       education, peer-reviewed literature,
 6       quality measures put forward by the
 7       Joint Commission.
 8              So the FDA labels are one part
 9       of that.
10  QUESTIONS BY MR. TSAI:
11       Q.     Any other sources of
12  information that doctors use in assessing the
13  risks and benefits and the propriety of
14  prescribing opioid medications?
15       A.     Well, another unfortunate
16  source is pharmaceutical company detailing,
17  so representatives from the pharmaceutical
18  industry going to doctors to essentially
19  advertise their drug, which we know has an
20  impact on prescribing, even when that doctor
21  doesn't believe that they've been impacted by
22  that contact.
23              So that's another source.
24       Q.     You're familiar with the
25  Cleveland Clinic?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.     Yes, I guess.
 2       Q.     In your opinion, do all the
 3  doctors at Cleveland Clinic who wrote
 4  prescriptions of opioid medications for their
 5  patients do so for the wrong reasons?
 6              MR. ARBITBLIT:  Object to form.
 7              THE WITNESS:  I would never
 8       make a broad, general claim like that.
 9  QUESTIONS BY MR. TSAI:
10       Q.     All right.  Do you -- let's
11  take a doctor at the Cleveland Clinic who
12  wrote prescriptions for his or her patients
13  for a defendant manufacturer who distributed
14  opioid medication.
15              Have you -- do you have any
16  reason to doubt that the doctor wrote it for
17  good reasons?
18              MR. ARBITBLIT:  Object to form.
19              THE WITNESS:  What do you mean
20       by "good reasons"?
21  QUESTIONS BY MR. TSAI:
22       Q.     For a legitimate and
23  appropriate and necessary medical condition.
24              MR. ARBITBLIT:  Object to form.
25
```

1   QUESTIONS BY MR. TSAI:
2       Q.   Have you reviewed any medical
3   records or any other information that allows
4   you to specify an instance where -- to doubt
5   that a doctor wrote an opioid prescription
6   for good reasons?
7           MR. ARBITBLIT:  Object to form.
8           THE WITNESS:  I think that
9       doctors trained in the 1990s and early
10      aughts continuing to today were
11      misinformed about the benefits and
12      risks of opioids such that there has
13      been an enormous amount of prescribing
14      opioids absent evidence to support
15      their use, but not because those
16      doctors are not good doctors.
17          In most cases they're
18      well-educated and well-intentioned,
19      but they have been led to believe
20      something false about the benefits and
21      risks of opioids such that their
22      prescribing has led to the harm of
23      their patients.  And I venture to say
24      that that includes doctors at the
25      Cleveland Clinic.

1   QUESTIONS BY MR. TSAI:
2       Q.   So let me give you a particular
3   example.
4           Do you agree that the most
5   common error made by physicians in using
6   opioid analgesics for pain relief is failure
7   to provide a sufficient dose to achieve
8   optimal relief?
9           MR. ARBITBLIT:  Object to form.
10          THE WITNESS:  I don't agree
11      with that.
12  QUESTIONS BY MR. TSAI:
13      Q.   Okay.  Tell me why you don't
14  agree with that statement.
15      A.   I think it's extremely
16  difficult to determine what an optimal dose
17  would be.  There is no pain-o-meter, so we
18  can't really objectively assess what a
19  patient's pain is.  The way that we use
20  opioids to treat pain is very much based on
21  what the prevailing practice is in a given
22  institution, hospital, community, country, at
23  that time.
24          And so I would argue that the
25  most common error made by physicians in using

1   opioid analgesics for pain relief is the
2   tendency to prescribe too high a dose and for
3   too long a duration, and I think we have
4   proof of that given that we are in the midst
5   of an opioid epidemic, which is first and
6   foremost an epidemic of overprescribing.
7       Q.   So just to be clear, there's no
8   thermometer analog, glucose meter analog, to
9   actually measure how much someone is
10  suffering from pain; you agree?
11      A.   Yes.
12      Q.   And because it's extremely
13  difficult to determine what an optimal dose
14  is, you would agree that the decision, with
15  respect to dose of an opioid medication, is
16  highly individualized?
17          MR. ARBITBLIT:  Object to form.
18          THE WITNESS:  No, I would
19      disagree with that, because we have a
20      wealth of evidence showing that
21      opioids prescribed above a certain
22      dose are highly dangerous and no
23      reliable evidence showing efficacy
24      used long term in the treatment of
25      chronic pain.

1   QUESTIONS BY MR. TSAI:
2       Q.   Do you agree that doctors at
3   the Cleveland Clinic followed treatment and
4   prescribing standards?
5           MR. ARBITBLIT:  Object to form.
6           THE WITNESS:  The standards for
7       treatment and prescribing over the
8       last three decades have been highly
9       manipulated by the defendants, such
10      that treatment standards today are not
11      based on the evidence.
12  QUESTIONS BY MR. TSAI:
13      Q.   Would you agree that the good
14  doctors in Cuyahoga and Summit Counties and
15  Cleveland Clinic know how to evaluate for
16  themselves an article they read in a medical
17  journal?
18          MR. ARBITBLIT:  Object to form.
19          THE WITNESS:  I believe that
20      most doctors, including those in
21      Cuyahoga and Summit County, don't have
22      the time or the training to read
23      peer-reviewed articles at the depth
24      required to appreciate the information
25      therein.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            And furthermore, the
 2     articles -- many of the articles that
 3     they have been exposed to have been
 4     manipulated by the defendants and are
 5     a misrepresentation of the evidence,
 6     such that doctors in Summit and
 7     Cuyahoga County cannot use their good
 8     judgment in individual cases because
 9     they don't have accurate evidence to
10     rely upon to inform that judgment.
11     QUESTIONS BY MR. TSAI:
12        Q.     Would you agree that the good
13     doctors at Cleveland Clinic and throughout
14     Cuyahoga and Summit Counties know how to
15     evaluate for themselves the information in an
16     FDA-approved label?
17            MR. ARBITBLIT:  Object to form.
18            THE WITNESS:  I would venture
19     to guess that many doctors don't rely
20     on the FDA label alone.  It's not even
21     a guess.  Doctors do not rely on the
22     FDA label alone in order to inform
23     their decisions.
24            They're much more likely to be
25     influenced by continuing medical
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     education courses they've attended, by
 2     the quality measures of their
 3     hospitals, and something as simple as
 4     how the practice of pain is conducted
 5     in that hospital.
 6     QUESTIONS BY MR. TSAI:
 7        Q.     So am I hearing that your null
 8     hypothesis is that when a doctor, in any
 9     given locality, prescribes an opioid
10     medication, then they have been duped into
11     that decision?
12        A.     Exactly, yes.
13        Q.     And you've written and stated
14     in various places that doctors themselves
15     must bear some responsibility for the opioid
16     epidemic, correct?
17        A.     Yes.
18        Q.     Okay.  If a doctor in Cuyahoga
19     and Summit Counties was prescribing opioid
20     medications to residents of the county purely
21     for their own personal profit, knowing that
22     those individuals really didn't need the
23     medicines for any medical pain condition, you
24     would agree that doctor is violating medical
25     ethics?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MR. ARBITBLIT:  Object to form.
 2            THE WITNESS:  I would agree
 3     that a doctor is violating
 4     medical ethics, but I have also
 5     written and published on the problem
 6     of prescribing, and we have shown,
 7     using Medicare Part D data, that the
 8     increase in opioid prescribing in this
 9     country over the past three decades
10     was not primarily due to a small
11     subset of prolific prescribers or
12     so-called pill mill doctors, unethical
13     doctors, doctors who have lost their
14     moral compass.  Those types of doctors
15     have always existed and will always
16     exist.
17            In fact, the increase in opioid
18     prescribing in this country has been
19     primarily driven by all types of
20     doctors across all types of
21     specialties because of the major
22     paradigm shift in the use of opioids
23     for minor and chronic pain conditions
24     as a result of misrepresentation of
25     the evidence on the part of the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     defendants.
 2     QUESTIONS BY MR. TSAI:
 3        Q.     If a doctor in the counties was
 4     prescribing opioid medications purely for
 5     their personal profit, knowing that the
 6     individual they're providing opioids to did
 7     not have a legitimate pain condition, would
 8     you agree that doctor is committing a crime?
 9            MR. ARBITBLIT:  Object to form.
10            THE WITNESS:  I would agree
11     that that doctor is committing a
12     crime, but I think doctors like that
13     constitute a small subset of the
14     overall opioid prescriptions.
15     QUESTIONS BY MR. TSAI:
16        Q.     Okay.  Do you have a method of
17     assigning the degree to which doctors in
18     Cuyahoga and Summit Counties, in your words,
19     bear some responsibility for the
20     overprescribing of opioids for chronic pain
21     versus the contribution of any of the other
22     factors we've discussed today?
23            MR. ARBITBLIT:  Object to form.
24            THE WITNESS:  I believe that
25     the majority of opioid prescribers in
```

1      Cuyahoga and Summit County and the
2      rest of the country are
3      well-intentioned doctors who were led
4      to believe that opioids work for
5      chronic pain and that the risks are
6      low, including the risk of addiction
7      and death.
8      QUESTIONS BY MR. TSAI:
9          Q.    Have you reviewed any materials
10     or have any other basis, or conducted any
11     kind of quantitative analysis, to reliably
12     rule out the likelihood that doctors in
13     Cuyahoga and Summit Counties, in your words,
14     bear some responsibility for the
15     overprescribing of opioids for chronic pain
16     to individuals in those counties?
17         MR. ARBITBLIT:  Object to form.
18         THE WITNESS:  I think that
19     prescribers bear responsibility in the
20     sense that they were misled by the
21     defendants, and they weren't more
22     questioning of what they were taught
23     in the '90s and early aughts.
24         And so they bear some
25     responsibility in the sense of not

1      having been more skeptical about the
2      use of opioids, but in general, I
3      believe that doctors were primarily
4      duped by the defendants into
5      prescribing opioids for chronic pain
6      and minor pain conditions.
7      QUESTIONS BY MR. TSAI:
8          Q.    And can you point to me
9      anywhere where you have quantified the degree
10     or extent of, as you say, the responsibility
11     of prescribers in Cuyahoga and Summit
12     Counties due to their lack of diligence or
13     negligence?
14         MR. ARBITBLIT:  Object to form.
15         THE WITNESS:  It's not a lack
16     of diligence or negligence.  It's a
17     matter of a paradigm shift in the way
18     that doctors were pressured into
19     treating pain with opioids, and I have
20     quantified that in an article that we
21     published in The Journal of the
22     American Medical Association, showing
23     that the increase in opioid
24     prescribing based on the Medicare
25     Part D database -- which is a database

1      that covers the entire United States,
2      showing that increased prescribing has
3      not been driven primarily by a small
4      subset of prolific prescribers, but by
5      a paradigm shift in prescribing
6      opioids across all different types of
7      prescribers such that we were all
8      prescribing more opioids as a result
9      of misrepresentation of the evidence
10     by the defendants.
11     QUESTIONS BY MR. TSAI:
12         Q.    And what was the quantification
13     of the degree of responsibility for
14     physicians in your analysis?
15         MR. ARBITBLIT:  Object to form.
16         THE WITNESS:  I feel like I've
17     answered that question.
18     QUESTIONS BY MR. TSAI:
19         Q.    Well, if there's an amount or a
20     number, would that be in the article?
21         MR. ARBITBLIT:  Object to form.
22     QUESTIONS BY MR. TSAI:
23         Q.    Or was it a qualitative
24     analysis?
25         A.    It was a quantitative analysis.

1          The article uses the
2      quantitative analysis of the Medicare Part D
3      database to demonstrate that pill mill
4      doctors, doctors who, as you suggested, are
5      committing crimes are not the major factor.
6      Those doctors exist.
7          Their behavior is
8      reprehensible, but the vast majority of
9      opioids prescribed in this country are
10     prescribed not by such ethically compromised
11     doctors, but by well-intentioned doctors who
12     have been prescribing according to the
13     misrepresentation of the evidence made
14     available to them by the actions of the
15     defendants.
16         (Lembke Exhibit 11 marked for
17     identification.)
18     BY MR. TSAI:
19         Q.    So I'll introduce exhibit next
20     in order.  So this is a --
21         A.    I don't have it yet.  Just grab
22     it?
23         Q.    I'll describe it to you while
24     the court reporter is marking it.
25         I'll represent to you that this

Highly Confidential - Subject to Further Confidentiality Review

```
1    is a press release from the US Department of
2    Justice.  It's dated August 22, 2018.
3                 Were you aware of that press
4    conference that happened right in Cleveland,
5    Ohio?
6         A.     I might have read about it if
7    it was in the public domain.  I don't
8    specifically recall.
9         Q.     Okay.  So if you could turn to
10   page -- starting on page 3 of this exhibit,
11   press release, and I would just like to focus
12   you in on this issue.  It is the third
13   paragraph from the bottom, and I'll just read
14   it.
15                "My third announcement arises
16   from Operation Darkness Falls, a joint
17   operation against dark net fentanyl
18   traffickers by the FBI, the IRS, our Postal
19   Inspectors and Homeland Security
20   investigators, again right here in northern
21   Ohio.
22                "Today I'm announcing that this
23   office has charged a husband and wife who, at
24   the time of their arrest, were the most
25   prolific dark fentanyl vendor in the United
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    States and the fourth most prolific on earth.
2    They were known online as MH4Life.
3                 "Last July, the Department of
4    Justice seized Alpha Bay, which was the
5    largest dark net marketplace in history."
6                 Moving on to page 3.  "This
7    site hosted some 220,000 drugs and countless
8    synthetic opioid overdoses, including the
9    tragic deaths of a 13-year-old," and it goes
10   on with a lot more details.
11                Are you familiar in your own
12   clinical work with patients with opioid use
13   disorder who are individuals who are addicted to
14   illegal or synthetic fentanyl?
15                MR. ARBITBLIT:  Object to form.
16   The question is unrelated to the
17   preface.
18                THE WITNESS:  So just to
19   restate your question, you're asking
20   me if I'm familiar in my clinical work
21   with patients with opioid use disorder
22   with individuals who are addicted to
23   illegal or synthetic fentanyl?
24   QUESTIONS BY MR. TSAI:
25        Q.     Have you worked with patients
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    who are addicted to illegal, synthetic
2    fentanyl?
3         A.     I have worked with patients who
4    are addicted to illegal opioids.
5         Q.     Okay.  And we can agree that
6    these dark net fentanyl dealers referred to
7    in the Department of Justice announcement are
8    criminals?
9                 MR. ARBITBLIT:  Object to form.
10                THE WITNESS:  I'm not a lawyer,
11   I haven't reviewed this, but it does
12   sound like they are criminals.
13   QUESTIONS BY MR. TSAI:
14        Q.     And if members of these dark
15   net fentanyl and other illegal drug selling
16   operation came into court and said, you know,
17   "Based on Dr. Lembke's expert opinion,
18   Gateway and Tsunami theories, I'm really not
19   guilty of anything; it's really the legal
20   drug manufacturers' and distributors' and
21   pharmacies' fault," would you support that
22   argument?
23                MR. ARBITBLIT:  Object to form.
24                Argumentative.
25                THE WITNESS:  The individuals
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    being accused here are the dealers; is
2    that right?
3    QUESTIONS BY MR. TSAI:
4         Q.     They are the operators of these
5    dark net fentanyl marketplaces.
6         A.     Okay.
7                 MR. ARBITBLIT:  There's no
8    question pending.  That's a statement.
9    Wait for a question.
10                THE WITNESS:  Okay.  Maybe you
11   could rephrase your question.
12   QUESTIONS BY MR. TSAI:
13        Q.     I'm just kind of seeing the
14   bounds of your opinion.
15                So if these dark net fentanyl
16   dealers said, "Well, you know, everyone has
17   been duped by this climate that you referred
18   to, I'm not guilty of anything, it's the
19   legal prescription, supply companies'
20   businesses" --
21                MR. ARBITBLIT:  Object to form.
22   QUESTIONS BY MR. TSAI:
23        Q.     -- "that should be indicted,"
24   would you agree with that argument?
25                MR. ARBITBLIT:  Object to form.
```

```
 1          Argumentative.
 2          THE WITNESS:  No, and that's
 3     not the argument that I've made.
 4     QUESTIONS BY MR. TSAI:
 5          Q.    So you agree that members of
 6     these dark net fentanyl and other illegal
 7     drug selling operations, including right here
 8     in northern Ohio, are responsible for their
 9     own criminal acts?
10          A.    Yes.
11          Q.    Okay.  In other words, the
12     existence of the legal prescription opioid
13     medication business is not a defense to the
14     crime of trafficking and possession of street
15     heroin and other illegal opioids?
16          MR. ARBITBLIT:  Object to form.
17          THE WITNESS:  I think without
18     knowing more, it's difficult for me to
19     comment, but most people who deal
20     opioids are also themselves addicted
21     to opioids.  So if these individuals
22     have become addicted to opioids, then
23     that would be a mitigating factor in
24     considering their punishment.
25          And I do think that the problem
```

```
 1          more broadly of opioids, including
 2     illicit opioids, is directly linked to
 3     the problem of overprescribing medical
 4     opioids as evidenced by the graph
 5     showing that as opioid prescriptions
 6     have increased over the past 15 to
 7     20 years, opioid overdose deaths have
 8     increased in lockstep.
 9     QUESTIONS BY MR. TSAI:
10          Q.    So you're not prepared to say
11     that with respect to these illegal fentanyl
12     operations that there is no connection to any
13     defendants' conduct?
14          MR. ARBITBLIT:  Object to form.
15          Argumentative.  Misstates the record.
16          THE WITNESS:  I think that
17     there's a potential for a connection
18     to the defendants' conduct.
19     QUESTIONS BY MR. TSAI:
20          Q.    Okay.  Would you be speculating
21     about that connection, or do you have any
22     specific basis that any defendant played any
23     part in these illegal fentanyl marketplaces?
24          MR. ARBITBLIT:  Object to form.
25          Argumentative and compound.
```

```
 1          THE WITNESS:  The connection to
 2     this conduct is a population of
 3     individuals who have become addicted
 4     to opioids as a result of the
 5     defendants' conduct, who are then
 6     seeking out illicit opioids as part of
 7     their addiction.  That, to me, is a
 8     link.
 9     QUESTIONS BY MR. TSAI:
10          Q.    And you would support a
11     defense, a mitigation defense, for these dark
12     net fentanyl dealers based upon this idea?
13          MR. ARBITBLIT:  Objection.
14     Argumentative.  Misstates the
15     testimony.
16          THE WITNESS:  I think you're --
17     maybe I'm misunderstanding you, but I
18     think you're making a connection that
19     I'm not making between the defense of
20     these dark net dealers and the fact
21     that we have an opioid epidemic.
22          Those, to me, are different
23     things.
24          I don't know enough about the
25     specifics of these dark net dealers to
```

```
 1     weigh in on any kind of defense for
 2     them, but I do think that there is a
 3     link between the fact that they have a
 4     booming market for their illicit
 5     opioids and the fact that the
 6     defendants' conduct contributed to an
 7     opioid epidemic based on
 8     misrepresentation of the evidence that
 9     led to physicians who were duped
10     overprescribing medical opioids.
11     QUESTIONS BY MR. TSAI:
12          Q.    And the link that you posited,
13     does that have any basis, anything specific
14     to these individuals that are called out in
15     this announcement?
16          MR. ARBITBLIT:  Object to form.
17          THE WITNESS:  Well, you are the
18     one who asked me to speculate based on
19     this, so I'm doing my best to try to
20     answer your question based on very
21     little information about these
22     individuals.
23     QUESTIONS BY MR. TSAI:
24          Q.    Okay.  So other than this, you
25     have not reviewed or are familiar with any
```

Highly Confidential - Subject to Further Confidentiality Review

1   conduct in relation to these dark net
2   fentanyl criminals; is that correct?
3           MR. ARBITBLIT:  Object to form.
4           THE WITNESS:  I feel like I
5           answered the question.
6   QUESTIONS BY MR. TSAI:
7       Q.    In preparation for your book,
8   you conducted interviews with patients who
9   received opioids and prescribers of opioids,
10  correct?
11      A.    Yes.
12      Q.    Okay.
13          MR. TSAI:  Could we get Tab 29?
14          (Lembke Exhibit 12 marked for
15          identification.)
16  QUESTIONS BY MR. TSAI:
17      Q.    So just to start out, in your
18  report on page 80, you talked about
19  manipulative behaviors of patients in
20  attempting to obtain opioid drugs from their
21  doctors.
22          Do you agree that patients
23  themselves engage in manipulative behaviors
24  to attempt to obtain opioid medications from
25  their doctor?

Highly Confidential - Subject to Further Confidentiality Review

1       A.    Yes, but it's important to
2   understand that behavior as part of the
3   disease of addiction.
4       Q.    Okay.  What types of
5   manipulative behaviors are examples that
6   you're familiar with?
7       A.    Doctors -- a patient's going to
8   multiple prescribers to get the same or a
9   similar prescription.  Patients exaggerating
10  their pain symptoms to get a certain type of
11  prescription.  Patients claiming to be
12  allergic to a certain medication in order to
13  get the specific medication that they want.
14          Those are some examples.
15      Q.    Okay.  So boiling it all down,
16  in those instances that you've described, the
17  patients are lying to their own doctors,
18  correct?
19          MR. ARBITBLIT:  Object to form.
20          THE WITNESS:  Yes.
21  QUESTIONS BY MR. TSAI:
22      Q.    And in your opinion, do you
23  believe that patients bear responsibility for
24  their decisions to lie to their doctors?
25          MR. ARBITBLIT:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  To me, the lying
2           is a result of their disease of
3           addiction, so in some sense they do
4           not actually have full capacity to be
5           responsible for those actions because
6           they're driven by the intense
7           physiologic need to get more opioids.
8   QUESTIONS BY MR. TSAI:
9       Q.    Have you reviewed any
10  information or have any other basis to
11  reliably rule out the likelihood that with
12  respect to opioids, patients in Cuyahoga and
13  Summit Counties lied to and manipulated their
14  doctors?
15      A.    I don't believe that Cuyahoga
16  and Summit Counties are an exception to
17  anywhere else in the United States.  And that
18  those individuals in Summit and Cuyahoga
19  County who have become addicted to opioids
20  may very well lie to and manipulate their
21  doctors as part of their disease of
22  addiction.
23      Q.    So if you could turn to your
24  Tab 29, and if you could go to the fourth
25  page in that packet.  Is that right?

