HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 352

```
 1            IN THE UNITED STATES DISTRICT COURT
 2                NORTHERN DISTRICT OF OHIO
 3                    EASTERN DIVISION
 4
                ~~~~~~~~~~~~~~~~~~~~~
 5
 6     IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
       OPIATE LITIGATION
 7                                  Case No. 17-md-2804
 8                                  Judge Dan Aaron
       This document relates to:      Polster
 9
       The County of Cuyahoga v. Purdue
10     Pharma L.P., et al.
       Case No. 18-OP-45090
11
       City of Cleveland, Ohio v. Purdue
12     Pharma L.P., et al
       Case No. 18-OP-45132
13
       The County of Summit, Ohio, et al.
14     v. Purdue Pharma L.P., et al.
       Case No. 17-OP-45004
15
                ~~~~~~~~~~~~~~~~~~~~~
16
                      Volume III
17             Continued deposition of
                  PATRICK LEONARD
18
                    May 23, 2019
19                    8:01 a.m.
20
                     Taken at:
21                  Ulmer & Berne
             1660 W. 2nd Street, Suite 1100
22                  Cleveland, Ohio
23           Renee L. Pellegrino, RPR, CLR
24        THIS TRANSCRIPT HAS BEEN DEEMED HIGHLY
       CONFIDENTIAL, ATTORNEYS' EYES ONLY AND MAY BE
25        SUBJECT TO A PROTECTIVE ORDER OR OTHER
                    STIPULATIONS
```

Veritext Legal Solutions

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 353

```
 1   APPEARANCES:
 2   On behalf of Summit County and City of Akron:
         Motley Rice
 3       JAMES W. LEDLIE, ESQ.
         28 Bridgeside Boulevard
 4       Mt. Pleasant, South Carolina  29464
         (843) 216-9229
 5       jledlie@motleyrice.com
 6   On behalf of the United States Department of Justice
     and Drug Enforcement Administration:
 7       United States Attorney's Office
         JAMES R. BENNETT, II, ESQ.
 8       RENEE A. BACCHUS, ESQ.
         United States Courthouse
 9       801 West Superior Avenue
         Suite 400
10       Cleveland, Ohio  44113
         (216) 622-3988
11       James.bennett4@usdoj.gov
         renee.bacchus@usdoj.gov
12
     On behalf of the U.S. Drug Enforcement
13   Administration:
         JOHN J. CIPRIANI, ESQ.
14       431 Howard Street
         Detroit, Michigan  48226
15       (313) 234-4002
         john.j.cipriani@usdoj.gov
16
     On behalf of Walmart, Inc.:
17       Jones Day
         CHRISTOPHER M. McLAUGHLIN, ESQ.
18       North Point, 901 Lakeside Avenue
         Cleveland, Ohio  44114-1190
19       (216) 586-3939
         cmmclaughlin@jonesday.com
20
     On behalf of CVS Indiana, LLC and CVS Rx Services,
21   LLC:
         Zuckerman Spaeder LLP
22       DANIEL P. MOYLAN, ESQ.
         100 East Pratt Street
23       Suite 2440
         Baltimore, Maryland  21202-1031
24       (410) 949-1159
         dmoylan@zuckerman.com
25                       ~ ~ ~ ~ ~
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 354

```
 1    APPEARANCES, CONT'D:
 2    On behalf of Janssen Pharmaceuticals, Inc. and
      Johnson & Johnson:
 3        Tucker Ellis
          RAYMOND KRNCEVIC, ESQ.
 4        950 Main Avenue, Suite 1100
          Cleveland, Ohio  44113
 5        (216) 696-4889
          raymond.krncevic@tuckerellis.com
 6           - and -
          O'Melveny & Myers
 7        (Via Telephone)
          MATT WALLACE, ESQ.
 8        1999 Avenue of the Stars, 8th Floor
          Los Angeles, California  90067
 9        mwallace@omm.com
          (310) 553-6700
10
      On behalf of Endo Pharmaceuticals, Inc., Endo
11    Health Solutions, Inc., Par Pharmaceuticals,
      Inc. and Par Pharmaceutical Companies, Inc.:
12        (Via Telephone)
          Arnold & Porter
13        WILSON D. MUDGE, ESQ.
          601 Massachusetts Avenue, NW
14        Washington, D.C.  20001-3743
          (202) 942-5743
15        wilson.mudge@arnoldporter.com
16    On behalf of McKesson Corporation:
          Covington & Burling LLP
17        BENJAMIN C. BLOCK, ESQ.
          STEPHEN RAIOLA, ESQ.
18        One CityCenter
          850 Tenth Street NW
19        Washington, D.C.  200001-4956
          (202) 662-5205
20        bblock@cov.com
          sraiola@cov.com
21
22                     ~ ~ ~ ~ ~
23
24
25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                              Page 355
 1    APPEARANCES, CONT'D:
 2    On behalf of HBC Service Company:
          (Via Telephone)
 3        Marcus & Shapira LLP
          ERIN GIBSON-ALLEN, ESQ.
 4        One Oxford Centre, 35th Floor
          Pittsburgh, Pennsylvania  15219
 5        (412) 338-3344
          allen@marcus-shapira.com
 6
      On behalf of Mallinckrodt, LLC:
 7        Ropes & Gray LLP
          JOSH GOLDSTEIN, ESQ.
 8        800 Boylston Street
          Boston, Massachusetts  02199
 9        (617) 951-7000
          joshua.goldstein@ropesgray.com
10
       On behalf of AmerisourceBergen Drug Corporation:
11        Jackson Kelly
          SANDRA K. ZERRUSEN, ESQ.
12        50 South Main Street
          Suite 201
13        Akron, Ohio  44308
          (330) 252-9060
14        skzerrusen@jacksonkelly.com
15    On behalf of Rite-Aid of Maryland:
          (Via Telephone)
16        Morgan Lewis
          JOHN P. LAVELLE, JR., ESQ.
17        1701 Market Street
          Philadelphia, Pennsylvania  19103-2921
18        (215) 963-4824
          john.lavelle@morganlewis.com
19
      On behalf of Walgreens:
20        (Via Telephone)
          Bartlit Beck
21        ALEX J. HARRIS, ESQ.
          1801 Wewatta Street
22        Suite 1200
          Denver, Colorado  80202
23        (303) 592-3197
          alex.harris@bartlit-beck.com
24
25                        ~ ~ ~ ~ ~
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 356

1    APPEARANCES, CONT'D:

2    On behalf of Henry Schein:
         (Via Telephone)

3        Locke Lorde
         MADELEINE E. BRUNNER, ESQ.

4        2200 Ross Avenue
         Suite 2800

5        Dallas, Texas  75201
         (214) 740-8000

6        maddie.brunner@lockelord

7

8    ALSO PRESENT:

9        Special Master David Cohen

10       Josh Payne

11
                       ~ ~ ~ ~ ~
12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 357

1                      TRANSCRIPT INDEX

2

3    APPEARANCES ...................................353

4    INDEX OF EXHIBITS .............................358

5    INDEX OF OBJECTIONS ..........................359

6

7    EXAMINATION OF PATRICK LEONARD:

8    BY MR. BLOCK .................................364

9    BY MR. GOLDSTEIN ............................462

10   BY MR. BLOCK ................................463

11   BY MR. LEDLIE ...............................464

12   BY MR. BLOCK ................................466

13

14   REPORTER'S CERTIFICATE .......................474

15

16   EXHIBIT CUSTODY - RETAINED BY COURT REPORTER

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 358

1                    INDEX OF EXHIBITS

2

3     Number              Description              Marked

4

5   Exhibit 30   E-Mail String Beginning Bates     429
                 Number AKRON_000368859

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 359

1           INDEX OF OBJECTIONS

2

3     Objection ...................................371
      Objection ...................................390
4     Objection ...................................390
      Objection ...................................390
5     Objection ...................................390
      Objection ...................................390
6     Objection ...................................392
      Objection ...................................393
7     Objection ...................................394
      Objection ...................................394
8     Objection ...................................394
      Objection ...................................396
9     Objection ...................................396
      Objection ...................................396
10    Objection...................................401
      Objection ...................................401
11    Objection ...................................401
      Objection ...................................401
12    Objection ...................................403
      Objection ...................................407
13    Objection ...................................408
      Objection ...................................410
14    Objection ...................................410
      Objection ...................................413
15    Objection ...................................413
      Objection...................................413
16    Objection ...................................414
      Objection ...................................416
17    Objection ...................................419
      Objection ...................................419
18    Objection ...................................420
      Objection ...................................420
19    Objection ...................................420
      Objection ...................................421
20    Objection ...................................421
      Objection ...................................422
21    Objection ...................................423
      Objection ...................................424
22    Objection ...................................424
      Objection ...................................424
23    Objection ...................................425
      Objection ...................................425
24    Objection ...................................425
      Objection ...................................426
25    Objection ...................................427

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           INDEX OF OBJECTIONS, CONT'D
2
3      Objection ...................................427
       Objection ...................................427
4      Objection ...................................427
       Objection ...................................428
5      Objection ...................................428
       Objection ...................................429
6      Objection ...................................430
       Objection ...................................432
7      Objection ...................................433
       Objection ...................................433
8      Objection ...................................434
       Objection ...................................434
9      Objection ...................................434
       Objection ...................................436
10     Objection ...................................436
       Objection ...................................437
11     Objection ...................................437
       Objection ...................................437
12     Objection ...................................437
       Objection ...................................438
13     Objection ...................................438
       Objection ...................................438
14     Objection ...................................438
       Objection ...................................438
15     Objection ...................................439
       Objection ...................................439
16     Objection ...................................439
       Objection ...................................439
17     Objection ...................................439
       Objection ...................................440
18     Objection ...................................440
       Objection ...................................441
19     Objection ...................................441
       Objection ...................................443
20     Objection ...................................443
       Objection ...................................446
21     Objection ...................................446
       Objection ...................................447
22     Objection ...................................447
       Objection ...................................449
23     Objection ...................................449
       Objection ...................................450
24     Objection ...................................451
       Objection ...................................452
25     Objection ...................................453

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 361

1           INDEX OF OBJECTIONS, CONT'D
2
3    Objection .....................................453
     Objection .....................................455
4    Objection .....................................455
     Objection .....................................456
5    Objection .....................................456
     Objection .....................................456
6    Objection .....................................457
     Objection .....................................457
7    Objection .....................................458
     Objection .....................................459
8    Objection .....................................459
     Objection .....................................459
9    Objection .....................................461
     Objection .....................................462
10   Objection .....................................463
     Objection .....................................463
11   Objection .....................................464
     Objection .....................................465
12   Objection .....................................465
     Objection .....................................465
13   Objection .....................................465
     Objection .....................................466
14   Objection .....................................467
     Objection .....................................468
15   Objection .....................................468
     Objection .....................................469
16   Objection .....................................469
     Objection .....................................469
17   Objection .....................................470
     Objection .....................................470
18   Objection .....................................471
     Objection .....................................471
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 362

1          MR. BLOCK:  We're here in the

2    National Prescription Opiate Litigation for the

3    continued deposition of Patrick Leonard.  We're

4    at Ulmer & Berne.  We should enter appearances

5    for the record, so, James, you want to start.

6          MR. LEDLIE:  Sure.

7          This is James Ledlie on behalf of

8    Summit County.

9          MR. BENNETT:  James Bennett from the

10   U.S. Attorney's Office for the Northern District

11   of Ohio here on behalf of the United States and

12   the Drug Enforcement Administration.

13         MR. CIPRIANI:  John Cipriani,

14   division counsel for DEA.

15         MS. BACCHUS:  Renee Bacchus, U.S.

16   Attorney's Office, Northern District of Ohio, on

17   behalf of the United States and DEA.

18         MS. ZERUSSEN:  Sandy Zerussen,

19   Jackson Kelly, on behalf of AmerisourceBergen

20   Drug Corporation.

21         MR. MOYLAN:  Daniel Moylan,

22   Zuckerman Spaeder, for CVS.

23         SPECIAL MASTER COHEN:  David Cohen,

24   Special Master.

25         MR. KRNCEVIC:  Raymond Krncevic,

Page 363

1    Tucker Ellis, for Janssen.

2              MR. GOLDSTEIN:  Joshua Goldstein,

3    Ropes & Gray, for Mallinckrodt, LLC.

4              MR. RAIOLA:  Stephen Raiola,

5    Covington & Burling, on behalf of McKesson.

6              MR. BLOCK:  And Benjamin Block from

7    Covington for McKesson.

8              MR. BENNETT:  And the U.S.

9    Attorney's Office, with the agreement of the

10   parties and the Special Master, there is a law

11   student, Josh Payne, who is observing the

12   deposition today.

13             Thank you.

14             MR. BLOCK:  Is there anyone on the

15   phone?  Anyone participating by phone, please

16   identify yourself.

17             MR. LAVELLE:  John Lavelle from

18   Morgan Lewis on behalf of Defendant Rite-Aid of

19   Maryland.

20             MS. GIBSON-ALLEN:  This is Erin

21   Gibson-Allen from Marcus & Shapira on behalf of

22   Defendant HBC.

23             MS. BRUNNER:  Madeleine Brunner of

24   Locke Lord on behalf of Henry Schein.

25             MR. MUDGE:  This is Wilson Mudge of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 364

1  Arnold & Porter on behalf of the Endo and Par

2  Defendants.

3           MR. HARRIS:  Alex Harris of Barlit

4  Beck on behalf of Walgreens.

5           MR. WALLACE:  Matt Wallace of

6  O'Melveny & Myers on behalf of Johnson & Johnson

7  and Janssen.

8       PATRICK LEONARD, of lawful age, called

9  for examination, as provided by the Federal

10  Rules of Civil Procedure, being by me first duly

11  sworn, as hereinafter certified, deposed and

12  said as follows:

13           EXAMINATION OF PATRICK LEONARD

14  BY MR. BLOCK:

15       Q.    Good morning, Detective Leonard.

16       A.    Good morning, sir.

17       Q.    Nice to meet you.

18           Did you do anything to prepare for

19  this portion of your deposition?

20       A.    I did review the sentencing for

21  Dr. ████.

22       Q.    Anything else?

23       A.    Reviewed some of the sentencing for

24  Dr. ████ as well.

25       Q.    Dr. ████ that was?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 365

1        A.        ███ .

2        Q.        And anything else?

3        A.        No, sir.

4        Q.        Any meetings with counsel?

5        A.        Met with counsel, yes.

6        Q.        How many times?

7        A.        Once.

8        Q.        When was that?

9        A.        Yesterday.

10       Q.        And with which counsel did you meet?

11       A.        I met with James Ledlie.  I met with

12   the DOJ this morning for 15 minutes.

13       Q.        How long was your meeting with

14   Mr. Ledlie yesterday?

15       A.        Two hours maybe.

16       Q.        Have you reviewed the transcripts

17   from the first two installments of your

18   deposition?

19       A.        I scanned through them.  They were

20   quite lengthy.  But yes.

21       Q.        Any corrections you need to make?

22       A.        Not that I saw that caught me as

23   something that needed to be corrected

24   immediately.

25       Q.        And other than Mr. Ledlie or counsel

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 366

1   for DEA and DOJ, have you spoken with anyone

2   about this case since last we saw you?

3          A.    No, sir.

4          Q.    How many investigations, sir, have

5   you worked on while assigned to the TDS?

6          A.    I have no idea.

7          Q.    Well, is it more than ten?

8          A.    Yes.

9          Q.    Is it more than a hundred?

10         A.    Doubtful, no.

11         Q.    It is more than 50?

12         A.    It could be close to 50.

13         Q.    And for how many of those were you

14  the lead agent?

15         A.    Maybe a third.

16         Q.    And who determines whether you're --

17  or how is it determined whether you're the lead

18  agent or an assisting agent on any particular

19  investigation?

20         A.    One is if I get the complaint, if I

21  start it and run with it.  Some of the ones that

22  I was the lead on were because they were City of

23  Akron cases that I charted and did through the

24  DEA, so those -- I would be lead on all of

25  those.  Or if referrals came from either Denise

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 367

1   Foster, our previous GS, or Hans Charters, that

2   took place in either Akron or Summit County,

3   those could be assigned to me as the lead.

4         Q.    When you say they were City of Akron

5   cases that you charted, what do you mean by

6   that?

7         A.    If I had a doctor shopper or a

8   pharmacist or pharmacy tech, a theft, a nurse

9   that was stealing from one of the hospitals, I

10  would do the case and it would be state charges,

11  but I would open a DEA case, so my reports would

12  be done through the DEA format with a DEA-6 and

13  the rest would be chartered.

14        Q.    Do you have a sense as to what

15  percentage of the investigations you've worked

16  on at TDS were -- if I followed that last answer

17  correctly, would have been also state-chartered

18  cases?

19        A.    When you say "worked on," I'm going

20  to assume you're talking about even if I did

21  surveillance and assisted on someone else's lead

22  case, so probably about half of my cases were

23  City of Akron cases.  The other half would have

24  been things that I assisted on or led through

25  DEA.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 368

1       Q.     And do you know, while at TDS have

2   you worked on cases that were also, for example,

3   City of Cleveland cases?

4       A.     I did not work on -- I don't know

5   that, no.  I don't know.

6       Q.     You're not aware of having worked on

7   a City of Cleveland case?

8       A.     That's correct.  I'm not aware of

9   that.

10      Q.     Would there be such a thing as a

11  Summit County case?

12      A.     Yes.

13      Q.     And at TDS have you worked on any

14  Summit County cases?

15      A.     Well, the City of Akron falls within

16  the borders of Summit County, so all my Akron

17  cases would have gone through Summit County

18  Common Pleas Court, so if that answers your

19  question.

20      Q.     I think so.

21             So is there anything else within

22  Summit County that would come to you that

23  wouldn't come to you through the City of Akron?

24      A.     I would get a referral outside of

25  the City of Akron.  I think I worked a Stow

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 369

1    case.  I've recently worked a pharmacist case

2    that was the City of Stow that's -- he's been

3    indicted in Summit County Grand Jury.

4         Q.    Have you ever worked on any Cuyahoga

5    County cases while at TDS?

6         A.    I believe I have.  There were other

7    task force officers that were Summit County

8    deputies or Cleveland Heights officers.

9         Q.    Did you mean Cuyahoga County?

10        A.    I'm sorry.  Cuyahoga County.

11        Q.    Okay.

12        A.    Or Cleveland Heights detectives that

13   were task force officers, and some of those

14   cases were taken locally rather than federally,

15   so that could be a Cuyahoga County case.

16        Q.    Who determines whether a case

17   ultimately is taken locally versus federally?

18        A.    There's -- I guess there's a couple

19   different ways.

20             If the AUSA isn't -- if we don't

21   meet the requirements of a minimum that the AUSA

22   wants for the case, then we take it state, or if

23   our department wants us to take it state, then

24   we'll take it state.

25        Q.    So I think you've said there are

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 370

1    approximately 50 investigations that you've

2    worked on in your time at TDS?

3         A.    Plus or minus, yes.

4         Q.    But are we talking plus or minus ten

5    or so?

6         A.    At most.

7         Q.    And how many of those investigations

8    involved investigating something other than

9    opioids?

10        A.    Less than a half dozen.

11        Q.    But you have worked on

12   investigations that were not related to opioids?

13        A.    The ones I'm -- well, I guess where

14   are you considering illicit fentanyl?

15        Q.    Well, how would you consider illicit

16   fentanyl?

17        A.    I consider it an opioid, but it's --

18   so then, you know, I'm trying to think of the

19   cases, whether --

20        Q.    Let me rephrase the question and ask

21   you, how many of those investigations have

22   involved something other than prescription

23   opioids?

24        A.    That would be less than a half,

25   probably a half dozen.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 371

1      Q.    For example, have you ever worked on

2   a case involving -- an investigation involving

3   steroids?

4      A.    Yes.

5      Q.    Cannabinoids?

6      A.    There may have been some

7   cannabinoids in a case, but it was never the

8   primary target.  You know, when you arrest some

9   of these people, they tend to have that with

10  them.

11     Q.    While at TDS have you ever worked on

12  an investigation into a licensed prescription

13  opioid manufacturer?

14     A.    No, sir, I have not.

15           MR. LEDLIE:  Objection.

16           MR. BENNETT:  I'm going to add an

17  objection that you are not authorized to discuss

18  active investigations at the DEA.

19     A.    Yes, sir.

20           MR. BLOCK:  Well, I think I already

21  have the answer to that question.  Special

22  Master Cohen, I don't believe I agree with that

23  objection, but I don't know that it matters

24  because I got the answer.  But it might for the

25  next question.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 372

1      Q.    At TDS have you ever worked on any

2   investigation into any licensed distributor?

3            MR. BENNETT:  Objection.  Vague.

4   Objection.  Scope.

5            You're not authorized to disclose

6   information regarding specific DEA

7   investigations or activities.

8            MR. BLOCK:  May I at least get a yes

9   or no answer to that question?

10            SPECIAL MASTER COHEN:  Yes, you can

11   get a yes or no answer.

12            Do you need it read back?

13            THE WITNESS:  Yes, because I'm not

14   sure what I'm allowed to answer.

15            SPECIAL MASTER COHEN:  You can

16   answer yes or no to the question.

17      Q.    And my question was, at TDS have you

18   ever worked on any investigation into any

19   licensed distributor?

20            MR. BENNETT:  Same objections.

21      A.    Yes.

22      Q.    How many?

23            MR. BENNETT:  Objection.  Scope.

24            You're not authorized to disclose

25   information regarding specific DEA

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 373

1   investigations or activities.

2              SPECIAL MASTER COHEN:  You can

3   answer.

4        A.    Two that I'm aware of.  There may be

5   another, but I'm not sure.

6        Q.    Are either of those investigations

7   closed?

8        A.    One is.

9        Q.    In the closed investigation were

10  charges brought?

11       A.    It ended up being civil.

12       Q.    And who was the --

13       A.    That was the one we talked about

14  before with Agent Brinks where we returned a

15  bunch of files to a facility in Wadsworth.  I

16  think it was like a 50 million dollar

17  settlement.  I don't remember.  I can't think of

18  the name of the company.  But that was -- Scott

19  Brinks was the DI that investigated that case.

20  I just assisted on it.

21       Q.    DI is diversion investigator?

22       A.    Yes, sir.

23       Q.    Is Mr. Brinks a member of the TDS?

24       A.    He was at that time.

25       Q.    And what is a diversion

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 374

 1  investigator?

 2        A.    It's a non -- he's not law

 3  enforcement, no arrest powers, but they

 4  investigate and monitor the Controlled

 5  Substances Act.  They're in charge of dispensing

 6  logs, suspicious activity reports.  I don't do

 7  their job so I don't know all of their -- the

 8  definition of what they do, but they assist us

 9  in our investigations.

10        Q.    The second matter involving a

11  distributor that you were testifying about, are

12  you the lead agent on that?

13        A.    No.

14        Q.    Is that one where you're assisting a

15  diversion investigator?

16              MR. BENNETT:  Objection.  Scope.

17              You're not authorized to disclose

18  the specific DEA investigations and activities

19  regarding those investigations.

20              SPECIAL MASTER COHEN:  You can

21  answer that question.

22        A.    I'm assisting in the office.

23  There's -- I don't know who the lead agent is on

24  it, whether it's a DI or an agent.  I'm

25  assisting in the office.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 375

1      Q.   Do you know whether -- I'll just ask

2  do you know whether that distributor is a

3  defendant in this lawsuit?

4          MR. BENNETT:  Objection.  Scope.

5          You're not authorized to disclose

6  specific DEA investigations or activities.

7  Identifying it as a defendant in this case would

8  narrow down who you are investigating and I

9  would instruct you not to answer that question.

10         SPECIAL MASTER COHEN:  He can answer

11  yes or no.  That's all it asked.

12         MR. BENNETT:  Special Master Cohen,

13  will you hear argument on that?

14         SPECIAL MASTER COHEN:  No.  We've

15  got at least two dozen defendants in this case

16  and simply a yes or no answer isn't going to

17  identify anybody in a way that would impede or

18  change an ongoing investigation, so you can

19  answer yes or no.

20         MR. BENNETT:  Special Master Cohen,

21  my concern would be that while there may be two

22  dozen distributors in this case, they're not all

23  within this area, which I think may limit and

24  allow them to determine --

25         SPECIAL MASTER COHEN:  You can

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 376

1    answer yes or no.

2          A.          █████

3          Q.    While at TDS have you worked on

4    investigations into suspected doctor shopping?

5                MR. LEDLIE:  Object to the form of

6    the question.

7                MR. BENNETT:  Objection.  Vague.

8                You can answer.

9          A.    You mean the patients that are

10   doctor shopping or --

11         Q.    Well, do you have an understanding

12   what doctor shopping is?

13         A.    I do.  I'm not sure what your

14   understanding is.

15         Q.    Tell me what yours is.

16         A.    Individuals who will seek

17   medication, pain medication, from multiple

18   physicians for either the same ailment or a

19   made-up ailment.

20         Q.    And using that definition, have you

21   worked any investigations into that kind of

22   doctor shopping while at TDS?

23         A.    Yes, sir.

24         Q.    How many of the 50 plus or minus

25   investigations were into potential doctor

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 377

1   shopping?

2           A.     Maybe 20, 25.

3           Q.     How about, do you have a definition

4   of a pill mill?

5           A.     I do.

6           Q.     What do you understand a pill mill

7   to mean?

8           A.     Individual with a medical license,

9   DEA registration, that is prescribing medication

10  to customers with no medical purpose, basically

11  a drug dealer.

12          Q.     Have any of the investigations

13  you've worked on at TDS involved pill mills?

14          A.     No, sir.

15          Q.     At TDS have any of the

16  investigations involved counterfeit pills?

17          A.     Yes, sir.

18          Q.     How many?

19          A.     At least two were counterfeit pills.

20          Q.     How about, have you done any

21  investigations into thefts of prescriptions?

22                 MR. LEDLIE:  Objection.  Vague as to

23  time.

24          Q.     I'm sorry.  I'm trying to focus on

25  your time at TDS because that's what we weren't

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 378

1   allowed to ask you earlier.

2         A.    Are you talking theft of paper

3   prescriptions, theft of medications?

4         Q.    Let's start with theft of, like,

5   prescribing pads or forgery of prescribing pads.

6   Have you done investigations into that?

7         A.    I haven't done a theft of a

8   prescribing pad for a long time.  They're

9   getting to the point where if there's any forged

10  prescriptions, some of these guys are good

11  enough that they get safety-backed paper and

12  they print their own rather than steal someone's

13  pad.

14        Q.    How about theft of prescription

15  medication?

