Page 1

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
2                     EASTERN DIVISION
3    _____
4    IN RE:  NATIONAL PRESCRIPTION     MDL No. 2804
     OPIATE LITIGATION                 Case No. 17-md-2804
5
6    This document relates to:        Judge Dan
                                      Aaron Polster
7    The County of Summit, Ohio,
     et al., v. Purdue Pharma, L.P.,
8    et al.
     Case No. 17-OP-45004
9
     The County of Cuyahoga v. Purdue
10   Pharma, L.P., et al.
     Case No. 17-OP-45090
11
     The City of Cleveland, Ohio v.
12   Purdue Pharma, L.P., et al.
     Case No. 18-OP-45132
13   _____
14
15
16
17        Videotaped Deposition of Allisyn Leppla
18                   Cleveland, Ohio
19                  January 15, 2019
20                      9:18 a.m.
21
22
23
24   Reported by:  Bonnie L. Russo
25   Job No. 3191877

Page 2

1   Deposition of Allisyn Leppla held at:

2

3

4

5

6       Napoli Shkolnik, PLLC

7       55 Public Square

8       Suite 2100

9       Cleveland, Ohio 44113

10

11

12

13

14

15   Pursuant to Notice, when were present on behalf

16   of the respective parties:

17

18

19

20

21

22

23

24

25

Page 4

1   APPEARANCES (CONTINUED):
2   On behalf of CVS Indiana, LLC and CVS Rx
     Services, Inc :
3    ZUCKERMAN SPAEDER, LLP
     DANIEL P MOYLAN, ESQ
4    100 East Pratt Street, Suite 2440
     Baltimore, Maryland 21202
5    410-332-0444
     dmoylan@zuckerman com
6
     On behalf of AmerisourceBergen Drug
7    Corporation:
     MICHAEL J SALIMBENE, ESQ
8    (Via Teleconference)
     REED SMITH, LLP
9    Three Logan Square, Suite 3100
     1717 Arch Street
10   Philadelphia, Pennsylvania 19103
     215-241-7910
11   msalimbene@reedsmith.com
12   On behalf of McKesson Corporation:
     COVINGTON & BURLING, LLP
13   JOHN W ZIPP, ESQ
     (Via Teleconference)
14   One CityCenter
     850 Tenth Street, N W
15   Washington, D C  20001
     202-662-6000
16   jzipp com
17   On behalf of Mallinckrodt and Spec Gx, LLC:
     JOSH GOLDSTEIN, ESQ
18   ROPES & GRAY, LLP
     Prudential Tower
19   800 Boylston Street
     Boston, Massachusetts 02199
20   617-951-7000
     joshua-goldstein@ropesgray com
21     -and-
     JESSICA R SORICELLI, ESQ
22   ROPES & GRAY, LLP
     1211 Avenue of the Americas
23   New York, New York 10036
     212-596-9000
24   jessica soricelli@ropesgray com
25   Also Present:  Daniel Russo, Videographer

Page 3

1   APPEARANCES:
2   On behalf of Cuyahoga County:
     SHAYNA E  SACKS, ESQ
3   NAPOLI SHKOLNIK, PLLC
     360 Lexington Avenue, 11th Floor
4   New York, New York 10017
     212-397-1000
5   ssacks@napolilaw com
6   On behalf of Johnson & Johnson and Janssen
     Pharmaceuticals, Inc
7   GIUSEPPE W  PAPPALARDO, ESQ
     TUCKER ELLIS, LLP
8   950 Main Avenue
     Suite 1100
9   Cleveland, Ohio 44113
     216-592-5000
10   gwp@tuckerellis com
11   On behalf of Walmart, Inc
     KRISTIN S M  MORRISON, ESQ
12   JONES DAY
     North Point
13   901 Lakeside Avenue
     Cleveland, Ohio 44114
14   216-586-3939
     kmorrison@jonesday com
15
     On behalf of Endo Pharmaceuticals, Inc , Endo
16   Health Solutions, Inc , Par Pharmaceuticals,
     Inc and Par Pharmaceutical Companies, Inc :
17   NICOLE LEIBOW, ESQ
     (Via Teleconference)
18   ARNOLD & PORTER
     250 West 55th Street
19   New York, New York 10019
     212-836-7838
20   nicole leibow@arnoldporter com
21   On behalf of Cardinal Health, LLP
     WILLIAMS & CONNOLLY, LLP
22   PAUL E  BOEHM, ESQ
     MELINDA JOHNSON, ESQ
23   725 12th Street, N W
     Washington, D C  20005
24   202-434-5000
     pboehm@wc com
25   mkjohnson@wc com

Page 5

1          C O N T E N T S
2   EXAMINATION OF ALLISYN LEPPLA   PAGE
3   BY MR  BOEHM      10
4   BY MR  GOLDSTEIN      357
5   BY MR  MOYLAN      378
6
7
8       EXHIBITS
9   Exhibit 1  Curriculum Vitae of   25
       Allisyn Leppla
10     CUYAH_O14186737-738
11   Exhibit 2  E-Mail dated 2-6-14   44
       Attachment
12     CUYAH_014181244-1248
13   Exhibit 3  Cuyahoga County   114
       Board of Health
14     2010 Annual Report
15   Exhibit 4  Cuyahoga County   119
       Board of Health
16     2012 Annual Report
17   Exhibit 5  Article entitled   138
       "Cuyahoga County Aims
18     to Reduce Overdose Fatalities"
       CUYAH_014188900-901
19
     Exhibit 6  Symposium Agenda   170
20     7-29-09
       ODH_MDL 1st Production_000980-981
21
     Exhibit 7  List of Attendees   172
22     ODH_MDL 3rd Production_00001-16
23   Exhibit 8  E-Mail dated 1-17-14   178
       CUYAH_-14211495-500
24
     Exhibit 9  E-Mail Chain   183
25     dated 12-21-16
       CUYAH_014195639-642

2 (Pages 2 - 5)

Page 6

1  EXHIBITS (CONTINUED):
2  Exhibit 10  Ohio Prescription Drug      228
        Abuse Task Force: Final
3       Report Task Force
        Recommendations
4
   Exhibit 11  Article Draft               249
5       CUYAH_014181983-987
6  Exhibit 12  PowerPoint Deck             268
        Prescription for Prevention:
7       Stop the Epidemic
        2-6-13
8
   Exhibit 13  E-Mail Chain                292
9       dated 8-13-14
        CUYAH_014178416-420
10
   Exhibit 14  E-Mail Chain                331
11      dated 9-24-15
        CUYAH_014231470-471
12
   Exhibit 15  PowerPoint Deck             340
13      Violence and Injury
        Prevention Program
14      CUYAH_014191053-073
15 Exhibit 16  Data Brief, Volume One,     343
        2016
16      SUMMIT_000874244-248
17 Exhibit 17  Undetermined risk factors   354
        for fentanyl-related overdose
18      deaths
        Ohio 2015
19      (EpiAid 2016-003)
        CUYAH-014244398-450
20
   Exhibit 18  Northeast Ohio Hospital     371
21      Opioid Consortium
        Goals and Objectives
22
23
24 (Exhibits attached with transcript )
25

Page 7

```
1              P R O C E E D I N G S
2
3          THE VIDEOGRAPHER:  Good morning.
4       We are going on the record at 9:18
5  a.m. on January 15th, 2019.
6          Please note that the microphones are
7  sensitive and may pick up whispering, private
8  conversations and cellular interference.
9  Please turn off all cell phones or place them
10 away from the microphones as they can interfere
11 with the deposition audio.  Audio and video
12 record willing continue to take place unless
13 all parties agree to go off the record.
14         This is Media Unit 1 of the video
15 recorded deposition of Allison Leppla, taken by
16 counsel for defendant in the matter of In Re
17 National Prescription Opiate Litigation, filed
18 in the United States District Court for the
19 Northern District of Ohio, Eastern Division,
20 case No. 17-MD-2804.
21         This deposition is being held at
22 Napoli Shkolnik, PLLC, located at 55 Public
23 Square, Suite 2100, Cleveland, Ohio.
24         My name is Daniel Russo from the
25 firm Veritext Legal Solution.  And I am your
```

Page 8

```
1  videographer.  The court reporter is Bonnie
2  Russo from the firm Veritext Legal Solutions.
3          Counsel and all present in the room
4  and everyone attending remotely will now state
5  their appearances and affiliations for the
6  record.
7          MS. SACKS:  Shayna Sacks for the
8  plaintiff and the witness, Napoli Shkolnik.
9          MR. BOEHM:  Paul Boehm for Cardinal.
10 And I'm joined by colleague Melinda Johnson.
11 We're from Williams & Connolly.
12         MR. GOLDSTEIN:  Joshua Goldstein,
13 Ropes & Gray -- Ropes & Gray, on behalf of
14 Mallinckrodt, LLC, and Spec Gx, LLC.
15         MS. SORICELLI:  Jessica Soricelli,
16 Ropes & Gray, on behalf of Mallinckrodt, LLC,
17 and Spec Gx, LLC.
18         MR. MOYLAN:  Dan Moylan, Zuckerman
19 Spaeder, on behalf of the CVS defendants.
20         MR. PAPPALARDO:  Giuseppe Pappalardo
21 with Tucker Ellis on behalf of Johnson &
22 Johnson and Janssen Pharmaceuticals.
23         MS. MORRISON:  Kristin Morrison of
24 Jones Day on behalf of Wal-Mart.
25         THE VIDEOGRAPHER:  Will the court
```

Page 9

```
1  reporter please swear in the witness.
2          THE REPORTER:  Can we get the
3  appearances on the phone, please.
4          THE VIDEOGRAPHER:  Okay.
5          MR. BOEHM:  I'm going to arbitrate.
6       Nicole, you go first.
7          MS. LEIBOW:  Okay.  Nicole Leibow of
8  Arnold Porter appearing on behalf of Endo and
9  Par defendants.
10         MR. SALIMBENE:  And this is Michael
11 Salimbene from Reed Smith for
12 AmerisourceBergen.
13         MR. ZIPP:  John Zipp from Covington
14 & Burling on behalf of McKesson.
15         THE VIDEOGRAPHER:  Will the reporter
16 swear in the witness.
17
18         ALLISYN LEPPLA,
19      being first duly sworn, to tell the
20 truth, the whole truth and nothing but the
21 truth, testified as follows:
22
23         THE VIDEOGRAPHER:  You may proceed,
24 Counsel.
25         MR. BOEHM:  Thank you.
```

3 (Pages 6 - 9)

Page 10

1
2  EXAMINATION BY COUNSEL FOR DEFENDANT CARDINAL
3            HEALTH
4      BY MR BOEHM:
5    Q    And good morning, Ms  Leppla
6       Thank you --
7    A    Good morning
8    Q    -- for being here
9       Would you please state and spell
10  your full name for the record
11   A    Sure
12      My name is Allisyn Leppla, spelled
13  A-L-L-I-S-Y-N, Leppla, L-E-P-P-L-A
14   Q    Thank you very much
15      We introduced ourself off the
16  record, but just again for the record, my name
17  is Paul Boehm  I'm going to be asking you some
18  questions today  I represent one of the
19  defendants in this lawsuit
20      Have you ever been deposed before
21  today?
22   A    I have not
23   Q    Okay  Did you do anything to
24  prepare for your deposition today?
25   A    I consulted with my lawyers

Page 11

1      Q.   Okay.  And when you say you
2  consulted with your lawyers, can you tell us
3  with whom you consulted?
4      A.   I had a phone meeting with the legal
5  counsel for the Cuyahoga County Board of
6  Health.  And then I met with Shayna and a few
7  other lawyers to prepare for this deposition.
8      Q.   Okay.  The -- the lawyer -- is there
9  a separate lawyer who's representing the
10  Cuyahoga County Board of Health apart from
11  Shayna and her colleagues?
12      A.   No.  There's a legal counsel for the
13  Cuyahoga County Board of Health.
14      Q.   I see.
15          Who is that?
16      A.   His name is Tom O'Donnell.
17      Q.   And -- and did you talk with Tom on
18  the phone in preparation for your deposition
19  today?
20      A.   I talked with him in regards to
21  scheduling.
22      Q.   Okay.  Did you talk with Mr.
23  O'Donnell in terms of the substance to prepare
24  for your deposition today?
25      A.   Did not.

Page 12

1      Q.   Okay.  And then you said you met
2  with Ms. Sacks?
3      A.   Correct.
4      Q.   Is that correct?
5      A.   That is correct.
6      Q.   And did you indicate that you had
7  met with other lawyers in addition to Ms. Sacks
8  to prepare for your deposition?
9      A.   Just the scheduling conversations
10  that I had in order to get the deposition
11  scheduled, in -- including the phone
12  conversation that I had with Tom O'Donnell.
13      Q.   Okay.  Setting aside the telephone
14  conversation with Mr. O'Donnell, did you have
15  in-person meetings with lawyers --
16      A.   I did not.
17      Q.   -- in preparation?
18      A.   I did not.
19      Q.   Okay.  And who was on the phone
20  during your conversation with Ms. Sacks?
21      A.   I'm sorry.  Can you repeat the
22  question.
23      Q.   I think you said you had a
24  preparation session with Ms. Sacks by
25  telephone?

Page 13

1      A.   That was an in-person meeting.
2      Q.   Oh, that was in person.  Okay.  So
3  --
4      A.   Uh-huh.
5      Q.   So my question -- I want to make
6  sure you heard my first question --
7      A.   Okay.
8      Q.   -- correctly then.
9          My question to you was, setting
10  aside your telephone conversation with Mr.
11  O'Donnell, did you have in-person meetings with
12  attorneys to prepare for your deposition?
13      A.   I did.
14      Q.   Okay.  When did you have those
15  meetings?
16      A.   Yesterday.
17      Q.   Other than yesterday, did you have
18  any other meetings to prepare for your
19  deposition?
20      A.   I did not.
21      Q.   For how long did you meet?
22      A.   We met for approximately five hours.
23      Q.   Who was there?
24      A.   Ms. Sacks was there as well as a few
25  other lawyers.

4 (Pages 10 - 13)

Page 14

1    Q.   Who are the other lawyers?
2         Do you remember their names?
3    A.   Mr. Gallucci and the others.  I just
4  met.  Forgive me.  I do not know their names.
5    Q.   Okay.  Did you do anything else to
6  prepare for your deposition today besides meet
7  with the lawyers yesterday for approximately
8  five hours?
9    A.   I did not.
10   Q.   Have you reviewed any documents to
11 prepare for your deposition?
12   A.   I reviewed the materials that were
13 presented to me.
14   Q.   Okay.  Were there any materials that
15 you looked at to prepare for your deposition
16 that refreshed your memory or your recollection
17 about things that you had known?
18   A.   No.
19   Q.   Okay.  Did you have any
20 conversations with individuals other than the
21 attorneys in preparation for your deposition
22 today?
23   A.   I did not.
24   Q.   Have you talked with any of your
25 professional colleagues or friends, family in

Page 15

1  your personal life about the fact that you
2  would be giving a deposition today?
3    A.   I did.
4    Q.   Okay.  With whom have you spoken
5  about that, and -- and what did you discuss?
6    A.   Just the fact that I have never been
7  deposed before, and I am on the list of
8  witnesses to be deposed.  We did not discuss
9  details of the case.
10   Q.   Okay.  Have you read the complaint
11 that was filed by Cuyahoga County in this
12 lawsuit?
13   A.   I believe that was presented to me
14 this morning.
15   Q.   Okay.  Is that the first time you
16 had ever seen the written complaint?
17   A.   Correct.
18   Q.   Did you have an opportunity to read
19 the complaint?
20   A.   I did not.
21   Q.   Did you skim it?
22   A.   Not for content.
23   Q.   Okay.  You just had it in your hand,
24 took a quick look at it?
25   A.   Correct.

Page 16

1         MS. SACKS:  If I may, she saw the
2  notice, not the complaint.
3         MR. BOEHM:  I see.  Thank you.
4         THE WITNESS:  That is correct.
5         MR. BOEHM:  Okay.
6         THE WITNESS:  Yes.
7         BY MR. BOEHM:
8    Q.   So have you ever seen the -- do you
9  know what a -- a complaint is in a lawsuit?
10   A.   No.
11   Q.   Okay.  Are you aware that there was
12 a written complaint that was filed in this
13 lawsuit on behalf of Cuyahoga County?
14   A.   Yes.
15   Q.   Have you ever seen that document?
16   A.   I -- no.
17   Q.   Okay.  Have you read or reviewed
18 transcripts of depositions that other people
19 have given in this litigation?
20   A.   No.
21   Q.   Okay.  Well, given that you have not
22 had a deposition before, I'm just going to give
23 you a little bit of the ground rules.  And I'm
24 sure that Ms. Sacks has -- went over some of
25 this with you already.

Page 17

1         The -- the first important point is
2  that I'm going to ask you questions, and then
3  you're going to answer the questions --
4    A.   Uh-huh.
5    Q.   -- as best and most -- and as
6  honestly as you can.
7    A.   Sure.
8    Q.   It's important for the record that
9  we try not to speak at the same time.  As you
10 noticed, we have Bonnie here writing down what
11 we say.  And it's a big favor to her if I'm
12 able to finish my question, then you get to
13 respond.
14         And I'm going to do the same.  I'll
15 try my very best to wait until you're done with
16 your answer, and then I'll ask my next
17 question.
18   A.   Understood.
19   Q.   We will not have a perfect record at
20 the end of the day.  Because sometimes we won't
21 notice.  We'll think somebody's done, and they
22 are not.  Or it's just our natural tendency
23 sometimes to start talking too soon.  We'll
24 just do our very best.
25         Does that sound fair?

5 (Pages 14 - 17)

Page 18

1    A.   That sounds fair.
2    Q.   Okay.  If you don't understand a
3  question -- and that probably will happen at
4  some point today too -- will you just let me
5  know that, and I'll try and rephrase it?
6    A.   Yes.
7    Q.   And there may be occasions where Ms.
8  Sacks objects to the form of the question.
9  She'll say, "Objection to form."
10       And you understand that you should
11  still answer the question that I've asked?
12    A.   Yes.
13    Q.   You took an oath to tell the truth
14  today.
15       You understand that?
16    A.   I do.
17    Q.   Is there any reason why you cannot
18  testify today truthfully and thoroughly?
19    A.   No.
20    Q.   Okay.  You indicated that you have
21  not seen the written complaint filed by
22  Cuyahoga County in this lawsuit.
23       Has anybody ever asked you to review
24  a draft complaint or a summary of allegations
25  related to this lawsuit?

Page 19

1    A.   No.
2    Q.   Has anybody ever asked your opinion
3  about whether or not the county should file a
4  lawsuit?
5    A.   No.
6    Q.   Has anyone ever asked your opinion
7  about whether or not the allegations that are
8  stated in the written complaint filed by the
9  county are accurate?
10    A.   No.
11    Q.   To the best of your knowledge, was
12  anybody at or on behalf of the Cuyahoga County
13  Board of Health consulted about the substance
14  of the written complaint filed by Cuyahoga
15  County in this lawsuit?
16    A.   Not to my knowledge.
17    Q.   You understand that the lawsuit has
18  to do with the opioid abuse epidemic in the
19  county, right?
20    A.   Yes.
21    Q.   Have you ever used a prescription
22  opioid?
23       MS SACKS:  Objection.
24       And I instruct you not to answer.
25       MR. BOEHM:  Sorry.  So you're

Page 20

1  instructing her not to answer?
2       MS SACKS:  Yeah.  I don't think it's
3  relevant.
4       MR. BOEHM:  Okay.  On relevance
5  grounds?
6       MS. SACKS:  Yes.
7       MR. BOEHM:  Okay.
8  BY MR. BOEHM:
9    Q.   Are you willing to answer the
10  question?
11       THE WITNESS:  Should I answer the
12  question?
13       MS. SACKS:  It -- I'm instructing
14  you not to.  You can choose whether you --
15       MR. BOEHM:  It's up to you.
16       MS. SACKS:  -- want to follow my
17  instruction or not, is what he's saying.
18       THE WITNESS:  I'll choose to not
19  answer the question.
20       BY MR. BOEHM:
21    Q.   Has a licensed physician ever
22  written you a prescription for a FDA-approved
23  opioid medication?
24       MS SACKS:  Same objection.  And to
25  form.

Page 21

1       THE WITNESS:  I will follow the lead
2  of my lawyer and not --
3       MR. BOEHM:  Okay.
4       THE WITNESS:  -- answer the
5  question.
6       BY MR. BOEHM:
7    Q.   And -- and why is it that you don't
8  want to answer that question?
9       MS SACKS:  Objection.
10       Direct you not to answer.
11       MR. BOEHM:  What's the basis of that
12  instruction?
13       MS SACKS:  Relevancy.
14       BY MR. BOEHM:
15    Q.   Have you ever had any conversation
16  with a healthcare provider in Cuyahoga County
17  about the risks and the benefits to patients in
18  connection with prescription opioids?
19       MS SACKS:  Objection to form.
20       You can answer if you understand and
21  -- and know what he's saying.
22       THE WITNESS:  Can you repeat the
23  question, please.
24       MR. BOEHM:  Sure.
25       BY MR. BOEHM:

6 (Pages 18 - 21)

1    Q.   Have you ever had any conversation
2  with a healthcare provider in Cuyahoga County
3  about the risks and the benefits of using a
4  prescription opioid medication?
5    A.   The nature of my professional work
6  placed me in conversations with healthcare
7  providers regarding opioids.
8    Q.   Okay.  So what's the answer to my
9  question about whether or not you've had
10  conversations with healthcare providers in
11  Cuyahoga County about the risks and the
12  benefits --
13    A.   The answer --
14    Q.   -- of prescript --
15    A.   -- to your --
16    Q.   Sorry.
17    A.   Sorry.
18    Q.   -- of -- of using prescription
19  opioids?
20    A.   Yes.  In a professional capacity.
21    Q.   Okay.  Do you know if any of your
22  family members have ever used a prescription
23  opioid medication?
24    A.   Yes.  Well, a prescription opioid
25  medication, no, not to my knowledge.

1    Q.   Okay.  Do you have family members
2  who have used a -- a illicit opiate?
3    A.   Yes.
4    Q.   Okay.  And -- and -- and would you
5  tell us about that?
6    A.   Sure.  I would be happy to share.
7      I have a relative who overdosed on
8  heroin in my aunt's home, who happened to be
9  running an in-home daycare.  And he overdosed
10  and died in her home.
11    Q.   I'm very sorry to hear about that.
12    A.   Thank you.
13    Q.   When did that happen?
14    A.   I don't recall exactly what year it
15  happened.
16    Q.   Okay.  And you said that that person
17  was -- overdosed on heroin?
18    A.   Heroin.
19    Q.   For how long was that individual
20  experiencing a substance use disorder?
21    A.   I don't know specifically.
22    Q.   Do you know how that person came to
23  be addicted to heroin?
24    A.   I do not.
25    Q.   Do you know if that person ever

1  received a prescription for a opioid medication
2  from a licensed physician?
3    A.   I do not.
4    Q.   Okay.  Do you have any other close
5  friends or family members who have experienced
6  substance abuse disorders?
7    A.   I do.  There is a history of
8  substance abuse in my family, on both sides of
9  my family as well as my in-laws.
10    Q.   Okay.  Has that had an impact on
11  your approach to your professional
12  responsibilities insofar as it concerns
13  substance abuse and particularly opioid
14  addiction?
15    A.   I can't say that it -- it didn't.  I
16  mean of course experiencing an individual or a
17  loved one with a substance abuse disorder make
18  an impact.  And it -- I carry that with me in
19  the professional work that I do, yes.
20      MR. BOEHM:  Okay.  Bonnie, would you
21  like to mark the exhibits, or do you want to
22  just fill them out or -- you tell me what you
23  prefer.
24      THE REPORTER:  However you want to
25  do it.

1      MR. BOEHM:  Okay.
2      (Discussion held off the
3  stenographic record.)
4      (Deposition Exhibit 1 was marked for
5  identification.)
6      BY MR. BOEHM:
7    Q.   Ms. Leppla, I'll be marking some
8  documents as exhibits for your deposition here
9  today.  And this is the first of those
10  documents.  So this is a document that's been
11  marked as Exhibit 1 for purposes of your
12  deposition.
13      And it is something that was
14  produced to us by the county in connection with
15  the litigation and appears to be a résumé of
16  yours; is that correct?
17    A.   That is correct.
18    Q.   Did you prepare this?
19    A.   I did, yes.
20    Q.   By looking at this document, are you
21  able to discern approximately when you prepared
22  this résumé?
23    A.   This document, I cannot tell you
24  specifically when it was created.  It does look
25  very old to me.  It was created quite some time

7 (Pages 22 - 25)

Page 26

1   ago, and it would have been prior to 2014.
2       Q.   And why do you say it would have
3   been prior to 2014?
4       A.   Because I stepped into a different
5   role at that time.  And so this would have been
6   outdated.
7       Q.   Okay.  So let's talk a little bit
8   about that.
9           This résumé indicates that you
10  started at the Cuyahoga County Board of Health
11  in the year 2002; is that correct?
12      A.   That is correct.
13      Q.   And you came to the Cuyahoga County
14  Board of Health from the Cleveland Clinic,
15  correct?
16      A.   Correct.
17      Q.   What did you do at the Cleveland
18  Clinic?
19      A.   I did cardiovascular research at the
20  Cleveland Clinic in the intravascular
21  ultrasound laboratory.
22      Q.   Right.
23          And that work is summarized on the
24  second page of this résumé, right?
25      A.   Correct.

Page 27

1       Q.   The final bullet point under your
2   Cleveland Clinic entry on this résumé states:
3   "Established relationships with pharmaceutical
4   companies."
5           Do you see that?
6       A.   I do.
7       Q.   I think I read that correctly.
8           Did I?
9       A.   Can you reread it.
10      Q.   "Established relationships with
11  pharmaceutical companies."
12      A.   Correct.
13      Q.   What does that refer to?
14      A.   That refer to one of the trials that
15  we worked on was a trial that was for the drug
16  Lipitor.  And Pfizer represented that drug at
17  the time.  And there were representatives from
18  Pfizer that would visit our lab.
19      Q.   Okay.  Were there any companies
20  other than Pfizer that were involved in the
21  trial that you participated in at Cleveland
22  Clinic?
23      A.   I do not recall.
24      Q.   Okay.  I just note that it says
25  "pharmaceutical companies."  So there seems to

Page 28

1   be some suggestion that there was more than
2   one.
3           Do you see that?
4       A.   I do.
5       Q.   Do you -- do you know why you made
6   it a plural?
7       A.   I do not recall.
8       Q.   Okay.  Do you know whether or not
9   any manufacturers of prescription opioids were
10  among the pharmaceutical companies with whom
11  you established relationships at Cleveland
12  Clinic?
13      A.   I do not recall.
14      Q.   You were at the Cleveland Clinic for
15  approximately one year?  Yes?
16      A.   Correct.
17      Q.   Then you went to the Cuyahoga County
18  Board of Health?
19      A.   Yes.  That is correct.
20      Q.   If I sometimes use the shorthand
21  CCBH, will you understand that to be the
22  Cuyahoga County Board of Health?
23      A.   I will.
24      Q.   And is that a -- a shortened form
25  for the Cuyahoga County Board of Health that

Page 29

1   people typically use here?
2       A.   We -- yes.  We use that acronym
3   frequently.
4       Q.   Okay.  Why did you choose to accept
5   a position with CCBH?
6       A.   I was young in my career.  I was not
7   too long out of college.  And while I really
8   loved my work at the Cleveland Clinic, I did
9   not have an opportunity to grow within that
10  position.
11          And I had interacted with the
12  Cuyahoga County Board of Health prior to
13  accepting the role at the Cleveland Clinic.
14  And during the time of my experience at the
15  Cleveland Clinic, I was contacted by one of the
16  supervisors.  And at that time it was a logical
17  decision for my career in terms of advancement.
18      Q.   Was there something about the
19  position at CCBH that seemed promising in
20  particular to you?
21      A.   What was appealing to me at that
22  time was the ability to grow as a professional.
23      Q.   And what do you mean by that?
24      A.   Like I had mentioned, in my role at
25  the Cleveland Clinic, we were a small team, and

8 (Pages 26 - 29)

Page 30

1  there was not a lot of upward movement within
2  that position.  And I was attracted to the idea
3  that at the Cuyahoga County Board of Health I
4  could grow professionally and potentially
5  continue advancement within the company.
6      Q.   Who offered you the job at CCBH?
7      A.   I do not recall specifically.  There
8  were a team of individuals with whom I had
9  interviewed with.  If my memory serves me
10  correctly, it was the director of the
11  environmental health services division at that
12  time.
13      Q.   Who was that?
14      A.   His name was B.J. Meter.
15      Q.   Okay.  Who was the head of CCBH in
16  2002 when you joined?
17      A.   Who -- are you asking me who the
18  health commissioner was of the Cuyahoga County
19  Board of Health?
20      Q.   We can start there.
21      A.   Okay.  The health commissioner, when
22  I was hired by the Cuyahoga County Board of
23  Health, was Tim Horgan.
24      Q.   Okay.  Was there an executive
25  director of CCBH at that time?

Page 31

1      A.   No.
2      Q.   Okay.  Was there somebody else who
3  you would consider potentially kind of being
4  the head of CCBH besides the -- the
5  commissioner?
6      A.   The commissioner was the overall
7  head of the Cuyahoga County Board of Health
8  And there were different service areas that
9  each had a director.
10      Q.   To whom did you report?
11      A.   My -- I was a direct report to a
12  gentleman by the name of Rick Melendes.
13      Q.   What was your title?
14      A.   I was a registered sanitarian.
15      Q.   Just to make sure I understood that
16  correctly, a registered -- what was the second
17  word?
18      A.   Sanitarian.
19      Q.   Sanitarian?
20      A.   Correct.
21      Q.   And what does a registered
22  sanitarian do?
23      A.   It is a health inspector.
24  Registered sanitarian is the license in the
25  State of Ohio that allows individuals to

Page 32

1  practice environmental public health in the
2  State of Ohio.
3      Q.   What were your responsibilities?
4      A.   I conducted field inspections at the
5  time.  When I was first hired, I was primarily
6  conducting inspections of licensed food service
7  operations in retail food establishments.  I
8  also conducted some illness investigations that
9  were potentially connected to those facilities.
10      Q.   The résumé that's marked as Exhibit
11  1 indicates that, as of the date of this
12  document, you were still a registered
13  sanitarian.
14      You see that?
15      A.   Can you repeat the statement.
16      Q.   I'm just looking at your résumé
17  here.
18      A.   Uh-huh.
19      Q.   It's Exhibit 1.  And it says:
20  "Cuyahoga County Board of Health, 2002 to
21  Present."
22      Directly underneath that, it states:
23  "Registered sanitarian."
24      Do you see that?
25      A.   I do.

Page 33

1      Q.   Were you still a registered
2  sanitarian at the time this résumé was
3  prepared?
4      A.   I'm -- yes.  I am still licensed as
5  a registered sanitarian.
6      Q.   Okay.  And then it also indicates
7  that you had taken on a position of injury
8  prevention coordinator.
9      Do you see that?
10      A.   It does.  I do see that now.
11      Q.   In what year did you become an
12  injury prevention coordinator?
13      A.   2014.
14      Q.   Okay.  So this résumé is -- it --
15  it's -- it was prepared no later -- or I should
16  say not earlier than 2014.
17      Fair?
18      A.   Can you repeat the statement.  I'm
19  sorry.
20      Q.   This résumé was prepared not sooner
21  than 2014.
22      Fair?
23      A.   That is fair.
24      Q.   Were you continuing to work as a
25  registered sanitarian in 2014?

9 (Pages 30 - 33)

Page 34

1    A.   I was licensed to still work as a
2   registered sanitarian in 2014.  My
3   responsibilities, when we received funding for
4   my position as the injury prevention
5   coordinator, had me in that position.  It was
6   not -- I was no longer in the field as a
7   registered sanitarian.
8    Q.   When did you stop working in the
9   field as a registered sanitarian?
10    A.   That would have concluded early
11   2014.
12    Q.   Is it fair to say that, from 2002
13   until 2014, you were working in the field as a
14   registered sanitarian on behalf of CCBH?
15    A.   Correct.
16    Q.   In 2014 did CCBH receive an Ohio
17   Department of Health Injury Prevention Grant?
18    A.   Yes, they did.
19    Q.   In connection with CCBH's receipt of
20   the Ohio Department of Health Injury Prevention
21   Grant, did you assume the position of injury
22   prevention coordinator?
23    A.   Correct.
24    Q.   What were your responsibilities as
25   injury prevention coordinator?

Page 35

1    A.   My responsibilities as the injury
2   prevention coordinator were to oversee the
3   deliverables as required by the funding
4   opportunity.
5    Q.   The first bullet point under
6   "Responsibilities" of this résumé marked as
7   Exhibit 1 states:  "Ensure all deliverables are
8   met for the Ohio Department of Health Injury
9   Prevention Grant."
10    Do you see that?
11    A.   I do.
12    Q.   Now, it says ODH.
13    See that?
14    A.   I do.
15    Q.   But we know that ODH means Ohio
16   Department of Health, correct?
17    A.   That is correct.
18    Q.   What were the deliverables that you
19   were charged with ensuring were met in
20   connection with the Ohio Department of Health
21   Injury Prevention Grant?
22    A.   The deliverables varied from year to
23   year of the Ohio Department of Health Injury
24   Prevention Grant.  I was required to complete a
25   work plan.  I had oversight of our budget

Page 36

1   and -- to ensure that the -- the grant was
2   carried out to the expectations of the Ohio
3   Department of Health.
4    Q.   What were the expectations of the
5   Ohio Department of Health in connection with
6   them having given CCBH an Injury Prevention
7   Grant?
8    MS. SACKS:  Object to form.
9    BY MR. BOEHM:
10    Q.   Go ahead.
11    MS. SACKS:  Sorry.  Go -- you --
12    THE WITNESS:  Okay.
13    BY MR. BOEHM:
14    Q.   You remember before I said --
15    MS. SACKS:  Go ahead.
16    BY MR. BOEHM:
17    Q.   -- she may object to form, but you
18   got to stay with me.
19    A.   Okay.
20    Q.   Okay.
21    A.   Okay.  Their overall and our
22   overarching goal was to see a total reduction
23   in accidental fatalities attributed to
24   prescription drug overdose.
25    Q.   Is it fair to say that this grant

Page 37

1   was earmarked for particular purposes rather
2   than discretionary?
3    A.   Can you please be more specific.
4    Q.   You know what the term "earmarked"
5   means, right?
6    A.   I do.
7    Q.   Okay.  So I'm just asking whether or
8   not the grant funds that the Ohio Department of
9   Health gave to CCBH were earmarked for a
10   particular purpose.
11    A.   They -- that is correct.
12    Q.   Okay.  And what were the -- what was
13   the purpose or the purposes of the funds
14   provided --
15    A.   Uh-huh.
16    Q.   -- to CCBH by the Ohio Department of
17   Health in connection with the Injury Prevention
18   Grant?
19    A.   Those funds were intended to cover
20   not only salary but to support policy systems
21   and environmental change strategies that would
22   have a positive impact on reducing the
23   fatalities attributed to prescription drug
24   overdose.
25    Q.   The -- the Ohio Department of Health

10 (Pages 34 - 37)

Page 38

1  Injury Prevention Grant was directed
2  specifically at issues related to prescription
3  drug overdoses; is that true?
4      A.   That is true.
5      Q.   And if I understand correctly, as
6  the injury prevention coordinator, it was your
7  responsibility to ensure that the deliverables
8  for that grant were met.
9      A.   That is correct.
10     Q.   Did you share that responsibility
11 with anybody else at CCBH?
12     A.   I did.
13     Q.   With whom did you share
14 responsibility for ensuring that the Injury
15 Prevention Grant deliverables were met?
16     A.   Vince Caraffi.
17     Q.   Anybody else?
18     A.   We had administrative support staff
19 that assisted with the financial component --
20     Q.   What was --
21     A.   -- of the grant.
22     Q.   I'm sorry.
23     A.   Of the grant.
24     Q.   What was the breakdown of
25 responsibilities as between yourself and Mr.

Page 39

1  Caraffi in connection with ensuring that the
2  deliverables for the Ohio Department of Health
3  Injury Prevention Grant were met?
4      A.   So when I first stepped into the
5  role of injury prevention coordinator, I was
6  working at a part-time status.  And I don't
7  recall the percentage of the breakdown of my
8  time versus Mr. Caraffi's time.  He assumed a
9  percentage of that time due to my part-time
10 status.
11         After a period of time within the
12 grant, I was required to be 100 percent and
13 returned to full-time status.  And at that time
14 his involvement was from the supervisory level.
15     Q.   When you indicate that you were
16 working part-time --
17     A.   Uh-huh.
18     Q.   -- are you -- what -- what are you
19 referring to?
20         You were working part-time in your
21 role as a registered sanitarian?
22     A.   For a period of time.
23     Q.   Okay.
24     A.   Yes.
25     Q.   So when the Ohio Department of

Page 40

1  Health Injury Prevention Grant came into CCBH,
2  you had been working part-time as a --
3      A.   That --
4      Q.   -- as a registered sanitarian for
5  CCBH.
6      A.   That is correct.
7      Q.   Did you become a full-time employee
8  of CCBH when the CCBH received this Injury
9  Prevention Grant?
10     A.   Not immediately.
11     Q.   Why not?
12     A.   We had conversations with the Ohio
13 Department of Health.  And I was able to
14 fulfill the requirements of the grant in my
15 capacity at the hours per week that I was
16 working with their acceptance and awareness
17 that Vince Caraffi would be covering a
18 percentage of that time.
19     Q.   Okay.  How many hours a week were
20 you working --
21     A.   30.
22     Q.   -- as the Ohio Department of Health
23 Injury Prevention Grant coordinator?
24     A.   I was working 30 hours per week.
25     Q.   Were all 30 hours that you were

Page 41

1  working as the injury prevention coordinator
2  dedicated to ensuring the deliverables of the
3  grant were met?
4      A.   They were.
5      Q.   And you indicated that Mr. Caraffi
6  also had responsibility for ensuring the
7  deliverables were met, right?
8      A.   That is correct.
9      Q.   What were the nature -- what was the
10 nature of Mr. Caraffi's responsibilities in
11 connection -- in connection with ensuring that
12 the deliverables of this grant from the Ohio
13 Department of Health were met?
14     A.   Mr. Caraffi acted -- even when he
15 was in there -- in the grant at a percentage of
16 the time, he was a supervisor in his capacity.
17 And he worked with several of the
18 community-based organizations that we had
19 partnered with to ensure that those
20 deliverables were met.
21     Q.   So his role was to work with other
22 members of the community?
23     A.   Correct.
24     Q.   Anything else?
25     A.   Not that I can think of in this

11 (Pages 38 - 41)

1    moment.
2        Q.   Okay.  How did you go about ensuring
3    that the deliverables of the grant were met?
4        A.   We -- we partnered with
5    community-based organizations that would have a
6    reach with the policy -- policy systems and
7    environmental change strategies that I had
8    previously mentioned.  And those partners --
9    some remained consistent throughout the
10   duration of the granted, while there were
11   addition of others as the grant continued to
12   move forward and others that we did not
13   contract with as we moved forward.
14       Q.   Okay.  You indicated that the
15   deliverables changed over time in connection
16   with this grant, right?
17       A.   Slightly.
18       Q.   Okay.  In what ways did they change,
19   and in what ways did they stay the same?
20       A.   Not having our work plan directly in
21   front of me, I don't remember specifically what
22   each deliverable was and what each agency that
23   we contacted with, what the specifics of that
24   deal was.
25       Q.   Okay.  You indicated that the grant

1    itself was fundamentally for the purpose of
2    addressing the opioid abuse epidemic in the
3    county, right?
4        A.   That is correct.
5        Q.   And -- and fundamentally what did
6    you consider your responsibility to be, in
7    light of your position as the injury prevention
8    coordinator --
9        A.   Uh-huh.
10       Q.   -- to address the opioid epidemic in
11   Cuyahoga County?
12       A.   Well, as the Cuyahoga County Board
13   of Health was the leading public health agency
14   within the county, it was our role to convene
15   and collaborate with other community partners
16   that had a more direct -- direct line of
17   conversation or a direct impact with patients.
18           We -- at the health department we
19   are not treatment providers; we are not law
20   enforce; we're not medical professionals.  So,
21   as you can imagine, we worked with those
22   community-based organizations that were able to
23   have a positive impact in the goals that we set
24   forth in the work plan --
25       Q.   Okay.

1        A.   -- and in the contract.
2            (Deposition Exhibit 2 was marked for
3    identification.)
4        BY MR. BOEHM:
5        Q.   A document I've marked as Exhibit 2
6    for purposes of your deposition is in front of
7    you.
8            Do you see that document?
9        A.   I do not have Exhibit 2.
10       Q.   It's right here.
11       A.   I do see this document.
12       Q.   This is an attachment to an e-mail
13   sent in 2014.  And it identifies personnel
14   costs and responsibilities in connection with
15   what I believe is the -- the Ohio Department of
16   Health Injury Prevention Grant; is that
17   correct?
18       A.   That is correct.
19       MS. SACKS:  Go ahead and just read
20   the whole document so you're familiar with it,
21   please.
22       MR. BOEHM:  Well, I'm going to ask
23   questions.  And she can read what she needs to
24   read to answer the questions.
25       BY MR. BOEHM:

1        Q.   You're certainly welcome, Ms.
2    Leppla, if -- if you need to to answer a
3    question, to look at what you need to look at.
4        A.   I appreciate that.  Because I -- I
5    think I -- just perusing the résumé, I didn't
6    realize it was from the time period that you
7    were in question.  So if I could have some time
8    to -- to read this, that would be helpful.
9        Q.   The way it'll work is I'll ask you a
10   question; and then, if you need to refer to the
11   document --
12       A.   Uh-huh.
13       Q.   -- in order to answer my question,
14   then absolutely you can do that.  Sometimes
15   I'll just have a very quick question --
16       A.   Okay.
17       Q.   -- that will not require that.
18   Sometimes it may require that.  So --
19       A.   Understood.
20       Q.   -- we'll just -- we'll just play it
21   by ear in that regard.
22           I just want to direct your attention
23   to the first category here under "Personnel" --
24       A.   Uh-huh.
25       Q.   -- where it says "Injury Prevention

Page 46

1 Coordinator."
2     And then that's your name, right?
3     A.   That is.
4     Q.   In parentheses it says "$44,323.50."
5       Do you see that?
6     A.   Yes.
7     Q.   Is that the amount of money that you
8 were making that year for your work as the
9 injury prevention coordinator?
10     A.   I don't recall specifically, but
11 that would indicate that that was the amount of
12 money that I was making at that time.
13     Q.   Does that seem about right?
14     A.   That was for part-time status.
15     Q.   Well, the next thing it's says is
16 "Full-Time Employee."
17     A.   I do see that.
18     Q.   Do you know why it says that?
19     A.   Because, at the board of health
20 working, a 30-hour workweek was still
21 technically considered full-time.  And I was --
22 a hundred percent of my hours that I was
23 working per week were dedicated to the Injury
24 Prevention Grant.
25     So while I worked a reduced-hour

Page 47

1 workweek, I was still fully dedicated to that
2 position in my hours that I worked during the
3 week.
4     Q.   The injury prevention coordinator
5 description goes on to identify
6 responsibilities that you had in your capacity
7 as the coordinator.
8       Do you see that?
9     A.   Yes.
10     Q.   The first thing that's identified is
11 "Creation of a coalition needs assessment,"
12 right?
13     A.   Yes.
14     Q.   What is that?
15     A.   The coalition needs assessment was a
16 assessment of our Cuyahoga County coalition
17 members to identify gaps and barriers as well
18 as strengths and weaknesses at that time.
19     Q.   Okay.  You -- were you responsible
20 for creating a coalition needs assessment?
21     A.   Yes.
22     Q.   In parentheses it says "40 percent."
23       Does that indicate that
24 approximately 40 percent of your time would be
25 dedicated to the creation of a coalition needs

Page 48

1 assessment?
2     A.   Yes.
3     Q.   The second item identified as one of
4 your responsibilities is "Case reviews from the
5 poison death review."
6       You see that?
7     A.   Yes.
8     Q.   What is that?
9     A.   The poison death review was a
10 committee that was spearheaded by the Cuyahoga
11 County Medical Examiner's Office with
12 stakeholders from throughout the county that
13 would review cases of unintentional overdose
14 attributed to prescription drug abuse.
15       And that poison death review
16 committee was put in place to identify trends
17 and utilize data to help steer prevention
18 efforts.
19     Q.   How was it determined which cases to
20 review?
21     A.   I do not recall specifically.  It
22 was -- the -- the cases that were reviewed were
23 cases of accidental drug overdose throughout
24 that given year.
25     Q.   You didn't review all the cases, I

Page 49

1 take it, in connection with the poison death
2 review?
3       You didn't review every case of a
4 drug overdose; is that --
5     A.   No.
6     Q.   -- right?
7     A.   That is correct.
8     Q.   You reviewed a sampling of case?
9     A.   That is correct.
10     Q.   And you don't know how it was
11 determined which cases would be used as the
12 samples?
13     A.   During the meetings would take place
14 on a semiregular frequency.  I don't recall if
15 they were monthly, bimonthly.  In the cases
16 that had been ruled at that time, which there
17 would have been a lag time, were chosen to
18 review.
19       And during -- during that time, not
20 all the cases would have been completed at the
21 time.
22     Q.   Do you know how it was decided which
23 specific cases would be selected for review in
24 connection with this poison death review?
25     A.   I do not.

13 (Pages 46 - 49)

Page 50

1    Q.   Do you know who had responsibility
2  for selecting those cases?
3    A.   That would have been the Cuyahoga
4  County Medical Examiner's Office.
5    Q.   The third responsibility listed in
6  this paragraph is "Coordinator of partnership
7  with two universities, 15 percent."
8       You see that?
9    A.  I do.
10   Q.   Can you please describe for us what
11 your responsibilities were in connection with
12 coordinating partnership with the universities?
13   A.   In year one of our funding
14 opportunity, we partnered with Case Western
15 Reserve University and Baldwin Wallace
16 University at that time to continue working on
17 those systems and environmental change
18 strategies that I had described to you.
19   Q.   Okay.  What was the nature of your
20 coordination and partnership with those
21 universities?
22   A.   The nature of my coordination in
23 terms of my interaction with them or the -- the
24 goals of which we were trying to accomplish?
25   Q.   The goals and the substance of the

Page 51

1  partnership you were trying to create.
2    A.   So the two universities that we
3  contracted with were entirely different by --
4  different in nature, Case Western Reserve
5  University being a larger institution, Baldwin
6  Wallace being a smaller -- smaller university.
7  And their structure and programming that they
8  had in terms of prevention efforts were very
9  different.
10      And we -- we partnered with Case
11 Western Reserve University, who had a very
12 supportive environment for individuals in the
13 recovery community as well as some other
14 programming in place, and sort of utilized that
15 platform and that model to assist Baldwin
16 Wallace University to increase and enhance
17 their prevention efforts.
18   Q.   In what way did Baldwin Wallace
19 increase and enhance their drug overdose
20 prevention efforts?
21   A.   The -- the way that they increased
22 and enhanced their drug overdose prevention
23 efforts was primarily by educating students and
24 faculty.
25   Q.   Are these medical school students?

Page 52

1    A.   They were not.
2    Q.   These are undergraduate students?
3    A.   They were.
4    Q.   So when you say "educating
5  students," are these people who potentially
6  would become substance abusers and -- and
7  trying to prevent abuse?
8       MS. SACKS:  Objection.
9       THE WITNESS:  We were try to prevent
10 abuse.
11      BY MR. BOEHM:
12   Q.   Right.  But my question's a little
13 bit different.
14      You were trying to educate students
15 because you didn't want the students to abuse
16 substances; is that right?
17   A.   That is correct.
18   Q.   Did you make presentations to
19 students in connection with those efforts?
20   A.   Yes.
21   Q.   Okay.  Would you use slide decks?
22   A.   Yes.
23   Q.   The next item here on the list is
24 "OARRS Data Review, 15 percent."
25      Do you see that?

Page 53

1    A.   Yes.
2    Q.   What is OARRS?
3    A.   OARRS is our -- Ohio's prescription
4  drug monitoring program.
5    Q.   Okay.  For the record, OARRS is an
6  acronym, right?
7    A.   It is.
8    Q.   It's O-A-R-R-S, right?
9    A.   Yes.
10   Q.   Do you know what the acronym stands
11 for?
12   A.   I do.
13   Q.   What is that?
14   A.   Ohio Automated Prescription
15 Reporting System.  And the -- even though it
16 says "prescription," the R was for was Rx for
17 prescription.
18   Q.   Did you review OARRS data during
19 your time at CCBH?
20   A.   I did not have access to the OARRS
21 database.  However, partners that had access to
22 that database would provide the data to us.
23   Q.   Who were the partners who had access
24 to OARRS data who could then provide the data
25 to you?

14 (Pages 50 - 53)

Page 54

1      A.   The Cuyahoga County Medical
2  Examiner's Office.
3      Q.   Would the Cuyahoga County Office of
4  the Medical Examiner provide OARRS data to
5  CCBH?
6      A.   The data was provided to us in a
7  format that assisted us with prevention
8  efforts.
9      Q.   I'm sorry.  That wasn't quite my
10  question.
11         My question was whether or not the
12  Cuyahoga County Office of the Medical Examiner
13  provided OARRS data to CCBH.
14      A.   I do not recall specifically.
15      Q.   You indicated that you had partners
16  who had access to OARRS, right?
17      A.   Yes.
18      Q.   And one of those partners was the
19  Medical Examiner's Office for Cuyahoga County?
20      A.   Correct.
21      Q.   Were there any other of your
22  partners who had access to OARRS, as far as you
23  know?
24      A.   MetroHealth System would have had
25  access to the OARRS data as well.

Page 55

1      Q.   Okay.  Did MetroHealth share OARRS
2  data with CCBH?
3      A.   I do not recall.
4      Q.   Okay.  I thought you had earlier
5  indicated that your partners did, in fact,
6  share OARRS data with CCBH.
7      A.   That was the intention of the grant.
8  And forgive me.  This was several years ago.  I
9  don't really recall how or what specifically
10  that data was or looked like.  I know that that
11  was the intention when -- when we wrote and
12  submitted the grant.
13      Q.   Okay.  As you sit here today, do you
14  know whether or not CCBH ever took advantage of
15  OARRS data, whether through partners or
16  otherwise, for purposes of its review in
17  addressing the opioid epidemic in the county?
18         MS. SACKS:  Objection.
19         THE WITNESS:  Can you be more
20  specific.  You say take advantage of --
21         MR. BOEHM:  Use it.
22         THE WITNESS:  -- OARRS data.
23         BY MR. BOEHM:
24      Q.   I just mean did you use it.
25      A.   That was the intention of the grant,

Page 56

1  to utilize that data to assist us in steering
2  prevention efforts.
3      Q.   So my question to you is, as you sit
4  here today, do you know whether or not CCBH
5  ever utilized OARRS data as part of its efforts
6  to address the opioid abuse epidemic in
7  Cuyahoga County?
8      A.   Yes, but not definitively.  And I
9  understand that that's a -- clouded response.
10      Q.   I'm sure you can help us understand
11  what you mean.
12      A.   Hopefully.
13         Yes, that was the intention of the
14  grant, to utilize OARRS data to assist us with
15  the prevention efforts.  I do not recall
16  specifically receiving that OARRS data or how
17  it was utilized at that time.
18      Q.   Okay.  Let me try this one more time
19  or in a slightly different way.
20         As you sit here today, do you know
21  whether or not the Cuyahoga County Board of
22  Health ever utilized data from the OARRS system
23  as part of its efforts to address the opioid
24  abuse epidemic within Cuyahoga County?
25         MS. SACKS:  Objection.

Page 57

1         THE WITNESS:  I do not recall
2  specifically in this very moment.
3         BY MR. BOEHM:
4      Q.   Okay.  You're not saying it didn't
5  happen?
6      A.   I'm not saying it didn't happen.  In
7  this very moment, I cannot say definitively.
8      Q.   Okay.  You had intent to do that?
9      A.   We did have intent to do that.
10      Q.   And you had access to the data
11  through partners.
12      A.   Through partners.
13      Q.   Okay.  You identified the Medical
14  Examiner's Office and MetroHealth.
15         Were there any other partners that
16  CCBH had that allowed you access to OARRS data?
17         MS. SACKS:  Objection.
18         THE WITNESS:  Throughout the
19  duration of the grant, the Cuyahoga County
20  Medical Examiner's Office and MetroHealth would
21  have been the partners that had access to the
22  OARRS data.
23         BY MR. BOEHM:
24      Q.   Okay.  Prior to CCBH's receipt of
25  the Ohio Department of Health Injury Prevention

15 (Pages 54 - 57)

Page 58

1  Grant, do you know whether or not CCBH ever
2  utilized the OARRS system as part of your
3  efforts to address the opioid abuse epidemic in
4  Cuyahoga County?
5      A.  I do not recall definitively.
6      Q.  Is there somebody we would need to
7  ask about that to get an answer?
8      A.  You could.  You could -- you could
9  try Vince Caraffi to see if -- if he has
10  recollection of that.
11      Q.  For those listening who may not be
12  familiar with the OARRS system, can you
13  describe what the OARRS database provides?
14      A.  The OARRS database is a prescription
15  drug monitoring program that monitors
16  controlled substances that are prescribed
17  throughout the State of Ohio.
18      Q.  In what way is utilization of OARRS
19  helpful in understanding and addressing the
20  opioid abuse epidemic in Cuyahoga County?
21      A.  The OARRS system was helpful because
22  it allowed individuals to monitor prescribing
23  trends and prescribing patterns,
24  overprescribing by specific physicians, as well
25  as for individuals that potentially would have

Page 59

1  been what was considered doctor shopping.
2      Q.  The OARRS data system would also
3  allow the county to see the overall volume of
4  prescriptions being written within the county,
5  correct?
6      A.  That is correct.
7      Q.  It tells you the amount of
8  prescription opioids being prescribed in the
9  county on a per capita basis as well, correct?
10      A.  Can you repeat the question.
11      Q.  Sure.
12          You can use the OARRS data system to
13  determine the volume of opioid prescriptions in
14  the county on a per capital basis, correct?
15      A.  Correct.
16      Q.  Do you know when the OARRS system
17  was established?
18      A.  I do not know specifically.
19      Q.  Do you agree that utilization of
20  OARRS is important to reducing prescription
21  opioid abuse?
22          MS. SACKS:  Objection.
23          THE WITNESS:  Yes.
24          BY MR. BOEHM:
25      Q.  Why do you believe that to be the

Page 60

1  case?
2      A.  I think that would be helpful
3  because it monitors trends in prescribing.  We
4  can see the number of medications dispensed and
5  provide targeted prevention efforts to areas
6  identified from that data.
7      Q.  You indicated that utilization of
8  OARRS by public health officials can identify
9  cases of doctor shopping.
10          I think I heard you mention that; is
11  that right?
12      A.  That is correct.
13      Q.  What is doctor shopping?
14      A.  Doctor shopping would be an
15  individual who is drug seeking and visiting
16  more than one physician to obtain an increased
17  quantity of prescription medications.
18      Q.  Is doctor shopping legal?
19          MS. SACKS:  Objection.
20          BY MR. BOEHM:
21      Q.  Well, let's me put it this way:  Is
22  it illegal to engage in doctor shopping?
23          MS. SACKS:  Same objection.
24          THE WITNESS:  I -- I -- I do not
25  know.

Page 61

1          BY MR. BOEHM:
2      Q.  Okay.  So you're not aware one way
3  or another whether or not it's permissible
4  under the law for an --
5      A.  I --
6      Q.  -- individual to seek prescription
7  medications by going from doctor to doctor?
8      A.  I am not.
9      Q.  Doctor shopping is something that
10  the county was hoping to stop.
11          Fair?
12      A.  That --
13          MS. SACKS:  Objection.
14          THE WITNESS:  Correct.
15          BY MR. BOEHM:
16      Q.  Why was it important for the county
17  to try and identify cases of doctor shopping
18  and prevent that phenomenon?
19      A.  As an individual continues to -- to
20  seek out an increased quantity of medications
21  and take them in quantities that were not
22  intended or unknown to other providers, that
23  puts them and places them at an increased risk
24  for a potential overdose.
25      Q.  Licensed physicians also have access

16 (Pages 58 - 61)

Page 62

1  to the OARRS system, correct?
2      A.  Yes.
3      Q.  Do you know how the utilization of
4  the OARRS system in Cuyahoga County has changed
5  over time in the physician community?
6          MS. SACKS:  Objection.
7          THE WITNESS:  I -- I am not a
8  physician.  I'm not part of the medical
9  community.
10         From data that has been presented to
11  me, it's my understanding that the physicians
12  have increased their utilization of the OARRS
13  database.
14         BY MR. BOEHM:
15     Q.  And do you believe that the
16  increased utilization of OARRS by physicians
17  has had any impact on the abuse of prescription
18  opioids in Cuyahoga County?
19     A.  I can state a professional opinion
20  that I do think it has had a positive impact on
21  drug abuse in Cuyahoga County.
22     Q.  Can you please explain for us why
23  you believe that the utilization of OARRS by
24  licensed physicians has had a positive impact
25  on the opioid abuse epidemic in the county?

Page 63

1      A.  I think it allows physicians to
2  identify red flags in patients who have an
3  excess quantity of prescription medications.  I
4  think it also allows them to be more cognizant
5  of their own prescribing habits.
6          And at the moment, that's all I can
7  think of.  But I -- I know that there are other
8  benefits to utilizing the OARRS system as well.
9      Q.  Do you know if there is any
10  population-based statistical information that
11  supports your view that the implementation and
12  use of the OARRS system by licensed physicians
13  has had a positive impact on the opioid abuse
14  epidemic in the county?
15     A.  I don't have that information here
16  in front of me today.  But in my professional
17  capacity, that has been discussed.
18     Q.  You've seen that -- you've seen data
19  that support that concept, correct?
20     A.  I have seen articles, yes.
21     Q.  Under Ohio law, licensed physicians
22  are required to check the OARRS system for each
23  patient before they make a decision about
24  whether to prescribe an opioid medication to
25  that patient, correct?

Page 64

1          MS. SACKS:  Objection.
2          THE WITNESS:  Correct.
3          BY MR. BOEHM:
4      Q.  Why is that the case?
5          MS. SACKS:  Objection.
6          THE WITNESS:  I am not a medical
7  professional.  There is no way for me to know
8  that.
9          BY MR. BOEHM:
10     Q.  I'm asking you not as a -- a medical
11  doctor but rather as somebody who has spent
12  years trying to prevent injury --
13     A.  Uh-huh.
14     Q.  -- both at CCBH and outside of CCBH
15  and your work in trying to understand the scope
16  and scale and causes of the opioid epidemic.
17         So that's the capacity in which I'm
18  asking you for your understanding about why the
19  utilization -- the required utilization of the
20  OARRS system by licensed prescribers has had an
21  impact on the opioid epidemic in Cuyahoga
22  County.
23     A.  I -- it allows them to monitor
24  trends and prescribing patterns as well as
25  adhere to prescribing guidelines.

Page 65

1      Q.  Are there any responsibilities that
2  you had in the role of injury prevention
3  coordinator that you think are important that
4  we've not already addressed here this morning?
5      A.  Yes.  I -- I think as my role as
6  injury prevention coordinator being a -- a face
7  in the community to raise awareness to the
8  misuse of prescription medications and the
9  safety misconceptions of prescription
10  medication when they are prescribed by a
11  professional and being able to raise that
12  awareness to even community members to help to
13  eradicate that not my kid, not my community
14  mentality, as well as to continue to help to
15  reduce the stigma associated with drug abuse.
16     Q.  When you talk about the stigma
17  associated drug abuse, can you tell us more
18  about that?
19     A.  Sure.  I think the way and the
20  nature that we have treated addiction as a
21  whole over the years has had a negative impact
22  on how we have viewed individuals who are
23  suffering from a substance abuse disorder.  We
24  know that oftentimes individuals view addicts
25  or those suffering from a substance abuse as

17 (Pages 62 - 65)

1  having a moral flaw or moral character flaw as
2  opposed to suffering from a disease.
3      Q.   To what extent do you believe that a
4  cultural mind-set that stigmatizes addiction in
5  the way you described is responsible for the
6  opioid abuse epidemic?
7      A.   I think it absolutely plays a role
8  in the -- the opioid epidemic.  I think changes
9  that occurred in the late '90s with the
10  Intractable Pain Act have led to an environment
11  where we had overprescribing of medications by
12  physicians, and we have created a culture in
13  our society where Americans want a quick fix
14  for every ailment and sort of a -- a pill
15  for -- for everything and a -- and, like I
16  mentioned, a -- a quick fix.  I think the
17  self-medicating habits of individuals have
18  contributed to this.
19          But stigma as a whole and that
20  negative mind-set of individuals who are
21  suffering from a substance abuse disorder has
22  plagued the community as well as the way that
23  we talk about this or the way that we don't
24  talk about it and the way that we interact with
25  and treat individuals with substance abuse

1  disorder.
2      Q.   Has the cultural mind-set that
3  stigmatizes addiction in the way you just
4  described had an impact negatively on the way
5  communities and government and individuals have
6  responded to the opioid abuse epidemic?
7      A.   I -- yes.  It -- it took quite some
8  time and quite a bit of work to make a positive
9  impact, for example, with our police
10  departments being willing to carry Naloxone.
11          When -- when we first started
12  working with our police department to carry
13  Naloxone, it was a very small percentage of
14  them that -- that wanted to or were willing to
15  carry Naloxone.  And through efforts to try to
16  reduce the stigma and to educate people on the
17  disease of addiction we've made a positive
18  impact on -- on a mind-set.
19          And that's -- that's one example
20  that I'm able to provide, but...
21      Q.   And that example, I think, if I
22  understand you right, you're saying that there
23  was at least initially some resistance in law
24  enforcement to treating addiction more as a
25  medical issue rather than as a criminal justice

1  issue; is that fair?
2          MS. SACKS:  Objection.
3          THE WITNESS:  There were police
4  departments that did not view it as their
5  responsibility to carry Naloxone and treat that
6  patient medically.
7      BY MR. BOEHM:
8      Q.   Are there any other examples that
9  you can think of where governments or organs of
10  government were slow to react or clumsy in
11  their response, in part because of this
12  cultural mind-set --
13      A.   Uh-huh.
14      Q.   -- that stigmatizes addiction?
15          MS. SACKS:  Objection.
16          THE WITNESS:  I think in our school
17  systems.  We had several school systems who
18  were willing to host events to raise awareness
19  to the misconceptions and the dangers of
20  prescription drug abuse.  And then we had
21  others who were, again, not that -- not my kid,
22  not my community mentality.
23          I think organizations that dedicate
24  funding to this issue, I think that has evolved
25  over the years.  You know, this is this is a --

1  an issue that impacts everybody.
2      BY MR. BOEHM:
3      Q.   When you say organizations that have
4  donated -- or that have dedicated money to
5  addressing the opioid abuse epidemic --
6      A.   Uh-huh.
7      Q.   -- in the county and that having
8  changed over time, what are you referring to?
9      A.   Whether of those dollars originate
10  federally, from the state or from the local
11  level, I think a lot of effort and attention is
12  now being made to address this issue.
13      Q.   And you're saying --
14      A.   And so resources are being spent to
15  put prevention and/or treatment initiatives in
16  place to help curb the epidemic.
17      Q.   Is it your view that governments,
18  including Cuyahoga County government, was slow
19  in dedicating sufficient resources to address
20  the opioid abuse epidemic in the county?
21          MS. SACKS:  Objection.
22          THE WITNESS:  I think there was a
23  lack of awareness.  I think stigma played a
24  role.  I think lack of education and awareness
25  played a role.

18 (Pages 66 - 69)

Page 70

1     When we were clued in to the
2  severity of the issue, we acted.
3     BY MR. BOEHM:
4     Q.   When you say "we" --
5     A.   I'm referring to the Cuyahoga County
6  Board of Health specifically.
7     Q.   Did you find that other parts of the
8  government in the county were not as -- were
9  not sufficiently concerned with the epidemic
10  when it became an important issue for the CCBH?
11     MS. SACKS: Objection.
12     THE WITNESS: I did not find that in
13  my professional in capacity.  The one thing
14  that we have prided ourselves on and, in my
15  belief, had some substantial success is the
16  nature of our collaboration and willingness of
17  individuals from the county and community to
18  really step in and participate.
19     BY MR. BOEHM:
20     Q.   Okay.  Is it fair to say you took
21  your responsibilities seriously in terms of
22  your efforts at CCBH to address the opioid
23  abuse epidemic?
24     A.   Yes.  This is -- this is not just a
25  job.  I think this is something that you have

Page 71

1  to be passionate about.  It's a -- it's a hard
2  subject matter.  And I -- I did take it
3  seriously.
4     Q.   You indicated in one of the answers
5  you just gave that it was your feeling that
6  there was a lack of awareness.
7     Can you describe how you think that
8  lack of awareness manifested?
9     A.   Is your question how folks weren't
10  educated --
11     MS. SACKS: If you don't understand,
12  just say you don't understand.
13     THE WITNESS: I don't understand.
14     BY MR. BOEHM:
15     Q.   Well, we can -- it's a --
16     MS. SACKS: It's a little
17  conversational, so...
18     BY MR. BOEHM:
19     Q.   That -- that's okay.  I'm happy
20  to -- to make it more clear, if that's helpful
21  for you.
22     A.   That would be helpful.
23     Q.   Sure.
24     I think you were on the right track.
25     A.   Uh-huh.

Page 72

1     Q.   I'm really just trying to understand
2  more about what you said earlier when you
3  indicated that there was a little bit of a --
4  maybe a delay or a challenge to overcome in
5  trying to address the epidemic because, in your
6  view, there was a lack of education and a lack
7  of awareness.
8     A.   Uh-huh.
9     Q.   Is that fair?
10     A.   That is fair.
11     Q.   Okay.  And when you talk about the
12  lack of awareness and the lack of education,
13  who -- on whose part were you seeing a lack of
14  education and a lack of awareness insofar as it
15  concerned the objectives you --
16     A.   Uh-huh.
17     Q.   -- were trying to achieve --
18     A.   Sure.
19     Q.   -- at CCBH?
20     A.   I think there were numerous
21  populations of people that had a general lack
22  of understanding to the nature and severity of
23  the epidemic.  It was newer in nature to those
24  community organizations that were beginning to
25  work on this initiative.

Page 73

1     We've seen other epidemics
2  historically in the past that have gained a lot
3  of media attention, such as the heroin epidemic
4  of previous times and the crack cocaine
5  epidemic.
6     But this -- when this began to take
7  off, I think there was a general lack of
8  understanding that this was being caused and
9  driven by prescription drugs.
10     And there was general misconception,
11  because these medications were oftentimes
12  originally prescribed by a physician, that they
13  were safer to use than illicit substances.
14     Q.   Do you agree that one of your duties
15  and responsibilities at CCBH was to understand
16  the causes and the scope of the opioid abuse
17  epidemic within Cuyahoga County?
18     A.   Yes, I do.
19     Q.   If you turn back to Exhibit 1, which
20  is this résumé from not before 2014, on the
21  second page under a section entitled "Relevant
22  Experience," you indicate that you were a
23  member of the Cuyahoga County Opiate Task
24  Force.
25     Do you see that?

19 (Pages 70 - 73)

Page 74

1    A.    Yes.
2    Q.    What's the Cuyahoga County Opiate
3    Task Force?
4    A.    The Cuyahoga County Opiate Task
5    Force was a group of professionals with wide
6    ranging experience and expertise that convened
7    to not only increase their knowledge of the
8    currently landscape of opioid abuse in Cuyahoga
9    County but also they were the folks with boots
10   on the ground in the communities implementing
11   programming.
12   Q.    What was your role with respect to
13   the Cuyahoga County Opiate Task Force?
14   A.    I was a -- a member of the Cuyahoga
15   County Opiate Task Force.  Some of my duties
16   within my grant required additional efforts
17   within the -- Cuyahoga County task force.
18   But I was not the chair; I was a member.
19   Q.    Were you ever the cochair of the
20   Cuyahoga County Opiate Task Force?
21   A.    I stepped into the role of cochair
22   occasionally if the chair was unavailable.  But
23   I was not primarily the chair nor cochair.
24   Q.    There -- so if I understand you
25   correctly, there were times when you assumed

Page 75

1    the duties and responsibilities of cochair of
2    the Cuyahoga County Opiate Task Force, but that
3    was not your standard or standing position?
4    A.    It wasn't a standing position.
5    Q.    Who was the chair of the Cuyahoga
6    County Opiate Task Force?
7    A.    The chair of the Cuyahoga County
8    Opiate Task Force was Vince Caraffi.
9    Q.    Has Mr. Caraffi always been the
10   chair of the Cuyahoga County Opiate Task Force?
11   A.    He was the chair since the inception
12   of the Cuyahoga County Opiate Task Force.  He's
13   no longer the chair.
14   Q.    Okay.  Who's presently the chair of
15   the task force?
16   A.    There are -- it's my understanding
17   there are cochairs of task force now colead by
18   the Cuyahoga County ADAMHS Board and the
19   Cuyahoga County Board of Health.
20   Q.    Was the Cuyahoga County Opiate Task
21   Force always a joint partnership between CCBH
22   and the ADAMHS Board?
23   A.    No.
24   Q.    When did it become a joint project
25   with the ADAMHS Board?

Page 76

1    A.    That became a joint project in 2018.
2    Q.    Do you know why?
3    A.    There was -- it -- it's my
4    understanding that there were language changes.
5    I -- I don't know if it was legislation, but
6    there were language changes that mandated that
7    ADAMHS Boards have control of county opiate
8    task forces.
9    Q.    But in Cuyahoga County, that had not
10   been true up until this past year, right?
11   A.    That is my understanding.
12   Q.    Okay.  When was the Cuyahoga County
13   Opiate Task Force established?
14   A.    Officially established in 2010.
15   Q.    When you say it was officially
16   established in 2010 --
17   A.    Uh-huh.
18   Q.    -- does that mean that there was
19   something like this that existed prior to 2010
20   but it just wasn't official?
21   A.    Prior to 2010 we had a small group
22   of individuals who primarily dedicated their
23   time to drug take-back events.  And so there
24   was a smaller foundation of individuals from
25   the organizations that are still currently

Page 77

1    represented on the task force.
2         But in 2010 is when the Ohio
3    Department of Health partnered with
4    FleishmanHillard, and it officially kicked off
5    the Cuyahoga County Board of Health.  So in --
6    in 2010 was the formal inception and
7    establishment of the Opiate --
8    Q.    When did --
9    A.    -- Task Force.
10   Q.    I'm sorry.
11   A.    No.  It's okay.
12   Q.    When did the unofficial group start
13   to do its work in terms of addressing the
14   opioid epidemic in Cuyahoga County prior to the
15   2010 establishment of the task force?
16   A.    I don't recall precisely what year
17   that occurred.  We began working in putting
18   forth some efforts in 2006 -- as far back as
19   2006.  I don't know specifically what year the
20   other groups came together.
21   Q.    Were you involved in the efforts
22   here in Cuyahoga County to address the opioid
23   abuse epidemic that began in 2006?
24   A.    Yes.
25   Q.    What were your responsibilities back

1  in 2006 when you all started to address the
2  opioid abuse epidemic in the county?
3       MS. SACKS:  Objection.
4       THE WITNESS:  In 2006 my role with
5  this initiative really was primarily focused on
6  improper disposal of medications and the
7  negative impacts that they were having on the
8  environment, landfills, waterways, things of
9  that nature.
10      My role was housed in the
11  environmental health service area at the
12  Cuyahoga County Board of Health, which is how
13  this program landed in that service area.
14      And so at that time we did begin to
15  work with community partners and would host
16  those take-back events.  And through
17  partnership and connection with the Ohio
18  Department of Health and other community-based
19  organizations, we began to see the data that
20  showed the drastic increase in unintentional
21  fatalities.
22      And so it was at that time -- I
23  don't recall specifically what year -- but at
24  the time when we began receiving the data on
25  the increase in the fatalities, we shifted our

1  focus from the environmental impacts to
2  prevention efforts.
3    Q.   Okay.  Is it fair to say that you
4  were aware -- at least those of you at CCBH
5  working on this issue were aware of the
6  increased number of prescription drug overdoses
7  and overdose deaths in connection with
8  prescription opioids by the 2006, 2007 time
9  frame?
10      MS. SACKS:  Objection.
11      THE WITNESS:  I don't recall
12  specifically if it was within the 2006, 2007
13  time frame.
14      BY MR. BOEHM:
15    Q.   Okay.  Do -- do you recall when it
16  was that you realized that there was an uptick
17  in prescription opioid overdoses in Cuyahoga
18  County?
19      I don't mean the exact date.  I mean
20  --
21    A.   Yeah.  Yeah.  So it was -- but --
22  but to even pinpoint a specific year, I don't
23  recall specifically.
24    Q.   Okay.  We'll look at some documents
25  about that that --

1    A.   That would help.
2    Q.   -- hopefully will refresh your
3  recollection.
4    A.   Okay.
5    Q.   Who were the founders of the
6  Cuyahoga County Opiate Task Force?
7    A.   The Cuyahoga County Opiate Task
8  Force was formed at the Cuyahoga County Board
9  of Health.  I was one of the initial members,
10  as was Mr. Caraffi, and then a few other folks
11  from community-based organizations.
12    Q.   Is there a relationship between the
13  Ohio Department of Health Injury Prevention
14  Grant and the formation of the Cuyahoga County
15  Opiate Task Force, or are those two separate
16  and independent events?
17    A.   They're separate and independent
18  events.  However, the establishment of the
19  Cuyahoga County Opiate Task Force, ODH, I
20  believe I mentioned, in 2010 partnered with a
21  PR firm known as FleishmanHillard.  That was by
22  design of the Ohio Department of Health.
23      One of the counties that
24  FleishmanHillard worked with was Cuyahoga
25  County.  And that was due to burden within that

1  county.  And so the establishment was there.
2      The funding opportunity, although it
3  was independent of that work, I think because
4  we had the solid relationships and had already
5  laid the foundation of the task force, I think
6  that did assist in us being successful in
7  receiving the funding.
8    Q.   Did you or others at CCBH work
9  directly with FleishmanHillard in connection
10  with addressing the opioid abuse epidemic in
11  Cuyahoga County?
12      MS. SACKS:  Objection.
13      THE WITNESS:  Can you be more
14  specific about -- what do you mean by
15  "directly"?
16      BY MR. BOEHM:
17    Q.   Well, did you work with them?
18      I -- I'm try -- I'm intentionally
19  not being overly specific.
20    A.   Uh-huh.
21    Q.   And my question to you is whether or
22  not you or others at CCBH, to your knowledge,
23  worked with --
24    A.   Uh-huh.
25    Q.   -- people from FleishmanHillard in

21 (Pages 78 - 81)

Page 82

1 connection with your efforts to address the
2 opioid abuse epidemic --
3     A.  Uh-huh.
4     Q.  -- in Cuyahoga County.
5     A.  My recollection of our interaction
6 with FleishmanHillard is that they -- they
7 attended our existing Opiate Task Force
8 meetings, and they were responsible for
9 creating marketing materials in the form of
10 educational and awareness-raising documents and
11 materials.
12     Q.  Okay.  Did they have medical
13 professionals at FleishmanHillard who were
14 assisting in that efforts?
15     A.  I do not know.
16     Q.  Did you personally work with anyone
17 at FleishmanHillard in connection with
18 addressing the opiate -- opioid epidemic in
19 Cuyahoga County?
20     A.  I did not, other than communicating
21 with the individual who attended the Cuyahoga
22 County Opiate Task Force meeting.
23     Q.  Did FleishmanHillard provide
24 materials for you to use in connection with
25 your awareness efforts or other initiatives?

Page 83

1     A.  They did.
2     Q.  Do you know how those materials were
3 generated?
4     A.  I do not.
5     Q.  Did you use those materials?
6     A.  My recollection is yes.
7     Q.  Would those be materials you would
8 put into slide decks, or were they used in
9 other ways?
10     A.  Their logo and color scheme that
11 they had created was used in slide decks.
12     Q.  Okay.  Setting aside logos and
13 colors.  I'm talking about content.
14         Did they provide content?
15     A.  I believe so, yes.
16     Q.  And would you use content provided
17 to you by FleishmanHillard in terms of your
18 efforts to -- to increase awareness about the
19 opioid epidemic or for other initiatives?
20     A.  Yes.
21     Q.  And how would you use those
22 materials?
23     A.  We would use them when we were at
24 community events.  As you mentioned, we would
25 utilize those in slide presentations.  And it's

Page 84

1 my understanding that a lot of that content was
2 derived from data from the Ohio Department of
3 Health.
4     Q.  But you're not aware of exactly how
5 those materials were created?
6     A.  I couldn't say specifically.
7     Q.  Okay.  If you go to the next bullet
8 point on Page 2 of Exhibit 1, it says:  "Member
9 of the Ohio Injury Prevention Partnership,
10 OIPP."
11         Do you see that?
12     A.  I do.
13     Q.  What is the Ohio Injury Prevention
14 Partnership?
15     A.  The Ohio Injury Prevention
16 Partnership was a statewide coalition of injury
17 professionals that included a prescription drug
18 action group, which is the -- the next acronym
19 that you see.  So that was a subcommittee of
20 the overall OIPP.
21         So there were statewide
22 professionals that attended that meeting for a
23 variety of injury prevention topics.
24     Q.  When did you become a member of
25 OIPP?

Page 85

1     A.  I don't recall specifically.  I can
2 make a guess, but it would be a guess.
3     Q.  Do you remember roughly?
4     A.  It would have been between 2008 and
5 2010.
6     Q.  Was the Ohio Injury Prevention
7 Partnership established for the purposes of
8 addressing prescription drug abuse?
9     A.  That was one of their priority
10 injury action areas.  I could not say
11 definitively if that was one of the sole
12 purposes in which it was established.
13     Q.  Do you know when it was established?
14     A.  I do not.
15     Q.  Did you join when it was establish
16 or around the time it was established?
17     A.  No.  It was established prior to me
18 joining.
19     Q.  And then you indicated that there
20 was this subgroup of the Ohio Injury Prevention
21 Partnership called the Prescription Drug Abuse
22 Action Group.
23     A.  Correct.
24     Q.  And it looks like there's an acronym
25 for that, P-D-A-A-G?

22 (Pages 82 - 85)

Page 86

1    A.   Correct.
2    Q.   Do you sometime -- what to you call
3  that, PDAAG?
4    A.   PDAAG.
5    Q.   What is the Prescription Drug Abuse
6  Action Group?
7    A.   The Prescription Drug Abuse Action
8  Group was a subcommittee of the overall larger
9  Ohio Injury Prevention Partnership.  And just
10  in the way that OIPP was comprised of injury
11  prevention professionals that were dedicated to
12  a handful of other -- other injury prevention
13  topics, this subcommittee was comprised of
14  individuals that were focused primarily on
15  prescription drug abuse.
16    Q.   Okay.  When was the Prescription
17  Drug Abuse Action Group set up?
18    A.   I do not know.
19    Q.   Do you know roughly?
20    A.   I do not.
21    Q.   But you were a member of that?
22    A.   I was.  I was not a founding member,
23  but I was a member.
24    Q.   Do you recall when you became a
25  member of the Prescription Drug Abuse Action

Page 87

1  Group?
2    A.   It would have been at the same time
3  that I joined the OIPP.
4    Q.   Sometime between 2008 and 2010?
5    A.   Approximately.
6    Q.   What was your role in connection
7  with the Prescription Drug Abuse Action Group?
8    A.   Initially I was an attendee.  I
9  would attend and -- and listen in.  And we
10  talked about statewide efforts that were
11  underway, share best practices and -- and talk
12  about things of that nature.
13         As time progressed, I did play more
14  of a role in the PDAAG.
15    Q.   Okay.  Tell me about how your role
16  evolved.
17    A.   So as our time with the grant
18  evolved, we received supplemental funding from
19  the Ohio Department of Health to enhance and
20  increase our statewide efforts and initiatives.
21  And that included chairing the -- cochairing
22  the Prescription Drug Abuse Action Group.
23    Q.   So you ultimately became the cochair
24  of the Prescription Drug Abuse Action Group?
25    A.   Correct.

Page 88

1    Q.   Okay.  What were your
2  responsibilities as cochair?
3    A.   My responsibilities in cochair were
4  primarily administrative:  creating agendas,
5  meeting minutes, and organizing guest speakers
6  for the group.
7    Q.   Would you make public presentations
8  in your capacity as a member and then
9  ultimately cochair of the Prescription Drug
10  Abuse Action Group?
11    A.   Not on behalf of the PDAAG.
12    Q.   Okay.  You were making presentations
13  on behalf of CCBH at the time but not on behalf
14  of PDAAG?
15    A.   That is correct.  I -- I can't
16  recall, as -- in my time as cochair or even as
17  a member, if I gave a presentation while
18  attending a PDAAG meeting.  But I never give a
19  community-based presentation on behalf of
20  PDAAG.
21    Q.   Obviously this résumé is not a
22  hundred percent up-to-date.  So maybe you and I
23  can fill in some of the gaps for the record.
24         You're no longer employed at CCBH,
25  correct?

Page 89

1    A.   That is correct.
2    Q.   When did you leave CCBH?
3    A.   I left CCBH August of 2017.
4    Q.   Why did you choose to leave from
5  your position at the Cuyahoga County Board of
6  Health?
7    A.   I had another opportunity that
8  presented itself.
9    Q.   What opportunity was that?
10    A.   That was the role of the executive
11  director of the Northeast Ohio Hospital Opioid
12  Consortium.
13    Q.   What is the Northeast Ohio Hospital
14  Opioid Consortium?
15    A.   The Northeast Ohio Hospital Opioid
16  Consortium was a collaboration of five of our
17  area's large hospital systems that had come
18  together to work collaboratively to curb the
19  opiate epidemic.
20    Q.   What are the member hospitals of
21  this consortium?
22    A.   There were five member hospital:
23  the Cleveland Clinic, University Hospitals,
24  MetroHealth, the VA, and St. Vincent Charity
25  Medical Center.

23 (Pages 86 - 89)

Page 90

1    Q.    Did I understand correctly that this
2    consortium was established specifically for the
3    purpose of addressing the opioid epidemic?
4        A.    That is correct.
5        Q.    And you became the executive
6    director?
7        A.    That is correct.
8        Q.    What were your responsibilities in
9    that role as executive director of the
10   Northeast Ohio Hospital Opioid Consortium?
11       A.    My responsibility was to streamline
12   and coordinate the efforts, share best
13   practices within the hospitals that were
14   participants in that, to create a strategic
15   plan to move us forward in unison and agree
16   on -- on common goals.
17       Q.    Okay.  You indicated that one of
18   your responsibilities was to help establish
19   best practices, right?
20       A.    My role was not to establish the
21   best practices.  It was to share best practices
22   that were underway within the hospital systems.
23       Q.    Okay.  Tell us about the best
24   practices that you have in mind when you talk
25   about sharing those within the hospitals that

Page 91

1    are participating in the consortium.
2        A.    One example that comes to mind is
3    building functionality into their EMRs that
4    would essentially prohibit and limit the
5    overprescribing of medications.
6            Another example that comes to mind
7    was systemwide education on proper prescribing
8    and misconceptions to opioid abuse.  So
9    essentially educating the staff with a unified
10   message.
11       Q.    Okay.  Any other examples come to
12   mind in terms of best practices?
13       A.    There were others, but not at the
14   moment.  Those are the two that -- that come to
15   mind.
16       Q.    Okay.  Let's talk about those two.
17            What is an EMR?
18       A.    An ER -- EMR is an electronic
19   medical record.
20       Q.    Okay.  What were the best practices
21   in terms of electronic medical record
22   functionality insofar as it concerns
23   appropriate use of prescription opioids?
24       A.    My understanding, from my capacity
25   and not having direct access to their EMRs or

Page 92

1    being responsible for inputting this data, the
2    information that was shared with me was a
3    particular hospital system building into their
4    own EMR -- and I should state also that these
5    hospitals systems did not all share the same
6    type of EMR.  They didn't communicate with one
7    another.  The EMRs did not communicate with one
8    another.
9            But they -- they built functionality
10   into the system that, when a physician would
11   input in a prescription dosage or information
12   about a patient, if it exceeded a quantity that
13   had been set forth by their hospital's adoption
14   of prescribing guidelines, it would trip a red
15   flag.
16            And then, based upon the physician
17   recommendations or what they felt, they
18   could -- they could supersede that -- that red
19   flag, or they could make other determinations.
20            But this -- this capturing of this
21   data within their system did identify
22   prescribing patterns and trends among the
23   providers within the hospital systems.
24       Q.    I -- okay.
25            Is it fair to say that there had

Page 93

1    been variation as between the different
2    hospitals participating in the consortium in
3    terms of the level of functionality for
4    electronic medical records?
5        A.    That is correct.
6        Q.    Was one of your objectives to
7    standardize a functionality across the
8    consortium?
9        A.    One of my objectives wasn't
10   necessarily to standardize it in the sense that
11   they would all be on the same EMR.  But it
12   would be -- one of my objectives would be to
13   share this information with another hospital
14   system in the hopes that -- that they could
15   elevate their system to -- to meet those same
16   objectives.
17            Didn't necessarily have to mirror
18   one another but to share that best practice.
19       Q.    Okay.  Was there one or two of the
20   hospitals that seemed to be doing a better job
21   in terms of EMR functionality than the others
22   that -- that served as a --
23       A.    Uh-huh.
24       Q.    -- kind of the model or the
25   standard?

24 (Pages 90 - 93)

Page 94

1      MS SACKS:  Objection.
2      BY MR. BOEHM:
3      Q.   Go ahead.
4      A.   From the information that was shared
5  with me, again, not ever working directly with
6  their EMRs, you know, they each had their --
7  their own strengths and weaknesses, not only in
8  terms of the EMR but with a broad sense of
9  their opioid related prevention efforts and
10 programming.
11     Does that answer your question?
12     Q.   I think partly.
13     Were -- was -- was there a hospital
14 or two among the consortium that -- that, in
15 your view, had better practices and procedures
16 in terms of guiding physicians and staff --
17     A.   Uh-huh.
18     Q.   -- in terms of the use of
19 prescription opioids?
20     A.   In terms of specifically referring
21 to the EMR, the Cleveland Clinic and
22 MetroHealth stood out to me as examples that
23 had sound systems place.  In terms of education
24 and prevention efforts, those two systems also
25 stood out.

Page 95

1      The VA excelled in different areas
2  in terms of their Naloxone distribution, for
3  example.
4      And St. Vincent's also had strengths
5  and weaknesses as well.
6      The -- the hospital systems that
7  made up the consortium were very diverse.  And
8  that was intended to lead -- lead to the
9  strength of the consortium.
10     Q.   What were some of the weaknesses
11 that you spotted or others spotted as part of
12 this consortium efforts -- that -- that you all
13 addressed?
14     A.   Uh-huh.  One of the weaknesses that
15 was identified was the lack of a systemwide
16 standard education message in -- in terms of
17 opioids.
18     Nurses were a -- an area that
19 continued to come to light with specific needs
20 in terms of not only their own education but
21 being able to properly communicate with -- with
22 their patients.  So nursing and education of
23 the nurses and that standardized message was --
24 was one area of weakness.
25     Another area that was identified was

Page 96

1  the -- the level to which the hospital systems
2  distributed Naloxone.
3      Q.   So when you talk about the nurses'
4  education, can you describe for us just a
5  little bit more about what you mean.
6      What was the issue that you were
7  seeing that needed to be addressed?
8      A.   So the information that was shared
9  with me from this -- from these nurses was that
10 there was a lack of education from within the
11 hospital systems, almost as if they felt
12 forgotten.
13     They often have significant
14 interaction with the patients prior to their
15 physician.  There were safety concerns among
16 the nurses.  And they really felt the need to
17 be equipped with the tools to be able to
18 properly communicate not only with the patients
19 but also with the patients' families.
20     To give you an example, there were
21 examples of patients in the hospitals where a
22 family member, friend, loved one would come
23 onto the floor seeking drugs or with the intent
24 to pass along drugs to those patients.  And
25 overdoses were occurring while the individual

Page 97

1  was either a patient within the hospital or
2  their family member or friend or loved one that
3  came to visit them.  And the staff needed to be
4  equipped to properly deal with that.
5      Q.   Okay.  Did you implement changes in
6  terms of the way nurses were being included and
7  the way nurses were being educated when it
8  comes to dealing with individuals who were
9  addicted to opioids?
10     A.   We started to.  Prior to my
11 departure from the Center For Health Affairs,
12 we had created a nursing workgroup to focus on
13 specifically that.  Started with a survey of
14 existing resources and -- and continued from
15 there.  So that was started prior to my
16 departure.
17     Q.   You indicated that you were able to
18 identify trends through review of the
19 electronic medical records and -- and
20 addressing functionality concerns.
21     Did hear that correctly?
22     A.   I specifically did not identify the
23 trends.  The individuals working within the
24 hospital systems that utilize those systems
25 were able to identify those trends.

25 (Pages 94 - 97)

1    Q.    What trends did those individuals
2  identify through the -- the -- the electronic
3  medical records?
4    A.    They were able to identify quantity
5  of prescriptions.  They were able to narrow it
6  down not only to specific providers but also to
7  specific departments within the hospitals.
8            And by identifying those trends, not
9  only to the overprescribers or superprescribers
10  or the -- the departments with the highest
11  rates of dispensing or prescribing of these
12  medications, they were able to create targeted
13  education to those departments.
14    Q.    Okay.
15    A.    And if -- if I'm correct, that was
16  part of the functionality that was built into
17  their -- their EMR.  There were links that
18  would connect them directly to educational
19  platforms.
20    Q.    So if I understand you correctly,
21  through efforts to improve the electronic
22  medical record systems at these hospitals, it
23  became possible to more easily identify
24  physicians at the hospitals who were perhaps
25  prescribing too many prescription opioids to

1  their patients.
2            Is that what I understand?
3    A.    Correct.
4    Q.    Okay.  How many physicians, to your
5  knowledge, were identified as requiring
6  targeted education due to the volume of their
7  prescribing habits?
8    A.    I do not know.
9    Q.    Were there physicians identified at
10  each of the member hospitals whose prescribing
11  habits led to targeted education efforts?
12    A.    Well, remember not all of the
13  participating hospitals utilized that same
14  system.  But those that did, it was my
15  understanding that they were able to identify
16  prescribers that did not comply or had habits
17  that were out of line with the prescribing
18  guidelines.
19    Q.    Which of the member hospitals had
20  EMR systems that allowed for the identification
21  of the overprescribing physicians?
22    A.    It's my understanding that was the
23  Cleveland Clinic and MetroHealth.
24    Q.    And MetroHealth and Cleveland Clinic
25  were able to identify physicians who were not

1  following guidelines or were somehow otherwise
2  overprescribing to patients?
3    A.    That --
4          MS. SACKS:  Objection.
5          BY MR. BOEHM:
6    Q.    Go ahead.
7    A.    That was my understanding.
8    Q.    Do you know many -- how many
9  physicians at Cleveland Clinic were identified
10  as potentially overprescribing?
11    A.    I do not know.
12    Q.    Do you know how many physicians of
13  MetroHealth were identified as overprescribing?
14    A.    I do not know.
15    Q.    What efforts were undertaken by
16  those hospitals or by the consortium overall to
17  address the prescribing habits of the specific
18  physicians at those institution who were
19  identified as overprescribing?
20    A.    It's my understanding that each of
21  those institution that utilized that type of
22  system had their own education and
23  requirements.  Once those physicians or
24  departments were identified, they -- they had
25  their own requirements on how it was addressed,

1  through education, through disciplinary action.
2  That was not standardized among the consortium
3  hospitals.
4    Q.    How many physicians at Cleveland
5  Clinic or MetroHealth were disciplined in
6  connection with their prescribing habits of
7  prescription opioids?
8    A.    I do not know.
9          MS. SACKS:  Objection.
10    Q.    Were some disciplined?
11          MS SACKS:  Objection.
12          THE WITNESS:  I do not know
13  specifically.
14          BY MR. BOEHM:
15    Q.    Do you know who we would have to ask
16  about that?
17    A.    You would have to ask those
18  institutions.
19    Q.    Okay.  You indicated that you were
20  able -- those institution were able to
21  identifying physicians who weren't following
22  guidelines, right?
23    A.    Yes.
24    Q.    What guidelines are you referring
25  to?

1  A.  So the hospital systems had
2  adopted -- whether it was the CDC proper
3  prescribing guidelines or the Ohio department
4  proper prescribing guidelines.  I'm referring
5  to those proper prescribing guidelines.
6  Q.  Okay.  Have those guidelines
7  outlined by the CDC been adopted by the
8  Northeast Ohio Hospital Opioid Consortium?
9  A.  I cannot say specifically whether
10  they have adopted standardized uniform
11  prescribing guidelines.  I know that the -- the
12  participating hospitals and the consortium have
13  adopted a version of the CDC or the Ohio
14  guidelines.
15  Q.  You said a version of the CDC or
16  Ohio guidelines?
17  A.  Uh-huh.
18  Q.  And what do you mean by "Ohio
19  guidelines"?
20  A.  Ohio released their own set of
21  proper prescribing guidelines that had called
22  out specific areas:  acute care, emergency
23  departments settings.  And I believe there was
24  one other environment that they called out in
25  their prescribing guidelines.

1  Q.  Do you know if the member hospitals
2  of the Northeast Ohio Hospital Opioid
3  Consortium have each formally adopted a written
4  guideline for the prescribing of prescription
5  opioid medications?
6  A.  It's my understanding that they
7  have, yes.
8  Q.  Have each of the members of the
9  opioid consortium adopted the same written
10  guideline, or do they have variation between
11  them?
12  A.  That's what I'm unsure of.  I don't
13  know if they're the same or if there is
14  variation among them.
15  Q.  You know the prescribing guidelines
16  from the State of Ohio and from other medical
17  organizations have changed over time with
18  respect to prescription opioids, right?
19  A.  Yes.
20  Q.  Okay.  Do you know when the member
21  hospitals for the Northeast Ohio Hospital
22  Opioid Consortium adopted the guidelines
23  currently in place for prescribing opioids?
24  A.  I do not.
25  Q.  Do you know if those guidelines were

1  adopted during the time that you were the
2  executive director of the Northeast Ohio
3  Hospital Opioid Consortium?
4  A.  I do not.
5  Q.  What is the overarching mission of
6  the Northeast Ohio Hospital Opioid Consortium?
7  A.  The overarching mission would be to
8  see a reduction in accidental fatalities
9  attributed to opioid abuse.
10  Q.  Do you believe that the efforts of
11  the Northeast Ohio Hospital Opioid Consortium
12  have had an impact in reducing the number of
13  prescription drug overdoses in Cuyahoga County?
14  A.  I could not quantify that with a
15  percentage that would support that claim.  I do
16  believe that, with the programming that has put
17  in place, that over time it will have a
18  positive impact, if it has not had already.
19  Q.  You indicated that you are no longer
20  with the Northeast Ohio Hospital Opioid
21  Consortium, correct?
22  A.  That is correct.
23  Q.  When did you leave that position?
24  A.  I left that position April of 2018.
25  MS. SACKS:  Before we get into that,

1  could we take a break?
2  MR. BOEHM:  Of course.
3  MS. SACKS:  Okay.
4  MR. BOEHM:  We can go off the
5  record.
6  THE VIDEOGRAPHER:  We are going off
7  the record.
8  This is the end of Media Unit No. 1.
9  The time is 11:01.
10  (A short recess was taken.)
11  THE VIDEOGRAPHER:  We are going back
12  on the record.
13  This is the beginning of Media Unit
14  No. 2.
15  The time is 11:20.
16  You may proceed, Counsel.
17  MR. BOEHM:  Thank you.
18  BY MR. BOEHM:
19  Q.  Welcome back from our short break --
20  A.  Thank you.
21  Q.  -- Ms. Leppla.
22  When we went off the record, we were
23  just finishing our conversation about your time
24  with the Northeast Ohio Hospital Opioid
25  Consortium.  And I had asked you a little bit

27 (Pages 102 - 105)

1  about the EMR systems --
2     A.   Uh-huh.
3     Q.   -- that those hospitals had in
4  place.
5        Do you remember that?
6     A.   I do.
7     Q.   And you particularly mentioned the
8  systems for the Cleveland Clinic and for
9  MetroHealth.  And I just had a couple of
10 follow-ups on that.
11       Have the other hospitals in the
12 consortium -- that is the -- the VA,
13 St. Vincent's and University Hospitals -- have
14 those hospitals adopted the standards and
15 systems for electronic medical record
16 functionality that are in effect at Cleveland
17 Clinic and MetroHealth?
18    A.   I believe they have adopted some
19 functionality within their EMRs.  But they're
20 not standardized to the same level of which the
21 Cleveland Clinic and MetroHealth were
22 utilizing.
23    Q.   When did Cleveland Clinic and
24 MetroHealth adopt their EMR systems?
25    A.   I don't know specifically.  It was

1  prior to my role at the consortium.
2     Q.   Okay.  Did the VA, St. Vincent's or
3  University Hospitals update their EMR systems
4  during the time that you were the executive
5  director of the consortium?
6     A.   That was in progress during my time.
7        MS SACKS: I'm sorry.  One second.
8  My -- my scroll's not working.
9        Oh, nobody's is?
10       THE REPORTER:  Off the record then?
11       MR. BOEHM:  Sure.
12       THE VIDEOGRAPHER:  We -- we are
13 going off the record.
14       The time is 11:22.
15       (A short recess was taken.)
16       THE VIDEOGRAPHER:  We are back on
17 the record.
18       The time is 11:25.
19       You may proceed, Counsel.
20       BY MR. BOEHM:
21    Q.   Ms. Leppla, do you have any views
22 about the strength or weaknesses of the systems
23 in place at University Hospitals insofar as it
24 concerns addressing prescribing of opioid
25 medications?

1     A.   I think the diversity of the member
2  hospitals that were participating on the
3  consortium really lent itself to the intention
4  of what the consortium was all about and to
5  help share those best practices and elevate one
6  hospital system to the level of another one
7  that was excelling in a certain area.
8     Q.   Right.  And that's partly the -- the
9  gist of my question, but it's directly
10 specifically at the University Hospital system.
11       Do you have any views about whether
12 or not that particular hospital had particular
13 strengths or particular weaknesses in terms of
14 their processes and procedures and guidelines
15 insofar as it concerned prescription opioid
16 medications?
17    A.   I do not.
18    Q.   I think you indicated that, in
19 February 2000 -- I'm sorry.
20       It was April 2018 you left your
21 position as the head of this consortium?
22    A.   That is correct.
23    Q.   So you were there in that role for
24 just about one year on the mark.
25    A.   No.  I was there for less than a

1  year.
2     Q.   Less than a year.  I'm sorry.  I
3  must --
4     A.   Uh-huh.
5     Q.   -- have got the dates wrong.
6        Would you just remind me of when you
7  started as the director of the Northeast Ohio
8  Opioid Consortium.
9     A.   I started in September of 2017.
10    Q.   And left in April 2018.
11    A.   Yes.
12    Q.   Why did you leave?
13    A.   The consortium went a different
14 direction and wanted somebody with a clinical
15 background in my role.
16    Q.   Who's in that role now?
17    A.   They have not backfilled my position
18 at this time.
19    Q.   Okay.  Did you want to leave?
20       MS SACKS:  Objection.
21       THE WITNESS:  I was asked to leave.
22 I did want to see the initiatives through.
23       BY MR. BOEHM:
24    Q.   Are you presently employed?
25    A.   I am.

28 (Pages 106 - 109)

Page 110

1    Q.    Where are you working now?
2    A.    I work for PAX Behavioral Health.
3    Q.    What is PAX Behavioral Health?
4    A.    PAX Behavioral Health is a treatment
5 and recovery facility.
6    Q.    What is your position?
7    A.    My position there is twofold. I'm a
8 business development specialist and outreach
9 coordinator.
10    Q.    Is PAX Behavioral Health --
11    A.    Sorry.
12    Q.    That's okay.
13        Is PAX Behavioral Health a business
14 that provides addiction recovery services?
15    A.    Correct.
16    Q.    When were you hired by PAX
17 Behavioral Health?
18    A.    October of 2018.
19    Q.    What are your duties?
20    A.    My duties, in terms of the business
21 development specialist, are to assist them with
22 making an informed decision on where to
23 potentially open a Northeast Ohio facility
24 location.
25        And then I also am doing outreach to

Page 111

1 help place patients at one of our two locations
2 in Florida or Tennessee.
3    Q.    Does PAX Behavioral Health presently
4 have a location in Ohio?
5    A.    They do not.
6    Q.    They intend to open one?
7    A.    That is their intention.
8    Q.    And one of your responsibilities is
9 to look into potential opportunities for the
10 opening of a -- of a location here in Ohio?
11    A.    To assist them making an informed
12 decision on where to locate that facility.
13    Q.    Okay. And then you said you're also
14 an outreach coordinator.
15        What are your responsibilities as an
16 outreach coordinator for PAX Behavioral Health?
17    A.    As an outreach coordinator, my
18 responsibilities are to network and establish
19 relationships with other providers in the --
20 the goal of seeking referrals from patients who
21 would benefit from the care at one of the two
22 locations.
23    Q.    Is PAX Behavioral Health a
24 for-profit corporation?
25    A.    It is.

Page 112

1    Q.    Does PAX Behavioral Health
2 specialize in any particular type of treatment?
3    A.    PAX Behavioral Health offers partial
4 hospitalization and intensive outpatient
5 programming at our Memphis, Tennessee, location
6 and intensive outpatient treatment an
7 outpatient at the Lake Worth, Florida,
8 location. They do provide boarding for those
9 in need.
10    Q.    Does PAX Behavioral Health
11 specialize in the treatment of any particular
12 type of substance use disorders?
13    A.    They are substance abuse as a whole.
14 Yes. They're -- they're substance abuse as a
15 whole.
16    Q.    So they deal with patients who are
17 addicted to virtually any substance.
18        Is that fair?
19    A.    They have the credentialing to do
20 so.
21    Q.    Do you recall participating in the
22 preparation of Cuyahoga County Board of Health
23 annual reports?
24    A.    Yes.
25    Q.    Did you help prepare those reports?

Page 113

1    A.    Yes.
2    Q.    Who else participated in the
3 preparation of the CCBH annual reports?
4    A.    It varied throughout the years. I
5 am not entirely sure how many years I compiled
6 the reports. But primarily I authored the
7 report with contributions from Vince Caraffi,
8 from others from our health department. Our
9 marking and communications director would
10 review it and help edit it for grammar, not so
11 much content but formation.
12    Q.    Is it fair to say that you typically
13 were the principal drafter of the CCBH annual
14 report?
15    A.    Yes.
16        Oh. Forgive me.
17        Are you talking about the Cuyahoga
18 County Board of Health overall annual report?
19    Q.    Yeah. That -- that is what I was
20 referring to.
21    A.    Okay. I apologize.
22    Q.    It's okay.
23    A.    I misunderstood the question.
24        I was the lead author for the
25 Cuyahoga County Opiate Task Force annual

29 (Pages 110 - 113)

Page 114

1  reports.  I was not the lead author for the
2  agencywide annual report.
3       I apologize for misunderstanding the
4  question.
5   Q.   No.  That's okay.  Thank you for
6  clarifying.
7   A.   Uh-huh.
8   Q.   So with respect to the Cuyahoga
9  County Board of Health annual report, did you
10  participate in any way in the preparation of
11  that report?
12   A.   Over the years I would be asked to
13  contribute a -- an article that was related to
14  opioid abuse potentially.  So I don't know how
15  many years that occurred.  But often it would
16  be a section within that annual report.
17   Q.   Did the Cuyahoga County Board of
18  Health prepare an annual report for each of the
19  years that you were employed there?
20   A.   To my knowledge, yes.
21       (Deposition Exhibit 3 was marked for
22  identification.)
23       BY MR. BOEHM:
24   Q.   I'm handing you a document that
25  we've marked as Exhibit 3 for the deposition.

Page 115

1  And is it the 2010 annual report from Cuyahoga
2  County Board of Health.
3       Is this a document that you would
4  have seen before?
5   A.   Yes.
6   Q.   The pages are numbered.  And I'm
7  going to direct your attention to a section
8  that has to do with transcription drug abuse.
9  It's on Page 9.
10       Would you just tell me when you're
11  there.
12   A.   Page 9.  I'm here.
13   Q.   You see the title of this section is
14  "Unintentional Prescription Drug Poisonings and
15  Unused Medications."
16       Did I --
17   A.   Yes.
18   Q.   Did I read that correctly?
19   A.   Yes.
20   Q.   It reads:  "According to the Ohio
21  Department of Health, recent statistics show an
22  alarming trend in Ohio, an increase in
23  prescription drug abuse and overdose."
24       You see that?
25   A.   Yes.

Page 116

1   Q.   And then it refers to a new
2  education and awareness campaign recently
3  launched by the Ohio Department of Health to
4  address the trend, right?
5   A.   Right.
6   Q.   And it says:  "This campaign,
7  Prescription For Prevention, Stop the Epidemic,
8  includes the development of public service
9  announcements, fact sheets and brochures."
10       And it goes on, right?
11   A.   Correct.
12   Q.   Is this a -- is this section a
13  reference to the opioid abuse epidemic?
14   A.   Yes.  This is a reference to the
15  opioid abuse epidemic.
16   Q.   Okay.  And then, if you skip down a
17  sentence or two, there are some bullet points.
18       See that?
19   A.   Yes.
20   Q.   The first bullet point says that, in
21  2007, unintentional drug poisonings became the
22  leading cause of injury death in Ohio,
23  surpassing motor vehicle crashes and suicides.
24       See that?
25   A.   Yes, I do.

Page 117

1   Q.   Okay.  Were you aware of that at the
2  time in 2007?
3       MS SACKS:  Objection.
4       THE WITNESS:  That statistic was
5  presented to me not in 2007 but at the time
6  that this article was produced.
7       BY MR. BOEHM:
8   Q.   What article are you referring to?
9   A.   Or this -- this --
10   Q.   This report?
11   A.   -- section of the annual report.
12   Q.   Okay.  So did you know about the
13  fact that in 2007 the intentional drug
14  poisonings became the leading -- leading cause
15  of injury death before the 2010 annual report
16  was published by CCBH?
17   A.   I don't recall specifically when
18  that data was presented to me that the
19  statistic was what it was in 2007.  But yes, at
20  the time that this was produced, I was aware of
21  that.
22   Q.   If you skip down to the next full
23  paragraph, it says:  "Cuyahoga County is one of
24  the top five counties in Ohio for reported
25  prescription drug overdoses."

30 (Pages 114 - 117)

Page 118

1      You see that?
2    A.   Yes.
3    Q.   When -- do you know what that means?
4      Is that in terms of total number, or
5  is that per capita?
6      What is the measure that's being
7  used to reach that conclusion?
8    A.   At that time -- and this was with
9  that partnership with FleishmanHillard, and ODH
10  contracted with their firm to do this campaign.
11  They identified Cuyahoga County as having -- as
12  being one of the top five counties in the state
13  for having the heaviest burden of accidental
14  drug overdoses at that time.
15    Q.   Fair to say that, in or before 2010,
16  you were aware that Cuyahoga County was
17  experiencing an opioid abuse epidemic?
18    A.   Yes.
19    Q.   Does the Cuyahoga County -- well,
20  let met strike that.
21      Did you always read the Cuyahoga
22  County Board of Health annual reports?
23      MS SACKS:  Objection.
24      THE WITNESS:  Cover to cover?  I
25  don't recall reading them in their entirety

Page 119

1  always.
2      BY MR. BOEHM:
3    Q.   Okay.  Would you typically at least
4  take a look?
5    A.   Yes.
6      MS SACKS:  Objection.
7      (Deposition Exhibit 4 was marked for
8  identification.)
9      BY MR. BOEHM:
10    Q.   Ms. Leppla, I'm handing you a
11  document that I've now marked as Exhibit 4 for
12  purposes of your deposition.  This is the 2012
13  annual report from the Cuyahoga County Board of
14  Health.
15      Do you see that?
16    A.   I do.
17    Q.   Would you have helped to prepare any
18  portion of this annual report?
19    A.   I cannot say specifically without
20  seeing the contents --
21    Q.   Okay.
22    A.   -- of the report.
23    Q.   Would it have been typical for you
24  to have participated in the preparation of the
25  CCBH annual report?

Page 120

1    A.   Only when requested to provide
2  information for a drug-related article.
3    Q.   Okay.  So if there was a section of
4  an annual report from the CCBH having to do
5  with the opioid abuse epidemic in the county,
6  is that something that you likely would have
7  participated in?
8    A.   Yes, likely.
9    Q.   If you turn to the next page of the
10  2012 annual report, you see at the very top
11  there's a photograph of the members of the
12  board; there's a reference to core values; and
13  then a statement of the mission.
14      Do you see that?
15    A.   Yes.
16    Q.   It says the mission is to "Prevent
17  disease and injury, promote positive health
18  outcomes, and provide critical services to
19  improve the health of the community."
20      You see that?
21    A.   Yes.
22    Q.   Is that the mission of the CCBH that
23  has always been in place during the time that
24  you were employed there?
25    A.   I do not believe so.  I believe that

Page 121

1  the -- the overall message of the mission
2  remained consistent throughout my time there.
3  I believe that the language changed at one
4  point during my time of employment --
5    Q.   Do you --
6    A.   -- there.
7    Q.   I'm sorry.
8      Do you recall in what way it
9  changed?
10    A.   The language.  Just the -- the
11  changing up of -- of the language.
12    Q.   Okay.
13    A.   The -- the overall mission and --
14  and intent of our programming remained
15  consistent.  I think they updated to give a
16  fresh mission.
17    Q.   Okay.  Your understanding is the
18  mission itself didn't change, but maybe the way
19  it was described was tweaked in some way, is
20  the --
21    A.   Correct.
22    Q.   Is it your understanding that the
23  mission of CCBH encompassed understanding and
24  responding to the opioid abuse epidemic within
25  the county?

31 (Pages 118 - 121)

Page 122

1    A.   I'm sorry.  Can you repeat the
2    question.
3        Q.   Sure.
4            Is it your understanding that the
5    mission of CCBH encompassed responding to and
6    understanding the opioid abuse epidemic within
7    Cuyahoga County?
8        A.   Yes.
9        Q.   And earlier today you mentioned that
10   you considered CCBH to be the leading health
11   agency in the county that was charged with
12   addressing the opioid abuse epidemic; is that
13   right?
14       A.   We were the -- the county public
15   health agency.  There's also the City of
16   Cleveland Public Health Department that also
17   provides services for the City of Cleveland.
18           So Cuyahoga County Board of Health
19   provided services to municipalities with the
20   exception of the City of Cleveland; and at my
21   -- during my tenure there, Shaker Heights; and
22   during a portion of my time, Lake -- the City
23   of Lakewood.
24       Q.   Okay.  So if we carve out Cleveland,
25   Shaker Heights and Lakewood?

Page 123

1        A.   We -- we absorbed the City of
2    Lakewood health department in 2008.
3        Q.   Okay.  How about Shaker Heights?
4        A.   That was after my departure.
5        Q.   Okay.  Is Shaker Heights now been --
6    let me start over.
7            Has public health responsibility for
8    Shaker Heights now been subsumed within the
9    CCBH?
10       A.   I believe so.
11       Q.   Did that happen after you left CCBH?
12       A.   Correct.
13       Q.   Okay.
14       A.   We were providing some services for
15   those municipalities but not -- not entirely.
16       Q.   And then you indicated that the
17   Cleveland Department of Public Health was in
18   some way independent from CCBH.
19       A.   They are an independent public
20   health agency.
21       Q.   Does Cuyahoga County itself have an
22   independent health agency separate and apart
23   from the Cuyahoga County Board of Health
24   charged with understanding and addressing the
25   opioid abuse epidemic in the county?

Page 124

1        A.   I'm not sure I'm understanding your
2    question.
3        Q.   Does Cuyahoga County itself have a
4    public health agency separate and part from the
5    Cuyahoga County Board of Health that is charged
6    with understanding and addressing the opioid
7    abuse epidemic within the county?
8        A.   There are other agencies within
9    Cuyahoga County that are charged with
10   addressing the opioid epidemic, yes.
11       Q.   Which agencies are those?
12       A.   One that comes to mind is the ADAMHS
13   Board of Cuyahoga County.
14       Q.   For how long has the Cuyahoga County
15   ADAMHS Board had the responsibility of
16   understanding and responding to the opioid
17   abuse epidemic within Cuyahoga County?
18       A.   I do not know.
19       Q.   Did they have that responsibility
20   during the years that you were at CCBH?
21       A.   I do not know when they began their
22   opioid-related programming.
23       Q.   You indicated that, as of the last
24   year or so, the Cuyahoga County Opiate Task
25   Force is now kind of a joint partnership

Page 125

1    between CCBH and the ADAMHS Board.
2            Did understand that correctly?
3        A.   Yes.
4        Q.   Okay.  Setting that aside, in what
5    ways has the ADAMHS Board had responsibility
6    for understanding the scope and addressing of
7    the implications of the opioid abuse epidemic
8    within Cuyahoga County?
9        A.   Not being an employee of the ADAMHS
10   Board, and being intimately embedded in their
11   programming, I cannot say with specifics.
12           But I do know that the ADAMHS Board
13   has created education and awareness campaigns.
14   I know that they've provided funding to create
15   and enhance existing programs or to implement
16   novel programs.  They -- they do community
17   awareness events, public presentations.
18           And I'm sure that's not an
19   exhaustive list.  That's what's coming to mind
20   in this moment.
21       Q.   For how long has the ADAMHS Board
22   been involved in responding to the opioid abuse
23   epidemic in Cuyahoga County?
24       A.   I do not know.
25       Q.   Had the ADAMHS Board undertaken

32 (Pages 122 - 125)

Page 126

1 activities related to addressing the opioid
2 epidemic in Cuyahoga County during the time
3 that you were at the Cuyahoga County Board of
4 Health?
5     A.   Yes, they did.
6     Q.   Okay.  What were the nature of those
7 activities?
8     A.   The nature of those activities were
9 educational campaigns; public awareness
10 campaigns that included radio -- radio spots,
11 billboards.  They, again, have partnered with
12 other agencies, provided funding to enhance
13 their programs.
14     Q.   Do you know the source of the
15 funding that ADAMHS Board provided to other
16 programs?
17     A.   I -- I don't know specifically the
18 source.  I know those are -- they're county
19 dollars that have been spent to enhance
20 programs.
21     Q.   When you say you know they're county
22 dollars, let's spend some time on that.
23       What is the basis for your statement
24 that you know those are county dollars?
25     A.   Well, the ADAMHS Board being a

Page 127

1 county-run agency and being -- funneling those
2 funds and being fiscally responsible to handle
3 those funds and dispense them, those are funds
4 that a county agency receives that they then
5 dispense to organizations to utilize for their
6 programs.
7     Q.   Are you aware of the sources of
8 revenue that the ADAMHS Board has available to
9 it?
10     A.   No.
11     Q.   Okay.  So when you say they're
12 county dollars, you don't mean to say that you
13 have any understanding about the various
14 sources of revenue that the ADAMHS Board
15 actually has available to it.
16       Fair?
17     A.   That's fair.
18     Q.   Okay.  Do you know whether or not
19 the ADAMHS Board receives money from the
20 federal government?
21     A.   I do not know.
22     Q.   Do you know whether or not the
23 ADAMHS Board receives money from the state
24 government?
25     A.   Not definitively.

Page 128

1     Q.   So you don't know, sitting here
2 today, from which sources the ADAMHS Board has
3 made expenditures or provided funding related
4 to addressing the opioid epidemic.
5       Fair?
6     A.   Fair.
7     Q.   Are there any other agencies within
8 Cuyahoga County that, to your understanding,
9 has had responsibility for understanding the
10 scope of or addressing the implications of the
11 opioid abuse epidemic within Cuyahoga County?
12     A.   There are many agencies and
13 organizations within Cuyahoga County that have
14 played a role in addressing this epidemic.
15     Q.   Are there other Cuyahoga County
16 government agencies that, to your
17 understanding, have had responsibility for
18 addressing the opioid epidemic?
19     A.   Yes.
20     Q.   You mentioned the ADAMHS Board.
21     A.   Uh-huh.
22     Q.   Are there any others?
23     A.   The jail.
24     Q.   Okay.  Did you mean the department
25 of corrections?

Page 129

1       Not sure?
2     A.   Not sure.
3     Q.   Okay.  And when you talk about the
4 jail, what do you mean?
5     A.   Again, I -- I don't know the
6 specifics to their programming.  I do know that
7 they have recently expanded their scope of work
8 to be able to provide proper care for the
9 inmates in their facilities that are addicted
10 to opiates.
11     Q.   Okay.  Any other agencies?
12     A.   Are you asking for agencies that are
13 specifically operated by Cuyahoga County?
14     Q.   Yes.
15     A.   Our -- our drug court programs.  Our
16 Naloxone education and distribution program,
17 Project DAWN, that is operated out of
18 MetroHealth.  They've done an amazing job of
19 getting Naloxone into the hands of community
20 members and professionals.
21       Those are what are coming to mind in
22 this moment.
23     Q.   Okay.  To the extent the jail, the
24 drug court, or Project DAWN have made
25 expenditures related to the opioid epidemic in

33 (Pages 126 - 129)

Page 130

1  Cuyahoga County, do you know the source of the
2  revenue that was used for those expenditures?
3      A.  I do not.
4      Q.  Okay.  If you take the 2012 annual
5  report, which is Exhibit 4 --
6      A.  Uh-huh.
7      Q.  -- to your deposition, and turn to
8  Page 19, it's a little confusing, actually,
9  because this annual report has one number in
10  the upper left-hand corner and one number in
11  the lower right-hand corner.
12      A.  I see that.
13      Q.  I don't know if that's just how it
14  prints out or -- or -- or -- or why it comes
15  out that way.  But we'll call this pages 18 and
16  19 even though it's a single page.
17      Is that okay?
18      A.  That is fine.
19      MS SACKS:  I see this doesn't have
20  any Bates numbers.
21      Do you know where you got it from?
22      Maybe it's not a final or --
23      MR. BOEHM:  I -- I don't.  But I
24  imagine this is also just available on the web
25  site.  Let's ask Ms. Leppla.

Page 131

1      BY MR. BOEHM:
2      Q.  Ms. Leppla, are the CCBH annual
3  reports available on the CCBH web site?
4      A.  I don't know at present day if it's
5  available on the web site.  It is -- it is
6  habit of the Board of Health to post the annual
7  reports --
8      Q.  Okay.
9      A.  -- on the web.
10      Q.  On this page, it says at the very
11  top, in all caps and bolded font, "Opiate Abuse
12  Epidemic."
13      Do you see that?
14      A.  Yes.
15      Q.  Why did the Cuyahoga County Board of
16  Health refer to this public health issue as an
17  opiate abuse epidemic?
18      A.  Can you clarify the question.
19      Q.  I'm not sure I can, but I can say it
20  back to you again.
21      My question is why did the Cuyahoga
22  County Board of Health refer to this public
23  health issue as an opiate abuse epidemic?
24      A.  Can we -- are -- are you talking
25  specifically in terms of -- of this document

Page 132

1  that we're reviewing?
2      Q.  I guess we can start there.  Sure.
3      A.  The opiate abuse epidemic would have
4  been referred to as an epidemic because it
5  was -- that term was used and backed by data
6  that our office received.  And we knew that we
7  had an unexpected and an increased number of
8  accidental fatalities within a given population
9  over a particular period of time.
10      Q.  What data are you referring to?
11      A.  I am referring to when we started to
12  be made aware of the increase in fatalities
13  from the data sources from the Ohio Department
14  of Health and Cuyahoga County Medical
15  Examiner's Office.
16      Q.  So when the Cuyahoga County Board of
17  Health refers to the term "epidemic," are they
18  referring specifically to the number of
19  accidental drug overdose fatalities?
20      MS SACKS:  Objection.
21      THE WITNESS:  In public health
22  speak, an epidemic is typically when you have
23  an increased presence of disease or injury, an
24  unexpected increase, over a particular period
25  of time within a given population.

Page 133

1      BY MR. BOEHM:
2      Q.  Okay.  And you determine that
3  Cuyahoga County was experiencing such an
4  epidemic?
5      MS SACKS:  Objection.
6      THE WITNESS:  We had data to back
7  that there had been a significant increase in
8  the number of accidental fatalities.
9      BY MR. BOEHM:
10      Q.  Do you know which criteria or
11  definitions are employed in the public health
12  space to determine when a public health issue
13  qualifies as an epidemic?
14      A.  I'm sorry.  Can you repeat the
15  question.
16      MR. BOEHM:  Maybe I can ask the
17  court reporter to read that back, if it's okay.
18      THE WITNESS:  I'm fine with that.
19      (The record was read as requested.)
20      THE WITNESS:  So in public health
21  space, the CDC defines an epidemic as an
22  increased presence of disease or injury within
23  a particular population over a period of time.
24      BY MR. BOEHM:
25      Q.  Does there need to be a certain

34 (Pages 130 - 133)

Page 134

1    amount of increase, or is any increase
2    sufficient to qualify as an epidemic?
3        A.   I do not know.
4        Q.   Who was it, on behalf of the
5    Cuyahoga County Board of Health, that
6    determined that there was an opioid abuse
7    epidemic taking place in the county?
8        A.   That wasn't a sole determination by
9    a singular employee at the Cuyahoga County
10   Board of Health.
11       Q.   Was it a group discussion?
12       A.   It was a group discussion.
13       Q.   Were you involved in those
14   discussions?
15       A.   I'm sure I was over the years.
16       Q.   When did you first start having
17   conversations with people at the Cuyahoga
18   County Board of Health about the fact that you
19   believed that the data supported the reality of
20   an opioid abuse epidemic in Cuyahoga County?
21       A.   I recall specifically having those
22   conversations in conjunction with the inception
23   of the Cuyahoga County Opiate Task Force and,
24   just prior to that, being made aware of that
25   data, which is what contributed to the

Page 135

1    formation of the Opiate Task Force.
2        Q.   If I showed you materials today that
3    made reference to this significant increase in
4    opioid-related drug overdose fatalities several
5    years before the formation of the Cuyahoga
6    County Opiate Task Force, would that be
7    surprising to you?
8        MS SACKS:  Objection.
9        THE WITNESS:  No.  I don't think it
10   would be surprising.  And efforts were underway
11   prior to the formal inception of the opiate
12   task force.
13       If I recall correctly, you asked me
14   when I remember being specifically made aware.
15   We formed the Cuyahoga County Opiate Task Force
16   in 2010.  We did begin working on efforts and
17   initiatives prior to that.  I don't recall
18   specifically, but there was a reason that we
19   did that.  There had to be data to support
20   those efforts.
21       So I would not be surprised if you
22   had documents that indicated that we were made
23   aware of the data prior to 2010.
24       BY MR. BOEHM:
25       Q.   This document goes on to list

Page 136

1    several efforts in which the Cuyahoga County
2    Board of Health has engaged to address opiate
3    abuse in the county.
4        Do you see that?
5        It's -- it's -- I'm actually
6    specifically looking about two-thirds of the
7    way down page where there are some bullet
8    points.
9        A.   Yes.  I do see those bullet points.
10       Q.   It says "Examples of our involvement
11   include," and then it goes on to list several
12   initiatives and programs that the Cuyahoga
13   County Board of Health has undertaken to
14   address opioid abuse in the county.
15       Fair?
16       A.   Do you mind if I take a moment to
17   read the document?
18       Q.   Not at all.  Please.
19       A.   Okay.  Thank you.
20       Q.   Is that fair?
21       A.   Yes.
22       Q.   There's a reference in the fourth
23   bullet point down to an Opiate Epidemic Across
24   the Life-Span Regional Conference in 2012.
25       A.   Correct.

Page 137

1        Q.   Did you have a role in putting
2    that's conference together?
3        A.   I did.
4        Q.   What was the purpose of that
5    conference?
6        A.   The purpose of that conference was
7    to bring together stakeholders and community
8    members to educate, increase awareness and
9    provide -- provide resources in the community
10       Q.   What region is being referred to
11   when it -- when this bullet point talks about a
12   regional conference?
13       A.   We advertised the event online in a
14   online format.  The members of the Cuyahoga
15   County Opiate Task Force weren't necessarily
16   specifically confined to Cuyahoga County.
17       But when it says "regional
18   conference," it's my understanding that that
19   would refer to the northeast geographic region
20   of the state.  But it certainly wasn't
21   exclusive to that region.
22       Q.   Was the Cuyahoga County Board of
23   Health responsible for putting that conference
24   together?
25       A.   It was a joint efforts.

35 (Pages 134 - 137)

Page 138

1    Q.   Who were the other organizers, if
2  any?
3    A.   There were -- we -- the Cuyahoga
4  County Board of Health took the lead.  But
5  there were other organizations that were
6  members of the Opiate Task Force that did
7  assist in the planning and creation of the
8  event.
9    Q.   Do you remember who those partners
10  were?
11    A.   I remember a few of them.
12    Q.   Who are they?
13    A.   We had -- the Community Awareness
14  and Prevention Association was represented.
15  The Westshore Enforcement Bureau was
16  represented.  Dr. Christina Dallas-Reyes was
17  represented.  Recovery Resources.
18        Those are the ones that first come
19  to mind.
20        (Deposition Exhibit 5 was marked for
21  identification.)
22    BY MR. BOEHM:
23    Q.   The next document we've marked as an
24  exhibit for your deposition is some kind of
25  brochure or summary that was authored by

Page 139

1  yourself and Mr. Caraffi entitled "Cuyahoga
2  County Aims to Reduce Overdose Fatalities."
3        You see that?
4    A.   Yes.
5    Q.   Does this document look familiar to
6  you?
7    A.   Yes.
8    Q.   Do you remember when it was
9  prepared?
10    A.   I do not.
11    Q.   In the second paragraph in the
12  "Background" section, you and Mr. Caraffi write
13  that: "Under the leadership of the Cuyahoga
14  County Board of Health, the Cuyahoga County
15  Opiate Task Force has played a significant role
16  in bringing partners together to combat this
17  public health epidemic."
18        You see that?
19    A.   I do.
20    Q.   When you say that the Cuyahoga
21  County Board of Health has played a significant
22  role in bringing partners together to address
23  the epidemic in the county, what do you mean by
24  that?
25    A.   As the public health agency, it was

Page 140

1  our role to work with stakeholders and work
2  with community-based organizations who are all
3  dedicated to seeing a reduction in these
4  fatalities, to bring them to the table, to
5  participate not only with the Cuyahoga County
6  Opiate Task Force but other initiatives that
7  were occurring throughout the county.
8    Q.   If you turn to the second page of
9  the document, there's a section entitled
10  "Future Directions."
11        Do you see that?
12    A.   Yes.
13    Q.   And you and Mr. Caraffi wrote in the
14  second paragraph there that: "The task force
15  is eager to encourage local hospitals implement
16  physician education" -- I think you meant "to
17  implement physician education."
18        Is that fair?
19    A.   That's fair.
20    Q.   -- "adopt proper prescribing
21  guidelines, and the mandated use of the Ohio
22  Automated Prescription Reporting System."
23        Did I read that correctly?
24    A.   You did.
25    Q.   Can you describe for us why the task

Page 141

1  force was eager to encourage physician
2  education, proper prescribing guidelines, and
3  the mandated use of the OARRS system?
4    A.   I don't know when specifically this
5  document was authored and whether or not it is
6  a final draft.
7        But as part of our grant
8  requirements, as well as with the information
9  that have been shared among the task force
10  members, we felt that those particular tasks
11  and activities would lend themselves to being
12  the types of changes that would make a positive
13  impact in seeing a reduction --
14    Q.   How --
15    A.   -- of fatalities.
16    Q.   I'm sorry.
17    A.   It's okay.
18    Q.   Didn't mean to cut you off.
19    A.   It's okay.
20    MR. BOEHM:  Did you get that?
21    THE REPORTER:  Yes.
22    BY MR. BOEHM:
23    Q.   How has the CCBH or the Cuyahoga
24  County Opiate Task Force encouraged proper
25  prescribing guidelines for the use of

36 (Pages 138 - 141)

Page 142

1  prescription opioids?
2      A.  We partnered closely with -- with
3  MetroHealth and throughout their duration of
4  making their policy and systems changes to
5  incorporate and adopt their prescribing
6  guidelines and increase their use of OARRS that
7  had been occurring prior to our involvement
8  with them.
9          But part of our role was to, you
10  know, attempt to spread the message to increase
11  the usage of OARRS.
12      Q.  With respect to proper prescribing
13  guidelines, in the view of CCBH and the
14  Cuyahoga County Opiate Task Force, in what way
15  were prior prescribing guidelines not proper?
16      A.  I -- as -- I'm not a medical
17  professional.  I couldn't answer that question.
18      Q.  Well, you and Mr. Caraffi wrote this
19  document, right?
20      A.  Yes.
21      Q.  You wrote that the task force was
22  eager to adopt proper prescribing guidelines,
23  right?
24      A.  Correct.
25      Q.  And the -- I think a fair

Page 143

1  implication of that is that you believed that
2  prescribing guidelines had not been proper.
3          Is that fair?
4      A.  That is fair.
5      Q.  Okay.  In what way do you believe
6  that the prior prescribing guidelines had not
7  been proper?
8      A.  I believe that the prescribing
9  patterns have not -- were not aligned with the
10  prescribing guidelines that were released from
11  the State of Ohio or from the CDC.
12          Guidelines prior to the inceptions
13  of these, I -- I could not answer that
14  question.
15      Q.  Okay.  So I think we are talking
16  about two different concepts maybe.  Let me see
17  if we can tease this out just a little bit.
18          I think you said that you've seen
19  evidence that prescribing patterns by licensed
20  physicians who prescribe prescription opioids
21  to their patients have not always matched up
22  with the guidelines put into effect by the CDC
23  and the Ohio Medical Board.
24          Is that right?
25      A.  That is correct.

Page 144

1      Q.  What evidence have you seen of that?
2      A.  We had data to support that claim
3  from the CDC and the Ohio Department of Health.
4      Q.  What were -- what was the -- the
5  gist or the gravamen of -- of those data?
6      A.  The -- the gist would have been
7  the -- the quantities of medications that were
8  being prescribed.  It was in that nature of
9  what I'm referring to.
10      Q.  Okay.  And -- and you also I think
11  indicated that these had been more recent
12  amendments to prescribing guidelines from the
13  CDC and the medical board, correct?
14      A.  I'm sorry.  I don't think I'm
15  understanding.
16      Q.  Well, you said that they -- they --
17  that prescribing guidelines have put into
18  effect by the CDC and by the Ohio Medical
19  Board --
20      A.  Uh-huh.
21      Q.  -- and that the prescribing patterns
22  that you have not seen don't seem to match those
23  prescribing guidelines, right?
24      A.  Right.
25      Q.  What -- what guidelines from the CDC

Page 145

1  and the Ohio Medical Board are you referring
2  to?
3      A.  I'm referring to the proper
4  prescribing guidelines from the CDC and the
5  State of Ohio.  Those are the only ones that
6  I'm referring to.
7      Q.  When were those put into effect?
8      A.  There have, from the State of Ohio,
9  been a few iterations of those guidelines.
10      Q.  How have the prescribing guidelines
11  changed over time?
12      A.  They have changed in terms -- one
13  example would be the length of dosage of a --
14  particular medications.  MME equivalents have
15  changed over time.
16          Those two examples I can think of at
17  the moment.
18      Q.  So when you talk about the
19  guidelines that are -- you've seen evidence
20  that leads you to believe are not always being
21  followed, are you talking about the guidelines
22  for prescribing opioid medications that are
23  currently in place from the CDC and the Ohio
24  Medical Board, or are you talking about past
25  iterations of prescribing guidelines from those

37 (Pages 142 - 145)

Page 146

1  entities?
2      A.   I don't know if there have been
3  different versions released since we were
4  talking about this.  I believe that we were
5  referring to prescribing patterns.
6      Q.   Well, let's just look at the --
7      A.   That's how --
8      Q.   -- language here.  Because you say
9  you think you need to encourage the adoption of
10  proper prescribing guidelines, which implies
11  pretty clearly that there was something
12  improper about guidelines already in place.
13          Fair?
14      A.   The -- the intent of encouraging the
15  adoption of proper prescribing guidelines was
16  for hospitals to adopt and implement the
17  current prescribing guidelines.
18      Q.   You believe that certain hospitals
19  had failed to adopt guidelines that had been
20  set forth by the Ohio Medical Board and the
21  CDC?
22          MS SACKS:  Objection.
23          THE WITNESS:  Information had been
24  presented to us by task force members that
25  indicated that hospitals could do a better job

Page 147

1  of implementing these prescribing guidelines.
2          BY MR. BOEHM:
3      Q.   Okay.  Is it your understanding that
4  certain hospitals had failed to adopt the
5  guidelines for prescribing prescription opioids
6  that had been set forth by the Ohio Medical
7  Board and the CDC?
8      A.   I don't believe that they had failed
9  to adopt what was required of them.
10          The information that had been
11  presented to us is that there was room for
12  improvement and to adoplement [sic] -- or adopt
13  and implement these guidelines on a systemwide
14  basis.
15      Q.   What -- when -- when you and
16  Mr. Caraffi wrote that you wanted to adopt
17  proper prescribing guidelines, what specific
18  guidelines did you have in mind that you
19  thought ought to be adopted?
20      A.   At that time, it's my understanding
21  that we were talking about the most recent
22  iteration of Ohio prescribing guidelines.
23      Q.   Okay.  Did you believe that adoption
24  of the most recent Ohio Medical Board
25  prescribing guidelines would have an impact on

Page 148

1  the volume of prescriptions that licensed
2  physician were providing to their patients?
3      A.   Yes.  That was our understanding --
4      Q.   How so?
5      A.   -- at the time.
6          In terms of -- in terms of quantity
7  of medications prescribed.  In terms of
8  utilizing the OARRS system more regularly.  And
9  also in terms of accountability within their
10  systems.
11      Q.   How does one, in your view, go about
12  determining whether or not a individual
13  prescribing decision by a licensed physician to
14  an individual patient is proper or improper?
15      A.   That was not our determination to
16  make.  The information that was shared with us
17  from members of the Cuyahoga County Opiate Task
18  Force as well as the community agencies that we
19  partnered with on our initiatives provided that
20  information.
21      Q.   What information?
22      A.   The information that there could be
23  enhanced use or adoption of the guidelines.
24      Q.   Okay.  Was there ever a time when,
25  in your view, prescribing guidelines

Page 149

1  contributed to the opioid abuse epidemic in
2  Cuyahoga County?
3          MS SACKS:  Objection.
4          THE WITNESS:  I couldn't say
5  definitively.
6          BY MR. BOEHM:
7      Q.   Couldn't say.
8          So if I found in one of your slide
9  decks, these presentations that you went around
10  talking about, that said you thought the
11  prescribing guidelines had been a contributing
12  factor to the opioid abuse epidemic in Cuyahoga
13  County, that would be a surprise to you?
14          MS SACKS:  Objection.
15          THE WITNESS:  Prescribing practices
16  I felt contributed to it.  I do not recall
17  specifically talking about prescribing
18  guidelines contributing to the epidemic.
19          BY MR. BOEHM:
20      Q.   Okay.  Do you know whether or not
21  the Ohio Medical Board, the CDC, the Federation
22  of State Medical Boards, or any other medical
23  associations or organizations have -- have
24  modified their proposed guidelines for the
25  prescribing of prescription medications over

38 (Pages 146 - 149)

Page 150

1  the last decade?
2      A.   Can you repeat the question.
3          MR. BOEHM:  I can have the court
4  reporter read it back to you.
5          (The record was read as requested.)
6          MR. BOEHM:  Prescription opioids
7  over the last decade.
8          THE WITNESS:  That was my
9  understanding.
10          BY MR. BOEHM:
11      Q.   Your understanding is that they have
12  modified them?
13      A.   That they have modified them.
14      Q.   Okay.  In what ways do you
15  understand medical organizations, including the
16  Ohio Medical Board, to have modified their
17  recommendations and guidelines for how licensed
18  physician prescribe opioids to their patients?
19      A.   In terms of -- they have created
20  guidelines for specific settings.  I don't know
21  the specific language or cannot site specific
22  examples of how they have been modified over
23  the last decade.
24      Q.   Okay.  Just looking back to your
25  language here with Mr. Caraffi about the

Page 151

1  adoption of proper prescribing guidelines, is
2  it your testimony, as you sit here today, that
3  what you and Mr. Caraffi actually meant is that
4  hospitals needed to implement existing
5  guidelines?
6      A.   "Existing" may be a fair term.  We
7  did work regularly with staff members at the
8  Ohio Department of Health, and adoption of
9  proper prescribing guidelines was commonly a
10  phrase that was used and talked about.
11      Q.   When you heard that phrase used and
12  talk [sic] about, the adoption of appropriate
13  prescribing guidelines, what did you understand
14  that to mean?
15      A.   That the State of Ohio had created a
16  set of guidelines that would assist with
17  prescribing habits of providers.
18      Q.   And --
19      A.   -- and prescribers.
20      Q.   And what's your understanding as to
21  when the State of Ohio adopted guidelines to
22  assist licensed physicians with the prescribing
23  of prescription opioids to their patients?
24      A.   I don't know when they were first
25  adopted.

Page 152

1      Q.   Do you -- are you able to identify
2  roughly any particular time when the State of
3  Ohio adopted guidelines to assist physicians in
4  prescribing opioids to their patients?
5      A.   No.  Not specifically.
6      Q.   In the final sentence of the second
7  page of this brochure from you and Mr. Caraffi,
8  which is Exhibit 5, it states that by 2018 it's
9  a goal of the Cuyahoga County Opiate Task Force
10  to see a 15 percent reduction in accidental
11  deaths from prescription drug overdose.
12          Did I read that correctly?
13      A.   You did.
14      Q.   How does the Cuyahoga County Board
15  of Health define a prescription drug overdose?
16      A.   A prescription drug overdose
17  was this data -- was data that was provided to
18  us from the Cuyahoga County Medical Examiner's
19  Office.  We did not set forth the definition.
20          The Ohio Department of Health, as
21  well as our Cuyahoga County Medical Examiner's
22  Office, with access to their data, would rule a
23  drug overdose accidental based upon the
24  information that they had about that individual
25  case or patient.

Page 153

1      Q.   Do you know though Cuyahoga County
2  Office of the Medical Examiner would
3  characterize or classify overdose deaths as
4  between illicit opiates like heroin versus
5  prescription opioids that are available through
6  a licensed physician?
7      A.   So through their toxicology screens,
8  they were able to identify the substances that
9  were within the individual's system as well as
10  had access to the OARRS report that would
11  supplement that information.
12      Q.   Is it your understanding that the
13  Cuyahoga County Office of the Medical Examiner
14  could specifically identify a particular type
15  of prescription opioid medication as part of
16  the toxicology analysis it performed upon
17  autopsy?
18      A.   That was my understanding.
19      Q.   Okay.  What is the basis of that
20  understanding?
21      A.   We did the poison death review
22  committee, as well as the Cuyahoga County
23  Medical Examiner's Office would provide us with
24  data and case reviews of the patients that had
25  died from a drug-related overdose.  And within

39 (Pages 150 - 153)

1  that report, in the toxicology screen, it would
2  indicate the substances that were in their
3  system.
4      Q.   And could you identify the
5  particular type of prescription opioid --
6          MS SACKS:  Objection.
7          BY MR. BOEHM:
8      Q.   -- through the toxicology report?
9      A.   It would indicate things like
10  hydrocodone, oxycodone, a benzodiazepine.  It
11  would -- it would list those out --
12     Q.   Were you --
13     A.   -- specifically.
14     Q.   Sorry.
15         Through the toxicology reports from
16  the Cuyahoga County Office of Medical Examiner,
17  were you able to determine the manufacturer of
18  any particular opioid that was detected through
19  the toxicology reports performed?
20     A.   I personally was not.
21     Q.   Do you know if anybody at the
22  Medical Examiner's Office could have used
23  toxicology data to identify the manufacturer of
24  an opioid detected through the toxicology
25  analysis?

1      A.   I'm not certain.  Unless there was
2  an exception where there was a particular type
3  of drug that had a singular manufacturer.
4      Q.   You write here that you're hoping to
5  see a 15 percent reduction in accidental deaths
6  from prescription drug overdoses.
7          Was that objective with respect to
8  prescription opioid medications or accidental
9  prescription drug overdoses in general?
10     A.   That reduction was -- we were hoping
11  to see a 15 percent reduction in accidental
12  prescription drug overdoses.
13     Q.   Okay.  So not just opioid
14  medications.
15     A.   I don't recall.  But the -- the main
16  goal was to see a reduction in accidental drug
17  overdoses from prescription medications.
18     Q.   Got it.  And I'm just trying to --
19     A.   Uh-huh.
20     Q.   -- understand better whether or not
21  this --
22     A.   Yeah.
23     Q.   -- reference is specific to
24  prescription opioid medications or if it's more
25  general to prescription drugs overall.

1      A.   And I was trying to think that
2  through out loud a little bit.  We were
3  primarily focused on accidental drug overdoses
4  that were attributed to opioids.
5      Q.   Do you know if there has been a
6  15 percent reduction in accidental deaths from
7  prescription drug overdoses in Cuyahoga County?
8      A.   I don't know specifically.  I was no
9  longer employed with the Board of Health at the
10  time that that final analysis was run.
11     Q.   Do you know what the trends are in
12  terms of the number of prescription drug
13  overdose over the last five or ten years
14  increase Cuyahoga County?
15     A.   Yes.
16     Q.   Are they going up, or are they going
17  down?
18     A.   They --
19         MS SACKS:  Objection.
20         THE WITNESS:  They had gone up.
21  I -- recently they have decreased and declined.
22         BY MR. BOEHM:
23     Q.   For how many years -- well, and I
24  don't know if you know this.
25         But do you know for how many years

1  the number of prescription opioid drug
2  overdoses --
3      A.   Uh-huh.
4      Q.   -- has been declining in Cuyahoga
5  County?
6      A.   I know that, when we first began
7  working in this space, we were continuing to
8  see an increase --
9      Q.   Right.  But my --
10     A.   -- in those deaths.
11     Q.   I have a different question.
12         My question is do you know for how
13  many years the number of prescription opioid
14  drug overdoses has been declining in Cuyahoga
15  County?
16     A.   Not specifically.
17     Q.   But it has been declining for
18  several years right?
19     A.   Yes.
20     Q.   Do you consider the Cuyahoga County
21  Board of Health to be a part of Cuyahoga
22  County?
23     A.   I'm not sure I understand --
24     Q.   Let -- let me --
25     A.   -- the question.

40 (Pages 154 - 157)

Page 158

1    Q.   -- ask it a different way.  Yeah.
2   That's a little bit clumsy.
3        Is the Cuyahoga County Board of
4   Health a part of Cuyahoga County government?
5    A.   We operated independently of the
6   Cuyahoga County government with the exception
7   of their fiscal responsibility --
8    Q.   And --
9    A.   -- or fiscal --
10   Q.   -- I'm not --
11   A.   -- fiscal relationship with us.
12   Q.   What do you mean the fiscal
13  relationship with the county?
14   A.   It was my understanding that they
15  served as our bank, for lack of a better way to
16  describe it.
17   Q.   What do you mean by that?
18   A.   Our paychecks were signed by the
19  county auditor.  Certain grant requirements had
20  to funnel through county agencies.
21       But other than financially, we
22  operated, for the most part, independently of
23  Cuyahoga County government.
24   Q.   Who is responsible for budgeting and
25  expenditures at the Cuyahoga County Board of

Page 159

1   Health?
2    A.   There's more than one person that's
3   responsible for that.  We do have -- or the
4   Cuyahoga County Board of Health has a chief
5   financial officer.  And she would be the
6   head --
7    Q.   Who is that?
8    A.   -- of that.
9        Her name is Judy Wirsching.
10   Q.   Will you spell the last name,
11  please?
12   A.   W-I-R-S-C-H-I-N-G.
13   Q.   Is Ms. Wirsching still at the
14  Cuyahoga County Board of Health?
15   A.   I don't know.
16   Q.   Was she there when you left?
17   A.   Yes.
18   Q.   Was she there when you started?
19   A.   I believe so, but I'm not certain.
20   Q.   Is she the person who you believe
21  had primary responsibility for managing budgets
22  and expenditures on behalf of Cuyahoga County
23  Board of Health?
24   A.   Yes.
25   Q.   What are the -- do you know, or

Page 160

1   would we have to ask Ms. Wirsching, what the
2   sources of revenues are for the Cuyahoga County
3   Board of Health?
4    A.   That would be a question for
5   Ms. Wirsching.
6    Q.   Did you know that information during
7   the time that you were employed at CCBH?
8    A.   Can you rephrase the question --
9    Q.   Well, I'm asking --
10   A.   -- repeat the question.
11   Q.   -- whether or not, during the time
12  that you were at CCBH, you could tell us what
13  the sources of revenue were for the operations
14  and programs of the Cuyahoga County Board of
15  Health.
16   A.   That was not a intimate part of my
17  job.  I could have been made privy to that
18  information at points along the way, but it
19  wasn't something that I dealt with on a daily
20  basis.
21   Q.   Okay.  Well, setting aside the level
22  of intimacy you had with that, is that
23  information you -- you know?
24   A.   Not at this moment, no.
25   Q.   So sitting here today, you don't

Page 161

1   know what sources of revenue the Cuyahoga
2   County Board of Health had available to it
3   during the time you worked there for purposes
4   of running its operations and its programs
5   and -- and other expenses?
6    A.   I mean yes, we -- we did have
7   revenue from grants and from taxpayer dollars
8    Q.   Okay.  What grants did you receive?
9    A.   There were numerous grants that we
10  received that I wouldn't even be able to begin
11  to list them all.
12   Q.   And when you talk about taxpayer
13  dollars, what do you mean?
14   A.   That the -- the residents of
15  Cuyahoga County taxpayer dollars went to
16  support the -- the funding of the Cuyahoga
17  County Board of Health.
18   Q.   Through what tax --
19   A.   I --
20   Q.   -- is it your understanding that the
21  citizens of Cuyahoga County paid for purposes
22  of CCBH expenditures?
23   A.   I don't know what tax.
24   Q.   Are -- were there any other sources
25  of revenue for CCBH besides grants and -- and

41 (Pages 158 - 161)

Page 162

1  this understanding of yours that there were
2  taxpayer dollars involved?
3      A.   Potentially.
4      Q.   What else?
5      A.   I don't know.
6      Q.   One source of funding would be the
7  Ohio Department of Health, right?
8      A.   That would be a grant.
9      Q.   Okay.  So that's a grant from a
10  state?
11     A.   Correct.  And the -- the initial
12  source of the dollars were federal.
13     Q.   Then --
14     A.   For --
15     Q.   I'm sorry.
16     A.   For our specific grant, the initial
17  source of the dollars were federal dollars.
18     Q.   Other than the Ohio Department of
19  Health Injury Prevention Grant that we've
20  discussed at length this morning, were there
21  any other grants that the Cuyahoga County Board
22  of Health received that were specific for the
23  purpose of addressing the opioid abuse epidemic
24  in the county?
25     A.   Not to my knowledge in my time

Page 163

1  there.
2      Q.   Are you aware of whether or not the
3  Cuyahoga County Board of Health made funding
4  requests directly to Cuyahoga County?
5          MS SACKS:  Objection.
6          THE WITNESS:  Can you repeat the
7  question.
8          BY MR. BOEHM:
9      Q.   Sure.
10         Do you know whether the Cuyahoga
11  County Board of Health made funding requests to
12  Cuyahoga County?
13         MS SACKS:  Same objection.
14         THE WITNESS:  I don't know.
15         BY MR. BOEHM:
16     Q.   To your knowledge, has Cuyahoga
17  County ever budgeted funds specifically for the
18  purpose of studying the causes of the opioid
19  abuse epidemic in Cuyahoga County?
20     A.   Not to my knowledge, outside of the
21  parameters of the grant.
22     Q.   So you threw in a caveat there about
23  outside the parameters of the grant.  And I
24  don't know what that means.
25         What -- what grant are you referring

Page 164

1  to?
2      A.   I'm referring to the Ohio Department
3  of Health Injury Prevention Grant.
4      Q.   Okay.  But -- but I'm asking about
5  something different.  That's a grant --
6      A.   Maybe I didn't understand.
7      Q.   Okay.  My question to you is, to
8  your knowledge, has Cuyahoga County ever
9  budgeted funds specifically for the purpose of
10  studying the causes of the opioid epidemic?
11         Not talking about a grant that comes
12  from the federal government or the state.
13     A.   Okay.  And you're referring to
14  Cuyahoga County, no longer specifically
15  Cuyahoga County Board of Health.
16     Q.   Correct.
17     A.   Okay.  And that threw me off.
18         I could only assume.  I don't know
19  definitively.
20     Q.   You're not -- let's ask it this way:
21  To your knowledge, has Cuyahoga County ever
22  budgeted funds specifically for the purpose of
23  studying the causes of the opioid abuse
24  epidemic in the county?
25     A.   Again, it would be an assumption.

Page 165

1      Q.   I'm not asking for your assumption.
2  I'm asking --
3      A.   I don't -- no.  No.  I don't know.
4      Q.   So -- so the answer is "no."
5          MS. SACKS:  I think she said, "I
6  don't know."
7          BY MR. BOEHM:
8      Q.   Well, I'm asking to -- let me just
9  say it again.
10         To your knowledge, has Cuyahoga
11  County ever budgeted funds specifically for the
12  purpose of studying the causes of the opioid
13  epidemic?
14     A.   Again, my -- I -- I apologize my
15  answer is the same.  I assume that that answer
16  is yes, but I can't say that with 100 percent
17  certainty.
18     Q.   Why do you assume that that answer
19  is yes?
20     A.   Because Cuyahoga County has been
21  working towards combatting this issue for
22  several years now.  It's a problem in our
23  community.  And through conversations, it's my
24  assumption that the county has budgeted dollars
25  to assist --

42 (Pages 162 - 165)

Page 166

1   Q.   Okay.
2   A.   -- with this problem.
3   Q.   Can I ask you just for a moment to
4   set aside your guesses and assumptions and --
5   and answer just with your knowledge.
6        Is that okay?
7   A.   Yes.
8   Q.   Is that fair?
9   A.   It -- it -- it's fair, but I -- it's
10  not a definitive answer.
11  Q.   Understood.  I -- I know you don't
12  know --
13  A.   Uh-huh.
14  Q.   None of us are an encyclopedia of
15  knowledge about everything in the --
16  A.   Right.
17  Q.   -- universe.  So I'm just asking
18  about what you know.
19  A.   Okay.
20  Q.   To your knowledge, has Cuyahoga
21  County ever budgeted funds specifically for the
22  purpose of studying the causes of the opioid
23  abuse epidemic in the county?
24  A.   To my knowledge, my answer would be
25  yes.

Page 167

1   Q.   They have.
2   A.   Yes.
3   Q.   Okay.  Tell me about your knowledge
4   about Cuyahoga County having budgeted funds
5   specifically for the purpose of studying the
6   causes of the opioid epidemic in the county.
7   A.   My knowledge stems from the
8   information that I had just shared with members
9   of the Cuyahoga County Opiate Task Force
10  placing priority on this problem, and through
11  conversations that have occurred, that they
12  have budged dollars.  But I do not know --
13  Q.   When did they do that?
14  A.   -- definitively.
15       I don't know.
16  Q.   How much?
17  A.   I don't know.
18  Q.   Who participated?
19  A.   I don't know.
20  Q.   What were the results?
21  A.   I don't know.
22  Q.   Do you have any knowledge that
23  Cuyahoga County has actually budgeted funds for
24  purposes of studying the causes of the opioid
25  abuse epidemic in the county?

Page 168

1   A.   No.
2   Q.   To your knowledge, has Cuyahoga
3   County ever budgeted funds specifically for the
4   purpose of addressing the opioid epidemic in
5   Cuyahoga County?
6        MS SACKS:  Objection.
7        THE WITNESS:  I only -- I am only
8   aware of the programs that were implemented and
9   discussed at -- at our events.  In terms of
10  their budgeting and the resources that were
11  utilized, I -- I don't know definitively.
12       BY MR. BOEHM:
13  Q.   Okay.  So to your knowledge, has
14  Cuyahoga County ever budgeted funds
15  specifically for the purpose of addressing the
16  opioid epidemic in the county?
17  A.   No.
18  Q.   Do you recall attending a symposium
19  on prescription drug overdoses in July 2009
20  sponsored by the Ohio Department of Health, the
21  Ohio Department of Alcohol and Drug Addiction
22  Service and the Ohio Injury Prevention
23  Partnership?
24  A.   I -- I attended several symposiums.
25  Q.   Do you recall attending one in 2009

Page 169

1   that was sponsored by the Ohio Department of
2   Health, the Drug Addiction Services and the
3   Ohio Prevention Injury Partnership related to
4   prescription drug overdose information?
5   A.   I would need to know more details
6   about it.  I don't -- I don't know specifically
7   if I attended that one.
8   Q.   Does that ring a bell for you?
9        MS SACKS:  Objection.
10       THE WITNESS:  Again, there were
11  numerous conferences and symposiums and events.
12       BY MR. BOEHM:
13  Q.   I understand.
14       I'm just asking if this -- when I
15  describe this one to you, does that ring a
16  bell?
17  A.   No.
18  Q.   Okay.  And I think that the Ohio
19  Injury Prevention Partnership was an entity
20  with which you had an affiliation, right?
21  A.   Yes.
22  Q.   And, in fact, we talked earlier
23  about PDAAG, and you were the cochair of PDAAG,
24  right?
25  A.   Yes.  Uh-huh.

43 (Pages 166 - 169)

Page 170

1    Q.   And PDAAG is a -- a -- a subgroup of
2  the Ohio Injury Prevention Partnership, right?
3    A.   Correct.
4    Q.   But sitting here today, you don't
5  recall attending a conference on the subject of
6  prescription drug overdoses in 2009 that was
7  sponsored in part by the Ohio Injury Prevention
8  Partnership?
9    A.   I was not chair at that time.  I'm
10 not saying that it didn't happen.  I don't -- I
11 can't say that I attended the one that you are
12 specifically referring to.
13      MR. BOEHM:  Okay.  I'm going to mark
14 and show you a document, Ms. Leppla, about that
15 conference from July 2009 to see if it
16 refreshes your recollection about it.
17      (Deposition Exhibit 6 was marked for
18 identification.)
19      BY MR. BOEHM:
20   Q.   Ms. Leppla, I've marked a document
21 as Exhibit 6 for purposes of your deposition
22 that is dated July 29, 2009, and is the agenda
23 for a symposium entitled "Epidemic of
24 Prescription Drug Overdoses:  A Call to
25 Action."

Page 171

1       Do you see that?
2    A.   Yes.
3    Q.   I'll give you a minute to just look
4  over the agenda.
5    A.   Thank you.
6    Q.   And -- and would you please, when
7  you've had an opportunity to do that, let me
8  know whether or not you recall attending this
9  symposium.
10   A.   Okay.  I am finished reading the
11 document.
12   Q.   Do you recall attending this
13 symposium?
14   A.   I actually do not.
15   Q.   None -- nothing on this agenda rings
16 a bell for you?
17      MS SACKS:  Objection.
18      THE WITNESS:  Unfortunately, in this
19 moment, no.
20      BY MR. BOEHM:
21   Q.   Okay.  Is it fair to say that, in
22 and around this time, you were attending
23 multiple conferences on the subject of
24 prescription drug overdose issues?
25   A.   I would say around this time we

Page 172

1  attend conferences and symposiums on this
2  topic.  I think that number would increase over
3  the years.  But it doesn't mean that in 2009 we
4  weren't attending conferences of this nature.
5    Q.   And you see the title of this is
6  "Epidemic of Prescription Drug Overdoses,"
7  right?
8    A.   Yes.
9    Q.   Do you know why in July 2009 this
10 symposium was entitled "Epidemic of
11 Prescription Drug Overdoses"?
12   A.   That would have been the
13 determination of the symposium sponsors.
14      MR. BOEHM:  Okay.  I've marked as
15 the next exhibit a document that is an
16 attendance list for this conference.
17      THE WITNESS:  Uh-huh.
18      MR. BOEHM:  And that's Exhibit 7.
19      (Deposition Exhibit 7 was marked for
20 identification.)
21      BY MR. BOEHM:
22   Q.   And quite conveniently, this seems
23 to be at least partially ordered alphabetically
24 by first name, which means we don't have to go
25 very far to find your name.

Page 173

1    A.   Right.
2    Q.   In fact, it's the second name
3  listed:  "Allisyn Leppla, Cuyahoga County Board
4  of Health."
5       Do you see that?
6    A.   I see that.
7    Q.   Okay.  I take it this doesn't help
8  you remember that you attended this symposium?
9    A.   Honestly, my answer is the same.  I
10 -- if my name is on this attendance list, then
11 I -- it means I attended.  But I do not recall
12 this very specific symposium.
13      I -- I recall attending other
14 statewide conferences and symposiums.  I do not
15 recall this one specifically.
16   Q.   That's fair enough.
17      I want to direct your attention down
18 toward the bottom of the page.  There's the
19 name Colin Johnson.
20      And it appears that Mr. -- Mr.
21 Johnson?
22   A.   Correct.
23   Q.   Yes?
24      -- also was affiliated with the
25 Cuyahoga County Board of Health?

Page 174

1    A.    That's correct.
2    Q.    What was Mr. Johnson's job?
3    A.    Colin Johnson was a supervisor at
4  the Cuyahoga County Board of Health.  He was a
5  supervisor at the time in our water quality
6  division.
7         And in the early days of the
8  Cuyahoga County Board of Health being involved
9  in this issue and, as I had previously
10 mentioned, been focused on the negative
11 environmental impacts that would have, colon
12 was involved in his capacity as supervisor of
13 our water quality division.
14   Q.    If you turn over to the fourth page,
15 I see the name Sandi Hoch, H-O-C-H.
16        Do you know that name?
17   A.    Sandi Hoch.
18   Q.    Oh, okay.  I was mispronouncing it.
19   A.    Sure.
20   Q.    Thank you for the correction.
21        Sandi Hoch, also affiliated with
22 CCBH, right?
23   A.    Yes.
24   Q.    And is Sandi a -- a man or woman?
25   A.    It's a female.

Page 175

1    Q.    Okay.  Is -- Ms. Hoch attended this
2  conference as well?
3    A.    Per the attendance sheet that you
4  have.
5    Q.    Do you recall attending any
6  conference with Ms. Hoch and/or Mr. Johnson on
7  the subject of prescription drug overdoses?
8    A.    Not specifically.  I -- I believe
9  that Sandi Hoch attended the -- the 2012
10 conference that we hosted.
11   Q.    Okay.  And if you flip over to the
12 fifth page, there's another name that's already
13 come up today.  That's Vince Caraffi.
14   A.    Yes.
15   Q.    And he attended this conference as
16 well.
17        Do you see that?
18   A.    Yes.
19   Q.    Do you recall attending a conference
20 on the subject of prescription opioid abuse
21 with Mr. Caraffi, Ms. Hoch and Mr. Johnson?
22   A.    Not collectively.  Vince Caraffi and
23 I attend several conferences, similar
24 conferences.
25   Q.    And then you can see there are

Page 176

1  several people from other parts of the state
2  who also attended the symposia, right?
3    A.    Yes.
4    Q.    For example, on Page 47 there's a
5  Mr. Paul Wilkinson, Jr., from the Akron Health
6  Department about a third of the way down that
7  page.
8    A.    Page 4 of Exhibit 7?
9    Q.    Yes.
10   A.    Okay.
11   Q.    See that?
12   A.    Yes.
13   Q.    And on page 5 at the very bottom,
14 there are two other individuals on behalf of
15 Akron, Ohio:  Darryl Brake and Gwen Wilson.
16        Do you see that?
17   A.    Yes.
18   Q.    Okay.  Does any of this help you
19 remember this conference?
20   A.    No.  Unfortunately, it doesn't.
21   Q.    What specifically did the Cuyahoga
22 County Board of Health do in or around this
23 time, the late -- let's say 2006 to 2010
24 period?
25        Let me start that over.

Page 177

1        MS SACKS:  Objection.  Yeah.
2        BY MR. BOEHM:
3    Q.    Between the years 2006 and 2010,
4  what specifically -- what specifically did the
5  Cuyahoga County Board of Health do to
6  investigate the causes of the opioid epidemic
7  in the county?
8    A.    In the time period that you're
9  referencing between 2006 and 2007, as I have
10 mentioned, that around the 2006 time frame was
11 when we initially began this work.
12        At that time we did not have a
13 singular dedicated employee, such as in the
14 role when we received the funding with -- with
15 the grant.
16        We were focused on the improper
17 disposal of the medications.  We convened
18 partners to host those drug take-back events.
19 And we would host those twice a year, the drug
20 take-back events.  We would host meetings with
21 those partners.  We would participate in
22 community events.
23   Q.    Okay.  Did you investigate the
24 causes of the opioid epidemic during that
25 period of time?

45 (Pages 174 - 177)

Page 178

1    A.   I do not recall specifically.

2    Q.   Do you recall when you at CCBH first
3    undertook to investigate the causes of the
4    opioid abuse epidemic in Cuyahoga County?

5    A.   Post 2006 and before 2010.

6         MR. BOEHM:  Ms. Leppla, I'm handing
7    you a document that will be marked as Exhibit 8
8    for the deposition here today.

9         (Deposition Exhibit 8 was marked for
10   identification.)

11   BY MR. BOEHM:

12   Q.   It's an e-mail from January 2014
13   that was written by Mr. Caraffi to several
14   members of the Cuyahoga County Board of Health
15   where he refers to you by name.

16        And specifically, in the second
17   paragraph of the e-mail, he writes:  "I have
18   attached the 2012 opiate summary report created
19   by Allisyn Leppla, who will be taking the lead
20   on the Injury Prevention Grant we spoke about
21   during our meeting."

22        You see that?

23   A.   I do.

24   Q.   Okay.  Do you recall having prepared
25   a 2012 opiate summary report?

Page 179

1    A.   Yes.

2    Q.   And if you turn, in fact, a couple
3    of pages into this document, you'll see the
4    attachment that Mr. Caraffi sent to the
5    recipients of the e-mail, right?

6    A.   Yes.

7    Q.   Specifically there is an "Ohio's
8    Opiate Abuse Epidemic Summary Report 2012."

9    A.   Correct.

10   Q.   Did you prepare this?

11   A.   I did, with the assistance of other
12   employees of the Board of Health.

13   Q.   Who assisted you in preparing this
14   report?

15   A.   Vince Caraffi would have assisted
16   and our communications director.

17   Q.   In the third paragraph of this
18   report that you prepared, it states:  "In 2010,
19   based on the recommendations of Governor
20   Strickland's Ohio Prescription Drug Abuse Final
21   Report, the Ohio Department of Health launched
22   a comprehensive education and awareness
23   campaign known as Prescription For Prevention:
24   Stop the Epidemic."

25        See that?

Page 180

1    A.   Yes.

2    Q.   Are you aware of the fact that in
3    2010 there was a Ohio prescription drug abuse
4    task force established which then prepared a
5    final report?

6    A.   Yes.

7    Q.   Have you read that report?

8    A.   Years ago.

9    Q.   Okay.  Did you read it at the time
10   that it was issued back in 2010?

11   A.   Yes.

12   Q.   How regularly did you prepare
13   reports such as this one that's an -- an
14   attachment to Vince's e-mail here in Exhibit 8?

15   A.   Typically on any annual basis.

16   Q.   To what extent did your
17   responsibilities at the Cuyahoga County Board
18   of Health include raising money for the
19   programs and operations of CCBH?

20   A.   I -- I was not responsible for
21   fundraising for -- for our programs
22   specifically.

23   Q.   Was there somebody at CCBH who had
24   responsibility for fundraising?

25   A.   I don't think we had a dedicated

Page 181

1    staff member that was responsible for
2    fundraising.

3    Q.   Did you have employees at CCBH who,
4    while perhaps not a dedicated employee to that
5    pursuit, did have responsibility for
6    fundraising operations?

7    A.   I -- not to my knowledge.

8    Q.   Okay.  Did you assist in the
9    application for grants on behalf of CCBH?

10   A.   Yes.

11   Q.   Can you describe what your
12   responsibilities were in terms of applying for
13   grants on behalf of CCBH?

14   A.   Yes.  So my responsibilities in
15   terms of applying for the Ohio Department of
16   Health Injury Prevention Grant, I assisted with
17   the compilation of the application in reaching
18   out to community partners to obtain information
19   and data that would have supported our
20   application.

21        And that would have been, in my
22   mind, applying for funding.

23   Q.   Did you have primary responsibility
24   at CCBH for applying for grant funding?

25   A.   We had several employees that would

46 (Pages 178 - 181)

Page 182

1 apply for grant funding, depending upon the
2 nature of the grant.
3     Q.   Did you assist in the preparation of
4 the grant application for the Ohio Department
5 of Health Injury Prevention Grant that we
6 discussed earlier today?
7     A.   Yes.
8     Q.   Okay.  Did you have primary
9 responsibility for that grant application?
10    A.   In -- not in year one.  Years two
11 through five it would be safe to say that I had
12 primary responsibility.
13    Q.   Who had primary responsibility for
14 the Ohio Department of Health Injury Prevention
15 Grant in year one?
16    A.   Vince Caraffi.
17    Q.   Was the grant application process
18 for the Ohio Department of Health Injury
19 Prevention Grant competitive?
20    A.   It was.  It -- it was -- just want
21 to clarify.  In year one that was a competitive
22 cycle.  It was a five-year award that was not
23 competitive in subsequent years.
24    Q.   In subsequent years you just
25 provided an update to the Department of Health,

Page 183

1 or what were your duties in terms of reporting?
2     A.   We had a variety of responsibilities
3 in terms of reporting quarterly, annually.  And
4 we had to submit a continuation application to
5 the Ohio Department of Health.
6         But during that cycle, it was -- it
7 was not competitive in years two through five.
8     Q.   Other than the Ohio Department of
9 Health Injury Prevention Grant that we've
10 discussed, did, to your knowledge, the Cuyahoga
11 County Board of Health at any other time
12 receive a grant dedicated to addressing the
13 opioid abuse epidemic within Cuyahoga County?
14    A.   I don't believe, in my time at the
15 Board of Health.
16    Q.   Are you aware whether or not the
17 CCBH has received a grant dedicated to
18 addressing the opioid abuse epidemic in the
19 county for a period when you were not employed
20 there?
21    A.   I couldn't say definitively.
22         (Deposition Exhibit 9 was marked for
23 identification.)
24         BY MR. BOEHM:
25    Q.   Okay.  Let's go to the next

Page 184

1 document, which I've marked as Exhibit 9, which
2 is a -- another e-mail exchange.
3         And this is an e-mail exchange
4 that's a little bit longer.  And as these
5 things go, to start from the beginning, you
6 actually have to start at the bottom.
7     A.   Sure.
8     Q.   And the e-mail exchange actually
9 begins with you writing to Mr. Hugh Shannon on
10 November 16th, 2016.
11         Do you see that?
12    A.   Yes.
13    Q.   And you asked him to send you
14 overdose cases for 2015?
15    A.   Correct.
16    Q.   What exactly were you asking for?
17         What data did you want to see?
18    A.   So as part of our grant
19 requirements, we were required to enter in the
20 county death data for that particular year.
21 And in year one of the grant, we realized that,
22 due to the -- the lag time in final rulings on
23 cases, ODH instructed that there -- there would
24 be -- trying to think of how to properly phrase
25 this -- we would -- we would wait a year to

Page 185

1 enter that data.
2         But it was the death data from the
3 Medical Examiner's Office that they had ruled
4 as deaths attributed to drug overdose.
5     Q.   Would the data you received from the
6 Office of the Medical Examiner differentiate as
7 between prescription drug overdoses as opposed
8 to overdoses using illicit opiates?
9     A.   No.  I do not believe so.
10    Q.   You were just getting a big number
11 that included all of opioid-related overdose
12 deaths?
13    A.   It would be --
14         MS SACKS:  Objection.
15         THE WITNESS:  It was indicated in
16 their toxicology screen.  And there was a -- a
17 form database in which the information from the
18 case review was inputted in -- or input into
19 a -- in a database.
20         BY MR. BOEHM:
21    Q.   Okay.  Did you have access to the
22 database?
23    A.   Yes.
24    Q.   Okay.  So you could go into the
25 database -- or the Office of the Medical

47 (Pages 182 - 185)

Page 186

1  Examiner -- and look at the particulars of a
2  particular overdose case?
3      A.   No.  I did not go into a database
4  that was owned and housed by the Office of the
5  Medical Examiner.  This was a database and
6  spreadsheet that was created by the Ohio
7  Department of Health with the intentions of us
8  simply entering in the data that was provided
9  from the Medical Examiner's Office.
10     Q.   Okay.  So my question -- and I'm
11 probably not asking this very clearly.
12     But my question really is or not
13 the -- the data you received from the Office of
14 the Medical Examiner differentiated as between
15 prescription opioid overdoses versus overdoses
16 in individuals who were using illicit opiates.
17     MS SACKS:  Objection.
18     THE WITNESS:  Again, the -- the
19 cases were provided to us.  And in the
20 toxicology screen, it could indicate the
21 substances that were detected as part of the
22 toxicology screen.
23     BY MR. BOEHM:
24     Q.   Did you receive, from the Office of
25 the Medical Examiner, the toxicology analysis

Page 187

1  reports?
2      A.   I had a summary case review sheet.
3      Q.   What is that?
4      A.   It was a sheet on each fatality
5  attributed to drug overdose in Cuyahoga County
6  that would provide demographic information,
7  ethnicity, things of that nature, health
8  history, criminal history, and information
9  regarding the toxicology screen.
10     Q.   Would the toxicology screening
11 provide you information about the substance or
12 substances that were detected during the
13 toxicology analysis?
14     A.   Often.
15     Q.   Were there times when it wouldn't?
16     A.   Not that I can recall specifically.
17     Q.   Okay.  Where were these reports that
18 you received from the Office of the Medical
19 Examiner stored?
20     A.   They were -- they were -- the
21 information was put into the spreadsheet that
22 was created by the Ohio Department of Health,
23 and then they were destroyed.
24     Q.   Was their electronic database kept?
25     A.   The -- the spreadsheet that was sent

Page 188

1  back to the Ohio Department of Health, that was
2  kept.  But it did not capture patient
3  information.
4      Q.   Did you load the information you
5  received from the Office of the Medical
6  Examiner into an Excel spreadsheet?
7      A.   Yes.
8      Q.   And then did you send the Excel
9  spreadsheet to the Ohio Department of Health?
10     A.   Yes.
11     Q.   Was that part of the Injury
12 Prevention Grant deliverables?
13     A.   Yes.
14     Q.   Okay.  Do you know what the Ohio
15 Department of Health did with the Excel
16 spreadsheet that you would send to them?
17     A.   It was intended to identify trends
18 and help steer prevention efforts.
19     Q.   Were data from the spreadsheets
20 concerning overdose data that was sent by the
21 CCBH to the Ohio Department of Health populated
22 into a database?
23     A.   It was a spreadsheet.
24     Q.   You sent them a spreadsheet, right?
25     A.   I sent them a spreadsheet.

Page 189

1      Q.   Okay.  And then what did the -- did
2  the Ohio Department of Health load the
3  information from spreadsheet into a database?
4      A.   I don't know.
5      Q.   You -- you --
6      A.   I don't -- I don't know what -- what
7  transpired after I sent it to the Ohio
8  Department of Health.
9      Q.   But you testified that your
10 understanding was that the data was being used
11 to identify trends.
12     A.   The -- the spreadsheet had -- if I'm
13 remembering it correctly, it had calculations
14 that would create summaries in terms of
15 percentages of males versus females, breakdown
16 by age, percentage of specific drugs that were
17 indicated in the toxicology screen, race,
18 marital status, education status.
19     Q.   Who prepared the reports generated
20 from the data that was put into the
21 spreadsheet?
22     A.   Can you be more -- I -- I just want
23 to make sure that I'm understanding --
24     Q.   I'm trying to under --
25     A.   -- the --

48 (Pages 186 - 189)

Page 190

1    Q.   Sorry.
2       I'm trying to understand a little
3 bit better this concept of identifying trends
4 and how that was done.
5       And I took you to be saying,
6 although you should certainly correct me if
7 I've got this --
8    A.   Uh-huh.
9    Q.   -- wrong somehow, that you
10 received -- the CCBH received data concerning
11 drug overdose deaths from the Office of the
12 Medical Examiner, right?
13    A.   Yes.
14    Q.   The data you -- that the CCBH
15 received from the Office of the Medical
16 Examiner was then populated into an Excel
17 spreadsheet.
18    A.   Correct.
19    Q.   The Excel spreadsheet was then sent
20 to the Ohio Department of Health.
21    A.   Correct.
22    Q.   And you indicated that the data that
23 was sent to the Ohio Department of Health was
24 used to identify trends, including demographic
25 trends and other types of trends that you just

Page 191

1 indicated.
2    A.   Uh-huh.
3    Q.   So my question to you right now is
4 who generated the reports that identified those
5 trends?
6    A.   The Ohio Department of Health would
7 have generated those reports.  And also another
8 intention for the spreadsheet was to identi --
9 help identify numbers of overdoses within the
10 county.
11       They're utilizing dollars being
12 spent to us for programming.  And we were
13 inputting this information into the spreadsheet
14 that would warrant the need for that funding.
15    Q.   Would the Ohio Department of Health
16 send you back its analyses of the data?
17    A.   No, I don't believe so.
18    Q.   Did the Cuyahoga County Board of
19 Health ever undertake on its own to analyze or
20 identify trends based on the drug overdose data
21 that was being provide to it by the Cuyahoga
22 County Office of Medical Examiner?
23    A.   Yes.
24    Q.   Who was responsible for those
25 analyses?

Page 192

1    A.   Our epidemiology informatics and
2 surveillance service area.  The director of
3 epidemiology took the lead on that.
4    Q.   Who is --
5    A.   And --
6    Q.   Who is that?
7    A.   Chris Kippes.
8    Q.   Okay.  Would Chris Kippes then share
9 his own analyses with members of the Cuyahoga
10 County Board of Health?
11    A.   Yes.
12    Q.   Do you remember any trends that he
13 identified in terms of data from the Oh --
14 Cuyahoga County Office of Medical Examiner?
15    A.   So the reports that Chris generated
16 weren't exclusively utilizing data from the
17 Cuyahoga County Medical Examiner's Office.  It
18 was also using data from EpiCenter, which is
19 Ohio's syndromic surveillance system in
20 capturing information from our emergency
21 departments.
22    Q.   Okay.
23    A.   And he would run statistical
24 analysis on that data and generate reports that
25 were shared.

Page 193

1    Q.   Okay.  I want to take a break for
2 lunch here, if that works for you.  But let me
3 just ask you a couple quick questions before we
4 do that, some odds and ends.
5       We talked earlier about MetroHealth
6 updating its prescribing guidelines for use of
7 prescription opioids.
8       Do you recall that?
9    A.   Yes.
10    Q.   Do you recall when MetroHealth
11 updated the prescribing guidelines for the use
12 of prescription opioids?
13    A.   I do not.
14    Q.   Was it before or after 2010?
15    A.   It would have been after 2010, but I
16 am -- I'm not ultimately familiar with what
17 they had existing prior to that.
18    Q.   Did I hear you earlier say something
19 along the lines that a FleishmanHillard had
20 been -- had been retained by the Ohio
21 Department of Health to participate in
22 responding to the opioid abuse epidemic in
23 Ohio?
24    A.   That was my understanding.
25    Q.   Okay.  Do you know why the Ohio

49 (Pages 190 - 193)

Page 194

1 Department of Health retained a -- public
2 relations firm to assist in responding to the
3 opioid epidemic in the state?
4     A.    I -- I don't know specifically why
5 that they utilized them.  I -- based on what I
6 saw and what was produced, we were provided
7 with a lot of marketing materials to utilize to
8 enhance our efforts.
9     Q.    When you talk about marketing
10 materials, what do you mean?
11     A.    Primarily brochures, booklets.
12     Q.    Do you know who paid the fees for
13 this public relation firm, FleishmanHillard?
14     A.    It's my understanding it was the
15 Ohio Department of Health.
16     Q.    Okay.  Just to be clear, the Ohio
17 Department of Health is a state agency?
18     A.    Yes.
19         MR. BOEHM:  Is now a good time
20 for --
21         MS. SACKS:  Yeah.
22         MR. BOEHM:  -- a lunch break.
23         MS SACKS:  Yeah.
24         Let me go find out what's the deal.
25         THE VIDEOGRAPHER:  We are going off

Page 195

1 the record.
2         This is the end of Media Unit No. 2.
3         The time is 1:05.
4         (A short recess was taken.)
5         THE VIDEOGRAPHER:  We back on the
6 record.
7         This is the beginning of Media Unit
8 No. 3.
9         The time is 2:10.
10         You may proceed, Counsel.
11         MR. BOEHM:  Thank you very much.
12         BY MR. BOEHM:
13     Q.    Ms. Leppla, welcome back from lunch.
14     A.    Thank you.
15     Q.    We were looking at Exhibit 9, which
16 is back in front of you, when we broke.  And I
17 just want to return our attention to that
18 particular document.
19         We had started at the bottom of the
20 e-mail chain.  And now we got to work our way
21 up a little bit to see what else was written.
22         You writ on November 16th, 2016 --
23 this is on Page 2 of the exhibit -- to Mr.
24 Shannon to ask him about when information is
25 going to be available.  You say: "Not trying

Page 196

1 to be a pest; just a grant requirement."
2         You see that?
3     A.    Yes.
4     Q.    What data were you requesting from
5 Mr. Shannon?
6     A.    Do you mind if I take a moment to --
7     Q.    Not at all.
8     A.    -- peruse the --
9     Q.    Please?
10     A.    -- document?
11         So the -- the data that I was
12 looking for from Hugh in this particular e-mail
13 was in regards to the 2015 overdose death data.
14     Q.    So those data have to do with the
15 conversation we were having earlier before we
16 broke, right?
17     A.    They do.
18     Q.    Okay.  Mr. Shannon is at the Office
19 of Medical Examiner for Cuyahoga County; is
20 that correct?
21     A.    That is correct.
22     Q.    Do you know what his position is
23 there?
24     A.    He's the administrator for the
25 county Medical Examiner's Office.

Page 197

1     Q.    Do you know if he's a medical
2 doctor?
3     A.    It's my understanding that he is
4 not.
5     Q.    Okay.  When you write that you were
6 not trying to be a pest, just a grant
7 requirement, what are you referring to there?
8     A.    I am referring to the fact that I
9 know their office is -- is busy.  There is a
10 chance that I had asked for this data once
11 before, and I needed the death data to complete
12 the spreadsheet that we were referring to
13 earlier in a timely fashion to meet the grant
14 requirement.
15     Q.    Okay.  In the next sentence you
16 write: "I don't need the analyzed numbers.  I
17 just need the case/tox reports like you've sent
18 in" -- "in years past."
19     A.    Uh-huh.
20     Q.    You see that?
21     A.    Yes.
22     Q.    What distinction are you drawing as
23 between the analyzed numbers and the toxicology
24 reports that have been sent to you in the past?
25     A.    So they would provide individual

50 (Pages 194 - 197)

Page 198

1  summary case reviews that were on a
2  individualized basis.  Following that, after
3  the Medical Examiner's Office had had some time
4  to run the analyses that they would typically
5  run on their numbers, they would then later
6  provide a more comprehensive report on the
7  final rulings of all of those cases.
8     Q.   How often did the Office of Medical
9  Examiner provide to you analyzed numbers?
10    A.   They provided us with -- with
11  individual numbers on an annual basis.  They
12  released more broadly the analyzed numbers to
13  other members of the community as well.  And
14  the Board of Health was one of those
15  recipients.
16    Q.   Okay.  Mr. Shannon writes back to
17  you on December 21st, 2016, several weeks after
18  your e-mail to him, in fact more than a month
19  after.
20        Do you see that?
21    A.   Yes.
22    Q.   And he writes:  "Allisyn, we lost or
23  Epi doctor.  And as a result, we will not be
24  able to complete 2015 before the deadline.
25  Therefore, we will not be accepting grant

Page 199

1  funds."
2        You see that?
3    A.   Yes.
4    Q.   Do you know what Epi doctor he's
5  referring to?
6    A.   That was an employee of the Cuyahoga
7  County Medical Examiner's Office.
8    Q.   Somebody who had already been
9  employed and then was no longer employed?
10    A.   That is my understanding.
11    Q.   Do you know what specific doctor
12  that refers to?
13    A.   I do not know who that individual
14  is.
15    Q.   When he indicates that he'll not be
16  able to complete the 2015 before the deadline,
17  what did you understand him to mean by that?
18    A.   That he would not be able to provide
19  the individual case reviews, as he had done in
20  the past, prior to the deadline that had been
21  established for 2015.
22    Q.   What -- and when he says --
23    A.   Or -- I'm sorry.  To -- I -- I
24  apologize.
25        To the deadline that probably would

Page 200

1  have been establish in a following year as we
2  entered data from the previous year.
3    Q.   When he writes "Therefore, we will
4  not be accepting grant funds," what did you
5  understand him to mean by that?
6    A.   That they would not move forward in
7  contracting with the Cuyahoga County Board of
8  Health to be a recipient of financial -- of
9  finances from the Ohio Department of Health
10  Injury Prevention Grant.
11    Q.   At this time is it correct that the
12  Cuyahoga County Office of Medical Examiner was
13  receiving a grant from the Cuyahoga County
14  Board of Health that was funded by the Ohio
15  Department of Health Injury Prevention Grant?
16    A.   The Ohio Department of Health
17  provided that funding to the Cuyahoga County
18  Board of Health.  It was then up to the
19  Cuyahoga County Board of Health how to best
20  utilize that funding.  And we did provide a
21  small amount of money in funding to the
22  Cuyahoga County Medical Examiner's Office.
23    Q.   Do you recall how much money you had
24  -- Cuyahoga County Board of Health provided to
25  the Cuyahoga County Medical Examiner's Office

Page 201

1  for purposes of responding to or addressing in
2  any way the opioid abuse epidemic in the
3  county?
4        MS SACKS:  Objection.
5        THE WITNESS:  It was a small amount
6  of money that changed slightly year to year
7  within each grant psych.
8        BY MR. BOEHM:
9    Q.   Approximately how much money are --
10  are you referring to?
11    A.   Approximately 4- to $5,000.
12    Q.   Okay.  Did the Cuyahoga County Board
13  of Health provide grant funds to any other
14  divisions, departments or programs of Cuyahoga
15  County government other than the Ohio -- I'm
16  sorry -- other than the Cuyahoga County Medical
17  Examiner's Office?
18    A.   We provided funding to MetroHealth.
19    Q.   Do you consider MetroHealth to be a
20  division, department or program of Cuyahoga
21  County?
22    A.   I -- I only mention MetroHealth
23  because they are, yeah, our -- our county
24  hospital.
25    Q.   For what purpose did Cuyahoga County

51 (Pages 198 - 201)

Page 202

1  Board of Health provide a grant to MetroHealth?
2      A.   We provided a grant to MetroHealth
3  because we have had an established relationship
4  with employees of MetroHealth who were --
5  excuse me -- dedicated to working on the opioid
6  crisis.
7          MetroHealth also housed the Project
8  DAWN program, which was a significant portion
9  of -- our grant activities, as well as, like
10  I said, having that established relationship
11  with them and knowing the direction that they
12  were heading moving forward with their
13  programming.
14     Q.   How much money in grant funds has
15  the Cuyahoga County Board of Health provided to
16  the MetroHealth system in connection with the
17  opioid abuse epidemic in Cuyahoga County?
18     A.   I -- I couldn't say at this very
19  moment.  I would have to go back and look at
20  our final submission of the budget.
21     Q.   Can you say approximately?
22     A.   Are you looking in total or
23  annually?
24     Q.   Either way.
25     A.   Ballpark figure on an annual basis

Page 203

1  was approximately 15- to $20,000.
2      Q.   For what years?
3      A.   2014 to 2000 -- through 2018.
4      Q.   And for what years did the Cuyahoga
5  County Board of Health provide an approximately
6  4- to $5,000 grant to the Cuyahoga County
7  Office of the Medical Examiner?
8      A.   For that same duration, from 2014
9  through 2018.  I do not recall specifically if
10  they ended up accepting funding for the 2017 or
11  2018 period.
12     Q.   Other than the 4- to $5,000 grant to
13  the Office of the Medical Examiner for the
14  years you just identified --
15     A.   Uh-huh.
16     Q.   -- and the 15- to $20,000 grant
17  provided to MetroHealth for the years you just
18  identified --
19     A.   Uh-huh.
20     Q.   -- has the Cuyahoga County Board of
21  Health provided grants to any other program,
22  division or department of Cuyahoga County
23  government in connection specifically with the
24  opioid abuse epidemic in the county?
25     A.   I would have to go back and look at

Page 204

1  our submissions.  Circle Health Services is
2  coming to mind.  At this moment, without seeing
3  the final submissions of our application, I
4  can't say definitively if we moved forward with
5  providing them with funding.
6      Q.   What is Circle Health Services?
7      A.   Circle Health Services was formerly
8  known as the Free Medical Clinic of Greater
9  Cleveland.  They operate our mobile syringe
10  exchange van as well as head up the fentanyl
11  test strips that are distributed from our
12  syringe exchange van.
13     Q.   Is Circle Health Services a
14  department, division or program of Cuyahoga
15  County government?
16     A.   I -- I'm not sure.
17     Q.   Has Cuyahoga County Board of Health
18  provided grant funds to nongovernmental
19  programs, entities or departments for purposes
20  of addressing the opioid epidemic in Cuyahoga
21  County?
22     A.   Yes.
23     Q.   Can you name entities, programs,
24  departments that are not part of Cuyahoga
25  County government to whom the Cuyahoga County

Page 205

1  Board of Health has provided grant funds in
2  connection with the opioid abuse epidemic?
3      A.   Sure.  We -- I think we touched on
4  briefly earlier the two higher education
5  institution, Baldwin Wallace University, Case
6  Western Reserve University.
7          One or more years we provided
8  funding to Recovery Resources.  We provided
9  funding to a medical resident, Dr. Melanie
10  Golumbiewski.  And we also provided funding to
11  neighboring counties to assist them to elevate
12  their opioid-related programming and coalition
13  efforts.
14         And that --
15     Q.   How --
16     A.   -- that may not be an exhaustive
17  list.
18     Q.   There may be more, but those are the
19  ones that come to mind?
20     A.   Correct.
21     Q.   Okay.  Can you say how much funding
22  was provided to Dr. Golumbiewski?
23     A.   It was a small amount, in the
24  ballpark of $3,000.
25     Q.   Was that a total amount or a per

52 (Pages 202 - 205)

Page 206

1 year amount?
2     A.   Per year.
3     Q.   For how many years has Cuyahoga
4 County Board of Health provided approximately
5 $3,000 in grant funding to Dr. Golumbiewski?
6     A.   I would have to go back and -- and
7 look.  Two years comes to mind.
8     Q.   For what purpose did Cuyahoga County
9 Board of Health provide money to Dr.
10 Golumbiewski?
11     A.   Dr. Melanie Golumbiewski was --
12     Q.   Thank you for the mispronounce --
13 thank you for correcting my pronunciation.
14     A.   Sure.
15     Q.   Is it Golumbiewski?
16     A.   Golumbiewski.
17     Q.   Thank you.
18     A.   Sure.
19          So she was -- when we first
20 contracted with her, she was a medical resident
21 at University Hospitals.  And she had some
22 oversight of two distinct departments, one
23 being the family medicine residency program and
24 the preventive medicine residency program.
25          And so she created a field component

Page 207

1 that would be an addition to their -- their
2 core curriculum that they were required to go
3 through with their medical school training.
4          And she created this field component
5 that would provide them exposure to drug court
6 and Project DAWN education and distribution
7 sites as well as educating them to the current
8 landscape of the opioid epidemic in Cuyahoga
9 County.
10     Q.   Do you know if Dr. Golumbiewski's
11 work on behalf of Cuyahoga County Board of
12 Health involved any assessment or suggested
13 revisions to prescribing guidelines of
14 prescription opioids?
15     A.   So she did conduct a pre- and
16 post-assessment with the students that -- that
17 went through her curriculum.
18          I have not seen her findings for a
19 few years at this point.  I would need to go
20 back and reread her document to determine
21 whether or not there were specifically called
22 out regarding the prescribing guidelines.
23     Q.   Okay.  How much money did Cuyahoga
24 County Board of Health provide to recovery
25 resource in connection with the opioid abuse

Page 208

1 epidemic in the county?
2     A.   I can't say definitively right at
3 this moment without seeing it.
4     Q.   Can you tell me approximately how
5 much money the Cuyahoga County Board of Health
6 has awarded to Recovery Resources in connection
7 with the opioid epidemic?
8     A.   Approximately -- if my memory serves
9 me correctly, approximately $10,000.  And that
10 was I believe on an annual basis.
11     Q.   For how many years?
12     A.   Approximately three.
13     Q.   Which years?
14     A.   They would have been -- not in 2014.
15 In -- in the middle portion of the grant, 2000
16 -- potential '15, '16, '17.
17     Q.   Okay.  And then you also mentioned
18 that the Cuyahoga County Board of Health had
19 awarded grant funds to some universities --
20     A.   Yes.
21     Q.   -- in connection with the opioid
22 abuse epidemic in the county.
23          Did I understand that correctly?
24     A.   That is correct.
25     Q.   Okay.  Which universities did

Page 209

1 Cuyahoga County Board of Health provide grant
2 funds to?
3     A.   We provided grant funding to Case
4 Western Reserve University and Baldwin Wallace
5 University.
6     Q.   For what purpose?
7     A.   For assessment of the current state
8 of potential drug abuse on their campuses, to
9 assess the misconceptions of drug abuse on the
10 college campuses, as well as to provide details
11 on existing programming and resources available
12 at each of those universities, as well as
13 student and staff education.
14     Q.   How much money in grant funds has
15 Cuyahoga County Board of Health awarded to Case
16 Western and -- and Baldwin Wallace universities
17 in connection with its efforts to address the
18 opioid abuse epidemic in the county?
19     A.   We -- if I -- if I remember
20 correctly, we only partnered with Case Western
21 Reserve University in year one of the grant.
22 And that was a smaller amount of money that
23 actually went to one of the graduate students
24 in Case Western Reserve University who was
25 embedded in doing this work.

53 (Pages 206 - 209)

Page 210

1 He was also a person in long-term
2 recovery. And he worked with us to carry out
3 the deliverables that I had mentioned with
4 that. I want to say that would have been
5 approximately $3,000.
6 Q. A one-time grant of $3,000?
7 A. Correct.
8 Q. Okay. Is the extent of the
9 grant funds provided to Case Western?
10 A. If my memory serves me correctly.
11 Q. Okay. And how about with respect to
12 Baldwin Wallace?
13 A. With Baldwin Wallace, I believe that
14 we contracted with that university for two
15 consecutive years. And that amount of money
16 was funneled through one of their professors.
17 Went -- it's my understanding it went to the
18 university but was directed to one of the
19 professors who was instrumental in -- in
20 implementing the deliverables.
21 I -- I don't recall the specific
22 amount of money. I do remember it being on a
23 smaller side because they felt it didn't
24 justify the work that was being done.
25 Q. Who -- who felt that the work --

Page 211

1 that it didn't justify the work being done?
2 A. The -- the professor from Baldwin
3 Wallace University, in order to get approval
4 from the university to do the work, felt that
5 the university would want a more significant
6 sum of money for their time to be spent on
7 reaching the deliverables.
8 Q. For how many years did the Cuyahoga
9 County Board of Health provide grant funds to
10 Baldwin Wallace University?
11 A. If my memory serves me correctly, it
12 was two years.
13 Q. Okay. And I was just looking back
14 at Exhibit 2. And on the back of that, the
15 last two pages of the document reference
16 contracts -- if you'd like you can pull it out,
17 but -- but I'm just going to show you here
18 too -- with the Cuyahoga County Medical
19 Examiner's Office, MetroHealth Hospital
20 Systems, something called Young People in
21 Recovery Coordinator --
22 A. Okay.
23 Q. -- and then Baldwin Wallace
24 University?
25 A. Yes.

Page 212

1 Q. Do you see that?
2 A. Yes.
3 Q. And the Baldwin Wallace University
4 entry on the very last page of Exhibit 2
5 references an amount of $1,500.
6 See that?
7 A. Yes.
8 Q. Does that sound right to you?
9 A. I don't know. I can't confirm
10 whether this was the final version that was
11 submitted or that we worked with. But I do see
12 that in this document.
13 Q. Okay. There's also a reference, if
14 you turn back one page, to the amount of money
15 granted to MetroHealth hospital systems.
16 A. Yes.
17 Q. There's a specific reference to a
18 Dr. Joan Papp.
19 Do you see that?
20 A. I do.
21 Q. Who's that?
22 A. Dr. Joan Papp was an emergency room
23 physician who also was their medical director
24 for the Office of Opioid Safety. And she was
25 instrumental in bringing Project DAWN to

Page 213

1 Cuyahoga County.
2 Q. Why do you say she was instrumental
3 in that regard?
4 A. Dr. Joan Papp has been a great
5 advocate in Northeast Ohio in passage of
6 certain legislation. And she really laid a lot
7 of the groundwork to bring Project DAWN to
8 Cuyahoga County.
9 We were not the original founders of
10 Project DAWN. But they worked very hard to get
11 it here as quickly as possible in Cuyahoga
12 County.
13 Q. And then one thing that you didn't
14 mention but that is listed here is an entry for
15 Young People in Recovery Coordinator. This is
16 on the second-to-last page of Exhibit 2.
17 Do you see that?
18 A. I do.
19 Q. There's a reference to somebody by
20 the name of Mike D'Aegro?
21 A. D'Aegro.
22 Q. It says he's a college graduate
23 student.
24 A. So when I was referring to Case
25 Western Reserve University and that we had

54 (Pages 210 - 213)

Page 214

1  partnered with a graduate student from Case
2  Western Reserve University, this is what I was
3  referring to.
4      Q.   Okay.  And I notice that Circle
5  Health Services isn't on this list.
6          Do you notice that as well?
7      A.   I do.  This looks like an
8  application, given that the dates of the e-mail
9  that is on here is 2014.  So it the appears
10  that this is either a draft or a final version
11  of what was submitted for our year one
12  application.
13          And the partners that we contracted
14  with as well as the amount of funding that was
15  awarded to the -- the subgrantees changed year
16  to year based upon the amount of money that was
17  awarded to us as well as the deliverables that
18  they were going to be working on.
19      Q.   Okay.  So you've mentioned the
20  Office of the Medical -- let me back up.
21          In terms of grants by the Cuyahoga
22  County Board of Health to other entities,
23  whether they be Cuyahoga County governmental
24  programs or departments or nongovernmental
25  departments or -- or -- or programs, you've

Page 215

1  identified the Office of Medical Examiner;
2  MetroHealth; a couple of university-related --
3      A.   Uh-huh.
4      Q.   -- grants, Case Western and Baldwin
5  Wallace; you mentioned Dr. Golumbiewski --
6      A.   Uh-huh.
7      Q.   -- and Recovery Resources, right?
8      A.   Yes.
9      Q.   And you mentioned neighboring
10  counties.
11      A.   That is correct.
12      Q.   Are there any other recipients of
13  CCBH grants that you can think of with respect
14  to efforts to address the opioid epidemic in
15  the county?
16      A.   Yes.  Discount Drug Mart was also a
17  recipient of grant dollars.
18      Q.   Can you tell us more about that?
19      A.   So we partnered with Discount Drug
20  Mart as well as collaborated with MetroHealth
21  and Dr. Joan Papp serving in that role as
22  medical director of Office of Opioid Safety to
23  get Naloxone distribution widespread across the
24  Discount Drug Mart pharmacies in the State of
25  Ohio.

Page 216

1      Q.   Did the Cuyahoga County Board of
2  Health provide grant funds to Discounts Drug
3  Mart in connection with your efforts to make
4  Naloxone more widely available?
5      A.   We were not allowed to use the grant
6  dollars for direct service, which would include
7  utilizing those dollars on Naloxone
8  specifically.  But we did provide them with a
9  small amount of money in their efforts to --
10  the time spent and the policy development to
11  get that program implemented systemwide within
12  their pharmacies.
13      Q.   How much money did Cuyahoga County
14  Board of Health provide to Discount Drug Mart
15  in connection with Naloxone efforts?
16      A.   It was also a small amount.  In the
17  ballpark of $3,000.
18      Q.   Was that on an annual basis, or was
19  that a one-time -- one-time deal?
20      A.   I cannot recall if that was one or
21  two years.
22      Q.   Okay.  All right.  Any other
23  recipients of CCBH grants that's we've not
24  already discussed?
25      A.   In terms of this very specific

Page 217

1  Injury Prevention Grant that we're talking
2  about.
3      Q.   Well, that was one of my questions.
4          Right now my question is whether or
5  not there were any other grant recipients from
6  CCBH in connection with efforts to address the
7  opioid epidemic in the county that you've not
8  already identified?
9      A.   Not that I can recall in this very
10  moment.
11      Q.   Okay.  So all of the grant
12  recipients from CCBH were -- received those
13  grant funds in connection with the office --
14  sorry -- the Ohio Department of Health Injury
15  Prevention Grant that had been warded to CCBH.
16          Do I understand that exactly?
17      A.   That is correct.
18      Q.   Okay.  Were all of the grants that
19  CCBH awarded to other entities in connection
20  with the opioid epidemic in Cuyahoga County
21  funded by and through the Ohio Department of
22  Health Injury Prevention Grant?
23      A.   I'm sorry.  I don't think I
24  understand the question.
25          MR. BOEHM:  Would you mind reading

55 (Pages 214 - 217)

Page 218

1  that back to the witness.
2      (The record was read as requested.)
3      THE WITNESS:  The funding that came
4  from the Ohio Department of Health -- or I'm
5  sorry -- through the Cuyahoga County Board of
6  Health to the community-based organizations or
7  partners that we just mentioned stemmed from
8  the funding that we received from the Ohio
9  Department of Health.
10      So I think that's a long yes.
11      BY MR. BOEHM:
12  Q.   Okay.  Just to make sure it's a --
13  it's a "yes," there were no other sours of
14  revenue that were used for purposes of awarding
15  grants to any of these entities that we've just
16  discussed; is that right?
17      MS SACKS:  Objection.
18      THE WITNESS:  Not to my knowledge.
19      BY MR. BOEHM:
20  Q.   And in this instance, I understand
21  Mr. Shannon to be saying to you they're not
22  going to be accepting grant funds in that year;
23  is that right?
24  A.   Yes.
25  Q.   And -- and by "they," that's the

Page 219

1  Office of the Medical Examiner?
2  A.   Yes.  That is --
3  Q.   Okay.
4  A.   -- the Medical Examiner's Office.
5      And that does not mean that they
6  ceased to do that work.  They were still
7  gathering that data and analyzing the data.
8  They just fel, because they couldn't meet the
9  deadlines that had been set forth from the Ohio
10  Department of Health, that it would not be fair
11  to be a recipient of those dollars.
12  Q.   Okay.  In the next e-mail you
13  respond to Mr. Shannon same day to -- to ask
14  him to I think reconsider.
15      You say -- it's on the first page.
16  A.   Okay.
17  Q.   There you go.
18  A.   Thank you.
19  Q.   In the middle of that second
20  paragraph you write:  "It's a small amount of
21  funds, $4,500.  And I have no doubt you can
22  invoice us for that amount very easily with the
23  hours that have been spent on this project.  At
24  this late in the game with no prior
25  communication on my end to my office or the

Page 220

1  Ohio Department of Health, I really need you to
2  spend that money."
3      See that?
4  A.   Uh-huh.
5  Q.   Did I read that correctly?
6  A.   Yes.
7  Q.   And I notice that you put "really
8  need" in all caps.
9  A.   Yes.
10  Q.   You wanted to emphasize that?
11  A.   I -- I apparently did on the day
12  that I wrote the e-mail.
13  Q.   Okay.  Why did you want to express
14  to Mr. Shannon that you really needed him to
15  spend the money?
16  A.   Because our -- our funds in our
17  budget are set at the very beginning of the
18  year and actually the year prior.  We have a --
19  an ability at the beginning of the year to make
20  a budget revision.
21      However, at the time that he was
22  telling me that he was not going to be able to
23  spend that money, that -- those dollars had
24  already been earmarked for the Cuyahoga County
25  Medical Examiner's Office.

Page 221

1      And it was my understanding that
2  they had already completed the work, spent the
3  hours necessary to justify their hours in --
4  their time spent on this project.  And it was
5  much easier for them to bill us for those
6  hours.
7      We were not permitted, from the Ohio
8  Department of Health, to do a budget revision
9  post the third quarter.  And so it would have
10  been a huge red flag through our office and the
11  Ohio Department of Health if, in the fourth
12  quarter, that we were all of a sudden saying
13  that one of our subgrantees could not meet the
14  requirements and the deliverables of the grant.
15      So I -- I was not asking him to do
16  anything that had not already been done.  It
17  was a matter of invoicing us for the amount of
18  hours that had already been spent --
19  Q.   He says he's --
20  A.   -- on that activity.
21  Q.   -- he wouldn't be able to complete
22  2015 before the deadline, right?
23  A.   Providing us with the specific case
24  review sheets.
25  Q.   Right.

56 (Pages 218 - 221)

Page 222

1     So he tells you, "I'm not going to
2   be able to do that," right?
3     And -- and his understanding was,
4   because he's not able to do that work, he
5   wouldn't be -- the Office of the Medical
6   Examiner would not be accepting grant funds,
7   right?
8     A.   Yes.
9     Q.   And you say to him you expect that
10  he's already done enough work to be able to
11  send an invoice for the amount of money of the
12  grant, right?
13    A.   Not enough work.  He -- this is --
14  these are efforts that Cuyahoga County Medical
15  Examiner's Office had been doing for a period
16  of time prior to us even contracting with them.
17    So this wasn't work that they were
18  doing necessarily in addition to the daily work
19  to meet the -- the grant requirements.  It was
20  getting us the data in a timely fashion that
21  lined up with the Ohio Department of Health.
22    Q.   It -- it --
23    A.   -- deliverables deadline.
24    Q.   I'm sorry.
25    Isn't it true that you needed the

Page 223

1   overdose cases for 2015 in order to fulfill the
2   grant requirement from the Ohio Department of
3   Health?
4     A.   Yes.
5     Q.   And Mr. Shannon tells you he can't
6   do that for that year, right?
7     A.   Yes.
8     Q.   And he -- and you say to him,
9   "That's okay.  Just invoice us for the $4,500
10  because you've already probably done a lot of
11  work."
12    And he says, "Okay.  I'll put
13  together an invoice," right?
14    A.   Uh-huh.
15    MS SACKS:  Objection.
16    BY MR. BOEHM:
17    Q.   Does he ever provide to you the 2015
18  data you had requested in connection with the
19  grant requirement from the Ohio Department of
20  Health?
21    A.   I don't recall in this very moment.
22  It's my understanding that, yes, he did in that
23  the invoice that indicated specifically the
24  hours that were spent was provided to our
25  office.

Page 224

1     If my memory also serves me
2   correctly, I do recall having a conversation
3   with our grant -- grant coordinator from the
4   Ohio Department of Health indicating that that
5   deadline would not have been met but that, as
6   soon as the information would be available, it
7   would be provided to us and subsequently to
8   them.
9     Q.   So you're saying you -- you got on
10  the phone with the Ohio Department of Health,
11  and you told them that there was this problem
12  with the Medical Examiner's Office, and -- and
13  they said that would be fine?
14    A.   Yes.
15    MS SACKS:  Objection.
16    BY MR. BOEHM:
17    Q.   Okay.  Did you write that in an
18  e-mail?
19    A.   I don't recall if that was in an
20  e-mail or a telephone conversation.
21    Q.   When you wrote back to Mr. Shannon,
22  had you already cleared with the Ohio
23  Department of Health that it would be fine not
24  to meet this particular grant requirement this
25  year for the Ohio -- I'm sorry -- for the

Page 225

1   Cuyahoga County Medical Examiner's Office?
2     MS SACKS:  Objection.
3     THE WITNESS:  I don't recall which
4   conversation occurred first.
5     BY MR. BOEHM:
6     Q.   Well, you can see that Mr. Shannon
7   informed you at 7:43 a m. that he wouldn't be
8   able to meet the grant requirement.  And you
9   wrote back at 9:01 a m. of the same day telling
10  him that was fine, just to send an invoice.
11    See that?
12    A.   Yes.
13    Q.   Do you think that, between 7:43 a.m.
14  and 9:01 a.m., you had a conversation with the
15  Ohio Department of Health about the fact that
16  the Cuyahoga County Medical Examiner's Office
17  would not be able to meet this grant
18  requirement?
19    MS SACKS:  Objection.
20    THE WITNESS:  There's a possibility.
21  I started work between the hours of 8:00 a.m.
22  and 8:30 a.m. typically on most days.  So there
23  -- there's a possibility.  I don't recall.
24    BY MR. BOEHM:
25    Q.   Is that what you think happened?

57 (Pages 222 - 225)

1     MS SACKS:  Objection.

2     THE WITNESS:  I don't recall.

3     BY MR. BOEHM:

4     Q.   All right.  Let's just go back for a

5  moment to our discussion of other counties as a

6  recipient of CCBH grants funded through the

7  Ohio Department of Health Injury Prevention

8  Grant.

9         What neighboring counties did

10  Cuyahoga County Board of Health provide funds

11  to in connection with addressing the opioid

12  abuse epidemic?

13     A.   The first year that we partnered

14  with neighboring counties it was Trumbull

15  County and Mahoning County.  And the following

16  year it was Medina County and Lorain County.

17     Q.   How did CCBH go about determining

18  which counties to provide funds to?

19     A.   That was a decision that was

20  facilitated by the Ohio Department of Health.

21     Q.   Did the Ohio Department of Health

22  instruct CCBH about who the appropriate

23  recipients of these funds should be?

24     A.   They instructed us on certain

25  deliverables of the grant, certain requirements

1  that they wanted to be met with those dollars.

2  And then we were given the flexibility to make

3  the proper determination who those -- who those

4  agencies best would be.

5     Q.   Okay.  But you indicated that, with

6  respect to the neighboring counties, perhaps

7  the Ohio Department of Health was a little bit

8  more prescriptive; is that right?

9     A.   That is correct.

10     Q.   Do you know why?

11     A.   I do.  Because those were

12  supplemental dollars that were awarded to

13  Cuyahoga County because they continued to

14  utilize our program as a model throughout the

15  state.

16         And so they provided supplemental

17  funding that were state dollars that they

18  wanted us to help reach these neighboring

19  counties in an attempt to elevate their

20  programming.

21     Q.   Okay.  Well, setting aside the

22  neighboring counties, did the Ohio Department

23  of Health mandate or require CCBH to fund the

24  other governmental and nongovernmental entities

25  that we've discussed as CCBH grantees?

1     A.   That was not mandated by the Ohio

2  Department of Health.

3     Q.   Did the Ohio Department of Health

4  weigh in in any way to provide any kind of

5  instruction or advice about who the appropriate

6  recipients would be of the Injury Prevention

7  Grant funds --

8     A.   Uh-huh.

9     Q.   -- that were going through CCBH?

10     A.   Again, knowing what the intended

11  outcomes -- the intended desire outcomes were,

12  we were given that flexibility to -- to choose

13  those partners.  We were required to create and

14  submit a work plan as well as our contracts,

15  all that were required to be approved by the

16  Ohio Department of Health before we could

17  disburse or dispense any funds or move forward

18  with the project.

19         So they had final approval.

20     Q.   Did they have to approve each grant

21  recipient that CCBH selected in connection with

22  the grants we've been discussing?

23     A.   Yes.

24         (Deposition Exhibit 10 was marked

25  for identification.)

1     BY MR. BOEHM:

2     Q.   I'm putting a document in front of

3  you that's been marked as Exhibit 10.

4         We discussed this document earlier

5  today.  And now we're actually going to look at

6  it.  This is the final report of the Ohio

7  Prescription Drug Abuse Task Force that was

8  established by Governor Strickland in early

9  2010.  The report is dated October 2 -- 2010.

10         Do you see that?

11     A.   Yes.

12     Q.   Have you read this report before?

13         I think I actually asked you that,

14  and you said you did read it before, right?

15     A.   I have seen this report before.

16  I -- I -- I did not read it in its entirety in

17  one sitting.

18     Q.   Okay.  Well, setting -- setting

19  aside for a moment how many sittings it took

20  you to read this report, did you read this

21  report at the time or around the time that it

22  was issued?

23     A.   Around the time that it was issued.

24     Q.   Okay.

25     A.   And I used it as a reference.

58 (Pages 226 - 229)

Page 230

1    Q.   What do you mean when you say you
2  used it as a reference?
3    A.   I used it as a reference in the
4  sense that -- you know, I don't -- I don't
5  recall sitting down and reading it in its
6  entirety.  I -- if I recall correctly, I -- I
7  used particular sections of the document as
8  reference.
9    Q.   Okay.  I'm going to ask you to turn
10 to Page 21 of this report.  Because that's the
11 beginning of a section entitled "How Did This
12 Become an Epidemic?"
13   A.   21?  Page 21?
14   Q.   21.  Right.
15        Do you see that?
16   A.   Yes.
17   Q.   Do you recall that this report
18 included a section that addressed the task
19 force's conclusions about how an opioid abuse
20 epidemic was being caused?
21   A.   Yes.
22   Q.   And there's this graphic at the
23 bottom of Page 21.
24        Do you see that?
25   A.   Yes.

Page 231

1    Q.   Says "Epidemic" in a circle, and
2  then there are various boxes with arrows kind
3  of pointing toward the circle, suggesting that
4  those are various causes of the epidemic,
5  right?
6    A.   Yes.
7    Q.   Have you seen this graphic before?
8    A.   Yes.
9    Q.   Have you used a graphic like this or
10 even identical to this in your own
11 presentations on behalf of CCBH?
12   A.   Yes.
13   Q.   For purposes of your own
14 presentations, is the -- this task force report
15 the source of your own slide decks where you've
16 used a similar graphic?
17   A.   I'm sorry.  I don't think I
18 understand the question.
19   Q.   Yeah.  I probably messed it up.
20        I'm asking whether or not, when you
21 used a graphic like this one in your own
22 presentations on behalf of CCBH, was this 2010
23 report from the -- this task force source of --
24 of -- of you having used it in your own slides?
25   A.   I don't recall specifically.  But

Page 232

1  there's a very good chance.
2    Q.   And there are several causes that
3  are identified here as contributing factors to
4  the epidemic, right?
5    A.   Yes.
6    Q.   Changes in clinical pain management
7  is one.
8        See that?
9    A.   Yes.
10   Q.   And if you go to the next page, in
11 fact, that's the first one that's specifically
12 addressed in the text.
13        Do you agree that changes in
14 clinical pain management has been a significant
15 contributing factor to the opioid abuse
16 epidemic insofar as it concerns Cuyahoga
17 County?
18   A.   In my professional capacity and the
19 partners that we have, it is my understanding
20 that changes in clinical pain management have
21 been a contributing factor.
22   Q.   Okay.  What is your view about the
23 ways in which changes in clinical pain
24 management have been a contributing factor to
25 the opioid abuse epidemic in Cuyahoga County?

Page 233

1    A.   Well, I believe that the Intractable
2  Pain Act of the late 1990s that indicated pain
3  as the fifth vital sign created a culture of
4  overprescribing.
5        I think it potentially led to a
6  population of individuals who had a zero pain
7  expectation; who, due to their perceptions in
8  medication being originally prescribed by a
9  physician, that they were safer to consume than
10 an illicit substance.
11   Q.   Okay.  Let's see if we can break
12 that down just a little bit more.
13        You made a reference to the
14 Intractable Pain Act of the late 1990s, right?
15   A.   Uh-huh.
16   Q.   What is your understanding about
17 what the Intractable Pain Act did to contribute
18 to the opioid abuse epidemic in the county?
19   A.   It's my understanding that it
20 created an environment that allowed for high
21 potency pain medications that typically had
22 been reserved for hospital settings for
23 situations such as end-stage cancer pain to be
24 more readily available in community -- in the
25 hospitals and community-based distribution

Page 234

1  points.
2      Q.   Is it your understanding that the --
3  that the Intractable Pain Act modified
4  prescribing guidelines that licensed physicians
5  used in making their judgment about when and
6  how to prescribe prescription opioids?
7      A.   I don't know.
8      Q.   Okay.  I'm just trying to better
9  understand how you believe that the changes
10  enacted by this piece of legislation impacted
11  the opioid epidemic in the county.
12      A.   Well, in my professional capacity
13  and interacting with these professionals and
14  hearing their examples of the Intractable Pain
15  Act, that that is a specific turning point in
16  which increased the amount of high potency
17  medications for pain that were available in
18  their setting.
19      Q.   Do you know -- oh, I'm sorry.  Go
20  ahead.
21      A.   As well as the patient satisfaction
22  surveys that -- that were tied to hospital
23  reimbursement.  That is also tied into that as
24  well.
25      Q.   Okay.  Let's talk about that too.

Page 235

1          But before we move ahead, I want to
2  just ask you a few more questions about the
3  Intractable Pain Act.
4          Do you have an understanding about
5  what that legislation did?
6      A.   Other -- my --
7      Q.   Let me -- let me ask it a different
8  way.  That's a little bit confusing, given the
9  context --
10      A.   Uh-huh.
11      Q.   -- of our conversation.
12          What is your understanding about how
13  the Intractable Pain Act changed the law?
14      A.   In terms of how it changed the law,
15  I don't know.
16      Q.   Do you know why it is that the
17  Intractable Pain Act has been considered a
18  significant contributor to the opioid abuse
19  epidemic in Ohio and in Cuyahoga County?
20      A.   The reasons that I shared
21  previously.
22      Q.   I'm -- I'm sorry.
23          Can you just say those for me one --
24  I want to make sure I understand your answer on
25  that.

Page 236

1      A.   The -- the reasons that I shared
2  prior were that it facilitated in having an
3  increased amount of high potency pain
4  medications more readily available in the
5  clinic setting.
6      Q.   How did the Intractable Pain Act
7  create or facilitate an environment in which
8  prescription opioid medications became more
9  available?
10      A.   It's my understanding, by having
11  physicians do everything in their power to
12  adequately treat a patient in pain in the --
13  the -- the tie and correlation to the patient
14  satisfaction surveys.
15      Q.   And for those who may not be
16  familiar with this specific piece of
17  legislation, the Intractable Pain Act is a
18  piece of legislation that was a past -- that
19  was passed by the Ohio general assembly,
20  correct?
21      A.   I do not know.
22      Q.   You don't know who passed that act?
23      A.   I don't.
24      Q.   You don't know if it was a federal
25  or state government?

Page 237

1      A.   I don't.
2      Q.   Okay.  So if we were to look later
3  at some of your slide decks that provide a
4  little bit more information, maybe we could get
5  an answer to that?
6      A.   Potentially.
7      Q.   Do you remember discussing in some
8  of your presentations the Intractable Pain Act?
9      A.   I do.
10      Q.   And is it -- but you don't recall
11  whether or not that came from the Ohio general
12  assembly?
13      A.   I don't.
14      Q.   Okay.  You also mentioned something
15  called the fifth vital sign.
16          What did you mean by that --
17      A.   That it recognized pain as a vital
18  sign to one's -- to one's life.
19      Q.   And when you say it recognized it,
20  is it your understanding that the Intractable
21  Pain Act officially recognized the treatment of
22  pain as the fifth vital sign?
23      A.   That was my understanding.
24      Q.   Okay.  What does it mean to
25  recognize the treatment of pain as a fifth

60 (Pages 234 - 237)

Page 238

1 vital sign?
2    A.   I don't know.
3    Q.   You indicated that you thought that
4 the Intractable Pain Act's adoption of the
5 treatment of pain as a fifth vital sign had led
6 to overprescribing of prescription medications.
7         Did I hear you correctly on that?
8    A.   Yes.  That's correct.
9    Q.   Okay.  When you use the term
10 "overprescribing," what do you mean by that?
11    A.   Again, I'm not a physician or a
12 medical professional.  But through my
13 professional capacity and interacting with
14 clinicians and other medical professionals, the
15 information was shared that prescriptions were
16 provided to patients for extended periods of
17 times and quantities that potentially would not
18 have been justifile [sic] -- justifiable for
19 the procedure or in excess dosages.
20    Q.   Do you agree that the decision to
21 prescribe opioid medication lies with the
22 medical practitioner who evaluates a patient?
23        MS SACKS:  Objection.
24        THE WITNESS:  I'm not -- I'm not a
25 medical professional.

Page 239

1        BY MR. BOEHM:
2    Q.   No.  I understand.  But you are
3 somebody who was the cochair of the Cuyahoga
4 County --
5    A.   Uh-huh.
6    Q.   -- Opiate Task Force, somebody who
7 has presented on topics related --
8    A.   Uh-huh.
9    Q.   -- to the opioid abuse epidemic
10 many, many times, right?
11    A.   Yes.
12    Q.   Okay.  So it's in that capacity that
13 I'm asking you that question.
14    A.   Can you repeat the question?
15    Q.   Sure.
16        Do you agree that the decision to
17 prescribe opioid medications lies with the
18 medical practitioner, that is the licensed
19 physician --
20    A.   Uh-huh.
21    Q.   -- who evaluates a particular
22 patient?
23        MS SACKS:  Objection.
24        THE WITNESS:  I do, coupled with --
25 with information and awareness by the patient

Page 240

1 and/or family member of the patient.
2        BY MR. BOEHM:
3    Q.   In other words, you're saying that
4 healthcare providers have a duty to describe to
5 patients the benefits and the risks of the
6 drugs that are being prescribed.
7         Is that fair?
8        MS SACKS:  Objection.
9        THE WITNESS:  Can you repeat the
10 question.
11        BY MR. BOEHM:
12    Q.   You had mentioned that, in
13 connection with the individuals who are
14 receiving the -- the drug and the -- and the
15 family members.
16        What did you mean by that?
17    A.   I mean that, if -- when I'm talking
18 specifically about family members, if it's a
19 minor or somebody who may not be of capacity to
20 fully understand the type of medication that
21 they're receiving from their provider, that
22 would be an example when the information would
23 be shared with family member or loved one.
24    Q.   So in other words, doctors, in your
25 view, have a duty to discuss with the patients

Page 241

1 to whom they're prescribing medications the
2 risks and the benefits of the drug that's being
3 prescribed.
4         Fair?
5    A.   A medical professional, yes.
6    Q.   Do you agree that doctors cannot
7 write a prescription without an individualized
8 determination of medical necessity --
9        MS. SACKS:  Object --
10        BY MR. BOEHM:
11    Q.   -- for each patient?
12        MS SACKS:  Objection.
13        THE WITNESS:  I'm sorry.  Can you
14 please repeat.
15        BY MR. BOEHM:
16    Q.   Sure.
17        Do you agree that doctors cannot
18 write a prescription without an individualized
19 determination of medical need for a particular
20 patient?
21        MS SACKS:  Objection.
22        THE WITNESS:  I don't have capacity
23 to answer that question.
24        BY MR. BOEHM:
25    Q.   That's not something that you've

61 (Pages 238 - 241)

Page 242

1  ever learned in your role as the cochair of the
2  Cuyahoga County Opiate Task Force or a longtime
3  employee of the Cuyahoga County Board of
4  Health?
5      A.  No.
6          MS SACKS:  Objection.
7          BY MR. BOEHM:
8      Q.  Do you agree that a licensed
9  prescriber's decision to prescribe or not to
10 prescribe an opioid medication to a particular
11 patient depends on information that is specific
12 to each patient's medical history and
13 condition?
14     A.  Yes.
15         MS SACKS:  Objection.
16         BY MR. BOEHM:
17     Q.  Other than the Ohio General
18 Assembly, in the form of the Intractable Pain
19 Act, are you aware of any other medical
20 organizations, governmental bodies or other
21 entities that have adopted the treatment of
22 pain as the fifth vital sign?
23     A.  I am not aware.
24     Q.  Okay.  Have you ever heard of the
25 Joint Commission?

Page 243

1      A.  Yes.
2      Q.  And what is your understanding about
3  the Joint Commission?
4      A.  I -- I don't have much of an
5  understanding of their role.
6      Q.  Okay.  All right.  We'll -- we'll
7  return to some of this a little bit later.
8          The next contributing factor that
9  was identified by the task force on
10 prescription drug overdoses in 2010 is
11 marketing by pharmaceutical companies.
12         Do you see that?
13     A.  Yes.
14     Q.  Do you have any views one way or
15 another about whether or not marketing by the
16 manufacturers of prescription opioids has
17 contributed to the opioid abuse epidemic in
18 Cuyahoga County?
19     A.  I -- I can just speak to my personal
20 and professional experience and the
21 direct-to-consumer marketing that is among us
22 from TV, radio, billboards, from a variety of
23 media platforms, that -- that we see it often.
24     Q.  Do you have a view one way or
25 another about whether or not marketing by the

Page 244

1  manufacturers of prescription opioid
2  medications has been a contributive --
3  contributing factor to the opioid abuse
4  epidemic in Cuyahoga County?
5      A.  Not being a marketing professional
6  or having specific data here with me at this
7  moment to back up that claim, I -- I cannot
8  justify, other than speaking from my personal
9  and professional experience and -- and seeing
10 the ads on a regular basis.
11     Q.  Okay.  As you sit here today, do you
12 have a view one way or another about whether or
13 not marketing by the manufacturers of
14 prescription opioids has been a contributing
15 factor to the epidemic in Cuyahoga County?
16     A.  I cannot make that claim.
17     Q.  Do you have any knowledge of false
18 and misleading statements by manufacturers of
19 prescription opioid medications?
20     A.  I'm sorry.  Can you please repeat
21 the question.
22     Q.  Yeah.  That was poorly done.  Let me
23 try again.
24         Do you have any knowledge of false
25 or misleading statements or advertising by the

Page 245

1  manufacturers of prescription opioid
2  medications in -- in -- in the context of those
3  medicines?
4      A.  No.  And not firsthand conversations
5  that I have been a part of or privy to.
6      Q.  Okay.  What about -- you kind of --
7  I don't know if that was a caveat.  You said
8  not firsthand.
9          My question really is more -- even
10 more broad.
11     A.  Uh-huh.
12     Q.  Do you have any knowledge about
13 false or misleading statements by manufacturers
14 of prescription opioid medications insofar as
15 it concerns the benefits or risks of those
16 medications?
17     A.  Not with a hundred percent
18 certainty, other than that these medications
19 were once marketed as being nonaddictive.
20     Q.  Okay.  Let's just see if we can
21 break that down a little bit.
22         My question to you is, as you sit
23 here today, Ms. Leppla, do you have knowledge
24 about any false or misleading statements made
25 by the manufacturers of prescription opioid

62 (Pages 242 - 245)

Page 246

1  medications in connection with the risks or
2  benefits of those medications?
3      A.  No.
4      Q.  Okay.  And then you said you thought
5  that maybe they had suggested that they were
6  not addictive?
7          Did hear that right?
8      A.  Can you please repeat your --
9      Q.  I thought that you had maybe thrown
10  in at one -- in -- at the back end of one of
11  your answers the idea that prescription opioid
12  manufacturers have at some point marketed their
13  products as nonaddictive.
14          Did I hear you say that?
15      A.  You did.
16      Q.  Okay.  What is your basis for that
17  statement?
18      A.  Conversations that occurred with
19  other professionals, whether it be within the
20  task force or throughout the State of Ohio.
21      Q.  What conversations are you thinking
22  of?
23      A.  I -- I can't recall specifically.
24      Q.  Okay.  And you can't think of any
25  actually instances in which manufacturers of

Page 247

1  prescription opioids have made claims that
2  their products were not addictive, can you?
3      A.  No.
4      Q.  Okay.  Let's go to the next one on
5  this list here:  "Growing use of prescription
6  opioids."
7          Do you see that?
8      A.  Yes.
9      Q.  Do you agree that the growing use of
10  prescription opioids has in some manner
11  contributed to the opioid abuse epidemic in
12  Cuyahoga County?
13      A.  I -- I cannot say definitively.
14      Q.  You don't know for sure one way or
15  another?
16      A.  I don't.
17      Q.  Okay.  And then you indicated that
18  direct-to-consumer marketing is something that
19  you've seen.
20          And -- and that shows up as one of
21  the contributing factors that's identified in
22  this report, correct?
23      A.  Correct.
24      Q.  Okay.  Is it your opinion that
25  direct-to-consumer marketing of pharmaceuticals

Page 248

1  has in some way contributed to the opioid abuse
2  epidemic in Cuyahoga County?
3      A.  Yes.
4      Q.  How so?
5      A.  I -- I think that having a
6  population of individuals who regularly see
7  advertisement on a variety of media
8  platforms -- either see or hear advertisement
9  on a variety of media platforms, that we may
10  create a environment that is more of the -- the
11  norm as opposed to understanding all of the
12  risks and benefits associated with the
13  medication.
14      Q.  When you say "Direct-to-Consumer
15  advertising may create an environment that's
16  more of the norm," I'm not sure I understand
17  what that means.
18          Can you help me?
19          What did you mean by that?
20      A.  Yeah.  I don't -- I don't think I
21  explained that very good myself.
22          Just -- just an environment where
23  this is -- this is normal and it's accepted and
24  it's -- you know, if a -- if a physician
25  prescribes this type of medication, then it

Page 249

1  must be okay because my doctor prescribed it to
2  me; and I saw an advertisement on TV.
3      Q.  Do you know of any particular
4  instances of direct-to-consumer marketing of
5  prescription opioids in Cuyahoga County?
6      A.  No.
7      Q.  We might come back to this one.  So
8  don't put it too far away.
9          MS SACKS:  Do you need a break?
10  We've been going like two hours.  Are you okay?
11          THE WITNESS:  I'm good.
12          MR. BOEHM:  Okay.  I'm going to mark
13  the next document as an exhibit.
14          (Deposition Exhibit 11 was marked
15  for identification.)
16          BY MR. BOEHM:
17      Q.  This a documented I've marked as
18  Exhibit 11 for purposes of your deposition,
19  Ms. Leppla.  I'm handing it to you now.
20          And I'll represent, as you can see
21  from the Bates number at the -- in the bottom
22  right-hand corner, this was produced to us by
23  lawyers for the county.
24          It says at the beginning that:  "The
25  Cuyahoga County Opiate Task Force, under the

1  leadership of the Cuyahoga County Board of
2  Health, has played a significant role in
3  bringing professionals from drug treatment and
4  recovery, education, healthcare, mental, law
5  enforcement and public health together at a
6  local level to fight the growing epidemic of
7  opiate abuse."
8       See that?
9    A.   Yes.
10   Q.   And if you look in the "Background"
11  section, do you see the third sentence?
12       Well, let me just back up.
13       Do you remember this document?
14   A.   I remember an iteration of this
15  document.
16   Q.   Okay.
17   A.   It doesn't -- yeah.  It --
18   Q.   Would you -- I'm sorry.
19   A.   It doesn't look entirely foreign to
20  me.
21   Q.   Okay.  Would you have helped in the
22  authorship of a document like this?
23   A.   In a document like this, yes.  I --
24  I cannot state specifically, without reading it
25  more thoroughly, whether or not I assisted in

1  authoring this one.
2    Q.   Okay.  Fair enough.
3        I wanted to ask you specifically
4  about the third sentence in the "Background"
5  section that reads:  "The contributing factors
6  leading to this public health crisis have been
7  driven by"...
8        And then the sentence goes on to
9  list several factors, correct?
10   A.   Yes.
11   Q.   The first factor that the CCBH
12  identifies in this document is:  "The nation's
13  culture of a pill-for-everything mind frame."
14       Do you see that?
15   A.   Yes.
16   Q.   Do you know what that means?
17   A.   It is referring to -- that a culture
18  has been created for a -- a quick fix or a
19  quick solution to almost any ailment in the
20  form of a pill.
21   Q.   That seems to be consistent with
22  what the conclusions of the 2010 report were
23  from the governor's task force where they said
24  that self-medicating habits of baby boomers was
25  a contributing factor to the opioid abuse

1  epidemic; is that correct?
2        MS. SACKS:  Objection.
3        THE WITNESS:  Can you re -- restate
4  the question, please.
5        BY MR. BOEHM:
6    Q.   Yeah.
7        The -- the 2010 report that is
8  Exhibit 10 --
9    A.   Yes.
10   Q.   -- to your deposition identifies as
11  one of the contributing factors to the opioid
12  abuse epidemic "self-medicating habits of baby
13  boomers."
14       Is that the same idea as what the
15  CCBH has identified here in -- in saying one
16  cause is the nation's culture of a
17  pill-for-everything mind frame?
18   A.   Yes.
19       MS SACKS:  Objection.
20       THE WITNESS:  They -- there seems to
21  be similarities.  I don't know that they have
22  necessarily mirrored --
23       MR. BOEHM:  Okay.
24       THE WITNESS:  -- that statement.
25       BY MR. BOEHM:

1    Q.   Do you agree that a cultural
2  mind-set of self-medicating or the taking a
3  pill for everything, as you put it here, is a
4  contributing factor to the opioid abuse
5  epidemic in the county?
6        MS SACKS:  Objection.
7        THE WITNESS:  I can't say
8  definitively.
9        BY MR. BOEHM:
10   Q.   It's written here on the CCBH
11  document, right?
12   A.   Yes.
13   Q.   Okay.  And you don't know if you
14  agree with that statement or not?
15       MS SACKS:  Objection.
16       THE WITNESS:  I -- I don't know when
17  this document was -- was created.  It was years
18  ago.  I don't remember what the conversations
19  were that occurred and if I wrote it, if an --
20  another individual wrote it.
21       BY MR. BOEHM:
22   Q.   Fair enough.
23       My -- my question actually,
24  fortunately, is simpler than that.
25       My question to you is whether or not

64 (Pages 250 - 253)

Page 254

1  you agree with the statement that's written
2  here in this CCBH document that a contributing
3  factor to the opioid abuse epidemic in the
4  county is a culture of a pill-for-everything
5  mind frame.
6      MS SACKS:  Objection.
7      THE WITNESS:  I cannot say
8  definitively.
9      BY MR. BOEHM:
10     Q.   You don't have a view one way or
11  another?
12     MS. SACKS:  Objection.
13     THE WITNESS:  No.
14     BY MR. BOEHM:
15     Q.   Is this a idea that you've
16  identified in your own presentations on the
17  opioid abuse epidemic, that there is this
18  cultural mind-set toward taking prescription
19  medications?
20     A.   That is likely that that was a part
21  of our presentations.
22     Q.   You wouldn't present facts to
23  audiences that you didn't believe yourself,
24  would you?
25     MS SACKS:  Objection.

Page 255

1      THE WITNESS:  A lot of the
2  presentations I put together.  Some I presented
3  in public; some I did not.  Some I did not
4  build the presentation.
5      We were a piece in the overall
6  puzzle and were operated, you know, in
7  alignment with the Ohio Department of Health.
8      BY MR. BOEHM:
9      Q.   But if you disagreed with something
10  that was in a slide deck that you were
11  presenting, you wouldn't include in your own
12  presentation a fact or a statement that you
13  thought was false, would you?
14     MS SACKS:  Objection.
15     THE WITNESS:  I couldn't say
16  definitively.
17     BY MR. BOEHM:
18     Q.   You might do that?
19     MS. SACKS:  Objection.
20     THE WITNESS:  I couldn't provide an
21  example in which I would do that.
22     BY MR. BOEHM:
23     Q.   Okay.  Do you think you would?
24     MS. SACKS:  Objection.
25     BY MR. BOEHM:

Page 256

1      Q.   Do you think you would provide
2  information or facts or statements in your own
3  presentations on the subject of the opioid
4  abuse epidemic that you did not yourself agree
5  with?
6      MS SACKS:  Objection.
7      THE WITNESS:  I can't say
8  definitively.
9      BY MR. BOEHM:
10     Q.   Don't know one way or another?
11     A.   No.
12     Q.   Okay.  The second item that's listed
13  here is:  "Clinical pain management
14  guidelines."
15     Do you see that?
16     A.   Yes.
17     Q.   Do you agree that clinical pain
18  management guidelines have been a contributing
19  factor to the opioid abuse epidemic in Cuyahoga
20  County?
21     A.   In the professional capacity in
22  which that information had been shared with us.
23     Q.   I'm not sure what -- what that
24  meant.
25     Is that a "yes"?

Page 257

1      A.   I can't say definitively.
2      Q.   Okay.  So you don't know one way or
3  another whether or not clinical pain management
4  guidelines have contributed to the opioid abuse
5  epidemic in Cuyahoga County?
6      A.   Other than information that was
7  shared to us by our partners that indicated
8  that that was a contributing factor.
9      Q.   Is that a potential contributing
10  factor that you and others at Cuyahoga County
11  Board of Health yourselves considered and --
12  and -- and made judgments about whether or not
13  it was a factor?
14     MS SACKS:  Objection.
15     THE WITNESS:  Those were
16  conversations that occurred among members of
17  the task force.
18     BY MR. BOEHM:
19     Q.   You yourself didn't have a view?
20     A.   I'm -- I'm not a medical
21  professional.  I couldn't indicate whether or
22  not, in practice, that the clinical pain
23  management guidelines were a contributing --
24     Q.   Okay.
25     A.   -- factor.

65 (Pages 254 - 257)

Page 258

1    Q.   But you were a cochair of the
2   Cuyahoga County Opiate Task Force, correct?
3    A.   I was not the cochair.
4    Q.   Oh, okay.  That -- that's right.
5        You -- you were only sometimes an
6   acting cochair, right?
7    A.   Correct.
8    Q.   And you were the head of the Ohio
9   Department of Health injury prevention program
10  grant that was designed specifically to address
11  opioid abuse in the county, right?
12   A.   It was designed to -- yes, reduce
13  opioid abuse --
14   Q.   Yeah.
15   A.   -- within our county.
16   Q.   Okay.  So it's in that capacity that
17  I'm asking you whether or not, in your view,
18  clinical pain management guidelines were a
19  contributing factor to the opioid abuse
20  epidemic in the county.
21   A.   In the professional capacity in the
22  conversations that occurred, it was indicated
23  to me that that was a contributing factor.
24   Q.   Okay.  And if you included, in your
25  own presentations and speaking obligations --

Page 259

1    A.   Uh-huh.
2    Q.   -- about the opioid abuse epidemic
3   in Cuyahoga County, this particular factor as
4   one that had contributed --
5    A.   Uh-huh.
6    Q.   -- that's representative of the fact
7   that you believed it, right?
8        MS SACKS:  Objection.
9        THE WITNESS:  It was, again, in
10  alignment with the Ohio Department of Health
11  funding, the document that you were referring
12  to from the governor's Opiate Task Force as
13  being their final report, and it was utilized
14  as a resource.
15       I have no basis of saying whether or
16  not the -- the clinical pain management
17  guidelines, in my professional capacity, other
18  than the information that was shared with us
19  from medical professionals and medical
20  providers as being a contributing factor.
21       BY MR. BOEHM:
22   Q.   Did medical professionals tell you,
23  in your professional conversations with them
24  about the opioid epidemic in the county, that
25  prescribing guidelines had contributed to the

Page 260

1   epidemic in the county?
2    A.   I don't recall specific
3   conversations, but they -- that was a topic of
4   discussion through professionals.
5    Q.   I'm not asking you whether it was a
6   topic of conversation.
7        I'm asking you whether or not --
8   because I've asked you the question --
9    A.   Uh-huh.
10   Q.   -- whether you have a view on it.
11  You've said you don't.  You'd have to -- you
12  were just saying what people had told you.
13       Now I'm asking you about what people
14  told you.
15       Understood?  Does that make sense?
16   A.   Understood.
17   Q.   Okay.  So my question to you is
18  whether or not health care providers and other
19  people in the medical community and public
20  health community told you that clinical pain
21  management guidelines had in some way
22  contributed to the opioid abuse epidemic in
23  Cuyahoga County.
24   A.   I do not recall specific --
25  specifically.

Page 261

1    Q.   You indicated earlier that patient
2   satisfaction surveys were a factor that
3   contributed to the opioid abuse epidemic in the
4   county, right?
5    A.   Yes.
6    Q.   Is that your view?
7    A.   Again, same as the clinical pain
8   management guidelines example.  This was
9   information that was provided to us through
10  data and through clinicians and medical
11  professionals as being a contributing factor.
12   Q.   Okay.  As somebody who worked at the
13  Cuyahoga County Board of Health from 2002, and
14  as you testified earlier, from 2006 forward was
15  considering the opioid abuse epidemic in the
16  county, do you have any views, as you sit here
17  today, about what the contributing factors to
18  the opioid abuse epidemic in Cuyahoga County
19  are?
20       MS SACKS:  Objection.
21       THE WITNESS:  I have opinions.  I
22  know what to be true from the information
23  that's been shared with me from data, other
24  agencies and other professionals.
25       BY MR. BOEHM:

66 (Pages 258 - 261)

Page 262

1    Q.   Okay.  Are you hesitant to express
2  those opinions here today under oath?
3        MS SACKS:  Objection.
4        THE WITNESS:  Can you rephrase your
5  question.
6        BY MR. BOEHM:
7    Q.   Do you have any hesitancy in sharing
8  your opinions about what the contributing
9  factors to the opioid epidemic in Cuyahoga
10  County have been?
11   A.   It's not in my professional capacity
12  to say.  I mean my -- my role was a convener
13  and a coordinator of these professionals who
14  are living it, breathing it, working in that
15  capacity.
16        I was responsible for convening them
17  together in learning from the information that
18  they were providing.
19   Q.   What's your understanding about how
20  clinical patient satisfaction surveys have
21  contributed to the opioid epidemic in Cuyahoga
22  County?
23   A.   My understanding in that is that
24  hospital reimbursement was tied to patient
25  satisfaction surveys; and that, if the

Page 263

1  physicians did not do everything in their power
2  to adequately treat pain, then reimbursement
3  rates may, you know, be lowered or not received
4  by hospital systems.
5    Q.   Who prepared those surveys, the
6  patient satisfaction surveys?
7    A.   I don't know.
8    Q.   Who made the decision to tie patient
9  satisfaction survey ratings to hospital
10  reimbursement and compensation?
11   A.   I don't know.
12   Q.   In what way do you think tying
13  together patient satisfaction survey ratings
14  and hospital compensation and reimbursement
15  impacted the opioid abuse epidemic in Cuyahoga
16  County?
17   A.   Can you please restate the question.
18        MR. BOEHM:  Maybe I'd have Bonnie do
19  it, if that's okay with you.
20        THE WITNESS:  Okay with me.
21        MR. BOEHM:  Do you want me to do it?
22  Is it?
23        (The record was read as requested.)
24        MR. BOEHM:  No, no, no.  I'll try it
25  -- I'll try it again.

Page 264

1        THE WITNESS:  Oh, I'm sorry.
2        MR. BOEHM:  No.  It's okay.  Sorry,
3  Bonnie.  It's --
4        THE REPORTER:  Uh-huh.
5        MR. BOEHM:  -- it's not always easy
6  to do.
7        BY MR. BOEHM:
8    Q.   In what way do you believe that
9  patient satisfaction survey ratings being tied
10  to hospital compensation and reimbursement has
11  contributed to the opioid abuse epidemic in
12  Cuyahoga County?
13   A.   It is my understanding that the
14  prescribing patterns of physicians to be able
15  to adequately treat their patients' pain that
16  would allow for the patient to complete a
17  positive patient satisfaction survey would be
18  tied to their reimbursement; and therefore,
19  that physician would want to make their patient
20  happy.
21   Q.   Are there any other factors that
22  we've not already addressed that you believe,
23  based on the history of many years of working
24  on the subject of the opioid abuse epidemic at
25  Cuyahoga County, that you believe have

Page 265

1  contributed to the abuse epidemic that we've
2  not already discussed here today so far?
3    A.   I think the graphic presented in the
4  final report, I think some of the reasons that
5  have been indicated in these presentations have
6  been the main contributing factors --
7    Q.   Okay.
8    A.   -- in the epidemic.
9    Q.   Are there any other contributing
10  factors that -- that you believe have been
11  material to impacting the opioid abuse epidemic
12  in Cuyahoga County that are not already
13  depicted here on Page 21 of --
14   A.   Do you mind if I --
15   Q.   -- Exhibit 10?
16   A.   -- take a moment to look at the
17  document again?
18   Q.   Not at all.  In fact, I -- I think
19  that's a good idea.
20   A.   The only other thing that comes to
21  mind that I'm not seeing in this graphic is
22  co-occurring mental health disorder.
23   Q.   Yeah.  Thank you for mentioning
24  that.  Because that shows up in some of your
25  slides.

67 (Pages 262 - 265)

Page 266

1    So can you please describe for us in
2  what way you believe that underlying mental
3  health illnesses have contributed to the opioid
4  abuse epidemic in the county?
5    A.   Well, not being a mental health
6  professional or a medical provider, it is my
7  understanding that an individual with a
8  co-occurring mental health condition could be
9  more inclined to self-medicate.
10    And oftentimes there have been
11  discussions of -- of really which came first,
12  the mental health condition or the substance
13  abuse disorder and self-medicating to treat one
14  versus the other, which puts them at an
15  increased risk for a potentially fatal
16  overdose.
17    Q.   All right.  Are there any other
18  factors that we've not discussed already today
19  that you believe have been material
20  contributing factors to the opioid abuse
21  epidemic in Cuyahoga County?
22    A.   None that are coming to mind at this
23  very moment.
24    Q.   Okay.
25    MS SACKS:  Is this a good time for a

Page 267

1  break?
2    We're like two and a half hours in.
3    Is that a --
4    MR. BOEHM:  Yeah.  Whatever --
5    MS. SACKS:  -- good point?
6    MR. BOEHM:  Yeah.  Sure.  Whatever
7  you --
8    MS. SACKS:  I don't know if you're
9  done with your document.
10    MR. BOEHM:  Let's go off the record.
11    MS. SACKS:  Yeah.
12    THE VIDEOGRAPHER:  We are going off
13  the record.
14    This is the end of Media Unit No. 3.
15    The time is 3:27.
16    (A short recess was taken.)
17    THE VIDEOGRAPHER:  We are back on
18  the record.
19    This is the beginning of Media Unit
20  No. 4.
21    The time is 3:43.
22    You may proceed, Counsel.
23    MR. BOEHM:  Thank you.
24    BY MR. BOEHM:
25    Q.   Welcome back from your break,

Page 268

1  Ms. Leppla.
2    A.   Thank you.
3    MR. BOEHM:  All right.  Let's go off
4  the record for just a second.  I'm sorry.
5    THE VIDEOGRAPHER:  We are going off
6  the record.
7    The time is 3:43.
8    (Pause.)
9    THE VIDEOGRAPHER:  We are going back
10  on the record.
11    The time is 3:46.
12    You may proceed, Counsel.
13    MR. BOEHM:  Thank you.
14    (Deposition Exhibit 12 was marked
15  for identification.)
16    BY MR. BOEHM:
17    Q.   Ms. Leppla, I've marked as the next
18  exhibit for purposes of your deposition a slide
19  deck that I've put in front of you.  It's
20  Exhibit 12.  The title of the slide deck is:
21  "Prescription For Prevention.  Stop the
22  Epidemic."
23    Do you see that?
24    A.   Yes.
25    Q.   And do you see that this is your

Page 269

1  slide deck?
2    A.   Yes.
3    Q.   Your name is right there, Allisyn
4  Leppla, RS?
5    A.   Yes.
6    Q.   What does RS stand for?
7    A.   Registered sanitarian.
8    Q.   Okay.  And the date of this
9  particular slide deck is February 26, 2013.
10    See that?
11    A.   Yes.
12    Q.   Is this slide deck substantially
13  similar to other presentation materials that
14  you've used over the course of time that you
15  were at CCBH presenting on the subject of the
16  opioid abuse epidemic in the county?
17    A.   Do you --
18    MS SACKS:  Objection.
19    THE WITNESS:  Can I have a minute
20  to --
21    BY MR. BOEHM:
22    Q.   Yeah.  Just flip --
23    A.   -- to look through it?
24    Q.   -- through it, and tell me if this
25  looks to be substantially the same or similar

68 (Pages 266 - 269)

Page 270

1 to presentations you've made on behalf of CCBH
2 about the opioid abuse epidemic in Cuyahoga
3 County.
4 MR. BOEHM: Did we lose -- did
5 somebody push a button?
6 Do we need to go off the record
7 again? It looks like we've lost the phone
8 connection. Doesn't matter to me, but --
9 THE VIDEOGRAPHER: We are going off
10 the record.
11 The time is 3:48.
12 (A short recess was taken.)
13 THE VIDEOGRAPHER: We are going back
14 on the record.
15 The time is 3:50.
16 You may proceed, Counsel.
17 MR. BOEHM: Thank you very much.
18 BY MR. BOEHM:
19 Q. Ms. Leppla, before we had to go off
20 the record, I showed to you this slide deck
21 from February 6, 2013, entitled "Prescription
22 For Prevention. Stop the Epidemic."
23 And I asked you to look at it and
24 tell us whether or not this was substantially
25 similar to the types of presentations that you

Page 271

1 made on behalf of CCBH about the opioid abuse
2 epidemic in the county.
3 A. Our presentations and the content of
4 our presentations evolved over time as the
5 information provided us to evolved.
6 A lot of the information looks
7 similar and would have been presented in other
8 presentations but not in its entirety.
9 Q. Okay. Great.
10 And we've been talking a little bit
11 about the contributing factors to the opioid
12 abuse epidemic in the county, right?
13 A. Yes.
14 Q. And we've talked about the fact that
15 you regularly presented on the subject of what
16 the causes were of the epidemic in the county,
17 right?
18 A. Yes.
19 Q. Okay. And indeed, earlier this
20 morning I asked you whether or not you
21 considered it one of your duties and
22 responsibilities in your professional capacity
23 to try and understand the scope and the causes
24 of the opioid abuse epidemic in the county.
25 And you said yes, right?

Page 272

1 A. Yes.
2 Q. And do you stand by that?
3 A. Yes.
4 Q. If you turn to the slide that's
5 entitled "Contributing Factors" -- and if I
6 could give you a number, I would. But
7 unfortunately, the deck itself is not numbered.
8 It's about halfway through.
9 A. Here we go.
10 Q. See "Contributing Factors"? You've
11 to go a couple more. One more, and you're
12 there.
13 A. Okay.
14 Q. See it?
15 A. Yes.
16 Q. Okay. This particular slide of your
17 presentation identifies several contributing
18 factors to the opioid abuse epidemic in the
19 county.
20 Fair?
21 A. Fair.
22 Q. You identify causes under the
23 category of "Supply," causes under the category
24 of "Demand," and -- and causes under the
25 category of "Illegal."

Page 273

1 You see that?
2 A. Yes.
3 Q. All right. Well, let's talk first
4 about the categories that you've put under the
5 -- or I'm sorry -- the causes that you have put
6 under the category of supply. Okay?
7 The first thing you say under the
8 supply category is legal.
9 What do you mean by that?
10 A. If my memory serves me correctly, we
11 were specifically referencing prescription drug
12 use and factors that would affect prescription
13 -- the prescribing of these medications.
14 Q. And you identify, under the legal
15 factors that have contributed to the opioid
16 abuse epidemic, growth and overall prescription
17 drug use.
18 You see that?
19 A. Yes.
20 Q. Did you mean to refer to the growth
21 of prescription drug use across all types of
22 drugs, or are you referring specifically here
23 to the growth in prescription opioid use?
24 A. In the nature of the work and what
25 we did, we were primarily focused on

69 (Pages 270 - 273)

Page 274

1 prescription opioids.
2     Q.   Okay.  What is your view as to why
3 there was growth in the overall use of
4 prescription opioid medications?
5     A.   I think there was an increased
6 supply.
7     Q.   Can you explain what you mean by
8 that?
9     A.   I think that, as the number of
10 prescription opioids dispensed increased, there
11 -- they were more available in the community
12 setting.
13     Q.   I do want to ask you about that.
14 But I don't think -- you can tell me if I'm
15 wrong, if that's what you're referring to here.
16         You say that there's growth in
17 overall prescription drug use, right?
18     A.   That's what the presentation says.
19     Q.   Okay.  And a -- and a healthcare
20 provider doesn't make a decision to prescribe
21 or not prescribe a prescription opioid to a
22 particular patient based on how much
23 prescription opioid there is available down at
24 the pharmacy, right?
25         MS. SACKS:  Objection.

Page 275

1         THE WITNESS:  I don't know.
2         BY MR. BOEHM:
3     Q.   Are you aware of any healthcare
4 provider making a decision to prescribe an
5 opioid to a patient based on what the volume of
6 prescription opioids is available at the local
7 pharmacy?
8     A.   No.  I am not.
9         MS SACKS:  Objection.
10         BY MR. BOEHM:
11     Q.   Because a healthcare provider, in
12 making that decision, looks at case-by-case
13 factors related to that patient, right?
14         MS SACKS:  Objection.
15         THE WITNESS:  That is not something
16 that I -- I'm not a healthcare provider.
17         BY MR. BOEHM:
18     Q.   Okay.  Why do you believe there was
19 growth in the overall use of prescription
20 opioids?
21         MS SACKS:  Objection.
22         THE WITNESS:  So again, this was
23 information that was provided to us from a
24 variety of data sources from a variety of
25 professionals who are working in this space.

Page 276

1         It was my role to package this
2 information and format it in a way that was
3 presentable and digestible to the intended
4 audience.
5     Q.   As part of your efforts to try and
6 understand the scope and the causes of the
7 opioid abuse epidemic in Cuyahoga County, did
8 you speak with experts about that?
9         MS SACKS:  Objection.
10         THE WITNESS:  I'm sorry.  Can you
11 repeat the question.
12         BY MR. BOEHM:
13     Q.   Sure.
14         As part of your effort to try and
15 understand the scope and the causes of the
16 opioid abuse epidemic in Cuyahoga County --
17     A.   Uh-huh.
18     Q.   -- did you consult and discuss those
19 factors with experts?
20         MS SACKS:  Objection.
21         THE WITNESS:  That was information
22 that was provided to us from our partners, both
23 within the task force and partners within the
24 Ohio Department of Health grant.
25         BY MR. BOEHM:

Page 277

1     Q.   And you attend conferences on that
2 subject, right?
3     A.   Yes.
4     Q.   And experts presented, right?
5     A.   Yes.
6     Q.   And you did your very best to try
7 and learn as much as you could about the causes
8 of the opioid epidemic in the county.
9         Is that fair?
10         MS SACKS:  Objection.
11         THE WITNESS:  I -- I utilized the
12 information that was provided.
13         BY MR. BOEHM:
14     Q.   Ms. Leppla, did you do your very
15 best?
16         MS SACKS:  Objection.
17         BY MR. BOEHM:
18     Q.   -- to try and understand the causes
19 of the opioid abuse epidemic in Cuyahoga
20 County?
21     A.   Again, I took the information that
22 was provided to me; I packaged it and presented
23 it in the parameters of my job.
24     Q.   It's a simple question.
25         Ms. Leppla, did you do your best to

70 (Pages 274 - 277)

Page 278

1    try to understand the causes of the opioid
2    abuse epidemic in Cuyahoga County?
3          MS SACKS:  Objection.
4          THE WITNESS:  It was -- it was the
5    nature of my job to take the information from
6    the individuals and the professionals that
7    provided it to us and for me to be able the
8    present it to the --
9          BY MR. BOEHM:
10     Q.   I need you to --
11     A.   -- intended audience.
12          BY MR. BOEHM:
13     Q.   -- listen to my question.  It's a
14    simple one.  I know you understand it.
15     A.   Uh-huh.
16     Q.   Did you do area best in your
17    capacity?
18     A.   Yes.
19     Q.   You did your best to try and
20    understand the causes of the opioid abuse
21    epidemic in the county, correct?
22          MS SACKS:  Objection.
23          THE WITNESS:  Yes.  In the capacity
24    of my role.
25          BY MR. BOEHM:

Page 279

1     Q.   And in the capacity of your role,
2    that meant you were a member of the Cuyahoga
3    County Opiate Task Force, right?
4     A.   Yes.
5     Q.   And you were the head of the
6    Cuyahoga County Board of Health's efforts to
7    address the opioid abuse epidemic as part of
8    the Ohio Department of Health Injury Prevention
9    Grant, right?
10     A.   I was the -- the head of the Ohio
11    Department of Health Injury Prevention Grant.
12     Q.   You were the --
13     A.   Yes.
14     Q.   -- coordinator of that grant.
15     A.   Yes.
16     Q.   And you indicated in your testimony
17    earlier -- and I can pull it up if we need
18    to -- that that meant you coordinated with
19    partners in the community to try and understand
20    the opioid epidemic, right?
21     A.   Yes.
22     Q.   You met with healthcare providers,
23    right?
24     A.   Yes.
25     Q.   You talked with experts about the

Page 280

1    causes, right?
2     A.   Yes.
3     Q.   You even met with members of the
4    Cuyahoga County Medical Examiner's Office and
5    sat on a poison review committee, right?
6     A.   Yes.
7     Q.   And all of those things informed
8    your views and understandings about what
9    contributed to the Cuyahoga County opioid abuse
10    epidemic, right?
11          MS SACKS:  Objection.
12          THE WITNESS:  Yes.
13          BY MR. BOEHM:
14     Q.   Now, are the contributing factors
15    that we see in your various slide decks about
16    the reasons why there was a Cuyahoga County
17    opioid abuse epidemic consistent or
18    inconsistent with the things that you learned
19    and the things that you discussed with experts
20    when it comes to the question of what caused
21    the epidemic in Cuyahoga County?
22     A.   These are consistent.
23     Q.   What is your understanding about why
24    there was growth in overall prescription opioid
25    use in Cuyahoga County?

Page 281

1     A.   My understanding was that there was
2    an increase in the number of opioid medications
3    that were being prescribed and dispensed.
4     Q.   Why do you believe there was an
5    increase in the number of prescription opioid
6    medications that were being prescribed by
7    licensed physicians in Cuyahoga County?
8     A.   I'm -- I'm not a medical
9    professional.  I --
10     Q.   I understand.
11          But what's your understanding about
12    why there was an increase in the amount of
13    prescription opioid medications that were being
14    prescribed to patients by licensed physicians?
15     A.   My understanding is that there was
16    an increase due to the fact that physicians
17    were trying to adequately satisfy their
18    patients.
19     Q.   And when you say healthcare
20    providers were trying to satisfy their
21    patients, and that's what led to the increase
22    in prescribing of prescription opioids, what do
23    you mean?
24     A.   I just mean I think that there --
25    there -- I mean there were mechanisms in place,

71 (Pages 278 - 281)

Page 282

1   such as the patient satisfaction surveys,
2   that -- that created an environment for
3   physicians to prescribe these medications to
4   their patients.
5       Q.   Okay.  And let's talk about the
6   second bullet point here.  It says:  "New
7   clinical guidelines on pain management."
8        What is your understanding about how
9   new clinical guidelines on pain management
10  contributed to the opioid abuse epidemic in
11  Cuyahoga County?
12      A.   Looking at that bullet point, new
13  clinical guidelines on proper prescribing --
14  I'm not -- I -- honestly, I don't remember what
15  that bullet was intending.
16      Q.   Does that have to do with treatment
17  of pain as a fifth vital sign?
18      A.   I don't recall.
19      Q.   Then the third bullet point you have
20  there is:  "Pressure to satisfy customers."
21       What does that mean?
22      A.   I think that was referring to the
23  patient satisfaction surveys.
24      Q.   And if you go on a little bit along
25  the deck, you get to a slide that's entitled:

Page 283

1   "Changes in clinical pain management."
2        You see that?
3       A.   Yes.
4       Q.   Is that what you had in mind when
5   you had this bullet that said "New clinical
6   guidelines on pain management"?
7       A.   I don't recall when this --
8       Q.   Okay.  You have a --
9       A.   -- presentation was put together.
10      Q.   Ms. Leppla, you have a bullet point
11  right here that --
12      A.   Uh-huh.
13      Q.   -- says, among the contributing
14  factors:  "New clinical guidelines on pain
15  management."
16       You see that?
17      A.   I do.
18      Q.   Okay.  And then two slides later you
19  have a slide that's entitled "Changes in
20  clinical pain management."
21       Do you see that?
22      A.   I do.
23      Q.   Okay.  Are those related?
24      A.   Honestly, I don't know.  I don't
25  know if I'm talking --

Page 284

1       Q.   Okay.
2       A.   -- about prescribing guidelines on
3   painge [sic] man -- pain management or if I'm
4   talking about the changes that occurred in
5   1998 --
6       Q.   Okay.
7       A.   -- with that bullet points.  I don't
8   --
9       Q.   Well, let's --
10      A.   -- recall.
11      Q.   -- talk about each one at a time.
12       What are the changes in prescribing
13  guidelines that you understand took place in
14  the late 19 -- or the late 2000s that impacted
15  the level of prescribing --
16      A.   I'm sorry.  Can you repeat --
17      Q.   -- of prescription opioids?
18      A.   Can you repeat the question.
19      Q.   What are the changes in -- in
20  prescribing guidelines that took place that
21  impacted the level and volume of prescription
22  opioids that were being prescribed to patients
23  by licensed physicians?
24      A.   My understanding of the prescribing
25  guidelines is that they were put in place to

Page 285

1   make a positive impact on the number of opioids
2   that were prescribed, meaning that there was a
3   reduction in the number of opioids that were
4   prescribed.
5       Q.   Okay.  When do you believe those
6   changes took place?
7       A.   I don't know.
8       Q.   Okay.  Well, your slide deck
9   actually refers to 1997, doesn't it?
10      A.   The -- you were just asking me about
11  prescribing guidelines.
12      Q.   Exactly.
13       Right here you have a slide that's
14  entitled "Changes in clinical pain management."
15       You see that?
16      A.   Yes.
17      Q.   Okay.  And the first thing you write
18  on that slide is "In 1997 changes occurred as a
19  result of pain management advocates."
20       You see that?
21      A.   Yes.
22      Q.   And then you specifically reference
23  the Intractable Pain Relief Act.
24       Do you see that?
25      A.   Yes.

72 (Pages 282 - 285)

Page 286

1    Q.    And you even provide a citation to
2    the Ohio revised code.
3         You see that?
4    A.   Yes.
5    Q.   "Ohio Revised Code 4731.21, drug
6    treatment of intractable pain."
7         Do you see that?
8    A.   Yes.
9    Q.   I read all that correctly, right?
10   A.   Yes.
11   Q.   Okay.  And this is a slide that's in
12   your own slide deck from February 2013,
13   correct?
14   A.   Yes.
15   Q.   The Intractable Pain Relief Act is
16   the piece of legislation that you were
17   referring to earlier today in your deposition
18   when you said there was a change in the law
19   that implemented treatment of pain as the fifth
20   vital sign that impacted the amount of
21   prescription opioids that were being prescribed
22   to patients, right?
23   A.   Yes.
24   Q.   Okay.  Same piece of legislation,
25   right?

Page 287

1    A.   Yes.
2         MS SACKS:  Objection.
3         BY MR. BOEHM:
4    Q.   And we see here that this, in fact,
5    is an Ohio law that was passed, right?
6    A.   I see that.
7    Q.   Okay.  Does that refresh your
8    recollection that the Intractable Pain Act was
9    a piece of legislation from the Ohio General
10   Assembly?
11   A.   Yes.
12   Q.   In what way do you think that the
13   passage of the Intractable Pain Act from 1997
14   impacted clinical pain management?
15   A.   I -- I couldn't say definitively.
16   Q.   Could you say it any way?
17        MS SACKS:  Objection.
18        BY MR. BOEHM:
19   Q.   Have you completely forgotten what
20   you would talk about when you showed this slide
21   to your audiences?
22        MS SACKS:  Objection.
23        THE WITNESS:  No.
24        BY MR. BOEHM:
25   Q.   What would you say?

Page 288

1         MS SACKS:  Objection.
2         THE WITNESS:  Again, this was
3    information that was -- was shared to me
4    from -- with me from a variety of -- of
5    sources.
6         BY MR. BOEHM:
7    Q.   Experts, right?
8         MS SACKS:  Objection.
9         THE WITNESS:  Or databases.
10        BY MR. BOEHM:
11   Q.   Okay.  So this was --
12   A.   Data sources.
13   Q.   -- that you got from experts or data
14   sources, and then you communicated this
15   information to your audiences, right?
16   A.   Yes.
17   Q.   And when you presented this slide,
18   "Changes in clinical pain management," what did
19   you say to people?
20        MS SACKS:  Objection.
21        THE WITNESS:  Paraphrasing,
22   obviously, because I don't recall specifically
23   word for word what I said.  But we talked about
24   changes that occurred in the late teen -- late
25   1990s that led to an increased amount of high

Page 289

1    potency pain medications that historically had
2    been reserved for the hospital setting that
3    were now more readily available in the
4    community setting and for use in a treatment of
5    a variety of conditions.
6         BY MR. BOEHM:
7    Q.   Okay.  If you go back to your
8    contributing factor slide -- and I see you
9    still have it in front of you -- you have a
10   section or a bucket called "Illegal."
11        Do you see that?
12   A.   Yes.
13   Q.   And you say:  "Widespread diversion
14   through multiple channels."
15        You see that?
16   A.   Yes.
17   Q.   What is diversion?
18   A.   I don't -- not being law
19   enforcement, I don't know the technical
20   definition.  But diversion, for our
21   understanding, was illegal distribution of a
22   substance.
23   Q.   What are the forms of diversion when
24   it came to prescription opioid abuse?
25   A.   I -- I don't know.

73 (Pages 286 - 289)

Page 290

1    Q.    How were prescription opioids
2   diverted?
3          You talked about that in your
4   slides, right?
5          MS. SACKS:  Objection.
6          BY MR. BOEHM:
7    Q.    You have entire slides, Ms. Leppla,
8   that are devoted to the subject of diversion.
9   Many slides.  I've seen them.
10         Do you remember that?
11   A.    Not specifically.
12   Q.    Okay.  Do you remember presenting to
13  audiences on behalf of the Cuyahoga County
14  Board of Health on the subject of diversion
15  insofar as it concerns opioid abuse?
16   A.    I remember it being a part of the
17  presentations.
18   Q.    What is your understanding about
19  what diversion is?
20   A.    It's my understanding from diversion
21  that -- what I just previously stated, that the
22  drugs were distributed illegally.
23   Q.    What are the ways in which
24  prescription opioid medications can be
25  illegally distributed?

Page 291

1    A.    I -- I don't have an exhaustive
2   list.
3    Q.    Well, can you name any?
4    A.    Sure.  The bullet points on the
5   presentation:  through pill mills, through
6   illegal ordering from the Internet, through
7   dealers on the street.
8    Q.    What about theft from friend or
9   family?
10   A.    Sure.
11   Q.    Those are all forms of diversion?
12   A.    In my understanding.
13   Q.    And diversion is illegal, right?
14   A.    Yes.
15         MS SACKS:  Objection.
16         BY MR. BOEHM:
17   Q.    What's a pill mill?
18   A.    I mean I don't know a -- a technical
19  definition.  In the case of this presentation,
20  we were talking about and referring to
21  unscrupulous providers providing quantities of
22  pills for potentially nonexistent ailments.
23   Q.    Has Cuyahoga County ever had any
24  pill mills?
25         MS SACKS:  Objection.

Page 292

1          THE WITNESS:  I don't know
2   definitively.
3          BY MR. BOEHM:
4    Q.    Well, you were the head of the
5   Cuyahoga County Opiate Task Force.
6          Did you ever hear of any pill mills
7   in Cuyahoga County in your capacity as the head
8   of the task force on that subject?
9    A.    Not that I can recall.
10         MR. BOEHM:  Okay.  I'm going to mark
11  the next document as Exhibit 13, Ms. Leppla.
12         (Deposition Exhibit 13 was marked
13  for identification.)
14         BY MR. BOEHM:
15   Q.    This is an e-mail from -- an e-mail
16  exchange from August 2014 between you and a
17  high school student by the name of Laurel
18  Booth, who was asking you some questions about
19  the opioid abuse epidemic insofar as it
20  concerns Cuyahoga County.
21         Do you remember having such an
22  exchange?
23   A.    Not specifically.
24   Q.    Okay.  She reached out to you with a
25  series of questions, and then you provided

Page 293

1   answers to those questions in this e-mail
2   exchange.
3          MS SACKS:  Do you want to read it?
4          THE WITNESS:  Yes.
5          BY MR. BOEHM:
6    Q.    And I'm going to direct your
7   attention to some questions in particular.
8    A.    Do you mind if I take a moment to
9   read it?
10   Q.    Well, let me -- let me ask you the
11  question, and then you can look at what you
12  need in order to answer it.
13         She asked you this question.  It's
14  on Page 2.  First question she asked you:  "Is
15  public awareness still a major issue in
16  Cuyahoga County?  Are there groups of people
17  particularly difficult to reach?"
18         Do you see that?
19   A.    Yes.
20   Q.    Okay.  Did you tell Ms. Booth that
21  you were not qualified or knowledgeable enough
22  to answer her questions?
23   A.    No.  I'm going to take a moment to
24  read --
25   Q.    Okay.

74 (Pages 290 - 293)

Page 294

1    A.  -- the document.
2    Q.  Is the answer "no" to that question.
3    A.  I don't know --
4    Q.  Okay.
5    A.  -- without reading it.
6    Q.  Okay.
7       Ms. Leppla, I have some specific
8 questions for you.
9       MS SACKS:  Are you done?
10      THE WITNESS:  Just about.
11 Okay.
12      BY MR. BOEHM:
13   Q.  Did you tell Ms. Booth that you were
14 not qualified or knowledgeable enough to answer
15 her questions?
16   A.  No.
17   Q.  Okay.  You answered them, right?
18   A.  Yes.
19   Q.  Okay.
20   A.  To the best of my ability.
21   Q.  Yeah.
22      You tried to be as honest and
23 accurate as you could be?
24      MS SACKS:  Objection.
25      THE WITNESS:  Yes, with the

Page 295

1 information that I had at that time.
2      BY MR. BOEHM:
3   Q.  And you tried to be as forthright
4 and forthcoming as you could be, right?
5   A.  Yes.
6      MS SACKS:  Objection.
7      BY MR. BOEHM:
8   Q.  You wrote, in response to her first
9 question, starting with the fourth sentence:
10 "Changes that occurred in the healthcare
11 setting in 1997 led to an increase in high
12 potency pain pills.  Physicians have been
13 prescribing high quantity of opiates to treat
14 pain.  Historically, they have also been
15 difficult to reach.  New laws and proper
16 prescribing guidelines, as well as some of the
17 work we are doing here with MetroHealth land UH
18 are helping to change that."
19      You see that?
20   A.  Forgive me.  What page are you on?
21   Q.  It's the first question that she
22 asked you and then your answer to it.  It's on
23 the second page of this exhibit.
24   A.  Okay.
25   Q.  You see that?

Page 296

1   A.  Yes.
2   Q.  So you told Ms. Booth, in a private
3 e-mail exchange from August 2014, that you
4 thought that the -- there were changes in -- in
5 prescribing guidelines set into motion in 1997,
6 right?
7   A.  Yes.
8   Q.  And that you thought that had
9 contributed to the opioid epidemic in Cuyahoga
10 County, right?
11   A.  Yes.
12   Q.  And you stand by that here today?
13      MS SACKS:  Objection.
14      THE WITNESS:  Yes.  In my capacity
15 of my role and the information that I had, I --
16      MR. BOEHM:  Yeah.
17      THE WITNESS:  -- stand by that
18 statement.
19      BY MR. BOEHM:
20   Q.  Yeah.
21      Now, Ms. Leppla, we can't ask you to
22 be something that you're not.
23   A.  Uh-huh.
24   Q.  And nobody's ever asking you to do
25 that.  I know you keep saying that in your

Page 297

1 answer.  And -- and I just want to be clear.
2 Because we -- I think I ought to just get past
3 it.
4      We're --
5   A.  Yeah.
6   Q.  We're just asking you, based on what
7 you know as somebody who was at the Cuyahoga
8 County Board of Health since 2002, who was
9 charged with being the head of the Ohio
10 Department of Health Injury Prevention Grant,
11 who was focused on trying to understand the
12 opioid abuse epidemic in Cuyahoga County since
13 2006.
14      But -- but we're not asking you to
15 be somebody that you're not.  Okay?
16      Is that fair?
17   A.  That's fair.
18   Q.  Okay.  And it was your understanding
19 and is your understanding that changes in the
20 prescribing guidelines have contributed to the
21 opioid abuse epidemic in the county, right?
22   A.  Yes.
23   Q.  And you stand by that here today?
24   A.  Yes.
25   Q.  You said earlier that you have heard

75 (Pages 294 - 297)

Page 298

1  of the Joint Commission.
2      A.   I've heard of them.
3      Q.   Do you know what Joint Commission
4  is?
5      A.   No.
6      Q.   How have you heard of the Joint
7  Commission?
8      A.   I don't recall specifically.
9      Q.   Have you heard of the VA?
10     A.   Yes.
11     Q.   Okay.  Do you know whether the VA
12  adopted the treatment of pain as the fifth
13  vital sign?
14     A.   I don't know.
15     Q.   Do you know whether the Joint
16  Commission adopted the treatment of pain as the
17  fifth vital sign?
18     A.   I don't.
19     Q.   Do you know whether any other
20  medical organizations or accrediting
21  institutions adopted the treatment of pain as a
22  fifth vital sign?
23     A.   I don't.
24     Q.   Do you agree that undertreatment of
25  pain was broadly recognized by the medical

Page 299

1  community as a legitimate and serious public
2  health problem in the 1990s and the 2000?
3          MS SACKS:  Objection.
4          THE WITNESS:  Can you please repeat
5  the question.
6          BY MR. BOEHM:
7      Q.   Sure.
8          Do you agree that undertreatment of
9  pain was broadly recognized in the medical
10  community as a legitimate and serious public
11  health problem during the 1990s and in the
12  2000s?
13         MS SACKS:  Objection.
14         THE WITNESS:  I don't know.
15         BY MR. BOEHM:
16     Q.   Okay.  That's not something you ever
17  remember hearing about?
18     A.   (Witness shaking head.)  No.
19     Q.   What's your understanding as to why
20  the Ohio General Assembly passed the
21  Intractable Pain Act of 1997?
22     A.   I --
23         MS. SACKS:  Objection.
24         THE WITNESS:  I don't know.
25         BY MR. BOEHM:

Page 300

1      Q.   Do you know whether or not medical
2  schools taught the concept of treating pain as
3  a fifth vital sign?
4      A.   I do not know the medical school
5  curriculum.
6      Q.   You have talked, though, at length
7  about ensuring that physicians and other
8  healthcare providers were being appropriately
9  trained when it came to the treatment of pain,
10  right?
11     A.   Yes.
12     Q.   We talked about that as one of the
13  deliverables in connection with the Ohio
14  Department of Health Injury Prevention Grant,
15  right?
16     A.   Yes.
17     Q.   Okay.  In what way did the CCBH, and
18  you as the head of the Ohio Department of
19  Health Injury Prevention Grant for CCBH,
20  attempt to educate physicians and other
21  healthcare providers about the treatment of
22  pain?
23     A.   The Cuyahoga County Board of Health
24  did not attempt to educate providers.  We
25  partnered with experts within that field who

Page 301

1  had the capacity and credentialing to educate
2  providers.
3      Q.   Okay.  And -- and what were the
4  changes in treatment standards that you with
5  the partner experts were advancing?
6      A.   I'm sorry.  Can you please repeat.
7      Q.   Sure.
8          What were the specific changes in
9  the treatment of pain that you and your partner
10  experts were advancing in the community in
11  terms of the treatment of pain?
12     A.   I -- I don't recall specifically.
13  For example, we talked about earlier the
14  functionality that was built into their ER to
15  monitor prescribing patterns of their patients.
16  Another topic that physicians educated on was
17  signs and symptoms potentially of those that
18  could be drug seeking.
19         Those are two examples.
20     Q.   So how would a doctor, just by way
21  of example, try to figure out whether or not a
22  patient was doctor shopping or drug seeking?
23     A.   You know, I -- I -- I don't know
24  specifically, other than that there were
25  techniques and interview skills and techniques

76 (Pages 298 - 301)

Page 302

1  that they utilize as well as utilizing the
2  OARRS system to be able to make a professional
3  judgment.
4     Q.   Okay.  In your view, do licensed
5  physician who have prescribed opioid
6  medications in or around Cuyahoga County
7  contributed in any way to the opioid abuse
8  epidemic in the county?
9     A.   I don't know.  I saw data that
10  indicated that, as an increase in the number of
11  opioid medications were dispensed, there was a
12  direct correlation with an increase in the
13  number of fatalities.
14     Q.   Do you agree that, without medical
15  records of a specific individual, it's
16  impossible to determine if any specific
17  prescription was medically proper or --
18     MS. SACKS:  Objection.
19     BY MR. BOEHM:
20     Q.   -- improper?
21     MS SACKS:  Objection.
22     THE WITNESS:  I'm sorry.  Can you
23  please repeat.
24     MR. BOEHM:  Yeah.  Sure.  I wasn't
25  quite done when the objection arrived.  So let

Page 303

1  me say that from the start.
2     MS. SACKS:  I'm sorry.
3     MR. BOEHM:  That's okay.
4     BY MR. BOEHM:
5     Q.   Do you agree that, without medical
6  records of a specific individual or patient, it
7  is not possible to determine if any specific
8  prescription written by a licensed physician
9  was medically improper?
10     MS SACKS:  Objection.
11     THE WITNESS:  I -- I can't say.
12     BY MR. BOEHM:
13     Q.   You don't know one way or another?
14     A.   No.
15     Q.   Has the Cuyahoga County Board of
16  Health had any formal responsibility in
17  overseeing doctor prescribing practices?
18     MS. SACKS:  Was that the end?
19     MR. BOEHM:  Uh-huh.
20     MS SACKS:  Objection.
21     THE WITNESS:  I'm --
22     MR. BOEHM:  What's the basis of that
23  objection?
24     BY MR. BOEHM:
25     Q.   My question is --

Page 304

1     MS. SACKS:  I didn't under --
2     BY MR. BOEHM:
3     Q.   -- has the Cuyahoga County Board of
4  Health had any formal responsibility in
5  overseeing doctor prescribing practices?
6     A.   Formal overseeing, no.  In the sense
7  of partnering with those organization who have
8  formal oversight, yes.  We do not have
9  oversight, "we" meaning the Cuyahoga County
10  Board of Health.
11     Q.   Okay.  In what way has the Cuyahoga
12  County Board of Health, formally or
13  informally --
14     A.   Uh-huh.
15     Q.   -- or in partnership or on its
16  own --
17     A.   Uh-huh.
18     Q.   -- had responsibility for impacting
19  doctor prescribing practices?
20     A.   Within the partnership of
21  MetroHealth and the practices that they
22  implemented with their health system and the
23  information that was shared with us at that
24  time.
25     Q.   Do you believe that pharmacists who

Page 305

1  have dispensed prescription opioid medications
2  in or around Cuyahoga County by filling
3  prescriptions from licensed physicians have
4  responsibility for the opioid abuse epidemic in
5  the county?
6     A.   I can't say definitively.
7     Q.   Do you have a view?
8     A.   Can you repeat the question, please.
9     Q.   Sure.
10     Do you believe that pharmacists who
11  have dispensed opioid medications in or around
12  Cuyahoga County by filling prescriptions from
13  licensed physicians share in the responsibility
14  for the opioid abuse epidemic in Cuyahoga
15  County?
16     A.   Again, not in my professional
17  capacity to be able to adequately answer that
18  question.
19     Q.   Do you have a view?
20     A.   Yes.
21     Q.   What is your view?
22     A.   I think that they are responsible
23  for filling the prescription.  It's my
24  understanding that they also have access to the
25  OARRS database.

77 (Pages 302 - 305)

Page 306

1      I don't know that to be factual
2  though.  That's my understanding from --
3      Q.   Okay.
4      A.   -- information that was shared with
5  me.
6      Q.   Okay.  You know prescribing
7  physicians have access to the OARRS database,
8  right?
9      A.   Yes.
10     Q.   Okay.  Who else is -- has access to
11  the OARRS database?
12     A.   I do know that the Cuyahoga County
13  Medical Examiner's Office had access.  I -- I
14  don't recall of others.
15     Q.   Okay.  Do you believe that the
16  scientists and medical doctor at the Food and
17  Drug Administration have responsibility for the
18  opioid abuse epidemic in Cuyahoga County?
19         MS. SACKS:  Objection.
20         THE WITNESS:  Can you please repeat.
21         BY MR. BOEHM:
22     Q.   Sure.
23         Do you believe that the scientists
24  and medical doctors at the Food and Drug
25  Administration have responsibility for the

Page 307

1  opioid abuse epidemic in Cuyahoga County?
2      A.   I don't know.
3      Q.   You don't have a view on that?
4      A.   No.
5      Q.   Okay.  Do you know what the drug --
6  the United States Drug Enforcement Agency is?
7      A.   Yes.
8      Q.   Okay.  Do you know what the
9  responsibilities of the United States DEA are?
10     A.   No.
11     Q.   Do you know what role the DEA plays
12  in the context of regulating controlled
13  substances, including prescription opioids?
14     A.   No.
15     Q.   Do you have a view as to whether or
16  not the United States Drug Enforcement Agency
17  has responsibility for the opioid abuse
18  epidemic in Cuyahoga County?
19     A.   No.
20     Q.   You -- you have no view?
21     A.   I do not.
22     Q.   Do you know what the role of
23  wholesale drug distributors is in the delivery
24  of healthcare in the United States?
25     A.   No.

Page 308

1      Q.   Do you have any understanding at all
2  about what role, if any, wholesale drug
3  distributors have had in connection with the
4  use of prescription opioids in the United
5  States?
6      A.   No.
7      Q.   Have you ever heard of Cardinal
8  Health?
9      A.   Yes.
10     Q.   What is -- what is your
11  understanding and what do you know about
12  Cardinal Health?
13     A.   It's my understanding that they were
14  a manufacturer of medications.  And I also know
15  that they were an agency that provided funding
16  for some community agencies that we also worked
17  with.
18     Q.   What medications do you believe
19  Cardinal Health manufacturers?
20     A.   I don't know.
21     Q.   Okay.  Have you ever heard of
22  McKesson?
23     A.   Yes.
24     Q.   What do you know about McKesson?
25     A.   I don't know anything like in detail

Page 309

1  about McKesson.  I've -- I've heard of
2  McKesson.  I don't know specifics.
3      Q.   What have you heard about McKesson?
4      A.   I don't know if they're a
5  manufacturer or a distributor.
6      Q.   Okay.  Have you ever heard of
7  AmerisourceBergen?
8      A.   No.
9      Q.   Are you aware of any specific
10  misconduct on the part of wholesale drug
11  distributors in -- in Cuyahoga County in the
12  context of the opioid abuse epidemic?
13     A.   No.
14     Q.   Do you believe that the county
15  itself shares responsibility for the opioid
16  abuse epidemic?
17     A.   I'm sorry.  Can you please repeat.
18     Q.   Sure.
19         Do you believe that the county
20  itself shares responsibility for the opioid
21  abuse epidemic?
22     A.   No.
23     Q.   You indicated earlier today that it
24  was your feeling that, while the Cuyahoga
25  County Board of Health was trying to increase

78 (Pages 306 - 309)

Page 310

1  awareness within county government and outside
2  of county government --
3      A.   Uh-huh.
4      Q.   -- that that was a difficult
5  process.
6          Do you remember giving that
7  testimony?
8      A.   Yes.
9      Q.   That it took a while to get people
10  to understand what was happening, right?
11      A.   Yes.
12      Q.   In retrospect, do you believe that
13  the county could have done things differently
14  in a way that would have alleviated the opioid
15  epidemic within Cuyahoga County?
16      A.   I think this was a rapidly evolving
17  epidemic.  I think the information was changing
18  weekly, if not daily, The information that was
19  provided to us.  I think we acted accordingly
20  in -- at a time when the information was
21  provided to us.
22      Q.   Okay.  You're talking -- when you
23  say about "us" and "we," are you talking about
24  the Cuyahoga County Board of Health?
25      A.   I'm talking about the Cuyahoga

Page 311

1  County Board of Health and the partners that
2  were involved in the Opiate Task Force.
3      Q.   Okay.  So my question right now is a
4  little bit different than that.  I'm asking you
5  about the county overall.
6      A.   Uh-huh.
7      Q.   And my question to you is, sitting
8  here today, in retrospect, do you believe that
9  Cuyahoga County could have made different
10  decision or done things differently in a way
11  that would have mitigate the impact of the
12  opioid abuse epidemic in the county?
13      A.   I think we always want tomorrow to
14  be better than today.  I think we took -- "we"
15  meaning board and its partners -- took the
16  information that we had and acted with the
17  information that was provided to us.
18      Q.   Respectfully, you still haven't
19  answered my question.  Because my question is
20  about the county.
21      A.   Uh-huh.
22      Q.   And my question to you, once again,
23  is, sitting here today, in retrospect, do you
24  believe that the county could have made
25  different decisions or done things differently

Page 312

1  in a way that would have mitigated the opioid
2  abuse epidemic in the county?
3      A.   My answer is, again, going to be a
4  longer answer.  I think we can always do things
5  differently in retrospect to make changes.
6      Q.   Hindsight is 20/20, right?
7      A.   Hindsight is 20/20.
8      Q.   Okay.  But imagine if we could go
9  back in time, with the benefit of hindsight,
10  which of course we don't have --
11      A.   Uh-huh.
12      Q.   -- what do you believe the county
13  could have done differently or sooner in order
14  to address the opioid abuse epidemic in
15  Cuyahoga County?
16      A.   You know, my -- my -- and I think I
17  shared this earlier.  I think we've always felt
18  privileged in Cuyahoga County that we've had
19  excellent collaboration and buy-in from our
20  community partners.  I feel that everybody
21  approached it in a timely fashion.  That was my
22  experiencing, that we acted accordingly with
23  the information that we had.
24          There was a lot of effort within
25  Cuyahoga County that -- and resources that were

Page 313

1  dedicated to this issue.  A few examples of
2  that would be the creation and formation of the
3  MetroHealth Office of Opioid Safety, the
4  formation of the Project DAWN Naloxone
5  education and distribution program, the syringe
6  exchange, research into determining if
7  expansion of syringe exchange was possible,
8  drug dropbox efforts, public awareness
9  campaigns.
10          I feel that we acted accordingly and
11  in a timely fashion with the information and
12  resources that we had.
13      Q.   Okay.  Do you remember what my
14  question was?
15      A.   Yes.  But if you could repeat it,
16  that would be helpful.
17      Q.   Sure.
18          In retrospect, with 20/20 hindsight,
19  is there anything that you think Cuyahoga
20  County could have done differently to address
21  the opioid epidemic; or do you they -- their
22  conducted, even in retrospect, was spotless and
23  perfect?
24      A.   I think, in retrospect -- I mean no
25  one's conduct was spotless and perfect.  This

79 (Pages 310 - 313)

1  was a new epidemic.  No one really knew what we
2  were doing.  There weren't a lot of
3  evidence-based programs to go by off of.  It
4  was honestly by trial and error that we were
5  combatting this issue.
6      I don't know -- to answer your
7  question, I don't know specifically what they
8  could have done differently to address the
9  issue.
10      Q.  Okay.  Fair to say, though, that the
11  opioid abuse epidemic in Cuyahoga County and
12  outside of it is an extraordinary complex set
13  of issues.
14      Is that fair?
15      A.  That's fair.
16      Q.  And we've talked about many of the
17  contributing factors, and there are many
18  more --
19      A.  Yes.
20      Q.  -- that we could talk about.
21      Is that fair?
22      A.  That is fair.
23      Q.  And I'm going to ask you about some
24  more.
25      Would you be able to, sitting here,

1  in a -- take a look at all the contributing
2  factors, of which there are many, and assign or
3  allocate how much each of those factors exactly
4  has contributed to the opioid abuse epidemic in
5  the county?
6      A.  I cannot.
7      Q.  Why wouldn't you be able the do
8  that?
9      A.  That would require a -- team of
10  professionals to be able to make that
11  determination.
12      Q.  And you agree, even for a team of
13  professionals, that would be extraordinarily
14  complex.
15      MS. SACKS:  Objection.
16      BY MR. BOEHM:
17      Q.  Fair?
18      A.  There's no way of knowing until you
19  started to dive into the thing.  I -- I don't
20  have a way to know the answer to that.
21      Q.  Do you believe that the State of
22  Ohio shares responsibility for the opioid abuse
23  epidemic in Cuyahoga County?
24      A.  My answer would be the same as
25  whether or not the county shares

1  responsibility.  I think the State of Ohio
2  shared the data that they had at that time and
3  acted accordingly with the information that was
4  at their disposal.
5      Q.  We talk earlier today about how in
6  1998 the Ohio -- 1997 or 1998 the Ohio General
7  Assembly passed a piece of legislation called
8  the Intractable Pain Act.
9      Remember that?
10      A.  Yes.
11      Q.  Okay.  Do you believe that the State
12  of Ohio shares responsibility for the opioid
13  abuse epidemic in Cuyahoga County?
14      A.  I -- I don't know to the extent of
15  what impact that had specifically on Cuyahoga
16  County.
17      Q.  And you remember the Ohio Medical
18  Board, you said, adopted the treatment of pain
19  as a fifth vital sign.
20      A.  Yes.
21      Q.  Right?
22      A.  Yes.
23      Q.  Okay.  Sitting here today with 20/20
24  hindsight, do you believe that the State of
25  Ohio could have and should have done things

1  differently in connection with the opioid abuse
2  epidemic?
3      A.  Again, I think, in retrospect, we --
4  we all could have done things differently,
5  knowing the information that we know now that
6  we did not know at that time.
7      Q.  You agree that it's not fair to sit
8  here in 2019 and overly pass judgment about
9  things that happened 10 or 15 years ago when
10  people did not understand the scope of the
11  epidemic?
12      MS SACKS:  Objection.
13      THE WITNESS:  I think, as you
14  mentioned, there are a variety of contributing
15  factors that -- that led to this epidemic.
16  Which one had the most weight, I -- I cannot
17  say.
18      BY MR. BOEHM:
19      Q.  But -- but my question is do you
20  agree that, sitting here now with the benefit
21  of hindsight, it'd be a little bit unfair to go
22  back in the fast -- past 10 or 15 years and
23  pass judgment when not everything was so clear
24  then as it is now?
25      Is that fair?

80 (Pages 314 - 317)

Page 318

1    A.   That's fair.
2         MS SACKS:  Objection.
3         BY MR. BOEHM:
4    Q.   Do you believe that drug dealers are
5    responsible for the opioid abuse epidemic in
6    Cuyahoga County?
7         MS SACKS:  Objection.
8         THE WITNESS:  I believe that they
9    play a role.
10        BY MR. BOEHM:
11   Q.   They share some responsibility,
12   right?
13   A.   Yes.
14        MS SACKS:  Objection.
15        BY MR. BOEHM:
16   Q.   What about drug cartels?
17        MS SACKS:  Objection.
18        THE WITNESS:  Yes.
19        BY MR. BOEHM:
20   Q.   Do you know what black tar heroin
21   is?
22   A.   I've -- I've heard of black tar
23   heroin.
24   Q.   Do you know when black tar heroin
25   started being use in Cuyahoga County?

Page 319

1    A.   Not initially, no.
2    Q.   Do you know -- do you have an
3    understanding of the first year when black tar
4    heroin arrived on the streets of Cuyahoga
5    County?
6         MS SACKS:  Objection.
7         THE WITNESS:  No.
8         BY MR. BOEHM:
9    Q.   Is that something you've ever looked
10   into as part of your responsibilities at CCBH
11   or as a member of the Cuyahoga County Opiate
12   Task Force?
13   A.   Yes.
14   Q.   You did look into that?
15   A.   I -- I recall it being a part of our
16   presentations and a part of the work that we
17   had done.  I recall past heroin epidemics and
18   knowing that this one, per data that was
19   provided to us, was substantially greater.
20   Q.   Do you know what the difference is
21   between an opiate and an opioid?
22   A.   I believe I do.
23   Q.   Can you explain that for us?
24   A.   It's my understanding -- again, not
25   in a medical professional capacity -- but it

Page 320

1    was my understanding that opiates are naturally
2    derived chemicals that can relieve sensations
3    of pain.  Opioids are an all-encompassing group
4    of chemicals that can be manmade or synthetic
5    that work on opiate receptors in the brain to
6    reduce sensations of pain.
7    Q.   And the Food & Drug Administration
8    for the United States has approved certain
9    opioid medications for use by licensed
10   physicians for certain medical needs and
11   indications, right?
12   A.   Yes.
13   Q.   Do you have any familiarity with the
14   process by which the Food and Drug
15   Administration's -- reviews data in order to
16   reach its determinations about what drugs are
17   appropriate and for which indications?
18   A.   I do not.
19   Q.   But heroin is an example of an -- an
20   opiate that's not a prescription FDA-approved
21   medication, right?
22   A.   Correct.
23   Q.   Okay.  Some opiates are illegal,
24   right?
25   A.   Yes.

Page 321

1    Q.   Heroin is illegal, right?
2    A.   Heroin is illegal.
3    Q.   And do you know what fentanyl is?
4    A.   I -- I do.
5    Q.   And do you know that illegal
6    fentanyl has sometimes been used in connection
7    with heroin and other drugs?
8    A.   Yes.  I have been made aware of
9    that.
10   Q.   Okay.  And do you know that fentanyl
11   that gets used here in Cuyahoga County and in
12   other places in Ohio is illegally made and
13   illegally distributed?
14   A.   Yes.
15   Q.   Do you know what carfentanil is?
16   A.   Yes.
17   Q.   Carfentanil is not an FDA-approved
18   medication for humans, right?
19   A.   Yes.
20   Q.   It's not, right?
21   A.   Correct.  It's not.
22   Q.   There's no legitimate reason to have
23   heroin, carfentanil or a fentanyl analog,
24   right?
25        MS SACKS:  Objection.

81 (Pages 318 - 321)

Page 322

1      THE WITNESS: It's my understanding
2  that there are medical uses for fentanyl.
3      BY MR. BOEHM:
4    Q.  Well, I'm -- I'm talking about
5  the -- the type of fentanyl that gets used on
6  the -- on -- and -- and -- and is responsible
7  for drug overdoses.
8      That's illicit fentanyl, right?
9      MS. SACKS: Objection.
10     THE WITNESS: Primarily, yes.
11     BY MR. BOEHM:
12   Q.  And there's no legitimate medical
13  need why somebody would use heroin or
14  carfentanil or this illicit fentanyl that gets
15  made and distributed illegally.
16     Fair?
17     MS SACKS: Objection.
18     THE WITNESS: Not to my knowledge,
19  yes.
20     BY MR. BOEHM:
21   Q.  Doctors don't prescribe those
22  substances?
23   A.  No.
24   Q.  And pharmacies do not dispense them,
25  right?

Page 323

1   A.  That is correct.
2      MS SACKS: Objection.
3      BY MR. BOEHM:
4    Q.  Do you know what the percentage of
5  first-time abusers of painkillers who have
6  obtained them from sources other than a
7  licensed physician for a legitimate medical
8  need?
9    A.  I do not.
10     MS SACKS: Objection.
11     BY MR. BOEHM:
12   Q.  So in other words, what I'm asking
13  you, Ms. Leppla, is whether or not you know, to
14  the extent individuals begin abusing
15  prescription opioids, what percentage of them
16  have actually received their prescription
17  opioid from a licensed physician for a
18  legitimate medical need as opposed to through
19  some form of diversion?
20   A.  I don't know that percentage.
21   Q.  Is that something you've ever looked
22  into in your capacity as a member of the
23  Cuyahoga County Opiate Task Force or as the
24  coordinator of the Ohio Department of Health
25  Injury Prevention Grant or in any other

Page 324

1  capacity at CCBH?
2    A.  That's fair to say. And I -- I do
3  believe that that statistic presented itself
4  somewhere in my involvement. I don't know what
5  that number is though. I don't know the
6  percentage.
7    Q.  So you have looked into that
8  question.
9    A.  Yes.
10   Q.  Okay. So -- so I want to make sure
11  this is clear.
12     Ms. Leppla, have you looked into the
13  question of the extent to which abusers of
14  prescription opioids have begun abusing based
15  on a prescription from a licensed physician for
16  a legitimate medical need?
17   A.  My recollection is that, at some
18  point along the way, that there was a statistic
19  and a number that was provided to us. I did
20  not set out to seek and find that number.
21   Q.  Okay. Let's talk a little bit about
22  that.
23     Who provided that number to you?
24   A.  I don't recall.
25   Q.  When did you receive that number?

Page 325

1    A.  I don't recall.
2    Q.  Did you ask anybody for that number?
3    A.  I don't recall.
4    Q.  Do you remember approximately what
5  that number was?
6    A.  I do -- I do not.
7    Q.  Do you know on what statistics that
8  number is based?
9    A.  I -- I don't.
10   Q.  Do you know if that was a national
11  estimate or if that was a Cuyahoga
12  County-specific estimate?
13   A.  I don't recall.
14   Q.  Okay. Do you know what percentage
15  of prescription opioids that are used for abuse
16  as opposed to use for a legitimate medical need
17  are obtained from sources other than through a
18  legitimate prescription from a licensed
19  physician?
20   A.  Can you please repeat.
21   Q.  Sure.
22     Do you know what percentage of
23  prescription opioid pills that are abused --
24   A.  Uh-huh.
25   Q.  -- are received through a legitimate

82 (Pages 322 - 325)

1  prescription from a licensed physician for a
2  legitimate medical need?
3      A.  I do not.
4      Q.  Is that something you ever recall
5  having had knowledge of?
6      A.  No.  I -- I do not recall.
7          MR. BOEHM:  Okay.  Let's take a
8  break here, if you don't mind.  We'll go off
9  the record for a little bit.
10         THE VIDEOGRAPHER:  We are going off
11 the record.
12         The time is 4:47.
13         (A short recess was taken.)
14         THE VIDEOGRAPHER:  We are back on
15 the record.
16         The time is 5:14.
17         You may proceed, Counsel.
18         MR. BOEHM:  Thank you.
19         BY MR. BOEHM:
20     Q.  Welcome back Ms. Leppla.
21     A.  Thank you.
22     Q.  I'm going to direct your attention
23 back to the exhibit that we marked as Exhibit
24 13.
25         Do you have the stack there in front

1  of you?
2      A.  Yes.  And I have the -- the
3  document.
4      Q.  This is that e-mail from August
5  2014.
6          Do you recall our discussion about
7  this e-mail exchange with the high school
8  student?
9      A.  Yes.
10     Q.  The third question she asked was
11 whether there was enough public resources to
12 support the programs that are in place.
13         Do you see that?
14     A.  Yes.
15     Q.  And would you just read your
16 response to that.
17     A.  My response says:  "Absolutely not.
18 Lack of funding and space for treatment has
19 been a major hurdle in fighting this epidemic."
20     Q.  Why did you say that there was
21 absolutely not enough public resources to
22 support the programs of the Cuyahoga County
23 Board of Health in connection with the opioid
24 abuse epidemic --
25     A.  Uh-huh.

1      Q.  -- in this community?
2      A.  At the date of this e-mail in 2014,
3  in -- in response to her e-mail and the
4  information that we had at that time, I did not
5  feel that there was enough funding or treatment
6  opportunities who -- for those who were in need
7  of seeking treatment or funding to implement
8  programming that had yet to be implemented.
9      Q.  Did you ever go to anybody in
10 Cuyahoga County government and declare your
11 view that there was absolutely not enough
12 public resources being devoted to the opioid
13 abuse epidemic in the county?
14     A.  I did not.
15     Q.  Okay.
16     A.  No.
17     Q.  If you had had additional public
18 resources to address the opioid abuse epidemic
19 in Cuyahoga County, what would you have done
20 that you weren't already doing?
21     A.  At that time in 2014, we could have
22 expanded our Naloxone education and
23 distribution efforts.  We could have expanded
24 treatment for those seeking treatment.
25         I -- I don't know specifically what

1  -- in this very moment, I don't know exactly
2  what programs were in place in that moment and
3  what we could have done.  But there's always
4  opportunity to expand and enhance programming.
5      Q.  Do you have any particular
6  initiatives or programs in mind, as you sit
7  here today, that you would have promoted with
8  additional public funding?
9      A.  I -- I -- as I mentioned, Project
10 DAWN would have been one program that came to
11 mind.
12     Q.  Project DAWN is something that's
13 come up today.
14         Can you --
15     A.  Uh-huh.
16     Q.  -- please just explain what Project
17 DAWN is.
18     A.  Sure.
19         Project DAWN is the State of Ohio's
20 Naloxone education and distribution program.
21 And DAWN is an acronym that's used throughout
22 the State of Ohio that stands for Deaths
23 Avoided With Naloxone.
24     Q.  Okay.  Was Project DAWN in Cuyahoga
25 County run through the Cuyahoga County Board of

83 (Pages 326 - 329)

Page 330

1  Health?
2      A.   It was not run through the Cuyahoga
3  County Board of Health.  We served as a
4  location that operated as one of the walk-in
5  community distribution sites.
6      Q.   And you said it was a statewide
7  program?
8      A.   Project DAWN was a statewide.
9      Q.   Okay.  Did funding for Project DAWN
10  come from the Ohio Department of Health?
11      A.   Yes.  Some of the funding was
12  provided by the Cuyahoga County Board of
13  Health.
14      Q.   Were there any other sources of
15  funding for Project DAWN besides funding from
16  the Ohio Department of Health insofar as it
17  concerns Cuyahoga County?
18      A.   Potentially within Cuyahoga County,
19  but not that I'm certain of.
20      Q.   Okay.  So you don't know one way or
21  another?
22      A.   Not specifically at this moment.  I
23  don't recall.
24          MR. BOEHM:  Okay.  I'm going to hand
25  you our next document.  It's Exhibit 14 for

Page 331

1  your deposition.
2          (Deposition Exhibit 14 was marked
3  for identification.)
4          THE WITNESS:  Thank you.
5          BY MR. BOEHM:
6      Q.   This is another e-mail exchange.
7  In this case you were having an
8  exchange with Mr. Caraffi, who's come up a time
9  or two earlier today, right?
10      A.   Yes.
11      Q.   Okay.  And Mr. Caraffi is somebody
12  who you worked with at the Cuyahoga County
13  Board of Health --
14      A.   Yes.
15      Q.   -- right?
16      A.   Yes.
17      Q.   And you indicated I think earlier
18  that he is no longer employed at CCBH, true?
19      A.   False.  He is still employed at the
20  Cuyahoga County Board of Health but no longer
21  serves as the chair of the Cuyahoga County
22  Opiate Task Force.
23      Q.   Do you know why Mr. Caraffi is no
24  longer a chair of the Cuyahoga County Opiate
25  Task Force?

Page 332

1      A.   I do not.
2      Q.   Do you know what Mr. Caraffi's
3  position is at the Cuyahoga County Board of
4  Health?
5      A.   I do.
6      Q.   What is his position?
7      A.   He is a supervisor in the
8  Environmental Health Services area at the
9  Cuyahoga County Board of Health.
10      Q.   That's a different position than the
11  one he had while you were there, right?
12      A.   No.
13      Q.   Is that the same position?
14      A.   It is the same position.
15      Q.   Okay.  Has -- is that the position
16  Mr. Caraffi has always had at CCBH?
17      A.   Not in his entire duration as an
18  employee of the Cuyahoga County Board of
19  Health.  He has not always served as a
20  supervisor.
21      Q.   Okay.  To whom does Mr. Caraffi
22  report?
23      A.   He's a direct report to -- at least
24  during my time at the Board of Health, he was a
25  direct report to a deputy director of the Board

Page 333

1  of Health.
2      Q.   Okay.  What other positions has Mr.
3  Caraffi held at Cuyahoga County Board of
4  Health?
5      A.   If my memory serves me correctly, he
6  started off his career at the Board of Health
7  as a registered sanitarian, was promoted to
8  program manager position, and then promoted to
9  a supervisor position.
10      Q.   Are there any other positions that,
11  to your knowledge, Mr. Caraffi has held at
12  CCBH?
13      A.   Those are his titles that I am aware
14  of as of his time at the Board of Health.
15      Q.   Are you differentiating between
16  titles and positions?
17      A.   No.
18      Q.   In any event, you and Mr. Caraffi
19  are having an e-mail exchange in September
20  2015.
21          Do you see that?
22      A.   Yes.
23      Q.   And on September 24th, 2015, Mr.
24  Caraffi writes to you on the subject of
25  fentanyl significantly contributing to a rise

84 (Pages 330 - 333)

1  in Ohio drug overdose deaths.
2      Do you see that?
3      A.   Forgive me, but --
4      Q.   Do you have the same document I do?
5      A.   I'm not sure what document you have.
6      Q.   You do.
7      A.   Okay.
8      Q.   You see in the subject:  "Line
9  fentanyl significantly contributing to a rise
10  in Ohio drug overdose deaths"?
11     A.   I see that in the subject line.
12     Q.   And -- and if you turn to the bottom
13  of the e-mail exchange, you can see there's a
14  whole summary from September 24th, 2015, from
15  the Ohio Health Alert Network about fentanyl
16  significantly contributing to a rise in Ohio
17  drug overdose deaths.
18     You see that?
19     A.   Yes.
20     Q.   Okay.  And then Mr. Caraffi, on
21  September 24th at 3:11 p.m., writes to you and
22  to Terry Allan saying that he has "the county
23  into, but it will be posted tomorrow.  The
24  fentanyl is basement-grade, not prescription."
25     See that?

1      A.   Yes.
2      Q.   What is your understanding of what
3  Mr. Caraffi meant when said that fentanyl is
4  basement-grade, not prescription?
5      A.   It's my understanding that he was
6  referring to illicit fentanyl that was not
7  prescribed by a physician.
8      Q.   Okay.  Fentanyl not made by any
9  pharmaceutical manufacturer, right?
10     A.   That would be correct.
11     Q.   Do you know what Mr. Caraffi meant
12  when he was referring to county information?
13     A.   Can you give me a sec?
14     Q.   Sure.
15     A.   So I would assume that Mr.
16  Caraffi -- being that this alert is addressing
17  fentanyl-related drug overdose deaths in the
18  State of Ohio, that he is referring to Cuyahoga
19  County-specific information that would have
20  been provided to him at that time.
21     Q.   Do you agree that, at least as of
22  2015 when this e-mail exchange occurred,
23  illicit fentanyl was the biggest battle and the
24  primary driver of opioid-related overdose
25  deaths in Cuyahoga County?

1      A.   I do remember at this time period
2  2015 that fentanyl had really emerged on the
3  scene as a significant drug threat --
4      Q.   Okay.  Let me ask --
5      A.   -- to the county.
6      Q.   Sorry.  I didn't mean to cut you off
7  before you were done.
8      Were you done?
9      A.   I'm done.
10     Q.   My --
11     THE REPORTER:  I'm sorry.  And the
12  very last part of your answer, "significant
13  drug threat"...
14     THE WITNESS:  In Cuyahoga County.
15     THE REPORTER:  Okay.
16     BY MR. BOEHM:
17     Q.   And do you agree that, at least as
18  of the time of this e-mail exchange, September
19  2015, fentanyl was Cuyahoga County's biggest
20  battle and primary driver of opioid-related
21  overdose deaths in Cuyahoga County?
22     A.   I do recall at this time period
23  that, like I said, fentanyl had emerged on the
24  scene as a significant drug threat and really
25  driving -- and then the data that was provided

1  from the Medical Examiner's Office, that it was
2  driving the -- the deaths in that time period.
3      And to add to that, I mean, as you
4  all know, we have seen a shift in the epidemic
5  over time with -- when we came on the scene, we
6  saw an epidemic that was primarily attributed
7  to prescription drug abuse and accidental
8  overdose -- dose deaths that were attributed to
9  prescription drug abuses -- or drug abuse.
10  Then we saw the shift to heroin, subsequently
11  fentanyl.
12     Q.   Okay.  When did heroin- and
13  fentanyl-related drug overdose deaths surpass
14  overdose deaths associated with the abuse of
15  prescription opioids?
16     A.   I don't recall the specific year.
17     Q.   Do you recall roughly when that
18  would have happened in Cuyahoga County?
19     A.   Not at this very moment, without the
20  data in front of me.
21     Q.   Do you agree that prescription
22  opioid -- let me start -- start over with
23  that question.
24     Do you agree that overdose death
25  related to prescription opioid abuse have been

85 (Pages 334 - 337)

Page 338

1  trending downward in Cuyahoga County since 2011
2  or 2012 at the latest?
3      A.   Again, I would need to see the data
4  in front of me to be specific with the years of
5  when that started to trend down.  But I do
6  know, at the same time that it started to trend
7  down, we really started to see a trend upwards
8  with heroin and subsequently with fentanyl.
9      Q.   Is it your view that the downward
10 trend in prescription opioid-related overdose
11 deaths was due in part to the activities of the
12 Cuyahoga County Board of Health to address the
13 opioid abuse epidemic in the county?
14     A.   Of course that would be our -- our
15 hope.  I cannot say definitively if it was a
16 direct result of our efforts.
17     Q.   Do you have a view as to why at the
18 same time heroin-related overdose deaths
19 started to go up?
20     A.   The data that was provided by the
21 Medical Examiner's Office indicated that, as
22 the -- the numbers of prescription drug
23 overdose-related deaths started to decrease,
24 that the number of heroin-related overdose
25 deaths increased in that the mind-set was that

Page 339

1  prevention measures that could have been in --
2  could have been -- could have been put in place
3  to curb the prescription pill epidemic could
4  have inadvertently shifted folks to heroin.
5      Q.   In other words, people who could no
6  longer obtain diverted prescription opioid
7  pills started to use heroin?
8          MS SACKS:  Objection.
9          THE WITNESS:  I can't say that that
10 happened definitively.  But that was a
11 mind-set.
12         BY MR. BOEHM:
13     Q.   Is that your understanding?
14     A.   It was my understanding that that
15 was one of the contributing factors to the rise
16 in -- an increase of heroin-related fatalities.
17     Q.   And when you say that was one of the
18 drivers of that shift, what is "that" that
19 you're talking about?
20     A.   The -- the decrease in use or
21 availability of prescription medications,
22 perhaps cost associated with the street value
23 of prescription medications.
24     Q.   Okay.  I'm going to show you a
25 document from the Ohio Department of Health.

Page 340

1          Is it fair to say that you consider
2  the Ohio Department of Health a partner of
3  Cuyahoga County Board of Health in terms of
4  addressing the opioid abuse epidemic in the
5  county?
6      A.   I think that would be safe to say,
7  that we would consider them certainly as a
8  resource.
9      Q.   Would you consider them to be a
10 partner?
11     A.   Yes.
12         (Deposition Exhibit 15 was marked
13 for identification.)
14         BY MR. BOEHM:
15     Q.   Okay.  I want to direct your
16 attention to a graphic in the slide deck that's
17 now marked as Exhibit 15 for purposes of your
18 deposition entitled "Violence and Injury
19 Prevention Program" from the Ohio Department of
20 Health. It's on Page 12.
21     A.   Okay.
22     Q.   Unfortunately, this document was
23 produced to us only in black and white.  So
24 it's a little hard to see.
25         But you can tell from looking at

Page 341

1  this that right around 2011 fentanyl-related
2  overdose deaths starts to go up dramatically --
3  or I should say -- sorry.  Let me back up a
4  second.  I messed that up.
5          Right around 2011 prescription
6  opioid -- I'm going to start over once again.
7          It's late in the day.  We're going
8  to make it.
9          You can see from this graphic that
10 overdose deaths associated with the abuse of
11 prescription opioids begins to go down in 2011
12 and then level off, while in 2011
13 heroin-related overdose deaths starts to go up
14 dramatically.
15         Do you see that?
16     A.   I believe I do.
17         Can you confirm that prescription
18 opioids is the top line?
19     Q.   Yeah.  That's my understanding.
20 Yes.
21     A.   Okay.
22     Q.   And then you see in 2011 the heroin
23 line jumps up?
24     A.   Would that be this line here?
25     Q.   Yeah.  The record is hard to pick up

86 (Pages 338 - 341)

Page 342

1    what we're pointing at.
2        But it's the one that is -- goes
3    above -- it's the highest as of 2012 and
4    continues to trend upward.
5        You see that?
6    A.    Yes.
7    Q.    Okay.  And then there's another one
8    that jumps up in 2013, and that it's the
9    fentanyl line.
10    A.    Yes.
11    Q.    And does that -- those general
12    trends sound about right in terms of your
13    understanding about what opioids were causing
14    overdose deaths in Cuyahoga County during these
15    years?
16    A.    Potentially.  I can't say
17    definitively that I recall fentanyl being a
18    significant problem beginning in 2013.
19    Q.    When do you believe that fentanyl
20    became a significant problem in Cuyahoga
21    County?
22    A.    I would have to go back and look at
23    the reports and the data that was provided.
24    Certainly by 2015 I do remember it being a
25    significant problem.

Page 343

1    Q.    When do you recall that heroin
2    became a primary driver of opioid-related
3    overdose deaths in Cuyahoga County?
4    A.    Again, I couldn't say definitively
5    when it became the primary driver.  Certainly
6    before fentanyl.  So if my memory served me
7    correctly, in my memory of somewhere between
8    2014 and 2015 being a significant year for
9    fentanyl, heroin would have been prior to that.
10        (Deposition Exhibit 16 was marked
11    for identification.)
12        BY MR. BOEHM:
13    Q.    This is Exhibit 16.  It's a document
14    prepared by the Cuyahoga County Board of Health
15    from 2016.  It looks like it's intended to
16    cover a period of January 1 through September
17    30th, 2016.
18        Do you see that?
19    A.    Yes.
20    Q.    And you were at CCBH during that
21    time, correct?
22    A.    Correct.
23    Q.    The title of this document is
24    "Drug-Related Emergency Room Visits."
25        Do you see that?

Page 344

1    A.    Yes.
2    Q.    Did you prepare this document?
3    A.    I was not the -- not the sole
4    author, but I wasn't the lead author on this
5    document.
6    Q.    I'm sorry.  Would you just say that
7    one more time.
8    A.    I was not the lead author on the
9    document.  I did contribute to the creation,
10    but I did not have the lead.
11    Q.    Who was the lead author?
12    A.    The lead author -- there were a few
13    folks that actually worked on this document.  I
14    -- Chris Kippes was one of the individuals, who
15    was our director of epidemiology and
16    surveillance.  He ran the numbers for the
17    report and then provided that information.
18        And we also had another individual
19    who worked on the report.  And she was a -- a
20    medical resident that had a rotation that spent
21    some time working in our office.  So she also
22    helped contribute to the preparation.
23    Q.    Who was that?
24    A.    Her name was Dr. Erica Stopski.
25    Q.    So the three of you collaborated to

Page 345

1    prepare this report?
2    A.    Yes.  And I don't recall if Vince
3    had any ownership of the document.  He may have
4    contributed as well.
5    Q.    Is this the kind of document that
6    Mr. Caraffi typically would want to review and
7    approve before it was finalized?
8    A.    He would want to review it, yes.
9    Q.    Okay.  This particular report is
10    entitled "Drug-Related Emergency Visits From
11    January 1 to September 30th, 2016," right?
12    A.    Yes.
13    Q.    Okay.  And I want to direct your
14    attention to the fourth page of this document
15    that refers to emergency room visits that are
16    drug-related by drug category.
17        Do you see that?
18    A.    Yes.
19    Q.    Okay.  And what this section is
20    trying to do is break down by numbers and by
21    percentages which drug category was responsible
22    for its corresponding amount of emergency room
23    visits, right?
24    A.    Yes.
25    Q.    Okay.  And -- and it looks like it's

87 (Pages 342 - 345)

Page 346

1 ranked from highest to lowest.
2         Does that look right to you?
3     A.   It does.
4     Q.   And the first thing that's listed
5 there under the drug category is "Heroin Only."
6         You see that?
7     A.   Yes.
8     Q.   The second column of this graph has
9 an N.
10        What does the N mean?
11    A.   I think the N is the total number of
12 cases.
13    Q.   Is that the total number of
14 emergency room visits for heroin-only-related
15 visits?
16    A.   Yes.  And I be -- I would need to go
17 back and read the document a little bit more
18 thoroughly to determine which hospital systems
19 or emergency room departments these numbers
20 were pulled from.
21    Q.   Would that be something that's
22 available to us who are reviewing this document
23 and didn't prepare it ourselves?
24    A.   I believe it's probably embedded
25 within the document --

Page 347

1     Q.   On --
2     A.   -- the source of --
3     Q.   On the first page, it says:  "Data
4 for this report were taken from EpiCenter, a
5 web-based surveillance tool" --
6     A.   Uh-huh.
7     Q.   -- "administered through the Ohio
8 Department of Health."
9         Do you see that?
10    A.   Yes.
11    Q.   Is that where these data would be
12 from?
13    A.   Yes.  So EpiCenter was a syndromic
14 surveillance tool that was operate -- owned and
15 operated by the Ohio Department of Health.  It
16 had been used for a variety of diseases and
17 emergency-related events prior to them
18 capturing drug-related emergency department
19 visits.
20        I was just trying to recall which
21 hospitals in Cuyahoga County that this was a
22 raw number for.
23    Q.   Okay.  Can you tell?
24    A.   I mean it does say:  "Drug-related
25 visits to emergency rooms in Cuyahoga County."

Page 348

1     Q.   Is there any reason why any
2 emergency rooms in Cuyahoga County would have
3 been left out?
4     A.   Only if they were not inputting that
5 data into the system that captured this.  I
6 don't believe we would have excluded any
7 hospitals --
8     Q.   Okay.
9     A.   -- for any particular reasons.
10    Q.   Do you know of any hospitals who
11 don't input data into the EpiCenter system?
12    A.   No.  Not off --
13    Q.   Okay.
14    A.   -- the top of my head.
15    Q.   Okay.  Well, when you say off the
16 top of your head, I'm trying to understand if
17 that's some kind of caveat.
18        Do you know?
19    A.   This -- this was a newer system.
20 This was a newer system that was put in place
21 just prior to my departure.  We hadn't used it
22 often.  I hadn't really had a ton of
23 interaction with this system.  These reports
24 were not something that we did very frequently.
25    Q.   The point is you're not aware of any

Page 349

1 hospitals in Cuyahoga County who don't
2 participate by providing their data to the
3 EpiCenter database?
4     A.   I am not aware.
5     Q.   Okay.  So under the N, which we
6 understand to be the number of ER visits in
7 Cuyahoga County, we see 895, which represents
8 just over 62 percent of the total drug-related
9 emergency room visits in Cuyahoga County,
10 right?
11    A.   That is correct.
12    Q.   Okay.  And the next category is
13 "Opioid General," with 327, which comes out to
14 22.7 percent, right?
15    A.   Yes.
16    Q.   And you have "Cocaine" and
17 "Polysubstance" are the next two, right?
18    A.   Yes.
19    Q.   And then after that you get to
20 prescription opioids.
21        Do you see that?
22    A.   Yes.
23    Q.   That one's 42 total for a total of
24 2.9 percent, right?
25    A.   Correct.

88 (Pages 346 - 349)

Page 350

1    Q.   Okay.  Why do you think that,
2  between the months of January and September
3  2016, drug-related emergency room -- sorry.
4       Why do you think, between the months
5  January and September 2016,
6  prescription-opioid-related emergency room
7  visits represented only 2.9 percent of total
8  drug-related emergency room visits in Cuyahoga
9  County?
10   A.   It's my understanding, from the data
11  that was provided to us at that time, that
12  prescription opioid -- exclusive prescription
13  opioid overdoses had started to trend downwards
14  as heroin began to trend upwards.
15   Q.   Okay.  You agree it's a -- there's a
16  pretty dramatic difference between 895 versus
17  42?
18   A.   Yes.
19   Q.   And is it your understanding that
20  that trend of declining
21  prescription-opioid-related emergency room
22  visits versus heroin and other illicit
23  opioid-related overdose and emergency room
24  visits -- that those trends have continued in
25  the same direction as they were headed in 2015?

Page 351

1    A.   Do you mind repeating the question
2  for me.  I'm sorry.
3    Q.   Yeah.  I know.  It was so long.
4       Is it your understanding that the
5  trend we were seeing here in 2016 where you had
6  only 2.9 percent of drug-related emergency room
7  visits being related to prescription opioids,
8  whether that trend has continued in the years
9  since 2016 in Cuyahoga County?
10   A.   It is my understanding that that
11  trend has continued as the drug epidemic has
12  continued to evolve.  I think that it has
13  evolved very rapidly over the years.  And
14  during this time frame and in recent years,
15  prescription opioid overdose deaths have
16  declined per the data that has been provided.
17   Q.   Is it your expectation that
18  prescription-related emergency room visits and
19  overdose deaths will continue to decline based
20  on the trends that are occurring right now in
21  Cuyahoga County?
22   A.   It is my hope.
23   Q.   Do you have reason to believe that
24  that's true, based on the data that you've
25  seen?

Page 352

1       MS SACKS:  Objection.
2       THE WITNESS:  Can you be more
3  specific or repeat the question for me, please.
4       BY MR. BOEHM:
5    Q.   Sure.
6       Based on the data that you've seen
7  and the information you have available to you,
8  do you agree that the trends we've seen, in
9  terms of the declining number --
10   A.   Uh-huh.
11   Q.   -- of emergency room visits and
12  overdoses related to prescription opioid
13  medications, are likely to continue to decline
14  in subsequent years?
15       MS SACKS:  Objection.
16       THE WITNESS:  I have no way of
17  really predicting that.  Again, it is my hope
18  that they would continue to decline.  But as
19  the epidemic has evolved and we've -- we've
20  seen different drugs present themselves as the
21  emerging threats, there's no way for me to
22  definitively say that prescription drugs
23  fatalities wouldn't have a spike or increase in
24  a particular year.
25       BY MR. BOEHM:

Page 353

1    Q.   Do you have any reason to think that
2  prescription-drug-related overdose deaths will
3  increase in the coming years as opposed to
4  continue to decrease?
5    A.   I don't.
6    Q.   Illicit fentanyl is sometimes now
7  being used by drug dealers in connection with
8  nonopioid substances, correct?
9    A.   Yes.  I have been made aware of
10  that.
11   Q.   Fentanyl is showing up in
12  methamphetamines, correct?
13   A.   I don't know that definitively.
14   Q.   Have you ever heard that?
15   A.   Honestly, I can't say definitively
16  if I've heard that it's been mixed with
17  methamphetamines.
18   Q.   Have you heard that fentanyl is
19  something being mixed with cocaine?
20   A.   Yes.
21   Q.   Okay.  Do you know if Cuyahoga
22  County is claiming damages related to overdose
23  deaths where an individual died from using
24  cocaine that was cut with fentanyl?
25   A.   I don't know.

89 (Pages 350 - 353)

Page 354

1    Q.   Are you familiar with the concept of
2    fentanyl test strips?
3    A.   Yes.
4    Q.   What do fentanyl test strips do?
5    A.   It's my understanding that the
6    fentanyl test strips are distributed as part of
7    the mobile syringe exchange unit and allow a --
8    a drug user to test their product for the
9    presence of fentanyl.
10        (Deposition Exhibit 17 was marked
11   for identification.)
12        BY MR. BOEHM:
13   Q.   This document has been marked as
14   Exhibit 17.  It's a 2015 report from the CDC
15   about their trip to Ohio to look into
16   fentanyl-related overdose deaths.
17        Are you familiar with the fact that
18   the CDC came to Ohio in 2015 to look into some
19   fentanyl-related deaths?
20   A.   Yes.  I do recall that visit.
21   Q.   How did you know that that had
22   happened?
23   A.   One of the locations that they
24   visited was the Cuyahoga County Board of
25   Health.

Page 355

1    Q.   Did you meet with anybody from the
2    CDC at that time?
3    A.   I -- I was -- I was present in the
4    room during the meeting.
5    Q.   Describe for us the nature of the
6    meeting.
7        What did you all discuss?
8    A.   We -- I -- I don't recall how many
9    people were there, who the stakeholders were at
10   that time.  I recall a member or two from the
11   CDC being present.  And the -- their purpose or
12   intent of their visit was to try to get a
13   better understanding of fentanyl presence
14   within Cuyahoga County, if I recall correctly.
15   That was quite some time ago.
16   Q.   Were the members or representatives
17   of the CDC healthcare professionals?
18   A.   I don't remember their specific
19   titles or backgrounds.
20   Q.   Did they request information from
21   the CCBH?
22   A.   I don't remember.
23   Q.   What did you discuss during the
24   meeting?
25   A.   I don't recall specifics of that

Page 356

1    meeting.  And to be honest, I'm questioning if
2    I was present for the entire duration of that
3    meeting.  If I was, I played a very small role
4    in that meeting, and I was merely present and
5    at the table.
6    Q.   Okay.  Well, whether you can
7    remember specifics or not, what -- what do you
8    recall about the meting?
9    A.   Not much.  I remember that it took
10   place.  I remember that we met in a conference
11   room at the Board of Health.  And I recall
12   that we were talking about the presence of
13   fentanyl in Cuyahoga County.
14   Q.   Do you know why the CDC came to Ohio
15   to look into fentanyl-related overdose deaths?
16   A.   At that time we were experiencing
17   fentanyl as being a significant drug threat.
18   Q.   Do you know Dr. Farid Sabet?
19   A.   No.
20   Q.   Never heard that name before?
21   A.   It's sound familiar, but I do not
22   know who that is.
23        MR. BOEHM:  Let's go off the record,
24   if we could.
25        THE VIDEOGRAPHER:  We are going off

Page 357

1    the record.
2        The time is 5:50.
3        (A short recess was taken.)
4        THE VIDEOGRAPHER:  We are back on
5    the record.
6        The time is 6:02.
7        You may proceed, Counsel.
8        MR. BOEHM:  Ms. Leppla, thank you
9    very much for your time today.  I'm going to
10   let some of my colleagues spend some time with
11   you.  And it's possible I'll ask you some more
12   questions later, depending on how the rest of
13   the day plays out.
14        But otherwise, really appreciate you
15   being here and taking time to -- to talk to us.
16        THE WITNESS:  Sure.  Thank you.
17        EXAMINATION BY COUNSEL FOR DEFENDANTS
18   MALLINCKRODT, LLC, AND SPEC GX, LLC
19        BY MR. GOLDSTEIN:
20   Q.   Hi, Ms. Leppla.
21   A.   Hello.
22   Q.   Good evening, just about.
23        As I said before, my name's Josh
24   Goldstein.  I represent certain of the
25   defendants in this litigation.

90 (Pages 354 - 357)

Page 358

1      Same rules apply as when my
2  colleague was asking you questions before.
3      Does that sound good?
4   A.  Yes.
5   Q.  You testified earlier that you
6  hadn't reviewed any direct-to-consumer
7  marketing materials related to prescription
8  opioids.
9      Do you recall that testimony?
10  A.  I'm sorry.  Can -- I -- I think I
11  missed some of what you said.
12  Q.  Sure.
13      I think you testified earlier that
14  you hadn't reviewed any direct-to-consumer
15  marketing materials from any -- related to
16  prescription opioids.
17  A.  I'm sorry if I'm not understanding
18  what you mean "reviewed."
19  Q.  Have you -- have you seen any
20  direct-to-consumer marketing materials related
21  to prescription opioids?
22  A.  Not that I can recall.  I -- I -- I
23  can recall advertising materials.  But whether
24  or not they were specifically related to
25  opioids, I don't know for certain.

Page 359

1   Q.  So you've generally seen marketing
2  related to prescription drugs but not
3  necessarily opioids?
4   A.  That is correct.
5   Q.  Now, I take it the same is true of
6  marking materials that are not
7  direct-to-consumer?
8   A.  What would be an example of a
9  marketing material that --
10  Q.  Sure.
11  A.  -- that you're referring to?
12  Q.  Are you familiar with any type of
13  marketing activities that pharmaceutical
14  companies do directly to prescribers?
15  A.  I am not.
16  Q.  Okay.  I'm going to read you a -- a
17  list of companies.  We'll go one by one.  And
18  I'm just going to ask the same question each
19  time.
20      So have you heard of a company
21  called Anda?
22  A.  No.
23  Q.  Have you heard of a company Actavis?
24  A.  No.
25  Q.  Have you heard of a company called

Page 360

1  Cephalon?
2   A.  I'm not certain.
3   Q.  What do you mean you're not certain?
4   A.  The -- the words "Cephalon" is
5  ringing a bell, but I don't recall if I
6  remember it in the capacity of being a drug
7  company.
8   Q.  Fair enough.
9      Have you heard of a company called
10  Endo?
11  A.  No.
12  Q.  Have you heard of a company called
13  Insys?
14  A.  No.
15  Q.  Have you heard of a company called
16  Janssen?
17  A.  Yes.
18  Q.  What do you know about Janssen?
19  A.  Nothing other than that I have heard
20  of them.
21  Q.  Have you heard of a company called
22  Mallinckrodt?
23  A.  No.
24  Q.  Have you heard of a company called
25  Purdue?

Page 361

1   A.  Yes.
2   Q.  What do you know about Purdue?
3   A.  To be the manufacturer of Oxycontin.
4   Q.  Anything else?
5   A.  No.
6   Q.  Do you know anything about a company
7  called Spec Gx?
8   A.  No.
9   Q.  Do you know anything about a company
10  called Teva?
11  A.  No.
12  Q.  Are you aware of any specific
13  misconduct on the part of manufacturer
14  defendants in this litigation?
15  A.  No.
16  Q.  Do you have any idea who the
17  manufacturer defendants are in this litigation?
18  A.  No.
19  Q.  Now, in connection with your work
20  with the Injury Prevention Grant -- you recall
21  discussing that earlier today?
22  A.  Yes.
23  Q.  How was it decided how grant funding
24  would be allotted?
25  A.  So grant funding, the determination

91 (Pages 358 - 361)

Page 362

1   of the allotment of those funds, was based on
2   meeting the overall goals and expectations of
3   the Ohio Department of Health grant.  We
4   partnered with community organizations that
5   were already embedded in doing that work that
6   would help us achieve that goal.
7       Q.   And what was the criteria from the
8   Ohio Department of Health grant?
9       A.   There -- there were a few criteria.
10  Ultimately our overarching goal was to see a
11  reduction in fatalities attributed to
12  prescription drug overdose deaths.  They wanted
13  to see policy, systems and environmental
14  changes take place at institutions.  For
15  example, the hospitals or in the higher
16  education settings, policy or systems changes
17  that would have created an environment to
18  assist with prevention efforts or seeing a
19  reduction in those deaths or educating,
20  depending on who the recipient of the funding
21  was.
22      Q.   Was there any work that you wanted
23  to pursue that would have been aimed at
24  addressing the opioid abuse epidemic in
25  connection with your work with the Injury

Page 363

1   Prevention Grant that you weren't able to do
2   because of lack of funding?
3       A.   Yes.  One thing that comes to mind
4   was the expansion of our syringe exchange
5   program.  That was something that we had looked
6   into and had had conversations about the
7   reality of expanding that program.  And funding
8   was -- was one of the issues that was raised in
9   terms of sustaining that program.
10      Q.   With respect to the Ohio Department
11  of Health grant in particular, was there any --
12  you just testified about the criteria that they
13  established.
14      A.   Uh-huh.
15      Q.   Was there any programs that would
16  have been aimed at the prescription opioid
17  abuse epidemic, as you've called it, that did
18  not fit that criteria?
19      A.   I'm sorry.  I don't think I
20  understand the question.  Can you repeat it --
21      Q.   Sure.
22      A.   -- for me, please.
23      Q.   Let me ask it a different way.
24           Were there any funding requests that
25  you considered that you ultimately rejected

Page 364

1   because they didn't meet the criteria?
2       A.   Only in the sense of mini grants.
3   So in -- in one year or two years, potentially
4   three years, in the final year of the grant,
5   there was supplemental funding that was
6   provided by the Ohio Department of Health for
7   us to offer mini grants to statewide agencies,
8   not just specifically Cuyahoga County.
9            And there were some agencies that
10  applied for those dollars that were not awarded
11  funding because they didn't meet the criteria
12  that the Ohio Department of Health was looking
13  for.
14      Q.   Do you recall any agencies in
15  particular?
16      A.   Oh, gosh.  It was a long time when
17  those applications were submitted.  I don't.
18      Q.   Did you ever seek grant funding from
19  other sources besides Ohio Department of
20  Health?
21      A.   We contributed to applications that
22  were submitted to other agencies other than the
23  Ohio Department of Health.
24      Q.   What does that mean, you contributed
25  to other applications?

Page 365

1       A.   There was an application that was
2   submitted or conversations had occurred with
3   potential funding from the CDC that -- if my
4   memory serves me correctly, that MetroHealth
5   took the lead on.  And we are -- were one of
6   the stakeholders that were at the table through
7   those discussions with the potential funding
8   from CDC.
9       Q.   And do you remember what that
10  initiative was aimed at?
11      A.   That initiative was going to be
12  aimed at our jail population as well as
13  medication assisted treatment efforts from
14  within MetroHealth.
15      Q.   And did that initiative go forward;
16  do you remember?
17      A.   Not at that time.  It -- it did not.
18      Q.   Now, you recall testifying earlier
19  about your work on the Northeast Ohio Hospital
20  Opioid Consortium?
21      A.   Yes.
22      Q.   What was the mission of that
23  organization?
24      A.   We had a formalized mission.  I
25  don't recall specifically what the language was

92 (Pages 362 - 365)

Page 366

1  for that mission.  But ultimately it was a
2  collaboration of our five large hospital
3  systems to work together collaboratively to
4  address this epidemic.
5      Q.   Why was it important for the
6  hospitals to work together collaboratively as
7  opposed to independently?
8      A.   Well, as you can imagine, often the
9  hospitals that were participants on the
10  consortium were competitors, and best practice
11  and data was not shared among those hospital
12  systems historically.
13         And so the goal of the consortium
14  was for those hospitals to begin to form
15  collaborative relationships and share best
16  practices.
17      Q.   Did you see that happen during your
18  time there?
19      A.   It had started to occur.
20      Q.   Do you recall specifics?
21      A.   The example that we've talked about
22  today was the functionality built into the EMR
23  as well as with education -- systemwide
24  education initiatives.
25      Q.   So I -- I think the testimony you're

Page 367

1  referring to is -- is the way the hospitals
2  would use the EMR systems to identify what you
3  categorize as overprescribing doctors.
4         Does that sound right?
5      A.   That's correct.
6      Q.   Did the consortium receive any data
7  from the hospitals related to that effort?
8      A.   Not prior to my departure.  It was
9  being worked on but had not occurred prior to
10  me leaving.
11      Q.   Do you know what format that data
12  was contemplated being produced in?
13      A.   No.
14      Q.   And what was the point of sharing it
15  with the consortium?
16         What was going to be the purpose of
17  that?
18         MS SACKS:  Objection.
19         THE WITNESS:  The consortium was
20  collaborating again to share those best
21  practices.  And I think, by identifying the
22  trends in the hospital sharing, that it would
23  be informative for the other participating
24  hospitals that did not have the same system in
25  place.

Page 368

1      BY MR. GOLDSTEIN:
2      Q.   Were there particular individuals --
3  I know you testified about Dr. Joan Papp at --
4      A.   Yes.
5      Q.   -- MetroHealth.
6         But at the other institutions, were
7  there particular individuals that were worked
8  with during your time on the consortium?
9      A.   Yes.
10      Q.   And who were those individuals?
11      A.   So each hospital had identified a
12  physician lead who would participate on the
13  consortium.  There was also a layer of
14  government relations representatives as well as
15  foundation team members.
16         And then, just prior to my
17  departure, they had created a subcommittee of
18  nurse -- nursing professionals.
19      Q.   Do you recall who the physician lead
20  was at Cleveland Clinic?
21      A.   It -- it actually changed a few
22  times in my time there.  Initially it was Dr.
23  Lisa Yerian.  Dr. David Stream had some
24  involvement.  And there's another gentleman who
25  I'm looking right at his face right now, and

Page 369

1  his name is escaping me.  Apologize.
2      Q.   And what about the -- you said
3  there's -- you worked with foundation team
4  members.
5         What did you mean by that?
6      A.   So the foundation team members were
7  from the foundation or fundraising level of the
8  hospital systems.  And they were represented on
9  the consortium in terms of us seeking potential
10  grant opportunities.
11      Q.   Do you remember specifically at
12  Cleveland Clinic who you worked with?
13      A.   From the foundations team?
14      Q.   Yes.
15      A.   Amanda was her first name.  I don't
16  recall her last name.
17      Q.   And on the government relations side
18  from Cleveland Clinic, do you recall who you
19  worked with?
20      A.   There were a few folks, but it was
21  primarily Jennifer Johns.
22      Q.   And what about at University
23  Hospital?
24      A.   In which role?
25      Q.   Sorry.

93 (Pages 366 - 369)

1      Start with the physician lead.
2      A.    The physician lead was Dr. Randy
3  Jernejcic.
4      Q.    And what about the foundation team?
5      A.    The foundation team represented
6  [sic] -- representative from University
7  Hospital -- I don't recall a -- I don't recall
8  his name.  I think it was a -- it was a male,
9  but I don't recall his name.
10     Q.    In government relations?
11     A.    Government relations from University
12  Hospitals would have been Dan Bucci or Heidi --
13  Heidi Garland.
14     Q.    The physician team leads, was your
15  understanding that they had a role in the -- in
16  their respective hospitals related to
17  monitoring physicians and their prescribing
18  practices?
19     A.    The physician leads from each
20  hospital played some role in the opioid-related
21  programming.
22     Q.    But it changed hospital to hospital?
23     A.    Yes.
24     Q.    You talked about using the EMR data
25  to identify what you called overprescribers.

1      And I'm just wondering, when you use
2  that term, what are you -- what are you
3  referring to?
4      What's an overprescriber?
5      A.    I was referring to metrics that each
6  system had put in place for that particular
7  department and what would fall within the
8  normal realm from that provider treating that
9  particular patient.  Those metrics and systems
10  were put in place by the hospital systems.
11     Q.    Did you have an understanding as to
12  how -- as to what the different metrics were at
13  each hospital?
14     A.    Not entirely, no.
15     Q.    What was the understanding you had?
16     A.    One under -- understanding that I
17  had had to do with MMEs for -- for opioids in
18  different departments.  And the functionality
19  of the system would create a red flag if that
20  particular physician exceeded that limit.
21     MR. GOLDSTEIN:  I just want to show
22  you one document briefly.  This will be Exhibit
23  18.
24     (Deposition Exhibit 18 was marked
25  for identification.)

1      BY MR. GOLDSTEIN:
2      Q.    And unfortunately the Bates was cut
3  off.  But I'll just read it for the record.
4  It's CHA 00001777.  That's the front page.
5      Do you recognize this document?
6      MS SACKS:  Do you have a copy for
7  me?
8      MR. GOLDSTEIN:  Oh.  Apologize.
9      MS. SACKS:  It's okay.
10     MR. GOLDSTEIN:  I do.  Here it is.
11     MS. SACKS:  Thank you.
12     THE WITNESS:  I do recognize this
13  document.
14     BY MR. GOLDSTEIN:
15     Q.    What is it?
16     A.    It is the strategic action plan for
17  the northeast Ohio Hospital Opioid Consortium.
18  I cannot confirm if this was a draft or final
19  copy, but this was completed prior to -- or I'm
20  sorry -- post my departure.
21     Q.    And I'll represent to you in -- in
22  tiny letters at the top-right corner it says
23  it's -- it's dated -- the effective date is
24  November 30th, 2018.
25     Does that sound right?

1      A.    I don't know when it was completed,
2  but --
3      Q.    And -- and so is this a document
4  that you worked on before your departure?
5      A.    Yes.  We had be -- begun the process
6  of creating the strategic action plan.
7      Q.    What prompted you to create this?
8      A.    To get the hospitals to agree and
9  identify common goals.
10     Q.    And so was -- was the information
11  that's reflected here information that was
12  provided by the hospitals?
13     A.    I would need to take a look at the
14  document.  But the nature of the document was
15  collaborative by nature with the hospitals'
16  input primarily from the physician leads in
17  this document.  Not exclusively of the
18  physician leads, but...
19     Q.    Do you know who else besides
20  individuals from the various hospitalize
21  entities that were members in the consortium
22  would have contributed goals to this document?
23     A.    I can't think of any at least layer
24  of representation in the consortium that would
25  not have contributed to this document.  Meaning

Page 374

1  that the government relations representatives
2  would have certainly had a say in this
3  document.  The physician leader representation
4  from the hospitals absolutely would have had a
5  say.
6          Without reading the final version, I
7  can't say definitively if the foundations team
8  members contributed.
9      Q.   But those would all be individuals
10  who are affiliated with the hospitals?
11      A.   With the hospitals, yes.
12      Q.   And if you just turn very briefly to
13  Page 4 of this document, you see the goal at
14  the top of the page:  "Improving Prescribing
15  Practice Within Each Hospital System"?
16      A.   I don't think I'm on Page 4.
17      Q.   Right there at the top of the page.
18  Yes.
19      A.   Yes.
20      Q.   And so it lists a goal:  "Develop
21  and share quality prescriber peer review and
22  identify outliers."
23          Do you have an understanding of what
24  that's referring to?
25      A.   Prior to my departure, it was

Page 375

1  discussed that in part of the functionality of
2  that EMR would be able to capture this
3  information.  And there were potentially other
4  sources of information that would contribute to
5  identifying outliers -- prescribing outliers.
6          And "develop and share quality
7  prescriber peer review"...
8          I remember one hospital system in
9  particular talking about a peer-review process
10  that they had developed should a physician have
11  been identified as being an outlier.
12      Q.   And so the idea was that this could
13  be a goal that -- that that could -- that model
14  could work in -- strike that.
15          Was the idea that the consortium
16  could adopt a similar model for all five
17  hospitals?
18      A.   The idea was that that information
19  would be shared among the hospitals for them to
20  determine if that would be a right fit for
21  their hospital system.
22      Q.   So the hospitals would be sharing
23  the systems as opposed to be sharing their own
24  internal peer reviews and outliers?
25      A.   That is correct.  That is my

Page 376

1  understanding.
2      Q.   Okay.  And is the same thing true of
3  the -- the next line down, the educational
4  opportunities?
5          MS SACKS:  Objection.
6          BY MR. BOEHM:
7      Q.   So the record's clear, it says:
8  "Provide educational opportunities to help
9  prescribers fully incorporate state and federal
10  opioid prescribing guidelines."
11          So I guess my question is what is
12  that referring to?
13      A.   Again, this document was finalized
14  after my departure from the Center For Health
15  Affairs.
16      Q.   So you don't know?
17      A.   I know that we talked about creating
18  systemwide education for all levels of
19  employees within the hospital system.  I don't
20  know -- I can't say definitively if that's what
21  this bullet point is referring to.
22      Q.   In other words, educational
23  materials that would be uniform across all five
24  hospitals?
25      A.   That was the hope prior to my

Page 377

1  departure.
2      Q.   And why was that a goal?
3      A.   To -- to have a standardized message
4  for all hospital systems to have the same
5  message of educating their providers, their
6  staff members and their patients.  Really just
7  the hope of creating a unified message.
8      Q.   Was there any risk that, if certain
9  hospitals' procedures or guidelines were less
10  stringent than others, that it would lead to
11  sort of patients -- I'll just strike the
12  question.
13          MR. GOLDSTEIN:  I'm going to turn it
14  over now to one of my colleagues.  But thank
15  you very much --
16          THE WITNESS:  Okay.
17          MR. GOLDSTEIN:  -- for your time.
18          We can --
19          THE WITNESS:  Thank you.
20          MR. GOLDSTEIN:  -- go off the record
21  for a minute.
22          THE VIDEOGRAPHER:  We are going off
23  the record.
24          The time is 6:24.
25          (A short recess was taken.)

95 (Pages 374 - 377)

1    THE VIDEOGRAPHER: We are back on
2 the record.
3    The time is 6:24.
4    You may proceed, Counsel.
5    MR. MOYLAN: Thank you.
6    EXAMINATION BY COUNSEL FOR DEFENDANTS
7    CVS INDIANA, LLC and CVS RX SERVICES, INC.
8    BY MR. MOYLAN:
9    Q.   Ms. Leppla, again, my name is Daniel
10 Moylan. I represent the CVS defendants in the
11 litigation. I have relatively few questions
12 for you.
13    The first is have you ever heard of
14 a company before called CVS Indiana, LLC?
15    A.   I've heard of CVS, not the LLC in
16 its entirety.
17    Q.   Okay. Have you heard of a company
18 called CVS Rx Services, Inc.?
19    A.   No.
20    Q.   So is it fair to -- for me to infer
21 that you have no understanding of what their --
22 what the -- the business of those entities is?
23    A.   I -- I would think that would be
24 fair.
25    Q.   Okay. Were you aware that either of

1 those companies is defendants in this case?
2    A.   No.
3    Q.   Okay. So you don't have any
4 understanding of the nature of the claims
5 against either of them?
6    A.   No.
7    Q.   In addition to CVS, were you aware
8 that any other national retail pharmacy chains
9 are defendants in this case?
10    A.   No.
11    Q.   So you were unaware that Rite Aid is
12 a defendant?
13    A.   That is correct. I was unaware.
14    Q.   Okay. Unaware that Walgreens is a
15 defendant?
16    A.   Unaware.
17    Q.   And you're unaware that Wal-Mart is
18 a defendant in the litigation?
19    A.   Until today when introductions were
20 made, I did not know that Wal-Mart was a
21 defendant.
22    Q.   Okay. And as to each one of them,
23 you don't have any understanding of the nature
24 of the claims against those entities in this
25 case?

1    A.   I do not.
2    Q.   Did you -- I think you testified to
3 -- to this before.
4    But you did not review any of the
5 allegations in the complaint in this case; is
6 that correct?
7    A.   That is correct.
8    Q.   Okay. So it's -- it's fair to say
9 that you don't -- you're unaware that, with
10 respect to each of the national retail pharmacy
11 chains, they're not sued in their role as
12 dispensers of medications; is that correct?
13    A.   That is correct.
14    Q.   During your time at the Cuyahoga
15 County Board of Health, did you ever have
16 occasion to have personal discussions with
17 personnel from CVS regarding the programming or
18 services related to opioids that you were
19 involved in?
20    A.   Not to my knowledge.
21    Q.   Same question with respect to Rite
22 Aid: Have you ever communicated with Rite Aid
23 personnel regarding efforts to combat the
24 prescription opioid epidemic in Cuyahoga
25 County?

1    A.   Not to my knowledge.
2    Q.   And have you ever had any
3 interactions with personnel from Walgreens
4 concerning efforts to combat the opioid crisis
5 in Cuyahoga County?
6    A.   Not personally, no.
7    Q.   When you say "not personally," are
8 you aware of other interactions that CCBH
9 personnel have had with Walgreens personnel?
10    A.   I can't say definitively if it was a
11 CCBH personnel that had the conversation. I
12 know that one of the -- or a member of the task
13 force or some community partner along the way
14 had discussions with Walgreens potentially in
15 their distribution efforts of Naloxone without
16 a prescription.
17    Q.   Okay. Do you remember the name of
18 the task force partner who had those kind of --
19 those discussions?
20    A.   I do not.
21    Q.   Okay. And you're unaware of who at
22 Walgreens they interacted with?
23    A.   That is correct.
24    Q.   Have you ever personally interacted
25 with any -- anyone from Wal-Mart on efforts to

96 (Pages 378 - 381)

Page 382

1  deal with the prescription opioid epidemic in
2  Cuyahoga County?
3     A.   Not to my knowledge.
4        MR. MOYLAN:  Okay.  That's all the
5  questions I have.
6        THE WITNESS:  Okay.
7        MR. MOYLAN:  Thank you.
8        THE WITNESS:  Thank you.
9        MR. MOYLAN:  Go off the record
10  again?
11       MR. BOEHM:  Well, we can.
12       Shayna, are you going have any
13  questions?
14       MS SACKS:  No.
15       MR. BOEHM:  Okay.  So I think that's
16  --
17       MR. MOYLAN:  Okay.
18       MS. SACKS:  Okay.
19       MR. BOEHM:  I don't know --
20       MS. SACKS:  I didn't know if they
21  did.
22       MR. BOEHM:  I don't know that we
23  need to go off the record.
24       Any other questions?
25       Thank you for your time.

Page 383

1        THE VIDEOGRAPHER:  We are off the
2  record at 6:29 p.m.
3        And This concludes today's testimony
4  given by Allisyn Leppla.
5        The total number of media units used
6  was four and will be retained by Veritext Legal
7  Solutions.
8        (Whereupon, the proceeding was
9  concluded at 6:29 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 384

1        C E R T I F I C A T E
2
3        I, Bonnie L. Russo, Certified Shorthand
4  Reporter, and Notary Public, hereby certify:
5        That ALLISYN LEPPLA was duly sworn by
6  me, an authorized Notary Public, and that this
7  deposition is a true and correct record of the
8  testimony given by such witness to the best of
9  my knowledge and ability.
10        I further certify that I am not related
11  to any of the parties to this action and that I
12  am in no way interested in the outcome of this
13  matter.
14        In witness whereof, I have hereunto set
15  my hand this day, January 17, 2019.
16
17  _Bonnie L. Russo_
18  Bonnie L. Russo
19  Certified Shorthand Reporter
20
21
22
23
24
25

Page 385

1        Veritext Legal Solutions
          1100 Superior Ave
2            Suite 1820
          Cleveland, Ohio 44114
3          Phone: 216-523-1313
4
   January 18, 2019
5
   To: Shayna E  Sacks, Esq
6
   Case Name: In Re: National Prescription Opiate Litigation
7
   Veritext Reference Number: 3191877
8
   Witness:  Allisyn Leppla       Deposition Date: 1/15/2019
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext com
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

97 (Pages 382 - 385)

Page 386

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 3191877
CASE NAME: In Re: National Prescription Opiate Litigation
DATE OF DEPOSITION: 1/15/2019
WITNESS' NAME: Allisyn Leppla
In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me
I have made no changes to the testimony
as transcribed by the court reporter

Date          Allisyn Leppla
Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn
Statement; and
Their execution of this Statement is of
their free act and deed

I have affixed my name and official seal

this _____ day of _____, 20____

_____
Notary Public

_____
Commission Expiration Date

---

Page 388

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 1/15/2019
PAGE/LINE(S) /        CHANGE        /REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Date          Allisyn Leppla
SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
DAY OF _____, 20_____ .

_____
Notary Public

_____
Commission Expiration Date

---

Page 387

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 3191877
CASE NAME: In Re: National Prescription Opiate Litigation
DATE OF DEPOSITION: 1/15/2019
WITNESS' NAME: Allisyn Leppla
In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me
I have listed my changes on the attached
Errata Sheet, listing page and line numbers as
well as the reason(s) for the change(s)
I request that these changes be entered
as part of the record of my testimony

I have executed the Errata Sheet, as well
as this Certificate, and request and authorize
that both be appended to the transcript of my
testimony and be incorporated therein

Date          Allisyn Leppla

Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:
They have read the transcript;
They have listed all of their corrections
in the appended Errata Sheet;
They signed the foregoing Sworn
Statement; and
Their execution of this Statement is of
their free act and deed
I have affixed my name and official seal
this _____ day of _____, 20____

_____
Notary Public

_____
Commission Expiration Date

98 (Pages 386 - 388)

[& - 2014]                                                                    Page 1

**&**

**&**  3:6,18,21 4:12
  4:18,22 8:11,13,13
  8:16,21 9:14
  320:7

**0**

**00001-16**  5:22
**00001777**  372:4
**000874244-248**
  6:16
**000980-981**  5:20
**014178416-420**
  6:9
**014181244-1248**
  5:12
**014181983-987**
  6:5
**014188900-901**
  5:18
**014191053-073**
  6:14
**014195639-642**
  5:25
**014231470-471**
  6:11
**014244398-450**
  6:19
**02199**  4:19

**1**

**1**  5:9 7:14 25:4,11
  32:11,19 35:7
  73:19 84:8 105:8
  343:16 345:11
**1,500**  212:5
**1-17-14**  5:23
**1/15/2019**  385:8
  386:3 387:3 388:2
**10**  5:3 6:2 228:24
  229:3 252:8
  265:15 317:9,22

**10,000**  208:9
**100**  4:4 39:12
  165:16
**10017**  3:4
**10019**  3:19
**10036**  4:23
**11**  6:4 249:14,18
**1100**  3:8 385:1
**114**  5:13
**119**  5:15
**11937**  384:17
**11:01**  105:9
**11:20**  105:15
**11:22**  107:14
**11:25**  107:18
**11th**  3:3
**12**  6:6 268:14,20
  340:20
**12-21-16**  5:25
**1211**  4:22
**12th**  3:23
**13**  6:8 292:11,12
  326:24
**138**  5:17
**14**  6:10 330:25
  331:2
**14211495-500**
  5:23
**15**  1:19 6:12 50:7
  52:24 152:10
  155:5,11 156:6
  203:1,16 208:16
  317:9,22 340:12
  340:17
**15th**  7:5
**16**  6:15 208:16
  343:10,13
**16th**  184:10
  195:22
**17**  1:4,8,10 6:17
  7:20 208:16

**354**:10,14 384:15
**170**  5:19
**1717**  4:9
**172**  5:21
**178**  5:23
**18**  1:12 6:20
  130:15 371:23,24
  385:4
**1820**  385:2
**183**  5:24
**19**  130:8,16 284:14
**19103**  4:10
**1990s**  233:2,14
  288:25 299:2,11
**1997**  285:9,18
  287:13 295:11
  296:5 299:21
  316:6
**1998**  284:5 316:6,6
**1:05**  195:3
**1st**  5:20

**2**

**2**  5:11 44:2,5,9
  84:8 105:14 195:2
  195:23 211:14
  212:4 213:16
  229:9 293:14
**2-6-13**  6:7
**2-6-14**  5:11
**2.9**  349:24 350:7
  351:6
**20**  386:16 387:22
  388:22
**20,000**  203:1,16
**20/20**  312:6,7
  313:18 316:23
**2000**  108:19 203:3
  208:15 299:2
**20001**  4:15
**20005**  3:23

**2000s**  284:14
  299:12
**2002**  26:11 30:16
  32:20 34:12
  261:13 297:8
**2006**  77:18,19,23
  78:1,4 79:8,12
  176:23 177:3,9,10
  178:5 261:14
  297:13
**2007**  79:8,12
  116:21 117:2,5,13
  117:19 177:9
**2008**  85:4 87:4
  123:2
**2009**  168:19,25
  170:6,15,22 172:3
  172:9
**2010**  5:14 76:14,16
  76:19,21 77:2,6,15
  80:20 85:5 87:4
  115:1 117:15
  118:15 135:16,23
  176:23 177:3
  178:5 179:18
  180:3,10 193:14
  193:15 229:9,9
  231:22 243:10
  251:22 252:7
**2011**  338:1 341:1,5
  341:11,12,22
**2012**  5:16 119:12
  120:10 130:4
  136:24 175:9
  178:18,25 179:8
  338:2 342:3
**2013**  269:9 270:21
  286:12 342:8,18
**2014**  26:1,3 33:13
  33:16,21,25 34:2
  34:11,13,16 44:13

73:20 178:12
203:3,8 208:14
214:9 292:16
296:3 327:5 328:2
328:21 343:8
**2015**  6:18 184:14
196:13 198:24
199:16,21 221:22
223:1,17 333:20
333:23 334:14
335:22 336:2,19
342:24 343:8
350:25 354:14,18
**2016**  6:15 184:10
195:22 198:17
343:15,17 345:11
350:3,5 351:5,9
**2016-003**  6:19
**2017**  89:3 109:9
203:10
**2018**  76:1 104:24
108:20 109:10
110:18 152:8
203:3,9,11 372:24
**2019**  1:19 7:5
317:8 384:15
385:4
**202-434-5000**  3:24
**202-662-6000**  4:15
**21**  230:10,13,13,14
230:23 265:13
**2100**  2:8 7:23
**212-397-1000**  3:4
**212-596-9000**  4:23
**212-836-7838**  3:19
**21202**  4:4
**215-241-7910**  4:10
**216-523-1313**
385:3
**216-586-3939**  3:14

**216-592-5000**  3:9
**21st**  198:17
**22.7**  349:14
**228**  6:2
**2440**  4:4
**249**  6:4
**24th**  333:23
334:14,21
**25**  5:9
**250**  3:18
**26**  269:9
**268**  6:6
**2804**  1:4,4 7:20
**29**  170:22
**292**  6:8
**2:10**  195:9

**3**

**3**  5:13 114:21,25
195:8 267:14
**3,000**  205:24 206:5
210:5,6 216:17
**30**  40:21,24,25
46:20
**30th**  343:17
345:11 372:24
**3100**  4:9
**3191877**  1:25
385:7 386:2 387:2
**327**  349:13
**331**  6:10
**340**  6:12
**343**  6:15
**354**  6:17
**357**  5:4
**360**  3:3
**371**  6:20
**378**  5:5
**3:11**  334:21
**3:27**  267:15
**3:43**  267:21 268:7

**3:46**  268:11
**3:48**  270:11
**3:50**  270:15
**3rd**  5:22

**4**

**4**  5:15 119:7,11
130:5 176:8
201:11 203:6,12
267:20 374:13,16
**4,500**  219:21 223:9
**40**  47:22,24
**410-332-0444**  4:5
**42**  349:23 350:17
**44**  5:11
**44,323.50.**  46:4
**44113**  2:9 3:9
**44114**  3:13 385:2
**45004**  1:8
**45090**  1:10
**45132**  1:12
**47**  176:4
**4731.21**  286:5
**4:47**  326:12

**5**

**5**  5:17 138:20
152:8 176:13
**5,000**  201:11 203:6
203:12
**55**  2:7 7:22
**55th**  3:18
**5:14**  326:16
**5:50**  357:2

**6**

**6**  5:19 170:17,21
270:21
**617-951-7000**  4:20
**62**  349:8
**6:02**  357:6
**6:24**  377:24 378:3

**6:29**  383:2,9

**7**

**7**  5:21 172:18,19
176:8
**7-29-09**  5:20
**725**  3:23
**7:43**  225:7,13

**8**

**8**  5:23 178:7,9
180:14
**8-13-14**  6:9
**800**  4:19
**850**  4:14
**895**  349:7 350:16
**8:00**  225:21
**8:30**  225:22

**9**

**9**  5:24 115:9,12
183:22 184:1
195:15
**9-24-15**  6:11
**901**  3:13
**90s**  66:9
**950**  3:8
**9:01**  225:9,14

**a**

**a.m.**  1:20 7:5
225:7,9,13,14,21
225:22
**aaron**  1:6
**ability**  29:22
220:19 294:20
384:9
**able**  17:12 25:21
40:13 43:22 65:11
67:20 95:21 96:17
97:17,25 98:4,5,12
99:15,25 101:20
101:20 129:8

152:1 153:8
154:17 161:10
198:24 199:16,18
220:22 221:21
222:2,4,10 225:8
225:17 264:14
278:7 302:2
305:17 314:25
315:7,10 363:1
375:2
**absolutely** 45:14
66:7 327:17,21
328:11 374:4
**absorbed** 123:1
**abuse** 6:2 19:18
24:6,8,13,17 43:2
48:14 52:7,10,15
56:6,24 58:3,20
59:21 62:17,21,25
63:13 65:15,17,23
65:25 66:6,21,25
67:6 68:20 69:5
69:20 70:23 73:16
74:8 77:23 78:2
81:10 82:2 85:8
85:21 86:5,7,15,17
86:25 87:7,22,24
88:10 91:8 104:9
112:13,14 114:14
115:8,23 116:13
116:15 118:17
120:5 121:24
122:6,12 123:25
124:7,17 125:7,22
128:11 131:11,17
131:23 132:3
134:6,20 136:3,14
149:1,12 162:23
163:19 164:23
166:23 167:25
175:20 178:4

179:8,20 180:3
183:13,18 193:22
201:2 202:17
203:24 205:2
207:25 208:22
209:8,9,18 226:12
229:7 230:19
232:15,25 233:18
235:18 239:9
243:17 244:3
247:11 248:1
250:7 251:25
252:12 253:4
254:3,17 256:4,19
257:4 258:11,13
258:19 259:2
260:22 261:3,15
261:18 263:15
264:11,24 265:1
265:11 266:4,13
266:20 269:16
270:2 271:1,12,24
272:18 273:16
276:7,16 277:19
278:2,20 279:7
280:9,17 282:10
289:24 290:15
292:19 297:12,21
302:7 305:4,14
306:18 307:1,17
309:12,16,21
311:12 312:2,14
314:11 315:4,22
316:13 317:1
318:5 325:15
327:24 328:13,18
337:7,9,14,25
338:13 340:4
341:10 362:24
363:17

**abused** 325:23
**abusers** 52:6
323:5 324:13
**abuses** 337:9
**abusing** 323:14
324:14
**accept** 29:4
**acceptance** 40:16
**accepted** 248:23
**accepting** 29:13
198:25 200:4
203:10 218:22
222:6
**access** 53:20,21,23
54:16,22,25 57:10
57:16,21 61:25
91:25 152:22
153:10 185:21
305:24 306:7,10
306:13
**accidental** 36:23
48:23 104:8
118:13 132:8,19
133:8 152:10,23
155:5,8,11,16
156:3,6 337:7
**accomplish** 50:24
**accountability**
148:9
**accrediting** 298:20
**accurate** 19:9
294:23
**achieve** 72:17
362:6
**acknowledge**
386:11 387:16
**acronym** 29:2
53:6,10 84:18
85:24 329:21
**act** 66:10 233:2,14
233:17 234:3,15

235:3,13,17 236:6
236:17,22 237:8
237:21 242:19
285:23 286:15
287:8,13 299:21
316:8 386:14
387:20
**act's** 238:4
**actavis** 359:23
**acted** 41:14 70:2
310:19 311:16
312:22 313:10
316:3
**acting** 258:6
**action** 84:18 85:10
85:22 86:6,7,17,25
87:7,22,24 88:10
101:1 170:25
372:16 373:6
384:11
**activities** 126:1,7,8
141:11 202:9
338:11 359:13
**activity** 221:20
**acute** 102:22
**adamhs** 75:18,22
75:25 76:7 124:12
124:15 125:1,5,9
125:12,21,25
126:15,25 127:8
127:14,19,23
128:2,20
**add** 337:3
**addicted** 23:23
97:9 112:17 129:9
**addiction** 24:14
65:20 66:4 67:3
67:17,24 68:14
110:14 168:21
169:2

**addictive** 246:6
247:2
**addicts** 65:24
**addition** 12:7
42:11 207:1
222:18 379:7
**additional** 74:16
328:17 329:8
**address** 43:10
56:6,23 58:3
69:12,19 70:22
72:5 77:22 78:1
82:1 100:17 116:4
136:2,14 139:22
209:17 215:14
217:6 258:10
279:7 312:14
313:20 314:8
328:18 338:12
366:4 385:15
**addressed** 65:4
95:13 96:7 100:25
230:18 232:12
264:22
**addressing** 43:2
55:17 58:19 69:5
77:13 81:10 82:18
85:8 90:3 97:20
107:24 122:12
123:24 124:6,10
125:6 126:1 128:4
128:10,14,18
162:23 168:4,15
183:12,18 201:1
204:20 226:11
335:16 340:4
362:24
**adequately** 236:12
263:2 264:15
281:17 305:17

**adhere** 64:25
**administered**
347:7
**administration**
306:17,25 320:7
**administration's**
320:15
**administrative**
38:18 88:4
**administrator**
196:24
**adoplement**
147:12
**adopt** 106:24
140:20 142:5,22
146:16,19 147:4,9
147:12,16 375:16
**adopted** 102:2,7
102:10,13 103:3,9
103:22 104:1
106:14,18 147:19
151:21,25 152:3
242:21 298:12,16
298:21 316:18
**adoption** 92:13
146:9,15 147:23
148:23 151:1,8,12
238:4
**ads** 244:10
**advancement**
29:17 30:5
**advancing** 301:5
301:10
**advantage** 55:14
55:20
**advertised** 137:13
**advertisement**
248:7,8 249:2
**advertising** 244:25
248:15 358:23

**advice** 228:5
**advocate** 213:5
**advocates** 285:19
**affairs** 97:11
376:15
**affect** 273:12
**affiliated** 173:24
174:21 374:10
**affiliation** 169:20
**affiliations** 8:5
**affixed** 386:15
387:21
**age** 189:16
**agencies** 124:8,11
126:12 128:7,12
128:16 129:11,12
148:18 158:20
227:4 261:24
308:16 364:7,9,14
364:22
**agency** 42:22
43:13 122:11,15
123:20,22 124:4
127:1,4 139:25
194:17 307:6,16
308:15
**agencywide** 114:2
**agenda** 5:19
170:22 171:4,15
**agendas** 88:4
**ago** 26:1 55:8
180:8 253:18
317:9 355:15
**agree** 7:13 59:19
73:14 90:15
232:13 238:20
239:16 241:6,17
242:8 247:9 253:1
253:14 254:1
256:4,17 298:24
299:8 302:14

303:5 315:12
317:7,20 335:21
336:17 337:21,24
350:15 352:8
373:8
**ahead** 36:10,15
44:19 94:3 100:6
234:20 235:1
**aid** 379:11 380:22
380:22
**ailment** 66:14
251:19
**ailments** 291:22
**aimed** 362:23
363:16 365:10,12
**aims** 5:17 139:2
**akron** 176:5,15
**al** 1:7,8,10,12
**alarming** 115:22
**alcohol** 168:21
**alert** 334:15
335:16
**aligned** 143:9
**alignment** 255:7
259:10
**allan** 334:22
**allegations** 18:24
19:7 380:5
**alleviated** 310:14
**allison** 7:15
**allisyn** 1:17 2:1
5:2,9 9:18 10:12
173:3 178:19
198:22 269:3
383:4 384:5 385:8
386:4,9 387:4,13
388:20
**allocate** 315:3
**allotment** 362:1
**allotted** 361:24

allow 59:3 264:16
354:7
allowed 57:16
58:22 99:20 216:5
233:20
allows 31:25 63:1
63:4 64:23
alphabetically
172:23
amanda 369:15
amazing 129:18
amendments
144:12
americans 66:13
americas 4:22
amerisourceberg...
4:6 9:12 309:7
amount 46:7,11
59:7 134:1 200:21
201:5 205:23,25
206:1 209:22
210:15,22 212:5
212:14 214:14,16
216:9,16 219:20
219:22 221:17
222:11 234:16
236:3 281:12
286:20 288:25
345:22
analog 321:23
analyses 191:16
191:25 192:9
198:4
analysis 153:16
154:25 156:10
186:25 187:13
192:24
analyze 191:19
analyzed 197:16
197:23 198:9,12

analyzing 219:7
anda 359:21
announcements
116:9
annual 5:14,16
112:23 113:3,13
113:18,25 114:2,9
114:16,18 115:1
117:11,15 118:22
119:13,18,25
120:4,10 130:4,9
131:2,6 180:15
198:11 202:25
208:10 216:18
annually 183:3
202:23
answer 17:3,16
18:11 19:24 20:1
20:9,11,19 21:4,8
21:10,20 22:8,13
44:24 45:2,13
58:7 94:11 142:17
143:13 165:4,15
165:15,18 166:5
166:10,24 173:9
235:24 237:5
241:23 293:12,22
294:2,14 295:22
297:1 305:17
312:3,4 314:6
315:20,24 336:12
answered 294:17
311:19
answers 71:4
246:11 293:1
anybody 18:23
19:2,12 38:11,17
154:21 325:2
328:9 355:1
apart 11:10
123:22

apologize 113:21
114:3 165:14
199:24 369:1
372:8
apparently 220:11
appealing 29:21
appear 386:11
387:15
appearances 3:1
4:1 8:5 9:3
appearing 9:8
appears 25:15
173:20 214:9
appended 387:11
387:18
application 181:9
181:17,20 182:4,9
182:17 183:4
204:3 214:8,12
365:1
applications
364:17,21,25
applied 364:10
apply 182:1 358:1
applying 181:12
181:15,22,24
appreciate 45:4
357:14
approach 24:11
approached
312:21
appropriate 91:23
151:12 226:22
228:5 320:17
appropriately
300:8
approval 211:3
228:19
approve 228:20
345:7

approved 20:22
228:15 320:8,20
321:17
approximately
13:22 14:7 25:21
28:15 47:24 87:5
201:9,11 202:21
203:1,5 206:4
208:4,8,9,12 210:5
325:4
april 104:24
108:20 109:10
arbitrate 9:5
arch 4:9
area 78:11,13
95:18,24,25 108:7
192:2 278:16
332:8
area's 89:17
areas 31:8 60:5
85:10 95:1 102:22
arnold 3:18 9:8
arnoldporter.com
3:20
arrived 302:25
319:4
arrows 231:2
article 5:17 6:4
114:13 117:6,8
120:2
articles 63:20
aside 12:13 13:10
83:12 125:4
160:21 166:4
227:21 229:19
asked 18:11,23
19:2,6 105:25
109:21 114:12
135:13 184:13
197:10 229:13
260:8 270:23

271:20 293:13,14
295:22 327:10
asking 10:17
30:17 37:7 64:10
64:18 129:12
160:9 164:4 165:1
165:2,8 166:17
169:14 184:16
186:11 221:15
231:20 239:13
258:17 260:5,7,13
285:10 292:18
296:24 297:6,14
311:4 323:12
358:2
assembly 236:19
237:12 242:18
287:10 299:20
316:7
assess 209:9
assessment 47:11
47:15,16,20 48:1
207:12,16 209:7
assign 315:2
assignment 386:2
387:2 388:2
assist 51:15 56:1
56:14 81:6 110:21
111:11 138:7
151:16,22 152:3
165:25 181:8
182:3 194:2
205:11 362:18
assistance 179:11
assisted 38:19
54:7 179:13,15
181:16 250:25
365:13
assisting 82:14
associated 65:15
65:17 248:12

337:14 339:22
341:10
association 138:14
associations
149:23
assume 34:21
164:18 165:15,18
335:15
assumed 39:8
74:25
assumption
164:25 165:1,24
assumptions 166:4
attached 6:24
178:18 387:7
attachment 5:11
44:12 179:4
180:14
attempt 142:10
227:19 300:20,24
attend 87:9 172:1
175:23 277:1
attendance 172:16
173:10 175:3
attended 82:7,21
84:22 168:24
169:7 170:11
173:8,11 175:1,9
175:15 176:2
attendee 87:8
attendees 5:21
attending 8:4
88:18 168:18,25
170:5 171:8,12,22
172:4 173:13
175:5,19
attention 45:22
69:11 73:3 115:7
173:17 195:17
293:7 326:22
340:16 345:14

attorneys 13:12
14:21
attracted 30:2
attributed 36:23
37:23 48:14 104:9
156:4 185:4 187:5
337:6,8 362:11
audience 276:4
278:11
audiences 254:23
287:21 288:15
290:13
audio 7:11,11
auditor 158:19
august 89:3
292:16 296:3
327:4
aunt's 23:8
author 113:24
114:1 344:4,4,8,11
344:12
authored 113:6
138:25 141:5
authoring 251:1
authorize 387:11
authorized 384:6
authorship 250:22
automated 53:14
140:22
autopsy 153:17
availability
339:21
available 127:8,15
130:24 131:3,5
153:5 161:2
195:25 209:11
216:4 224:6
233:24 234:17
236:4,9 274:11,23
275:6 289:3
346:22 352:7

ave 385:1
avenue 3:3,8,13
4:22
avoided 329:23
award 182:22
awarded 208:6,19
209:15 214:15,17
217:19 227:12
364:10
awarding 218:14
aware 16:11 61:2
79:4,5 84:4 117:1
117:20 118:16
127:7 132:12
134:24 135:14,23
163:2 168:8 180:2
183:16 242:19,23
275:3 309:9 321:8
333:13 348:25
349:4 353:9
361:12 378:25
379:7 381:8
awareness 40:16
65:7,12 68:18
69:23,24 71:6,8
72:7,12,14 82:10
82:25 83:18 116:2
125:13,17 126:9
137:8 138:13
179:22 239:25
293:15 310:1
313:8

b

b.j. 30:14
baby 251:24
252:12
back 73:19 76:23
77:18,25 78:16
105:11,19 107:16
131:20 133:6,17
150:4,24 177:18

177:20 180:10
188:1 191:16
195:5,13,16
198:16 202:19
203:25 206:6
207:20 211:13,14
212:14 214:20
218:1 224:21
225:9 226:4 244:7
246:10 249:7
250:12 267:17,25
268:9 270:13
289:7 312:9
317:22 326:14,20
326:23 341:3
342:22 346:17
357:4 378:1
385:15
**backed** 132:5
**backfilled** 109:17
**background**
109:15 139:12
250:10 251:4
**backgrounds**
355:19
**baldwin** 50:15
51:5,15,18 205:5
209:4,16 210:12
210:13 211:2,10
211:23 212:3
215:4
**ballpark** 202:25
205:24 216:17
**baltimore** 4:4
**bank** 158:15
**barriers** 47:17
**based** 41:18 42:5
43:22 63:10 78:18
80:11 88:19 92:16
140:2 152:23
179:19 191:20

194:5 214:16
218:6 233:25
264:23 274:22
275:5 297:6 314:3
324:14 325:8
347:5 351:19,24
352:6 362:1
**basement** 334:24
335:4
**basis** 21:11 59:9
59:14 126:23
147:14 153:19
160:20 180:15
198:2,11 202:25
208:10 216:18
244:10 246:16
259:15 303:22
**bates** 130:20
249:21 372:2
**battle** 335:23
336:20
**began** 73:6 77:17
77:23 78:19,24
124:21 157:6
177:11 350:14
**beginning** 72:24
105:13 184:5
195:7 220:17,19
230:11 249:24
267:19 342:18
**begins** 184:9
341:11
**begun** 324:14
373:5
**behalf** 2:15 3:2,6
3:11,15,21 4:2,6
4:12,17 8:13,16,19
8:21,24 9:8,14
16:13 19:12 34:14
88:11,13,13,19
134:4 159:22

176:14 181:9,13
207:11 231:11,22
270:1 271:1
290:13
**behavioral** 110:2
110:3,4,10,13,17
111:3,16,23 112:1
112:3,10
**belief** 70:15
**believe** 15:13
44:15 59:25 62:15
62:23 66:3 80:20
83:15 102:23
104:10,16 106:18
120:25,25 121:3
123:10 143:5,8
145:20 146:4,18
147:8,23 159:19
159:20 175:8
183:14 185:9
191:17 208:10
210:13 233:1
234:9 254:23
264:8,22,25
265:10 266:2,19
275:18 281:4
285:5 304:25
305:10 306:15,23
308:18 309:14,19
310:12 311:8,24
312:12 315:21
316:11,24 318:4,8
319:22 324:3
341:16 342:19
346:24 348:6
351:23
**believed** 134:19
143:1 259:7
**bell** 169:8,16
171:16 360:5

**benefit** 111:21
312:9 317:20
**benefits** 21:17
22:3,12 63:8
240:5 241:2
245:15 246:2
248:12
**benzodiazepine**
154:10
**best** 17:5,15,24
19:11 87:11 90:12
90:19,21,21,23
91:12,20 93:18
108:5 200:19
227:4 277:6,15,25
278:16,19 294:20
366:10,15 367:20
384:8
**better** 93:20 94:15
146:25 155:20
158:15 190:3
234:8 311:14
355:13
**big** 17:11 185:10
**biggest** 335:23
336:19
**bill** 221:5
**billboards** 126:11
243:22
**bimonthly** 49:15
**bit** 16:23 26:7
52:13 67:8 72:3
96:5 105:25
143:17 156:2
158:2 184:4 190:3
195:21 227:7
233:12 235:8
237:4 243:7
245:21 271:10
282:24 311:4
317:21 324:21

326:9 346:17
**black** 318:20,22
  318:24 319:3
  340:23
**board** 5:13,15
  11:5,10,13 19:13
  26:10,14 28:18,22
  28:25 29:12 30:3
  30:19,22 31:7
  32:20 43:12 46:19
  56:21 70:6 75:18
  75:19,22,25 77:5
  78:12 80:8 89:5
  112:22 113:18
  114:9,17 115:2
  118:22 119:13
  120:12 122:18
  123:23 124:5,13
  124:15 125:1,5,10
  125:12,21,25
  126:3,15,25 127:8
  127:14,19,23
  128:2,20 131:6,15
  131:22 132:16
  134:5,10,18 136:2
  136:13 137:22
  138:4 139:14,21
  143:23 144:13,19
  145:1,24 146:20
  147:7,24 149:21
  150:16 152:14
  156:9 157:21
  158:3,25 159:4,14
  159:23 160:3,14
  161:2,17 162:21
  163:3,11 164:15
  173:3,25 174:4,8
  176:22 177:5
  178:14 179:12
  180:17 183:11,15
  191:18 192:10

198:14 200:7,14
200:18,19,24
201:12 202:1,15
203:5,20 204:17
205:1 206:4,9
207:11,24 208:5
208:18 209:1,15
211:9 214:22
216:1,14 218:5
226:10 242:3
250:1 257:11
261:13 279:6
290:14 297:8
300:23 303:15
304:3,10,12
309:25 310:24
311:1,15 316:18
327:23 329:25
330:3,12 331:13
331:20 332:3,9,18
332:24,25 333:3,6
333:14 338:12
340:3 343:14
354:24 356:11
380:15
**boarding** 112:8
**boards** 76:7
  149:22
**bodies** 242:20
**boehm** 3:22 5:3
  8:9,9 9:5,25 10:4
  10:17 16:3,5,7
  19:25 20:4,7,8,15
  20:20 21:3,6,11,14
  21:24,25 24:20
  25:1,6 36:9,13,16
  44:4,22,25 52:11
  55:21,23 57:3,23
  59:24 60:20 61:1
  61:15 62:14 64:3
  64:9 68:7 69:2

70:3,19 71:14,18
79:14 81:16 94:2
100:5 101:14
105:2,4,17,18
107:11,20 109:23
114:23 117:7
119:2,9 130:23
131:1 133:1,9,16
133:24 135:24
138:22 141:20,22
147:2 149:6,19
150:3,6,10 154:7
156:22 163:8,15
165:7 168:12
169:12 170:13,19
171:20 172:14,18
172:21 177:2
178:6,11 183:24
185:20 186:23
194:19,22 195:11
195:12 201:8
217:25 218:11,19
223:16 224:16
225:5,24 226:3
229:1 239:1 240:2
240:11 241:10,15
241:24 242:7,16
249:12,16 252:5
252:23,25 253:9
253:21 254:9,14
255:8,17,22,25
256:9 257:18
259:21 261:25
262:6 263:18,21
263:24 264:2,5,7
267:4,6,10,23,24
268:3,13,16
269:21 270:4,17
270:18 275:2,10
275:17 276:12,25
277:13,17 278:9

278:12,25 280:13
287:3,18,24 288:6
288:10 289:6
290:6 291:16
292:3,10,14 293:5
294:12 295:2,7
296:16,19 299:6
299:15,25 302:19
302:24 303:3,4,12
303:19,22,24
304:2 306:21
315:16 317:18
318:3,10,15,19
319:8 322:3,11,20
323:3,11 326:7,18
326:19 330:24
331:5 336:16
339:12 340:14
343:12 352:4,25
354:12 356:23
357:8 376:6
382:11,15,19,22
**bolded** 131:11
**bonnie** 1:24 8:1
  17:10 24:20
  263:18 264:3
  384:3,18
**booklets** 194:11
**boomers** 251:24
  252:13
**booth** 292:18
  293:20 294:13
  296:2
**boots** 74:9
**boston** 4:19
**bottom** 173:18
  176:13 184:6
  195:19 230:23
  249:21 334:12
**boxes** 231:2

**boylston**  4:19
**brain**  320:5
**brake**  176:15
**break**  105:1,19
   193:1 194:22
   233:11 245:21
   249:9 267:1,25
   326:8 345:20
**breakdown**  38:24
   39:7 189:15
**breathing**  262:14
**brief**  6:15
**briefly**  205:4
   371:22 374:12
**bring**  137:7 140:4
   213:7
**bringing**  139:16
   139:22 212:25
   250:3
**broad**  94:8 245:10
**broadly**  198:12
   298:25 299:9
**brochure**  138:25
   152:7
**brochures**  116:9
   194:11
**broke**  195:16
   196:16
**bucci**  370:12
**bucket**  289:10
**budged**  167:12
**budget**  35:25
   202:20 220:17,20
   221:8
**budgeted**  163:17
   164:9,22 165:11
   165:24 166:21
   167:4,23 168:3,14
**budgeting**  158:24
   168:10

**budgets**  159:21
**build**  255:4
**building**  91:3 92:3
**built**  92:9 98:16
   301:14 366:22
**bullet**  27:1 35:5
   84:7 116:17,20
   136:7,9,23 137:11
   282:6,12,15,19
   283:5,10 284:7
   291:4 376:21
**burden**  80:25
   118:13
**bureau**  138:15
**burling**  4:12 9:14
**business**  110:8,13
   110:20 378:22
**busy**  197:9
**button**  270:5
**buy**  312:19

**c**

**c**  5:1 7:1 159:12
   174:15 384:1,1
**ca**  385:25
**calculations**
   189:13
**call**  86:2 130:15
   170:24
**called**  85:21
   102:21,24 207:21
   211:20 237:15
   289:10 316:7
   359:21,25 360:9
   360:12,15,21,24
   361:7,10 363:17
   370:25 378:14,18
**campaign**  116:2,6
   118:10 179:23
**campaigns**  125:13
   126:9,10 313:9

**campuses**  209:8
   209:10
**cancer**  233:23
**capacity**  22:20
   40:15 41:16 47:6
   63:17 64:17 70:13
   88:8 91:24 174:12
   232:18 234:12
   238:13 239:12
   240:19 241:22
   256:21 258:16,21
   259:17 262:11,15
   271:22 278:17,23
   279:1 292:7
   296:14 301:1
   305:17 319:25
   323:22 324:1
   360:6
**capita**  59:9 118:5
**capital**  59:14
**caps**  131:11 220:8
**capture**  188:2
   375:2
**captured**  348:5
**capturing**  92:20
   192:20 347:18
**caraffi**  38:16 39:1
   40:17 41:5,14
   58:9 75:8,9 80:10
   113:7 139:1,12
   140:13 142:18
   147:16 150:25
   151:3 152:7
   175:13,21,22
   178:13 179:4,15
   182:16 331:8,11
   331:23 332:16,21
   333:3,11,18,24
   334:20 335:3,11
   335:16 345:6

**caraffi's**  39:8
   41:10 332:2
**cardinal**  3:21 8:9
   10:2 308:7,12,19
**cardiovascular**
   26:19
**care**  102:22
   111:21 129:8
   260:18
**career**  29:6,17
   333:6
**carfentanil**  321:15
   321:17,23 322:14
**carried**  36:2
**carry**  24:18 67:10
   67:12,15 68:5
   210:2
**cartels**  318:16
**carve**  122:24
**case**  1:4,8,10,12
   7:20 15:9 48:4
   49:3,8 50:14 51:4
   51:10 60:1 64:4
   152:25 153:24
   185:18 186:2
   187:2 197:17
   198:1 199:19
   205:5 209:3,15,20
   209:24 210:9
   213:24 214:1
   215:4 221:23
   275:12,12 291:19
   331:7 379:1,9,25
   380:5 385:6 386:3
   387:3
**cases**  48:13,19,22
   48:23,25 49:11,15
   49:20,23 50:2
   60:9 61:17 184:14
   184:23 186:19
   198:7 223:1

[cases - clarifying]                                                    Page 10

346:12
**categories**  273:4
**categorize**  367:3
**category**  45:23
272:23,23,25
273:6,8 345:16,21
346:5 349:12
**cause**  116:22
117:14 252:16
**caused**  73:8
230:20 280:20
**causes**  64:16 73:16
163:18 164:10,23
165:12 166:22
167:6,24 177:6,24
178:3 231:4 232:2
271:16,23 272:22
272:23,24 273:5
276:6,15 277:7,18
278:1,20 280:1
**causing**  342:13
**caveat**  163:22
245:7 348:17
**ccbh**  28:21 29:5,19
30:6,15,25 31:4
34:14,16 36:6
37:9,16 38:11
40:1,5,8,8 53:19
54:5,13 55:2,6,14
56:4 57:16 58:1
64:14,14 70:10,22
72:19 73:15 75:21
79:4 81:8,22
88:13,24 89:2,3
113:3,13 117:16
119:25 120:4,22
121:23 122:5,10
123:9,11,18
124:20 125:1
131:2,3 141:23
142:13 160:7,12

161:22,25 174:22
178:2 180:19,23
181:3,9,13,24
183:17 188:21
190:10,14 215:13
216:23 217:6,12
217:15,19 226:6
226:17,22 227:23
227:25 228:9,21
231:11,22 251:11
252:15 253:10
254:2 269:15
270:1 271:1
300:17,19 319:10
324:1 331:18
332:16 333:12
343:20 355:21
381:8,11
**ccbh's**  34:19 57:24
**cdc**  102:2,7,13,15
133:21 143:11,22
144:3,13,18,25
145:4,23 146:21
147:7 149:21
354:14,18 355:2
355:11,17 356:14
365:3,8
**ceased**  219:6
**cell**  7:9
**cellular**  7:8
**center**  89:25 97:11
376:14
**cephalon**  360:1,4
**certain**  108:7
133:25 146:18
147:4 155:1
158:19 159:19
213:6 226:24,25
320:8,10 330:19
357:24 358:25
360:2,3 377:8

**certainly**  45:1
137:20 190:6
340:7 342:24
343:5 374:2
**certainty**  165:17
245:18
**certificate**  387:11
**certification**  386:1
387:1
**certified**  384:3,19
**certify**  384:4,10
**cha**  372:4
**chain**  5:24 6:8,10
195:20
**chains**  379:8
380:11
**chair**  74:18,22,23
75:5,7,10,11,13,14
170:9 331:21,24
**chairing**  87:21
**challenge**  72:4
**chance**  197:10
232:1
**change**  37:21 42:7
42:18 50:17
121:18 286:18
295:18 385:13,14
387:8 388:3
**changed**  42:15
62:4 69:8 103:17
121:3,9 145:11,12
145:15 201:6
214:15 235:13,14
368:21 370:22
**changes**  66:8 76:4
76:6 97:5 141:12
142:4 232:6,13,20
232:23 234:9
283:1,19 284:4,12
284:19 285:6,14
285:18 288:18,24

295:10 296:4
297:19 301:4,8
312:5 362:14,16
385:12 386:7
387:7,9
**changing**  121:11
310:17
**channels**  289:14
**character**  66:1
**characterize**  153:3
**charged**  35:19
122:11 123:24
124:5,9 297:9
**charity**  89:24
**check**  63:22
**chemicals**  320:2,4
**chief**  159:4
**choose**  20:14,18
29:4 89:4 228:12
**chosen**  49:17
**chris**  192:7,8,15
344:14
**christina**  138:16
**circle**  204:1,6,7,13
214:4 231:1,3
**citation**  286:1
**citizens**  161:21
**city**  1:11 122:15
122:17,20,22
123:1
**citycenter**  4:14
**civil**  386:5 387:5
**claim**  104:15
144:2 244:7,16
**claiming**  353:22
**claims**  247:1 379:4
379:24
**clarify**  131:18
182:21
**clarifying**  114:6

classify  153:3
clear  71:20 194:16
 297:1 317:23
 324:11 376:7
cleared  224:22
clearly  146:11
 186:11
cleveland  1:11,18
 2:9 3:9,13 7:23
 26:14,17,20 27:2
 27:21 28:11,14
 29:8,13,15,25
 89:23 94:21 99:23
 99:24 100:9 101:4
 106:8,16,21,23
 122:16,17,20,24
 123:17 204:9
 368:20 369:12,18
 385:2
clinic  26:14,18,20
 27:2,22 28:12,14
 29:8,13,15,25
 89:23 94:21 99:23
 99:24 100:9 101:5
 106:8,17,21,23
 204:8 236:5
 368:20 369:12,18
clinical  109:14
 232:6,14,20,23
 256:13,17 257:3
 257:22 258:18
 259:16 260:20
 261:7 262:20
 282:7,9,13 283:1,5
 283:14,20 285:14
 287:14 288:18
clinicians  238:14
 261:10
close  24:4
closely  142:2

clouded  56:9
clued  70:1
clumsy  68:10
 158:2
coalition  47:11,15
 47:16,20,25 84:16
 205:12
cocaine  73:4
 349:16 353:19,24
cochair  74:19,21
 74:23 75:1 87:23
 88:2,3,9,16 169:23
 239:3 242:1 258:1
 258:3,6
cochairing  87:21
cochairs  75:17
code  286:2,5
cognizant  63:4
colead  75:17
colin  173:19 174:3
collaborate  43:15
collaborated
 215:20 344:25
collaborating
 367:20
collaboration
 70:16 89:16
 312:19 366:2
collaborative
 366:15 373:15
collaboratively
 89:18 366:3,6
colleague  8:10
 358:2
colleagues  11:11
 14:25 357:10
 377:14
collectively  175:22
college  29:7
 209:10 213:22

colon  174:11
color  83:10
colors  83:13
column  346:8
combat  139:16
 380:23 381:4
combatting
 165:21 314:5
come  89:17 91:11
 91:14 95:19 96:22
 138:18 175:13
 205:19 249:7
 329:13 330:10
 331:8
comes  91:2,6 97:8
 124:12 130:14
 164:11 206:7
 265:20 280:20
 349:13 363:3
coming  125:19
 129:21 204:2
 266:22 353:3
commission
 242:25 243:3
 298:1,3,7,16
 386:19 387:25
 388:25
commissioner
 30:18,21 31:5,6
committee  48:10
 48:16 153:22
 280:5
common  90:16
 373:9
commonly  151:9
communicate  92:6
 92:7 95:21 96:18
communicated
 288:14 380:22
communicating
 82:20

communication
 219:25
communications
 113:9 179:16
communities  67:5
 74:10
community  41:18
 41:22 42:5 43:15
 43:22 51:13 62:5
 62:9 65:7,12,13
 66:22 68:22 70:17
 72:24 78:15,18
 80:11 83:24 88:19
 120:19 125:16
 129:19 137:7,9
 138:13 140:2
 148:18 165:23
 177:22 181:18
 198:13 218:6
 233:24,25 260:19
 260:20 274:11
 279:19 289:4
 299:1,10 301:10
 308:16 312:20
 328:1 330:5 362:4
 381:13
companies  3:16
 27:4,11,19,25
 28:10 243:11
 359:14,17 379:1
company  30:5
 359:20,23,25
 360:7,9,12,15,21
 360:24 361:6,9
 378:14,17
compensation
 263:10,14 264:10
competitive
 182:19,21,23
 183:7

competitors
  366:10
compilation
  181:17
compiled  113:5
complaint  15:10
  15:16,19 16:2,9,12
  18:21,24 19:8,14
  380:5
complete  35:24
  197:11 198:24
  199:16 221:21
  264:16
completed  49:20
  221:2 372:19
  373:1 385:15
completely  287:19
complex  314:12
  315:14
comply  99:16
component  38:19
  206:25 207:4
comprehensive
  179:22 198:6
comprised  86:10
  86:13
concept  63:19
  190:3 300:2 354:1
concepts  143:16
concerned  70:9
  72:15 108:15
concerning  188:20
  190:10 381:4
concerns  24:12
  91:22 96:15 97:20
  107:24 232:16
  245:15 290:15
  292:20 330:17
concluded  34:10
  383:9

concludes  383:3
conclusion  118:7
conclusions
  230:19 251:22
condition  242:13
  266:8,12
conditions  289:5
conduct  207:15
  313:25
conducted  32:4,8
  313:22
conducting  32:6
conference  136:24
  137:2,5,6,12,18,23
  170:5,15 172:16
  175:2,6,10,15,19
  176:19 356:10
conferences
  169:11 171:23
  172:1,4 173:14
  175:23,24 277:1
confined  137:16
confirm  212:9
  341:17 372:18
confusing  130:8
  235:8
conjunction
  134:22
connect  98:18
connected  32:9
connection  21:18
  25:14 34:19 35:20
  36:5 37:17 39:1
  41:11,11 42:15
  44:14 49:1,24
  50:11 52:19 78:17
  79:7 81:9 82:1,17
  82:24 87:6 101:6
  202:16 203:23
  205:2 207:25
  208:6,21 209:17

216:3,15 217:6,13
  217:19 223:18
  226:11 228:21
  240:13 246:1
  270:8 300:13
  308:3 317:1 321:6
  327:23 353:7
  361:19 362:25
connolly  3:21 8:11
consecutive
  210:15
consider  31:3 43:6
  157:20 201:19
  340:1,7,9
considered  46:21
  59:1 122:10
  235:17 257:11
  271:21 363:25
considering
  261:15
consistent  42:9
  121:2,15 251:21
  280:17,22
consortium  6:21
  89:12,14,16,21
  90:2,10 91:1 93:2
  93:8 94:14 95:7,9
  95:12 100:16
  101:2 102:8,12
  103:3,9,22 104:3,6
  104:11,21 105:25
  106:12 107:1,5
  108:3,4,21 109:8
  109:13 365:20
  366:10,13 367:6
  367:15,19 368:8
  368:13 369:9
  372:17 373:21,24
  375:15
consult  276:18

consulted  10:25
  11:2,3 19:13
consume  233:9
consumer  243:21
  247:18,25 248:14
  249:4 358:6,14,20
  359:7
contacted  29:15
  42:23
contemplated
  367:12
content  15:22
  83:13,14,16 84:1
  113:11 271:3
contents  119:20
context  235:9
  245:2 307:12
  309:12
continuation
  183:4
continue  7:12 30:5
  50:16 65:14
  351:19 352:13,18
  353:4
continued  4:1 6:1
  42:11 95:19 97:14
  227:13 350:24
  351:8,11,12
continues  61:19
  342:4
continuing  33:24
  157:7
contract  42:13
  44:1
contracted  51:3
  118:10 206:20
  210:14 214:13
contracting  200:7
  222:16
contracts  211:16
  228:14

contribute  114:13
  233:17 344:9,22
  375:4
contributed  66:18
  134:25 149:1,16
  243:17 247:11
  248:1 257:4 259:4
  259:25 260:22
  261:3 262:21
  264:11 265:1
  266:3 273:15
  280:9 282:10
  296:9 297:20
  302:7 315:4 345:4
  364:21,24 373:22
  373:25 374:8
contributing
  149:11,18 232:3
  232:15,21,24
  243:8 244:3,14
  247:21 251:5,25
  252:11 253:4
  254:2 256:18
  257:8,9,23 258:19
  258:23 259:20
  261:11,17 262:8
  265:6,9 266:20
  271:11 272:5,10
  272:17 280:14
  283:13 289:8
  314:17 315:1
  317:14 333:25
  334:9,16 339:15
contributions
  113:7
contributive  244:2
contributor
  235:18
control  76:7
controlled  58:16
  307:12

convene  43:14
convened  74:6
  177:17
convener  262:12
conveniently
  172:22
convening  262:16
conversation
  12:12,14,20 13:10
  21:15 22:1 43:17
  105:23 196:15
  224:2,20 225:4,14
  235:11 260:6
  381:11
conversational
  71:17
conversations  7:8
  12:9 14:20 22:6
  22:10 40:12
  134:17,22 165:23
  167:11 245:4
  246:18,21 253:18
  257:16 258:22
  259:23 260:3
  363:6 365:2
coordinate  90:12
coordinated
  279:18
coordinating
  50:12
coordination
  50:20,22
coordinator  33:8
  33:12 34:5,22,25
  35:2 38:6 39:5
  40:23 41:1 43:8
  46:1,9 47:4,7 50:6
  65:3,6 110:9
  111:14,16,17
  211:21 213:15
  224:3 262:13

279:14 323:24
copy  372:6,19
core  120:12 207:2
corner  130:10,11
  249:22 372:22
corporation  4:7
  4:12 111:24
correct  12:3,4,5
  15:17,25 16:4
  25:16,17 26:11,12
  26:15,16,25 27:12
  28:16,19 31:20
  34:15,23 35:16,17
  37:11 38:9 40:6
  41:8,23 43:4
  44:17,18 49:7,9
  52:17 54:20 59:5
  59:6,9,14,15 60:12
  61:14 62:1 63:19
  63:25 64:2 85:23
  86:1 87:25 88:15
  88:25 89:1 90:4,7
  93:5 98:15 99:3
  104:21,22 108:22
  110:15 116:11
  121:21 123:12
  136:25 142:24
  143:25 144:13
  162:11 164:16
  170:3 173:22
  174:1 179:9
  184:15 190:6,18
  190:21 196:20,21
  200:11 205:20
  208:24 210:7
  215:11 217:17
  227:9 236:20
  238:8 247:22,23
  251:9 252:1 258:2
  258:7 278:21
  286:13 320:22

321:21 323:1
  335:10 343:21,22
  349:11,25 353:8
  353:12 359:4
  367:5 375:25
  379:13 380:6,7,12
  380:13 381:23
  384:7
correcting  206:13
correction  174:20
corrections  128:25
  385:12 387:17
correctly  13:8
  27:7 30:10 31:16
  38:5 74:25 90:1
  97:21 98:20
  115:18 125:2
  135:13 140:23
  152:12 189:13
  208:9,23 209:20
  210:10 211:11
  220:5 224:2 230:6
  238:7 273:10
  286:9 333:5 343:7
  355:14 365:4
correlation  236:13
  302:12
corresponding
  345:22
cost  339:22
costs  44:14
counsel  7:16 8:3
  9:24 10:2 11:5,12
  105:16 107:19
  195:10 267:22
  268:12 270:16
  326:17 357:7,17
  378:4,6
counties  80:23
  117:24 118:12
  205:11 215:10

226:5,9,14,18
227:6,19,22
**county** 1:7,9 3:2
5:13,15,17 11:5,10
11:13 15:11 16:13
18:22 19:3,9,12,15
19:19 21:16 22:2
22:11 25:14 26:10
26:13 28:17,22,25
29:12 30:3,18,22
31:7 32:20 43:3
43:11,12,14 47:16
48:11,12 50:4
54:1,3,12,19 55:17
56:7,21,24 57:19
58:4,20 59:3,4,9
59:14 61:10,16
62:4,18,21,25
63:14 64:22 69:7
69:18,20 70:5,8,17
73:17,23 74:2,4,9
74:13,15,17,20
75:2,6,7,10,12,18
75:19,20 76:7,9,12
77:5,14,22 78:2,12
79:18 80:6,7,8,14
80:19,25 81:1,11
82:4,19,22 89:5
104:13 112:22
113:18,25 114:9
114:17 115:2
117:23 118:11,16
118:19,22 119:13
120:5 121:25
122:7,11,14,18
123:21,23,25
124:3,5,7,9,13,14
124:17,24 125:8
125:23 126:2,3,18
126:21,24 127:1,4
127:12 128:8,11

128:13,15 129:13
130:1 131:15,22
132:14,16 133:3
134:5,7,9,18,20,23
135:6,15 136:1,3
136:13,14 137:15
137:16,22 138:4
139:2,14,14,21,23
140:5,7 141:24
142:14 148:17
149:2,13 152:9,14
152:18,21 153:1
153:13,22 154:16
156:7,14 157:5,15
157:20,22 158:3,4
158:6,13,19,20,23
158:25 159:4,14
159:22 160:2,14
161:2,15,17,21
162:21,24 163:3,4
163:11,12,17,19
164:8,14,15,21,24
165:11,20,24
166:21,23 167:4,6
167:9,23,25 168:3
168:5,14,16 173:3
173:25 174:4,8
176:22 177:5,7
178:4,14 180:17
183:11,13,19
184:20 187:5
191:10,18,22
192:10,14,17
196:19,25 199:7
200:7,12,13,17,19
200:22,24,25
201:3,12,15,16,21
201:23,25 202:15
202:17 203:5,6,20
203:22,24 204:15
204:17,21,25,25

206:4,8 207:9,11
207:24 208:1,5,18
208:22 209:1,15
209:18 211:9,18
213:1,8,12 214:22
214:23 215:15
216:1,13 217:7,20
218:5 220:24
222:14 225:1,16
226:10,15,15,16
226:16 227:13
232:17,25 233:18
234:11 235:19
239:4 242:2,3
243:18 244:4,15
247:12 248:2
249:5,23,25 250:1
253:5 254:4
256:20 257:5,10
258:2,11,15,20
259:3,24 260:1,23
261:4,13,16,18
262:10,22 263:16
264:12,25 265:12
266:4,21 269:16
270:3 271:2,12,16
271:24 272:19
276:7,16 277:8,20
278:2,21 279:3,6
280:4,9,16,21,25
281:7 282:11
290:13 291:23
292:5,7,20 293:16
296:10 297:8,12
297:21 300:23
302:6,8 303:15
304:3,9,12 305:2,5
305:12,15 306:12
306:18 307:1,18
309:11,14,19,25
310:1,2,13,15,24

311:1,5,9,12,20,24
312:2,12,15,18,25
313:20 314:11
315:5,23,25
316:13,16 318:6
318:25 319:5,11
321:11 323:23
325:12 327:22
328:10,13,19
329:25,25 330:3
330:12,17,18
331:12,20,21,24
332:3,9,18 333:3
334:22 335:12,19
335:25 336:5,14
336:21 337:18
338:1,12,13 340:3
340:5 342:14,21
343:3,14 347:21
347:25 348:2
349:1,7,9 350:9
351:9,21 353:22
354:24 355:14
356:13 364:8
380:15,25 381:5
382:2 386:10
387:15
**county's** 336:19
**couple** 106:9
179:2 193:3 215:2
272:11
**coupled** 239:24
**course** 24:16
105:2 269:14
312:10 338:14
**court** 1:1 7:18 8:1
8:25 129:15,24
133:17 150:3
207:5 386:7
**cover** 37:19
118:24,24 343:16

[covering - cuyahoga]

**covering** 40:17
**covington** 4:12
  9:13
**crack** 73:4
**crashes** 116:23
**create** 51:1 90:14
  98:12 125:14
  189:14 228:13
  236:7 248:10,15
  371:19 373:7
**created** 25:24,25
  66:12 83:11 84:5
  97:12 125:13
  150:19 151:15
  178:18 186:6
  187:22 206:25
  207:4 233:3,20
  251:18 253:17
  282:2 362:17
  368:17
**creating** 47:20
  82:9 88:4 373:6
  376:17 377:7
**creation** 47:11,25
  138:7 313:2 344:9
**credentialing**
  112:19 301:1
**criminal** 67:25
  187:8
**crisis** 202:6 251:6
  381:4
**criteria** 133:10
  362:7,9 363:12,18
  364:1,11
**critical** 120:18
**cultural** 66:4 67:2
  68:12 253:1
  254:18
**culture** 66:12
  233:3 251:13,17
  252:16 254:4

**curb** 69:16 89:18
  339:3
**current** 146:17
  207:7 209:7
**currently** 74:8
  76:25 103:23
  145:23
**curriculum** 5:9
  207:2,17 300:5
**customers** 282:20
**cut** 141:18 336:6
  353:24 372:2
**cuyah** 5:10,12,18
  5:23,25 6:5,9,11
  6:14,19
**cuyahoga** 1:9 3:2
  5:13,15,17 11:5,10
  11:13 15:11 16:13
  18:22 19:12,14
  21:16 22:2,11
  26:10,13 28:17,22
  28:25 29:12 30:3
  30:18,22 31:7
  32:20 43:11,12
  47:16 48:10 50:3
  54:1,3,12,19 56:7
  56:21,24 57:19
  58:4,20 62:4,18,21
  64:21 69:18 70:5
  73:17,23 74:2,4,8
  74:13,14,17,20
  75:2,5,7,10,12,18
  75:19,20 76:9,12
  77:5,14,22 78:12
  79:17 80:6,7,8,14
  80:19,24 81:11
  82:4,19,21 89:5
  104:13 112:22
  113:17,25 114:8
  114:17 115:1
  117:23 118:11,16

  118:19,21 119:13
  122:7,18 123:21
  123:23 124:3,5,9
  124:13,14,17,24
  125:8,23 126:2,3
  128:8,11,13,15
  129:13 130:1
  131:15,21 132:14
  132:16 133:3
  134:5,9,17,20,23
  135:5,15 136:1,12
  137:14,16,22
  138:3 139:1,13,14
  139:20 140:5
  141:23 142:14
  148:17 149:2,12
  152:9,14,18,21
  153:1,13,22
  154:16 156:7,14
  157:4,14,20,21
  158:3,4,6,23,25
  159:4,14,22 160:2
  160:14 161:1,15
  161:16,21 162:21
  163:3,4,10,12,16
  163:19 164:8,14
  164:15,21 165:10
  165:20 166:20
  167:4,9,23 168:2,5
  168:14 173:3,25
  174:4,8 176:21
  177:5 178:4,14
  180:17 183:10,13
  187:5 191:18,21
  192:9,14,17
  196:19 199:6
  200:7,12,13,17,19
  200:22,24,25
  201:12,14,16,20
  201:25 202:15,17
  203:4,6,20,22

  204:14,17,20,24
  204:25 206:3,8
  207:8,11,23 208:5
  208:18 209:1,15
  211:8,18 213:1,8
  213:11 214:21,23
  216:1,13 217:20
  218:5 220:24
  222:14 225:1,16
  226:10 227:13
  232:16,25 235:19
  239:3 242:2,3
  243:18 244:4,15
  247:12 248:2
  249:5,25 250:1
  256:19 257:5,10
  258:2 259:3
  260:23 261:13,18
  262:9,21 263:15
  264:12,25 265:12
  266:21 270:2
  276:7,16 277:19
  278:2 279:2,6
  280:4,9,16,21,25
  281:7 282:11
  290:13 291:23
  292:5,7,20 293:16
  296:9 297:7,12
  300:23 302:6
  303:15 304:3,9,11
  305:2,12,14
  306:12,18 307:1
  307:18 309:11,24
  310:15,24,25
  311:9 312:15,18
  312:25 313:19
  314:11 315:23
  316:13,15 318:6
  318:25 319:4,11
  321:11 323:23
  325:11 327:22

328:10,19 329:24
329:25 330:2,12
330:17,18 331:12
331:20,21,24
332:3,9,18 333:3
335:18,25 336:14
336:19,21 337:18
338:1,12 340:3
342:14,20 343:3
343:14 347:21,25
348:2 349:1,7,9
350:8 351:9,21
353:21 354:24
355:14 356:13
364:8 380:14,24
381:5 382:2
**cvs**  4:2,2 8:19
  378:7,7,10,14,15
  378:18 379:7
  380:17
**cycle**  182:22 183:6

**d**

**d**  7:1 85:25
**d'aegro**  213:20,21
**d.c.**  3:23 4:15
**daily**  160:19
  222:18 310:18
**dallas**  138:16
**damages**  353:22
**dan**  1:6 8:18
  370:12
**dangers**  68:19
**daniel**  4:3,25 7:24
  378:9
**darryl**  176:15
**data**  6:15 48:17
  52:24 53:18,22,24
  53:24 54:4,6,13,25
  55:2,6,10,15,22
  56:1,5,14,16,22
  57:10,16,22 59:2

59:12 60:6 62:10
63:18 78:19,24
84:2 92:1,21
117:18 132:5,10
132:13 133:6
134:19,25 135:19
135:23 144:2,5
152:17,17,22
153:24 154:23
181:19 184:17,20
185:1,2,5 186:8,13
188:19,20 189:10
189:20 190:10,14
190:22 191:16,20
192:13,16,18,24
196:4,11,13,14
197:10,11 200:2
219:7,7 222:20
223:18 244:6
261:10,23 275:24
288:12,13 302:9
316:2 319:18
320:15 336:25
337:20 338:3,20
342:23 347:3,11
348:5,11 349:2
350:10 351:16,24
352:6 366:11
367:6,11 370:24
**database**  53:21,22
58:13,14 62:13
185:17,19,22,25
186:3,5 187:24
188:22 189:3
305:25 306:7,11
349:3
**databases**  288:9
**date**  32:11 79:19
88:22 269:8 328:2
372:23 385:8
386:3,9,19 387:3

387:13,25 388:20
388:25
**dated**  5:11,23,25
6:9,11 170:22
229:9 372:23
**dates**  109:5 214:8
**david**  368:23
**dawn**  129:17,24
202:8 207:6
212:25 213:7,10
313:4 329:10,12
329:17,19,21,24
330:8,9,15
**day**  3:12 8:24
17:20 131:4
219:13 220:11
225:9 341:7
357:13 384:15
386:16 387:22
388:22
**daycare**  23:9
**days**  174:7 225:22
385:18
**dea**  307:9,11
**deadline**  198:24
199:16,20,25
221:22 222:23
224:5
**deadlines**  219:9
**deal**  42:24 97:4
112:16 194:24
216:19 382:1
**dealers**  291:7
318:4 353:7
**dealing**  97:8
**dealt**  160:19
**dear**  385:10
**death**  48:5,9,15
49:1,24 116:22
117:15 153:21
184:20 185:2

196:13 197:11
337:24
**deaths**  6:18 79:7
152:11 153:3
155:5 156:6
157:10 185:4,12
190:11 329:22
334:1,10,17
335:17,25 336:21
337:2,8,13,14
338:11,18,23,25
341:2,10,13
342:14 343:3
351:15,19 353:2
353:23 354:16,19
356:15 362:12,19
**decade**  150:1,7,23
**december**  198:17
**decided**  49:22
361:23
**decision**  29:17
63:23 110:22
111:12 148:13
226:19 238:20
239:16 242:9
263:8 274:20
275:4,12 311:10
**decisions**  311:25
**deck**  6:6,12 255:10
268:19,20 269:1,9
269:12 270:20
272:7 282:25
285:8 286:12
340:16
**decks**  52:21 83:8
83:11 149:9
231:15 237:3
280:15
**declare**  328:10
**decline**  351:19
352:13,18

declined   156:21
   351:16
declining   157:4,14
   157:17 350:20
   352:9
decrease   338:23
   339:20 353:4
decreased   156:21
dedicate   68:23
dedicated   41:2
   46:23 47:1,25
   69:4 76:22 86:11
   140:3 177:13
   180:25 181:4
   183:12,17 202:5
   313:1
dedicating   69:19
deed   386:14
   387:20
deemed   385:19
defendant   7:16
   10:2 379:12,15,18
   379:21
defendants   8:19
   9:9 10:19 357:17
   357:25 361:14,17
   378:6,10 379:1,9
define   152:15
defines   133:21
definition   152:19
   289:20 291:19
definitions   133:11
definitive   166:10
definitively   56:8
   57:7 58:5 85:11
   127:25 149:5
   164:19 167:14
   168:11 183:21
   204:4 208:2
   247:13 253:8
   254:8 255:16

256:8 257:1
   287:15 292:2
   305:6 338:15
   339:10 342:17
   343:4 352:22
   353:13,15 374:7
   376:20 381:10
delay   72:4
deliverable   42:22
deliverables   35:3
   35:7,18,22 38:7,15
   39:2 41:2,7,12,20
   42:3,15 188:12
   210:3,20 211:7
   214:17 221:14
   222:23 226:25
   300:13
delivery   307:23
demand   272:24
demographic
   187:6 190:24
department   34:17
   34:20 35:8,16,20
   35:23 36:3,5 37:8
   37:16,25 39:2,25
   40:13,22 41:13
   43:18 44:15 57:25
   67:12 77:3 78:18
   80:13,22 84:2
   87:19 102:3 113:8
   115:21 116:3
   122:16 123:2,17
   128:24 132:13
   144:3 151:8
   152:20 162:7,18
   164:2 168:20,21
   169:1 176:6
   179:21 181:15
   182:4,14,18,25
   183:5,8 186:7
   187:22 188:1,9,15

188:21 189:2,8
   190:20,23 191:6
   191:15 193:21
   194:1,15,17 200:9
   200:15,16 201:20
   203:22 204:14
   217:14,21 218:4,9
   219:10 220:1
   221:8,11 222:21
   223:2,19 224:4,10
   224:23 225:15
   226:7,20,21 227:7
   227:22 228:2,3,16
   255:7 258:9
   259:10 276:24
   279:8,11 297:10
   300:14,18 323:24
   330:10,16 339:25
   340:2,19 347:8,15
   347:18 362:3,8
   363:10 364:6,12
   364:19,23 371:7
   385:22
departments
   67:10 68:4 98:7
   98:10,13 100:24
   102:23 192:21
   201:14 204:19,24
   206:22 214:24,25
   346:19 371:18
departure   97:11
   97:16 123:4
   348:21 367:8
   368:17 372:20
   373:4 374:25
   376:14 377:1
depending   182:1
   357:12 362:20
depends   242:11
depicted   265:13

deposed   10:20
   15:7,8
deposition   1:17
   2:1 7:11,15,21
   10:24 11:7,18,24
   12:8,10 13:12,19
   14:6,11,15,21 15:2
   16:22 25:4,8,12
   44:2,6 114:21,25
   119:7,12 130:7
   138:20,24 170:17
   170:21 172:19
   178:8,9 183:22
   228:24 249:14,18
   252:10 268:14,18
   286:17 292:12
   331:1,2 340:12,18
   343:10 354:10
   371:24 384:7
   385:8,11 386:1,3
   387:1,3
depositions   16:18
deputy   332:25
derived   84:2 320:2
describe   50:10
   58:13 71:7 96:4
   140:25 158:16
   169:15 181:11
   240:4 266:1 355:5
described   50:18
   66:5 67:4 121:19
description   47:5
design   80:22
designed   258:10
   258:12
desire   228:11
destroyed   187:23
detail   308:25
details   15:9 169:5
   209:10

detected  154:18
154:24 186:21
187:12
determination
134:8 148:15
172:13 227:3
241:8,19 315:11
361:25
determinations
92:19 320:16
determine  59:13
133:2,12 154:17
207:20 302:16
303:7 346:18
375:20
determined  48:19
49:11 134:6
determining
148:12 226:17
313:6
develop  374:20
375:6
developed  375:10
development
110:8,21 116:8
216:10
devoted  290:8
328:12
died  23:10 153:25
353:23
difference  319:20
350:16
different  26:4 31:8
51:3,4,9 52:13
56:19 93:1 95:1
109:13 143:16
146:3 157:11
158:1 164:5 235:7
311:4,9,25 332:10
352:20 363:23
371:12,18

differentiate  185:6
differentiated
186:14
differentiating
333:15
differently  310:13
311:10,25 312:5
312:13 313:20
314:8 317:1,4
difficult  293:17
295:15 310:4
digestible  276:3
direct  21:10 31:11
43:16,16,17 45:22
91:25 115:7
173:17 216:6
243:21 247:18,25
248:14 249:4
293:6 302:12
326:22 332:23,25
338:16 340:15
345:13 358:6,14
358:20 359:7
directed  38:1
210:18
direction  109:14
202:11 350:25
directions  140:10
directly  32:22
42:20 81:9,15
94:5 98:18 108:9
163:4 359:14
director  30:10,25
31:9 89:11 90:6,9
104:2 107:5 109:7
113:9 179:16
192:2 212:23
215:22 332:25
344:15
disagreed  255:9

disburse  228:17
discern  25:21
disciplinary  101:1
disciplined  101:5
101:10
discount  215:16
215:19,24 216:14
discounts  216:2
discretionary  37:2
discuss  15:5,8
240:25 276:18
355:7,23
discussed  63:17
162:20 168:9
182:6 183:10
216:24 218:16
227:25 229:4
265:2 266:18
280:19 375:1
discussing  228:22
237:7 361:21
discussion  25:2
134:11,12 226:5
260:4 327:6
discussions  134:14
266:11 365:7
380:16 381:14,19
disease  66:2 67:17
120:17 132:23
133:22
diseases  347:16
disorder  23:20
24:17 65:23 66:21
67:1 265:22
266:13
disorders  24:6
112:12
dispense  127:3,5
228:17 322:24
dispensed  60:4
274:10 281:3

302:11 305:1,11
dispensers  380:12
dispensing  98:11
disposal  78:6
177:17 316:4
distinct  206:22
distinction  197:22
distributed  96:2
204:11 290:22,25
321:13 322:15
354:6
distribution  95:2
129:16 207:6
215:23 233:25
289:21 313:5
328:23 329:20
330:5 381:15
distributor  309:5
distributors
307:23 308:3
309:11
district  1:1,1 7:18
7:19
dive  315:19
diverse  95:7
diversion  289:13
289:17,20,23
290:8,14,19,20
291:11,13 323:19
diversity  108:1
diverted  290:2
339:6
division  1:2 7:19
30:11 174:6,13
201:20 203:22
204:14
divisions  201:14
dmoylan  4:5
doctor  59:1 60:9
60:13,14,18,22
61:7,7,9,17 64:11

197:2 198:23
199:4,11 249:1
301:20,22 303:17
304:5,19 306:16
**doctors** 240:24
241:6,17 306:24
322:21 367:3
**document** 1:6
16:15 25:10,20,23
32:12 44:5,8,11,20
45:11 114:24
115:3 119:11
131:25 135:25
136:17 138:23
139:5 140:9 141:5
142:19 170:14,20
171:11 172:15
178:7 179:3 184:1
195:18 196:10
207:20 211:15
212:12 229:2,4
230:7 249:13
250:13,15,22,23
251:12 253:11,17
254:2 259:11
265:17 267:9
292:11 294:1
327:3 330:25
334:4,5 339:25
340:22 343:13,23
344:2,5,9,13 345:3
345:5,14 346:17
346:22,25 354:13
371:22 372:5,13
373:3,14,14,17,22
373:25 374:3,13
376:13
**documented**
249:17
**documents** 14:10
25:8,10 79:24

82:10 135:22
**doing** 93:20
110:25 209:25
222:15,18 295:17
314:2 328:20
362:5
**dollars** 69:9
126:19,22,24
127:12 161:7,13
161:15 162:2,12
162:17,17 165:24
167:12 191:11
215:17 216:6,7
219:11 220:23
227:1,12,17
364:10
**donated** 69:4
**dosage** 92:11
145:13
**dosages** 238:19
**dose** 337:8
**doubt** 219:21
**downward** 338:1
338:9
**downwards**
350:13
**dr** 138:16 205:9,22
206:5,9,11 207:10
212:18,22 213:4
215:5,21 344:24
356:18 368:3,22
368:23 370:2
**draft** 6:4 18:24
141:6 214:10
372:18
**drafter** 113:13
**dramatic** 350:16
**dramatically**
341:2,14
**drastic** 78:20

**drawing** 197:22
**driven** 73:9 251:7
**driver** 335:24
336:20 343:2,5
**drivers** 339:18
**driving** 336:25
337:2
**dropbox** 313:8
**drug** 4:6 6:2 27:15
27:16 36:24 37:23
38:3 48:14,23
49:4 51:19,22
53:4 58:15 60:15
62:21 65:15,17
68:20 76:23 79:6
84:17 85:8,21
86:5,7,15,17,25
87:7,22,24 88:9
104:13 115:8,14
115:23 116:21
117:13,25 118:14
120:2 129:15,24
132:19 135:4
152:11,15,16,23
153:25 155:3,6,9
155:12,16 156:3,7
156:12 157:1,14
168:19,21 169:2,4
170:6,24 171:24
172:6,11 175:7
177:18,19 179:20
180:3 185:4,7
187:5 190:11
191:20 207:5
209:8,9 215:16,19
215:24 216:2,14
229:7 240:14
241:2 243:10
250:3 273:11,17
273:21 274:17
286:5 301:18,22

306:17,24 307:5,6
307:16,23 308:2
309:10 313:8
318:4,16 320:7,14
322:7 334:1,10,17
335:17 336:3,13
336:24 337:7,9,9
337:13 338:22
343:24 345:10,16
345:16,21 346:5
347:18,24 349:8
350:3,8 351:6,11
353:2,7 354:8
356:17 360:6
362:12
**drugs** 73:9 96:23
96:24 155:25
189:16 240:6
273:22 290:22
320:16 321:7
352:20,22 359:2
**due** 39:9 80:25
99:6 184:22 233:7
281:16 338:11
**duly** 9:19 384:5
**duration** 42:10
57:19 142:3 203:8
332:17 356:2
**duties** 73:14 74:15
75:1 110:19,20
183:1 271:21
**duty** 240:4,25

| e |
| --- |

**e** 3:2,22 5:1,11,23
5:24 6:8,10 7:1,1
10:13 44:12
178:12,17 179:5
180:14 184:2,3,8
195:20 196:12
198:18 214:8
219:12 220:12

[e - enhance]

224:18,20 292:15
292:15 293:1
296:3 327:4,7
328:2,3 331:6
333:19 334:13
335:22 336:18
384:1,1 385:5
**eager**  140:15
141:1 142:22
**ear**  45:21
**earlier**  33:16 55:4
72:2 122:9 169:22
182:6 193:5,18
196:15 197:13
205:4 229:4 261:1
261:14 271:19
279:17 286:17
297:25 301:13
309:23 312:17
316:5 331:9,17
358:5,13 361:21
365:18
**early**  34:10 174:7
229:8
**earmarked**  37:1,4
37:9 220:24
**easier**  221:5
**easily**  98:23
219:22
**east**  4:4
**eastern**  1:2 7:19
**easy**  264:5
**edit**  113:10
**educate**  52:14
67:16 137:8
300:20,24 301:1
**educated**  71:10
97:7 301:16
**educating**  51:23
52:4 91:9 207:7
362:19 377:5

**education**  69:24
72:6,12,14 91:7
94:23 95:16,20,22
96:4,10 98:13
99:6,11 100:22
101:1 116:2
125:13 129:16
140:16,17 141:2
179:22 189:18
205:4 207:6
209:13 250:4
313:5 328:22
329:20 362:16
366:23,24 376:18
**educational**  82:10
98:18 126:9 376:3
376:8,22
**effect**  106:16
143:22 144:18
145:7
**effective**  372:23
**effort**  69:11
276:14 312:24
367:7
**efforts**  48:18 51:8
51:17,20,23 52:19
54:8 56:2,5,15,23
58:3 60:5 67:15
70:22 74:16 77:18
77:21 79:2 82:1
82:14,25 83:18
87:10,20 90:12
94:9,24 95:12
98:21 99:11
100:15 104:10
135:10,16,20
136:1 137:25
188:18 194:8
205:13 209:17
215:14 216:3,9,15
217:6 222:14

276:5 279:6 313:8
328:23 338:16
362:18 365:13
380:23 381:4,15
381:25
**either**  97:1 202:24
214:10 248:8
378:25 379:5
**electronic**  91:18
91:21 93:4 97:19
98:2,21 106:15
187:24
**elevate**  93:15
108:5 205:11
227:19
**ellis**  3:7 8:21
**email**  385:17
**embedded**  125:10
209:25 346:24
362:5
**emerged**  336:2,23
**emergency**  102:22
192:20 212:22
343:24 345:10,15
345:22 346:14,19
347:17,18,25
348:2 349:9 350:3
350:6,8,21,23
351:6,18 352:11
**emerging**  352:21
**emphasize**  220:10
**employed**  88:24
109:24 114:19
120:24 133:11
156:9 160:7
183:19 199:9,9
331:18,19
**employee**  40:7
46:16 125:9 134:9
177:13 181:4
199:6 242:3

332:18
**employees**  179:12
181:3,25 202:4
376:19
**employment**  121:4
**emr**  91:17,18 92:4
92:6 93:11,21
94:8,21 98:17
99:20 106:1,24
107:3 366:22
367:2 370:24
375:2
**emrs**  91:3,25 92:7
94:6 106:19
**enacted**  234:10
**enclosed**  385:11
**encompassed**
121:23 122:5
**encompassing**
320:3
**encourage**  140:15
141:1 146:9
**encouraged**
141:24
**encouraging**
146:14
**encyclopedia**
166:14
**ended**  203:10
**endo**  3:15,15 9:8
360:10
**ends**  193:4
**enforce**  43:20
**enforcement**
67:24 138:15
250:5 289:19
307:6,16
**engage**  60:22
**engaged**  136:2
**enhance**  51:16,19
87:19 125:15

126:12,19 194:8
329:4
**enhanced**  51:22
148:23
**ensure**  35:7 36:1
38:7 41:19
**ensuring**  35:19
38:14 39:1 41:2,6
41:11 42:2 300:7
**enter**  184:19 185:1
**entered**  200:2
387:9
**entering**  186:8
**entire**  290:7
332:17 356:2
386:5 387:5
**entirely**  51:3
113:5 123:15
250:19 371:14
**entirety**  118:25
229:16 230:6
271:8 378:16
**entities**  146:1
204:19,23 214:22
217:19 218:15
227:24 242:21
373:21 378:22
379:24
**entitled**  5:17 73:21
139:1 140:9
170:23 172:10
230:11 270:21
272:5 282:25
283:19 285:14
340:18 345:10
**entity**  169:19
**entry**  27:2 212:4
213:14
**environment**
51:12 66:10 78:8
102:24 233:20

236:7 248:10,15
248:22 282:2
362:17
**environmental**
30:11 32:1 37:21
42:7 50:17 78:11
79:1 174:11 332:8
362:13
**epi**  198:23 199:4
**epiaid**  6:19
**epicenter**  192:18
347:4,13 348:11
349:3
**epidemic**  6:7
19:18 43:2,10
55:17 56:6,24
58:3,20 62:25
63:14 64:16,21
66:6,8 67:6 69:5
69:16,20 70:9,23
72:5,23 73:3,5,17
77:14,23 78:2
81:10 82:2,18
83:19 89:19 90:3
116:7,13,15
118:17 120:5
121:24 122:6,12
123:25 124:7,10
124:17 125:7,23
126:2 128:4,11,14
128:18 129:25
131:12,17,23
132:3,4,17,22
133:4,13,21 134:2
134:7,20 136:23
139:17,23 149:1
149:12,18 162:23
163:19 164:10,24
165:13 166:23
167:6,25 168:4,16
170:23 172:6,10

177:6,24 178:4
179:8,24 183:13
183:18 193:22
194:3 201:2
202:17 203:24
204:20 205:2
207:8 208:1,7,22
209:18 215:14
217:7,20 226:12
230:12,20 231:1,4
232:4,16,25
233:18 234:11
235:19 239:9
243:17 244:4,15
247:11 248:2
250:6 252:1,12
253:5 254:3,17
256:4,19 257:5
258:20 259:2,24
260:1,22 261:3,15
261:18 262:9,21
263:15 264:11,24
265:1,8,11 266:4
266:21 268:22
269:16 270:2,22
271:2,12,16,24
272:18 273:16
276:7,16 277:8,19
278:2,21 279:7,20
280:10,17,21
282:10 292:19
296:9 297:12,21
302:8 305:4,14
306:18 307:1,18
309:12,16,21
310:15,17 311:12
312:2,14 313:21
314:1,11 315:4,23
316:13 317:2,11
317:15 318:5
327:19,24 328:13

328:18 337:4,6
338:13 339:3
340:4 351:11
352:19 362:24
363:17 366:4
380:24 382:1
**epidemics**  73:1
319:17
**epidemiology**
192:1,3 344:15
**equipped**  96:17
97:4
**equivalents**
145:14
**er**  91:18 301:14
349:6
**eradicate**  65:13
**erica**  344:24
**errata**  385:13,18
387:7,10,18 388:1
**error**  314:4
**escaping**  369:1
**esq**  3:2,7,11,17,22
3:22 4:3,7,13,17
4:21 385:5
**essentially**  91:4,9
**establish**  85:15
90:18,20 111:18
200:1
**established**  27:3
27:10 28:11 59:17
76:13,14,16 85:7
85:12,13,16,17
90:2 180:4 199:21
202:3,10 229:8
363:13
**establishment**
77:7,15 80:18
81:1
**establishments**
32:7

estimate 325:11
325:12
et 1:7,8,10,12
ethnicity 187:7
evaluates 238:22
239:21
evening 357:22
event 137:13
138:8 333:18
events 68:18 76:23
78:16 80:16,18
83:24 125:17
168:9 169:11
177:18,20,22
347:17
everybody 69:1
312:20
evidence 143:19
144:1 145:19
314:3
evolve 351:12
evolved 68:24
87:16,18 271:4,5
351:13 352:19
evolving 310:16
exact 79:19
exactly 23:14 84:4
184:16 217:16
285:12 315:3
329:1
examination 5:2
10:2 357:17 378:6
examiner 54:4,12
153:2,13 154:16
185:6 186:1,5,14
186:25 187:19
188:6 190:12,16
191:22 192:14
196:19 198:9
200:12 203:7,13
215:1 219:1 222:6

examiner's 48:11
50:4 54:2,19
57:14,20 132:15
152:18,21 153:23
154:22 185:3
186:9 192:17
196:25 198:3
199:7 200:22,25
201:17 211:19
219:4 220:25
222:15 224:12
225:1,16 280:4
306:13 337:1
338:21
example 67:9,19
67:21 91:2,6 95:3
96:20 145:13
176:4 240:22
255:21 261:8
301:13,21 320:19
359:8 362:15
366:21
examples 68:8
91:11 94:22 96:21
136:10 145:16
150:22 234:14
301:19 313:1
exceeded 92:12
371:20
excel 188:6,8,15
190:16,19
excelled 95:1
excellent 312:19
excelling 108:7
exception 122:20
155:2 158:6
excess 63:3 238:19
exchange 184:2,3
184:8 204:10,12
292:16,22 293:2
296:3 313:6,7

327:7 331:6,8
333:19 334:13
335:22 336:18
354:7 363:4
excluded 348:6
exclusive 137:21
350:12
exclusively 192:16
373:17
excuse 202:5
executed 387:10
execution 386:14
387:19
executive 30:24
89:10 90:5,9
104:2 107:4
exhaustive 125:19
205:16 291:1
exhibit 5:9,11,13
5:15,17,19,21,23
5:24 6:2,4,6,8,10
6:12,15,17,20 25:4
25:11 32:10,19
35:7 44:2,5,9
73:19 84:8 114:21
114:25 119:7,11
130:5 138:20,24
152:8 170:17,21
172:15,18,19
176:8 178:7,9
180:14 183:22
184:1 195:15,23
211:14 212:4
213:16 228:24
229:3 249:13,14
249:18 252:8
265:15 268:14,18
268:20 292:11,12
295:23 326:23,23
330:25 331:2
340:12,17 343:10

343:13 354:10,14
371:22,24
exhibits 5:8 6:1,24
24:21 25:8
existed 76:19
existing 82:7
97:14 125:15
151:4,6 193:17
209:11
expand 329:4
expanded 129:7
328:22,23
expanding 363:7
expansion 313:7
363:4
expect 222:9
expectation 233:7
351:17
expectations 36:2
36:4 362:2
expenditures
128:3 129:25
130:2 158:25
159:22 161:22
expenses 161:5
experience 29:14
73:22 74:6 243:20
244:9
experienced 24:5
experiencing
23:20 24:16
118:17 133:3
312:22 356:16
expertise 74:6
experts 276:8,19
277:4 279:25
280:19 288:7,13
300:25 301:5,10
expiration 386:19
387:25 388:25

explain  62:22
274:7 319:23
329:16
explained  248:21
exposure  207:5
express  220:13
262:1
extended  238:16
extent  66:3 129:23
180:16 210:8
316:14 323:14
324:13
extraordinarily
315:13
extraordinary
314:12

**f**

f  384:1
face  65:6 368:25
facilitate  236:7
facilitated  226:20
236:2
facilities  32:9
129:9
facility  110:5,23
111:12
fact  15:1,6 55:5
116:9 117:13
134:18 169:22
173:2 179:2 180:2
197:8 198:18
225:15 232:11
255:12 259:6
265:18 271:14
281:16 287:4
354:17
factor  149:12
232:15,21,24
243:8 244:3,15
251:11,25 253:4
254:3 256:19

257:8,10,13,25
258:19,23 259:3
259:20 261:2,11
289:8
factors  6:17 232:3
247:21 251:5,9
252:11 261:17
262:9 264:21
265:6,10 266:18
266:20 271:11
272:5,10,18
273:12,15 275:13
276:19 280:14
283:14 314:17
315:2,3 317:15
339:15
facts  254:22 256:2
factual  306:1
faculty  51:24
failed  146:19
147:4,8
fair  17:25 18:1
33:17,22,23 34:12
36:25 61:11 68:1
70:20 72:9,10
79:3 92:25 112:18
113:12 118:15
127:16,17 128:5,6
136:15,20 140:18
140:19 142:25
143:3,4 146:13
151:6 166:8,9
171:21 173:16
219:10 240:7
241:4 251:2
253:22 272:20,21
277:9 297:16,17
314:10,14,15,21
314:22 315:17
317:7,25 318:1
322:16 324:2

340:1 360:8
378:20,24 380:8
fall  371:7
false  244:17,24
245:13,24 255:13
331:19
familiar  44:20
58:12 139:5
193:16 236:16
354:1,17 356:21
359:12
familiarity  320:13
families  96:19
family  14:25 22:22
23:1 24:5,8,9
96:22 97:2 206:23
240:1,15,18,23
291:9
far  54:22 77:18
172:25 249:8
265:2
farid  356:18
fashion  197:13
222:20 312:21
313:11
fast  317:22
fatal  266:15
fatalities  5:18
36:23 37:23 78:21
78:25 104:8 132:8
132:12,19 133:8
135:4 139:2 140:4
141:15 302:13
339:16 352:23
362:11
fatality  187:4
favor  17:11
fda  20:22 320:20
321:17
february  108:19
269:9 270:21

286:12
federal  127:20
162:12,17 164:12
236:24 376:9
federally  69:10
federation  149:21
feel  312:20 313:10
328:5
feeling  71:5
309:24
fees  194:12
fel  219:8
felt  92:17 96:11,16
141:10 149:16
210:23,25 211:4
312:17
female  174:25
females  189:15
fentanyl  6:17
204:10 321:3,6,10
321:23 322:2,5,8
322:14 333:25
334:9,15,24 335:3
335:6,8,17,23
336:2,19,23
337:11,13 338:8
341:1 342:9,17,19
343:6,9 353:6,11
353:18,24 354:2,4
354:6,9,16,19
355:13 356:13,15
356:17
field  32:4 34:6,9
34:13 206:25
207:4 300:25
fifth  175:12 233:3
237:15,22,25
238:5 242:22
282:17 286:19
298:12,17,22
300:3 316:19

**fight** 250:6
**fighting** 327:19
**figure** 202:25
  301:21
**file** 19:3
**filed** 7:17 15:11
  16:12 18:21 19:8
  19:14
**fill** 24:22 88:23
**filling** 305:2,12,23
**final** 6:2 27:1
  130:22 141:6
  152:6 156:10
  179:20 180:5
  184:22 198:7
  202:20 204:3
  212:10 214:10
  228:19 229:6
  259:13 265:4
  364:4 372:18
  374:6
**finalized** 345:7
  376:13
**finances** 200:9
**financial** 38:19
  159:5 200:8
**financially** 158:21
**find** 70:7,12
  172:25 194:24
  324:20 385:11
**findings** 207:18
**fine** 130:18 133:18
  224:13,23 225:10
**finish** 17:12
**finished** 171:10
**finishing** 105:23
**firm** 7:25 8:2
  80:21 118:10
  194:2,13
**first** 9:6,19 13:6
  15:15 17:1 25:9

32:5 35:5 39:4
45:23 47:10 67:11
116:20 134:16
138:18 151:24
157:6 172:24
178:2 206:19
219:15 225:4
226:13 232:11
251:11 266:11
273:3,7 285:17
293:14 295:8,21
319:3 323:5 346:4
347:3 369:15
378:13
**firsthand** 245:4,8
**fiscal** 158:7,9,11
  158:12
**fiscally** 127:2
**fit** 363:18 375:20
**five** 13:22 14:8
  89:16,22 117:24
  118:12 156:13
  182:11,22 183:7
  366:2 375:16
  376:23
**fix** 66:13,16
  251:18
**flag** 92:15,19
  221:10 371:19
**flags** 63:2
**flaw** 66:1,1
**fleishmanhillard**
  77:4 80:21,24
  81:9,25 82:6,13,17
  82:23 83:17 118:9
  193:19 194:13
**flexibility** 227:2
  228:12
**flip** 175:11 269:22
**floor** 3:3 96:23

**florida** 111:2
  112:7
**focus** 79:1 97:12
**focused** 78:5 86:14
  156:3 174:10
  177:16 273:25
  297:11
**folks** 71:9 74:9
  80:10 339:4
  344:13 369:20
**follow** 20:16 21:1
  106:10
**followed** 145:21
**following** 100:1
  101:21 198:2
  200:1 226:15
**follows** 9:21
**font** 131:11
**food** 32:6,7 306:16
  306:24 320:7,14
**force** 6:2,3 73:24
  74:3,5,13,15,17,20
  75:2,6,8,10,12,15
  75:17,21 76:13
  77:1,9,15 80:6,8
  80:15,19 81:5
  82:7,22 113:25
  124:25 134:23
  135:1,6,12,15
  137:15 138:6
  139:15 140:6,14
  141:1,9,24 142:14
  142:21 146:24
  148:18 152:9
  167:9 180:4 229:7
  231:14,23 239:6
  242:2 243:9
  246:20 249:25
  251:23 257:17
  258:2 259:12
  276:23 279:3

292:5,8 311:2
319:12 323:23
331:22,25 381:13
381:18
**force's** 230:19
**forces** 76:8
**foregoing** 386:13
  387:18
**foreign** 250:19
**forgive** 14:4 55:8
  113:16 295:20
  334:3
**forgotten** 96:12
  287:19
**form** 18:8,9 20:25
  21:19 28:24 36:8
  36:17 82:9 185:17
  242:18 251:20
  323:19 366:14
**formal** 77:6
  135:11 303:16
  304:4,6,8
**formalized** 365:24
**formally** 103:3
  304:12
**format** 54:7
  137:14 276:2
  367:11
**formation** 80:14
  113:11 135:1,5
  313:2,4
**formed** 80:8
  135:15
**formerly** 204:7
**forms** 289:23
  291:11
**forth** 43:24 77:18
  92:13 146:20
  147:6 152:19
  219:9

forthcoming 295:4
forthright 295:3
fortunately
253:24
forward 42:12,13
90:15 200:6
202:12 204:4
228:17 261:14
365:15 385:15
found 149:8
foundation 76:24
81:5 368:15 369:3
369:6,7 370:4,5
foundations
369:13 374:7
founders 80:5
213:9
founding 86:22
four 383:6
fourth 136:22
174:14 221:11
295:9 345:14
frame 79:9,13
177:10 251:13
252:17 254:5
351:14
free 204:8 386:14
387:20
frequency 49:14
frequently 29:3
348:24
fresh 121:16
friend 96:22 97:2
291:8
friends 14:25 24:5
front 42:21 44:6
63:16 195:16
229:2 268:19
289:9 326:25
337:20 338:4
372:4

fulfill 40:14 223:1
full 10:10 39:13
40:7 46:16,21
117:22
fully 47:1 240:20
376:9
functionality 91:3
91:22 92:9 93:3,7
93:21 97:20 98:16
106:16,19 301:14
366:22 371:18
375:1
fund 227:23
fundamentally
43:1,5
funded 200:14
217:21 226:6
funding 34:3 35:3
50:13 68:24 81:2
81:7 87:18 125:14
126:12,15 128:3
161:16 162:6
163:3,11 177:14
181:22,24 182:1
191:14 200:17,20
200:21 201:18
203:10 204:5
205:8,9,10,21
206:5 209:3
214:14 218:3,8
227:17 259:11
308:15 327:18
328:5,7 329:8
330:9,11,15,15
361:23,25 362:20
363:2,7,24 364:5
364:11,18 365:3,7
fundraising
180:21,24 181:2,6
369:7

funds 37:8,13,19
127:2,3,3 163:17
164:9,22 165:11
166:21 167:4,23
168:3,14 199:1
200:4 201:13
202:14 204:18
205:1 208:19
209:2,14 210:9
211:9 216:2
217:13 218:22
219:21 220:16
222:6 226:10,18
226:23 228:7,17
362:1
funnel 158:20
funneled 210:16
funneling 127:1
further 384:10
future 140:10

**g**

g 7:1 85:25 159:12
gained 73:2
gallucci 14:3
game 219:24
gaps 47:17 88:23
garland 370:13
gathering 219:7
general 72:21 73:7
73:10 155:9,25
236:19 237:11
242:17 287:9
299:20 316:6
342:11 349:13
generally 359:1
generate 192:24
generated 83:3
189:19 191:4,7
192:15
gentleman 31:12
368:24

geographic 137:19
getting 129:19
185:10 222:20
gist 108:9 144:5,6
giuseppe 3:7 8:20
give 16:22 88:18
96:20 121:15
171:3 272:6
335:13
given 16:19,21
36:6 48:24 132:8
132:25 214:8
227:2 228:12
235:8 383:4 384:8
giving 15:2 310:6
go 7:13 9:6 36:10
36:11,15 42:2
44:19 84:7 94:3
100:6 105:4
148:11 172:24
183:25 184:5
185:24 186:3
194:24 202:19
203:25 206:6
207:2,19 219:17
226:4,17 232:10
234:19 247:4
267:10 268:3
270:6,19 272:9,11
282:24 289:7
312:8 314:3
317:21 326:8
328:9 338:19
341:2,11,13
342:22 346:16
356:23 359:17
365:15 377:20
382:9,23
goal 36:22 111:20
152:9 155:16
362:6,10 366:13

374:13,20 375:13
377:2
**goals**  6:21 43:23
50:24,25 90:16
362:2 373:9,22
**goes**  47:5 116:10
135:25 136:11
251:8 342:2
**going**  7:4 9:5
10:17 16:22 17:2
17:3,14 44:22
61:7 105:6,11
107:13 115:7
156:16,16 170:13
194:25 195:25
211:17 214:18
218:22 220:22
222:1 228:9 229:5
230:9 249:10,12
267:12 268:5,9
270:9,13 292:10
293:6,23 312:3
314:23 326:10,22
330:24 339:24
341:6,7 356:25
357:9 359:16,18
365:11 367:16
377:13,22 382:12
**goldstein**  4:17,20
5:4 8:12,12
357:19,24 368:1
371:21 372:1,8,10
372:14 377:13,17
377:20
**golumbiewski**
205:10,22 206:5
206:10,11,15,16
215:5
**golumbiewski's**
207:10

**good**  7:3 10:5,7
194:19 232:1
248:21 249:11
265:19 266:25
267:5 357:22
358:3
**gosh**  364:16
**government**  67:5
68:10 69:18 70:8
127:20,24 128:16
158:4,6,23 164:12
201:15 203:23
204:15,25 236:25
310:1,2 328:10
368:14 369:17
370:10,11 374:1
**governmental**
214:23 227:24
242:20
**governments**  68:9
69:17
**governor**  179:19
229:8
**governor's**  251:23
259:12
**grade**  334:24
335:4
**graduate**  209:23
213:22 214:1
**grammar**  113:10
**grant**  34:17,21
35:9,21,24 36:1,7
36:25 37:8,18
38:1,8,15,21,23
39:3,12 40:1,9,14
40:23 41:3,12,15
42:3,11,16,25
44:16 46:24 55:7
55:12,25 56:14
57:19 58:1 74:16
80:14 87:17 141:7

158:19 162:8,9,16
162:19 163:21,23
163:25 164:3,5,11
177:15 178:20
181:16,24 182:1,2
182:4,5,9,15,17,19
183:9,12,17
184:18,21 188:12
196:1 197:6,13
198:25 200:4,10
200:13,15 201:7
201:13 202:1,2,9
202:14 203:6,12
203:16 204:18
205:1 206:5
208:15,19 209:1,3
209:14,21 210:6,9
211:9 215:17
216:2,5 217:1,5,11
217:13,15,22
218:22 221:14
222:6,12,19 223:2
223:19 224:3,3,24
225:8,17 226:8,25
228:7,20 258:10
276:24 279:9,11
279:14 297:10
300:14,19 323:25
361:20,23,25
362:3,8 363:1,11
364:4,18 369:10
**granted**  42:10
212:15
**grantees**  227:25
**grants**  161:7,8,9
161:25 162:21
181:9,13 203:21
214:21 215:4,13
216:23 217:18
218:15 226:6
228:22 364:2,7

**graph**  346:8
**graphic**  230:22
231:7,9,16,21
265:3,21 340:16
341:9
**gravamen**  144:5
**gray**  4:18,22 8:13
8:13,16
**great**  213:4 271:9
**greater**  204:8
319:19
**ground**  16:23
74:10
**grounds**  20:5
**groundwork**
213:7
**group**  74:5 76:21
77:12 84:18 85:22
86:6,8,17 87:1,7
87:22,24 88:6,10
134:11,12 320:3
**groups**  77:20
293:16
**grow**  29:9,22 30:4
**growing**  247:5,9
250:6
**growth**  273:16,20
273:23 274:3,16
275:19 280:24
**guess**  85:2,2 132:2
376:11
**guesses**  166:4
**guest**  88:5
**guideline**  103:4,10
**guidelines**  64:25
92:14 99:18 100:1
101:22,24 102:3,4
102:5,6,11,14,16
102:19,21,25
103:15,22,25
108:14 140:21

[guidelines - health]

141:2,25 142:6,13
142:15,22 143:2,6
143:10,12,22
144:12,17,23,25
145:4,9,10,19,21
145:25 146:10,12
146:15,17,19
147:1,5,13,17,18
147:22,25 148:23
148:25 149:11,18
149:24 150:17,20
151:1,5,9,13,16,21
152:3 193:6,11
207:13,22 234:4
256:14,18 257:4
257:23 258:18
259:17,25 260:21
261:8 282:7,9,13
283:6,14 284:2,13
284:20,25 285:11
295:16 296:5
297:20 376:10
377:9
**guiding** 94:16
**gwen** 176:15
**gwp** 3:10
**gx** 4:17 8:14,17
357:18 361:7

**h**

**h** 159:12 174:15
174:15
**habit** 131:6
**habits** 63:5 66:17
99:7,11,16 100:17
101:6 151:17
251:24 252:12
**half** 267:2
**halfway** 272:8
**hand** 15:23 130:10
130:11 249:22
330:24 384:15

**handful** 86:12
**handing** 114:24
119:10 178:6
249:19
**handle** 127:2
**hands** 129:19
**happen** 18:3 23:13
57:5,6 123:11
170:10 366:17
**happened** 23:8,15
225:25 317:9
337:18 339:10
354:22
**happening** 310:10
**happy** 23:6 71:19
264:20
**hard** 71:1 213:10
340:24 341:25
**he'll** 199:15
**head** 30:15 31:4,7
108:21 159:6
204:10 258:8
279:5,10 292:4,7
297:9 299:18
300:18 348:14,16
**headed** 350:25
**heading** 202:12
**health** 3:16,21
5:13,15 10:3 11:6
11:10,13 19:13
26:10,14 28:18,22
28:25 29:12 30:3
30:11,18,19,21,23
31:7,23 32:1,20
34:17,20 35:8,16
35:20,23 36:3,5
37:9,17,25 39:2
40:1,13,22 41:13
43:13,13,18 44:16
46:19 56:22 57:25
60:8 70:6 75:19

77:3,5 78:11,12,18
80:9,13,22 84:3
87:19 89:6 97:11
110:2,3,4,10,13,17
111:3,16,23 112:1
112:3,10,22 113:8
113:18 114:9,18
115:2,21 116:3
118:22 119:14
120:17,19 122:10
122:15,16,18
123:2,7,17,20,22
123:23 124:4,5
126:4 131:6,16,16
131:22,23 132:14
132:17,21 133:11
133:12,20 134:5
134:10,18 136:2
136:13 137:23
138:4 139:14,17
139:21,25 144:3
151:8 152:15,20
156:9 157:21
158:4 159:1,4,14
159:23 160:3,15
161:2,17 162:7,19
162:22 163:3,11
164:3,15 168:20
169:2 173:4,25
174:4,8 176:5,22
177:5 178:14
179:12,21 180:18
181:16 182:5,14
182:18,25 183:5,9
183:11,15 186:7
187:7,22 188:1,9
188:15,21 189:2,8
190:20,23 191:6
191:15,19 192:10
193:21 194:1,15
194:17 198:14

200:8,9,14,15,16
200:18,19,24
201:13 202:1,15
203:5,21 204:1,6,7
204:13,17 205:1
206:4,9 207:12,24
208:5,18 209:1,15
211:9 214:5,22
216:2,14 217:14
217:22 218:4,6,9
219:10 220:1
221:8,11 222:21
223:3,20 224:4,10
224:23 225:15
226:7,10,20,21
227:7,23 228:2,3
228:16 242:4
250:2,5 251:6
255:7 257:11
258:9 259:10
260:18,20 261:13
265:22 266:3,5,8
266:12 276:24
279:8,11 290:14
297:8,10 299:2,11
300:14,19,23
303:16 304:4,10
304:12,22 308:8
308:12,19 309:25
310:24 311:1
323:24 327:23
330:1,3,10,13,16
331:13,20 332:4,8
332:9,19,24 333:1
333:4,6,14 334:15
338:12 339:25
340:2,3,20 343:14
347:8,15 354:25
356:11 362:3,8
363:11 364:6,12
364:20,23 376:14

[health - huh]

380:15
health's 279:6
healthcare 21:16
22:2,6,10 240:4
250:4 274:19
275:3,11,16
279:22 281:19
295:10 300:8,21
307:24 355:17
hear 23:11 97:21
193:18 238:7
246:7,14 248:8
292:6
heard 13:6 60:10
151:11 242:24
297:25 298:2,6,9
308:7,21 309:1,3,6
318:22 353:14,16
353:18 356:20
359:20,23,25
360:9,12,15,19,21
360:24 378:13,15
378:17
hearing 234:14
299:17
heaviest 118:13
heidi 370:12,13
heights 122:21,25
123:3,5,8
held 2:1 7:21 25:2
333:3,11
hello 357:21
help 48:17 56:10
65:12,14 69:16
80:1 90:18 108:5
111:1 112:25
113:10 173:7
176:18 188:18
191:9 227:18
248:18 362:6
376:8

helped 119:17
250:21 344:22
helpful 45:8 58:19
58:21 60:2 71:20
71:22 313:16
helping 295:18
hereunto 384:14
heroin 23:8,17,18
23:23 73:3 153:4
318:20,23,24
319:4,17 320:19
321:1,2,7,23
322:13 337:10,12
338:8,18,24 339:4
339:7,16 341:13
341:22 343:1,9
346:5,14 350:14
350:22
hesitancy 262:7
hesitant 262:1
hi 357:20
high 233:20
234:16 236:3
288:25 292:17
295:11,13 327:7
higher 205:4
362:15
highest 98:10
342:3 346:1
hindsight 312:6,7
312:9 313:18
316:24 317:21
hired 30:22 32:5
110:16
historically 73:2
289:1 295:14
366:12
history 24:7 187:8
187:8 242:12
264:23

hoch 174:15,17,21
175:1,6,9,21
home 23:8,9,10
honest 294:22
356:1
honestly 17:6
173:9 282:14
283:24 314:4
353:15
hope 338:15
351:22 352:17
376:25 377:7
hopefully 56:12
80:2
hopes 93:14
hoping 61:10
155:4,10
horgan 30:23
hospital 6:20
89:11,13,15,17,22
90:10,22 92:3,23
93:13 94:13 95:6
96:1,11 97:1,24
102:1,8 103:2,21
104:3,6,11,20
105:24 108:6,10
108:12 201:24
211:19 212:15
233:22 234:22
262:24 263:4,9,14
264:10 289:2
346:18 365:19
366:2,11 367:22
368:11 369:8,23
370:7,20,22,22
371:10,13 372:17
374:15 375:8,21
376:19 377:4
hospital's 92:13
hospitalization
112:4

hospitalize 373:20
hospitals 89:20,23
90:13,25 92:5
93:2,20 96:21
98:7,22,24 99:10
99:13,19 100:16
101:3 102:12
103:1,21 106:3,11
106:13,14 107:3
107:23 108:2
140:15 146:16,18
146:25 147:4
151:4 206:21
233:25 347:21
348:7,10 349:1
362:15 366:6,9,14
367:1,7,24 370:12
370:16 373:8,12
373:15 374:4,10
374:11 375:17,19
375:22 376:24
377:9
host 68:18 78:15
177:18,19,20
hosted 175:10
hour 46:20,25
hours 13:22 14:8
40:15,19,24,25
46:22 47:2 219:23
221:3,3,6,18
223:24 225:21
249:10 267:2
housed 78:10
186:4 202:7
huge 221:10
hugh 184:9 196:12
huh 13:4 17:4
32:18 37:15 39:17
43:9 45:12,24
64:13 68:13 69:6
71:25 72:8,16

76:17 81:20,24
82:3 93:23 94:17
95:14 102:17
106:2 109:4 114:7
128:21 130:6
144:20 155:19
157:3 166:13
169:25 172:17
190:8 191:2
197:19 203:15,19
215:3,6 220:4
223:14 228:8
233:15 235:10
239:5,8,20 245:11
259:1,5 260:9
264:4 276:17
278:15 283:12
296:23 303:19
304:14,17 310:3
311:6,21 312:11
325:24 327:25
329:15 347:6
352:10 363:14
humans 321:18
hundred 46:22
88:22 245:17
hurdle 327:19
hydrocodone
154:10

i

idea 30:2 246:11
252:14 254:15
265:19 361:16
375:12,15,18
identi 191:8
identical 231:10
identification 25:5
44:3 99:20 114:22
119:8 138:21
170:18 172:20
178:10 183:23

228:25 249:15
268:15 292:13
331:3 340:13
343:11 354:11
371:25
identified 47:10
48:3 57:13 60:6
95:15,25 99:5,9
100:9,13,19,24
118:11 191:4
192:13 203:14,18
215:1 217:8 232:3
243:9 247:21
252:15 254:16
368:11 375:11
identifies 44:13
251:12 252:10
272:17
identify 47:5,17
48:16 60:8 61:17
63:2 92:21 97:18
97:22,25 98:2,4,23
99:15,25 152:1
153:8,14 154:4,23
188:17 189:11
190:24 191:9,20
272:22 273:14
367:2 370:25
373:9 374:22
identifying 98:8
101:21 190:3
367:21 375:5
illegal 60:22
272:25 289:10,21
291:6,13 320:23
321:1,2,5
illegally 290:22,25
321:12,13 322:15
illicit 23:2 73:13
153:4 185:8
186:16 233:10

322:8,14 335:6,23
350:22 353:6
illness 32:8
illnesses 266:3
imagine 43:21
130:24 312:8
366:8
immediately 40:10
impact 24:10,18
37:22 43:17,23
62:17,20,24 63:13
64:21 65:21 67:4
67:9,18 104:12,18
141:13 147:25
285:1 311:11
316:15
impacted 234:10
263:15 284:14,21
286:20 287:14
impacting 265:11
304:18
impacts 69:1 78:7
79:1 174:11
implement 97:5
125:15 140:15,17
146:16 147:13
151:4 328:7
implementation
63:11
implemented
168:8 216:11
286:19 304:22
328:8
implementing
74:10 147:1
210:20
implication 143:1
implications 125:7
128:10
implies 146:10

important 17:1,8
59:20 61:16 65:3
70:10 366:5
impossible 302:16
improper 78:6
146:12 148:14
177:16 302:20
303:9
improve 98:21
120:19
improvement
147:12
improving 374:14
inadvertently
339:4
inception 75:11
77:6 134:22
135:11
inceptions 143:12
inclined 266:9
include 136:11
180:18 216:6
255:11
included 84:17
87:21 97:6 126:10
185:11 230:18
258:24 385:13
includes 116:8
including 12:11
69:18 150:15
190:24 307:13
inconsistent
280:18
incorporate 142:5
376:9
incorporated
387:12
increase 51:16,19
74:7 78:20,25
83:18 87:20
115:22 132:12,24

133:7 134:1,1
135:3 137:8 142:6
142:10 156:14
157:8 172:2 281:2
281:5,12,16,21
295:11 302:10,12
309:25 339:16
352:23 353:3
**increased** 51:21
60:16 61:20,23
62:12,16 79:6
132:7,23 133:22
234:16 236:3
266:15 274:5,10
288:25 338:25
**independent** 80:16
80:17 81:3 123:18
123:19,22
**independently**
158:5,22 366:7
**indiana** 4:2 378:7
378:14
**indicate** 12:6
39:15 46:11 47:23
73:22 154:2,9
186:20 257:21
**indicated** 18:20
41:5 42:14,25
54:15 55:5 60:7
71:4 72:3 85:19
90:17 97:17
101:19 104:19
108:18 123:16
124:23 135:22
144:11 146:25
185:15 189:17
190:22 191:1
223:23 227:5
233:2 238:3
247:17 257:7
258:22 261:1

265:5 279:16
302:10 309:23
331:17 338:21
**indicates** 26:9
32:11 33:6 199:15
**indicating** 224:4
385:13
**indications** 320:11
320:17
**individual** 23:19
24:16 60:15 61:6
61:19 82:21 96:25
148:12,14 152:24
197:25 198:11
199:13,19 253:20
266:7 302:15
303:6 344:18
353:23
**individual's** 153:9
**individualized**
198:2 241:7,18
**individuals** 14:20
30:8 31:25 51:12
58:22,25 65:22,24
66:17,20,25 67:5
70:17 76:22,24
86:14 97:8,23
98:1 176:14
186:16 233:6
240:13 248:6
278:6 323:14
344:14 368:2,7,10
373:20 374:9
**infer** 378:20
**informally** 304:13
**informatics** 192:1
**information** 63:10
63:15 92:2,11
93:13 94:4 96:8
120:2 141:8
146:23 147:10

148:16,20,21,22
152:24 153:11
160:6,18,23 167:8
169:4 181:18
185:17 187:6,8,11
187:21 188:3,4
189:3 191:13
192:20 195:24
224:6 237:4
238:15 239:25
240:22 242:11
256:2,22 257:6
259:18 261:9,22
262:17 271:5,6
275:23 276:2,21
277:12,21 278:5
288:3,15 295:1
296:15 304:23
306:4 310:17,18
310:20 311:16,17
312:23 313:11
316:3 317:5 328:4
335:12,19 344:17
352:7 355:20
373:10,11 375:3,4
375:18
**informative**
367:23
**informed** 110:22
111:11 225:7
280:7
**initial** 80:9 162:11
162:16
**initially** 67:23
87:8 177:11 319:1
368:22
**initiative** 72:25
78:5 365:10,11,15
**initiatives** 69:15
82:25 83:19 87:20
109:22 135:17

136:12 140:6
148:19 329:6
366:24
**injury** 6:13 33:7
33:12 34:4,17,20
34:21,25 35:1,8,21
35:23 36:6 37:17
38:1,6,14 39:3,5
40:1,8,23 41:1
43:7 44:16 45:25
46:9,23 47:4
57:25 64:12 65:2
65:6 80:13 84:9
84:13,15,16,23
85:6,10,20 86:9,10
86:12 116:22
117:15 120:17
132:23 133:22
162:19 164:3
168:22 169:3,19
170:2,7 178:20
181:16 182:5,14
182:18 183:9
188:11 200:10,15
217:1,14,22 226:7
228:6 258:9 279:8
279:11 297:10
300:14,19 323:25
340:18 361:20
362:25
**inmates** 129:9
**input** 92:11
185:18 348:11
373:16
**inputted** 185:18
**inputting** 92:1
191:13 348:4
**insofar** 24:12
72:14 91:22
107:23 108:15
232:16 245:14

290:15 292:19
330:16
**inspections** 32:4,6
**inspector** 31:23
**instance** 218:20
**instances** 246:25
249:4
**institution** 51:5
100:18,21 101:20
205:5
**institutions** 101:18
298:21 362:14
368:6
**instruct** 19:24
226:22
**instructed** 184:23
226:24
**instructing** 20:1
20:13
**instruction** 20:17
21:12 228:5
**instrumental**
210:19 212:25
213:2
**insys** 360:13
**intend** 111:6
**intended** 37:19
61:22 95:8 188:17
228:10,11 276:3
278:11 343:15
**intending** 282:15
**intensive** 112:4,6
**intent** 57:8,9 96:23
121:14 146:14
355:12
**intention** 55:7,11
55:25 56:13 108:3
111:7 191:8
**intentional** 117:13
**intentionally**
81:18

**intentions** 186:7
**interact** 66:24
**interacted** 29:11
381:22,24
**interacting** 234:13
238:13
**interaction** 50:23
82:5 96:14 348:23
**interactions** 381:3
381:8
**interested** 384:12
**interfere** 7:10
**interference** 7:8
**internal** 375:24
**internet** 291:6
**interview** 301:25
**interviewed** 30:9
**intimacy** 160:22
**intimate** 160:16
**intimately** 125:10
**intractable** 66:10
233:1,14,17 234:3
234:14 235:3,13
235:17 236:6,17
237:8,20 238:4
242:18 285:23
286:6,15 287:8,13
299:21 316:8
**intravascular**
26:20
**introduced** 10:15
**introductions**
379:19
**investigate** 177:6
177:23 178:3
**investigations**
32:8
**invoice** 219:22
222:11 223:9,13
223:23 225:10

**invoicing** 221:17
**involved** 27:20
77:21 125:22
134:13 162:2
174:8,12 207:12
311:2 380:19
**involvement** 39:14
136:10 142:7
324:4 368:24
**issue** 67:25 68:1
68:24 69:1,12
70:2,10 79:5 96:6
131:16,23 133:12
165:21 174:9
293:15 313:1
314:5,9
**issued** 180:10
229:22,23
**issues** 38:2 171:24
314:13 363:8
**it'd** 317:21
**it'll** 45:9
**item** 48:3 52:23
256:12
**iteration** 147:22
250:14
**iterations** 145:9
145:25

**j**

**j** 4:7
**jail** 128:23 129:4
129:23 365:12
**janssen** 3:6 8:22
360:16,18
**january** 1:19 7:5
178:12 343:16
345:11 350:2,5
384:15 385:4
**jennifer** 369:21
**jernejcic** 370:3

**jessica** 4:21 8:15
**jessica.soricelli**
4:24
**joan** 212:18,22
213:4 215:21
368:3
**job** 1:25 30:6
70:25 93:20
129:18 146:25
160:17 174:2
277:23 278:5
**john** 4:13 9:13
**johns** 369:21
**johnson** 3:6,6,22
8:10,21,22 173:19
173:21 174:3
175:6,21
**johnson's** 174:2
**join** 85:15
**joined** 8:10 30:16
87:3
**joining** 85:18
**joint** 75:21,24 76:1
124:25 137:25
242:25 243:3
298:1,3,6,15
**jones** 3:12 8:24
**jonesday.com**
3:14
**josh** 4:17 357:23
**joshua** 4:20 8:12
**jr** 176:5
**judge** 1:6
**judgment** 234:5
302:3 317:8,23
**judgments** 257:12
**judy** 159:9
**july** 168:19 170:15
170:22 172:9
**jumps** 341:23
342:8

[justice - late]                                                                                    Page 32

justice 67:25
justifiable 238:18
justifile 238:18
justify 210:24
  211:1 221:3 244:8
jzipp.com 4:16

**k**

keep 296:25
kept 187:24 188:2
kicked 77:4
kid 65:13 68:21
kind 31:3 93:24
  124:25 138:24
  228:4 231:2 245:6
  345:5 348:17
  381:18
kippes 192:7,8
  344:14
kmorrison 3:14
knew 132:6 314:1
know 14:4 16:9
  18:5 21:21 22:21
  23:21,22,25 28:5,8
  35:15 37:4 46:18
  49:10,22 50:1
  53:10 54:23 55:10
  55:14 56:4,20
  58:1 59:16,18
  60:25 62:3 63:7,9
  64:7 65:24 68:25
  76:2,5 77:19
  82:15 83:2 85:13
  86:18,19 94:6
  99:8 100:8,11,12
  100:14 101:8,12
  101:15 102:11
  103:1,13,15,20,25
  106:25 114:14
  117:12 118:3
  124:18,21 125:12
  125:14,24 126:14

126:17,18,21,24
127:18,21,22
128:1 129:5,6
130:1,13,21 131:4
133:10 134:3
141:4 142:10
146:2 149:20
150:20 151:24
153:1 154:21
156:5,8,11,24,24
156:25 157:6,12
159:15,25 160:6
160:23 161:1,23
162:5 163:10,14
163:24 164:18
165:3,6 166:11,12
166:18 167:12,15
167:17,19,21
168:11 169:5,6
171:8 172:9
174:16 188:14
189:4,6 193:25
194:4,12 196:22
197:1,9 199:4,11
199:13 207:10
212:9 227:10
230:4 234:7,19
235:15,16 236:21
236:22,24 238:2
245:7 247:14
248:24 249:3
251:16 252:21
253:13,16 255:6
256:10 257:2
261:22 263:3,7,11
267:8 275:1
278:14 283:24,25
285:7 289:19,25
291:18 292:1
294:3 296:25
297:7 298:3,11,14

298:15,19 299:14
299:24 300:1,4
301:23,23 302:9
303:13 306:1,6,12
307:2,5,8,11,22
308:11,14,20,24
308:25 309:2,4
312:16 314:6,7
315:20 316:14
317:5,6 318:20,24
319:2,20 321:3,5
321:10,15 323:4
323:13,20 324:4,5
325:7,10,14,22
328:25 329:1
330:20 331:23
332:2 335:11
337:4 338:6
348:10,18 351:3
353:13,21,25
354:21 356:14,18
356:22 358:25
360:18 361:2,6,9
367:11 368:3
373:1,19 376:16
376:17,20 379:20
381:12 382:19,20
382:22
knowing 202:11
  228:10 315:18
  317:5 319:18
knowledge 19:11
  19:16 22:25 74:7
  81:22 99:5 114:20
  162:25 163:16,20
  164:8,21 165:10
  166:5,15,20,24
  167:3,7,22 168:2
  168:13 181:7
  183:10 218:18
  244:17,24 245:12

245:23 322:18
326:5 333:11
380:20 381:1
382:3 384:9
knowledgeable
  293:21 294:14
known 14:17
  80:21 179:23
  204:8
kristin 3:11 8:23

**l**

l 1:24 10:13,13,13
  10:13 384:3,18
l.p. 1:7,10,12
lab 27:18
laboratory 26:21
lack 69:23,24 71:6
  71:8 72:6,6,12,12
  72:13,14,21 73:7
  95:15 96:10
  158:15 327:18
  363:2
lag 49:17 184:22
laid 81:5 213:6
lake 112:7 122:22
lakeside 3:13
lakewood 122:23
  122:25 123:2
land 295:17
landed 78:13
landfills 78:8
landscape 74:8
  207:8
language 76:4,6
  121:3,10,11 146:8
  150:21,25 365:25
large 89:17 366:2
larger 51:5 86:8
late 66:9 176:23
  219:24 233:2,14
  284:14,14 288:24

288:24 341:7
**latest** 338:2
**launched** 116:3
179:21
**laurel** 292:17
**law** 43:19 61:4
63:21 67:23
235:13,14 250:4
286:18 287:5
289:18
**laws** 24:9 295:15
**lawsuit** 10:19
15:12 16:9,13
18:22,25 19:4,15
19:17
**lawyer** 11:8,9 21:2
**lawyers** 10:25
11:2,7 12:7,15
13:25 14:1,7
249:23
**layer** 368:13
373:23
**lead** 21:1 95:8,8
113:24 114:1
138:4 178:19
192:3 344:4,8,10
344:11,12 365:5
368:12,19 370:1,2
377:10
**leader** 374:3
**leadership** 139:13
250:1
**leading** 43:13
116:22 117:14,14
122:10 251:6
**leads** 145:20
370:14,19 373:16
373:18
**learn** 277:7
**learned** 242:1
280:18

**learning** 262:17
**leave** 89:2,4
104:23 109:12,19
109:21
**leaving** 367:10
**led** 66:10 99:11
233:5 238:5
281:21 288:25
295:11 317:15
**left** 89:3 104:24
108:20 109:10
123:11 130:10
159:16 348:3
**legal** 7:25 8:2 11:4
11:12 60:18 273:8
273:14 383:6
385:1 388:1
**legislation** 76:5
213:6 234:10
235:5 236:17,18
286:16,24 287:9
316:7
**legitimate** 299:1
299:10 321:22
322:12 323:7,18
324:16 325:16,18
325:25 326:2
**leibow** 3:17 9:7,7
**lend** 141:11
**length** 145:13
162:20 300:6
**lent** 108:3
**leppla** 1:17 2:1 5:2
5:9 7:15 9:18 10:5
10:12,13 25:7
45:2 105:21
107:21 119:10
130:25 131:2
170:14,20 173:3
178:6,19 195:13
245:23 249:19

268:1,17 269:4
270:19 277:14,25
283:10 290:7
292:11 294:7
296:21 323:13
324:12 326:20
357:8,20 378:9
383:4 384:5 385:8
386:4,9 387:4,13
388:20
**letter** 385:19
**letters** 372:22
**level** 39:14 69:11
93:3 96:1 106:20
108:6 160:21
250:6 284:15,21
341:12 369:7
**levels** 376:18
**lexington** 3:3
**license** 31:24
**licensed** 20:21
24:2 32:6 33:4
34:1 61:25 62:24
63:12,21 64:20
143:19 148:1,13
150:17 151:22
153:6 234:4
239:18 242:8
281:7,14 284:23
302:4 303:8 305:3
305:13 320:9
323:7,17 324:15
325:18 326:1
**lies** 238:21 239:17
**life** 15:1 136:24
237:18
**light** 43:7 95:19
**limit** 91:4 371:20
**line** 43:16 99:17
334:8,11 341:18
341:23,24 342:9

376:3 385:13
387:7 388:3
**lined** 222:21
**lines** 193:19
**links** 98:17
**lipitor** 27:16
**lisa** 368:23
**list** 5:21 15:7
52:23 125:19
135:25 136:11
154:11 161:11
172:16 173:10
205:17 214:5
247:5 251:9 291:2
359:17
**listed** 50:5 173:3
213:14 256:12
346:4 387:7,17
**listen** 87:9 278:13
**listening** 58:11
**listing** 387:7
**lists** 374:20
**litigation** 1:4 7:17
16:19 25:15
357:25 361:14,17
378:11 379:18
385:6 386:3 387:3
**little** 16:23 26:7
52:12 71:16 72:3
96:5 105:25 130:8
143:17 156:2
158:2 184:4 190:2
195:21 227:7
233:12 235:8
237:4 243:7
245:21 271:10
282:24 311:4
317:21 324:21
326:9 340:24
346:17

**living** 262:14
**llc** 4:2,17 8:14,14
  8:16,17 357:18,18
  378:7,14,15
**llp** 3:7,21 4:3,8,12
  4:18,22
**load** 188:4 189:2
**local** 69:10 140:15
  250:6 275:6
**locate** 111:12
**located** 7:22
**location** 110:24
  111:4,10 112:5,8
  330:4
**locations** 111:1,22
  354:23
**logan** 4:9
**logical** 29:16
**logo** 83:10
**logos** 83:12
**long** 13:21 23:19
  29:7 124:14
  125:21 210:1
  218:10 351:3
  364:16
**longer** 34:6 75:13
  88:24 104:19
  156:9 164:14
  184:4 199:9 312:4
  331:18,20,24
  339:6
**longtime** 242:2
**look** 15:24 25:24
  45:3,3 79:24
  111:9 119:4 139:5
  146:6 171:3 186:1
  202:19 203:25
  206:7 229:5 237:2
  250:10,19 265:16
  269:23 270:23
  293:11 315:1

319:14 342:22
  346:2 354:15,18
  356:15 373:13
**looked** 14:15
  55:10 319:9
  323:21 324:7,12
  363:5
**looking** 25:20
  32:16 136:6
  150:24 195:15
  196:12 202:22
  211:13 282:12
  340:25 364:12
  368:25
**looks** 85:24 214:7
  269:25 270:7
  271:6 275:12
  343:15 345:25
**lorain** 226:16
**lose** 270:4
**lost** 198:22 270:7
**lot** 30:1 69:11 73:2
  84:1 194:7 213:6
  223:10 255:1
  271:6 312:24
  314:2
**loud** 156:2
**loved** 24:17 29:8
  96:22 97:2 240:23
**lower** 130:11
**lowered** 263:3
**lowest** 346:1
**lunch** 193:2
  194:22 195:13

**m**

**madam** 385:10
**mahoning** 226:15
**mail** 5:11,23,24
  6:8,10 44:12
  178:12,17 179:5
  180:14 184:2,3,8

195:20 196:12
  198:18 214:8
  219:12 220:12
  224:18,20 292:15
  292:15 293:1
  296:3 327:4,7
  328:2,3 331:6
  333:19 334:13
  335:22 336:18
**main** 3:8 155:15
  265:6
**major** 293:15
  327:19
**making** 46:8,12
  88:12 110:22
  111:11 142:4
  234:5 275:4,12
**male** 370:8
**males** 189:15
**mallinckrodt** 4:17
  8:14,16 357:18
  360:22
**man** 174:24 284:3
**management**
  232:6,14,20,24
  256:13,18 257:3
  257:23 258:18
  259:16 260:21
  261:8 282:7,9
  283:1,6,15,20
  284:3 285:14,19
  287:14 288:18
**manager** 333:8
**managing** 159:21
**mandate** 227:23
**mandated** 76:6
  140:21 141:3
  228:1
**manifested** 71:8
**manmade** 320:4

**manner** 247:10
**manufacturer**
  154:17,23 155:3
  308:14 309:5
  335:9 361:3,13,17
**manufacturers**
  28:9 243:16 244:1
  244:13,18 245:1
  245:13,25 246:12
  246:25 308:19
**marital** 189:18
**mark** 24:21
  108:24 170:13
  249:12 292:10
**marked** 25:4,11
  32:10 35:6 44:2,5
  114:21,25 119:7
  119:11 138:20,23
  170:17,20 172:14
  172:19 178:7,9
  183:22 184:1
  228:24 229:3
  249:14,17 268:14
  268:17 292:12
  326:23 331:2
  340:12,17 343:10
  354:10,13 371:24
**marketed** 245:19
  246:12
**marketing** 82:9
  194:7,9 243:11,15
  243:21,25 244:5
  244:13 247:18,25
  249:4 358:7,15,20
  359:1,9,13
**marking** 25:7
  113:9 359:6
**mart** 8:24 215:16
  215:20,24 216:3
  216:14 379:17,20
  381:25

**maryland** 4:4
**massachusetts**
4:19
**match** 144:22
**matched** 143:21
**material** 265:11
266:19 359:9
**materials** 14:12,14
82:9,11,24 83:2,5
83:7,22 84:5
135:2 194:7,10
269:13 358:7,15
358:20,23 359:6
376:23
**matter** 7:16 71:2
221:17 270:8
384:13
**mckesson** 4:12
9:14 308:22,24
309:1,2,3
**md** 1:4 7:20
**mdl** 1:4 5:20,22
**mean** 24:16 29:23
55:24 56:11 76:18
79:19,19 81:14
96:5 102:18
127:12 128:24
129:4 139:23
141:18 151:14
158:12,17 161:6
161:13 172:3
194:10 199:17
200:5 219:5 230:1
237:16,24 238:10
240:16,17 248:19
262:12 273:9,20
274:7 281:23,24
281:25 282:21
291:18 313:24
336:6 337:3
346:10 347:24

358:18 360:3
364:24 369:5
**meaning** 285:2
304:9 311:15
373:25
**means** 35:15 37:5
118:3 163:24
172:24 173:11
248:17 251:16
**meant** 140:16
151:3 256:24
279:2,18 335:3,11
**measure** 118:6
**measures** 339:1
**mechanisms**
281:25
**media** 7:14 73:3
105:8,13 195:2,7
243:23 248:7,9
267:14,19 383:5
**medical** 43:20
48:11 50:4 51:25
54:1,4,12,19 57:13
57:20 62:8 64:6
64:10 67:25 82:12
89:25 91:19,21
93:4 97:19 98:3
98:22 103:16
106:15 132:14
142:16 143:23
144:13,18 145:1
145:24 146:20
147:6,24 149:21
149:22,22 150:15
150:16 152:18,21
153:2,13,23
154:16,22 185:3,6
185:25 186:5,9,14
186:25 187:18
188:5 190:12,15
191:22 192:14,17

196:19,25 197:1
198:3,8 199:7
200:12,22,25
201:16 203:7,13
204:8 205:9
206:20 207:3
211:18 212:23
214:20 215:1,22
219:1,4 220:25
222:5,14 224:12
225:1,16 238:12
238:14,22,25
239:18 241:5,8,19
242:12,19 257:20
259:19,19,22
260:19 261:10
266:6 280:4 281:8
298:20,25 299:9
300:1,4 302:14
303:5 306:13,16
306:24 316:17
319:25 320:10
322:2,12 323:7,18
324:16 325:16
326:2 337:1
338:21 344:20
**medically** 68:6
302:17 303:9
**medicate** 266:9
**medicating** 66:17
251:24 252:12
253:2 266:13
**medication** 20:23
22:4,23,25 24:1
63:24 65:10
153:15 233:8
238:21 240:20
242:10 248:13,25
320:21 321:18
365:13

**medications** 60:4
60:17 61:7,20
63:3 65:8 66:11
73:11 78:6 91:5
98:12 103:5
107:25 108:16
115:15 144:7
145:14,22 148:7
149:25 155:8,14
155:17,24 177:17
233:21 234:17
236:4,8 238:6
239:17 241:1
244:2,19 245:2,14
245:16,18 246:1,2
254:19 273:13
274:4 281:2,6,13
282:3 289:1
290:24 302:6,11
305:1,11 308:14
308:18 320:9
339:21,23 352:13
380:12
**medicine** 206:23
206:24
**medicines** 245:3
**medina** 226:16
**meet** 13:21 14:6
93:15 197:13
219:8 221:13
222:19 224:24
225:8,17 355:1
364:1,11
**meeting** 11:4 13:1
82:22 84:22 88:5
88:18 178:21
355:4,6,24 356:1,3
356:4 362:2
**meetings** 12:15
13:11,15,18 49:13
82:8 177:20

| | | | |
|---|---|---|---|
| **melanie** 205:9 | **mentioned** 29:24 | 313:3 365:4,14 | **misconduct** |
| 206:11 | 42:8 66:16 80:20 | 368:5 | 309:10 361:13 |
| **melendes** 31:12 | 83:24 106:7 122:9 | **michael** 4:7 9:10 | **misleading** 244:18 |
| **melinda** 3:22 8:10 | 128:20 174:10 | **microphones** 7:6 | 244:25 245:13,24 |
| **member** 73:23 | 177:10 208:17 | 7:10 | **mispronounce** |
| 74:14,18 84:8,24 | 210:3 214:19 | **middle** 208:15 | 206:12 |
| 86:21,22,23,25 | 215:5,9 218:7 | 219:19 | **mispronouncing** |
| 88:8,17 89:20,22 | 237:14 240:12 | **midwest** 385:17 | 174:18 |
| 96:22 97:2 99:10 | 317:14 329:9 | 388:1 | **missed** 358:11 |
| 99:19 103:1,20 | **mentioning** | **mike** 213:20 | **mission** 104:5,7 |
| 108:1 181:1 240:1 | 265:23 | **mill** 291:17 | 120:13,16,22 |
| 240:23 279:2 | **merely** 356:4 | **mills** 291:5,24 | 121:1,13,16,18,23 |
| 319:11 323:22 | **message** 91:10 | 292:6 | 122:5 365:22,24 |
| 355:10 381:12 | 95:16,23 121:1 | **mind** 66:4,20 67:2 | 366:1 |
| **members** 22:22 | 142:10 377:3,5,7 | 67:18 68:12 90:24 | **misunderstanding** |
| 23:1 24:5 41:22 | **messed** 231:19 | 91:2,6,12,15 | 114:3 |
| 47:17 65:12 80:9 | 341:4 | 124:12 125:19 | **misunderstood** |
| 103:8 120:11 | **met** 11:6 12:1,7 | 129:21 136:16 | 113:23 |
| 129:20 137:8,14 | 13:22 14:4 35:8 | 138:19 147:18 | **misuse** 65:8 |
| 138:6 141:10 | 35:19 38:8,15 | 181:22 196:6 | **mitigate** 311:11 |
| 146:24 148:17 | 39:3 41:3,7,13,20 | 204:2 205:19 | **mitigated** 312:1 |
| 151:7 167:8 | 42:3 118:20 224:5 | 206:7 217:25 | **mixed** 353:16,19 |
| 178:14 192:9 | 227:1 279:22 | 251:13 252:17 | **mkjohnson** 3:25 |
| 198:13 240:15,18 | 280:3 356:10 | 253:2 254:5,18 | **mme** 145:14 |
| 257:16 280:3 | **meter** 30:14 | 265:14,21 266:22 | **mmes** 371:17 |
| 355:16 368:15 | **methamphetami...** | 283:4 293:8 326:8 | **mobile** 204:9 |
| 369:4,6 373:21 | 353:12,17 | 329:6,11 338:25 | 354:7 |
| 374:8 377:6 | **meting** 356:8 | 339:11 351:1 | **model** 51:15 93:24 |
| **memory** 14:16 | **metrics** 371:5,9,12 | 363:3 | 227:14 375:13,16 |
| 30:9 208:8 210:10 | **metrohealth** 54:24 | **mini** 364:2,7 | **modified** 149:24 |
| 211:11 224:1 | 55:1 57:14,20 | **minor** 240:19 | 150:12,13,16,22 |
| 273:10 333:5 | 89:24 94:22 99:23 | **minute** 171:3 | 234:3 |
| 343:6,7 365:4 | 99:24 100:13 | 269:19 377:21 | **moment** 42:1 57:2 |
| **memphis** 112:5 | 101:5 106:9,17,21 | **minutes** 88:5 | 57:7 63:6 91:14 |
| **mental** 250:4 | 106:24 129:18 | **mirror** 93:17 | 125:20 129:22 |
| 265:22 266:2,5,8 | 142:3 193:5,10 | **mirrored** 252:22 | 136:16 145:17 |
| 266:12 | 201:18,19,22 | **misconception** | 160:24 166:3 |
| **mentality** 65:14 | 202:1,2,4,7,16 | 73:10 | 171:19 196:6 |
| 68:22 | 203:17 211:19 | **misconceptions** | 202:19 204:2 |
| **mention** 60:10 | 212:15 215:2,20 | 65:9 68:19 91:8 | 208:3 217:10 |
| 201:22 213:14 | 295:17 304:21 | 209:9 | 223:21 226:5 |

229:19 244:7
265:16 266:23
293:8,23 329:1,2
330:22 337:19
**money**  46:7,12
69:4 127:19,23
180:18 200:21,23
201:6,9 202:14
206:9 207:23
208:5 209:14,22
210:15,22 211:6
212:14 214:16
216:9,13 220:2,15
220:23 222:11
**monitor**  58:22
64:23 301:15
**monitoring**  53:4
58:15 370:17
**monitors**  58:15
60:3
**month**  198:18
**monthly**  49:15
**months**  350:2,4
**moral**  66:1,1
**morning**  7:3 10:5
10:7 15:14 65:4
162:20 271:20
**morrison**  3:11
8:23,23
**motion**  296:5
**motor**  116:23
**move**  42:12 90:15
200:6 228:17
235:1
**moved**  42:13
204:4
**movement**  30:1
**moving**  202:12
**moylan**  4:3 5:5
8:18,18 378:5,8,10
382:4,7,9,17

**msalimbene**  4:11
**multiple**  171:23
289:14
**municipalities**
122:19 123:15

**n**

**n**  5:1,1 7:1 10:13
159:12 346:9,10
346:11 349:5
**n.w.**  3:23 4:14
**naloxone**  67:10,13
67:15 68:5 95:2
96:2 129:16,19
215:23 216:4,7,15
313:4 328:22
329:20,23 381:15
**name**  7:24 10:10
10:12,16 11:16
30:14 31:12 46:2
159:9,10 172:24
172:25 173:2,10
173:19 174:15,16
175:12 178:15
204:23 213:20
269:3 291:3
292:17 344:24
356:20 369:1,15
369:16 370:8,9
378:9 381:17
385:6 386:3,4,15
387:3,4,21
**name's**  357:23
**names**  14:2,4
**napoli**  2:6 3:3 7:22
8:8
**napolilaw.com**  3:5
**narrow**  98:5
**nation's**  251:12
252:16
**national**  1:4 7:17
325:10 379:8

380:10 385:6
386:3 387:3
**natural**  17:22
**naturally**  320:1
**nature**  22:5 41:9
41:10 50:19,22
51:4 65:20 70:16
72:22,23 78:9
87:12 126:6,8
144:8 172:4 182:2
187:7 273:24
278:5 355:5
373:14,15 379:4
379:23
**necessarily**  93:10
93:17 137:15
222:18 252:22
359:3
**necessary**  221:3
**necessity**  241:8
**need**  45:2,3,10
58:6 96:16 112:9
133:25 146:9
169:5 191:14
197:16,17 207:19
220:1,8 241:19
249:9 270:6
278:10 279:17
293:12 322:13
323:8,18 324:16
325:16 326:2
328:6 338:3
346:16 373:13
382:23
**needed**  96:7 97:3
151:4 197:11
220:14 222:25
**needs**  44:23 47:11
47:15,20,25 95:19
320:10

**negative**  65:21
66:20 78:7 174:10
**negatively**  67:4
**neighboring**
205:11 215:9
226:9,14 227:6,18
227:22
**network**  111:18
334:15
**never**  15:6 88:18
356:20
**new**  3:4,4,19,19
4:23,23 116:1
282:6,9,12 283:5
283:14 295:15
314:1
**newer**  72:23
348:19,20
**nicole**  3:17 9:6,7
**nicole.leibow**  3:20
**nobody's**  107:9
296:24
**nonaddictive**
245:19 246:13
**nonexistent**
291:22
**nongovernmental**
204:18 214:24
227:24
**nonopioid**  353:8
**norm**  248:11,16
**normal**  248:23
371:8
**north**  3:12
**northeast**  6:20
89:11,13,15 90:10
102:8 103:2,21
104:2,6,11,20
105:24 109:7
110:23 137:19
213:5 365:19

372:17
**northern**  1:1 7:19
**notarized**  385:14
**notary**  384:4,6
385:25 386:10,18
387:15,23 388:23
**note**  7:6 27:24
385:12
**notice**  2:15 16:2
17:21 214:4,6
220:7
**noticed**  17:10
**novel**  125:16
**november**  184:10
195:22 372:24
**number**  60:4 79:6
104:12 118:4
130:9,10 132:7,18
133:8 156:12
157:1,13 172:2
185:10 249:21
272:6 274:9 281:2
281:5 285:1,3
302:10,13 324:5
324:19,20,23,25
325:2,5,8 338:24
346:11,13 347:22
349:6 352:9 383:5
385:7,13
**numbered**  115:6
272:7
**numbers**  130:20
191:9 197:16,23
198:5,9,11,12
338:22 344:16
345:20 346:19
387:7
**numerous**  72:20
161:9 169:11
**nurse**  368:18

**nurses**  95:18,23
96:3,9,16 97:6,7
**nursing**  95:22
97:12 368:18

**o**

**o**  5:1 7:1 53:8
174:15
**o'donnell**  11:16,23
12:12,14 13:11
**o14186737-738**
5:10
**oarrs**  52:24 53:2,3
53:5,18,20,24 54:4
54:13,16,22,25
55:1,6,15,22 56:5
56:14,16,22 57:16
57:22 58:2,12,13
58:14,18,21 59:2
59:12,16,20 60:8
62:1,4,12,16,23
63:8,12,22 64:20
141:3 142:6,11
148:8 153:10
302:2 305:25
306:7,11
**oath**  18:13 262:2
**object**  36:8,17
241:9
**objection**  18:9
19:23 20:24 21:9
21:19 52:8 55:18
56:25 57:17 59:22
60:19,23 61:13
62:6 64:1,5 68:2
68:15 69:21 70:11
78:3 79:10 81:12
94:1 100:4 101:9
101:11 109:20
117:3 118:23
119:6 132:20
133:5 135:8

146:22 149:3,14
154:6 156:19
163:5,13 168:6
169:9 171:17
177:1 185:14
186:17 201:4
218:17 223:15
224:15 225:2,19
226:1 238:23
239:23 240:8
241:12,21 242:6
242:15 252:2,19
253:6,15 254:6,12
254:25 255:14,19
255:24 256:6
257:14 259:8
261:20 262:3
269:18 274:25
275:9,14,21 276:9
276:20 277:10,16
278:3,22 280:11
287:2,17,22 288:1
288:8,20 290:5
291:15,25 294:24
295:6 296:13
299:3,13,23
302:18,21,25
303:10,20,23
306:19 315:15
317:12 318:2,7,14
318:17 319:6
321:25 322:9,17
323:2,10 339:8
352:1,15 367:18
376:5
**objective**  155:7
**objectives**  6:21
72:15 93:6,9,12,16
**objects**  18:8
**obligations**  258:25

**obtain**  60:16
181:18 339:6
**obtained**  323:6
325:17
**obviously**  88:21
288:22
**occasion**  380:16
**occasionally**  74:22
**occasions**  18:7
**occur**  366:19
**occurred**  66:9
77:17 114:15
167:11 225:4
246:18 253:19
257:16 258:22
284:4 285:18
288:24 295:10
335:22 365:2
367:9
**occurring**  96:25
140:7 142:7
265:22 266:8
351:20
**october**  110:18
229:9
**odds**  193:4
**odh**  5:20,22 35:12
35:15 80:19 118:9
184:23
**offer**  364:7
**offered**  30:6
**offers**  112:3
**office**  48:11 50:4
54:2,3,12,19 57:14
57:20 132:6,15
152:19,22 153:2
153:13,23 154:16
154:22 185:3,6,25
186:4,9,13,24
187:18 188:5
190:11,15 191:22

| | | | |
|---|---|---|---|
| 192:14,17 196:18 | 102:3,8,13,16,18 | 279:8,10 286:2,5 | 79:3,15,24 80:4 |
| 196:25 197:9 | 102:20 103:2,16 | 287:5,9 297:9 | 82:12 83:12 84:7 |
| 198:3,8 199:7 | 103:21 104:2,6,11 | 299:20 300:13,18 | 86:16 87:15 88:1 |
| 200:12,22,25 | 104:20 105:24 | 315:22 316:1,6,6 | 88:12 90:17,23 |
| 201:17 203:7,13 | 109:7 110:23 | 316:12,17,25 | 91:11,16,20 92:24 |
| 211:19 212:24 | 111:4,10 115:20 | 321:12 323:24 | 93:19 97:5 98:14 |
| 214:20 215:1,22 | 115:22 116:3,22 | 329:22 330:10,16 | 99:4 101:19 102:6 |
| 217:13 219:1,4,25 | 117:24 132:13 | 334:1,10,15,16 | 103:20 105:3 |
| 220:25 221:10 | 140:21 143:11,23 | 335:18 339:25 | 107:2 109:19 |
| 222:5,15 223:25 | 144:3,18 145:1,5,8 | 340:2,19 347:7,15 | 110:12 111:13 |
| 224:12 225:1,16 | 145:23 146:20 | 354:15,18 356:14 | 113:21,22 114:5 |
| 280:4 306:13 | 147:6,22,24 | 362:3,8 363:10 | 116:16 117:1,12 |
| 313:3 337:1 | 149:21 150:16 | 364:6,12,19,23 | 119:3,21 120:3 |
| 338:21 344:21 | 151:8,15,21 152:3 | 365:19 372:17 | 121:12,17 122:24 |
| **officer**  159:5 | 152:20 162:7,18 | 385:2 | 123:3,5,13 125:4 |
| **official**  76:20 | 164:2 168:20,21 | **ohio's**  53:3 179:7 | 126:6 127:11,18 |
| 386:15 387:21 | 168:22 169:1,3,18 | 192:19 329:19 | 128:24 129:3,11 |
| **officially**  76:14,15 | 170:2,7 176:15 | **oipp**  84:10,20,25 | 129:23 130:4,17 |
| 77:4 237:21 | 179:20,21 180:3 | 86:10 87:3 | 131:8 133:2,17 |
| **officials**  60:8 | 181:15 182:4,14 | **okay**  9:4,7 10:23 | 136:19 141:17,19 |
| **oftentimes**  65:24 | 182:18 183:5,8 | 11:1,8,22 12:1,13 | 143:5,15 144:10 |
| 73:11 266:10 | 186:6 187:22 | 12:19 13:2,7,14 | 147:3,23 148:24 |
| **oh**  13:2 107:9 | 188:1,9,14,21 | 14:5,14,19 15:4,10 | 149:20 150:14,24 |
| 113:16 174:18 | 189:2,7 190:20,23 | 15:15,23 16:5,11 | 153:19 155:13 |
| 192:13 234:19 | 191:6,15 193:20 | 16:17,21 18:2,20 | 160:21 161:8 |
| 258:4 264:1 | 193:23,25 194:15 | 20:4,7 21:3 22:8 | 162:9 164:4,7,13 |
| 364:16 372:8 | 194:16 200:9,14 | 22:21 23:1,4,16 | 164:17 166:1,6,19 |
| **ohio**  1:1,7,11,18 | 200:16 201:15 | 24:4,10,20 25:1 | 167:3 168:13 |
| 2:9 3:9,13 6:2,18 | 213:5 215:25 | 26:7 27:19,24 | 169:18 170:13 |
| 6:20 7:19,23 | 217:14,21 218:4,8 | 28:8 29:4 30:15 | 171:10,21 172:14 |
| 31:25 32:2 34:16 | 219:9 220:1 221:7 | 30:21,24 31:2 | 173:7 174:18 |
| 34:20 35:8,15,20 | 221:11 222:21 | 33:6,14 36:12,19 | 175:1,11 176:10 |
| 35:23 36:2,5 37:8 | 223:2,19 224:4,10 | 36:20,21 37:7,12 | 176:18 177:23 |
| 37:16,25 39:2,25 | 224:22,25 225:15 | 39:23 40:19 42:2 | 178:24 180:9 |
| 40:12,22 41:12 | 226:7,20,21 227:7 | 42:14,18,25 43:25 | 181:8 182:8 |
| 44:15 53:14 57:25 | 227:22 228:1,3,16 | 45:16 47:19 50:19 | 183:25 185:21,24 |
| 58:17 63:21 77:2 | 229:6 235:19 | 52:21 53:5 55:1,4 | 186:10 187:17 |
| 78:17 80:13,22 | 236:19 237:11 | 55:13 56:18 57:4 | 188:14 189:1 |
| 84:2,9,13,15 85:6 | 242:17 246:20 | 57:8,13,24 61:2 | 192:8,22 193:1,25 |
| 85:20 86:9 87:19 | 255:7 258:8 | 70:20 71:19 72:11 | 194:16 196:18 |
| 89:11,13,15 90:10 | 259:10 276:24 | 75:14 76:12 77:11 | 197:5,15 198:16 |

201:12 205:21
207:23 208:17,25
210:8,11 211:13
211:22 212:13
214:4,19 216:22
217:11,18 218:12
219:3,12,16
220:13 223:9,12
224:17 227:5,21
229:18,24 230:9
232:22 233:11
234:8,25 237:2,14
237:24 238:9
239:12 242:24
243:6 244:11
245:6,20 246:4,16
246:24 247:4,17
247:24 249:1,10
249:12 250:16,21
251:2 252:23
253:13 255:23
256:12 257:2,24
258:4,16,24
260:17 261:12
262:1 263:19,20
264:2 265:7
266:24 269:8
271:9,19 272:13
272:16 273:6
274:2,19 275:18
282:5 283:8,18,23
284:1,6 285:5,8,17
286:11,24 287:7
288:11 289:7
290:12 292:10,24
293:20,25 294:4,6
294:11,17,19
295:24 297:15,18
298:11 299:16
300:17 301:3
302:4 303:3

304:11 306:3,6,10
306:15 307:5,8
308:21 309:6
310:22 311:3
312:8 313:13
314:10 316:11,23
320:23 321:10
324:10,21 325:14
326:7 328:15
329:24 330:9,20
330:24 331:11
332:15,21 333:2
334:7,20 335:8
336:4,15 337:12
339:24 340:15,21
341:21 342:7
345:9,13,19,25
347:23 348:8,13
348:15 349:5,12
350:1,15 353:21
356:6 359:16
372:9 376:2
377:16 378:17,25
379:3,14,22 380:8
381:17,21 382:4,6
382:15,17,18
**old** 25:25
**once** 100:23
197:10 245:19
311:22 341:6
**one's** 237:18,18
313:25 349:23
**ones** 138:18 145:5
205:19
**online** 137:13,14
**op** 1:8,10,12
**open** 110:23 111:6
**opening** 111:10
**operate** 204:9
347:14

**operated** 129:13
129:17 158:5,22
255:6 330:4
347:15
**operations** 32:7
160:13 161:4
180:19 181:6
**opiate** 1:4 7:17
23:2 73:23 74:2,4
74:13,15,20 75:2,6
75:8,10,12,20 76:7
76:13 77:7 80:6,7
80:15,19 82:7,18
82:22 89:19
113:25 124:24
131:11,17,23
132:3 134:23
135:1,6,11,15
136:2,23 137:15
138:6 139:15
140:6 141:24
142:14 148:17
152:9 167:9
178:18,25 179:8
239:6 242:2
249:25 250:7
258:2 259:12
279:3 292:5 311:2
319:11,21 320:5
320:20 323:23
331:22,24 385:6
386:3 387:3
**opiates** 129:10
153:4 185:8
186:16 295:13
320:1,23
**opinion** 19:2,6
62:19 247:24
**opinions** 261:21
262:2,8

**opioid** 6:21 19:18
19:22 20:23 22:4
22:23,24 24:1,13
43:2,10 55:17
56:6,23 58:3,20
59:13,21 62:25
63:13,24 64:16,21
66:6,8 67:6 69:5
69:20 70:22 73:16
74:8 77:14,22
78:2 79:17 81:10
82:2,18 83:19
89:11,14,15 90:3
90:10 91:8 94:9
102:8 103:2,5,9,22
104:3,6,9,11,20
105:24 107:24
108:15 109:8
114:14 116:13,15
118:17 120:5
121:24 122:6,12
123:25 124:6,10
124:16,22 125:7
125:22 126:1
128:4,11,18
129:25 134:6,20
135:4 136:14
145:22 149:1,12
153:15 154:5,18
154:24 155:8,13
155:24 157:1,13
162:23 163:18
164:10,23 165:12
166:22 167:6,24
168:4,16 175:20
177:6,24 178:4
183:13,18 185:11
186:15 193:22
194:3 201:2 202:5
202:17 203:24
204:20 205:2,12

207:8,25 208:7,21
209:18 212:24
215:14,22 217:7
217:20 226:11
230:19 232:15,25
233:18 234:11
235:18 236:8
238:21 239:9,17
242:10 243:17
244:1,3,19 245:1
245:14,25 246:11
247:11 248:1
251:25 252:11
253:4 254:3,17
256:3,19 257:4
258:11,13,19
259:2,24 260:22
261:3,15,18 262:9
262:21 263:15
264:11,24 265:11
266:3,20 269:16
270:2 271:1,11,24
272:18 273:15,23
274:4,21,23 275:5
276:7,16 277:8,19
278:1,20 279:7,20
280:9,17,24 281:2
281:5,13 282:10
289:24 290:15,24
292:19 296:9
297:12,21 302:5,7
302:11 305:1,4,11
305:14 306:18
307:1,17 309:12
309:15,20 310:14
311:12 312:1,14
313:3,21 314:11
315:4,22 316:12
317:1 318:5
319:21 320:9
323:17 325:23

327:23 328:12,18
335:24 336:20
337:22,25 338:10
338:13 339:6
340:4 341:6 343:2
349:13 350:6,12
350:13,21,23
351:15 352:12
362:24 363:16
365:20 370:20
372:17 376:10
380:24 381:4
382:1
**opioids** 21:18 22:7
22:19 28:9 59:8
62:18 79:8 91:23
94:19 95:17 97:9
98:25 101:7
103:18,23 142:1
143:20 147:5
150:6,18 151:23
152:4 153:5 156:4
193:7,12 207:14
234:6 243:16
244:14 247:1,6,10
249:5 274:1,10
275:6,20 281:22
284:17,22 285:1,3
286:21 290:1
307:13 308:4
320:3 323:15
324:14 325:15
337:15 341:11,18
342:13 349:20
351:7 358:8,16,21
358:25 359:3
371:17 380:18
**opportunities**
111:9 328:6
369:10 376:4,8

**opportunity** 15:18
29:9 35:4 50:14
81:2 89:7,9 171:7
329:4
**opposed** 66:2
185:7 248:11
323:18 325:16
353:3 366:7
375:23
**order** 12:10 45:13
211:3 223:1
293:12 312:13
320:15
**ordered** 172:23
**ordering** 291:6
**organization**
304:7 365:23
**organizations**
41:18 42:5 43:22
68:23 69:3 72:24
76:25 78:19 80:11
103:17 127:5
128:13 138:5
140:2 149:23
150:15 218:6
242:20 298:20
362:4
**organizers** 138:1
**organizing** 88:5
**organs** 68:9
**original** 213:9
**originally** 73:12
233:8
**originate** 69:9
**ought** 147:19
297:2
**ourself** 10:15
**outcome** 384:12
**outcomes** 120:18
228:11,11

**outdated** 26:6
**outlier** 375:11
**outliers** 374:22
375:5,5,24
**outlined** 102:7
**outpatient** 112:4,6
112:7
**outreach** 110:8,25
111:14,16,17
**outside** 64:14
163:20,23 310:1
314:12
**overall** 31:6 36:21
59:3 84:20 86:8
100:16 113:18
121:1,13 155:25
255:5 273:16
274:3,17 275:19
280:24 311:5
362:2
**overarching** 36:22
104:5,7 362:10
**overcome** 72:4
**overdose** 5:18
6:17 36:24 37:24
48:13,23 49:4
51:19,22 61:24
79:7 115:23
132:19 135:4
139:2 152:11,15
152:16,23 153:3
153:25 156:13
169:4 171:24
184:14 185:4,11
186:2 187:5
188:20 190:11
191:20 196:13
223:1 266:16
334:1,10,17
335:17,24 336:21
337:8,13,14,24

[overdose - particular]

338:10,18,23,24
341:2,10,13
342:14 343:3
350:23 351:15,19
353:2,22 354:16
356:15 362:12
**overdosed** 23:7,9
23:17
**overdoses** 38:3
79:6,17 96:25
104:13 117:25
118:14 155:6,9,12
155:17 156:3,7
157:2,14 168:19
170:6,24 172:6,11
175:7 185:7,8
186:15,15 191:9
243:10 322:7
350:13 352:12
**overly** 81:19 317:8
**overprescriber**
371:4
**overprescribers**
98:9 370:25
**overprescribing**
58:24 66:11 91:5
99:21 100:2,10,13
100:19 233:4
238:6,10 367:3
**oversee** 35:2
**overseeing** 303:17
304:5,6
**oversight** 35:25
206:22 304:8,9
**owned** 186:4
347:14
**ownership** 345:3
**oxycodone** 154:10
**oxycontin** 361:3

**p**

**p** 4:3 7:1 10:13,13
85:25
**p.m.** 334:21 383:2
383:9
**package** 276:1
**packaged** 277:22
**page** 5:2 26:24
73:21 84:8 115:9
115:12 120:9
130:8,16 131:10
136:7 140:8 152:7
173:18 174:14
175:12 176:4,7,8
176:13 195:23
212:4,14 213:16
219:15 230:10,13
230:23 232:10
265:13 293:14
295:20,23 340:20
345:14 347:3
372:4 374:13,14
374:16,17 385:13
385:15 387:7
388:3
**pages** 115:6
130:15 179:3
211:15
**paid** 161:21
194:12
**pain** 66:10 232:6
232:14,20,23
233:2,2,6,14,17,21
233:23 234:3,14
234:17 235:3,13
235:17 236:3,6,12
236:17 237:8,17
237:21,22,25
238:4,5 242:18,22
256:13,17 257:3
257:22 258:18

259:16 260:20
261:7 263:2
264:15 282:7,9,17
283:1,6,14,20
284:3 285:14,19
285:23 286:6,15
286:19 287:8,13
287:14 288:18
289:1 295:12,14
298:12,16,21,25
299:9,21 300:2,9
300:22 301:9,11
316:8,18 320:3,6
**painge** 284:3
**painkillers** 323:5
**papp** 212:18,22
213:4 215:21
368:3
**pappalardo** 3:7
8:20,20
**par** 3:16,16 9:9
**paragraph** 50:6
117:23 139:11
140:14 178:17
179:17 219:20
**parameters**
163:21,23 277:23
**paraphrasing**
288:21
**parentheses** 46:4
47:22
**part** 39:6,9,16,20
40:2 46:14 56:5
56:23 58:2 62:8
68:11 72:13 95:11
98:16 124:4 141:7
142:9 153:15
157:21 158:4,22
160:16 170:7
184:18 186:21
188:11 204:24

245:5 254:20
276:5,14 279:7
290:16 309:10
319:10,15,16
336:12 338:11
354:6 361:13
375:1 387:9
**partial** 112:3
**partially** 172:23
**participants** 90:14
366:9
**participate** 70:18
114:10 140:5
177:21 193:21
349:2 368:12
**participated** 27:21
113:2 119:24
120:7 167:18
**participating** 91:1
93:2 99:13 102:12
108:2 112:21
367:23
**particular** 29:20
37:1,10 92:3
108:12,12,13
112:2,11 132:9,24
133:23 141:10
145:14 152:2
153:14 154:5,18
155:2 184:20
186:2 195:18
196:12 224:24
230:7 239:21
241:19 242:10
249:3 259:3 269:9
272:16 274:22
293:7 329:5 345:9
348:9 352:24
363:11 364:15
368:2,7 371:6,9,20
375:9

**particularly** 24:13 106:7 293:17

**particulars** 186:1

**parties** 2:16 7:13 384:11

**partly** 94:12 108:8

**partner** 301:5,9 340:2,10 381:13 381:18

**partnered** 41:19 42:4 50:14 51:10 77:3 80:20 126:11 142:2 148:19 209:20 214:1 215:19 226:13 300:25 362:4

**partnering** 304:7

**partners** 42:8 43:15 53:21,23 54:15,18,22 55:5 55:15 57:11,12,15 57:21 78:15 138:9 139:16,22 177:18 177:21 181:18 214:13 218:7 228:13 232:19 257:7 276:22,23 279:19 311:1,15 312:20

**partnership** 50:6 50:12,20 51:1 75:21 78:17 84:9 84:14,16 85:7,21 86:9 118:9 124:25 168:23 169:3,19 170:2,8 304:15,20

**parts** 70:7 176:1

**pass** 96:24 317:8 317:23

**passage** 213:5 287:13

**passed** 236:19,22 287:5 299:20 316:7

**passionate** 71:1

**patient** 63:23,25 68:6 92:12 97:1 148:14 152:25 188:2 234:21 236:12,13 238:22 239:22,25 240:1 241:11,20 242:11 261:1 262:20,24 263:6,8,13 264:9 264:16,17,19 274:22 275:5,13 282:1,23 301:22 303:6 371:9

**patient's** 242:12

**patients** 21:17 43:17 63:2 95:22 96:14,18,19,21,24 99:1 100:2 111:1 111:20 112:16 143:21 148:2 150:18 151:23 152:4 153:24 238:16 240:5,25 264:15 281:14,18 281:21 282:4 284:22 286:22 301:15 377:6,11

**patterns** 58:23 64:24 92:22 143:9 143:19 144:21 146:5 264:14 301:15

**paul** 3:22 8:9 10:17 176:5

**pause** 268:8

**pax** 110:2,3,4,10 110:13,16 111:3

**pbaag** 111:16,23 112:1,3 112:10

**paychecks** 158:18

**pboehm** 3:24

**pdaag** 86:3,4 87:14 88:11,14,18 88:20 169:23,23 170:1

**peer** 374:21 375:7 375:9,24

**pennsylvania** 4:10

**people** 16:18 29:1 52:5 67:16 72:21 81:25 134:17 176:1 211:20 213:15 260:12,13 260:19 288:19 293:16 310:9 317:10 339:5 355:9

**percent** 39:12 46:22 47:22,24 50:7 52:24 88:22 152:10 155:5,11 156:6 165:16 245:17 349:8,14 349:24 350:7 351:6

**percentage** 39:7,9 40:18 41:15 67:13 104:15 189:16 323:4,15,20 324:6 325:14,22

**percentages** 189:15 345:21

**perceptions** 233:7

**perfect** 17:19 313:23,25

**performed** 153:16 154:19

**period** 39:11,22 45:6 132:9,24 133:23 176:24 177:8,25 183:19 203:11 222:15 336:1,22 337:2 343:16

**periods** 238:16

**permissible** 61:3

**permitted** 221:7

**person** 12:15 13:1 13:2,11 23:16,22 23:25 159:2,20 210:1

**personal** 15:1 243:19 244:8 380:16

**personally** 82:16 154:20 381:6,7,24 386:11 387:15

**personnel** 44:13 45:23 380:17,23 381:3,9,9,11

**peruse** 196:8

**perusing** 45:5

**pest** 196:1 197:6

**pfizer** 27:16,18,20

**pharma** 1:7,10,12

**pharmaceutical** 3:16 27:3,11,25 28:10 243:11 335:9 359:13

**pharmaceuticals** 3:6,15,16 8:22 247:25

**pharmacies** 215:24 216:12 322:24

**pharmacists** 304:25 305:10

**pharmacy** 274:24 275:7 379:8 380:10
**phenomenon** 61:18
**philadelphia** 4:10
**phone** 9:3 11:4,18 12:11,19 224:10 270:7 385:3
**phones** 7:9
**photograph** 120:11
**phrase** 151:10,11 184:24
**physician** 20:21 24:2 60:16 62:5,8 73:12 92:10,16 96:15 140:16,17 141:1 148:2,13 150:18 153:6 212:23 233:9 238:11 239:19 248:24 264:19 302:5 303:8 323:7 323:17 324:15 325:19 326:1 335:7 368:12,19 370:1,2,14,19 371:20 373:16,18 374:3 375:10
**physicians** 58:24 61:25 62:11,16,24 63:1,12,21 66:12 94:16 98:24 99:4 99:9,21,25 100:9 100:12,18,23 101:4,21 143:20 151:22 152:3 234:4 236:11 263:1 264:14 281:7,14,16 282:3

284:23 295:12 300:7,20 301:16 305:3,13 306:7 320:10 370:17
**pick** 7:7 341:25
**piece** 234:10 236:16,18 255:5 286:16,24 287:9 316:7
**pill** 66:14 251:13 251:20 252:17 253:3 254:4 291:5 291:17,24 292:6 339:3
**pills** 291:22 295:12 325:23 339:7
**pinpoint** 79:22
**place** 7:9,12 48:16 49:13 51:14 69:16 94:23 103:23 104:17 106:4 107:23 111:1 120:23 134:7 145:23 146:12 281:25 284:13,20 284:25 285:6 327:12 329:2 339:2 348:20 356:10 362:14 367:25 371:6,10
**placed** 22:6
**places** 61:23 321:12
**placing** 167:10
**plagued** 66:22
**plaintiff** 8:8
**plan** 35:25 42:20 43:24 90:15 228:14 372:16 373:6

**planning** 138:7
**platform** 51:15
**platforms** 98:19 243:23 248:8,9
**play** 45:20 87:13 318:9
**played** 69:23,25 128:14 139:15,21 250:2 356:3 370:20
**plays** 66:7 307:11 357:13
**please** 7:6,9 9:1,3 10:9 21:23 37:3 44:21 50:10 62:22 136:18 159:11 171:6 196:9 241:14 244:20 246:8 252:4 263:17 266:1 299:4 301:6 302:23 305:8 306:20 309:17 325:20 329:16 352:3 363:22 385:11,11
**pllc** 2:6 3:3 7:22
**plural** 28:6
**point** 3:12 17:1 18:4 27:1 35:5 84:8 116:20 121:4 136:23 137:11 207:19 234:15 246:12 267:5 282:6,12,19 283:10 324:18 348:25 367:14 376:21
**pointing** 231:3 342:1

**points** 116:17 136:8,9 160:18 234:1 284:7 291:4
**poison** 48:5,9,15 49:1,24 153:21 280:5
**poisonings** 115:14 116:21 117:14
**police** 67:9,12 68:3
**policy** 37:20 42:6 42:6 142:4 216:10 362:13,16
**polster** 1:6
**polysubstance** 349:17
**poorly** 244:22
**populated** 188:21 190:16
**population** 63:10 132:8,25 133:23 233:6 248:6 365:12
**populations** 72:21
**porter** 3:18 9:8
**portion** 119:18 122:22 202:8 208:15
**position** 29:5,10 29:19 30:2 33:7 34:4,5,21 43:7 47:2 75:3,4 89:5 104:23,24 108:21 109:17 110:6,7 196:22 332:3,6,10 332:13,14,15 333:8,9
**positions** 333:2,10 333:16
**positive** 37:22 43:23 62:20,24 63:13 67:8,17

[positive - prescription]                                                        Page 45

104:18 120:17
141:12 264:17
285:1
**possibility** 225:20
225:23
**possible** 98:23
213:11 303:7
313:7 357:11
**post** 131:6 178:5
207:16 221:9
372:20
**posted** 334:23
**potency** 233:21
234:16 236:3
289:1 295:12
**potential** 61:24
111:9 208:16
209:8 257:9 365:3
365:7 369:9
**potentially** 30:4
31:3 32:9 52:5
58:25 100:10
110:23 114:14
162:3 233:5 237:6
238:17 266:15
291:22 301:17
330:18 342:16
364:3 375:3
381:14
**power** 236:11
263:1
**powerpoint** 6:6,12
**pr** 80:21
**practice** 32:1
93:18 257:22
366:10 374:15
**practices** 87:11
90:13,19,21,21,24
91:12,20 94:15
108:5 149:15
303:17 304:5,19

304:21 366:16
367:21 370:18
**practitioner**
238:22 239:18
**pratt** 4:4
**pre** 207:15
**precisely** 77:16
**predicting** 352:17
**prefer** 24:23
**preparation** 11:18
12:17,24 14:21
112:22 113:3
114:10 119:24
182:3 344:22
**prepare** 10:24
11:7,23 12:8
13:12,18 14:6,11
14:15 25:18
112:25 114:18
119:17 179:10
180:12 344:2
345:1 346:23
**prepared** 25:21
33:3,15,20 139:9
178:24 179:18
180:4 189:19
263:5 343:14
**preparing** 179:13
**prescribe** 63:24
143:20 150:18
234:6 238:21
239:17 242:9,10
274:20,21 275:4
282:3 322:21
**prescribed** 58:16
59:8 65:10 73:12
144:8 148:7 233:8
240:6 241:3 249:1
281:3,6,14 284:22
285:2,4 286:21
302:5 335:7

**prescriber** 374:21
375:7
**prescriber's** 242:9
**prescribers** 64:20
99:16 151:19
359:14 376:9
**prescribes** 248:25
**prescribing** 58:22
58:23 60:3 63:5
64:24,25 91:7
92:14,22 98:11,25
99:7,10,17 100:17
101:6 102:3,4,5,11
102:21,25 103:4
103:15,23 107:24
140:20 141:2,25
142:5,12,15,22
143:2,6,8,10,19
144:12,17,21,23
145:4,10,22,25
146:5,10,15,17
147:1,5,17,22,25
148:13,25 149:11
149:15,17,25
151:1,9,13,17,22
152:4 193:6,11
207:13,22 234:4
241:1 259:25
264:14 273:13
281:22 282:13
284:2,12,15,20,24
285:11 295:13,16
296:5 297:20
301:15 303:17
304:5,19 306:6
370:17 374:14
375:5 376:10
**prescript** 22:14
**prescription** 1:4
6:2,6 7:17 19:21
20:22 21:18 22:4

22:18,22,24 24:1
28:9 36:24 37:23
38:2 48:14 53:3
53:14,16,17 58:14
59:8,20 60:17
61:6 62:17 63:3
65:8,9 68:20 73:9
79:6,8,17 84:17
85:8,21 86:5,7,15
86:16,25 87:7,22
87:24 88:9 91:23
92:11 94:19 98:25
101:7 103:4,18
104:13 108:15
115:14,23 116:7
117:25 140:22
142:1 143:20
147:5 149:25
150:6 151:23
152:11,15,16
153:5,15 154:5
155:6,8,9,12,17,24
155:25 156:7,12
157:1,13 168:19
169:4 170:6,24
171:24 172:6,11
175:7,20 179:20
179:23 180:3
185:7 186:15
193:7,12 207:14
229:7 234:6 236:8
238:6 241:7,18
243:10,16 244:1
244:14,19 245:1
245:14,25 246:11
247:1,5,10 249:5
254:18 268:21
270:21 273:11,12
273:16,21,23
274:1,4,10,17,21
274:23 275:6,19

280:24 281:5,13
281:22 284:17,21
286:21 289:24
290:1,24 302:17
303:8 305:1,23
307:13 308:4
320:20 323:15,16
324:14,15 325:15
325:18,23 326:1
334:24 335:4
337:7,9,15,21,25
338:10,22 339:3,6
339:21,23 341:5
341:11,17 349:20
350:6,12,12,21
351:7,15,18
352:12,22 353:2
358:7,16,21 359:2
362:12 363:16
380:24 381:16
382:1 385:6 386:3
387:3
**prescriptions**  59:4
59:13 98:5 148:1
238:15 305:3,12
**prescriptive**  227:8
**presence**  132:23
133:22 354:9
355:13 356:12
**present**  2:15 4:25
8:3 32:21 131:4
254:22 278:8
352:20 355:3,11
356:2,4
**presentable**  276:3
**presentation**
88:17,19 255:4,12
269:13 272:17
274:18 283:9
291:5,19

**presentations**
52:18 83:25 88:7
88:12 125:17
149:9 231:11,14
231:22 237:8
254:16,21 255:2
256:3 258:25
265:5 270:1,25
271:3,4,8 290:17
319:16
**presented**  14:13
15:13 62:10 89:8
117:5,18 146:24
147:11 239:7
255:2 265:3 271:7
271:15 277:4,22
288:17 324:3
**presenting**  255:11
269:15 290:12
**presently**  75:14
109:24 111:3
**pressure**  282:20
**pretty**  146:11
350:16
**prevent**  52:7,9
61:18 64:12
120:16
**prevention**  6:6,13
33:8,12 34:4,17,20
34:22,25 35:2,9,21
35:24 36:6 37:17
38:1,6,15 39:3,5
40:1,9,23 41:1
43:7 44:16 45:25
46:9,24 47:4
48:17 51:8,17,20
51:22 54:7 56:2
56:15 57:25 60:5
65:2,6 69:15 79:2
80:13 84:9,13,15
84:23 85:6,20

86:9,11,12 94:9,24
116:7 138:14
162:19 164:3
168:22 169:3,19
170:2,7 178:20
179:23 181:16
182:5,14,19 183:9
188:12,18 200:10
200:15 217:1,15
217:22 226:7
228:6 258:9
268:21 270:22
279:8,11 297:10
300:14,19 323:25
339:1 340:19
361:20 362:18
363:1
**preventive**  206:24
**previous**  73:4
200:2
**previously**  42:8
174:9 235:21
290:21
**prided**  70:14
**primarily**  32:5
51:23 74:23 76:22
78:5 86:14 88:4
113:6 156:3
194:11 273:25
322:10 337:6
369:21 373:16
**primary**  159:21
181:23 182:8,12
182:13 335:24
336:20 343:2,5
**principal**  113:13
**prints**  130:14
**prior**  26:1,3 29:12
57:24 76:19,21
77:14 85:17 96:14
97:10,15 107:1

134:24 135:11,17
135:23 142:7,15
143:6,12 193:17
199:20 219:24
220:18 222:16
236:2 343:9
347:17 348:21
367:8,9 368:16
372:19 374:25
376:25
**priority**  85:9
167:10
**private**  7:7 296:2
**privileged**  312:18
**privy**  160:17
245:5
**probably**  18:3
186:11 199:25
223:10 231:19
346:24
**problem**  165:22
166:2 167:10
224:11 299:2,11
342:18,20,25
**procedure**  238:19
386:5 387:5
**procedures**  94:15
108:14 377:9
**proceed**  9:23
105:16 107:19
195:10 267:22
268:12 270:16
326:17 357:7
378:4
**proceeding**  383:8
**process**  182:17
310:5 320:14
373:5 375:9
**processes**  108:14
**produced**  25:14
117:6,20 194:6

249:22 340:23
367:12
**product** 354:8
**production** 5:20
5:22 385:15,17,22
**products** 246:13
247:2
**professional** 14:25
22:5,20 24:11,19
29:22 62:19 63:16
64:7 65:11 70:13
142:17 232:18
234:12 238:12,13
238:25 241:5
243:20 244:5,9
256:21 257:21
258:21 259:17,23
262:11 266:6
271:22 281:9
302:2 305:16
319:25
**professionally**
30:4
**professionals**
43:20 74:5 82:13
84:17,22 86:11
129:20 234:13
238:14 246:19
250:3 259:19,22
260:4 261:11,24
262:13 275:25
278:6 315:10,13
355:17 368:18
**professor** 211:2
**professors** 210:16
210:19
**profit** 111:24
**program** 6:13
53:4 58:15 78:13
129:16 201:20
202:8 203:21

204:14 206:23,24
216:11 227:14
258:9 313:5
329:10,20 330:7
333:8 340:19
363:5,7,9
**programming**
51:7,14 74:11
94:10 104:16
112:5 121:14
124:22 125:11
129:6 191:12
202:13 205:12
209:11 227:20
328:8 329:4
370:21 380:17
**programs** 125:15
125:16 126:13,16
126:20 127:6
129:15 136:12
160:14 161:4
168:8 180:19,21
201:14 204:19,23
214:24,25 314:3
327:12,22 329:2,6
363:15
**progress** 107:6
**progressed** 87:13
**prohibit** 91:4
**project** 75:24 76:1
129:17,24 202:7
207:6 212:25
213:7,10 219:23
221:4 228:18
313:4 329:9,12,16
329:19,24 330:8,9
330:15
**promising** 29:19
**promote** 120:17
**promoted** 329:7
333:7,8

**prompted** 373:7
**pronunciation**
206:13
**proper** 91:7 102:2
102:4,5,21 129:8
140:20 141:2,24
142:12,15,22
143:2,7 145:3
146:10,15 147:17
148:14 151:1,9
227:3 282:13
295:15 302:17
**properly** 95:21
96:18 97:4 184:24
**proposed** 149:24
**provide** 53:22,24
54:4 60:5 67:20
82:23 83:14 112:8
120:1,18 129:8
137:9,9 153:23
187:6,11 191:21
197:25 198:6,9
199:18 200:20
201:13 202:1
203:5 206:9 207:5
207:24 209:1,10
211:9 216:2,8,14
223:17 226:10,18
228:4 237:3
255:20 256:1
286:1 376:8
**provided** 37:14
54:6,13 83:16
122:19 125:14
126:12,15 128:3
148:19 152:17
182:25 186:8,19
194:6 198:10
200:17,24 201:18
202:2,15 203:17
203:21 204:18

205:1,7,8,10,22
206:4 209:3 210:9
223:24 224:7
227:16 238:16
261:9 271:5
275:23 276:22
277:12,22 278:7
292:25 308:15
310:19,21 311:17
319:19 324:19,23
330:12 335:20
336:25 338:20
342:23 344:17
350:11 351:16
364:6 373:12
**provider** 21:16
22:2 240:21 266:6
274:20 275:4,11
275:16 371:8
**providers** 22:7,10
43:19 61:22 92:23
98:6 111:19
151:17 240:4
259:20 260:18
279:22 281:20
291:21 300:8,21
300:24 301:2
377:5
**provides** 58:13
110:14 122:17
**providing** 123:14
148:2 204:5
221:23 262:18
291:21 349:2
**prudential** 4:18
**psych** 201:7
**public** 2:7 7:22
32:1 43:13 60:8
88:7 116:8 122:14
122:16 123:7,17
123:19 124:4

125:17 126:9
131:16,22 132:21
133:11,12,20
139:17,25 194:1
194:13 250:5
251:6 255:3
260:19 293:15
299:1,10 313:8
327:11,21 328:12
328:17 329:8
384:4,6 386:10,18
387:15,23 388:23
**published** 117:16
**pull** 211:16 279:17
**pulled** 346:20
**purdue** 1:7,9,12
360:25 361:2
**purpose** 37:10,13
43:1 90:3 137:4,6
162:23 163:18
164:9,22 165:12
166:22 167:5
168:4,15 201:25
206:8 209:6
355:11 367:16
**purposes** 25:11
37:1,13 44:6
55:16 85:7,12
119:12 161:3,21
167:24 170:21
201:1 204:19
218:14 231:13
249:18 268:18
340:17
**pursuant** 2:15
**pursue** 362:23
**pursuit** 181:5
**push** 270:5
**put** 48:16 60:21
69:15 83:8 104:16
143:22 144:17

145:7 187:21
189:20 220:7
223:12 249:8
253:3 255:2
268:19 273:4,5
283:9 284:25
339:2 348:20
371:6,10
**puts** 61:23 266:14
**putting** 77:17
137:1,23 229:2
**puzzle** 255:6

**q**

**qualified** 293:21
294:14
**qualifies** 133:13
**qualify** 134:2
**quality** 174:5,13
374:21 375:6
**quantify** 104:14
**quantities** 61:21
144:7 238:17
291:21
**quantity** 60:17
61:20 63:3 92:12
98:4 148:6 295:13
**quarter** 221:9,12
**quarterly** 183:3
**question** 12:22
13:5,6,9 17:12,17
18:3,8,11 20:10,12
20:19 21:5,8,23
22:9 45:3,7,10,13
45:15 54:10,11
56:3 59:10 71:9
81:21 94:11 108:9
113:23 114:4
122:2 124:2
131:18,21 133:15
142:17 143:14
150:2 157:11,12

157:25 160:4,8,10
163:7 164:7
186:10,12 191:3
217:4,24 231:18
239:13,14 240:10
241:23 244:21
245:9,22 252:4
253:23,25 260:8
260:17 262:5
263:17 276:11
277:24 278:13
280:20 284:18
293:11,13,14
294:2 295:9,21
299:5 303:25
305:8,18 311:3,7
311:19,19,22
313:14 314:7
317:19 324:8,13
327:10 337:23
351:1 352:3
359:18 363:20
376:11 377:12
380:21
**question's** 52:12
**questioning** 356:1
**questions** 10:18
17:2,3 44:23,24
193:3 217:3 235:2
292:18,25 293:1,7
293:22 294:8,15
357:12 358:2
378:11 382:5,13
382:24
**quick** 15:24 45:15
66:13,16 193:3
251:18,19
**quickly** 213:11
**quite** 25:25 54:9
67:7,8 172:22
302:25 355:15

**r**

**r** 4:21 7:1 53:8,8
53:16 159:12
384:1
**race** 189:17
**radio** 126:10,10
243:22
**raise** 65:7,11
68:18
**raised** 363:8
**raising** 82:10
180:18
**ran** 344:16
**randy** 370:2
**ranging** 74:6
**ranked** 346:1
**rapidly** 310:16
351:13
**rates** 98:11 263:3
**ratings** 263:9,13
264:9
**raw** 347:22
**reach** 42:6 118:7
227:18 293:17
295:15 320:16
**reached** 292:24
**reaching** 181:17
211:7
**react** 68:10
**read** 15:10,18
16:17 27:7 44:19
44:23,24 45:8
115:18 118:21
133:17,19 136:17
140:23 150:4,5
152:12 180:7,9
218:2 220:5
229:12,14,16,20
229:20 263:23
286:9 293:3,9,24
327:15 346:17

359:16 372:3
386:5,6,12 387:5,6
387:17
**readily** 233:24
236:4 289:3
**reading** 118:25
171:10 217:25
230:5 250:24
294:5 374:6
385:19
**reads** 115:20
251:5
**reality** 134:19
363:7
**realize** 45:6
**realized** 79:16
184:21
**really** 29:7 55:9
70:18 72:1 78:5
96:16 108:3
186:12 213:6
220:1,7,14 245:9
266:11 314:1
336:2,24 338:7
348:22 352:17
357:14 377:6
**realm** 371:8
**reason** 18:17
135:18 321:22
348:1 351:23
353:1 385:14
387:8 388:3
**reasons** 235:20
236:1 265:4
280:16 348:9
**recall** 23:14 27:23
28:7,13 30:7 39:7
46:10 48:21 49:14
54:14 55:3,9
56:15 57:1 58:5
77:16 78:23 79:11

79:15,23 85:1
86:24 88:16
112:21 117:17
118:25 121:8
134:21 135:13,17
149:16 155:15
168:18,25 170:5
171:8,12 173:11
173:13,15 175:5
175:19 178:1,2,24
187:16 193:8,10
200:23 203:9
210:21 216:20
217:9 223:21
224:2,19 225:3,23
226:2 230:5,6,17
231:25 237:10
246:23 260:2,24
282:18 283:7
284:10 288:22
292:9 298:8
301:12 306:14
319:15,17 324:24
325:1,3,13 326:4,6
327:6 330:23
336:22 337:16,17
342:17 343:1
345:2 347:20
354:20 355:8,10
355:14,25 356:8
358:9,22,23 360:5
361:20 364:14
365:18,25 366:20
368:19 369:16,18
370:7,7,9
**receipt** 34:19
57:24 385:18
**receive** 34:16
161:8 183:12
186:24 324:25
367:6

**received** 24:1 34:3
40:8 87:18 132:6
161:10 162:22
177:14 183:17
185:5 186:13
187:18 188:5
190:10,10,15
217:12 218:8
263:3 323:16
325:25
**receives** 127:4,19
127:23
**receiving** 56:16
78:24 81:7 200:13
240:14,21
**receptors** 320:5
**recess** 105:10
107:15 195:4
267:16 270:12
326:13 357:3
377:25
**recipient** 200:8
215:17 219:11
226:6 228:21
362:20
**recipients** 179:5
198:15 215:12
216:23 217:5,12
226:23 228:6
**recognize** 237:25
372:5,12
**recognized** 237:17
237:19,21 298:25
299:9
**recollection** 14:16
58:10 80:3 82:5
83:6 170:16 287:8
324:17
**recommendations**
6:3 92:17 150:17
179:19

**reconsider** 219:14
**record** 7:4,12,13
8:6 10:10,16,16
17:8,19 25:3 53:5
88:23 91:19,21
98:22 105:5,7,12
105:22 106:15
107:10,13,17
133:19 150:5
195:1,6 218:2
263:23 267:10,13
267:18 268:4,6,10
270:6,10,14,20
326:9,11,15
341:25 356:23
357:1,5 372:3
377:20,23 378:2
382:9,23 383:2
384:7 387:9
**record's** 376:7
**recorded** 7:15
**records** 93:4 97:19
98:3 302:15 303:6
**recovery** 51:13
110:5,14 138:17
205:8 207:24
208:6 210:2
211:21 213:15
215:7 250:4
**red** 63:2 92:14,18
221:10 371:19
**reduce** 5:18 65:15
67:16 139:2
258:12 320:6
**reduced** 46:25
**reducing** 37:22
59:20 104:12
**reduction** 36:22
104:8 140:3
141:13 152:10
155:5,10,11,16

156:6 285:3
362:11,19
**reed**  4:8 9:11
**reedsmith.com**
4:11
**refer**  27:13,14
45:10 131:16,22
137:19 273:20
**reference**  116:13
116:14 120:12
135:3 136:22
155:23 211:15
212:13,17 213:19
229:25 230:2,3,8
233:13 285:22
385:7 386:2 387:2
**referenced**  386:11
387:15
**references**  212:5
**referencing**  177:9
273:11
**referrals**  111:20
**referred**  132:4
137:10
**referring**  39:19
69:8 70:5 94:20
101:24 102:4
113:20 117:8
132:10,11,18
144:9 145:1,3,6
146:5 163:25
164:2,13 170:12
197:7,8,12 199:5
201:10 213:24
214:3 251:17
259:11 273:22
274:15 282:22
286:17 291:20
335:6,12,18
359:11 367:1
371:3,5 374:24

376:12,21
**refers**  116:1
132:17 178:15
199:12 285:9
345:15
**reflected**  373:11
**refresh**  80:2 287:7
**refreshed**  14:16
**refreshes**  170:16
**regard**  45:21
213:3
**regarding**  22:7
187:9 207:22
380:17,23
**regards**  11:20
196:13
**region**  137:10,19
137:21
**regional**  136:24
137:12,17
**registered**  31:14
31:16,21,24 32:12
32:23 33:1,5,25
34:2,7,9,14 39:21
40:4 269:7 333:7
**regular**  244:10
**regularly**  148:8
151:7 180:12
248:6 271:15
**regulating**  307:12
**reimbursement**
234:23 262:24
263:2,10,14
264:10,18
**rejected**  363:25
**related**  6:17 18:25
38:2 94:9 114:13
120:2 124:22
126:1 128:3
129:25 135:4
153:25 169:3

185:11 205:12
215:2 239:7
275:13 283:23
335:17,24 336:20
337:13,25 338:10
338:18,23,24
339:16 341:1,13
343:2,24 345:10
345:16 346:14
347:17,18,24
349:8 350:3,6,8,21
350:23 351:6,7,18
352:12 353:2,22
354:16,19 356:15
358:7,15,20,24
359:2 367:7
370:16,20 380:18
384:10
**relates**  1:6
**relation**  194:13
**relations**  194:2
368:14 369:17
370:10,11 374:1
**relationship**  80:12
158:11,13 202:3
202:10
**relationships**  27:3
27:10 28:11 81:4
111:19 366:15
**relative**  23:7
**relatively**  378:11
**released**  102:20
143:10 146:3
198:12
**relevance**  20:4
**relevancy**  21:13
**relevant**  20:3
73:21
**relief**  285:23
286:15

**relieve**  320:2
**remained**  42:9
121:2,14
**remember**  14:2
36:14 42:21 85:3
99:12 106:5
135:14 138:9,11
139:8 173:8
176:19 192:12
209:19 210:22
237:7 250:13,14
253:18 282:14
290:10,12,16
292:21 299:17
310:6 313:13
316:9,17 325:4
336:1 342:24
355:18,22 356:7,9
356:10,11 360:6
365:9,16 369:11
375:8 381:17
**remembering**
189:13
**remind**  109:6
**remotely**  8:4
**repeat**  12:21 21:22
32:15 33:18 59:10
122:1 133:14
150:2 160:10
163:6 239:14
240:9 241:14
244:20 246:8
276:11 284:16,18
299:4 301:6
302:23 305:8
306:20 309:17
313:15 325:20
352:3 363:20
**repeating**  351:1
**rephrase**  18:5
160:8 262:4

**report** 5:14,16 6:3
31:10,11 113:7,14
113:18 114:2,9,11
114:16,18 115:1
117:10,11,15
119:13,18,22,25
120:4,10 130:5,9
153:10 154:1,8
178:18,25 179:8
179:14,18,21
180:5,7 198:6
229:6,9,12,15,20
229:21 230:10,17
231:14,23 247:22
251:22 252:7
259:13 265:4
332:22,23,25
344:17,19 345:1,9
347:4 354:14
**reported** 1:24
117:24
**reporter** 8:1 9:1,2
9:15 24:24 107:10
133:17 141:21
150:4 264:4
336:11,15 384:4
384:19 386:7
**reporting** 53:15
140:22 183:1,3
**reports** 112:23,25
113:3,6 114:1
118:22 131:3,7
154:15,19 180:13
187:1,17 189:19
191:4,7 192:15,24
197:17,24 342:23
348:23
**represent** 10:18
249:20 357:24
372:21 378:10

**representated**
370:5
**representation**
373:24 374:3
**representative**
259:6 370:6
**representatives**
27:17 355:16
368:14 374:1
**represented** 27:16
77:1 138:14,16,17
350:7 369:8
**representing** 11:9
**represents** 349:7
**request** 355:20
387:9,11
**requested** 120:1
133:19 150:5
218:2 223:18
263:23
**requesting** 196:4
**requests** 163:4,11
363:24
**require** 45:17,18
227:23 315:9
**required** 35:3,24
39:12 63:22 64:19
74:16 147:9
184:19 207:2
228:13,15 385:25
**requirement**
196:1 197:7,14
223:2,19 224:24
225:8,18
**requirements**
40:14 100:23,25
141:8 158:19
184:19 221:14
222:19 226:25
**requiring** 99:5

**reread** 27:9
207:20
**research** 26:19
313:6
**reserve** 50:15 51:4
51:11 205:6 209:4
209:21,24 213:25
214:2
**reserved** 233:22
289:2
**residency** 206:23
206:24
**resident** 205:9
206:20 344:20
**residents** 161:14
**resistance** 67:23
**resource** 207:25
259:14 340:8
**resources** 69:14
69:19 97:14 137:9
138:17 168:10
205:8 208:6
209:11 215:7
312:25 313:12
327:11,21 328:12
328:18
**respect** 74:12
103:18 114:8
142:12 155:7
210:11 215:13
227:6 363:10
380:10,21
**respectfully**
311:18
**respective** 2:16
370:16
**respond** 17:13
219:13
**responded** 67:6
**responding** 121:24
122:5 124:16

125:22 193:22
194:2 201:1
**response** 56:9
68:11 295:8
327:16,17 328:3
**responsibilities**
24:12 32:3 34:3
34:24 35:1,6
38:25 41:10 44:14
47:6 48:4 50:11
65:1 70:21 73:15
75:1 77:25 88:2,3
90:8,18 111:8,15
111:18 180:17
181:12,14 183:2
271:22 307:9
319:10
**responsibility**
38:7,10,14 41:6
43:6 50:1,5 68:5
90:11 123:7
124:15,19 125:5
128:9,17 158:7
159:21 180:24
181:5,23 182:9,12
182:13 303:16
304:4,18 305:4,13
306:17,25 307:17
309:15,20 315:22
316:1,12 318:11
**responsible** 47:19
66:5 82:8 92:1
127:2 137:23
158:24 159:3
180:20 181:1
191:24 262:16
305:22 318:5
322:6 345:21
**rest** 357:12
**restate** 252:3
263:17

[result - running]                                                                          Page 52

result  198:23
  285:19 338:16
results  167:20
retail  32:7 379:8
  380:10
retained  193:20
  194:1 383:6
retrospect  310:12
  311:8,23 312:5
  313:18,22,24
  317:3
return  195:17
  243:7
returned  39:13
  385:18
revenue  127:8,14
  130:2 160:13
  161:1,7,25 218:14
revenues  160:2
review  18:23 48:5
  48:9,13,15,20,25
  49:2,3,18,23,24
  52:24 53:18 55:16
  97:18 113:10
  153:21 185:18
  187:2 221:24
  280:5 345:6,8
  374:21 375:7,9
  380:4 385:12
  386:1 387:1
reviewed  14:10,12
  16:17 48:22 49:8
  358:6,14,18
reviewing  132:1
  346:22
reviews  48:4
  153:24 198:1
  199:19 320:15
  375:24
revised  286:2,5

revision  220:20
  221:8
revisions  207:13
reyes  138:16
rick  31:12
right  19:19 26:22
  26:24 37:5 41:7
  42:16 43:3 44:10
  46:2,13 47:12
  49:6 52:12,16
  53:6,8 54:16
  60:11 67:22 71:24
  76:10 90:19
  101:22 103:18
  108:8 116:4,5,10
  122:13 130:11
  142:19,23 143:24
  144:23,24 157:9
  157:18 162:7
  166:16 169:20,24
  170:2 172:7 173:1
  174:22 176:2
  179:5 188:24
  190:12 191:3
  196:16 208:2
  212:8 215:7
  216:22 217:4
  218:16,23 221:22
  221:25 222:2,7,12
  223:6,13 226:4
  227:8 229:14
  230:14 231:5
  232:4 233:14
  239:10 243:6
  246:7 249:22
  253:11 258:4,6,11
  259:7 261:4
  266:17 268:3
  269:3 271:12,17
  271:25 273:3
  274:17,24 275:13

277:2,4 279:3,9,20
  279:23 280:1,5,10
  283:11 285:13
  286:9,22,25 287:5
  288:7,15 290:4
  291:13 294:17
  295:4 296:6,10
  297:21 300:10,15
  306:8 310:10
  311:3 312:6
  316:21 318:12
  320:11,21,24
  321:1,18,20,24
  322:8,25 331:9,15
  332:11 335:9
  341:1,5 342:12
  345:11,23 346:2
  349:10,14,17,24
  351:20 367:4
  368:25,25 372:22
  372:25 374:17
  375:20
ring  169:8,15
ringing  360:5
rings  171:15
rise  333:25 334:9
  334:16 339:15
risk  6:17 61:23
  266:15 377:8
risks  21:17 22:3
  22:11 240:5 241:2
  245:15 246:1
  248:12
rite  379:11 380:21
  380:22
role  26:5 29:13,24
  39:5,21 41:21
  43:14 65:2,5 66:7
  69:24,25 74:12,21
  78:4,10 87:6,14,15
  89:10 90:9,20

107:1 108:23
  109:15,16 128:14
  137:1 139:15,22
  140:1 142:9
  177:14 215:21
  242:1 243:5 250:2
  262:12 276:1
  278:24 279:1
  296:15 307:11,22
  308:2 318:9 356:3
  369:24 370:15,20
  380:11
room  8:3 147:11
  212:22 343:24
  345:15,22 346:14
  346:19 349:9
  350:3,6,8,21,23
  351:6,18 352:11
  355:4 356:11
rooms  347:25
  348:2
ropes  4:18,22 8:13
  8:13,16
ropesgray.com
  4:20,24
rotation  344:20
roughly  85:3
  86:19 152:2
  337:17
rs  269:4,6
rule  152:22
ruled  49:16 185:3
rules  16:23 358:1
  386:5 387:5
rulings  184:22
  198:7
run  127:1 156:10
  192:23 198:4,5
  329:25 330:2
running  23:9
  161:4

**russo** 1:24 4:25
7:24 8:2 384:3,18
**rx** 4:2 53:16 378:7
378:18
**résumé** 25:15,22
26:9,24 27:2
32:10,16 33:2,14
33:20 35:6 45:5
73:20 88:21

**s**

**s** 5:1 7:1 10:13
53:8 159:12
385:15 387:8,8
388:3
**s.m.** 3:11
**sabet** 356:18
**sacks** 3:2 8:7,7
12:2,7,20,24 13:24
16:1,24 18:8
19:23 20:2,6,13,16
20:24 21:9,13,19
36:8,11,15 44:19
52:8 55:18 56:25
57:17 59:22 60:19
60:23 61:13 62:6
64:1,5 68:2,15
69:21 70:11 71:11
71:16 78:3 79:10
81:12 94:1 100:4
101:9,11 104:25
105:3 107:7
109:20 117:3
118:23 119:6
130:19 132:20
133:5 135:8
146:22 149:3,14
154:6 156:19
163:5,13 165:5
168:6 169:9
171:17 177:1
185:14 186:17

194:21,23 201:4
218:17 223:15
224:15 225:2,19
226:1 238:23
239:23 240:8
241:9,12,21 242:6
242:15 249:9
252:2,19 253:6,15
254:6,12,25
255:14,19,24
256:6 257:14
259:8 261:20
262:3 266:25
267:5,8,11 269:18
274:25 275:9,14
275:21 276:9,20
277:10,16 278:3
278:22 280:11
287:2,17,22 288:1
288:8,20 290:5
291:15,25 293:3
294:9,24 295:6
296:13 299:3,13
299:23 302:18,21
303:2,10,18,20
304:1 306:19
315:15 317:12
318:2,7,14,17
319:6 321:25
322:9,17 323:2,10
339:8 352:1,15
367:18 372:6,9,11
376:5 382:14,18
382:20 385:5
**safe** 182:11 340:6
**safer** 73:13 233:9
**safety** 65:9 96:15
212:24 215:22
313:3
**salary** 37:20

**salimbene** 4:7
9:10,11
**samples** 49:12
**sampling** 49:8
**sandi** 174:15,17,21
174:24 175:9
**sanitarian** 31:14
31:18,19,22,24
32:13,23 33:2,5,25
34:2,7,9,14 39:21
40:4 269:7 333:7
**sat** 280:5
**satisfaction**
234:21 236:14
261:2 262:20,25
263:6,9,13 264:9
264:17 282:1,23
**satisfy** 281:17,20
282:20
**saw** 16:1 194:6
249:2 302:9 337:6
337:10
**saying** 20:17 21:21
57:4,6 67:22
69:13 170:10
190:5 218:21
221:12 224:9
240:3 252:15
259:15 260:12
296:25 334:22
**says** 27:24 32:19
35:12 45:25 46:4
46:15,18 47:22
53:16 84:8 116:6
116:20 117:23
120:16 131:10
136:10 137:17
199:22 213:22
221:19 223:12
231:1 249:24
274:18 282:6

283:13 327:17
347:3 372:22
376:7
**scale** 64:16
**scene** 336:3,24
337:5
**scheduled** 12:11
**scheduling** 11:21
12:9
**scheme** 83:10
**school** 51:25 68:16
68:17 207:3
292:17 300:4
327:7
**schools** 300:2
**scientists** 306:16
306:23
**scope** 64:15 73:16
125:6 128:10
129:7 271:23
276:6,15 317:10
**screen** 154:1
185:16 186:20,22
187:9 189:17
**screening** 187:10
**screens** 153:7
**scroll's** 107:8
**seal** 386:15 387:21
**sec** 335:13
**second** 26:24
31:16 48:3 73:21
107:7 139:11
140:8,14 152:6
173:2 178:16
213:16 219:19
256:12 268:4
282:6 295:23
341:4 346:8
**section** 73:21
114:16 115:7,13
116:12 117:11

[section - shannon]

120:3 139:12
140:9 230:11,18
250:11 251:5
289:10 345:19
**sections** 230:7
**see** 11:14 16:3
27:5 28:3 32:14
32:24 33:9,10
35:10,13 36:22
44:8,11 46:5,17
47:8 48:6 50:8
52:25 58:9 59:3
60:4 73:25 78:19
84:11,19 104:8
109:22 115:13,24
116:18,24 118:1
119:15 120:10,14
120:20 130:12,19
131:13 136:4,9
139:3,18 140:11
143:16 152:10
155:5,11,16 157:8
170:15 171:1
172:5 173:5,6
174:15 175:17,25
176:11,16 178:22
179:3,25 184:11
184:17 195:21
196:2 197:20
198:20 199:2
212:1,6,11,19
213:17 220:3
225:6,11 229:10
230:15,24 232:8
233:11 243:12,23
245:20 247:7
248:6,8 249:20
250:8,11 251:14
256:15 268:23,25
269:10 272:10,14
273:1,18 280:15

283:2,16,21
285:15,20,24
286:3,7 287:4,6
289:8,11,15
293:18 295:19,25
327:13 333:21
334:2,8,11,13,18
334:25 338:3,7
340:24 341:9,15
341:22 342:5
343:18,25 345:17
346:6 347:9 349:7
349:21 362:10,13
366:17 374:13
**seeing** 72:13 96:7
119:20 140:3
141:13 204:2
208:3 244:9
265:21 351:5
362:18
**seek** 61:6,20
324:20 364:18
**seeking** 60:15
96:23 111:20
301:18,22 328:7
328:24 369:9
**seen** 15:16 16:8,15
18:21 63:18,18,20
73:1 115:4 143:18
144:1,22 145:19
207:18 229:15
231:7 247:19
290:9 337:4
351:25 352:6,8,20
358:19 359:1
**selected** 49:23
228:21
**selecting** 50:2
**self** 66:17 251:24
252:12 253:2
266:9,13

**semiregular** 49:14
**send** 184:13 188:8
188:16 191:16
222:11 225:10
**sensations** 320:2,6
**sense** 93:10 94:8
230:4 260:15
304:6 364:2
**sensitive** 7:7
**sent** 44:13 179:4
187:25 188:20,24
188:25 189:7
190:19,23 197:17
197:24
**sentence** 116:17
152:6 197:15
250:11 251:4,8
295:9
**separate** 11:9
80:15,17 123:22
124:4
**september** 109:9
333:19,23 334:14
334:21 336:18
343:16 345:11
350:2,5
**series** 292:25
**serious** 299:1,10
**seriously** 70:21
71:3
**served** 93:22
158:15 330:3
332:19 343:6
**serves** 30:9 208:8
210:10 211:11
224:1 273:10
331:21 333:5
365:4
**service** 31:8 32:6
78:11,13 116:8
168:22 192:2

216:6
**services** 4:2 30:11
110:14 120:18
122:17,19 123:14
169:2 204:1,6,7,13
214:5 332:8 378:7
378:18 380:18
**serving** 215:21
**session** 12:24
**set** 43:23 66:4,20
67:2,18 68:12
86:17 92:13
102:20 146:20
147:6 151:16
152:19 166:4
219:9 220:17
253:2 254:18
296:5 314:12
324:20 338:25
339:11 384:14
**setting** 12:13 13:9
83:12 125:4
160:21 227:21
229:18,18 234:18
236:5 274:12
289:2,4 295:11
**settings** 102:23
150:20 233:22
362:16
**severity** 70:2
72:22
**shaker** 122:21,25
123:3,5,8
**shaking** 299:18
**shannon** 184:9
195:24 196:5,18
198:16 218:21
219:13 220:14
223:5 224:21
225:6

**share** 23:6 38:10
38:13 55:1,6
87:11 90:12,21
92:5 93:13,18
108:5 192:8
305:13 318:11
366:15 367:20
374:21 375:6
**shared** 92:2 94:4
96:8 141:9 148:16
167:8 192:25
235:20 236:1
238:15 240:23
256:22 257:7
259:18 261:23
288:3 304:23
306:4 312:17
316:2 366:11
375:19
**shares** 309:15,20
315:22,25 316:12
**sharing** 90:25
262:7 367:14,22
375:22,23
**shayna** 3:2 8:7
11:6,11 382:12
385:5
**she'll** 18:9
**sheet** 175:3 187:2
187:4 385:13
387:7,10,18 388:1
**sheets** 116:9
221:24
**shift** 337:4,10
339:18
**shifted** 78:25
339:4
**shkolnik** 2:6 3:3
7:22 8:8
**shopping** 59:1
60:9,13,14,18,22

**short** 105:10,19
107:15 195:4
267:16 270:12
326:13 357:3
377:25
**shortened** 28:24
**shorthand** 28:20
384:3,19
**show** 115:21
170:14 211:17
339:24 371:21
**showed** 78:20
135:2 270:20
287:20
**showing** 353:11
**shown** 385:16
**shows** 247:20
265:24
**sic** 147:12 151:12
238:18 284:3
370:6
**side** 210:23 369:17
**sides** 24:8
**sign** 233:3 237:15
237:18,22 238:1,5
242:22 282:17
286:20 298:13,17
298:22 300:3
316:19
**signature** 384:17
385:14
**signed** 158:18
386:13 387:18
**significant** 96:13
133:7 135:3
139:15,21 202:8
211:5 232:14
235:18 250:2
336:3,12,24
342:18,20,25

**61**:9,17 301:22
343:8 356:17
**significantly**
333:25 334:9,16
**signing** 385:19
**signs** 301:17
**similar** 175:23
231:16 269:13,25
270:25 271:7
375:16
**similarities** 252:21
**simple** 277:24
278:14
**simpler** 253:24
**simply** 186:8
**sincerely** 385:21
**single** 130:16
**singular** 134:9
155:3 177:13
**sir** 385:10
**sit** 55:13 56:3,20
151:2 244:11
245:22 261:16
317:7 329:6
**site** 130:25 131:3,5
150:21
**sites** 207:7 330:5
**sitting** 128:1
160:25 170:4
229:17 230:5
311:7,23 314:25
316:23 317:20
**sittings** 229:19
**situations** 233:23
**skills** 301:25
**skim** 15:21
**skip** 116:16
117:22
**slide** 52:21 83:8,11
83:25 149:8
231:15 237:3
255:10 268:18,20

**269**:1,9,12 270:20
272:4,16 280:15
282:25 283:19
285:8,13,18
286:11,12 287:20
288:17 289:8
340:16
**slides** 231:24
265:25 283:18
290:4,7,9
**slightly** 42:17
56:19 201:6
**slow** 68:10 69:18
**small** 29:25 67:13
76:21 200:21
201:5 205:23
216:9,16 219:20
356:3
**smaller** 51:6,6
76:24 209:22
210:23
**smith** 4:8 9:11
**society** 66:13
**sole** 85:11 134:8
344:3
**solid** 81:4
**solution** 7:25
251:19
**solutions** 3:16 8:2
383:7 385:1 388:1
**somebody** 31:2
58:6 64:11 109:14
180:23 199:8
213:19 239:3,6
240:19 261:12
270:5 297:7,15
322:13 331:11
**somebody's** 17:21
**soon** 17:23 224:6
**sooner** 33:20
312:13

| | | | |
|---|---|---|---|
| **soricelli**  4:21 8:15 | 325:17 330:14 | 42:21 46:10 48:21 | **specifics**  42:23 |
| 8:15 | 364:19 375:4 | 54:14 55:9 56:16 | 125:11 129:6 |
| **sorry**  12:21 19:25 | **sours**  218:13 | 57:2 59:18 70:6 | 309:2 355:25 |
| 22:16,17 23:11 | **space**  133:12,21 | 77:19 78:23 79:12 | 356:7 366:20 |
| 33:19 36:11 38:22 | 157:7 275:25 | 79:23 84:6 85:1 | **spell**  10:9 159:10 |
| 54:9 77:10 107:7 | 327:18 | 90:2 94:20 97:13 | **spelled**  10:12 |
| 108:19 109:2 | **spaeder**  4:3 8:19 | 97:22 101:13 | **spend**  126:22 |
| 110:11 121:7 | **span**  136:24 | 102:9 106:25 | 220:2,15,23 |
| 122:1 133:14 | **speak**  17:9 132:22 | 108:10 117:17 | 357:10 |
| 141:16 144:14 | 243:19 276:8 | 119:19 126:17 | **spent**  64:11 69:14 |
| 154:14 162:15 | **speakers**  88:5 | 129:13 131:25 | 126:19 191:12 |
| 190:1 199:23 | **speaking**  244:8 | 132:18 134:21 | 211:6 216:10 |
| 201:16 217:14,23 | 258:25 | 135:14,18 136:6 | 219:23 221:2,4,18 |
| 218:5 222:24 | **spearheaded** | 137:16 141:4 | 223:24 344:20 |
| 224:25 231:17 | 48:10 | 149:17 152:5 | **spike**  352:23 |
| 234:19 235:22 | **spec**  4:17 8:14,17 | 153:14 154:13 | **spoke**  178:20 |
| 241:13 244:20 | 357:18 361:7 | 156:8 157:16 | **spoken**  15:4 |
| 250:18 264:1,2 | **specialist**  110:8,21 | 163:17 164:9,14 | **sponsored**  168:20 |
| 268:4 273:5 | **specialize**  112:2 | 164:22 165:11 | 169:1 170:7 |
| 276:10 284:16 | 112:11 | 166:21 167:5 | **sponsors**  172:13 |
| 301:6 302:22 | **specific**  37:3 49:23 | 168:3,15 169:6 | **spotless**  313:22,25 |
| 303:2 309:17 | 55:20 58:24 79:22 | 170:12 173:15 | **spots**  126:10 |
| 336:6,11 341:3 | 81:14,19 95:19 | 175:8 176:21 | **spotted**  95:11,11 |
| 344:6 350:3 351:2 | 98:6,7 100:17 | 177:4,4 178:1,16 | **spread**  142:10 |
| 358:10,17 363:19 | 102:22 147:17 | 179:7 180:22 | **spreadsheet**  186:6 |
| 369:25 372:20 | 150:20,21,21 | 187:16 194:4 | 187:21,25 188:6,9 |
| **sort**  51:14 66:14 | 155:23 162:16,22 | 203:9,23 207:21 | 188:16,23,24,25 |
| 377:11 | 173:12 189:16 | 216:8 223:23 | 189:3,12,21 |
| **sound**  17:25 94:23 | 199:11 210:21 | 231:25 232:11 | 190:17,19 191:8 |
| 212:8 342:12 | 212:17 216:25 | 240:18 246:23 | 191:13 197:12 |
| 356:21 358:3 | 221:23 234:15 | 250:24 251:3 | **spreadsheets** |
| 367:4 372:25 | 236:16 242:11 | 258:10 260:25 | 188:19 |
| **sounds**  18:1 | 244:6 260:2,24 | 273:11,22 285:22 | **square**  2:7 4:9 |
| **source**  126:14,18 | 294:7 301:8 | 288:22 290:11 | 7:23 |
| 130:1 162:6,12,17 | 302:15,16 303:6,7 | 292:23 298:8 | **ssacks**  3:5 |
| 231:15,23 347:2 | 309:9 325:12 | 301:12,24 314:7 | **st**  89:24 95:4 |
| **sources**  127:7,14 | 335:19 337:16 | 316:15 328:25 | 106:13 107:2 |
| 128:2 132:13 | 338:4 352:3 | 330:22 358:24 | **stack**  326:25 |
| 160:2,13 161:1,24 | 355:18 361:12 | 364:8 365:25 | **staff**  38:18 91:9 |
| 275:24 288:5,12 | **specifically**  23:21 | 369:11 | 94:16 97:3 151:7 |
| 288:14 323:6 | 25:24 30:7 38:2 | | 181:1 209:13 |

377:6
**stage**  233:23
**stakeholders**
    48:12 137:7 140:1
    355:9 365:6
**stand**  269:6 272:2
    296:12,17 297:23
**standard**  75:3
    93:25 95:16
**standardize**  93:7
    93:10
**standardized**
    95:23 101:2
    102:10 106:20
    377:3
**standards**  106:14
    301:4
**standing**  75:3,4
**stands**  53:10
    329:22
**start**  17:23 30:20
    77:12 123:6 132:2
    134:16 176:25
    184:5,6 303:1
    337:22,22 341:6
    370:1
**started**  26:10
    67:11 78:1 97:10
    97:13,15 109:7,9
    132:11 159:18
    195:19 225:21
    315:19 318:25
    333:6 338:5,6,7,19
    338:23 339:7
    350:13 366:19
**starting**  295:9
**starts**  341:2,13
**state**  8:4 10:9
    31:25 32:2 58:17
    62:19 69:10 92:4
    103:16 118:12

127:23 137:20
143:11 145:5,8
149:22 151:15,21
152:2 162:10
164:12 176:1
194:3,17 209:7
215:24 227:15,17
236:25 246:20
250:24 315:21
316:1,11,24
329:19,22 335:18
376:9 386:10
387:15
**stated**  19:8 290:21
**statement**  32:15
    33:18 120:13
    126:23 246:17
    252:24 253:14
    254:1 255:12
    296:18 386:13,14
    387:19,19
**statements**  244:18
    244:25 245:13,24
    256:2
**states**  1:1 7:18
    27:2 32:22 35:7
    152:8 179:18
    307:6,9,16,24
    308:5 320:8
**statewide**  84:16,21
    87:10,20 173:14
    330:6,8 364:7
**statistic**  117:4,19
    324:3,18
**statistical**  63:10
    192:23
**statistics**  115:21
    325:7
**status**  39:6,10,13
    46:14 189:18,18

**stay**  36:18 42:19
**steer**  48:17 188:18
**steering**  56:1
**stemmed**  218:7
**stems**  167:7
**stenographic**  25:3
**step**  70:18
**stepped**  26:4 39:4
    74:21
**stigma**  65:15,16
    66:19 67:16 69:23
**stigmatizes**  66:4
    67:3 68:14
**stood**  94:22,25
**stop**  6:7 34:8
    61:10 116:7
    179:24 268:21
    270:22
**stopski**  344:24
**stored**  187:19
**strategic**  90:14
    372:16 373:6
**strategies**  37:21
    42:7 50:18
**stream**  368:23
**streamline**  90:11
**street**  3:18,23 4:4
    4:9,14,19 291:7
    339:22
**streets**  319:4
**strength**  95:9
    107:22
**strengths**  47:18
    94:7 95:4 108:13
**strickland**  229:8
**strickland's**
    179:20
**strike**  118:20
    375:14 377:11
**stringent**  377:10

**strips**  204:11
    354:2,4,6
**structure**  51:7
**student**  209:13
    213:23 214:1
    292:17 327:8
**students**  51:23,25
    52:2,5,14,15,19
    207:16 209:23
**studying**  163:18
    164:10,23 165:12
    166:22 167:5,24
**subcommittee**
    84:19 86:8,13
    368:17
**subgrantees**
    214:15 221:13
**subgroup**  85:20
    170:1
**subject**  71:2 170:5
    171:23 175:7,20
    256:3 264:24
    269:15 271:15
    277:2 290:8,14
    292:8 333:24
    334:8,11
**submission**  202:20
**submissions**  204:1
    204:3
**submit**  183:4
    228:14
**submitted**  55:12
    212:11 214:11
    364:17,22 365:2
**subscribed**  386:10
    387:14 388:21
**subsequent**  182:23
    182:24 352:14
**subsequently**
    224:7 337:10
    338:8

**substance**  11:23
19:13 23:20 24:6
24:8,13,17 50:25
52:6 65:23,25
66:21,25 112:12
112:13,14,17
187:11 233:10
266:12 289:22
**substances**  52:16
58:16 73:13 153:8
154:2 186:21
187:12 307:13
322:22 353:8
**substantial**  70:15
**substantially**
269:12,25 270:24
319:19
**subsumed**  123:8
**success**  70:15
**successful**  81:6
**sudden**  221:12
**sued**  380:11
**suffering**  65:23,25
66:2,21
**sufficient**  69:19
134:2
**sufficiently**  70:9
**suggested**  207:12
246:5
**suggesting**  231:3
**suggestion**  28:1
**suicides**  116:23
**suite**  2:8 3:8 4:4,9
7:23 385:2
**sum**  211:6
**summaries**  189:14
**summarized**  26:23
**summary**  18:24
138:25 178:18,25
179:8 187:2 198:1
334:14

**summit**  1:7 6:16
**superior**  385:1
**superprescribers**
98:9
**supersede**  92:18
**supervisor**  41:16
174:3,5,12 332:7
332:20 333:9
**supervisors**  29:16
**supervisory**  39:14
**supplement**
153:11
**supplemental**
87:18 227:12,16
364:5
**supply**  272:23
273:6,8 274:6
**support**  37:20
38:18 63:19
104:15 135:19
144:2 161:16
327:12,22
**supported**  134:19
181:19
**supportive**  51:12
**supports**  63:11
**sure**  10:11 13:6
16:24 17:7 21:24
23:6 31:15 56:10
59:11 65:19 71:23
72:18 107:11
113:5 122:3 124:1
125:18 129:1,2
131:19 132:2
134:15 157:23
163:9 174:19
184:7 189:23
204:16 205:3
206:14,18 218:12
235:24 239:15
241:16 247:14

248:16 256:23
267:6 276:13
291:4,10 299:7
301:7 302:24
305:9 306:22
309:18 313:17
324:10 325:21
329:18 334:5
335:14 352:5
357:16 358:12
359:10 363:21
**surpass**  337:13
**surpassing**  116:23
**surprise**  149:13
**surprised**  135:21
**surprising**  135:7
135:10
**surveillance**  192:2
192:19 344:16
347:5,14
**survey**  97:13
263:9,13 264:9,17
**surveys**  234:22
236:14 261:2
262:20,25 263:5,6
282:1,23
**sustaining**  363:9
**swear**  9:1,16
**sworn**  9:19 384:5
386:10,13 387:14
387:18 388:21
**symposia**  176:2
**symposium**  5:19
168:18 170:23
171:9,13 172:10
172:13 173:8,12
**symposiums**
168:24 169:11
172:1 173:14
**symptoms**  301:17

**syndromic**  192:19
347:13
**synthetic**  320:4
**syringe**  204:9,12
313:5,7 354:7
363:4
**system**  53:15
54:24 56:22 58:2
58:12,21 59:2,12
59:16 62:1,4 63:8
63:12,22 64:20
92:3,10,21 93:14
93:15 99:14
100:22 108:6,10
140:22 141:3
148:8 153:9 154:3
192:19 202:16
302:2 304:22
348:5,11,19,20,23
367:24 371:6,19
374:15 375:8,21
376:19
**systems**  37:20
42:6 50:17 68:17
68:17 89:17 90:22
92:5,23 94:23,24
95:6 96:1,11
97:24,24 98:22
99:20 102:1 106:1
106:8,15,24 107:3
107:22 142:4
148:10 211:20
212:15 263:4
346:18 362:13,16
366:3,12 367:2
369:8 371:9,10
375:23 377:4
**systemwide**  91:7
95:15 147:13
216:11 366:23
376:18

| t | | | |
|---|---|---|---|
| **t**  5:1,1 384:1,1 | 131:24 143:15 | **tasks**  141:10 | **tenure**  122:21 |
| **table**  140:4 356:5 | 145:21,24 146:4 | **taught**  300:2 | **term**  37:4 132:5 |
| 365:6 | 147:21 149:10,17 | **tax**  161:18,23 | 132:17 151:6 |
| **take**  7:12 49:1,13 | 164:11 217:1 | **taxpayer**  161:7,12 | 210:1 238:9 371:2 |
| 55:20 61:21 71:2 | 240:17 271:10 | 161:15 162:2 | **terms**  11:23 29:17 |
| 73:6 76:23 78:16 | 283:25 284:4 | **team**  29:25 30:8 | 50:21 51:8 70:21 |
| 105:1 119:4 130:4 | 291:20 310:22,23 | 315:9,12 368:15 | 77:13 83:17 91:12 |
| 136:16 173:7 | 310:25 322:4 | 369:3,6,13 370:4,5 | 91:21 93:3,21 |
| 177:18,20 193:1 | 339:19 356:12 | 370:14 374:7 | 94:8,16,18,20,23 |
| 196:6 265:16 | 375:9 | **tease**  143:17 | 95:2,16,20 97:6 |
| 278:5 293:8,23 | **talks**  137:11 | **technical**  289:19 | 108:13 110:20 |
| 315:1 326:7 359:5 | **tar**  318:20,22,24 | 291:18 | 118:4 131:25 |
| 362:14 373:13 | 319:3 | **technically**  46:21 | 145:12 148:6,6,7,9 |
| **taken**  7:15 33:7 | **targeted**  60:5 | **techniques**  301:25 | 150:19 156:12 |
| 105:10 107:15 | 98:12 99:6,11 | 301:25 | 168:9 181:12,15 |
| 195:4 267:16 | **task**  6:2,3 73:23 | **teen**  288:24 | 183:1,3 189:14 |
| 270:12 326:13 | 74:3,4,13,15,17,20 | **teleconference** | 192:13 214:21 |
| 347:4 357:3 | 75:2,6,8,10,12,15 | 3:17 4:8,13 | 216:25 235:14 |
| 377:25 | 75:17,20 76:8,13 | **telephone**  12:13 | 301:11 340:3 |
| **talk**  11:17,22 26:7 | 77:1,9,15 80:6,7 | 12:25 13:10 | 342:12 352:9 |
| 65:16 66:23,24 | 80:15,19 81:5 | 224:20 | 363:9 369:9 |
| 72:11 87:11 90:24 | 82:7,22 113:25 | **tell**  9:19 11:2 | **terry**  334:22 |
| 91:16 96:3 129:3 | 124:24 134:23 | 18:13 23:5 24:22 | **test**  204:11 354:2,4 |
| 145:18 151:12 | 135:1,6,12,15 | 25:23 65:17 87:15 | 354:6,8 |
| 161:12 194:9 | 137:15 138:6 | 90:23 115:10 | **testified**  9:21 |
| 234:25 273:3 | 139:15 140:6,14 | 160:12 167:3 | 189:9 261:14 |
| 282:5 284:11 | 140:25 141:9,24 | 208:4 215:18 | 358:5,13 363:12 |
| 287:20 314:20 | 142:14,21 146:24 | 259:22 269:24 | 368:3 380:2 |
| 316:5 324:21 | 148:17 152:9 | 270:24 274:14 | **testify**  18:18 |
| 357:15 | 167:9 180:4 229:7 | 293:20 294:13 | **testifying**  365:18 |
| **talked**  11:20 14:24 | 230:18 231:14,23 | 340:25 347:23 | **testimony**  151:2 |
| 87:10 151:10 | 239:6 242:2 243:9 | **telling**  220:22 | 279:16 310:7 |
| 169:22 193:5 | 246:20 249:25 | 225:9 | 358:9 366:25 |
| 271:14 279:25 | 251:23 257:17 | **tells**  59:7 222:1 | 383:3 384:8 386:6 |
| 288:23 290:3 | 258:2 259:12 | 223:5 | 386:7 387:6,9,12 |
| 300:6,12 301:13 | 276:23 279:3 | **ten**  156:13 | **teva**  361:10 |
| 314:16 366:21 | 292:5,8 311:2 | **tendency**  17:22 | **text**  232:12 |
| 370:24 376:17 | 319:12 323:23 | **tennessee**  111:2 | **thank**  9:25 10:6,14 |
| **talking**  17:23 | 331:22,25 381:12 | 112:5 | 16:3 23:12 105:17 |
| 83:13 113:17 | 381:18 | **tenth**  4:14 | 105:20 114:5 |
| | | | 136:19 171:5 |

174:20 195:11,14
206:12,13,17
219:18 265:23
267:23 268:2,13
270:17 326:18,21
331:4 357:8,16
372:11 377:14,19
378:5 382:7,8,25
**theft** 291:8
**thing** 46:15 47:10
70:13 213:13
265:20 273:7
285:17 315:19
346:4 363:3 376:2
**things** 14:17 78:8
87:12 154:9 184:5
187:7 280:7,18,19
310:13 311:10,25
312:4 316:25
317:4,9
**think** 12:23 17:21
20:2 27:7 41:25
45:5 60:2,10
62:20 63:1,4,7
65:3,5,19 66:7,8
66:16 67:21 68:9
68:16,23,24 69:11
69:22,23,24 70:25
71:7,24 72:20
73:7 81:3,5 94:12
108:1,18 121:15
135:9 140:16
142:25 143:15,18
144:10,14 145:16
146:9 156:1 165:5
169:18 172:2
180:25 184:24
205:3 215:13
217:23 218:10
219:14 225:13,25
229:13 231:17

233:5 246:24
248:5,20 255:23
256:1 263:12
265:3,4,18 274:5,9
274:14 281:24
282:22 287:12
297:2 305:22
310:16,17,19
311:13,14 312:4
312:16,17 313:19
313:24 316:1
317:3,13 331:17
340:6 346:11
350:1,4 351:12
353:1 358:10,13
363:19 366:25
367:21 370:8
373:23 374:16
378:23 380:2
382:15
**thinking** 246:21
**third** 50:5 176:6
179:17 221:9
250:11 251:4
282:19 327:10
**thirds** 136:6
**thirty** 385:18
**thoroughly** 18:18
250:25 346:18
**thought** 55:4
147:19 149:10
238:3 246:4,9
255:13 296:4,8
**threat** 336:3,13,24
356:17
**threats** 352:21
**three** 4:9 208:12
344:25 364:4
**threw** 163:22
164:17

**thrown** 246:9
**tie** 236:13 263:8
**tied** 234:22,23
262:24 264:9,18
**tim** 30:23
**time** 15:15 17:9
25:25 26:5 27:17
29:14,16,22 30:12
30:25 32:5 33:2
39:6,8,8,9,9,11,13
39:13,16,20,22
40:2,7,18 41:16
42:15 45:6,7
46:12,14,16,21
47:18,24 49:16,17
49:19,21 50:16
53:19 56:17,18
62:5 67:8 69:8
76:23 78:14,22,24
79:8,13 85:16
87:2,13,17 88:13
88:16 103:17
104:1,17 105:9,15
105:23 107:4,6,14
107:18 109:18
117:2,5,20 118:8
118:14 120:23
121:2,4 122:22
126:2,22 132:9,25
133:23 145:11,15
147:20 148:5,24
152:2 156:10
160:7,11 161:3
162:25 170:9
171:22,25 174:5
176:23 177:8,10
177:12,25 180:9
183:11,14 184:22
194:19 195:3,9
198:3 200:11
210:6 211:6

216:10,19,19
220:21 221:4
222:16 229:21,21
229:23 266:25
267:15,21 268:7
268:11 269:14
270:11,15 271:4
284:11 295:1
304:24 310:20
312:9 316:2 317:6
323:5 326:12,16
328:4,21 331:8
332:24 333:14
335:20 336:1,18
336:22 337:2,5
338:6,18 343:21
344:7,21 350:11
351:14 355:2,10
355:15 356:16
357:2,6,9,10,15
359:19 364:16
365:17 366:18
368:8,22 377:17
377:24 378:3
380:14 382:25
**timely** 197:13
222:20 312:21
313:11
**times** 73:4 74:25
187:15 238:17
239:10 368:22
**tiny** 372:22
**title** 31:13 115:13
172:5 268:20
343:23
**titles** 333:13,16
355:19
**today** 10:18,21,24
11:19,24 14:6,22
15:2 18:4,14,18
25:9 55:13 56:4

56:20 63:16 122:9
128:2 135:2 151:2
160:25 170:4
175:13 178:8
182:6 229:5
244:11 245:23
261:17 262:2
265:2 266:18
286:17 296:12
297:23 309:23
311:8,14,23 316:5
316:23 329:7,13
331:9 357:9
361:21 366:22
379:19
**today's** 383:3
**told** 224:11 260:12
260:14,20 296:2
**tom** 11:16,17
12:12
**tomorrow** 311:13
334:23
**ton** 348:22
**tool** 347:5,14
**tools** 96:17
**top** 117:24 118:12
120:10 131:11
341:18 348:14,16
372:22 374:14,17
**topic** 172:2 260:3
260:6 301:16
**topics** 84:23 86:13
239:7
**total** 36:22 118:4
202:22 205:25
346:11,13 349:8
349:23,23 350:7
383:5
**touched** 205:3
**tower** 4:18

**tox** 197:17
**toxicology** 153:7
153:16 154:1,8,15
154:19,23,24
185:16 186:20,22
186:25 187:9,10
187:13 189:17
197:23
**track** 71:24
**trained** 300:9
**training** 207:3
**transcribed** 386:7
**transcript** 6:24
385:11,12 386:5
386:12 387:5,11
387:17
**transcription**
115:8
**transcripts** 16:18
**transpired** 189:7
**treat** 66:25 68:5
236:12 263:2
264:15 266:13
295:13
**treated** 65:20
**treating** 67:24
300:2 371:8
**treatment** 43:19
69:15 110:4 112:2
112:6,11 237:21
237:25 238:5
242:21 250:3
282:16 286:6,19
289:4 298:12,16
298:21 300:9,21
301:4,9,11 316:18
327:18 328:5,7,24
328:24 365:13
**trend** 115:22
116:4 338:5,6,7,10
342:4 350:13,14

350:20 351:5,8,11
**trending** 338:1
**trends** 48:16 58:23
60:3 64:24 92:22
97:18,23,25 98:1,8
156:11 188:17
189:11 190:3,24
190:25,25 191:5
191:20 192:12
342:12 350:24
351:20 352:8
367:22
**trial** 27:15,21
314:4
**trials** 27:14
**tried** 294:22 295:3
**trip** 92:14 354:15
**true** 38:3,4 76:10
222:25 261:22
331:18 351:24
359:5 376:2 384:7
**trumbull** 226:14
**truth** 9:20,20,21
18:13
**truthfully** 18:18
**try** 17:9,15 18:5
52:9 56:18 58:9
61:17 67:15 81:18
244:23 263:24,25
271:23 276:5,14
277:6,18 278:1,19
279:19 301:21
355:12
**trying** 50:24 51:1
52:7,14 64:12,15
72:1,5,17 155:18
156:1 184:24
189:24 190:2
195:25 197:6
234:8 281:17,20
297:11 309:25

345:20 347:20
348:16
**tucker** 3:7 8:21
**tuckerellis.com**
3:10
**turn** 7:9 73:19
120:9 130:7 140:8
174:14 179:2
212:14 230:9
272:4 334:12
374:12 377:13
**turning** 234:15
**tv** 243:22 249:2
**tweaked** 121:19
**twice** 177:19
**two** 50:7 51:2
80:15 91:14,16
93:19 94:14,24
111:1,21 116:17
136:6 143:16
145:16 176:14
182:10 183:7
205:4 206:7,22
210:14 211:12,15
216:21 249:10
267:2 283:18
301:19 331:9
349:17 355:10
364:3
**twofold** 110:7
**tying** 263:12
**type** 92:6 100:21
112:2,12 153:14
154:5 155:2
240:20 248:25
322:5 359:12
**types** 141:12
190:25 270:25
273:21
**typical** 119:23

**typically** 29:1
113:12 119:3
132:22 180:15
198:4 225:22
233:21 345:6

**u**

**uh** 13:4 17:4 32:18
37:15 39:17 43:9
45:12,24 64:13
68:13 69:6 71:25
72:8,16 76:17
81:20,24 82:3
93:23 94:17 95:14
102:17 106:2
109:4 114:7
128:21 130:6
144:20 155:19
157:3 166:13
169:25 172:17
190:8 191:2
197:19 203:15,19
215:3,6 220:4
223:14 228:8
233:15 235:10
239:5,8,20 245:11
259:1,5 260:9
264:4 276:17
278:15 283:12
295:17 296:23
303:19 304:14,17
310:3 311:6,21
312:11 325:24
327:25 329:15
347:6 352:10
363:14
**ultimately** 87:23
88:9 193:16
362:10 363:25
366:1
**ultrasound** 26:21

**unavailable** 74:22
**unaware** 379:11
379:13,14,16,17
380:9 381:21
**undergraduate**
52:2
**underlying** 266:2
**underneath** 32:22
**understand** 18:2
18:10,15 19:17
21:20 28:21 38:5
56:9,10 64:15
67:22 71:11,12,13
72:1 73:15 74:24
90:1 98:20 99:2
125:2 150:15
151:13 155:20
157:23 164:6
169:13 190:2
199:17 200:5
208:23 217:16,24
218:20 231:18
234:9 235:24
239:2 240:20
248:16 271:23
276:6,15 277:18
278:1,14,20
279:19 281:10
284:13 297:11
310:10 317:10
348:16 349:6
363:20
**understanding**
58:19 62:11 64:18
72:22 73:8 75:16
76:4,11 84:1
91:24 99:15,22
100:7,20 103:6
121:17,22,23
122:4,6 123:24
124:1,6,16 125:6

127:13 128:8,9,17
137:18 144:15
147:3,20 148:3
150:9,11 151:20
153:12,18,20
158:14 161:20
162:1 189:10,23
193:24 194:14
197:3 199:10
210:17 221:1
222:3 223:22
232:19 233:16,19
234:2 235:4,12
236:10 237:20,23
243:2,5 248:11
262:19,23 264:13
266:7 280:23
281:1,11,15 282:8
284:24 289:21
290:18,20 291:12
297:18,19 299:19
305:24 306:2
308:1,11,13 319:3
319:24 320:1
322:1 335:2,5
339:13,14 341:19
342:13 350:10,19
351:4,10 354:5
355:13 358:17
370:15 371:11,15
371:16 374:23
376:1 378:21
379:4,23
**understandings**
280:8
**understood** 17:18
31:15 45:19
166:11 260:15,16
**undertake** 191:19
**undertaken**
100:15 125:25

136:13
**undertook** 178:3
**undertreatment**
298:24 299:8
**underway** 87:11
90:22 135:10
**undetermined**
6:17
**unexpected** 132:7
132:24
**unfair** 317:21
**unfortunately**
171:18 176:20
272:7 340:22
372:2
**unified** 91:9 377:7
**uniform** 102:10
376:23
**unintentional**
48:13 78:20
115:14 116:21
**unison** 90:15
**unit** 7:14 105:8,13
195:2,7 267:14,19
354:7
**united** 1:1 7:18
307:6,9,16,24
308:4 320:8
**units** 383:5
**universe** 166:17
**universities** 50:7
50:12,21 51:2
208:19,25 209:12
209:16
**university** 50:15
50:16 51:5,6,11,16
89:23 106:13
107:3,23 108:10
205:5,6 206:21
209:4,5,21,24
210:14,18 211:3,4

[university - wallace]

211:5,10,24 212:3
213:25 214:2
215:2 369:22
370:6,11
**unknown**  61:22
**unofficial**  77:12
**unscrupulous**
291:21
**unsure**  103:12
**unused**  115:15
**update**  107:3
182:25
**updated**  121:15
193:11
**updating**  193:6
**upper**  130:10
**ups**  106:10
**uptick**  79:16
**upward**  30:1
342:4
**upwards**  338:7
350:14
**usage**  142:11
**use**  23:20 28:20
29:1,2 52:21
55:21,24 59:12
63:12 73:13 82:24
83:5,16,21,23
91:23 94:18
112:12 140:21
141:3,25 142:6
148:23 193:6,11
216:5 238:9 247:5
247:9 273:12,17
273:21,23 274:3
274:17 275:19
280:25 289:4
308:4 318:25
320:9 322:13
325:16 339:7,20
367:2 371:1

**user**  354:8
**uses**  322:2
**utilization**  58:18
59:19 60:7 62:3
62:12,16,23 64:19
64:19
**utilize**  48:17 56:1
56:14 83:25 97:24
127:5 194:7
200:20 227:14
302:1
**utilized**  51:14 56:5
56:17,22 58:2
99:13 100:21
168:11 194:5
259:13 277:11
**utilizing**  63:8
106:22 148:8
191:11 192:16
216:7 302:1

**v**

**v**  1:7,9,11
**va**  89:24 95:1
106:12 107:2
298:9,11
**value**  339:22
**values**  120:12
**van**  204:10,12
**variation**  93:1
103:10,14
**varied**  35:22 113:4
**variety**  84:23
183:2 243:22
248:7,9 275:24,24
288:4 289:5
317:14 347:16
**various**  127:13
231:2,4 280:15
373:20
**vehicle**  116:23

**veritext**  7:25 8:2
383:6 385:1,7
388:1
**veritext.com.**
385:17
**version**  102:13,15
212:10 214:10
374:6
**versions**  146:3
**versus**  39:8 153:4
186:15 189:15
266:14 350:16,22
**video**  7:11,14
**videographer**  4:25
7:3 8:1,25 9:4,15
9:23 105:6,11
107:12,16 194:25
195:5 267:12,17
268:5,9 270:9,13
326:10,14 356:25
357:4 377:22
378:1 383:1
**videotaped**  1:17
**view**  63:11 65:24
68:4 69:17 72:6
94:15 142:13
148:11,25 232:22
240:25 243:24
244:12 254:10
257:19 258:17
260:10 261:6
274:2 302:4 305:7
305:19,21 307:3
307:15,20 328:11
338:9,17
**viewed**  65:22
**views**  107:21
108:11 243:14
261:16 280:8
**vince**  38:16 40:17
58:9 75:8 113:7

175:13,22 179:15
182:16 345:2
**vince's**  180:14
**vincent**  89:24
**vincent's**  95:4
106:13 107:2
**violence**  6:13
340:18
**virtually**  112:17
**visit**  27:18 97:3
354:20 355:12
**visited**  354:24
**visiting**  60:15
**visits**  343:24
345:10,15,23
346:14,15 347:19
347:25 349:6,9
350:7,8,22,24
351:7,18 352:11
**vitae**  5:9
**vital**  233:3 237:15
237:17,22 238:1,5
242:22 282:17
286:20 298:13,17
298:22 300:3
316:19
**volume**  6:15 59:3
59:13 99:6 148:1
275:5 284:21

**w**

**w**  3:7 4:13 159:12
**wait**  17:15 184:25
**waived**  385:19
**wal**  8:24 379:17
379:20 381:25
**walgreens**  379:14
381:3,9,14,22
**walk**  330:4
**wallace**  50:15 51:6
51:16,18 205:5
209:4,16 210:12

210:13 211:3,10
211:23 212:3
215:5
**walmart**  3:11
**want**  13:5 20:16
21:8 24:21,24
45:22 52:15 66:13
109:19,22 173:17
182:20 184:17
189:22 193:1
195:17 210:4
211:5 220:13
235:1,24 263:21
264:19 274:13
293:3 297:1
311:13 324:10
340:15 345:6,8,13
371:21
**wanted**  67:14
109:14 147:16
220:10 227:1,18
251:3 362:12,22
**warded**  217:15
**warrant**  191:14
**washington**  3:23
4:15
**water**  174:5,13
**waterways**  78:8
**way**  45:9 51:18,21
56:19 58:18 60:21
61:2 64:7 65:19
66:5,22,23,24 67:3
67:4 86:10 97:6,7
114:10 121:8,18
121:19 123:18
130:15 136:7
142:14 143:5
158:1,15 160:18
164:20 176:6
195:20 201:2
202:24 228:4

235:8 243:14,24
244:12 247:14
248:1 254:10
256:10 257:2
260:21 263:12
264:8 266:2 276:2
287:12,16 300:17
301:20 302:7
303:13 304:11
310:14 311:10
312:1 315:18,20
324:18 330:20
352:16,21 363:23
367:1 381:13
384:12
**ways**  42:18,19
83:9 125:5 150:14
232:23 290:23
**wc.com**  3:24,25
**we've**  65:4 67:17
73:1 114:25
138:23 162:19
183:9 216:23
218:15 227:25
228:22 249:10
264:22 265:1
266:18 270:7
271:10,14 312:17
312:18 314:16
352:8,19,19
366:21
**weakness**  95:24
**weaknesses**  47:18
94:7 95:5,10,14
107:22 108:13
**web**  130:24 131:3
131:5,9 347:5
**week**  40:15,19,24
46:23 47:3
**weekly**  310:18

**weeks**  198:17
**weigh**  228:4
**weight**  317:16
**welcome**  45:1
105:19 195:13
267:25 326:20
**went**  16:24 28:17
105:22 109:13
149:9 161:15
207:17 209:23
210:17,17
**west**  3:18
**western**  50:14
51:4,11 205:6
209:4,16,20,24
210:9 213:25
214:2 215:4
**westshore**  138:15
**whereof**  384:14
**whispering**  7:7
**white**  340:23
**wholesale**  307:23
308:2 309:10
**wide**  74:5
**widely**  216:4
**widespread**
215:23 289:13
**wilkinson**  176:5
**williams**  3:21 8:11
**willing**  7:12 20:9
67:10,14 68:18
**willingness**  70:16
**wilson**  176:15
**wirsching**  159:9
159:13 160:1,5
**witness**  8:8 9:1,16
16:4,6 20:11,18
21:1,4,22 36:12
52:9 55:19,22
57:1,18 59:23
60:24 61:14 62:7

64:2,6 68:3,16
69:22 70:12 71:13
78:4 79:11 81:13
101:12 109:21
117:4 118:24
132:21 133:6,18
133:20 135:9
146:23 149:4,15
150:8 156:20
163:6,14 168:7
169:10 171:18
172:17 185:15
186:18 201:5
218:1,3,18 225:3
225:20 226:2
238:24 239:24
240:9 241:13,22
249:11 252:3,20
252:24 253:7,16
254:7,13 255:1,15
255:20 256:7
257:15 259:9
261:21 262:4
263:20 264:1
269:19 275:1,15
275:22 276:10,21
277:11 278:4,23
280:12 287:23
288:2,9,21 292:1
293:4 294:10,25
296:14,17 299:4
299:14,18,24
302:22 303:11,21
306:20 317:13
318:8,18 319:7
322:1,10,18 331:4
336:14 339:9
352:2,16 357:16
367:19 372:12
377:16,19 382:6,8
384:8,14 385:8,11

**[witness - zuckerman.com]**

386:1,4,11 387:1,4
387:15
**witnesses** 15:8
**witness'** 385:14
**woman** 174:24
**wondering** 371:1
**word** 31:17 288:23
288:23
**words** 240:3,24
323:12 339:5
360:4 376:22
**work** 22:5 24:19
26:23 29:8 33:24
34:1 35:25 41:21
42:20 43:24 45:9
46:8 64:15 67:8
72:25 77:13 78:15
81:3,8,17 82:16
89:18 110:2 129:7
140:1,1 151:7
177:11 195:20
207:11 209:25
210:24,25 211:1,4
219:6 221:2 222:4
222:10,13,17,18
223:11 225:21
228:14 273:24
295:17 319:16
320:5 361:19
362:5,22,25
365:19 366:3,6
375:14
**worked** 27:15
41:17 43:21 46:25
47:2 80:24 81:23
161:3 210:2
212:11 213:10
261:12 308:16
331:12 344:13,19
367:9 368:7 369:3
369:12,19 373:4

**workgroup** 97:12
**working** 34:8,13
39:6,16,20 40:2,16
40:20,24 41:1
46:20,23 50:16
67:12 77:17 79:5
94:5 97:23 107:8
110:1 135:16
157:7 165:21
202:5 214:18
262:14 264:23
275:25 344:21
**works** 193:2
**workweek** 46:20
47:1
**worth** 112:7
**writ** 195:22
**write** 139:12 155:4
197:5,16 219:20
224:17 241:7,18
285:17
**writes** 178:17
198:16,22 200:3
333:24 334:21
**writing** 17:10
184:9
**written** 15:16
16:12 18:21 19:8
19:14 20:22 59:4
103:3,9 178:13
195:21 253:10
254:1 303:8
**wrong** 109:5 190:9
274:15
**wrote** 55:11
140:13 142:18,21
147:16 220:12
224:21 225:9
253:19,20 295:8

## y

**y** 10:13
**yeah** 20:2 79:21
79:21 113:19
155:22 158:1
177:1 194:21,23
201:23 231:19
244:22 248:20
250:17 252:6
258:14 265:23
267:4,6,11 269:22
294:21 296:16,20
297:5 302:24
341:19,25 351:3
**year** 23:14 26:11
28:15 33:11 35:22
35:23 46:8 48:24
50:13 76:10 77:16
77:19 78:23 79:22
108:24 109:1,2
124:24 177:19
182:10,15,21,22
184:20,21,25
200:1,2 201:6,6
206:1,2 209:21
214:11,15,16
218:22 220:18,18
220:19 223:6
224:25 226:13,16
319:3 337:16
343:8 352:24
364:3,4
**years** 55:8 64:12
65:21 68:25 113:4
113:5 114:12,15
114:19 124:20
134:15 135:5
156:13,23,25
157:13,18 165:22
172:3 177:3 180:8
182:10,23,24

183:7 197:18
203:2,4,14,17
205:7 206:3,7
207:19 208:11,13
210:15 211:8,12
216:21 253:17
264:23 317:9,22
338:4 342:15
351:8,13,14
352:14 353:3
364:3,4
**yerian** 368:23
**yesterday** 13:16
13:17 14:7
**york** 3:4,4,19,19
4:23,23
**young** 29:6 211:20
213:15

## z

**zero** 233:6
**zipp** 4:13 9:13,13
**zuckerman** 4:3
8:18
**zuckerman.com**
4:5

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.