Highly Confidential - Subject to Further Confidentiality Review

1    UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF OHIO
2          EASTERN DIVISION
3    ************************
      IN RE:  NATIONAL
4    PRESCRIPTION OPIATE     MDL No. 2804
      LITIGATION
5                      Case No.
      This document relates   17-MD-2804
6    to:
7    The County of Cuyahoga,   Hon. Dan A. Polster
      et al. v. Purdue
8    Pharma L.P., et al.
      Case No. 17-OP-45004
9    (N.D. Ohio)
10   ************************
11     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12          CONFIDENTIALITY REVIEW
13
14        Videotaped Deposition of JEFFREY
15   B. LIEBMAN, Ph.D. held at the offices of Ropes
16   & Gray LLP, 800 Boylston Street, Boston,
17   Massachusetts, commencing at 9:03, on the 3rd
18   of May, 2019, before Maureen O'Connor
19   Pollard, Registered Diplomate Reporter,
20   Realtime Systems Administrator, Certified
21   Shorthand Reporter.
22
         GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
24

Highly Confidential - Subject to Further Confidentiality Review

1    APPEARANCES:
2
      FOR THE PLAINTIFFS:
3
4    ANN K. RITTER, ESQ.
      ANDREW P. ARNOLD, ESQ.
5    ANNE M. KEARSE, ESQ. (Remotely)
          MOTLEY RICE LLC
6          28 Bridgeside Boulevard
           Mt. Pleasant, South Carolina 29464
7          843-216-9250
           aarnold@motleyrice.com
8          aritter@motleyrice.com
9
10   FOR THE PLAINTIFFS AND THE DEPONENT:
11   DAVID KO, ESQ.
          KELLER ROHRBACK, PLLC
12         1201 Third Avenue
           Seattle, Washington 98101
13         206-623-1900
           dko@kellerrohrback.com
14
15
16   FOR CAYAHOGA COUNTY:
17   SALVATORE C. BADALA, ESQ. (Remotely)
      JOSEPH L. CIACCIO, ESQ. (Remotely)
      HUNTER J. SHKOLNIK, ESQ. (Remotely)
18         NAPOLI SHKOLNIK PLLC
           400 Broadhollow Road
19         Melville, New York 11747
           631-224-1133
20         sbadala@napolilaw.com
           jciaccio@napolilaw.com
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

1    APPEARANCES (Continued):
2    FOR THE TENNESSEE PLAINTIFFS:
3    ANTHONY A. ORLANDI, ESQ. (Remotely)
          BRANSTETTER, STRANCH & JENNINGS, PLLC
4          223 Rosa L. Parks Avenue
           Nashville, Tennessee 37203
5          615-254-8801
           aorlandi@bsjfirm.com
6
7
      FOR PURDUE PHARMA:
8
      ALISON COONEY, ESQ.
9          DECHERT LLP
           35 West Wacker Drive
10         Chicago, Illinois 60601
           312-646-5800
11         alison.cooney@dechert.com
12
13   FOR McKESSON CORPORATION:
14   MICHA NANDARAJ GALLO, ESQ.
          COVINGTON & BURLING LLP
15         620 Eighth Avenue
           New York, New York 10018
16         212-841-1000
           mnandarajgallo@cov.com
17
18
      FOR AMERISOURCEBERGEN DRUG CORPORATION:
19
      KELLY H. HIBBERT, ESQ.
20         REED SMITH LLP
           1301 K Street, NW
21         Washington, DC 20005
           202-414-9226
22         khibbert@reedsmith.com
23
24

Highly Confidential - Subject to Further Confidentiality Review

1    APPEARANCES (Continued):
2
      FOR WALGREENS:
3
4    ALEX HARRIS, ESQ.
          BARTLIT BECK LLP
5          1801 Wewatta Street
           Denver, Colorado 80202
6          303-592-3197
           alex.harris@bartlitbeck.com
7
8    FOR WALMART:
9    EDWARD M. CARTER, ESQ.
          JONES DAY
10         325 John H. McDonnell Boulevard
           Columbus, Ohio 43215-2673
11         614-469-3939
           emcarter@jonesday.com
12
13
      FOR CVS INDIANA, LLC and CVS RX SERVICES,
14   INC.:
15   DANIEL P. MOYLAN, ESQ.
          ZUCKERMAN SPAEDER, LLP
16         100 East Pratt Street
           Baltimore, Maryland 21202-1031
17         410-949-1159
           dmoylan@zuckerman.com
18
19
      FOR ALLERGEN FINANCE:
20
      MARIA PELLEGRINO RIVERA, ESQ.
21         KIRKLAND & ELLIS LLP
           300 North LaSalle
22         Chicago, Illinois 60654
           312-862-7170
23         mrivera@kirkland.com
24

Highly Confidential - Subject to Further Confidentiality Review

```
1     APPEARANCES (Continued):
2
      FOR JANSSEN and JOHNSON & JOHNSON DEFENDANTS:
3
      JUSTIN E. RICE, ESQ.
4          TUCKER ELLIS LLP
           950 Main Street
5          Cleveland, Ohio 44113
           216-696-3670
6          justin.rice@tuckerellis.com
7
8     FOR HBC SERVICE, INC.:
9     SCOTT D. LIVINGSTON, ESQ.
           MARCUS & SHAPIRA LLP
10         One Oxford Centre, 35th Floor
           301 Grant Street
11         Pittsburgh, Pennsylvania 15219-6401
           412-338-4690
12         livingston@marcus-shapira.com
13
14    FOR ENDO PHARMACEUTICALS INC., ENDO HEALTH
      SOLUTIONS INC., PAR PHARMACEUTICAL COMPANIES,
15    INC. (f/k/a PAR PHARMACEUTICAL HOLDINGS,
      INC.)
16
      SEAN MORRIS, ESQ.
17         ARNOLD & PORTER KAYE SCHOLER LLP
           777 South Figueroa Street
18         Los Angeles, California 90017
           213-243-4222
19         sean.morris@arnoldporter.com
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     APPEARANCES (Continued):
2
      FOR TEVA PHARMACEUTICALS USA, INC., CEPHALON,
3     INC., WATSON LABORATORIES, INC., ACTAVIS LLC,
      ACTAVIS PHARMA, INC., f/k/a WATSON PHARMA,
4     INC.:
5     MELISSA M. COATES, ESQ. (Remotely)
      ELIZABETH BUECHNER, ESQ. (Remotely)
6          MORGAN, LEWIS & BOCKIUS LLP
           200 S. Biscayne Boulevard, Suite 5300
7          Miami, Florida 33131-2339
           305-415-3419
8          melissa.coates@morganlewis.com
9
10    FOR RITE AID:
11    CAROLYN A. SILANE, ESQ. (Remotely)
           MORGAN, LEWIS & BOCKIUS LLP
12         101 Park Avenue
           New York, New York 10178-0060
13         212-309-6734
           carolyn.silane@morganlewis.com
14
15
      FOR HENRY SCHEIN, INC., and HENRY SCHEIN
16    MEDICAL SYSTEMS, INC.:
17    CHRISTOPHER BOECK, ESQ. (Remotely)
           LOCKE LORD LLP
18         2200 Ross Avenue, Suite 2800
           Dallas, Texas 75201
19         214-740-8445
           christopher.boech@lockelord.com
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     APPEARANCES (Continued):
2
      FOR MALLINCKRODT, LLC and SPECGX, LLC:
3
      KIA GRANT-SMITH, ESQ.
4          ROPES & GRAY LLP
           2099 Pennsylvania Avenue
5          Washington, DC 20006
           202-508-4618
6          kia.grant-smith@ropesgray.com
7
8     FOR WEST VIRGINIA BOARD OF PHARMACY:
9     HARRISON CYRUS, ESQ. (Remotely)
           BAILEY & WYANT PLLC
10         500 Virginia Street East
           Charleston, West Virginia 25301
11         304-345-4222
           hcyrus@baileywyant.com
12
13    Also Present:
14    Constance Kelly, Compass Lexecon (Remotely)
      Alice Kaminski, Compass Lexecon (Remotely)
15
16    VIDEOGRAPHER:  Robert Martignetti
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                     INDEX
2     EXAMINATION                          PAGE
3     JEFFREY B. LIEBMAN, Ph.D.
4     BY MR. MORRIS                        13
5     BY MS. HIBBERT                      282
6     BY MR. MOYLAN                       343
7     BY MS. RITTER                       357
8     BY MR. CARTER                       362
9
10
11             E X H I B I T S
12    NO.        DESCRIPTION
13    PAGE
14    1    Dr. Liebman's Curriculum Vitae.... 16
15    2    Printout from Government
           Performance Labs website titled
16         Our Mission...................... 45
17    3    Document titled Six Additional
           Governments to Receive Technical
18         Support from Harvard Kennedy
           School's Government Performance
19         Lab.............................. 47
20    4    Expert Report of Dr. Jeffrey B.
           Liebman, March 25, 2019.......... 17
21
      5    Tables associates with March 25,
22         2019 report...................... 51
23    6    Supplemental Expert Report of
           Dr. Jeffrey A. Liebman, April 3,
24         2019............................. 33
```

```
 1
 2      7    Tables associated with April 3,
            2019 report...................... 52
 3      8    Set of tables.................... 53
 4      9    Two page errata provided with
            Exhibit 8........................ 53
 5
 6     10    Appendix B - Materials
            Considered....................... 54
 7     11    Pitt, et al paper, Modeling
            Health Benefits and Harms of
 8          Public Policy Responses to the
            US Opioid Epidemic...............108
 9
       12    GAO Cost Estimating and
10          Assessment Guide.................121
11     13    Expert Report of Anna Lembke,
            MD, March 25, 2019...............177
12
13     14    Expert Report of Theodore Parran..255
       15    Copy of 11/20/18 deposition
14          transcript of Gary Gingell........272
15     16    Document titled Liebman
            Interview Notes...................355
16
17
18
19
20
21
22
23
24
```

---

```
 1              P R O C E E D I N G S
 2
 3          THE VIDEOGRAPHER:  We are now
 4     on the record.  My name is Robert
 5     Martignetti.  I am a videographer for
 6     Golkow Litigation Services.  Today's
 7     date is May 3, 2019, and the time is
 8     9:03 a.m.
 9          This video deposition is being
10     held in Boston, Massachusetts, In Re:
11     National Prescription Opioid
12     Litigation.
13          The deponent is Jeffrey
14     Liebman, Ph.D.
15          Will counsel please identify
16     themselves.
17          MS. RITTER:  Ann Ritter,
18     counsel for the plaintiff.
19          MR. KO:  Good morning.  David
20     Ko of Keller Rohrback on behalf of
21     plaintiffs and on behalf of the
22     witness.
23          MR. ARNOLD:  Andrew Arnold on
24     behalf of the plaintiffs.
```

---

```
 1          MR. HARRIS:  Alex Harris on
 2     behalf of Walgreen Company and
 3     Walgreen Eastern Company.
 4          MS. GALLO:  Micha Nandaraj
 5     Gallo from Covington & Burling for
 6     McKesson.
 7          MR. RICE:  Justin Rice from
 8     Tucker Ellis on behalf of Johnson &
 9     Johnson and Janssen.
10          MR. CARTER:  Ed Carter for
11     Walmart.
12          MS. RIVERA:  Maria Rivera from
13     Kirkland & Ellis on behalf of the
14     Allergen entities.
15          MR. MOYLAN:  Daniel Moylan,
16     Zuckerman Spaeder, for CVS.
17          MS. COONEY:  Alison Cooney from
18     Dechert on behalf of Purdue Pharma.
19          MR. LIVINGSTON:  Scott
20     Livingston on behalf of HBC.
21          MS. GRANT-SMITH:  Kia
22     Grant-Smith from Ropes & Gray on
23     behalf of Mallinckrodt, LLC and
24     SPECGX, LLC.
```

---

```
 1          MR. MORRIS:  And Sean Morris
 2     from Arnold & Porter on behalf of the
 3     Endo entities and the Par entities,
 4     defendants.
 5          THE VIDEOGRAPHER:  The court
 6     reporter is Maureen Pollard, and will
 7     now swear in the witness.
 8          BOECK:  I'm sorry, we also have
 9     some attorneys on the phone.
10          This is Chris Boeck of Locke
11     Lord on behalf of Henry Schein, Inc.
12     and Henry Schein Medical Systems, Inc.
13          MR. ORLANDI:  This is Tony
14     Orlandi for the Tennessee plaintiffs.
15          MS. KEARSE:  Ann Kearse for the
16     plaintiffs.
17          MS. BADALA:  Salvatore Badala
18     for the plaintiff.
19          MS. SILANE:  Carolyn Silane,
20     Morgan Lewis, for Rite Aid.
21          MS. COATES:  Melissa Coates for
22     the Teva defendants.
23          MS. HIBBERT:  I stepped in
24     late.  Kelly Hibbert on behalf of
```

1      AmerisourceBergen from Reed Smith.
2          MR. MORRIS:  Have we sworn in
3      the witness?
4
5          JEFFREY B. LIEBMAN, Ph.D.,
6      having been duly identified and sworn, was
7      examined and testified as follows:
8                  EXAMINATION
9  BY MR. MORRIS:
10         Q.    Dr. Liebman, good morning.
11         A.    Good morning.
12         Q.    We met off the record and I
13     just introduced myself, but again, I'm Sean
14     Morris, counsel for the Endo entity
15     defendants as well as the Par defendants in
16     this case.
17              Have you given a deposition
18     before?
19         A.    No.
20         Q.    Okay.  I'm sure your counsel
21     has gone over some of the ground rules, but
22     let me go over them as well.
23              Any reason that you can't give
24     your best testimony today, any medications or

1  conditions?
2          A.    No.
3          Q.    Okay.  The court reporter is
4  taking down everything that you and I say,
5  plus any objections, which means that if you
6  can wait for me to ask my questions, and I'll
7  wait for you to finish your answers, that
8  will make for a cleaner record.
9              Fair enough?
10         A.    Sounds good.
11         Q.    Okay.  And that also means that
12  we need to have audible, oral answers.
13  Shakes of the head, nods don't really come
14  across very well on the transcript.
15              Fair enough?
16         A.    Makes sense.
17         Q.    I'm going to try to ask
18  understandable questions.  If you don't
19  understand something, let me know, but if you
20  answer the question I'm going to assume that
21  you've understood it.
22              Fair enough?
23         A.    Sounds good.
24         Q.    During the course of the day

1  we'll be taking breaks.  If there's some
2  reason you need to take a break, let me know,
3  and we'll do our best to accommodate you, as
4  long as there's not a question pending, okay?
5          A.    Good.
6          Q.    Okay.  Have you been asked to
7  provide testimony at the trial in this case?
8          A.    I have not been told one way or
9  the other whether that's planned.
10         Q.    Okay.  Are you setting aside
11  time in October of this year to potentially
12  testify in the trial of this case?
13         A.    I have not been asked to do so.
14         Q.    If you are asked to testify,
15  will you?
16         A.    Yes.
17         Q.    Have you ever testified as an
18  expert in litigation before?
19         A.    No.
20         Q.    Have you ever testified in a
21  court proceeding as a layperson before?
22         A.    No.
23         Q.    Have you given other sorts of
24  testimony, congressional testimony, things

1  like that?
2          A.    Yes.
3          Q.    Okay.  And what -- how many
4  times, what circumstances?
5          A.    I've testified several times as
6  a -- well, as an economist, professor, in
7  front of a variety of congressional
8  committees, and I also testified a couple
9  times when I was an Obama administration
10  official in front of congressional
11  committees.
12         Q.    Any of those times when you've
13  testified or spoken with Congress related to
14  addressing the opioid abuse issues?
15         A.    No.
16         Q.    If you could pull out now -- go
17  to Exhibit 1.
18              (Whereupon, Liebman Exhibit
19          Number 1 was marked for
20          identification.)
21  BY MR. MORRIS:
22         Q.    Which is your CV.  Or I should
23  ask you, I've marked what looks like your CV.
24         A.    Looks like it to me, too.

1    Q.    Okay.  That was what was

2  provided to us through counsel.  Is that your

3  CV?

4    A.    Yes.

5    Q.    Okay.  And I see that it's

6  marked -- or dated as March, 2019.  Was it

7  current as of March, 2019?

8    A.    The one you've handed me is not

9  the current one.  You have handed me an

10  April, 2018 one.

11    Q.    I apologize.

12    Okay.  So was it current as of

13  April, 2019?

14    A.    This one says 2018 on it.

15    Q.    2018.  I'm all discombobulated.

16  Why don't we do this.

17    Can you pull out your report

18  from March 25th, which I believe has been

19  marked as Exhibit 4?

20    (Whereupon, Liebman Exhibit

21    Number 4 was marked for

22    identification.)

23  BY MR. MORRIS:

24    Q.    Okay.  And in the back as one

1  of the appendix I believe is your CV.  Have

2  you found that?

3    A.    Yes.

4    Q.    And which one -- what is that

5  one dated?

6    A.    March, 2019.

7    Q.    Okay.  So is it current as

8  of -- was it correct as of March, 2019?

9    A.    Yes.

10    Q.    Okay.

11    MS. RITTER:  You're referring

12    now to Exhibit 4?

13    MR. MORRIS:  I am referring to

14    Exhibit 4.

15    MS. RITTER:  Okay.

16    MR. MORRIS:  I went out of

17    order because obviously --

18    MS. RITTER:  Right, but we

19    didn't mark it, so...

20  BY MR. MORRIS:

21    Q.    Got it.  All right.  So since

22  March, 2019, has there been any updates to

23  your CV?

24    A.    I have written some things, and

1  I don't know if they were already on here.

2  But do you want me to --

3    Q.    If you could check.  What do

4  you have in mind as to what it is that you've

5  written recently?

6    A.    It's already on here, so paper

7  number 18 is, I think, my most recent paper.

8  So it's on here.

9    Q.    Got it.

10    Okay.  And you have a Ph.D in

11  economics, correct?

12    A.    I do.

13    Q.    And do you have a particular

14  area in economics in which you specialize?

15    A.    I study public sector economics

16  which includes health economics, and I'm also

17  an expert in public sector budgeting, budget

18  policy.  And then my other area of expertise

19  is in the design and management of government

20  social programs.

21    Q.    Can you break down that last

22  category for me a little bit more?  What does

23  having expertise in design and management of

24  government social programs mean?

1    A.    So I teach a course called

2  Government Turnarounds at the Harvard Kennedy

3  School, and the basic framing of that course

4  is -- imagine you were just appointed by a

5  governor to be a cabinet secretary for a

6  social service agency, what do you do to

7  accomplish your missions.

8    Q.    And I see on your resume and in

9  other documents there's a reference to the

10  Government Performance Lab.

11    A.    Yes.

12    Q.    Can you explain what that is?

13    A.    Yes.  So for the last seven

14  years I have been running the Government

15  Performance Lab, which I founded, and it is

16  an effort to figure out and do research on

17  how government agencies, particularly social

18  service agencies, can be more effective.  And

19  the way we operate is I hire recent graduates

20  of public policy schools, law schools,

21  business schools, social work programs, and I

22  embed them full-time in state, city, or

23  county social service agencies, often for a

24  year, sometimes two or three years to work on

Highly Confidential - Subject to Further Confidentiality Review

1  whatever their current problems are.

2          And so the goal of this is to

3  both help those particular jurisdictions

4  solve those problems, but also to build a set

5  of knowledge that can be spread through

6  teaching and through executive education and

7  other committees to improve how government

8  social services operate and the kinds -- and

9  to make more rapid progress in solving some

10  of our nation's most difficult social

11  problems.

12      Q.    I've also seen reference to the

13  Pay for Success model?

14      A.    Yes.

15      Q.    Can you explain what that is?

16      A.    Yeah.  There's a general

17  question about whether there are ways to

18  improve the implementation of social programs

19  by getting everyone involved in delivering

20  services, the government, the non-profits

21  that are being contracted with, focused on

22  outcomes.  Sometimes when one runs programs,

23  people think about filling slots in programs,

24  and sort of output measures and not thinking

Highly Confidential - Subject to Further Confidentiality Review

1  about the ultimate outcomes that we're trying

2  to achieve.

3          And so the Pay for Success

4  initiatives have been exploring whether

5  there's other ways to structure how social

6  service deliveries -- how social service

7  delivery organizations are paid by government

8  to try to orient everyone toward achieving

9  the outcomes that are the ultimate goals of

10  these programs.

11      Q.    Is it fair to say that part of

12  the way the Pay for Success model works is

13  that you find the programs that work, and

14  focus and fund those as opposed to those that

15  don't achieve the outcomes?

16      A.    I don't think I would describe

17  it exactly that way.  I really think it's

18  much more about the government saying we are

19  going to pay for the outcomes we're trying to

20  achieve rather than just paying for an

21  organization to deliver services, and by

22  doing that it causes the outcome to be

23  measured and creates an incentive such that

24  the whole system, including the government

Highly Confidential - Subject to Further Confidentiality Review

1  agency and the providers, wake up every day

2  and say, how are we going to move things

3  toward that outcome.

4      Q.    So an important part of that is

5  being able to measure the outcome in order to

6  determine whether or not the program has been

7  a success, is that true?

8      A.    Yes.

9      Q.    We'll come back to some of your

10  work with GPL in a little bit.  For the

11  moment I want to talk about some other

12  disciplines and see if there are things that

13  you have expertise in.

14          Is it correct that you're not a

15  medical doctor?

16      A.    Correct.

17      Q.    And so you don't have a medical

18  degree?

19      A.    I do not.

20      Q.    And you've never treated

21  patients?

22      A.    I have never treated patients.

23      Q.    So I assume, then, that you've

24  never treated anybody with chronic pain?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    That's correct.

2      Q.    And you've never prescribed an

3  opioid?

4      A.    That's correct.

5      Q.    In your reports and elsewhere,

6  you use the term opioid use disorder, or OUD.

7  Are you familiar with that term?

8      A.    I am.

9      Q.    You never treated anybody with

10  OUD, is that correct?

11      A.    That's correct.

12      Q.    Or any other addictions, you

13  never treated them?

14      A.    Not as a medical provider.

15  I've helped government agencies that I worked

16  in trying to get people treatment, but I have

17  not personally --

18      Q.    Fair enough.  I was asking

19  about whether you've treated them in a

20  medical way.  You've not done that?

21      A.    No.

22      Q.    Also true that you're not a

23  pharmacist?

24      A.    That's correct.

1    Q.    You're not a pharmacologist?

2    A.    That's correct.

3    Q.    You're not a toxicologist?

4    A.    That's correct.

5    Q.    You're not a marketing expert,

6  correct?

7    A.    That's correct.

8    Q.    You're not a statistician?

9    A.    Well, as an economist I have

10  substantial training in statistics and teach

11  courses in statistics, so my Ph.D is in

12  economics, not statistics, though.

13    Q.    You're not an epidemiologist?

14    A.    That's correct.

15    Q.    And you're not an expert in

16  public health, true?

17    A.    I'm -- health economics is part

18  of my expertise.  I'm not exactly sure where

19  one draws the line between health economics

20  and public health.

21    Q.    Understood.

22          But you don't have, for

23  example, a master's in public health?

24    A.    That's correct.

1    Q.    Are you an expert in the -- or

2  let me ask this first.

3          Have you heard of the

4  suspicious order monitoring program and

5  requirements that are under the Controlled

6  Substances Act, the federal --

7    A.    I'm broadly aware of it.

8    Q.    But you're not an expert in

9  those requirements?

10    A.    No.

11    Q.    You're not an expert in FDA

12  regulatory issues?

13    A.    It's not a specialty.  I've

14  worked on them when I've been in the

15  government.

16    Q.    So you're familiar with FDA

17  issues, but you wouldn't consider yourself to

18  be an expert in the FDA requirements, for

19  example?

20    A.    That's correct.

21    Q.    Prior to this case, you've

22  never studied programs or policies that might

23  best reduce the impact of opioid abuse, true?

24    A.    No, that's not true.

1    Q.    Okay.  In what context have you

2  studied programs or policies that might best

3  reduce the impact of opioid abuse?

4    A.    I helped teach a course at the

5  Harvard Kennedy school that was addressing

6  these issues.

7    Q.    And which course was that?

8    A.    So our master's in public

9  policy students in their first year take

10  courses in economics and statistics and

11  management and politics, and then at the end

12  of their first year we stop the whole core

13  curriculum for two weeks and we do a

14  simulation where they are given a real world

15  policy problem to address.

16          And last year and the year

17  before -- I can't remember if it was the

18  three years before, but at least last year

19  and the year before the simulation we gave

20  them was to come up with a solution.  One of

21  the years was to -- I think the simulation

22  was to advise the governor of Kentucky -- I

23  forget what the other framing was -- around

24  what that state's solution to the opioid

1  crisis should be.

2    Q.    Was this -- and I'm sorry, this

3  was a part of the course?  I'm just trying to

4  figure out how to describe what it is

5  you're --

6    A.    It's -- why don't we call it --

7  we will call it the spring exercise.

8    Q.    The exercise, okay.  The spring

9  exercise.  The spring exercise, was this

10  before or after you were retained as an

11  expert in this case?

12    A.    Before.

13    Q.    And this was a two-week

14  exercise, is that true?

15    A.    The intense part of it.

16  There's obviously planning and curriculum

17  design and arranging for all the experts to

18  come visit campus as part of this.  But the

19  sort of intense part is two weeks for the

20  students.

21    Q.    Okay.  And this is an exercise

22  to help students learn how to do these sorts

23  of analyses?

24    A.    How to pull all the parts of

Highly Confidential - Subject to Further Confidentiality Review

1  the curriculum together and perform in a

2  professional setting with a realistic policy

3  scenario.

4      Q.    Okay.  And were the results of

5  this exercise presented to -- for example,

6  you said one of them was based on assuming

7  you were the advising the governor of

8  Kentucky.  Were the results presented to the

9  governor of Kentucky?

10     A.    I actually don't remember how

11 we did it that year.  What we generally do is

12 on the very last day we bring in outside

13 officials to receive the briefings, and then

14 sometimes we take the winning team of all the

15 teams and get them in front of the real

16 person.  I don't remember if we ended up

17 doing -- I wasn't -- that part of logistics

18 wasn't my responsibility.

19     Q.    And as part of this exercise,

20 who is -- who were the people doing the work

21 on it, the students that are --

22     A.    The students.

23     Q.    So this isn't something that

24 you are doing as an analyst to review,

Highly Confidential - Subject to Further Confidentiality Review

1  correct, to review the policies that best

2  might address the impact of opioid use,

3  correct?

4      A.    I wasn't generating a solution.

5  I was thinking about what materials would be

6  relevant for the students to read and which

7  outside experts did we want to hear from as

8  part of that period.

9      Q.    Okay.  Other than the spring

10 exercise that we've been talking about, have

11 you studied any programs or policies that

12 might best reduce the impact of opioid abuse,

13 other than in the context of this litigation?

14     A.    In some of our Government

15 Performance Lab work we have been involved

16 with jurisdictions that were thinking about

17 addiction issues.

18     Q.    Any that were specific to

19 opioid addiction?

20     A.    So all of them were broader,

21 included other addictions, but opioid

22 addictions were part of -- were at the

23 forefront of several of them.

24     Q.    And which jurisdictions are you

Highly Confidential - Subject to Further Confidentiality Review

1  thinking of?

2      A.    I'm thinking of Florida,

3  Connecticut, Louisville.

4            If you don't mind, I'll look at

5  my report and see if I forgot one.  I think

6  those are the three that --

7      Q.    And you're looking at now

8  Exhibit 4?

9      A.    Exhibit 4.  I would say

10 Bernalillo County, Albuquerque belongs in

11 that category, too.

12     Q.    Have you ever done any, outside

13 the context of this litigation, calculations

14 about how much it might cost to provide

15 services to reduce the impact of opioid

16 abuse?

17     A.    Specifically opioid abuse?

18     Q.    Yes.

19     A.    No.

20     Q.    And again specific to opioid

21 abuse, have you ever done any calculations as

22 to where money might best be spent to reduce

23 the impact of opioid abuse, outside the

24 context of this litigation?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Outside of the specific GPL

2  projects I mentioned, no.

3      Q.    And those GPL projects didn't

4  address just opioid abuse, correct?

5      A.    Right, they included other

6  addictions.

7      Q.    And as part of those GPL

8  projects, were opioid issues culled out as a

9  separate category?  For example, just where

10 I'm going, right, you know, were you looking

11 at the ways in which governments might

12 address abuse, but were there, like, separate

13 spreadsheets or line items with respect to

14 opioids?

15          MR. KO:  Object to the form.

16     A.    Can you simplify that question

17 for me?

18 BY MR. MORRIS:

19     Q.    I'll try.  I'll grant you that

20 was not a very good question.  I'll come back

21 to that concept.

22     A.    Okay.

23     Q.    Did you bring anything with you

24 today to prepare for your deposition?

1  A.    No.

2  Q.    What did you do to prepare for

3  your deposition today?

4  A.    I reviewed my report.  I

5  reviewed some of the sources that I cite in

6  the report.  I met with counsel.

7  Q.    Okay.  Let's start with the

8  review of the report.

9  When you say the review of the

10  report, which report did you review?

11  A.    Primarily the supplemental

12  report.

13  (Whereupon, Liebman Exhibit

14  Number 6 was marked for

15  identification.)

16  MR. MR. MORRIS:

17  Q.    Okay.  And is that -- if you

18  take a look at what has been marked as

19  Exhibit 6 --

20  A.    Yes.

21  Q.    -- that's one that's marked --

22  is dated April 3, 2019?

23  A.    Correct.

24  Q.    That's what you're referring to

1  as the supplemental report that you reviewed

2  to prepare for this deposition?

3  A.    Assuming that it has the

4  appendix tables, the answer is yes.

5  Q.    That's a good notation.  So the

6  reports themselves have appendix attached to

7  them, correct?

8  A.    That's correct.

9  Q.    But then there are separate

10  Excel spreadsheets that have the appendix

11  plus additional material.  Are you familiar

12  with those?

13  A.    Certainly.

14  Q.    Okay.  Did you review any of

15  the Excel spreadsheets as part of preparing

16  for your deposition today?

17  A.    Yes.

18  Q.    And which ones did you review?

19  A.    There's one big spreadsheet

20  that has all the tabs in it, and so I looked

21  at several of those tabs.

22  Q.    Got it.  And we've gotten

23  different versions of that Excel document,

24  and my question is, do you know which one

1  you've looked at?

2  A.    I presume it's the -- whatever

3  the one was that was supplied to you most

4  recently.

5  Q.    You said that you also looked

6  at some of the citations from your report?

7  A.    Correct.

8  Q.    Which citations did you look

9  at?

10  A.    I don't think it would be

11  simple for me to -- I looked through a bunch

12  of them.

13  Q.    Okay.  Let me ask --

14  A.    We could flip through and I

15  could start telling you which ones I looked

16  at recently, if that's helpful.

17  Q.    Let me ask it this way.

18  How many of the citations did

19  you review to prepare for the deposition,

20  roughly?

21  A.    I'm not sure I can actually

22  give you that estimate in a useful way.

23  Q.    Was it more than ten of the

24  citations?

1  A.    Yes.

2  Q.    How long did you spend

3  preparing for your deposition today?

4  A.    I haven't added up those hours

5  in a useful way either.  Do you want me to

6  walk you through my schedule of the last

7  couple of weeks and tell you which days I

8  spent time on this?

9  Q.    Let's do it this way.  Let me

10  back into that.

11  You said you also met with

12  counsel.  How many times did you meet with

13  counsel?

14  A.    I met with counsel this past

15  Monday, and I believe two other -- three

16  times, I think, total.

17  Q.    Before or after Monday?

18  A.    Before Monday.

19  Q.    And how long did you meet with

20  counsel for each of those meetings?

21  A.    I think two of them were, let's

22  say, two-thirds of the day, six hours or

23  something like that, and one was a half day.

24  Q.    When did you first become an

1  expert consultant in this litigation?
2      A.    Late last spring.  I can't
3  remember if it was May or June, but in that
4  time frame.
5      Q.    And how did you come to be
6  retained as an expert consultant in
7  litigation?
8      A.    David got in touch with me.
9      Q.    That was my next question.
10      Who contacted you?
11      A.    David Ko.
12      Q.    And did you know Mr. Ko before
13  he reached out to talk to you about working
14  on this litigation?
15      A.    I did not.
16      Q.    And what was -- do you know why
17  Mr. Ko contacted you?
18      MR. KO:  I instruct the witness
19      not to disclose any privileged
20      communications.  So to the extent that
21      you're asking why or rationale or
22      substance or context, I actually
23      instruct you not to answer.  So next
24      question.

1  BY MR. MORRIS:
2      Q.    You don't have any answer other
3  than what would be encompassed within the
4  instruction not to answer?
5      MR. KO:  Actually let me be
6      clear.  I'll instruct the witness not
7      to answer the why in the question that
8      you asked.
9      A.    Can you ask the question over
10  again?  I am now mixed up.
11  BY MR. MORRIS:
12      Q.    Fair enough.  I'm going to come
13  back to this in a different way.
14      How much are you charging for
15  your services in this litigation?
16      A.    $900 an hour for my general
17  services, and $1,000 an hour for the
18  deposition.
19      Q.    And putting aside the
20  deposition and the preparation for the
21  deposition, how many hours have you spent
22  working on the litigation?
23      A.    Just under 300 hours.
24      Q.    And have you had people working

1  with you as part of this litigation project?
2      A.    Yes.
3      Q.    And who -- how many and who?  I
4  know that's a compound question, but...
5      A.    Answer in the opposite
6  direction.  So people from Compass Lexecon,
7  and I guess there are three main people I
8  have worked with from that firm.
9      Q.    Have you worked with anybody to
10  assist you in preparing your report other
11  than people from Compass Lexecon?
12      A.    No.
13      Q.    So nobody, for example, from
14  the GPL?
15      A.    No.
16      Q.    And who are the people at
17  Compass Lexecon that have assisted you with
18  the report?
19      A.    So the person who leads the
20  team is Hal Sider, and then Constance Kelly,
21  and then Alice Kaminski.  And then I think
22  they had some colleagues that I didn't
23  directly interact with who were presumably
24  working with them.

1      Q.    So do you know how many hours
2  they've spent working on and assisting you
3  with your report?
4      A.    I do not.
5      Q.    Do you know how much they
6  charge?
7      A.    I do not.
8      Q.    You said that you spent about
9  300 hours at $900 an hour.  Is that about --
10  what's the total amount of money that you
11  have charged to this point?
12      A.    About $250,000.
13      Q.    Would you agree with me that
14  chronic pain is a serious medical condition?
15      A.    I'm not a medical expert, so I
16  don't have an expert opinion on that.
17      Q.    Let me ask you this way.
18      Do you agree that chronic pain
19  affects millions of people in the United
20  States?
21      A.    I have never looked at
22  statistics on that, but, you know, based on
23  casual reading of newspapers, that sounds
24  like a plausible number.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you agree that chronic pain
2  affects people within Summit County, Ohio?
3    A.    Yes.
4    Q.    And same thing, that chronic
5  pain affects people within Cuyahoga County,
6  Ohio?
7    A.    Yes.
8    Q.    Do you agree that there are
9  risks associated with untreated chronic pain?
10   A.    I think you're asking me to
11 talk about things that I am, as an economist,
12 not qualified to talk about.
13   Q.    Fair enough.
14         Do you agree that there are
15 monetary costs to society due to untreated
16 chronic pain?
17   A.    Yes.
18   Q.    And is that something that
19 you've studied or examined?
20   A.    No.
21   Q.    This may also be one that
22 you're not qualified to answer, but let me
23 just explore.
24         Do you agree that in some

Highly Confidential - Subject to Further Confidentiality Review

1  patients opioids may be the only effective
2  treatment for chronic non-cancer pain?
3         MR. KO:  Object to the form.
4    A.    I think you're asking me
5  clinical questions again that are beyond my
6  area of expertise.
7  BY MR. MORRIS:
8    Q.    What about this one, do you
9  agree that prescription opioids are approved
10 by the FDA as safe and effective for their
11 intended use?
12         MR. KO:  Object to the form.
13   A.    That's not something I have any
14 expertise about.
15 BY MR. MORRIS:
16   Q.    Do you agree that the majority
17 of patients who have ever been prescribed an
18 opioid do not become addicted?
19         MR. KO:  Object to the form.
20   A.    That is consistent with what
21 I've read in the literature.
22 BY MR. MORRIS:
23   Q.    Do you agree that individuals
24 can and do become addicted to illicit opioids

Highly Confidential - Subject to Further Confidentiality Review

1  without ever first obtaining a legal
2  prescription for an opioid?
3    A.    I think the literature finds
4  that about 80 percent who end up with illicit
5  opioids start with prescription opioids, but
6  that leaves 20 percent that didn't.
7    Q.    Do you agree that the question
8  of who may become addicted is highly
9  individualized?
10         MR. KO:  Object to the form.
11   A.    I don't think I know what
12 highly individualized means in this context,
13 and I think you're asking me another clinical
14 question.
15 BY MR. MORRIS:
16   Q.    Okay.  Well, let me ask you
17 this way.
18         You just referred to a
19 statistic that you've read about the number
20 of people who become addicted who haven't
21 taken or been prescribed a prescription
22 opioid versus those that become addicted to
23 illicit opioids.  And my question is, do you
24 agree that the question of who may become

Highly Confidential - Subject to Further Confidentiality Review

1  addicted is an individualized question,
2  meaning you've got to look to the actual
3  patients or individual as opposed to
4  statistics?
5         MS. RITTER:  Objection.  Form.
6    A.    I think I don't understand your
7  question still.
8  BY MR. MORRIS:
9    Q.    Yeah.  Sure.
10         You'd agree with me that who
11 might become addicted to an opioid, whether
12 it's a prescription medication or an illicit
13 opioid, depends on a variety of factors
14 including things like genetics,
15 predisposition, environmental factors, things
16 like that?
17         MS. RITTER:  Objection.  Form.
18   A.    I'm not an expert on that, but
19 it sounds plausible to me.
20 BY MR. MORRIS:
21   Q.    Do you agree that how to treat
22 someone who has an addiction or an opioid use
23 disorder is an individualized issue?
24         MR. KO:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1      Asked and answered.

2      A.    I believe that individual

3  physicians have to figure out how to treat

4  individual patients.

5  BY MR. MORRIS:

6      Q.    Let me turn back to the

7  Government Performance Lab for a minute.  Let

8  me mark, or give you -- this has been marked

9  as Exhibit 2.

10           (Whereupon, Liebman Exhibit

11           Number 2 was marked for

12           identification.)

