Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION
- - -

IN RE: NATIONAL            : HON. DAN A.
PRESCRIPTION OPIATE        : POLSTER
LITIGATION                 :
                           :
APPLIES TO ALL CASES       : NO.
                           : 1:17-MD-2804

- HIGHLY CONFIDENTIAL -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
- - -
JANUARY 22, 2019
- - -

Videotaped sworn deposition of

BRIAN LORTIE, taken pursuant to notice,

was held at McCARTER & ENGLISH, LLP,

1600 Market Street, Suite 3900,

Philadelphia, Pennsylvania, beginning at

9:06 a.m., on the above date, before

Margaret M. Reihl, a Registered

Professional Reporter, Certified

Shorthand Reporter, Certified Realtime

Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

---

Page 2

```
1   A P P E A R A N C E S:
2
3   SEEGER WEISS LLP
    BY:  JENNIFER SCULLION, ESQUIRE
4       ERICA KUBLY, ESQUIRE
        SABRINA TYJER, PARALEGAL
    77 Water Street
5   New York, NY 10005
    (212) 584-0700
6   jscullion@seegerweiss.com
    Representing the Plaintiffs
7
8
    BRANSTETTER, STRANCH & JENNINGS, PLLC
9   BY:  JOE P. LENISKI, JR., ESQUIRE
    The Freedom Center
10  223 Rosa L. Parks Avenue, Suite 200
    Nashville, Tennessee  37203
11  (625) 254-8801
    joyl@bsjfirm.com
12  Representing the Tennessee Plaintiffs
13
14  GOODELL DEVRIES LEECH & DANN, LLP
    BY:  ROBERT LIMBACHER, ESQUIRE
15      ADAM S. TOLIN, ESQUIRE
    Two Commerce Square
16  2001 Market Street, Suite 3700
    Philadelphia, Pennsylvania  19103
17  (267) 765-3600
    rlimbacher@gdldlaw.com
18  atolin@gdldlaw.com
    Representing the Defendant Endo and
19  the witness
20
21
22
23
24
```

Page 3

```
1   A P P E A R A N C E S: (cont'd)
2
3   PIETRAGALLO GORDON ALFANO
    BOSICK & RASPANTI, LLP
4   BY:  DOUGLAS K. ROSENBLUM, ESQUIRE
    1818 Market Street, Suite 3402
5   Philadelphia, Pennsylvania  19103
    (215) 988-1464
6   dkr@pietragallo.com
    Representing Cardinal Health
7
8
9   ALSO PRESENT:
10
    Carolyn M. Hazard, Litigation Counsel
11  Endo
12  Bill Geigert, Videographer
13  Bradley Smith, Trial Technician
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1   APPEARANCES VIA TELECONFERENCE AND STREAM
2
3   ULMER & BERNE, LLP
    BY:  JOSHUA A. KLARFELD, ESQUIRE
    1660 West 2nd Street
4   Suite 1100
    Cleveland, Ohio  44113
5   (261) 583-7000
    jklarfeld@ulmer.com
6   Representing Amneal Pharmaceuticals, Inc
7
8   JONES DAY
    BY:  TAYLOR GOODSPEED, ESQUIRE
9   555 California Street, 26th Floor
    San Francisco, California  94104-1500
10  (415) 875-5804
    tgoodspeed@jonesday.com
11  Representing the Defendant Walmart
12
    CLARK MICHIE LLP
13  BY:  BRUCE CLARK, ESQUIRE
        CHRISTOPHER J. MICHIE, ESQUIRE
14  220 Alexander Street
    Princeton, New Jersey  08540
15  (609) 423-2142
    Representing the Defendant,
16  Pernix Therapeutics Holdings, Inc
17
18  REED SMITH LLP
    BY:  RYAN K. BLAKE, ESQUIRE
19  Three Logan Square
    1717 Arch Street, Suite 3100
20  Philadelphia, Pennsylvania  19103
    (215) 851-8280
21  rblake@reedsmith.com
    Representing the Defendant AmerisourceBergen
22
23              - - -
24
```

Page 5

```
1              I N D E X
2   WITNESS                    PAGE
    BRIAN LORTIE
3
        By Ms Scullion         12
4
5          E X H I B I T S
6   NO      DESCRIPTION        PAGE
7   Endo-
    Lortie-1  Notice of Deposition of
8       Brian Lortie          13
9   Endo-
    Lortie-2  Subpoena to Testify at a
10      Deposition in a Civil Action  13
11  Endo-
    Lortie-3  Resume Brian Andrew Lortie  27
12
13  Endo-
    Lortie-4  Separation Agreement
14      dated 6/27/16
        [ENDO_OPIOID_MDL_DEPONENT-
        000019346 through 9351]   29
15
    Endo-
16  Lortie-5  Endo's Open Letter on the
        Opioid Abuse Crisis
17      [no Bates]             45
18  Endo-
    Lortie-6  Endo Independent Directors'
19      Report, October 2018
        [E1588 1 through 10]      76
20
    Endo-
21  Lortie-7  Risk Minimization Action
        Plan for Opana ER
22      June 2007
        [ENDO-CHI_LIT-00234542
23      through 4587]         123
24
```

2 (Pages 2 to 5)

Highly Confidential - Subject to Further Confidentiality Review

Page 6

E X H I B I T S

NO        DESCRIPTION          PAGE

Endo-
Lortie-8  E-mail dated 9/7/07
          Subject, FW: Opana Top
          50 Writers
          with attachment produced
          natively
          [ENDO-OPIOID_MDL-00869053
          through 9054]          155

Endo-
Lortie-9  Document "Withheld for
          Privilege", Excel Spreadsheets
          E1247 1 through E1247 122
          [ENDO-OPIOID_MDL-02924490]  173

Endo-
Lortie-10 Report of Suspected
          Diversion, blank
          [ENDO-OPIOID_MDL-02148238]  172

Endo-
Lortie-11 E-mail string, top one
          dated 2/8/10
          Subject, RE: Dr  Winthrop
          Risk (Cedar Rapids, Iowa)
          [ENDO-OR-CID-00408959
          through 8966]          192

Endo-
Lortie-12 E-mail string, top one
          dated 3/19/10
          Subject, RE: 2009
          Performance Information
          for Corrective Action
          [ENDO-OPIOID_MDL-02098725
          through 8731]          197

Page 8

E X H I B I T S

NO        DESCRIPTION          PAGE

Endo-
Lortie-19 Marketing and Advertising
          Review Committee
          Standard Operating Procedure
          May 2013
          [END00747404 through
          747]                   249

Endo-
Lortie-20 File Provided Natively
          Slide deck, Compliance
          Overview ELC
          March 21, 2013
          [EPI002412332]         259

Endo-
Lortie-21 Health Care Compliance
          Guide, Revised May 2009
          [END00401724 through
          1777]                  274

Endo-
Lortie-22 Provided in Response to
          Topic 13 of Plaintiffs'
          Amended Rule 30(b)(6)
          Notice to Endo
          Pharmaceuticals Inc
          and Endo Health Solutions Inc
          [no Bates]             283
Endo-
Lortie-23 Patient Brochure
          "Taking a Long-Acting
          Opioid, What does it
          mean to me?"
          [ENDO-CHI_LIT-00538441
          through 8449]          289

Page 7

E X H I B I T S

NO        DESCRIPTION          PAGE

Endo-
Lortie-13 E-mail dated 4/15/10
          Subject, Corrective Action
          Request, with attachment
          [ENDO-OPIOID_MDL-02182533
          through 2536]          198

Endo-
Lortie-14 Endo Pharmaceuticals
          Percocet History
          Time & Events in the
          News Media
          [ENDO-CHI_LIT-00543478
          through 3495]          215

Endo-
Lortie-15 An opioid crisis where
          'death specification'
          prosecutions are
          only one answer:
          Carole S  Rendon (Opinion)
          [E1007 1 through 7 4]   221

Endo-
Lortie-16 Percocet Death Reports
          (1999-2000)
          [ENDO-OPIOID_MDL-03259246
          through 9247]          218

Endo-
Lortie-17 E-mail string, top one
          dated 3/18/13
          Subject, Fwd McKesson
          Contracts, with
          attachments
          [ENDO-OPIOID_MDL-01056072
          through 6200]          237
Endo-
Lortie-18 Corporate Policy for
          Promotional Materials
          Review Board
          [END00747325 through 7342]  248

Page 9

E X H I B I T S

NO        DESCRIPTION          PAGE

Endo-
Lortie-24 American Pain Society
          article, 12/10/07
          "Advocacy,
          Definitions Related to
          the Use of Opioids
          for the Treatment of Pain
          [ENDO-OPIOID MDL-06233148
          through 3151]          295

Endo-
Lortie-25 E-mail dated 9/1/10
          Subject, RE: Opana
          ER Launch: List of
          Community Organizations
          Contacted
          with attachment
          [ENDO-CHI_LIT-00051623
          through 1624]          313

Endo-
Lortie-26 Endo Pharmaceuticals, Inc
          Oxymorphone Extended
          Release (ER) Tablets
          EN3202
          Application Summary
          Updated Annotated Labeling
          dated 11/23/05
          [ENDO-OPIOID_MDL-00291042
          through 1088]          329
Endo-
Lortie-27 Endo letter dated
          6/30/06
          RE: NDA #21-610
          [ENDO-OPIOID_MDL-00299009
          through 9010]          329
Endo-
Lortie-28 FDA Letter re:
          NDA 21-610, dated 6/2/06
          [ENDO-OPIOID_MDL-00298948
          through 9000]          329

Highly Confidential - Subject to Further Confidentiality Review

Page 10

```
 1        E X H I B I T S
 2  NO    DESCRIPTION           PAGE
 3
    Endo-
 4  Lortie-29 FDA letter
              NDA Approval
 5            NDA 201655
              dated 12/9/11
 6            [EPI001314350
              through 4441]        329
 7
    Endo-
 8  Lortie-30 E-mails dated 5/15/12
              Subject, Re: New language
 9            OER selling piece
10            [ENDO-CHI_LIT-00206530
              through 6531]        346
11  Endo-
    Lortie-31 E-mails dated 5/15/12
12            Subject, Re: New language
              OER selling piece
13            [ENDO-CHI_LIT-00110100]    351
14  Endo-
    Lortie-32 E-mail string, top one
15            dated 1/9/13,
              Subject, RE: OER Pharmacy
16            Market Research Revised
              Report
17            [END00095867 through 5870]  357
18  Endo-
    Lortie-33 E-mails dated 9/17/13
19            Subject, Re: Opana ER
              Prescriber
20            [END00465847 through
              5848]               365
21
22
23
24
```

Page 11

```
 1        E X H I B I T S
 2  NO    DESCRIPTION           PAGE
 3  Endo-
    Lortie-34 File Provided Natively
 4            Slide deck, Opana ER
              Crush Resistant
 5            Formulation Research
              Wave 5, Qualitative
 6            Interviews, 12/13/12
              [ENDO-CHI_LIT-001356]     368
 7
 8  Endo-
    Lortie-35 Endo Health Solutions
 9            Sues FDA to Protect
              Consumers from Non-Tamper
10            Resistant Oxymorphone
              dated 11/30/12
11            [no Bates]           377
12  Endo-
    Lortie-36 File Provided Natively
13            Compendia Status Update
              December 2012
14            [EPI001932419 and
              EPI002485011]       389
15
16  Endo-
    Lortie-37 E-mail string, top one
17            dated 1/14/13
              Subject, Re: generic
18            OPANA ER
              [END00121820 through
19            1822]               399
20  Endo-
    Lortie-38 E-mail dated 1/12/13
21            Subject, Final Opana ER
              Strategic Platform
22            with attachment provided
              natively
23            [ENDO-CHI_LIT-00467546
              through 7547]       403
24         - - -
```

Page 12

```
 1        THE VIDEOGRAPHER:  Good morning.
 2  We are now on the record.  My name is
 3  Bill Geigert, I am a videographer for
 4  Golkow Litigation Services.  Today's
 5  date is January 22nd, 2019, and the time
 6  is 9:06 a.m.  This video deposition is
 7  being held in Philadelphia, Pennsylvania
 8  in the matter of National Prescription
 9  Opiate Litigation for the U.S. District
10  Court, Northern District of Ohio,
11  Eastern Division.
12        The deponent is Brian Lortie.
13        Counsel will be noted on the
14  stenographic record.
15        The court reporter is Peg Reihl
16  and she will now swear in the witness.
17        ... BRIAN LORTIE, having been
18  duly sworn as a witness, was examined
19  and testified as follows:
20  BY MS. SCULLION:
21      Q.    Good morning, Mr. Lortie.
22      A.    Good morning.
23      Q.    We met briefly off the record,
24  but for the record, my name is Jennifer
```

