Highly Confidential - Subject to Further Confidentiality Review

Page 421

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION
- - -

IN RE: NATIONAL           : HON. DAN A.
                          : POLSTER
PRESCRIPTION OPIATE       :
LITIGATION                :
                          :
APPLIES TO ALL CASES      : NO.
                          : 1:17-MD-2804

- HIGHLY CONFIDENTIAL -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
- - -
JANUARY 23, 2019
- - -
VOLUME II

Videotaped sworn continued

deposition of BRIAN LORTIE, taken

pursuant to notice, was held at McCARTER

& ENGLISH, LLP, 1600 Market Street,

Suite 3900, Philadelphia, Pennsylvania,

beginning at 2:36 p.m., on the above

date, before Margaret M. Reihl, a

Registered Professional Reporter,

Certified Shorthand Reporter, Certified

Realtime Reporter, and Notary Public.


- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

---

Page 422

1  A P P E A R A N C E S:
2
3  SEEGER WEISS LLP
   BY:  JENNIFER SCULLION, ESQUIRE
4      ERICA KUBLY, ESQUIRE
       SABRINA TYJER, PARALEGAL
5  77 Water Street
   New York, NY 10005
6  (212) 584-0700
   jscullion@seegerweiss.com
7  Representing the Plaintiffs
8
9  BRANSTETTER, STRANCH & JENNINGS, PLLC
   BY:  JOE P  LENISKI, JR , ESQUIRE
10 The Freedom Center
   223 Rosa L  parks Avenue, Suite 200
11 Nashville, Tennessee  37203
   (625) 254-8801
12 joeyl@bsjfirm.com
   Representing the Tennessee Plaintiffs
13
14 GOODELL DEVRIES LEECH & DANN, LLP
   BY:  ROBERT LIMBACHER, ESQUIRE
15     ADAM S  TOLIN, ESQUIRE
   Two Commerce Square
16 2001 Market Street, Suite 3700
   Philadelphia, Pennsylvania  19103
17 (267) 765-3600
   rlimbacher@gdldlaw.com
18 atolin@gdldlaw.com
   Representing the Defendant Endo and
19 the witness
20
21
22
23
24

---

Page 424

1  APPEARANCES VIA TELECONFERENCE AND STREAM
2
3  ULMER & BERNE, LLP
   BY:  SARAH M  BENOIT, ESQUIRE
4  65 East State Street, Suite 1100
   Suite 1100
5  Columbus, Ohio  43215
   (614) 229-0016
6  sbenoit@ulmer.com
   Representing Amneal Pharmaceuticals, Inc
7
8  JONES DAY
   BY:  TAYLOR GOODSPEED, ESQUIRE
9  555 California Street, 26th Floor
   San Francisco, California  94104-1500
10 (415) 875-5804
   tgoodspeed@jonesday.com
11 Representing the Defendant Walmart
12
13 CLARK MICHIE LLP
   BY:  BRUCE CLARK, ESQUIRE
14 220 Alexander Street
   Princeton, New Jersey  08540
15 (609) 423-2142
   Representing the Defendant,
16 Pernix Therapeutics Holdings, Inc
17
18 REED SMITH LLP
   BY:  SHANA E  RUSSO, ESQUIRE
19     RYAN K  BLAKE, ESQUIRE
   Three Logan Square
20 1717 Arch Street, Suite 3100
   Philadelphia, Pennsylvania  19103
21 (215) 851-8280
   srusso@reedsmith.com
22 rblake@reedsmith.com
   Representing the Defendant AmerisourceBergen
23
24         ---

---

Page 423

1  A P P E A R A N C E S: (cont'd)
2
3  PIETRAGALLO GORDON ALFANO
   BOSICK & RASPANTI, LLP
4  BY:  DOUGLAS K. ROSENBLUM, ESQUIRE
   1818 Market Street, Suite 3402
5  Philadelphia, Pennsylvania  19103
   (215) 988-1464
6  dkr@pietragallo.com
   Representing Cardinal Health
7
8
9  ALSO PRESENT:
10
   Carolyn M. Hazard, Litigation Counsel
11 Endo
12 Bill Geigert, Videographer
13 Bradley Smith, Trial Technician
14
15
16
17
18
19
20
21
22
23
24

---

Page 425

1         I N D E X
2  WITNESS            PAGE
   BRIAN LORTIE
3
4      By Ms  Scullion     430
       By Mr  Leniski      591
5      By Mr  Limbacher    642
6       E X H I B I T S
7  NO      DESCRIPTION      PAGE
8  Endo-
   Lortie-39 E-mail dated 8/1/01
9      Subject, Update from
       American Pain Foundation,
10     with attachments
       [ENDO-OPIOID MDL-06234029
11     through 4037]        443
12 Endo-
   Lortie-40 E-mail dated 11/10/15
13     Subject, Bilirakis Bill and
       CDC Guidelines
14     [ENDO-OPIOID MDL-01552423]  462
15 Endo-
   Lortie-41 E-mails dated 1/28/16
16     Subject, RE: VA PROMISE
       Act Amendments
17     [ENDO-OPIOID_MDL-01902150
       through 2151]        469
18
   Endo-
19 Lortie-42 E-mail dated 2/25/16
       Subject, Government
20     Affairs Update: Endo
       Victory on Amended
21     PROMISE Act
       [ENDO-OPIOID_MDL-01211912]  478
22
23
24

2 (Pages 422 to 425)

Highly Confidential - Subject to Further Confidentiality Review

Page 426

```
 1          E X H I B I T S
 2    NO.    DESCRIPTION        PAGE
 3    Endo-
      Lortie-43 E-mail string, top one
 4          dated 2/17/16
            Subject, RE: FW: CDC Follow-Up
 5          [ENDO-OPIOID_MDL-04948416
            through 8419]        481
 6
      Endo-
 7    Lortie-44 E-mail dated 2/25/16
            Subject, Re: Government
 8          Affairs Update: Endo
            Victory on Amended PROMISE
 9          Act
            [ENDO-OPIOID MDL-01211917
10          through 1918]        490
11    Endo-
      Lortie-45 E-mail string, top one
12          dated 3/16/16
            Subject, RE: Opana ER -
13          doses >30mg?
            [ENDO-OPIOID MDL-01902659
14          through 2662]        494
15    Endo-
      Lortie-46 E-mail string, top one
16          dated 7/7/16
            Subject, RE: Endo Government
17          Affairs Update: CARA
            [ENDO-OPIOID MDL-01230052
18          through 0055]        508
19    Endo-
      Lortie-47 E-mail string, top one
20          dated 2/12/16
            Subject, Re: Guidelines
21          [ENDO-OPIOID MDL-01563548
            through 3551]        516
22
23
24
```

Page 428

```
 1          E X H I B I T S
 2    NO.    DESCRIPTION        PAGE
 3    Endo-
      Lortie-54 E-mail string, top one
 4          dated 1/23/19
            Subject, Opiates: Endo 30b6
 5          [no Bates]           582
 6    Endo-
      Lortie-55 E-mail dated 5/30/12
 7          Subject, Draft Rx Drug
            Abuse Deck for 6/5/12
 8          with attached slide deck
            produced natively
 9          [ENDO-OPIOID_MDL-01941783
            through 1784]        596
10
      Endo-
11    Lortie-56 File Provided Natively
            slide deck of charts
12          [EPI001932425]       606
13    Endo-
      Lortie-57 E-mail dated 11/25/14
14          Subject, NOVEMBER 2014 pptx
            with attached slide deck
15          produced natively
            [ENDO-OPIOID_MDL-01333143]  615
16
      Endo-
17    Lortie-58 E-mails dated 11/13/14
            Subject, FW: TN Opana ER
18          [ENDO-OPIOID_MDL-02667006
            through 7007]        626
19
      Endo-
20    Lortie-59 E-mail string, top one
            dated 11/13/14
21          with attached slide deck
            produced natively
22          [ENDO-OPIOID_MDL-02667012]  630
23
24
```

Page 427

```
 1          E X H I B I T S
 2    NO.    DESCRIPTION        PAGE
 3
      Endo-
 4    Lortie-48 E-mail string, top one
            dated 12/12/07
 5          Subject, RE: Woman dies
            of apparent Opana ER
 6          overdose in Paducah, KY
            [ENDO-OPIOID MDL-0077 4063
 7          through 4067]        532
 8    Endo-
      Lortie-49 Attachment 16
 9          [ENDO-OR-CID-00694084
            through 4087]        538
10
      Endo-
11    Lortie-50 RiskMAP Update Report
            for Opana ER 5/22/08
12          [ENDO-CHI_LIT-00032209
            through 2237]        546
13
      Endo-
14    Lortie-51 Buc & Beardsley letter
            dated 3/2/09
15          [ENDO-OPIOID_MDL-01485661
            through 5665]        558
16
      Endo-
17    Lortie-52 Opana ER W-2 IVR vocal
            response listing for study
18          number M508202
            [Endo-CHI_LIT-00150080]  567
19
      Endo-
20    Lortie-53 E-mail dated 12/1/09
            Subject, 3305B1 Field
21          Visit - 12/1/09
            [ENDO-OPIOID_MDL-00992589
22          through 2591]        578
23
24
```

Page 429

```
 1          E X H I B I T S
 2    NO.    DESCRIPTION        PAGE
 3    Endo-
      Lortie-60 E-mail string, top one
 4          dated 7/13/11
            DEA dated July 13, 2011
 5          [END000027562 through 7563]  660
 6    Endo-
      Lortie-61 RISKMAP UPDATE REPORT
 7          FOR OPANA ER
            1/1/09-3/31/09
 8          [EPI000119179 through
            9206]                670
 9
10    Endo-
      Lortie-62 RISKMAP UPDATE REPORT
11          FOR OPANA ER
            1/1/10-3/31/10
12          [ENDO-OR-CID-00681354
            through 1377]        671
13    Endo-
      Lortie-63 RISKMAP UPDATE REPORT
14          FOR OPANA ER
            1/1/11-3/31/11
15          [END00308793 through
            8831]                672
16
      Endo-
17    Lortie-64 RISKMAP UPDATE REPORT
            FOR OPANA ER
18          1/1/11-9/30/11
            [EPI000015268 through
19          5298]                673
20    Endo-
      Lortie-65 RISKMAP UPDATE REPORT
21          FOR OPANA ER
            10/1/11-12/31/11
22          [ENDO-OR-CID-01044118
            through 4148]        675
23
24              - - -
```

Highly Confidential - Subject to Further Confidentiality Review

Page 430

1           THE VIDEOGRAPHER:  Good
2   afternoon.  We are back on the record.
3   Today's date is January 23rd, 2019, and
4   the time is 2:36 p.m.  This is the
5   continuation of the deposition of Brian
6   Lortie.
7           Sir, I'm reminding you you're
8   still under oath.
9           THE WITNESS:  Yes, thank you.
10  BY MS. SCULLION:
11      Q.    Good afternoon, Mr. Lortie.
12  Welcome back.
13      A.    Thank you.
14      Q.    As the videographer reminded you,
15  you're still under oath, you realize that?
16      A.    I understand.
17      Q.    Terrific.  Between the time we
18  ended yesterday and today, did you do anything
19  further to prepare for the deposition?
20      A.    I did not.
21      Q.    Did you meet with counsel?
22      A.    Only on our way from here to --
23  as we were walking up, but nothing substantial.
24      Q.    And did you discuss your

Page 431

1   testimony with anyone other than counsel?
2       A.    No, I did not.
3       Q.    Okay.  One of the things we
4   looked at early in the deposition yesterday was
5   your Severance Agreement --
6       A.    Yes.
7       Q.    -- with Endo.  Do you remember
8   that?



Page 432

Page 433

Highly Confidential - Subject to Further Confidentiality Review



Page 434

14  BY MS. SCULLION:
15      Q.    Okay.  Let's go back into your
16  corporate capacity.

Page 436

Page 435

Page 437

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 438

Page 440

1    -- as part of Endo's procedures -- sorry --
2    anti-diversion procedures, was the risk
3    management team making an assessment about
4    whether prescriptions were medically necessary?
5        MR. LIMBACHER:  Same objections.
6        THE WITNESS:  Yeah, I think my
7    answer is exactly the same.  They were
8    convened to look at prescriptions among
9    the other inputs to the activities of
10   that committee, for the sole purpose in
11   that case of understanding whether those
12   prescriptions were appropriate or
13   unusual for any way.
14       Beyond that, how they addressed
15   those, I'm just -- I wasn't part of that
16   team, so I can't give you any further
17   detail.
18   BY MS. SCULLION:
19       Q.    And I'm trying to understand when
20   in the context of what you just said in trying
21   to determine whether -- sorry -- whether the
22   prescriptions were appropriate or unusual in any
23   way, did that include an assessment of whether
24   the prescriptions were medically necessary?

Page 439

Page 441

1        MR. LIMBACHER:  Same objections,
2    asked and answered.
3        THE WITNESS:  Yeah, and I don't
4    know any further detail than what I've
5    testified in answering that question.
6    BY MS. SCULLION:
7        Q.    Okay.  So let's turn to topic
8    number 39 for the corporate representative
9    issues, and that is Endo's collaboration with
10   other defendants.
11       Did Endo collaborate with any
12   other manufacturers with respect to issues of
13   marketing, sales, distribution of opioid
14   products?
15       A.    No.
16       MS. SCULLION:  Let's have Exhibit
17   Number E1326.
18   BY MS. SCULLION:
19       Q.    Endo was a long-time supporter of
20   the American Pain Foundation, correct?
21       A.    I'm not sure how long Endo was a
22   supporter of that.  I recognize that from time
23   to time through unrestricted medical grants and
24   the like that that that would have been one of

Page 439 (lower portion):

15       Q.    And you can't speak to that as
16   the corporate representative today, correct?
17       MR. LIMBACHER:  Object to form
18   and object to the extent it falls
19   outside the scope of the topics on which
20   he's been designated.
21       THE WITNESS:  I've answered it to
22   the best of my ability.
23   BY MS. SCULLION:
24       Q.    Okay.  And do you know whether in

Highly Confidential - Subject to Further Confidentiality Review

Page 442

1  the sources of support.
2      Q.    And the American Pain Foundation,
3  other supporters include other manufacturers of
4  opioids, such as Purdue, correct?
5      A.    That I don't know.
6      Q.    Do you know that as Endo's
7  corporate representative here today?
8          MR. LIMBACHER: Object to form,
9      and I object as falling outside the
10     scope of the topics on which he's been
11     designated. That falls under topic 36
12     of your deposition notice, and he has
13     not been designated on that topic.
14         MS. SCULLION: This goes to the
15     questions of collaboration through the
16     APF. Let me hand you what's been
17     marked as Exhibit Number --
18         MR. LIMBACHER: The deposition
19     notice specifically references
20     relationships with a number of entities,
21     including the American Academy of Pain
22     Medicine, the American Pain Foundation,
23     the American Pain Society and others.
24         (Document marked for

Page 443

1          identification as Endo-Lortie Deposition
2          Exhibit No. 39.)
3  BY MS. SCULLION:
4      Q.    Let me hand you what's been
5  marked as Exhibit Number 39.
6          And for the record, Exhibit 39 is
7  Bates stamped ENDO-OPIOID_MDL-02634029.
8          Mr. Lortie, do you see Exhibit 39
9  is a August 1st, 2001 e-mail from Linda
10 Kitlinksi to, among others, Carol Ammon?
11     A.    Yes, I see that on the cover, the
12 e-mail cover, yes.
13     Q.    Carol Ammon was at the time the
14 CEO of Endo, correct?
15     A.    I believe so. Again, August 2001
16 was fully eight years before I arrived at Endo,
17 but Carol was the founding CEO, so --
18     Q.    Right.
19     A.    -- that's probably correct.
20     Q.    Okay. And do you see
21 Ms. Kitlinksi is referring to Mr. Giglio, the
22 new executive director of the American Pain
23 Foundation and that he's expressing his
24 appreciation for the support Endo has provided

Page 444

1  to the APF?
2          MR. LIMBACHER: Object to form
3      and also object as falling outside the
4      scope of the topics on which he's been
5      designated. This falls squarely within
6      topic number 36 of your deposition
7      notice.
8          THE WITNESS: So would you just
9      mind reasking the question.
10 BY MS. SCULLION:
11     Q.    Yeah. That Ms. Kitlinksi is
12 referring to Mr. Giglio, the new executive
13 director of the American Pain Foundation, and
14 she is conveying that he's expressing his
15 appreciation for the support Endo has provided
16 to the APF.
17         Do you see that?
18         MR. LIMBACHER: Same objections.
19         THE WITNESS: Yes, I read that in
20     Linda's e-mail.
21 BY MS. SCULLION:
22     Q.    And, in particular, it refers to
23 a grant submission request that the APF is going
24 to be sending to Endo, correct?

Page 445

1          MR. LIMBACHER: Same objections.
2          THE WITNESS: I don't know. I'll
3      read on to see.
4  BY MS. SCULLION:
5      Q.    The end of the e-mail?
6      A.    This predates me, so, therefore,
7  I'm not -- I'm obviously not a recipient of it.
8          Yes. And so I see where he -- as
9  you mentioned before, he expresses his
10 appreciation of support and is forwarding a copy
11 of something along related to a grant submission
12 request.
13     Q.    Okay. And if you go to page --
14 sorry, we've marked Exhibit 39 as -- with E1326
15 at the top right-hand corner.
16         If you go to page E1326.3, which
17 is "Background and Update to Endo
18 Pharmaceuticals From the American Pain
19 Foundation."
20         Do you see in the second
21 paragraph of the overview of the American Pain
22 Foundation it states here, the "APF was founded
23 in 1997 by three former presidents of the
24 American Pain Society"?

7 (Pages 442 to 445)

Highly Confidential - Subject to Further Confidentiality Review

Page 446

1      MR. LIMBACHER:  Object to form
2   and foundation and object as falling
3   outside the scope of the topics on which
4   he's been designated.  Again, these
5   questions fall squarely within topic
6   number 36 of your deposition notice.
7      THE WITNESS:  If it's okay, I'm
8   just going to read a couple of pages
9   here to orient myself.
10  BY MS. SCULLION:
11     Q.    I mean, the only question is do
12  you see that it says that the APF was founded in
13  1997 by three former presidents of the American
14  Pain Society?
15     A.    Yeah, just a second, if I could,
16  I just want to kind of ground myself, since this
17  was not a communication that --
18     Q.    I'll tell you, it's the only
19  question I have about this page.
20     A.    Sure, but it's just important
21  that I get what is being communicated here.
22     MR. LIMBACHER:  Take your time
23  and review the document.
24  BY MS. SCULLION:

Page 447

1      Q.    I'll withdraw the question.
2      Now, is it your contention, is it
3   Endo's contention that Endo did not collaborate
4   with any other manufacturers of opioids such as
5   Purdue Pharma through the APF?
6      MR. LIMBACHER:  Object to form,
7   foundation and to the extent it falls
8   outside the scope of the topics on which
9   he's been designated.
10     THE WITNESS:  I believe the
11  question I answered originally was
12  regards to three specific topics, sales,
13  marketing and distribution, and the
14  answer to that is, no, Endo did not
15  collaborate with any other manufacturers
16  on those topics.
17  BY MS. SCULLION:
18     Q.    How about with respect to the use
19  of opioids, did it collaborate with other
20  manufacturers with respect to the use of
21  opioids?
22     MR. LIMBACHER:  Same objections.
23     THE WITNESS:  I'm not sure I
24  really understand the question.

