Highly Confidential - Subject to Further Confidentiality Review

1          IN THE UNITED STATES DISTRICT COURT
2           FOR THE NORTHERN DISTRICT OF OHIO
3                   EASTERN DIVISION
4                      -  -  -
5

      IN RE:  NATIONAL        :   HON. DAN A.
6     PRESCRIPTION OPIATE      :   POLSTER
      LITIGATION               :
7                              :
      APPLIES TO ALL CASES     :   NO.
8                              :   1:17-MD-2804
                               :
9

          - HIGHLY CONFIDENTIAL -
10
      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11

                      -  -  -
12
                    May 29, 2019
13
                      -  -  -
14
15            Videotaped deposition of
      JONATHAN R. MACEY, taken pursuant to
16    notice, was held at the offices of
      Kirkland Ellis, LLP, 601 Lexington
17    Avenue, New York, New York, beginning at
      9:10 a.m., on the above date, before
18    Michelle L. Gray, a Registered
      Professional Reporter, Certified
19    Shorthand Reporter, Certified Realtime
      Reporter, and Notary Public.
20
                      -  -  -
21
22         GOLKOW LITIGATION SERVICES
      877.370.3377 ph | 917.591.5672 fax
23              deps@golkow.com
24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2

      ROBBINS GELLER RUDMAN & DOWD, LLP
 3    BY:  AELISH M. BAIG, ESQ.
      Post-Montgomery Center
 4    One Montgomery Street
      Suite 1800
 5    San Francisco, California 94104
      (415) 288-4545
 6    aelishb@rgrdlaw.com
 7         - and -
 8    ROBBINS GELLER RUDMAN & DOWD, LLP
      BY:  DORY P. ANTULLIS, ESQ.
 9    120 East Palmetto Park Road
      Boca Raton, Florida 33432
10    (561) 750-3000
      Dantullis@rgrdlaw.com
11    Representing the Plaintiffs
12

      KIRKLAND & ELLIS, LLP
13    BY:  JENNIFER LEVY, ESQ.
      1301 Pennsylvania Avenue, N.W.
14    Washington, D.C. 20004
      (202) 879-5211
15    jennifer.levy@kirkland.com
      Representing the Defendant, Allergan
16    Finance
17

      DECHERT, LLP
18    BY:  ALYSSA CLARK, ESQ.
      1095 Avenue of the Americas
19    New York, New York 10036
      (212) 698-3500
20    Alyssa.clark@dechert@dechert.com
      Representing the Defendant, Purdue
21    Pharmaceuticals
22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    TELEPHONIC/STREAMING APPEARANCES:
 2
 3    KIRKLAND & ELLIS, LLP
      BY:  ELIZABETH DALMUT, ESQ.
 4    1301 Pennsylvania Avenue, N.W.
      Washington, D.C. 20004
 5    (202) 879-5211
      Elizabeth.dalmut@kirkland.com
 6    Representing the Defendant, Allergan
      Finance
 7
 8    O'MELVENY & MYERS, LLP
      BY:  JEN CARDELÚS, ESQ.
 9    400 South Hope Street, 18th Floor
      Los Angeles, California 90071
10    (213) 430-6665
      Jcardelus@omm.com
11    Representing the Defendant, Janssen and
      Johnson & Johnson
12
13    BAILEY WYANT PLLC
      BY:  JOHN P. FULLER, ESQ.
14    500 Virginia Street East
      Suite 600
15    Charleston, West Virginia 25301
      (304) 720-0704
16    jfuller@baileywyant.com
      Representing the Defendant, West
17    Virginia Board of Pharmacy
18
19    ALSO PRESENT:
20
21    VIDEO TECHNICIAN:
22    Devyn Mulholland
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -

 2               I N D E X

 3                      -   -   -

 4

    Testimony of:

 5

                        JONATHAN R. MACEY

 6

    By Ms. Baig                          7

 7

    By Ms. Levy                          264

 8

 9

10                      -   -   -

11               E X H I B I T S

12                      -   -   -

13

14   NO.             DESCRIPTION            PAGE

15   Macey-1         Notice of Deposition   8

16   Macey-2         Expert Report of       73
                     Jonathan R. Macey
17                   5/10/19

18   Macey-3         Curriculum Vitae       152
                     Of Jonathan R. Macey
19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       -   -   -

