Highly Confidential - Subject to Further Confidentiality Review

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE NORTHERN DISTRICT OF OHIO
3   EASTERN DIVISION
4           - - -
5

6   IN RE:  NATIONAL        :  HON. DAN A.
    PRESCRIPTION OPIATE     :  POLSTER
    LITIGATION              :
7                           :
    APPLIES TO ALL CASES    :  NO.
8                           :  1:17-MD-2804
                            :
9

        - HIGHLY CONFIDENTIAL -
10
    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11

            - - -
12
        March 15, 2019
13

            - - -
14

15          Videotaped deposition of
    STEPHEN C. MACRIDES taken pursuant to
16  notice, was held at the offices of
    McCarter & English, LLP, 1600 Market
17  Street, Philadelphia, Pennsylvania,
    beginning at 9:05 a.m., on the above
18  date, before Michelle L. Gray, a
    Registered Professional Reporter,
19  Certified Shorthand Reporter, Certified
    Realtime Reporter, and Notary Public.
20

            - - -
21

22      GOLKOW LITIGATION SERVICES
    877.370.3377 ph | 917.591.5672 fax
23          deps@golkow.com
24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2

      SEEGER WEISS, LLP
 3    BY:  DAVID R. BUCHANAN, ESQ.
      77 Water Street
 4    New York, New York 10005
      (212) 584-0700
 5    Dbuchanan@seegerweiss.com
 6    Representing the Plaintiffs
 7    BRANSTETTER, STRANCH & JENNINGS, PLLC
      BY:  MICHAEL G. STEWART, ESQ.
 8    223 Rosa L. Parks Avenue
      Suite 200
 9    Nashville, Tennessee 37203
      (615) 254-8801
10    Mstewart@bsjfirm.com
      Representing the Tennessee Plaintiffs
11
12    McCARTER & ENGLISH LLP
      BY:  AMY M. VANNI, ESQ.
13    1600 Market Street, Suite 3900
      Philadelphia, Pennsylvania 19103
14    (215) 979-3848
      avanni@mccarter.com
15
               - and -
16
      McCARTER & ENGLISH LLP
17    BY:  HAYLEY J. REESE, ESQ.
      Renaissance Centre
18    405 N. King Street, 8th Floor
      Wilmington, Delaware 19801
19    (302) 227-6308
      hreese@mccarter.com
20    Representing the Defendants, Endo Health
      Solutions; Endo Pharmaceuticals, Inc.;
21    Par Pharmaceutical Companies, Inc. f/k/a
      Par Pharmaceutical Holdings, Inc. and the
22    Witness
23
24
```

```
 1   APPEARANCES:  (Cont'd.)

 2

 3   PIETRAGALLO GORDON ALFANO BOSICK &
     RASPANTI, LLP
 4   BY:  ALEXANDER M. OWENS, ESQ.
     1818 Market Street, Suite 3402
 5   Philadelphia, Pennsylvania 19103
     (215) 320-6200
 6   amo@pietragallo.com
     Representing the Defendant, Cardinal
 7   Health

 8

     JONES DAY
 9   BY:  ADAM HOLLINGSWORTH, ESQ.
     North Point
10   901 Lakeside Avenue
     Cleveland, Ohio  44114
11   (216) 586-3939
     ahollingsworth@jonesday.com
12   Representing the Defendant, Walmart

13

     TELEPHONIC/STREAMING APPEARANCES:
14

15   BRANSTETTER, STRANCH & JENNINGS, PLLC
     BY:  JOE P. LENISKI, JR., ESQ.
16   223 Rosa L. Parks Avenue
     Suite 200
17   Nashville, Tennessee 37203
     (615) 254-8801
18   Joeyl@bsjfirm.com
     Representing the Tennessee Plaintiffs
19

20   JACKSON KELLY, PLLC
     BY:  JON L. ANDERSON, ESQ.
21   500 Lee Street East
     Charleston, West Virginia 25301
22   (304) 340-1288
     Jlanderson@jacksonkelly.com
23   Representing the Defendant,
     AmerisourceBergen
24
```

```
 1   TELEPHONIC/STREAMING APPEARANCES:
     (Cont'd.)
 2
 3   BAILEY WYANT PLLC
     BY:  MICHAEL W. TAYLOR, ESQ.
 4   500 Virginia Street East, Suite 600
     Charleston, West Virginia 25301
 5   (304) 345-4222
     Mtaylor@baileywyant.com
 6   Representing the Defendant, West
     Virginia Board of Pharmacy
 7
 8   ULMER BERNE, LLP
     BY:  SARAH MILLER BENOIT, ESQ.
 9   65 East State Street
     Columbus, OH 43215
10   (614) 229-0016
     Sbenoit@ulmer.com
11   Representing the Defendant, Gemini
     Laboratories, Inc.
12
13   ARNOLD & PORTER KAYE SCHOLER, LLP
     BY:  JOANNA PERSIO ESQ.
14        JOSHUA M. DAVIS, ESQ.
     601 Massachusetts Avenue, NW
15   Washington, D.C. 20001
     (202) 942-5866
16   Joanna.persio@arnoldporter.com
     Joshua.davis@arnoldporter.com
17   Representing the Defendants, Endo
     Health Solutions; Endo Pharmaceuticals,
18   Inc.; Par Pharmaceutical Companies, Inc.,
     f/k/a Par Pharmaceutical Holdings, Inc.
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Cont'd.)

 2

 3

      ALSO PRESENT:

 4

 5    Elina Rakhlin - Law Clerk
      Charles Bachmann - Paralegal
 6    (Seeger Weiss)

 7

      Jobina Jones-McDonnell, Esq.
 8    (Endo)

 9

      VIDEOTAPE TECHNICIAN:

10

      Devyn Mulholland

11

12

      LITIGATION TECHNICIAN

13

      Bradley Smith

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          -   -   -

 2                       I N D E X

 3                          -   -   -

 4

 5

      Testimony of:

 6

                              STEPHEN C. MACRIDES

 7

 8         By Mr. Buchanan                    21

 9         By Mr. Stewart                    555

10

11

12

                              -   -   -

13

                       E X H I B I T S

14

                              -   -   -

15

16   NO.              DESCRIPTION              PAGE

17   Endo
     Macrides-1   Curriculum Vitae        21
18                Stephen C. Macrides

19   Endo
     Macrides-2   Notice of Deposition    28
20

     Endo
21   Macrides-3   E-mail Thread           29
                  3/12/19
22                Subject, Opiates
                  Macrides' Topics
23                (No Bates)

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -
 2          E X H I B I T S  (Cont'd.)
 3                    -   -   -
 4
 5   NO.                DESCRIPTION              PAGE
 6   Endo
     Macrides-4    Graph                        44
 7                 1999-2017 Endo
                   Total Pills/Units
 8                 Shipped
                   E1811.1
 9
     Endo
10   Macrides-5    Graph                        44
                   Par Total Pills/
11                 Units
                   E1809.1
12
     Endo
13   Macrides-6    QT Total Pills/              44
                   Unit Counts
14                 E1810.1
15   Endo
     Macrides-7    Graphs of Maps               70
16                 Estimated Age-
                   Adjusted Death
17                 Rate Per 100,000
                   1999-2016
18                 E0772.1
     Endo
19   Macrides-8    E-mail, 10/2/03              119
                   Subject, Revised
20                 DEA Meeting Minutes
                   ENDO-OPIOID_MDL-
21                 01706006-11
                   E0550.1
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -  -  -
 2           E X H I B I T S  (Cont'd.)
 3                      -  -  -
 4
 5   NO.              DESCRIPTION              PAGE
 6   Endo
     Macrides-9    E-mail, 7/14/03        121
 7                 Subject, Action
                   Plan to Prevent
 8                 Diversion
                   ENDO-OPIOID_MDL-
 9                 01692316-21
                   E0548.1
10
     Endo
11   Macrides-10   Exhibit A to Par's     146
                   Supplemental
12                 Interrogatory Responses
                   E1848.1
13                 (No Bates)
14   Endo
     Macrides-11   E-mail Thread          159
15                 5/13/10
                   Subject, Review Report
16                 PAR_OPIOID_MDL_
                   0001053153-68
17                 E1056.1
18   Endo
     Macrides-12   E-mail, 6/21/12        177
19                 Subject, Suspicious
                   Order Monitoring
20                 (SOM)
                   PAR_OPIOID_MDL_
21                 0001058273-79
                   E1839.1
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       -   -   -
 2             E X H I B I T S  (Cont'd.)
 3                       -   -   -
 4
 5    NO.                DESCRIPTION              PAGE
 6    Endo
      Macrides-13   Par SOP                      193
 7                  SO0002.0
                    PAR_OPIOID_MDL_
 8                  0001410508-13
                    E1841.1
 9

10    Endo
      Macrides-14   E-mail Thread                210
                    7/15/15
11                  Subject, Buzzeo
                    PDMA DEA Audit
12                  Report 4/28-30/15
                    PAR_OPIOID_MDL_
13                  0001024034-79
                    E1072.1
14

15    Endo
      Macrides-15   E-mail Thread                241
                    10/25/16
16                  Subject, SOMs
                    PAR_OPIOID_MDL_
17                  0002161313-34
                    E1840.1
18

19    Endo
      Macrides-16   Summary Chart                254
                    To Exhibit 6
20                  E1847.1
                    (No Bates)
21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                         -   -   -
 4
 5     NO.              DESCRIPTION              PAGE
 6     Endo
       Macrides-17   E-mail, 5/27/10            259
 7                   100507 Qualitest
                     Overview for
 8                   BusDev
                     PAR_OPIOID_MDL_
 9                   0001593258-75
                     E1813.1
10
       Endo
11     Macrides-18   Effective Controls         295
                     Against Diversion
12                   Of Controlled
                     Substances
13                   Meeting with Vintage
                     Pharma 3/6/13
14                   PAR_OPIOID_MDL_
                     0002016179-89
15                   E1117.1
16     Endo
       Macrides-19   E-mail Thread              316
17                   3/7/13
                     Subject, Charts
18                   From DEA Meeting
                     ENDO-OPIOID_MDL-
19                   02975958-18
                     E0575.1
20
       Endo
21     Macrides-20   E-mail, 4/12/13            324
                     Subject, Attached
22                   Image
                     PAR_OPIOID_MDL_
23                   0001647888-91
                     E1824.1
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          -   -   -
 2               E X H I B I T S  (Cont'd.)
 3                          -   -   -
 4
 5    NO.                 DESCRIPTION              PAGE
 6    Endo
      Macrides-21    E-mail Thread             361
 7                   3/13/13
                     Subject, Slide Deck
 8                   For this Morning's
                     Meeting
 9                   PAR_OPIOID_MDL_
                     0000365381
10                   E0581.1
11    Endo
      Macrides-22    E-mail, 1/22/17           372
12                   SOM 101.pptx
                     PAR_OPIOID_MDL_
13                   0001355348-49
                     E0589.1
14
      Endo
15    Macrides-23    E-mail Thread             387
                     9/4/08
16                   Subject, Qualitest
                     08-2008
17                   PAR_OPIOID_MDL_
                     0000076009-11
18                   E1051.1
19    Endo
      Macrides-24    E-mail Thread             412
20                   12/1/08
                     Subject, SOM Intro
21                   Call
                     PAR_OPIOID_MDL_
22                   0001656118-21
                     E1790.1
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       -   -   -
 2             E X H I B I T S  (Cont'd.)
 3                       -   -   -
 4
 5    NO.             DESCRIPTION              PAGE
 6    Endo
      Macrides-25   E-mail, 7/2/09            432
 7                  Subject, Reports
                    From Recent Reviews
 8                  PAR_OPIOID_MDL_
                    0000398174-91
 9                  E1037.1
10    Endo
      Macrides-26   E-mail Thread            444
11                  11/16/11
                    Subject, DEA
12                  Inspection Wrap-Up
                    In Charlotte
13                  PAR_OPIOID_MDL_
                    0000390035-37
14                  E0567.1
15    Endo
      Macrides-27   (Skipped)
16
      Endo
17    Macrides-28   E-mail Thread            454
                    3/22/13
18                  Subject, Composite
                    Risk Assessment
19                  PAR_OPIOID_MDL_
                    0000035162-64
20                  E0573.1
21    Endo
      Macrides-29   Summary of Meeting       457
22                  With DEA Quota Office
                    PAR_OPIOID_MDL_
23                  0000369261-63
                    E1082.1
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -
 2             E X H I B I T S  (Cont'd.)
 3                      -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    Endo
      Macrides-30  (Skipped)
 7
      Endo
 8    Macrides-31  E-mail, 2/9/13        468
                   Subject, DEA Compliance
 9                 Initiatives Presentation
                   PAR_OPIOID_MDL_
10                 0000034190
                   0001424664-67
11                 E1052.1
12    Endo
      Macrides-32  E-mail, 2/9/13        478
13                 Subject, DEA
                   Compliance Initiatives
14                 Presentation
                   PAR_OPIOID_MDL_
15                 0000034190-15
                   E107.1
16
      Endo
17    Macrides-33  E-mail, 1/17/14       487
                   Subject, Advanced
18                 Pharmacy
                   PAR_OPIOID_MDL_
19                 0000020402-19
                   E1137.1
20
      Endo
21    Macrides-34  E-mail, 12/30/13      505
                   Subject, Big Tex
22                 Pharmacy
                   PAR_OPIOID_MDL_
23                 0000020216-19
                   E1139.1
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                      -   -   -
 4
 5   NO.             DESCRIPTION              PAGE
 6   Endo
     Macrides-35   E-mail, 12/31/13      509
 7                 Subject, BZ Pharmacy
                   PAR_OPIOID_MDL_
 8                 0000020254-57
                   E1138.1
 9
     Endo
10   Macrides-36   Site Visit Report     516
                   PAR_OPIOID_MDL_
11                 0001599706
                   E1087.1
12
     Endo
13   Macrides-37   E-mail, 1/16/15       520
                   Subject, SOMs Customers
14                 PAR_OPIOID_MDL_
                   0000017143
15                 E1151.1
16   Endo
     Macrides-38   (Skipped)
17
     Endo
18   Macrides-39   (Skipped)
19   Endo
     Macrides-40   E-mail Thread         532
20                 5/8/13
                   Subject, TopRx
21                 Pharmacy, Revocation
                   Of Registration
22                 PAR_OPIOID_MDL_
                   0001648312-56
23                 E1868.1
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         -   -   -
 2               E X H I B I T S  (Cont'd.)
 3                         -   -   -
 4
 5    NO.                DESCRIPTION              PAGE
 6    Endo
      Macrides-41  Suspicious Orders      530
 7                 And Customers Reported
                   To DEA by Par
 8                 (No Bates)
                   E1788.1
 9
      Endo
10    Macrides-42  Supply Chain &         476
                   DEA Compliance
11                 ENDO_OPIOID_MDL-
                   02278909-17
12                 E0391.1
13    Endo
      Macrides-43  (Skipped)
14
      Endo
15    Macrides-44  Transactions           539
                   Pended and Cleared
16                 E1869.1
17    Endo
      Macrides-45  Cross Notice           555
18                 Tennessee
19    Endo
      Macrides-46  E-mail Thread          608
20                 5/9/14
                   Subject, SOM
21                 Summary
                   ENDO_OPIOID_MDL-
22                 05948280-85
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -

 2               E X H I B I T S  (Cont'd.)

 3                        -   -   -

 4

 5    NO.              DESCRIPTION              PAGE

 6    Endo
      Macrides-47   E-mail Thread          612
 7                  8/31/17
                    Subject, Privileged
 8                  & Confidential
                    Draft Response
 9                  ENDO_OPIOID_MDL-
                    06235529-37
10

      Endo
11    Macrides-48   E-mail Thread          613
                    7/11/12
12                  Subject, American
                    Pain
13                  ENDO_OPIOID_MDL-
                    06211237-45
14

      Endo
15    Macrides-49   E-mail Thread          627
                    8/9/12
16                  Subject, UPS's
                    Know Your Customer
17                  Program
                    ENDO_OPIOID_MDL-
18                  05968927-29
19    Endo
      Macrides-50   E-mail Thread          629
20                  10/16/13
                    Subject, DEA
21                  Presentation Review
                    EPI001763070
22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         -  -  -
 2              E X H I B I T S  (Cont'd.)
 3                         -  -  -
 4
 5     NO.              DESCRIPTION              PAGE
 6     Endo
       Macrides-51    Supplemental             652
 7                    Declaration of
                      Mark Collins
 8
       Endo
 9     Macrides-52    E-mail Thread            653
                      10/29/13
10                    Subject, Opana
                      ER Risk Management
11                    ENDO_OPIOID_MDL-
                      01398417-20
12
       Endo
13     Macrides-53    E-mail Thread            659
                      2/1/17
14                    Subject, Opana ER
                      Risk Management
15                    ENDO_OPIOID_MDL-
                      01239749-53
16
       Endo
17     Macrides-54    E-mail Thread            667
                      4/1/14
18                    Subject, C-II
                      Orders Handled by
19                    Memphis
                      ENDO_OPIOID_MDL-
20                    05962559-63
21     Endo
       Macrides-55    Fueling An               676
22                    Epidemic
                      Report 3
23                    HSGAC Minority
                      Staff Report
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -

