```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF OHIO
 3                     EASTERN DIVISION
 4                       -  -  -
 5

 6   IN RE:  NATIONAL        :  HON. DAN A.
     PRESCRIPTION OPIATE     :  POLSTER
     LITIGATION              :
 7                           :
     APPLIES TO ALL CASES    :  NO.
 8                           :  1:17-MD-2804
                             :
 9

             - HIGHLY CONFIDENTIAL -
10
     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
12                     -  -  -
13             November 28, 2018
14                     -  -  -
15            Videotaped deposition of
     WILLIAM DE GUTIERREZ-MAHONEY, taken
16   pursuant to notice, was held at the law
     offices of Covington & Burling, LLP, The
17   New York Times Building, 620 Eighth
     Avenue, New York, New York, beginning at
18   9:08 a.m., on the above date, before
     Michelle L. Gray, a Registered
19   Professional Reporter, Certified
     Shorthand Reporter, Certified Realtime
20   Reporter, and Notary Public.
21                     -  -  -
22          GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
23             deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2

 3         LEVIN PAPANTONIO THOMAS
           MITCHELL RAFFERTY & PROCTOR, PA
           BY:  BRANDON L. BOGLE, ESQ.
 4         BY:  WESLEY BOWDEN, ESQ.
           316 South Baylen Street, Suite 600
 5         Pensacola, Florida 32502
           (888) 435-7001
 6         bbogle@levinlaw.com
           wbowden@levinlaw.com
 7         Representing the Plaintiffs
 8

           COVINGTON & BURLING, LLP
 9         BY:  PAUL W. SCHMIDT, ESQ.
           620 Eighth Avenue
10         New York, NY 10018
           (212) 841-1000
11         Pschmidt@cov.com
12            - and -
13         COVINGTON & BURLING, LLP
           BY:  LAUREN C. DORRIS, ESQ.
14         850 10th Street, NW
           Washington, DC 20001
15         (202) 662-6000
           ldorris@cov.com
16         Representing the Defendant, McKesson
           Corporation and the Witness
17

18         WILLIAMS & CONNOLLY, LLP
           BY:  COLLEEN MCNAMARA, ESQ.
19         725 12th Street, NW
           Washington, D.C. 20005
20         (202) 434-5148
           Cmcnamara@wc.com
21         Representing the Defendant, Cardinal
           Health
22

23

24
```

```
 1        APPEARANCES:  (Cont'd.)
 2
          MARCUS & SHAPIRA, LLP
 3        BY:  SCOTT D. LIVINGSTON, ESQ.
          One Oxford Centre, 35th Floor
 4        Pittsburgh, Pennsylvania 15219
          (412) 338-4683
 5        livingston@marcus-shapira.com
          Representing the Defendant, HBC
 6        Service Company
 7
          JACKSON KELLY, PLLC
 8        BY:  GRETCHEN M. CALLAS, ESQ.
          500 Lee Street East
 9        Suite 1600
          Charleston West Virginia 25301
10        (304) 340-1169
          Gcallas@jacksonkelly.com
11        Representing the Defendant,
          AmerisourceBergen
12
13        JONES DAY
          BY:  LAURA JANE DURFEE, ESQ.
14        2727 North Harwood Street
          Dallas, Texas 75201
15        (214) 220-3939
          Ldurfee@jonesday.com
16        Representing the Defendant, Walmart
17
          PELINI CAMPBELL & WILLIAMS, LLC
18        BY:  PAUL B. RICARD, ESQ.
          8040 Cleveland Avenue NW, Suite 400
19        North Canton, Ohio 44720
          (330) 305-6400
20        Pbricard@pelini-law.com
          Representing the Defendant,
21        Prescription Supply, Inc.
22
23
24
```

```
1        TELEPHONIC APPEARANCES:
2
         ALLEGAERT, BERGER & VOGEL, LLP
3        BY:  LUCY N. ONYEFORO, ESQ.
         111 Broadway, 20th Floor
4        New York, New York  10006
         (212) 616-7060
5        Lonyeforo@abv.com
         Representing the Defendant,
6        Rochester Drug Corporation
7
         KIRKLAND & ELLIS, LLP
8        BY:  PRATIK K. GHOSH, ESQ.
         300 North LaSalle Street
9        Chicago, Illinois 60654
         (312) 862-2595
10       Pratik.ghosh@kirkland.com
         Representing the Defendant, Allergan
11
12       FOX ROTHSCHILD, LLP
         BY: EILEEN OAKES MUSKETT, ESQ.
13       1301 Atlantic Avenue
         Midtown Building, Suite 400
14       Atlantic City, New Jersey 08401
         (609) 348-4515
15       Emuskett@foxrothschild.com
         Representing the Defendant, Validus
16       Pharmaceuticals
17
         ALSO PRESENT:
18
         VIDEOTAPE TECHNICIAN:
19          Henry Marte
20
         LITIGATION TECHNICIAN:
21          Mike Kutys
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



```
 1                    -   -   -

 2               I N D E X

 3                    -   -   -

 4

      Testimony of:

 5            WILLIAM DE GUTIERREZ-MAHONEY

 6

          By Mr. Bogle              20, 550

 7

          By Mr. Bowden                 301

 8

          By Mr. Schmidt          483, 599

 9

10

11

12                    -   -   -

13            E X H I B I T S

14                    -   -   -

15
```



- - -

E X H I B I T S  (Cont'd.)

- - -

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





- - -

E X H I B I T S  (Cont'd.)

- - -

Highly Confidential - Subject to Further Confidentiality Review



E X H I B I T S  (Cont'd.)



- - -

E X H I B I T S  (Cont'd.)

- - -





1                    -   -   -

2        E X H I B I T S  (Cont'd.)

3                    -   -   -

4

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1                          -   -   -

 2              DEPOSITION  SUPPORT  INDEX

 3                          -   -   -

 4

 5   Direction to Witness Not to Answer

 6   PAGE    LINE
     None.

 7

 8   Request for Production of Documents

 9   PAGE    LINE
     None.

10

11   Stipulations

12   PAGE    LINE
     None.

13

     Questions Marked

14

     PAGE    LINE

15   None.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1   THE VIDEOGRAPHER:  We are

2   now on the record.  My name is

3   Henry Marte, the videographer with

4   Golkow Litigation Services.

5   Today's date is November 28,

6   2018.  And the time is 9:08 a.m.

7   This videotaped deposition

8   is being held at Covington and

9   Burling LLP, located at 620 Eighth

10  Avenue, New York, New York, in the

11  matter of National Prescription

12  Opiate Litigation.

13  The deponent today is

14  William de Gutierrez-Mahoney.

15  Counsel, please introduce

16  themselves for the record, which

17  after the court reporter will

18  administer the oath to the

19  witness.

20  MR. BOGLE:  Brandon Bogle on

21  behalf of plaintiffs.

22  MR. BOWDEN:  Wes Bowden on

23  behalf of plaintiffs.

24  MR. LIVINGSTON:  Scott

1    Livingston on behalf of Defendant,

2    HBC.

3         MR. RICARD:  Paul Ricard on

4    behalf of Prescription Supply.

5         MS. DURFEE:  Laura Jane

6    Durfee on behalf of Walmart.

7         MS. McNAMARA:  Colleen

8    McNamara, on behalf of Cardinal

9    Health.

10        MS. CALLAS:  Gretchen Callas

11   on behalf of AmerisourceBergen.

12        MS. DORRIS:  Lauren Dorris

13   on behalf of McKesson.

14        MR. SCHMIDT:  Paul Schmidt

15   on behalf of McKesson.

16        And let me just say, if I

17   may, I don't know what the prior

18   practice has been, I meant to

19   check this, but my understanding

20   is that everyone in the room and

21   everyone on the phone is

22   subjective to the protective order

23   and the deposition will be covered

24   by the confidentiality provisions

Highly Confidential - Subject to Further Confidentiality Review

1          of the protective order.  But if

2          that's not true as to anyone,

3          please correct me.

4               MR. BOGLE:  I think that's

5          accurate.

6               MS. MUSKETT:  Michelle, did

7          you get Fox Rothschild.

8               MS. ONYEFORO:  Lucy Onyeforo

9          of Allegaert, Berger & Vogel is on

10         the phone as well for Rochester

11         Drug Corporation.

12                   -  -  -

13         ... WILLIAM DE GUTIERREZ-MAHONEY,

14    having been first duly sworn, was

15    examined and testified as follows:

16                   -  -  -

17                 EXAMINATION

18                   -  -  -

19    BY MR. BOGLE:

20         Q.    Good morning, Mr. Mahoney.

21    How are you doing?

22         A.    Good morning.  Good.

23         Q.    My name is Brandon Bogle,

24    I'm going to be asking you some questions

1    today.

2         Just starting out for the

3    record, can I get your full name, please?

4         A.    William de

5    Gutierrez-Mahoney.

6         Q.    Okay.  And have you ever had

7    your deposition taken before?

8         A.    I've been deposed in other

9    matters, but not with opioids.

10        Q.    Right.  And I'm talking

11   generally in this sense.  So how many

12   times have you been deposed in any sort

13   of matter prior to today?

14        A.    Once.  Once.

15        Q.    Once.  What was the general

16   subject matter in that deposition?

17        A.    It was -- it was a murder

18   case, and the question was about chain of

19   custody.

20        Q.    Okay.  Were you testifying

21   in some law enforcement capacity?

22        A.    It was a criminal case.  And

23   the state wanted to know if the product

24   that had been used in the crime had come

1  from McKesson.

2      Q.     Okay.  So you were working

3  for McKesson at that point in time?

4      A.     Yes.

5      Q.     Okay.  So just to kind of

6  refresh you a little bit on a deposition,

7  just sort of the basics, I'm going to ask

8  you some questions today.  I'll do my

9  very best to ask my question, give you

10 every opportunity to answer before I ask

11 my next question.

12          I'll also ask that even if

13 you think you know where I'm going, if

14 you can let me get my full question out

15 there before you answer so that we don't

16 step on each others' toes, I think that

17 the court reporter will appreciate that.

18 Is that fair?

19      A.     Yes.

20      Q.     Okay.  And you can take a

21 break whenever you want.  It's not an

22 endurance contest.  Just tell myself or

23 your own counsel here.  The only thing I

24 ask is if I've got a question pending, if

Highly Confidential - Subject to Further Confidentiality Review

1    you could answer that question and we can

2    break for whenever -- however you want.

3            And the last thing is if you

4    don't understand or don't hear something

5    that I say, ask me to repeat or rephrase.

6    I'll do my best to make it clear to you.

7    But if you answer my question, I'm going

8    to assume that you understood it.  Is

9    that fair?

10           A.    Yes.

11           Q.    Okay.  Where are you

12   currently employed?

13           A.    At McKesson.

14           Q.    Okay.  And how long have you

15   been with McKesson?

16           A.    I've been with McKesson for

17   17-plus years.

18           Q.    Okay.  So starting

19   approximately 2001; is that right?

20           A.    Yes.

21           Q.    Okay.  What was your job in

22   2001 when you started, job title?

23           A.    I joined McKesson as a

24   business process manager.

1    Q.    Was that at Lakeland?

2    A.    Our facility in Florida at

3    that time was in Tampa.

4    Q.    Okay.  How long did you have

5    that position?

6    A.    I think I had it between

7    let's say one year and two years.

8    Q.    Okay.  What was your next

9    job at McKesson after that?

10    A.    It was assistant

11    distribution center manager.

12    Q.    Was it in the Tampa

13    facility?

14    A.    Yes.

15    Q.    How long did you have that

16    job?  Just the years is fine.

17    A.    Until '04.

18    Q.    Okay.  And beginning in '04,

19    it's my understanding that you took the

20    role as distribution center manager for

21    the Lakeland facility; is that right?

22    A.    Yes.

23    Q.    Okay.  And you held that

24    position from 2004 until approximately

1   December 2007; is that right?

2          A.    Yes.

3          Q.    Beginning in January 2008

4   you took over as director of regulatory

5   affairs for the southeast region, fair?

6          A.    Yes.

7          Q.    Okay.  Has that been your

8   job title from January 2008 to the

9   present?

10          A.    Yes.

11          Q.    Okay.  Now, just so I

12   understand, when we talk about the

13   southeast region, can you give me a sense

14   of what that encompasses, whether it be

15   states or distribution centers or however

16   that's divided out at McKesson.

17          A.    Initially, I was responsible

18   for six distribution centers, in

19   Lakeland; Atlanta; Birmingham, Alabama;

20   Memphis, Tennessee; Conroe, Texas; and

21   Oklahoma City.

22          Q.    Okay.  And you said

23   initially.  So at some point in time, did

24   that change?

1      A.      Yes.

2      Q.      When did that change?

3      A.      We brought on another person

4  in 2013.  And at that point I was

5  responsible for Birmingham, Lakeland, and

6  Atlanta.

7      Q.      Who is the person that was

8  brought on in 2013?

9      A.      Linda Martin.  There's been

10  a subsequent change too.

11      Q.      Okay.  What was that?  First

12  of all, when did that subsequent change

13  occur?

14      A.      I believe it happened in the

15  middle of 2014.

16      Q.      Okay.  What changed?

17      A.      Jerry Carmack joined.  And

18  he picked up Memphis and Birmingham.

19  Linda moved to Texas and Oklahoma City,

20  and I was responsible for Atlanta and

21  Lakeland.

22          MR. SCHMIDT:  And I

23      apologize.  I can appreciate if

24      you were running something off the

Highly Confidential - Subject to Further Confidentiality Review

1    screen.  Do you have a copy of

2    whatever you're running?

3         MR. BOGLE:  I haven't marked

4    anything yet.  I'm not -- we can

5    take that down.  I haven't marked

6    anything yet.  It's not supposed

7    to be on the screen yet.  Yeah, we

8    certainly will when we go through

9    it.

10        MR. SCHMIDT:  I understand.

11   BY MR. BOGLE:

12        Q.    Okay.  So I didn't catch the

13   last part there.  So I apologize.  I'm

14   going to repeat part of this so I

15   understand.  I want to know from your

16   perspective in mid-2014, which facilities

17   you were responsible for from a

18   regulatory perspective?

19        A.    From then on --

20        Q.    Yes, sir.

21        A.    -- I became responsible for

22   Atlanta and Lakeland.

23        Q.    Atlanta and Lakeland.  Has

24   that been true from mid-2014 to present?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Now, going back to the time

3  that you were distribution center manager

4  for Lakeland, would that have encompassed

5  running the day-to-day operations for the

6  distribution center?

7    A.    Yes.

8    Q.    Okay.  And can you just give

9  me a general sense, again, as a

10  distribution center manager for Lakeland,

11  what your general job responsibilities

12  were?

13    A.    I was responsible for hiring

14  and enabling the distribution center to

15  service its customer base.  We would

16  receive product from manufacturers, stock

17  the shelves, and process orders in the

18  evening for delivery the following day.

19    Q.    Okay.  And the time period

20  that you had that role from '04 to '07,

21  there would also have been

22  responsibilities under the Controlled

23  Substances Act that would have fallen

24  within your purview, right?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes.

2        Q.      Okay.   That would include,

3    for example, suspicious order monitoring

4    for controlled substances, right?

5        A.      Yes.

6        Q.      Okay.   And can you give me a

7    sense of what your role during that time

8    period would have been from that

9    perspective of suspicious order

10   monitoring?

Highly Confidential - Subject to Further Confidentiality Review

11    just asking your recollection.  So if you

12    don't recall, that's fine.

13          A.    Right.

14          Q.    Okay.  The Lakeland

15    distribution center, we'll start with '04

16    to '07 time frame, what -- geographically

17    what states did that cover as far as a

18    customer base?

19          A.    In '04, I think we covered

20    actually some portions -- the geography

21    that we covered moved between '04 and

22    '06 --

23          Q.    Okay.

24          A.    -- because of the Florida

Highly Confidential - Subject to Further Confidentiality Review

1    pedigree law.

2         Q.    Okay.

3         A.    And the decision was made to

4    basically make Lakeland the primary with

5    only one -- one or two backups, vehicle

6    for delivering -- acquiring and

7    delivering pedigree product to conform

8    with the Florida pedigree law.

9         Q.    When you say pedigree

10   product, I want to make sure that our

11   jury understands what that means.  What

12   is a pedigree product?

13        A.    Because of investigations

14   which observed that there is companies or

15   entities were counterfeiting product or

16   repackaging it in a way that undermined

17   its efficacy and whether it was safe for

18   the public, Florida implemented the

19   Florida pedigree law.  And initially they

20   chose 30 drugs that they viewed as being

21   subject to diversion that way.

22              And they required a pedigree

23   on who had bought the various

24   transactions which took place between the

Highly Confidential - Subject to Further Confidentiality Review

1  manufacturer and -- or actually the

2  distributor who bought it from the

3  manufacturer and the pharmacy or entity

4  to which it was sold.

5      Q.    Would it be fair to say that

6  it's sort of similar to what you

7  mentioned before in the respect that you

8  testified before, sort of a chain of

9  custody throughout the lifecycle of the

10 product to establish at all times it was

11 a legitimate product?

12     A.    Right.

13     Q.    Okay.  And let me ask my

14 other question maybe a different way.

15 From 2004 to present, has the Lakeland

16 distribution center serviced customers in

17 the State of Florida?

18     A.    Yes.

19     Q.    Okay.  You mentioned the

20 term "diversion" in your answer just a

21 minute ago.  What do you understand the

22 term "diversion" to mean?

23     A.    Where a product is

24 inappropriately taken out of the normal

Highly Confidential - Subject to Further Confidentiality Review

1    supply chain.  In this case, one of the

2    modes was that customers would buy a

3    product and then attempt to return

4    altered or not pedigree product into the

5    supply chain.

6         Q.    Okay.  And the concept of

7    diversion is -- it can be broader than

8    that, right?

9         A.    Sure, sure.

10        Q.    Okay.  Are there any other

11   examples of diversion that you can think

12   of?

13        A.    Yeah.  There is -- I guess,

14   not chain.  There's diversion that used

15   to take place between closed door

16   pharmacies and independent retail

17   pharmacies in which pricing which was

18   offered to closed door pharmacies would

19   be diverted into the normal chain of

20   independent flow, at which it would be

21   able to be sold for higher prices.  That

22   was something that the manufacturers

23   really clamped down on.

24             And then there's diversion

1    of controlled substances.

2         Q.    Okay.  And the concept of

3    diversion, as I read it, is sort of

4    generally defined as the use of a drug

5    for an illegitimate medical purpose.  Do

6    you think that's a fair general

7    statement?

8         A.    Particularly in the case of

9    controls.

10        Q.    Right.  Is that a fair

11   general statement for controlled

12   substances?

13        A.    Yes.

14        Q.    Okay.  So prior to taking on

15   your role as director of regulatory

16   affairs in 2008, did you have any prior

17   experience working in a regulatory

18   capacity for any company?

19        A.    No.

Highly Confidential - Subject to Further Confidentiality Review

⬛ ▬▬▬▬▬▬    ▬▬▬▬▬▬▬▬

⬛ ▬▬▬▬▬▬▬▬▬

⬛ ▬▬▬▬▬▬▬▬▬

⬛ ▬▬▬▬▬

5          Q.    Okay.  And you said CSA.

6    And, again, I just want to make sure

7    we're clear on what everything means

8    here.  That's the Controlled Substance

9    Act?

10          A.    Yes, sir.

11          Q.    Okay.  I saw a reference

12    somewhere to you previously working for

13    Cardinal Health; is that right?

14          A.    I worked -- yes.

15          Q.    Okay.  What period of time

16    did you work there?

17          A.    I worked for Cardinal from

18    March of '98 to the summer of 2000.

19          Q.    Okay.  What did you do

20    generally for Cardinal?

21                First of all, what was your

22    job title?  Let's start there.

23          A.    Job title was director of

24    operations.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Was that for a distribution

2    center?

3    A.    Yes.

4    Q.    Where?

5    A.    In Lakeland.

6    Q.    Okay.  Were your job

7    responsibilities similar there to what

8    they were at McKesson when you were

9    distribution center manager?

10   A.    Yes.

11   Q.    Okay.  You worked for --

12   did -- had you worked for any other

13   pharmaceutical distributors prior to

14   working for Cardinal?

15   A.    No.

16   Q.    And McKesson is a

17   distributor of pharmaceutical products,

18   right?

19   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

3        Q.      And obviously the deposition

4    today is going to focus largely on opioid

5    products.  You understand that, right?

6        A.      Yes.

7        Q.      That's what we're here to

8    talk about?

9        A.      Yes.

10       Q.      And you are familiar with

11   opioids, right?

12       A.      Yes.

13       Q.      Okay.  And McKesson has

14   distributed opioids during the time that

15   you've worked with the company, right?

16       A.      Yes.

17       Q.      And opioids are a controlled

18   substance, right?

19       A.      Yes.

20       Q.      And opioids are -- fall into

21   the category of a narcotic drug, right?

22       A.      Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20          MR. SCHMIDT:  Objection.

21     Foundation.

22  BY MR. BOGLE:

23          Q.    You can still answer unless

24  he tells you not to answer.

1    A.    Okay.  Can you repeat that?

2    Q.    Sure, I can.



8         MR. SCHMIDT:  Same

9    objection.

Highly Confidential - Subject to Further Confidentiality Review



2          MR. SCHMIDT:  Objection.

3     Form.

4              (Document marked for

5          identification as Exhibit

6          MCK-Mahoney-1)

7     BY MR. BOGLE:

8          Q.    Okay.  I'm going to hand you

9     what's marked as Exhibit 1.1464.  Also

10    marked as Exhibit 1 to your deposition.

11    And the beginning Bates number is

12    MCK_MDL_00478906.

13             Here's your copy.  And this

14    is a long table, sir, so I'm not trying

15    to throw stuff at you, I swear.

16             Okay.  So looking at

17    Exhibit 1 here.  Let me introduce it and

18    then I want to ask you some questions

19    about it.

20             Do you see this is a letter

21    from the U.S. Department of Justice Drug

22    Enforcement Administration dated

23    September 27, 2006.  Do you see that?

24          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Have you seen this

2  letter before today?

3    A.    Yes.

4    Q.    Okay.  Did you see it in and

5  around 2006?

6    A.    Yes.

7    Q.    Okay.  How was it -- how did

8  you come to see it in and around 2006?

9    A.    It may have been addressed

10  to me at the DC.  But I also saw it via

11  e-mail internally.

12    Q.    Okay.  All right.  So I want

13  to discuss a few portions of this letter.

14    The first paragraph there

15  says, "This letter is being sent to every

16  commercial entity in the United States

17  registered with the Drug Enforcement

18  Administration to distribute controlled

19  substances.  The purpose of this letter

20  is to reiterate the responsibilities of

21  controlled substance distributors in view

22  of the prescription drug abuse problem

23  our nation currently faces."

24    Do you see that?

1        A.      Yes.

2        Q.      Okay.  And McKesson in 2006

3   was registered with the DEA to distribute

4   controlled substances, right?

5        A.      Yes.

6        Q.      And if you go down to the

7   third paragraph on the first page.  And

8   I'm in the -- let's start with the first

9   sentence.  It says, "The CSA was designed

10  by Congress to combat diversion by

11  providing for a closed system of drug

12  distribution in which all legitimate

13  handlers of controlled substances must

14  obtain a DEA registration, and as a

15  condition of maintaining such

16  registration, must take reasonable steps

17  to ensure that their registration's not

18  being utilized as a source of diversion.

19  Distributors are, of course, one of the

20  key components of the distribution chain.

21  If the closed system is to function

22  properly as Congress envisioned,

23  distributors must be vigilant in deciding

24  whether a prospective customer can be

Highly Confidential - Subject to Further Confidentiality Review

1   trusted to deliver controlled substances

2   only for lawful purposes."

3             Did I read that correctly?

4        A.    Yes.

5        Q.    Okay.  There's a reference

6   here to a closed system in this regard.

7   What do you understand a closed system to

8   mean?

9        A.    A closed system is a system

10  in which the -- the drugs are initiated

11  at a manufacturer, usually acquired by

12  distributor.  Could be sent to another

13  distributor, or to a pharmacy.

14            The prescription is

15  initiated with the -- the doctor.  And

16  the distributor delivers the drugs to the

17  pharmacy, and the pharmacy fills scripts

18  which are initiated by the doctor.

19       Q.    And in a closed system in --

20  in the concept of controlled substances

21  means that essentially you have to have

22  this DEA registration in order to be able

23  to prescribe or distribute or manufacture

24  controlled substances, right?

1        A.    Yes.

2        Q.    Okay.  Okay.  Look at the

3   next sentence here.  It says, "This

4   responsibility is critical as Congress

5   has expressly declared that the illegal

6   distribution of controlled substances has

7   a substantial and detrimental effect on

8   the health and general welfare of the

9   American people."

10             Do you see that?

11       A.    Yes.

12       Q.    Do you agree with that

13  sentence?

14             MR. SCHMIDT:  Objection.

15       Foundation.

16             THE WITNESS:  Yes.

17  BY MR. BOGLE:

18       Q.    And turning to the second

19  page of this document, one more section

20  that I wanted to look at with you.

21             You see in the middle of the

22  page there where it says the DEA

23  regulations require?  Do you see that?

24       A.    Yes.

1    Q.    It says, "The DEA

2    regulations require all distributors to

3    report suspicious orders of controlled

4    substances.  Specifically the regulations

5    state in 21 C.F.R. 1301.74(b), "The

6    registrant shall design and operate a

7    system to disclose to the registrant

8    suspicious orders of controlled

9    substances.  The registrant shall inform

10   the field division office of the

11   administration in his area of suspicious

12   orders when discovered by the registrant.

13   Suspicious orders include orders of

14   unusual size, orders deviating

15   substantially from a normal pattern, and

16   orders of unusual frequency."

17            Do you see that?

18       A.    Yes.

19       Q.    And that paragraph I just

20   read that's from the C.F.R., that's a

21   paragraph that you're familiar with,

22   right?

23       A.    Yes.

24       Q.    And then it goes on to say,

Highly Confidential - Subject to Further Confidentiality Review

1   "It bears emphasis that the foregoing

2   reporting requirement is in addition to,

3   and not in lieu of, the general

4   requirement under 21 U.S.C. 823(e) that a

5   distributor maintain effective controls

6   against diversion.  Thus, in addition to

7   reporting all suspicious orders, a

8   distributor has statutory responsibility

9   to exercise due diligence to avoid

10  filling suspicious orders that might be

11  diverted into other than a legitimate

12  medical, scientific, and industrial

13  channels."

14            Do you see that?

15       A.    Yes.

16       Q.    And these -- this additional

17  duty to avoid filling here, that's what

18  we talked about earlier which is the duty

19  to block suspicious orders when they're

20  detected, right?

21       A.    Yes.

22       Q.    Okay.  And would you agree

23  that reporting suspicious orders to the

24  DEA is important because it allows the

1      DEA to decide whether it wants to

2      investigate whether diversion is

3      occurring as to the order you're

4      reporting?

5              MR. SCHMIDT:  Objection.

6          Foundation.

7              THE WITNESS:  I'm not sure

8          what the DEA used the information

9          that we sent to them for.

10     BY MR. BOGLE:

3       Q.    Okay.  So do you have a

4   sense as to whether -- actually, strike

5   that.

6               Would you agree with me that

7   blocking a suspicious order is important

8   because it ensures that potential

9   diversion does not occur with that order?

10               MR. SCHMIDT:  Same

11           objection.  Foundation.

12               THE WITNESS:  That's the

13           intent, yes.

14   BY MR. BOGLE:

15       Q.    Okay.  And diversion of

16   controlled substances, including opioids

17   can be prevented by compliance with the

18   Controlled Substance Act, right?

19               MR. SCHMIDT:  Same

20           objection.

21               THE WITNESS:  I think there

22           are a lot of different

23           participants.  And even if

24           Controlled Substance Act is

Highly Confidential - Subject to Further Confidentiality Review

1    complied with by a majority of the

2    participants, diversion can still

3    occur.

4  BY MR. BOGLE:

5        Q.    Okay.  So you would not

6  agree then that diversion of opioids

7  specifically can be prevented through

8  compliance with the Controlled Substance

9  Act?

10           MR. SCHMIDT:  Same

11       objection.

12           THE WITNESS:  Are you

13       talking about relative to

14       distributors?

15  BY MR. BOGLE:

16       Q.    Yeah.  We can start there.

17       A.    Okay.  Can you repeat the

18  question?

1    Q.    Okay.  Do you agree that

2  there is an ongoing opioid epidemic in

3  the United States?

4    A.    Yes.

5    Q.    And that epidemic has been

6  going on for more than a decade in this

7  country, right?

8         MR. SCHMIDT:  Objection.

9    Foundation.

10        THE WITNESS:  I'm not sure

11   exactly when it began.

12  BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



21    opioid overdoses are the leading cause of

22    injury-related death in the United

23    States?

24            A.    I'm not sure about that.

1    Q.    Okay.

2    A.    I've heard that for

3  different age groups and that kind of

4  thing.  But I'm not sure.

5    Q.    Okay.  Why don't we take a

6  look at something here with you on that

7  point.  I'm going to hand you 1.264,

8  which is marked as Exhibit 2.

9         (Document marked for

10        identification as Exhibit

11        MCK-Mahoney-2.)

12 BY MR. BOGLE:

13    Q.    This is a public document.

14 So no Bates numbers.

15        MR. SCHMIDT:  You can throw

16    it.  I know you're not being rude.

17    It's a big table.

18 BY MR. BOGLE:

19    Q.    Okay.  Mr. Mahoney, what

20 I've handed you -- here again, I'll

21 introduce it, and we'll kind of go from

22 there -- is a document from May 4, 2018,

23 from the U.S. House of Representatives

24 Committee on Energy and Commerce.

Highly Confidential - Subject to Further Confidentiality Review

1    Do you see that?

2         A.    Mm-hmm.

3         Q.    Okay.  Have you seen this

4    document before?

5         A.    I don't think I've seen this

6    document.

7         Q.    Okay.  Do you see that the

8    line at the top notes, "Regarding hearing

9    entitled 'Combatting the Opioid Epidemic:

10   Examining Concerns About Distribution and

11   Diversion.'"

12              Do you see that?

13        A.    Yes.

14        Q.    Okay.  And if you look here,

15   on that first page, there's a section

16   that lists witnesses for the hearing.

17        A.    Yes.

18        Q.    Do you see that section?

19        A.    Mm-hmm.

20        Q.    And you see the third person

21   listed there is a John H. Hammergren --

22        A.    Yes.

23        Q.    -- president and CEO of

24   McKesson.  Do you see that?

1        A.      Mm-hmm.

2        Q.      Okay.  And you are familiar

3    with Mr. Hammergren, right?

4        A.      Yes.

5        Q.      Okay.  I mean, you know who

6    he is, right?

7        A.      Yeah.

8        Q.      Okay.  Were you aware that

9    he testified before Congress in 2018?

10       A.      Yes.

11       Q.      Yes.  What information were

12   you provided about his testimony?

13       A.      I believe I watched it.

14       Q.      Okay.  So you did watch at

15   least portions of this hearing that we're

16   talking about here?

17       A.      Yes.

18       Q.      Okay.  So going to the

19   second page of this document, and I'm

20   looking at the paragraph below the chart

21   that says, "The U.S. continues."

22       A.      Okay.

23       Q.      Do you see that?

24               It says, "The U.S. continues

Highly Confidential - Subject to Further Confidentiality Review

1    to experience an opioid epidemic which

2    has worsened over the last two decades.

3    Opioid-involved overdose deaths are the

4    leading cause of injury death in the U.S.

5    and take the lives of 115 Americans per

6    day.  According to a recent report issued

7    by the Centers For Disease Control and

8    Prevention, CDC, prescription or illicit

9    opioids were involved in nearly

10    two-thirds of all drug overdose deaths in

11    the U.S. during 2016, a 27.7 percent

12    increase from 2015.

13               "In total, more than 351,000

14    people have died since 1999 due to an

15    opioid-involved overdose.  The crisis has

16    become so severe that the average life

17    expectancy declined in 2016 from the

18    previous year largely because of opioid

19    overdoses."

20               Do you see that there?

21        A.    Yes.

22        Q.    Okay.  Prior to looking at

23    this today, were you aware that the life

24    expectancy, at least in 2016, had

Highly Confidential - Subject to Further Confidentiality Review

1    declined largely because of opioid

2    overdoses?

3                MR. SCHMIDT:  Objection.

4         Foundation.

5                THE WITNESS:  I had heard

6         that life expectancy had gone

7         down.  But I hadn't attributed it

8         necessarily to just opioids.

9                Suicide, depression.  There

10        were a lot of different things in

11        what I had seen.

12   BY MR. BOGLE:

13        Q.    Okay.  But you've never seen

14   the reference similar to the one here

15   that decline, at least from 2016 versus

16   2015, was largely because of opioid

17   overdoses?

18        A.    I hadn't seen that sentence,

19   no.

20        Q.    Any reason to dispute that

21   finding?

22        A.    No.

23                MR. SCHMIDT:  Same

24        objection.

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. BOGLE:
2          Q.    We talked a little bit
3    earlier about your involvement at the
4    Lakeland distribution center, initially
5    as the assistant distribution center
6    manager -- I think that was the title
7    that you gave me -- then distribution
8    center manager, and then as director of
9    regulatory affairs responsible for
10   Lakeland.  We talked about that earlier,
11   right?
12         A.    Yes.
13         Q.    Okay.  So Florida -- let me
14   back up.  Strike that.
15               Do you live in Florida?
16         A.    I do.
17         Q.    Okay.  How long have you
18   lived in Florida?
19         A.    About 20 years.
20         Q.    Okay.  So being a Florida
21   resident in addition to being an employee
22   of McKesson in the capacities that we've
23   discussed, you understand that Florida
24   has been hit very hard by the opioid
```

Highly Confidential - Subject to Further Confidentiality Review

1    epidemic, correct?