Highly Confidential - Subject to Further Confidentiality Review

1           Actually, yeah, if you could --
2           these are the handwritten notes that were
3           provided by your counsel to us prior to this
4           deposition.  If you could -- and they weren't
5           numbered.
6           If you could turn to what is
7           sequentially page 9 of this packet, and if it
8           would help, there's -- in the middle of that
9           page, there is a heading or a phrase "how to
10          fool doctors."
11          Do you see that?
12      A.    Yes.
13      Q.    So part of this is just a
14  mechanical exercise to make sure I'm reading
15  your handwriting.
16          Let me read it.  "How to fool
17  doctors:  After the surgery it was easy to
18  get, very patient.  I would never try to push
19  or inject what I was looking for unless it
20  was the absolute thing to do.  Easy on the --
21  for them, for the narcotics, treat him, get
22  rid of him, seems like a nice guy, try to
23  fool him as inconspicuously as you can."
24          Does that look about right?
25      A.    Yes.

1    Q.    Can you explain the context of
2  the meaning of these notes?
3    A.    Sure.
4         So this is a qualitative
5  interview I did with a patient of mine who
6  became addicted to opioids through a doctor's
7  prescription, and he was somebody who was in
8  recovery from alcohol use disorder for over a
9  decade when he developed low back pain and
10  was prescribed opioids for that low back
11  pain.
12         That continued for some time,
13  and he -- because of the phenomenon of
14  cross-addiction, he immediately felt the same
15  physiologic urges that he had had with
16  alcohol but now replaced by opioids, and he
17  continued to go to his doctor to ask for more
18  opioids.  He felt he was in pain, but he also
19  felt on some level that he was craving
20  opioids because of his addiction.
21         And then he -- when the doctor
22  refused after a number of weeks to refill
23  that prescription, he began going to a
24  variety of walk-in clinics in order to get
25  opioids from the doctors working there.  And

1  he developed a kind of repertoire of
2  behaviors that he used in order to get this
3  prescription that he wanted.  Namely, a
4  prescription for opioids.
5         I will add that he is a very
6  lovely man, and that because of his exposure
7  to opioids through a medical prescription, he
8  relapsed his addiction and engaged in these
9  manipulative behaviors as a symptom of his
10  addiction.
11    Q.    So this individual for his
12  particular case history, he had alcohol use
13  disorder --
14    A.    Yes.
15    Q.    -- before ever being exposed to
16  prescription opioids?
17    A.    That's correct.
18    Q.    Okay.  And this individual,
19  this is an example of someone who is lying to
20  his doctor or multiple doctors in order to
21  get opioids?
22         MR. ARBITBLIT:  Object to form.
23         THE WITNESS:  Yes.  Uh-huh.
24         MR. TSAI:  Can we go off the
25  record?

1         VIDEOGRAPHER:  Okay.  We are
2  now going off the record, and the time
3  is 1:32 p.m.
4   (Off the record at 1:32 p.m.)
5         VIDEOGRAPHER:  We are now going
6  back on the record, and the time is
7  1:34 p.m.
8  QUESTIONS BY MR. TSAI:
9    Q.    So staying on that page, if you
10  could go down to the following paragraph.  I
11  just wanted to make sure I read this
12  correctly in your notes.  I have it as, "Some
13  colleagues' goals is just to keep up
14  percentage of money, just get them out the
15  door, time and space, one trusted colleague
16  said 'just give them what they want.'"
17         Did I read that accurately?
18    A.    I'm sorry, where -- is that the
19  same page or --
20    Q.    Sorry.  It is actually -- if
21  you, in this packet, go to the -- do you see
22  it near the end, this blue space?
23    A.    The blue -- the first blue
24  space?
25    Q.    The last blue space.

1    A.    The last blue space, okay.
2         And it is after the last blue
3  space?
4    Q.    It's before.
5         If you could flip four pages
6  before that, please, and as a marker the top
7  line says "fee structure."
8         MR. TSAI:  Can we go off the
9  record?  Maybe it will just be easier
10  for me to point it out.
11         VIDEOGRAPHER:  We are going off
12  the record.  And the time is 1:35 p.m.
13         (Off the record.)
14         We're still on.  Back on the
15  record.  It's 1:36 p.m.
16  QUESTIONS BY MR. TSAI:
17    Q.    So on that page, the paragraph,
18  I would say the second paragraph from the
19  bottom, I'm going to read it to see if I have
20  it accurately.
21         It says, "Some colleagues'
22  goals is just to keep up percentage of money,
23  just get them out the door, time and space.
24  One trusted colleague 'just said give them
25  what they want.'"

```
1              Did I read that accurately?
2       A.  Not quite.
3       Q.  Can you read it then?
4       A.  Sure.
5              "Some colleagues' goals is just
6  to keep the ED moving, just get them out the
7  door, time and space."
8       Q.  "One trusted colleague said
9  'just give them what they want'"?
10      A.  Yes.
11      Q.  And what does "the ED moving"
12 refer to?
13      A.  This is the emergency
14 department.
15      Q.  Okay.  And generally, this
16 packet of notes, you recognize this as a true
17 and correct copy of your notes?
18      A.  Yes, I do.
19      Q.  Okay.  And is this an example
20 of medical practitioners, doctors, who feel
21 pressured to, in your words, follow the
22 assembly line of prescribing and treating
23 patients?
24      A.  Yes, it is.
25          MR. TSAI:  I'm going to go off
```

```
1  the record.  I would like to take a
2  quick break.  Thanks.
3          VIDEOGRAPHER:  We're going off
4  the record, and the time is 1:37 p.m.
5      (Off the record at 1:37 p.m.)
6          VIDEOGRAPHER:  We are now going
7  back on the record, and the time is
8  1:56 p.m.
9      (Lembke Exhibit 13 marked for
10 identification.)
11 QUESTIONS BY MR. TSAI:
12      Q.  So the next exhibit is
13 Appendix I to your report, and it has five
14 sections.  Section B relates to Mallinckrodt.
15          Can you turn to that?
16      A.  Sure.
17      Q.  So, first of all, have you
18 reviewed any information that you can point
19 to or have any other basis to say that any of
20 the statements that you attribute to
21 Mallinckrodt in Appendix I.B of your report
22 were actually seen by any specific doctor or
23 other person in Cuyahoga and Summit Counties?
24      A.  I don't have specific examples,
25 but I do believe these misrepresentations
```

```
1  were widely disseminated, including in Summit
2  and Cuyahoga Counties.
3      Q.  So are you speculating that
4  they would be seen by doctors in Cuyahoga and
5  Summit Counties but cannot point to any
6  specific basis to back that up?  Is that fair
7  to say?
8          MR. ARBITBLIT:  Object to form.
9          THE WITNESS:  Because these
10 misrepresentations were so deeply
11 interwoven into medical education, it
12 would be hard for me to believe that
13 physicians in Summit and Cuyahoga
14 Counties hadn't seen these
15 misrepresentations, but I cannot point
16 to any specific examples.
17 QUESTIONS BY MR. TSAI:
18      Q.  And when you talked to doctors
19 after your pair of talks last year in Ohio,
20 did any of those doctors who practice in
21 Cuyahoga and Summit Counties tell you that
22 they relied on any of the statements that you
23 attribute to Mallinckrodt specifically?
24          MR. ARBITBLIT:  Object to form.
25          THE WITNESS:  The doctors that
```

```
1  I spoke with validated that the
2  misrepresentations laid out here in
3  this section under Mallinckrodt were
4  misrepresentations that they had been
5  the recipients of in their medical
6  training and that had led them to
7  prescribe opioids in a way that they
8  now realize was not evidence based.
9  QUESTIONS BY MR. TSAI:
10      Q.  Did anyone use the word
11 "Mallinckrodt"?
12      A.  No, not that I recall.
13      Q.  Did anyone use the word -- any
14 of the products that are -- that Mallinckrodt
15 made specifically?
16      A.  Not that I recall.
17      Q.  Okay.  Have you done any
18 analysis to determine whether or to what
19 extent Mallinckrodt's marketing of opioid
20 products, specifically Mallinckrodt,
21 influenced prescribing decisions or rates in
22 Cuyahoga and Summit Counties?
23          MR. ARBITBLIT:  Object to form.
24          THE WITNESS:  Mallinckrodt held
25 the Train-the-Trainer events which
```

```
 1        communicated these misrepresentations
 2        to individuals who then went
 3        throughout the country disseminating
 4        these misrepresentations, and I don't
 5        have any specific examples, but I
 6        wouldn't be surprised if they
 7        disseminated these misrepresentations
 8        also in Summit and Cuyahoga Counties.
 9             Also Mallinckrodt promoted a
10        book through the CARES Alliance called
11        Defeat Chronic Pain Now!, and I
12        wouldn't be surprised if that book was
13        read by providers in Cuyahoga and
14        Summit County and that book contained
15        these misrepresentations.
16   QUESTIONS BY MR. TSAI:
17        Q.    So you say you wouldn't be
18   surprised, but can you point to anything in
19   your materials that you've provided to us
20   that specifically isolates the contribution
21   of Mallinckrodt's conduct to promotional
22   activity with respect to opioid prescribing
23   or any adverse event in Cuyahoga and Summit
24   County?
25             MR. ARBITBLIT:  Object to form.
```

```
 1             THE WITNESS:  No, I cannot, but
 2        as I said before, I don't think
 3        Cuyahoga and Summit Counties are an
 4        exception to the national trend.
 5             (Lembke Exhibit 14 marked for
 6        identification.)
 7   QUESTIONS BY MR. TSAI:
 8        Q.    So the next exhibit -- if you
 9   could turn to page 4 of the Mallinckrodt
10   section.
11        A.    Yes.
12        Q.    So the topic under Number 5 is
13   "Abuse-Deterrent Formulations Prevent
14   Addiction," and you reference this exhibit,
15   which is the next exhibit -- it starts
16   MNK-T1.  The range is 529004 to 529126.
17             And once that's introduced, I
18   would like you to turn to the -- yeah.
19             If you could turn to the page
20   that's -- has -- ends in Bates Number 9077.
21        A.    529077?
22        Q.    529077, correct.
23             Do you have any basis to say
24   that Mallinckrodt ever characterized one of
25   its own opioid products specifically as abuse
```

```
 1   deterrent?
 2             MR. ARBITBLIT:  Object to form.
 3             THE WITNESS:  I believe that in
 4        one -- in the Mallinckrodt
 5        Train-the-Trainer events, there were
 6        speakers who claimed that
 7        abuse-deterrent formulations make
 8        abuse more difficult, and since
 9        Mallinckrodt sponsored that event, the
10        implication is that that would include
11        Mallinckrodt's products.
12             MR. TSAI:  I'll move to strike.
13   QUESTIONS BY MR. TSAI:
14        Q.    My question was:  Can you name
15   a particular product made by Mallinckrodt
16   that Mallinckrodt characterized as being
17   abuse deterrent?
18             MR. ARBITBLIT:  Object to form.
19   QUESTIONS BY MR. TSAI:
20        Q.    And if so, could you --
21        A.    Broadly speaking, I would say
22   that Mallinckrodt, like other defendants,
23   misrepresented the risk of addiction to
24   opioids prescribed for chronic pain, and in
25   that sense communicated that the risk was low
```

```
 1   or nonexistent, implying abuse deterrent.
 2             MR. TSAI:  And for the record,
 3        again, I'll move to strike, and that
 4        is absolutely not responsive to my
 5        question.
 6   QUESTIONS BY MR. TSAI:
 7        Q.    Let me say it again.  Can you
 8   name a particular product made or sold by
 9   Mallinckrodt that Mallinckrodt characterized
10   as this product is abuse deterrent?
11             MR. ARBITBLIT:  Object to form.
12             THE WITNESS:  I think that
13        Mallinckrodt and the other defendants
14        in many ways characterized all of
15        their opioids as abuse deterrent, as
16        long as they were being prescribed by
17        a doctor for a medical condition.
18   QUESTIONS BY MR. TSAI:
19        Q.    Okay.  And you cited this
20   document, and you specifically cited in your
21   report at page 529077, and this says,
22   "Abuse-deterrent formulations, as the name
23   implies, make the abuse of the medication
24   more difficult.  Recently the FDA released a
25   guidance statement pertaining to the
```

1  evaluation and labeling of certain

2  abuse-deterrent formulations.

3         That's what you cited in your

4  report.

5         There's nothing here specific

6  to a Mallinckrodt product; do you agree?

7         MR. ARBITBLIT:  Object to form.

8         THE WITNESS:  I agree.

9  QUESTIONS BY MR. TSAI:

10     Q.    If you could now go to -- back

11 to Mallinckrodt section page 4 where we were,

12 the Item 4, the topic is "Pseudoaddiction-

13 Respond With More Opioids."  I have it at 32.

14        So taking a step back, do you

15 agree that if a patient came to you seeking a

16 higher dose of opioid medications, for

17 example, "Doctor, my spinal stenosis is

18 killing me, I think I need more pain relief,"

19 would you automatically conclude that he has

20 opioid use disorder, or would you further

21 investigate?

22        MR. ARBITBLIT:  Object to form.

23        Incomplete hypothetical.

24        THE WITNESS:  Your question

25        suggests that there are only two

---

1  choices there, that either that's a

2  legitimate reason to go up or he has

3  opioid use disorder.  I don't think

4  that's how I would conceptualize that

5  situation.

6         I think a patient could come in

7  and say, "Doctor, I need more opioids

8  because my pain is unbearable," and

9  that that would not necessarily imply

10 that that individual has opioid use

11 disorder.

12        On the other hand, that also

13 isn't indication to go up on the

14 opioids since there's no reliable

15 evidence that increasing the dose or

16 even using opioids in the first place

17 works for chronic pain and the risk

18 factors go up with dose and duration.

19        (Lembke Exhibit 15 marked for

20        identification.)

21 QUESTIONS BY MR. TSAI:

22     Q.    If we could look at the next

23 exhibit.  This is the document that you cited

24 for this characterization.

25        And I would like to direct

---

1  you -- this is MNK-T1_1279950.

2         And it was produced in native,

3  so I'll ask you to turn to the internal

4  slide 45.

5         Do you see that?

6         Do you agree that on this slide

7  that you cited in your report, it doesn't

8  actually say "Pseudoaddiction-Respond With

9  More Opioids," correct?

10        MR. ARBITBLIT:  Object to form.

11        THE WITNESS:  You're referring

12     to the heading?  You're referring to

13     my heading there?

14 QUESTIONS BY MR. TSAI:

15     Q.    You referenced Slide Number 45?

16     A.    Uh-huh.

17     Q.    And you referenced that as a

18 misrepresentation, which you characterize as

19 "Pseudoaddiction-Respond With More Opioids."

20        Do you agree that what you

21 referenced doesn't actually say that?

22        MR. ARBITBLIT:  Object to form.

23        THE WITNESS:  So that's a

24     heading that "Pseudoaddiction-Respond

25     With More Opioids," is in bold

---

1  letters.  It's the heading to

2  introduce the misrepresentation.

3  That's not in quotes, so it's not an

4  error.

5  QUESTIONS BY MR. TSAI:

6      Q.    Do you have any basis to say

7  that Mallinckrodt ever used the term

8  "pseudoaddiction" in connection with one of

9  its own products specifically?

10        MR. ARBITBLIT:  Object to form.

11        THE WITNESS:  This example here

12     is from a Train-the-Trainer event that

13     Mallinckrodt put on to educate a cadre

14     of speakers who would again go out and

15     disseminate the concept of

16     pseudoaddiction more broadly among

17     physicians in the United States.  It

18     doesn't matter that they didn't

19     specifically mention their product.

20        They were promoting this

21     misrepresentation, which changed the

22     way that physicians prescribed opioids

23     which promoted their product.

24 QUESTIONS BY MR. TSAI:

25     Q.    Can you identify any

1     Mallinckrodt product that the company
2     promoted using the term "pseudoaddiction"?
3              MR. ARBITBLIT:  Object to form.
4              THE WITNESS:  I feel like I
5         answered that question.
6     QUESTIONS BY MR. TSAI:
7         Q.     I haven't heard it, the name of
8     a product; is that correct?
9              MR. ARBITBLIT:  Object to form.
10            Argumentative.
11             THE WITNESS:  This reference
12        here comes from something called
13        Exalgo REMS and CARES Alliance
14        Train-the-Trainer, CARES Alliance
15        education module.  So Exalgo, which is
16        one of Mallinckrodt's products, is in
17        the heading of this Train-the-Trainer
18        event.
19    QUESTIONS BY MR. TSAI:
20        Q.     Do you agree that there are
21    indicators of addiction that are more
22    indicative of addiction compared to others?
23             MR. ARBITBLIT:  Object to form.
24    QUESTIONS BY MR. TSAI:
25        Q.     As set forth in this slide?

1              MR. ARBITBLIT:  Object to the
2         form.
3              THE WITNESS:  I believe that
4         the diagnosis of addiction shouldn't
5         be made on just one behavior.  It has
6         to be a 360-degree view of all of the
7         circumstances involved.
8     QUESTIONS BY MR. TSAI:
9         Q.     So stealing money to obtain
10    drugs, you would agree, is a behavior more
11    indicative of potential addiction than using
12    more opioids than recommended?
13             MR. ARBITBLIT:  Object to form.
14             THE WITNESS:  Not necessarily.
15             Given that individual's
16        circumstance, stealing money to obtain
17        drugs or using more than recommended,
18        they may have equal severity of
19        disease.  It really depends.
20             Because of the myth perpetrated
21        by the defendants that no dose is too
22        high, I have seen many cases of
23        patients who were receiving many more
24        morphine milligram equivalents daily
25        directly from their prescriber than

1         patients who are getting illicit
2         opioids on the street.
3              So for several generations it
4         wasn't necessary to go out and find a
5         dealer or to steal money or any of
6         these other listings in order to be
7         severely addicted because you could
8         get your opioids directly from a
9         well-intentioned doctor who was taught
10        that no dose is too high.
11    QUESTIONS BY MR. TSAI:
12        Q.     So the differential diagnosis
13    of whether a particular individual has true
14    addiction under DSM-IV, DSM-V, what have you,
15    versus needing more pain relief legitimately,
16    does depend on individual circumstances, you
17    would agree?
18             MR. ARBITBLIT:  Object to form.
19             THE WITNESS:  I agree that all
20        of the information needs to be taken
21        into account with the caveat that
22        several generations of physicians have
23        been miseducated as to the evidence.
24             (Lembke Exhibit 16 marked for
25        identification.)

1     QUESTIONS BY MR. TSAI:
2         Q.     And you mentioned dose.  If you
3     could look at the next exhibit in order.
4              And this is still on page 4 of
5     the Mallinckrodt section of Appendix I.B,
6     Number 3 heading is the topic of "No Dose is
7     Too High," and you cited MNK-T1_626241
8     through 626269, specifically at page 6262 and
9     once the exhibit is marked, if you could turn
10    to that.
11        A.     What page number in the
12    exhibit?
13        Q.     6262 is the ending.
14        A.     It only goes up to -- oh.
15        Q.     The next exhibit.
16        A.     I see.  I'm sorry.  626257?
17        Q.     626262.
18        A.     Oh, okay.
19        Q.     And once again, just for
20    clarity, the heading that you have in your
21    report, "No Dose is Too High," it doesn't
22    actually say that in the page that you've
23    cited in Mallinckrodt's document; do you
24    agree?
25             MR. ARBITBLIT:  Object to form.

```
 1            THE WITNESS:  I don't see those
 2       exact words, but equivalent words,
 3       quote, "Be sure to continue to titrate
 4       upwards until an effective dose is
 5       reached.  This is essential to overall
 6       patient success," unquote.
 7   QUESTIONS BY MR. TSAI:
 8       Q.    Do you have any basis to say
 9   that Mallinckrodt ever caused any doctor in
10   Cuyahoga and Summit Counties to overtitrate
11   to such a level that led to an adverse event?
12            MR. ARBITBILT:  Object to form.
13            THE WITNESS:  I believe that
14       doctors in the Summit and Cuyahoga
15       County, like the rest of the nation,
16       were taught that no dose is too high,
17       such that they increased their doses
18       of their patients with good
19       intentions, putting those patients at
20       imminent risk for overdose and
21       addiction.
22            And we know that Cuyahoga and
23       Summit Counties have not been spared
24       the opioid epidemic, that there are if
25       not equal, even worse rates of opioid
```

```
 1       addiction and overdose in the state of
 2       Ohio and in those counties.
 3   QUESTIONS BY MR. TSAI:
 4       Q.    Can you name a single specific
 5   doctor or patient that fits that scenario
 6   that you've just posited in Cuyahoga --
 7            MR. ARBITBILT:  Object to form.
 8   QUESTIONS BY MR. TSAI:
 9       Q.    -- and Summit Counties?
10            MR. ARBITBILT:  Object to form.
11            THE WITNESS:  I can't name
12       specifics, but given the death
13       rates...
14   QUESTIONS BY MR. TSAI:
15       Q.    So in your report, you talk
16   about an article that talks about a 1 percent
17   rate of addiction.
18            Can you identify any instance
19   where Mallinckrodt used the phrase "less than
20   1 percent get addicted"?
21       A.    Mallinckrodt has used terms
22       such as "rarely" and "uncommon" to describe
23       the risk of addiction in patients treated
24       with opioids for chronic pain.
25            I don't see the specific
```

```
 1   reference to less than 1 percent, but they
 2   used equivalent phrases.
 3       Q.    And my last question:  Do you
 4   have any basis to say that when doctors in
 5   Cuyahoga or Summit County heard the
 6   qualitative adjectives "low" or "rarely,"
 7   that they had any specific number in mind?
 8            MR. ARBITBILT:  Object to form.
 9            THE WITNESS:  The messaging
10       that was dominant in the '90s and
11       early aughts, all over the United
12       States, was that the risk of addiction
13       is rare, uncommon, less than
14       1 percent, very unlikely in patients
15       treated with opioids for a chronic
16       pain condition.
17            And so, hence, I believe that
18       prescribers in Cuyahoga and Summit
19       Counties were also led to believe that
20       that was the case, even though that is
21       a misrepresentation of the evidence.
22   QUESTIONS BY MR. TSAI:
23       Q.    Did you conduct any survey or
24   any analysis of any doctors in Cuyahoga and
25   Summit Counties regarding what number they
```

```
 1   associate, say, with the adjective "low"?
 2            MR. ARBITBILT:  Object to form.
 3            THE WITNESS:  I didn't do a
 4       survey on the adjective "low" in
 5       Summit or Cuyahoga Counties.
 6            MR. TSAI:  Thank you.
 7       Reserving all rights, I'll pass the
 8       witness at this time.  We should go
 9       off the record.
10            VIDEOGRAPHER:  Okay.  We're now
11       going off the record, and the time is
12       2:20 p.m.
13        (Off the record at 2:20 p.m.)
14            VIDEOGRAPHER:  We are now going
15       back on the record, and the time is
16       2:22 p.m.
17            CROSS-EXAMINATION
18   QUESTIONS BY MR. LAVELLE:
19       Q.    Good afternoon, Doctor.  My
20   name is John Lavelle, I'm an attorney at
21   Morgan Lewis, and I'm representing Rite Aid
22   of Maryland doing business as Mid Atlantic
23   Distribution Center.
24            Are you aware that pharmacies
25   have been sued as defendants in this
```

1  litigation?