16        A.    Yes.  Yes.

17        Q.    And how many of the 50 plus or minus

18  investigations were into the theft of

19  prescription medication?

20        A.    I don't know exact numbers on it.

21  I'd be guessing.

22        Q.    I'm trying to get a sense of the

23  relative predominance of different -- or

24  taxonomy of the types of investigations you've

25  worked on.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 379

1      A.    Most of my nursing arrests are

2    thefts of drugs.  Those cases are brought to me

3    by agents from the Board of Nursing.  Those are

4    normally self-medicating RNs and those end up

5    being theft of drugs.  Some pharmacy techs

6    normally end up being a theft of drugs.  Maybe a

7    dozen.  I don't know.  A half dozen, dozen.

8      Q.    Thank you.

9            Of the 50 plus or minus

10   investigations that you've worked on, how many

11   have resulted in arrests; do you know?

12     A.    Gosh, I don't have numbers for you

13   on these.  Most of the theft of drugs, the

14   deception to obtain, the doctor shoppers, those,

15   typically probably 99, 95 percent of those end

16   up in arrests.  If it's a theft from a patient

17   with a home healthcare aide, those rarely end up

18   in arrests.  Very difficult to prove.  And most

19   of those I didn't even add into the 50 cases

20   because I don't open a case on those.  I'll

21   follow through with whether there's anything to

22   follow up on or if I have anything to open a

23   case.  For the majority of those there just

24   isn't enough evidence to start anything.

25     Q.    How about, have you made any arrests

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 380

1    in counterfeit pill cases?

2         A.    Yes, sir.

3         Q.    How many?

4         A.    Well, the one case had three

5    individuals.  The other case, we made arrests.

6    I don't know how many individuals there were off

7    the top of my head.

8         Q.    At TDS have you done any

9    investigations into physicians or other

10   authorized medical practitioners for improper

11   prescribing?

12        A.    Yes.

13        Q.    How many of those type of

14   investigations?

15        A.    Including those that are probably

16   still open, there's probably a dozen of them.

17        Q.    Can you describe generally at a

18   general level what the factors are that you look

19   for in determining whether a physician is

20   overprescribing?

21             MR. BENNETT:  Objection.  Scope.

22             You're not authorized to disclose

23   information that would reveal investigative or

24   intelligence gathering and dissemination

25   techniques whose effectiveness would thereby be

Page 381

1  impaired, and I believe that the Special Master

2  has ruled that the document related to this

3  question has also been allowed to be clawed

4  back.  So to the extent that you can answer

5  generally without disclosing confidential

6  techniques, you may answer.

7       A.    Can you repeat it then for me,

8  please?

9       Q.    Yes.

10            Could you please describe for us

11  generally the factors that you look for in

12  determining whether or not a physician is -- how

13  do you figure out whether a physician is

14  overprescribing?

15            MR. LEDLIE:  Objection.  Asked and

16  answered already at the last -- volume II.  I

17  can give you the pages, but this has been

18  covered.

19       A.    There's a lot of factors that go

20  into it.  I mean, whether I get a complaint,

21  someone obviously calls and says, you know,

22  they're having a problem.  Sometimes it's a

23  family member who will call that one of their

24  children is being, they believe, overprescribed.

25  There's got to be something that brings it to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 382

1    our attention first, and then it will fall into

2    more the investigative techniques on what we do

3    once we get a substantial lead in a case to

4    start opening investigations.

5            Q.    Have you ever worked on an

6    investigation at TDS into someone for potential

7    overprescribing and concluded that that person

8    was not overprescribing?

9            A.    I've worked on cases where I didn't

10   have enough proof that I could bring charges,

11   but not ever where I didn't think there was a

12   problem.

13           Q.    Not ever where you didn't think

14   there was a problem?

15           A.    No.

16           Q.    But you have worked on cases where

17   you couldn't determine or you didn't think you

18   had enough proof to decide whether or not

19   someone was overprescribing?

20              MR. LEDLIE:  Object to the form of

21   the question.

22           A.    I didn't have enough evidence to

23   bring charges at that time.

24           Q.    Have you worked on a case -- worked

25   on an investigation and closed it and not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 383

1   brought charges to improper prescribing?

2          A.     Yes, sir, I have.

3          Q.     And can we agree that it can be

4   difficult to determine whether a physician is

5   overprescribing?

6                 MR. LEDLIE:  Objection.  Vague.

7                 MR. BENNETT:  Objection.  Scope.

8                 You can answer.

9          A.     Sure.  There are -- some doctor

10  cases are some of the most difficult cases to

11  work.

12         Q.     Have any of your investigations

13  involved marketing materials related to

14  prescription opioids, any of your investigations

15  while at TDS?

16         A.     What type of marketing materials are

17  you talking about?

18         Q.     Marketing that the manufacturer of

19  the medicine provides to doctors.

20         A.     No, sir.  Mine have not.

21         Q.     Does the TDS maintain statistics on

22  the different types of diversion cases that it's

23  working on?

24         A.     Not that I'm aware of.

25         Q.     Of the investigations that you've

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 384

1  worked on at TDS, how many of those were

2  conducted outside of Summit County?

3              MR. BENNETT:  Objection.  Vague.

4      A.    I don't know off the top of my head.

5  We are responsible for pretty much Mansfield

6  north in Ohio.  We have about 30 -- I think it's

7  maybe 32 or 34 counties.  And we've had cases

8  all across the northern part of the state.  I

9  don't have a number for you.

10      Q.    For the ones that you've been the

11  lead agent for, have you -- sorry.  I'll get the

12  question out.

13              Have you been the lead agent on an

14  investigation that was focused outside of Summit

15  County?

16      A.    I've been a co-lead agent on some

17  that are outside of Summit County.

18      Q.    And you've assisted on

19  investigations that are outside of Summit

20  County?

21      A.    Yes, sir.

22      Q.    Have you worked on investigations

23  that are outside the state of Ohio?

24      A.    Yes, sir.

25      Q.    Do you know how many?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 385

1          A.     At least three of them, maybe four.

2          Q.     What percentage of prescription

3    opioids, diverted prescription opioids, in the

4    city of Akron have been diverted from areas

5    outside the city of Akron?

6          A.     I would have no idea or no way of

7    calculating that number.

8          Q.     Why not?

9          A.     I don't know where pills come from.

10   Just because someone has them, they could have

11   filled them in a pharmacy in Florida.  I don't

12   know when I investigate someone -- if they're

13   not cooperating and telling me where they came

14   from, I got no way of determining it myself.

15         Q.     If we go back through -- let me make

16   sure -- we talked about doctor shopping

17   investigations, pill mill investigations or lack

18   thereof, counterfeit pills, thefts of

19   prescription medication, improper prescribing.

20   Have I left out any categories of diversion type

21   investigations that you've worked on at TDS?

22         A.     Not that I can think of.

23         Q.     And then so going back through

24   those, I'd like to find out in general the

25   length of time it takes to conduct an

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 386

1  investigation into these different types of

2  diversion.  So starting with doctor shopping, is

3  there either a range or an average length of

4  time it takes to do a doctor shopping

5  investigation?

6      A.    It depends how clearcut it is.

7  ████████████████████████████████████████████

8  ████████████████████████████████████████████

9  ████████████████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ████████████████████████████████████████████

13 ████████████████████████████████████████████

14 ████████████████████████████████████████████

15      Q.    How about for a pill mill

16 investigation?

17      A.    I haven't done any pill mill

18 investigations.

19      Q.    Do others at TDS work on pill mill

20 investigations?

21      A.    We haven't done one in our office

22 that I'm aware of.

23      Q.    How about counterfeit pill

24 investigations?

25      A.    Those can be somewhat lengthy.  We

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 387

1  open and close. ████ ██████████ ███ ████████████ ████

2  ████████████ ████████ ██████████ ██████ ███ ███ ████████

3  ██████ ████████ ███ ██████ ████████ ███ ██████████████ ████

4  ████████████ ████ ████████████ ████████ ████████████ ██████

5  ██████████ ██████████ .

6       Q.    How about theft of prescription

7  medication, like you mentioned the arrests of

8  nurses who were in effect self-medicating, I

9  think you said?

10       A.    Nurses are normally fairly easy.

11  That's a quick case because the nursing board

12  brings them to me and they have to cooperate

13  with the nursing board -- they can lose their

14  license.  So I pretty much get handed that case

15  on a silver platter.  Again, couple weeks until

16  it's done.

17       Q.    How about the improper prescribing

18  cases?

19       A.    Well, those are going to take a lot

20  more time. ████████ ██████ ██████ ████ ███ ████ ████████

21  ██████████ ██████ ███ ████ ████████████ ████████████ ███ ████████

22  ██████ ████████ ███ ████████ ██████████ ██ ████████

23  ██████ ████████ █ ████████ ████████ ████████ Some doctor

24  cases take two, three, four years.  There's no

25  real timeline of when it has to be done by or

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 388

1    how quickly we do it.

2         Q.    Does the length of time -- the types

3    of cases that you're working on at TDS, are

4    those -- the types of diversion cases, is that

5    similar to the kind of diversion cases you

6    worked for --

7              MR. LEDLIE:  City of Akron.

8         Q.    Thank you -- for the City of Akron

9    before you joined the TDS?

10        A.    They are.  They're similar,

11   especially the doctor shopper, some of the cases

12   that I've charted on both city and DEA.  The

13   only difference would be, with a larger team and

14   more resources, we can work the doctor

15   overprescribing cases, where with the City of

16   Akron it took a lot more time and a lot more

17   resources since it was only me in -- in the

18   unit.

19        Q.    But even at TDS, if I -- I want to

20   make sure I understood your testimony correctly.

21   Even at TDS, with all the resources, it can

22   still take multiple years to do an improper

23   prescribing investigation?

24        A.    It can.

25        Q.    Who at TDS determines the priority

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 389

1    of work?

2         A.    Our group supervisor.

3         Q.    And who is that today?

4         A.    Today it's Hans Charters.

5         Q.    And before Mr. Charters it was

6    Ms. Foster?

7         A.    Denise Foster, correct.

8         Q.    And who at TDS tells you which

9    matters you should be working on?

10        A.    My group supervisor, GS.

11        Q.    Do you know who gives the GS the

12   priorities for the TDS, for example?  Does the

13   GS report to somebody else?

14        A.    Well, he's going to report to the

15   RAC, but we -- I don't know that they give

16   direction on what cases to work at that point.

17   We pretty much report to them what cases we're

18   working and how our cases are coming along.

19        Q.    Have you ever done an investigation

20   -- at TDS have you ever done an investigation

21   into perceived or potential overprescribing

22   without the use of undercover -- without the use

23   of some sort of surveillance?

24             MR. LEDLIE:  Object to the form of

25   the question.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              MR. BENNETT:  Objection.  Scope.

2              You can answer.

3         A.    So I don't think you can do any case

4    without some type of surveillance.  I'm not sure

5    where you're -- when you threw surveillance in

6    at the end, you changed the question on me.  Can

7    you repeat it?

8         Q.    So in every case where you've

9    arrested someone -- sorry.  All of the doctor

10   shopping investigations have involved

11   surveillance of the suspect?

12        A.    No, not doctor shopping cases.

13        Q.    So I'm just trying to figure out for

14   an improperly prescribing case, can you do one

15   of those without some sort of surveillance of

16   the target of the investigation?

17             MR. BENNETT:  Objection.  Scope.

18             You can answer.

19        A.    I don't believe you can, no.

20        Q.    Have you worked on any -- can you do

21   an improper prescribing case without the use of

22   a -- without help from a medical expert?

23             MR. LEDLIE:  Object to the form.

24             MR. BENNETT:  Objection.  Scope.

25             You are not authorized to disclose

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 391

1    the internal deliberative process of the United

2    States Department of Justice.  To the extent you

3    can answer this question based on your personal

4    capacity, you can answer.

5                    SPECIAL MASTER COHEN:  I think it

6    was a yes or no question.

7            A.    So yes, I think you need a medical

8    expert.

9            Q.    And you've worked with medical

10   experts before?

11           A.    Yes, sir.

12           Q.    And you said you reviewed the file

13   from the Dr. Harper case?

14                    MR. LEDLIE:  Objection.  Misstates

15   testimony.

16           A.    I did not review the file.  I

17   reviewed the sentencing memorandum.

18           Q.    And you worked on the Dr. Harper

19   investigation?

20           A.    I did.

21           Q.    Were you the lead agent?

22           A.    I was.

23           Q.    And how long did that investigation

24   take?

25           A.    Oh, you know, I reviewed it.  I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 392

1    don't remember when he was sentenced.  It

2    started in maybe 2010.  In 2009 he became -- he

3    was an Ob-Gyn that decided to be a pain

4    management specialist.  We started getting

5    complaints shortly after that.  So probably at

6    least three or four years it took for that case.

7         Q.    And the entire time you were

8    investigating Dr. Harper but before he was

9    arrested, he was prescribing opioids to

10   patients?

11        A.    He was, yes.

12        Q.    And did you tell any pharmacists

13   during the course of the investigation that you

14   were investigating Dr. Harper?

15             MR. LEDLIE:  Object to the form to

16   the extent it reveals sensitive police matters

17   of conversations with pharmacists.

18             MR. BENNETT:  And I'll object --

19        Q.    Let me rephrase the question, if I

20   may.

21             During the course of the

22   investigation did you send out warnings to

23   pharmacies that they shouldn't fill

24   prescriptions from Dr. Harper?

25        A.    ████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 393

1    Q.    And did you contact any distributors

2  of medications and say they shouldn't distribute

3  to pharmacies where Dr. Harper might be writing

4  prescriptions?

5    A.    

6

7

8

9                                                     ,

10              ; if you think this is an

11  overprescribing physician, it's your name and

12  your reputation and your business that's going

13  to be liable.  And that was the extent of it.

14  Let them make the decision whether they felt it

15  was necessary or legal to fill the prescription.

16    Q.    Did a pharmacist ever ask you how

17  you define medical prescription for a legitimate

18  medical purpose?

19              MR. BENNETT:  Objection.  Scope.

20              You can answer.

21    A.    No.

22    Q.    How do you define legitimate medical

23  prescription for a legitimate medical purpose?

24              MR. BENNETT:  Objection.  Vague.

25  Scope.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 394

1          You can answer.

2          A.     Again, this is why we need a medical

3    expert when we do these cases, but when you're

4    writing for the holy trinity, and I've got

5    patients from offices that have died from

6    overdoses, I think common sense dictates on some

7    of it that some of the pharmacists should be

8    able to see what the prescriptions are and

9    refuse to fill.

10         Q.     I didn't follow writing for the holy

11   trinity.

12         A.     Holy trinity was when they're

13   getting 180 oxycodone, 90 methadone and 90 Xanax

14   all from the same doctor every month on the same

15   script, same three scripts.

16         Q.     Other than that?

17                MR. LEDLIE:  Object to the form.

18   Vague.

19         A.     Other than that, what?

20         Q.     So I take it you would, in your view

21   the -- well, let me ask it this way:  Is the

22   holy trinity -- could that ever be for

23   legitimate medical purposes?

24                MR. BENNETT:  Objection.

25         A.     Again, I'm not a medical -- I'm not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 395

1  a doctor.  I didn't spend time in medical

2  school.  I don't believe it is.  Just because

3  the numbers were so high on most of those.

4  Obviously if there's someone at a legitimate

5  cancer treatment center that is suffering, then

6  absolutely.  There's definitely areas where the

7  norm is not going to be the norm, where we have

8  to swing the other way, and I absolutely agree

9  with that.  These are just -- I'm discussing the

10 Harper case.

11        Q.    Yes.

12        A.    These are people that didn't have a

13 legitimate need for medication and he continued

14 to write them after they were testing positive

15 for other drugs in their system and they were

16 testing negative for the drugs that he

17 prescribed them to be in their system and still

18 writing the same prescriptions every month for

19 them.  That was part of the problem.

20        Q.    What's the significance of the

21 testing negative for the drugs that had been

22 prescribed?

23        A.    Well, if they're not in your system,

24 you're not taking them, you're either selling

25 them or they're being diverted to someone

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 396

1    they're not supposed to be.

2         Q.    We can agree that the pharmacist

3    doesn't have the blood test results for the

4    individual patient?

5              MR. LEDLIE:  Objection to the form.

6    Calls for speculation.

7         A.    Yes, we can agree the pharmacist

8    doesn't have that information.

9         Q.    We can agree that distributors of

10   the pharmaceuticals don't have the medical

11   records of the patients who are being prescribed

12   medications?

13        A.    I would agree with that, yes.

14        Q.    And neither do the manufacturers of

15   the medications?

16        A.    And I would agree with that as well.

17        Q.    The Harper case, did that get

18   started on a tip from a pharmacist?

19             MR. LEDLIE:  Object to the form of

20   the question and objection to the extent it

21   calls for the divulging of any non-public police

22   investigative techniques.

23             MR. BENNETT:  Objection.  Scope.  I

24   would join counsel.

25             MR. BLOCK:  This is a closed case

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 397

1    that has resulted in charges and I'm not asking

2    for a specific person.

3              MR. LEDLIE:  You're asking about how

4    he investigated a case, which those facts were

5    never part of the public proceedings in this

6    case and have never been revealed, and so I

7    stand on my objection and instruct the witness

8    not to answer.

9              MR. BENNETT:  And I join in the

10   objection.

11             MR. BLOCK:  I'd like the Special

12   Master to rule on that, please.

13             SPECIAL MASTER COHEN:  I just want

14   to make sure I understand which question it is

15   that we're talking about.  Why don't you ask the

16   question again.

17        Q.    Did the Harper case get started on a

18   tip from a pharmacist?

19             SPECIAL MASTER COHEN:  You can

20   answer that yes or no.

21        A.    ███████ ████ █ █ ███ ██ ███

22   ██████ ███ █████ ████ ████ █ █ ███ █ ██████

23   ██████████ ███ ███████ ███ ███ ███ ████████

24   █ ████ ███ ████ ███ ████ █████ ████ ████

25   █████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 398

1      Q.    Did you receive assistance from any

2  pharmacist in connection with the Harper case?

3              MR. BENNETT:  Objection.  Scope.

4              You are not authorized to disclose

5  confidential sources or information that's not

6  publicly disclosed in the case.  To the extent

7  that answer has been publicly disclosed, you may

8  answer.

9              MR. BLOCK:  I think I can at least

10  get -- Special Master Cohen, we, as you know,

11  disagree that Touhy has any application here, so

12  I don't fully understand the basis of the

13  instruction, but for purposes of this question,

14  I just want a yes or no.

15              SPECIAL MASTER COHEN:  To answer

16  your Touhy point, I understand, I think I agree

17  with you, but I also think that these go to law

18  enforcement privilege regardless of whether he's

19  a federal employee, and, again, I think this is

20  a question you can answer just yes or no.

21      Q.    And the question, again, was, did

22  you get assistance from pharmacists in

23  connection with the Harper case?

24      A.    ███ ████ ████ ████ ████ █ ████

25  █████████ ██ ███ ████ █.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 399

1        Q.    Did you seek any assistance from
2   distributors in connection with the Harper case?
3        A.    I did not.
4        Q.    How about from manufacturers?
5        A.    No, sir.
6        Q.    Why not?
7        A.    Wasn't part of my case.
8        Q.    Okay.  That answer applies to both
9   distributors and manufacturers?
10       A.    Yes, sir.
11       Q.    Could you describe, please, your
12  general practice -- if you get a complaint or a
13  tip about perceived diversion, do you have a
14  general practice for following up?
15       A.    I mean, I investigate everything
16  that is assigned to me.
17       Q.    Okay.  And how do -- fair enough.
18             At TDS have you ever used suspicious
19  order reports?
20       A.    No, sir.
21       Q.    Do you know what a suspicious order
22  report is?
23       A.    Yes, sir.
24       Q.    What is a suspicious order report?
25       A.    That would be mostly handled by the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 400

1   diversion investigators.  If a pharmacist was

2   receiving a lot more medication than maybe per

3   capita, they could be dispensing in an area.  If

4   it was mostly numbers, I believe that -- if an

5   area was getting something they shouldn't get,

6   that would alert, red flag diversion.

7          Q.    Why don't you use suspicious order

8   reports?

9          A.    We have a diversion investigator in

10  our office.  If they use them and that's one of

11  the resources they use to refer a case to us,

12  it's very possible.  I don't ask them how they

13  come up with all of their information.  I just

14  take my part and stay in my lane and do my part

15  of the job.

16         Q.    How many of the investigations that

17  you've worked on was assigned to you by a

18  diversion investigator?

19         A.    Nothing is assigned to me by a

20  diversion investigator.  That would go through

21  the chain of command.

22         Q.    Well, do you know whether any of the

23  investigations you've worked on involved

24  something related to -- you know, had input

25  based on suspicious order reports?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 401

1          MR. LEDLIE:  I'm going to object to

2   the form and object to the extent you're asking

3   any questions about any open investigations.

4          MR. BENNETT:  I'm going to object.

5   Vague.

6          MR. BLOCK:  I'm following up on the

7   prior --

8          SPECIAL MASTER COHEN:  They haven't

9   instructed him not to answer.  They're just

10   lodging form investigations.  You can answer.

11      A.    I believe they have.  I couldn't

12   give you a number or how many, but I know that's

13   part of the information gathering during the

14   investigation that determines whether we would

15   follow up on a case or open a case.

16      Q.    What sort of cases do you believe --

17   what sort of investigations do you believe

18   suspicious order reports have been used for?

19          MR. BENNETT:  Objection.  Scope.

20          You can answer.

21      A.    Pharmacy investigations.

22      Q.    What do you mean by that?

23      A.    Whether a particular pharmacy is

24   overprescribing or filling prescriptions they

25   shouldn't.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 402

1    Q.    Any other types of investigations?

2    A.    I don't use that data.  I'd be

3    guessing.

4    Q.    That's what I'm trying to make sure

5    you don't do.

6          So have you worked on any -- I think

7    that's a type of investigation that we haven't

8    talked about yet.  Have you, Detective Leonard,

9    worked on any pharmacy investigations at TDS?

10   A.    Yes.

11   Q.    How many?

12         THE COURT REPORTER:  I'm sorry?

13         MR. BENNETT:  He can answer yes or

14   no to the last question.  He looked at me for

15   instruction.  This next question --

16   Q.    How many pharmacy investigations

17   have you worked on?

18         MR. BENNETT:  You can answer that

19   question.