13  BY MR. MORRIS:

14      Q.    Dr. Liebman, this is a printout

15  from the website for the Government

16  Performance Labs.  Do you recognize this is

17  something that comes from the GPL website?

18      A.    Yes.

19      Q.    If you go to the second

20  paragraph, and this is -- it's got a title of

21  it called "Our Mission," in the second

22  paragraph, the one that begins "The mission

23  of Harvard Kennedy School Government

24  Performance Labs," further on in that

Highly Confidential - Subject to Further Confidentiality Review

1  paragraph it says, "We hire and train

2  full-time employees, embedding them in

3  government agencies to lead 12 to 36 months

4  intensive reform projects."

5           Do you see that?

6      A.    I do.

7      Q.    That's not something that

8  happened here in preparation for your report

9  in this case, correct?

10      A.    So are you asking, did I --

11      Q.    Let me -- in doing your

12  analysis --

13      A.    Yeah.

14      Q.    -- nobody -- we already talked

15  about the fact that nobody from GPL worked on

16  assisting you with your report, correct?

17      A.    That's correct.

18      Q.    Okay.  So nobody from GPL was

19  imbedded for 12 to 36 months in reviewing the

20  opioid issues in Cuyahoga or Summit, correct?

21      A.    So when we get ready to do a

22  project at the GPL, we will scope a project

23  for some period of time before we put someone

24  on the ground.  When it becomes time to

Highly Confidential - Subject to Further Confidentiality Review

1  implement and actually carry out the policy,

2  that's when we put someone on the ground.

3      Q.    Understood.  And implementation

4  hasn't happened yet?  That's a bad question.

5           In any event, there wasn't any

6  embedding of somebody for 12 to 36 months as

7  part of this project, correct?

8      A.    "This project" being my report

9  in the opioid case?

10      Q.    Correct.

11      A.    Correct.

12      Q.    Okay.  I'll give you now what's

13  been marked as Exhibit 3.

14           (Whereupon, Liebman Exhibit

15           Number 3 was marked for

16           identification.)

17  BY MR. MORRIS:

18      Q.    And, Dr. Liebman, Exhibit 3

19  is -- it's like a press release of some sort

20  that refers to some of the projects that the

21  Government Performance Lab has engaged in.  I

22  just wanted to draw your attention to, on the

23  second page of Exhibit 3, there's a reference

24  to Cuyahoga County, Ohio.

Highly Confidential - Subject to Further Confidentiality Review

1           Do you see that?

2      A.    Yes.

3      Q.    Okay.  So GPL conducted a

4  project for Cuyahoga County, Ohio previously?

5      A.    Yes.

6      Q.    Is that project ongoing?

7           MS. RITTER:  Objection to the

8           form.

9      A.    The fellow we placed there we

10  placed for six months and then got hired by

11  the county, and so we don't have a direct

12  involvement but we are still in touch and in

13  conversations around the project.

14  BY MR. MORRIS:

15      Q.    And what was the nature of the

16  project that GPL did for Cuyahoga County?

17      A.    We were working with their

18  human services agency around some of their

19  workforce programs.

20      Q.    And was it a specific set of

21  goals that were -- what were the goals that

22  the project was hoping to achieve?

23      A.    To try to strengthen the

24  programs that connect people receiving public

1  assistance to employment.

2      Q.    That project didn't have

3  anything to do with opioids, did it?

4      A.    Not in any direct way.

5      Q.    Was that project -- did that

6  project have any connection to how you were

7  retained in this case?

8      A.    No.

9      Q.    Did you do any work yourself on

10  the Cuyahoga County GPL project?

11      A.    Yes.

12      Q.    And what did you do?

13      A.    I spoke to our fellow and

14  coached that fellow in his work.  I did a

15  joint meeting with the fellow and the

16  government official he was reporting to.

17      Q.    And who is the fellow that

18  became employed by Cuyahoga?

19      A.    Oh, you're going to get me in

20  trouble if I --

21      Q.    I won't tell him.

22      A.    -- forgot his name.  All right.

23  I'm going to be in big trouble now.  You'll

24  have to --

1      Q.    That's okay.  We'll come back

2  to it.  Yes, I'll give you a chance to come

3  up with that later.

4            How did the funding for this

5  work?  Did Cuyahoga provide funding to the

6  GPL?  How was the project funded?

7      A.    No.  Nearly all of our projects

8  are philanthropically funded, and we give our

9  services to the governments pro bono.

10      Q.    Is the goal, then, once a

11  project that GPL does initial work for is

12  proven to be successful, the government takes

13  it over and funds it going forward?

14      A.    Yeah, I mean, sometime, yes.

15  The goal is to get something off the ground

16  in a way that it continues after our fellow

17  is no longer there.

18      Q.    And for GPL projects, is there

19  -- how often is it where after the initial

20  project is begun that it turns out that it's

21  not something that could be successful and,

22  therefore, isn't picked up by the government?

23      A.    Maybe one in ten times.

24      Q.    Okay.  Let me do this to orient

1  us with the various reports that -- or

2  portions of the reports that are in front of

3  you, because then I'm going to ask you

4  questions about the specifics of what you

5  were asked to do in this case.

6            If you can pull out -- let's

7  just walk through, we've already looked at a

8  couple of them -- but Exhibit 4.  And is that

9  the original report you submitted, the one

10  dated March 25, 2019?

11      A.    It looks like it.

12      Q.    And I'll represent to you that

13  we printed it out with the appendices and

14  whatnot.

15            If you go to Exhibit 5.

16            (Whereupon, Liebman Exhibit

17      Number 5 was marked for

18      identification.)

19      A.    I think it would be after 4.

20  This okay.

21  BY MR. MORRIS:

22      Q.    Do you recognize what Exhibit 5

23  is?

24      A.    Yes.

1      Q.    Okay.  And what is Exhibit 5?

2      A.    It is the tables associated

3  with the March 25th report.

4      Q.    Okay.  Yes.  And I will

5  represent to you that's the printout we had,

6  or the Excel file that we printed out that

7  went along with the March 25th report.

8            If you go to Exhibit 6, we

9  talked about this one, I think, a little bit

10  already.  What is Exhibit 6, when you get

11  there?

12      A.    It's the supplemental report

13  that was filed on April 3rd.

14      Q.    Okay.  If you go to Exhibit 7.

15            (Whereupon, Liebman Exhibit

16      Number 7 was marked for

17      identification.)

18  BY MR. MORRIS:

19      Q.    Do you recognize what Exhibit 7

20  is?

21      A.    I'm guessing these are the

22  tables that go with that report.  They look

23  like that.

24      Q.    Correct.  Exhibit 8?

**Page 53**

1      (Whereupon, Liebman Exhibit
2      Number 8 was marked for
3      identification.)
4  BY MR. MORRIS:
5      Q.    I'll represent to you that we
6  got a file that further updated things dated
7  April 17th as an Excel spreadsheet.  If you
8  want to look at Exhibit 9 as well, that was
9  an errata that was provided to us along with
10  that.
11      (Whereupon, Liebman Exhibit
12      Number 9 was marked for
13      identification.)
14      A.    Okay.
15  BY MR. MORRIS:
16      Q.    Do you recognize what
17  Exhibits 8 and 9 are?
18      A.    Yes.  Let me just compare
19  something here to make sure I understand
20  what's going on, but I think so.
21      (Witness reviewing document.)
22      A.    Yes.  Okay.  I recognize this.
23      Q.    Okay.  So what is Exhibit 8 and
24  its companion Number 9?

1      A.    It's the most recent set of
2  numbers that we have provided to you.
3      Q.    Okay.  And what's the
4  difference between the Exhibit 7, which is
5  the Excel spreadsheet that went along with
6  the April 3rd report, and Exhibit 8?
7      A.    In the Exhibit 7 version I
8  reversed two numbers on the child welfare
9  population.  There's cases under
10  investigation and the cases that are active
11  open cases, and we -- and I entered them
12  wrong on the spreadsheet and reversed them.
13      Q.    And that's what Exhibit 9 is
14  designed to highlight, what the changes --
15      A.    It shows the change that
16  results.
17      Q.    Okay.  And if you can look at
18  Exhibit 10.
19      (Whereupon, Liebman Exhibit
20      Number 10 was marked for
21      identification.)
22  BY MR. MORRIS:
23      Q.    Do you recognize what
24  Exhibit 10 is?

1      A.    It looks like a list of the
2  materials that I considered in writing my
3  report.
4      Q.    Okay.  We got that as a
5  separate file recently.  Do you know why
6  Exhibit 10 was provided to us?
7      A.    I don't actually know in
8  detail.  I know that some documents, I guess,
9  were not in the original one, but I don't
10  know the details of that.
11      Q.    Okay.  Fair enough.  I went
12  through them that way, just so you know what
13  you have in front of you, because we'll be
14  going back and forth now between some of
15  them.
16      If you can take out Exhibit 6,
17  which is the April 3rd report.
18      A.    Excellent.
19      Q.    Okay.  If you could go to
20  Paragraph 1.  Sorry, I need to get there
21  myself.
22      Okay.  And in Exhibit 1, you
23  refer to Cuyahoga County and Summit County as
24  the communities.

1      Do you see that?
2      A.    Yes.
3      Q.    Why did you cull out those two
4  counties?
5      A.    Those were the two counties
6  that I was asked to design and cost an
7  abatement plan for.
8      Q.    Do you know that there's
9  currently a trial set for October, 2019 in
10  which those two counties are plaintiffs?
11      A.    Yes.
12      Q.    Do you have any opinions about
13  any jurisdictions other than Cuyahoga or
14  Summit Counties that you've been asked to
15  create?
16      MS. RITTER:  Objection.
17      If he can -- if he's been asked
18      to do some, it would be protected
19      privileged communications, so I would
20      instruct him not to answer if you're
21      asking about litigation.
22      MR. MORRIS:  I'm asking whether
23      he's been asked to do -- and I
24      understand your objection.  I'm not

1    necessarily agreeing with it.
2    BY MR. MORRIS:
3      Q.    But my question is, have you
4    been asked to come up with any opinions about
5    any jurisdictions other than Cuyahoga and
6    Summit County?
7      MS. RITTER: Again, objection.
8    Instruct him not to answer to the
9    extent you're asking about litigation.
10    BY MR. MORRIS:
11      Q.    Are there any non-litigation
12    opinions with respect to jurisdictions other
13    than Cuyahoga and Summit Counties regarding
14    analysis of the opioid abuse issues?
15      MR. KO: Object to the form.
16      A.    Sorry, I don't think that's a
17    question anymore. Can you start over,
18    please?
19    BY MR. MORRIS:
20      Q.    Sure.
21      Counsel instructed not to
22    answer with respect to if you've done work to
23    create opinions about jurisdictions, other
24    jurisdictions in connection with litigation,

1    so I'm asking the question, have you -- do
2    you have any opinions about any jurisdictions
3    other than Cuyahoga and Summit Counties
4    outside of litigation?
5      MS. RITTER: Objection to the
6    form.
7      A.    What does do I have an opinion
8    mean?
9    BY MR. MORRIS:
10      Q.    Opinions regarding opioid abuse
11    issues and potential abatement costs.
12      A.    I have not constructed any
13    other estimates for any other jurisdictions
14    other than these counties. And I want to be
15    clear, the counties encompass not just the
16    county governments, but the cities and towns
17    and unincorporated areas within them.
18      Q.    Do you have any plans to expand
19    your opinions in this case to include other
20    jurisdictions other than Cuyahoga or Summit
21    Counties? And I understand that includes
22    towns and cities within those counties. But
23    other than that?
24      MR. KO: Object to the form.

1      A.    Sorry. So I have not been
2    asked to do work on any other jurisdictions
3    outside of these two counties and the areas
4    within them.
5    BY MR. MORRIS:
6      Q.    Is one of the areas within the
7    opinions that you're providing the City of
8    Cleveland?
9      A.    Yes.
10      Q.    And do the issues affecting the
11    City of Cleveland -- I'll come back to that.
12      What's your understanding about
13    the claims that these two communities have
14    brought in this litigation?
15      A.    I'm broadly aware that the
16    litigation is about whether improper
17    activities by the defendants led to and
18    exacerbated the opioid crisis in a way that
19    caused suffering and deaths and other harms
20    in these communities.
21      Q.    One of the things I should have
22    asked you before, are you a -- do you have
23    any training in the law?
24      A.    No.

1      Q.    Do you know what the claims,
2    the causes of actions are in this case?
3      A.    Not in any specific way.
4      Q.    Do you know who the defendants
5    are?
6      A.    I know broadly that there are
7    producers and distributors and retailers
8    involved.
9      Q.    Do you know the names of any of
10    them?
11      A.    I have some guesses based on
12    the -- what the -- who the attorneys said
13    they represented going around the table.
14      Q.    Let me ask it this way.
15      Prior to coming in today and
16    hearing people announce who they're
17    representing, did you know who the defendants
18    were?
19      A.    If you'd asked me, I couldn't
20    have given an exact list, but I've certainly
21    heard names come up in the discussions.
22      Q.    Which names have you heard come
23    up in the discussions?
24      A.    I don't know which ones came up

1  in discussions and which I read in the
2  newspaper.
3        Q.    I asked about whether --
4  broadly speaking your understanding of the
5  nature of the plaintiffs' claims.  Do you
6  have an understanding about what the
7  defendants' defenses are?
8        A.    Not in any significant way.
9        Q.    Okay.  Let's go back to your
10  report then.  If you can take a look at
11  Paragraph 2 of Exhibit 6.
12        A.    Yes.
13        Q.    Okay.  And in Paragraph 2 in
14  describing what you were asked to do, it says
15  that you were "asked to present opinions
16  related to (i) identifying how the
17  Communities can best utilize the tools and
18  practices available to implement programs
19  aimed at furthering the communities' efforts
20  to ameliorate and abate the crisis they face;
21  and (ii) estimating the cost of providing
22  these services."
23              Do you see that?
24        A.    I do.

1        Q.    And do those two things
2  describe the opinions you were asked to
3  render in this case?
4        A.    Yes.
5              MR. KO:  Object to the form.
6  BY MR. MORRIS:
7        Q.    And are those two things -- do
8  those describe the opinions that you intend
9  to offer in this case?
10        A.    Yes.
11        Q.    Any other opinions that you
12  intend to offer in this case?
13              MS. RITTER:  Objection to the
14        form.  Asked and answered.
15        A.    I think the report stands for
16  itself.  I'm trying to design a program that
17  would abate the crisis and figure out how
18  much that would cost.
19  BY MR. MORRIS:
20        Q.    Understood.
21              And so in terms of what you
22  were asked to do in this case, these two
23  categories describe them?
24        A.    Yes.

1        Q.    And there's nothing else I'm
2  missing, in other words, that there's
3  something -- some other set of opinions that
4  you intend to provide in this case?
5              MS. RITTER:  Objection to the
6        form.  Foundation.
7        A.    My full work on this case
8  involves constructing an abatement plan and
9  figuring out the cost of it.
10  BY MR. MORRIS:
11        Q.    Am I correct you're not
12  offering an opinion regarding the cause of
13  what you refer to as the crisis?
14        A.    That's correct.
15        Q.    And you're not offering an
16  opinion in this case regarding the conduct of
17  any particular defendant?
18        A.    That's correct.
19        Q.    Or the conduct of any
20  particular group of defendants?
21        A.    That's correct.
22        Q.    And so no opinion regarding the
23  role or responsibility of any defendant in
24  injuring any person?

1        A.    I'm not providing any opinion
2  on that.
3        Q.    And you're not offering any
4  opinion regarding the role or responsibility
5  of any defendant in causing what you refer to
6  as the opioid crisis?
7        A.    I missed the difference between
8  that question and the previous one.
9        Q.    There may not have been.
10        A.    Okay.  Ask it again.
11        Q.    You're not rendering an opinion
12  regarding the role or responsibility of any
13  defendant in causing what you refer to as the
14  opioid crisis?
15        A.    Correct.
16        Q.    Now, this one is slightly
17  different.  No opinion regarding the role or
18  responsibility of any defendant in causing a
19  public nuisance?
20        A.    That's correct.
21        Q.    And you're not offering any
22  opinion that assigns any percentage of fault
23  to any defendant, is that correct?
24        A.    That's correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And you have no opinion
2  regarding the specific -- any specific
3  defendant's products?
4    A.    Well, I suppose some of the
5  products that are -- for example, the
6  medication-assisted treatment might be
7  produced by one of the defendants, although
8  I'm not sure about that.
9    Q.    Fair enough.
10         You're not rendering an opinion
11  regarding the efficacy, for example, of any
12  defendant's prescription opioid medication?
13    A.    That's correct.
14    Q.    And you're not rendering an
15  opinion regarding the marketing or
16  distribution activities of any defendant,
17  correct?
18    A.    I mean, but there are places
19  where the abatement needed responds to the
20  need, and so in some way some of these things
21  may be linked together.
22    Q.    You haven't studied the
23  marketing practices, for example, of any
24  particular defendant?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    No.
2    Q.    And you haven't studied or
3  analyzed the distribution practices of any
4  particular defendant, correct?
5    A.    Correct.
6    Q.    Correct, then, that you can't
7  -- let me put it this way.  Sorry.
8         It's correct, then, that you're
9  not offering an opinion about whether what
10  you referred to as the opioid crisis would
11  look any different today if any manufacturer
12  had not marketed its opioids?
13         MR. KO:  Object to the form.
14    A.    There was some negatives in
15  that sentence that I need to parse.  Would
16  you repeat that one more time?
17  BY MR. MORRIS:
18    Q.    Sure.  Let me -- yeah, let's do
19  it this way rather than getting confused.
20         Is it correct that you are not
21  rendering -- well, let me start again myself.
22         Is it correct that you can't
23  say whether what you refer to as the opioid
24  crisis would look any different today if any

Highly Confidential - Subject to Further Confidentiality Review

1  one of the manufacturers had not marketed its
2  opioid -- prescription opioid products?
3         MR. KO:  Same objection.
4    A.    I think as someone who has
5  spent the last year thinking about this
6  crisis, I don't think I agree that -- I don't
7  know anything about that topic, but it is not
8  the subject of my report.
9  BY MR. MORRIS:
10    Q.    You're not offering any opinion
11  about that in this case?
12         MR. KO:  Object to the form.
13    A.    My opinion involves designing a
14  program to abate the crisis and figuring out
15  the cost of that, and that's what it is.
16  BY MR. MORRIS:
17    Q.    And then just to be clear then,
18  it's not about -- you're not rendering an
19  opinion regarding the conduct of any
20  defendant, correct?
21         MS. RITTER:  Objection to the
22    form.  Asked and answered.
23         MR. MORRIS:  I'll strike that.
24    That's fine.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. MORRIS:
2    Q.    In marching through the
3  different exhibits that have already been
4  marked and the two different reports, what's
5  the difference between the March 25th report,
6  your original report which is Exhibit 4, and
7  the April 3rd report which is Exhibit 6?
8    A.    The March 25th report describes
9  an abatement plan that has 19 components to
10  it, and provides cost estimates for seven of
11  those that account for just under 80 percent
12  of the total dollars.
13         And then in the April 3rd
14  report, the April 3rd report includes
15  estimates for the other 12 components of the
16  plan.
17    Q.    What changed between April 25th
18  and April 3rd that required a supplemental
19  report?
20    A.    I was initially asked by the
21  attorneys to include estimates of -- for the
22  seven categories in the initial report, and
23  then I was subsequently asked to include 12
24  more.

1    Q.    In your March 25th report,
2 though, those additional categories are
3 identified, correct?
4    A.    Yes, I had constructed an
5 overall abatement plan that included all 19,
6 and that was -- that whole plan is laid out
7 in the March 25th report.
8    Q.    So was it that -- well, why
9 didn't you provide the cost estimate for
10 those additional 19 -- I'm sorry, was it the
11 additional 12?
12    A.    Additional 12.
13    Q.    -- the additional 12 as part of
14 your March 25th report?
15         MR. KO:  Objection.  Asked and
16    answered.
17    A.    The attorneys asked me to put
18 seven in, so I put seven in.
19 BY MR. MORRIS:
20    Q.    You weren't asked to do -- to
21 give actual estimates for the other 12 until
22 after March 25th?
23         MR. KO:  Objection.
24         MS. RITTER:  Objection.  Asked

1 and answered.
2    A.    I was asked to include seven in
3 this report, and then they asked me to
4 produce the rest of the numbers.
5 BY MR. MORRIS:
6    Q.    Could you have included the
7 additional 12 in your March 25th report?
8    A.    Yes.
9    Q.    Am I understanding you right
10 that the only reason you didn't was because
11 the attorneys hadn't asked you for it?
12         MS. RITTER:  Objection.  Asked
13    and answered.
14    A.    If the attorneys said, please
15 put these seven in this report, then I put
16 them in the report.
17 BY MR. MORRIS:
18    Q.    If you had put the 12
19 additional cost estimates that ultimately
20 were in your April 3rd report in the
21 March 25th report, would they have been the
22 same numbers?
23         MS. RITTER:  Objection to the
24    form.

1    A.    The answer -- yes, they would
2 have been the same numbers.
3 BY MR. MORRIS:
4    Q.    And you had those numbers as of
5 March 25?
6         MR. KO:  Objection.  Asked and
7    answered three times.
8    A.    I had done estimates, I had
9 been working on estimates of all the
10 categories all along the way.
11 BY MR. MORRIS:
12    Q.    We talked about the April 17th
13 Appendix D update that had the errata that
14 went along with it that's Exhibits 8 and 9,
15 and you explained that before, that you had
16 transposed numbers.
17    A.    Mm-hmm.
18    Q.    Do you intend to offer any
19 other supplements to your report?
20    A.    There are two other changes
21 that in reviewing for this deposition I would
22 now like to offer.  One is that in appendix
23 -- find the appendix.  In Appendix C, which
24 lists the interviews I had with members of

1 the community, I incorrectly identified Scott
2 Osiecki as working at the Cuyahoga Medical
3 Examiner's Office, he works at the ADAMHS
4 Board.  That's the first one.
5    Q.    Okay.
6    A.    And then in addition, in
7 reviewing my spreadsheets, I would like to
8 improve my estimates of the -- let's find the
9 table so I can point you to it.
10    Q.    Sure.  Just so I can follow
11 along, which one are you looking at now,
12 which exhibit?
13    A.    I am looking at Exhibit 6,
14 April 3rd report.  If you would turn to --
15 just give me one second to figure out what
16 table it is.  If you would turn to Tables
17 C.11 and S.11 which have the estimated cost
18 of social support housing --
19    Q.    Hold on one second,
20 Dr. Liebman, I want to make sure I'm there
21 now.  Okay.  I'm there.
22    A.    In Table C.11, C.12, which
23 contain the cost of social support housing, I
24 would like to improve my methodology that was

Highly Confidential - Subject to Further Confidentiality Review

```
 1   used there.
 2        Q.    Okay.  So how would you improve
 3   your methodology?
 4        A.    So in estimating the number of
 5   homeless per night, I have the total number
 6   of homeless people in Cuyahoga County, but I
 7   would like to separate that out into the
 8   homeless individuals and the homeless
 9   families, which would bring down the number
10   of homeless -- the number of housing units a
11   bit and bring down the costs a bit.
12        Q.    Okay.  So how would that look
13   then?  You've got right now the number for
14   total number, average number of homeless per
15   night for -- I'm looking at the one for
16   Cuyahoga, is 1,808.  How does your change
17   impact that, or how does it look?
18        A.    That will come down a bit.  I
19   don't have the exact numbers with me.
20        Q.    Okay.  So do you have actual
21   spreadsheets that you're working with?
22        A.    Yes, I've made a new version of
23   the spreadsheet.
24        Q.    Okay.  But you don't have that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   with you today?
 2        A.    I don't have that with me.
 3        Q.    Is the work done?
 4        A.    Yes.
 5        Q.    Any reason you didn't bring it
 6   with you today?
 7        A.    I was told you bring nothing to
 8   a deposition.
 9        Q.    This change you're talking
10   about is just to the Table 11, but for both
11   Cuyahoga and --
12        A.    Yes, it brings down the costs a
13   little bit.
14        Q.    Okay.  And how much does it
15   bring down the cost?
16        A.    Again, I don't have the table
17   with me.
18        Q.    Order of magnitude or estimate?
19        A.    Let me look and see if I can --
20   let me not do this from memory because I will
21   screw it up.  But it's -- it's, you know,
22   it's not -- this is a small -- to begin with
23   -- it is not -- it will not change either of
24   the first two digits in the aggregate cost of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   this plan.
 2        Q.    Okay.  Does the -- for line
 3   item 2, I'm trying to understand the
 4   best I can as I sit here without having the
 5   spreadsheet, you have the OUD prevalence
 6   among homeless at 17.9 percent --
 7        A.    Yeah.
 8        Q.    -- for Cuyahoga -- I guess for
 9   both.  Does that change?
10        A.    No.  The only other thing that
11   changes is I'm going to improve line 4 as
12   well which at the moment takes the average of
13   the cost of a housing unit for a one-person
14   unit and a two-bedroom unit, and in the
15   version here it's equally weighting those
16   two, because I'm now disaggregating the
17   population between the individuals and the
18   families.  Individuals are a bigger share of
19   the population, so I'm going to put more
20   weight on the lower one-bedroom cost than the
21   two-bedroom cost, and that brings down that
22   number a bit as well.
23        Q.    So the cost for a one-bedroom
24   is lower than the -- for example, for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Cuyahoga, $13,000?
 2        A.    The cost of one-bedroom is
 3   below that, and the cost of two is above it.
 4   This is an average.  The average is going to
 5   move more toward the one-bedroom number.
 6        Q.    What prompted you to make the
 7   change to Table 11?
 8        A.    As I was going through the
 9   spreadsheets to prepare for this I looked at
10   what I'd done, and I thought there was a
11   better way to do it.
12        MR. MORRIS:  Obviously ask for
13        and request that -- the spreadsheet to
14        be provided, while reserving our
15        objection to its late production.
16        Is there any reason that we
17        can't get it forthwith?
18        MS. RITTER:  Are you asking
19        him?  If you want to ask us, Dave and
20        I can talk about what -- Counsel, is
21        it a question for him, or is it a
22        question for us?
23        MR. MORRIS:  I would like it as
24        soon as possible and, if possible,
```

```
 1        before the end of the deposition so we
 2        can at least have it.
 3               MS. RITTER:  We'll take your
 4        request under advisement.
 5               Also, can we take a break?
 6        It's been just a little bit over an
 7        hour.
 8               MR. MORRIS:  Okay.
 9               THE VIDEOGRAPHER:  The time is
10        10:16 a.m., and we're off the record.
11               (Whereupon, a recess was
12        taken.)
13               THE VIDEOGRAPHER:  The time is
14        10:31 a.m., and we're on the record.
15   BY MR. MORRIS:
16        Q.     Dr. Liebman, before the break
17   we were talking about the changes you had to
18   Table 11.
19        A.     Yes.
20        Q.     When did you note that had you
21   changes to 11?  When did you decide that you
22   wanted to make changes?
23        A.      In the last couple days as I
24   was preparing.
```

```
 1        Q.     And when did you notify counsel
 2   that you had changes?
 3        A.     Sometime in the last couple
 4   days.
 5        Q.     If you can go back to
 6   Exhibit 6, which is your April 3rd report.
 7   And turning -- going back to Paragraph 2 that
 8   we were talking about before which has the
 9   description of the two opinions, in the end
10   of the first opinion that you were asked to
11   provide it refers to "efforts to ameliorate
12   and abate the crisis."
13               Do you see that?
14        A.     Mm-hmm.
15        Q.     What do you mean by "the
16   crisis"?
17        A.     The conditions such that people
18   in the two communities are suffering, dying.
19   The communities are having resources
20   stretched, all of the impacts of the opioid
21   epidemic.
22        Q.     Okay.  And that was my next --
23   one of my next questions.  You also in the
24   paragraph above refer to a public health
```

```
 1   emergency.
 2               Do you see that?
 3        A.     Yeah.
 4        Q.     Is that the same thing as the
 5   crisis?
 6        A.     I would say the people I've
 7   interacted with in the bellwether communities
 8   seem to use crisis, emergency, epidemic
 9   pretty interchangeably, and I think there has
10   been a, if I recall right, a technical
11   emergency declared by the State of Ohio, so
12   there is -- I think there's maybe a little
13   bit more term of art to that one.
14               But the point here is that
15   there is a big problem that needs to be
16   addressed, and my report is about how to
17   abate that problem.
18        Q.     Okay.  And so in your report
19   sometimes you refer to crisis, sometimes you
20   refer to epidemic.  Is there a difference in
21   the way you're using those terms?
22        A.     No.  I'm treating those as
23   synonyms.
24        Q.     And let me go back to that.
```

```
 1               An epidemic or crisis of what
 2   exactly?
 3        A.     That there are lots of harms
 4   happening in these communities because of the
 5   effects of people being addicted to opioids,
 6   and people are having lives ruined.  People
 7   are dying.  The communities are having
 8   difficulty delivering standard public
 9   services because so much is being allocated
10   to deal with this crisis.
11        Q.     Let me talk about a couple more
12   terms that you use in the report.
13               You obviously refer to opioids.
14   What do you use that term to mean in your
15   report?
16        A.     It encompasses heroin,
17   synthetics like fentanyl, prescriptions,
18   OxyContin, the whole range of the related
19   compounds.
20        Q.     So not just prescription
21   medication?
22        A.     No.  Opioids means the full
23   range in the way I'm using it.
24        Q.     And so there's also -- I see
```

1  you reference sometimes to illicit or illegal
2  opioids.  What does that refer to?
3      A.    That would refer to things like
4  heroin that are not legal, not for legal use.
5      Q.    Are you familiar with different
6  types of illicit opioids?
7      A.    I mean, there's illicit ones
8  that are always illicit.  There are ones that
9  can be illicit only if used in a way that
10  they were not intended to be used.  So
11  there's a range --
12      Q.    You're getting -- yeah, so
13  you're getting to one of the questions I
14  have.
15          So when you're use the term
16  illicit opioid, for example, are you
17  including in that prescription medication
18  that is in the hands of somebody who
19  shouldn't have it?
20      A.    So just to be clear, there's
21  nothing in my plan that is distinguishing
22  between illicit and not illicit.  My
23  assignment was to come up with an abatement
24  plan to adjust the whole opioid crisis, and

1  not to distinguish.
2          So, you know, I think the only
3  place that I remember that the language comes
4  up is in a couple of the footnotes that --
5  pointing out that I'm dealing with the whole
6  crisis and not distinguishing.
7      Q.    Okay.  And we'll get there when
8  we're going through some of the specifics,
9  but some of the costs that you are examining
10  differ, depending on whether it's a
11  prescription opioid medication versus an
12  illicit opioid?
13          MS. RITTER:  Objection to the
14      form.
15      A.    So my plan attempts to abate
16  the harm, the harms that come from people
17  misusing prescription opioids and from people
18  who are misusing illicit opioids.
19  BY MR. MORRIS:
20      Q.    Okay.  We talked about this
21  term before, opioid use disorder, or OUD.
22  What do you use that term to mean?
23      A.    I use that to encompass the
24  disorder associated with the full range again

1  of opioids.
2      Q.    There's also, though, heroin
3  use disorder, or HUD, which sometimes is
4  referred to.  How do you use that term?
5      A.    That would be the subset.  So I
6  use opioid use disorder to be the overall,
7  and heroin use disorder is a subset of that.
8      Q.    Going back to Paragraph 2 in
9  Exhibit 6, and we were talking about the
10  phrase efforts to ameliorate or -- sorry, "to
11  ameliorate and abate the crisis," then we
12  started talking about crisis.
13          What does ameliorate mean?
14      A.    To reduce the harms.
15      Q.    And does that mean to lessen
16  the harms in any way?  Is there a metric that
17  you're using for that?
18          MR. KO:  Object to the form.
19      A.    The plan I put together is
20  meant to make a deep and rapid -- to have a
21  deep and rapid effect in reducing harms.
22  BY MR. MORRIS:
23      Q.    It also says "and abate."  How
24  are you using the term abate?

1      A.    Similarly to reduce the harms
2  associated with this crisis.
3      Q.    Okay.  For purposes of your
4  report, is there any difference between
5  ameliorate and abate?
6      A.    I think of the whole plan as an
7  abatement plan that is trying to move as fast
8  as we can to stop people from dying and stop
9  the other harms associated with the opioid
10  crisis.
11      Q.    Is there a specific goal that
12  would define what has abated the crisis?
13      A.    I don't have a specific goal.
14  I'm trying to make as much progress as we can
15  make as fast as we can.
16      Q.    And not to make light of it,
17  I'm just trying to figure out what the bounds
18  are.  So if the plan were to probably impact
19  ten people, that would in your terminology
20  abate the public nuisance?
21          MS. RITTER:  Objection to the
22      form.
23      A.    I'm really not trying to -- I
24  don't have any -- I'm trying to put forth a

1  plan that will do much more than that, and I
2  don't have a -- the parsing of these words
3  isn't something that I have thought hard
4  about.
5  BY MR. MORRIS:
6      Q.    I understand.  Like I said, I'm
7  not trying to be pejorative or make light of
8  this at all.  I'm just trying to figure out
9  whether there's some trigger at which
10  something becomes, ah, we've reached, quote,
11  abatement that you've measured as part of
12  your activity, your opinions.
13          MS. RITTER:  Objection to the
14      form.  I'm not even sure there was a
15      question.
16      A.    I've forgotten the question.
17  If you wouldn't mind answering -- asking it
18  again.
19  BY MR. MORRIS:
20      Q.    Sure.  I'll come back to it.
21  When we get to some specifics --
22      A.    Okay.
23      Q.    -- I'll turn back to it.
24          If you could turn now to

1  Paragraph 14.  We were looking at Paragraph 2
2  before which was raised in terms of the
3  opinions you were asked to provide, and 14
4  refers to things that you have concluded, and
5  then identifies an A and a B, in the first
6  sentence at least.
7          Do you see that?
8      A.    Mm-hmm.
9      Q.    Is there -- let me do it this
10  way.  Can you read the first sentence?
11      A.    Of Paragraph 14?
12      Q.    Of Paragraph 14.
13      A.    "I conclude that there is a
14  framework within the area of applied
15  economics by which an economist can
16  reasonably evaluate the level of abatement
17  resources needed for the next 15 years in the
18  communities of Cuyahoga County and Summit
19  County, Ohio, to abate the opioid crisis and
20  the cost of those resources."
21      Q.    Okay.  You use the term
22  "framework" here in discussing the
23  conclusions that you've reached.  What does
24  framework mean?

1      A.    I'm saying that there is a
2  methodology that one can use to do what I did
3  in this report.
4      Q.    And as an economist, are you
5  offering an opinion about what specific
6  programs should be implementing to abate the
7  crisis?
8      A.    I am doing what I always do
9  when I am asked by a committee to help them
10  make progress on a social problem, which is I
11  consult with national -- with the national --
12  I read literature that's been written about
13  the problem, often nationally, I consult with
14  national experts.  I then learn enough about
15  the local situation to craft a solution that
16  matches the local conditions.
17          So that's a framework that I
18  have applied over and over again both when I
19  have served in government and in my work at
20  the Government Performance Lab.
21      Q.    Okay.  And if you look in
22  Figure 1, there's a listing of the 19
23  specific elements of the abatement plan.  Who
24  came up with those 19 elements?

1      A.    I did.
2      Q.    And you came up with those 19
3  elements to -- in your opinion would be the
4  things that would abate the crisis?
5      A.    Exactly.
6      Q.    And you came up with these 19
7  elements of the plan even though you're not
8  an expert in the treatment of people in
9  communities with opioid use disorder?
10          MR. KO:  Object to the form.
11      A.    I did exactly what I do every
12  time I'm asked to solve a policy problem; I
13  consult with experts, I study the literature,
14  I talk to people in the community, and then I
15  put together the policy proposal that I
16  believe can best help that community.
17  BY MR. MORRIS:
18      Q.    This is the first time you've
19  done such a thing for the opioid crisis, as
20  you've termed it, correct?
21          MR. KO:  Object to the form.
22      A.    This is the first time that I
23  have assembled an abatement plan for a
24  community on the opioid crisis, that is

1    correct.

2    BY MR. MORRIS:

3        Q.    Are you relying on other people

4    to say what should be part of the 19

5    elements?

6        A.    So I am relying on the sources

7    I cite in my report.  So, for example, the

8    CDC has recommendations, the Surgeon General

9    has recommendations.  I'm relying on advice I

10   got from a variety of experts, including

11   Dr. Lembke, Dr. Alexander and other, and I'm

12   relying on what I learned from talking to

13   local medical experts, local people working

14   on these policy issues in the community.

15       Q.    Okay.  Let me ask it this way.

16             When did you start developing

17   your abatement plan?

18       A.    About a year ago.

19       Q.    And was that in the summer of

20   2018?

21       A.    Yes.

22       Q.    And you then submitted the

23   first report in March of 2019?

24       A.    Yes.

1        Q.    So that's approximately nine

2    months?

3        A.    Mm-hmm.

4        Q.    You've got to say yes or no.

5        A.    Yes, approximately.

6        Q.    Did you have a full-time job

7    during that period that wasn't working on

8    this opinion?

9        A.    Yes.

10       Q.    I may have asked you this

11   before.  Do you know how many hours the

12   individuals at Compass Lexecon spent working

13   on --

14       A.    I do not.

15       Q.    -- your opinion?

16       A.    I do not.

17       Q.    Who did the drafting of your

18   opinion?

19       A.    The writing?

20       Q.    Yes.

21       A.    I wrote nearly all of the first

22   draft.  There were a few paragraphs where I

23   asked someone under my direction to draft

24   them, and then I reviewed them and edited

1    them.

2        Q.    And who did you ask under your

3    direction to make edits, or do additional

4    drafting?

5        A.    The three people at Compass

6    Lexecon that I mention before.

7        Q.    And what direction did you give

8    them?

9             MR. KO:  I'd advise the witness

10            not to disclose -- to the extent these

11            communications have been with or were

12            involving counsel, I'd instruct the

13            witness not to answer.

14       A.    So an example would be I would

15   say to them that I would like them to find

16   out if there's any literature, further

17   literature on the topic that I found a couple

18   papers on, and find that literature for me in

19   case I wanted to cite additional sources.

20   BY MR. MORRIS:

21       Q.    Anything else you can think of

22   for direction you gave them?

23            MR. KO:  Same instruction.

24       A.    Not specifically.

1    BY MR. MORRIS:

2        Q.    How long did you spend doing

3    interviews of people?