Page 13

```
 1  Scullion, and I represent the plaintiffs in this
 2  matter.
 3        Mr. Lortie, I'm going to hand you
 4  what's been marked as Exhibits 1 and 2.
 5        (Documents marked for
 6        identification as Endo-Lortie Deposition
 7        Exhibit Nos. 1 and 2.)
 8  BY MS. SCULLION:
 9      Q.    Let me hand you Exhibit 1, which
10  is a copy of the Notice of Deposition of Brian
11  Lortie.
12      A.    Thank you.
13      Q.    And Exhibit 2 which is a copy of
14  the subpoena.
15        Mr. Lortie, before we look at the
16  exhibits, have you ever been deposed before?
17      A.    Yes, I have.
18      Q.    How many times?
19      A.    I would have to think, but it's
20  been several, probably five or six.
21      Q.    Were all of those in connection
22  with your employment with Endo?
23      A.    The majority have been yes, some
24  -- one or two with my prior employer.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    Q.    And starting with the depositions
2  for Endo, can you tell me the subject matter of
3  the lawsuits that the depositions took place in?
4    A.    Sure.  To the best of my
5  recollection, they were either patent litigation
6  or there were two actual anti-trust cases, and
7  that's, I think, a complete record.
8    Q.    My understanding is you did
9  testify before in an FTC proceeding.  That was
10  an in court proceeding, right?
11    A.    Correct, yes.
12    Q.    Did you also testify in
13  deposition, or are you counting that as one of
14  the depositions I asked you about?
15    A.    I'm counting that as one of the
16  depositions in front of the FTC, yes, yes.
17    Q.    Okay.  All right.  And that
18  was -- that was the Impax matter, correct?
19    A.    The FTC was involved in Impax and
20  I think it also involved Lidoderm as well, if
21  I'm recalling correctly.
22    Q.    All right.  Other than patent
23  litigations and anti-trust litigations, did you
24  testify in any other proceedings when you were

Page 15

1  with Endo?
2    A.    No, I believe that's complete.
3    Q.    Did you testify before the New
4  York Attorney General?
5    A.    No, I did not.
6    Q.    Did you submit written testimony
7  or declaration?
8    A.    I don't recall.  I may have.  I'm
9  not sure.
10    Q.    All right.  And you said that
11  other than testimony with respect to your work
12  with Endo, you also testified for some prior
13  employers.  Can you tell me about those?
14    A.    Sure.  GlaxoSmithKIine was my
15  prior employer for the majority of my career.
16  There were two, I believe, depositions.  One was
17  a patent case, intellectual property case, and
18  then quite a bit earlier I was a witness in an
19  employee relations age discrimination case,
20  again, with regards to my employment there.  I
21  wasn't involved in the case.  I was a deponent.
22    Q.    So you've testified a number of
23  times, so I'm sure you're quite familiar with
24  the process, and counsel has, I'm sure, prepared

Page 16

1  you well, but just so we can go over a couple of
2  ground rules for today.
3    Probably most important is that
4  we try to not speak over each other because Peg,
5  our court reporter, needs to be able to take
6  down our words, so I'm going to try to not speak
7  over your answers, if you could wait until I
8  finish my questions, and that way we can keep it
9  straight for the court reporter.
10    Does that work for you?
11    A.    Sure.  I will do my best.
12    Q.    Thanks.  The other thing is,
13  again, for the court reporter, we do need to
14  have actually oral responses, not shaking head
15  or uh-huh or uh-uhs.  We need to actually put
16  words on the piece of paper.
17    Does that work for you?
18    A.    Yes, I understand.
19    Q.    Okay, great.  And then if at any
20  point today you don't understand one of my
21  questions, would you please let me know?
22    A.    Yes, I will.
23    Q.    Thank you.  Is there any reason
24  that you can't give your best testimony today?

Page 17

1    A.    No, I don't think so.
2    Q.    Not taking any medication that
3  would affect your cognitive abilities, for
4  example?
5    A.    That's correct.
6    Q.    That's correct that you're not
7  taking any?
8    A.    It's correct I am not.
9    Q.    Okay, thank you very much.
10    If you'll look at Exhibit Number
11  1, this is the Notice of Deposition of Brian
12  Lortie.
13    Are you aware that you are here
14  today to testify as a representative for Endo on
15  certain topics?
16    A.    I am, yes.
17    Q.    And are you aware you're also
18  here to testify today in your personal capacity?
19    A.    Yes.
20    Q.    Are you represented by counsel
21  today?
22    A.    I am.
23    Q.    Who is that?
24    A.    Counsel to my left from Goodell,

5 (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  as well as Carrie Hazard from Endo.
2  Q.  Okay.  And can you just briefly
3  go over what I understand to be the topics that
4  you are to be representative on today, and I'll
5  ask you let me know if you understand these to
6  be the topics as well.
7  So the first topic --
8  MR. LIMBACHER:  Jen, I don't mean
9  to interrupt.
10  MS. SCULLION:  No, please.
11  MR. LIMBACHER:  Just for purposes
12  of the record, I think Endo has served
13  objections to the 30(b)(6) notice, and I
14  think there's also been considerable
15  correspondence back and forth between
16  counsel with regard to the scope of the
17  topics on which he has been designated.
18  So if there's any issues or concerns
19  there, I'm happy to discuss it with you,
20  but I think you know the basic scope on
21  which he is being presented as a
22  30(b)(6) witness.
23  MS. SCULLION:  And I'd just like
24  to confirm it with the witness.  I agree

Page 19

1  with those statements.
2  BY MS. SCULLION:
3  Q.  So the first topic is any
4  analysis of the effectiveness of Endo's sales or
5  marketing efforts, including any analysis of
6  return on investment in sales or marketing
7  activities related to Endo's opioid products.
8  Do you have an understanding that
9  you're testifying on those topics?
10  A.  Yes.  Is that -- I mean, I see
11  that the topics are listed by number here.  Can
12  I also take a look at the subpoena, just so
13  I'm --
14  Q.  The subpoena is actually
15  different, and we will get to that.  The
16  subpoena is directed to you in your personal
17  capacity.
18  A.  Okay.
19  Q.  And we will get to that.
20  What I just recited was
21  identified as topic number 9, and you said, yes,
22  you understand you're going to be testifying on
23  that topic?
24  A.  Yes, I was just accustomed to

Page 20

1  seeing it in writing, so but, yes, that sounds
2  like number 9.
3  Q.  And the next topic, which is
4  topic number 13, is the process for determining
5  the accuracy, completeness and legality of and
6  approval and implementation of any sales or
7  marketing information Endo made available to
8  medical professionals, patients or the public
9  concerning opioids or any of Endo's opioid
10  products in any format, including printed
11  materials, videos, websites, any in-person
12  messaging or detailing by sales representatives.
13
14  Do you understand that you're
15  going to be testifying as to that process,
16  generally?
17  A.  Yes, yes.
18  MR. LIMBACHER:  Jen, just so
19  we're clear on the record, he'll be
20  testifying consistent with and subject
21  to the objections that Endo has served
22  you with with regard to the 30(b)(6)
23  notice and also within the scope of what
24  we have identified as appropriate areas

Page 21

1  for testimony with regard to each of
2  these topics, and that's been set forth
3  in considerable e-mail between I believe
4  yourself and Josh Davis.
5  MS. SCULLION:  And you'll let me
6  know, obviously, you'll make an
7  objection if you think it's outside the
8  scope.
9  BY MS. SCULLION:
10  Q.  With respect, though, to the
11  claims in marketing information concerning
12  Endo's opioid products, do you also understand
13  that you are prepared to testify to certain
14  specific claims that we provided to counsel to
15  testify to just what was the support for those
16  claims?
17  A.  Yes, I understand that.
18  Q.  Okay.  And we have a chart that
19  we've been provided with, and we can walk
20  through some of that.
21  The next two topics that are
22  quite similar, and they relate to the applicable
23  policies, procedures, records and systems for
24  abuse and diversion issues at Endo.  And on that

6  (Pages 18 to 21)

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    what we've agreed to is that you be prepared to
2    testify to the substance of the reasons for any
3    changes to those policies or procedures, the
4    effectiveness of those policies or procedures.
5         And then topic 32 also goes to
6    the procedures, record systems, training
7    policies for ensuring compliance with abuse and
8    diversion laws and regulations and, again, the
9    substance of any reasons for any changes to
10   those and the effectiveness of compliance
11   procedures.
12        Do you understand you're
13   testifying to those issues as well?
14        MR. LIMBACHER:  Let me just
15        object, because I don't know that you
16        accurately characterized Endo's position
17        with regard to what he's actually going
18        to be designated to testify on with
19        regard to topics 30, 31 and 32.  The
20        general subject matter you have
21        accurately described, but in terms of
22        the specifics of what he's prepared to
23        testify to, I believe you misstated, but
24        having said that, you can answer the

Page 23

1    question, as best you can.
2         MS. SCULLION:  Well, on that we
3         probably should then take a break,
4         because I'm reading from language from
5         an e-mail I sent to Josh Davis and that
6         he confirmed.  So I do want to be sure
7         that we are on the same page on that.
8         So let's finish this, and then, I think,
9         take a quick break because I do want to
10        make sure that we're on the same page.
11   BY MS. SCULLION:
12        Q.    You also would speak to the role
13   of wholesalers, distributors and pharmacies in
14   monitoring for abuse and diversion?
15        A.    Yes.
16        MR. LIMBACHER:  Topic 31.
17        MS. SCULLION:  Thirty-one, yes.
18        THE WITNESS:  Yes.  And I believe
19        there's a call out one exception to
20        that, where another witness has been
21        designated as corporate representative
22        for one of the topics or one of the
23        subtopics.
24   BY MS. SCULLION:

Page 24

1         Q.    Right.  Is it your understanding
2    that a separate representative will be speaking
3    to suspicious order monitoring procedures?
4         A.    Yes, that's my understanding.
5         Q.    Okay.  That's my understanding as
6    well, so good.
7              And then topic 39 is any effort
8    you made directly or through any third party to
9    collaborate with one or more other
10   pharmaceutical manufacturers or distributors
11   concerning marketing, use, prescribing, sale,
12   distribution or regulation of any one or the
13   class of opioid products, including any
14   collaborative lobbying efforts concerning any of
15   the foregoing.
16             And do you understand you're
17   prepared to testify to that topic as well?
18        A.    I do.
19             MS. SCULLION:  Why don't we take
20        a short break, because I do want to
21        clarify the record on topics 30 and
22        32.  I apologize.
23             THE VIDEOGRAPHER:  Off the
24        record, 9:18 a.m.

Page 25

1    (Brief recess.)
2         THE VIDEOGRAPHER:  We are back on
3    the record at 9:37 a.m.
4         MS. SCULLION:  So we went off the
5    record and had a discussion with
6    Mr. Limbacher, and, Mr. Limbacher, will
7    you confirm that my description of the
8    topics for Mr. Lortie in 30 and 32 --
9    30, 31 and 32 are accurate?
10        MR. LIMBACHER:  I believe that is
11   consistent with the e-mail exchanges
12   between Mr. Davis and yourself, but we
13   stand by whatever is in those e-mails
14   and, also, our objections to the
15   30(b)(6) notice.
16        MS. SCULLION:  Okay.  And it's
17   our understanding that the objections
18   have been addressed through the e-mail
19   exchange.  We won't burden the record
20   further on that.
21   BY MS. SCULLION:
22        Q.    Mr. Lortie, can you look at
23   Exhibit Number 2, which is the subpoena?
24        A.    Yes.

7  (Pages 22 to 25)

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    Q.    Have you seen the subpoena
2  before?
3    A.    Yes, I have.
4    Q.    And do you understand it was
5  directed to you personally?
6    A.    I do, yes.
7    Q.    Okay.  And the subpoena, if you
8  will turn to page 2, has categories of documents
9  that were requested.
10        Did you search your personal
11  records for these documents?
12    A.    I don't have any personal records
13  with regards to this, but I was asked to confirm
14  that, yes.
15    Q.    Okay.  And that includes looking,
16  for example, at personal e-mails?
17    A.    Correct.
18    Q.    Okay.  Terrific.  We can put
19  aside Exhibit.
20  Number 2.
21        This morning we were handed a
22  copy of your CV.
23        Let me hand you a copy that's
24  been marked Exhibit Number 3.

Page 27

1        (Document marked for
2        identification as Endo-Lortie Deposition
3        Exhibit No. 3.)
4  BY MS. SCULLION:
5    Q.    Do you recognize Exhibit Number
6  3?
7    A.    I do.
8    Q.    And what is it?
9    A.    It's a current copy of my resume.
10    Q.    This is a resume you prepared?
11    A.    It is.
12    Q.    And, to the best of your
13  knowledge, it's accurate?
14    A.    Yes.
15    Q.    Okay.  We can go back, start at
16  the beginning.  As we were discussing off the
17  record, you have an undergraduate degree from BU
18  and that's a pre-med degree, correct?
19    A.    It is correct, yes.
20    Q.    And then you went on to Villanova
21  for business school?
22    A.    I did, yes.
23    Q.    And in terms of your employment
24  history, looks like the entirety of your career

Page 28

1  has been spent in the pharmaceutical industry,
2  correct?
3    A.    That is correct.
4    Q.    And you started off at SmithKline
5  in 1987, and, as I read your resume, you joined
6  Endo in July of 2009; is that correct?
7    A.    It's actually 1986.
8    Q.    I'm so sorry.
9    A.    Just to correct the record, when
10  I began with SmithKline, but you're correct,
11  2009 was when I joined Endo.
12    Q.    Okay.  And before joining Endo,
13  had you had any experience with marketing or
14  sales of controlled substances?
15    A.    No.
16    Q.    Did any of your prior -- any of
17  your work before Endo concern any pain products?
18    A.    No, it did not.
19    Q.    And at Endo, so you began in July
20  of 2009 as senior vice president and general
21  manager for branded pharmaceuticals.
22        And then you were promoted to
23  president for US branded pharmaceuticals in May
24  of 2014, correct?

Page 29

1    A.    That's correct.
2    Q.    And then you were promoted again
3  to president and CEO -- I'm sorry, I got that
4  wrong entirely -- and then you left Endo in
5  October 2016, correct?
6    A.    That is correct, yes.
7    Q.    All right.  Before we go back
8  into that, can we have Exhibit Number 4.
9        (Document marked for
10        identification as Endo-Lortie Deposition
11        Exhibit No. 4.)
12  BY MS. SCULLION:
13    Q.    Hand you Exhibit Number 4 Bates
14  stamped ENDO_OPIOID_MDL_DEPONENT-000019346.
15        Do you recognize Exhibit Number
16
17
18
19
20
21
22
23
24

8  (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review



BY MS. SCULLION:

Highly Confidential - Subject to Further Confidentiality Review

Page 34



Page 36

1  I'd caution the witness not to
2  inadvertently disclose any privileged
3  communications, but you can go ahead and
4  answer the question.
5      THE WITNESS:  No.  All of my work
6  done has been in preparation for this
7  deposition with regards to this
8  litigation.
9  BY MS. SCULLION:
10      Q.    And to make sure just more
11  broadly, since leaving Endo, have you been paid
12  for your time by Endo in connection with
13  anything other than this litigation?
14      A.    Only other litigation, which we
15  described before, other depositions in the same
16  fashion.
17      Q.    Okay.  Do you have any -- other
18  than the Separation Agreement, which is Exhibit
19  4, do you have any other current agreements with
20  Endo?
21      A.    I do not.
22      Q.    Do you have any current financial
23  interest in Endo?
24      A.    I still remain a shareholder, so

Page 35

Page 37

1  I own some equity, but, other than that, no.

11  sure, I've asked a series of questions about
12  your relationships with Endo, do you have any
13  current relationship with Par, Par
14  Pharmaceuticals?
15      A.    Not -- no.
16      Q.    And do you have any -- so no
17  current agreements, correct?
18      A.    That's correct.
19      Q.    And no current financial
20  relationship with Par?
21      A.    That's correct.
22      Q.    Okay.  Let's go back to your CV,
23  Exhibit Number 3, and focusing on your time at
24  Endo.  It says here that you were -- on page 2

19      Q.    Okay.  Other than preparing for
20  today's deposition and being here today as
21  Endo's corporate representative on certain
22  topics, have you provided any other cooperation
23  to Endo in connection with this litigation?
24      MR. LIMBACHER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1   that you were a member of the executive
2   leadership team.
3           What was that?
4       A.    Yes, and, again, I should point
5   out just for accuracy, that period described
6   2009 through 2014, my job responsibilities
7   evolved over time, more things were added and at
8   the -- I would say around the middle of 2013, I
9   was named to the executive leadership team.  The
10  executive leadership team was essentially the
11  senior leaders of the corporation, for the most
12  part, direct reports of the CEO.  And there were
13  periods of time there where I was a direct
14  report.  There were also some periods of time
15  there where there was a chief operating officer
16  that I reported to and that person reported to
17  the CEO.
18      Q.    Do you know which period of time
19  you reported to a chief operating officer?
20      A.    The first chief operating officer
21  I reported to in, if I recall correctly, March
22  of 2011, and I believe she left in May of 2013.
23  From May of 2013, if my recollection is correct,
24  until around August or September of 2013, I

Page 39

1   reported to the chief executive.
2           Then another chief operating
3   officer was recruited and I reported to him
4   until sometime in 2014, when he departed.  I
5   don't recall the exact date.
6           And from that point forward until
7   the end of my employment with Endo, I reported
8   directly to the chief executive.



Page 40

11      Q.    During the time that you were
12  employed by Endo, I want to make sure I
13  understand, were you ever a member of the PMRB?
14      A.    I was not a direct member of the
15  PRB, although those who were reporting to me or
16  reporting up through my business were sitting
17  members on that team.
18      Q.    But you, yourself were not a
19  member of the PMRB?
20      A.    I believe I was not directly
21  myself.
22      Q.    And we'll talk a little bit in
23  more detail about PMRB in a bit, but, similarly,
24  you, yourself, were not a member of MARC,

Page 41

1   correct?
2       A.    Correct, same answer with regards
3   to MARC.  MARC was really an evolution of PMRB.
22      Q.    Okay.  Did you ever sit on any
23  compliance committee at Endo?
24           MR. LIMBACHER:  Object to form.

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1        THE WITNESS:  I'm -- I don't
2   recall specifically.  Of course, I was
3   well involved with our compliance
4   officer and familiar with the activities
5   and the requirements of that, but
6   whether or not I actually sat on a
7   compliance committee, sitting here
8   today, I don't recall.
9   BY MS. SCULLION:
10
11
12
13
14
15
16
17
18
19   point of clarification in terms of the scope of
20   your testimony as a corporate representative
21   today, we've been speaking of Endo.  There was a
22   period of time when Qualitest was a subsidiary
23   of Endo, correct?
24        A.    Yes.

Page 43

1        Q.    And are you going to be speaking
2   today about the policies and procedures at
3   Qualitest with respect to abuse and diversion
4   issues?
5        MR. LIMBACHER:  Object to form.
6        THE WITNESS:  I am most familiar
7   and prepared extensively on those that
8   pertain to the branded business, which
9   was my area of responsibility, and the
10   company involved Qualitest was actually
11   the result of an acquisition, and there
12   were some distinctions there and some --