Page 448

1   BY MS. SCULLION:
2      Q.    For example, with respect to
3   medical guidelines for the use of opioids, did
4   Endo collaborate with other manufacturers on
5   that issue?
6      MR. LIMBACHER:  Same objections.
7      THE WITNESS:  I don't -- I'm not
8   aware specifically because that didn't
9   fall squarely in my responsibility.  To
10  the extent to which Endo collaborated
11  with any other manufacturer on a broad
12  topic, as you just mentioned,
13  guidelines, et cetera.
14     MS. SCULLION:  So, counsel, is
15  Mr. Lortie here to testify on topic 39
16  with respect to collaboration among Endo
17  and any other pharmaceutical
18  manufacturers concerning use of opioid
19  products?
20     MR. LIMBACHER:  He's here to
21  testify with regard to topic 39 as it
22  reads in your deposition notice and in
23  the context of the other topics which
24  you have set forth in your deposition

Page 449

1   notice.
2      He's not here to testify about
3   other topics that are clearly distinct
4   from topic number 39.
5      MS. SCULLION:  Right, and is it
6   Endo's contention that topic 39 does not
7   include collaboration with other
8   pharmaceutical manufacturers concerning
9   the use of opioids as stated here --
10  I'll read for the record, our notice
11  states, any effort you, you're Endo,
12  made directly or through any third party
13  to collaborate with one or more other
14  pharmaceutical manufacturers or
15  distributors concerning marketing, use,
16  prescribing, sale, distribution or
17  regulation of any one or the class of
18  opioid products, including any
19  collaborative lobbying efforts
20  concerning any of the foregoing.
21     MR. LIMBACHER:  You read that
22  correctly, counsel, and we may have
23  disagreement with regard to how you're
24  defining the word use, if that is the

8  (Pages 446 to 449)

Page 450

```
 1    issue that's on the table.  But why
 2    don't you use your time to ask him
 3    questions.
 4           MS. SCULLION:  I will use the
 5    time to ask the questions.  It is our
 6    contention that that is -- so
 7    collaboration with respect to medical
 8    guidelines, for example, would be part
 9    of that topic.
10  BY MS. SCULLION:
11       Q.    Are you familiar with --
12           MR. LIMBACHER:  He answered those
13    questions, subject to my objections.
14           MS. SCULLION:  Right, and his
15    answer was he didn't know because it
16    wasn't within his area of
17    responsibility, and I was asking whether
18    he'd been prepared as a corporate
19    representative to speak to, for example,
20    Endo's collaboration with other
21    manufacturers on medical guidelines for
22    the use of opioids.
23  BY MS. SCULLION:
24       Q.    Let me ask you this question: are
```

Page 451

```
 1    you familiar with medical guidelines?
 2       A.    As a general topic.
 3       Q.    Okay.  And can you explain what
 4    your understanding is of --
 5       A.    That was a yes.  I was asking you
 6    for your clarification, as a general topic,
 7    medical guidelines?
 8       Q.    Yes.
 9       A.    Yes, I am familiar.
10       Q.    And can you explain what your
11    understanding is of what medical guidelines are?
12       A.    Across any number of therapeutic
13    areas from time to time bodies of healthcare
14    professionals and other interested parties often
15    come together, occasionally, it's the government
16    or the CDC or others, to provide medical
17    guidelines, in other words, therapeutic
18    guidelines for approaches to certain disease or
19    diagnosis of disease or treatment of disease.
20    So just about my experience of many years in
21    this industry, that's something that occurs as a
22    matter of routine activity across any number of
23    therapeutic areas.
24  BY MS. SCULLION:
```

Page 452

```
 1       Q.    And so for the layperson, do
 2    medical guidelines relate to the use of the
 3    given drug category?
 4           MR. LIMBACHER:  Object to form.
 5           THE WITNESS:  It's possible that
 6    they could.  But as I tried to explain,
 7    it could also speak to diagnosis,
 8    therapeutic advances, therapy, as you
 9    point out, so it could, but it also is a
10    broader and more broadly defined
11    category.
12  BY MS. SCULLION:
13       Q.    Could it -- do they also relate
14    to the prescribing of a given category of drug
15    products, guidelines for prescribing those?
16           MR. LIMBACHER:  Object to form.
17           THE WITNESS:  It could, yes,
18    sometimes that's the case.
19  BY MS. SCULLION:
20       Q.    Okay.  Are you prepared today, as
21    Endo's corporate representative, to speak to
22    Endo's collaboration with other manufacturers
23    concerning medical guidelines to the extent that
24    those guidelines relate to the use of opioid
```

Page 453

```
 1    products?
 2           MR. LIMBACHER:  Counsel, if you
 3    have documents you want to put in front
 4    of him that fall within the scope of
 5    topic 39, he is prepared to answer those
 6    questions.
 7           MS. SCULLION:  I don't want to
 8    sit here and show him documents if he's
 9    not been prepared to speak to the topic,
10    and we are not going to have this time
11    come out of our 30(b)(6) time because
12    it's apparent that he has not been
13    prepared on the full scope of the
14    topics, but I do want to make sure I
15    understand.
16  BY MS. SCULLION:
17       Q.    Have you been prepared to speak
18    to Endo's collaboration with other manufacturers
19    on medical guidelines to the extent the
20    guidelines relate to the use of opioid products?
21           MR. LIMBACHER:  And, again,
22    counsel he's been prepared to testify
23    within the scope of a reasonable
24    definition and interpretation of topic
```

Page 454

1    39, recognizing that there are a lot of
2    other topics in this deposition notice
3    that sometimes more specifically refer
4    to some of the issues that you are
5    raising.
6           So if you have questions about
7    particular documents, why don't you put
8    those documents in front of him, and
9    he'll be happy to answer those
10   questions, subject to my objections.
11   BY MS. SCULLION:
12   Q.    Were you prepared on that issue?
13   A.    I am sure I can shed light on
14   certain areas of that topic.  We just spoke
15   about the definition of guidelines and how
16   they're used.
17           There will be a level beyond
18   which I was not involved specifically, so I
19   can't attest based on my own experience because
20   I don't recall sitting on a guidelines
21   preparation committee, and -- but I'd be happy
22   to do my very best to answer the questions if
23   you can show me what you'd like me to respond
24   to.

Page 455

1    Q.    I was going to ask you, can you
2    tell me what you know, as Endo's corporate
3    representative, about the extent to which Endo
4    collaborated with other manufacturers of opioids
5    with respect to medical guidelines concerning
6    the use of opioids?
7           MR. LIMBACHER:  Object to form
8           and foundation and object to the extent
9           it falls outside the scope of the topics
10          on which he's been designated.  He is
11          not the corporate representative on any
12          and every issue that you care to raise
13          with him, counsel.
14          He has been specifically
15          designated on precise topics following
16          extensive communication back and forth
17          between lawyers for Endo and yourself.
18          MS. SCULLION:  None of this --
19          none of colloquy is going to be coming
20          out of our time.
21   BY MS. SCULLION:
22   Q.    Can you tell me what you know
23   about that issue as Endo's corporate
24   representative?

Page 456

1    A.    Sure, I can.  Based on my
2    experience, my recollections generally are that
3    when medical guidelines were either communicated
4    to Endo or when Endo had an opportunity to
5    respond to requests for having input, my view is
6    I understood Endo's contribution to those
7    discussions in concert with our physicians, with
8    our regulators, for example, our health economic
9    team, whatever the question was, we would
10   always, if invited, put the appropriate staff in
11   contact and respond to those.
12           To the extent that other
13   companies were involved and also asked to
14   contribute to guidelines, and, again, I'm
15   talking generally, I'm not speaking with regards
16   to any specific one, although I'd be happy to do
17   that, I can't tell you because I never had
18   visibility to the other groups, constituents or
19   companies that may have been asked to
20   contribute.  So my view on guidelines and my
21   experience with guidelines is I was looking at
22   it through Endo's involvement, but I was not
23   privy to other company's involvement.
24   Q.    Do you know, as Endo's corporate

Page 457

1    representative, can you tell me about Endo's
2    participation in the American Pain Society
3    guideline project?
4           MR. LIMBACHER:  Object to form
5           and foundation and object as falling
6           outside the scope of the topics on which
7           he's been designated.
8           THE WITNESS:  Specifically, I
9           cannot, but, again, I'd be happy to
10          review something to see if I have
11          information that would be helpful.
12   BY MS. SCULLION:
13   Q.    You've not been prepared on that
14   topic, correct?
15          MR. LIMBACHER:  That's because
16          he's not designated on that topic,
17          counsel.  The American Pain Society is
18          specifically referenced in topic 36 of
19          your deposition notice.  It is not in
20          topic number 39, and I don't see the
21          words medical guidelines anywhere in
22          topic 39.
23          MS. SCULLION:  Counsel, as you
24          know, I've asked him the question with

Highly Confidential - Subject to Further Confidentiality Review

Page 458

1    respect to use of opioids and it's
2    squarely within topic 39. I'm not going
3    to have any of this colloquy come out of
4    our time for a 30(b)(6) deposition.
5         MR. LIMBACHER: You're the one
6    who is choosing to question him on
7    topics on which he has not been
8    designated.
9         MS. SCULLION: Counsel, we're not
10   doing this. If you want to do this off
11   the record, I'm happy to do it. I'm not
12   doing it on the record anymore.
13   BY MS. SCULLION:
14        Q.   Do you know as Endo's corporate
15   representative whether Endo co-sponsored, along
16   with other manufacturers of opioids, prescribing
17   guides for opioids?
18        A.   I'm not aware of such a thing,
19   no.
20        Q.   Not prepared to speak to that,
21   correct?
22        A.   I'm not aware of that having
23   happened.
24        MR. LIMBACHER: Object to form

Page 459

1    and foundation and object to the extent
2    it falls outside the scope of the topics
3    on which he's been designated.
4    BY MS. SCULLION:
5         Q.   Are you prepared to speak as
6    Endo's corporate representative with respect to
7    Endo's collaboration with other manufacturers of
8    opioids on the REMS implementation?
9         MR. LIMBACHER: Object to form,
10   foundation and to the extent it falls
11   outside the scope of the topics on which
12   he's been designated. I don't see any
13   reference to REMS implementation in
14   topic number 39.
15        THE WITNESS: I think we've
16   testified before, REMS was an
17   industry-wide requirement by the FDA,
18   and, therefore, other companies -- I'm
19   sure every manufacturer was involved.
20        I know Endo's involvement in
21   that. Again, same answer as before, to
22   the extent as REMS was being developed
23   and we were required to implement it as
24   part of our risk management program

Page 460

1    through our own internal people, I was
2    aware of our contribution to that and
3    our responsibilities. I was not privy
4    to what other companies' input on that
5    was. If I can just finish.
6    BY MS. SCULLION:
7         Q.   Sure, please. I thought you
8    were. I apologize, go ahead.
9         A.   I do recall that, in general,
10   knowing that other companies were part of that,
11   again, because it was industry wide requirement.
12        Q.   You say it was an industry-wide
13   requirement, so it was a regulation on the
14   industry with respect to opioid products,
15   correct?
16        MR. LIMBACHER: Same objections.
17        THE WITNESS: I believe that's
18   correct, yes.
19   BY MS. SCULLION:
20        Q.   Okay. But you have not reviewed
21   documents or otherwise prepared to speak to
22   Endo's collaboration with any other
23   manufacturers on the REMS initiative as part of
24   the regulation of opioid products, correct?

Page 461

1        MR. LIMBACHER: Object as falling
2    outside the scope of topic number 39 on
3    which he has been designated.
4        THE WITNESS: I've explained to
5    you the depth of my knowledge
6    specifically on the REMS process. I
7    wasn't a part of the working group, so I
8    don't know.
9    BY MS. SCULLION:
10        Q.   Okay. As part of your
11   preparation for the deposition, did you review
12   the RiskMAP updates that Endo submitted to the
13   FDA?
14        A.   I reviewed probably some of them.
15   I'm not sure I reviewed every single one, but I
16   did review sequence of them and studied them to
17   get a general sense what I understand, you know,
18   so I understand what those were.
19        Q.   Okay. We'll come back to that.
20   I just wanted to make sure I understood.
21        MS. SCULLION: Could I have 1570,
22   1574, 1571.
23   BY MS. SCULLION:
24        Q.   I'm going to switch back to your

11 (Pages 458 to 461)

Highly Confidential - Subject to Further Confidentiality Review

Page 462

1     personal capacity, to be very clear.
2          A.    Thank you.  I appreciate the
3     clarification.
4          Q.    No problem.
5          (Document marked for
6          identification as Endo-Lortie Deposition
7          Exhibit No. 40.)
8     BY MS. SCULLION:
9          Q.    Mr. Lortie, Endo was involved in
10    some lobbying efforts in 2016 with respect to
11    the VA Promise Act.
12          Do you recall that?
13          A.    Not specifically, but I'd be
14    happy to review documents to help jog my memory.
15          Q.    Do you recall the VA Promise Act,
16    an act that, among other things, concerned
17    medical guidelines that the VA would use with
18    respect to the use of long-acting opioids?
19          A.    Based on what you just said, I
20    recall a little bit, but not a lot of detail.
21          Q.    Okay.
22          A.    I haven't reviewed anything
23    relative to that.
24          Q.    Okay.  Let me hand you what's

Page 463

1     been marked as Exhibit 40.
2          And for the record, Exhibit 40 is
3     Bates stamped ENDO-OPIOID_MDL-01552423 and
4     that's stamped on the upper right-hand corner
5     E1570 --
6          A.    I'm sorry, just the stamp on the
7     lower right, I don't believe I've got the same
8     number you mentioned.
9          Q.    The upper right, does yours say
10    E1570?
11          A.    It says E1574.1.
12          Q.    Oh, I'm sorry.  I handed you the
13    wrong document.
14          A.    And I was also referring to the
15    Bates stamp as different.
16          Q.    I meant 1570.
17          A.    Checking to make sure I'm with
18    you.
19          Q.    Sure.  Thank you very much.  I
20    misspoke.  Thank you.
21          Try this again.  So I'm handing
22    you what's marked as Exhibit 40.
23          A.    Everyone gets a do-over.
24          Q.    Thank you.

Page 464

1          And this Exhibit 40 is Bates
2     stamped ENDO-OPIOID-MDL_01552423, and just to
3     make sure in the upper right-hand corner E1570,
4     correct?
5          A.    Yes, that is the document I have.
6          Q.    Great, terrific.
7          You see this is a November 2015
8     e-mail from Timothy Byrne to yourself and others
9     at Endo?
10          A.    I do.
11          Q.    And the subject matter here is
12    Bilirakis Bill and CDC guidelines.
13          Do you see that?
14          MR. LIMBACHER:  Take your time
15    and review the document.
16          THE WITNESS:  Yeah, that's what's
17    written in the subject line.  I'll just
18    take a look at the text here for a
19    moment.
20    BY MS. SCULLION:
21          Q.    Sure.
22          A.    (Witness reviews document.)
23          Okay.  Thank you.
24          Q.    Okay.  Looking at Exhibit 40,

Page 465

1     does this refresh your recollection about Endo's
2     lobbying with respect to what's called here the
3     Bilirakis bill, it's called within the -- sorry,
4     in the body of the e-mail, it does refer to the
5     bill, and it's -- strike that.
6          Does this refresh your
7     recollection about a bill concerning the VA's
8     use of the CDC guidelines?
9          A.    It doesn't specifically refresh
10    my recollection, but I do read that here, so
11    it's clear that that's the connection that's
12    being made.
13          Q.    Okay.  And if you -- who was Tim
14    Byrne?
15          A.    Tim Byrne was a member of our --
16    trying to remember specifically what that
17    department was called, but essentially our -- he
18    was not in our Washington office but government
19    affairs.
20          Q.    Government affairs?
21          A.    Thank you, government affairs.
22          Q.    And government affairs, among
23    other things, worked with lobbyists that Endo
24    engaged; is that right?

Highly Confidential - Subject to Further Confidentiality Review

Page 466

1         MR. LIMBACHER:  Object to form
2    and foundation.
3         THE WITNESS:  Sorry, to the
4    extent that lobbyists were engaged, they
5    would have been engaged through that
6    department, yes.
7    BY MS. SCULLION:
8         Q.    Okay.  And if you look in the
9    first paragraph of Mr. Byrne's e-mail in the
10   second sentence, do you see that he explains in
11   the second half of that sentence, we are
12   opposing a provision in this Bilirakis bill,
13   "opposing a provision that would require the
14   VA/DOD Clinical Practice Guideline for the
15   Management of Opioid Therapy for Chronic Pain be
16   updated to include recommended guidelines as
17   compiled by the Centers for Disease Control and
18   Prevention (CDC)."
19        Do you see that?
20        A.    Yes, I do.  I read that.
21        Q.    Okay.  And then Mr. Byrne goes on
22   to explain in the next paragraph, "we," Endo,
23   "are currently working with many other
24   stakeholders in opposing the recently proposed

Page 467

1    CDC Guidelines for Prescribing Opioids for
2    Chronic Pain."
3         Did I read that correctly?
4         A.    You read the sentence correctly.
5         Q.    Okay.  And the other
6    stakeholders, that included other opioid
7    manufacturers; is that right?
8         A.    That's not clear here.  It says
9    other stakeholders.
10        Q.    Do you recall that Endo worked
11   with other manufacturers, among other
12   stakeholders, in opposing the CDC guidelines?
13        A.    Not specifically, I don't recall.
14        Q.    And he goes on to explain that
15   the reason that Endo was opposing the CDC
16   guidelines is because, in Endo's view, they
17   would oppose dosing and duration limits and
18   restrict access for patients.
19        Do you see that?
20        MR. LIMBACHER:  Object to form.
21        THE WITNESS:  Just finding that
22   line.  Yes, you read that correctly.
23   BY MS. SCULLION:
24        Q.    Okay.  And so, again, if you go

Page 468

1    to the last paragraph, last sentence before the
2    closing of Mr. Byrne's e-mail he says, "We will
3    also continue to work with those in the pain
4    community in proposing the proposed CDC
5    guidelines."
6         Do you see that?
7         A.    Yes, you read that correctly.
8         Q.    And looking at that, again, does
9    that refresh your recollection that Endo was
10   collaborating with other opioid manufacturers in
11   opposing the proposed CDC guidelines?
12        A.    No, it does not.
13        Q.    Do you recall that Endo worked
14   with the Pain Care Forum in opposing the CDC
15   guidelines?
16        A.    I don't, not specifically, no.
17        Q.    Do you recall Endo working with
18   any organizations in opposing the CDC
19   guidelines?
20        A.    This doesn't help me recall
21   anything, no.
22        Q.    Okay.  Let's go to -- Mr. Lortie,
23   you personally did go to lobby against the
24   inclusion -- sorry -- you went to personally

Page 469

1    lobby against a bill that would have required
2    the VA to follow only the CDC guidelines with
3    respect to the use of opioids, correct?
4         A.    I don't recall that, no.
5         Q.    Okay.  Hand you what's been
6    marked as Exhibit number 41.
7              (Document marked for
8         identification as Endo-Lortie Deposition
9         Exhibit No. 41.)
10   BY MS. SCULLION:
11        Q.    And Exhibit 41 is Bates stamped
12   ENDO-OPIOID_MDL-01902150, and it's in the upper
13   right-hand corner E1574.
14        A.    Yes, this is the one I had
15   before.
16        Q.    It is.
17
18
19
20
21
22
23
24

13 (Pages 466 to 469)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 478

21    Q.    Okay.  And this is now dated --
22    an e-mail, sorry, from Scott -- Andrew Scott
23    dated February 25th, 2016.
24            Do you see that?

Page 480

Page 479

1    A.    Yes, I do.
2    Q.    And Mr. Scott, as it says in his
3    signature block, was the government affairs
4    liaison for Endo at the time, correct?
5    A.    Yes.
6    Q.    Down in DC, right?
7    A.    Yes, he worked in our office in
8    Washington, DC.

Page 481

17        (Document marked for
18        identification as Endo-Lortie Deposition
19        Exhibit No. 43.)
20    BY MS. SCULLION:
21    Q.    Let's look at what's been marked
22    Exhibit Number 43.
23        And Exhibit Number 43 is Bates
24    stamped ENDO-OPIOID_MDL-04948416, and at the top

16 (Pages 478 to 481)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 490

19      Q.    Okay.  And then --
20            MS. SCULLION:  Can I have 1572.
21            (Document marked for
22       identification as Endo-Lortie Deposition
23       Exhibit No. 44.)
24   BY MS. SCULLION:

Page 492

Page 491

1      Q.    And the changes to the House bill
2   we reviewed earlier, those were also really
3   important to the company, right?
4            MR. LIMBACHER:  Object to form.
5            THE WITNESS:  I don't recall.
6   BY MS. SCULLION:
7      Q.    Let me hand you what's been
8   marked as Exhibit Number 44.
9            And Exhibit Number 44 is Bates
10   stamped ENDO-OPIOID_MDL-01211917, and it's Bates
11   stamped in the upper right-hand corner E1572.
12            Do you see that?
13      A.    Yes, I have that document.