 2            DEPOSITION SUPPORT INDEX

 3                       -   -   -

 4

 5    Direction to Witness Not to Answer

 6    PAGE    LINE
      110     10

 7

 8    Request for Production of Documents

 9    PAGE    LINE
      None.

10

11    Stipulations

12    PAGE    LINE
      None.

13

14    Questions Marked

15    PAGE    LINE
      None.

16

17

18

19

20

21

22

23

24
```

1                    -   -   -

2                THE VIDEOGRAPHER:  We are

3        now on the record.

4                My name is Devyn Mulholland,

5        I'm a videographer with Golkow

6        Litigation Services.

7                Today's date is May 29,

8        2019, and the time is 9:10 a.m.

9                This video deposition is

10       being held in New York, New York,

11       in the matter of National

12       Prescription opiate litigation.

13               The deponent is Jonathan

14       Macey.

15               Counsel will be noted on the

16       stenographic record.  The court

17       reporter is Michelle Gray and will

18       now swear in the witness.

19                   -   -   -

20               ... JONATHAN R. MACEY,

21       having been first duly sworn, was

22       examined and testified as follows:

23                   -   -   -

24               EXAMINATION

Highly Confidential - Subject to Further Confidentiality Review

1                          -  -  -

2    BY MS. BAIG:

3         Q.    Good morning, Mr. Macey.

4         A.    Good morning, counselor.

5         Q.    We met briefly off the

6    record, but could you state your full

7    name and address for the record?

8         A.    Certainly.  My name is

9    Jonathan R. Macey, and my address is 27

10   Rimmon Road, Woodbridge, Connecticut

11   06525.

12        Q.    And have you had your

13   deposition taken before?

14        A.    Yes.

15        Q.    Approximately how many

16   times?

17        A.    50.

18        Q.    Okay.  So you understand

19   very well the procedures of the

20   deposition; is that right?

21        A.    I believe I do.

22        Q.    Okay.  And have you seen

23   your deposition notice in this case?

24        A.    I have.

Highly Confidential - Subject to Further Confidentiality Review

1       MS. BAIG:  Let's have this

2    marked as Exhibit 1.

3           (Document marked for

4    identification as Exhibit

5    Macey-1.)

6  BY MS. BAIG:

7    Q.     And is this the deposition

8  notice that you saw before?

9    A.     Yes, it is.

10    Q.     And if you turn to the third

11  page, do you see Exhibit A?

12    A.     I do.

13    Q.     And did you bring any

14  documents with you to the deposition

15  today?

16    A.     I did not.

17    Q.     Okay.  Do you see the

18  document request here for three

19  categories of documents?

20    A.     Yes.

21    Q.     And the first one being all

22  documents or other materials you reviewed

23  since the date of your report that you

24  have not specifically identified in your

Highly Confidential - Subject to Further Confidentiality Review

1    report in preparation for your expected

2    testimony.

3              Do you see that?

4         A.    Yes, I do.

5         Q.    And do you have any such

6    materials?

7         A.    I do not.

8         Q.    Understanding you don't have

9    them here today, do you have them at all

10   or no?

11        A.    Respectfully, Counselor,

12   there is no "them."  If by "them" you

13   refer to materials that I reviewed since

14   the date of my report.  Because I have

15   not reviewed any additional materials

16   since the date of my report.

17        Q.    Okay.  And the second

18   category is an itemization of the hours

19   spent and compensation paid or to be paid

20   for your work in this matter and your

21   staff's work in this matter, including

22   all invoices you have submitted to

23   counsel.  Have you produced those

24   documents already?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I don't know.

2    Q.    Did you bring them here

3    today?

4    A.    No.

5    Q.    And why not?

6    A.    I -- I don't readily have

7    them available.

8          I don't believe that I

9    submit invoices to counsel in this case

10   actually.

11   Q.    You haven't submitted any

12   invoices to counsel in this case?

13   A.    I've submitted invoices,

14   just to be -- so the record is clear, I

15   don't believe I submit them to counsel.

16   I submit them on some computer system.

17   Q.    Who do you submit them to?

18   A.    I think they go to the

19   counsel's office at the client, but I'm

20   not certain.

21   Q.    And who do you under -- who

22   is the client?

23   A.    I believe that the clients

24   are Allergan PLC, Allergan Finance,

Highly Confidential - Subject to Further Confidentiality Review

1    Allergan Sales, and Allergan USA.

2         Q.    Okay.  Do you have a copy of

3    the invoices that you have submitted to

4    the client at your home or office?

5         A.    They exist in the cloud.

6         Q.    Okay.

7         A.    I have access to them via my

8    computer, which is both at home and at

9    the office.

10         Q.    Okay.  And why did you not

11    bring them here today pursuant to this

12    deposition notice?

13              MS. LEVY:  He wasn't asked

14         to.

15              THE WITNESS:  I was told not

16         to bring them.

17              MS. BAIG:  Okay.  We would

18         ask again that those documents be

19         produced, Counsel.

20              MS. LEVY:  Understood.  We

21         are negotiating with Special

22         Master Cohen whether there will be

23         such a requirement and whether it

24         will be mutual.  We've asked that

Highly Confidential - Subject to Further Confidentiality Review

1       of plaintiffs' lawyers,

2       plaintiffs' experts, and they have

3       not gotten them produced.

4  BY MS. BAIG:

5       Q.    Okay.  And the third

6  category is a copy of the most current

7  and accurate CV.

8       Do you see that?

9       A.    I do.

10      Q.    And is the most current and

11 accurate CV the one that is attached to

12 your expert report?

13      A.    Yes, it is.

14      Q.    Okay.  Do you have an idea

15 of how much you have been paid to date

16 for your services in this case?

17      A.    I'm sorry.  Do I have an

18 idea of how much I've been paid to date?

19      Q.    Mm-hmm.

20      A.    Yes, Counselor.

21      Q.    And what is that?

22      A.    I don't know the exact

23 figure, but I think it's approximately

24 $27,000.

1    Q.    Okay.  And do you know

2  approximately how much is outstanding?

3    A.    I do not.

4    Q.    Do you know whether it's --

5  27,000 reflects more than half of your

6  total work so far in this case?

7    A.    I'm sorry.  You're asking me

8  what now?

9    Q.    Whether the $27,000 figure

10  that you just stated, is that about half

11  of your work so far?  Do you know whether

12  that's about half, or more or less than

13  half is still unpaid?

14    A.    Oh, so, right -- well, so

15  that figure represents both the hours

16  that I've spent, so it would be that

17  figure, divided by the number of hours I

18  spent.  But it would have to be adjusted.

19  There are also out-of-pocket expenses

20  associated with travel.  So there would

21  be -- have to be an adjustment to that --

22  to that figure.

23    Q.    Do you know roughly how many

24  hours you've spent working on this case?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I don't know how many hours

2  I spent working on this case.

3    Q.    What's your best estimate of

4  about how many hours you've spent working

5  on this case?

6    A.    Maybe -- I -- this is really

7  just a guess.  I would say maybe 80-ish.

8  I don't know.

9    Q.    And your hourly rate is

10  what?

11    A.    $1,250 an hour.

12    Q.    And what are the travel

13  expenses that you've incurred so far?

14    A.    So I've traveled to New York

15  from my home, and I've incurred parking

16  and train expenses.

17    Q.    On how many occasions?

18    A.    Maybe -- including today?

19  Three or four.

20    Q.    And who actually retained

21  you in this action?

22    A.    I'd have to review my

23  retention letter.  I don't recall

24  specifically.

1    Q.    Do you recall what firm

2  retained you?

3    A.    Oh you mean what law firm.

4  Oh, sorry.  Kirkland & Ellis.

5    Q.    And who are you working with

6  at Kirkland & Ellis?

7    A.    Most recently, Jennifer

8  Levy.

9    Q.    Okay.  Anybody else?

10    A.    Ms. Donna Welch and some

11  other attorneys who -- associate

12  attorneys.

13    Q.    From Kirkland & Ellis?

14    A.    Correct.

15    Q.    And have you met with any

16  other law firms in connection with your

17  work on this case?

18    A.    I have not.

19    Q.    Do you recall when you were

20  first contacted about being an expert in

21  this case?

22    A.    Within the last six months.

23    Q.    Do you know whether it was

24  2018 or 2019?

1          A.     It would have been very late

2    in 2018.  I believe it was 2019.

3          Q.     And who first contacted you?

4          A.     I don't recall.

5          Q.     Is it your understanding

6    that you're working not only on behalf of

7    the Allergan entities that you

8    identified, but also on behalf of Teva?

9          A.     That is not my

10   understanding.

11         Q.     Have you spoken with anybody

12   from Teva about this case?

13         A.     I have not.

14         Q.     Have you spoken with anyone

15   from Morgan Lewis about this case?

16         A.     I have not.

17         Q.     Do you have an idea of what

18   additional work you intend to do in this

19   case?

20         A.     I do not.  I would review

21   any documents provided to me by counsel

22   should -- I would expect, subject to,

23   obviously the wishes of the client, that

24   should there be expert reports filed by

1  plaintiffs, that I would read those

2  reports and, if appropriate, respond.

3         Q.    And do you intend to testify

4  at trial in this case?

5         A.    Do I personally intend to?

6  If -- I am prepared to testify at trial.

7  I don't know that I'm -- I don't know

8  that I would assign a probability to that

9  actually occurring, but I haven't really

10  thought about it.

11         Q.    Have you asked to testify at

12  trial in this case, should there be a

13  trial?

14         A.    I don't recall.

15         Q.    Are you collaborating with

16  anybody on your work?

17         A.    I'm not.

18         Q.    So you don't have any staff

19  or other people that you work with that

20  are helping you prepare your reports and

21  whatnot?

22         A.    That is correct.  All of the

23  document review and document preparation

24  and all other work is done exclusively by

1   me.

2          Q.     Have you been retained by

3   Kirkland & Ellis before?

4          A.     Yes.

5          Q.     On what occasions?

6          A.     I don't recall.  I think

7   I've had other engagements with them

8   though.

9          Q.     How many approximately?

10         A.     I don't recall specifically.

11  At least two.

12         Q.     You don't recall anything

13  about those engagements?

14         A.     I don't -- sitting here

15  right now, I don't recall the parties.  I

16  have some vague recollection of some of

17  the issues involved.

18         Q.     Approximately when were

19  those retentions?

20         A.     They were some time ago.

21  Years.  I don't recall exactly when.

22         Q.     More than ten years ago?

23         A.     I don't believe so.  I think

24  there have been recent.

1        Q.      Less than five years ago?

2        A.      I believe so.

3        Q.      And what were the issues

4    that you do recall?

5        A.      I don't recall with any

6    specificity, but I seem to recall there

7    was some issues regarding corporate

8    governance, corporate structuring,

9    ordinary and customary business practices

10   of corporations and their subsidiaries,

11   that sort of thing.

12       Q.      And you don't recall who

13   your -- who the clients were?

14       A.      Correct.

15       Q.      Did you submit expert

16   report -- an expert report to the court

17   in both of those -- in connection with

18   both of those cases?

19       A.      Yeah, just so the record is

20   clear, when I said both, I mean, I don't

21   recall precisely how many cases I've

22   worked on with Kirkland & Ellis, but I

23   have prepared expert reports.

24               Sitting here right now, I

Highly Confidential - Subject to Further Confidentiality Review

1   don't recall whether those -- when the

2   cases settled or where -- if the reports

3   were ever filed in court.  I don't -- I

4   just don't know.  I don't specifically

5   recall ever testifying at trial in a

6   matter on which I was retained by

7   Kirkland & Ellis at a -- as an expert.

8          Q.    Do you recall testifying in

9   deposition on other matters in which you

10  were retained by Kirkland & Ellis?

11         A.    I believe so.  I -- I think

12  so.  I don't have a specific

13  recollection, but I believe I've

14  testified at deposition in cases in which

15  I've been retained by Kirkland & Ellis as

16  an expert.

17         Q.    Do you believe it's on more

18  than two occasions?

19         A.    I don't believe so, no.

20         Q.    And you have no idea who the

21  clients were in either -- in either case?

22         A.    Well, I don't remember the

23  names of the clients.  I wouldn't say I

24  have no idea.  I recall one was in -- a

Highly Confidential - Subject to Further Confidentiality Review

1    real estate developer, I just don't

2    remember the name of them -- they

3    developed a lot of, what do you call

4    those -- you know, malls, it was one.  I

5    think there was a private equity firm

6    or -- yeah, a private equity firm may

7    have been a client.  I -- I just -- I'm

8    not positive.

9          Q.    And do you recall anything

10   about your opinion in the case that had

11   to do with a real estate developer?

12         A.    I do -- I have some vague

13   recollection with respect to the real

14   estate developer that it involved

15   fiduciary duties that were owed to a

16   minority investor in a partnership or

17   LLC.  I can't remember the organizational

18   form right now in -- with respect to

19   issues such as use or patient corporate

20   opportunity.  And -- and participation

21   rights in development ventures that

22   arguably could or could not have been

23   attributable to the legal entity that the

24   minority investors were invested in.

1    Q.    To your recollection, was

2    there any overlap with the issues in that

3    case and the issues in this case?

4    A.    Well, they both involved a

5    corporate governance analysis at a very

6    high level of abstraction.  So if one

7    were taking a survey course in say a

8    corporate governance class, the issues in

9    that case and the issues in this case

10   would be covered in both courses so

11   there's some commonality, but there

12   really wouldn't be a direct overlap.

13   Q.    And with respect to the

14   second case that you recall being

15   retained by Kirkland & Ellis in with

16   respect to the private equity firm, do

17   you have an understanding of -- or do you

18   have a memory of what your opinions were

19   in that case?

20   A.    I do not.  That one was a

21   longer time ago.  And I don't remember

22   any details about it.

23   Q.    Do you -- do you recall

24   generally what that case was about?

1          A.     I could -- I could guess.

2     But I don't specific -- I don't really

3     know.  I don't really remember.

4          Q.     And that case was between

5     five and 10 years ago?

6          A.     I believe so.

7          Q.     Okay.  So you don't recall

8     anything about that case; is that right?

9          A.     Well, it involved a private

10    equity firm.  I could -- I mean, a lot of

11    these cases involving private equity

12    firms involve similar fact patterns.  I

13    don't -- I can tell you what the fact

14    patterns were, but I don't remember if

15    this case involved that fact pattern or

16    was a little bit different.  So I

17    don't -- I would just be guessing.

18         Q.     Have you done any work for

19    the Allergan entities before?

20         A.     I have not, no.

21         Q.     How about for Actavis or

22    Watson?

23         A.     No, I have not.

24         Q.     Have you been engaged by any

1    of the other defendants in this case

2    before?

3          A.    Not that I'm aware of, no.

4          Q.    Have you been engaged by any

5    pharmaceutical companies before?

6          A.    Yes.

7          Q.    Which ones?

8          A.    Boehringer Ingelheim.

9          Q.    Any others?

10         A.    Pharmaceutical companies?  I

11   may have been -- yes, I think so, maybe

12   Schering-Plough.  Are they a

13   pharmaceutical company?  I don't

14   specifically recall who the client was.

15         I had a -- a -- I was an

16   expert witness in -- in an arbitration

17   involving a pharmaceutical company

18   acquisition with two or three very large

19   pharmaceutical companies, one of which

20   was Schering-Plough.

21         Q.    Do you remember what the

22   other -- the other two or three were?

23         A.    Oh dear.  I think Merck was

24   another one of these insurance

1   companies -- or sorry, sorry.  I beg your

2   pardon, counselor, pharmaceutical

3   companies is what I meant to say.  Merck,

4   Schering-Plough, and there was a third.

5   But I don't remember the name of it.

6           Q.    Have you been retained by

7   any pharmaceutical distributors before?

8           A.    No.

9           Q.    So you've never been

10  retained by McKesson or Cardinal Health

11  or AmerisourceBergen?

12          A.    What was the third one?

13          Q.    AmerisourceBergen.

14          A.    No, I have not.

15          Q.    Have you been retained by

16  pharmacies before?

17          A.    Yes.

18          Q.    Which ones?

19          A.    Walgreens.

20          Q.    And what was the nature of

21  that retention?

22          A.    Walgreens had been acquired

23  by a company called Alliance Boots.

24                And Walgreens had a contract

Highly Confidential - Subject to Further Confidentiality Review

1   with -- I believe it was CVS.  But in any

2   event, Walgreens had a contract with a

3   third company.  And the contract with the

4   third company was a very large contract.

5   And the contractual provisions between

6   the two parties, Walgreens and whatever

7   this other party was, provided that

8   should Walgreens be acquired or should

9   there be a change of control of some

10  particularly defined sort, then the

11  contract would terminate and be

12  renegotiated.  And there was an

13  arbitration brought by the contracting

14  party -- it might have been CVS, I really

15  don't remember who it was -- that claimed

16  that the Walgreens-Alliance Boots

17  transaction triggered the termination of

18  the contract and required that the

19  contract be renegotiated with new prices.

20          And Walgreens retained me,

21  or Walgreens counsel retained me to

22  testify about the -- the

23  Walgreens-Alliance Boots

24  acquisition/merger transaction.  And the

1    question being whether the contractual

2    provisions in this -- I think -- in this

3    contract were triggered by this business

4    combination between Walgreens and

5    Alliance Boots.

6           Q.    And what was your opinion in

7    that matter?

8           A.    I don't remember precisely.

9           Q.    Do you remember generally?

10          A.    Generally speaking, I

11   characterized the transaction as

12   accurately as I could and explained the

13   sort of economics of the transaction.

14   And I explained or went into this

15   agreement and described the sort of

16   business justifications for the

17   agreement.  I don't recall -- I don't --

18   beyond that I don't recall the details.

19          Q.    Do you recall whether you

20   opined that the contractual provisions

21   were or were not triggered by the

22   business combination?

23          A.    I believe I said that they

24   were not triggered, but I would say about

Highly Confidential - Subject to Further Confidentiality Review

1   an 80 percent degree of certainty with

2   respect to that answer.

3        Q.    And when was your retention

4   in that case?

5        A.    Couple of -- two or three

6   years ago.  Maybe more.  Three or

7   four years ago.  I'm not really sure.

8        Q.    And where was that case

9   pending?

10        A.    It was an arbitration

11   somewhere in the state of Arizona.  I

12   believe Phoenix, but it might have been

13   Tucson.

14        Q.    And you submitted an expert

15   report?

16        A.    Yes.

17        Q.    Did you testify at the

18   arbitration?

19        A.    Yes.

20        Q.    And who was presiding over

21   the arbitration?

22        A.    It was -- it was a retired

23   circuit court judge, a single judge, but

24   I don't recall his name.

1    Q.    Where in Arizona was it?

2    A.    I don't recall.  It was -- I

3  think it was either Phoenix or Tucson.  I

4  don't -- I don't really remember.  It was

5  in an office building there.  And I

6  recall -- I believe that I stayed in a

7  hotel in one of those two cities and went

8  and testified at the arbitration in the

9  other.  But I don't recall which I

10  stayed -- place I stayed and which place

11  I testified in.

12    Q.    Have you been retained by

13  any -- oh.  Actually, what counsel

14  retained you in that case?

15    A.    It was a law firm by the

16  name of Bartlit Beck.  I don't -- they

17  have a longer name, they are in Chicago,

18  but I don't remember the rest of the

19  name.

20    Q.    And who did you work with at

21  Bartlit Beck?

22    A.    Oh dear.  A very nice

23  person.  I'm extremely fond of him and

24  I'm blanking on his name.  I don't recall

1    the name of the -- of the lawyers that I

2    worked with at Bartlit Beck, I apologize.

3         Q.    Have you been retained by

4    any other pharmacies?

5         A.    I don't think -- not that I

6    recall sitting here right now.

7         Q.    Have you ever been retained

8    by Morgan Lewis?

9         A.    Maybe.  I just don't

10   specifically recall.  It's a well-known

11   firm.  I may have been retained by them.

12   But if I was, I don't remember it right

13   now.  It's within the realm of

14   possibility, though.

15        Q.    How about Dechert?

16        A.    I -- well, same answer.

17   It's possible.  I'm familiar with the

18   firm.  I may have -- it seems like I may

19   have.  I just don't remember.

20        Q.    How about Arnold and Porter?

21        A.    I don't believe I've ever

22   been retained by Arnold and Porter.

23        Q.    How about Ropes & Gray?

24        A.    I may have done work with

1    Ropes & Gray.  I don't specifically

2    recall.  I don't believe so.

3           Q.    How about Jones Day?

4           A.    I have been retained as an

5    expert by Jones Day.

6           Q.    And when was that?

7           A.    Several years ago, maybe

8    seven, five.  I don't remember.

9           Q.    And who was the client?

10          A.    I don't remember who the

11   client was.

12          Q.    Do you recall whether you

13   submitted an expert report?

14          A.    I believe I did.

15          Q.    Do you recall where the case

16   was pending?

17          A.    It was somewhere in the City

18   of Chicago, in a district court, I --

19   U.S. District Court in Chicago.

20          Q.    Do you recall the nature of

21   the opinion?

22          A.    I beg your pardon.  I didn't

23   hear you.  I'm sorry.

24          Q.    Do you recall the nature of

1    your opinion?

2         A.    Yes.

3         Q.    What was that?

4         A.    So my recollection is that

5    this case involved the hostile takeover

6    by an Australian mineral company, very

7    large company, for a very large Canadian

8    mineral company.  And Jones Day

9    represented the target company in the

10   hostile acquisition, which was a

11   Canadian -- sorry, yeah which was the

12   Canadian company.  And the question was

13   to provide -- the issue that I addressed

14   was to provide an economic and policy

15   analysis of the nature of the structure

16   and nature of the bidder's offer for the

17   target and to explain what -- the

18   economic nature of the offer with

19   particular focus on an opinion as to

20   whether the offer would be considered

21   coercive to the target company

22   shareholders from a game theory

23   perspective.

24        Q.    What was the dispute there?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Well, the dispute was that

2  this big Australian company wanted to

3  take over the not quite as big, but quite

4  big, Canadian company, and the Canadian

5  company did not want to get taken over

6  and was resisting the offer.

7    Q.    And your opinion was what?

8    A.    My opinion was essentially

9  to describe the structure of the offer

10  and to explain a little bit of game

11  theory, particularly what's known as the

12  prisoner's dilemma and to describe ways

13  in which the offer by the bidder could be

14  construed as coercive to the target

15  company's shareholders.

16    Q.    Have you been retained in

17  connection with any other opioid-related

18  litigation?

19    A.    I have not.

20    Q.    So this is your sole

21  retention ever on behalf of any Allergan

22  entity, correct?

23    A.    That's my -- that's my

24  recollection.  I believe that to be the

Highly Confidential - Subject to Further Confidentiality Review

1   case.  I don't believe I've ever been

2   retained by any Allergan affiliate,

3   subsidiary, et cetera, ever, no.

4        Q.    And this is your sole

5   retention in opioid litigation?

6        A.    That is correct.

7        Q.    When was your first

8   experience testifying as an expert

9   witness?

10        A.    I'm tempted to say before

11   you were born, but a long time ago.  Let

12   me try to give it a date.

13            Maybe -- I would say

14   approximately 1998, 1999.  That's -- I'm

15   just trying to extrapolate back.  I may

16   be off.  But it was somewhere in the late

17   '80s or the 1990s.  I honestly don't

18   remember.

19        Q.    And that was your first

20   experience being retained as an expert

21   witness; is that right?

22        A.    This is my -- to the best of

23   my recollection, yes.

24        Q.    And how did you become --

Highly Confidential - Subject to Further Confidentiality Review

 1    how did you come to be an expert?  And by

 2    that, I don't mean your educational

 3    background.

 4          A.    I understand.

 5          Q.    We'll get to that.  I mean

 6    more your work as a testifying expert.

 7          A.    So if I'm -- correct me,

 8    obviously, if I'm not providing -- giving

 9    you the information that you need.  But,

10    so I was a law professor at the time at

11    Cornell Law School in Ithaca, New York.

12    And I was contacted by a lawyer at a law

13    firm called McLane something in New

14    Hampshire, was looking for a corporate

15    governance expert, corporate -- an expert

16    on piercing the corporate veil, and

17    reached out to me.

18          Q.    Do you recall the name of

19    that lawyer?

20          A.    It was something Life.

21    Bruce Felmly.  That was his name.  I

22    don't recall the spelling, but I think it

23    was F-E-M-L-E-Y, or F-E-L-M-E-Y.  Felmly,

24    something of that nature.  It was a law

1  firm -- the McLane law firm in -- I

2  believe in Manchester, New Hampshire.

3          Q.    Going back for a moment to

4  the cases that you've just described for

5  me.  Were any of those related to

6  piercing the corporate veil?

7          A.    When you say any of those,

8  do you mean -- what do you mean?  Any of

9  the ones that I've talked about today?

10          Q.    Mm-hmm.

11          A.    Well, the one that I just

12  talked about was a piercing the corporate

13  veil case.  So that one certainly was.

14  The others involved corporate governance

15  and corporate control.  I don't recall if

16  they had piercing elements in them.

17          Q.    Do you recall any cases that

18  you've testified in that had piercing the

19  corporate veil elements in them?

20          A.    Well, it would be -- I mean,

21  I -- I've testified in several cases that

22  have piercing the corporate veil elements

23  in them, yes.  I do recall testifying in

24  piercing the corporate veil cases in

Highly Confidential - Subject to Further Confidentiality Review

1    the -- in the past.

2         Q.    Which cases do you recall

3    testifying on that issue?

4         A.    So the -- this is not --

5    this is not a complete list.  But the

6    first retention that I mentioned to you a

7    moment ago from a long time ago, was a

8    piercing the corporate veil case.

9              The Boehringer Ingelheim

10   pharmaceutical case that I mentioned to

11   you not long ago was a piercing the

12   corporate veil case.

13             Incidentally, I --

14   this is -- this discussion of Boehringer

15   Ingelheim has jogged my memory.  You were

16   asking me a while ago about cases in

17   which I've been retained by Kirkland &

18   Ellis.  And I'm pretty sure that Kirkland

19   & Ellis was the law firm that retained me

20   in the Boehringer Ingelheim litigation.

21   In terms of going back to your more

22   recent question, I'm not quite sure what

23   you're asking.

24             Those -- of the cases that

Highly Confidential - Subject to Further Confidentiality Review

1   we've discussed so far this morning and

2   which I've served as an expert witness,

3   those are the ones that I immediately

4   remember as involving piercing the

5   corporate veil issues.

6               I've testified in other

7   cases in this -- as an expert in piercing

8   the corporate veil, in cases involving --

9   in which the issue of piercing the

10  corporate veil has been raised.

11       Q.    What cases do you recall

12  testifying about piercing the corporate

13  veil?

14       A.    So I don't -- I can't recall

15  names of these cases specifically.  I

16  just recall that I've testified in cases.

17  In addition to the two that I mentioned

18  involving piercing the corporate veil,

19  there have been a handful of others.

20       Q.    What do you recall about the

21  handful of others?

22       A.    Some of them involved public

23  utilities.  Some of them involved

24  construction companies.  That's what I --

Highly Confidential - Subject to Further Confidentiality Review

1    that's what I recall right at the moment.

2         Q.    Do you recall ever opining

3    that the corporate veil was pierced?

4         A.    I'm not -- I don't really

5    understand the question.  That the

6    corporate veil was pierced?

7         Q.    Yes.

8         A.    I don't -- I don't --

9         Q.    Or ought to be pierced?

10        A.    Oh, I see.  Sorry, sorry.

11             I don't -- so I would

12   view -- I don't -- so, let me see how to

13   put this.

14             Generally speaking, my

15   testimony would not involve -- I don't

16   think I would generally testify that the

17   corporate veil should be pierced.  I

18   think my testimony would take the form of

19   it would be consistent or inconsistent

20   with ordinary and customary corporate

21   behavior to peers the corporate veil.

22             Or it would be -- it would

23   further or detract from principles of

24   economic efficiency or valid public

1   policy to pierce the corporate veil under

2   a particular fact pattern or not to

3   pierce the corporate veil.

4              I don't believe I would

5   ever -- I don't -- so my testimony would

6   sort of take that form.  I realize this

7   may not be responsive.  I'm happy to

8   answer, obviously, follow-up questions,

9   but -- so in other words, I don't think I

10  would -- I -- I don't think -- I'm not

11  sure.  I'd have to look, but I don't know

12  that I've ever testified either way,

13  that, oh, the corporate veil should be

14  pierced or the corporate veil should not

15  be pierced.

16             But I've, you know,

17  testified with respect to economic or

18  public policy issues surrounding, you

19  know, the reasons for the veil-piercing

20  doctrine and the reasons for the notion

21  of, you know, corporate separateness and

22  limited liability and things like that.

23             I hope -- I hope that's

24  somewhat responsive.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Have you ever provided any

2    opinion that you recall that would

3    support piercing the corporate veil?

4    A.    Yes.

5    Q.    Which do you recall?

6    A.    So I have testified in

7    several cases that piercing the corporate

8    veil would be consistent with public

9    policy that would be, you know, to be

10   blunt about it, I guess, cases in which

11   the law firm that retained me was

12   seeking, in the litigation in which I was

13   retained, to have the corporate veil

14   pierced, and in which I gather the law

15   firm thought that the expert report that

16   I prepared and the testimony that I

17   provided was useful to them as advocates

18   because they retained me in the case, and

19   filed my expert report and had me testify

20   in the cases.

21   So, I mean, just to be blunt

22   or mercenary about it, I suppose, I've

23   been what one might colloquially describe

24   as having been on the plaintiff's side in

Highly Confidential - Subject to Further Confidentiality Review

1    piercing cases before.

2         Q.    Which cases?

3         A.    So the one I mentioned to

4    you before in Manchester and then several

5    other cases, all of them are -- you know,

6    involved kind of the same basic

7    constellation of -- of facts.  They

8    involve -- these are cases involving

9    public utilities.  So the case Florida

10   Power & Light that I recall.  A case

11   called Ageco.  A case called New York Gas

12   & Electric.  Manchester Gas I think.

13   There's a -- those are the parties' names

14   that I -- that I recall.

15        Q.    The Manchester case, was

16   that pending in Manchester?

17        A.    I believe at the time, it's

18   no longer pending obviously, but when I

19   was retained, yes, it was pending in --

20   somewhere in New Hampshire.  I would say

21   Manchester.  It could have been in a

22   different city.  The law firm that

23   retained me was in Manchester.  They had

24   an office in another New Hampshire city.

1    And I -- I testified in trial in that

2    case, and I don't recall -- I believe it

3    was in Manchester.  I'm pretty sure, but

4    I'm not 100 percent sure.

5            Q.    Do you recall who the judge

6    was in that case?

7            A.    I do not.

8            Q.    Do you recall who the

9    parties were in that case?

10           A.    They were -- one was I think

11   Manchester Gas & Electric.  And the other

12   party was, I think it was UGI, but I'm

13   not 100 percent positive.

14           Q.    Do you recall whether it was

15   in state or federal court?

16           A.    I believe it was in federal

17   court.

18           Q.    Do you have a copy of your

19   report in that case?

20           A.    No.

21           Q.    You don't keep copies of