 2          E X H I B I T S  (Cont'd.)

 3                    -  -  -

 4

 5    NO.           DESCRIPTION            PAGE

 6    Endo

      Macrides-56  E-mail, 10/3/16        680

 7                 Subject, Pilot

                   Doctors Pharmacy

 8                 Data

                   ENDO_OPIOID_MDL-

 9                 01905809

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -

 2           DEPOSITION SUPPORT INDEX

 3                      -   -   -

 4

 5    Direction to Witness Not to Answer

 6    PAGE    LINE
      None.
 7

 8    Request for Production of Documents

 9    PAGE    LINE
      None.
10

11    Stipulations

12    PAGE    LINE
      None.
13

      Questions Marked
14

      PAGE    LINE
15    None.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                  -   -   -
2            THE VIDEOGRAPHER:  We are
3      now on the record.  My name is
4      Devyn Mulholland.  I'm a
5      videographer for Golkow Litigation
6      Services.
7            Today's date is March 15,
8      2019.  The time is 9:05 a.m.
9            This video deposition is
10     being held in Philadelphia,
11     Pennsylvania, in the matter of
12     National Prescription Opiate
13     Litigation.
14           The deponent is Steven
15     Macrides.
16           Counsel will be noted on the
17     stenographic record.
18           The court reporter is
19     Michelle Gray and will now swear
20     in the witness.
21                  -   -   -
22           ... STEPHEN C. MACRIDES,
23     having been first duly sworn, was
24     examined and testified as follows:
```

Highly Confidential - Subject to Further Confidentiality Review

1          - - -

2                    EXAMINATION

3          - - -

4     BY MR. BUCHANAN:

5          Q.    Good morning, Mr. Macrides.

6     How are you today?

7          A.    Good.   How are you?

8          Q.    Good.   Welcome to your

9     deposition.   Could you state your full

10    name for the record, please?

11         A.    Steven Christopher Macrides.

12         Q.    Okay.   I understand that you

13    are a current employee of Endo

14    International; is that correct?

15         A.    I am.

16         Q.    Okay.   Let me pass you a

17    copy of your CV.

18              (Document marked for

19              identification as Exhibit

20              Endo-Macrides-1.)

21    BY MR. BUCHANAN:

22         Q.    It's been handed to me by

23    your counsel.   I assume you saw it before

24    you came in today.

1    A.    I have.

2    Q.    Is this your current CV,

3  current form of your CV?

4    A.    It's the most updated

5  version, yes.

6    Q.    Okay.  And I put that

7  qualifier on, because I understand that

8  it hasn't been updated in a few months,

9  years, how long?

10    A.    I haven't updated this

11  probably in a year, year and-a-half.

12    Q.    Okay.  I see the last most

13  recent updated entry at the bottom of

14  page one, vice president global supply

15  chain 6-2017 to the present for Endo

16  International, correct?

17    A.    Right.  That's not my

18  current title, however.

19    Q.    Okay.  What is your current

20  title?

21    A.    My current title is senior

22  vice president of global supply chain.

23    Q.    Okay.  And we're not going

24  to have a copy of this for the video, so

Highly Confidential - Subject to Further Confidentiality Review

1    can I have the Elmo, please.

2              All right.  To orient us

3    here, sir, this is Exhibit 1 to your

4    deposition.  This is the most current

5    version of your CV, correct?

6         A.    Yes.

7         Q.    Okay.  And you corrected or

8    clarified orally this entry at the

9    bottom, or at least provided a more

10   current title.  It's senior vice

11   president; is that right?

12        A.    That's correct.

13        Q.    Same division or function,

14   global supply chain?

15        A.    Global supply chain.

16        Q.    Gotcha.

17              Okay.  You have been with

18   Endo, as I understand it, for a few

19   years; is that right?

20        A.    Since 2012.

21        Q.    Okay.  And senior director

22   finance enterprise supply chain 2012 to

23   2015; is that right?

24        A.    That's correct.

1          Q.     Okay.  Moved up and became a

2    vice president in 2015, correct?

3          A.     Correct.

4          Q.     And then that was vice

5    president supply chain generics from

6    February 2015 to 2017, correct?

7          A.     Correct.

8          Q.     And then in 2017, you became

9    the vice president of global supply

10   chain, so you took responsibility, I take

11   it for both branded and nonbranded

12   products; is that right?

13              MS. VANNI:  Object to form.

14              THE WITNESS:  At that time I

15         had some responsibility for

16         branded and generics, yes.

17   BY MR. BUCHANAN:

18         Q.     Okay.  So prior to 2017,

19   from 2015 to 2017, to be more specific,

20   you were responsible for the supply chain

21   for generics, correct?

22         A.     Correct.

23         Q.     Okay.  Have you had your

24   deposition taken before?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Once.

2        Q.    And what was the context on

3   that?

4        A.    It was a litigation related

5   to a previous company that I worked for.

6        Q.    Okay.  How many years ago?

7        A.    That would have been in --

8   prior to 2000.  I don't remember the

9   exact year.

10       Q.    You understand, sir, your

11  deposition is being taken today by

12  counsel for various municipalities,

13  counties, states for the MDL and

14  litigation against manufacturers and

15  distributors of opioid products, correct?

16       A.    I understand.

17       Q.    Okay.  In connection with

18  your prior deposition, was your prior

19  deposition in an action that related in

20  any way to opioid products?

21       A.    No.

22       Q.    Okay.  Did it relate to drug

23  products?

24       A.    No.

1   Q.   Okay.  Was it a personal

2   matter?

3   A.   It was a -- how do I

4   describe it?  It was a matter related to

5   diversion of funds.  That's the best way

6   I can describe it.

7   Q.   Okay.  A claim involving a

8   government entity or not?

9   A.   No, it was a claim involving

10  a contractor and a CEO who had been

11  involved in some redirection of funds for

12  personal use.

13  Q.   Okay.  And what entity were

14  you working for at that time?

15  A.   I was working for a company

16  called Astra USA.

17  Q.   Okay.  So you have been an

18  employee of Endo or Endo affiliates since

19  2012?

20  A.   Correct.

21  Q.   Okay.  And current home base

22  for you is here in the states or

23  overseas?

24  A.   I'm an ex-pat.  So I -- my

1   job technically is based in Dublin,

2   Ireland.

3          Q.    Okay.  So let's -- when we

4   see here employment history 2015 to the

5   present.  Is the entity that you work for

6   still Endo International PLC?

7          A.    It is.

8          Q.    Okay.  You were working for

9   Endo International PLC, no longer at the

10  Malvern location, but now in an ex-US

11  location?

12         A.    My office is in Dublin,

13  Ireland.

14         Q.    Gotcha.  And how long has

15  that been the case?

16         A.    About two years.

17         Q.    Okay.  You understand, sir,

18  that you've been called to testify

19  obviously about information that you may

20  have personally.  But you've also been

21  designated to speak on behalf of the

22  company on certain topics, correct?

23         A.    I understand that.

24                MR. BUCHANAN:  Okay.  Can I

1     have a copy of the notice and the

2     letter.

3          (Document marked for

4     identification as Exhibit

5     Endo-Macrides-2.)

6   BY MR. BUCHANAN:

7     Q.     Passing you, sir, what's

8   been marked as Exhibit 2 to your

9   deposition.  It's a document entitled

10  "Notice of Deposition of Stephen

11  Macrides."  That's for here at this

12  location today.

13          Do you see that?

14     A.    I see it.

15     Q.     You see that it was a notice

16  that was issued to the entities.  And

17  you've been designated to testify on

18  certain particular topics.  Do you see

19  those topics?  30, 31, 32, 33, and 35?

20     A.    I see that.

21     Q.     Okay.  I take it that you've

22  had a chance to see this notice before,

23  sir?

24     A.    Yes, I've seen this notice.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    I take it that you've had a

2   chance to see the topics?

3      A.    I've seen the topics.

4      Q.    Okay.  Passing you what we

5   are marking as Exhibit 3.

6           (Document marked for

7           identification as Exhibit

8           Endo-Macrides-3.)

9   BY MR. BUCHANAN:

10     Q.    And this is kind of the

11  inside baseball, the way this case is

12  proceeding.

13          It's an e-mail thread

14  between --

15          MS. VANNI:  Thank you.

16  BY MR. BUCHANAN:

17     Q.    -- counsel for your employer

18  and related entities, and counsel for

19  plaintiffs concerning those topics.

20          Have you seen this

21  correspondence?  Feel free to flip the

22  pages.

23     A.    I haven't actually seen this

24  document.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Let -- let me direct your

2    attention, sir, to, for the record,

3    Exhibit 3 is an exchange among

4    Ms. Scullion of my office and Mr. Davis

5    and others, counsel noted in the room,

6    related to the deposition today.

7              Do you see the headline,

8    subject Re, opiates Macrides topics?

9        A.    I see that.

10       Q.    Okay.  And I understand you

11   may not have seen the topics in this

12   form, you may have seen them in some

13   other digested form.  But I just want to

14   confirm that we are on the same page

15   before we get rolling today, okay.

16             Let's turn to Page 3, turn

17   to Page 3.

18             And we have at the bottom of

19   the page it says, "For ease of reference

20   we set forth here our now modestly

21   revised agreements on topics to which

22   Mr. Macrides will be prepared to testify

23   under Rule 30(b)(6) as a corporate

24   representative for Endo/Par."

Highly Confidential - Subject to Further Confidentiality Review

1            Do you see that?

2       A.    I see it.

3       Q.    Do you see the statement for

4  Topic 30?

5       A.    I see it.

6       Q.    Okay.  I'll just give you a

7  moment to read that.  I'll read it while

8  you read it to yourself.  "For Endo and

9  Par, including Qualitest, for all periods

10  during which any Class II opioids were

11  sold, an explanation of the applicable

12  policies, procedures, records and systems

13  to investigate, report or halt actual or

14  suspected suspicious orders, as well as

15  the substance of, A, the reasons for

16  material changes to the same; B, the

17  effectiveness of the same; and C, reports

18  to the DEA or Ohio authorities with the

19  understanding that the witness will not

20  have committed to memory every report."

21            Did I read that correctly?

22       A.    You did.

23       Q.    Did you have that

24  understanding, sir, that you were to be

Highly Confidential - Subject to Further Confidentiality Review

1    prepared to talk about that today?

2            A.    I understand.

3            Q.    Okay.

4                  MS. VANNI:  Counsel, just

5            note for the record that there is

6            a time limitation that we worked

7            out with counsel, Ms. Scullion,

8            with respect to Qualitest

9            Pharmaceuticals and the purchase,

10           and this witness is prepared to

11           testify as far back as

12           October 31st, 2007.

13                 MR. BUCHANAN:  Yeah, I --

14           there's -- there's some debate

15           about that point, and we'll

16           clarify that as we proceed today.

17                 But I'll -- I'll note that,

18           and the e-mail also notes a

19           clarifying point on that.  And

20           we'll get to that in a moment.

21   BY MR. BUCHANAN:

22           Q.    For Par, including

23   Qualitest, for all periods during which

24   any Class II opioids were sold an

1    explanation of the applicable policies,

2    procedures, records and systems to

3    investigate, report or halt actual or

4    suspected abuse or diversion, as well as

5    the substance of, A, the reasons for

6    material changes to the same; B, the

7    effectiveness of the same; and C, reports

8    to the DEA or Ohio authorities with the

9    understanding the witness will not have

10   committed to memory every report."

11              Did I read that correctly?

12        A.    Yes.

13        Q.    And you have that

14   understanding --

15        A.    I understand.

16        Q.    -- to be prepared to testify

17   to that today?

18        A.    I understand.

19        Q.    Okay.  Please take a look at

20   Topic 31.  I don't think I'm going to

21   litter the record with a reading of each

22   of these.

23              I'd like you to read

24   Topic 31 to yourself.  It's displayed on

1    the screen so there's no dispute as to

2    what we're referring to.

3                There are two bullets there,

4    one for Endo and Par, and one for Par

5    separately.  Just let me know after

6    you've read it.

7          A.    I've read it.

8          Q.    Okay.  Are you prepared to

9    testify on those topics today, sir?

10          A.    I am.

11          Q.    Okay.  Topic 32.  Please

12    read those two bullets.  They are now

13    displayed on the screen.  One for Endo

14    and Par.  One for just Par including

15    Qualitest.

16          A.    I've read it.

17          Q.    Okay.  You had that

18    understanding before you came in today,

19    sir, you were going to be providing

20    testimony on those topics?

21          A.    I understand.

22          Q.    Okay.  And you are prepared

23    to do so?

24          A.    I am.

1      Q.    Okay.  Topic 33.  Could you

2   read that please?

3      A.    I've read it.

4      Q.    Okay.  Before you came in

5   today you had the understanding you were

6   going to be providing testimony on that

7   topic?

8      A.    I understand.

9      Q.    Are you prepared to do so?

10     A.    I am.

11     Q.    Okay.  And Topic 35.  Could

12  you read that, please?

13     A.    I read it.

14     Q.    Okay.  Are you prepared to

15  provide testimony on that topic?

16     A.    I am.

17     Q.    And you had that

18  understanding before you came in today?

19     A.    Yes.

20     Q.    Okay.  Good.  All right.  A

21  number of the topics, sir, that are --

22  are listed, or a number of the subject

23  matters that are touched on concern

24  issues related to, I'll say, suspicious

Highly Confidential - Subject to Further Confidentiality Review

1    order monitoring, diversion, abuse, you

2    saw those in your re-reading of the

3    topics?

4         A.    I did.

5         Q.    Okay.  Have you held a DEA

6    compliance function for Endo, Par, or

7    Qualitest?

8         A.    The DEA compliance function

9    reports to me.

10        Q.    So my question was, have you

11   held a DEA compliance function in your

12   time at Endo, Par, or Qualitest?

13        A.    When you say held, I'm not

14   sure exactly what you mean by held.

15        Q.    Okay.  I looked at your

16   CV --

17        A.    Have -- have I been the head

18   of DEA compliance?

19        Q.    Yeah.

20        A.    No, I have not been the head

21   of DEA compliance.

22        Q.    Have you been somebody who

23   has been kind of hands-on in ensuring DEA

24   compliance?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I've not been hands --

2                MS. VANNI:  Object to form.

3                THE WITNESS:  I've not been

4     a hands-on DEA compliance person.

5     BY MR. BUCHANAN:

6          Q.    Okay.  So if we looked at an

7     org chart and we looked at DEA

8     compliance, for example, there would be a

9     head of DEA compliance, right?

10         A.    That's correct.

11         Q.    And there may not have been

12    a head of DEA compliance at various

13    points in time.  But there currently is,

14    correct?

15                MS. VANNI:  Objection.

16                THE WITNESS:  There is.

17    BY MR. BUCHANAN:

18         Q.    Okay.  And if we looked

19    underneath of the -- the role of DEA

20    compliance, we would see names of other

21    people that fulfilled some responsibility

22    within that function, correct?

23         A.    You would.

24                MS. VANNI:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. BUCHANAN:

2       Q.    Would you fall either in the

3  head or underneath that kind of pyramid

4  of structure for DEA compliance?

5       A.    The head of DEA compliance

6  would report to me --

7       Q.    Okay.  So --

8       A.    -- as part of my overall

9  responsibility.

10       Q.    So the answer to my question

11  would be you would not be within that

12  umbrella, you would be above that

13  umbrella?

14       A.    That's correct.

15       Q.    Okay.  So you're saying that

16  the person responsible for that was

17  responsible to report to you?

18       A.    Correct.

19       Q.    Okay.  Have you been

20  responsible yourself for suspicious order

21  monitoring?

22            MS. VANNI:  Object to form.

23            THE WITNESS:  Not directly.

24  BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Have you been

2    responsible yourself for ensuring there

3    were effective controls against

4    diversion?

5         A.    Yes.

6         Q.    In what sense, sir?

7         A.    In the sense that the DEA

8    compliance function as part of my overall

9    responsibilities as a senior vice

10    president of global supply chain.

11         Q.    Okay.  And that became the

12    case at what point in time?

13         A.    The DEA compliance function

14    reported to me in early 2015.

15         Q.    Okay.

16         A.    I don't remember the exact

17    date.

18         Q.    Okay.  So -- so let's --

19    let's do a little history so we can kind

20    of orient ourselves with these companies.

21    Because the companies merged and had

22    prior histories prior to the mergers,

23    correct?

24         A.    That's right.

1          Q.    Okay.  Endo is the result of

2    a few executives from DuPont, Merck

3    leaving in 1997, forming a new entity

4    around that time, correct?

5          A.    That's my understanding.

6          Q.    And Endo has been in the

7    business of the manufacture and sale and

8    distribution of opioids since about 1997,

9    fair?

10         A.    That's my understanding.

11               MS. VANNI:  Just for the

12         record, you're asking him these

13         questions in his personal

14         capacity, based on his personal

15         understanding or are you asking

16         his 30(b)(6)?

17               MR. BUCHANAN:  I think I

18         need to understand how he could do

19         his job as a 30(b)(6).  So I

20         mean -- on the 30(b)(6) topics.

21         So we're trying to elicit

22         corporate testimony.

23    BY MR. BUCHANAN:

24         Q.    Prior to the merger with

1   Endo in 2010, Qualitest was a standalone

2   entity, correct?

3          A.    That's my understanding.

4          Q.    Qualitest was in the

5   business of the manufacture and sale of

6   opioid products prior to 2010, correct?

7          A.    Opioids and other

8   medications.

9          Q.    Qualitest has a history

10  going back to the '80s, correct?

11              MS. VANNI:  Object to form.

12              THE WITNESS:  It has a long

13      history.  I'm not sure exactly

14      when they began.

15  BY MR. BUCHANAN:

16         Q.    Do you have that knowledge,

17  that Qualitest has been in the business

18  of manufacturing, distributing opioids

19  for dozens of years?

20         A.    I have an understanding that

21  Qualitest has been in the business of

22  manufacturing and distributing opioids,

23  yes.  Through some time period.

24         Q.    Prior to the 2000s?

1       A.    Prior to 2000s, yes.

2       Q.    Okay.  Fine.  Without

3   fussing on a year, prior to the 2000s.

4   Okay.

5             All right.  Par is a third

6   entity and prior to its, I'll say, merger

7   with the Endo entities in 2015, was also

8   in the business of the manufacture and

9   distribution and the sale of opioids,

10  correct?

11      A.    That's my understanding.

12      Q.    Okay.  It's got a history of

13  making opioids for years prior to the

14  merger with the Endo/Qualitest entities,

15  correct?

16            MS. VANNI:  Object to form.

17            THE WITNESS:  It has a

18        history.  I don't know the exact

19        details of the history.  I'm much

20        more familiar, given that I was an

21        Endo employee.  But I do

22        understand that Par was in that

23        business of distributing and

24        manufacturing opioids.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2          Q.    You understand that you've

3    been designated to testify --

4          A.    I understand.

5          Q.    Let me just finish the

6    question.  And I realize it's been a

7    while since you've last been deposed.

8    But just so we are not stepping on each

9    other with our questions and answers.

10          You understand that you've

11   been designated to testify about systems,

12   procedures, the effectiveness of those

13   procedures that Par, as an entity,

14   maintained or had with regard to opioids,

15   correct?

16         A.    I understand that.

17         Q.    Okay.  You understand that

18   Par was in the business of manufacturing,

19   distributing, and selling opioids prior

20   to 2015, correct?

21         A.    I do.

22         Q.    Okay.  And you are prepared

23   to talk about that today, correct?

24         A.    I am.

1     MR. BUCHANAN:  Can I have

2     E-1811, E-1809, and E-1810.  How

3     are they being numbered?

4          (Document marked for

5     identification as Exhibit

6     Endo-Macrides-4.)

7          (Document marked for

8     identification as Exhibit

9     Endo-Macrides-5.)

10         (Document marked for

11    identification as Exhibit

12    Endo-Macrides-6.)

13  BY MR. BUCHANAN:

14    Q.   Let's start with Endo just

15  to orient ourselves a little, sir.  Just

16  passing you what we're marking as

17  Exhibit 4 to your deposition.

18         MR. BUCHANAN:  Can you

19    please pull up E-1811.

20         Can you pull up the

21    left-hand column.

22  BY MR. BUCHANAN:

23    Q.   Sir, on the screen and

24  before you -- it might be easier to read

Highly Confidential - Subject to Further Confidentiality Review

1    on the screen.  You're welcome certainly

2    to try it on the printout.  My eyes are

3    challenged for that kind of print.

4              But on the screen you'll see

5    a chart prepared from shipping data that

6    Endo has produced to us and pointed us to

7    in its answers to interrogatories.

8              In connection with your

9    preparation today, sir, did you review

10   Endo, Par, and Qualitest answer to

11   interrogatories?

12        A.    Can you just clarify?  When

13   you say answer to interrogatories?

14        Q.    Right.  So what we do kind

15   of when we try to figure things out in

16   litigation, is sometimes we ask for

17   documents, sometimes we ask for answers

18   to questions in writing.

19              They're called

20   interrogatories.  It's a formal legal

21   exchange.  We have served those on the

22   Endo entities, including Par.  We have

23   received responses to those, certain of

24   those questions concerned issues relevant

Highly Confidential - Subject to Further Confidentiality Review

1    to our discussion today, including

2    shipment data, including suspicious order

3    monitoring protocols, including due

4    diligence investigations.  They represent

5    the company's formal statement back to us

6    in response to questions.

7                 Have you reviewed the

8    company's answers to those questions by

9    us?

10        A.    I haven't specifically seen

11   those questions.  I reviewed a number of

12   documents in preparation.  But I have not

13   specifically seen questions from you

14   to --

15        Q.    That's fine.  And maybe I'll

16   show you one and we can mark that in the

17   record and get confirmation whether

18   you've seen that or not.

19                 I'll represent to you, sir,

20   that what we see on the screen is

21   prepared from shipping data that Endo has

22   pointed us to.

23                 And it reflects a range of

24   products over a range of years, opioid

Highly Confidential - Subject to Further Confidentiality Review

1  products that Endo has manufactured,

2  marketed and sold.  Do you see that list,

3  sir?

4          A.    I see it.

5          Q.    Do you recognize that, sir,

6  as a list of products, opioid-containing

7  products that Endo has made over the

8  years?

9              MS. VANNI:  Object to form.

10             THE WITNESS:  I do.

11  BY MR. BUCHANAN:

12         Q.    Okay.  And you can see at

13  the bottom, sir, there's a tally of total

14  pills and units shipped for each of the

15  years.

16         A.    I see that.

17         Q.    Okay.  And you can see, and

18  we can go back in time.  All the way, not

19  too long after Endo's beginning.  Endo is

20  shipping hundreds of millions of pills or

21  dosage units of opioid-containing

22  products, correct, sir?

23             MS. VANNI:  Objection.

24  BY MR. BUCHANAN:

1    Q.    Do you see that?

2    A.    Yes.  Endo is shipping

3    opioid pills to the patients that needed

4    them.

5    Q.    Well, Endo was shipping

6    opioids to who was ordering them,

7    correct?

8         MS. VANNI:  Object to form.

9         THE WITNESS:  Yes, Endo was

10        shipping patients -- Endo was

11        shipping pills, medicines to our

12        customers to give to patients who

13        needed them.

14   BY MR. BUCHANAN:

15   Q.    Okay.  Well, the way it

16   works, sir, as I understand it, in your

17   business, is the company gets orders,

18   right?

19   A.    That's correct.

20   Q.    And the company processes

21   orders, right?

22   A.    We do.

23   Q.    Okay.  So that little piece

24   that you're putting on the end -- and you

Highly Confidential - Subject to Further Confidentiality Review

1    understand that Endo, Par and Qualitest

2    products were subject to abuse and

3    diversion, correct?

4                    MS. VANNI:  Object to form.

5                    THE WITNESS:  I understand

6           that opioid products, if not

7           properly controlled and kept

8           within a closed system, can be

9           subject to abuse.

10   BY MR. BUCHANAN:

11        Q.    By definition, sir,

12   controlled substance, certainly a C-II

13   controlled substance has a high risk of

14   abuse and diversion, correct?

15                   MS. VANNI:  Object to form.

16                   THE WITNESS:  It does, which

17          is why we have regulations and

18          controls that we abide by in the

19          management, manufacture, and

20          distribution of those products.

21                   MR. BUCHANAN:  We'll move to

22          strike everything after "it does."

23   BY MR. BUCHANAN:

24        Q.    And we can agree, sir, over

1    the years that Endo, Qualitest and Par's

2    products were abused and diverted,

3    correct?

4              MS. VANNI:  Objection.

5              THE WITNESS:  I don't know

6         to what degree Endo and Qualitest

7         products were diverted.

8    BY MR. BUCHANAN:

9         Q.    I didn't ask you to what

10   degree.  We can agree that Endo and

11   Qualitest opioid products were abused and

12   diverted, correct, sir?

13             MS. VANNI:  Objection.

14             THE WITNESS:  We can agree

15        that if these products are not

16        properly controlled, they can be

17        diverted and abused.

18   BY MR. BUCHANAN:

19        Q.    That's not my question.

20             Sitting here today, as the

21   corporate representative for Par, Endo

22   and Qualitest, is it your testimony, sir,

23   that no -- and we're looking at hundreds

24   of millions of pills and dosage units for

Highly Confidential - Subject to Further Confidentiality Review

1    each year, that none of the Endo opioids,

2    of the Par opioids, of the Qualitest

3    opioids, were abused or diverted, is that

4    your testimony, sir?

5              MS. VANNI:  Objection.

6              THE WITNESS:  I can't -- I

7         cannot speak to the degree to

8         which Endo or Qualitest opioid

9         products may or may not have been

10        abused.

11             What I can testify to is

12        that if these products are not

13        properly controlled, they -- they

14        can be abused and diverted.

15   BY MR. BUCHANAN:

16        Q.    Right.  And again, you keep

17   coming back to the degree, which I guess

18   does answer my question, sir.

19             Because you do agree that

20   Endo, Qualitest and Par products were

21   abused and diverted?

22        A.    I agree that these

23   products --

24             MS. VANNI:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1      Objection.  Misstates his

2      testimony.

3             Go ahead.  Give me a second

4      to object.

5             THE WITNESS:  I -- sorry.

6             MS. VANNI:  It's okay.

7   BY MR. BUCHANAN:

8      Q.    You can answer.

9             MS. VANNI:  You can answer.

10            THE WITNESS:  I'm testifying

11     that these products, if not

12     properly controlled, can be abused

13     or diverted.

14  BY MR. BUCHANAN:

15     Q.    I'm just trying to get an

16  answer, sir, to a very, I think, simple

17  question.

18            Is it the testimony of Endo,

19  Par and Qualitest corporate designee that

20  Endo, Qualitest, and Par's opioid

21  products were not abused or diverted?

22            MS. VANNI:  Objection.

23  BY MR. BUCHANAN:

24     Q.    Is that your testimony, sir?

1                    MS. VANNI:  Objection.

2          Asked and answered.

3                    THE WITNESS:  My testimony

4          is that if these products are not

5          properly controlled, they can be

6          abused or diverted.

7  BY MR. BUCHANAN:

8          Q.    Okay.  I don't think we're

9  communicating, are we?

10                   MS. VANNI:  Objection to

11         colloquy.

12 BY MR. BUCHANAN:

13         Q.    This feels like a Sunday

14 morning talk show five minutes in.

15                   Are you having a problem

16 understanding my question?

17                   MS. VANNI:  Objection.

18                   THE WITNESS:  I don't --

19         I -- I'm not having a problem

20         understanding your question.

21 BY MR. BUCHANAN:

22         Q.    Okay.  So my question, sir,

23 and just as a -- it will really help us,

24 I think, throughout the day, if I

1    understand really the point of view of

2    the company with regard to whether or not

3    its drugs have been -- have been abused

4    or diverted.

5              MS. VANNI:  Objection.

6         Asked and answered.

7    BY MR. BUCHANAN:

8         Q.    Is it the companies'

9    understanding that its drugs have not

10   been abused or diverted?

11             MS. VANNI:  Objection.

12             THE WITNESS:  I'm saying

13        that it's the companies'

14        understanding that if its products

15        are not properly controlled and

16        kept within a closed system, that

17        they can be abused or diverted.

18        That's how I'm answering the

19        question.

20   BY MR. BUCHANAN:

21        Q.    I -- I understand that, as

22   a -- as a speaker of the English

23   language, do you understand my question?

24             MS. VANNI:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1          form.   Argumentive.

2    BY MR. BUCHANAN:

3          Q.    Do you understand what I'm

4    asking?

5          A.    I understand what you're

6    asking.

7          Q.    And you're electing not to

8    answer it?

9          A.    You're asking me if I have

10   specific knowledge that our products have

11   been abused, and I'm telling you that I

12   do not.

13         Q.    No, no.

14         A.    What I -- what I'm telling

15   you is that I have an understanding that

16   if our products are not properly

17   controlled, they can be abused or

18   diverted.

19         Q.    Would it surprise you to

20   learn, sir, that, in fact, Endo's,

21   Qualitest's, and Par's products were

22   indeed abused and diverted?

23              MS. VANNI:  Object to form.

24   BY MR. BUCHANAN:

1    Q.    Would that surprise you?

2    A.    As I stated, if our products

3  are not properly controlled, they can be

4  diverted.

5    Q.    I'm asking you whether you'd

6  be surprised to learn that your products

7  were abused and diverted?

8        MS. VANNI:  Object to form.

9        THE WITNESS:  I would be

10       surprised in the context that we

11       have proper controls in place to

12       prevent abuse and diversion.

13  BY MR. BUCHANAN:

14    Q.    I -- what does that mean?

15  I'm just asking you as a fact.

16        As a fact, would it be

17  surprising to you, sir, that drugs were

18  not used for legitimate medical need

19  pursuant to proper prescription, would

20  that surprise you?

21        MS. VANNI:  Object to form.

22        THE WITNESS:  I understand

23       that there is an opioid abuse

24       epidemic in this country.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2            Q.    Okay.

3            A.    And I understand that opioid

4    products are making their way out of the

5    closed system and are subject to abuse

6    and diversion.  Yes, I understand that.

7            Q.    Okay.  Okay.  So we can

8    agree on a few things then.

9                  There's an opioid epidemic.

10                 MS. VANNI:  Object to form.

11                 THE WITNESS:  Opioid abuse

12           epidemic.

13   BY MR. BUCHANAN:

14           Q.    Okay.  So, meaning opioids

15   are being abused that were made for

16   medical purposes, but are, in fact, being

17   abused and used in illicit ways, fair?

18           A.    I understand that there is

19   abuse of opioids.

20           Q.    You are, you, speaking for

21   the company, are a very large

22   manufacturer and distributor of opioid

23   products, correct?

24                 MS. VANNI:  Object to form.

1           THE WITNESS:  We are a

2       manufacturer and distributor of

3       opioid products.

4   BY MR. BUCHANAN:

5       Q.    Okay.  Looking at our chart

6   here, we see billions and billions and

7   billions of pills for one of the three

8   entities that were made over the years of

9   opioid products, correct?

10          MS. VANNI:  Objection.  Also

11      objection to the use of this

12      demonstrative with this witness.

13      You're asking him to authenticate

14      your demonstrative.  I think it's

15      an improper use.

16          MR. BUCHANAN:  Well, that's

17      interesting, because we've asked

18      you to authenticate things and you

19      just consistently refuse to do so.

20          So I do have a corporate rep

21      who is here so...

22  BY MR. BUCHANAN:

23      Q.    So are you aware of anything

24  that's wrong with this chart, sir?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     What I see with this chart

2     is an average of about 440 million

3     tablets per year being distributed.

4          Q.     Consistent with your

5     knowledge and understanding of Endo's

6     production of opioids over the years,

7     sir?

8          A.     It is.

9          Q.     Okay.  So we see all the way

10    back in 1999 hundreds of millions of

11    opioid pills being made by Endo and

12    entering the market, correct?

13               MS. VANNI:  Object to form.

14               THE WITNESS:  We see pills

15          being distributed to customer to

16          be distributed to patients who

17          need them.

18    BY MR. BUCHANAN:

19          Q.     Mm-hmm.  And answering my

20    question:  Hundreds of millions of pills,

21    correct?

22          A.     Is there a specific --

23          Q.     Back in 19 --

24          A.     Is there a specific year you

1   want me to?

2          Q.    I was referring to 1999 to

3   orient you.

4          A.    1999, 357 million.

5          Q.    And we can go forward to

6   2000 and we see, I guess, business has

7   grown, right?

8               MS. VANNI:  Object to form.

9               THE WITNESS:  We see --

10  BY MR. BUCHANAN:

11         Q.    Did you see more or less in

12  2000?

13         A.    We see 545 million in -- I'm

14  sorry, 2000?

15         Q.    2000, what do you see?

16         A.    452 million.

17         Q.    Yeah.  And my question was,

18  was it growing over 1999?

19              MS. VANNI:  Object to form.

20              THE WITNESS:  2000 is a

21         higher number than 1999.

22  BY MR. BUCHANAN:

23         Q.    That would mean it's

24  growing?

1    A.    There's growth.

2    Q.    Okay.  And let's see, how

3 did we do from 2000 to 2001, sir?

4          Doing better?

5          MS. VANNI:  Object to form.

6 BY MR. BUCHANAN:

7    Q.    Selling more?

8          MS. VANNI:  Objection.

9          THE WITNESS:  We're shipping

10     more product to patients who need

11     them.

12 BY MR. BUCHANAN:

13    Q.    Okay.  500 plus million,

14 half a billion pills; is that right?

15    A.    516 million.

16    Q.    Okay.

17          MS. VANNI:  Also note my

18     objection that he is not a

19     30(b)(6) on sales history.

20 BY MR. BUCHANAN:

21    Q.    Okay.  I believe, in fact,

22 you are a designee on suspicious order

23 monitoring, correct?

24    A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Each of the shipments

2    that are memorialized in shipping records

3    followed an order, right?

4              MS. VANNI:  Object to form.

5              THE WITNESS:  You need an

6         order to ship a product.

7    BY MR. BUCHANAN:

8         Q.    Understood.  Since the

9    beginning of Endo's existence, Endo has

10   been charged with maintain -- maintaining

11   effective controls against diversion,

12   correct?

13             MS. VANNI:  Object to form.

14             THE WITNESS:  The

15        regulations state that we need to

16        have controls to prevent

17        diversion.

18   BY MR. BUCHANAN:

19        Q.    Not just any controls,

20   right?

21        A.    Can you clarify what you

22   mean by that?

23        Q.    You have to have effective

24   controls, right?

1          A.     Yes.   We have to have

2    controls in place to prevent diversion.

3          Q.     You have to have -- what's

4    the word you dropped?

5               MS. VANNI:  Object to form.

6    BY MR. BUCHANAN:

7          Q.     Effective controls, right?

8          A.     That those controls should

9    be effective.

10         Q.     That's right.

11         A.     I don't disagree with you.

12         Q.     Okay.  So from the

13   beginning, from 1999 till today, Endo has

14   been responsible for ensuring it has

15   effective controls to prevent diversion,

16   correct?

17         A.     By the regulations, that's

18   what we need to do.

19         Q.     As a reasonable company,

20   that's what you need to do --

21               MS. VANNI:  Object to form.

22   BY MR. BUCHANAN:

23         Q.     -- right?

24         A.     We have a responsibility to

1  abide by the regulations and make sure we

2  have effective controls in place to

3  prevent the abuse and diversion of our

4  products, and that's what we've done.

5       Q.    As a human being or a

6  company that's supposed to be acting like

7  a human being, you have an obligation to

8  keep this stuff in its channel, right?

9            MS. VANNI:  Object to form.

10            THE WITNESS:  I don't know

11        what you mean by acting like a

12        human being.  That's very vague.

13            What I can tell you is that

14        we have a responsibility to abide

15        by the regulations that are in

16        place to prevent the abuse and

17        diversion of our products.

18  BY MR. BUCHANAN:

19       Q.    Is there any doubt in your

20  mind, sir, that this stuff is dangerous?

21            MS. VANNI:  Object to form.

22            THE WITNESS:  These

23        products, if not properly

24        controlled and kept within the

1    controlled system, can be abused

2    and diverted and in that context

3    could be dangerous.

4  BY MR. BUCHANAN:

5        Q.    Dangerous how?

6              MS. VANNI:  Object to form.

7              THE WITNESS:  I understand

8    they can lead to addiction which

9    can lead to other problems.

10  BY MR. BUCHANAN:

11        Q.    Like what?

12              MS. VANNI:  Objection.  It's

13    beyond the scope of his 30(b)(6).

14              THE WITNESS:  It can lead to

15    all kinds of problems.  I'm not a

16    doctor, so I can't necessarily

17    speak to the specifics of that.

18  BY MR. BUCHANAN:

19        Q.    As a -- as an executive in a

20  pharmaceutical company making opioids in

21  2019, what are some of those dangers,

22  sir?

23              MS. VANNI:  Object to form.

24              THE WITNESS:  Opioid

1    products, if not properly

2    controlled, can lead to misuse,

3    diversion, and abuse.

4  BY MR. BUCHANAN:

5    Q.    And what does that mean,

6  sir?  What does that mean?

7    A.    That means they -- they can

8  fall outside of the prescribed use for

9  the products and could be dangerous.

10    Q.    Dangerous in the sense that

11  they can kill people, right?

12        MS. VANNI:  Object to form.

13        THE WITNESS:  That could be

14    one outcome.

15  BY MR. BUCHANAN:

16    Q.    Are you surprised to learn,

17  sir, that as sales of opioid products

18  have increased over the years, the body

19  count from opioid deaths has increased?

20        MS. VANNI:  Objection.

21  BY MR. BUCHANAN:

22    Q.    Year after year after year?

23        MS. VANNI:  Objection.

24        THE WITNESS:  As I stated

1    earlier, I understand that there

2    is an opioid abuse epidemic in

3    this country.

4  BY MR. BUCHANAN:

5    Q.    Okay.  And I'm talking about

6  one of those dangers with a senior

7  executive of a company that's pretty big

8  in opioids.

9    So is one of those dangers,

10  sir, death?

11    MS. VANNI:  Object to the

12    colloquy.

13    THE WITNESS:  I don't have

14    specific knowledge on the outcomes

15    of opioid abuse.

16    What I can tell you is that

17    if our products are not properly

18    controlled and kept within the

19    closed system, they can be

20    diverted and abused.

21    Our focus as an organization

22    is to put the right controls in

23    place to make sure that these

24    products are not abused and

1    diverted.

2              MR. BUCHANAN:  Can we have

3         the sales chart back up?

4    BY MR. BUCHANAN:

5         Q.    So over the course of Endo's

6    history, sir, it looks like you sold

7    enough opioids to give, what, every human

8    being in the United States a 30-count

9    bottle?

10              MS. VANNI:  Object to form.

11   BY MR. BUCHANAN:

12        Q.    Every human being in the

13   United States?

14              MS. VANNI:  Same objection.

15   BY MR. BUCHANAN:

16        Q.    Maybe a little shy.  29, 28

17   pills?

18        A.    We -- we've sold --

19              MS. VANNI:  Same objection.

20              THE WITNESS:  We've sold

21        quantities of products based on

22        orders from customers based on

23        patients who need them.

24   BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So, I mean let's -- let's

2    look at really what's happened at this

3    same timeline.

4           Am I correct, sir, in

5    understanding that you don't have an

6    appreciation that deaths secondary to

7    opioid use have increased dramatically as

8    use of opioids has increased

9    dramatically?

10          MS. VANNI:  Objection.

11       Misstates his testimony.

12          THE WITNESS:  As I stated

13       earlier, I understand that there

14       is an opioid abuse epidemic in

15       this country.  And I understand

16       that death could be an outcome of

17       that.

18    BY MR. BUCHANAN:

19    Q.    Okay.  Okay.  And then do

20    you understand, sir, that as sales of

21    opioids have gone up, yours included,

22    deaths have gone up?

23          MS. VANNI:  Objection.

24    BY MR. BUCHANAN:

1      Q.    Do you have that

2  understanding, sir?

3      A.    I don't have specific

4  knowledge about the number of -- of

5  deaths related to opioid abuse.

6      Q.    Okay.  Am I correct, sir,

7  you have current responsibility for DEA

8  compliance?

9      A.    I have responsibility for

10  DEA compliance.

11          (Document marked for

12          identification as Exhibit

13          Endo-Macrides-7.)

14  BY MR. BUCHANAN:

15      Q.    Passing you what we're

16  marking as Exhibit 7 to your deposition.

17          In examining the companies'

18  DEA compliance function, and the

19  effectiveness of the companies' controls,

20  have you sought to understand really what

21  has happened in terms of abuse and death

22  as sales have boomed?

23          MS. VANNI:  Objection.

24  BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Grown?

2           MS. VANNI:  Objection to

3      form.  Beyond the scope of his

4      30(b)(6).  You can answer.

5           THE WITNESS:  As I stated

6      earlier, what I understand is that

7      there is an opioid abuse epidemic

8      in this country.  And I understand

9      that that has gotten worse over a

10     period of time.

11          And as a responsible person

12     for DEA compliance, we have

13     continued to evolve and enhance

14     our programs to ensure that we

15     have the proper controls in place

16     to prevent diversion and abuse.

17 BY MR. BUCHANAN:

18     Q.   Okay.  Well, let's look at

19 where we were in 1999, sir.  Where we

20 were in this country in terms of deaths

21 per 100,000 people in this country from

22 opioids.

23          Do you see the chart in

24 front of you?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yeah, I see a chart with a

2     lot of colors on it.

3          Q.     Right.  And what -- most of

4     them are blue, right?

5          A.     Right.

6          Q.     You recognize blue as being

7     a pretty good thing, or at least on the

8     lower end of the scale, right?

9               MS. VANNI:  Object to form.

10              THE WITNESS:  I see the

11          scale says estimated age, adjusted

12          death rate.  I see that.

13     BY MR. BUCHANAN:

14          Q.     Per 100,000.  And you see

15     you know, less than two is deep blue.

16     And then, you know, going from blue to

17     red.  Red and brown.  That's really where

18     you don't want to be, right?

19              MS. VANNI:  Object to form.

20          And object to use of this in any

21          capacity as a 30(b)(6) witness.

22              THE WITNESS:  I -- I

23          don't --

24              MS. VANNI:  Let me just

1    finish my objection, Steve.

2           THE WITNESS:  Sorry.

3           MS. VANNI:  He was noticed

4    to provide testimony on the

5    applicable procedures and policies

6    of the company, and you're asking

7    him now to interpret data, the

8    source of which he doesn't even

9    know.

10          MR. BUCHANAN:  I -- I

11   understand your objection.  I

12   think it fits either his 30(b)(6)

13   or his personal capacity, Counsel.

14   We don't have to fuss about it.

15          He is an executive with

16   current responsibility over DEA

17   compliance.

18          MS. VANNI:  Just note my

19   objection.

20   BY MR. BUCHANAN:

21      Q.   But you'd agree, sir -- I

22   don't think I got an answer to my last

23   question.

24          You could agree that brown

1    is worse, right?

2                MS. VANNI:  Object to form.

3                THE WITNESS:  I'm just

4        trying to interpret this.

5    BY MR. BUCHANAN:

6        Q.    You haven't seen it before?

7        A.    What -- what -- what is

8    the --

9        Q.    Let's start with --

10       A.    -- estimated age adjusted

11   death rate.  Death from opioids?  It

12   doesn't say that.

13       Q.    Have you seen this before,

14   sir?

15       A.    I don't believe I've seen

16   these documents.

17       Q.    Okay.  Well, let's scroll

18   forward in time.  See, let's just kind of

19   take a snapshot here.  Let's go to 2005.

20   You see that?

21       A.    2005.

22       Q.    Actually let's go to --

23   yeah, 2005 is good.

24       A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You see the blue starting to

2    get from deep blue to lighter blue, we're

3    starting to see more orange or more brown

4    in the chart?

5            MS. VANNI:  Object to form.

6            THE WITNESS:  I see that.

7    BY MR. BUCHANAN:

8        Q.    Okay.  Let's move forward

9    now to I guess around the time -- when

10   did you say you joined the company?

11       A.    2012.

12       Q.    2012.  Let's -- let's kind

13   of scroll forward.  2012.  Wow, we got a

14   lot of brown and amber and red and

15   yellow.

16            A lot less blue, right, sir?

17            MS. VANNI:  Object to form.

18            THE WITNESS:  There's less

19       blue than there was in the first

20       chart.

21   BY MR. BUCHANAN:

22       Q.    A lot more brown, and a lot

23   more red, right?

24            MS. VANNI:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1        THE WITNESS:  I see that.

2   BY MR. BUCHANAN:

3        Q.    Okay.  And we're talking

4   about brown, we're talking about

5   age-adjusted death rates per 100,000

6   people greater than 30, right?

7        A.    That's what it says.

8        Q.    Talking about the deepest

9   blue, we are talking about less than two,

10  right?

11       A.    That's what it says.

12       Q.    Okay.  So we got a lot of

13  bodies piling up in this country.

14            MS. VANNI:  Object to form.

15  BY MR. BUCHANAN:

16       Q.    Did you have that knowledge,

17  sir?

18            MS. VANNI:  Objection.

19  BY MR. BUCHANAN:

20       Q.    Due to opioids?

21            MS. VANNI:  Objection.

22            THE WITNESS:  As I stated

23       earlier, I -- I understand that

24       there is an opioid abuse epidemic

1    in this country.  And I understand

2    that that has gotten worse over

3    some time period.

4 BY MR. BUCHANAN:

5    Q.    Okay.

6    A.    As I stated earlier, we have

7 put enhanced controls in place over the

8 years to prevent the diversion and abuse

9 of our products.

10    I don't really know how to

11 interpret these charts relative to Endo's

12 products.

13    What I can tell you is what

14 I just stated.

15    Q.    Right.  Would it surprise

16 you, sir, that abuse and diversion was

17 increasing over the years for opioids?

18    A.    I just --

19    MS. VANNI:  Object to form.

20    THE WITNESS:  -- stated that

21    I understood there was an opioid

22    abuse epidemic and it had been

23    getting worse over some time

24    period.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2        Q.    Fair enough.

3            Okay.  So we can agree, sir,

4    that abuse and diversion were getting

5    worse, right?

6            MS. VANNI:  Object to form.

7            THE WITNESS:  I understand

8        that there is an opioid abuse

9        epidemic in this country and that

10       it has gotten worse over some time

11       period.

12   BY MR. BUCHANAN:

13       Q.    We can agree that deaths in

14   terms of the frequency of people dying

15   has gotten worse, right?

16           MS. VANNI:  Object to form.

17           THE WITNESS:  I understand

18       that death is an outcome,

19       potential outcome of opioid abuse.

20   BY MR. BUCHANAN:

21       Q.    And it's gotten worse?

22           MS. VANNI:  Objection.

23   BY MR. BUCHANAN:

24       Q.    Do we have to fuss that?

1        I'm not asking for a

2   specific number, sir.

3        But do you have a general

4   understanding that in 2019, we are in a

5   far worse place in terms of opioid abuse,

6   diversion and death than we were in 1999?

7        MS. VANNI:  Objection to

8        form and beyond the scope.

9        THE WITNESS:  I've already

10       stated that I understand that

11       there's an opioid epidemic abuse

12       in this country and that it's

13       gotten worse over some period of

14       time.

15   BY MR. BUCHANAN:

16       Q.   Okay.  And so I guess as far

17   out as this goes, is 2016.  And this

18   would be around the time, you assumed --

19   was this the year that you assumed

20   responsibility for, I guess, DEA

21   compliance that Endo reported into you?

22       A.   I assumed responsibility for

23   DEA compliance in early 2015.

24       Q.   Okay.  So you had

1    responsibility for DEA compliance in

2    2016; is that right?

3            A.     I did.

4            Q.     And would that be for all of

5    the Endo entities, Par, Qualitest, and

6    Endo?

7            A.     That would have been for

8    Qualitest.

9            Q.     Okay.  So Qualitest Par at

10   that --

11           A.     And Par at some point during

12   that time point.

13           Q.     Whenever the transition --

14           A.     Whenever the transaction was

15   finalized.

16           Q.     When did you assume

17   responsibility for Endo's DEA compliance,

18   Endo -- this gets a little confusing

19   today.  So let's just take a step back

20   and make sure we have terminology clear.

21               Endo is the parent company;

22   is that right?

23           A.     Endo International is the

24   parent company.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      Okay.   There's an operating

2    company known as Endo, right?

3          A.      Right.

4          Q.      That line of business

5    includes the company's branded portfolio;

6    is that accurate?

7          A.      That would be accurate.

8          Q.      Okay.   There's an operating

9    company known as Par today?

10         A.      Correct.

11         Q.      Just owned by the Irish Endo

12   entity, correct?

13         A.      Correct.

14         Q.      Par today owns what used to

15   be Endo's generic business, as well as

16   what used to be called Qualitest's

17   business, correct?

18              MS. VANNI:  Object to form.

19         He's also not a corporate designee

20         on corporate structure, corporate

21         history.

22   BY MR. BUCHANAN:

23         Q.      And I'm really not trying to

24   do that, you know, for a legal purpose.

Highly Confidential - Subject to Further Confidentiality Review

1    I just want to make sure we're clear in

2    communicating today, because it could get

3    confusing.

4         A.    What I can tell you is Par

5    had a generics business.  Endo had a

6    generics business that it operated as

7    Qualitest.  Par and Qualitest were merged

8    into a single generics business that now

9    operates under the Par name.

10        Q.    Okay.  So the current -- the

11   current generics business is all under

12   the Par name.  Is it in the Par entity?

13             MS. VANNI:  Object to form.

14             THE WITNESS:  I'm not an

15        expert on our legal entity

16        structure.  Our generics business

17        operates under the Par name.

18   BY MR. BUCHANAN:

19        Q.    Okay.

20        A.    That's what I can tell you.

21        Q.    We have named Par and we

22   have named Endo.

23        A.    Right.

24        Q.    I want to know when I talk

Highly Confidential - Subject to Further Confidentiality Review

1    about Par as the legal entity that we've

2    sued, that I'm talking about Par and all

3    of -- any of the Endo affiliates'

4    generics businesses.  Would that be

5    accurate?

6                  MS. VANNI:  Object to form.

7    BY MR. BUCHANAN:

8        Q.    To the best of your

9    knowledge?

10       A.    To the best of my knowledge,

11   that's accurate.

12       Q.    Okay.  The way you

13   understand the company is currently

14   operating and configured, the branded

15   business exists within the Endo

16   affiliate, subsidiary, and the generic

17   business operates under the Par

18   affiliate; is that accurate?

19       A.    That's accurate.

20       Q.    Thank you.

21             Okay.  So where we are in

22   2016 here, back to our chart, sir, you

23   have assumed responsibility as of

24   2015/2016 for the Par and Qualitest DEA

1  compliance responsibility.  And I guess

2  I'd say it reported into you.  You were

3  not the boots on the ground, so to speak,

4  on DEA compliance, right?

5              MS. VANNI:  Object to form.

6              THE WITNESS:  Correct.

7  BY MR. BUCHANAN:

8      Q.    Okay.  But this is a

9  snapshot, at least of where we are, in

10  terms of the epidemic that you understand

11  we are currently in as of 2016.  It's

12  722.18.

13              MS. VANNI:  Object to form.

14  BY MR. BUCHANAN:

15      Q.    The number is in the top

16  right corner.  Fair to say, sir, in this

17  chart, we're in a pretty different place

18  than we were in 1999?

19              MS. VANNI:  Object to form.

20              THE WITNESS:  I see

21          different colors than I saw in the

22          earlier charts.

23  BY MR. BUCHANAN:

24      Q.    Okay.  And those different

Highly Confidential - Subject to Further Confidentiality Review

1    colors, indicating that -- well, per

2    100,000 people, a lot of people are

3    dying?

4              MS. VANNI:  Object.

5    BY MR. BUCHANAN:

6         Q.    Right?

7              MS. VANNI:  Object to form.

8              THE WITNESS:  I see the

9         colors changing.  I don't know the

10        origin of these charts.

11   BY MR. BUCHANAN:

12        Q.    As a person who had at least

13   the ability to dictate and direct and

14   fund DEA compliance within Qualitest and

15   Par, you were not aware, really, of the

16   details of the scope of the epidemic as

17   of 2016?

18              MS. VANNI:  Object to form.

19              THE WITNESS:  I stated

20        earlier that I understand that

21        this is an opioid abuse epidemic

22        in this country.  I understand

23        that that has gotten worse over

24        some time period.

Highly Confidential - Subject to Further Confidentiality Review

1          And certainly that knowledge

2     and information would be taken

3     into consideration as we enhance

4     and develop our programs to

5     prevent diversion and abuse.

6  BY MR. BUCHANAN:

7     Q.    Okay.  But it's really not

8  news that opioids are addictive, right?

9          MS. VANNI:  Object to form.

10  BY MR. BUCHANAN:

11     Q.    Is that news to you?

12     A.    I understand that opioids

13  can be addictive.

14     Q.    And you knew that, sir,

15  before you went and worked for an opioid

16  manufacturer, didn't you?

17          MS. VANNI:  Object to form.

18          THE WITNESS:  I understand

19     that opioids can be addictive.

20  BY MR. BUCHANAN:

21     Q.    Right.  Because, I mean,

22  these drugs, whether derived directly

23  from poppies or the milk from poppies

24  that's dried out, or synthetically

Highly Confidential - Subject to Further Confidentiality Review

1    derived, they go back a long period of

2    time, right?

3                MS. VANNI:  Object to form.

4         And beyond the scope of his

5         30(b)(6).

6    BY MR. BUCHANAN:

7         Q.    Do you have that knowledge,

8    sir?

9         A.    I don't understand the

10   complete history of opioids.  But I do

11   understand that they've been around for a

12   number of years.

13        Q.    Right.  And we know poppies,

14   and you probably learned this in college,

15   were used by Egyptians thousands of years

16   ago and were known for their addictive

17   and abuse properties.

18                Did you know that?

19                MS. VANNI:  Object to form.

20                THE WITNESS:  I understand

21        that opioids can be addictive.

22        Opioids also serve a real purpose

23        to patients with chronic pain who

24        need these products.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2        Q.    And that's why, because

3    they're addictive, because they're prone

4    to abuse and have been forever, and you

5    keep this stuff in cages and vaults in

6    your warehouses, right?

7            MS. VANNI:  Object to form.

8            THE WITNESS:  We keep the

9            product in controlled areas based

10           on what the regulations state that

11           we need to do.  There are

12           regulations to control these

13           products because, if not

14           controlled properly, they can be

15           diverted and abused.

16   BY MR. BUCHANAN:

17       Q.    To answer my question, sir,

18   your oxycodone products, for example,

19   controlled substance, right?  That's a

20   yes answer?

21       A.    Yes.

22       Q.    I knew it, but it won't show

23   up on the transcript if you don't speak.

24       A.    Understood.

1    Q.    Okay.  Schedule II?

2    A.    Schedule II.

3    Q.    Got to store it in a safe?

4    A.    It has to be stored in a

5  vault or a safe per regulations.

6    Q.    In a vault or a safe.

7    Why do you think that is,

8  sir?

9    MS. VANNI:  Object to form.

10    Beyond the scope.

11    THE WITNESS:  The

12    regulations require us to store

13    these products in vaults and safes

14    because they have the potential to

15    be diverted or abused.

16  BY MR. BUCHANAN:

17    Q.    Right.

18    In the warehouse you've got

19  to store this stuff in a safe, correct?

20    MS. VANNI:  Objection.

21    Asked and answered.

22    THE WITNESS:  The product is

23    stored in a vault with a number of

24    controls around how it's handled,

1    how it's moved through the

2    facility, and how it's ultimately

3    manufactured and distributed.

4  BY MR. BUCHANAN:

5        Q.    Right.  When you move the

6  product through the facility, you got to

7  have two people moving it from Point A to

8  Point B, right?

9        A.    We have a number of controls

10 in place to ensure that the product isn't

11 diverted as it moves through the

12 facility.

13       Q.    Do you agree with me what I

14 just said, sir, that's one of them

15 though?  You've got to have two people

16 watching it?

17       A.    One of -- one of the

18 controls we have is to ensure that we

19 have multiple people managing the product

20 as it moves through the facility.

21       Q.    Because this stuff is highly

22 prone to being diverted, correct?

23              MS. VANNI:  Objection.

24       Asked and answered.

1          THE WITNESS:  These

2          products, Schedule II products,

3          can be diverted, have a high

4          propensity to be diverted.

5          Therefore, there are controls in

6          place required by the regulations

7          for manufacturers and distributors

8          to abide by.

9     BY MR. BUCHANAN:

10          Q.    So whenever --

11          A.    Those are the controls that

12     we implement.  Those are the controls

13     that we follow.

14          Q.    So -- in the warehouse, keep

15     it in a vault.  Moving it to the

16     manufacturing line, the raw material to

17     make the pills, got to have two people

18     watching it.

19               On the line you've got to

20     have people watching each other on the

21     line so they don't slip it in their

22     gloves, put it in their pockets, or

23     otherwise try and I guess take, damaged

24     pills, finished pills, all concerns

Highly Confidential - Subject to Further Confidentiality Review

1    because of the abuse potential for these

2    drugs, in the warehouse, or in the

3    manufacturing plant, fair?

4               MS. VANNI:  Object to form.

5               THE WITNESS:  We treat these

6          products very uniquely versus

7          products that are noncontrolled.

8               And we have a whole set of

9          controls that apply to the

10         handling of Schedule II products

11         as they move through the facility,

12         so that we can prevent the abuse

13         and diversion of these products

14         and ensure that they get to the

15         patients who need them.

16   BY MR. BUCHANAN:

17         Q.    You'd agree with me, sir,

18   that the concern that's exercised with

19   keeping it in a vault or in a safe or

20   making sure that your own employees are

21   not trying to slip it into the gloves or

22   take it out the door, it shouldn't stop

23   at the point in time when you receive an

24   order for the product, right?

1          MS. VANNI:  Object to form.

2          THE WITNESS:  There -- there

3     are other regulations, controls,

4     that we follow that would more be

5     under the category of suspicious

6     order monitoring when it comes to

7     DEA compliance, to ensure that

8     orders are properly reviewed,

9     investigated before they are

10    distributed.

11 BY MR. BUCHANAN:

12         Q.    Okay.  And that's what I

13 wanted to understand.

14         So the concern that you have

15 and the care you have to take with

16 handling this product in the warehouse or

17 handling this product in manufacturing

18 with your own employees, people who you

19 trust and hire, has to be exercised in

20 investigating, in reviewing, every single

21 order you receive, because that concern

22 doesn't stop in the warehouse, right?

23         MS. VANNI:  Object to form.

24         THE WITNESS:  The control --

Highly Confidential - Subject to Further Confidentiality Review

1    the proper control of these

2    products extends throughout the

3    supply chain.

4  BY MR. BUCHANAN:

5        Q.    Right.  So when the company

6  receives an order for one of its

7  controlled products, it has an obligation

8  to maintain effective controls against

9  diversion with regard to the orders it

10 receives, right?

11            MS. VANNI:  Object to form.

12            THE WITNESS:  We have a

13       responsibility under the

14       regulations to make sure that we

15       are reviewing orders, that we are

16       understanding any orders of

17       interest, we are investigating

18       those.  And if it comes to it, and

19       if we determine that the order is

20       suspicious, then not to ship that

21       order.

22 BY MR. BUCHANAN:

23       Q.    Okay.  So we were looking at

24 the Endo orders just a moment ago, just

Highly Confidential - Subject to Further Confidentiality Review

1   to give us some context.  I believe it's

2   Exhibit 4.

3               Let's look at 1999.  You

4   know, shipped -- shipped hundreds of

5   millions of opioid products in 1999.

6   Every one of those was by an order.

7               And how many suspicious

8   orders did the company report to the DEA

9   in 1999 for Endo products, sir?

10              MS. VANNI:  Object to form.

11         The colloquy.

12              THE WITNESS:  I don't

13         believe we reported any suspicious

14         orders as an outcome of our

15         investigations.

16  BY MR. BUCHANAN:

17         Q.   Okay.  So in 1999 the

18  company reported no suspicious orders to

19  the DEA for Endo's orders?

20         A.   I don't believe we reported

21  any suspicious orders to the DEA in 1999

22  as a result of our investigations.

23         Q.   Okay.  How about in 2000,

24  we've got, you know, hundreds of millions

1    of pills again, 400 million plus.  I

2    guess that's also syrups, so dosage units

3    of syrups.

4                400-plus million pills and

5    dosage units all pursuant to orders.  And

6    how many suspicious orders did -- did

7    Endo report to the DEA for 2000?

8                MS. VANNI:  Object to form.

9                THE WITNESS:  I don't

10        believe we reported any suspicious

11        orders in 2000 as an outcome of

12        our investigations into anything

13        that was of interest.

14   BY MR. BUCHANAN:

15        Q.    Okay.  How about 2001, it

16   looks like -- well, sales are growing.

17   We talked about that a moment ago.

18   500-plus million pills and dosage units

19   for Endo in 2001.

20                How many suspicious orders

21   got reported to the DEA that year?

22                MS. VANNI:  Object to the

23        colloquy.  You can answer.

24                THE WITNESS:  I don't

1      believe we reported any suspicious

2      orders to DEA after the outcome of

3      our invest -- as an outcome of our

4      investigations into anything that

5      was of interest.

6    BY MR. BUCHANAN:

7      Q.    Oh.  Okay.  So thousands and

8    thousands and thousands of orders, right?

9      A.    We had orders.  I can't tell

10   you specifically how many orders we had.

11   But we had orders that represented these

12   quantities.

13     Q.    Okay.  That -- that on an

14   annual basis would give every American an

15   opioid, right?

16          MS. VANNI:  Object to form.

17          THE WITNESS:  We got

18     order -- we received orders for

19     opioids from our customers who in

20     turn sold them to patients who

21     needed them.

22   BY MR. BUCHANAN:

23     Q.    And not one suspicious order

24   was reported to the DEA in 2001?

1    A.    We did not report any

2  suspicious orders to DEA after

3  investigating internally any orders that

4  we deemed as of interest.

5    Q.    Okay.  How about 2002?

6  Sales still on the move.  Growing along,

7  I guess we can pull out our -- our death

8  map that we looked at a moment ago.  We'd

9  see the deep blue going to lighter blue,

10  going to tan and yellow, and more people

11  dying.

12         How many suspicious orders

13  did you report to the DEA in 2002?

14              MS. VANNI:  Objection.

15              THE WITNESS:  I don't

16       believe we reported any orders,

17       suspicious orders to DEA as an

18       outcome of our internal

19       investigations into any orders of

20       interest.

21  BY MR. BUCHANAN:

22    Q.    Okay.  2003, sales still on

23  the move, right?  We are back on

24  Exhibit 4.

1          800 million pills, opioids,

2    dosage units in 2003.  All pursuant to

3    orders the company received, right?

4          MS. VANNI:  Object to form.

5          THE WITNESS:  Yes.  We would

6       receive orders to represent those

7       quantities shipped.

8    BY MR. BUCHANAN:

9          Q.   Okay.  And how many of those

10   did the company identify as suspicious?

11         A.   I don't believe we reported

12   any suspicious orders to the DEA as an

13   outcome of our internal investigations

14   into any orders of interest.

15         Q.   Okay.  So you didn't report

16   any over this period of time as we just

17   looked at a five-year window.

18         How many did you not ship?

19         A.   I don't believe we

20   ultimately -- we ultimately shipped all

21   of these orders as an outcome of our

22   internal investigations into any orders

23   of interest.

24         Q.   Okay.  So you've got a drug

Highly Confidential - Subject to Further Confidentiality Review

1    that is -- a drug, I'm sorry, 15 or more

2    drugs that Endo is making, highly prone

3    to abuse and diversion over which, for as

4    long as you've been selling them, you've

5    got to keep them in vaults and cages and

6    under camera and under a watchful eye for

7    which you receive thousands of orders,

8    and which you've shipped as of this point

9    in time a few billion pills, right?

10              MS. VANNI:  Object to form.

11   BY MR. BUCHANAN:

12        Q.    Or dosage units?

13              MS. VANNI:  Same objection.

14   BY MR. BUCHANAN:

15        Q.    Would that be right?

16        A.    That would be correct.

17        Q.    Okay.  Hadn't identified a

18   single suspicious order in that five-year

19   period of time?

20        A.    As I stated, any orders that

21   were deemed of interest based on our

22   internal reviews under our suspicious

23   order monitoring system would have been

24   reviewed and investigated.  If we

1    determined the order to not be

2    suspicious, we would have shipped it.

3                MS. VANNI:  David, we've

4          been going about an hour, whenever

5          we can take a break.

6                MR. BUCHANAN:  Yeah.  Let me

7          finish this.  Can I finish this

8          thread?

9    BY MR. BUCHANAN:

10         Q.    Are you okay?  It will be

11   under five minutes.

12               MS. VANNI:  We can finish

13         this thread.

14               THE WITNESS:  Okay.

15   BY MR. BUCHANAN:

16         Q.    So, sir, we can go forward

17   in time here, and I guess we can do it

18   year by year and maybe my tech can blow

19   out the bottom, but so we don't belabor

20   this too much.  Hundreds of millions of

21   pills and dosage units year after year

22   shipped by Endo for its opioid products,

23   fair?

24               MS. VANNI:  Object to form.

1          THE WITNESS:  Are you asking

2      me to verify the number here?

3  BY MR. BUCHANAN:

4          Q.    That's what I'm saying.  If

5  you look forward in time, sir, for the

6  remaining 2004 to the end?

7          A.    Right.

8          Q.    Okay.  And we go, you know,

9  eight-plus billion pills and dosage units

10  for the Endo entity?

11          A.    Over an 18-year period, yes,

12  that's what it says here.

13          Q.    Yeah, and in fact we'll talk

14  about it a little later that, for some of

15  the later years, some of these products

16  got moved into the Qualitest and Par

17  affiliates, right?

18          A.    They did.

19          Q.    Okay.  Like Endocet and

20  Percocet.  And there are some big numbers

21  on here for those products.  In the

22  earlier period of time they got pushed

23  into the ledger for Qualitest, at a later

24  point in time, right?

Highly Confidential - Subject to Further Confidentiality Review

1              MS. VANNI:  Object to form.

2              THE WITNESS:  Some of these

3         generics were moved into the

4         generic operating unit.

5    BY MR. BUCHANAN:

6         Q.    Okay.  Still made by, if you

7    will, the Endo family of companies, but

8    just for the corporate organization, the

9    branded ultimately got shipped -- excuse

10   me -- organized into the Endo subsidiary,

11   and the generic ultimately got organized

12   into the Par/Qualitest subsidiary, right?

13             MS. VANNI:  Object to form

14        beyond the scope of 30(b)(6).

15             THE WITNESS:  Some of these

16        products were sold by different

17        entities over the time period.

18   BY MR. BUCHANAN:

19        Q.    Okay.  So where we land

20   though, with regard to Endo the entity,

21   that's reflected, the sales data that's

22   been provided to us, is some eight

23   billion dosage units and pills over the

24   course of many years, fair?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Over the course of about

2    18 years.

3        Q.    With thousands and thousands

4    and thousands of orders, right?

5             MS. VANNI:  Object to form.

6             THE WITNESS:  I don't know

7        exactly how many orders.  There

8        were orders that reflect these

9        quantities.

10   BY MR. BUCHANAN:

11       Q.    Please tell the jury how

12   many of those orders the company didn't

13   ship.

14            MS. VANNI:  Object to form.

15            THE WITNESS:  We shipped all

16       of those orders after thorough

17       review within our SOM system, and

18       any investigations into orders of

19       interest to make a determination

20       if the order was suspicious or

21       not.

22   BY MR. BUCHANAN:

23       Q.    Every single order Endo

24   received, it shipped; is that correct,

1    sir?

2                    MS. VANNI:  Object to form.

3                    THE WITNESS:  We shipped

4            these orders after thorough review

5            under our suspicious order

6            monitoring system, under our

7            distributor's suspicious order

8            monitoring system, and the orders

9            were deemed to not be suspicious

10           and they were shipped.

11                   MR. BUCHANAN:  Move to

12           strike the nonresponsive portion.

13   BY MR. BUCHANAN:

14           Q.   My question, sir, is, every

15   single order that Endo received for its

16   opioid products, it shipped, correct?

17                   MS. VANNI:  Object to form.

18                   THE WITNESS:  The orders

19           you're referencing --

20   BY MR. BUCHANAN:

21           Q.   Yes or no?

22           A.   The orders you're

23   referencing shipped after thorough review

24   and investigation into any orders of

1    issues through our suspicious order

2    monitoring system.  That's my answer.

3         Q.    Not a single one was ever

4    reported to DEA?

5         A.    If an order had been

6    determined to be suspicious, it would

7    have been reported to DEA.

8         Q.    As a numbers matter, sir,

9    just stay with my question.

10            Did the company ever report

11   any order that Endo received for any of

12   its opioid products over the period of

13   time, 1999 to present to the DEA as a

14   suspicious order?

15            MS. VANNI:  Object to form.

16            THE WITNESS:  If an order

17       was deemed suspicious --

18   BY MR. BUCHANAN:

19        Q.    Did the company ever do it?

20        A.    If the order was -- if an

21   order was deemed suspicious, it would

22   have been reported to the DEA.

23        Q.    It doesn't answer my

24   question.  I just want the fact.  Not an

Highly Confidential - Subject to Further Confidentiality Review

1    if.  Did the company ever report any

2    order that Endo received for any of its

3    opioid products from 1999 to 2019 to the

4    DEA as suspicious?

5              MS. VANNI:  Object to form.

6    BY MR. BUCHANAN:

7         Q.    Did it ever do that?

8         A.    We --

9         Q.    You've got to answer it yes

10   or no, sir.

11        A.    We did not have any orders

12   that we deemed suspicious during that

13   time period.

14        Q.    So the answer to my

15   question --

16        A.    So the orders were

17   subsequently shipped.

18        Q.    My question was, did you

19   ever report any order that Endo received

20   for any controlled substance over the

21   last 20 years to the DEA ever?

22              MS. VANNI:  Objection.

23        Asked and answered.