2           A.    Yes.

3           Q.    Are you familiar with Gary

4    Boggs at McKesson?

5           A.    Yes, mm-hmm.

6           Q.    Did you know him in any

7    capacity prior to him joining the

8    company?

9           A.    I may have met him before.

10   But I didn't know him.

11          Q.    Okay.  You do know that he

12   was with the DEA prior to joining

13   McKesson, right?

14          A.    Yes.

15          Q.    And he works in the

16   regulatory affairs department at McKesson

17   presently, right?

18          A.    Yes.

19          Q.    And has for the past five

20   years or so, right?

21          A.    Yes.

22                (Document marked for

23          identification as Exhibit

24          MCK-Mahoney-3.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BOGLE:

2        Q.    I'm going to hand you what

3    I'm marking Exhibit 1.851, also marked as

4    Exhibit 3.

5            MR. SCHMIDT:  Bill, when

6         you're done with the exhibits,

7         I'll just put them here.  If we

8         need to go back to any earlier

9         ones --

10           MR. BOGLE:  Yeah, we may

11        bounce a little back and forth.

12        But --

13           MR. SCHMIDT:  I'll help you

14        with that, which should be

15        terrifying to everyone in the

16        room.  I'll do my best.

17   BY MR. BOGLE:

18       Q.    All right.  So Exhibit 3

19   here, also marked as 1.851, is a

▪    ████████████████████████████████

▪    ████████████████████    ██████████

▪    ██████████████████

23           Do you see that?

24       A.    Yes.



Highly Confidential - Subject to Further Confidentiality Review

1    A.    Mm-hmm.

2    Q.    Is that a yes?

3    A.    Yes.

4    Q.    I'm sorry, I'm not trying to

5  be rude, just want to make sure --

6    A.    No, I understand --

7  understand.

8    Q.    The concept of a pill mill,

9  what does that mean to you?

10    A.    The way I envision the pill

11  mill is a doctor, doctor or doctor's

12  office, in which people are seeing the

13  doctor and getting opioids on the way

14  out.

15    Q.    Okay.

16    A.    So from my exposure or

17  things that I've seen, it would be a high

18  volume-type operation.

19    Q.    Okay.  In the term "pill

20  mill" as used generally in -- strike

21  that.

22         The term "pill mill" when

23  you are talking about the sales of

24  controlled substances is -- has a

1    negative connotation to it, right?

2         A.    Yes.



10         Q.    Okay.  What is DU, do you

11    know what that stands for?

12         A.    Dosage units.

Highly Confidential - Subject to Further Confidentiality Review



3          MR. SCHMIDT:  Objection.

4          Foundation.







2      Q.    And you've seen that

3   reference before today, right?

4      A.    I believe so.

Highly Confidential - Subject to Further Confidentiality Review



9          MR. SCHMIDT:   Objection.

10        Vague.

Highly Confidential - Subject to Further Confidentiality Review

2          (Document marked for

3      identification as Exhibit

4      MCK-Mahoney-4.)

5  BY MR. BOGLE:

6          Q.    I'm going to hand you next

7  what I'm marking as Exhibit 1.1968, also

8  marked as Exhibit 4 to your deposition.

9              And the start date here is

10  MCK_MDL_00651331.

11              Okay.  So what I've given

12  you here is Exhibit 4.   The title is

20          Q.    Okay.  And before we get

21  into it, I have a few questions about it,

22  but before we get there, ISMC, what does

23  that stand for at McKesson?

24          A.    Independent and small and

Highly Confidential - Subject to Further Confidentiality Review

1    medium chain.

2         Q.    Okay.

3         A.    So it's a segment of the

4    retail marketplace.

5         Q.    Okay.  It's a type of

6    pharmacy customer; is that fair?

7         A.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



9          MR. SCHMIDT:  Objection.

10     Foundation.



Highly Confidential - Subject to Further Confidentiality Review



10        MR. SCHMIDT:  Let me just

11    say, I think there was an issue in

12    one of the earlier depositions

13    about geographic focus

14    restriction.  We're, I think, well

15    outside of it with Florida.  I'd

16    ask you to kind of focus on what's

17    at issue geographically.  And if

18    not, we'll obviously preserve our

19    objection and maybe seek relief on

20    that basis.

21        MR. BOGLE:  Yeah, I mean,

22    you're certainly entitled to

23    object, but there's no geographic

24    restrictions as to what I can ask.

1    I'm aware of nothing of the sort.

2         MR. SCHMIDT:  I don't think

3    we understand that in that way in

4    terms of the judge ordering -- the

5    special master ordering that

6    discovery should be focused on the

7    jurisdictions that would be

8    subject to the first trial.

9    BY MR. BOGLE:

10        Q.    My question stands.  Do you

11   recall my question?

12        A.    Can you repeat it, please?



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



5          MR. SCHMIDT:  Objection.

6     Foundation.

19          Q.   Okay.  And Florida

20     specifically, is it your understanding,

21     has historically had one of the highest

22     rates of diversion of opioids in the

23     country?

24          A.   Let me see.  Historically?

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Yeah.  So, well let me ask

2  you.  Here, we'll just look at the

3  document.  We'll cut to it.

4           (Document marked for

5       identification as Exhibit

6       MCK-Mahoney-5.)

7  BY MR. BOGLE:

8    Q.    I'll hand you what's marked

9  as Exhibit 1.1434, also marked as

10  Exhibit 5, and start with Bates

11  MCKMDL00403517.

12           That's as far as I can get

13  it.

14           Okay.  We'll start with the

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

8      Q.    Are you familiar with the

9  concept known as migration when it comes

10  to controlled substances?

11          MR. SCHMIDT:  Objection.

12      Vague.

13          THE WITNESS:  I have -- I'm

14      not sure.

15  BY MR. BOGLE:

16      Q.    Okay.  Not sure if you ever

17  heard that term used in the context of

18  controlled substances?

19      A.    I may have heard about it in

20  various modes or forms.

21      Q.    Okay.  Do you have any sense

22  of what that means, again focused on

23  controlled substances?

24      A.    I think that one of the

Highly Confidential - Subject to Further Confidentiality Review

1    things, for example, that was seen was

2    that as the states were doing their part

3    to fight the system, they were making

4    more tools available to doctors and

5    pharmacists that they could track what

6    their patients were doing.

7              So state by state, they were

8    implementing prescription monitoring

9    programs.  And some states were early to

10   embrace them, and some were later.

11             And I think that one of the

12   things that was observed was that that

13   was a strong tool that caused abuse to

14   move to states that did not have those

15   kinds of systems.

16             So as they were

17   implemented -- and I don't know when the

18   first one was implemented.  But they may

19   have moved from states where they were

20   implemented.  Maybe Kentucky and Ohio

21   were among the early ones.  And abuse

22   moved to states where there were less --

23   less strong monitoring programs.

24        Q.    Okay.  Have you heard of the

1    concept of migration used in the sense of

2    when controlled substances or even

3    illegal -- applies equally to illegal

4    drugs -- are supplied to a market,

5    oversupplied to a market, when that

6    market is oversupplied, the excess will

7    tend to migrate somewhere else?

8              MR. SCHMIDT:  Objection.

9         Vague.

10   BY MR. BOGLE:

11        Q.    Are you familiar with that

12   kind of concept, migration?

13        A.    I can understand --

14             MR. SCHMIDT:  Same

15        objection.

16             Go ahead.

17             THE WITNESS:  I understand

18        what you're saying.

19   BY MR. BOGLE:

20        Q.    Okay.  Does that make sense

21   to you?

22             MR. SCHMIDT:  Same

23        objection.  Vague.

24             THE WITNESS:  It sounds like

Highly Confidential - Subject to Further Confidentiality Review

1       it makes sense.

2    BY MR. BOGLE:

3       Q.    Okay.  And specifically

4    talking about the State of Florida, there

5    has been significant migration of drug

6    diversion out of the State of Florida up

7    to the east coast and the Midwest, right?

8       A.    I'm not sure.

9            (Document marked for

10       identification as Exhibit

11       MCK-Mahoney-6.)

12    BY MR. BOGLE:

13       Q.    I'm going to hand you what

14    I'm marking as Exhibit 1.1355, also

15    marked as Exhibit 6.  And it's Bates

16    Number MCKMDL00407451.





1          Do you see that?

19          MR. BOGLE:  This is a decent

20    breaking point if you don't mind.

21    Quick break, I'll reset my

22    documents.

23          MR. SCHMIDT:  Okay.

24          THE VIDEOGRAPHER:  Remove

1      your microphones.  The time is

2      10:12 a.m.  Going off the record.

3           (Short break.)

4           THE VIDEOGRAPHER:  We are

5      back on the record.  The time is

6      10:27 a.m.

7  BY MR. BOGLE:

8      Q.    All right, Mr. Mahoney.

9  While you were distribution center

10 manager for Lakeland distribution center,

11 it was -- you had ultimate responsibility

12 for every pill that left the distribution

13 center, correct?

14      A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



21     Q.     I'm going to hand you what

22  I'm marking as Exhibit 1.1946, also

23  marked as Exhibit 7 to your deposition.

24          (Document marked for

1          identification as Exhibit

2          MCK-Mahoney-7.)

3     BY MR. BOGLE:

4          Q.     And the start Bates number

5     is MCKMDL00496859.

6               You don't need to worry

7     about those numbers.  They just tell me

8     that I have to read them off.

9               Okay.  So Exhibit 7 to

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15          MR. SCHMIDT:  Object to

16     characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



6          MR. SCHMIDT:  Objection.

7     Characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





23          MR. SCHMIDT:   Objection.

24       Just a second.   Sorry.

Highly Confidential - Subject to Further Confidentiality Review



1          Objection.  Foundation.

15              MR. SCHMIDT:  Objection.

16      Foundation.

17      BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



21          MR. SCHMIDT:  Object to the

22     characterization.  You've got to

23     give me just a second to lodge an

24     objection.

Highly Confidential - Subject to Further Confidentiality Review



1            THE WITNESS:  Okay.  Sorry.

2            MR. SCHMIDT:  That's okay.

3       BY MR. BOGLE:

19           MR. SCHMIDT:  Object to the

20      characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





22          MR. SCHMIDT:  Object to the

23     characterization.

24     BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



8            MR. SCHMIDT:  Objection.

9       Characterization.

13   BY MR. BOGLE:

14       Q.    Okay.  I'm going to hand you

15   what I'm marking as 1.1789.  Also marked

16   as Exhibit 8.

17            Start Bates Number is

18   MCK_MDL_00496876.

19            (Document marked for

20       identification as Exhibit

21       MCK-Mahoney-8.)

22   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24              MR. SCHMIDT:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1          characterization.



17         You see that, right?

18         MR. SCHMIDT:  Same

19    objection.

24         MR. SCHMIDT:  Same

Highly Confidential - Subject to Further Confidentiality Review

1        objection.



11        MR. SCHMIDT:   Objection.

12       Foundation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



8          (Document marked for

9          identification as Exhibit

10          MCK-Mahoney-9.)

11     BY MR. BOGLE:

12          Q.    I'm going to hand you what

13     I'm marking as Exhibit 1.1963, also

14     marked as Exhibit 9.  Bates Number

15     MCKMDL00571360.



Highly Confidential - Subject to Further Confidentiality Review



            MR. SCHMIDT:  Objection.

     Foundation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Objection.

11      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



15          I'm going to hand you what

16   I'm marking as Exhibit 1.1943, which is

17   also Exhibit 10.

18              (Document marked for

19          identification as Exhibit

20          MCK-Mahoney-10.)

21              MR. BOGLE:  Start Bates is

22          MCK_MDL_00496306.

23   BY MR. BOGLE:

24          Q.    Okay.  Start by sort of

Highly Confidential - Subject to Further Confidentiality Review

1    orienting you to this document since it's

2    a larger one here.  You see on the front

8         Q.    Okay.  Have you seen this

9    before, this document?

10        A.    I'm not sure.

11        Q.    Okay.  All right.  Let's

12   take a look first at, looking at the

13   Bates numbers, it's 6309, excuse me.

14             I think it's the third page,

15   or the fourth page of the document?

16        A.    Mm-hmm.

17        Q.    And you see this is the

18   actual order to show cause that was filed

19   by the DEA, do you see that?

20        A.    Yes.

21        Q.    Okay.  And you've seen this

22   before, right?

23        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12          Do you see that?

13      A.      Yes.

14      Q.      This term "rogue internet

15  pharmacies," what do you understand that

16  to mean?

17      A.      I understand it to mean

18  illegal -- pharmacies that are acting

19  illegally to sell hydrocodone or

20  oxycodone or other -- other products.

21      Q.      Okay.

22      A.      In some cases I think it was

23  Viagra and Cialis and that kind of thing.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12          MR. SCHMIDT:  Object to

13    form.  Compound.



Highly Confidential - Subject to Further Confidentiality Review



22          MR. SCHMIDT:  Objection.

23      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



2          MR. SCHMIDT:  Objection.

3      Foundation.

23          MR. SCHMIDT:  Objection.

24      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



17          MR. SCHMIDT:   Objection.

18      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



          9              MR. SCHMIDT:  Objection.

         10      Foundation.



Highly Confidential - Subject to Further Confidentiality Review



7          MR. SCHMIDT:  Objection.

8      Foundation.

20          MR. SCHMIDT:  Same

21      objection.  Foundation.

22  BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



15          MR. SCHMIDT:  Objection.

16     Foundation.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. SCHMIDT:  Objection.

2      Foundation.

5  BY MR. BOGLE:

6          Q.   Okay.  I'm going to hand you

7  what I'm marking as Exhibit 1.1947.

8  Exhibit 11.  Start Bates is

9  MCK_MDL_00497154.

10             (Document marked for

11         identification as Exhibit

12         MCK-Mahoney-11.)

13         MR. SCHMIDT:  Are you done

14     with this one?

15         MR. BOGLE:  I'm done for

16     now, but it's one we'll come back

17     to at some point.  So however you

18     want to deal with that.

19         MR. SCHMIDT:  I'll dig it

20     out when we come back to it.

21         MR. BOGLE:  It's an easy one

22     to find.

23  BY MR. BOGLE:

24         Q.   Okay.  So I want to

1  introduce this document to you here.  Oh,

2  sorry.