2        A.     Yes, I am.

3        Q.     Okay.  Now, when you were

4  retained as an expert in the case in January

5  of 2018, the pharmacies were not defendants;

6  is that right?

7        A.     I was not aware of that.

8        Q.     Okay.  When did you become

9  aware that pharmacies were defendants in the

10  litigation?

11        A.     When I read the complaint.

12        Q.     All right.  You must have read

13  the first amended complaint, because they

14  weren't in the original complaint, right?

15              So when did you read the

16  complaint that had the pharmacies as

17  defendants?

18        A.     About two weeks ago.

19        Q.     Okay.  In preparation for

20  today's deposition.

21        A.     That's right.

22        Q.     So I'm going to be asking you

23  some questions on behalf of a group of

24  defendants who we refer to as the retail

25  pharmacy defendants.  So let me just name

1        them for you and ask you whether you're aware

2        that they are defendants.  So the first one

3        is the client I am representing, Rite Aid.

4              You're aware that Rite Aid is a

5        defendant in the case?

6        A.     Yes.

7        Q.     Other retail pharmacy

8        defendants include Walgreens.  Are you aware

9        that they're a defendant in the case?

10        A.     Yes.

11        Q.     Are you aware that Walmart is a

12        defendant in the litigation?

13        A.     Yes.

14        Q.     You're aware that CVS is a

15        defendant in the litigation?

16        A.     Yes.

17        Q.     Are you aware that Giant Eagle

18        is a defendant in the litigation?

19        A.     Yes.

20        Q.     Okay.  And you became aware of

21        all of those as defendants as of two weeks

22        ago; is that right?

23        A.     That's correct.

24        Q.     Now, you prepared your report

25        in this matter as of March 25, 2019; is that

1  right?

2        A.     Yes.

3        Q.     I'm just looking at the cover

4  of your report, and that's the date that you

5  have on it, right?

6        A.     Well, I would say that my

7  report is based on the research that I did

8  prior to being retained by counsel, as well

9  as the ongoing and additional research that I

10  did beginning in the spring of 2019 until the

11  finalized and submitted report.

12        Q.     Understood.

13              So the finalized and submitted

14  report was dated March 25, 2019; is that

15  correct, Doctor?

16        A.     I think that's the date, yes.

17        Q.     Were you aware when you

18  finalized this report that all those retail

19  pharmacy defendants were defendants in the

20  litigation?

21        A.     I knew that pharmacies were

22  defendants in the litigation, along with

23  distributors and opioid manufacturers.  I

24  wasn't aware of the specific pharmacies that

25  were named.

1        Q.     All right.  So I'm just trying

2        to get the timing --

3        A.     Yes.

4        Q.     -- the timing right, because I

5        think you said earlier, and I don't want to

6        misrepresent it, but you learned about the

7        specific pharmacies about two weeks ago when

8        you were preparing for the deposition?

9        A.     Yes.  But I knew that

10        pharmacies were named much earlier on.

11        Q.     I see.

12              All right.  So --

13        A.     And I'm sorry.

14        Q.     Yes.

15        A.     I also read an earlier version

16        of the complaint much earlier than two weeks

17        ago.  I can't remember the exact date that I

18        read the earlier version of the complaint.

19        Q.     Do you recall whether that

20        earlier version of the complaint had

21        pharmacies as defendants in the case?

22        A.     I believe that it did.

23        Q.     All right.  Are you aware of

24        what the plaintiffs' claims are against the

25        retail pharmacies in this litigation?

```
 1         A.    I haven't been asked to express
 2   an opinion on that.  I understand that there
 3   will be other expert witnesses who will
 4   testify in that regard, but broadly speaking,
 5   based on my understanding of the overall
 6   problem, as well as my reading of the
 7   complaint, pharmacies are accused of not
 8   acting or turning the other cheek when it was
 9   patently obvious that they were disseminating
10   prescription opioid pain relievers to
11   individuals who were struggling with opioid
12   addiction and at risk because of opioids.
13         Q.    So just to break that down.
14   I'll have a couple follow-ups for you on
15   that.
16               Do you know whether these
17   retail pharmacy chains have been sued as
18   distributors or as dispensers or both?
19               MR. ARBITBLIT:  Object to form.
20               THE WITNESS:  My understanding,
21               based on what's in the public domain,
22               as well as my reading of the
23               complaint, is that there are
24               essentially three groups of
25               defendants:  There are opioid
```

```
 1         manufacturers; there are opioid
 2         distributors; and there are opioid
 3         pharmacies, some of which act also as
 4         dispensers.
 5   QUESTIONS BY MR. LAVELLE:
 6         Q.    All right.  So you believe, as
 7   you sit here today, that there are claims
 8   against the pharmacies as dispensers?
 9               MR. ARBITBLIT:  Object to form.
10   QUESTIONS BY MR. LAVELLE:
11         Q.    Is that what you believe?
12         A.    Could you define "dispensers"?
13         Q.    Yes.
14               Someone who fills prescriptions
15   for a medical product such as an opioid.
16         A.    Yes, that's my understanding.
17         Q.    Okay.  Now, I think you said in
18   response to a question a couple moments ago
19   that you have not formed any opinions with
20   respect to the pharmacies; is that correct?
21         A.    I was not asked to opine with
22   respect to pharmacies, but broadly I agree
23   with the complaint that all of those entities
24   comprise what I have called the
25   pharmaceutical opioid industry, and all bear
```

```
 1   some responsibility.
 2         Q.    All right.  So we're going to
 3   need to get into that in a little more detail
 4   because that was one question I had for you,
 5   is you used the term in this report
 6   "pharmaceutical opioid industry," but you
 7   haven't defined what that -- what you mean by
 8   that.
 9               Can you explain what you mean
10   by that and who was included in that?
11         A.    The pharmaceutical opioid
12   industry, as used in my report, refers to the
13   named opioid manufacturers, the named opioid
14   distributors, and the named opioid dispensing
15   pharmacies.
16         Q.    All right.  Are you aware of
17   any marketing of opioids that was done by any
18   of the retail chain pharmacies?
19         A.    No, I am not.
20         Q.    And, in fact, you do not
21   reference any marketing of opioids by any of
22   the retail chain pharmacies in your report;
23   isn't that correct?
24         A.    That is correct.
25         Q.    So when you have talked during
```

```
 1   your deposition today and when you talk in
 2   your report about marketing by defendants or
 3   marketing by the pharmaceutical opioid
 4   industry, you're not referring to any of the
 5   retail chain pharmacies, right?
 6         A.    That's correct.
 7         Q.    You're not referring to Rite
 8   Aid; you're not referring to Walmart; you're
 9   not referring to CVS, Walgreens or Giant
10   Eagle.  Is that correct?
11         A.    That's correct.
12         Q.    Did you review any marketing
13   materials from any of those entities?
14         A.    I did not.
15         Q.    To the best of your knowledge,
16   did any of those entities actually engage in
17   any marketing of opioids?
18         A.    Not to my knowledge.
19         Q.    Now, would you agree with me
20   that pharmacists have a duty to fulfill
21   prescriptions that are presented to them when
22   there's a valid doctor-patient relationship?
23               MR. ARBITBLIT:  Object to form.
24               THE WITNESS:  Pharmacists have
25               many duties, one of which includes
```

1  filling prescriptions, but they also
2  have a duty to keep patients safe and
3  when they see warning signs about a
4  patient asking for certain types of
5  medications, be it the type of
6  medication or the mixing of that
7  medication with another dangerous
8  medication or the quantity of that
9  medication, they have a duty to warn
10  the patient and potentially also
11  contact the provider and warn the
12  provider.
13        And if it's on a large-enough
14  scale, I would think that they would
15  have a duty to also alert the
16  distributors, the FDA, anybody else
17  who's involved in making sure that
18  patient stays safe vis-à-vis these
19  medications.
20  QUESTIONS BY MR. LAVELLE:
21     Q.     Now, you do not have that --
22  you have not expressed that opinion in your
23  report; is that correct?
24     A.     That's correct.
25     Q.     You weren't asked to offer an

1  opinion on that; is that correct?
2     A.     That's correct.
3     Q.     And you don't have that opinion
4  to a reasonable degree of medical certainty;
5  is that correct?
6        MR. ARBITBLIT:  Object to form.
7        THE WITNESS:  Well, I have that
8     opinion, and I'm pretty certain about
9     it, but I wasn't asked to opine on it
10     in my report.
11  QUESTIONS BY MR. LAVELLE:
12     Q.     Okay.  If you believe that
13  doctors were duped into increasing opioid
14  prescriptions, do you believe pharmacists
15  were also duped?
16     A.     I think it's possible that on
17  an individual basis some pharmacists were
18  also not aware of the dangers with opioids.
19  It's possible.
20     Q.     It's possible, but you're not
21  certain?
22     A.     That's right.
23        Mainly because I'm not as
24  familiar with pharmacy training as I am with
25  physician training.

1     Q.     What knowledge do you have
2  about pharmacy training?
3     A.     I know that they have a
4  certification -- they have schooling, a
5  certification process, but I don't know a
6  whole lot more than that.
7     Q.     Okay.  You're not a pharmacist?
8     A.     No.  And I haven't studied what
9  pharmacists go through.
10     Q.     And you wouldn't hold yourself
11  out as having expertise with respect to
12  pharmacy?
13     A.     That's correct.
14     Q.     A second here.  Do you have any
15  knowledge as we sit here today concerning the
16  distribution activities of any of those
17  retail pharmacy chains that I mentioned
18  earlier?
19     A.     I have some knowledge based on
20  what's in the public domain about
21  distribution activities more broadly of
22  opioid pain pills, specifically the influx of
23  very large amounts of opioid pain pills in
24  small communities that could not possibly be
25  justified based on the need for analgesia in

1  that community.
2     Q.     Do you know, as you're sitting
3  here today, whether any of the retail chain
4  pharmacies I mentioned earlier actually
5  distributed opioids?
6     A.     I have not been asked to opine
7  on that.
8     Q.     And you don't know which
9  opioids they distributed, if any; is that
10  right?
11     A.     That's right.
12        MR. LAVELLE:  Okay.  I'm going
13     to stop there.  Thank you, Doctor.
14        THE WITNESS:  You're welcome.
15        VIDEOGRAPHER:  Okay.  We're now
16     going off the record, and the time is
17     2:33 p.m.
18     (Off the record at 2:33 p.m.)
19        VIDEOGRAPHER:  We are now going
20     back on the record, and the time is
21     2:35 p.m.
22              CROSS-EXAMINATION
23  QUESTIONS BY MR. MOONEY:
24     Q.     Good afternoon.  My name is
25  Matt Mooney.  I am an attorney with the law

1    firm of Williams & Connolly.

2         You said you read the

3    complaint -- the complaints in this case, at

4    least two weeks ago, possibly before; is that

5    right?

6         A.    Yes.

7         Q.    And I believe you said that

8    you're aware of the role of distributors in

9    this case; is that correct?

10        A.    That's correct.

11        Q.    Which distributors have been

12   named as defendants in this litigation?

13        A.    Cardinal, McKesson,

14   AmerisourceBergen are the ones that I recall.

15        Q.    Okay.  Do you know if any other

16   distributors were named as defendants in this

17   litigation?

18        A.    I can't recall.

19        Q.    Prescription Supply, have you

20   ever heard of that company?

21        A.    No.

22        Q.    Do you know if they're named as

23   a defendant in this case?

24        A.    I don't recall.

25        Q.    How about a company called

1    Henry Schein, do you know if they're a

2    defendant in this case?

3         A.    I don't recall.

4         Q.    Miami-Luken?

5         A.    I don't recall.

6         Q.    Anda?

7         A.    I don't recall.

8         Q.    Earlier today you said that you

9    acknowledged the distributors' contribution

10   to the opioid epidemic; is that right?

11        A.    Yes.

12        Q.    Okay.  Are you prepared to

13   offer an opinion in this litigation

14   concerning the contribution of any

15   distributor to the opioid epidemic?

16        A.    It's my opinion -- it's my

17   understanding that other expert witnesses

18   will be offering testimony on distributors.

19   I've not been asked to offer testimony on

20   that.

21        Q.    Okay.  And so when you

22   referenced the pharmaceutical opioid industry

23   in your report, are distributor defendants

24   included in that insofar as -- strike all

25   that.

1         You mentioned the

2    pharmaceutical opioid industry in your

3    report, and you told Mr. Lavelle that as you

4    define that term, it includes manufacturers,

5    distributors and pharmacies; is that right?

6         A.    That's right.

7         Q.    When you reference misleading

8    or false marketing material and attribute it

9    to the pharmaceutical opioid industry in your

10   report, are you referring to the distributors

11   that have been named as defendants in this

12   case?

13        A.    No.

14        Q.    And in preparing your report,

15   did you consider any documents that were

16   produced by a distributor that is named as a

17   defendant in this case?

18        A.    No.

19        Q.    Do you have any training or

20   expertise in supply chain management?

21        A.    No.

22        Q.    Do you have any training or

23   expertise in the distribution of controlled

24   substances?

25        A.    No.

1         Q.    Do you have any training or

2    experience in suspicious order monitoring for

3    controlled substances?

4         A.    No.

5         Q.    Do you have any training or

6    expertise in a distributors' legal or

7    regulatory responsibilities concerning the

8    distribution of controlled substances?

9         A.    No.

10        Q.    Do you have your report in

11   front of you?

12        A.    I do.

13        Q.    Okay.  If you don't mind

14   turning to page 82 of your report.

15        Are you there?

16        A.    Yes.

17        Q.    Okay.  Do you see where you

18   say, "In the case of prescription opioids,

19   factors relevant to that epidemic have been

20   addressed throughout this report and are

21   summarized as follows."

22        Do you see where it says that

23   in your report?

24        A.    Yes.

25        Q.    And then one of the bullets

```
 1    below says, "An efficient distributor supply
 2    chain made prescription opioids available on
 3    a mass scale to large numbers of people in
 4    rural and remote settings expanding both the
 5    elicit and illicit drug market and sets this
 6    opioid epidemic apart from prior epidemics
 7    and other drug epidemics."
 8              Did I read that correctly?
 9         A.   Yes.
10         Q.   And that paragraph doesn't have
11    a footnote identifying any documents that
12    support that position; is that correct?
13         A.   That's correct.
14         Q.   Okay.  Where else in your
15    report did you address the fact that an
16    efficient distributor supply chain made
17    prescription opioids available in a mass
18    scale?
19         A.   That's the only place.
20         Q.   Okay.  And what do you mean by
21    "an efficient distributor supply chain"?
22         A.   By that I mean the fact that
23    very easily large quantities of opioid pain
24    pills could be disseminated all across the
25    country, even in remote and rural regions,
```

```
 1    putting those individuals at higher risk
 2    because access to addictive substances is one
 3    of the major risk factors for becoming
 4    addicted.
 5         Q.   Okay.  And are you going to be
 6    offering an opinion in this litigation that
 7    an efficient distributor supply chain made
 8    prescription opioids available on a mass
 9    scale?
10         A.   It's in my report, so I will be
11    offering that opinion.
12         Q.   Okay.  And so what did you --
13    what documents did you rely upon to determine
14    that an efficient distributor supply chain
15    made prescription opioids available on a mass
16    scale to large numbers of people, expanding
17    both the elicit and illicit drug market?
18         A.   I based that on the
19    epidemiology of the opioid epidemic and the
20    fact that unlike other drug crises in our
21    history which typically have been isolated to
22    specific geographical regions, what we see
23    with the opioid epidemic is a dissemination
24    across all states, all counties, and I
25    attribute that to this efficient distributor
```

```
 1    supply chain.
 2         Q.   Okay.  Did you review any
 3    documents or any distribution data related to
 4    the distribution of opioids in forming your
 5    opinion?
 6         A.   No, but I did have access to
 7    what is in the public domain regarding that.
 8         Q.   And did you review that and
 9    consider it in forming your opinion in this
10    report?
11         A.   Yes.
12         Q.   Okay.  And is that -- what data
13    did you rely on?
14         A.   I relied on what I read in the
15    public domain regarding, for example, small
16    towns in rural West Virginia that received
17    millions of prescriptions for a town of a
18    thousand people.  Those aren't exact numbers,
19    but just to give a sense of the problem.
20         Q.   So you didn't review any
21    specific distribution data related to
22    prescription opioids?
23         A.   That's correct.
24         Q.   Okay.  Did you conduct any
25    analysis of the distribution of opioids to
```

```
 1    Summit or Cuyahoga County in order to form an
 2    opinion in this case?
 3         A.   No.
 4         Q.   And so other than what you have
 5    read in the public domain about the number of
 6    prescription pills -- opioid pills that have
 7    been distributed, have you relied on any
 8    other information to opine that an efficient
 9    distributor supply chain made prescription
10    opioids available in a mass scale?
11         A.   No.
12         Q.   Another bullet on that page 83.
13         A.   Yeah.
14         Q.   And so this is, again,
15    something that -- this is something that you
16    write, "In the case of prescription opioids,
17    factors relevant to that epidemic have been
18    addressed throughout this report and are
19    summarized as follows," this is another one
20    of the bullets, correct?
21              And you wrote, "The problem of
22    addiction more broadly in society and culture
23    today does not negate the significant role of
24    opioid manufacturers and distributors in
25    causing this epidemic."
```

1     Did I read that correctly?

2     A.   Yes.

3     Q.   Okay.  And I think I understood

4 you earlier to say that you're not offering

5 an opinion in this case about the conduct of

6 any distributor that's been named as a

7 defendant in this case; is that right?

8     A.   Except for what's in my report.

9     Q.   Okay.  So what is your basis

10 for determining that the opioid distributors

11 played a role in causing the opioid epidemic?

12     A.   The widespread nature of the

13 opioid epidemic.

14     Q.   And what do you mean by "the

15 widespread nature of the opioid epidemic"?

16     A.   The fact that every region in

17 the country has been affected.  The fact that

18 the risk of opioid addiction and overdose

19 death in a given county is directly

20 correlated with the amount of prescribing in

21 that county.

22     Q.   Anything else?

23     A.   No.

24     Q.   And this paragraph -- or this

25 bullet also doesn't have a footnote

1 identifying any documents on which you relied

2 to support your opinion, correct?

3     A.   That's correct.

4     Q.   And you didn't consider any

5 documents that were produced by the

6 distributor defendants in reaching the

7 opinion that you have in that bullet,

8 correct?

9     A.   That's correct.

10     Q.   You haven't done any analysis

11 of the distribution patterns of any

12 distributor, defendant or not, to reach that

13 opinion; is that correct?

14     A.   That's correct.

15     Q.   When you mentioned earlier that

16 you spoke at Ohio State University, at least

17 in April 2018 and February 2019; is that

18 right?

19     A.   Yes.

20     Q.   Did you tell the audience that

21 you had been retained by the plaintiffs in

22 this litigation during your talk?

23     A.   I did not inform the audience

24 that in April 2018, but if memory serves, I

25 believe I did in February 2019, although I'm

1 not 100 percent certain.

2     Q.   Okay.  Your report identifies

3 information, marketing, that you believe

4 was -- promoted misconceptions concerning

5 opioids; is that correct?

6     A.   Yes.

7     Q.   And your report doesn't

8 identify any marketing claims by any of the

9 distributor defendants, does it?

10     A.   No.

11     Q.   Okay.  Are you aware of any

12 distributor defendant that has been named in

13 this case as having made a false or

14 misleading marketing claim regarding opioids?

15     A.   I didn't review that material.

16     Q.   Is it your opinion that the

17 distributor defendants were aware that

18 marketing material concerning the safety and

19 efficacy of opioids contained misleading or

20 false information?

21     A.   My guess is they were probably

22 aware, but I don't have anything specific to

23 base that on.