20   A.    I'm currently working one.

21   Q.    Have you worked on any before?

22   A.    I guess I've got to clarify in my

23   head.  I've worked on a lot of investigations

24   where I've arrested pharmacy technicians, I've

25   arrested pharmacists, but in those, even though

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 403

```
 1   they were partially in my mind pharmacy

 2   investigations, I wasn't investigating the

 3   pharmacy per se.  So I just want to make clear

 4   on your question what you're looking for.

 5         Q.    Sure.  Well, I'm following up based

 6   on your answers, but let's see if we can unpack

 7   this.

 8               The prior cases that you worked on

 9   involving pharmacists, was that where the

10   pharmacist was maybe self-dealing?

11         A.    You know, either theft for

12   medication himself, or a current one that has

13   just been indicted in Summit County for

14   trafficking, supplying medication to his

15   girlfriend, so normally it's either theft or

16   trafficking.

17         Q.    And then I think you were also

18   talking about a kind of investigation into a

19   pharmacy where the pharmacy was, if I followed

20   you, filling too many prescriptions?

21               MR. BENNETT:  Objection.  Scope.

22               I think his answer was that he had

23   done a pharmacy investigation, I don't think he

24   gave any of the specifics of that investigation,

25   and I would instruct that he's not authorized to
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 404

1  disclose any specific investigation or

2  activities into pharmacies.  So your question as

3  far as what he was investigating the pharmacy

4  for is beyond the scope of his authorization and

5  would reveal confidential law enforcement

6  investigations.

7          SPECIAL MASTER COHEN:  Why don't you

8  go ahead and answer and see how far we get.

9          THE WITNESS:  That's currently an

10  open investigation.

11          MR. BLOCK:  And, Special Master, I'm

12  referring to the prior answer, which is -- the

13  witness said pharmacy investigations; he means

14  whether a particular pharmacy is overprescribing

15  or filling prescriptions they shouldn't, and I'm

16  trying to figure out if he's worked on one of

17  those.

18      A.     ███ ███ ████ ████ ███ ████ ███

   ██ ██████ ████ ████ ████ ████ ███ ██ ██ ████

   ██ ███████ ████ █ ███ ████ ████ ███ ████

   ██ █████ ███ --

22          MR. BENNETT:  Objection.  Stop.

23          Special Master Cohen, may we speak

24  with you ex-parte in camera about this issue?

25          SPECIAL MASTER COHEN:  We may have

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 405

1  to do that, but let me see if we can get past it

2  without it.  I want you to start asking other --

3  let's see how far we get.  Ask a different

4  question because I'm not sure exactly where we

5  are.

6           MR. BENNETT:  And Special Master

7  Cohen, we are going to request that portions of

8  this transcript be marked highly confidential,

9  attorney eyes' only, regarding the questions

10  regarding distributors and regarding active

11  investigations of pharmacies and whether it's

12  the parties to this case.

13           MR. BLOCK:  I think that's the way

14  around a law enforcement investigation, too,

15  Your Honor.

16           SPECIAL MASTER COHEN:  Maybe.

17      Q.    Setting aside any active

18  investigations on which you are currently

19  working at TDS, have you at TDS ever worked

20  previously on a pharmacy investigation, your

21  definition, a pharmacy that was overprescribing

22  or overfilling?

23      A.    No, sir.

24      Q.    Do you use ARCOS data in your work

25  at TDS?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 406

1      A.    I do not.  I had an ARCOS password

2  at one point several years ago.  I have not used

3  it, no.

4      Q.    When you had the password, did you

5  ever use it in connection with investigations?

6      A.    ███ █████ █████ ██ █████ ████ █████

   █ ██████ █████ ███ ███ ████ ███ █████ ███ █████

   █ █████ ██████ ████ ███ ████ █ ████ ███ █████

   █ █████ █ ████ █████ ███ █ ████ █████

10      Q.    In the course of investigations with

11  the DIs -- that's the diversion investigators?

12      A.    █████ █████

13      Q.    So in the course of investigations

14  that you work on, do you ever go to DIs and ask

15  them to do something with ARCOS to help you in

16  the investigation?

17      A.    ███ █ ██████ ██ ███ ████ █████

   █ █████ ███ ███ ███ █ ███ █████ ██ ███ █████

   █ █████ ███ ███ ███ ████ █████ ███ ███

   █ ███ █████ ███ ████ ████ ███ █████ ████

   █ ████ ██████ ████ █ ███ █████ ██ ███ █████

   █ ███ █████ ████ ████ █████████

23      Q.    What was Dr. █████ charged with?

24      A.    Trafficking.  I'm not sure if it was

25  possession of drugs.  He had multiple charges.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 407

1      Q.    To the layman, what was he doing
2  wrong?
3      A.    Well, he wasn't keeping any --
4            MR. BENNETT:  Objection.
5            You can answer.
6      A.    He wasn't keeping proper records, no
7  dispensing records, so where the pills went
8  wasn't where they were supposed to go.
9      Q.    What kind of doctor was Dr. ███
10     A.    I'm not sure if he was an M.D. or a
11  D.O.
12     Q.    And where was his office?
13     A.    ███ ███ ███ ████████ ███
14  ███ █████ █████ ██ ██ ██ ███ ████
15  ██████ ███ █ ███ █ ███ ████ ████
16  ████
17     Q.    Were you the lead investigator in
18  the Heim case?
19     A.    No, sir, I was not.
20     Q.    Lead agent?
21     A.    I'm not an agent.  I'm a task force
22  officer.  So it could be either way.
23     Q.    Who was the lead?
24     A.    I believe that was -- Diversion
25  Investigator Brinks was the lead on that one.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 408

1      Q.    Do you know how long the ███
2  investigation took?
3      A.    No, sir, I don't.
4      Q.    Was it years?
5      A.    I don't know.
6      Q.    Do you know where Dr. ███ was
7  getting the medication from?
8      A.    I may have at the time, but I don't
9  at this point.
10     Q.    Do you know of anyone at TDS that
11  uses ARCOS data other -- how many diversion
12  investigators are on the TDS?
13     A.    One.
14     Q.    Do you know of anyone else on the
15  TDS that uses ARCOS data other than the
16  diversion investigator?
17     A.    I believe some of the agents do.
18     Q.    Do you know what for, generally what
19  they use it for?
20     A.    The same things the DIs use it for,
21  intelligence gathering.
22     Q.    Why are there some agents that use
23  it but you don't?
24          MR. LEDLIE:  Object to the form.
25     A.    I haven't had a case where I've

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 409

 1    needed to use it.

 2         Q.    What would a kind of case be that

 3    would require the use of ARCOS data?

 4         A.    Well, if I was the lead on one of

 5    those doctor cases, then I may need to use it.

 6    Being a co-lead or an assist on it, the lead

 7    agent was using it so I didn't need to log in to

 8    get that information.

 9         Q.    OARRS, do you use OARRS in your work

10    at TDS?

11         A.    I do.

12         Q.    Can you say generally what you use

13    OARRS for?

14         A.    OARRS is used for one of two things.

15    You can run patient profiles through OARRS or I

16    can run physician OARRS.  Physician OARRS will

17    give me a list of all the physician's patients

18    and what he's prescribed to them in the past two

19    years.

20         Q.    And at a general level, you can use

21    that to look for patterns of things that look

22    odd?

23         A.    I can at a general level, but you're

24    not allowed to use it as a fishing expedition.

25    You have to have merit and probable cause to be

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 410

1   running a physician's OARRS, so something else

2   is going to lead up to me having enough

3   suspicion that I can run an OARRS on a

4   physician.

5          Q.    At a general level, what does it do

6   for you with respect to patients?

7          A.    ███  ███  ████  ███  ███  ████

8   ███████  ███████  ██  ███  ████  ███  ███ r

9   ███  ███  ████  ███  ██ █  ███  ████  ███  ██

10  ████  ███  ████  ███  ███  ███  ████  ████████

11  ██  ███████  ███  ████  █████  ██  ███

12  █████  ███  ███  ███  ███  ███  ███  ███

13  █████  ████  ████  ███  ██  ███  ███  ███  ████████

14  ███  ███  ███  ███  ████  ███  ███  ████  ██

15  ████  ███  ███ .

16         Q.    Is OARRS helpful for you in terms of

17  your work at TDS?

18               MR. BENNETT:  Objection.  Vague.

19               You can answer.

20         A.    It is.

21         Q.    Would your job be harder if you

22  didn't have OARRS?

23               MR. BENNETT:  Objection.  Vague.

24         A.    It would be more time-consuming.

25  Prior -- when I was a detective working

Veritext Legal Solutions

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 411

1  prescription medication prior to OARRS, then I

2  would have to go to every single pharmacy, get a

3  patient profile, print it out from the

4  pharmacist, take it back to my office and enter

5  it into an Excel spreadsheet, and that's when

6  doctor shopper cases took me a month instead of

7  a couple weeks.

8         Q.    So OARRS has increased the speed

9  with which you can resolve doctor shopping

10  cases?

11        A.    It's increased the speed we can do

12  anything.  It makes the data readily available.

13        Q.    Have you ever determined the total

14  number of opioids that are prescribed to the

15  residents of the City of Akron?

16        A.    No.

17        Q.    Or Summit?

18        A.    No, sir.

19        Q.    Or Cuyahoga County?

20        A.    No, sir.

21        Q.    Why not?

22        A.    That would be -- for one, it would

23  be something that I don't know that I would ever

24  need to do that, and it would be, I would think,

25  almost an impossible feat to run every -- I'd

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 412

1  have to run every physician in Summit, in

2  Cuyahoga County, and, one, I'm not authorized to

3  run physicians that aren't under my scope of an

4  investigation, so I would be violating OARRS by

5  running all those people.

6          Q.    At any of your investigations at TDS

7  have you worked with the Ohio Medical Board?

8          A.    Yes.

9          Q.    How many times?

10         A.    It would be a guess.  Eight to ten.

11         Q.    Is there a particular type of

12  investigation on which you work with the Ohio

13  Medical Board as opposed to others?

14         A.    Normally it would be a physician.

15         Q.    So that would be an overprescribing

16  investigation or other types as well?

17         A.    It could be any type of physician

18  investigation.

19         Q.    Are there ever investigations of

20  physicians where you don't work with the Ohio

21  Medical Board?

22         A.    Yes.

23         Q.    What's the distinguishing factor?

24         A.    One might be whether they bring us

25  the case or not.  If we determine we need their

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 413

1    assistance, we would call and ask for their

2    assistance.

3         Q.    Do you know how many of the

4    investigations you've -- you, Detective Leonard,

5    have worked on at TDS involving physicians have

6    been brought to your attention by the Ohio

7    Medical Board?

8         A.    I do not know.

9         Q.    Does the Ohio Medical Board bring

10   cases to the attention of TDS?

11        A.    Yes.

12        Q.    Is that a common occurrence?

13             MR. BENNETT:  Objection.  Vague.

14        A.    It's happened a couple times in my

15   seven and a half years with the TDS.

16        Q.    How would you describe your working

17   relationship with the Ohio Medical Board?

18             MR. BENNETT:  Objection.  Scope.

19             You can answer.

20        A.    Good.

21        Q.    Should the board be bringing more

22   cases to your attention?

23             MR. BENNETT:  Objection.  Scope.

24             It's outside the scope of your

25   authorization.  You're not answering on behalf of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 414

1  DEA.  You may answer in your personal or Akron

2  capacity.

3          A.    I guess -- I don't know.  I assume

4  that -- and assuming gets me in trouble -- they

5  brought all their cases -- if they need

6  assistance, they come to us, the same as we

7  would go to them.  There's a reciprocation

8  there.

9          Q.    Is the Ohio Medical Board, in your

10  view, proactive enough in terms of investigating

11  potential doctor misconduct related to

12  prescription opioids?

13              MR. BENNETT:  Objection.  Scope.

14              Same instructions as before.  In

15  addition, you're not authorized to disclose any

16  non-public information in forming your opinions.

17  To the extent that you have an opinion based on

18  public information or information you acquired

19  outside of your work at DEA, you may answer.

20          A.    All of my opinions are based on my

21  work, so I don't believe I'm allowed to answer

22  that.

23              MR. BLOCK:  Well, then I guess I

24  need a ruling on that objection because it's not

25  law enforcement privilege, so I don't know what

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 415

1   the basis for the objection or the limitation

2   is.

3              MR. LEDLIE:  I would object in part

4   on law enforcement privilege.

5              MR. BENNETT:  I would indicate that

6   under the authorization letter, he's not

7   authorized to form opinions as a task force

8   officer on non-public facts or information.

9   You've asked him to -- in his view, whether the

10  medical board is proactive enough.  To the

11  extent that he has information he's acquired as

12  a task force officer that's not public

13  information, he wouldn't be able to use that as

14  the basis for his opinion.  That was my

15  instruction.

16             SPECIAL MASTER COHEN:  You can

17  answer that yes or no again.

18        Q.    The question is whether the Ohio

19  Medical Board has been proactive enough in

20  investigating misconduct by doctors related to

21  prescription opioids.

22        A.    I don't know what all they

23  investigate.  They don't share their

24  investigation techniques with us or who they

25  have investigated.  When we have worked with

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 416

1  them, it has been positive.  Like I said, I

2  don't know how many other doctors they

3  investigate because they don't report to us, so

4  for me to form an opinion on whether they're

5  proactive enough, I don't have enough

6  information to make that decision.

7       Q.    You said they've been cooperative

8  when you've worked with them.  In the cases in

9  which you've worked with the Ohio Medical Board,

10  have you gone to the board and said I need your

11  help with something?

12            MR. LEDLIE:  Object to form.

13  Misstates testimony.

14       A.    We have.

15       Q.    Have there been cases where it's

16  been the board coming to you and saying we need

17  help with something?

18       A.    Yes, sir.

19       Q.    And you said that was a couple of

20  times?

21       A.    Yes, sir.

22       Q.    So more often than not when you work

23  with the board, it's at your initiative?

24       A.    No.  It's probably 50/50.

25       Q.    50/50 of the eight to ten

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 417

1    investigations over your time at TDS?

2         A.    Correct.

3         Q.    We're going to do the same thing.

4    We're going to talk about the Ohio Board of

5    Pharmacy.

6              While at TDS have you had any

7    investigations in which you've worked with the

8    Ohio Board of Pharmacy?

9         A.    I have.

10        Q.    How many?

11        A.    This goes back -- you know, that's

12   more than with the medical board, so probably at

13   least a dozen or so of those cases involve the

14   pharmacy board.

15        Q.    And is there a particular type of

16   diversion case where you've worked with the

17   pharmacy board, you know, doctor shopping versus

18   theft versus counterfeit pills?

19        A.    Well, I -- to give you an example,

20   this past pharmacist that I arrested, I did all

21   that I could do for the investigation and I came

22   to a dead end.  I ████████ ████ ██ ██ ██ ██ ████

23   ████████ ██████ ██ ██ ███████ ██ ██ ███ ██

24   ████████ ████ ███ ██ ██ ██ █████

25   ███████ ██ ███████ ████ ██ ██ ████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 418

1   ███████  █████  ████████  ███████

2          Q.    And this was an individual who was

3   cribbing from the shelf I'm guessing?

4          A.    Taking whatever he wanted.

5          Q.    And so that would be a theft type of

6   diversion case?

7          A.    It was a theft and a trafficking.

8          Q.    Because he would take it and then he

9   would sell it?

10         A.    Yes, sir.

11         Q.    And has the pharmacy board ever

12  brought cases to your attention and asked for

13  your help in working them?

14         A.    Yes, sir.

15         Q.    How many times has that happened?

16         A.    Some of those doctor shopper cases,

17  the board would send me information.  The board

18  has helped us on -- they've helped us in other

19  cases.  I just can't think of some of the

20  different cases they've helped us on.  I

21  assisted writing a search warrant for the Board

22  of Pharmacy for a case in Cuyahoga Falls and I

23  can't think of the name of the doctor's office

24  that we were working on.

25         Q.    In your view, has the Board of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 419

1   Pharmacy been proactive in trying to combat

2   diversion of prescription opioids?

3           MR. BENNETT:  Objection.  Scope.

4   Vague.

5           Same instructions.

6       A.   On the cases I've worked with them

7   on, yes, they've been proactive.

8       Q.   And on the cases you've worked on

9   with them, some of those have been cases where

10  you have gone to the board and said I need your

11  help with something?

12      A.   Correct.

13      Q.   And you don't know whether the board

14  was even aware of the issue before you went to

15  them and said I need your help?

16          MR. LEDLIE:  Object to the form.

17  Calls for speculation.

18      A.   On the last one they were not aware

19  of it.  I brought the information to them.

20      Q.   Has there been any change in the

21  level -- you've been at TDS for how many years

22  now?

23      A.   Since February of 2012, over seven

24  years.

25      Q.   Has there been any improvement on

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 420

1    the level of cooperation from the Ohio Medical

2    Board -- I'm going back to the medical board --

3    over time while you've been at TDS?

4              MR. BENNETT:  Objection.  Vague.

5        A.    I think we've always had good

6    cooperation.  I don't know better or worse.

7        Q.    Same question for the Board of

8    Pharmacy?

9              MR. BENNETT:  Same objection.

10   Vague.

11       A.    Probably the same answer.  I've been

12   working with some of these people for 20 years,

13   so there's been an established relationship.

14       Q.    So some of these folks you worked

15   with prior to TDS when you were a City of

16   Akron --

17       A.    Detective.

18       Q.    The drug unit or --

19       A.    No.  I was a detective in the

20   diversion unit.

21       Q.    Diversion unit.  Thank you.

22             Have you worked with the FBI in

23   connection with any investigations at TDS?

24             MR. BENNETT:  Objection.  Scope.

25             You may answer that question yes or

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 421

```
1    no only.

2          A.    Yes.

3          Q.    How many times?

4                MR. BENNETT:  Objection.  Scope.

5                You can answer.

6          A.    Maybe three or four times.

7          Q.    In terms of the type of diversion

8    cases, is there a type of diversion case where

9    the FBI gets involved?

10               MR. BENNETT:  Objection.  Vague.

11         A.    We had an FBI agent as a member of

12   our task force.  He recently retired.  So for

13   four years he was part of our task force.  He

14   brought information as well.  So even if it was

15   opened as a DEA case, we worked together on some

16   of them.

17         Q.    What period of time was there an FBI

18   agent on the TDS?

19         A.    I've had two different ones, so

20   maybe four or five years out of the seven.

21         Q.    Is there an FBI agent on the TDS

22   now?

23         A.    No.  He recently retired, last fall.

24         Q.    When you said you worked with the

25   FBI on maybe three occasions, were you talking
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 422

1    about the agent at TDS?

2         A.    No.  I was talking about the

3    Dr. Harper case.  The FBI got involved in that

4    towards the end.  And then some other cases with

5    that agent.

6         Q.    And why did the FBI get involved in

7    the Dr. Harper case?

8              MR. BENNETT:  Objection.  Scope.

9              You're not authorized to disclose

10   the internal deliberative process of the

11   Department of Justice, you're not authorized to

12   disclose confidential law enforcement

13   investigative techniques, the effectiveness of

14   which would be impaired, and you're not

15   authorized to disclose specific DEA activities

16   that are non-public.  To the extent you can

17   answer, you may.

18             THE WITNESS:  Can I ask him a

19   question real quick?

20             MR. BENNETT:  Can we step out for a

21   minute?

22             SPECIAL MASTER COHEN:  That's fine.

23                (Short recess had.)

24             MR. BENNETT:  Thank you for letting

25   us confer with the witness.  After talking

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 423

1    through the answer with the witness, he is

2    authorized to answer the question, so you can

3    provide the information we discussed.

4         A.    The question with working with the

5    FBI, there was a -- as part of the Harper

6    investigation, there was a task force for

7    Medicare/Medicaid fraud and the FBI was part of

8    that task force.  Dr. Harper was also convicted

9    of Medicare/Medicaid fraud and I worked with the

10   FBI on that case.

11             MR. BLOCK:  Why don't we take our

12   morning break for this deposition now.

13             MR. BENNETT:  Can I ask what the

14   schedule is for the day for the three witnesses?

15             MR. BLOCK:  Let's go off the record.

16                  (Recess had.)

17        Q.    I want to go back to the Dr. Harper

18   case for a second.

19             Were any of the prescriptions that

20   Dr. Harper was writing over the course of the

21   time that he was being investigated valid

22   prescriptions?

23             MR. BENNETT:  Objection.  Vague.

24   Objection.  Calls for a medical conclusion.

25        Q.    You may answer.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 424

1          A.    I don't believe they were, no.

2          Q.    Every single one of them?

3          A.    Yes.

4          Q.    Have you ever investigated doctors

5     who were writing some prescriptions you thought

6     were valid and others you thought were invalid?

7          A.    Gosh, I don't know how --

8          Q.    Let's unpack that for one second.

9                How do you define an invalid

10    prescription --

11               MR. LEDLIE:  Objection.

12         Q.    -- from a doctor?

13               MR. LEDLIE:  Object to the form to

14    the extent it calls for the revealing of any

15    investigative techniques or sensitive police

16    matters.

17               MR. BENNETT:  Same objection.

18         A.    By definition, it has to have a

19    medical purpose.

20         Q.    Have you ever been investigating

21    doctors who were prescribing some medications to

22    patients for a medical purpose and others where

23    you thought there was no medical purpose to the

24    prescription?

25               A.    I would think, yes, probably.  Part

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 425

 1   of the investigation, though, is we're focusing

 2   on the illegal prescriptions.  I'm not analyzing

 3   and critiquing all the patient files and records

 4   that may or may not be legitimate or

 5   illegitimate.

 6        Q.    Following that up, there may have

 7   been some patients seeing Dr. Harper who had

 8   legitimate medical needs and were taking the

 9   medication that he prescribed and it was helping

10   them with their medical needs.  Is that right?

11             MR. LEDLIE:  Objection to the form.

12             MR. BENNETT:  Objection.  Calls for

13   speculation.  Objection.  Scope.

14             You can answer.

15        A.    I don't believe so.  Maybe when he

16   was an Ob-Gyn, he was -- once he switched to

17   pain management, no.

18        Q.    And why do you say that?

19             MR. BENNETT:  Objection.  Scope.

20             You can answer.

21        A.    ███████ ████ ████ ████ ███████

22   ███████ ████ ███████ ████ ███████ ████ ███████

23   ████ ████ ███████ ███████ █████ ███████ ███████

24   ████ ████ ███████ ████ ████ ████ ████ ███████

25   ████ ████ ██ ███████ ████ ███████ ███████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 426

1 ███████ ████ ██ ██████ █ ██ ████ ██████ ███ ████

2 █████     So no, I don't believe any of

3 Dr. Harper's patients, once he became a pain

4 management physician, quote, unquote, were

5 legitimate.

6      Q.     How about Dr. █████; were any of

7 Dr. ████'s prescriptions legitimate?

8           MR. BENNETT:  Objection.  Vague.

9 Objection.  Scope.

10           You can answer.

11      A.    █ ██████ █████ ███ ██ ██████ █████

12 ██████ ████ ███████ █ ███ ███████ ███████ █████

13 █████ ████ █ ████ ████████ ███ ████ ████ █████

14 ███████ █ ████ █████ ████ █████ ██████ ███ ██

15 █████ ████ ████ █████ ██████ █ ██ █████ █████

16 ████ ███ █████ █████ ████ ███ ███ █████ ████ ███

17 ██ ████ ██████ ██████ ██████████ ██████ █████

18 ████ █████████.

19      Q.    And Dr. █████, is it █████████?

20      A.    ████████ or ██████.

21      Q.    However it's spelled.  He was

22 registered with the DEA?

23      A.    He had a DEA registration.

24      Q.    Which allowed him under the law to

25 have scheduled substances delivered to his

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 427

```
 1   office, right?
 2              MR. LEDLIE:  Objection to form.
 3              MR. BENNETT:  Objection.  Calls for
 4   a legal conclusion.
 5        A.    Yes, sir.
 6        Q.    Have you ever opened an
 7   investigation based solely -- into a
 8   physician -- well, let me rephrase it.  I'll
 9   make it even more general.
10              Have you ever started an
11   investigation related to diversion based solely
12   on the volume of prescriptions being written?
13        A.    I personally have not, no.
14        Q.    Have you ever started an
15   investigation related to diversion based solely
16   on the volume of prescription opioids being
17   dispensed?
18              MR. BENNETT:  Objection.  Scope.
19        A.    No.  There's always more factors
20   that are looked at before an investigation is
21   opened.
22        Q.    Volume alone can't tell you that
23   something is necessarily wrong?
24              MR. LEDLIE:  Object to form.
25              MR. BENNETT:  Objection.  Scope.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 428

1          You can answer.

2     A.    No.

3     Q.    In any of your investigations at TDS

4  have you worked with the IRS?

5     A.    I don't think so.

6     Q.    How about local law enforcement?

7     A.    Yes.

8     Q.    And is local law enforcement always

9  cooperative with TDS?

10         MR. BENNETT:  Objection.  Vague.

11    A.    Yeah.  I think it's just based on --

12  you know, in my dealings with local law

13  enforcement, because I am local law enforcement,

14  I have a good rapport with most individuals, so

15  yeah, I think our communication and our

16  cooperation is pretty good with local law

17  enforcement.

18    Q.    Let me just probe that a little bit

19  because I watch TV and I see these shows,

20  they're on my turf and stuff.  So if you're

21  doing an investigation outside of Akron, maybe

22  somewhere where you don't regularly work, have

23  you ever got the vibe that people weren't

24  thrilled that the task force was there?

25         MR. BENNETT:  Objection.  Vague.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 429

1    Objection.  Scope.

2              You can answer.

3         A.    No.   Normally what I like to do is

4    reach out to whatever department it is, if

5    possible, and bring one of them on board and

6    say, Hey, listen, we're going to be working this

7    in your area, can you supply somebody to assist

8    us, or at least let them know we're there.  We

9    don't always do that, but it's beneficial when

10   we do.

11                   -   -   -   -   -

12              (Thereupon, Leonard Deposition

13              Exhibit 30, E-Mail String Beginning

14              Bates Number AKRON_000368859, was

15              marked for purposes of

16              identification.)

17                   -   -   -   -   -

18        Q.    I hand you what has been marked as

19   Leonard Exhibit 30.  This is an e-mail with an

20   attachment.  It bears Bates label

21   AKRON_000368859 through 368861.  And the e-mail

22   is -- I think the original e-mail is dated May

23   5th, 2015.

24              Detective Leonard, do you recognize

25   the e-mail?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 430

1     A.    It's an e-mail sent to me from
2   Courtney Janish, who was our administrative
3   assistant in the DEA diversion unit -- or in the
4   DEA TDS.
5         Q.    And you asked Ms. Janish to send you
6   a copy of a draft DEA-6.
7              Do you see that?  That's the second
8   entry.
9         A.    Yes.
10        Q.    What's a DEA-6?
11             MR. BENNETT:  Objection.  Scope.
12             You can answer.
13        A.    It's a confidential report, details
14   of the case.
15        Q.    Generally what is it used for?
16        A.    Prosecution.
17        Q.    And then the last page of this
18   document, is that the DEA-6 that you -- do you
19   know what the last page of this document is?
20        A.    No, but it's definitely not a DEA-6.
21        Q.    Do you recognize the last page of
22   this document?
23        A.    I do not.
24        Q.    A mystery perhaps.  We'll continue.
25        A.    It looks like something possibly

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 431

1   from the Harper case.

2          Q.    Why do you say that?

3          A.    ████████  ████████  ████████  ████████

4   ██████  ████████  ████████  ████  ████  ████████

5   ████████  ████  ████  ████████  ████████  ████  ████

6   ████████  ████  ████  ████████  ████████  ████  ████

7   ████████  ████████  ████████  ████████  ████████  ████,

8   ████████  ████████  ████████  ████████  ████████.

9          Q.    The facts here seem consistent to

10  you with some of what was going on in the Harper

11  case?

12         A.    Yes, sir.

13         Q.    All right.  What does it mean with

14  the -- do you understand what top 25 patient

15  names means?

16         A.    Yes.

17         Q.    What's that mean?

18         A.    ████████  ████  ████  ████████  ████████  ████  ████████  ████  ████

██  ████████  ████████  ████  ████  ████  ████████

██  ████████  ████████  --

21              MR. BENNETT:  I'll stop you.

22              Detective Leonard, I'm going to

23  object based on scope.  You're not authorized to

24  disclose confidential law enforcement

25  investigative techniques.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 432

1          MR. BLOCK:  Special Master Cohen,

2    may I have a ruling on that objection because I

3    think he's just instructed him not to answer?

4          MR. BENNETT:  I don't know if he

5    said that it is a confidential technique.  I'm

6    not sure what he's talking about.  So maybe I

7    can step out and speak to the witness.

8          SPECIAL MASTER COHEN:  If you can

9    answer the question without revealing

10   confidential law enforcement techniques, then

11   you should.

12          THE WITNESS:  ████ ███ █ ███████

██ ████ ████ ████ █ ███████ ████ ███ ████ ███████ █

██ ████ █ ████████ ███ ██████ ████████ ██████████

15          MR. LEDLIE:  Move to strike his

16   answer based on law enforcement privilege.

17          SPECIAL MASTER COHEN:  I'm going to

18   let that stand.  Maybe why don't you try to ask

19   a different question.

20          MR. BLOCK:  I think in the interest

21   of time, I'll move on.  Thank you, Special

22   Master Cohen.

23       Q.    Dr. Harper, did he have a DEA

24   registration?

25       A.    He did.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 433

1      Q.    Did he have a DEA registration the

2   entire time he was being investigated?

3      A.    I believe so, yes.

4      Q.    At the outset when I asked you --

5            (Interruption.)

6      Q.    After I so rudely interrupted

7   myself, at the beginning I was asking you about

8   opioids and you were asking me how we are

9   defining fentanyl.  Do you remember?

10     A.    Yes.  Back in the beginning, yes.

11     Q.    Have you worked at any

12  investigations at TDS involving fentanyl?

13            MR. BENNETT:  Objection.  Scope.

14            You can answer that yes or no.

15     A.    Yes.

16     Q.    Is that prescription fentanyl or

17  fentanyl that's coming in like -- for lack of a

18  better term, illicit fentanyl that's not

19  manufactured by a licensed manufacturer?

20            MR. BENNETT:  Objection.  Scope.

21            You can answer.

22     A.    Both.  Some of the investigations

23  started as manufactured fentanyl and ended up

24  being illicit, some were illicit, and some of

25  the investigations -- one of the investigations,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 434

1    ████  ████  ████  ██████████ , started as a

2    prescription oxycodone investigation and ended

3    up as an illicit fentanyl case.

4         Q.    Did the fake oxycodone tablets have

5    fentanyl in them?

6         A.    Yes, they did.

7         Q.    And can we agree that this -- it was

8    like illicit fentanyl, right?

9              MR. BENNETT:  Objection.

10        Q.    It wasn't fentanyl purchased from a

11   licensed manufacturer of fentanyl here in the

12   United States?

13             MR. BENNETT:  Objection.  Vague.

14   Objection.  Mischaracterizes testimony.

15        Q.    You may answer.

16             MR. BENNETT:  Yes, you can answer.

17        A.    Yes, it was illicit.

18        Q.    And do you know whether it came to

19   the U.S. from outside the country?

20             MR. BENNETT:  Objection.  Scope.

21             You're not authorized to disclose

22   specific DEA investigations or activities that

23   are not public.  To the extent the answer to

24   that question is publicly known, you may answer.

25        A.    The interview with the suspect is

Page 435

```
1    not public information.
2          Q.    Has there been an arrest made in
3    that case?
4          A.    Yes.
5          Q.    Has the criminal case been -- is it
6    still pending?
7          A.    No.  It's closed.  He pled guilty
8    and is serving time in a federal penitentiary.
9                MR. BENNETT:  Then I think you can
10   answer that question.  If it's closed and he was
11   convicted, then you can answer a question, so I
12   withdraw my objection to answering that specific
13   question, where it came from.
14         A.    Okay.  The suspect said that the
15   fentanyl came from Mexico.
16         Q.    And can we agree that fentanyl
17   coming into the country from outside the United
18   States is at least part of the opioid -- let me
19   make sure I got the terms correct as you used
20   them from the prior deposition.  Is there an
21   opioid epidemic presently in your view,
22   Detective Leonard?
23         A.    Yes.
24         Q.    And is there an opioid crisis
25   presently?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 436

1        A.    Well, a crisis comes before an

2    epidemic I think, so yeah, we've already passed

3    crisis.  We're still at the epidemic.