4        A.    Can we turn to the exhibit that

5    has the interviews on it?

6        Q.    Sure.

7        A.    That would help me give you an

8    answer to that question.

9        Q.    Sure.  We're still on

10   Exhibit 6?

11       A.    Yes.  In Exhibit 6 and we're

12   going to go to Appendix -- one of the

13   appendices, Appendix C, please.  So this is

14   the list of interviews we did.  I guess we

15   could try to count them up to give you an

16   answer to your question of how long.

17       Q.    Let me ask this.  How many --

18   were all these interviews done in person?

19       A.    No.

20       Q.    How many interviews did you

21   conduct that weren't in person?

22       A.    So you can see on the list the

23   ones that say "call" were done on the phone,

24   and the ones that say "meeting" were done in

1    person.

2         Q.    And when you met with people,

3    aside from the interviewees, were there other

4    people present?

5         A.    Yes.

6         Q.    And who would that be?

7         A.    It varied by meeting.

8    Typically there would be counsel there.

9         Q.    How did you determine what

10   documents to review in creating your

11   abatement plan?

12         MR. KO:  Same instruction as

13         before.  To the extent that these

14         conversations involved or were with

15         counsel, I'd instruct the witness not

16         to answer.

17         A.    I did what I always do when I

18   am studying a topic.  I do literature

19   searches, I direct people working for me to

20   do additional literature searches, I ask

21   experts if there are other sources that would

22   be relevant, and then I go find those

23   sources.  I -- you know, if there's anything

24   in one paper that cites another that looks

1    relevant, I'll go find that.  I'll ask the

2    experts, you know, if it's a particular

3    question I'll say, I've seen these three

4    papers, is there anything important that I'm

5    missing?  Other people involved, like

6    counsel, will sometimes send me things that

7    they run into that they thought might be

8    relevant to what I'm working on.

9    BY MR. MORRIS:

10        Q.    And you said you spent

11   approximately 300 hours in total in working

12   on creating your report for March, 2019?

13         MR. KO:  Asked and answered.

14        A.    That's correct.

15   BY MR. MORRIS:

16        Q.    How much of that time was spent

17   reviewing literature?

18        A.    I have not pressed that --

19   separated out the different activities like

20   that in my head.

21        Q.    I saw reference to depositions

22   that you've reviewed.

23        A.    Mm-hmm.

24        Q.    How did you determine which

1    depositions to review?

2         A.    Counsel would suggest to me

3    ones that were relevant to the things I was

4    working with, and sometimes would share the

5    whole deposition with me and sometimes a

6    portion.

7         Q.    Let's go back to Figure 1 of

8    your April report on Page 7, which is

9    Exhibit 6.

10              You divided the abatement plan,

11   your abatement plan into four main

12   categories, correct?

13        A.    That's right.

14        Q.    We'll go into details about

15   some of those later, but did you consider any

16   other categories to include?

17        A.    They're categories that -- I

18   guess the answer is yes.

19        Q.    And which categories did you

20   consider including but not include?

21        A.    Well, as I reviewed the

22   literature, some of the recommendations are

23   not relevant for these communities, such as

24   that there should be new research on

1    developing safer pharmaceuticals.  That's

2    clearly not something that's going to happen

3    in Cuyahoga or in Summit.  It's going to

4    happen at the national level.  So things like

5    that I didn't include in my proposal for the

6    bellwethers.

7         Q.    Okay.  So potential new

8    research for safer pharmaceuticals.  Anything

9    else that you considered but did not include

10   in your abatement plan?

11        A.    I guess a similar thing would

12   be, you know, Customs department

13   interventions, to inspect more packages

14   coming in from China for fentanyl.  Again,

15   that would -- that's not in the scope of

16   what -- is not relevant to the --- for these

17   -- for a plan that could be given in these

18   communities.

19              So there are probably other

20   things in that category, but basically I

21   was -- I tried to incorporate as many of the

22   practices that people were recommending and

23   that had -- I mean, there's a pretty strong

24   consensus in the literature about -- these

Highly Confidential - Subject to Further Confidentiality Review

1    are not particularly original categories,

2    just about every one of these reports is

3    recommending a similar set of things.

4        Q.    So the category that you just

5    mentioned that is not included -- as not

6    being, in your view, relevant to something

7    implemented by the counties is -- you refer

8    to it as Customs control.  That would include

9    things like law enforcement efforts to stop

10   illegal or illicit drugs from crossing into

11   the United States from other countries?

12       MR. KO:  Object to the form.

13       A.    Sorry.  Customs does not

14   include -- you're talking -- you're saying

15   what would the Customs department activities?

16   BY MR. MORRIS:

17       Q.    Let's do it this way.  Yes.  So

18   let me re-ask the question.  I clearly got

19   off track a little bit.

20            You're not including in this

21   abatement plan things like federal law

22   enforcement designed to try and prevent

23   illegal drugs from coming into the country,

24   correct?

---

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Correct.

2        Q.    Things like illegal or illicit

3    fentanyl coming into the country and into

4    these two counties has a major impact on

5    them, though, correct?

6        MR. KO:  Object to the form.

7        A.    Part of the, obvious -- some of

8    the -- you know, a lot of the spike in

9    overdose deaths is from illegal fentanyl, for

10   example, some of which comes in from outside

11   the country.

12   BY MR. MORRIS:

13       Q.    So efforts to stem the flow of

14   illegal or illicit fentanyl, for example,

15   coming into the country would be part of

16   potential ways of abating the problem in the

17   two counties, correct?

18       MR. KO:  Object to the form.

19       A.    A national strategy absolutely

20   needs to include that as a component.

21   BY MR. MORRIS:

22       Q.    It's just not part of what your

23   opinion for an abatement plan for these two

24   particular counties includes?

---

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Right.  I was asked to focus on

2    these counties, but, you know, if you think

3    about the overall abatement strategy needed

4    for the country, it would cost more than what

5    I'm doing here because there are other

6    components at other levels of government.

7        Q.    I asked the question in terms

8    of whether there were other categories that

9    you considered but did not include.

10            You have elements within those

11   categories.  Were there other elements within

12   these categories that you considered but did

13   not include?

14       A.    There likely are, but there

15   aren't any that are on the top of my mind

16   right now.

17       Q.    Hold on a second, I dropped my

18   pen.

19       A.    No problem.

20       Q.    If you go back to Paragraph 7

21   of Exhibit 6.

22       A.    Yes.

23       Q.    In the last sentence you're

24   describing some of the government service

---

Highly Confidential - Subject to Further Confidentiality Review

1    that you've engaged in in your career, and

2    you say "I supervised the development of cost

3    estimates of complicated multi-faceted

4    government initiatives," and then you give

5    some examples.

6        A.    Mm-hmm.

7        Q.    Would you agree that the --

8    what you're describing as the opioid crisis

9    is a complicated multi-faceted issue?

10       A.    Yes.

11       Q.    And one of the things that you

12   worked on that you include here as an example

13   is working on the Affordable Care Act of

14   2010?

15       A.    Yes.

16       Q.    What was your role in that?

17       A.    So during the -- well, during

18   my time at OMB, I was one of the people who

19   was on a roughly 20-person team that was

20   within the White House that was working on

21   development of legislation, and I

22   specifically being at OMB had responsibility

23   over figuring out how to estimate the cost of

24   different things we were considering

1  including in the legislation.

2    Q.    Okay.  And that was one of the

3  questions I was going to ask.  You mentioned

4  that you had 20 people that were working on

5  that with you at OMB?

6    A.    That would be -- that would

7  include throughout the White House.  I'm sort

8  of thinking there were more people total

9  working on it, but I'm sort of thinking about

10  the senior level task force that was working

11  on it, 20, 30, something like that.

12    Q.    At OMB, how many people were

13  working on the issue of trying to cost out

14  the Affordable Care Act?

15    A.    How big was the health team?  I

16  don't know that exactly.  The total OMB staff

17  is -- there were 500, and I don't know, mid

18  two digits, but I don't know the exact

19  number.

20    Q.    And how long did the work you

21  were doing for the -- with the OMB in

22  analyzing the cost of the Affordable Care

23  Act, how long did that take?

24    A.    Well, there were a lot of

1  waves.  You know, there was sort of our

2  initial figuring out what our policy position

3  was and estimating the cost of that.  Then

4  there was the legislation that Senator Baucus

5  was moving and trying to figuring out that,

6  and there was sort of the house -- I mean,

7  there was -- I was working on this issue,

8  though, from the beginning of the

9  administration until the day the Affordable

10  Care Act passed, and then beyond.  But any

11  particular estimate, you know, it depended on

12  how much time we had to produce it.

13    Q.    In footnote 7 of your report

14  you state that -- if you could go to there --

15  that "My estimates of the plan costs are not

16  reduced to reflect costs arising in

17  connection with heroin use in the community

18  where the individual had never used

19  prescription opioids."

20        Do you see that?

21    A.    Yes.

22    Q.    What does that mean?

23    A.    It means the same thing I told

24  you a little earlier, that my plan is to

1  abate.  What I was asked to do was figure out

2  an abatement plan for the whole opioid

3  crisis, and I was not asked to parse out

4  anything having to do with different reasons

5  for components of where that crisis came

6  from.

7    Q.    Okay.  So in other words, your

8  cost estimates include the cost of treatment,

9  for example, of people who never used

10  prescription opioids?

11    A.    Yes.

12    Q.    If you were to try and account

13  for individuals in your plan who never used

14  prescription opioids, do you have an estimate

15  as to how much lower the abatement plan would

16  be?

17    A.    I have not thought about that.

18    Q.    You're noting that the

19  abatement plan is not reduced based on an

20  individual who has never used prescription

21  opioids.  Are there other reductions that are

22  included?

23        MS. RITTER:  Objection to the

24    form.

1    A.    Unless this is a -- nothing is

2  occurring to me, but I may be -- that was a

3  broad question.  As we get to individual

4  elements maybe I will see some other place

5  where I --

6  BY MR. MORRIS:

7    Q.    Okay.  Fair enough.  I ask

8  because you cull out specifically in footnote

9  7 that it's not being reduced for that

10  purpose, and I was wondering if there was

11  some category or thing that you have in mind

12  that the plan is being reduced for.

13    A.    I think I was just trying to be

14  clear that this was -- that I was addressing

15  the whole crisis.

16    Q.    Okay.  Let's go to

17  Paragraph 18, please.

18    A.    Yes.

19    Q.    And there in the first sentence

20  you say that you estimate that the

21  "implementation of the programs of Abatement

22  Plan evaluated to date will cost $5 billion

23  in Cuyahoga County and $2.2 billion in Summit

24  County over the next 15 years."

1   Do you see that?

2   A.   I do.

3   Q.   What do you mean by "to date"?

4   A.   I mean, that it is possible

5   that more categories could pop up that

6   experts start recommending as part of the

7   solution to this crisis, and in that case I

8   could amend them in my report in that way.

9   Q.   As you sit here today, though,

10  do you have in mind any other categories?

11  A.   No.

12  Q.   Going on in Paragraph 18, at

13  the bottom of Page 7, the sentence that runs

14  on the next page, it says "In addition, I am

15  informed that the costs of certain services

16  contemplated in the Plan have been or will be

17  provided in documents or testimony from the

18  Counties."

19  Do you see that?

20  A.   Yes.

21  Q.   What did you mean by that?

22  A.   I meant that as this report was

23  being written and lots of other depositions

24  and other things were coming in, it was

1   possible that there would be -- that new

2   numbers would come in that would make it

3   possible for me to come up with better

4   methodologies to improve some of these

5   estimates.

6   Q.   And you say that there -- it's

7   your understanding that the costs will be

8   provided in documents or testimony from the

9   counties, implying in the future.  Do you

10  have anything in mind?

11  A.   No.

12  Q.   There's nothing you're aware of

13  that may be coming in the future to be

14  provided to you?

15  A.   No.

16  Q.   Okay.  If you go to

17  Paragraph 19, please.

18  A.   Yes.

19  Q.   And that paragraph, can you

20  read that paragraph, please?

21  A.   "Available studies indicate

22  that an intensive effort like the one

23  described in this plan is needed to address

24  the problems faced in these communities

1   because of the opioid epidemic and further

2   indicate that implementation of such a range

3   of programs will result in reduced mortality

4   and morbidity associated with opioid

5   addiction?

6   Q.   Okay.  And then you cite -- you

7   have a footnote there, and you cite a couple

8   of papers.

9   Do you see that?

10  A.   Yes.

11  Q.   Actually it's one paper.  It's

12  the Pitt paper?

13  A.   Mm-hmm.

14  Q.   Have you reviewed the Pitt

15  paper?

16  A.   Yes.

17  Q.   And is that one of the

18  documents you reviewed to prepare for your

19  deposition today?

20  A.   I didn't read every word again,

21  but I did look at it again.

22  Q.   Let me get that out.  I'll put

23  this together.  This is going to be

24  Exhibit 11.

1   (Whereupon, Liebman Exhibit

2   Number 11 was marked for

3   identification.)

4   BY MR. MORRIS:

5   Q.   Are you aware that the Pitt

6   paper has the actual article and then a

7   supplement that goes along with it?

8   A.   Yes.

9   Q.   I'm going to mark them together

10  as a single exhibit, Exhibit 11.

11  Okay.  Now, I'm correct, right,

12  that the authors of this article -- and it's

13  entitled "Modeling Health Benefits and Harms

14  of Public Policy Responses to the US Opioid

15  Epidemic."  These authors created a model of

16  US adults that have a variety of exposures to

17  opioids and experiences with pain, and

18  attempted to project health outcomes based on

19  11 policy responses to the opioid epidemic?

20  MR. KO:  Object to the form.

21  A.   These models have created --

22  yes.  Well, this paper, the authors created a

23  model and studied 11 policy responses.

24  BY MR. MORRIS:

1    Q.    Do you know what kind of model
2  the authors used?
3    A.    Called a compartment model.
4    Q.    And you didn't create a model
5  for your abatement plan, correct?
6    A.    Correct.  Or should I say I
7  didn't create a compartment model.  I
8  obviously created a budget model.
9    Q.    And what's the difference
10  between a compartment model and a budget
11  model?
12    A.    A compartment model is a model
13  in which you separate out the population into
14  a bunch of categories, and then you model how
15  people move from one category or compartment
16  to another as time passes.
17    Q.    And your budget model then,
18  though, just takes categories and elements of
19  things that might be done to address the
20  issues, opioid issues facing the counties,
21  and try to determine how much those elements
22  are going to cost?
23    MR. KO:  Object to the form.
24  BY MR. MORRIS:

1    Q.    When you say "budgeting model,"
2  that's what you did, right?
3    A.    The budget model figures out
4  the quantity of resources needed to address
5  the epidemic, and then the associated price
6  with each of those quantities that you
7  multiply to get a cost.
8    Q.    Now, it's true that you haven't
9  tried to measure any impact that implementing
10  any one or more of the categories that you've
11  included in your abatement plan might have,
12  correct?
13    MR. KO:  Object to the form.
14    A.    That's correct.
15  BY MR. MORRIS:
16    Q.    Now, the authors of the Pitt
17  article -- I refer to as the Pitt article.
18    A.    That's fine.
19    Q.    The Pitt team noted a number of
20  limitations even under their modeling,
21  correct?
22    A.    I think they had a standard
23  section at the end of the paper that
24  discusses this.

1    Q.    If you go then -- let's turn to
2  that.  If you go to Page e6.
3    A.    Okay.
4    Q.    And there's a helpful heading
5  that says "Limitations."
6    Do you see that?
7    A.    I do.
8    Q.    Okay.  In that first paragraph
9  the authors write after the first sentence,
10  "First, the drivers behind the opioid
11  epidemic are dynamic, non-linear, and
12  uncertain."
13    Do you agree with that?
14    A.    I think it depends.  I think
15  it's a complicated, compound sentence.  I
16  think we might want to talk about different
17  parts of it.
18    Q.    Okay.  Let's talk about
19  different parts of it.
20    Do you agree that the drivers
21  behind the opioid epidemic are dynamic?
22    A.    So what do "drivers" mean?
23    Q.    Do you have an understanding
24  about what the driver -- what drivers mean?

1    A.    It is certainly the case that
2  things are going to change over time, that's
3  what dynamic means, but I'm not -- this seems
4  like a pretty vague sentence, so I'm not sure
5  how to agree or disagree with it.
6    Q.    Okay.  Let's go on to something
7  else.
8    The next sentence, can you read
9  the next sentence, the one that begins
10  "Although"?
11    A.    "Although we tested the impact
12  of each policy on multiple potential models
13  of the current state, the epidemic continues
14  to change and may be substantially different
15  in just five years."
16    Q.    Do you agree that the epidemic
17  continues to change and may be substantially
18  different in just five years?
19    A.    I don't know what
20  "substantially" means in terms of magnitude,
21  but I certainly think the epidemic changes
22  when you -- you know, fentanyl comes into
23  Cuyahoga in a much greater extent and we see
24  a lot more deaths or, you know, lots of

1  things change over time, and it's one of the
2  reasons in my plan that I say one needs to
3  build into the plan a way to modify the plan
4  over time as information comes in.
5          And that's why I put resources
6  in to measure how things are coming in over
7  time, because any time you implement
8  something that is complex like this you want
9  to be able to respond to conditions on the
10  ground promptly.
11      Q.    Your abatement plan estimates
12  costs going out 15 years, correct?
13      A.    Correct.
14      Q.    Why did you choose 15 years to
15  cost out the abatement plan?
16      A.    It seemed clear that it was
17  going to take, well, the resources and
18  attention for at least that long to be able
19  to make the progress that needs to be made
20  against the crisis.
21      Q.    When you say "the progress that
22  needs to be made," what's your measurement of
23  that progress?
24      A.    I don't have a quantitative

1  sense, but it's -- you know, if you look at
2  the opinions of the medical experts like
3  Dr. Lembke, she states quite clearly that we
4  need these kind of resources and this isn't
5  going to be something where two or
6  three years of additional resources is going
7  to make this crisis go away.
8      Q.    Understood.  I was just -- you
9  had said that you needed 15 years to make the
10  kind of progress, and I was trying to figure
11  out, well, what's the progress then that --
12  measurement that you're using, if any?
13      A.    You know, my -- as you
14  mentioned in your question, I was not given
15  the assignment of measuring the impact, and I
16  think one would want to answer your more
17  recent question in that context.
18      Q.    You'd agree with me that trying
19  to predict the costs of even a slightly
20  complex problem out over a period of 15 years
21  is difficult?
22          MR. KO:  Object to the form.
23      A.    Well, projecting 10, 15 years
24  costs of complicated government proposals is

1  done all the time.  Congressional budget
2  office does it, we did it at OMB, so it's a
3  pretty standard practice that one does
4  because you have to make decisions based on
5  the information we have today.
6  BY MR. MORRIS:
7      Q.    Is it difficult to do that?
8      A.    I spent a lot of time getting
9  trained and getting experience to be able to
10  do it well.  I guess -- I don't know if I
11  would say about --
12      Q.    Let me -- we talked about the
13  fact that the -- what you're referring to as
14  the opioid crisis is a complex, multi-faceted
15  problem.  Agree?
16      A.    Agreed.
17      Q.    And a complex, multi-faceted
18  problem, trying to budget over 15 years for a
19  plan to address it, is a difficult thing to
20  do, correct?
21          MR. KO:  Object to the form.
22      A.    I don't know what "difficulty"
23  means in this context.  It is something I
24  have been trained to do and have done many

1  times in these kind of proposals.
2  BY MR. MORRIS:
3      Q.    Difficult to predict
4  accurately?
5          MS. RITTER:  Objection.
6  BY MR. MORRIS:
7      Q.    Let me be clear.  It's not
8  difficult to engage in the process perhaps.
9  Difficult to predict accurately what the
10  projected costs, what the costs will be for a
11  complex problem like the opioid crisis?
12          MS. RITTER:  Objection to the
13      form.
14  BY MR. MORRIS:
15      Q.    Agreed?
16      A.    No, I don't agree.  I think
17  it's quite clear from the sources I've
18  discussed that led me to choose the
19  components of these plans, what level of
20  treatment capacity, for example, is needed,
21  and we have a good methodology, solid
22  methodologies to figure out and project that
23  into the future.  And so, you know, I think
24  it is possible to generate good forecasts

1    into the future.

2         Q.    If you go to Paragraph 20 of

3    your report.  And again, we're still on

4    Exhibit 6, which is the April 3rd version of

5    your report.

6         A.    Yeah.

7         Q.    I believe you mentioned this

8    before in one of your earlier questions --

9    answers -- well, let me do it this way.

10             Can you just read the first

11   sentence?

12        A.    "Because it is possible that

13   the epidemic will evolve in ways that either

14   reduce or increase the need for resources

15   relative to my primary estimates, it is

16   appropriate for me as an economist to provide

17   a range of estimates for lower cost and

18   higher cost scenarios."

19        Q.    So there you're recognizing

20   that given future events, that actual costs

21   of the plan you're proposing might be higher

22   and they might be lower?

23        A.    Yes.

24        Q.    Okay.  If you can go on to read

1    the next sentence.

2         A.    "It is also important to build

3    in feedback mechanisms into the Abatement

4    Plan, so that the level of abatement

5    resources and the allocation of those

6    resources can be adjusted over time as new

7    information about needs becomes available."

8         Q.    Is that what you were referring

9    to earlier about the need to be able to

10   assess the implementation of the plan as it

11   goes forward to determine what the costs

12   might be based on new information?

13             MR. KO:  Object to the form.

14        A.    Yes, I was referring to that

15   sentence, but also to the whole category of

16   the plan that's -- that you can see in Figure

17   1, system coordination, that you need the

18   capacity to do that.

19   BY MR. MORRIS:

20        Q.    Right.  That's Table 19 of your

21   appendices?

22        A.    It's not -- let's see.  It's

23   19, but also, for example, the -- I would

24   also include 17, the cost of tracking

1    abatement process.

2         Q.    Okay.  We'll get to those

3    specifics in a little bit.

4             Do you know what a confidence

5    interval is?

6         A.    Yes.

7         Q.    What is it?

8         A.    It's a measure of statistical

9    uncertainty.

10        Q.    And that's a standard

11   requirement in budgeting processes, correct?

12             MR. KO:  Object to the form.

13        A.    It's pretty unusual to see

14   confidence intervals in budget documents.

15   There are a few where they're used, but

16   it's -- in statistics when you're running a

17   regression and looking at a coefficient,

18   that's the context where we see confidence

19   intervals and use them all the time.  You'll

20   sometimes see it done in budget forecasts,

21   but it's the exception, not the rule.

22   BY MR. MORRIS:

23        Q.    When you say -- you explain

24   what a confidence interval is by saying it's

1    a measure of statistical uncertainty.  Does

2    that mean it's a way of determining or

3    expressing how accurate the person thinks

4    their prediction is?

5         A.    Well, it gives you the -- I

6    mean, if you're doing a statistical estimate,

7    you get out of that a point estimate or a

8    mean, and then you might want to know what

9    the full probability distribution is around

10   that point estimate.  And the confidence

11   interval, assuming you know that the thing is

12   not only distributed or what the functional

13   form is, helps you understand what that full

14   distribution looks like.

15        Q.    And you mentioned that you

16   can -- when you have a point estimate you can

17   have a confidence interval around that.  Did

18   I have -- I'm just referring -- I want to

19   direct you to your use of the term "point

20   estimate."  That's one of the things you

21   refer to in your answer?

22        A.    In answer to your question.

23        Q.    Yes.

24        A.    Yes.

1  Q.    Is the estimates that you
2  provided for the abatement plan, are those --
3  is that a point estimate?
4        MR. KO:  Object to the form.
5  A.    I wouldn't use that term for it
6  because there wasn't an underlying data
7  sample that I measured something from.  The
8  point estimate is a term you use when you --
9  you're measuring, you know, the government
10 does a survey of everyone's wages in the
11 country and you measure the mean wage, and
12 the mean is the point estimate, and you say,
13 you know, there's a distribution around that
14 mean.
15       There wasn't some underlying
16 data exercise here with a sample of that
17 sort.  So it's not a term I think I've seen
18 used in the budget literature.
19 BY MR. MORRIS:
20 Q.    Give me one second.  I'm going
21 to pull out another exhibit here.
22 A.    Okay.
23       (Whereupon, Liebman Exhibit
24       Number 12 was marked for

1  identification.)
2  BY MR. MORRIS:
3  Q.    Okay.  I've handed you
4  Exhibit 12.  Do you recognize what Exhibit 12
5  is?
6  A.    Yes.
7  Q.    What is Exhibit 12?
8  A.    It's a guide that the US
9  Government Accountability Office has put out.
10 Q.    And this is one of the
11 documents that you cited in your report,
12 correct?
13 A.    Yes.
14 Q.    If you go to Page 11 of your
15 report.
16 A.    Of my report?
17 Q.    Yes.  And that's where it says
18 in Paragraph 28, the last sentence, "My
19 framework follows the standard approaches
20 used by the Congressional Budget Office, the
21 President's Office of Management and Budget,
22 and the Government Accountability Office in
23 estimating costs and projecting budgets."
24       Do you see that?

1  A.    I do.
2  Q.    And footnote 23 is a citation
3  to the GAO Cost Estimating and Assessment
4  Guide?
5  A.    It is.
6  Q.    And is the Exhibit 12 that
7  guide?
8  A.    It is.
9  Q.    If you could turn to Page 9 of
10 the guide, there's a chart that starts
11 there -- actually, there's a table that
12 starts there and runs for a few pages, and
13 it's labeled "Table 2:  The Twelve Steps of a
14 High-Quality Cost Estimating Process."
15 A.    Yep.
16 Q.    Do you see that?
17 A.    Yep.
18 Q.    Did your creation of the
19 abatement plan follow these steps for
20 creating a cost estimate?
21 A.    I did not review these steps in
22 any detail.  I was familiar with this guide
23 from my time in government.
24 Q.    Okay.  Well, let me direct you

1  to, for example, number 9, step 9.
2        Do you see that?
3  A.    I do.
4  Q.    In step 9, for example, is --
5  the description of it is "Conduct risk and
6  uncertainty analysis."
7        Do you see that?
8  A.    Yes.
9  Q.    Did you do that as part of your
10 abatement plan budgeting?
11 A.    What I did is for the main
12 component that I think we don't know exactly
13 how the world is going to play out, I gave
14 you high and low estimates that vary
15 according to that, and that's a form of
16 sensitivity analysis.
17 Q.    Okay.  So if you go to step 8
18 above that, that's "Conduct sensitivity
19 analysis"?
20 A.    Right.
21 Q.    Do you see that?  So that would
22 fall -- what you just described would fall
23 under step 8, correct?
24 A.    Yeah, they're both techniques

1  for trying to communicate both what is
2  unknown and how estimates would vary -- can
3  vary in alternative states of the world.
4      Q.    Okay.  But a sensitivity
5  analysis, you'd agree with me, doesn't give a
6  prediction of accuracy, correct?
7          MR. KO:  Object to the form.
8      A.    A sensitivity analysis
9  sometimes is informed by one's assessment of
10  what the likely range of an outcome is, and
11  so sometimes it does incorporate some, I
12  think, information about accuracy, but it's
13  not the same as -- you know, for example, in
14  here, if you have data on the probability
15  distributions doing a Monte Carlo simulation,
16  which is what they're talking about in number
17  9.
18  BY MR. MORRIS:
19      Q.    So the sensitivity analysis is
20  something that measures how much of a change
21  there might be to the output, such as the
22  estimated cost if the inputs change.  Have I
23  got that right?
24      A.    Yes.

1      Q.    But the sensitivity analysis
2  isn't something that measures how accurate
3  the assumed inputs are?
4          MR. KO:  Object to the form.
5  BY MR. MORRIS:
6      Q.    Correct?
7          MR. KO:  Object to the form.
8      A.    The sensitivity analysis does
9  exactly what you said.  It takes different
10  inputs and tells you how the results would
11  change.
12  BY MR. MORRIS:
13      Q.    Okay.  You mentioned, or you
14  referred to one of the bullet points in
15  number 9 that reads "Use an acceptable
16  statistical analysis method (e.g., Monte
17  Carlo simulation) to develop a confidence
18  interval around the point estimate."
19          And that's something you didn't
20  do here, correct?
21      A.    I did not do that here.
22      Q.    The next bullet point is
23  "Identify the confidence level of the point
24  estimate."

1          That's also something that you
2  didn't do here, correct?
3      A.    That's correct.
4      Q.    Would you agree that that's a
5  key step in a high quality budget?
6          MS. RITTER:  Objection to the
7      form.
8      A.    One can only do Monte Carlo
9  estimates when you have a probability
10  distribution to use as the basis for them.
11  And there are lots of problems where we don't
12  have a data set to draw a probability
13  distribution from, and that's why it's pretty
14  uncommon to publish and do those kind of
15  uncertainty analysis.  You know, for example,
16  when we were estimating the cost of the
17  Affordable Care Act, we didn't do anything
18  like this.
19          And so you will occasionally
20  see this done in budgeting, but it's not --
21  you know, as I said in the very beginning of
22  this discussion, it's the exception rather
23  than the rule.
24  BY MR. MORRIS:

1      Q.    If you could turn to Page 153
2  of Exhibit 12.
3      A.    That's the same exhibit we're
4  in, right?
5      Q.    Yes.  The GAO document.
6      A.    I lost track.  Okay.  You said
7  153?
8      Q.    153.
9      A.    Okay.
10      Q.    And this chapter is entitled
11  "Cost Risk and Uncertainty."
12          Do you see that?
13      A.    Mm-hmm.
14      Q.    Now if you could turn to the
15  next page, 154, there's a section entitled
16  "Point Estimates Alone Are Insufficient For
17  Good Decisions."
18          Do you see that?
19      A.    I do.
20      Q.    First, do you agree with that
21  statement?
22      A.    I don't think I agree with that
23  in general.  I think most of the times that
24  we were making decisions in government, the

1 best that we have is a point estimate, and
2 so -- and we make decisions, important
3 decisions based on that all the time, so I
4 would not describe point estimates as
5 insufficient.
6 Q. If you could read the first
7 sentence -- actually why don't you -- if you
8 could read aloud the first sentence of right
9 underneath that heading.
10 A. "Since cost estimates are
11 uncertain, making good predictions about how
12 much funding a program needs to be successful
13 is difficult."
14 Q. Do you agree with that?
15 A. I think it depends on what it
16 is you're guesstimating. Some things are
17 difficult to estimate and some aren't.
18 Q. And the more complex the thing
19 you're trying to estimate, the harder it is
20 to predict, or to estimate?
21 A. The more -- maybe the more
22 unknown things are.
23 Q. You'd agree with me that there
24 are a significant number of unknowns in the

1 cost estimate that you created for the
2 abatement plan, correct?
3 MR. KO: Object to the form.
4 A. I think we need to talk about
5 particular components to get into that
6 question.
7 BY MR. MORRIS:
8 Q. Okay. We'll come back to that
9 then.
10 If you could go to the third
11 paragraph underneath "Point Estimates Alone
12 Are Insufficient For Good Decisions," it
13 starts with the sentence "Point estimates are
14 more uncertain."
15 Do you see that?
16 A. Yes.
17 Q. Can you read that sentence?
18 A. "Point estimates are more
19 uncertain at the beginning of a program,
20 because less is known about its detailed
21 requirements and opportunity for change is
22 greater."
23 Q. Do you agree with that?
24 A. Yes.

1 Q. And then the next sentence,
2 could you read that one, please?
3 A. "In addition, early in a
4 program's lifecycle, only general statements
5 can be made."
6 Q. Do you agree with that?
7 A. I think it depends. That is
8 too blanket a statement.
9 Q. If you go to the next page on
10 155, in the first full paragraph there, the
11 last sentence begins, and I'll read this one,
12 "Thus, a point estimate, by itself, provides
13 no information about the underlying
14 uncertainty other than that it is the value
15 chosen as most likely."
16 Do you see that?
17 A. Yes.
18 Q. Can you read the next sentence?
19 A. "A confidence interval, in
20 contrast, provides a range of possible costs,
21 based on a specified probability level."
22 Q. Okay. We've gone over that.
23 That's something that is not part of your
24 cost estimate for your abatement plan,

1 correct?
2 A. I do not provide confidence
3 intervals.
4 Q. But that's another way of
5 stating in the sentence here what a
6 confidence interval does, right, gives a
7 range and then states, based on a percentage,
8 how confident the person doing the budget is
9 in the ultimate -- what the ultimate costs
10 will fall within that range?
11 A. It gives you the probability
12 distribution of the estimates.
13 Q. Okay. If you go then to two
14 more pages in, 157, the paragraph that
15 begins, the first full paragraph there, "One
16 way to determine."
17 Do you see that?
18 A. Yes.
19 Q. Can you read that sentence?
20 A. "One way to determine whether a
21 program is realistically budgeted is to
22 perform an uncertainty analysis, so that the
23 probability associated with achieving its
24 point estimate can be determined."

1    Q.    Did you perform an uncertainty
2  analysis being described here in this
3  sentence for your abatement plan?
4    A.    I just want to make sure I
5  understand what they're using uncertainty
6  analysis to mean here.
7          (Witness reviewing document.)
8    A.    So I think -- I'm just reading
9  this section of this report so I'm not sure
10  if they defined uncertainty analysis
11  previously, but if what they are saying here
12  is that they did a Monte Carlo and out of the
13  Monte Carlo they created a cumulative
14  probability distribution, I did not do that
15  in my report.
16    Q.    Okay.  And the next sentence
17  there says, "A cumulative probability
18  distribution, more commonly known as an S
19  curve - usually derived from a simulation
20  such as Monte Carlo - can be particularly
21  useful in portraying the uncertainty
22  implications of various cost estimates."
23          And that -- you didn't run an S
24  curve?

1    A.    You have to -- the S curve is
2  just a way of plotting the outcomes of a
3  Monte Carlo distribution.  And as I said, I
4  did not do a Monte Carlo distribution.
5    Q.    So is it fair that you're not
6  offering -- to say that you're not offering
7  an opinion as to how accurate your cost
8  estimates are?
9          MR. KO:  Object to the form.
10    A.    I think that I've produced
11  reasonable estimates, so I do think they are
12  accurate, and I am offering opinion that they
13  are accurate.
14  BY MR. MORRIS:
15    Q.    And to what degree of certainty
16  are you opining that they're accurate?
17    A.    I don't have a quantitative
18  measure of the degree of certainty.
19    Q.    And you built into the plan a
20  continued re-evaluation of the plan over time
21  to try and track to see whether the costs go
22  up or down?
23    A.    Yes, because whenever one
24  develops a complicated multi-year plan, you

1  want to -- this is what one does all the
2  time, and I do this at the GPL.  When I've
3  done this in government, you want to devise
4  the best plan that you can devise today, and
5  you want to be in a world to improve it over
6  time as we learn more and as the world
7  unfolds.
8    Q.    Do you know what a cost-benefit
9  analysis is?
10    A.    Yes.
11    Q.    And what is a cost-benefit
12  analysis?
13    A.    It's an analysis where one
14  compares the costs of a program and the
15  benefits of a program.
16    Q.    It's all in the name, right?
17          You didn't perform a
18  cost-benefit analysis as part of your work on
19  your opinion, did you?
20    A.    No, I was not asked to do that.
21    Q.    I want to talk a little more,
22  then, about what the $5 billion estimate for
23  Cuyahoga and $2.2 billion estimate for Summit
24  County represents.

1          First, am I correct, those are
2  the total estimated amounts for all of your
3  abatement plan costs for the two counties
4  added up over the 15-year period, correct?
5    A.    Correct.
6    Q.    And you estimated how much
7  money might have been spent in year 1 or
8  might be spent in year 2, 3, and down the
9  line, and that's what you've added up,
10  correct?
11    A.    Yes.
12    Q.    You're familiar with the
13  concept of the present value or net present
14  value of money?
15    A.    Certainly.
16    Q.    Can you explain it to me?
17    A.    Sure.  That if I offered you
18  $100 a year from now, you would likely not be
19  willing to give me $100 today because a
20  dollar today is -- most people prefer to a
21  dollar in the future.
22    Q.    And that's because the concept
23  is to take into account that if you have a
24  dollar today it will grow into something more

```
 1   in the future?
 2       A.    Yeah, I would say that people
 3   have time preference.  They prefer
 4   consumption today to time in the future, and
 5   because of that, the market has to pay one
 6   rate of return to get you to give up money
 7   today.
 8       Q.    And there's a calculation in
 9   economics to -- that you can do to try and
10   determine the present value of a stream of
11   payments that go out into the future, is that
12   true?
13       A.    Yes, absolutely.
14       Q.    And did you do such a
15   calculation for your 15-year plan estimate?
16       A.    I don't provide one, but it's
17   trivial.  You can take the numbers in my
18   report and calculate one in three seconds if
19   you feel like it.
20       Q.    Understood.
21             But the -- what I'm trying to
22   get at is the roughly $7 billion of your
23   estimated abatement plan for the two counties
24   is not $7 million of today money?
```

```
 1       A.    Right, they're in nominal
 2   dollars, but I provide all the information.
 3   If you would prefer to see that other
 4   information, I followed the practice that,
 5   for example, the Congressional Budget Office
 6   does in doing annual calculations, and then
 7   giving you the nominal sum.  And I thought
 8   that was the more standard way to present
 9   that, but one can convert back and forth, I
10   mean, literally in seconds.
11       Q.    Okay.  But you didn't -- and I
12   get that, but that's not something you've
13   done?
14       A.    No.  But again, I've given all
15   the information you need if you wanted to
16   know that number.
17       Q.    Understood.  Because my next
18   question would be, do you know what that
19   number would be?
20       A.    No, but one could -- again, one
21   could calculate that very fast.
22       Q.    And that's a standard
23   calculation.  It is readily applied by
24   economists and accountants?
```

```
 1       A.    It's -- you know, it's more
 2   common, I would say, in benefit-cost analysis
 3   than in budget documents, but sometimes
 4   you'll see it in the budget documents.  Like
 5   the Social Security Administration when doing
 6   its 75-year forecast will do it in a thing
 7   that's more like in a budget document.
 8       Q.    Does your estimated cost for
 9   the abatement plan take into account the fact
10   that counties may get some money from, for
11   example, the federal government specifically
12   earmarked for the type of activities within
13   your abatement plan?
14       A.    So the scope of my assignment
15   was not to parse out who would be paying for
16   it.  It was just to figure out what the needs
17   were in the community, what services needed
18   to be offered to address those needs, and
19   then what the costs of all of that was.
20       Q.    Got it.
21             So just so I'm clear, so again
22   taking the total amount, estimated amount of
23   $7 billion, that's the total amount of your
24   estimated cost, and if there's money that's
```

```
 1   provided by the federal government, that
 2   would go to that, but you haven't reduced
 3   your $7 billion estimate taking into account
 4   money that the federal government may have
 5   already given Cuyahoga County, for example?
 6             MS. RITTER:  Objection to form.
 7       A.    I give you the total costs, and
 8   I'm not -- it was beyond the scope of what I
 9   was asked to do to figure out who would pay
10   and what that would do.
11   BY MR. MORRIS:
12       Q.    Fair enough.  I'm really just
13   trying to figure out what's embedded or not
14   in the $7 million.
15             So, for example, some of the
16   costs that you identified, and we'll go
17   through the details in a little bit, are
18   medical costs, and insurance companies
19   sometimes pay for those medical costs.  You
20   didn't subtract out the amount that insurance
21   companies may be paying for those costs in
22   the future, correct?
23       A.    Correct.
24       Q.    What was the purpose in
```

Highly Confidential - Subject to Further Confidentiality Review

1  providing an estimated cost for your

2  abatement plan?