13   frankly some personnel that we were able
14   to take advantage of, but I'm not
15   specifically prepared to testify in
16   depth to Qualitest's policies and
17   procedures.
18   BY MS. SCULLION:
19        Q.    Okay.  And the Qualitest
20   functions were eventually moved over to Par
21   after the Par acquisition, correct?
22        A.    Yes, that's correct.  Qualitest
23   was a generic business, and so either as a
24   stand-alone or when Par came in as an extension

Page 44

1   or expansion of our generic business, they were
2   put together.
3        Q.    Okay.
4        MS. SCULLION:  Can I have the
5   open letter.
6        MR. LIMBACHER:  Jen, I assume
7   we're going to handle this one the way
8   we handled Kristin Vitanza's deposition.
9   You will let us know on the record when
10   you're going to be asking him questions
11   in his capacity as a 30(b)(6) witness,
12   and then when you finish those
13   questions, you'll let us know that
14   you've finished and to the extent
15   there's any uncertainty, we will assume
16   that he is being questioned in his
17   capacity as a fact witness.
18        MS. SCULLION:  Yes.
19        MR. LIMBACHER:  Thank you.
20        MS. SCULLION:  Thank you.
21   BY MS. SCULLION:
22        Q.    And if you ever have any
23   questions during the day about what capacity I'm
24   asking you questions in, please, again, just let

Page 45

1   me know.
2        A.    I will ask for clarification.
3   Thank you.
4        (Document marked for
5   identification as Endo-Lortie Deposition
6   Exhibit No. 5.)
7   BY MS. SCULLION:
8        Q.    Let me hand you a copy what's
9   marked as Exhibit Number 5, which is a document
10   taken from Endo's website entailed "Endo's Open
11   Letter on the Opioid Abuse Crisis."
12        And, Mr. Lortie, if I can direct
13   your attention to the second paragraph, which
14   discusses, The US FDA has worked to balance
15   access to pain care medications for appropriate
16   patients while aggressively mitigating the risks
17   of opioid abuse.
18        And the next sentence "Endo
19   supports these efforts and has taken parallel
20   actions."
21        Let me ask you this question:  As
22   Endo's corporate representative, are you
23   familiar with the actions that Endo has taken,
24   the parallel actions Endo has taken to mitigate

12  (Pages 42 to 45)

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1    the risks of opioid abuse?
2         MR. LIMBACHER:  Object to form.
3    Take your time and review the document.
4         THE WITNESS:  Yeah, I just --
5    this letter actually, I believe, came
6    out after I left the company, but if I
7    could just take a second just to read it
8    for context.
9         MS. SCULLION:  Yes, please.
10        THE WITNESS:  Thank you.
11        MR. LIMBACHER:  And you're
12   questioning him with regard to which
13   topic?
14        MS. SCULLION:  I believe this
15   would be topic at least 30, likely 32.
16   Again, I think those two bleed together.
17        (Witness reviews document.)
18        THE WITNESS:  Okay, thank you.
19   I've had a chance to look it over.
20   BY MS. SCULLION:
21   Q.    Terrific.
22        MR. LIMBACHER:  Sorry, Jen.  Just
23   note my objection to the extent the
24   exhibit that you're questioning him

Page 47

1    about I think goes beyond the scope of
2    topics 30 and 32, but you can go ahead
3    and ask your questions.
4         MS. SCULLION:  Well, we really do
5    need to understand that, because this
6    does speak to parallel actions to
7    mitigate the risks of opioid abuse, and
8    topic 30 does speak to policies and
9    procedures to, among other things, halt
10   abuse.  So our understanding is this
11   falls squarely within the scope of the
12   topic.
13        MR. LIMBACHER:  It also goes on
14   to talk about things like, for example,
15   the voluntary withdrawal of Opana ER
16   from the market, which I think is beyond
17   the scope of the topics and also is
18   beyond the time period in which he was
19   an employee at the company.
20        MS. SCULLION:  I mean, to the
21   extent that Endo has identified these
22   actions as being actions to mitigate the
23   risks of opioid abuse, again, I think
24   they fall squarely within the topic, and

Page 48

1    I understand he was not at the company,
2    but he is here today as the corporate
3    representative on those issues, but let
4    me just ask you.
5    BY MS. SCULLION:
6    Q.    Are you prepared today to testify
7    as Endo's corporate representative with respect
8    to the -- what's described here some of -- as
9    the parallel actions Endo took to mitigate the
10   risks of opioid abuse?
11        MR. LIMBACHER:  Well, he's
12   prepared to testify consistent with the
13   e-mail exchanges between counsel and
14   subject to the objections to the
15   30(b)(6) notice.
16   BY MS. SCULLION:
17   Q.    Let me ask you, as Endo's
18   corporate representative, did Endo voluntarily
19   stop promoting opioid products to healthcare
20   professionals as one aspect of mitigating of the
21   risks of opioid abuse?
22        MR. LIMBACHER:  I'm going to
23   object to that question as being beyond
24   the scope of the topics on which he has

Page 49

1    been designated and as agreed upon
2    between counsel in e-mails, but he can
3    go ahead and answer the question.
4
5
6
7
8
9
10
11
12
13
14
15
16
17   Q.    So if I understand, you're not
18   prepared to testify today as Endo's corporate
19   representative to that particular action
20   identified as an action Endo took to mitigate
21   the risks of opioid abuse?
22        MR. LIMBACHER:  Again, I'm going
23   to object to the question to the extent
24   it's beyond the scope of the topics on

13  (Pages 46 to 49)

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1   which he's been designated, but you can
2   go ahead and answer the question.
3       THE WITNESS:  I've prepared to
4   discuss the many things that Endo had in
5   place, not just from September 2016
6   onward but really back even predating my
7   arrival and able to discuss those things
8   in detail.  Endo has always been
9   committed to taking whatever steps it
10  could to mitigate abuse, diversion,
11  improper prescribing, et cetera.
12      But to the specifics around the
13  decision to be permanently -- to
14  permanently stop promoting Opana ER as
15  referred to here, there's a limit to
16  which I can represent anything there
17  because it happened after I had
18  departed.
19      MS. SCULLION:  I think we'll get
20  back to the preparation for being a
21  corporate rep, but just to make sure I
22  understand the lines being drawn here,
23  counsel, is it your position that steps
24  Endo took to mitigate the risks of

Page 51

1   opioid abuse are beyond the scope of the
2   topics here.
3       MR. LIMBACHER:  No.  My position
4   is that he's prepared to testify
5   consistent with the e-mail exchanges
6   that you entered into with Mr. Davis.
7   He's here to testify with regard to the
8   policies regarding diversion, and I
9   think that questions with regard to the
10  voluntary withdrawal, which postdate his
11  employment at the company, are outside
12  the scope of the topics on which he has
13  been designated.
14      MS. SCULLION:  I apologize for
15  burdening the record, but are you saying
16  he is designated solely with respect to
17  the issue of diversion, because our
18  understanding is he was designated with
19  respect to both diversion and abuse?
20      MR. LIMBACHER:  He's -- yes, he's
21  here to testify with regard to diversion
22  and abuse with regard to topic number
23  30, I believe.
24      MS. SCULLION:  Correct.  And so

Page 52

1   steps that Endo took to mitigate abuse,
2   how do those not fall squarely within
3   the scope of the topic?
4       MR. LIMBACHER:  How does what?
5   I'm confused by what your question is of
6   me at this point in time.
7       MS. SCULLION:  The question is
8   why he would not be prepared to speak
9   to -- as a corporate representative to
10  speak to Endo's actions taken to
11  mitigate the risks of opioid abuse.
12      MR. LIMBACHER:  He is prepared to
13  testify about that.  The point I've been
14  trying to make, counsel, is that I think
15  it's beyond the scope of the agreements
16  that have been entered into between
17  counsel that he's here to talk about
18  the -- what led up to the voluntary
19  withdrawal of the product after he left
20  the company.
21      MR. TOLIN:  And, Jen, I'd add
22  topic 48 states your decisions to
23  discontinue original Opana ER and
24  withdraw reformulated Opana ER from the

Page 53

1   market, it seems to me your specific
2   question with respect to this letter
3   would apply to topic 48 and not the
4   topics on which he was designated.
5       MS. SCULLION:  So I disagree.  I
6   mean, the topic you just read, Adam, is
7   specific to Opana ER.  The topics 30 and
8   32 speak more generally to opioid
9   products, as does the open letter, which
10  goes beyond the withdrawal of Opana ER
11  to stop -- Endo voluntarily having
12  stopped promoting opioid products to
13  healthcare professionals as an action to
14  mitigate the risks of opioid abuse.
15      I don't want to burden the record
16  further.  It is our position that this
17  is an area that Endo was obligated to
18  provide a corporate representative on.
19  We are prepared to take testimony on
20  these issues today, and whether we do it
21  during a break or otherwise, we'll need
22  to take this up with the special master.
23      MR. LIMBACHER:  Well, he's
24  prepared to testify consistent with the

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1    e-mail exchanges between counsel on the
2    processes that were in place to deal
3    with suspected abuse or diversion
4    consistent with the language of topic
5    number 30 in your 30(b)(6) deposition
6    notice.
7        He's not prepared and there's
8    nothing, I don't think, in the e-mail
9    exchanges to suggest that he should be
10   prepared to talk specifically about the
11   topic number 48 in your deposition
12   notice.  That is not a topic on which he
13   has been designated.
14       MS. SCULLION:  All right.  We're
15   going to have to do this on the record,
16   I apologize.  Topic 48 is about the
17   withdrawal of Opana ER.  The topics on
18   which Mr. Lortie has been designated are
19   with respect to abuse, mitigation of
20   abuse, more generally, for opioid
21   products, and he is, as per the e-mail,
22   to be testifying to the substance of any
23   changes in those policy and procedures
24   and the reasons for those changes and

Page 55

1    the effectiveness of the policies and
2    procedures.
3        And it's evident here that Endo
4    made a policy decision as part of its
5    efforts to mitigate the risks of opioid
6    abuse, a policy decision to stop
7    promoting opioid products to healthcare
8    professionals, and so I am entitled to a
9    corporate representative on that issue.
10       If he's not -- if Mr. Lortie is
11   not prepared or has not been prepared to
12   speak to that topic today, we will need
13   to have a representative prepared to
14   come back.
15       MR. LIMBACHER:  He's prepared to
16   testify on topics 9, 13, 30, 31, 32 and
17   39, consistent with the e-mail exchanges
18   between counsel.
19       He is not prepared to testify,
20   for example, with regard to topic number
21   48.
22       MS. SCULLION:  I think we're
23   talking past each other.
24   BY MS. SCULLION:

Page 56

1        Q.    So, Mr. Lortie, let me ask you,
2    so we can shortcut, I think, this dispute.
3        In Exhibit Number 5 in the second
4    paragraph, Endo describes a number of what it
5    calls parallel actions it has taken to mitigate
6    the risks of opioid abuse.  One is it says
7    voluntarily stop promoting opioid products to
8    healthcare professionals, correct?  I'm just
9    asking what it says.
10       A.    Yes, that's correct.
11       Q.    Okay.  And it says it "eliminated
12   the company's entire pain product sales force,"
13   correct?
14       A.    That's what it says, correct.
15       Q.    It also does say, "Endo
16   voluntarily withdrew Opana ER from the market,"
17   correct?
18       A.    That's correct.
19       Q.    "Discontinued the research and
20   development of new opioid products", correct?
21       A.    That's correct.
22       Q.    "And implemented additional
23   anti-diversion measures," correct?
24       A.    Yes, correct.

Page 57

1        Q.    "Including product serialization
2    aimed at thwarting counterfeiting and theft to
3    protect patient safety."
4        Did I read that correctly?
5        A.    You did, you read all of those
6    correctly, and, again, it's describing those as
7    actions taken "since," I'm reading from the
8    document here, "our new executive leadership
9    team began working together in September 2016."
10       So, yes, you read that correctly.
11       Q.    Are you prepared as Endo's
12   corporate representative today to speak to any
13   of those actions Endo took to mitigate the risks
14   of opioid abuse?
15       MR. LIMBACHER:  Jen, he's
16   prepared to testify consistent with what
17   I've described now repeatedly.  He's
18   here to testify specifically with regard
19   to topics 30, 31 and 32 as limited by
20   the e-mail exchanges between counsel.
21       To the extent Exhibit 5
22   references issues and topics and conduct
23   that falls outside the scope of the
24   agreements that counsel have arrived at

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    with regard to topics 30, 31 and 32, he
2    is not prepared to testify as to that.
3         You can ask him questions, but
4    that's beyond the scope of what was
5    agreed to.
6   BY MS. SCULLION:
7    Q.    So I'm just trying -- I'm trying
8   to make sure I understand because counsel has
9   not been clear about what is the difference
10  between my understanding of the scope and his
11  understanding, so I'm trying to understand what
12  you are or are not prepared to testify to today.
13  Let's take one particular example.
14        Can you identify for me today
15  what the additional anti-diversion measures are
16  that are referenced in this second paragraph of
17  Exhibit 5?
18        MR. LIMBACHER:  Object to form,
19    object to the extent it's beyond the
20    scope of topics on which he's
21    designated, but go ahead and answer the
22    question.
23        THE WITNESS:  And I'm just going
24    to ask for clarification when you use

Page 59

1    the word "additional," because I don't
2    see that in here.  So are you referring
3    to those that are described that you
4    just read into the record and described
5    after occurring -- sorry -- occurring
6    after September 2016?
7   BY MS. SCULLION:
8    Q.    I am asking about steps taken
9   after September 2016, and if you'll look at the
10  second line from the bottom of that paragraph,
11  it indicates one of the things that happened
12  after September 2016 was Endo implemented
13  additional anti-diversion measures including
14  product serialization, and we read that, rest of
15  that sentence before.
16        Are you prepared as Endo's
17  corporate representative today to tell me what
18  those additional anti-diversion measures were?
19        MR. LIMBACHER:  That were
20    implemented after September of 2016?
21        MS. SCULLION:  That's correct.
22  BY MS. SCULLION:
23    Q.    Are you prepared to testify to
24  that today?

Page 60

1    A.    I am not, no.
2         MR. LIMBACHER:  I think that's
3    outside the scope of what he was
4    designated on.
5         MS. SCULLION:  Counsel, is it
6    your position it's outside the scope
7    because it's after September 2016?  I'm
8    not clear.
9         MR. LIMBACHER:  No, it's because
10   it's outside the scope of what you and
11   Mr. Davis agreed upon, which was for him
12   to be prepared to testify with regard to
13   the processes that were in place with
14   regard to suspected abuse and diversion.
15   So that's the basis for my objection.
16        MS. SCULLION:  Well, the topic
17   also speaks to policies and processes
18   with respect to halting diversion, and
19   anti-diversion measures clearly would be
20   halting diversion.  So it is our
21   position that this is square within the
22   topic that we need a representative on.
23   I understand, Mr. Lortie, you're not --
24   you've not been prepared on that today.

Page 61

1   BY MS. SCULLION:
2    Q.    Do you -- are you prepared to
3   speak to any policies Endo adopted after 2016
4   with regard to product serialization as one
5   anti-diversion measure?
6    A.    No, I'm not prepared for that,
7   no.  I thought actually that was your last
8   question of me so...
9    Q.    Trying to be a specific as I can.
10   A.    I understand.
11   Q.    And just to be clear, are you
12  able to speak to Endo's policy decision to
13  voluntarily stop promoting opioid products to
14  healthcare professionals as part of its
15  anti-abuse efforts?
16        MR. LIMBACHER:  And note my
17   objection as I believe that topic in
18   that question is beyond the scope on
19   which he has been designated.
20        THE WITNESS:  And I'm not
21   prepared.  Again, that happened after I
22   departed the company.
23  BY MS. SCULLION:
24   Q.    Okay.  Let's go back to then I

16  (Pages 58 to 61)

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1   want to ask you what did you do to prepare today
2   to testify as Endo's corporate representative on
3   Endo's policies and procedures with respect to
4   abuse and diversion, including efforts to ensure
5   compliance with applicable laws and regulations?
6       A.    Sure.  And, in fact, this is
7   consistent with how I prepared for all of the
8   topics I've been designated on.
9           I spent five or six days working
10  with counsel, reviewing documents.  I spoke to
11  two Endo employees to help refresh my
12  recollection of certain specific policies,
13  procedures or identify the way certain materials
14  had been used so I -- and I had considerable
15  homework each evening.
16          So, you know, I did my best to
17  bring myself back up to speed so that I could be
18  helpful today.
19      Q.    Which were the Endo employees
20  that you spoke with?
21      A.    We spoke with Kristin Vitanza
22  and, also, Brian Munroe, M-u-n-r-o-e.  I think
23  that was the only two people we spoke with, if I
24  recall.

Page 63

1       Q.    When did you speak with
2   Ms. Vitanza?
3       A.    Yesterday.
4       Q.    Approximately how long?
5       A.    How long did we --
6       Q.    Speak.
7       A.    15, 20 minutes.
8       Q.    Was that by phone or in person?
9       A.    By telephone.
10      Q.    And did Ms. Vitanza provide you
11  with information that will inform your testimony
12  today as Endo's corporate representative on any
13  of the topics we discussed?
14      A.    Yes, she did.
15      Q.    What information did you obtain
16  from Ms. Vitanza?
17      A.    I had some specific questions on
18  certain pieces of material, promotional
19  material.  I needed some help in understanding
20  and recalling how they had specifically been
21  used and with whom.  She was able to clarify
22  that.
23      Q.    Which pieces of material did you
24  speak about?

Page 64

1       A.    Specifically, there was a series
2   of patient profiles called clin cases, if I'm
3   recalling correctly.  I didn't recall how they
4   had been used, and given, I believe, some of the
5   claims that are in question came out of those, I
6   wanted to make sure I understood with whom they
7   had been used and in what form the claims had
8   been.
9       Q.    And what did Ms. Vitanza tell you
10  in that regard?
11      A.    She clarified that they had been
12  used as educational material with physicians, so
13  we considered them promotional materials, and,
14  therefore, those claims were subject to all of
15  the necessary safeguards to ensure that they
16  were well supported by medical evidence, they
17  had been cleared by our medical, legal and
18  regulatory team.
19      Q.    Did you discuss any other
20  promotional materials with Ms. Vitanza?
21      A.    No, those were the ones in
22  question.
23      Q.    Did you discuss any other topics
24  at all with Ms. Vitanza that inform your

Page 65

1   testimony today?
2       A.    No.  She was able to answer my
3   question.
4       Q.    Okay.  And Mr. Munroe, what did
5   you speak with him about?
6       A.    I asked him to refresh my
7   recollection as to the activities specifically
8   of the Pain Care Forum.  This was relative to
9   the topic number 39, I believe.
10      Q.    Did you only speak to him about
11  the Pain Care Forum?
12      A.    Yes.
13      Q.    When did you speak with
14  Mr. Munroe?
15      A.    That was also yesterday.
16      Q.    And was that by phone as well?
17      A.    Yes.
18      Q.    About how long on the phone?
19      A.    We were on the phone maybe 45