Page 493

Highly Confidential - Subject to Further Confidentiality Review



Page 494

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12          MS. SCULLION: Can I have E1573,
13   please.
14          (Document marked for
15   identification as Endo-Lortie Deposition
16   Exhibit No. 45.)
17          MR. LIMBACHER: Counsel, whenever
18   is a good time for a break.
19          MS. SCULLION: We can finish
20   after he -- we can take a break after
21   this topic.
22          MR. LIMBACHER: Sure.
23          MS. SCULLION: Just a little bit
24   more.
```

Page 495

```
 1          MR. LIMBACHER: Thank you.
 2   BY MS. SCULLION:
 3      Q.    I'm going to hand you what's been
 4   marked as Exhibit Number 45.
 5          And it's Bates stamped in the
 6   bottom right-hand corner
 7   ENDO-OPIOID_MDL-01902659.  On the upper
 8   right-hand corner is E1573.
 9          Do we have the correct document?
10      A.   I have that document, yes.
11      Q.    Okay.  And if you will, again,
12   start at the back of the document, best place to
13   start is actually on the page E1573.3, at the
14   very bottom there's an e-mail from Keri Mattox
15   to John Harlow, cc'ing you and Mr. Munroe, and
16   that carries over to the next page.
17          Do you see that?
18      A.   To E1573.4?
19      Q.   Yes.
20      A.   So I'll take a look at that.
21          (Witness reviews document.)
22   Okay, thank you.  I've looked through the
23   document.
24      Q.    So starting with -- is it
```

Page 496

```
 1   Ms. Mattox, Keri Mattox?
 2      A.    Keri Mattox is, yes.
 3      Q.    A woman?
 4      A.    Yes.
 5      Q.    Starting with Ms. Mattox's
 6   e-mail, Ms. Mattox, she's listed as "SVP
 7   Investor Relations & Corporate Affairs"; is that
 8   right?
 9      A.    Yes.  At that time, yes.
10      Q.    Is investor relations typically
11   the department -- was that typically the
12   department within Endo that had input with
13   respect to medical guidelines for the use of
14   Endo's products?
15          MR. LIMBACHER: Object to form.
16          THE WITNESS: Input into medical
17   guidelines?
18   BY MS. SCULLION:
19      Q.    Correct?
20      A.    No.
21      Q.    Ms. Mattox is only commenting on
22   the CDC guidelines because of the potential
23   impact that she says on Opana ER revenues.
24          Do you see that?
```

Page 497