22   your reports?

23           A.    Well, I -- I have copies of

24   some of my reports.  That report was a

Highly Confidential - Subject to Further Confidentiality Review

1  long time ago.  I was -- I was at a

2  different law school, I had a different

3  computer.  So I don't have that with me.

4  I don't have it anymore.

5          Q.    You don't have it with you

6  or you don't have it at all?

7          A.    I could search for it.  I

8  don't believe I have it at all.  There's

9  a chance I have it, but I don't believe

10  so.  I'd -- I'd have to -- I'd have to

11  search.

12          Q.    Was it filed publicly?

13          A.    Well, I was an expert

14  witness and I testified at trial.  I

15  don't believe it was under seal or

16  anything.  I just -- I believe it's --

17  what -- it's as much a part of the court

18  record as anything else in that

19  proceeding.

20          Q.    And the second case you

21  mentioned, I think Florida Power & Light;

22  is that right?

23          A.    Yes.

24          Q.    And that's a case where your

Highly Confidential - Subject to Further Confidentiality Review

1    opinion would have supported piercing the

2    corporate veil; is that right?

3           A.    It would have been

4    consistent -- it would have -- it would

5    have been consistent with that idea, that

6    notion that piercing the corporate veil

7    would have -- would not have violated

8    public policy.

9           Q.    And where was that case

10   pending?

11          A.    So it was a Florida -- I

12   want to say Ohio.  But I'm not positive.

13          Q.    Do you know whether it was

14   state or federal court?

15          A.    I believe it was federal

16   court.

17          Q.    Do you recall the judge?

18          A.    I believe it was Judge

19   Polster.

20          Q.    Do you recall the year?

21          A.    I do not.

22          Q.    Do you recall the judge in

23   the Manchester case?

24          A.    I do not.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you recall roughly the

2  year of the case before Judge Polster?

3    A.    I don't recall roughly the

4  year.  I would say -- if I had to guess,

5  I would say maybe eight years ago.  But

6  it -- literally a guess.  I don't recall

7  the exact date.

8    Q.    And did you testify at trial

9  in that case?

10    A.    I don't believe I did.

11    Q.    So you testified only at

12  deposition?

13    A.    I think that's right.  I

14  mean, I filed a report in that case.

15  I -- I don't specifically recall being

16  deposed in the case, although I -- I have

17  no reason to think that I wasn't.  I just

18  don't recall.

19    Q.    And what was the controversy

20  in that case?

21    A.    It was what -- I'll be happy

22  to give you a longer version if you

23  prefer, but in -- in a short version it

24  was a reverse piercing case.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What do you mean by that?

2    A.    It's a case in which -- so

3 generally speaking in piercing the

4 corporate veil cases, creditors are

5 attempting to pierce the corporate veil

6 against a subsidiary and to hold

7 liability to a parent or shareholder.

8            In this particular case,

9 the -- a subsidiary company was the

10 plaintiff and was seeking to have its own

11 corporate veil pierced such -- so as to

12 find liability from the parent.  That's

13 what I mean by a reverse piercing case.

14 It's where a subsidiary attempts to

15 pierce the corporate veil so that the

16 assets of a parent or controlling

17 shareholder will be available to satisfy

18 claims against the subsidiary.

19    Q.    And you were retained by

20 what party?

21    A.    Plaintiff.

22    Q.    And what was the basis of

23 your opinion, that you recall?

24    A.    The basis of my opinion had

1    to do with ordinary and customary

2    corporate behavior in public utility

3    holding companies, in particular in

4    holding companies in general in the

5    period prior to the passage of the Public

6    Utility Holding Company Act, and -- and

7    essentially in the kind of late 1800s,

8    early 1900s period of American history

9    and what was ordinary and customary

10   behavior among corporate affiliates in

11   that historical point in time.

12          Q.    And was your opinion in that

13   case that the corporate veil should be

14   pierced?

15          A.    Well, I don't -- I think

16   I've answered that.  I'll give you the

17   same answer I gave you before, which is I

18   believe that my testimony was that -- was

19   consistent or at least not inconsistent

20   with the plaintiff's veil piercing

21   theory.  I don't believe I actually

22   asserted that -- that the veil should

23   have been pierced.

24                My -- my hesitation,

1    frankly, is, sitting here right now, it's

2    my view that that opinion would usurp the

3    judge's prerogative to make an ultimate

4    determination of the legal outcome of the

5    case.  And I would -- I believe, although

6    I could be mistaken, that I would have

7    refrained from doing that.

8                   I think my testimony was

9    that the corporate governance of this

10   particular subsidiary was aberrant, did

11   not -- was not -- did not conform with

12   ordinary and customary corporate

13   governance behavior.  And that there were

14   particular facts in the case that -- that

15   suggested that the -- the general policy

16   in which courts respect the corporate

17   form and decline to pierce the corporate

18   veil could be -- could be ignored without

19   doing serious violence to the capital

20   formation process in the United States.

21        Q.    Do you recall what any of

22   those factors were or what the evidence

23   was in that case that supported your

24   opinion?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I -- yeah, so, essentially

2    the factors that supported my opinion in

3    that case as I recall, was a company --

4    the parent company in that case, which I

5    believe was Ageco, was essentially a

6    criminal enterprise that had been run for

7    the purpose of defrauding investors and

8    provided the impetus for the passage of

9    the Public Utility Holding Company Act,

10   and that there was what I described as

11   aberrant behavior in the running of the

12   firm, where the corporate governance of

13   the firm, of the subsidiary that had --

14   subsidiaries that had retained me, had

15   been outsourced from a couple of

16   companies in Florida to New York.  And

17   that assets were improperly commingled

18   and -- and that the subsidiaries were

19   incapable of operating themselves

20   without -- without the -- without the day

21   to -- the guidance over the day-to-day

22   environmental operation -- oversight of

23   the parent.

24            And that the oversight of

Highly Confidential - Subject to Further Confidentiality Review

1    the parent was abusive in that it

2    stripped -- systematically stripped

3    assets in a variety of ways from the

4    subsidiary and for the benefit of the --

5    of the parent.

6           Q.    Did the case go to trial?

7           A.    I believe -- I believe --

8    yes.  So I believe so.

9           Q.    Do you recall the outcome of

10   that trial?

11          A.    I believe that the judge in

12   that case declined to pierce the

13   corporate veil and respected the

14   corporate integrity of the particular

15   entities involved in the case.

16          Q.    Do you recall the basis for

17   that opinion?

18          A.    I -- I am -- I --

19          Q.    I mean the judge's opinion.

20          A.    Oh, thank you.  Certainly.

21                I believe that the opinion

22   was predicated on the -- a strong

23   adherence by the judge to the principle

24   of corporate separateness to the idea

Highly Confidential - Subject to Further Confidentiality Review

1  that the corporate veil should be pierced

2  only in extraordinary circumstances.  And

3  I believe the judge determined that there

4  had been -- that the operation of these

5  corporations in the way that I described

6  them in my expert report did not violate

7  public policy to an extent that merited

8  piercing the corporate veil.  That's my

9  recollection sitting here right now of

10 the basis for the judge's opinion.

11        Q.    And do you recall who

12 retained you in that case?

13        A.    I believe I was retained by

14 the law firm, now defunct, of Dickstein &

15 Shapiro.  But I'm not positive.  I

16 believe that's the case.

17        Q.    Do you remember the name of

18 the lawyer that you worked with on that

19 case?

20        A.    Almost.  Let me -- give me a

21 second.  I think I can conjure this guy's

22 name up.

23             I do -- his name is not

24 coming to me.  I believe that I will

Highly Confidential - Subject to Further Confidentiality Review

1    remember it.  And if I do, if you want me

2    to, I'll -- it's very close, but I can't

3    just bring it up right now.  I'm sorry.

4         Q.    Okay.  Did you already give

5    me a rough time frame for that case

6    before Judge Polster?

7         A.    No.  I tried.  I think I

8    told you about eight -- I want to say

9    eight years ago.  But I would not assign

10   a high level of confidence to that -- to

11   that estimate.  But that's to the best of

12   my recollection.

13        Q.    What is the next case that

14   you recall providing an opinion which

15   could be considered supportive of

16   piercing the corporate veil?

17        A.    When you say the next, just

18   the next one that comes to mind or next

19   one chronologically?  Or just -- how

20   would you like me to answer?

21        Q.    Well, you've mentioned the

22   Manchester case.

23        A.    Right.

24        Q.    You've mentioned Florida --

1  Florida Power.

2          A.     Right.

3          Q.     Is that the same as the Age

4  company, or the Age company is separate?

5          A.     So I believe that in the

6  Florida Power case, the defendant --

7  Florida Power was the plaintiff and Ageco

8  was the defendant, is my -- I believe,

9  yeah.

10         Q.     Okay.  And you mentioned New

11  York Gas and Electric?

12         A.     Correct.

13         Q.     Are there any others?

14         A.     Manchester, New York Gas and

15  Electric.

16                There was a case that I

17  testified in Federal District Court in

18  New Haven -- I remember that, because it

19  was in my hometown -- in one of -- on --

20  in a piercing a corporate veil case

21  involving public utilities and the public

22  utility holding companies.

23                And I'm trying to remember.

24  It was a Connecticut utility and the

Highly Confidential - Subject to Further Confidentiality Review

1  defendant was either UGI or Ageco, as I

2  recall.  So that -- that was another

3  case.  I don't -- I can't recall

4  sitting -- I believe that was prior to

5  the Florida case, but that might have

6  been after.  I don't --

7           Q.     Who retained you in the New

8  York Gas and Electric case?

9           A.     I believe that was also

10  Dickstein & Shapiro.

11           Q.     And you were retained about

12  behalf of the plaintiff or the defendant?

13           A.     Plaintiff.  All these cases

14  were -- I mean, the -- were -- are

15  plaintiff cases; that is, all these

16  utility cases that we've been talking

17  about the past few minutes.

18           Q.     And what was the approximate

19  time frame of the New York Gas and

20  Electric case?

21           A.     That was some time ago.  I

22  believe that was prior to Florida and

23  Connecticut.  Maybe -- that was maybe 10

24  or 15 years ago.

1    Q.    By Florida, you mean the

2  Florida Power?

3         A.    Florida Power case.

4         Q.    And by Connecticut you mean

5  Manchester?

6         A.    No, no.  Sorry.  Manchester

7  is New Hampshire.  Connecticut, I don't

8  remember the name of the plaintiff.  It

9  was maybe Connecticut Power and Light.  I

10  don't -- I mean, I don't remember --

11        Q.    That's the public utility?

12        A.    It was just -- I call it the

13  Connecticut case, but it's distinct from

14  the New Hampshire case.  Those are two

15  different cases.

16        Q.    By Connecticut, you mean the

17  public utilities holding case; is that

18  right?

19        A.    They're all public utility

20  holding company cases, actually.  Yeah.

21        Q.    Okay.  Who was the judge in

22  the New York Gas and Electric case?

23        A.    I don't recall.  It was a

24  judge in Rochester New York, as I recall.

1    But I don't remember the judge's name.

2          Q.    Federal court or state?

3          A.    Federal.

4          Q.    Did you testify at trial?

5          A.    Yes.

6          Q.    And in deposition?

7          A.    Correct.

8          Q.    Approximate time frame?

9          A.    I think that was 10 to

10   15 years ago.

11         Q.    Do you recall any facts of

12   that case that you used to come to an

13   opinion that was consistent with piercing

14   the corporate veil?

15         A.    I believe it was the same

16   defendant.  I believe my testimony was

17   that the same defendants operated and

18   controlled these various subsidiaries and

19   that their sort of corporate governance

20   modus operandi, their -- their corporate

21   strategy and tactics and their corporate

22   governance relationships with these

23   various plaintiff subsidiaries was the

24   same so that the control was what I

Highly Confidential - Subject to Further Confidentiality Review

1  characterized, as I recall, as aberrant

2  and abusive and involved diverting --

3  improperly diverting assets of the

4  subsidiary company to the parent through

5  a variety of what I regarded to be

6  abusive, self-dealing contracts,

7  particularly managerial agreements

8  between the subsidiaries and companies

9  under the control of the parent.

10      Q.    What do you mean by

11  managerial agreements?

12      A.    What do I mean by?

13      Q.    Managerial agreements?

14      A.    When I say managerial

15  agreements, what I mean is a contract

16  between a subsidiary and a parent that is

17  called a managerial agreement.  And that

18  essentially outsources from the

19  subsidiary to the parent the various

20  components of the actual management of

21  the subsidiary, the literal operations of

22  the subsidiary on a day-to-day basis.

23  That's what I mean by managerial

24  agreement.

1    Q.    Do you recall any other

2    types of documents that supported your

3    opinion in that case?

4    A.    Sorry.  Help me.  Which case

5    are we talking about particularly now?

6    Q.    Which case were you talking

7    about, when you -- managerial --

8    A.    So in my immediate last

9    answer I was talking about the NYSEG case

10   in upstate New York.

11   Q.    The what case?

12   A.    NY -- New York State

13   Electric and Gas, the case in Rochester,

14   New York.

15   Q.    Right.  Okay.  That's the

16   case that I thought we were on as well.

17   A.    Good.  Okay.  Good.

18   Q.    Were there any other

19   categories of documents that you looked

20   at that supported your opinion?

21   A.    In that case?  There were --

22   the documents in all of these cases, but

23   I think particularly NYSEG, there were

24   massive amounts of documents, boxes and

Highly Confidential - Subject to Further Confidentiality Review

1    boxes.  So yes, I relied on hundreds, if

2    not thousands of documents.

3              There -- so -- and that --

4    it just -- essentially the historical

5    record of the period, the legislative

6    history of the Public Utility Holding

7    Company Act, which described the

8    relationship between public utilities and

9    their various operating subsidiaries in

10   the era prior to the passage of the

11   Public Utility Holding Company Act during

12   the Roosevelt administration, those sorts

13   of documents.

14        Q.   Apart from legislative

15   history documents, what categories of

16   company documents did you rely on to

17   reach your opinion in that case?

18        A.   There was some company

19   documents.  The -- it was a very -- the

20   case occurred -- was, from a historical

21   period, a very long time ago, so a lot of

22   the documents were missing.

23              I don't recall with

24   specificity what the documents were,

1    but -- but -- so I don't recall

2    specifically what -- what the actual

3    corporate records were.  I recall there

4    were some corporate records.  I just

5    don't recall with specificity what those

6    records were in which case.

7         Q.    All right.  So apart from

8    the managerial agreements and the

9    legislative history documents, do you

10   have any further recollection of the

11   documents that you reviewed in that case

12   that supported your opinion?

13        A.    Well, there are a lot of

14   documents.  I don't recall specifically

15   what they were, what the documents were.

16   I just have a distinct recollection that

17   there were -- it was a -- that there was

18   a very large number of documents.  I

19   don't recall what the content of those

20   documents were, it was about a decade ago

21   now, and I just don't remember.

22        Q.    All right.  I believe the

23   next case that you mentioned in which

24   your opinion could be construed as

1   consistent with piercing the corporate

2   veil was public utilities company case in

3   Connecticut; is that right?

4           A.     Okay.  Well, I definitely --

5   I don't know if it was the next case.  I

6   definitely testified in a case in

7   Connecticut involving piercing the

8   corporate veil.

9           Q.     Was that case in state or

10  federal court?

11          A.     Federal.

12          Q.     Who was the judge?

13          A.     I don't recall his name.  He

14  has tragically deceased at a very young

15  age.  Was a well known and very respected

16  district judge who actually taught at

17  Yale law school.  And his name also

18  escapes me at the moment.

19                 But it -- like the other

20  name, it may come back to me and I'll let

21  you know.

22          Q.     What year roughly?

23          A.     This was -- again, I don't

24  remember the year of the Connecticut

Highly Confidential - Subject to Further Confidentiality Review

1    case.  But it was -- it could have been

2    as many as ten years ago.  It could have

3    been more.

4          Q.    What was the dispute?

5          A.    It was a reverse piercing

6    case for a conduct that occurred prior to

7    the Public Utility Holding Company Act

8    involving alleged abusive control of

9    subsidiaries in a public utility holding

10   company that was national in scope as was

11   permissible prior to the passage of the

12   Public Utility Holding Company Act.

13         Q.    Did that case go to trial?

14         A.    I believe that it did.  I'm

15   pretty sure that I testified in trial in

16   Connecticut, in New Haven, yes.

17         Q.    What was the outcome of the

18   trial?

19         A.    I don't recall.  I'm not --

20   the case may have settled after my

21   testimony.  I don't know that it did.

22   But I don't recall an opinion in that

23   case sitting here right now.  So I don't

24   know.

1    Q.    Do you recall what the

2    outcome of the veil piercing issue was?

3    A.    No.

4    Q.    Do you recall the types of

5    documents that you reviewed in that case

6    to form the basis of your opinion?

7    A.    No.

8    Q.    You don't recall any of

9    them?

10    A.    Not with any specificity,

11    no.  I mean it would have been the same,

12    historical documents, but I don't recall

13    what they were.

14    Q.    Even generally?

15    A.    Even generally.  I mean,

16    other than the legislative history of the

17    Public Utility Holding Company Act and

18    the description of these relationships.

19    There might -- I'm -- so I -- I mean I

20    recall looking at documents.  I don't

21    know -- recall with specificity which

22    documents I looked at in which case,

23    because I don't recall which documents

24    were available in which case, it sort of

Highly Confidential - Subject to Further Confidentiality Review

1  varied from case to case, because the --

2  they were very old documents pre-20th

3  century.  So it was -- it was kind of --

4  attaining the documents was often a

5  challenge.

6           Q.    Do you recall generally how

7  many times you've been retained as an

8  expert?

9           A.    On any subject in my whole

10  life?

11           Q.    Yes.

12           A.    I can't recall with any

13  specificity.  I would guess maybe 75,

14  maybe, maybe 80, maybe.  Something in

15  that range.  Less than 100, more than 75.

16           Q.    Have you told me about all

17  of the cases in which you were retained

18  and offered an opinion consistent with

19  piercing the corporate veil?

20           A.    I have offered -- I have

21  provided you with all of the types of

22  cases.  They're all -- I think there may

23  have been others frankly.  I don't -- I

24  can't -- sitting here right now, I simply

Highly Confidential - Subject to Further Confidentiality Review

1  don't recall.  I don't -- I don't recall

2  any -- testifying -- I don't recall the

3  names of any other cases.  I may have

4  testified in other cases involving

5  piercing the corporate veil in ways that

6  would have -- in cases in which I've been

7  retained by plaintiffs' counsel.  But

8  sitting here right now, I don't recall.

9       Q.    Do you recall any other

10  plaintiffs' counsel firms that have

11  retained you that you have not already

12  mentioned?

13       A.    With respect to piercing or

14  just generally with respect to being

15  retained by counsel in other kinds of

16  cases representing the plaintiff?  I

17  don't understand.

18       Q.    Let's do both.  Let's do

19  piercing first and then generally.

20       A.    Okay.  I believe I was

21  retained in a piercing case by a law firm

22  called Dowd Bennett somewhere in the

23  Midwest.  I don't recall where.  But I

24  believe that I was retained by that firm

1  in a piercing case.  But I don't really

2  recall the details.  And I don't recall

3  whether it was the plaintiffs' side or

4  the -- it may have been the defense side

5  actually now, that I think of it.

6             In terms of plaintiffs'

7  retention, I mentioned McLane, I

8  mentioned Dickstein Shapiro.  There may

9  have been another firm, but if so, I

10  don't recall what it is.

11      Q.    So you've told me all of the

12  plaintiff retentions that you can recall

13  generally as well, correct?

14      A.    Yes, yes, ma'am.

15      Q.    For the Dowd Bennett case,

16  when was that?

17      A.    I don't remember.

18      Q.    Do you remember what decade?

19      A.    Excuse me?

20      Q.    Do you remember what decade?

21      A.    I think it was within the

22  last ten years.

23      Q.    Where was the case pending?

24      A.    I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you recall what part of

2  the country it was?

3    A.    No.  I never traveled, I

4  don't believe I was ever deposed.  So I

5  don't remember -- no, I don't remember

6  where it was.

7    Q.    Were you deposed in that

8  case?

9    A.    Not that -- I don't recall

10  if I was.  I don't think so.  But I

11  don't -- I don't remember.

12    Q.    Did you testify at trial in

13  that case?

14    A.    I don't believe so.  I don't

15  recall.

16    Q.    And you have no recollection

17  of what your opinion was in that case?

18    A.    Correct.

19    Q.    Do you recall what the

20  controversy was in that case?

21    A.    No.  I think there was a

22  piercing issue.  But I don't recall any

23  details about what the piercing issue

24  was.  I don't recall any particular

Highly Confidential - Subject to Further Confidentiality Review

1  facts.

2      Q.    What are the other types of

3  opinions that you have offered separate

4  and apart from veil piercing?

5      A.    I have -- so my areas of

6  expertise are corporate governance,

7  securities regulation, banking.  I've

8  testified in cases about, kind of what I

9  would call entity theories.  For example,

10  I testified in a case involving a very

11  high ranking banking officials who had

12  left a -- the bank that they worked for

13  and had organized another bank.  And the

14  issue -- the nature of the new corporate

15  organization that they had formed and

16  whether or not the functions that they

17  were performing as officers and directors

18  of this new organization were the kinds

19  of functions that were captured in the

20  covenant not to compete agreement that

21  they had entered into with the -- with

22  their former employer.

23          I've testified about issues

24  relating to options back dating,

Highly Confidential - Subject to Further Confidentiality Review

1   specifically with respect to the way that

2   committees function on corporate boards

3   and the authority of committees of

4   corporate boards of directors to make

5   decisions related to CEO or senior

6   executive compensation in public

7   companies.

8           I've testified in cases

9   involving insider trading, issues

10  involving various issues before the

11  Securities & Exchange Commission.  I've

12  testified in issues regarding the

13  economic nature and function of fiduciary

14  duties in corporate organizations.

15          So, basically, broadly

16  speaking issues involving corporate

17  governance and control.

18      Q.    Generally speaking, what's

19  the nature of your testimony in the

20  securities fraud cases, context of them?

21      A.    Well, so there have been a

22  variety.  Some have to do with -- these

23  have to do with the cases involving

24  market timing and late trading.  Just

Highly Confidential - Subject to Further Confidentiality Review

1  generally a description of the mutual

2  fund industry and the -- the way that

3  mutual fund trades are executed and --

4  and placed, and the -- the intersection

5  between the SEC rules, primarily SEC Rule

6  19C-4, and the way that the mutual fund

7  industry sort of functions as a practical

8  matter.

9        Q.    And in those cases, are you

10  generally testifying on behalf of the

11  defense?

12        A.    I think that's fair.  I

13  may not -- not -- maybe not exclusively,

14  but I've definitely testified on behalf

15  of the defense in these cases, yes.

16        Q.    Of the 75 to 100 cases in

17  which you've been retained, what

18  percentage of those cases would you

19  estimate was on behalf of defense?

20        A.    I have no idea.  I would say

21  maybe -- certainly -- well, more than

22  half, maybe two-thirds.  I don't recall

23  specifically.

24        Q.    Do you have a list of all of

Highly Confidential - Subject to Further Confidentiality Review

1    the cases in which you've been retained

2    as an expert?

3            A.    I think I have a list of

4    just the last few years.  I don't have a

5    list of ever.

6            Q.    That was not part of your

7    resumé though; is that right?  Has that

8    document been produced?

9            A.    Yes.  I believe it's an

10   exhibit -- I believe it's Exhibit

11   Number 2 to my expert witness report.  I

12   think -- that's right.  I think -- yeah.

13   I thought I saw it there in your

14   notebook.  There we go.

15           Q.    So I'm going to mark the

16   expert report.  And we'll get to that.

17   But just for purposes of right now, this

18   list, it appears, goes back to 2014.

19               Do you have a list that goes

20   back further than that?

21           A.    I don't believe so.  Not a

22   complete list, no.

23               MS. BAIG:  All right.  Why

24       don't we take a short break.

Highly Confidential - Subject to Further Confidentiality Review

1      THE VIDEOGRAPHER:  Off the

2      record at 10:25 a.m.

3           (Short break.)

4           THE VIDEOGRAPHER:  We're

5      back on the record at 10:47 a.m.

6  BY MS. BAIG:

7      Q.    All right.  Let's have this

8  document marked as Exhibit 2.  It's the

9  expert report of Jonathan Macey.

10      A.    Thank you.

11           (Document marked for

12      identification as Exhibit

13      Macey-2.)

14  BY MS. BAIG:

15      Q.    If you could, turn to

16  Exhibit 2, please.  And this is the

17  exhibit that we were just talking about

18  that has a list of cases in which you've

19  been retained that goes back to 2014.

20           Do you see that?

21      A.    I do.

22      Q.    And starting at the bottom

23  of the list, so with the most recent

24  case, can you please let me know what the

1    issue was in each of these cases.  So

2    beginning with the Blueblade Capital

3    Opportunities case?

4          A.    I will to the best of my

5    ability.  So you're asking me for the

6    issues in each case?  I'm sorry, just to

7    be sure what your question is.

8          Q.    Yes.  What was your ultimate

9    opinion?

10          A.    Okay.  Blueblade Capital

11    Opportunities LLC involved the

12    acquisition of a Delaware corporation in

13    a merger transaction in which a number of

14    hedge funds who are shareholders in the

15    target entity asserted their statutory

16    rights of appraisal under Delaware

17    general corporate law, Section 221.

18              And I was asked to opine on

19    the deal process and the issue of whether

20    the CEO and board of directors of the

21    target company, which was a company

22    called SciQuest, had done everything

23    appropriate and negotiated terms such

24    that the shareholders of SciQuest would

Highly Confidential - Subject to Further Confidentiality Review

1    receive a fair price for their shares in

2    the sale of control merger transaction.

3         Q.    And your opinion was?

4         A.    My opinion was that there

5    was an inadequate presale price discovery

6    process.  And that the -- under the

7    particular facts of the case, the

8    post-signing sales process was reasonable

9    to permit the emergence of subsequent

10   higher bidders had any such subsequent

11   higher bidders existed.

12        Q.    And you were retained on

13   behalf of the plaintiff or the defendant?

14        A.    I don't believe that these

15   case -- this case had a -- had a

16   plaintiff or a defendant.

17             These cases were brought

18   under the Delaware appraisal statute.  So

19   one shareholder is bringing a statutory

20   action asking that the share -- the value

21   of their shares be appraised.  And the

22   judge is required under Delaware law to

23   find, to calculate a fair price for the

24   shares.

Highly Confidential - Subject to Further Confidentiality Review

1    So while it's kind of an

2   adversarial proceeding, in that where one

3   party is essentially arguing that the

4   price should be different than the price

5   that the other party is arguing, one

6   wants a high price shall the other wants

7   a low price, I don't know that it -- I

8   don't know that it's accurate as a matter

9   of lexicon or procedure to say there's a

10  plaintiff and a --

11       Q.    Were you --

12       A.    -- and a defendant.

13       Q.    Were you testifying on

14  behalf of the shareholder or the

15  corporation?

16       A.    So I was testifying, not on

17  behalf of the hedge fund, but on

18  behalf of the -- I was retained by the

19  company that had been -- that had been

20  acquired, and by the company that

21  acquired that company, which was

22  SciQuest.

23       Q.    And what counsel retained

24  you?

1    A.    I don't -- it was a Chicago

2  law firm.  I can't remember the name of

3  it, a smaller one.  I can get you the

4  name.  I've forgotten the name.

5    Q.    Going to the next case,

6  United States of America, versus AT&T

7  Inc.

8    A.    Okay.  This case --

9    Q.    What --

10    A.    Sorry.

11    Q.    What was your opinion -- the

12  gist of your opinion in this case?

13    A.    The gist of my opinion in

14  this case was that when AT&T, when and if

15  AT&T was to acquire a group of target

16  firms, which included CNN and HBO and a

17  number of firms, my -- that my testimony

18  related to what the corporate governance

19  of the combined entity would look like,

20  what the economic incentives of the

21  executives of the acquired entity would

22  be, how much control the parent,

23  particularly the CEO of AT&T, would have

24  over the senior executives of the

Highly Confidential - Subject to Further Confidentiality Review

1  acquired entities, and the extent to

2  which these subsidiary companies in the

3  combined new corporate group would

4  operate as a -- as a single entity for

5  profit-maximizing purposes or would

6  operate completely independently.

7          Q.     And you were retained by

8  whom?

9          A.     I was retained by the civil

10  division of the United States Department

11  of Justice.

12          Q.     Where was that case venued?

13          A.     United States District Court

14  for the District of Columbia.

15          Q.     Going to the next case,

16  Robinson Mechanical Contractors Inc.,

17  versus PTC Group Holdings Corp.  You were

18  retained by whom in that case?

19          A.     I was retained by the

20  defendant in this case.  I was retained

21  by the defendant.

22          Q.     PTC Group Holdings?

23          A.     I'm pretty sure that was the

24  name of it.  Yeah.  But I'm not positive.

Highly Confidential - Subject to Further Confidentiality Review

1    I believe so.

2           Q.    That's what's listed here on

3    this chart, correct?

4           A.    That is what's listed on

5    this chart, yeah.  Yes.

6           Q.    Do you have any reason to

7    believe there's an error on the chart?

8           A.    No, I don't think -- there's

9    no error on the chart.  Sometimes in my

10   experience, you know, if you have a case

11   on appeal, sometimes the plaintiff name

12   goes second, for example in the Supreme

13   Court.  So, you know, I don't know that

14   one can always go how they're listed.

15   Maybe you can.  But in any event, I have

16   no reason not to believe it was PTC Group

17   Holdings Corp.

18          Q.    Okay.  Do you -- you do have

19   a recollection that you were not retained

20   by Robinson Mechanical Contractors,

21   correct?  Or are you uncertain?

22          A.    I was retained by one of the

23   parties.  I don't remember which one.  I

24   think it was PTC Group Holdings.  I don't

Highly Confidential - Subject to Further Confidentiality Review

1  remember who was the plaintiff and who

2  was the defendant.  It looks from the way

3  the parties are aligned with respect to

4  the V in the case, that it was PTC Group

5  Holdings.  I have no reason to disbelieve

6  that.  I just don't have a specific

7  recollection sitting here right now.

8        Q.    What was the gist of your

9  opinion in this case?

10       A.    It had to do with -- I think

11 this was a piercing case involving

12 testimony on my part about ordinary and

13 customary behavior among parents and

14 subsidiaries and appropriate economics of

15 corporate control and the public policy

16 issues related to corporate governance

17 and corporate control.

18       Q.    Did your opinion support

19 piercing the corporate veil or not

20 piercing the corporate veil?

21       A.    To the best of my

22 recollection, my opinion supported not

23 piercing the corporate veil.