24              THE WITNESS:  I think I

1       answered your question.

2  BY MR. BUCHANAN:

3       Q.    You haven't.  You haven't.

4  You're answering something that you'd

5  like me to ask you.  But I'm not asking

6  you that.

7            MS. VANNI:  Objection to the

8       colloquy.

9  BY MR. BUCHANAN:

10      Q.    My question to you is, did

11 Endo ever report any order to the DEA as

12 a suspicious order for any Endo product

13 from 1999 to present?

14      A.    And my answer, is that we

15 determined through our SOMs system that

16 the orders you're referring to were not

17 suspicious and, therefore, we did not

18 report any suspicious orders to the DEA

19 during that time period.

20      Q.    So the answer to my

21 question, sir, is you did not report any

22 orders to the DEA during that time

23 period, correct?

24            MS. VANNI:  Objection.

1    Asked and answered.  Misstates his

2    testimony.  You just don't like

3    his answer.

4         THE WITNESS:  That's what I

5    just stated.

6         MR. BUCHANAN:  Thank you.

7         We can take a break.

8         THE VIDEOGRAPHER:  Off the

9    record at 10:14 a.m.

10        (Short break.)

11        THE VIDEOGRAPHER:  We are

12   back on the record at 10:30 a.m.

13 BY MR. BUCHANAN:

14        Q.    Mr. Macrides, we kind of got

15 into it pretty early.  I just wanted to

16 circle back with your 30(b)(6) notice.

17             You obviously did some work

18 to prepare for today, fair?

19        A.    Fair.

20        Q.    Okay.  Who did you talk to

21 other than counsel?

22        A.    I spoke with Lisa Walker who

23 currently works within Endo.

24        Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I spoke with Angela Feniger

2  who has some history with DEA compliance

3  on the Par side of the business.

4      Q.    Could you clarify on the Par

5  side?  Just because of the merger I get

6  confused.

7      A.    So -- so she would -- she

8  was essentially the head of DEA

9  compliance for Par prior to its

10  acquisition by Endo.  And then she

11  continued in that capacity for some

12  period of time after the acquisition.

13      Q.    Is she still with the

14  company?

15      A.    She's still with the

16  company.  She actually works in the

17  quality organization now.

18      Q.    So she's not in DEA

19  compliance currently?

20      A.    Not anymore.

21      Q.    What was her title when she

22  was at Par?

23      A.    I think it was -- I don't

24  remember exactly.  I think she had

1    quality compliance and DEA compliance in

2    her title.

3         Q.    Okay.  So she had a -- she

4    wore multiple hats?

5         A.    She wore multiple hats.

6         Q.    Okay.  Anyone else you spoke

7    with?

8         A.    I spoke with Mike

9    Meggiolaro, who is our current head of

10   DEA compliance.

11        Q.    And how long has he been in

12   that capacity?

13        A.    He has been in that capacity

14   since June of 2018.

15        Q.    Gotcha.  Anyone else?

16        A.    He has a person, Mary-Lou

17   Schoonover, who is currently our manager

18   of suspicious order monitoring.

19        Q.    So if I was looking on an

20   org chart today, I'd see Mike Meggiolaro

21   as the head of DEA compliance.  And I'd

22   see Mary-Lou Schoonover underneath of him

23   as somebody who does SOMs or suspicious

24   order monitoring?

1        A.    Correct.

2        Q.    Gotcha.  Anyone else you

3    spoke with?

4        A.    I think that's it.  Well, I

5    spoke with -- with counsel.

6        Q.    Okay.  And let -- let's talk

7    about the time you spent with each of

8    these four individuals.  Was that time

9    together with counsel or without counsel?

10       A.    With counsel.

11       Q.    Okay.  So how many meetings

12   did you have with counsel?

13       A.    I'm going to say five or

14   six.

15       Q.    Okay.  Beginning when?

16       A.    In the January time frame.

17   I think this thing has been delayed a few

18   times.

19       Q.    I thought at your request,

20   but --

21       A.    I don't know.  I'm just

22   telling you what I know.

23       Q.    I would have rather have

24   done it two months ago, sir.

1          All right.  So you said four

2     or five times.  Roughly how long was each

3     meeting?

4          A.    The meetings probably ranged

5     in time frame anywheres from four to six

6     or seven hours.

7          Q.    Okay.  So apart from your

8     time in these meetings, did you have

9     teleconferences or kind of review

10    sessions where you'd look at stuff on the

11    screen?

12         A.    No.

13         Q.    Okay.  Did you have any

14    teleconferences?

15         A.    We had a few

16    teleconferences, very brief.

17         Q.    Okay.  Most of your prep

18    work with counsel was in meetings,

19    those --

20         A.    In meetings.

21         Q.    Okay.  Where did you do

22    that, over in Ireland?

23         A.    I've been spending --

24              MS. VANNI:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  I've been

2      spending more time in the U.S. in

3      the first quarter.  So we did it

4      over here in the U.S.

5  BY MR. BUCHANAN:

6          Q.    Okay.  Okay.  So you're in

7  Malvern now?

8          A.    My job requires me to be in

9  a lot of places.

10         Q.    Okay.  At least with regard

11 to the first quarter of 2019, have you

12 been more in the Pennsylvania area?

13         MS. VANNI:  Object to form.

14         THE WITNESS:  I've been in

15     Pennsylvania.  I've been in New

16     York.  I've been in various

17     places.

18 BY MR. BUCHANAN:

19         Q.    Okay.  So we've got the --

20 the four to five meetings.  That sounds

21 right to you, four to five meetings, or

22 more?

23         A.    I said five to six I

24 believe.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Five to six meetings, okay.

2    I apologize.

3          So that still -- as we're

4    talking through this and you're thinking

5    about the people you've met with and over

6    the time period, is that --

7    A.    That sounds about right.

8    Q.    Okay.  And somewhere between

9    a half a day and a full day each of these

10   meetings?

11   A.    Yes.

12         MS. VANNI:  Object to form.

13   BY MR. BUCHANAN:

14   Q.    Okay.  Apart from your time

15   with counsel, you know, in the meetings,

16   were you reviewing things that you were

17   provided or that you accessed on your

18   own?

19   A.    I would say yes, I reviewed

20   certain documents on my own.

21   Q.    Okay.  And did those refresh

22   your recollection, sir, or at least

23   assist you in preparing for your

24   testimony today?

1          MS. VANNI:  Object to form.

2          THE WITNESS:  I would

3     categorize those documents as

4     helping prepare me for today.

5  BY MR. BUCHANAN:

6          Q.    In some respects, you were

7  probably learning things, right?

8          MS. VANNI:  Object to form.

9          THE WITNESS:  In my 30(b)(6)

10    capacity I think I learned some

11    things.  I think that's a fair

12    statement.

13  BY MR. BUCHANAN:

14         Q.    Right.  And so what did you

15  look at to learn the things you learned?

16         MS. VANNI:  Object to form.

17    He's not going to tell you

18    specific documents that he

19    reviewed.  That's privileged.

20         MR. BUCHANAN:  I don't think

21    it is.  It's the foundation for a

22    30(b)(6) testimony.

23         MS. VANNI:  Okay.  Well, we

24    can agree to disagree.  You can

Highly Confidential - Subject to Further Confidentiality Review

1    ask him about categories of

2    documents.  He's already told you

3    amply how he's prepared for today.

4         We'll represent to you that

5    he has not seen anything that

6    hasn't already been produced in

7    this litigation.

8  BY MR. BUCHANAN:

9       Q.    Okay.  Did you review

10 testimony, sir?

11      A.    I read some depositions.

12      Q.    Okay.  Did you review the

13 deposition of Mr. Brantley?

14      A.    I did.

15      Q.    Did you review the

16 deposition of Ms. Walker?

17      A.    I did.

18      Q.    Did you review the testimony

19 of Ms. Hernandez Norton?

20      A.    I did.

21      Q.    Any other witnesses that you

22 reviewed?

23      A.    No.

24      Q.    Did you review the videos of

Highly Confidential - Subject to Further Confidentiality Review

1  those witnesses' testimony?

2      A.    I viewed brief video clips

3  of Lisa Walker's testimony and of Tracey

4  Norton Hernandez's testimony.

5      Q.    Okay.  And did they help

6  acquaint you with particular issues?

7      A.    I would say they clarified

8  certain things for me.

9      Q.    Is their testimony the

10  foundation of testimony you're going to

11  provide to us today?

12          MS. VANNI:  Object to form.

13          THE WITNESS:  I would say

14      no.

15  BY MR. BUCHANAN:

16      Q.    Did you review the exhibits

17  to their depositions, any of them?

18          MS. VANNI:  Object to form.

19          THE WITNESS:  I may have

20      viewed some of them.  Mostly I

21      read the text.

22  BY MR. BUCHANAN:

23      Q.    Okay.  Did you talk to

24  anyone else within Endo, Qualitest, Par,

1    current employees or former employees as

2    part of your preparation?

3          A.    I did not.

4          Q.    Okay.  Nobody else in the

5    management team, executive team, of the

6    companies?

7          A.    No.

8          Q.    No third parties?

9          A.    No.

10         Q.    Okay.  I wanted to circle

11   back to something that we talked about

12   before in terms of your awareness or not

13   of Endo's products being diverted.

14               MR. BUCHANAN:  Could we pull

15         up 550 and provide a copy to

16         counsel.

17               MS. VANNI:  Note my

18         objection to the colloquy.

19               MR. BUCHANAN:  I'm sorry,

20         what did I say?  It seems pretty

21         innocuous to me, but...

22               (Document marked for

23         identification as Exhibit

24         Endo-Macrides-8.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2        Q.    I'm passing you, sir, what

3    we're marking as Exhibit 8 to your

4    deposition.

5             MS. VANNI:  Thank you.

6    BY MR. BUCHANAN:

7        Q.    Sir, you'll recall before

8    the break we were talking about your

9    awareness or not of Endo's products being

10   diverted.  Do you recall that?

11       A.    I recall that.

12       Q.    Okay.  Showing you what is

13   an e-mail from Mr. Barto to Ms. Connell

14   from 2003, subject revised DEA meeting

15   minutes.  Do you see that?

16       A.    I see it.

17       Q.    Okay.  Who's Mr. Barto?

18       A.    I believe he was a former

19   employee of Endo.

20       Q.    You recognize him as being

21   in regulatory affairs for Endo?

22       A.    It says here that he worked

23   in regulatory affairs.

24       Q.    Okay.  Ms. Connell, you

1    recognize her as being on the supply

2    chain side?

3              A.    I do.

4              Q.    Okay.  In connection with

5    your preparation, sir, were you aware

6    that the company sat down with the DEA in

7    2003 to discuss abuse and diversion

8    measures with regard to Endo's products?

9                   MS. VANNI:  Object to form.

10                  THE WITNESS:  In 2003?

11   BY MR. BUCHANAN:

12             Q.    Mm-hmm.

13             A.    I was aware that Endo had

14   discussions with DEA during the time

15   period that we are talking about.

16             Q.    Okay.  I'll pass you, sir,

17   Exhibit 9 to your deposition.

18                  (Document marked for

19                  identification as Exhibit

20                  Endo-Macrides-9.)

21   BY MR. BUCHANAN:

22             Q.    Is that a yes answer, that

23   you're aware that the company had

24   discussed abuse and diversion of Endo's

Highly Confidential - Subject to Further Confidentiality Review

1    product with the DEA and FDA as far back

2    as 2003?

3            A.    I'm aware of that, yes.

4            Q.    Okay.  And we looked at the

5    sales chart that covered that period that

6    you'll recall that went all the way back

7    to 1999 that the company was making

8    controlled substances, correct?

9            A.    Correct.

10           Q.    Okay.  So one of the

11   company's products was Percocet, right?

12           A.    Percocet.  Yes.

13                 MR. BUCHANAN:  Can we pull

14           up that sales chart real quick and

15           then take a look at it to see what

16           the company was doing with

17           Percocet in the early 2000s.  It's

18           E -- excuse me for the video

19           record, it's E-1811.  It's

20           Exhibit 4 to the deposition.  Pull

21           up the product list.

22   BY MR. BUCHANAN:

23           Q.    I understand, sir, you

24   weren't at the company, but many of these

1    brands are brands that you're familiar

2    with, right?

3          A.    I'm familiar with these

4    brands.

5          Q.    Endocet is just Percocet in

6    a different name, right?

7                MS. VANNI:  Object to form.

8                THE WITNESS:  Endocet is a

9          generic version of Percocet.

10   BY MR. BUCHANAN:

11         Q.    Right.  Percocet is an

12   oxycodone product, right?

13         A.    Correct.

14         Q.    Oxycodone is the active

15   pharmaceutical ingredient in OxyContin,

16   correct?

17                MS. VANNI:  Object to form.

18                THE WITNESS:  As I

19         understand it, yes.

20   BY MR. BUCHANAN:

21         Q.    Okay.  So we've got

22   Percocet, which has oxycodone in it.

23   We've got oxycodone ER, oxycodone/APAP.

24   Do you recognize oxycodone/APAP, sir, as

Highly Confidential - Subject to Further Confidentiality Review

1    another formulation of Percocet?

2              MS. VANNI:  Object to form.

3              THE WITNESS:

4         Oxycodone/APAP, I do.  It's a

5         generic version.

6    BY MR. BUCHANAN:

7         Q.    Generic version.  The active

8    pharmaceutical ingredient in Percocet and

9    Endocet is oxycodone, correct?

10        A.    That's correct.

11        Q.    One of them.

12        A.    That's correct.

13        Q.    And APAP is acetaminophen;

14   is that right?

15        A.    APAP is acetaminophen.

16        Q.    So it's essentially

17   oxycodone combined with Tylenol, right?

18             MS. VANNI:  Object to form.

19             THE WITNESS:  Oxycodone and

20        APAP.

21   BY MR. BUCHANAN:

22        Q.    APAP is Tylenol?

23        A.    Acetaminophen.

24        Q.    And acetaminophen is

Highly Confidential - Subject to Further Confidentiality Review

1    Tylenol?

2         A.    The brand name is Tylenol.

3         Q.    Fair enough.  Thanks.  Just

4    want to make sure we're communicating.

5              The brand name of

6    OxyContin -- excuse me.  The brand name

7    of oxycodone or one formulation of

8    oxycodone is OxyContin, right?

9              MS. VANNI:  Objection.

10             THE WITNESS:  As I

11        understand it, yes.

12   BY MR. BUCHANAN:

13        Q.    And the brand name of APAP

14   or acetaminophen is Tylenol, right?

15        A.    Right.

16        Q.    So Percocet is a combination

17   of oxycodone and acetaminophen, or

18   Tylenol, right?

19             MS. VANNI:  Object to form.

20             THE WITNESS:  As I

21        understand it.

22   BY MR. BUCHANAN:

23        Q.    So when we look here on this

24   chart, we see Percocet, Endocet,

1    oxycodone/APAP.  All three of those are

2    essentially the same pharmaceutical

3    combination, they just get marketed in

4    different ways, right?

5              MS. VANNI:  Objection.

6         Beyond the scope.

7              THE WITNESS:  Some are

8         branded and some are generic.

9    BY MR. BUCHANAN:

10        Q.    Fair.  I mean, I wasn't

11   trying to be tricky with that.  I just

12   wanted to -- the company, for whatever

13   its business reasons over time, has used

14   different trade names or branded names

15   for the same pharmaceutical combination,

16   true?

17             MS. VANNI:  Object to form.

18             THE WITNESS:  The branded

19        name is Percocet.  And then there

20        are generics that go by different

21        names.

22   BY MR. BUCHANAN:

23        Q.    Okay.  All right, good.  So

24   Percocet in abuse and diversion was a big

1    deal into the early 2000s; isn't that

2    right?

3                MS. VANNI:  Objection.

4                THE WITNESS:  I don't have

5         specific knowledge on Percocet

6         abuse because --

7    BY MR. BUCHANAN:

8         Q.    Sorry.

9         A.    Well, as I stated earlier,

10   if our products aren't properly

11   controlled, if they get out of the closed

12   system, then they have -- they can be

13   abused and diverted.

14        Q.    Okay.

15                MR. BUCHANAN:  Can we pull

16        up the chart for the first --

17        let's just say through 2003,

18        please.

19                There you go.

20   BY MR. BUCHANAN:

21        Q.    All right.  So we can see

22   that in fact Percocet, Endocet, and

23   oxycodone/APAP -- let's get the Percocet

24   up there.  Those are big movers for the

1  company in the early -- late '90s, early

2  2000s, right?

3              MS. VANNI:  Object to form.

4              THE WITNESS:  Can you

5         clarify what you mean by "big

6         mover"?

7  BY MR. BUCHANAN:

8         Q.    I guess, for simplicity,

9  two-thirds of your sales?

10        A.    We were shipping Percocet

11  and Endocet based on orders from our

12  customers based on patient demand.

13        Q.    I understand that, sir.  But

14  looking at the chart so we have some

15  rough sense of what the business

16  represented, about two-thirds of sales,

17  at least in terms of pills, was Percocet

18  or Percocet-like formulations, correct,

19  sir?

20              MS. VANNI:  Object to form.

21              THE WITNESS:  Yes, based

22         on -- if we're looking at 1999, a

23         majority of the tablets shipped

24         were Percocet or Endocet.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2         Q.    Right.  And roughly, what is

3    that, 260 million pills, Percocets,

4    versus a total of 360 or so?

5         A.    Right.

6         Q.    Okay.  And excuse my

7    rounding.  I'm just trying to make it

8    faster and simpler for both of us.

9              All right.  We go forward in

10   2000.  And you're, you know, again, at

11   roughly 340 million of 450 million pills

12   are the Percocet and Endocet drugs,

13   right?

14             MS. VANNI:  Object to form.

15             THE WITNESS:  That's what it

16        says.

17   BY MR. BUCHANAN:

18        Q.    Percocet was Endo's brand?

19        A.    Percocet was a branded

20   product or is a branded product.

21        Q.    But the brand Percocet, was

22   that Endo's brand name?

23        A.    It was.

24        Q.    They owned it?

Highly Confidential - Subject to Further Confidentiality Review

1           MS. VANNI:  Object to form.

2           THE WITNESS:  Correct.

3    BY MR. BUCHANAN:

4           Q.    So when the jury or consumer

5    hears Percocet, they should think of

6    Endo?

7           MS. VANNI:  Object to form.

8    BY MR. BUCHANAN:

9           Q.    Right?

10          A.    Percocet is the brand.

11          Q.    That's the name you marketed

12   it under, right?

13          A.    That's the name that Endo

14   marketed the product under, Percocet.

15          Q.    And if we looked at Percocet

16   pills shipped by Endo, we'd see a little

17   R with a circle around it, right?

18          It was your registered trade

19   name for it, correct?

20          A.    It was.

21          Q.    You had the exclusive right

22   to use that name, right?

23          MS. VANNI:  Object to form.

24          Beyond the scope.

1            THE WITNESS:  From a

2       regulatory perspective, yes.

3    BY MR. BUCHANAN:

4            Q.    Right.  So when the jury

5    hears Percocet it can think Endo, right?

6            MS. VANNI:  Objection.

7    BY MR. BUCHANAN:

8            Q.    It has your name?

9            MS. VANNI:  Objection.

10           THE WITNESS:  Percocet was

11      our branded product.  I will say

12      though, that as a strip that you

13      put on a cut, it's called a

14      Band-Aid, there is a branded

15      Band-Aid.  And there are a lot of

16      other kinds of band-aids.

17           There is a branded Percocet

18      product and there are a lot of

19      generic Percocet products.  Some

20      distributed by Endo, some

21      distributed not by Endo.

22           So there are a number of

23      products, generic products, that

24      get referred to as Percocet, that

1          may or may not be the branded

2          Percocet.

3    BY MR. BUCHANAN:

4          Q.    Fair point, sir.

5                And we see, in fact, you

6    sold a generic version of your own

7    branded product, right?

8          A.    We did.

9          Q.    Right.  Well, we can't

10   dispute that -- or you don't dispute, do

11   you, sir, that you sold a lot of

12   Percocet?

13               MS. VANNI:  Object to form.

14   BY MR. BUCHANAN:

15         Q.    And its generic equivalence?

16               MS. VANNI:  Object to form.

17               THE WITNESS:  We sold

18         Percocet.  I'm not disputing that.

19   BY MR. BUCHANAN:

20         Q.    Okay.  And as we see through

21   the years, certainly the early years

22   here, sir, Percocet is a big part of your

23   sales portfolio, right?

24               MS. VANNI:  Object to form.

1              THE WITNESS:  We sold the

2          quantities of Percocet that are

3          listed on this sheet.

4    BY MR. BUCHANAN:

5          Q.    Okay.  So by 2003, wow, you

6    have taken, with your Percocet and

7    Endocet brand, you've gone from, what,

8    about 260 million pills of Percocet and

9    Endocet in 1999, to, what is that, about

10   640 million pills, of Percocet and

11   Endocet for one year in 2003?

12         A.    About that.

13         Q.    Just about doubled, five

14   years.

15         A.    Right.  Reflecting the

16   demand for the product, for the patients

17   that need it.

18         Q.    A lot of growth, agreed?

19               MS. VANNI:  Object to form.

20   BY MR. BUCHANAN:

21         Q.    Doubled sales in five years

22   of Percocets?

23         A.    There's growth from 1999 to

24   2003 reflecting the increased demand for

Highly Confidential - Subject to Further Confidentiality Review

1    the products for the patients that need

2    them.

3                MR. BUCHANAN:  Let's --

4         let's have 548, please.

5                THE WITNESS:  548?

6    BY MR. BUCHANAN:

7         Q.    I called it 548.  We have a

8    system that'll just help our tech to pull

9    up the documents.  That's in the top

10   right corner.

11        A.    Oh, I see.  I see.

12        Q.    From time to time I will

13   refer to the point numbers for your

14   convenience and mine.

15               MR. BUCHANAN:  But we've

16        marked it as what exhibit number?

17   BY MR. BUCHANAN:

18        Q.    Okay.  Passing you

19   Exhibit 9, sir.  It's an action plan to

20   prevent diversion.

21               Do you see that?

22        A.    I do.

23        Q.    Okay.  Sue Tolen, do you

24   remember her?

1        A.      No.

2        Q.      She preceded you?

3        A.      I don't know Sue Tolen.

4        Q.      Didn't speak with her in

5    your preparation for today?

6        A.      No.  No, I have not.

7        Q.      It's a -- it's an alert from

8    the DEA, do you see that?

9                Drugs and chemicals of

10   concern.  It says, "Oxycodone."  And it

11   says, "Action plan to prevent the

12   diversion and abuse of OxyContin."

13               Do you see that?

14       A.      I see that.

15       Q.      Okay.  I'll direct you to

16   548.3.  To orient us, this is an e-mail

17   exchange from 7/14/2003.  We are now on

18   .3 at the bottom, please.

19               MR. BUCHANAN:  Can you blow

20          out that paragraph.

21   BY MR. BUCHANAN:

22       Q.      It reads:  "Oxycodone has

23   been marketed in combination products

24   with aspirin and acetaminophen, Percodan

1    and Percocet for many years."

2                What's the next sentence

3    say, sir?

4         A.    It says, "Diversion and

5    abuse of these products continue."

6         Q.    Let's pause.  Okay.  Does

7    that help you understand, sir, in the

8    context of your earlier testimony that

9    really fairly early on Endo's products

10   were a subject of abuse and diversion?

11               MS. VANNI:  Objection.

12               THE WITNESS:  What I stated

13        earlier was that if our products

14        aren't properly controlled through

15        the regulations and the controls

16        we put in place to prevent abuse

17        and diversion, then they could be

18        abused and diverted.

19   BY MR. BUCHANAN:

20        Q.    And what this says, sir, is

21   that diversion and abuse of these

22   products, referencing Percodan and

23   Percocet in the prior sentence,

24   continues.

Highly Confidential - Subject to Further Confidentiality Review

1        Do you see that, sir?

2            MS. VANNI:  Object to form.

3            THE WITNESS:  I see what it

4    says here.

5    BY MR. BUCHANAN:

6        Q.    And you've told us, sir,

7    Percocet was your brand name.  You see

8    the little R there, right?

9        A.    I see that R.

10       Q.    That's Endo's product, with

11   the R.

12           How about Percodan, was that

13   also your brand name, sir?

14       A.    Yeah, I believe we sold

15   Percodan for some period of time, yes.

16           MR. BUCHANAN:  Can we go

17   back to Exhibit 4 for a moment.

18   BY MR. BUCHANAN:

19       Q.    Percodan is the combination

20   of oxycodone and aspirin, right?

21           MS. VANNI:  Object to form.

22           THE WITNESS:  Yes, yes.

23           MR. BUCHANAN:  Can you

24   highlight the Percodan there?

Highly Confidential - Subject to Further Confidentiality Review

1        Okay.

2             And I think the -- maybe you

3        could blow it out so we can see

4        the -- the actual sales up through

5        2003.

6             Thank you.  Good.

7   BY MR. BUCHANAN:

8        Q.   All right.  So Percodan is a

9   good product for you.  Do you see that?

10            MS. VANNI:  Object to form.

11            THE WITNESS:  I see that we

12       sold Percodan.

13  BY MR. BUCHANAN:

14       Q.   Millions and millions and

15  millions of Percodan as well, right?

16            MS. VANNI:  Objection.

17            THE WITNESS:  I see we sold

18       42 million Percodan tablets over

19       18 years.

20  BY MR. BUCHANAN:

21       Q.   Okay.  How about over this

22  period of time, because it looks like --

23  and I guess this is just the nongeneric

24  formulation, right?

Highly Confidential - Subject to Further Confidentiality Review

1              Because you made a generic

2      formulation of Percodan, correct?

3              A.    We did.

4              Q.    Okay.  You made Endodan.  So

5      let's talk about that one.

6                    MR. BUCHANAN:  Can you

7              highlight that line as well?

8              Okay.

9      BY MR. BUCHANAN:

10             Q.    So we see for Endodan over

11     that four-year period of time, you sold

12     85 million tablets of Endodan, right?

13             A.    About that.

14             Q.    Okay.  It looks like another

15     30, 35 million of Percodan, right?

16             A.    About that.

17             Q.    It's over a hundred million

18     Percodan products, right, oxycodone and

19     aspirin combined, right?

20             A.    That's what it says here.

21             Q.    Okay.  And just satisfy me,

22     sir, that both the Percocet products

23     which you sold in the quantities we've

24     talked about, and the Percodan products

1    that you sold and we've talked about,

2    were in fact highlighted by the DEA as

3    products for which diversion and abuse

4    continued as of 2003?

5              MS. VANNI:  Object to form.

6    BY MR. BUCHANAN:

7         Q.    Can you confirm that's what

8    the DEA reported?

9         A.    What it says here is,

10   "Oxycodone has been marketed in

11   combination with products with aspirin

12   and acetaminophen, Percodan and Percocet,

13   for many years.  Diversion and abuse of

14   these products continue."

15        Q.    Thank you.

16        A.    That's what it says here.

17        Q.    Okay.  So by 2003,

18   certainly, we have this DEA release in

19   the company's files.

20              And you don't dispute that

21   the company was aware as of that point in

22   time that diversion and abuse were

23   continuing with Percocet and Percodan as

24   of that point in time, do you, sir?

Highly Confidential - Subject to Further Confidentiality Review

1              MS. VANNI:  Object to form.

2              THE WITNESS:  As I stated

3         earlier, if these products aren't

4         controlled properly, they can be

5         abused and diverted.  I also

6         stated that branded products like

7         Percocet, Percodan, and many times

8         the generic is confused with the

9         brand or people refer to the

10        branded product -- to the generic

11        product as the branded product.

12   BY MR. BUCHANAN:

13        Q.    Are you disputing the DEA's

14   statement, sir, that diversion and abuse

15   continued with regard to Percodan and

16   Percocet as of 2003?

17             MS. VANNI:  Object to form.

18             THE WITNESS:  I'm not

19        debating what it says in front of

20        me.

21   BY MR. BUCHANAN:

22        Q.    Okay.  And continue means

23   it's happened before and it's still

24   happening, fair?

Highly Confidential - Subject to Further Confidentiality Review

1            MS. VANNI:  Object to form.

2            THE WITNESS:  Abuse and

3       diversion can happen if these

4       products aren't properly

5       controlled.  Misuse of the

6       products can also occur with

7       people who have a valid

8       prescription for the product.  I'm

9       not disputing that.

10  BY MR. BUCHANAN:

11       Q.   I'm not asking you in a

12  general sense.  I'm asking to make sure

13  we understand each other with regard to

14  what the word "continue" means.

15            Continue means is it was

16  happening and is happening; is that fair?

17            MS. VANNI:  Object to form.

18            THE WITNESS:  That's what

19       DEA is saying here.

20  BY MR. BUCHANAN:

21       Q.   Abuse and diversion of

22  Percodan and Percocet has happened and

23  it's still happening, right?

24            MS. VANNI:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  That's what it

2      says here.

3   BY MR. BUCHANAN:

4           Q.    Okay.  And that's something

5   that Endo was certainly aware of as of

6   2003?

7           MS. VANNI:  Object to form.

8           THE WITNESS:  Endo had this

9      communication from DEA in 2003.

10  BY MR. BUCHANAN:

11          Q.    Thank you.

12          MR. BUCHANAN:  You can take

13     that down.

14  BY MR. BUCHANAN:

15          Q.    I don't know an easy way to

16  kind of talk about Par versus Qualitest

17  versus Endo, because their timelines are

18  different.  So I'm going to try to do

19  them separately to keep the record clear.

20  So I'm going to announce to you that I'm

21  going to be focusing on the Par period of

22  time.  Okay?  And the pre-merger into the

23  Endo entity's period of time, fair?

24          A.    Fair.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    So to orient you from a time

2    frame perspective, it'll be the time

3    period, I believe, prior to 2015, 2016,

4    and Par's activities, conduct, drugs,

5    things like that, okay?

6            Passing you, sir, what we're

7    marking as Exhibit 5, filling in some

8    gaps from earlier.

9            Par is a company that, like

10   Endo, has made opioids over the years,

11   correct, sir?

12      A.    Correct.

13      Q.    This is, in fact, a chart of

14   the opioid-containing products that Par

15   has identified to us over the years.

16            The way it's been produced

17   to us, I'll represent to you, doesn't

18   draw a distinction between the pre-merger

19   entity and the post-merger entity.  So at

20   some point in time, I'm assuming, as of

21   2016 to 2018, sales for Qualitest are

22   reflected in there, but let's focus first

23   on the 2010 to 2015 period of time.

24   Okay?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Right.  I believe, in

2   looking at the chart, the Qualitest

3   products are included in 2015.

4        Q.    And you're making that

5   inference based on the product mix and

6   the quantities?

7        A.    I'm making that inference

8   based on my knowledge of the product mix

9   and the quantities.

10        Q.    Okay.  So if we want to get

11   a sense of kind of Par's pre-merger

12   opioid business, we can get a pretty good

13   perspective looking at the 2014 prior

14   period?

15             MS. VANNI:  Object to form.

16             THE WITNESS:  I think that

17        would make sense.

18   BY MR. BUCHANAN:

19        Q.    Okay.  So the company is

20   making some hydrocodone products, right?

21             MS. VANNI:  Just note my

22        objection to the use of this

23        document consistent with my prior

24        objection.

Highly Confidential - Subject to Further Confidentiality Review

1    Also, it looks to have a

2    product from another manufacturer

3    on here, Purdue, oxycodone,

4    Purdue.

5    MR. BUCHANAN:  This is as

6    produced to us by the defense.

7    And actually, it was a question

8    that I was going to ask the

9    witness.

10    MS. VANNI:  Okay.  Also note

11    my objection that he is not a

12    30(b)(6) on sales, and he can't

13    authenticate the information

14    contained in this.

15    You can proceed.

16    (Document marked for

17    identification as Exhibit

18    Endo-Macrides-10.)

19  BY MR. BUCHANAN:

20    Q.    Passing you also, sir,

21  Exhibit 10.

22    Exhibit 10, is, I'll

23  represent to you, sir, Exhibit A to Par's

24  supplemental interrogatory responses.  We

1    asked for the records of the products

2    that were shipped by Par.  That is the

3    data that was given to us, and it's been

4    collapsed and enlarged for your

5    convenience in the prior exhibit.  I

6    think you'll find the prior exhibit,

7    Exhibit 5 easier to read.

8            A.    I can't read that.

9            Q.    That's why we did what we

10   did.

11           A.    Okay.

12           Q.    Okay.  You have the source

13   materials, if you'd like, Exhibit 10.

14                 Exhibit 5 is our summary

15   table for your convenience.

16                 All right.  So we see prior

17   to the 2015 merger that Par is in the

18   business of making a hydrocodone kind of

19   liquid.

20                 Do you see that?

21           A.    I see that.

22           Q.    Okay.  As of 2014 selling a

23   hundred-plus million dosage units of

24   that.  It's got an oral transmucosal

Highly Confidential - Subject to Further Confidentiality Review

1    fentanyl citrate product.

2              Do you see that?

3         A.    I see that.

4         Q.    And fentanyl is a pretty

5    potent opioid, fair?

6              MS. VANNI:  Object to form.

7              THE WITNESS:  I understand

8         that fentanyl is an opioid.

9    BY MR. BUCHANAN:

10        Q.    Do you understand that it's

11   fairly potent?

12        A.    I don't have specific

13   knowledge of the potency of fentanyl.  I

14   understand it's an opioid.

15        Q.    Okay.  Do you have a sense

16   of the relative desirability of different

17   active pharmaceutical ingredients in

18   terms of the street value?

19              MS. VANNI:  Object to form.

20              THE WITNESS:  I don't have

21        any specific knowledge of that.  I

22        understand that my responsibility

23        is to control all opioid products

24        in the same way to prevent the

1       diversion and abuse of those

2       products.

3   BY MR. BUCHANAN:

4       Q.    Certain products can be more

5   desirable than others though in the

6   street, true?

7           MS. VANNI:  Object to form.

8           THE WITNESS:  I imagine that

9       could be true.  I have no --

10  BY MR. BUCHANAN:

11      Q.    Do you have any knowledge in

12  that regard?

13      A.    I have no specific

14  knowledge --

15      Q.    Fair enough.

16      A.    -- on the --

17      Q.    Okay.

18          So we see the company is

19  making fentanyl patches in 2014.  It's

20  got -- making oral transmucosal fentanyl

21  citrate.  It's making morphine sulfate.

22          Do you see that?

23      A.    I see that.

24      Q.    Okay.  It's -- there's a

1    line item here for oxycodone and on the

2    chart that was produced to us it says --

3              MR. BUCHANAN:  I'm sorry,

4         can you pull up E1809 for

5         everyone's benefit.

6              If I do that again, just

7         somebody give me an elbow so you

8         can see.  Okay?

9              Can you blow out to 2014.

10        The -- actually include 2015, just

11        so we have a -- no, I'm sorry,

12        with the drug names all the way to

13        2015.

14              Thank you.  Okay.

15   BY MR. BUCHANAN:

16        Q.    That may help you if you

17   want to read the screen, sir.

18        A.    Oh, I can read this.

19        Q.    Okay.  So Par, prior to its

20   merger with Endo and Qualitest in 2015 is

21   also in the opioid business, right?

22        A.    They are.

23        Q.    Okay.  Millions of pills and

24   millions of dosage units of syrups,

1  patches.  It looks like oral

2  transmucosals, of various opioid

3  formulations.

4          Is that fair?

5          MS. VANNI:  Object to form.

6          THE WITNESS:  Yes.  Parceled

7      and marketed opioid products.

8  BY MR. BUCHANAN:

9      Q.    Okay.  It looks like they

10  are also in the Percocet business, right,

11  2014?

12      A.    The -- the Percocet would

13  have been -- I believe that would be the

14  Endo product.

15      Q.    Well, we know Endo doesn't

16  buy Par until when?

17      A.    2015.

18      Q.    Right.  So in 2014, in the

19  data that's been provided to us, we see

20  some 272 million pills?

21      A.    That's oxycodone/APAP, not

22  Percocet.  You said Percocet.  Percocet

23  was zero in 2014.

24      Q.    Oh, I'm sorry.  Is -- is

Highly Confidential - Subject to Further Confidentiality Review

1    oxycodone/APAP not the generic

2    formulation of Percocet?

3         A.    It is the generic

4    formulation of Percocet.  I was just

5    confused because you said Percocet and

6    Percocet is zero on here in 2014.

7         Q.    Oh, that -- that's fair.

8    Okay.

9              So what I'm -- what I'm

10   highlighting, sir, is oxycodone/APAP is

11   the generic form of Percocet.  And I

12   apologize if I confused you with that.

13             By 2014, Par is in the

14   Percocet business, right?

15             MS. VANNI:  Object to form.

16             THE WITNESS:  They are in

17        the generic Percocet business,

18        yes.

19   BY MR. BUCHANAN:

20        Q.    Okay.  By 2014, Par is in

21   the generic Percocet business, do you

22   agree?

23        A.    I agree.

24        Q.    To the tune of about a pill

1    for every American?

2                   MS. VANNI:  Object to form.

3                   THE WITNESS:  The quantity

4        here says 272 million tablets.

5    BY MR. BUCHANAN:

6        Q.   Okay.  About a pill for

7    every American?

8                   MS. VANNI:  Object to form.

9        Beyond the scope.

10                  THE WITNESS:  It's 272

11       million tablets.

12   BY MR. BUCHANAN:

13       Q.   A lot of pills, right?

14                  MS. VANNI:  Object to form.

15                  THE WITNESS:  It's 272

16       million tablets.

17   BY MR. BUCHANAN:

18       Q.   Okay.  And Par as a

19   manufacturer of opioids and a distributor

20   of opioid products, was also charged with

21   maintaining effective controls against

22   diversion, correct?

23       A.   Correct.

24       Q.   Also had to have a

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious order monitoring program,

2    right?

3              A.    Correct.

4              Q.    Also received orders before

5    it shipped each of those pills, patches

6    and liquids, correct?

7              A.    Correct.

8              Q.    In 2010 how many -- and I'll

9    represent to you, sir, I don't have data

10   that goes back prior to 2010 for -- for

11   Par.  That may be because they didn't

12   make it prior to that point in time, or

13   it may be because it just wasn't given to

14   us.

15              But as of 2010, did the

16   company stop shipping any order it

17   received because of excessive quantity,

18   frequency, or any of the other categories

19   for a suspicious order?

20                   MS. VANNI:  Object to form.

21                   THE WITNESS:  Par had a DEA

22         compliance function and procedures

23         around reviewing orders.  I don't

24         believe there were any orders

Highly Confidential - Subject to Further Confidentiality Review

1           reported that were deemed

2           suspicious after review and

3           investigation of any orders of

4           interest.

5    BY MR. BUCHANAN:

6           Q.    Any order that it

7    stop-shipped and didn't fill?

8           A.    I don't believe so.

9           Q.    Okay.  So for 2010, no

10   orders reported to DEA and no orders

11   stop-shipped, true?

12          A.    My understanding is that we

13   did not report any suspicious orders

14   after investigation of any orders of

15   interest that came through our SOMs

16   program.

17          Q.    Okay.  2011, again,

18   150 million pills, units, patches.  I

19   guess it's just pills, excuse me.  Oral

20   transmucosal fentanyl and cough syrup at

21   that point in time.

22                Any reports to the DEA in

23   2011?

24                MS. VANNI:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  I'm not aware

2      of any orders that were reported

3      as suspicious after review and

4      investigation of any orders of

5      interest.

6  BY MR. BUCHANAN:

7      Q.     Okay.  Any stop-ships?

8      A.     Not that I'm aware of.

9      Q.     Okay.  2012, 190 million,

10 180 million, something like that, dosage

11 units, pills, patches, liquids.

12          Numbers going up, right?

13     A.     So these products in 2012,

14 Par had a very active history as a

15 generics company of launching new

16 products.  These products appear to have

17 been launched in 2012, which is why

18 they -- they show up there.

19     Q.     So --

20     A.     I'm not aware of any orders

21 that were reported as suspicious after

22 review and investigation through our SOMs

23 system.

24          Also any time a product was

1    launched there were specific procedures

2    around reviewing customers who were

3    ordering that product, you know, to

4    ensure that they had the appropriate

5    licenses, programs, et cetera, in place

6    to control these products properly.

7            Q.    Well, let's talk about that,

8    I guess.

9            In 2010, please describe for

10   the jury what Par's suspicious order

11   monitoring program was.

12           A.    I would describe the program

13   as standard operating procedures looking

14   at orders that would be deemed of

15   interest based on orders that were

16   excessive relative to, you know,

17   historical parameters.

18           There was also, as I

19   understand it, diligence around new

20   customers.

21           Those -- those SNOPs and

22   programs would have been evolving.

23           THE VIDEOGRAPHER:  Off the

24           record at 11:11 a.m.

1              (Brief pause.)

2              THE VIDEOGRAPHER:  We are

3        back on the record at 11:12 a.m.

4    BY MR. BUCHANAN:

5        Q.    Okay.  I apologize for

6    the -- for the interruption, sir.

7              You were telling us about

8    Par's suspicious order monitoring program

9    back in time here, pre-merger period.

10             In fact, as of 2010, the

11   company didn't even have a suspicious

12   order monitoring program, isn't that

13   true?

14             MS. VANNI:  Object to form.

15             THE WITNESS:  You might

16        describe it more as an order

17        management program.  I think new

18        customers were being reviewed and

19        orders were being reviewed at some

20        level.

21             MR. BUCHANAN:  Can I have

22        1056, please.

23   BY MR. BUCHANAN:

24        Q.    Did you find an SOP for a

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious order monitoring program for

2    Par as of 2010, sir?

3          A.    I looked at a lot of

4    documents.  If you can show me a document

5    that you're referring to.  I looked at a

6    lot of documents.  I don't remember

7    exactly all the documents that I looked

8    at.  I did look at documents with

9    specific procedures for Par around

10   suspicious order monitoring, new

11   customers -- setting up new customers, et

12   cetera.

13         Q.    The hard thing for me is I

14   can't show you something that doesn't

15   exist.  So in 2010, sir, are you aware of

16   an SOP or a policy or procedure for

17   suspicious order monitoring?

18         A.    I reviewed policies and

19   procedures for Par.  I don't remember the

20   exact dates.

21              (Document marked for

22         identification as Exhibit

23         Endo-Macrides-11.)

24   BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    I'm passing you, sir, what

2    we've marked as, I think that's

3    Exhibit 11 for your deposition.

4            MR. BUCHANAN:  Provide a

5       copy to counsel, please.

6            Can you pull up E-1056.

7    BY MR. BUCHANAN:

8      Q.    All right.  This, sir, is an

9    e-mail from Joseph -- I'll probably

10   mispronounce his name.

11     A.    Barbarite.

12     Q.    Barbarite.  Okay.  To Angela

13   Feniger and others.  Was Ms. Feniger one

14   of the people you talked with?

15     A.    She was.

16     Q.    Okay.  When you talked with

17   her, sir, did she tell you that they had

18   no suspicious order monitoring in place

19   while they were selling controlled

20   substances in 2010?

21            MS. VANNI:  Object to form.

22            THE WITNESS:  I don't

23       believe we specifically discussed

24       that.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2         Q.    Okay.  Y'all invited a

3    company in to take a look at your systems

4    in 2010, right?  A company called Cegedim

5    Dendrite.  Buzzeo might be another name

6    that you recall.

7         A.    Yeah.  That's what it says

8    here, yes.

9         Q.    Okay.  Had you seen this

10   document before?

11        A.    I had not seen this

12   document.

13        Q.    Okay.  So this is the report

14   back from your consultant to you in, I

15   guess, early 2010, following an

16   April 2010 inspection.  Let's go to

17   1056.2.  That is the cover letter that

18   accompanies the report.

19        A.    I see it.

20        Q.    Signed by Mr. Buzzeo, chief

21   compliance officer.

22             Do you see that?

23        A.    I see that.

24        Q.    Okay.  You've seen reports

Highly Confidential - Subject to Further Confidentiality Review

1    and analyses by Mr. Buzzeo over the years

2    to your company?

3         A.    I have.

4         Q.    Okay.  The company worked

5    with Mr. Buzzeo after this point in time,

6    right?

7              MS. VANNI:  Object to form.

8              THE WITNESS:  We did.

9    BY MR. BUCHANAN:

10        Q.    And before this point in

11   time, right?

12        A.    We did.

13        Q.    All right.  You relied on

14   him?

15             MS. VANNI:  Object to form.

16             THE WITNESS:  We used them

17        for input into how we can improve

18        our programs.

19   BY MR. BUCHANAN:

20        Q.    And you respected their

21   advice, right?

22             MS. VANNI:  Object to form.

23             THE WITNESS:  If we hired a

24        consultant it was to give us

Highly Confidential - Subject to Further Confidentiality Review

1    specific input to challenge us and

2    to give us suggestions on how we

3    can improve.

4  BY MR. BUCHANAN:

5    Q.    Sure.

6    A.    In that context that's why

7  we -- that's how we would have --

8    Q.    And you invited them into

9  your shop, right?

10    MS. VANNI:  Object to form.

11  BY MR. BUCHANAN:

12    Q.    Per the 1056.3?

13    A.    I'm just looking this over.

14  Yes, it looked like there was a visit to

15  the facility.

16    Q.    Visit to the facility, short

17  review of documents, to provide findings

18  and recommendations back to the company,

19  correct?  We're going to 1056.10.

20    A.    1056.10?

21    Q.    Yes.  Is that correct?  You

22  called them in.  They looked at stuff.

23  They gave you a report and analysis back?

24  Fair, sir?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    It looked like they did an

2    audit and gave us some -- some findings.

3          Q.    Okay.  Let's go to Finding

4    Number 8.

5          A.    Are you on --

6          Q.    1056.10.

7          A.    Okay.

8          Q.    I'm sorry.

9                Finding Number 8, SOM,

10   below.  I guess there's two Finding

11   Number 8 -- Findings Number 8.

12               Finding Number 8, SOM.

13   Could you read that sentence for us, sir?

14         A.    "There is no suspicious

15   order monitoring program in place."

16         Q.    Okay.  Let's pause there.

17   As of 2010, the company is selling

18   controlled substances that it must keep

19   in a vault and in a cage in its warehouse

20   and production facilities, correct?

21               MS. VANNI:  Object to form.

22               THE WITNESS:  Par was

23          selling opioids that had certain

24          regulations on how they needed to

1    be stored and controlled.

2  BY MR. BUCHANAN:

3        Q.    And there is a requirement?

4              MR. BUCHANAN:  Can we blow

5        that out?

6  BY MR. BUCHANAN:

7        Q.    Under 21 C.F.R. 1301.74(b).

8  Do you see that?  That the company must

9  maintain and operate a system to disclose

10  to the registrant suspicious orders of

11  controlled substances, right?

12             Do you see that?

13       A.    Yeah.  And if I could just

14  have a minute to read it.  Yes, this is

15  what the regulation says.

16       Q.    Okay.  And that regulation's

17  not a new one, right?

18       A.    No.

19       Q.    I mean, that regulation has

20  been around for as long as Endo has been

21  around, right?

22             MS. VANNI:  Objection.

23             THE WITNESS:  The

24       regulations has been in place for

Highly Confidential - Subject to Further Confidentiality Review

1    whatever period of time they've

2    been in place.

3  BY MR. BUCHANAN:

4       Q.    Right.  And the Controlled

5  Substance Act actually has a provision

6  that manufacturers and distributors are

7  supposed to maintain effective controls

8  against diversion, right?  Are you aware

9  of that?

10      A.    I'm aware of that, yes.

11      Q.    Okay.  So as of 2010, sir,

12 there is no suspicious order monitoring

13 program in place.  That's what you're

14 told by the consultants you hired to look

15 at this issue, correct?

16      A.    That's what the report says.

17      Q.    Okay.

18      A.    So as I said earlier, we

19 hired --

20      Q.    That's my question sir.

21            Recommendation underneath,

22 "Although it was stated that sales are

23 mainly to large wholesalers" -- let's

24 pause.

Highly Confidential - Subject to Further Confidentiality Review

1                As a registrant, you have an

2    obligation to maintain a suspicious order

3    monitoring program, period, correct, sir?

4                MS. VANNI:  Object to form.

5                THE WITNESS:  We have an

6           obligation to do what it says here

7           in the regulations, to design and

8           operate a system to disclose to

9           the registrant suspicious orders

10          of controlled substances.

11   BY MR. BUCHANAN:

12         Q.    Right.

13         A.    That's what we have an

14   obligation to do.

15         Q.    Right.  It doesn't -- the

16   explanation given to your consultant that

17   well, we just sell to wholesalers, that

18   doesn't mean that you don't have to have

19   a suspicious order monitoring program,

20   right?

21               MS. VANNI:  Object to form.

22               THE WITNESS:  We have to --

23   BY MR. BUCHANAN:

24         Q.    You know better than that?

Highly Confidential - Subject to Further Confidentiality Review

1      MS. VANNI:  Object to form.

2      THE WITNESS:  We have to do

3  what it says in the registrant --

4  in the register -- in the -- I'm

5  sorry, in the C.F.R.  We have to

6  do what it says in the C.F.R.

7  BY MR. BUCHANAN:

8      Q.    Right.  You must have a

9  program, right?

10     A.    We must have a system to

11 disclose suspicious orders of controlled

12 substances.

13     Q.    That's right.  And it says

14 here, a program must be what?

15 Instituted, correct?

16     A.    I'm sorry.  Where are you

17 reading that?

18     Q.    The top says, "There is no

19 suspicious order" -- "no suspicious order

20 monitoring program in place."

21     First sentence, right?

22     A.    Right.

23     Q.    It advises your team, there

24 is a regulation that requires one.

Highly Confidential - Subject to Further Confidentiality Review

1    That's the second part, right?  It says

2    that's the requirement?

3         A.    Yes, they are quoting the

4    regulations here.

5         Q.    And then they are saying,

6    here is our recommendation, that you

7    institute one, that you comply with the

8    law.

9              MS. VANNI:  Object to form.

10             THE WITNESS:  The way I

11        interpret this document, we hired

12        these consultants to come in

13        because we recognized that the --

14        as I said earlier, that these

15        products, opioid products, if they

16        are not properly controlled, can

17        be abused and diverted.

18             We -- we brought these

19        consultants in, in a proactive

20        way, to give us guidance and

21        direction on how to develop a

22        better program for ensuring that

23        our orders were reviewed properly,

24        comprehensively, and ultimately

1          any orders of interest were

2          investigated.

3     BY MR. BUCHANAN:

4          Q.     Did you say --

5          A.     That's how I interpret this

6     document.

7          Q.     Did you say a better

8     program, sir?  A better?

9               There was no program prior

10    to this point in time.  None.

11         A.     I'm not interpreting this

12    document to suggest that there was no

13    program.

14         Q.     What did they say, sir?

15         A.     I'm -- I'm interpreting this

16    document as the consultants, as they

17    would define a suspicious order

18    monitoring program, that they felt that

19    we needed to improve.

20         Q.     Please tell the jury what

21    SOP Par had for suspicious order

22    monitoring prior to this date, sir.

23         A.     I'm not referencing a

24    specific SOP.  I'm just telling you how

Highly Confidential - Subject to Further Confidentiality Review

1    I'm interpreting this document.

2            Q.    Well, please tell me --

3            A.    I'm not interpreting the

4    document to suggest that Par wasn't in

5    some way reviewing orders that, you know,

6    potentially would be excessive based on

7    historical parameters.

8                  Now, that may not be the way

9    the consultant is defining the suspicious

10   order monitoring program.  But that

11   doesn't mean that these orders weren't

12   being looked at to determine whether or

13   not there was an order that was, quote,

14   excessive.

15           Q.    So these consultants that

16   you hired came in, and you understand

17   they have specific DEA compliance

18   experience, Cegedim, Dendrite, Buzzeo?

19           A.    Of course.

20           Q.    Okay.  Brought them in to

21   look at your system, sir.  They looked at

22   the system, and finding Number 8 says

23   there is no suspicious order monitoring

24   program in place.

Highly Confidential - Subject to Further Confidentiality Review

1           We can agree that's not an

2    ambiguous sentence, correct?

3           MS. VANNI:  Object to form.

4           THE WITNESS:  We can agree

5       that's what they said and wrote

6       into the report.

7    BY MR. BUCHANAN:

8       Q.    Right.  And we can also

9    agree sitting here today, sir, you are

10   not aware of a standard operating

11   procedure that the company actually has

12   dated prior to this point in time

13   concerning suspicious order monitoring,

14   correct?

15      A.    Like I said, I reviewed a

16   lot of documents.  I reviewed a lot of

17   Par SOPs.  I can't go back and tell you

18   exactly what date.

19           I -- I do know that Par had

20   an evolving program, as did Qualitest, as

21   did Endo, around suspicious order

22   monitoring and ensuring that our -- our

23   orders were reviewed and investigated to

24   prevent abuse and diversion.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Sitting here today, sir, you

2    don't recall a single Par policy,

3    procedure, or standard operating document

4    prior to the date of this memo for

5    suspicious order monitoring, correct,

6    sir?

7              MS. VANNI:  Object to form.

8              THE WITNESS:  I do recall a

9         suspicious order monitoring SOP.

10             I do not recall the time

11        frame at which that was

12        implemented.

13   BY MR. BUCHANAN:

14        Q.    Okay.  Well, we'll look at

15   that.  Okay.

16             Because the company, a few

17   years later, implements an SOP, right?

18             MS. VANNI:  Object to form.

19   BY MR. BUCHANAN:

20        Q.    After it's been selling

21   opioids for years --

22             MS. VANNI:  Objection.

23   BY MR. BUCHANAN:

24        Q.    -- right?

1    MS. VANNI:  Objection.

2    THE WITNESS:  As I said, our

3    programs were evolving in response

4    to increasing our diligence around

5    monitoring orders and ensuring

6    that we were doing everything we

7    could within the regulations to

8    prevent our abuse and diversion.

9    This step of bringing in a

10   consultant, which we do quite

11   frequently, to challenge us, to

12   help us raise the bar, to give us

13   their view on things.

14   MR. BUCHANAN:  Move to

15   strike.

16   BY MR. BUCHANAN:

17   Q.   My question was, the company

18   has been selling opioids for years prior

19   to the time it implements its first SOP.

20   Do you know that, sir?

21   MS. VANNI:  Objection.

22   Asked and answered.

23   THE WITNESS:  I have data

24   here that says the company was

Highly Confidential - Subject to Further Confidentiality Review

1    selling opioids in 2010.

2    BY MR. BUCHANAN:

3          Q.    Okay.  Let's take a look

4    at -- and you are not aware of an SOP

5    from 2010, are you, sir?

6               MS. VANNI:  Objection.

7    BY MR. BUCHANAN:

8          Q.    For suspicious order

9    monitoring?

10              MS. VANNI:  Objection.

11              THE WITNESS:  I think I

12         already said that I reviewed SOPs,

13         but I -- I did not -- I'm not

14         aware of the actual dates.  I

15         don't remember the dates of -- of

16         specific SOPs that I reviewed.

17   BY MR. BUCHANAN:

18         Q.    Okay.  We can agree that --

19   we have -- we have your memory obviously

20   of not having a specific date for an SOP.

21              We have your consultants

22   though who came in and did a

23   three-year -- three-day, excuse me, site

24   visit.  Spoke with people, looked at

1    things, and delivered a report which said

2    there is no suspicious order monitoring

3    program in place as of this date in 2010,

4    correct, sir?

5              MS. VANNI:  Object to form.

6              THE WITNESS:  As the

7         consultants define suspicious

8         order monitoring program, their

9         input was we needed to enhance

10        whatever we were doing in terms of

11        looking at orders and formalize

12        the program.  That's how I would

13        interpret their response here.

14   BY MR. BUCHANAN:

15        Q.    Okay.  And so the answer to

16   my question, sir, though about whether

17   you are aware of a standard operating

18   procedure for SOMs or a policy as of 2010

19   is still the same, you're not aware of

20   one, correct?

21              MS. VANNI:  Objection.

22        Misstates his testimony.

23              THE WITNESS:  I reviewed a

24        lot of documents.  I know I

Highly Confidential - Subject to Further Confidentiality Review

1    reviewed documents, Par documents,

2    that were related to suspicious

3    order monitoring.

4        I don't remember -- I don't

5    recall the date.  I looked at a

6    lot of documents to prepare for

7    this.  I didn't commit them all to

8    memory.

9 BY MR. BUCHANAN:

10    Q.    Okay.  Let me show you the

11 first one we found, sir.  Okay.

12        MR. BUCHANAN:  Can I have

13    1839.

14        (Document marked for

15    identification as Exhibit

16    Endo-Macrides-12.)

17 BY MR. BUCHANAN:

18    Q.    I'm passing you, sir, what

19 we're marking as Exhibit 12.  This is an

20 e-mail from Ms. Feniger to Ms. Lipari and

21 some others on the team.  Suspicious

22 order monitoring.

23        SOM, do you see that?

24    A.    I see that.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    Attachments SO002.  Do you

2   see that?

3       A.    I see that.

4       Q.    Okay.  The quality is

5   something we're both suffering with, sir.

6   I wish I could have given you a better

7   copy.

8             And so what we have here is

9   the SOM.  And it's SOP number SO002.0.

10  Do you see that?

11      A.    I see that.

12      Q.    And it says supersedes.

13  What does it say after that?

14            MR. BUCHANAN:  Can you go to

15       .2 please.

16            THE WITNESS:  I'm sorry.

17  BY MR. BUCHANAN:

18      Q.    I'm sorry.  It's the top of

19  the page, sir.  I know my question was

20  confusing.

21            We see the SOP number on the

22  right.  You recognize that companies like

23  yours number their SOPs?

24      A.    Right.

1    Q.    And they often put a version

2    number, a dot after to indicate an

3    incremental change to an SOP?

4    A.    Right.

5    Q.    Okay.  What's the title of

6    this particular SOP, sir?

7    A.    Suspicious order monitoring.

8    Q.    Okay.  And the SOP number

9    for it is SO002.0, correct?

10   A.    Correct.

11   Q.    Supersedes?

12   A.    It says not applicable.

13   Q.    What is the date, the

14   effective date of this SOP, sir?

15   A.    April 17th of 2012.

16   Q.    Okay.  And we've got

17   signatures and approvals written by,

18   checked by, approved by.

19         Do you see all that?

20   A.    I do.

21   Q.    Okay.  This was actually

22   written by the head of sales?

23   A.    Written by Patricia Lipari,

24   director of sales.

1          Q.    Okay.

2          A.    Sales operations.

3          Q.    Okay.  Sales ops.  And it

4    was checked by a technical writer in

5    documentation, right?

6          A.    Checked by, yeah, Angela

7    Feniger.

8          Q.    I can't read the approved by

9    name.  Do you know that name?

10          A.    Dino Taraban.

11          Q.    Okay.  And so, sir, this

12    is -- the .0 or the first version of

13    Par's SOM, suspicious order monitoring

14    SOP, correct, sir?

15          A.    Appears to be the first

16    specific SOP entitled suspicious order

17    monitoring.

18          Q.    Okay.  And --

19          A.    But I wouldn't interpret

20    that as suggesting that orders were not

21    being looked at in some capacity prior to

22    that.

23          Q.    Yeah, that wouldn't be

24    helpful, right?  That'd be a real

1    problem?

2               MS. VANNI:  Object to form.

3    BY MR. BUCHANAN:

4         Q.    I mean, you had a consultant

5    come -- withdrawn.

6               You had a consultant come in

7    in 2010, in April, right?  The Buzzeo

8    group came in in April 2010?

9         A.    April.

10        Q.    We looked at that.

11        A.    Right.

12        Q.    They said, "There is no

13   suspicious order monitoring program," is

14   what they said, right?

15        A.    That was their observation.

16        Q.    Right.

17        A.    Those were their words.

18        Q.    They showed you the C.F.R.

19   They made a recommendation, right?  They

20   said, "You need an SOP," right?

21               MS. VANNI:  Object to form.

22        The document speaks for itself.

23               MR. BUCHANAN:  I'm happy to

24        let it speak for all of us.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  They said --
2          MR. BUCHANAN:  I told you
3     I'd allow that to happen.
4          THE WITNESS:  My
5     interpretation of what they said
6     is they said we need to improve
7     our program around order
8     monitoring.
9  BY MR. BUCHANAN:
10     Q.     What they said, "There is no
11  suspicious order monitoring program in
12  place."  You can agree that's what they
13  wrote and told the company in early 2010,
14  correct?
15     A.     That's what they said in
16  2010, based on the way they would define
17  suspicious order monitoring.
18     Q.     Right.  And -- well, they
19  said you had no suspicious order
20  monitoring program in place.  Yes or no?
21     A.     That's what it says here.
22     Q.     Thank you.  They quoted you
23  the regulation.  Yes or no?
24     A.     They quoted the regulation.

1    Q.    They said, "Although it was

2    stated" -- okay, do you understand that

3    to be referring to your people talking to

4    the Buzzeo folks, right?

5         MS. VANNI:  Object to form.

6    BY MR. BUCHANAN:

7    Q.    "Although it was stated that

8    sales are mainly to large wholesalers" --

9    is that your understanding, sir?

10   A.    Right.

11   Q.    The Buzzeo folks got that

12   information from your team at Par, right?

13   A.    Presumably yes, they were

14   speaking to people at Par.

15   Q.    Right.  "Although it was

16   stated that sales are mainly to large

17   wholesalers, a program must be instituted

18   based on customer sales, volumes,

19   seasonal fluctuations, et cetera, with a

20   firm statistical analysis as the basis

21   for such a program."

22        Did I read that correctly,

23   sir?

24        A.    You read -- that's what it

1    says.

2          Q.    Okay.  "It is further

3    recommended that the basis for

4    conducting" -- what?  Due diligence.

5                Do you see that?

6          A.    I see that.

7          Q.    -- "of new and existing

8    customers and identifying and

9    investigating and clearing of reporting

10   suspicious orders be documented in an

11   SOP."

12               Did I read that correctly,

13   sir?

14         A.    You did.

15         Q.    Okay.  And so we have now,

16   the rest of 2010 passes without an SOP,

17   right?

18         A.    This appears to be the first

19   SOP that is specifically titled

20   "Suspicious Order Monitoring."

21         Q.    All of 2011 passes without

22   an SOP, right?

23         A.    As I said, this is the first

24   SOP that appears to be entitled

Highly Confidential - Subject to Further Confidentiality Review

1    "Suspicious Order Monitoring."  That

2    doesn't mean that Par wasn't complying

3    with the registration around identifying

4    potentially suspicious orders --

5            Q.    And then in --

6            A.    -- in the 2010-2011 time

7    frame.

8            Q.    Then sometime around April

9    of 2012, you got around to getting an

10   SOP, huh?

11           MS. VANNI:  Object to form.

12   BY MR. BUCHANAN:

13           Q.    Do I have that right?

14           MS. VANNI:  Object to form.

15           THE WITNESS:  In April

16   of 2012, we published an SOP.

17   BY MR. BUCHANAN:

18           Q.    Okay.  And you published

19   that SOP, and, you know, we can agree

20   some 200 million units of pills and doses

21   and patches -- I guess it's not pills.

22   It's oral transmucosal fentanyl citrate

23   and syrups, are going out the door with

24   hydrocodone and fentanyl in 2010 and

1    2011, correct?

2                    MS. VANNI:  Object to form.

3                    MR. BUCHANAN:  Withdrawn.

4         Very confusing question.

5                    MS. VANNI:  Very.

6    BY MR. BUCHANAN:

7         Q.    You told us earlier in

8    April 2012 you published that SOP.  Yet

9    in 2010 and 2011 some 200 million dosage

10   units of fentanyl citrate and hydrocodone

11   went out the door, correct?

12        A.    We sold those products in

13   2010 and 2011.

14        Q.    Okay.

15        A.    You're assuming that the

16   lack of -- the lack of an SOP meant that

17   those orders were not being looked at or

18   not being reviewed.

19        Q.    You have not been able to

20   highlight any written procedure, any

21   documentation for the company that

22   preceded the April 2012 SOP, correct,

23   sir?

24                    MS. VANNI:  Object to form.

1          THE WITNESS:  I don't have a

2     document.

3 BY MR. BUCHANAN:

4          Q.    So could you describe for

5 us, sir, where in Exhibit 12 the company

6 describes how it's going to determine

7 what gets reported to the DEA?

8          A.    If you can give me a minute

9 to review this.

10          Q.    Sure.  Let's just -- let's

11 just go to 1839.2 real quick.

12          A.    1839.2.

13          Q.    We can agree under purpose,

14 policy, and responsibility, there's

15 nothing in here about reporting stuff to

16 the DEA, correct?

17          A.    It says, "Define process of

18 suspicious order monitoring as determined

19 by sales operations that we are in line

20 with DEA requirements."

21          So if -- if the order needs

22 to be reported to DEA, that would be in

23 line with DEA requirements.

24          Q.    Okay.  So what orders, then,

Highly Confidential - Subject to Further Confidentiality Review

1    are suspicious orders under your SOP for

2    suspicious order monitoring, sir?

3            A.    Orders that would be deemed

4    of interest.

5            Q.    Where are those?  You're

6    looking -- it sounds like you are not on

7    1839.2.  You are now on 18 point --

8            A.    I'm just reviewing the

9    document.

10           Q.    -- 1839.3.  We can agree

11   1839.2 doesn't identify what a suspicious

12   order is, correct?

13           MS. VANNI:  Object to form.

14   BY MR. BUCHANAN:

15           Q.    Characteristics, quality.

16   We could agree?

17           A.    It says, "Define a process

18   for suspicious order monitoring that's in

19   line with DEA requirements."  That's what

20   it says.

21           Q.    Okay.  Let's go to 1839.3.

22           So what were you telling

23   your sales operations folks was a

24   suspicious order on 1839.3?

1      A.   So what this is telling me

2  is that they're looking at orders that

3  are considered to be excessive.  "If

4  quantities are higher than the average

5  transmission, it is questioned."

6      Q.   Where are you, sir?

7      A.   I'm on -- under procedure.

8      Q.   Okay.  What paragraph?

9      A.   The second one.  "Weekly

10  replenishment purchase orders are

11  analyzed by account service executives

12  versus customer provided usages.  If

13  quantities are higher than the average

14  transmission it is questioned.

15          "The buyer is contacted to

16  review a written request, is asked as to

17  the reason for the increase.  It is

18  reviewed to ensure it is correct and

19  warranted."

20      Q.   Mm-hmm.  And then what gets

21  reported to the DEA?

22      A.   If there is not a reasonable

23  explanation for the order, and it was

24  deemed suspicious, then under the

Highly Confidential - Subject to Further Confidentiality Review

1   regulations it would need to be reported

2   to DEA.

3          Q.    Okay.  And where is that?

4   I'm just trying to find that?

5              Can we agree, sir, nothing

6   in here spells out what and how it gets

7   reported to the DEA?

8          A.    It doesn't seem to describe

9   that exact process.  It seems to talk

10  more about monthly reports are generated

11  and sent to quality compliance for

12  submission to DEA on a quarterly basis.

13         Q.    Okay.  We can agree, sir, in

14  2010, I think your testimony was no

15  orders were identified as suspicious or

16  reported to DEA, correct?

17         A.    We did not submit any

18  suspicious orders based on our review of

19  the orders.

20         Q.    And not in 2011 or in 2012,

21  correct, sir?

22         A.    Not to my knowledge.

23         Q.    Okay.

24         A.    After review and

Highly Confidential - Subject to Further Confidentiality Review

1    investigation.

2          Q.    Well, in fact, there was no

3    SOP in force until April of 2012,

4    correct?

5                MS. VANNI:  Object to form.

6                THE WITNESS:  Yes.  No SOP

7          specifically entitled "Suspicious

8          Order Monitoring."

9    BY MR. BUCHANAN:

10         Q.    Okay.  And, in fact, please

11   tell the jury who had a responsibility

12   for evaluating orders once you had an

13   SOP.

14                Let's go to 1839.2.  Do you

15   see the heading that says Responsibility?

16                Who had responsibility?

17         A.    "Sales" -- "sales

18   operations/account services to monitor

19   applicable Par trade customer purchase

20   orders."

21         Q.    Okay.  So the sales group?

22         A.    These aren't -- these aren't

23   salespeople.  These are -- these are

24   people that -- these are more clerical

1   people, administrative people that take

2   the orders.  They are not salespeople.

3         Q.    They are not compliance

4   people.

5               MS. VANNI:  Object to form.

6               THE WITNESS:  No, they are

7         customer service people.

8   BY MR. BUCHANAN:

9         Q.    Customer service -- in the

10  sales side of the organization, correct?

11        A.    They would sit in the sales

12  organization.

13        Q.    Okay.  And so not too long

14  after this particular SOP, sir, you

15  crafted another SOP, right?

16              Have you seen any of these,

17  by the way?

18        A.    I've reviewed SOPs,

19  policies.

20        Q.    Have you seen these?

21        A.    I saw this one.

22        Q.    Oh, you did.  Okay.  So --

23        A.    Like I said earlier, I

24  just -- I couldn't recall the date.  I

Highly Confidential - Subject to Further Confidentiality Review

1    have seen the document.

2          Q.    Okay.  All right.  Let's go

3    to 1845, please.

4                We're going to pass it over

5    to you.  It's going to be the next in

6    order.

7                MR. BUCHANAN:  What is the

8          next in order?

9                13.

10               (Document marked for

11         identification as Exhibit

12         Endo-Macrides-13.)

13   BY MR. BUCHANAN:

14         Q.    Okay.  So here we go, sir.

15   Passing you what we now have as

16   Exhibit 13 to your deposition.

17               This is the next iteration

18   of the suspicious order monitoring

19   protocol, correct?

20         A.    Version 2.1, yes.

21         Q.    Okay.  And that's the way we

22   can track these SOPs, by an SOP number

23   and then a dot with a version number?

24         A.    Version number.

1    Q.    Okay.  That's kind of the

2   way the corporate stuff works?

3    A.    That's how we work from a

4   compliance perspective.

5    Q.    Gotcha.  And then it says

6   over here, "Supersedes."  And it lists

7   the prior one we just looked at, right?

8    A.    That's correct.

9    Q.    Okay.  Does that help give

10  you comfort, sir, we were looking at the

11  first SOP just a moment ago on suspicious

12  order monitoring of Par, as of

13  April 2012?

14   A.    Yeah, I believe I already

15  said that.

16   Q.    Okay.  Well, let's look at

17  how the company framed its suspicious

18  order monitoring duties.

19        MS. VANNI:  Object to form.

20        MR. BUCHANAN:  Can we go

21     to -- I think it's .3.

22        Actually, just for the

23     jury's benefit can we go back to

24     .1.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2         Q.    This was put in force in

3    October of 2012, correct?

4         A.    That's what it says.

5         Q.    Okay.  And then if we go to

6    dot -- and again it was -- go back again,

7    I'm sorry.

8              Again, it was written by the

9    same director of sales operations, right?

10        A.    Right.

11        Q.    And signed off by the --

12   excuse me, checked by the account

13   services executive, right?

14        A.    Right.

15        Q.    That's a different name than

16   last name.

17             And then we've got that same

18   Dino person, head of QA?

19        A.    Yeah, he was -- he was head

20   of compliance for the -- for Par.

21        Q.    Okay.

22        A.    All of compliance.

23        Q.    Okay.

24        A.    Quality and DEA compliance.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  And well, let's look

2  at how this SOP evolved.

3         MR. BUCHANAN:  Can we go to

4    .3.

5  BY MR. BUCHANAN:

6    Q.   It says, "Reporting

7  suspicious criminal activities."

8         Do you see that?

9    A.   I see that.

10    Q.   Okay.  "If criminal activity

11  is suspected, report the following" --

12  "report the following to the state

13  agencies that are" -- "that license the

14  facility, e.g., board of pharmacy and

15  Food and Drug Administration, as well as

16  Drug Enforcement Administration for

17  controlled substances within three days

18  of suspecting criminal activity."

19         Do you see that, sir?

20    A.   I see that.

21    Q.   Okay.  We can agree, sir,

22  that your obligation and your promise as

23  a registrant, is to report orders of

24  unusual frequency, orders of unusual