Highly Confidential - Subject to Further Confidentiality Review



24          MR. SCHMIDT:   Objection.



1    Foundation.

2    BY MR. BOGLE:

5    MR. SCHMIDT:  Objection.

6    Foundation.

Highly Confidential - Subject to Further Confidentiality Review



18          MR. SCHMIDT:    Objection.

19      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



22        MR. SCHMIDT:  Objection.

23        Foundation.

Highly Confidential - Subject to Further Confidentiality Review

4          MR. SCHMIDT:  Same

5     objection.

7  BY MR. BOGLE:

8          Q.    Okay.  All right.  I'm going

9     to hand you what I'm marking as

10    Exhibit 12, which is also marked as

11    1.1951.

12              (Document marked for

13         identification as Exhibit

14         MCK-Mahoney-12.)

15         MR. BOGLE:  Bates number

16    MCKMDL00496536.

17         MR. SCHMIDT:  While he's

18    looking at that I think we're

19    about an hour.  Maybe after this

20    document, can we take a break?

21         MR. BOGLE:  Yeah, we can

22    take one now if you want.

23         MR. SCHMIDT:  No, if you

24    want to go through the document.

Highly Confidential - Subject to Further Confidentiality Review

1          I don't want you to get --

2   BY MR. BOGLE:

3          Q.    Well, I'll hand you -- all

4   right.  And again, this is government

5   Exhibit 3.  Do you see that statement on

6   it there?

7          A.    Mm-hmm.

8          Q.    And I'll represent to you

9   this came from McKesson as being part of

10  the show cause exhibits for the Lakeland

11  show cause proceeding that was given to

12  us.

13         A.    Mm-hmm.

14         Q.    You see there's actually a

15  stamp at the bottom, Drug Enforcement

16  Administration.

17         A.    Right.

18         Q.    Right?  Do you see that?

19         A.    Mm-hmm.

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



14          MR. SCHMIDT:  Objection.

15      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13          MR. BOGLE:  Okay.  We can

14   take a break now.

15          THE VIDEOGRAPHER:  Stand by

16   please.  Remove your microphones.

17   The time is 11:35 a.m.  Going off

18   the record.

19          (Short break.)

20          THE VIDEOGRAPHER:  Okay.  We

21   are back on the record.  The time

22   is 11:55 a.m.

23   BY MR. BOGLE:

24          Q.   Okay.  Mr. Mahoney, if we



1    can start by going back to Exhibit 7.

Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Objection.

11      Characterization.

Highly Confidential - Subject to Further Confidentiality Review



4          MR. SCHMIDT:  Same

5     objection.  Characterization.

Highly Confidential - Subject to Further Confidentiality Review



1               MR. SCHMIDT:  Objection.

Highly Confidential - Subject to Further Confidentiality Review



3          MR. SCHMIDT:  Objection.

4      Characterization.

Highly Confidential - Subject to Further Confidentiality Review



15          (Document marked for

16      identification as Exhibit

17      MCK-Mahoney-13.)

18  BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review





6          MR. SCHMIDT:  Objection.

7      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



14          MR. SCHMIDT:  Objection.

15     Foundation.  Characterization.

Highly Confidential - Subject to Further Confidentiality Review



 7      Q.    Okay.   I'm going to hand you

 8   now what I'm marking as Exhibit 14.   Also

 9   numbered as 1.1953.

10           (Document marked for

11           identification as Exhibit

12           MCK-Mahoney-14.)

13   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



15       MR. SCHMIDT:  Object to

16   characterization.

24       MR. SCHMIDT:  Same

Highly Confidential - Subject to Further Confidentiality Review



1    objection.  Foundation.

2  BY MR. BOGLE:

5  Exhibit 15, also marked as 1.1958.

6           (Document marked for

7       identification as Exhibit

8       MCK-Mahoney-15.)

9  BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



21          MR. SCHMIDT:  Object to the

22    characterization.

Highly Confidential - Subject to Further Confidentiality Review

7      Q.    I'm going to hand you what

8    I'm marking as Exhibit 16.  Also marked

9    as 1.1970.

10              (Document marked for

11         identification as Exhibit

12         MCK-Mahoney-16.)

13   BY MR. BOGLE:

14      Q.    This is an article that I

15   pulled off the internet from the Ledger

16   titled "Pharmacy Raided by DEA Agents,"

17   posted November 17, 2006.

18              Do you see that?

19      A.    Yes.

20      Q.    Okay.  And it says -- and

21   from Lakeland, "A local pharmacy's

22   license was suspended Thursday after it

23   was raided by agents from the U.S. Drug

24   Enforcement Administration."

Highly Confidential - Subject to Further Confidentiality Review

1          MR. SCHMIDT:  Can I just

2     have an ongoing, running objection

3     to the questions on this document,

4     this unauthenticated document?

5          MR. BOGLE:  Okay.

6  BY MR. BOGLE:

7     Q.     "Federal agents, with help

8  from local law enforcement agencies,

9  seized several boxes of prescription

10  drugs from Medcenter Pharmacy located

11  at" -- and it provides the address in

12  Lakeland.  And it says, "Agents also

13  raided a sister store at 4607 Clark

14  Avenue in Tampa that operated under the

15  name MediPharm-Rx, Inc."

16          Do you see that?

17     A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

7        Q.      And it says, "Both

8    pharmacies are owned by a Robert L.

9    Caddick, whose last known address was in

10   Oviedo," also in Florida, right?

11       A.      Oviedo?  Yeah.

12       Q.      And then it says, "Jeannette

13   Moran, spokeswoman for the DEA's Miami

14   field office, said that both pharmacies'

15   licenses to sell controlled substances

16   have been suspended."  And then it goes

17   on to say, "She said the DEA considers

18   the operation as a whole to be an

19   imminent danger to public health and

20   safety."

21           Do you see that reference?

22       A.      Yes.

23       Q.      And she says -- "She said

24   agents pulled 635,000 doses of

Highly Confidential - Subject to Further Confidentiality Review

1    prescription medicines from the Tampa

2    location.  Most of those medicines were

3    hydrocodone, sold as Vicodin, and

4    alprazolam sold as Xanax."

5               Do you see that?

6         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Objection.

11     Foundation.

14  BY MR. BOGLE:

15          Q.    Okay.  I'm going to hand you

16  what I'm marking as 1.1969, also marked

17  as Exhibit 17.

18              (Document marked for

19          identification as Exhibit

20          MCK-Mahoney-17.)

21          MR. SCHMIDT:  Same running

22     objection on the authenticity of

23     this.

24          MR. BOGLE:  Okay.

1    BY MR. BOGLE:

2          Q.    You see this is an article

3    from the Tampa Tribune published

4    March 17, 2008.

5              Do you see that?

6          A.    Yes.

7          Q.    Okay.  On the second page,

8    in the middle, I'll kind of point to it

9    if it helps you.  It says, "The DEA also

10   arrested."

11         A.    Okay.

12         Q.    It says, "The DEA also

13   arrested two men tied to a Tampa pharmacy

14   the agency had targeted in

15   November 2006."  That's the time frame we

16   just looked at, right, where they were

17   raided; is that right?

18         A.    Yes.

19         Q.    Okay.  And it lists the

20   first person's name.  The second name is

21   "Robert Caddick, 51, of 1007 Eagens

22   Creek, Oviedo, were arrested on federal

23   charges of conspiracy to possess with

24   intent to distribute hydrocodone, an

Highly Confidential - Subject to Further Confidentiality Review

```
1   opiate nearly equivalent to morphine for
2   pain relief."
3              And it's noted further on
4   down there that Mr. Caddick was the owner
5   registered agent of MediPharm-Rx.  Do you
6   see that?  It's a couple sentences down
7   from there.
8              A.    I see it.  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review



1                MR. SCHMIDT:   Object to

2          characterization.

18             MR. SCHMIDT:   Object to the

19         characterization.

Highly Confidential - Subject to Further Confidentiality Review

5    I'm going to guide you.  So it should be

6    Exhibit 10.

7           A.    10.

8           Q.    It's the biggest one.

9           A.    Right.

10          MR. SCHMIDT:  It's the big?

11          MR. BOGLE:  The biggest

12   document.  1943.

13          MR. SCHMIDT:  I just wanted

14   to get that on the record twice.

15   No, the second part.  Go ahead.

16   I'm giving you a hard time.

17          MR. BOGLE:  No problem.

18   It's easy to do.

19   BY MR. BOGLE:

20          Q.    All right.  So let's go to

21   Page 6444, on the Bates numbers on the

22   left.  I think this will address what you

23   want to look at.

24                Okay.  And this is some

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



5          Q.    Okay.  I'm going to hand

6    you -- excuse me.

7               Let me hand you what I'm

8    marking as Exhibit 1.1997, also marked as

9    Exhibit 18.

10              (Document marked for

11              identification as Exhibit

12              MCK-Mahoney-18.)

13              MR. BOGLE:  I think I only

14              have three of these instead of

15              four.  I apologize for that.

16   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17          MR. SCHMIDT:  Objection.

18     Foundation.

Highly Confidential - Subject to Further Confidentiality Review



17          MR. SCHMIDT:  Objection.

18     Foundation.

19          THE WITNESS:  Can you say

20     that again, please?

21  BY MR. BOGLE:

22     Q.   Sure.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
10          MR. SCHMIDT:  Objection.

11     Speculation.
```

```
18          MR. SCHMIDT:  Same

19     objection.  Speculation.
```

Highly Confidential - Subject to Further Confidentiality Review



13          MR. SCHMIDT:  I'll object to

14      the speculation.

Highly Confidential - Subject to Further Confidentiality Review



8          MR. SCHMIDT:  Objection.

9      Vague.

17          MR. SCHMIDT:  Same

18      objection.  Vague.

19   BY MR. BOGLE:



Highly Confidential - Subject to Further Confidentiality Review



10    Q.    Okay.  And you are aware

11  that settlement occurred in 2008, true?

12    A.    Yes.

13    Q.    Okay.  And as part of that

14  settlement, McKesson agreed to multiple

15  things, but one was to pay a fine of

16  $13,250,000, right?

17    A.    Yes.

18    Q.    Okay.  And in fairness to

19  the Lakeland distribution center, it was

20  for conduct not just involving Lakeland

21  but involving other distribution centers

22  too, right?

23    A.    Correct.

24    Q.    I'm sorry?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    Okay.  Have you seen the

3   settlement agreement from the 2008

4   settlement?

5        A.    Yes.

6        Q.    You have?  Okay.

7              I want to take a look at a

8   couple aspects of that with you here.

9              I'll hand you what I'm

10  marking as Exhibit 19, also marked as

11  Exhibit 1.889.

12              (Document marked for

13        identification as Exhibit

14        MCK-Mahoney-19.)

15  BY MR. BOGLE:

16        Q.    This is titled "Settlement

17  and Release Agreement and Administrative

18  Memorandum of Agreement" dated, on the

19  first page, 2nd day of May, 2008.

20              Do you see that?

21        A.    Yes.

22        Q.    Okay.  So this is a document

23  that you've seen before, true?

24        A.    I believe so.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Do you want to -- if

2    you want to look at something first, just

3    let me know.

4    A.    Yeah, let me just take a --

5    Q.    Yeah, go ahead.  Just let me

6    know when you're ready.

7    A.    Okay.

8    Q.    Are you familiar with this

9    document?

10    A.    Yes.

11    Q.    And so just to sort of

12    orient ourselves here.  Under the

13    background section, first paragraph says,

14    "Whereas, on August 4, 2006, DEA by its

15    deputy assistant administrator Joseph T.

16    Rannazzisi issued an order to show cause,

17    Order Number 1, to McKesson with respect

18    to its Lakeland distribution center," and

19    then it lists the address.

20         Do you see that?

21    A.    Right.

22    Q.    Okay.  And that's the order

23    to show cause that we've been talking for

24    the last hour and a half or so, right?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    Okay.  So then if we can

3   take a look at Bates page ending 1052, do

4   you see that toward the top, there's a

5   little H?

6        A.    Yes.

7        Q.    It says, "McKesson agrees to

8   pay civil penalties to the United States

9   of America under 21 U.S.C. 842(c) for

10  violations of 21 U.S.C. 842-A(5) in the

11  amount of $13,250,000 in settlement of

12  claims or potential claims made by the

13  United States of America for failing to

14  report suspicious orders of controlled

15  substance and for failing to report

16  thefts or significant losses of

17  controlled substances."

18            Do you see that?

19       A.    Yes.

20       Q.    Okay.  You have a general

21  understanding that that's why -- those

22  are the reasons why the fine was incurred

23  by McKesson, right?

24       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. SCHMIDT:  Object to the

2      characterization.

3  BY MR. BOGLE:

4          Q.    And then if you go back to

5  Page 1060, you see there's a section

6  towards the middle of the page, it says,

7  "The covered conduct shall mean the

8  following alleged conduct."

9          Do you see that?

10      A.    Yes.

11      Q.    And first of all, I don't

12  want to go through all six of them.  You

13  would acknowledge there are six different

14  sections here talking about six different

15  distribution centers at McKesson, true?

16          MR. SCHMIDT:  I'm sorry.

17      What page are you on?

18          MR. BOGLE:  Yeah, 1060

19      carrying over to 1061.

20          MR. SCHMIDT:  Thank you.

21  BY MR. BOGLE:

22      Q.    My question was simply that

23  six distribution centers are covered here

24  in the covered conduct section?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    Okay.  So I want to focus

3   the one that we've been talking about,

4   which is Lakeland.  So that's letter B.

5      A.    Mm-hmm.

6      Q.    So it says, "In

7   October 2005, McKesson-Lakeland sold

8   approximately 2.1 million dosage units of

9   hydrocodone to seven pharmacies in the

10  Tampa area."  And then it lists them out.

11      Do you see that?

12      A.    Yes.

16      Q.    Okay.  "And failed to report

17  these sales as suspicious orders to the

18  DEA when discovered as required by and is

19  a violation of 21 C.F.R. 1301.74(b) and

20  21 U.S.C. Section 842-A(5)."