24     Q.   Okay.  And so when you say your

25 "guess is that they were probably aware,"

1 you're not relying on any expertise to say --

2 to reach that conclusion, correct?

3     A.   Well, I mean, my expertise is

4 my research of the opioid epidemic more

5 broadly, and my -- I agree with the complaint

6 that this was a kind of collusion or a

7 synchronicity among all of the defendants.

8     Q.   Have you reviewed any documents

9 that have been produced in this case that

10 show that there is collusion or a

11 synchronicity between the defendants in this

12 case?

13     A.   I wasn't asked to review those

14 documents.  I have not reviewed those

15 documents.

16     Q.   So that's just your opinion?

17     A.   Yes.

18     Q.   But it's not based on anything

19 you've seen or reviewed for the purposes of

20 this case?

21     A.   That's correct.

22     Q.   Okay.  You described that there

23 was a paradigm shift in the prescribing of

24 opioids; is that right?

25     A.   Yes.

1    Q.    And I understand that you
2    believe that that paradigm shift was due to
3    certain false or misleading statements that
4    were made; is that right?
5        A.    That's correct.
6        Q.    Okay.  Setting aside for a
7    minute the reasons for the paradigm shift, do
8    you agree that because of the paradigm shift
9    it was a generally accepted medical practice
10   to prescribe opioid medications for the
11   treatment of chronic noncancer pain?
12       A.    Yes.
13       Q.    And for the treatment of acute
14   pain?
15       A.    I think for the treatment of
16   acute pain, it was already an established
17   practice.  It was the transition to using
18   opioids for minor pain conditions and using
19   opioids in high doses long-term for chronic
20   pain that was really the departure from past
21   practice and also from the evidence.
22       Q.    Other than documents that the
23   distributor defendants produced in this
24   litigation, did you review any materials and
25   consider them in forming your report that in

1    order to reach the opinions that you purport
2    to have regarding the efficient supply chain
3    and the distributor -- the opioid --
4    distributors' role in causing an opioid
5    epidemic?
6            MR. ARBITBLIT:  Objection.
7        Argumentative.
8            THE WITNESS:  No.
9    QUESTIONS BY MR. MOONEY:
10       Q.    Okay.  And so other than the
11   public reporting that you've seen about the
12   number of pills, you don't have any other
13   basis to opine that opioid distributors
14   played a role in causing an opioid epidemic?
15           MR. ARBITBLIT:  Object to form.
16       Misstates the record.
17           THE WITNESS:  Yeah, I was not
18       asked to give an opinion on that.  I
19       understand that other experts will
20       give an opinion on that.
21   QUESTIONS BY MR. MOONEY:
22       Q.    Okay.  So you aren't going to
23   get -- you aren't going to state that opinion
24   at trial then; is that right?
25           MR. ARBITBLIT:  Object to form.

1            THE WITNESS:  Well, if somebody
2        asks me my opinion, I will state
3        what's in my report.
4    QUESTIONS BY MR. MOONEY:
5        Q.    Okay.  And what will be the
6    basis for the opinion other than the public
7    reporting that you've identified?
8        A.    And the information that I read
9    in the complaint.
10       Q.    Okay.  And you understand that
11   the allegations in a complaint are not
12   necessarily proven as true until the evidence
13   introduced at trial supports them; is that
14   right?
15       A.    Okay.  Yes.
16           MR. MOONEY:  Okay.  Can we go
17       off the record for a moment?
18           VIDEOGRAPHER:  Okay.  We're now
19       going off the record, and the time is
20       2:51 p.m.
21        (Off the record at 2:51 p.m.)
22           VIDEOGRAPHER:  We are now going
23       back on the record, and the time is
24       3:03 p.m.
25           (Lembke Exhibit 17 marked for

1        identification.)
2            CROSS-EXAMINATION
3    QUESTIONS BY MR. EHSAN:
4        Q.    Good afternoon, Dr. Lembke.  My
5    name is Houman Ehsan, and I represent the
6    Janssen defendants in this litigation.
7            Doctor, do you know which
8    prescription opioids, if any, Janssen
9    manufactures or manufactured?
10       A.    I'm sorry?  I didn't hear that.
11       Q.    Do you know -- sure.
12           Do you know which opioid
13   medications Janssen manufactures or
14   manufactured?
15       A.    Opana ER and Percocet.
16       Q.    Thank you, Doctor.
17           I've handed you what's been
18   marked Exhibit 17 to your report, which is --
19   or Exhibit 17 to this deposition, which is
20   Appendix I.C of your report, and it
21   specifically reference Janssen's misleading
22   messages; is that correct?
23       A.    Yes.
24       Q.    Focusing your attention on the
25   bottom of the page, A 3, you note that there

1    is a document that describes how opioids
2    improve function and quality of life, and you
3    reference a particular Bates number that ends
4    in 573.
5              Do you see that?
6         A.   Yes.
7         Q.   And is it your opinion, Doctor,
8    that this was a misleading message that
9    Janssen disseminated?
10        A.   Yes.
11             (Lembke Exhibit 18 marked for
12        identification.)
13   QUESTIONS BY MR. EHSAN:
14        Q.   Doctor, I'm going to hand you
15   what's going to be marked as Exhibit 18.
16             And, Doctor, please note that
17   the Bates stamp on this document ends in 5 --
18   or ends in 809573, which is the same Bates
19   stamp as what's referenced in Item 3,
20   Exhibit 17, we just talked about.
21             Do you see that?
22             If you go back to the first
23   page of Exhibit 17, the last item on that
24   page --
25        A.   Yes.

1         Q.   -- is a document from 573 to
2    575, and that happens to be the same Bates
3    range for this document; is that correct?
4         A.   Yes.
5         Q.   I just want to take -- bring
6    your attention to the very top left-hand side
7    of this document.
8              Do you see how it states,
9    "Draft 7/16/02"?
10        A.   Yes.
11        Q.   At the time you reviewed this
12   document, did you appreciate that it was a
13   draft document?
14        A.   I did not.
15        Q.   Did you believe that this
16   document was, in fact, disseminated to anyone
17   in particular?
18        A.   I'm not sure I knew for sure
19   whether it had been disseminated.
20        Q.   Sitting here today, Doctor,
21   would you agree that you don't have a basis
22   to opine to a reasonable degree of medical
23   certainty that this document, labeled with a
24   draft notation, was actually disseminated to
25   any doctor in Cuyahoga or Summit County,

1    correct?
2         A.   If it wasn't disseminated,
3    period, then it wasn't likely disseminated to
4    doctors in Cuyahoga and Summit Counties.
5         Q.   Well, do you have an opinion as
6    to whether or not a draft document would be
7    disseminated to doctors in the community?
8         A.   Well, just because it says
9    "draft" on it isn't proof to me that it
10   wasn't disseminated.
11        Q.   Well, would you agree that you
12   cannot opine to a reasonable degree of
13   medical certainty that the document wasn't
14   altered or changed or edited before it was
15   disseminated, if it was, in fact,
16   disseminated?
17        A.   I can't speak to that.
18             What's salient to me, however,
19   is that Janssen was reprimanded by the FDA
20   for this document, and if it wasn't
21   disseminated, it's likely that without
22   reprimand it would have been disseminated
23   because it's very similar to the types of
24   messaging that were otherwise disseminated.
25        Q.   Again, you cite a draft

1    document and you believed the FDA reprimanded
2    Janssen for this draft document; is that
3    correct?
4              MR. ARBITBLIT:  Object to form.
5         Misstates.
6              THE WITNESS:  Yes, I do believe
7         that the FDA reprimanded Janssen for
8         this document.
9              (Lembke Exhibit 19 marked for
10        identification.)
11   QUESTIONS BY MR. EHSAN:
12        Q.   Thank you, Doctor.  You can put
13   that aside.
14             I want to hand you a two-part
15   document.  And we will be marking that as --
16   I believe that's 19.
17             And I apologize for the fact
18   that it's a two-piecer, but it was produced
19   natively, so the first page actually has the
20   Bates stamp and the native document is
21   printed behind.
22             I want to focus your attention
23   on page 3 of Exhibit 17, which is your
24   Exhibit 1.C.
25             Let me know when you're there.

1   A.   Page 3 of my report?

2   Q.   That's correct.

3   A.   Okay.

4   Q.   Let me know when you're there.

5   A.   I'm there.

6   Q.   The second bullet point on that

7   page references speakers' notes from a

8   Janssen sales training presentation site to

9   Joranson 2000 that -- to state that

10  "Investigators concluded that the trend of

11  increasing medical use of opioid analgesics

12  to treat pain does not appear to contribute

13  to increases in health consequences of opioid

14  abuse, period."

15          Did I read that correctly,

16  Doctor?

17  A.   The second bullet point on

18  page 3?  Yes, you did.

19  Q.   And the reference you give or

20  the Bates stamp reference you give for this

21  document is JAN-MS-0032787, correct?

22  A.   Yes.

23  Q.   If you look at the first half

24  of what's been handed to you as Exhibit 19,

25  do you see that that document bears the same

---

1   Bates stamp, JAN-MS-0032787?

2   A.   I'm not --

3   Q.   You have to look at the bottom

4   of this document.

5   A.   Oh, I see.

6   Q.   Because it was produced

7   natively unfortunately it doesn't have Bate

8   stamps on the actual document.

9   A.   Yes.

10  Q.   Okay.  And I'll represent to

11  you that the natively produced document is

12  the second half of that Exhibit 19 that I've

13  handed to you.

14          I just want to draw your

15  attention to the first page of the document.

16          Do you see that this is, in

17  fact, a Duragesic PowerPoint presentation?

18  A.   Yes.

19  Q.   And do you see at the bottom

20  there's a little note "For PriCara training

21  use only.  Do not duplicate, modify,

22  distribute or use this item when detailing."

23          Do you see that?

24  A.   Yes.

25  Q.   Do you understand what the term

---

1   "detailing" means?

2   A.   I do.

3   Q.   And what is your understanding

4   of that term?

5   A.   It's the phenomenon of

6   representatives from pharmaceutical companies

7   going to -- directly to prescribers to,

8   quote/unquote, educate them about their drug.

9   Q.   So when the statement of this

10  document bears a stamp that you are not to

11  duplicate, modify, distribute or use this

12  item when detailing, would that suggest to

13  you, Doctor, that it should not be -- should

14  not have been used by pharmaceutical

15  representatives in their interactions with

16  physicians?

17          MR. ARBITBLIT:  Object to form.

18  Misleading.

19          THE WITNESS:  I'm quite

20      doubtful that that small print at the

21      bottom of this page had a substantial

22      impact on the messaging that

23      representatives from Janssen used when

24      they went to detail prescribers or

25      other trainees of Janssen messaging.

---

1          The overall messaging is

2      consistent what I have in my report

3      that the benefits of opioids were

4      overstated and the risks were

5      understated, and this is an example of

6      that.

7          MR. EHSAN:  I'll move to strike

8      as nonresponsive.

9   QUESTIONS BY MR. EHSAN:

10  Q.   Doctor, my question was a

11  little bit more simple so let me ask it

12  again.

13          Do you believe or -- let me ask

14  it this way.

15          Is it your opinion that this

16  particular PowerPoint presentation and its

17  contents are an example of how doctors were

18  misled by pharmaceutical messaging and

19  marketing?

20          MR. ARBITBLIT:  Objection.

21          THE WITNESS:  Yes.

22          MR. ARBITBLIT:  Go ahead.

23  QUESTIONS BY MR. EHSAN:

24  Q.   Doctor, if you could go back --

25  you can put that document aside, thank you.

```
1        If you can go back to
2   Exhibit 17.  Actually, Exhibit 1.C, which is
3   part of your report.
4        A.   Oh, correct.
5        Q.   Going to page 2, do you see you
6   have a Section B titled "Risk Understated"
7   and below that you have point 1 which is
8   states "Addiction/Abuse is rare/uncommon/less
9   than 1 percent."
10        Do you see that?
11        A.   Yes.
12        Q.   Now, Doctor, would you agree
13  that the risk of addiction abuse or misuse of
14  an opioid varies from patient to patient?
15             MR. ARBITBLIT:  Object to form.
16             THE WITNESS:  I would say that
17        individual factors from patient to
18        patient have some role in the risk of
19        who will develop an opioid use problem
20        while receiving opioids for the
21        treatment of chronic pain, but that
22        far and away the bigger risk factor is
23        dose and duration of that opioid.
24  QUESTIONS BY MR. EHSAN:
25        Q.   And you anticipated my next
```

```
1   question.
2             Dose and duration of which you
3   are going to prescribe a medication for a
4   patient impacts the risk for that particular
5   patient of developing abuse or misuse of a
6   medication, correct?
7        A.   I'm sorry, could you restate
8   the question?
9        Q.   Sure.
10             The dose and duration for which
11  the prescription is written also impacts the
12  risk of abuse or addiction for the patient
13  receiving that prescription, correct?
14        A.   Yes.
15        Q.   Obviously the dose and duration
16  for which you're prescribing the opioid will
17  vary from patient to patient, correct?
18             MR. ARBITBLIT:  Object to form.
19             THE WITNESS:  It will vary from
20        patient to patient, but the general
21        trend over the last three decades is
22        high doses for long duration putting
23        very large cohorts of patients at high
24        risk.
25
```

```
1   QUESTIONS BY MR. EHSAN:
2        Q.   So let me ask the question
3   slightly differently, Doctor.
4             If a patient was to ask you
5   without any additional further information,
6   Dr. Lembke, "What is my risk of getting
7   addicted to an opioid," could you answer that
8   question without knowing something about the
9   patient's background, history as well as why
10  the prescription is being written, for how
11  long and at what dose?
12             MR. ARBITBLIT:  Objection.
13        Compound.  Incomplete hypothetical.
14             THE WITNESS:  Yes, I believe I
15        could answer that question.
16  QUESTIONS BY MR. EHSAN:
17        Q.   And what would you answer
18  that -- how would you answer that patient's
19  question?
20        A.   I would say to the patient that
21  based on the most reliable evidence, the risk
22  of becoming addicted to an opioid, even when
23  prescribed for real pain in the course of
24  medical treatment, is at the very least 1 in
25  10.  So it's a very common risk and it may
```

```
1   even be much higher than that.  Volz, et al.,
2   which I cite in my report, talks about risk
3   being 8 to 12 percent for moderate to severe
4   opioid use disorder, and as high as
5   25 percent by my reading of the Volz data.
6   So about a quarter of patients are at risk
7   for developing an opioid use disorder in the
8   course of chronic pain treatment, which is
9   undoubtedly a very high risk.
10        Q.   Doctor, do you understand that
11  individual risk of a side effect with a
12  medication are a zero-one phenomenon?
13             MR. ARBITBLIT:  Object to form.
14             THE WITNESS:  I don't
15        understand your question.
16  QUESTIONS BY MR. EHSAN:
17        Q.   Sure.
18             The patient will either develop
19  the side effect or won't develop the side
20  effect, correct?
21             MR. ARBITBLIT:  Object to form.
22             THE WITNESS:  That's not been
23        my medical experience that it's cut
24        and dried like that.
25             Some patients will need more or
```

```
 1            less exposure to develop a side
 2       effect.  Some patients will have a
 3       side effect if they combine that
 4       medication with another medication.
 5       Some patients may develop a side
 6       effect if they develop a medical
 7       condition that then results in that
 8       medication leading to a side effect.
 9            So it's not a --
10  QUESTIONS BY MR. EHSAN:
11       Q.   So let me show you this
12  question.
13            When I would consent a patient
14  for surgery and if the patient asked me,
15  "What's my chances of dying," even assuming
16  that the chance of dying with a carotid
17  endarterectomy is 3 percent for the
18  institution, no one is going to die
19  3 percent, Doctor.  They're either going to
20  survive the surgery or they're not going to
21  survive the surgery.  That means 3 out of 100
22  may die.  That's where the 3 percent comes
23  from, but for an individual, you either will
24  experience the side effect or you will not
25  experience the side effect.
```

```
 1            Would you agree with me on
 2  that?
 3            MR. ARBITBLIT:  Object to form.
 4            THE WITNESS:  To me the salient
 5       point is that patients actually be
 6       given informed consent before
 7       consenting to an intervention, whether
 8       it's surgery or prescribing opioids.
 9  QUESTIONS BY MR. EHSAN:
10       Q.   I understand, Doctor.
11            But have you ever met a patient
12  who was 20 percent addicted to opioids?
13            MR. ARBITBLIT:  Object to form.
14            THE WITNESS:  I don't even
15       really understand your question.
16  QUESTIONS BY MR. EHSAN:
17       Q.   Well, your patients are either
18  addicted, they carry a diagnosis of opioid
19  use disorder, or they don't, correct?
20            MR. ARBITBLIT:  Object to form.
21            THE WITNESS:  That's incorrect.
22            The DSM-V stipulates that
23       opioid use disorder is, in fact, a
24       spectrum disorder based on mild,
25       moderate to severe symptoms.  So
```

```
 1            people can have varying degrees of
 2       severity of their addiction.
 3  QUESTIONS BY MR. EHSAN:
 4       Q.   But they either have an opioid
 5  use disorder, mild, moderate or severe, or
 6  they don't have a diagnosis of opioid use
 7  disorder, would you agree with that?
 8       A.   I would not actually agree with
 9  that, because the diagnosis of opioid use
10  disorder has become increasingly complex due
11  to changes in the criteria from DSM-IV to
12  DSM-V, and also given the last three decades
13  of the problem of overprescribing opioids for
14  chronic pain, there are many individuals who
15  are addicted to opioids who have only ever
16  taken them as prescribed disqualifying them
17  from DSM-V criteria.
18            So it is a very complicated
19  issue.  It's not, you know, cut and dry.
20       Q.   So do you have patients who you
21  have simultaneously diagnosed as having
22  opioid use disorder and not having opioid
23  disorder?
24            MR. ARBITBLIT:  Objection.
25       Argumentative.  Misstates the
```

```
 1       testimony.
 2            THE WITNESS:  I don't think
 3       that's what I said.
 4  QUESTIONS BY MR. EHSAN:
 5       Q.   Okay.  Doctor, how about before
 6  the DSM-V criteria for opioid use disorder,
 7  going to DSM-IV-TR where there was dependence
 8  and abuse, do you have patients who are
 9  simultaneously dependent and not dependent to
10  opioids?
11       A.   The way that the DSM-IV
12  criteria were defined was slightly different
13  from the way that they actually were used in
14  real practice.  Opioid abuse was primarily
15  for individuals who developed consequences
16  due to their opioid use, whether or not they
17  were physiologically dependent, and you can
18  be addicted without necessarily being
19  dependent.
20            Opioid dependence was to
21  characterize individuals who had had these
22  physiologic changes as a result of regular
23  use of the substance, in addition to other
24  psychological factors.
25            So there was this dichotomized
```

1  definition.  The way that it was commonly
2  used in practice is that for milder cases of
3  opioid use disorder, opioid addiction, people
4  would often use the opioid abuse
5  nomenclature.  For more severe forms, they
6  would use the opioid dependence nomenclature.
7          With the DSM-V, they encoded
8  widespread recognition that opioid use
9  disorder is a spectrum, not everybody is
10  equally addicted, and some people have milder
11  forms and some people have more significant
12  forms, and based on the number of criteria
13  they meet, we diagnose either a mild,
14  moderate or severe opioid use disorder.
15          But I would say one of the most
16  challenging aspects in real clinical time is
17  the difference between people who meet DSM-V
18  criteria for mild opioid use disorder and
19  those who don't because of the new criteria
20  and meet criterion instead for opioid
21  dependence, and that can be a real hard
22  judgment call.
23          MR. EHSAN:  Thank you, Doctor.
24  I move to strike as nonresponsive.
25          Doctor, I didn't ask you about DSM-V,

---

1          but I appreciate that.  But in the
2  interest of time, I'm going to move
3  on.  Can I get this marked next?
4          (Lembke Exhibit 20 marked for
5  identification.)
6  QUESTIONS BY MR. EHSAN:
7      Q.  Doctor, I've handed you what's
8  been marked as Exhibit 20.  It is a package
9  insert from Duragesic fentanyl transdermal
10  system, and if you look at the very last
11  page, it bears an electronic signature of Bob
12  Rappaport, who I'll represent is from the FDA
13  of 2/4/2005, which is the date that this
14  label became effective.
15          You can see that at the very,
16  very last page --
17      A.  Oh, here, I see.
18      Q.  -- there's an electronic
19  signature.
20          Have you ever seen a package
21  insert from Duragesic before?
22      A.  Yes.
23      Q.  If you go to the very front
24  page of the document, are you aware of what a
25  black box is?