4        Q.    Can we agree that illicit fentanyl

5    is part of the opioid epidemic?

6        A.    Yes.

7        Q.    And do you know whether there are

8    drug trafficking organizations that traffic

9    diverted prescription opioids into northeast

10   Ohio or within northeast Ohio?

11       A.    I'm sorry.  Can you say it again?

12       Q.    Right.

13            Do you know whether there are drug

14   trafficking organizations that traffic diverted

15   prescription opioids in northeast Ohio?

16            MR. BENNETT:  Objection.  Scope.

17            You can answer that yes or no.

18       A.    Yes.

19       Q.    Can we agree that the activities of

20   those drug trafficking organizations are part of

21   the reason for the opioid epidemic?

22            MR. LEDLIE:  Object to the form.

23       A.    Yes.

24       Q.    And those drug trafficking

25   organizations are -- some of them are getting

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 437

1    those diverted prescription opioids from outside

2    northeast Ohio and bringing them into northeast

3    Ohio?

4              MR. BENNETT:  Objection.  Scope.

5              You can answer that question yes or

6    no only.

7         A.   Yes.

8         Q.   Some of them are getting diverted

9    prescription opioids from outside the United

10   States and getting them into northeast Ohio?

11             MR. BENNETT:  Objection.  Scope.

12             You can answer that question yes or

13   no only if you know.

14        A.   I don't know the answer to that

15   question.

16        Q.   The counterfeit pills are part of

17   the opioid epidemic?

18             MR. LEDLIE:  Object to the form.

19        A.   Yes.

20        Q.   And some of those counterfeit pills

21   come from outside of northeast Ohio and are

22   brought into northeast Ohio?

23             MR. LEDLIE:  Objection.  Misstates

24   testimony.

25        A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 438

1              MR. BENNETT:  Objection.  Scope.

2              You can answer yes or no.

3         Q.    And some of those counterfeit pills

4    come from outside of the United States into the

5    U.S. and eventually to northeast Ohio?

6              MR. BENNETT:  Objection.  Scope.

7              You can answer if you know.

8         A.    Yes.

9         Q.    And these counterfeit pills -- a

10   licensed manufacturer of prescription opioids is

11   not involved in the making of counterfeit pills;

12   can we agree on that?

13             MR. LEDLIE:  Object to the form of

14   the question.

15             MR. BENNETT:  Objection.  Scope.

16        A.    Yes.

17        Q.    And we can agree that licensed

18   distributors of medications are not involved in

19   the -- with counterfeit pills, at least not

20   knowingly?

21             MR. LEDLIE:  Objection.  Vague.

22             MR. BENNETT:  Objection.  Scope.

23        A.    Yes.

24        Q.    And we can agree that licensed

25   pharmacies are not intending to be distributing

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 439

1    or dispensing counterfeit pills?

2                MR. BENNETT:  Objection.  Scope.

3                You can answer.

4         A.    Yes.

5         Q.    And we can agree that licensed

6    manufacturers are not selling medications

7    directly to drug trafficking organizations?

8                MR. LEDLIE:  Object to the form of

9    the question.

10               MR. BENNETT:  Objection.  Scope.

11        A.    Not that I'm aware of.

12        Q.    And licensed distributors are not

13   distributing medications directly to drug

14   trafficking organizations?

15               MR. BENNETT:  Objection.  Scope.

16        A.    Not that I'm aware of.

17        Q.    Licensed pharmacies, are licensed

18   pharmacies dispensing medications directly to

19   drug trafficking organizations?

20               MR. BENNETT:  Objection.  Scope.

21               You're not authorized to disclose

22   any specific DEA investigations or activities.

23        A.    Not that I'm aware of.

24        Q.    Can we agree that heroin is part of

25   the opioid epidemic?

Page 440

```
 1        A.    Yes.
 2        Q.    And licensed manufacturers do not
 3   manufacture heroin?
 4        A.    Correct.
 5        Q.    And licensed distributors do not
 6   distribute heroin?
 7              MR. LEDLIE:  Object to the form of
 8   the question.
 9        A.    Correct.
10        Q.    And licensed pharmacies do not
11   dispense heroin?
12              MR. LEDLIE:  Object to the form of
13   the question.  Vague as to time.
14        A.    Not that I'm aware of.
15        Q.    And --
16        A.    Can we go back to -- when it comes
17   to the fake prescriptions, they're making them
18   to look like 30 milligram and 15 milligram
19   oxycodone, so people on the street that are
20   buying those fake pills are under the impression
21   that they're buying manufactured legitimate
22   medications.  They don't know they're buying
23   fentanyl.  So they're buying those thinking
24   they're getting oxycodone, which is what they
25   want, and they're not getting that medication,
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 441

1   so that -- I don't know if that clears up or --

2   even though they may not be the product made by

3   -- they think they're buying your product --

4   they think they're buying that product that came

5   from legitimate sources.

6          Q.    Well, they think they're buying it

7   from somebody on the street as opposed to going

8   to a doctor and getting a prescription and going

9   to a pharmacy to get it filled?

10         A.    And they're thinking that that

11  person went to the pharmacy and got it filled

12  and now they're selling their prescriptions.

13         Q.    And can we agree that someone who is

14  buying prescription medication on the street not

15  via prescription and not from a licensed

16  pharmacist, they're contributing to the opioid

17  epidemic?

18              MR. LEDLIE:  Object to the form of

19  the question.

20              MR. BENNETT:  Objection.  Vague.

21         A.    Yes.

22         Q.    That's a crime?

23         A.    It is.

24         Q.    That's a crime that you investigate?

25         A.    It is.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 442

1        Q.    The drug trafficking organizations,

2   that's been going on for -- you were aware when

3   you were -- prior to your time at TDS you were

4   aware that there were drug trafficking

5   organizations trafficking prescription opioids

6   in northeast Ohio?

7        A.    Yes.

8        Q.    Were you aware of illicit fentanyl

9   prior to your time at TDS?  I'm just trying to

10  get a sense for how long this has been going on.

11       A.    I don't -- it wasn't a red flag

12  problem.  I don't know that there was illicit

13  fentanyl investigations that I did prior to

14  2012.  I can't be --

15       Q.    When is the first illicit fentanyl

16  investigation you remember doing?

17       A.    It was at DEA.  I knew -- there were

18  some that I didn't do that were going on in my

19  office that some of the detectives that handled

20  the heroin death investigations were doing

21  probably in that, guessing, maybe '14, '15.  I'm

22  not sure of exact years when they started

23  investigating illicit fentanyl.

24       Q.    Have you done any investigations

25  into carfentanil?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 443

1             MR. BENNETT:  Objection.  Scope.

2             You can answer that question yes or

3    no only.

4         A.    Yes.

5         Q.    Is that while at TDS?

6         A.    Yes.

7         Q.    And carfentanil, is that a

8    prescription opioid?

9         A.    I believe it is for elephants.  I

10   believe there is a legitimate prescription for

11   that, legitimate need for that medication.

12        Q.    But it's not something where a

13   patient can go to a doctor and get a

14   prescription for carfentanil?

15        A.    Not that I'm aware of.

16        Q.    And it's not something that a

17   pharmacy can fill for a patient?

18        A.    No, sir.

19        Q.    How many carfentanil investigations

20   have you worked on at TDS?

21            MR. BENNETT:  Objection.  Scope.

22            You can answer if you know.

23        A.    I believe it came up in one

24   investigation.

25        Q.    And did the carfentanil come to the

Page 444

1    United States from outside the United States?

2         A.    I don't know.

3         Q.    Was there an arrest made in that

4    investigation?

5         A.    Yes.

6         Q.    Was there a conviction?

7         A.    I believe it's still pending.

8         Q.    Heroin use, there was heroin prior

9    to your time at TDS?

10        A.    There was heroin prior to my birth.

11        Q.    And so I'm not sure we got an answer

12   to this at the last deposition.  When did the

13   opioid epidemic begin?

14        A.    I don't have an exact time frame

15   when it began.  I don't think it began before I

16   went to TDS in 2012.  We definitely had a

17   crisis.  We were trying to manage it as best we

18   could.  To put a time and date on when it became

19   a crisis -- I wasn't -- at that point I was

20   working opioid investigations with the DEA.  I

21   wasn't on the front line with the guys in my

22   office that were working the heroin/fentanyl

23   death investigations.  So I'm not sure I can

24   give you a month and year when I think it began.

25        Q.    Fair enough.

Page 445

1              What data would we need to look at

2    to -- based on your definitions of crisis versus

3    epidemic, what is it that we need to look for

4    that we can figure out when that happened,

5    that's when the epidemic must have started?

6         A.    Somewhere around the area where we

7    were starting to have casualties, and then we

8    had mass casualties on some weekends, so there

9    was a direct increase in overdoses and overdose

10   deaths.

11        Q.    When you say "casualties," does that

12   mean a death?

13        A.    Yes, sir.

14        Q.    And prior to your time at TDS you

15   were aware of people who had died of drug

16   overdoses?

17        A.    Yes, sir.

18        Q.    So it's not just a casualty that

19   makes it an epidemic, it's the number of deaths?

20        A.    Correct.

21        Q.    And what, in your view, is the

22   number of deaths that move something from a

23   crisis to an epidemic?

24             MR. LEDLIE:  Object to the form.

25   Misstates testimony.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 446

1      A.    I don't know that I have a number.

2  Every life is valuable.  Prior to going into

3  2012, the overdose deaths that were part of any

4  of my cases were from opioid prescription

5  medication.  Some were enhanced with cocaine or

6  other illicit drugs.  But it wasn't a multiple

7  weekend where you would have a half dozen people

8  that died on a weekend from one batch of bad

9  drugs.  So I don't have a number to say five

10  deaths, ten deaths, 30 deaths.

11      Q.    Understood.

12           The rise in the number of deaths, is

13  that correlated to the prevalence of illicit

14  fentanyl in part at least?  You got more people

15  dying of fentanyl now, is that part of the

16  reason it's an epidemic now?

17      A.    I believe that's part of it, yes.

18      Q.    And whether or not another

19  prescription opioid is -- were ever prescribed,

20  dispensed, again, in the United States, there

21  would still be an issue with fentanyl and

22  heroin?

23           MR. BENNETT:  Objection.  Vague.

24  Objection.  Calls for speculation.

25           MR. LEDLIE:  Objection.  Compound.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 447

1              THE WITNESS:  Am I allowed to

2     answer?

3              MR. BENNETT:  Yes, you can answer if

4     you have an answer.

5         A.    Yes.  Heroin has been here for a

6     century.  I mean, heroin has been a problem for

7     a long time.

8         Q.    And some of that heroin is brought

9     into the United States by drug trafficking

10    organizations?

11        A.    Yes, sir.

12        Q.    From sophisticated drug trafficking

13    organizations?

14        A.    I would agree with that statement.

15        Q.    And from both inside and outside the

16    United States?

17        A.    I believe so, yes.

18        Q.    And I think we can agree that the

19    opioid crisis -- there was an -- the opioid

20    crisis started prior to the time you joined TDS

21    in 2012?

22              MR. LEDLIE:  Object to the form.

23        A.    It definitely continued to rise from

24    the time I started working prescription

25    investigations in 1998 to the time I joined the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 448

1    TDS in 2012.  There was an increase of opioid

2    abuse that led to a crisis.

3         Q.    And opioid abuse was abuse of both

4    prescription and non-prescription opioids?

5         A.    When I originally started working

6    the prescription investigations, I didn't work

7    any illicit investigations, so I don't have any

8    knowledge of that during that time frame.  Mine

9    was all prescription opioids.

10        Q.    Today, what forms of diversion of

11   prescription opioids are most prevalent in

12   Akron?

13        A.    We still have plenty of doctor

14   shoppers.  We still have people that are -- we

15   have overprescribers.  We have some physicians

16   that, I believe, still overprescribe.  We have

17   theft of drugs.  There's always theft of drugs

18   from elderly in nursing homes.  We have nurses

19   that have stolen drugs.  I mean, no matter what

20   profession it is, there's a small percentage

21   that aren't legitimate.

22        Q.    What is that percentage?

23        A.    Gosh, if I knew that, I'd run for

24   president.  I don't know.

25        Q.    But it's a small percentage?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 449

1      A.    I believe so, yes.  We have an

2   excellent medical staff in Summit County, we

3   have excellent nurses and physicians, but

4   there's bad apples in the group.

5      Q.    But they're the exception and not

6   the rule?

7            MR. LEDLIE:  Object to the form.

8   Calls for speculation.

9      A.    I believe so, yes.

10      Q.    And in your experience, the vast

11   majority of medical professionals are good

12   medical professionals?

13            MR. LEDLIE:  Objection.  Calls

14   for --

15      Q.    They're not intentionally diverting

16   medications?

17      A.    In my opinion, the majority are good

18   professionals, yes, good medical professionals.

19      Q.    And the majority of citizens in

20   Akron are good citizens who are not doctor

21   shopping?

22      A.    Yes.

23      Q.    Are you aware of any studies to

24   assess the relative prevalence of diversion in

25   Akron?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 450

1      A.    No, sir.

2      Q.    Is that something you've ever looked

3  for?

4      A.    No, sir.

5      Q.    Is that information that would be

6  helpful to you?

7           MR. BENNETT:  Objection.  Vague.

8      A.    I don't know if -- I'm so busy that

9  I don't know that that would be beneficial or

10  not.

11     Q.    The opioid crisis that you were

12  testifying about, has that changed at all over

13  time?

14     A.    It's continued to get worse.  I

15  mean, the crisis elevated to an epidemic.

16     Q.    Has it changed at all in any other

17  way?  I think we've discussed that fentanyl

18  maybe wasn't so much in the picture before and

19  it is now.  Any other changes?

20     A.    Well, things have evolved over time,

21  like we discussed.  Originally people thought

22  they were buying oxycodone and then they were

23  getting fentanyl.  So things have evolved.  I

24  mean, nothing is constant except change.  So I'm

25  not sure if I'm answering your question or --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 451

1    Q.    You are.  Thank you.  I appreciate
2  that.
3        A.    Okay.
4        Q.    Are you aware of any data regarding
5  how common it is for someone who abuses heroin
6  to have first -- to have previously used a
7  prescription opioid?
8        A.    I received an internal e-mail at one
9  point with -- of a medical study on it that
10  showed, I believe it was, 80 or 85 percent of
11  heroin users started with a prescription opioid.
12        Q.    And did that study say where the
13  prescription opioid came from?
14        A.    I don't recall.
15        Q.    We can agree a person can get a
16  prescription opioid without ever actually having
17  gotten a prescription for that opioid?
18        MR. BENNETT:  Objection.
19        You can answer.
20        A.    Yes.
21        Q.    That's part of what you're
22  investigating?
23        A.    Yes.
24        Q.    Do you know how common it is -- to
25  the extent there is a history of prescription

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 452

1   opioid use to heroin use, how common it is that

2   the prescription opioid use started with an

3   actual prescription from a doctor for that

4   patient who went to the pharmacy and got it

5   filled versus they got it from their brother,

6   they stole it from a friend, they bought it on

7   the street?

8          MR. LEDLIE:  Objection.  Compound.

9       A.   I only know this from some of the

10  people I interviewed after arresting them, that

11  they had started with a prescription opioid.  I

12  have no idea what percentage of the population

13  started with a prescription opioid or obtained

14  one by deception.

15      Q.   When you say they started with a

16  prescription opioid --

17      A.   A legitimate prescription opioid.

18      Q.   And how many of those interviews

19  have you done?

20      A.   Gosh, I -- probably a hundred.  This

21  is just talking with people as I arrest them.

22      Q.   Right.  And they tell you the name

23  of the doctor and they show you the prescription

24  and they tell you which date they went and what

25  their condition was and who they saw and where

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 453

1   they got it filled and all that stuff?

2              MR. LEDLIE:  Objection.  Compound.

3              MR. BENNETT:  Objection.  Form.

4       A.    I don't ask them those questions.  I

5   normally either have an OARRS report, or prior

6   to OARRS I had done a spreadsheet.  I know what

7   doctor they went to and where they got it from.

8   So those are -- most of my percentages are

9   knowing that they received legitimate

10  prescription medication.  Now, I don't know that

11  all those people went and did heroin or fentanyl

12  afterwards, but I know that I've arrested those

13  doctor shoppers for receiving legitimate

14  medications from physicians.

15      Q.    And part of the way you are able to

16  find a doctor shopper is through the use of

17  OARRS?

18      A.    Yes, that's part of the way.

19      Q.    I lost my train of thought.  One

20  second.  Sorry about that.

21              Is that something you, Detective

22  Leonard, have ever tried to investigate or

23  determine, how prevalent it is for someone who's

24  using heroin to have previously received an

25  actual prescription from an actual licensed

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 454

1   doctor for a prescription opioid?

2        A.    No.

3        Q.    Why not?

4        A.    It wasn't part of my case.  If I'm

5   doing a criminal case, once I establish my

6   probable cause, I make my arrest.  It turns over

7   to the court.  I move on to the next case.  I'm

8   not following up on that particular item.

9        Q.    The doctor shoppers that you've

10  arrested, are they all abusing -- are they all

11  abusing the prescription opioids themselves or

12  are -- I guess what I'm getting at, are they

13  shopping around to then use them themselves or

14  are they shopping around to accumulate a supply

15  and then sell it to others?

16       A.    It's a little bit of both.  They

17  tend to network.  If they're calling in fake

18  prescriptions or they share DEA numbers if they

19  have a physician's DEA number to call in fake

20  prescriptions for themselves or others, they

21  tend to work in groups.  So they'll share pills,

22  they'll trade pills, they'll use pills, kind of

23  all of the above when it comes to the pills.

24       Q.    And am I correct that one of -- in

25  addition to -- one of the other concerns about

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 455

1   doctor shoppers is that this may be a way in

2   which drug trafficking organizations can harvest

3   more pills, they can end up getting some from

4   these folks who are going around and getting

5   them from multiple pharmacies?

6           MR. LEDLIE:  Object to the form.

7           You may answer.

8       A.    Normally the doctor shoppers are

9   pretty much their own little clique or their own

10  group.  There have been investigations where

11  someone would take a group of people to a bad

12  doctor, get prescriptions and take them to the

13  pharmacy and pay them for a flat line $20 or $50

14  to have the prescription filled on their

15  Medicare/Medicaid, and then they would keep all

16  the medication and sell it.  But that's

17  different than a doctor shopper, that's part of

18  a DTO, a drug trafficking organization, that is

19  set up for that purpose.

20      Q.    And have you worked on any DTO

21  investigations at TDS of the kind you just

22  described?

23          MR. BENNETT:  Objection.  Scope.

24          You may answer that question yes or

25  no only.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 456

1      A.    Yes.

2      Q.    And how many?

3            MR. BENNETT:  Objection.  Scope.

4            You can answer.

5      A.    A couple.  I don't know.  Two or

6   three.

7      Q.    Have any of those resulted in

8   convictions?

9      A.    They're still currently under

10  investigation.

11     Q.    Is there information or data that

12  you don't currently have access to at TDS, that

13  if you had access to it, you think you could be

14  more effective in your investigations?

15           MR. LEDLIE:  Object to the form.

16           MR. BENNETT:  Objection.  Calls for

17  speculation.

18           You can answer.

19     A.    I mean, I don't know what I don't

20  know, so I don't know if there's anything out

21  there that could help me or not.  I haven't come

22  across any information of something that might

23  be out there.

24     Q.    You mentioned limitations on your

25  ability to query OARRS, that you have to have

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 457

1    probable cause or something before you could run

2    certain OARRS queries; is that right?

3         A.    Sure.  That works like LEADs, the

4    law enforcement gateway.  So if I wanted to put

5    your name into OHLeg, into OARRS, and I wanted

6    to run you to see what your criminal history

7    was, I'd have to have probable cause for it or

8    I'm violating your rights.  The same thing with

9    OARRS.  I don't have the right to look up your

10   patient profile unless I've got probable cause

11   to see that you've done something wrong.

12        Q.    Is that something you think should

13   be changed so that you should be able to look at

14   OARRS more frequently?

15              MR. LEDLIE:  Object to the form.

16              MR. BENNETT:  Objection.

17        A.    Absolutely not.  I believe

18   individuals have their personal rights and

19   privacy.

20        Q.    Have you ever looked at commercial

21   prescriber level data that, you know, companies

22   like IMS produce?

23        A.    No.

24        Q.    Are you aware of what IMS is?

25        A.    I am not.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 458

1      Q.    Do you know whether the TDS has ever
2   obtained IMS information?
3      A.    I don't know that information.
4      Q.    Do you know if there's anything that
5   prevents DEA from purchasing that information?
6           MR. BENNETT:  Object to the form of
7   the question.
8      A.    I'm not aware of the information.
9      Q.    And did I understand that you have
10  to have probable cause in order to run certain
11  OARRS queries related to the physician as
12  opposed to of an individual patient?
13     A.    It's the same for both.  I have to
14  have some type of suspicion to run someone.  I
15  can't just go out on a fishing expedition and
16  pick Dr. Smith at the Cleveland Clinic and
17  decide I want to run his OARRS and see who he's
18  prescribing to.  I have to have some type of
19  complaint, some type of suspicion, some type of
20  reason -- reasonable suspicion to run it.
21     Q.    And just in practice, how does that
22  work?  You police yourself as to whether or not
23  you have probable cause before you run the OARRS
24  query?
25          MR. LEDLIE:  Object to the form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 459

1      Q.    In other words, do you have to apply

2  to OARRS and say I'm running a query on this

3  person and here's my probable cause?

4      A.    No.

5      Q.    You got a log-in and password,

6  right?

7      A.    Right.  And once I run Joe Smith

8  doctor shopper, I don't get the information.  It

9  gets forwarded to my supervisor, who has to

10  approve my running of OARRS, and then the

11  information is sent to me.  So there's a checks

12  and balance in OARRS.

13      Q.    Does that mean you have to give your

14  supervisor some information so he can -- what's

15  your supervisor basing the approval on?

16          MR. LEDLIE:  Object to the form to

17  the extent this calls for any revealing of

18  police investigative techniques.  I would assert

19  the law enforcement privilege.

20          MR. BENNETT:  And I would also

21  object based on scope.

22          You're not authorized to disclose

23  the internal deliberative process of the DEA.  I

24  also would object, calls for speculation.  With

25  those instructions, you can answer within those

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 460

1    bounds.

2         A.    When I run someone through OARRS, I

3    let my supervisor know, hey, I'm running this

4    guy, I'm looking into whether it's an open case

5    or not or I'm going to open a case.  And I

6    believe part of the disclosure -- you got a copy

7    of my OARRS book where I list the date I ran

8    someone, who I ran.  I list the physician, I

9    think, and I list who referred it to me, whether

10   it was another officer, whether it was a

11   pharmacist or a physician, or whoever called and

12   gave me whatever information I felt necessary

13   that I had enough information to run.  So I keep

14   a log of all the people I run through OARRS.

15   That way I cover myself that I'm not just --

16   someone can't say, hey, you ran your ex-wife and

17   you're trying to cause problems.

18        Q.    Has your request to run OARRS on

19   someone ever been denied by your supervisor?

20        A.    No, sir.

21        Q.    And I can't remember if I asked you

22   this before.  Do you ever look at volume data,

23   volume of prescriptions, volume of dispensing,

24   as a potential way to identify people who you

25   should investigate?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 461

1            MR. BENNETT:  Objection.  Vague.

2       A.    That information could come from a

3  DI when they run ARCOS or check something.  I

4  have not done that, but yes, that's possible.

5       Q.    But you don't know whether -- I

6  think -- I want to make sure.  Do you know

7  whether a DI has ever given you -- said I think

8  we should investigate X whatever or whoever X is

9  based on volume?

10       A.    I'm not aware of how they -- my

11  belief is they have other information besides

12  just volume when they're doing that

13  investigation.

14            MR. BLOCK:  I'm going to yield the

15  floor to co-counsel with the indulgence I may

16  have one or two follow-ups.

17            MR. BENNETT:  Does the court

18  reporter know how long we've been on the record,

19  because I have it as us being on almost two

20  hours already?

21            SPECIAL MASTER COHEN:  We will go

22  off the record and you can do a count.

23                 (Short recess had.)

24            EXAMINATION OF PATRICK LEONARD

25  BY MR. GOLDSTEIN:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 462

1      Q.    Good morning, Detective Leonard.

2  We've met before.  I'm Josh Goldstein.  I

3  represent one of the manufacturers in this case.

4  Just a couple quick follow-up questions.

5            Is there any data that you receive

6  in your work at the TDS in the aggregate related

7  to volume within the jurisdictions for which the

8  TDS operates?

9      A.    I don't personally receive any of

10 that information.

11     Q.    And to clarify, on the volume of

12 prescription opioids written?

13     A.    Yes.  And, again, I don't personally

14 receive any information of numbers or volume.

15     Q.    Is that information that people that

16 work at the TDS review to your knowledge?

17            MR. BENNETT:  Objection.  Scope.

18 Objection.  Calls for speculation.

19            You can answer within your

20 knowledge.

21     A.    I don't know what everyone else's

22 job specifications are.  I am aware that ARCOS

23 is used by TDS and volume and numbers are

24 reviewed.  I don't know how much or how often.

25     Q.    As far as you're aware, is ARCOS or

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 463

1  any other volume data used to identify target

2  areas within the geographic area in which TDS

3  operates?

4              MR. BENNETT:  Objection.  Scope.

5        A.    It can be.

6        Q.    And can you explain?

7              MR. BENNETT:  Objection.  Scope.

8              You are not authorized to disclose

9  confidential law enforcement investigative

10 techniques, the effectiveness of which would be

11 impaired by disclosure.  To the extent you can

12 answer without disclosing confidential

13 techniques, then you can answer.

14       A.    That would be a law enforcement

15 technique.

16       Q.    Without getting into what specific

17 data you look at, is it fair to say that folks

18 within TDS look at -- I'll strike the question.

19 That's all I have.

20       FURTHER EXAMINATION OF PATRICK LEONARD

21 BY MR. BLOCK:

22       Q.    I just had one more, which is you

23 testified earlier, Detective Leonard, that

24 you're working on an investigation into a

25 distributor that's one of the Defendants in the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 464

1    case, and my follow-up question to that is, is

2    that a distributor that is national in the scope

3    of its operations?

4              MR. BENNETT:  Objection.  Beyond the

5    scope of the authorization.  Would reveal facts

6    about an ongoing investigation.  Instruct the

7    witness not to answer.

8              SPECIAL MASTER COHEN:  Sustained.

9              MR. BLOCK:  Then I have no further

10   questions.  Nice to meet you.  Thank you, sir.

11         EXAMINATION OF PATRICK LEONARD

12   BY MR. LEDLIE:

13        Q.    Detective Leonard, are you familiar

14   with the Controlled Substances Act through your

15   detective work?

16        A.    Yes.

17        Q.    Under the Controlled Substances Act,

18   are there rules concerning who is allowed to

19   make, distribute and dispense scheduled drugs --

20        A.    Yes.

21        Q.    -- in America?

22              And generally what are the rules

23   that you're aware of with respect to the

24   obligations of registrants in the DEA for

25   scheduled drugs?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 465

1          MR. BENNETT:  Object to form.

2     A.    They're responsible for the safe

3  distribution of medications to the public.

4          MR. BENNETT:  I'm sorry for

5  belating.  I was reading it.  Objection.  Scope.

6  But I'm not instructing you not to answer so

7  it's okay that you answered it.  Objection.

8  It's beyond the scope since you're speaking for

9  DEA.

10     Q.    In your personal work have you --

11  are you aware of the concept that DEA

12  registrants must maintain effective controls

13  against diversion?

14     A.    Yes.

15     Q.    In your tenure with the TDS, has the

16  manufacturers and distributors of scheduled

17  opioid medications maintained effective controls

18  to prevent diversion?

19          MR. BLOCK:  Objection.  Form.

20          MR. BENNETT:  Objection.  Scope.

21          You're not authorized to disclose

22  information regarding specific DEA activities

23  and investigations that are non-public.  You

24  also are not authorized to use non-public

25  information in forming fact or expert opinions.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 466

1    To the extent that you have an opinion that is

2    based on public information or information you

3    acquired outside of your role with the DEA, you

4    may answer.

5            A.    So your question again?

6            Q.    My question, Detective Leonard, is,

7    during your tenure with the TDS has diversion

8    been a continuous problem?

9            A.    Yes.

10           Q.    At a general level, is it your

11   personal opinion, based on the public disclosure

12   of convictions, court records, cases that you've

13   worked -- is it -- can you tell me whether or

14   not the registrants who have supplied opioids to

15   the jurisdictions that you've worked in were

16   effective in preventing and having effective

17   controls to prevent diversion?

18               MR. BLOCK:  Object to the form.

19           A.    I don't believe they were.

20               MR. LEDLIE:  That's all I have.

21       FURTHER EXAMINATION OF PATRICK LEONARD

22   BY MR. BLOCK:

23           Q.    What registrants did you mean in

24   your last answer?  You're talking about

25   Dr. Harper wasn't effective?

Page 467

1       A.      No.  I'm talking about the market of

2   Summit County with the number of opioids being

3   prescribed overall.

4       Q.      Explain the basis for your belief

5   that any particular manufacturer or distributor

6   was not effective in preventing and having

7   effective controls to prevent diversion.

8       A.      The epidemic, by definition, grew

9   out of opioid prescription medication.  My

10  personal belief is that the number of people

11  that became addicted to prescription medication

12  has driven the number of people that are

13  addicted to both prescription medication and

14  illicit opioids that have been part and -- of

15  our epidemic.

16      Q.      That's based on something you

17  haven't studied?  You haven't done any studies

18  about that, right?

19              MR. LEDLIE:  Object to the form.

20  Misstates testimony.

21      A.      I have investigated prescription

22  opioid abuse for 21 years in Summit County.

23      Q.      You've never investigated a

24  pharmaceutical manufacturer?

25      A.      No, sir.  We've established that.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 468