3      A.    I guess my understanding is

4  that in some of the theories of this case, an

5  estimated cost would be useful in figuring

6  out what the defendants would end up paying

7  in a way that would allow this problem to

8  actually get abated.

9      Q.    Are you saying that there

10  should be a pot of money created that has 5

11  billion for Cuyahoga and roughly 2 billion

12  for -- 2.2 billion for Summit County,

13  respectively, now for them to draw upon?

14      A.    I'm not giving an opinion on

15  that.  I was asked to figure out what an

16  abatement plan would be and what it would

17  cost, and that's what I give you.

18      Q.    As a matter of economics, it

19  wouldn't make sense to have a giant pot of

20  money with $7.2 billion in it now for the

21  counties to draw down upon over the course of

22  15 years.  You agree with me on that, right?

23      MR. KO:  Object to the form.

24      A.    I think there may be two

Highly Confidential - Subject to Further Confidentiality Review

1  different things you're asking me.

2      Can you re-ask that.

3  BY MR. MORRIS:

4      Q.    Sure.

5      As a matter of economics and

6  logic, it wouldn't make sense to have a pot

7  of money created now, create a bank account,

8  and deposit $7.2 billion into it upon which

9  the counties would draw upon for the next

10  15 years to implement your abatement plan?

11      MR. KO:  Same objection.

12      A.    I think you have two different

13  things going on in this question.  So one is

14  if I were asked to give policy advice on how

15  to set aside money so that you would be sure

16  it would still be there for the next

17  15 years, what kind of mechanism would one

18  use, and I have not thought about in this

19  question whether you'd want to have a pot of

20  money up front versus a flow coming in over

21  time.

22      But then you had a specific

23  number in there, and so I'm not sure whether

24  you were asking questions about whether if

Highly Confidential - Subject to Further Confidentiality Review

1  you were putting money in an account like

2  that, whether it would be a different number.

3  MR. MR. MORRIS:

4      Q.    Well, let me ask you this way.

5      Are you offering an opinion in

6  this case, or intending to offer an opinion

7  in this case about whether an abatement fund

8  should be created?

9      A.    As I said, I don't have an

10  opinion on that.  I created a abatement plan,

11  and how one uses that is up to others.

12      Q.    Okay.  If you could turn to

13  Paragraph 17.  And right now I'm directing

14  your attention to the last sentence which

15  goes on to Page 7.

16      A.    I'm sorry, I think I went to

17  Page 17.

18      Q.    Oh, yeah, I'm sorry.

19  Paragraph 17.

20      A.    Paragraph 17.  Yes.

21      Q.    Okay.  And the last sentence of

22  that says, "My analysis does not address how

23  abatement costs should be shared among

24  various entities or parties."

Highly Confidential - Subject to Further Confidentiality Review

1      We talked about that before,

2  correct?

3      A.    Mm-hmm.

4      Q.    You're not offering an opinion

5  about who should be paying for the estimated

6  abatement costs that you've calculated as

7  part of your opinion?

8      MS. RITTER:  Objection to the

9      form.  Asked and answered.

10      A.    This sentence is right, my

11  analysis does not address how costs should be

12  shared.

13  BY MR. MORRIS:

14      Q.    So no opinion about that

15  defendant A should pay a certain percentage

16  of abatement costs?

17      A.    I have no opinion on that.

18      MR. MORRIS:  Why don't we take

19      a break.

20      THE VIDEOGRAPHER:  The time is

21      11:52 a.m., and we're off the record.

22      (Whereupon, a recess was

23      taken.)

24      THE VIDEOGRAPHER:  The time is

```
 1          12:07 p.m., and we're on the record.
 2   BY MR. MORRIS:
 3      Q.    Okay.  Dr. Liebman, I'm going
 4   to start going through some of the specific
 5   tables that you have in your abatement plan
 6   now.  What's the -- and I'm going to ask
 7   questions about the things that are on the
 8   charts and whatnot.
 9          What do you think is the best
10   version for me to walk through?  Should we
11   go -- and I understand if there's a question
12   that needs to be turned to something else,
13   that's fine.  But should we -- do you think
14   it's fair to start with the April 3rd report
15   and use the tables, appendices that are
16   there?
17      A.    Is that Exhibit --
18      Q.    That's Exhibit 6.
19      A.    -- 6?
20      Q.    That's what we've been working
21   off of through the actual text of your
22   report.
23      A.    So can you remind me again the
24   difference between Exhibit 6 -- I'm sorry,
```

```
 1   the report.  Okay.  The report -- okay.  Yes,
 2   the report -- well, if we're going -- it
 3   depends -- if we're going to get into the
 4   details and the numbers, we will pretty
 5   quickly end up in exhibits, you know, in
 6   Exhibit 5, 7 and 8.
 7      Q.    So why don't we do this.  We'll
 8   start -- why don't you put in front of you
 9   Exhibit 6 and 7, which I think gets us most
10   of the way there, except for the errata which
11   we'll deal with when we get there.
12      A.    6 and 7.  Okay.  We're good.
13      Q.    Okay.  So now I'm going to --
14   if you go to Table -- I'm going to start
15   talking about Table 1, which also refers back
16   to Table 0, but let me just ask some general
17   questions about what is in Table 1 first.
18   That's the first category of costs for
19   treatment, excluding medication-assisted
20   treatment, correct?
21      A.    We're talking about the first
22   row in Table 1?
23      Q.    Yes.
24      A.    Yes.
```

```
 1      Q.    And that's the largest cost
 2   that you include in your abatement plan,
 3   correct?
 4      A.    That's true, yes.
 5      Q.    Okay.  And by far that's the
 6   largest cost, correct?
 7      A.    It's my -- or four or five
 8   times the next biggest one, so I guess, yes.
 9      Q.    And roughly that combined is
10   about $4.3 billion, if I've done my math
11   correctly?
12      A.    You just combined the two
13   jurisdictions --
14      Q.    The two jurisdictions.
15      A.    I never do that in my head, but
16   you said 3 plus 1.3 is 4.3.  Good job.
17      Q.    And we've talked about this
18   before, but these estimates you have, going
19   forward in time, these are estimates for
20   treatment of actual people, that actual
21   people will receive --
22      A.    Yes.
23      Q.    -- in the future?
24          And some of those people who
```

```
 1   are treated will not have any connection to
 2   the defendants in this case, correct?
 3          MR. KO:  Object to the form.
 4      A.    I don't have an opinion on
 5   that.
 6   BY MR. MORRIS:
 7      Q.    Now, the starting point for the
 8   number of people who you estimate might
 9   receive treatment, if I understand that
10   correctly, is calculations that you've done
11   on Table 0?
12      A.    That's right.
13      Q.    So let's go there.
14          And just so I'm tracking, which
15   exhibit are you looking at right now?  Are
16   you looking at 6 or 7?
17      A.    I am looking at 7.
18      Q.    Got it.
19      A.    I hope that I've done it up to
20   this point.
21      Q.    Sorry.  I'm going to organize
22   myself here, just a second, for the
23   questions.
24          Okay.  In -- let me know if
```

1  I've got this right.  You have -- for each of
2  the cost categories, you have a table, and
3  you have a table that's labeled C, and a
4  table that's labeled S that correspond to the
5  two counties?
6      A.    Exactly.
7      Q.    Looking off of Table C.O, so
8  Table 0 for Cuyahoga County, you start at the
9  top with line item 1 of OUD rate.
10           Do you see that?
11     A.    Yes.
12     Q.    Okay.  Can you explain to me
13  what that means?
14     A.    It is the percentage of the
15  population in that county, age 12 or above,
16  with opioid use disorder.
17     Q.    Okay.  And for -- and the total
18  estimate you have there is 1.4 percent?
19     A.    Yes.
20     Q.    And that then ties to the
21  source notes below?
22     A.    Correct.
23     Q.    You get to the 1.4 by adding
24  .77 percent for OUD prevalence and .63 HUD

---

1  prevalence?
2      A.    Correct.
3      Q.    So this is a situation where
4  you are separating out the heroin use
5  disorder?
6      A.    I wouldn't say I'm separating
7  out.  I'm combining the two numbers to get
8  the totals of what I'm modeling.
9      Q.    Okay.  But from your
10  calculation, though, within footnote 1, OUD
11  prevalence does not include HUD prevalence.
12     A.    So there's two different
13  terminologies going on in the literature
14  here.  I'm taking these numbers from the
15  Pitt, et al. study, and they use OUD to mean
16  the non-HUD -- OUD, and so when I am adding
17  their number, their two numbers, I refer to
18  them the way they do, but in my study I use
19  OUD to be the combined amount.
20     Q.    Let's take a look at the Pitt
21  study.  Let's pull that out as well.  And
22  that's Exhibit 12.
23           MR. KO:  The Pitt study is
24     Exhibit 11.

---

1           MR. MORRIS:  Oh, I'm sorry.
2       Thank you.  Exhibit 11.
3  BY MR. MORRIS:
4      Q.    And you reference the -- well,
5  let me ask you this way.
6           Where does the .77 OUD
7  prevalence come from?
8      A.    So there's a table of
9  parameters at the end on, I guess it's
10  page -- let's see where this is -- so this is
11  in the appendix.  I guess it's on page S.88.
12  And if you look -- one, two, three -- four
13  rows down you see the .77 number.
14     Q.    Okay.  And the source for that,
15  there's a column next to the value of .77,
16  and the source column says "Assumed."
17           Do you see that?
18     A.    Yes.
19     Q.    And then they -- the authors of
20  this study cite to additional studies.  Did
21  you review those studies?
22     A.    Can I just remember which ones
23  they cited to?
24     Q.    Sure.

---

1      A.    But I assume this is the
2  National Survey of Drug Use and Health, but I
3  just want to double-check that I'm
4  remembering that right.  Do you know where
5  their citations go to?
6           MS. RITTER:  For the .77, is
7       that what you all are talking about?
8           MR. MORRIS:  Yes.
9  BY MR. MORRIS:
10     Q.    I have the listing of the
11  references starting, or including on S.106.
12     A.    Yeah, so I think they go under
13  the CDC.  I'm pretty sure that CDC number is
14  -- originates in the National Survey of Drug
15  Use and Health.
16     Q.    Did you review those citations
17  that they cite to?
18     A.    Yes.
19     Q.    And is that .77 based on Ohio
20  data?
21     A.    No, that's national data.
22     Q.    And when it says "Assumed,"
23  what does that mean?
24     A.    I do not remember exactly what

1    that wording meant.

2         Q.    Do you know what the ultimate

3    underlying source for the .77 percent was?  I

4    know that it cites to -- the Pitt authors

5    cite to other articles.  Do you know how they

6    calculated .77?

7         A.    Again, I think the base input

8    here is the National Survey of Drug Use and

9    Health, which is a national representative

10   survey that is the most commonly used source

11   for figuring out what the prevalence of

12   opioid use disorder is.

13              But that study has some

14   limitations.  In particular, it leaves out

15   homeless populations, incarcerated

16   populations, other institutionalized

17   populations, and it's also a survey.  And

18   people often underreport substance abuse to

19   surveys, so for that reason they're making

20   adjustments, and I followed them in making

21   adjustments to that underlying data.

22        Q.    The authors of the Pitt

23   article, they didn't do original research to

24   try and determine the severe opioid use

---

1    disorder prevalence, correct?

2              MR. KO:  Object to the form.

3    BY MR. MORRIS:

4         Q.    In other words, they were

5    getting their information from somewhere

6    else?

7              MR. KO:  Object to the form.

8         A.    They are -- they are citing the

9    standard source for this.

10   BY MR. MORRIS:

11        Q.    Okay.  We talked then about the

12   next step in your line item 1 there from the

13   source notes is adding .63 HUD prevalence.

14        A.    Yep.

15        Q.    How did you calculate that?

16        A.    So they have an estimate for

17   the HUD prevalence, but they have decreased

18   it by 20 percent because they are only

19   studying the portion of opioid use -- sorry,

20   of heroin use that was preceded by

21   prescription opioid use.  And so their number

22   is too low for my purpose, which is to cover

23   all opioid use.  And so they have scaled

24   something down by -- they've taken 80 percent

---

1    of something, and so I have to take this .51

2    and divide it by .8 to get it back to the

3    population level.

4         Q.    So they took out individuals

5    who in their estimation did not progress to

6    heroin use disorder after first having an

7    opioid prescription?

8         A.    Exactly.

9         Q.    And you attempted -- your

10   calculation is designed to add that back in?

11        A.    Exactly.

12        Q.    Isn't -- does the OUD

13   prevalence number not include that already?

14        A.    No.  And to be clear, the

15   heroin number comes from a RAND study which

16   is dealing with underreporting of heroin use,

17   so it's a slightly different set of

18   underlying data then, the pure opioid use

19   number.

20        Q.    So that's from a different

21   source than the OUD number?

22        A.    It's a -- yes, another source

23   that starts with the same original one, but

24   does some stuff to the numbers.

---

1         Q.    Again, these are national data

2    calculations, assumptions, not specific to

3    Ohio?

4              MR. KO:  Object to the form.

5    BY MR. MORRIS:

6         Q.    Or these two counties?

7              MR. KO:  Object to the form.

8         A.    This paper, the Pitt, et al.

9    one, is modeling the opioid crisis at the

10   national level and is using national data.

11   BY MR. MORRIS:

12        Q.    Do you know what the confidence

13   level is in the estimates that are reflected

14   in .77 OU prevalence?  For example, do you

15   know what the authors of those studies stated

16   about that?

17             MR. KO:  Object to the form.

18        A.    So I think if you're asking me

19   to draw probability distribution of OUD, the

20   way I'm defining it, broadly defined, you

21   would need to incorporate two different

22   components.  One is the sampling error

23   because the underlying -- this data was a

24   finite sample and not the whole population,

1    and that would give you -- you know, it's a
2    pretty large sample so it would give you a
3    pretty tight confidence interval, but then
4    there's a question of how well this is
5    measuring things.
6         And there's some recent
7    studies, for example, one from Massachusetts
8    that suggests that the survey approaches
9    significantly understate the amount of opiate
10   use disorder.  The Massachusetts study found
11   that the prevalence was 4.6 percent.
12        I decided to stick with the
13   more conventional estimate because I don't
14   think the scientific opinion has moved all
15   the way toward these higher level estimates.
16   But there definitely is, I think, some
17   discussion going on among the experts that
18   the numbers that you got, as to like that the
19   one that Pitt uses and that I adopt, could be
20   significantly too low, and then if that were
21   the case, my estimates of the treatment needs
22   would need to be quite a bit higher.
23   BY MR. MORRIS:
24        Q.    You then calculate an estimated

1    OUD population year 1 on line 3.  Do you see
2    that?  Is that just applying 1.4 percent to
3    the Cuyahoga population?
4         A.    To the 12 and over population.
5         Q.    12 an over.
6         Okay.  The next line down,
7    "Percentage of OUD population receiving
8    treatment."
9         Do you see that?
10        A.    Mm-hmm.
11        Q.    How did you arrive at that?
12        A.    Sorry, let me just get away
13   from the Pitt study and into the right tables
14   again.
15        Okay.  So the specific numbers
16   I take are based on what Dr. Lembke thinks is
17   possible to achieve, but a general number in
18   that range is supported by a wide range.
19   This is actually the initial number.  I'm
20   sorry.  I was trying to give you the answer
21   about the whole trajectory.
22        This initial number comes from
23   estimates that the -- which paper was it --
24   that SAMSA has done that only about

1    20 percent of the population with OUD get
2    treatment.
3         Q.    In your cost estimate going
4    forward -- one, two, three -- four years,
5    going forward you'd anticipate, right, that
6    if an abatement plan were implemented that
7    you'd be able to replace assumed numbers or
8    estimated numbers with actual treatment
9    numbers?
10        MR. KO:  Object to the form.
11        A.    We would be able to measure --
12   one in theory could try to measure the number
13   of people being treated.  That is challenging
14   because you have private facilities and
15   publicly funded facilities, and somehow one
16   would actually have to make that data exist
17   to get total treatment.
18        But one of the reasons to set
19   up the data capacity in this plan is that
20   tracking that right now is difficult, but we
21   would want to be able to do that going
22   forward.
23   BY MR. MORRIS:
24        Q.    So you don't know -- you

1    couldn't, for example, today say within
2    Cuyahoga, for example, how many people
3    received, within the OUD population, received
4    treatment?
5         A.    Well, in coming up with this
6    number, I not only looked at the national
7    estimates and talked to national experts, but
8    I also talked to providers on the ground and
9    the ADAMHS Board, and my judgment in using
10   this number comes from both national data and
11   from local perspective on how they think
12   they're doing in treating people.
13        Q.    I get that.  What you were
14   saying is going forward you'd need somebody
15   to try and help figure out the actual numbers
16   because that kind of data set doesn't exist.
17   And that's true for Cuyahoga and Summit
18   County, correct?
19        A.    I have certainly not been
20   provided with such data.  Whether someone is
21   better at getting claims data than I am, I
22   don't know.
23        Q.    Okay.  You used the same -- if
24   you go from your Table 0 to looking at Table

```
 1    C.1, you use the same assumed prevalence rate
 2    from year 1 all the way through year 15,
 3    correct?
 4         A.    No.  I don't make any
 5    assumptions on prevalence going forward.  I
 6    make assumptions about treatment capacity.
 7         Q.    Well, you're -- let me walk
 8    through this.
 9              Your number of people estimated
10    OUD population receiving treatment in year 1
11    is based on applying the OUD rate against the
12    population, and then multiplying that against
13    the estimated percentage of population
14    receiving treatment, correct?
15         A.    In year 1.
16         Q.    In year 1?
17         A.    Yeah.
18         Q.    Okay.  And your year 2 takes
19    that number and does what?
20         A.    So I have phase-in up to a
21    higher percentage of people getting treatment
22    such that the treatment capacity doubles by
23    the -- so if you look at the table, you'll
24    see that the year 1 treatment capacity in
```

```
 1    Cuyahoga -- sorry, the population receiving
 2    treatment is 3,033, and by year 4 it's 6,067,
 3    so that's doubling.  That is a statement
 4    about treatment capacity.  It's not -- I'm
 5    not making any forecasts about prevalence
 6    going forward.
 7         Q.    So I'm understanding this,
 8    let's just go to year 4, which is where
 9    you've actually gotten to the point of the
10    estimate doubling.  You're not -- that 6,067,
11    and I'm looking at Page 7 now, 6,067 is not
12    your estimate of how many people will receive
13    treatment in year 4?
14         A.    Oh, it is an estimate of how
15    many people will receive treatment, but it's
16    not based on an estimate in that year of
17    prevalence.  It's based on taking the initial
18    year treatment capacity and getting to double
19    of that.
20         Q.    Okay.  But the initial year is
21    based on the prevalence rate, correct?
22         A.    Yes.
23         Q.    And then what you've done to
24    get to year 4 is double that, correct?
```

```
 1         A.    I doubled the capacity, but I
 2    don't have some underlying projection, for
 3    example, of how the population in the county
 4    is changing or anything like that.  I'm
 5    doubling capacity for treatment.
 6         Q.    Okay.  I'm really not trying to
 7    be obtuse here.  Doubling capacity to me
 8    means that that's what the system could
 9    tolerate, not this is how many people I'm
10    predicting will be receiving treatment, at
11    least within the base case.  Am I missing
12    something?
13              MS. RITTER:  Objection to form.
14         A.    Is the -- I guess --
15    BY MR. MORRIS:
16         Q.    We're talking --
17              Why don't you ask again.
18         Q.    Let me ask again.  Let me ask
19    again, although I'm enjoying the
20    conversation.
21              Your first year estimate is
22    based on a prevalence rate?
23         A.    Yes.
24         Q.    And the only thing you've done
```

```
 1    to try and predict how many people will
 2    receive treatment in year 4 is to double
 3    that?
 4         A.    So I'm not trying to predict
 5    treatment.  I'm trying to devise an abatement
 6    plan.  So the question is if we're trying to
 7    be as aggressive as we can in treating this
 8    crisis, what additional capacity do we need.
 9    And based on my being -- the literature and
10    the expert opinion of Dr. Lembke, I have come
11    to the conclusion that we can double
12    treatment, and that we should double
13    treatment capacity, and then maintain that
14    doubled capacity through the end of the
15    15-year period.
16         Q.    Okay.  This is where I'm
17    getting to now.  Are you saying -- because
18    what you're ultimately doing for each one of
19    these line items is giving an estimate as to
20    how much it will cost, correct?
21         A.    Mm-hmm.
22         Q.    Is that a prediction of how
23    much you think it is going to cost, or how
24    much it could cost?
```

Highly Confidential - Subject to Further Confidentiality Review

1    MS. RITTER:  Objection to the
2    form.
3        A.    I am saying that if we're going
4    to make as much progress as we can on the
5    opioid crisis in Cuyahoga, we should double
6    the treatment capacity, and I am then telling
7    you how much it will cost to double that
8    capacity and maintain that doubled capacity.
9    BY MR. MORRIS:
10       Q.    Are you offering an opinion
11   that in your estimation the number of people
12   who will receive treatment in year 4 will be
13   6,067 individuals in the Cuyahoga chart?
14       A.    We will create the capacity to
15   treat that many people, and I certainly hope
16   all the slots would be filled.  You know,
17   maybe we only keep 98 percent of slots
18   filled.  But I'm not trying to parse that
19   issue.
20       Q.    Are you rendering an opinion
21   about how many people actually will receive
22   treatment in, for example, year 4?
23       A.    I am rendering an opinion that
24   the abatement plan that is needed in these

Highly Confidential - Subject to Further Confidentiality Review

1    communities is to provide the capacity to
2    treat twice as many people.
3        Q.    So is that a no, you're not
4    offering an opinion that -- about the number
5    of people who will receive treatment in year
6    4?
7             MR. KO:  Objection.  Asked and
8        answered.
9    BY MR. MORRIS:
10       Q.    I certainly asked it.  I'm not
11   sure he's answered it.
12            MR. KO:  He's answered it in
13       the way that he truthfully believes he
14       can respond to your question.
15       A.    The abatement plan is designed
16   to double capacity, and I -- my experience
17   has been that in these kind of programs, one
18   keeps them filled, so then the capacity and
19   the number of people served tends to be
20   pretty close as a number.
21   BY MR. MORRIS:
22       Q.    In Table C.1 at the line 12,
23   you have a base case there, and it's north of
24   approximately $3 billion, correct?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    In Cuyahoga, yes.
2        Q.    In Cuyahoga.
3        A.    Yes.
4        Q.    Is that -- are you rendering an
5    opinion that that is your estimate as to how
6    much it will cost over 15 years to implement
7    your abatement plan?
8        A.    That's a component of it, yes.
9        Q.    And as part of that component,
10   that component is built of subcomponents that
11   includes the number of people who are treated
12   each of the years, correct?
13       A.    Yes.
14       Q.    So in order to reach a
15   conclusion or render an opinion that
16   $3 billion or so is the estimated cost,
17   aren't you opining that the number of people
18   that you've identified in each year will
19   actually receive treatment?
20       A.    I'm trying to figure out -- are
21   we just having a disagreement about whether
22   when you have a facility with ten beds, all
23   ten beds are always filled?  Is that the
24   question you're trying to ask me?  Or whether

Highly Confidential - Subject to Further Confidentiality Review

1    that -- I'm not understanding your question.
2        Q.    Okay.  Let me ask it this way.
3             In year 4, for example, the
4    6,067, is that the cost of actually treating
5    -- sorry, that's not a cost.  Those people
6    are actually treated, or in your parlance,
7    the number of beds available for people to be
8    treated?
9             MR. KO:  Object to the form.
10       A.    I'm not trying to draw a
11   distinction here.  I am saying that we're
12   going to have capacity to treat this many
13   people.  There are fixed costs in delivering
14   these kind of services.  So if a bed is empty
15   for a day, you don't suddenly save, say you
16   have ten beds, one-tenth of your cost for
17   that day because you've still got your staff,
18   still got your electricity, everything else.
19   And so I feel like we're having a back and
20   forth about a hundredth of a number.  I'm not
21   sure why we're...
22   BY MR. MORRIS:
23       Q.    Okay.  Let me ask it -- let me
24   ask this.

```
1          The cost of actually treating
2   somebody versus the cost of having the
3   capacity to treat somebody are different
4   costs, correct?
5          A.    If you have a -- if you have
6   two programs, let's suppose you have two
7   programs on separate sites.  They each can
8   treat ten people.  If you have this program
9   over here empty and you can shut it down and
10  this program over here full, you suddenly
11  save half your costs.  If you've got two
12  programs going and they've each got five
13  people in them, you don't save half your
14  costs.  So there are a lot of fixed costs in
15  running these kind of programs.  And so the
16  point is I'm assuming that we need this
17  capacity, and I am assuming that treatment
18  levels are going to be very close to the
19  total capacity.
20         Q.    Because in line 4 you say the
21  average cost of treatment provided, and you
22  give a number there to start out with as
23  24,023 per person, correct?
24         A.    Yes.
```

```
1          Q.    Okay.  And that's the average
2   cost of actual treatment of people?
3          A.    We're again going back and
4   forth on the fixed cost, marginal cost thing
5   here.  So suppose you have a treatment
6   facility with ten beds, and nine of them are
7   filled the whole year and you never fill that
8   tenth bed, but you've had some costs because
9   it exists and you had more space, that would
10  probably get built into the cost on the --
11  you know, if you're sort of thinking about
12  the reimbursement on the nine.
13         So I just -- I don't think -- I
14  don't know why we're going back and forth on
15  something that I don't think is a meaningful
16  distinction here, at least not in the way I'm
17  understanding your question.
18         Q.    Do you have an estimate as to
19  how many people who, when you say that
20  there's a capacity to treat 6,000 --
21  estimated 6,067 people, do you have an
22  estimate as to how many people will actually
23  receive treatment?
24         MR. KO:  Object to the form.
```

```
1          A.    I think I answered that before.
2   My presumption is that those numbers are
3   going to be approximately the same.
4   BY MR. MORRIS:
5          Q.    Okay.  If you go across the
6   time here, you've calculated -- well, let's
7   go back then to the -- what got us down this
8   road.
9          I'd asked whether the
10  1.4 percent OUD rate is applied across all of
11  the years.  That's the basis -- that's one of
12  the underlying bases for the calculation for
13  each of the years going forward, correct?
14         A.    No, no.  My assumption is that
15  we figure out what today's capacity is from
16  the 1.4.
17         Q.    Yes.
18         A.    That based on what I have
19  learned from studying the literature and
20  talking to experts, including local experts,
21  that we need to double that capacity, and
22  that after we build up that capacity, and a
23  capacity that I assume will mostly be filled,
24  that we will need to maintain that capacity
```

```
1   because the number of people who need to be
2   treated in the community will be maintained
3   at that level.
4          But I'm not going back and
5   doing the 1.4 again later in any kind of --
6   I'm not making any projection about future
7   OUD in future years in this table or anywhere
8   in the report.
9          Q.    Okay.  So if you go to line 2
10  and you go across, once you reach year 4 on
11  the Cuyahoga chart in the base case, the
12  population receiving treatment is that number
13  we've been talking about, 6,067, and it goes
14  forward and remains constant through year 15.
15  If the abatement program is working, wouldn't
16  you assume that the number of people needing
17  treatment would reduce?
18         A.    Unfortunately not, because
19  what's going on with the opioid epidemic is
20  that once someone has been addicted, had OUD,
21  that sticks with them for their lifetime.
22  They may not be active OUD at the point, they
23  may still be in treatment, they may be
24  relapsing.  And so the opinion of the medical
```

Highly Confidential - Subject to Further Confidentiality Review

1  experts that I've relied on is that even as
2  we may reduce the new flow of people into OUD
3  through various things that are in the other
4  components of the plan, the prevention
5  aspects, because the stock of people who have
6  ever had OUD is constantly rising, and some
7  of those people are relapsing and needing
8  more treatment, that we're going to need the
9  sustained level of capacity going forward.
10  So that's what my assumption is based upon.
11      Q.    You apply the same cost of
12  treatment with an inflation rate across time,
13  though, correct?
14          MR. KO:  Object to the form.
15      A.    No, that's true, yes.
16  BY MR. MORRIS:
17      Q.    Is the nature of the people who
18  are in the 6,067 number in year 13, for
19  example, the nature of their need for
20  treatment the same as in year 2, if once --
21  assuming the abatement plan has been put into
22  place?
23      A.    I didn't have any information
24  to assume a different distribution of

Highly Confidential - Subject to Further Confidentiality Review

1  treatment needs for the people who are
2  relapsing or who are getting longer term
3  treatment, so I assume the same distribution.
4      Q.    Is there a measurement of
5  success of the abatement program that is
6  reflected in the estimates for the number of
7  people who are going to be treated?
8      A.    I have not made any projections
9  about outcomes here.  All I've simply done is
10  followed the guidance of the literature, I've
11  consulted the experts I've consulted that we
12  need to ramp up capacity and maintain that
13  capacity for at least 15 years.
14      Q.    So who are you relying on for
15  the concept or the idea that the number of
16  people potentially receiving treatment in
17  year 12 should be the same as those in year
18  5, and that the cost applied to that
19  treatment should be the same?
20          MR. KO:  Object to the form.
21      A.    Can you break that question up?
22  You had two different --
23  BY MR. MORRIS:
24      Q.    Sure.

Highly Confidential - Subject to Further Confidentiality Review

1      A.    -- and in the middle there.
2      Q.    Who are you relying on for the
3  proposition that the number of people in year
4  12 as receiving treatment would be the same
5  as the number of people in year 5?
6      A.    So Dr. Lembke's report
7  specifically says that we need to ramp up
8  treatment and maintain it for the extended
9  period of time.
10      Q.    Okay.  Are you referring to
11  Dr. Lembke's assertion about percentage of
12  individual people could go from 20 percent to
13  40 percent?  Is that what you're referring
14  to?
15          MR. KO:  Object to the form.
16  BY MR. MORRIS:
17      Q.    I'll bring out the report.  I
18  just want to know -- I want to get you to the
19  right portion of the report.
20      A.    So that --
21          MR. KO:  Hold on.  Is there a
22  question?
23          MR. MORRIS:  It was a
24  follow-up.  But let me ask it this