20  minutes or so, I think.
21      Q.    And what specifically did you
22  discuss with Mr. Munroe about the Pain Care
23  Forum?
24      A.    To the extent it related to topic

17  (Pages 62 to 65)

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  39, I wanted to understand the specifics of how
2  that group was organized, what were the
3  objectives of the group, who were the members to
4  the extent -- sorry, let me rephrase that.
5          To what extent was it formal or
6  informal, some of the history.  I was familiar
7  with the concept of the Pain Care Forum, but in
8  order to prepare adequately, I wanted to get
9  some specifics from him.
10      Q.    And what did he provide?  What
11  did he tell you about the specifics you asked
12  about?
13      A.    He reminded me that this was an
14  informal gathering of a number of stakeholders
15  in the -- that would be interested in the world
16  of pain medicine, policy, legislation,
17  manufacturers, patient representatives, et
18  cetera.
19          And, importantly, he reminded me
20  that it was informal, the agenda was open.
21  There were no positions taken by the Pain Care
22  Forum, et cetera.  I wanted clarity on
23  specifically some of those topics, so he was
24  able to remind me of what they did.

Page 67

1      Q.    In terms of the -- you said it
2  was a forum for a number of stakeholders you
3  said including manufacturers.
4          Do you know what other
5  manufacturers other than Endo of opioid products
6  were part of that forum?
7          MR. LIMBACHER:  Jen, just so
8      we're clear, I assume these questions
9      are questions he is being asked in his
10      capacity as a 30(b)(6) witness?
11          MS. SCULLION:  That's fine.
12          THE WITNESS:  So your question
13      again, please.
14  BY MS. SCULLION:
15      Q.    Sure.  Do you know which other
16  manufacturers other than Endo of opioid products
17  were members of the Pain Care Forum?
18      A.    The way it was represented to me
19  is that the membership was evolving and dynamic.
20  People would participate in some of the
21  meetings, not participate in others; that
22  literally the agenda, as well as the
23  participation was open.  So he specifically
24  indicated that to the extent that some people

Page 68

1  would call in on a teleconference line, they
2  were not required to identify themselves, so
3  he -- the point he was making is this was an
4  open forum to anyone that may be on any number
5  of the various facets of the topic were invited
6  to listen in, call in.  So, you know, some
7  manufacturers were there routinely.  He
8  mentioned that Purdue was often represented,
9  and, in fact, that the -- but we didn't speak
10  about -- he didn't identify any other specific
11  industry attendees, because, again, that
12  attendance was something that was fluid.
13      Q.    And did you speak with Mr. Munroe
14  about the relationship between the Pain Care
15  Forum and the American Pain Foundation?
16      A.    Not specifically.
17          MS. SCULLION:  I apologize.
18      We're having a technical difficulty.
19      Off the record.
20          THE VIDEOGRAPHER:  Off the record
21      at 10:22.
22          (Brief recess.)
23          THE VIDEOGRAPHER:  We are back on
24      the record at 10:37 a.m.

Page 69

1  BY MS. SCULLION:
2      Q.    Welcome back, Mr. Lortie.  You
3  understand you're still under oath, correct?
4      A.    I do.
5      Q.    Thank you.  We were speaking
6  about your discussion with Mr. Munroe, and you
7  explained your discussion of the Pain Care
8  Forum.
9          Is there anything else that you
10  discussed with Mr. Munroe?
11      A.    No, that was essentially it.
12      Q.    Okay.  And other than Ms. Vitanza
13  and Mr. Munroe, is there anyone else other than
14  counsel that you spoke with to prepare for your
15  deposition as Endo's corporate representative?
16      A.    No.
17      Q.    You said you spent five or six
18  days preparing for -- to be Endo's corporate
19  representative.
20          When was that?
21      A.    It's all been in the month of
22  January.  I can't remember.  We started on the
23  12th or 13th perhaps, and I spent considerable
24  time last weekend, I can tell you that.

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1          Q.    Okay.  And as we go through
2    today, I'll ask you whether you've reviewed
3    certain documents in connection with your
4    preparation, I think that's probably the most
5    efficient way to do that.
6    BY MS. SCULLION:
7          Q.    Other than looking at documents
8    with counsel, you said you did some home study
9    and speaking with Ms. Vitanza and Mr. Munroe, is
10   there anything else that you did to prepare to
11   testify as Endo's corporate representative
12   today?
13         A.    No, that's the complete list of
14   activities.
15         Q.    And then separate from preparing
16   to be Endo's corporate representative, is there
17   anything else that you did to prepare for
18   today's deposition?
19         A.    No, same activities helped me
20   prepare for both.
21         Q.    Did you discuss today's
22   deposition with anyone other than counsel?
23         A.    No.
24         Q.    Have you discussed this

Page 71

1    litigation with anyone other than counsel?
2          A.    I have not, no.
3          Q.    Okay.  And just so we can be
4    clear and I think move on in terms of the scope
5    of your preparation, can you just confirm for
6    me, are you prepared today to speak as Endo's
7    corporate representative on any of Endo's
8    anti-abuse policies that postdate the time you
9    worked with the company?
10         MR. LIMBACHER:  Jen, I think
11         we've been over this.  He is prepared to
12         testify with regard to abuse and
13         diversion on the topics on which he's
14         been designated consistent with the
15         e-mail exchanges between counsel.
16   BY MS. SCULLION:
17         Q.    Right.  I just want to confirm
18   because there's been some discussion about
19   things that happened after you left and things
20   that happened before.
21               Are you prepared, for example, to
22   testify as Endo's corporate representative with
23   respect to what Endo's current anti-abuse
24   policies are?

Page 72

1          A.    No, I'm not prepared to do that.
2          MR. LIMBACHER:  And I would
3    object as being beyond the scope of the
4    designations.
5          MS. SCULLION:  And we disagree
6    with that.
7    BY MS. SCULLION:
8          Q.    And then, similarly, are you
9    prepared to testify as to what Endo's current
10   anti-diversion policies are?
11         MR. LIMBACHER:  Same objection.
12         THE WITNESS:  I am not.  I
13   haven't been there for over two years,
14   so I can testify as to the activities
15   that were underway during my employment,
16   but not after.
17         MS. SCULLION:  Okay.  And, again,
18   we disagree with the objection as to
19   scope.
20               We're going to move on.  We think
21   we've made our position clear that these topics
22   do fall squarely within the agreed scope of the
23   topic.  I understand counsel has taken a
24   different position.  We will reserve our rights

Page 73

1    on that issue.
2    BY MS. SCULLION:
3          Q.    Going back to your personal
4    capacity.
5          A.    Thank you for the clarification.
6          Q.    When I asked you about Endo's
7    open letter, Exhibit 5, and the reference to
8    Endo voluntarily stopping promoting opioid
9    products to healthcare professionals as a means
10   of mitigating the risk of opioid abuse, you
11   began to discuss it sounds like steps along
12   those lines that did take place while you were
13   with Endo.  You've mentioned, I think,
14   ratcheting down on the promotion of opioid
15   products.
16               Can you tell me what -- were
17   there any steps that Endo took while you were
18   with Endo to limit promotion of opioid products
19   as a means of mitigating opioid abuse?
20         MR. LIMBACHER:  Object to form.
21         THE WITNESS:  To be clear, there
22   were a number of steps that Endo took to
23   reduce promotion generally after I
24   arrived, across all product categories,

19 (Pages 70 to 73)

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    including opioids, but also,
2    importantly, including others.
3         I should also maybe point out
4    that for the majority of the time I was
5    there, promotion of the opioids was not,
6    to the best of my recollection,
7    anywheres near the most significant
8    recipient of promotional attention or
9    money.  But, generally, for business
10   reasons, we, I would say over the arc of
11   my time there, ratcheted down
12   promotional spend as well as detailing
13   across all products.
14        And it's in that context that I
15   was mentioning that there were times, in
16   fact, with regards to Opana ER where we
17   stopped promoting it because we were
18   launching alternative non-opioid
19   products but products that required
20   attention of the sales force, so that
21   was kind of what I was trying to
22   explain.
23   BY MS. SCULLION:
24        Q.    Can you tell me when did Endo

Page 75

1    stop actively promoting Opana ER?
2         MR. LIMBACHER:  Objection.
3    BY MS. SCULLION:
4         Q.    You just referenced a point in
5    time?
6         MR. LIMBACHER:  Object to form.
7         THE WITNESS:  Sure.  And, again,
8    just for clarification, they
9    obviously -- and this letter helps us
10   understand that they stopped permanently
11   at a period of time after
12   September 2016.
13        We had a period where Opana was
14   not actively being promoted, to the best
15   of my recollection, and that was most
16   likely sometime in 2014.  I don't recall
17   the specific dates of stopping and
18   restarting, but there was a period of
19   time there where we were launching a
20   newly acquired product and we made the
21   business decision to have the sales
22   force focus on the launch of that, and
23   we took them off of Opana ER.
24

Page 76

1    BY MS. SCULLION:
2         Q.    What was the newly acquired
3    product?
4         A.    This was a product called
5    Sumavel, S-u-m-a-v-e-l.  It was an injectable
6    product for the treatment of migraine.
7         Q.    And the decision to switch the
8    promotional efforts from Opana ER to focus more
9    on Sumavel, you said that was purely for
10   commercial reasons, correct?
11        A.    Yes.
12        Q.    It was not intended to mitigate
13   opioid abuse, correct?
14        A.    That's my recollection.
15        (Document marked for
16        identification as Endo-Lortie Deposition
17        Exhibit No. 6.)
18   BY MS. SCULLION:
19        Q.    Handing you what's been marked as
20   Exhibit Number 6.
21        MS. SCULLION:  And, I'm sorry,
22        what is the E number on this one?
23        MS. KUBLY:  1588.
24   BY MS. SCULLION:

Page 77

1         Q.    It's marked E1588 on the top
2    right-hand corner.
3         Do you recognize Exhibit Number
4    6, Mr. Lortie?
5         A.    No, I don't believe I've seen
6    this.
7         Q.    Okay.  So this was not --
8    obviously not something you reviewed in
9    connection with your preparation for today's
10   deposition, correct?
11        A.    I believe that's true.  I don't
12   recognize it.
13        Q.    Okay.  I'll represent to you that
14   it is a copy of what's labeled as the Endo
15   independent director's report of October 2018.
16   Again, this is a document we retrieved from
17   Endo's website, publicly available document.
18        If you could turn to what's page
19   1 of the document at the bottom.
20        MR. LIMBACHER:  Take your time
21        and review the document.
22   BY MS. SCULLION:
23        Q.    I'm going to just point you to
24   specific parts of the document.  If at any point

20  (Pages 74 to 77)

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    you think you need to review more, you can let
2    me know.
3         A.    Thank you.
4         Q.    Just looking at the top under
5    "Introduction," you will see it refers to "Since
6    its founding as a family business in 1920, Endo
7    International plc ("we," "Endo" or the
8    "Company") has evolved into a generics and
9    specialty branded pharmaceutical company with an
10   innovative suite of branded and generic
11   medications helping millions of patients lead
12   healthier lives."
13        Did I read that correctly?
14        A.    That's what it says here, yes.
15        Q.    And if you look briefly back at
16   Exhibit Number 5, which was the open letter.
17        And you see that open letter
18   again starts off similarly, "Since its founding
19   as a family business in 1920, Endo has evolved
20   into a generics and specialty branded
21   pharmaceutical company whose products help
22   millions of patients lead healthier lives."
23        Did I read that correctly?
24        A.    Yes, you did.

Page 79

1         Q.    When you were with Endo, did Endo
2    similarly promote its heritage going back to a
3    family business in 1920?
4         MR. LIMBACHER:  Object to form.
5         THE WITNESS:  No, it didn't.  In
6    fact, I'm somewhat surprised to read
7    that because that's not consistent with
8    what my understanding was, but, no, we
9    didn't promote that as part of the
10   company message.
11   BY MS. SCULLION:
12        Q.    Do you recall that there was a
13   business by the name of Endo that was founded
14   some decades prior to the Endo that you worked
15   for being founded?
16        A.    Yes, and I am aware of that in
17   history, and my understanding was that that was
18   a completely separate entity, even though the
19   name was the same name and the name was
20   readopted after the company was established in
21   1999 or 2000 as a spin out from DuPont Merck.
22   So my understanding was always that there was a
23   disconnection between the two, other than the
24   fact that they share a name.

Page 80

1         Q.    Is your understanding, though,
2    that the Endo entity that was founded, as you
3    said, as a spin-off of DuPont Merck that it
4    acquired a portfolio of products, product rights
5    from DuPont Merck?
6         MR. LIMBACHER:  Object to form
7    and foundation.
8         THE WITNESS:  Yes, that's my
9    understanding.
10   BY MS. SCULLION:
11        Q.    And among that portfolio, there
12   was Percocet; is that right?
13        A.    Yes, that's correct, that's my
14   understanding.
15        Q.    And are you familiar with
16   Numorphan?
17        A.    Not specifically, no.
18        Q.    Okay.  Do you recall that among
19   the portfolio of product rights Endo acquired
20   from DuPont Merck were rights with respect to
21   oxymorphone products?
22        A.    That I don't know in detail.  As
23   you said, I recognize that Percocet and the
24   Percocet products were part of the -- were part

Page 81

1    of the management led buyout, but beyond that, I
2    don't know what the specific products were.
3         Q.    Okay.  And Percocet, do you
4    recall that's an oxycodone APAP combination
5    product?
6         A.    Yes, I understand.
7         Q.    So going back to this Exhibit
8    Number 6, the Independent Directors' Report, I'd
9    like to get a sense from this again of what
10   areas of Endo's risk mitigation you're prepared
11   to testify to.
12        If you look to page 2 of the
13   document, you'll see under the heading that says
14   "Recent Risk Mitigation Efforts," this section
15   appears to discuss the efforts since
16   September 2016, we've already discussed that at
17   some length about whether you're prepared to
18   testify as Endo's rep on that.
19        But let me take you to the top of
20   the next page, page 3.
21        MR. LIMBACHER:  Jen, I'm a little
22   confused.  I thought when you handed him
23   this document you said you were going to
24   be asking him questions in his capacity

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    as a fact witness.  Are we now asking
2    him questions in his role as a 30(b)(6)
3    witness?
4         MS. SCULLION:  You're right.  I
5    have switched back to the 30(b)(6).
6    Thank you very much.
7    BY MS. SCULLION:
8         Q.    So now we're back in 30(b)(6)
9    land.
10        A.    Duly noted.  Thank you.
11        Q.    Keep saying we thought about
12   bringing actual hats, but that won't really work
13   too well.
14        So top of page 3, you see the
15   reference in the last line of the carryover
16   paragraph to "FDA's Risk Evaluation and
17   Mitigation Strategy ("REMS") program"?
18        A.    This is little (v) in that top
19   paragraph?
20        Q.    Yes.
21        A.    Yes, I see that.
22        Q.    At some point in time, Opana ER
23   was subject to a class wide REMS, correct?
24        A.    That's correct, yes.

Page 83

1         Q.    Are you prepared today to speak
2    to the policies and procedures that Endo adopted
3    to implement REMS with respect to Opana ER?
4         MR. LIMBACHER:  Just for the sake
5         of the record, to the extent that that
6         subject falls within the scope of the
7         topics on which he has been designated
8         consistent with e-mail correspondence
9         between counsel, he is prepared to give
10        that testimony.
11        And I believe we identified for
12        you yesterday some topics -- I'm
13        sorry -- some documents that he was
14        going to have in front of him, which, in
15        fact, he does have in front of him,
16        including, I think, the REMS document.
17        THE WITNESS:  Yes, that's my
18        understanding.  I will only say that I'm
19        not aware of what Endo may have done
20        since the time I left, so to the extent
21        that there are changes to it I'm not
22        aware of, I can't testify to those, but,
23        generally speaking, the REMS program I'm
24        prepared to testify on.

Page 84

1    BY MS. SCULLION:
2         Q.    Okay.  And then I think counsel
3    is also referring to a document which we'll look
4    at a little bit later, a RiskMAP.
5         Do you recall that prior to --
6    strike that.
7         Do you recall that REMS was
8    implemented for Opana ER as well as all of their
9    long-acting opioids in I believe 2012; is that
10   right?
11        A.    That's my understanding, yes.
12   That was an industry wide program that was put
13   into place that supplemented and followed but
14   didn't replace the RiskMAP.  RiskMAP had been in
15   place since 2007.
16        Q.    Right.  So you are prepared to
17   speak today to RiskMAP for Opana ER?
18        A.    I am and I also -- as counsel
19   pointed out, I have some of those documents in
20   front of me, so we can discuss those.
21        Q.    Right.
22        Are you prepared to speak to
23   Endo's RiskMAP with respect to its generic
24   OxyContin product?

Page 85

1         MR. LIMBACHER:  Object to the
2         form.
3         THE WITNESS:  I have not done
4         that, no.
5         MR. LIMBACHER:  I'm not sure that
6         falls within the scope of the topics on
7         which he's designated.
8    BY MS. SCULLION:
9         Q.    Did Endo -- do you recall that
10   Endo did for a period of time in 2004, I think
11   2004, 2006, sell a generic OxyContin --
12   oxycodone product, rather?
13        A.    For two reasons, one being that
14   that predated me by considerable time, and also
15   if it was a generic, that would have been on the
16   generic side of the business.  I don't really
17   have any particular information or knowledge on
18   that topic.
19        Q.    Oxycodone is an opioid product,
20   correct?
21        A.    Oxycodone is an opioid, yes.
22        MS. SCULLION:  Okay.  Counsel,
23        the topic was not limited to --
24        certainly was not limited to the branded

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    opioids. It's all opioid products.
2    That product was sold by Endo, not by
3    Qualitest, and we do need a corporate
4    representative to speak to Endo's
5    policies and procedures with respect to
6    addressing risks of abuse and diversion
7    with respect to generic OxyContin. I
8    understand the witness is not prepared
9    on that today. I'm not faulting him for
10   that. I'm just pointing it out so we're
11   going to reserve our rights on that.
12          MR. LIMBACHER: I'm not sure it
13   does fall within the scope of the topics
14   on which he's been designated.
15          MS. SCULLION: We'll take it up
16   off the record. The special master made
17   very clear this case involves the
18   generics as well.
19          MR. LIMBACHER: I'm not disputing
20   that. The issue is what topics he's
21   been designated on.
22   BY MS. SCULLION:
23      Q.   If you'll go down to the bottom
24   of that same page we were on, the last paragraph

Page 87

1    speaks to "the company" -- in this case Endo --