```
 1          MR. LIMBACHER: Object to form.
 2          THE WITNESS: I'm not sure what
 3      you're asking.
 4   BY MS. SCULLION:
 5      Q.    Well, why is Ms. Mattox
 6   commenting on the issuance of the CDC
 7   guidelines?
 8          MR. LIMBACHER: Object to form
 9      and foundation.
10          THE WITNESS:  Well, if you read
11      the entirety of the e-mail chain,
12      there's a desire to assess what, if any,
13      financial impact there may be on the
14      business as a result of those
15      guidelines.  This was -- Keri was in
16      charge of investor relations, corporate
17      communications, and so this would have
18      been very normal in the course of her
19      work.
20   BY MS. SCULLION:
21      Q.    Right.  And so starting with her
22   e-mail, she explains -- strike that -- she is
23   asking whether the aspect of the CDC's -- CDC
24   guidelines concerning start low and go slow,
```

Highly Confidential - Subject to Further Confidentiality Review

Page 498

1    whether that would impact Opana ER doses greater
2    than 30 milligrams, and if yes, what portion of
3    the Opana ER revenues could be affected; that's
4    what she's asking about, right?
5         MR. LIMBACHER:  Object to form.
6         THE WITNESS:  You read that
7    correctly.  That appears to be part of
8    her question.
9    BY MS. SCULLION:
10        Q.    Right.
11             And she explains that the CDC
12   guidelines reference to start low and go slow
13   she explains, start low and go slow should
14   carefully reassess evidence of individual
15   benefits and risk when considering increasing
16   dosage to greater than or equal to 50 morphine
17   milligram equivalents (MME) a day and should
18   avoid increasing dosage to greater than or equal
19   to 90 MME a day or carefully justify a decision
20   to titrate dosage to greater than or equal to 90
21   MME a day, correct?
22        A.    You read that correctly.
23        Q.    And then you respond directly to
24   Ms. Mattox on the next page, E1573.3, correct?

Page 499

1         A.    On 1573.3 in the middle, yes.
2         Q.    Yes.
3              And one of the things that you
4    explain is at the very end of your e-mail,
5    "Although this is a relatively low margin
6    business, it accounts for a bit of share."
7         Do you see that?
8         A.    Yes, you read that correctly.
9         Q.    So you thought that it was
10   worthwhile investigating the potential impact of
11   the CDC guidelines on Endo's revenues for Opana
12   ER, correct?
13        MR. LIMBACHER:  Object to form.
14        THE WITNESS:  That's not what I
15   recall from reading that, no.
16   BY MS. SCULLION:
17        Q.    In the same e-mail you do again
18   remind folks that thanks to Brian, which I
19   understand to be Brian Munroe, and the GA team,
20   that's the government affairs team, right?
21        A.    Yeah, I think so.
22        Q.    And the government affairs team,
23   the VA/DOD have expressly removed the guidelines
24   from consideration for active military and

Page 500

1    veterans/families.
2         Did I read that correctly?
3         A.    Yes, you did.
4         Q.    And that's a reference to what we
5    saw earlier with respect to the changes to the
6    House and Senate bills, correct?
7         A.    I can't draw that conclusion
8    here.  I have to look back at the timing, so I'm
9    not completely sure.
10        Q.    Okay.  But, regardless, you are
11   reminding folks that, in fact, as Endo desired,
12   the VA/DOD removed the CDC guidelines from
13   consideration for active military and veterans
14   family, correct?
15        MR. LIMBACHER:  Object to form.
16        THE WITNESS:  Again, I'd have to
17   go back and tie this together in time
18   and process, but you read the sentence
19   accurately.
20   BY MS. SCULLION:
21        Q.    Okay.  And then if you go to the
22   next e-mail, which is from John Harlow, vice
23   president and general manager, pain business
24   unit, and his e-mail starts on page E1573.2 at

Page 501

1    the bottom and carries over to the top of
2    1573.3.  Mr. Harlow is now writing to you and to
3    Ms. Mattox, correct?
4         A.    And others.
5         Q.    And Mr. Harlow explains that he
6    has reviewed the guidelines and some of the
7    noise around them, right?
8         A.    Yes, you read that correctly.
9         Q.    And one of the things he has
10   concluded, if you look in the second paragraph
11   of his e-mail, second sentence is "You have to
12   calculate the total daily spelling dose of OER
13   first, so these guidelines could impact the 20,
14   30 and 40 mg dosages," correct?
15        A.    Yes, you read that correctly.
16        Q.    And then if you go above that,
17   Ms. Mattox responds to Mr. Harlow, thanks for
18   the -- thanks.  That clarification is helpful.
19             And she indicates that they will
20   look for the portion of revenues represented by
21   those dosages and will keep you posted regarding
22   final key messages, correct?
23        A.    Yes, you read that correctly.
24        Q.    And then above that, then, we

Highly Confidential - Subject to Further Confidentiality Review

Page 502

1  have some beginning assessment of the potential
2  impact with respect to those dosage forms. We
3  have Mr. Chris Degnan -- is it Mr. or Ms.; do
4  you know?
5      A.   That was Mr.
6      Q.   Mr. Chris Degnan is writing back
7  to Kerry with an analysis of the 2015 actual
8  Opana ER ex-factory units and net sales by
9  strengths, correct?
10     A.   Yes, you read that correctly.
11     Q.   And what Mr. Degnan says a couple
12 points to note are that the 30 and 40-milligram
13 doses, which Mr. Harlow said could be impacted
14 by the CDC guidelines, account for about 40% of
15 the volume sold in 2015, correct?
16     A.   I'm sorry. Point me to that once
17 again, please.
18     Q.   So we saw that Mr. Harlow had
19 said that the dosages that could be impacted by
20 the CDC guidelines were the 20, 30 and
21 40-milligram dosages, correct. That was in the
22 bottom e-mail at the bottom of E1573.2?
23     A.   Within those sold within this
24 channel, I should point that out, within the

Page 503

1  VA/DOD military channel.
2      Q.   Well, this is no longer just
3  about the VA/DOD, right; this is about CDC
4  guidelines, more generally?
5          MR. LIMBACHER: Object to form.
6          THE WITNESS: That's not how I
7      recall it, no. That's not what I read.
8      I read this as an approximation of the
9      impact of the VA/DOD guidelines which
10     are specifically for products sold
11     within that distribution channel or that
12     channel of business.
13 BY MS. SCULLION:
14     Q.   Well, if you go back to E 1573.3,
15 your e-mail.
16     A.   Yes, in the middle.
17     Q.   Yeah, your e-mail is confirming
18 that, in fact, by this point in 2016, the VA/DOD
19 had already expressly removed the guidelines
20 from consideration of active military and
21 veteran families, right?
22     A.   It doesn't clearly indicate the
23 timing.
24     Q.   I'm sorry. It says the VA/DOD

Page 504

1  have expressly removed the guidelines from
2  consideration for active military and veterans
3  families. That's what you wrote on March 15th,
4  2016, right?
5          MR. LIMBACHER: Object to form.
6          THE WITNESS: That's what's
7      written here, but, again, as I've
8      testified before, I don't recall how
9      this lines up to the publication of the
10     guidelines or when they were put into
11     action. I'm not sure whether they were
12     in place by then or not. I just don't
13     recall, sitting here today.
14 BY MS. SCULLION:
15     Q.   Regardless of when they were
16 published, at this point in time as of
17 March 2016, the VA/DOD had already removed those
18 guidelines from its medical guidelines; that's
19 what you were saying, right?
20         MR. LIMBACHER: Object to form.
21         THE WITNESS: No, that's not what
22     I was saying. That's the point I'm
23     trying to clarify. I don't know that.
24 BY MS. SCULLION:

Page 505

1      Q.   Okay. In any event, going back
2  to Mr. Degnan's e-mail at the top of E1573.2,
3  he's conveying that of the dosage forms that
4  Mr. Harlow indicates may be impacted by the CDC
5  guidelines, that the 30 and 40-milligram doses
6  account for about 40% of volume sold in 2015,
7  right?
8          MR. LIMBACHER: Object to form.
9          THE WITNESS: And, again, I'm
10     confused. There's really a missing
11     piece of information in all of these
12     e-mails, and that is to extent of which
13     the measurement is relative to the
14     VA/DOD distribution channel, which is a
15     discrete channel of business versus all
16     doses, so it's not clear.
17     I would suspect that at the time
18     everybody knew exactly how and what
19     channel was being discussed at which
20     point, but it's just not clear, and,
21     sitting here today, I don't recall how
22     that was being calculated.
23 BY MS. SCULLION:
24     Q.   Okay. You would agree that

22 (Pages 502 to 505)

Highly Confidential - Subject to Further Confidentiality Review

Page 506

1    Mr. Degnan's e-mail doesn't reference the VA
2    channel, correct, doesn't say it's -- doesn't
3    say it's with respect to the VA channel, right?
4           MR. LIMBACHER:  Object to form.
5           THE WITNESS:  None of them
6       explicitly say that.  That's why I'm
7       confused, and I don't recall exactly how
8       this was being characterized.
9    BY MS. SCULLION:
10      Q.    And then if you go to first page
11   of Exhibit 45, looking now at Ms. Mattox's
12   March 16th e-mail responding to Mr. Degnan's,
13   she is now drafting key messages with respect to
14   the CDC guidelines, correct?
15      A.    She is, yes.
16      Q.    Okay.  And among the key messages
17   that she has drafted here, if you look at the
18   second bullet point under her second paragraph
19   is "These guidelines could potentially affect
20   Endo's opioid product portfolio," correct?
21      A.    Yes.
22      Q.    And she says underneath of that
23   that she does not anticipate a material impact
24   to Schedule III Belbuca, right?

Page 507

1       A.    That's what's written, yes.
2       Q.    Okay.  But the key message with
3    respect to Opana ER that she writes here is
4    "Opana ER indicated 'for the management of pain
5    severe enough to require daily,
6    around-the-clock, long-term opioid treatment and
7    for which alternative treatment options are
8    inadequate'; doses most likely to be affected
9    are the 20 mg, 30 mg and 40 mg doses, which made
10   up 65% of product volume and 83% of product
11   revenue in 2015."
12          Did I read that correctly?
13      A.    Yes, you did.
14          MS. SCULLION:  Can I have E1559.
15          MR. LIMBACHER:  Counsel, we've
16      been going for --
17          MS. SCULLION:  This is all part
18      of the same topic, we will finish it up.
19          MR. LIMBACHER:  Well,
20      respectfully, I'd like to take a break.
21      Is there a reason why you're not
22      accommodating the hourly request for a
23      break.  We're now approximately 20
24      minutes past an hour.

Page 508

1           MS. SCULLION:  Because we spent
2       some of that time, unfortunately, on
3       colloquy about the scope of the
4       30(b)(6), and we are trying to be finish
5       up this issue.  We're trying to be
6       efficient and get through it.  We're in
7       the middle of it so I think it would be
8       much more efficient.
9           MR. LIMBACHER:  Are you close to
10      finishing?
11          MS. SCULLION:  Yes, we are.
12          (Document marked for
13      identification as Endo-Lortie Deposition
14      Exhibit No. 46.)
15   BY MS. SCULLION:
16      Q.    I'll show you what's been marked
17   as Exhibit Number 46.
18          Exhibit 46 is Bates stamped
19   ENDO-OPIOID_MDL-01230052, and it says in the
20   upper right-hand corner E1559.1.
21          Are we on the same page?
22      A.    Yes, we are indeed.
23      Q.    Okay.  And here if you'll go to
24   page E1559.3, which is the beginning of -- at

Page 509

1    the bottom the beginning of Andrew Scott's
2    e-mail of July 7th, 2016 to you, Mr. Campanelli
3    and others, which carries over to page E1559.4?
4       A.    Okay.  I will just look at it, if
5    I can.
6       Q.    Sure.
7       A.    (Witness reviews document.)
8    Okay.  I have looked at that e-mail.  I have to
9    refer to others but if you're going to point me
10   towards that one --
11      Q.    Sure.
12      A.    -- I've looked it over.  Thank
13   you.
14      Q.    I'm going to the second page
15   E1559.4, the second half of Mr. Scott's e-mail,
16   where he is conveying the significant successes
17   Endo has achieved on the conference legislation.
18   It's referring to Comprehensive Addiction and
19   Recovery Act, and he says that those significant
20   successes Endo has achieved include, first one,
21   "We defeated an effort to make the CDC
22   guidelines mandatory - they instead remain
23   voluntary," correct?
24      A.    You read that correctly, yes.

23  (Pages 506 to 509)

Highly Confidential - Subject to Further Confidentiality Review

Page 510

1      Q.    Okay.  So Endo had significant
2    success in not having CDC guidelines be
3    mandatory.
4              Number 3 he lists here is
5    defeating an effort by senator Baldwin and
6    Gillibrand to broaden the CDC guidelines to
7    include acute pain.  That was another
8    significant success, according to Mr. Scott,
9    correct?
10     A.    Yes, according to Mr. Scott, you
11   read that correctly.
12     Q.    Okay.  And then another
13   significant success Mr. Scott conveys is to help
14   pass a new model opioid guideline development
15   process.
16             Do you see that, number 4?
17     A.    Number 4 I read, "We were key in
18   helping to pass a new model opioid guidelines
19   development process that is open and includes
20   the input of a broad range of government and
21   external stakeholders."
22     Q.    Right, and he goes on to explain
23   that the expectation is that this new process
24   will -- right, "will compete with the CDC

Page 511

1    guidelines."
2              Do you see that?
3      A.    The second sentence reads, "This
4    new process is supported by patient and
5    physician groups, and we expect will compete
6    with the CDC guidelines."
7      Q.    Right.  So among the significant
8    successes are CDC guidelines are no longer
9    mandatory, they're not being broadened to
10   include acute pain, and there's going to be an
11   attempt to develop a competing set of guidelines
12   to the CDC, correct?
13             MR. LIMBACHER:  Object to form.
14             THE WITNESS:  You read into the
15       record what Andrew Scott wrote here, and
16       I agree with what you read.
17   BY MS. SCULLION:
18     Q.    And if you go back to then page
19   E1559.3, you see your response to Mr. Scott?
20     A.    At the top?
21     Q.    Yes.
22     A.    Yes.
23     Q.    And you're not disputing
24   Mr. Scott's assessment that these were

Page 512

1    significant successes for Endo, right?
2      A.    Well, specifically, I'm happy to
3    read what I wrote.  "Andrew and team" --
4      Q.    I didn't ask -- I'm sorry.  I'm
5    just asking did you --
6      A.    "Truly excellent work across an
7    impressive set of accomplishments."
8              MS. SCULLION:  I move to strike.
9       I didn't ask him to read the e-mail.
10             MR. LIMBACHER:  Complete your
11       response.
12             THE WITNESS:  You asked me to
13       characterize the response and how I
14       viewed his document.  I'd like to read
15       what I wrote him.
16   BY MS. SCULLION:
17     Q.    That's fine, you can read it.
18     A.    "Andrew and team, truly excellent
19   work across an impressive set of
20   accomplishments.  As we've stated many times, as
21   a company we are supportive of treatment and
22   therapeutic guidelines that balance the needs of
23   all stakeholders - most importantly patients and
24   the physicians who treat them.  Your work to

Page 513

1    ensure checks and balances against purely
2    political agendas is much appreciated."
3      Q.    So you didn't disagree with him
4    that what he recited were significant successes
5    for Endo, correct?
6              MR. LIMBACHER:  Object to form.
7              THE WITNESS:  Correct.
8    BY MS. SCULLION:
9      Q.    And, in fact, you characterized
10   the agendas against which Endo was successful as
11   purely political, right?
12             MR. LIMBACHER:  Object to form,
13       misstates the evidence.
14             THE WITNESS:  Yeah, I can read it
15       again if you'd like.
16   BY MS. SCULLION:
17     Q.    That's okay.
18             Did you regard the efforts to
19   have the CDC guidelines become mandatory as
20   purely political?
21             MR. LIMBACHER:  Object to form.
22             THE WITNESS:  I don't recall
23       specifically, no.
24   BY MS. SCULLION:

24 (Pages 510 to 513)

Highly Confidential - Subject to Further Confidentiality Review

Page 514

1      Q.    Did you regard the efforts to
2  broaden the CDC guidelines to include acute pain
3  as a purely political agenda?
4           MR. LIMBACHER:  Object to form.
5           THE WITNESS:  I don't recall
6      specifically.
7  BY MS. SCULLION:
8      Q.    Let me just ask you more
9  generally.
10          Did you regard anything -- any
11 efforts with respect to developing guidelines
12 for the use of opioids in the treatment of
13 chronic, non-cancer pain to be a purely
14 political agenda?
15          MR. LIMBACHER:  Object to form.
16          THE WITNESS:  I don't recall
17     specifically, no.
18 BY MS. SCULLION:
19     Q.    What was the purely political
20 agendas that you were referring to here in your
21 e-mail?
22     A.    I don't recall specifically, but
23 I'm congratulating the work of the team on
24 behalf of -- you know, as I said, guidelines

Page 515

1  that balance the need of all stakeholders.
2           MR. LIMBACHER:  I thought we were
3      stopping after this.
4           MS. SCULLION:  This is all part
5      of the same.
6           MR. TOLIN:  I think, in fairness,
7      when the witness is reading from other
8      parts of the document but your tech guy
9      is just highlighting the parts you're
10     reading, he should also highlight the
11     parts --
12          MS. SCULLION:  I agree with that.
13     The intention is that he should be
14     highlighting whatever the witness is
15     reading.  Thank you.
16          MR. TOLIN:  Thank you.
17          MR. LIMBACHER:  Again, we've now
18     been going for an hour and a half.
19          MS. SCULLION:  This is the last
20     document.
21          MR. LIMBACHER:  Okay, thank you.
22          MS. SCULLION:  This is the last
23     document in this sequence.
24          (Document marked for

Page 516

1      identification as Endo-Lortie Deposition
2      Exhibit No. 47.)
3  BY MS. SCULLION:
4      Q.    Mr. Lortie, let's put your
5  corporate representative hat back on.
6           And Endo did, in fact,
7  collaborate with other manufacturers of opioids,
8  including defendants in this action, through the
9  PCF in opposing implementation of the CDC
10 guidelines, correct?
11          MR. LIMBACHER:  Object to form
12     and object to the extent it falls
13     outside of the scope of the topics on
14     which he's been designated.
15          THE WITNESS:  I don't believe
16     that to be the case, no.
17 BY MS. SCULLION:
18     Q.    Show you what's been marked as
19 Exhibit 47.
20          And Exhibit 47, for the record,
21 is Bates stamped ENDO-OPIOID_MDL-01563548.
22          Let me direct your attention to
23 the second to last page of Exhibit 47, which has
24 in the middle an e-mail from Wade Delk to Burt

Page 517

1  Rosen, subject matter, Brooks bill.
2           Do you see that?
3      A.    And just so I'm clear, this one
4  is not intended to have a marking.
5      Q.    Correct, it doesn't an E number
6  at the top, that's right.
7      A.    So you want me to look at the
8  third page.
9      Q.    Looking at the Wade Delk e-mail
10 to Burt Rosen, subject matter, Brooks bill?
11     A.    Yes, okay.
12     Q.    Do you see that?
13     A.    Yes, on February 12th.
14     Q.    2016?
15     A.    Yes.
16     Q.    And Mr. Rosen was an employee of
17 Purdue Pharma, correct?
18     A.    Well, his e-mail is pharma.com,
19 and I believe that is a Purdue e-mail, so yes.
20     Q.    And Mr. Delk, in writing to
21 Mr. Rosen, states "Burt, can you please send
22 this out to the PCF."
23          Do you see that?
24     A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 518

1    Q.    And it's with regard to, he says,
2   "This bill is moving fast and we would like to
3   see if others support this approach."
4         Do you see that?
5    A.    Yes, that's -- you read that
6   correctly.
7    Q.    And the bill that he is referring
8   to, if you go down to his -- the draft he has
9   addressed to the Pain Care Forum members, he is
10  discussing "The below amendment (which passed
11  the Senate Judiciary Committee) would codify
12  essentially the Brooks language (HR 2805) which
13  many of us have been supportive of.  That is, we
14  support guidelines as long as they are fair,
15  balanced, constructed in an unbiased way, and
16  done with evidence and data.  Importantly, the
17  committee added FDA to the list of advisory
18  groups, and it also added that the
19  proposed CDC guidelines be considered along with
20  all of the other information/perspectives
21  offered by the entire task force and its
22  participants," correct?
23        MR. LIMBACHER:  Object to all of
24        these questions as falling outside the

Page 519

1         scope of the topics on which he's been
2         designated.  There is no specific
3         reference to the Pain Care Forum in
4         topic 39.  It is specifically referenced
5         in both topic 36 and topic 40, so I
6         believe it's outside the scope of the
7         topic on which he has been designated.
8   BY MS. SCULLION:
9    Q.    I'm happy to have you answer
10  these questions in your personal capacity
11  because you're on these e-mails.
12        Did I correctly read Mr. Delk's
13  draft communication to the Pain Care Forum
14  members?
15   A.    Yes, and do we know who Mr. Delk
16  is?  His e-mail is just at Gmail address, so I
17  don't recognize that name.  I don't know who he
18  is.
19   Q.    I do not know.
20        In any event, if you go then to
21  the -- turning to the next e-mail in Exhibit 47,
22  it actually begins on the very first page of the
23  exhibit.
24   A.    First page back in time?

Page 520

1    Q.    The very first page of Exhibit
2   47, 0156345 -- 3548, rather.
3    A.    The top page.
4    Q.    Yeah.  Do you see at the bottom
5   it begins -- it's an e-mail from Burt Rosen, as
6   you said, at pharma.com, right?
7    A.    Yes, that's where it says "begin
8   forwarded message"?
9    Q.    Right.
10   A.    Yeah.
11   Q.    And Mr. Rosen has addressed his
12  e-mail to a quite lengthy list of folks.
13   A.    It's the entirety of the second
14  page.
15   Q.    Correct.  And among the people to
16  whom he's forwarding the e-mail, if you look at
17  the third line down on that second page, it's
18  all the e-mail addresses is Brian Munroe at
19  Endo, correct?
20   A.    Give me a moment.
21   Q.    Sure.
22   A.    There's a lot here.
23   Q.    They appear to be in alphabetical
24  order by first name?

Page 521

1    A.    That's an interesting way.  Okay,
2   yes, I see Brian Munroe listed there.
3    Q.    And do you see right next to
4   Brian Munroe, Bruce Colligen with an e-mail
5   address at jnj.com?
6    A.    Its.jnj.com, yep.
7    Q.    Right, and jnj, that would be
8   Janssen and Johnson, right?
9    A.    I'm not sure.  Did you say
10  Janssen Johnson or Johnson & Johnson.
11   Q.    Johnson & Johnson.
12   A.    It could be, it's jnj, but I'm
13  not sure.
14   Q.    And if you'll go down, look on
15  the left-hand side of this block of e-mails, you
16  see about a quarter of the way down, Derek Naten
17  at Mallinckrodt.com?
18   A.    Yes, on the left-hand side, yes,
19  I do see that.
20   Q.    All right.  And, obviously,
21  that's referring then to Mallinckrodt, correct?
22   A.    It's a Mallinckrodt e-mail
23  address.
24   Q.    Right.  Mallinckrodt is another

26  (Pages 518 to 521)

Highly Confidential - Subject to Further Confidentiality Review

Page 522

1  defendant in this lawsuit.  You understand that,
2  correct?
3       A.    I'm not familiar with all of the
4  defendants in the lawsuit.
5       Q.    And right under, if you just go
6  right under Mr. Naten's e-mail, you see
7  Alexander Kraus at Grunenthal.com.
8            Do you see that?
9       A.    Yes, I do.
10      Q.    And Grunenthal had been Endo's
11  partner in the development of reformulated Opana
12  ER, correct?
13           MR. LIMBACHER:  Object to form.
14           THE WITNESS:  That's correct.
15  BY MS. SCULLION:
16      Q.    Okay.  Keep going down in that
17  left-hand side of this block, you'll see Dr. J.
18  David Haddox at pharma.com.  Do you see that?
19      A.    How far down am I?
20      Q.    Not too far down, about five, six
21  lines down, Dr. J David Haddox at pharma.com?
22      A.    Below Grunenthal.
23      Q.    Correct?
24      A.    Yes, I see that.

Page 523

1       Q.    And so, again, that's a Purdue
2  Pharma e-mail address, correct?
3       A.    I believe pharma.com is their
4  e-mail address.
5       Q.    Okay.  If you go to about halfway
6  down on the left-hand side, halfway down this
7  block of e-mails, you also see Julian Malasi at
8  Mallinckrodt.com?
9       A.    Yes, I see that.
10      Q.    And staying on that same line on
11  the right-hand side, do you see the e-mail is
12  also addressed to Karen Hill at tevapharm.com?
13      A.    Same line, yes.  Yes, I see that.
14      Q.    And going down, follow down from
15  Ms. Hill's e-mail, four lines down, do you see
16  Kristin Recchiuti?
17      A.    I'm sorry to say I lost my place.
18  Can you just reorient me.
19      Q.    Sure.  If you look at Ms. Hill's
20  address, Karen Hill.
21      A.    Okay, yes.
22      Q.    And then go about four lines
23  down, you see Kristin Recchiuti?
24      A.    On the right side.

Page 524

1       Q.    Correct.  You see that?
2       A.    Yes, yes.
3       Q.    And that lists again an address
4  at its.jnj.com?
5       A.    Yes, it does.
6       Q.    And, in fact, the next two -- I'm
7  sorry -- the next e-mail Lauryl Jackson is also
8  for its.jnj.com?
9       A.    On the next line?
10      Q.    Right.
11      A.    Yes, correct.
12      Q.    If you'll go to the next page of
13  the exhibit, the end of the next page of the
14  exhibit, at the top is the end of the chain of
15  e-mails to which Mr. Rosen has forwarded this
16  communication?
17      A.    So I'm at the top of the third
18  page now?
19      Q.    Correct.  You see Susan Stone at
20  Allergan.com?
21      A.    Stone_Susan at Allergan, yes, I
22  see that.
23      Q.    So that's -- obviously, that's an
24  Allergan e-mail address, correct?

Page 525

1       A.    It says Susan underscore -- or it
2  has Allergan.com, and that's the only conclusion
3  I'm going to be able to draw.
4       Q.    Okay.  And then Mr. Rosen writes
5  here that the request is from Wade, that would
6  be Wade Delk, and he identifies Wade Delk as
7  being from the American Society for Pain
8  Management Nursing.
9            Do you see that?
10           MR. LIMBACHER:  Object to form.
11           THE WITNESS:  So I'm still on the
12  top of the third page?
13  BY MS. SCULLION:
14      Q.    Yes.
15      A.    So this is -- I'm just reminding
16  myself.  So this all relates to the forwarded
17  message from Burt Rosen at pharma.com on the
18  first page, right?  I'm just making sure.
19      Q.    That's how I read it, yes.  Is
20  that how you read it?
21      A.    It's just a very long set of
22  addresses.
23      Q.    It is.
24      A.    Yes, okay.  It appears to be what

27 (Pages 522 to 525)

Highly Confidential - Subject to Further Confidentiality Review

Page 526

1  it is, yes.
2      Q.    Okay.  And then going to the
3  first page of the exhibit, which is Bates
4  stamped 01563548?
5      A.    Before I do, I think you read --
6  I just want too make sure we're correct, so you
7  talked about the bill -- or sorry -- the subject
8  of the e-mail from Burt Rosen to the long number
9  of addressees, and then it says "Please see this
10 request from Wade at the American Society for
11 Pain Management Nursing.  Wade is requesting a
12 timely reply from your organization."  Is that
13 the -- that's what you wanted me to see, right?
14     Q.    Right.  I want to see that that's
15 identifying -- you asked who Mr. Delk was, and
16 it's identifying him as being from the American
17 Society For Pain Management Nursing.
18     A.    Thank you.  Yep.
19     Q.    Do you see that?
20     A.    Yes.
21     Q.    And then on the very first page
22 of the exhibit, you see that -- so Mr. Munroe
23 has forwarded this communication to you, among
24 others, at Endo, correct?

Page 527

1      A.    Munroe to me and others, yes.
2      Q.    And your response at the very top
3  of the page, Exhibit 47, was what?
4      A.    I sent a note to Brian, Deb
5  Logan, Neil Shusterman, Matt Maletta, Jen Dubas,
6  John Harlow, Timothy Byrne, Keri Mattox and
7  Andrew Scott, and I wrote "well done."
8      Q.    So you're congratulating
9  Mr. Munroe on this coordinated effort through
10 the Pain Care Forum members to communicate their
11 opposition to implementation of the CDC
12 guidelines as set forth in the draft
13 communication we looked at, the last two pages
14 of the exhibit?
15         MR. LIMBACHER:  Object to form.
16         THE WITNESS:  Is that a question?
17 BY MS. SCULLION:
18     Q.    Is that what you were
19 congratulating him on?
20     A.    No, I don't believe that's the
21 case.  I can't draw that conclusion from reading
22 what you've presented to me.
23         MS. SCULLION:  Okay.  We can take
24 a break.

Page 528

1         MR. LIMBACHER:  Thank you.
2         THE VIDEOGRAPHER:  Off the
3  record, 4:16.
4         (Brief recess.)
5         THE VIDEOGRAPHER:  We are back on
6  the record at 4:33.
7  BY MS. SCULLION:
8      Q.    Mr. Lortie, asking you in your
9  capacity as a corporate representative, with
10 respect to the effectiveness of Endo's
11 anti-diversion procedures, did Endo ever
12 determine that any prescriptions of Opana ER
13 were medically unnecessary?
14     A.    Is your question did Endo ever
15 determine that any individual prescription was
16 medically unnecessary?
17     Q.    We can start with that.
18     A.    I'm not aware of whether the
19 company did or did not.  That's a level of
20 detail I'm not familiar with.
21     Q.    Same question, though, but with
22 respect to did Endo -- strike that.
23         Did Endo ever determine that any
24 prescriptions of Opana ER were medically

Page 529

1  unnecessary at some higher level, not just
2  individually, but at a higher level?
3         MR. LIMBACHER:  Object to form.
4         THE WITNESS:  Yes, I'm sure that
5         there were cases that would fall under
6         that heading, yes.
7  BY MS. SCULLION:
8      Q.    Does Endo have records indicating
9  findings that certain cases I think as you said
10 were determined to be medically unnecessary?
11         MR. LIMBACHER:  Object to form.
12         THE WITNESS:  I don't know
13         specifically, but I would -- I would
14         think that our pharmacovigilance and
15         drug safety department would have
16         maintained such records.
17 BY MS. SCULLION:
18     Q.    Did you review any such records
19 in preparation for today's deposition?
20     A.    No, not specifically at that
21 level of detail, no.
22     Q.    Okay.  As part of Endo's
23 anti-diversion efforts, did Endo monitor for