24       Q.    And who retained you in that

1    case, which counsel?

2        A.    I believe it was that Dowd

3    Bennett firm that we mentioned before,

4    I'm pretty sure.

5        Q.    And you don't recall whether

6    or not the court decided to pierce the

7    corporate veil or not; is that right?

8        A.    Correct.

9        Q.    Moving to the next case, the

10   2016 CaremarkPCS Health LLC versus

11   Walgreens case.

12             Do you see that?

13       A.    I do.

14       Q.    Is this the case for which

15   you were retained on behalf of Walgreens?

16       A.    Yes, it is.

17       Q.    And what was the gist of

18   your opinion in this case?

19       A.    The gist of my opinion in

20   this case was that -- that Walgreens was

21   the -- as I recall, my -- Walgreens was

22   the acquirer in the Walgreens-Alliance

23   Boots M&A transaction, such that there

24   was no change in control of Walgreens.

1    That the corporate governance

2    infrastructure of Walgreens remained

3    intact and the corporate board of

4    directors of Walgreens and the management

5    infrastructure and the shareholding

6    configuration was such that after the

7    transaction there had not been a --

8    excuse me, a change of control of

9    Walgreens.

10        Q.    And what firm retained you

11   in this case?

12        A.    That was Bartlit Beck.

13   There's a -- they have more words in the

14   name -- names in the name, but Bartlit

15   Beck something and something, in Chicago.

16        Q.    Moving to the next page.

17   Panattoni Development Company Inc. versus

18   Scout Funds.

19        A.    Okay.

20        Q.    What was the gist of your

21   opinion in this case?

22        A.    This was, I believe, a

23   piercing case in which I testified on

24   behalf of the defendant.  I think it was

1    a piercing case.  It had to do with

2    corporate control and governance.

3            Q.    Did your opinion support

4    piercing or not piercing the corporate

5    veil?

6            A.    I believe my -- I was

7    retained by the defendants.  And I

8    believe that my testimony was that the

9    behavior of the various corporate

10   affiliates and subsidiaries and parents

11   was not aberrant or -- or inconsistent

12   with ordinary and customary corporate

13   behavior.

14           Q.    So your opinion supported

15   not piercing the corporate veil, correct?

16           A.    It was consistent with a --

17   the defendant's position that the

18   corporate veil should not be pierced.

19           Q.    And who retained you in that

20   case, what firm?

21           A.    I -- I don't know.  I can't

22   recall.  I think it was Jones Day, but

23   I'm not -- I'm not positive.

24           Q.    And you were retained on

Highly Confidential - Subject to Further Confidentiality Review

1    behalf of Scout Funds?

2         A.    I don't remember.  It might

3    have been -- there might -- it might have

4    been Panattoni, it might have been a

5    counterclaim.  But I don't specifically

6    recall.  I have this dim recollection it

7    was Panattoni, but I'm not -- I don't

8    recall with precision.

9         Q.    Do you remember the outcome

10   of the veil-piercing issue in that case?

11        A.    I do not.  I'm not -- if

12   there was an outcome, I'm not aware of

13   it.

14        Q.    And you did not testify at

15   trial in that case?

16        A.    Correct.

17        Q.    For this entire chart where

18   it says testimony given, you would

19   indicate here if you testified at trial;

20   is that right?

21        A.    Yes.

22        Q.    So if it just says

23   deposition testimony, that means you did

24   not testify at trial, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I believe that's right, yes.

2    Q.    Do you recall testifying at

3  trial in any of these?

4    A.    Well, I recall in 2014

5  testifying in Spokane, Washington, in the

6  Stanley against Sterling Financial Corp.

7  case.  And that's -- during the -- that's

8  the only case I remember testifying in

9  trial about.

10    Q.    Okay.  So moving up the list

11  to the Future Select versus Tremont Group

12  case.  What was the gist of your opinion

13  in that case?

14    A.    Sitting here right now, I

15  have no recollection of that case.  I

16  don't recall what the issues were, who

17  retained me.  I just don't remember.

18    Q.    Moving up to the Paolo

19  Moreno versus SPX Entertain -- sorry, SFX

20  Entertainment case, what was the gist of

21  your testimony in that case?

22    A.    This was a case involving

23  allegations of breach of fiduciary duty

24  and breach of contract within the context

1    of a corporation that was prominent in

2    the -- I believe it's the EDM industry,

3    electronic dance music.  And this was an

4    issue having to do with fiduciary duties

5    owed to minority investors who were also

6    people who worked within the company

7    and -- and contributed to its formation.

8         Q.    So was this a case between

9    investors and -- and a company?

10        A.    I believe it would be more

11   accurately characterized, Counselor, as a

12   case involving a dispute among investors.

13   Investors suing one another.

14             The company may have been

15   named, but the -- the real parties and

16   interests were kind of the founding

17   investors in this -- in this enterprise,

18   as I recall.

19        Q.    And who retained you in that

20   case?

21        A.    It's a law firm in Los

22   Angeles whose address is on the Avenue of

23   the Stars.  They have a big active First

24   Amendment practice.  But I'm blanking on

Highly Confidential - Subject to Further Confidentiality Review

1    their name.  It will come to me.

2              Incidentally, I told you I

3    would -- I would -- I promised you I

4    would tell you if I remembered the name

5    of the lawyer at Dickstein and Shapiro

6    who retained me before the break.  It was

7    David Elkin.

8         Q.    What case was that again?

9         A.    That was in the -- I believe

10   it was in that Florida case that we

11   talked about and also in the New York

12   State Electric & Gas case.  And I believe

13   also in the Connecticut case.

14             I think I was -- when he was

15   at Dickstein and Shapiro, I think I was

16   retained by him, say, three or four

17   times.

18        Q.    Do you know what firm he's

19   with now?

20        A.    He went from Dickstein and

21   Shapiro to the Orrick firm.  I'm not sure

22   that he's there now, but I have no reason

23   to believe that he isn't.  I haven't been

24   in contact with him since he left

1 Dickstein and Shapiro.

2          Q.     Have you been retained by

3 the Orrick firm?

4          A.     I seem to recall I did

5 briefly do some work with the Orrick firm

6 on a case that kind of moved over from

7 Dickstein and Shapiro to Orrick.  But I

8 believe that case transferred to another

9 set of lawyers who I continued to work

10 for.  But so I did -- I did remember

11 having some interaction with the Orrick

12 law firm, but -- but -- but it was kind

13 of in the middle of a case as I recall.

14 And -- and I don't have any interactions

15 with them any -- any longer.

16          Q.     Moving up on this list to

17 the -- to the next case, the 2015 case,

18 In the Matter of Office of the

19 Comptroller of the Currency versus James

20 E. Plack?

21          A.     Right.

22          Q.     Do you recall who retained

23 you in that case?

24          A.     I don't.  It was a

1    Washington law firm, I don't recall which

2    one.  A smaller firm.  I don't remember

3    the name of it.

4         Q.    Do you recall who you were

5    retained to represent?

6         A.    James E. Plack.  I was -- I

7    was retained as an expert witness by the

8    law firm that was representing James E.

9    Plack.

10        Q.    And what was the gist of

11   your opinion there?

12        A.    The gist of my opinion was

13   that, as I recall, were that -- was that

14   James E. Plack, who was the CEO of a --

15   either a bank or a mortgage company, had

16   acted in a way that was consistent with

17   appropriate corporate behavior for

18   someone in his position in light of the

19   kinds of transactions that the bank was

20   engaged in or the financial institution

21   was engaged in.

22        Q.    And he was the defendant in

23   that case?

24        A.    I'm sorry?

1        Q.     He was the defendant in that

2   case?

3        A.     Correct, yeah, sorry.

4        Q.     And what were the

5   allegations against him?

6        A.     That he had entered into

7   improper trades with other firms in which

8   one bank transferred assets, mortgage

9   interest to another financial institution

10  and received assets in return in

11  transactions that the comptroller of the

12  currency alleged resulted in the

13  misrepresentation of the financial

14  results of the financial institution.

15       Q.     Moving to the next case on

16  the list.  We have George L. Miller,

17  Chapter 7 trustee, versus Kirkland &

18  Ellis.

19              Do you see that?

20       A.     I do.

21       Q.     And you were retained by

22  Kirkland & Ellis in this case?

23       A.     No.

24       Q.     Who were you retained by?

1      A.    I think it's a San Francisco

2  law firm with the name Fox in it.  I'm

3  trying to remember now.

4      Q.    Were you retained on behalf

5  of Kirkland & Ellis?

6      A.    Yes.

7      Q.    And what was the gist of

8  your opinion here?

9      A.    I can't -- I don't recall

10  that.  I don't recall any of the facts of

11  this case.  I don't remember why

12  Kirkland -- Kirkland & Ellis was being

13  sued by the trustee in a bankruptcy

14  proceeding, but I don't remember -- I

15  don't remember why.

16      Q.    So you don't remember

17  anything about the controversy in that

18  case?

19      A.    Nothing.  I have a vague

20  recollection it may have something to do

21  with a private equity fund, but I don't

22  recall beyond that.

23      Q.    Did you collaborate with

24  anybody with respect to your work on that

1    case?

2           A.    No.

3           Q.    So you did it all yourself?

4           A.    Well, to the -- I performed

5    in that case in exactly the same manner

6    I'm performing in this case.  I did -- I

7    reviewed the documents myself and

8    prepared my -- the expert report myself,

9    and did not have any collaboration or

10   assistance or employees or agents or

11   anything of that nature.

12          Q.    Okay.  But you don't

13   remember anything further regarding the

14   dispute in that case?

15          A.    Nothing.

16          Q.    Or the gist of your opinion

17   or the basis of your opinion?

18          A.    No.  I don't even remember

19   what the case was about.  I don't

20   remember what they were -- what the

21   dispute was about.

22                I could also be wrong about

23   who retained me.  I think it might have

24   been -- I may be mistaken.  It might have

1    been a New York -- a smaller New York

2    firm.  I don't remember who retained me

3    in that case either, frankly.

4            Q.    Do you recall the outcome of

5    that case?

6            A.    I'm unaware -- if there was

7    an outcome, I'm unaware of what it was.

8            Q.    Moving up to the next item

9    on the list.  We have State versus --

10   State of Connecticut versus the

11   McGraw-Hill Companies and Standard &

12   Poor's.  Do you recall the gist of your

13   opinions in this case?

14           A.    I do.

15           Q.    And what was that?

16           A.    This was a case brought

17   against the rating agency Moody's, which

18   was owned by McGraw-Hill Companies, and

19   Standard and Poor's by the State of

20   Connecticut for violating state consumer

21   fraud laws with respect to credit ratings

22   that these credit rating agencies had

23   issued for mortgage-backed securities and

24   collateralized debt obligations during

1   the period leading up to and during the

2   '07, '08 financial crisis.

3          Q.    And you were retained on

4   behalf of whom?

5          A.    The State of Connecticut.

6   The Office of the Attorney General of the

7   State of Connecticut.  That would be the

8   plaintiff in this case.

9          Q.    Do you remember the outcome

10  of this case?

11         A.    Yes.  I believe those cases

12  settled, or that case settled.

13         Q.    Moving to the next item on

14  the list, we have New York versus Maurice

15  Greenberg?

16         A.    Yes.

17         Q.    Do you remember the gist of

18  your opinion in this case?

19         A.    Yes.

20         Q.    What was that?

21         A.    This opinion related to an

22  evaluation of Maurice Greenberg's tenure

23  as chairman and chief executive officer

24  of the AIG group of insurance companies

Highly Confidential - Subject to Further Confidentiality Review

1    prior to his departure from the -- his

2    position on the board of the company.  He

3    had been sued by Elliott Spitzer, the

4    then Attorney General of the State of New

5    York, and in litigation related to

6    violations of a New York statute called

7    the Martin Act.

8         Q.    But what was the gist of

9    your opinion in the case?

10        A.    The gist of my opinion in

11   that case had to do -- related to

12   examining Maurice Greenberg's role as CEO

13   and chairman and to determine -- my

14   opinion was that he acted in a normal and

15   appropriate way consistent with ordinary

16   and customary behavior of CEOs of large

17   public corporations in terms of the way

18   that he did his job and essentially that

19   he did not micromanage the business.  I'm

20   not looking at that thing but --

21        Q.    That's okay.  There's people

22   on the phone that might not want to see

23   my scribble.

24             And I take it that you were

1    retained on behalf of Maureen Greenberg?

2         A.    That's correct.

3         Q.    And what was the outcome of

4    that case?

5         A.    I believe the case settled.

6    I'm not entirely sure.  But I believe

7    there was a settlement in the case, or

8    the charges were dismissed, or -- I don't

9    specifically recall.

10        Q.    Moving to the next item

11   there's Florida Power Corporation versus

12   First Energy.

13              What was the gist of your

14   opinion in that case?

15        A.    That was the case that we

16   talked about before, the break that

17   involved a Public Utility Holding Company

18   Act case.  And I testified -- I was

19   retained by the law firm representing the

20   plaintiffs to testify about corporate

21   control, piercing the corporate veil,

22   alter ego doctrine issues.

23        Q.    We've discussed that one in

24   depth already.

Highly Confidential - Subject to Further Confidentiality Review

1    Moving to the next item.

2    2014 case, Heidi Stanley versus Sterling

3    Financial Corporation.  What was the gist

4    of your testimony in this case?

5    A.    The gist of my testimony

6    related to the conduct of the officers

7    and directors of a corporation, in this

8    case, Sterling Financial Corporation,

9    that had dismissed an employee, and just

10   to describe the way that corporations

11   work and the way that personnel decisions

12   are made within corporations from a

13   corporate governance perspective.

14   Q.    Did you represent the

15   employee or the corporation?

16   A.    No.  I wasn't -- I was an

17   expert witness.  I didn't represent

18   any --

19   Q.    Sorry.  I meant, were you

20   retained on behalf of the employee or the

21   corporation?

22   A.    I was retained by the law

23   firm that was representing the

24   corporation.

1    Q.    When you described your

2    testimony, you stated that it was to

3    describe the way that corporations work.

4    But what was the gist of your ultimate

5    opinion in that case?

6    A.    That's the best I can

7    recall.  I don't recall my opinion with

8    any more specificity.  I don't recall

9    what motivated my retention or what I

10   thought motivated my retention or what

11   the nature of my opinion was.  I simply

12   don't recall.

13   Q.    You don't recall how your

14   opinion assisted the corporation in its

15   case?

16   A.    I believe that -- it is

17   my recollect -- so my recollection is

18   that there was, in this case, a holding

19   company that owned an operating company.

20   And the question in the case had to do

21   with which of these entities actually

22   fired the plaintiff, Heidi Stanley, and

23   whether the holding company and certain

24   directors of the holding company could be

Highly Confidential - Subject to Further Confidentiality Review

1   named in a lawsuit claiming that there

2   had been a wrongful discharge of someone

3   who is not an employee of the holding

4   company, but was an employee of the

5   operating company, which was a, as I

6   recall, some kind of a financial

7   institution, a bank or a savings and loan

8   or something.

9        Q.    And did your opinion support

10  that the directors of the holding company

11  could be named or could not be named?

12       A.    I think it was -- it was a

13  little more tangential than that.  I

14  think it had more to do with what's the

15  difference between a holding company and

16  a regular and an operating company and

17  what are the various corporate governance

18  responsibilities of each of these

19  entities.

20            And -- but it was -- but my

21  testimony was offered into evidence by

22  the lawyers for the defense, for the --

23  for the defendants, or people who --

24  entities that were named as defendants.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Were those defendants the

2   holding company?

3      A.     I believe that the

4   defendants were the holding company as a

5   corporate juridical entity.  I believe

6   there were certain individuals named

7   personally, but I'm not positive of that.

8   I simply can't recall.  It may have been

9   the case.

10      Q.     So you don't recall whether

11   you were retained on behalf of the

12   holding company or not?

13      A.     I believe I was obtained --

14   I was obtain -- I was retained -- I

15   believe I was retained on behalf of one

16   or more of the corporate entities

17   involved.  I don't specifically recall.

18      Q.     So you don't recall whether

19   it was the holding company or a --

20   a different --

21      A.     Right.

22      Q.     -- different entity?

23      A.     That's correct, I don't

24   recall.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you recall whether your

2    ultimate opinion supported that the

3    directors of the holding company could be

4    named or not?

5    A.    I don't recall.

6    Q.    Moving to the next item.

7    The Edgar Bachrach versus Bachrach

8    Clothing Holding Corporation.  Do you

9    recall the gist of your opinion in this

10   case?

11   A.    I do not.

12   Q.    Do you recall what the issue

13   of dispute was in this case?

14   A.    No, I don't recall what

15   the -- what it was about at all.

16   Q.    Do you recall what firm

17   retained you in this case?

18   A.    I do not.

19   Q.    Where you have here "Expert

20   report served as direct testimony," where

21   does that refer to, at trial?

22   A.    I don't really -- I believe

23   that I did not physically appear in the

24   courtroom.  I believe what this means is

1  that my expert report was introduced into

2  evidence and -- and served as a

3  substitute for direct testimony by me.

4  And that then I was cross-examined before

5  a court reporter, but not during the

6  trial, in a different -- just in a court

7  reporter's -- before a court reporter in

8  a kind of a setting such as this, more

9  like a deposition and outside of a

10 physical courtroom.  That's my

11 recollection.

12        Q.    You don't recall anything

13 about what this case was about?

14        A.    No, I don't recall that --

15 no, I don't.  I don't recall the -- nor

16 do I recall the redirect examination

17 before a court reporter.  That's just

18 what I believe those words mean sitting

19 here right now.

20        Q.    Did you create this -- this

21 chart?

22        A.    Yes.

23        Q.    When did you create this

24 chart?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Well, I maintain this chart

2  and kind of continually edit it and

3  update it.  So I -- it was created a very

4  long time ago.  And I keep it, you know,

5  when I testify in a new matter, like

6  after today, I will go back and put in

7  2019 and add in this case.  And then when

8  2020 comes, I'll delete the 2014 cases to

9  keep it up -- to keep it appropriate.

10    Q.    So do you have a chart that

11  goes back beyond 2014?

12    A.    No.  No.  So I just -- I

13  keep this one chart.

14    Q.    And you just started keeping

15  it in 2014?

16    A.    No, no.  This chart

17  represents the edited version of the

18  first chart I ever created.

19    Q.    So do you still have the

20  first chart you ever created?

21    A.    Well, this is the first

22  chart I've ever created.  It's just

23  edited to look like what it -- the way it

24  looks now.  In other words, it's a Word

Highly Confidential - Subject to Further Confidentiality Review

1    document, so I will put -- I will delete

2    May 10, 2019, and write in, if I prepare

3    a new report, whatever the date of the

4    new report is, and I will add in my

5    testimony creating -- it's in a Word

6    document.  I believe I'll add a new row

7    for each additional item.  And then I

8    will delete the old rows and then save

9    the document.

10          Q.    Do you have any list of

11   cases in which you've been retained that

12   goes back beyond 2014?

13          A.    I don't believe so.

14          Q.    So you have no record at all

15   of any of your retentions prior to 2014?

16                MS. LEVY:  Objection.  The

17          rules require four years back and

18          that's what he's provided.

19                MS. BAIG:  I'm entitled to

20          ask him whether he has any record

21          at all --

22                MS. LEVY:  He's answered

23          that question already.

24                MS. BAIG:  Well, I have --

Highly Confidential - Subject to Further Confidentiality Review

1              MS. LEVY:  You can keep

2         asking all you want.  You can

3         answer the question again,

4         Professor.

5    BY MS. BAIG:

6         Q.    Do you have any record of

7    any of your retentions that goes back

8    prior to 2014?

9         A.    So, what -- help me out to

10   understand what you mean by a record.

11        Q.    Do you have any records that

12   show which case -- in which cases you've

13   been retained prior to 2014?

14        A.    Okay.  So let me answer it

15   this way.  So when I'm retained I have

16   a -- I keep documents in files on my

17   computer.  And I have a file called

18   "Active File," so this case would be in

19   the active file.

20              And I have a file called, I

21   don't know, I think it's called "Inactive

22   Files."  And so when, if this case were

23   to end, I would move this -- documents

24   related to this case over to my inactive

1    file.

2              I don't think that list is

3    complete.  I haven't done it with, you

4    know, exact, you know, in every single

5    case.  But many of my prior retentions,

6    you know, are in the inactive file.  I --

7    and, you know, I don't know.  Sometimes

8    my reports are in those files.  But, you

9    know, many cases in which I've testified

10   in the past are listed in this inactive

11   file.  I can't say that it's complete,

12   but it will have more than -- it will

13   have cases that are not on this list, I

14   guess is what I was saying in response to

15   your question.

16        Q.    And roughly how far back

17   does it go?  To the beginning of your --

18   does it go all the way back to the

19   beginning of --

20        A.    So I left Cornell and

21   went --

22        Q.    Hang on -- the beginning of

23   your work as an expert?

24        A.    I apologize for

1    interrupting.

2         Q.    That's okay.

3         A.    No.  So I started as an

4    expert before I got to Yale.  This

5    file -- I didn't create this kind of more

6    organized system until after I was -- I

7    had moved from Cornell law school to Yale

8    law school which was around 2004.  And

9    then it started somewhere after that.

10             So there are certainly some

11   retentions that are older that I don't

12   have.  Cases which -- you know, so I -- I

13   don't remember exactly when I started.

14   It was sometime subsequent, I think, to

15   2004.

16        Q.    So, does your inactive file

17   have a summary index?

18        A.    No.

19        Q.    So if you go onto your

20   computer and you go into the inactive

21   file, can you see a list of all the

22   cases?

23        A.    No, I don't think -- I don't

24   know, I have to picture it.  I mean,

Highly Confidential - Subject to Further Confidentiality Review

1   you -- so if you went into the inactive

2   file, it would be whatever the drive

3   would be, say U drive, inactive file.

4   You know, it would be -- it would say

5   something -- it would be -- there would

6   be, you know, there would be some

7   identifier.  Would be -- you know, I

8   have a -- for each of these, just in

9   terms of my own personal reference, I

10  will give cases, retention -- matters in

11  which I was retained, a number like 89.

12  So there will be Matter Number 89 and

13  then some description.  It's not done in

14  a very uniform way.

15          The -- the screen will be

16  populated by files with names of that

17  sort, if that's helpful.

18      Q.    There will be a description

19  that allows you to figure out which case

20  it was that Matter Number 89 is; is that

21  right?

22      A.    Usually, yes.  I mean it --

23  or it will be -- there'll be some kind of

24  description.  Sometimes I just have to do

Highly Confidential - Subject to Further Confidentiality Review

1    a word search for a party or something,

2    if I want to find something.

3              But -- so not all -- but --

4    so not -- not always.  So for example,

5    this might be -- I don't -- just by way

6    of example.  This case might show up as

7    in Re National Prescription litigation.

8    The names of the parties may not -- may

9    not show up in that description.  But

10   something will show up in the description

11   that's descriptive.

12        Q.    Apart from your inactive

13   file, do you have any other summary list

14   of the cases in which you've been

15   retained?

16        A.    No.

17              MS. BAIG:  Counsel, would

18         you agree to produce a list of the

19         cases in which this expert has

20         been retained?

21              MS. LEVY:  No.  We'll agree

22         to comply with federal rules and

23         to do what plaintiffs have done in

24         their cases.  So if we want to

1    talk about a mutual agreement to

2    go back further than the rules

3    require, we can talk about that in

4    a different context and offline.

5         MS. BAIG:  Okay.

6  BY MS. BAIG:

7         Q.    Can you give me a list of

8  the cases that you recall being retained

9  in, starting from the beginning?

10        MS. LEVY:  I'm going to

11   instruct you not to answer that.

12        MS. BAIG:  On what grounds?

13        MS. LEVY:  It's not required

14   by the rules, and he's already

15   answered the question.

16        MS. BAIG:  There's no valid

17   basis for instructing him not to

18   answer.

19        MS. LEVY:  You're entitled

20   to go back four years.

21        MS. BAIG:  No.  You're

22   saying that I have no ability to

23   ask this witness about prior

24   testimony?

1        MS. LEVY:  I mean, he has

2    already testified.

3        You can answer to the extent

4    that you know.

5        MS. BAIG:  Yes.

6        MS. LEVY:  Go -- you're

7    welcome to use your time however

8    you want.  I'll --

9        MS. BAIG:  Thank you.

10        MS. LEVY:  If you've already

11    answered the question, you don't

12    need to answer again.

13        THE WITNESS:  So just --

14    that I'm --

15  BY MS. BAIG:

16    Q.    That's -- I don't wish to go

17  back through all of the cases that we've

18  already discussed.

19    A.    Okay.

20    Q.    But --

21    A.    Fair enough.

22    Q.    -- I would like as complete

23  a list that you are able to provide --

24    A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    -- of the cases that you've

2    been retained.

3    A.    Okay.  So I will -- I will

4    now answer the question.

5         I'm going to purposely not

6    include cases we've already talked about

7    like the -- whatever the -- you know,

8    the -- you know, the cases on the -- you

9    know, on the Index 2 that we already

10   talked about and the cases that we talked

11   about before the break.

12        So what I'll try to do is

13   think of cases that I've worked on as an

14   expert, testified as an expert that

15   are -- that we haven't talked about.

16   Okay.  So -- and I'll do the best I can.

17   Q.    Let's start -- try to -- try

18   to do it to the best of your ability

19   chronologically --

20   A.    Okay.

21   Q.    -- so we have some

22   assemblage of order.

23   A.    Okay.

24        MS. LEVY:  Do not guess.

Highly Confidential - Subject to Further Confidentiality Review

1    You can testify as to what you

2    know and what you recall, but I

3    will instruct you not to

4    speculate.

5         THE WITNESS:  I testified as

6    an expert witness for a person

7    whose name I do not recall, who

8    was being sued by the Securities &

9    Exchange Commission for violating

10   a bar on his ability to perform --

11   to serve as an accountant before

12   the SEC.

13        And my testimony related to

14   my opinion with respect to what it

15   meant to testify as an accountant

16   before the SEC in connection with

17   the issue of whether the services

18   that this person performed for his

19   employer constituted acting as an

20   accountant before the SEC.

21   BY MS. BAIG:

22        Q.    And who were you retained on

23   behalf of?

24        A.    It was -- I believe it was

Highly Confidential - Subject to Further Confidentiality Review

1    Brown -- I don't recall the name of the

2    firm.  It was a New York firm, fairly

3    large.  I don't recall the name of it.

4         Q.    Which party were you

5    retained on behalf of?

6         A.    There was -- be the

7    defendant, the accountant who's --

8    against whom the bar on performing -- for

9    practicing accounting before the SEC was

10   being instituted.

11        Q.    And the rough time frame of

12   this?

13        A.    15 years ago, 10 years ago.

14   I don't remember.

15        Q.    What's the next case that

16   you recall being retained by -- in?

17        A.    So I testified as an expert

18   witness in an insider trading case

19   brought by the Securities & Exchange

20   Commission against defendants from Texas

21   named Wylie, W-Y-L-I-E.  And this

22   transact -- this case had to do with

23   allegations that a swap transaction that

24   the Wylies had engaged in while they were

Highly Confidential - Subject to Further Confidentiality Review

1  the CEO and chairman of a public company

2  involved the -- a transaction in

3  connection with the purchase or sale of

4  securities.

5        Q.    And you were retained on

6  behalf of which party?

7        A.    By -- on behalf of the Wylie

8  defendants.

9        Q.    And what firm retained you?

10       A.    It was a Washington firm, or

11  maybe a New York firm.  I don't recall

12  the name of it.

13       Q.    Do you remember what

14  jurisdiction the case was pending in?

15       A.    I believe it was the U.S.

16  District Court for the Southern District

17  of New York, but I'm not positive.  It

18  could have been DC actually.  I'm not --

19  I don't recall.

20       Q.    Do you remember what the

21  gist of your opinion was and how it

22  helped the defendant, or how it was

23  designed to help the defendant?

24       A.    I would have to resist the

1    premise of your question.  In this

2    particular case, I don't believe my

3    testimony helped the defendant.  So just

4    so that the record is clear.

5              My testimony had to do

6    with -- with what -- what it means --

7    what the -- I -- what it means to -- for

8    a transaction to be in connection with

9    the purchase or sale of securities as a

10   matter of sort of ordinary lexicon.

11        Q.    Well, you were retained by

12   the defendant, correct?

13        A.    Yes.

14        Q.    So presumably they retained

15   you because they thought that you could

16   offer testimony which helped them in

17   their case.  Would you agree with that?

18        A.    Well, it depends on -- if

19   you're talk -- if you are -- if you and I

20   are in agreement that we're talking about

21   what the parties that retained me thought

22   at the moment of the retention, then I

23   would agree with you, yes.

24        Q.    I see.  So ultimately --

Highly Confidential - Subject to Further Confidentiality Review

1   ultimately your opinion did not support

2   the defendant's position?  Is that -- is

3   that what you're saying?

4          A.    Well, you'd have to ask the

5   defendants about that.

6                I believe -- it is my belief

7   and understanding that -- that my

8   testimony was construed as being

9   unhelpful to the defendants.  And by the

10  way, sorry, I do recall the firm that

11  retained me in that case.  I said I

12  forgot.  It was Sussman Godfrey.

13         Q.    And why is it your belief

14  that -- that your testimony was construed

15  as being unhelpful to defendants?

16         A.    I'm happy to answer that.

17  It's just going to be kind of a long

18  answer.  Is that okay?

19         Q.    Sure.  I just --

20         A.    I don't know how to answer

21  it any other way.

22         Q.    -- want the gist of it.  Why

23  is it your belief that your testimony was

24  construed as being unhelpful ultimately?

1     A.    Okay.  So the defendants in

2  that case had entered into what's known

3  as a total return swap, in which they

4  entered into essentially a contract with

5  the then investment bank, now defunct

6  firm, Lehman Brothers.  And Lehman

7  Brothers accepted a payment for these

8  defendants.  And in exchange for that

9  payment for the defendants, Lehman

10 Brothers guaranteed to provide them with

11 a payment exactly equal to the economic

12 return of an underlying equity security.

13         So these defendants entered

14 into the swap transaction.  If the stock

15 went up, they got money.  If the stock

16 paid a dividend, they got money.  If the

17 stock went down, they didn't get any

18 money and they lost the amount that they

19 paid for the swap for Lehman Brothers.

20         The SEC's claim in the case

21 was that this was -- that these

22 defendants had material inside

23 information about the company when they

24 entered into the swap transaction.  The

¹ stock -- underlying stock price went up.

² And they got paid a lot of money.

³       At the time of the

⁴ transaction, and this is no longer the

⁵ case, but at the time of the

⁶ transactions, swap transactions of this