```
1   size, consistent with the regulation we
2   looked at a moment ago.
3             Do you recall that?
4        A.    The regulation states that
5   if we deem an order to be suspicious,
6   then we report it.
7        Q.    Right.  I mean, the standard
8   is not whether it's suspicious criminal
9   activities, right?
10            MS. VANNI:  Object to form.
11            THE WITNESS:  If we deem an
12        order to be suspicious, then we
13        report it.
14  BY MR. BUCHANAN:
15        Q.    Right.  That is what the
16  regulation requires, right?
17        A.    That's what the regulation
18  says.
19        Q.    Right.  And what this says
20  is, if criminal activity is suspected,
21  that's when you have to do this, correct?
22            MS. VANNI:  Object to form.
23            THE WITNESS:  That's not how
24        I would interpret this.  This
```

1            seems to be covering more broadly

2            activity around -- I think it's

3            a -- it's a broad statement that

4            goes beyond just identifying a

5            suspicious order.

6    BY MR. BUCHANAN:

7            Q.    Well, we could agree, sir,

8    that the language that's reflected here

9    in terms of, if criminal activity is

10   suspected report the following to, and it

11   lists the agencies and whatnot.

12            That does not align with

13   what the Buzzeo group told you in 2010,

14   correct?

15            MS. VANNI:  Object to form.

16   BY MR. BUCHANAN:

17            Q.    Of your regulatory

18   responsibility?

19            A.    The Buzzeo report

20   specifically referenced the C.F.R.

21            Q.    Right.

22            A.    This is talking about

23   suspicious criminal activity.

24            Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Which goes, in my

2   interpretation, beyond simply identifying

3   and reporting a suspicious order.

4         Q.    Right.  Well beyond, right?

5         MS. VANNI:  Object to form.

6   BY MR. BUCHANAN:

7         Q.    This was, in fact, sir, the

8   SOP that you had in force for the next

9   several years, right?

10        MS. VANNI:  Object to form.

11        THE WITNESS:  Well, this SOP

12        would have been in existence until

13        we revised it.

14  BY MR. BUCHANAN:

15        Q.    Okay.  Well, we could agree

16  that the Buzzeo group said you need a

17  statistically valid suspicious order

18  monitoring methodology that took account

19  of seasonal fluctuation, customer sales

20  volumes, with a firm statistical analysis

21  and basis for the program.  We can agree

22  that's what they told you to do, right?

23        A.    Buzzeo made a recommendation

24  of what they felt we should do, yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Based on somebody

2    with a lot of industry exposure,

3    experience, and knowledge of what's

4    expected under the regulations, fair?

5    A.    Based on their experience,

6    yes.

7    Q.    Okay.  We could agree that

8    you did not institute a program with a

9    firm statistical analysis, sales volume,

10   seasonal fluctuations, as the basis for

11   your suspicious order monitoring program,

12   correct?

13             MS. VANNI:  Object to form.

14             THE WITNESS:  I wouldn't

15        characterize it that way.

16   BY MR. BUCHANAN:

17        Q.    Okay.  Because frankly,

18   there is no statistical analysis that's

19   performed as part of Par's suspicious

20   order monitoring program as of 2012,

21   right, sir?

22             MS. VANNI:  Object to form.

23             THE WITNESS:  What this

24        says, and what we were doing was

1            looking at orders versus

2            historical parameters and making

3            an assessment of whether or not

4            the order was exceeding that.  And

5            then doing the appropriate

6            investigation to determine whether

7            we conclude whether the order

8            could be suspicious.

9       BY MR. BUCHANAN:

10           Q.    Right.

11           A.    That's what we were doing.

12      Which -- which the regulation requires us

13      to have a program in place to identify a

14      suspicious order.

15           Q.    Right.

16           A.    The SOP is focused on

17      meeting that obligation under the

18      regulation.

19           Q.    Okay.  We can agree, sir,

20      without regard to whether you said it met

21      it or didn't meet it, that the program

22      the company had in place as of 2012 did

23      not have a firm statistical foundation

24      that was accounting for seasonal

1    fluctuation of customer sales volumes,

2    other classes of trade, et cetera,

3    correct?

4                    MS. VANNI:  Object to form.

5                    THE WITNESS:  Well, that

6              would depend upon what your

7              definition of a -- of a firm

8              statistical analysis here.  We do

9              talk about -- in the SOP, you

10             know, we do talk about looking at

11             these orders and understanding if

12             an order deviates from what we

13             expect, then reviewing that across

14             a number of parameters, one of

15             which could be seasonality.

16   BY MR. BUCHANAN:

17             Q.    Where are the records of all

18   of the orders that pended -- so you

19   understand there's some language they use

20   in this space as pended or held with

21   regard to orders that come in under

22   suspicious order monitoring systems?

23                   MS. VANNI:  Object to form.

24   BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Do you understand that

2    language?

3        A.    I understand that language,

4    yes.

5        Q.    So Par had a sales order

6    system, right?

7        A.    Par had a system for taking

8    orders, yes.

9        Q.    So how many orders that Par

10    had between 2010 and prior to the

11    acquisition by Qualitest or Endo were

12    pended?

13        A.    I don't have that

14    information.

15        Q.    Okay.  What system did

16    Qualitest track its orders by?

17        A.    Are you asking me about Par

18    or Qualitest?

19        Q.    Did I say Qualitest?

20            MS. VANNI:  You said

21        Qualitest.

22            THE WITNESS:  You said

23        Qualitest.

24            MR. BUCHANAN:  That was a

1    slip.

2    BY MR. BUCHANAN:

3        Q.    What system did Par,

4    pre-merger with Qualitest, use to conduct

5    its suspicious order monitoring?

6        A.    I believe Par at that time

7    would have been using JD Edwards as its

8    ERP system to take orders.  So how orders

9    were held or pended would have depended

10   on the functionality of JD Edwards.

11       Q.    Okay.  And does the JD

12   Edwards system have records of all the

13   pended orders?

14       A.    I can't speak to that.

15       Q.    Are you aware of any orders

16   that were ever pended between 2010 and

17   2015 for Par customers?

18       A.    I can't speak to which

19   specific orders were pended.  I can only

20   speak to what we were doing here relative

21   to the SOP.

22       Q.    Okay.  And did the JD

23   Edwards system actually have an algorithm

24   in it as of 2010, 2011, 2012?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    The JD Edwards system would

2  have had information on the history --

3  the history of orders.

4    Q.    Not asking you that, sir.

5  I'm asking you whether they actually had

6  an algorithm to identify orders of

7  interest.

8              MS. VANNI:  Object to form.

9              THE WITNESS:  There were

10        sales history, order history to

11        use to evaluate orders.

12  BY MR. BUCHANAN:

13    Q.    So you're saying that a

14  customer service person was supposed to

15  look at order history for every order.

16  The system wasn't doing anything to flag

17  orders?

18    A.    I don't know if there

19  were --

20              MS. VANNI:  Object to form.

21              THE WITNESS:  I'm sorry.

22        I don't know if there were

23        specific reports that people

24        were -- JD Edwards has a report

Highly Confidential - Subject to Further Confidentiality Review

1       writing mechanism.  There may have

2       been specific reports that

3       customer service representatives

4       were looking at or had developed

5       by IT that would help them, you

6       know, collate that data for their

7       review.

8   BY MR. BUCHANAN:

9       Q.    Okay.  Well, you do have

10  some knowledge, obviously, of what an

11  algorithm looks like for suspicious order

12  monitoring, correct?

13      A.    Correct.

14      Q.    We'll talk about later

15  today, Qualitest implemented something in

16  2013 and '14 a more involved suspicious

17  order monitoring --

18      A.    We used -- yeah, we used

19  Cegedim to develop the algorithm.

20      Q.    You used the very

21  consultant --

22      A.    We did.

23      Q.    -- that came in and told you

24  in 2010 that there was no suspicious

Highly Confidential - Subject to Further Confidentiality Review

1  order monitoring program for Par,

2  correct?

3          MS. VANNI:  Object to form.

4          THE WITNESS:  As I said,

5      we've used consultants over the

6      years to help us enhance our

7      programs.

8  BY MR. BUCHANAN:

9      Q.    That wasn't my question.  My

10  question was you used the same consultant

11  to incorporate the suspicious order

12  monitoring algorithm in 2014 that told

13  you, you had no program in 2010 in Par,

14  correct?

15          MS. VANNI:  Object to form.

16          THE WITNESS:  We used

17      Cegedim to develop an algorithm

18      for us.

19  BY MR. BUCHANAN:

20      Q.    Okay.  And that algorithm,

21  we could agree, is certainly more

22  advanced than what's reflected in the

23  exhibit before you, the 2012 SOP,

24  correct, sir?

1          A.    I think this is -- as the

2     landscape has evolved here around

3     suspicious order monitoring, the

4     algorithms have become more

5     sophisticated.

6          Q.    Well, sir, y'all were pretty

7     sophisticated in figuring out how to sell

8     your products, right?

9               MS. VANNI:  Object to form.

10              THE WITNESS:  I'm not here

11          to testify on how we sell our

12          products.

13    BY MR. BUCHANAN:

14         Q.    I know, but --

15         A.    That's somebody else's

16    responsibility.

17         Q.    You used a lot of different

18    systems to make money, right?

19              MS. VANNI:  Objection.

20          Beyond the scope.  Argumentive.

21    BY MR. BUCHANAN:

22         Q.    I'm just suggesting, sir --

23    I mean, look, the company had success

24    growing its business.  We looked at the

Highly Confidential - Subject to Further Confidentiality Review

1    charts.  We looked at how the pill counts

2    grew.  We looked at how that evolved.  We

3    looked at how -- and we know how

4    companies invest in infrastructure to

5    figure out how to best promote and sell

6    and make money.  Do you agree --

7              MS. VANNI:  Object.

8    BY MR. BUCHANAN:

9         Q.    -- companies do that?

10             MS. VANNI:  Objection to

11        form.

12             THE WITNESS:  We are a

13        company that sells --

14   BY MR. BUCHANAN:

15        Q.    Do you agree that companies

16   do that?

17             MS. VANNI:  Objection to

18        form.  You just cut him off.  He

19        was answering.

20             Go ahead and answer.

21             THE WITNESS:  We are a

22        company that sells --

23   BY MR. BUCHANAN:

24        Q.    Withdrawn.  No question.

Highly Confidential - Subject to Further Confidentiality Review