21      Do you see that?

22      A.    Yes.

23      Q.    Okay.  And this is a portion

24  of the settlement agreement that you're

Highly Confidential - Subject to Further Confidentiality Review

```
 1    familiar with too, right?

 2         A.    Yes.

 3         Q.    Okay.  And this fine of

 4    $13,250,000, more than half of that was

 5    related to the conduct at Lakeland,

 6    right?

 7         A.    Yes.

 8         Q.    And specifically, Page 1062,

 9    I think, outlines the numbers.

10              So under terms and

11    conditions, Letter B, it says, "McKesson

12    shall pay the sum of $7,456,000.  Payment

13    shall be made by electronic funds."  And

14    it goes on.  And that's related to the

15    conduct at Lakeland, right, the

16    $7,456,000 fine, right?

17         A.    Yes.

18         Q.    Which we can agree is more

19    than half of the overall fine, right?

20         A.    Yes.

21         Q.    Also the highest fine

22    allocated to any specific distribution

23    center, right?

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review



20    Q.    Okay.  Let me hand you what

21  I'm marking as Exhibit 20, also marked as

22  1.1950.

23            (Document marked for

24      identification as Exhibit

1       MCK-Mahoney-20.)

2    BY MR. BOGLE:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24                    MR. SCHMIDT:   Objection.



1    Foundation.

18    MR. SCHMIDT:  Object to the

19    characterization.

Highly Confidential - Subject to Further Confidentiality Review



16          MR. SCHMIDT:  Object to the

17     characterization.

18     BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Objection.

11      Characterization.

Highly Confidential - Subject to Further Confidentiality Review



17           MR. SCHMIDT:  Object to the

18    characterization.

Highly Confidential - Subject to Further Confidentiality Review

5     BY MR. BOGLE:

6           Q.    Okay.

7                 MR. BOGLE:  I'm actually

8           switching to a whole other topic

9           area.  This might be a decent time

10          to break for lunch if you guys are

11          okay with it.

12                MR. SCHMIDT:  Sure.

13                How much time have we been

14          on the record for?

15                THE VIDEOGRAPHER:  Sure.

16          We've used up 2 hours 58 minutes.

17                The time is 12:42 p.m.

18          Going off the record.

19                      -  -  -

20                (Lunch break.)

21                      -  -  -

22                THE VIDEOGRAPHER:  We are

23          back on record.  The time is

24          1:40 p.m.

Highly Confidential - Subject to Further Confidentiality Review

1                    -   -   -

2        A F T E R N O O N   S E S S I O N

3                    -   -   -

4              EXAMINATION (Cont'd.)

5                    -   -   -

6    BY MR. BOGLE:

7         Q.    Okay.  Mr. Mahoney, we are

8    back from lunch.  I wanted to shift gears

9    a little bit to another topic.  We talked

10   about earlier in the deposition that you

11   became the director of regulatory affairs

12   in January 2008, true?

13        A.    Yes.

20        Q.    Okay.  And was that a

21   promotion for you to move from

22   distribution manager to director of

23   regulatory affairs?

24        A.    It was a lateral move.

Highly Confidential - Subject to Further Confidentiality Review



11          MR. SCHMIDT:  Object to the

12    characterization.

13   BY MR. BOGLE:

16          MR. SCHMIDT:  Go ahead.  I

17    cut off your question.  You might

18    want to --

19          MR. BOGLE:  Yeah, let me

20    re-ask the question.

21   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



2          MR. SCHMIDT:  And that's

3     where I object to the

4     characterization.

Highly Confidential - Subject to Further Confidentiality Review



 9          Q.     Okay.  I'm going to hand you

10     what's being marked as Exhibit 1.1675,

11     also marked as Exhibit 21.

12               (Document marked for

13               identification as Exhibit

14               MCK-Mahoney-21.)

15     BY MR. BOGLE:

16          Q.     Okay.  So to orient you to

17     the document first, and we'll go from

Highly Confidential - Subject to Further Confidentiality Review



17        MR. SCHMIDT:  Can I say

18    given the header on this, I don't

19    know how -- I think this has been

20    used in prior depositions.

21        MR. BOGLE:  I think it has.

22        MR. SCHMIDT:  I don't know

23    how we've been using it.  I'm just

24    going to make an objection and

Highly Confidential - Subject to Further Confidentiality Review

1    I'll ask it be a running objection

2    given that this was prepared for

3    settlement purposes.  I don't know

4    that we've sorted that issue out.

5    I think we can sort it out later.

6    If I could make a running

7    objection on that.

8         MR. BOGLE:  That's fine.

9  BY MR. BOGLE:

10        Q.    Let me get back to the

11  question and make sure we are on the same

19        Q.    I'm going to walk you to a

20  place that I don't think is going to be

21  confusing.  So I have to kind of set the

22  table here.

23        A.    Sure.

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

5      MR. SCHMIDT:  Object to

6      characterization.

12    BY MR. BOGLE:

13         Q.    Okay.  I'm going to hand you

14    what I'm marking as 1.1960, also

15    Exhibit 22 to your deposition.

16              (Document marked for

17         identification as Exhibit

18         MCK-Mahoney-22.)

19    BY MR. BOGLE:

20         Q.    Okay.  This is a string of

21    e-mails, we're going to start at the

22    bottom.  And actually I think it's all

23    pretty much on the first page.

24         A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review



11    Q.    Okay.  Steve Miller is noted

12  to be VPDO of the south region.  Do you

13  know what VPDO stands for?

14    A.    Yes.

15    Q.    What does that stand for?

16    A.    Vice president distribution

17  operations.

18    Q.    Okay.  Would that be sort of

19  one step below Don Walker on the

20  hierarchy at McKesson on the operation

21  side?

22    A.    He -- he reported to Don.

23    Q.    Okay.  And he was VPDO for

24  the south region which was the same

Highly Confidential - Subject to Further Confidentiality Review



1    region you had regulatory responsibility

2    for during this time, right?

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22        MR. SCHMIDT:  Object to the

23    characterization.

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



24          MR. SCHMIDT:  Object to

1          characterization.





```
 5        Q.    Okay.  I'm going to hand you
 6   what I'm marking Exhibit 1.1942, also
 7   marked as Exhibit 23.
 8               (Document marked for
 9               identification as Exhibit
10               MCK-Mahoney-23.)
11   BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17     A.     Tom was the vice

18 president/general manager in Birmingham.

19     Q.     Okay.  The term vice

20 president and general manager, what does

21 that person generally do at McKesson?

22 What is that role meant to do?

23     A.     He is -- the director of

24 operations would report to him as well as

Highly Confidential - Subject to Further Confidentiality Review

1    the sales personnel.

2         Q.    So that position is more on

3    the -- on the -- it's sort of a mix

4    between the operation and sales side?

5         A.    Yes.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21        MR. SCHMIDT:  Object to

22    characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22        MR. SCHMIDT:  Object to

23        characterization.



18          MR. SCHMIDT:  Object to

19     characterization.

Highly Confidential - Subject to Further Confidentiality Review



MR. SCHMIDT:  Objection.

Foundation.

Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Objection.

11     Foundation.



2          MR. SCHMIDT:  Same -- same

3     objection.  Asked and answered.

14          MR. SCHMIDT:  Objection.

15     Foundation.

Highly Confidential - Subject to Further Confidentiality Review



5          MR. SCHMIDT:  Objection.

6      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



9          MR. SCHMIDT:  Objection.

10     Foundation.

Highly Confidential - Subject to Further Confidentiality Review





13          MR. SCHMIDT:   Objection.

14     Vague.

Highly Confidential - Subject to Further Confidentiality Review



12      Q.    Okay.  All right.

13            Okay.  I'm going to hand you

14   what's marked as 1.7195, also marked as

15   Exhibit 24.

16            (Document marked for

17            identification as Exhibit

18            MCK-Mahoney-24.)

19   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1     MR. SCHMIDT:  Object to

2     characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



2          MR. SCHMIDT:  Objection.

3     Foundation.

22          MR. SCHMIDT:  Object to

23     characterization.

Highly Confidential - Subject to Further Confidentiality Review



21          MR. SCHMIDT:  Objection.

22     Foundation.

Highly Confidential - Subject to Further Confidentiality Review





3           MR. SCHMIDT:  Object to

4       characterization.



5          MR. SCHMIDT:  Object to

6      characterization.  Asked and

7      answered.

10  BY MR. BOGLE:

11         Q.   Okay.  I'm going to hand you

12  what I'm marking as Exhibit 25.  Also

13  marked as 1.1962.

14             (Document marked for

15      identification as Exhibit

16      MCK-Mahoney-25.)

17  BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



14          Do you see that?

15     A.     Yes.

16     Q.     Have you ever seen this

17 document before?

18          A.     I'm not sure.  Do you have a

19 date on this?

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18          MR. SCHMIDT:  Object to

19     characterization.

Highly Confidential - Subject to Further Confidentiality Review



13          MR. SCHMIDT:  Object to

14     characterization.

15  BY MR. BOGLE:



1      MR. SCHMIDT:  Object to

2      characterization.

19      Q.   Okay.  Well, maybe we'll

20   narrow down a few of those issues then.

21   I'll mark as Exhibit 26, also marked as

22   Exhibit 1.1743.

23           (Document marked for

24      identification as Exhibit

Highly Confidential - Subject to Further Confidentiality Review



1          MCK-Mahoney-26.)

2      BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



14          MR. SCHMIDT:  Objection.

15     Foundation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16          MR. BOGLE:  I'm done with my

17     questions.  Mr. Bowden is going to

18     have some additional follow-up.

19     Maybe we can take a break and

20     switch around.  I'm done with

21     mine.

22          MR. SCHMIDT:  Are we at four

23     hours now?

24          THE VIDEOGRAPHER:  We are at

Highly Confidential - Subject to Further Confidentiality Review

1    4 hours and 3 minutes.

2         Shall we go off the record.

3         MR. BOGLE:  Yes.

4         THE VIDEOGRAPHER:  The time

5    2:45 p.m.  Going off the record.

6         (Short break.)

7         THE VIDEOGRAPHER:  We are

8    back on the record.  The time is

9    3:04 p.m.

10              -   -   -

11              EXAMINATION

12              -   -   -

13   BY MR. BOWDEN:

14        Q.    Good afternoon, Mr. Mahoney.

15        A.    What's going on?

16        Q.    My name is Wes Bowden.  I'm

17   going to ask you a couple questions and

18   finish out your deposition.

19        A.    Okay.

20        Q.    Before we left off the break

21   you talked with my partner about some of

22   the larger issues with the CSMP.

23              And one thing that I was

24   going to ask you about -- trying to get

Highly Confidential - Subject to Further Confidentiality Review



1    my computer booted up here.  You had

11         MR. SCHMIDT:  Object to the

12    characterization.

16    BY MR. BOWDEN:

17         Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Can I just

11     remind the folks on the phone to

12     go on mute, including people who

13     are typing and shuffling papers.

14 BY MR. BOWDEN:

20          Q.     Okay.  I'm going to hand you

21 what I will mark as Exhibit 27.  It's

22 RP-1.1680.

23          MR. SCHMIDT:  Again, can I

24     ask people on the phone to go on

Highly Confidential - Subject to Further Confidentiality Review

1          mute, including whoever was just

2          typing.

3                 (Document marked for

4          identification as Exhibit

5          Mahoney-27.)

6     BY MR. BOWDEN:

7          Q.    I apologize.  I did not put

8     the sticker on yours.  I'll take that

9     back from you.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



The image is mostly redacted.

Highly Confidential - Subject to Further Confidentiality Review



19    MR. SCHMIDT:  Object to

20    characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14          MR. SCHMIDT:  Object to the

15     characterization.

Highly Confidential - Subject to Further Confidentiality Review



4          MR. SCHMIDT:  Object to the

5     characterization.

Highly Confidential - Subject to Further Confidentiality Review



 4                MR. SCHMIDT:   Object to the

 5        characterization.



15          MR. SCHMIDT:  Object to

16     characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1          MR. SCHMIDT:  Objection.

2      Foundation.



13          Q.    Going to mark for you, this

14  will be Exhibit 28 to your deposition.

15  It's our P-1.1783.

16          (Document marked for

17      identification as Exhibit

18      Mahoney-28.)

19  BY MR. BOWDEN:

20          Q.    Do you remember getting this

24  Do you recall reading this?

Highly Confidential - Subject to Further Confidentiality Review

1        A.        I'd have to take a look at

2    it.

3        Q.        Okay.  And we're going to go

4    through it.

5        A.        Okay.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21          MR. SCHMIDT:  Objection.

22      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



6      Q.    And Conroe at the time, when

7  we first started the deposition, you had

8  listed six different distribution centers

9  in which you were overseeing.  And Conroe

10 was one of them, right?

11      A.    Yes.  Yes.

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21          Q.     In 2011, how many

22     distribution centers did McKesson have?

23          A.     I'm not sure.

24          Q.     You think about 30?

Highly Confidential - Subject to Further Confidentiality Review



1      A.     Approximately 30.  I would

2  say 28 to 30.

3      Q.     28 to 30.  And of those 28

17           MR. SCHMIDT:  Object to the

18  characterization.

Highly Confidential - Subject to Further Confidentiality Review



22   BY MR. BOWDEN:

23        Q.    What was Mr. Walker's

24   position in the company?  He was a senior

1    vice president, right?

2            A.    Yes.

3            Q.    And he was the person that

4    you answered to?

5            A.    Yes.



Highly Confidential - Subject to Further Confidentiality Review



14    right.  I'm handing you what I'm marking

15    as Exhibit 29 to your deposition.

16                 (Document marked for

17          identification as Exhibit

18          Mahoney-29.)

19    BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





13          MR. SCHMIDT:  Objection.

14     Foundation.

15  BY MR. BOWDEN:

16     Q.    Is that correct?

17     A.    I think there was --

18          MR. SCHMIDT:  Same

19     objection.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



7            MR. SCHMIDT:  Object to the

8       characterization.

9    BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



18          MR. SCHMIDT:  Object to the

19     characterization.

Highly Confidential - Subject to Further Confidentiality Review



24                    MR. SCHMIDT:  Object to



Highly Confidential - Subject to Further Confidentiality Review



18          MR. SCHMIDT:  Objection.

19     Foundation.

Highly Confidential - Subject to Further Confidentiality Review



14          MR. SCHMIDT:  Objection.

15     Compound.  Characterization.

16  BY MR. BOWDEN:

17          Q.    Isn't that what you

18  testified to earlier?

19          A.    Could you repeat that?

20          MR. SCHMIDT:  Same

21     objection.

22  BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17          MR. SCHMIDT:  Objection.

18      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



2          MR. SCHMIDT:  Object to the

3     characterization, foundation.

15          MR. SCHMIDT:  Object to the

16     characterization.

Highly Confidential - Subject to Further Confidentiality Review



24          MR. SCHMIDT:  Object to the



1    characterization.

13          MR. SCHMIDT:  Just a second.

14    Were you finished with your

15    answer?

16          THE WITNESS:  No, not yet.

17    BY MR. BOWDEN:

18          Q.    I'm sorry, go ahead, sir.

Highly Confidential - Subject to Further Confidentiality Review



13    BY MR. BOWDEN:

14         Q.    Okay.   You can go ahead and

15    set that one aside, sir.

16              I'm going to mark for you

17    what will be Exhibit Number 30 to your

18    deposition.   Going to be P-1.1936.

19              (Document marked for

20         identification as Exhibit

21         Mahoney-30.)

22    BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13          MR. SCHMIDT:  Object to the

14     characterization.

Highly Confidential - Subject to Further Confidentiality Review



1          MR. SCHMIDT:  Object to the

2     characterization.

19          MR. SCHMIDT:  Object to

20     characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23        MR. SCHMIDT:  Object to the

24    characterization.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  I'm curious

2          about what you're referring to.

3     BY MR. BOWDEN:

11          Q.    Okay.  I'll hand you what

12    I'm marking Exhibit 31.  It's P1.1979.

13              (Document marked for

14          identification as Exhibit

15          Mahoney-31.)

16    BY MR. BOWDEN:

17          Q.    Why don't you go ahead and

18    flip to the last page of this document.

Highly Confidential - Subject to Further Confidentiality Review



18          MR. SCHMIDT:   Objection.

19     Foundation.

Highly Confidential - Subject to Further Confidentiality Review



        4           MR. SCHMIDT:  Objection.

        5      Foundation.

        6           THE WITNESS:  Can you repeat

        7      that again?

        8   BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



7    Q.    How many distribution

8  centers are there as we sit here today?

9    A.    My estimate would be around

10  28 plus or minus one or two.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



 8          MR. SCHMIDT:  Object to the

 9   characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17          MR. SCHMIDT:  Objection.

18     Characterization.

Highly Confidential - Subject to Further Confidentiality Review



9          MR. SCHMIDT:  Objection.

10         Speculation.

Highly Confidential - Subject to Further Confidentiality Review



21          MR. SCHMIDT:  Objection.

22     Vague.

Highly Confidential - Subject to Further Confidentiality Review



24            MR. SCHMIDT:   Objection.

Highly Confidential - Subject to Further Confidentiality Review

1    Object to characterization.  I'll

2    move to strike the preamble.

3         THE WITNESS:  What's the

4    question?

5  BY MR. BOWDEN:

6         Q.    I'll rephrase it since

7  there's an objection.

16        MR. SCHMIDT:  Objection.

17  Foundation.

Highly Confidential - Subject to Further Confidentiality Review



16          MR. SCHMIDT:  Objection.

17     Characterization.

Highly Confidential - Subject to Further Confidentiality Review



13          MR. SCHMIDT:  Object to

14   characterization.

21          MR. BOWDEN:  I'm about to

22   switch gears.  Do you want to take

23   a break?  We went 56 minutes.