---

1      A.  Yes.
2      Q.  What is your understanding of a
3  black box?
4          MR. ARBITBLIT:  Counsel, she's
5          already answered that question with an
6          earlier inquirer.  I don't want to
7          stop you, but --
8          MR. EHSAN:  Okay.
9          MR. ARBITBLIT:  -- if it's only
10          going to be a minute, but we're not
11          supposed to duplicate --
12          MR. EHSAN:  That's okay.
13          MR. ARBITBLIT:  -- during this
14          part of the process.
15  QUESTIONS BY MR. EHSAN:
16      Q.  I'll move on only to say,
17  Doctor, could you read the first paragraph in
18  the black box warning of Duragesic?
19      A.  "Duragesic contains a high
20  concentration of a potent Schedule II opioid
21  agonist fentanyl.  Schedule II opioid
22  substances which include fentanyl,
23  hydromorphone, methadone, morphine,
24  oxycodone, and oxymorphone have the highest
25  potential for abuse and associated risk of

---

1  fatal overdose due to respiratory depression.
2  Fentanyl can be abused and is subject to
3  criminal diversion.  The high content of
4  fentanyl in the patches, Duragesic may be a
5  particular target for abuse and diversion."
6      Q.  Doctor, do you find that
7  language to be false or misleading?
8      A.  No.
9      Q.  Do you think that a doctor
10  reading that portion of the package insert
11  for Duragesic in 2005 would adequately
12  understand the risks of prescribing a
13  fentanyl patch for a patient --
14          MR. ARBITBLIT:  Object to form.
15  QUESTIONS BY MR. EHSAN:
16      Q.  -- at least as it relates to
17  abuse or criminal diversion?
18          MR. ARBITBLIT:  Object to form.
19          THE WITNESS:  I think that a
20          prescriber reading this may take away
21          from it that these -- that Duragesic
22          and other opioids have addictive
23          potential, but would still not
24          appreciate the extent to which a
25          patient being treated with opioids for

```
 1        pain could actually get addicted in
 2    the course of medical care because of
 3    the misleading messaging to
 4    prescribers communicated to them, as
 5    long as they were prescribing opioids
 6    for a medical condition, there was a
 7    very rare, uncommon or less than
 8    1 percent risk of getting addicted to
 9    the opioid.
10 QUESTIONS BY MR. EHSAN:
11        Q.    So is it your opinion, Doctor,
12    that despite the language saying that these
13    medications have the highest potential for
14    abuse and associated risk of fatal overdoses
15    due to respiratory depression, that a
16    physician would nevertheless accept what a
17    pharmaceutical representative may tell him or
18    her about the risk of the medication?
19            MR. ARBITBLIT:  Object to form.
20            THE WITNESS:  The defendants
21        were remarkably successful at
22        convincing several generations of
23        prescribers that the risk was so low,
24        as long as they were prescribing for a
25        medical condition, that independent of
```

```
 1        this black box warning, they need not
 2        be concerned about that in their
 3        patients.
 4 QUESTIONS BY MR. EHSAN:
 5        Q.    And you agree that the black
 6    box doesn't have anything about that this
 7    risk is only applicable if the patient is not
 8    taking it as prescribed, correct?
 9            MR. ARBITBLIT:  Object to form.
10            THE WITNESS:  I didn't quite
11        understand your question.
12 QUESTIONS BY MR. EHSAN:
13        Q.    Sure.
14        The black box language you read
15    didn't have any caveats about taking it as
16    prescribed or not as prescribed, correct?
17        A.    The black box warning doesn't
18    address that particular issue.
19        Q.    If you go back to Exhibit 17,
20    which is your report, Doctor?
21        A.    Uh-huh.
22        Q.    You can put that aside.
23        Again, on page 2, you cite
24    several documents that specify -- or at least
25    go to the topic of the understated risk in
```

```
 1    Janssen's materials.
 2        Do you see those?
 3        A.    Yes.
 4        Q.    And several of those date back
 5    to 2001, which are the first two bullet
 6    points, for example, correct?
 7        A.    Yes.
 8        Q.    Now, would you agree with me
 9    that the science in 2001 was different than
10    the science in 2019, as it relates to the
11    risk of opioid medication?
12            MR. ARBITBLIT:  Object to form.
13            THE WITNESS:  Not at all.
14 QUESTIONS BY MR. EHSAN:
15        Q.    So it was known within the
16    scientific community that these medications
17    had the -- had a risk of addiction and abuse
18    that was the same in 2001 as it is today?
19        A.    Well, that's a different
20    question, whether or not it was broadly known
21    what the science showed.  It was certainly
22    known that opioids are highly addictive
23    dating back to the Civil War, but because --
24    I'm sorry, did you want to --
25        Q.    No, go ahead.
```

```
 1        A.    Because of the
 2    misrepresentation of the evidence beginning
 3    in the early 1990s, doctors were miseducated
 4    on this point, but the evidence was not new.
 5        Q.    Well, when you go -- please go
 6    to page 3 of that same section -- in your
 7    report which is the end of that same section.
 8    You cite -- you have a comment section.  You
 9    cite several studies, but all those
10    studies are from -- all those studies are
11    from 2008, 2004, 2004.
12        Do you see those?
13        A.    So the 2008 is a Fishbain
14    meta-analysis, which reviews studies of the
15    risk of opioid addiction in the 1990s.
16    Furthermore, there were -- there were other
17    studies that Fishbain also reviewed in
18    earlier 1992 meta-analysis showing that the
19    risks of addiction were as much as
20    24 percent.
21        So it was well-known in terms
22    of what the actual evidence showed.
23        Q.    But you don't cite any -- you
24    don't cite any publication that predates 2004
25    in your comment section; is that correct?
```

1  MR. ARBITBLIT:  Object to form.
2  THE WITNESS:  The comment
3  section here is an augmentation of the
4  actual report because I decided that
5  to put all of these promotional
6  statements in the body of the report
7  would make it harder to read, but
8  they're all a piece.  And I do discuss
9  in my report the many examples in the
10  literature showing higher risks of
11  addiction, well above the less than
12  1 percent, called rare, predating
13  2001, in fact, going back to the early
14  1990s.
15  QUESTIONS BY MR. EHSAN:
16  Q.  Doctor, do you believe that the
17  use of opioids in cancer pain management is
18  appropriate?
19  MR. ARBITBLIT:  Object to form.
20  THE WITNESS:  What do you mean
21  by "appropriate"?
22  QUESTIONS BY MR. EHSAN:
23  Q.  Do you believe that opioids can
24  be used effectively in the treatment of
25  cancer pain?

1  MR. ARBITBLIT:  Object to form.
2  Incomplete hypothetical.
3  THE WITNESS:  It really would
4  depend on how long they were used, for
5  what purpose, the other circumstances
6  involved.
7  QUESTIONS BY MR. EHSAN:
8  Q.  Do you believe opioids are
9  effective for the treatment of cancer pain?
10  MR. ARBITBLIT:  Object to form.
11  THE WITNESS:  I don't believe
12  that there's reliable evidence to show
13  efficacy of opioids for chronic pain,
14  even including pain related to cancer
15  pain.
16  QUESTIONS BY MR. EHSAN:
17  Q.  Thank you, Doctor.
18  One last document.
19  (Lembke Exhibit 21 marked for
20  identification.)
21  QUESTIONS BY MR. EHSAN:
22  Q.  I'm going to hand you what's
23  been marked as Exhibit -- sorry, I'm going to
24  hand you what's been marked as Exhibit 21.
25  Doctor, this is -- I apologize.

1  This is -- the first page is just the
2  providence of this particular document, but I
3  will represent to you that -- that this is a
4  screen capture from a Food and Drug
5  Administration website, and if you can read
6  the tiny, tiny print on the second page of
7  the document itself, it says, "Page last
8  updated in December of 2008."  It is in very
9  tiny print.
10  A.  Yes, I can see that.
11  Q.  And if you look at this
12  particular document, this is really tiny --
13  I'm trying to -- one second.  I apologize.
14  Under the heading "Misuse and
15  Abuse," which is on the second page, the
16  second paragraph, and again, I apologize for
17  the tiny print, it states, "According to the
18  National Institutes of Health, studies have
19  shown that properly managed medical use of
20  opioid analgesic compounds taken exactly as
21  prescribed is safe, can manage pain
22  effectively and rarely causes addiction."
23  Do you see that, Doctor?
24  A.  I don't.
25  Q.  Okay.

1  A.  Oh, yes, I do, under "Misuse
2  and Abuse."
3  Q.  Yes.
4  A.  Yeah.
5  Q.  Now, do you agree with that
6  statement from the FDA?
7  MR. ARBITBLIT:  Which page are
8  you looking at?
9  MR. EHSAN:  The second -- it's
10  202, under the heading "Misuse and
11  Abuse."
12  THE WITNESS:  So --
13  MR. EHSAN:  It's the second --
14  the second --
15  THE WITNESS:  Yeah.
16  MR. EHSAN:  -- I won't even call
17  it a paragraph, but the second full
18  thing.
19  THE WITNESS:  So that statement
20  does not specify whether they're
21  talking about acute versus chronic
22  pain.  In the case of acute pain, I
23  would agree with that statement.  In
24  the case of chronic pain, I would
25  disagree with that statement.

QUESTIONS BY MR. EHSAN:

1 Q. And that statement itself
doesn't clarify whether it's acute or chronic
or which one it's in reference to, correct?
A. That's correct.
MR. EHSAN: Thank you for your
time, Doctor.
THE WITNESS: You're very
welcome.
MR. ARBITBLIT: Counsel, before
we switch, I just want to point out
one thing with the document that you
introduced, which is Exhibit 19, I'm
sure it wasn't intentional, but we
have a version of that that has
meta-data attached to it that was
provided to the witness, and it did
not appear on the version that you
introduced as Exhibit 19, specifically
the -- these notes that accompanied
the PowerPoint, and we can provide a
copy to you after the deposition.
You can choose to replace it or
not, but the question doesn't match
the exhibit unless you have those

notes with it.
MR. EHSAN: Oh, that's
perfectly fine. My questions were not
at all about the contents of the
document, per se. It was about the
draft language and the stamp. So if
you want to swap it out with one that
includes the speakers' notes, that's
perfectly fine.
MR. ARBITBLIT: Fine. Thank
you.
VIDEOGRAPHER: Okay. We're now
going off the record, and the time is
3:33 p.m.
(Off the record at 3:33 p.m.)
VIDEOGRAPHER: We are now going
back on the record, and the time is
3:35 p.m.
CROSS-EXAMINATION
QUESTIONS BY MR. TAM:
Q. Good afternoon, Doctor. My
name is Jonathan Tam, and I represent Purdue.
Have you ever been detailed by
a Purdue sales representative about
OxyContin?

A. I don't recall specifically
being detailed by Purdue about OxyContin, but
I have been detailed by representatives in
the past.
Q. Representatives of Purdue?
A. Representatives of
pharmaceutical companies over the years.
Q. Have you been prescribed
OxyContin?
A. Dating all the way back to the
beginning of my medical career, I'm sure that
I have, but I don't recall any specific
situation where I prescribed it.
Q. So as you sit here today, you
don't recall -- strike that. Let me ask that
again.
Did you ever prescribe
OxyContin because of anything that a Purdue
sales representative said to you?
A. I don't recall a specific
event, but the messaging from Purdue pervaded
the entirety of my medical training and had a
huge impact on the way that I and my
colleagues prescribed throughout the '90s and
early aughts, including the influence, the

enormous influence, on the Joint Commission
and pain as a quality measure leading to all
of us prescribing more opioids, including
OxyContin.
Q. So your testimony is that you
believe you have prescribed OxyContin because
of Purdue's marketing?
MR. ARBITBLIT: Object to form.
Misstates.
THE WITNESS: I believe that
due to the misrepresentations of the
benefits and risks of OxyContin, that
I have prescribed OxyContin
inappropriately at some point in my
career due to that messaging, yes.
QUESTIONS BY MR. TAM:
Q. Do you know how many OxyContin
prescriptions you wrote that you think were
inappropriate?
A. I don't have a specific
recollection of specific prescriptions. I'm
referring to the broader trend in OxyContin
prescribing, which is well-documented.
Q. Do you know whether any of
those patients that you prescribed OxyContin

1 to became addicted to OxyContin?

2    A.    I don't know of any patients to

3 whom I prescribed OxyContin who became

4 addicted, but I have treated many patients

5 who have become addicted to OxyContin through

6 the prescriptions of other health care

7 providers.

8    Q.    How many patients have you

9 treated who were addicted to OxyContin?

10    A.    It's hard for me to quantify

11 that.  I've been practicing medicine for more

12 than 20 years.  I see somewhere between 20

13 and 40 patients a week.  About, I would say,

14 three-quarters of those patients are addicted

15 to opioids.  That's based on my sense of it.

16 I haven't gone back and specifically counted,

17 and a large number have reported getting

18 OxyContin, and I currently have patients who

19 are addicted to OxyContin and struggling with

20 that in my current practice.

21    Q.    You said that around 75 percent

22 of your patients are addicted to opioids

23 generally.

24    Has that figure changed over

25 time in the span of your career?  Is it more?

1 Is it less?

2    A.    It has changed over time.  So

3 in the early 1990s when I was first starting

4 my career, I actually didn't know much about

5 addiction.  I didn't know how to screen or

6 intervene for that problem, but I became

7 aware of more and more of my patients who

8 were presenting for treatment of their

9 psychiatric disorders manifesting signs and

10 symptoms of opioid addiction, many of whom --

11 most of whom got those opioids from a

12 well-intended prescriber.

13    So I became curious about the

14 problem in an effort to help my patients.  I

15 started to learn more about the problem of

16 addiction, and eventually I became the go-to

17 person in my department to help patients who

18 had become addicted to opioids.  And so a

19 much larger percentage of my practice today

20 consists of patients addicted to OxyContin

21 and other opioids.

22    Honestly in the early aughts,

23 it could have been also a large number, but I

24 wasn't aware because I wasn't educated and

25 had asked those questions, and I didn't

1 appreciate the risk involved because of the

2 way that I was trained in large part due to

3 the misrepresentation of the evidence.

4    Q.    The patients you've treated who

5 were addicted to OxyContin, did any of them

6 die from an overdose of OxyContin?

7    A.    I have had patients die of

8 overdoses, and I believe that there was

9 OxyContin involved, but I can't say for sure.

10    Q.    So you can't say for sure that

11 the overdose was from OxyContin, can you?

12    A.    That's right.

13    Q.    In the patients you treat who

14 are addicted to OxyContin, do you know

15 whether they were lawfully prescribed

16 OxyContin by their doctors?

17    A.    The vast majority of the

18 patients that I treat who are addicted to

19 opioids started out with a lawfully

20 prescribed opioid prescribed by their doctor

21 for pain.

22    Q.    And is your answer the same

23 with respect to OxyContin specifically, so

24 for the patients who are addicted to

25 OxyContin, is it the case that most of those

1 patients were prescribed OxyContin lawfully

2 from their own doctor?

3    A.    Yes.

4    Q.    But some of your patients did

5 receive OxyContin from some other source; is

6 that correct?

7    A.    Yes.

8    Q.    And what are those other

9 sources?

10    A.    Other sources could include an

11 illegal online source or a dealer or an

12 acquaintance or a family member.

13    Q.    Now, for the patients who were

14 prescribed OxyContin lawfully by their

15 doctors, do you know whether they took the

16 OxyContin as directed by their doctors?

17    A.    The majority of my patients who

18 are addicted to opioids began with a lawful

19 prescription and took the prescription

20 opioid, including OxyContin, just as

21 prescribed.

22    Q.    But did some of those patients

23 eventually take them in a way that was

24 inconsistent with their doctor's directions?

25    MR. ARBITBLIT:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  So the natural
 2       progression of the disease of
 3       addiction is that patients will need
 4       more and more to get the same effect.
 5       Often that need was actually
 6       accommodated by the prescriber because
 7       we were taught that no dose is too
 8       high.
 9              So I have seen patients who
10       have developed addiction to OxyContin
11       and other opioids manufactured by the
12       defendants who only ever took their
13       opioids as prescribed.
14              And I have seen patients who
15       have started out taking their opioids
16       as prescribed and ultimately began to
17       misuse those opioids.
18              So I have seen the full range.
19  QUESTIONS BY MR. TAM:
20       Q.    And for the patients who you've
21  treated that were addicted to OxyContin, were
22  they also addicted to other substances?
23              MR. ARBITBLIT:  Object to form.
24              THE WITNESS:  Very frequently
25       these were individuals who had no
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       prior history of addiction, who were
 2       not addicted to other substances.
 3  QUESTIONS BY MR. TAM:
 4       Q.    But there were still some
 5  patients that you treated who were addicted
 6  to OxyContin who were also addicted to other
 7  substances?
 8       A.    There were some patients.
 9       Q.    Can you quantify that or offer
10  a percentage of your patient population for
11  that?
12       A.    I would say more of my -- of my
13  patients addicted to opioids -- I would say
14  approximately 80 percent of them took the
15  opioid as lawfully prescribed for most of
16  their opioid exposure.
17       Q.    I appreciate that.  My question
18  was a little bit different.
19              Of the patients you've treated
20  who were addicted to OxyContin, what
21  percentage of those were also addicted to
22  other substances?
23       A.    I can't tell you the percentage
24  specifically addicted to OxyContin.
25              In my work, that's not a major
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1  focus.  What we focus on is morphine
 2  milligram equivalent doses and duration and
 3  the aspects related to their disease of
 4  addiction.
 5              So I can tell you that the
 6  majority, 80 percent of my patients, addicted
 7  to opioids began taking their opioids as
 8  lawfully prescribed for a medical condition
 9  and through most of their opioid exposure
10  took their medications as prescribed for that
11  medical condition.  So there was not deviant
12  or abhorrent behavior in the majority of my
13  patients, except in some portion of them at
14  the very end.
15       Q.    Have you been able to treat
16  your patients who were addicted to OxyContin?
17       A.    Yes.
18       Q.    And have you been able to treat
19  them successfully?
20       A.    Yes.
21       Q.    Have you conducted any research
22  or analysis to determine how many
23  prescriptions for Purdue opioids were written
24  in Cuyahoga or Summit County for higher doses
25  because of Purdue's marketing?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. ARBITBLIT:  Object to form.
 2              THE WITNESS:  I have analyzed
 3       and followed the CDC data, looking at
 4       the number of prescriptions in
 5       Cuyahoga and Summit Counties written
 6       per 100 persons, which does not break
 7       down by specific opioid.
 8  QUESTIONS BY MR. TAM:
 9       Q.    Are you done?
10       A.    (Witness nods head.)
11       Q.    Okay.  So respectfully, I don't
12  think that answers my question.
13              Have you conducted any research
14  or analysis to determine how many
15  prescriptions for Purdue opioids were written
16  in Cuyahoga or Summit County for higher doses
17  because of Purdue's marketing?
18              MR. ARBITBLIT:  Object to form.
19              THE WITNESS:  Purdue's
20       marketing was instrumental in the
21       paradigm shift that I've described
22       that led to minimizing the risks and
23       misrepresenting the benefits that was
24       at the heart of the change in pain
25       management in this country.
```

Highly Confidential - Subject to Further Confidentiality Review

1    So I would say that Purdue's
2    marketing strategies had a huge impact
3    on Summit and Cuyahoga Counties.
4  QUESTIONS BY MR. TAM:
5    Q.    I appreciate that's your
6  opinion, but please focus on my question.
7    Let me try it another way.  Can
8  you tell me or quantify the number of
9  prescriptions for Purdue opioid medications
10 that were written in Cuyahoga or Summit
11 Counties for higher doses because of Purdue's
12 marketing?
13    MR. ARBITBLIT:  Objection.
14    Argumentative.  Asked and answered.
15    THE WITNESS:  So the
16    quadrupling of opioid prescribing that
17    we've seen nationwide since the 1990s,
18    including in Cuyahoga and Summit
19    Counties and including OxyContin, is a
20    direct result of the marketing of
21    Purdue Pharma.
22 QUESTIONS BY MR. TAM:
23    Q.    The quadrupling of opioid
24 prescribing, but that's all opioids, correct?
25    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And you attribute all of those
2  opioid prescriptions to Purdue?
3    MR. ARBITBLIT:  Object to form.
4    THE WITNESS:  Purdue had a
5    major role in changing the paradigm
6    around pain treatment.
7  QUESTIONS BY MR. TAM:
8    Q.    What's your methodology for
9  determining that they played a, quote, "major
10 role"?
11    A.    My methodology is my personal
12 experience having been the recipient of
13 Purdue's marketing.  My methodology is the
14 research that I did for my book, the more
15 than 400 articles that I've read here, my
16 study of the way that Purdue Pharma
17 deliberately manipulated the Joint
18 Commission, the Federation of State Medical
19 Boards, the Wisconsin Pain & Policy Group, in
20 order to change opioid prescribing practices
21 in this country.
22    Q.    Now, you referenced a
23 quadrupling of prescriptions.
24    Is it your testimony that all
25 of those prescriptions were for higher doses?

Highly Confidential - Subject to Further Confidentiality Review

1    MR. ARBITBLIT:  Object to form.
2    THE WITNESS:  How would you
3    define higher doses?  How are you
4    defining them?
5  QUESTIONS BY MR. TAM:
6    Q.    Well, your report refers to
7  prescriptions being written in high doses,
8  correct?
9    MR. ARBITBLIT:  Object to form.
10    THE WITNESS:  My report cites
11    evidence showing that dose and
12    duration directly impact the risk of
13    overdose and opioid use disorder.
14 QUESTIONS BY MR. TAM:
15    Q.    What would you consider a high
16 dose of OxyContin?
17    A.    I base it on morphine milligram
18 equivalents consistent with the CDC
19 guidelines, anything over 90 morphine
20 milligram equivalents, but in my report I
21 also qualify that patients can suffer
22 morbidity and mortality even at lower doses.
23    Q.    So in the quadrupling statistic
24 that you gave to me, you can't differentiate
25 which of those prescriptions were for high or

Highly Confidential - Subject to Further Confidentiality Review

1  low doses, can you?
2    MR. ARBITBLIT:  Object to form.
3    THE WITNESS:  The point that I
4    made with the quadrupling -- well,
5    actually, let me look at my report.
6    So in my report I cite
7    Paulozzi --
8  QUESTIONS BY MR. TAM:
9    Q.    What page are you on?
10    A.    I'm sorry, I'm on page 11.
11    "By 2005 long-term opioid
12 therapy was being prescribed to an estimated
13 10 million US adults.  The volume of
14 prescribed opioid analgesics was 100 morphine
15 milligram equivalents per person in 1997.
16    "In 2007, the morphine
17 milligram equivalent per person had increased
18 to almost 700 morphine milligram equivalents.
19    "And a very recent study found
20 that the 2017 level of morphine milligram
21 equivalents had declined from its peak to 543
22 morphine milligram equivalents, which remain
23 well over five times higher than the
24 prescribing rate in 1997."
25    So my answer is due to Purdue's

Highly Confidential - Subject to Further Confidentiality Review

1    marketing and that of the other defendants,
2    there was not just an increase in the number
3    of prescriptions, but also a large increase
4    in the number of prescriptions written for
5    chronic therapy and the dose written to
6    patients.
7            Q.    But you can't give me a
8    specific number of prescriptions of OxyContin
9    in Cuyahoga or Summit County, can you?
10           MR. ARBITBLIT:  Object to form.
11           THE WITNESS:  I don't really
12       think it's relevant, but I can't give
13       you a specific number.
14   QUESTIONS BY MR. TAM:
15           Q.    If you could turn to -- I think
16   it's Exhibit 17, which is Appendix I.A -- I.A
17   of your report, sorry.  And I.A is the part
18   about Purdue.
19           Are you with me, Doctor?
20           A.    Yes.  Appendix I.A, page 1.
21           Q.    Yes.
22           So can we agree that all of the
23   documents that you cite in here that you
24   attribute to Purdue are all dated 2001 or
25   earlier?

Highly Confidential - Subject to Further Confidentiality Review

1            A.    No.  The first one is 1997.
2            Q.    Let me just make sure you
3    understand my question.
4            I said -- I asked, can we agree
5    that all of the documents that you cite in
6    here that you attribute to Purdue are all
7    dated from 2001 or earlier, from before 2001?
8            A.    Oh, let me take a look.
9            MR. ARBITBLIT:  While she's
10       looking at it, I just wanted to point
11       out that Exhibit 17 did not include
12       the complete appendices and we
13       included Janssen, so your reference to
14       Exhibit 17, I don't think that
15       document the witness has been asked to
16       review now has been marked as an
17       exhibit.
18           MR. TAM:  Thank you for that
19       clarification.
20           Do you have a copy?
21           MR. ARBITBLIT:  Other than it
22       might be part of the Exhibit 1, the
23       report, it's not --
24           THE WITNESS:  Yes, we can agree
25       they are all dated 2001 or earlier.

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. TAM:
2            Q.    Thank you.
3            And to address counsel's
4    clarification, I appreciate it, I did refer
5    to Exhibit 17, which is just the Janssen
6    portion of Appendix I, but for the record,
7    Exhibit 13 is the entire Exhibit 1, which
8    would include the section that has the Purdue
9    statements.
10           MR. ARBITBLIT:  Okay.
11   QUESTIONS BY MR. TAM:
12           Q.    Did you review any documents
13   that Purdue produced from 2002 or later?
14           A.    I reviewed a lot of documents,
15   and I didn't focus on the dates, so I'm not
16   sure.
17           Q.    Can you identify a doctor from
18   Summit or Cuyahoga County who saw any of the
19   documents that you cite in Appendix I.A?
20           MR. ARBITBLIT:  Object to form.
21           THE WITNESS:  I would answer
22       what I answered to a similar question
23       that was asked prior, that the kind of
24       misrepresentation that I describe in
25       my report was widespread and Cuyahoga

Highly Confidential - Subject to Further Confidentiality Review

1            and Summit Counties would not have
2            been exempt from that.  So I believe
3            that the doctors in Cuyahoga and
4            Summit Counties were exposed to this
5            misrepresented evidence as a result of
6            the defendants' marketing.
7    QUESTIONS BY MR. TAM:
8            Q.    And I appreciate that's your
9    opinion.  I'm just trying to understand the
10   bounds of it.
11           So you're not going to come
12   into court at trial and identify any Summit
13   County or Cuyahoga County doctor who you say
14   saw any of these documents in Appendix I.A,
15   are you?
16           A.    Not unless you ask me to review
17   some specific document.
18           Q.    And as you sit here today,
19   you're not aware of any specific Cuyahoga or
20   Summit County doctor who saw any of the
21   documents that you cite in Appendix A?
22           MR. ARBITBLIT:  Object to form.
23   QUESTIONS BY MR. TAM:
24           Q.    Right?
25           MR. ARBITBLIT:  Sorry.