```
 1        Q.    You've never investigated a
 2   pharmaceutical distributor except for one
 3   pending investigation?
 4        A.    Correct.
 5        Q.    And so the basis for your opinion is
 6   that there is an epidemic, therefore, somebody
 7   must have done something wrong?
 8              MR. LEDLIE:  Objection.  Misstates
 9   testimony.
10        A.    That kind of sums it up in a real
11   vague way, but I think there could have been and
12   should have been more controls at all levels,
13   and that being -- pills in the market is part of
14   it.
15        Q.    And would that include the DEA
16   should have had lower quotas for prescription
17   opioids?
18              MR. BENNETT:  Objection.
19              You can answer.
20        A.    I don't know what the quotas are so
21   I don't know if they should have been higher or
22   lower.
23        Q.    Is it your view that there are too
24   many opioids in circulation?
25        A.    There are.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 469

1    Q.    So is it your view that the quota
2    should be lower?
3              MR. LEDLIE:  Objection.  Calls for
4    speculation.
5    A.    Certain regions may be higher than
6    others, so I can't say -- you know, the
7    population of Chicago should obviously have more
8    opioids from a distributor than the population
9    of, say, Warren, Ohio.
10   Q.    Should have been more controls at
11   all levels.  Is one of those levels the federal
12   level?  Back to your prior answer.  Your view is
13   there should have been more controls at all
14   levels.  Is one of those the federal level?
15             MR. BENNETT:  Objection.  Vague.
16             MR. LEDLIE:  Object to form.
17   A.    I wasn't talking about law
18   enforcement at that point.  I was talking about
19   distributors.
20   Q.    Does law enforcement have any
21   responsibility whatsoever?
22   A.    We react.  Law enforcement reacts to
23   what's going on.  We don't have the manpower to
24   investigate every crime that's happening.  We
25   supply and do the best we can with what we have

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 470

1   and we've been overwhelmed.

2        Q.    How about the medical board; does

3   the medical board have some responsibility?

4             MR. LEDLIE:  Objection.  Asked and

5   answered.

6             Strike that.  You may answer.

7        A.    They have investigation ability.

8   Whether they have responsibility towards people

9   overdosing and dying, I don't think that any of

10  law enforcement has the responsibility for that.

11  We have the responsibility to investigate for

12  the reasons.  I don't know that we're

13  responsible for people that have abused

14  medication and died over it.

15       Q.    How about the pharmacy board?

16       A.    And they continue to do

17  investigations as well.

18       Q.    Do they have any responsibility for

19  the opioid epidemic?

20       A.    I don't believe so, no.

21            MR. LEDLIE:  Object to the form.

22       Q.    How about the state legislature?

23       A.    I am not involved with the

24  government.

25       Q.    How about the individuals who are

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 471

1   abusing medications?

2           MR. LEDLIE:  Objection.  Asked and

3   answered.

4       A.    Sure, I think they have some

5   responsibility.

6       Q.    How about the individuals who are --

7   how about the drug traffickers that are

8   trafficking drugs?

9       A.    I believe so.  They're taking

10  advantage of a situation.

11      Q.    The doctors who prescribe

12  medications?

13          MR. LEDLIE:  Objection.  Vague.

14      A.    Yes.

15          SPECIAL MASTER COHEN:  I think we're

16  at our time limit.

17          MR. BLOCK:  I was following up on

18  the redirect that my opponent did, but okay.

19          SPECIAL MASTER COHEN:  If you have

20  just a couple more questions, that's fine.

21          MR. BLOCK:  Thank you.  Nice to see

22  you.

23          MR. BENNETT:  Before we go off the

24  record, the United States hereby specifically

25  requests that the transcript and the information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 472

1    contained therein be marked highly confidential,

2    attorney eyes only until the DEA has had the

3    chance to vet the transcript.  Once it's been

4    vetted, we may be able to reduce portions of

5    that that are not highly confidential and

6    subject to attorney eyes only.

7                    SPECIAL MASTER COHEN:  Any

8    objection?

9                    MR. BLOCK:  No, Your Honor.

10                   SPECIAL MASTER COHEN:  That's fine.

11                   MR. BLOCK:  Just that it be done

12   timely.

13

14        (Deposition concluded at 10:15 a.m.)

15                        - - - - -

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 473

1  Whereupon, counsel was requested to give

2  instruction regarding the witness' review of

3  the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6  Transcript review was requested pursuant to

7  the applicable Rules of Civil Procedure.

8

9                TRANSCRIPT DELIVERY:

10  Counsel was requested to give instruction

11  regarding delivery date of transcript.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 474

1                 REPORTER'S CERTIFICATE

2    The State of Ohio,     )

3                           ) SS:

4    County of Cuyahoga.    )

5

6          I, Renee L. Pellegrino, a Notary Public

7    within and for the State of Ohio, duly

8    commissioned and qualified, do hereby certify

9    that the within named witness, PATRICK LEONARD, was

10   by me first duly sworn to testify the truth, the

11   whole truth and nothing but the truth in the cause

12   aforesaid; that the testimony then given by the

13   above referenced witness was by me reduced to

14   stenotypy in the presence of said witness;

15   afterwards transcribed, and that the foregoing is a

16   true and correct transcription of the testimony so

17   given by the above referenced witness.

18          I do further certify that this

19   deposition was taken at the time and place in the

20   foregoing caption specified and was completed

21   without adjournment.

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 475

1          I do further certify that I am not a

2    relative, counsel or attorney for either party,

3    or otherwise interested in the event of this

4    action.

5          IN WITNESS WHEREOF, I have hereunto set

6    my hand and affixed my seal of office at

7    Cleveland, Ohio, on this 29th day of May, 2019.

8

9

10

11

12

13   Renee L. Pellegrino, Notary Public

14   within and for the State of Ohio

15

16   My commission expires October 12, 2020.

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                                   Page 476

 1                    Veritext Legal Solutions
                         1100 Superior Ave
 2                          Suite 1820
                       Cleveland, Ohio 44114
 3                    Phone: 216-523-1313
 4
      May 29, 2019
 5
      To: James Ledlie, Esq.
 6
      Case Name: In Re: National Prescription Opiate Litigation
 7
      Veritext Reference Number: 3389786
 8
      Witness:  Patrick Leonard      Deposition Date:  5/23/2019
 9
10    Dear Sir/Madam:
11
      Enclosed please find a deposition transcript.  Please have the witness
12
      review the transcript and note any changes or corrections on the
13
      included errata sheet, indicating the page, line number, change, and
14
      the reason for the change.  Have the witness' signature notarized and
15
      forward the completed page(s) back to us at the Production address
16    shown
17    above, or email to production-midwest@veritext.com.
18
      If the errata is not returned within thirty days of your receipt of
19
      this letter, the reading and signing will be deemed waived.
20
21    Sincerely,
22    Production Department
23
24
25    NO NOTARY REQUIRED IN CA
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 477

1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
2

 ASSIGNMENT REFERENCE NO: 3389786
3   CASE NAME: In Re: National Prescription Opiate Litigation
 DATE OF DEPOSITION: 5/23/2019
4   WITNESS' NAME: Patrick Leonard
5        In accordance with the Rules of Civil
 Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7        I have made no changes to the testimony
 as transcribed by the court reporter.
8

 _____      _____
9   Date                    Patrick Leonard
10        Sworn to and subscribed before me, a
 Notary Public in and for the State and County,
11   the referenced witness did personally appear
 and acknowledge that:
12
         They have read the transcript;
13        They signed the foregoing Sworn
         Statement; and
14        Their execution of this Statement is of
         their free act and deed.
15
         I have affixed my name and official seal
16
 this _____ day of_____, 20_____.
17

                 _____
18                Notary Public
19                _____
                 Commission Expiration Date
20
21
22
23
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 478

1          DEPOSITION REVIEW
              CERTIFICATION OF WITNESS

2

       ASSIGNMENT REFERENCE NO: 3389786
3      CASE NAME: In Re: National Prescription Opiate Litigation
       DATE OF DEPOSITION: 5/23/2019
4      WITNESS' NAME: Patrick Leonard
5          In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
6      my testimony or it has been read to me.
7          I have listed my changes on the attached
       Errata Sheet, listing page and line numbers as
8      well as the reason(s) for the change(s).
9          I request that these changes be entered
       as part of the record of my testimony.
10
           I have executed the Errata Sheet, as well
11     as this Certificate, and request and authorize
       that both be appended to the transcript of my
12     testimony and be incorporated therein.
13     _____        _____
       Date                     Patrick Leonard
14
           Sworn to and subscribed before me, a
15     Notary Public in and for the State and County,
       the referenced witness did personally appear
16     and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18         in the appended Errata Sheet;
           They signed the foregoing Sworn
19         Statement; and
           Their execution of this Statement is of
20         their free act and deed.
21         I have affixed my name and official seal
22     this _____ day of_____, 20_____.
23         _____
           Notary Public
24
           _____
25         Commission Expiration Date

Veritext Legal Solutions

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 479

1                    ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
2                ASSIGNMENT NO: 3389786
3      PAGE/LINE(S) /      CHANGE      /REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19

       _____        _____
20     Date                    Patrick Leonard
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23                     _____
                       Notary Public
24

                       _____
25                     Commission Expiration Date

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

[& - 45132]

Page 1

**&**

**&**  352:21 354:2,6
   354:12,16 355:3,7
   362:4 363:3,5,21
   364:1,6,6

**0**

**000368859**  358:5
   429:14,21
**02199**  355:8

**1**

**100**  353:22
**10:15**  472:14
**1100**  352:21 354:4
   476:1
**12**  475:16
**1200**  355:22
**13**  406:7
**14**  442:21
**15**  365:12 404:18
   440:18 442:21
**1500**  387:2 434:1
**15219**  355:4
**1660**  352:21
**17**  352:7,14
**1701**  355:17
**18**  352:10,12
**180**  394:13
**1801**  355:21
**1820**  476:2
**19103-2921**
   355:17
**1998**  447:25
**1999**  354:8

**2**

**20**  377:2 420:12
   455:13 477:16
   478:22 479:22
**200001-4956**
   354:19

**20001-3743**
   354:14
**2009**  392:2
**201**  355:12
**2010**  392:2
**2012**  406:7 419:23
   442:14 444:16
   446:3 447:21
   448:1
**2015**  429:23
**2019**  352:18 475:7
   476:4
**202**  354:14,19
**2020**  475:16
**21**  467:22
**21202-1031**
   353:23
**214**  356:5
**215**  355:18
**216**  353:10,19
   354:5
**216-523-1313**
   476:3
**216-9229**  353:4
**2200**  356:4
**2227**  475:12
**23**  352:18
**234-4002**  353:15
**2440**  353:23
**25**  377:2 431:14
**252-9060**  355:13
**28**  353:3
**2800**  356:4
**2804**  352:6,7
**29**  476:4
**29464**  353:4
**29th**  475:7
**2nd**  352:21

**3**

**30**  358:5 384:6
   429:13,19 440:18
   446:10
**303**  355:23
**310**  354:9
**313**  353:15
**32**  384:7
**330**  355:13
**338-3344**  355:5
**3389786**  476:7
   477:2 478:2 479:2
**34**  384:7
**353**  357:3
**358**  357:4
**359**  357:5
**35th**  355:4
**364**  357:8
**368861**  429:21
**371**  359:3
**390**  359:3,4,4,5,5
**392**  359:6
**393**  359:6
**394**  359:7,7,8
**396**  359:8,9,9

**4**

**400**  353:9
**401**  359:10,10,11
   359:11
**403**  359:12
**407**  359:12
**408**  359:13
**410**  353:24 359:13
   359:14
**412**  355:5
**413**  359:14,15,15
**414**  359:16
**416**  359:16
**419**  359:17,17

**420**  359:18,18,19
**421**  359:19,20
**422**  359:20
**423**  359:21
**424**  359:21,22,22
**425**  359:23,23,24
**426**  359:24
**427**  359:25 360:3,3
   360:4
**428**  360:4,5
**429**  358:5 360:5
**430**  360:6
**431**  353:14
**432**  360:6
**433**  360:7,7
**434**  360:8,8,9
**436**  360:9,10
**437**  360:10,11,11
   360:12
**438**  360:12,13,13
   360:14,14
**439**  360:15,15,16
   360:16,17
**440**  360:17,18
**441**  360:18,19
**44113**  353:10
   354:4
**44114**  476:2
**44114-1190**
   353:18
**443**  360:19,20
**44308**  355:13
**446**  360:20,21
**447**  360:21,22
**449**  360:22,23
**450**  360:23
**45004**  352:14
**45090**  352:10
**451**  360:24
**45132**  352:12

**452**   360:24
**453**   360:25 361:3
**455**   361:3,4
**456**   361:4,5,5
**457**   361:6,6
**458**   361:7
**459**   361:7,8,8
**461**   361:9
**462**   357:9 361:9
**463**   357:10 361:10
   361:10
**464**   357:11 361:11
**465**   361:11,12,12
   361:13
**466**   357:12 361:13
**467**   361:14
**468**   361:14,15
**469**   361:15,16,16
**470**   361:17,17
**471**   361:18,18
**474**   357:14
**48226**   353:14

**5**

**5/23/2019**   476:8
   477:3 478:3
**50**   355:12 366:11
   366:12 370:1
   373:16 376:24
   378:17 379:9,19
   455:13
**50/50**   416:24,25
**553-6700**   354:9
**586-3939**   353:19
**592-3197**   355:23
**5th**   429:23

**6**

**6**   367:12 430:6,10
   430:18,20
**601**   354:13

**617**   355:9
**622-3988**   353:10
**662-5205**   354:19
**696-4889**   354:5

**7**

**740-8000**   356:5
**75201**   356:5

**8**

**80**   451:10
**800**   355:8
**801**   353:9
**80202**   355:22
**843**   353:4
**85**   451:10
**850**   354:18
**8:01**   352:19
**8th**   354:8

**9**

**90**   394:13,13
**90067**   354:8
**901**   353:18
**942-5743**   354:14
**949-1159**   353:24
**95**   379:15
**950**   354:4
**951-7000**   355:9
**963-4824**   355:18
**97**   426:1
**99**   379:15

**a**

**a.m.**   352:19
   472:14
**aaron**   352:8
**ability**   456:25
   470:7
**able**   387:21 394:8
   415:13 453:15
   457:13 472:4

**absolutely**   395:6,8
   457:17
**abuse**   448:2,3,3
   467:22
**abused**   410:15
   470:13
**abuses**   451:5
**abusing**   454:10,11
   471:1
**access**   456:12,13
**accumulate**
   454:14
**acknowledge**
   477:11 478:16
**acquired**   414:18
   415:11 466:3
**act**   374:5 464:14
   464:17 477:14
   478:20
**action**   475:4
**active**   371:18
   405:10,17
**activities**   372:7
   373:1 374:18
   375:6 404:2
   422:15 434:22
   436:19 439:22
   465:22
**activity**   374:6
**actual**   452:3
   453:25,25
**add**   371:16 379:19
**addicted**   467:11
   467:13
**addition**   414:15
   454:25
**address**   407:15
   476:15
**adjournment**
   474:21

**administration**
   353:6,13 362:12
**administrative**
   430:2
**advantage**   471:10
**affixed**   475:6
   477:15 478:21
**aforesaid**   474:12
**age**   364:8 410:12
**agent**   366:14,18
   366:18 373:14
   374:12,23,24
   384:11,13,16
   391:21 407:20,21
   409:7 421:11,18
   421:21 422:1,5
**agents**   379:3
   387:21 408:17,22
**aggregate**   462:6
**ago**   404:19 406:2
**agree**   371:22
   383:3 395:8 396:2
   396:7,9,13,16
   398:16 434:7
   435:16 436:4,19
   438:12,17,24
   439:5,24 441:13
   447:14,18 451:15
**agreement**   363:9
**ahead**   404:8
**aid**   355:15 363:18
**aide**   379:17
**ailment**   376:18,19
**akron**   353:2
   355:13 358:5
   366:23 367:2,4,23
   368:15,16,23,25
   385:4,5 388:7,8,16
   407:14 411:15
   414:1 420:16
   428:21 429:14,21

448:12 449:20,25
**al** 352:10,12,13,14
**alert** 400:6
**alex** 355:21 364:3
**alex.harris** 355:23
**allen** 355:3,5
363:20,21
**allow** 375:24
**allowed** 372:14
378:1 381:3
409:24 414:21
426:24 447:1
464:18
**america** 464:21
**amerisourceberg...**
355:10 362:19
**analysts** 410:8
**analyzing** 425:2
**angeles** 354:8
**answer** 367:16
371:21,24 372:9
372:11,14,16
373:3 374:21
375:9,10,16,19
376:1,8 381:4,6
383:8 390:2,18
391:3,4 393:20
394:1 397:8,20
398:7,8,15,20
399:8 401:9,10,20
402:13,18 403:22
404:8,12 407:5
410:19 413:19
414:1,19,21
415:17 420:11,25
421:5 422:17
423:1,2,25 425:14
425:20 426:10
428:1 429:2
430:12 432:3,9,16
433:14,21 434:15

434:16,23,24
435:10,11 436:17
437:5,12,14 438:2
438:7 439:3 443:2
443:22 444:11
447:2,3,4 451:19
455:7,24 456:4,18
459:25 462:19
463:12,13 464:7
465:6 466:4,24
468:19 469:12
470:6
**answered** 381:16
465:7 470:5 471:3
**answering** 413:25
435:12 450:25
**answers** 368:18
403:6
**anybody** 375:17
**apd** 431:4
**appear** 477:11
478:15
**appearances**
353:1 354:1 355:1
356:1 357:3 362:4
**appended** 478:11
478:18
**apples** 449:4
**applicable** 473:7
**application** 398:11
**applied** 406:9
**applies** 399:8
**apply** 459:1
**appreciate** 451:1
**approval** 459:15
**approve** 459:10
**approximately**
370:1
**arcos** 405:24
406:1,15,18,22
408:11,15 409:3

461:3 462:22,25
**area** 375:23 400:3
400:5 429:7 445:6
463:2
**areas** 385:4 395:6
463:2
**argument** 375:13
**arnold** 354:12
364:1
**arnoldporter.com**
354:15
**arrest** 371:8 374:3
435:2 444:3
452:21 454:6
**arrested** 387:1
390:9 392:9
402:24,25 417:20
453:12 454:10
**arresting** 452:10
**arrests** 379:1,11
379:16,18,25
380:5 387:7
**aside** 405:17
**asked** 375:11
381:15 404:19
415:9 418:12
430:5 433:4
460:21 470:4
471:2
**asking** 397:1,3
401:2 405:2 433:7
433:8
**assert** 459:18
**assess** 449:24
**assigned** 366:5
367:3 399:16
400:17,19
**assignment** 477:2
478:2 479:2
**assist** 374:8 409:6
429:7

**assistance** 398:1
398:22 399:1
413:1,2 414:6
**assistant** 430:3
**assisted** 367:21,24
373:20 384:18
418:21
**assisting** 366:18
374:14,22,25
**assume** 367:20
414:3
**assuming** 414:4
**attached** 478:7
**attachment**
429:20
**attention** 382:1
413:6,10,22
418:12
**attorney** 405:9
472:2,6 475:2
**attorney's** 353:7
362:10,16 363:9
**attorneys** 352:24
**ausa** 369:20,21
**authorization**
404:4 413:25
415:6 464:5
**authorize** 478:11
**authorized** 371:17
372:5,24 374:17
375:5 380:10,22
390:25 398:4
403:25 412:2
414:15 415:7
422:9,11,15 423:2
431:23 434:21
439:21 459:22
463:8 465:21,24
**available** 411:12
**ave** 476:1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**avenue** 353:9,18 354:4,8,13 356:4
**average** 386:3
**aware** 368:6,8 373:4 383:24 386:22 406:18,21 419:14,18 439:11 439:16,23 440:14 442:2,4,8 443:15 445:15 449:23 451:4 457:24 458:8 461:10 462:22,25 464:23 465:11

**b**

**bacchus** 353:8 362:15,15
**back** 372:12 381:4 385:15,23 411:4 417:11 420:2 423:17 433:10 440:16 469:12 476:15
**backed** 378:11
**bad** 446:8 449:4 455:11
**balance** 459:12
**baltimore** 353:23
**barlit** 364:3
**bartlit** 355:20,23
**based** 391:3 400:25 403:5 404:18 414:17,20 427:7,11,15 428:11 431:23 432:16 445:2 459:21 461:9 466:2,11 467:16
**basically** 377:10
**basing** 459:15

**basis** 398:12 415:1 415:14 467:4 468:5
**batch** 446:8
**bates** 358:5 429:14 429:20
**bblock** 354:20
**bears** 429:20
**beck** 355:20 364:4
**beck.com** 355:23
**began** 444:15,15 444:24
**beginning** 358:5 429:13 433:7,10
**behalf** 353:2,6,12 353:16,20 354:2 354:10,16 355:2,6 355:10,15,19 356:2 362:7,11,17 362:19 363:5,18 363:21,24 364:1,4 364:6 413:25
**belating** 465:5
**belief** 461:11 467:4,10
**believe** 369:6 371:22 381:1,24 390:19 395:2 400:4 401:11,16 401:17 407:24 408:17 414:21 424:1 425:15,25 426:2,11 433:3 443:9,10,23 444:7 446:17 447:17 448:16 449:1,9 451:10 457:17 460:6 466:19 470:20 471:9
**beneficial** 429:9 450:9