Highly Confidential - Subject to Further Confidentiality Review

1  way.  That's a good point.
2  BY MR. MORRIS:
3      Q.    Let me first do this.
4          Can you go to your report at
5  Paragraph 42, Exhibit 6?  If you could read
6  the second and third sentences of
7  Paragraph 42, please.
8      A.    "The cost estimates anticipate
9  that the number of individuals that receive
10  treatment will ramp up over four years such
11  that the number of individuals receiving
12  treatment for OUD will double between 2020
13  and 2023."
14      Q.    Okay.  And then the next
15  sentence?
16      A.    "I understand that the Expert
17  Report of Anna Lembke explains then an
18  effective Abatement Plan could expand its
19  reach in this way by 2024."
20      Q.    Okay.  And you say there that
21  you understand that her report says that.
22  Have you read her report?
23      A.    I have.
24

```
 1              (Whereupon, Liebman Exhibit
 2        Number 13 was marked for
 3        identification.)
 4              MR. KO:  Sean, up to you, but
 5        maybe after this round of questioning
 6        we can have lunch?
 7              MR. MORRIS:  Yeah, that was my
 8        plan.  I'm going to tie this off and
 9        then we can go to lunch.
10   BY MR. MORRIS:
11        Q.    If you go to Page 96, please.
12   If you look at Paragraph 17.
13        A.    Yes.
14        Q.    And she writes in 17, "With an
15   aggressive infusion of resources and efforts
16   in Summit and Cuyahoga Counties, it would be
17   reasonable that within four years the number
18   of bellwether individuals with OUD who
19   receive substance abuse treatment services
20   within a year could double, assuming that
21   only 20 percent of individuals with OUD
22   currently receive treatment."
23              Do you see that?
24        A.    I do.
```

```
 1        Q.    Okay.  Is that what you were
 2   referring to as what you're relying on for
 3   the doubling of the potential treatment of
 4   individuals?
 5        A.    That's one place.  There may be
 6   a couple other places where this comes up in
 7   this report, but yes.  Yes, I think that's
 8   the right place.
 9        Q.    And there she does not cite to
10   any sources, correct?
11        A.    That's right.  I want to
12   emphasize, though, that the specific numbers
13   I take from Lembke, but there are other
14   sources that I've drawn upon in forming my
15   opinion that we can achieve, and that this is
16   the right level of treatment to be targeting
17   in this abatement plan.
18        Q.    There are other sources that
19   talk about doubling the people who will
20   receive treatment within Summit and Cuyahoga?
21        A.    That it would be possible that
22   one can achieve -- that increases in the
23   number of people who receive treatment if one
24   implements an effective plan.
```

```
 1        Q.    Okay.  Do you have any
 2   empirical reason to believe that?
 3        A.    Well, if you look, for example,
 4   in Vermont which has, I think, one of the
 5   most aggressive efforts, they were able to
 6   achieve when they undertook that plan
 7   increases in the percentage of people who
 8   were receiving treatment that I think were
 9   higher than doubling.
10        Q.    And where is that located?
11   Where is that information located?
12        A.    Can we go to the -- actually we
13   can get it out of -- if we go to my report
14   and go to -- this is going to be like 24 or
15   25.  Let's see if I can find it.
16              I think that may be in the
17   Brooklyn and Sigmon article cited in footnote
18   24, although there were other Vermont papers
19   that I read, so, I'm not 100 percent sure
20   that that was the one I'm thinking of.
21        Q.    Did you put a numerical
22   estimate as to how confident you are in the
23   number of people who will receive treatment
24   in year 11, let's say?
```

```
 1        A.    So that's the area where I did
 2   do sensitivity analysis because I wanted to
 3   show how the results can change depending on
 4   if the world turned out in different ways.
 5        Q.    Right.  So we talked about
 6   that, though.
 7              The sensitivity analysis is if
 8   the inputs change, how much will they change
 9   for any given line item, right?
10        A.    That's correct.
11        Q.    That's not an estimate of how
12   competent one is in the prediction of the
13   output number, correct?
14              MR. KO:  Object to the form.
15        A.    That's correct.
16              MR. MORRIS:  Okay.  Why don't
17   we take a break for lunch.
18              THE VIDEOGRAPHER:  The time is
19   12:52 p.m., and we're off the record.
20              (Whereupon, a luncheon recess
21   was taken.)
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

1       AFTERNOON SESSION

2

3           THE VIDEOGRAPHER:  The time is

4   1:48 p.m., and we're on the record.

5   BY MR. MORRIS:

6       Q.    Okay.  Dr. Liebman, you realize

7   you're still under oath?

8       A.    Yes.

9       Q.    Has anything that we've talked

10  about during the morning session caused you

11  to change any of the opinions in your report?

12      A.    No.

13      Q.    Before we went on break we were

14  talking about the estimated increase in the

15  number of people receiving services over

16  time, and we talked about Anna Lembke's

17  expert report that you cite in your report.

18          And then when I asked you

19  whether there's any other bases for that

20  assumption in your opinion, you mentioned a

21  Vermont article.

22          Do you remember anything more

23  about the Vermont article?  Do you remember

24  what it was entitled?

Highly Confidential - Subject to Further Confidentiality Review

1       A.    I can look up the title.  I

2   think we read it before.

3       Q.    Okay.  I'm sorry, you're right,

4   you pointed that out to me.  Let me ask it

5   this way.

6           Is there anything other than

7   the Lembke report and the Vermont article

8   that you're basing the increase from 20 to

9   40 percent?

10          MR. KO:  Object to the form.

11      A.    I'd say the general view that

12  it is possible to greatly increase the

13  percentage of people in treatment comes from

14  a much broader set of sources, including the

15  federal government's strategies around --

16  recommended strategies around combatting the

17  opioid crisis, the SAMSA reports, the CD

18  reports that are recommending strategies, all

19  those contemplated a much higher level of

20  treatment than we're currently doing.

21          And my other conversations with

22  medical experts like Dr. Alexander and with

23  local physicians on the ground in the two

24  bellwethers all contributed to me believing

Highly Confidential - Subject to Further Confidentiality Review

1   that this was a reasonable assumption.

2           THE VIDEOGRAPHER:  Can we go

3   off for a second?

4           The time is 1:50 p.m., and

5   we're off the record.

6           (Pause.)

7           THE VIDEOGRAPHER:  The time is

8   1:52 p.m., and we're on the record.

9   BY MR. MORRIS:

10      Q.    These other sources that you're

11  referring to, do they predict a doubling of

12  the number of people who could receive

13  treatment?

14          MR. KO:  Object to the form.

15      A.    Some of the conversations with

16  other medical experts, in some of those

17  conversations I was able to confirm that they

18  thought that was a reasonable assumption for

19  me to be making.

20  BY MR. MORRIS:

21      Q.    And which of the medical

22  experts are you referring to?

23      A.    I'm thinking particularly

24  Dr. Parran in Cuyahoga.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    And do you know what he was

2   basing his agreement with you about doubling

3   the number of people who could receive

4   treatment, what he was basing that on?

5       A.    My impression, based on his

6   expertise in treating people and designing

7   the systems and treating people in the

8   community.

9       Q.    You don't know whether he had

10  any empirical analysis to back up his

11  agreement with you?

12      A.    I don't know.

13      Q.    So keeping on Table 1 and using

14  Cuyahoga as the example while we're looking

15  at year 1 where there's 3,033 people listed

16  in the population receiving treatment on the

17  base case, and then increasing to 6,067 in

18  your report moving forward, you mentioned in

19  one of your answers before people moving in,

20  people moving out of that number.  Is it the

21  same cohort of people year-over-year that are

22  in that category?

23          MR. KO:  Object to the form.

24      A.    What category?

Highly Confidential - Subject to Further Confidentiality Review

BY MR. MORRIS:

Q.    So when you're listing the people who -- in the population receiving treatment, and in year 5 it's 6,067 and in year 6 it's 6,067, it's not the same 6,067 people between year 5 and year 6, is that right?

MS. RITTER:  Objection to form.

A.    Some of the individuals overlap, but some will be different.

BY MR. MORRIS:

Q.    And have you done any calculation as to how many will overlap and how many will be different?

A.    I don't specifically model that because I'm not fundamentally modeling the people.  I'm modeling that needed treatment capacity.

Q.    Okay.  Again, I really don't want to beat a dead horse on this one, but you say modeling the treatment capacity.  But the line item is titled "Population Receiving Treatment," it's not capacity to receive treatment, correct?

Highly Confidential - Subject to Further Confidentiality Review

A.    I guess the point I'm making is that I'm not using a compartment model of people flowing through states of the world.  I'm doing a budget projection of what it would cost to be able to treat this many people and what it would cost to treat that many people over time.

Q.    Moving to the line item of average cost of treatment provided, and you have the estimate there of 24,023 per person on the Cuyahoga chart, and I guess it's the same on the Summit County chart.  How did you calculate that?

A.    There was a -- the best study that I am aware of, of treatment costs, was a study that was done of facilities in Florida where they were able to collect data on a wide range of facilities of each type, and so I started with those numbers, and then I spoke to people in the bellwethers who were delivering similar services to confirm that the numbers I'd gotten from the Florida study were similar to what kind of fees were being paid in Cuyahoga and in Summit.

Highly Confidential - Subject to Further Confidentiality Review

Q.    And who did you speak to about the Florida estimates to determine whether they were applicable to the northern Ohio counties?

A.    People at the two ADAMHS boards which are the entities that fund a lot of those services.

Q.    Okay.  And did they do any calculations, or did they just kind of give you their opinion about that seems about right?

MR. KO:  Object to the form.

A.    For some of these services, they knew the exact daily rates, and I can multiply them by 365 to compare them with the numbers I was using, and then verify that we were in the right -- you know, that these things were similar.

BY MR. MORRIS:

Q.    And the backup for the number, the average cost of treatment provided is in one of the further spreadsheets, is that right?

A.    That's right.

Highly Confidential - Subject to Further Confidentiality Review

Q.    Okay.  And if we're working off of the same Exhibit 7, if you go to Page 61, is that the backup that goes into the starting point of $24,023 per person for the average cost of treatment?

A.    Yes.

Q.    What are the items on the left that are describing look like to be treatment things, where did those come from?

A.    If you look at the Society of Addiction Medicine guidelines around the range of treatment that they recommend the community have, these are the -- these come from there and from -- I mean, it's one of those things where there's remarkable consensus, so I can point you to other places that would say the same thing.

Q.    Okay.  And so for adult outpatient, what does that encompass?  What kind of cost does that encompass?

A.    So outpatient in this context means someone who is coming to get services that could be, for example, therapeutic services.  I think the technical definition

Highly Confidential - Subject to Further Confidentiality Review

1  is that intensive outpatient starts at nine

2  hours a week or more, and so adult outpatient

3  would be services that are less than that

4  amount of services a week.

5      Q.    I see.

6          So that's distinguished from

7  the next line item, the intensive outpatient

8  is nine hours plus?

9      A.    Nine hours plus.

10     Q.    How did -- so can you walk me

11 through how the adult outpatient line item

12 then rolls into a -- the cost per individual?

13     A.    Do you want me to sort of take

14 you through each column or give you the --

15     Q.    Yeah, actually I'm confused

16 about how -- what gets multiplied against

17 what or applied against what.

18     A.    Okay.  So in the first column

19 we have 3,874, which was the median cost for

20 adult outpatient in the Florida study.  And

21 in the second column, you have the mean,

22 which was 27,359.  In theory, the mean is the

23 better concept because if you have outliers

24 that's part of the cost and you'd want to

Highly Confidential - Subject to Further Confidentiality Review

1  include that.  But some of the folks who are

2  high cost are getting treatment for more than

3  a year, and I'm doing an annual number, and

4  so the mean is too high because it includes

5  some of the things that go beyond 12 months

6  of treatment.  The median, on the other hand,

7  is too low because it misses the right tail

8  of the distribution that's picked up in the

9  mean.  So what happens in column 3 and column

10 4 was simply adjust for inflation.

11         Then in column 5 we assume that

12 many people before they go into therapy have

13 to go through deep detox, 50 percent of them

14 do, and so we add to column 3 and 4 the detox

15 cost.  And so then we have these two numbers.

16 And then on top of that some people don't

17 just need the therapeutic services, they need

18 somewhere to live while they're getting

19 treatment, and that number is -- we assume is

20 30 percent.  I assume it's 30 percent here.

21 And so then you see the total cost

22 including -- you see the total cost including

23 the therapy, the detox if they got it, the

24 housing if they got it.  And you see that in

Highly Confidential - Subject to Further Confidentiality Review

1  2018 dollars for both the mean and the

2  median.

3          And then because the median is

4  almost certainly too low and the mean is

5  almost certainly too high, we want to get

6  something in the middle, so I take the mean

7  of those two, and then I do that same thing

8  for each of the four rows, and then I take a

9  weighted average of those because people

10 might be getting different -- to represent

11 the different kinds of treatment that people

12 are getting, and that results in the bottom

13 right cell.

14     Q.    That methodology of taking a

15 weighted approach to the mean and the median,

16 is that something that was in, then, in the

17 Florida study, or was that something that you

18 did for purposes here?

19     A.    Their numbers didn't give me

20 the exact number I wanted, which was the

21 annual mean, and so I know it has to be

22 between the median and the mean.  And for

23 simplicity I took the midpoint to get the

24 best estimate I could given the data that was

Highly Confidential - Subject to Further Confidentiality Review

1  available.

2      Q.    And was that decision to take

3  the midpoint between the median and the mean

4  based on a -- based on something, or just

5  that was what you felt was the right answer?

6          MR. KO:  Object to the form.

7      A.    I had -- yeah, I had to use my

8  judgment given that we didn't have the

9  perfect data to get us a number that would be

10 reasonable for the use I was putting it to.

11 BY MR. MORRIS:

12     Q.    On my sheet, the partial

13 hospitalization line, do you see that?

14     A.    Yes.

15     Q.    There's a shading there.  Do

16 you know why that's shaded?  I'll represent

17 to you that was the way it was in the Excel

18 spreadsheet.  I didn't know if that had some

19 meaning.

20     A.    Certainly doesn't have any

21 meaning to me right now.

22     Q.    Okay.  The line items that are

23 listed here, the adult outpatient, intensive

24 outpatient, partial hospitalization, adult

Highly Confidential - Subject to Further Confidentiality Review

1  residential, detoxification, do those include
2  fixed costs?
3       A.    The nice thing about the
4  Florida study, which is why I base my results
5  on the Florida study and then confirm them
6  locally rather than just taking local fees,
7  is that it was a properly done economic cost
8  analysis that, for example, included ongoing
9  maintenance costs for the facility and things
10 that might, you know, be offering
11 depreciation of the facility and things like
12 that that you actually have to pay, but
13 sometimes government payers don't pay the
14 full average cost of services.  So because it
15 was the most careful methodology, it was
16 thinking hard about what the full cost was,
17 that's why I relied on that one.
18      Q.    Would it be possible to do a
19 study like that with respect to using actual
20 Cuyahoga and Summit data?
21      MR. KO:  Object to the form.
22      A.    If one had probably a year to
23 do it, one could.  The reason it's
24 challenging is that they're not just

Highly Confidential - Subject to Further Confidentiality Review

1  non-profits funded by the ADAMHS boards,
2  they're all the private providers also that
3  -- the folk, the government folks who I
4  couldn't get data for didn't have access to
5  their numbers, and so one would have go to --
6  one would have to get a census of the
7  different kinds of providers in the community
8  to administer a survey like the one that the
9  Florida team did, and get them to report data
10 that's different than what they probably are
11 normally reporting in their -- you know,
12 you'd have to get them to do -- each of the
13 providers to do some work to do this, so it
14 would be -- I mean, there's a reason, as far
15 as I know, this has only been done well in
16 one state.  It's not a trivial study.
17 BY MR. MORRIS:
18      Q.    If you go back then to the
19 actual Table 1.  Hold on one second, excuse
20 me.  Okay.  Going back to Table 1 then and
21 using the Cuyahoga C.1 as the example, if
22 looking at just year 1, if the estimate of
23 the number of people receiving treatment is
24 off by just ten people, does that mean that

Highly Confidential - Subject to Further Confidentiality Review

1  the -- there's a difference of $250,000?
2       A.    Yes.
3       Q.    And again, just straight math,
4  if the estimate is off by 100, then there's a
5  difference of $2.5 million?
6       A.    I didn't, yeah, the math --
7       Q.    Sorry.
8       A.    I will presume you did the math
9  right, but I didn't listen to your numbers.
10      Q.    Don't presume.  I went from 10
11 to 100.  And the 10 was 50,000 and the 100
12 gets you to 2.5 million.
13      A.    Okay.  Yes.
14      Q.    And the spread gets higher the
15 longer you go into the years, correct,
16 because the number -- the average cost of
17 treatment gets higher?  You're off by that
18 same ten, the -- you're off by the same 100,
19 the actual difference or the spread is closer
20 to 4.5 million by the time you get to year
21 15, correct?
22      MR. KO:  Objection.  Form.
23      A.    I -- your question had several
24 parts to it.  On the question of whether the

Highly Confidential - Subject to Further Confidentiality Review

1  number, the spread gets bigger, as the
2  program is getting phased in and getting
3  bigger, the overall program's bigger but ten
4  people would still be the same effects, so
5  it's not getting bigger for that reason.
6  Then inflation is kicking in, but in real
7  dollars it's not getting any bigger.  It's
8  just because inflation is happening here.  So
9  I'm not sure I would -- I think I don't agree
10 with your general premise there.
11 BY MR. MORRIS:
12      Q.    Okay.  Understood.  It's as a
13 result of inflation that the number gets
14 bigger, but it is, in fact, a bigger number
15 than if you were off by 100 people in year 1?
16      MR. KO:  Objection.
17      Mischaracterizes Dr. Liebman's prior
18      testimony.
19      A.    It is a bigger number in
20 current dollars but not in constant dollars.
21 BY MR. MORRIS:
22      Q.    Let's jump for a minute in the
23 chart and go to Table 19.
24      MR. KO:  Do you know what page

1    that's on?

2         MR. MORRIS:  Let me work on

3    that here.

4  BY MR. MORRIS:

5       Q.    Yes, so Page 57 of 144.

6       MR. KO:  Thanks.

7       A.    Are we in the tables or in the

8  report?

9  BY MR. MORRIS:

10      Q.    I'm in Exhibit 7.

11      A.    Say one more time, please.

12      Q.    Page 57 of 144.

13      A.    Okay.

14      Q.    Before we get into the details

15  of that, if you can also pull out your

16  report, which is Exhibit 6, and turn to

17  Paragraph 90.  And in the middle of that

18  paragraph, it says that "The team would be

19  responsible for establishing high frequency,

20  weekly and monthly metrics for tracking the

21  progress and efficacy of the abatement plan,

22  and for convening relevant stakeholders to

23  collaboratively review the metrics and

24  determine how to take action so as to

1    maximize the number of residents who receive

2    needed treatment, minimize the harms

3    associated with opioid use, and reduce the

4    flow of new individuals who use or become

5    addicted to opioids."

6         Do you see that?

7       A.    I do.

8       Q.    Okay.  Is that the kind of

9  thing that the Government Performance Lab

10  does?

11      A.    We try to coach governments and

12  communities in doing those kind of activity.

13      Q.    Okay.  When working with the

14  GPL, though, whether coaching to do that,

15  does that process happen before significant

16  funds are spent?

17      MR. KO:  Object to the form.

18      A.    Most commonly in our projects,

19  we scope a project five or six months before

20  implementation starts.  That involves someone

21  on our team being on the ground in the

22  community for a few days typically.  Every

23  once in a while we'll spend longer on the

24  ground, but typically two or three days, lots

1    of phone calls with the government we're

2    working with to figure out what the project

3    is going to be and then define that, and then

4    five months or so later after I've hired a

5    person or a team in some cases to go be on

6    the ground is when we start the

7    implementation phase that includes this kind

8    of work.

9  BY MR. MORRIS:

10      Q.    And does that happen before or

11  after the funding of the program?

12      A.    The most common projects we do

13  are ones where funding already exists, an

14  agency may be spending one hundred,

15  $200 million a year on services, but there's

16  concern that they're not getting good results

17  for those services.  And so we come in and

18  work with the agency and the existing service

19  providers to set up these kind of high

20  frequency data-driven collaborations to start

21  getting better results.  So typically we're

22  coming in where the funding, the spending is

23  already happening.

24      Q.    Is the -- are the systems in

1    place currently to just start implementing

2    the abatement plan as you proposed it?

3         MS. RITTER:  Objection to form.

4       A.    I think I need to know how you

5  define systems in that question.

6  BY MR. MORRIS:

7       Q.    If all of the funding were

8  suddenly available, could the abatement plan

9  be implemented as you proposed it?

10      A.    My recommendation at that point

11  would be to do more intensive work to make --

12  you know, there's a lot of things that are

13  not specified in my plan in full detail.  For

14  example, we know how many treatment slots

15  there's supposed to be but not which specific

16  providers to contract with, or whether new

17  capacity needs to be built, and so there

18  would have to be a decision-making process

19  about allocating those funds that would get

20  to -- for the level of granularity beyond

21  what is specified in my report.  And so I

22  would certainly recommend that the

23  communities do further intensive scoping and

24  planning.  Some things one could tick off

```
 1   right away and one should just get, going but
 2   others will take some planning.
 3        Q.    And that's in part what the
 4   bucket that's represented by Table 19 is
 5   intended to try and help do, if I'm
 6   understanding right?
 7        A.    Yes, I would imagine the
 8   initial period would be a lot of trying to
 9   get things off the ground, and then beyond
10   the initial period, there would be a lot of
11   trying to make sure that what's going on is
12   using these dollars as effectively as
13   possible.
14        Q.    And in your contemplation, the
15   initial implementation organization and then
16   the continued work that you just described
17   would be done by the people that are
18   represented by the employees you've got
19   listed here on table 19?
20             MR. KO:  Object to the form.
21        A.    It would be in collaboration
22   with a lot of people in organizations already
23   on the ground.  These communities have been
24   working to combat the opioid crisis for years
```

```
 1   at this point, and so they have some very
 2   effective, I think, collaborations going on,
 3   but the people who are collaborating in those
 4   working groups, most of them have full-time
 5   other jobs, and, you know, they're sort of
 6   adding this on.  They don't have the capacity
 7   that I think they need of -- to produce the
 8   realtime data or to be -- they need
 9   additional capacity beyond what's happening
10   right now and that's why that's in here.
11   BY MR. MORRIS:
12        Q.    And why is the realtime data
13   important?
14        A.    Let me give you an example from
15   a project I'm doing in Tampa right now.
16   We've got families in the child welfare
17   system where the reason the children are
18   being maltreated is that the parent has an
19   addiction, and so the child welfare agency
20   wants to connect these parents with addiction
21   treatment services so that the kid can be
22   safe and obviously it's good for the parent,
23   too, to not be addicted.  And today if you
24   look at the data, when the child welfare
```

```
 1   agency makes a decision that it wants to
 2   connect someone to services, about 5 percent
 3   of those people are getting into services,
 4   which is obviously not enough.  And so they
 5   had a general sense that they weren't getting
 6   a lot of people into services and that the
 7   problem of addiction that was -- meaning that
 8   the kids were being maltreated wasn't going
 9   away, but they didn't know exactly, they
10   didn't even know the basic number of what
11   percent were getting there.  We got a fellow
12   on the ground there.  We started measuring
13   this with high frequency.  We started
14   bringing together the treatment side and the
15   child welfare side for conversations about
16   why these roles weren't resulting in
17   treatment, and through that process and
18   discussion in a few months, that number is
19   already up significantly.  So that's the kind
20   of example, if you're actually measuring what
21   you're trying to accomplish and if you get
22   people together to discuss the numbers and
23   where you can go, you can get to much better
24   results for the population you're trying to
```

```
 1   serve and it's obviously a much more cost
 2   effective way to use the dollars if it's
 3   getting better results.
 4        Q.    For this data informed systems
 5   re-engineering and management category that
 6   we're talking about as being Table 19, you
 7   contemplate, or you propose five individuals
 8   in each county to be hired, is that right?
 9   Am I reading that right?
10        A.    Yes.
11        Q.    And you have estimated salaries
12   for the individuals listed in Table 19,
13   correct?
14        A.    Yes.
15        Q.    And those are based on
16   estimated salaries from Government
17   Performance Lab, GPL, people?
18        A.    Yes, I have hired people even
19   this week to do these exact functions, so I
20   know what they -- what I pay them.
21        Q.    And do you expect GPL employees
22   will be hired for this?
23        A.    I have no expectation of that.
24   I just think this function needs to exist.
```

1    Q.    You're estimating the same
2  staffing level for all 15 years?
3    A.    Yes.
4    Q.    And what is that based on?
5    A.    I think if you are doing a
6  program of this size and complexity, one
7  absolutely wants to be working to make sure
8  implementation is as strong as possible for
9  the whole period.
10    Q.    You say for the whole period.
11  Would they go beyond year 15?
12    A.    I haven't tried to make
13  projections beyond that.
14    Q.    We talked earlier this morning
15  -- well, scratch that.
16         Do you envision that
17  significant changes would be made to the
18  abatement plan once these ten individuals in
19  the two counties are in place and start
20  thinking about what outcomes are needed to be
21  achieved?
22    A.    I think the general categories
23  are the ones that are needed, but the
24  communities, we need more community

1  involvement in figuring out, for example, you
2  know, within treatment what mix, exact mix do
3  we really need of intensive outpatient versus
4  special hospitalization and things like that,
5  so I anticipate refinement, but I think the
6  categories and the aggregate spending
7  amounts, you know, those are going to hold
8  up.  But I'm sure they will reallocate based
9  on local conditions and how local conditions
10  change from when I was last there and when
11  this actually gets implemented.
12    Q.    The point of this category of
13  people is to try and be as effective and as
14  efficient as possible, fair?
15    A.    I'm all in favor of
16  effectiveness and efficiency.  I think the
17  point of these people I probably wouldn't
18  describe it that way.  There's other things
19  they're trying to do.
20    Q.    Okay.  I get that they may do
21  other things, but I mean, they are trying to
22  make the plan as effective as possible --
23    A.    Yes.
24    Q.    -- in the most efficient way

1  possible, correct?
2    A.    Yes.
3    Q.    And to the extent that they're
4  particularly successful at that particularly
5  with efficiency, that could drive the costs
6  down across other categories, correct?
7    MR. KO:  Object to the form.
8    A.    I think it is -- the world can
9  evolve in ways in which there's need for
10  greater resources that are in my estimates
11  and lesser resources.  My estimates are my
12  best estimates of what's going to be needed
13  for the next 15 years, but I gave you upper
14  and lower estimates for some components to
15  illustrate how things could change if, for
16  example, the Massachusetts number of OUD
17  being 4.6 percent or something in that
18  direction was more accurate than the 1.4
19  number then costs could be much -- and need
20  could be much higher than what I've estimated
21  here.
22  BY MR. MORRIS:
23    Q.    On that point of doing the
24  higher and lower estimates, if you go,

1  looking at Table 1 where we were talking
2  about the cost of treatment -- and for --
3  I'll give you a second to get there.  It's
4  Page 7 of 144.
5    A.    I'm going to cheat to go to the
6  other document.  It will be faster.
7    Q.    That's fine.  In any event it's
8  Table C.1.
9    A.    Table C.1.  All right.  Yes.
10    Q.    For the projected population
11  receiving treatment, your low case subtracted
12  33 percent from the base case, and your high
13  case increased it by 33 percent.  Why did you
14  select those two numbers for your high and
15  low?
16    A.    So when the future is unknown
17  and one needs to make assumptions, you want
18  to -- you know, that standard practice is to
19  do your sensitivity analysis in the way that
20  will be relevant and useful, and one way one
21  can do that is try to find -- in a case like
22  this where there isn't some probability
23  distribution that I can run a Monte Carlo out
24  of, a way to try to capture the relevant

1    range is to look at projections that, the
2    range of projections that are out there in
3    the literature for how the crisis might
4    evolve, and so there was, there's a study
5    which I cite somewhere, anyway, where a bunch
6    of different experts were making a projection
7    about how the opioid crisis would evolve, and
8    I looked at that and there was one that
9    seemed like a total outlier and I sort of
10   ignored that one but then took a number that
11   was in the middle of the others, and that's
12   how I kind of got to this number.
13        Q.    As part of the population
14   receiving treatment category, as time goes
15   on, did you have a different calculation for
16   changing percentages of those who suffer from
17   OUD versus HUD?
18            MR. KO:  Object to the form.
19        A.    So my treatment cost numbers
20   are not varying depending on that split, and
21   so that's not something that is in my
22   estimates.
23   BY MR. MORRIS:
24        Q.    Let's go to Table 2 now, if we

1    could.  And that's treatment services for the
2    medication assisted treatment, correct?
3        A.    That's the medication treatment
4    itself, not -- the same people might also be
5    getting some of the appropriate treatment,
6    but this is the medical, the medication
7    component.
8        Q.    Okay.  And for this one you
9    also calculated, or you estimated that the
10   number of people, percent of the population
11   receiving MAT treatment would double by year
12   4?
13        A.    Not quite.  The population
14   receiving MAT quadruples by year 4.  So you
15   see 4,045 is twice 1,011.
16        Q.    I'm sorry.  Caught my on my bad
17   reading skills there.
18            And what is that based on?
19        A.    It's very similar to the
20   conversation we already had about the
21   doubling of treatment.  There is both a
22   general consensus in the literature, in the
23   literature that is recommending abatement
24   strategies that one can significantly

1    increase the percentage of people receiving
2    MAT and that that would be a good thing to do
3    to reduce deaths and improve well-being, but
4    then the specific number I use relies on
5    Dr. Lembke's report.
6        Q.    The same reference that we
7    looked at before?
8        A.    It's roughly, it's maybe a
9    paragraph later than where we were looking.
10       Q.    Okay.  We were on Page 96
11   before of the Lembke report, and I'm sorry, I
12   already lost track of which exhibit that is.
13            MR. KO:  I don't think you ever
14       marked it as an exhibit.
15            MR. MORRIS:  I did.  I probably
16       didn't say it.
17       A.    On mine it's Exhibit 13.
18   BY MR. MORRIS:
19       Q.    Exhibit 13.  Thank you.  Before
20   we were in -- on Page 96, Page 17, is there a
21   different reference to the increase for MAT
22   services?
23       A.    We were in Paragraph 17 before,
24   and I think you want to look at Paragraph 18

1    now.
2        Q.    Okay.  And there does she cite
3    to any support for her estimate of
4    quadrupling the number of people who receive
5    MAT treatment?
6        A.    I think she cites to a study
7    down here which I'm not familiar with, but
8    then she also notes, I think, in Paragraph B
9    that she's relying partially on evidence from
10   Massachusetts and Vermont.
11       Q.    Okay.  You said that you, for
12   the assumption of moving the MAT treatment,
13   quadrupling the number of people who receive
14   the treatment, you referred to Lembke,
15   discussions that you've had.  What else
16   beside Lembke did you rely on for that?  I've
17   forgotten what your earlier answers, I'm not
18   trying to trick you.  You mentioned Lembke.
19   What else did you rely on for your assumption
20   of your estimation of quadrupling people who
21   receive MAT treatment?
22            MR. KO:  Object to the form.
23       A.    So in, for the -- for my
24   conclusion, my general conclusion, that it is

Highly Confidential - Subject to Further Confidentiality Review

```
 1    possible to greatly increase the percentage
 2    of people receiving MAT, that comes from, if
 3    we turn to -- I've lost my report.  Right
 4    here.  If we turn to my report, Page 12,
 5    footnote 24, you can see the CDC report
 6    "Evidence-Based Strategies For Preventing
 7    Opioid Overdose, What's Working in the US."
 8    You can also see the Surgeon General's report
 9    "Facing Addiction in America, the Surgeon
10    General's Spotlight on Opioids."  So both of
11    those recommend that the nation take efforts
12    to greatly increase the amount of MAT and
13    think that it can happen and think that it
14    will have a major impact on deaths and other
15    harms.  I spoke with the national experts
16    like Alexander and Lembke and discussed this
17    with them and with local physicians like
18    Dr. Parran, Dr. Smith, so all of those
19    approaches to gathering information which is
20    what I do whenever I'm trying to design a
21    solution to a policy problem, read the
22    literature, gather information from national
23    experts, talk to local people, they all
24    informed my judgment that it was reasonable
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to rely on the numbers that were in
 2    Dr. Lembke's report.
 3         Q.     You mentioned speaking to
 4    Dr. Alexander.  How often did you speak --
 5    how many times did you speak to
 6    Dr. Alexander?
 7         A.     I don't know the exact number.
 8    I would have to go look at my calendar to
 9    figure out exactly how many.
10         Q.     Did you talk to Dr. Alexander
11    following his deposition?
12         A.     No.
13         Q.     Did you talk to Dr. Alexander
14    in preparation for your deposition today?
15         A.     No.
16         Q.     Did you talk -- did you talk to
17    Dr. Lembke?
18         A.     Yes.
19         Q.     How often did you -- how many
20    times did you talk to Dr. Lembke?
21         A.     Either once or twice.  I
22    remember specifically once, but there might
23    be one other.
24         Q.     How long ago was that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.     I think it was -- I'm pretty
 2    sure it was in 2018, and I could guess what
 3    month, but it would be plus or minus two
 4    months, so that's probably not a good thing
 5    for me to do.
 6         Q.     What did you talk to Dr. Lembke
 7    about?
 8              MR. KO:  To the extent that
 9         these communications and conversations
10         happened in the presence of counsel,
11         I'd instruct the witness not to
12         answer.
13         A.     I would say the main -- well,
14    there were a lot of people, so it was a long
15    -- the call I'm remembering was a long call,
16    but it was two and a half hours or something
17    like that.  And so there were a lot of topics
18    discussed.  One thing I remember spending a
19    lot of time on in that call was the question
20    of whether someone is ever cured of OUD or
21    whether people need persistent treatment for
22    a long period of time, and Dr. Lembke's view
23    was that one needs to think about addiction
24    as a chronic condition that lasts for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    someone's lifetime after they've experienced
 2    addiction, and that we have to have treatment
 3    capacity capable of serving the whole stock
 4    of people who have ever experienced OUD for
 5    quite some time.  So that was like -- that
 6    was one of the things we talked about.
 7    BY MR. MORRIS:
 8         Q.     Do you remember anything else?
 9         A.     We definitely talked about the
10    question of if one put a lot more resources
11    into this problem what percent of people
12    could one get into treatment and get to take
13    up MAT, you know, because you could imagine
14    doing an abatement plan that says that
15    15,000 people with OUD, let's assume costs
16    associated with giving 100 percent of them
17    MAT, and I needed to decide whether that was
18    a reasonable thing to do or whether I should
19    assume that we were going to treat a number
20    smaller than 100 percent, so there was
21    discussion of what the evidence suggested
22    was, could be achieved with an injection of
23    additional resources.
24         Q.     You mentioned you also talked
```

```
 1    to Dr. Alexander, and I forgot if I asked you
 2    this so I apologize.  How many times did you
 3    talk to Dr. Alexander in connection with this
 4    case?
 5              MR. KO:  Asked and answered,
 6         but you can answer again.
 7         A.    I don't remember the exact
 8    number.
 9    BY MR. MORRIS:
10         Q.    You don't remember how many
11    times you talked to him?  I don't remember
12    that you said you don't remember how many
13    times you talked to him.  All right.  Do you
14    remember what you talked to him about,
15    though?
16         A.    So there were a variety of
17    conversations, so --
18              MR. KO:  I provide the same
19         instruction as before to the extent
20         that his communications were with or
21         involving counsel, I instruct the
22         witness not to answer.
23         A.    I would say there were two
24    broad categories of conversations.  One was
```

```
 1    about what components should be in an
 2    abatement plan.  The second category had to
 3    do with the compartment model that he was
 4    building.
 5    BY MR. MORRIS:
 6         Q.    And the conversation you had
 7    with him regarding his compartment model,
 8    what was that conversation?
 9         A.    He was explaining -- I'm not
10    very familiar with his model so I may be not
11    able to go into great detail here, but he was
12    explaining why -- what he had added to his
13    model that was, I would say, an advance over
14    existing compartment models.
15         Q.    Did that have relevance to the
16    opinion you were developing for this case?
17         A.    I don't think I can answer that
18    question and comply with your advice to me,
19    David.
20         Q.    Well, let me ask this.
21              Did you have conversations with
22    Dr. Alexander where counsel was present that
23    included information that you were relying on
24    for your opinion?
```

```
 1         A.    Not in the context of the
 2    compartment model discussions.  To the extent
 3    that we were discussing where the categories,
 4    harm reduction and prevention that should be
 5    in a treatment plan, he was one of many
 6    sources that suggested what are a pretty
 7    standard set of components that I included in
 8    my plan.
 9         Q.    And those were conversations
10    you had with him while counsel was present?
11         A.    I think, my memory is that --
12    sorry, I'm trying to remember, the
13    conversations we're talking about are in the
14    previous calendar year, so it is -- my memory
15    is that most of those conversations had
16    counsel present, but I cannot be sure if
17    100 percent of them did.
18         Q.    Okay.  So what I'd like to do
19    is be able to get any information that you
20    gathered from Dr. Alexander that you used and
21    relied upon in your opinion regardless of
22    whether counsel was there or not, because if
23    you got information from him that you relied
24    on, doesn't matter to me whether counsel was
```

```
 1    there or not.  Let him say whatever he's
 2    going to say.  My question is, have you told
 3    me about every conversation you had with
 4    Dr. Alexander where he provided you
 5    information that you were relying upon for
 6    your opinion?
 7              MR. KO:  Objection.  Asked and
 8         answered.
 9         A.    I don't think there were any --
10    I do not remember any further conversations
11    beyond the two categories that I described
12    for you, the ones about his compartment model
13    and the ones where we were discussing what
14    categories should be included in the report.
15    BY MR. MORRIS:
16         Q.    On the topic of what categories
17    to include in the report, have you reviewed
18    Dr. Alexander's report?
19         A.    Yes.
20         Q.    And your categories and his
21    categories are not exactly overlapping,
22    correct?
23              MR. KO:  Object to the form.
24         A.    There are things in my report,
```

1　in my categories that are not in his, and
2　there are things in his that are not in mine.
3　BY MR. MORRIS:
4　　　Q.　Why is that?
5　　　A.　I think there are two reasons.
6　One is an issue we talked about before that
7　he was a doing a national proposal, and so
8　there are categories that are, for example,
9　federal responsibilities that were beyond the
10　scope of what I was doing that are in his
11　report but they just weren't things I was
12　including.  And then there were some things
13　that I put in my report, I think, because of
14　my experience, having been working on the
15　ground on these issues in a number of
16　jurisdictions, that I'm aware of and think of
17　as important, like the system coordination
18　elements that wouldn't necessarily be a thing
19　that a physician would start with if they
20　were putting together their top ten list of
21　components.
22　　　Q.　On the category of issues
23　categories for an abatement plan that you
24　don't include in your -- and we talked about

1　that before, kind of national in scope
2　things, have you considered what those
3　categories that you did include, how they
4　might impact your estimated costs for your
5　abatement plan?
6　　　MR. KO:  Object to the form.
7　　　A.　I think what the literature is
8　very clear on and what the expert opinion is
9　very clear on is that a solution to this
10　crisis is multifaceted, and you need to not
11　only do all the things that I propose here
12　for these bellwethers, but the federal
13　government needs to be doing a bunch of
14　things as well, and so I think these things
15　are all interconnected.
16　BY MR. MORRIS:
17　　　Q.　Did you do any calculations to
18　say, well, if the federal government does
19　more of X, it will impact the abatement plan
20　that I'm developing for Cuyahoga and Summit
21　in Y way?
22　　　MR. KO:  Object to the form.
23　　　A.　I have considered in general
24　the overall environment that we're in and

1　that these things interact, and -- but I
2　think if you look at the expert consensus,
3　say, for how much treatment is needed or how
4　much MAT is needed.  There's not anyone out
5　there saying, hey, if customs does a little
6　bit more, we're not going to have to treat
7　all these people or even it's going to
8　significantly change the number we're going
9　to treat.  I've thought about that issue, but
10　it's not -- anyway, I've thought about that
11　issue.
12　BY MR. MORRIS:
13　　　Q.　But there's no calculation that
14　you've done about the way in which, as a
15　matter of metrics or any sort of numerical
16　value of impacts, the federal government may
17　have on the Cuyahoga and Summit?
18　　　MR. KO:  Object to the form.
19　　　A.　So I don't, I have not built a
20　compartment model to project impacts of
21　different components.
22　BY MR. MORRIS:
23　　　Q.　Have you told me about all the
24　conversations that you had with Dr. Alexander

1　in which conversation impacted your opinion
2　in this case?
3　　　MR. KO:  Object to the form.  I
4　　　don't think he said "impacted."
5　　　Anyway, go ahead.  I'm sorry.
6　　　MR. MORRIS:  No, that's fine.
7　BY MR. MORRIS:
8　　　Q.　What I meant was, have you told
9　me about all of the conversations you've had
10　with Dr. Alexander in which you relied upon
11　something he said in forming your opinion?
12　　　A.　I think I've described the two
13　main types of conversations we had.  I'm sure
14　there are other categories of things where he
15　was helpful in directing me to papers to read
16　and literature that I might not be aware of,
17　and so I think -- so I think there's -- I'm
18　sure I got other benefit from him beyond what
19　we've explicitly talked about.
20　　　Q.　Nothing that you can remember
21　expressly, though, as you sit here today?
22　　　A.　No.
23　　　Q.　We talked about Dr. Lembke and
24　conversations you had with her.  Are there

1  any other conversations you had with her in
2  which you benefited or relied upon something
3  she said to form your opinion that we haven't
4  talked about?
5       A.    No.
6       Q.    I'm going to go into some next
7  tables.  Maybe we can take a quick break.
8            MS. RITTER:  That's what I was
9       wondering.  It's been about an hour.
10      A.    It's a good time to break.
11           THE VIDEOGRAPHER:  The time is
12      2:48 p.m., and we're off the record.
13           (Whereupon, a recess was
14      taken.)
15           THE VIDEOGRAPHER:  The time is
16      3:00 p.m., and we're on the record.
17           MS. RITTER:  Is the phone back
18      on now because they said they --
19           THE COURT REPORTER:  Yes.
20  BY MR. MORRIS:
21      Q.    Dr. Lembke, we're going to go
22  through some more of the -- your categories
23  in your tables.
24           MR. KO:  You just called him

1  Dr. Lembke.
2  BY MR. MORRIS:
3       Q.    Oh, I'm sorry.
4       A.    I think you gave me a
5  promotion, but I'm not sure.
6       Q.    Dr. Liebman, I apologize.  We
7  will we going through those tables in a
8  second.  Question for you, though, in
9  communicating with other experts that have
10  been disclosed in this case, like
11  Dr. Alexander, Dr. Lembke, did you have any
12  e-mail communications with them?
13      A.    Yes.
14      Q.    And with which expert, other
15  expert did you have e-mail communications?
16      A.    So what I'm not sure of is
17  there's sort of two ways that communication
18  happened.  Sometimes there would be a
19  document that would go from me to the
20  attorneys and the attorneys to them, or
21  vice-versa if we were, like, sharing a paper
22  we wanted the other person to read or
23  something like that, like academic paper that
24  we thought would be useful to the other

1  person.  And sometimes there were -- less
2  frequently there were direct e-mails with the
3  attorneys CC'd, so there were -- so I think,
4  so you asked which experts.  Do you have a
5  list of the -- does someone have a list?
6       Q.    Well, let's go -- I'll go
7  through them.  Dr. Alexander?
8            MR. KO:  So what's the
9       question, if he had e-mail
10      communications with Dr. Alexander?
11           MR. MORRIS:  Yes.
12      A.    I'm not sure whether there are
13  any direct ones.  I think most of them were
14  through the attorneys, but I can't remember
15  all e-mails.
16  BY MR. MORRIS:
17      Q.    And putting aside, you know,
18  like, scheduling things or, hey, there's a
19  trial date of this, you know, things that
20  deal with timing and things like that, I'm
21  talking about substantive e-mails about your
22  reports, were there those sorts of e-mails
23  with Dr. Alexander?
24      A.    The ones I remember were all

1  sending documents, not, you know, an e-mail
2  saying, hey, what do you think about this,
3  but I have to go through all my e-mails to
4  make sure I'm not forgetting something.
5            MS. RITTER:  And if you're
6       asking about communications that
7       include the lawyers, then we would
8       have to instruct him not to answer,
9       but right now you're just asking him
10      for the people, right?
11           MR. MORRIS:  Right, whether
12      there were e-mails.
13           MS. RITTER:  So that question
14      we're fine with.  If we're going to go
15      beyond that to the content of it, then
16      we would instruct him not to answer.
17           MR. MORRIS:  And that's where I
18      would explore, if there were e-mails
19      that he was using to rely upon in
20      forming his opinions, then we might
21      have to parse some things.
22  BY MR. MORRIS:
23      Q.    So for the moment let's start
24  with Dr. Alexander.  Do you know how many

```
 1   e-mails there were?
 2        A.    So they're -- the different
 3   kind of question, you said the scheduling
 4   ones, so anyway, the answer is I would have
 5   to go look.
 6        Q.    Ones where substantive
 7   information was being communicated including
 8   like, A, read this article, do you have an
 9   estimate as to how many of those type of
10   e-mails?
11        A.    I would have to go look at my
12   e-mails.
13        Q.    Okay.  Dr. Lembke, were there
14   e-mails with her?
15        A.    I do not believe I've ever
16   e-mailed Dr. Lembke.  I think I've been CC'd
17   on scheduling e-mails that she and I were on
18   the same e-mail, but I don't think I've ever,
19   to my recollection -- but recollection I've
20   never e-mailed with her.
21        Q.    How about Parran?
22        A.    To the best of my recollection,
23   I have not e-mailed with him.
24        Q.    Are you aware that the Parran
```