2    "maintains programs for overseeing and tracking
3    shipments for signals of potential diversion."
4          Do you see that sentence or that
5    portion of the first sentence?
6       A.   Yes, I see that.
7       Q.   Okay. Are you prepared today to
8    speak to Endo's programs to oversee and track
9    shipments for signals of potential diversion
10   with respect to any opioid products?
11      A.   I believe this falls under the
12   suspicious order management, so I am not
13   prepared on that. I think we've got somebody
14   else who is going to cover that.
15      Q.   Okay. That's one of the things I
16   did want to clarify.
17          MS. SCULLION: Counsel, is it
18   Endo's intention to have those issues
19   addressed by the representative
20   designated for suspicious order
21   monitoring.
22          MR. LIMBACHER: Specific to
23   overseeing and tracking shipments, I
24   think the answer is yes.

Page 88

1          MS. SCULLION: Okay. The reason
2    I ask is that's not our understanding of
3    what suspicious order monitoring
4    entails, but that's fine, as long as
5    there's going to be somebody to speak to
6    that aspect of anti-diversion.
7    BY MS. SCULLION:
8       Q.   Let's continue down in that same
9    paragraph. The next to last sentence on this
10   page begins "Endo's Pharmacovigilance."
11          Do you see that?
12      A.   Yes, I see that.
13      Q.   Okay. And this speaks to
14   pharmacovigilance and risk management reviewing
15   adverse event reports received via postmarketing
16   surveillance.
17          Are you prepared today to speak
18   to Endo's policies and procedures with respect
19   to those reviews?
20          MR. LIMBACHER: And, counsel,
21   consistent with the e-mail exchanges
22   you've had with Mr. Davis, he's prepared
23   to testify with regard to the process of
24   reviewing adverse event reports received

Page 89

1    postmarketing.
2          MS. SCULLION: Terrific.
3    BY MS. SCULLION:
4       Q.   Let me ask you this as Endo's
5    corporate representative: The reference here to
6    Endo's risk management department, do you know
7    at what point in time a risk management
8    department was established at Endo? Let me ask
9    a better question.
10          Do you know when a risk
11   management department was established that had
12   as part of its responsibilities reviewing
13   adverse event reports via post-marketing
14   surveillance?
15          MR. LIMBACHER: And you're
16   referencing the language at the bottom
17   of page 3 that talks about Endo's
18   pharmacovigilance and risk management
19   department?
20          MS. SCULLION: Good point. I had
21   separated those.
22   BY MS. SCULLION:
23   ███████████████████████████████
24   ███████████████████████████████

Highly Confidential - Subject to Further Confidentiality Review



Page 90

Page 91

1    Q.    If you'll go to the next page, 4,
2  under the heading "Historical and Existing
3  Compliance Measures."
4        So a similar question to what we
5  just talked about before, but the second
6  paragraph, which refers to, in quotes,
7  compliance department, Endo's Compliance and
8  Business Practices Department, it says (the
9  "Compliance Department").
10        Do you know when Endo established
11  that department?
12    A.    Endo had a compliance function,
13  chief compliance officer reporting to the CEO as
14  well as to the board during my entire career
15  there.
16        I don't recall specifically them
17  calling it the compliance and business practices
18  department, again, but the compliance function
19  was fully staffed and an important function
20  during all of my time there, and I assume it
21  continues.
22    Q.    Do you know when before your time
23  there a chief compliance officer position had
24  been established?

Page 92

1    A.    I don't know the specific date.
2  I know that there was a chief compliance officer
3  in place when I joined in 2009, and there
4  certainly was one there when I left in 2016.
5    Q.    Okay.  Let's go down to the next
6  paragraph, which speaks to Endo's robust
7  compliance program operated by the compliance
8  department has continued to evolve since its
9  establishment in 2004.
10        As Endo's corporate
11  representative, are you prepared today to speak
12  to what efforts, what compliance efforts were in
13  place at Endo prior to 2004 with respect to
14  opioid anti-abuse regulations and policies?
15        MR. LIMBACHER:  Object to form
16    and object to the extent it's beyond the
17    scope of the topics on which he has been
18    designated.
19        THE WITNESS:  Specifically, I
20    can't, I'm not prepared, I wasn't there.
21    To the extent that they represent things
22    that continued during my tenure, I can
23    certainly speak to that, but I can't --
24    I'm not prepared to speak about what

Page 93

1  happened prior to my arrival,
2  specifically five years prior to my
3  arrival here in this case.
4  BY MS. SCULLION:
5    Q.    And I asked you that question
6  with respect to compliance efforts for
7  anti-abuse regulations.
8        Is your answer the same with
9  respect to compliance efforts for anti-diversion
10  regulations and laws prior to 2004, are you
11  prepared to speak to those?
12        MR. LIMBACHER:  Object to form
13    and object to the extent it goes beyond
14    the scope of the topics on which he's
15    been designated.
16        THE WITNESS:  No, I am not
17    prepared to address those topics.
18        MS. SCULLION:  Counsel, Endo had
19    objected to time frame initially.  That
20    objection was resolved and the time
21    frame objection was withdrawn, largely
22    in response to the special master having
23    ruled that the generics business and
24    business other than just Opana ER was

24  (Pages 90 to 93)

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1       fairly part of this case and is
2       relevant.  So, again, I understand we
3       may have a difference of opinion.
4       Clearly, the witness is not prepared
5       and, again not faulting him, but we're
6       going to reserve our rights to seek
7       additional testimony on that period.
8               MR. LIMBACHER:  I think he's
9       prepared to testify with regard to the
10      abuse and diversion policies in place
11      that are reflected in the June of 2007
12      RiskMAP, which would predate his
13      employment at the company.  I don't know
14      that he's prepared to testify with
15      regard to policies that predate 2004.
16              MS. SCULLION:  Right.
17      BY MS. SCULLION:
18          Q.    You recall, though, that Endo was
19      actively marketing, for example, Percocet prior
20      to 2004?
21          A.    I'm not sure of the timing, but,
22      again, you've already established that that was
23      part of the company formation, so I think that
24      that's fair to say.  That was part of our, at

Page 95

1       that time, quite small generics business,
2       separate from branded, and, of course, it
3       predates me by five years.
4           Q.    Okay.  Let's go to the next page,
5       5, and I'm looking at the second full paragraph,
6       it begins "in February of 2014," second sentence
7       of that paragraph -- sorry, the paragraph is
8       discussing the corporate integrity agreement,
9       which we discussed earlier, correct?
10          A.    Yes, I see the paragraph.
11          Q.    Okay.  And the second sentence
12      says, "Pursuant to the CIA, Endo developed and
13      implemented a Field Force Monitoring Program
14      ("FFMP") to evaluate and monitor its sales
15      representatives' interactions with HCPs."



Page 96

Page 97

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 98

Page 100

1  designation of this RAMP, that's not a -- that's
2  not an acronym that I'm familiar with, so this
3  may have come together in the period of time
4  after I left.
5          Having said that, I can certainly
6  speak to activities related to promotional
7  activities, risk assessment activities
8  undertaken that I think is in here, but I can't
9  attest to whether or not that's complete under
10  this topic of RAMP because I don't recognize
11  what RAMP -- the complete details of what RAMP
12  may refer to.
13      Q.   Okay.  If you go to the next
14  page, 6, the heading "Review and approval of
15  promotional materials," you see this first
16  paragraph refers to the "Marketing and
17  Advertising Review Committee ("MARC")"?
18      A.   Yes.  Again, I'm going to just
19  take a minute and read the paragraphs here just
20  to orient myself.
21      Q.   Sure.
22      A.   (Witness reviews document.)
23          Okay, I've read that section.
24  Thank you.

Page 99

Page 101

paragraphs down, the paragraph begins, "The
compliance department has also implemented a
risk assessment and mitigation process (RAMP) to
standardize and centralize risk assessments
relating to promotional activities."
10          Are you prepared as Endo's
11  corporate representative to speak to the RAMP
12  process?
13          MR. LIMBACHER:  Object to the
14          extent that that calls for him to
15          testify beyond the scope of the topics
16          on which he's been designated as
17          described in more detail in the e-mails
18          between counsel.
19          MS. SCULLION:  Again, we'll
20          disagree that it's beyond the scope.
21  BY MS. SCULLION:
22      Q.   Are you prepared to speak to
23  that?
24      A.   Again, with regards to the

1      Q.   Okay.  And I think you explained
2  earlier you're now prepared to testify to Endo's
3  policies and procedures implemented through MARC
4  with respect to opioid products, correct?
5      A.   Yes, I think I'm well prepared
6  for that.
7      Q.   Okay.  And to be clear, the
8  predecessor to MARC was the PMRB, correct?
9      A.   Yes.
10      Q.   And you're prepared to testify to
11  the policies and procedures used by the PMRB
12  with respect to opioid products, correct?
13      A.   I believe they're essentially one
14  in the same, to my recollection, so yes.
15      Q.   That's what we're going to get
16  to.
17          If you go to page 7, the heading
18  "Identification of healthcare providers eligible
19  for; sales calls."
20          Do you see that heading?
21      A.   I do.
22      Q.   And then the second paragraph
23  down, the second sentence says, "The company's
24  Abuse and Diversion Detection Program ("ADD

26 (Pages 98 to 101)

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  program") has included," and then it lists a
2  number of items there.
3          Are you familiar with the
4  company's ADD program referenced here?
5      A.  I am in general.  Again, it's --
6  I'm familiar with that acronym.  It really --
7  all of these link back to the RiskMAP, the REMS
8  in terms of policies and procedures the company
9  had in place for many years to accomplish the
10  objectives set out here and explained here.
11         Q.   I think I misheard your
12  testimony, but you are not familiar with the ADD
13  --
14         A.   I'm familiar with that acronym.
15         Q.   You are?
16         A.   I am, yes.
17         Q.   Okay, I heard wrong.  Thank you.
18         A.   Sorry, my mistake.
19         Q.   No, no, I heard incorrectly.
20         Okay.  And I think you said
21  you're prepared to speak to that today as Endo's
22  corporate representative, correct?
23         MR. LIMBACHER:  To the extent
24  that it falls within the scope of the

Page 103

1  topics on which he's been designated,
2  yes, he's prepared.
3         MS. SCULLION:  Okay.
4         THE WITNESS:  Just for clarity,
5  within the documents here that I have to
6  refer to in real time, we have the
7  RiskMAP and the REMS.  I don't think we
8  have the ADD document specifically, so
9  it may be that I need some help, but if
10  you've got some specific point in that,
11  something that I can refer to, but,
12  generally, I'm prepared to address that
13  topic.
14  BY MS. SCULLION:



Page 104

6      Q.   Got it.  Thank you.
7          And then the last paragraph on
8  this page 7 does speak to suspicious order
9  monitoring programs, and I think we discussed
10  that there's going to be a separate corporate
11  representative on those issues.
12         But let's take off your corporate
13  representative hat then for the moment.  Just
14  based on your experience at Endo, was there
15  any -- was there any connection between the ADD
16  program and the SOM programs at Endo?
17         MR. LIMBACHER:  Object to form.
18  BY MS. SCULLION:

Page 105

Highly Confidential - Subject to Further Confidentiality Review



Page 106

Page 108

1  for the entirety of time that Endo sold opioid
2  products?
3       MR. LIMBACHER:  Object to the
4  extent it falls outside the scope of the
5  topics on which he's been designated.
6       MS. SCULLION:  Again, we disagree
7  with that.
8       THE WITNESS:  Well, as explained
9  here, this is discussing the
10  establishment in 2004, which I wasn't
11  aware of for an earlier question, and it
12  explains that the compliance department
13  and the policies and procedures have
14  continued to evolve since that point in
15  time.
16       With regards to Opana, which was
17  launched in 2006 or Opana ER -- sorry --
18  Opana ER and Opana, I believe, were both
19  launched in 2006 and my arrival in 2009,
20  this is consistent with my recollection
21  for that period of time.  Prior to that,
22  I can't attest to what happened.
23  BY MS. SCULLION:
24       Q.    Okay.  So --

Page 107

Page 109

1       A.    Or what the policies and
2  procedures were.
3       Q.    Okay.  So you'd agree that with
4  respect to compliance -- sorry.
5            With respect to enforcing, for
6  example, the regulations and laws and policies
7  for anti-abuse for opioids, that these
8  fundamental elements of an effective compliance
9  program would apply to such compliance efforts,
10  correct?
11       MR. LIMBACHER:  Object to form.
12       THE WITNESS:  I'm really sorry, I
13  really don't understand that question.
14  BY MS. SCULLION:
15       Q.    Sure, try that one again.
16       A.    Yeah.
17       Q.    Well, you're here to speak today
18  in part as Endo's corporate representative on
19  Endo's efforts to ensure compliance with
20  anti-abuse laws, regulations and policies,
21  correct?
22       MR. LIMBACHER:  Object to form.
23       THE WITNESS:  To the extent that
24  it's in the topics designated, yes.

12       Q.    One more thing, in that same
13  exhibit, the independent director's report, turn
14  to page 4, Exhibit Number 6 again.
15            Bottom of page 4, the last
16  paragraph, last sentence says, "Endo's
17  compliance program incorporates the fundamental
18  elements of an effective compliance program
19  including," and then there are bullet points at
20  the bottom of page 4 that extend over to the top
21  of page 5.  I'm asking this in your capacity as
22  Endo's corporate representative, were these
23  fundamental elements of an effective compliance
24  program applicable to Endo's compliance program

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1     BY MS. SCULLION:
2         Q.    Okay.  And same thing with
3     respect to anti-diversion laws, regulations and
4     policies, you're here to speak to Endo's
5     compliance efforts with -- to ensure compliance
6     with those laws, regulations and policies,
7     right?
8              MR. LIMBACHER:  Object to form.
9              THE WITNESS:  Yeah, with the
10             exception of specific detail on SOMS,
11             that's my understanding.
12    BY MS. SCULLION:
13        Q.    Correct, thank you.
14             And you'd agree that for those
15    compliance efforts to be effective, they would
16    need to, for example, have as indicated in the
17    first bullet point here, clear rules, clear set
18    of rules?
19             MR. LIMBACHER:  Object to form.
20             THE WITNESS:  That sounds
21             reasonable.
22    BY MS. SCULLION:
23        Q.    Written down somewhere?
24        A.    I would think so.

Page 111

1         Q.    Okay.  And there needs to be
2     training on those rules and efforts to assess
3     the effectiveness of those rules --
4              MR. LIMBACHER:  Object to form.
5     BY MS. SCULLION:
6         Q.    -- effectiveness of the training?
7              MR. LIMBACHER:  Object to form.
8              THE WITNESS:  That sounds like a
9              reasonable, reasonable statement.
10    BY MS. SCULLION:
11        Q.    There should be records kept of
12    the compliance process, correct?
13        A.    I think you're asking me just to
14    explain what a rigorous compliance program would
15    be.  In my experience, during my time there, as
16    well as at other companies, those things that
17    you're mentioning sound like reasonable aspects
18    of a typical compliance program.
19        Q.    Let's just make sure then that
20    we're on the same page on that.
21             So we said clear rules, yes,
22    written down, yes, correct?
23        A.    I would think that would be
24    reasonable, yes.

Page 112

1         Q.    We talked about training and
2     assessing the effectiveness of the training,
3     also reasonable?
4              MR. LIMBACHER:  Object to form.
5              THE WITNESS:  I think that's
6              reasonable.
7     BY MS. SCULLION:
8         Q.    Keeping records so they could be
9     subject to audit, correct?
10        A.    Again, sounds reasonable.
11        Q.    To then actually go in and audit
12    records of compliance, that would also be a
13    reasonable part of a compliance program?
14             MR. LIMBACHER:  Object to form.
15             THE WITNESS:  Probably have less
16             particular knowledge about audit
17             procedures as they -- as they pertain to
18             compliance in general, so I'm not -- I'm
19             less sure about that specifically.  I
20             know that under a CIA, for example,
21             there are explicit rules and audit
22             reporting.  I'm not sure -- you're kind
23             of describing a general concept for good
24             compliance.  So, you know, in that

Page 113

1     context, I'm not sure about the audit
2     requirements or what would or would not
3     be reasonable.  I'm not an audit
4     professional, for example.
5     BY MS. SCULLION:
6         Q.    Okay.  Would you agree that
7     consistent discipline measures to ensure
8     compliance would be a part of a reasonable
9     compliance program?
10             MR. LIMBACHER:  Object to form.
11             THE WITNESS:  I would agree with
12             that, yes.
13    BY MS. SCULLION:
14        Q.    How about what's called tone at
15    the top.  Are you familiar with that phrase?
16        A.    Generally I've heard that, yes.
17        Q.    Okay.  Well, let's look on page 4
18    of Exhibit 6.  If you look at the last bullet
19    point there it says, "Effective lines of
20    communication including messages from senior
21    level leaders regarding commitment to
22    compliance."
23             Is messages from senior level
24    leaders regarding commitment to compliance, is

29  (Pages 110 to 113)

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1    that's what referred to as tone at the top?
2              MR. LIMBACHER:  Object to form.
3              THE WITNESS:  I think that's
4        consistent with my understanding of the
5        term, yes.
6    BY MS. SCULLION:
7        Q.    Okay.  Would you agree it would
8    be inconsistent with a reasonable compliance
9    program if the tone at the top was that an
10   anti-abuse policy was, quote, unquote, window
11   dressing?
12             MR. LIMBACHER:  Object to form.
13             THE WITNESS:  Would I agree that
14       it would be inconsistent and did you say
15       that a senior leader would be the person
16       writing or communicating?
17   BY MS. SCULLION:
18       Q.    I'm sorry, that a senior leader
19   would -- would, yeah, refer to an anti-abuse
20   program as window dressing.
21             MR. LIMBACHER:  Object to form.
22             THE WITNESS:  It would be most
23       helpful if there was a specific instance
24       of communication so that I could

Page 115

1        understand the context of the person,
2        how we are describing senior leader.
3        With those qualifications, in my
4        opinion, yes, that would be correct,
5        that that would be inconsistent with
6        tone from the top.
7    BY MS. SCULLION:



Page 116

Page 117

6        Q.    Okay.  And with regard to Endo's
7    approach to ensuring compliance with -- let's
8    start with compliance with the laws and
9    regulations governing promotional materials --
10       A.    I'm sorry.  I coughed literally
11   when you said an important word.  So before you
12   say the whole thing, could you start again.
13       Q.    Absolutely.

Highly Confidential - Subject to Further Confidentiality Review



Page 118

Page 120