24 signals that Opana ER had street value?

28  (Pages 526 to 529)

Highly Confidential - Subject to Further Confidentiality Review

Page 530

1      MR. LIMBACHER: Object to form.
2      THE WITNESS: I believe that
3  whether it was actively -- as a result
4  of active monitoring or as a result
5  of -- well, let me restate that.
6      As part of the internet
7  surveillance and other surveillance of
8  media and chat rooms and the like that
9  are part of the RiskMAP and subsequently
10  added to by the REMS, that that was part
11  of what the team did, and then those
12  things were reviewed at the -- my
13  understanding is reviewed at the Risk
14  Management Committee level.
15  BY MS. SCULLION:
16      Q.    And in terms of the effectiveness
17  of Endo's procedures you just described, did
18  Endo, in fact, see evidence that Opana ER had a
19  street value?
20      MR. LIMBACHER: Object to form
21  and to the extent it falls outside the
22  scope of the topics he's been
23  designated.
24      THE WITNESS: Yeah, my answer was

Page 531

1      regarding the question of did Endo
2      monitor for that.
3  BY MS. SCULLION:
4      Q.    Yes.
5      A.    And the answer was yes. Beyond
6  that, I don't know.
7      Q.    That's what I'm asking. In terms
8  of understanding the effectiveness of its
9  monitoring, do you know whether those -- that
10  monitoring was, in fact, effective to pick up
11  signals that Opana ER had street value?
12      MR. LIMBACHER: Same objections.
13      THE WITNESS: I don't know. I
14      mean, the monitoring was done. I'm not
15      sure how you quantify effectiveness of
16      monitoring. By virtue of monitoring,
17      you see things that are posted, and
18      that's reviewed by the Risk Management
19      Committee, but I don't know beyond that
20      how to quantify the effectiveness in
21      that context.
22  BY MS. SCULLION:
23      Q.    Do you understand, though, that
24  Endo did, in fact, see evidence that Opana ER

Page 532

1  early on had street value?
2      MR. LIMBACHER: Object to form.
3      THE WITNESS: I don't recall that
4      specifically. I didn't sit on that
5      committee, so I, you know, wasn't
6      familiar with that.
7      MS. SCULLION: Can I have E1585,
8      please.
9      (Document marked for
10      identification as Endo-Lortie Deposition
11      Exhibit No. 48.)
12  BY MS. SCULLION:
13      Q.    I'm going to hand you what's been
14  marked as Exhibit Number 48.
15      And Exhibit 48 is Bates stamped
16  ENDO-OPIOID_MDL-00774063, and we've marked it
17  E1585 in the top right-hand corner.
18      Mr. Munroe, I'd like to direct
19  your attention to page E1585.3.
20      A.    I think you mean Mr. Lortie but
21  --
22      Q.    I am so sorry.
23      A.    He's the other Brian.
24      Q.    Thank you, Mr. Lortie. I direct

Page 533

1  your attention to page E1585.3. You see at the
2  bottom, there's an e-mail from John Bullock to
3  Sherri Ferstler. And the content of that e-mail
4  starts at the bottom of 1585.3 and continues all
5  the way through 1585.5. I just want to orient
6  you to the document.
7      MR. LIMBACHER: Are we asking him
8      now in his capacity as a fact witness?
9      MS. SCULLION: Sure.
10      THE WITNESS: Okay. So I see
11      that e-mail that starts on the bottom of
12      1585.3. Would you like me to read that?
13  BY MS. SCULLION:
14      Q.    Sure. You can go ahead and read
15  through that.
16      A.    Okay. Thank you. Give me a
17  moment to do that.
18      (Witness reviews document.)
19  Okay. I've read that e-mail. Thank you.
20      Q.    Okay. And do you see the e-mail
21  is forwarding on an article from the Paducah Sun
22  dated December 10th, 2007 concerning an overdose
23  death being investigated by the Marshall
24  sheriff's office?

29  (Pages 530 to 533)

Highly Confidential - Subject to Further Confidentiality Review

Page 534

1    A.    Yes, December 10th is on the next
2  page.
3    Q.    Right.
4    A.    It evidently refers to it in the
5  e-mail as December 11th but, yes, it appears to
6  be following -- sorry -- forwarding along that
7  newspaper article.
8    Q.    And if you go down on page 1585.4
9  within the body of the article, go towards the
10  last quarter of that page where it begins the
11  words Miranda Minter-Banister.
12    Do you see that?
13    A.    Yes, I do.
14    Q.    Do you see this is conveying that
15  Miranda Minter-Banister, age 27, of Benton,
16  Kentucky died at her home and it was after using
17  an Opana pill purchased, says Minter-Banister
18  bought a second Opana pill for $30 from
19  Spiceland that Minter-Banister and her husband
20  later inhaled.
21    Do you see that?
22    MR. LIMBACHER:  Object to form.
23    THE WITNESS:  I mean, you've
24    picked a couple of lines out of that --

Page 535

1    out of that paragraph, but I see where
2    you're reading that, yes.
3  BY MS. SCULLION:
4    Q.    So this is referring to a
5  purchase of Opana other than through a
6  prescription, correct?
7    A.    It could be.  I mean, I'm reading
8  it at the same time you are.
9    Q.    Right.  It's referring to someone
10  buying an Opana pill from another person, a
11  neighbor or a friend, correct?
12    MR. LIMBACHER:  Object to form.
13    THE WITNESS:  It appears that
14    that could be the case.
15  BY MS. SCULLION:
16    Q.    Okay.  And then if you go right
17  above that paragraph, you see the paragraph that
18  says Opana is similar to the painkiller
19  OxyContin and it goes by the street name.
20    And what's the street name
21  indicated here for Opana?
22    A.    You're asking me that?
23    Q.    Yeah.
24    A.    You'd like me to read that?

Page 536

1    Q.    Yeah.
2    A.    It has the words stop sign in
3  quotation marks.
4    Q.    Right.  So by this time Opana --
5  at least by this time, Opana is not only being
6  sold but, in fact, has a street name; that's
7  what the article is conveying, right?
8    MR. LIMBACHER:  Object to form.
9    THE WITNESS:  It is -- it is
10    suggesting that for some reason the
11    author is reporting that it goes by the
12    street name stop sign.  That's what it
13    says.
14  BY MS. SCULLION:
15    Q.    And you saw other similar media
16  reports during your time at Endo, correct,
17  conveying that Opana ER was being bought and
18  sold on the street, had street value, had a
19  street name, was resulting in overdose deaths,
20  correct?
21    MR. LIMBACHER:  Object to form
22    and foundation.
23    THE WITNESS:  I don't recall
24    that.  That was certainly not a regular

Page 537

1    part of my responsibilities.
2  BY MS. SCULLION:
3    Q.    You don't recall ever seeing any
4  media reports about Opana ER contributing to the
5  opioid epidemic?
6    A.    From time to time I'm sure things
7  were forwarded along, as this one appears to
8  have been.  This one actually predates me by
9  some time, but I don't recall any specific ones,
10  and it was not a routine part of my job
11  responsibilities to review media reports.
12    Q.    And you recall, though, that you
13  were employed by Endo in 2011, correct?
14    A.    Yes.
15    Q.    And where was your office?
16    A.    In 2011 where was my office?  It
17  was in --
18    Q.    What town?
19    A.    Chaddsford.
20    Q.    Pennsylvania?
21    A.    Yes.
22    Q.    That's just outside of
23  Philadelphia?
24    A.    It's 15 or 20 miles outside of

30  (Pages 534 to 537)

Highly Confidential - Subject to Further Confidentiality Review

Page 538

1    Philadelphia.
2       Q.    And do you recall in 2011 that
3    the Philadelphia office of the DEA specifically
4    issued an alert with respect to Opana's -- Opana
5    ER's street use and its contribution to the
6    opioid epidemic?
7            MR. LIMBACHER:  Object to form.
8            THE WITNESS:  Do I recall that?
9    BY MS. SCULLION:
10      Q.    Yes.
11      A.    I do not recall that.
12           MS. SCULLION:  Can I have E563,
13   please.
14           (Document marked for
15   identification as Endo-Lortie Deposition
16   Exhibit No. 49.)
17   BY MS. SCULLION:
18      Q.    I hand you what's been marked as
19   Exhibit Number 49.
20           And Exhibit 49 is Bates stamped
21   ENDO-OR-CID-00694084.  And, Mr. Lortie, it bears
22   number E563 at the top right-hand corner,
23   correct?
24      A.    Yes, I have that document.

Page 539

1       Q.    Okay.  In 2011 did you have any
2    responsibilities as part of your product
3    portfolio for Opana ER?
4       A.    I had commercial
5    responsibilities, yes, I think we've already
6    established that.
7       Q.    If you go to page E563.2, do you
8    see this is a Drug Intelligence Brief from the
9    Philadelphia Division Intelligence Program for
10   Drug Enforcement Administration?
11      A.    That's how it's titled, yes.  I
12   see that on the top of the document.
13      Q.    And what is the title of this
14   Drug Intelligence Brief itself?
15      A.    Underneath the header that says
16   "Drug Intelligence Brief," it says "Opana
17   (Oxymorphone) Abuse."
18      Q.    And can you read the summary of
19   this Drug Intelligence Brief, please.
20      A.    You'd like me to read what the
21   summary statement is?
22      Q.    Yeah, what the DEA has stated in
23   its summary here?
24      A.    So underneath the headline it

Page 540

1    says, "Summary, the Philadelphia Division
2    Intelligence Program received information on a
3    possible emerging trend in the region;
4    Oxymorphone (brand name Opana) has been reported
5    by several sources of information as the 'big
6    thing right now' in pharmaceutical drug abuse in
7    the region."
8       Q.    And Endo was aware in at least
9    May 2011 that, in fact, Opana ER was being
10   reported as the big thing right now in
11   pharmaceutical drug abuse, at least in the
12   Philadelphia region; is that correct?
13           MR. LIMBACHER:  Object to form
14   and foundation.
15           THE WITNESS:  So I have not seen
16   this before.  At least I don't recall
17   seeing it before, so I can't attest to
18   whether or not the company saw this.
19           I can say that I don't recognize
20   seeing it.
21   BY MS. SCULLION:
22      Q.    You don't recall ever, as someone
23   with commercial responsibility for Opana ER in
24   May of 2011, ever being told that the

Page 541

1    Philadelphia Division Intelligence Program, the
2    DEA was issuing a brief indicating that the
3    product you had commercial responsibility for
4    was the big thing right now in pharmaceutical
5    drug abuse in the region?
6            MR. LIMBACHER:  Object to form.
7    BY MS. SCULLION:
8       Q.    It never came to your attention?
9       A.    I don't recall seeing this, no.
10      Q.    Okay.  And among other things,
11   this Drug Intelligence Brief confirms, if you
12   look in the details section below the summary --
13      A.    Still on the same page, .2?
14      Q.    Correct.
15           You see the details section
16   confirms that not only is Opana being reported
17   as of May 2011 as the big thing right now in
18   pharmaceutical drug abuse, but that "in the
19   early 1970s, oxymorphone in the form of
20   Numorphan instant-release tablets was one of the
21   most sought-after and well-regarded opioids of
22   the class IV community."
23           Do you see that?
24      A.    Yes, I see the sentence that you

31 (Pages 538 to 541)

Highly Confidential - Subject to Further Confidentiality Review

Page 542

1   just read.
2       Q.    And then it goes -- and it goes
3   on to explain that oxymorphone in the form of
4   Numorphan instant-release tablets, in fact, had
5   a street name popularly known as "blues" for
6   their blue coloring.
7           Do you see that?
8           MR. LIMBACHER:  Object to form.
9           THE WITNESS:  I see the line you
10          just read, it's a part of the next
11          sentence.
12  BY MS. SCULLION:
13      Q.    Okay.  So, again, so the DEA is
14  not only confirming that as of May 2011 Opana ER
15  is being abused as a street drug, but, in fact,
16  oxymorphone had a history of such abuse,
17  correct?
18          MR. LIMBACHER:  Object to form.
19          THE WITNESS:  You read the
20          summary, you read the details, so I
21          think the text explains apparently what
22          the DEA was reporting.
23  BY MS. SCULLION:
24      Q.    And you don't have any reason to

Page 544

1           MR. LIMBACHER:  -- or what it was
2           part of?
3           MS. SCULLION:  I do not.
4   BY MS. SCULLION:
5       Q.    You said that in connection with
6   your preparation for the deposition, you did
7   review some of the RiskMAP updates that Endo
8   submitted for Opana ER to the FDA, right?
9       A.    Yes.
10      Q.    And do you recall that those
11  RiskMAP updates did include discussions of cases
12  of apparent abuse of Opana ER from time to time?
13      A.    Generally, from time to time,
14  yes.  Again, I didn't review every single one,
15  but just to refresh my recollection or to
16  understand that these were regular part of the
17  risk management team's activities.
18      Q.    And those reports also showed
19  from time to time overdoses from Opana ER,
20  correct?
21          MR. LIMBACHER:  Object to form.
22          THE WITNESS:  I would put those
23          under the same heading as adverse
24          events.

Page 543

1   dispute what the DEA, the federal agency charged
2   with enforcement of laws concerning Opana ER and
3   other narcotics, you don't dispute their
4   assessment of Opana ER's street use, do you?
5           MR. LIMBACHER:  Object to form.
6           THE WITNESS:  Providing this is
7           truly a DEA brief, no, I don't have any
8           grounds to dispute DEA actions.
9   BY MS. SCULLION:
10      Q.    Okay.
11          MR. LIMBACHER:  Counsel, Exhibit
12          49 has on the first page "Attachment
13          16." Was this part of a larger
14          document?
15          MS. SCULLION:  I will tell you it
16          was produced to us this way, so I do not
17          know.
18          MR. LIMBACHER:  Would it be with
19          other attachments?
20          MS. SCULLION:  I do not know,
21          sitting here.
22          MR. LIMBACHER:  So you don't know
23          to what it was attached to --
24          MS. SCULLION:  Or not attached.

Page 545

1   BY MS. SCULLION:
2       Q.    So deaths from Opana ER?
3           MR. LIMBACHER:  Object to form.
4           THE WITNESS:  I do think that the
5           one I reviewed that I did see that, but,
6           again, I don't recall the details.  I
7           wasn't reviewing it at that level of
8           detail.
9   BY MS. SCULLION:
10      Q.    And showed reference to street
11  use of Opana ER, correct?
12          MR. LIMBACHER:  Object to form.
13          THE WITNESS:  If there's a
14          specific report that you'd like me to
15          look at, I could probably give you more
16          information.
17  BY MS. SCULLION:
18      Q.    Do you recall those same
19  indications that Opana ER was being abused,
20  including by people buying and selling Opana ER?
21          MR. LIMBACHER:  Object to form.
22          THE WITNESS:  I know in the
23          records that I reviewed, I don't
24          specifically recall that, but, again, as

Highly Confidential - Subject to Further Confidentiality Review

Page 546

1    I said, I'd be happy to review a
2    specific one, if you'd like, if that
3    would be helpful.
4            MS. SCULLION:  Let's see if we
5    can.  Can we have the Q1 2008 RiskMAP
6    update.
7            (Document marked for
8    identification as Endo-Lortie Deposition
9    Exhibit No. 50.)
10   BY MS. SCULLION:
11       Q.    Let me hand you what's been
12   marked as Exhibit 50.
13            And Exhibit 50 is Bates stamped
14   ENDO-CHI_LIT-00032209.  And, Mr. Lortie, this
15   does not bear an E number.
16       A.    Okay, thank you.
17       Q.    This is the RiskMAP update report
18   for Opana ER dated May 22nd, 2008 covering the
19   period January 1st, 2008 to March 31, 2008,
20   correct?
21       A.    Yes, that's the date that's on
22   the title page.
23       Q.    And if you'll turn to page 20 of
24   the update report, the page numbers are in the

Page 547

1    upper right-hand corner.
2        A.    Yes, got it.
3        Q.    And if you'll go to the section
4    "6. Post Marketing Surveillance," section "6.1
5    Periodic Reports," going down to the subheading
6    "Drug Abuse/Intentional Drug misuse."
7            Are you with me?
8        A.    Yeah, I'm just going to kind of
9    orient myself here.
10       Q.    Yep.
11       A.    (Witness reviews document.)
12            Okay.  And you'd like me to look
13   at the subsection?
14       Q.    The subsection "Drug
15   Abuse/Intentional Drug Misuse."
16       A.    Okay.
17       Q.    Are you there?
18       A.    Yes, I'm focused on that.
19       Q.    Okay.  And in this update report,
20   Endo has reported to the FDA "There were 7
21   reports related to drug abuse and misuse of
22   Opana ER," correct?
23       A.    That's what the sentence says,
24   yes.

Page 548

1        Q.    That's what Endo told the FDA in
2    this report, correct?
3            MR. LIMBACHER:  Object to form.
4            THE WITNESS:  Yes, that's what's
5    written in the report.
6    BY MS. SCULLION:
7        Q.    And then Endo further told the
8    FDA, "In all 7 reports, Opana ER was misused by
9    crushing and snorting the tablets," correct?
10       A.    Yes, that's what it says.
11       Q.    And then if you'll go down to the
12   sentence that begins, "another report."
13       A.    Yes.
14       Q.    You see that?
15       A.    On the fourth line.
16       Q.    And this is indicating -- sorry,
17   strike that.
18            In this sentence Endo has told
19   the FDA that "Another report (OPER20080023)
20   involved a 45-year-old man who was a known drug
21   abuser being treated for drug addiction, was
22   purchasing Opana ER 40 mg tablets with a
23   twenty-dollar co-pay and was also buying the
24   product on the streets."

Page 549

1            Do you see that?
2        A.    Yes, I do.
3        Q.    So, I mean, Endo is telling the
4    FDA that it has reports as of at least May 22nd,
5    2008 of Opana ER being purchased on the street,
6    correct?
7            MR. LIMBACHER:  Object to form.
8            THE WITNESS:  That apparently is
9            what's in the report, yes.
10   BY MS. SCULLION:
11       Q.    So Endo knew at that point, at
12   least, if not earlier, that Opana ER had street
13   value, correct?
14            MR. LIMBACHER:  Object to form.
15            THE WITNESS:  Well, it's
16            acknowledging and reporting to the FDA
17            that in this case that product was
18            purchased on the street.
19   BY MS. SCULLION:
20       Q.    Which meant it had street value,
21   right?
22            MR. LIMBACHER:  Object to form.
23            THE WITNESS:  I'm not sure what
24            street value means.  It doesn't quantify

33 (Pages 546 to 549)

Highly Confidential - Subject to Further Confidentiality Review

Page 550

1    it, but it was purchased, so I imagine
2    there was an exchange of value of some
3    sort.
4    BY MS. SCULLION:
5        Q.   I mean, as your -- in your time
6    with commercial responsibility for Opana ER, did
7    you have any training on the concept of Opana ER
8    or other opioid products being bought and sold
9    on the street and having street value?  Is that
10   something you had training on?
11       MR. LIMBACHER:  Object to form.
12       THE WITNESS:  I don't understand
13   what training would be with regards to
14   street value.
15   BY MS. SCULLION:
16       Q.   Were you given training on the
17   ways in which narcotics like Opana ER could be
18   diverted?
19       MR. LIMBACHER:  Object to form.
20       THE WITNESS:  That's a very
21   different question.
22   BY MS. SCULLION:
23       Q.   I'm asking a different question.
24   Were you given training on that issue?

Page 551

1        A.   All employees, as part of the
2    code of conduct, especially those with
3    involvement in our controlled substances had to
4    undergo periodic training, certify their
5    compliance with that, and within that context,
6    generally, I would say that all employees were
7    aware of the potential for diverse and abuse --
8    or abuse and diversion of the opioid product.
9    So at that level, everyone was aware because it
10   was part of the responsibility to watch out for
11   that, and it's the underpinning of the RiskMAP
12   and the REMS and all of the other documents.
13       Beyond that, I don't recall any
14   specific training on street value or any of the
15   like at that level, I don't.
16       Q.   Putting your 30(b)(6) hat, your
17   corporate representative hat back on, seeing all
18   the reports of abuse, misuse, diversion of Opana
19   ER over the years that were reported to the FDA
20   in the RiskMAP updates, did Endo ever tell the
21   FDA that its RiskMAP was ineffective to combat
22   diversion or abuse?
23       MR. LIMBACHER:  Object to the
24   form and object as falling outside the

Page 552

1    scope of the topics on which he's been
2    designated.
3        THE WITNESS:  I don't know.
4    BY MS. SCULLION:
5        Q.   Did -- in response to all the
6    evidence of abuse and diversion of Opana ER over
7    a number of years in which the RiskMAP updates
8    were submitted to the FDA, did Endo ever change
9    its policies or procedures with respect to
10   combating diversion of Opana ER in response to
11   that evidence?
12       MR. LIMBACHER:  Same objections.
13       THE WITNESS:  As we've testified
14   before, the RiskMAP formed the basis in
15   2007 of a broad array of activities
16   undertaken by the company.  The RiskMAP
17   report that you just focused me on from
18   2008, reports like that were done
19   periodically as part of that.  The
20   RiskMAP was enhanced in 2012 with the
21   industry-wide REMS, so I would say that
22   constituted a change or an evolution of
23   the policies and procedures.
24       There was a further evolution as

Page 553

1    a result of discussions with the New
2    York Attorney General later, several
3    years later.
4        So I would say that, yes, Endo's
5    policies and procedures did evolve over
6    time, but they were always grounded in
7    the same principles that were put
8    forward back in 2007 in the very
9    comprehensive RiskMAP.
10   BY MS. SCULLION:
11       Q.   So the question is, though,
12   during the period when Endo had its RiskMAP in
13   place, did Endo ever change its anti-diversion
14   procedures in response to the growing evidence
15   that Opana ER was being abused?
16       MR. LIMBACHER:  Same objections,
17   asked and answered.
18       THE WITNESS:  Same answer.  I
19   mean, I can repeat the answer, if you
20   would like.
21   BY MS. SCULLION:
22       Q.   Well, the answer, as I
23   understood, was that the change occurred, in
24   your view, when REMS was implemented.

34  (Pages 550 to 553)

Highly Confidential - Subject to Further Confidentiality Review

Page 554

1        Before REMS, if I'm wrong, you'll
2   tell me no, before REMS, did Endo change any of
3   its anti-diversion procedures in response to the
4   evidence of Opana ER abuse?
5        MR. LIMBACHER:  Same objections,
6        and I think you misstated his testimony.
7   BY MS. SCULLION:
8        Q.    Please let me know if I did.
9        A.    You did.  So I'll explain again.
10       The principles as put forth in
11  the 2007 REMS were the underpinning of all of
12  the activities.
13       Q.    Did you mean RiskMAP?
14       A.    What did I say?
15       Q.    REMS.
16       A.    Strike that, please, or I'll
17  repeat that.  Thank you.
18       In the 2007 RiskMAP the
19  principles that were put forward there were the
20  -- formed the foundation of the broad array of
21  activities that continue today.  So the RiskMAP
22  was not replaced by the REMS, it was supplanted
23  by it or it was supplemented by the REMS.
24       As I said, also, as a result of

Page 555

1   discussions with the New York Attorney General
2   several years later, there was some further
3   evolutions of policies and procedures, but I
4   can't attest that those are in response to any
5   specific trigger or any specific event.  They
6   were in response to ongoing focus by a broad
7   array of cross-functional experts within the
8   company to make sure that the company was doing
9   everything within its power to mitigate abuse
10  and diversion.  Again, those are the principles
11  as put forward in the 2007 RiskMAP.
12       Q.    Well, in response to the evidence
13  of abuse of Opana ER, did Endo ever, for
14  example, say, well, we want to go beyond just
15  monitoring and we want to go out and actively
16  look for pill mills and ensure that our product
17  is not being supplied to pill mills?
18       MR. LIMBACHER:  Same objections.
19       THE WITNESS:  Endo certainly had
20       safeguards in place to mitigate the
21       chance that its products were being
22       diverted to, as you say, pill mills.
23       Whether that was in response to any one
24       specific trigger, it was in response to

Page 556

1   broad understanding that opioids had the
2   potential of being abused and diverted.
3   BY MS. SCULLION:
4        Q.    But can you identify any
5   particular change Endo made to its
6   anti-diversion procedures in response to growing
7   evidence of Opana ER abuse, any specific,
8   concrete changes that Endo made?
9        MR. LIMBACHER:  Same objections.
10       THE WITNESS:  As I said before,
11       the REMS, industry-wide REMS was part of
12       the evolution of the program.  The
13       changes put forward as a result of
14       discussions with the New York Attorney
15       General, the ADD program had several
16       enhancements to it.
17       I would say that one of the
18       changes Endo made in response to
19       knowledge of the growing threat was to
20       formulate a product that was designed to
21       mitigate at least one of the forms of
22       abuse of the product.  So, yes, Endo
23       undertook several steps to try and
24       mitigate that problem.

Page 557

1   BY MS. SCULLION:
2        Q.    But the FDA didn't agree that, in
3   fact, the reformulated version of Opana ER was
4   any more effective at combating abuse, correct?
5        MR. LIMBACHER:  Object to form.
6   BY MS. SCULLION:
7        Q.    The FDA never accepted any data
8   that Endo put forward on that point?
9        MR. LIMBACHER:  Object to form.
10       THE WITNESS:  Oh, FDA accepted
11       all the date we submitted.
12  BY MS. SCULLION:
13       Q.    It didn't accept the conclusion
14  that reformulated Opana ER was, in fact, abuse
15  deterrent, right; they never made that finding?
16       MR. LIMBACHER:  Object to form.
17       THE WITNESS:  Correct.  At the
18       end of the submission and the
19       evaluation, the FDA ultimately did not
20       agree, but they accepted everything we
21       submitted.
22  BY MS. SCULLION:
23       Q.    Now, you just referenced REMS --
24       A.    Yes.

35  (Pages 554 to 557)

Highly Confidential - Subject to Further Confidentiality Review

Page 558

1    Q.   -- as being enhancement I think
2  is how you described it to Endo's
3  anti-diversion, anti-abuse efforts; is that
4  right?
5    A.   I would say an enhancement.  I
6  think I also used the word supplemental.  So, in
7  other words, the point I was -- the distinction
8  I was trying to make is that it did not replace.
9  RiskMAP stays -- I assume the RiskMAP is still
10  in place today, but the REMS, the industry-wide
11  REMS was additive in terms of steps taken,
12  again, in the -- in the pursuit of activities to
13  mitigate abuse and diversion.
14          MS. SCULLION:  Can I have E1610,
15      please.
16          (Document marked for
17      identification as Endo-Lortie Deposition
18      Exhibit No. 51.)
19  BY MS. SCULLION:
20      Q.   Mr. Lortie, but it's, in fact,
21  the case that the industry-wide working group
22  opposed applying REMS to focus on abuse,
23  deliberate abuse, correct?
24          MR. LIMBACHER:  Object to form

Page 559

1      and foundation and to the extent it
2      falls outside the scope of the topics on
3      which he's been designated.
4          THE WITNESS:  I don't know that
5      to be correct, no.
6  BY MS. SCULLION:
7      Q.   Okay.  Going to hand you what's
8  been marked as Exhibit 51.
9          And Exhibit 51 is Bates stamped
10  ENDO-OPIOID_MDL-01485661, and we've stamped it
11  E1610.
12          Mr. Lortie, you'll see that
13  E16 -- sorry -- Exhibit 51 is a letter from
14  Nancy Buc at Buc & Beardsley in Washington, D.C.
15  to Dr. Bob Rappaport at the CDER.
16          Do you see that?
17      A.   Yes, I see that as the cover
18  letter, yes.
19      Q.   And Ms. Buc refers in her first
20  paragraph of her cover letter to "In preparation
21  for the March 3 meeting on extended release
22  opioid analgesics, a number of sponsors invited
23  to the meeting and others with an interest in
24  the issues to be discussed have prepared the

Page 560

1  attached concept paper and the attached list of
2  questions for the FDA."
3          Do you see that?
4          MR. LIMBACHER:  Object to the
5      form and foundation and to the extent it
6      falls outside the scope of the topics on
7      which he's been designated.
8          THE WITNESS:  You read the
9      sentence accurately.
10  BY MS. SCULLION:
11      Q.   And Endo was part of this group
12  of sponsors and others with interest in the
13  issues that were supporting the concept paper
14  that Ms. Buc is forwarding on to Dr. Rappaport,
15  correct?
16          MR. LIMBACHER:  Same objections.
17          THE WITNESS:  I do not know.
18  BY MS. SCULLION:
19      Q.   Okay.  If you'll go to the
20  concepts themselves in the concept paper, page
21  E1610.2.
22      A.   If it's okay, I'll read through
23  the paper.
24      Q.   No, I actually want to just refer

Page 561

1  you to the concepts.  I'm not looking at the
2  entirety of the paper, just there's certain
3  concepts.  If you'll look to concept number 3.
4      A.   Sorry.  If it's okay, I'll look
5  through the document.
6          MR. LIMBACHER:  Yeah, take your
7      time and review the document.
8          MS. SCULLION:  Well, I'm not
9      going to have our time taken up with
10      reading through the document on the
11      record.  We can take a break and read it
12      off the record and come back on, if
13      that's okay, happy to do that.
14          MR. LIMBACHER:  He has been
15      reading the documents you've been
16      putting in front of him on the record
17      for the last two days.
18          MS. SCULLION:  Right.
19          MR. LIMBACHER:  And I think he
20      does it in a reasonably expeditious
21      manner, so if you just give him a minute
22      or two, I'm sure he can answer whatever
23      questions you have, but I don't think
24      it's fair or appropriate for you to ask

36 (Pages 558 to 561)



Page 562

1  him questions about a document and not
2  give him the opportunity to at least
3  look through it.
4  .        MS. SCULLION:  I'm happy to have
5  him look through it, as long as it
6  doesn't come out of our time.
7        THE WITNESS:  I've never seen the
8  document.  It predates me.  I'd like to
9  look it so I can understand the context.
10  It's three pages.  We've used up more
11  time than I think I'm going to use to
12  look at it.
13        (Witness reviews document.)  I've
14  taken at least an overview of it.  Thank
15  you.
16  BY MS. SCULLION:

Page 564

Page 563

18      Q.    The document was produced to us
19  from Endo's production; you understand that?
20      A.    I don't know the technicalities
21  of the production, so I do not understand that.
22      Q.    Put that aside.

Page 565

1      Q.    Let's go back then to your
2  personal capacity.

Highly Confidential - Subject to Further Confidentiality Review



Page 566

Page 568