⁷ particular kind were not included in the

⁸ definition of security under the federal

⁹ securities fraud rules.

¹⁰       So in order for the SEC

¹¹ successfully to sue these defendants, the

¹² SEC had to show that the swap transaction

¹³ was consummated in connection with the

¹⁴ purchase or sale, not of the swap, but of

¹⁵ the underlying equity securities.

¹⁶       So it turns out, as a matter

¹⁷ of fact, that when Lehman Brothers

¹⁸ entered into the swap transactions with

¹⁹ the Wylies, Lehman Brothers determined

²⁰ obviously that they had financial

²¹ exposure, because if the stock went way

²² up, they would have to pay the Wylies

²³ money.

²⁴       In order to deal with that

1   financial exposure, the Wylie -- sorry,

2   Lehman Brothers went into the marketplace

3   and actually bought the underlying equity

4   securities in an exact -- in the exact

5   amount that was the nominal amount of the

6   underlying swap agreement, such that if

7   the stock went up, that Lehman Brothers

8   made money on the stock, that offset what

9   they had to pay to the Wylies.

10          It turned out that in the

11  actual legal contract, the swap agreement

12  that Lehman Brothers entered into with

13  the Wylies, purchasing the underlying

14  stock as a hedge was contemplated in the

15  swap agreement.  It was part of the swap

16  agreement.  And, therefore it was very --

17  therefore, I didn't feel that I could

18  testify that -- that the swap agreement

19  was not in connection with the purchase

20  or sale of securities, taking into

21  account these precise provisions of this

22  codicil in the actual swap agreement.

23          So while none of this was,

24  you know, while -- so essentially that --

Highly Confidential - Subject to Further Confidentiality Review

1  I was deposed in the case, but I -- my

2  testimony was not offered.  It is my

3  belief that it was not viewed as

4  particularly helpful to defendants in the

5  case ultimately, that as -- as I learned

6  more about the case and my opinion

7  evolved, that it was not that great of

8  use to the -- to the defendants in the

9  case.

10       Q.    Do you know what the

11  ultimate outcome was of that case?

12       A.    I believe the case -- I

13  don't -- no, actually -- I'm sorry.  My

14  recollection is that -- that, while I was

15  no longer involved with the case, I think

16  the case went to trial, and I think the

17  Wylies were -- were found to have

18  violated the SEC Rule 10(b)(5) in

19  Section 10(b) of the Securities and

20  Exchange Act of 1934.

21       Q.    And do you recall roughly

22  the time frame of that case?

23       A.    No.

24       Q.    Do you recall the judge?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     No.

2          Q.     Do you recall that this was

3     approximately 10 or 15 years ago?

4          A.     That's my recollection, yes.

5          Q.     Any -- any more specificity

6     on that?

7          A.     No.

8          Q.     What's the next case that

9     you recall being retained in?

10          A.     I was retained in a case a

11     very long time ago, maybe 15 years ago

12     now, involving a -- satellite television

13     companies, namely DirecTV.  And DirecTV

14     had entered into a partnership agreement

15     in Latin America, particularly in Mexico,

16     related to the provision of satellite TV

17     services in particular areas.  And there

18     was a plaintiff who was a significant

19     minority shareholder in this joint

20     venture with DirecTV, was arguing that

21     there had been a breach of fiduciary duty

22     in that DirecTV was essentially aiming

23     satellites and taking market share in

24     northern parts of Mexico that properly

Highly Confidential - Subject to Further Confidentiality Review

1  belonged to the joint venture that the

2  plaintiff had invested in and was seeking

3  to take a larger than fair share of the

4  revenues associated with that particular

5  market for itself.  So it was essentially

6  a breach of fiduciary duty claim.

7          Q.    And the gist of your opinion

8  was?

9          A.    My gist of my opinion

10  related to the fiduciary duties that

11  majority joint venture partners owed to

12  minority joint venture partners.  Whether

13  in limited liability company, limited

14  liability companies, the default rule is

15  that fiduciary duties are owed to

16  minority shareholders who have membership

17  or equity interest in limited liability

18  companies.

19          Q.    Did your opinion support

20  that there was or was not a breach of

21  fiduciary duty?

22          A.    My -- I was retained by the

23  law firm representing the plaintiff, and

24  I believe their view was that my

Highly Confidential - Subject to Further Confidentiality Review

1  testimony was consistent with the

2  plaintiff's theory that the fiduciary

3  duty of loyalty had been breached with

4  respect to that plaintiff.

5        Q.    Do you remember what firm

6  retained you?

7        A.    Yes.  It was the Cravath,

8  Swaine & Moore law firm.

9        Q.    Do you remember where this

10  case was pending?

11        A.    No.

12        Q.    Do you remember what part of

13  the country it was pending?

14        A.    My -- I remember my

15  deposition was taken in New York.

16        Q.    Do you remember whether it

17  was filed in state or federal court?

18        A.    I don't recall.

19        Q.    Are most of the cases in

20  which you are retained filed in federal

21  court?

22        A.    I have never evaluated the

23  cases in which I've been retained as an

24  expert to determine which -- whether more

1    in state or federal court.  If I were --

2    so -- I don't know.  There have been a

3    significant number of cases in state

4    court, a significant number of cases in

5    federal court.

6                I would say that it's been a

7    real -- a mix.  I don't -- I don't know.

8    I couldn't say which is more.

9         Q.    What's the next case that

10   you recall being retained in?

11               Actually, before we move on,

12   do you recall who you worked with at

13   Cravath?

14        A.    Yes.

15        Q.    Who?

16        A.    There was a partner there,

17   who I believe is still there, whose name

18   is Julie North, N-O-R-T-H.

19        Q.    Do you recall anyone else?

20        A.    No.

21        Q.    Okay.  What's the next case

22   that you recall being -- being retained

23   in?

24        A.    I was an expert witness for

1  a large accounting firm, I believe

2  Deloitte, who was being sued as having --

3  for having aided and abetted a securities

4  fraud in the financial reporting by a

5  provider of cable television TV boxes

6  called Scientific Atlanta.  And the

7  question was what the -- what the -- the

8  question in the case was what the

9  culpability was of this -- of this

10  accounting firm for the financial

11  misreporting of earnings of the -- of the

12  Scientific Atlanta or the other -- or the

13  other cable television companies involved

14  in the litigation.

15       Q.    And what was the gist of

16  your opinion on behalf of Deloitte?

17       A.    I don't -- my testimony

18  related to what it is that national

19  accounting firms do, what an audit is.  I

20  don't recall my testimony with any

21  greater specificity.

22       Q.    Who retained you in that

23  case?

24       A.    That was also the Cravath

Highly Confidential - Subject to Further Confidentiality Review

1    law firm, but a different lawyer who's

2    now retired.  Whose first name was Bud,

3    and whose last name started with an S.

4    But I don't remember what it was.

5           Q.    And roughly what year was

6    that?

7           A.    This was -- this would have

8    been in the late '90s, early 2000s, I

9    think.

10          Q.    And where was that case

11   pending?

12          A.    I don't recall.

13          Q.    Do you recall what part of

14   the country it was pending?

15          A.    No.  I recall being deposed

16   in Manhattan.  But I don't recall

17   where -- what the -- where the actual --

18   I never testified.  I don't recall where

19   the case was, so --

20          Q.    And you don't recall who the

21   judge was?

22          A.    Correct.

23          Q.    Do you recall if you

24   testified at trial?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I'm fairly certain that I --

2   the case settled, there was no trial.  I

3   don't recall.  I certainly don't believe

4   I testified at a trial in that case.

5      Q.    What's the next case that

6   you recall being retained in?

7      A.    I'm -- I recall -- generally

8   speaking, I've been an expert witness in

9   other cases, I've served in the expert

10  witness role.  But sitting here right

11  now, that exhausts my recollection.

12     Q.    Okay.  You don't recall any

13  other cases that you've been retained in,

14  as you sit here right now?

15     A.    Sitting here right now, no.

16     Q.    And if you wanted to refresh

17  your recollection as to what other cases

18  you've been retained in, what would you

19  look at?

20     A.    I -- I suppose I would go

21  back to that inactive file and -- and try

22  to figure it out.

23     Q.    Have you ever testified

24  before Congress?

1       A.      Yes.

2       Q.      On what -- how many

3   occasions?

4       A.      I don't recall.  I'm sorry,

5   I've never testified before the entire

6   Congress, like all 435 people.  But I've

7   testified before committees of Congress.

8       Q.      Okay.  On how many

9   occasions?

10      A.      Five or six I suppose.

11      Q.      All right.  Can you walk me

12  through those five or six instances

13  please?

14      A.      So I've testified several

15  times about various insider -- proposed

16  statutes regarding insider trading

17  legislation.

18              I've testified with respect

19  to the role of credit rating agencies and

20  the financial crisis.  Those -- that's --

21  those -- that's the testimony I

22  specifically recall sitting here right

23  now.

24      Q.      What was the gist -- the

1    nature of -- of your opinions on which

2    you were testifying before Congress?

3          A.    So with respect to insider

4    trading, my testimony essentially was

5    that there is a distinction between the

6    contours of the U.S. law of insider

7    trading that is articulated by the U.S.

8    federal courts in construing the federal

9    securities law statutes and SEC

10   Rule 10(b)(5) and that that -- the

11   contours of those laws, those legal

12   rules, are substantively different than

13   the rule -- law of insider trading that

14   the SEC, the Securities & Exchange

15   Commission envisions the law of the U.S.

16   So that we have essentially two kind of

17   competing laws of insider trading in the

18   United States, the law that the U.S.

19   Supreme Court and the lower federal

20   courts, particularly the Second Circuit,

21   have articulated, and the law that the

22   SEC has championed in its -- in briefs in

23   those courts and in its SEC enforcement

24   policy.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And who asked you to testify

2    on that occasion?

3    A.    These would have been

4    congressional staffers who were

5    organizing hearings.

6    Q.    What congressional staffers?

7    A.    I don't recall any of the

8    names.

9    Q.    Do you recall what Congress

10   members they were associated with?

11   A.    I recall distinctly one was

12   from Pennsylvania who was organizing

13   hearings.  But I don't recall that

14   person's name or the name of the

15   subcommittee.

16   Q.    Do you recall any other --

17   any others that asked you to testify?

18   A.    I recall distinctly being in

19   the -- in the -- you know, testimony

20   before the senate banking committee, at

21   which Elizabeth Warren was in attendance

22   because she's now running for president.

23   But I don't recall -- she was not sharing

24   the hearings.  And the testimony had to

1    do with, I think, certain consumer

2    banking issues.

3          Q.    But you don't recall who

4    asked you to testify at that hearing?

5          A.    That's correct.  I do not

6    recall who asked me to testify at that

7    hearing.

8          Q.    And you don't recall what

9    Congress member --

10         A.    Correct.

11         Q.    -- that request was coming

12   from?

13         A.    That is correct.

14         Q.    How did you come to learn

15   that you were being invited or asked to

16   speak there?

17         A.    Generally speaking in

18   situations such as this, I think either

19   formally I received a telephone call from

20   a staffer or someone working on a

21   congressional staff or a subcommittee

22   staff or a congressperson's staff, and we

23   have a discussion about whatever the

24   substantive issue happens to be that is

Highly Confidential - Subject to Further Confidentiality Review

1    the subject of the hearing.

2              And then subsequent to that

3    conversation, I will receive a formal

4    letter requesting me to testify.

5         Q.    And you don't recall who

6    sent you that formal letter?

7         A.    That's correct.

8         Q.    And you don't recall whose

9    office sent you that formal letter,

10   correct?

11        A.    That's correct.  It would

12   have been -- the letter itself would have

13   been by the actual member of the House of

14   Representatives or senator who was

15   chairing the hearings, I believe.  But I

16   don't recall the names of the people who

17   were requesting my testimony.

18        Q.    And were you paid for your

19   testimony?

20        A.    Never -- I've never been

21   paid for my testimony before any facet of

22   Congress.

23        Q.    When did you testify before

24   Congress regarding insider trading?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      This would have been several

2   years ago, maybe eight or so.

3        Q.      And how many times?

4        A.      With respect to insider

5   trading, over the years, maybe three,

6   three or four.  I don't recall

7   specifically.

8        Q.      And when did you testify

9   regarding credit rating agencies?

10       A.      That would have been

11  sometime subsequent to the financial

12  crisis.

13       Q.      2009 or '10?

14       A.      So that would be my -- that

15  would be my estimate, yes.

16       Q.      And do you recall the nature

17  of your testimony on that issue?

18       A.      I believe my testimony with

19  respect to credit rating agencies was

20  that the economic incentives of credit

21  rating agencies with respect to their

22  work on residential mortgage-backed

23  securities and CDOs, collateralized debt

24  obligations, differed from the economic

Highly Confidential - Subject to Further Confidentiality Review

1    incentives that motivated the credit

2    rating agencies with respect to their

3    delivery of credit ratings for

4    traditional corporate issuers that were

5    nonspecial purpose vehicles of the kind

6    that issued the residential

7    mortgage-backed securities or the

8    collateralized debt obligation, such that

9    there was more -- greater incentives on

10   the part of the credit rating agencies to

11   inflate the ratings of the special

12   purpose vehicle entity issuers of

13   collateralized debt obligations and

14   residential mortgage-backed securities

15   than the credit ratings agencies faced

16   with respect to rating ordinary issuers

17   of debt, such as a railroad or IBM or

18   General Electric or something of that

19   nature, an ordinary corporate issue where

20   there was not a special purpose vehicle

21   but an actual operating entity.

22        Q.    And if you were asked to

23   summarize that testimony for a fifth

24   grader or someone who is non-finance, how

Highly Confidential - Subject to Further Confidentiality Review

1 would you do that?

2      A.    I would say that people who

3 want to borrow money issue promises to

4 pay, and that the credit rating agencies

5 will provide a grade like AAA, or AA or

6 A, to these promises to pay.  And the

7 higher the grade, the more likely the

8 credit rating agency believes repayment

9 will be made and that the people won't be

10 unable to repay when time for repayment

11 is due, and that the credit rating

12 agencies in a kind of bad way inflated

13 the grades of the -- which are also known

14 as the ratings of the promises to pay

15 that were issued by some issuers, some

16 borrowers, in ways that they didn't

17 inflate for other promissors to pay.  How

18 does -- does that work?

19      Q.    That works.  Do you recall

20 who requested that you testify on that

21 issue?

22      A.    No.

23      Q.    You don't recall anything

24 about how you came to testify on that

Highly Confidential - Subject to Further Confidentiality Review

1 issue before Congress?

2   A. Other than what I've

3 testified.  Some staffer called me, and,

4 you know, it -- and, you know, typically

5 it would be on the basis of an op-ed --

6 of an editorial that I've written or an

7 article that they've read that they

8 believed was -- they were interested in

9 pursuing a line of questions about.  That

10 would be the typical way.  But I simply

11 don't specifically recall.

12   Q. Do you have transcripts of

13 your testimony before Congress?

14   A. I do not.

15   Q. Have you ever testified

16 before a grand jury?

17   A. Never.

18   Q. Have you ever testified for

19 the DEA?

20   A. The Drug Enforcement

21 Administration?  No.

22   Q. FDA?

23   A. I don't believe so, no.

24   Q. The CDC?

1       A.      No.

2       Q.      Any other governmental

3  agencies?

4       A.      Well, I've been retained as

5  an expert witness on a couple of

6  occasions by the Department of Justice.

7               I believe I served as an

8  expert witness for the Securities &

9  Exchange Commission, but I don't

10  recall -- I don't recall specifically

11  those matters.

12               I have certainly discussed

13  testimony with the SEC.  I don't recall

14  if I've actually ever testified.  Other

15  government agencies, I testified before

16  as an expert witness for other government

17  agencies, the Texas State Department of

18  Banking, the Connecticut Attorney

19  General, the Attorney General of the

20  State of Illinois, and some other states.

21  I forget which.

22       Q.      Were these in litigation

23  matters that we've already discussed or

24  were these in other matters?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Well, so -- it may be better

2    to take them kind of one at a time if

3    that would be --

4         Q.    Sure.   That's fine.   Let's

5    start with the Texas State Department of

6    Banking.

7         A.    So a very long time ago, I

8    was retained as an expert witness by the

9    Texas State Department of Banking.   The

10   Texas State Department of Banking had

11   brought a lawsuit against a bank alleging

12   that the bank had violated state law

13   rules which limit the amount of money

14   that a bank could loan to a single

15   borrower.

16             The borrower's defense was

17   that -- I'm sorry.   I beg your pardon.

18             The lender bank's defense

19   was that the -- that the bank had not

20   violated the limits on the amount of

21   money that could be loaned to any one

22   borrower because the lender had actually

23   loaned money not to one borrower, but to

24   two borrowers because the strip shopping

Highly Confidential - Subject to Further Confidentiality Review

1    center that received -- received the

2    proceeds of the loan was actually owned

3    by two corporations, one corporation that

4    owned half of the strip shopping center,

5    I believe in Dallas, and the other

6    corporation owned the other half of the

7    strip shopping center.

8              So that for the purposes of

9    calculating whether this bank in Texas

10   had violated the statutory lending

11   limits, the issue was essentially whether

12   this should count as a loan to a single

13   borrower or a loan to more than one

14   borrower.

15        Q.    And you were retained on

16   behalf of whom?

17        A.    The Texas State Department

18   of Banking.  It was an administrative

19   proceeding.

20        Q.    Against whom?

21        A.    A bank and an officer of the

22   bank, as I recall.  I don't recall the

23   name of the bank or the name of the

24   officer.

1     Q.    Okay.  And what year was

2  that, about?

3     A.    A very long time ago.  Maybe

4  in the -- in 1990s.  I don't specifically

5  recall.

6     Q.    Do you remember who retained

7  you?

8     A.    It was a woman who was an

9  attorney in the enforcement division of

10  the Texas State Department of Banking,

11  but I don't recall that person's name.

12     Q.    All right.  What was the

13  next item of testimony on behalf of

14  governmental agencies?

15     A.    So I was -- I signed

16  retention agreements and was retained by

17  a number of state attorneys general in

18  connection with litigation against the

19  credit rating agencies.

20         The only time that I was

21  retained was -- sorry.  I beg your

22  pardon.

23         The only time that I -- I

24  actually testified in a deposition was in

1    the Connecticut case.

2              I believe that there was a

3    pool of funds from a variety of attorneys

4    general that was pulled together and

5    constituted the source of the fees out of

6    which I was paid.  And there were a

7    number of states.  I recall specifically

8    interacting with the state of Illinois,

9    who had another case that was further

10   along.  So I did work for that entity,

11   the state -- the state of Illinois.

12         Q.    What other states were you

13   retained by in connection with that

14   matter?

15         A.    And this, again, was a long

16   time ago.  I don't recall.  There was a

17   state in the south that was involved in

18   this.  I believe it was Mississippi, but

19   I don't specifically recall.

20         Q.    Do you recall any others?

21         A.    No.

22         Q.    What time frame was that?

23         A.    So this would have been

24   after the financial crisis of '08 in the

1    '09, '10, '11, time frame.

2         Q.    Do you know where that

3    litigation was pending?

4         A.    So there was litigation

5    pending in state court in Connecticut,

6    state court in Illinois.  Many different

7    states.  Mississippi.  Those are the

8    particular jurisdictions that I recall.

9         Q.    But the only case in which

10   you testified was Connecticut's; is that

11   right?

12        A.    That's correct.  I mean

13   testified in deposition, that's correct.

14        Q.    And you didn't testify in

15   any trials?

16        A.    That's correct.  I believe

17   these cases settled before trial.  I

18   believe there was a global settlement

19   reached with respect to all of the

20   states.

21        Q.    And did you work solely with

22   the AGs' offices or did you work with

23   private outside counsel?

24        A.    Solely with AGs' offices,

Highly Confidential - Subject to Further Confidentiality Review

1    other than when I was deposed and the

2    outside counsel for the credit rating

3    agencies deposed me.

4          Q.    Any other testimony that you

5    can recall?

6          A.    So I was retained as an

7    expert witness a very long time ago by

8    the Department of Justice civil division

9    in litigation related to the so-called

10   Winstar line of cases involving

11   government liability for -- to investors

12   in savings and loan associations that

13   failed during the S&L crisis of the '80s,

14   of the 1980s.

15         Q.    Do you recall the gist of

16   your opinion?

17         A.    Yes.

18         Q.    What was it?

19         A.    The gist of my opinion had

20   to do with the accounting for merger and

21   acquisition transactions.  And whether,

22   when two savings and loan associations

23   merged, it was -- it was appropriate from

24   an economic substantive point of view to

Highly Confidential - Subject to Further Confidentiality Review

1    record an item known as regulatory

2    goodwill on the asset side of the balance

3    sheet of the combined entity subsequent

4    to the merger where the relevant

5    regulatory agency, which at the time was

6    the office of thrift supervision,

7    approved the -- the entry of regulatory

8    goodwill as an asset on the balance sheet

9    of the merged entity.

10         Q.    And what was the time frame?

11         A.    This would have been in the

12   '90s.  Legislation in the wake of the

13   U.S. Supreme Court's decision in Winstar.

14   And so in the -- in the 1990s.

15         Q.    Do you recall any other

16   testimony?

17         A.    No.

18         Q.    Do you recall any other

19   retentions that you have not already told

20   me about, expert retentions?

21         A.    No.  And when you mentioned

22   government agencies it jarred my memory

23   with respect to the Winstar kind of

24   cases, and the Texas case.  But I don't

1    recall any others sitting here right now.

2         Q.    For the Winstar line of

3    cases, did you actually testify in

4    deposition?

5         A.    No.

6         Q.    And you didn't testify in

7    any trial?

8         A.    Correct.

9         Q.    Did you submit an expert

10   report to the court?

11        A.    I believe in that case I was

12   a consulting witness.  I provided reports

13   to the attorneys litigating the cases.  I

14   don't believe that I'd served as a

15   testifying -- I don't believe I was

16   designated and I don't believe I served

17   as a testifying expert in those cases.

18        Q.    And do you recall where

19   those cases were pending?

20        A.    I was retained by what they

21   called the main justice in Washington.

22   And I believe there were many, many cases

23   in lots of jurisdictions primarily in the

24   Southwest, Texas, Arizona, but -- but in

1    other states as well.  But I believe

2    the -- the kind of focal point of the

3    litigation was Arizona, Texas, and the

4    Southwest.

5         Q.    Do you recall who retained

6    you?

7         A.    There was a senior official

8    in the Department of Justice whose -- I

9    don't recall who.  I think his name may

10   have been Levy.  But I'm not positive.

11   L-E-V-Y.

12        Q.    And what is your current --

13   your current rate?

14        A.    $1,250 an hour.

15        Q.    And how has that changed

16   over the years?

17        A.    It's gone up.

18        Q.    Sure.  But roughly, can

19   you -- can you let me know how you came

20   to arrive at that figure?

21        A.    Well, I started, I believe

22   my initial billing rate was $500 an hour.

23   Periodically, as we've discussed today,

24   I'm retained as an expert witness in

1   cases.  In the course of those retentions

2   I learn about the -- not always, but

3   often, I learn about the billing rate of

4   the experts who -- other experts who have

5   been retained in the case by other law

6   firms.  And I adjust my billing rate to

7   be what I believe to be in line with what

8   I deem to be current market rates on the

9   basis of what these other experts are

10  charging.

11      Q.   And in your history of -- of

12  being retained as an expert witness, have

13  you ever collaborated with anybody in

14  performing those services?

15      A.   There have been retentions

16  in my life in which the law firm

17  retaining me has also retained an

18  economic consulting firm like a firm such

19  as a Lexicon or a Cornerstone Research,

20  or something of that nature.  And

21  occasionally I've worked with some of

22  those firms, I believe, in -- in

23  litigation matters in the past.

24      Q.   But you have never worked

Highly Confidential - Subject to Further Confidentiality Review

1    with students or associates or colleagues

2    in collaborating with your expert

3    reports?

4         A.    I have had actually -- I

5    think I have a couple of times worked

6    with a colleague, not on this case, but

7    sometimes I've had a colleague who has

8    been retained as an expert and I -- who's

9    asked me to -- to collaborate.  That --

10   that has occurred as I recall.

11        Q.    Who was that?

12        A.    So I have a colleague who is

13   a tax professor, Yai Listokin, and he and

14   I have worked together on a couple of --

15   of matters.

16        Q.    But you have never had

17   anybody who assists you in writing your

18   expert reports or in reviewing materials

19   in order to write your expert reports.

20   You only --

21        A.    That's correct.  Never --

22   that's correct.

23        Q.    And who prepares your

24   invoices?

1    A.    I do.

2    Q.    And do you send counsel

3  invoices on a regular basis?

4    A.    Are you asking me about this

5  particular litigation matter or my

6  general practice?

7    Q.    In the litigation matter?

8    A.    As I recall, my -- in this

9  particular litigation matter, there's

10  some -- there's a website run by some,

11  like, internet service provider or

12  something, and I log onto that website

13  and agonizingly convert my invoices into

14  some other format, and then upload them

15  to, I believe -- to -- so to upload them,

16  this is -- I follow a procedure that

17  was -- has been specified in my retention

18  letter.  And that -- and I -- I submit my

19  invoices in that way.

20    Q.    And do you do that on a

21  regular basis?

22    A.    It's my practice to submit

23  invoices sometime at the beginning of

24  each month.  That includes the billing

1    for my time and out-of-pocket expenses

2    for the previous month.

3          Q.    Do you know who the internet

4    service provider is?

5          A.    No.  The name -- it has --

6    there's something related to Serengeti, I

7    think.  Although I may be -- that may be

8    the name of a park in South Africa.  I

9    may be confusing it.  Anyway, there's

10   something like that.

11         Q.    And your rates are the same,

12   whether you're reviewing documents or

13   testifying in deposition or testifying in

14   trial; is that right?

15         A.    Currently at this time,

16   that's correct.  There have been -- that

17   practice has evolved over time.  But for

18   the last several years, that's been my

19   practice and policy, uniformly, yes.

20         Q.    Do you need a break or do

21   you want to keep going?

22         A.    I could use a bathroom

23   break, but I can go for ten minutes or

24   so.

Highly Confidential - Subject to Further Confidentiality Review

1            MS. BAIG:  It's okay.

2            THE WITNESS:  All right.

3       Thank you.

4            THE VIDEOGRAPHER:  Off the

5       record at 12:14 p.m.

6            (Short break.)

7            THE VIDEOGRAPHER:  We are

8       back on the record at 12:33 p.m.

9            THE COURT REPORTER:  Counsel

10      on the phone, you wanted to make a

11      stipulation.

12           MS. CARDELÚS:  Yes, this is

13      Jen Cardelús at O'Melveny.  And

14      I'd like to record the parties'

15      stipulation that one defendant's

16      objection preserves objection for

17      all other defendants.

18           MS. BAIG:  That's fine.

19           (Document marked for

20      identification as Exhibit

21      Macey-3.)

22           MS. BAIG:  Actually, let's

23      have this CV marked as Exhibit 3.

24   BY MS. BAIG:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    This is a true and correct

2  copy of your current resumé; is that

3  right?

4    A.    Yes.

5    Q.    And everything on here is

6  accurate?

7    A.    To the best of my knowledge.

8    Q.    You have no corrections?

9    A.    Not at this time.

10    Q.    And no updates?

11    A.    That's correct, I believe.

12  Let me just look.

13         There's a -- it is possible

14  that I have a couple of articles that

15  have been published that would appear on

16  Page 3 more recently, I believe.  But

17  maybe -- I believe I had a short article,

18  the SMU Law Review -- no, it's here.

19  Never mind.  No, I believe it is

20  up-to-date.  I apologize.

21    Q.    Okay.  Do you have any

22  intention to publish anything in the next

23  several months before trial?

24    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What do you plan to publish?

2    A.    I have two articles that

3  have been accepted for publication, which

4  likely will be published prior to the

5  trial, although obviously I don't know --

6  I mean, not obviously -- but I don't know

7  when the trial is.  But I have a couple

8  of articles.  And I'm writing others.  I

9  have two that are, I would say, fairly

10  far along in the production process.  And

11  they've been accepted for publication and

12  are in the process of being edited.  One

13  of them is in page proofs.

14    Q.    And what are those articles

15  about?

16    A.    One of the articles is about

17  the nature of the corporation and an

18  analysis of the way that the United

19  States Supreme Court characterized the

20  U.S. corporate form in a -- in a Supreme

21  Court case of Citizens United involving

22  corporate campaign -- corporate

23  expenditures on political issues and

24  political candidates and, et cetera.

1    Q.    And what is the -- and who's

2  publishing that one?

3    A.    That's being published by

4  the University of Wisconsin Law Review.

5    Q.    And you're not sure when; is

6  that right?

7    A.    I believe it's imminent.  I

8  would say within the next -- I'd have to

9  check with my co-author, but probably in

10  the next three weeks.

11    Q.    Who is your co-author?

12    A.    His name is Leo Strine.  He

13  is the Chief Justice of the Delaware

14  Supreme Court.

15    Q.    How many articles have you

16  published jointly with Chief Justice Leo

17  Strine?

18    A.    None.  We have written this

19  one, which is about to appear, and we

20  have another one that we're working on.

21    Q.    Haven't you collaborated

22  with him on others?

23    A.    No.

24    Q.    I thought I saw his name in

1    your resumé somewhere, no?

2         A.    Well, he might have been in

3    a forthcoming or something.  I don't

4    know.

5         Q.    Have you collaborated with

6    him on any books?

7         A.    No.

8         Q.    Okay.  And what is the

9    nature of the second article that's

10   forthcoming?

11        A.    The second article is

12   forthcoming in The Business Lawyer, which

13   is an ABA publication, and it is -- it is

14   an analysis of the economics of the

15   statutory right of appraisal and what it

16   means to determine the fair value for the

17   stock of a corporation and how -- we have

18   suggestions about how from an economic

19   perspective courts -- state courts might

20   approach the issue of -- they're called

21   upon to determine in appraisal

22   proceedings, which is what the fair value

23   of the shares of an -- an acquired

24   company actually are.

1    Q.    In your view, do either of

2    these forthcoming articles have any

3    bearing on your opinions in this case?

4    A.    I don't think that -- I

5    don't think that the business lawyer

6    article does really, but the -- so I

7    actually cite in my expert opinion in

8    this case on Page 9 in Paragraph 12 the

9    forthcoming article with Chief Justice

10   Strine.  And so I do think there's

11   probably some -- I do think there's some