```
1                MS. VANNI:  Can we take a
2         lunch break now?  We've been going
3         about an hour and a half.
4                MR. BUCHANAN:  Let me -- let
5         me just finish this thread.
6                MS. VANNI:  Okay.
7                MR. BUCHANAN:  So -- can I
8         have 1072?
9    BY MR. BUCHANAN:
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
10        MS. VANNI:  Objection to
11   colloquy and arguing with the
12   witness.
13        THE WITNESS:  What specific
14   part of the document are you
15   referring to?  Let's go back and
16   look at it.
17        MS. VANNI:  I'm going to
18   need a lunch break soon.  We've
19   been going over an hour and a
20   half.
21        MR. BUCHANAN:  I -- I
22   understand that and I -- I
23   certainly would not have
24   anticipated this kind of fuss on
```

Highly Confidential - Subject to Further Confidentiality Review

1          this point.

2     BY MR. BUCHANAN:

3          Q.    Okay.  Let's go to 11.

4          A.    Page 11?

5          Q.    I'm sorry, Exhibit 11,

6     E-1056.10.

7          A.    Oh, I'm sorry.  Back in the

8     other one.

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7      Q.      Thank you.

8             MR. BUCHANAN:  We can take a

9      break.

10             THE VIDEOGRAPHER:  Off the

11      record at 12:09 p.m.

12                  -   -   -

13             (Lunch break.)

14                  -   -   -

15      A F T E R N O O N   S E S S I O N

16                  -   -   -

17             THE VIDEOGRAPHER:  We are

18      back on the record at 12:58 p.m.

19                  -   -   -

20             EXAMINATION (Cont'd.)

21                  -   -   -

22    BY MR. BUCHANAN:

23      Q.      All right, sir, welcome

24    back.  Do you understand you're still

Highly Confidential - Subject to Further Confidentiality Review

1    under oath?

2           A.    I do.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22          MR. BUCHANAN:   Can I have

23      1840, please.

24

1    BY MR. BUCHANAN:

2         Q.    Okay.  Passing to you what

3    we're marking as Exhibit 15.

4              (Document marked for

5              identification as Exhibit

6              Endo-Macrides-15.)

7    BY MR. BUCHANAN:

8         Q.    And Exhibit 15 is an e-mail

9    exchange, if we start at bottom up, which

10   would be on the second page, sir, 1840.2.

11   We see an e-mail from Jaydeep Shukla to

12   Jessica Clark and others.

13             Do you see that?

14        A.    Yes.

15        Q.    Jaydeep Shukla, do you know

16   who that is?

17        A.    She was a -- actually, I

18   think it's a he.  I apologize.  Works in

19   the DEA compliance group within Par.

20        Q.    Okay.  Are you getting that

21   just from the e-mail signature, or did

22   you --

23        A.    No, no.  I know who this

24   person is.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    Okay.  Okay.  Fair.  There's
2    a question that's being sent.  Was
3    Jaydeep part of the former organization
4    of Par or the former organization of
5    Qualitest?
6          A.    Former organization of Par.
7          Q.    Okay.  So Jaydeep was asking
8    her colleague?  Or his colleague?
9          A.    Jaydeep is a he.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5          Q.     Thank you.

6                 Okay.  So let's talk a

7    little about Qualitest, then.

8          A.     Okay.

9          Q.     I'm just going to keep my

10   stacks clean.

11                MR. BUCHANAN:  Can you get

12          that ready for me?

13   BY MR. BUCHANAN:

14         Q.     Before we move into talking

15   in detail about Qualitest, can you pull

16   up Exhibit 4, please.

17                We spent some time looking

18   at this briefly at the outset.  This is,

19   to reorient yourself, sir, this is

20   Exhibit 4.  It's -- looks like it's to

21   your right.

22                Yeah.  This is a chart of

23   the -- the Endo sales of

24   opioid-containing products over the

Highly Confidential - Subject to Further Confidentiality Review

1    years.

2              Do you see that?

3         A.    I do.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15    Q.    Okay.  All right.  Let's

16  take now a look at Qualitest.

17         (Document marked for

18         identification as Exhibit

19         Endo-Macrides-16.)

20  BY MR. BUCHANAN:

21    Q.    Sir, passing you what's --

22  what we're marking as Exhibit 6.

23         Again, as in the last case,

24  sir, Exhibit 6 is the summary chart.

1           MS. VANNI:  Thank you.

2           MR. BUCHANAN:  Can I

3     actually have the underlying

4     schedule that was provided to us

5     by defense counsel?

6  BY MR. BUCHANAN:

7      Q.    I say provided to us by

8  defense counsel.  The -- this was the

9  data that was identified by Par as its

10  sales and shipments of opioid-containing

11  products over the years.

12      A.    So this data is this --

13      Q.    Yeah.  It's -- it's just

14  collapsed down so that you can see it.

15      A.    Thank you.

16      Q.    On a sheet.

17           MR. BUCHANAN:  What did we

18     call this?  Exhibit 6.

19  BY MR. BUCHANAN:

20      Q.    Okay.  So let's now look at

21  Exhibit 6.  And feel free to reference

22  Exhibit 16 which is the underlying data,

23  if you need to.  To me it's easier to

24  look at Exhibit 6.

Highly Confidential - Subject to Further Confidentiality Review

1           But looking at Exhibit 6.

2           MR. BUCHANAN:  And pulling

3      up 1810 on the screen, please.

4  BY MR. BUCHANAN:

5      Q.   Qualitest data was produced

6  to us only from 2008 to 2015.  So our

7  chart here starts at 2008.

8           It is my understanding, sir,

9  is it yours, that Qualitest was in the

10  business of making opioids well before

11  2008?

12           MS. VANNI:  Object to form.

13           THE WITNESS:  I can't speak

14      to Qualitest prior to 2007.  That

15      was a different company.

16           I can tell you that we would

17      have been distributing opioids in

18      2007.  I can't speak to prior to

19      2007.

20  BY MR. BUCHANAN:

21      Q.   Obviously the -- the entity

22  was bought by, is it Apax Partners or --

23  do you -- do you know who the predecessor

24  entity was before Endo bought Qualitest?

1       A.    I believe it was a company

2   called Apax.

3       Q.    Right.  And they bought an

4   established business in late 2007 that

5   continued to do business as Qualitest,

6   correct?

7               MS. VANNI:  Object to form.

8               THE WITNESS:  The company

9           that Endo purchased did business

10          as Qualitest.

11  BY MR. BUCHANAN:

12      Q.    And the company that Endo

13  purchased it bought from Apax, correct?

14      A.    That is my understanding.

15      Q.    Apax is a private equity

16  firm?

17      A.    That is my understanding.

18      Q.    Apax bought the company in

19  2007, gussied it up and flipped it off to

20  Endo in 2010.

21              MS. VANNI:  Object to form.

22              THE WITNESS:  I don't really

23          know much about Apax' operating

24          philosophy.  I just know that they

1    owned the company and then sold it

2    to Endo.

3  BY MR. BUCHANAN:

4        Q.    Okay.  Well, and I guess the

5  relevant point for us, sir, is that the

6  entity that Apax bought in 2007 had been

7  in the opioid business for years, right?

8        A.    I can't really speak to

9  anything prior to 2007.  I -- I

10 believe -- I believe that Endo bought

11 different legal entities than what was

12 being operated prior to 2007.

13            But I don't have specific

14 knowledge about the legal entity

15 structure of those companies.

16       Q.    Okay.  Let's -- let's take a

17 short fork in the road just so we can

18 make sure the record is clear.

19            MR. BUCHANAN:  Could I have

20       1813, please.  I think that's one

21       of my -- there we go.

22            What's this going to be next

23       in order, 17?

24            (Document marked for

Highly Confidential - Subject to Further Confidentiality Review

1       identification as Exhibit

2       Endo-Macrides-17.)

3   BY MR. BUCHANAN:

4       Q.      There you are, sir.  Passing

5   you what's been marked as Exhibit 17 to

6   your deposition.  It's an e-mail between

7   Paul Evans and Jeremy Tatum.  Do you know

8   Paul?

9       A.      I do not know Paul Evans.

10      Q.      Do you know Mr. Tatum?

11      A.      I do know Jeremy Tatum.

12      Q.      Who's Mr. Tatum?

13      A.      Jeremy Tatum was involved in

14  the commercial organization within

15  Qualitest.

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



10     BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review



9    BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1     Q.    You also know, sir, in 2012,

2   there's a declaration by the CDC that

3   this was an epidemic, right?

4           MS. VANNI:  Object to form.

5   BY MR. BUCHANAN:

6     Q.    Did you hear that?

7           MS. VANNI:  Beyond the

8         scope.

9           THE WITNESS:  I believe I

10        testified earlier that I

11        understood that there was an

12        opioid abuse epidemic in this

13        country.

14          MR. BUCHANAN:  Can we pull

15        that back up, please.

16  BY MR. BUCHANAN:

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4    BY MR. BUCHANAN:

5         Q.    Okay.  I'd like to talk to

6    you about Qualitest's specific suspicious

7    order monitoring programs.  You've been

8    designated on that as well.  You are

9    aware of that?

10        A.    I am.

11        Q.    Okay.

12             MR. BUCHANAN:  Do you mind

13        if we do an early break?

14             MS. VANNI:  No.  We can take

15        a break.

16             THE VIDEOGRAPHER:  Off the

17        record at 1:47 p.m.

18             (Short break.)

19             THE VIDEOGRAPHER:  We are

20        back on the record at 1:56 p.m.

21    BY MR. BUCHANAN:

22        Q.    All right, sir.  Just to

23    orient you and kind of keep our buckets

24    clean, we spent some time talking about

Highly Confidential - Subject to Further Confidentiality Review

1  Par and kind of its evolution, its

2  business, its suspicious order monitoring

3  practices over time.

4          Do you recall that?

5      A.    I do.

6      Q.    Now I'm going to focus in

7  on -- because I'm going to probably use

8  the time -- the name Par from time to

9  time and Qualitest from time to time.

10         But I want to refer to the

11  predecessor entity's business that was

12  Qualitest.  That's where we finished up

13  before the break, and if there's any

14  confusion in my terminology, please ask

15  me to clarify and I'll be happy to do

16  that.

17         Okay?

18      A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8          Q.     Okay.  And taking your

9    30(b)(6) hat off for the moment.

10         A.     Okay.

11         Q.     Were you -- were you in the

12   Qualitest side of the business prior to

13   the merger?

14         A.     I was an Endo employee at

15   this particular time.

16         Q.     But just to answer my

17   question.  Did -- did you have

18   Qualitest's role and function prior to

19   the merger?

20         A.     Prior to the merger, prior

21   to the Par merger?

22         Q.     Yes, sir.

23         A.     So I was an Endo employee

24   initially.  At some point I became a

Highly Confidential - Subject to Further Confidentiality Review

1    Qualitest employee.  I believe that was

2    in early 2015.

3            Q.    Okay.  So in and around the

4    time that the Par-Qualitest transaction

5    was going to happen?

6            A.    Correct.

7            Q.    Okay.  So at this point in

8    time really, and in the information,

9    testimony you're going to provide is

10   really on the basis of the preparation

11   that you've done to -- to testify for the

12   company today?

13               MS. VANNI:  Object to form.

14               THE WITNESS:  Correct.

15   BY MR. BUCHANAN:

16           Q.    When I say "and around this

17   point in time," I'm pointing to the

18   document.

19               But when we're talking about

20   the interaction between Qualitest or

21   Vintage Pharmaceuticals and the DEA in

22   2013, your testimony really reflects the

23   preparation you've done to answer these

24   questions for us today, correct?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I would agree.

2          Q.    No firsthand experience at

3    the time, correct?

4          A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

3          THE VIDEOGRAPHER:  Off the

4     record at 2:06 p.m.

5          (Brief pause.)

6          THE VIDEOGRAPHER:  Back on

7     the record at 2:08 p.m.

8  BY MR. BUCHANAN:

9          Q.    Sir, we are on Exhibit 8 --

10  is it 8 or 18?  It's 18.

11          A.    18.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5              MR. BUCHANAN:  Okay.  Can I

6     please have 575.

7              THE WITNESS:  But I -- you

8     know, that's my recollection.

9            (Document marked for

10    identification as Exhibit

11    Endo-Macrides-19.)

12 BY MR. BUCHANAN:

13     Q.    Passing you what we're

14 marking as Exhibit 19 to your deposition,

15 sir.

16          It's a transmittal from

17 Ms. Hernandez to Peter Bigelow, Sanjay

18 Patel, and Denise Hudson.

19          Do you see that?

20     A.    I see that.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9          Q.    Okay.  All right.  So

10   let's -- let's orient ourselves a little

11   further in that meeting.

12              MR. BUCHANAN:  Can I please

13        have E-1824.

14              (Document marked for

15        identification as Exhibit

16        Endo-Macrides-20.)

17   BY MR. BUCHANAN:

18          Q.    I'm passing to you what

19   we're marking as Exhibit 20 to your

20   deposition today, sir.

21              It's an e-mail from

22   Mr. Patel to Ms. Hernandez from 2013

23   forwarding an image.

24              Do you see that?  Do you see

Highly Confidential - Subject to Further Confidentiality Review

1    that, sir?

2           A.    Yeah.  I see it's forwarding

3    an image.  I'm just familiarizing myself

4    with the document.

5           Q.    And this says Mr. Patel is

6    with Endo?

7           A.    He was an Endo employee.

8           Q.    Okay.  So what was his role

9    and function at Endo?

10          A.    He was at that time

11   responsible for Endo's supply chain

12   function.  And he was a -- it was a

13   corporate position.  So that would have

14   extended to supply chain operations

15   within the Qualitest business.

16          Q.    Okay.  And so the Endo folks

17   were supporting the Qualitest folks?

18                MS. VANNI:  Object to form.

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



MS. VANNI:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. BUCHANAN:

2       Q.    That's what sales does.

3  Sales sells, right?

4            MS. VANNI:  Objection.

5  BY MR. BUCHANAN:

6       Q.    Isn't that what the sales

7  function is designed to do, sir, to sell?

8       A.    Sales has a primary

9  responsibility to sell product.  Sales

10  has other responsibilities that, you

11  know, get into the compliance part of the

12  business.

13       Q.    Please cite for me somewhere

14  sir, in your sales SOPs or in your

15  guidance where your sales force was

16  instructed to do the due diligence on

17  suspicious orders and suspicious

18  customers.

19       A.    I'm not pointing to an SOP.

20       Q.    I'm asking you to do so.

21       A.    We didn't have -- I'm --

22  I -- I am not able to do that.

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18        Q.     Y'all weren't doing

19   anything?

20        A.     I wouldn't --

21             MS. VANNI:  Object.

22   BY MR. BUCHANAN:

23        Q.     No due diligence, right?

24             MS. VANNI:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  I wouldn't

2       characterize it that way.

3   BY MR. BUCHANAN:

4       Q.    No, because it's not good.

5           MS. VANNI:  Objection.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24           MR. BUCHANAN:  Can I have

Highly Confidential - Subject to Further Confidentiality Review

1          581, please.

2     BY MR. BUCHANAN:

3          Q.    And just to clarify this,

4     this thing about the sales team.

5               (Document marked for

6               identification as Exhibit

7               Endo-Macrides-21.)

8     BY MR. BUCHANAN:

9          Q.    Passing you what we've

10    marked as 581 -- excuse me.  That's my

11    internal numbering.

12               MR. BUCHANAN:  What's the

13          numbering on it?

14               MR. BACHMANN:  It is 21.

15    BY MR. BUCHANAN:

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          MS. VANNI:  Object to form.

19          THE WITNESS:  I don't agree

20      with that characterization at all.

21  BY MR. BUCHANAN:

22          Q.    Okay.  We'll look at what

23  happened over time throughout the day

24  today.

Highly Confidential - Subject to Further Confidentiality Review

1              "You need to visit your

2     customers' customers and document your

3     findings," right?

4          A.    That's what it says.

5          Q.    Okay.  You weren't visiting

6     your customers' customers prior to this

7     point in time, right?

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18      Q.      Mm-hmm.  Okay.  All right.

19              So -- I just want to make

20      sure we're not confused on a point, sir.

21              MR. BUCHANAN:  What exhibit

22      will this be?  23?

23              (Document marked for

24      identification as Exhibit

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Endo-Macrides-22.)

 2    BY MR. BUCHANAN:

 3         Q.    Passing you Exhibit 22 to

 4    your deposition.  It's a series of slide

 5    decks.

 6              Okay.  It's a --

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1

2

3          I'd like to take you to

4    589.22, what's referred to as, "The

5    Meeting."

6          Do you see that?

7    A.    I'm getting there.

8    Q.    What we were told.

9    A.    Okay.  I'm there.

10   Q.    Okay.

11   A.    If I could just have a

12   minute to look at this.

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21        MS. VANNI:  Objection.

22     Asked and answered.

23        THE WITNESS:  As I

24     testified, I'm not aware of any

Highly Confidential - Subject to Further Confidentiality Review

1           documents documenting those

2           visits.

3      BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2          MR. BUCHANAN:  Okay.  And

3     just can we pull up, please,

4     Exhibit 6 again.

5          THE WITNESS:  Which one was

6     that?

7  BY MR. BUCHANAN:

8     Q.   I put it up on the screen

9  for you.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12          MR. BUCHANAN:  Let's take a

13     break.

14          THE VIDEOGRAPHER:  Off the

15     record at 3:13 p.m.

16          (Short break.)

17          THE VIDEOGRAPHER:  We are

18     back on the record at 3:32 p.m.

19 BY MR. BUCHANAN:

20     Q.    Okay.  Sir, I'm passing you

21 over a stack of exhibits.  We'll go

22 through them in sequence.  There's -- why

23 don't we start with what's been marked as

24 Exhibit Number 23.

Highly Confidential - Subject to Further Confidentiality Review

1              (Document marked for

2          identification as Exhibit

3          Endo-Macrides-23.)

4              MR. BUCHANAN:  Charles,

5          could you pass a copy for defense

6          counsel.

7   BY MR. BUCHANAN:

8          Q.    For the record, it's

9   internally labeled as E-1051.  If we can

10  pull up that on the screen.  E-1051, sir,

11  is an e-mail to John Schultz, Mike

12  Reiney, Charles Propst, others.

13              Do you recognize any of

14  those names?

15          A.    I recognize most of the

16  names.

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



        Q.    The SOP, it's referring to

    review of -- let's talk about details at

    the bottom.

                MR. BUCHANAN:  I'm sorry.

        Can you please go to .2.  Thank

        you.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2         Q.    In the middle it says the

3    issues were noted during the review, and

4    we talked about 1 and 2.

5              Do you recall that, sir?

6         A.    Right.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16          MS. VANNI:   Object to form.
17      BY MR. BUCHANAN:
18          Q.    In 2008, right?
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23          Again, this document was --

24     BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Is that a yes answer to my

2   question?

3        A.    I just answered your

4   question.

5        Q.    I just want to understand.

6   Were you agreeing with me?

7              MS. VANNI:  Object to form.

8              THE WITNESS:  I answered

9        your question.

10  BY MR. BUCHANAN:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15          MS. VANNI:  Object to form.

16          THE WITNESS:  I recall us

17       looking at documents.

18    BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23           MS. VANNI:  Object to form.

24      BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    We've talked about that

2    today.

3    A.    I don't know to what degree

4    our products were being --

5    Q.    Not to what --

6    A.    -- diverted.

7    Q.    -- degree.  We know your

8    products were being diverted.  Others

9    will decide --

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18         MS. VANNI:  Object to form.

19  BY MR. BUCHANAN:

20         Q.    Right?

21         MS. VANNI:  Same objection.

22  BY MR. BUCHANAN:

23         Q.    Because if you're trying to

24  prevent something from happening --

Highly Confidential - Subject to Further Confidentiality Review

1    withdrawn.

2              If you're trying to prevent

3    something from happening and you want to

4    see how effective you're doing at

5    preventing something from happening, one

6    of the things that you want to try and

7    measure is the extent to which it's

8    happening, notwithstanding your efforts,

9    right?

10             MS. VANNI:  Object to form.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22          MR. BUCHANAN:  Can I have

23      Exhibit 24, please.

24   BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13         Q.    Okay.

14         A.    If I could just review the

15  document then.

16         Q.    That's fine.

17            (Document marked for

18            identification as Exhibit

19            Endo-Macrides-24.)

20  BY MR. BUCHANAN:

21         Q.    Who -- who is Gary Glotz,

22  sir?

23           MS. VANNI:  Do you want him

24           to review the document or do you

Highly Confidential - Subject to Further Confidentiality Review

1          want him to answer your question?

2                    MR. BUCHANAN:  Well,

3          let's -- let's identify the people

4          and then --

5                    MS. VANNI:  Okay.

6                    MR. BUCHANAN:  -- the review

7          is fine.

8                    MS. VANNI:  For the record,

9          this is Exhibit 24?

10                   MR. BUCHANAN:  24.

11                   MS. VANNI:  Thank you.

12    BY MR. BUCHANAN:

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



17          MR. BUCHANAN:  Can you blow

18      up the comment, please.

19          There you go.  Right there.

20      Thank you.

21  BY MR. BUCHANAN:

22      Q.   "In the process of reviewing

23  our current suspicious order monitoring

24  process, but we are well aware that what

1   we have is NOT compliant by today's

2   standards."

3               Did I read that correctly,

4   sir?

5        A.    That's what this e-mail

6   says.

7        Q.    Okay.  And I guess, so the

8   record is clear, not is in all caps?

9        A.    Not is in all caps.

10       Q.    Okay.  And so this is, again

11  orienting ourselves, a few months after

12  the meeting with Mr. Mapes, or the audit

13  of Mr. Mapes, correct?

14       A.    It's after the audit of

15  Mr. Mapes.

16       Q.    Okay.  Reporting out and

17  seeking consultant advice because your

18  system is not compliant by today's

19  standards.  That's what's written,

20  correct?

21       A.    That's what an IT person

22  wrote who would not be qualified to

23  assess the compliance of our suspicious

24  order monitoring or any other aspect of

Highly Confidential - Subject to Further Confidentiality Review

1  DEA compliance.

2      Q.    And indeed she looped in the

3  head of the compliance as part of the

4  meeting, correct?

5          Mr. John Schultz, I think

6  you told us, was the head of compliance.

7          Do I have that correctly,

8  sir?

9      A.    John Schultz, as I

10  understand it, was DEA compliant.

11      Q.    Let's look at the

12  PowerPoint --

13      A.    John Schultz didn't write

14  this e-mail.  LeeAnn Smith, the IT

15  person, wrote this e-mail.

16      Q.    Right.  And you don't

17  think --

18      A.    And she wouldn't be

19  qualified for evaluating or assessing

20  whether we were or weren't in

21  compliance --

22      Q.    I see --

23      A.    -- with suspicious order

24  monitoring or other aspects of DEA.

1    Q.    Were -- were you a part of

2  the conversations among Ms. Smith and

3  Mr. Schultz and others in 2008, sir?

4    A.    I didn't work for the

5  company in 2008.

6    Q.    Okay.  So in terms of your

7  attempted commentary on how this

8  originated, you don't have any insight to

9  bear -- to bring beyond the document

10  itself, fair?

11         MS. VANNI:  Object to form.

12         THE WITNESS:  I'm just

13     telling you that an IT person

14     isn't qualified to comment on DEA

15     compliance.

16  BY MR. BUCHANAN:

17    Q.    What does she say in terms

18  of "we are all well aware that what we

19  have is NOT," in all caps, "compliant by

20  today's standards."

21         Did I read that correctly,

22  sir?

23    A.    That's what this woman wrote

24  in this e-mail, who is an IT person who

Highly Confidential - Subject to Further Confidentiality Review

1  is not qualified to comment on DEA

2  compliance or suspicious order

3  monitoring.

4      Q.    "We are looking for

5  assistance," correct?

6      A.    She uses the word we.

7      Q.    And who is the we that she

8  includes, sir, in the meeting?

9            Spike Pannell and John

10  Schultz?

11      A.    She is including them in the

12  meeting.

13      Q.    Okay.  And John Schultz

14  would be the head of compliance at that

15  point in time, correct, sir?

16      A.    Right.  But John Schultz

17  isn't making this comment.  The IT person

18  is making this comment.

19      Q.    Right.  Right.  And we have

20  your testimony as to who the we are, sir.

21            Let's go to the PowerPoint.

22  Can we go to .5.  Suspicious order

23  monitoring.

24            Mr. Hamby, Gary Glotz making

Highly Confidential - Subject to Further Confidentiality Review

1    the presentation.

2            .7.  "Companies are not

3    meeting the regulatory requirements."

4            Did I read that correctly?

5        A.    That's what the consultant

6    says in his presentation.

7        Q.    "Inconsistent implementation

8    and lack of understanding of regulatory

9    requirements."

10           Did I read that correctly?

11       A.    That's what it says.

12       Q.    Next page, .8, middle

13   bullet.  "SOM, as well as appropriate due

14   diligence and 'know your customer'

15   efforts are key" --

16       A.    I'm sorry, wait.  I'm on the

17   wrong page.

18       Q.    .8?

19       A.    Just give me a minute.

20   Okay.  I'm there.

21       Q.    "SOM, as well as appropriate

22   due diligence and 'know your customer'

23   efforts are key to DEA's efforts to curb

24   diversion of controlled drugs and listed

Highly Confidential - Subject to Further Confidentiality Review

1  chemicals."

2          Did I read that correctly?

3      A.    You read it correctly.

4      Q.    And certainly the company

5  had that understanding as of 2008,

6  correct?

7      A.    The company had that

8  understanding.

9      Q.    Okay.  There's a listing on

10  the next page of SOM requirements.

11          Do you see that, sir?

12          MS. VANNI:  Take your time

13      and review it.

14          THE WITNESS:  This is the

15      same quote from the C.F.R. that we

16      reviewed earlier.

17  BY MR. BUCHANAN:

18      Q.    Right.  And it says,

19  "Further iterated in September of '06,

20  February of '07 and December of 2007 DEA

21  letters," correct?

22      A.    That's what it says.

23      Q.    You've seen those letters,

24  sir?

1        A.    I've seen some of these

2    letters.  I'm sure I reviewed them as

3    part of my preparation.

4        Q.    And those letters say that

5    rigid formulas are insufficient as part

6    of a SOMs program, correct, sir?

7        A.    DEA is using these letters

8    to provide guidance around the evolving

9    landscape around SOMs --

10        Q.    I'm not asking --

11        A.    -- to encourage companies to

12    improve their programs.

13        Q.    Sir --

14        A.    That's the purpose of these

15    letters and these guidelines.

16        Q.    I'm not asking you for the

17    purpose, sir.  I'm asking you what it

18    communicated.

19        A.    It communicated guidelines

20    on how to improve your SOMs programs.

21        Q.    And the guidelines stated

22    that rigid formulas were inadequate as a

23    basis for identifying suspicious or

24    non-suspicious, correct?

1           MS. VANNI:  Objection.  Are

2      you characterizing the letters

3      from DEA for him?

4           MR. BUCHANAN:  I'm asking

5      him.

6 BY MR. BUCHANAN:

7      Q.   Do you agree, sir?  And we

8 can pull out the letters if you think

9 necessary.

10      A.   Let's look at one of the

11 letters.

12      Q.   Okay.  We'll come back to

13 it.

14           Do you have a recollection,

15 sir, as to whether the DEA was advising

16 registrants that rigid formulas were

17 inadequate to identify suspicious orders?

18           MS. VANNI:  Objection.

19 BY MR. BUCHANAN:

20      Q.   Do you have that

21 recollection?  Yes or no.

22           MS. VANNI:  Objection.

23           Go ahead.  You can answer.

24           THE WITNESS:  The DEA was

1    providing guidance around a number

2    of areas related to suspicious

3    order monitoring, including

4    algorithms and how orders should

5    be looked at.  I have that

6    understanding.

7  BY MR. BUCHANAN:

8        Q.    You have the understanding

9  that rigid formulas, the DEA says are

10 inadequate, correct?

11            MS. VANNI:  Object to form.

12            THE WITNESS:  I don't

13   remember seeing that specific

14   language.  But if we look at a

15   letter that would refresh my

16   memory, then we can do that.

17 BY MR. BUCHANAN:

18       Q.    Let's go to the last bullet.

19 "In addition, DEA's chemical

20 handler's" -- "In addition, DEA's

21 chemical handler's manual devote several

22 pages to know your customer in proof of

23 identity due diligence issues."

24            Do you see that, sir?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      I see that.

2       Q.      Next page.  "Arbitrarily set

3   values do not satisfy the regs in terms

4   of SOMs."

5               Do you see that, sir?

6       A.      I see that.

7       Q.      You got to review things by

8   category of accounts, classes of trades,

9   right?

10      A.      That's what the consultant

11  is communicating.

12      Q.      What are they referencing

13  there?

14      A.      They're referencing the

15  December 2007 DEA letter.

16      Q.      Okay.  They identify on .11,

17  "Overall objective, a total SOM program

18  that meet DEA requirements."

19              First bullet, what does it

20  say?

21      A.      "Develop a total SOM

22  solution to review each of your

23  customer's orders product by product

24  comparing orders with historical ordering

Highly Confidential - Subject to Further Confidentiality Review

1    patterns for that customer and product."

2          Q.    I'm sorry, sir.  I was

3    identifying --

4          A.    You asked me to read the

5    first.

6          Q.    -- the first bullet at the

7    bottom of the page.  "Overall objective,

8    a total SOM program that meets DEA

9    requirements.

10                "1.  Statistically viable

11    system, justifiable and defensible."

12                Right?

13          A.    That's what they say here.

14          Q.    Do you remember seeing that

15    in a letter two years later that went to

16    Par Pharmaceuticals?

17                MS. VANNI:  Object to form.

18    BY MR. BUCHANAN:

19          Q.    From 2010, from that

20    consultant presentation?

21          A.    I remember looking at that

22    earlier.

23          Q.    Okay.  "Statistics,

24    methodologies and indexes are confirmed

1    and validated."

2              Do you recall that, sir?

3         A.    I understand that DEA was

4    making suggestions to move -- to

5    statistical algorithms.  I do.

6         Q.    Right.  And this is 2008,

7    correct?

8         A.    This is 2008.

9         Q.    And the company, in terms of

10   implementing such an algorithm, first did

11   so in late 2013, early 2014, correct,

12   sir?

13        A.    The company continued to

14   evolve its programs to review potentially

15   suspicious orders --

16        Q.    Please tell the jury --

17        A.    -- in that time frame.

18        Q.    Please tell the jury when

19   the company first implemented a

20   statistically validated algorithm.

21        A.    In 2013 we engaged with

22   Cegedim to do that.

23        Q.    Okay.  So the very

24   consultant who told you in 2005 this is

1    what -- excuse me, in 2008, that this is

2    what was required, right?

3          A.    All companies were reviewing

4    the guidance by DEA to move in the

5    direction of statistical models --

6          Q.    You still have to answer my

7    question.

8          A.    -- to adapt their programs.

9          MS. VANNI:  Objection to

10         form.

11   BY MR. BUCHANAN:

12         Q.    You still have to answer my

13   question.  So my --

14         A.    Can you ask it again,

15   please.

16         Q.    Yeah.  My question to you,

17   sir, after you said, "In 2013, we engaged

18   with Cegedim to do that," I said, "So the

19   very consultant who told you in 2008 that

20   this is what was required was the

21   consultant you used in 2013 to implement

22   the statistically validated algorithm for

23   Qualitest, correct?"

24         A.    We worked with them in 2013

Highly Confidential - Subject to Further Confidentiality Review

1    to enhance the program and build us a,

2    you know, more advanced algorithm.

3         Q.    Right.  In fact you did that

4    after you sat down with the DEA in March

5    of 2013, correct?

6         A.    I think I testified earlier

7    that we had identified areas to improve

8    our program throughout that period but as

9    early as 2011 when we had engaged Tracey

10   Hernandez to lead our DEA compliance.

11        Q.    When did management first

12   approve and fund a statistically

13   validated algorithm to detect potentially

14   suspicious orders, sir?

15             MS. VANNI:  Objection.

16   BY MR. BUCHANAN:

17        Q.    Before or after the

18   March 2013 meeting with the DEA?

19        A.    In 2013 we engaged with

20   Cegedim to develop the algorithm.

21        Q.    After you met with the DEA,

22   correct?

23        A.    Subsequent to March of 2013.

24        Q.    Which means after, right?

1    A.    It was implemented after the

2    meeting.

3          Q.    And you engaged them after

4    the meeting to implement a statistically

5    validated algorithm, correct sir?

6          A.    To do the specific work

7    around implementing the algorithm.

8          Q.    All right.  So let's go to

9    .12.  We talk about a statistically

10   defensible system that consultants have

11   been recommending since 2008 to the

12   company.

13               It says, "Rather than

14   looking just at purchasing volume, it

15   evaluates a variety of order

16   characteristics, such as order size,

17   history, trends, frequency, et cetera."

18               Did I read that correctly?

19         A.    You read that correctly.

20         Q.    Okay.  And those are the

21   characteristics of the system the company

22   ultimately implemented after the DEA sat

23   down with it and said it had six months

24   to get its stuff together, right?

1             MS. VANNI:  Object to form.

2             THE WITNESS:  What they are

3        saying is that these things should

4        be part of a -- what they are

5        saying with this bullet is that

6        these things should be part of the

7        review of the orders.

8             In fact, you would have

9        his -- you would have history on

10        orders that you could look at

11        without even developing an

12        algorithm.

13   BY MR. BUCHANAN:

14        Q.   Sir, these are the order

15   characteristics, order size, history,

16   trends, frequency, et cetera, that are

17   implemented in the statistically

18   validated algorithm the company adopted

19   through Cegedim, this very vendor, five

20   years later after the DEA sat down with

21   it in March of 2013, correct?

22             MS. VANNI:  Objection.

23             THE WITNESS:  These

24        parameters would be part of a

Highly Confidential - Subject to Further Confidentiality Review

1      statistical model.

2  BY MR. BUCHANAN:

3          Q.     Thank you.  Let's go to .14.

4              The consultant you reached

5  out to in 2008 told you that you had to

6  investigate your accounts, right?

7          A.     Are you reading the first

8  bullet here, "SOPs on rules around

9  account investigation and order release"?

10         Q.     Well, let's just read it,

11 sir.  Says, "Account investigation and

12 disposition:

13             "Establish an

14 appropriate" -- "establish appropriate

15 practices for investigation of

16 potentially suspicious" -- "suspicious

17 accounts."

18             Is that one of the items

19 that was identified for the company?

20         A.     That's in the report, yes.

21         Q.     Okay.  "SOPs on rules around

22 account investigation and order release,"

23 correct?

24             That's what it states?

1          A.     That's what it says.

2          Q.     Customer self-assessment

3    questionnaires, correct?

4          A.     That's what it says.

5          Q.     "On-site account

6    verification visits."

7                 Did I read that correctly?

8          A.     That's what it says.

9          Q.     Okay.  You can set that one

10   aside, sir.  Moving forward, from 2008.

11                Let's go to 2009.

12                (Document marked for

13          identification as Exhibit

14          Endo-Macrides-25.)

15   BY MR. BUCHANAN:

16         Q.     In 2009, sir, we're now

17   looking at Exhibit 25, Mr. Mapes, your

18   consultant, is back in the mix, right?

19         A.     Mr. Mapes.  Yes, I see that.

20         Q.     Okay.  Mike Mapes sends an

21   e-mail to John Schultz.  The same John

22   Schultz we were just talking about, head

23   of compliance, right?

24         A.     Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And we're looking at

2   E-1037, please.  It's from July 2009.  If

3   we go to .2, it says, "Review of order

4   monitoring program, Qualitest

5   Pharmaceuticals."

6             It says -- let's go forward

7   now to .4, which reports on suspicious

8   order reporting to DEA.

9    A.    .4?

10    Q.    .4.  It's the top right

11   corner.

12    A.    Can you just give me a

13   minute to look at this?

14    Q.    Sure.  I've got it on your

15   screen there if that helps.

16             Last paragraph says, "The

17   review of order release requests showed

18   that many requests were made for

19   quantities of drugs that were several

20   times greater than the current limit set

21   in the order monitoring system."

22             Let's pause on that.

23             So your consultant comes in

24   and is looking at certain order release

Highly Confidential - Subject to Further Confidentiality Review

1    requests.

2              Do you see that?

3         A.    I see that.

4         Q.    So you talked about a system

5    that would identify potentially

6    suspicious orders, right, do you recall

7    that?

8         A.    I do.

9         Q.    And at this point in time,

10   the company was using, not a

11   statistically validated model, but a

12   different one, pursuant to its SOPs,

13   right?

14        A.    I'm sorry, repeat that

15   please.

16        Q.    At this point in time, the

17   company was not using the Cegedim

18   statistically validated model, correct?

19        A.    Correct.

20        Q.    Okay.  This is 2009.  And it

21   says, "In most of those instances,"

22   meaning those where the requests -- where

23   there were orders that were pended and

24   then released, "the size of the order was

1    cut down and the order was approved to be

2    released with some increase to the limit

3    in the order monitoring system."

4              Did I read that correctly?

5        A.    Yes, that's what it says.

6        Q.    Okay.  So what's happening

7    here, sir, is that orders are tripping

8    the wire under whatever method the

9    company was using under its SOPs at that

10   point in time.  And the sales team that's

11   reviewing the orders is reducing the

12   order to get close to thresholds, raising

13   the threshold a little bit, and then

14   authorizing the order to be shipped.

15              That's what the company is

16   being told by its consultants, right?

17              MS. VANNI:  Object to form.

18              THE WITNESS:  The

19         consultants are -- I'm -- I'm

20         trying to read the document while

21         you are talking.  I'm sorry.  I'm

22         just trying to familiarize myself

23         with this last paragraph.

24              Just ask me the question

Highly Confidential - Subject to Further Confidentiality Review

1    again, please.

2   BY MR. BUCHANAN:

3        Q.    Okay.  My question, sir, was

4   that, what's happening here is orders are

5   tripping the wire, meaning there's an

6   algorithm --

7        A.    Orders are being identified

8   that are of interest.

9        Q.    Of interest.  "The order

10  size is several times higher than the

11  threshold."

12            That's what's reported in

13  the analysis from your consultants,

14  correct?

15       A.    That's correct.

16       Q.    And what's happening is the

17  folks who were reviewing these, which

18  would have been the sales folks at that

19  time, right?

20            That's a yes answer?

21       A.    It would have been the sales

22  folks.

23       Q.    Okay.  So the sales folks,

24  what they are doing is, they are either

1    cutting them down in size or increasing

2    the order threshold, right?

3              MS. VANNI:  Object to form.

4              THE WITNESS:  They are,

5         where there -- where there could

6         be valid reasons to do either one

7         of those things.

8    BY MR. BUCHANAN:

9         Q.    Right.

10        A.    Upon investigation.

11        Q.    And then what the consultant

12   is stating here is that -- and the

13   consultant is noting this as a concern,

14   right?

15             MS. VANNI:  Object to form.

16             THE WITNESS:  The consultant

17        is suggesting that those orders,

18        because they've been modified,

19        should be reported to the DEA.

20   BY MR. BUCHANAN:

21        Q.    Right.  You can't cut and

22   ship -- when I say cut and ship, I mean

23   reduce the size of the order and ship

24   without telling the DEA, right?

1    A.    Consultant is saying that

2  these orders should be sent to DEA as a

3  suspicious order.

4    Q.    Okay.  And we can agree --

5    A.    He is indicating that this

6  would document to DEA that Qualitest is

7  monitoring orders.

8    Q.    "Each order release request

9  that is rejected or modified by Qualitest

10  should be sent to DEA as a suspicious

11  order."

12          Is that what you were told

13  in 2009, sir?

14    A.    That's what he's saying in

15  this document.

16    Q.    And, sir, sitting here

17  today, as part of your preparation as the

18  corporate representative for Qualitest,

19  you were not aware of any suspicious

20  orders that were reported for Qualitest

21  in 2009 or 2008, or frankly anytime prior

22  to that meeting with the DEA, right?

23          MS. VANNI:  Object to form.

24          THE WITNESS:  I said -- I

1        stated earlier that I wasn't aware

2        of a suspicious order that had

3        been submitted to the DEA.

4   BY MR. BUCHANAN:

5        Q.    Okay.  And your consultants

6   actually looked at specific requests --

7   excuse me, specific orders that were cut,

8   reduced, and shipped and not reported to

9   the DEA, correct?

10       A.    The orders were adjusted,

11  and according to the consultant, not

12  reported to the DEA.

13       Q.    Not before he came in mid

14  2009, right?

15            MS. VANNI:  Object to form.

16            THE WITNESS:  Not before

17       he --

18  BY MR. BUCHANAN:

19       Q.    Not before or after this

20  audit, right?

21       A.    I'm not sure what you mean.

22       Q.    I'm saying there are orders

23  that are identified by the consultant as

24  cut and shipped, right?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Yes, and he's suggesting

2     that those orders should have been

3     reported to the DEA.  And he's saying

4     sending orders to the DEA will document

5     to DEA that Qualitest is monitoring the

6     orders on a continuing basis and is

7     monitoring controlled substance orders in

8     a reasonable manner.

9          Q.    Right --

10          A.    This is his suggestion.

11     He's not suggesting that these orders are

12     suspicious.  He's suggesting that

13     Qualitest should report them.

14          Q.    He's saying, sir, each order

15     that is released that is rejected or

16     modified by QT should be sent to DEA as a

17     suspicious order.

18               Did I read that correctly,

19     sir?

20               MS. VANNI:  Object to form.

21          Asked and answered.

22     BY MR. BUCHANAN:

23          Q.    Did I read that correctly?

24          A.    You read that correctly.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Thank you.

2                 Let's look at -- I mean, in

3    fact --

4          A.     But he's saying sending

5    these orders to DEA --

6          Q.     No question pending, sir.

7                 MR. BUCHANAN:  Can I have

8          589 for counsel.  Oh Exhibit 22.

9                 THE WITNESS:  22.  Oh.

10                MR. BUCHANAN:  Can we pull

11   up 589, please.

12   BY MR. BUCHANAN:

13         Q.     I'd like to direct your

14   attention, sir, to .24 is the page

15   number, we looked at this a little

16   earlier today.  And this is a

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 9    A.    I don't have any information
10  on that.

11    Q.    Okay.  Let's go forward to
12  Exhibit 26.  You can set that one aside
13  now, sir.

14         (Document marked for
15         identification as Exhibit
16         Endo-Macrides-26.)

17  BY MR. BUCHANAN:

18    Q.    Okay.  We're now moving
19  forward.  We're up to 2011.  This is an
20  exchange among Ms. Hudson, Ms. Hernandez
21  and others.

22         At this point in time, on
23  the first page, 567.1 we see the e-mail
24  from her to several, from November 16,

Highly Confidential - Subject to Further Confidentiality Review

1    2011.

2              Do you see that?

3         A.    I see that.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
4
5
6
7
8
9
10
11
12
13
```