24          MR. SCHMIDT:  Yeah, I just

Highly Confidential - Subject to Further Confidentiality Review

```
 1          figure -- don't want to be here

 2          late into the night.

 3                MR. BOWDEN:  That's fine.  I

 4          just want to get some water.

 5                THE VIDEOGRAPHER:  Okay.

 6          Stand by, please.  The time is

 7          4:01 p.m.  Going off the record.

 8                (Brief recess.)

 9                THE VIDEOGRAPHER:  We are

10          back on the record.  The time is

11          4:16 p.m.

12   BY MR. BOWDEN:

13          Q.    All right, Mr. Mahoney.
```

Highly Confidential - Subject to Further Confidentiality Review

4      Q.    Okay.  Well, just in

5  general, though, having controls in place

6  to make sure that opioids get into the

7  right hands is a good thing, right?

8      A.    Yes.

9      Q.    It's a good thing because

10  opioids can have a dramatic impact on

11  people's lives, addiction, injury,

12  potentially death, right?

15      Q.    Right.  But that's not what

16  the DEA was concerned with, was it?  It

17  wasn't people such as yourself who might

18  take it for a brief period of time and

19  then let go of it.  It was for the

20  epidemic that had been brewing since the

21  2000s, right?

22          MR. SCHMIDT:  Objection.

23          THE WITNESS:  I've had

24       interactions actually recently

Highly Confidential - Subject to Further Confidentiality Review

1           with the DEA around Hurricane

2           Michael in which they wanted to

3           make sure that people had access

4           to their opioids.

5   BY MR. BOWDEN:

6           Q.    Okay.  And -- okay.  But

7   you're talking about something that's

8   going to be an act of God or a natural

9   disaster, making sure that the support is

10  there so that people get medication who

11  were prescribed medication and should be

12  legitimately taking it, right?

13          A.    I'm sorry.  Can you repeat

14  the last --

15          Q.    What you're talking about

16  anecdotally is that there might be very

17  narrow circumstances in which the DEA

18  might want drugs to go out there to make

19  sure that people with legitimate medical

20  needs, that their needs are met, correct?

21          A.    I think -- I think that the

22  DEA understands that it's gray in terms

23  of determining, especially from a

24  distributor's point of view, how hard it

1    is to determine whether something is for

2    legitimate medical purpose or it's for

3    some other illicit purpose.  And that's

4    why we do what we do.

5         Q.   Okay.  Well, I'm going to

6    hand you what I've marked as Exhibit 32

7    to your deposition.  This would be

8    P1.1845.

9              (Document marked for

10             identification as Exhibit

11             Mahoney-32.)

12   BY MR. BOWDEN:

13        Q.   And you know that McKesson

14   also distributes methadone, right?

15        A.   Yes.

16        Q.   And in 2008, McKesson was

17   distributing methadone, right?

18        A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14      Q.    Right.  So let me hand you

15  what I'm marking as Exhibit 33, which

16  will be P1.1848.

17          (Document marked for

18          identification as Exhibit

19          Mahoney-33.)

20          MR. SCHMIDT:  Can we put

21          this to the side, or do you want

22          him to keep it?

23          MR. BOWDEN:  He can probably

24          put it to the side.  That's fine.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. BOWDEN:

2      Q.    Now, in January of 2008,

3  were you still the distribution center

4  manager for Lakeland, Florida?



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



10          MR. BOWDEN:  In fact,

11    Michael, can we do a split screen

12    with the top paragraph of the last

13    document?

14          If you can put underneath

15    that, yeah, put that at the top

16    for our witness to see.

Highly Confidential - Subject to Further Confidentiality Review



19          MR. BOWDEN:  And can you put

20      the block quote from the other

21      paragraph from the other exhibit

24          That's good enough.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BOWDEN:

2         Q.    While he's doing that we'll

3    go ahead and read it.

21         MR. SCHMIDT:  Objection.

22    Compound.

23    BY MR. BOWDEN:

24         Q.    That's what this document

Highly Confidential - Subject to Further Confidentiality Review

1    says?

2         A.    I think what's happened --

3         MR. SCHMIDT:  Same

4    objection.





10          MR. SCHMIDT:  Objection to

11     the characterization.

22          MR. SCHMIDT:  Object to --

23     object to the characterization.

24  BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



7          MR. SCHMIDT:  Object to the

8     characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



3          MR. SCHMIDT:  Objection.

4     Form.

23          MR. SCHMIDT:  Object to

24     characterization.

Highly Confidential - Subject to Further Confidentiality Review



17          MR. SCHMIDT:  Object to

18      characterization.

Highly Confidential - Subject to Further Confidentiality Review

6    BY MR. BOWDEN:

7         Q.   Okay.  All right.  I'm going

8    to hand you what I will mark as 34,

9    Exhibit 34 to your deposition.  That will

10   be P-1.1959.

11              (Document marked for

12              identification as Exhibit

13              Mahoney-34.)

14              MR. SCHMIDT:  Sorry.

15              MR. BOWDEN:  No problem.

16   BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



12          MR. SCHMIDT:  Object to

13      characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



6          MR. SCHMIDT:  Objection.

7     Compound.

8          THE WITNESS:  What's the

9     question?

10   BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



17          MR. SCHMIDT:  Object to

18      speculation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1          MR. SCHMIDT:  Objection.

2      Foundation.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16      Q.    Gotcha.  You mentioned

17   Mallinckrodt.  I'm going to show you

18   P-1.1697.

19           (Document marked for

20           identification as Exhibit

21           Mahoney-35.)

22   BY MR. BOWDEN:

23      Q.    That should be Exhibit

24   Number 35, which is P-1.1697.

Highly Confidential - Subject to Further Confidentiality Review



 6    And that is a manufacturer of opioids,

 7    correct?

 8          A.    Mallinckrodt, yes.

 9          Q.    Okay.  And they're a

10    supplier -- or rather, McKesson is a

11    purchaser of Mallinckrodt opioids,

12    correct, for distribution?

13          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13        MR. SCHMIDT:  Objection.

14     Asked and answered.

24        MR. SCHMIDT:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1          Vague.



15              MR. SCHMIDT:   Objection.

16          Vague.

Highly Confidential - Subject to Further Confidentiality Review





8          MR. SCHMIDT:  Objection.

9      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



21          MR. SCHMIDT:  Objection.

22     Foundation.

23          THE WITNESS:  I -- and I

24     think --

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BOWDEN:

2         Q.    I'm not asking the context

3    of this e-mail.

4              MR. SCHMIDT:  Let him finish

5         his answer, please.  I think he

6         gets to answer your question.

7              You can answer the question.

23             MR. SCHMIDT:  Objection.

24        Vague.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



7        Q.     Okay.   Switching over to --

8    I'll hand you what I'm marking as

9    Exhibit Number 36.  P-1.1990.

10              (Document marked for

11              identification as Exhibit

12              Mahoney-36.)

13   BY MR. BOWDEN:

19              MR. SCHMIDT:   Object to

20              characterization.

21   BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19    A.    I'll agree with you what?

20  I'm sorry.

21    Q.    Are you having trouble

22  hearing me or just understanding the

23  question?

24    A.    It was a long question and I

Highly Confidential - Subject to Further Confidentiality Review



1    lost the train.

2         Q.    All right.  I'll break it

3    down for you.