```
 1              THE WITNESS:  I'm not aware of
 2      a specific doctor, but I believe that
 3      doctors more broadly in Cuyahoga and
 4      Summit Counties have been exposed to
 5      these marketing messages, as we all
 6      were.
 7  QUESTIONS BY MR. TAM:
 8      Q.     And you can't identify any
 9  doctor in Cuyahoga or Summit County who
10  relied on any of the statements or the
11  content in the documents cited in
12  Appendix I.A when they prescribed a Purdue
13  opioid medication to their patients, can you?
14      A.     Again, I would say I can't cite
15  a specific individual, but more broadly, all
16  physicians in the last two-plus decades have
17  been misled by these false marketing
18  messages, and it has fundamentally changed
19  the way that opioids have been prescribed.
20      Q.     Now, some of the documents you
21  cite in Appendix I.A are from third parties,
22  not Purdue, correct?
23              MR. ARBITBLIT:  Object to form.
24              THE WITNESS:  Could you define
25      third parties?
```

```
 1  QUESTIONS BY MR. TAM:
 2      Q.     Sure, why don't we do it this
 3  way.
 4              Can you turn to page 7 of
 5  Appendix I.A, and you see your section
 6  heading number 4?
 7      A.     Yes.
 8      Q.     And then the first bullet under
 9  there, you cite a CME course, right?
10      A.     Uh-huh.
11      Q.     And you note that this CME
12  course was supported by an education grant
13  from Purdue Pharma and distributed by
14  familypractice.com.
15              Do you see that?
16      A.     Yes, I do.
17      Q.     So it's your understanding that
18  Purdue provided a grant for this CME, right?
19      A.     That's my understanding, yes.
20      Q.     Have you seen any evidence that
21  demonstrates that Purdue controlled or
22  dictated the content of this specific CME
23  course?
24      A.     There is evidence that when a
25  pharmaceutical company sponsors a continuing
```

```
 1  medical education event, that the physicians
 2  who leave that -- after having participated
 3  in that CME are more likely to prescribe the
 4  drug produced by the pharmaceutical company
 5  that sponsored the CME event.
 6      Q.     My question was a little
 7  different.
 8              Have you seen any evidence
 9  about this particular CME that demonstrates
10  that Purdue controlled or dictated the
11  content of the CME?
12              MR. ARBITBLIT:  Object to form.
13              THE WITNESS:  I don't really
14      think that that's that relevant.  I
15      think that the reason that Purdue
16      funds continuing medical education
17      courses is precisely to promote the
18      false messaging because they have
19      found that that's a very effective
20      strategy for doing that.
21  QUESTIONS BY MR. TAM:
22      Q.     Doctor, I appreciate if you
23  think it's irrelevant, but I'm entitled to
24  ask my questions.
25              Can you point me any evidence
```

```
 1      that demonstrates that Purdue controlled or
 2      dictated the content of this CME?
 3              MR. ARBITBLIT:  Object to form.
 4              THE WITNESS:  I'll refer you to
 5      page 19 of my report, in which I quote
 6      from an article by Van Zee called "The
 7      Promotion and Marketing of OxyContin,
 8      Commercial Triumph, Public Health
 9      Tragedy."  Quote, "From 1996 to 2001,
10      Purdue conducted more than 40 national
11      pain management and speaker training
12      conferences at resorts in Florida,
13      Arizona and California.  More than
14      5,000 physicians, pharmacists and
15      nurses attended these all-expense paid
16      symposia where they were recruited and
17      trained for Purdue's national speaker
18      bureau.  It is well-documented that
19      this type of pharmaceutical company
20      symposium influences physicians'
21      prescribing even though the physicians
22      who attend such symposia believe that
23      such enticements do not alter their
24      prescribing patterns."
25
```

1    QUESTIONS BY MR. TAM:

2        Q.    Doctor, nothing that you just

3    read from the Van Zee study says that by

4    funding a program Purdue has controlled or

5    dictated the content of that program, right?

6            MR. ARBITBLIT:  Object to form.

7            THE WITNESS:  I would disagree,

8        but that is the very reason that

9        Purdue and the other defendants fund

10       these CMEs, because the CMEs promote

11       their messages, key opinion leaders

12       who promote the use of their drugs are

13       invited and sponsored as speakers at

14       these CMEs.  That's how the whole

15       system works.

16   QUESTIONS BY MR. TAM:

17       Q.    Are you going to be offering

18   testimony about the intent of defendants when

19   providing funding for CMEs?

20           MR. ARBITBLIT:  Object to form.

21           THE WITNESS:  It's not a matter

22       of offering an opinion on the intent.

23       It's a matter of looking at the whole

24       system and recognizing the patterns of

25       influence and the way in which Purdue

1        Pharma and other defendants covertly

2        infiltrated physician education in

3        order to promote their false messages.

4    QUESTIONS BY MR. TAM:

5        Q.    So your opinion is that by

6    providing funding, a pharmaceutical

7    company -- strike that.  Let me try it again.

8            Your opinion is that when a

9    pharmaceutical company provides funding for a

10   program, it is necessarily controlling and

11   dictating the content of the program simply

12   by virtue of providing the funding?

13           MR. ARBITBLIT:  Object to form.

14       Misstates the record.

15           THE WITNESS:  I think you've

16       misstated my words.

17           What I am saying, and it's my

18       opinion, but it's also based in

19       evidence, that when a pharmaceutical

20       company funds a continuing medical

21       education course, it has a direct

22       impact on the way that physicians

23       prescribe, such that they are more

24       likely to prescribe the medication

25       that is manufactured by that company.

1    QUESTIONS BY MR. TAM:

2        Q.    Right.

3            But my questions aren't

4    directed about -- at what physicians are

5    likely to do after they attend a CME.

6            My question is about the

7    content in the CME itself.

8            Are you with me, Doctor?

9        A.    Yes.

10       Q.    So are you familiar with what

11   unrestricted grants are?

12       A.    Yes.

13       Q.    Have you ever received an

14   unrestricted grant?

15       A.    I have.

16       Q.    So what's an unrestricted

17   grant?

18       A.    An unrestricted grant is a

19   grant whereby an individual can use those

20   funds for whatever they want, essentially.

21       Q.    And when you receive an

22   unrestricted grant --

23       A.    By the way, let me -- just --

24   I'm sorry.

25       Q.    No.

1        A.    I just want to say I've not --

2    I've never received an unrestricted grant

3    from a pharmaceutical company.  I've received

4    unrestricted grants from Stanford for

5    educational material that I worked on.

6        Q.    Okay.  So you anticipated one

7    of my questions.

8            But --

9        A.    Sorry to interrupt.

10       Q.    -- when you receive an

11   unrestricted grant, that means that the

12   sponsor, the one who provided you the money,

13   does not control or dictate what you do with

14   that money or how you conduct your research,

15   right?

16           MR. ARBITBLIT:  Object to form.

17           THE WITNESS:  What I think your

18       line of questioning is missing is the

19       subtle forms of influence because of

20       the relationship that occurs between

21       the individual who receives the grant

22       from the pharmaceutical company and

23       what they then choose to emphasize in

24       a continuing medical education course.

25           And there's good evidence in my

1    report about the way in which Purdue
2    Pharma and other defendants enlisted
3    key opinion leaders and promoted their
4    careers and had them speak at
5    continuing medical education courses.
6  QUESTIONS BY MR. TAM:
7        Q.    When you receive an
8  unrestricted grant, your work is done
9  independent of the sponsor or the funder,
10  correct?
11            MR. ARBITBLIT:  Object to form.
12            THE WITNESS:  There is an
13    important difference between receiving
14    unrestricted grant from the university
15    or from a purely educational entity
16    versus receiving an unrestricted grant
17    from a pharmaceutical company that has
18    a profit agenda.  And there's lots of
19    evidence to show that when physicians
20    accept even small gifts from a
21    pharmaceutical company, even in
22    unrestricted form, that will affect
23    their prescribing.  And there's lots
24    of evidence to show that.  Wazana, et
25    al., is one of the -- one of the many

1    articles showing that, and I do cite
2    that in the report.
3            MR. TAM:  Respectfully I'm
4    going to move to strike that answer as
5    nonresponsive.
6  QUESTIONS BY MR. TAM:
7        Q.    When you receive an
8  unrestricted grant, your work is done
9  independent of the sponsor or funder,
10  correct?
11            MR. ARBITBLIT:  Object to form.
12    Misstates.
13            THE WITNESS:  When I receive an
14    unrestricted grant, I would like to
15    believe that my work is done
16    independently, but I concede that
17    there may be some influence based on
18    the source of the funding because it's
19    human nature to want to please and be
20    in positive relationships to those
21    people who give us money or other
22    forms of, you know, financial wealth.
23            One thing that's clear is the
24    way in which Purdue Pharma cultivated
25    relationships with thought leaders in

1    pain medicine in order to influence
2    prescribing, and I give many examples
3    in my report from the Pain & Policy
4    Study Group to the Joint Commission to
5    the changes in the DSM-V.
6            MR. TAM:  I'm going to move to
7    strike that second paragraph in your
8    answer as nonresponsive.
9  QUESTIONS BY MR. TAM:
10        Q.    Doctor, you're being paid as an
11  expert in this case, right?
12        A.    Yes.
13        Q.    Do you think you're influenced
14  by plaintiffs' lawyers?
15        A.    My opinions in my report were
16  formed before I ever had contact with the
17  plaintiffs' lawyers.  I'm on the record
18  publicly in my book and with my opinions in
19  this.  So I think that although we're all
20  susceptible to influence, including myself, I
21  think that I have not been influenced by the
22  plaintiffs' lawyers in this case.
23        Q.    What about other experts who,
24  unlike you, have not published their opinions
25  prior to becoming experts in this litigation?

1            MR. ARBITBLIT:  Object to form.
2    Speculative.
3            THE WITNESS:  I would like to
4    think they're not influenced either.
5  QUESTIONS BY MR. TAM:
6        Q.    Have you reviewed any
7  agreements between Purdue and the Pain &
8  Policy Study Group?
9        A.    Yes, I have.
10        Q.    And did you see documents that
11  made clear that the funding that Purdue was
12  providing was in the form of an unrestricted
13  grant?
14            MR. ARBITBLIT:  Object to form.
15            THE WITNESS:  I have reviewed
16    documents that have showed numerous
17    defendants providing funding to the
18    Pain & Policy Study Group over many
19    years, which I think had a direct
20    impact on the false messaging that
21    changed the practice of opioid
22    prescribing in pain treatment.
23            MR. TAM:  Respectfully move to
24    strike as nonresponsive.
25

1    QUESTIONS BY MR. TAM:

2       Q.    But can we agree that those

3    were unrestricted grants between -- that were

4    provided by Purdue to the Pain & Policy

5    Studies Group?

6           MR. ARBITBLIT:  Object to form.

7           THE WITNESS:  I can't agree

8       with that just because I don't --

9       didn't see anywhere where it said

10      unrestricted grant.  I believe you

11      that it may be an unrestricted grant,

12      but I didn't see the payments

13      highlighted as restricted or

14      unrestricted.

15           And as I've already stated, I

16      don't think it would make a big

17      difference whether or not they were

18      restricted or unrestricted.

19           (Lembke Exhibit 22 marked for

20      identification.)

21   QUESTIONS BY MR. TAM:

22      Q.    Can we mark this document as

23   the next exhibit, please?  I am handing you

24   what I've marked as Exhibit 22.  All right.

25           Doctor, do you see that this is

---

1    a letter from the Pain & Policy Studies Group

2    to Purdue?

3       A.    Yes.

4       Q.    And it's dated October 5, 2006?

5       A.    Yes.

6       Q.    Okay.  So the second paragraph

7    says, "The purpose of this letter is to

8    confirm that this contribution is intended as

9    a gift and that all parties agree to the

10   general conditions concerning gifts to

11   UW-Madison.  The university defines a gift

12   and funding provided for general or

13   unrestricted support for research, public

14   service, instruction, fellowship,

15   traineeships or other activities."

16           Do you see that?

17      A.    Yes, I do.

18      Q.    And if you look later in the

19   paragraph, the second to the last sentence,

20   it says, "The donor may not restrict

21   publication by the university of the results

22   of the work resulting from the gift in any

23   way."

24           Do you see that?

25      A.    Yes.

---

1       Q.    All right.  So can we agree

2    that this document says that at least the

3    $50,000 being provided by Purdue is

4    unrestricted?

5       A.    Yes.

6       Q.    And are you aware that Purdue

7    provided the Joint Commission with

8    unrestricted grants?

9           MR. ARBITBLIT:  Object to form.

10          THE WITNESS:  I guess I would

11      like to see specific material on that.

12      I'm aware that Purdue Pharma provided

13      the Joint Commission with educational

14      material they disseminated.  I

15      wouldn't be at all surprised if they

16      also provided unrestricted grants, but

17      I can't say that I recall specific

18      unrestricted grants.

19          MR. TAM:  Doctor, I think

20      that's my time.  So I will reserve our

21      rights and subject to any questioning

22      that your counsel may have, concede my

23      time to -- or pass the time to the

24      next counsel.

25           VIDEOGRAPHER:  We are now going

---

1       off the record, and the time is

2       4:13 p.m.

3        (Off the record at 4:13 p.m.)

4           VIDEOGRAPHER:  We're now going

5       back on the record, and the time is

6       4:16 p.m.

7           (Lembke Exhibit 23 marked for

8       identification.)

9           CROSS-EXAMINATION

10   QUESTIONS BY MR. STAMPFL:

11      Q.    Good afternoon, Doctor.  My

12   name is Karl Stampfl, and I represent the

13   Allergan defendants.  I've marked your

14   Materials Considered list as Exhibit 23.

15           Do you have it in front of you?

16      A.    Yes.

17      Q.    And is this the document where

18   you listed the materials you considered in

19   forming the opinions in your report?

20      A.    Yes, it is.

21      Q.    Could you turn to the page 33

22   of Exhibit 23?

23           Do you see there that beginning

24   at Entry 425 you list what you call

25   Bates-stamped documents?

1    A.    Yes.
2    Q.    That's where the documents that
3  you considered that came from the defendants'
4  files, among others, are listed, correct?
5    A.    Yes.
6    Q.    You listed five documents that
7  were produced by my client, Allergan,
8  correct?
9    A.    Yes.
10    Q.    Were you aware that Allergan
11  produced hundreds of thousands of documents
12  in this case?
13    A.    Yes.
14    Q.    How did you select these five
15  documents to review out of those hundreds of
16  thousands?
17    A.    These documents were provided
18  to me by counsel.
19    Q.    Do you think it's fair to opine
20  about Allergan's marketing conduct based on
21  review of only five out of hundreds of
22  thousands of documents?
23        MR. ARBITBLIT:  Object to form.
24        THE WITNESS:  I do think that
25     it's fair, yes.

1  QUESTIONS BY MR. STAMPFL:
2    Q.    You have no idea what were in
3  the other hundreds of thousands of documents,
4  right?
5        MR. ARBITBLIT:  Object to form.
6        THE WITNESS:  I think it's fair
7     because for 20 years, I was the
8     recipient as a practicing physician of
9     this misleading marketing, so I have a
10     pretty good idea of what that
11     constitutes.
12        And in reading the documents
13     that I did, I felt like the themes
14     were pretty well-saturated, and I
15     didn't feel the need to read
16     additional documents.
17  QUESTIONS BY MR. STAMPFL:
18    Q.    Can you identify any statement
19  that you're aware of prior to this case from
20  Allergan?
21        MR. ARBITBLIT:  Object to form.
22        THE WITNESS:  I believe that
23     Allergan's statements are pieced with
24     the other defendants, that this is
25     overall the marketing messaging that

1     they participated in collectively to
2     change the practice of opioid
3     prescribing by misrepresenting the
4     risks and benefits.
5  QUESTIONS BY MR. STAMPFL:
6    Q.    But you're not basing that on
7  anything beyond these five documents out of
8  hundreds of thousands, right?
9        MR. ARBITBLIT:  Object to form.
10     Misstates.
11        THE WITNESS:  I'm basing this
12     on my experience as a physician, being
13     trained in the climate that was
14     affected by the defendants' actions
15     regarding these misleading messages,
16     as well as these specific documents
17     that I reviewed from Allergan.
18  QUESTIONS BY MR. STAMPFL:
19    Q.    Have you ever been detailed by
20  an Allergan or Actavis sales representative
21  about Kadian?
22    A.    Not to my specific
23  recollection.
24    Q.    Do you know anyone who's ever
25  been detailed by any Allergan or Actavis

1  sales representative about Kadian?
2    A.    Not to my specific
3  recollection.
4    Q.    Prior to your involvement in
5  this case, did you know that Allergan sold
6  opioids?
7    A.    Yes.
8    Q.    What opioids?
9    A.    Kadian, which is long-acting
10  morphine sulfate, and then it's also my
11  understanding that Allergan acquired Teva
12  Pharmaceuticals.
13        Is that accurate?
14    Q.    I can't testify, but I can
15  represent to you that, no, that's not --
16    A.    Okay.
17    Q.    -- that's not accurate.
18    A.    Okay.
19    Q.    So let me ask you:  Sitting
20  here today, can you identify any other
21  opioids that Allergan sold?
22    A.    No.
23    Q.    Do you recall mentioning
24  Allergan or Actavis even once in your book
25  "Drug Dealer, MD"?