**benjamin** 354:17 363:6
**bennett** 353:7 362:9,9 363:8 371:16 372:3,20 372:23 374:16 375:4,12,20 376:7 380:21 383:7 384:3 390:1,17,24 392:18 393:19,24 394:24 396:23 397:9 398:3 401:4 401:19 402:13,18 403:21 404:22 405:6 407:4 410:18,23 413:13 413:18,23 414:13 415:5 419:3 420:4 420:9,24 421:4,10 422:8,20,24 423:13,23 424:17 425:12,19 426:8 427:3,18,25 428:10,25 430:11 431:21 432:4 433:13,20 434:9 434:13,16,20 435:9 436:16 437:4,11 438:1,6 438:15,22 439:2 439:10,15,20 441:20 443:1,21 446:23 447:3 450:7 451:18 453:3 455:23 456:3,16 457:16 458:6 459:20 461:1,17 462:17 463:4,7 464:4 465:1,4,20 468:18 469:15 471:23

**berne** 352:21 362:4
**best** 444:17 469:25
**better** 420:6 433:18
**beyond** 404:4 464:4 465:8
**billing** 425:24 426:1
**birth** 444:10
**bit** 428:18 454:16
**block** 354:17 357:8,10,12 362:1 363:6,6,14 364:14 371:20 372:8 396:25 397:11 398:9 401:6 404:11 405:13 414:23 423:11,15 432:1,20 461:14 463:21 464:9 465:19 466:18,22 471:17,21 472:9 472:11
**blood** 396:3
**board** 379:3 387:11,13 412:7 412:13,21 413:7,9 413:17,21 414:9 415:10,19 416:9 416:10,16,23 417:4,8,12,14,17 418:1,11,17,17,21 418:25 419:10,13 420:2,2,7 429:5 470:2,3,15
**book** 460:7
**borders** 368:16
**boston** 355:8
**bought** 452:6

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**boulevard** 353:3
**bounds** 460:1
**boylston** 355:8
**break** 410:12
  423:12
**breakdown** 410:9
**bridgeside** 353:3
**bring** 382:10,23
  412:24 413:9
  429:5
**bringing** 413:21
  437:2
**brings** 381:25
  387:12
**brinks** 373:14,19
  373:23 407:25
**brother** 452:5
**brought** 373:10
  379:2 383:1 387:2
  413:6 414:5
  418:12 419:19
  421:14 437:22
  447:8
**brunner** 356:3
  363:23,23
**building** 431:5,6
**bunch** 373:15
**burling** 354:16
  363:5
**business** 393:12
**busy** 450:8
**buying** 440:20,21
  440:22,23 441:3,4
  441:6,14 450:22

**c**

**c** 354:17
**ca** 476:25
**calculating** 385:7
**california** 354:8
**call** 381:23 413:1
  454:19

**called** 364:8 431:7
  460:11
**calling** 454:17
**calls** 381:21 396:6
  396:21 419:17
  423:24 424:14
  425:12 427:3
  446:24 449:8,13
  456:16 459:17,24
  462:18 469:3
**camera** 404:24
**cameras** 417:23
**cancer** 395:5
**cannabinoids** 371:5,7
**capacity** 391:4
  414:2
**capita** 400:3
**caption** 474:20
**carfentanil** 442:25
  443:7,14,19,25
**carolina** 353:4
**case** 352:7,10,12
  352:14 366:2
  367:10,11,22
  368:7,11 369:1,1
  369:15,16,22
  371:2,7 373:19
  375:7,15,22
  379:20,23 380:4,5
  382:3,24 386:13
  387:11,14 390:3,8
  390:14,21 391:13
  392:6 395:10
  396:17,25 397:4,6
  397:17,22,25
  398:2,6,23 399:2,7
  400:11 401:15,15
  405:12 407:18
  408:25 409:2
  412:25 417:16

418:6,22 421:8,15
  422:3,7 423:10,18
  430:14 431:1,11
  432:13 434:3
  435:3,5 454:4,5,7
  460:4,5 462:3
  464:1 476:6 477:3
  478:3
**cases** 366:23 367:5
  367:18,22,23
  368:2,3,14,17
  369:5,14 370:19
  379:2,19 380:1
  382:9,16 383:10
  383:10,22 384:7
  387:18,24 388:3,4
  388:5,11,15
  389:16,17,18
  390:12 394:3
  401:16 403:8
  409:5 411:6,10
  413:10,22 414:5
  416:8,15 417:13
  418:12,16,19,20
  419:6,8,9 421:8
  422:4 446:4
  466:12
**casualties** 445:7,8
  445:11
**casualty** 445:18
**categories** 385:20
**caught** 365:22
  417:25
**cause** 409:25
  454:6 457:1,7,10
  458:10,23 459:3
  460:17 474:11
**center** 395:5
  406:20
**centre** 355:4

**century** 447:6
**certain** 457:2
  458:10 469:5
**certificate** 357:14
  474:1 478:11
**certification** 477:1
  478:1
**certified** 364:11
**certify** 474:8,18
  475:1
**chain** 400:21
**chance** 472:3
**change** 375:18
  419:20 450:24
  476:13,14 478:8
  479:3
**changed** 390:6
  450:12,16 457:13
**changes** 450:19
  476:12 477:7
  478:7,9
**charge** 374:5
**charged** 387:5
  406:23
**charges** 367:10
  373:10 382:10,23
  383:1 397:1
  406:25
**charted** 366:23
  367:5 388:12
**chartered** 367:13
  367:17
**charters** 367:1
  389:4,5
**check** 461:3
**checks** 459:11
**chicago** 469:7
**children** 381:24
**christopher**
  353:17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

[cipriani - correct] Page 6

cipriani 353:13
362:13,13
circulation 468:24
citizens 449:19,20
city 352:11 353:2
366:22 367:4,23
368:3,7,15,23,25
369:2 385:4,5
388:7,8,12,15
411:15 420:15
citycenter 354:18
civil 364:10
373:11 473:3,7
477:5 478:5
clarify 402:22
462:11
clawed 381:3
clear 403:3
clearcut 386:6
clears 441:1
cleveland 352:11
352:22 353:10,18
354:4 368:3,7
369:8,12 407:13
458:16 475:7
476:2
clinic 458:16
clique 455:9
close 366:12 387:1
closed 373:7,9
382:25 396:25
435:7,10
clr 352:23
cmmclaughlin
353:19
cocaine 446:5
code 425:24
codes 426:1
cohen 356:9
362:23,23 371:22
372:10,15 373:2

374:20 375:10,12
375:14,20,25
391:5 397:13,19
398:10,15 401:8
404:7,23,25 405:7
405:16 415:16
422:22 432:1,8,17
432:22 461:21
464:8 471:15,19
472:7,10
collect 386:10
colorado 355:22
combat 419:1
come 368:22,23
385:9 400:13
414:6 417:22
437:21 438:4
443:25 456:21
461:2
comes 436:1
440:16 454:23
coming 389:18
416:16 433:17
435:17
command 400:21
commercial
457:20
commission
475:16 477:19
478:25 479:25
commissioned
474:8
common 368:18
394:6 413:12
451:5,24 452:1
communication
428:15
companies 354:11
457:21
company 355:2
373:18 431:3

complaint 366:20
381:20 399:12
458:19
complaints 392:5
completed 474:20
476:15
compound 446:25
452:8 453:2
computer 410:13
concept 465:11
concern 375:21
concerning 464:18
concerns 454:25
concluded 382:7
472:14
conclusion 423:24
427:4
condition 452:25
conduct 385:25
conducted 384:2
confer 422:25
confidential
352:24 381:5
398:5 404:5 405:8
422:12 430:13
431:24 432:5,10
432:14 463:9,12
472:1,5
connection 398:2
398:23 399:2
406:5 420:23
consider 370:15
370:17
considering
370:14
consistent 431:9
constant 450:24
consuming 410:24
cont'd 354:1 355:1
356:1 360:1 361:1

contact 393:1
contacted 431:3
contained 472:1
continue 430:24
470:16
continued 352:17
362:3 395:13
447:23 450:14
continuous 466:8
contributing
441:16
controlled 374:4
464:14,17
controls 465:12,17
466:17 467:7
468:12 469:10,13
conversations
392:17 393:5
convicted 423:8
435:11
conviction 444:6
convictions 456:8
466:12
cooperate 387:12
cooperating
385:13
cooperation
417:25 420:1,6
428:16
cooperative 416:7
428:9
copley 407:15
copy 430:6 460:6
corporation
354:16 355:10
362:20
correct 368:8
389:7 417:2
419:12 435:19
440:4,9 445:20
454:24 468:4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

[correct - delivery]

Page 7

474:16
**corrected** 365:23
**corrections** 365:21
476:12 478:17
**correctly** 367:17
388:20
**correlated** 446:13
**counsel** 362:14
365:4,5,10,25
396:24 461:15
473:1,10 475:2
**count** 461:22
**counterfeit** 377:16
377:19 380:1
385:18 386:23
417:18 437:16,20
438:3,9,11,19
439:1
**counties** 384:7
**country** 431:8
434:19 435:17
**county** 352:9,13
353:2 362:8 367:2
368:11,14,16,17
368:22 369:3,5,7,9
369:10,15 384:2
384:15,17,20
403:13 407:14
411:19 412:2
449:2 467:2,22
474:4 477:10
478:15
**couple** 369:18
386:12 387:15
397:22 411:7
413:14 416:19
456:5 462:4
471:20
**course** 392:13,21
406:10,13 423:20

**court** 352:1
357:16 368:18
402:12 454:7
461:17 466:12
477:7
**courthouse** 353:8
**courtney** 430:2
**cov.com** 354:20,20
**cover** 460:15
**covered** 381:18
**covington** 354:16
363:5,7
**cribbing** 418:3
**crime** 441:22,24
469:24
**criminal** 435:5
454:5 457:6
**crisis** 435:24 436:1
436:3 444:17,19
445:2,23 447:19
447:20 448:2
450:11,15
**critiquing** 425:3
**current** 403:12
**currently** 402:20
404:9 405:18
456:9,12
**custody** 357:16
**customers** 377:10
**cuyahoga** 352:9
369:4,9,10,15
411:19 412:2
418:22 474:4
**cvs** 353:20,20
362:22

**d**

**d** 354:13
**d.c.** 354:14,19
**d.o.** 407:11
**dallas** 356:5

**dan** 352:8
**daniel** 353:22
362:21
**data** 402:2 405:24
406:22 408:11,15
409:3 411:12
445:1 451:4
456:11 457:21
460:22 462:5
463:1,17
**date** 444:18
452:24 460:7
473:11 476:8
477:3,9,19 478:3
478:13,25 479:20
479:25
**dated** 429:22
**david** 356:9
362:23
**day** 353:17 423:14
475:7 477:16
478:22 479:22
**days** 476:18
**dea** 362:14,17
366:1,24 367:11
367:12,12,25
371:18 372:6,25
374:18 375:6
377:9 388:12
414:1,19 421:15
422:15 426:22,23
430:3,4,6,10,18,20
432:23 433:1
434:22 439:22
442:17 444:20
454:18,19 458:5
459:23 464:24
465:9,11,22 466:3
468:15 472:2
**dead** 417:22

**dealer** 377:11
**dealing** 403:10
**dealings** 428:12
**dear** 476:10
**death** 442:20
444:23 445:12
**deaths** 445:10,19
445:22 446:3,10
446:10,10,12
**deception** 379:14
452:14
**decide** 382:18
458:17
**decided** 392:3
**decision** 393:14
416:6
**deed** 477:14
478:20
**deemed** 352:24
476:19
**defendant** 363:18
363:22 375:3,7
**defendants** 364:2
375:15 463:25
**define** 393:17,22
424:9
**defining** 433:9
**definitely** 395:6
430:20 444:16
447:23
**definition** 374:8
376:20 377:3
405:21 424:18
467:8
**definitions** 445:2
**deliberative** 391:1
422:10 459:23
**delivered** 406:19
426:13,25
**delivery** 473:9,11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[denied - doing]**

Page 8

denied 460:19
denise 366:25
 389:7
denver 355:22
department 353:6
 369:23 391:2
 422:11 429:4
 476:22
depends 386:6
deposed 364:11
deposition 352:17
 362:3 363:12
 364:19 365:18
 423:12 429:12
 435:20 444:12
 472:14 474:19
 476:8,11 477:1,3
 478:1,3
deputies 369:8
describe 380:17
 381:10 399:11
 413:16
described 455:22
description 358:3
details 430:13
detective 364:15
 402:8 410:25
 413:4 420:17,19
 429:24 431:22
 435:22 453:21
 462:1 463:23
 464:13,15 466:6
detectives 369:12
 442:19
determine 375:24
 382:17 383:4
 412:25 432:13
 453:23
determined
 366:17 411:13
 431:19

determines 366:16
 369:16 388:25
 401:14
determining
 380:19 381:12
 385:14
detroit 353:14
di 373:19,21
 374:24 461:3,7
dictates 394:6
died 394:5 445:15
 446:8 470:14
difference 388:13
different 369:19
 378:23 383:22
 386:1,8 405:3
 418:20 421:19
 432:19 455:17
difficult 379:18
 383:4,10
direct 445:9
direction 389:16
directly 439:7,13
 439:18
dis 406:8,11,14
 408:20
disagree 398:11
disclose 372:5,24
 374:17 375:5
 380:22 390:25
 398:4 404:1
 414:15 422:9,12
 422:15 431:24
 434:21 439:21
 459:22 463:8
 465:21
disclosed 398:6,7
disclosing 381:5
 463:12
disclosure 460:6
 463:11 466:11

discuss 371:17
discussed 423:3
 450:17,21
discussing 395:9
dispense 440:11
 464:19
dispensed 427:17
 446:20
dispensing 374:5
 400:3 407:7 439:1
 439:18 460:23
dissemination
 380:24
distinguishing
 412:23
distribute 393:2
 440:6 464:19
distributing
 438:25 439:13
distribution
 406:20 465:3
distributor 372:2
 372:19 374:11
 375:2 463:25
 464:2 467:5 468:2
 469:8
distributors
 375:22 393:1
 396:9 399:2,9
 405:10 438:18
 439:12 440:5
 465:16 469:19
district 352:1,2
 362:10,16
diversion 373:21
 373:25 374:15
 383:22 385:20
 386:2 388:4,5
 399:13 400:1,6,9
 400:18,20 406:11
 407:24 408:11,16

417:16 418:6
 419:2 420:20,21
 421:7,8 427:11,15
 430:3 448:10
 449:24 465:13,18
 466:7,17 467:7
diverted 385:3,4
 395:25 436:9,14
 437:1,8
diverting 449:15
division 352:3
 362:14
divulging 396:21
dmoylan 353:24
doctor 367:7
 376:4,10,12,22,25
 379:14 383:9
 385:16 386:2,4
 387:23 388:11,14
 390:9,12 394:14
 395:1 407:9 409:5
 411:6,9 414:11
 417:17 418:16
 424:12 441:8
 443:13 448:13
 449:20 452:3,23
 453:7,13,16 454:1
 454:9 455:1,8,12
 455:17 459:8
doctor's 418:23
doctors 383:19
 386:8 415:20
 416:2 424:4,21
 471:11
document 352:8
 381:2 430:18,19
 430:22
doing 407:1
 426:13 428:21
 442:16,20 454:5
 461:12

www.veritext.com

888-391-3376

**doj** 365:12 366:1
**dollar** 373:16
**doubtful** 366:10
**dozen** 370:10,25
  375:15,22 379:7,7
  379:7 380:16
  417:13 446:7
**dr** 364:21,24,25
  391:13,18 392:8
  392:14,24 393:3,7
  406:19,23 407:9
  408:6 422:3,7
  423:8,17,20 425:7
  426:3,6,7,19 431:6
  431:8 432:23
  458:16 466:25
**draft** 430:6
**driven** 467:12
**drug** 353:6,12
  355:10 362:12,20
  377:11 420:18
  436:8,13,20,24
  439:7,13,19 442:1
  442:4 445:15
  447:9,12 455:2,18
  471:7
**drugs** 379:2,5,6,13
  395:15,16,21
  406:25 425:22
  446:6,9 448:17,17
  448:19 464:19,25
  471:8
**dto** 455:18,20
**duly** 364:10 474:7
  474:10
**dying** 446:15
  470:9

**e**

**e** 356:3 358:5
  426:19,20,20
  429:13,19,21,22

**429:25** 430:1
  451:8
**earlier** 378:1
  463:23
**east** 353:22
**eastern** 352:3
**easy** 387:10
**effect** 387:8
**effective** 456:14
  465:12,17 466:16
  466:16,25 467:6,7
**effectiveness**
  380:25 422:13
  463:10
**eight** 387:3 412:10
  416:25
**either** 366:25
  367:2 373:6
  376:18 386:3
  395:24 403:11,15
  407:22 453:5
  475:2
**elderly** 448:18
**elephants** 443:9
**elevated** 450:15
**ellis** 354:3 363:1
**else's** 367:21
  462:21
**email** 476:17
**employee** 398:19
**enclosed** 476:11
**ended** 373:11
  433:23 434:2
**endo** 354:10,10
  364:1
**enforcement**
  353:6,12 362:12
  374:3 398:18
  404:5 405:14
  414:25 415:4
  422:12 428:6,8,13

**428:13,17** 431:24
  432:10,14,16
  457:4 459:19
  463:9,14 469:18
  469:20,22 470:10
**enhanced** 446:5
**enter** 362:4 410:8
  411:4
**entered** 478:9
**entire** 392:7 433:2
  477:5 478:5
**entry** 430:8
**epidemic** 435:21
  436:2,3,5,21
  437:17 439:25
  441:17 444:13
  445:3,5,19,23
  446:16 450:15
  467:8,15 468:6
  470:19
**erin** 355:3 363:20
**errata** 476:13,18
  478:7,10,18 479:1
**especially** 388:11
**esq** 353:3,7,8,13
  353:17,22 354:3,7
  354:13,17,17
  355:3,7,11,16,21
  356:3 476:5
**establish** 454:5
**established** 420:13
  467:25
**et** 352:10,12,13,14
**event** 475:3
**eventually** 438:5
**evidence** 379:24
  382:22
**evolved** 450:20,23
**ex** 404:24 460:16
**exact** 378:20
  442:22 444:14

**exactly** 405:4
**examination** 357:7
  364:9,13 461:24
  463:20 464:11
  466:21
**example** 368:2
  371:1 389:12
  417:19
**excel** 411:5
**excellent** 449:2,3
**exception** 449:5
**executed** 387:4
  478:10
**execution** 477:14
  478:19
**exhibit** 357:16
  358:5 429:13,19
**exhibits** 357:4
  358:1
**expedition** 409:24
  458:15
**experience** 449:10
**expert** 390:22
  391:8 394:3
  465:25
**experts** 391:10
**expiration** 477:19
  478:25 479:25
**expired** 406:8
**expires** 475:16
**explain** 463:6
  467:4
**extent** 381:4 391:2
  392:16 393:13
  396:20 398:6
  401:2 414:17
  415:11 422:16
  424:14 434:23
  451:25 459:17
  463:11 466:1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**eyes** 352:24 405:9
472:2,6

**f**

**facility** 373:15
**fact** 465:25
**factor** 412:23
**factors** 380:18
381:11,19 427:19
**facts** 397:4 415:8
431:9 464:5
**fair** 399:17 444:25
463:17
**fairly** 387:10
**fake** 387:2 426:2
434:1,4 440:17,20
454:17,19
**fall** 382:1 421:23
**falls** 368:15
418:22
**familiar** 464:13
**family** 381:23
397:22
**far** 404:3,8 405:3
462:25
**fbi** 420:22 421:9
421:11,17,21,25
422:3,6 423:5,7,10
**feat** 411:25
**february** 419:23
**federal** 364:9
398:19 435:8
469:11,14
**federally** 369:14
369:17
**feel** 393:8
**felt** 393:14 460:12
**fentanyl** 370:14,16
433:9,12,16,17,18
433:23 434:3,5,8
434:10,11 435:15
435:16 436:4

**440:23 442:8,13
442:15,23 444:22
446:14,15,21
450:17,23 453:11
figure** 381:13
390:13 404:16
445:4
**file** 391:12,16
**files** 373:15 425:3
**fill** 392:23 393:6
393:10,15 394:9
443:17
**filled** 385:11 441:9
441:11 452:5
453:1 455:14
**filling** 401:24
403:20 404:15
**find** 385:24 410:14
453:16 476:11
**fine** 422:22 471:20
472:10
**finished** 386:14
**first** 364:10
365:17 382:1
406:7 442:15
451:6 474:10
**fishing** 409:24
458:15
**five** 386:8 421:20
446:9
**flag** 400:6 442:11
**flat** 455:13
**floor** 354:8 355:4
461:15
**florida** 385:11
**focus** 377:24
**focused** 384:14
**focusing** 425:1
**folks** 420:14 455:4
463:17

**follow** 379:21,22
394:10 401:15
461:16 462:4
464:1
**followed** 367:16
403:19
**following** 399:14
401:6 403:5 425:6
454:8 471:17
**follows** 364:12
**force** 369:7,13
407:21 415:7,12
421:12,13 423:6,8
428:24
**foregoing** 474:15
474:20 477:13
478:18
**forged** 378:9
**forgery** 378:5
**form** 376:5 382:20
389:24 390:23
392:15 394:17
396:5,19 401:2,10
408:24 415:7
416:4,12 419:16
424:13 425:11
427:2,24 436:22
437:18 438:13
439:8 440:7,12
441:18 445:24
447:22 449:7
453:3 455:6
456:15 457:15
458:6,25 459:16
465:1,19 466:18
467:19 469:16
470:21
**format** 367:12
**forming** 414:16
465:25

**forms** 448:10
**forward** 476:15
**forwarded** 459:9
**foster** 367:1 389:6
389:7
**four** 385:1 387:24
392:6 421:6,13,20
431:7
**frame** 444:14
448:8
**fraud** 423:7,9
**free** 477:14 478:20
**frequently** 457:14
**friend** 452:6
**front** 444:21
**fully** 398:12
**further** 463:20
464:9 466:21
474:18 475:1

**g**

**gateway** 457:4
**gathering** 380:24
401:13 408:21
**general** 380:18
385:24 399:12,14
409:20,23 410:5
427:9 466:10
**generally** 380:17
381:5,11 408:18
409:12 430:15
464:22
**geographic** 463:2
**getting** 378:9
386:8 392:4
394:13 400:5
408:7 426:12
436:25 437:8,10
440:24,25 441:8
450:23 454:12
455:3,4 463:16

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

[gibson - identify]                                    Page 11

gibson  355:3
    363:20,21
girlfriend  403:15
give  381:17 389:15
    401:12 409:17
    417:19 444:24
    459:13 473:1,10
given  406:6 461:7
    474:12,17
gives  389:11
giving  426:16
go  381:19 385:15
    386:9 398:17
    400:20 404:8
    406:14 407:8
    411:2 414:7
    423:15,17 440:16
    443:13 458:15
    461:21 471:23
goes  417:11
going  367:19
    371:16 375:16
    385:23 387:19
    389:14 393:12
    395:7 401:1,4
    405:7 406:21
    410:2 417:3,4
    420:2 429:6
    431:10,22 432:17
    441:7,8 442:2,10
    442:18 446:2
    455:4 460:5
    461:14 469:23
goldstein  355:7
    357:9 363:2,2
    461:25 462:2
good  364:15,16
    378:10 413:20
    420:5 428:14,16
    449:11,17,18,20
    462:1

gosh  379:12 424:7
    448:23 452:20
gotten  451:17
government
    470:24
grand  369:3
gray  355:7 363:3
grew  467:8
group  389:2,10
    449:4 455:10,11
groups  454:21
gs  367:1 389:10,11
    389:13
guess  369:18
    370:13 402:22
    412:10 414:3,23
    454:12
guessing  378:21
    402:3 418:3
    442:21
guideline  425:25
guilty  435:7
guy  460:4
guys  378:10
    444:21
gyn  392:3 425:16

h

h  426:19
half  367:22,23
    370:10,24,25
    379:7 413:15
    446:7
hand  429:18 475:6
handed  387:14
handled  399:25
    442:19
hanging  431:4,7
hans  367:1 389:4
happened  413:14
    418:15 445:4

happening  469:24
harder  410:21
harper  364:21
    391:13,18 392:8
    392:14,24 393:3,7
    395:10 396:17
    397:17,22 398:2
    398:23 399:2
    422:3,7 423:5,8,17
    423:20 425:7
    431:1,8,10 432:23
    466:25
harper's  426:3
    431:6
harris  355:21
    364:3,3
harvest  455:2
hbc  355:2 363:22
head  380:7 384:4
    402:23
health  354:11
healthcare  379:17
hear  375:13
heights  369:8,12
heim  364:24,25
    365:1 406:17,19
    406:23 407:9,18
    408:1,6 426:6,19
heim's  426:7
help  390:22
    406:15 416:11,17
    418:13 419:11,15
    456:21
helped  418:18,18
    418:20
helpful  410:16
    450:6
helping  425:9
henry  356:2
    363:24

hereinafter  364:11
hereunto  475:5
heroin  439:24
    440:3,6,11 442:20
    444:8,8,10,22
    446:22 447:5,6,8
    451:5,11 452:1
    453:11,24
hey  429:6 460:3
    460:16
high  395:3
higher  468:21
    469:5
highest  425:24
highly  352:24
    405:8 472:1,5
history  451:25
    457:6
holy  394:4,10,12
    394:22
home  379:17
homes  448:18
honor  405:15
    472:9
hospitals  367:9
hours  365:15
    461:20
howard  353:14
hundred  366:9
    452:20
hydrocodone
    406:19 426:12

i

idea  366:6 385:6
    452:12
identification
    429:16
identify  363:16
    375:17 460:24
    463:1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

identifying   375:7
ii   353:7 381:16
    410:10
iii   352:16 410:10
illegal   425:2
illegitimate   425:5
illicit   370:14,15
    433:18,24,24
    434:3,8,17 436:4
    442:8,12,15,23
    446:6,13 448:7
    467:14
immediately
    365:24
impaired   381:1
    422:14 463:11
impede   375:17
impossible   411:25
impression   440:20
improper   380:10
    383:1 385:19
    387:17 388:22
    390:21
improperly
    390:14
improvement
    419:25
ims   457:22,24
    458:2
include   468:15
included   476:13
including   380:15
incorporated
    478:12
increase   445:9
    448:1
increased   411:8
    411:11
index   357:1,4,5
    358:1 359:1 360:1
    361:1

indiana   353:20
indicate   415:5
indicating   476:13
indicted   369:3
    403:13
individual   377:8
    387:1 396:4
    410:10 417:25
    418:2 458:12
individuals   376:16
    380:5,6 428:14
    457:18 470:25
    471:6
indulgence   461:15
information   372:6
    372:25 380:23
    396:8 398:5
    400:13 401:13
    409:8 410:9
    414:16,18,18
    415:8,11,13 416:6
    418:17 419:19
    421:14 423:3
    435:1 450:5
    456:11,22 458:2,3
    458:5,8 459:8,11
    459:14 460:12,13
    461:2,11 462:10
    462:14,15 465:22
    465:25 466:2,2
    471:25
initiative   416:23
input   400:24
inside   447:15
install   417:23
installments
    365:17
instruct   375:9
    397:7 403:25
    464:6

instructed   401:9
    432:3
instructing   465:6
instruction   398:13
    402:15 415:15
    473:2,10
instructions
    414:14 419:5
    459:25
intelligence
    380:24 408:21
    410:8
intending   438:25
intentionally
    449:15
intercepted   387:3
interest   432:20
interested   475:3
internal   391:1
    422:10 431:19
    451:8 459:23
interrupted   433:6
interruption   433:5
interview   434:25
interviewed
    452:10
interviews   452:18
invalid   424:6,9
investigate   374:4
    385:12 399:15
    415:23 416:3
    441:24 453:22
    460:25 461:8
    469:24 470:11
investigated
    373:19 397:4
    415:25 423:21
    424:4 433:2
    467:21,23 468:1
investigating
    370:8 375:8 392:8