```
 1   opinion has been withdrawn from the case?
 2        A.    Yes, I've read that.
 3        Q.    Are you relying on anything
 4   from the Parran opinion?
 5        A.    There are several citations in
 6   my report to the -- to Parran's report.
 7   Those are things where I also had broader
 8   knowledge of the topic or had discussed with
 9   him on the phone, so they were not things
10   where I was exclusively relying on Parran.
11        Q.    Understood.  But are you
12   relying on anything from his opinion, in your
13   opinion?
14             MR. KO:  Objection.  Asked and
15             answered.
16        A.    All of the things where I cite
17   Dr. Parran, I have -- I know that information
18   from places in addition to his report.
19   BY MR. MORRIS:
20        Q.    So you're not relying, then, on
21   Dr. Parran for your opinions?
22             MR. KO:  Objection.  Asked and
23             answered.
24        A.    I think I'm going to give the
```

```
 1   same answer again, which is all the places
 2   where I cite Dr. Parran I have other ways to
 3   know the same information.
 4   BY MR. MORRIS:
 5        Q.    Right.  So there's two or more
 6   things that you're relying on where you rely
 7   on Dr. Parran, I get that.  My question is,
 8   are you -- when you have multiple, are you
 9   also relying on Dr. Parran?
10             MR. KO:  Multiple what?
11        Objection.  Form.
12        A.    I think that relying on has a
13   technical legal meaning that I probably don't
14   understand in this context that I may need
15   explained to me.
16   BY MR. MORRIS:
17        Q.    In forming your opinion, is the
18   material in the Parran report -- I'll come
19   back to this.  I'll come back to this.
20             How about Professor Cutler,
21   have you e-mailed with him regarding the
22   opinions in this case?
23             MR. KO:  Regarding the opinions
24        that Dr. Liebman is giving in this
```

```
 1        case?
 2             MR. MORRIS:  Either one, his or
 3        Cutler's.
 4        A.    Most of my interactions with
 5   Dr. Cutler were very early in the process, so
 6   I'm not sure that any of that communication
 7   pertained to things that are in -- I would
 8   have to figure out whether any of that
 9   pertained to anything that ended up being the
10   scope of my report, and I don't actually know
11   what the scope of his report is, but I've had
12   e-mails with Dr. Cutler.
13   BY MR. MORRIS:
14        Q.    How about with Dr. Rosenthal?
15        A.    I've e-mailed Dr. Rosenthal.
16        Q.    And what was the substance of
17   those communications?
18        A.    What am I allowed to say if
19   lawyers are on the e-mails?
20             MS. RITTER:  I instruct him not
21        to answer to the extent the
22        communication also involved counsel.
23        But your question was pretty broad.
24        He could have e-mailed her about her
```

1  garden because the last question

2  didn't say about the report you were

3  issuing in this case or her reports so

4  it makes it a little bit difficult --

5        MR. MORRIS:  Let me ask it --

6        MS. RITTER:  -- but I would

7  instruct him not to answer to the

8  extent that it's information that

9  involved counsel.

10  BY MR. MORRIS:

11        Q.    Let me ask it this way.  Were

12  there e-mail communications you had with

13  Dr. Rosenthal regarding your opinions in this

14  case?

15        A.    I asked her for some citations

16  on a particular topic, and she supplied those

17  for me.

18        Q.    What was of the topic that you

19  asked for citations for?

20        A.    The future price trajectories

21  of pharmaceuticals.

22        Q.    Meaning how much

23  pharmaceuticals might cost in the future?

24        A.    What inflation rates to use for

---

1  prescription drugs.

2        Q.    Do you remember which of the

3  articles it was that she sent to you, or

4  provided to you?

5        A.    Let me look at the tables, I

6  may or may not be able to remember.  All

7  right.

8             (Witness reviewing document.)

9        A.    Sorry, give me one second.

10  Okay.  So in Table C.2, row 7, there was the

11  question of what would happen to the price of

12  Naltrexone when it comes off patent, and I

13  believe she gave me a reference for

14  literature on how prices come down after

15  things go off patent, but what I don't

16  remember is whether I used that one or a

17  different source on that topic.

18        Q.    On the topic of inflation

19  rates, what -- for the inflation rate that's

20  on Table I, it's Page 5.

21        A.    We're still on -- this is of

22  144.

23        Q.    Yes, 5 of 144.

24        A.    I messed up because I don't

---

1  have a three-ring binder here.  All right.

2  5.  Yes.

3        Q.    Okay.  What did you use those

4  -- what categories did you apply that

5  inflation rate to?

6             MR. KO:  Object to the form.

7        A.    Okay.  So there are ten

8  inflation rates, so I can start with one and

9  take you through it.

10  BY MR. MORRIS:

11        Q.    Sure.  Let's go down, yeah.

12        A.    All right.  I'm going to have

13  to cross-reference tables so this may take --

14  I will try to be efficient at giving you the

15  flavor of this rather than being exhaustive

16  if that's --

17        Q.    Let me ask you -- and we can

18  walk through it.  I'm not trying to cut you

19  off.

20        A.    Okay.

21        Q.    But my first question is, what

22  did you use, or why did you choose the

23  inflation rates that are listed here?

24        A.    There are different kinds of

---

1  goods and servicing -- services that would

2  need to be provided in the abatement plan,

3  and different goods and services have

4  historically and will likely in the future

5  have different price paths.  And so to be as

6  accurate as possible, I tried to use an

7  inflation rate that applied to the category

8  of product or service that was being used.

9  So for example, when thinking about what

10  would happen -- so for things that involved

11  hiring somebody, I have an initial wage and I

12  have to -- and I initial benefits and I

13  have to project that into the future.  The

14  sensible thing to use for that is the

15  employment cost index which is a price index

16  that is specifically meant to measure costs

17  associated with employment, and I further

18  disaggregated because historically there's

19  been a difference in the inflation rate for

20  private employment and state and local

21  government employment, and so for positions

22  that I anticipated would be within

23  government, I used the state and local one.

24  For ones that were outside the government, I

Highly Confidential - Subject to Further Confidentiality Review

```
 1   used the private industry one.
 2        Q.     Are all of the ones that are
 3   listed here US-wide as opposed to regional?
 4        A.     Yes.
 5        Q.     Did you consider using for any
 6   of the places where you were going to use an
 7   inflation rate to use a regional inflation
 8   rate?
 9        A.     Well, for some of the things,
10   there's sort of a national market, and so
11   that wouldn't -- I don't think that would --
12   there would be a distinction there.  You
13   know, for most inflation rates for big
14   categories like employment costs, we wouldn't
15   have an obvious reason to project big
16   differences in different regions for those
17   costs, so the national number, I think, is
18   useful.  And the other thing that's good
19   about the national number is that there
20   actually exists several forecasters of those
21   numbers whereas I'm not aware of subnational
22   forecasts, say, for the consumer price index.
23   I mean, there's obviously subnational
24   retrospective numbers, but not forecasts that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   I've encountered, although maybe someone in
 2   the private sector does that.
 3        Q.     There are differences, though,
 4   depending on the kind of thing you're trying
 5   to measure, in inflation rates based on
 6   geography?
 7               MR. KO:  Object to the form.
 8        A.     I think the more relevant issue
 9   is that there are difference in levels of
10   prices based on geography that what you would
11   pay someone to do a job in Cuyahoga might be
12   different than what you'd pay them to do the
13   job in Los Angeles, and those kind of level
14   differences are reflected in my report.  So
15   for example when we are putting in a social
16   worker salary, we're taking them from the
17   data from existing social worker salaries in
18   the specific bellwethers, so I think I
19   incorporated what is the most important
20   regional variation to incorporate.
21   BY MR. MORRIS:
22        Q.     Okay.  Let me, before we get
23   back into the other tables let me just finish
24   this off.  Did you have e-mails with McGuire?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     Yes.
 2        Q.     And what were the --
 3   substantive e-mails regarding your opinions
 4   in this case, you had those kind of e-mails?
 5               MR. KO:  Object to the form.
 6   BY MR. MORRIS:
 7        Q.     The reason I asked it that way
 8   is before I got chastised for potentially
 9   asking you about e-mails that wanted to know
10   about the weather, so I'm only asking you
11   about e-mails, substantive e-mails related to
12   the opinions that you're giving in this case.
13   Did you have such e-mail exchanges with
14   McGuire?
15        A.     Yes.
16        Q.     And what was the nature, the
17   subject of those e-mails?
18        A.     The main one I recall was a
19   discussion of the rate of opioid use disorder
20   in the bellwethers.
21        Q.     And is that one where he gave
22   you a reference to look at, or is he just
23   giving you his opinion about it?
24               MR. KO:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     We were discussing different
 2   ways of extrapolating from national rates to
 3   local rates, and one possibility was to use
 4   the relative mortality rates in the
 5   bellwethers relative to the nation, which
 6   would have resulted in a higher rate of
 7   opioid use disorder than I use in my report
 8   and higher expenditures on treatment.  And we
 9   were discussing the relative merits of that
10   versus doing what I did, which was assume
11   that the national numbers applied to the
12   bellwethers.
13   BY MR. MORRIS:
14        Q.     Did you have e-mail,
15   substantive e-mail exchanges about your
16   opinion with Gruber?
17        A.     Any e-mails I had with
18   Dr. Gruber were in the first month or so of
19   the case, and I'm pretty sure they weren't
20   any things that were substantive having to do
21   with my opinion.
22        Q.     Okay.  Let's go to Table 4
23   which I have starting at Page 13 of 144.
24        A.     All right.
```

Highly Confidential - Subject to Further Confidentiality Review

1   MR. KO:  Just to be clear, it's

2   C.4, right?

3        MR. MORRIS:  C.4, correct.  I

4   know that there's two Table 4s, but

5   we'll start with C.4.  And this is

6   your estimate for the cost of

7   connecting individuals to services, is

8   that right.

9        A.    Yes.

10  BY MR. MORRIS:

11       Q.    Okay.  Now, in this category

12  you have staffing of a 24-hour, 7-day-a-week

13  referral line.  You have staffing for

14  emergency departments, transportation

15  assistance and web-based referral systems?

16       A.    Yes.

17       Q.    What's your basis for those

18  items as effective for connecting individuals

19  to services?

20       A.    So first as a general point,

21  that I think there's a very strong consensus

22  in both the national literature and in my

23  conversations with individuals in the

24  communities that one of the biggest

Highly Confidential - Subject to Further Confidentiality Review

1   challenges in combatting the opioid crisis is

2   actually getting people to get connected with

3   services and start receiving services, that

4   people will be open to treatment for a short

5   window of time but if treatment isn't

6   available to them at that point in time, then

7   they may not access services and that in the

8   bellwethers particularly I heard lots of

9   discussions, for example, when we talked to

10  the EMS and police and other first responders

11  about their frustrations about when they drop

12  someone off at an emergency room in an

13  overdose that there isn't a way to

14  immediately get that person -- at least, you

15  know, to trying hard to get that person

16  connected to services.  So there was a bunch

17  of sources that contributed to my view that

18  this general category was -- was really

19  important, and that one couldn't achieve the

20  increase in levels of take-up of MAT or of

21  the therapeutic services if you didn't also

22  solve the connecting people to services

23  problem.

24       Would you like me to go one by

Highly Confidential - Subject to Further Confidentiality Review

1   one through each of the categories?

2        Q.    Thank you.  We'll do that

3   together.

4        A.    Okay.

5        Q.    How about that?  So you have

6   down here -- well, let me just stop you

7   there.  So I heard you talking about

8   conversations with people in general

9   consensus.  I didn't see any citations to any

10  articles, for example, for including the

11  categories that you do on Table 4.

12       A.    Let me just turn to my report

13  for a minute.

14       Q.    Sure.  I have that on Page 17

15  going into 18.

16       A.    Well, it does look like I

17  treated this as something that was so obvious

18  I didn't need to cite again to the, you know,

19  major report categories.  But, you know, if

20  you -- if you look at the big national

21  reports about what needs to be done, you

22  know, those do talk about this issue and it's

23  certainly part of what Vermont focused very

24  heavily on in making progress on as well.

Highly Confidential - Subject to Further Confidentiality Review

1        In terms of the specific needs

2   in the bellwethers, all --

3        Q.    Let me -- we'll go through each

4   one of them.

5        A.    Okay.

6        Q.    Thank you for that.  So let's

7   start then.  It will make it easier if I ask

8   questions and you respond.  Going into the

9   first category here, staff the 24/7 referral

10  hotline, you have eight people operating the

11  24/7 line.  Any consideration of the number

12  of people required decreasing over time based

13  on the success of the abatement program

14  overall?

15       A.    The issue is you want someone

16  to be able to get someone on the phone and

17  not be put on hold, and the reason for -- you

18  know, the reason for staffing it this way is

19  to make sure there's adequate staffing for

20  that.  I would think even 12 years from now

21  if someone is having a relapse and somebody

22  needs treatment, we don't want them put on

23  hold.

24       Q.    Is there some reason or basis

Highly Confidential - Subject to Further Confidentiality Review

1  you came up with eight as opposed to five or
2  fifteen?
3       A.    Yes.  It was based on
4  calculating the hours of coverage.  Let me
5  see if I can remember the exact calculation
6  there.
7       Q.    I see.  If you go -- to help
8  you out, you go to the note 1.
9       A.    Yep.  Oh, there I do.  So I
10 figured out how many hours there were to be
11 covered and I wanted two people there at all
12 times and I divided -- I assume that no one
13 wanted to work more than 50 weeks a year
14 potentially -- we assumed -- actually I'm not
15 sure we're assuming they got any vacation,
16 52 weeks a year, and so that's how I did that
17 calculation.
18      Q.    Okay.  And it's for two
19 operators at all times?
20      A.    Yes.
21      Q.    Okay.  And is there a metric by
22 which their success would be measured?
23           MR. KO:  Object to the form.
24      A.    One of the things I would very

Highly Confidential - Subject to Further Confidentiality Review

1  much hope would be in these high frequency
2  measures that would be created as the system
3  got set up would be, for example, the percent
4  of people showing up at the emergency
5  department because of an overdose who began
6  treatment within a week, or within two weeks,
7  and so that kind of metric would help us
8  understand whether we were doing enough on
9  the connection side.
10 BY MR. MORRIS:
11      Q.    Next one is staff emergency
12 departments, and you have 22 social workers
13 listed there?
14      A.    Yes.
15      Q.    I see from the notes that
16 that's based on 22 registered hospitals in
17 Cuyahoga?
18      A.    Yes.
19      Q.    Is that right?  Okay.
20           And is there a metric by which
21 you would measure the success of that line
22 item?
23      A.    I think I would use the same
24 metric of people presenting at the emergency

Highly Confidential - Subject to Further Confidentiality Review

1  department who needed treatment -- sorry, who
2  had overdosed or showed other evidence of
3  need of treatment, how many of them got
4  connected to services within some period of
5  time.
6       Q.    So moving on to the estimated
7  transportation costs -- sorry.  Before we
8  move on to that one.  The salary that you've
9  assigned for the staffing of emergency
10 services to -- assigned to opioid-related
11 visits and a percentage using recovery coach
12 remains the same over your 15-year estimate,
13 is that right?
14      A.    Yes.
15      Q.    So no estimated change based on
16 changing circumstances over that period of
17 time?
18      A.    This is consistent with my
19 broad approach here, which is that even if we
20 hope that fewer people are having first
21 incidence of OUD they're still going to --
22 there's going to be this rising stock of
23 people who are relapsing and needing
24 services, and so what the -- I think what the

Highly Confidential - Subject to Further Confidentiality Review

1  medical experts advised me was that they
2  thought treatment capacity was going to need
3  to continue at this level through the
4  15 years.
5       Q.    When you've talked about --
6  scratch that.  If you go to the cost of
7  transportation, that's tied to the number of
8  individuals that we were talking about from
9  chart 1, right, 25 percent of those
10 individuals, is that right?
11      A.    Let me just double-check the
12 number, but it was a number like that.  So
13 remind me what row we were on.
14      Q.    I think it's --
15      A.    Yes.  Let's see.  Do I have
16 that?  Sorry, let me just do the math.  So
17 the number sounds right.  I just want to make
18 sure before I say yes that it is right.  So
19 we have 758 divided by, whatever the number
20 is on C.1.  Let me look over here again.
21 Yes, 25 percent looks right.
22      Q.    Do you know where the
23 25 percent came from?
24      A.    Yes.  I looked at three numbers

```
 1    in coming up with a judgment that that was
 2    the right number.  The first estimates -- or
 3    there's survey data that shows that -- I
 4    think it was either 38 or 39 percent of
 5    people attending specialty treatment
 6    facilities are provided with transportation.
 7    So something in this magnitude is already
 8    being seen as a need by these facilities in
 9    order to get people into treatment.  There's
10    also a study that said that when people --
11    when people asked why they didn't get
12    treatment, 10 percent of people say it's
13    because they're -- they couldn't get there
14    because of transportation, and they also
15    looked at data on the percent of people in
16    the community who had cars and from looking
17    at those three sources, I judged the
18    25 percent was a reasonable number to use
19    here.
20         Q.    And the three sources you're
21    talking about, are they cited somewhere?
22         A.    They're in the materials
23    considered.  I can probably find them for
24    you, if that would be helpful.
```

```
 1         Q.    Are they listed on the -- in
 2    the note section of the chart?
 3         A.    I think they may only be in the
 4    materials considered.  I think because I was
 5    using my judgment based on reading things
 6    rather than using a number specifically from
 7    someone.  I may have been asked that
 8    indirectly, though.
 9         Q.    Okay.  So you don't recall a
10    specific 25 percent number?
11         A.    I just told you three numbers
12    that I looked at and used my judgment to say
13    25 percent is a good estimate here.
14         Q.    Go to Table 7, please, and
15    we'll start with -- we'll use the Cuyahoga
16    one as the example.  So it's Page 23.
17         A.    Okay.
18         Q.    Okay.  So first question is,
19    here like other categories, this is based on
20    assumption that the number of people needing
21    assistance, the jail population, does not
22    decrease, correct?
23              MR. KO:  Object to the form.
24         A.    That's correct.
```

```
 1    BY MR. MORRIS:
 2         Q.    Did you calculate, or did you
 3    come up with a sensitivity range for this
 4    one?  I didn't see a high, low case?
 5         A.    I did not.
 6         Q.    Is there a reason for that for
 7    this category?
 8         A.    So I guess I would say two
 9    things.  I think the categories where I did
10    do sensitivity was to what I think is the
11    factor that has -- we talked earlier about
12    the first couple of categories being the
13    biggest and the factor that if it changed
14    could most have an impact on this plan is the
15    number of people needing treatment for OUD,
16    and that's the number where, as I mentioned,
17    there's some chance the number is actually
18    higher than what I'm using here and so I
19    wanted to be able to show that.  Here there
20    was some concern that, you know, if you read,
21    for example, the Pitt et al. study, there's
22    some concern that in the transition in which
23    we are more effective at getting people to
24    use -- to not be abusing prescription opioids
```

```
 1    that might lead to more heroin use during
 2    that period, and there was concerns that in
 3    the jail population that might mean that we
 4    would have continued high rates throughout
 5    this period, and so I think it was a
 6    combination of this not being as large a
 7    category as the other and there being some
 8    evidence that maybe this was going to stay
 9    high for reasons I've been talking about,
10    about relapse and also transitions between
11    different forms of opioid misuse that made me
12    think this -- assuming a constant capacity
13    here was reasonable.
14         Q.    Let's move to Table 8, please,
15    which is Page 28 of 144 for the Table C, C.8.
16    Hold on.  While you're orienting yourself,
17    I'm going to grab the next exhibit.
18              MS. RITTER:  What page did you
19         say?
20              MR. KO:  28.  28, I think.
21              MR. MORRIS:  28 of 144.
22              MS. RITTER:  Okay, I'm sorry, I
23         mixed up the numbers.
24    BY MR. MORRIS:
```

1    Q.    Okay.  Dr. Liebman, on this one
2  your calculations assume that there will be
3  three to nine doses that should be made
4  available community-wide for each opioid
5  dependent individual, is that correct?
6    A.    Let me just review that.  Where
7  are you looking at the three to nine?
8    Q.    If you go to -- it's actually
9  in your report.  If you go to Page 21 of your
10  report, I think we're still working on
11  Exhibit 6.
12    A.    I see.  Yes, I was mixing up
13  doses and kits in my head.  That's why I was
14  -- the numbers weren't sounding right to me.
15  Okay.  Yes.
16    Q.    Fair enough.  But just to
17  reset.  So the calculations assume three to
18  nine doses made available community-wide to
19  each opioid-dependent individual, correct?
20    A.    That's the number for the
21  community.  We're not giving that all to the
22  users.  We're going to give it to family
23  members.  We're trying to have them out in
24  the community in general.

1    Q.    Understood.  But the
2  calculations for your --
3    A.    Yeah.
4    Q.    -- estimated cost --
5    A.    Yeah.
6    Q.    -- were based on that?
7    A.    Yeah.
8    Q.    Okay.  And you get that number
9  of three to nine doses from Dr. Parran's
10  report?
11    A.    My memory, it was a different
12  report, but I may be wrong.
13    Q.    I'm looking at, if you go to --
14  and you're welcome to look at your chart, but
15  if you go back to your actual report on
16  Page 21.
17    A.    Okay.  You're right.  The text
18  does rely on the Parran report, but I think
19  we also had that number in a second doctor's
20  report but I'm forgetting which one.
21    Q.    Okay.  Let me show you what
22  I've marked as Exhibit 14, which is the
23  expert report for Theodore Parran.
24           (Whereupon, Liebman Exhibit

1           Number 14 was marked for
2           identification.)
3           MR. MORRIS:  Parran, I'm not
4      sure how to pronounce it actually.
5           MS. RITTER:  Parran, you're
6      right.
7  BY MR. MORRIS:
8    Q.    If you go in Exhibit 14 to
9  Paragraph 352.
10    A.    Okay.
11    Q.    And that's where Dr. Parran
12  writes "Best estimates demonstrate that for
13  every person identified with dependence as
14  well as misuse use disorder, administrators
15  should plan for between three to nine" --
16  sorry, "three and nine doses of naloxone per
17  person."  He doesn't cite anything for that
18  proposition.  Do you know what that's based
19  on?
20    A.    I don't, though I've heard very
21  similar numbers from some of other physician
22  experts.
23    Q.    What other physician experts?
24    A.    I should say experts in

1  general.  I believe -- I'm honestly getting
2  confused between whether this is in Keyes or
3  Lembke or Alexander but I've seen discussion
4  of this issue in at least one of those.
5    Q.    Dr. Parran states that it's --
6  the best estimates demonstrate that three to
7  nine is an appropriate figure.  That's not a
8  statement of certainty, correct?
9           MR. KO:  Object to the form.
10    A.    I think that's a pretty precise
11  range that tells us, gives us a very good
12  guidance to how much you would want to
13  provide in the community.
14  BY MR. MORRIS:
15    Q.    Do you know how many doses of
16  naloxone are currently being used within the
17  communities?
18    A.    We had data on that because, if
19  I recall correctly, in Cleveland EMS buys
20  for, I think, everyone in the community and
21  so we were able to see numbers on that, and
22  so let's see if -- I cite this use data.  I'm
23  looking at the first responder.  I need the
24  footnotes.  Okay.  So you can see, you can

1  see footnote 15 off of Table C.8.  You can
2  see the cite to the Cleveland EMS document
3  that let us know the number of doses
4  currently being purchased, so that's the
5  12,082 number in Table C.8.
6      Q.    And that's the number that was
7  currently being purchased by first
8  responders, and then you had that
9  extrapolated out over time, correct, for that
10  line item?
11     A.    Yes, there's -- yes, right.
12     Q.    The projected population
13  requiring Narcan kits in the top of that,
14  though, is additive of the naloxone doses
15  purchased by first responders, correct?
16     A.    That's right.
17     Q.    All right.  Let's move to Table
18  9, which I have for Cuyahoga starting on
19  Page 32 of Exhibit 7.  Okay.  And this is the
20  estimated cost of syringe exchange program.
21  Do you see that?
22     A.    Yes.
23     Q.    And this assumes that there's
24  going to be an increase in needles exchanged

1  in Cuyahoga County by 50 percent over the
2  15-year period?
3      A.    Yes.
4      Q.    There's an assumption, though,
5  if you go to the Summit chart --
6      A.    Yeah.
7      Q.    -- that the needles exchange in
8  Summit would be increased by two-thirds?
9      A.    Mm-hmm.
10     Q.    What's that based on?  Why is
11  there a difference between the two?
12     A.    Because we had different
13  information from the two communities about
14  the unmet need, and so we had -- in Summit
15  there was a specific document that I -- there
16  was a -- I think it was a budget proposal
17  saying here's what we really need if we had
18  the money to do it, and so we were basing
19  that ramp-up on what they said they needed,
20  and then similarly in Cuyahoga there was some
21  information on additional capacity they used
22  to have that they scaled back because of
23  funding and we based off of that.  We
24  calibrated it to that.

1      Q.    Okay.  Are those citations
2  somewhere?
3      A.    Let's see where the citations
4  are here.  I'm not seeing the citation on
5  Cuyahoga.  I think they're probably in the
6  materials I consulted but not in the
7  citations here.
8      Q.    Do you know which of the things
9  within the materials consulted?
10     A.    I can try to look, but I fear
11  that will be a lengthy process.
12     Q.    What kind of article are you
13  thinking of, or what kind of citation are you
14  thinking of?
15     A.    So I think in Summit it was
16  something in the -- as I said, something in
17  the spirit of a budget request, and I don't
18  remember where the document was in Cuyahoga
19  that talked their about their -- how they
20  worked.  I think there was a mobile van that
21  they used to have that they were no longer
22  able to afford, but I don't remember if that
23  was in the annual report of the program or of
24  the ADAMHS Board or somewhere like that.

1      Q.    Why don't we do this, we may
2  come back to that.  If you go to now Table
3  10, a question about that one, which is a few
4  pages further in, Page 36 and 37.  And this
5  is the estimated cost of HAV --
6      A.    Yes.
7      Q.    -- and HCV treatment?
8      A.    Yes.
9      Q.    And the costs there are based
10  on an estimate of the number of people who
11  became infected by injecting heroin or other
12  opioids, is that correct?
13     A.    Yes, yes.
14     Q.    Okay.  Now, it looked to me
15  like for this population you actually
16  calculated a decrease over time in the
17  number?
18     A.    What I did here was I only put
19  in the costs for treating people who are
20  currently infected.  In the future more
21  people are going to get infected, but I
22  didn't have a good way to model that given
23  that I'm -- given the framework I'm using,
24  and so to be conservative, I only put enough

```
 1   resources in to treat all the people who
 2   currently are infected, but in fact, one
 3   would probably need some additional resources
 4   for newly infected people but fortunately the
 5   rate of new infections is not that high right
 6   now so that number would not be that big.
 7          Q.     There's no equivalent
 8   information about rates of infection with --
 9   of HIV from heroin users as there is for the
10   projections you're making, for example, just
11   for overall OUD use?
12          A.     I didn't feel like I had a good
13   basis to protect the future infections, and
14   so I decided to go conservative and just
15   treat the people who currently are infected.
16          Q.     Table 11, this is for the
17   category "Estimated Costs of Social Support
18   Housing," and this estimates, the estimate is
19   based on the number of homeless who have OUD
20   and then calculates the cost to cause those
21   individuals, correct?
22          A.     Yes.
23          Q.     And it assumes that the number
24   of individuals who are homeless and suffer
```

```
 1   from OUD stays constant over 15 years?
 2          A.     Yes.
 3          Q.     Is there a reason why you had
 4   that number staying constant?
 5          A.     Basically simplicity.  Again,
 6   it's a population that I thought would be
 7   hard for me to make a specific projection
 8   for.
 9          Q.     Is there current housing stock
10   available for these individuals?
11          A.     I'm not sure how to answer that
12   question.
13          Q.     Because it's a bad question,
14   that's why you can't figure it out.  Is there
15   housing stock that is currently being
16   utilized by individuals with either -- that
17   are homeless that have -- suffer from OUD?
18   Obviously if they're homeless, by definition
19   they're not using the houses, but what I'm
20   saying is, are there houses available for
21   people who are homeless to be put into?
22                 MS. RITTER:  Objection to form.
23          A.     You're asking whether there
24   exists vacant housing units in either of the
```

```
 1   bellwether communities?
 2   BY MR. MORRIS:
 3          Q.     Yes.
 4          A.     I have not specifically looked
 5   at that, but I'm sure the other communities
 6   I've looked at, one doesn't have 100 percent
 7   occupancy.
 8          Q.     The housing cost, in other
 9   words, is the cost to place people in
10   existing facilities?
11          A.     Often when you set up a
12   supportive housing program, you need to do
13   some retrofitting, making it appropriate,
14   putting in the support service capacity, the,
15   you know, place for the counselors to do
16   their counseling.  So this is a number, the
17   price here is consistent with the community
18   where there is existing housing where you can
19   do this work.  We just did a supportive
20   housing project, the Government Performance
21   Lab did in Denver where there really wasn't
22   that and Denver had to build new units, big
23   new units to house the homeless, and if I
24   designed a plan like that, that would have
```

```
 1   been much more expensive, but my assumption
 2   here was we would be getting this housing
 3   from existing housing stock primarily.
 4          Q.     And here you've calculated the
 5   number of homeless with OUD per night at 324,
 6   correct?
 7          A.     Yes.
 8          Q.     And the projected or estimated
 9   cost for the housing is based on an
10   assumption that all of those individuals who
11   are homeless utilize the homes, the housing?
12          A.     Yes.
13          Q.     Is there a basis for that?
14          A.     In the projects that I have,
15   that my Government Performance Lab has helped
16   set up in Massachusetts and in Denver where
17   we provided supportive housing to homeless
18   individuals and specifically targeted
19   homeless individuals who had either complex
20   mental health or substance abuse problems, we
21   were able to house a very large fraction of
22   those individuals.  I don't have exact
23   numbers in my head, but it was definitely in
24   the 80s or above that.  So the assumption
```

1  that one could house most of these people, I
2  think, is reasonable.
3      Q.     And that they would actually
4  take advantage of the housing?
5      A.     Yes, and retention was quite
6  good, yes.
7      Q.     And that's through additional
8  education efforts or outreach efforts?
9      A.     This is called supportive
10 housing, and so what that means is you're not
11 just giving them the housing but you're
12 giving them a social worker who is helping
13 them access the other services they need as
14 part of the housing.
15     Q.     Is that something that's picked
16 up in another category, or is that built into
17 the cost of the housing?
18     A.     It's built into the cost here.
19     Q.     If you go to Table 13, please.
20 And that's at page 44 of 144, and it's for
21 the estimated cost of school-based
22 prevention.
23     A.     Yes.
24     Q.     Here you've got a number of 106

1  social workers to be employed for this
2  purpose.
3      A.     Yes.
4      Q.     Do you see that?
5      A.     It sounds right, but I'm not
6  seeing it exactly.
7      Q.     Yeah, I'm sorry.  It's line
8  item 1 actually.  This is for the Cuyahoga
9  version of it.
10     A.     Yeah, I've got Summit.  That's
11 why I'm having trouble here.  Yes.
12     Q.     Okay.  What is that -- do you
13 know what that means with respect to the
14 terms of ratio of social workers to students?
15     A.     Yes, so that's all sort of
16 explained in this long footnote 1.  Would you
17 like to go into the details?
18     Q.     Well, let me ask it this way.
19 Would there be -- what would the metric be to
20 determine success or not with this program?
21     A.     I would measure whether -- I
22 would measure the rate at which teenagers and
23 people in their early twenties were becoming
24 addicted to opioids over time and whether

1  that was coming down.
2      Q.     And the goal would be to, what
3  you just said --
4      A.     Exactly, yeah.
5      Q.     -- reduce the number of people
6  in the future, kids in the future who become
7  addicted, correct?
8      A.     Yes.
9      Q.     And have you calculated a
10 potential estimate of how many -- the level
11 of reduction that would result as a result of
12 implementing the school-based prevention
13 programs?
14     A.     My analysis doesn't involve
15 creating projections of the future opioid
16 population.
17     Q.     If you go to Table 14, and this
18 is the Cuyahoga version of it.  It starts at
19 Page 46 of 144, and this is for the cost of
20 medical provider education and outreach
21 category.  You have here three full-time
22 equivalent medical outreach providers for
23 Cuyahoga.  Do you see that?
24     A.     I do.

1      Q.     What would these three people
2  be doing?
3      A.     They would be doing a variety
4  of activities to try to coach providers in
5  appropriate prescribing practices of opioids,
6  and they would probably also, if we could get
7  the data sharing working right, would be
8  identifying the 5 to 10 percent of
9  prescribers who seem to have the highest
10 rates of prescribing and focusing efforts
11 particularly on them.
12     Q.     If you look in the note number
13 1, there's -- it's based on an assumption
14 that approximately 10 percent of physicians
15 will be targeted for education.  Do you see
16 that?
17     A.     Yes.
18     Q.     Why did you assume that
19 percentage of physicians being targeted for
20 education?
21     A.     When I've talked to medical
22 experts who have been involved in this kind
23 of medical detailing, that's what they've
24 described as the kind of strategies you

1  employ to focus your attention on the people
2  who seem to -- who might be the ones who are
3  overprescribing.
4      Q.     And do you know how many visits
5  per year that would mean for physicians by
6  the outreach individuals?
7      A.     I have a number in my head, but
8  I just want to make sure it's the same one
9  that I'm using here.
10     Q.     If you go to Page 134, which is
11 the further backup material for the tables.
12     A.     Okay.  It has the two.  That
13 was the number I was going to say, but I
14 wanted to make sure I was right.  Okay.
15     Q.     Okay.  So two, this would be a
16 target for two physician visits per year by
17 the employees in this category, the
18 practitioners?
19     A.     And that's an average.  In
20 fact, you wouldn't literally go to everyone
21 for two.  Some may need more visits.  Some
22 may need less.
23     Q.     The goal of this also would be
24 to reduce the number of people who eventually

1  become in the category of opioid -- having
2  opioid use disorders?
3      A.     All of the components of the
4  prevention plans that we're talking about
5  that you try to prevent people from becoming
6  misusers or addicted to opioids.
7      Q.     Okay.  And like the other
8  preventative categories, you don't have a
9  metric to determine or a number in mind to
10 determine success of those programs?
11     MR. KO:  Object to the form.
12     A.     I think in this one it's quite
13 clear what metric one would use to tell if
14 you're making progress, which is whether
15 prescriptions were coming down.  In
16 particular I hope one would be able to do a
17 more nuanced version and be able to measure
18 the amount of appropriate and inappropriate
19 prescriptions.  So I think one could track
20 progress on this one.
21 BY MR. MORRIS:
22     Q.     You don't have a goal set,
23 though, as part of your -- this portion of
24 your abatement plan?

1      A.     The goal is to make as much
2  progress as one can make.
3      Q.     Let's go to Table 16.  And
4  that's at Page 58 of 144 for the Cuyahoga
5  version and 51 for Summit County.
6      A.     Yes.
7      Q.     And it's cost of law
8  enforcement investigations.
9      A.     Mm-hmm.
10     Q.     And have you an estimate for 25
11 detectives investigating overdoses.  Do you
12 see that?
13     A.     Yes.
14     Q.     And for support for that, you
15 have a citation to the deposition of Gary
16 Gingell?
17     A.     Yes.
18     Q.     Okay.  Is that the basis for
19 your number of detectives for Cuyahoga
20 County?
21     A.     Yes.
22     Q.     And you cite to two pages from
23 his deposition.  Do you see that?
24     A.     Yes.

1          (Whereupon, Liebman Exhibit
2          Number 15 was marked for
3          identification.)
4  BY MR. MORRIS:
5      Q.     Giving you what's been marked
6  as Exhibit 15, okay.  If you can go to the
7  pages that you cited there of the Exhibit 15
8  which is the deposition transcript for Gary
9  Gingell, if you can go to the pages in that
10 deposition transcript 243, 244.
11         (Witness reviewing document.)
12     Q.     You see his testimony there at
13 the bottom of Page 243 where he talks about,
14 he says "I could use, yeah, with the volume
15 of -- with the numbers here, 243 deaths.
16 I'll give you an example.  The homicide unit
17 had, I don't know, 110 or 115, whatever it
18 was, homicides last year with, I think, 14
19 detectives, so my guys had 243 death cases
20 with 5 detectives and another 1300 something
21 nonfatal cases.  So yeah, I could keep that
22 many people busy easy, and then you would
23 need the bosses.  Each squad would need a
24 sergeant.  You would need a lieutenant.

1    "Question, so if you could say
2  you needed 20 to 25 more, it would be for the
3  HIDI?
4    "Answer, for the HIDI."
5    Is that what you based your
6  estimate of 25 detectives in Table C.16?
7    A.    Yes, that and a similar
8  conversation with him in person.
9    Q.    Okay.  So you had a
10  conversation with him where he told you he
11  thought that he could use 25 additional
12  detectives?
13    A.    Yes.
14    Q.    Did you talk to anybody else
15  about the number of detectives that might be
16  needed?
17    A.    So I looked at the death
18  statistics and the caseloads to verify that
19  his view of this was reasonable.
20    Q.    And in Summit County, you have
21  four additional?
22    A.    Yep.
23    Q.    What was that based on?
24    A.    It was again based on the view

1  of the local law enforcement individuals
2  about the amount of their staff time that was
3  being diverted to overdoses instead of doing
4  what they used to be doing previously.
5    Q.    And did you do any empirical
6  analysis of whether those two metrics were
7  accurate?
8    MR. KO:  Object to the form.
9    A.    I relied on the local experts
10  for these numbers.
11  BY MR. MORRIS:
12    Q.    If OUD-related homicides were
13  to go down, then there would be fewer
14  officers needed for that, is that correct?
15    A.    Yes.
16    Q.    If you go to Table 17.  If you
17  look at the Summit one on this one, so this
18  is for cost of tracking abatement process.
19  The Summit version of the table is at
20  Page 54.  You have two individuals, a
21  forensic scientist, FTE and an autopsy
22  technician FTE.  Do you see that?
23    A.    Yes.
24    Q.    I didn't see a reference for

1  the basis for that.  Is there one?
2    A.    So I had detailed information
3  from Cuyahoga about the relationship between
4  the opioid crisis and the staff resources,
5  and I came up with the Summit number by
6  scaling basically based on the relative
7  populations of the two counties.
8    Q.    Okay.  Table 18, please.
9  Before we go there, so Table 17, I think you
10  referred earlier to this category of cost of
11  tracking abatement process as related to the
12  Category 19 or Table 19 which is the cost of
13  data informed systems?
14    A.    They're related in that they
15  are both activities that give us data that
16  allow us to tell how much progress we're
17  making.
18    Q.    Okay.  So the individuals that
19  would be doing work as reflected in Tables --
20  Table 17 would be the kind of people that
21  would give you additional information to
22  determine whether the abatement plan was
23  working?
24    A.    The people in Table 17 are

1  doing very specific things.  They are
2  conducting autopsies and figuring out what
3  substance was in the body, and they are also
4  often -- it's often the same office that if
5  the police see some narcotics on the street
6  and want to figure out what it is, they're
7  the ones figuring that out.  So it's a
8  different activity than overall data
9  planning, but it's an important contributor
10  to knowing what's going on.
11    Q.    Understood.  Okay.  If you look
12  at Table 18 now, that's the cost of court
13  systems resources.
14    A.    Yes.
15    Q.    My question is, can you explain
16  what people in this category would be doing
17  generally?
18    A.    Yes.  When I spoke to people in
19  the courts, I learned that there were two
20  places where additional capacity was needed.
21  One was in helping connect people coming
22  through the criminal justice service --
23  sorry, the criminal justice system with
24  services.  And the drug court judges talked

Highly Confidential - Subject to Further Confidentiality Review