```
 1        MS. SCULLION:  Thank you, okay.
 2    BY MS. SCULLION:
```

Page 119

```
13        MS. SCULLION:  And just to be
14    clear, I disagree with the scope
15    objections.
16        Counsel, if we can have an
17    agreement that I don't need to keep
18    saying that?
19        MR. LIMBACHER:  Yes, I agree you
20    do not.
21        MS. SCULLION:  Assume I don't
22    necessarily agree with your scope
23    objections.
24        MR. LIMBACHER:  I understand.
```

Page 121

31 (Pages 118 to 121)

Highly Confidential - Subject to Further Confidentiality Review



Page 122

Page 124

```
 1          Do you recognize Exhibit Number
 2   7?
 3       A.   Yes, I do.
 4       Q.   And is this a copy of the
 5   June 2007 RiskMAP for Opana ER?
 6       A.   It is, yes.
 7       Q.   And this is one of the documents
 8   that you did review to prepare for today's
 9   deposition, correct?
10       A.   That is correct.
```

Page 123

```
14       the RiskMAP.
15          (Document marked for
16       identification as Endo-Lortie Deposition
17       Exhibit No. 7.)
18   BY MS. SCULLION:
19       Q.   Hand you what's been marked as
20   Exhibit Number 7, and Exhibit 7 is Bates stamped
21   ENDO-CHI_LIT-00234542.
22          Mr. Lortie, do you recognize --
23   we'll go back to your personal capacity for the
24   moment.
```

Page 125

Highly Confidential - Subject to Further Confidentiality Review



Page 126

Page 128

1  some source of -- some inappropriate source of
2  acquiring controlled substances for the purpose
3  of using them outside of their intended medical
4  use.  So, for example, a physician's office who
5  was prescribing said medicines for purposes
6  other than their intended labeled use.

Page 127

Page 129

33 (Pages 126 to 129)

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



**Page 138**

19  BY MS. SCULLION:
20      Q.    Right, so but you're not prepared
21  to testify today --
22      A.    That's correct.
23      Q.    -- as Endo's corporate
24  representative with respect to Endo's policies

**Page 139**

1   about ensuring against diversion at its
2   contracted -- sorry, contractual manufacturers,
3   correct?
4       A.    Specifically, I think you're
5   correct.

19  BY MS. SCULLION:
20      Q.    Okay.  And are you able to speak
21  today to Endo's policies with respect to
22  ensuring that its contracted distribution center
23  had sufficient anti-diversion procedures in
24  place?

**Page 140**

1           MR. LIMBACHER:  Object to form
2   and object to the extent it falls
3   outside of the scope of the topics on
4   which he has been designated.
5           THE WITNESS:  Yeah, I think
6   specifically by definition what you're
7   asking is the suspicious order
8   monitoring program because that defines
9   what the distribution center has, so I
10  believe you have another witness that
11  will represent the company on that topic
12  or that portion of the topic.
13  BY MS. SCULLION:

**Page 141**

36  (Pages 138 to 141)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 154

Page 155

5    (Document marked for
6    identification as Endo-Lortie Deposition
7    Exhibit No. 8.)
8    BY MS. SCULLION:
9        Q.    Hand you what's been marked as
10   Exhibit Number 8.  Exhibit Number 8 is Bates
11   stamped ENDO-OPIOID_MDL-00869053, and we've
12   marked it in the upper right-hand corner, E1175.

Page 156

Page 157

Highly Confidential - Subject to Further Confidentiality Review



Page 158

15  BY MS. SCULLION:
16      Q.    Are you aware of anyone -- put
17  your corporate representative hat back on.
18      A.    Okay.

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 166

Page 167

Page 168

Page 169

20    MS. SCULLION:  Okay.  We can stop
21    here for lunch.
22        MR. LIMBACHER:  Thank you.
23        THE VIDEOGRAPHER:  Going off the
24    record at 12:38 p.m.

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 170

```
1          (Luncheon recess.)
2          THE VIDEOGRAPHER:  We are back on
3     the record at 1:19.
4     BY MS. SCULLION:
5          Q.    Welcome back, Mr. Lortie.  You
6     understand you're still under oath, correct?
7          A.    Of course, yes.
8          Q.    Thank you.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 172

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 171

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 173

```
1
2
3
4
5
6
7
8          Q.    Okay.  And to be clear, all these
9     questions are in your 30(b)(6) capacity?
10         A.    Okay.
11         Q.    Or representative capacity.
12               And let me hand you what's been
13    marked as Exhibit 9.
14               (Document marked for
15               identification as  Endo-Lortie
16               Deposition Exhibit No. 9.)
17    BY MS. SCULLION:
18         Q.    I'll hand you what's been marked
19    as Exhibit Number 9.  And Exhibit Number 9 is
20    Bates stamped ENDO-OPIOID_MDL-02924490, and we
21    have stamped it in the upper right-hand corner
22    E1247.
23               And, Mr. Lortie, if you could
24    turn to page E1247.5, which is the last of the
```

Page 174

```
 1    ordinary size, eight and a half by 11 size
 2    pages?
 3        A.    Okay.
```



Page 176

Page 175

Page 177

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 190

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 191

```
1
2
3
4
5
6
7
8
9
10
11
12        MR. LIMBACHER:  Object to form,
13   objection to the extent this falls
14   outside the scope of the topics on which
15   he's been designated.
16        THE WITNESS:  Yeah, I'm not sure
17   I understand your question.  Sorry.
18        MS. SCULLION:  Sure.  Let's look
19   at some documents.  Can I have E1599,
20   1600 and 1601.
21        MR. LIMBACHER:  Are these
22   questions in his capacity as a fact
23   witness or as a 30(b)(6) witness?
24        MS. SCULLION:  These are
```

Page 192

```
1    30(b)(6).
2         MR. LIMBACHER:  I'm sorry?
3         MS. SCULLION:  These are
4    30(b)(6).
5         MR. LIMBACHER:  I object to the
6    extent they fall outside the scope of
7    the topics on which he has been
8    designated.
9         (Document marked for
10   identification as Endo-Lortie Deposition
11   Exhibit No. 11.)
12   BY MS. SCULLION:
13        Q.    Mr. Lortie, let me hand you
14   Exhibit Number 11, and that is Bates stamped
15   ENDO-OR-CID-00408959.  Upper right-hand corner
16   we've marked it E1599.
17        And --
18        A.    I'll just take a look, if it's
19   okay.
20        Q.    Sure.
21        A.    (Witness reviews document.)
22        Thank you.  I've looked it over.
23        Q.    You've looked over Exhibit Number
24   11.
```

Page 193

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Page 194

Page 196

Page 195

Page 197

19    (Document marked for
20    identification as Endo-Lortie Deposition
21    Exhibit No. 12.)
22  BY MS. SCULLION:
23        Q.    Okay.  Hand you what's been
24  marked Exhibit Number 12, and Number 12 is Bates

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1    stamped ENDO-OPIOID_MDL-02098725, and we've
2    stamped it E1600.1.



11        Do you see that?
12        MR. LIMBACHER:  Object to form.
13        THE WITNESS:  So what's the -- I
14   mean, I see the two forms that you're
15   referring to, yes.
16   BY MS. SCULLION:
17        Q.   Okay.  And this is a prelude then
18   to the next document.  I just want to make sure
19   you saw the chain of events here.
20             And then let's look at Exhibit
21   Number 13.
22             (Document marked for
23             identification as Endo-Lortie Deposition
24             Exhibit No. 13.)

Page 199

1             THE WITNESS:  Let me just finish
2    with this one.
3         MS. SCULLION:  Sure.
4             THE WITNESS:  I'll take that, but
5    I'm going to look at it in a second.
6         (Witness reviews document.)
7         MS. SCULLION:  And for the
8    record, Exhibit Number 13 is Bates
9    stamped ENDO-OPIOID_MDL-02182533.
10            MR. LIMBACHER:  Again, note my
11   objection to this series of questions to
12   the extent it falls outside the scope of
13   the topics on which he's been
14   designated.
15   BY MS. SCULLION:

Page 200

Page 201

51 (Pages 198 to 201)

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 214



Page 216

1   stamped ENDO-CHI_LIT-00543478, and we've stamped
2   it in the upper right-hand corner E142.
3          Mr. Lortie, this is a document
4   entitled "Percocet History, Time & Events in the
5   News Media."  It bears Endo's logo and it says
6   on the front it's prepared by Dhaval Mavani and
7   Jacob Gettier.
8          Do you know who those individuals
9   were?
10      A.   I do not.  No, I don't recognize
11  either of those names.  I'll just take a look,
12  if it's okay through the slides.
13      Q.   Yeah, sure.
14      A.   (Witness reviews document.)
15          MR. LIMBACHER:  Jen, when this
16  was produced, did it have the
17  handwriting on it?
18          MS. SCULLION:  Yes, I checked
19  multiple times.  It actually looked
20  suspiciously like mine, but it's not.
21          THE WITNESS:  (Witness reviews
22  document.)
23          Okay.  I mean, I've generally
24  looked at it.  If there's a particular

Page 215

Page 217

1          page, I'm sure you'll point me to it.
2   BY MS. SCULLION:
3      Q.    Sure.  Yeah, if you can go to
4   E142.7.
5          You see the box in the middle of
6   the page there that says by 2002: approximately
7   9.7 million individuals age 12 and up had used
8   Percocet, Percodan or Tylox for nonmedical use
9   at least once in their life compared to
10  1.9 million for OxyContin.
11          Do you see that?
12      A.   Yes, I do.
13      Q.   Any reason to dispute those
14  numbers?
15      A.   I have no reason to agree with
16  them nor dispute them.  I have not seen this
17  before.  It predates me by a long time and has
18  to do with Percocet, which wasn't subject of my
19  preparation today.
20      Q.   Okay.  And you'll see that that
21  box it says a source to the National Survey on
22  Drug Use and Health Report, May 2004.
23          It's at the bottom of the -- of
24  page E142.7.

14          MS. SCULLION:  Can I have E142,
15  478 and 1007, please.
16          MR. LIMBACHER:  Jen, are we still
17  asking questions as a 30(b)(6) witness?
18          MS. SCULLION:  Yes.
19          (Document marked for
20  identification as Endo-Lortie Deposition
21  Exhibit No. 14.)
22  BY MS. SCULLION:
23      Q.    I hand you what's been marked as
24  Exhibit Number 14, and Exhibit 14 is Bates

Highly Confidential - Subject to Further Confidentiality Review



Page 218

21  (Document marked for
22  identification as Endo-Lortie Deposition
23  Exhibit No. 16.)
24  BY MS. SCULLION:

Page 219

1      Q.    Let me hand you what's been
2  marked as Exhibit 16.  And Exhibit 16 --
3          MR. LIMBACHER:  Is there a 15?
4          MS. SCULLION:  There will be.
5  BY MS. SCULLION:
6      Q.    Exhibit 16 is Bates stamped
7  ENDO-OPIOID_MDL-03259246, and we've marked it
8  E478 in the upper right-hand corner.

Page 220

6  outside the scope of the topics on which
7  he has been designated.
8          THE WITNESS:  This document
9  predates my time there by at least eight
10  years, so I have no basis to understand
11  what Endo took into account at that
12  time.
13  BY MS. SCULLION:

Page 221

14  identification as Endo-Lortie Deposition
15  Exhibit No. 15.)
16  BY MS. SCULLION:
17      Q.    Let me hand you now what's been
18  marked as Exhibit Number 15.
19          Exhibit 15 is an article from
20  Cleveland.com -- or it's just an opinion piece
21  rather from Cleveland.com authored by Carole
22  Rendon, and we've stamped it E1007.1, and it's
23  dated July 13th, 2016.
24          And if you'll go to page E1007.2,

Highly Confidential - Subject to Further Confidentiality Review



Page 222

1    Ms. Rendon states four paragraphs down, "The
2    opioid epidemic has caused an unprecedented wave
3    of death and destruction throughout Northeast
4    Ohio."
5            Did I read that correctly?
6        A.   I'd like to look at the document
7    first, if that's okay, quickly just to...
8        Q.   Sure.
9            MR. LIMBACHER:  Counsel, are we
10   asking questions with regard to this
11   document in his capacity as a 30(b)(6)
12   witness?
13           MS. SCULLION:  We are.
14           MR. LIMBACHER:  Then I would
15   object to all such questions as falling
16   outside the scope of the topics on which
17   he's been designated.
18
19           THE WITNESS:  (Witness reviews
20   document.)
21           Okay.  Thank you.  I've taken a
22   look.
23   BY MS. SCULLION:
24

Page 223

Page 224

Page 225

57  (Pages 222 to 225)