```
 1          study number M508-202?
 2                  A.    Yeah, I see that identifier, yes.
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24          BY MS. SCULLION:
```

Page 567

```
10                  MS. SCULLION:  Can we have E281,
11          please.
12                  (Document marked for
13          identification as Endo-Lortie Deposition
14          Exhibit No. 52.)
15          BY MS. SCULLION:
16                  Q.    Hand you what's been marked as
17          Exhibit Number 52.
18                  Exhibit 52, which is Bates
19          stamped ENDO-CHI_LIT-00150080 and is stamped
20          hopefully helpfully in the upper right-hand
21          corner E281.
22                  Mr. Lortie, you see Exhibit 52 is
23          identified in the upper left-hand corner, first
24          page Opana ER W2 IVR vocal response listing for
```

Page 569

```
 1                  Q.    Have you seen from time to time
 2          reports of verbatim responses from physicians
 3          with respect to Endo products; did you see
 4          those?
 5                  A.    I don't recall seeing those at
 6          Endo, no.  It could be.  I was there for seven
 7          or eight years, and I had responsibility for
 8          many products, but I don't -- this I have not
 9          seen for sure, and I really don't know what it's
10          representing.
11                  Q.    Okay.  If you'll go to page
12          E281.9.
13                  MR. LIMBACHER:  Same objections
14          to the extent you're going to be
15          questioning him about what's been marked
16          as Exhibit 52.
17          BY MS. SCULLION:
18                  Q.    No, I apologize.  Let's go to
19          page E281.24.
20                  A.    281?
21                  Q.    281.24, yes.
22                  A.    Okay, I have that page.
23                  Q.    And the bottom half of the page,
24          there's a report with respect to what's labeled
```

Highly Confidential - Subject to Further Confidentiality Review



Page 570

Page 572

1  correct?
2       A.   All I can attest to is that the
3  date that they have on the call date is
4  11/14/2007, as you pointed out.
5       Q.   And then you go to the next page
6  E281.25, and we'll see for sequence number
7  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.
8            Do you see that sequence number?
9       A.   The lowest one on the list, yes,
10  I do.
11       Q.   And for the specialty it's
12  indicated again primary care physician, correct?
13       A.   The header is not represented on
14  the page, but if it follows the previous one, I
15  think I see PCP in that column.
16
17
18
19
20
21            THE WITNESS:  Yes, that's what's
22  written in that column.
23  BY MS. SCULLION:
24       Q.   And if you go to page E281.94.

Page 571

1
2
3            MR. LIMBACHER:  Object to form.
4            THE WITNESS:  Yes, you read that,
5       that's what's represented here on the
6       page.
7  BY MS. SCULLION:
8       Q.   Okay.  And that's dated as of
9  11/14/2007, correct?
10       A.   That's the --
11       Q.   For the call date?
12       A.   That's the date on that line,
13  yes.
14       Q.   For the call date, right?
15       A.   It appears to be, that's yes.
16       Q.   And Endo referred to in-person
17  detailing on healthcare providers as calls,
18  right?
19       A.   Yeah, I would think a call would
20  be a detail.
21       Q.   So one could understand that a
22  call date referred to the date on which that
23  physician was -- that prescriber -- provider
24  rather, sorry -- that provider was detailed,

Page 573

1       A.   94?
2       Q.   Correct.
3            And here on this page, if we go
4  to sequence number, again, bottom approximately
5  third of the page, sequence number 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.
6       A.   994?
7       Q.   Yes, are you there?
8       A.   Yes, I am.
9       Q.   And, again, specialty here is
10  primary care physician, correct?
11       A.   PCP is what's listed.
12       Q.   That's primary care physician
13  again, correct?
14       A.   Well, I think that's what we've
15  assumed it's referring to.
16
17
18
19
20
21
22
23
24

39  (Pages 570 to 573)

Highly Confidential - Subject to Further Confidentiality Review



Page 574

```
 7          MR. LIMBACHER:  Same objections
 8   to all of these questions with regard to
 9   Exhibit 52.
10          THE WITNESS:  You read the
11   sentence accurately.
12   BY MS. SCULLION:
13      Q.   Okay.  And then if you go to page
14   E281.96, drawing your attention again to the
15   bottom third of the page, just to the column
16   headers, again see sequence, next column
17   specialty, correct?
18      A.   In the bottom section here?
19      Q.   Yes.
20      A.   On 96, correct?
21      Q.   Correct.
22      A.   Still on the right page, yes.
23      Q.   You see sequence, next column to
24   the right is specialty again, correct?
```

Page 576

```
 1          THE WITNESS:  Yes, you read that
 2   accurately.  That's what's on the page.
 3   BY MS. SCULLION:
```

```
17      Q.   Well, let's look -- are you
18   familiar with Endo -- Endo coaching or Endo sale
19   coaching reports?
20      A.   Endo sale coaching reports?
21      Q.   Yes.
22      A.   That doesn't ring a bell.
```

Page 575

```
 1      A.   Correct.
 2      Q.   Next column is "Of all the topics
 3   discussed by the sales representative during the
 4   presentation, what one topic, from your
 5   perspective, was the most important to you?"
 6          Did I read that correctly?
 7      A.   You did.
 8      Q.   And if you go to the next page,
 9   E281.97, go to sequence Number 115-0 -- sorry,
10   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, do you see the specialty listed
11   here now is pain management?
12      A.   Yes, that's the second from the
13   bottom.
14      Q.   Yep.
15      A.   I do.
```

```
24          MR. LIMBACHER:  Same objections.
```

Page 577

Highly Confidential - Subject to Further Confidentiality Review



**Page 578**

```
 8          MS. SCULLION:  Can I have E1593.
 9          (Document marked for
10      identification as Endo-Lortie Deposition
11      Exhibit No. 53.)
12  BY MS. SCULLION:
13      Q.    I hand you what's been marked as
14  Exhibit 53.
15          And Exhibit 53 is Bates stamped
16  ENDO-OPIOID_MDL-00992589, and we've marked it
17  E1593 in the upper right-hand corner.
18          Do you see this is an e-mail from
19  Ben Manibog to Demir Bingol?
20      A.    I do see that, yes.
21      Q.    And that was dated as of
22  December 1st, 2009, correct?
23      A.    That's the date on the e-mail,
24  yes.
```

**Page 579**

```
 1      Q.    And at the time of this e-mail
 2  you were employed by Endo and had responsibility
 3  for Opana ER, correct?
 4      A.    Yes, as of that date I did.
 5      Q.    And Mr. Bingol, what was his
 6  position with Endo in December of 2009?
 7      A.    To the best of my recollection,
 8  he had marketing responsibility for Opana.
 9      Q.    Was he also serving as a regional
10  business director for the Midwest region during
11  that period?
12      A.    No.
13      Q.    You don't recall he had
14  concurrent responsibilities for a period of time
15  both as brand manager and as a regional business
16  director?
17      A.    Oh, I do recall that, but it was
18  not at this time.  It was later.
19      Q.    What's your understanding of when
20  he had the concurrent responsibilities?
21      A.    It was later than December of
22  2009, I'm certain of that.  I don't recall
23  specifically, but it was either later in 2010 or
24  in 2011, he had a developmental assignment,
```

**Page 580**

```
 1  where he, as you say, had concurrent
 2  responsibilities.
 3      Q.    If you go to page E1593.2, you
 4  see this is a Work Session Planner dated
 5  December 1st, 2009?
 6          MR. LIMBACHER:  Objection, form
 7  and foundation.
 8          THE WITNESS:  I see that as the
 9  title or the header on that page, 93.2.
10  BY MS. SCULLION:
```

**Page 581**

```
22          MS. SCULLION:  Let's take a quick
23  break.
24          THE VIDEOGRAPHER:  Going off the
```

Page 582

1    record 5:30.
2    (Brief recess.)
3    THE VIDEOGRAPHER: We are back on
4    the record at 5:52.
5    (Document marked for
6    identification as Endo-Lortie Deposition
7    Exhibit No. 54.)
8    MS. SCULLION: Mr. Lortie,
9    welcome back. I have no further
10   questions for you today. I do want to
11   mark as an exhibit, though, for the
12   record, we'll mark it as Exhibit Number
13   54.
14   And Exhibit 54 is a printout of
15   an e-mail I sent to Mr. Davis, counsel
16   to Endo in this case on August 10th,
17   2018, and I'm marking it as an exhibit
18   to the record because it reflects at
19   least some of the agreements we came to
20   with Endo a few months ago as to the
21   scope of the 30(b)(6) responses to be
22   provided, including Mr. Lortie's
23   testimony, and the agreements that we
24   reached, to my understanding, were not

Page 583

1    honored, as reflected in the record
2    yesterday, where we had to spend an
3    inordinate amount of time understanding
4    what Endo had chosen and not chosen to
5    prepare the witness to testify to as its
6    corporate representative.
7    So, among other things, the
8    e-mail recites that with respect to time
9    frame for the 30(b)(6) responses that in
10   its August 1st letter, Endo indicated it
11   would not provide responsive information
12   concerning pre-June 2004 periods ("Time
13   Period Limit"). On our August 3 call,
14   Endo confirmed that, consistent with
15   special master Cohen's rulings, Endo is
16   withdrawing its Time Period Limit, and
17   it was, therefore, our understanding
18   that, in fact, there were no time period
19   limits with respect to Endo's 30(b)(6)
20   responses. However, as reflected
21   yesterday, the witness was not prepared
22   to speak to virtually any of Endo's
23   policies or procedures or other topics
24   in which he was designated for any time

Page 584

1    periods prior to the launch of Opana ER.
2    Similarly, with respect to
3    products other than Opana ER, the e-mail
4    reflects that Endo's objections to
5    providing discovery for all of its
6    opioid products (branded and generic)
7    have been overruled.
8    MR. LIMBACHER: Jen,
9    respectfully, is there a reason why
10   you're putting this on the record.
11   MS. SCULLION: Yes, I'm.
12   MR. LIMBACHER: Because you've
13   marked the e-mail as an exhibit. It
14   will be attached to the transcript. Why
15   are we doing this?
16   MS. SCULLION: Counsel, we spent
17   an inordinate amount of time trying to
18   parse out again what this witness had or
19   had not been prepared to and we're going
20   to put on the record what the agreement
21   was back in August of 2018 as to the
22   scope of the 30(b)(6) responses. Sorry.
23   So let me start again.
24   Now, with respect to the scope

Page 585

1    for the products that Endo's objections
2    for providing discovery for all of its
3    opioid products (branded and generic)
4    have been overruled.
5    Next sentence, thus we understand
6    Endo will now be providing discovery
7    (including 30(b)(6) testimony/written
8    responses) not only for Opana ER but
9    Opana IR, Numorphan, Percocet, Percodan
10   and Endo's various generic opioids, as
11   well as opioids as a class. As
12   reflected in the record from yesterday,
13   the witness was not prepared to speak
14   to, for among other things, Percocet or
15   Endo's generic OxyContin product. I
16   think the witness said today that he was
17   also not familiar -- maybe it was
18   yesterday, I apologize, that he was not
19   familiar with Numorphan. And so it is
20   our position, again, that no fault of
21   the witness' but that he was not
22   properly prepared to speak to the
23   entirety of the scope of the topics on
24   which he was designated and which we

42 (Pages 582 to 585)

Highly Confidential - Subject to Further Confidentiality Review

Page 586

1    prepared to take his testimony over the
2    course of the last two days.
3         We reserve all our rights with
4    respect to what we believe was a
5    violation of the rules, and with that,
6    we will end our questioning here today,
7    but with the right to continue
8    questioning on the issues for which
9    we've had no representative provided.
10        MR. LIMBACHER:  Respectfully,
11   counsel, I disagree.  I think the
12   witness was fully prepared to testify
13   with regard to all of the topics on
14   which he had been designated.  You've
15   provided a self-serving e-mail only from
16   you without any response from Mr. Davis
17   that goes back to August of 2018.  There
18   has been considerable subsequent e-mail
19   exchanges between the parties with
20   regard to the proper topics under the
21   30(b)(6) notice and which witness is or
22   is not being designated on specific
23   topics.
24        Without being comprehensive, I

Page 587

1    would refer you to an e-mail dated
2    December the 12th, 2018 from Mr. Davis,
3    an e-mail dated January the 6th of 2019
4    from Mr. Davis.  I would also refer you
5    to an e-mail dated October 22nd, 2018
6    from Mr. Davis, January 29th of 2019
7    from Mr. Davis, and I could go on and on
8    and on.
9         So by no means does Exhibit 54
10   reflect all of the agreements between
11   the parties that were worked out amongst
12   counsel in advance of Mr. Lortie's
13   deposition, and I strenuously reject the
14   notion that this witness was not
15   properly prepared.  You asked him
16   multiple questions on multiple topics
17   that clearly fell outside the scope of
18   the language in the 30(b)(6) notice and
19   were inconsistent with both the letter
20   and the spirit of the e-mail exchanges
21   between counsel.
22        I'd also point out since you went
23   to the trouble of marking this
24   August 10th, 2018 e-mail but none of the

Page 588

1    other e-mails that reflect the
2    agreements among counsel, that even in
3    this e-mail that you, counsel, wrote,
4    you say at the bottom on the first
5    page -- near the bottom of the first
6    page that even you acknowledge that
7    Endo's willingness to provide 30(b)(6)
8    discovery with respect to generic opioid
9    products sold, licensed, distributed by
10   its wholly-owned subsidiary Par
11   Pharmaceuticals remains unclear.
12        So with that, counsel, I think we
13   can move on and try to accomplish
14   something since it's 6:00 at night.
15        MS. SCULLION:  I just do want to
16   respond that the sentence you just
17   referred to was with respect to Par's
18   generics.  The sentence before that was
19   with respect to Endo's generics.  Endo,
20   long before the Par acquisition, did, in
21   fact, have its own generic opioid
22   products, including generic OxyContin,
23   including Endocet.
24        MR. LIMBACHER:  Counsel, am I

Page 589

1    right that you and Mr. Davis have
2    engaged in multiple exchanges of e-mails
3    subsequent to August of 2018 with regard
4    to the agreements amongst counsel
5    concerning what this witness and other
6    witnesses are going to be designated to
7    testify on?
8         MS. SCULLION:  The answer is,
9    yes, we did, and in none of those e-mail
10   exchanges was there ever a change in the
11   fact that the 30(b)(6) responses,
12   whether written, in writing or in
13   testimony were not to be limited to any
14   particular time frame, nor were they to
15   be limited solely to Opana ER, and that
16   is what we have witnessed over the
17   course of the last two days.
18        And I do want to make clear,
19   because I don't think I was clear
20   before, that with respect to reserving
21   our rights, we are also reserving the
22   right to seek preclusion to the extent
23   Endo would try to offer or seek to offer
24   any evidence with respect to the topics

43 (Pages 586 to 589)

Highly Confidential - Subject to Further Confidentiality Review

Page 590

1    on which this witness has not prepared.
2         I understand that it sounds like
3    from counsel from Endo there's a
4    disagreement about that, but I am making
5    that clear for the record that we're
6    reserving our right to, in fact, seek
7    preclusion.
8         MR. LIMBACHER:  Well, again, I
9    object to an attempt here through this
10   Exhibit 54 to suggest that an e-mail
11   from August of 2018 is a reflection of
12   the actual state of the agreement
13   amongst counsel.  That's simply not
14   correct.
15        And, again, this witness was
16   fully and properly prepared to testify
17   with regard to the topics on which he
18   was designated, as reflected by multiple
19   exchanges of e-mails that are subsequent
20   to August of 2018.
21        MS. SCULLION:  Thank you for your
22   time.
23        THE VIDEOGRAPHER:  Going off the
24   record at 6:02.

Page 591

1         (Pause.)
2         THE VIDEOGRAPHER:  We are back on
3    the record at 6:03.
4    BY MR. LENISKI:
5         Q.    Good afternoon, Mr. Lortie.  My
6    name is Joe Leniski, we met yesterday.  I
7    represent plaintiffs in Tennessee, and I'm going
8    to try to be brief, and I know it's been a long
9    two days.
10        MR. LENISKI:  So before I begin,
11   though, I need to state that the
12   Tennessee state plaintiffs have a
13   standing objection, which I will adopt
14   here, to these depositions due to a lack
15   of adequate notice, a lack of document
16   production and because there are
17   different civil rules that apply in
18   Tennessee, including the lack of a
19   limitation on time limits for
20   depositions.  Unless you have some
21   response, counsel, I'll proceed.
22        MR. LIMBACHER:  No, we understand
23   your position.
24        MR. LENISKI:  Thank you.

Page 592

1    BY MR. LENISKI:
2         Q.    I'm going to be asking questions
3    today both as a fact witness and in your
4    capacity as 30(b)(6), similar to the MDL
5    counsel.
6         MR. LIMBACHER:  And, counsel,
7    just so we have the same understanding,
8    unless you make it clear on the record
9    that you're asking him in his capacity
10   as a 30(b)(6) witness, I think my
11   position will be that he's being
12   questioned in his capacity as a fact
13   witness.
14   BY MR. LENISKI:
15        Q.    Understood.  And I'll try to make
16   that clear.  I'll use the hat analogy, so go
17   ahead and put on your 30(b)(6) hat.
18        A.    Thank you.
19        Q.    Before Endo began marketing
20   Opana, did it believe that prescription abuse
21   was a real problem?
22        MR. LIMBACHER:  Object to form
23   and object to the extent it falls
24   outside the scope of the topics on which

Page 593

1    he's been designated.
2         THE WITNESS:  My recollection is
3    Opana was marketed after 2006.  So prior
4    to that, it was prior to 2006.  I joined
5    in 2009, so I can't really draw a
6    conclusion as to what Endo's position
7    was back then.
8    BY MR. LENISKI:
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review



Page 594

Page 596

```
 1          identification as Endo-Lortie Deposition
 2      Exhibit No. 55.)
 3   BY MR. LENISKI:
 4      Q.    Handing you Exhibit 55.  There's
 5   extra copies there for counsel on down.
 6          This is ENDO-OPIOID_MDL-01941783.
 7   It's an e-mail with an attached PowerPoint.
 8          MR. LIMBACHER:  This is 55?
 9          MR. LENISKI:  Correct, sorry,
10      Exhibit 55.
11   BY MR. LENISKI:
12      Q.    Mr. Lortie, do you recognize the
13   document?
14      A.    I don't recall seeing it, but I
15   recognize it as a document from Brian Munroe to
16   myself and others.
17      Q.    Okay.  And this is dated
18   May 30th, 2012, correct?
19      A.    Yes, that's correct.
20      Q.    And this is approximately the
21   time that Endo is launching the reformulated
22   Opana ER; is that your recollection?
23      A.    Yes, I think that's true.  That
24   was in the middle of 2012.
```

Page 595

Page 597