12   relevance, some way in which the analysis

13   in that article is germane to issues in

14   this case.

15   Q.    There it is.  So that's the

16   article cited in Footnote 6, right?

17   A.    Yes, correct.

18   Q.    How is that article germane

19   to the issues in this case?

20   A.    So that article analyzes,

21   and I will say takes a position on the

22   kind of existential question of what is a

23   corporation and whether or not a

24   corporation, is a distinct legal entity

Highly Confidential - Subject to Further Confidentiality Review

1  separate and apart from its shareholders

2  that can enter into contracts, sue and be

3  sued, have a particular duration of

4  existence and otherwise be considered

5  legally separate from its residual

6  claimants, which is the economic term for

7  equity holders or shareholders.

8             And it juxtaposes that view

9  of the corporate form with the view of

10  the corporate form articulated by the

11  Supreme Court in the Citizens United

12  case.

13        Q.    And this article is not yet

14  public?

15        A.    I'm sorry?

16        Q.    This article is not yet

17  public, correct?

18        A.    Public?  Oh, no, it's quite

19  public.  If you look at Footnote 6, there

20  are three links to different places that

21  you can find this article on the

22  internet.  It's available on the

23  University of Pennsylvania Law and

24  Economics research paper website or the

Highly Confidential - Subject to Further Confidentiality Review

1    Yale Law and Economics website or the

2    Harvard Law School --

3            Q.    Oh, great.

4            A.    It's also --

5            Q.    Okay.  I thought you said it

6    hadn't been published yet.

7            A.    Well, so -- it's also

8    available on the Social Science Research

9    Network.  It is -- these are, you know,

10   kind of, what would be pre-publication

11   versions that have been distributed at

12   workshops or provided, you know, in the

13   sort of academic world.

14               The final published

15   version -- you're absolutely right.  The

16   final published version has not come out

17   in the Wisconsin Law Review.  And that

18   should be out in the next few weeks.

19               But it -- so it -- in its --

20   it doesn't appear in its final published

21   form.  But the -- a version that's

22   virtually the same other than some

23   typographical and bluebooking corrections

24   can be found in those -- at those links.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And anybody can

2    access it?

3    A.    Correct.

4    Q.    Does that article have

5    anything to do with piercing the

6    corporate veil?

7    A.    Well, it -- the article

8    mentions the concept of piercing the

9    corporate veil.  And explains the

10   connection between the doctrine of

11   piercing the corporate veil and the legal

12   recognition that corporations are

13   separate juridical entities.  So it

14   definitely -- it definitely, as part of

15   its analysis, considers the doctrine of

16   piercing the corporate veil.

17   Q.    Okay.  Can you walk me

18   through your education, please?

19   A.    Yes.  So I went to college

20   at Harvard College and received a

21   bachelor of arts in economics.

22   After college I worked for

23   two years in New York in the finance

24   industry.  And then went to law school

Highly Confidential - Subject to Further Confidentiality Review

1  at, Yale law school where I graduated in

2  1982 and then went to work as a law clerk

3  for a federal judge on the U.S. Court of

4  Appeals for the Second Circuit.

5       Q.    That was Judge Friendly?

6       A.    Yes, Henry J. Friendly.

7       Q.    And when you worked for two

8  years in the finance industry, what years

9  were that -- was that?

10      A.    So that would have been '77

11 to '79.

12      Q.    And who did you work for?

13      A.    I worked for what -- the

14 entity then known as Bankers Trust

15 Company, which has now been absorbed into

16 Deutsche Bank.  And then I worked for a

17 small consulting firm called Lloyd Bush &

18 Associates.

19      Q.    And what did you do for

20 those companies?

21      A.    So for Bankers Trust

22 Company, I served as a bond trader, an

23 underwriter of municipal bonds, buying

24 and selling general obligation bonds

Highly Confidential - Subject to Further Confidentiality Review

1   issued by various states and

2   municipalities in the U.S.

3           Then for Lloyd Bush &

4   Associates, I worked as a consultant to

5   municipalities and investment banks that

6   were -- that were issuing mortgage-backed

7   securities, securities where the payment

8   of principle and interest on those

9   securities was derived from payments by

10  mortgage holders of the principle and

11  interest due on their mortgages.  And

12  doing financial analysis to ascertain and

13  determine whether the stream of cash

14  flows, the stream of payments of

15  principle and interest by people on these

16  mortgage would be sufficient to make

17  timely payments of the principle and

18  interest on the bonds that were issued,

19  to provide financing for the underlying

20  houses under various stress conditions,

21  such as high rates of prepayment or

22  inflation or changing interest rates and

23  that sort of thing.

24          Q.    And after two years of

Highly Confidential - Subject to Further Confidentiality Review

1 working in that capacity, you went to

2 Yale; is that right?

3 　　　　A.　　No.　I spent my -- so I went

4 to Emory law school in Atlanta for my

5 first year, and then transferred at the

6 end of my first year to Yale.　So I did

7 not spend my first year at Yale.

8 　　　　Q.　　And after you graduated from

9 Yale what did you do then?

10 　　　　A.　　I clerked for Henry Friendly

11 on the U.S. Court of Appeals for the

12 Second Circuit.

13 　　　　Q.　　For how long?

14 　　　　A.　　A year.

15 　　　　Q.　　And then -- and then what

16 did you do?

17 　　　　A.　　Then I joined the faculty at

18 Emory law school in Atlanta as an

19 assistant professor.

20 　　　　Q.　　Assistant professor of what?

21 　　　　A.　　Of law, sorry.

22 　　　　Q.　　What type of law did you

23 teach?

24 　　　　A.　　I taught the basic course in

Highly Confidential - Subject to Further Confidentiality Review

1  corporate law.  I taught bankruptcy.  I

2  taught securities regulation.  And I

3  taught banking.  Those were the primary

4  courses that I taught as I recall at

5  Emory.

6        Q.    And you stayed at Emory for

7  how long?

8        A.    Three years.

9        Q.    Then where did you go?

10       A.    Then I went to the

11  University of Virginia law school in

12  Charlottesville, Virginia.

13       Q.    And what was your position

14  there?

15       A.    Visiting associate professor

16  of law.

17       Q.    How long were --

18       A.    As I recall.

19       Q.    How long were you there?

20       A.    One year.

21       Q.    And what did you teach?

22       A.    I taught business

23  organizations and securities regulation.

24  And I don't recall.  I taught -- I think

Highly Confidential - Subject to Further Confidentiality Review

1    I taught other courses, but I don't

2    recall what they were.

3            Q.    And that year was when, what

4    year was that?

5            A.    Let me see if I can pull it

6    up.  That would have been 1986 to 1987.

7            Q.    And you were at Emory from

8    1983 to 1986?

9            A.    Correct.

10           Q.    So you were clerking for

11   Judge Friendly in 1982; is that right?

12           A.    Correct.  Well, I graduated

13   from law school in June of 1982 and then

14   went to work in the fall for Judge

15   Friendly.

16           Q.    Okay.  And from 1980 -- what

17   were you doing in 1988?

18           A.    In 1988, I was a professor

19   of law at Cornell University school of

20   law in Ithaca, New York.

21           Q.    Okay.  And what did you

22   teach there?

23           A.    I -- at Cornell I taught

24   business organizations, securities

1   regulation, banking.  I taught a course

2   in family law one time.  I taught

3   seminars related to corporate governance

4   and corporate control.  I believe I

5   taught a bankruptcy class once.  But my

6   primary focus was in corporate law,

7   corporate governance, and financial

8   institutions and securities.

9          Q.    And from there you went to

10  the University of Chicago?

11         A.    Correct.

12         Q.    And what did you teach

13  there?

14         A.    Business organizations and

15  banking.

16         Q.    Were you also at this point

17  in time being engaged as an expert

18  witness?

19         A.    In 1990?

20         Q.    In that time frame, yeah.

21         A.    I don't recall.  I don't

22  remember.

23         Q.    Do you recall when your

24  first engagement was?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    No.

2      Q.    Roughly.

3      A.    It would have been late

4  '80s, early '90s, I don't -- I don't --

5  or mid '90s, I don't remember.

6      Q.    So from Cornell you went to

7  University of Chicago, correct?

8      A.    Yes.

9      Q.    Did you tell me what you

10  taught there?

11      A.    Yes.  Well --

12      Q.    Okay.

13      A.    -- business organizations

14  and financial institutions.

15      Q.    Okay.  And from there you

16  went to work as a research fellow at the

17  International Center For Economic

18  Research in Turin, Italy; is that right?

19      A.    Not exactly.  So I worked at

20  the International Center For Economic

21  Research during periods of time when I

22  was fully employed at U.S. law schools.

23  I worked there when I was on sabbatical

24  leave.

Highly Confidential - Subject to Further Confidentiality Review

1          I -- so I had simultaneous

2     appointments as a research fellow on at

3     the -- what is known as the ICER, the

4     International Center For Economic

5     Research, while I was a law professor at

6     Cornell.

7          Q.    Okay.  So you were not

8     teaching at ICER, correct?

9          A.    That is correct.  I gave

10    occasional lectures at universities in

11    northern and northwest Italy, but I did

12    not have -- did not teach a full course.

13         Q.    And as a research fellow

14    what were you researching?

15         A.    I was researching corporate

16    law articles.  Law articles relating to

17    corporate governance and corporate

18    control and law, -- articles related to

19    law and economics, the application of

20    economic analysis to legal problems.

21         Q.    And were those articles

22    published?

23         A.    Those articles would be

24    reflected in my resumé, yes, under the

Highly Confidential - Subject to Further Confidentiality Review

1    "Items Published."

2         Q.    And in 1993 you were a

3    visiting professor at Stockholm School of

4    Economics; correct?

5         A.    Yes, that is correct.

6         Q.    And what did you teach

7    there?

8         A.    I taught corporate

9    governance and corporate finance.

10        Q.    And what did you do between

11   1993 and 1998?

12        A.    So between 1993 and 1998 I

13   taught at Cornell law school.  I was a

14   professor at -- at Cornell law school,

15   it's reflected in my resumé on the fourth

16   item from the top.  I was the J. DuPratt

17   White Professor of Law at Cornell law

18   school.

19        Q.    And what did you teach

20   there?

21        A.    Same constellation of

22   courses I taught:  Business

23   organizations, securities regulation,

24   financial institutions, corporate

Highly Confidential - Subject to Further Confidentiality Review

1    governance seminars, seminars on

2    corporate governance and control.  I

3    taught -- as a service to the school I

4    taught a course on family law.  I think I

5    taught bankruptcy one year.

6         Q.    And when you were a visiting

7    professor at Harvard law school from 1998

8    to 1999, what did you teach there?

9         A.    Securities regulation.

10        Q.    Just that one course?

11        A.    Yes.

12        Q.    And when you were a visiting

13   professor at Yale, from 2003 to 2004,

14   what did you teach there?

15        A.    I taught the basic course in

16   business organizations and banking

17   financial institutions, banking and

18   financial institutions.  That's one

19   course, banking and financial

20   institutions, that is.

21        Q.    And you have been a Sam

22   Harris Professor of corporate law,

23   securities law, and corporate finance

24   from 2004 forward, correct?

1     A.     Yes.

2     Q.     At Yale?

3     A.     Yes.

4     Q.     Do you teach any -- have you

5  taught any other classes at Yale other

6  than those reflected here?

7     A.     So I've taught -- I've

8  taught seminars on corporate governance.

9  I teach a course in ethics in financial

10  markets.  I've taught a course regularly

11  on what's kind of a -- what's known as an

12  experiential or clinical offering related

13  to writing comment letters to the SEC or

14  amicus briefs in various issues of

15  importance from public policy point of

16  view that students will -- will

17  participate and draft comment letters or

18  amicus briefs on issues of relevance in

19  corporate governance or finance pending

20  before courts or administrative agencies.

21     Q.     And what did you teach in

22  Milan?

23     A.     I taught corporate

24  governance and corporate finance at

1    Bocconi in Milan.  This was while I was

2    on leave -- sabbatical leave from Yale in

3    2012.

4         Q.    And the current activities

5    listed here, is this a complete list of

6    all of your current activities?

7         A.    I don't know.  Let me review

8    it.

9              I guess I would say, for

10   completeness, it would be -- one -- I

11   would -- I would say that one should look

12   at my current activities on Pages 24 and

13   25 of my resumé, but also look at my

14   current positions, which is on the front

15   page of the resumé.  So there are certain

16   positions that I have that are listed

17   there that involve activities on my part.

18              I believe that the current

19   activities list are essentially

20   activities that are outside of Yale, and

21   the current positions are either

22   administrative positions related to my

23   teaching or -- or involve some I guess

24   more -- a little more allocation of time

1    on my part.

2         Q.    What's the nature of your

3    responsibilities as the Yale -- chair of

4    the Yale faculty committee on athletics?

5         A.    The Yale faculty committee

6    on athletics is a faculty committee at

7    Yale which advises the president of the

8    university on issues related to oversight

9    and governance of the department of

10   athletics, the student athlete

11   experience, and the sort of time-life

12   balance involved in playing sports at the

13   Division I level and being a student

14   athlete at an Ivy League school.

15        Q.    How long have you been in

16   that position?

17        A.    Several years, I don't

18   recall exactly.  But three or four I

19   think.

20        Q.    And have you had to deal

21   with issues related to the college

22   admissions scandal for athletes?

23        A.    I've had no -- to deal with

24   no issues with the college admissions

Highly Confidential - Subject to Further Confidentiality Review

1    scandal which -- that I don't -- that I

2    believe would be covered by the

3    attorney/client privilege.

4         Q.    I see.  So do you act in

5    that capacity as legal counsel to Yale?

6         A.    No, I do not act -- I do not

7    serve as legal counsel to Yale, no.  Yale

8    has an office of general counsel who

9    serves as counsel and represents Yale

10   in -- or in -- in -- in legal and

11   regulatory matters.

12        Q.    And so your dealings with

13   respect to that issue are based solely on

14   advice that you've received from Yale's

15   counsel?

16        A.    Well, not -- I've simply

17   been at meetings where the issue you

18   raise has been discussed.  And there have

19   been -- at all of those meetings present

20   member -- legal counsel, outside legal

21   counsel, and I've been advised that those

22   meetings are covered by the

23   attorney/client privilege.

24        Q.    Were you involved in any of

Highly Confidential - Subject to Further Confidentiality Review

1    Yale's public releases on that issue?

2          A.    No.

3          Q.    By that I mean press

4    releases.

5          A.    I know exactly what you

6    mean, yeah.

7          Q.    Okay.  What is the nature of

8    your responsibilities as the -- as a

9    member of the executive committee on Yale

10   Law School Center For the Study of

11   Corporate Law?

12         A.    We're involved in a variety

13   of activities, planning programs,

14   continuing legal education for alumni.

15   We have some prizes and fellowship awards

16   that are distributed, and generally

17   providing support for that aspect of Yale

18   Law School experience which relates to

19   the study of corporate law and -- and

20   corporate governance.

21         Q.    What's the nature of your

22   responsibilities as a member of the

23   economics advisory board for the

24   Financial Industry Regulatory Authority,

Highly Confidential - Subject to Further Confidentiality Review

1    FINRA?

2         A.    So FINRA, Financial Industry

3    Regulatory Authority, is the

4    self-regulatory authority that governs

5    capital markets and broker-dealer firms.

6    It operates under the kind of regulatory

7    aegis of the Securities & Exchange

8    Commission.

9              And this is a group of

10   people who -- economists who provide

11   economic analysis of regulatory issues

12   that FINRA is dealing with and provides

13   advice to FINRA executives and management

14   about what enforcement issues they might

15   think about and how the literature in

16   finance, the economics and finance

17   literature, might inform their

18   enforcement process or regulatory --

19   their rulemaking promulgation.

20        Q.    And so your involvement

21   entails providing that sort of economic

22   analysis?

23        A.    That is correct.

24        Q.    And what is the nature of

Highly Confidential - Subject to Further Confidentiality Review

1    your responsibilities as a member of the

2    European corporate governance institute?

3            A.    So that is an honorary group

4    of people who are considered to be

5    academic leaders in the field of

6    corporate governance.  And it involves

7    attending conferences, presenting papers,

8    evaluating papers submitted to

9    conferences and generally participating

10   in the intellectual life of the institute

11   which studies corporate governance.

12           Q.    What percentage of your time

13   is devoted to teaching at this point?

14           A.    Well, we're on summer

15   vacation now, so zero.

16           Q.    On an annual basis.

17           A.    On an annual basis I teach

18   generally three classes a year.  I'm in

19   the classroom for a total of 26 weeks.

20   But on each week, I will meet classes

21   maybe once or twice a week.

22           Q.    Three classes.  Are those

23   three classes for the full year?

24           A.    Yes.  Two classes in one

1    semester generally, and one class in the

2    other semester.

3           Q.    What percentage of your time

4    is spent working as an expert?

5           A.    Well, tracking my previous

6    answer, I would say today about

7    90 percent.  But usually about a quarter

8    to a third.

9           Q.    What percentage of your

10   overall income is derived from serving as

11   an expert?

12          A.    Approximately 40 or 50, I

13   would say.

14          Q.    And that's true for this

15   year?

16          A.    2019?

17          Q.    Yes.

18          A.    I believe so.  So my income

19   on an annual basis is derived from kind

20   of three sources:  Payments for -- salary

21   payments, payments -- second bucket would

22   be payments for lectures and royalties on

23   published books, and the third category

24   would be what you asked about, which

1    would be consulting.  So I don't know.  I

2    haven't -- you know, I tabulated for tax

3    purposes in April.  I couldn't really

4    estimate what it is for 2019.  But it is

5    not -- I do not anticipate that it will

6    be materially different for 2019 than it

7    has been for previous years.

8         Q.    And for how many years has

9    it been at the 40 or 50 percent level?

10        A.    I don't -- maybe ten.

11        Q.    And what percentage of your

12   time spent is devoted to working as an

13   expert?

14        A.    Maybe 20 percent.

15        Q.    And that's true for the last

16   ten years or so?

17        A.    That would be at most, some

18   years it's probably less, over the last

19   ten years.  But on average, maybe

20   something close to 20, I would guess.

21        Q.    Do you have a different

22   resumé for non expert work?

23        A.    No.  This is the only resumé

24   that I have.  I think that I may delete

Highly Confidential - Subject to Further Confidentiality Review

1   the -- from -- sometimes the consulting

2   rate, which appears on Page 26 of this

3   resumé, but that would be the only change

4   that I would make if I would distribute

5   the resumé, say, in connection with an

6   academic presentation or something of

7   that sort.

8        Q.    Would you agree to provide

9   us with a copy of this resumé to the

10  extent that it changes before trial?

11            MS. LEVY:  Object to form.

12       The -- we -- we'll do what the

13       court orders us to do on that.

14            MS. BAIG:  So you will not

15       agree to provide us with any

16       updates made to his resumé before

17       trial?

18            MS. LEVY:  I instruct you

19       not to answer that.  That's a

20       matter for --

21            MS. BAIG:  I'm asking you,

22       Counsel.

23            MS. LEVY:  That's a matter

24       for counsel.  I instruct you not

1          to answer.

2              MS. BAIG:  So my question is

3          to you, Counsel.  Would you agree

4          to provide us with any updates to

5          this resumé to the extent there

6          are any made prior to trial?

7              MS. LEVY:  You don't have to

8          answer that.  That's a --

9              MS. BAIG:  I'm not asking

10         him.  I'm asking you.

11             MS. LEVY:  I -- I'm -- I'm

12         not speaking to you.  I'm speaking

13         to the witness.

14             You do not have to answer

15         that question.

16             MS. BAIG:  Are you refusing

17         to answer?

18             I'm asking you, Jennifer.

19             MS. LEVY:  You ask him if

20         he's refusing to answer, and he

21         will -- he can answer that

22         question for you.

23             MS. BAIG:  So you won't talk

24         with me about that at all --

1    MS. LEVY:  Yeah, I'm telling

2    you that we -- that counsel have

3    mutually reciprocal agreements

4    about what with respect to the

5    experts will be produced when

6    before trial.  Whatever we agree

7    to do, our side will do, as long

8    as it's mutual.

9         And the -- what -- the

10   witness does not know about that,

11   nor does he need to.

12        MS. BAIG:  So you will not

13   agree at this point in time to

14   provide us with any updates made

15   to that resumé --

16        MS. LEVY:  Here's what we

17   will agree to --

18        MS. BAIG:  -- between now

19   and trial; is that right?

20        MS. LEVY:  We will agree to

21   whatever the parties mutually

22   agree to do that the court orders

23   us to do.

24   BY MS. BAIG:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Where have you been licensed
2  as an attorney?
3    A.    Georgia.
4    Q.    Anywhere else?
5    A.    No.
6    Q.    Are you currently licensed
7  in Georgia?
8    A.    Yes.
9    Q.    Have you practiced law in
10  Georgia?
11    A.    No.
12    Q.    How many books have you
13  written roughly, your best estimate?
14    A.    I would -- I would -- so
15  I've written eight, about eight books.  I
16  have been an editor of a couple books
17  where I served as editor, where
18  substantial portions of the book have
19  been written by others and -- and as
20  contributing authors.
21         And then I've written with
22  co-authors to case books where a
23  significant percentage of the material --
24  material in the book came in the form of

Highly Confidential - Subject to Further Confidentiality Review

1    published opinions by judges, which I

2    certainly would not claim authorship to,

3    but -- but I would be -- would have been

4    in charge of editing and compiling those

5    cases and materials, and writing notes

6    and comments and questions for students

7    related to that material, and I'm listed

8    as the author.  But I don't know that I

9    would -- I would count myself as being an

10   author of those case books in quite the

11   same way as say, a book that I had

12   written cover to cover myself.

13        Q.    And these are the -- the

14   books listed here on Page 2, correct?

15        A.    So the first two listed on

16   Page 2 under the heading "Books" are case

17   books that fit the description of

18   containing a substantial portion of

19   published written opinions by judges, and

20   then the others are books that I've

21   either written, co -- co-authored or

22   served as editor on, and those are --

23   the -- those are -- are specified as such

24   on the resumé.

1    Q.    And which of these, if any,

2    deal with piercing the corporate veil?

3    A.    So in terms of the books,

4    the book, "Cases and Materials on

5    Corporations Including Partnerships and

6    Limited Liability Companies," contains

7    material on piercing the corporate veil.

8    Similarly, the --

9    the two-volume treatise updated manually,

10   "Macey on Corporation Law," contains

11   information on piercing the corporate

12   veil.

13   I don't recall right now

14   whether there are chapters in the "Iconic

15   Cases in Corporate Law" book published in

16   2008 dealing with piercing the corporate

17   veil.  I don't think so, but it might.

18   But those are the --

19   Q.    Sorry.  What was the third

20   one you mentioned?

21   A.    So the "Iconic Cases in

22   Corporate Law."

23   Q.    Got it.

24   A.    That's the one I don't

Highly Confidential - Subject to Further Confidentiality Review

1 recall if there are chapters in --

2 related to piercing.

3          Q.    And which of the articles

4 that you've written specifically address

5 piercing the corporate veil to your

6 knowledge?

7          A.    The primary article that

8 I've written that addresses piercing the

9 corporate veil is the article entitled

10 "Finding Order in the Morass:  The Three

11 Real Justification For Piercing the

12 Corporate Veil" which was published at

13 100 Cornell Law Review in 2014.

14          Q.    Any others?

15          A.    I have -- I likely have

16 touched on the issue of piercing the

17 corporate veil in other articles such as

18 the article on Citizens United with

19 Justice Strine that we talked about

20 earlier.  But that's the only article

21 that I can recall sitting here right now

22 that deals exclusively with piercing the

23 corporate veil.

24          Q.    Or deals significantly?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     That's right.

2      Q.     What are the primary subject

3  areas of the -- of the other books that

4  you've written?

5      A.     So -- with -- unless you

6  would prefer that I do it a different

7  way, I'll simply start at the top of the

8  list on Page 2 and work my way down, if

9  that's acceptable to you.

10      Q.     Sure.  I don't need

11  everything that the book covers, but

12  just --

13      A.     Okay.

14      Q.     -- you know, primarily what

15  it's about.

16      A.     So, "Cases and Materials on

17  Corporations Including Partnerships and

18  Limited Liability Companies, in addition

19  to dealing with piercing the corporate

20  veil, which we've discussed, deals with

21  agency principles.  It deals with the

22  differences between various forms of

23  business organizations, including

24  partnerships, corporations, limited

1    liability companies, Subchapter S

2    corporations, and the like.

3              It also deals with issues

4    related to how the corporation -- how --

5    how to form a corporation or other kind

6    of limited liability entity and how such

7    entities are -- are governed and what the

8    controlling principles are with respect

9    to regulating the activities of officers

10   and directors and other key

11   decisionmakers in various forms of

12   business organizations.

13             It also deals with certain

14   selected issues in security -- federal

15   securities regulation and state

16   securities regulation, such as the

17   process of going public and the rules of

18   insider trading.

19             The second book, "The Law of

20   Banking and Financial Institutions" deals

21   with the structure of the financial

22   industry, the basic regulations that deal

23   with commercial banking, including the

24   Bank Holding Company Act and the

1    Gramm-Leach-Bliley Act and the Dodd-Frank

2    Act.

3              It deals with regulations of

4    insurance companies, regulations of

5    mutual funds, also known as investment

6    companies, regulation of certain other

7    forms of business organizations or that

8    are involved in the financial industry,

9    such as hedge funds and private equity

10   firms.

11             It deals with the issue of

12   so-called structured finance.  Things

13   like residential mortgage-backed

14   securities and collateralized debt

15   obligations.

16             "Macey on Corporation Law"

17   is a treatise that deals with various

18   subjects in corporate law.  Generally the

19   same subjects I described before as being

20   dealt with in the cases and material on

21   corporate law, but -- but more focused

22   narrowly on corporations and away from

23   partnerships and LLCs.

24             "The Death of Corporate

Highly Confidential - Subject to Further Confidentiality Review

1    Reputation:  How Integrity Has Been

2    Destroyed on Wall Street," is a book

3    about the economic theory of -- of --

4    excuse me.  The economic theory of

5    reputation of Wall Street firms,

6    including investment banks and law firms

7    and private equity firms and hedge funds,

8    and why that kind of standard economic

9    theory account of corporate reputation no

10   longer provides a very accurate

11   explanatory framework for understanding

12   the economics and incentives that these

13   Wall Street actors operate under.

14            "Corporate Governance:

15   Promises Kept, Promises Broken" is a book

16   about what corporate governance is and

17   what kinds of mechanisms and institutions

18   of corporate governance are most

19   effective in controlling aberrant or

20   inappropriate behavior by officers and

21   directors, particularly activities that

22   divert wealth from investors to the sort

23   of pockets of the officers and directors

24   who are charged with running the firm.

Highly Confidential - Subject to Further Confidentiality Review

1       "Classics in Corporate Law

2    and Economics" deals with -- is a book

3    that I edited in which various other

4    colleagues in academia contributed

5    articles in which they discuss classic

6    articles in corporate law and economics,

7    famous articles; iconic cases in

8    corporate law, a series of articles by

9    academics, myself and others, on the most

10   famous, what are known -- we call in the

11   title iconic cases in corporate law.

12       The Costly Policies book,

13   "Costly Policies:  State regulation and

14   the Antitrust Exemption in Insurance

15   Markets" is about the McCarran-Ferguson

16   Act and the policy implications

17   associated with the allocation of

18   regulatory authority over insurance

19   company -- companies, which in the United

20   States is focused -- focuses regulatory

21   authority on state regulators as distinct

22   from federal regulators, such as the

23   comptroller of the currency or the

24   Securities & Exchange Commission.

Highly Confidential - Subject to Further Confidentiality Review

1            A book -- the book

2    "Corporate Law in Transition:  A Law and

3    Economics Analysis" deals with issues of

4    corporate governance, what corporate law

5    is and the relationship between corporate

6    law and microeconomic theory.

7            The Third-Party Legal

8    Opinions book deals with the provision by

9    law firms of third-party legal opinions

10   in corporate law transactions and what

11   their responsibilities are when issuing

12   legal opinions, essentially, to

13   non-clients.

14            The book "Insider Trading,

15   Economics, Politics and Policy" deals

16   with the economic basis for regulating

17   the trading of -- in securities by

18   parties that have material non-public

19   information about the companies whose

20   financial assets are being traded.

21            "An Introduction to Modern

22   Financial Theory" is a book about basic

23   principles of corporate finance, such as

24   the capital asset pricing model or the

1  efficient capital markets hypothesis or

2  portfolio theory or the nature of the --

3  what in financial economics is known as

4  the beta coefficient.  It explains

5  economic and finance concepts to -- in a

6  nontechnical way designed to provide

7  information to lawyers who are working

8  with investment bankers who are working

9  in finance, where in order to provide

10  more effective counsel that's useful for

11  the lawyers to understand certain

12  financial theories.

13          Q.    Thank you.  Now, when you

14  were -- I believe you testified that you

15  were first retained in this case in late

16  2018 or early 2019.

17              During that initial contact,

18  what were you asked to do in this case?

19          A.    I don't recall the exact

20  words of the conversation.  My

21  recollection is that I was told that

22  there was litigation brought against

23  certain corporate entities and that I was

24  being retained to look at the corporate

Highly Confidential - Subject to Further Confidentiality Review

1    governance relationship between and among

2    the various corporate entities that had

3    been named as defendants in this

4    litigation and to, in particular, look at

5    the corporate control and governance

6    implications associated with certain

7    sales of shares and assets that had

8    occurred in the past.

9          Q.    And did that ask evolve over

10   time at all?

11         A.    I would say that they -- I

12   don't think they evolved very much, no.

13   I think that essentially the scope of my

14   work and the nature of my retention

15   essentially has stayed the same.

16         Q.    And did you understand the

17   reason for -- for the retention?  Or what

18   was your understanding of a reason for

19   the retention?

20         A.    I -- you're asking me why do

21   I think that the lawyers at Kirkland

22   Ellis retained me?

23         Q.    Mm-hmm.

24         A.    I don't know.  You have to

Highly Confidential - Subject to Further Confidentiality Review