14      Q.    Okay.

15            MR. BUCHANAN:   Next

16      document.  We're going to -- we're

17      going to 573 which is Exhibit 28.

18            (Document marked for

19      identification as Exhibit

20      Endo-Macrides-28.)

21   BY MR. BUCHANAN:

22      Q.    I'm passing you another

23   little stack, sir.

24            Okay.  This is an e-mail

Highly Confidential - Subject to Further Confidentiality Review

1   exchange, let's see.  It's in early 2013,

2   but it's forwarding a September 2012

3   spreadsheet.  Integrated compliance risk

4   assessment.  Do you see that, sir?

5               The -- the e-mail at the

6   bottom of the page from Ms. Hudson to

7   others is discussing a composite risk

8   assessment based on discussions.

9               Do you see that?

10      A.    I see that.

11      Q.    Okay.  And that's from, I

12   guess what, September of 2012?

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16              MS. VANNI:  Object to form.

17   BY MR. BUCHANAN:

18         Q.    That's my question.

19         A.    This is -- let me look at

20   the date.  March 22nd -- I'm sorry.

21         Q.    Remember there's the

22   e-mail --

23         A.    September 3, 2012.

24         Q.    Thank you, sir.

Highly Confidential - Subject to Further Confidentiality Review

1              We can go to the next

2    document now, sir.

3                 (Document marked for

4           identification as Exhibit

5           Endo-Macrides-29.)

6    BY MR. BUCHANAN:

7           Q.    It's Exhibit 29.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4            MS. VANNI:  I object that

5      you didn't read the complete

6      sentence there.

7            MR. BUCHANAN:  I'm fine with

8      that.

9            I don't know where it is.

10     Is it on the screen still?  I

11     think I did read the complete

12     sentence.

13           MS. VANNI:  No.

14           MR. BUCHANAN:  All right.

15     The question is lost to me at this

16     point, but...

17           THE REPORTER:  Do you want

18     me to read back?

19           MR. BUCHANAN:  Okay.

20           THE REPORTER:  Want me to

21     read it back?

22           MR. BUCHANAN:  I'll read

23     the -- the full sentence.

24  BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6              MS. VANNI:   Object to form.

7    BY MR. BUCHANAN:

8          Q.    Do you remember that?

9          A.    I'm not sure what heads-up

10   you're referring to.  Is there a document

11   that you're referring to?

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



16    I'm sorry, it was confusing.  We are in

17    Exhibit 31.

18          A.    Oh, I'm sorry.

19              (Document marked for

20          identification as Exhibit

21          Endo-Macrides-31.)

22              MS. VANNI:  I don't have

23          that exhibit.

24              THE WITNESS:  I don't have

Highly Confidential - Subject to Further Confidentiality Review

1        that exhibit.  I'm on Exhibit 30.

2               MS. VANNI:  I don't have --

3   BY MR. BUCHANAN:

4        Q.    Let's move to Exhibit 31,

5   get everybody caught up.

6               MS. VANNI:  This is 31?

7               MR. BUCHANAN:  Mm-hmm.

8               MS. VANNI:  Thank you.

9               THE WITNESS:  Okay.  So this

10       is --

11  BY MR. BUCHANAN:

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3      Q.     Okay.
 4             (Document marked for
 5      identification as Exhibit
 6      Endo-Macrides-32.)
 7  BY MR. BUCHANAN:
 8      Q.     Let's go to Exhibit 32.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10  BY MR. BUCHANAN:

11        Q.    And with respect, sir, you

12  had no role or responsibility for any

13  aspect of this in 2013?

14        A.    I already testified to that.

15        Q.    The answer to that is,

16  "You're right, Mr. Buchanan, I didn't."

17        A.    I didn't have direct --

18              MS. VANNI:  Object to form.

19        Argumentive.

20  BY MR. BUCHANAN:

21        Q.    Right?

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5          MR. BUCHANAN:  Okay.  Do you

6     want to take a short break?

7          MS. VANNI:  Yeah.

8          THE VIDEOGRAPHER:  Off the

9     record at 4:41 p.m.

10         (Short break.)

11         THE VIDEOGRAPHER:  We are

12     back on the record at 5:14 p.m.