Highly Confidential - Subject to Further Confidentiality Review



23      Q.      Okay.  You can set that one

24   aside.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. BOWDEN:  Off the record
 2       real quick.  Can you say the time.
 3              THE VIDEOGRAPHER:
 4       44 minutes on the record.  And
 5       total 5 hours and 46 minutes.
 6              MR. SCHMIDT:  That's not
 7       correct.  We've been going since
 8       4:01.
 9              THE VIDEOGRAPHER:  You mean
10       the time on the record?
11              MR. SCHMIDT:  This last
12       break, we've been going since
13       4:01.  It was the wrong time down.
14              MR. BOWDEN:  I just wanted
15       to use full time.  I'm not asking
16       to take a break.
17              MR. SCHMIDT:  Maybe I wrote
18       down the wrong time.  But I
19       thought we'd been going for six
20       hours.
21              THE VIDEOGRAPHER:  We've
22       been on the record for 45 minutes.
23       And the record on the camera is
24       five hours and 46 minutes.
```

1      Should I stop the camera?

2      MR. SCHMIDT:  No, let's stay

3   on the record.  Unless you want

4   to --

5      MR. BOWDEN:  No, I just

6   asked to go off to get a count.

7      MR. SCHMIDT:  I might

8   have -- just to be clear, I might

9   have written down the wrong time.

10      THE VIDEOGRAPHER:  No

11   problem.

12      MR. SCHMIDT:  It's just the

13   extra 15 minutes at this time of

14   day, it felt like it crushed my

15   soul.  So I had to react.

16      MR. BOWDEN:  I'll withhold

17   the comments on the soul.

18      MR. SCHMIDT:  That comes in

19   spades, my friend.

20      MR. BOWDEN:  I'll tell you

21   what, let's pause for a second.

22   I'm cutting down some documents.

23   Not to -- I'm not going to leave

24   or anything.  Go off the record

1      for a second.

2              THE VIDEOGRAPHER:   The time

3      is 5:02 p.m.  Off the record.

4              (Short break.)

5              THE VIDEOGRAPHER:   The time

6      is 5:05 p.m.  Back on the record.

7   BY MR. BOWDEN:

8      Q.    Sir, you're familiar with

9   the HDMA, correct?

10     A.    Yes.

11     Q.    And that was an industry

12  organization in which McKesson was a

13  member?

14     A.    Yes.

15     Q.    All right.  And that

16  industry trade group -- is that fair to

17  call it an industry trade group?

18     A.    Yes.

19     Q.    -- helped to develop or had

20  developed its own guidelines for

21  monitoring of suspicious ordering; is

22  that right?

23     A.    I think they had worked with

24  members in order to collect some best



1    practices, that kind of thing.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

3      Q.    I'm going to hand you what

4  I'm marking as Exhibit Number 37,

5  P1.1941.

6            (Document marked for

7            identification as Exhibit

8            Mahoney-37.)

9  BY MR. BOWDEN:

10      Q.    This is an e-mail from you,

11  March 11, 2013, to Don Walker, Bruce

12  Russell, and Gary Hilliard.

13            Do you see that?

14      A.    Yes.

15      Q.    And the subject is "HDMA

16  notes," right?

17      A.    Yes.

18      Q.    And it says, "Gary and I

19  attended the HDMA conference last week.

20  These are my notes.  Perhaps the most

21  surprising revelation was Steve Reardon

22  and Gilberto Quintero saying Cardinal

23  does not report suspicious orders to the

24  DEA, no upside."

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see where that's

2    written?

3          A.    I do.

4          Q.    Do you agree that there's no

5    upside to reporting suspicious orders to

6    the DEA?

7          A.    You know, I think I --

8              MS. McNAMARA:  Objection to

9    form.

10             MR. SCHMIDT:  You can still

11          answer.  Go ahead.

12             THE WITNESS:  I believe that

13          in my writing this, I misspoke.

14          And I was referring to when they

15          shut customers down because they

16          were suspicious customers.

17    BY MR. BOWDEN:

18          Q.    When did you come up with

19    that belief?  Is that recent?

20          A.    I saw that -- I said

21    suspicious orders.  That isn't what they

22    said.  What we do -- what we did was to

23    write a letter to the DEA when we were

24    shutting a customer down.  And they said

Highly Confidential - Subject to Further Confidentiality Review

1    they don't do that.

2         Q.    Okay.  Well, if Cardinal

3    were not reporting suspicious orders,

4    would you agree -- strike that.

5              It would be inappropriate to

6    not report suspicious orders, true?

7         A.    Like I said, I misspoke

8    here.



14          MR. SCHMIDT:  Object to

15     characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22          MR. SCHMIDT:  Do you want to

23      review it?

24          THE WITNESS:  Yeah, let me



1     review.

2   BY MR. BOWDEN:

3       Q.    Let me know when you get to

4   Page 5.

5       A.    I'm on Page 5.

Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Objection.

11     Speculation.

Highly Confidential - Subject to Further Confidentiality Review



6      Q.    Okay.  I'm going to hand you

7  what I will mark as Exhibit Number 38,

8  which is P-1.1806.

9            (Document marked for

10           identification as Exhibit

11           Mahoney-38.)

12  BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



19          MR. SCHMIDT:  Objection to

20      the characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21          MR. SCHMIDT:  Object to

22    characterization.

Highly Confidential - Subject to Further Confidentiality Review



24          MR. SCHMIDT:   Object to

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Objection.

11     Mischaracterization.

18     BY MR. BOWDEN:

19          Q.    All right.  Sir, I will hand

20     you what I will mark as Exhibit Number 39

21     to your deposition.  P-1.1971.

22               (Document marked for

23          identification as Exhibit

24          Mahoney-39.)



1    BY MR. BOWDEN:

19    MR. SCHMIDT:  Objection to

20    form.

Highly Confidential - Subject to Further Confidentiality Review



5          (Brief white noise

6     interference.)

7          MR. SCHMIDT:  I think the

8     reporter may not have gotten it.

9          THE COURT REPORTER:  Yeah, I

10    didn't want to ask you to repeat.

11         MR. SCHMIDT:  And I wasn't

12    jumping on your question, but I

13    could just see...

14         MR. BOWDEN:  That's okay.

15    Let me re-ask it then.

16    BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1          MR. SCHMIDT:  Let him finish

2     his answer, please.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



11          MR. SCHMIDT:  Objection to

12      the assumption.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



15          MR. SCHMIDT:  Object to the

16      characterization.

Highly Confidential - Subject to Further Confidentiality Review



6          MR. SCHMIDT:  Objection to

7      the characterization.

20          Q.    I'll hand you what I'll mark

21      as Exhibit Number 40.

22          (Document marked for

23      identification as Exhibit

24      Mahoney-40.)

Highly Confidential - Subject to Further Confidentiality Review

1          MR. BOWDEN:  Let me find an

2     extra copy here.  I only have the

3     one.

4          MR. SCHMIDT:  You don't

5     have more?

6          Thank you.  Appreciate it.

7  BY MR. BOWDEN:





11        Do you see that?

12   A.    Yes.

13        MR. SCHMIDT:  Did you mean

14   to give him a highlighted copy?

15        MR. BOWDEN:  Absolutely not.

16        MR. SCHMIDT:  Okay.  I just

17   saw that.  Why don't we just move

18   the sticker over if you want.  You

19   can give me a clean copy because I

20   already started writing on mine.

21        Do you have a clean copy

22   that you can give us back?

23        MR. BOWDEN:  I appreciate

24   the candor.

Highly Confidential - Subject to Further Confidentiality Review



1    MR. SCHMIDT:  All right.  He

2  was on Page 11.

3    MR. BOWDEN:  Thank you.

4  BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19          MR. SCHMIDT:  Object to the

20     characterization.

Highly Confidential - Subject to Further Confidentiality Review



15    Q.    Set that aside.

16          I'll hand you what I'm

17    marking as Exhibit Number 41.  This will

18    be P-1.1443.

19          (Document marked for

20          identification as Exhibit

21          Mahoney-41.)

22    BY MR. BOWDEN:

23    Q.    Is that a question for your

24    counsel or for me?



1          A.    Just curious.

21         Q.    You have seen this letter?

22         A.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18          MR. SCHMIDT:  Objection.

19      Foundation.

20  BY MR. BOWDEN:

24          MR. SCHMIDT:  Objection.

Case: 1:17-md-02804-DAP Doc #: 1981-6 Filed: 07/24/19 467 of 606. PageID #: 237467.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



8          MR. SCHMIDT:  Object to the

9      characterization.

12   BY MR. BOWDEN:

18          Q.    I'm going to hand you what

19   I'll mark as Exhibit Number 42.

20          (Document marked for

21      identification as Exhibit

22      Mahoney-42.)

23   BY MR. BOWDEN:

24          Q.    On the first page, you can

Highly Confidential - Subject to Further Confidentiality Review

1    see this is the administrative memorandum

2    of agreement.  It's between the DEA and

3    McKesson Corporation, right?

4         A.    Yes.

5         Q.    And in the background

6    section, in Section Number 5, you can see

7    that there were -- read that together.

8    "Between March 2013 and the present, DEA

9    executed one additional AIW and served

10   numerous administrative subpoenas and

11   conducted a number of cyclic inspections

12   at various McKesson U.S. pharmaceutical

13   distribution centers Nationwide,

14   including McKesson Washington Courthouse,

15   Ohio, distribution center, McKesson

16   Livonia, Lakeland, and Aurora."

17              Do you see that?

18        A.    Yes.

19        Q.    On Page 2, you see Bullet

20   Point Number 7?

21        A.    Page 2, Number 7.

22        Q.    It cites that, "On" -- "On

23   or about November 14, 2014, McKesson

24   received a letter dated November 4, 2014,

Highly Confidential - Subject to Further Confidentiality Review

1    from the DEA stating the DEA was

2    separately pursuing administrative action

3    against McKesson-Aurora for the conduct

4    outlined in the August 13, 2014, letter."

5              Do you see that?

6        A.    Yes.

7        Q.    And they go --

8        A.    The prior letter?

9        Q.    Right.

10       A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

2          Q.     Go on to Page 3.  As part of

3     this agreement, McKesson did accept

4     responsibility.  You're aware of that,

5     right?

6          A.     I'm not sure the details of

7     the settlement.

8          Q.     Well, let's look at

9     bullet --

10         A.     You're talking about Number

11    2 there?

12         Q.     Right.  Number 2, acceptance

13    of responsibility.

14         A.     Mm-hmm.

15         Q.     The -- halfway down, it

16    says, "McKesson acknowledges that at

17    various times during the period from

18    January 1, 2009, up through and including

19    the effective date of this agreement, it

20    did not identify or report to DEA certain

21    orders placed by certain pharmacies which

22    should have been detected by McKesson as

23    suspicious based on the guidance

24    contained in the DEA letters about the

Highly Confidential - Subject to Further Confidentiality Review

1    requirements set forth in the CSA, right?

2         A.    Yes.

3         Q.    Underneath that on or

4    about -- excuse me.  Strike that.



11              MR. SCHMIDT:  Object to the

12         characterization.

Highly Confidential - Subject to Further Confidentiality Review



2          MR. SCHMIDT:   Object to the

3     characterization.

15          MR. SCHMIDT:   Object to the

16     characterization.

Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Same

11     objection.

12          THE WITNESS:  Can you repeat

13     the question?

14 BY MR. BOWDEN:

15          Q.    Sure.  Another item they

16 took issue with was the fact that

17 McKesson should have been reporting

18 suspicious orders and was failing to do

19 so, right?

20          A.    Yes.

21          Q.    And if you go down to the

22 bottom of Page 3, says, "McKesson failed

23 to maintain effective controls against

24 diversion of particularly controlled

1   substances into other legitimate medical,

2   scientific, and industrial channels by

3   sales of certain" -- "by sales to certain

4   of its customers in violation of the CSA

5   and the CSA implementing regulations."

6            Do you see that?

7       A.    Yes.

8       Q.    And then it gives a list of

9   some of those distribution centers that

10  failed to maintain effective controls

11  against diversions, right?

12      A.    Yes.

13      Q.    And Lakeland, Florida, is

14  one of those distribution centers, right?

15      A.    I see that.

16      Q.    And Lakeland, Florida, was

17  one of the distribution -- distribution

18  centers of which you had responsibility

19  for during that time period, right?

20      A.    Yes.

21      Q.    In fact, during that entire

22  time period from 2008 up until this

23  agreement was signed in 2017, you had

24  responsibility for Lakeland, Florida,

1   right?

2          A.     From a regulatory

3   perspective?

4          Q.     Correct.

5          A.     Yes.

6          Q.     Now, as a result of this

7   action, if you turn to Page 7, bullet

8   point G.  G, yes.

9                 "McKesson agrees that its

10  authority to distribute controlled

11  substances containing the drug code for

12  Schedule II hydromorphone products, that

13  is DEA drug code 9150 from its

14  McKesson-Lakeland distribution center,

15  DEA certificate of registration

16  PM0000771, will be suspended for a period

17  of one year commencing from the effective

18  date of the agreement except for orders

19  placed by permitted registrants."

20                Do you see that there?

21         A.     I do.

22         Q.     So as part of the penalty

23  for Lakeland distribution center not

24  appropriately sending suspicious order

Highly Confidential - Subject to Further Confidentiality Review

1    reports to the DEA, their license to

2    distribution center Schedule II products

3    was suspended for a period of one year,

4    right?

5              MR. SCHMIDT:  I'll object to

6         the characterization.

7              THE WITNESS:  Hydrocodone,

8         or hydromorphone?

9    BY MR. BOWDEN:

10        Q.    Hydromorphone.

11        A.    Was suspended for one year.

12   So that was a very narrow -- that's --

13   that's one base code.

18        Q.    Okay.  And ultimately, as a

19   result of the settlement agreement,

20   McKesson agreed to pay $150 million fine,

21   correct?

22        A.    Yes.

23              MR. BOWDEN:  Take a break.

24              THE VIDEOGRAPHER:  Remove

Highly Confidential - Subject to Further Confidentiality Review

1    your microphones.  The time is

2    6:02 p.m.  Going off the record.

3              (Short break.)

4              THE VIDEOGRAPHER:  We are

5    back on the record.  The time is

6    6:14 p.m.

7                    -  -  -

8              EXAMINATION

9                    -  -  -

10   BY MR. SCHMIDT:

11        Q.    Mr. Mahoney, my name is Paul

12   Schmidt.  I represent McKesson in this

13   case.  We've been here for a very long

14   day.  We're now into the evening, and

15   upside, so I'm going to be targeted in my

16   questions to you.

17              Can you tell the jury how

18   long you have been at McKesson.

19        A.    Almost 18 years.  17 to

20   18 years.

21        Q.    And what is it about your

22   work at McKesson that's made you stay

23   there for that period of time?

24        A.    Has good culture, and I

Highly Confidential - Subject to Further Confidentiality Review

1    think the mission is something that I

2    enjoy, empowering healthcare.

3          Q.    Can you describe for the

4    jury the role that McKesson

5    Pharmaceutical place in how prescription

6    medicines get from the companies that

7    make them to patients?

8          A.    McKesson buys

9    pharmaceuticals from lots of different

10   manufacturers and brings them into our

11   local DC where customers, i.e.,

12   pharmacies and hospitals, are able to

13   order them for next-day delivery so they

14   have them when they need them.

15         Q.    Does McKesson

16   Pharmaceutical's work focus on

17   interacting directly with doctors?

18         A.    Not generally, no.

19         Q.    Do you have an understanding

20   of -- about whether when McKesson ships a

21   prescription medicine to a pharmacy, a

22   patient is only able to get that medicine

23   from the pharmacy if they've seen a

24   doctor and the doctor has made a judgment

Highly Confidential - Subject to Further Confidentiality Review

1    that that patient should get a

2    prescription for that medicine?

3            MR. BOGLE:  Object to form.

4            THE WITNESS:  McKesson

5        provides the supply for pharmacies

6        who are responding to scripts that

7        patients bring them generated by a

8        doctor.

9    BY MR. SCHMIDT:

10       Q.    If a physician is writing

11   more prescriptions for opioids, does that

12   increase the overall distribution level

13   for opioids?

14           MR. BOGLE:  Object to form.

15           THE WITNESS:  Can you repeat

16       that.

17   BY MR. SCHMIDT:

18       Q.    Yeah, if physicians write

19   more prescriptions for opioids, does that

20   increase the overall level of

21   distribution of opioids?

22       A.    Yes.

23           MR. BOGLE:  Object to form.

24   BY MR. SCHMIDT:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Does your level of

2    distribution follow from what

3    prescriptions do, or do you actually

4    influence what prescriptions -- what

5    physicians do?

6              MR. BOGLE:  Object to form.

7    BY MR. SCHMIDT:

8        Q.    And let me re-ask it.  I

9    think I misspoke in my question.

10              Does your level of

11    distribution follow from decisions that

12    physicians make, or do you actually

13    influence the decisions physicians

14    make --

15              MR. BOGLE:  Object to form.

16    BY MR. SCHMIDT:

17        Q.     -- in terms of prescribing

18    medicines?

19        A.    In the distribution center

20    we don't have any influence on

21    prescribing habits.  We are just

22    responding to what is pulled from us by

23    the pharmacies.

24        Q.    Is this role that you've

Highly Confidential - Subject to Further Confidentiality Review

1    been talking about true for opioids as

2    well as other prescription medicines that

3    McKesson distributes?

4           A.    Yes.

5           Q.    And can you give us a sense

6    of whether, from your experience, opioids

7    are a substantial majority, a majority, a

8    minority, a substantial minority of the

9    medicines that McKesson distributes?

10                MR. BOGLE:  Object to form.

11                THE WITNESS:  Substantial

12          minority.

13   BY MR. SCHMIDT:

14          Q.    Do you have an understanding

15   of the responsibility that a pharmacy has

16   in terms of when they pass along an

17   opioid to a patient that they have

18   purchased from McKesson?

19          A.    Do I --

20                MR. BOGLE:  Object to form.

21   BY MR. SCHMIDT:

22          Q.    Do you understand the

23   responsibility that a pharmacy has when

24   they pass along an opioid purchased from

1    McKesson to a patient?

2          A.    Yes.  They have

3    corresponding responsibility.

4          Q.    Is part of your work -- does

5    part of your work involve trying to

6    identify where pharmacies might not be

7    meeting their responsibilities in terms

8    of whether you interact with those

9    pharmacies?

10         A.    Yes.

11         Q.    And you've discussed

12   McKesson's regulatory programs today.  Am

13   I understanding correctly from your

14   testimony over the course of the day that

15   McKesson's programs for doing diligence

16   into pharmacies have changed over time?

17         A.    Yes.

18         Q.    Have developed?

19         A.    Yes.

20         Q.    What are those changes made

21   in response to?

22         A.    They've been made to give us

23   greater granularity of what we see in a

24   pharmacy as they are buying from us and

Highly Confidential - Subject to Further Confidentiality Review

1    dispensing to their patients.

2        Q.    Are those changes made as

3    you develop more information about

4    practices with regards to opioids,

5    concerns about diversions, information

6    you get from your diligence, things like

7    that?

8              MR. BOGLE:  Object to form.

9              THE WITNESS:  Yes.

10   BY MR. SCHMIDT:

16        Q.    Do you have a view as to

17   whether that's a good thing to try to

18   improve your processes over time?

19              MR. BOGLE:  Object to form.

20              THE WITNESS:  It's

21         absolutely a good thing.

22   BY MR. SCHMIDT:

23        Q.    Let's take one example.  You

24   have Exhibit 26, please.

Highly Confidential - Subject to Further Confidentiality Review

1       MR. BOGLE:  Can you give me

2   the corresponding -- the other

3   exhibit number at the bottom?

4       MR. SCHMIDT:  The Bates

5   number?

6       MR. BOGLE:  No.

7       MR. SCHMIDT:  It's 1743, I

8   think you're thinking of.

9       MR. BOGLE:  Yeah.

10  BY MR. SCHMIDT:

11      Q.   And if you look at Page 26

12  of this exhibit.

13      A.   26?

Highly Confidential - Subject to Further Confidentiality Review



6          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



6          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



10          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



11          MR. BOGLE:  Object to form.



Highly Confidential - Subject to Further Confidentiality Review



14              MR. BOGLE:   Object to form.



Highly Confidential - Subject to Further Confidentiality Review



3          MR. BOGLE:  Object to form.

4    BY MR. SCHMIDT:

17   BY MR. SCHMIDT:

21          MR. BOGLE:  Object to form.

22   BY MR. SCHMIDT:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



3          MR. BOGLE:  Object to form.

6  BY MR. SCHMIDT:

7          Q.    Do you have Exhibit 1 handy?

8  Do you remember being asked questions

9  about this 2006 letter from the DEA by

10  the plaintiff lawyer?

11          A.    Yes.

12          Q.    And if you look at the

13  second page of this letter -- it's 1464.

14  If you look at the second page of this

15  letter, about halfway down the letter,

16  before and after the block quote is

17  language getting at this idea of blocking

18  orders.  Do you see that?  Do you

19  remember being asked questions about

20  that?

21          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



4                    MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



14          MR. BOGLE:  Object to form.



7          MR. BOGLE:  Object to form.

22          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



```
22        Q.    In the time that you've

23  served as director of regulatory affairs,

24  am I correct that your territory is
```

Highly Confidential - Subject to Further Confidentiality Review

1   focused on the Southeastern United

2   States?

3        A.    That's true.

4        Q.    Have you, other than filling

5   in for people or doing backup duty,

6   has -- has the primary focus of your work

7   ever been on Ohio?

8        A.    Well --

9        Q.    On Cuyahoga County or Summit

10  County in Ohio?

14       Q.    Did you have primary

15  responsibility for opening or closing any

16  pharmacies in Cuyahoga or Summit County?

17       A.    No, I didn't.

Highly Confidential - Subject to Further Confidentiality Review



9          MR. BOGLE:   Object to form.

Highly Confidential - Subject to Further Confidentiality Review



22        MR. BOGLE:  Object to form.

23   BY MR. SCHMIDT:

24        Q.    So let me re-ask the

Highly Confidential - Subject to Further Confidentiality Review





8        MR. SCHMIDT:  Does someone

9    have the last exhibit number?

10    I'll call this Exhibit 50.

11        (Document marked for

12    identification as Exhibit

13    Mahoney-50.)

14  BY MR. SCHMIDT:

15    Q.    I've marked as Exhibit 50 a

16  document --

17        MR. SCHMIDT:  I'll pass it

18    down.  I'm sorry, I need that

19    back.  Apologies.

20  BY MR. SCHMIDT:

21    Q.    I've marked as Exhibit 50 a

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



10          MR. BOGLE:  Object to form.

11     BY MR. SCHMIDT:

Highly Confidential - Subject to Further Confidentiality Review



11          MR. BOGLE:   Object to form.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



4          Q.      I've marked as Exhibit 51 --

5                  MR. SCHMIDT:  Thank you.

6                  (Document marked for

7          identification as Exhibit

8          Mahoney-51.)

9      BY MR. SCHMIDT:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



8          MR. BOGLE:   Object to form.

Highly Confidential - Subject to Further Confidentiality Review



14          MR. BOGLE:  Object to form.

15     BY MR. SCHMIDT:

Highly Confidential - Subject to Further Confidentiality Review



8          First off, prior to 2006,

9   was Lakeland responsible for supplying

10  opioids to Summit County, Ohio or

11  Cuyahoga County, Ohio?

12          A.    No.

21          MR. BOGLE:  Object to form.

22  BY MR. SCHMIDT:

Highly Confidential - Subject to Further Confidentiality Review



5            MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



21          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



14          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



4          Q.     Let's look at Exhibit 9,

7                 Do you see that?

8          A.     Yes.

9                 MR. BOGLE:  What's the --

10         what's the number?

11                MR. SCHMIDT:  1963.

12    BY MR. SCHMIDT:

13         Q.     Do you see that,

14    Mr. Mahoney?

15         A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review



6            MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



5          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



14          MR. BOGLE:  Objection to

15          form.

Highly Confidential - Subject to Further Confidentiality Review



21          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



21      Q.    Let me ask you about a

22   couple other exhibits.  Exhibit 11,

23   please.

24            Do you have that in front of

Highly Confidential - Subject to Further Confidentiality Review

1    you?

2              MR. BOGLE:  What's the

3         cross-reference?

4              MR. SCHMIDT:  1947.

5    BY MR. SCHMIDT:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18    Q.    Do you have Exhibit 16 and

19  17 in front of you?

20    A.    Yes.

21    Q.    These are, I believe, web

22  page articles that the plaintiff lawyer

23  said he pulled down and asked you

24  questions about.  Do you have any way to

Highly Confidential - Subject to Further Confidentiality Review

1   vouch for the accuracy of what they

2   report?

3        A.    I don't.



15            MR. BOGLE:  Same objection.

16   BY MR. SCHMIDT:

Highly Confidential - Subject to Further Confidentiality Review

5          MR. BOGLE:  Object to form.

6     BY MR. SCHMIDT:

7          Q.     Do you have in front of you

8     Exhibit 19, the agreement in 2008?

9          A.     Yes.

10         Q.     Look with me if you would at

11    Page 2 of the document.  It's 889.  Do

12    you see where it says, "No admission or

13    concession"?

14         A.     Yes.

15         Q.     Tell me if I read this

16    correctly:  "This agreement is neither an

17    admission by McKesson of liability or of

18    any allegations made by DEA in the orders

19    and investigations nor a concession by

20    DEA that its allegations in the orders of

21    investigations are not well founded."

22               Did I read that correctly?

23         A.     Yes.

24         Q.     If you look at Page 0714 of

1    this document.  Down below.  14 at the

2    top?

3             A.    That's easier.

4             Q.    I'm going to read

5    Paragraph 9 and ask you if I've read this

6    correctly.  "By entering into this

7    agreement McKesson does not admit to the

8    violations alleged as a result of any DEA

9    investigation or to any violation of law,

10   liability, fault, misconduct or

11   wrongdoing.  McKesson explicitly denies

12   any allegations of violations of the CSA

13   or DEA regulations and represents that

14   the company has defenses to the

15   violations alleged by the government."

16             Did I read that correctly?

17             A.    Yes.

22             MR. BOGLE:  Object to form.

23   BY MR. SCHMIDT:

24             Q.    Just a few more.

Highly Confidential - Subject to Further Confidentiality Review

1          Do you have exhibit -- do

2     you have Exhibit 3 in front of you?  851.

3          A.    Yes.

4          Q.    Turn with me if you would to

5     Page 18.  Do you remember being called --

6     asked questions about this slide deck?

7          A.    18, 19?

19          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12          MR. BOGLE:  Object to form.

13    BY MR. SCHMIDT:

22          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



16          MR. BOGLE:  Sorry, what was

17      the cross-reference?

18          MR. SCHMIDT:  1355.

Highly Confidential - Subject to Further Confidentiality Review



17                      MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



21        MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



10      BY MR. SCHMIDT:

Highly Confidential - Subject to Further Confidentiality Review



16          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



15          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



11          MR. SCHMIDT:  That's all I

12     have, Mr. Mahoney.  Thank you.

13          MR. BOGLE:  I've got some

14     follow-up, and you guys have a

15     chance to ask questions if you

16     want.  I just want to mark the

17     time.  Let's go off the record.

18          THE VIDEOGRAPHER:  Sure.

19     Okay.  The time is 7:05 p.m.

20     Going off the record.

21          (Short break.)

22          THE VIDEOGRAPHER:  We are

23     back on the record.  The time is

24     7:09 p.m.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                - - -

 2               EXAMINATION

 3                - - -

 4  BY MR. BOGLE:

 5       Q.    Mr. Mahoney, I have a few

 6  follow-up questions for you.  I know you

 7  probably want to get out of here.  So you

 8  were asked some questions about when

 9  McKesson supplies drugs to pharmacies.  I

10  think you provided testimony along the

11  lines of that McKesson only distributes

12  when there's a prescription from a

13  doctor, right?

14       A.    I think what I was saying is

15  that we -- we don't -- we don't push the

16  drugs.  We respond to orders from

17  pharmacists who are filling scripts from

18  doctors.
```