```
 1          A.   No, but the emphasis of my book
 2    was not specific opioids.  It was the problem
 3    of opioid -- opioids more generally and the
 4    misrepresentation of the evidence and the
 5    promoting of false messages more generally.
 6          Q.   Now, you said a little bit
 7    earlier that the opinions in your report you
 8    put out into the public in your book and in
 9    other public statements prior to your report.
10          Do you recall that testimony?
11          MR. ARBITBLIT:  Objection.
12    Object to form.  Misstates.
13          THE WITNESS:  Could you clarify
14    the question?
15    QUESTIONS BY MR. STAMPFL:
16          Q.   Yeah.
17          Didn't you just testify in
18    response to Purdue's counsel questioning that
19    we can know that you hadn't been influenced
20    by plaintiffs' lawyers because you had
21    published your opinions prior to your putting
22    out your report in this case.
23          Do you recall that testimony?
24          A.   I recall that testimony, but I
25    think it's -- if I said that, it's a
```

```
 1    misstatement.
 2          I had opinions based on my own
 3    research prior to being involved in this
 4    litigation.
 5          Since being involved in this
 6    litigation, I've had the opportunity to
 7    evaluate many more documents, which has only
 8    served to augment my opinions and elaborate
 9    on them.  I haven't changed my opinions.
10    They've been strengthened by the opportunity
11    to review additional documents.
12          Q.   And the additional documents
13    that you've reviewed that were produced by my
14    client were five out of hundreds of
15    thousands; is that right?
16          MR. ARBITBLIT:  Object to form.
17    Asked and answered.  Argumentative.
18          THE WITNESS:  I think I
19    answered that.
20    QUESTIONS BY MR. STAMPFL:
21          Q.   Is it correct?
22          MR. ARBITBLIT:  Object to form.
23          THE WITNESS:  I reviewed these
24    documents that are listed in the
25    Bates-stamped documents.
```

```
 1    QUESTIONS BY MR. STAMPFL:
 2          Q.   It's certainly fair to say,
 3    Doctor, that you didn't review many more
 4    documents produced by Allergan, right?
 5          MR. ARBITBLIT:  Object to form.
 6          THE WITNESS:  I didn't feel it
 7    was necessary.
 8    QUESTIONS BY MR. STAMPFL:
 9          Q.   You just made assumptions about
10    Allergan based on the fact that it was a
11    defendant in this case, right?
12          MR. ARBITBLIT:  Object to form.
13    Argumentative.  Misstates the record.
14          THE WITNESS:  I don't believe I
15    made assumptions.  I based my
16    assumptions on the documents that I
17    reviewed, on my clinical experience,
18    on my own research on the opioid
19    epidemic.
20    QUESTIONS BY MR. STAMPFL:
21          Q.   Can you point to any research
22    that you did about Allergan or anything it
23    did or said prior to your report?
24          MR. ARBITBLIT:  Object to form.
25          THE WITNESS:  So this appendix
```

```
 1          lists specific misrepresentations of
 2          the evidence, which are consistent
 3          more broadly with the
 4          misrepresentations by other
 5          defendants, and which are, I believe,
 6          instrumental in leading to the opioid
 7          epidemic.
 8    QUESTIONS BY MR. STAMPFL:
 9          Q.   We can agree, can't we, Doctor,
10    that it wouldn't be fair to blame Allergan
11    for anything that any other defendant did or
12    said, right?
13          MR. ARBITBLIT:  Object to form.
14          THE WITNESS:  I wouldn't
15          necessarily agree with that.  I think
16          that there was a way in which the
17          defendants utilized the messaging in
18          concert to advance their own agendas.
19    QUESTIONS BY MR. STAMPFL:
20          Q.   You're aware, aren't you, that
21    Allergan didn't acquire Kadian until
22    December 2008, right?
23          A.   I was not aware of that.
24          Q.   You didn't consider that fact
25    in formulating the opinions in your report?
```

```
 1        A.    No.
 2              (Lembke Exhibit 24 marked for
 3        identification.)
 4   QUESTIONS BY MR. STAMPFL:
 5        Q.    I'm going to mark an excerpt
 6   from plaintiffs' complaint as Exhibit 24.
 7              And you reviewed plaintiffs'
 8   complaint you testified earlier, right,
 9   Dr. Lembke?
10        A.    Yes.
11        Q.    And could you look at
12   paragraph 51 from the excerpt I just marked?
13        A.    I'm sorry, is it numbered --
14        Q.    Paragraph 51 is on page 16.
15        A.    Yeah.
16        Q.    Do you see here that
17   plaintiffs' complaint states in the middle of
18   paragraph 51, "In 2008, Actavis, Inc., now
19   known as Allergan Finance, LLC, acquired the
20   opioid, Kadian, through its subsidiary,
21   Actavis Elizabeth, LLC, which had been the
22   contract manufacturer of Kadian since 2005."
23              Do you see that?
24        A.    Yes, I do.
25        Q.    So do you agree then that
```

```
 1   Allergan didn't acquire Kadian until December
 2   of 2008?
 3        A.    Yes.
 4        Q.    So you have no basis to claim
 5   that Allergan or Actavis caused any rise in
 6   prescriptions prior to 2009, right?
 7              MR. ARBITBLIT:  So just to
 8        interject, it calls for a legal
 9        conclusion.  Objection.
10   QUESTIONS BY MR. STAMPFL:
11        Q.    I'm glad to repeat the question
12   for you.
13        A.    Please, thanks.
14        Q.    Do you have any reason to
15   believe that Allergan or Actavis caused any
16   rise in prescriptions in 2009 when it
17   acquired Kadian?
18              MR. ARBITBLIT:  Object -- same
19        objection.  Calls for a legal
20        conclusion.
21              THE WITNESS:  No.
22   QUESTIONS BY MR. STAMPFL:
23        Q.    Do you have any basis to claim
24   that Allergan or Actavis caused what you
25   referred to as the epidemic of prescription
```

```
 1   opioid use to the extent that epidemic
 2   occurred prior to 2009?
 3              MR. ARBITBLIT:  Same objection.
 4        Calls for a legal conclusion.
 5              THE WITNESS:  No.
 6   QUESTIONS BY MR. STAMPFL:
 7        Q.    You have no basis to claim that
 8   Allergan or Actavis caused the opioid crisis
 9   to the extent it occurred prior to 2009,
10   correct?
11              MR. ARBITBLIT:  Calls for a
12        legal conclusion.
13              THE WITNESS:  Correct.
14   QUESTIONS BY MR. STAMPFL:
15        Q.    In fact, isn't it true that by
16   2010, shortly after what was then known as
17   Actavis acquired Kadian, opioid prescriptions
18   had begun decreasing?
19        A.    Opioid prescriptions began
20   decreasing around 2012, so there was quite a
21   bit of time between 2009, when Actavis
22   acquired Kadian, and 2012.
23        Q.    Could you look at paragraph 14
24   C of your report, please?
25              Do you have your report in
```

```
 1   front of you, Doctor?
 2        A.    I do.
 3              MR. ARBITBLIT:  Do you have a
 4        page number?
 5              MR. STAMPFL:  I don't.  It's
 6        paragraph 14 C.  I'll try to get one
 7        for you.  I believe it's page 87.
 8   QUESTIONS BY MR. STAMPFL:
 9        Q.    Now, I know you just said 2012,
10   but do you see that here in paragraph 14 C,
11   second sentence, you write, "Opioid
12   prescriptions per person in the total US
13   increased annually at an average rate of
14   6.9 percent per year until 2010 and decreased
15   at an average rate of 3.8 percent per year
16   from 2010 until -- or through 2015."
17              Do you see that, Doctor?
18        A.    Uh-huh.
19        Q.    Do you agree that by 2010,
20   shortly after Actavis acquired Kadian, opioid
21   prescriptions began, in fact, decreasing?
22        A.    Well, this is opioid
23   prescriptions per person, so there are
24   multiple ways to measure this.
25        Q.    Okay.  In that case, I'll
```

1   withdraw my question and revise it.

2          Do you agree that by 2010,

3   shortly after Actavis acquired Kadian, opioid

4   prescriptions per person had begun

5   decreasing?

6      A.   Yes.

7      Q.   Do you agree that by 2010,

8   shortly after Actavis acquired Kadian, MME

9   per person had begun decreasing?

10         And the reference is the next

11  sentence, 14 C.

12     A.   Yes.

13     Q.   Would the opioid crisis have

14  occurred had Actavis never purchased and

15  promoted Kadian?

16         MR. ARBITBLIT:  Object to form.

17         THE WITNESS:  I think the

18     opioid crisis would have occurred

19     had -- independent of that.

20  QUESTIONS BY MR. STAMPFL:

21     Q.   Isn't it fair to say, Doctor,

22  that Allergan didn't cause the opioid crisis?

23         MR. ARBITBLIT:  Object to form.

24         THE WITNESS:  I believe that

25     all of the defendants played some

---

1      role, but based on this timeline, it

2      does appear that Allergan's role may

3      be less.

4   QUESTIONS BY MR. STAMPFL:

5      Q.   Don't you think to the extent

6   that Allergan had any role in the opioid

7   crisis, it was very limited?

8          MR. ARBITBLIT:  Object to form.

9          THE WITNESS:  I actually

10     believe that the opioid crisis

11     continues to this day, and that these

12     misrepresentations continue to be a

13     problem.  And so to the extent that

14     Allergan is contributing to that

15     problem, Allergan has responsibility.

16  QUESTIONS BY MR. STAMPFL:

17     Q.   I understand.

18         So when was the last time

19  Allergan promoted Kadian in any way?

20         And, Doctor, are you referring

21  now to Appendix I.E?

22     A.   Yes, I am.

23     Q.   And I'll represent to you that

24  the latest date you have in there is

25  February 2013.

---

1          Does that sound right to you?

2      A.   Yes, it does.

3      Q.   Can you identify any allegedly

4   inappropriate Allergan statements after

5   February 2013?

6      A.   I would have to re-review the

7   documents, specifically paying attention to

8   dates, which is not something that I paid

9   attention to.

10     Q.   And the documents that you

11  would have to re-review are the five

12  documents that you considered about Allergan,

13  correct?

14     A.   Yes.

15     Q.   Were you aware that in

16  Appendix I.E you, in fact, relied on

17  documents that weren't marketing or even

18  training materials from Allergan but rather

19  Kadian's prior owner, Alpharma?

20     A.   I wasn't aware of that because

21  they were Bates stamped or -- Allergan.

22     Q.   You understand that the Bate

23  stamp just means who produces the document,

24  not who used or created the document, right?

25     A.   Yes.

---

1      Q.   So do you have any basis to try

2   to hold Allergan responsible for anything

3   that the prior, unaffiliated owner of Kadian

4   did or said?

5          MR. ARBITBLIT:  Objection.

6      Argumentative.  And calls for a legal

7      conclusion.

8          THE WITNESS:  Well, it doesn't

9      matter so much who produced the

10     document.  It's whether or not

11     Allergan used the document.

12  QUESTIONS BY MR. STAMPFL:

13     Q.   Precisely, that's right.

14         So if it's a document that

15  another company used, we couldn't blame

16  Allergan for that document, right?

17         MR. ARBITBLIT:  Objection.

18     Argumentative.  Calls for a legal

19     conclusion.

20         THE WITNESS:  So Kadian

21     marketing overview with sales

22     representative training in October

23     of 2011, after Allergan acquired

24     Kadian.

25

1   QUESTIONS BY MR. STAMPFL:

2       Q.   Okay.  Can you look at the

3   bottom of page 2 and top of page 3 in your

4   Appendix I?

5            Do you see that you're

6   referring to something called the Kadian

7   Learning System?

8       A.   Uh-huh.

9            (Lembke Exhibit 25 marked for

10      identification.)

11  QUESTIONS BY MR. STAMPFL:

12      Q.   And I'm going to mark that

13  document now as Exhibit 25.

14           Okay.  Doctor, I've handed you

15  Exhibit 25.

16           Is that the document that

17  you're referring to in your Appendix I.E

18      A.   Yes, it appears to be that

19  document.

20      Q.   And do you see that on the very

21  face of -- can you see that on the very face

22  of that document it indicates it's not an

23  Allergan or an Actavis document, but rather

24  an Alpharma document?

25      A.   Yes, I do see that.

1       Q.   And this is one of the five

2   documents you considered in part of forming

3   your opinions about Allergan, right?

4       A.   Yes.

5       Q.   So really there are only, at

6   most, four documents that were actually

7   Allergan documents that you considered,

8   right?

9            MR. ARBITBLIT:  Object to form.

10      Calls for a legal conclusion.

11      Argumentative.

12           THE WITNESS:  My understanding

13      was that these were all Allergan

14      documents.

15  QUESTIONS BY MR. STAMPFL:

16      Q.   Though this one says on its

17  face it's an Alpharma document, right?

18           MR. ARBITBLIT:  Object to form.

19           THE WITNESS:  It does say that

20      on the face.

21  QUESTIONS BY MR. STAMPFL:

22      Q.   Did you review these documents

23  before you wrote your report?

24      A.   Yes.

25           MR. STAMPFL:  I will concede my

1   time and pass the witness.  Thank you.

2            THE WITNESS:  You're welcome.

3            VIDEOGRAPHER:  We're now going

4       off the record, and the time is

5       4:36 p.m.

6        (Off the record at 4:36 p.m.)

7            VIDEOGRAPHER:  We are now going

8       back on the record, and the time is

9       4:47 p.m.

10           CROSS-EXAMINATION

11  QUESTIONS BY MS. VICARI:

12      Q.   Good afternoon, Dr. Lembke.  My

13  name is Angela Vicari, and I am with the law

14  firm of Arnold and Porter, and I represent

15  Endo Pharmaceuticals, Inc., The Health

16  Solutions, Inc., and I also represent Par

17  Pharmaceutical, Inc., in this case.

18      Dr. Lembke, your report makes

19  no reference to Par, so you're not offering

20  any opinions in this case as to Par

21  Pharmaceutical, correct?

22           MR. ARBITBLIT:  Objection.

23      Calls for a legal conclusion.

24           THE WITNESS:  So one thing that

25      I am not aware of is the various

1       acquisitions of one company by

2       another.

3            So maybe you could clarify for

4       me is -- was Par acquired by Endo?  I

5       can't really speak to that.  I can

6       speak to my knowledge of the actions

7       of Endo based on the documents that I

8       have reviewed and my broader knowledge

9       of the causality in the opioid

10      epidemic.

11  QUESTIONS BY MS. VICARI:

12      Q.   Are you aware of any

13  promotional activities by Par Pharmaceutical,

14  Inc.?

15      A.   What opioid does Par

16  Pharmaceutical, Inc., manufacture?

17      Q.   Sitting here today, you don't

18  know what opioids Par Pharmaceutical, Inc.,

19  manufactures, correct?

20      A.   No.

21      Q.   And if you don't know what

22  pharmaceutical medications Par

23  Pharmaceutical, Inc., makes, you can't make

24  any -- you can't issue any opinions to a

25  reasonable degree of medical certainty about

Highly Confidential - Subject to Further Confidentiality Review

```
1    any marketing or promotional activities that
2    Par engaged in, correct?
3             MR. ARBITBLIT:  Object to form.
4         Legal conclusion.
5             THE WITNESS:  I haven't
6         reviewed specific promotional
7         documents for Par Pharmaceuticals.
8    QUESTIONS BY MS. VICARI:
9         Q.    Dr. Lembke, do you recall ever
10   prescribing Opana to a patient?
11        A.    I don't specifically recall
12   prescribing Opana, but I may have done over
13   the years.
14        Q.    Okay.  Do you recall
15   prescribing original Opana ER to a patient?
16        A.    I may have done, but I don't
17   recall specifically prescribing that.
18        Q.    Do you recall prescribing a
19   reformulated Opana ER to a patient?
20        A.    I don't have a specific
21   recollection.
22        Q.    And do you recall ever
23   prescribing Percocet to a patient?
24        A.    I don't have a specific
25   recollection of prescribing a specific opioid
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    over the years.
2         Q.    Do you have a recollection of
3    prescribing any other Endo opioid medications
4    to a patient?
5         A.    No.
6         Q.    In your opinion, have you ever
7    prescribed an Endo opioid where an opioid was
8    not medically necessary?
9         A.    So in my opinion, the practice
10   of prescribing opioids for the treatment of
11   chronic pain is not evidence-based and,
12   therefore, not medically necessary.
13        Q.    Okay.  Thank you.
14             My question was:  Have you ever
15   prescribed an Endo opioid where it was not
16   medically necessary?
17        A.    I don't have a specific
18   recollection of prescribing Endo, so I can't
19   speak to the medical necessity.
20        Q.    Dr. Lembke, are you aware of
21   any doctors who have safely and effectively
22   prescribed opioids to treat chronic pain?
23             MR. ARBITBLIT:  Object to form.
24             THE WITNESS:  I am aware of
25        lots of doctors who claim that their
```

Highly Confidential - Subject to Further Confidentiality Review