392:14 403:2
    404:3 414:10
    415:20 424:20
    442:23 451:22
investigation
    366:19 371:2,12
    372:2,18 373:9
    375:18 382:6,25
    384:14 386:1,5,12
    386:16 388:23
    389:19,20 390:16
    391:19,23 392:13
    392:22 401:14
    402:7 403:18,23
    403:24 404:1,10
    405:14,20 406:16
    406:17,22 408:2
    412:4,12,16,18
    415:24 417:21,24
    423:6 425:1 427:7
    427:11,15,20
    428:21 431:19
    434:2 442:16
    443:24 444:4
    456:10 461:13
    463:24 464:6
    468:3 470:7
investigations
    366:4 367:15
    370:1,7,12,21
    371:18 372:7
    373:1,6 374:9,18
    374:19 375:6
    376:4,21,25
    377:12,16,21
    378:6,18,24
    379:10 380:9,14
    382:4 383:12,14
    383:25 384:19,22
    385:17,17,21
    386:18,20,24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

390:10 400:16,23
401:3,10,17,21
402:1,9,16,23
403:2 404:6,13,20
405:11,18 406:5
406:10,13 412:6
412:19 413:4
417:1,7 420:23
428:3 433:12,22
433:25,25 434:22
439:22 442:13,20
442:24 443:19
444:20,23 447:25
448:6,7 455:10,21
456:14 465:23
470:17
**investigative**
380:23 382:2
396:22 422:13
424:15 431:25
459:18 463:9
**investigator**
373:21 374:1,15
400:9,18,20
407:17,25 408:16
**investigators**
400:1 406:11
408:12
**involve** 417:13
**involved** 370:8,22
377:13,16 383:13
390:10 400:23
421:9 422:3,6
438:11,18 470:23
**involving** 371:2,2
374:10 403:9
413:5 433:12
**irs** 428:4
**issue** 404:24
419:14 446:21

**item** 454:8
**ivs** 410:10

**j**

**j** 353:13 355:21
**jackson** 355:11
362:19
**jacksonkelly.com**
355:14
**james** 353:3,7
362:5,7,9 365:11
476:5
**james.bennett4**
353:11
**janish** 430:2,5
**janssen** 354:2
363:1 364:7
**jledlie** 353:5
**job** 374:7 400:15
410:21 462:22
**joe** 459:7
**john** 353:13
355:16 362:13
363:17
**john.j.cipriani**
353:15
**john.lavelle**
355:18
**johnson** 354:2,2
364:6,6
**join** 396:24 397:9
**joined** 388:9
447:20,25
**jones** 353:17
**jonesday.com**
353:19
**josh** 355:7 356:10
363:11 462:2
**joshua** 363:2
**joshua.goldstein**
355:9

**jr** 355:16
**judge** 352:8
**jurisdictions**
462:7 466:15
**jury** 369:3
**justice** 353:6
391:2 422:11

**k**

**k** 355:11
**keep** 455:15
460:13
**keeping** 407:3,6
**kelly** 355:11
362:19
**kind** 376:21 388:5
403:18 407:9
409:2 431:18
454:22 455:21
468:10
**knew** 442:17
448:23
**know** 368:1,4,5
370:18 371:8,23
374:7,23 375:1,2
378:20 379:7,11
380:6 381:21
384:4,25 385:9,12
386:11 389:11,15
391:25 397:24
398:10 399:21
400:22,24 401:12
403:11 408:1,5,6
408:10,14,18
410:13 411:23
413:3,8 414:3,25
415:22 416:2
417:11,17 419:13
420:6 424:7
426:15 428:12
429:8 430:19
432:4 434:18

436:7,13 437:13
437:14 438:7
440:22 441:1
442:12 443:22
444:2 446:1
448:24 450:8,9
451:24 452:9
453:6,10,12 456:5
456:19,20,20
457:21 458:1,3,4
460:3 461:5,6,18
462:21,24 468:20
468:21 469:6
470:12
**knowing** 453:9
**knowingly** 438:20
**knowledge** 448:8
462:16,20
**known** 434:24
**krncevic** 354:3
362:25,25

**l**

**l** 352:23 474:6
475:13
**l.p.** 352:10,12,14
**label** 429:20
**lack** 385:17
433:17
**lakeside** 353:18
**lane** 400:14
**larger** 388:13
**lavelle** 355:16
363:17,17
**law** 363:10 374:2
398:17 404:5
405:14 414:25
415:4 422:12
426:24 428:6,8,12
428:13,16 431:24
432:10,14,16
457:4 459:19

463:9,14 469:17
469:20,22 470:10
**lawful** 364:8
**lawsuit** 375:3
**layman** 407:1
**lead** 366:14,17,22
366:24 367:3,21
374:12,23 382:3
384:11,13,16
391:21 407:17,20
407:23,25 409:4,6
409:6 410:2
**leads** 457:3
**led** 367:24 448:2
**ledlie** 353:3
357:11 362:6,7
365:11,14,25
371:15 376:5
377:22 381:15
382:20 383:6
388:7 389:24
390:23 391:14
392:15 394:17
396:5,19 397:3
401:1 408:24
415:3 416:12
419:16 424:11,13
425:11 427:2,24
432:15 436:22
437:18,23 438:13
438:21 439:8
440:7,12 441:18
445:24 446:25
447:22 449:7,13
452:8 453:2 455:6
456:15 457:15
458:25 459:16
464:12 466:20
467:19 468:8
469:3,16 470:4,21
471:2,13 476:5

**left** 385:20
**legal** 393:15 427:4
476:1 479:1
**legislature** 470:22
**legitimate** 393:8,9
393:17,22,23
394:23 395:4,13
425:4,8 426:5,7,18
440:21 441:5
443:10,11 448:21
452:17 453:9,13
**length** 385:25
386:3 388:2
**lengthy** 365:20
386:25
**leonard** 352:17
357:7 362:3 364:8
364:13,15 402:8
413:4 429:12,19
429:24 431:22
435:22 453:22
461:24 462:1
463:20,23 464:11
464:13 466:6,21
474:9 476:8 477:4
477:9 478:4,13
479:20
**letter** 415:6
476:19
**letting** 422:24
**level** 380:18
409:20,23 410:5
419:21 420:1
457:21 466:10
469:12,14
**levels** 468:12
469:11,11,14
**lewis** 355:16
363:18
**liable** 393:13

**license** 377:8
387:14
**licensed** 371:12
372:2,19 433:19
434:11 438:10,17
438:24 439:5,12
439:17,17 440:2,5
440:10 441:15
453:25
**life** 446:2
**limit** 375:23
471:16
**limitation** 415:1
**limitations** 456:24
**line** 444:21 455:13
476:13 478:7
479:3
**list** 409:17 460:7,8
460:9
**listed** 478:7,17
**listen** 429:6
**listing** 478:7
**litigation** 352:6
362:2 476:6 477:3
478:3
**little** 428:18
454:16 455:9
**llc** 353:20,21 355:6
363:3
**llp** 353:21 354:16
355:3,7
**local** 428:6,8,12,13
428:16
**locally** 369:14,17
**located** 431:6
**locke** 356:3 363:24
**lockelord** 356:6
**lodging** 401:10
**log** 409:7 459:5
460:14

**logs** 374:6
**long** 365:13 378:8
391:23 408:1
442:10 447:7
461:18
**look** 380:18
381:11 409:21,21
440:18 445:1,3
457:9,13 460:22
463:17,18
**looked** 402:14
427:20 450:2
457:20
**looking** 403:4
460:4
**looks** 430:25
**lord** 363:24
**lorde** 356:3
**los** 354:8
**lose** 387:13
**lost** 453:19
**lot** 381:19 387:19
388:16,16 400:2
402:23
**lower** 468:16,22
469:2

**m**

**m** 353:17 426:19
426:20,20
**m.d.** 407:10
**madam** 476:10
**maddie.brunner**
356:6
**madeleine** 356:3
363:23
**mail** 358:5 429:13
429:19,21,22,25
430:1 451:8
**mailing** 407:14
**main** 354:4 355:12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

[maintain - mischaracterizes]                                    Page 15

**maintain** 383:21 465:12
**maintained** 465:17
**majority** 379:23 449:11,17,19
**making** 438:11 440:17
**mallinckrodt** 355:6 363:3
**manage** 444:17
**management** 392:4 425:17 426:4 431:3
**managers** 431:5
**manpower** 469:23
**mansfield** 384:5
**manufacture** 440:3
**manufactured** 433:19,23 440:21
**manufacturer** 371:13 383:18 433:19 434:11 438:10 467:5,24
**manufacturers** 396:14 399:4,9 439:6 440:2 462:3 465:16
**marcus** 355:3,5 363:21
**marked** 358:3 405:8 429:15,18 472:1
**market** 355:17 467:1 468:13
**marketing** 383:13 383:16,18
**maryland** 353:23 355:15 363:19

**mass** 445:8
**massachusetts** 354:13 355:8
**massillon** 407:13
**master** 356:9 362:23,24 363:10 371:22 372:10,15 373:2 374:20 375:10,12,14,20 375:25 381:1 391:5 397:12,13 397:19 398:10,15 401:8 404:7,11,23 404:25 405:6,16 415:16 422:22 432:1,8,17,22 461:21 464:8 471:15,19 472:7 472:10
**materials** 383:13 383:16
**matt** 354:7 364:5
**matter** 374:10 425:22 448:19
**matters** 371:23 389:9 392:16 424:16
**mckesson** 354:16 363:5,7
**mclaughlin** 353:17
**md** 352:7
**mdl** 352:6
**mean** 367:5 369:9 376:9 377:7 381:20 386:7 399:15 401:22 431:13,17 445:12 447:6 448:19 450:15,24 456:19 459:13 466:23

**means** 404:13 431:15
**medicaid** 423:7,9 455:15
**medical** 377:8,10 380:10 390:22 391:7,9 393:9,17 393:18,22,23 394:2,23,25 395:1 396:10 412:7,13 412:21 413:7,9,17 414:9 415:10,19 416:9 417:12 420:1,2 423:24 424:19,22,23 425:8,10 449:2,11 449:12,18 451:9 470:2,3
**medicare** 423:7,9 455:15
**medicating** 379:4 387:8
**medication** 376:17 376:17 377:9 378:15,19 385:19 387:7 395:13 400:2 403:12,14 408:7 411:1 425:9 426:14 440:25 441:14 443:11 446:5 453:10 455:16 467:9,11 467:13 470:14
**medications** 378:3 393:2 396:12,15 410:12 424:21 438:18 439:6,13 439:18 440:22 449:16 453:14 465:3,17 471:1,12

**medicine** 383:19
**meet** 364:17 365:10 369:21 464:10
**meeting** 365:13
**meetings** 365:4
**member** 373:23 381:23 421:11
**members** 397:22
**memorandum** 391:17
**mentioned** 387:7 456:24
**merit** 409:25
**met** 365:5,11,11 462:2
**methadone** 394:13
**mexico** 435:15
**michigan** 353:14
**midwest** 476:17 479:1
**mill** 377:4,6 385:17 386:15,17 386:19
**milligram** 440:18 440:18
**million** 373:16
**mills** 377:13
**mind** 403:1
**mine** 383:20 406:8 448:8
**minimum** 369:21
**minus** 370:3,4 376:24 378:17 379:9
**minute** 422:21
**minutes** 365:12 404:19
**mischaracterizes** 434:14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

[misconduct - objection]                                     Page 16

misconduct
  414:11 415:20
misstates 391:14
  416:13 437:23
  445:25 467:20
  468:8
monitor 374:4
month 394:14
  395:18 411:6
  444:24
months 387:3
morgan 355:16
  363:18
morganlewis.com
  355:18
morning 364:15
  364:16 365:12
  423:12 462:1
motley 353:2
motleyrice.com
  353:5
move 432:15,21
  445:22 454:7
moylan 353:22
  362:21,21
mt 353:4
mudge 354:13
  363:25,25
multiple 376:17
  388:22 406:25
  446:6 455:5
mwallace 354:9
myers 354:6 364:6
mystery 430:24

        n

name 373:18
  393:11 418:23
  452:22 457:5
  476:6 477:3,4,15
  478:3,4,21

named 474:9
names 431:15
narrow 375:8
national 352:6
  362:2 464:2 476:6
  477:3 478:3
necessarily 427:23
necessary 393:15
  460:12
need 365:21
  372:12 391:7
  394:2 395:13
  409:5,7 411:24
  412:25 414:5,24
  416:10,16 419:10
  419:15 443:11
  445:1,3
needed 365:23
  409:1 417:22
needs 425:8,10
negative 395:16
  395:21
neither 396:14
network 454:17
never 371:7 397:5
  397:6 406:9
  467:23 468:1
new 406:9
nice 364:17 464:10
  471:21
non 374:2 396:21
  414:16 415:8
  422:16 448:4
  465:23,24
norm 395:7,7
normally 379:4,6
  386:13 387:10
  403:15 412:14
  429:3 453:5 455:8
north 353:18
  384:6

northeast 436:9
  436:10,15 437:2,2
  437:10,21,22
  438:5 442:6
northern 352:2
  362:10,16 384:8
notarized 476:14
notary 474:6
  475:13 476:25
  477:10,18 478:15
  478:23 479:23
note 476:12
number 358:3,5
  384:9 385:7
  401:12 411:14
  429:14 431:7
  445:19,22 446:1,9
  446:12 454:19
  467:2,10,12 476:7
  476:13
numbers 378:20
  379:12 395:3
  400:4 454:18
  462:14,23 478:7
nurse 367:8
nurses 387:8,10
  448:18 449:3
nursing 379:1,3
  387:11,13 448:18
nw 354:13,18

        o

o'melveny 354:6
  364:6
oarrs 409:9,9,13
  409:14,15,16,16
  410:1,3,16,22
  411:1,8 412:4
  453:5,6,17 456:25
  457:2,5,9,14
  458:11,17,23
  459:2,10,12 460:2

460:7,14,18
ob 392:3 425:16
object 376:5
  382:20 389:24
  390:23 392:15,18
  394:17 396:19
  401:1,2,4 408:24
  415:3 416:12
  419:16 424:13
  427:24 431:23
  436:22 437:18
  438:13 439:8
  440:7,12 441:18
  445:24 447:22
  449:7 455:6
  456:15 457:15
  458:6,25 459:16
  459:21,24 465:1
  466:18 467:19
  469:16 470:21
objection 359:3,3
  359:4,4,5,5,6,6,7,7
  359:8,8,9,9,10,10
  359:11,11,12,12
  359:13,13,14,14
  359:15,15,16,16
  359:17,17,18,18
  359:19,19,20,20
  359:21,21,22,22
  359:23,23,24,24
  359:25 360:3,3,4,4
  360:5,5,6,6,7,7,8,8
  360:9,9,10,10,11
  360:11,12,12,13
  360:13,14,14,15
  360:15,16,16,17
  360:17,18,18,19
  360:19,20,20,21
  360:21,22,22,23
  360:23,24,24,25
  361:3,3,4,4,5,5,6,6

361:7,7,8,8,9,9,10
361:10,11,11,12
361:12,13,13,14
361:14,15,15,16
361:16,17,17,18
361:18 371:15,17
371:23 372:3,4,23
374:16 375:4
376:7 377:22
380:21 381:15
383:6,7 384:3
390:1,17,24
391:14 393:19,24
394:24 396:5,20
396:23 397:7,10
398:3 401:19
403:21 404:22
407:4 410:18,23
413:13,18,23
414:13,24 415:1
419:3 420:4,9,24
421:4,10 422:8
423:23,24 424:11
424:17 425:11,12
425:13,19 426:8,9
427:2,3,18,25
428:10,25 429:1
430:11 432:2
433:13,20 434:9
434:13,14,20
435:12 436:16
437:4,11,23 438:1
438:6,15,21,22
439:2,10,15,20
441:20 443:1,21
446:23,24,25
449:13 450:7
451:18 452:8
453:2,3 455:23
456:3,16 457:16
461:1 462:17,18

463:4,7 464:4
465:5,7,19,20
468:8,18 469:3,15
470:4 471:2,13
472:8
**objections** 357:5
359:1 360:1 361:1
372:20
**obligations** 464:24
**observing** 363:11
**obtain** 379:14
**obtained** 452:13
458:2
**obviously** 381:21
395:4 469:7
**occasions** 421:25
**occurrence** 413:12
**october** 475:16
**odd** 409:22
**office** 353:7
362:10,16 363:9
374:22,25 386:21
400:10 406:20
407:12 410:8
411:4 418:23
426:13 427:1
431:3,4,5,6 442:19
444:22 475:6
**officer** 407:22
415:8,12 460:10
**officers** 369:7,8,13
**offices** 394:5
**official** 477:15
478:21
**oh** 391:25
**ohio** 352:2,11,13
352:22 353:10,18
354:4 355:13
362:11,16 384:6
384:23 412:7,12
412:20 413:6,9,17

414:9 415:18
416:9 417:4,8
420:1 436:10,10
436:15 437:2,3,10
437:21,22 438:5
442:6 469:9 474:2
474:7 475:7,14
476:2
**ohleg** 457:5
**okay** 369:11 399:8
399:17 435:14
451:3 465:7
471:18
**omm.com** 354:9
**once** 365:7 382:3
386:9 425:16
426:3 454:5 459:7
472:3
**ones** 366:21
370:13 384:10
421:19
**ongoing** 375:18
464:6
**op** 352:10,12,14
**open** 367:11
379:20,22 380:16
387:1 401:3,15
404:10 460:4,5
**opened** 421:15
427:6,21
**opening** 382:4
**operates** 462:8
463:3
**operations** 464:3
**opiate** 352:6 362:2
476:6 477:3 478:3
**opinion** 414:17
415:14 416:4
449:17 466:1,11
468:5

**opinions** 414:16
414:20 415:7
465:25
**opioid** 370:17
371:13 435:18,21
435:24 436:5,21
437:17 439:25
441:16 443:8
444:13,20 446:4
446:19 447:19,19
448:1,3 450:11
451:7,11,13,16,17
452:1,2,11,13,16
452:17 454:1
465:17 467:9,22
470:19
**opioids** 370:9,12
370:23 383:14
385:3,3 392:9
411:14 414:12
415:21 419:2
427:16 433:8
436:9,15 437:1,9
438:10 442:5
448:4,9,11 454:11
462:12 466:14
467:2,14 468:17
468:24 469:8
**opponent** 471:18
**opposed** 412:13
441:7 458:12
**order** 352:25
399:19,21,24
400:7,25 401:18
458:10
**organization**
455:18
**organizations**
436:8,14,20,25
439:7,14,19 442:1
442:5 447:10,13

455:2
**original** 429:22
**originally** 448:5
450:21
**outset** 433:4
**outside** 368:24
384:2,14,17,19,23
385:5 413:24
414:19 428:21
434:19 435:17
437:1,9,21 438:4
444:1 447:15
466:3
**overall** 467:3
**overbilling** 425:23
**overdose** 445:9
446:3
**overdoses** 394:6
445:9,16
**overdosing** 470:9
**overfilling** 405:22
**overprescribe**
448:16
**overprescribed**
381:24
**overprescribers**
448:15
**overprescribing**
380:20 381:14
382:7,8,19 383:5
388:15 389:21
393:11 401:24
404:14 405:21
412:15
**overwhelmed**
470:1
**oxford** 355:4
**oxycodone** 386:9
387:2 394:13
434:1,2,4 440:19
440:24 450:22

**p**

**p** 353:22 355:16
**pad** 378:8,13
**pads** 378:5,5
**page** 430:17,19,21
476:13,15 478:7
479:3
**pages** 381:17
**pain** 376:17 392:3
425:17 426:3
**paper** 378:2,11
**par** 354:11,11
364:1
**part** 384:8 395:19
397:5 399:7
400:14,14 401:13
415:3 421:13
423:5,7 424:25
431:18 432:13
435:18 436:5,20
437:16 439:24
446:3,14,15,17
451:21 453:15,18
454:4 455:17
460:6 467:14
468:13 478:9
**parte** 404:24
**partially** 403:1
**participating**
363:15
**particular** 366:18
401:23 404:14
412:11 417:15
454:8 467:5
**parties** 363:10
405:12
**party** 475:2
**passed** 436:2
**password** 406:1,4
406:6,9 459:5

**patient** 379:16
386:10 396:4
409:15 411:3
425:3 431:14
443:13,17 452:4
457:10 458:12
**patients** 376:9
392:10 394:5
396:11 409:17
410:6 424:22
425:7 426:3,15,16
431:4,7,20
**patrick** 352:17
357:7 362:3 364:8
364:13 461:24
463:20 464:11
466:21 474:9
476:8 477:4,9
478:4,13 479:20
**pattern** 387:22,23
**patterns** 409:21
**pay** 455:13
**payne** 356:10
363:11
**pellegrino** 352:23
474:6 475:13
**pending** 435:6
444:7 468:3
**penitentiary** 435:8
**pennsylvania**
355:4,17
**people** 371:9
386:7 395:12
412:5 420:12
428:23 440:19
445:15 446:7,14
448:14 450:21
452:10,21 453:11
455:11 460:14,24
462:15 467:10,12
470:8,13

**perceived** 389:21
399:13
**percent** 379:15
426:1 451:10
**percentage** 367:15
385:2 410:11
448:20,22,25
452:12
**percentages** 453:8
**period** 421:17
**person** 382:7
397:2 441:11
451:15 459:3
**personal** 391:3
414:1 457:18
465:10 466:11
467:10
**personally** 427:13
462:9,13 477:11
478:15
**pharma** 352:10,12
352:14
**pharmaceutical**
354:11 467:24
468:2
**pharmaceuticals**
354:2,10,11
396:10
**pharmacies**
392:23 393:3
404:2 405:11
438:25 439:17,18
440:10 455:5
**pharmacist** 367:8
369:1 393:16
396:2,7,18 397:18
398:2 400:1
403:10 411:4
417:20 441:16
460:11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**pharmacists**
392:12,17 393:6
394:7 397:23
398:22 402:25
403:9
**pharmacy** 367:8
379:5 385:11
401:21,23 402:9
402:16,24 403:1,3
403:19,19,23
404:3,13,14
405:20,21 406:21
411:2 417:5,8,14
417:17,23 418:1
418:11,22 419:1
420:8 441:9,11
443:17 452:4
455:13 470:15
**philadelphia**
355:17
**phone** 363:15,15
476:3
**physician** 380:19
381:12,13 383:4
393:11 409:16,16
410:4 412:1,14,17
426:4 427:8
458:11 460:8,11
**physician's** 409:17
410:1 454:19
**physicians** 376:18
380:9 412:3,20
413:5 448:15
449:3 453:14
**pick** 458:16
**picture** 450:18
**pill** 377:4,6,13
380:1 385:17
386:15,17,19,23
**pills** 377:16,19
385:9,18 407:7

417:18 437:16,20
438:3,9,11,19
439:1 440:20
454:21,22,22,23
455:3 468:13
**pittsburgh** 355:4
**place** 367:2 474:19
**platter** 387:15
**pleas** 368:18
**pleasant** 353:4
**please** 363:15
381:8,10 397:12
399:11 476:11,11
**pled** 435:7
**plenty** 448:13
**plus** 370:3,4
376:24 378:17
379:9
**point** 353:18 378:9
389:16 398:16
406:2 408:9 410:7
444:19 451:9
469:18
**police** 392:16
396:21 424:15
458:22 459:18
**polster** 352:8
**population** 452:12
469:7,8
**porter** 354:12
364:1
**portion** 364:19
**portions** 405:7
472:4
**positive** 395:14
416:1
**possession** 406:25
**possible** 400:12
429:5 461:4
**possibly** 430:25

**potential** 376:25
382:6 389:21
414:11 460:24
**powers** 374:3
**practice** 399:12,14
458:21
**practitioners**
380:10
**pratt** 353:22
**predominance**
378:23
**prepare** 364:18
**prescribe** 471:11
**prescribed** 395:17
395:22 396:11
409:18 411:14
425:9 446:19
467:3
**prescriber** 457:21
**prescribing** 377:9
378:5,5,8 380:11
383:1 385:19
387:17 388:23
390:14,21 392:9
410:11 424:21
458:18
**prescription** 352:6
362:2 370:22
371:12 378:14,19
383:14 385:2,3,19
387:6 393:9,15,17
393:23 411:1
414:12 415:21
419:2 424:10,24
425:21 427:16
433:16 434:2
436:9,15 437:1,9
438:10 441:8,14
441:15 442:5
443:8,10,14 446:4
446:19 447:24