```
 1    about their frustrations of, you know,
 2    needing to leave people in jail when they
 3    should have been in treatment just because
 4    there wasn't a treatment bed yet, so trying
 5    to solve that kind of problem is one thing
 6    that they would be doing.  And the second I
 7    would say is as part of the process to make
 8    all the pieces work together someone needs to
 9    represent the courts in these inner agency
10    processes because the flow between the people
11    in the courts and the jails and treatment is
12    obviously an important nexus and one that,
13    for example, in the Summit intercept report
14    where the community was analyzing some of the
15    challenges they were facing on getting people
16    into treatment and into the appropriate
17    setting, one that needed to be addressed, and
18    so based on that I came up with my view that
19    we needed two people in the courts to be
20    doing that.
21         Q.    And these would be two new
22    additional people.  There aren't people that
23    are currently doing this?
24         A.    This is in addition to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    current capacity.
 2         Q.    And what would the metrics be
 3    used -- what metrics would be used to
 4    determine their success?
 5         A.    I think we could use metrics on
 6    people diverted from jail to treatment, for
 7    example.  If you give me a few minutes, I can
 8    come up with more but a bunch of things in
 9    that spirit.
10         Q.    And you're estimating, though,
11    or anticipating that they would be in those
12    positions for the full 15 years of the
13    abatement plan?
14         A.    I think the issue of
15    coordinating connections between jails and
16    treatment is not something -- you know, this
17    is a small number of people.  You're not
18    going to go from one person to half a person
19    and you're going to need that capacity going
20    forward.
21         Q.    You have totalled -- you have a
22    total estimated amount for your abatement
23    plan broken down by years as we discussed add
24    infinitum today.  Did you calculate how much
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    it would cost per year if you add up just all
 2    of year 1, all of year 2, that way, as
 3    opposed to across?
 4         MR. KO:  Object to the form.
 5         A.    So for example, in Table 1 you
 6    see one of the years of that in the first
 7    column, is that -- am I understanding your
 8    question?
 9    BY MR. MORRIS:
10         Q.    Maybe.  Let me take a look at
11    one.  I see, so you're looking at the annual
12    cost year 5?
13         A.    So I gave you one year after
14    everything had been phased in.  I have to
15    admit I do not remember whether --
16         Q.    That's fine.
17         A.    -- there is a table, but my
18    guess is we do have a table that adds them
19    all up by year, but I can't remember off --
20         Q.    Yeah, my question was merely a
21    precursor.
22         A.    Okay.
23         Q.    So we can work with the annual
24    cost year 5?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.    Could I -- can we take a break
 2    just to get something quick, please?
 3         Q.    I'm almost done --
 4         A.    Okay.
 5         Q.    -- with this and then we will
 6    definitely take a break.
 7         A.    Okay.
 8         Q.    Here on Table 1 you've got the
 9    annual cost year 5 at $312 million, .2.  Have
10    you done any calculation such as if there
11    were only 50 percent of $312 million
12    available which portions of your abatement
13    plan would get funded?
14         A.    I have not.
15         Q.    Have you done any sort of
16    prioritization?
17         A.    I think the literature shows
18    pretty strongly that you want to be doing all
19    of these things.  The Pitt et al. paper makes
20    that point pretty strongly.  The Chen paper
21    makes that point pretty strongly.  I think if
22    we're actually going to make significant
23    progress on abatement, we're going to have to
24    be doing treatment, we're going to have to be
```

1  doing harm reduction, we're going to have to
2  be doing prevention and we're going to have
3  to have it all work together so that we don't
4  waste resources and have the best effect we
5  can.
6      Q.    Okay.  And so you don't have --
7  if you have less than all money available to
8  you, you haven't done sort of a --
9      A.    I haven't.
10         MR. MORRIS:  Let's take a
11  break.
12         THE WITNESS:  Okay.  Thank you.
13         THE VIDEOGRAPHER:  The time is
14  4:16 p.m., and we're off the record.
15         (Whereupon, a recess was
16  taken.)
17         THE VIDEOGRAPHER:  The time is
18  4:32 p.m., and we're on the record.
19         MR. MORRIS:  Dr. Liebman, thank
20  you very much for your time today.
21  I'm going to cede my time, the rest of
22  my time to a colleague who will pick
23  up questioning.  Appreciate your time.
24         I'll simply note for the record

1      that we object to the time limitations
2  placed on defendants for the taking of
3  expert depositions.  So while I'm
4  ceding my time, I am preserving my
5  objection.
6         EXAMINATION
7  BY MS. HIBBERT:
8      Q.    Hi, Dr. Liebman.  I'm not sure
9  we actually had a chance to meet off the
10  record today, but my name is Kelly Hibbert
11  and I represent one of the defendants in this
12  case, AmerisourceBergen Drug Corporation.
13  Thanks again for being here today.
14         I have the fun job of picking
15  up second, and because of that I'm going to
16  be jumping around a little bit, so pardon me
17  for that.
18         I want to go back to a
19  discussion that we were having a little bit
20  earlier about the inflation rates that you
21  used.
22         Do you recall that testimony?
23      A.    I recall generally that we
24  talked about inflation rates.

1      Q.    Do you know whether the
2  inflation rates for, let's say, the midwest,
3  if those would be lower than the rates that
4  you use for any category?
5      A.    I think it would depend on what
6  product and what time period.
7      Q.    Have you looked at that?
8      A.    I haven't in conjunction with
9  this case.  As an economist I thought about
10  that from time to time.
11      Q.    Would that have been something
12  that you would have liked to have known when
13  determining which inflation rate to use?
14      A.    What I have seen in my past
15  work is that rates don't vary enough by
16  region for that to be something that needs a
17  lot of attention in an estimate like this.
18  When I've done estimates for plaintiffs like
19  this, I generally use the national numbers.
20      Q.    What would be a large enough
21  variation to, I think you said, to be
22  important enough to account for?
23      A.    The place where you want to
24  think hard about regional price variation

1  would be something I think in -- perhaps in,
2  if you're making specific projections about a
3  housing market where -- for example, big
4  coastal cities have tended to have higher
5  housing price growth than the middle of the
6  country.  But there are specific things where
7  because things are enough different to
8  different parts of the country that you might
9  want to think about it.  But when I've done
10  this kind of work, you know, for the GPL,
11  doing price estimates in different
12  communities and we need that inflation
13  number, I tend to take the projections from
14  CBO like I did in this report.
15      Q.    So would there be a numerical
16  amount that would be a big enough variation
17  for you to want to consider using the
18  regional inflation rate versus a national
19  inflation rate?
20      A.    I don't have one in mind.
21      Q.    And same questions for the
22  inflation rate that would be specific for the
23  Cleveland, Akron area, you didn't look at
24  that rate to determine whether it would be

1  lower for any of the categories that you use,
2  correct?
3          MR. KO:  Object to the form.
4      Asked and answered.
5      A.    I think as I said earlier, the
6  key issue is that levels of prices are
7  different, and I do incorporate the fact
8  that, say, salaries are different in Cuyahoga
9  and Summit that they might than, say, a
10  national average salary.  That's the thing
11  that's a big enough difference to be worth
12  making sure one takes care of it in an
13  analysis like this.
14  BY MS. HIBBERT:
15      Q.    But certainly a lower inflation
16  rate could make a difference especially when
17  you're talking about multiple millions of
18  dollars, correct?
19          MR. KO:  Object to the form.
20      A.    An inflation rate that is
21  higher or lower will lead to different
22  numbers.
23  BY MS. HIBBERT:
24      Q.    And if you used a lower

1  inflation rate for any of the categories in
2  your estimate, your cost estimate here, those
3  numbers could have been lower, correct?
4      A.    Mechanically if I used a lower
5  inflation rate, the number would be lower.
6      Q.    I want to go back to the
7  discussion that you had earlier about your
8  conversations with Dr. Alexander who has been
9  identified as an expert in this case.  Do you
10  recall generally that testimony from earlier?
11      A.    Yes.
12      Q.    I believe you said that one
13  conversation that you had with Dr. Alexander
14  pertained to certain components of the
15  abatement -- your abatement plan, correct?
16      A.    Yes.
17      Q.    Were there any components of
18  your abatement plan that Dr. Alexander
19  specifically recommended?
20          MR. KO:  Objection.  Asked and
21      answered.
22      A.    I don't remember.  I mean, as
23  I've said a few times today these components
24  are common across just about every proposal

1  for abating this crisis, so the fact that
2  there's a lot of overlap between what I was
3  reading, what he was saying, what other
4  experts is saying is not a surprise here.
5  BY MS. HIBBERT:
6      Q.    Let me ask it a different way.
7  Were there any components of your abatement
8  plan that you didn't already have included in
9  the plan that Dr. Alexander then recommended
10  to be included?
11      A.    I'm just looking at my
12  components to see if there's anything that I
13  think we didn't already know about from five
14  other sources.
15          There's nothing that pops out
16  that I didn't already know would likely be a
17  component.
18      Q.    Were there any components of
19  your abatement plan that Dr. Alexander
20  recommended not be included?
21      A.    No.
22      Q.    Same question for any
23  components of Dr. Alexander's abatement plan,
24  did you offer any recommendations as to his

1  abatement plan?
2      A.    No.
3      Q.    Have you reviewed
4  Dr. Alexander's expert report in this case?
5      A.    Yes.
6      Q.    So then you're aware of some
7  differences in the total cost estimates for
8  some of your overlapping programs, is that
9  right?
10      A.    He's doing national estimates
11  and I'm doing bellwether ones, so it's not a
12  direct comparison there.
13      Q.    There's no direct comparisons
14  for any of the overlapping components of
15  either of your abatement plans, is that your
16  understanding?
17          MR. KO:  Object to the form.
18          MS. RITTER:  Object to the
19      form.
20      A.    Can you ask that again, please?
21  BY MS. HIBBERT:
22      Q.    There's no direct comparisons
23  for any of the overlapping components for
24  either of your abatement plans, is that your

1  understanding?

2  MR. KO:  Same objection.

3  A.  His estimates are national and

4  mine are local, so one would have to figure

5  out some way to convert the national ones to

6  the local estimates, for example, dividing by

7  the ratios of opioid deaths or population or

8  something like that before you could compare

9  the magnitudes.

10  BY MS. HIBBERT:

11  Q.  You're aware then, if you

12  reviewed his report, that his abatement plan

13  is for a 10-year time period.  Is that -- are

14  you aware of that?

15  A.  I don't specifically remember

16  that, but I take your word for it.

17  Q.  Did you have any conversations

18  with Dr. Alexander as to why he had a 10-year

19  abatement plan versus your 15-year abatement

20  plan?

21  A.  No.

22  Q.  Do you have an understanding of

23  why there would be a difference in the length

24  of the abatement plans?

1  MS. RITTER:  Objection.  And I

2  would instruct him not to answer.  In

3  case he would have to rely on a

4  conversation with counsel in order to

5  answer the question, I would instruct

6  him not to answer only that portion of

7  an answer that he would be tempted to

8  provide.

9  BY MS. HIBBERT:

10  Q.  With that instruction, can you

11  answer?

12  A.  I do not know why he decided to

13  use 10 years.

14  Q.  Why did you decide to use

15  15 years for your abatement plan?

16  MR. KO:  Objection.  Asked and

17  answered.  Go ahead.

18  A.  Because from reading the

19  literature on abatement plans and from

20  talking to both national and local experts, I

21  came to the conclusion that it was going to

22  take sustained effort over a 15-year period

23  to abate this crisis.

24  BY MS. HIBBERT:

1  Q.  What specific national and

2  local experts did you speak to and rely upon

3  in making that determination?

4  A.  I think I can't point to the

5  specific ones, but there were a lot of

6  different conversations and things I read.

7  Q.  Can you point to any specific

8  literature that you relied upon for that

9  determination?

10  A.  Not off the top of my head.

11  Q.  Is there any way that I can,

12  you know, know sitting here today what the

13  basis is for your determination that a

14  15-year abatement plan is most appropriate in

15  this case?

16  A.  I think you can see in the

17  medical expert reports of Dr. Lembke, for

18  example, that medical experts think that we

19  need a sustained effort at least that long.

20  Dr. Lembke talks extensively about how people

21  who are addicted today, many of them are

22  going to need lifetime treatment, and so I

23  think that's one of several places where you

24  can see quite clearly the medical consensus

1  that this is not a short-term -- it's not --

2  there's not a short-term solution to this

3  problem, that it's going to take sustained

4  effort over a long period of time to abate

5  the opioid epidemic.

6  Q.  Lifetime is certainly more than

7  15 years, right?

8  MR. KO:  Object to the form.

9  A.  Sorry, you're saying that

10  people live longer than 15 years?

11  BY MS. HIBBERT:

12  Q.  Your lifetime, your 15-year

13  abatement plan isn't to take into account the

14  lifetime of any particular person that might

15  be serviced by this plan, is it?

16  MR. KO:  Object to the form.

17  A.  Sorry, I give a 15-year plan.

18  I would expect that we need to continue to

19  spend resources on this beyond 15 years.

20  BY MS. HIBBERT:

21  Q.  Does Dr. Lembke discuss why a

22  15-year abatement plan would be better than,

23  say, a 10-year abatement plan?

24  A.  I don't recall specifically.

1    Q.     Have you spoken to anybody

2 aside from counsel in this case about the

3 appropriate length of time for an abatement

4 plan?

5         MS. RITTER:  Objection to the

6    form.  Foundation.

7    A.     Yes.

8 BY MS. HIBBERT:

9    Q.     Who?

10    A.     I did a phone call that was a

11 group call with several of the medical

12 experts where we explicitly discussed this

13 topic.

14    Q.     What medical experts did that

15 include?

16    A.     Dr. Ryan from Cincinnati,

17 Dr. Parran from Cuyahoga, and Dr. Lembke.

18    Q.     And what was the substance of

19 that conversation?

20    A.     Among the topics we discussed

21 was whether the level of services in an

22 abatement plan needed to extend beyond 10

23 years, and the consensus out of my discussion

24 with those doctors was that it did.

1    Q.     And did all three of those

2 doctors agree that it needed to extend

3 further than 10 years, longer than 10 years?

4    A.     My impression and memory of

5 that call was that at the end of the call we

6 were -- that three of them were in the same

7 place there and all agreed on that.

8    Q.     And do you recall any of the

9 reasons that they said or that they thought

10 that the abatement plan needed to extend

11 15 years as opposed to 10?

12    A.     Yes.  They said that we have to

13 think about this as a chronic disease, not as

14 something that gets solved quickly, and that

15 because the stock of people who have ever had

16 OUD is constantly rising, that treatment

17 needs were going to continue even if we

18 started slowing the rate that new people

19 started having addictions.

20    Q.     Right.  But why 15 over ten?

21         MR. KO:  Objection.  Asked and

22    answered.

23    A.     That was the view of the

24 medical experts.

1 BY MS. HIBBERT:

2    Q.     Or 15 over 14, it was just a

3 determination -- let me ask you this

4 question.  Strike that.

5         Was there any discussion as to

6 whether the abatement plan should continue

7 for 14 years versus 15 years?

8    A.     I think the discussion we had

9 was ten versus 15.

10    Q.     And when did that discussion

11 take place?

12    A.     If we look at my -- let's see.

13 If we look at my report, I think we can find

14 that in the conversations.  Sorry, I only

15 have the conversations with the local

16 experts.  I don't have the medical experts

17 here.  It was in 2018.  I could give you a

18 guess of the month, but it would be plus or

19 minus two months.

20    Q.     When you were just looking at

21 something, I can't see beyond what's in front

22 of you there, and you said you only had the

23 conversations with the local experts and not

24 the medical experts, what were you looking at

1 there?  Is that Appendix C to your report?

2    A.     Appendix C, yes.

3    Q.     So are there additional

4 conversations that you're relying on for your

5 opinions in this case that aren't disclosed

6 here on Appendix C of your report?

7         MS. RITTER:  Objection to the

8    form.

9    A.     First of all, checking to see

10 if -- so I've had lots of conversations with

11 lots of people who helped me generally

12 understand this crisis.  And so this is a

13 list of interviews I did with people from the

14 bellwethers, so that's not a list of the

15 general conversations I had with people to

16 understand the crisis.

17 BY MS. HIBBERT:

18    Q.     Just to be clear, there are

19 conversations that you've had with other

20 folks that aren't from the bellwethers as you

21 stated that you're relying on for your

22 opinions in this case?

23    A.     I think you need to define the

24 legal term rely.  There's lots of things that

1  help me understand the situation in a broad
2  sense.
3      Q.    Clearly you're relying on the
4  conversation that you've told me about with
5  these medical experts, Dr. Ryan, you said,
6  Dr. Parran and Dr. Lembke for the basis for
7  your determination to use a 15-year length of
8  time for your abatement plan versus a
9  10-year, correct?
10     A.    That conversation informed my
11 judgment on that, as did other evidence that
12 this was a problem that was not going to be
13 solved in a few years.
14     Q.    Are there any other
15 conversations that aren't disclosed in the
16 Appendix C that informed your judgment
17 underlying your opinions in this case?
18     A.    I'm not aware of any.
19     Q.    You're not offering any
20 opinions in this case, Dr. Liebman, are you,
21 that regarding any costs already incurred by
22 the plaintiffs as a result of the defendants'
23 action in this case, correct?
24         MR. KO:  Object to the form.

1      A.    Are you asking about costs in
2  the past?
3  BY MS. HIBBERT:
4      Q.    Correct.
5      A.    I am not.
6      Q.    And you're not offering any
7  opinions regarding any costs incurred or to
8  be incurred by plaintiffs outside of what is
9  detailed in your abatement plan and estimate
10 of costs, correct?
11         MR. KO:  Object to the form.
12     A.    The opinion I am offering is
13 that there is -- that one can construct an
14 abatement plan and that one can have costs on
15 it.  That's what my opinion is.
16 BY MS. HIBBERT:
17     Q.    And all of your opinions
18 regarding your abatement plan and your
19 estimation of the costs are included in your
20 report, the supplemental report and the
21 supplemental appendices that you have -- that
22 have been submitted to us in this case that
23 we've looked at here today, is that right?
24     A.    Yes.

1      Q.    You don't have anything else
2  aside from what you've told us about today, I
3  think there were two circumstances, that you
4  intend to supplement or change in any way
5  with regard to your opinions, is that right?
6         MR. KO:  Object to the form.
7  Asked and answered.
8      A.    That's correct.
9  BY MS. HIBBERT:
10     Q.    There were a number of the
11 components to your abatement plan where you
12 seem to assume a population that stayed
13 constant over time.  I think you said it
14 included child welfare population, the
15 maternal program, inmates with opioid use
16 disorder, and the homeless population.  Would
17 you agree with that?
18         MR. KO:  Object to the form.
19     A.    In most cases I am assuming
20 that the capacity needs stayed constant over
21 time, is the specific thing I'm assuming.
22 BY MS. HIBBERT:
23     Q.    I'm sorry, the capacity for
24 what?

1      A.    For example, with the jails, in
2  Cuyahoga I recommend that there be two
3  specialty facilities available to treat
4  people with addictions and that those
5  facilities that would be -- well, there's one
6  already, but the additional facilities would
7  be open for the full 15-year duration.
8      Q.    And with regard to the child
9  welfare, we can take a look at the table if
10 you'd like, you're also assuming that the
11 children placed in foster or institutional
12 care, the number of children placed in foster
13 or institutional care stays constant over the
14 15-year time period for your plan, correct?
15         MS. RITTER:  Objection to the
16 form.
17     A.    I assume that there is a number
18 of social workers and caseworkers and other
19 clinical staff in that department that we
20 need to get to and that we would then keep
21 that level constant.
22 BY MS. HIBBERT:
23     Q.    Based on the fact that the
24 number of children in those programs would

1 stay the same, is that fair?

2 A. Well, I'm basing the number

3 based on the needs today, and then I'm

4 assuming that we are going to need that

5 higher capacity going forward.

6 Q. You're assuming that the needs

7 stay constant for the next 15 years, is that

8 fair?

9 A. I'm assuming that the service,

10 yeah, the same level of services would be

11 provided, yes.

12 Q. Because the need would be

13 there, the need would stay constant?

14 MS. RITTER: Objection to form.

15 BY MS. HIBBERT:

16 Q. I'm not trying to beat around

17 the bush. I just -- I'm asking a question.

18 You're answering a little bit of a different

19 question.

20 A. Well, because I didn't -- the

21 way I thought about what I did isn't the way

22 you're phrasing it. The way I thought about

23 it was I figured out the level of services

24 that are needed now and I assumed that that

1 level of services would continue to be

2 available into the future.

3 Q. Are you offering an opinion in

4 this case as to the level of services that

5 will continue to be needed in the next

6 15 years for any of the components of your

7 plan?

8 MR. KO: Object to the form.

9 A. I think implicit in making a

10 15-year projection of an abatement plan, I am

11 doing my best job to project what those

12 service needs will be.

13 BY MS. HIBBERT:

14 Q. Earlier you testified, I

15 believe, and correct me if I'm wrong, that

16 the abatement plan and cost estimates don't

17 identify or take into account who should be

18 paying for any of these estimated costs, is

19 that correct?

20 MS. RITTER: Objection. Asked

21 and answered.

22 A. That is correct.

23 BY MS. HIBBERT:

24 Q. And that includes the

1 individual defendants in this case, right?

2 A. That's correct.

3 Q. And it may also include the

4 plaintiffs themselves, is that fair?

5 A. I'm sorry, the question about

6 the plaintiffs? Say the question again,

7 please?

8 Q. Sure. Is it fair to assume

9 that your -- strike that.

10 Is it fair that the plaintiffs

11 themselves may actually contribute to the

12 estimated costs, paying for the estimated

13 costs in your abatement plan?

14 MR. KO: Object to the form.

15 A. I don't have any -- I don't

16 have any opinions about that. I'm just

17 explaining what the resource needs are, and I

18 don't have a -- I have not formed an opinion

19 about who would pay.

20 BY MS. HIBBERT:

21 Q. And your plan doesn't take into

22 account any third-party payers like the

23 federal government or the State of Ohio or

24 any insurance companies or anybody like that,

1 correct?

2 A. I wasn't asked to figure out

3 who would pay for this. I was asked to

4 figure out what the needs were to abate the

5 opioid crisis.

6 Q. Would there be a way for

7 somebody who would want to make that

8 determination to look at your abatement plan

9 and estimation of costs and break out what,

10 if any, portion would be attributable to,

11 say, the individual defendants in this case?

12 MR. KO: Object to the form.

13 A. I think in order to do that,

14 one would have to incorporate some additional

15 information beyond what's in my report.

16 BY MS. HIBBERT:

17 Q. What additional information

18 would we need to do that?

19 A. I think we're about to get into

20 a discussion of legal theories of blame that

21 I am not qualified to discuss.

22 Q. You're not qualified to discuss

23 that and you haven't done that in your

24 report, or your plan, correct?

1    A.    That's correct.

2         MR. KO:  Object to the form.

3    BY MS. HIBBERT:

4    Q.    Is there any way to determine,

5    based on your abatement plan and the cost

6    estimates, what's already being paid for or a

7    type of program or component that's already

8    being paid for by, like, the federal

9    government, for instance?

10   A.    In constructing this plan and

11   thinking about what should go in it, I

12   thought about both how do we continue the

13   things that are already being done and how do

14   we do enough additional so that we make as

15   much progress as possible on the opioid

16   crisis.  So in thinking about that and

17   understanding what's currently being done,

18   some of the information I gathered would

19   allow one to figure out who was paying for

20   things now.

21   Q.    And do you have that -- have

22   you made a determination and offered an

23   opinion here in this case as to who is

24   ultimately -- strike that.

1         So down the line in this case,

2    somebody might want to look at your abatement

3    plan and cost estimates and say -- or make a

4    determination as to who might be paying what.

5    Would we be able to look at your abatement

6    plan and estimation costs and determine what

7    portion of the plan and estimation of costs

8    the federal government would be responsible

9    for?

10        MR. KO:  Object to the form.

11   A.    I'm not sure I know how to

12   answer that question.  You would have to make

13   an assumption about future -- whether, you

14   know, federal government has been making

15   grants, let's say, to states for naloxone.

16   You'd have to make an assumption about

17   whether those were going to continue, so I

18   have not done that analysis.

19   BY MS. HIBBERT:

20   Q.    Would we be able to look at

21   your abatement plan and estimation of costs

22   to determine what components have

23   historically been paid for by the federal

24   government or the State of Ohio versus the

1    counties?

2    A.    That's not something I was

3    asked to do, so it's not in the report.

4    Q.    So based on what's in the

5    report, opinions that you've offered at this

6    point, no one would be able to make that

7    determination, is that fair?

8         MS. RITTER:  Objection to the

9         form.

10   A.    I'm not sure someone who

11   thought hard about this would know where

12   child welfare is paid for in the budget and,

13   you know, there's a literature on what share

14   of MAT is paid for by Medicaid, so I think

15   starting from this, one can start to think

16   about that question, but it is not something

17   I have done.

18   BY MS. HIBBERT:

19   Q.    Further analysis and

20   calculations would have to be done, is that

21   fair?

22   A.    Yes.

23        MR. KO:  Object to the form.

24   BY MS. HIBBERT:

1    Q.    In determining your abatement

2    plan cost estimates, did you consider the

3    county's current ability to provide some of

4    the services that you're recommending?

5    A.    What do you mean by ability?

6    Q.    Have you reviewed any of the

7    budgets for any county departments that would

8    be responsible for implementing these

9    programs?

10   A.    Yes.

11   Q.    And did you assess whether

12   there was currently any money available in

13   those budgets to implement some of these

14   programs that you're recommending?

15   A.    You mean like spare money that

16   they're not spending on anything?

17   Q.    Sure.

18   A.    I did not see any such money.

19   Q.    Did you make that assessment?

20   A.    It was not part of my

21   assignment, but I've looked at a lot of

22   budgets, and I mean, what was quite clear

23   from conversations with government officials

24   in Cleveland and Akron and Cuyahoga and

1    Summit is that exactly the opposite is going
2    on, because the opioid crisis is using up so
3    much resources, they are not being able to
4    provide the usual level of public services in
5    lots of other parts of their budget, and so
6    there's squeezing and -- other services in
7    order to be able to do much, you know, more
8    here in a way that's having a detrimental
9    effect on the public services they used to be
10   giving.
11        Q.    What years did you look at for
12   the budgets for the county departments that
13   you looked at?
14        A.    I would have to look at my
15   notes to answer that question.
16        Q.    Did you note, for example, that
17   in Summit County the children's services
18   budget did not utilize the full grant for
19   the -- I think it's the start program there
20   that was provided to them over the course of
21   the, I think, five-year period that they had
22   that grant?
23        MR. KO:  Objection to the form.
24        Objection, assumes facts not in

1    evidence.  Go ahead if you know.
2        A.    I'm not aware of that.
3    BY MS. HIBBERT:
4        Q.    Would that be something that
5    would be important for you to be aware of in
6    assessing the amount of estimated costs for
7    children's services in Summit County?
8        A.    No.  That was not the
9    assignment I was given.  The assignment I was
10   given was to figure out what services needed
11   to be delivered, not figure out where they
12   were going to get paid for.
13        Q.    So why look at the budgets at
14   all?
15        A.    Because I wanted to understand
16   what level of services was being given, what
17   kinds of programs are in this community
18   versus another, because there are different
19   strategies you might -- you know, might use
20   in a different community.  Just to give you
21   one example, when I was working on substance,
22   families involved in substance abuse in the
23   child welfare system in Connecticut, they
24   mostly contracted out for treatment services

1    and there was a very strong provider and I
2    was considering whether we should propose a
3    similar program for the bellwethers, but when
4    I studied what services were being provided
5    in the bellwethers, it was clear that they do
6    this in-house in the bellwethers and so the
7    thing to propose would be more social workers
8    in-house rather than to think about
9    contracting for those services, so I looked
10   at budgets to understand the treatment
11   strategies that would work in these
12   particular communities.
13        Q.    Did you look at staffing levels
14   for any departments?
15        A.    When it was relevant to my
16   work.
17        Q.    Did you look at the staffing
18   levels over time for the children's services
19   department for Cuyahoga and Summit County?
20        A.    I gathered some information on
21   that.
22        Q.    What information specifically?
23        A.    In my conversations with the
24   leaders of those departments, they described

1    to me how their staffing had evolved.
2        Q.    Did your conversations involve
3    how staffing was cut for both Cuyahoga and
4    Summit County in the 2008, 2009 time period
5    due to the recession?
6        A.    I definitely remember
7    conversations about staffing cuts.  I can't
8    remember the exact years.
9        Q.    Did your conversations involve
10   how those staffing levels after the 2008,
11   2009 layoffs had remained consistent since
12   that time period?
13        MR. KO:  Objection.
14        A.    You mean that they'd been at
15   the lower level.
16   BY MS. HIBBERT:
17        Q.    Yes.
18        MR. KO:  Object to the form.
19        Object to the extent it misrepresents
20        the actual evidence in this case.
21        A.    I definitely got the general
22   perspective that staffing levels had been cut
23   and were not back to where they had been
24   before.

Highly Confidential - Subject to Further Confidentiality Review

BY MS. HIBBERT:

Q.    The staffing levels currently are not back to where they were in the pre-2008, pre-2009 layoff period, correct?

A.    I don't know the exact years, but there was an earlier period where they had more resources.

Q.    And their staffing levels now are not back to where they were before they had -- during that -- before that earlier period when they had more resources, is that fair?

MR. KO:  Object to the form. Object to the extent it misrepresents the discovery and evidence that's been produced in this case.

A.    Sorry, I need you to ask the question again.

BY MS. HIBBERT:

Q.    Sure.  Their staffing levels now are not back to where they were in that earlier time period before the layoffs, is that your understanding?

MR. KO:  Same objections.

Highly Confidential - Subject to Further Confidentiality Review

A.    I think you were referring to a specific earlier time period.  I do not know what that earlier time period is so I don't -- I can't confirm whatever you mean by that period, but there was an earlier period that I understand where staffing levels were higher.

BY MS. HIBBERT:

Q.    There was an earlier period where staffing levels were higher and the current staffing levels now are not back to what they were before that earlier time period when they were cut, is that correct?

MS. RITTER:  Objection to the form.

A.    I think I'm not understanding what's new --

BY MS. HIBBERT:

Q.    Let me ask --

A.    -- about this question compared --

Q.    Let me --

A.    -- to what I already said.

Q.    It's not new, it just hasn't

Highly Confidential - Subject to Further Confidentiality Review

been answered.  Let me ask it a little bit different.  Is it fair to say the current staffing levels have never -- the staffing levels have never recovered from the earlier time period, whenever that might be, when they were cut?

MS. RITTER:  Objection to the form.  I'm not trying to be rude, but I don't know if you're talking about Cuyahoga or Summit so I'm having trouble following.

BY MS. HIBBERT:

Q.    Doctor, did you understand --

MR. KO:  I started the questioning talking about Cuyahoga and Summit.

MS. RITTER:  Okay.  Sorry, I just lost the train.

A.    So I think we're getting beyond my knowledge on this question.

BY MS. HIBBERT:

Q.    Earlier you told me that you were aware that there were staffing cuts in an earlier time period, is that fair?

Highly Confidential - Subject to Further Confidentiality Review

A.    Yes.

Q.    And I believe you told me that you were aware that the staffing levels currently are not up to what the staffing levels were before those cuts were made, is that fair?

A.    That is my understanding.

Q.    Does your abatement plan and cost estimates take that into account, the fact that the staffing levels for Cuyahoga and Summit County children's services department have remained consistent since an earlier time period where layoffs occurred?

MR. KO:  Object to the form. Object to the extent it misrepresents the evidence.

A.    My exercise is to figure out what staffing level we need going forward. That includes staffing level to serve opioid-related families that already exist and incremental staffing above that.  I give the total.  I don't -- it is not my -- I was not given the assignment of disaggregating that into current and additional.  I just

1   give you the total.

2   BY MS. HIBBERT:

3       Q.    So is it fair to say then the

4   staffing levels you recommend for Cuyahoga

5   and Summit County children's services in your

6   plan would essentially get those departments

7   back up to what they were before layoffs and

8   then something additional to that, is that

9   fair?

10          MR. KO:  Object to the form.

11          Object to the extent it misrepresents

12          the evidence.

13      A.    I don't think that's a correct

14  statement in that the broader question of

15  staffing applies to families beyond the

16  opioid-related families.  I'm focusing simply

17  on what the needs of those families are, how

18  that should be staffed, and so I'm not

19  addressing in any way the question you're

20  asking about back to some other level.  I'm

21  just figuring out what is needed now compared

22  to what is needed -- figure out what is

23  needed now.

24  BY MS. HIBBERT:

1       Q.    You're not taking into account

2   what was needed five years ago?

3           MR. KO:  Object to the form.

4       A.    I am not looking backwards.

5   BY MS. HIBBERT:

6       Q.    Does your plan and cost

7   estimates take into account whether Cuyahoga

8   or Summit County children's services

9   department had made specific requests for

10  additional staffing over the last ten years?

11      A.    I think in the discussions I

12  had about the unmet need, the topic of, you

13  know, what the agencies -- so topics of

14  agency budgets came up in a general way but

15  not in a specific way.

16      Q.    Did you consider whether there

17  were any barriers to implementation of any of

18  the programs that you were recommending in

19  your abatement plan?

20          MR. KO:  Object to the form.

21      A.    Yes, that's why this is a

22  multifaceted plan.  So for example, a barrier

23  to getting people into treatment is

24  connecting individuals to services, and so I

1   couldn't just propose more MAT or more

2   treatment.  I also had to have the resources

3   to overcome the barrier of people making it

4   to treatment, so if you look at the plan, the

5   various pieces fit together into a hole in a

6   way that is supposed to overcome some of the

7   things that prevent success today.

8   BY MS. HIBBERT:

9       Q.    What were some of the barriers

10  to implementation of the MAT treatment that

11  you considered and incorporated into your

12  abatement plan?

13      A.    We need more physicians capable

14  of supervising patients receiving MAT on an

15  outpatient basis after they've passed through

16  some of the more specialized facilities, and

17  so for example, that's why I have the

18  category for recruiting PCPs to provide MAT.

19      Q.    Did you take into account any

20  push-back from the community in implementing

21  a more extensive MAT program in these

22  counties?

23          MR. KO:  Object to the form.

24      A.    I'm aware that these are

1   counties where some of the most prominent

2   abstinence only approaches were founded, and

3   so that has affected some of the historic

4   patterns of service delivery, but it didn't

5   enter specifically.  I relied on the medical

6   experts in terms of thinking about, for

7   example, how -- what fraction of MAT we could

8   produce.

9   BY MS. HIBBERT:

10      Q.    Your report in your opinions

11  recognize certain efforts that have been made

12  in Cuyahoga County and Summit County to

13  combat the opioid epidemic, correct?

14      A.    Yes.

15      Q.    And those included the Cuyahoga

16  opioid task force, is that fair?

17      A.    Yes.

18      Q.    I think you specifically

19  mentioned that in your report?

20      A.    I don't remember if it's in my

21  report, but I'm certainly aware of it and I

22  think it was an effort.

23      Q.    I'll turn your attention --

24      A.    I believe you.  I believe you.

1    Q.    Well, turn real quick to
2  Page 36 of your April report.  I think that's
3  is Exhibit 4.  Correct me if I'm wrong?
4    A.    April 30, Exhibit 6.
5    Q.    Exhibit 6.
6    A.    Say the page again, please.
7    Q.    36.  Paragraph 36.  And here
8  you outline various -
9    A.    Yeah.
10   Q.    -- things that the Cuyahoga
11 County opiate task force has done and
12 implemented already to address the opioid
13 epidemic, is that correct?
14   A.    Yes.
15   Q.    Did your model and cost
16 estimates take into account these efforts and
17 programs that have already been implemented?
18   A.    In many cases, yes, they helped
19 me understand by discussing with the people
20 running the programs the unmet need, what
21 level of additional services were necessary.
22        MR. KO:  Kelly, I should have
23        mentioned this before you started
24        questioning.  The witness has asked to

1  split up the remaining amount of time.
2  He wanted a break in between like at
3  the halfway point of the hour 25, so I
4  think we're around there, so if
5  there's a good point for your to
6  break.
7        MS. HIBBERT:  Let me just
8        finish this line.
9        MR. KO:  Yeah, of course, I
10       just wanted to make sure you're aware.
11 BY MS. HIBBERT:
12   Q.    Does your model also take into
13 account the efforts of the -- Summit County's
14 opiate task force?  I know -- I don't think
15 that's mentioned in your report.
16   A.    I'm certainly aware of their --
17 of the efforts going on in the Summit
18 communities.
19   Q.    Now, the cost estimates that
20 you have put into place here -- let's take
21 for example the naloxone distribution.
22 That's something that both the Cuyahoga
23 County and the Summit County opiate task
24 force have already begun implementing that

1  program, is that correct?  Is that your
2  understanding?
3        MR. KO:  Object to the form.
4    A.    Both communities have expanded
5  the distribution of naloxone in recent years.
6  BY MS. HIBBERT:
7    Q.    So the cost estimates in your
8  program pertaining to the naloxone
9  distribution, those are not taking into
10 account the money that's already being spent
11 by the counties for those programs, is that
12 right?
13   A.    No, it's not right.  It takes
14 into account both that money and the
15 additional money.  It is the sum of that
16 money and additional money that is needed.
17   Q.    Okay.  So that money -- the
18 money that's already being spent is built
19 into the cost estimates, is that fair?
20       MR. KO:  Objection to the form.
21   A.    Continuing a similar amount of
22 money in the future is built into the cost
23 estimates.
24 BY MS. HIBBERT:

1    Q.    The cost estimates aren't just
2  for the additional money that it would take
3  to continue with those programs?
4    A.    Sorry, the cost estimates,
5  repeat that question, please.
6    Q.    Sure.  The cost estimates
7  aren't just for the additional money that it
8  would take to continue implementing those
9  programs.
10   A.    Additional and continue seem to
11 conflict in that sense.  I both have the
12 costs that would be necessary to continue,
13 and I have the additional.  It is the sum of
14 the two.
15       MS. HIBBERT:  Let's take that
16       quick break.
17       MR. KO:  Thanks.
18       THE VIDEOGRAPHER:  The time is
19 5:15 p.m., and we're off the record.
20       (Whereupon, a recess was
21 taken.)
22       THE VIDEOGRAPHER:  The time is
23 5:25 p.m., and we're on the record.
24 BY MS. HIBBERT:

1  Q.  Dr. Liebman, we talked earlier
2  about how your abatement plan and cost
3  estimates, do they include the estimates for
4  individuals who were addicted or are addicted
5  to illicit opioids like heroin and fentanyl
6  and car fentanyl and various analogs, do you
7  recall that testimony?
8  A.  Yes.
9  Q.  Would it have been possible for
10  you to separate out that population of people
11  in performing your analysis and calculations
12  in this case?
13  A.  I wasn't asked to do that so I
14  haven't thought heard about that question,
15  but I think it would be complicated.
16  Q.  Have you ever done a
17  calculation like this before where you would
18  have to separate out a certain population
19  like this?
20  A.  So, sorry, explain what like
21  this means.
22  Q.  Well, when you say that it
23  would be complicated, what do you mean by
24  that?

1  A.  I guess I was -- were you
2  simply -- was your question simply could I
3  make -- could we separate out MAT into people
4  who are currently using heroin and people who
5  are currently using prescription opioids?
6  Q.  Let me put it this way.  Would
7  it be possible to separate out all of your
8  cost components for every component any cost
9  associated with individuals that use or abuse
10  illicit opioids that have never used a
11  prescription opioid in their life?
12  A.  The reason it could be
13  complicated is that there are market factors
14  in the illegal drug market that determine how
15  much heroin is supplied to a community that
16  probably is dependent on, overall on -- I
17  really haven't thought about this issue so I
18  don't think I want to offer an opinion.
19  Q.  Okay.  If someone wanted to do
20  that, take your abatement plan and estimation
21  of cost and take out of it all of the
22  estimates for costs associated with
23  individuals that have never taken a
24  prescription opioid in their life, would that

1  be possible?
2  A.  Someone could make an
3  assumption of, I guess, on the treatment side
4  of what fraction of people were in that
5  category and simply break out that number
6  into 80 percent and 20 percent or whatever it
7  was.
8  Q.  You didn't do that here in your
9  report?
10  A.  I was not asked to do that.
11  Q.  If someone asked you or if
12  someone wanted to down the line to take out
13  any of the estimated costs that were specific
14  to the cities of Cleveland and Akron, would
15  that be possible?
16  A.  Do you mean expenditures of
17  city government or people living in those
18  communities being served?
19  Q.  The expenditures associated
20  with those cities specifically?
21  A.  I'm sorry, I don't think you
22  answered that.  I'm not supposed to be asking
23  questions, but I don't think you answered.
24  You didn't make me understand your question.

1  So are you asking me which part of this
2  program would be -- would I propose to be
3  administered by the city governments and,
4  therefore, dollars would have to flow through
5  them to administer those programs?
6  Q.  Let me try to make it more
7  clear since you don't understand, and that's
8  reasonable.
9  Would it be possible to
10  separate out any of the estimated costs that
11  are associated with residents that are in the
12  City of Cleveland or the City of Akron?
13  Start there.
14  A.  One could do that, for example,
15  by taking the fraction of the total county
16  population that lives in those communities.
17  Some of the rates might differ in the cities
18  and the outlying areas, and one would have to
19  think hard about whether one would make
20  different assumptions in the different parts
21  of the county.
22  Q.  What rates are you thinking of?
23  A.  Maybe the number of the
24  percentage of families involved in the child

1  welfare system where opioid abuse is an issue
2  in that family, it could be that that rate
3  was different in the city than in the rest of
4  the county.
5      Q.    Was there any data or any
6  information that you looked for or wanted to
7  see in forming your opinions and performing
8  your calculations that you couldn't find or
9  wasn't provided to you?
10     A.    I think when everyone does
11 analysis like this, one has something you're
12 trying to estimate and you try to go find the
13 best source of data and you -- in lots of
14 categories, I look for one thing and I look
15 for another and I find what the best source
16 is that I can find out there.  So I think the
17 answer is definitely yes, but I'm not -- it's
18 not going to be easy for me to give you a
19 detailed disk.
20     Q.    Have you asked anyone,
21 including the folks that you're working with
22 from Compass, any other experts or counsel in
23 this case, have you asked for any materials
24 that haven't been provided to you?

1      A.    Materials that they have?
2      Q.    I don't know.  Materials that
3  you would have liked to have to perform your
4  analyses.
5      A.    Let me give you an example.  I
6  propose a facility for women and children who
7  when the moms need treatment, that was
8  modelled after a prior program called Miracle
9  Village.  I tried to obtain the budget for
10 that but I think the program was around, say,
11 15 years ago.  We asked lots of people, and
12 we never found this so I had to come up with
13 another way to estimate that based on similar
14 programs rather than that specific program.
15 So lots of things like that where, you know,
16 the way you find information is to dig and
17 you get the best information you can.
18     Q.    And that program specifically
19 that you were just referencing, the maternal,
20 the new mom program, is that a fair
21 characterization?
22     A.    Not necessarily new moms, but
23 it's the addicted moms program, moms who need
24 treatment program.  Yeah.

1      Q.    Strike that.  Okay.
2            I'm going to ask you to turn
3  to, I think it's Exhibit Number 8.  Is that
4  your -- the updated most recent copy of your
5  tables?
6      A.    Okay.  I think we've been
7  working off number 7, but I'm happy to move
8  to number 8.
9      Q.    What's the difference between
10 number 7 and number 8?
11     A.    Let me just triple check before
12 I give you the answer.  Exhibit 8 includes
13 the correction in the child welfare category.
14     Q.    Let's use Exhibit 8 then
15 because that's where we're going.
16     A.    Good.
17     Q.    Page 17 of 133, Table C.5 of
18 Exhibit 8, please.  Let me know when you're
19 there.
20     A.    You went too fast.  Say it
21 again, please.
22     Q.    Page 17 of 133.
23     A.    Thank you.
24     Q.    Are you there?

1      A.    I am.
2      Q.    I have some specific questions
3  so bear with me.  For line number 8, the
4  family advocate of ongoing caseload, do you
5  see that line?
6      A.    Yes.
7      Q.    On your sources and notes you
8  state for number 8 that this is assumed to be
9  an approximately equal to line number 6 which
10 was the social worker ongoing caseload, do
11 you see that?
12     A.    Yes.
13     Q.    Why is that, why did you make
14 that assumption?
15     A.    The assumption is that one
16 would likely pair a family advocate with a
17 social worker around a caseload.
18     Q.    Is that based on any
19 conversations you had with folks at Cuyahoga
20 County or any documents that you reviewed?
21     A.    I had several conversations
22 with the leadership of the Cuyahoga child
23 welfare department about how they would think
24 about staffing and so this was consistent

Highly Confidential - Subject to Further Confidentiality Review

1   with that.

2       Q.    Is it your understanding that

3   the family advocates are specific to the

4   opioid-related cases?

5       A.    The family advocates I am

6   proposing are specific to those cases.

7       Q.    And the family advocates here,

8   let me back that up.  The numbers here

9   reflected in lines 5 through 8, those are the

10  total caseloads for Cuyahoga County that

11  you're proposing not just opioid-related,

12  fair, because then you take an opioid-related

13  percentage of that, is that right?

14      A.    I'm sorry.  We've not gotten

15  down below that line.

16      Q.    I'm looking at lines 5

17  through 8?

18      A.    Yeah, just give me a second to

19  catch up on where we are on this table.  5

20  through 8 is just the number of cases a

21  person would have if they were being assigned

22  to different functions.

23      Q.    Okay.  So in line number 6, you

24  have social worker ongoing caseload being ten

Highly Confidential - Subject to Further Confidentiality Review

1   cases.  That includes non-opioid-related

2   cases, correct?

3       A.    This is the assumption about

4   the appropriate caseload for serving opioid

5   cases.

6       Q.    I see.  So this is not a total

7   caseload for all child welfare cases.  It's

8   only specific to opioid-related cases?

9       A.    Yeah, I don't have a view on

10  the appropriate staffing of all cases.  This

11  is my view on the appropriate staffing of

12  opioid-related cases.

13      Q.    Now, you use in lines 9 and 24

14  and 28 of this chart an opioid-related

15  percentage, correct?

16      A.    Yes.

17      Q.    And that's based on an estimate

18  by another expert in this case, David Cutler,

19  is that correct?

20      A.    That's correct.

21      Q.    Did you understand that --

22  strike that.  Do you have an understanding of

23  what Dr. Cutler's methodology was in

24  determining that percentage?

Highly Confidential - Subject to Further Confidentiality Review

1       A.    I reviewed it at the time that

2   I was given the relevant table and section

3   from his report.

4       Q.    And did you agree with his

5   methodology?

6       A.    Yes, I thought it was reliable.

7       Q.    The percentage that you use for

8   your calculation for both Summit County and

9   Cuyahoga County opioid percentage based on

10  Dr. Cutler's estimates, those stay constant

11  for the entirety of your abatement plan, the

12  length of your abatement plan, correct?

13          MS. RITTER:  Objection to the

14      form.

15      A.    I use these particular numbers

16  to figure out a level of resources for these

17  cases, and I continue that level of cases.  I

18  don't make any particular projection about

19  this number in the future.

20  BY MS. HIBBERT:

21      Q.    So you're not accounting for

22  whether there would be less removals, child

23  removals from their homes related to opioids

24  as the years progress throughout your

Highly Confidential - Subject to Further Confidentiality Review

1   abatement plan, is that fair?

2       A.    I'm assuming the same level of

3   resources for these families going forward.

4       Q.    And if there were less children

5   being removed from their homes due to

6   opioid-related issues, would your estimates

7   then need to be decreased?

8       A.    If there were fewer families

9   that were opioid involved over time, the

10  resource needs could decline in the future.

11      Q.    And if Dr. Cutler's percentages

12  for the opioid-related removals, if those

13  were actually determined to be different in

14  any way, higher or lower, would you need to

15  adjust your calculations for this entire

16  table?

17          MS. RITTER:  Objection to the

18      form.

19      A.    I would have to adjust any

20  portion of this table that relies on -- that

21  derives from that number.

22  BY MS. HIBBERT:

23      Q.    Is there any portion of this

24  table that doesn't derive from that number?