Highly Confidential - Subject to Further Confidentiality Review



Page 226

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 228

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 227

```
 1
 2
 3
 4
 5
 6
 7
 8
 9       MR. LIMBACHER:  Object to form.
10       THE WITNESS:  I'm sorry.  I
11   didn't hear the question.
12   BY MS. SCULLION:
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 229

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 230

8       about an hour.  Is this a good spot for
9       a break?
10    BY MS. SCULLION:
11          Q.    Do you know who Ms. Rendon is?
12          A.    Not other than what I read here
13    on the paper.
14          Q.    At the time she was the U.S.
15    Attorney for the Northern District of Ohio,
16    correct?
17          A.    That's what this says, yes.
18          Q.    Are you aware that she is today
19    Endo's counsel in this case?
20          MR. LIMBACHER:  Object to form.
21          THE WITNESS:  I'm not aware of
22    that, no.
23          MS. SCULLION:  We can take a
24    break.

Page 231

1          THE VIDEOGRAPHER:  Off the
2    record, 2:23.
3          (Brief recess.)
4          THE VIDEOGRAPHER:  The time is
5    now 2:39 p.m.  We are back on the
6    record.
7          MR. LIMBACHER:  Jen, I just
8    wanted to put on the record, you and I
9    talked briefly during the break with
10    regard to how late we might go today and
11    what we anticipate for tomorrow.
12          My understanding is that you do
13    not think you're going to be able to
14    finish your questioning today.  The
15    witness is available to come back
16    tomorrow.  He can be here, he believes,
17    and ready to go starting at 2:30.  My
18    preference, as I indicated during the
19    break, is that we go tonight until a
20    reasonable hour, approximately 7:00 to
21    try to get as much done today so that
22    tomorrow can be relatively brief, and we
23    can complete the deposition as quickly
24    as possible.

Page 232

1          My understanding is, for reasons
2    I don't fully understand, you want to
3    shut it down today at 5:30, and I would
4    strongly encourage you to agree to let's
5    go beyond 5:30, let's go until 7:00.  I
6    think that's a reasonable time for
7    everybody, and that will make it much
8    more likely that we're going to be able
9    to complete the deposition tomorrow by a
10    reasonable hour.
11          MS. SCULLION:  And as we also
12    discussed off the record and in some
13    prior e-mails, first we do appreciate
14    the witness' ability to come back
15    tomorrow beginning at 2:30.  We had
16    noticed the deposition to go day to day,
17    and we had specifically given a heads-up
18    a few weeks ago that we did expect your
19    deposition to go for two days, given the
20    breadth of the topics on which you're
21    designated, as well as our intent to ask
22    you questions in your personal capacity.
23          And with that, although in cases
24    where we only expected to have a

Page 233

1    deposition for one day, we've been
2    willing to go what I would call these
3    marathon depositions until late in the
4    evening.  There's really just -- there's
5    no need.  We did give the heads-up.  We
6    give it for a reason.  We planned for
7    the two days.
8          I was only given notice, I
9    apologize, last night or yesterday, I
10    should say, probably yesterday afternoon
11    that you would not be available tomorrow
12    morning but only in the afternoon.
13          Nonetheless, we had planned for
14    two days, and you can correct me if I'm
15    wrong, but my understanding is that when
16    there have been depositions going for
17    two days planned in this case, that the
18    practice has been to stop at around 5:30
19    or 6:00 and then continue the next day.
20    That's our intent.  We intend to use,
21    you know, our full-time, we're trying to
22    be efficient about it.
23          I will say that our disagreements
24    as to the scope, in particular, have

59  (Pages 230 to 233)

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1    caused us to have to rejigger our
2    approach to the examination, so that's
3    also problematic for us, but we will go
4    till 6:00 today, and then we can
5    reconvene tomorrow.
6         The witness did indicate, and I
7    very much appreciate it, that he is able
8    to then sit for as long as it takes, I
9    think you said, tomorrow.  We don't
10   intend to go till 10:00 or 11:00 at
11   night.  And so if we get to a point
12   tomorrow where we still have questions
13   that we need to take -- examine you on
14   and have not used our time and it's
15   getting too late, we will just reconvene
16   for another day.
17        MR. LIMBACHER:  Well, if you
18   think you're going to need two full days
19   with this witness, all the more reason,
20   if we're going to resume tomorrow at
21   2:30, that we should go later than 5:30
22   today.  I'm not sure I understand what
23   the thinking is as to why you're so
24   unwilling to make full use of the time

Page 235

1    today.  If we shut it down at 5:30, I'm
2    not even sure we're going to have had a
3    total of seven hours of questioning
4    today.
5         So, again, I would ask that we go
6    past 5:30, we go past 6:00, we get as
7    much done today as we can so that
8    realistically we can get it finished
9    tomorrow because I'm not interested and
10   I don't think we're obligated to bring
11   him back for a third day.
12        MS. SCULLION:  So I don't think
13   we need to spend more time on this.  We
14   do think that we are entitled to the two
15   full days.  Again, we hadn't known he
16   wasn't going to be available in the
17   morning.  We had given a heads-up that
18   we wanted him for two full days.  We can
19   discuss this if and when it becomes an
20   issue.
21        MR. LIMBACHER:  I'll just note
22   from my experience that Kristin Vitanza
23   was a 30(b)(6) witness as well, and we
24   finished her up as both a fact witness

Page 236

1    and a 30(b)(6) witness in one day.
2         MS. SCULLION:  And that hasn't
3    happened always.  For example, I think
4    Dr. Shusterman, you know, was two days,
5    also 30(b)(6) and a fact witness, and I
6    think -- again, I think the first day
7    was ended at 5:30 or 6:00 or so.
8         MR. LIMBACHER:  Just would point
9    out that Mr. Lortie doesn't work for the
10   company anymore and to try to have this
11   deposition extend into a third day is
12   really unreasonable.  Under the
13   circumstances, we should go well beyond
14   5:30 today to try to get this finished
15   tomorrow.
16        MS. SCULLION:  And, again, we're
17   not trying to be unreasonable.  We
18   hadn't known that you weren't available
19   tomorrow morning until we were told that
20   yesterday.  We had asked for you for two
21   days.  So, again, let's deal with it if
22   the issue is still live at the end of
23   tomorrow.
24        (Document marked for

Page 237

1    identification as Endo-Lortie Deposition
2    Exhibit No. 17.)
3    BY MS. SCULLION:
4    Q.   Let me hand you what's been
5    marked as Exhibit Number 17.  And Exhibit 17 is
6    Bates stamped ENDO-OPIOID_MDL-01056072, and
7    we've stamped it in the upper right-hand corner
8    E1010.
9         And, Mr. Lortie, asking you in
10   your capacity -- these questions would be in
11   your capacity as a corporate representative on
12   the role of wholesalers and distributors and
13   retailers in combating abuse and diversion of
14   opioid products.
15        So if you'll look at Exhibit 17,
16   it's a series of e-mails attaching a McKesson
17   distribution agreement and various amendments
18   thereto.  I'm not going to be asking you to go
19   through the entirety of these contracts.  And if
20   I can direct your attention, though, to page in
21   the upper right-hand corner E1010.10?
22   A.   1010.10.
23   Q.   You got it.
24

Highly Confidential - Subject to Further Confidentiality Review



Page 238

15    2.3 refers to "Chargeback Processing."
16              Do you see that?
17        A.    Yes, I see that.  I see that vi.

Page 240

Page 239

Page 241

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 246

Page 247

Page 248

1   concerning promotional materials.
2       A.    Okay.
3       Q.    That's one of the areas in which
4   you have been designated, correct?
5       A.    Yes.
6       Q.    Okay.
7             MS. SCULLION:  Could we have
8       exhibits 1458 and 1456.
9             (Document marked for
10      identification as Endo-Lortie Deposition
11      Exhibit No. 18.)
12  BY MS. SCULLION:
13      Q.    I'll hand you what's been marked
14  as Exhibit Number 18.  I'm going to need a copy.
15            And Exhibit 18 is Bates stamped
16  END00747325, and we have marked it in the upper
17  right-hand corner E1458.
18
19
20
21
22
23
24

Page 249

1
2
3
4       Q.    Okay.  You did review this in --
5       A.    I did.
6       Q.    -- the course of preparing for
7   today's deposition?  Okay.
8             MS. SCULLION:  And then can we
9       have 1456.
10            (Document marked for
11      identification as Endo-Lortie Deposition
12      Exhibit No. 19.)
13  BY MS. SCULLION:
14      Q.    Now I'm going to hand you what's
15  been marked as Exhibit 19.
16
17
18
19
20
21
22
23
24

Page 247

20      Q.    Okay.  Do you recall whether at
21  any point in time -- strike that.
22            I'd like to ask you some
23  questions with respect to Endo's policies and
24  procedures for enforcing laws and regulations

Highly Confidential - Subject to Further Confidentiality Review





Page 254

10    MR. LIMBACHER: Are you asking
11 these questions in his capacity as a
12 30(b)(6) witness?
13    MS. SCULLION: I am, because one
14 of the aspects of the 30(b)(6) is with
15 respect to compliance as it applied to
16 enforcement of abuse and diversion laws
17 and regulations.
18    THE WITNESS: I don't recall
19 specifically --
20    MR. LIMBACHER: Excuse me.
21    THE WITNESS: Sorry.
22    MR. LIMBACHER: I would object to
23 the extent it falls outside the scope of
24 the topics on which he's been

Page 255

1 designated.
2    You can answer.
3    THE WITNESS: I don't recall
4 specifically with regards to that
5 Lidoderm question.
6 BY MS. SCULLION:
7    Q.    Okay. Just one second. We'll
8 come back to that when we find it. You guys
9 keep will looking.

Page 256

20 BY MS. SCULLION:
21    Q.    Okay. And do you recall that --
22 strike that.
23    Was it Endo's policy to have
24 product specific guides as the foundation for

Page 257

1 the promotional materials review process?
2    MR. LIMBACHER: Object to form.
3    THE WITNESS: I'm not sure what
4 that means.
5 BY MS. SCULLION:

65 (Pages 254 to 257)

Highly Confidential - Subject to Further Confidentiality Review

Page 258



Page 260

1
2      MR. LIMBACHER:  Just note my
3  objection.  If you're asking these
4  questions in his role as a 30(b)(6)
5  witness, I believe it goes beyond the
6  scope of the topics on which he's been
7  designated.
8  BY MS. SCULLION:
9      Q.    Just so you know the reason we
10  disagree with that is, again, one of the topics
11  on which you've been designated are -- is with
12  respect to changes in policies and procedures
13  and reasons therefor, and we believe this
14  document goes directly to questions of changes
15  in policies and procedures that, among other
16  things, impacted efforts to ensure compliance
17  with applicable laws and regulations for the
18  sale, marketing, distribution, et cetera, of
19  opioids.
20      I'm sorry.  I was asking on the
21  lower left-hand corner of the first page of the
22  PowerPoint where it says ELC, is that Executive
23  Leadership Committee?
24      A.    It was at that point in time,

Page 259

1
2
3
4
5
6
7
8
9    (Document marked for
10  identification as Endo-Lortie Deposition
11  Exhibit No. 20.)
12  BY MS. SCULLION:
13
14
15
16
17
18
19
20
21
22
23
24

Page 261

1  yes.
2      Q.    Looking at Exhibit 20, do you
3  recall seeing a compliance overview in March of
4  2013?
5      A.    I was not a member of ELC at that
6  point, so no.
7      Q.    Were you aware that -- looking at
8  this, does this refresh your recollection that
9  compliance overview was undertaken around that
10  time?
11      A.    I don't recall.
12
13
14
15
16
17
18
19
20
21
22
23
24



Page 262

Page 264

Page 263

Page 265

BY MS. SCULLION:
    Q.    Do you have an understanding of
the concept of record review in connection with
compliance?
    A.    This is what I'm asking for
clarification on because I need some help in
recalling what the definition of that
specifically is in this context.  So if you've

Highly Confidential - Subject to Further Confidentiality Review



Page 266

1    got something, I'd be happy to look at it.

Page 267

1    Q.    Do you know what efforts Endo --
2    strike that.

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 274

9   (Document marked for
10   identification as Endo-Lortie Deposition
11   Exhibit No. 21.)
12  BY MS. SCULLION:
13   Q.   Okay.  Let me show you what's
14  been marked as Exhibit Number 2.
15       And Exhibit Number 21 is
16  marked -- is Bates stamped END00401724, and
17  we've marked it E1604.1 in the upper right-hand
18  corner.

Page 276

1   my preparation.

Page 275

7   I actually only have a question for you about
8   one page of the Health Care Compliance Guide.  I
9   take it you did not review this in connection
10  with your preparation for today's deposition?
11       A.   I don't recall reviewing it.  If
12  you'd like to point me to the page, but I'd
13  still --
14       Q.   Sure.
15       A.   -- reserve the ability to
16  understand the context.
17       Q.   The page is E1604.18?
18       MR. LIMBACHER:  I'm sorry.  Which
19  page?
20       MS. SCULLION:  1604.18.
21  BY MS. SCULLION:
22       Q.   Are you with me?
23       A.   Yeah, I'm just understanding the
24  chapter, and I now recognize I have seen this in

Page 277

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 282

20    MR. LIMBACHER:  It's almost an
21  hour, so maybe we'll take a short break.
22    MS. SCULLION:  Yeah, that's fine.
23    MR. LIMBACHER:  Thank you.
24    THE VIDEOGRAPHER:  The time is

Page 283

1    3:35.  We are now going off the record.
2      (Brief recess.)
3      THE VIDEOGRAPHER:  The time is
4  3:48.  We are now back on record.
5      (Document marked for
6  identification as Endo-Lortie Deposition
7  Exhibit No. 22.)
8  BY MS. SCULLION:
9    Q.    Mr. Lortie, let me hand you
10  what's been marked as Exhibit Number 22.
11      And Exhibit Number 22 is a copy
12  of the -- of material that your counsel provided
13  to us in advance of your deposition, and it is,
14  to my understanding, a chart showing the claims
15  that we've asked you to speak to in response to
16  topic 13 of the 30(b)(6) notice on the left-hand
17  side, and on the right-hand side are the
18  supporting references for those claims.
19      Mr. Lortie, did you review
20  Exhibit 22 before today's deposition?
21    A.    Yes, I did.
22    Q.    Do you know who prepared Exhibit
23  22?
24    A.    This was prepared by our counsel

Page 284

1  in preparation for this topic.
2    Q.    Did you assist in its
3  preparation?
4    A.    I did not prepare it.  I reviewed
5  it and ensured by checking and referring to some
6  of the references so that I could familiarize
7  myself with the material.
8    Q.    Okay.  The material listed as
9  supporting references on the right side of
10  Exhibit 22, were those materials that were cited
11  contemporaneously as support for the claims,
12  meaning at the time that the marketing piece
13  listed in the left-hand column of the chart was
14  authorized for use?
15      MR. LIMBACHER:  Object to form,
16    outside the scope of the topics on which
17    he's been designated.
18      THE WITNESS:  I believe that to
19    be the case, but I'm not sure I
20    personally checked the dates on each
21    one, but that's my understanding.
22  BY MS. SCULLION:
23    Q.    Do you have an understanding
24  about whether -- what information exists in

Page 285

1  Endo's records that would allow one to know
2  whether these materials were, in fact, the
3  materials cited contemporaneously to support a
4  claim in a given piece of marketing -- sorry,
5  promotional material?
6      MR. LIMBACHER:  Object to form.
7      THE WITNESS:  I'm not sure I
8    understand what you're asking.
9  BY MS. SCULLION:

Highly Confidential - Subject to Further Confidentiality Review



Page 286

Page 287

Page 288

Page 289

```
 1
 2
 3
 4        So if we could go to claim number
 5   24, which is on page 9 of Exhibit 22.  And in
 6   our request with respect to this claim, we cited
 7   to a document Bates stamped
 8   ENDO-CHI_LIT-00538441.
 9        MS. SCULLION:  And do we have
10   that, it's E785?
11        (Document marked for
12   identification as Endo-Lortie Deposition
13   Exhibit No. 23.)
14   BY MS. SCULLION:
15   Q.    Let me hand you what's been
16   marked as Exhibit 23.
17        And Exhibit 23 you'll see does
18   bear that Bates number, correct, lower
19   right-hand corner?
20   A.    Yes, it does.
21        MR. LIMBACHER:  And, counsel,
22   just so we're clear, you've been asking
23   him questions in his capacity as a
24   30(b)(6) witness?
```

Highly Confidential - Subject to Further Confidentiality Review



Page 290

1      MS. SCULLION:  Yes, except to the
2  extent that you've objected that it's
3  beyond the scope.  We'll have to see
4  where that comes out.
5  BY MS. SCULLION:
6      Q.    And you'll see in the chart we
7  cite to certain statements in this document on
8  pages 3 and 4, and if you turn in Exhibit 23 to
9  page E785.3, you'll see on the right-hand side
10  that is page 3.
11      Do you see that?
12      A.    I see 785.3, yes, page 3, which
13  is the column, right.
14      Q.    Right.
15      A.    The right-hand column, yep.
16      Q.    All right.  So before we get into
17  specifics, if you can turn back to the first
18  page of Exhibit 23.
19
20
21
22
23
24

Page 292

15      Q.    Okay.  And this was one such
16  brochure, right?
17      A.    Yes.
18      Q.    Okay.  And if you'll try and hold
19  both Exhibit 23 and 22 open at the same time,
20  turning to page 3 of Exhibit 23 of the brochure,
21  I just want to try and match up the language on
22  the page with the language in the claims chart
23  that is Exhibit 22.
24      Do you follow what I'm trying to

Page 291

Page 293

1  do?
2      A.    Yes, I'm doing that in advance.

Highly Confidential - Subject to Further Confidentiality Review

Page 294



Page 296

1  supporting references and then asking
2  him questions about what is in those
3  supporting references.  I believe Josh
4  Davis made it very clear to you in his
5  e-mail of January 6, 2019 that
6  Mr. Lortie was not going to be prepared
7  to speak as a corporate representative
8  in full detail to all substantive or
9  scientific aspects of all support that
10  may be identified in this chart.
11       So if I can have a continuing
12  objection to those types of questions
13  where you're showing him the supporting
14  references and then asking him to match
15  that up with what's in the chart.
16       MS. SCULLION:  I hear your
17  objection.  You can certainly have it on
18  a continuing basis.  I'd just note that
19  our understanding was that although
20  Mr. Lortie might not be prepared to sit
21  here and parse in detail the scientific
22  basis for any particular claim that's
23  cited, that he was to be prepared to
24  speak to the support for those claims.

Page 295

1       Q.    And then we've got a lot of
2  moving pieces here.
3       MS. SCULLION:  Can we have the
4  definitions.
5       (Document marked for
6  identification as Endo-Lortie Deposition
7  Exhibit No. 24.)
8  BY MS. SCULLION:
9       Q.    I hand you what's been marked as
10  Exhibit 24.
11       A.    Should I keep these open or
12  nearby?
13       Q.    It probably will be useful.
14       And Exhibit 24 is Bates stamped
15  ENDO-OPIOID_MDL-06233148.  Mark that down,
16  Exhibit 24.
17       And Exhibit 24 is the definitions
18  section cited in the claims chart we just looked
19  at, right?
20       A.    Yes.
21       Q.    Okay.  Just one second.
22       MR. LIMBACHER: Jen, just for the
23  record, I want to object to any
24  questions where you are showing him the

Page 297

1       In fact, Mr. Davis made something
2  of a point about the burden it would be
3  for Mr. Lortie to be prepared on any
4  additional claims because it had taken
5  so much to prepare him to speak to the
6  claims that we did have in the chart.
7  BY MS. SCULLION:
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

75 (Pages 294 to 297)

Highly Confidential - Subject to Further Confidentiality Review



Page 298

Page 300

BY MS. SCULLION:
Q.    Right.
A.    -- you're correct, the authors did not lift the entirety of the definitions as the claim or as support.
Q.    Right.

Page 299

THE WITNESS:  There are many paragraphs that follow the cited reference so --

Page 301

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 306

Page 308

1    That was not the question.
2    BY MS. SCULLION:

Page 307

Page 309

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 310

Page 312

5      A.   Sorry.  Let me just catch up
6   here.
7      Q.   Sure, the bottom of page 3.
8      A.   It's actually in the middle of
9   page 3, I think, right?
10      Q.   I'm looking at the page that's
11   labeled in the lower left-hand corner 3 of 4,
12   and underneath it says the date on which it was
13   approved by the AAPM Board of Directors,
14   February 13th, 2001.
15           Do you see that?
16      A.   Okay.  I'm sorry I was on the
17   cover where the three organizations were listed.
18   I think they're probably the same ones, but so
19   I'll go to your page.
20      Q.   Let's -- I want to go -- be
21   specific on page 3 of 4, you see after the
22   definitions it says "Approved by the AAPM Board
23   of Directors on February 13, 2001."
24      A.   Yes.

Page 311

Page 313

1      Q.   And the AAPM is American Academy
2   of Pain Medicine, right?
3      A.   Yes.
4      Q.   And the American Academy of Pain
5   Medicine was recognized as the industry-friendly
6   organization, correct?
7           MR. LIMBACHER:  Object to form.
8           THE WITNESS:  I don't know.  I
9   don't know that.

79  (Pages 310 to 313)

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 318

Page 320

Page 319

Page 321

| 3 | MR. LIMBACHER:  Object to form |
|---|---|
| 4 | and, again, object as outside the scope |
| 5 | of the topics on which he has been |
| 6 | designated. |
| 7 | The subject of Endo's |
| 8 | relationship with the American Academy |
| 9 | of Pain Medicine is specifically |
| 10 | referenced in topic number 36 of your |
| 11 | 30(b)(6) deposition notice, and this |
| 12 | witness has not been designated to |
| 13 | testify with regard to topic number 36. |
| 14 | MS. SCULLION:  Counsel, objection |
| 15 | to beyond the scope is just fine.  I |
| 16 | think you're now crossing a line to try |
| 17 | to coach the witness. |
| 18 | MR. LIMBACHER:  I'm not coaching |
| 19 | the witness. |
| 20 | MS. SCULLION:  It's -- it is |
| 21 | beyond -- |
| 22 | MR. LIMBACHER:  I'm trying to |
| 23 | gently suggest to you, counsel -- |
| 24 | MS. SCULLION:  Counsel, if you |

81  (Pages 318 to 321)

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1    let me finish my statement, I let you
2    finish yours.
3            MR. LIMBACHER:  -- that you are
4    asking questions that go well beyond the
5    scope of what you know this witness has
6    been designated for.
7            MS. SCULLION:  And you know that
8    we asked for this witness both with
9    respect to his 30(b)(6) topics and in
10   his personal capacity.  If it is indeed
11   beyond the topic, which I don't agree,
12   he's perfectly welcome to answer the
13   questions in his personal capacity.
14           MR. LIMBACHER:  Well, you're not
15   going to get 14 hours of questioning of
16   this witness in his individual capacity.
17   You have to make a decision as to
18   whether or not you're asking him
19   questions in his role as a 30(b)(6)
20   witness or not.  We have an agreement
21   that we memorialized at the outset of
22   this deposition that unless you make it
23   clear that you are asking him questions
24   about 30(b)(6), then he's answering

Page 323

1    these questions in his role as a fact
2    witness, but you have told us that all
3    of the questions with regard to this
4    chart are in his capacity as a 30(b)(6)
5    witness, but the questions you are now
6    asking with regard to the American
7    Academy of Pain Medicine fall well
8    outside the scope of the topics on which
9    he has been designated and, in fact, are
10   specifically referenced in topic 36.
11           MS. SCULLION:  Right, so we
12   disagree.  I think they're also
13   encompassed within topic 37.  I suggest
14   we just -- you just say object to the
15   scope and we deal with it at some other
16   time if needed, but let's -- I think we
17   should move on with the testimony.
18   BY MS. SCULLION:
19        Q.    And then one of the other
20   organizations, going back to Exhibit 24, which
21   is the definitions and consensus statement, one
22   of the other organizations that approved the
23   definitions that you've cited was the American
24   Pain Society, and that's at page 3 of 4 of

Page 324

1    Exhibit 24, correct?
2        A.    I'm looking for that.
3        Q.    Sure.  At the very bottom
4    underneath the approval by the AAPM, you next
5    have approved by the APS Board of Directors.
6            Do you see that?
7        A.    And then under that it says
8    American Pain Society, correct?
9        Q.    Correct.
10           MR. LIMBACHER:  Same objections,
11   counsel.  And, again, American Pain
12   Society is specifically referenced in
13   topic 36.
14   BY MS. SCULLION:
15        Q.    And then if you go back to
16   Exhibit 25, you also see that American Pain
17   Society is also identified as a tier one
18   advocate, and that is at -- if you go to page --
19   where we were -- page 15, it says "First Tier
20   Professional Pain Management Advocacy
21   Organizations," right, so it's going to be
22   listing multiple organizations.  The first one
23   we've been through the American Academy of Pain
24   Medicine.

Page 325

1            Go to the next page, the next of
2    those first tier professional pain management
3    advocacy organizations is the American Pain
4    Society, correct?
5            MR. LIMBACHER:  Same objections,
6    beyond the scope.
7            THE WITNESS:  On top of page 16,
8    I see "American Pain Society," yes.
9    BY MS. SCULLION:
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



Page 326

22    MR. LIMBACHER:  Same objections
23    and move to strike.
24    BY MS. SCULLION:

Page 328

Page 327

Page 329

11    MS. SCULLION:  Okay.  Can we have
12    the binder of labels.  Can we mark these
13    as the next four exhibits.
14    (Documents marked for
15    identification as  Endo-Lortie
16    Deposition Exhibit Nos. 26, 27, 28 and
17    29.)
18    BY MS. SCULLION:
19    Q.    I'm going to hand you a binder
20    with exhibits that have been marked Exhibits
21    27 --
22    A.    Mine starts with 26.
23    Q.    Twenty-six, that's what I got
24    wrong, thank you, 26, 27, 28 and 29.



Page 330

1   And let's start with Exhibit 26,
2   which is Bates stamped ENDO-OPIOID_MDL00291042,
3   and we've marked it in the upper right-hand
4   corner E1407.1.

Highly Confidential - Subject to Further Confidentiality Review



Page 334

1  BY MS. SCULLION:
2      Q.    And then if you go to Exhibit
3  Number 27, which is next in your binder, and
4  it's Bates stamped ENDO-OPIOID_MDL-00299099, in
5  the upper right-hand corner we've labeled it
6  E1408.

Highly Confidential - Subject to Further Confidentiality Review



Page 338

16 stopping point?
17        MS. SCULLION:  Yeah, we can stop
18 there.
19        MR. LIMBACHER:  Thank you.
20        THE VIDEOGRAPHER:  The time is
21 4:43.  We're going off the record.
22        (Brief recess.)
23        THE VIDEOGRAPHER:  The time is
24 5:00 p.m.  We are now back on the

Page 339

1        record.
2 BY MS. SCULLION:
3        Q.    Mr. Lortie, welcome back.  I'm
4 going to ask you some questions in your personal
5 capacity.
6        A.    Okay.
7        Q.    Sure is good news to counsel's
8 ears at this point.
9        Mr. Lortie, when you were with
10 Endo, you recall that Endo -- sorry, Endo sought
11 FDA approval for a reformulated version of Opana
12 ER?

Page 340

Page 341

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 346

Page 348

Page 347