```
 1      Q.    Okay.  And if you look, the
 2   attachment is titled Rx drug abuse deck for
 3   6/5/12.
 4          MR. LIMBACHER:  Counsel, to the
 5      extent it's not clear, I'm continuing my
 6      objections to this line of questions to
 7      the extent it falls outside the scope of
 8      the topics on which he's been
 9      designated.
10   BY MR. LENISKI:
11      Q.    Okay.  In this e-mail Mr. Munroe
12   sent to yourself he writes, thanks team for
13   helping put this together.  Brian, I promised
14   you a draft to look at before I send to Julie
15   and I thought I would include everyone on the
16   team if anyone has comments or improvements.  I
17   plan on highlighting, Brian, our close
18   partnership with you and your team on every
19   aspect of what we are doing.
20          Have I read that correctly?
21      A.    Yes.
22      Q.    And the Brian, is the Brian he's
23   referring to in those comments you?  Is that a
24   fair assumption?
```

```
 8      Q.    Did Endo ever question whether
 9   prescription -- abuse of prescription opioids
10   was a real problem?
11          MR. LIMBACHER:  Same objections.
12          THE WITNESS:  I don't know.  I
13      don't recall that myself, but I don't
14      know.
15   BY MR. LENISKI:
16      Q.    At any point do you recall Endo
17   claiming the problem of abuse of prescription
18   opioids was merely a perception created by the
19   media and the government?
20          MR. LIMBACHER:  Objection, same
21      objections.
22          THE WITNESS:  I don't recall
23      that.
24          (Document marked for
```

Highly Confidential - Subject to Further Confidentiality Review

| Page 598 | Page 600 |
|---|---|

Page 598

1    A.    I think that's a fair assumption.
2  It's written a little bit awkwardly, but there's
3  no other Brian on the e-mail so I can --
4    Q.    And when he's referring to our
5  close partnership with you and your team, is he
6  referring to the partnership between the
7  legislative and regulatory team at Endo and your
8  division at Endo?
9    A.    It could be that's what he means.
10  I mean, it's not my e-mail.  It's written to me,
11  but it's not written by me, so beyond reading
12  here, I can't tell you exactly what he was
13  thinking.
14    Q.    Does this refresh your
15  recollection at all about why Mr. Munroe was
16  putting this particular slide deck together?
17    A.    No, it does not.  I'm happy to
18  look through the deck to see if anything in here
19  does refresh my recollection.
20    Q.    Okay.  Go ahead.
21    A.    (Witness reviews document.)
22    Q.    And when you're ready, I'm going
23  to refer to you page 2 and 3 of the slide deck.
24    A.    Okay.  I'll just take a minute to

Page 599

1  quickly review the document.  (Witness reviews
2  document.)
3    MR. LIMBACHER:  Counsel, which
4  topic in the 30(b)(6) notice are you
5  claiming this line of questioning is
6  covered by?
7    MR. LENISKI:  Well, I can
8  actually question him in his personal
9  capacity, since he received the e-mail.
10    MR. LIMBACHER:  Okay.
11    MR. LENISKI:  But I would think
12  it would be proper under policies for
13  abuse and diversion issues at Endo
14  ensuring compliance with anti-diversion
15  laws and regulations.
16    MR. LIMBACHER:  Are you going to
17  be now questioning him in his individual
18  capacity?
19    MR. LENISKI:  I am right now.
20    MR. LIMBACHER:  Thank you.
21    THE WITNESS:  I looked through
22  generally, so I've got an idea of the
23  document.  I don't recall seeing it.
24  BY MR. LENISKI:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 606

10          (Document marked for
11     identification as Endo-Lortie Deposition
12     Exhibit No. 56.)
13          MR. LENISKI:  I'm handing the
14     witness Exhibit 56 to his deposition,
15     and this is EPI001932425.
16  BY MR. LENISKI:
17     Q.    Mr. Lortie, I'll represent to you
18  that this came from your custodial file, and
19  there is no cover page that was produced to us
20  that we could locate.  It's just what appears to
21  be slides, for your reference.
22     A.    For my efforts, sorry?
23     Q.    For your reference?
24     A.    For my reference, okay.  May I

Page 608

Page 607

1  take a look through them?
2     Q.    Yes.  And when you're ready, I'm
3  going to be asking you questions specifically
4  about what's on pages 9 through 13.
5     A.    Okay, that's helpful.  Thank you.
6          (Witness reviews document.)
7  Okay.  I haven't read the whole document, but
8  I've read up through 9 through 13, so I'm happy
9  to look at it.
10     Q.    Do you recognize the document?
11     A.    I don't, not sitting here, no, I
12  don't, and I don't -- as you said, there's not a
13  cover letter that orients us, but so I don't
14  recall -- I don't recognize it sitting here.  I
15  haven't reviewed it.

Page 609

Highly Confidential - Subject to Further Confidentiality Review



Page 610

Page 611

BY MR. LENISKI:

Page 612

1    Q.    Okay.  Put back on your 30(b)(6)
2    hat.  Look at slide 13.
3         A.    I was just going to add, just to
4    finish my --
5         Q.    Sorry.
6         A.    It is nearly six years since
7    this.
8         Q.    Understood.  Put back on your
9    30(b)(6) hat.  Look at slide 13.
10        A.    Thirteen, okay.

Page 613

49  (Pages 610 to 613)

Highly Confidential - Subject to Further Confidentiality Review



Page 614

24  BY MR. LENISKI:

Page 615

1        Q.    Put that down.  Do you recall
2   being asked some questions earlier about the
3   risk management team?
4        A.    I recall that we've discussed
5   that, but I don't recall the specific questions.
6        Q.    At no point did you in your
7   individual capacity were a member of the risk
8   management team, correct?
9        A.    That is correct.
10         (Document marked for
11      identification as Endo-Lortie Deposition
12      Exhibit No. 57.)
13      MR. LENISKI:  I apologize, I
14      think I need a copy back.  Hand the
15      witness Exhibit 57,
16      ENDO-OPIOID_MDL-01333143.
17  BY MR. LENISKI:
18      Q.    My question to you, and this is
19  in your capacity as a 30(b)(6) witness, is
20  whether or not you reviewed this document in
21  preparation for your testimony today?
22      A.    Before I answer that, can I just
23  point out that the next page has a different
24  number on the bottom.  It has 144 and then there

Page 616

1   are no such numbers on the deck whatsoever.
2        Q.    And let me explain that.  So this
3   is how it was produced to us.  The cover page
4   says "Produced in Native Format."
5        A.    Yes.
6        Q.    And what you see ensuing is the
7   printout of the native PowerPoint presentation,
8   which is why there are no Bates stamps on it
9   because we don't Bates stamp evidently native
10  files.
11      A.    Okay, I understand.  I just
12  wanted to make sure that I was looking at the
13  right thing.
14        So I believe you asked me if I
15  had seen this in preparation.  I do not recall
16  seeing this specific document.
17      Q.    Okay.  The cover e-mail is from
18  Mark Collins, and you recognize that Mr. Collins
19  was a member of the risk management team,
20  correct?
21      A.    I believe that's true, yes.
22      Q.    To Deborah Logan, and who is
23  that?
24      A.    I believe Deborah Logan was one

Page 617

1   of our corporate attorneys.  I'm not completely
2   sure, but I believe that's the case.
3        Q.    If you look at page -- I'm sorry,
4   item 6 on the agenda which is on page 2 of the
5   PowerPoint.
6        A.    And so this is the PowerPoint,
7   the November 2014 PowerPoint that's referred to
8   in the attachment.
9        Q.    Correct, this is -- correct, so
10  this is the PowerPoint that's identified in the
11  cover e-mail.
12      A.    Okay.  And you're pointing me to
13  page 2, the agenda?
14      Q.    Correct.
15      A.    I have that in front of me now.
16      Q.    Do you see number 6, Inflexxion,
17  third quarter 2014 update?
18      A.    Yes, I see that.

Highly Confidential - Subject to Further Confidentiality Review

Page 618

1
2
3    Q.    Okay.  And if you look at the --
4    I neglected to identify this, but on page 1 of
5    the slides it states, "November 2014, Opana ER,
6    Risk Management Committee Meeting, November 25,
7    2014," correct?
8    A.    Yes, I see that.
9    Q.    Okay.  Can you turn to page --
10   I'm sorry slide 14.
11   A.    Slide 14.  Mine, actually, I
12   don't have a slide 14.
13           MR. LIMBACHER:  I don't either.
14           THE WITNESS:  I go from 12 to 15.
15           MR. LENISKI:  One second.  Off
16   the record real quick.
17           THE VIDEOGRAPHER:  Off the
18   record, 6:32.
19           (Pause.)
20           THE VIDEOGRAPHER:  Back on the
21   record at 6:35.
22   BY MR. LENISKI:
23   Q.    Exhibit 57 that I've handed you
24   was produced to us with odd numbered slides, so

Page 619

1    what you have before you is what was produced to
2    at least Tennessee plaintiffs.  So if it's
3    missing numbers, misnumbered slides, that's how
4    it was produced.  I'll represent that to you,
5    okay?
6            MR. LIMBACHER:  Joe, just so
7            we're clear on the record, I obviously
8            don't have the ability or opportunity to
9            verify what you just said, so I'll
10           object to questions with regard to
11           Exhibit 57 to the extent it's an
12           incomplete document, but I understand
13           what your position is, and go ahead and
14           ask your questions.
15   BY MR. LENISKI:
16   Q.    Okay.  If you turn to the slide
17   16.
18   A.    Okay, yes, I have that in front
19   of me.
20
21
22
23
24

Page 620

Page 621



Highly Confidential - Subject to Further Confidentiality Review



Page 622

Page 623

Page 624

Page 625

```
19        Q.    Okay.  I'm done with that.
20              Mr. Lortie, before your
21   deposition, counsel for Endo informed counsel
22   for Tennessee plaintiffs that you had no
23   Tennessee-specific knowledge.
24              Was that an accurate statement?
```

Highly Confidential - Subject to Further Confidentiality Review



Page 626

1       A.     Yes, I think that's true.
17             (Document marked for
18      identification as Endo-Lortie Deposition
19      Exhibit No. 58.)
20             MR. LENISKI:  Handing the witness
21      Exhibit 58 to his deposition.  This is
22      ENDO-OPIOID_MDL-02667006.
23      BY MR. LENISKI:
24      Q.     Mr. Lortie, do you recognize the

Page 627

1       e-mails I just handed you?
2              A.    I don't recall them specifically.
3       I'm reading them right now, though.
4              (Witness reviews document.)
5       Okay.  I have reviewed it.  There's nothing on
6       the second page other than the company logo; is
7       that correct?
8              Q.    That's correct.
9              Okay.  So Exhibit 58 is two
10      e-mails, correct?
11             A.    That is true, yes.
12             Q.    And the first e-mail
13      chronologically at the bottom is from you to
14      Jason Reckner on November 13, 2004, correct?
15             A.    2014.
16             Q.    I'm sorry, 2014, thank you.
17             A.    That's correct.
18             Q.    Who is Jason Reckner?

Page 628

Page 629

Highly Confidential - Subject to Further Confidentiality Review



Page 630

4    (Document marked for
5    identification as Endo-Lortie Deposition
6    Exhibit No. 59.)
7  BY MR. LENISKI:
8    Q.    Keep that one handy.
9    A.    Okay.
10    Q.    I'm handing you Exhibit 59 to
11  your deposition.  This is
12  ENDO-OPIOID_MDL-02667012.  It includes printouts
13  of native -- of a native version of the
14  spreadsheet that was attached.
15    A.    Is it just -- it's what's
16  stapled, I guess, right?  There was a paper
17  clip, but it doesn't appear to be doing
18  anything.
19    Q.    Correct, you should have a
20  stapled version?
21    A.    That's the entirety of the
22  exhibit there?
23    Q.    Yes.
24    A.    Okay.  I'm sorry.  If you asked

Page 632

Page 631

1  me a question, I was paying more attention to
2  the making sure I had the correct exhibit.
3    Q.    No problem.
4    So I've handed you Exhibit 59.
5  It's a series of e-mails, which you are not
6  copied on, but the first e-mail in the sequence

Page 633

Highly Confidential - Subject to Further Confidentiality Review



Page 636

16    BY MR. LENISKI:
17         Q.    Okay.  Go back to Exhibit 58.
18    This is the e-mail.
19         A.    I have it.

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 638

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 640

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 639

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 641

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20    MR. LIMBACHER:  Take a short
21  break.
22    THE VIDEOGRAPHER:  Going off the
23  record, 6:59.
24    (Brief recess.)

56 (Pages 638 to 641)

Highly Confidential - Subject to Further Confidentiality Review

Page 642

1      THE VIDEOGRAPHER:  We are back on
2  the record at 7:18.
3  BY MR. LIMBACHER:
4      Q.    Good evening, Mr. Lortie.  Now
5  it's my opportunity to ask you some questions.
6  I know it's been a couple of very long days.
7  It's after 7:00 at night.  I'm not going to
8  prolong this too much, but I want to just have
9  you, first of all, tell us a little bit about
10  yourself.
11      Tell us where do you live?
12      A.    I live in the Western suburbs of
13  Philadelphia in Paoli, Pennsylvania.
14      Q.    And are you married, sir?
15      A.    I am, yes.
16      Q.    Do you have kids?
17      A.    I have two lovely daughters, both
18  grown.
19      Q.    And I know it's been covered over
20  the course of the past couple days, but remind
21  us, when were you employed at Endo?
22      A.    I began in July of 2009, and I
23  left in September of 2016.
24      Q.    Where do you work now?

Page 643

1      A.    I work for a company called
2  Onspira Therapeutics.
3      Q.    And what do you do there?
4      A.    I'm the CEO.
5      Q.    Can you tell us just a little bit
6  about your education, please.
7      A.    Yes, I went to Boston University
8  for my undergraduate, pursued a premedical
9  curriculum, graduated with honors in 1982 and
10  then went to work essentially almost the
11  entirety of my career in the pharmaceutical
12  industry, starting with Smith, Kline & French,
13  which became SmithKline Beecham which then
14  became GlaxoSmithKline, had a number of
15  different assignments along the way starting in
16  the --
17      Q.    If I can interrupt, when did you
18  start actually at GlaxoSmithKline or one of the
19  predecessor companies?
20      A.    In the mid '80s, '84, '85, '86 in
21  that area.  I think my resume is available.
22      I began in sales force.  I spent
23  year and a half or two years in the sales force,
24  and then I was transferred into the home office

Page 644

1  into a marketing role, where I grew through a
2  number of different roles of increasing
3  responsibility.  I was then given the
4  opportunity to take my family and move to
5  Ireland for four years.
6      Q.    Nice.
7      A.    And I was the general manager
8  there of our pharmaceutical business.
9      Returning from Ireland, I was
10  posted to a senior sales management job based in
11  Dallas, Texas for about 18 months or so and from
12  there returned to the home office in
13  Philadelphia as a commercial leader with -- as a
14  marketing vice president.
15      Q.    And when you left GSK, was that
16  in 2009?
17      A.    Yes.
18      Q.    And you left there, then started
19  at Endo?
20      A.    That's correct.  I was recruited
21  to Endo.
22      Q.    And what was your job title when
23  you first started working at Endo in 2009?
24      A.    It was senior vice president of

Page 645

1  the pain business.
2      Q.    And did your title change over
3  the course of the years that you worked with the
4  company?
5      A.    Yes, it did.
6      Q.    And when you left in 2016, what
7  was your job title at that point in time?
8      A.    I was president of the
9  pharmaceutical business.

Highly Confidential - Subject to Further Confidentiality Review



Page 646

8    company in 2009, did you have some
9    responsibility for Opana ER?
10       A.    Yes, Opana was one of the
11    products in the pain products portfolio.

Page 648

Page 647

Page 649

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 650

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 652