1    ask them.  I don't -- I don't know.

2           Q.    And did you review any

3    materials in preparation for your

4    deposition today other than your expert

5    report?

6           A.    Yes.

7           Q.    What did you review?

8           A.    I re -- I looked at some

9    organizational charts that I had

10   previously looked at, but in preparation

11   for my deposition, I looked at them

12   again.

13              I looked at a litigation

14   settlement document.  No, I think I

15   looked at that earlier.  Never mind.  No,

16   that wasn't anything new.

17              Mainly I re-read my -- I

18   re-read my expert report.  I looked at

19   the -- and I looked at the organizational

20   charts.

21          Q.    You have a list in your

22   expert report of the materials that were

23   reviewed or relied upon in connection

24   with the report.

1    Do you recall that?

2         A.    Yes.

3         Q.    I believe it's on Page 4 of

4    Exhibit 3.

5         A.    I believe that -- I may have

6    misunderstood your question.  I

7    apologize.  I believe -- I apologize, but

8    I believe all of Exhibit 3, including the

9    first few pages, contains documents that

10   I reviewed in connection with this

11   retention.

12        Q.    Okay.  And were the org

13   charts that you looked at in preparation

14   for this deposition, are they itemized

15   here on Exhibit 3?

16        A.    Yes.

17        Q.    Where?

18        A.    They -- those documents

19   would be in the production documents

20   listed in Roman Numeral III.

21        Q.    So on Page -- beginning on

22   Page 4?

23        A.    Beginning on Page 4,

24   correct.

1    Q.    So you didn't look at any

2    new organizational charts apart from the

3    ones that you had looked at in connection

4    with your report; is that right?

5    A.    I only looked at -- so the

6    set of organizational charts cited here,

7    they were certainly new to me when I was

8    retained in this matter.  The ones that I

9    looked at in preparation for this

10   deposition were no different than that

11   ones -- they weren't different -- they

12   were the same ones that I looked at in

13   connection with my preparation of the

14   original report.

15            Sorry if I was unclear about

16   that.

17   Q.    Understood.  And so the

18   litigation settlement document that you

19   looked at, what document was that?

20   A.    I had looked, in connection

21   with my preparation of the original

22   report, some -- there was appendix, I

23   believe, to an annual report that I

24   looked at, one of the ones cited in Roman

1  Numeral II.  There was an appendix that

2  talked about some litigation between Teva

3  and Allergan, as I recall.

4      Q.  So is this Exhibit 3 a

5  complete list of all materials reviewed

6  and/or relied upon in connection with

7  your report and your testimony today?

8      A.  Yes, it is.

9      Q.  I would ask that to the

10  extent that you review additional

11  materials in connection with any sort of

12  rebuttal report or testimony at trial,

13  that we be provided with a copy of those

14  materials or at least a list of those

15  materials.

16          MS. BAIG:  Would you agree

17      with that, Counsel?

18          MS. LEVY:  To the extent

19      that there are such materials,

20      we'll address them as they arise.

21          MS. BAIG:  You'll advise us

22      if there are additional materials?

23          MS. LEVY:  We'll see as we

24      go.  It all depends on what

1    agreements are struck between your

2    side and our side going forward.

3    We will comply with the court's

4    rules and procedures.

5        MS. BAIG:  But you won't

6    agree, as you sit here right now,

7    to provide us with any updated

8    materials; is that right?

9        MS. LEVY:  We will agree to

10    apply -- to abide by all

11    applicable rules and procedures

12    and mutual agreements that we

13    reach.  I won't agree to anything

14    sitting here because I don't -- I

15    don't know what's going to happen

16    in the future.

17  BY MS. BAIG:

18    Q.    Have you created any

19  demonstratives to sort of explain any of

20  the opinions in your expert report?

21    A.    There are certain charts

22  that I prepared.  But those are all in

23  the report, they're part and parcel of

24  the report.  So there's a chart, for

1   example, on Page 35 or Page 33.  I don't

2   know if you would call these

3   demonstratives.  But to the extent that

4   they are, I prepared them.  And -- but

5   they are included in my report.  There

6   are no demonstratives or other material

7   that I prepared that's not in my report.

8         Q.    Do you intend to prepare any

9   demonstratives in preparation for your

10  testimony at trial, if you do testify at

11  trial?

12        A.    I have no current intention.

13  I have prepared demonstratives in the

14  past in connection with testimony that I

15  have made.  I certainly would not rule it

16  out.  But I have no present intention to

17  create any demonstratives.

18        Q.    Did any of the

19  demonstratives that you've prepared in

20  the past -- in the past deal with

21  piercing the corporate veil?

22        A.    I don't remember.

23        Q.    So you have no additional

24  opinions about -- about this case, apart

1    from those that are set forth in this

2    expert report; is that correct?

3          A.    There -- I have no opinions

4    that I'm intending to offer as an expert

5    that are not reflected in this report,

6    no.

7          Q.    So you have some opinions,

8    but not ones that you're going to offer

9    at trial or in a rebuttal report, is that

10   what you're saying?

11         A.    Yeah, I mean, I think like

12   most people, I have a lot of opinions

13   about a lot of things, the vast majority

14   of which are probably irrelevant to this

15   litigation.

16               But -- but these -- I

17   believe that this report contains a

18   complete list of -- of -- of my -- subset

19   of my opinions in the world that relate

20   to matters upon which I'll testify as an

21   expert witness in this case or that I

22   expect to sitting here right now.

23               I would -- I would imagine a

24   possibility that plaintiffs in the case

1  could produce a report related to

2  corporate governance and corporate

3  control issues, and I could imagine that

4  I would, you know, prepare -- formulate

5  opinions based on that, but I've not seen

6  any such report and I don't have any such

7  opinions related to that sitting here

8  right now.

9          Q.    And the summary of your

10  opinions is -- begins on Page 11,

11  correct?

12          A.    Yes.

13          Q.    And there's seven of them,

14  correct?

15          A.    Yes.

16          Q.    And do you have any

17  additional bases for any of these

18  opinions that are not set forth here in

19  this report?

20          A.    None that I can think of

21  sitting here right now.

22          Q.    Do you have a file of all of

23  the materials reviewed in connection with

24  your creating this report?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I have materials both in

2  hardcopy and electronic form.  The

3  materials in hardcopy are in kind of

4  notebooks.  The materials in electronic

5  form are -- are in -- are in electronic

6  files.

7         Q.    And those are all identified

8  in Exhibit 3, correct?

9         A.    I'm not quite sure.  All of

10  the materials, yes, are identified in --

11  in Exhibit 3.  Sometimes the name of the

12  files on my computer will be, if I

13  receive a document on May 28th, I'll call

14  the file that contains that document, May

15  28, 2019.

16              That -- the actual document

17  is listed on this report, but the name

18  that I use, that date I don't think is on

19  this list.  But that would not represent

20  a document that I reviewed.

21              The -- all of the material

22  that I reviewed is referenced in this

23  exhibit.

24         Q.    And how did you come to

Highly Confidential - Subject to Further Confidentiality Review

1  review the produced documents, the

2  production documents that are set forth

3  on Pages 4, 5 and 6 of Exhibit 3 of your

4  report?

5          How did you find those

6  documents?  Were those provided to you by

7  counsel?

8      A.    I would -- most of these

9  were provided to me by counsel.  Some of

10  them I found on my own, like for -- just

11  to pick -- so for example, all -- I think

12  all of the production documents were

13  provided to me by counsel.

14          These cases that are cited

15  on Page 4 or, you know, items that are

16  listed in this --

17      Q.    No, I'm just talking about

18  the production documents.

19      A.    Oh, I'm sorry, yes.

20  Correct.  I would be -- all of the

21  production documents in Roman Numeral III

22  were provided to me by counsel.

23      Q.    So these are the only

24  documents produced by the Allergan

1    entities in this case that you have

2    reviewed; is that right?

3         A.    Well, I'm not sure about

4    that.  Because if you look at -- if you

5    look at Roman Numeral I, there are other

6    documents such as County of Cuyahoga,

7    Ohio, against Purdue Pharma LP.

8              I -- sitting here right now,

9    I -- that document may have been provided

10   to me by counsel.  I may have found it

11   doing a web search.  I don't recall,

12   but --

13        Q.    Wait, wait, you are talking

14   about the complaint?

15        A.    Oh no, sorry.  No, no, no,

16   I'm not.  I beg your pardon.

17             I'm talking about, in item

18   Roman Numeral I-B, these memorandum

19   opinions --

20        Q.    Wait, I'm not talking about

21   opinions or caselaw.

22        A.    Okay.

23        Q.    I'm just talking about

24   documents that have been produced in the

Highly Confidential - Subject to Further Confidentiality Review

1  MDL litigation.

2      A.   Oh, I'm sorry, I thought a

3  case -- I thought -- I call them all

4  documents.  I beg your pardon --

5      Q.   Documents produced.  So you

6  have here production documents, do you

7  see that, under Section 3?

8      A.   Yes.

9      Q.   And there's a number of

10 documents that have Bates ranges?

11     A.   Yes.

12     Q.   And those Bates -- Bates

13 ranges, Bates numbers, indicate that

14 those documents have been produced in

15 this MDL litigation.

16     A.   Okay.

17     Q.   By -- by Allergan or an

18 Allergan entity.

19     A.   Okay.

20     Q.   Do you see that -- except

21 for one that has a Teva Bate -- Teva

22 Bates stamp.  Do you see that, at the

23 very -- one or two at the very end?

24     A.   I do see that, yes.  I was

Highly Confidential - Subject to Further Confidentiality Review

1    unaware.  I mean, I knew that -- I

2    thought the Bates numbers were done to

3    identify the documents.  I didn't realize

4    they identified who produced them.  I

5    didn't know that, thank you.

6            Q.    Okay.  So these documents

7    are all of the documents that have been

8    produced in this action as -- as evidence

9    that you have reviewed; is that right?

10           A.    Yes.

11           Q.    There are no additional

12   evidentiary documents produced in this

13   action that you have reviewed that form

14   the basis of any of the opinions in your

15   report; is that right?

16           A.    Yes.

17           Q.    And did you have access to a

18   database or otherwise to all of the

19   documents that were produced by Allergan

20   in this case?

21           A.    I -- there were no documents

22   that I asked for that were not provided

23   to -- to me.  I don't know that I -- I

24   think I asked for documents and the

1  documents were provided to me.  I don't

2  think that -- I don't think I had access

3  to the global database of -- of all of

4  the documents that had been produced.

5       Q.    You didn't run any searches

6  yourself in a larger database; is that

7  right?

8       A.    I ran various searches to

9  produce -- but not with respect to the

10  production documents.  I did no searches

11  of the production documents, that's

12  correct.

13       Q.    Okay.  What documents did

14  you ask counsel to provide to you, what

15  categories of documents did you ask for?

16       A.    Well, I asked for

17  organizational charts.  I asked for

18  documents that provided information about

19  the nature of the corporate entities

20  involved in this case, documents related

21  to the structure and organization of

22  the -- of the defendants that were --

23  were -- that I was asked to -- the

24  particular defendants that I was asked

1    to -- to evaluate, which specifically are

2    the ones that are listed in Paragraph 7

3    and 8 and 9 of my report.  I asked for

4    documents related to those entities.

5         Q.    Documents related to the

6    structure and organization of those

7    entities?

8         A.    Correct.

9         Q.    Okay.  So apart from org

10   charts, documents showing information

11   about the nature of corporate entities,

12   and documents showing the structure and

13   organization of the entities that you

14   just identified, what additional

15   categories of documents, if any, did you

16   ask for?

17        A.    So situations in which

18   these -- instances in which these

19   entities had been involved in disputes

20   with one another or had been involved in

21   certain in -- litigation with third

22   parties.  Formational documents.

23        Q.    Any other --

24             (Brief telephonic

1     interruption.)

2  BY MS. BAIG:

3     Q.    Any other categories of

4  documents that you asked for?

5     A.    So I'd made a general

6  request for documents that were relevant

7  to understanding the corporate governance

8  relationship among these firms and the

9  corporate governance structure of these

10  firms.  So annual reports would be

11  included within that list for example.

12     Q.    Anything else that you can

13  think of?

14     A.    Not offhand, no.

15     Q.    Did you review any

16  deposition testimony in connection with

17  your preparation of your report?

18     A.    Yes.

19     Q.    What testimony did you

20  review?

21     A.    Well, I specifically recall

22  reviewing -- reading the deposition

23  testimony of a Mr. Kaufhold who was a

24  treasurer of certain Allergan entities,

Highly Confidential - Subject to Further Confidentiality Review

1    including Allergan PLC.  I may have

2    reviewed other deposition testimony.  But

3    sitting here right now I don't recall it

4    offhand.

5          Q.    Would that be listed in

6    here?

7          A.    Yes.

8          Q.    Where is that listed?

9          A.    It's listed under Roman

10   Numeral I-D.

11         Q.    So you just have Kaufhold

12   listed there, correct?

13         A.    Correct.  And the exhibit --

14   there were substantial exhibits to

15   Kaufhold, which I also reviewed.

16         Q.    Okay.  But did -- so is it

17   your testimony that you did not review

18   any other deposition testimony other than

19   Stephen Kaufhold?

20         A.    That's correct.  I don't

21   recall reviewing any other deposition

22   testimony.

23         Q.    And if you had, you would

24   have included it in this report; is that

1  correct?

2      A.    It would certainly be my

3  intention, yes, that's correct.

4      Q.    And it's not your

5  understanding as you sit here right now

6  that there's an error in the report as

7  far as --

8      A.    That's correct.  I'm not

9  aware of any such error.

10      Q.    Okay.  Did you review the

11  entire deposition transcript of Steven

12  Kaufhold or sections of it?

13      A.    The entire deposition

14  transcript.  I reviewed the entire

15  deposition transcript.

16      Q.    And you did not review any

17  additional depositions since the creation

18  of this report?

19      A.    I don't believe I did.  I

20  believe if I had reviewed any

21  depositions, I would have included them

22  on this list.  I don't see any included

23  and I do not recall having reviewed any

24  other depositions.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Since this -- since this --

2    A.    Since this, correct.  Sorry.

3    Yeah.  Got it.  No, I haven't reviewed

4    any since this.

5    Q.    Okay.  Did you ask to review

6    any additional documents that you were

7    not provided with?

8    A.    No, not that I recall.

9    Q.    Did you ask to review any

10   additional testimony that you were not

11   provided with?

12   A.    No.

13   Q.    Did you ask to review the

14   Kaufhold deposition transcript or was

15   that offered to you by counsel?

16   A.    I believe it was offered to

17   me.  I was unaware of Mr. Kaufhold's

18   existence prior to my retention in this

19   matter.  My recollection is I asked for

20   documents that would be relevant to my

21   analysis in any way, shape, or form.  And

22   they -- that was provided to me.

23   Q.    And you had not reviewed any

24   transcripts of any other defendants; is

1   that right?  Including Teva?

2         A.     That is correct.  That's --

3   to the best of my recollection, and I

4   believe I would remember it.  I had not

5   reviewed any other deposition testimony,

6   including Teva.

7         Q.     For the documents that are

8   identified as production documents in

9   Section Roman Numeral III, were those

10  documents provided to you in hardcopy or

11  electronically?

12        A.     Some were provided, I

13  believe, in -- I think they were all

14  provided electronically.  In addition, I

15  believe some were also provided to me in

16  hardcopy.

17        Q.     And why were some provided

18  in hardcopy?  Were those larger documents

19  or was there some reason for those being

20  provided in hardcopy?

21        A.     I don't believe I expressed

22  a preference.  I don't know.  You'd have

23  to -- that would be -- I believe -- I

24  don't know.  I think -- I think I may

Highly Confidential - Subject to Further Confidentiality Review

1    have asked for a couple of documents in

2    hardcopy.  The organizational charts are,

3    in my opinion, easier to read in

4    hardcopy.  And when I looked at those, I

5    looked at them in hardcopy.

6            But I don't -- but beyond

7    that, it was -- it didn't -- it was, you

8    know, I -- there were no documents that

9    were provided to me electronically that I

10   couldn't print out if I wanted to, so it

11   didn't really matter.

12           Q.    And were the documents

13   provided to you with attorney notes on

14   them or highlighting or anything like

15   that, or were they clean copies?

16           A.    Clean copies.

17                 THE WITNESS:  Can I take a

18       five-minute bathroom break?

19                 MS. BAIG:  Sure.

20                 THE VIDEOGRAPHER:  Off the

21       record at 1:47 p.m.

22                 (Short break.)

23                 THE VIDEOGRAPHER:  We are

24       back on the record at 2:08 p.m.

1    BY MS. BAIG:

2         Q.    All right.  If you could

3    turn your attention, please, to Page 11

4    of your expert report.

5         A.    Okay.

6         Q.    You see there it begins to

7    set forth the summary of your opinions.

8               Do you see that?

9         A.    I do.

10        Q.    And directing your attention

11   to Opinion Number 1, which begins, "There

12   are strong and long-standing economic and

13   efficiency justifications for the

14   principle of limited liability."

15              Do you see that?

16        A.    Yes.

17        Q.    And if you flip to Page 14,

18   you have your support identified for

19   Opinion Number 1.

20              Do you see that?

21        A.    Yes.

22        Q.    Is there any additional

23   support for Opinion Number 1 that's not

24   included in this report that you're aware

Highly Confidential - Subject to Further Confidentiality Review

1  of?

2         A.    Yes.

3         Q.    And what is that?

4         A.    Well, there are -- there's a

5  vast literature on the economics and

6  efficiency justifications for the

7  principle of limited liability.

8              I did not cite every source

9  that supports the concept that limited

10  liability is economically efficient and

11  a -- and a -- and a positive thing from a

12  public policy perspective.  There are

13  just, you know, articles and -- in both

14  law and economics literature and the

15  finance literature on this topic.  I

16  didn't cite every single thing.  I think

17  there are probably hundreds if not

18  thousands.

19        Q.    And are there any documents

20  produced in this case which are

21  identified in Exhibit 3, Roman Numeral

22  III, production documents, that you

23  specifically used to support this

24  opinion?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Well, certainly, the law

2    review article that is cited --

3          Q.    No, I'm looking at produced

4    documents.

5          A.    I'm sorry.  I don't --

6          Q.    Produced documents are just

7    documents with?

8          A.    Oh, with the Bates

9    numbers --

10         Q.    -- evidentiary documents

11   with the Bates numbers that were produced

12   in this case.

13         A.    Okay.  Thanks.  What was the

14   question?

15         Q.    Is this opinion -- this

16   opinion, it seems to me, is based

17   primarily on your review of literature

18   and not on the production of documents in

19   this particular case.  And I'm just

20   asking you if that's -- if that

21   understanding is correct.

22         A.    Yes and no.  So I think

23   the -- my Opinion Number 1 relates to the

24   definition of limited liability, what the

1    term means, and what the economic and

2    efficiency justifications are for the

3    principle.

4              There are -- there are

5    documents in -- the production documents

6    that I cite that I believe to be

7    consistent with that insight.  Or to be

8    more precise, that rely on that insight

9    being correct.  And, therefore,

10   supportive of the insight.

11             But they're not directly

12   supportive as much as sort of impliedly

13   or implicitly supportive.

14        Q.    What documents are those?

15        A.    These would be the

16   documents -- well, to begin with, the

17   organizational chart, the documents that

18   indicate that Allergan organized itself

19   as an -- Allergan PLC and Allergan

20   Finance LLC organized itself as a holding

21   company.

22             The documents about the --

23   the -- the -- well, for example, the

24   master purchase agreement between the

1  Allergan entities and Teva, which I refer

2  to in my expert report as the buyer.

3  The -- those documents, specific

4  provisions of those documents in my

5  opinion reflect reliance on the

6  principles described in Opinion 1.

7       Q.    Anything else that you can

8  think of?

9       A.    No.  Not at the moment.

10      Q.    And there are no additional

11 bases for this opinion that we have not

12 already discussed; is that right?

13      A.    Well, I think there are

14 additional bases for this opinion that we

15 haven't discussed, yes, actually.

16      Q.    Such as?

17      A.    Well, so there are other --

18 there are, as I mentioned before, a vast

19 number of -- there's a vast amount of

20 support for the concept of limited

21 liability.  I gave what I regard to be an

22 overview in Roman Numeral III.

23           There are -- there are

24 additional bases of support, for example,

1    I'll -- that it would be in the absence

2    of limited liability.  So if investors

3    were unlimitedly liable, it would be

4    impossible to price financial assets such

5    as equity securities with any accuracy

6    because the value of any, for example,

7    share of stock would not only be a

8    function of the present value of the

9    future income associated with an

10   investment in those shares, it would also

11   be a function of the expected liability

12   of a shareholder, which in turn would be

13   a function of the wealth of that

14   shareholder.

15             So, in essence, that means

16   that two shareholders who own identical

17   stock in identical firms would have

18   different valuations placed on those

19   shares of stock depending on whether that

20   shareholder was judgment proof or not.

21             So, essentially, the greater

22   your assets are, the least interested or

23   likely or -- you would be in making

24   investments.  That's one additional

Highly Confidential - Subject to Further Confidentiality Review

1    argument for limited liability that I

2    don't really -- that I don't really go

3    into in this opinion.

4              Another argument in favor of

5    limited liability is that if -- if there

6    were unlimited liability, this would skew

7    the value of financial assets in a very

8    inefficient way in favor of holding debt

9    as opposed to holding equity.  Because

10   the investors in debt instruments, and

11   bonds, for example, or people who make

12   loans, would not be generally responsible

13   to other creditors the way that

14   shareholders would be in a regime of

15   limited liability.

16             So we would see a -- there's

17   a lot of literature in finance that said

18   if we didn't have limited liability, then

19   we'd simply see a change in capital

20   structure of businesses so they'd have a

21   whole lot more debt than -- than equity.

22             In addition though --

23        Q.    Isn't that the argument

24   that's reflected in Paragraph 22?

1    A.    It is not inconsistent with

2  that argument.  It's slightly different.

3              Argument 22 -- the argument

4  I just made is about capital structure.

5  Argument 22 is not at all about capital

6  structure.  It's a different -- different

7  argument.

8              I mean, they both have in

9  common that they are supportive of the

10  principle of limited liability.  But they

11  are not the same argument.

12    Q.    Okay.  Any other argument --

13  or bases for Opinion Number 1 that are

14  not in this report?

15    A.    So something that's related

16  to this, the -- my support for Opinion 1

17  that I don't talk about specifically, but

18  relates sort of to number --

19  Paragraph 20, Number C, which relates to

20  allowing investors to form, invest and

21  manage in multiple businesses, is that if

22  we didn't have limited liability, it

23  would significantly compromise the

24  economic advantages of portfolio

1    diversification.

2              That you wouldn't -- the

3    notion of diversification is you

4    shouldn't hold all of your eggs in one

5    basket.  It's a good idea to invest in a

6    lot of different enterprises.  But if

7    you're -- if an investor is unlimitedly

8    liable for every single equity investment

9    that they make, then this -- this

10   diversification strategy would no longer

11   be rationale.

12             So that -- that is kind of

13   implicit in Paragraph 20, Number C, but

14   the specific point about portfolio theory

15   and diversification isn't really made in

16   this -- in these -- in Roman Numeral III.

17        Q.    Any other bases of support

18   for Opinion Number 1 that you did not

19   include in your report?

20        A.    I don't think so.  I think

21   that's all I can think of right now.

22        Q.    Looking at Opinion Number 2,

23   as set forth on Paragraph 12?

24        A.    Okay.

1    Q.    I'm sorry, on Page 12?

2    A.    Got it.  Yeah.

3    Q.    And you find in that opinion

4  that, "All such control was a necessary

5  and inevitable consequence of the fact

6  that the Allergan entities directly or

7  indirectly owned 100 percent of the stock

8  of the divested entities," correct?

9    A.    Yes, correct.

10    Q.    And beginning on Page 16,

11  you set forth your support for Opinion

12  Number 2.

13        Do you see that?

14    A.    Yes.

15    Q.    Are there any additional

16  bases for your Opinion Number 2 that you

17  did not set forth in your expert report?

18    A.    Yes.  So there -- there is

19  more support for Opinion Number 2 than is

20  contained in this discussion in -- oh no,

21  I'm sorry, I beg your pardon.  I was

22  ending with Page 18.

23        I think the support for

24  Opinion Number 2 continues -- okay.  I

Highly Confidential - Subject to Further Confidentiality Review

1    beg your pardon.

2              So the -- what I was talking

3    about is the support provided in

4    Paragraph 33, which I think is also

5    support for Opinion Number 2.  It's

6    just --

7         Q.    I think it continues to

8    paragraph -- to Page 32, correct?

9         A.    Okay.  Good.  Okay.  Thank

10   you.

11             No, I can't -- sitting here,

12   I can't think of additional support for

13   Opinion Number 2 that is not reflected in

14   Roman Numeral IV, Pages 16 to 32 in my

15   report.

16        Q.    Okay.  And looking at

17   Page 12, Opinion Number 3, that begins,

18   "The Allergan entities and the divested

19   entities were all substantial companies

20   with their own corporate governance

21   infrastructures."

22             Do you see that?

23        A.    Yes, I do, thank you.

24        Q.    And that "they operated in a

1    manner that was separate and distinct

2    from the operations of their parents

3    companies and affiliates and had a

4    significant amount of independence."

5           Do you see that?

6       A.    Yes.

7       Q.    And is there any support for

8    this Opinion Number 3 that is not

9    reflected under Roman Numeral V, support

10   for Opinion Number 3 that begins at

11   Page 32 of your report?

12      A.    No, I think all of the

13   opinion -- all of the support for that

14   opinion, to the best of my knowledge

15   sitting here right now, are -- are

16   reflected in the report.

17      Q.    And were there specific

18   produced documents, evidentiary documents

19   produced by the Allergan entities in this

20   litigation that are supportive of this

21   Opinion Number 3?

22      A.    Yes.

23      Q.    And what were those?

24      A.    They are the documents that

Highly Confidential - Subject to Further Confidentiality Review

1   are cited -- well, I'm sorry, you are

2   drawing a distinction between documents

3   reviewed and documents produced?  I'm

4   just not quite --

5        Q.    I'm talking about the Bates

6   stamped documents produced by Allergan.

7        A.    Okay.  Got it.

8        Q.    The evidence that you

9   reviewed in this case, evidence as

10  opposed to legal opinions or articles.

11       A.    Right.  Right.  Right.

12             It's a little confusing to

13  me, because there are -- there are

14  articles that were not produced -- there

15  were documents not produced in this case

16  that are not articles or -- or opinions.

17  You know, there are things like exhibits

18  to deposition testimony.

19             But -- but I guess, with

20  respect to the --

21       Q.    That's what I'm talking

22  about.

23       A.    Yeah.  So I would say

24  with -- I mean, I'm not really sure what

1    you're asking, but --

2          Q.    So if you look at Page 4 of

3    Exhibit 3, there's category Roman Numeral

4    III that says production documents, and

5    there's a list of Bates stamped ranges.

6          A.    Right.

7          Q.    And those are the Allergan

8    documents produced in the MDL litigation

9    that you reviewed in -- in connection

10   with your preparation of this report,

11   correct?

12         A.    Correct.

13         Q.    And so my question to you

14   is, what of those documents, what of

15   those documents evident -- evidence

16   produced in this case is supportive of

17   your Opinion Number 3?

18         A.    And do you mean other than

19   the ones that are cited in my report?

20         Q.    Well, which of those?  There

21   are -- what do you recall --

22         A.    I mean --

23         Q.    -- are the categories of

24   documents that were --

Highly Confidential - Subject to Further Confidentiality Review

1          A.    So this --

2          Q.    -- produced that would be

3    supportive of Opinion Number 3; are they

4    org charts --

5          A.    Yeah, I don't really -- I

6    mean --

7          Q.    -- what types of documents?

8          A.    So this would be -- we can

9    look at the documents.

10    Allergan_MDL_03367292.

11    Allergan_MDL_0336 --

12          Q.    What are you reading from?

13          A.    -- 7294.

14          I'm -- I'm reading from the

15    charts that I prepared that appear on

16    Pages 39 and 40 of my expert report.

17          Q.    Got it.  Okay.  So there's

18    the Bates stamped numbers that are cited

19    in the report?

20          A.    Right.

21          Q.    Are there any other

22    additional categories of -- of Allergan

23    produced documents that you recall

24    looking at that would support this

Highly Confidential - Subject to Further Confidentiality Review

1   opinion, Number 3?

2        A.    Categories of produced

3   documents?

4        Q.    Correct.

5        A.    I don't know.  I mean, it's

6   impossible for me to answer your question

7   counselor because in the context of

8   preparing this report, I did not draw a

9   distinction between the produced -- a

10  document that was produced and,

11  therefore, would be susceptible to

12  answering your question, versus another

13  document, like a -- the memorandum of

14  opinion in this case, or the Allergan

15  Form 10(k) or other materials that I

16  considered that would be the, you know,

17  the public offering document.

18             So we take for example the

19  master purchase agreement.  I can't --

20  sitting here right now, I have -- I don't

21  know whether this was one of the

22  documents that you describe as a

23  production document or not.

24        Q.    It was actually produced.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    So I'm not able to answer

2    your question.

3        Q.    The master purchase

4    agreement was produced.

5        A.    Okay.

6        Q.    You know, I guess the

7    distinction that I'm drawing is between

8    literature and case opinions, which is

9    different from Allergan-specific

10    documents that have either been produced

11    in this case or, you know, even the

12    10(k)s, I don't recall whether they were

13    produced or not --

14        A.    Well, start for example --

15        Q.    -- specific to Allergan?

16        A.    Well, the Stephen Kaufhold

17    deposition, which is -- I have listed

18    under Roman Numeral I-D.  To me, that's

19    an Allergan-specific document.

20        Q.    Correct.

21        A.    But I don't know.  Is it

22    a -- but it doesn't -- it's not on the

23    production document list.

24        Q.    Well, you have identified it

Highly Confidential - Subject to Further Confidentiality Review

1    as -- and the exhibits to the Kaufhold

2    deposition would have been produced by

3    Allergan.  But is that something --

4           A.    I thought you didn't want me

5    to talk about any documents other than

6    Roman Numeral III.  That's why I'm

7    confused.  This Kaufhold deposition is in

8    Roman Numeral I.

9           Q.    Okay.  So Kaufhold is the

10   one -- is the one sort of exception

11   because he's a -- he's the one witness

12   whose testimony you reviewed and his

13   exhibits you reviewed.  But apart from