13  BY MR. BUCHANAN:

14         Q.   Okay.  Sir, we're going to

15  shift gears a little bit.  We spent some

16  time, and we're still talking about

17  Qualitest at this point.  We've been

18  doing that for the last several minutes

19  certainly.

20         We talked about the meeting

21  that the DEA had with the Qualitest folks

22  in March of 2013.  Then we talked about

23  some of the statements and

24  recommendations, requests made of

Highly Confidential - Subject to Further Confidentiality Review

1    Qualitest with regard to its SOMs program

2    at that point in time.

3              And then we looked to orient

4    you again about kind of the statements

5    that have been made and the information

6    the company received from consultants and

7    its internal folks about the limitations

8    or inadequacies of the program or other

9    facts about the program over time.

10             Do you recall our

11   discussions about those items?

12        A.   I recall the discussions

13   we've had.

14        Q.   Okay.  Now I want to zoom

15   forward a little bit, because what ended

16   up happening, sir, is that after the --



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8  BY MR. BUCHANAN:

9       Q.   Okay.  Well, I mean,

10  let's -- you don't have to characterize

11  it, sir.  We've got the memo that went to

12  the board of directors.

13       It's not in your stack right

14  now.  I didn't intend to mark this, but

15  we will.

16       MR. BUCHANAN:  It's E-391.

17       I'll get it up on the screen while

18       we're getting ready to mark it.

19       And this is going to be -- our

20       next in order is what, Charles?

21       (Document marked for

22       identification as Exhibit

23       Endo-Macrides-42.)

24       MR. BUCHANAN:  42.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2           Q.    Exhibit 42 is a memo to the

3    board of directors, right?

4                 MS. VANNI:   Thank you.

5    BY MR. BUCHANAN:

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15              Do you see that, sir?
16      A.    Yeah.
17      Q.    Did I read that correctly?
18  I'm not asking for comments.  Do you see
19  that, sir?
20      A.    Yeah, I see it.
21      Q.    Okay.  Let's focus on,
22  "Background and current state, Qualitest
23  business unit."
24              Do you see that section?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.    I see that.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17          Q.      Withdrawn.  Withdrawn, sir.

18          A.      DEA compliance.

19          Q.      Withdrawn.

20                  MS. VANNI:  You need to

21          allow --

22     BY MR. BUCHANAN:

23          Q.      Sir, if you're not staying

24     with my questions, we're going to move

Highly Confidential - Subject to Further Confidentiality Review

1    along.

2              Exhibit 33.  Do you have

3    that before you?

4              MS. VANNI:  I don't.

5              (Document marked for

6         identification as Exhibit

7         Endo-Macrides-33.)

8              MR. BUCHANAN:  You were

9         passed that one already.

10              MS. VANNI:  I was?  Okay.

11    BY MR. BUCHANAN:

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8          A.    I reviewed documents --

9          Q.    Were you involved in any

10    way --

11          A.    I'm speaking on behalf of

12    the company --

13              MS. VANNI:  Let him answer

14          the question.

15              THE WITNESS:  I have

16          reviewed documents --

17              MR. BUCHANAN:  Withdrawn.

18          Withdrawn.

19              MS. VANNI:  I'm going to

20          state an objection too, because he

21          was educated and he's here

22          testifying as a 30(b)(6).  And you

23          can't accept testimony that's

24          convenient for you and reject

Highly Confidential - Subject to Further Confidentiality Review

1      testimony that's not convenient

2      for you.

3           This witness has been

4      educated on 30(b)(6) issues and is

5      entitled to infer documents that

6      you are asking him to infer.  And

7      it is not fair to take part of it

8      and not another part.  Just note

9      my objection.

10          MR. BUCHANAN:  All you got

11     to say is "objection to form."

12  BY MR. BUCHANAN:

13          Q.    Okay.  So the question was

14  withdrawn.  And, therefore, it was an

15  inapt comment.

16          MS. VANNI:  Well, it applies

17     retroactive to your other

18     document.

19          MR. BUCHANAN:  Mr. -- I

20     don't know what that applies to.

21  BY MR. BUCHANAN:

22          Q.    Mr. Macrides --

23          MS. VANNI:  The record will

24     speak for itself.

1        MR. BUCHANAN:  As it always

2    does.

3    BY MR. BUCHANAN:



20        Q.    So we just took about a

21    25-minute break.  And I got to know, sir,

22    what did you look at on the break that

23    caused you to just change your testimony

24    about your role and involvement about the

1    company's response to the DEA meeting in

2    2013?

3              MS. VANNI:  Objection to

4         form.

5    BY MR. BUCHANAN:

6         Q.    What were you shown to

7    refresh your recollection and recant your

8    testimony before the break about your

9    role and involvement about response to

10   the DEA meeting in March of 2013?

11             Please tell the jury.

12        A.    I --

13             MS. VANNI:  Objection.  And

14        he is not recanting any testimony.

15        It's an unfair characterization.

16   BY MR. BUCHANAN:

17        Q.    What did you review during

18   the break?

19        A.    I didn't review anything.  I

20   just -- you just -- you challenged me on

21   my knowledge and my engagement in some of

22   these documents and some of these issues

23   were discussed.  And I'm just clarifying

24   that my -- my involvement and engagement,

1    that's all.

2         Q.    During the break were you

3    having discussions with counsel, sir?

4         A.    Of course I was having

5    discussions with counsel.

6         Q.    Thank you.

7              MS. VANNI:  Object to form.

8              MR. BUCHANAN:  Was the

9         witness shown documents during the

10        break, Counsel?

11             MS. VANNI:  Oh, I'm not

12        being deposed, Counsel.  And you

13        are not entitled --

14             MR. BUCHANAN:  Aiding the

15        witness in recanting and changing

16        his testimony is inappropriate.

17             MS. VANNI:  Okay.  Well, I

18        take offense to that, because I

19        have not done any such thing and

20        would never do any such thing.

21             MR. BUCHANAN:  Well, when --

22             MS. VANNI:  And this witness

23        is not recanting his testimony.

24        He is providing context to

1    documents that you are questioning

2    him about and then saying he

3    was -- he has no personal

4    knowledge of it.

5        All we're saying is he was

6    shown documents in preparation for

7    his 30(b)(6) testimony here.

8    Those documents regardless of

9    whether he was involved in them

10   personally or not, if he was

11   educated on them, he should be

12   allowed to testify fully to them.

13       MR. BUCHANAN:  He is --

14       MS. VANNI:  And not what you

15   want to choose to ask him about.

16       He should be able to provide

17   context, and you are moving to

18   strike his testimony in an

19   improper way, frankly, because he

20   didn't have personal knowledge of

21   it.

22       And our -- my point simply

23   is, that he has been educated on

24   these documents and should be able

```
1          to testify fully to them.

2              MR. BUCHANAN:  What he

3          shouldn't be is educated over a

4          break by counsel, during an

5          examination, Counsel.

6              MS. VANNI:  And -- and he

7          was not done --

8              MR. BUCHANAN:  He was in the

9          middle of cross-examination.  And

10         I -- look, the record does speak

11         for itself and the jury or the

12         judge will decide whether, in

13         fact, he was coached into changing

14         his testimony.

15             MS. VANNI:  Okay.  Well, I

16         wanted the record to be clear --

17     BY MR. BUCHANAN:

18         Q.   I'm referring to

19     Exhibit 33 --

20             MS. VANNI:  Well, wait.  I

21         want the record to be clear --

22             MR. BUCHANAN:  We'll just

23         add time to this.

24             MS. VANNI:  -- that I
```

Highly Confidential - Subject to Further Confidentiality Review

1    engaged in no such coaxing.

2              MR. BUCHANAN:  Okay.

3              MS. VANNI:  I want the

4    record to be clear.

5              MR. BUCHANAN:  We have the

6    witness's testimony before and

7    after the break that's pretty

8    evident.

9              MS. VANNI:  That's fine.

10   BY MR. BUCHANAN:

11

12

13

14

15

16

17

18

19

20

21

22

23

24



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12          Q.     Right.   And so first time

13   we've got boots on the ground in your

14   customers.

15              By the way, Qualitest is

16   still doing direct business with retail

17   pharmacies after telling the DEA in 2009

18   that it wasn't going to do it anymore.

19              MS. VANNI:   Object to form.

20   BY MR. BUCHANAN:

21          Q.     Right?

22              As of 2014, Qualitest is

23   still doing business with retail

24   pharmacies directly, correct, sir?

1           MS. VANNI:  Object to form.

2           THE WITNESS:  I believe

3      the -- the decision was that we

4      weren't shipping hydrocodone

5      products to independent retail

6      pharmacies.

7   BY MR. BUCHANAN:

8      Q.    I see.  But the rest of the

9   holy trinity was okay?

10          MS. VANNI:  Object to form.

11          THE WITNESS:  I'm just

12      clarifying your assessment.

13  BY MR. BUCHANAN:

14      Q.    Okay.  So you put boots on

15  the ground, and he actually learned this

16  isn't a real pharmacy, right?

17          MS. VANNI:  Object to form.

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19    BY MR. BUCHANAN:

20              Q.    Okay.   Let's look at

21    Exhibit 34.

22              MS. VANNI:   Can I have that?

23              (Document marked for

24        identification as Exhibit

Highly Confidential - Subject to Further Confidentiality Review

1              Endo-Macrides-34.)

2      BY MR. BUCHANAN:

3              Q.    December 30, 2013,

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



Case: 1:17-md-02804-DAP Doc #: 1981-5 Filed: 07/24/19 507 of 695. PageID #: 236812



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5    BY MR. BUCHANAN:

6         Q.    Let's go onto the next one

7    in this Texas road trip.

8         A.    Would that be Exhibit 35?

9         Q.    Sure.

10             (Document marked for

11             identification as Exhibit

12             Endo-Macrides-35.)

13   BY MR. BUCHANAN:

14        Q.    Again, actually going and

15   meeting your customers.  Good idea,

16   correct, sir?

17             MS. VANNI:  Objection.

18   BY MR. BUCHANAN:

19        Q.    Can we agree that going and

20   meeting your customers, their place of

21   business when they're handling controlled

22   substances, is a good idea?

23        A.    I think I've testified that

24   visiting customers is an important part

1    of a suspicious order monitoring program.

23   Mr. Brantley requests dispensing

24   histories for controlled substance.

1    According to the pharmacy, they filled

2    450 to 600 prescriptions monthly.  About

3    44 percent.

4             But when the actual

5    dispensing history was asked for, the

6    pharmacy refused to provide it, correct?

7         A.    Yeah.  I think what this

8    report is saying --

9         Q.    Is that what it states, sir?

10        A.    Yeah, the question -- in the

11   questionnaire --

12        Q.    Excuse me, sir.  Please stay

13   with my questions.

14            According to the

15   questionnaire, 70 percent of the

16   prescriptions were paid in cash.  Is that

17   what it states?

18        A.    That's what it says.

19        Q.    Okay.  We know that's not

20   right.

21            MS. VANNI:  Object to form.

22   BY MR. BUCHANAN:

23        Q.    Right?

24        A.    Certainly that would be a

1    concern, and the recommendation as a

2    result of those concerns was discontinue

3    shipment to this customer.

4        Q.    Right.  Because when you

5    actually went out and did questionnaires

6    and did due diligence with your

7    customers, who you were already shipping

8    products to, you found these are not

9    customers that we can trust for

10   maintaining effective controls against

11   diversion; isn't that right?

12           MS. VANNI:  Object to form.

13           THE WITNESS:  As I stated

14       earlier, during this time frame,

15       we were -- we were enhancing our

16       suspicious order monitoring

17       program, and these enhancements

18       were resulting in decisions we

19       took to not ship to certain

20       customers --

21   BY MR. BUCHANAN:

22       Q.    Again --

23       A.    -- as in this example.

24       Q.    Again, after the sit-down

1    with the DEA in March of 2013, right?

2                    MS. VANNI:  Object to form.

3                    THE WITNESS:  We had

4            identified previously to 2013 that

5            we needed to make certain

6            improvements to our DEA compliance

7            programs.

8    BY MR. BUCHANAN:

9            Q.    You had been told for years,

10   years, that you needed to make

11   improvements, but it wasn't until after

12   you sat down with the DEA in March of

13   2013 that you hired a head of SOMs and

14   you actually sent DEA compliance to start

15   knocking on your customers' doors,

16   correct?

17                   MS. VANNI:  Object to form.

18                   THE WITNESS:  I don't agree

19           with that characterization.

20   BY MR. BUCHANAN:

21           Q.    When was Mr. Brantley hired,

22   sir?

23           A.    We had an evolving program

24   throughout that time period.  The DEA

1  meeting in 2013 was another part of that

2  evolution to get additional information,

3  additional guidance, so we could develop

4  improved programs.

5      Q.   Okay.  When was Mr. Brantley

6  hired, before or after the DEA meeting?

7      A.   After the DEA meeting.

8      Q.   Thank you.  He was the head

9  of what?

10     A.   He was the manager of

11 suspicious order monitoring.

12     Q.   Okay.  And he is the one who

13 was actually doing DEA due diligence

14 visits, correct?

15     A.   He did some DEA due

16 diligence visits.

17     Q.   Okay.  And the

18 recommendation following the interaction

19 with this customer was stop selling,

20 right?

21     A.   Based on the questionnaire,

22 yes.

23     Q.   Okay.  So those were all

24 retail pharmacies, or some retail

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacies during this Texas road trip in

2    late 2013, early 2014.

3                   I'd like to talk about some

4    of your interactions with your

5    distributors.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 9              MS. VANNI:  Object to form.

10              THE WITNESS:  There's no

11         knowledge here that -- or

12         information that they were

13         reported to the DEA.

14   BY MR. BUCHANAN:

15         Q.    Because in fact, you were

16   the person selling to them?  You were

17   selling directly to people that were

18   problematic customers, right?

19              MS. VANNI:  Object to form.

20              THE WITNESS:  We were

21         selling to these customers.

22   BY MR. BUCHANAN:

23         Q.    Please look at Exhibit 41,

24   sir.
```

1          (Document marked for

2          identification as Exhibit

3          Macrides-41.)

4              THE WITNESS:  41?

5    BY MR. BUCHANAN:

6         Q.    Yeah.  Exhibit 41, sir, is

7    excerpted from the company's

8    interrogatories that were prepared by the

9    company and counsel and produced to us in

10   the last two weeks.

11             It says suspicious orders

12   and --

13             MS. VANNI:  This is a

14        demonstrative based on the --

15             MR. BUCHANAN:  It -- it's a

16        demonstrative.  But it is, in

17        fact, the entire chart as -- as

18        reflected in the interrogatory.

19   BY MR. BUCHANAN:

20        Q.    These are, in fact, either

21   suspicious orders or customers reported

22   to DEA by Par Pharmaceuticals, as

23   disclosed in discovery responses to us,

24   sir.

Highly Confidential - Subject to Further Confidentiality Review

1              We could agree, sir, looking

2      at this list, that you don't see any

3      reports to the DEA of any suspicious

4      orders or any suspicious customers prior

5      to the meeting with the DEA in March of

6      2013, correct, sir?

7                  MS. VANNI:  Objection.

8                  THE WITNESS:  All these

9           dates are after March of 2013.

10                 MS. VANNI:  I want to make

11          one more objection to the extent

12          that I don't -- I don't know

13          whether that interrogatory even

14          called for that information.

15                 MR. BUCHANAN:  It does.  But

16          your objection is noted.

17                 MS. VANNI:  I also object to

18          completeness.

19     BY MR. BUCHANAN:

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11          A.      Yeah, which sheet are you

12   referring to?

13          Q.      The company had a meeting

14   with the DEA in March of 2013 --

15          A.      I'm aware of that.

16          Q.      There was a binder that was

17   prepared that showed the company's

18   shipments of various products --

19          A.      Try to find that -- right.

20   Right.

21          Q.      We don't need to dig -- dig

22   it out.

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4   BY MR. BUCHANAN:

5          Q.    Okay.  Let's move on.

6                I told you we were going to

7   talk in segments today.  I want to return

8   to one we'd talked about at the

9   beginning.

10         A.    Okay.

11         Q.    Endo.

12         A.    Okay.

13               MR. BUCHANAN:  Can I have,

14         please, Exhibit 4 back up on the

15         screen.

16  BY MR. BUCHANAN:

17         Q.    What we have here, sir, is

18  the -- the summary of data reflecting,

19  you know, the pills for various

20  categories over various years that the

21  company sold relating to opioid products.

22               Do you recall our

23  discussions about that earlier?

24         A.    Yeah, I have it in front of

Highly Confidential - Subject to Further Confidentiality Review

1      me.

2             Q.    Okay.  The company -- we've

3      asked the company to tell us how we can

4      identify those orders that were pended

5      over time and then released.

6                    There's a system that tracks

7      orders in -- orders by Endo, as to

8      whether they've been pended, correct?

9             A.    That would be in SAP.

10            Q.    Okay.  And so whatever the

11     algorithm was at the time, it would pend,

12     and then after it was pended it could be

13     released, correct?

14            A.    If it pended after it was

15     reviewed and investigated, it could be

16     released.

17            Q.    And I think your testimony,

18     sir, is that in no instance was a pended

19     order not shipped for Endo, correct?

20            A.    That was my testimony.

21            Q.    And in no -- in no instance

22     was a pended order ever reported as

23     suspicious to the DEA, correct?

24            A.    As a result of our review

Highly Confidential - Subject to Further Confidentiality Review

1    and investigation, no orders were deemed

2    to be suspicious and, therefore, reported

3    to FDA -- or DEA, I'm sorry.

4              (Document marked for

5         identification as Exhibit

6         Endo-Macrides-44.)

7    BY MR. BUCHANAN:

8         Q.    I'm passing you, sir,

9    Exhibit 44.

10             Here you go.  You can take

11   the rubber band off it, sir.

12             MS. VANNI:  Do you have a

13        copy for me?

14             MR. BUCHANAN:  We do.  Do

15        you want it?

16             You can probably take

17        that -- I'll take the cardboard

18        back from you, sir.

19             (Discussion held off the

20        record.)

21   BY MR. BUCHANAN:

22        Q.    Sir, I'll represent to you

23   that we asked the company to identify for

24   us the transactions that had been pended

1    and cleared --

2            A.    Okay.

3            Q.    -- by the team at Endo.  And

4    they pointed us to a spreadsheet, and

5    this is the spreadsheet that reflects

6    them.

7            Could you go to the first

8    substantive page of that document, sir?

9            MR. BUCHANAN:  Can we pull

10           it up on the screen, please.

11           All right.  The print could

12           be challenging on pages of that

13           size, but too many trees were

14           dying to provide copies as it was.

15           THE WITNESS:  I can see it.

16   BY MR. BUCHANAN:

17           Q.    Does this reflect, sir, to

18   your knowledge an output of the system

19   that tracks pended orders?

20           A.    This appears to be output

21   from our SAP system.

22           Q.    That is indeed the system

23   that would track pended orders?

24           A.    That's the system where the

1    orders would be.

2         Q.    Okay.   These have been

3    identified, sir, as the pended orders

4    over the years for Endo, I'll represent

5    to you.   To my knowledge, through our

6    team's review, it only reflects orders

7    prior to 2014.

8         A.    Prior to 2014.

9         Q.    Okay.   Is there another

10   system that would track pended orders

11   after that point in time?

12        A.    The system is still SAP.

13   The only thing that's significant about

14   the 2014 time frame is there was a fairly

15   substantial upgrade that was done to SAP.

16        Q.    I'll represent to you, sir,

17   that there are 147,000-plus lines of

18   orders.

19        A.    Okay.

20        Q.    That were pended by Endo.

21        A.    Okay.

22        Q.    Am I correct in

23   understanding your testimony, sir, that

24   for each and every one of those 147,000

1  orders, somebody pressed "ship" for Endo

2  after it tripped a wire for suspicious

3  order flags?

4          MS. VANNI:  Object to form.

5          THE WITNESS:  What I can

6      tell you is that if these orders

7      were pended, as they were here,

8      then they were reviewed and

9      investigated, including contacting

10     the customer and requesting

11     specific information about the

12     order, and then if they were

13     deemed to be not suspicious, then

14     they were released.

15          Additionally, these orders

16     would then have gone to a

17     third-party distribution partner,

18     UPS, and would have gone through

19     UPS's SOMs program and algorithm

20     for further review.

21          And if it pended in UPS

22     system, then there would have been

23     further discussion and review

24     before the orders shipped to the

Highly Confidential - Subject to Further Confidentiality Review

1    ultimate end customer.

2  BY MR. BUCHANAN:

3        Q.    UPS didn't have a

4  relationship with your customers,

5  correct?

6        A.    UPS is our distribution

7  partner.

8        Q.    My question to you, sir, is,

9  UPS -- you were UPS's customer, correct?

10            MS. VANNI:  Object to form.

11            THE WITNESS:  UPS --

12       correct.  UPS is a third-party

13       distributor.

14  BY MR. BUCHANAN:

15       Q.    Right.  UPS did not have

16  visibility to your customers and did not

17  conduct due diligence of your customers,

18  correct, sir?

19            MS. VANNI:  Object to form.

20            THE WITNESS:  No UPS -- UPS

21       is the registrant for

22       distribution, for the distribution

23       license would be required to have

24       a suspicious order monitoring

1    program in place.

2    BY MR. BUCHANAN:

3         Q.    My --

4         A.    It would be the

5    responsibility of the client, in this

6    case Endo, to manage the customer

7    relationship.

8         Q.    For you to manage your

9    customer, your Morris and Dickson, your

10   FW Kerr, your Top Rx, your BZ Pharmacies.

11   Those were your customers?

12        A.    That's how -- yes, that's

13   how these relationships work.

14        Q.    Right.  And it was your job

15   to manage your -- and do -- manage and do

16   the due diligence on your customers,

17   correct?

18             MS. VANNI:  Object to form.

19             THE WITNESS:  The model here

20        is to outsource distribution.  The

21        customer relationship, the

22        customer diligence is with Endo in

23        that case.

24             Now UPS, given the fact that

Highly Confidential - Subject to Further Confidentiality Review

1        they have a SOMs program and given

2        the fact that they ship on behalf

3        of multiple clients to, you know,

4        the same customers, certainly

5        might have information that's

6        valuable to us and certainly

7        outputs of their SOMs programs

8        would be -- would be information

9        we would be interested in.  And

10        that's a collaboration.  That's a

11        partnership.

12            But the ultimate

13        responsibility for the customer

14        resides with Endo, not with UPS.

15   BY MR. BUCHANAN:

16        Q.    Okay.  And so with regard to

17   the spreadsheet printout that is before

18   you, do you think there is a similar

19   transaction record for everything after

20   2014 in another system?

21        A.    There should be.

22        Q.    And as I understand it, sir,

23   the way it worked is the computer flagged

24   orders as potentially of concern or

1    suspicious for tripping a wire, some

2    threshold, some frequency concern,

3    whatever it was in this pre-2014 period?

4            A.    Quantity, frequency, you

5    know, order patterns, you know, we have

6    products that are seasonal, for example.

7    So those products would tend to kick out

8    in this kind of a program.  And then you

9    would look at it, and you would examine

10   it and you would say, "Oh, okay, this is

11   a seasonal product.  So there's more that

12   gets ordered during certain times of the

13   year."

14           Q.    And in every single

15   instance, each of the 147,000 orders

16   required a human being to say, "Send it,"

17   right?

18           MS. VANNI:  Object to form.

19   BY MR. BUCHANAN:

20           Q.    A human being from Endo

21   after the computer had held the order as

22   suspicious for one of those factors, had

23   to press "ship," right?

24           MS. VANNI:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  An employee of

2          Endo had to complete a review and

3          investigation on why that order

4          kicked out, and there could be

5          numerous reasons why the order

6          pended that would have to be

7          investigated before the order

8          could be moved into UPS's system.

9    BY MR. BUCHANAN:

10          Q.    And of 147,000 orders, the

11    Endo people who are looking at this

12    didn't identify one, not a single order

13    over the 15 years that are reflected in

14    the data before you that compose 147,000

15    orders that shouldn't --

16          A.    147,000 line items.  That's

17    not necessarily 147,000 orders --

18          Q.    Thank you.

19          A.    -- just to clarify.

20          Q.    The team at Endo who looked

21    at these, or the person or people who

22    looked at these over this period of time

23    didn't identify a single product order or

24    line item, as you stated, that it found

1    shouldn't be shipped or that it found

2    needed to be reported to the DEA,

3    correct?

4              MS. VANNI:  Object to form.

5              THE WITNESS:  After review

6         and thorough investigation of

7         these orders that pended, the

8         conclusion was that the order

9         pended for a valid reason and,

10        therefore, was not suspicious, and

11        was therefore moved to UPS to go

12        through the additional check of

13        UPS's suspicious order monitoring

14        system.

15   BY MR. BUCHANAN:

16        Q.    Sir, the total value of the

17   pended orders in that spreadsheet is

18   $4.5 billion.

19              Did you know that?

20              MS. VANNI:  Objection.

21        Beyond the scope.

22              THE WITNESS:  I didn't know

23        the exact quantity of this.  But I

24        do -- I do have an understanding

1        of our -- of our sales.

2    BY MR. BUCHANAN:

3        Q.    Every one of them shipped?

4        A.    After the proper due

5    diligence was performed and the

6    conclusion was made that the order was

7    not suspicious, it was moved to UPS.  It

8    went through UPS's suspicious order

9    monitoring system, UPS's algorithm.  And

10   if it passed successfully through that,

11   it shipped.

12       Q.    Please tell the jury how

13   many orders UPS reported to the DEA for

14   Endo products?

15       A.    These orders, after going

16   through UPS system --

17           MS. VANNI:  Object to form.

18           THE WITNESS:  -- were

19       further concluded that they were

20       not suspicious.

21   BY MR. BUCHANAN:

22       Q.    In fact, UPS paid a

23   $40 million fine for its activities in

24   shipping controlled substances and

1    soliciting business from people who were

2    diverting controlled substances and

3    opioids.

4              MS. VANNI:  Objection.

5    BY MR. BUCHANAN:

6         Q.    Do you know that, sir?

7              MS. VANNI:  Objection.

8              THE WITNESS:  I know that

9         UPS was fined, I believe related

10        to their small parcel business,

11        which -- which wasn't the business

12        that we were using for

13        distribution of these products.

14   BY MR. BUCHANAN:

15        Q.    Did you know UPS was

16   soliciting business, sir, from internet

17   pharmacies and not reporting the

18   suspicious orders that they were

19   receiving from those pharmacies?  Did you

20   know that?

21             MS. VANNI:  Objection.

22   BY MR. BUCHANAN:

23        Q.    They were, in fact,

24   soliciting business from them.

1           MS. VANNI:  Objection.

2           THE WITNESS:  I understand

3      that UPS was fined for activities

4      in, I believe, their small parcel

5      business.

6           MS. VANNI:  Counsel, by my

7      calculation, I think we are at

8      seven hours.

9           MR. BUCHANAN:  Okay.

10          And just so we have the fact

11     clear.

12 BY MR. BUCHANAN:

13     Q.    To your knowledge, sir, not

14 a single Endo order processed by UPS has

15 ever been reported to the DEA, correct?

16          MS. VANNI:  Object to form.

17          THE WITNESS:  I believe I've

18     testified that after review and

19     investigation and a run through

20     UPS's SOM systems, the orders were

21     deemed to not be suspicious and,

22     therefore, were shipped.

23          MR. BUCHANAN:  I'm -- I'm

24     out of time.

Highly Confidential - Subject to Further Confidentiality Review

1        THE VIDEOGRAPHER:  Off the
2     record at 6:13 p.m.
3        (Short break.)
4        MS. VANNI:  I object to any
5     questioning by counsel for
6     Tennessee.  This witness,
7     Mr. Macrides, has no special
8     knowledge related to Tennessee.
9     We do not believe that this
10    deposition was properly
11    cross-noticed.
12       We are going to allow
13    Mr. Macrides to testify in a very
14    limited capacity today.  I don't
15    expect there to be any
16    duplication.  And the questioning
17    should be related to Endo, and
18    in -- only in connection with any
19    Tennessee issues.
20       If -- if it becomes
21    duplicative or if it exceeds the
22    parameters of questions related to
23    Endo in connection with Tennessee,
24    I'm going to instruct the witness

1      not to answer.

2          MR. STEWART:  And I'll just

3      say obviously it's a properly

4      noticed deposition.  If -- if

5      defendant had an objection,

6      defendant could have sought a

7      protective order.  Has chosen not

8      to do so.  So it's properly

9      noticed per -- in the same way

10     that the other multiple

11     depositions that we participated

12     in has been properly noticed.

13     And -- and so we're here

14     appropriately, and we plan to

15     question the witness about any

16     aspect of the testimony for which

17     he's been put forward, which is

18     Items 30, 31, 32, 33 and 35,

19     without limitation.

20          And I'll just tell you we

21     will probably take two hours.

22          So I don't know if you want

23     to take a break before we get

24     started --

1      MS. VANNI:  Yes, we are

2    going to take a break.  But my

3    objection stands.

4        (Short break.)

5      MS. VANNI:  With respect --

6    I want to further clarify my

7    objection to this line of

8    questioning.  With respect to the

9    cross-notice I want to note that

10   it was just issued yesterday and

11   we did lodge an objection via

12   e-mail to counsel, and at that

13   point in time, told counsel that

14   we weren't going to allow any

15   questioning, which our objection

16   is in line with the CMO on the

17   deposition and the parameters

18   that -- that this counsel's

19   colleagues have been following

20   with respect to Endo witnesses in

21   the Tennessee litigation.

22      And just note, that as a

23   concession, we're going to allow

24   the testimony but under the

Highly Confidential - Subject to Further Confidentiality Review

1    limited parameters that I've

2    previously stated.

3           Thank you.

4           MR. STEWART:  And -- and

5    like I said, it's properly noticed

6    and we're going to proceed as we

7    have in all the other depositions

8    that we've taken.

9           THE VIDEOGRAPHER:  On the

10   video record at 6:34 p.m.

11            -  -  -

12          EXAMINATION

13            -  -  -

14   BY MR. STEWART:

15      Q.    And I'd like to hand you,

16   sir, an exhibit, marked Exhibit 45.

17          (Document marked for

18   identification as Exhibit

19   Endo-Macrides-45.)

20   BY MR. STEWART:

21      Q.    Do you see that?

22          MS. VANNI:  Do you have a

23   copy for me?

24          MR. STEWART:  I think it's

Highly Confidential - Subject to Further Confidentiality Review

1    right in front of you.

2              MS. VANNI:  This is it?

3              MR. STEWART:  Yes.

4              MS. VANNI:  Okay.

5              THE WITNESS:  I see this.

6    BY MR. STEWART:

7         Q.    Yeah, do you see a document

8    that has an exhibit sticker 45 on it?

9         A.    I do.

10        Q.    And do you see it's a

11   cross-notice of oral videotaped

12   deposition with your name?

13             It's the very first line,

14   please take notice, or -- or the heading?

15        A.    I see that.

16        Q.    Okay.  And, sir, can you

17   turn to Page 16 of that -- of the

18   document that accompanies the notice

19   that's part of Exhibit 45?

20             Do you see that?

21        A.    I see 16.

22        Q.    And do you see Item 30?

23        A.    I see Item 30.

24        Q.    And is that -- are Items 30

Highly Confidential - Subject to Further Confidentiality Review

1    and 31 two of the subjects you're

2    supposed to testify on today?

3                MS. VANNI:  Objection.

4           These have been further revised

5           subject to communications with

6           counsel for the MDL.  And to the

7           extent that he is only going to be

8           questioned with respect to Endo,

9           he has not been designated with

10          respect to diversion or abuse with

11          respect to Endo.  The record

12          should be clear on that.

13               It's being handled by

14          another witness.

15   BY MR. STEWART:

16          Q.    You can answer.

17                I mean, you're here to talk

18   about the suspicious order monitoring

19   program with respect to opioids.

20                Is that fair?

21          A.    I believe that's fair.

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18          Q.     How would I find out?  Where

19     would I find out whether or not Endo has

20     conducted a site visit in Tennessee?

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



9      Q.     Because you've got

10   records -- and I say you, I'm using the

11   term "you" for Endo as defined in your

12   notice.  Can we agree on that?

13      A.     Repeat that, please.

14      Q.     When I use the word "you,"

15   I'm talking about Endo.  Fair?

16      A.     Fair.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15            MS. VANNI:  Object to form.

16            THE WITNESS:  Not that I'm

17       aware of.

18  BY MR. STEWART:

19       Q.    So I can't say give me all

20  the documents that show every

21  investigated order out of Tennessee?

22       A.    Not in the same way you're

23  getting the stack of orders that pended.

24       Q.    Okay.  What sort of

Highly Confidential - Subject to Further Confidentiality Review

1    information could I find about specific

2    actions taken by Endo personnel with

3    respect to investigating suspicious

4    orders from the State of Tennessee?

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



```
11        Q.    Are you at the meeting?

12        A.    I'm not at the meeting.

13        Q.    And --

14        A.    I could have attended

15   meeting.  I haven't actually attended

16   one.  Sometimes it just has to do with my

17   schedule.

18        Q.    Anyone else that you know

19   who attends them?

20        A.    No.

21        Q.    And are minutes kept or is

22   there some record kept of the meetings

23   between the head of DEA compliance and

24   the CEO?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I'm not -- I'm not -- I'm

2  not sure if we're actually keeping

3  minutes from those meetings.

4      Q.    Do you get a summary e-mail

5  of what they talked about?

6      A.    I discuss it with Mike.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18      A.      Yes.
19      Q.      Tell me about that
20  discussion.
21              MS. VANNI:  Objection.
22
23
24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14                    MS. VANNI:  Object to form.

15                    THE WITNESS:  I'm not aware

16          of any instance.

17     BY MR. STEWART:

18          Q.    We talked about your

19     communicating with the CEO 2016 to 2018.

20     What about prior to 2016, while you were

21     at the company, who would have made those

22     communications with the CEO of Endo?

23          A.    Prior to 2016?

24          Q.    Sure.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



10          MS. VANNI:  Objection.

11          THE WITNESS:  It's a fair

12     statement.

13  BY MR. STEWART:

14          Q.    Okay.  And who would have

15  predated you, who would have done it

16  prior to the time you took over as head

17  of DEA compliance?

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11          A.    Well, that would --

12    that's -- yeah --

13          MS. VANNI:  Objection.  It

14    exceeds the scope of --

15          THE WITNESS:  Right.

16          MS. VANNI:  -- of his

17    designation and also is related to

18    Qualitest and Par.  I'm not going

19    to allow him to answer that.

20          MR. STEWART:  Okay.  What's

21    your basis?

22          MS. VANNI:  I just stated,

23    stated it.

24          MR. STEWART:  Well, Endo is

Highly Confidential - Subject to Further Confidentiality Review

1    defined as including its

2    subsidiaries.

3         You're saying prior to these

4    entities becoming part of Endo, is

5    that your position, counsel?

6         MS. VANNI:  Well, my

7    position --

8         MR. STEWART:  It's a

9    momentous event to tell a witness

10   not to answer in a deposition, so

11   I'm wondering what your

12   justification is.

13        MS. VANNI:  Well, this is

14   based on my well-articulated

15   objection at the outset of this

16   deposition, that this deposition

17   was not properly noticed.  Despite

18   what you say, it was noticed

19   yesterday.  Not in compliance with

20   the deposition CMO.

21        We objected and said we

22   weren't going to allow him to

23   testify to anything, because Par

24   isn't even a defendant in any

Highly Confidential - Subject to Further Confidentiality Review

1    Tennessee action.

2         Today we're making a

3    concession, based on goodwill and

4    the fact that you're here,

5    allowing him to testify as to

6    Endo.  That is my basis.

7         MR. STEWART:  Okay.  I guess

8    what I'm saying is, first of all,

9    Par is a component of Endo as it

10   stands today.  So -- so Endo

11   encompasses Par as -- as indicated

12   by the notice and now by your

13   local counsel in Tennessee.

14        Beyond that, as you know,

15   the scope of a deposition, those

16   sorts of objections can be made

17   for the record, but that's not one

18   of the three bases under Rule 30

19   to tell a witness not to answer.