Highly Confidential - Subject to Further Confidentiality Review



8          MR. SCHMIDT:  Objection.

9      Foundation.

1          MR. SCHMIDT:   Objection.

2      Form.



13          MR. SCHMIDT:   Objection.

14      Form.

Highly Confidential - Subject to Further Confidentiality Review



21          MR. SCHMIDT:  Objection.

22     Characterization.

Highly Confidential - Subject to Further Confidentiality Review



```
10          MR. SCHMIDT:  Objection.
11     Characterization.
```

Highly Confidential - Subject to Further Confidentiality Review



15          MR. SCHMIDT:  Objection to

16     the characterization.

17 BY MR. BOGLE:

18          Q.    You recall that discussion,

19 don't you?

20          A.    Yes, I recall that

21 discussion.

Highly Confidential - Subject to Further Confidentiality Review



13    Q.    Okay.  And you were asked

14  some questions about the 2008 settlement

15  agreement and whether McKesson accepted

16  liability or responsibility for those

17  actions outlined in the agreement.  Do

18  you recall that?

19    A.    Yes.

20    Q.    Okay.  I believe you

21  testified that there was no admission of

22  guilt.  Something to that effect, right?

23    A.    That was just asked, right?

24    Q.    Right, right.  By your

Highly Confidential - Subject to Further Confidentiality Review

1  counsel.

2          A.     Right.

3          Q.     And so, listen, in your

4  experience at 18 years at McKesson, does

5  the company routinely pay

6  $13-plus-million fines for things that

7  they didn't do?

8               MR. SCHMIDT:  Objection.

9          Foundation.

10              THE WITNESS:  I don't

11         believe so.

12  BY MR. BOGLE:

21              Q.     They don't have to roll over

22  and just say we quit, right?

23              MR. SCHMIDT:  Objection.

24         Foundation.  Calls for a legal

Highly Confidential - Subject to Further Confidentiality Review

1    conclusion.

2    BY MR. BOGLE:

10        Q.    Right.  And McKesson quit on

11   that fight, right?

12            MR. SCHMIDT:  Object to

13        characterization.

14            THE WITNESS:  There was a

15        settlement.

16   BY MR. BOGLE:

17        Q.    Right.  $13-plus-million

18   settlement, right?

19            MR. SCHMIDT:  Objection.

20        Asked and answered.

21            THE WITNESS:  Yes.

22   BY MR. BOGLE:



 6              MR. SCHMIDT:  Objection,

 7        calls --

 8   BY MR. BOGLE:

 9        Q.    They didn't have to settle?

10              MR. SCHMIDT:  Objection.

11        Calls for a legal conclusion.

12   BY MR. BOGLE:

13        Q.    True?

14        A.    That's my understanding.

Highly Confidential - Subject to Further Confidentiality Review



7    Q.    You were asked -- I'm trying

8  to find the exhibit number.  1.1962 which

9  is Exhibit 25.  If you can track that one

10 down.

Highly Confidential - Subject to Further Confidentiality Review



10          MR. SCHMIDT:  Objection.

11     Foundation.

Highly Confidential - Subject to Further Confidentiality Review



```
 5              MR. SCHMIDT:  Object to the
 6         preamble; move to strike the
 7         preamble.  Object to form.
 8    BY MR. BOGLE:
```

```
22              MR. SCHMIDT:  Objection to
23         form.
```

Highly Confidential - Subject to Further Confidentiality Review



12          MR. SCHMIDT:  Objection to

13      form.

Highly Confidential - Subject to Further Confidentiality Review



23          MR. SCHMIDT:   Objection.

24      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



7          MR. SCHMIDT:  Objection.

8      Vague.

17          MR. SCHMIDT:  Objection.

18      Form.

23   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



8          MR. SCHMIDT:  Objection.

9      Form.

24          MR. SCHMIDT:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1            Form.   Vague as to time.

2      BY MR. BOGLE:

3            Q.     Any time.

4                  MR. SCHMIDT:  Objection to

5            form.

6      BY MR. BOGLE:

20                 MR. SCHMIDT:   Objection.

21           Asked and answered three or four

22           times now.

Highly Confidential - Subject to Further Confidentiality Review



7           MR. SCHMIDT:  Objection.

8      Form.  Foundation.

9   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



1        MR. SCHMIDT:  Let him finish

2      his answer, please.

13         MR. SCHMIDT:  Objection.

14      Form.  Asked and answered.

Highly Confidential - Subject to Further Confidentiality Review



6            MR. SCHMIDT:  Objection.

7      Foundation.  Vague as to time.

8  BY MR. BOGLE:

9      Q.    Anytime.

10           MR. SCHMIDT:  Objection.

11     Foundation.  Asked and answered.

Highly Confidential - Subject to Further Confidentiality Review



MR. SCHMIDT:  I'll just
object to the lecturing of the
witness.  It's not inappropriate.
I'll move to strike the preamble.
Asked and answered.  Form.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



3           MR. SCHMIDT:  Object to

4     characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20        MR. BOGLE:  How much time

21    have I used?

22            THE VIDEOGRAPHER:

23    20 minutes.

24    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I'm going to hand you what

2    I'm marking as Exhibit 43.    Also marked

3    as 1.1864.

4              (Document marked for

5              identification as Exhibit

6              Mahoney-43.)

7    BY MR. BOGLE:

12             MR. SCHMIDT:  I'm just going

13        to enter an objection on the

14        scope.  I think this is well

15        outside the scope of anything that

16        I did.  If I could have a running

17        objection.

18             MR. BOGLE:  He raised the

19        issue.  I wasn't going to go here,

20        but he raised the issue.

21             MR. SCHMIDT:  I still think

22        it's outside the scope.  May I

23        have a running objection?

24             MR. BOGLE:  Sure.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20          MR. SCHMIDT:  Object to the

21     characterization.  Foundation.

22     BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



12    MR. SCHMIDT:  Object to

13    foundation.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. SCHMIDT:  Objection.

2     Foundation.

3  BY MR. BOGLE:



Highly Confidential - Subject to Further Confidentiality Review



7          MR. SCHMIDT:   Object to

8    characterization.   Foundation.

22         MR. SCHMIDT:   Objection.

23   Characterization.

Highly Confidential - Subject to Further Confidentiality Review

10   BY MR. BOGLE:

11          Q.    Okay.   It wasn't absolute

12   meaning that there was no -- it was up to

13   the distribution center itself to decide

14   whether they wanted to fill above the

15   8,000 level.   There was no hard blocking,

16   right?

17          A.    There was no hard blocking.

18                MR. SCHMIDT:   Object to the

19          characterization.

20   BY MR. BOGLE:

21          Q.    You were asked about

22   Exhibit 1.1464, which was Exhibit 1 to

23   the deposition.   It's the September 27,

24   2006, letter from Mr. Rannazzisi.   You

Highly Confidential - Subject to Further Confidentiality Review

1    again talked about the reference to

2    potentially blocking orders being new in

3    this letter.  Do you recall saying that?

4           A.    Yes.

10          MR. SCHMIDT:  Objection.

11    Foundation.

12    BY MR. BOGLE:

23          Q.    Okay.  Well, you're familiar

24    with the statistic I believe that's even

1  on McKesson's website that one-third of

2  all pills distributed in the United

3  States come from your company, right?

4  Are you familiar with that stat?

5      A.   I'm not sure that I've seen

6  it on the website.  But I know that our

7  market share is roughly in line with

8  that.

9      Q.   Right.  So to say that you

10 guys at McKesson don't have an impact on

11 the amount of pills, and specifically

12 controlled substances that might appear

13 in any region in this country, is a bit

14 overstated if you guys, in fact, supply

15 one out of every three pills in the

16 United States, right?

17          MR. SCHMIDT:  Objection.

18      Characterization.

19          THE WITNESS:  I think that

20      an expression of our market share

21      in saying that one out of every

22      three opioids, I don't see the

23      linkage there necessarily as cause

24      and effect.

Highly Confidential - Subject to Further Confidentiality Review



1    BY MR. BOGLE:

7             MR. SCHMIDT:  Objection.

8    Foundation.

23            MR. SCHMIDT:  And I think he

24   did answer your question.  Asked

Highly Confidential - Subject to Further Confidentiality Review

1          and answered.

2      BY MR. BOGLE:



11              MR. SCHMIDT:  Objection.

12      Compound.  And form.

Highly Confidential - Subject to Further Confidentiality Review



6          MR. SCHMIDT:  Objection.

7      Objection.  Argumentive.

16          MR. SCHMIDT:  Objection.

17      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



2          MR. SCHMIDT:  Objection.

3      Foundation.

16          MR. SCHMIDT:  Objection to

17      characterization.



2          MR. SCHMIDT:  Objection.

3     Form.

14          MR. SCHMIDT:  Objection.

15     Argumentive.

Highly Confidential - Subject to Further Confidentiality Review



17          MR. SCHMIDT:   Objection.

18      Foundation.

Highly Confidential - Subject to Further Confidentiality Review



23          MR. SCHMIDT:  Objection.

24      Foundation.  Characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



10        MR. SCHMIDT:  Objection.

11    Asked and answered.

23        MR. SCHMIDT:  Were you --

24    were you finished with your

Highly Confidential - Subject to Further Confidentiality Review

1    answer?



12    MR. SCHMIDT:  Object to

13    characterization.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12          MR. SCHMIDT:  Objection.

13     Characterization.

14  BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



```
10          MR. SCHMIDT:  Objection.

11     Characterization.

12     BY MR. BOGLE:
```

```
20          MR. BOGLE:  No further

21     questions.

22          MR. SCHMIDT:  I just need a

23     minute.

24          THE VIDEOGRAPHER:  Off the
```

Highly Confidential - Subject to Further Confidentiality Review

1    record, right?  The time is

2    7:46 p.m.  Going off the record.

3              (Short break.)

4              THE VIDEOGRAPHER:  The time

5    is 7:49 p.m.  Back on the record.

6                   -   -   -

7              EXAMINATION

8                   -   -   -

9    BY MR. SCHMIDT:

17             MR. BOGLE:  Object to form.



11          MR. SCHMIDT:  Thank you.

12     That's all.

13          MR. BOGLE:  Got nothing.

14          THE VIDEOGRAPHER:  Okay.

15     Stand by, please.  This marks the

16     end of today's deposition.  The

17     time is 7:50 p.m.  Off the record.

18          (Excused.)

19          (Deposition concluded at

20     approximately 7:50 p.m.)

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2                  CERTIFICATE

 3

 4

 5          I HEREBY CERTIFY that the
       witness was duly sworn by me and that the
 6     deposition is a true record of the
       testimony given by the witness.

 7

              It was requested before
 8     completion of the deposition that the
       witness, WILLIAM DE GUTIERREZ-MAHONEY,
 9     have the opportunity to read and sign the
       deposition transcript.

10

11

12
            _____
            MICHELLE L. GRAY,
13          A Registered Professional
            Reporter, Certified Shorthand
14          Reporter, Certified Realtime
            Reporter and Notary Public
15          Dated:  December 3, 2018

16

17

18          (The foregoing certification
19     of this transcript does not apply to any
20     reproduction of the same by any means,
21     unless under the direct control and/or
22     supervision of the certifying reporter.)

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1          INSTRUCTIONS TO WITNESS

2

3              Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8              After doing so, please sign

9    the errata sheet and date it.

10              You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14              It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
1                    –   –   –   –   –   –

                      E  R  R  A  T  A

2                    –   –   –   –   –   –

3

4      PAGE   LINE    CHANGE

5    _____  _____    _____

6       REASON:  _____

7    _____  _____    _____

8       REASON:  _____

9    _____  _____    _____

10      REASON:  _____

11   _____  _____    _____

12      REASON:  _____

13   _____  _____    _____

14      REASON:  _____

15   _____  _____    _____

16      REASON:  _____

17   _____  _____    _____

18      REASON:  _____

19   _____  _____    _____

20      REASON:  _____

21   _____  _____    _____

22      REASON:  _____

23   _____  _____    _____

24      REASON:  _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3
 4              I,_____, do
 5    hereby certify that I have read the
 6    foregoing pages, 1 - 606, and that the
 7    same is a correct transcription of the
 8    answers given by me to the questions
 9    therein propounded, except for the
10    corrections or changes in form or
11    substance, if any, noted in the attached
12    Errata Sheet.
13
14
15    _____
16     WILLIAM DE GUTIERREZ-MAHONEY       DATE
17
18
19    Subscribed and sworn
      to before me this
20    _____ day of _____, 20_____.
21    My commission expires:_____
22

      _____
23    Notary Public
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      LAWYER'S NOTES

 2      PAGE   LINE

 3      _____  _____   _____

 4      _____  _____   _____

 5      _____  _____   _____

 6      _____  _____   _____

 7      _____  _____   _____

 8      _____  _____   _____

 9      _____  _____   _____

10      _____  _____   _____

11      _____  _____   _____

12      _____  _____   _____

13      _____  _____   _____

14      _____  _____   _____

15      _____  _____   _____

16      _____  _____   _____

17      _____  _____   _____

18      _____  _____   _____

19      _____  _____   _____

20      _____  _____   _____

21      _____  _____   _____

22      _____  _____   _____

23      _____  _____   _____

24      _____  _____   _____
```