```
1             prescribing of opioids in the
2             treatment of chronic pain is
3             effective, but I believe that they
4             have been misinformed and do not fully
5             appreciate the risks involved.
6    QUESTIONS BY MS. VICARI:
7         Q.    Do you believe that there is a
8    way for doctors to safely and prescribe --
9    strike that.
10             Is there a way for doctors to
11   safely and effectively prescribe opioids to
12   treat chronic pain?
13             MR. ARBITBLIT:  Object to form.
14             THE WITNESS:  I think there may
15        be rare exceptions in which that's
16        true, but for the vast majority of
17        patients, I don't believe that opioids
18        for chronic pain are either safe or
19        effective, and nor is it supported by
20        the evidence.
21   QUESTIONS BY MS. VICARI:
22        Q.    You're not saying that the
23   prescription of opioids for the treatment of
24   chronic pain is malpractice, are you?
25             MR. ARBITBLIT:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1             THE WITNESS:  I'm not saying
2        it's malpractice.  In fact, I would
3        say that doctors have been duped and
4        so are not responsible for the ways in
5        which they have been prescribing,
6        despite the lack of evidence to
7        support the use of opioids in the
8        treatment of chronic pain.
9    QUESTIONS BY MS. VICARI:
10        Q.    And do you believe that even
11   as -- sitting here today --
12             MR. ARBITBLIT:  Object to form.
13   QUESTIONS BY MS. VICARI:
14        Q.    -- it's currently being
15   prescribed?
16             MR. ARBITBLIT:  Object to form.
17             THE WITNESS:  I believe that
18        there are physicians who continue to
19        lack a full understanding of the
20        evidence regarding benefit and risks
21        of opioids in the treatment of chronic
22        pain.
23   QUESTIONS BY MS. VICARI:
24        Q.    What steps can a doctor take to
25   safely and effectively prescribe opioids to
```

1   treat chronic pain?

2         MR. ARBITBLIT:  Object to form.

3         Argumentative.  Assumes facts not in

4         evidence.  Misstates the testimony.

5         THE WITNESS:  Yeah, so your

6         question assumes that opioids are an

7         effective treatment for chronic pain,

8         and the evidence doesn't support that.

9   QUESTIONS BY MS. VICARI:

10        Q.    Is every prescription of

11  opioids written for chronic noncancer pain

12  not medically necessary?

13        MR. ARBITBLIT:  Object to form.

14        THE WITNESS:  There's no

15        evidence to support the benefit of

16        opioids in the treatment of chronic

17        pain.

18  QUESTIONS BY MS. VICARI:

19        Q.    Is it your opinion that Endo's

20  engaging in misleading promotion of opioids

21  today?

22        MR. ARBITBLIT:  Object to form.

23        THE WITNESS:  I believe that

24        the problem of the defendants

25        manipulating and misrepresenting the

---

1         evidence to promote opioid prescribing

2         is a problem that continues to this

3         day.

4   QUESTIONS BY MS. VICARI:

5         Q.    Okay.  That wasn't my question.

6   My question was very specific to Endo.

7               Is it your opinion that Endo is

8   engaging in misleading promotion of opioids

9   today?

10        A.    Yes.

11        Q.    Okay.  And is it your opinion

12  is that Endo is miseducating doctors, even

13  today?

14        A.    Yes.

15        Q.    What is your basis for saying

16  that Endo is engaging -- or that Endo is

17  engaging in misleading promotion of opioids

18  today?

19        A.    I believe that the defendants

20  still fail to acknowledge the weight of the

21  evidence that is insufficient and weak with

22  regards to the use of opioids in the

23  treatment of chronic pain, and still fail to

24  recognize the very high risk of addiction,

25  even when patients are prescribed opioids by

---

1   a doctor for the treatment of chronic pain.

2         Q.    Can you tell me what

3   promotional activities Endo is engaged in

4   today?

5         A.    I believe that the false

6   messaging that is in my report continues

7   generally today.

8         Q.    My question was very specific

9   to Endo.

10              Can you tell me what

11  promotional activities Endo is engaged in

12  today?

13        A.    I think that the extent of the

14  impact of the defendants' false messaging is

15  so profound and wide-reaching that in order

16  to really constitute an end to that false

17  messaging, it would require opioid

18  manufacturers to come out and boldly

19  acknowledge the ways in which they have

20  falsely promoted those messages and work to

21  correct those false statements and false

22  marketing.

23              And failure to do so, in my

24  opinion, constitutes continued implicit

25  marketing of older messages.

---

1         Q.    So the marketing you're talking

2   about today is implicit marketing?

3         A.    Much of it is covert and

4   implicit, and that's one of the major

5   arguments that I make in my report is the way

6   that opioid manufacturers have infiltrated

7   key opinion leaders and watchdog

8   organizations inside of medicine to give the

9   impression that these marketing messages are

10  based in science, when, in fact, that's not

11  the case.

12        Q.    Dr. Lembke, all the documents

13  that you considered in forming your opinions

14  as to Endo are set forth in Exhibit B to your

15  report and in the supplement that plaintiffs'

16  counsel I believe sent to defense counsel on

17  April 22nd; is that correct?

18        A.    Yes.

19        Q.    Okay.  You didn't consider any

20  deposition testimony given by Endo witnesses,

21  did you?

22        A.    No.

23        Q.    And you didn't consider any

24  deposition testimony given by Par witnesses,

25  did you?

1    A.    No.

2    Q.    And you didn't review all of

3  Endo's marketing materials, did you?

4    A.    No.

5    Q.    And you didn't consider all of

6  Endo's marketing materials in issuing your

7  opinions in this case, correct?

8    A.    That's correct.

9    Q.    And you're not offering an

10  opinion on Endo marketing materials that

11  aren't listed in Exhibit B to your report or

12  in the supplement that we received from

13  plaintiffs' counsel, correct?

14    A.    That's correct.

15    Q.    And you're not offering an

16  opinion on any studies that were sponsored by

17  Endo that aren't listed in Exhibit B to your

18  report or in the 4/22 supplement that we

19  received from plaintiffs' counsel, correct?

20    MR. ARBITBLIT:  Include -- are

21    you including what she's mentioned in

22    her report itself?

23    MS. VICARI:  Well, if it's in

24    her report, she considered it, and

25    it's in Exhibit B.  Correct, Counsel?

1    MR. ARBITBLIT:  Yes.

2    MS. VICARI:  You know what?

3    I'm talking about Exhibit B.  I'll

4    repeat my question.

5  QUESTIONS BY MS. VICARI:

6    Q.    You're not offering an opinion

7  on any studies that were sponsored by Endo

8  that aren't listed in Exhibit B or in the

9  4/22 supplement?

10    A.    That's correct.

11    Q.    And you're not offering an

12  opinion on any statements by Endo that aren't

13  in documents that are listed in Exhibit B or

14  in the 4/22 supplement, correct?

15    A.    That's correct.

16    Q.    And all the opinions that you

17  intend to offer at trial are included in your

18  report, correct?

19    A.    Yes, unless there are

20  additional documents that you would like me

21  to review.  I would be happy to do that.

22    Q.    You don't intend to offer

23  opinions at trial that aren't in your report,

24  correct?

25    A.    That's correct.

1    Q.    Now, you in appendix -- in the

2  appendix of your report, you have a five-page

3  section in which you refer to Endo

4  Pharmaceuticals, correct?

5    I believe it's Exhibit 13?

6    A.    Yes.

7    Q.    Okay.  And in those five pages,

8  Section 1.D, you cite several Endo documents

9  and studies, correct?

10    A.    I'm not finding 1.D.

11    Q.    If you hand me Exhibit 13, I

12  had left it open on your stack of exhibits

13  next to you.

14    A.    Oh, I see, yes.  I do see that,

15  the D.

16    Q.    Exhibit 13, Section 1.D,

17  correct?

18    A.    Yes, I was looking at the

19  letters.

20    Q.    And in those five pages, we'll

21  call it the Endo section of your report, you

22  cite several Endo documents and studies,

23  correct?

24    A.    That's right.

25    Q.    Can you identify any doctors in

1  Cuyahoga and Summit County who actually read

2  the documents you cite in those pages of your

3  report?

4    MR. ARBITBLIT:  Object to form.

5    THE WITNESS:  I cannot cite

6    specific doctors, but this was a

7    wide-ranging campaign on the part of

8    Endo and other defendants, so I'm

9    confident that providers in Summit and

10    Cuyahoga County were exposed to this

11    false messaging.

12  QUESTIONS BY MS. VICARI:

13    Q.    My question wasn't about false

14  messaging generally.  Very specific question.

15    You can't identify any doctors

16  in Cuyahoga or Summit County who read the

17  documents that you cite on those five pages

18  of your report?

19    MR. ARBITBLIT:  Objection.

20    Argumentative.

21    THE WITNESS:  I can't cite

22    specific doctors.

23  QUESTIONS BY MS. VICARI:

24    Q.    And you can't cite specific

25  doctors who relied on any of the specific

Highly Confidential - Subject to Further Confidentiality Review

1    documents that you cite in those five pages
2    of your report, correct?
3         A.    I would be very surprised if
4    doctors in Cuyahoga and Summit Counties had
5    not been exposed to this misleading marketing
6    as it was a national campaign, and we were
7    all exposed to it, and it caused the paradigm
8    shift that changed the way that opioids are
9    prescribed in this country.
10        Q.    Thank you, Doctor.
11             I was talking about the
12   specific documents that you cite in those
13   five pages.
14        A.    Uh-huh.
15        Q.    You can't identify any doctors
16   in Cuyahoga or Summit County who relied on
17   those documents that you cite in those five
18   pages of your report, correct?
19             MR. ARBITBLIT:  Objection.
20        Objection.  Argumentative.  Misstates.
21             THE WITNESS:  I feel like I
22        answered the question to the best of
23        my ability.
24   QUESTIONS BY MS. VICARI:
25        Q.    You can't say that any patient

Highly Confidential - Subject to Further Confidentiality Review

1    in Summit or Cuyahoga County who was
2    prescribed an Endo opioid medication would
3    not have been prescribed a different opioid
4    if Endo did not market opioids, correct?
5         A.    Oh, can you rephrase that?
6    Sorry.
7         Q.    You can't say that any patient
8    in Summit or Cuyahoga County who was
9    prescribed an Endo opioid would not otherwise
10   have been prescribed an opioid if Endo did
11   not market opioid products?
12             MR. ARBITBLIT:  Objection.
13        Speculative.
14             THE WITNESS:  I guess I'm going
15        to ask you to rephrase the question.
16        I'm having trouble understanding it.
17   QUESTIONS BY MS. VICARI:
18        Q.    Patients in Summit and Cuyahoga
19   Counties were prescribed opioids?
20        A.    Correct.
21        Q.    And some were prescribed Endo
22   opioids, correct?
23        A.    Yes.
24        Q.    And if Endo opioids weren't
25   available to those patients, you can't say

Highly Confidential - Subject to Further Confidentiality Review

1    that those patients would not have otherwise
2    been prescribed a different opioid product,
3    correct?
4              MR. ARBITBLIT:  Objection.
5         Speculative.
6              THE WITNESS:  It's hard for me
7         to know if they hadn't been prescribed
8         Endo, whether or not they would have
9         been prescribed some other opioid.
10   QUESTIONS BY MS. VICARI:
11        Q.    It depends on the individual
12   patient and the individual doctor, correct?
13             MR. ARBITBLIT:  Object to form.
14             THE WITNESS:  Again, it's very
15        hard for me to speculate on that type
16        of scenario.
17   QUESTIONS BY MS. VICARI:
18        Q.    You would be speculating
19   because it's an individualized inquiry,
20   right?
21             MR. ARBITBLIT:  Object to form.
22        Misstates.
23   QUESTIONS BY MS. VICARI:
24        Q.    You can answer the question.
25        A.    Can you rephrase it?

Highly Confidential - Subject to Further Confidentiality Review

1         Q.    I said you would be speculating
2    because it's an individualized inquiry,
3    correct?
4              MR. ARBITBLIT:  Object to form.
5              THE WITNESS:  Can you rephrase
6         your question?  Sorry.
7    QUESTIONS BY MS. VICARI:
8         Q.    You would be speculating
9    because it depends on the patient, right?
10             MR. ARBITBLIT:  Object to form.
11             THE WITNESS:  I think it's just
12        speculative, and so it's hard for me
13        to answer.
14   QUESTIONS BY MS. VICARI:
15        Q.    You would agree with me that
16   there are nonopioid medications that can
17   treat pain, right?
18        A.    Yes.
19        Q.    Okay.  And you would agree with
20   me that all medications are accompanied with
21   risks of some sort?
22        A.    Yes.
23        Q.    Okay.  And acetaminophen is a
24   drug that can be used to treat pain, correct?
25        A.    Yes.

1      Q.     And but you would agree with me

2   that treatment with acetaminophen is not

3   appropriate in all patients, right?

4      A.     Yes.

5      Q.     And you would agree with me

6   that treatment with NSAIDs is not appropriate

7   in all patients, right?

8      A.     Yes.

9      Q.     Dr. Lembke, you don't have an

10  opinion about whether Endo violated any FDA

11  regulations concerning pharmaceutical

12  marketing, correct?

13     A.     There are other experts who

14  will testify regarding the FDA.  I was not

15  asked to provide an opinion on that.

16     Q.     Dr. Lembke, on page 55 of your

17  report, you cite a study by McIlwain, and you

18  note that Endo sponsored that study.

19          My only question to you is

20  whether you can identify any physicians in

21  Summit or Cuyahoga County who read the

22  McIlwain study?

23          MR. ARBITBLIT:  Object to form.

24          THE WITNESS:  I can't speak to

25          individual physicians, but I do think

1          that the Cochrane analysis had a huge

2          impact on physicians' perception of

3          risk --

4   QUESTIONS BY MS. VICARI:

5      Q.     I didn't ask about the Cochrane

6   analysis.  I have limited time.  I asked

7   about the McIlwain study.

8          MR. ARBITBLIT:  Limited time or

9          not, Counsel, you're supposed to let

10         her finish.

11         THE WITNESS:  I think I did

12         answer it.

13  QUESTIONS BY MS. VICARI:

14     Q.     You can't identify any

15  physicians, correct?

16         MR. ARBITBLIT:  Object to form.

17         THE WITNESS:  Again, I think

18         that I've answered this before in

19         other ways, with other defendants

20         asking similar questions, that

21         although I don't -- I can't identify

22         any specific physicians.  Broadly this

23         is misleading marketing messages.  We

24         were all exposed to them in the '90s

25         and ongoing to today.

1          And it had a significant and

2          instrumental effect on the way that we

3          prescribe opioids.

4   QUESTIONS BY MS. VICARI:

5      Q.     Dr. Lembke, you would agree

6   with me that as a general matter, a patient's

7   exposure to an ineffective medical treatment

8   should be minimized, correct?

9          MR. ARBITBLIT:  Object to form.

10         Incomplete hypothetical.

11         THE WITNESS:  It says here --

12         can you restate because it says

13         "shouldn't be minimized."  But I think

14         you meant should be minimized.

15  QUESTIONS BY MS. VICARI:

16     Q.     That is a mistake in the

17  transcript.

18          You would agree with me that a

19  patient's exposure to an ineffective medical

20  treatment should be minimized?

21         MR. ARBITBLIT:  Object to form.

22         THE WITNESS:  I do agree with

23         that.

24         MS. VICARI:  Thank you.  I have

25         no further questions.  We can go off

1          the record.  I'll pass the witness.

2          VIDEOGRAPHER:  We're now going

3          off the record, and the time is

4          5:07 p.m.

5          (Off the record at 5:07 p.m.)

6          VIDEOGRAPHER:  We're now going

7          back on the record, and the time is

8          5:08 p.m.

9          CROSS-EXAMINATION

10  QUESTIONS BY MS. HOLLY:

11     Q.     My name is Pam Holly.  I'm an

12  attorney with Morgan Lewis, and we represent

13  Teva Pharmaceuticals, USA, Cephalon, Inc.,

14  Actavis Pharma, Watson Laboratories and

15  Actavis, LLC.

16          Are you familiar -- or are you

17  aware that Watson Laboratories is a party to

18  this action?

19     A.     I was not aware.

20     Q.     Is it fair to say that you

21  don't know what opioid medications they sell?

22     A.     I know what opioids Teva

23  Pharmaceuticals sells, so if that's all part

24  of the same entity, Actiq and Fentora.

25     Q.     So is it fair to say that you

```
 1   don't know what opioids Watson Labs sells,
 2   correct?
 3        A.    Correct.
 4        Q.    Are you aware that Actavis
 5   Pharma is a part of this litigation?
 6        A.    I believe that Actavis Pharma
 7   was mentioned in combination with Allergan.
 8        Q.    A different entity, not Actavis
 9   Pharma.
10        A.    Okay.  Okay.
11        Q.    So it's fair to say that you're
12   not aware that Actavis Pharma is a party to
13   this litigation?
14        A.    It's fair to say that I'm not
15   aware of the various mergers, and it is very
16   confusing.  So I'm not entirely aware of who
17   owned what when.
18        Q.    Are you aware that Actavis,
19   LLC, is a party to this litigation?
20        A.    I wasn't aware, but I am aware
21   now.
22        Q.    Are you aware of what opioid
23   medications they sell?
24        A.    No.
25        Q.    Are you aware that generic
```

```
 1   manufacturers do not -- excuse me, do not
 2   market their products?
 3        A.    I wasn't specifically aware of
 4   that, no.
 5        Q.    Are you aware that Teva
 6   Pharmaceuticals USA is a party to this
 7   litigation?
 8        A.    Yes.
 9        Q.    Do you know what products Teva
10   Pharmaceuticals --
11        A.    Actiq and Fentora.
12        Q.    Your report makes no reference
13   to Teva Pharmaceuticals USA, is it fair to
14   say that you can't offer an opinion to a
15   reasonable degree of medical certainty about
16   the marketing of Teva USA; is that correct?
17        A.    I disagree.  If they're named
18   in the complaint, and I see all the
19   defendants as party to the litigation, and --
20        Q.    Any -- pardon me.
21        A.    Go ahead.  Go ahead.
22        Q.    I was going to ask you to point
23   me to a reference in your report to Teva
24   Pharmaceuticals USA.
25             We may have to go off the
```

```
 1   record, but I only have five minutes.
 2        A.    Sorry.  Yeah.  There's no
 3   specific reference in my report to Teva
 4   Pharmaceuticals, but if they're named in the
 5   complaint, I believe -- I agree with the
 6   complaint, and my report applies to all the
 7   defendants in particular as pertains to the
 8   misrepresentation of the benefits and risks
 9   of opioids more broadly as a class of drugs.
10        Q.    So Appendix I of your report
11   has five sections, correct?
12        A.    Yes.
13        Q.    And none of those five sections
14   relate to Teva Pharmaceuticals or Cephalon,
15   correct?
16        A.    That's correct.
17        Q.    So it's fair to say that in
18   your report, you're not offering an opinion
19   in this litigation about the marketing
20   conducted by those entities, correct?
21        A.    No.  I feel like I answered
22   that question already.
23        Q.    Well, I don't -- I disagree
24   with all due respect.
25             There's no section -- what is
```

```
 1   the title of Appendix I?
 2        A.    Appendix I?
 3        Q.    In the table of contents, you
 4   refer to it as misleading promotional
 5   messages, correct?
 6        A.    Yes.
 7             MR. ARBITBLIT:  That's it.
 8   Thank you, Counsel.  It's been nice.
 9   Feel free to take whatever is left
10   over at the end, sandwiches, I mean.
11             VIDEOGRAPHER:  Shall we
12   conclude?
13             MR. ARBITBLIT:  Yes.
14             VIDEOGRAPHER:  Okay.  This
15   concludes the video deposition of Anna
16   Lembke.  We are --
17             MS. HOLLY:  I'm sorry, I did
18   not have five minutes.
19             MS. DO AMARAL:  You did.
20             MS. HOLLY:  I did not have five
21   minutes.
22             VIDEOGRAPHER:  I have five.
23             MS. HOLLY:  I am --
24             MR. ARBITBLIT:  What does your
25   timer say, Pam?  Have you timed
```

1    yourself?

2         MS. HOLLY:  Yeah, my time is

3    three minutes.

4         MS. DO AMARAL:  No.  No, sorry.

5         MR. ARBITBLIT:  No.

6         MS. DO AMARAL:  Your

7    codefendants, the videographer, and by

8    my count --

9         MS. HOLLY:  All right.  I'm

10   going to state for the record that I

11   have specific time to ask questions

12   that I intended to ask on behalf of my

13   clients, and I object and don't agree

14   to close the deposition, and I reserve

15   all rights to raise with the Court to

16   request the appropriate relief,

17   including any deposition testimony

18   that went unanswered here today.

19        MR. ARBITBLIT:  Well, let's do

20   two more minutes, Pam, and ask your

21   questions.  Let's not fight about two

22   minutes.

23        MS. HOLLY:  Okay.  Well, then I

24   need -- I need -- I need full two

25   minutes.

1         MR. ARBITBLIT:  Calm down.

2         MS. HOLLY:  I need some answers

3    within that time, please.

4         MR. ARBITBLIT:  Well, we're not

5    going to give you answers just to give

6    you answers.  If you ask questions,

7    the witness will answer them.

8         MS. HOLLY:  I'm not going to

9    waste time talking about this.  I made

10   my objection, and I'm going to

11   continue my examination.

12        MR. ARBITBLIT:  This is not

13   your two minutes.  This is discussion

14   about you're claiming that she's not

15   answering your questions, which I

16   disagree.  Start your two minutes and

17   ask your questions.

18   QUESTIONS BY MS. HOLLY:

19        Q.    Are you aware of any marketing

20   statements made by Teva or Cephalon in Summit

21   or Cuyahoga County?

22        A.    I'm not specifically aware of

23   marketing specifically in those counties, but

24   I believe that the misleading promotional

25   statements have disseminated across every

1    region of the United States, and that

2    Cuyahoga County and Summit County are not

3    exceptions to that.

4         Q.    And what are the misleading

5    statements made by -- contained in your

6    report -- in your opinion in your report by

7    Cephalon and Teva?

8         A.    If they were named in the

9    complaint, and they were, then they

10   participated in the misleading marketing that

11   overstated the benefits and understated the

12   risks.

13        Q.    So your opinion then is based

14   on the complaint allegations as opposed to

15   underlying evidence or documents?

16        MR. ARBITBLIT:  Object to form.

17        THE WITNESS:  My complaint is

18        based on my understanding of the ways

19        in which opioid manufacturers across

20        the board, including all of the

21        defendants named in the complaint,

22        misrepresented the evidence.

23   QUESTIONS BY MS. HOLLY:

24        Q.    But Exhibit {inaudible} does

25   not contain any documents produced by Teva or

1    Cephalon, correct?

2         A.    Pardon me?

3         Q.    Exhibit -- your report does not

4    contain any documents produced by Teva or

5    Cephalon; is that correct?

6         A.    I do not have a section in my

7    appendix on Teva or Cephalon.

8         Q.    So what is the basis of your

9    opinion as it relates to Teva and Cephalon if

10   you have nothing in your report that relates

11   to them?

12        A.    I was the recipient of

13   marketing for products made by Teva,

14   including Actiq and Fentora, in my medical

15   training and residency, so I don't need to

16   review specific documents.  I've been hearing

17   those messages for two decades.

18        MR. ARBITBLIT:  And that was

19        over two minutes, and we're done.

20        MS. HOLLY:  I renew my

21        objection to the time.

22        MR. ARBITBLIT:  Take it up with

23        your co-counsel.  Take it up with your

24        defense counsel.  They divided the

25        time.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              VIDEOGRAPHER:  Okay.  We are
 2      now concluding the video deposition of
 3      Anna Lembke.  We are now going off the
 4      record, and the time is 5:17 p.m.
 5      (Deposition concluded at 5:17 p.m.)
 6                - - - - - - -
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  CERTIFICATE
 2
 3          I, CARRIE A. CAMPBELL, Registered
        Diplomate Reporter, Certified Realtime
 4      Reporter and Certified Shorthand Reporter, do
        hereby certify that prior to the commencement
 5      of the examination, Anna Lembke, M.D., was
        duly sworn by me to testify to the truth, the
 6      whole truth and nothing but the truth.
 7          I DO FURTHER CERTIFY that the
        foregoing is a verbatim transcript of the
 8      testimony as taken stenographically by and
        before me at the time, place and on the date
 9      hereinbefore set forth, to the best of my
        ability.
10
            I DO FURTHER CERTIFY that I am
11      neither a relative nor employee nor attorney
        nor counsel of any of the parties to this
12      action, and that I am neither a relative nor
        employee of such attorney or counsel, and
13      that I am not financially interested in the
        action.
14
15
16
17      CARRIE A. CAMPBELL,
        NCRA Registered Diplomate Reporter
18      Certified Realtime Reporter
        Notary Public
19      Dated:  April 29, 2019
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          INSTRUCTIONS TO WITNESS
 2
 3          Please read your deposition over
 4      carefully and make any necessary corrections.
 5      You should state the reason in the
 6      appropriate space on the errata sheet for any
 7      corrections that are made.
 8          After doing so, please sign the
 9      errata sheet and date it.  You are signing
10      same subject to the changes you have noted on
11      the errata sheet, which will be attached to
12      your deposition.
13          It is imperative that you return
14      the original errata sheet to the deposing
15      attorney within thirty (30) days of receipt
16      of the deposition transcript by you.  If you
17      fail to do so, the deposition transcript may
18      be deemed to be accurate and may be used in
19      court.
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          ACKNOWLEDGMENT OF DEPONENT
 2
 3
 4          I,_____, do
        hereby certify that I have read the foregoing
 5      pages and that the same is a correct
        transcription of the answers given by me to
 6      the questions therein propounded, except for
        the corrections or changes in form or
 7      substance, if any, noted in the attached
        Errata Sheet.
 8
 9
10
11
12      _____
        Anna Lembke, M.D.              DATE
13
14
15      Subscribed and sworn to before me this
16      _____ day of _____, 20 _____.
17      My commission expires: _____
18
19      Notary Public
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1               - - - - - - -
                   ERRATA
 2               - - - - - - -
 3     PAGE    LINE   CHANGE/REASON
 4     ____    ____   _____
 5     ____    ____   _____
 6     ____    ____   _____
 7     ____    ____   _____
 8     ____    ____   _____
 9     ____    ____   _____
10     ____    ____   _____
11     ____    ____   _____
12     ____    ____   _____
13     ____    ____   _____
14     ____    ____   _____
15     ____    ____   _____
16     ____    ____   _____
17     ____    ____   _____
18     ____    ____   _____
19     ____    ____   _____
20     ____    ____   _____
21     ____    ____   _____
22     ____    ____   _____
23     ____    ____   _____
24     ____    ____   _____
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1               - - - - - - -
                 LAWYER'S NOTES
 2               - - - - - - -
 3     PAGE    LINE
 4     ____    ____   _____
 5     ____    ____   _____
 6     ____    ____   _____
 7     ____    ____   _____
 8     ____    ____   _____
 9     ____    ____   _____
10     ____    ____   _____
11     ____    ____   _____
12     ____    ____   _____
13     ____    ____   _____
14     ____    ____   _____
15     ____    ____   _____
16     ____    ____   _____
17     ____    ____   _____
18     ____    ____   _____
19     ____    ____   _____
20     ____    ____   _____
21     ____    ____   _____
22     ____    ____   _____
23     ____    ____   _____
24     ____    ____   _____
25
```