448:4,4,6,9,11
451:7,11,13,16,17
451:25 452:2,3,11
452:13,16,17,23
453:10,25 454:1
454:11 455:14
462:12 467:9,11
467:13,21 468:16
476:6 477:3 478:3
**prescriptions**
377:21 378:3,10
392:24 393:4
394:8 395:18
401:24 403:20
404:15 423:19,22
424:5 425:2 426:7
426:17 427:12
440:17 441:12
454:18,20 455:12
460:23
**presence** 474:14
**present** 356:8
**presently** 435:21
435:25
**president** 448:24
**pretty** 384:5
387:14 389:17
428:16 455:9
**prevalence** 446:13
449:24
**prevalent** 448:11
453:23
**prevent** 465:18
466:17 467:7
**preventing** 466:16
467:6
**prevents** 458:5
**previous** 367:1
**previously** 405:20
451:6 453:24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | | |
|---|---|---|---|
| **primary** 371:8 | **product** 441:2,3,4 | **put** 386:10 410:13 | **quotas** 468:16,20 |
| **print** 378:12 411:3 | **production** 476:15 | 444:18 457:4 | **quote** 426:4 |
| **prior** 401:7 403:8 | 476:17,22 | **q** | **r** |
| 404:12 410:25 | **profession** 448:20 | **qualified** 474:8 | **r** 353:7 |
| 411:1 420:15 | **professionals** | **queries** 457:2 | **rac** 389:15 |
| 435:20 442:3,9,13 | 449:11,12,18,18 | 458:11 | **raiola** 354:17 |
| 444:8,10 445:14 | **profile** 411:3 | **query** 456:25 | 363:4,4 |
| 446:2 447:20 | 457:10 | 458:24 459:2 | **ran** 460:7,8,16 |
| 453:5 469:12 | **profiles** 386:10 | **question** 368:19 | **range** 386:3 |
| **priorities** 389:12 | 409:15 | 370:20 371:21,25 | **rapport** 428:14 |
| **priority** 388:25 | **proof** 382:10,18 | 372:9,16,17 | **rarely** 379:17 |
| **privacy** 457:19 | **proper** 407:6 | 374:21 375:9 | **raymond** 354:3 |
| **privilege** 398:18 | **prosecution** | 376:6 381:3 | 362:25 |
| 414:25 415:4 | 430:16 | 382:21 384:12 | **raymond.krncevic** |
| 432:16 459:19 | **protective** 352:25 | 389:25 390:6 | 354:5 |
| **proactive** 414:10 | **prove** 379:18 | 391:3,6 392:19 | **reach** 429:4 |
| 415:10,19 416:5 | **provide** 423:3 | 396:20 397:14,16 | **react** 469:22 |
| 419:1,7 | **provided** 364:9 | 398:13,20,21 | **reacts** 469:22 |
| **probable** 409:25 | **provides** 383:19 | 402:14,15,19 | **read** 372:12 477:5 |
| 454:6 457:1,7,10 | **public** 396:21 | 403:4 404:2 405:4 | 477:6,12 478:5,6 |
| 458:10,23 459:3 | 397:5 414:16,18 | 415:18 420:7,25 | 478:17 |
| **probably** 367:22 | 415:8,12 422:16 | 422:19 423:2,4 | **readily** 411:12 |
| 370:25 379:15 | 434:23 435:1 | 432:9,19 434:24 | **reading** 465:5 |
| 380:15,16 392:5 | 465:3,23,24 466:2 | 435:10,11,13 | 476:19 |
| 406:6 416:24 | 466:11 474:6 | 437:5,12,15 | **real** 387:25 422:19 |
| 417:12 420:11 | 475:13 477:10,18 | 438:14 439:9 | 468:10 |
| 424:25 442:21 | 478:15,23 479:23 | 440:8,13 441:19 | **reason** 436:21 |
| 452:20 | **publicly** 398:6,7 | 443:2 450:25 | 446:16 458:20 |
| **probe** 428:18 | 434:24 | 455:24 458:7 | 476:14 478:8 |
| **problem** 381:22 | **purchased** 434:10 | 463:18 464:1 | 479:3 |
| 382:12,14 395:19 | **purchasing** 458:5 | 466:5,6 | **reasonable** 458:20 |
| 442:12 447:6 | **purdue** 352:9,11 | **questioned** 397:23 | **reasons** 470:12 |
| 466:8 | 352:14 | **questions** 401:3 | **recall** 451:14 |
| **problems** 460:17 | **purpose** 377:10 | 405:9 453:4 462:4 | **receipt** 476:18 |
| **procedure** 364:10 | 393:9,18,23 | 464:10 471:20 | **receive** 398:1 |
| 473:7 477:5 478:5 | 424:19,22,23 | **quick** 387:11 | 462:5,9,14 |
| **proceedings** 397:5 | 455:19 | 422:19 462:4 | **received** 451:8 |
| **process** 391:1 | **purposes** 394:23 | **quickly** 388:1 | 453:9,24 |
| 422:10 459:23 | 398:13 429:15 | **quite** 365:20 | **receiving** 400:2 |
| **produce** 457:22 | **pursuant** 473:3,6 | **quota** 469:1 | 453:13 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | | |
|---|---|---|---|
| **recess** 422:23 | **related** 370:12 | **require** 409:3 | 467:18 |
| 423:16 461:23 | 381:2 383:13 | **required** 476:25 | **rights** 457:8,18 |
| **reciprocation** | 400:24 414:11 | **requirements** | **rise** 446:12 447:23 |
| 414:7 | 415:20 427:11,15 | 369:21 | **rite** 355:15 363:18 |
| **recognize** 429:24 | 458:11 462:6 | **residents** 411:15 | **rns** 379:4 |
| 430:21 | **relates** 352:8 | **resolve** 411:9 | **road** 407:13 |
| **record** 362:5 | **relationship** | **resources** 388:14 | **role** 466:3 |
| 423:15 461:18,22 | 413:17 420:13 | 388:17,21 400:11 | **ropes** 355:7 363:3 |
| 471:24 478:9 | **relative** 378:23 | **respect** 410:6 | **ropesgray.com** |
| **records** 396:11 | 449:24 475:2 | 464:23 | 355:9 |
| 407:6,7 425:3 | **remember** 373:17 | **responsibility** | **ross** 356:4 |
| 466:12 | 392:1 433:9 | 469:21 470:3,8,10 | **rpr** 352:23 |
| **red** 400:6 442:11 | 442:16 460:21 | 470:11,18 471:5 | **rudely** 433:6 |
| **redirect** 471:18 | **renee** 352:23 | **responsible** 384:5 | **rule** 397:12 449:6 |
| **reduce** 472:4 | 353:8 362:15 | 465:2 470:13 | **ruled** 381:2 |
| **reduced** 474:13 | 474:6 475:13 | **rest** 367:13 | **rules** 364:10 |
| **refer** 400:11 | **renee.bacchus** | **resulted** 379:11 | 464:18,22 473:3,7 |
| **reference** 431:4 | 353:11 | 397:1 456:7 | 477:5 478:5 |
| 476:7 477:2 478:2 | **repeat** 381:7 390:7 | **results** 396:3 | **ruling** 414:24 |
| **referenced** 474:13 | **rephrase** 370:20 | **retained** 357:16 | 432:2 |
| 474:17 477:11 | 392:19 427:8 | **retired** 421:12,23 | **run** 366:21 409:15 |
| 478:15 | **report** 389:13,14 | **returned** 373:14 | 409:16 410:3 |
| **referral** 368:24 | 389:17 399:22,24 | 476:18 | 411:25 412:1,3 |
| **referrals** 366:25 | 416:3 430:13 | **reveal** 380:23 | 448:23 457:1,6 |
| **referred** 460:9 | 453:5 | 404:5 464:5 | 458:10,14,17,20 |
| **referring** 404:12 | **reporter** 357:16 | **revealed** 397:6 | 458:23 459:7 |
| **refuse** 394:9 | 402:12 461:18 | **revealing** 424:14 | 460:2,13,14,18 |
| **regarding** 372:6 | 477:7 | 432:9 459:17 | 461:3 |
| 372:25 374:19 | **reporter's** 357:14 | **reveals** 392:16 | **running** 410:1 |
| 405:9,10,10 451:4 | 474:1 | **review** 364:20 | 412:5 459:2,10 |
| 465:22 473:2,11 | **reports** 367:11 | 391:16 462:16 | 460:3 |
| **regardless** 398:18 | 374:6 399:19 | 473:2,6 476:12 | **rx** 353:20 |
| **regions** 469:5 | 400:8,25 401:18 | 477:1 478:1 | |
| **registered** 426:22 | **represent** 462:3 | **reviewed** 364:23 | **s** |
| **registrants** 464:24 | **reputation** 393:12 | 365:16 391:12,17 | **s** 476:15 478:8,8 |
| 465:12 466:14,23 | **request** 405:7 | 391:25 462:24 | 479:3 |
| **registration** 377:9 | 460:18 478:9,11 | **rice** 353:2 | **safe** 465:2 |
| 426:23 432:24 | **requested** 473:1,6 | **right** 425:10 427:1 | **safety** 378:11 |
| 433:1 | 473:10 | 431:13 434:8 | **sandra** 355:11 |
| **regularly** 428:22 | **requests** 471:25 | 436:12 452:22 | **sandy** 362:18 |
| | | 457:2,9 459:6,7 | **saw** 365:22 366:2 |
| | | | 452:25 |

**[saying - sorry]**                                                      Page 22

saying  404:18
  416:16
says  381:21
scanned  365:19
schedule  410:10
  423:14
scheduled  426:25
  464:19,25 465:16
schein  356:2
  363:24
school  395:2
scope  372:4,23
  374:16 375:4
  380:21 383:7
  390:1,17,24
  393:19,25 396:23
  398:3 401:19
  403:21 404:4
  412:3 413:18,23
  413:24 414:13
  419:3 420:24
  421:4 422:8
  425:13,19 426:9
  427:18,25 429:1
  430:11 431:23
  433:13,20 434:20
  436:16 437:4,11
  438:1,6,15,22
  439:2,10,15,20
  443:1,21 455:23
  456:3 459:21
  462:17 463:4,7
  464:2,5 465:5,8,20
scott  373:18
script  394:15
scripts  394:15
  397:23
se  403:3 426:16
seal  475:6 477:15
  478:21

search  387:4
  418:21
second  374:10
  423:18 424:8
  430:7 453:20
see  394:8 403:6
  404:8 405:1,3
  428:19 430:7
  457:6,11 458:17
  471:21
seeing  386:8 425:7
seek  376:16 399:1
seen  425:23
self  379:4 387:8
  403:10
sell  418:9 454:15
  455:16
selling  395:24
  439:6 441:12
send  392:22
  418:17 430:5
sense  367:14
  378:22 394:6
  442:10
sensitive  392:16
  424:15
sent  430:1 459:11
sentenced  392:1
sentencing  364:20
  364:23 391:17
  425:25
separate  426:14
service  355:2
services  353:20
serving  435:8
set  455:19 475:5
setting  405:17
settlement  373:17
seven  413:15
  419:23 421:20

shapira  355:3
  363:21
shapira.com  355:5
share  415:23
  454:18,21
sheet  476:13 478:7
  478:10,18 479:1
shelf  418:3
shipments  387:4
shopper  367:7
  388:11 411:6
  418:16 453:16
  455:17 459:8
shoppers  379:14
  448:14 453:13
  454:9 455:1,8
shopping  376:4,10
  376:12,22 377:1
  385:16 386:2,4
  390:10,12 411:9
  417:17 449:21
  454:13,14
short  422:23
  461:23
shortly  392:5
show  387:22
  452:23
showed  451:10
showing  387:23
shown  476:16
shows  426:1
  428:19
signature  473:5
  475:12 476:14
signed  477:13
  478:18
significance
  395:20
signing  476:19
silver  387:15

similar  388:5,10
simply  375:16
sincerely  476:21
single  411:2 424:2
sir  364:16 365:3
  366:3,4 371:14,19
  373:22 376:23
  377:14,17 380:2
  383:2,20 384:21
  384:24 391:11
  399:5,10,20,23
  405:23 406:12
  407:19 408:3
  411:18,20 416:18
  416:21 418:10,14
  427:5 431:12
  443:18 445:13,17
  447:11 450:1,4
  460:20 464:10
  467:25 476:10
situation  471:10
six  387:2
skzerrusen  355:14
small  448:20,25
smith  458:16
  459:7
solely  427:7,11,15
solutions  354:11
  476:1 479:1
somebody  389:13
  429:7 441:7 468:6
someone's  378:12
somewhat  386:25
sophisticated
  447:12
sorry  369:10
  377:24 384:11
  390:9 402:12
  436:11 453:20
  465:4

**sort** 389:23 390:15
  401:16,17
**sources** 387:22
  398:5 441:5
**south** 353:4
  355:12
**spaeder** 353:21
  362:22
**speak** 404:23
  432:7
**speaking** 465:8
**special** 356:9
  362:23,24 363:10
  371:21 372:10,15
  373:2 374:20
  375:10,12,14,20
  375:25 381:1
  391:5 397:11,13
  397:19 398:10,15
  401:8 404:7,11,23
  404:25 405:6,16
  415:16 422:22
  432:1,8,17,21
  461:21 464:8
  471:15,19 472:7
  472:10
**specialist** 392:4
**specific** 372:6,25
  374:18 375:6
  397:2 404:1
  422:15 434:22
  435:12 439:22
  463:16 465:22
**specifically** 471:24
**specifications**
  462:22
**specifics** 403:24
**specified** 474:20
**spectrum** 410:14
**speculation** 396:6
  419:17 425:13

446:24 449:8
  456:17 459:24
  462:18 469:4
**speed** 411:8,11
**spelled** 426:21
**spend** 395:1
**spoken** 366:1
**spreadsheet**
  386:11 411:5
  453:6
**sraiola** 354:20
**ss** 474:3
**staff** 449:2
**stand** 397:7
  432:18
**stars** 354:8
**start** 362:5 366:21
  378:4 379:24
  382:4 405:2
**started** 392:2,4
  396:18 397:17,24
  427:10,14 433:23
  434:1 442:22
  445:5 447:20,24
  448:5 451:11
  452:2,11,13,15
**starting** 386:2
  445:7
**state** 367:10,17
  369:22,23,24
  384:8,23 470:22
  474:2,7 475:14
  477:10 478:15
**statement** 447:14
  477:13,14 478:19
  478:19
**states** 352:1 353:6
  353:7,8 362:11,17
  391:2 434:12
  435:18 437:10
  438:4 444:1,1

446:20 447:9,16
  471:24
**statistics** 383:21
**stay** 400:14
**steal** 378:12
**stealing** 367:9
**stenotypy** 474:14
**step** 422:20 432:7
**stephen** 354:17
  363:4
**steroids** 371:3
**stipulations**
  352:25
**stole** 452:6
**stolen** 448:19
**stonewalled**
  398:25
**stop** 404:22
  431:21
**stow** 368:25 369:2
**straight** 393:7
**street** 352:21
  353:14,22 354:18
  355:8,12,17,21
  440:19 441:7,14
  452:7
**strike** 432:15
  463:18 470:6
**string** 358:5
  429:13
**student** 363:11
**studied** 467:17
**studies** 449:23
  467:17
**study** 451:9,12
**stuff** 428:20 453:1
**subject** 352:25
  472:6
**subscribed** 477:10
  478:14 479:21

**substances** 374:5
  426:25 464:14,17
**substantial** 382:3
**suffering** 395:5
**suite** 352:21 353:9
  353:23 354:4
  355:12,22 356:4
  476:2
**summit** 352:13
  353:2 362:8 367:2
  368:11,14,16,17
  368:22 369:3,7
  384:2,14,17,19
  403:13 407:14
  411:17 412:1
  449:2 467:2,22
**sums** 468:10
**superior** 353:9
  476:1
**supervisor** 389:2
  389:10 459:9,14
  459:15 460:3,19
**supplied** 466:14
**supply** 429:7
  454:14 469:25
**supplying** 403:14
**supposed** 396:1
  407:8
**sure** 362:6 372:14
  373:5 376:13
  383:9 385:16
  388:20 390:4
  397:14 402:4
  403:5 405:4
  406:24 407:10
  432:6 435:19
  442:22 444:11,23
  450:25 457:3
  461:6 471:4
**surveillance**
  367:21 389:23

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

390:4,5,11,15
**suspect** 390:11
  434:25 435:14
**suspected** 376:4
**suspicion** 410:3
  458:14,19,20
**suspicious** 374:6
  399:18,21,24
  400:7,25 401:18
**sustained** 464:8
**swing** 395:8
**switched** 425:16
**sworn** 364:11
  474:17 477:10,13
  478:14,18 479:21
**system** 395:15,17
  395:23

**t**

**tablets** 434:4
**take** 369:22,23,24
  387:19,24 388:22
  391:24 394:20
  400:14 411:4
  418:8 423:11
  455:11,12
**taken** 352:20
  369:14,17 474:19
**takes** 385:25 386:4
  387:23
**talk** 417:4
**talked** 373:13
  385:16 402:8
**talking** 367:20
  370:4 378:2
  383:17 397:15
  403:18 421:25
  422:2,25 432:6
  452:21 466:24
  467:1 469:17,18
**target** 371:8
  390:16 463:1

**task** 369:7,13
  407:21 415:7,12
  421:12,13 423:6,8
  428:24
**taxonomy** 378:24
**tds** 366:5 367:16
  368:1,13 369:5
  370:2 371:11
  372:1,17 373:23
  376:3,22 377:13
  377:15,25 380:8
  382:6 383:15,21
  384:1 385:21
  386:19 388:3,9,19
  388:21,25 389:8
  389:12,20 399:18
  402:9 405:19,19
  405:25 406:7
  408:10,12,15
  409:10 410:17
  412:6 413:5,10,15
  417:1,6 419:21
  420:3,15,23
  421:18,21 422:1
  428:3,9 430:4
  433:12 442:3,9
  443:5,20 444:9,16
  445:14 447:20
  448:1 455:21
  456:12 458:1
  462:6,8,16,23
  463:2,18 465:15
  466:7
**team** 388:13
**tech** 367:8
**technicians** 402:24
**technique** 417:24
  432:5,12,14
  463:15
**techniques** 380:25
  381:6 382:2

396:22 415:24
  422:13 424:15
  431:25 432:10
  459:18 463:10,13
**techs** 379:5
**telephone** 354:7
  354:12 355:2,15
  355:20 356:2
**tell** 376:15 392:12
  393:7 427:22
  452:22,24 466:13
**telling** 385:13
**tells** 389:8
**ten** 366:7 370:4
  412:10 416:25
  446:10
**tend** 371:9 454:17
  454:21
**tenth** 354:18
**tenure** 465:15
  466:7
**term** 433:18
**terms** 410:16
  414:10 421:7
  435:19
**test** 396:3
**testified** 463:23
**testify** 474:10
**testifying** 374:11
  450:12
**testimony** 388:20
  391:15 416:13
  434:14 437:24
  445:25 467:20
  468:9 474:12,16
  477:6,7 478:6,9,12
**testing** 395:14,16
  395:21
**texas** 356:5
**thank** 363:13
  379:8 388:8

420:21 422:24
  432:21 451:1
  464:10 471:21
**theft** 367:8 378:2,3
  378:4,7,14,18
  379:5,6,13,16
  387:6 403:11,15
  417:18 418:5,7
  448:17,17
**thefts** 377:21
  379:2 385:18
**thereof** 385:18
**thing** 368:10 417:3
  457:8
**things** 367:24
  408:20 409:14,21
  450:20,23
**think** 368:20,25
  369:25 370:18
  371:20 373:16,17
  375:23 382:11,13
  382:17 384:6
  385:22 387:9
  390:3 391:5,7
  393:10 394:6
  398:9,16,17,19
  402:6 403:17,22
  403:23 405:13
  407:15 410:15
  411:24 418:19,23
  420:5 424:25
  426:17 428:5,11
  428:15 429:22
  432:3,20 435:9
  436:2 441:3,4,6
  444:15,24 447:18
  450:17 456:13
  457:12 460:9
  461:6,7 468:11
  470:9 471:4,15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[thinking - vague]**                                                Page 25

**thinking**  440:23
441:10
**third**  366:15
**thirty**  476:18
**thought**  424:5,6
424:23 450:21
453:19
**three**  380:4 385:1
387:24 392:6
394:15 421:6,25
423:14 425:22
456:6
**threw**  390:5
**thrilled**  428:24
**time**  370:2 373:24
377:23,25 378:8
382:23 385:25
386:4 387:3,20,23
388:2,16 392:7
395:1 408:8
410:24 417:1
420:3 421:17
423:21 432:21
433:2 435:8
440:13 442:3,9
444:9,14,18
445:14 447:7,20
447:24,25 448:8
450:13,20 471:16
474:19
**timeline**  387:25
**timely**  472:12
**times**  365:6 412:9
413:14 416:20
418:15 421:3,6
**tip**  396:18 397:18
399:13
**tips**  397:21
**today**  363:12
389:3,4 448:10

**top**  380:7 384:4
431:14
**total**  411:13
**touhy**  398:11,16
**township**  407:16
**trade**  454:22
**traffic**  436:8,14
**traffickers**  471:7
**trafficking**  403:14
403:16 406:24
418:7 436:8,14,20
436:24 439:7,14
439:19 442:1,4,5
447:9,12 455:2,18
471:8
**train**  453:19
**transcribed**
474:15 477:7
**transcript**  352:24
357:1 405:8
471:25 472:3
473:3,6,9,11
476:11,12 477:5
477:12 478:5,11
478:17
**transcription**
474:16
**transcripts**  365:16
**treating**  426:15
**treatment**  395:5
**tried**  453:22
**trinity**  394:4,11,12
394:22
**trouble**  414:4
**true**  474:16
**truth**  474:10,11,11
**try**  432:18
**trying**  370:18
377:24 378:22
390:13 402:4
404:16 419:1

442:9 444:17
460:17
**tucker**  354:3
363:1
**tuckerellis.com**
354:5
**turf**  428:20
**turning**  386:14
**turns**  454:6
**tv**  428:19
**two**  365:15,17
373:4 375:15,21
377:19 387:24
409:14,18 421:19
456:5 461:16,19
**type**  380:13
383:16 385:20
390:4 402:7
412:11,17 417:15
418:5 421:7,8
458:14,18,19,19
**types**  378:24
383:22 386:1
388:2,4 402:1
412:16
**typically**  379:15

**u**

**u.s.**  353:12 362:10
362:15 363:8
434:19 438:5
**ulmer**  352:21
362:4
**ultimately**  369:17
**undercover**
387:21 389:22
**understand**  377:6
397:14 398:12,16
431:14 458:9
**understanding**
376:11,14

**understood**
388:20 446:11
**unit**  388:18 420:18
420:20,21 430:3
**united**  352:1 353:6
353:7,8 362:11,17
391:1 434:12
435:17 437:9
438:4 444:1,1
446:20 447:9,16
471:24
**unpack**  403:6
424:8
**unquote**  426:4
**ups**  461:16
**usdoj.gov**  353:11
353:11,15
**use**  387:21,22
389:22,22 390:21
400:7,10,11 402:2
405:24 406:5
408:19,20,22
409:1,3,5,9,12,20
409:24 415:13
444:8 452:1,1,2
453:16 454:13,22
465:24
**users**  451:11
**uses**  408:11,15

**v**

**v**  352:9,11,14
**vague**  372:3 376:7
377:22 383:6
384:3 393:24
394:18 401:5
410:18,23 413:13
419:4 420:4,10
421:10 423:23
426:8 428:10,25
434:13 438:21
440:13 441:20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**[vague - years]** Page 26

446:23 450:7
461:1 468:11
469:15 471:13
**valid** 423:21 424:6
**valuable** 446:2
**vast** 449:10
**veritext** 476:1,7
479:1
**veritext.com.**
476:17
**versus** 369:17
417:17,18 445:2
452:5
**vet** 472:3
**vetted** 472:4
**vibe** 428:23
**view** 394:20
414:10 415:9
418:25 435:21
445:21 468:23
469:1,12
**violating** 412:4
457:8
**visits** 425:25
**volume** 352:16
381:16 427:12,16
427:22 460:22,23
460:23 461:9,12
462:7,11,14,23
463:1

**w**

**w** 352:21 353:3
**wadsworth** 373:15
**waived** 476:19
**walgreens** 355:19
364:4
**wallace** 354:7
364:5,5
**walmart** 353:16
**want** 362:5 388:19
397:13 398:14

403:3 405:2
423:17 440:25
458:17 461:6
**wanted** 418:4
457:4,5
**wants** 369:22,23
**warnings** 392:22
**warrant** 418:21
**warrants** 387:4
**warren** 469:9
**washington**
354:14,19
**watch** 428:19
**way** 375:17 385:6
385:14 394:21
395:8 405:13
407:22 450:17
453:15,18 455:1
460:15,24 468:11
**ways** 369:19
**we've** 375:14
384:7 420:5 436:2
450:17 461:18
462:2 467:25
470:1
**weekend** 446:7,8
**weekends** 445:8
**weeks** 386:12
387:15 411:7
**went** 407:7 419:14
441:11 444:16
452:4,24 453:7,11
**west** 353:9
**wewatta** 355:21
**whatsoever**
469:21
**whereof** 475:5
**wife** 460:16
**wilson** 354:13
363:25

**wilson.mudge**
354:15
**withdraw** 435:12
**witness** 372:13
397:7 404:9,13
422:18,25 423:1
432:7,12 447:1
464:7 473:2 474:9
474:13,14,17
475:5 476:8,11
477:1,4,11 478:1,4
478:15
**witnesses** 423:14
**witness'** 476:14
**words** 459:1
**work** 368:4 383:11
386:19 388:14
389:1,16 405:24
406:14 409:9
410:17 412:12,20
414:19,21 416:22
428:22 448:6
454:21 458:22
462:6,16 464:15
465:10
**worked** 366:5
367:15,19 368:2,6
368:13,25 369:1,4
370:2,11 371:1,11
372:1,18 376:3,21
377:13 378:25
379:10 382:5,9,16
382:24,24 384:1
384:22 385:21
388:6 390:20
391:9,18 400:17
400:23 402:6,9,17
402:21,23 403:8
404:16 405:19
412:7 413:5
415:25 416:8,9

417:7,16 419:6,8
420:14,22 421:15
421:24 423:9
428:4 433:11
443:20 455:20
466:13,15
**working** 383:23
388:3 389:9,18
402:20 405:19
410:25 413:16
418:13,24 420:12
423:4 429:6
444:20,22 447:24
448:5 463:24
**works** 457:3
**worse** 420:6
450:14
**write** 395:14
**writing** 393:3
394:4,10 395:18
418:21 423:20
424:5
**written** 427:12
462:12
**wrong** 407:2
427:23 457:11
468:7

**x**

**x** 461:8,8
**xanax** 386:9
394:13

**y**

**yeah** 426:12
428:11,15 436:2
**year** 444:24
**years** 387:24
388:22 392:6
406:2 408:4
409:19 413:15
419:21,24 420:12

www.veritext.com 888-391-3376

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

421:13,20 442:22
467:22
**yesterday**   365:9
365:14
**yield**   461:14

**z**

**zerrusen**   355:11
**zerussen**   362:18
362:18
**zuckerman**   353:21
362:22
**zuckerman.com**
353:24

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.