```
1        MS. RITTER:  Objection to the
2   form.
3        A.    If you give me a moment, I will
4   figure that out.
5        (Witness reviewing document.)
6        A.    The trauma counselor in line 16
7   is not a result of that number.  A single FTE
8   that is provided that isn't derivative of the
9   caseload number.
10  BY MS. HIBBERT:
11       Q.    Anything else?
12       (Witness reviewing document.)
13       A.    I'm not seeing -- there's
14  another sub, but I'm not seeing the formula
15  here that I would need to check to be sure on
16  this spreadsheet.
17       Q.    Which formula are you looking
18  for?
19       A.    The row 19 recruit foster
20  families formula.
21       Q.    You're not sure what the basis
22  is for line 19?
23       A.    Yeah, I want to see whether
24  that was calculated straight off of 15.7 or
```

```
1   not.
2        Q.    Looking at your report and
3   these appendices that you have before you
4   today, you can't say what line 19 is based
5   off of?
6        A.    I need to see the cell
7   calculation to give you the answer to the
8   question you asked, which is whether the 15.7
9   number affects that number.
10       Q.    I also saw on the sources and
11  notes that there wasn't a line for line 23.
12  How did you derive that calculation?
13       A.    For line 23?
14       Q.    Yes.
15       A.    I think that comes from --
16       MS. RITTER:  Objection to the
17  form.
18       A.    I think that comes straight
19  from the -- either the annual report or the
20  numbers about how many foster care placements
21  there are.  Actually I think -- can we go to
22  the backup table for this, so C.5 goes to --
23  BY MS. HIBBERT:
24       Q.    Yeah, it's Page 71 of 133.
```

```
1        A.    71.  Let me see if it's there
2   or whether --
3        MS. RITTER:  71.
4        MS. HIBBERT:  I'm sorry, give
5   me --
6   BY MS. HIBBERT:
7        Q.    It's Page 71 of 133, do you see
8   that?
9        A.    Yes.  So you can see the data
10  that come from the 2017 and 2018 statistical
11  reports of the children and family services
12  agency that we got that number from.
13       Q.    I'm not trying to be dense.
14  I'm trying to understand exactly.  The
15  number -- take Cuyahoga, for example, line 23
16  is 1,454.  I see on here the table at Page 71
17  of 133 of Exhibit 8.  That's the number at
18  the very bottom left-hand side or the average
19  number in 2018 for children placed in foster
20  and institutional care, is that right?
21       A.    Yes.
22       Q.    And what makes up the
23  foster/institutional care?  What categories
24  that are reflected here on Page 71 make up
```

```
1   that group?
2        A.    So if you go to the table above
3   and you go down to the 28 data, we just need
4   to look at the formula in that cell and we
5   can tell you which three or four of those
6   columns are in there.
7        Q.    I see.  So the formula for the
8   cell indicating 1,455 would tell us what
9   other cells are actually --
10       A.    It's going to be two or three
11  of those.  I think it's going to be two or
12  three of those columns right above that are
13  in that category.
14       Q.    For line 25, you have the
15  estimated cost per placement average, and for
16  Cuyahoga County you have listed 17,492.
17       A.    So we're back on table C.5?
18       Q.    Yes.
19       A.    Say again which line in 25.
20  Yes.
21       Q.    Actually let me just confirm.
22  That number from line 25 in Table C.5, can we
23  confirm the formula that's used for that
24  calculation through the supporting table on
```

Highly Confidential - Subject to Further Confidentiality Review

1   Page 71 of 133?  There's a cell I see there
2   for the average cost per placement.  Can we
3   determine from that cell what specific
4   numbers you're drawing from for that
5   calculation?
6        A.     Just give me a second to review
7   these numbers again.
8               (Witness reviewing document.)
9        A.     Yes, if we looked at the
10  formulas, we would see the numbers from right
11  above that are combined to get that number.
12       Q.     Okay.  Now, turning to the
13  Summit County chart, Table S5 on page 19 of
14  133, for the estimated cost per placement of
15  line 25 for the Summit County table, in the
16  sources and notes, you have referenced here
17  back to the Cuyahoga line item 25, table of
18  C.5.  Is that correct?
19       A.     Yes.
20       Q.     And why is that?
21       A.     We did not have specific data
22  on either the caseloads or the prices for
23  Summit County, so we assumed -- I assumed
24  that the costs are similar.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.     Did you ask for specific data
2   regarding the caseloads and the average cost
3   per placement for children in Summit County
4   children's services?
5        A.     We tried to obtain that data,
6   but I wasn't able to.
7        Q.     Was that data not included in
8   the budget information that you looked at?
9   Strike that.
10              Did you look at the actual
11  budget information for Summit County child
12  welfare?
13       A.     I tried to find comparable data
14  for Summit County and was unable to do so.
15       Q.     Okay.  And obviously if the
16  actual data pertaining to the estimated cost
17  per placement, the average cost per placement
18  for children for Summit County was less than
19  what you've indicated based on Cuyahoga's
20  numbers, all of your calculations for the
21  costs of out of home placements for Summit
22  County child welfare would have to be
23  changed, correct?
24              MS. RITTER:  Objection to the

Highly Confidential - Subject to Further Confidentiality Review

1   form.
2        A.     And if it was higher, they
3   would also have to be changed.
4   BY MS. HIBBERT:
5        Q.     Okay.  Dr. Liebman, I'm going
6   to reserve a few more minutes for another
7   colleague.  Thank you so much for your time
8   today.
9               MR. KO:  Off the record for
10  just a moment.
11              THE VIDEOGRAPHER:  The time is
12  5:49 p.m., and we're off the record.
13              (Whereupon, a recess was
14  taken.)
15              THE VIDEOGRAPHER:  Are the time
16  is 5:50 p.m., and we're on the record.
17              EXAMINATION
18  BY MR. MOYLAN:
19       Q.     Professor, I'm going to have a
20  few follow-up questions for my colleagues.
21  The first one is that your plan assumes that
22  no person with an opioid use disorder
23  recovers to the point that they no longer
24  require treatment services as laid out in

Highly Confidential - Subject to Further Confidentiality Review

1   your tables, is that correct?
2        A.     No, it's not correct.
3        Q.     Okay.  Can you clarify what is
4   incorrect about that statement?
5        A.     As we discussed earlier, in any
6   given year different people are getting
7   treatment, so some people may get treatment
8   and their disorder may go into remission,
9   some new people may start getting treatment.
10  Some of the people formerly in remission may
11  come back, so the population of people
12  receiving treatment is changing over time.
13       Q.     Okay.  Mr. Morris asked you
14  some questions earlier about prescriber
15  education, and I believe you told him that it
16  could be useful to gather data on prescribing
17  rates.  Do you remember testifying to that
18  effect, to see if prescribing rates were
19  changing over time?
20       A.     He asked me whether, in order
21  to assess the efficacy of the abatement plan,
22  that would be a metric we could use.  He
23  asked me what metric would be useful going
24  forward for that component, and I suggested

1  that metric.

2      Q.    Okay.  And that's because

3  that's a metric that you think would be

4  useful to have in measuring the efficacy of

5  the program?

6      A.    Of the -- specifically the

7  effort to educate doctors on proper

8  prescribing practices.

9      Q.    Right.  Apart from measuring

10  the efficacy of the program for doctor

11  prescribing practices, are there any other

12  uses that would be -- that you would have in

13  terms of designing the plan for prescriber

14  education, or it just to measure future

15  outcomes?

16      A.    Any other uses of what?

17      Q.    Prescriber data, how prescriber

18  rates have been changing over time?

19      A.    In thinking about how to target

20  the educational efforts, data on prescribing

21  practices, let's say there was one health

22  plan that was doing better than another or

23  whatever, would be very helpful in thinking

24  about where, you know, where our progress has

1  already been made and when there's a need for

2  more progress.

3      Q.    Did you look for that data in

4  the course of your preparing your abatement

5  plan in this case?

6      A.    That wasn't in the scope of

7  what I was doing here.

8      Q.    Okay.  But, so you didn't ask

9  if that kind of provider prescribing data is

10  available?

11      A.    It wasn't relevant to what I

12  was doing.

13      Q.    Are you aware the prescribing

14  rates for prescription opioids have been

15  steadily declining in the state of Ohio since

16  around 2011?

17      A.    I don't know the exact year

18  that the peak occurred, but I am aware that

19  in general prescribing rates have been coming

20  down.

21      Q.    But your view is that that

22  information wouldn't have been useful to have

23  in the course of preparing your abatement

24  plan?

1          MS. RITTER:  Objection to the

2      form.

3      A.    That's not what I believe.  I

4  believe that for the purpose of what I was

5  doing, which is to figure out what capacity

6  is needed to do further work with providers

7  on proper prescribing, I was able to do what

8  I needed to do given what I knew about the

9  aggregate pattern.

10  BY MR. MOYLAN:

11      Q.    Okay.  Again, I think I asked

12  this, but I'm just not clear on the answer.

13  Apart from measuring future performance of

14  that provider education program and how

15  prescribing rates could change over time, is

16  there any way in which having prescribing

17  data or trends would have been relevant in

18  preparing that component of your abatement

19  plan?

20          MS. RITTER:  Objection to the

21      form.  Asked and answered.

22      A.    Understanding the trend in

23  aggregate is useful for assessing where we

24  are and how much progress and it was -- that

1  was informative for me thinking about the

2  capacity we need.  I think at the next stage

3  as one goes to implementation, having

4  disaggregated data that would allow you to

5  figure out which prescribers or which

6  practices or which health plans are still

7  using -- you know, prescribing patterns were

8  matching the ones ten years ago would be very

9  helpful in targeting the efforts most

10  effectively.

11  BY MR. MOYLAN:

12      Q.    Okay.  So it could have been

13  useful to have the trend of prescribing

14  practices going back ten years through 2018

15  in the course of preparing your report and

16  your abatement plan?

17          MS. RITTER:  Objection to the

18      form.  Misstates his testimony.

19      A.    In designing this plan, as I

20  said at the beginning, I was aware that

21  prescribing levels have come down.

22  BY MR. MOYLAN:

23      Q.    Okay.  Were you aware that

24  there's a prescription drug monitoring

1  program in the state of Ohio called the OARRS

2  system?

3      A.    Yes.

4      Q.    Did you ask to see any data

5  concerning the specific trend in prescribing

6  over time?

7      A.    That wasn't within the scope of

8  what I was doing.

9      Q.    Okay.  I think you referred

10  earlier to your engagement by the plaintiffs

11  in this case.  Did you have a separate

12  engagement agreement with Mr. Ko who was here

13  earlier as your individual counsel for the

14  deposition?

15      A.    I have a single engagement with

16  -- I think it's with several law firms, but

17  there's only one engagement document.

18      Q.    Okay.  If the court in this

19  case were to limit the plaintiff's claims

20  only to cover the costs that are associated

21  with prescription opioid misuse, in other

22  words, if illicit opioids were removed from

23  consideration in the case, is it correct that

24  the plan that you've created is unable to

1  estimate the costs that are just limited to

2  the prescription opioid misuse in these

3  counties?

4          MS. RITTER:  Objection to the

5      form.

6      A.    I don't address that question

7  in my report.  If someone gave that -- gave

8  me that assignment, I could work on it.

9  BY MR. MOYLAN:

10      Q.    In that scenario do you agree

11  that the current plan that you've created

12  would overstate the costs that are associated

13  just with prescription opioids?

14      A.    I wouldn't describe it as

15  overstating.  I would say that my plan abates

16  the -- is designed to abate the entire

17  crisis.  A plan to abate only part of the

18  crisis would cost less.

19      Q.    And you can't quantify based on

20  your report or tables what that specific

21  amount would be, the delta between the plan

22  that you have today and a plan that would

23  only be limited to prescription opioid

24  misuse, correct?

1          MS. RITTER:  Objection to the

2      form.  Asked and answered.

3      A.    I haven't done that to date.

4  BY MR. MOYLAN:

5      Q.    I think you told Mr. Morris

6  earlier in response to a number of questions

7  that you're not trying to apportion costs

8  among any entities or parties.  But can you

9  rule out any parties, any defendants that may

10  not be responsible for costs of abatement?

11  Let me ask a specific hypothetical to make

12  that question a little bit more precise.  If

13  a defendant stopped distributing opioids,

14  say, five years ago in 2014, or if a

15  defendant never sold a certain type of

16  opioids, would that be relevant in

17  understanding how the abatement plan should

18  apply to that defendant?

19          MS. RITTER:  Objection to the

20      form.  Asked and answered.

21      A.    I haven't been asked to think

22  about that question.  I don't have an opinion

23  on it.

24  BY MR. MOYLAN:

1      Q.    Okay.  So for example with

2  respect to future costs of preventing, opioid

3  use disorder, would it make any sense to

4  apply that component of a plan to a defendant

5  that's been out of the market for five years?

6          MS. RITTER:  Objection to the

7      form.  Asked and answered.

8      A.    You're asking something that is

9  not in the scope of what I was asked to do.

10  I was asked to design a plan to abate the

11  opioid crisis.  I wasn't asked to come up

12  with the legal theory about who should pay

13  for that so I don't have a VIEW on that.

14  BY MR. MOYLAN:

15      Q.    Even apart from a legal theory,

16  as an economist creating an abatement plan,

17  would you agree that for a defendant that's

18  been out of the market for five years that

19  future costs to try to prevent opioid use

20  disorder in a new population of users

21  wouldn't make sense to apply a future looking

22  prevention plan to a defendant that's not in

23  the market?

24          MS. RITTER:  Objection to the

1    form, asked and answered.

2         A.    I have no -- I have no view on

3    that.

4    BY MR. MOYLAN:

5         Q.    But your current model doesn't

6    account for that situation of a defendant

7    that's exited the market, you'd agree with

8    that?

9              MS. RITTER:  Objection to the

10        form.  Asked and answered.

11        A.    My plan doesn't -- my report

12   does not address that issue at all.

13   BY MR. MOYLAN:

14        Q.    I think you told Ms. Hibbert a

15   little bit earlier that in discussion with

16   Drs. Parran, Ryan and Lembke they told you

17   that a 15-year term was appropriate to use

18   given the nature of this -- the nature of

19   this epidemic.  Is that fair?

20        A.    I would say that what -- the

21   consensus of that conversation was that we

22   were going to need to sustain this new higher

23   level of resources for at least 15 years.

24        Q.    Okay.  And that was one

1    conversation with those three doctors?

2         A.    There's one where all three

3    were on together.  I've had separate

4    conversations with definitely two of them,

5    and I'm forgetting whether I had one with the

6    third.

7         Q.    Okay.  Do you think there are

8    notes of those conversations that are in

9    existence?

10        A.    All notes that I'm aware of

11   have been provided.

12        Q.    Okay.  How many times -- just

13   limiting now my question to Dr. Ryan, how

14   many times have you spoken with Dr. Ryan?

15        A.    I don't know exactly.  I'd have

16   to go back and look at my calendar.

17        Q.    Would it be one time or more

18   than one time?

19             MS. RITTER:  Objection to the

20        form.  Asked and answered.

21        A.    It's more than one.

22   BY MR. MOYLAN:

23        Q.    Okay.  I'm going to mark -- I

24   guess we're up to Exhibit 16.

1              (Whereupon, Liebman Exhibit

2         Number 16 was marked for

3         identification.)

4    BY MR. MOYLAN:

5         Q.    So these are a set of interview

6    notes that we received in connection with

7    your report.  Do these look familiar to you?

8         A.    Some of them do.

9         Q.    Who prepared the notes?

10        A.    It varied.  Some of the

11   conversations I took my own notes although in

12   most cases, because I was running the

13   meeting, someone else was taking notes.

14   Sometimes counsel took notes.  Sometimes

15   someone from Compass Lexecon took notes.

16        Q.    Okay.  Just directing your

17   attention to Page 7, there appear to be notes

18   of a conversation on June 22, 2018 with

19   Dr. Waller and Dr. Ryan.  Do you see that?

20        A.    Yes.

21        Q.    They go on for several pages.

22   If you could look through those notes and

23   tell me if you find any reference to the term

24   of the abatement plan within the course of

1    those notes.

2              (Witness reviewing document.)

3         A.    In my brief review I do not see

4    any mention of that here.

5         Q.    Okay.  And these are the only

6    notes that you have had that involve a

7    conversation with Dr. Ryan, is that correct?

8         A.    Assuming this is the full set

9    of notes produced, then that's it.

10             MR. MOYLAN:  Okay.  That's

11        going to be all the questions I have.

12        I am going to make an objection.  We

13        had asked this morning to receive a

14        copy of the revised spreadsheet that

15        Dr. Liebman mentioned earlier, which

16        apparently has been available for

17        several days.  We didn't receive a

18        copy.

19             MS. RITTER:  It wasn't several

20        days.  We said one or two days.  We

21        don't have it here with us, I don't

22        have it with me, he doesn't have it

23        with me, we didn't deny the request,

24        we said we heard your request.  Also

Highly Confidential - Subject to Further Confidentiality Review

```
 1        he gave the information that allowed
 2        the questioning about the differences
 3        in the flip of the numbers.  So you're
 4        welcome to ask him questions about it,
 5        but we haven't denied --
 6             MR. MOYLAN:  I'm not sure --
 7             MS. RITTER:  You can object.
 8        We haven't denied that --
 9             MR. MOYLAN:  Yeah, that's all
10        I'm doing.
11             MS. RITTER:  Okay.
12             MR. MOYLAN:  I'm objecting that
13        we've requested it, we haven't
14        received it, and I don't think that we
15        were able to ask all the questions
16        that we would have wanted to do
17        without the revised version.  So with
18        that unless there is anything else, I
19        think we can go off the record.
20             MS. RITTER:  We have a couple
21        questions.
22        BY MS. RITTER:
23        Q.     Just briefly, Dr. Liebman.
24   When Ms. Hibbert was questioning you about
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Exhibit 8, I think she maybe inadvertently
 2   said that --
 3             PHONE PARTICIPANT:  I'm sorry.
 4        It's almost impossible to hear you.
 5        Can you please speak up.
 6             MS. RITTER:  I have a mic.
 7        I'll try to talk louder.
 8   BY MS. RITTER:
 9        Q.     When Ms. Hibbert was
10   questioning you earlier about Table C.5 in
11   Exhibit 8, I think she overlooked a reference
12   for line 23, so I'd like you to look at page
13   18 of 133 and then the page preceding which
14   was 17 which is what it relates to, and tell
15   me if you do see a reference there for line
16   23 for the children placed in foster
17   institutional care average number.
18             MR. CARTER:  Object to the
19        form.
20        A.     Sorry, line 23?
21   BY MS. RITTER:
22        Q.     Yes.
23        A.     I'm not seeing any line 23.  Am
24   I looking at the right thing?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.     When you -- Dr. Liebman, if you
 2   look at Page 18 of 133, and if you go down,
 3   the third line where it says in brackets 1 to
 4   4, 23, 27 --
 5        A.     I see, 23 is up there.  Oh,
 6   good, fine.  I was looking for 23 between 22
 7   and 24, but it was up there.  I see.  That
 8   does, in fact, come from the statistical
 9   report of the county, yes.
10        Q.     Looking at Page 18 of 133 then,
11   what is the reference for line 23 on the
12   preceding page?
13        A.     The children placed in foster
14   care --
15        Q.     Yes.
16        A.     -- comes from the statistical
17   report of the Cuyahoga County Division of
18   Children and Family Services for January to
19   September, 2018.
20        Q.     That's all the questions I have
21   about that document.  Then shifting to your
22   report which is marked as Exhibit 6, and
23   specifically in the Appendix D, Page 2 of 55,
24   which is Table SO, looking on that page, what
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   does the bracket number 1 refer to?
 2        A.     It's the calculation in the
 3   Pitt et al. paper -- it's the two numbers
 4   from the Pitt et al. paper that I combined in
 5   order to get the overall opioid use disorder
 6   rate in line 1.
 7        Q.     And turning now to Exhibit 11,
 8   is this the article you just referenced?
 9        A.     Yes.
10        Q.     And turning to the supplement
11   of that article, and specifically to page
12   S.4, if you can go down to the -- that's a
13   section S.1.3, if people are looking for it,
14   called "Initial Compartment Sizes" on page
15   S.4 of the supplement to that article --
16        A.     Yes.
17        Q.     -- which is the second part of
18   that exhibit.  Can you go down to the last
19   paragraph which begins "NSDUH" and read that
20   section down to the words "overdose death."
21        A.     "NSDUH and the National
22   Epidemiological Survey of Alcohol and Related
23   Conditions reports rates of prescription
24   opioid dependence and use trends" --
```

1    Q.    Oh, no.  The next paragraph,
2  sorry, "NSDUH and the National Epidemiologic
3  Survey on Alcohol and Related" --
4    A.    Yeah.  I think I was doing
5  that.
6    Q.    With the NESARC language?
7    A.    I didn't read the
8  parenthetical.  Do I need to read that?
9    Q.    Okay.  That's all right.  Okay.
10  Go ahead.  Okay.  Okay.
11    A.    I just went straight to use --
12  I apologize.
13    Q.    Okay.  Go ahead.
14    A.    "However, prevalence of severe
15  opioid use disorder is not reported.
16  Additionally these surveys suffer from
17  underreporting in key populations of
18  relevance to the epidemic.  We, therefore,
19  estimated SOUD prevalence based on reported
20  prescription opioid overdose deaths adjusted
21  for underreporting and the estimated
22  likelihood of overdose death.  We performed
23  the adjustment for underreporting by assuming
24  that the actual number of prescription

1  opioid-related deaths was 24 percent greater
2  than the total opioid deaths, minus deaths
3  from illicit opioids reported by the Centers
4  for Disease Control and prevention."
5    Q.    What, if anything -- what, if
6  any, clarification does that language provide
7  regarding the source of their calculation in
8  the Pitt and Brandow study of the initial
9  compartment size?
10    MR. MORRIS:  Objection to form.
11    A.    Well, it describes how Pitt et
12  al. -- exactly how they did what I described
13  earlier which is they adjusted the NSDUH
14  numbers for the underreporting and for the
15  missing populations.
16    MS. RITTER:  That's all I have.
17    MR. CARTER:  I have a follow-up
18    question on the article.
19    MS. RITTER:  What did you say?
20    MR. CARTER:  I have a follow-up
21    question on what you just asked.
22    MS. RITTER:  Exhibit 11.
23  BY MR. CARTER:
24    Q.    Professor Liebman, my name is

1  Ed Carter.  We didn't have a chance to meet
2  earlier.
3    What's your understanding as
4  the reason or reasons why there is
5  underreporting?
6    MS. RITTER:  Object to the
7    form.
8  BY MR. CARTER:
9    Q.    Let me ask it this way.  Do you
10  have any understanding or expertise as to why
11  there may be underreporting referenced in
12  that article?
13    A.    Yes.  There -- I think as we
14  discussed at the very beginning today, there
15  are several reasons why we think the
16  estimates -- why there's a pretty strong
17  consensus that the estimates that come from
18  the National Survey of Drug Use and Health
19  are likely to be lower than the actual
20  number -- lower than the actual percentage of
21  opioid use disorder.  Part of it is that the
22  survey doesn't cover several populations that
23  we think are higher than average in opioid
24  use, including the homeless, those who are

1  incarcerated and other institutional
2  populations and also because people
3  underreport to surveys and in addition when
4  people have used other methodologies like the
5  recent Massachusetts study that uses claims
6  data, they have found much higher rates of
7  opioid use disorder.
8    Q.    And with respect to reporting
9  of opioid use disorder, have you seen
10  literature that because of some of those same
11  factors people are more likely to cite
12  prescription opioids than their illicit drug
13  use and that illicit drug use is
14  underreported as an initiating drug?
15    A.    I'm not aware of that research.
16    MR. CARTER:  Okay.  No further
17    questions on that.  I do join in the
18    other objections in terms of the time
19    limitations.  I had a number of
20    questions for the professor on behalf
21    of my client that due to the time
22    restrictions I have not had the
23    opportunity to ask, so I would lodge
24    an objection to that.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            THE VIDEOGRAPHER:  The time is
 2      6:14 p.m.  This deposition has
 3      concluded, and we are off the record.
 4            (Whereupon, the deposition was
 5      concluded.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      COMMONWEALTH OF MASSACHUSETTS )
 2      SUFFOLK, SS.                  )
 3            I, MAUREEN O'CONNOR POLLARD, RMR,
 4      CLR, and Notary Public in and for the
 5      Commonwealth of Massachusetts, do certify
 6      that on the 3rd day of May, 2019, at 9:03
 7      o'clock, the person above-named was duly
 8      sworn to testify to the truth of their
 9      knowledge, and examined, and such examination
10      reduced to typewriting under my direction,
11      and is a true record of the testimony given
12      by the witness.  I further certify that I am
13      neither attorney, related or employed by any
14      of the parties to this action, and that I am
15      not a relative or employee of any attorney
16      employed by the parties hereto, or
17      financially interested in the action.
18            In witness whereof, I have
19      hereunto set my hand this 5th day of May,
20      2019
21      _____
22      MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC
23      Realtime Systems Administrator
24      CSR #149108
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            INSTRUCTIONS TO WITNESS
 2
 3            Please read your deposition over
 4      carefully and make any necessary corrections.
 5      You should state the reason in the
 6      appropriate space on the errata sheet for any
 7      corrections that are made.
 8            After doing so, please sign the errata
 9      sheet and date it.  It will be attached to
10      your deposition.
11            It is imperative that you return the
12      original errata sheet to the deposing
13      attorney within thirty (30) days of receipt
14      of the deposition transcript by you.  If you
15      fail to do so, the deposition transcript may
16      be deemed to be accurate and may be used in
17      court.
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            - - - - -
               E R R A T A
 2            - - - - -
 3      PAGE  LINE  CHANGE
 4      ____ ____ _____
 5           REASON: _____
 6      ____ ____ _____
 7           REASON: _____
 8      ____ ____ _____
 9           REASON: _____
10      ____ ____ _____
11           REASON: _____
12      ____ ____ _____
13           REASON: _____
14      ____ ____ _____
15           REASON: _____
16      ____ ____ _____
17           REASON: _____
18      ____ ____ _____
19           REASON: _____
20      ____ ____ _____
21           REASON: _____
22      ____ ____ _____
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2               ACKNOWLEDGMENT OF DEPONENT
 3
 4        I, _____, do
         Hereby certify that I have read the foregoing
 5       pages, and that the same is a correct
         transcription of the answers given by me to
 6       the questions therein propounded, except for
         the corrections or changes in form or
 7       substance, if any, noted in the attached
         Errata Sheet.
 8
 9
         _____
10       Jeffrey B. Liebman, Ph.D.     Date
11
12
13
14
15
16
         Subscribed and sworn
17       To before me this
         _____ day of _____, 20____.
18
         My commission expires: _____
19
20       _____
         Notary Public
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1               LAWYER'S NOTES
 2    PAGE   LINE
 3    _____  _____  _____
 4    _____  _____  _____
 5    _____  _____  _____
 6    _____  _____  _____
 7    _____  _____  _____
 8    _____  _____  _____
 9    _____  _____  _____
10    _____  _____  _____
11    _____  _____  _____
12    _____  _____  _____
13    _____  _____  _____
14    _____  _____  _____
15    _____  _____  _____
16    _____  _____  _____
17    _____  _____  _____
18    _____  _____  _____
19    _____  _____  _____
20    _____  _____  _____
21    _____  _____  _____
22    _____  _____  _____
23    _____  _____  _____
24    _____  _____  _____
```