```
 1        Q.    Okay.  Let me show you what's
 2   been marked as E14 -- I'm sorry, Exhibit 30.
 3        Exhibit 30 is Bates stamped
 4   ENDO-CHI_LIT00206530, and it's stamped in upper
 5   right-hand corner E1497.
 6        And do you recognize Exhibit 30
 7   as an e-mail chain, which includes an e-mail
 8   from you to Kristin Vitanza dated May 15th, 2012
 9   concerning the new language for the OER selling
10   piece?
11        MR. LIMBACHER:  Take your time
12   and review the document.
13        THE WITNESS:  You said 1497,
14   correct?
15        MS. SCULLION:  Yeah.
16        THE WITNESS:  So let me just take
17   a look from the beginning to orient
18   myself.
19        (Witness reviews document.)
20        Okay.  Thank you.  I've reviewed
21   it.
22   BY MS. SCULLION:
23
24
```

Page 349

For page 346 (continuing):
```
22        identification as Endo-Lortie Deposition
23        Exhibit No. 30.)
24   BY MS. SCULLION:
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 351

5    MS. SCULLION:  Let's look at
6    what's been marked as Exhibit 31.
7        (Document marked for
8    identification as Endo-Lortie Deposition
9    Exhibit No. 31.)
10   BY MS. SCULLION:
11       Q.    And Exhibit 31 is Bates stamped
12   ENDO-CHI_LIT00110100, and we've marked it E1482
13   in the upper right-hand corner.
14       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



Page 354

```
 4      BY MS. SCULLION:
 5          Q.    Now, this is in May of 2012,
 6      correct?
 7          A.    May 5th, in fact, yes.
```

Page 356

Page 355

Page 357

```
10              MS. SCULLION:  Can we have E1501
11      and E1498.
12              (Document marked for
13      identification as Endo-Lortie Deposition
14      Exhibit No. 32.)
15      BY MS. SCULLION:
16          Q.    I'll hand you what's been marked
17      as Exhibit Number 32.
18              And Exhibit Number 32 is Bates
19      stamped END00095867, and we've marked it E1501.
20              And, Mr. Lortie, do you see that
21      Exhibit 32 is a series of e-mails referencing
22      OER pharmacy market research revised report?
23          A.    I see that at the top.  I'm just
24      going to, if it's okay, take a moment to look
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 358

```
 1    through the e-mails here.
 2    Q.    Yeah.
 3    A.    (Witness reviews document.)
 4          Okay.  Thank you.  I've taken a
 5    look.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 360

Page 359

Page 361

Highly Confidential - Subject to Further Confidentiality Review



Page 362

1    BY MS. SCULLION:
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 363

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 364

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20        Q.    I hand you what I marked as
21    Exhibit -- I think it's 33, right?
22        A.    Thirty-three, yes.
23            (Document marked for
24    identification as Endo-Lortie Deposition

Page 365

1    Exhibit No. 33.)
2    BY MS. SCULLION:
3        Q.    Yeah, Exhibit 33, a document
4    Bates stamped END00465847, and we've labeled it
5    E1498 in the top right-hand corner.
6            Do you have Exhibit 33?
7        A.    Yes.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

92  (Pages 362 to 365)

Highly Confidential - Subject to Further Confidentiality Review

Page 366

Page 368

9  MS. SCULLION: Can I have Exhibit
10  1409, E1409.
11  BY MS. SCULLION:
12       Q.    Let me hand you what has been
13  marked as Exhibit -- sorry, I didn't keep track.
14       A.    Thirty-four.
15            (Document marked for
16       identification as Endo-Lortie Deposition
17       Exhibit No. 34.)
18  BY MS. SCULLION:
19       Q.    Thank you, 34, which is Bates
20  stamped ENDO-CHI_LIT-00135664, and we've marked
21  in the upper right-hand corner E1409. If you'll
22  turn to the first page of the PowerPoint, which
23  is E1409.3, this is reporting on "Opana ER
24  Crush-Resistant Formulation Research, Wave 5,

Page 367

Page 369

1  Qualitative Interviews" dated December 13th,
2  2012, correct?
3       A.    Yes. I'll just take a minute, if
4  it's okay, and look through the deck.
5       Q.    Sure.
6       A.    (Witness reviews document.)
7            Okay. I've taken a look at most
8  of the pages.
9       Q.    Okay. And Exhibit 34 is
10  reporting on market research that the KJT Group
11  did on behalf of Endo, correct?
12       A.    Apparently, yes.

Highly Confidential - Subject to Further Confidentiality Review



Page 370

22    MR. LIMBACHER:  I apologize for
23 interrupting, but my real time is not
24 working.  I don't know if I did

Page 371

1 something or what, I apologize, but I
2 need a little technical help.
3    THE VIDEOGRAPHER:  Off the
4 record, 5:35.
5    (Pause.)
6    THE VIDEOGRAPHER:  It is 5:36.
7 We are back on the record.
8 BY MS. SCULLION:

Page 372

Page 373

Highly Confidential - Subject to Further Confidentiality Review



Page 374

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 376

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 375

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 377

1
2
3
4
5
6
7
8       MS. SCULLION:  So do we have the
9    press release?
10       (Document marked for
11    identification as Endo-Lortie Deposition
12    Exhibit No. 35.)
13    BY MS. SCULLION:
14       Q.    Hand you what's been marked as
15    Exhibit 35.
16       And Exhibit 35 is a copy of a --
17    publicly available on Endo's website -- a copy
18    of a November 30th, 2012 press release entailed
19    "Endo Health Solutions Sues FDA to Protect
20    Consumers from Non-Tamper Resistant
21    Oxymorphone."
22       Did I read that correctly?
23       A.    Yes, that's the headline.
24       Q.    And the subheadline in the press

95  (Pages 374 to 377)

Highly Confidential - Subject to Further Confidentiality Review



Page 378

1    release says, "Surveillance data show dramatic
2    decrease in abuse rates of reformulated Opana ER
3    designed to be crush-resistant when compared to
4    non-tamper resistant formulation."
5            Did I read that correctly?
6    A.    You did.

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 386

Page 387

      7          MS. SCULLION:  And then can we
      8     have E959, 1494, 1483.
      9   BY MS. SCULLION:
     10     Q.    Now, the other way that Endo --
     11   another way that Endo got out the message that
     12   the reformulated version of Opana ER was crush
     13   resistant was through a formulary -- I'm
     14   sorry -- compendia submissions, correct?
     15          MR. LIMBACHER:  Object to form.
     16          THE WITNESS:  No, that's not
     17     correct.
     18   BY MS. SCULLION:

Page 388

     21     Q.    Okay.
     22          MS. SCULLION:  Go to E959.
     23          (Document marked for
     24     identification as Endo-Lortie Deposition

Page 389

      1     Exhibit No. 36.)
      2   BY MS. SCULLION:
      3     Q.    I've handed you what's been
      4   marked as Exhibit 36.  I'll look at the Bates
      5   Number in one second.
      6          MR. LIMBACHER:  Take your time
      7     and review the document.
      8          (Witness reviews document.)
      9   BY MS. SCULLION:
     10     Q.    Have you had a chance to review
     11   the exhibit?
     12     A.    I have.  Just I'm noting page 2,
     13   959.2 is blank.  Is that intentionally blank?
     14     Q.    Yes.
     15     A.    I just wanted to make sure I'm
     16   not missing an e-mail or something.
     17     Q.    No, no, you're not.

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review





Page 398

Page 400

Page 399

identification as Endo-Lortie Deposition
Exhibit No. 37.)
BY MS. SCULLION:
    Q.    Let me hand you what's been
marked as Exhibit Number 37.
        And Exhibit 37 is Bates stamped
END00121820, and we've marked it E1494 at the
top.

Page 401



Page 402

Page 404

Page 403

```
 8   break.  We have the document with us
 9   before.  Let's go back to that.
10        THE VIDEOGRAPHER:  The time is
11   6:10.  We are going off the record.
12        (Brief recess.)
13        (Document marked for
14   identification as Endo-Lortie Deposition
15   Exhibit No. 38.)
16        THE VIDEOGRAPHER:  We are back on
17   the record at 6:22.
18   BY MS. SCULLION:
19        Q.   Mr. Lortie, we've handed you off
20   the record and provided to counsel a copy of
21   Exhibit Number 38, which is Bates stamped
22   ENDO-CHI_LIT-00467546, and we've Bates stamped
23   it -- or, sorry, stamped the top right-hand
24   corner E119.
```

Page 405

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 414

Page 416

7    MS. SCULLION:  So we're going to
8  end for today.  We have gone past 6:00.
9  We've tried to do, frankly, a good unit,
10  but we're going to end for today and
11  resume the deposition tomorrow at
12  approximately 2:30, if that is
13  convenient to you?
14    THE WITNESS:  Yes, thank you,
15  that will work.
16    MR. LIMBACHER:  I just want to be
17  clear before we all leave here today
18  that it's our position that we should be
19  able to get this deposition completed
20  tomorrow.  I would ask that everybody
21  use their best efforts to get it
22  completed tomorrow.
23    And do you have any expectation
24  as to how much more you have?

Page 415

Page 417

1    MS. SCULLION:  I do not, sitting
2  here today, but we can talk tomorrow.  I
3  would anticipate that our portion of the
4  deposition would be done tomorrow.  I
5  know that counsel from Tennessee is also
6  here, so I suspect he'll have some
7  examination, as you may as well.
8    MR. LIMBACHER:  Understood.
9  Thank you.
10    THE VIDEOGRAPHER:  That concludes
11  today's testimony.  The time is
12  6:38 p.m.
13    (Witness excused.)
14        ---
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 418

1    C E R T I F I C A T I O N
2         I, MARGARET M. REIHL, a
3    Registered Professional Reporter,
4    Certified Realtime Reporter, Certified
5    Shorthand Reporter, Certified LiveNote
6    Reporter and Notary Public, do hereby
7    certify that the foregoing is a true and
8    accurate transcript of the testimony as
9    taken stenographically by and before me
10   at the time, place, and on the date
11   hereinbefore set forth.
12         I DO FURTHER CERTIFY that I
13   am neither a relative nor employee nor
14   attorney nor counsel of any of the
15   parties to this action, and that I am
16   neither a relative nor employee of such
17   attorney or counsel, and that I am not
18   financially interested in the action.
19
20
21   -------------------------------
     Margaret M. Reihl, RPR, CRR, CLR
22   CSR #XI01497  Notary Public
23
24

Page 420

1    ACKNOWLEDGMENT OF DEPONENT
2
3         I, BRIAN LORTIE, do hereby
4    certify that I have read the foregoing
5    pages, and that the same is a correct
6    transcription of the answers given by me
7    to the questions therein propounded,
8    except for the corrections or changes in
9    form or substance, if any, noted in the
10   attached Errata Sheet.
11
12
13
     _____
14   BRIAN LORTIE            DATE
15
     Subscribed and sworn to before me this
16
     _____ day of _____, 2018.
17
     My commission expires:_____
18
19   _____
     Notary Public
20
21
22
23
24

Page 419

1         - - - - - -
2         E R R A T A
3         - - - - - -
4    PAGE  LINE  CHANGE
5    ____  ____  _____
6    REASON: _____
7    ____  ____  _____
8    REASON: _____
9    ____  ____  _____
10   REASON: _____
11   ____  ____  _____
12   REASON: _____
13   ____  ____  _____
14   REASON: _____
15   ____  ____  _____
16   REASON: _____
17   ____  ____  _____
18   REASON: _____
19   ____  ____  _____
20   REASON: _____
21   ____  ____  _____
22   REASON: _____
23   ____  ____  _____
24   REASON: _____