```
1
2
3
4
5
6
7
8
9
10
11
12    BY MR. LIMBACHER:
13        Q.    I think you were shown a copy of
14    one of these, but did Endo provide any regular
15    updates of its RiskMAP activities to the FDA?
16
17
18
19
20
21
22
23
24
```

Page 651

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 653

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

59 (Pages 650 to 653)

Highly Confidential - Subject to Further Confidentiality Review



Page 654

3           MS. SCULLION:  Objection, move to
4   strike as nonresponsive to the extent he
5   talked about information beyond the
6   RiskMAP.
7  BY MR. LIMBACHER:

Page 656

1  that you were just mentioning.  I think you have
2  it in front of you.  It was marked by counsel as
3  Exhibit 10.
4         Do you have that there,
5  Mr. Lortie?
6     A.   Yes, I do.
7     Q.   And what are some of the things
8  that are -- that the sales reps were to be
9  looking for to see if there was any suspected
10  diversion?
11     A.   I can read some of them here.  I
12  mean, there were nine specifically listed that
13  were signals or attributes of situations that a
14  rep may encounter in the course of their
15  day-to-day responsibilities.  They include a
16  large proportion of prescriptions being paid for
17  in cash, drugs and doses being prescribed not
18  individualized, meaning every prescription that
19  was written by a physician was for 40-milligram
20  tablets rather than titrated to a given -- the
21  need of a given individual patient.
22         Lack of qualified office staff,
23  such as no nurses or PAs in the office.  Special
24  entrance requirements to the practice or lack of

Page 655

18     Q.   Let's take a look at that --
19         MS. SCULLION:  Objection, sorry,
20  move to strike everything before part of
21  that and everything that discussed
22  anything except the sales training.
23  BY MR. LIMBACHER:
24     Q.   Let's take a look at that form

Page 657

1  signage that indicates, you know, what you would
2  normally expect to see.  Large distances between
3  the doctor, patients and pharmacy.  High
4  frequency of prescriptions to replace lost
5  prescriptions or medications.  Managed care
6  organization excluding a particular physician
7  from the ability to write prescriptions that are
8  reimbursed by that managed care organization.  A
9  presence of law enforcement in or around the
10  office.  Indication from the prescriber to the
11  sales representative personally that the
12  prescriber is no longer allowed or able to
13  prescribe scheduled products.  And then there's
14  a section here, of course, that the
15  representative could fill in if there was
16  something that fell outside of those particular
17  attributes that caused them concern.
18     Q.   When you joined the company, what
19  was the state of the development of the
20  reformulated version of Opana?
21         MS. SCULLION:  Objection,
22  foundation.
23         THE WITNESS:  To my recollection,
24  it certainly was in development and

Highly Confidential - Subject to Further Confidentiality Review

Page 658

1   underway.  The product was submitted to
2   the FDA in 2010, I believe, and, of
3   course, it was the subject of a typical
4   and lengthy and comprehensive
5   development program that involved trying
6   out different formulations, finding
7   formulations that worked during the
8   clinical trials, putting those clinical
9   trials together, submitting the dossier.
10  That's a comprehensive process, of
11  course, and it takes some time.  So, you
12  know, my recollection is that that began
13  perhaps in 2006 or 2007, certainly began
14  before 2009, because, as I said --
15  because, as I said, the submission was
16  done in 2010, I believe.
17      MS. SCULLION:  Move to strike,
18  everything, the narrative beyond the
19  statement "development and underway."
20  BY MR. LIMBACHER:
21      Q.   As head of the pain business at
22  Endo at this time when you joined the company in
23  2009, did you come to understand why the company
24  embarked on a program to develop a new

Page 659

1   formulation of Opana?
2       A.   My understanding was, and, again,
3   this development was underway prior to my
4   arrival, but that it was undertaken as a result
5   of the company realizing that one of the routes
6   of abuse and misuse that was being seen for
7   long-acting opioids, not just Opana but others
8   as well, was the crushing and snorting, so
9   insufflation, and the company realized through
10  investigation that there was an ability from a
11  technological standpoint that had a chance of
12  mitigating that through physical
13  characteristics.
14          They embarked on finding a
15  technology that worked, licensing that
16  technology in and then completing a development
17  program, but it was all done to mitigate one
18  form of abuse.  Everybody recognized, of course,
19  that there was no one approach that would
20  mitigate all forms of abuse, but crushing and
21  snorting was a big problem, and it was one that
22  the company thought they could solve.
23      MS. SCULLION:  Objection to the
24  narrative beyond "physical

Page 660

1   characteristics."
2   BY MR. LIMBACHER:
3       Q.   Did you participate in meetings
4   with the DEA, Mr. Lortie, regarding Endo's
5   development of a reformulated version of Opana
6   ER?
7       A.   I do recall at least one meeting
8   where I personally attended with the DEA on that
9   topic, yes.
10      Q.   Let me show you what we've marked
11  as Exhibit number 60.
12          (Document marked for
13          identification as Endo-Lortie Deposition
14          Exhibit No. 60.)
15  BY MR. LIMBACHER:
16      Q.   I ask you to take a look at that
17  and let us know if this references that meeting
18  that you just testified about.
19      A.   (Witness reviews document.)
20      MS. SCULLION:  Do you want to
21  read the Bates number into the record?
22      MR. LIMBACHER:  Sure.  It's Bates
23  number END00027562.
24      THE WITNESS:  Yes, this is the

Page 661

1   meeting that I had in mind.
2   BY MR. LIMBACHER:
3       Q.   And this is an e-mail dated
4   July 13th of 2011; is that right?
5       A.   Yes, that's correct.
6       Q.   And the e-mail is written by
7   Steven Cowan?
8       A.   Yes.
9       Q.   Was Mr. Cowan also at the
10  meeting?
11      A.   He was, yes.
12      Q.   And did you receive a copy of the
13  e-mail that's been marked as Exhibit 60?
14      A.   I'm cc'd on it, so, yes, I'm sure
15  I did.
16      Q.   And do you recall attending this
17  particular meeting?
18      A.   I do, yes.
19      Q.   And what do you recall about the
20  DEA's views regarding Endo's plans to introduce
21  a reformulated version of Opana ER?
22      MS. SCULLION:  Objection,
23  foundation.
24      THE WITNESS:  I recall very

61  (Pages 658 to 661)

Highly Confidential - Subject to Further Confidentiality Review

Page 662

1   clearly that the DEA, first of all, by
2   the fact that they allowed us to have
3   this meeting with the fairly high
4   ranking number of DEA personnel was
5   quite remarkable, and I recall them
6   indicating to us that they were also --
7   they shared our objective of making
8   incremental steps to try and mitigate
9   abuse of in this case -- in our case of
10  Opana.  They recognized that crushing
11  and snorting was an important route of
12  abuse and misuse, and they were
13  particularly aligned with our efforts in
14  support of -- in fact, there's some text
15  in here that indicates the DEA being
16  highly aligned with Endo's plan to
17  introduce a new formulation as quickly
18  as possible.
19          And, again, generally, I recall
20  them recognizing and being in alignment
21  with our recognition of the problem and
22  our plans to try to address it.
23          MS. SCULLION:  Note also my
24  objection to the hearsay.

Page 663

1   BY MR. LIMBACHER:
2       Q.    If you have in front of you
3   Exhibit 55.  I wanted to ask you a couple of
4   questions about that.  That's one of the
5   exhibits that counsel from Tennessee was asking
6   you about.
7       A.    And you said 55?
8       Q.    Yes.
9       A.    Thank you.  Sorry about that.
10      Q.    Take a look at Exhibit 55.
11          Do you recall being asked
12  questions about this particular document by
13  counsel representing plaintiffs from Tennessee?
14      A.    Yes, I do.
15      Q.    And do you recall that the
16  questions you were being asked suggested that
17  Endo considered abuse and misuse an issue of
18  mere perception?
19      A.    I do recall that, yes.
20      Q.    Did he show you various pages
21  from the slide deck that is attached to the
22  first page of Exhibit 55?
23      A.    Yes, he did.
24      Q.    Let me refer you to slide number

Page 664

1   6 of Exhibit 55.  It has the heading "Abuse &
2   Misuse Overview."
3       A.    Yes, I have slide 6.
4       Q.    Did counsel show this particular
5   slide to you?
6       A.    I do not believe he did, no.
7       Q.    Can you summarize for us what's
8   set forth on this particular slide?
9          MS. SCULLION:  Objection to form,
10          foundation.  As I recall, the objection
11          was made to the witness testifying about
12          the slide deck on the grounds that he
13          did not recall it.
14  BY MR. LIMBACHER:
15      Q.    You can go ahead and answer the
16  question.
17      A.    Thank you.  So what I read on
18  this slide is that it's acknowledging -- that
19  the author is acknowledging after the previous
20  slides to set up whatever the discussion is and,
21  again, just to reinforce, I wasn't part of that
22  discussion, so I don't know who the audience was
23  or the context, but after setting that up with
24  some of the previous slides that I reviewed, the

Page 665

1   author now states that abuse and misuse, at
2   least in the view of the author, is a real
3   public health epidemic, a real public health
4   epidemic and has several points of support for
5   that statement, including number of overdoses,
6   deaths related to overdoses, how many Americans
7   reported nonmedical use of prescription pain
8   medications, emergency department visits,
9   nonmedical use of prescriptions medications
10  costing health insurers billions of dollars.
11          So it puts into context, I think,
12  a view on the seriousness of the abuse and
13  misuse of controlled substances.
14      Q.    We've been here two days and
15  you've answered a lot of questions, Mr. Lortie.
16  I just want to have you step back for just a
17  moment and ask you how would you describe Endo's
18  efforts to minimize the risk of abuse and
19  diversion of Opana?
20          MS. SCULLION:  Objection to form.
21          THE WITNESS:  I spent seven years
22          or so there in a senior position, always
23          with some close proximity to the pain
24          business, and it was a company that was

62  (Pages 662 to 665)

Highly Confidential - Subject to Further Confidentiality Review

Page 666

1  deeply rooted in pain therapeutics and,
2  therefore, believed importantly that
3  patients who suffer from chronic pain
4  deserve access to medicines that help
5  them live as nearly normal a life as
6  possible.
7      The company always also
8  recognized that there's a potential for
9  diversion and misuse and abuse of these
10  medicines.  That's been long established
11  long before I got there.
12      And, therefore, always had in
13  place not just policies and procedures
14  and professionals whose job it was to
15  play an important role in making sure to
16  the extent of the company's capabilities
17  that that was taken seriously and
18  necessary steps were taken, but also a
19  company culture of compliance with
20  regulations and the spirit so that there
21  wasn't jeopardy to patients who deserved
22  to have access to important medicines to
23  live their normal lives.
24      So it was not just company

Page 667

1  activity, but it was really a cultural
2  aspect of compliance, and I'm proud of
3  my time there.  I really feel that the
4  company did what it could and always
5  took it very seriously.
6      MS. SCULLION:  Move to strike as
7  improper narrative.
8      MR. LIMBACHER:  Thank you,
9  Mr. Lortie.  That's all the questions I
10  have.
11      THE VIDEOGRAPHER:  Going off the
12  record at 7:43 p.m.
13      (Brief recess.)
14      THE VIDEOGRAPHER:  We are back on
15  the record at 8:01.
16  BY MS. SCULLION:
17      Q.    Mr. Lortie, welcome back.
18      Counsel had asked you to describe
19  Endo's efforts to minimize their risk of abuse
20  and diversion of Opana.
21      Do you remember he asked that
22  question?
23      A.  Yes, I do.
24      Q.    Okay.  Now, the fact is that Endo

Page 668

1  withdrew original Opana ER for safety reasons,
2  correct, discontinued for safety reasons?
3      MR. LIMBACHER:  Object to form.
4      THE WITNESS:  That was our
5      understanding at the time, yes.
6  BY MS. SCULLION:
7      Q.    And the safety reasons for which
8  Endo cited for the withdrawal were that Opana ER
9  was subject to both intentional and inadvertent
10  abuse and misuse, correct?
11      MR. LIMBACHER:  Object to form.
12      THE WITNESS:  I believe that to
13      be the case at the time.  That was the
14      company's understanding, yes.
15  BY MS. SCULLION:
16      Q.    And, in fact, throughout the time
17  that Endo was submitting RiskMAP updates to the
18  FDA, Endo was consistently noting case after
19  case of abuse and misuse of Opana ER, correct?
20      MR. LIMBACHER:  Object to form.
21      THE WITNESS:  The subject of the
22      RiskMAP -- of the RiskMAP updates would
23      have included that type of information,
24      that is correct.

Page 669

1  BY MS. SCULLION:
2      Q.    Let's look at some of the RiskMAP
3  updates.  Can you pull back Exhibit Number 50.
4      A.  I will find it, yes.
5      Q.    Do you have Exhibit Number 50 in
6  front of you?
7      A.  I do have Exhibit Number 50, yes.
8      Q.    Okay.  And this is the RiskMAP
9  update report we looked at before dated
10  May 22nd, 2008.
11      Can you turn to page 20 of that
12  exhibit?
13      A.  Sure.
14      Q.    You see under "Periodic Reports"
15  that Endo reports to the FDA that there were a
16  total of 306 adverse event reports submitted to
17  the agency since approval of the product,
18  correct?
19      A.  Yes, that's correct.
20      Q.    Endo then goes on to state in the
21  last sentence of that paragraph, "Post marketing
22  safety surveillance of Opana ER since launch has
23  not identified any new safety issues," correct?
24      A.    That's what it says, yes.

63  (Pages 666 to 669)

Highly Confidential - Subject to Further Confidentiality Review

Page 670

1    Q.    Right.  And then that was the
2  update report covering January 1st, 2008 to
3  March 31st, 2008.
4          Let's look at the next year.
5          (Document marked for
6      identification as Endo-Lortie Deposition
7      Exhibit No. 61.)
8  BY MS. SCULLION:
9    Q.    Show you what's been marked as
10  Exhibit 61.
11          And Exhibit 61 for the record is
12  Bates stamped EPI000119179, and this is a
13  RiskMAP Update Report covering the period
14  January 1st, 2009 to March 31st, 2009.
15          If you could turn to page 16 of
16  this RiskMAP Update Report.  And again looking
17  under "Post Marketing Surveillance," 6.1, do you
18  see the last sentence of that paragraph, Endo
19  once again reports "Post marketing surveillance
20  of Opana ER since launch has not identified any
21  new safety issues."
22          Did I read that correctly?
23    A.    Let me just catch up to you here.
24  And that's in paragraph 6.1, correct.

Page 671

1    Q.    Last sentence.
2    A.    Periodic reports.
3          Yes, I believe you read that
4  accurately.
5    Q.    And let's look now at the report
6  for January 1st, 2010 to March 31st, 2010.
7          (Document marked for
8      identification as Endo-Lortie Deposition
9      Exhibit No. 62.)
10  BY MS. SCULLION:
11    Q.    It's Exhibit Number 62.
12          And it's Bates stamped
13  ENDO-OR-CID-00681354.  And here again, if you'll
14  turn to page 15 of this RiskMAP update, bottom
15  of the page, "Post Marketing Surveillance,
16  Periodic Reports," and the paragraph carries
17  over to the top of the next page, page 16, and,
18  once again, at the end of that paragraph, Endo
19  reports "Postmarketing surveillance of Opana ER
20  since launch has not identified any new safety
21  issues," correct?
22    A.    Yeah, I read that as any new
23  safety issues, in other words, any new safety
24  issues that have not been previously described

Page 672

1  in terms of the definition of them.
2    Q.    It's the same sentence in every
3  report so far, right?
4          MR. LIMBACHER:  Object to form.
5          THE WITNESS:  I'm not sure.
6          (Document marked for
7      identification as Endo-Lortie Deposition
8      Exhibit No. 63.)
9  BY MS. SCULLION:
10    Q.    So then let's go to the report
11  for the period January 1st, 2011 to March 31st,
12  2011.  I hand you what's been marked as Exhibit
13  Number 63.
14          And that is Bates stamped
15  END00308793.
16          And, again, if you'll turn to
17  page 18, section "Post marketing Surveillance,"
18  subsection 6.1, "Periodic Reports."
19    A.    Can you just let me catch up to
20  where you are.
21    Q.    Sure.
22    A.    Okay, thank you.  You said 18,
23  correct?
24    Q.    Correct.  Do you see paragraph

Page 673

1  6.1 Periodic Reports?
2    A.    I do.
3    Q.    And, again, Endo reports to the
4  FDA "Postmarketing surveillance of Opana ER
5  since launch has not identified any new safety
6  issues."
7          That's what it says, right?
8    A.    You read that correctly.
9    Q.    Okay.  And let's look at the
10  report for the last half of 2011.
11          (Document marked for
12      identification as Endo-Lortie Deposition
13      Exhibit No. 64.)
14  BY MS. SCULLION:
15    Q.    Hand you what's been marked as
16  Exhibit Number 64.
17          And Exhibit 64 is Bates stamped
18  EPI000015268.
19          And if you'll turn in this
20  exhibit to page 18, I direct your attention
21  again to the section "Post Marketing
22  Surveillance," paragraph 6.1, "Periodic
23  Reports."
24          Are you with me?

Highly Confidential - Subject to Further Confidentiality Review

Page 674

1        A.    Yes, on the top of 18.
2        Q.    And, once again, for the period
3    July 1st, 2011 to September 30th, 2011, Endo's
4    reporting "Postmarketing surveillance of Opana
5    ER since launch has not identified any new
6    safety issues."
7            Did I read that correctly?
8        A.    Yes, you did.
9        Q.    Now, as we saw earlier in your
10   testimony, as of May 2011, the DEA for the
11   Philadelphia area office had, in fact,
12   identified that there was evidence of widespread
13   abuse of Opana ER, correct?
14           MR. LIMBACHER:  Object to form,
15       foundation.
16           THE WITNESS:  I'd be happy to
17       look at that document again.  We saw it
18       a while ago.
19   BY MS. SCULLION:
20       Q.    It's in the record.
21           So now let's turn to the RiskMAP
22   Update Report for the period October 1st, 2011
23   to December 31st, 2011, and I'll note it's dated
24   March 7th, 2012.

Page 675

1            (Document marked for
2        identification as Endo-Lortie Deposition
3        Exhibit No. 65.)
4    BY MS. SCULLION:
5        Q.    It's Exhibit 65.
6            And Exhibit 65 is Bates stamped
7    ENDO-OR-CID-01044118.
8        A.    Yes, I have that.
9        Q.    Okay.  Now, if you'll go to page
10   4 of this report, under the heading
11   "Introduction," looking at the second paragraph,
12   and Endo reports to the FDA, "Overall, during
13   this period no safety signals have been
14   identified and no patterns have diversion were
15   observed in the supply chain."
16           Did I read that correctly?
17           MR. LIMBACHER:  Object to form.
18           THE WITNESS:  That's -- you read
19       the sentence accurately.
20   BY MS. SCULLION:
21       Q.    Next sentence, "Based on the
22   available data, no new trends were observed, but
23   abuse and misuse of Opana and Opana ER continues
24   to be a problem."

Page 676

1            Do you see that?
2        A.    Yes, again, you read that
3    correctly.
4        Q.    Okay.  So Endo is acknowledging
5    finally in this report that abuse and misuse of
6    Opana ER is a problem, nonetheless Endo is
7    saying there's no safety signal; is that
8    correct?
9            MR. LIMBACHER:  Object to form,
10       misstates the evidence.
11           THE WITNESS:  Well, you pointed
12       me to a different spot.  I'd be happy to
13       go back and look at the other exhibits.
14       We didn't look at the introduction, so I
15       can't comment on the -- whether or not
16       the comment about abuse and misuse of
17       Opana and Opana ER continues to be a
18       problem.  I suspect it's in the
19       introduction of the other documents as
20       well.
21   BY MS. SCULLION:
22       Q.    Well, if you look at the date for
23   Exhibit 65, this is dated March 7th, 2012,
24   correct?

Page 677

1        A.    That's the date of the report,
2    yes.
3        Q.    And as of that date, Endo now had
4    FDA approval for its reformulated version of
5    Opana ER, correct?
6        A.    Well, as of March 7th it did.  Of
7    course, the period is covering December 31st,
8    the product had just received approval, but it
9    was not yet marketed.  In fact, in March of 2012
10   it was not on the market.
11       Q.    But as of the date of the report,
12   Endo had in hand now approval to launch a new
13   product, correct?
14       A.    FDA approval was received in
15   December of 2011, but there was some time to
16   ensure manufacturing of adequate supply before
17   it was put into the marketplace.
18       Q.    And the question is, though, as
19   of the date of this report, Endo now had in hand
20   FDA approval for a reformulated version of Opana
21   ER, right?
22       A.    As of the time of the report it
23   did, yes.
24       Q.    And Endo's intention was to

Highly Confidential - Subject to Further Confidentiality Review

Page 678

1   substitute the reformulated version of Opana ER
2   for the original version, correct?
3           MR. LIMBACHER: Object to form
4   and foundation.
5           THE WITNESS: The plan was to
6       effect as smooth as possible a
7       transition between the original
8       formulation and new formulation, the key
9       objective being to ensure that patients
10      who were titrated to effect were not --
11      didn't experience an interruption in
12      supply. We had some challenges doing
13      that but...
14  BY MS. SCULLION:
15      Q.   But Endo intended at the end of
16  that to have the newly reformulated version of
17  Opana ER replace the old version, correct?
18          MR. LIMBACHER: Same objections.
19          THE WITNESS: The ultimate plan
20      was to have only the new version on the
21      market.
22  BY MS. SCULLION:
23      Q.   Correct.
24          And, as we discussed before,

Page 679

1   Endo's intent was to have that reformulated
2   version approved as an abuse deterrent
3   formulation, correct?
4           MR. LIMBACHER: Same objections.
5           THE WITNESS: That was the intent
6       and the objective, yes.
7   BY MS. SCULLION:
8       Q.   Right, and the FDA never approved
9   the reformulated product as an abuse deterrent
10  formulation, correct?
11          MR. LIMBACHER: Object to form,
12      asked and answered.
13          THE WITNESS: Ultimately, after
14      much deliberation and submission of data
15      and negotiations and discussions, that's
16      correct, they have not yet or they never
17      did finally approve that language.
18  BY MS. SCULLION:
19      Q.   And you're aware, are you not,
20  that after a number of years of selling the
21  reformulated product, Endo withdrew that product
22  after the FDA had determined that the abuse of
23  the reformulated product also showed that its
24  risks outweighed its benefits from a safety

Page 680

1   perspective, correct?
2           MR. LIMBACHER: Object to form
3   and outside the scope of the direct.
4           THE WITNESS: I understand that
5       is what eventually happened. That, of
6       course, happened after I left the
7       company, so I wasn't part of that
8       decision.
9   BY MS. SCULLION:
10      Q.   So, overall, the original Opana
11  ER proved to be too unsafe because of abuse, and
12  the reformulated version of Opana ER likewise
13  proved to be too unsafe because of abuse,
14  correct?
15          MR. LIMBACHER: Objection, form
16      foundation and misstates the evidence.
17          THE WITNESS: Yeah, I don't think
18      I can agree with that, so I disagree.
19          MS. SCULLION: I have no further
20      questions.
21          THE VIDEOGRAPHER: That concludes
22      today's deposition. The time is
23      8:14 p.m.
24          (Brief recess.)

Page 681

1           (Deposition resumes at 8:15 p.m.)
2           MR. LIMBACHER: We have no
3   questions.
4           (Witness excused.)
5           - - -

Highly Confidential - Subject to Further Confidentiality Review

Page 682

```
 1          C E R T I F I C A T I O N
 2              I, MARGARET M. REIHL, a
 3      Registered Professional Reporter,
 4      Certified Realtime Reporter, Certified
 5      Shorthand Reporter, Certified LiveNote
 6      Reporter and Notary Public, do hereby
 7      certify that the foregoing is a true and
 8      accurate transcript of the testimony as
 9      taken stenographically by and before me
10      at the time, place, and on the date
11      hereinbefore set forth.
12              I DO FURTHER CERTIFY that I
13      am neither a relative nor employee nor
14      attorney nor counsel of any of the
15      parties to this action, and that I am
16      neither a relative nor employee of such
17      attorney or counsel, and that I am not
18      financially interested in the action.
19
20
21      ------------------------------
        Margaret M. Reihl, RPR, CRR, CLR
22      CSR #XI01497  Notary Public
23
24
```

Page 684

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2
 3          I, BRIAN LORTIE, do hereby
 4      certify that I have read the foregoing
 5      pages, and that the same is a correct
 6      transcription of the answers given by me
 7      to the questions therein propounded,
 8      except for the corrections or changes in
 9      form or substance, if any, noted in the
10      attached Errata Sheet.
11
12
13
        _____
14      BRIAN LORTIE           DATE
15
        Subscribed and sworn to before me this
16
        _____ day of _____, 2018.
17
        My commission expires:_____
18
19      _____
        Notary Public
20
21
22
23
24
```

Page 683

```
 1            - - - - -
 2            E R R A T A
 3            - - - - -
 4      PAGE  LINE  CHANGE
 5      ____  ____  _____
 6      REASON: _____
 7      ____  ____  _____
 8      REASON: _____
 9      ____  ____  _____
10      REASON: _____
11      ____  ____  _____
12      REASON: _____
13      ____  ____  _____
14      REASON: _____
15      ____  ____  _____
16      REASON: _____
17      ____  ____  _____
18      REASON: _____
19      ____  ____  _____
20      REASON: _____
21      ____  ____  _____
22      REASON: _____
23      ____  ____  _____
24      REASON: _____
```

67  (Pages 682 to 684)