14   that, I would imagine everything Allergan

15   specific would be on the documents

16   produced list?

17          A.    I don't know.  For example,

18   in Roman Numeral II, other materials

19   considered, we have the Allergan Inc.

20   Form 10(k) from 2014.  So that's Allergan

21   specific.

22          Q.    All right.  So let's get at

23   this another way.

24                Which -- are there any

1    documents that you feel support this

2    Opinion Number 3 that you have not cited

3    in the section of your report that is

4    support for Opinion Number 3?  And if

5    there are specific documents that you

6    recall, you can answer that way.  If

7    there are categories of documents that

8    you recall, you can answer that way.

9           A.    So I just want to make sure

10   I'm answering your question in a form

11   that is acceptable to you or that you

12   want me to answer it in.

13           You want me to say -- to

14   tell you what supports my Opinion Number

15   3 other than what's cited in the

16   discussion of Opinion Number 3 in Roman

17   Numeral V; is that correct or --

18           Q.    That's correct.

19           A.    Okay.

20           Q.    I just don't want -- we

21   don't want to be surprised at trial.  If

22   there are additional categories of

23   documents that you feel support this

24   opinion that you didn't include in your

1    report for whatever reason, I would want

2    to know about those.

3              A.    Right.  So just to be clear,

4    there would be a document such as the

5    master purchase agreement, which on a

6    quick look at the citations in Opinion 3,

7    I don't see cited.  In the footnotes to

8    Opinion 3 on Pages 32 to 41, certainly

9    the master purchase agreement is a

10   document that I relied on in forming my

11   opinion and that supports my opinion,

12   several of my opinions, including Opinion

13   Number 3, that the Allergan entities and

14   divested entities were all substantial

15   companies with their own corporate

16   governance infrastructures.

17             Q.    And by master purchase

18   agreement, just so the record is clear,

19   you are referring to the purchase

20   agreement governing the purchase of the

21   generics entities by Teva from the

22   Allergan PLC, correct?

23             A.    Yes, dated July 26, 2015.

24             Q.    Okay.  Are there any

Highly Confidential - Subject to Further Confidentiality Review

1    additional documents that are not cited

2    in Heading 5, support for Opinion 3, that

3    you believe support Opinion 3?

4         A.    Sitting here right now, I

5    can't recall any additional documents

6    that I relied on other than the master

7    purchase agreement between Allergan and

8    Teva that is not cited in Roman Numeral

9    V, support for Opinion 3.

10        Q.    So looking at Opinion 4 on

11   Page 12 of your report.

12             Do you see that?

13        A.    Yes.

14        Q.    And it begins with, "The

15   2016 transactions with buyer involved the

16   sale of 100 percent of the stock that the

17   Allergan entities owned in the divested

18   entities."

19             Do you see that?

20        A.    Yes.

21        Q.    And it goes on to state,

22   "These transactions do not indicate that

23   the Allergan entities improperly

24   controlled the divested entities."

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.    Yes.

3     Q.    It also goes on to state,

4  that, "Because the 2016 transactions was

5  done at arm's length between a

6  sophisticated seller and a sophisticated

7  buyer, the transactions also provide a

8  further indication that there was

9  complete corporate separateness between

10  the Allergan entities and the divested

11  entities whose shares were sold to buyer

12  in 2016."

13          Do you see that?

14     A.    Yes.

15     Q.    And by buyer you're

16  referring to Teva; is that right?

17     A.    So specifically by buyer,

18  I'm referring to the entities described

19  in Footnote 2 on Page 5 of my report.

20     Q.    That's Teva Pharmaceuticals

21  Industries Limited, correct?

22     A.    I believe it's Teva

23  Pharmaceuticals Industries Limited or

24  affiliates or subsidiaries designated by

1    Teva Pharmaceuticals Industry Limited.

2    But it would be Teva Pharmaceuticals

3    Industries Limited or an affiliate or

4    subsidiary of Teva Pharmaceuticals

5    Industries Limited that are designated by

6    Teva Pharmaceuticals Industries Limited.

7            Q.    So in support of Opinion

8    Number 4, are there any additional

9    documents or categories of documents that

10   are not identified in Section Roman

11   Numeral VI which begins on Page 41

12   entitled "Support For Opinion Number 4"?

13           A.    Okay.  There --

14               (Brief phone interruption.)

15               THE WITNESS:  So I'm a

16           little -- I believe that

17           everything is -- that all of the

18           sources of my support for Opinion

19           Number 4 are in Roman Numeral VI

20           of my report, Pages 41 to 45.

21               I notice that in Paragraph

22           96 of my report I talk about a

23           settlement agreement and mutual

24           releases dated January 31, 2018.

Highly Confidential - Subject to Further Confidentiality Review

1    I believe that this document

2    refers to a settlement that

3    related to a dispute about working

4    capital in connection with the

5    transactions described in the

6    master purchase agreement.

7         But I'm not 100 percent sure

8    sitting here right now if that's a

9    separate document.  Then I would

10   reference that document.  But I

11   think it's the same document.  I'd

12   have to -- I'd have to go back

13   and -- and check the document

14   to -- to make sure.  But these --

15   these -- this post closing

16   litigation, I believe, is

17   supportive of my Opinion Number 4

18   and I just want to make sure that

19   that's what -- that all of that

20   litigation is being described

21   in -- in Paragraph 96.

22        In addition to that -- those

23   constitute the bases for my -- for

24   my opinion.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. BAIG:

2         Q.    Okay.  There's no additional

3    bases for Opinion Number 4 that are not

4    set forth in this report; is that right?

5         A.    Well, with the possible

6    exception that I just mentioned, that's

7    correct.

8         Q.    Okay.  And there are no

9    additional documents that you relied on

10   in forming Opinion Number 4 that are not

11   set forth in this report with the

12   possible exception that you just

13   mentioned?

14        A.    Correct.

15        Q.    Looking at Opinion Number 5

16   on Page 12.  It states, "The structure of

17   the 2016 transactions with buyer show

18   that the 2016 sales transactions did not

19   result in any harm or unfairness to tort

20   claimants, such as the plaintiffs."

21             Do you see that?

22        A.    Yes, I do.

23        Q.    And the bases for your

24   Opinion Number 5 are set forth on Roman

1    Numeral VII beginning on Page 45 of your

2    report.

3            Do you see that?

4        A.    I do, yes.

5        Q.    And do you have any

6    additional bases that are not set forth

7    in Roman Numeral VII that support Opinion

8    Number 5?

9        A.    I would -- the -- was a

10   significant payment made by Allergan to

11   Teva in a post-closing transaction

12   settling up that related to

13   reconciliation of -- of working capital

14   accounts.  And I believe that settlement

15   agreement is described in

16   Allergan_MDL_01396687.

17            To the extent that that

18   document is not cited in -- in Opinion

19   Number 5, I would add that as additional

20   support for that opinion.

21       Q.    And what is your

22   understanding as to -- as to what the

23   reconciliation for under -- for working

24   capital accounts was?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    So, as a matter of ordinary

2    and customary practice in mergers and

3    acquisitions transactions, the price paid

4    by an arm's-length buyer from an

5    arm's-length seller equals the buyers

6    estimate of the value of the assets being

7    acquired minus those liabilities.  An

8    important part of that assets minus

9    liabilities equation is what's known as

10   working capital, which are current assets

11   and current liabilities, and it is

12   ordinary and customary practice for the

13   parties to say, in essence, we are unable

14   to calculate at the moment of settlement

15   exactly what the size of the -- of the

16   working assets and what the size of

17   the -- of the working liabilities are

18   because it depends on things like how our

19   ability to collect from suppliers and --

20   and customers and the timing of payments,

21   and certain other information that won't

22   be decided until later.

23            So the parties agree on

24   bases various formulas and step functions

1    common in the industry to have a payment

2    from one side to the other to reconcile

3    differences between the amount of the --

4    in the working capital accounts of the

5    selling entities that existed at the time

6    of -- that existed in reality and what

7    was predicted at the time of closing.

8            And there was apparently a

9    dispute between Allergan and Teva about

10   this.  And there was some form of

11   litigation between the parties, I think

12   it was an arbitration.  And then the

13   parties reached a settlement.

14       Q.    Okay.  Any additional bases

15   of support for Opinion Number 5 that are

16   not set forth in your section entitled

17   "Support For Opinion Number 5"?

18       A.    Yeah.  So with respect to

19   Opinion Number 5, which is that the

20   structure of the 2016 transactions with

21   buyer show that the 2016 sales

22   transactions did not result in any harm

23   or unfairness to tort claimant, such as

24   the plaintiffs.

1      In part, my Opinion Number 5

2  is predicated on what I would

3  colloquially describe as a -- as a dog

4  that didn't bark kind of support for my

5  Opinion Number 5.  In that it would have

6  been concerning to me if I had seen any

7  indication of any kind of, what is --

8  what is known as asset stripping, any

9  efforts to take money out of the entities

10  that were transferred to Teva in any way

11  that was improper or inappropriate.

12      Instead, as I mentioned a

13  few moments ago, Allergan returned a

14  consideration to Teva in the settlement

15  transaction and I saw no evidence in any

16  documents, although I specifically

17  searched for such documents and asked for

18  such documents, that there was any --

19  any -- any inappropriate asset stripping

20  of assets from these transferred

21  entities.  And the fact that there was no

22  such evidence was relevant to me in light

23  of my experience as an expert in this

24  matter and in other cases where one sees

1    allegations of that sort.

2          Q.     Any additional bases or

3    documents that are supportive of Opinion

4    Number 5 that are not set forth in your

5    report under the heading Roman Numeral

6    VII, "Support For Opinion Number 5"?

7          A.     Sitting here right now, no,

8    I can't think of any other, any

9    additional support that's not included in

10   that section.

11         Q.     So looking back again at

12   Page 12.  Your Opinion Number 6 which

13   begins, "After the sale to buyer by the

14   Allergan entities of all of their stock

15   in the divested entities in 2016, the

16   Allergan entities complete" --

17   "completely severed their corporate

18   governance ties with the divested

19   entities."

20                Do you see that?

21         A.     Yes.

22         Q.     And the support for Opinion

23   Number 6 begins in your paragraph Roman

24   Numeral VIII titled "Support For Opinion

1    Number 6," on Page 52.

2              Do you see that?

3         A.    Yes, I do.

4         Q.    And are there any additional

5    bases of support for Opinion Number 6

6    that are not set forth in this report

7    under that heading?

8         A.    So the answer to that is

9    yes, in a -- in a way similar to my

10   answer with respect to Opinion 5, which

11   is, in addition to the discussion of

12   Opinion 6 in Roman Numeral VIII between

13   Pages 52 and -- and 54, I looked in the

14   record and on the internet, in public

15   filing documents and elsewhere, for any

16   evidence or indication or suggestion that

17   after the sale to the buyer in 2016,

18   Allergan or any Allergan entities had any

19   continuing corporate governance

20   relationship with the divested entities,

21   and I -- I found no such evidence.

22              And -- and that kind of, if

23   you will, negative finding or lack of any

24   evidence provided further support for my

1  Opinion Number 6.

2      Q.    Anything else that's not set

3  forth in this report under Roman Numeral

4  Section VIII entitled "Support For

5  Opinion Number 6"?

6      A.    None that I can think of

7  right now, no.

8      Q.    So looking back at Page 13

9  of your expert report, where it

10  summarizes Opinion Number 7 which begins,

11  "On December 30, 2008, a former Allergan

12  subsidiary purchased certain assets

13  related to the branded oral long-acting

14  opioid analgesic drug Kadian."

15          Do you see that?

16      A.    Yes, I do.

17      Q.    And do you see a little

18  further down after the reference to

19  Footnote 14, it states, "As a matter of

20  basic corporate governance, for very

21  sound reasons of finance and economics,

22  it is well established that the sale of

23  assets from one corporation to another

24  does not result in tort liability for the

Highly Confidential - Subject to Further Confidentiality Review

1    company that purchases the assets for the

2    contract or tort liabilities of the

3    corporation that sells the assets absent

4    an explicit agreement to the contrary by

5    the parties."

6            Do you see that?

7       A.    Yes.

8       Q.    And the bases for your

9    Opinion Number 7 are set forth in Roman

10   Numeral IX of your report entitled

11   "Support For Opinion Number 7."

12           Do you see that?

13      A.    Yes.  In addition,

14   counselor, I --

15      Q.    Hang on.  I've got to ask

16   the question first.

17      A.    I beg your pardon.

18      Q.    You see -- you see the

19   section Roman Numeral IX?

20      A.    Yes.

21      Q.    "Support For Opinion

22   Number 7," correct?

23      A.    I do.

24      Q.    And this section sets forth

Highly Confidential - Subject to Further Confidentiality Review

1    the bases for your Opinion Number 7,

2    correct?

3          A.    Yes.

4          Q.    Are there any additional

5    bases for your Opinion Number 7 that are

6    not set forth in this section?

7          A.    Yes.

8          Q.    And what are those?

9          A.    So I would add, and with

10   respect to all of my answers, but

11   particularly with respect to this one, as

12   I mentioned in Paragraph 12 of my report

13   on Page 9, an additional bases or support

14   for my opinions, the opinions that I

15   express in this report, is the concept

16   that the incorporation process permits

17   the creation of a legal entity that is

18   not an association of individuals, but

19   rather a discrete legal entity whose

20   rights and obligations are distinct from

21   those of its creators, investors,

22   managers and other constituents.

23               And -- and I would say

24   that -- that the information contained in

1    my report or the -- points, the analysis

2    in Paragraphs 12 through 16 of my report

3    provide -- are consistent with and

4    provide further support for Opinion

5    Number 7, particularly.

6            Q.    Are there any additional

7    bases of support for Opinion Number 7

8    that are not referenced in your report

9    under this section?

10           A.    I mean I could be more

11   specific and expand on how these various

12   doctrines support Opinion Number 7, but

13   it would just be being a little bit more

14   specific, which I'm happy to do.  It

15   wouldn't be providing additional sources.

16           Q.    Are there any additional

17   documents that are not cited in this

18   section that are supportive of your

19   Opinion Number 7 that you reviewed?

20           A.    No.

21           Q.    So you have no corrections

22   as you sit here today to your expert

23   report; is that right?

24           A.    I have no substantive

1    corrections.  I believe when I read

2    through my report in connection with my

3    preparation for today's deposition, I

4    found a couple of typographical errors,

5    but I'm not sure that I could identify

6    them right now, and I found no

7    typographical errors that would affect or

8    change my opinion -- oh, so for example,

9    if one were to look on Page 18, Paragraph

10   32 of my deposition, the very end --

11        Q.    Of your report you mean?

12        A.    Did I say deposition?  I'm

13   sorry my report.  I think there are two

14   periods after the word "efficiency."  So

15   I would delete that.

16            But other than corrections

17   of that kind, I don't have any

18   corrections to my report.

19        Q.    So the report and all

20   exhibits are complete and accurate to the

21   best of your knowledge as you sit here

22   today; is that right?

23        A.    Yes.

24            MS. BAIG:  I would again

Highly Confidential - Subject to Further Confidentiality Review

1          request that any inaccuracies in

2          the written report discovered

3          after today please be provided to

4          us in advance of trial.  Would you

5          agree to that, Counsel?

6                    MS. LEVY:  We will agree to

7          that.

8     BY MS. BAIG:

9          Q.    Do you have any outline of

10    this report or notes associated with this

11    report?

12         A.    No.

13         Q.    Do you have any additional

14    plans on working on this case other than

15    what you've already testified between now

16    and trial?

17         A.    No.

18         Q.    Is there anything additional

19    that you feel that you need to do in

20    order to give opinions about this case at

21    trial?  Is there any additional work that

22    you feel you need to perform?

23         A.    At the moment, no.  I would

24    anticipate that should other expert

Highly Confidential - Subject to Further Confidentiality Review

1    reports be filed in the future related to

2    the subject matter of my testimony today,

3    that I would review those, but I have no

4    current awareness of any such reports or

5    immediate plans to review any such

6    reports.

7         Q.    And you have no plans to

8    review any additional documents prior to

9    trial?

10        A.    Not -- no, sitting here

11   right now, I have no such plans.

12        Q.    Is there any information

13   that you do not currently have that would

14   either strengthen or weaken your

15   opinions?

16             MS. LEVY:  Objection to

17        form.  Calls for speculation.

18             THE WITNESS:  Certainly, as

19        I say specifically in my report, I

20        would never -- I would not rule

21        out the possibility that something

22        could happen that would change my

23        mind.  I specifically would refer

24        to Paragraph 6 on Page 4 of my

Highly Confidential - Subject to Further Confidentiality Review

1    report where I reserve the right

2    to modify or supplement the

3    opinions in light of new evidence.

4         It's certainly -- I would

5    not rule out or consider it

6    impossible or unimaginable that

7    there could be additional evidence

8    that would cause me to reconsider

9    my opinion.  I'm not aware of any

10   such evidence or even of the

11   possibility of the existence of

12   any such evidence.

13        But it certainly, as a -- as

14   a -- as a statistical matter, the

15   probability is greater than zero

16   that such evidence might exist

17   that could reinforce or undermine

18   the opinions that I've expressed

19   today.

20   BY MS. BAIG:

21        Q.   Are there any facts that you

22   can think of as you sit here right now

23   that would -- that would influence or

24   change your opinions in any way?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Any particular facts?  Or --

2     I'm not quite sure.  I'm not quite sure.

3     I mean, I don't -- I don't -- if -- if --

4     if it were revealed to me that Mr. --

5     that -- that -- that Mr. Hertz's

6     declaration or Mr. Kaufhold's declaration

7     or the -- or the -- or the master

8     purchase agreement or the public

9     reporting of the companies that I cite in

10    Roman Numeral II, if there were -- if it

11    turned out that these were factually

12    wrong and I was predicating some or

13    portions of my opinion on incorrect

14    factual assumptions, that could have an

15    effect on my opinion, I suppose.  It's

16    certainly within the realm of

17    possibility.

18               I have no reason to believe

19    that there are any -- that these

20    documents are fraudulent or there's

21    anything mistaken about it.  But

22    certainly if I were apprised of that

23    fact, it would change my -- it could

24    likely change my opinion, depending on

Highly Confidential - Subject to Further Confidentiality Review

1    what new information came out.

2         Q.    Anything else that you can

3    think of right now?

4         A.    No.

5         Q.    Any additional categories of

6    documents that could change your opinion

7    that you haven't reviewed already?

8         A.    No, not -- I don't believe

9    so.

10         Q.    And there's nothing more to

11    your knowledge that needs to be reviewed

12    in order to support your opinions; is

13    that right?

14         A.    That's correct.

15         Q.    How certain of you are

16    your -- how certain are you of your

17    opinions in this case?

18              MS. LEVY:  Object to form.

19    BY MS. BAIG:

20         Q.    Do you have a degree of

21    certainty?

22         A.    Mm-hmm.  I would say I --

23    with respect to the opinions expressed in

24    this report, I am extremely certain, I

Highly Confidential - Subject to Further Confidentiality Review

1   could say that in the -- I've never been

2   more certain about my opinion in any of

3   the 80 cases in which I've testified as

4   an expert witness, so I would hold these

5   opinions with an extremely high degree of

6   certainty.

7           Q.    Have you met with any other

8   experts in this case?

9           A.    I have not.

10          Q.    And you have -- I think

11  you've said before that you have not met

12  with any other lawyers for any of the

13  other defendants, correct?

14          A.    That is correct.

15          Q.    Are you aware of -- of who

16  the experts are that have been retained

17  in this case?

18          A.    I am not.

19          Q.    You're not aware of any of

20  them, any of the names of any of the

21  experts in this case?

22          A.    I am not.

23          Q.    So it's safe to assume that

24  you have not reviewed any other expert

Highly Confidential - Subject to Further Confidentiality Review

1    reports in this case?

2          A.    That is correct.  I've not

3    reviewed any other expert reports.

4                MS. BAIG:  I'm close to the

5          end, so why don't we take a

6          five-minute break.

7                THE WITNESS:  Okay.  Good.

8                THE VIDEOGRAPHER:  Off the

9          record at 3:06 p.m.

10               (Short break.)

11               THE VIDEOGRAPHER:  We are

12         back on the record at 3:18 p.m.

13   BY MS. BAIG:

14         Q.    Okay.  Has your testimony

15   ever been excluded from trial?

16         A.    My testimony has never been

17   excluded in the sense that I've never

18   been prohibited from testifying.  I

19   believe there have been cases where my

20   testimony has been curtailed such that a

21   particular topic, like professional

22   responsibility, was kind of preemptively

23   excluded as a topic for my testimony.

24               But to my knowledge, while

Highly Confidential - Subject to Further Confidentiality Review

1   my testimony has been curtailed on

2   occasion, I don't -- I do not -- I

3   believe there's never been a case where

4   my testimony has been completely

5   excluded.

6          Q.    You're familiar with

7   something called a Daubert motion?

8          A.    Yes, I am.

9          Q.    And so you've never been

10  Dauberted?  You've never been excluded as

11  a result of a Daubert motion?

12         A.    Well, not to mince words.

13  So I take it Dauberted means, the way I

14  see it is, someone makes a motion to

15  exclude the testimony.  And I believe

16  that has been done in my case.  I don't

17  believe a motion has ever been

18  successful.

19         Q.    Okay.  And what are the

20  cases that you recall where your

21  testimony has been curtailed?

22         A.    So I think that there was a

23  case a long time ago in Texas called

24  Seven Seas.  I don't remember what it was

Highly Confidential - Subject to Further Confidentiality Review

1    about.  But it had something to with

2    Colombia, the country Colombia, an oil

3    pipeline there and an investment in it.

4    And I was permitted to testify about

5    corporate governance matters, but I was

6    not permitted to testify about issues

7    related to professional responsibility of

8    lawyers, although my testimony has was

9    not being offered relative professional

10   responsibility of lawyers.  But the judge

11   said that I shouldn't -- that at trial

12   that I wouldn't be allowed to testify

13   about that.

14           Q.    Wait, wait.  Who was the

15   judge?

16           A.    I don't recall.

17           Q.    State or federal court?

18           A.    I don't remember if it was

19   state or -- I don't recall.

20           Q.    Where was it venued?

21           A.    The -- the law firm that

22   retained me was in Texas.  The economic

23   activity that gave rise to the legal

24   dispute was in Columbia.  I don't know.

Highly Confidential - Subject to Further Confidentiality Review

1 I don't know where -- what the

2 jurisdiction of the court was.

3        Q.    And do you remember either

4 of the parties' names?

5        A.    Yes.  One party was named 7

6 Seas, S-E-A-S, and the Number 7,

7 S-E-V-E-N.  I don't remember the other

8 parties.

9        Q.    And you were retained on

10 behalf of 7 Seas?

11        A.    I don't recall.

12        Q.    Any other cases that you

13 recall in which your testimony was

14 curtailed?

15        A.    There is a case on my list,

16 there's -- of testimony, the Robinson

17 case, and I believe that there were

18 limitations placed on my testimony in

19 that case, although I don't recall what

20 they were.  I think the case settled.  I

21 don't really -- I don't remember what the

22 limitations were.  I was -- my testimony

23 was not prohibited, but there were -- it

24 was -- there were certain limitations

1  placed on it.

2       Q.    Do you recall who the judge

3  was there?

4       A.    No.

5       Q.    That would be in Exhibit 2

6  of your --

7       A.    Yes, I believe it should be.

8       Q.    Okay.  What year?

9       A.    Oh, I don't know.  I can

10  look though.  I can tell you.  Hold on.

11       Q.    Oh.  2017, Robinson

12  Mechanical Contractors Inc. versus PTC

13  Group Holdings Corp.?

14       A.    Yes.

15       Q.    And you don't recall what

16  portion of your testimony was excluded or

17  what the basis was?

18       A.    Correct.

19       Q.    Any other cases where you

20  recall your testimony was excluded or

21  curtailed in any way?

22       A.    No.

23       Q.    After having been through

24  the list of cases that you recall having

1    been retained in, do you have an estimate

2    of what percentage of those cases you

3    were retained for the defense as opposed

4    to for the plaintiffs?

5           A.    In all of the cases?

6           Q.    Out of all of them?

7           A.    I would say in the

8    neighborhood of 50 percent.  Yeah, I

9    would -- I could not -- I could not

10   predict with any certainty whether I

11   testified more on behalf of plaintiffs or

12   more on behalf of defendants.  So I would

13   say it's -- my estimate would be roughly

14   in equipoise, all the -- the work that

15   I've done for government has generally

16   been on the plaintiff side, with the

17   exception of the Winstar cases, which is

18   on the defense side for the government.

19          Q.    Have you --

20          A.    So that would -- that would

21   be my best estimate.

22          Q.    Okay.  Have you ever

23   practiced law?

24          A.    No.

1          MS. BAIG:  Okay.  I have no

2     further questions.  Thank you for

3     your time.

4          MS. LEVY:  I just have a

5     quick follow-up.

6          Professor Macey --

7          THE VIDEOGRAPHER:  Counsel,

8     I'm sorry, can you put your

9     microphone on.

10                    -  -  -

11               EXAMINATION

12                    -  -  -

13  BY MS. LEVY:

14     Q.   For the last hour or so of

15  your deposition, counsel was asking you

16  about the bases of your opinions, the

17  specific bases for your opinions in your

18  report.

19          Are there any other bases

20  more general than the specifics you were

21  asked for your -- for the opinions that

22  you offered in your report?

23     A.   So generally speaking, in

24  addition to deriving support for my

1   opinions from the documents I reviewed

2   that are listed in Exhibit 3 of my

3   report, I also relied on my general

4   experience as an academic and teaching

5   and research and the information and

6   experience I've garnered for testifying

7   in an expert -- as an expert witness in

8   prior cases, serving on boards of

9   directors of public companies that have

10   affiliates and subsidiaries and other

11   general academic and -- and life

12   experience, as well as behavior that I've

13   observed in other cases, such as looting

14   a subsidiary, that I did not observe in

15   this case.

16       Q.   Are your opinions in your

17   expert report independent of each other

18   or related to each other?

19       A.   I would describe them as

20   related to each other. That they -- as I

21   mentioned in the early part of my report,

22   they are all based on a single kind of

23   overarching analytical premise that

24   companies are distinct entities and

Highly Confidential - Subject to Further Confidentiality Review

1    that -- that the concept of limited

2    liability reflects that principle.

3            Q.    Earlier in your deposition

4    you used the phrase "a dog that didn't

5    bark."  Can you explain further what you

6    mean by that?

7            A.    So essentially the -- the

8    idea is in many cases, in fact all of the

9    cases that I've worked on, involving

10   disregarding the corporate form, there

11   has been a -- an indication that in order

12   for the corporate veil to be pierced,

13   there should be some evidence of fraud,

14   or a significant wrongdoing.

15           So the dog that didn't bark

16   would be the absence of evidence of fraud

17   or significant wrongdoing.  The absence

18   of allegations of fraud or significant

19   wrongdoing have -- with respect to abuse

20   of the corporate form, would be sort of

21   the silence, the thing you don't hear,

22   the proverbial dog that didn't bark.

23           Q.    And is the -- the dog that

24   didn't bark, do you rely on absence of

Highly Confidential - Subject to Further Confidentiality Review

1    information in forming your opinions in

2    this case?

3         A.    Yes.

4              MS. LEVY:  Okay.  Thank you.

5    I don't have anything further.

6              MS. BAIG:  Nor do I.

7              THE VIDEOGRAPHER:  This

8    concludes today's deposition.  The

9    time is 3:27 p.m.  We are off the

10   record.

11             (Excused.)

12             (Deposition concluded at

13   approximately 3:27 p.m.)

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2                    CERTIFICATE
 3
 4
 5            I HEREBY CERTIFY that the
      witness was duly sworn by me and that the
 6    deposition is a true record of the
      testimony given by the witness.
 7
             It was requested before
 8    completion of the deposition that the
      witness, JONATHAN R. MACEY, have the
 9    opportunity to read and sign the
      deposition transcript.
10
11
12
      _____
      MICHELLE L. GRAY,
13    A Registered Professional
      Reporter, Certified Shorthand
14    Reporter, Certified Realtime
      Reporter and Notary Public
15    Dated:  May 30, 2019
16
17
18            (The foregoing certification
19    of this transcript does not apply to any
20    reproduction of the same by any means,
21    unless under the direct control and/or
22    supervision of the certifying reporter.)
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

1          INSTRUCTIONS TO WITNESS

2

3               Please read your deposition

4     over carefully and make any necessary

5     corrections.  You should state the reason

6     in the appropriate space on the errata

7     sheet for any corrections that are made.

8               After doing so, please sign

9     the errata sheet and date it.

10              You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14              It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
1              -   -   -   -   -   -

              E  R  R  A  T  A

2              -   -   -   -   -   -

3

4     PAGE   LINE   CHANGE

5     _____  _____   _____

6           REASON: _____

7     _____  _____   _____

8           REASON: _____

9     _____  _____   _____

10          REASON: _____

11    _____  _____   _____

12          REASON: _____

13    _____  _____   _____

14          REASON: _____

15    _____  _____   _____

16          REASON: _____

17    _____  _____   _____

18          REASON: _____

19    _____  _____   _____

20          REASON: _____

21    _____  _____   _____

22          REASON: _____

23    _____  _____   _____

24          REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

1

2           ACKNOWLEDGMENT OF DEPONENT

3

4           I,_____, do

5    hereby certify that I have read the

6    foregoing pages, 1 - 272, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16    JONATHAN R. MACEY                    DATE

17

18

19   Subscribed and sworn
     to before me this

20   _____ day of _____, 20____.

21   My commission expires:_____

22

     _____

23   Notary Public

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    LAWYER'S NOTES

 2      PAGE   LINE

 3      _____  _____   _____

 4      _____  _____   _____

 5      _____  _____   _____

 6      _____  _____   _____

 7      _____  _____   _____

 8      _____  _____   _____

 9      _____  _____   _____

10      _____  _____   _____

11      _____  _____   _____

12      _____  _____   _____

13      _____  _____   _____

14      _____  _____   _____

15      _____  _____   _____

16      _____  _____   _____

17      _____  _____   _____

18      _____  _____   _____

19      _____  _____   _____

20      _____  _____   _____

21      _____  _____   _____

22      _____  _____   _____

23      _____  _____   _____

24      _____  _____   _____
```