20        So I'm just going to tell

21   you if you -- if you interfere

22   with the deposition and tell the

23   witness not to answer for some

24   reason, other than those

Highly Confidential - Subject to Further Confidentiality Review

1    articulated in the Rules of Civil

2    Procedure, I think you are -- I

3    think it's likely we'll have to

4    come back and just get those

5    questions at a different time,

6    likely at your expense.

7         MS. VANNI:  If this was a

8    properly noticed deposition, I

9    might agree with you.  This is not

10   a properly noticed deposition, and

11   your colleagues in the Tennessee

12   litigation have been following the

13   protocol with respect to

14   cross-noticing of depositions with

15   respect to cases where Endo is a

16   defendant.  Not Par.

17        Given that he is testifying

18   on behalf of Endo and Par, we are

19   permitting him to testify with

20   respect to your questions as to

21   Endo also.

22        MR. STEWART:  Like I said, I

23   think we obviously have a

24   disagreement about the application

Highly Confidential - Subject to Further Confidentiality Review

1          of Rule 30, the law, the

2          proprietary of the notice and so

3          forth.

4               But we've set it out on the

5          record, and we'll have to contend

6          with it after this deposition.

7               I think telling the witness

8          not to answer is improper.

9     BY MR. STEWART:

10         Q.    Tell me, did anyone at --

11    did anybody while you were at Endo ever

12    review information about doctors, nurse

13    practitioners, physician assistants, or

14    other providers who had been arrested or

15    disciplined for overprescribing opioids

16    in Tennessee?

17         A.    Not that I was involved in,

18    although I will -- as I said earlier,

19    there are other departments, other groups

20    in Endo that deal with various aspects of

21    compliance, complaints, patient safety,

22    et cetera.  And they may have been

23    involved in that type of activity.

24         Q.    I take it that Endo's

Highly Confidential - Subject to Further Confidentiality Review

1    specific order monitoring program never

2    encompassed an effort to review records

3    of physicians, nurse practitioners, and

4    physician assistants who had been

5    arrested and disciplined?

6              MS. VANNI:  Object to form.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24        Q.    And did Endo have access to

Highly Confidential - Subject to Further Confidentiality Review

1    data about where pharmacies that received

2    Endo products were then selling Endo's

3    products?

4                MS. VANNI:  Objection.

5           Asked and answered.  This was

6           covered in detail by counsel for

7           the MDL, in which you were present

8           for the deposition.  Becoming

9           repetitive.

10   BY MR. STEWART:

11          Q.    Go ahead and answer.  I

12   mean, that was your testimony earlier

13   today, fair?

14          A.    I've testified on suspicious

15   order monitoring.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15              MS. VANNI:   Objection.

16        Beyond the scope of his 30(b)(6)

17        designation.

18   BY MR. STEWART:

19        Q.    You can answer.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
4
```

5              (Document marked for

6         identification as Exhibit

7         Endo-Macrides-46.)

8    BY MR. STEWART:

9         Q.    I'll hand you Exhibit 46.

10              And can you turn -- do you

11   see that you have got a document in front

12   of you that's got an exhibit sticker, 46?

13        A.    I do.

14        Q.    Do you see at the bottom of

15   the document, there's a marker, bottom

16   right-hand corner, it says

17   ENDO-OPIOID_MDL-05948280.

18              Do you see that?

19        A.    I see that.

20        Q.    If you turn to the page

21   marked 282, the number that ends in 282.

22   It's the third page of the document.

23        A.    I see that.

24        Q.    Okay.  Take a moment, if you

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



t

1                  (Document marked for

2           identification as Exhibit

3           Endo-Macrides-47.)

4    BY MR. STEWART:

5           Q.    Let me hand you Exhibit 47.

6                 Do you see that you're

7    copied on this document?

8           A.    I'm copied on this document.

9           Q.    Is that right?

10                And do you see that the

11   bottom of the right-hand corner of

12   Exhibit 47, you've got a -- a number

13   ENDO-OPIOID_MDL-06235529?

14          A.    I see that.

15          Q.    Okay.  Can you take a look

16   at this document and tell me what it is,

17   what is the purpose of this document?

18                MS. VANNI:  I'm going to

19          object to this line of questioning

20          because, regardless of whether

21          it's a -- the Bates stamp is

22          ENDO-OPIOID, this is clearly a Par

23          document.

24                And for the reasons I -- I

Highly Confidential - Subject to Further Confidentiality Review

1    articulated at the outset of your

2    questioning, Counsel, the fact

3    that this is not a properly

4    noticed deposition, the fact that

5    Par is not a defendant in any

6    Tennessee case, I'm not going to

7    allow him to address this

8    document.

9  BY MR. STEWART:

10       Q.    Because your counsel is --

11   is telling you not to answer, we'll move

12   on to the next document.

13            I'd like to hand you

14   Exhibit 48.

15            (Document marked for

16       identification as Exhibit

17       Endo-Macrides-48.)

18  BY MR. STEWART:

19       Q.    And I'll ask you to look at

20   the document, and first tell me if it's

21   got a marker at the bottom

22   ENDO-OPIOID_MDL-06211237?

23       A.    It does.

24       Q.    Okay.  Do you know who Aaron

1    Graham is?

2          A.    Aaron Graham was head of

3    security at Qualitest in Huntsville.

4                MS. VANNI:  I'm going to

5          make the same objection as to this

6          document.  It's clearly a Par

7          document.  Aaron Graham, as the

8          witness just stated, was the

9          senior director of corporate

10         security at Huntsville.

11               Because Par is not a

12         defendant in the Tennessee cases,

13         and this deposition was not

14         properly noticed, and this is not

15         related to Endo, I'm not allowing

16         him to answer.

17               MR. STEWART:  Let's make

18         sure I understand.  I thought -- I

19         thought the witness just said he

20         was with Qualitest.

21               MS. VANNI:  Qualitest is not

22         a defendant in any of your

23         Tennessee matters.

24    BY MR. STEWART:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  Maybe you can answer

2   this question generally.

3           When did -- when did Endo

4   purchase Qualitest?

5           MS. VANNI:  Objection.

6           Covered during the main deposition

7           of the MDL.

8   BY MR. STEWART:

9      Q.    It was 2010, right?  You can

10  answer.

11      A.    Endo acquired Qualitest in

12  2010.

13      Q.    Okay.

14          MR. STEWART:  And so here we

15          have a 2012 document.  Endo has,

16          by your own witness's statement,

17          acquired Qualitest.  I don't

18          understand your objection even by

19          your improper framework that

20          you've created, Counsel.  This is

21          a Qualitest document.  Endo owns

22          Qualitest at this time.

23          What possible reason can you

24          have to tell the witness not to

1          answer the question?

2                  MS. VANNI:  Counsel, I've

3          said it about three times now.

4                  Tennessee counsel, your

5          co-counsel in all the Tennessee

6          litigation has appeared in cases

7          where Endo is a defendant.

8                  This deposition is not

9          properly noticed with respect --

10         just generally, with respect to

11         the CMO.  It's not properly

12         noticed.

13                 And we -- we went on record

14         yesterday as saying we weren't

15         going to even allow this witness

16         to testify.  Today we are making a

17         concession since you are here

18         allowing him to testify as to Endo

19         issues.  This document is clearly

20         a Qualitest document.

21                 MR. STEWART:  But Qualitest

22         is part of Endo at the time in

23         question.  What -- what

24         distinction are you making?

Highly Confidential - Subject to Further Confidentiality Review

1        MS. VANNI:  Qualitest was a

2    separate corporate entity.  It's

3    not a defendant in the Tennessee

4    litigations.

5        MR. STEWART:  Counsel, let

6    me ask you something, just to make

7    sure we're clear on this.  Because

8    I think it's extraordinary what

9    you're doing.

10       Do you know that in the --

11   and you're welcome to look at

12   Exhibit 45.  Here is how you

13   define Endo.  Okay?  Your own

14   counsel defined Endo as:

15       Endo Health Solutions Inc.

16   and Endo Pharmaceuticals Inc. and

17   their officers, directors,

18   employees, partners,

19   representatives, agents, corporate

20   parents, subsidiaries, affiliates,

21   divisions, predecessors or

22   successors in interest and other

23   persons or entities acting on its

24   behalf."

1    Now, are you, for the

2    purposes of this deposition,

3    fashioning a new heretofore

4    unprecedented definition of the

5    word Endo?

6         Explain.

7         MS. VANNI:  Are you asking

8    me a question?

9         MR. STEWART:  I am.  Yeah, I

10   am asking you to justify your

11   extraordinary decision to tell

12   this witness not to answer a

13   question about a document marked

14   Endo, which is clearly about Endo.

15        MS. VANNI:  This is not --

16   this document is clearly not about

17   Endo.  I'm looking at the First

18   Amended Complaint right now that's

19   filed in the Tennessee actions

20   where you name a number of

21   defendants, and with respect to

22   Endo, you name Endo Health

23   Solutions Inc. and Endo

24   Pharmaceuticals Inc.  There is no

1    mention of Par or Qualitest who

2    are separate corporate entities.

3              MR. STEWART:  Right.

4              MS. VANNI:  That's my

5    position.

6              MR. STEWART:  A separate

7    corporate entity owned by Endo at

8    the time the document was created

9    and defined by you as Endo.

10              I can tell you this is

11    extraordinary.  This is improper

12    what you're doing.  We're going to

13    be back at your expense to ask the

14    witness about this fundamental

15    document.

16              MS. VANNI:  So fundamental

17    that it wasn't even covered by

18    counsel for the MDL.

19    BY MR. STEWART:

20        Q.    Are you aware -- is

21    Tennessee a hot spot location, considered

22    by Endo a hot spot?

23              MS. VANNI:  Object to form.

24              THE WITNESS:  What do you

Highly Confidential - Subject to Further Confidentiality Review

1       mean by hot spot?

2    BY MR. STEWART:

3        Q.    You tell me.  Does Endo ever

4    identify states as hot spots?  Have you

5    ever heard that term?

6        A.    I've heard the term.

7        Q.    What does it mean within

8    your company, sir?  What does hot spot

9    mean?

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11     Q.     Has the DEA provided Endo

12  guidance with respect to hot spots?

13     A.     DEA -- not specifically

14  Endo.

15     Q.     What does that mean?

16     A.     It means I can only answer

17  that question based on Endo, and I said

18  not specifically to Endo --

19     Q.     So the DEA --

20     A.     -- that I'm aware of.

21     Q.     Has the DEA provided Endo

22  information about areas that are hot

23  spots for opioids generally?

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12      THE WITNESS:  Can we have

13  a --

14      MS. VANNI:  Counsel,

15  whenever we have a logical

16  stopping point.

17      MR. STEWART:  Sure.  We can

18  take a break.  Absolutely.

19      THE VIDEOGRAPHER:  Off the

20  record at 7:37 p.m.

21      (Short break.)

22      THE VIDEOGRAPHER:  We are

23  back on the record at 7:48 p.m.

24      (Document marked for

Highly Confidential - Subject to Further Confidentiality Review

1          identification as Exhibit

2          Endo-Macrides-49.)

3    BY MR. STEWART:

4          Q.    I'm going to hand you

5    Exhibit 49:  Do you see at the bottom of

6    Exhibit 49, it's got a marker that says

7    ENDO-OPIOID_MDL-05968927.

8          A.    I see that.

9          Q.    Okay.  And can you flip over

10   to the second page.  Actually the third

11   page.  Do you see that there is an

12   address block for Lisa Walker?

13         A.    I see that.

14         Q.    You see it's got her e-mail?

15         A.    I see that.

16         Q.    What's her e-mail say?

17         A.    It says

18   Walker.Lisa@Endo.com.

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15        A.      That's what it says here.

16              (Document marked for

17        identification as Exhibit

18        endo-Macrides-50.)

19    BY MR. STEWART:

20        Q.      I'll give you another

21    document marked as Exhibit 50.  Do you

22    see that this document attaches a

23    PowerPoint or series of PowerPoints that

24    are being prepared for the DEA meeting,

Highly Confidential - Subject to Further Confidentiality Review

1    2013?

2          A.    I see that this is a

3    document to prepare for a meeting with

4    DEA.

5          Q.    Okay.  Are you familiar with

6    it?

7          A.    I've seen this document.

8          Q.    Okay.  Turn to Page 18 of

9    the document.

10          Before we talk about the

11    document, Page 18, can you just tell me

12    which meeting, which DEA meeting was this

13    PowerPoint designed to relate to?

14          A.    Which DEA meeting?

15          Q.    Sure.  I mean, tell me a

16    link, if you could, the document we're

17    looking at, the PowerPoint, to a

18    particular meeting with the DEA if you

19    can?

20          MS. VANNI:  Object to form.

21          THE WITNESS:  It says

22    meeting with DEA on October 17,

23    2013.

24    BY MR. STEWART:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1  

2         Q.    Now, can you turn to, it's

3 another two pages down in the document,

4 there's a document, a slide entitled

5 "Phase I."

6               Do you see that?

7               MS. VANNI:  What page

8      number?

9               THE WITNESS:  Line --

10               MR. STEWART:  I believe so.

11               THE WITNESS:  Phase I.

12 BY MR. STEWART:

13         Q.    Yeah.  Do you see that?

14         A.    I see that.

15         Q.    And do you see that the

16 first sentence, the first portion of the

17 slide says, "Enhancement of the existing

18 SOMS calculation for all customers, all

19 controlled products and pseudoephedrine

20 products"?

21         A.    Can I see that?

22         Q.    And given the time table,

23 October of 2013, do you know what this

24 refers to?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. VANNI:  Object to form.

2          THE WITNESS:  Well, this is

3      providing DEA with an update on

4      the -- the status of enhancing

5      our -- our algorithm for

6      suspicious order monitoring.

7  BY MR. STEWART:

8      Q.    Can you turn to the next

9  page?

10          Do you see it says Phase II

11  at the top?

12      A.    I see that.

13      Q.    And do you see the first

14  phrase on this page says, "Hired

15  individuals to support the program"?

16          MS. VANNI:  Note my

17      objection.  This deals with

18      Qualitest and was covered already

19      during MDL counsel's questioning.

20  BY MR. STEWART:

21      Q.    Here you are talking about

22  hiring people to support the SOM program,

23  fair?

24      A.    Fair.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Let me ask you, before you

2    hired these individuals in 2013, how many

3    individuals within the company were

4    devoted full-time to the SOM program, the

5    suspicious order monitoring program?

6               MS. VANNI:  Are you asking

7          as to Endo?

8               MR. STEWART:  I'm asking as

9          to Endo and all entities owned by

10         Endo.

11   BY MR. STEWART:

12         Q.    How many people were in

13   charge or were paid to involve themselves

14   with a suspicious order monitoring

15   program before 2013?

16              MS. VANNI:  You can answer

17         as to Endo.

18              THE WITNESS:  I can -- okay.

19         I can answer as to Endo?

20              MS. VANNI:  Mm-hmm.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6   BY MR. STEWART:

7          Q.    Turn to Page 27.  Do you see

8   you have a -- a slide, and it's entitled,

9   "Rates of abuse self-reported at U.S.

10  drug treatment centers data through

11  second quarter 2013."

12              Do you see that?

13         A.    I see the document.

14         Q.    Okay.  And do you see there

15  is a graph for generic oxymorphone HCL?

16         A.    I see that.

17         Q.    Okay.  And what does that

18  graph show, can you tell?

19              MS. VANNI:  Object to form.

20              THE WITNESS:  If I'm reading

21         this graph it says, "Cases per

22         100,000 prescriptions dispensed."

23  BY MR. STEWART:

24         Q.    When it says cases, what

Highly Confidential - Subject to Further Confidentiality Review

1    case, these are abuse cases, people

2    abusing generic oxymorphone HCL?

3          A.    It says the number of

4    reported -- self-reported abuse cases.  I

5    think that's what it's showing.

6          Q.    So what the chart is showing

7    is they are going up for the generic

8    oxymorphone HCL, the abuse cases?

9          A.    That's what the chart says.

10         Q.    Now, do you see at the

11   bottom there is a source listing?

12         A.    I see that.

13         Q.    It says, "Source:  National

14   Addictions Vigilance Intervention and

15   Prevention Program, NAVIPPRO"?

16         A.    I see that.

17         Q.    Are you familiar with

18   NAVIPPRO?

19         A.    I have a general

20   understanding that they collect

21   information about opioid abuse.

22   

23   

24

Highly Confidential - Subject to Further Confidentiality Review



20          MS. VANNI:  Object to form.

21          THE WITNESS:  Fair.

22    BY MR. STEWART:

23          Q.    And do you use NAVIPPRO, the

24    NAVIPPRO system, in your work at Endo?

1    A.    I do not.

2    Q.    Okay.  Turn over to the next

3 page.  Do you see that Page 28 of this

4 exhibit, Exhibit 50, is entitled "Rates

5 of abuse reported to U.S. Poison Control

6 Centers data through first quarter of

7 2013"?

8         Do you see that?

9    A.    Yes, I do.

10    Q.    Let's make sure we're tied

11 up here.  Can you turn to the front page

12 of the document.  Real quick.  Just

13 confirm that it's Exhibit 50.

14    A.    It is.

15    Q.    Okay.  Good.  So Exhibit 50,

16 Page 28 we've got rates -- we've got a

17 slide entitled "Rates of abuse reported

18 to U.S.  poison centers - data through

19 first quarter of 2013," right?

20    A.    That's what it says.

21    Q.    Okay.  And do you see that

22 it's got Opana ER and other Schedule II

23 opioids?

24    A.    I see that.

1    Q.    Would other Schedule II

2  opioids include generic opioids?

3         MS. VANNI:  Object to form.

4         THE WITNESS:  I don't know

5    what -- like I said, I didn't

6    prepare this.  So I don't know

7    what's included in other Schedule

8    II opioids.

9  BY MR. STEWART:

10   Q.    Okay.  From a -- just a

11  common sense standpoint, the generic

12  oxycodone, for example, is a Schedule II

13  opioid, right?

14        MS. VANNI:  Object to form.

15        THE WITNESS:  Generic

16   oxycodone is a Schedule II opioid.

17  BY MR. STEWART:

18   Q.    Generic oxymorphone HCl is a

19  Schedule II opioid, right?

20   A.    Yes.

21   Q.    Do you see at the bottom of

22  slide -- of Exhibit 50, Page 28,

23  there's -- it says, "Source:  RADARS

24  system, Poison Control Center program"?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I see that.

2    Q.    Are you familiar with the

3  RADARS system Poison Control Center

4  program?

5    A.    I am not.

6    Q.    It's not something that you

7  used in your work?

8    A.    It's not an area that I

9  would be directly involved in.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19            MS. VANNI:  Object to form.

20            THE WITNESS:  No.

21    BY MR. STEWART:

22        Q.    Do you see page -- can you

23    turn to Page 33 of Exhibit 50.  Do you

24    see that that page is entitled

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9          MS. VANNI:   Objection.

10     Beyond the scope of his 30(b)(6)

11     designation.

12  BY MR. STEWART:

13          Q.    Is that what the slide

14  shows?

15          MS. VANNI:   It covers abuse

16     for Endo.

17  BY MR. STEWART:

18          Q.    Is that what the slide

19  shows?

20          A.    I'm just -- if you can just

21  let me familiarize myself --

22          Q.    Sure.

23          A.    -- with the slide, because

24  it is not my area of responsibility.

1          Okay.  So it seems to be

2   describing routes -- as it says, routes

3   of administration of misuse of product.

4          Q.    Can you tell me, do you

5   think there's a correlation between

6   misuse of Endo opioid products and abuse

7   of those products on the one hand, and

8   suspicious orders being filled in a

9   particular area?

10               MS. VANNI:  Object to form

11        and beyond the scope.

12               THE WITNESS:  I don't think

13        I understand your question.  Can

14        you clarify?

15  BY MR. STEWART:

16        Q.    Well, sure.  You're in

17  charge of suspicious order monitoring,

18  fair?

19               MS. VANNI:  Objection.

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Q.     Turn to the next page,

Page 34 of Exhibit 50.

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that this slide

2    presented to the DEA is entitled

3    "Injection data in ASI-MV comparison of

4    proportion of abusers who reported

5    injecting Opana ER CRF in TN, the other

6    states."

7          Do you see that?

8        A.    I see that.

9        Q.    Do you see that -- that this

10   slide, Page 34, compares Tennessee with

11   non-Tennessee states with respect to the

12   proportion of abusers reporting injection

13   of Opana ER?

14          MS. VANNI:  Object to form.

15          THE WITNESS:  I'm just

16       trying to understand the slide

17       here.

18   BY MR. STEWART:

19       Q.    Sure.

20       A.    I don't -- I don't know what

21   ASI/MV means.  Can you clarify that for

22   me?

23       Q.    I can't.

24          You can't clarify it, I take

1    it?

2           A.    No, as I said earlier, this

3    is -- preparing these slides is not

4    within my area of responsibility.

5           Q.    Do you -- do you see that --

6    that that's a comparison here being made

7    between Tennessee and all the other

8    states?

9           A.    I see that there is some

10   comparison being made here between

11   Tennessee and other states.

12          Q.    Do you know, within your

13   experience within Endo, if you've ever

14   seen other documents in which Tennessee

15   was singled out for comparison with all

16   other states because of its unusual use

17   or abuse or diversion of Endo products?

18               MS. VANNI:  Object to form

19          and beyond the scope.

20               THE WITNESS:  I don't recall

21          seeing other documents that

22          specifically compare Tennessee to

23          other states.

24   BY MR. STEWART:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You don't recall seeing

2  documents with words like the Tennessee

3  effect or Tennessee is different.  That

4  sort of thing?

5          MS. VANNI:  Object to form.

6  BY MR. STEWART:

7    Q.    Is that fair?

8    A.    I do not recall seeing those

9  types of documents.

10   Q.    Okay.  When did you arrive

11 at Endo?

12   A.    October of 2012.

13   Q.    Ever heard of somebody named

14 Mark Collins?

15   A.    I've seen that name in some

16 of the documentation I've reviewed in

17 preparing for my deposition.

18          (Document marked for

19          identification as Exhibit

20          Endo-Macrides-51.)

21 BY MR. STEWART:

22   Q.    I'll hand you Exhibit 51 --

23 I'll hand you Exhibit 51.

24          Have you ever seen that

1    document, Exhibit 51?

2         A.    I have not seen this

3    document.

4         Q.    And I take it you haven't

5    seen -- when you say that, you haven't

6    seen a draft of that document or any

7    aspect of that document before.

8              Is that fair?

9              MS. VANNI:  Object to form.

10             THE WITNESS:  I don't

11        believe I've seen this document.

12   BY MR. STEWART:

13        Q.    I'll hand you another

14   document.

15             (Document marked for

16        identification as Exhibit

17        Endo-Macrides-52.)

18   BY MR. STEWART:

19        Q.    This is marked Exhibit 52.

20             Do you see at the bottom

21   right-hand corner of that document you've

22   got the Bates number

23   ENDO-OPIOID_MDL-01398417, do you see

24   that?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I see that.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



BY MR. STEWART:

Q.    That goes to my question.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9   BY MR. STEWART:

10       Q.    These people would have to

11  be within Endo?

12       A.    Those people would be within

13  Endo.

14            (Document marked for

15       identification as Exhibit

16       Endo-Macrides-53.)

17  BY MR. STEWART:

18       Q.    I'm going to hand you

19  Exhibit 53.  Do you see on Exhibit 53,

20  the bottom right-hand corner of the page,

21  there's a Bates -- what we call Bates

22  number, which is this marker at the

23  bottom.  It says

24  ENDO-OPIOID_MDL-01239749.

Highly Confidential - Subject to Further Confidentiality Review

1        A.    I see that.

2        Q.    Okay.  And do you see a



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5  BY MR. STEWART:

6        Q.    We talked about meetings

7  that you had with the CEO.  Let me ask a

8  different question.  Have you -- how many

9  presentations have you made to the board

10  of Endo with respect to the suspicious

11  order monitoring program?

12              MS. VANNI:  Object to form.

13              THE WITNESS:  I don't

14        believe I've ever made a

15        presentation to the board of

16        directors specifically on

17        suspicious order monitoring.

18  BY MR. STEWART:

19        Q.    Have you made a presentation

20  to the board of directors of Endo about

21  any subject?

22        A.    I have made --

23              MS. VANNI:  Object to form.

24              THE WITNESS:  -- several

1        presentations to the Endo board of

2        directors.

3   BY MR. STEWART:

4        Q.    And have any of them

5   involved the suspicious order monitoring

6   program, any of your presentations to the

7   board of directors of Endo?

8        A.    Not directly related to

9   suspicious order monitoring.

10       Q.    Well, what --

11       A.    Not that I have personally

12  presented to the board of directors.

13       Q.    How many times have you

14  personally presented to the board of

15  directors of Endo?

16       A.    I don't recall exactly.  But

17  I'm going say probably about three times.

18       Q.    Tell me what you recall --

19  the subject matter of your presentations

20  to the board of directors of Endo.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    BY MR. STEWART:

23         Q.    Did -- did you have

24    discussions at any time within Endo about

1   whether a third party, perhaps a seller

2   of Qualitest, should be financially

3   obligated to Endo to pay money to

4   compensate Endo for failures with respect

5   to past suspicious order monitoring

6   programs?

7              MS. VANNI:  Object to form.

8              THE WITNESS:  No.

9              (Document marked for

10        identification as Exhibit

11        Endo-Macrides-54.)

12  BY MR. STEWART:

13        Q.    I'm going to hand you

14  Exhibit 54.

15              And do you see at the bottom

16  of Exhibit 54, there's a Bates number

17  which is -- it states

18  ENDO-OPIOID_MDL-05962559?

19        A.    I see that.

20

21

22

23

24



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1                    (Document marked for

2          identification as Exhibit

3          Endo-Macrides-55.)

4     BY MR. STEWART:

5          Q.    I'll hand you another

6     document.

7          A.    Thank you.

8          Q.    55.

9                    Now, you have in front of

10    you something entitled "Minority Staff

11    Report, Fueling an Epidemic, Report 3."

12                    Do you see that?

13         A.    I see it.

14         Q.    Is that Exhibit 55 to your

15    deposition?

16         A.    That's what it says.

17         Q.    Are you familiar with this

18    document?

19         A.    I'm not familiar with this

20    document.

21         Q.    Okay.  You have not looked

22    at -- at this report at all that you can

23    recall?

24                    MS. VANNI:  Object to form.

1          THE WITNESS:  I have not

2      reviewed this report.

3  BY MR. STEWART:

4      Q.    Okay.  And do you remember

5  doing anything to prepare materials that

6  would go into a Senate report like this?

7          MS. VANNI:  Object to form.

8          THE WITNESS:  This is the

9      McCaskell report?

10  BY MR. STEWART:

11      Q.    That's correct.

12      A.    I'm aware that people in our

13  company provided information and in --

14  input into this as Endo participated in

15  providing input that ultimately went into

16  this report.

17      Q.    How often does Endo review

18  chargeback data to identify customer

19  facilities of interest, do you know?

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4      Q.    What data does Endo review

5 with respect to nonbranded generic

6 products?

7           MS. VANNI:  Object to form.

8           With respect to suspicious

9      order monitoring?

10           MR. STEWART:  That's

11      correct.

12           THE WITNESS:  Can I answer

13      that?  That would be Par.

14           MS. VANNI:  You're asking

15      Endo, what's Endo review?

16           MR. STEWART:  I don't -- I

17      don't respect the limitations

18      of --

19 BY MR. STEWART:

20      Q.    I want to know for Endo, for

21 Endo and all of its subsidiaries.

22      A.    You asked specifically about

23 generics?

24      Q.    That's correct.

1           MS. VANNI:  He's not

2      answering as to Par.

3           MR. STEWART:  Okay.  That's

4      improper.

5  BY MR. STEWART:

6      Q.    You can answer to the extent

7  you can.

8      A.    I think I've been advised

9  not to answer.

10          MS. VANNI:  Based on my

11     previously articulated objections

12     that Par is not a defendant in the

13     Tennessee litigation, that this

14     deposition wasn't properly

15     noticed, that we've now been going

16     about two hours on Tennessee

17     questions and 11 hours

18     cumulatively throughout the entire

19     day.

20          And if you could answer as

21     to Endo, you can answer.  But not

22     as to Par.

23          THE WITNESS:  I think I

24     already answered as to Endo.

Highly Confidential - Subject to Further Confidentiality Review

1              (Document marked for

2         identification as Exhibit

3         Endo-Macrides-56.)

4    BY MR. STEWART:

5         Q.    I'll give you a document

6    marked as Exhibit 56.

7              You don't appear copied on

8    the document.  Do you recognize that?

9         A.    I don't recognize this

10   document.

11        Q.    Can you recall any

12   discussions that you've had, in which you

13   specifically discussed the State of

14   Tennessee and particular aspects of

15   suspicious order monitoring in Tennessee?

16        A.    No.

17        Q.    Can you tell me, if you've

18   had conversations with Aaron Graham about

19   suspicious orders?

20        A.    If I've had conversations

21   with Aaron Graham?

22        Q.    Yes.

23        A.    I don't recall a

24   conversation that I had with Aaron Graham

Highly Confidential - Subject to Further Confidentiality Review

1  on suspicious orders.  I have a lot of

2  conversations.  I don't recall that one.

3       Q.   Within Endo, I take it it's

4  accepted that Endo has and always has had

5  an obligation to monitor suspicious

6  orders with respect to generic pain

7  medicines as well as branded pain

8  medicines, fair?

9        MS. VANNI:  Object to form.

10       THE WITNESS:  That's a fair

11    statement.

12  BY MR. STEWART:

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

BY MR. STEWART:

Q.   And that's for generic and branded products, fair?

A.   I believe so, yes.

Q.   Let me ask you a question. This is a document -- you were told not

1   to answer questions about a July 2012

2   e-mail from Aaron Graham to Sandra

3   Parker.  Can you reach back in your pile

4   and grab that.  It should be probably

5   Exhibit 45, I think.

6              Do you see that?

7       A.    45 is this thing.

8       Q.    If you'll hand it to me,

9   I'll show you where it is.  If you can --

10  let me just see me the pile, and I'll

11  tell you where it is.

12             MS. VANNI:  48.

13  BY MR. STEWART:

14      Q.    48.  Can you turn to

15  Exhibit 48.

16             Can you tell me, do you see

17  that Aaron Graham's e-mail is included?

18      A.    I see that.

19      Q.    What is his e-mail?

20      A.    It says

21  Graham.Aaron2@Endo.com.

22      Q.    Endo.com.  @Endo.com, is

23  that an e-mail typically used by Endo

24  employees?

1          MS. VANNI:  Object to form.

2          THE WITNESS:  Yes and no.  I

3     have three different e-mail

4     addresses.

5  BY MR. STEWART:

6          Q.    Do you know anybody who uses

7     an e-mail that ends in Endo.com who's not

8     an Endo employee?

9          A.    I had an Endo e-mail

10    address, and I was a Qualitest employee.

11         MR. STEWART:  How much time

12    do I have?

13         THE VIDEOGRAPHER:  One

14    minute.

15         MR. STEWART:  Okay.

16  BY MR. STEWART:

17         Q.    Did you personally ever

18    travel to Tennessee to investigate

19    anything involving suspicious order

20    monitoring for Endo?

21         A.    No.

22         Q.    Do you know anyone who's

23    ever traveled to Tennessee in connection

24    with suspicious order monitoring at Endo?

Highly Confidential - Subject to Further Confidentiality Review

1     A.    I don't know specifically of

2  any person who traveled to Tennessee for

3  that purpose.

4     Q.    The reason that you're

5  phrasing it that way is because Endo for

6  a while had a Memphis -- might have --

7  there was a distribution center in

8  Memphis; is that fair?

9     A.    UPS distributes from

10  Memphis.

11     Q.    Okay.

12     A.    That still -- that still

13  exists today.

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



```
 8           THE VIDEOGRAPHER:  Off the
 9      record at 8:45 p.m.
10           (Short break.)
11           MR. STEWART:  I just want to
12      say, you articulated a position
13      for why you're telling the witness
14      not to answer certain questions.
15      I rejected that position, and we
16      haven't changed our positions,
17      fair?
18           MS. VANNI:  I have not
19      changed my position, and I will
20      note for the record that I gave
21      you a full two hours and a lot of
22      leeway to ask questions.  And you
23      sat through the deposition that
24      Mr. Buchanan took.  He had seven
```

Highly Confidential - Subject to Further Confidentiality Review

1    hours of questioning.  And our

2    position is the same as I've

3    already articulated.  And you have

4    not been prejudiced in any way.

5        MR. STEWART:  I think we

6    have been prejudice.  And

7    obviously we have the right to

8    come back and retake this

9    deposition to obtain the

10   information that we wanted.

11       This is a properly noticed

12   deposition.  We were entitled to

13   not two hours, as directed by you,

14   but as we decided.  So I think

15   we've definitely been prejudiced.

16   But I imagine you and I or others

17   will work this out in the future.

18   Thank you.

19       MS. VANNI:  Just final --

20   just I want to say that I disagree

21   with that characterization.

22       And with that, we can close

23   the deposition.  I don't have

24   redirect.

Highly Confidential - Subject to Further Confidentiality Review

1                    (Excused.)

2                    (Deposition concluded at

3            approximately 8:46 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2                        CERTIFICATE

3

4

5              I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6    deposition is a true record of the
    testimony given by the witness.

7

8              It was requested before
    completion of the deposition that the
    witness, STEPHEN C. MACRIDES, have the
9    opportunity to read and sign the
    deposition transcript.

10

11

12       _Michelle L. Gray_____
    MICHELLE L. GRAY,
13    A Registered Professional
    Reporter, Certified Shorthand
14    Reporter, Certified Realtime
    Reporter and Notary Public
15    Dated:  March 18, 2019

16

17

18              (The foregoing certification
19    of this transcript does not apply to any
20    reproduction of the same by any means,
21    unless under the direct control and/or
22    supervision of the certifying reporter.)

23

24

Highly Confidential - Subject to Further Confidentiality Review

1          INSTRUCTIONS TO WITNESS

2

3               Please read your deposition

4     over carefully and make any necessary

5     corrections.  You should state the reason

6     in the appropriate space on the errata

7     sheet for any corrections that are made.

8               After doing so, please sign

9     the errata sheet and date it.

10               You are signing same subject

11     to the changes you have noted on the

12     errata sheet, which will be attached to

13     your deposition.

14               It is imperative that you

15     return the original errata sheet to the

16     deposing attorney within thirty (30) days

17     of receipt of the deposition transcript

18     by you.  If you fail to do so, the

19     deposition transcript may be deemed to be

20     accurate and may be used in court.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     -   -   -   -   -   -

                      E  R  R  A  T  A

 2                     -   -   -   -   -   -

 3

 4      PAGE   LINE   CHANGE

 5      _____  _____  _____

 6         REASON: _____

 7      _____  _____  _____

 8         REASON: _____

 9      _____  _____  _____

10         REASON: _____

11      _____  _____  _____

12         REASON: _____

13      _____  _____  _____

14         REASON: _____

15      _____  _____  _____

16         REASON: _____

17      _____  _____  _____

18         REASON: _____

19      _____  _____  _____

20         REASON: _____

21      _____  _____  _____

22         REASON: _____

23      _____  _____  _____

24         REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3
 4          I,_____, do
 5   hereby certify that I have read the
 6   foregoing pages, 1 - 695, and that the
 7   same is a correct transcription of the
 8   answers given by me to the questions
 9   therein propounded, except for the
10   corrections or changes in form or
11   substance, if any, noted in the attached
12   Errata Sheet.
13
14
15   _____
16    STEPHEN C. MACRIDES              DATE
17
18
19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20____.
21   My commission expires:_____
22

     _____
23   Notary Public
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____    _____

 4      _____   _____    _____

 5      _____   _____    _____

 6      _____   _____    _____

 7      _____   _____    _____

 8      _____   _____    _____

 9      _____   _____    _____

10      _____   _____    _____

11      _____   _____    _____

12      _____   _____    _____

13      _____   _____    _____

14      _____   _____    _____

15      _____   _____    _____

16      _____   _____    _____

17      _____   _____    _____

18      _____   _____    _____

19      _____   _____    _____

20      _____   _____    _____

21      _____   _____    _____

22      _____   _____    _____

23      _____   _____    _____

24      _____   _____    _____
```