Page 1

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF OHIO

3                  EASTERN DIVISION

4

5                ~~~~~~~~~~~~~~~~~

6

  IN RE NATIONAL PRESCRIPTION OPIATE     MDL No. 2804

7 LITIGATION

                                         Case No. 17-md-2804

8

  This document relates to:             Judge Dan

9                                        Aaron Polster

  The County of Cuyahoga v. Purdue

10 Pharma L.P., et al.

  Case No. 17-OP-45005

11

12               ~~~~~~~~~~~~~~~~~

13

14           Videotaped Deposition of

15              TREVOR McALEER

16

17            January 10, 2019

18               9:06 a.m.

19

20               ~~~~~~~~~~~~~~~~~

21

22               Taken at:

           Climaco, Wilcox, Peca & Garofoli

23          55 Public Square, Suite 1950

                Cleveland, Ohio

24

25

Page 2

```
 1
 2
 3
 4
 5
 6
 7              ----------------
 8         Videotaped Deposition of TREVOR McALEER,
 9  taken before GREG S. WEILAND, CSR, RMR, CRR,
10  pursuant to the Federal Rules of Civil Procedure for
11  the United States District Court pertaining to the
12  taking of depositions, at Suite 1950, 55 Public
13  Square, in the City of Cleveland, Ohio, commencing
14  at 9:06 o'clock a.m., on the 10th day of January,
15  2019.
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1  PRESENT (CONTINUED):
 2
 3  ON BEHALF OF DEFENDANT CARDINAL HEALTH, INC.:
 4      WILLIAMS & CONNOLLY, LLP
 5      BY: MR. MATTHEW P. MOONEY
 6        725 Twelfth Street, N.W.
 7        Washington, D.C. 20005
 8        (202) 434-5421
 9        Email: mmooney@wc.com
10
11  ON BEHALF OF DEFENDANT McKESSON CORPORATION:
12      COVINGTON & BURLING LLP
13      BY: MS. LAENA ST-JULES
14        The New York Times Building
15        620 Eighth Avenue
16        New York, New York 10018
17        (212) 841-1201
18        Email: lstjules@cov.com
19
20
21
22
23
24
25
```

Page 3

```
 1  PRESENT:
 2
 3  ON BEHALF OF PLAINTIFF CUYAHOGA COUNTY:
 4      NAPOLI SHKOLNIK PLLC
 5      BY: MS. SHAYNA E. SACKS
 6        360 Lexington Avenue
 7        11th Floor
 8        New York, New York 10017
 9        (212) 397-1000
10        Email: ssacks@napolilaw.com
11          - and -
12      NAPOLI SHKOLNIK PLLC
13      BY: MS. MARIA FLEMING
14        55 Public Square
15        Suite 2100
16        Cleveland, Ohio 44113
17        (212) 397-1000
18        Email: mfleming@napolilaw.com
19
20
21
22
23
24
25
```

Page 5

```
 1  PRESENT (CONTINUED):
 2
 3  ON BEHALF OF DEFENDANT WALMART INC , f/k/a WAL-MART
 4  STORES, INC :
 5      JONES DAY
 6      BY: MS  LISA B  GATES
 7        901 Lakeside Avenue
 8        Cleveland, Ohio 44114
 9        (216) 586-7154
10        Email: lgates@jonesday.com
11
12  ON BEHALF OF DEFENDANTS JOHNSON & JOHNSON; JANSSEN
13  PHARMACEUTICALS, INC ; ORTHO-McNEIL-JANSSEN
14  PHARMACEUTICALS, INC  n/k/a JANSSEN PHARMACEUTICALS,
15  INC ; JANSSEN PHARMACEUTICA INC  f/k/a JANSSEN
16  PHARMACEUTICALS, INC :
17      TUCKER & ELLIS LLP
18      BY: MR  JUSTIN E  RICE
19        950 Main Avenue
20        Suite 1100
21        Cleveland, Ohio 44113
22        (216) 696-3670
23        Email: justin.rice@tuckerellis com
24
25
```

2 (Pages 2 - 5)

Page 6

1 PRESENT (CONTINUED):

2

3 ON BEHALF OF DEFENDANTS ENDO HEALTH SOLUTIONS INC ;

4 ENDO PHARMACEUTICALS INC ; PAR PHARMACEUTICAL, INC ;

5 and PAR PHARMACEUTICAL COMPANIES, INC :

6   BAKER HOSTETLER

7   MR  KENNETH G  PRABUCKI (via teleconference)

8   127 Public Square

9   Suite 2000

10   Cleveland, Ohio 44114

11   (216) 861-7718

12   Email: kprabucki@bakerlaw com

13

14 ALSO PRESENT:

15   MR  KURT HENSCHEL, The Videographer

16

17

18

19

20

21

22

23

24

25

Page 7

1          INDEX

2 January 10th, 2019

3 TESTIMONY OF TREVOR McALEER

4           PAGE

5 Examination by Mr. Mooney ........................12

6 Examination by Mr. Rice .........................329

7 Examination by Ms. Gates ........................334

8    DEPOSITION EXHIBITS

9 NUMBER    DESCRIPTION    PAGE

10 Exhibit 1   Email sent on 10/26/2012,   133

11   Subject: Status Update, with

12   attachment, Bates labeled

13   CUYAH_014537372 through

14   014537375

15 Exhibit 2   Email sent on 9/23/2013,   142

16   Subject: September 2013 Staff

17   Report, with attachments, Bates

18   labeled CUYAH_014394979 through

19   14394984

20 Exhibit 3   Email sent on 10/8/2013, with   191

21   attachment, Subject: Fwd: 2014

22   - 2015 Biennial Budget Hearing

23   Schedule, Bates labeled

24   CUYAH_014434268 through

25   014434275

Page 8

1   DEPOSITION EXHIBITS (CONTINUED)

2 NUMBER    DESCRIPTION    PAGE

3 Exhibit 4   Email sent on 11/19/2013,   226

4   Subject: ADAMHS Board Response

5   to County Council Follow-up

6   Questions, with attachments,

7   Bates labeled CUYAH_014408184

8   through 014408193

9 Exhibit 5   County Council of Cuyahoga   242

10   County, Ohio, Resolution No.

11   R2017-0182, Bates labeled

12   CUYAH_002426252 through

13   002426279

14 Exhibit 6   Email sent January 18, 2017,   265

15   through January 20, 2017,

16   Subject: OBM Fiscal Items for

17   1-24-2017 Council Agenda, Bates

18   labeled CUYAH_001730354 through

19   001730356

20 Exhibit 7   Emails sent on 11/14/2012 and   273

21   11/16/2012, Subject: Re: Public

22   Safety Meeting, Bates labeled

23   CUYAH_014486084 through

24   014486085

25

Page 9

1   DEPOSITION EXHIBITS (CONTINUED)

2 NUMBER    DESCRIPTION    PAGE

3 Exhibit 8   Emails sent on 11/16/2012,   279

4   Subject: 2013 Budget Follow Up,

5   Bates labeled CUYAH_014507122

6   through 14507123

7 Exhibit 9   Minutes, Cuyahoga County Public   284

8   Safety Committee Meeting,

9   Tuesday, November 27, 2012, no

10   Bates labels

11 Exhibit 10   Emails sent in August 2013,   291

12   Subject: Re: Fwd: town halls,

13   Bates labeled CUYAH 014394784

14 Exhibit 11   Emails sent 2/25/2014 and   296

15   2/27/2014, Subject: Fwd: Cuy Co

16   Opiate Efforts, Bates labeled

17   CUYAH_014391077 through

18   014391078, and attachment

19   produced in native format Bates

20   labeled CUYAH 014391079

21

22

23

24

25

3 (Pages 6 - 9)

1    DEPOSITION EXHIBITS (CONTINUED)
2  NUMBER        DESCRIPTION        PAGE
3  Exhibit 12    Emails sent on 4/22/2014,    311
4         Subject: Dettelbach: Cuyahoga
5         Approach on Heroin "Needs to Be
6         the National Model", Bates
7         labeled CUYAH_014392112 through
8         014392114
9  Exhibit 13    Emails sent on 11/13/2015,    324
10         Subject: Text about HHS poll
11         questions, Bates labeled
12         CUYAH_015836225
13
14
15
16
17
18
19
20
21
22
23
24
25

1        THE VIDEOGRAPHER:  Today's date is
2  January 10th, 2019.  We're on the record at 9:06.
3  We're here in the matter of the National
4  Prescription Opiate Litigation.  This deposition is
5  taking place in Cleveland, Ohio.
6        Will counsel please identify themselves
7  for the record.
8        MS. SACKS:  Shayna Sacks for the witness
9  and Cuyahoga County, Napoli Shkolnik.
10        MS. FLEMING:  Maria Fleming, Cuyahoga
11  County, Napoli Shkolnik.
12        MS. ST-JULES:  Laena St-Jules from
13  Covington & Burling for McKesson.
14        MS. GATES:  Lisa Gates, Jones Day, for
15  Walmart.
16        MR. RICE:  Justin Rice, Tucker Ellis LLP,
17  on behalf of Johnson & Johnson and Janssen.
18        MR. MOONEY:  Matt Mooney of
19  Williams & Connolly on behalf of Cardinal Health.
20        THE VIDEOGRAPHER:  Anyone on the
21  telephone?
22        MR. PRABUCKI:  This is Ken Prabucki,
23  BakerHostetler, representing the Endo defendants.
24        MR. MOONEY:  All right.  I guess that's
25  it.

1        (Witness sworn.)
2        TREVOR McALEER
3  after being first duly sworn, testified as follows:
4        EXAMINATION
5  BY MR. MOONEY:
6    Q.  Good morning, Mr. McAleer.
7    A.  Good morning.
8    Q.  We met briefly before we started, but my
9  name is Matt Mooney.  I'm an attorney with the law
10  firm of Williams & Connolly, and I represent
11  Cardinal Health, one of the defendants in this
12  lawsuit.
13        I understand that you're the legislative
14  budget adviser for the Cuyahoga County Council; is
15  that correct?
16    A.  Yes.
17    Q.  Okay.  Do you have an understanding of why
18  you've been identified as a witness in this case?
19    A.  I'm not really sure why, but I think as my
20  role as a legislative budget adviser is why I've
21  been asked to be here.
22    Q.  Have you ever testified under oath before?
23    A.  Yes.
24    Q.  When did you testify under oath
25  previously?

1    A.  I don't have the exact date but within the
2  last two months.
3    Q.  The last two months?
4    A.  Yes.
5    Q.  Okay.  And what was the reason that you
6  were testifying under oath?
7    A.  I don't -- I was told from the attorneys
8  that I'm not allowed to talk about that because it's
9  an ongoing investigation.
10    Q.  Okay.  Was it -- was your testimony in
11  court?
12    A.  It was in front of a grand jury.
13    Q.  Okay.  And who were the attorneys who told
14  you that you cannot testify about the testimony that
15  you gave?
16    A.  Matt Meyer, assistant county prosecutor
17  for Cuyahoga County.
18    Q.  And this is -- I intend it to be a
19  yes-or-no question.  I'm not asking you to divulge
20  anything other than, was the testimony concerning
21  prescription opioid abuse in Cuyahoga County?
22    A.  No.
23    Q.  Okay.  Other than the grand jury testimony
24  that you have been instructed not to talk about,
25  have you ever testified under oath under any other

Page 14

1  circumstances?
2     A.  No, sir.
3     Q.  Okay.  You understand that you're under
4  oath today?
5     A.  Yes, sir.
6     Q.  You understand that you're here to testify
7  about what you know, correct?
8     A.  Yes, sir.
9     Q.  Not what you think someone else might want
10  you to say, right?
11     A.  Correct.
12     Q.  Is there any reason that you may not be
13  able to testify accurately and completely today?
14     A.  No, sir.
15     Q.  Are you under any medications that would
16  affect your ability to answer my questions today?
17     A.  No, sir.
18     Q.  So as we proceed today, if I ask a
19  question that you don't understand, please let me
20  know, and I'll try to clarify as best as I can.
21        Does that make sense?
22     A.  Yes, it does.
23     Q.  And so if you answer one of my questions,
24  is it fair for me to assume that you understood it?
25     A.  Yes.

Page 15

1     Q.  And then you know we have a court
2  reporter, and he's going to be transcribing our
3  conversation today.
4        And so in order to make his life a lot
5  easier, I'm going to try my best not to interrupt if
6  you're speaking; and if you could do the same, I
7  would appreciate it.
8        Could you do that?
9     A.  Yes, sir.
10     Q.  Okay.  And throughout the deposition your
11  counsel may object.  It's sort of part of the
12  process.
13        Unless she instructs you not to answer my
14  questions, you can still answer them.
15        Does that make sense as well?
16     A.  Understood, yes.
17     Q.  Mr. McAleer, when did you learn about the
18  existence of this lawsuit?
19     A.  I learned about the existence of this
20  lawsuit -- excuse me -- about two days prior to the
21  press conference that was held at the Cuyahoga
22  County administration headquarters.
23     Q.  And who told you about the lawsuit?
24     A.  The county executive and some of his staff
25  came over to our council offices and, A, wanted to

Page 16

1  let us know about the announcement and, B, invited
2  us to attend down in the lobby.
3     Q.  Did the County Council have to approve the
4  filing of this lawsuit by Cuyahoga County?
5     MS. SACKS:  Objection.
6     You can answer.  Sorry.
7     THE WITNESS:  No.
8  BY MR. MOONEY:
9     Q.  Okay.  Do you know if anyone on the County
10  Council did approve of the lawsuit before it was
11  filed?
12     MS. SACKS:  Objection.
13     THE WITNESS:  Could I ask for
14  clarification on what you mean by "approve"?
15  BY MR. MOONEY:
16     Q.  Sure.  So you said that the county
17  executive and members of his staff came over before
18  the announcement, and they said, "We're going to
19  file a lawsuit; there's going to be a press
20  conference.  Do you want to come?"
21        Is that right?
22     A.  Correct.
23     Q.  To your knowledge, did the county
24  executive ask for permission of any member of
25  council to file the lawsuit?

Page 17

1     MS. SACKS:  Objection.
2     THE WITNESS:  I don't know.
3  BY MR. MOONEY:
4     Q.  Do you know if other members -- if members
5  of the County Council were aware that the lawsuit
6  would be filed prior to this meeting that the
7  executive and his staff organized?
8     MS. SACKS:  Objection.
9     THE WITNESS:  I don't know if they were
10  aware prior to the two-day notice that we were
11  given.
12  BY MR. MOONEY:
13     Q.  Okay.  Do you have any view about the
14  merits of this lawsuit?
15     MS. SACKS:  Objection.
16     THE WITNESS:  I don't have any.
17  BY MR. MOONEY:
18     Q.  Have you ever heard the term "opioid"
19  before today?
20     A.  Yes.
21     Q.  Do you have an understanding of what an
22  opioid is?
23     A.  I don't have a complete legal or medical
24  definition of what it is.  I have a I would say
25  probably general understanding of the term.

5 (Pages 14 - 17)

Page 18

1    Q.  Sure.  And what is your general
2  understanding of the term "opioid"?
3    A.  I would -- I consider it just a drug that
4  is prescribed for medical reasons that helps people
5  with various issues.
6    Q.  And what kind of issues do you understand
7  opioids help with?
8      MS. SACKS:  Objection.
9      THE WITNESS:  I don't know.
10  BY MR. MOONEY:
11    Q.  Are opioids used to treat chronic pain?
12      MS. SACKS:  Objection.
13      THE WITNESS:  Again, I'm not a hundred
14  percent sure what they're prescribed for.
15  BY MR. MOONEY:
16    Q.  Even if you're not a hundred percent sure
17  of what they're prescribed for, do you have any
18  understanding of why prescription opioids are
19  prescribed?
20    A.  I don't, no.
21    Q.  You mentioned that you understand opioids
22  to be drugs that are prescribed for medical reasons
23  that help people with various issues, right?
24      MS. SACKS:  Objection.
25      THE WITNESS:  Close to that, close to

Page 19

1  that.
2  BY MR. MOONEY:
3    Q.  Okay.  Are -- is OxyContin an opioid under
4  your understanding of what an opioid is?
5    A.  I don't know that for sure.
6    Q.  Do you know if oxycodone is an opioid
7  under your understanding of the term "opioid"?
8    A.  I do not know that for sure.
9    Q.  How about hydrocodone?
10    A.  I don't know that for sure.
11    Q.  Is heroin an opioid under your
12  understanding of the term "opioid"?
13    A.  I do not know that.
14    Q.  Do you know if heroin can be prescribed by
15  a doctor to help with medical issues?
16      MS. SACKS:  Objection.
17      THE WITNESS:  I don't know that.  I don't
18  believe so.
19  BY MR. MOONEY:
20    Q.  Is fentanyl an opioid under your
21  understanding of the term "opioid"?
22    A.  I don't know.
23    Q.  How about carfentanil?
24    A.  I don't know.
25    Q.  Cocaine?

Page 20

1    A.  I don't know.
2    Q.  Marijuana?
3    A.  I don't know.
4    Q.  Have you ever heard of the term "opiate"
5  as opposed to an "opioid" before?
6    A.  Yes, but I don't know the difference
7  between the two.
8    Q.  Okay.  That makes it easier.
9      Do you have an understanding of whether
10  some opioids can be legally prescribed to
11  individuals?
12      MS. SACKS:  Objection.
13      THE WITNESS:  I don't have an
14  understanding clearly.
15  BY MR. MOONEY:
16    Q.  Do you understand that some opioids are
17  illegal?
18      MS. SACKS:  Objection.
19      THE WITNESS:  I don't know.
20  BY MR. MOONEY:
21    Q.  So you don't know if there is a difference
22  between a prescription opioid and an illegal opioid?
23      MS. SACKS:  Objection.
24      THE WITNESS:  I don't know the legal
25  definition between the two.

Page 21

1  BY MR. MOONEY:
2    Q.  Okay.  Have you read the Complaint that
3  was filed in this lawsuit by Cuyahoga County?
4    A.  I have not.
5    Q.  Do you have an understanding of the
6  allegations that are in the Complaint filed by
7  Cuyahoga County?
8    A.  No, sir.
9    Q.  Do you have an opinion about what factors
10  contributed to the abuse of opioids in Cuyahoga
11  County?
12      MS. SACKS:  Objection.
13      THE WITNESS:  Can you ask that question
14  again, please?
15  BY MR. MOONEY:
16    Q.  Sure.  Do you have an opinion about what
17  factors contributed to the abuse of opioids in
18  Cuyahoga County?
19    A.  No, sir.
20    Q.  Do you know what a wholesale drug
21  distributor is?
22    A.  I do not.
23    Q.  Have you ever heard of my client, Cardinal
24  Health?
25    A.  No.  I've heard of a Cardinal Health, but

6 (Pages 18 - 21)

Page 22

1 it's not -- it's a different Cardinal Health.  It's
2 I think a local company not related to
3 pharmaceuticals.  I've heard the term "Cardinal
4 Health" before.
5     Q.  And what does the local Cardinal Health
6 company do, if you know?
7     A.  I believe the name is Cardinal Health.  It
8 used to provide medical care, if that is the correct
9 name.  That's where -- it's -- I don't even know if
10 they're still around anymore.
11    Q.  So was that local Cardinal Health that
12 you're referring to physicians, a group of
13 physicians?
14    A.  I believe so.  I don't -- I don't know
15 what type of exact company it was, but I remember
16 seeing the name around here.
17    Q.  Okay.  Have you ever heard of a company
18 called McKesson?
19    A.  No, sir.
20    Q.  Have you ever heard of a company called
21 AmeriSourceBergen?
22    A.  No, sir.
23    Q.  Mr. McAleer, did you do anything to
24 prepare for this deposition?
25    A.  Yes.

Page 23

1     Q.  Did you review any materials or documents
2 in advance of this deposition?
3     A.  I met with my lawyer yesterday.
4     Q.  Okay.  And who was present during that
5 meeting with your lawyer?
6     A.  She was here and Scott, and I'm sorry, I
7 don't remember Scott's last name.
8         MR. MOONEY:  Okay.  Is Scott with your law
9 firm?
10        MS. SACKS:  No.
11 BY MR. MOONEY:
12    Q.  Okay.  Do you know where -- do you know
13 who Scott is?
14    A.  He's a lawyer.
15    Q.  Okay.
16    A.  I just don't remember what law firm he's
17 from.
18    Q.  Do you know if Scott represents Cuyahoga
19 County in this lawsuit?
20    A.  I do not know for sure.
21    Q.  Okay.
22        MS. SACKS:  I do.
23        MR. MOONEY:  You do?
24        MS. SACKS:  He does.
25        MR. MOONEY:  Okay.  Thank you.

Page 24

1 BY MR. MOONEY:
2     Q.  So other -- and that was it though, only
3 your two lawyers?
4     A.  My co-worker also went over at the same
5 time.
6     Q.  Okay.  And who is your co-worker?
7     A.  My chief of staff, Joseph Nanni.
8     Q.  And so it was you, Mr. Nanni, and then
9 your attorneys?
10    A.  Correct.
11    Q.  During your -- during your preparation
12 session, did you review any materials?  I'm just
13 asking yes or no right now.
14    A.  Yes.
15    Q.  Okay.  And were those materials materials
16 that were provided to you by counsel?
17    A.  What counsel?
18    Q.  Your lawyers.
19    A.  Yes.
20    Q.  Sorry, yes, I'm going to have to clarify
21 between the two.  Yes, by your lawyers.  Okay.
22        Did any of the materials that you reviewed
23 during your preparation session refresh your
24 recollection of events that you previously knew?
25    A.  No.

Page 25

1     Q.  Have you read any of the transcripts of
2 other depositions that have taken place in this
3 case?
4     A.  No.
5     Q.  Other than your meeting yesterday, have
6 you met with your lawyers or lawyers at all in
7 relation to this deposition?
8     A.  No.
9     Q.  And how long did you meet with your
10 lawyers yesterday?
11    A.  It was approximately seven to eight hours.
12    Q.  And was Mr. Nanni with you the entire time
13 that you met with the lawyers?
14    A.  Not the entire time.
15    Q.  About how much time in the seven to eight
16 hours that you were with your lawyers was Mr. Nanni
17 also present?
18    A.  I would say somewhere between maybe
19 five-and-a-half to six-and-a-half hours.
20    Q.  Who first contacted you to ask about being
21 deposed in this case?
22    A.  I don't know for sure who it was.
23    Q.  Do you have a recollection of about when
24 you learned that you were going to be deposed in
25 this matter?

7 (Pages 22 - 25)

Page 26

1      A.  I mean, approximately four to six months,
2  I think somewhere in that time frame.
3      Q.  So it was last year that you --
4      A.  2018.
5      Q.  Between the time that you were told that
6  you were likely going to be deposed in this case
7  until the meeting that you had yesterday with your
8  lawyers, did you do anything to sort of get ready
9  for this deposition?
10        MS. SACKS:  Objection.
11        THE WITNESS:  No.
12  BY MR. MOONEY:
13      Q.  Okay.  Did you review any documents
14  related to this lawsuit before you met with your
15  attorneys?
16      A.  No, sir.
17      Q.  Okay.  Did you have any conversations with
18  anyone other than your lawyers about the testimony
19  that you would be giving in this deposition?
20      A.  No, sir.
21      Q.  Did you speak with Mr. Nanni about this
22  deposition other than during the time that you were
23  with your lawyers yesterday?
24      A.  Can you define what you mean speak with
25  about?  I mean, other than I'm on my way in this

Page 27

1  morning for it -- I mean, I don't know if that
2  counts -- but not about the details.
3      Q.  Okay.  That's -- that answers the
4  question.
5      A.  Okay.
6      Q.  Thank you.  Did you have any conversations
7  with Mr. Nanni about his deposition?
8      A.  No.
9      Q.  Did you have any conversations with
10  friends about this deposition they're giving?
11      A.  Just my wife that I'm -- what I'm doing
12  today, that I might not be available.
13      Q.  You didn't discuss the substance of what
14  you expected to say with your wife?
15      A.  No, sir.
16      Q.  Okay.  Any friends that you've spoken with
17  about this deposition?
18      A.  No, sir.
19      Q.  Would you please describe your educational
20  background for us.
21      A.  What level would you like me to talk
22  about?
23      Q.  Where did you -- did you graduate from
24  high school in the county?
25      A.  No, in Trumbell County.

Page 28

1      Q.  And then after you graduated from high
2  school, if you could pick up there with your
3  educational background.
4      A.  Yes.  After high school I attended
5  Youngstown State University, graduated there, and
6  came up to Cleveland State University to get my
7  master's.
8      Q.  And what did you study at Youngstown State
9  University?
10      A.  Political science.
11      Q.  Did you have a specific area of focus in
12  the political science department?
13      A.  Just general political science.
14      Q.  Okay.  Did you take any course work in
15  local government in your political science program?
16      A.  I'm trying to think.  I believe, yes, I
17  think there was a local government class.
18      Q.  Okay.  It sounds like you don't quite
19  remember exactly what you learned in that class.
20      A.  It's a long time ago.
21      Q.  No, I get it.
22        Other than political science, did you
23  major in any other disciplines while you were there?
24      A.  Not major.
25      Q.  Did you minor in any other disciplines at

Page 29

1  Youngstown State?
2      A.  No.
3      Q.  And then you said you went to Cleveland
4  State and got a master's degree.
5        What was your master's degree in?
6      A.  Master's in public administration.
7      Q.  And what course work was part of that
8  program if you could describe it generally?
9      A.  Generally it ranged from finances to kind
10  of local government issues, not necessarily local in
11  Cleveland or Cuyahoga County but just local
12  government discussions related to budgets and things
13  like that.
14      Q.  Was your concentration -- or did you
15  concentrate in anything in your master's program?
16      A.  No, no.  There was a focus on urban
17  government, but --
18      Q.  Was -- so you mentioned that you had
19  finance classes in local government practices about
20  budgets.
21        Were there other aspects of local
22  government as part of this program, or was it
23  primarily focused on the budgeting process?
24      A.  Most of the course work that I had was
25  around the financing and even like the legislative

8 (Pages 26 - 29)

Page 30

1  process.
2      Q.  Do you have any education or training in
3  law?
4      A.  No.
5      Q.  You're not a lawyer?
6      A.  No, sir.
7      Q.  How about any education or training in
8  medicine?
9      A.  No, sir.
10     Q.  Not a doctor?
11     A.  No, sir.
12     Q.  A registered nurse?
13     A.  No, sir.
14     Q.  Do you have any education or training in
15 pharmacology?
16     A.  No, sir.
17     Q.  Do you have any education or training in
18 epidemiology?
19     A.  No, sir.
20     Q.  Do you have any education or training in
21 law enforcement?
22     A.  No, sir.
23     Q.  Do you have any education or training in
24 supply chain management?
25     A.  No, sir.

Page 31

1      Q.  How long have you worked for Cuyahoga
2  County?
3      A.  Cuyahoga County as a whole, since 2005.
4      Q.  And have you been the legislative budget
5  adviser the entire time you've worked for the
6  County?
7      A.  No, sir.
8      Q.  What other jobs did you have with the
9  County before your role as legislative budget
10 adviser?
11     A.  Prior to legislative budget adviser I
12 worked at the Board of Elections.  Prior to that I
13 worked at the Office of Budget and Management.  And
14 prior to that I was an intern with the Cuyahoga
15 County Commissioners' Office.
16     Q.  Okay.  So I'm going to take those I think
17 in reverse order that you just provided them because
18 it sounds like -- was your internship with the
19 Cuyahoga County Commissioners the first position you
20 held --
21     A.  Yes.
22     Q.  -- at the County?
23         Okay.  And what are or is the Cuyahoga
24 County Commissioner?
25     A.  The Cuyahoga County Commissioners no

Page 32

1  longer exist today.  We have a new form of
2  government.
3      Q.  And when did the Cuyahoga County
4  Commissioners cease to exist?
5      A.  December 31st, 2010.
6      Q.  And what was the role, if you know, of the
7  Cuyahoga County Commissioners for the government of
8  the county?
9      A.  Can you provide a little clarification on
10 that, please?
11     Q.  Sure.  You said you worked for these
12 commissioners.
13     A.  Yeah.
14     Q.  They don't exist anymore.
15         What did they do before they disappeared?
16     A.  They did various things but from anywhere
17 between approving budgets to approving contracts.
18     Q.  So when you say that the commissioners
19 approved budgets, is that similar to the role that
20 the County Council currently plays in approving
21 budgets?
22     A.  Yes.  Both bodies would have to or now
23 have to adopt operating budgets for the various
24 departments.
25     Q.  And you said that they also approved

Page 33

1  contracts.
2         Was -- did they approve every contract the
3  County entered into?
4      A.  Not every --
5         MS. SACKS:  Objection.
6         Sorry, go ahead.
7         THE WITNESS:  Not every contract.
8  BY MR. MOONEY:
9      Q.  Was there -- under what circumstances
10 would the commissioners approve contracts for the
11 county?
12     A.  It was governed under the Ohio Revised
13 Code, so it was legal thresholds, dollar amounts.
14     Q.  Do you know what that dollar threshold is
15 or was?
16     A.  I don't know for sure.
17     Q.  You said that the commissioners no longer
18 exist because there's a new form of government; is
19 that right?
20     A.  That's correct.
21     Q.  And I take it that new form of government
22 began on January 1st, 2011?
23     A.  Yes.
24     Q.  Do you have an understanding of why the
25 County decided to implement a new form of government

9 (Pages 30 - 33)

Page 34

1 in 2011?
2       MS. SACKS: Objection.
3       THE WITNESS: The County didn't decide
4 that.
5 BY MR. MOONEY:
6    Q.  Okay.  Who decided?
7    A.  The voters of Cuyahoga County.
8    Q.  Okay.  And what was the process, if you
9 know, for the voters approving a new form of
10 government in 2010-2011?
11   A.  Can you describe that question?
12   Q.  Well, I guess I'm not -- I'd like to try
13 to understand how it was that the voters had the
14 ability to approve a new form of government in the
15 2010-2011 time frame.
16   A.  So I was not part of that, the citizen
17 process, but I worked at the Board of Elections at
18 that time, and it was petition-initiated.  So you
19 have -- there's a whole process laid out for that.
20   Q.  And when you say it was
21 petition-initiated, what do you mean by that?
22   A.  In order to get something on the ballot,
23 you have to go get so many signatures, valid
24 signatures, and that process took place by a group
25 of individuals.

Page 35

1    Q.  Do you know who led that effort to put
2 this ballot initiative on the ballot?
3    A.  I do not.
4    Q.  Do you have an understanding of why the
5 issue of forming a new government was placed on the
6 ballot?
7    A.  There were some issues with some county
8 elected officials and employees.
9    Q.  What issues were there with county elected
10 officials, if you know?
11   A.  I don't have the details of all the
12 various individuals that were involved, but it was
13 related to a federal investigation.
14   Q.  And do you know what the federal
15 government was investigating?
16       MS. SACKS: Objection.
17       THE WITNESS: Not the details.
18 BY MR. MOONEY:
19   Q.  Do you have -- even if not the details, do
20 you have a high-level understanding of what the
21 federal government was investigating in relation to
22 these county elected officials?
23       MS. SACKS: Objection.
24       THE WITNESS: Not a good understanding.
25

Page 36

1 BY MR. MOONEY:
2    Q.  Sure.  Did it involve bribery?
3       MS. SACKS: Objection.
4       THE WITNESS: I don't know.
5 BY MR. MOONEY:
6    Q.  Do you know if the county officials were
7 investigated because of allegations of corruption?
8       MS. SACKS: Objection.
9       THE WITNESS: I don't know.
10 BY MR. MOONEY:
11   Q.  Do you know if the county elected
12 officials that you understand were under
13 investigation were being investigated for financial
14 crimes?
15       MS. SACKS: Objection.
16       THE WITNESS: I don't know.
17 BY MR. MOONEY:
18   Q.  I think you also said that there were some
19 issues with county employees that might have
20 motivated this petition; is that right?
21       MS. SACKS: Objection.
22       THE WITNESS: That's my understanding.
23 BY MR. MOONEY:
24   Q.  And do you have an understanding of what
25 the issues were with the county employees?

Page 37

1    A.  I do not.
2    Q.  Do you know if the county employees that
3 you said had issues were also under federal
4 investigation?
5       MS. SACKS: Objection.
6       THE WITNESS: I don't know.
7 BY MR. MOONEY:
8    Q.  So after the new government was formed in
9 2011, is that when you had the County Council come
10 into creation?
11       MS. SACKS: Objection.
12       THE WITNESS: The new government was voted
13 on prior to 2011.
14 BY MR. MOONEY:
15   Q.  Okay.  And then on January 1st, 2011, the
16 new government sort of came into existence, is that
17 right, if the other government ended on the 31st of
18 2010?
19   A.  Yes, sir.
20   Q.  And do you have an understanding of
21 whether there are any differences between the
22 responsibilities of the County Commissioners and the
23 County Council as it is constituted today?
24       MS. SACKS: Objection.
25       THE WITNESS: Can you clarify that

10 (Pages 34 - 37)

Page 38

1  question?  That's a pretty open-ended question.
2  BY MR. MOONEY:
3     Q.  It's intended to be.
4        Are there -- do you have -- there was the
5  County Commissioners?
6     A.  Yes.
7     Q.  They were a legislative type body,
8  correct?
9     A.  Yes.
10    Q.  Okay.  Now you have the County Council,
11 right?
12    A.  Yes.
13    Q.  And they are also a legislative body?
14    A.  Yes.
15    Q.  To your knowledge, are there any
16 differences in the powers or responsibilities of the
17 County Commissioners as they existed before and the
18 County Council as it exists today?
19    A.  Yes, because not only the County
20 Commissioners went away in the new -- with the new
21 form of government, but an elected recorder, an
22 elected auditor, an elected treasurer, those
23 positions went away -- an elected sheriff, those
24 positions went away and were replaced with an
25 elected county executive and an elected 11 members

Page 39

1  of council.  And various responsibilities through
2  the charter, the new charter that took place,
3  assigned those responsibilities to different
4  positions.
5     Q.  Sure.  And do you have an understanding of
6  whether the new charter assigned new
7  responsibilities to the County Council that the
8  County Commissioners did not have under the old form
9  of government?
10    A.  Yes.  I would say the difference between
11 the two is that the County Commissioners, from my
12 understanding, the big difference, they did not pass
13 necessarily codified ordinances like the County
14 Council currently does.
15    Q.  And what is a codified ordinance as you
16 understand that term?
17    A.  My layman's term of a codified ordinance
18 is basically a code, county code that runs -- it's
19 kind of our local set of rules, like comparable to
20 like the Ohio Revised Code for the State of Ohio.
21    Q.  And is a codified ordinance different than
22 a resolution of the County Council?
23    A.  It is, yes.
24    Q.  And so what is a resolution?
25    A.  A resolution would be -- they're both

Page 40

1  legislation, but a resolution is a piece of
2  legislation that would approve a contract or
3  appropriate money or approve a board appointment for
4  a board versus an ordinance where it becomes
5  codified and part of the county code.
6     Q.  Okay.  So the County Council has contract
7  approval responsibilities like the commissioners did
8  in the old form of government?
9     A.  Yes, just different thresholds.
10    Q.  But the threshold -- well, where does that
11 threshold come from?
12    A.  An ordinance passed by Council.
13    Q.  So Council set its own threshold now?
14    A.  Correct.
15    Q.  Do you know what that threshold is?
16    A.  Yes.
17    Q.  Okay.  What is the threshold?
18    A.  The threshold for County Council?
19    Q.  Yes.
20    A.  $500,000 or more.  Generally there are
21 various nuances within the county code that might
22 require Council approval for other things, but for
23 most contracts and agreements.
24    Q.  And do you know when County Council passed
25 the ordinance setting the contract threshold at

Page 41

1  $500,000?
2     A.  I don't have an exact date.
3     Q.  Has the threshold that County Council
4  passed been in place for the last five years?
5     A.  Yes.
6     Q.  Has the threshold been in place since
7  2011?
8     A.  I don't know if it -- it was either 2011
9  or 2012.
10    Q.  Okay.  And has the threshold always been
11 set at $500,000, or has it been adjusted?
12    A.  It's been the same for County Council,
13 500,000.  Other thresholds have been adjusted.
14    Q.  What other thresholds are you referring
15 to?
16    A.  When these thresholds were set up
17 originally, part of the code, it created both a
18 Board of Control and a Contracts and Purchasing
19 Board.  The Contracts and Purchasing Board, which
20 has been since changed, but would approve everything
21 between $500 and $100,000.  And the Board of Control
22 would approve everything between 100 and $500,000.
23    Q.  Okay.  So you said the Contracts and
24 Purchasing Board has since changed, right?
25    A.  Yes.

11 (Pages 38 - 41)

Page 42

1    Q.   Okay.  And in what way has the Contracts
2  and Purchasing Board changed?
3    A.   That has been dissolved or removed, and
4  the Board of Control now sees everything between
5  $500 and $500,000.
6    Q.   And do you know when the Contracts and
7  Purchasing Board was dissolved?
8    A.   I don't have an exact date.
9    Q.   Was it within the last three years?
10   A.   I don't know for sure.
11   Q.   Okay.
12   A.   Sorry, it was -- it was in the last four
13  years.
14   Q.   Okay.  And who dissolved the Contracts and
15  Purchasing Board?
16   A.   It would require change to the county
17  code, which would require Cuyahoga County Council's
18  action.
19   Q.   Do you know why the County Council took
20  action to dissolve the Contracts and Purchasing
21  Board?
22   A.   Yes.
23      MS. SACKS:  Objection.
24  BY MR. MOONEY:
25   Q.   Why did the Council dissolve the board?

Page 43

1    A.   It was to ease administrative burden where
2  the two boards met on the same day within a
3  half-hour period, and it required two agendas and it
4  was duplicative, so it wanted to streamline the
5  process.
6    Q.   And how do you know that the Council
7  dissolved the board to ease administrative burden?
8    A.   Because I work for County Council.
9    Q.   Did you have any conversations with
10  members of County Council in which they expressed
11  that the reason they were dissolving the board or
12  they were going to vote to dissolve the board was to
13  ease administrative burdens?
14   A.   Yeah, to streamline the process.
15   Q.   And who on County Council did you speak to
16  about dissolving the Contracts and Purchasing Board?
17      MS. SACKS:  Objection.
18      THE WITNESS:  I don't remember.
19  BY MR. MOONEY:
20   Q.   Who sat on the Contracts and Purchasing
21  Board, if you know?
22      MS. SACKS:  Objection.
23      THE WITNESS:  I don't remember.
24  BY MR. MOONEY:
25   Q.   Were there any members of County Council

Page 44

1  on the Contracts and Purchasing Board before it was
2  dissolved?
3    A.   Yes.
4    Q.   Which members of County Council were also
5  members of the Contracts and Purchasing Board?
6      MS. SACKS:  Objection.
7      THE WITNESS:  I don't remember.
8  BY MR. MOONEY:
9    Q.   Did you sit on the Contracts and
10  Purchasing Board?
11   A.   No.
12   Q.   Were you ever asked to attend a Contracts
13  and Purchasing Board meeting?
14   A.   Yes.
15   Q.   Did you attend the Contracts and
16  Purchasing Board meetings frequently?
17   A.   Yes.
18   Q.   Every meeting that occurred?
19   A.   I can't say every meeting.
20   Q.   But most?  You were at most of the
21  meetings; is that right?
22   A.   Yes, sir.
23   Q.   And were you -- did you attend these
24  meetings at the request of a member of Council?
25      MS. SACKS:  Objection.

Page 45

1      THE WITNESS:  No.
2  BY MR. MOONEY:
3    Q.   So why did you attend these Contracts and
4  Purchasing Board meetings?
5    A.   Not a direct member of Council directed me
6  or asked me to go.  It was part of -- just as a
7  staff responsibility.
8    Q.   And what was your responsibility in
9  attending these Contracts and Purchasing Board
10  meetings?
11   A.   To observe to -- they are public meetings,
12  to observe to see what kind of questions are being
13  asked; what, if any, items would get held; if
14  anything might have come up that wasn't necessarily
15  on the agenda, those type of things.
16   Q.   What do you mean by "items would get
17  held"?
18   A.   If a Contracts and Purchasing Board member
19  had maybe a question that the presenter of the item
20  could not answer and would have to get more
21  information, an item would be held potentially for
22  the next week until additional information would be
23  provided.
24      That could be one.  That's one example of
25  an item getting held.

12 (Pages 42 - 45)

Page 46

1    Q.   Sure.  Are there -- so if the Contracts
2  and Purchasing Board approved an item, was that part
3  of the process as well, there was an approval
4  process?
5    A.   Yes.
6    Q.   And is the approval documented in some
7  way?
8    A.   Yes.
9      MS. SACKS:  Objection.
10 BY MR. MOONEY:
11    Q.   How is the Contracts and Purchasing Board
12 approval documented?
13    A.   Can you just kind of clarify what you mean
14 "documented"?
15    Q.   Sure.  Is there some sort of a record that
16 I could look at that says on January 1st of 2012 the
17 Contracts and Purchasing Board approved some item?
18    A.   Yes.
19    Q.   Okay.  And what is that document called?
20    A.   Minutes for each meeting.
21    Q.   And do the meeting minutes describe what
22 the item is, what the request was for?
23    A.   The meeting minutes provides the
24 department who's requesting it a brief description
25 of the item.  So it would have perhaps the vendor

Page 47

1  name, the dollar amount, the start and end date, and
2  a funding source.
3    Q.   And when you say "funding source," what do
4  you mean by that?
5    A.   Items could be funded from the general
6  fund, the Health and Human Services levy, or other
7  various funds that is related to the county.
8    Q.   Do you know if the -- if the fact of the
9  Contracts and Purchasing Board approved an item
10 meant necessarily that the money actually was spent
11 on the item that was approved by the Contracts and
12 Purchasing Board?
13    A.   I would not know that for every item.
14    Q.   Would there be a way that you could check
15 if you wanted to know?
16      MS. SACKS:  Objection.
17      THE WITNESS:  What -- can you clarify what
18 you mean by that?
19 BY MR. MOONEY:
20    Q.   Sure.  This is an example, but say a
21 council member knew that the Contracts and
22 Purchasing Board had approved a contract for $1,000
23 and then three months later they say, "Hey, did that
24 contract ever get signed, did that purchase order
25 get paid?"

Page 48

1      Is there a way that you could go back and
2  look or find out that information?
3    A.   Yes.
4    Q.   Okay.  What would you do to find that
5  information?
6    A.   What information?
7    Q.   The -- whether the contract had been
8  signed and the money had been paid.
9    A.   So I just need clarification because those
10 are two different things.
11    Q.   Sure.  Let's go with the money being paid.
12    A.   On money being paid, I would look in our
13 FAMIS system, which is our financial general ledger
14 system for the county currently.
15    Q.   And do you have access to FAMIS?
16    A.   I do.
17    Q.   Have you always had access to FAMIS since
18 the County -- since the County implemented that
19 program?
20    A.   Not since the County implemented the
21 program.  It's a 40-year-old program.
22    Q.   Okay.  So since you started working as the
23 legislative budget adviser, have you had access to
24 FAMIS?
25    A.   Yes.

Page 49

1    Q.   I've also heard of a system called BRASS.
2      Are you familiar with that system?
3    A.   Yes.
4    Q.   Is that a system that you also have access
5  to as the legislative budget adviser?
6    A.   I do have access to it.
7    Q.   And do you use FAMIS as part of your sort
8  of regular responsibilities as the legislative
9  budget adviser?
10    A.   Could you clarify what you mean by
11 "regular"?
12    Q.   Sure.  Do you remember your password when
13 you log in, or is it something that you use --
14    A.   For FAMIS I do.
15    Q.   But not for BRASS?
16    A.   I don't use BRASS as much.
17    Q.   Okay.  And what do you use FAMIS for?
18    A.   FAMIS, again, is our general ledger, tells
19 you when checks are issued or encumbrances are given
20 on a contract.
21      So I typically would use FAMIS for to see
22 if a voucher was processed for a payment for a
23 check.
24    Q.   Do you know if members of County Council
25 have access to the FAMIS system?

13 (Pages 46 - 49)

1    A.   They do not.
2    Q.   So if a County Council member had a
3 question about the County's accounting system, they
4 would likely talk to you about it?
5    A.   They would more than likely talk to me
6 about it.
7    Q.   Are there other members of the County
8 Council staff that they might speak with?
9    A.   Yes.  They very well could.
10    Q.   Who else would they speak with?
11    A.   Any one of my colleagues.
12    Q.   So everyone on the County Council staff
13 has access to FAMIS?
14    A.   They don't have access to it, but they --
15 council members would ask them.
16    Q.   And then they would ask you?
17    A.   Yes.
18    Q.   Okay.  You also mentioned that there was a
19 Board of Control?
20    A.   Yes.
21    Q.   And does the Board of Control operate in a
22 similar manner to the way the Contracts and
23 Purchasing Board did, just with a higher threshold?
24    A.   Yeah, the threshold was 100 to 500,000 at
25 that time when the Contracts and Purchasing Board

1 existed.
2    Q.   Right.  And so are there meetings of
3 the -- excuse me.
4        Are there meetings of the Board of Control
5 where items are discussed?
6    A.   Yes.
7    Q.   Are members of County Council also members
8 of the Board of -- Board of Control?
9    A.   Yes.
10    Q.   Do you know which members of County
11 Council are also members of the Board of Control?
12    A.   Yes.
13    Q.   And who?  Which council members are
14 members of the Board of Control?
15    MS. SACKS:  Objection.
16    THE WITNESS:  What -- so the -- are you
17 talking about today?
18 BY MR. MOONEY:
19    Q.   Yes, let's start with today.
20    A.   Councilman Dale Miller and Councilwoman
21 Nan Baker and Council President Dan Brady.
22    Q.   Now let's work our way back.
23        Is the council president to your knowledge
24 always also a member of the Board of Control?
25    MS. SACKS:  Objection.

1    THE WITNESS:  I don't understand the
2 question.
3 BY MR. MOONEY:
4    Q.   Well, before Council President Baker was a
5 member of the Board of Control, was Council
6 President Connally a member of the Board of Control?
7    A.   I don't remember.
8    Q.   Do you know how long Councilman Miller has
9 been a member of the Board of Control?
10    A.   Not definitively.
11    Q.   How about Council Member Baker, do you
12 know how long Council Member Baker has been a member
13 of the Board of Control?
14    A.   She took office -- she's a new council
15 member.  I don't know what date she was appointed to
16 the Board of Control.  She's a newer council
17 member --
18    Q.   Sure.
19    A.   -- compared to --
20    Q.   Are the -- so the council members --
21 sorry, strike that.
22        So you said you don't know which date
23 Council Member Baker was appointed to the Board of
24 Control.
25        Does that mean that there's an appointment

1 process for members, council members becoming
2 members of the Board of Control?
3    A.   Yes.
4    Q.   And what is that process?
5    A.   The council president appoints the three
6 members of County Council to the Board of Control
7 every two years because that's the term of a council
8 president.
9        I said every two years, right?
10    Q.   Yes.
11    A.   Okay.
12    Q.   Have you -- do you have an understanding
13 of the criteria the council president uses when
14 appointing members to the Board of Control?
15    MS. SACKS:  Objection.
16    THE WITNESS:  No.
17 BY MR. MOONEY:
18    Q.   Do you attend Board of Control meetings as
19 part of your responsibilities as the legislative
20 budget adviser for the Cuyahoga County Council?
21    A.   Yes.
22    Q.   And are you -- do you attend those
23 meetings for the same reasons that you attended the
24 Contracts and Purchasing Board meetings?
25    A.   No.

14 (Pages 50 - 53)

Page 54

1    Q.   So why do you attend the Board of Control
2  meetings?
3    A.   I serve as an alternate to the council
4  members, and I routinely go for the council
5  president.
6    Q.   And what are your responsibilities as an
7  alternate for the council members on the Board of
8  Control?
9    A.   It's full voting rights as a member of the
10 Board of Control.
11   Q.   So if an item comes before the Board of
12 Control, you vote whether to approve, disapprove or
13 hold the item; is that right?
14   A.   Yes, sir.
15   Q.   And when you vote as a member or as an
16 alternate for a council member, are you voting for
17 yourself, or are you voting on behalf of the council
18 member?
19   A.   Can you clarify that question?
20   Q.   Sure.  So in the meeting minutes, for
21 instance, if it says Trevor McAleer voted no on
22 Item 1755, is it -- do the minutes reflect that it's
23 Trevor McAleer voted no or Trevor McAleer for
24 President Council Baker voted no, or is there no
25 distinction to your knowledge?

Page 55

1    A.   On the minutes it has a roll call section
2  to say who's present.  It will say Trevor McAleer,
3  and then it will say alternate for person X.
4    Q.   So do you --
5    A.   Then under each item it will say Trevor
6  McAleer voted yes.  It won't say under each item --
7    Q.   As alternate for council member X?
8    A.   Correct.
9    Q.   Okay.  And so is it your understanding
10 that as an alternate you are there as a
11 representative of the County Council member for whom
12 you are the alternate?
13   A.   I'm there as an alternate for the council
14 member that I'm there for that day.
15   Q.   So before -- and before the meetings for
16 which you were an alternate, do you speak with the
17 council member about the upcoming items?
18   A.   What council member?
19   Q.   If you're an alternate for -- we will just
20 use Council Member Miller for this example.  If
21 you're going to stand in for Council Member Miller,
22 do you speak with him before the meeting and say,
23 "These are the items, how would you like me to
24 vote"?
25   A.   No.

Page 56

1    Q.   Do you have any conversation with Council
2  Member Miller about the items that will be on the
3  agenda for which you will serve as his alternate?
4    A.   Yes.
5    Q.   And what do you discuss during those
6  meetings with the council member about the Board of
7  Control meeting for which you will serve as an
8  alternate?
9        MS. SACKS:  Objection.
10       THE WITNESS:  They're not -- they're not
11 meetings.  They're more -- because they might be
12 emails.
13 BY MR. MOONEY:
14   Q.   Okay.  And what are the subjects of the
15 emails between you and the council member at a
16 general level?
17       MS. SACKS:  Objection.
18       THE WITNESS:  It's -- the agenda comes out
19 two or so days prior to each weekly agenda meeting,
20 each meeting, and the discussion is only around
21 advanced questions that we would send over to the
22 clerk of the board.
23 BY MR. MOONEY:
24   Q.   And what are advance questions or advanced
25 questions?

Page 57

1    A.   So you review the agenda, and we do send
2  over questions that -- just various questions about
3  any of the items over prior to the council
4  meeting -- I'm sorry, prior to the Board of Control
5  meeting.
6    Q.   And are the questions that are sent to the
7  Board of Control questions that you come up with?
8        MS. SACKS:  Objection.
9  BY MR. MOONEY:
10   Q.   Or are they Mr. Miller's questions that
11 you're conveying to the board?
12   A.   They're both.
13   Q.   And then do council members provide any
14 guidance to you, the council members who sit on the
15 Board of Control, do they provide any guidance to
16 you regarding whether or not they believe an item
17 should or should not be approved?
18       MS. SACKS:  Objection.
19       THE WITNESS:  No.
20       You're -- can I ask for clarification on
21 that question?
22 BY MR. MOONEY:
23   Q.   Sure.
24   A.   You're saying when I serve as their
25 alternate?

15 (Pages 54 - 57)

Page 58

1    Q.   Right.
2    A.   Okay.
3    Q.   What I'm trying to get at is, when you get
4  to the Board of Control meeting, are you sort of
5  free to make decisions that you think are in the
6  best interest of the county as opposed to what
7  you've been instructed by a member of council to do
8  at the meeting on their behalf?
9    A.   Yes, I -- even though I might serve as a
10 council alternate, I'm free to make my decision of
11 what I believe is the best interest.
12   Q.   Okay.  And how long have you served as an
13 alternate for members of council on the Board of
14 Control?
15   A.   I don't have an exact time frame.
16   Q.   Okay.  How about generally, since 2013
17 have you served as an alternate?
18   A.   It was later than that.
19   Q.   It was later.  Was it within the last two
20 years?
21   A.   It was longer than that.  It was --
22   Q.   Somewhere between I guess six now and six
23 and two years ago, okay.
24   A.   Less than four.
25   Q.   Before you were serving in an alternate

Page 59

1  capacity for members of council on the Board of
2  Control, was there another member of council staff
3  who served as the members' alternates at these Board
4  of Control meetings?
5    A.   No.
6    Q.   In your time attending contracts and -- is
7  it purchasing and contracts board or Contracts and
8  Purchasing Board?
9    A.   Board of Control and Contracts and
10 Purchasing Board.
11   Q.   Okay.  In your time attending meetings of
12 the Contracts and Purchasing Board, did you -- were
13 there ever any agenda items in which funds were
14 requested that related to prescription opioids?
15   A.   Can you ask that question one more time,
16 please?
17   Q.   Sure.  In your time attending meetings of
18 the Contracts and Purchasing Board, were there ever
19 any agenda items in which funds were requested that
20 related to prescription opioids?
21   A.   I don't know.
22   Q.   In your time attending meetings of the
23 Board of Control, were there ever any agenda items
24 in which funds were requested that related to
25 prescription opioids?

Page 60

1    MS. SACKS:  Objection.
2    THE WITNESS:  I don't know.
3  BY MR. MOONEY:
4    Q.   In your time serving as an alternate for a
5  member of the board -- excuse me, strike that.
6    In your time serving as an alternate for a
7  member of the County Council on the Board of
8  Control, have you ever voted on an item that
9  concerned prescription opioids?
10   MS. SACKS:  Objection.
11   THE WITNESS:  I don't know.
12 BY MR. MOONEY:
13   Q.   In your time serving as an alternate for a
14 member of council on the Board of Control, have you
15 ever voted on an item that concerned heroin?
16   MS. SACKS:  Same objection.
17   THE WITNESS:  I don't know.
18 BY MR. MOONEY:
19   Q.   Have -- has the Board of Control to your
20 knowledge ever approved an item related to Narcan?
21   A.   I don't know for sure.
22   Q.   For the Board of Control meetings, are
23 there also minutes like there were for the Contracts
24 and Purchasing Board that reflect the requests, the
25 vendor name, the amount of money, the start and end

Page 61

1  date of the contract and the funding source?
2    A.   Yes, sir.
3    Q.   And is the Board of Control responsible
4  for approving purchase order requests?
5    A.   The Board of Control is required to
6  purchase everything above $500 --
7    Q.   Okay.
8    A.   -- to 500,000.
9    Q.   Okay.  Because earlier when we were
10 discussing the Contracts and Purchasing Board, I
11 think one of the things you mentioned in the minutes
12 were a start and end date of the contract is often
13 included; is that right?
14   A.   For contracts.
15   Q.   Right.
16   A.   And agreements if they have start and end
17 dates.
18   Q.   Okay.  And that's the same for the Board
19 of Control?  They would approve contracts and
20 agreements and also purchasing orders above the
21 threshold that exists?
22   A.   There are purchase orders that don't have
23 start and end dates.
24   Q.   Right, exactly.  So if they needed to buy
25 $100,000 worth of pencils, that would be an item

16 (Pages 58 - 61)

Page 62

1 that would go before the Board of Control; is that
2 right?
3     A.   Yes.
4     Q.   And if an item is less than $500, is there
5 a board or organization that has to approve those?
6     A.   There's not a board.
7     Q.   And are those -- so if it's less than
8 $500, is that just the individual department can
9 approve the payment?
10    A.   Yes, sir.
11    Q.   And they can approve the contract if the
12 contract is going to be less than the threshold and
13 also doesn't hit on whatever other exceptions exist
14 that you described earlier?
15        MS. SACKS:  Objection.
16        THE WITNESS:  I don't know.
17 BY MR. MOONEY:
18    Q.   Let me take that in two pieces, and
19 maybe we can figure out if it's -- figure out if you
20 know the answer.
21        If a contract is less than the $500
22 threshold, a services contract, is the department
23 able to approve that without going to a separate
24 board?
25        MS. SACKS:  Objection.

Page 63

1        THE WITNESS:  I don't know.
2 BY MR. MOONEY:
3     Q.   All right.  We got a little off track of
4 where I wanted to go, so I'm going to swing back to
5 after your time as a Board of Elections intern and
6 between your time as the legislative budget adviser,
7 you said you were also a budget -- you worked for
8 OBM, is that right, the Office of Budget and
9 Management in a capacity?
10    A.   Just for clarification, I was not a Board
11 of Elections intern.
12    Q.   Okay.  Right, sorry.  You were an intern
13 with the County Commissioners?
14    A.   Commissioners.
15    Q.   And then what did you do after that?
16    A.   I went to the Office of Budget and
17 Management.
18    Q.   Okay.  And what was your role in the
19 Office of Budget and Management?
20    A.   I was a budget analyst.
21    Q.   And what was your role as a budget
22 analyst?
23    A.   Analysts would be assigned various
24 departments, and we would be responsible to work
25 with those departments throughout the year and

Page 64

1 oversee, do projections, do forecasting, do budget
2 preparations for those departments that we were
3 assigned.
4     Q.   And do you remember which departments you
5 were assigned to as your responsibilities as a
6 budget analyst?
7     A.   I don't remember them all.
8     Q.   Okay.  Do you remember some of them?
9     A.   Yes.
10    Q.   Okay.  Which ones were they?
11    A.   Public works, which was -- it's now called
12 public works.  It was then called central services
13 and the county engineer.
14    Q.   And is that -- I should say what is the --
15 what is central services and the county engineer?
16    A.   Basically custodians, trades.  That was
17 the division where they would pay all the utilities
18 and things like that, keep the building
19 maintained -- the buildings maintained.
20    Q.   Okay.  Do you remember any other
21 departments that you were assigned to?
22    A.   I was assigned to the Soldiers and Sailors
23 Monument.  And I don't remember any other offhand.
24    Q.   Okay.  Were you assigned to or I should
25 say was the police department one of the departments

Page 65

1 for which you had responsibility as a budget
2 analyst?
3     A.   The county does not have a police
4 department.
5     Q.   You're right, it doesn't.  The sheriff's
6 office, I'm sorry.
7     A.   I don't remember.
8     Q.   How about the ADAMHS Board, was that
9 something that you oversaw as your role as a budget
10 analyst?
11    A.   No.
12    Q.   Did you have responsibility for Children
13 and Family Services?
14    A.   No.
15    Q.   You said that one of the responsibilities
16 was to work on projections and forecasting for the
17 departments.
18        What did that entail?
19    A.   So working with -- for the most part each
20 department had their own finance or business person,
21 so working with them to see what new purchases they
22 may or may not want to make for the upcoming budget
23 year, what kind of -- particularly in central
24 services, like what capital needs were needed for
25 the buildings, any kind of like unexpected things

17 (Pages 62 - 65)

Page 66

1 that may have happened, you know, with a building
2 that you can't necessarily forecast or budget for,
3 things like that.
4     Q.   And did you work on any revenue
5 projections in your role as a budget analyst?
6     A.   What kind of revenue projections?
7     Q.   I didn't know there were more than one.
8         So what did you have in mind with your
9 question?
10    A.   Central services has an internal service
11 fund where they charge back to various departments
12 because they serve all departments.  Technically
13 that would be revenue for the central services
14 department.  But it's not new revenue in terms of
15 how I am anticipating that you're asking.
16    Q.   Right.  So you didn't have any
17 responsibility over general fund forecasting?
18    A.   Not -- not as that OBM analyst.
19    Q.   Sure.  And any responsibility for HHS levy
20 forecasting?
21    A.   Not at that time as an OBM analyst.
22    Q.   Okay.  And then did you -- you said you
23 also helped with the budget process for these
24 departments.
25         What did that entail?

Page 67

1     A.   So you mentioned the BRASS system earlier.
2 The -- going into the BRASS system and working with
3 the departments to make sure we had the appropriate
4 staffing levels; if there were vacancies, making
5 sure that's accounted for; having all the contracts
6 that were in the system or that were anticipated to
7 be procured throughout the year or the following
8 year, things of that nature.
9     Q.   And when you went into the BRASS system,
10 you were doing that for the departments for which
11 you had responsibility as a budget analyst; is that
12 right?
13    A.   Yes, sir.
14    Q.   And then throughout the year after the
15 budget had been passed, you said I think that you
16 oversaw the budget for the various departments; is
17 that right?
18    A.   Yes.
19    Q.   Okay.  And what did that entail?
20    A.   Again, similar to the budget prep, but
21 working with the departments, trying to, you know,
22 do accurate projections for quarterly or monthly
23 reports; include are you going to really hire those
24 vacant positions that you've had or, you know, when
25 do you anticipate them being onboard so we can have

Page 68

1 a better projection number and when are you going to
2 get that contract in place, when are you going to
3 start expending those funds, things of that nature.
4     Q.   Okay.  And so when -- for example, the
5 Soldiers and Sailors Monument organization receives
6 funds.
7         Do they just get a pot of money that then
8 they have to use consistent with the budget?  How
9 does that work?
10    MS. SACKS:  Objection.
11 BY MR. MOONEY:
12    Q.   Let me rephrase.
13         When the Council approves funding -- I
14 guess at this point when the commissioners approved
15 funding for the Soldiers and Sailors fund, is the
16 funding earmarked for specific contracts or specific
17 numbers of personnel?
18    A.   Not specific numbers of contracts.  They
19 would be budgeted from a personnel level, like
20 personal services, which would be staff, then
21 contracts and professional services, and then
22 capital.
23         So you have your various types of
24 expenditures, but that would be the level that the
25 County Commissioners at that time would approve the

Page 69

1 budget.
2     Q.   And is that -- the level with personnel,
3 contracting services and then capital, is that
4 consistent with how the County Council appropriates
5 funds today?
6     A.   Yes, it's the same level category.  We
7 don't for the most part appropriate capital like we
8 did back in the commissioners, but it's still an
9 available line.
10    Q.   Okay.  So other than overseeing the
11 budgeting process, working on forecasts and
12 projections and following up after the budget had
13 been approved, did you have any other
14 responsibilities as a budget analyst?
15    A.   Just constant continuing to work with the
16 departments that we were assigned.
17    Q.   And when were you -- well, actually I'll
18 finish that out.
19         After working for OBM, you went back to
20 the Board of Elections; is that right?
21    A.   I went to the Board of Elections.
22    Q.   To the Board of Elections.  I think I must
23 have been looking at the wrong LinkedIn page when I
24 was trying to figure out what you did before working
25 as a legislative budget adviser.

18 (Pages 66 - 69)

1      Okay.  So you went to the Board of
2  Elections, and what was your responsibility there?
3      A.  I was the fiscal services manager.
4      Q.  And what was the role of a fiscal services
5  manager in the Board of Elections?
6      A.  So I was in charge of, of course, the
7  finances and oversaw the operations of the -- we had
8  a couple different buildings, so both buildings, and
9  I had some staff as well.
10     Q.  When you say you were in charge of the
11 finances, does that mean you were involved in the
12 budget process for the Board of Elections?
13     A.  Yes.
14     Q.  And what were your responsibilities as a
15 fiscal services manager vis-a-vis the budget?
16     A.  In preparing for the budget?
17     Q.  Yes.
18     A.  So with elections each year is different.
19 You could have, you know, primary and general
20 county-wide elections if it's a presidential year or
21 governor's year or it might just be a municipal
22 year.  So every year the budget was always
23 constantly changing based on what elections were for
24 that calendar year.
25        So it was -- and the type of expenses you

1  needed varied from election to election as well.
2         So it was in terms of the budget basically
3  getting a good projection for each election year
4  over year for that.
5      Q.  Okay.  And so now taking a step back, when
6  you were an intern with the County Commissioners,
7  how long were you an intern?  What was the time
8  frame of that appointment or that internship?
9      A.  I don't recall the exact length of time.
10     Q.  Okay.  Was it before -- did you have the
11 internship while you were still at Cleveland State
12 getting your master's?
13     A.  I did, yes.
14     Q.  And then after you got your master's in
15 2006, is that when you went to become a budget
16 analyst?
17     A.  Somewhere within that window.
18     Q.  2006-2007-ish?
19     A.  Yes.
20     Q.  And do you know when you became the fiscal
21 services manager for the County Board of Elections?
22     A.  I don't have the exact date, but I believe
23 it was toward the end of 2007.
24     Q.  Okay.  And then you were in that role
25 until you became the legislative budget adviser?

1      A.  Yes.
2      Q.  And when did you become the legislative
3  budget adviser?
4      A.  In the summer of 2011.
5      Q.  I'm going to ask you a question based on
6  what I saw on your LinkedIn page or what I thought
7  was your LinkedIn page, but I might be wrong.
8         Are you a commissioner with the Ohio
9  Lottery Commission?
10     A.  Yes.
11     Q.  What is that role?
12        MS. SACKS:  Objection.
13 BY MR. MOONEY:
14     Q.  What is a commissioner of the Ohio Lottery
15 Commission?
16     A.  It is a position, a commission set up by
17 the Ohio Revised code.
18     Q.  And how -- did you apply to be a
19 commissioner for the Ohio Lottery Commission?
20     A.  Yes.
21     Q.  Okay.  Who did you apply to?
22     A.  The governor of the State of Ohio at that
23 time was Governor Kasich.
24     Q.  And so Governor Kasich appointed you to be
25 a commissioner for the Ohio Lottery Commission?

1      A.  Yes.
2      Q.  Are there more than one commissioner?
3      A.  Yes.
4      Q.  How many commissioners are there?
5      A.  There are seven --
6      Q.  Seven.
7      A.  -- I guess.  I just want to make sure
8  that's right.  Let me do my math, I'm sorry.
9      Q.  That's fine.
10     A.  Seven.  We have a vacancy, and it's been
11 throwing my numbers off.  I apologize.
12     Q.  That's fine.
13     A.  I'm not the only one.
14     Q.  Okay.  That's enough.
15        What is the role -- what is your role as a
16 commissioner?  What is your responsibilities, excuse
17 me, as a commissioner of the Ohio Lottery
18 Commission?
19     A.  Our main responsibilities include --
20 excuse me -- approving game rules, new games, and
21 the VLT -- I don't know if you're familiar with
22 VLTs -- but VLT theme.  They're all themed with
23 various type of themes, and we approve those as
24 well.
25     Q.  What is VLT if you know what that stands

Page 74

1 for?

2    A.  Video lottery terminals.

3    Q.  Okay.  Do you have any responsibility for

4 determining how the funds that -- well, I should say

5 when someone buys a lottery ticket, does the

6 commission for the Ohio Lottery Commission have

7 responsibility for those funds?

8    A.  The Ohio Lottery Commission does.

9    Q.  Yeah.

10    A.  The commissioners of the Ohio Lottery

11 Commission, not necessarily.

12    Q.  So do you have any responsibility for

13 determining how money of the Ohio Lottery Commission

14 receives is then allocated for whatever purposes

15 they're allocated for?

16    A.  Can you try to hone in a little bit on

17 that question, please?

18    Q.  Sure.  So someone buys a lottery ticket.

19 Some of that money goes to the winning if their

20 number is called, right?

21    A.  Yes.

22    Q.  And then some of the money the Commission

23 keeps and then distributes.

24       Is that also right?

25    A.  That's correct.

Page 75

1    Q.  Okay.  Are the distributions something

2 that you as a commissioner have any responsibility

3 for overseeing?

4    A.  Not -- not -- we cannot -- we don't direct

5 where money goes.

6    Q.  Okay.  So you can't say, for instance,

7 this money should go to education?

8    A.  No.

9    Q.  And you can't say that it should go to

10 public safety?

11    A.  No.

12    Q.  Do you -- do you know who has

13 responsibility for determining where the money the

14 Commission distributes goes?

15    A.  Particularly I can tell you the education

16 money.

17    Q.  Okay.

18    A.  The state legislature as part of their

19 budget process tells the Lottery Commission how much

20 we are -- our goal for the fiscal year shall be to

21 transfer to the education profits fund.

22    Q.  And does the State Lottery Commission or

23 has the State Lottery Commission allocated money to

24 respond to heroin abuse in the State of Ohio to your

25 knowledge?

Page 76

1    A.  I don't know.

2    Q.  How about has the Ohio Lottery Commission

3 distributed funds to respond to prescription opioid

4 abuse in the State of Ohio, to your knowledge?

5    A.  I don't know.

6    Q.  And when did you become one of the

7 commissioners on the Ohio Lottery Commission?

8    A.  I don't remember the exact date.

9    Q.  Okay.  Do you know if it was during

10 Governor Kasich's second term, which I think is 2014

11 to 2018?

12    A.  I'm pretty sure it was in the second term.

13    Q.  Okay.  In your previous responsibilities

14 as a county employee, as an intern for the Board of

15 Commissioners, as a budget analyst for OBM, or as

16 the fiscal services manager of the Board of

17 Elections, did your job responsibilities touch on

18 prescription opioid abuse in Cuyahoga County?

19       MS. SACKS:  Objection.

20       THE WITNESS:  I don't remember.  I don't

21 recall.

22 BY MR. MOONEY:

23    Q.  Did your -- did you have any role in those

24 three positions in assisting the county's response

25 to heroin abuse?

Page 77

1       MS. SACKS:  Objection.

2       THE WITNESS:  I don't remember.

3       MR. MOONEY:  Okay.  Do you want to take a

4 quick break?  I think we've been going for longer

5 than I intended to.

6       MS. SACKS:  Yes, that's fine.

7       MR. MOONEY:  Okay.

8       THE VIDEOGRAPHER:  Off the record, 10:22.

9          (Whereupon, a recess was taken

10          from 10:22 a.m. to 10:36 a.m.)

11       THE VIDEOGRAPHER:  On the record, 10:36.

12 BY MR. MOONEY:

13    Q.  Mr. McAleer, shortly before we took a

14 break, you mentioned that you started as the

15 legislative budget adviser sometime in the summer of

16 2011; is that correct?

17    A.  Yes, sir.

18    Q.  And what are your responsibilities as the

19 legislative budget adviser for the Cuyahoga County

20 Council?

21    A.  So there are 11 council members.  We have

22 a decently small staff, so my responsibilities are

23 pretty wide ranging from mundane administrative

24 tasks to helping draft legislation from policy ideas

25 that council members may have to help assisting and

20 (Pages 74 - 77)

Page 78

1  keeping council members apprised of the budget to,
2  as we previously discussed, attending Board of
3  Control meetings as alternates to council members.
4      Q.  Are there any other responsibilities that
5  you can think of sitting here today that you have as
6  the legislative budget adviser?
7      A.  Not -- I mean, it is -- it's wide range
8  because, again, we have a small staff.
9      Q.  So if a member has a question or a
10 project, they might come to you even though it's not
11 really budget-related; is that right?
12     A.  That's correct.
13     Q.  Let's start with drafting legislation.
14         What kind of legislation are you
15 responsible for drafting or have you drafted in the
16 past?
17     A.  Yes, so, again, we have 11 council
18 members.  They're part-time.  So if they have an
19 idea or concept or policy that they would like to
20 see considered by their colleagues, they will come
21 to me, or maybe a co-worker but, you know, I'm one
22 of the staff members, and say can you -- here are my
23 ideas, can you draft this.
24         An example of that is the kind of the
25 purchasing code that we previously discussed in

Page 79

1  terms of setting up boards, setting up thresholds
2  and things of that nature.  I would assist in help
3  drafting that type of legislation.
4      Q.  Did you assist in drafting that specific
5  legislation, the purchasing code?
6      A.  Yes.
7      Q.  Are there any other examples of
8  legislation that you've helped draft over the years
9  as a legislative budget adviser?
10     A.  Yes, there's dozens of -- it's a fairly
11 new government, so not hundreds but dozens of
12 codified ordinances that I've assisted in.
13     Q.  Have you assisted in drafting any
14 resolutions of the County Council?
15     A.  A few resolutions.
16     Q.  But fewer resolutions than ordinances?
17     A.  Correct.
18     Q.  And what types of resolutions have you
19 helped draft?
20     A.  For the most part, the type of resolutions
21 that I have helped draft would be related to board
22 appointments.  Those are done through resolutions.
23 So those type of resolutions is what I would
24 typically draft.
25         If the County Council enters into its own

Page 80

1  contract, I would help assist in drafting that
2  resolution.
3      Q.  You've mentioned board appointments a
4  couple times.
5          What boards exist that County Council
6  approves members for?
7      A.  There are approximately I believe 70 or so
8  boards.
9      Q.  Okay.  That's far too many --
10     A.  Yes.
11     Q.  -- to go through.
12         Are there sort of categories of boards,
13 financial boards, nonprofit boards, Metro Health?
14     A.  It's a wide range of boards.
15     Q.  Okay.  But does County Council approve
16 members to the board of trustees of the MetroHealth
17 Hospital system?
18     A.  They confirm, yes.
19     Q.  And they confirm members that are
20 nominated by the executive?
21     A.  That's correct.
22     Q.  And how about to the ADAMHS Board, does
23 the County Council approve members of the ADAMHS
24 Board?
25     A.  Yes, not all of them.

Page 81

1      Q.  Is there a separate approval process for
2  one, for members that are not approved by the County
3  Council?
4      A.  Yes.
5      Q.  And what is that process, if you know?
6      A.  It's done at the state level.
7      Q.  You mentioned that you helped draft the
8  resolutions approving those members.
9          Is there a -- are there hearings for
10 nominees before the County Council?
11     A.  Yes.
12     Q.  And are those appointments, those
13 nomination meetings, are they before the entire
14 County Council or a committee of the Council?
15     A.  I don't -- I would say the majority of the
16 appointments always go to the HR committee.
17     Q.  And who is the chairperson of the HR
18 committee today, if you know?
19     A.  Councilwoman Shontel Brown.
20     Q.  And how long was Councilwoman Brown served
21 as the chairperson of the HR committee, if you know?
22     A.  I don't have an exact time frame.
23     Q.  Has she served as the chairperson for the
24 HR committee for the past four years?
25     A.  I don't know.

21 (Pages 78 - 81)

Page 82

1    Q.   Do you know if there was or if there has
2   been another chairperson of the HR committee in your
3   time as the legislative budget adviser?
4    A.   Yes.
5    Q.   And who was that chairperson?
6    A.   Councilwoman Yvonne Conwell.
7    Q.   And do you attend the HR committee
8   meetings where these appointments are presented to
9   the committee?
10    A.   Yes.
11    Q.   And what happens or can you walk me
12   through the process of a hearing before the HR
13   committee?
14    A.   Yes.
15    Q.   Would you please do that.
16    A.   Yes.  The entire process includes the
17   county executive will nominate an individual to a
18   board.  That then gets drafted into legislation, a
19   resolution, that will be given to our clerk of
20   council.  Our clerk of council then will put that
21   resolution on a Council agenda, a full Council
22   agenda.
23       That resolution then gets referred to a
24   committee, which in this case is the HR committee.
25   Then the HR committee will meet and have as many

Page 83

1   number of committee meetings that they need.  And if
2   it gets -- the HR committee will then vote on to
3   refer that item back to the full council for
4   consideration of the item.
5    Q.   And then when it gets to council, is there
6   another hearing?
7    A.   There is a committee -- I'm sorry, a
8   council meeting where then the full council would
9   take action on that particular item.
10    Q.   And does the nominee for whichever board
11   is currently being considered, does that person
12   usually appear before the full council for an
13   additional hearing?
14    A.   No, just at the HR committee typically.
15    Q.   Right.  There are going to be differences,
16   but in general that's the way it works?
17    A.   Correct.
18    Q.   And is the process you just described the
19   way that the council has operated since you started
20   as a legislative budget adviser in the summer of
21   2011?
22    A.   Yes.
23    Q.   And throughout this process, aside from
24   sometimes drafting the resolution for the
25   appointments, do you have any other responsibilities

Page 84

1   in the nomination process that you just described?
2    A.   Occasionally, yes.
3    Q.   And what are those responsibilities?
4    A.   I may have to speak at the HR committee
5   meeting to answer a question by the committee, one
6   of the committee members.
7    Q.   What types of questions does the council
8   ask of you during these hearings?
9    A.   They tend to be high-level.  It's not
10   necessarily about the appointee but more about, say,
11   a term, if it's a term, when did it become vacant,
12   how many other seats might be vacant, things of that
13   nature.
14    Q.   So you're not being asked to provide a
15   recommendation one way or the other on whether a
16   nominee should be approved by the Council; is that
17   right?
18    A.   Not on executive-recommended appointments
19    Q.   Okay.  On non-executive-recommended
20   appointments, is your role different?  Do you -- is
21   your role different?
22    A.   Yes.
23    Q.   And how is your role different for
24   non-executive appointments?
25    A.   There are very few boards that Council

Page 85

1   directly appoints versus confirming to certain
2   boards, and I will handle that process along with
3   co-workers of coming up with a recommendation to
4   council members.
5    Q.   And which boards exist for the County for
6   which the County Council appoints members as opposed
7   to approving or confirming executive
8   recommendations?
9    A.   I don't have an exhaustive list, but one
10   is the Soldiers and Sailors Monument.
11    Q.   Can you think of any other examples?
12    A.   No.
13    Q.   Have you in your time as legislative
14   budget adviser participated in communications with
15   members of the County Council regarding specific
16   appointees to the ADAMHS Board?
17       MS. SACKS:  Objection.
18       THE WITNESS:  Can you ask that one more
19   time, please.
20   BY MR. MOONEY:
21    Q.   Maybe.  In your time as the legislative
22   budget adviser, have you been a part of any
23   conversations with members of the County Council
24   regarding appointments to the ADAMHS Board?
25       MS. SACKS:  Same objection.

22 (Pages 82 - 85)

Page 86

1    THE WITNESS: Can you clarify what you
2 mean by that question?
3 BY MR. MOONEY:
4    Q.  Sure.  So if the executive nominates Jane
5 Smith to the ADAMHS Board, have you had any
6 conversations with members of Council about whether
7 Jane Smith should or should not be confirmed as a
8 member of the ADAMHS Board?
9    A.  Not should or should not.
10    Q.  Have you had other conversations about
11 specific nominees to the ADAMHS Board with members
12 of council?
13    MS. SACKS:  Objection.
14    THE WITNESS:  Yes.
15 BY MR. MOONEY:
16    Q.  What kinds of conversations have you had
17 about nominees to the ADAMHS Board with members of
18 the County Council?
19    A.  It could be questions around, if it's a
20 reappointment for a particular individual, when was
21 this person first appointed; does this person
22 still -- I mean, is the person still working at X
23 place just to see if that person's resumé is still
24 up to date or things of that nature to get a
25 background on that individual person.

Page 87

1    Q.  Do you know why members of Council vote to
2 approve particular members of the ADAMHS Board?
3    MS. SACKS:  Objection.
4    THE WITNESS:  I don't know.
5 BY MR. MOONEY:
6    Q.  Do you know what considerations go into
7 members of Council's evaluation of whether or not an
8 appointee should or should not be approved as a
9 member of the ADAMHS Board?
10    A.  I don't know.
11    Q.  Have you had any conversations with
12 members of Council about the criteria that they
13 apply when evaluating whether or not to approve a
14 nominee for a position as an ADAMHS Board member?
15    A.  Can you ask that --
16    Q.  I can try.
17    Have you had any conversations with
18 members of Council about the criteria that they
19 apply when evaluating whether or not to approve a
20 nominee to the ADAMHS Board?
21    A.  What do you mean by criteria?
22    Q.  So a nomination comes before the County
23 Council, right, and they -- and the council member
24 either says yes, this person should be appointed or
25 approved or not, right?

Page 88

1    A.  Yes.
2    Q.  Have you had any conversations with
3 members of County Council about how they make that
4 determination of whether or not to vote to approve a
5 member or a nominee for the ADAMHS Board?
6    MS. SACKS:  Objection.
7    THE WITNESS:  I don't remember.
8 BY MR. MOONEY:
9    Q.  If I wanted to know why a council member
10 voted to approve an executive nominee to the ADAMHS
11 Board, who would I speak to if you don't know?
12    MS. SACKS:  Objection.
13    THE WITNESS:  I don't know who you would
14 speak to.
15 BY MR. MOONEY:
16    Q.  Would Mr. Nanni know, the chief of staff?
17 Yeah, would Mr. Nanni know?
18    A.  I don't know.
19    MS. SACKS:  Objection.
20 BY MR. MOONEY:
21    Q.  Is there a member of the County Council
22 staff with responsibility for assisting the council
23 members with the nomination process, that is their
24 overall responsibility as opposed to that's just
25 part of yours?

Page 89

1    MS. SACKS:  Objection.
2    THE WITNESS:  There is for the nomination
3 process.
4 BY MR. MOONEY:
5    Q.  Okay.  And who is that person?
6    A.  It's the clerk who clerks the HR
7 committee.
8    Q.  And is there a specific clerk for each of
9 the committees?
10    A.  There is.
11    Q.  Okay.  Do you have any role in drafting
12 budget resolutions?
13    A.  Not original budget resolutions, not the
14 introduced budget resolutions.
15    Q.  Okay.  So it sounds like you're making a
16 distinction between the original budget resolution
17 and then something else.
18    Is there a something else?
19    A.  Yes.
20    Q.  Okay.  What is -- what is that something
21 else that you do have responsibility for?
22    A.  It would be budget amendments to a
23 proposed budget resolution.
24    Q.  Let's start with the budget resolution
25 itself, the original one.

23 (Pages 86 - 89)

Page 90

1        Who has responsibility for drafting that
2 resolution?
3    A.  I don't know who drafts the budget, the
4 original budget resolution.
5    Q.  Is there a particular department in the
6 executive's office that drafts the resolution?
7    A.  There's -- there's a particular department
8 that's in charge of creating the contents of the
9 resolution.  I don't know who drafts it.
10    Q.  Okay.  And who is the department in charge
11 of creating the contents of the resolution?
12    A.  Office of Budget and Management.
13    Q.  And so OBM puts together the contents of a
14 resolution, someone creates the resolution itself,
15 and then it goes to the County Council; is that
16 right?
17    A.  It eventually comes to the County Council.
18    Q.  Okay.  And then there's a budget
19 amendment.  There's a budget amendment.
20        What's that?
21    A.  So if there is the budget resolution
22 that's introduced to the County Council, the County
23 Council goes through the budget process, which can
24 take up to anywhere between three months, up to
25 three months; and council members have in the past

Page 91

1 amended the proposed budget.
2    Q.  And then so if a council member wants to
3 amend the proposed budget, it would come to you to
4 draft the amendment?
5    A.  Yes.
6    Q.  And is that amendment a separate
7 resolution or something else?
8    A.  It could be -- it could be.
9    Q.  So it could be a separate resolution.  And
10 is the alternative that you would just enter into
11 the Word document and change a number?
12    A.  No.
13    Q.  So what's the other way that there could
14 be an amendment if not as a separate resolution?
15    A.  It could be an Excel spreadsheet with the
16 proposed amendments that then the council would take
17 action on those proposed amendments.  It could be a
18 writeup spelling out what the amendment would be,
19 and they could adopt those amendments that way.
20    Q.  And for each of these options for the
21 amendment, it would be your responsibility to create
22 that document; is that right?
23    A.  Yes.
24    Q.  You also mentioned that your
25 responsibilities include keeping the County Council

Page 92

1 apprised of the budget process.
2        What does that responsibility entail?
3    A.  So that includes ensuring that they have
4 all the necessary information that we receive from
5 the various directors, departments, and any other
6 additional information that OBM might need to submit
7 as supplemental material to the proposed budget
8 resolution and ensuring that council members are
9 receiving that information.
10    Q.  And so is it your role to sort of
11 interface between the County Council and the
12 executive's administration on matters relating to
13 the budget?
14    A.  Yes.
15    Q.  Other than ensuring that the County
16 Council has the information they need, are there
17 other responsibilities that you have as the
18 legislative budget adviser that sort of fall under
19 the umbrella of keeping the Council apprised of the
20 budget?
21    A.  Could you clarify that, what you mean by
22 that?
23    Q.  Sure.  I can try.
24        So after the budget is passed, do you have
25 any role in keeping the Council apprised of how the

Page 93

1 executive is performing in relation to the approved
2 budget?
3        MS. SACKS:  Objection.
4        THE WITNESS:  I don't know what you mean
5 by "how the executive is performing."
6 BY MR. MOONEY:
7    Q.  So the ADAMHS Board, I'm just using them
8 as an example, the ADAMHS Board gets $100,000, and
9 they're supposed to be spending $50,000 on
10 personnel.
11        Is it your responsibility to keep the
12 council members apprised of whether or not the
13 ADAMHS Board is spending money consistent with the
14 money that was allocated in the budget or if they've
15 gone over, they're actually going to spend $55,000
16 on personnel?  Is that within your wheelhouse as the
17 legislative budget adviser?
18    A.  There I think is a little misunderstanding
19 on how the ADAMHS Board in particular is funding
20 versus other agencies.
21    Q.  Okay.  Pick a different one that's sort of
22 more in line.
23    A.  So like an executive -- administrative
24 department of development.
25    Q.  Sure, great.

24 (Pages 90 - 93)

Page 94

1    A.   We get monthly projections from the Office
2  of Budget and Management on how they are performing.
3    Q.   And when you say "we," who do you mean by
4  that?
5    A.   Typically it will come to me, and
6  sometimes council members are on it.  I will make
7  sure council members have it from there if they're
8  not on the notification.
9    Q.   Okay.  And so once you've ensured that the
10  council members have the monthly reports from the
11  administrative agencies, do you communicate with the
12  council members about those documents at all?
13    A.   Sometimes, yes.
14    Q.   Okay.  And what kinds of conversations do
15  you have with the members of Council about those
16  monthly budget reports?
17    A.   It could vary from month to quarter in
18  terms of if something sticks out from the report,
19  just things that I want to make sure is on the
20  council members' radar.
21    Q.   So it is correct that you review the
22  reports to look for things that stick out?
23       MS. SACKS:  Objection.
24       THE WITNESS:  The monthly -- the monthly
25  reports.

Page 95

1  BY MR. MOONEY:
2    Q.   Okay.
3    A.   Or quarterly reports.
4    Q.   And what do you mean by things that stick
5  out in those monthly or quarterly reports?
6    A.   An example of that could be if our sales
7  tax revenue is down 3 percent from what was
8  originally projected, that's a significant variance,
9  is that going to be a trend or is that going to --
10  is this a one-time problem, things like that.
11    Q.   So do you in your role as the legislative
12  budget adviser work to create sort of trend reports
13  that show the changes in sales tax over time?
14    A.   I track sales tax.  I don't create.  I
15  don't create the reports that are sent to us.
16    Q.   Okay.  And so if there were a report that
17  tracked historical sales tax revenue, that would
18  come from OBM?
19    A.   Historical sales tax, yes.  I personally
20  also as my duty keep track of monthly sales tax
21  reports dating back for years.
22    Q.   But you don't create a separate document?
23    A.   I do not.
24    Q.   You just keep eyeballing it?
25    A.   Yes.

Page 96

1    Q.   You mentioned earlier that members will
2  come to you or other members of the council staff
3  with policy ideas; is that correct?
4    A.   Yes.
5    Q.   And they'll sometimes ask that the staff
6  implement or draft legislation to implement those
7  policy ideas?
8    A.   Yes.
9    Q.   In your time as the legislative budget
10  adviser, has any member of the County Council come
11  to you and asked for your assistance in drafting
12  legislation to respond to prescription opioid abuse
13  in Cuyahoga County?
14       MS. SACKS:  Objection.
15       THE WITNESS:  Can you ask that -- can you
16  rephrase that question, please?
17  BY MR. MOONEY:
18    Q.   Was there a particular part of the
19  question that you found confusing?
20    A.   Because when I was talking about a policy
21  getting drafted to legislation, I was referring to
22  codified ordinances, and I don't believe that's what
23  you're asking.  I don't believe that's what you're
24  seeking.
25    Q.   So okay.  Are there any codified

Page 97

1  ordinances that you're aware of that were enacted by
2  the County Council that relate to prescription
3  opioid abuse?
4    A.   Not codified ordinances.
5    Q.   Are there resolutions that relate to
6  prescription opioid abuse in Cuyahoga County that
7  the County Council has enacted?
8    A.   There have been budget amendments to
9  budgets related to the issue.
10    Q.   And when you say "related to the issue,"
11  what do you mean by that?
12    A.   The ADAMHS Board as well as other
13  departments have come to the County Council and have
14  talked to us about increased areas where they're
15  seeing that they would request additional resources
16  to help combat the issue.
17    Q.   And when you say "the issue," what do you
18  mean by that?
19    A.   They would talk about the -- they would
20  use the terms "opiate crisis," "the prescription
21  drug issue."  They are the ones coming to us asking
22  us for resources based on that.
23    Q.   When these departments or ADAMHS Board
24  have come and asked for additional resources to
25  combat the issue, have they also described the issue

25 (Pages 94 - 97)

1 as one involving heroin abuse?

2        MS. SACKS:  Objection.

3        THE WITNESS:  I don't remember.

4 BY MR. MOONEY:

5    Q.   Has the issue that you mentioned, has that

6 ever been described as a fentanyl issue?

7        MS. SACKS:  Objection.

8        THE WITNESS:  I don't know.

9 BY MR. MOONEY:

10    Q.   What -- what resources have -- has the

11 ADAMHS Board requested to respond or to combat the

12 opiate crisis?

13        MS. SACKS:  Objection.

14        THE WITNESS:  Can you clarify what you

15 mean by that?

16 BY MR. MOONEY:

17    Q.   Sure.  You said the budget -- the ADAMHS

18 Board as well as other departments have come to the

19 County Council and have talked about the increased

20 areas where they're seeing that they would request

21 additional resources to help combat the issue.

22    Right?

23    A.   Yes.

24    Q.   And then I said what is the issue, and you

25 said it's been described as an opiate crisis.

1        So my question is, what resources has the

2 ADAMHS Board requested of the County Council?

3    A.   So they have come to other -- they have

4 come to us asking for millions of dollars for

5 various programs seeking some help and assistance

6 from the County Council to increase their subsidy.

7    Q.   And when did the ADAMHS Board come to the

8 County Council asking for millions of dollars for

9 various programs seeking some help and assistance

10 from the County Council to increase their subsidy?

11    A.   They've come multiple times.

12    Q.   Okay.

13    A.   I don't have exact dates, but they've come

14 multiple times.

15    Q.   Do they come as part of during the

16 budgeting process?

17    A.   For the most part, they've come during the

18 budget hearing process.

19    Q.   Okay.  And so when was the most recent

20 budget hearing process?

21    A.   It was the fall of 2017 for the 2018-'19

22 biennial budget.

23    Q.   And the ADAMHS Board asked for money to

24 increase the services they could provide to respond

25 to the opiate crisis at this hearing -- these

1 hearings in the fall of 2017?

2        MS. SACKS:  Objection.

3        THE WITNESS:  I don't remember.

4 BY MR. MOONEY:

5    Q.   Okay.  When was the -- what was the budget

6 process that occurred before the fall of 2017?

7    A.   It would have been the fall of 2015 for

8 the 2016-'17 biennial budget.

9    Q.   Okay.  And did the ADAMHS Board come to

10 the County Council asking for dollars for various

11 programs seeking help and assistance from the County

12 Council to increase their subsidy to respond to the

13 opioid crisis in these fall of 2015 budget hearings?

14        MS. SACKS:  Objection.

15        THE WITNESS:  I don't know if it was

16 during that budget hearing.

17 BY MR. MOONEY:

18    Q.   Okay.  Before the fall of 2015, when was

19 the budget process before that?

20    A.   I don't have an exact date, but it would

21 have -- if the biennial budget process was in place,

22 because for a couple years we did single-year

23 budgets, then we moved to a biennial budget process,

24 if it was a biennial budget process, it would have

25 been the fall of 2013.

1    Q.   Even if it were an annual budget process,

2 would there have been hearings in the fall of 2013?

3    A.   Similar time frame, yes.

4    Q.   So in the fall of 2013, did members of the

5 ADAMHS Board come before County Council asking for

6 money to increase the services they could provide to

7 respond to the opiate crisis?

8        MS. SACKS:  Objection.

9        THE WITNESS:  I don't remember if it was

10 the fall of 2013.

11 BY MR. MOONEY:

12    Q.   Okay.  So what kinds of services were --

13 did the members of the ADAMHS Board who spoke to

14 County Council say they wanted to provide to respond

15 to the opiate crisis, if you know?

16        MS. SACKS:  Objection.

17        THE WITNESS:  I don't know specifically

18 what type of services.  I know that they would come

19 asking for money.

20 BY MR. MOONEY:

21    Q.   And as part of that process -- strike

22 that.

23        Understanding that you don't remember when

24 these conversations occurred, is it your belief that

25 the ADAMHS Board would have provided some kind of

Page 102

1  information about the types of services they wanted
2  to provide to respond to the opiate crisis for which
3  they sought additional funding?
4      A.  Yes, they would provide information.
5      Q.  And when you say the ADAMHS Board was
6  requesting funding, was it funding specifically
7  related to the opiate crisis?
8      MS. SACKS:  Objection.
9      THE WITNESS:  It would be for mental
10  health services and addiction services.
11  BY MR. MOONEY:
12      Q.  Which includes opiate addiction, right?
13      A.  I don't know for sure.
14      Q.  But it --
15      A.  I mean, it --
16      Q.  Probably?
17      A.  It was listed in their services, but I
18  couldn't tell you what type of services.
19      Q.  But there are services the ADAMHS Board
20  provides that are unrelated to opiate addiction?
21      MS. SACKS:  Objection.
22      THE WITNESS:  There are mental health
23  services and other services provided.
24  BY MR. MOONEY:
25      Q.  And so when the ADAMHS Board asks for

Page 103

1  additional funding, do they -- did the members of
2  the ADAMHS Board identify how much of that
3  additional funding would go to opiate addiction as
4  opposed to some other purpose?
5      A.  I don't remember.
6      Q.  Is it your experience that when the ADAMHS
7  Board provides funding requests they would
8  distinguish between services for opiate addiction
9  versus other services the ADAMHS Board might
10  provide?
11      A.  The ADAMHS Board would lay out pretty
12  detailed what their request for additional funding
13  would be for.
14      Q.  Okay.  Aside from the ADAMHS Board, which
15  other departments have come before the County
16  Council requesting additional resources to combat
17  the issue of prescription drug abuse?
18      A.  So in terms of specific requests, I can't
19  specifically pinpoint to one request, but we've
20  heard from various department directors of the type
21  of challenges and issues and increased costs that
22  they're seeing within their departments because of
23  the issue.
24      Q.  Okay.  Before we go there, I want to
25  circle back on the ADAMHS Board piece.

Page 104

1      Do you know whether in requesting
2  additional funding the ADAMHS Board distinguishes
3  between heroin abuse and prescription opioid abuse?
4      A.  I don't know.
5      Q.  All right.  Turning to the department
6  directors asking for additional funding, which
7  departments have asked for additional funding of the
8  County Council to respond to the opioid issue?
9      A.  So in terms of individual departments that
10  we've heard that is putting a strain on their
11  budgets include the Department of Children and
12  Family Services with the number of kids that are in
13  county custody because they -- the child, sometimes
14  babies, have lost one of their parents or both of
15  their parents to the issue.
16      They -- we have heard from our county
17  sheriff's department about the number of inmates
18  that are being taken into the jail custody.  That
19  number of inmates has skyrocketed over the years.
20      We have heard from our Medical Examiner's
21  Office in terms of something as simple as the
22  increased number of transportation, body
23  transportation contract that they had to increase
24  because of this.
25      And we've heard from the MetroHealth

Page 105

1  Hospital just in terms of the Project DAWN and other
2  areas that they are using or that they have tried to
3  combat the issue.
4      Those are the specific examples that I can
5  recall right now.
6      Q.  Okay.  So we have Child and Family
7  Services, the sheriff's department, medical examiner
8  and MetroHealth, and then the ADAMHS Board?
9      A.  And the ADAMHS Board, yes, sir.
10      Q.  Are there any other departments sitting
11  here today that you can recall coming before the
12  County Council and requesting funding to respond to
13  the opioid issue?
14      A.  Not that I can recall specifically that
15  have come and requested money to that, but I will
16  say that all of our departments at the County are
17  impacted in some form or fashion because we only
18  have so much money.  We can't print money.
19      So if we do have to increase different
20  departments, that's got to come from somewhere.
21      Q.  So when you say that all departments are
22  impacted in some form or fashion, are you -- you're
23  referring to there's a finite pot of money that the
24  county can allocate, and if you're spending money on
25  X you can't spend it on Y; is that right?

27 (Pages 102 - 105)

1    A.  Correct.  There's only so much money.

2    Q.  Okay.  Are there any other impacts that
3 all of the departments are experiencing because of
4 the opioid crisis?

5    A.  I will say I just thought of another
6 department based off your question would be child
7 support, where we have heard that the amount of
8 money that are being collected owed due to child
9 support has gone down because of the issue.

10        So now that doesn't financially impact the
11 county general fund or the Health and Human Services
12 levy, but that impacts other people who are
13 dependent on that type of money.

14        So that has -- that department has been
15 impacted as well.

16    Q.  Okay.  Do you know if the County is
17 seeking unpaid child support due to the opioid
18 crisis as part of this lawsuit?

19    MS. SACKS:  Objection.

20    THE WITNESS:  I don't know.

21 BY MR. MOONEY:

22    Q.  Circling back to the Child and Family
23 Services department, let's start there, when did
24 Child and Family Services inform the County Council
25 that its costs were increasing because of increased

1 numbers of kids in custody because of the opioid
2 crisis?

3    A.  I can't give you an exact date.  I don't
4 know the exact date.

5    Q.  Was it part of the 2017 budget hearing
6 process?

7    A.  I don't know.

8    Q.  Was it part of the 2015 budget hearing
9 process?

10    A.  I don't know.

11    Q.  Was it part of the 2013 budget hearing
12 process?

13    A.  I don't know.

14    Q.  Okay.  When the County -- when Child and
15 Family Services informed the County Council that it
16 was seeing an increase in the number of kids who
17 were in custody due to the opioid crisis, did the
18 individuals who provided that information
19 distinguish between overdoses of prescription
20 opioids and overdoses of heroin?

21    A.  I don't know.

22    Q.  Do you know, do you know what percentage
23 of children are in child custody now because of
24 issues related to prescription opioid abuse?

25    A.  I don't know.

1    Q.  Do you know if anyone on the County
2 Council has that information?

3    A.  I don't know.

4    Q.  Is there a particular committee of the
5 County Council that has responsibility or would have
6 heard this information from Child and Family
7 Services?

8    A.  There is a Health and Human Services
9 committee, but as I previously talked about, the
10 monthly or quarterly reports, that is from a
11 budgetary perspective.  And those reports provided
12 data of the average number of kids in custody.

13        So that would have been included in those
14 reports, and if you look over the years, you can see
15 an increase.

16    Q.  Has any member of the County Council
17 received those reports from Child and Family
18 Services that show an increase in the number of
19 children in custody?

20    A.  Those reports would have been initiated by
21 the Office of Budget and Management.

22    Q.  And then provided to you?

23    A.  Yes.

24    Q.  And then you would have seen that the
25 members of County Council received that report?

1    A.  Yes.

2    Q.  Has any member of County Council after
3 they received the report come back to you and asked
4 any questions about the report?

5    MS. SACKS:  Objection.

6    THE WITNESS:  Any questions about the
7 report?  Is that what you're asking?

8 BY MR. MOONEY:

9    Q.  About the reasons for the increase in the
10 number of children in custody.

11    A.  I don't know about the reasons.

12    Q.  Okay.

13    A.  We've talked about the number of kids in
14 custody and what that does to, say, overtime and
15 things of that nature but not the specific reasons.

16    Q.  Okay.  Are there any other costs that the
17 Child and Family Services department has informed
18 you or members of Council that have increased
19 because of the opioid crisis in Cuyahoga County?

20    A.  Except for the overtime, I mean --

21    Q.  So the overtime and the number of children
22 in custody have increased the costs to Child and
23 Family Services?

24    A.  I don't recall any other.

25    Q.  Okay.  And when the information -- when --

28 (Pages 106 - 109)

Page 110

1 do you have an understanding of how much of that
2 overtime increase is due to prescription opioid
3 abuse as compared to heroin abuse?
4    A.   I don't know.
5    Q.   When Child and Family Services asked for
6 additional funding to respond to the opioid issues
7 the County faces, did the County Council approve
8 that funding?
9       MS. SACKS:  Objection.
10      THE WITNESS:  It wasn't -- just going back
11 to the process where the administration provides a
12 recommended budget.  There have been times
13 throughout the budget process where County Council
14 has during the budget hearings increased DCFS's
15 budget.
16 BY MR. MOONEY:
17   Q.   Okay.  Above what the executive's
18 recommended budget was?
19   A.   Yes.
20   Q.   And the reason -- and did the members of
21 the County Council explain why they were increasing
22 the Child and Family Services budget above what was
23 requested from the county executive?
24   A.   One particular example is increase -- they
25 increased the number of social workers because the

Page 111

1 caseload sizes for the social workers were
2 unmanageable.
3    Q.   And as part of that -- sorry.
4       When did that increased number of social
5 workers occur?
6    A.   I don't have the exact budget time frame.
7    Q.   Sure.  And was part of the reason that the
8 number of social workers was so low because Child
9 and Family Services had to reduce the number of
10 social workers it had as a result of the economic
11 recession in 2008?
12      MS. SACKS:  Objection.
13      THE WITNESS:  I don't know.
14 BY MR. MOONEY:
15   Q.   Was there any explanation provided by the
16 members of Child and Family Services that they were
17 understaffed because of a large reduction in force
18 arising out of the economic conditions of The Great
19 Recession?
20      MS. SACKS:  Objection.
21      THE WITNESS:  I don't know.
22 BY MR. MOONEY:
23   Q.   Do you know how many social workers were
24 employed by Child and Family Services before the
25 County Council amended the budget to increase the

Page 112

1 amount that CFS would receive?
2    A.   I don't have that number.
3    Q.   You mentioned that the sheriff's
4 department has asked for additional funding of the
5 County Council because of the number of inmates that
6 have -- in custody that have I believe you used the
7 word "skyrocketed" over the years; is that right?
8    A.   That is correct.
9    Q.   Okay.  And when you say the number of
10 inmates in custody has skyrocketed, that's because
11 of prescription opioid abuse?
12   A.   I don't know.
13   Q.   Okay.  It's just that there are more
14 people going to jail now than there were at some
15 point in the past?
16   A.   There are more inmates in custody at the
17 Cuyahoga County Sheriff's Office.
18   Q.   And when did the sheriff's department
19 inform the Cuyahoga County Council that it needed
20 additional funding to respond to the increase in the
21 number of inmates in custody?
22   A.   Similar to DCFS, typically on the monthly
23 or quarterly OBM reports that we receive, it also
24 tracks the average daily population over time.  And
25 it's been an increasing issue with the number of

Page 113

1 inmates per year on average that are there every
2 day.  It's gone up year over year.
3       So you can see correlation, again similar
4 to DCFS, overtime increased costs because of the
5 number of inmates that are there and number of staff
6 you need there, and you can see that number going up
7 over the same time frame of the number of children
8 have gone up for DCFS.
9    Q.   And does the monthly reports that you're
10 referring to distinguish between inmates that are in
11 custody because of prescription opioid abuse as
12 opposed to some other reason?
13   A.   No.
14   Q.   Do you know which -- how -- what
15 percentage of the inmates in custody of the
16 sheriff's department are there as a result of opioid
17 abuse?
18   A.   I don't know.
19   Q.   How about of heroin abuse?
20   A.   I don't know.
21   Q.   For people who have been arrested for
22 possession of heroin?
23   A.   I don't know.
24   Q.   People who have been arrested for
25 possession of prescription opioids?

29 (Pages 110 - 113)

Page 114

1    A.  I don't know.

2    Q.  Okay.  Is that information that's provided

3 to members of County Council --

4        MS. SACKS:  Objection.

5 BY MR. MOONEY:

6    Q.  -- to your knowledge?

7    A.  I don't know.

8    Q.  And when did the sheriff's department

9 request additional funding from the County Council

10 because of inmate increases in their custody?

11    A.  It could either be increasing money mainly

12 because of overtime or if other departments had to

13 go through budget reductions where they could not

14 take -- similar to DCFS, where they could not absorb

15 a budget reduction.

16        So other departments might have gotten

17 reduced, not necessarily the sheriff might have seen

18 more money, but we were unable to reduce their

19 budget because of the issue.  And that has happened

20 over the same time frame as DCFS.  Over the last

21 budgets we were unable to do that.

22    Q.  Sure.  So in the fall of 2017, did this

23 issue arise of the sheriff having an increased

24 number of inmates due to or in their custody?

25        MS. SACKS:  Objection.

Page 115

1        THE WITNESS:  I don't know.

2 BY MR. MOONEY:

3    Q.  How about in the fall of 2015 during that

4 budgeting process, did the sheriff's department

5 request funding to respond to the increase in the

6 number of inmates in their custody?

7    A.  I don't know.

8    Q.  What about in the fall of 2013 during that

9 budgeting process, did the sheriff's department

10 request additional funding for responding to the

11 increase in the number of inmates in their custody?

12    A.  I don't know.

13    Q.  And just to make sure that you and I are

14 on the same page in how we're describing this of

15 increased resources, is it that the executive has

16 recommended that the budgets be increased, or is it

17 that the Council is considering amending the

18 recommended budget to add additional funds on top of

19 what the budget -- the recommended budget already

20 has in it?

21        MS. SACKS:  Objection.

22        THE WITNESS:  What do you mean in terms

23 of -- because can you --

24 BY MR. MOONEY:

25    Q.  Yes.  I realized while you were talking

Page 116

1 we've sort of been using the terminology "additional

2 funding," but then you mentioned that the sheriff's

3 department may not have seen additional funding.  It

4 may have actually just seen a level budget while

5 other budgets had to be decreased because, in your

6 understanding, there's a finite amount of money, and

7 the revenue might have been low, and so the

8 sheriff's department got to keep everything, but

9 other people saw reductions; is that right?

10    A.  Correct.

11    Q.  So my question is, when describing the

12 Child and Family Services request for funding, were

13 they requesting additional funding, or was it a

14 request to remain level?

15    A.  In the social worker example that I said

16 where council members provided additional social

17 workers, that's something that was done after the

18 resolution was introduced.

19    Q.  Okay.  Are there other examples that you

20 can think of in the Child and Family Services budget

21 where after the OBM resolution was introduced the

22 council determined that it would amend the

23 resolution to add additional funding to respond to

24 the prescription opioid issue in Cuyahoga County?

25    A.  On top of the social workers, it related

Page 117

1 to originally when one budget was introduced there

2 was a belief that over time it could be reduced, so

3 that was a budget reduction.  During the budget

4 hearings, I think they, they collectively, it wasn't

5 just Council but Council had to amend the budget,

6 but the overtime goals that were in the proposed

7 budget wouldn't be met, couldn't be met, the

8 reduction.  So there had to be an increase there as

9 well.

10    Q.  Okay.  When OBM provides the budget to you

11 and then it gets to the Council, do you have any

12 input in the development of the OBM budget?

13    A.  You're talking about the biennial budget?

14    Q.  Yes.  Or does it just sort of come to you

15 as a finished product that gets the council members

16 involved and the process going?

17    A.  In most cases, prior to introduction there

18 are some discussions going back and forth about what

19 is going to be introduced.

20    Q.  And what are those discussions or what do

21 those discussions entail?

22    A.  Particularly focused on if there are

23 reductions in departments' budgets, more as an FYI,

24 or here is a program that we haven't funded before

25 that we would like to fund, a new initiative or

30 (Pages 114 - 117)

Page 118

1 program.  That would be included in the budget.
2    Q.  So are these more informational meetings
3 so that you know what's coming down the pike for the
4 members of Council?
5    A.  Yes.
6    Q.  Do you have any role in determining how
7 much money the executive's budget will recommend for
8 any particular department in the Cuyahoga County
9 government?
10    A.  Not in the recommendation.
11    Q.  The way you answered that makes me think
12 you might play a role in some other part of the
13 budgeting process in recommending how much
14 departments receive.
15        Is that true?
16    A.  Yes.
17    Q.  Okay.  What role do you play in that
18 process?
19    A.  That would be during the budget amendment
20 process where Council, as we talked about, would
21 make amendments to the budget.
22    Q.  Okay.  And what is your involvement in
23 that process?
24    A.  I would help assist in creating the budget
25 amendments for the council members, working with OBM

Page 119

1 to -- kind of reverse of giving them a heads up that
2 this is what Council is going to do during the
3 amendment process, during those budget hearings.
4    Q.  And do you provide recommendations to
5 members of Council regarding whether -- whether or
6 not a request for funding should or should not be
7 approved?
8    A.  They ask me my opinion.
9    Q.  Are there particular members of the County
10 Council who ask your opinion more frequently than
11 others?
12    A.  On budget amendments?
13    Q.  On budget amendment issues, yes.
14    A.  It's a tough question to answer because it
15 happens every two years.
16    Q.  Okay.  Are there particular members of
17 County Council who are more involved in the budget
18 process than others?
19        MS. SACKS:  Objection.
20        THE WITNESS:  What do you mean "more
21 involved"?
22 BY MR. MOONEY:
23    Q.  So I assume that the department or the
24 committee of finance has overall responsibility as a
25 committee for the budget.

Page 120

1        Is that right?
2    A.  No.
3    Q.  No, okay.  Where am I wrong about that?
4    A.  The biennial budget goes to the Committee
5 of the Whole, so that is an example.
6    Q.  And what's the Committee of the Whole?
7    A.  It's all 11 members that meet.  It's not a
8 council meeting, so they can't officially approve
9 anything or adopt anything out of the Committee of
10 the Whole.  They still have to refer it out of
11 Committee of the Whole to the full council.
12        So the biennial process happens during the
13 Committee of the Whole process.
14    Q.  I see.  Is there -- who's the chair of the
15 Committee of the Whole?
16    A.  For most Committee of the Wholes it's the
17 council president, but for the budget process the
18 chair of the finance committee will chair the
19 Committee of the Whole.
20    Q.  Okay.  So for the budget processes, at
21 least as long as Dale Miller has been the chair of
22 the Department of Finance, he has been the chair for
23 the budget process, right?
24    A.  Of the Committee of the Whole, yes.
25    Q.  Okay.  And so who was the chair of the

Page 121

1 finance department or finance division -- finance
2 committee of the County Council before Council
3 Member Miller?
4    A.  What time frame?
5    Q.  Just before.
6    A.  Immediately before?
7    Q.  Sure.
8    A.  Dave Greenspan.
9    Q.  And before Mr. Greenspan?
10    A.  Dale Miller.
11    Q.  Okay.  So it went Miller, Greenspan,
12 Miller?
13    A.  Miller back, yes.
14    Q.  Before Miller, was there a different
15 chair?
16    A.  He was the first chair of the finance
17 committee.
18    Q.  I see.  And have you provided a
19 recommendation to members of the County Council
20 regarding whether additional funding should be
21 provided to address Cuyahoga's opioid addiction
22 issues?
23    A.  I discussed with the council members the
24 request for additional social workers, the restoring
25 of the funds for the overtime.

31 (Pages 118 - 121)

1    Q.   Anything else?
2    A.   I've discussed that -- the inability to
3  reduce the sheriff's budget because of the overtime
4  issue.
5    Q.   Anything else?
6    A.   I've discussed the -- we haven't talked
7  about the funding provided for first responders for
8  the naloxone, I believe.
9    Q.   Is that -- is that first responders
10  related to MetroHealth funding?
11    A.   Part of -- they were involved in the
12  project, but we also wanted to make available to
13  various cities and stuff some funding through -- we
14  have public safety grants that that money could be
15  used for that purpose.
16    Q.   I see.
17    A.   In addition, we discussed -- we increased
18  the ADAMHS Board subsidy.
19    Q.   You -- the ADAMHS Board is funded by the
20  Health and Human Services levy, right?
21    A.   Partially funded by the Health and Human
22  Services levy.
23    Q.   What other part is the ADAMHS Board
24  funded?
25    A.   They get money that directly.  They get

1  money from the State of Ohio.  I don't know the
2  particulars.
3    Q.   Okay.  So as far as Cuyahoga County's
4  funding of the ADAMHS Board is concerned, it's
5  coming from the HHS levy?
6    A.   Yes.  There is I would say an asterisk to
7  that though.  I believe the Court of Common Pleas
8  has contracts with the ADAMHS Board.  They might
9  not -- that portion of that contract might not be
10  funded from the Health and Human Services levy, but
11  those are small amounts compared to the full
12  subsidy.
13    Q.   Okay.  And the HHS levy is -- that's a tax
14  on Cuyahoga County properties; is that right?
15    A.   Yes.
16    Q.   And that HHS levy is approved by the
17  citizens of the county as a part of a ballot
18  process?
19    A.   Ballot initiative.
20    Q.   And does the -- does the HHS levy only
21  fund the ADAMHS Board, or does it fund other things
22  as well?
23    A.   It funds other things as well.
24    Q.   You mentioned the Medical Examiner's
25  Office also requested funding because of an increase

1  in body transportation costs related to the opioid
2  issues in Cuyahoga County; is that right?
3    A.   Yes.
4    Q.   Did that request come in the fall of 2017
5  as part of the budget process?
6    A.   It came -- that particular request came as
7  a contract amendment to the Board of Control.
8    Q.   I see.  And when did it come before the
9  Board of Control as a contract amendment?
10    A.   I don't have the exact date.
11    Q.   Was it within the last four years?
12    A.   I can't say for certain.
13    Q.   For the MetroHealth request for funding,
14  is it your understanding that Cuyahoga County
15  provides funding to operate the Project DAWN
16  program?
17    A.   Partially, it's my understanding.
18    Q.   And do you know when the Project DAWN --
19  when Project DAWN began in Cuyahoga County?
20    A.   I do not.
21    Q.   Does March of 2013 sound right for when
22  Project DAWN began?
23    A.   I don't know.
24    Q.   And Project DAWN is the naloxone program?
25    A.   Yes.

1    Q.   Makes naloxone available to people who
2  have overdosed from prescription opioids or heroin?
3    A.   That's my understanding of Project DAWN.
4    Q.   Other than the Child and Family Services,
5  sheriff department, medical examiner, MetroHealth
6  and ADAMHS Board, are there any other departments of
7  the government that have come before the County
8  Council and requested funding to respond to the
9  opioid crisis in Cuyahoga County?
10    A.   Not that I can remember at this time.
11    Q.   Okay.  When you became the legislative
12  budget adviser, were you required to take any sort
13  of oath?
14    A.   No.
15    Q.   Okay.  You're not like a member of
16  Congress where you have to swear to uphold the laws
17  of the Constitution?
18    A.   Some department directors at the County
19  have to do that.
20    Q.   Okay.  But you're not one of them --
21    A.   No.
22    Q.   -- as a staff member of the Council?
23    A.   As a staff member of Council.
24    Q.   Do you consider yourself to have any
25  duties to the residents of Cuyahoga County as a

32 (Pages 122 - 125)

Page 126

1 legislative budget adviser?
2       MS. SACKS:  Objection.
3       THE WITNESS:  Can you describe a little
4 further what you mean by that?
5 BY MR. MOONEY:
6    Q.   Sure.  Do you consider it your
7 responsibility to ensure that funds are allocated
8 responsibly among the various parts of the Cuyahoga
9 County government?
10      MS. SACKS:  Objection.
11      THE WITNESS:  I think as a public servant,
12 someone who is funded from the taxpayer money, yes.
13 BY MR. MOONEY:
14    Q.   Okay.  And does your -- do you consider
15 your role as the legislative budget adviser as also
16 including a responsibility that County Council has
17 accurate information regarding the budgets that it
18 ultimately passes into law?
19    A.   Yes.  I believe that is one of my main
20 responsibilities, to ensure council members are
21 informed accurately.
22    Q.   And do you consider your responsibility as
23 a legislative budget adviser to understand the
24 County's overall economic outlook in order to inform
25 council members of the budgeting process?

Page 127

1       MS. SACKS:  Objection.
2       THE WITNESS:  Can you rephrase that,
3 please?
4 BY MR. MOONEY:
5    Q.   So you mentioned earlier that one of the
6 things that you keep an eye on is the sales tax
7 collections.
8       Is it your -- do you believe it's one of
9 your responsibilities to understand the sort of
10 external economic factors that impact the revenue
11 that is available to the County's government?
12      MS. SACKS:  Objection.
13      THE WITNESS:  I don't believe it is my
14 direct responsibility.  We defer to OBM for that
15 information, but I like to have a knowledge of like,
16 example, the sales tax.
17 BY MR. MOONEY:
18    Q.   Do you keep an eye on the property tax
19 collections that are -- that go into the County's
20 revenue stream?
21      MS. SACKS:  Objection.
22      THE WITNESS:  What do you mean "keep an
23 eye on"?
24 BY MR. MOONEY:
25    Q.   So you follow trends in sales tax

Page 128

1 collections, right?
2    A.   Yes.
3    Q.   My understanding is that the property
4 taxes are collected by the state, right?
5    A.   No.
6    Q.   No, okay.  How am I wrong?
7    A.   The property tax -- the property taxes is
8 collected directly from the County.
9    Q.   Okay.
10   A.   So residents will send money directly to
11 the County.
12   Q.   Okay.  And as a legislative budget
13 adviser, do you watch for trends or -- I'm
14 forgetting the words you used to describe it, but
15 basically events that you think should be raised
16 with the members of the Council regarding the
17 County's property tax collection?
18   A.   I -- yes, I keep that on my radar.
19   Q.   And is it your understanding or do you
20 have an understanding of whether property values in
21 Cuyahoga County declined as part of the assessment
22 process in 2011?
23   A.   I can't speak to the reappraisal process
24 in 2011.
25   Q.   Okay.  Do you -- does anyone report to you

Page 129

1 as the legislative budget adviser?  Do you have a
2 staff?
3    A.   I do not have a staff --
4    Q.   Do you --
5    A.   -- that directly report to me.
6    Q.   Okay.  Do you report to -- do you report
7 to someone?
8    A.   I report directly to our chief of staff,
9 Joseph Nanni, but the staff do work for all 11
10 council members.  But we all directly report to our
11 chief of staff, Joe Nanni.
12   Q.   And what are Mr. Nanni's duties, as you
13 understand them?
14   A.   He's the chief of staff, so I kind of will
15 leave it there.  I mean, he's just -- he's
16 responsible for the staff, ensuring staff is meeting
17 the, you know, requests and needs of the council
18 members and things of that nature.
19   Q.   Okay.  What is the -- and then what is the
20 role of the clerk of council, as you understand it?
21   A.   The clerk of council, she has two staff
22 members, so there's a total of three clerks.  They
23 are there to manage the agenda, the minutes, the
24 records for all the committee members -- I'm sorry,
25 committees, not committee members, but the council

33 (Pages 126 - 129)

1  committees.
2      Q.  Okay.  What is -- I've seen a reference to
3  a special counsel.
4          What is that individual's role?
5      A.  That name, Michael King, who is my
6  co-worker, he is a fellow -- so I mentioned we have
7  three clerk staff.  We have a total of nine staff
8  for the Council.  Three of those are clerks.  One of
9  them is an administrative assistant.
10         And then the remaining -- the other one is
11  the chief of staff.  So the remaining four, which I
12  fall in that category, we consider ourselves policy
13  staff, and he is one of those four.
14     Q.  And what is the role of the policy staff?
15     A.  So similar to what we've, you know,
16  discussed, I focus -- I'm more heavily focused on
17  the budget aspect of it, but they also -- we have
18  one who is not the special counsel or whatever the
19  title that you referenced, but she focuses mainly on
20  the Health and Human Services committee because of
21  the volume of contracts and things of that nature
22  that go through that committee.
23         And then the other three of us focus on
24  the other committees.
25     Q.  Okay.  And what is the individual's name

1  who works with the Health and Human Services
2  committee?
3      A.  LeVine Ross.
4      Q.  Does the policy staff have any
5  responsibility for researching the causes of the
6  opioid issues that exist in Cuyahoga County?
7          MS. SACKS:  Objection.
8          THE WITNESS:  I don't know.
9  BY MR. MOONEY:
10     Q.  Do you know if the policy staff has any
11  work, has performed any work related to prescription
12  opioid abuse in Cuyahoga County?
13         MS. SACKS:  Objection.
14         THE WITNESS:  What do you mean by
15  performed work?
16  BY MR. MOONEY:
17     Q.  Have they conducted research regarding
18  prescription opioid abuse in Cuyahoga County?
19         MS. SACKS:  Objection.
20         THE WITNESS:  It's come up in discussions,
21  and I don't -- I don't necessarily know how to
22  define research for you.
23         So I don't want to mis -- I don't want to
24  incorrectly answer the question, but it's come up in
25  discussions.

1  BY MR. MOONEY:
2      Q.  Sure.  And in the discussions that you're
3  referring to, who was -- who participated in those
4  discussions?
5      A.  Myself, and she is no longer there, but
6  the individual you asked about, the special counsel
7  has replaced her because she, she left for another
8  opportunity.  But her name was Joanne Gross.
9      Q.  And what conversations or discussions did
10  you have with Ms. Gross about opioid abuse in
11  Cuyahoga County?
12     A.  So this was going back some time.  I don't
13  have an exact time frame for you.  But we, you know,
14  we were -- all of the various policy staff were
15  assigned different topics and areas, and we were
16  assigned kind of to just continue to work with the
17  department heads about this particular issue.
18         So we would receive reports and
19  information, so it was like we were in charge of
20  kind of ensuring that we're getting the appropriate
21  information for various issues, and this was one of
22  them.
23     Q.  And was that issue called a Heroin Impact
24  Report?
25     A.  That may have been part of something we

1  received --
2      Q.  Okay.
3      A.  -- as part of that being assigned to that
4  particular responsibility.  It was some time ago, so
5  I can't say.
6      Q.  Sure.  I'm finally going to show you a
7  document.
8      A.  Okay.
9          (Exhibit 1 was marked for
10          identification.)
11  BY MR. MOONEY:
12     Q.  I'm going to pass to you a document that's
13  been marked as McAleer -- Trevor McAleer, excuse me,
14  Exhibit 1.  This is an email from Joanne Gross to
15  Kahlil Seren, Joseph Nanni and to you dated
16  October 26, 2012, with the subject line Status
17  Report, and then it's Bates labeled CUYAH_014537372.
18         Mr. McAleer, if you'd like to take a
19  moment to look at that, I'll ask a couple of
20  questions about it.
21         All set?
22     A.  Yes.
23     Q.  Okay.  Okay.  First of all, do you
24  remember receiving this email from Ms. Gross in
25  October of 2012?

34 (Pages 130 - 133)

Page 134

1    A.  I don't directly remember receiving this
2  email.  The status report though is something I
3  remember.
4    Q.  Okay.  And so is this -- does this Status
5  Report, which is the attachment that ends in the
6  number 7373, is this staff report the type of report
7  that the County Council staff provided to members of
8  County Council on a regular basis?
9    A.  Can you define "regular"?
10    Q.  Sure.  Was it a monthly report?
11    A.  It was a report that didn't last long.
12    Q.  Okay.
13    A.  So I don't -- I can't tell you how many
14  reports were sent out, but we tried this.
15    Q.  Okay.
16    A.  And, again, this was the second year of
17  the new government, so we were trying to figure out
18  ways to make that the part-time council members
19  were up to speed, and this was one of our
20  approaches, but it didn't last very long.
21    Q.  It didn't last very long, okay.
22        And on the email from Sister Gross -- was
23  she a nun?
24    A.  She was a lawyer and a nun.
25    Q.  Wow, okay.  So when Sister Gross says,

Page 135

1  "See what you think of this as the report we give to
2  Ellen, et al.," do you know, do you have an
3  understanding of who "Ellen" refers to in this
4  email?
5    A.  I know who Ellen is.
6    Q.  Who is Ellen?
7    A.  That would be C. Ellen Connally, at that
8  time the council president.
9    Q.  And then on the next page of -- or on the
10  actual status report, there are the spreadsheet that
11  begins listing current and pending legislation, and
12  then there are various staff members assigned to the
13  legislation.
14        Do you see that?
15    A.  Yes.
16    Q.  And is that consistent with how you recall
17  the Council staff worked on pending legislation,
18  that they would each be assigned to particular
19  pieces of the pending legislation?
20    A.  I would say be the lead -- I know it says
21  "staff" -- because we would all kind of talk about
22  it.
23    Q.  Right.  Because it's a small staff, so you
24  all help out when you can, but someone would be sort
25  of the point person?

Page 136

1    A.  Yes.
2    Q.  Okay.  And so you were listed, for
3  example, as the point person on a Cuyahoga
4  County-based business preference legislation, right?
5    A.  Yes.
6    Q.  And then below that, there is possible
7  legislation.  And then if you turn to the next page,
8  there are current ongoing projects meetings and then
9  a list of projects and then staff members assigned.
10    A.  Yes.
11    Q.  And are the staff members listed, were
12  they also similarly point people on these, or this
13  was their responsibility?
14    A.  Similar to the current and pending
15  legislation, they would be the lead listed here.
16    Q.  Okay.  And so in the September status
17  report, one of the projects you were responsible for
18  was electronic medical record systems for the jail;
19  is that right?  It's five --
20    A.  Yes.
21    Q.  -- six down.
22        And then it says sort of five from the top
23  that you were also working on a project for
24  increasing funding for the animal shelter to hire
25  additional staff; is that right?  It's on the bottom

Page 137

1  of the page, five from the bottom.
2    A.  Yes.
3    Q.  And then if you turn to the next page that
4  ends in 375, the first project is Heroin Impact
5  Reports Follow-Up, and the staff members listed with
6  responsibility are J. Gross and T. McAleer.
7        Do you understand J. Gross to be referring
8  to Joanne Gross?
9    A.  Yes.
10    Q.  And T. McAleer is you?
11    A.  Yes.
12    Q.  Okay.  Do you know what the Heroin Impact
13  Report Follow-Up Project entailed in September of
14  2012?
15    A.  I can't give you the exact specifics
16  today, but like a lot of these, it would entail
17  where department heads or directors or points of
18  contacts would -- we would be working with them for
19  them to keep us apprised of their efforts, and then
20  we would funnel information to the appropriate
21  channels.
22    Q.  And so here the department directors would
23  be apprising you of the impact of heroin in a
24  report?
25    A.  I know -- this here specifically says

35 (Pages 134 - 137)

Page 138

1 Heroin Impact Reports.  I don't have what was all
2 sent to me, but it was not limited to heroin.
3    Q.  Okay.  What else was in these reports that
4 are titled here as Heroin Impact Reports but
5 included other information?
6    A.  It would include receiving reports from
7 the medical examiner on the number of deaths related
8 to the opiate issue; getting reports from Project
9 DAWN; getting reports from a committee that was set
10 up, an informal committee of like department heads
11 and directors and people from the Board of Health
12 and that nature, getting updates from them.
13    Q.  And what was this informal committee
14 called?
15    A.  I don't remember.
16    Q.  Was it the Heroin Initiative?
17    A.  I don't know.
18    Q.  The Cuyahoga County Opiate Task Force?
19    A.  That -- I don't know if that was the
20 correct name.  That sounds about right, but I don't
21 know the exact name.
22    Q.  Okay.  So in September of 2012, you were
23 receiving reports or information related to heroin
24 impacts, the death reports from opioids, and
25 information from an informal committee of department

Page 139

1 heads and other professionals about prescription
2 opioid abuse; is that right?
3    A.  I just wanted to clarify.  I don't know if
4 September of 2012 I was getting those reports.
5    Q.  Okay.
6    A.  I was assigned to receive reports.  It
7 could have happened before or after.
8    Q.  I see.
9    A.  This was just more of a status update at
10 that point in time.
11    Q.  So where it says follow-up, you sitting
12 here today don't know what follow-up would have been
13 required or would have been on your plate at the
14 time this document was circulated?
15    A.  I don't -- I can't recall today to tell
16 you everything that I received related to that
17 category.
18    Q.  Sure.  Not everything, but just generally,
19 do you know what follow-up you would have been
20 working on related to Heroin Impact Reports?
21    A.  I know -- what I do know is I received
22 reports from Project DAWN.  I remember working, you
23 know, getting stuff from them, you know, more for
24 FYIs, here's what we're working on.  I remember
25 getting reports from the medical examiners.

Page 140

1    I just don't know in terms of time frame
2 related to specifically those.
3    Q.  Sure.  Do you still receive Heroin Impact
4 Reports as the legislative budget adviser?
5    A.  Not to the volume that was received then.
6 We do still talk -- I mean, the medical examiner
7 will tell us they provide annual statistics to us
8 and things of that nature, but I think the volume
9 was more in terms of actually receiving reports
10 around that time than what it is --
11    Q.  Today in 2019?
12    A.  Yes.
13    Q.  I see, okay.  But are Heroin Impact
14 Reports still sort of a document that you receive in
15 2019?
16    A.  I wouldn't say -- this is outdated.
17    Q.  Okay.  The phrase "Heroin Impact Report"
18 is outdated?
19    A.  Yeah, and most of these are --
20    Q.  Sure.
21    A.  -- done.  We don't do the status reports
22 anymore.
23    Q.  Right, okay.  So it sounds like back in
24 2012 you received more Heroin Impact Reports than
25 you do now, 2012 and 2013 we will say?

Page 141

1    MS. SACKS:  Objection.
2    THE WITNESS:  I don't know.
3 BY MR. MOONEY:
4    Q.  Okay.  Did any specific member of Council
5 request that you follow up on these Heroin Impact
6 Reports that are referenced in the document attached
7 as Exhibit 1?
8    A.  I don't know.
9    Q.  You don't know because you don't remember
10 sitting here today?
11    A.  Yeah, I don't -- I can't tell you for sure
12 sitting here today.
13    Q.  You can set that document aside.
14    MS. SACKS:  Do you want to take a break?
15 Are you okay?  Do you want me to check on lunch?
16    MR. MOONEY:  It's up to you, Trevor.  If
17 you'd like to take a break, we certainly can.
18    THE WITNESS:  Would we break shortly for
19 lunch?
20    MS. SACKS:  It wouldn't be longer
21 regardless, right?
22    MR. MOONEY:  Yes.
23    THE WITNESS:  I can just wait.
24    MR. MOONEY:  If you're okay with going, we
25 will --

36 (Pages 138 - 141)

Page 142

1     MS. SACKS:  Court Reporter, you're good?
2     THE COURT REPORTER:  I'm okay.
3          (Exhibit 2 was marked for
4          identification.)
5  BY MR. MOONEY:
6     Q.  I'm giving you a document that has been
7  labeled as Trevor McAleer Deposition Exhibit 2 and
8  also handing it to your counsel.
9          For the record, this is an email from
10  Joanne Gross to a large number of individuals with
11  the subject line September 2013 Staff Report.  It's
12  dated September 23rd, 2013, with the Bates label
13  CUYAH_014394979.
14          Mr. McAleer, if you'd like to take a
15  moment to look at that.
16     A.  I would, please.
17     Q.  Sure.  All set?
18     A.  I think I'm okay.
19     Q.  Okay.  And if you need more time on
20  specific questions, obviously take the time that you
21  need.
22          My first question is, are the recipients
23  in the To line of this email the members of the
24  County Council?
25     A.  Can I just have one more second?  Sorry.

Page 143

1     Q.  Absolutely.  It's a long list.  That's
2  fine.
3     A.  Yes, the 11 individuals listed here were
4  the council members at that time.
5     Q.  Right.  They're not all members --
6     A.  Yes.
7     Q.  -- of Council today?  Okay.
8          And so Julian Rogers was a council member
9  in 2013?
10     A.  Yes, if he's listed here.  He left close
11  to around that time.  I don't have an exact date.
12  But if he's listed here, he would have been a
13  council member at this time.  I didn't send the
14  email.
15     Q.  Right.
16     A.  But he left I believe shortly after that.
17     Q.  Okay.  So it looks like in the cc line of
18  this email Ms. Gross, in addition to emailing you,
19  you're in the third to the -- third line from the
20  bottom kind of right in the middle.
21          Do you see your name?
22     A.  Yes.
23     Q.  Okay.  And then after that it says
24  Julian Rogers, and then it lists an @hotmail.com
25  address.

Page 144

1     Q.  Do you see that?
2     A.  Yes.
3     Q.  Do you have -- do you understand that that
4  @hotmail address is the personal email address of
5  Council Member Rogers or at least was at the time
6  this email was sent?
7     A.  I don't know.
8     Q.  Do you think that Ms. Gross would be
9  sending an email to another Julian Rogers with a
10  Hotmail address that is not Council Member Julian
11  Rogers?
12     MS. SACKS:  Objection.
13     THE WITNESS:  I don't know what Joanne
14  would have done.
15  BY MR. MOONEY:
16     Q.  Okay.  Do you recognize the next email
17  address, cellenc@aol.com, to be the personal email
18  address of Council President Ellen Connally at the
19  time this email was sent?
20     A.  Yes.
21     Q.  And the same for the email
22  Dave@DaveGreenspan.com, do you understand that to be
23  Dave Greenspan, the council member's, personal email
24  address as of September 2013?
25     A.  Yes.

Page 145

1     Q.  Do you recognize the email address
2  wblvd1272@aol.com?
3     A.  Yes.
4     Q.  Whose email address is that, if you know?
5     A.  Dan Brady's.
6     Q.  And Mr. Brady is the current council
7  president, correct?
8     A.  Yes.
9     Q.  And at the time he was just a member of
10  the Council?  His name is in the second line from
11  the top in the To line.
12     A.  He was of course a member of Council.  I
13  don't know if he was the vice president.
14     Q.  I see.
15     A.  That's my hesitation to saying just a
16  member.
17     Q.  Sure.  Okay.  But do you -- I should say
18  was it the practice of the staff of County Council
19  to send emails related to Council business to the
20  personal email addresses of County Council members?
21     A.  What do you mean by "practice"?
22     Q.  Was it something that you did as a member
23  of the Council staff?  Did you send emails to
24  personal email addresses as part of your job?
25     A.  Yes, I did.  In part I would always -- I

37 (Pages 142 - 145)

Page 146

1 would copy their personal email addresses.  It would
2 always -- their To would always include their County
3 email address.  And the reason that I would include
4 personal email addresses typically were if it was
5 before or after hours just to ensure that they saw
6 what I was sending them.
7     Q.  I see.  And so this email that was sent at
8 7:33 a m., it appears that Ms. Gross may have had a
9 different practice --
10     MS. SACKS:  Objection.
11 BY MR. MOONEY:
12     Q.  -- for sending emails to personal council
13 members' addresses?
14     A.  I can't speak to Sister Joanne's reasoning
15 for copying.
16     Q.  Sure.  Do -- sitting here today, do you
17 still send emails to the personal addresses of
18 council members to conduct County business?
19     MS. SACKS:  Objection.
20     THE WITNESS:  I always -- I include their
21 County email address.  I will say today it's far
22 less mainly because the majority of the council
23 members have put -- had the capability to put their
24 County email on their mobile device.
25     So the time issue is not really as

Page 147

1 relevant when trying to get them to learn how to do
2 it on their phone back then.
3 BY MR. MOONEY:
4     Q.  Correct, I see.  Okay.  If you would
5 please turn to the attachment, which is titled
6 Cuyahoga County status -- or Staff Status Report,
7 September 2013.
8     Do you see that?
9     A.  September 2013?
10     Q.  Yes.  And then under the -- on the second
11 page ending in 981 under the heading Possible
12 Legislation, do you see the last one listed is "Use
13 of surplus budgets for departments updated for
14 September report," and then you're listed as the
15 point staff member.  And the description says,
16 "Draft legislation that will require surplus of
17 departments' budgets to be returned to the County's
18 GF if it's not use for intended purpose."
19     Do you see where it says that?
20     A.  I do.
21     Q.  Okay.  Does -- do you know what possible
22 legislation this entry about the use of surplus
23 budgets for departments is referring to?
24     A.  Yes.
25     Q.  Okay.  And what is the legislation that is

Page 148

1 being described in the status report?
2     A.  It was an idea.  Just so you know, it
3 never became legislation.  But Councilman Gallagher
4 at the time was interested in ensuring that
5 departments would use their money for what they said
6 they were going to use their money for.  And he was
7 tossing around the potential concept of creating
8 legislation that if that wasn't the case, somehow we
9 would claw back money to return it back to the
10 general fund.
11     Q.  Was the idea of that legislation that if a
12 department was allocated $100,000 and spent 90 that
13 you would get the $10,000 back?
14     A.  No.  So in that -- in your example, that
15 10 would come back anyway if they didn't spend the
16 10.
17     Q.  I see, okay.
18     A.  His intention at the point because I
19 was -- I was more discussing with him.  It wasn't
20 even drafted --
21     Q.  Right.
22     A.  -- in the official legislation was if you
23 said you were going to buy 12 black pens to write
24 with and you decided to go buy three notebooks, a
25 generic example, that that's not what you said you

Page 149

1 were going to use the money for.  So we -- then the
2 idea would take away that dollar amount from your
3 other part of your budget.
4     Q.  I see, okay.  And that didn't become law?
5     A.  It did not become law.
6     Q.  I see.  So if you turn to the -- so below
7 that, excuse me, it says "Current ongoing projects
8 and meetings," and it has staff and status again,
9 right?
10     A.  Yes.
11     Q.  And on the page ending in 982, kind of
12 right in the middle, it looks like you're still
13 working on the electronic medical record systems for
14 the jail in September 2013, right?
15     A.  Yes.
16     Q.  Do you know if that ever came into
17 fruition?  Did you -- did the County implement
18 electronic medical records at the jail?
19     A.  Yes.  I would recommend talking to other
20 people that are more familiar with it, but that was
21 a big initiative then.
22     Q.  Sure.  And then on the page ending in 983,
23 the next page, fourth from the top, it again lists
24 Heroin Impact Reports, updated for September report,
25 and you are listed there, right?

Page 150

1    A.   Yes.
2    Q.   As one of the point people responsible for
3 the Heroin Impact Reports on the Council staff,
4 right?
5    A.   Yes.
6    Q.   And who is C. Culek?
7    A.   Culek.
8    Q.   Culek?
9    A.   Christina.
10    Q.   Okay.
11    A.   She was a deputy clerk in the clerk's
12 office.
13    Q.   And do you remember what you were doing in
14 September 2013 in relation to the Heroin Impact
15 Reports that are listed on this status report?
16    A.   I know what I was doing, and it was very
17 similar to what from the previous report.  It was
18 more if I was still getting information, which if
19 it's on here I probably was.  I can't tell you for
20 sure what dates I was getting reports.  That's what
21 I was doing related to this --
22    Q.   Okay.
23    A.   -- particular line item.
24    Q.   Before we take a break, I would like to
25 shift gears just a bit.  You can set that document

Page 151

1 aside, yes.
2         Mr. McAleer, have you ever been prescribed
3 a prescription opioid before?
4         MS. SACKS:  Objection.  I'm going to
5 instruct him not to answer.
6         MR. MOONEY:  And the basis of your
7 instruction?
8         MS. SACKS:  It's not relevant in this
9 litigation, his personal use.
10         MR. MOONEY:  And you know that your
11 colleagues have been asking witnesses on the defense
12 side that exact question in almost every deposition?
13         MS. SACKS:  I don't know what they've
14 done.
15         MR. MOONEY:  Okay.
16         MS. SACKS:  No.
17         MR. MOONEY:  You're instructing him not to
18 answer?
19         MS. SACKS:  Yes.
20 BY MR. MOONEY:
21    Q.   And will you follow your counsel's advice?
22    A.   Yes.
23    Q.   Have any members of your family been
24 prescribed prescription opiates before?
25         MS. SACKS:  Objection.

Page 152

1         MR. MOONEY:  Are you instructing him not
2 to answer again?
3         MS. SACKS:  No, he can answer if he knows.
4         THE WITNESS:  I don't know.
5 BY MR. MOONEY:
6    Q.   How about any of your close friends?
7         MS. SACKS:  Same objection.
8         THE WITNESS:  I don't know.
9         MR. MOONEY:  It's about lunch.  So do you
10 want to take a break?  You can have your lunch and
11 then we can come back.
12         THE WITNESS:  If that's --
13         MS. SACKS:  Is that good?  Is that good
14 for you?
15         That's fine.
16         THE VIDEOGRAPHER:  Off the record, 12:08.
17              (Whereupon, a lunch recess was
18               taken from 12:08 p.m. to
19               1:04 p.m.)
20         THE VIDEOGRAPHER:  On the record, 1:04.
21 BY MR. MOONEY:
22    Q.   All right.  Welcome back from the break.
23 Thank you for returning.
24         I wanted to circle back.  At the beginning
25 you mentioned that you learned about this lawsuit

Page 153

1 two days before it was filed, correct?
2    A.   Approximately two days.
3    Q.   Approximately two days?
4    A.   Yeah.
5    Q.   And you learned that in a meeting that the
6 county executive held along with members of his
7 staff where they informed you that a lawsuit would
8 be filed; is that right?
9    A.   It wasn't an official meeting.  He walked
10 over to our council offices to let us know that --
11 about the press conference and to let us know what
12 the press conference was about, which was leading to
13 the filing of the lawsuit.
14    Q.   Were any members of the city council
15 present in your office when the executive and his
16 staff came over to inform you of the lawsuit that
17 Cuyahoga County filed?
18    A.   City council members?
19    Q.   Did I say "city"?
20    A.   Yes.
21    Q.   I did.  Were any members of the County
22 Council present when you -- when Executive Budish
23 came over and asked -- or mentioned that the lawsuit
24 was going to be filed?
25    A.   I don't know for sure.

39 (Pages 150 - 153)

Page 154

1    Q.   When the executive and his staff came to
2  your office, who actually said Cuyahoga County was
3  going to be filing a lawsuit if you remember?
4    A.   I don't remember for sure who said it.
5    Q.   Is it your understanding that -- or do you
6  have an understanding whether the lawsuit had
7  already been finalized by that time that meeting
8  occurred?
9    A.   I don't know.
10       MS. SACKS:  Objection.
11 BY MR. MOONEY:
12    Q.   Do you know if the county executive
13 approved of the lawsuit being filed in this case?
14       MS. SACKS:  Objection.
15       THE WITNESS:  I don't know.
16 BY MR. MOONEY:
17    Q.   I'd like to ask a couple of questions
18 about the County Council a bit, and then that way we
19 can sort of talk through the budget process after
20 that.
21       Are there specific committees of the
22 County Council that have responsibility for the
23 County's budgeting process?  You mentioned the
24 Committee of the Whole last session.
25       Are there any other committees that have

Page 155

1  responsibility for the budgeting process?
2    A.   So not direct responsibility over the
3  budget process. I think when any types of contracts
4  go to all the committees, it's always asked is there
5  enough money in the budget, was this appropriated
6  type thing. So I guess indirectly, yes.
7        But finance or the Committee of the Whole
8  would be the two most significant committees where
9  specifically budget is discussed.
10    Q.   Okay. And you said that for the finance
11 committee the chair was Councilman Miller,
12 Councilman Greenspan, and then Councilman Miller
13 again?
14    A.   Yes.
15    Q.   I think in that order?
16    A.   In that order.
17    Q.   Yes. Are there other -- are there any
18 other members of the finance committee of the County
19 Council who have been members for the past -- for
20 more than three years?
21    A.   I can't say for certain, but knowing the
22 number of council members that have been here since
23 the start, more than likely, yes.
24    Q.   Are council memberships -- are council
25 memberships rotated?  Are you on a council for a

Page 156

1  limited period of time, or is it as long as the
2  council member wants to sit on the committee?
3    A.   The council president appoints committee
4  membership.
5    Q.   And that is done?
6    A.   Every two years.
7    Q.   And does -- do you know how the council
8  president determines which members will sit on which
9  committees?
10    A.   I don't know. Can you describe what you
11 mean how he does that?  I'm not sure.
12    Q.   Sure. Do you understand the process of
13 how the committeeman or how the council president
14 says Councilman Miller is going to be the chair of
15 the finance department as opposed to any of the
16 other nine council members?
17    A.   The council president has talked to staff,
18 me, about council committee appointments. He has
19 the final say. The council president, whoever the
20 council president is has the final say of what
21 member goes on what committee.
22    Q.   And so, for example, the finance
23 committee -- because that seems like it's the
24 closest one that you have interactions with, is that
25 fair?

Page 157

1    A.   It's one of the top.
2    Q.   Okay. So for the finance committee, the
3  council president has asked for your recommendation
4  as to who -- which members of council should be
5  appointed to that finance committee?
6    A.   Not recommendations but had bounced off
7  just like in his preparation of determining kind of
8  what is going to be in front of committee,
9  committees for the upcoming term, like, "Hey, what
10 do you think is going to be discussed in finance,"
11 or like what are the big items that would be in each
12 committee, just to kind of get staff members'
13 thoughts about the workload in various departments.
14    Q.   Okay. So it's not necessarily the
15 membership of the committees. It's what are the
16 action items that likely will occur this year?
17    A.   That's correct.
18    Q.   Okay. Do you attend meetings of the
19 finance committee in your job as the legislative
20 budget adviser?
21    A.   I do.
22    Q.   Has the finance committee of the Cuyahoga
23 County Council ever discussed the issue of
24 prescription opioid abuse in Cuyahoga County to your
25 knowledge?

40 (Pages 154 - 157)

Page 158

1    A.  It's been discussed.  I can't tell you
2  when.
3    Q.  And in what -- under what circumstances
4  was prescription opioid abuse in Cuyahoga County
5  discussed during a meeting of the finance committee
6  of the County Council?
7    A.  I can't give you every scenario, but if it
8  wasn't in finance committee it would have been in
9  the Committee of the Whole.  But I know, for
10  example, the ADAMHS Board has presented the
11  information.
12    Q.  And what information has the ADAMHS Board
13  provided about prescription opioid abuse in Cuyahoga
14  County?
15    A.  It is -- I mean, it's been -- it's a
16  presentation, so it's a lengthy presentation.  It's
17  been lengthy presentations.  So I can't specifically
18  say they said X about this, but I know it was on as
19  part of their presentations.
20    Q.  Do you know if the presentations that the
21  ADAMHS Board made to the County Council identified
22  factors that contribute to prescription opioid abuse
23  in Cuyahoga County?
24    A.  I don't know.
25    Q.  Do you know if the presentation that the

Page 159

1  ADAMHS Board presented to the -- the presentations
2  that the ADAMHS Board presented to the County
3  Council identified factors that contribute to heroin
4  abuse in the county?
5    A.  I don't know.
6    Q.  I think you said that there have been
7  lengthy presentations.
8      Is that true?  There have been multiple
9  presentations by the ADAMHS Board about prescription
10  opioid abuse in Cuyahoga County?
11    A.  Every opportunity, every budget
12  opportunity, how we were talking about the fall,
13  actually the fall dates for every biennial budget,
14  the ADAMHS Board has come in and requested
15  additional dollars, and that comes with the
16  presentations.
17    Q.  And as part of that presentation, the
18  ADAMHS Board says we need more money, and one of the
19  reasons we need more money is because of the heroin
20  abuse in the county.  Is that your recollection?
21    A.  Not specifically.
22    Q.  At a general level?
23    A.  There's general terms that they use
24  sometimes, you know, they know what it means in
25  their presentations, so I can't say specifically to

Page 160

1  that detail.
2    Q.  Right, okay.  Are there other committees
3  of the County Council that have jurisdiction over
4  the County's response to prescription opioid abuse?
5    A.  Can you rephrase or restate that question?
6  I'm sorry.
7    Q.  Sure.  So are there any committees other
8  than the finance committee for the reasons we've
9  discussed or the Committee of the Whole with their
10  budgets that have responsibility or jurisdiction
11  over the County's response to prescription opioid
12  abuse?
13    A.  So I would not necessarily use the word
14  "jurisdiction" but have discussed the issue.  I
15  would say Public Safety and Justice Affairs has been
16  another committee that this has been discussed,
17  particularly around the jail and the Medical
18  Examiner's Office.  They have presented in
19  committees.
20      The jail has presented -- the sheriff
21  about the jail particularly.  You know how we were
22  talking earlier about the overtime being an issue?
23  Kind of the one thing that they've also focused on
24  is the sense of how the jail is not your traditional
25  years ago just a county jail where someone sits for

Page 161

1  their term, you know, their whatever, the number of
2  days that they're in jail for, but it's become more
3  of a hospital in the sense of a mental health and
4  addiction services.  The treatments are shifting.
5  It's not just oversight of seeing people in their
6  pods or their cells.  It's having a different type
7  of medical care that is required now because of the
8  issue.
9      The Medical Examiner's Office, as I
10  mentioned, would come in and present statistics and
11  things of that nature in terms of various overdoses
12  and stuff like that, and they've come in.  The
13  Public Safety and Justice Affairs Committee have
14  done that as well.
15    Q.  You mentioned that the jail has become
16  more of a hospital in the sense of a mental health
17  and addiction services treatment center as well.
18      When did that shift occur, if you know?
19    A.  I don't know when that shift occurred.
20    Q.  Okay.  And do you know why the jail began
21  devoting additional resources to mental health and
22  addiction treatment?
23    A.  Can you repeat that?  Did you say why or
24  when?  I'm sorry.
25    Q.  Why.

41 (Pages 158 - 161)

Page 162

1    A.   Why?  I don't think they had a choice.
2  They were -- I mean, people were getting arrested on
3  various drugs.  I'm not -- I don't work for the
4  sheriff's office, but they were presented.  There
5  were just different types of inmates coming into
6  their care, and you don't have a choice.
7    Q.   Does the jail provide mental health
8  services unrelated to treatment for addiction?
9    A.   I don't know.
10    Q.   Other than the Public Safety and Justice
11  Affairs Committee, are there any other committees of
12  the County Council who have discussed opioid
13  addiction in Cuyahoga County?
14    A.   The Health and Human Services committee
15  would have discussed it either with Children and
16  Family Services for the instances we've talked about
17  or the ADAMHS Board, who not only presented at a
18  Committee of the Whole at times but they've also
19  come in and presented in the Health and Human
20  Services committee as well, depending on what time
21  of the year it is, or it might not be during the
22  budget hearings but it might just be a very
23  different presentation.
24    Q.   Okay.  And who is the current chair of the
25  Health and Human Services committee?

Page 163

1    A.   Current chair of the Health and Human
2  Services committee is Councilwoman Yvonne Conwell.
3    Q.   And before Ms. Conwell, who was the chair
4  of the Health and Human Services committee?
5    A.   I think I know who it is, but I don't know
6  for certain.
7    Q.   Okay.  Who do you think it is?
8    A.   If I'm wrong, is that okay?
9    Q.   That's fine.
10    A.   I think it was Councilwoman Shontel Brown,
11  but I don't recall for sure.
12    Q.   Do you know who the council -- or the
13  chair of the Health and Human Services committee was
14  before Councilwoman Brown, assuming it was
15  Councilwoman Brown?
16    A.   I don't remember.
17    Q.   What about the Public Safety Committee,
18  who is the current chair of the Public Safety and
19  Justice Affairs committee?
20    A.   Councilman Michael Gallagher.
21    Q.   And before Councilman Gallagher, who was
22  the chair of the Public Safety and Justice Affairs
23  committee?
24    A.   He has been the chair, I believe, for most
25  of the time.  The committees changed or restructured

Page 164

1  in, say, somewhere between 2013 and 2015; I forget
2  the date.
3       And they're used to be a -- I don't
4  remember the exact name, but there used to be kind
5  of two different committees.  They were kind of
6  merged into the Public Safety and Justice Affairs
7  committee.  He always had public safety under him,
8  but he took over the -- yeah, so it's ...
9    Q.   Okay.  Other than Health and Human
10  Services and Public Safety and Justice Affairs, are
11  there any other communities -- or sorry, committees,
12  excuse me, that have discussed opioid abuse in
13  Cuyahoga County?
14    A.   Not that I can remember at this time.
15    Q.   In your experience as the legislative
16  budget adviser, are there particular members of the
17  County Council who you believe have focused on the
18  opioid abuse problem in Cuyahoga County?
19    A.   I think as a staff person, to some degree
20  they've all focused on it.  Some have had community
21  meetings about it where the experts, like the
22  medical examiner's folks and the sheriff's office,
23  would come and talk to the community members.  Not
24  all council members have had those community
25  meetings.  That doesn't to me mean that one is more

Page 165

1  interested or, you know, how you were asking the
2  question but just in terms of give you a
3  different --
4    Q.   So they might be a little more visible in
5  their focus --
6    A.   Yeah.
7    Q.   -- but others might be focused as well?
8  Okay.
9       Have you attended any of the community
10  meetings that council members have held to talk
11  about the opioid issue that Cuyahoga County faces?
12    A.   I don't remember if I've attended those
13  specific community meetings.
14    Q.   Sure.  Do you know if the community
15  meetings that you're referring to were meetings
16  about heroin addiction in Cuyahoga County?
17    A.   I don't know.
18    Q.   Do you know if the meetings were focused
19  or discussed prescription opioid addiction?
20    A.   I don't know.
21    Q.   Other than some members hosting community
22  meetings, are there other examples of ways in which
23  members of council have sought to address the opioid
24  problem that Cuyahoga County faces?
25       MS. SACKS:  Objection.

42 (Pages 162 - 165)

1      THE WITNESS:  Could you -- could you ask
2 that question in a different way?
3 BY MR. MOONEY:
4      Q.   I can certainly try.
5      The members -- you said the members of
6 Council have held meetings, and then as a staff
7 member you believe that they're all focused on the
8 opioid problem in some way, shape or form.
9      I'm just wondering, are there other
10 examples of things that council members have
11 actually done that lead you to believe that the
12 council members are focused on the problem of
13 opioids in Cuyahoga County?
14      A.   I would say the budget amendments that we
15 talked about earlier would fall under their focus,
16 how we talked about there's not an unlimited pot of
17 money.  So if they're agreeing to dedicate funding
18 for a certain department or issue, it's taking
19 priority over something else.
20      So I would say yes in that, but we've
21 discussed that.
22      Q.   We sort of touched on this a little bit
23 before the break.
24      Have any members of Council asked members
25 of the council staff to write a report or white

1 paper of some sort describing the opioid problem
2 that Cuyahoga County faces?
3      A.   Can you ask that one more time?
4      Q.   Sure.  Has the -- I'll do it a different
5 way.
6      Has the council staff ever written a
7 report that discusses opioid abuse in Cuyahoga
8 County?
9      A.   So I, I as council staff legislative
10 budget adviser, worked on -- I don't know if a white
11 paper is the correct term but a document for a
12 council member that discussed the merits of doing a
13 separate mental health and addiction services levy
14 on top of the existing Health and Human Service
15 levies.
16      Q.   And which council member requested that
17 you work on that report?
18      A.   I don't remember of certain who that was.
19      Q.   Was it Councilman Miller?
20      A.   I don't think it was.
21      Q.   Was it Councilman Gallagher?
22      A.   It was -- I know it was not Councilman
23 Gallagher.
24      Q.   Was it -- well, do you remember when you
25 worked on the document discussing the merits of a

1 separate levy for mental health services?
2      A.   And addiction services.
3      Q.   And addiction, mental health and
4 addiction.
5      A.   I don't have -- I don't remember the date.
6 I just don't remember who for sure asked me to do
7 that.  I don't want to guess if I'm incorrect.
8      Q.   And when you worked on this document, was
9 it focused on opioid addiction?
10      A.   That was part of the work.
11      Q.   And then what was your ultimate
12 conclusion, if there was one, about the merits of a
13 separate mental health and addiction services levy?
14      A.   So I get -- a lot of my work was working
15 with the ADAMHS Board because that's what they do,
16 and my conclusion was that a separate mental health
17 and addiction services levy to meet the needs of the
18 ADAMHS Board was needed.  But that doesn't mean
19 that's going to automatically turn into a separate
20 mental health and addiction services levy.
21      Q.   And was -- was a separate mental health
22 and addiction services levy proposed by members of
23 Council?
24      A.   It was discussed in public meetings.
25 There wasn't legislation or anything, but the

1 discussion came up in public meetings.
2      Q.   So the -- excuse me.
3      The separate mental health and addiction
4 services levy never actually went into effect?
5      A.   Never made it to the ballot for -- it
6 would have to go to the ballot for the voters to
7 decide if they wanted to increase their property
8 taxes to have a separate mental health and addiction
9 services on top of the two Health and Human Service
10 levies we already had.
11      Q.   When the separate mental health and
12 addiction services levy was discussed, were there
13 particular members of Council that you recall being
14 in favor of enacting or approving such a levy?
15      A.   Yes.  I can't tell you every single
16 person, but I know certain people were in favor of
17 it.
18      Q.   Okay.  And who were the ones that you
19 remember?
20      A.   I can remember Dan Brady was in favor of
21 considering it, you know, like because he understood
22 the need.
23      Q.   Anyone else that you can recall?
24      A.   Councilwoman Conwell was in favor of
25 considering it.

43 (Pages 166 - 169)

Page 170

1    And those are the two that I can
2 definitely say were in favor.  There were others
3 supportive of it, but I don't want to cross my
4 memory in terms of misrepresenting one of them's
5 stance on it.
6    Q.   Sure.  Were there members of the County
7 Council who expressed disapproval of discussing the
8 separate levy?
9    A.   Not disapproval of discussing the separate
10 levy, excuse me.  The concern, if any, was going to
11 the taxpayers and asking them to burden a
12 significant levy on top of what they're already
13 paying to try to meet the needs of those who need
14 the Health and Human Services -- the existing Health
15 and Human Service levies.
16    Q.   And how do you know that the concern or
17 there was a concern among certain members of Council
18 about going to the taxpayers to propose a new levy?
19    A.   It was discussed in public meetings.
20    Q.   So you're basing that based on their
21 public statements that they've made?
22    A.   Yeah, and they've said similar things to
23 me, just how much can you tax a group before they
24 are no longer supportive of a levy because prior to
25 that the voters generously renewed the Health and

Page 171

1 Human Services levy, you know, prior to this
2 discussion.  So there was a concern of voter
3 fatigue.
4    Q.   Do you remember -- I should say and so
5 some of these discussions were also sort of office
6 discussions that you had with members of Council?
7    A.   Yeah, very similar to those that took
8 place in public though.  It was pretty clear
9 where -- you need eight votes to put something on
10 the ballot.
11    Q.   And there were not eight votes to put
12 this --
13    A.   It never made it to a formal vote, but
14 just based off people's concerns about increasing
15 taxes and how much that mental health and addiction
16 services levy would have cost your average taxpayer,
17 it was a significant request to the voter.
18    Q.   The ADAMHS Board used to receive funding
19 from Medicaid, right?
20    A.   I don't know every detail of the ADAMHS
21 Board, but my understanding, they were funded --
22 they got some money from Medicaid, yes.  I couldn't
23 go into the specifics on that.
24    Q.   And the funding that the ADAMHS Board
25 received from the federal government has declined

Page 172

1 over time since 2011, right?
2    A.   That -- I don't know if it's federal or
3 state funding, but I know their funding has
4 decreased over time.  And they were challenged to
5 meet the demands, and that was part of the
6 discussion around they're seeing increase in volume
7 of clients that they need to serve and decrease in
8 funding; what can we do, the County, to do -- to try
9 to help them.
10    Q.   Are you familiar with the managed Medicare
11 organization sales tax?
12    A.   Yes, I'm familiar enough I think.
13    Q.   And is it the case that the managed
14 Medicare organization sales tax has also been taken
15 away from the County's revenue sources?
16    A.   Yes.  So there was sales tax applied to
17 those managed Medicare things and that under state
18 law, because of federal changes, we were no longer
19 allowed to collect sales tax on those particular
20 services or issues.
21    So that went away maybe a year ago.
22    Q.   And do you have a sense sitting here today
23 what the financial impact of that sales tax being
24 taken away was in terms of dollars?
25    A.   It was -- yeah, it was again in those kind

Page 173

1 of monthly reports from OBM and quarterly reports in
2 preparation for those dollars to go away.  We are no
3 longer collecting that today, so they're --
4    Q.   And do you know how much money has been
5 taken away from the general fund as a result of this
6 managed Medicare organization sales tax?
7    A.   I don't have an exact number.
8    Q.   Does $27 million sound about right?
9    A.   That's the average we would use, but --
10    Q.   It may be more or less.
11    A.   Right.
12    Q.   Do you have a sense of the percentage of
13 the general fund that was the managed care
14 organization sales tax amount?
15    A.   Not offhand, no.
16    Q.   Does 7 percent sound about right?
17    A.   Approximately.
18    Q.   Has Council President Brady taken any
19 specific actions that you are aware of to respond to
20 the opioid abuse problem in Cuyahoga County?
21    MS. SACKS:  Objection.
22    THE WITNESS:  I wouldn't say anything on
23 top of what we already discussed.  He voted on the
24 budget changes, things like that.  So I think that
25 would fall under your category of responding to it.

44 (Pages 170 - 173)

Page 174

1 BY MR. MOONEY:
2    Q.  Sure.  Okay.  So putting aside voting on
3 budget amendments for funding and the community
4 meetings and then at least one asking you to work on
5 a document discussing the merits of a separate
6 mental health and addiction services levy, so
7 putting those all aside, are there any actions that
8 Councilwoman Conwell has taken related to the
9 problem of opioid abuse in Cuyahoga County?
10    A.  Not that I can recall on top of what we
11 discussed.
12    Q.  Again, setting aside the issues we've
13 already discussed, same way for Councilman
14 Gallagher.
15    A.  Not that I can recall.
16    Q.  Same question for Councilman Greenspan.
17    A.  Not that I can recall.
18    Q.  How about for Councilman Miller?
19    A.  Not that I can recall.
20    Q.  Councilwoman Simon?
21    A.  Not that I can recall.
22    Q.  Councilwoman Baker?
23    A.  Not that I can recall.
24    Q.  Council President Connally?
25    A.  Not that I can recall.

Page 175

1    Q.  If the members of Council that I just
2 referenced had taken some action other than the ones
3 we've already discussed, would you expect to have
4 been made aware of those actions?
5       MS. SACKS:  Objection.
6       THE WITNESS:  If it's directly
7 county-related, I would more than likely have known
8 about it.
9 BY MR. MOONEY:
10    Q.  Okay.  I'm going to shift gears a little
11 bit and ask almost a Sesame Street level question.
12       What is a budget in your understanding of
13 that term?
14    A.  A budget, a budget is a tool.  I would
15 classify it as a tool that gives resources to the
16 various departments, limited resources to the
17 departments within appropriate spending levels to
18 help meet their needs.
19    Q.  And who, speaking about the County's
20 budget, who determines whether spending levels are
21 appropriate to help meet their needs?
22    A.  So can you ask that question again?  What
23 do you mean?
24    Q.  Sure.  Well, you said that a budget is a
25 tool; it gives resources to departments within

Page 176

1 appropriate spending levels to help meet their
2 needs.
3       So I just wanted to know at least as it
4 relates to the County how determines whether or not
5 spending levels are appropriate to meet their needs.
6    A.  It initially starts off with the
7 department heads working with OBM, who then
8 discusses the budget with stakeholders in the
9 administration, who then would submit their budget
10 to Council for final adoption.
11    Q.  And so is it your belief that Council, the
12 County Council is the one who ultimately determines
13 whether spending levels are appropriate to help meet
14 the needs of the departments?
15    A.  The County Council approves and adopts the
16 final budget.  The county executive does have to
17 sign the legislation along with County Council, so I
18 would say that the 12 of them.
19    Q.  So the County Council and the executives
20 are the ones who determine whether or not spending
21 levels are appropriate to help meet the needs of the
22 departments of the county government?
23    A.  I would say they have the final say on
24 spending levels.  So if that's appropriate, in their
25 mind they have the final say.

Page 177

1    Q.  Do you have any reason to believe that the
2 Council and the executive have approved budgets that
3 they believe are inappropriate, that inappropriately
4 fund departments of the government?
5    A.  I think they -- at least Council believe
6 that they've approved budgets that are not
7 adequately funding departments and meeting all their
8 needs, and they know that they could never do that
9 because of the limited resources that are available.
10    Q.  Which departments or which budgets include
11 funding that isn't adequate for government
12 departments that the Council has passed or approved?
13    A.  I would say the ADAMHS Board.  I would say
14 DCFS if you look at, again, the caseload sizes.  I
15 think if you went to all the department heads and
16 directors, you would hear from them that if they had
17 more resources they could do X and they would like
18 to do X.
19       We would like to find more senior homes if
20 we could.  We don't have the money to do that,
21 senior centers in cities.  We fund so many.  We
22 can't fund them all.
23       We would like to give the ADAMHS Board --
24 you know, they've come in and asked for 15 million
25 sometimes.  Sure, we would like to give them more

45 (Pages 174 - 177)

Page 178

1  money.  We can't do that.
2      Q.  Because there's a limited amount of
3  revenue that the county receives every year to
4  allocate among the government?
5      A.  Cannot spend more than what you have.
6      Q.  Right.  And over the years the County has
7  received less and less funding from the State of
8  Ohio as the local government fund has been reduced,
9  correct?
10     A.  The local government fund over time,
11  particularly over the last decade, has decreased.
12     Q.  And the County experienced or collected
13  less revenue or has collected less revenue because
14  of declining property values, right?
15         MS. SACKS:  Objection.
16         THE WITNESS:  I don't know particularly
17  what's historically happened.  The last reappraisal
18  that just ended for this calendar year, the property
19  values have increased.
20  BY MR. MOONEY:
21     Q.  Just because a department says that with
22  more resources they would like to do more doesn't
23  mean that Council necessarily is going to agree that
24  doing more is a good idea, right?
25     A.  Not necessarily.

Page 179

1      Q.  And it's possible that a department could
2  ask the executive for more money and Council
3  Executive Budish would say, "No, you don't need
4  funding for this particular project"?
5         MS. SACKS:  Objection.
6         THE WITNESS:  It's possible.  I don't
7  know.
8  BY MR. MOONEY:
9      Q.  Why does the County draft a budget, if you
10  know?
11     A.  The county charter, which I would say is
12  like the Constitution for the county, requires that
13  there be a budget.
14     Q.  And is it important that the budget
15  contain accurate information?
16         MS. SACKS:  Objection.
17         THE WITNESS:  I'm not sure what you mean
18  by that.
19  BY MR. MOONEY:
20     Q.  The budget is made available to the
21  public; is that right?
22     A.  It's a public document.
23     Q.  Do you consider it important that the
24  public receives accurate information in the budget?
25     A.  Yes.

Page 180

1      Q.  Does the budget set forth the County's --
2  excuse me -- financial priorities?
3      A.  I think any time a budget is recommended
4  by someone, that is priorities of the particular
5  group or individual that's presenting the budget.
6      Q.  So the county executive's recommended
7  budget reflects the county executive's priorities in
8  terms of how spending should be allocated.
9         Is that your understanding?
10         MS. SACKS:  Objection.
11         THE WITNESS:  I can't speak to that.
12  BY MR. MOONEY:
13     Q.  So you said, "I think any time a budget is
14  recommended by someone, that is the priorities of
15  the particular group or individual that's presenting
16  the budget," right?
17     A.  That's what I think, yes.
18     Q.  Okay.  And so do you think that the county
19  executive's recommended budget reflects the county
20  executive's priorities?
21     A.  I can't speak to the county executive's
22  priorities, so I don't know if his recommended
23  budgets reflects his priorities.
24     Q.  Okay.  Understanding that you can't speak
25  for the executive, is it your understanding that

Page 181

1  when you have the county executive's recommended
2  budget that it is the recommendations of the county
3  executive?
4      A.  Yes.  It is called the executive's
5  recommended budget.
6      Q.  Right.  And so it is recommended because
7  it is his priorities of how the money should be
8  spent for the County?
9         MS. SACKS:  Objection.
10         THE WITNESS:  I don't know.
11  BY MR. MOONEY:
12     Q.  What don't you know?  I'm trying to -- I'm
13  just trying to figure out where we're sort of not
14  connecting.
15     A.  I don't know if his recommended budget
16  reflects his priorities.  I'm not in a position to
17  speak to that.
18     Q.  Okay.  So it's possible that the
19  executive's recommended budget reflects things that
20  he doesn't consider a priority?
21         MS. SACKS:  Objection.
22         THE WITNESS:  I don't know.
23  BY MR. MOONEY:
24     Q.  Okay.  Is another purpose of the budget to
25  help guide department spending decisions?

46 (Pages 178 - 181)

Page 182

1    A.   Yes.  It provides the parameters around
2 how a department can spend the money that they're
3 appropriated.
4    Q.   What do you mean by "the parameters around
5 how a department can spend the money that they're
6 appropriated"?
7    A.   So as we discussed, departments are
8 allocated money by personnel lines, contract lines,
9 capital lines.  They can't spend outside of the
10 parameters that the final budget authorized.
11        So if they have 100 staff that they can
12 hire, they can't go outside of those parameters
13 without getting an amendment to the budget.
14    Q.   And is it the case that the budget would
15 say a department can hire 100 people, or is it that
16 they have a pot of money that can go to hiring
17 people and they -- and so that's assumed to account
18 for 100 people?
19    A.   Yes, so the budget that is recommended
20 comes with what's referred to -- I don't know if
21 this is the proper name, but an FTE count per
22 division.  And those are hours, they're not
23 individuals.  So 280 hours is one FTE.  So you can
24 have technically two individuals working half that
25 to make up the 280.  So it's not necessarily people

Page 183

1 but FTEs.
2    Q.   And FTE is full-time equivalent?
3    A.   Yes, yeah.
4    Q.   If a department were to determine that it
5 could squeeze an extra FTE out by reducing the
6 salaries of some number of employees, would that
7 be -- could they do that without seeking approval of
8 the Council?
9    A.   Council wouldn't necessarily know that if
10 it's within that original parameter amount --
11    Q.   That you were --
12    A.   -- of the total dollar amount.
13    Q.   Okay.  Do you have any role in creating
14 the county executive's recommended budget?
15    A.   Not creating the budget.
16    Q.   Do you have any role in determining how
17 the recommended budget from the county executive
18 allocates money to different government departments?
19    A.   No.  The only role prior to coming to the
20 Council, as I mentioned earlier, was discussions
21 with OBM, you know, of what's coming or, you know,
22 kind of the highlights.
23    Q.   Right.  So just the informational sessions
24 to understand, you know, the ADAMHS Board is
25 actually going to be asking for $15 million, you

Page 184

1 should probably know that before it gets to Council
2 so you're prepped.  Is that the types of
3 conversations you're talking about?
4    A.   If we know it prior to it coming before
5 us, we potentially, I mean, not in every case
6 because, you know, things are always changing with
7 the budget, that's something we could mention to
8 them --
9    Q.   Okay.
10    A.   -- if they haven't already requested it
11 before it got recommended to us from -- to them.
12    Q.   Gotcha.  Okay.  So do you know who in the
13 county executive's administration is responsible for
14 creating the recommended budget?
15    A.   I don't -- Office of Budget and
16 Management.  I would say then if it needed to be one
17 person it would be the director of OBM.
18    Q.   When you were a budget analyst in the
19 Office of Budget and Management, do you know who had
20 responsibility for creating the budget at that time?
21    A.   The final creation would fall on the
22 director of OBM.  The analysts would play a role in
23 creating the departments that they were responsible
24 for, but putting it all together and seeing how all
25 the pieces fit would fall on the director of the

Page 185

1 department.
2    Q.   And who is the director of OBM today?
3    A.   Maggie Keenan.
4    Q.   And before Maggie Keenan who was the
5 director of OBM?
6    A.   I don't know who was directly the OBM
7 director prior to Maggie Keenan.
8    Q.   Do you know who any of the prior OBM
9 directors for Cuyahoga County were?
10    A.   Matt Rubino.
11    Q.   Do you know when Mr. Rubino was the OBM
12 director?
13    A.   I'm sorry?
14    Q.   Do you know when he was the OBM director?
15    A.   I don't have the exact dates.
16    Q.   Do you have a ballpark of when it was?
17    A.   It was early on in the new government.  It
18 might have been under the old commissioners too
19 prior to the new government taking place, but he was
20 the OBM director earlier in the new government.
21        And then prior to that was Sandy Turk,
22 Alexandra Turk.  She went by Sandy.  But that was
23 under the commissioners.
24        There could have been others in between.
25 I just can't remember right now.

47 (Pages 182 - 185)

## Page 186

1    Q.   Okay.  Do you have an understanding based
2  on your experience as a legislative budget adviser
3  how OBM goes about creating -- or obtaining
4  information and making recommendations for their
5  budget that they provide to Council?
6    A.   I don't think it's changed much from when
7  I was an OBM analyst in terms of the analyst's role
8  working with the departments, that then getting up
9  to the level of the OBM director and then the OBM
10  director looking at it and reviewing it.
11       There may be certain things where
12  department heads might go over their own department
13  fiscal people and over the OBM analyst people to
14  have a higher level conversation, but I wouldn't
15  know.  I wouldn't be aware of those.
16       But I don't think it's changed much from
17  when I was there in terms of how things get moving.
18    Q.   Do you know if any other member of the
19  County Council or the council staff are involved in
20  the creation of the county executive's recommended
21  budget?
22    A.   I don't know.
23    Q.   Do you know if any members of the County
24  Council offer recommendations for how funds should
25  be allocated in the recommended budget before they

## Page 187

1  receive the final recommended budget from OBM?
2    A.   So not directly during the budget prep for
3  the recommended budget, but if there are programs or
4  ordinances that Council may adopt throughout the
5  year, and if there is, say, like a funding that is
6  dedicated in future years, it's codified.  So that
7  doesn't necessarily direct that it has to be
8  included in the executive's recommended budget, but
9  we know we're planning to spend those dollars in
10  future years.
11    Q.   And so it is -- are you aware of any
12  communications between members of County Council and
13  members of the county executive's administration in
14  which the members make specific recommendations for
15  how funds ought to be allocated as part of the
16  budgeting process, again before they get the budget
17  book and --
18    A.   I'm not aware of ones prior to the
19  recommended budget being prepared.  There could be.
20  I'm not aware of any.  It's more communication of
21  when committee hearings are going to take place and
22  stuff like that.  That's really the prep prior to
23  council receiving the recommended budget.
24    Q.   Okay.  And so once the recommended budget
25  is finalized by OBM, what's the next step in that

## Page 188

1  process, in the budgeting process?
2    A.   I can't speak directly what OBM does with
3  it prior to giving it to our clerks to put it on an
4  agenda.  I don't know what happens in between when
5  OBM is done with the recommended budget and gets the
6  okay to move forward and what happens before it
7  comes to the clerk's office.  I can speak to you
8  what happens once it comes to the clerk's office.
9    Q.   Okay.  So the clerk -- so after it gets to
10  the clerk, the clerk puts the budget on the agenda?
11    A.   Yes.
12    Q.   And is the agenda item the budget
13  resolution, or is it the recommended budget book
14  that goes onto the agenda?
15    A.   The actual agenda item is the budget
16  resolution.  The budget book is received as, I would
17  say, supplemental to the legislation.  It's not --
18  it's not part of the signed legislation.  The budget
19  book is an additional document.
20    Q.   Earlier you mentioned that the resolution
21  allocates funding among personal services, contracts
22  and expenses, and then sometimes there's a capital
23  budget line item, right?
24    A.   Yeah.
25    Q.   So how -- what role, if any, is there

## Page 189

1  between the recommended budget and how -- the
2  information that it contains about how the money
3  will be spent and the resolution itself that
4  allocates the funding?
5    A.   That's -- so if you're looking for more
6  detail of behind the budget resolution, that's where
7  the budget book would come in, the executive
8  recommended budget book.
9    Q.   And is the recommended budget book, it's
10  separate from the resolution, but is it considered
11  part of the law that is passed?
12    A.   I don't know.  That question has never
13  been answered.  It's not in between -- the
14  resolution is multiple pages.  It's not part of
15  those pages.
16    Q.   But okay.  So are there -- are there
17  consequences for -- if the resolution is what the
18  Council passes, are there consequences of a
19  department straying from the budget book but
20  adhering to the allocation of funding for personal
21  services and the other actual resolution dollar
22  amounts?
23    A.   I'm not sure what you mean by
24  "consequences."
25    Q.   Sure.  So -- off the record for a second.

48 (Pages 186 - 189)

Page 190

1 THE VIDEOGRAPHER: Off the record.
2 (Whereupon, a recess was taken
3 from 1:54 p.m. to 2:06 p.m.)
4 THE VIDEOGRAPHER: We're on the record at
5 2:06.
6 BY MR. MOONEY:
7 Q. Mr. McAleer, before we broke, I had asked
8 you whether there are consequences if a department
9 strays from the budget book but adheres to the
10 allocation of funding for personal services in the
11 resolution for the budget, and you said you weren't
12 sure what I meant by consequences.
13 Does that sort of jog your memory of where
14 we were?
15 A. That's fair.
16 Q. Do you still not -- do you still need
17 clarification on what I mean by consequences?
18 A. Yeah, it's just a term that I don't
19 normally use in terms of budgeting.
20 Q. Does something happen -- does a department
21 get in trouble if -- they've been allocated, you
22 know, 100 FTEs and a thousand dollars for benefits
23 and whatever else falls in personal services and
24 that aggregates to a million dollars, and so the
25 county department is supposed to spend a million

Page 191

1 dollars on personal services.
2 If the department stays within that
3 million dollars but within the individual line items
4 is either more or less, is there any consequence or
5 problem with that happening?
6 A. I don't know if "consequence" is an
7 appropriate term. I would say what typically -- it
8 might be the reverse in terms of if a department was
9 authorized to have 100 FTEs and they only throughout
10 the year averaged 80, the consequence, to use that
11 word, might be why didn't -- where were the other
12 20, and sometimes that could be removed during the
13 next budget cycle.
14 Q. Because it's money that they --
15 A. They didn't spend.
16 Q. -- didn't think they need it? Okay.
17 (Exhibit 3 was marked for
18 identification.)
19 BY MR. MOONEY:
20 Q. I'm going to hand you a document that will
21 be marked Trevor McAleer Exhibit 3. I will hand it
22 to your counsel, slide it across the table to your
23 counsel as well.
24 This email for the record is from
25 Trevor McAleer to Laura Roche dated December --

Page 192

1 excuse me, October 8th, 2013, forwarding 2014-2015
2 biennial budget hearing schedule, Bates labeled
3 CUYAH_014434268.
4 You can take as much time as you need to
5 look through it. I will tell you that I'm going to
6 be sort of walking you through it at a pretty high
7 level just so that you can kind of know what to
8 expect with this.
9 A. I am familiar with this particular
10 schedule. It's something that we would typically do
11 for biennial budgets.
12 Q. And do you recall in 2013 forwarding the
13 biennial budget hearing schedule to Laura Roche?
14 A. This says I did.
15 Q. Okay. And who is Ms. Roche?
16 A. Roche, Laura Roche is the -- I don't know
17 her title, but the administrative type of assistant
18 to the county executive. At this point in time the
19 county executive, Ed FitzGerald.
20 Q. And is Ms. Roche still an administrative
21 assistant to the county executive?
22 A. She continued to serve the same role when
23 a new executive got elected.
24 Q. Okay. And do you know or do you remember
25 why it was you sent Ms. Roche the biennial budget

Page 193

1 hearing schedule?
2 A. So the county executive was aware of the
3 dates and times of our committee meetings and what
4 departments which are majority his at that time,
5 his, would be presenting what and when, not what
6 they would be presenting but what departments and
7 when they would be presenting.
8 Q. Okay. You clarified something possibly in
9 your answer where you said that the departments
10 which are majority of his at that time.
11 Has there been a shift in the departments
12 that are under the executive administration's --
13 A. No, I meant his, just in case there was
14 ever a her.
15 Q. Oh, I see.
16 A. So just ...
17 Q. Was it -- and below that is a message from
18 Joseph Nanni.
19 He's the chief of staff?
20 A. For County Council.
21 Q. Okay. And is it typical for the budget
22 hearing schedules to be sent through Chief of Staff
23 Nanni as opposed to some other member of the County
24 Council staff?
25 MS. SACKS: Objection.

49 (Pages 190 - 193)

Page 194

1     THE WITNESS:  I will say I usually send
2  them out.
3  BY MR. MOONEY:
4     Q.  Do you know why Mr. Nanni did in 2013?
5     A.  I don't know under what circumstance.  I
6  don't think I was on leave for a newborn or anything
7  during that time in my life, but I don't know.  I
8  can't speak to why Joe, Joe Nanni at that time sent
9  out that budget document.
10    Q.  On the next page, which is the attachment
11 ending in 269, the title is 2014-2015 Biennial
12 Budget Hearing Schedule.
13    And you said that this is a type of
14 document that you're familiar with?
15    A.  Yes.
16    Q.  Do you create this budget hearing schedule
17 as the legislative budget adviser?
18    A.  Yes.
19    Q.  And have you created the budget hearing
20 schedule for each of the biennial budgets that the
21 County Council has considered during your time as an
22 employee of the County Council?
23    A.  In conjunction with the chair.
24    Q.  Are you employed by the county government
25 or the County Council?

Page 195

1     A.  I'm technically employed by Cuyahoga
2  County, the government.  The Cuyahoga council --
3  Cuyahoga County Council is, I would say, a separate
4  branch of government from the executive and the
5  judicial, so they're an equal branch of the
6  government.
7     So I work for the County Council, but I
8  would say I'm employed by Cuyahoga County.
9     Q.  And when you receive a paycheck, is it
10 coming from the Cuyahoga County government?
11    A.  It's coming from Cuyahoga County.
12    Q.  Okay.  So I would like to just sort of
13 walk through this schedule to make sure that I
14 understand the process of how this works.  And we've
15 talked about this a little bit, so I'm going to try
16 to streamline so we don't repeat ourselves.
17    A.  Okay.
18    Q.  But I do think it's helpful to kind of
19 figure out how this process works from the County
20 Council's perspective.
21    So in looks like at the beginning, there's
22 some presentation from the county executive's office
23 who overviews the budget for the Council; is that
24 right?
25    A.  Yes.  Just you're talking about 269,

Page 196

1  right, the number 269 right here on top?
2     Q.  Yes.
3     A.  Yes.
4     Q.  And so is it the OBM director, Matt Rubino
5  and now Ms. Keenan and possibly someone in the
6  middle, are they the ones who present to Council the
7  financial outlook and overview for the budget?
8     A.  Typically, yes.  They give the kind of
9  30-foot, here is what your biennial budget, your
10 recommended biennial budget looks like.
11    Q.  And are there materials presented or
12 provided to members of Council in anticipation of
13 this 30-foot level?
14    A.  The -- typically, I can't say for every
15 single financial overview outlook of the biennial
16 budget, OBM will prepare a presentation.
17    Q.  And does that presentation contain
18 information about the revenue the executive
19 administration is projecting it will receive over
20 the course of the budget period?
21    A.  Typically, yes.  It would include general
22 fund revenue, Health and Human Services levy revenue
23 and other funds' revenue.
24    Q.  And does the presentations -- do the
25 presentations contain information identifying

Page 197

1  significant increases in expenses that are part of
2  the budget?
3     MS. SACKS:  Objection.
4     THE WITNESS:  Yeah, I don't know how you
5  would define "significant."
6  BY MR. MOONEY:
7     Q.  Does it highlight -- does the 30,000-foot
8  level, does it highlight specific line items that
9  are going -- that the -- does it highlight specific
10 line item expenses?
11    A.  I think both Matt Rubino and Maggie have
12 tried in their presentations to draw attention to
13 significant highlight changes from prior year
14 budgets.
15    Q.  So do you know if there has been an
16 instance where the presentation that the OBM manager
17 provides to the Committee of the Whole that draws
18 attention to the increased costs that the County is
19 budgeting for that are related to opioid abuse in
20 the county?
21    A.  I don't know.
22    Q.  How -- or is there a difference between
23 the financial overview outlook of the biennial
24 budget listed on Monday, the 21st, and then the
25 budget overview initial presentation of the biennial

50 (Pages 194 - 197)

Page 198

1 budget that was scheduled to occur on the 22nd?  Are
2 those distinct presentations?
3     A.  In this particular circumstance, I don't
4 know the differences between the two.  There
5 probably were cross -- similar cross-references, you
6 know, across.
7     Q.  Is it -- when the executive's recommended
8 budget is presented to the County Council in the
9 first instance, does the county executive or has the
10 county executive always presented to the Council on
11 the budget?
12     A.  Not always.
13     Q.  Are there instances that you can recall
14 where the county executive did not make a
15 presentation to the Council to describe his
16 recommended budget?
17     A.  I can't recall specific times when that
18 did not happen, but I know it didn't happen every
19 single budget update.
20     Q.  Has there been an instance where County
21 Executive Budish did not make a presentation to
22 Council regarding his recommended budget?
23     A.  I don't know.
24     Q.  Has -- did Council Executive FitzGerald
25 not present his recommended budget to the County

Page 199

1 Council?
2     A.  I don't think he did every single time.  I
3 don't know what dates he did not.
4     Q.  What does it mean for there to be a first
5 reading of the biennial budget?
6     A.  So how we were talking about when an item
7 goes on an agenda from the clerk's office, this
8 item, in particular the 2014-'15 biennial budget,
9 has a caption in the actual top of the legislation,
10 and it would say something along the lines of
11 County-recommended budget for the 2014 biennial
12 budget, et cetera, et cetera, and that's what is
13 read into the record.  And then it is referred to a
14 committee.
15     Q.  Okay.  So it's not -- someone doesn't read
16 line for line the entire resolution?
17     A.  Not the entire resolution, just the
18 caption, and that's the clerk staff.
19     Q.  And they're reading the resolution, not
20 the recommended budget, correct?
21     A.  They're reading --
22     Q.  They're reading the resolution into the
23 minutes?
24     A.  Yeah, into the minutes of the audio.
25     Q.  Sure.  Okay.  And then it looks like

Page 200

1 the -- you said the budget is referred to the
2 Committee of the Whole?
3     A.  Uh-huh.
4     Q.  Which ordinarily is chaired for these
5 hearings for the budget by the finance chair --
6     A.  Yeah.
7     Q.  -- correct?
8     A.  At times, if they go to Health and Human
9 Services departments, there has been times where the
10 HHS chair might take over for briefly, but lately
11 it's I think been pretty consistent with the finance
12 chair.
13     Q.  And what -- what are the responsibilities,
14 if you know, of a chair for the Committee of the
15 Whole as opposed to just being a council member on
16 the committee?
17     A.  I would -- this is oversimplifying, but
18 maintaining decorum, order, during the meeting,
19 calling on council members to ask questions, calling
20 on representatives from the departments or the
21 audience to come up, if needed, to respond to
22 council members' questions, just keeping order so
23 everyone is not talking over everyone.
24     Q.  So do they have -- do they control how
25 much time is allocated to a department for their

Page 201

1 presentations?
2     A.  Yeah, typically try to provide the initial
3 time frame for each department to get up and speak
4 about their proposed recommended budget to allow for
5 enough time to have follow-up questions and stuff
6 like that.
7     Q.  And then if the time runs beyond the
8 initial allocated time, is it the chair's
9 responsibility to cut off questioning whenever he or
10 she determines it's their discretion?
11     A.  At their discretion.
12     Q.  When the departments present to the
13 Committee of the Whole, are there documents provided
14 to the committee members regarding their budget
15 requests?
16     A.  Not all the time.
17     Q.  For the departments that do provide
18 budget -- or documents regarding their budgets, what
19 kinds of documents are provided to the Committee of
20 the Whole?
21     A.  It varies from department to -- from
22 department to department, but usually it is a
23 PowerPoint form that's loaded on the screen during
24 their presentation.  Some may bring handouts, but if
25 you're looking for more than others, more than

51 (Pages 198 - 201)

Page 202

1 likely the presentation.
2    Q.   And when the PowerPoints are presented to
3 the Committee of the Whole, how -- do you receive --
4 does the council staff receive those PowerPoints
5 ahead of time?
6    A.   We ask for them ahead of time so we can
7 have them loaded into the system so they can be up
8 on the video system within the committee room.  It
9 doesn't mean we always get them in time.
10    Q.   Right.  Does the PowerPoint or do the
11 presentations that the departments make reflect the
12 budget requests in the recommended budget, or does
13 it reflect the department's preferred budget, which
14 may or may not be the same as the recommended
15 budget?
16    A.   It varies.
17    Q.   So what do you mean by "it varies"?
18    A.   Some departments fall under the first part
19 of your question, and some departments or agencies
20 will fall under the second part.
21    Q.   So if a department in the recommended
22 budget is budgeted $100,000 but they thought that
23 they should have received $150,000, that may be in
24 the presentation to Council that they actually think
25 they should receive more money?

Page 203

1    A.   It could be that here is what -- I'm
2 getting recommended 100; I need the extra 50.  That
3 could fall in the individual agency or department's
4 budget's presentation.
5    Q.   And in your experience -- well, if it
6 isn't in the presentation and the department wanted
7 to receive more money than is budgeted in the
8 recommended budget, how else would the department
9 inform the Council that they needed or were
10 requesting more money?
11    A.   It could vary again.
12    Q.   Okay.  And how would it vary?
13    A.   It could be conversations with me, it could be
14 conversations with my co-workers.  It could be an
15 email.  It could be a letter to anyone just saying I
16 need the 150 versus the 100.
17       There's no set-in-stone how they could go
18 about doing that.  It could be saying something when
19 you're grabbing a coffee somewhere, you know.  But
20 the request, not always fulfilled, but is to include
21 it during these time slots.
22    Q.   Could the request or do you know if a
23 department has ever requested additional funds by
24 communicating directly with members of the County
25 Council outside of the hearing process?

Page 204

1    A.   I don't know.
2    Q.   Have you ever had a conversation with a
3 member of Council in which they told you a
4 department was asking for more money and they
5 learned that information when they were in a meeting
6 unrelated to an official Council hearing?
7    A.   I don't think it would have been anything
8 new from what I didn't already know.
9    Q.   When the Council -- excuse me, the county
10 departments or agencies are getting prepared to
11 present to the County Council, does the Council
12 itself provide any sort of guidance as to the
13 information that they would like to receive as part
14 of the hearing process?
15    A.   Usually, yes.  The chairperson tends to
16 send out a memo of kind of expectations of, you
17 know, that's where they say can you keep it within
18 so many minutes, your opening comments; can you
19 include this type of information, et cetera.
20    Q.   And does the memo that the chair sends to
21 the departments provide department-specific requests
22 for information?
23    A.   What do you mean by that?
24    Q.   So, for instance, if the sheriff's
25 department wants to hire another 35 FTEs, and that

Page 205

1 is a larger increase than their ordinarily is
2 between budgets, are there instances where the
3 Council would say, "Give us your presentation, but
4 we really want to know about this FTE increase
5 you're requesting," or some other sort of specific
6 line item request?
7    A.   So I don't have all the memos in front of
8 me, but the memos tend to request that if you're
9 going to ask for more money, focus on that area.  It
10 doesn't always happen for administrative
11 departments.  It tends to happen more for agencies
12 outside of the administration.
13    Q.   And when you're distinguishing between
14 administrative departments and agencies outside the
15 administration, are the ones that are outside the
16 ADAMHS Board and MetroHealth and Cuyahoga County
17 CCBH, Cuyahoga County Behavioral Health, is that an
18 agency outside of the administration --
19    A.   I'm not familiar with Behavioral Health.
20 I'm not familiar with that.
21    Q.   I may be making that one up.  A lot of
22 acronyms start to --
23    A.   I wasn't going to say that.  Yeah, and
24 another elected officials, so judges, prosecutor's
25 office, their budgets.

52 (Pages 202 - 205)

1    Q.   Does the Council have to submit a budget
2  to the executive that goes into the recommended
3  budget?
4    A.   We do.  We do -- I don't know if have to
5  is the -- we do.  We work with our council analyst,
6  the OBM analyst.  We have those meetings prior to
7  the executive recommended budget being finalized.
8  She will talk to us about what we need or is there
9  anything new or anything like that, and we go
10  through that same process.
11    Q.   So other than the memos -- excuse me --
12  which may or may not ask for specific information,
13  are there other processes through which members of
14  council are able to request additional information
15  from departments ahead of the budget hearings so
16  that the budget department representatives know what
17  they should be prepared to discuss?
18    A.   I don't know of any specifics, but there
19  could be.
20    Q.   Do you know if it's ever happened before,
21  that a member -- where a member has either asked the
22  department head directly or asked one of the staff
23  of the Council to ask a department head?
24    A.   I think it has happened.  I can't give you
25  a specific.  It would more than likely go to me and

1  say it would be, Dear X Department, please come
2  prepared to talk about these things at the committee
3  hearing, the budget hearing.
4    Q.   Do you attend the budget hearings?
5    A.   Yes.
6    Q.   And what is your role as the legislative
7  budget adviser during those hearings?
8    A.   For the most part, I'm in the room.  I
9  don't have to participate a lot in those
10  conversations.  There has been times where I might
11  have to get up to the podium and ask -- or answer a
12  question, but I don't actively publicly participate
13  in those meetings.  I'm more to hear what the
14  departments are saying or asking for so I can be
15  prepared to staff the council members, you know,
16  during or after if they have follow-up questions;
17  "Oh, what did Department Director X mean by this
18  statement," or something like that.
19    Q.   Do you interact with any of the department
20  representatives during the hearings themselves?
21    A.   If they're -- I know most of them.  By
22  interact, what do you mean?
23    Q.   About with respect to the budget itself as
24  opposed to social interaction, but do you have any
25  responsibility to interface with them about their

1  budget requests during the hearings themselves?
2    A.   Typically by the time the hearing is ready
3  there wouldn't be any more professional interaction.
4  It would be social.
5    Q.   Do you interact with members of Council
6  during the hearings themselves, the budget hearings?
7    A.   Occasionally.
8    Q.   Okay.  And what are those interactions?
9    A.   They'll come back, and if they're ready to
10  take a break, they'll just ask me a question of what
11  was that number or can you get me -- can you follow
12  up or ask this follow-up question, which we always
13  have follow-up questions pretty much for every
14  department.
15    Q.   Have any of the follow-up questions that
16  the council members have asked you to convey to the
17  department heads ever been related to opioid abuse
18  in Cuyahoga County?
19    A.   I don't know.
20    Q.   You don't remember, or you --
21    A.   I don't remember.
22    Q.   Are there minutes of the -- reflecting the
23  discussions that occurred during the budget
24  hearings?
25    A.   It's committee meetings, so there are

1  minutes of each committee meeting.
2    Q.   And do those minutes reflect everything
3  that was said during a particular meeting?
4    A.   No.
5       MS. SACKS:  Objection.
6  BY MR. MOONEY:
7    Q.   Other than the PowerPoints -- excuse me --
8  and the sometimes separate hard-copy documents, are
9  there other documents that are prepared by
10  department or agency heads that are used for the
11  budgeting process that are shared with Council, the
12  County Council?
13    A.   It would be the follow-up questions.  That
14  would be an additional document that would end up
15  being distributed and shared with council members.
16    Q.   Other than the Child and Family Services
17  request for funding related to social workers and
18  the sheriff's department for the jail and the
19  overtime payments for both CFS and the sheriff's
20  department, the MetroHealth funding, the ADAMHS
21  Board, has there been an instance of a department
22  requesting more money than is budgeted to them
23  through the recommended budget because of the
24  problems of opioid abuse in Cuyahoga County?
25    A.   I don't remember right now if there are

Page 210

1 additional items.
2    Q.  When the departments -- that you remember,
3 the departments that have requested additional
4 funding to -- because of the opioid abuse problems
5 in Cuyahoga County, did any of those departments
6 distinguish between prescription opioid abuse and
7 illegal opioid abuse?
8    A.  I don't know.
9    Q.  Do you know if any of the departments that
10 requested additional funding made a distinction
11 between prescription opioid abuse and heroin abuse?
12    A.  I don't know.
13    Q.  If a department had made such a
14 distinction, would that be reflected in the
15 documents that were shared with the Council at the
16 hearings that you're remembering?
17       MS. SACKS:  Objection.
18       THE WITNESS:  I don't know.  If the
19 department put it in there, then yes.
20 BY MR. MOONEY:
21    Q.  But sitting here today, you don't remember
22 if any of the documents made a distinction between
23 prescription and illegal opioids or between
24 prescription opioids and heroin abuse -- or heroin?
25    A.  I don't remember.

Page 211

1    Q.  Okay.  So after all of the budget hearings
2 occur, what -- you said there's usually follow-up
3 questions.
4       How does that follow-up question process
5 work?
6    A.  So throughout the committee process,
7 committee members, council members ask the
8 questions.  There are a lot "I don't know, I'll have
9 to get back to you" answers, responses.
10       And I follow-up with that, typically try
11 to do it that day just so it's fresh in everyone's
12 mind and send those follow-up questions out to all
13 of the participating departments for that particular
14 time frame.
15    Q.  And the questions that you compile and
16 provide to the department heads, are those questions
17 that council members ask?
18    A.  Yes, during the committee meeting.  There
19 could be one that they didn't think of after the
20 fact, but it's the unanswered questions in the
21 committee process.
22    Q.  And so during the meetings you're tracking
23 questions that aren't answered, and then you make a
24 note to yourself to follow up?
25    A.  Yes.

Page 212

1    Q.  Are the questions that are provided to the
2 department heads after the hearings ones that you
3 come up with your own too, or are they only council
4 member questions?
5    A.  They're usually council member questions.
6 I don't -- typically with the budget process I don't
7 have follow-up, my own follow-up questions.
8    Q.  Do you -- before you send the questions to
9 the department heads, do you have to receive some
10 sort of approval from a member of the County Council
11 to actually send the follow-up questions?
12    A.  No.  I don't -- it might have happened
13 earlier in the budget process, but as multiple
14 biennial budget processes continue, I don't seek
15 approval.
16    Q.  Do you share the questions that you intend
17 to provide to the department heads to members of
18 Council in advance of sending them to the department
19 head?
20    A.  I don't think it's in advance.  I think I
21 do it at the same time.
22    Q.  Do you -- after the hearings end, do you
23 participate in meetings with members of Council
24 about the presentations that just occurred in order
25 to understand the council members' position on

Page 213

1 budget requests?
2    A.  What do you mean by "meetings"?
3    Q.  Discussions with members of Council about
4 presentations.
5    A.  They're not structured or organized
6 meetings.  That usually might happen naturally after
7 a committee meeting just as follow up from, you
8 know, something that might have been said or
9 something and then go from there.  But ...
10    Q.  Do you know if after the hearings end the
11 members of Council meet together to discuss the
12 budget presentations that were provided to them in
13 the hearings for the budget?
14    A.  I don't know if they meet individually
15 with each other or not.
16    Q.  Does Ohio have an open records or public
17 records law -- open meetings law?  Excuse me.
18    A.  Yes.
19    Q.  And do you have an understanding of what
20 the Ohio open meeting law requires?
21    A.  Yes, very well aware of the provisions.
22    Q.  Okay.  Could you describe to me your
23 understanding of Ohio's open meeting law?
24    A.  So I'm not going to give you the legal
25 thing.

54 (Pages 210 - 213)

Page 214

1   Q.   Sure.
2   A.   But our -- we're always cognizant that we
3   cannot have a majority of members in a meeting -- in
4   a non-noticed public meeting.  And we hold that true
5   for committee meetings.  So not every member -- you
6   know, there's only five people for committees, so
7   you can't have more than the two if you want to talk
8   about something that happened in a committee.
9   Q.   Okay.  So your understanding is that Ohio
10  law requires that all meetings, I'm going to use the
11  word "meetings," but all meetings between a majority
12  of either the Council or committees of a Council
13  would require a notice of the public hearing?
14  A.   Yes.
15  Q.   When the -- for the majority of the
16  committee piece, because obviously with 11, more
17  than 5, then you would need a public notice, right?
18  A.   (Nods head.)
19  Q.   And so for the committee, if there's five
20  on a committee, is it -- how does the Council
21  determine whether or not three council members can
22  get together and chat?  Does it have to be about the
23  committee jurisdiction or committee matters, or is
24  it just that three council members can't get in a
25  room together and have a conversation?

Page 215

1   A.   Yeah, so if it's in particular around the
2   budget, we're not going to put four or five members
3   in a room because then you're getting -- and they're
4   very cognizant of that just because of how the
5   circumstances that they took office under.  So they
6   are very cognizant of that.
7        So if we have to, you know, we can do two
8   to three; I'll give them, you know, quick budget
9   overviews.  But we can't go beyond that.
10  Q.   I see.  So you would have multiple
11  meetings with sort of groups of Council so that you
12  don't -- there doesn't need to be a public --
13  A.   Yeah, if they're --
14  Q.   -- hearing?
15  A.   If it's needed, I mean in terms of budget
16  prep here is the department heads, like even if it's
17  just going over the schedule, we're like okay, can't
18  be more than three people.
19  Q.   And so if it were -- if there were three
20  members of the Health and Human Services committee
21  and they wanted to get together to discuss some
22  non-Health and Human Services committee business, is
23  there any issue with them doing that?
24  A.   I'm not aware of any issue.
25  Q.   Okay.

Page 216

1   A.   I don't know that answer definitely.  But
2   if we're talking about a proposed ordinance that has
3   nothing to do with Health and Human Services, you
4   know, it's not related to the HHS committee.
5   Q.   Okay.  You mentioned that you're not going
6   to put four or five members in a room and that
7   they're very cognizant of that because of how the
8   circumstances that they took office under.
9        Are you referring to the federal
10  investigation that we discussed earlier of certain
11  elected officials in Cuyahoga County?
12  A.   I'm talking about the new form of
13  government, the reasons why the new form of
14  government came in existence.
15  Q.   Okay.  After -- it looks like, turning
16  back to the attachment, 271, there's a period for
17  public testimony.
18       Is that the case for all of the biennial
19  budget, there's a public testimony portion of the
20  proceedings?  It's at the bottom of 271 on
21  November 12th.
22  A.   I don't know if it's the case for every
23  single biennial budget process, but every Committee
24  of the Whole agenda, even if it's not on this
25  schedule, always has public comment.

Page 217

1   Q.   So during your time as the legislative
2   budget adviser, has there been an instance of public
3   comment seeking additional funding to address the
4   problems of opioid abuse in Cuyahoga County?
5   A.   I don't know.
6   Q.   Do you know if anyone during the public
7   comment period has requested or advocated for
8   additional funding to address the problems of
9   prescription opioid abuse in Cuyahoga County?
10  A.   I don't know.
11  Q.   Do you know if anyone has spoken during
12  the public testimony portion of any hearing to
13  advocate or request more funding to address problems
14  of heroin abuse in Cuyahoga County?
15  A.   I don't know.
16  Q.   Has -- during the public testimony, has
17  anyone ever advocated for additional -- for the
18  County providing additional services to address the
19  problems of opioid abuse in Cuyahoga County?
20  A.   I don't know.
21  Q.   Same question for prescription opioids.
22  A.   I don't know.
23  Q.   Same question for heroin.
24  A.   I don't know.
25  Q.   Below the public testimony, it says

55 (Pages 214 - 217)

Page 218

1 Departmental Appeals.
2       What is that, if you know?
3    A.   That is a time slot that would be
4 available for departments to come in and give
5 another, another chance at their funding request.
6    Q.   Can any department appeal -- make an
7 appeal to the Council for additional funding during
8 this departmental appeal process?
9    A.   There's nothing that would prohibit
10 someone from coming in.
11    Q.   And how would a department know that they
12 ought to come in and appeal and that they're not
13 receiving the funding that they're going to get --
14 or they requested?  Excuse me.
15    A.   What do you mean by that?  I'm sorry.
16    Q.   I'm just wondering at what point does the
17 department learn that they're probably not going to
18 get the money that they wanted, and so they should
19 come in and participate in this departmental appeal
20 process?
21    A.   I can't speak for when individual
22 department heads know for sure.  If you look at how
23 committee presentations go, if you're a department
24 head, you can hear the questions.  You can hear
25 them, council members, speak about their requests.

Page 219

1 You may or may not be able to get a sense of where a
2 department is headed.
3       We -- I don't know in this particular
4 example, but council members may during any of these
5 committee meetings start talking about what
6 amendments he or she would make or proposed
7 amendments to the budget, so you might get a sense
8 from there.
9    Q.   So it's sort of a reading the tea leaves,
10 or there may be a statement that someone says you're
11 probably not going to get that money, is that
12 generally correct?
13    A.   You can get a general sense.  You might
14 not have a definite answer either way, but you could
15 have a sense.
16    Q.   And then below that there's a budget
17 update line item.
18       Do you know what the budget update --
19    A.   I don't remember what would fall under
20 that particular item.  It might have been a time
21 spot to allow for the OBM director to come in, and
22 if there's any errors, technical errors or, you
23 know, something it might have found in a 1 point --
24 you know, big budget, you might -- that could be an
25 opportunity, but ...

Page 220

1    Q.   On the next page, 272, there's a reference
2 to a substitute version accepted including all
3 amendments.
4    A.   Yes.
5    Q.   Do you know what that means?
6    A.   Yes.  So that would be in this particular
7 example the meeting where council members would move
8 forward their amendments, their proposed amendments.
9 It could be there will be times where Office of
10 Budget and Management, which we refer to as
11 technical amendments; it's not any additional
12 increases for new staffing or anything of that
13 nature.  But if -- if the benefits calculation was
14 off for certain departments, we would -- that would
15 be a technical amendment example.  That would be the
16 day where all of it is discussed, and Council would
17 consider all the amendments.
18    Q.   And so the amendment process that we
19 discussed earlier that you sometimes play a role in
20 is there are either amendments that are separate
21 resolutions or sometimes line-item edits directly to
22 the original resolution, right?
23    A.   Yes.  It gets all incorporated into that
24 new version that would ultimately be substituted
25 from a resolution perspective.

Page 221

1    Q.   Okay.  So when you get to the second
2 reading, that second reading is of whatever the
3 final product of the budget is that -- the original
4 budget plus any amendments and technical or
5 substantive?
6    A.   And you hope by second reading it is the
7 final.
8    Q.   Okay.
9    A.   Nothing prohibits anyone from bringing
10 forward additional amendments.  But in years past,
11 when it gets to the second reading, preparation for
12 a third reading passage, it tends to be the final
13 document.  But I just wanted to --
14    Q.   So it's possible there could be additional
15 amendments?
16    A.   It's possible.
17    Q.   Okay, that makes sense.
18       In many -- does the version that is
19 ultimately passed after a third reading, a version
20 of the budget resolution with all of the amendments
21 and changes that may have occurred over the course
22 of the hearing process, is that resolution --
23 does -- excuse me.
24       Does that resolution reflect the budget
25 numbers in the county executive's recommended

56 (Pages 218 - 221)

1 budget?

2        MS. SACKS:  Objection.

3        THE WITNESS:  I don't know what you mean

4 by that.

5 BY MR. MOONEY:

6    Q.   Sure.  That's fair.  That wasn't a very

7 clean question.

8        There's a -- so you go through all these

9 amendments and you have a recommended budget.

10        Presumably some of the numbers in the

11 resolution that is ultimately passed are different

12 than the ones that were in the original recommended

13 budget, correct?

14    A.   Yes.  If there are amendments, they would

15 not be the same.

16    Q.   And so does anybody, to your knowledge, go

17 back to the recommended budget and make changes so

18 that it reflects the amount of money that's

19 allocated in the budget resolution that the Council

20 passes and the executive signs?

21        MS. SACKS:  Objection.

22        THE WITNESS:  So in terms of the amendment

23 process, when -- using this as an example,

24 November 18th, if Council approved all the technical

25 and written amendments that are on the table,

1 whatever got adopted, that list goes back to OBM.

2 OBM prepares that new version of the line item

3 document, the resolution.

4 BY MR. MOONEY:

5    Q.   Okay.

6    A.   Does that --

7    Q.   That makes sense.  I guess my question is,

8 so there was a recommended budget and a proposed

9 resolution at the very beginning of the process when

10 it gets to Council, correct?

11    A.   Yes.

12    Q.   And so over time the resolution gets

13 amended and the numbers change or can change.

14        Does the recommended budget book, is that

15 document updated as well, or does that remain static

16 as the resolutions are changed?

17    A.   I don't know if the recommended budget

18 book changes with the amendments.

19    Q.   Okay.  So is there -- so if I were looking

20 at a budget, I would also want to look at the

21 resolution to know that the number that's budgeted

22 in the recommended budget is the number that was

23 ultimately approved?

24    A.   Yeah.  If you're looking for an accurate

25 number, it's the approved resolution document is

1 where I would say where you have to go look.

2    Q.   Okay.  And do you know if the -- do you

3 know if any --

4        THE VIDEOGRAPHER:  Off the record.

5        (Whereupon, a recess was taken

6        from 2:49 p.m. to 2:53 p.m.)

7        THE VIDEOGRAPHER:  On the record, 2:53.

8 BY MR. MOONEY:

9    Q.   Mr. McAleer, I want to talk a little bit

10 about how the follow-up question process works in

11 practice.  We've been using the example of the

12 ADAMHS Board at various times throughout this

13 deposition.

14        So what is your understanding of what the

15 ADAMHS Board is, if you have an understanding of

16 what it is?

17    A.   They are the alcohol, mental health and

18 addiction services board.

19    Q.   And are -- is the ADAMHS Board of Cuyahoga

20 County a part of the Cuyahoga County government?

21    A.   They are a part of a significant amount of

22 money that is received from Cuyahoga County.  I

23 can't legally give you an answer if they're part of

24 Cuyahoga County government or not.

25    Q.   Do you have an understanding of the types

1 of services that the ADAMHS Board provides to their

2 service recipients?

3    A.   Very general understanding.  I couldn't

4 get into specifics of exact services that they

5 provide.

6    Q.   So at a general level, what is your

7 understanding of the types of services the ADAMHS

8 Board provides?

9    A.   Yeah, I know they provide residential,

10 residential patient services, outpatient services

11 for mental health, individuals with mental health

12 issues, addiction services, alcohol-related

13 services.  They fund other nonprofits and other

14 groups that provide these services.  But passed

15 that, I can't get into the details of what exactly

16 specific types of services they provide.

17    Q.   Did does the ADAMHS Board, to your

18 knowledge, provide opioid addiction services?

19    A.   I don't know that.

20    Q.   Okay.  Do you know, between the mental

21 health services, the addiction services and the

22 alcohol services how much of the ADAMHS Board's

23 expenses are allocated between those?

24    A.   I don't.

25    Q.   Do you consider the employees of the

57 (Pages 222 - 225)

Page 226

1 ADAMHS Board to be experts in matters of drug
2 addiction?
3     A.  I haven't given -- I don't know that
4 answer.
5     Q.  Do you know if the employees of the ADAMHS
6 Board specialize in drug addiction treatment?
7     A.  I don't know.
8     Q.  Do you believe that the employees of the
9 ADAMHS Board understand the drug addiction issues
10 that the County faces?
11        MS. SACKS:  Objection.
12        THE WITNESS:  I don't know.
13            (Exhibit 4 was marked for
14            identification.)
15 BY MR. MOONEY:
16     Q.  I'm going to hand you a document that will
17 be marked McAleer Exhibit 4.  I will also provide
18 one to your counsel, if I could get it across the
19 table.
20        MS. SACKS:  Thank you.
21        MR. MOONEY:  You're welcome.
22 BY MR. MOONEY:
23     Q.  And this is an email from Scott Osiecki to
24 you and what appears to be members of city [sic]
25 council and other members of the ADAMHS Board dated

Page 227

1 November 19th, 2013, Subject line ADAMHS Board
2 response to Cuyahoga County Council follow-up
3 questions, and it's Bates labeled Cuyahoga -- or
4 CUYAH_014408184.
5        Again, as with this, I'm going to ask you
6 a couple general questions about it, about the
7 document, but please take the time that you need to
8 familiarize yourself with it.
9        All set --
10     A.  Yes.
11     Q.  -- as best as you can be?
12        First of all, do you remember receiving
13 this email marked McAleer Exhibit 4 in November of
14 2013?
15     A.  I see my name.  I don't specifically
16 remember receiving this, the email.
17     Q.  But the fact that this email includes your
18 name stands to reason that you received this email?
19     A.  Yes.
20        MR. MOONEY:  We can go off the record.
21        THE VIDEOGRAPHER:  Off the record, 2:59.
22            (Whereupon, a recess was taken
23            from 2:59 p.m. to 3:00 p.m.)
24        THE VIDEOGRAPHER:  On the record,
25 3:00 p.m.

Page 228

1 BY MR. MOONEY:
2     Q.  All right.  Mr. McAleer, do you know who
3 Scott Osiecki is?
4     A.  I do.
5     Q.  Okay.  And who is Mr. Osiecki?
6     A.  He is the current -- I don't know exact
7 title -- CEO of the ADAMHS Board.  At this point in
8 time he was not the CEO.
9     Q.  At this point in time, at least according
10 to his signature line, it looks like he was the
11 director of external affairs; is that right?
12     A.  Based off his signature line.
13     Q.  In your role as a legislative budget
14 adviser, were you -- was Mr. Osiecki your point of
15 contact when you had communications with members of
16 the ADAMHS Board -- or employees of the ADAMHS
17 Board?  Excuse me.
18     A.  It would typically be Scott as well as
19 Mr. Denihan.
20     Q.  And Mr. Denihan in 2013 was the CEO --
21     A.  CEO.
22     Q.  -- of the ADAMHS Board?
23     A.  Yes, sir.
24     Q.  The attachment to the email that starts at
25 185 -- or ends at 185 is titled ADAMHS Board of

Page 229

1 Cuyahoga County Response to Questions respond -- or
2 Requests Raised During the November 24, 2013
3 Cuyahoga County Council Committee of the Whole
4 Budget Hearing.
5        Did I read that close to correct?
6     A.  Close enough.
7     Q.  Okay.  And so is this document -- there's
8 a table in the document, and there are -- the first
9 column is County Council Questions/Request, and then
10 the second column is ADAMHS Board Response.
11        Do you see that?
12     A.  Yes.
13     Q.  And so are the questions that are listed
14 in the County Council Question/Request the kind of
15 questions that you would communicate to department
16 heads after a budget hearing to resolve the issues
17 that weren't resolved during the budget hearing
18 process?
19     A.  I think that's an open-ended question only
20 in the sense that I would ask questions and they
21 would respond.  I don't know if I specifically asked
22 these specific questions to them or if they were
23 tracking their own follow-up questions.
24     Q.  I see.  So sometimes the department heads
25 would recognize that there were unanswered questions

Page 230

1 that they themselves wanted to answer for the
2 Council even if you never specifically requested
3 them?
4    A.   That could happen, yes.
5    Q.   And is the question and answer table or
6 question and response table that the ADAMHS Board
7 provided, is this consistent with how other
8 departments would answer questions?  Would they
9 provide similar tables?
10    A.   There wasn't consistency on how each
11 individual department would respond.
12    Q.   Okay.  So there wasn't a set process for
13 how the responses would be provided back to the
14 members of Council?
15    A.   That's correct.
16    Q.   If you turn to the page ending in 186.
17    A.   Question 4?
18    Q.   Question 4, "Provide a list of county
19 agencies/departments that you overlap services
20 with."
21       Do you see where it says that?
22    A.   I do.
23    Q.   Do you know if that was a question that
24 members of Council asked -- a member of Council
25 asked of the ADAMHS Board?

Page 231

1    A.   I don't know.
2    Q.   Then there's a response -- excuse me --
3 that says, quote, "We do not overlap.  We
4 collaborate with other county agencies,
5 collaboration with the Heroin Task Force and Board
6 of Health."  And then under that is a set of
7 subbullets that list the ways in which the ADAMHS
8 Board collaborates with the Heroin Task Force and
9 the Board of Health.
10       Do you see that?
11    A.   I do see it.
12    Q.   Do you know if after the ADAMHS Board
13 responded by saying that they are in active
14 participation in Cuyahoga County's Opiate Task Force
15 if there was additional follow-up questions from the
16 members of Council about the ADAMHS Board's
17 participation?
18    A.   I don't know.
19    Q.   Do you know -- the last subbullet under
20 the collaboration with heroin and task force Board
21 of Health, there's a reference to "created a first
22 phase of a heroin prevention campaign that was
23 approved by chair of the Cuyahoga County Opiate Task
24 Force."
25       Do you see that?

Page 232

1    A.   I do.
2    Q.   Do you know what heroin prevention
3 campaign that was approved by the chair of the
4 Cuyahoga County Opiate Task Force is being
5 referenced in -- excuse me -- the ADAMHS Board's
6 response to Question Number 4?
7    A.   I do not.
8    Q.   On the page ending in 188, Question
9 Number 10 says, "Why would the County be responsible
10 for providing training to doctors on addiction and
11 prescribing opiates?"
12       Did I read that correctly?
13    A.   I didn't catch every word you said, but I
14 think you read it correctly.
15    Q.   Okay.  I will try to slow down a little
16 bit.
17    A.   Okay.
18    Q.   Do you know if the Question Number 10 was
19 a question that was posed by a member of the County
20 Council during the November 2013 budget hearing
21 process?
22    A.   I do not know.
23    Q.   Is the question "Why would the County be
24 responsible for providing training to doctors on
25 addiction and prescribing opiates" a question that

Page 233

1 you have heard a member of Council ask in other
2 circumstances?
3       MS. SACKS:  Objection.
4       THE WITNESS:  I don't know.
5 BY MR. MOONEY:
6    Q.   The response from the ADAMHS Board says,
7 quote, "If the money is available, it would be our
8 role as an expert in addiction to train doctors on
9 opiate addiction and how it leads to heroin
10 addiction."
11       Do you see where it says that?
12    A.   Yes, except for the typo.  You said it,
13 opiate addiction.  It says "addition" on the --
14    Q.   Oh, it does.  You're right.  So it says
15 "role as an expert in addition to train doctors on
16 opiate addition."
17       Do you think that the ADAMHS Board was
18 going to train doctors on opiate addition, or do you
19 think that was a typo?
20    A.   I don't know for sure, but I believe it
21 was a typo.
22    Q.   Do you know -- do you know whether the
23 County Council approved -- made money available for
24 the ADAMHS Board to train doctors on opiate
25 addiction and how it leads to heroin as part of the

59 (Pages 230 - 233)

Page 234

1 budget process in November of 2013?
2     A.  I don't remember.
3     Q.  If I wanted to look in a resolution of
4 the -- from the County Council, would there be a
5 specific line item that indicates that money was
6 allocated to the ADAMHS Board to train doctors on
7 opiate addiction and how it leads to heroin
8 addiction as part of the 2013 budget process?
9     A.  There would not be a specific line item
10 for what you just said.  It would be a line item for
11 the ADAMHS Board increase.  It wouldn't be a
12 specific line item for what you just referenced.
13    Q.  And so if the ADAMHS Board received an
14 additional amount of funding, if they then took that
15 money and spent it on something other than training
16 doctors on opiate addiction and how it leads to
17 heroin addiction, would there be a way that I could
18 determine that that money was used for some other
19 purpose in a document that the County Council has or
20 sees?
21    A.  Not a document that County Council has.  I
22 think the ADAMHS Board would have to provide that
23 information.
24    Q.  And do you know -- well, you already said
25 you don't know whether the funding was -- you don't

Page 235

1 know whether this funding was appropriated to the
2 ADAMHS Board for this purpose?
3     A.  Not in this time, 2013.
4     Q.  The next bullet says, "Doctors have told
5 us that medical schools and residency programs have
6 placed little emphasis on educating future doctors
7 [sic] about addiction and are poorly trained to
8 recognize and treat addictive disorders.  Thus, we
9 would provide the training."
10       Did I read that correctly?
11    A.  Yes.  You said doctors instead of
12 physicians, but ...
13    Q.  You're right, "educating future physicians
14 about addiction."
15    A.  I just don't want to mis --
16    Q.  No, that's fine.  I appreciate you
17 correcting the record.
18       So, "Doctors have told us that medical
19 schools and residency programs have placed little
20 emphasis on educating future physicians about
21 addiction and are poorly trained to recognize and
22 treat addictive disorders.  Thus, we would provide
23 the training."
24       Is that right?
25    A.  Yes, sir.

Page 236

1     Q.  Okay.  And do you know sitting here today
2 whether this statement from the ADAMHS Board that
3 doctors have told them that medical schools and
4 residency programs have placed little emphasis on
5 educating future physicians about addiction --
6       THE COURT REPORTER:  Counsel.
7       MR. MOONEY:  Sorry.
8       THE COURT REPORTER:  It's getting late.
9       Medical schools and residency?
10 BY MR. MOONEY:
11    Q.  -- programs have placed little emphasis on
12 educating future physicians about addiction, do you
13 know whether that statement is accurate?
14    A.  I don't know.
15    Q.  Do you know whether future physicians are
16 poorly trained to recognize and treat addictive
17 disorders?
18    A.  I don't know.
19    Q.  Do you know whether any members of Council
20 followed up with the ADAMHS Board about the
21 statement in response to Question 10 about the
22 training of physicians about addiction --
23    A.  I'm not aware --
24    Q.  -- and addictive disorder?
25    A.  -- of any follow-up.

Page 237

1     Q.  If you would go to the next page that ends
2 in 81 -- or 189, 8189.
3       At the top it indicates that the ADAMHS
4 Board was requesting $10,715,000 for adult mental
5 health and addiction treatment services.
6       Is that correct?
7     A.  That's what it says here, yes.
8     Q.  And under the Program Category column in
9 the table, there's a row titled Prevention, and
10 under that it says Priority 1.
11       Do you see where it says that?
12    A.  Yes, the bottom of the page.
13    Q.  Yes.  Do you know what it means in this
14 document that prevention is described as Priority 1?
15    A.  I don't know what the ADAMHS Board meant
16 by that.
17    Q.  Okay.  Do you see there's -- in that same
18 major column, there are a series of subcolumns, one
19 of which is Opiate/Heroin Prevention & Education
20 Campaign.
21    A.  Yes.
22    Q.  And it says requesting annual funding of
23 $200,000.
24    A.  Yes.
25    Q.  Do you know whether the ADAMHS Board -- or

60 (Pages 234 - 237)

Page 238

1 whether the County Council approved funding for that
2 project?
3    A.  I don't know.
4    Q.  At the page ending in 8192, there is a
5 table describing the children's mental health and
6 addiction treatment services additional funding
7 request from the ADAMHS Board of Cuyahoga County.
8    Do you see that?
9    A.  Yes, sir.
10    Q.  It says that they are requesting
11 $5,470,000 of additional funding requested for new
12 programs --
13    A.  Yes.
14    Q.  -- or to enhance current programs?
15    A.  Yes, sir.
16    Q.  And prevention expansion is listed as a
17 Priority 1.
18    Is that right?
19    A.  That's correct.
20    Q.  Do you understand that Priority 1 here
21 means that it is the number one priority of the
22 ADAMHS Board in terms of the various program
23 categories listed in this table?
24    A.  I don't know what ADAMHS Board meant by
25 Priority 1 here.

Page 239

1    Q.  Do you know whether when you received this
2 document you asked Mr. Osiecki or a member of the
3 ADAMHS Board what they were listing as Priority 1
4 and why?
5    A.  I don't remember.
6    MS. SACKS:  Hold on.  Wait until he's done
7 with the question.
8    THE WITNESS:  Sorry.
9    MS. SACKS:  You're answering something
10 different than he is.
11    Go ahead.
12    MR. MOONEY:  No, he's fine.  I said
13 Priority 1 and why, and he said he doesn't remember.
14    MS. SACKS:  Is that correct?
15    THE WITNESS:  Correct.
16    MS. SACKS:  Okay.
17 BY MR. MOONEY:
18    Q.  Okay.  Then there's a program of Opiate
19 Heroin Prevention Campaign requesting $500,000.
20    Do you see that?
21    A.  Yes, sir.
22    Q.  Do you know if the Council approved that
23 funding?
24    A.  I don't know.
25    Q.  And, again, if the Council had allocated

Page 240

1 some portion of the $5,470,000 that the ADAMHS Board
2 was requesting for the Children Mental Health
3 Treatment Services Funds, the resolution approving
4 that would only include the line item of additional
5 funds of whatever the approved number is, correct?
6    A.  Correct, for the ADAMHS Board.
7    Q.  And so if I wanted to know whether the
8 ADAMHS Board actually implemented a Heroin/Opiate
9 Prevention Campaign in the amount of $500,000, that
10 would not be reflected in the resolution, correct?
11    A.  That's correct.
12    Q.  You can set that one aside.  Thanks.
13    Aside from the hearing process that we've
14 described so far, the OBM creates the budget, there
15 are a bunch of hearings, then there's follow-up
16 amendments, passage of the law, is there a process
17 sort of in that larger scheme through which County
18 Council members work through and assess the
19 conflicting requests from the recommended budget and
20 the department requests during the hearing process
21 to the extent that they diverge?
22    A.  Could you clarify that a little bit?
23    Q.  Sure.  So I just want to make sure that I
24 haven't skipped a step in this process.
25    So there are hearings where a department

Page 241

1 head can request -- will explain the funding in the
2 budget, and then if they think they need more, they
3 might also make that statement to the Council.  And
4 then at some point the Council then has amendments
5 or not to the budget based on those hearings.
6    And I'm just wondering, is there an
7 interim step where the members of the County Council
8 get together and discuss the conflicting requests
9 and how to allocate the limited resources that the
10 county has from its revenue funds?
11    A.  If the Council members get together,
12 that's where we go back to only a certain number get
13 together, so it's not a full-body discussion.  It
14 would be one or two, max three discussion, three
15 members discussion.
16    Q.  And if those discussions occur, are those
17 discussions that you would participate in as the
18 legislative budget adviser?
19    A.  Typically, yes.
20    Q.  And after those meetings occur, are there
21 any -- are there any minutes of those
22 less-than-majority-member meetings?
23    A.  There are not minutes.
24    Q.  Are there any documents that are exchanged
25 reflecting what occurred during these

61 (Pages 238 - 241)

Page 242

1 less-than-majority-member minutes?
2    A.  The only document that I would be aware of
3 that would come out of that would be the proposed
4 list of amendments that I would create listening to
5 feedback from the council members, if they tell me,
6 because, again, they're not required to talk to me
7 about it.
8    Q.  And do you know whether any meetings have
9 occurred with less than a majority of the members of
10 the County Council during which opioid abuse was
11 discussed?
12    A.  I don't know.
13    Q.  Do you know whether any of the meetings --
14 whether any meetings have occurred with less than a
15 majority of the members of the County Council during
16 which heroin abuse in Cuyahoga County was discussed?
17    A.  I don't know.
18    Q.  Do you know whether any meetings have
19 occurred with less than a majority of the members of
20 the County Council during which prescription opioid
21 abuse in the county was discussed?
22    A.  I don't know.
23         (Exhibit 5 was marked for
24         identification.)
25

Page 243

1 BY MR. MOONEY:
2    Q.  I'm going to hand you a document that has
3 been marked as McAleer Exhibit 5.  And I will slide
4 it across to your counsel as well.
5         This is a document that is titled County
6 Council of Cuyahoga County, Ohio, Resolution
7 Number R2017-182.  And if you go to the last page of
8 the document, it says that it is Journal CC028,
9 December 12th, 2017.
10        And if you want to take a moment just to
11 look through it, I'm not going to ask you to sort of
12 become an expert in every single part of this
13 document, but I just wanted you to take a chance to
14 familiarize yourself.
15        All set?
16    A.  Uh-huh.
17    Q.  Okay.  So is this document marked as
18 Exhibit 5 an example of a budget resolution that has
19 been adopted and signed by the county president and
20 the -- County Council president and the county
21 executive?
22    A.  Yes.
23        MS. SACKS:  Objection.
24 BY MR. MOONEY:
25    Q.  And so in the "Sponsored By" column or

Page 244

1 sort of line near the top, it says that the
2 resolution is sponsored by County Executive Budish,
3 fiscal officer, Office of Budget and Management.
4        Does this mean that the resolution itself
5 was drafted by the budget -- or the Office of Budget
6 and Management and the county executive?
7    A.  It means that they were the sponsors.  It
8 does not mean they necessarily draft it.
9    Q.  And what does it mean to be a sponsor of a
10 resolution, if you know?
11    A.  Layman's terms, a sponsor is someone who
12 is introducing the legislation.
13    Q.  And so can members of the -- or can the
14 county executive introduce other resolutions to the
15 County Council other than resolutions adopting
16 biennial budgets?
17    A.  Yes.
18    Q.  Are there -- are there ...
19        How many members of the County Council are
20 required to adopt a budget resolution?
21    A.  To approve it?
22    Q.  Yes.
23    A.  Simple majority, so six.  The question
24 becomes immediately effective.  You would
25 technically need a supermajority, eight.  That means

Page 245

1 if you get six it's a 30-day window, but when it
2 comes to resolutions, that's not necessarily as
3 relevant.
4    Q.  So if I understand the distinction, if it
5 were a majority of the Council approving a
6 resolution, then there are 30 days before the
7 resolution becomes effective?
8    A.  Yes.
9    Q.  And what happens during those 30 days to
10 make the resolution become effective, or is it just
11 a waiting period?
12    A.  It's a waiting period for the most part.
13 It's not really relevant for resolutions.  It's more
14 relevant for ordinances.
15    Q.  And is the reason that it's not as
16 relevant for resolutions because resolutions
17 generally pass with at least a supermajority of the
18 Council?
19    A.  No.
20    Q.  Okay.  So why is it not as relevant for
21 resolutions?
22    A.  Resolutions tend to be more administrative
23 work, you know, approving -- we're talking about the
24 board appointments and approving budgets and
25 approving agreements.  The ordinances are codified,

62 (Pages 242 - 245)

Page 246

1 and that 30-day window would allow, per the charter,
2 for residents to overturn, to go gather signatures
3 to overturn ordinances.
4      You can't really overturn resolutions, if
5 that makes sense.
6    Q.  It makes as much sense as I think it can.
7      So in your time as the legislative budget
8 adviser, has there been an instance in which less
9 than a supermajority of the Council has voted to
10 approve a biennial operating budget resolution?
11    A.  I don't know.
12    Q.  On the last -- second-to-last page ending
13 in 278, it looks like there is a signature above the
14 line County Executive, and that signature appears to
15 be dated December 18th, 2017.
16      Do you see where that is?
17    A.  I do.
18    Q.  Do you know whose signature is that above
19 the County Executive line?
20    A.  I do.
21    Q.  Okay.  Whose signature is that?
22    A.  The county executive's.
23    Q.  And is the county executive required to
24 sign all resolutions the County Council passes?
25    A.  Not required to sign.  If there is not a

Page 247

1 signature within ten days, it becomes effective.
2    Q.  Okay.  And that's reflected in Section 4
3 of the resolution?  I don't know if you've had a
4 chance to sort of skim that, but it says, "Provided
5 that this resolution receives the affirmative vote
6 of at least eight members of Council, it shall take
7 effect and be enforced immediately upon the earliest
8 occurrence of any of the following," and then it
9 lists either the approval of the county executive
10 through signature, the expiration of the time during
11 which it may be disapproved by the county executive
12 under a provision of the charter.
13      Is that the ten-day window you're talking
14 about?
15    A.  Yes.
16    Q.  And then it looks like if the county
17 executive disapproves of the resolution, there's a
18 Council override process if the supermajority votes
19 in favor of approving it.
20      Is that consistent with your understanding
21 of how the process for resolutions works?
22    A.  Yes, and all that is laid out in the
23 charter.
24    Q.  Okay.  So after -- turning back to the
25 beginning of the resolution, Section 1 after the

Page 248

1 whereas clauses says that "The County Council hereby
2 adopts the Cuyahoga County 2018-2019 biennial
3 operating budget and capital improvement programs as
4 follows."
5      Did I read that correctly?
6    A.  You did, yes.
7    Q.  And then there's a spreadsheet that at the
8 bottom says it has 21 pages, and then there's a
9 second spreadsheet that is significantly shorter.
10      Do you see that?
11    A.  Yes.
12    Q.  Is this spreadsheet that is titled
13 2018-2019 Cuyahoga County Biennial Budget, is
14 that -- this is the budget that you were referring
15 to at the beginning of your deposition where you
16 said there are line items for services and expenses,
17 right?
18    A.  Yes, these are the budget categories
19 listed here.
20    Q.  Okay.  And so this in -- sorry.
21      In the bottom of the page there's a -- in
22 the footer of the spreadsheet above the confidential
23 tag, it says Office of Budget and Management.
24      Do you see where it says that?
25    A.  Yes.

Page 249

1    Q.  Do you interpret -- do you have an
2 understanding of why the department of Office and
3 Budget and Management is listed in this spreadsheet?
4    A.  Yes.  Going back to what we were
5 discussing, after any amendments, OBM creates the
6 new numbers here.  This is their report.
7    Q.  Okay.  And so as far as you know, this
8 report would reflect the amendments that were
9 approved through the budgeting process for the
10 biennial budget for Cuyahoga County?
11    A.  This particular report, being part of the
12 signed budget resolution, would incorporate the
13 changes made through the amendment process.
14    Q.  Okay.  And do you know if a member of the
15 County Council staff reviews the spreadsheet that
16 the Office of Budget and Management puts together
17 for the resolution before it's ultimately signed
18 into law?
19    A.  Can you describe a little bit what you
20 mean by that?
21    Q.  Sure.  So you said the Office of Budget
22 and Management updates the table to reflect the
23 amendments, and then presumably the amendment -- or
24 the table is returned to the County Council.
25      Does anyone on the Council staff look at

63 (Pages 246 - 249)

1 the new chart to confirm that it is consistent with
2 the approved amendments?
3    A.  Yes.
4    Q.  Okay.  And who is responsible for that?
5    A.  I would do that.
6    Q.  Do you -- does any member of the County
7 Council to your knowledge look through this report
8 to ensure its consistency with the amendments that
9 were approved through the hearing process?
10    A.  I don't know.
11    Q.  On the spreadsheet's headings, there's --
12 the first column is the list of the various
13 departments of the government; is that right?
14    A.  Under the -- under what column?
15    Q.  The department, the department heading.
16    A.  Yes.
17    Q.  And then there's a list or a heading that
18 says "Fund."
19         Do you know what the heading "Fund" refers
20 to?
21    A.  I know what some of the funds are under
22 the Fund.  I could not tell you what every fund
23 number listed here equates to what fund on here.
24    Q.  Okay.  So the codes or the -- so, for
25 instance, 01A001, which is the first combination of

1 letters and numbers that appears under the Fund
2 heading, that to your knowledge refers to a specific
3 fund of the county government?
4    A.  It refers to where the funding is coming
5 from to fund that amount of money.
6    Q.  So, for instance, 01A001 could mean, and
7 I'm not going to hold you to it, but that could be
8 the code for the general fund?
9    A.  It is the code for the general fund.
10    Q.  Okay.  So that's the code for the general
11 fund?
12    A.  Yeah.
13    Q.  Okay.  Do you know what the code for
14 67A100 refers to?
15    A.  I do not offhand.
16    Q.  Okay.  But that's what the fund is?  If I
17 had a list of the codes, I could tie the code to the
18 fund?
19    A.  Funding.
20    Q.  Okay.  What about the column Index, do you
21 know what that refers to?
22    A.  Yes.
23    Q.  Okay.  What does the Index refer to?
24    A.  An index code as, for example, the first
25 line EX, is what I refer to generically just as kind

1 of like your bank account number.  That specifically
2 ties back to where your appropriations go.
3         So the Fund column tells you what is
4 funding it, and then the Index code will tell you
5 what account your money is sitting in.
6    Q.  Okay.  And so do you know if the first two
7 letters, is that -- that defines or describes the
8 department who is receiving the funding?
9    A.  It tries to.
10    Q.  It tries to.  EX is county executive?
11    A.  Executive, yes.
12    Q.  And so if a fund -- if a document has an
13 index to EX, it is likely going to the county
14 executive as opposed to some other government
15 office?
16    A.  If it's a different number, then it could
17 go somewhere else, not the executive, not the office
18 of the county executive.
19    Q.  Okay.  Do you have any understanding of
20 what the number 016006 refers to?
21    A.  Not -- it's the numbers that were assigned
22 when this index code was created.
23    Q.  I see.  And then there's the column titled
24 Object or headed with Object, and it lists personal
25 services and other expenses.

1         And we've talked about those, right?
2    A.  Yes.
3    Q.  So personal services would be the
4 employees, money to spend on FTEs; is that right?
5    A.  Yes.
6    Q.  It would include the benefits package for
7 the employees?
8    A.  Yes.
9    Q.  What other personal services fall under
10 the Object personal services to your understanding?
11    A.  It would include Medicare contributions.
12 It would include OPRS, which is the Ohio Retirement
13 Public Pension Fund for employees.  It would include
14 that number.  It would include the benefits number.
15 And I don't know if I'm missing anything right now
16 that would fall under that category.
17    Q.  Does a contract for personal services, if
18 someone is contracted to mow the lawn of the local
19 park, is that something that would fall under
20 personal services or other expenses, if you know?
21    A.  If it's a contracted employee, so they're
22 not an employee of Cuyahoga County, it would fall
23 under other expenses.
24    Q.  Okay.  So if you could turn to the page
25 ending 6271.

64 (Pages 250 - 253)

Page 254

1      Are you there?
2      A.   Yes.
3      Q.   Okay.  Because we've been using the ADAMHS
4  Board as our example, there's a line item that says
5  "ADAMHS Board subsidy," and the fund says 29A392.
6      Do you know what fund 29A392 refers to?
7      A.   I do not know specifically what that
8  number would refer to.  However, it is funded out of
9  the Health and Human Services levy fund.
10      Q.   Okay.  And then the biennial budget has
11  $39,363,659 budgeted for 2018 and for 2019, correct?
12      A.   Correct.
13      Q.   Of the $39,363,659 budgeted in 2018, how
14  much of that amount was budgeted for opioid-related
15  expenses?
16      A.   I don't know.
17      Q.   Of the 39 -- excuse me -- the $39,363,659
18  budgeted in 2018 for the ADAMHS Board, how much of
19  that money was spent on opioid-related expenses?
20      A.   I don't know.
21      Q.   Does the County Council monitor how the
22  budgeted funds are spent against the recommended
23  budget that the County Council -- or the county
24  executive provided when the budget process begins?
25      A.   What do you mean by --

Page 255

1      MS. SACKS:  Objection.
2      THE WITNESS:  -- monitored?
3  BY MR. MOONEY:
4      Q.   Does the -- other than the monthly reports
5  that describe how the money is being spent by
6  various departments, does the -- is there any other
7  process through which the County Council follows how
8  money is being spent in a budget year and whether it
9  is being spent on the things that the money was
10  budgeted for by the county executive in the
11  recommended budget?
12      A.   In addition to the monthly reports, I
13  mentioned the quarterly reports which tend to go --
14  OBM goes a little deeper into the projections, they
15  also provide quarterly updates in the finance and
16  budgeting committee.
17      Q.   And during the finance committee meetings
18  where OBM provides updates, does OBM provide
19  additional materials to the finance committee, or do
20  they rely on the previously-provided monthly and
21  quarterly reports?
22      A.   They will do a presentation on top of the
23  reports that they provided, a PowerPoint.
24      Q.   Are there -- have there been instances
25  that you are aware of in which a department spent

Page 256

1  less money than it was allocated under the budget
2  process?
3      A.   Yes.
4      Q.   And when that happens, the money is
5  returned to the general fund or the original funding
6  source?
7      A.   Correct, the original funding source.
8      Q.   Are you aware of any examples of a
9  department spending money that was budgeted for a
10  specific purpose on something other than that
11  purpose?
12      MS. SACKS:  Objection.
13      THE WITNESS:  I'm aware of that, but it's
14  related to the issue with the current investigation.
15  BY MR. MOONEY:
16      Q.   Okay.  Other than the current -- and this
17  is the current investigation that you've been
18  instructed not to discuss during this deposition,
19  right?
20      A.   That's correct.
21      Q.   Okay.  Other than the investigation that
22  you're not supposed to be discussing, are you aware
23  of any other instance of County funds being budgeted
24  for one purpose but being used for a different
25  purpose?

Page 257

1      A.   Not that I'm aware of.
2      Q.   So when we looked at the status -- staff
3  status reports with that proposed legislation
4  earlier where one of the members of Council was
5  proposing legislation to address departments
6  spending money on things that they weren't budgeted
7  to spend the money on, was that proposed legislation
8  necessary -- sorry, motivated by anything, if you
9  know?
10      A.   I don't know what the council member's
11  motivation was specifically to that concept.
12      Q.   Has the process that we've been describing
13  for the budget hearings and the amendments and the
14  resolutions and the voting requirements, is that --
15  has that process been the same in your time as the
16  legislative budget adviser as a general matter?  Are
17  there things that have changed over time than the
18  way that we've been describing the budget process
19  from the Council's perspective?
20      A.   As a general matter, the biennial budget
21  processes have remained relatively the same.  It
22  could have tweaked, but not -- generally I would say
23  it's the same.
24      MR. MOONEY:  Okay.  Let's take a quick
25  break, ten minutes if you guys all want to take some

65 (Pages 254 - 257)

Page 258

1 time to grab water, use the restroom, whatever else.
2      MS. SACKS:  Yes.
3      THE VIDEOGRAPHER:  Off the record at 3:41.
4          (Whereupon, a recess was taken
5          from 3:41 p.m. to 4:00 p.m.)
6      THE VIDEOGRAPHER:  We're on the record,
7 4:00 p.m.
8 BY MR. MOONEY:
9   Q.   Mr. McAleer, once the budget has been
10 approved by the County Council, is there a process
11 for -- through which a department can request
12 additional funding from the Council between the
13 biennial budgets?
14   A.   They request directly to the Council or to
15 OBM?
16   Q.   Well, I guess would it go to OBM first?
17   A.   It could, yes.
18   Q.   Okay.  And then would -- if OBM approved a
19 request for funding, does it get before the Council
20 for their consideration?
21   A.   It does, yes.
22   Q.   Okay.  And where -- does the Council have
23 to pass a new resolution appropriating additional
24 funding as part of the -- as part of that process?
25   A.   It approves a separate resolution that we

Page 259

1 refer to as the biweekly fiscal agenda, and that
2 appears on most Council agendas throughout the year
3   Q.   And are the biweekly fiscal agendas ones
4 for which there is a resolution that's passed by the
5 County Council?
6   A.   Yes, it has to be done by resolution.
7   Q.   And do those biweekly agenda resolutions,
8 would they reflect the reason that the additional
9 funding is being approved?
10   A.   Yes.
11   Q.   So, for instance --
12   A.   Yes, in most instances.  There's a
13 description for each additional request or decrease.
14 It doesn't always have to be a request.
15   Q.   Sure.  And do you know of any biweekly
16 fiscal agenda resolution that allocates additional
17 funding to a department related to opioid abuse or
18 addiction in Cuyahoga County?
19   A.   I'm aware of some biweekly fiscal agendas
20 including additional appropriations for that.
21   Q.   Okay.  Which biweekly agendas are you
22 thinking of when you say that you're aware of some?
23   A.   I don't know what dates.
24   Q.   Okay.  But what were they -- what were the
25 appropriations for?

Page 260

1   A.   Specifically I recall some grants that we
2 received, that we the County, being additionally
3 appropriated on the fiscal -- the biweekly fiscal
4 agendas.
5   Q.   And are you aware of any biweekly fiscal
6 agendas that allocate additional funding to a
7 department related to opioid abuse or addiction in
8 Cuyahoga County for which the funds came from the
9 County's general fund?
10   A.   I don't know.
11   Q.   Are you aware of any such biweekly fiscal
12 agendas for which the funding came from the Health
13 and Human Services levy?
14   A.   I don't know.
15   Q.   Do you recall the grant that the County
16 received for which the opioid funding was going to
17 come, what that grant was for?
18   A.   I don't know offhand.
19   Q.   Are there instances in which a request for
20 additional funding is presented to Council but is
21 not approved by the County Council?
22   A.   Do you mean in general, anything?
23   Q.   Yeah.
24   A.   I don't recall of any specific instance
25 where something wasn't approved.  It could have

Page 261

1 happened.  I don't -- I can't remember.
2   Q.   Is that because, if you know, the requests
3 that -- that go onto the biweekly fiscal agendas are
4 ones that the OBM has already approved?
5   A.   What do you mean by that?
6   Q.   Well, you just say you're not -- you don't
7 know offhand if there are instances of a biweekly
8 fiscal agenda not being approved, and I'm wondering
9 do you know why that is, that there are not
10 instances that you can remember where they weren't
11 approved.
12   A.   Council may disagree with the
13 recommendation.
14   Q.   And if they disagree with the
15 recommendation, does that mean that the funding
16 would not be appropriated as part of the biweekly
17 fiscal agenda?
18   A.   If they were to substitute or amend that
19 particular item out of the resolution.
20   Q.   And so if that -- if the Council amended
21 the resolution to remove a funding request from a
22 biweekly agenda resolution, would that decision to
23 remove it be reflected in the minutes of the Council
24 meetings?
25   A.   The minutes would indicate that the

66 (Pages 258 - 261)

Page 262

1 biweekly fiscal agenda was amended.  I can't tell
2 you into detail what it would specify.
3     Q.  Is there a document that you know of that
4 would -- that would reflect that a request for
5 additional funding was made at the County Council
6 but the Council rejected that funding request?
7     A.  If an item was removed from a fiscal
8 agenda, our clerk staff would indicate that as part
9 of the original fiscal agenda, but it would be
10 crossed out, like stricken out.
11     Q.  And are those fiscal agendas with the
12 strike-through text, is that something that is
13 available to the public so they can see which
14 requests were approved and not approved?
15     A.  Yes.
16     Q.  Is there a process for reallocating
17 funding from one department to another as part of
18 the period between biennial budgets?
19     A.  Yes.  That would fall under the biweekly
20 fiscal agendas as well.
21     Q.  And is that process of reallocating funds
22 from one department to another, is that -- does that
23 have a specific phrase or term?
24     A.  Yes.
25     Q.  What is it called?

Page 263

1     A.  Appropriation transfers.
2     Q.  So appropriation transfers would be a
3 transfer from the sheriff's department to the Child
4 and Family Services, for example?
5     A.  For example.
6     Q.  Okay.  Is there a process by which money
7 can be reappropriated within a department, so, for
8 instance, from personal services to other expenses?
9     A.  Yes.
10     Q.  What is that process called?
11     A.  That would also be an appropriation
12 transfer.
13     Q.  Okay.  I've seen reference to something
14 called a cash transfer.
15        Do you know what that is?
16     A.  Yes.
17     Q.  What is the cash transfer?
18     A.  It's also on the biweekly fiscal agenda,
19 and that follows the appropriation transfer section.
20 That is when you're transferring cash from one fund
21 to -- from one subfund to another subfund.
22     Q.  Okay.  And the subfunds would be subfunds,
23 for instance, within the general fund?
24     A.  It could be.
25     Q.  Could be?

Page 264

1     A.  Yeah.
2     Q.  Sure.  As an example?
3     A.  Yeah.
4     Q.  Okay.  Are you aware of any instance in
5 which the County Council approved an appropriation
6 transfer either from -- or from one department of
7 the government to another to address issues of
8 opioid addiction in Cuyahoga County?
9     A.  I don't know.
10     Q.  How about for prescription opioids?
11     A.  I don't know.
12     Q.  Heroin?
13     A.  I don't know.
14     Q.  And how about are you aware of an instance
15 in which the Council authorized a transfer or an
16 appropriation transfer within the same department to
17 respond to issues of opioid abuse in Cuyahoga
18 County?
19     A.  I don't know.
20     Q.  How about for prescription opioid abuse?
21     A.  I don't know.
22     Q.  And heroin abuse?
23     A.  I don't know.
24     Q.  Other than through an appropriation
25 transfer or authorizing new appropriations on the

Page 265

1 biweekly fiscal agenda, are there any other ways in
2 which the County Council can reallocate funds from
3 the way that they were allocated as part of the
4 biennial budget process?
5     A.  None that I can think of that would be on
6 top of -- in addition to the fiscal, the biweekly
7 fiscal agenda.
8        (Exhibit 6 was marked for
9        identification.)
10 BY MR. MOONEY:
11     Q.  I'm going to show you or pass you a
12 document that will be marked as McAleer Exhibit 6.
13 Let me make sure I give you the right version.
14 There you are.
15        It is an email that is -- while you review
16 it I'll just read it into the record.  It's an email
17 dated January 20th, 2017, from Maggie Keenan to you,
18 Subject line OBM Fiscal Items for 1/24/2017 Council
19 Agenda, labeled CUYAH ending 001730354.
20        When you've had a chance to look through
21 it, let me know, and I will ask you a couple of
22 questions about this document.
23        You all set?
24     A.  Yes, sir.
25     Q.  Okay.  So this begins at the bottom of the

67 (Pages 262 - 265)

Page 266

1 email chain with an email from Jeanne Schmotzer?
2     A.   Schmotzer.
3     Q.   To the all-County Council Listserv as well
4 as the all-county Council staff Listserv.
5          Do you see that?
6     A.   Yes.
7     Q.   And she says that she's attaching
8 information related to the fiscal items and backup
9 materials from OBM for consideration at the
10 Council's next meeting.
11         And that attachment is not included in
12 this email thread, correct?
13     A.   I don't see it.
14     Q.   Okay.  It looks like then you respond to
15 Dennis Kennedy and Maggie Keenan.
16         And before -- who is Dennis Kennedy?
17     A.   Dennis Kennedy is the County's fiscal
18 officer.
19     Q.   And does he sit in relation to seniority
20 above Ms. Keenan, if you know?
21     A.   Based off the structure, he is a position
22 created in the county charter, and based off how
23 it's been organized, OBM typically reports to the
24 fiscal officer.
25     Q.   Okay.  And so you send an email to

Page 267

1 Mr. Kennedy and Ms. Keenan as well as Sharon Sobol
2 Jordan, who was the county executive's chief of
3 staff; is that right?
4     A.   She was, yes.
5     Q.   And then Armond Budish is the county
6 executive, right?
7     A.   Yes.
8     Q.   And then you also include a couple members
9 of the County Council but not the full all-County
10 Council list, correct?
11     A.   Yes, based off what is listed here.
12     Q.   Right.  Based on this document --
13     A.   Yeah.
14     Q.   -- it appears that that's -- you included
15 a subset of the council members?
16     A.   I will say that is unusual.  Usually I
17 list all 11 council members on the questions.
18     Q.   Okay.  So then you say, "Here are the
19 questions for the fiscal agenda."
20         Before we get to the questions, above that
21 email Ms. Keenan writes to you and Mr. Kennedy and
22 says, "Please see responses below in red."
23     A.   Yes.
24     Q.   Do you see that?
25     A.   Yes.

Page 268

1     Q.   Okay.  So now I'd like to turn back to
2 your email.
3     A.   Yes.
4     Q.   And looking at it, I realize this would
5 have been much easier if it had been printed in
6 color.  But under Item K, you ask the question,
7 "What is now not being funded or what is being
8 reduced in Work & Training Administration to fund
9 the additional $250,000 to the ADAMHS Board to help
10 combat the opiate addiction?"
11         Do you see that?
12     A.   Yes, I do.
13     Q.   And then there's a response, and if you
14 look really carefully, it looks a little bit lighter
15 than the question, which I think was probably red in
16 the original email that appears to
17 Ms. Kennedy's response -- or Ms. Keenan's response.
18         Do you see that?
19     A.   I do.
20     Q.   Sitting here today, do you believe that
21 the response, the sentence following the question
22 would be Ms. Keenan's response?
23     A.   I believe it is.
24     Q.   Okay.  And so Ms. Keenan writes, "No
25 services are being cut in HHS/Employment and Family

Page 269

1 Services.  The Department is confident that it can
2 generate additional revenue to reduce the amount
3 needed from the levy fund that can be redirected to
4 the crisis."
5          Did I read that correctly?
6     A.   You did read that correctly, yes.
7     Q.   Okay.  Do you know -- do you know what
8 reductions or what the Work & Training
9 Administration is, what that refers to?
10     A.   That would refer to the index code name
11 that we were discussing earlier on the biennial
12 budget resolution.
13     Q.   And it appears that at least as of
14 January 2017 the Office of Budget and Management
15 believed that reallocating $250,000 to combat the
16 opiate crisis would not lead to a reduction in the
17 services that HHS/Employment and Family Services
18 would provide?
19         MS. SACKS:  Objection.
20 BY MR. MOONEY:
21     Q.   Is that correct?
22     A.   The response, because -- I would add the
23 belief that it's because the department can generate
24 additional revenue.
25

68 (Pages 266 - 269)

Page 270

1    Q.  Okay.  But at least as of this date, it
2  appears that OBM believed that taking the $250,000
3  to respond or to combat the opiate addiction,
4  because there could be another revenue source, would
5  not impact the services that the HHS/Employment and
6  Family Services would be able to provide; is that
7  right?
8         MS. SACKS:  Objection.
9         THE WITNESS:  I don't want to speak to
10  what OBM believed.
11  BY MR. MOONEY:
12    Q.  Reading this statement, is that your
13  interpretation of what OBM meant?
14    A.  I would say that OBM was telling us that
15  nothing in HHS and Employment and Family Services
16  will be reduced because the department can secure
17  additional revenue.
18    Q.  Okay.  And so just because the $250,000
19  was being -- was requested to be removed and
20  transferred to the ADAMHS Board doesn't mean
21  necessarily that the services, the department from
22  which the funding was taken, were reduced.
23         MS. SACKS:  Objection.
24         THE WITNESS:  I don't know.
25

Page 271

1  BY MR. MOONEY:
2    Q.  You can't say one way or the other whether
3  the services would have been reduced; is that right?
4    A.  We asked if services would be reduced, and
5  their response was that no services would be
6  reduced.
7    Q.  And do you -- have there been other
8  instances in which funding was requested to be
9  transferred to a department, a new department to
10  combat issues of opioid abuse where you similarly
11  asked if that transfer would result in a reduction
12  of services for the original department?
13    A.  I don't know.
14    Q.  You may set that aside.
15         And there was coffee being made for you.
16  If you want to take just like three minutes to go
17  grab your coffee if you want, that would be fine.
18  It's up to you.
19    A.  Do you two want to take a quick break to
20  grab a coffee, or do you want to wait a little bit?
21         MS. SACKS:  Do you want a second?
22         MR. RICE:  It doesn't matter to me.
23         THE WITNESS:  I won't deny coffee, I'll
24  just say that.
25         MR. MOONEY:  We will go off the record.

Page 272

1         THE VIDEOGRAPHER:  Off the record, 4:18.
2         (Whereupon, a recess was taken
3          from 4:18 p.m. to 4:25 p.m.)
4         THE VIDEOGRAPHER:  On the record, 4:25.
5  BY MR. MOONEY:
6    Q.  Okay.  Mr. McAleer, you had mentioned
7  before that there is a committee of Public Safety
8  and Justice Affairs as part of the County Council;
9  is that right?
10    A.  Yes.
11    Q.  And before it was the county -- or the
12  committee of Public Safety and Justice Affairs, it
13  was just the Public Safety Committee, correct?
14    A.  I don't remember the exact name, but it
15  was something along those lines that ultimately
16  merged into the one.
17    Q.  Do you know if the County Council
18  Committee on Public Safety in whatever iteration it
19  has been named has ever held hearings about opioid
20  abuse in Cuyahoga County?
21    A.  Can you define what you mean by "opioid
22  abuse"?
23    Q.  Sure.  Has the Public Safety Committee
24  ever held a hearing about the issues of opioid abuse
25  in Cuyahoga County?

Page 273

1    A.  I don't know.
2    Q.  Do you know if issues related to opiate
3  abuse in Cuyahoga County have ever been discussed as
4  part of a meeting, if not the meeting -- if not the
5  purpose of the meeting itself?
6    A.  I can say the medical examiner has been in
7  the Public Safety and Justice Affairs Committee
8  discussing opioid and the issues around there.
9    Q.  And the medical examiner, when he comes to
10  present, is it usually around deaths related to --
11  from opioid?
12    A.  Yes.  It's usually the increasing number
13  of deaths by year.
14         (Exhibit 7 was marked for
15          identification.)
16  BY MR. MOONEY:
17    Q.  So I'm going to hand to you a document
18  that will be marked McAleer Exhibit 7, and it is
19  a -- I'll give it to your counsel first before I say
20  what it is.
21         But for the record, this is an email from
22  you, Trevor McAleer, to Thomas Gilson and
23  Hugh Shannon carbon copying Jan Mannion.
24         Is that how you pronounce that
25  individual's last name, if you know?

69 (Pages 270 - 273)

1    A.  I don't know how you say Jan's last name.
2    Q.  But this November 16th, 2012 email from
3 you is Subject line Public Safety Meeting, Bates
4 labeled CUYAH_014486084.
5        If you want to take a moment just to look
6 at it, it's a pretty short email.
7        You all set?
8    A.  Yes, sir.
9    Q.  So at the bottom there's an email from you
10 dated 11/14/2012 in which you write,
11 "Dr. Gilson/Hugh."
12        I assume that's Dr. Gilson, the medical
13 examiner, right?
14    A.  Dr. Gilson is the medical examiner.
15    Q.  And then Hugh Shannon, do you know what
16 his role is with the Cuyahoga County government?
17    A.  I don't know his official title, but I
18 would call him the administrator of the Medical
19 Examiner's Office.
20    Q.  Okay.  And you write, "Chairman Gallagher
21 of the public safety meeting wanted to give you a
22 heads up and invite you to his public safety in two
23 weeks.  He is going to have a follow-up on the
24 heroin issue."
25        Did I read that correctly?

1    A.  Yes.
2    Q.  What did you mean when you wrote in this
3 email that there was going to be a follow-up on the
4 heroin issue?
5    A.  I can't specifically say that I know for
6 sure in 2019 what I meant by follow-up from 2012,
7 but it was some type of follow-up from something
8 that happened prior to that point of the email.
9    Q.  Do you know what you meant by the phrase
10 "the heroin issue"?
11    A.  I do not.
12    Q.  Was there an issue involving heroin in
13 Cuyahoga County in 2012?
14        MS. SACKS:  Objection.
15        THE WITNESS:  I don't know.
16 BY MR. MOONEY:
17    Q.  Do you know why Chairman Gallagher wanted
18 to follow up on the heroin issue at a public safety
19 meeting two weeks from November 14th, 2012?
20    A.  I don't know what his specific reasons for
21 follow-up for this individual committee meeting was.
22    Q.  Do you know his general reasons for
23 following up on the heroin issue as part of the
24 public safety meeting?
25        MS. SACKS:  Objection.

1        THE WITNESS:  I don't know his general
2 issues.
3 BY MR. MOONEY:
4    Q.  So if I wanted to know why Chairman
5 Gallagher wanted to follow up on the heroin issue at
6 a public safety meeting that he was the chair of, I
7 would need to go ask Mr. Gallagher, right?
8    A.  Not necessarily.
9    Q.  Okay.  Who else might I talk to?
10    A.  You could look at the committee meeting
11 from that time and see what was presented.
12    Q.  And would that committee meeting say
13 Dr. -- or that Mr. Gallagher plans to host a
14 follow-up on the heroin issue at the next public
15 safety meeting?
16    A.  I don't know.
17    Q.  But if I wanted to know his reasons, not
18 just generally what was being discussed, I would
19 need to talk to Dr. -- or to Chairman Gallagher?
20        MS. SACKS:  Objection.
21        THE WITNESS:  I don't think necessarily
22 you would have to do that.  I think watching or
23 listening or looking at the minutes of those
24 committee meetings could tell you.
25

1 BY MR. MOONEY:
2    Q.  Okay.  So other than watching the meeting,
3 listening to the minutes, are there any other
4 sources that I could look to to understand why
5 Chairman Gallagher wanted to have a follow-up
6 meeting on the heroin issue as part of the Public
7 Safety Committee?
8    A.  Typically Dr. Gilson would prepare
9 presentations for the committee meetings, so you
10 might not even have to do that, but you could review
11 the presentations that were provided, if they were
12 provided during those committee meetings.  But it
13 would be fairly normal practice by the medical
14 examiner to have a corresponding presentation for
15 committee meetings.
16    Q.  Okay.  But if I wanted to know why there
17 was going to be follow-up, other than the agenda and
18 the meeting minutes and watching a video of the
19 committee itself, do you have any other places where
20 I would be able to determine why there would be
21 follow-up, not what was discussed originally, but
22 why there would be follow-up on the heroin issue?
23    A.  I don't know.
24    Q.  Did -- to your knowledge, did Chairman
25 Gallagher refer to a, quote, heroin issue, end

Page 278

1 quote?
2     A.  I don't know.
3         MS. SACKS:  Objection.
4 BY MR. MOONEY:
5     Q.  You don't know if that's his language or
6 yours?
7     A.  I know it's my language because this
8 appears to be my email.
9     Q.  But you don't know if you were parroting
10 language that Chairman Gallagher had conveyed to
11 you?
12     A.  I don't know.
13     Q.  Where --
14     A.  If I may add, similar to the status
15 reports that we talked about earlier, it might have
16 been labeled that, but it didn't necessarily mean
17 just heroin issue.
18     Q.  Do you know if this reference to the
19 heroin issue also included issues related to
20 prescription opioids?
21     A.  If the Medical Examiner's Office was
22 involved, it would have referenced opioids because
23 they would report on the number of deaths in the
24 committee, so yes.
25     Q.  And so in 2012, the medical examiner would

Page 279

1 have been able to report deaths from prescription
2 opioids versus heroin?
3         MS. SACKS:  Objection.
4         THE WITNESS:  I can't speak to what the
5 medical examiner would have presented to on how he
6 determined what, but that would have been in his
7 presentations.
8         (Exhibit 8 was marked for
9         identification.)
10 BY MR. MOONEY:
11     Q.  I'm handing you another document -- oh,
12 shoot, I put it on the wrong thing.
13         Now I'm handing you another document that
14 is McAleer Exhibit 8.  For the record, this is an
15 email from William Denihan to Trevor McAleer and
16 then other members of the Council and the Council
17 staff dated November 16th, 2012, Subject line 2013
18 Budget Follow-Up, CUYAH_014507122.
19         And once you've had a chance to review
20 that, Mr. McAleer, I'll ask you a couple questions.
21     A.  Okay.
22     Q.  All right.  And I think you mentioned this
23 earlier, but Mr. Denihan in 2012 was the CEO of the
24 ADAMHS Board of Cuyahoga County; is that right?
25     A.  Yes, sir.

Page 280

1     Q.  And so he was in charge of overseeing the
2 drug addiction and mental health services that the
3 board offered?
4     A.  I can't speak specifically to what he was
5 in charge of.  He was in charge of the entire
6 organization.
7     Q.  Okay.  And do you consider Mr. Denihan to
8 be an expert in his field of addiction and mental
9 health services?
10         MS. SACKS:  Objection.
11         THE WITNESS:  I don't know.
12 BY MR. MOONEY:
13     Q.  If Mr. Denihan provided you information
14 about addiction in Cuyahoga County, is he the kind
15 of person whose opinion you would have credited as
16 likely being something you should follow?
17         MS. SACKS:  Objection.
18         THE WITNESS:  What do you mean by that?
19 BY MR. MOONEY:
20     Q.  Well, you said earlier that you don't have
21 any background in sort of addiction services, right?
22     A.  Correct.
23     Q.  And so if Mr. Denihan as the CEO of the
24 ADAMHS Board provided you information about the
25 addiction services in the county, you would rely on

Page 281

1 his representations and not your own understanding.
2         Is that fair?
3     A.  I would trust that he has the resources
4 and staff to be able to get the necessary
5 information that I could never have access to.
6     Q.  All right.  And so and that's why you --
7 and then you would sometimes forward the information
8 from Mr. Denihan to the council members; is that
9 right?
10     A.  Yes.
11     Q.  Okay.  So in this email, which appears to
12 have started as a conversation about the 2013
13 budget, Mr. Denihan writes at the bottom, "FYI,
14 regarding the safety committee meeting that
15 Councilman Gallagher wanted me to attend on
16 November 27th, I called him today to advise him that
17 I will not be able to attend due to a previous
18 commitment in Columbus that I can't reschedule or
19 change."
20         Did I read that correctly?
21     A.  Yes.
22     Q.  Do you know if the public safety meeting
23 that Chairman Gallagher wanted Mr. Denihan to attend
24 on November 27th is the same public safety -- or
25 safety committee meeting that Mr. Gilson and

Page 282

1 Mr. Hugh were invited to in the document that was
2 marked as the previous exhibit?
3     A.  Can I go back and look at the previous
4 exhibit?
5     Q.  Sure.
6     A.  If the dates are the same, which they are,
7 November 27th, there would have been only one Public
8 Safety Committee meeting held that day.
9     Q.  Okay.  Mr. Denihan then reports that he
10 advised Chairman Gallagher and delegated members of
11 his staff to attend the safety committee meeting on
12 his behalf.
13         Do you know if other members of
14 Mr. Denihan's staff attended a safety committee
15 meeting on November 27th?
16     A.  I don't remember.
17     Q.  He then writes, "They will discuss the
18 merits and importance that prevention plays in our
19 efforts against the opiate and heroin epidemic we
20 face in our county."
21         Do you see where it says that?
22     A.  Yes.
23     Q.  So was it your understanding at this time,
24 November of 2012, that Cuyahoga County was facing an
25 opiate and heroin epidemic?

Page 283

1         MS. SACKS:  Objection.
2         THE WITNESS:  I don't know.
3 BY MR. MOONEY:
4     Q.  Do you have an understanding at the time
5 this email was sent that an opiate and heroin
6 epidemic would be a topic of discussion at the
7 November 27 safety meeting referenced in this email?
8     A.  At this time, based off me receiving this
9 email at somewhere around this time, I would have
10 read this; so yes, based off Mr. Denihan's words.
11     Q.  And so Mr. Denihan conveyed that he would
12 send delegates to discuss the merits and importance
13 that prevention plays in efforts against the opiate
14 and heroin epidemic in Cuyahoga County to you as
15 part of this email, right?
16     A.  That is correct.
17     Q.  And then he also sent it to Dale Miller,
18 right?  He's in the cc line.
19     A.  Yes, his email address is here.
20     Q.  Okay.  And then Dan Brady also was sent
21 this message from Mr. Denihan conveying that his --
22 that Mr. Denihan's staff would discuss the
23 importance of prevention in the opiate and heroin
24 epidemic in Cuyahoga County, correct?
25     A.  His words, yes.

Page 284

1     Q.  And then Chairman Gallagher also received
2 Mr. Denihan's email in which he said that he had
3 delegated members of his staff to discuss the
4 importance of prevention in efforts against opiate
5 and heroin epidemics in Cuyahoga County, right?
6     A.  Yes, Chairman Gallagher was on this email
7 as well.
8     Q.  Do you recall whether you attended a
9 meeting on November 27th, 2012, of the Public Safety
10 Committee?
11     A.  I don't recall if I was there.
12         (Exhibit 9 was marked for
13         identification.)
14 BY MR. MOONEY:
15     Q.  I'm handing you -- I almost gave you my
16 document.
17         I am handing you a document that does not
18 have a Bates label, but I will represent to you that
19 it is the minutes that I downloaded from the
20 Cuyahoga County Council's website, and the document
21 is titled Minutes, Cuyahoga County Public Safety
22 Committee Meeting, Tuesday, November 27th, 2012.
23         If you'd like to take a moment to review
24 that, please go ahead and do so.
25         MS. SACKS:  You said you got this from

Page 285

1 where?
2         MR. MOONEY:  I pulled it from the County's
3 website.  I don't have the exact URL, but if you
4 were to Google the Public Safety Committee you
5 should be able to find it.  And if not, I'm happy to
6 direct you in correspondence to you after this
7 deposition ends.
8         MS. SACKS:  Okay.  Thank you.
9 BY MR. MOONEY:
10     Q.  All set?
11     A.  Yes, sir.
12     Q.  Okay.  And so have you seen the minutes
13 that have been provided to you and marked as McAleer
14 Exhibit 9 before?
15     A.  I don't know for sure.
16     Q.  In your experience as a legislative budget
17 adviser, do you agree that the minutes of County
18 Council meetings should accurately describe what
19 happened during the meetings the minutes purport to
20 describe?
21         MS. SACKS:  Objection.
22         THE WITNESS:  Can you kind of clarify what
23 you mean by that?
24 BY MR. MOONEY:
25     Q.  Yeah.  So as the legislative budget

72 (Pages 282 - 285)

1 adviser for the County Council, do you believe that
2 minutes of council and committee meetings should
3 accurately reflect the events that occurred during
4 the meeting?
5     A.   Yes.  And if I can add, I will say our
6 clerk of council has also always indicated that
7 audio or video of each committee meeting also exists
8 as part of the minutes, even though it's not part of
9 the written minutes.
10     Q.   Okay.  And have those audio and video
11 recordings existed since the County Council came
12 into existence in 2011?
13     A.   I don't know if it was day one but close
14 to day one.
15     Q.   Okay.  So there are minutes and then also
16 there's a -- there would be a recording of some form
17 of the agenda itself -- or of the meeting itself?
18     A.   That's correct.
19     Q.   Okay.  Is there a process, do you know, by
20 which minutes are reviewed before they're posted
21 publicly?
22     A.   Before they're posted publicly on the
23 council website?
24     Q.   Yes.
25     A.   They are approved by the body.

1     Q.   Okay.
2     A.   So whatever committee.
3     Q.   So these minutes, if they were the ones
4 that were posted to the County's website, are --
5 would have been approved by the Public Safety
6 Committee at a later meeting, is that your
7 understanding?
8     A.   Yes.  The only timetable I'm not certain
9 about is if they post draft minutes first and then
10 they approve the actual minutes.  Whatever is
11 finally posted, the end document would be the
12 approved minutes from a committee meeting.
13     Q.   And so in these minutes there's a roll
14 call where Chairman Gallagher asked the clerk to
15 take roll, and it says that Committee Members --
16 excuse me -- Gallagher, Greenspan and Simon were in
17 attendance as were Council Members Miller and Brady.
18          Do you see that in the text under
19 bullet 2?
20     A.   Yes, sir.
21     Q.   Do you have any reason sitting here today
22 to believe that the minutes of this November 27th,
23 2012 Public Safety Committee meeting inaccurately
24 detailed the members of the County Council who were
25 present at that meeting?

1          MS. SACKS:  Objection.
2          THE WITNESS:  I don't know.
3 BY MR. MOONEY:
4     Q.   On Page 2 of the minutes under Discussion,
5 bullet point E describes that Mr. Osiecki as well as
6 the chief operating officer of the ADAMHS Board
7 addressed the committee regarding a request for
8 funding for the Opiate/Heroin Prevention Campaign
9 and that discussion ensued.
10          Do you see that?
11     A.   Yes, sir.
12     Q.   Does this reference to an Opiate/Heroin
13 Prevention Campaign refresh your recollection
14 that -- of the Opiate/Heroin Prevention Campaign
15 that we discussed in the ADAMHS Board document where
16 they listed the ways in which they collaborated with
17 other parts of the government to respond to the
18 opioid crisis in the county?
19          MS. SACKS:  Objection.
20          THE WITNESS:  I don't know.
21          MS. SACKS:  Do you know what exhibit
22 you're referring to?
23          MR. MOONEY:  I don't offhand.  I was going
24 to try to guess, but I didn't want to be wrong.  It
25 doesn't -- I'll let the objection stand.  It's fine.

1 BY MR. MOONEY:
2     Q.   On the next page, Page 3, it says,
3 "Committee members and council members asked
4 questions of Mr. Osiecki and Ms. Harper pertaining
5 to the item, which they answered accordingly."
6          Do you see that?
7     A.   Yes.
8     Q.   And then below that, it says, "Dr. Thomas
9 Gilson, medical examiner, and Ms. Andrea Rocco,
10 special counsel to County Executive FitzGerald,
11 addressed the committee regarding the Opiate Task
12 Force and the Opiate Collaborative.  Discussion
13 ensued following."
14          And then it says, "Committee members and
15 council members asked questions of Dr. Gilson and
16 Ms. Rocco pertaining to the item, which they
17 answered accordingly."
18          Do you, sitting here today, know the
19 questions that were asked of Mr. Osiecki and
20 Ms. Harper pertaining to the ADAMHS Board request
21 for funding?
22     A.   I don't know.
23     Q.   Did you have any discussions with the
24 members, committee members and council members who
25 attended this meeting regarding the discussions that

73 (Pages 286 - 289)

Page 290

1 ensued between the members and the medical examiner
2 and the special counsel to the county executive
3 regarding the Opiate Task Force and Opiate
4 Collaborative?
5      MS. SACKS:  Objection.
6      THE WITNESS:  Can you ask that again?
7 BY MR. MOONEY:
8   Q.  Sure.
9   A.  To clarify.
10   Q.  That's fine.  So it says discussions
11 ensued after Dr. Gilson and Ms. Rocco addressed the
12 committee.
13      Do you see that?
14   A.  Yes.
15   Q.  Did you have any communications with
16 members of Council after this public safety meeting
17 in which you discussed with those members the
18 statements or discussion that occurred between the
19 members of Council and Mr. -- or Ms. Rocco and
20 Dr. Gilson?
21   A.  I don't remember.
22   Q.  Do you know what the Opiate Task Force was
23 in November of 2012?
24   A.  I knew it existed.
25   Q.  Do you know if any members of the County

Page 291

1 Council were also members of the Opiate Task Force
2 in 2012?
3   A.  I don't know.
4   Q.  Do you know what the Opiate Collaborative
5 is?
6   A.  I don't know.
7   Q.  You can set that aside.
8      You mentioned in one of the earlier
9 sessions that certain members of Council have hosted
10 discussions with their constituents regarding issues
11 of opioid abuse.
12      Do you remember that you mentioned that
13 briefly?
14   A.  Yeah, I believe I called them community
15 meetings.
16   Q.  Community meetings, okay.  And do you know
17 which members of the County Council have hosted
18 community meetings regarding issues of opioid abuse
19 in Cuyahoga County?
20   A.  Not offhand.
21      (Exhibit 10 was marked for
22      identification.)
23 BY MR. MOONEY:
24   Q.  Exhibit 10, which is an email from Sunny
25 Simon dated August 30th, 2013, to a list of

Page 292

1 individuals, Subject line Town Halls, Bates labeled
2 CUYAH_014394784.
3      You can have a moment to look at that.
4   A.  I'm good.
5   Q.  So this is an email that you received from
6 Ms. Simon on August 30th of 2013; is that correct?
7   A.  That appears to be correct, yes.
8   Q.  And the other member or other individuals
9 who received this email with the exception of
10 Mr. Nanni, whose email is directly before yours, are
11 those members of the County Council?
12   A.  Sister Gross is not.  The other ones are.
13   Q.  Okay.  Oh, yes, I didn't see Ms. Gross or
14 Sister Gross in the middle of it.
15      At the bottom there's an email from
16 Thomas Gilson.
17      Is that the medical examiner?
18   A.  Dr. Gilson.
19   Q.  Dr. Gilson.  Okay.  And he writes, "I was
20 wondering if you and other members of Council do
21 much in the way of town halls, and, if so, would
22 there be any interest in doing one around the topic
23 of our heroin epidemic?  I can travel.  I did
24 something with David Greenspan last winter and it
25 went well."

Page 293

1      Did I read that correctly?
2   A.  You did.
3   Q.  Do you know -- do you have an
4 understanding of what Dr. Gilson meant when it says
5 the topic of, quote, "our heroin epidemic" in the
6 email at the bottom of this exhibit?
7      MS. SACKS:  Objection.
8      THE WITNESS:  I do not know what
9 Dr. Gilson meant.
10 BY MR. MOONEY:
11   Q.  Okay.  If you don't know what Dr. Gilson
12 meant, do you have an understanding on your own of
13 what "our heroin epidemic" might refer to?
14   A.  Nothing in addition that we've already
15 discussed about it showing up on the status report
16 and terms being used.
17   Q.  Okay.  So that in 2013, there would have
18 been information that you were receiving regarding
19 heroin addiction and abuse in Cuyahoga County,
20 correct?
21   A.  The reports that we've talked about and if
22 any other information was sent to me related around
23 that.
24   Q.  Okay.  So it could also include
25 prescription opioid abuse in addition to heroin

74 (Pages 290 - 293)

Page 294

1  abuse?
2      A.  I don't know.
3      Q.  And then Dr. Gilson reports that he did
4  something with David Greenspan last winter, and it
5  went well.
6          Do you know what the "something" refers to
7  in this email with Dr. Gilson and Council Member
8  Greenspan?
9      A.  Not specifically in this email.  I don't
10  know what the "something" refers to.
11      Q.  Did you attend an event that
12  Mr. Greenspan -- or Dr. Gilson and Council Member
13  Greenspan did the winter before August of 2013 about
14  Cuyahoga County's heroin epidemic?
15      A.  I don't know.
16      Q.  The next email is from Council President
17  Connally, and she writes, "As most of you know, the
18  rate of death by heroin overdose is on the increase,
19  primarily in the suburbs.  Some kind of town hall
20  meetings on a regional basis would be a good idea."
21          Do you see where it says that?
22      A.  Yes.
23      Q.  Did you know in August of 2013 that the
24  rate of death by heroin overdose was on the
25  increase?

Page 295

1          MS. SACKS:  Objection.
2          THE WITNESS:  I know the rate of deaths
3  based off what Dr. Gilson provided through
4  presentations were on the increase.
5  BY MR. MOONEY:
6      Q.  Do you have any idea sitting here today
7  why the rate of death by heroin overdose was on the
8  increase in August of 2013?
9      A.  I don't know.
10      Q.  After Council President Connally
11  recommended that town hall meetings on a regional
12  basis would be a good idea, we get to the email from
13  Councilwoman Simon, and she says, "I would like to
14  have one in my district."
15          Do you see that?
16      A.  Yes, sir.
17      Q.  Do you know if Councilwoman Simon hosted a
18  town hall on the heroin epidemic like she -- like
19  this email indicates?
20      A.  She eventually had one.  I don't know
21  when.
22      Q.  How do you know that she eventually had a
23  town hall event on the heroin epidemic in Cuyahoga
24  County?
25      A.  I don't recall a specific time frame, but

Page 296

1  I know I assisted in getting the -- someone, I
2  believe it was from the Medical Examiner's Office,
3  there to attend the meeting.
4      Q.  Did you attend the meeting that Council
5  Member Simon hosted with some other member of the
6  government about the heroin epidemic in Cuyahoga
7  County?
8      A.  I know I would not have attended the town
9  hall meeting.
10      Q.  And why do you know that you would not
11  have attended the town hall meeting?
12      A.  It's on the other side of town --
13      Q.  That will do it.
14      A.  -- from where I live.
15      Q.  All right.  You can set that one aside as
16  well.
17          (Exhibit 11 was marked for
18          identification.)
19  BY MR. MOONEY:
20      Q.  The document that I'm about to hand to you
21  and mark as Exhibit 11 I will warn you is longer
22  than I would prefer to be giving you this late in
23  the day, but I will also tell you that the
24  PowerPoint presentation that occurs in the middle is
25  not going to be the subject of my questions.  And so

Page 297

1  you can obviously look at it if you'd like, take as
2  much time as you need, but just so that you know,
3  you don't have to become an expert in that
4  PowerPoint because I'm not going to ask you
5  questions about it.
6          And while you're reviewing it, I'm just
7  going to put onto the record that this is an email
8  dated February 27th, 2014, from Trevor McAleer to
9  Sunny Simon, Subject line CUYCO Opiate Efforts,
10  Bates labeled CUYAH_014391077.
11          MS. SACKS:  So some of the pages don't
12  have Bates numbers.
13          MR. MOONEY:  So yeah, so the PowerPoint
14  was produced to us in native form.  So if you look
15  at the first page of the PowerPoint it's 79.  What
16  followed is the native form that was printed out
17  that doesn't have Bates labels.
18          MS. SACKS:  And then I see it jumps to 80.
19          MR. MOONEY:  Yes.
20          MS. SACKS:  Okay.
21  BY MR. MOONEY:
22      Q.  You all set?
23      A.  There's a lot in here.
24      Q.  All right.  So the first question, the
25  email address simonsunnys@aol.com, do you understand

75 (Pages 294 - 297)

1 that email address to be Councilwoman Simon's
2 personal email address?
3    A.  I do.
4    Q.  Okay.  And below that email from you is a
5 forward from Councilwoman Simon back to you
6 forwarding an email that begins on the pages ending
7 in 078, which is from Philip Angelo.  Or is it
8 Angelo, do you know?
9    A.  Angelo.
10    Q.  Angelo.  Neither of the two.
11       So from Mr. Angelo dated February 25th,
12 2014, again with the Subject line CUYCO opiate
13 efforts.
14       And Mr. Angelo writes, "Attached please
15 find some general talking points on the County's
16 efforts to stem the heroin epidemic."
17       Do you see where it says that?
18    A.  I do see where it says that.
19    Q.  Do you know why Councilwoman Simon
20 forwarded to you Mr. Angelo's email providing
21 general talking points on the County's efforts to
22 stem the heroin epidemic?
23    A.  I can't speak to why she forwarded it to
24 me.
25    Q.  Do you know why you would have then

1 forwarded it back to her?
2    A.  I don't know what took place first because
3 I don't see a time and date of when she sent it to
4 me.
5    Q.  Okay.
6    A.  So I don't know what happened here.
7    Q.  All right.  Unfortunately I only have the
8 information that was provided to us by your counsel,
9 and so I -- one way or the other.
10       So you don't know why Councilwoman Simon
11 sent the document to you, correct?
12    A.  I don't know.
13    Q.  But you said you hadn't -- you didn't
14 attend a town hall that Councilwoman Simon hosted
15 regarding the heroin epidemic in Cuyahoga County,
16 right?
17    A.  I didn't attend, but that doesn't
18 necessarily mean I didn't help prepare for it.
19    Q.  Okay.  And do you know what Mr. Angelo's
20 role -- I didn't say that right.  What was it again?
21    A.  Angelo.
22    Q.  Angelo, Mr. Angelo's role was with the
23 Cuyahoga County Sheriff's Department?
24    A.  He was an assistant to the sheriff at that
25 time.  He's no longer employed at Cuyahoga County.

1    Q.  I see, okay.  And so if you turn to the
2 page ending in 081, that appears to be a memo from
3 Mr. Angelo to Councilwoman Simon dated
4 February 25th, with the date February 25th, 2014.
5       Do you see that?
6    A.  Yes, sir.
7    Q.  Okay.  And under the heading Facts,
8 there's a bullet that says, quote, "During the late
9 '90s, pain was recognized as the fifth vital sign,
10 and this led doctors to treat pain more
11 aggressively."
12       Do you see where it says that?
13    A.  Yes, sir.
14    Q.  Do you have an understanding of what that
15 sentence means?
16       MS. SACKS:  Objection.
17       THE WITNESS:  I do not.
18 BY MR. MOONEY:
19    Q.  Have you ever heard of the phrase "fifth
20 vital sign"?
21    A.  I don't remember.
22    Q.  You don't remember if you've heard that
23 phrase before?
24    A.  No.
25    Q.  Do you have an understanding sitting here

1 today of what it means for pain to be recognized as
2 the fifth vital sign?
3    A.  I do not.
4    Q.  Okay.  Do you know who recognized pain as
5 a fifth vital sign?
6    A.  I do not.
7    Q.  Do you know if it is accurate that during
8 the late '90s pain was recognized as a fifth vital
9 sign, which led to doctors treating pain more
10 aggressively?
11    A.  I do not.
12    Q.  It then says, "This culture shift was the
13 beginning of the overabundance of RX opioid
14 prescribing."
15       Do you see that?
16    A.  I do.
17    Q.  Okay.  Do you know if that statement is
18 correct?
19    A.  I do not know.
20    Q.  On the next page ending in 082, the first
21 bullet says, "By now, I think we are all aware of
22 the heroin epidemic, often initiated by the misuse
23 of prescription opiates.  Stories of overdose deaths
24 have become far too common."
25       Do you see where it says that?

76 (Pages 298 - 301)

Page 302

1    A.  Yes.
2    Q.  Do you agree that by February of 2014 most
3 people in Cuyahoga County were aware that there was
4 a heroin epidemic in Cuyahoga County?
5        MS. SACKS:  Objection.
6        THE WITNESS:  I don't know.
7 BY MR. MOONEY:
8    Q.  Is it your understanding that Cuyahoga
9 County was experiencing a heroin epidemic in
10 February of 2014?
11        MS. SACKS:  Objection.
12        THE WITNESS:  I don't know.
13 BY MR. MOONEY:
14    Q.  Do you know if the statement that overdose
15 deaths are often initiated by the misuse of
16 prescription opiates is an accurate statement?
17    A.  I don't know.
18    Q.  On the -- if you could turn to the pages
19 ending in 084 on the bottom under Opiate/Heroin
20 Summit.
21        Do you see that?
22    A.  Yes, sir.
23    Q.  It says that, "On November 21st, 2013,
24 many of northern Ohio's leading institutions
25 gathered for a daylong summit at the Cleveland

Page 303

1 Clinic in an effort to find solutions to the
2 region's heroin epidemic."
3        Do you see where it says that?
4    A.  Yes, sir.
5    Q.  Do you know, did you attend the
6 Heroin/Opiate Summit that occurred on November 21st,
7 2013?
8    A.  I don't remember.
9    Q.  Do you know if any member of the County
10 Council attended a Heroin/Opiate Summit that
11 occurred at the Cleveland Clinic?
12    A.  I don't know.
13    Q.  The third bullet says, "From this summit,
14 a community action plan was developed."
15        Do you see that?
16    A.  Yes.
17    Q.  Have you seen such a community action plan
18 that arose from a Heroin/Opiate Summit that occurred
19 on November 21st, 2013?
20    A.  I don't remember.
21    Q.  Do you know if members of the County
22 Council have received a community action plan that
23 was developed during the November 21st, 2013
24 Heroin/Opiate Summit described in this document?
25    A.  I don't know.

Page 304

1    Q.  Do you know if the County Council has
2 taken any steps to implement a community action plan
3 that was developed from a Heroin/Opiate Summit that
4 occurred on November 21st, 2013?
5    A.  I don't know.
6    Q.  Other than Council Member Simon and
7 Council Member Greenspan, do you know if any other
8 members of the County Council hosted town halls with
9 Dr. Gilson on the heroin epidemic?
10    A.  I don't know.
11    Q.  Have you ever heard of the Cuyahoga County
12 Poison Death Review Committee?
13    A.  I think I've heard the name before.
14    Q.  Do you have an understanding of what the
15 Cuyahoga County Poison Death Review Committee is?
16    A.  I don't.
17    Q.  Other than what we have already discussed
18 today, are you aware of any other efforts by the
19 Cuyahoga County Council or its members to raise
20 awareness of the opioid abuse issues that the county
21 faces?
22    A.  I can't think of anything additional from
23 what we've already discussed.
24    Q.  Other than what we have already discussed
25 today, are you aware of any actions taken by the

Page 305

1 Cuyahoga County Council or their members to address
2 the problem of prescription opioid abuse in Cuyahoga
3 County?
4    A.  I don't know.
5    Q.  Other than what we've already discussed
6 today, are you aware of any actions taken by the
7 County Council or members of the Council to address
8 problems of heroin abuse in Cuyahoga County?
9    A.  I don't know.
10    Q.  Have you heard of the Health and Human
11 Services Strategic Plan?
12    A.  Can you go into a little bit more detail
13 of what you mean?
14    Q.  Unfortunately I can't.  I've seen a
15 reference to in an email to something called a
16 Health and Human Services Strategic Plan.  I'm just
17 wondering if you know anything about it.
18    A.  So I'm not comfortable answering that
19 question because there are a lot of nonprofits
20 around here that come up with Health and Human
21 Service Strategic Plans.
22        So I am aware of the County having a
23 Health and Human Services Strategic Plan, but I
24 don't know if you're asking me in that context.
25    Q.  Sure.  What is the County's Health and

77 (Pages 302 - 305)

Page 306

1 Human Services Strategic Plan?
2     A.  I can't speak to the details of it, but I
3 know there is a Health and Human Services Strategic
4 Plan.
5     Q.  Is there an individual or group of
6 individuals who have responsibility for the Health
7 and Human Services Strategic Plan?
8     A.  I don't know.
9     Q.  Okay.  Have you attempted to quantify the
10 total financial cost of the opioid crisis on
11 Cuyahoga County?
12     A.  Can you define "attempted"?
13     Q.  Have you made any efforts -- and I'm
14 speaking about you specifically.
15        Have you made any efforts to quantify the
16 total financial impact of the opioid crisis on
17 Cuyahoga County?
18     A.  I've thought about it.  I don't know if
19 that counts as your definition of attempt it.  I
20 have not put anything then pen to paper to try to
21 list it out.  But I start thinking about it, and it
22 gets so large, I can't put my arms around it.
23     Q.  And when you have thought about the total
24 financial cost of the opioid crisis on Cuyahoga
25 County, has your thinking distinguished between

Page 307

1 costs related to prescription opioid abuse as
2 opposed to heroin abuse?
3     A.  I have not gone to that point.
4     Q.  Has the County Council ever budgeted
5 funding to develop a system for tracking unlawfully
6 prescribed medication?
7     A.  I don't know.
8     Q.  Do you know if the County Council has ever
9 budgeted funding to develop a system for identifying
10 pill mills?
11     A.  I don't know.
12     Q.  Has the Cuyahoga County Council budgeted
13 any money to develop a system -- excuse me, to
14 identifying and investigating the causes of
15 addiction?
16     A.  I don't know.
17     Q.  Has -- have you analyzed whether or not
18 the Cuyahoga County Council -- excuse me, strike
19 that.
20        Have you analyzed whether Cuyahoga
21 County's expenses have increased as a result of the
22 opioid crisis?
23     A.  Not except for what we've already
24 discussed where I've --
25     Q.  Other than thinking about it, okay.

Page 308

1        Has -- to your knowledge, has any member
2 of the County Council analyzed whether the County's
3 expenses have increased because of the opioid crisis
4 in Cuyahoga County?
5        MS. SACKS:  Objection.
6        THE WITNESS:  Could you ask that again,
7 please.
8 BY MR. MOONEY:
9     Q.  Do you know if any member of the County
10 Council has analyzed whether the County's expenses
11 have increased because of an opioid crisis in
12 Cuyahoga County?
13        MS. SACKS:  Same objection.
14        THE WITNESS:  I don't know that answer.
15 BY MR. MOONEY:
16     Q.  Do you know if the County Council as an
17 entity has analyzed whether the County's expenses
18 have increased because of an opioid crisis?
19     A.  I don't know how the County Council as an
20 entity could do that.
21     Q.  Have you investigated whether Cuyahoga
22 County has received less tax revenue because of the
23 opioid crisis?
24     A.  What do you mean by "investigated"?
25     Q.  Have you thought about it at all in the

Page 309

1 same way that you thought about the costs of the
2 crisis?
3     A.  That is a possibility I've thought about.
4 I haven't -- I don't know.  I would not classify it
5 as an investigation.
6     Q.  When you have thought about the total
7 costs of the opioid crisis on Cuyahoga County in the
8 past, were you doing that because someone told you
9 to do such a thought exercise?
10     A.  No.
11     Q.  When did you learn that opiate abuse in
12 Cuyahoga County was resulting in harm to the County?
13        MS. SACKS:  Objection.
14        THE WITNESS:  I'm not sure what that
15 means.
16 BY MR. MOONEY:
17     Q.  In what year did you recognize -- did you
18 learn that opioid abuse was a problem in Cuyahoga
19 County?
20        MS. SACKS:  Objection.
21        THE WITNESS:  I don't know.
22 BY MR. MOONEY:
23     Q.  When did -- you mentioned earlier that
24 Cuyahoga County has increased funding to respond to
25 the opioid crisis; is that right?

78 (Pages 306 - 309)

Page 310

1    A.  In certain areas.
2    Q.  In certain areas.  When did that first
3  start?
4    A.  I don't know.
5    Q.  Has the County been forced to expend more
6  resources than it had budgeted to address opioid
7  problems in Cuyahoga County?
8        MS. SACKS:  Objection.
9        THE WITNESS:  The County can't spend more
10  money than what's budgeted.
11  BY MR. MOONEY:
12    Q.  Okay.  Has -- have you done anything to
13  investigate the causes of opioid abuse in Cuyahoga
14  County?
15    A.  I don't know.
16    Q.  Have you done anything -- do you know if
17  any members of the County Council have investigated
18  the causes of opioid abuse in Cuyahoga County?
19    A.  I don't know.
20        MR. MOONEY:  If we can take like a
21  five-minute break, I think I will be very close to
22  being done, if that's okay.
23        MS. SACKS:  Yes.
24        THE VIDEOGRAPHER:  Off the record, 5:15.
25

Page 311

1        (Whereupon, a recess was taken
2         from 5:15 p.m. to 5:27 p.m.)
3        THE VIDEOGRAPHER:  On the record, 5:27.
4        (Exhibit 12 was marked for
5         identification.)
6  BY MR. MOONEY:
7    Q.  Mr. McAleer, I've placed between you and
8  your counsel a document with the label Exhibit 12, I
9  believe.
10        MS. SACKS:  Oh, sorry.
11        MR. MOONEY:  No, I put it there during the
12  break.
13        MS. SACKS:  They were together.  This is
14  12.  Sorry.
15  BY MR. MOONEY:
16    Q.  And as you take a moment to read it, I
17  will reflect for the record that this is an email
18  from Trevor McAleer dated April 22nd, 2014, Subject
19  line Dettelbach Cuyahoga Approach to Heroin, quote,
20  Needs to be the National Model, end quote, and it's
21  Bates labeled CUYAH_014392112.
22        All set?
23    A.  Yes.
24    Q.  Okay.  And so this email from you in April
25  of 2014 is to CountyCouncil@CuyahogaCounty.us.

Page 312

1    Q.  Do you see that?
2    A.  Yes, sir.
3    Q.  Okay.  And that is the Listserv for the
4  members of the County Council, correct?
5    A.  Yes, sir.
6    Q.  And so is it your understanding that if
7  you sent this email that's been marked as Exhibit 12
8  to CuyahogaCounty@cuyahogacounty -- excuse me,
9  CountyCouncil@CuyahogaCounty.us that that would have
10  been distributed to each member of the County
11  Council?
12    A.  It would have went to every member in the
13  Listserv.
14    Q.  Okay.  And then the text of this email
15  from you says, "FYI, press release from the
16  administration regarding the Heroin Initiative."
17        Do you see that?
18    A.  I do.
19    Q.  Do you know, sitting here today, do you
20  remember why you sent the press release from the
21  administration regarding the Heroin Initiative?
22    A.  I would funnel a lot of information to
23  council members, including certain press releases or
24  press events that were taking place.
25    Q.  And so is this the only press release that

Page 313

1  you would have funneled to members of the County
2  Council regarding the administration -- the county
3  executive's administration's Heroin Initiative?
4    A.  I don't know.
5    Q.  Do you know who Richard Luchette is?
6    A.  Luchette?
7    Q.  Luchette.
8    A.  Yes, sir.
9    Q.  I'm not getting any of these right.
10        Who is Mr. Luchette?
11    A.  He used to work for the then county
12  executive in communications.
13    Q.  Okay.  And the county executive at this
14  time would have been Executive FitzGerald?
15    A.  In 2014, yes, sir.
16    Q.  And so Mr. Luchette reports that on
17  October 21st, U.S. Attorney Steve Dettelbach praised
18  Cuyahoga County's broad-based approach to the heroin
19  epidemic and argued that it, quote, needs to be the
20  national model, end quote.
21        Do you see that?
22    A.  I do not right now.
23    Q.  It's in the middle.
24    A.  On the 22nd.
25    Q.  Sorry, it's on the 22nd, but he says "in

79 (Pages 310 - 313)

1 case you missed it yesterday on the 21st."

2    A.  I see it.

3    Q.  Okay.  Did you attend the event at which

4 U.S. Attorney Dettelbach made the statement that

5 Mr. Luchette references in his email?

6    A.  I don't remember if I attended the event

7 or not.

8    Q.  Do you have an understanding of what

9 Cuyahoga County's broad-based approach to the heroin

10 epidemic was in April of 2014?

11    A.  I do not know.

12    Q.  Have you -- other than in this email, have

13 you -- had you heard that U.S. Attorney Dettelbach

14 argued that Cuyahoga County's broad-based approach

15 to the heroin epidemic needed to be a national

16 model?

17    A.  I don't remember.

18    Q.  All right.  You can set that aside.

19       Does Cuyahoga County have a written policy

20 regarding the retention of its documents?

21    A.  I don't know if Cuyahoga County does.

22    Q.  Does the County Council have a policy

23 regarding the retention of its documents?

24    A.  County Council codified a public records

25 section.

1    Q.  And that is codified -- it was codified in

2 an ordinance?

3    A.  Yes, sir.

4    Q.  And so that becomes part of the county

5 code?

6    A.  Yes, sir.

7    Q.  All right.  What is your understanding of

8 the public records code?

9    A.  I assisted in the creation of that code.

10 It was some time ago.  I don't -- I could not give

11 you the exact details in that code right now.

12    Q.  Are there policy manuals in the County

13 Council's office that describes how employees should

14 comply with the public records ordinance that the

15 Council enacted?

16    A.  Can you ask that again, please?  I'm not

17 sure.

18    Q.  Sure.  Is there some document that

19 employees of the County Council receive that

20 explains what their obligations are under the public

21 records ordinance that the Council passed?

22    A.  Council members, is that who you're asking

23 who receives it?  I'm not --

24    Q.  Council employees.

25    A.  Council employees.

1    Q.  So as a staff member, do you get a manual

2 or does the chief of staff get a document that says

3 these are the public records laws, here are your

4 obligations to comply with them?

5    A.  We get copies of the -- what is referred

6 to as the sunshine book.  That is the State of

7 Ohio's version of public record law.  They call it

8 the sunshine book.  And we also all have copies of

9 the county code.  It's electronically, but we have

10 access to it.

11    Q.  And so if you had a question about your

12 obligations under the County code's public records

13 law, is there someone that you would speak to about

14 those obligations?

15    A.  If it was a question about a public

16 records request, is that what you mean?

17    Q.  No.  If you were preserving your documents

18 consistent with your obligations under the public

19 records law, is there someone you could ask?

20    A.  I'm not sure in what situation I would --

21 I don't know what you mean by that question.  I'm

22 sorry.

23    Q.  Has it ever -- has -- well, is it because

24 you've never had a question about your obligations

25 to preserve documents under the public records law?

1    A.  I -- as a public employee, I have

2 obligations that I'm required under, you know,

3 certain, I mean, various sections of the Ohio

4 Revised Code and our county code to ensure documents

5 are kept appropriately.

6    Q.  And do you follow those policies and laws

7 to the best of your knowledge?

8    A.  To the best of my knowledge I do, yes.

9    Q.  Okay.  Is there a specific policy for

10 members of County Council regarding the retention of

11 documents?

12    A.  It wouldn't be anything additional in

13 terms of a specific policy.

14    Q.  Do you preserve your work documents in the

15 ordinary course of business?

16    A.  What do you mean by "preserve"?

17    Q.  When you create a document for work, is

18 there a process by which you maintain it for a

19 certain period of time, where you hold onto it?

20    A.  Are you asking me personally?

21    Q.  Yes.

22    A.  Me personally, I tend to save every single

23 document that I have electronically.

24    Q.  What about hard-copy documents, do you

25 save those?

Page 318

1     A.  I -- if I -- not on every instance, but if
2 I have a hard document, I will sometimes scan those
3 in electronically through my email, you know, and
4 save them electronically.
5         If it's a larger -- if I have a hard copy
6 of let's say a budget book, you know the size of a
7 budget book, I would file that.  But I also tend to
8 have electronic copy as well, but I keep most -- you
9 know, most document -- almost every document that I
10 get.
11     Q.  Do you -- does your county email address
12 have an auto-delete function?
13     A.  Not that I'm aware of.
14     Q.  Are you provided a -- you have your own
15 work email address, correct?
16     A.  Yes, the email address that we've talked
17 about throughout these documents.
18     Q.  That's tmcaleer@CuyahogaCounty.us?
19     A.  Yes, sir.
20     Q.  And has that been your work email since
21 you became the legislative budget adviser in 2011?
22     A.  Yes, since 2011, yes.
23     Q.  Okay.  And was there a different email
24 address in the old form of the government?
25     A.  I can't say with certain.  I think it was

Page 319

1 a different email address until the whole system
2 converted, not because of the government but just
3 because of the IT system.  It might have been
4 different.  Instead of tmcaleer it could have been
5 something else.  I don't remember what it was.
6     Q.  And do you use your personal email account
7 to communicate about work-specific topics?
8     A.  No.
9     Q.  Do you have a work computer?
10     A.  I have a work computer, yes.
11     Q.  Is it a desktop or a laptop?
12     A.  It is a laptop.  It has docking functions
13 so it could hook up to monitors.
14     Q.  How long have you had the laptop that you
15 currently use for your job?  When was the last time
16 it was replaced, if it ever was?
17     A.  It was replaced at some point.  I don't
18 know what -- I don't remember what time frame we got
19 the laptops we're currently working on.
20     Q.  Within the last two years?
21     A.  I don't know.
22     Q.  Have you ever had your hard drive replaced
23 on your laptop?
24     A.  Not that I'm aware of.
25     Q.  Do you use any network folders to save

Page 320

1 your documents?
2     A.  Yes.
3     Q.  What network folders do you use?
4     A.  Can you just clarify what you mean by
5 "network"?
6     Q.  I've seen something called an S drive.
7     A.  Yes, the share drive, yes.  There's a
8 share drive, and there's a clerk's drive.  I don't
9 know the letter referred to as S drive where the
10 clerk keeps all their agenda items that I have
11 access to as well.
12     Q.  And is that within the S drive, or that's
13 a separate --
14     A.  It's a separate letter.
15     Q.  Okay.
16     A.  I don't know what term you're looking for,
17 but -- and then the policy staff also has an
18 O drive.  It's similar to the S drive.  But that's
19 not -- I don't really use that that often.  I tend
20 to focus on the S drive.
21     Q.  Is the S drive a drive for --
22     A.  I'm sorry, there is an H drive that is
23 local to each individual, but it's not on the hard
24 drive.
25     Q.  Okay.

Page 321

1     A.  Does that make sense?  I can save stuff
2 there.
3     Q.  Is the S drive used for a particular
4 department or division?
5     A.  All I know is County Council has an
6 S drive.  I've heard other departments have
7 S drives.  I don't know if that's accurate.  But we
8 are the only ones that can access our S drive.
9     Q.  Okay.  And then on the S drive, do you
10 have a folder that you use to maintain documents?
11     A.  I save most of my documents on my H drive.
12 I will save some documents to the S drive, and I
13 will occasionally save some to the O drive.
14     Q.  Do you have a drive on the S drive called
15 the Trevor folder?
16     A.  I think my co-workers created a Trevor
17 folder so I could copy and paste all my H drive
18 folders to the Trevor folder on the S drive.
19     Q.  And do you -- do you keep -- do you do
20 anything to ensure that the documents on your
21 H drive are also on the Trevor folder in the
22 S drive?
23     A.  Not routinely.  I will try to update as
24 much as possible, but I -- it's not a priority.
25     Q.  Do you know whether documents from the

81 (Pages 318 - 321)

Page 322

1 S drive were collected in this litigation?
2     A.  I don't know that.
3     Q.  I'll take a step back.
4        Do you know what was done -- whether
5 anything was done to collect documents from the
6 S drive in this litigation?
7     A.  I don't know.
8     Q.  Do you know what was done to collect any
9 documents in this litigation?
10    A.  No.  I've received one notice about don't
11 touch documents or don't -- I don't know the exact
12 language, but that's the only knowledge that I have
13 about documents related to this litigation.
14    Q.  Okay.  And do you know when you received
15 that notice not to delete documents?
16    A.  I do not know offhand.
17    Q.  Have you ever posted about issues related
18 to your work on social media?
19    A.  On my personal social media account?
20    Q.  Yes.
21    A.  I don't believe I have.  I don't --
22    Q.  Not that you can recall sitting here
23 today?
24    A.  Correct.  I may have.  I tend to keep
25 things separate.

Page 323

1     Q.  Do you have -- is there a nonpersonal?  Is
2 there a distinction -- you said personal.  Is there
3 some other kind of social media account?
4     A.  County Council, we have our own social
5 media accounts for like Facebook, and I think it's
6 connected to Twitter.  So I will post things on the
7 County Council Facebook for County Council, say FYI,
8 committee meeting coming up.
9     Q.  And is there any way looking at a post to
10 know that it came from you as opposed to some other
11 members of the council staff or the County Council?
12    A.  I don't think -- I'm not a hundred percent
13 sure how behind the scenes works when it comes to
14 posting, but I believe the administrators, which are
15 the policy staff that we talked about, who can go in
16 and post something can see who can post something or
17 who posted it.  But I don't know if someone who
18 follows or likes County Council, if they can see who
19 posted that.  I don't know how that works.
20    Q.  So other than receiving the notice not to
21 delete documents, have you done any -- have you made
22 any other efforts to preserve documents related to
23 the allegations in this lawsuit?
24    A.  I don't know what you mean by "efforts."
25    Q.  Have you -- other than just receiving the

Page 324

1 notice and not deleting documents, have you done
2 anything else to make sure your documents remain
3 where they're supposed to be related to this
4 lawsuit?
5     A.  I've done nothing --
6     Q.  You've done nothing.
7     A.  I have not touched.
8     Q.  Okay.  Do you have -- do you know whether
9 the hard-copy documents that you have in your office
10 have been collected as part of this litigation?
11    A.  I don't know, and I don't know if I have
12 hard documents.
13    Q.  Okay.  Have you provided hard-copy
14 documents to your attorneys in connection with this
15 lawsuit?
16    A.  I don't -- I don't remember doing that.
17        (Exhibit 13 was marked for
18        identification.)
19 BY MR. MOONEY:
20    Q.  Okay.  That's another document I've
21 labeled it during the break.  It's Exhibit --
22        MS. SACKS:  Let me get that one.
23 BY MR. MOONEY:
24    Q.  Sorry, you take the one with the sticker
25 on the top.

Page 325

1        It is labeled Exhibit 13, Bates labeled
2 CUYAH_015836225, and it's an email from Dale Miller
3 to Trevor McAleer dated November 13, 2015, Subject
4 line Text about HHS poll questions.
5        Do you see that?
6     A.  I do.
7     Q.  At the bottom -- have you had a chance to
8 review it?
9     A.  I'm reviewing it as you're speaking.
10    Q.  I'll let you finish.
11    A.  Okay.  I know it.
12    Q.  Okay.  So at the bottom there's an email
13 from Council Member Miller to you where he says, "Hi
14 Trevor, I just got a text from you saying that you
15 emailed me HHS levy questions that Mary Louise sent
16 you.  Did you just send this text message, or is
17 this some cyberspace anomaly from the past?"
18        Do you see where it says that?
19    A.  Yes.
20    Q.  Was it your practice to send text messages
21 to members of Council in connection with your work
22 as a legislative budget adviser?
23    A.  HHS levy is not in connection with my
24 work.
25    Q.  Okay.  So is it your practice to send text

82 (Pages 322 - 325)

Page 326

1  messages to members of the County Council in
2  connection with your work as a legislative budget
3  adviser, understanding that this was not -- you said
4  this was not?
5      A.  And I can talk about this.  I have sent
6  text messages to council members.
7      Q.  Okay.  And what -- do those text messages
8  concern substantive issues that are before the
9  council as opposed to just are you coming to the
10  meeting?
11     A.  Most of the texts are the meeting started
12  five minutes ago, are you coming type thing.
13     Q.  So the email above that from you to
14  Councilman Miller says, "It's from my
15  ysu2121@aol.com.  I sent it to your gmail account.
16  Let me know."
17     A.  Yes.
18     Q.  Okay.  So ysu2121@aol.com, is that your
19  personal email address?
20     A.  Yes.
21     Q.  And so you were sending HHS levy questions
22  to Mr. Miller's personal email account in November
23  of 2015.  Is that --
24     A.  Yeah.
25     Q.  -- accurate?

Page 327

1      A.  I would like to clarify HHS levy.
2      Q.  First, if you could answer my question,
3  that this says that you sent from your AOL address
4  to Mr. Miller's gmail account HHS levy questions.
5      A.  Yes.
6      Q.  Okay.  Now what would you like to clarify?
7      A.  As you can see from the subject, it says
8  HHS poll questions.  The levy, HHS levy referenced
9  here is related to the Health and Human Service levy
10  campaigns.  As County workers, we are not allowed to
11  work on county time or use county resources to work
12  on -- it's all volunteer.
13         So I can't use my work email to talk about
14  HHS poll questions.
15     Q.  Okay.
16     A.  So I texted here Councilman Miller.  He
17  then wrote to my work email, which you can clearly
18  see here I responded and said it was personal and
19  done on off time.
20     Q.  Okay.  Have you communicated with members
21  of the County Council using your personal email
22  address regarding issues related to opioid abuse in
23  Cuyahoga County?
24     A.  It would have only been related to if I've
25  ever used my personal for campaign HHS levy.

Page 328

1      Q.  Okay.
2      A.  It would have never been work-related.
3      Q.  Okay.  Unrelated to your work, have you
4  ever emailed members of the County Council regarding
5  prescription opioid abuse in Cuyahoga County?
6      A.  As you can see here, there was a
7  question -- I don't remember how the question was
8  phrased -- on a polling that was used to gauge
9  interest from the voters about a Health and Human
10  Services levy, either renewal or increase.  I don't
11  know under what circumstances this poll was under.
12         Council members, similar to me, some would
13  volunteer to work on the campaign side.  It would
14  have been a distribution list of the kind of
15  executive, using that in a different term than our
16  county executive, but kind of an executive group of
17  individuals who volunteered.  If Council members
18  volunteered and they were on that executive list
19  that I would have emailed, then yes.
20         But I can't tell you specific if that --
21  if they were on there or not.
22     Q.  Okay.  So other than this HHS levy
23  question, which appears to have something about
24  heroin-related services, are you aware of any
25  instance in which you've emailed members of the

Page 329

1  County Council regarding opioid abuse in Cuyahoga
2  County?
3      A.  I'm not aware at this time of any
4  additional.
5      MR. MOONEY:  Okay.  Those are all of my
6  questions.  My friends on this side of the table may
7  have a couple of you, but I am done.  So thank you
8  for your time.
9      MR. RICE:  How do you want to do this?  Do
10  you want me to sit down and take the mic?
11     MR. MOONEY:  I can just swing over, unless
12  you want to just take that microphone and talk.
13     MR. RICE:  Does this microphone work?
14     THE VIDEOGRAPHER:  You can grab that one.
15     MS. SACKS:  How are we on time?
16     THE VIDEOGRAPHER:  Do you want to go off
17  the record for a moment?
18     MR. RICE:  Sure.  Go off the record.
19     THE VIDEOGRAPHER:  Off the record, 5:48.
20         (Whereupon, a recess was taken
21         from 5:48 p.m. to 5:50 p.m.)
22     THE VIDEOGRAPHER:  On the record, 5:50.
23         EXAMINATION
24  BY MR. RICE:
25     Q.  Mr. McAleer, good afternoon.  Just as a

83 (Pages 326 - 329)

1 reminder, my name is Justin Rice.  I represent
2 Johnson & Johnson and Janssen Pharmaceuticals in
3 this case.  I just have I think just a handful of
4 questions for you really quick.
5        In your position as the legislative budget
6 adviser for the Cuyahoga County Council and any
7 other position that you've had with Cuyahoga County,
8 have you ever had any communications with a
9 prescription opioid manufacturer?
10    A.  I don't -- not that I'm aware of.  I don't
11 think that's ever happened.
12    Q.  Do you -- as you sit here today, do you
13 know what companies have made prescription opioids
14 over the past 20 years?
15    A.  I don't know.
16    Q.  And in the interactions that you've had in
17 the positions we've discussed today, have you heard
18 of anyone else having any interactions with a
19 prescription opioid manufacturer?
20        MS. SACKS:  Objection.
21        THE WITNESS:  I'm not aware.  I don't
22 know.
23 BY MR. RICE:
24    Q.  And when issues relating to funding for
25 the County and budgets for the County have arisen,

1 even in the context of the opioid or heroin
2 epidemic, are you aware of anyone specifically
3 pointing to any activities or actions of
4 manufacturing -- opioid manufacturers during those
5 discussions?
6        MS. SACKS:  Objection.
7        THE WITNESS:  Not that I can remember at
8 this time.
9 BY MR. RICE:
10    Q.  Okay.  You may recall earlier in the
11 deposition, and actually it was quite a while ago,
12 one of the earliest exhibits referenced your
13 involvement with medical records for the county
14 jail.
15        Do you remember that?
16    A.  I do, yes.
17    Q.  Okay.  Can you just tell me briefly a
18 little bit more about what that project entailed?
19    A.  Yes.  That sometime between 2012 and 2013,
20 I don't remember exact dates, at that point in time
21 there were not medical records in the county jail
22 for inmates.  And, you know, we were trying to push
23 to have some type of medical record system so when
24 inmates were either entered into the jail system or
25 exit it, their records would stay with them.

1    Q.  And when you say "their records would stay
2 with them," what records are you referring to?
3    A.  Their medical records.
4    Q.  Okay.  So from some other source?
5    A.  At that time the discussion was around
6 MetroHealth Hospital System coming into the jail.
7 We were aware of what they used.  I don't have data,
8 but we were aware that a lot of the inmates also
9 received care at MetroHealth when they're outside of
10 the jail system.
11        So the goal was try to get what they used
12 into the system, into the jail so that way it would
13 stick with -- their record would continue with the
14 inmate.
15    Q.  Sure.  So if the inmate received medical
16 treatment while in jail, the medical care provider
17 could refer to their medical records at MetroHealth,
18 for example?
19    A.  For example.  I'm not the expert in that
20 matter.
21    Q.  Sure.  That was the idea?
22    A.  The idea.
23    Q.  So if I understand you correctly, the
24 effort was being made to create a system where
25 medical records from MetroHealth, for example, could

1 be viewed and then also medical information could be
2 entered that would stay with that individual?
3    A.  That was the theory behind it.
4    Q.  Okay.  And did that actually take place?
5    A.  Yes.  Epic I believe is the name of the
6 program that MetroHealth is using.  I would defer to
7 them, but that's my knowledge of what's happened at
8 the jail.
9    Q.  Sure.  Is it your understanding that
10 MetroHealth currently administers the medical
11 records for county jail inmates?
12    A.  I don't know.
13    Q.  And the work that you were doing on that,
14 did that require special funding?  I'm trying to
15 understand why you were involved.
16    A.  It was because it was part of the
17 discussion in the Public Safety Committee meeting in
18 terms of transitioning to MetroHealth of coming and
19 taking over the medical care.
20        So that was my role.
21    Q.  Okay.  And then was there some sort of
22 legislative aspect to that as well?
23    A.  There -- the MetroHealth contract would
24 have required legislative action.
25    Q.  Okay.  So there would have been

84 (Pages 330 - 333)

Page 334

1 legislation passed to alter the MetroHealth contract
2 to perform these additional services?
3     A.  I don't know if it was to alter or to
4 ultimately just approve.  I don't know if there was
5 a contract in place and then it was amended,
6 altered, or if it was just part of the original
7 contract.  I don't remember the circumstances.
8     Q.  Sure.  Are you aware of how, prior to the
9 ability to transfer records from MetroHealth
10 electronically into the jail system, how healthcare
11 providers at the jail were able to have access to an
12 inmate's medical history?
13     A.  I don't know.
14     Q.  Okay.  But your understanding is that now
15 there is an electronic system for medical records of
16 Cuyahoga County jail inmates?
17     A.  That's my understanding.
18        MR. RICE:  Okay.  Okay.  I don't have any
19 other questions.  Thank you.
20             EXAMINATION
21 BY MS. GATES:
22     Q.  Ready?
23        Mr. McAleer, my name is Lisa Gates again,
24 and I represent Walmart.
25        Are you aware that Cuyahoga County has

Page 335

1 sued my client, Walmart, in this case?
2     A.  I'm not aware.
3     Q.  Are you aware that the County has sued
4 Walgreens?
5     A.  I'm not aware.
6     Q.  Rite Aid?
7     A.  I'm not aware.
8     Q.  CVS?
9     A.  I'm not aware.
10     Q.  Do you have any knowledge of any facts
11 that would suggest why the County might have decided
12 to sue any of those entities?
13     A.  I don't know.
14     Q.  Since you don't know that they've been
15 sued, I take it that you don't know about any of the
16 specific allegations against any of those four
17 entities?
18     A.  No.
19     Q.  And you wouldn't have any knowledge about
20 whether any of the allegations are true?
21     A.  I'm not aware.
22     Q.  Setting aside what's in the Complaint, can
23 you identify a single instance in which Walmart,
24 Walgreens, Rite Aid or CVS dealt with opioids
25 inappropriately?

Page 336

1        MS. SACKS:  Objection.
2        THE WITNESS:  I don't know.
3 BY MS. GATES:
4     Q.  Can you point to any specific conduct by
5 Walmart, Walgreens, Rite Aid or CVS relating to
6 opioids that caused any monetary losses to the
7 County?
8     A.  I don't know.
9        MS. GATES:  Thanks.  I don't have any
10 other questions.
11        MR. MOONEY:  Anyone on the phone?
12        MS. SACKS:  Anybody on the phone?
13        MR. PRABUCKI:  I have no questions.
14        MS. SACKS:  Thank you.  I have nothing.
15        MR. MOONEY:  All right.  Mr. McAleer,
16 thank you so much for your time.
17        Do you guys want to read and sign I
18 assume?
19        MS. SACKS:  Yes, whatever we do normally.
20        MR. MOONEY:  Okay.  Thanks so much for
21 your time, and safe travels back through what is
22 apparently a snowstorm.
23        THE VIDEOGRAPHER:  Off the record, 5:59.
24        (Whereupon, the deposition was
25        concluded at 5:59 p m.)

Page 337

1        C E R T I F I C A T E
2     The within and foregoing deposition of the
3 witness, TREVOR McALEER, was taken before GREG S.
4 WEILAND, CSR, RMR, CRR, at Suite 1950, 55 Public
5 Square, in the City of Cleveland, Ohio, commencing
6 at 9:06 o'clock a.m., on the 10th day of January,
7 2019.
8     The said witness was first duly sworn and
9 was then examined upon oral interrogatories; the
10 questions and answers were taken down in shorthand
11 by the undersigned, acting as stenographer; and the
12 within and foregoing is a true, accurate and
13 complete record of all the questions asked of and
14 answers made by the aforementioned witness at the
15 time and place hereinabove referred to.
16     The signature of the witness was not
17 waived and the deposition was submitted to the
18 deponent as per copy of the attached letter.
19     The undersigned is not interested in the
20 within case, nor of kin or counsel to any of the
21 parties.
22     Witness my signature on this 15th day of
23 J
24

GREG S. WEILAND, CSR, RMR, CRR
25 License No. 084-003472

85 (Pages 334 - 337)

Page 338

1        Veritext Legal Solutions
           1100 Superior Ave
2          Suite 1820
         Cleveland, Ohio 44114
3       Phone: 216-523-1313
4
January 15, 2019
5
To: Shayna Sacks
6
Case Name: In Re: National Prescription Opiate Litigation v
7
Veritext Reference Number: 3182081
8
Witness: Trevor McAleer    Deposition Date: 1/10/2019
9
10 Dear Sir/Madam:
11
    Enclosed please find a deposition transcript  Please have the witness
12
review the transcript and note any changes or corrections on the
13
included errata sheet, indicating the page, line number, change, and
14
the reason for the change  Have the witness' signature notarized and
15
forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext com
18
    If the errata is not returned within thirty days of your receipt of
19
this letter, the reading and signing will be deemed waived
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 339

1      DEPOSITION REVIEW
      CERTIFICATION OF WITNESS
2
  ASSIGNMENT REFERENCE NO: 3182081
3  CASE NAME: In Re: National Prescription Opiate Litigation v
    DATE OF DEPOSITION: 1/10/2019
4  WITNESS' NAME: Trevor McAleer
5    In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6  my testimony or it has been read to me
7    I have made no changes to the testimony
    as transcribed by the court reporter
8
                                      
9  Date          Trevor McAleer
10    Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
    They have read the transcript;
13  They signed the foregoing Sworn
    Statement; and
14    Their execution of this Statement is of
    their free act and deed
15
    I have affixed my name and official seal
16
    this _____ day of_____, 20____
17
18      Notary Public
19
      Commission Expiration Date
20
21
22
23
24
25

Page 340

1      DEPOSITION REVIEW
      CERTIFICATION OF WITNESS
2
  ASSIGNMENT REFERENCE NO: 3182081
3  CASE NAME: In Re: National Prescription Opiate Litigation v
    DATE OF DEPOSITION: 1/10/2019
4  WITNESS' NAME: Trevor McAleer
5    In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6  my testimony or it has been read to me
7    I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s)
9    I request that these changes be entered
    as part of the record of my testimony
10
    I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein
13                           
    Date         Trevor McAleer
14
    Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17    They have read the transcript;
    They have listed all of their corrections
18  in the appended Errata Sheet;
    They signed the foregoing Sworn
19  Statement; and
    Their execution of this Statement is of
20  their free act and deed
21  I have affixed my name and official seal
22 this _____ day of_____, 20____
23                         
    Notary Public
24
                       
25    Commission Expiration Date

Page 341

1      ERRATA SHEET
    VERITEXT LEGAL SOLUTIONS MIDWEST
2    ASSIGNMENT NO: 1/10/2019
3  PAGE/LINE(S) /    CHANGE    /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  Date        Trevor McAleer
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
    Notary Public
24
    _____
25  Commission Expiration Date

86 (Pages 338 - 341)

**[& - 2012]**                                                                                    Page 1

| & |
|---|
| **&** 1:22 4:4,12 5:12 5:17 11:13,17,19 12:10 237:19 268:8 269:8 330:2 |

| 0 |
|---|
| **001730354** 8:18 265:19 |
| **001730356** 8:19 |
| **002426252** 8:12 |
| **002426279** 8:13 |
| **014391077** 9:17 297:10 |
| **014391078** 9:18 |
| **014391079** 9:20 |
| **014392112** 10:7 311:21 |
| **014392114** 10:8 |
| **014394784** 9:13 292:2 |
| **014394979** 7:18 142:13 |
| **014408184** 8:7 227:4 |
| **014408193** 8:8 |
| **014434268** 7:24 192:3 |
| **014434275** 7:25 |
| **014486084** 8:23 274:4 |
| **014486085** 8:24 |
| **014507122** 9:5 279:18 |
| **014537372** 7:13 133:17 |
| **014537375** 7:14 |
| **015836225** 10:12 325:2 |
| **016006** 252:20 |

**01a001** 250:25 251:6
**078** 298:7
**081** 300:2
**082** 301:20
**084** 302:19
**084-003472** 337:25

| 1 |
|---|
| **1** 7:10 133:9,14 141:7 219:23 237:10,14 238:17 238:20,25 239:3 239:13 247:25 |
| **1,000** 47:22 |
| **1-24-2017** 8:17 |
| **1/10/2019** 338:8 339:3 340:3 341:2 |
| **1/24/2017** 265:18 |
| **10** 1:17 9:11 148:15,16 232:9 232:18 236:21 291:21,24 |
| **10,000** 148:13 |
| **10,715,000** 237:4 |
| **10/26/2012** 7:10 |
| **10/8/2013** 7:20 |
| **100** 41:22 50:24 182:11,15,18 190:22 191:9 203:2,16 |
| **100,000** 41:21 61:25 93:8 148:12 202:22 |
| **10017** 3:8 |
| **10018** 4:16 |
| **10:22** 77:8,10 |
| **10:36** 77:10,11 |
| **10th** 2:14 7:2 11:2 337:6 |

**11** 9:14 38:25 77:21 78:17 120:7 129:9 143:3 214:16 267:17 296:17,21
**11/13/2015** 10:9
**11/14/2012** 8:20 274:10
**11/16/2012** 8:21 9:3
**11/19/2013** 8:3
**1100** 5:20 338:1
**11th** 3:7
**12** 7:5 10:3 148:23 176:18 311:4,8,14 312:7
**127** 6:8
**12:08** 152:16,18
**12th** 216:21 243:9
**13** 10:9 324:17 325:1,3
**133** 7:10
**142** 7:15
**14394984** 7:19
**14507123** 9:6
**14th** 275:19
**15** 177:24 183:25 199:8 338:4
**150** 203:16
**150,000** 202:23
**15th** 337:22
**16th** 274:2 279:17
**17** 1:7,10 100:8
**1706** 337:24
**1755** 54:22
**18** 8:14
**1820** 338:2
**185** 228:25,25
**186** 230:16
**188** 232:8

**189** 237:2
**18th** 222:24 246:15
**19** 99:21
**191** 7:20
**1950** 1:23 2:12 337:4
**19th** 227:1
**1:04** 152:19,20
**1:54** 190:3
**1st** 33:22 37:15 46:16

| 2 |
|---|
| **2** 7:15 142:3,7 287:19 288:4 |
| **2/25/2014** 9:14 |
| **2/27/2014** 9:15 |
| **20** 8:15 191:12 330:14 339:16 340:22 341:22 |
| **200,000** 237:23 |
| **2000** 6:9 |
| **20005** 4:7 |
| **2005** 31:3 |
| **2006** 71:15 |
| **2006-2007** 71:18 |
| **2007** 71:23 |
| **2008** 111:11 |
| **2010** 32:5 37:18 |
| **2010-2011** 34:10 34:15 |
| **2011** 33:22 34:1 37:9,13,15 41:7,8 72:4 77:16 83:21 128:22,24 172:1 286:12 318:21,22 |
| **2012** 9:9 41:9 46:16 133:16,25 137:14 138:22 139:4 140:24,25 274:2 275:6,13,19 |

278:25 279:17,23
282:24 284:9,22
287:23 290:23
291:2 331:19
**2013**   7:16 9:4,11
58:16 100:25
101:2,4,10 107:11
115:8 124:21
140:25 142:11,12
143:9 144:24
147:7,9 149:14
150:14 164:1
192:1,12 194:4
227:1,14 228:20
229:2 232:20
234:1,8 235:3
279:17 281:12
291:25 292:6
293:17 294:13,23
295:8 302:23
303:7,19,23 304:4
331:19
**2014**   7:21 76:10
199:8,11 297:8
298:12 300:4
302:2,10 311:18
311:25 313:15
314:10
**2014-2015**   192:1
194:11
**2015**   7:22 100:7,13
100:18 107:8
115:3 164:1 325:3
326:23
**2016**   100:8
**2017**   8:14,15 99:21
100:1,6 107:5
114:22 124:4
243:9 246:15
265:17 269:14

**2018**   26:4 76:11
99:21 254:11,13
254:18
**2018-2019**   248:2
248:13
**2019**   1:17 2:15 7:2
11:2 140:11,15
254:11 275:6
337:7,23 338:4
**202**   4:8
**20th**   265:17
**21**   248:8
**2100**   3:15
**212**   3:9,17 4:17
**216**   5:9,22 6:11
**216-523-1313**
338:3
**21st**   197:24 302:23
303:6,19,23 304:4
313:17 314:1
**226**   8:3
**22nd**   198:1 311:18
313:24,25
**23rd**   142:12
**24**   229:2
**242**   8:9
**250,000**   268:9
269:15 270:2,18
**25th**   298:11 300:4
300:4
**26**   133:16
**265**   8:14
**269**   194:11 195:25
196:1
**27**   9:9 173:8 283:7
**271**   216:16,20
**272**   220:1
**273**   8:20
**278**   246:13
**279**   9:3

**27th**   281:16,24
282:7,15 284:9,22
287:22 297:8
**280**   182:23,25
**2804**   1:6,7
**284**   9:7
**291**   9:11
**296**   9:14
**29a392**   254:5,6
**2:06**   190:3,5
**2:49**   224:6
**2:53**   224:6,7
**2:59**   227:21,23

**3**

**3**   7:20 95:7 191:17
191:21 289:2
**30**   196:9,13 245:1
245:6,9 246:1
**30,000**   197:7
**30th**   291:25 292:6
**311**   10:3
**3182081**   338:7
339:2 340:2
**31st**   32:5 37:17
**324**   10:9
**329**   7:6
**334**   7:7
**35**   204:25
**360**   3:6
**375**   137:4
**39**   254:17
**39,363,659**   254:11
254:13,17
**397-1000**   3:9,17
**3:00**   227:23,25
**3:41**   258:3,5

**4**

**4**   8:3 226:13,17
227:13 230:17,18
232:6 247:2

**4/22/2014**   10:3
**40**   48:21
**434-5421**   4:8
**44113**   3:16 5:21
**44114**   6:10 338:2
**44144**   5:8
**45005**   1:10
**4:00**   258:5,7
**4:18**   272:1,3
**4:25**   272:3,4

**5**

**5**   8:9 214:17
242:23 243:3,18
**5,470,000**   238:11
240:1
**50**   203:2
**50,000**   93:9
**500**   41:21 42:5
61:6 62:4,8,21
**500,000**   40:20 41:1
41:11,13,22 42:5
50:24 61:8 239:19
240:9
**55**   1:23 2:12 3:14
337:4
**55,000**   93:15
**586-7154**   5:9
**5:15**   310:24 311:2
**5:27**   311:2,3
**5:48**   329:19,21
**5:50**   329:21,22
**5:59**   336:23,25

**6**

**6**   8:14 265:8,12
**620**   4:15
**6271**   253:25
**67a100**   251:14
**696-3670**   5:22

**7**

**7**  8:20 173:16
  273:14,18
**70**  80:7
**725**  4:6
**7373**  134:6
**79**  297:15
**7:33**  146:8

**8**

**8**  9:3 279:8,14
**80**  191:10 297:18
**81**  237:2
**8189**  237:2
**8192**  238:4
**841-1201**  4:17
**861-7718**  6:11
**8th**  192:1

**9**

**9**  9:7 284:12
  285:14
**9/23/2013**  7:15
**90**  148:12
**901**  5:7
**90s**  300:9 301:8
**950**  5:19
**981**  147:11
**982**  149:11
**983**  149:22
**9:06**  1:18 2:14
  11:2 337:6

**a**

**a.m.**  1:18 2:14
  77:10,10 146:8
  337:6
**aaron**  1:9
**ability**  14:16 34:14
  334:9
**able**  14:13 62:23
  206:14 219:1
  270:6 277:20

279:1 281:4,17
285:5 334:11
**absolutely**  143:1
**absorb**  114:14
**abuse**  13:21 21:10
  21:17 75:24 76:4
  76:18,25 96:12
  97:3,6 98:1
  103:17 104:3,3
  107:24 110:3,3
  112:11 113:11,17
  113:19 131:12,18
  132:10 139:2
  157:24 158:4,13
  158:22 159:4,10
  159:20 160:4,12
  164:12,18 167:7
  173:20 174:9
  197:19 208:17
  209:24 210:4,6,7
  210:11,11,24
  217:4,9,14,19
  242:10,16,21
  259:17 260:7
  264:17,20,22
  271:10 272:20,22
  272:24 273:3
  291:11,18 293:19
  293:25 294:1
  304:20 305:2,8
  307:1,2 309:11,18
  310:13,18 327:22
  328:5 329:1
**accepted**  220:2
**access**  48:15,17,23
  49:4,6,25 50:13,14
  281:5 316:10
  320:11 321:8
  334:11
**account**  182:17
  252:1,5 319:6

322:19 323:3
  326:15,22 327:4
**accounted**  67:5
**accounting**  50:3
**accounts**  323:5
**accurate**  67:22
  126:17 179:15,24
  223:24 236:13
  301:7 302:16
  321:7 326:25
  337:12
**accurately**  14:13
  126:21 285:18
  286:3
**acknowledge**
  339:11 340:16
**acronyms**  205:22
**act**  339:14 340:20
**acting**  337:11
**action**  42:18,20
  83:9 91:17 157:16
  175:2 303:14,17
  303:22 304:2
  333:24
**actions**  173:19
  174:7 175:4
  304:25 305:6
  331:3
**active**  231:13
**actively**  207:12
**activities**  331:3
**actual**  135:10
  188:15 189:21
  199:9 287:10
**adamhs**  8:4 65:8
  80:22,23 85:16,24
  86:5,8,11,17 87:2
  87:9,14,20 88:5,10
  93:7,8,13,19 97:12
  97:23 98:11,17
  99:2,7,23 100:9

101:5,13,25 102:5
  102:19,25 103:2,6
  103:9,11,14,25
  104:2 105:8,9
  122:18,19,23
  123:4,8,21 125:6
  158:10,12,21
  159:1,2,9,14,18
  162:17 168:15,18
  171:18,20,24
  177:13,23 183:24
  205:16 209:20
  224:12,15,19
  225:1,7,17,22
  226:1,5,9,25 227:1
  228:7,16,16,22,25
  229:10 230:6,25
  231:7,12,16 232:5
  233:6,17,24 234:6
  234:11,13,22
  235:2 236:2,20
  237:3,15,25 238:7
  238:22,24 239:3
  240:1,6,8 254:3,5
  254:18 268:9
  270:20 279:24
  280:24 288:6,15
  289:20
**add**  115:18 116:23
  269:22 278:14
  286:5
**addiction**  102:10
  102:12,20 103:3,8
  121:21 161:4,17
  161:22 162:8,13
  165:16,19 167:13
  168:2,3,4,9,13,17
  168:20,22 169:3,8
  169:12 171:15
  174:6 224:18
  225:12,18,21

226:2,6,9 232:10
232:25 233:8,9,10
233:13,25 234:7,8
234:16,17 235:7
235:14,21 236:5
236:12,22 237:5
238:6 259:18
260:7 264:8
268:10 270:3
280:2,8,14,21,25
293:19 307:15
**addictive**  235:8,22
236:16,24
**addition**  122:17
143:18 233:13,15
233:16,18 255:12
265:6 293:14,25
**additional**  45:22
83:13 92:6 97:15
97:24 98:21 102:3
103:1,3,12,16
104:2,6,7 110:6
112:4,20 114:9
115:10,18 116:1,3
116:13,16,23
121:20,24 136:25
159:15 161:21
188:19 203:23
206:14 209:14
210:1,3,10 217:3,8
217:17,18 218:7
220:11 221:10,14
231:15 234:14
238:6,11 240:4
255:19 258:12,23
259:8,13,16,20
260:6,20 262:5
268:9 269:2,24
270:17 304:22
317:12 329:4
334:2

**additionally**  260:2
**address**  121:21
143:25 144:4,4,10
144:17,18,24
145:1,4 146:3,21
165:23 217:3,8,13
217:18 257:5
264:7 283:19
297:25 298:1,2
305:1,7 310:6
318:11,15,16,24
319:1 326:19
327:3,22 338:15
**addressed**  288:7
289:11 290:11
**addresses**  145:20
145:24 146:1,4,13
146:17
**adequate**  177:11
**adequately**  177:7
**adheres**  190:9
**adhering**  189:20
**adjusted**  41:11,13
**administers**
333:10
**administration**
15:22 29:6 92:12
110:11 176:9
184:13 187:13
196:19 205:12,15
205:18 268:8
269:9 312:16,21
313:2
**administration's**
193:12 313:3
**administrative**
43:1,7,13 77:23
93:23 94:11 130:9
192:17,20 205:10
205:14 245:22

**administrator**
274:18
**administrators**
323:14
**adopt**  32:23 91:19
120:9 187:4
244:20
**adopted**  223:1
243:19
**adopting**  244:15
**adoption**  176:10
**adopts**  176:15
248:2
**adult**  237:4
**advance**  23:2
56:24 212:18,20
**advanced**  56:21
56:24
**advice**  151:21
**advise**  281:16
**advised**  282:10
**adviser**  12:14,20
31:5,10,11 48:23
49:5,9 53:20 63:6
69:25 71:25 72:3
77:15,19 78:6
79:9 82:3 83:20
85:14,22 92:18
93:17 95:12 96:10
125:12 126:1,15
126:23 128:13
129:1 140:4
157:20 164:16
167:10 186:2
194:17 207:7
217:2 228:14
241:18 246:8
257:16 285:17
286:1 318:21
325:22 326:3
330:6

**advocate**  217:13
**advocated**  217:7
217:17
**affairs**  160:15
161:13 162:11
163:19,22 164:6
164:10 228:11
272:8,12 273:7
**affect**  14:16
**affirmative**  247:5
**affixed**  339:15
340:21
**aforementioned**
337:14
**afternoon**  329:25
**agencies**  93:20
94:11 202:19
204:10 205:11,14
230:19 231:4
**agency**  203:3
205:18 209:10
**agenda**  8:17 45:15
56:3,18,19 57:1
59:13,19,23 82:21
82:22 129:23
188:4,10,12,14,15
199:7 216:24
259:1,7,16 261:8
261:17,22 262:1,8
262:9 263:18
265:1,7,19 267:19
277:17 286:17
320:10
**agendas**  43:3
259:2,3,19,21
260:4,6,12 261:3
262:11,20
**aggregates**  190:24
**aggressively**
300:11 301:10

**ago** 28:20 58:23
133:4 160:25
172:21 315:10
326:12 331:11
**agree** 178:23
285:17 302:2
**agreeing** 166:17
**agreements** 40:23
61:16,20 245:25
**ahead** 33:6 202:5
202:6 206:15
239:11 284:24
**aid** 335:6,24 336:5
**al** 1:10 135:2
**alcohol** 224:17
225:12,22
**alexandra** 185:22
**allegations** 21:6
36:7 323:23
335:16,20
**allocate** 105:24
178:4 241:9 260:6
**allocated** 74:14,15
75:23 93:14 126:7
148:12 180:8
182:8 186:25
187:15 190:21
200:25 201:8
222:19 225:23
234:6 239:25
256:1 265:3
**allocates** 183:18
188:21 189:4
259:16
**allocation** 189:20
190:10
**allow** 201:4
219:21 246:1
**allowed** 13:8
172:19 327:10

**alter** 334:1,3
**altered** 334:6
**alternate** 54:3,7
54:16 55:3,7,10,12
55:13,16,19 56:3,8
57:25 58:10,13,17
58:25 60:4,6,13
**alternates** 59:3
78:3
**alternative** 91:10
**amend** 91:3
116:22 117:5
261:18
**amended** 91:1
111:25 223:13
261:20 262:1
334:5
**amending** 115:17
**amendment** 90:19
90:19 91:4,6,14,18
91:21 118:19
119:3,13 124:7,9
182:13 220:15,18
222:22 249:13,23
**amendments**
89:22 91:16,17,19
97:8 118:21,25
119:12 166:14
174:3 219:6,7
220:3,8,8,11,17,20
221:4,10,15,20
222:9,14,25
223:18 240:16
241:4 242:4 249:5
249:8,23 250:2,8
257:13
**amerisourceberg...**
22:21
**amount** 47:1
60:25 106:7 112:1
116:6 149:2

173:14 178:2
183:10,12 222:18
224:21 234:14
240:9 251:5
254:14 269:2
**amounts** 33:13
123:11 189:22
**analyst** 63:20,22
64:6 65:2,10 66:5
66:18,21 67:11
69:14 71:16 76:15
184:18 186:7,13
206:5,6
**analyst's** 186:7
**analysts** 63:23
184:22
**analyzed** 307:17
307:20 308:2,10
308:17
**andrea** 289:9
**angelo** 298:7,8,9
298:10,11,14
299:21,22 300:3
**angelo's** 298:20
299:19,22
**animal** 136:24
**announcement**
16:1,18
**annual** 101:1
140:7 237:22
**anomaly** 325:17
**answer** 14:16,23
15:13,14 16:6
45:20 62:20 84:5
119:14 131:24
151:5,18 152:2,3
193:9 207:11
216:1 219:14
224:23 226:4
230:1,5,8 308:14
327:2

**answered** 118:11
189:13 211:23
289:5,17
**answering** 239:9
305:18
**answers** 27:3
211:9 337:10,14
**anticipate** 67:25
**anticipated** 67:6
**anticipating** 66:15
**anticipation**
196:12
**anybody** 222:16
336:12
**anymore** 22:10
32:14 140:22
**anyway** 148:15
**aol** 327:3
**aol.com** 144:17
145:2 297:25
326:18
**aol.com.** 326:15
**apologize** 73:11
**apparently** 336:22
**appeal** 218:6,7,8
218:12,19
**appeals** 218:1
**appear** 83:12
339:11 340:15
**appears** 146:8
226:24 246:14
251:1 259:2
267:14 268:16
269:13 270:2
278:8 281:11
292:7 300:2
328:23
**appended** 340:11
340:18
**applied** 172:16

**apply** 72:18,21
 87:13,19
**appointed** 52:15
 52:23 72:24 86:21
 87:24 157:5
**appointee** 84:10
 87:8
**appointees** 85:16
**appointing** 53:14
**appointment** 40:3
 52:25 71:8
**appointments**
 79:22 80:3 81:12
 81:16 82:8 83:25
 84:18,20,24 85:24
 156:18 245:24
**appoints** 53:5 85:1
 85:6 156:3
**appreciate** 15:7
 235:16
**apprised** 78:1 92:1
 92:19,25 93:12
 137:19
**apprising** 137:23
**approach** 10:5
 311:19 313:18
 314:9,14
**approaches**
 134:20
**appropriate** 40:3
 67:3 69:7 132:20
 137:20 175:17,21
 176:1,5,13,21,24
 191:7
**appropriated**
 155:5 182:3,6
 235:1 260:3
 261:16
**appropriately**
 317:5

**appropriates** 69:4
**appropriating**
 258:23
**appropriation**
 263:1,2,11,19
 264:5,16,24
**appropriations**
 252:2 259:20,25
 264:25
**approval** 40:7,22
 46:3,6,12 81:1
 183:7 212:10,15
 247:9
**approve** 16:3,10
 16:14 33:2,10
 34:14 40:2,3
 41:20,22 54:12
 61:19 62:5,9,11,23
 68:25 73:23 80:15
 80:23 87:2,13,19
 88:4,10 110:7
 120:8 244:21
 246:10 287:10
 334:4
**approved** 32:19
 32:25 46:2,17
 47:9,11,22 57:17
 60:20 68:14 69:13
 81:2 84:16 87:8
 87:25 93:1 119:7
 123:16 154:13
 177:2,6,12 222:24
 223:23,25 231:23
 232:3 233:23
 238:1 239:22
 240:5 249:9 250:2
 250:9 258:10,18
 259:9 260:21,25
 261:4,8,11 262:14
 262:14 264:5
 286:25 287:5,12

**approves** 68:13
 80:6 176:15
 258:25
**approving** 32:17
 32:17,20 34:9
 61:4 73:20 81:8
 85:7 169:14 240:3
 245:5,23,24,25
 247:19
**approximately**
 25:11 26:1 80:7
 153:2,3 173:17
**april** 311:18,24
 314:10
**area** 28:11 205:9
**areas** 97:14 98:20
 105:2 132:15
 310:1,2
**argued** 313:19
 314:14
**arisen** 330:25
**arising** 111:18
**armond** 267:5
**arms** 306:22
**arose** 303:18
**arrested** 113:21
 113:24 162:2
**aside** 83:23 103:14
 141:13 151:1
 174:2,7,12 240:12
 240:13 271:14
 291:7 296:15
 314:18 335:22
**asked** 12:21 44:12
 45:6,13 84:14
 96:11 97:24 99:23
 104:7 109:3 110:5
 112:4 132:6
 153:23 155:4
 157:3 166:24
 168:6 177:24

190:7 206:21,22
 208:16 229:21
 230:24,25 239:2
 271:4,11 287:14
 289:3,15,19
 337:13
**asking** 13:19
 24:13 66:15 96:23
 97:21 99:4,8
 100:10 101:5,19
 104:6 109:7
 151:11 165:1
 170:11 174:4
 183:25 204:4
 207:14 305:24
 315:22 317:20
**asks** 102:25
**aspect** 130:17
 333:22
**aspects** 29:21
**assess** 240:18
**assessment** 128:21
**assigned** 39:3,6
 63:23 64:3,5,21,22
 64:24 69:16
 132:15,16 133:3
 135:12,18 136:9
 139:6 252:21
**assignment** 339:2
 340:2 341:2
**assist** 79:2,4 80:1
 118:24
**assistance** 96:11
 99:5,9 100:11
**assistant** 13:16
 130:9 192:17,21
 299:24
**assisted** 79:12,13
 296:1 315:9
**assisting** 76:24
 77:25 88:22

**assume** 14:24 119:23 274:12 336:18
**assumed** 182:17
**assuming** 163:14
**asterisk** 123:6
**attached** 141:6 298:14 337:18 340:7
**attaching** 266:7
**attachment** 7:12 7:21 9:18 134:5 147:5 194:10 216:16 228:24 266:11
**attachments** 7:17 8:6
**attempt** 306:19
**attempted** 306:9 306:12
**attend** 16:2 44:12 44:15,23 45:3 53:18,22 54:1 82:7 157:18 207:4 281:15,17,23 282:11 294:11 296:3,4 299:14,17 303:5 314:3
**attendance** 287:17
**attended** 28:4 53:23 165:9,12 282:14 284:8 289:25 296:8,11 303:10 314:6
**attending** 45:9 59:6,11,17,22 78:2
**attention** 197:12 197:18
**attorney** 12:9 313:17 314:4,13

**attorneys** 13:7,13 24:9 26:15 324:14
**audience** 200:21
**audio** 199:24 286:7,10
**auditor** 38:22
**august** 9:11 291:25 292:6 294:13,23 295:8
**authorize** 340:11
**authorized** 182:10 191:9 264:15
**authorizing** 264:25
**auto** 318:12
**automatically** 168:19
**available** 27:12 69:9 122:12 125:1 127:11 177:9 179:20 218:4 233:7,23 262:13
**ave** 338:1
**avenue** 3:6 4:15 5:7,19
**average** 108:12 112:24 113:1 171:16 173:9
**averaged** 191:10
**aware** 17:5,10 97:1 173:19 175:4 186:15 187:11,18 187:20 193:2 213:21 215:24 236:23 242:2 255:25 256:8,13 256:22 257:1 259:19,22 260:5 260:11 264:4,14 301:21 302:3 304:18,25 305:6

305:22 318:13 319:24 328:24 329:3 330:10,21 331:2 332:7,8 334:8,25 335:2,3,5 335:7,9,21
**awareness** 304:20

**b**

**b** 5:6 16:1
**babies** 104:14
**back** 48:1 51:22 63:4 66:11 69:8 69:19 71:5 83:3 95:21 103:25 106:22 109:3 110:10 117:18 121:13 132:12 140:23 147:2 148:9,9,13,15 152:11,22,24 208:9 211:9 216:16 222:17 223:1 230:13 241:12 247:24 249:4 252:2 268:1 282:3 298:5 299:1 322:3 336:21 338:15
**background** 27:20 28:3 86:25 280:21
**backup** 266:8
**baker** 6:6 51:21 52:4,11,12,23 54:24 174:22
**bakerhostetler** 11:23
**bakerlaw.com** 6:12
**ballot** 34:22 35:2,2 35:6 123:17,19 169:5,6 171:10

**ballpark** 185:16
**bank** 252:1
**based** 70:23 72:5 97:22 106:6 136:4 170:20 171:14 186:1 228:12 241:5 266:21,22 267:11,12 283:8 283:10 295:3 313:18 314:9,14
**basically** 39:18 64:16 71:2 128:15
**basing** 170:20
**basis** 134:8 151:6 294:20 295:12
**bates** 7:12,17,23 8:7,11,17,22 9:5 9:10,13,16,19 10:6 10:11 133:17 142:12 192:2 227:3 274:3 284:18 292:1 297:10,12,17 311:21 325:1
**becoming** 53:1
**began** 33:22 124:19,22 161:20
**beginning** 152:24 195:21 223:9 247:25 248:15 301:13
**begins** 135:11 254:24 265:25 298:6
**behalf** 3:3 4:3,11 5:3,12 6:3 11:17 11:19 54:17 58:8 282:12
**behavioral** 205:17 205:19

**belief** 101:24
117:2 176:11
269:23
**believe** 19:18 22:7
22:14 28:16 57:16
58:11 71:22 80:7
96:22,23 112:6
122:8 123:7
126:19 127:8,13
143:16 163:24
164:17 166:7,11
177:1,3,5 226:8
233:20 268:20,23
286:1 287:22
291:14 296:2
311:9 322:21
323:14 333:5
**believed** 269:15
270:2,10
**benefits** 190:22
220:13 253:6,14
**best** 14:20 15:5
58:6,11 227:11
317:7,8
**better** 68:1
**beyond** 201:7
215:9
**biennial** 7:22
99:22 100:8,21,23
100:24 117:13
120:4,12 159:13
192:2,11,13,25
194:11,20 196:9
196:10,15 197:23
197:25 199:5,8,11
212:14 216:18,23
244:16 246:10
248:2,13 249:10
254:10 257:20
258:13 262:18
265:4 269:11

**big** 39:12 149:21
157:11 219:24
**bit** 74:16 150:25
154:18 166:22
175:11 195:15
224:9 232:16
240:22 249:19
268:14 271:20
305:12 331:18
**biweekly** 259:1,3
259:7,15,19,21
260:3,5,11 261:3,7
261:16,22 262:1
262:19 263:18
265:1,6
**black** 148:23
**board** 8:4 31:12
34:17 40:3,4
41:18,19,19,21,24
42:2,4,7,15,21,25
43:7,11,12,16,21
44:1,5,10,13,16
45:4,9,18 46:2,11
46:17 47:9,12,22
50:19,21,23,25
51:4,8,8,11,14,24
52:5,6,9,13,16,23
53:2,6,14,18,24
54:1,7,10,11 56:6
56:22 57:4,7,11,15
58:4,13 59:1,3,7,8
59:9,10,12,18,23
60:5,7,14,19,22,24
61:3,5,10,18 62:1
62:5,6,24 63:5,10
65:8 69:20,21,22
70:1,5,12 71:21
76:14,16 78:2
79:21 80:3,16,22
80:24 82:18 83:10
85:16,24 86:5,8,11

86:17 87:2,9,14,20
88:5,11 93:7,8,13
93:19 97:12,23
98:11,18 99:2,7,23
100:9 101:5,13,25
102:5,19,25 103:2
103:7,9,11,14,25
104:2 105:8,9
122:18,19,23
123:4,8,21 124:7,9
125:6 138:11
158:10,12,21
159:1,2,9,14,18
162:17 168:15,18
171:18,21,24
177:13,23 183:24
205:16 209:21
224:12,15,18,19
225:1,8,17 226:1,6
226:9,25 227:1
228:7,16,17,22,25
229:10 230:6,25
231:5,8,9,12,20
233:6,17,24 234:6
234:11,13,22
235:2 236:2,20
237:4,15,25 238:7
238:22,24 239:3
240:1,6,8 245:24
254:4,5,18 268:9
270:20 279:24
280:3,24 288:6,15
289:20
**board's** 225:22
231:16 232:5
**boards** 43:2 79:1
80:5,8,12,13,13,14
84:25 85:2,5
**bodies** 32:22
**body** 38:7,13
104:22 124:1

241:13 286:25
**book** 187:17
188:13,16,19
189:7,8,9,19 190:9
223:14,18 316:6,8
318:6,7
**bottom** 136:25
137:1 143:20
216:20 237:12
248:8,21 265:25
274:9 281:13
292:15 293:6
302:19 325:7,12
**bounced** 157:6
**brady** 51:21 145:6
169:20 173:18
283:20 287:17
**brady's** 145:5
**branch** 195:4,5
**brass** 49:1,15,16
67:1,2,9
**break** 77:4,14
141:14,17,18
150:24 152:10,22
166:23 208:10
257:25 271:19
310:21 311:12
324:21
**bribery** 36:2
**brief** 46:24
**briefly** 12:8
200:10 291:13
331:17
**bring** 201:24
**bringing** 221:9
**broad** 313:18
314:9,14
**broke** 190:7
**brown** 81:19,20
163:10,14,15

[budget - calendar]                                                                 Page 9

| | | | |
|---|---|---|---|
| **budget** 7:22 9:4 | 157:20 159:11,13 | 221:24 222:1,9,13 | 115:16 116:5 |
| 12:14,20 31:4,9,11 | 162:22 164:16 | 222:17,19 223:8 | 117:23 126:17 |
| 31:13 48:23 49:5 | 166:14 167:10 | 223:14,17,20,22 | 147:13,17,23 |
| 49:9 53:20 63:6,7 | 173:24 174:3 | 228:13 229:4,16 | 160:10 177:2,6,10 |
| 63:8,16,19,20,21 | 175:12,14,14,20 | 229:17 232:20 | 180:23 192:11 |
| 64:1,6 65:1,9,22 | 175:24 176:8,9,16 | 234:1,8 240:14,19 | 194:20 197:14 |
| 66:2,5,23 67:11,15 | 179:9,13,14,20,24 | 241:2,5,18 243:18 | 201:18 205:2,25 |
| 67:16,20 68:8 | 180:1,3,5,7,13,16 | 244:3,5,5,20 246:7 | 244:16 245:24 |
| 69:1,12,14,25 | 180:19 181:2,5,15 | 246:10 248:3,13 | 258:13 262:18 |
| 70:12,15,16,22 | 181:19,24 182:10 | 248:14,18,23 | 330:25 |
| 71:2,15,25 72:3 | 182:13,14,19 | 249:3,10,12,16,21 | **budish** 153:22 |
| 75:19 76:15 77:15 | 183:14,15,17 | 254:10,23,24 | 179:3 198:21 |
| 77:19 78:1,6,11 | 184:7,14,15,18,19 | 255:8,11 256:1 | 244:2 267:5 |
| 79:9 82:3 83:20 | 184:20 186:2,5,21 | 257:13,16,18,20 | **building** 4:14 |
| 85:14,22 89:12,13 | 186:25 187:1,2,3,8 | 258:9 265:4 | 64:18 66:1 |
| 89:14,16,22,23,24 | 187:16,19,23,24 | 269:12,14 279:18 | **buildings** 64:19 |
| 90:3,4,12,18,19,21 | 188:5,10,12,13,15 | 281:13 285:16,25 | 65:25 70:8,8 |
| 90:23 91:1,3 92:1 | 188:16,18,23 | 318:6,7,21 325:22 | **bullet** 235:4 |
| 92:7,13,18,20,24 | 189:1,6,7,8,9,19 | 326:2 330:5 | 287:19 288:5 |
| 93:2,14,17 94:2,16 | 190:9,11 191:13 | **budget's** 203:4 | 300:8 301:21 |
| 95:12 96:9 97:8 | 192:2,13,25 | **budgetary** 108:11 | 303:13 |
| 98:17 99:18,20,22 | 193:21 194:9,12 | **budgeted** 68:19 | **bunch** 240:15 |
| 100:5,8,13,16,19 | 194:16,17,19 | 202:22 203:7 | **burden** 43:1,7 |
| 100:21,23,24 | 195:23 196:7,9,10 | 209:22 223:21 | 170:11 |
| 101:1 107:5,8,11 | 196:16,20 197:2 | 254:11,13,14,18 | **burdens** 43:13 |
| 108:21 110:12,13 | 197:24,25 198:1,8 | 254:22 255:10 | **burling** 4:12 11:13 |
| 110:14,15,18,22 | 198:11,16,19,22 | 256:9,23 257:6 | **business** 65:20 |
| 111:6,25 114:13 | 198:25 199:5,8,11 | 307:4,9,12 310:6 | 136:4 145:19 |
| 114:15,19 115:18 | 199:12,20 200:1,5 | 310:10 | 146:18 215:22 |
| 115:19,19 116:4 | 201:4,14,18 | **budgeting** 29:23 | 317:15 |
| 116:20 117:1,3,3,5 | 202:12,12,13,15 | 69:11 99:16 115:4 | **buy** 61:24 148:23 |
| 117:7,10,12,13 | 202:22 203:8 | 115:9 118:13 | 148:24 |
| 118:1,7,19,21,24 | 206:1,3,7,15,16 | 126:25 154:23 | **buys** 74:5,18 |
| 119:3,12,13,17,25 | 207:3,4,7,23 208:1 | 155:1 187:16 | |
| 120:4,17,20,23 | 208:6,23 209:23 | 188:1 190:19 | **c** |
| 122:3 124:5 | 211:1 212:6,13,14 | 197:19 209:11 | **c** 135:7 150:6 |
| 125:12 126:1,15 | 213:1,12,13 215:2 | 249:9 255:16 | 337:1,1 |
| 126:23 128:12 | 215:8,15 216:19 | **budgets** 29:12,20 | **ca** 338:25 |
| 129:1 130:17 | 216:23 217:2 | 32:17,19,21,23 | **calculation** 220:13 |
| 140:4 149:3 | 219:7,16,18,24 | 97:9 100:23 | **calendar** 70:24 |
| 154:19 155:3,5,9 | 220:10 221:3,4,20 | 104:11 114:21 | 178:18 |

| | | | |
|---|---|---|---|
| call 55:1 274:18 287:14 316:7 | 339:3 340:3 | certification 339:1 | 197:13 221:21 |
| called 22:18,20 | caseload 111:1 | 340:1 | 222:17 223:18 |
| 46:19 49:1 64:11 | 177:14 | cetera 199:12,12 | 249:13 338:12 |
| 64:12 74:20 | cases 117:17 | 204:19 | 339:7 340:7,9 |
| 132:23 138:14 | cash 263:14,17,20 | cfs 112:1 209:19 | changing 70:23 |
| 181:4 262:25 | catch 232:13 | chain 30:24 266:1 | 184:6 |
| 263:10,14 281:16 | categories 80:12 | chair 120:14,18,18 | channels 137:21 |
| 291:14 305:15 | 238:23 248:18 | 120:21,22,25 | charge 66:11 70:6 |
| 320:6 321:14 | category 69:6 | 121:15,16 155:11 | 70:10 90:8,10 |
| calling 200:19,19 | 130:12 139:17 | 156:14 162:24 | 132:19 280:1,5,5 |
| campaign 231:22 | 173:25 237:8 | 163:1,3,13,18,22 | chart 250:1 |
| 232:3 237:20 | 253:16 | 163:24 194:23 | charter 39:2,2,6 |
| 239:19 240:9 | caused 336:6 | 200:5,10,12,14 | 179:11 246:1 |
| 288:8,13,14 | causes 131:5 | 204:20 231:23 | 247:12,23 266:22 |
| 327:25 328:13 | 307:14 310:13,18 | 232:3 276:6 | chat 214:22 |
| campaigns 327:10 | cc 143:17 283:18 | chair's 201:8 | check 47:14 49:23 |
| capability 146:23 | cc028 243:8 | chaired 200:4 | 141:15 |
| capacity 59:1 63:9 | ccbh 205:17 | chairman 274:20 | checks 49:19 |
| capital 65:24 | cease 32:4 | 275:17 276:4,19 | chief 24:7 88:16 |
| 68:22 69:3,7 | cellenc 144:17 | 277:5,24 278:10 | 129:8,11,14 |
| 182:9 188:22 | cells 161:6 | 281:23 282:10 | 130:11 193:19,22 |
| 248:3 | center 161:17 | 284:1,6 287:14 | 267:2 288:6 316:2 |
| caption 199:9,18 | centers 177:21 | chairperson 81:17 | child 104:13 105:6 |
| carbon 273:23 | central 64:12,15 | 81:21,23 82:2,5 | 106:6,8,17,22,24 |
| cardinal 4:3 11:19 | 65:23 66:10,13 | 204:15 | 107:14,23 108:6 |
| 12:11 21:23,25 | ceo 228:7,8,20,21 | challenged 172:4 | 108:17 109:17,22 |
| 22:1,3,5,7,11 | 279:23 280:23 | challenges 103:21 | 110:5,22 111:8,16 |
| care 22:8 161:7 | certain 85:1 | chance 218:5 | 111:24 116:12,20 |
| 162:6 173:13 | 124:12 155:21 | 243:13 247:4 | 125:4 209:16 |
| 332:9,16 333:19 | 163:6 166:18 | 265:20 279:19 | 263:3 |
| carefully 268:14 | 167:18 169:16 | 325:7 | children 65:12 |
| carfentanil 19:23 | 170:17 186:11 | change 42:16 | 104:11 107:23 |
| case 1:7,10 12:18 | 216:10 220:14 | 91:11 223:13,13 | 108:19 109:10,21 |
| 25:3,21 26:6 | 241:12 287:8 | 281:19 338:13,14 | 113:7 162:15 |
| 82:24 148:8 | 291:9 310:1,2 | 340:8 341:3 | 240:2 |
| 154:13 172:13 | 312:23 317:3,19 | changed 41:20,24 | children's 238:5 |
| 182:14 184:5 | 318:25 | 42:2 163:25 186:6 | choice 162:1,6 |
| 193:13 216:18,22 | certainly 141:17 | 186:16 223:16 | christina 150:9 |
| 314:1 330:3 335:1 | 166:4 | 257:17 | chronic 18:11 |
| 337:20 338:6 | certificate 340:11 | changes 95:13 | circle 103:25 |
| | | 172:18 173:24 | 152:24 |

[circling - commission] Page 11

circling 106:22
circulated 139:14
circumstance
194:5 198:3
circumstances
14:1 33:9 158:3
215:5 216:8 233:2
328:11 334:7
cities 122:13
177:21
citizen 34:16
citizens 123:17
city 2:13 153:14
153:18,19 226:24
337:5
civil 2:10 339:5
340:5
clarification 16:14
32:9 48:9 57:20
63:10 190:17
clarified 193:8
clarify 14:20
24:20 37:25 46:13
47:17 49:10 54:19
86:1 92:21 98:14
139:3 240:22
285:22 290:9
320:4 327:1,6
class 28:17,19
classes 29:19
classify 175:15
309:4
clauses 248:1
claw 148:9
clean 222:7
clear 171:8
clearly 20:14
327:17
clerk 56:22 82:19
82:20 89:6,8
129:20,21 130:7

150:11 188:9,10
188:10 199:18
262:8 286:6
287:14 320:10
clerk's 150:11
188:7,8 199:7
320:8
clerks 89:6 129:22
130:8 188:3
cleveland 1:23
2:13 3:16 5:8,21
6:10 11:5 28:6
29:3,11 71:11
302:25 303:11
337:5 338:2
client 21:23 335:1
clients 172:7
climaco 1:22
clinic 303:1,11
close 18:25,25
143:10 152:6
229:5,6 286:13
310:21
closest 156:24
cocaine 19:25
code 33:13 39:18
39:18,20 40:5,21
41:17 42:17 72:17
78:25 79:5 251:8
251:9,10,13,17,24
252:4,22 269:10
315:5,8,9,11 316:9
317:4,4
code's 316:12
codes 250:24
251:17
codified 39:13,15
39:17,21 40:5
79:12 96:22,25
97:4 187:6 245:25
314:24 315:1,1

coffee 203:19
271:15,17,20,23
cognizant 214:2
215:4,6 216:7
collaborate 231:4
collaborated
288:16
collaborates 231:8
collaboration
231:5,20
collaborative
289:12 290:4
291:4
colleagues 50:11
78:20 151:11
collect 172:19
322:5,8
collected 106:8
128:4,8 178:12,13
322:1 324:10
collecting 173:3
collection 128:17
collections 127:7
127:19 128:1
collectively 117:4
color 268:6
columbus 281:18
column 229:9,10
237:8,18 243:25
250:12,14 251:20
252:3,23
combat 97:16,25
98:11,21 103:16
105:3 268:10
269:15 270:3
271:10
combination
250:25
come 16:20 37:9
40:11 45:14 57:7
78:10,20 91:3

94:5 95:18 96:2
96:10 97:13,24
98:18 99:3,4,7,11
99:13,15,17 100:9
101:5,18 103:15
105:15,20 109:3
117:14 124:4,8
125:7 131:20,24
148:15 152:11
159:14 161:10,12
162:19 164:23
177:24 189:7
200:21 207:1
208:9 212:3 218:4
218:12,19 219:21
242:3 260:17
305:20
comes 54:11 56:18
87:22 90:17
159:15 182:20
188:7,8 245:2
273:9 323:13
comfortable
305:18
coming 85:3 97:21
105:11 118:3
123:5 162:5
183:19,21 184:4
195:10,11 218:10
251:4 323:8 326:9
326:12 332:6
333:18
commencing 2:13
337:5
comment 216:25
217:3,7
comments 204:18
commission 72:9
72:15,16,19,25
73:18 74:6,6,8,11
74:13,22 75:14,19

75:22,23 76:2,7
339:19 340:25
341:25
**commissioner**
31:24 72:8,14,19
72:25 73:2,16,17
75:2
**commissioners**
31:15,19,25 32:4,7
32:12,18 33:10,17
37:22 38:5,17,20
39:8,11 40:7
63:13,14 68:14,25
69:8 71:6 73:4
74:10 76:7,15
185:18,23
**commitment**
281:18
**committee** 9:8
81:14,16,18,21,24
82:2,7,9,13,24,24
82:25 83:1,2,7,14
84:4,5,6 89:7
108:4,9 119:24,25
120:4,6,9,11,13,15
120:16,18,19,24
121:2,17 129:24
129:25 130:20,22
131:2 138:9,10,13
138:25 154:24
155:7,11,18 156:2
156:3,18,21,23
157:2,5,8,12,19,22
158:5,8,9 160:8,9
160:16 161:13
162:11,14,18,20
162:25 163:2,4,13
163:17,19,23
164:7 187:21
193:3 197:17
199:14 200:2,14

200:16 201:13,14
201:19 202:3,8
207:2 208:25
209:1 211:6,7,18
211:21 213:7
214:5,8,16,19,20
214:23,23 215:20
215:22 216:4,23
218:23 219:5
229:3 255:16,17
255:19 272:7,12
272:13,18,23
273:7 275:21
276:10,12,24
277:7,9,12,15,19
278:24 281:14,25
282:8,11,14
284:10,22 285:4
286:2,7 287:2,6,12
287:15,23 288:7
289:3,11,14,24
290:12 304:12,15
323:8 333:17
**committeeman**
156:13
**committees** 89:9
129:25 130:1,24
154:21,25 155:4,8
156:9 157:9,15
160:2,7,19 162:11
163:25 164:5,11
214:6,12
**common** 123:7
301:24
**communicate**
94:11 229:15
319:7
**communicated**
327:20
**communicating**
203:24

**communication**
187:20
**communications**
85:14 187:12
228:15 290:15
313:12 330:8
**communities**
164:11
**community**
164:20,23,24
165:9,13,14,21
174:3 291:14,16
291:18 303:14,17
303:22 304:2
**companies** 6:5
330:13
**company** 22:2,6
22:15,17,20
**comparable** 39:19
**compared** 52:19
110:3 123:11
**compile** 211:15
**complaint** 21:2,6
335:22
**complete** 17:23
337:13
**completed** 338:15
**completely** 14:13
**comply** 315:14
316:4
**computer** 319:9
319:10
**concentrate** 29:15
**concentration**
29:14
**concept** 78:19
148:7 257:11
**concern** 170:10,16
170:17 171:2
326:8

**concerned** 60:9,15
123:4
**concerning** 13:20
**concerns** 171:14
**concluded** 336:25
**conclusion** 168:12
168:16
**conditions** 111:18
**conduct** 146:18
336:4
**conducted** 131:17
**conference** 15:21
16:20 153:11,12
**confident** 269:1
**confidential**
248:22
**confirm** 80:18,19
250:1
**confirmed** 86:7
**confirming** 85:1,7
**conflicting** 240:19
241:8
**confusing** 96:19
**congress** 125:16
**conjunction**
194:23
**connally** 52:6
135:7 144:18
174:24 294:17
295:10
**connected** 323:6
**connecting** 181:14
**connection** 324:14
325:21,23 326:2
**connolly** 4:4 11:19
12:10
**consequence**
191:4,6,10
**consequences**
189:17,18,24
190:8,12,17

**consider** 18:3
125:24 126:6,14
126:22 130:12
179:23 181:20
220:17 225:25
280:7
**consideration** 83:4
258:20 266:9
**considerations**
87:6
**considered** 78:20
83:11 189:10
194:21
**considering**
115:17 169:21,25
**consistency**
230:10 250:8
**consistent** 68:8
69:4 93:13 135:16
200:11 230:7
247:20 250:1
316:18
**constant** 69:15
**constantly** 70:23
**constituents**
291:10
**constituted** 37:23
**constitution**
125:17 179:12
**contact** 228:15
**contacted** 25:20
**contacts** 137:18
**contain** 179:15
196:17,25
**contains** 189:2
**contents** 90:8,11
90:13
**context** 305:24
331:1
**continue** 132:16
212:14 332:13

**continued** 4:1 5:1
6:1 8:1 9:1 10:1
192:22
**continuing** 69:15
**contract** 33:2,7
40:2,6,25 47:22,24
48:7 49:20 61:1
61:12 62:11,12,21
62:22 68:2 80:1
104:23 123:9
124:7,9 182:8
253:17 333:23
334:1,5,7
**contracted** 253:18
253:21
**contracting** 69:3
**contracts** 32:17
33:1,10 40:23
41:18,19,23 42:1,6
42:14,20 43:16,20
44:1,5,9,12,15
45:3,9,18 46:1,11
46:17 47:9,11,21
50:22,25 53:24
59:6,7,7,9,12,18
60:23 61:10,14,19
67:5 68:16,18,21
123:8 130:21
155:3 188:21
**contribute** 158:22
159:3
**contributed** 21:10
21:17
**contributions**
253:11
**control** 41:18,21
42:4 50:19,21
51:4,8,11,14,24
52:5,6,9,13,16,24
53:2,6,14,18 54:1
54:8,10,12 56:7

57:4,7,15 58:4,14
59:2,4,9,23 60:8
60:14,19,22 61:3,5
61:19 62:1 78:3
124:7,9 200:24
**conversation** 15:3
56:1 186:14 204:2
214:25 281:12
**conversations**
26:17 27:6,9 43:9
85:23 86:6,10,16
87:11,17 88:2
94:14 101:24
132:9 184:3
203:13,14 207:10
**converted** 319:2
**convey** 208:16
**conveyed** 278:10
283:11
**conveying** 57:11
283:21
**conwell** 82:6 163:2
163:3 169:24
174:8
**copies** 316:5,8
**copy** 146:1 209:8
317:24 318:5,8
321:17 324:9,13
337:18
**copying** 146:15
273:23
**corporation** 4:11
**correct** 12:15 14:7
14:11 16:22 22:8
24:10 33:20 38:8
40:14 55:8 74:25
77:16 78:12 79:17
80:21 83:17 94:21
96:3 106:1 112:8
116:10 138:20
145:7 147:4 153:1

157:17 167:11
178:9 199:20
200:7 219:12
222:13 223:10
229:5 230:15
237:6 238:19
239:14,15 240:5,6
240:10,11 254:11
254:12 256:7,20
266:12 267:10
269:21 272:13
280:22 283:16,24
286:18 292:6,7
293:20 299:11
301:18 312:4
318:15 322:24
**correcting** 235:17
**corrections** 338:12
340:17
**correctly** 232:12
232:14 235:10
248:5 269:5,6
274:25 281:20
293:1 332:23
**correlation** 113:3
**correspondence**
285:6
**corresponding**
277:14
**corruption** 36:7
**cost** 171:16 306:10
306:24
**costs** 103:21
106:25 109:16,22
113:4 124:1
197:18 307:1
309:1,7
**council** 8:5,9,17
12:14 15:25 16:3
16:10,25 17:5
32:20 37:9,23

38:10,18 39:1,7,14
39:22 40:6,12,13
40:18,22,24 41:3
41:12 42:19,25
43:6,8,10,15,25
44:4,24 45:5
47:21 49:24 50:2
50:8,12,15 51:7,11
51:13,21,23 52:4,5
52:11,12,14,16,20
52:23 53:1,5,6,7
53:13,20 54:3,4,7
54:16,17,24 55:7
55:11,13,17,18,20
55:21 56:1,6,15
57:3,13,14 58:7,10
58:13 59:1,2 60:7
60:14 68:13 69:4
77:20,21,25 78:1,3
78:17 79:14,25
80:5,15,23 81:3,10
81:14,14 82:20,20
82:21,21 83:3,5,8
83:8,12,19 84:7,16
84:25 85:4,6,15,23
86:6,12,18 87:1,12
87:18,23,23 88:3,9
88:21,22 90:15,17
90:22,23,25 91:2
91:16,25 92:8,11
92:16,19,25 93:12
94:6,7,10,12,15,20
96:2,10 97:2,7,13
98:19 99:2,6,8,10
100:10,12 101:5
101:14 103:16
104:8 105:12
106:24 107:15
108:2,5,16,25
109:2,18 110:7,13
110:21 111:25

112:5,19 114:3,9
115:17 116:16,22
117:5,5,11,15
118:4,20,25 119:2
119:5,10,17 120:8
120:11,17 121:2,2
121:19,23 125:8
125:22,23 126:16
126:20,25 128:16
129:10,17,20,21
129:25 130:8
134:7,8,18 135:8
135:17 141:4
142:24 143:4,7,8
143:13 144:5,10
144:18,23 145:6
145:10,12,18,19
145:20,23 146:12
146:18,22 150:3
153:10,14,18,22
154:18,22 155:19
155:22,24,24,25
156:2,3,7,13,16,17
156:18,19,20
157:3,4,23 158:6
158:21 159:3
160:3 162:12
163:12 164:17,24
165:10,23 166:6
166:10,12,24,25
167:6,9,12,16
168:23 169:13
170:7,17 171:6
173:18 174:24
175:1 176:10,11
176:12,15,17,19
177:2,5,12 178:23
179:2 183:8,9,20
184:1 186:5,19,19
186:24 187:4,12
187:23 189:18

193:20,24 194:21
194:22,25 195:2,3
195:7,23 196:6,12
198:8,10,15,22,24
199:1 200:15,19
200:22 202:4,24
203:9,25 204:3,6,9
204:11,11 205:3
206:1,5,14,23
207:15 208:5,16
209:11,12,15
210:15 211:7,17
212:3,5,10,18,23
212:25 213:3,11
214:12,12,20,21
214:24 215:11
218:7,25 219:4
220:7,16 222:19
222:24 223:10
226:25 227:2
229:3,9,14 230:2
230:14,24,24
231:16 232:20
233:1,23 234:4,19
234:21 236:19
238:1 239:22,25
240:18 241:3,4,7
241:11 242:5,10
242:15,20 243:6
243:20 244:15,19
245:5,18 246:9,24
247:6,18 248:1
249:15,24,25
250:7 254:21,23
255:7 257:4,10
258:10,12,14,19
258:22 259:2,5
260:20,21 261:12
261:20,23 262:5,6
264:5,15 265:2,18
266:3,4 267:9,10

267:15,17 272:8
272:17 279:16,16
281:8 285:18
286:1,2,6,11,23
287:17,24 289:3
289:15,24 290:16
290:19 291:1,9,17
292:11,20 294:7
294:12,16 295:10
296:4 303:10,22
304:1,6,7,8,19
305:1,7,7 307:4,8
307:12,18 308:2
308:10,16,19
310:17 312:4,11
312:23 313:2
314:22,24 315:15
315:19,21,22,24
315:25 317:10
321:5 323:4,7,7,11
323:11,18 325:13
325:21 326:1,6,9
327:21 328:4,12
328:17 329:1
330:6
**council's** 42:17
87:7 195:20
257:19 266:10
284:20 315:13
**councilman** 51:20
52:8 148:3 155:11
155:12,12 156:14
163:20,21 167:19
167:21,22 174:13
174:16,18 281:15
326:14 327:16
**councilwoman**
51:20 81:19,20
82:6 163:2,10,14
163:15 169:24
174:8,20,22

**[councilwoman - county]** Page 15

| | | | |
|---|---|---|---|
| 295:13,17 298:1,5 | 76:14,18 77:19 | 165:24 166:13 | 249:10,15,24 |
| 298:19 299:10,14 | 79:14,25 80:5,15 | 167:2,8 170:6 | 250:6 251:3 |
| 300:3 | 80:23 81:2,10,14 | 172:8 173:20 | 252:10,13,18 |
| **counsel** 11:6 15:11 | 82:17 85:5,6,15,23 | 174:9 175:7 176:4 | 253:22 254:21,23 |
| 24:16,17 130:3,18 | 86:18 87:22 88:3 | 176:12,15,16,17 | 254:23 255:7,10 |
| 132:6 142:8 | 88:21 90:15,17,22 | 176:19,22 178:3,6 | 256:23 258:10 |
| 191:22,23 226:18 | 90:22 91:25 92:11 | 178:12 179:9,11 | 259:5,18 260:2,8 |
| 236:6 243:4 | 92:15 96:10,13 | 179:12 180:6,7,18 | 260:15,21 262:5 |
| 273:19 289:10 | 97:2,6,7,13 98:19 | 180:19,21 181:1,2 | 264:5,8,18 265:2 |
| 290:2 299:8 311:8 | 99:2,6,8,10 100:10 | 181:8 183:14,17 | 266:3,4,22 267:2,5 |
| 337:20 | 100:11 101:5,14 | 184:13 185:9 | 267:9,9 272:8,11 |
| **counsel's** 151:21 | 103:15 104:8,13 | 186:19,20,23 | 272:17,20,25 |
| **count** 182:21 | 104:16 105:12,16 | 187:12,13 190:25 | 273:3 274:16 |
| **counts** 27:2 | 105:24 106:11,16 | 192:18,19,21 | 275:13 279:24 |
| 306:19 | 106:24 107:14,15 | 193:2,20,23 | 280:14,25 282:20 |
| **county** 1:9 3:3 8:5 | 108:1,5,16,25 | 194:21,22,24,25 | 282:24 283:14,24 |
| 8:9,10 9:7 11:9,11 | 109:2,19 110:7,7 | 195:2,3,7,8,10,11 | 284:5,20,21 |
| 12:14 13:16,17,21 | 110:13,21,23 | 195:19,22 197:18 | 285:17 286:1,11 |
| 15:22,24 16:3,4,9 | 111:25 112:5,17 | 197:20 198:8,9,10 | 287:24 288:18 |
| 16:16,23 17:5 | 112:19 114:3,9 | 198:14,20,25 | 289:10 290:2,25 |
| 21:3,7,11,18 23:19 | 116:24 118:8 | 199:11 203:24 | 291:17,19 292:11 |
| 27:24,25 29:11 | 119:9,17 121:2,19 | 204:9,11 205:16 | 293:19 295:24 |
| 31:2,3,6,9,15,19 | 123:14,17 124:2 | 205:17 208:18 | 296:7 299:15,23 |
| 31:22,24,25 32:3,7 | 124:14,19 125:7,9 | 209:12,24 210:5 | 299:25 302:3,4,9 |
| 32:8,20 33:3,11,25 | 125:18,25 126:9 | 212:10 216:11 | 303:9,21 304:1,8 |
| 34:3,7 35:7,9,22 | 126:16 128:8,11 | 217:4,9,14,18,19 | 304:11,15,19,20 |
| 36:6,11,19,25 37:2 | 128:21 131:6,12 | 221:25 224:20,20 | 305:1,3,7,8,22 |
| 37:9,22,23 38:5,10 | 131:18 132:11 | 224:22,24 226:10 | 306:11,17,25 |
| 38:17,18,19,25 | 134:7,8 136:4 | 227:2 229:1,3,9,14 | 307:4,8,12,18 |
| 39:7,8,11,13,18,22 | 138:18 142:24 | 230:18 231:4,23 | 308:2,4,9,12,16,19 |
| 40:5,6,18,21,24 | 145:18,20 146:2 | 232:4,9,19,23 | 308:22 309:7,12 |
| 41:3,12 42:16,17 | 146:18,21,24 | 233:23 234:4,19 | 309:12,19,24 |
| 42:19 43:8,10,15 | 147:6 149:17 | 234:21 238:1,7 | 310:5,7,9,14,17,18 |
| 43:25 44:4 47:7 | 153:6,17,21 154:2 | 240:17 241:7,10 | 312:4,10 313:1,2 |
| 48:14,18,18,20 | 154:12,18,22 | 242:10,15,16,20 | 313:11,13 314:19 |
| 49:24 50:2,7,12 | 155:18 157:23,24 | 242:21 243:5,6,19 | 314:21,22,24 |
| 51:7,10 53:6,20 | 158:4,6,14,21,23 | 243:20,20 244:2,6 | 315:4,12,19 316:9 |
| 55:11 58:6 60:7 | 159:2,4,10,20 | 244:14,15,19 | 316:12 317:4,10 |
| 63:13 64:13,15 | 160:3,25 162:12 | 246:14,19,22,23 | 318:11 321:5 |
| 65:3 68:25 69:4 | 162:13 164:13,17 | 246:24 247:9,11 | 323:4,7,7,11,18 |
| 70:20 71:6,21 | 164:18 165:11,16 | 247:16 248:1,2,13 | 326:1 327:10,11 |

327:11,21,23
328:4,5,16 329:1,2
330:6,7,25,25
331:13,21 333:11
334:16,25 335:3
335:11 336:7
339:10 340:15
**county's** 50:3
76:24 123:3
126:24 127:11,19
128:17 147:17
154:23 160:4,11
172:15 175:19
180:1 231:14
260:9 266:17
285:2 287:4
294:14 298:15,21
305:25 307:21
308:2,10,17
313:18 314:9,14
**countycouncil**
311:25 312:9
**couple** 70:8 80:4
100:22 133:19
154:17 227:6
265:21 267:8
279:20 329:7
**course** 28:14 29:7
29:24 70:6 145:12
196:20 221:21
317:15
**court** 1:1 2:11
13:11 15:1 123:7
142:1,2 236:6,8
339:7
**cov.com** 4:18
**covington** 4:12
11:13
**create** 91:21 95:12
95:14,15,22
194:16 242:4

317:17 332:24
**created** 41:17
194:19 231:21
252:22 266:22
321:16
**creates** 90:14
240:14 249:5
**creating** 90:8,11
118:24 148:7
183:13,15 184:14
184:20,23 186:3
**creation** 37:10
184:21 186:20
315:9
**credited** 280:15
**crimes** 36:14
**crisis** 97:20 98:12
98:25 99:25
100:13 101:7,15
102:2,7 106:4,18
107:2,17 109:19
125:9 269:4,16
288:18 306:10,16
306:24 307:22
308:3,11,18,23
309:2,7,25
**criteria** 53:13
87:12,18,21
**cross** 170:3 198:5
198:5
**crossed** 262:10
**crr** 2:9 337:4,24
**csr** 2:9 337:4,24
**culek** 150:6,7,8
**culture** 301:12
**current** 135:11
136:8,14 145:6
149:7 162:24
163:1,18 228:6
238:14 256:14,16
256:17

**currently** 32:20
39:14 48:14 83:11
319:15,19 333:10
**custodians** 64:16
**custody** 104:13,18
107:1,17,23
108:12,19 109:10
109:14,22 112:6
112:10,16,21
113:11,15 114:10
114:24 115:6,11
**cut** 201:9 268:25
**cuy** 9:15
**cuyah** 7:13,18,24
8:7,12,18,23 9:5
9:13,17,20 10:7,12
133:17 142:13
192:3 227:4
265:19 274:4
279:18 292:2
297:10 311:21
325:2
**cuyahoga** 1:9 3:3
8:9 9:7 10:4 11:9
11:10 12:14 13:17
13:21 15:21 16:4
21:3,7,10,18 23:18
29:11 31:1,3,14,19
31:23,25 32:3,7
34:7 42:17 53:20
76:18 77:19 96:13
97:6 109:19
112:17,19 116:24
118:8 123:3,14
124:2,14,19 125:9
125:25 126:8
128:21 131:6,12
131:18 132:11
136:3 138:18
147:6 153:17
154:2 157:22,24

158:4,13,23
159:10 162:13
164:13,18 165:11
165:16,24 166:13
167:2,7 173:20
174:9 185:9 195:1
195:2,3,8,10,11
205:16,17 208:18
209:24 210:5
216:11 217:4,9,14
217:19 224:19,20
224:22,24 227:2,3
229:1,3 231:14,23
232:4 238:7
242:16 243:6
248:2,13 249:10
253:22 259:18
260:8 264:8,17
272:20,25 273:3
274:16 275:13
279:24 280:14
282:24 283:14,24
284:5,20,21
291:19 293:19
294:14 295:23
296:6 299:15,23
299:25 302:3,4,8
304:11,15,19
305:1,2,8 306:11
306:17,24 307:12
307:18,20 308:4
308:12,21 309:7
309:12,18,24
310:7,13,18
311:19 313:18
314:9,14,19,21
327:23 328:5
329:1 330:6,7
334:16,25
**cuyahoga's** 121:21

cuyahogacounty
  312:8,8
cuyahogacounty...
  312:9 318:18
cuyahogacounty...
  311:25
cuyco 297:9
  298:12
cvs 335:8,24 336:5
cyberspace 325:17
cycle 191:13

**d**

d.c. 4:7
daily 112:24
dale 51:20 120:21
  121:10 283:17
  325:2
dan 1:8 51:21
  145:5 169:20
  283:20
data 108:12 332:7
date 11:1 13:1
  41:2 42:8 47:1
  52:15,22 61:1,12
  71:22 76:8 86:24
  100:20 107:3,4
  124:10 143:11
  164:2 168:5 270:1
  299:3 300:4 338:8
  339:3,9,19 340:3
  340:13,25 341:20
  341:25
dated 133:15
  142:12 191:25
  226:25 246:15
  265:17 274:10
  279:17 291:25
  297:8 298:11
  300:3 311:18
  325:3

dates 61:17,23
  99:13 150:20
  159:13 185:15
  193:3 199:3
  259:23 282:6
  331:20
dating 95:21
dave 121:8 144:22
  144:23
davegreenspan.c...
  144:22
david 292:24
  294:4
dawn 105:1
  124:15,18,19,22
  124:24 125:3
  138:9 139:22
day 2:14 5:5 11:14
  17:10 43:2 55:14
  113:2 211:11
  220:16 245:1
  246:1 247:13
  282:8 286:13,14
  296:23 337:6,22
  339:16 340:22
  341:22
daylong 302:25
days 15:20 56:19
  153:1,2,3 161:2
  245:6,9 247:1
  338:18
dcfs 112:22 113:4
  113:8 114:14,20
  177:14
dcfs's 110:14
dealt 335:24
dear 207:1 338:10
death 138:24
  294:18,24 295:7
  304:12,15

deaths 138:7
  273:10,13 278:23
  279:1 295:2
  301:23 302:15
decade 178:11
december 32:5
  191:25 243:9
  246:15
decently 77:22
decide 34:3 169:7
decided 33:25
  34:6 148:24
  335:11
decision 58:10
  261:22
decisions 58:5
  181:25
declined 128:21
  171:25
declining 178:14
decorum 200:18
decrease 172:7
  259:13
decreased 116:5
  172:4 178:11
dedicate 166:17
dedicated 187:6
deed 339:14
  340:20
deemed 338:19
deeper 255:14
defendant 4:3,11
  5:3
defendants 5:12
  6:3 11:23 12:11
defense 151:11
defer 127:14 333:6
define 26:24
  131:22 134:9
  197:5 272:21
  306:12

defines 252:7
definite 219:14
definitely 170:2
  216:1
definition 17:24
  20:25 306:19
definitively 52:10
degree 29:4,5
  164:19
delegated 282:10
  284:3
delegates 283:12
delete 318:12
  322:15 323:21
deleting 324:1
demands 172:5
denihan 228:19,20
  279:15,23 280:7
  280:13,23 281:8
  281:13,23 282:9
  283:11,21
denihan's 282:14
  283:10,22 284:2
dennis 266:15,16
  266:17
deny 271:23
department 28:12
  46:24 62:8,22
  64:25 65:4,20
  66:14 90:5,7,10
  93:24 103:20
  104:5,11,17 105:7
  106:6,14,23
  109:17 112:4,18
  113:16 114:8
  115:4,9 116:3,8
  118:8 119:23
  120:22 121:1
  125:5,18 132:17
  137:17,22 138:10
  138:25 148:12

156:15 166:18
176:7 177:15
178:21 179:1
181:25 182:2,5,15
183:4 185:1
186:12,12 189:19
190:8,20,25 191:2
191:8 200:25
201:3,21,22,22
202:21 203:6,8,23
204:4,21,25
206:16,22,23
207:1,17,19
208:14,17 209:10
209:18,20,21
210:13,19 211:16
212:2,9,17,18
215:16 218:6,11
218:17,22,23
219:2 229:15,24
230:11 240:20,25
249:2 250:15,15
252:8 255:25
256:9 258:11
259:17 260:7
262:17,22 263:3,7
264:6,16 269:1,23
270:16,21 271:9,9
271:12 299:23
321:4 338:22
**department's**
202:13 203:3
**departmental**
218:1,8,19
**departments**
32:24 63:24,25
64:2,4,21,25 65:17
66:11,12,24 67:3
67:10,16,21 69:16
92:5 97:13,23
98:18 103:15,22

104:7,9 105:10,16
105:20,21 106:3
114:12,16 117:23
118:14 125:6
147:13,17,23
148:5 157:13
175:16,17,25
176:14,22 177:4,7
177:10,12 182:7
183:18 184:23
186:8 193:4,6,9,11
200:9,20 201:12
201:17 202:11,18
202:19 204:10,21
205:11,14 206:15
207:14 210:2,3,5,9
211:13 218:4
220:14 230:8,19
250:13 255:6
257:5 321:6
**dependent**   106:13
**depending**   162:20
**deponent**   337:18
**deposed**   25:21,24
26:6
**deposition**   1:14
2:8 7:8 8:1 9:1
10:1 11:4 15:10
22:24 23:2 25:7
26:9,19,22 27:7,10
27:17 142:7
151:12 224:13
248:15 256:18
285:7 331:11
336:24 337:2,17
338:8,11 339:1,3
340:1,3
**depositions**   2:12
25:2
**deputy**   150:11

**describe**   27:19
29:8 34:11 46:21
126:3 128:14
156:10 198:15
213:22 249:19
255:5 285:18,20
**described**   62:14
83:18 84:1 97:25
98:6,25 148:1
237:14 240:14
303:24
**describes**   252:7
288:5 315:13
**describing**   115:14
116:11 167:1
238:5 257:12,18
**description**   7:9
8:2 9:2 10:2 46:24
147:15 259:13
**desktop**   319:11
**detail**   160:1
171:20 189:6
262:2 305:12
**detailed**   103:12
287:24
**details**   27:2 35:11
35:17,19 225:15
306:2 315:11
**determination**
88:4
**determine**   176:20
183:4 214:21
234:18 277:20
**determined**
116:22 279:6
**determines**   156:8
175:20 176:4,12
201:10
**determining**   74:4
74:13 75:13 118:6
157:7 183:16

**dettelbach**   10:4
311:19 313:17
314:4,13
**develop**   307:5,9,13
**developed**   303:14
303:23 304:3
**development**
93:24 117:12
**device**   146:24
**devoting**   161:21
**difference**   20:6,21
39:10,12 197:22
**differences**   37:21
38:16 83:15 198:4
**different**   22:1 39:3
39:21 40:9 48:10
70:8,18 84:20,21
84:23 93:21
105:19 121:14
132:15 146:9
161:6 162:5,23
164:5 165:3 166:2
167:4 183:18
222:11 239:10
252:16 256:24
318:23 319:1,4
328:15
**direct**   45:5 75:4
127:14 155:2
187:7 285:6
**directed**   45:5
**directly**   85:1
122:25 128:8,10
129:5,8,10 134:1
175:6 185:6 187:2
188:2 203:24
206:22 220:21
258:14 292:10
**director**   184:17,22
184:25 185:2,5,7
185:12,14,20

186:9,10 196:4
207:17 219:21
228:11
**directors** 92:5
103:20 104:6
125:18 137:17,22
138:11 177:16
185:9
**disagree** 261:12
261:14
**disappeared** 32:15
**disapproval** 170:7
170:9
**disapprove** 54:12
**disapproved**
247:11
**disapproves**
247:17
**disciplines** 28:23
28:25
**discretion** 201:11
**discuss** 27:13 56:5
206:17 213:11
215:21 241:8
256:18 282:17
283:12,22 284:3
**discussed** 51:5
78:2,25 121:23
122:2,6,17 130:16
155:9 157:10,23
158:1,5 160:9,14
160:16 162:12,15
164:12 165:19
166:21 167:12
168:24 169:12
170:19 173:23
174:11,13 175:3
182:7 216:10
220:16,19 242:11
242:16,21 273:3
276:18 277:21

288:15 290:17
293:15 304:17,23
304:24 305:5
307:24 330:17
**discusses** 167:7
176:8
**discussing** 61:10
148:19 167:25
170:7,9 174:5
249:5 256:22
269:11 273:8
**discussion** 56:20
169:1 171:2 172:6
241:13,14,15
283:6 288:4,9
289:12 290:18
332:5 333:17
**discussions** 29:12
117:18,20,21
131:20,25 132:2,4
132:9 171:5,6
183:20 208:23
213:3 241:16,17
289:23,25 290:10
291:10 331:5
**disorder** 236:24
**disorders** 235:8,22
236:17
**dissolve** 42:20,25
43:12
**dissolved** 42:3,7
42:14 43:7 44:2
**dissolving** 43:11
43:16
**distinct** 198:2
**distinction** 54:25
89:16 210:10,14
210:22 245:4
323:2
**distinguish** 103:8
107:19 113:10

210:6
**distinguished**
306:25
**distinguishes**
104:2
**distinguishing**
205:13
**distributed** 76:3
209:15 312:10
**distributes** 74:23
75:14
**distribution**
328:14
**distributions** 75:1
**distributor** 21:21
**district** 1:1,2 2:11
295:14
**diverge** 240:21
**division** 1:3 64:17
121:1 182:22
321:4
**divulge** 13:19
**docking** 319:12
**doctor** 19:15
30:10
**doctors** 232:10,24
233:8,15,18,24
234:6,16 235:4,6
235:11,18 236:3
300:10 301:9
**document** 1:8
46:19 91:11,22
95:22 133:7,12
139:14 140:14
141:6,13 142:6
150:25 167:11,25
168:8 174:5
179:22 188:19
191:20 194:9,14
209:14 221:13
223:3,15,25

226:16 227:7
229:7,8 234:19,21
237:14 239:2
242:2 243:2,5,8,13
243:17 252:12
262:3 265:12,22
267:12 273:17
279:11,13 282:1
284:16,17,20
287:11 288:15
296:20 299:11
303:24 311:8
315:18 316:2
317:17,23 318:2,9
318:9 324:20
**documented** 46:6
46:12,14
**documents** 23:1
26:13 94:12
201:13,18,19
209:8,9 210:15,22
241:24 314:20,23
316:17,25 317:4
317:11,14,24
318:17 320:1
321:10,11,12,20
321:25 322:5,9,11
322:13,15 323:21
323:22 324:1,2,9
324:12,14
**doing** 27:11 67:10
150:13,16,21
167:12 178:24
203:18 215:23
292:22 309:8
324:16 333:13
**dollar** 33:13,14
47:1 149:2 183:12
189:21
**dollars** 99:4,8
100:10 159:15

[dollars - emails]

Page 20

172:24 173:2
187:9 190:22,24
191:1,3
**downloaded**
284:19
**dozens** 79:10,11
**dr** 274:11,12,14
276:13,19 277:8
289:8,15 290:11
290:20 292:18,19
293:4,9,11 294:3,7
294:12 295:3
304:9
**draft** 77:24 78:23
79:8,19,21,24 81:7
91:4 96:6 147:16
179:9 244:8 287:9
**drafted** 78:15
82:18 96:21
148:20 244:5
**drafting** 78:13,15
79:3,4,13 80:1
83:24 89:11 90:1
96:11
**drafts** 90:3,6,9
**draw** 197:12
**draws** 197:17
**drive** 319:22 320:6
320:7,8,8,9,12,18
320:18,20,21,21
320:22,24 321:3,6
321:8,9,11,12,13
321:14,14,17,18
321:21,22 322:1,6
**drives** 321:7
**drug** 18:3 21:20
97:21 103:17
226:1,6,9 280:2
**drugs** 18:22 162:3
**due** 106:8,17
107:17 110:2

114:24 281:17
**duly** 12:3 337:8
**duplicative** 43:4
**duties** 125:25
129:12
**duty** 95:20

**e**

**e** 3:5 5:18 288:5
337:1,1
**earlier** 61:9 62:14
67:1 96:1 127:5
160:22 166:15
183:20 185:20
188:20 212:13
216:10 220:19
257:4 269:11
278:15 279:23
280:20 291:8
309:23 331:10
**earliest** 247:7
331:12
**early** 185:17
**earmarked** 68:16
**ease** 43:1,7,13
**easier** 15:5 20:8
268:5
**eastern** 1:3
**economic** 111:10
111:18 126:24
127:10
**ed** 192:19
**edits** 220:21
**educating** 235:6
235:13,20 236:5
236:12
**education** 30:2,7
30:14,17,20,23
75:7,15,21 237:19
**educational** 27:19
28:3

**effect** 169:4 247:7
**effective** 244:24
245:7,10 247:1
**effort** 35:1 303:1
332:24
**efforts** 9:16
137:19 282:19
283:13 284:4
297:9 298:13,16
298:21 304:18
306:13,15 323:22
323:24
**eight** 25:11,15
171:9,11 244:25
247:6
**eighth** 4:15
**either** 41:8 87:24
114:11 162:15
191:4 206:21
214:12 219:14
220:20 247:9
264:6 328:10
331:24
**elected** 35:8,9,22
36:11 38:21,22,22
38:23,25,25
192:23 205:24
216:11
**election** 71:1,1,3
**elections** 31:12
34:17 63:5,11
69:20,21,22 70:2,5
70:12,18,20,23
71:21 76:17
**electronic** 136:18
149:13,18 318:8
334:15
**electronically**
316:9 317:23
318:3,4 334:10

**ellen** 135:2,3,5,6,7
144:18
**ellis** 5:17 11:16
**email** 3:10,18 4:9
4:18 5:10,23 6:12
7:10,15,20 8:3,14
133:14,24 134:2
134:22 135:4
142:9,23 143:14
143:18 144:4,6,9
144:16,17,19,21
144:23 145:1,4,20
145:24 146:1,3,4,7
146:21,24 191:24
203:15 226:23
227:13,16,17,18
228:24 265:15,16
266:1,1,12,25
267:21 268:2,16
273:21 274:2,6,9
275:3,8 278:8
279:15 281:11
283:5,7,9,15,19
284:2,6 291:24
292:5,9,10,15
293:6 294:7,9,16
295:12,19 297:7
297:25 298:1,2,4,6
298:20 305:15
311:17,24 312:7
312:14 314:5,12
318:3,11,15,16,20
318:23 319:1,6
325:2,12 326:13
326:19,22 327:13
327:17,21 338:17
**emailed** 325:15
328:4,19,25
**emailing** 143:18
**emails** 8:20 9:3,11
9:14 10:3,9 56:12

56:15 145:19,23
146:12,17
**emphasis**  235:6,20
236:4,11
**employed**  111:24
194:24 195:1,8
299:25
**employee**  76:14
194:22 253:21,22
317:1
**employees**  35:8
36:19,25 37:2
183:6 225:25
226:5,8 228:16
253:4,7,13 315:13
315:19,24,25
**employment**
268:25 269:17
270:5,15
**enacted**  97:1,7
315:15
**enacting**  169:14
**enclosed**  338:11
**encumbrances**
49:19
**ended**  37:17 38:1
178:18 229:19
**endo**  6:3,4 11:23
**ends**  134:5 137:4
228:25 237:1
285:7
**enforced**  247:7
**enforcement**
30:21
**engineer**  64:13,15
**enhance**  238:14
**ensued**  288:9
289:13 290:1,11
**ensure**  126:7,20
134:18 146:5
250:8 317:4

321:20
**ensured**  94:9
**ensuring**  92:3,8,15
129:16 132:20
148:4
**entail**  65:18 66:25
67:19 92:2 117:21
137:16
**entailed**  137:13
331:18
**enter**  91:10
**entered**  33:3
331:24 333:2
340:9
**enters**  79:25
**entire**  25:12,14
31:5 81:13 82:16
199:16,17 280:5
339:5 340:5
**entities**  335:12,17
**entity**  308:17,20
**entry**  147:22
**epic**  333:5
**epidemic**  282:19
282:25 283:6,14
283:24 292:23
293:5,13 294:14
295:18,23 296:6
298:16,22 299:15
301:22 302:4,9
303:2 304:9
313:19 314:10,15
331:2
**epidemics**  284:5
**epidemiology**
30:18
**equal**  195:5
**equates**  250:23
**equivalent**  183:2
**errata**  338:13,18
340:7,10,18 341:1

**errors**  219:22,22
**et**  1:10 135:2
199:12,12 204:19
**evaluating**  87:13
87:19
**evaluation**  87:7
**event**  294:11
295:23 314:3,6
**events**  24:24
128:15 286:3
312:24
**eventually**  90:17
295:20,22
**everyone's**  211:11
**ex**  251:25 252:10
252:13
**exact**  13:1 22:15
41:2 42:8 58:15
71:9,22 76:8
81:22 99:13
100:20 107:3,4
111:6 124:10
132:13 137:15
138:21 143:11
151:12 164:4
173:7 185:15
225:4 228:6
272:14 285:3
315:11 322:11
331:20
**exactly**  28:19
61:24 225:15
**examination**  7:5,6
7:7 12:4 329:23
334:20
**examined**  337:9
**examiner**  105:7
125:5 138:7 140:6
273:6,9 274:13,14
277:14 278:25
279:5 289:9 290:1

292:17
**examiner's**  104:20
123:24 160:18
161:9 164:22
274:19 278:21
296:2
**examiners**  139:25
**example**  45:24
47:20 55:20 68:4
78:24 93:8 95:6
110:24 116:15
120:5 127:16
136:3 148:14,25
156:22 158:10
219:4 220:7,15
222:23 224:11
243:18 251:24
254:4 263:4,5
264:2 332:18,19
332:25
**examples**  79:7
85:11 105:4
116:19 165:12
166:10 256:8
**excel**  91:15
**exception**  292:9
**exceptions**  62:13
**exchanged**  241:24
**excuse**  15:20 51:3
60:5 73:16,20
133:13 149:7
164:12 169:2
170:10 180:2
192:1 204:9
206:11 209:7
213:17 218:14
221:23 228:17
231:2 232:5
254:17 287:16
307:13,18 312:8

**executed** 340:10
**execution** 339:14
  340:19
**executive** 15:24
  16:17,24 17:7
  38:25 80:20 82:17
  84:18,19,24 85:7
  86:4 88:10 93:1,5
  93:23 110:23
  115:15 153:6,15
  153:22 154:1,12
  176:16 177:2
  179:2,3 180:25
  181:3 183:17
  189:7 192:18,19
  192:21,23 193:2
  193:12 195:4
  196:18 198:9,10
  198:14,21,24
  206:2,7 222:20
  243:21 244:2,6,14
  246:14,19,23
  247:9,11,17
  252:10,11,14,17
  252:18 254:24
  255:10 267:6
  289:10 290:2
  313:12,13,14
  328:15,16,16,18
**executive's** 90:6
  92:12 110:17
  118:7 180:6,7,19
  180:20,21 181:1,4
  181:19 183:14
  184:13 186:20
  187:8,13 195:22
  198:7 221:25
  246:22 267:2
  313:3
**executives** 176:19

**exercise** 309:9
**exhaustive** 85:9
**exhibit** 7:10,15,20
  8:3,9,14,20 9:3,7
  9:11,14 10:3,9
  133:9,14 141:7
  142:3,7 191:17,21
  226:13,17 227:13
  242:23 243:3,18
  265:8,12 273:14
  273:18 279:8,14
  282:2,4 284:12
  285:14 288:21
  291:21,24 293:6
  296:17,21 311:4,8
  312:7 324:17,21
  325:1
**exhibits** 7:8 8:1
  9:1 10:1 331:12
**exist** 32:1,4,14
  33:18 62:13 80:5
  85:5 131:6
**existed** 38:17 51:1
  286:11 290:24
**existence** 15:18,19
  37:16 216:14
  286:12
**existing** 167:14
  170:14
**exists** 38:18 61:21
  286:7
**exit** 331:25
**expansion** 238:16
**expect** 175:3 192:8
**expectations**
  204:16
**expected** 27:14
**expend** 310:5
**expending** 68:3
**expenditures**
  68:24

**expenses** 70:25
  188:22 197:1,10
  225:23 248:16
  252:25 253:20,23
  254:15,19 263:8
  307:21 308:3,10
  308:17
**experience** 103:6
  164:15 186:2
  203:5 285:16
**experienced**
  178:12
**experiencing**
  106:3 302:9
**expert** 233:8,15
  243:12 280:8
  297:3 332:19
**experts** 164:21
  226:1
**expiration** 247:10
  339:19 340:25
  341:25
**explain** 110:21
  241:1
**explains** 315:20
**explanation**
  111:15
**expressed** 43:10
  170:7
**extent** 240:21
**external** 127:10
  228:11
**extra** 183:5 203:2
**eye** 127:6,18,23
**eyeballing** 95:24

**f**

**f** 5:3,15 337:1
**face** 282:20
**facebook** 323:5,7
**faces** 110:7 165:11
  165:24 167:2

  226:10 304:21
**facing** 282:24
**fact** 47:8 211:20
  227:17
**factors** 21:9,17
  127:10 158:22
  159:3
**facts** 300:7 335:10
**fair** 14:24 156:25
  190:15 222:6
  281:2
**fairly** 79:10
  277:13
**fall** 92:18 99:21
  100:1,6,7,13,18,25
  101:2,4,10 114:22
  115:3,8 124:4
  130:12 159:12,13
  166:15 173:25
  184:21,25 202:18
  202:20 203:3
  219:19 253:9,16
  253:19,22 262:19
**falls** 190:23
**familiar** 49:2
  73:21 149:20
  172:10,12 192:9
  194:14 205:19,20
**familiarize** 227:8
  243:14
**family** 65:13
  104:12 105:6
  106:22,24 107:15
  108:6,17 109:17
  109:23 110:5,22
  111:9,16,24
  116:12,20 125:4
  151:23 162:16
  209:16 263:4
  268:25 269:17
  270:6,15

**[famis - forecasts]** Page 23

**famis** 48:13,15,17
48:24 49:7,14,17
49:18,21,25 50:13
**far** 80:9 123:3
146:21 240:14
249:7 301:24
**fashion** 105:17,22
**fatigue** 171:3
**favor** 169:14,16,20
169:24 170:2
247:19
**february** 297:8
298:11 300:4,4
302:2,10
**federal** 2:10 35:13
35:14,21 37:3
171:25 172:2,18
216:9
**feedback** 242:5
**fellow** 130:6
**fentanyl** 19:20
98:6
**fewer** 79:16
**field** 280:8
**fifth** 300:9,19
301:2,5,8
**figure** 62:19,19
69:24 134:17
181:13 195:19
**file** 16:19,25 318:7
**filed** 16:11 17:6
21:3,6 153:1,8,17
153:24 154:13
**filing** 16:4 153:13
154:3
**final** 156:19,20
176:10,16,23,25
182:10 184:21
187:1 221:3,7,12
**finalized** 154:7
187:25 206:7

**finally** 133:6
287:11
**finance** 29:19
65:20 119:24
120:18,22 121:1,1
121:1,16 155:7,10
155:18 156:15,22
157:2,5,10,19,22
158:5,8 160:8
200:5,11 255:15
255:17,19
**finances** 29:9 70:7
70:11
**financial** 36:13
48:13 80:13
172:23 180:2
196:7,15 197:23
306:10,16,24
**financially** 106:10
**financing** 29:25
**find** 48:2,4 177:19
285:5 298:15
303:1 338:11
**fine** 73:9,12 77:6
143:2 152:15
163:9 235:16
239:12 271:17
288:25 290:10
**finish** 69:18
325:10
**finished** 117:15
**finite** 105:23 116:6
**firm** 12:10 23:9,16
**first** 12:3 25:20
31:19 86:21
121:16 122:7,9
133:23 137:4
142:22 198:9
199:4 202:18
227:12 229:8
231:21 250:12,25

251:24 252:6
258:16 273:19
287:9 297:15,24
299:2 301:20
310:2 327:2 337:8
**fiscal** 8:16 70:3,4
70:15 71:20 75:20
76:16 186:13
244:3 259:1,3,16
259:19 260:3,3,5
260:11 261:3,8,17
262:1,7,9,11,20
263:18 265:1,6,7
265:18 266:8,17
266:24 267:19
**fit** 184:25
**fitzgerald** 192:19
198:24 289:10
313:14
**five** 25:19 41:4
136:19,22 137:1
214:6,19 215:2
216:6 310:21
326:12
**fleming** 3:13 11:10
11:10
**floor** 3:7
**focus** 28:11 29:16
130:16,23 165:5
166:15 205:9
320:20
**focused** 29:23
117:22 130:16
160:23 164:17,20
165:7,18 166:7,12
168:9
**focuses** 130:19
**folder** 321:10,15
321:17,18,21
**folders** 319:25
320:3 321:18

**folks** 164:22
**follow** 8:5 9:4
127:25 137:5,13
139:11,12,19
141:5 151:21
201:5 207:16
208:11,12,13,15
209:13 211:2,4,10
211:12,24 212:7,7
212:11 213:7
224:10 227:2
229:23 231:15
236:25 240:15
274:23 275:3,6,7
275:18,21 276:5
276:14 277:5,17
277:21,22 279:18
280:16 317:6
**followed** 236:20
297:16
**following** 67:7
69:12 247:8
268:21 275:23
289:13
**follows** 12:3 248:4
255:7 263:19
323:18
**foot** 196:9,13
197:7
**footer** 248:22
**force** 111:17
138:18 231:5,8,14
231:20,24 232:4
289:12 290:3,22
291:1
**forced** 310:5
**forecast** 66:2
**forecasting** 64:1
65:16 66:17,20
**forecasts** 69:11

foregoing 337:2
337:12 339:13
340:18
forget 164:1
forgetting 128:14
form 32:1 33:18
33:21,25 34:9,14
38:21 39:8 40:8
105:17,22 166:8
201:23 216:12,13
286:16 297:14,16
318:24
formal 171:13
format 9:19
formed 37:8
forming 35:5
forth 117:18 180:1
forward 188:6
220:8 221:10
281:7 298:5
338:15
forwarded 298:20
298:23 299:1
forwarding 192:1
192:12 298:6
found 96:19
219:23
four 26:1 42:12
58:24 81:24
124:11 130:11,13
215:2 216:6
335:16
fourth 149:23
frame 26:2 34:15
58:15 71:8 81:22
101:3 111:6 113:7
114:20 121:4
132:13 140:1
201:3 211:14
295:25 319:18

free 58:5,10
339:14 340:20
frequently 44:16
119:10
fresh 211:11
friends 27:10,16
152:6 329:6
front 13:12 157:8
205:7
fruition 149:17
fte 182:21,23
183:2,5 205:4
ftes 183:1 190:22
191:9 204:25
253:4
fulfilled 203:20
full 54:9 82:21
83:3,8,12 120:11
123:11 183:2
241:13 267:9
function 318:12
functions 319:12
fund 47:6 66:11,17
68:15 75:21
106:11 117:25
123:21,21 148:10
173:5,13 177:4,21
177:22 178:8,10
196:22 225:13
250:18,19,22,22
250:23 251:1,3,5,8
251:9,11,16,18
252:3,12 253:13
254:5,6,9 256:5
260:9 263:20,23
268:8 269:3
funded 47:5
117:24 122:19,21
122:24 123:10
126:12 171:21
254:8 268:7

funding 47:2,3
61:1 68:13,15,16
93:19 102:3,6,6
103:1,3,7,12 104:2
104:6,7 105:12
110:6,8 112:4,20
114:9 115:5,10
116:2,3,12,13,23
119:6 121:20
122:7,10,13 123:4
123:25 124:13,15
125:8 136:24
166:17 171:18,24
172:3,3,8 174:3
177:7,11 178:7
179:4 187:5
188:21 189:4,20
190:10 209:17,20
210:4,10 217:3,8
217:13 218:5,7,13
234:14,25 235:1
237:22 238:1,6,11
239:23 241:1
251:4,19 252:4,8
256:5,7 258:12,19
258:24 259:9,17
260:6,12,16,20
261:15,21 262:5,6
262:17 270:22
271:8 288:8
289:21 307:5,9
309:24 330:24
333:14
funds 47:7 59:13
59:19,24 68:3,6
69:5 74:4,7 76:3
115:18 121:25
123:23 126:7
186:24 187:15
196:23 203:23
240:3,5 241:10

250:21 254:22
256:23 260:8
262:21 265:2
funnel 137:20
312:22
funneled 313:1
further 126:4
future 187:6,10
235:6,13,20 236:5
236:12,15
fwd 7:21 9:12,15
fyi 117:23 281:13
312:15 323:7
fyis 139:24

**g**

g 6:7
gallagher 148:3
163:20,21 167:21
167:23 174:14
274:20 275:17
276:5,7,13,19
277:5,25 278:10
281:15,23 282:10
284:1,6 287:14,16
game 73:20
games 73:20
garofoli 1:22
gates 5:6 7:7 11:14
11:14 334:21,23
336:3,9
gather 246:2
gathered 302:25
gauge 328:8
gears 150:25
175:10
general 17:25 18:1
28:13 47:5 48:13
49:18 56:16 66:17
70:19 83:16
106:11 148:10
159:22,23 173:5

173:13 196:21
219:13 225:3,6
227:6 251:8,9,10
256:5 257:16,20
260:9,22 263:23
275:22 276:1
298:15,21
**generally** 29:8,9
40:20 58:16
139:18 219:12
245:17 257:22
276:18
**generate** 269:2,23
**generic** 148:25
**generically** 251:25
**generously** 170:25
**getting** 45:25 71:3
71:12 96:21
132:20 138:8,9,12
139:4,23,25
150:18,20 162:2
182:13 186:8
203:2 204:10
215:3 236:8 296:1
313:9
**gf** 147:18
**gilson** 273:22
274:11,12,14
277:8 281:25
289:9,15 290:11
290:20 292:16,18
292:19 293:4,9,11
294:3,7,12 295:3
304:9
**give** 107:3 135:1
137:15 158:7
165:2 177:23,25
196:8 205:3
206:24 213:24
215:8 218:4
224:23 265:13

273:19 274:21
315:10
**given** 17:11 49:19
82:19 226:3
**gives** 175:15,25
**giving** 26:19 27:10
119:1 142:6 188:3
296:22
**gmail** 326:15
327:4
**go** 33:6 34:23 45:6
48:1,11 54:4 62:1
63:4 75:7,9 80:11
81:16 87:6 103:3
103:24 114:13
127:19 130:22
148:24 155:4
169:6 171:23
173:2 182:12,16
186:12 200:8
203:17 206:9,25
213:9 215:9
218:23 222:8,16
224:1 227:20
237:1 239:11
241:12 243:7
246:2 252:2,17
255:13 258:16
261:3 271:16,25
276:7 282:3
284:24 305:12
323:15 329:16,18
**goal** 75:20 332:11
**goals** 117:6
**goes** 74:19 75:5,14
90:15,23 120:4
156:21 186:3
188:14 199:7
206:2 223:1
255:14

**going** 15:2,5 16:18
16:19 24:20 25:24
26:6 31:16 43:12
55:21 62:12,23
63:4 67:2,23 68:1
68:2 72:5 77:4
83:15 93:15 95:9
95:9 110:10
112:14 113:6
117:16,18,19
119:2 132:12
133:6,12 141:24
148:6,23 149:1
151:4 153:24
154:3 156:14
157:8,10 168:19
170:10,18 175:10
178:23 183:25
187:21 191:20
192:5 195:15
197:9 205:9,23
213:24 214:10
215:2,17 216:5
218:13,17 219:11
226:16 227:5
233:18 243:2,11
249:4 251:7
252:13 260:16
265:11 273:17
274:23 275:3
277:17 288:23
296:25 297:4,7
**good** 12:6,7 35:24
71:3 142:1 152:13
152:13 178:24
292:4 294:20
295:12 329:25
**google** 285:4
**gotcha** 184:12
**gotten** 114:16

**governed** 33:12
**government** 28:15
28:17 29:10,12,17
29:19,22 32:2,7
33:18,21,25 34:10
34:14 35:5,15,21
37:8,12,16,17
38:21 39:9 40:8
79:11 118:9 125:7
126:9 127:11
134:17 171:25
176:22 177:4,11
178:4,8,10 183:18
185:17,19,20
194:24 195:2,4,6
195:10 216:13,14
224:20,24 250:13
251:3 252:14
264:7 274:16
288:17 296:6
318:24 319:2
**governor** 72:22,23
72:24 76:10
**governor's** 70:21
**grab** 258:1 271:17
271:20 329:14
**grabbing** 203:19
**graduate** 27:23
**graduated** 28:1,5
**grand** 13:12,23
**grant** 260:15,17
**grants** 122:14
260:1
**great** 93:25 111:18
**greenspan** 121:8,9
121:11 144:23
155:12 174:16
287:16 292:24
294:4,8,12,13
304:7

**greg** 2:9 337:3,24

**gross** 132:8,10
133:14,24 134:22
134:25 137:6,7,8
142:10 143:18
144:8 146:8
292:12,13,14

**group** 22:12 34:24
170:23 180:5,15
306:5 328:16

**groups** 215:11
225:14

**guess** 11:24 34:12
58:22 68:14 73:7
155:6 168:7 223:7
258:16 288:24

**guidance** 57:14,15
204:12

**guide** 181:25

**guys** 257:25
336:17

**h**

**h** 320:22 321:11
321:17,21

**half** 25:19,19 43:3
182:24

**hall** 294:19 295:11
295:18,23 296:9
296:11 299:14

**halls** 9:12 292:1,21
304:8

**hand** 191:20,21
226:16 243:2
273:17 296:20

**handful** 330:3

**handing** 142:8
279:11,13 284:15
284:17

**handle** 85:2

**handouts** 201:24

**happen** 190:20
198:18,18 205:10
205:11 213:6
230:4

**happened** 66:1
114:19 139:7
178:17 206:20,24
212:12 214:8
261:1 275:8
285:19 299:6
330:11 333:7

**happening** 191:5

**happens** 82:11
119:15 120:12
188:4,6,8 245:9
256:4

**happy** 285:5

**hard** 209:8 317:24
318:2,5 319:22
320:23 324:9,12
324:13

**harm** 309:12

**harper** 289:4,20

**head** 206:22,23
212:19 214:18
218:24 241:1

**headed** 219:2
252:24

**heading** 147:11
250:15,17,19
251:2 300:7

**headings** 250:11

**headquarters**
15:22

**heads** 119:1
132:17 137:17
138:10 139:1
176:7 177:15
186:12 208:17
209:10 211:16
212:2,9,17 215:16

218:22 229:16,24
274:22

**health** 4:3 6:3
11:19 12:11 21:24
21:25 22:1,4,5,7
22:11 47:6 80:13
102:10,22 106:11
108:8 122:20,21
123:10 130:20
131:1 138:11
161:3,16,21 162:7
162:14,19,25
163:1,4,13 164:9
167:13,14 168:1,3
168:13,16,20,21
169:3,8,9,11
170:14,14,25
171:15 174:6
196:22 200:8
205:17,19 215:20
215:22 216:3
224:17 225:11,11
225:21 231:6,9,21
237:5 238:5 240:2
254:9 260:12
280:2,9 305:10,16
305:20,23,25
306:3,6 327:9
328:9

**healthcare** 334:10

**hear** 177:16
207:13 218:24,24

**heard** 17:18 20:4
21:23,25 22:3,17
22:20 49:1 103:20
104:10,16,20,25
106:7 108:6 233:1
300:19,22 304:11
304:13 305:10
314:13 321:6
330:17

**hearing** 7:22
82:12 83:6,13
99:18,20,25
100:16 107:5,8,11
192:2,13 193:1,22
194:12,16,19
203:25 204:6,14
207:3,3 208:2
214:13 215:14
217:12 221:22
229:4,16,17
232:20 240:13,20
250:9 272:24

**hearings** 81:9 84:8
100:1,13 101:2
110:14 117:4
119:3 162:22
187:21 200:5
206:15 207:4,7,20
208:1,6,6,24
210:16 211:1
212:2,22 213:10
213:13 240:15,25
241:5 257:13
272:19

**heavily** 130:16

**held** 15:21 31:20
45:13,17,21,25
153:6 165:10
166:6 272:19,24
282:8

**help** 18:7,23 19:15
77:25 79:2 80:1
97:16 98:21 99:5
99:9 100:11
118:24 135:24
172:9 175:18,21
176:1,13,21
181:25 268:9
299:18

**helped**  66:23 79:8
79:19,21 81:7
**helpful**  195:18
**helping**  77:24
**helps**  18:4
**henschel**  6:15
**hereinabove**
337:15
**heroin**  10:5 19:11
19:14 60:15 75:24
76:25 98:1 104:3
107:20 110:3
113:19,22 125:2
132:23 137:4,12
137:23 138:1,2,4
138:16,23 139:20
140:3,13,17,24
141:5 149:24
150:3,14 159:3,19
165:16 210:11,24
210:24 217:14,23
231:5,8,20,22
232:2 233:9,25
234:7,17 237:19
239:19 240:8
242:16 264:12,22
274:24 275:4,10
275:12,18,23
276:5,14 277:6,22
277:25 278:17,19
279:2 282:19,25
283:5,14,23 284:5
288:8,12,14
292:23 293:5,13
293:19,25 294:14
294:18,24 295:7
295:18,23 296:6
298:16,22 299:15
301:22 302:4,9,19
303:2,6,10,18,24
304:3,9 305:8

307:2 311:19
312:16,21 313:3
313:18 314:9,15
328:24 331:1
**hesitation**  145:15
**hey**  47:23 157:9
**hhs**  10:10 66:19
123:5,13,16,20
200:10 216:4
268:25 269:17
270:5,15 325:4,15
325:23 326:21
327:1,4,8,8,14,25
328:22
**hi**  325:13
**high**  27:24 28:1,4
35:20 84:9 192:6
**higher**  50:23
186:14
**highlight**  197:7,8
197:9,13
**highlights**  183:22
**hire**  67:23 136:24
182:12,15 204:25
**hiring**  182:16
**historical**  95:17,19
**historically**
178:17
**history**  334:12
**hit**  62:13
**hold**  54:13 214:4
239:6 251:7
317:19
**homes**  177:19
**hone**  74:16
**hook**  319:13
**hope**  221:6
**hospital**  80:17
105:1 161:3,16
332:6

**host**  276:13
**hosted**  291:9,17
295:17 296:5
299:14 304:8
**hostetler**  6:6
**hosting**  165:21
**hotmail**  144:4,10
**hotmail.com**
143:24
**hour**  43:3
**hours**  25:11,16,19
146:5 182:22,23
**hr**  81:16,17,21,24
82:2,7,12,24,25
83:2,14 84:4 89:6
**hugh**  273:23
274:11,15 282:1
**huh**  200:3 243:16
**human**  47:6
106:11 108:8
122:20,21 123:10
130:20 131:1
162:14,19,25
163:1,4,13 164:9
167:14 169:9
170:14,15 171:1
196:22 200:8
215:20,22 216:3
254:9 260:13
305:10,16,20,23
306:1,3,7 327:9
328:9
**hundred**  18:13,16
323:12
**hundreds**  79:11
**hydrocodone**  19:9

**i**

**idea**  78:19 148:2
148:11 149:2
178:24 294:20
295:6,12 332:21

332:22
**ideas**  77:24 78:23
96:3,7
**identification**
133:10 142:4
191:18 226:14
242:24 265:9
273:15 279:9
284:13 291:22
296:18 311:5
324:18
**identified**  12:18
158:21 159:3
**identify**  11:6
103:2 335:23
**identifying**  196:25
307:9,14
**illegal**  20:17,22
210:7,23
**immediately**  121:6
244:24 247:7
**impact**  106:10
127:10 132:23
137:4,12,23 138:1
138:4 139:20
140:3,13,17,24
141:5 149:24
150:3,14 172:23
270:5 306:16
**impacted**  105:17
105:22 106:15
**impacts**  106:2,12
138:24
**implement**  33:25
96:6,6 149:17
304:2
**implemented**
48:18,20 240:8
**importance**
282:18 283:12,23
284:4

**important**  179:14
179:23
**improvement**
248:3
**inability**  122:2
**inaccurately**
287:23
**inappropriate**
177:3
**inappropriately**
177:3 335:25
**include**  67:23
73:19 91:25
104:11 138:6
146:2,3,20 177:10
196:21 203:20
204:19 240:4
253:6,11,12,13,14
267:8 293:24
**included**  61:13
108:13 118:1
138:5 187:8
266:11 267:14
278:19 338:13
**includes**  82:16
92:3 102:12
227:17
**including**  126:16
220:2 259:20
312:23
**incorporate**
249:12
**incorporated**
220:23 340:12
**incorrect**  168:7
**incorrectly**  131:24
**increase**  99:6,10
99:24 100:12
101:6 104:23
105:19 107:16
108:15,18 109:9

110:2,24 111:25
112:20 115:5,11
117:8 123:25
169:7 172:6 205:1
205:4 234:11
294:18,25 295:4,8
328:10
**increased**  97:14
98:19 103:21
104:22 106:25
109:18,22 110:14
110:25 111:4
113:4 114:23
115:15,16 122:17
178:19 197:18
307:21 308:3,11
308:18 309:24
**increases**  114:10
197:1 220:12
**increasing**  106:25
110:21 112:25
114:11 136:24
171:14 273:12
**index**  7:1 251:20
251:23,24 252:4
252:13,22 269:10
**indicate**  261:25
262:8
**indicated**  286:6
**indicates**  234:5
237:3 295:19
**indicating**  338:13
**indirectly**  155:6
**individual**  62:8
82:17 86:20,25
104:9 132:6 180:5
180:15 191:3
203:3 218:21
230:11 275:21
306:5 320:23
333:2

**individual's**  130:4
130:25 273:25
**individually**
213:14
**individuals**  20:11
34:25 35:12
107:18 142:10
143:3 182:23,24
225:11 292:1,8
306:6 328:17
**inform**  106:24
112:19 126:24
153:16 203:9
**informal**  138:10
138:13,25
**information**  45:21
45:22 48:2,5,6
92:4,6,9,16 102:1
102:4 107:18
108:2,6 109:25
114:2 126:17
127:15 132:19,21
137:20 138:5,23
138:25 150:18
158:11,12 179:15
179:24 186:4
189:2 196:18,25
204:5,13,19,22
206:12,14 234:23
266:8 280:13,24
281:5,7 293:18,22
299:8 312:22
333:1
**informational**
118:2 183:23
**informed**  107:15
109:17 126:21
153:7
**initial**  197:25
201:2,8

**initially**  176:6
**initiated**  34:18,21
108:20 301:22
302:15
**initiative**  35:2
117:25 123:19
138:16 149:21
312:16,21 313:3
**inmate**  114:10
332:14,15
**inmate's**  334:12
**inmates**  104:17,19
112:5,10,16,21
113:1,5,10,15
114:24 115:6,11
162:5 331:22,24
332:8 333:11
334:16
**input**  117:12
**instance**  54:21
75:6 197:16 198:9
198:20 204:24
209:21 217:2
246:8 250:25
251:6 256:23
259:11 260:24
263:8,23 264:4,14
318:1 328:25
335:23
**instances**  162:16
198:13 205:2
255:24 259:12
260:19 261:7,10
271:8
**institutions**  302:24
**instruct**  151:5
**instructed**  13:24
58:7 256:18
**instructing**  151:17
152:1

**instruction** 151:7
**instructs** 15:13
**intend** 13:18
  212:16
**intended** 38:3 77:5
  147:18
**intention** 148:18
**interact** 207:19,22
  208:5
**interaction** 207:24
  208:3
**interactions**
  156:24 208:8
  330:16,18
**interest** 58:6,11
  292:22 328:9
**interested** 148:4
  165:1 337:19
**interface** 92:11
  207:25
**interim** 241:7
**intern** 31:14 63:5
  63:11,12 71:6,7
  76:14
**internal** 66:10
**internship** 31:18
  71:8,11
**interpret** 249:1
**interpretation**
  270:13
**interrogatories**
  337:9
**interrupt** 15:5
**introduce** 244:14
**introduced** 89:14
  90:22 116:18,21
  117:1,19
**introducing**
  244:12
**introduction**
  117:17

**investigate** 310:13
**investigated** 36:7
  36:13 308:21,24
  310:17
**investigating**
  35:15,21 307:14
**investigation** 13:9
  35:13 36:13 37:4
  216:10 256:14,17
  256:21 309:5
**invite** 274:22
**invited** 16:1 282:1
**involve** 36:2
**involved** 35:12
  70:11 117:16
  119:17,21 122:11
  186:19 278:22
  333:15
**involvement**
  118:22 331:13
**involving** 98:1
  275:12
**ish** 71:18
**issue** 35:5 97:9,10
  97:16,17,21,25,25
  98:5,6,21,24
  103:17,23 104:8
  104:15 105:3,13
  106:9 112:25
  114:19,23 116:24
  122:4 132:17,23
  138:8 146:25
  157:23 160:14,22
  161:8 165:11
  166:18 215:23,24
  256:14 274:24
  275:4,10,12,18,23
  276:5,14 277:6,22
  277:25 278:17,19
**issued** 49:19

**issues** 18:5,6,23
  19:15 29:10 35:7
  35:9 36:19,25
  37:3 103:21
  107:24 110:6
  119:13 121:22
  124:2 131:6
  132:21 172:20
  174:12 225:12
  226:9 229:16
  264:7,17 271:10
  272:24 273:2,8
  276:2 278:19
  291:10,18 304:20
  322:17 326:8
  327:22 330:24
**item** 45:19,21,25
  46:2,17,22,25 47:9
  47:11,13 54:11,13
  54:22 55:5,6
  57:16 60:8,15,20
  61:25 62:4 83:3,4
  83:9 150:23
  188:12,15,23
  197:10 199:6,8
  205:6 219:17,20
  220:21 223:2
  234:5,9,10,12
  240:4 254:4
  261:19 262:7
  268:6 289:5,16
**items** 8:16 45:13
  45:16 47:5 51:5
  55:17,23 56:2
  57:3 59:13,19,23
  157:11,16 191:3
  197:8 210:1
  248:16 265:18
  266:8 320:10
**iteration** 272:18

## j

**j** 137:6,7
**jail** 104:18 112:14
  136:18 149:14,18
  160:17,20,21,24
  160:25 161:2,15
  161:20 162:7
  209:18 331:14,21
  331:24 332:6,10
  332:12,16 333:8
  333:11 334:10,11
  334:16
**jan** 273:23
**jan's** 274:1
**jane** 86:4,7
**janssen** 5:12,13,14
  5:15,15 11:17
  330:2
**january** 1:17 2:14
  7:2 8:14,15 11:2
  33:22 37:15 46:16
  265:17 269:14
  337:6,23 338:4
**jeanne** 266:1
**joanne** 132:8
  133:14 137:8
  142:10 144:13
**joanne's** 146:14
**job** 76:17 145:24
  157:19 319:15
**jobs** 31:8
**joe** 129:11 194:8,8
**jog** 190:13
**johnson** 5:12,12
  11:17,17 330:2,2
**jones** 5:5 11:14
**jonesday.com**
  5:10
**jordan** 267:2
**joseph** 24:7 129:9
  133:15 193:18

**journal** 243:8
**judge** 1:8
**judges** 205:24
**judicial** 195:5
**jules** 4:13 11:12,12
**julian** 143:8,24
  144:9,10
**jumps** 297:18
**jurisdiction** 160:3
  160:10,14 214:23
**jury** 13:12,23
**justice** 160:15
  161:13 162:10
  163:19,22 164:6
  164:10 272:8,12
  273:7
**justin** 5:18 11:16
  330:1
**justin.rice** 5:23

**k**

**k** 5:3,14,15 268:6
**kahlil** 133:15
**kasich** 72:23,24
**kasich's** 76:10
**keenan** 185:3,4,7
  196:5 265:17
  266:15,20 267:1
  267:21 268:24
**keenan's** 268:17
  268:22
**keep** 64:18 93:11
  95:20,24 116:8
  127:6,18,22
  128:18 137:19
  204:17 318:8
  321:19 322:24
**keeping** 78:1
  91:25 92:19,25
  200:22
**keeps** 74:23
  320:10

**ken** 11:22
**kennedy** 266:15
  266:16,17 267:1
  267:21
**kennedy's** 268:17
**kenneth** 6:7
**kept** 317:5
**kids** 104:12 107:1
  107:16 108:12
  109:13
**kin** 337:20
**kind** 18:6 29:9
  39:19 45:12 46:13
  65:23,25 66:6
  78:14,24 101:25
  119:1 129:14
  132:16,20 135:21
  143:20 149:11
  157:7,12 160:23
  164:4,5 172:25
  183:22 192:7
  195:18 196:8
  204:16 229:14
  251:25 280:14
  285:22 294:19
  323:3 328:14,16
**kinds** 86:16 94:14
  101:12 201:19
**king** 130:5
**knew** 24:24 47:21
  290:24
**know** 14:7,20 15:1
  16:1,9 17:2,4,9
  18:9 19:5,6,8,10
  19:13,14,17,22,24
  20:1,3,6,19,21,24
  21:20 22:6,9,14
  23:12,12,18,20
  25:22 27:1 32:6
  33:14,16 34:9
  35:1,10,14 36:4,6

36:9,11,16 37:2,6
40:15,24 41:8
42:6,10,19 43:6,21
47:8,13,15 49:24
51:10 52:8,12,15
52:22 59:21 60:2
60:11,17,21 62:16
62:20 63:1 66:1,7
67:21,24 70:19
71:20 73:21,25
75:12 76:1,5,9
78:21 81:5,18,21
81:25 82:1 87:1,4
87:6,10 88:9,11,13
88:16,17,18 90:3,9
93:4 98:8 100:15
101:15,17,18
102:13 104:1,4
106:16,20 107:4,7
107:10,13,21,22
107:22,25 108:1,3
109:11 110:4
111:13,21,23
112:12 113:14,18
113:20,23 114:1,7
115:1,7,12 118:3
123:1 124:18,23
129:17 130:15
131:8,10,21
132:13 135:2,5,20
137:12,25 138:17
138:19,21 139:3
139:12,19,21,21
139:23,23 140:1
141:2,8,9 144:7,13
145:4,13 147:21
148:2 149:16
150:16 151:10,13
152:4,8 153:10,11
153:25 154:9,12
154:15 156:7,10

158:9,18,20,24,25
159:5,24,24
160:21 161:1,18
161:19,20 162:9
163:5,5,12 165:1
165:14,17,18,20
167:10,22 169:16
169:21 170:16
171:1,20 172:2,3
173:4 176:3 177:8
177:24 178:16
179:7,10 180:22
181:10,12,15,22
182:20 183:9,21
183:21,24 184:1,4
184:6,12,19 185:6
185:8,11,14
186:15,18,22,23
187:9 188:4
189:12 190:22
191:6 192:7,16,24
194:4,5,7 197:4,15
197:21 198:4,6,18
198:23 199:3
200:14 203:19,22
204:1,8,17 205:4
206:4,16,18,20
207:15,21 208:19
210:8,9,12,18
211:8 213:8,10,14
214:6 215:7,8
216:1,4,22 217:5,6
217:10,11,15,20
217:22,24 218:2
218:11,22 219:3
219:18,23,24
220:5 222:3
223:17,21 224:2,3
225:9,19,20 226:3
226:5,7,12 228:2,6
229:21 230:23

231:1,12,18,19
232:2,18,22 233:4
233:20,22,22
234:24,25 235:1
236:1,13,14,15,18
236:19 237:13,15
237:25 238:3,24
239:1,22,24 240:7
242:8,12,13,17,18
242:22 244:10
245:23 246:11,18
247:3 249:7,14
250:10,19,21
251:13,21 252:6
253:15,20 254:6,7
254:16,20 257:9
257:10 259:15,23
260:10,14,18
261:2,7,9 262:3
263:15 264:9,11
264:13,19,21,23
265:21 266:20
269:7,7 270:24
271:13 272:17
273:1,2,25 274:1
274:15,17 275:5,9
275:15,17,20,22
276:1,4,16,17
277:16,23 278:2,5
278:7,9,12,18
280:11 281:22
282:13 283:2
285:15 286:13,19
288:2,20,21
289:18,22 290:22
290:25 291:3,4,6
291:16 293:3,8,11
294:2,6,10,15,17
294:23 295:2,9,17
295:20,22 296:1,8
296:10 297:2

298:8,19,25 299:2
299:6,10,12,19
301:4,7,17,19
302:6,12,14,17
303:5,9,12,21,25
304:1,5,7,10 305:4
305:9,17,24 306:3
306:8,18 307:7,8
307:11,16 308:9
308:14,16,19
309:4,21 310:4,15
310:16,19 312:19
313:4,5 314:11,21
316:21 317:2
318:3,6,9 319:18
319:21 320:9,16
321:5,7,25 322:2,4
322:7,8,11,14,16
323:10,17,19,24
324:8,11,11
325:11 326:16
328:11 330:13,15
330:22 331:22
333:12 334:3,4,13
335:13,14,15
336:2,8
**knowing** 155:21
**knowledge** 16:23
38:15 51:23 54:25
60:20 75:25 76:4
114:6 127:15
157:25 222:16
225:18 250:7
251:2 277:24
308:1 317:7,8
322:12 333:7
335:10,19
**known** 175:7
**knows** 152:3
**kprabucki** 6:12

**kurt** 6:15

**l**

**l.p.** 1:10
**label** 142:12
284:18 311:8
**labeled** 7:12,18,23
8:7,11,18,22 9:5
9:13,16,20 10:7,11
133:17 142:7
192:2 227:3
265:19 274:4
278:16 292:1
297:10 311:21
324:21 325:1,1
**labels** 9:10 297:17
**laena** 4:13 11:12
**laid** 34:19 247:22
**lakeside** 5:7
**language** 278:5,7
278:10 322:12
**laptop** 319:11,12
319:14,23
**laptops** 319:19
**large** 111:17
142:10 306:22
**larger** 205:1
240:17 318:5
**late** 236:8 296:22
300:8 301:8
**lately** 200:10
**laura** 191:25
192:13,16
**law** 12:9 23:8,16
30:3,21 126:18
149:4,5 172:18
189:11 213:17,17
213:20,23 214:10
240:16 249:18
316:7,13,19,25
**lawn** 253:18

**laws** 125:16 316:3
317:6
**lawsuit** 12:12
15:18,20,23 16:4
16:10,19,25 17:5
17:14 21:3 23:19
26:14 106:18
152:25 153:7,13
153:16,23 154:3,6
154:13 323:23
324:4,15
**lawyer** 23:3,5,14
30:5 134:24
**lawyers** 24:3,18
24:21 25:6,6,10,13
25:16 26:8,18,23
**lay** 103:11
**layman's** 39:17
244:11
**lead** 135:20
136:15 166:11
269:16
**leading** 153:12
302:24
**leads** 233:9,25
234:7,16
**learn** 15:17 147:1
218:17 309:11,18
**learned** 15:19
25:24 28:19
152:25 153:5
204:5
**leave** 129:15 194:6
**leaves** 219:9
**led** 35:1 300:10
301:9
**ledger** 48:13 49:18
**left** 132:7 143:10
143:16
**legal** 17:23 20:24
33:13 213:24

[legal - long]

338:1 341:1
**legally** 20:10
　224:23
**legislation** 40:1,2
　77:24 78:13,14
　79:3,5,8 82:18
　96:6,12,21 135:11
　135:13,17,19
　136:4,7,15 147:12
　147:16,22,25
　148:3,8,11,22
　168:25 176:17
　188:17,18 199:9
　244:12 257:3,5,7
　334:1
**legislative** 12:13
　12:20 29:25 31:4
　31:9,11 38:7,13
　48:23 49:5,8
　53:19 63:6 69:25
　71:25 72:2 77:15
　77:19 78:6 79:9
　82:3 83:20 85:13
　85:21 92:18 93:17
　95:11 96:9 125:11
　126:1,15,23
　128:12 129:1
　140:4 157:19
　164:15 167:9
　186:2 194:17
　207:6 217:1
　228:13 241:18
　246:7 257:16
　285:16,25 318:21
　325:22 326:2
　330:5 333:22,24
**legislature** 75:18
**length** 71:9
**lengthy** 158:16,17
　159:7

**letter** 203:15
　320:9,14 337:18
　338:19
**letters** 251:1 252:7
**level** 27:21 35:20
　56:16 68:19,24
　69:2,6 81:6 84:9
　116:4,14 159:22
　175:11 186:9,14
　192:7 196:13
　197:8 225:6
**levels** 67:4 175:17
　175:20 176:1,5,13
　176:21,24
**levies** 167:15
　169:10 170:15
**levine** 131:3
**levy** 47:6 66:19
　106:12 122:20,22
　123:5,10,13,16,20
　167:13 168:1,13
　168:17,20,22
　169:4,12,14 170:8
　170:10,12,18,24
　171:1,16 174:6
　196:22 254:9
　260:13 269:3
　325:15,23 326:21
　327:1,4,8,8,9,25
　328:10,22
**lexington** 3:6
**lgates** 5:10
**license** 337:25
**life** 15:4 194:7
**lighter** 268:14
**likes** 323:18
**limited** 138:2
　156:1 175:16
　177:9 178:2 241:9
**line** 69:9 93:22
　133:16 142:11,23

143:17,19 145:10
　145:11 150:23
　188:23 191:3
　197:8,10 199:16
　199:16 205:6
　219:17 220:21
　223:2 227:1
　228:10,12 234:5,9
　234:10,12 240:4
　244:1 246:14,19
　248:16 251:25
　254:4 265:18
　274:3 279:17
　283:18 292:1
　297:9 298:12
　311:19 325:4
　338:13 340:7
　341:3
**lines** 182:8,8,9
　199:10 272:15
**linkedin** 69:23
　72:6,7
**lisa** 5:6 11:14
　334:23
**list** 85:9 136:9
　143:1 223:1
　230:18 231:7
　242:4 250:12,17
　251:17 267:10,17
　291:25 306:21
　328:14,18
**listed** 102:17
　136:2,11,15 137:5
　143:3,10,12
　147:12,14 149:25
　150:15 197:24
　229:13 238:16,23
　248:19 249:3
　250:23 267:11
　288:16 340:7,17

**listening** 242:4
　276:23 277:3
**listing** 135:11
　239:3 340:7
**lists** 143:24 149:23
　247:9 252:24
**listserv** 266:3,4
　312:3,13
**litigation** 1:7 11:4
　151:9 322:1,6,9,13
　324:10 338:6
　339:3 340:3
**little** 32:9 63:3
　74:16 93:18 126:3
　165:4 166:22
　175:10 195:15
　224:9 232:15
　235:6,19 236:4,11
　240:22 249:19
　255:14 268:14
　271:20 305:12
　331:18
**live** 296:14
**llp** 4:4,12 5:17
　11:16
**loaded** 201:23
　202:7
**lobby** 16:2
**local** 22:2,5,11
　28:15,17 29:10,10
　29:11,19,21 39:19
　178:8,10 253:18
　320:23
**log** 49:13
**long** 25:9 28:20
　31:1 52:8,12
　58:12 71:7 81:20
　120:21 134:11,20
　134:21 143:1
　156:1 319:14

**longer** 32:1 33:17
58:21 77:4 132:5
141:20 170:24
172:18 173:3
296:21 299:25
**look** 46:16 48:2,12
94:22 108:14
133:19 142:15
177:14 192:5
218:22 223:20
224:1 234:3
243:11 249:25
250:7 265:20
268:14 274:5
276:10 277:4
282:3 292:3 297:1
297:14
**looked** 257:2
**looking** 69:23
186:10 189:5
201:25 223:19,24
268:4 276:23
320:16 323:9
**looks** 143:17
149:12 195:21
196:10 199:25
216:15 228:10
246:13 247:16
266:14 268:14
**losses** 336:6
**lost** 104:14
**lot** 15:4 137:16
168:14 205:21
207:9 211:8
297:23 305:19
312:22 332:8
**lottery** 72:9,14,19
72:25 73:17 74:2
74:5,6,8,10,13,18
75:19,22,23 76:2,7

**louise** 325:15
**low** 111:8 116:7
**lstjules** 4:18
**luchette** 313:5,6,7
313:10,16 314:5
**lunch** 141:15,19
152:9,10,17

**m**

**madam** 338:10
**maggie** 185:3,4,7
197:11 265:17
266:15
**main** 5:19 73:19
126:19
**maintain** 317:18
321:10
**maintained** 64:19
64:19
**maintaining**
200:18
**major** 28:23,24
237:18
**majority** 81:15
146:22 193:4,10
214:3,11,15
241:22 242:1,9,15
242:19 244:23
245:5
**making** 67:4 89:15
186:4 205:21
**manage** 129:23
**managed** 172:10
172:13,17 173:6
173:13
**management**
30:24 31:13 63:9
63:17,19 90:12
94:2 108:21
184:16,19 220:10
244:3,6 248:23
249:3,16,22

269:14
**manager** 70:3,5,15
71:21 76:16
197:16
**manner** 50:22
**mannion** 273:23
**manual** 316:1
**manuals** 315:12
**manufacturer**
330:9,19
**manufacturers**
331:4
**manufacturing**
331:4
**march** 124:21
**maria** 3:13 11:10
**marijuana** 20:2
**mark** 296:21
**marked** 133:9,13
142:3 191:17,21
226:13,17 227:13
242:23 243:3,17
265:8,12 273:14
273:18 279:8
282:2 284:12
285:13 291:21
296:17 311:4
312:7 324:17
**mart** 5:3
**mary** 325:15
**master's** 28:7 29:4
29:5,6,15 71:12,14
**material** 92:7
**materials** 23:1
24:12,15,15,22
196:11 255:19
266:9
**math** 73:8
**matt** 11:18 12:9
13:16 185:10
196:4 197:11

**matter** 11:3 25:25
257:16,20 271:22
332:20
**matters** 92:12
214:23 226:1
**matthew** 4:5
**max** 241:14
**mcaleer** 1:15 2:8
7:3 12:2,6 15:17
22:23 54:21,23,23
55:2,6 77:13
133:13,13,18
137:6,10 142:7,14
151:2 190:7
191:21,25 224:9
226:17 227:13
228:2 243:3 258:9
265:12 272:6
273:18,22 279:14
279:15,20 285:13
297:8 311:7,18
325:3 329:25
334:23 336:15
337:3 338:8 339:4
339:9 340:4,13
341:20
**mckesson** 4:11
11:13 22:18
**mcneil** 5:13
**md** 1:7
**mdl** 1:6
**mean** 16:14 26:1
26:24,25 27:1
34:21 45:16 46:13
47:4,18 49:10
52:25 70:11 78:7
86:2,22 87:21
92:21 93:4 94:3
95:4 97:11,18
98:15 102:15
109:20 115:22

119:20 126:4
127:22 129:15
131:14 140:6
145:21 156:11
158:15 162:2
164:25 168:18
175:23 178:23
179:17 182:4
184:5 189:23
190:17 199:4
202:9,17 204:23
207:17,22 213:2
215:15 218:15
222:3 244:4,8,9
249:20 251:6
254:25 260:22
261:5,15 270:20
272:21 275:2
278:16 280:18
285:23 299:18
305:13 308:24
316:16,21 317:3
317:16 320:4
323:24
**means** 159:24
220:5 237:13
238:21 244:7,25
300:15 301:1
309:15
**meant** 47:10
190:12 193:13
237:15 238:24
270:13 275:6,9
293:4,9,12
**media** 322:18,19
323:3,5
**medicaid** 171:19
171:22
**medical** 17:23
18:4,22 19:15
22:8 104:20 105:7

123:24 125:5
136:18 138:7
139:25 140:6
149:13,18 160:17
161:7,9 164:22
235:5,18 236:3,9
273:6,9 274:12,14
274:18 277:13
278:21,25 279:5
289:9 290:1
292:17 296:2
331:13,21,23
332:3,15,16,17,25
333:1,10,19
334:12,15
**medicare** 172:10
172:14,17 173:6
253:11
**medication** 307:6
**medications** 14:15
**medicine** 30:8
**meet** 25:9 82:25
120:7 168:17
170:13 172:5
175:18,21 176:1,5
176:13,21 213:11
213:14
**meeting** 8:22 9:8
17:6 23:5 25:5
26:7 44:13,18,19
46:20,21,23 54:20
55:22 56:7,19,20
57:4,5 58:4,8 83:8
84:5 120:8 129:16
153:5,9 154:7
158:5 177:7
200:18 204:5
209:1,3 211:18
213:7,20,23 214:3
214:4 220:7
266:10 273:4,4,5

274:3,21 275:19
275:21,24 276:6
276:10,12,15
277:2,6,18 281:14
281:22,25 282:8
282:11,15 283:7
284:9,22 286:4,7
286:17 287:6,12
287:23,25 289:25
290:16 296:3,4,9
296:11 323:8
326:10,11 333:17
**meetings** 44:16,21
44:24 45:4,10,11
51:2,4 53:18,23,24
54:2 55:15 56:6
56:11 59:4,11,17
59:22 60:22 78:3
81:13 82:8 83:1
118:2 136:8 149:8
157:18 164:21,25
165:10,13,15,15
165:18,22 166:6
168:24 169:1
170:19 174:4
193:3 206:6
207:13 208:25
211:22 212:23
213:2,6,17 214:5
214:10,11,11
215:11 219:5
241:20,22 242:8
242:13,14,18
255:17 261:24
276:24 277:9,12
277:15 285:18,19
286:2 291:15,16
291:18 294:20
295:11
**member** 16:24
44:24 45:5,18

47:21 50:2 51:24
52:5,6,9,11,12,12
52:15,17,23 54:9
54:15,16,18 55:7
55:11,14,17,18,20
55:21 56:2,6,15
58:7 59:2 60:5,7
60:14 78:9 86:8
87:9,14,23 88:5,9
88:21 91:2 96:10
108:16 109:2
121:3 125:15,22
125:23 141:4
143:8,13 144:5,10
145:9,12,16,22
147:15 156:2,21
166:7 167:12,16
186:18 193:23
200:15 204:3
206:21,21 212:4,5
212:10 214:5
230:24 232:19
233:1 239:2
241:22 242:1
249:14 250:6
292:8 294:7,12
296:5,5 303:9
304:6,7 308:1,9
312:10,12 316:1
325:13
**member's** 144:23
257:10
**members** 16:17
17:4,4 38:25
43:10,25 44:4,5
49:24 50:7,15
51:7,7,10,11,13,14
52:20 53:1,1,2,6
53:14 54:4,7
57:13,14 58:13
59:1,3 77:21,25

| | | | |
|---|---|---|---|
| 78:1,3,18,22 80:6 | 216:6 218:25 | 237:4 238:5 240:2 | **michael** 130:5 |
| 80:16,19,23 81:2,8 | 219:4 220:7 | 280:2,8 | 163:20 |
| 84:6 85:4,6,15,23 | 226:24,25 228:15 | **mention** 184:7 | **microphone** |
| 86:6,11,17 87:1,2 | 230:14,24 231:16 | **mentioned** 18:21 | 329:12,13 |
| 87:7,12,18 88:3,23 | 236:19 240:18 | 29:18 50:18 61:11 | **middle** 143:20 |
| 90:25 92:8 93:12 | 241:7,11,15 242:5 | 67:1 77:14 80:3 | 149:12 196:6 |
| 94:6,7,10,12,15,20 | 242:9,15,19 | 81:7 91:24 96:1 | 292:14 296:24 |
| 96:1,2 101:4,13 | 244:13,19 247:6 | 98:5 112:3 116:2 | 313:23 |
| 103:1 108:25 | 257:4 267:8,15,17 | 123:24 127:5 | **midwest** 338:17 |
| 109:18 110:20 | 279:16 281:8 | 130:6 152:25 | 341:1 |
| 111:16 114:3 | 282:10,13 284:3 | 153:23 154:23 | **miller** 51:20 52:8 |
| 116:16 117:15 | 287:15,17,24 | 161:10,15 183:20 | 55:20,21 56:2 |
| 118:4,25 119:5,9 | 289:3,3,14,15,24 | 188:20 216:5 | 120:21 121:3,10 |
| 119:16 120:7 | 289:24,24 290:1 | 255:13 272:6 | 121:11,12,13,14 |
| 121:19,23 126:20 | 290:16,17,19,25 | 279:22 291:8,12 | 155:11,12 156:14 |
| 126:25 128:16 | 291:1,9,17 292:11 | 309:23 | 167:19 174:18 |
| 129:10,18,22,24 | 292:20 303:21 | **merged** 164:6 | 283:17 287:17 |
| 129:25 134:7,18 | 304:8,19 305:1,7 | 272:16 | 325:2,13 326:14 |
| 135:12 136:9,11 | 310:17 312:4,23 | **merits** 17:14 | 327:16 |
| 137:5 142:23 | 313:1 315:22 | 167:12,25 168:12 | **miller's** 57:10 |
| 143:4,5 145:20 | 317:10 323:11 | 174:5 282:18 | 326:22 327:4 |
| 146:13,18,23 | 325:21 326:1,6 | 283:12 | **million** 173:8 |
| 151:23 153:6,14 | 327:20 328:4,12 | **message** 193:17 | 177:24 183:25 |
| 153:18,21 155:18 | 328:17,25 | 283:21 325:16 | 190:24,25 191:3 |
| 155:19,22 156:8 | **membership** | **messages** 325:20 | **millions** 99:4,8 |
| 156:16 157:4,12 | 156:4 157:15 | 326:1,6,7 | **mills** 307:10 |
| 164:16,23,24 | **memberships** | **met** 12:8 23:3 25:6 | **mind** 66:8 176:25 |
| 165:10,21,23 | 155:24,25 | 25:13 26:14 43:2 | 211:12 |
| 166:5,5,10,12,24 | **memo** 204:16,20 | 117:7,7 | **minor** 28:25 |
| 166:24 168:22 | 300:2 | **metro** 80:13 | **minute** 310:21 |
| 169:13 170:6,17 | **memory** 170:4 | **metrohealth** 80:16 | **minutes** 9:7 46:20 |
| 171:6 175:1 | 190:13 | 104:25 105:8 | 46:21,23 54:20,22 |
| 186:23 187:12,13 | **memos** 205:7,8 | 122:10 124:13 | 55:1 60:23 61:11 |
| 187:14 196:12 | 206:11 | 125:5 205:16 | 129:23 199:23,24 |
| 200:19,22 201:14 | **mental** 102:9,22 | 209:20 332:6,9,17 | 204:18 208:22 |
| 203:24 206:13 | 161:3,16,21 162:7 | 332:25 333:6,10 | 209:1,2 241:21,23 |
| 207:15 208:5,16 | 167:13 168:1,3,13 | 333:18,23 334:1,9 | 242:1 257:25 |
| 209:15 211:7,7,17 | 168:16,20,21 | **meyer** 13:16 | 261:23,25 271:16 |
| 212:17,23,25 | 169:3,8,11 171:15 | **mfleming** 3:18 | 276:23 277:3,18 |
| 213:3,11 214:3,21 | 174:6 224:17 | **mic** 329:10 | 284:19,21 285:12 |
| 214:24 215:2,20 | 225:11,11,20 | | 285:17,19 286:2,8 |

286:9,15,20 287:3
287:9,10,12,13,22
288:4 326:12
**mis** 131:23 235:15
**misrepresenting**
170:4
**missed** 314:1
**missing** 253:15
**misunderstanding**
93:18
**misuse** 301:22
302:15
**mmooney** 4:9
**mobile** 146:24
**model** 10:6 311:20
313:20 314:16
**moment** 133:19
142:15 243:10
274:5 284:23
292:3 311:16
329:17
**monday** 197:24
**monetary** 336:6
**money** 40:3 47:10
48:8,11,12 60:25
68:7 74:13,19,22
75:5,7,13,16,23
93:13,14 99:23
101:6,19 105:15
105:18,18,23,24
106:1,8,13 114:11
114:18 116:6
118:7 122:14,25
123:1 126:12
128:10 148:5,6,9
149:1 155:5
159:18,19 166:17
171:22 173:4
177:20 178:1
179:2 181:7 182:2
182:5,8,16 183:18

189:2 191:14
202:25 203:7,10
204:4 205:9
209:22 218:18
219:11 222:18
224:22 233:7,23
234:5,15,18 251:5
252:5 253:4
254:19 255:5,8,9
256:1,4,9 257:6,7
263:6 307:13
310:10
**monitor** 254:21
**monitored** 255:2
**monitors** 319:13
**month** 94:17
**monthly** 67:22
94:1,10,16,24,24
95:5,20 108:10
112:22 113:9
134:10 173:1
255:4,12,20
**months** 13:2,3
26:1 47:23 90:24
90:25
**monument** 64:23
68:5 85:10
**mooney** 4:5 7:5
11:18,18,24 12:5,9
16:8,15 17:3,12,17
18:10,15 19:2,19
20:15,20 21:1,15
23:8,11,23,25 24:1
26:12 33:8 34:5
35:18 36:1,5,10,17
36:23 37:7,14
38:2 42:24 43:19
43:24 44:8 45:2
46:10 47:19 51:18
52:3 53:17 56:13
56:23 57:9,22

60:3,12,18 62:17
63:2 68:11 72:13
76:22 77:3,7,12
85:20 86:3,15
87:5 88:8,15,20
89:4 93:6 95:1
96:17 98:4,9,16
100:4,17 101:11
101:20 102:11,24
106:21 109:8
110:16 111:14,22
114:5 115:2,24
119:22 126:5,13
127:4,17,24 131:9
131:16 132:1
133:11 141:3,16
141:22,24 142:5
144:15 146:11
147:3 151:6,10,15
151:17,20 152:1,5
152:9,21 154:11
154:16 166:3
174:1 175:9
178:20 179:8,19
180:12 181:11,23
190:6 191:19
194:3 197:6 209:6
210:20 222:5
223:4 224:8
226:15,21,22
227:20 228:1
233:5 236:7,10
239:12,17 243:1
243:24 255:3
256:15 257:24
258:8 265:10
269:20 270:11
271:1,25 272:5
273:16 275:16
276:3 277:1 278:4
279:10 280:12,19

283:3 284:14
285:2,9,24 288:3
288:23 289:1
290:7 291:23
293:10 295:5
296:19 297:13,19
297:21 300:18
302:7,13 308:8,15
309:16,22 310:11
310:20 311:6,11
311:15 324:19,23
329:5,11 336:11
336:15,20
**morning** 12:6,7
27:1
**motivated** 36:20
257:8
**motivation** 257:11
**move** 188:6 220:7
**moved** 100:23
**moving** 186:17
**mow** 253:18
**multiple** 99:11,14
159:8 189:14
212:13 215:10
**mundane** 77:23
**municipal** 70:21

| n |
|---|

**n** 5:14
**n.w.** 4:6
**naloxone** 122:8
124:24 125:1
**name** 12:9 22:7,9
22:16 23:7 47:1
60:25 130:5,25
132:8 138:20,21
143:21 145:10
164:4 182:21
227:15,18 269:10
272:14 273:25
274:1 304:13

330:1 333:5
334:23 338:6
339:3,4,15 340:3,4
340:21
**named** 272:19
**nan** 51:21
**nanni** 24:7,8 25:12
25:16 26:21 27:7
88:16,17 129:9,11
133:15 193:18,23
194:4,8 292:10
**nanni's** 129:12
**napoli** 3:4,12 11:9
11:11
**napolilaw.com**
3:10,18
**narcan** 60:20
**national** 1:6 10:6
11:3 311:20
313:20 314:15
338:6 339:3 340:3
**native** 9:19 297:14
297:16
**naturally** 213:6
**nature** 67:8 68:3
79:2 84:13 86:24
109:15 129:18
130:21 138:12
140:8 161:11
220:13
**near** 244:1
**necessarily** 29:10
39:13 45:14 47:10
66:2 74:11 84:10
114:17 131:21
157:14 160:13
178:23,25 182:25
183:9 187:7 244:8
245:2 270:21
276:8,21 278:16
299:18

**necessary** 92:4
257:8 281:4
**need** 48:9 83:1
92:6,16 113:6
142:19,21 159:18
159:19 169:22
170:13 171:9
172:7 179:3
190:16 191:16
192:4 203:2,16
206:8 214:17
215:12 227:7
241:2 244:25
276:7,19 297:2
**needed** 61:24
65:24 71:1 112:19
168:18 184:16
200:21 203:9
215:15 269:3
314:15
**needs** 10:5 65:24
129:17 168:17
170:13 175:18,21
176:2,5,14,21
177:8 311:20
313:19
**neither** 298:10
**network** 319:25
320:3,5
**never** 148:3 169:4
169:5 171:13
177:8 189:12
230:2 281:5
316:24 328:2
**new** 3:8,8 4:14,16
4:16 32:1 33:18
33:21,25 34:9,14
35:5 37:8,12,16
38:20,20 39:2,6,6
52:14 65:21 66:14
73:20 79:11

117:25 134:17
170:18 185:17,19
185:20 192:23
204:8 206:9
216:12,13 220:12
220:24 223:2
238:11 249:6
250:1 258:23
264:25 271:9
**newborn** 194:6
**newer** 52:16
**nine** 130:7 156:16
**nods** 214:18
**nominate** 82:17
**nominated** 80:20
**nominates** 86:4
**nomination** 81:13
84:1 87:22 88:23
89:2
**nominee** 83:10
84:16 87:14,20
88:5,10
**nominees** 81:10
86:11,17
**non** 84:19,24
214:4 215:22
**nonpersonal** 323:1
**nonprofit** 80:13
**nonprofits** 225:13
305:19
**normal** 277:13
**normally** 190:19
336:19
**northern** 1:2
302:24
**notarized** 338:14
**notary** 338:25
339:10,18 340:15
340:23 341:23
**note** 211:24
338:12

**notebooks** 148:24
**notice** 17:10
214:13,17 322:10
322:15 323:20
324:1
**noticed** 214:4
**notification** 94:8
**november** 9:9
216:21 222:24
227:1,13 229:2
232:20 234:1
274:2 275:19
279:17 281:16,24
282:7,15,24 283:7
284:9,22 287:22
290:23 302:23
303:6,19,23 304:4
325:3 326:22
**nuances** 40:21
**number** 7:9 8:2
9:2 10:2 68:1
74:20 83:1 91:11
104:12,17,19,22
107:16 108:12,18
109:10,13,21
110:25 111:4,8,9
112:2,5,9,21,25
113:5,5,6,7 114:24
115:6,11 134:6
138:7 142:10
155:22 161:1
173:7 183:6 196:1
208:11 223:21,22
223:25 232:6,9,18
238:21 240:5
241:12 243:7
250:23 252:1,16
252:20 253:14,14
254:8 273:12
278:23 338:7,13

numbers  68:17,18
  73:11 107:1
  221:25 222:10
  223:13 249:6
  251:1 252:21
  297:12 340:7
nun  134:23,24
nurse  30:12

**o**

o  320:18 321:13
o'clock  2:14 337:6
oath  12:22,24 13:6
  13:25 14:4 125:13
object  15:11
  252:24,24 253:10
objection  16:5,12
  17:1,8,15 18:8,12
  18:24 19:16 20:12
  20:18,23 21:12
  26:10 33:5 34:2
  35:16,23 36:3,8,15
  36:21 37:5,11,24
  42:23 43:17,22
  44:6,25 46:9
  47:16 51:15,25
  53:15 56:9,17
  57:8,18 60:1,10,16
  62:15,25 68:10
  72:12 76:19 77:1
  85:17,25 86:13
  87:3 88:6,12,19
  89:1 93:3 94:23
  96:14 98:2,7,13
  100:2,14 101:8,16
  102:8,21 106:19
  109:5 110:9
  111:12,20 114:4
  114:25 115:21
  119:19 126:2,10
  127:1,12,21 131:7
  131:13,19 141:1

144:12 146:10,19
151:4,25 152:7
154:10,14 165:25
173:21 175:5
178:15 179:5,16
180:10 181:9,21
193:25 197:3
209:5 210:17
222:2,21 226:11
233:3 243:23
255:1 256:12
269:19 270:8,23
275:14,25 276:20
278:3 279:3
280:10,17 283:1
285:21 288:1,19
288:25 290:5
293:7 295:1
300:16 302:5,11
308:5,13 309:13
309:20 310:8
330:20 331:6
336:1
obligations  315:20
  316:4,12,14,18,24
  317:2
obm  8:16 63:8
  66:18,21 69:19
  76:15 90:13 92:6
  95:18 112:23
  116:21 117:10,12
  118:25 127:14
  173:1 176:7
  183:21 184:17,22
  185:2,5,6,8,11,14
  185:20 186:3,7,9,9
  186:13 187:1,25
  188:2,5 196:4,16
  197:16 206:6
  219:21 223:1,2
  240:14 249:5

255:14,18,18
258:15,16,18
261:4 265:18
266:9,23 270:2,10
270:13,14
observe  45:11,12
obtaining  186:3
obviously  142:20
  214:16 297:1
occasionally  84:2
  208:7 321:13
occur  111:5
  157:16 161:18
  198:1 211:2
  241:16,20
occurred  44:18
  100:6 101:24
  154:8 161:19
  208:23 212:24
  221:21 241:25
  242:9,14,19 286:3
  290:18 303:6,11
  303:18 304:4
occurrence  247:8
occurs  296:24
october  133:16,25
  192:1 313:17
offer  186:24
offered  280:3
offhand  64:23
  173:15 251:15
  260:18 261:7
  288:23 291:20
  322:16
office  31:13,15
  52:14 63:8,16,19
  65:6 90:6,12 94:1
  104:21 108:21
  112:17 123:25
  150:12 153:15
  154:2 160:18

161:9 162:4
164:22 171:5
184:15,19 188:7,8
195:22 199:7
205:25 215:5
216:8 220:9 244:3
244:5 248:23
249:2,16,21
252:15,17 269:14
274:19 278:21
296:2 315:13
324:9
officer  244:3
  266:18,24 288:6
offices  15:25
  153:10
official  148:22
  153:9 204:6
  274:17 339:15
  340:21
officially  120:8
officials  35:8,10
  35:22 36:6,12
  205:24 216:11
oh  193:15 207:17
  233:14 279:11
  292:13 311:10
ohio  1:2,23 2:13
  3:16 5:8,21 6:10
  8:10 11:5 33:12
  39:20,20 72:8,14
  72:17,19,22,25
  73:17 74:6,8,10,13
  75:24 76:2,4,7
  123:1 178:8
  213:16,20 214:9
  243:6 253:12
  317:3 337:5 338:2
ohio's  213:23
  302:24 316:7

**okay** 12:17 13:5
13:10,13,23 14:3
15:10 16:9 17:13
19:3 20:8 21:2
22:17 23:4,8,12,15
23:21,25 24:6,15
24:21 26:13,17
27:3,5,16 28:14,18
31:16,23 34:6,8
37:15 38:10 40:6
40:17 41:10,23
42:1,11,14 46:19
48:4,22 49:17
50:18 53:11 55:9
56:14 58:2,12,16
58:23 59:11 61:7
61:9,18 62:18
63:12,18 64:8,10
64:20,24 66:22
67:19 68:4 69:10
70:1 71:5,10,24
72:21 73:14 74:3
75:1,6,17 76:9,13
77:3,7 80:9,15
84:19 89:5,11,15
89:20 90:10,18
93:21 94:9,14
95:2,16 96:25
99:12,19 100:5,9
100:18 101:12
103:14,24 105:6
106:2,16 107:14
109:12,16,25
110:17 112:9,13
114:2 116:19
117:10 118:17,22
119:16 120:3,20
120:25 121:11
123:3,13 125:11
125:15,20 126:14
128:6,9,12,25

129:6,19 130:2,25
133:2,8,23,23
134:4,12,15,21,25
136:2,16 137:12
138:3,22 139:5
140:13,17,23
141:4,15,24 142:2
142:18,19 143:7
143:17,23 144:16
145:17 147:4,21
147:25 148:17
149:4 150:10,22
151:15 155:10
157:2,14,18 160:2
161:20 162:24
163:7,8 164:9
165:8 169:18
174:2 175:10
180:18,24 181:18
181:24 183:13
184:9,12 186:1
187:24 188:6,9
189:16 191:16
192:15,24 193:8
193:21 195:12,17
199:15,25 203:12
208:8 211:1
213:22 214:9
215:17,25 216:5
216:15 221:1,8,17
223:5,19 224:2
225:20 228:5
229:7 230:12
232:15,17 236:1
237:17 239:16,18
243:17 245:20
246:21 247:2,24
248:20 249:7,14
250:4,24 251:10
251:13,16,20,23
252:6,19 253:24

254:3,10 256:16
256:21 257:24
258:18,22 259:21
259:24 263:6,13
263:22 264:4
265:25 266:14,25
267:18 268:1,24
269:7 270:1,18
272:6 274:20
276:9 277:2,16
279:21 280:7
281:11 282:9
283:20 285:8,12
286:10,15,19
287:1 291:16
292:13,19 293:11
293:17,24 297:20
298:4 299:5,19
300:1,7 301:4,17
306:9 307:25
310:12,22 311:24
312:3,14 313:13
314:3 317:9
318:23 320:15,25
321:9 322:14
324:8,13,20
325:11,12,25
326:7,18 327:6,15
327:20 328:1,3,22
329:5 331:10,17
332:4 333:4,21,25
334:14,18,18
336:20
**old** 39:8 40:8
48:21 185:18
318:24
**onboard** 67:25
**once** 94:9 187:24
188:8 258:9
279:19

**ones** 64:10 97:21
169:18 175:2
176:20 187:18
196:6 205:15
212:2 222:12
259:3 261:4 287:3
292:12 321:8
**ongoing** 13:9
136:8 149:7
**op** 1:10
**open** 38:1 213:16
213:17,20,23
229:19
**opening** 204:18
**operate** 50:21
124:15
**operated** 83:19
**operating** 32:23
246:10 248:3
288:6
**operations** 70:7
**opiate** 1:6 9:16
11:4 20:4 97:20
98:12,25 99:25
101:7,15 102:2,7
102:12,20 103:3,8
138:8,18 231:14
231:23 232:4
233:9,13,16,18,24
234:7,16 237:19
239:18 240:8
268:10 269:16
270:3 273:2
282:19,25 283:5
283:13,23 284:4
288:8,12,14
289:11,12 290:3,3
290:22 291:1,4
297:9 298:12
302:19 303:6,10
303:18,24 304:3

309:11 338:6
339:3 340:3
**opiates** 151:24
232:11,25 301:23
302:16
**opinion** 21:9,16
119:8,10 280:15
**opioid** 13:21 17:18
17:22 18:2 19:3,4
19:6,7,11,12,20,21
20:5,22,22 76:3,18
96:12 97:3,6
100:13 104:3,8
105:13 106:4,17
107:1,17,24
109:19 110:2,6
112:11 113:11,16
116:24 121:21
124:1 125:9 131:6
131:12,18 132:10
139:2 151:3
157:24 158:4,13
158:22 159:10
160:4,11 162:12
164:12,18 165:11
165:19,23 166:8
167:1,7 168:9
173:20 174:9
197:19 208:17
209:24 210:4,6,7
210:11 217:4,9,19
225:18 242:10,20
254:14,19 259:17
260:7,16 264:8,17
264:20 271:10
272:19,21,24
273:8,11 288:18
291:11,18 293:25
301:13 304:20
305:2 306:10,16
306:24 307:1,22

308:3,11,18,23
309:7,18,25 310:6
310:13,18 327:22
328:5 329:1 330:9
330:19 331:1,4
**opioids** 18:7,11,18
18:21 20:10,16
21:10,17 59:14,20
59:25 60:9 107:20
113:25 125:2
138:24 166:13
210:23,24 217:21
264:10 278:20,22
279:2 330:13
335:24 336:6
**opportunity** 132:8
159:11,12 219:25
**opposed** 20:5 58:6
85:6 88:24 103:4
113:12 156:15
193:23 200:15
207:24 252:14
307:2 323:10
326:9
**oprs** 253:12
**options** 91:20
**oral** 337:9
**order** 15:4 31:17
34:22 47:24 61:4
126:24 155:15,16
200:18,22 212:24
**orders** 61:20,22
**ordinance** 39:15
39:17,21 40:4,12
40:25 216:2 315:2
315:14,21
**ordinances** 39:13
79:12,16 96:22
97:1,4 187:4
245:14,25 246:3

**ordinarily** 200:4
205:1
**ordinary** 317:15
**organization** 62:5
68:5 172:11,14
173:6,14 280:6
**organized** 17:7
213:5 266:23
**original** 89:13,16
89:25 90:4 183:10
220:22 221:3
222:12 256:5,7
262:9 268:16
271:12 334:6
**originally** 41:17
95:8 117:1 277:21
**ortho** 5:13
**osiecki** 226:23
228:3,5,14 239:2
288:5 289:4,19
**ought** 187:15
218:12
**outdated** 140:16
140:18
**outlook** 126:24
196:7,15 197:23
**outpatient** 225:10
**outside** 182:9,12
203:25 205:12,14
205:15,18 332:9
**overabundance**
301:13
**overall** 88:24
119:24 126:24
**overdose** 294:18
294:24 295:7
301:23 302:14
**overdosed** 125:2
**overdoses** 107:19
107:20 161:11

**overlap** 230:19
231:3
**override** 247:18
**oversaw** 65:9
67:16 70:7
**oversee** 64:1
**overseeing** 69:10
75:3 280:1
**oversight** 161:5
**oversimplifying**
200:17
**overtime** 109:14
109:20,21 110:2
113:4 114:12
117:6 121:25
122:3 160:22
209:19
**overturn** 246:2,3,4
**overview** 196:7,15
197:23,25
**overviews** 195:23
215:9
**owed** 106:8
**oxycodone** 19:6
**oxycontin** 19:3

**p**

**p** 4:5
**p.m.** 152:18,19
190:3,3 224:6,6
227:23,23,25
258:5,5,7 272:3,3
311:2,2 329:21,21
336:25
**package** 253:6
**page** 7:4,9 8:2 9:2
10:2 69:23 72:6,7
115:14 135:9
136:7 137:1,3
147:11 149:11,22
149:23 194:10
220:1 230:16

[page - personally]

232:8 237:1,12
238:4 243:7
246:12 248:21
253:24 288:4
289:2,2 297:15
300:2 301:20
338:13,15 340:7
341:3
**pages** 189:14,15
248:8 297:11
298:6 302:18
**paid** 47:25 48:8,11
48:12
**pain** 18:11 300:9
300:10 301:1,4,8,9
**paper** 167:1,11
306:20
**par** 6:4,5
**parameter** 183:10
**parameters** 182:1
182:4,10,12
**parents** 104:14,15
**park** 253:19
**parroting** 278:9
**part** 15:11 29:7,22
34:16 40:5 41:17
45:6 46:2 49:7
53:19 65:19 69:7
75:18 78:18 79:20
85:22 88:25 96:18
99:15,17 101:21
106:18 107:5,8,11
111:3,7 118:12
122:11,23 123:17
124:5 128:21
132:25 133:3
134:18 145:24,25
149:3 158:19
159:17 168:10
172:5 187:15
188:18 189:11,14

197:1 202:18,20
204:13 207:8
224:20,21,23
233:25 234:8
243:12 245:12
249:11 258:24,24
261:16 262:8,17
265:3 272:8 273:4
275:23 277:6
283:15 286:8,8
315:4 324:10
333:16 334:6
340:9
**partially** 122:21
124:17
**participate** 207:9
207:12 212:23
218:19 241:17
**participated** 85:14
132:3
**participating**
211:13
**participation**
231:14,17
**particular** 83:9
86:20 87:2 90:5,7
93:19 96:18 108:4
110:24 118:8
119:9,16 124:6
132:17 133:4
135:18 150:23
164:16 169:13
172:19 179:4
180:4,15 192:9
198:3 199:8 209:3
211:13 215:1
219:3,20 220:6
249:11 261:19
321:3
**particularly** 65:23
75:15 117:22

160:17,21 178:11
178:16
**particulars** 123:2
**parties** 337:21
**parts** 126:8 288:17
**pass** 39:12 133:12
245:17 258:23
265:11
**passage** 221:12
240:16
**passed** 40:12,24
41:4 67:15 92:24
177:12 189:11
221:19 222:11
225:14 259:4
315:21 334:1
**passes** 126:18
189:18 222:20
246:24
**password** 49:12
**paste** 321:17
**patient** 225:10
**pay** 64:17
**paycheck** 195:9
**paying** 170:13
**payment** 49:22
62:9
**payments** 209:19
**peca** 1:22
**pen** 306:20
**pencils** 61:25
**pending** 135:11,17
135:19 136:14
**pens** 148:23
**pension** 253:13
**people** 18:4,23
106:12 112:14
113:21,24 116:9
125:1 136:12
138:11 149:20
150:2 161:5 162:2

169:16 182:15,17
182:18,25 186:13
186:13 214:6
215:18 302:3
**people's** 171:14
**percent** 18:14,16
95:7 173:16
323:12
**percentage** 107:22
113:15 173:12
**perform** 334:2
**performed** 131:11
131:15
**performing** 93:1,5
94:2
**period** 43:3 156:1
196:20 216:16
217:7 245:11,12
262:18 317:19
**permission** 16:24
**person** 55:3 65:20
83:11 86:21,21,22
86:25 87:24 89:5
135:25 136:3
164:19 169:16
184:17 280:15
**person's** 86:23
**personal** 68:20
144:4,17,23
145:20,24 146:1,4
146:12,17 151:9
188:21 189:20
190:10,23 191:1
252:24 253:3,9,10
253:17,20 263:8
298:2 319:6
322:19 323:2
326:19,22 327:18
327:21,25
**personally** 95:19
317:20,22 339:11

340:15
personnel 68:17
68:19 69:2 93:10
93:16 182:8
perspective
108:11 195:20
220:25 257:19
pertaining 2:11
289:4,16,20
petition 34:18,21
36:20
pharma 1:10
pharmaceutica
5:15
pharmaceutical
6:4,5
pharmaceuticals
5:13,14,14,16 6:4
22:3 330:2
pharmacology
30:15
phase 231:22
philip 298:7
phone 147:2
336:11,12 338:3
phrase 140:17
262:23 275:9
300:19,23
phrased 328:8
physicians 22:12
22:13 235:12,13
235:20 236:5,12
236:15,22
pick 28:2 93:21
piece 40:1 103:25
214:16
pieces 62:18
135:19 184:25
pike 118:3
pill 307:10

pinpoint 103:19
place 11:5 25:2
34:24 39:2 41:4,6
68:2 86:23 100:21
171:8 185:19
187:21 299:2
312:24 333:4
334:5 337:15
placed 35:5 235:6
235:19 236:4,11
311:7
places 277:19
plaintiff 3:3
plan 303:14,17,22
304:2 305:11,16
305:23 306:1,4,7
planning 187:9
plans 276:13
305:21
plate 139:13
play 118:12,17
184:22 220:19
plays 32:20 282:18
283:13
pleas 123:7
please 11:6 14:19
21:14 27:19 32:10
59:16 74:17 82:15
85:19 96:16 127:3
142:16 147:5
207:1 227:7
267:22 284:24
298:14 308:7
315:16 338:11,11
pllc 3:4,12
plus 221:4
podium 207:11
pods 161:6
point 68:14 112:15
135:25 136:3,12
139:10 147:15

148:18 150:2
192:18 218:16
219:23 228:7,9,14
241:4 275:8 288:5
307:3 319:17
331:20 336:4
pointing 331:3
points 137:17
298:15,21
poison 304:12,15
police 64:25 65:3
policies 317:6
policy 77:24 78:19
96:3,7,20 130:12
130:14 131:4,10
132:14 314:19,22
315:12 317:9,13
320:17 323:15
political 28:10,12
28:13,15,22
poll 10:10 325:4
327:8,14 328:11
polling 328:8
polster 1:9
poorly 235:7,21
236:16
population 112:24
portion 123:9
216:19 217:12
240:1
posed 232:19
position 31:19
72:16 87:14
181:16 212:25
266:21 330:5,7
positions 38:23,24
39:4 67:24 76:24
330:17
possession 113:22
113:25

possibility 309:3
possible 136:6
147:11,21 179:1,6
181:18 221:14,16
321:24
possibly 193:8
196:5
post 287:9 323:6,9
323:16,16
posted 286:20,22
287:4,11 322:17
323:17,19
posting 323:14
pot 68:7 105:23
166:16 182:16
potential 148:7
potentially 45:21
184:5
powerpoint
201:23 202:10
255:23 296:24
297:4,13,15
powerpoints
202:2,4 209:7
powers 38:16
prabucki 6:7
11:22,22 336:13
practice 145:18,21
146:9 224:11
277:13 325:20,25
practices 29:19
praised 313:17
prefer 296:22
preference 136:4
preferred 202:13
prep 67:20 187:2
187:22 215:16
preparation 24:11
24:23 157:7 173:2
221:11

preparations 64:2
prepare 22:24
  196:16 277:8
  299:18
prepared 187:19
  204:10 206:17
  207:2,15 209:9
prepares 223:2
preparing 70:16
prepped 184:2
prescribed 18:4
  18:14,17,19,22
  19:14 20:10 151:2
  151:24 307:6
prescribing
  232:11,25 301:14
prescription 1:6
  11:4 13:21 18:18
  20:22 59:14,20,25
  60:9 76:3,18
  96:12 97:2,6,20
  103:17 104:3
  107:19,24 110:2
  112:11 113:11,25
  116:24 125:2
  131:11,18 139:1
  151:3,24 157:24
  158:4,13,22 159:9
  160:4,11 165:19
  210:6,11,23,24
  217:9,21 242:20
  264:10,20 278:20
  279:1 293:25
  301:23 302:16
  305:2 307:1 328:5
  330:9,13,19 338:6
  339:3 340:3
present 3:1 4:1 5:1
  6:1,14 23:4 25:17
  55:2 153:15,22
  161:10 196:6

198:25 201:12
  204:11 273:10
  287:25
presentation
  158:16,16,25
  159:17 162:23
  195:22 196:16,17
  197:16,25 198:15
  198:21 201:24
  202:1,24 203:4,6
  205:3 255:22
  277:14 296:24
presentations
  158:17,19,20
  159:1,7,9,16,25
  196:24,25 197:12
  198:2 201:1
  202:11 212:24
  213:4,12 218:23
  277:9,11 279:7
  295:4
presented 82:8
  158:10 159:1,2
  160:18,20 162:4
  162:17,19 196:11
  198:8,10 202:2
  260:20 276:11
  279:5
presenter 45:19
presenting 180:5
  180:15 193:5,6,7
preserve 316:25
  317:14,16 323:22
preserving 316:17
president 51:21,23
  52:4,6 53:5,8,13
  54:5,24 120:17
  135:8 144:18
  145:7,13 156:3,8
  156:13,17,19,20
  157:3 173:18

174:24 243:19,20
  294:16 295:10
presidential 70:20
press 15:21 16:19
  153:11,12 312:15
  312:20,23,24,25
presumably
  222:10 249:23
pretty 38:1 76:12
  77:23 103:11
  171:8 192:6
  200:11 208:13
  274:6
prevention 231:22
  232:2 237:9,14,19
  238:16 239:19
  240:9 282:18
  283:13,23 284:4
  288:8,13,14
previous 76:13
  150:17 281:17
  282:2,3
previously 12:25
  24:24 78:2,25
  108:9 255:20
primarily 29:23
  294:19
primary 70:19
print 105:18
printed 268:5
  297:16
prior 15:20 17:6
  17:10 31:11,12,14
  37:13 56:19 57:3
  57:4 117:17
  170:24 171:1
  183:19 184:4
  185:7,8,19,21
  187:18,22 188:3
  197:13 206:6
  275:8 334:8

priorities 180:2,4
  180:7,14,20,22,23
  181:7,16
priority 166:19
  181:20 237:10,14
  238:17,20,21,25
  239:3,13 321:24
probably 17:25
  102:16 150:19
  184:1 198:5
  218:17 219:11
  268:15
problem 95:10
  164:18 165:24
  166:8,12 167:1
  173:20 174:9
  191:5 305:2
  309:18
problems 209:24
  210:4 217:4,8,13
  217:19 305:8
  310:7
procedure 2:10
  339:5 340:5
proceed 14:18
proceedings
  216:20
process 15:12
  29:23 30:1 34:8
  34:17,19,24 43:5
  43:14 46:3,4 53:1
  53:4 66:23 69:11
  70:12 75:19 81:1
  81:5 82:12,16
  83:18,23 84:1
  85:2 88:23 89:3
  90:23 92:1 99:16
  99:18,20 100:6,19
  100:21,23,24
  101:1,21 107:6,9
  107:12 110:11,13

[process - public]                                                    Page 44

115:4,9 117:16
118:13,18,20,23
119:3,18 120:12
120:13,17,23
123:18 124:5
126:25 128:22,23
154:19,23 155:1,3
156:12 187:16
188:1,1 195:14,19
203:25 204:14
206:10 209:11
211:4,6,21 212:6
212:13 216:23
218:8,20 220:18
221:22 222:23
223:9 224:10
229:18 230:12
232:21 234:1,8
240:13,16,20,24
247:18,21 249:9
249:13 250:9
254:24 255:7
256:2 257:12,15
257:18 258:10,24
262:16,21 263:6
263:10 265:4
286:19 317:18
**processed**  49:22
**processes**  120:20
206:13 212:14
257:21
**procured**  67:7
**produced**  9:19
297:14
**product**  117:15
221:3
**production**  338:15
338:17,22
**professional**  68:21
208:3

**professionals**
139:1
**profits**  75:21
**program**  28:15
29:8,15,22 48:19
48:21,21 117:24
118:1 124:16,24
237:8 238:22
239:18 333:6
**programs**  99:5,9
100:11 187:3
235:5,19 236:4,11
238:12,14 248:3
**prohibit**  218:9
**prohibits**  221:9
**project**  78:10
105:1 122:12
124:15,18,19,22
124:24 125:3
136:23 137:4,13
138:8 139:22
179:4 238:2
331:18
**projected**  95:8
**projecting**  196:19
**projection**  68:1
71:3
**projections**  64:1
65:16 66:5,6
67:22 69:12 94:1
255:14
**projects**  136:8,9
136:17 149:7
**pronounce**  273:24
**proper**  182:21
**properties**  123:14
**property**  127:18
128:3,7,7,17,20
169:7 178:14,18
**propose**  170:18

**proposed**  89:23
91:1,3,16,17 92:7
117:6 168:22
201:4 216:2 219:6
220:8 223:8 242:3
257:3,7
**proposing**  257:5
**prosecutor**  13:16
**prosecutor's**
205:24
**provide**  22:8 32:9
57:13,15 84:14
99:24 101:6,14
102:2,4 103:10
119:4 140:7 162:7
186:5 201:2,17
204:12,21 211:16
212:17 225:5,9,14
225:16,18 226:17
230:9,18 234:22
235:9,22 255:15
255:18 269:18
270:6
**provided**  24:16
31:17 45:23
101:25 102:23
107:18 108:11,22
111:15 114:2
116:16 121:18,21
122:7 134:7
158:13 196:12
201:13,19 212:1
213:12 230:7,13
247:4 254:24
255:20,23 277:11
277:12 280:13,24
285:13 295:3
299:8 318:14
324:13
**provider**  332:16

**providers**  334:11
**provides**  46:23
102:20 103:7
110:11 117:10
124:15 182:1
197:17 225:1,8
255:18
**providing**  217:18
232:10,24 298:20
**provision**  247:12
**provisions**  213:21
**public**  1:23 2:12
3:14 6:8 8:21 9:7
29:6 45:11 64:11
64:12 75:10
122:14 126:11
160:15 161:13
162:10 163:17,18
163:22 164:6,7,10
168:24 169:1
170:19,21 171:8
179:21,22,24
213:16 214:4,13
214:17 215:12
216:17,19,25
217:2,6,12,16,25
253:13 262:13
272:7,12,13,18,23
273:7 274:3,21,22
275:18,24 276:6
276:14 277:6
281:22,24 282:7
284:9,21 285:4
287:5,23 290:16
314:24 315:8,14
315:20 316:3,7,12
316:15,18,25
317:1 333:17
337:4 339:10,18
340:15,23 341:23

**[publicly - reasons]**

**publicly** 207:12
286:21,22
**pulled** 285:2
**purchase** 47:24
61:4,6,22
**purchases** 65:21
**purchasing** 41:18
41:19,24 42:2,7,15
42:20 43:16,20
44:1,5,10,13,16
45:4,9,18 46:2,11
46:17 47:9,12,22
50:23,25 53:24
59:7,8,10,12,18
60:24 61:10,20
78:25 79:5
**purdue** 1:9
**purport** 285:19
**purpose** 103:4
122:15 147:18
181:24 234:19
235:2 256:10,11
256:24,25 273:5
**purposes** 74:14
**pursuant** 2:10
**push** 331:22
**put** 35:1 82:20
146:23,23 171:9
171:11 188:3
210:19 215:2
216:6 279:12
297:7 306:20,22
311:11
**puts** 90:13 188:10
249:16
**putting** 104:10
174:2,7 184:24

**q**

**quantify** 306:9,15
**quarter** 94:17

**quarterly** 67:22
95:3,5 108:10
112:23 173:1
255:13,15,21
**question** 13:19
14:19 21:13 27:4
34:11 38:1,1
45:19 50:3 52:2
54:19 57:21 59:15
66:9 72:5 74:17
78:9 84:5 86:2
96:16,19 99:1
106:6 116:11
119:14 131:24
142:22 151:12
160:5 165:2 166:2
174:16 175:11,22
189:12 202:19
207:12 208:10,12
211:4 217:21,23
222:7 223:7
224:10 229:14,19
230:5,6,17,18,23
232:6,8,18,19,23
232:25 236:21
239:7 244:23
268:6,15,21
297:24 305:19
316:11,15,21,24
327:2 328:7,7,23
**questioning** 201:9
**questions** 8:6
10:11 14:16,23
15:14 45:12 56:21
56:24,25 57:2,2,6
57:7,10 84:7
86:19 109:4,6
133:20 142:20
154:17 200:19,22
201:5 207:16
208:13,15 209:13

211:3,8,12,15,16
211:20,23 212:1,4
212:5,7,8,11,16
218:24 227:3,6
229:1,9,13,15,20
229:22,23,25
230:8 231:15
265:22 267:17,19
267:20 279:20
289:4,15,19
296:25 297:5
325:4,15 326:21
327:4,8,14 329:6
330:4 334:19
336:10,13 337:10
337:13
**quick** 77:4 215:8
257:24 271:19
330:4
**quite** 28:18 331:11
**quote** 231:3 233:7
277:25 278:1
293:5 300:8
311:19,20 313:19
313:20

**r**

**r** 337:1
**r2017-0182** 8:11
**r2017-182** 243:7
**radar** 94:20
128:18
**raise** 304:19
**raised** 128:15
229:2
**range** 78:7 80:14
**ranged** 29:9
**ranging** 77:23
**rate** 294:18,24
295:2,7
**read** 21:2 25:1
199:13,15 229:5

232:12,14 235:10
248:5 265:16
269:5,6 274:25
281:20 283:10
293:1 311:16
336:17 339:5,6,12
340:5,6,17
**reading** 199:5,19
199:21,22 219:9
221:2,2,6,11,12,19
270:12 338:19
**ready** 26:8 208:2,9
334:22
**realize** 268:4
**realized** 115:25
**reallocate** 265:2
**reallocating**
262:16,21 269:15
**really** 12:19 67:23
78:11 146:25
187:22 205:4
245:13 246:4
268:14 320:19
330:4
**reappointment**
86:20
**reappraisal**
128:23 178:17
**reappropriated**
263:7
**reason** 13:5 14:12
43:11 110:20
111:7 113:12
146:3 177:1
227:18 245:15
259:8 287:21
338:14 340:8
341:3
**reasoning** 146:14
**reasons** 18:4,22
53:23 109:9,11,15

**[reasons - referred]** Page 46

159:19 160:8
216:13 275:20,22
276:17
**recall** 71:9 76:21
105:5,11,14
109:24 135:16
139:15 163:11
169:13,23 174:10
174:15,17,19,21
174:23,25 192:12
198:13,17 260:1
260:15,24 284:8
284:11 295:25
322:22 331:10
**receipt** 338:18
**receive** 92:4 112:1
112:23 118:14
132:18 139:6
140:3,14 171:18
187:1 195:9
196:19 202:3,4,25
203:7 204:13
212:9 315:19
**received** 108:17
108:25 109:3
133:1 139:16,21
140:5,24 171:25
178:7 188:16
202:23 224:22
227:18 234:13
239:1 260:2,16
284:1 292:5,9
303:22 308:22
322:10,14 332:9
332:15
**receives** 68:5
74:14 178:3
179:24 247:5
315:23
**receiving** 92:9
133:24 134:1

138:6,23 140:9
187:23 218:13
227:12,16 252:8
283:8 293:18
323:20,25
**recess** 77:9 152:17
190:2 224:5
227:22 258:4
272:2 311:1
329:20
**recession** 111:11
111:19
**recipients** 142:22
225:2
**recognize** 144:16
145:1 229:25
235:8,21 236:16
309:17
**recognized** 300:9
301:1,4,8
**recollection** 24:24
25:23 159:20
288:13
**recommend** 118:7
149:19
**recommendation**
84:15 85:3 118:10
121:19 157:3
261:13,15
**recommendations**
85:8 119:4 157:6
181:2 186:4,24
187:14
**recommended**
84:18,19 110:12
110:18 115:16,18
115:19 180:3,6,14
180:19,22 181:1,5
181:6,15,19
182:19 183:14,17
184:11,14 186:20

186:25 187:1,3,8
187:19,23,24
188:5,13 189:1,8,9
196:10 198:7,16
198:22,25 199:11
199:20 201:4
202:12,14,21
203:2,8 206:2,7
209:23 221:25
222:9,12,17 223:8
223:14,17,22
240:19 254:22
255:11 295:11
**recommending**
118:13
**record** 11:2,7
46:15 77:8,11
136:18 142:9
149:13 152:16,20
189:25 190:1,4
191:24 199:13
224:4,7 227:20,21
227:24 235:17
258:3,6 265:16
271:25 272:1,4
273:21 279:14
297:7 310:24
311:3,17 316:7
329:17,18,19,22
331:23 332:13
336:23 337:13
340:9
**recorder** 38:21
**recording** 286:16
**recordings** 286:11
**records** 129:24
149:18 213:16,17
314:24 315:8,14
315:21 316:3,12
316:16,19,25
331:13,21,25

332:1,2,3,17,25
333:11 334:9,15
**red** 267:22 268:15
**redirected** 269:3
**reduce** 111:9
114:18 122:3
269:2
**reduced** 114:17
117:2 178:8 268:8
270:16,22 271:3,4
271:6
**reducing** 183:5
**reduction** 111:17
114:15 117:3,8
269:16 271:11
**reductions** 114:13
116:9 117:23
269:8
**refer** 83:3 120:10
220:10 251:23,25
254:8 259:1
269:10 277:25
293:13 332:17
**reference** 130:2
220:1 231:21
263:13 278:18
288:12 305:15
338:7 339:2 340:2
**referenced** 130:19
141:6 175:2 232:5
234:12 278:22
283:7 327:8
331:12 339:11
340:15
**references** 198:5
314:5
**referred** 82:23
182:20 199:13
200:1 316:5 320:9
337:15

**referring** 22:12
41:14 96:21
105:23 113:10
132:3 137:7
147:23 165:15
216:9 248:14
288:22 332:2
**refers** 135:3
250:19 251:2,4,14
251:21 252:20
254:6 269:9 294:6
294:10
**reflect** 54:22 60:24
202:11,13 209:2
221:24 249:8,22
259:8 262:4 286:3
311:17
**reflected** 210:14
240:10 247:2
261:23
**reflecting** 208:22
241:25
**reflects** 180:7,19
180:23 181:16,19
222:18
**refresh** 24:23
288:13
**regarding** 57:16
85:15,24 119:5
121:20 126:17
128:16 131:17
198:22 201:14,18
281:14 288:7
289:11,25 290:3
291:10,18 293:18
299:15 312:16,21
313:2 314:20,23
317:10 327:22
328:4 329:1
**regardless** 141:21

**region's** 303:2
**regional** 294:20
295:11
**registered** 30:12
**regular** 49:8,11
134:8,9
**rejected** 262:6
**relate** 97:2,5
**related** 22:2 26:14
29:12 35:13 47:7
59:14,20,24 60:20
78:11 79:21 97:9
97:10 102:7
107:24 116:25
122:10 124:1
131:11 138:7,23
139:16,20 140:2
145:19 150:21
174:8 175:7
197:19 208:17
209:17 216:4
225:12 254:14,19
256:14 259:17
260:7 266:8 273:2
273:10 278:19
293:22 307:1
322:13,17 323:22
324:3 327:9,22,24
328:2,24
**relates** 1:8 176:4
**relating** 92:12
330:24 336:5
**relation** 25:7
35:21 93:1 150:14
266:19
**relatively** 257:21
**release** 312:15,20
312:25
**releases** 312:23
**relevant** 147:1
151:8 245:3,13,14

245:16,20
**rely** 255:20 280:25
**remain** 116:14
223:15 324:2
**remained** 257:21
**remaining** 130:10
130:11
**remember** 22:15
23:7,16 28:19
43:18,23 44:7
49:12 52:7 64:4,7
64:8,20,23 65:7
76:8,20 77:2 88:7
98:3 100:3 101:9
101:23 103:5
125:10 133:24
134:1,3 138:15
139:22,24 141:9
150:13 154:3,4
163:16 164:4,14
165:12 167:18,24
168:5,6 169:19,20
171:4 185:25
192:24 208:20,21
209:25 210:2,21
210:25 219:19
227:12,16 234:2
239:5,13 261:1,10
272:14 282:16
290:21 291:12
300:21,22 303:8
303:20 312:20
314:6,17 319:5,18
324:16 328:7
331:7,15,20 334:7
**remembering**
210:16
**reminder** 330:1
**remove** 261:21,23
**removed** 42:3
191:12 262:7

270:19
**renewal** 328:10
**renewed** 170:25
**repeat** 161:23
195:16
**rephrase** 68:12
96:16 127:2 160:5
**replaced** 38:24
132:7 319:16,17
319:22
**report** 7:17 94:18
95:16 108:25
109:3,4,7 128:25
129:5,6,6,8,10
132:24 133:17
134:2,5,6,6,10,11
135:1,10 136:17
137:13,24 140:17
142:11 147:6,14
148:1 149:24
150:15,17 166:25
167:7,17 249:6,8
249:11 250:7
278:23 279:1
293:15
**reporter** 15:2
142:1,2 236:6,8
339:7
**reports** 67:23
94:10,16,22,25
95:3,5,12,15,21
108:10,11,14,17
108:20 112:23
113:9 132:18
134:14 137:5
138:1,3,4,6,8,9,23
138:24 139:4,6,20
139:22,25 140:4,9
140:14,21,24
141:6 149:24
150:3,15,20 173:1

173:1 255:4,12,13
255:21,23 257:3
266:23 278:15
282:9 293:21
294:3 313:16
**represent** 12:10
284:18 330:1
334:24
**representations**
281:1
**representative**
55:11
**representatives**
200:20 206:16
207:20
**representing**
11:23
**represents** 23:18
**request** 44:24
46:22 97:15 98:20
103:12,19 114:9
115:5,10 116:12
116:14 119:6
121:24 124:4,6,13
141:5 171:17
203:20,22 205:6,8
206:14 209:17
217:13 218:5
229:9,14 238:7
241:1 258:11,14
258:19 259:13,14
260:19 261:21
262:4,6 288:7
289:20 316:16
340:9,11
**requested** 59:14
59:19,24 98:11
99:2 105:15
110:23 123:25
125:8 159:14
167:16 184:10

203:23 210:3,10
217:7 218:14
230:2 238:11
270:19 271:8
**requesting** 46:24
102:6 103:16
104:1 105:12
116:13 203:10
205:5 209:22
237:4,22 238:10
239:19 240:2
**requests** 60:24
61:4 103:7,18
129:17 201:15
202:12 204:21
208:1 213:1
218:25 229:2
240:19,20 241:8
261:2 262:14
**require** 40:22
42:16,17 147:16
214:13 333:14
**required** 43:3 61:5
125:12 139:13
161:7 242:6
244:20 246:23,25
317:2 333:24
338:25
**requirements**
257:14
**requires** 179:12
213:20 214:10
**reschedule** 281:18
**research** 131:17
131:22
**researching** 131:5
**residency** 235:5
235:19 236:4,9
**residential** 225:9
225:10

**residents** 125:25
128:10 246:2
**resolution** 8:10
39:22,24,25 40:1
80:2 82:19,21,23
83:24 89:16,23,24
90:2,4,6,9,11,14
90:14,21 91:7,9,14
92:8 116:18,21,23
188:13,16,20
189:3,6,10,14,17
189:21 190:11
199:16,17,19,22
220:22,25 221:20
221:22,24 222:11
222:19 223:3,9,12
223:21,25 234:3
240:3,10 243:6,18
244:2,4,10,20
245:6,7,10 246:10
247:3,5,17,25
249:12,17 258:23
258:25 259:4,6,16
261:19,21,22
269:12
**resolutions** 79:14
79:15,16,18,20,22
79:23 81:8 89:12
89:13,14 97:5
220:21 223:16
244:14,15 245:2
245:13,16,16,21
245:22 246:4,24
247:21 257:14
259:7
**resolve** 229:16
**resolved** 229:17
**resources** 97:15
97:22,24 98:10,21
99:1 103:16
115:15 161:21

175:15,16,25
177:9,17 178:22
241:9 281:3 310:6
327:11
**respect** 207:23
**respond** 75:24
76:3 96:12 98:11
99:24 100:12
101:7,14 102:2
104:8 105:12
110:6 112:20
115:5 116:23
125:8 173:19
200:21 229:1,21
230:11 264:17
266:14 270:3
288:17 309:24
**responded** 231:13
327:18
**responders** 122:7
122:9
**responding** 115:10
173:25
**response** 8:4 76:24
160:4,11 227:2
229:1,10 230:6
231:2 232:6 233:6
236:21 268:13,17
268:17,21,22
269:22 271:5
**responses** 211:9
230:13 267:22
**responsibilities**
37:22 38:16 39:1
39:3,7 40:7 49:8
53:19 54:6 64:5
65:15 69:14 70:14
73:16,19 76:13,17
77:18,22 78:4
83:25 84:3 91:25
92:17 126:20

127:9 200:13
responsibility
  45:7,8 65:1,12
  66:17,19 67:11
  70:2 74:3,7,12
  75:2,13 88:22,24
  89:21 90:1 91:21
  92:2 93:11 108:5
  119:24 126:7,16
  126:22 127:14
  131:5 133:4
  136:13 137:6
  154:22 155:1,2
  160:10 184:20
  201:9 207:25
  306:6
responsible 61:3
  63:24 78:15
  129:16 136:17
  150:2 184:13,23
  232:9,24 250:4
responsibly 126:8
restate 160:5
restoring 121:24
restroom 258:1
restructured
  163:25
result 111:10
  113:16 173:5
  271:11 307:21
resulting 309:12
resumé 86:23
retention 314:20
  314:23 317:10
retirement 253:12
return 148:9
returned 147:17
  249:24 256:5
  338:18
returning 152:23

revenue 66:4,6,13
  66:14 95:7,17
  116:7 127:10,20
  172:15 178:3,13
  178:13 196:18,22
  196:22,23 241:10
  269:2,24 270:4,17
  308:22
reverse 31:17
  119:1 191:8
review 23:1 24:12
  26:13 57:1 94:21
  265:15 277:10
  279:19 284:23
  304:12,15 325:8
  338:12 339:1
  340:1
reviewed 24:22
  286:20
reviewing 186:10
  297:6 325:9
reviews 249:15
revised 33:12
  39:20 72:17 317:4
rice 5:18 7:6 11:16
  11:16 271:22
  329:9,13,18,24
  330:1,23 331:9
  334:18
richard 313:5
right 11:24 14:10
  16:21 18:23 24:13
  33:19 36:20 37:17
  38:11 41:24 44:21
  51:2 53:9 54:13
  58:1 61:13,15,24
  62:2 63:3,8,12
  65:5 66:16 67:12
  67:17 69:20 73:8
  74:20,24 78:11
  83:15 84:17 87:23

87:25 90:16 91:22
98:22 102:12
104:5 105:5,25
112:7 116:9 120:1
120:23 122:20
123:14 124:2,21
128:1,4 135:23
136:4,19,25
138:20 139:2
140:23 141:21
143:5,15,20
148:21 149:9,12
149:14,25 150:4
152:22 153:8
160:2 171:19
172:1 173:8,11,16
178:6,14,24
179:21 180:16
181:6 183:23
185:25 188:23
195:24 196:1,1
202:10 209:25
214:17 220:22
228:2,11 233:14
235:13,24 238:18
248:17 250:13
253:1,4,15 256:19
265:13 267:3,6,12
270:7 271:3 272:9
274:13 276:7
279:22,24 280:21
281:6,9 283:15,18
284:5 296:15
297:24 299:7,16
299:20 309:25
313:9,22 314:18
315:7,11 336:15
rights 54:9
rite 335:6,24 336:5
rmr 2:9 337:4,24

rocco 289:9,16
  290:11,19
roche 191:25
  192:13,15,16,16
  192:20,25
rogers 143:8,24
  144:5,9,11
role 12:20 31:9
  32:6,19 63:18,21
  65:9 66:5 70:4
  71:24 72:11 73:15
  73:15 76:23 84:20
  84:21,23 89:11
  92:10,25 95:11
  118:6,12,17
  126:15 129:20
  130:4,14 183:13
  183:16,19 184:22
  186:7 188:25
  192:22 207:6
  220:19 228:13
  233:8,15 274:16
  299:20,22 333:20
roll 55:1 287:13,15
room 202:8 207:8
  214:25 215:3
  216:6
ross 131:3
rotated 155:25
routinely 54:4
  321:23
row 237:9
rubino 185:10,11
  196:4 197:11
rules 2:10 39:19
  73:20 339:5 340:5
runs 39:18 201:7
rx 301:13

| s | | | |
| --- | --- | --- | --- |

**s**

**s** 2:9 320:6,9,12,18
320:20,21 321:3,6
321:7,8,9,12,14,18
321:22 322:1,6
337:3,24 338:15
340:8,8 341:3
**sacks** 3:5 11:8,8
16:5,12 17:1,8,15
18:8,12,24 19:16
20:12,18,23 21:12
23:10,22,24 26:10
33:5 34:2 35:16
35:23 36:3,8,15,21
37:5,11,24 42:23
43:17,22 44:6,25
46:9 47:16 51:15
51:25 53:15 56:9
56:17 57:8,18
60:1,10,16 62:15
62:25 68:10 72:12
76:19 77:1,6
85:17,25 86:13
87:3 88:6,12,19
89:1 93:3 94:23
96:14 98:2,7,13
100:2,14 101:8,16
102:8,21 106:19
109:5 110:9
111:12,20 114:4
114:25 115:21
119:19 126:2,10
127:1,12,21 131:7
131:13,19 141:1
141:14,20 142:1
144:12 146:10,19
151:4,8,13,16,19
151:25 152:3,7,13
154:10,14 165:25
173:21 175:5
178:15 179:5,16

180:10 181:9,21
193:25 197:3
209:5 210:17
222:2,21 226:11
226:20 233:3
239:6,9,14,16
243:23 255:1
256:12 258:2
269:19 270:8,23
271:21 275:14,25
276:20 278:3
279:3 280:10,17
283:1 284:25
285:8,21 288:1,19
288:21 290:5
293:7 295:1
297:11,18,20
300:16 302:5,11
308:5,13 309:13
309:20 310:8,23
311:10,13 324:22
329:15 330:20
331:6 336:1,12,14
336:19 338:5
**safe** 336:21
**safety** 8:22 9:8
75:10 122:14
160:15 161:13
162:10 163:17,18
163:22 164:6,7,10
272:7,12,13,18,23
273:7 274:3,21,22
275:18,24 276:6
276:15 277:7
281:14,22,24,25
282:8,11,14 283:7
284:9,21 285:4
287:5,23 290:16
333:17
**sailors** 64:22 68:5
68:15 85:10

**salaries** 183:6
**sales** 95:6,13,14,17
95:19,20 127:6,16
127:25 172:11,14
172:16,19,23
173:6,14
**sandy** 185:21,22
**sat** 43:20
**save** 317:22,25
318:4 319:25
321:1,11,12,13
**saw** 72:6 116:9
146:5
**saying** 57:24
145:15 203:15,18
207:14 231:13
325:14
**says** 46:16 54:21
87:24 134:25
135:20 136:22
137:25 139:11
143:23 147:15,19
149:7 156:14
159:18 178:21
192:14 217:25
219:10 230:21
231:3 232:9 233:6
233:11,13,14
235:4 237:7,10,11
237:22 238:10
243:8 244:1 247:4
248:1,8,23,24
250:18 254:4,5
266:7 267:22
282:21 287:15
289:2,8,14 290:10
293:4 294:21
295:13 298:17,18
300:8,12 301:12
301:21,25 302:23
303:3,13 312:15

313:25 316:2
325:13,18 326:14
327:3,7
**scan** 318:2
**scenario** 158:7
**scenes** 323:13
**schedule** 7:23
192:2,10,13 193:1
194:12,16,20
195:13 215:17
216:25
**scheduled** 198:1
**schedules** 193:22
**scheme** 240:17
**schmotzer** 266:1,2
**school** 27:24 28:2
28:4
**schools** 235:5,19
236:3,9
**science** 28:10,12
28:13,15,22
**scott** 23:6,8,13,18
226:23 228:3,18
**scott's** 23:7
**screen** 201:23
**seal** 339:15 340:21
**seats** 84:12
**second** 76:10,12
134:16 142:25
145:10 147:10
189:25 202:20
221:1,2,6,11
229:10 246:12
248:9 271:21
**section** 55:1 247:2
247:25 263:19
314:25
**sections** 317:3
**secure** 270:16
**see** 45:12 49:21
65:21 78:20 86:23

108:14 113:3,6
120:14 121:18
122:16 124:8
135:1,14 139:8
140:13 143:21
144:1 145:14
146:7 147:4,8,12
147:19 148:17
149:4,6 193:15
215:10 227:15
229:11,24 230:21
231:10,11,25
233:11 237:11,17
238:8 239:20
246:16 248:10,24
252:23 262:13
266:5,13 267:22
267:24 268:11,18
276:11 282:21
287:18 288:10
289:6 290:13
292:13 294:21
295:15 297:18
298:17,18 299:3
300:1,5,12 301:15
301:25 302:21
303:3,15 312:1,17
313:21 314:2
323:16,18 325:5
325:18 327:7,18
328:6
**seeing** 22:16 97:15
98:20 103:22
107:16 161:5
172:6 184:24
**seek** 212:14
**seeking** 96:24 99:5
99:9 100:11
106:17 183:7
217:3

**seen** 108:24
114:17 116:3,4
130:2 263:13
285:12 303:17
305:14 320:6
**sees** 42:4 234:20
**send** 56:21 57:1
128:10 143:13
145:19,23 146:17
194:1 204:16
211:12 212:8,11
266:25 283:12
325:16,20,25
**sending** 144:9
146:6,12 212:18
326:21
**sends** 204:20
**senior** 177:19,21
**seniority** 266:19
**sense** 14:21 15:15
160:24 161:3,16
172:22 173:12
219:1,7,13,15
221:17 223:7
229:20 246:5,6
321:1
**sent** 7:10,15,20 8:3
8:14,20 9:3,11,14
10:3,9 57:6 95:15
134:14 138:2
144:6,19 146:7
192:25 193:22
194:8 283:5,17,20
293:22 299:3,11
312:7,20 325:15
326:5,15 327:3
**sentence** 268:21
300:15
**separate** 62:23
81:1 91:6,9,14
95:22 167:13

168:1,13,16,19,21
169:3,8,11 170:8,9
174:5 189:10
195:3 209:8
220:20 258:25
320:13,14 322:25
**september** 7:16
136:16 137:13
138:22 139:4
142:11,12 144:24
147:7,9,14 149:14
149:24 150:14
**seren** 133:15
**series** 237:18
**servant** 126:11
**serve** 54:3 56:3,7
57:24 58:9 66:12
172:7 192:22
**served** 58:12,17
59:3 81:20,23
248:16 252:25
**service** 66:10
167:14 169:9
170:15 225:2
305:21 327:9
**services** 47:6
62:22 64:12,15
65:13,24 66:10,13
68:20,21 69:3
70:3,4,15 71:21
76:16 99:24 101:6
101:12,18 102:1
102:10,10,17,18
102:19,23,23
103:8,9 104:12
105:7 106:11,23
106:24 107:15
108:7,8,18 109:17
109:23 110:5,22
111:9,16,24
116:12,20 122:20
122:22 123:10

125:4 130:20
131:1 161:4,17
162:8,14,16,20,25
163:2,4,13 164:10
167:13 168:1,2,13
168:17,20,22
169:4,9,12 170:14
171:1,16 172:20
174:6 188:21
189:21 190:10,23
191:1 196:22
200:9 209:16
215:20,22 216:3
217:18 224:18
225:1,4,7,10,10,12
225:13,14,16,18
225:21,21,22
230:19 237:5
238:6 240:3
248:16 252:25
253:3,9,10,17,20
254:9 260:13
263:4,8 268:25
269:1,17,17 270:5
270:6,15,21 271:3
271:4,5,12 280:2,9
280:21,25 305:11
305:16,23 306:1,3
306:7 328:10,24
334:2
**serving** 58:25 60:4
60:6,13
**sesame** 175:11
**session** 24:12,23
154:24
**sessions** 183:23
291:9
**set** 39:19 40:13
41:11,16 72:16
133:21 138:9
141:13 142:17

**[set - social]** Page 52

150:25 180:1
203:17 227:9
230:12 231:6
240:12 243:15
265:23 271:14
274:7 285:10
291:7 296:15
297:22 311:22
314:18
**setting**  40:25 79:1
79:1 174:12
335:22
**seven**  25:11,15
73:5,6,10
**shannon**  273:23
274:15
**shape**  166:8
**share**  212:16
320:7,8
**shared**  209:11,15
210:15
**sharon**  267:1
**shayna**  3:5 11:8
338:5
**sheet**  338:13 340:7
340:10,18 341:1
**shelter**  136:24
**sheriff**  38:23
114:17,23 125:5
160:20 299:24
**sheriff's**  65:5
104:17 105:7
112:3,17,18
113:16 114:8
115:4,9 116:2,8
122:3 162:4
164:22 204:24
209:18,19 263:3
299:23
**shift**  150:25
161:18,19 175:10

193:11 301:12
**shifting**  161:4
**shkolnik**  3:4,12
11:9,11
**shontel**  81:19
163:10
**shoot**  279:12
**short**  274:6
**shorter**  248:9
**shorthand**  337:10
**shortly**  77:13
141:18 143:16
**show**  95:13 108:18
133:6 265:11
**showing**  293:15
**shown**  338:16
**sic**  226:24 235:7
**side**  151:12 296:12
328:13 329:6
**sign**  176:17 246:24
246:25 300:9,20
301:2,5,9 336:17
**signature**  228:10
228:12 246:13,14
246:18,21 247:1
247:10 337:16,22
337:24 338:14
**signatures**  34:23
34:24 246:2
**signed**  47:24 48:8
188:18 243:19
249:12,17 339:13
340:18
**significant**  95:8
155:8 170:12
171:17 197:1,5,13
224:21
**significantly**  248:9
**signing**  338:19
**signs**  222:20

**similar**  32:19
50:22 67:20 101:3
112:22 113:3
114:14 130:15
136:14 150:17
170:22 171:7
198:5 230:9
278:14 320:18
328:12
**similarly**  136:12
271:10
**simon**  174:20
287:16 291:25
292:6 295:13,17
296:5 297:9 298:5
298:19 299:10,14
300:3 304:6
**simon's**  298:1
**simonsunnys**
297:25
**simple**  104:21
244:23
**sincerely**  338:21
**single**  100:22
169:15 196:15
198:19 199:2
216:23 243:12
317:22 335:23
**sir**  14:2,5,8,14,17
15:9 21:8,19
22:19,22 26:16,20
27:15,18 30:6,9,11
30:13,16,19,22,25
31:7 37:19 44:22
54:14 61:2 62:10
67:13 77:17 105:9
228:23 235:25
238:9,15 239:21
265:24 274:8
279:25 285:11
287:20 288:11

295:16 300:6,13
302:22 303:4
312:2,5 313:8,15
315:3,6 318:19
338:10
**sister**  134:22,25
146:14 292:12,14
**sit**  44:9 57:14
156:2,8 266:19
329:10 330:12
**sits**  160:25
**sitting**  78:5 105:10
139:11 141:10,12
146:16 172:22
210:21 236:1
252:5 268:20
287:21 289:18
295:6 300:25
312:19 322:22
**situation**  316:20
**six**  25:19 26:1
58:22,22 136:21
244:23 245:1
**size**  318:6
**sizes**  111:1 177:14
**skim**  247:4
**skipped**  240:24
**skyrocketed**
104:19 112:7,10
**slide**  191:22 243:3
**slot**  218:3
**slots**  203:21
**slow**  232:15
**small**  77:22 78:8
123:11 135:23
**smith**  86:5,7
**snowstorm**  336:22
**sobol**  267:1
**social**  110:25
111:1,4,8,10,23
116:15,16,25

[social - staff]

121:24 207:24
208:4 209:17
322:18,19 323:3,4
**soldiers** 64:22
68:5,15 85:10
**solutions** 6:3
303:1 338:1 341:1
**sorry** 16:6 23:6
24:20 33:6 42:12
52:21 57:4 63:12
65:6 73:8 83:7
111:3 129:24
142:25 160:6
161:24 164:11
185:13 218:15
236:7 239:8
248:20 257:8
311:10,14 313:25
316:22 320:22
324:24
**sort** 15:11 26:8
37:16 46:15 49:7
58:4 80:12 92:10
92:18 93:21 95:12
116:1 117:14
125:12 127:9
135:24 136:22
140:14 154:19
166:22 167:1
171:5 181:13
190:13 192:6
195:12 204:12
205:5 212:10
215:11 219:9
240:17 243:11
244:1 247:4
280:21 333:21
**sought** 102:3
165:23
**sound** 124:21
173:8,16

**sounds** 28:18
31:18 89:15
138:20 140:23
**source** 47:2,3 61:1
256:6,7 270:4
332:4
**sources** 172:15
277:4
**speak** 26:21,24
43:15 50:8,10
55:16,22 84:4
88:11,14 128:23
146:14 180:11,21
180:24 181:17
188:2,7 194:8
201:3 218:21,25
270:9 279:4 280:4
298:23 306:2
316:13
**speaking** 15:6
175:19 306:14
325:9
**special** 130:3,18
132:6 289:10
290:2 333:14
**specialize** 226:6
**specific** 28:11
68:16,16,18 79:4
85:15 86:11 89:8
103:18 105:4
109:15 141:4
142:20 154:21
165:13 173:19
187:14 197:8,9
198:17 204:21
205:5 206:12,25
225:16 229:22
234:5,9,12 251:2
256:10 260:24
262:23 275:20
295:25 317:9,13

319:7 328:20
335:16 336:4
**specifically** 101:17
102:6 103:19
105:14 137:25
140:2 155:9
158:17 159:21,25
227:15 229:21
230:2 252:1 254:7
257:11 260:1
275:5 280:4 294:9
306:14 331:2
**specifics** 137:15
171:23 206:18
225:4
**specify** 262:2
**speed** 134:19
**spelling** 91:18
**spend** 93:15
105:25 148:15
178:5 182:2,5,9
187:9 190:25
191:15 253:4
257:7 310:9
**spending** 93:9,13
105:24 175:17,20
176:1,5,13,20,24
180:8 181:25
256:9 257:6
**spent** 47:10
148:12 181:8
189:3 234:15
254:19,22 255:5,8
255:9,25
**spoke** 101:13
**spoken** 27:16
217:11
**sponsor** 244:9,11
**sponsored** 243:25
244:2

**sponsors** 244:7
**spot** 219:21
**spreadsheet** 91:15
135:10 248:7,9,12
248:22 249:3,15
**spreadsheet's**
250:11
**square** 1:23 2:13
3:14 6:8 337:5
**squeeze** 183:5
**ssacks** 3:10
**st** 4:13 11:12,12
**staff** 7:16 15:24
16:17 17:7 24:7
45:7 50:8,12 59:2
68:20 70:9 77:22
78:8,22 88:16,22
96:2,5 113:5
125:22,23 129:2,3
129:8,9,11,14,16
129:16,21 130:7,7
130:11,13,14
131:4,10 132:14
134:6,7 135:12,17
135:21,23 136:9
136:11,25 137:5
142:11 145:18,23
147:6,15 149:8
150:3 153:7,16
154:1 156:17
157:12 164:19
166:6,25 167:6,9
182:11 186:19
193:19,22,24
199:18 202:4
206:22 207:15
249:15,25 257:2
262:8 266:4 267:3
279:17 281:4
282:11,14 283:22
284:3 316:1,2

320:17 323:11,15
**staffing** 67:4
220:12
**stakeholders**
176:8
**stance** 170:5
**stand** 55:21
288:25
**stands** 73:25
227:18
**start** 47:1 51:19
60:25 61:12,16,23
68:3 78:13 89:24
106:23 155:23
205:22 219:5
306:21 310:3
**started** 12:8 48:22
77:14 83:19
281:12 326:11
**starts** 176:6
228:24
**state** 28:5,6,8 29:1
29:4 39:20 71:11
72:22 75:18,22,23
75:24 76:4 81:6
123:1 128:4 172:3
172:17 178:7
316:6 339:10
340:15
**statement** 207:18
219:10 236:2,13
236:21 241:3
270:12 301:17
302:14,16 314:4
339:13,14 340:19
340:19
**statements** 170:21
290:18
**states** 1:1 2:11
**static** 223:15

**statistics** 140:7
161:10
**status** 7:11 133:16
134:2,4 135:10
136:16 139:9
140:21 147:6,6
148:1 149:8
150:15 257:2,3
278:14 293:15
**stay** 331:25 332:1
333:2
**stays** 191:2
**stem** 298:16,22
**stenographer**
337:11
**step** 71:5 187:25
240:24 241:7
322:3
**steps** 304:2
**steve** 313:17
**stick** 94:22 95:4
332:13
**sticker** 324:24
**sticks** 94:18
**stone** 203:17
**stores** 5:4
**stories** 301:23
**strain** 104:10
**strategic** 305:11
305:16,21,23
306:1,3,7
**straying** 189:19
**strays** 190:9
**stream** 127:20
**streamline** 43:4,14
195:16
**street** 4:6 175:11
**stricken** 262:10
**strike** 52:21 60:5
101:21 262:12
307:18

**structure** 266:21
**structured** 213:5
**study** 28:8
**stuff** 122:13
139:23 161:12
187:22 201:5
321:1
**subbullet** 231:19
**subbullets** 231:7
**subcolumns**
237:18
**subfund** 263:21,21
**subfunds** 263:22
263:22
**subject** 7:11,16,21
8:4,16,21 9:4,12
9:15 10:4,10
133:16 142:11
227:1 265:18
274:3 279:17
292:1 296:25
297:9 298:12
311:18 325:3
327:7
**subjects** 56:14
**submit** 92:6 176:9
206:1
**submitted** 337:17
**subscribed** 339:10
340:14 341:21
**subset** 267:15
**subsidy** 99:6,10
100:12 122:18
123:12 254:5
**substance** 27:13
**substantive** 221:5
326:8
**substitute** 220:2
261:18
**substituted** 220:24

**suburbs** 294:19
**sue** 335:12
**sued** 335:1,3,15
**suggest** 335:11
**suite** 1:23 2:12
3:15 5:20 6:9
337:4 338:2
**summer** 72:4
77:15 83:20
**summit** 302:20,25
303:6,10,13,18,24
304:3
**sunny** 291:24
297:9
**sunshine** 316:6,8
**superior** 338:1
**supermajority**
244:25 245:17
246:9 247:18
**supplemental** 92:7
188:17
**supply** 30:24
**support** 106:7,9
106:17
**supportive** 170:3
170:24
**supposed** 93:9
190:25 256:22
324:3
**sure** 12:19 16:16
18:1,14,16 19:5,8
19:10 21:16 23:20
25:22 32:11 33:16
36:2 39:5 42:10
46:1,15 47:20
48:11 49:12 52:18
54:20 57:23 59:17
60:21 66:19 67:3
67:5 73:7 74:18
76:12 86:4 92:23
93:25 94:7,19

98:17 102:13
111:7 114:22
115:13 121:7
126:6 132:2 133:6
134:10 139:18
140:3,20 141:11
142:17 145:17
146:16 149:22
150:20 153:25
154:4 156:11,12
160:7 163:11
165:14 167:4
168:6 170:6 174:2
175:24 177:25
179:17 189:23,25
190:12 195:13
199:25 214:1
218:22 222:6
233:20 240:23,23
249:21 259:15
264:2 265:13
272:23 275:6
282:5 285:15
290:8 305:25
309:14 315:17,18
316:20 323:13
324:2 329:18
332:15,21 333:9
334:8
**surplus**   147:13,16
147:22
**swear**   125:16
**swing**   63:4 329:11
**sworn**   12:1,3
337:8 339:10,13
340:14,18 341:21
**system**   48:13,14
49:1,2,4,25 50:3
67:1,2,6,9 80:17
202:7,8 307:5,9,13
319:1,3 331:23,24

332:6,10,12,24
334:10,15
**systems**   136:18
149:13

**t**

**t**   137:6,10 337:1,1
**table**   191:22
222:25 226:19
229:8 230:5,6
237:9 238:5,23
249:22,24 329:6
**tables**   230:9
**tag**   248:23
**take**   28:14 31:16
33:21 62:18 77:3
83:9 90:24 91:16
114:14 125:12
133:18 141:14,17
142:14,20 149:2
150:24 152:10
187:21 192:4
200:10 208:10
227:7 243:10,13
247:6 257:24,25
271:16,19 274:5
284:23 287:15
297:1 310:20
311:16 322:3
324:24 329:10,12
333:4 335:15
**taken**   1:22 2:9
25:2 77:9 104:18
152:18 172:14,24
173:5,18 174:8
175:2 190:2 224:5
227:22 258:4
270:22 272:2
304:2,25 305:6
311:1 329:20
337:3,10

**talk**   13:8,24 27:21
50:4,5 97:19
135:21 140:6
154:19 164:23
165:10 206:8
207:2 214:7 224:9
242:6 276:9,19
326:5 327:13
329:12
**talked**   97:14 98:19
108:9 109:13
118:20 122:6
156:17 162:16
166:15,16 195:15
253:1 278:15
293:21 318:16
323:15
**talking**   51:17
96:20 115:25
117:13 149:19
159:12 160:22
184:3 195:25
199:6 200:23
216:2,12 219:5
245:23 247:13
298:15,21
**task**   138:18 231:5
231:8,14,20,23
232:4 289:11
290:3,22 291:1
**tasks**   77:24
**tax**   95:7,13,14,17
95:19,20 123:13
127:6,16,18,25
128:7,17 170:23
172:11,14,16,19
172:23 173:6,14
308:22
**taxes**   128:4,7
169:8 171:15

**taxpayer**   126:12
171:16
**taxpayers**   170:11
170:18
**tea**   219:9
**technical**   219:22
220:11,15 221:4
222:24
**technically**   66:12
182:24 195:1
244:25
**teleconference**   6:7
**telephone**   11:21
**tell**   75:15 102:18
134:13 139:15
140:7 141:11
150:19 158:1
169:15 192:5
242:5 250:22
252:4 262:1
276:24 296:23
328:20 331:17
**telling**   270:14
**tells**   49:18 75:19
252:3
**ten**   247:1,13
257:25
**tend**   84:9 205:8
245:22 255:13
317:22 318:7
320:19 322:24
**tends**   204:15
205:11 221:12
**term**   17:18,25
18:2 19:7,12,21
20:4 22:3 39:16
39:17 53:7 76:10
76:12 84:11,11
157:9 161:1
167:11 175:13
190:18 191:7

262:23 320:16
328:15
**terminals** 74:2
**terminology** 116:1
**terms** 66:14 71:2
79:1 94:18 97:20
103:18 104:9,21
105:1 115:22
140:1,9 159:23
161:11 165:2
170:4 172:24
180:8 186:7,17
190:19 191:8
215:15 222:22
238:22 244:11
293:16 317:13
333:18
**testified** 12:3,22
13:25
**testify** 12:24 13:14
14:6,13
**testifying** 13:6
**testimony** 7:3
13:10,14,20,23
26:18 216:17,19
217:12,16,25
339:6,7 340:6,9,12
**text** 10:10 262:12
287:18 312:14
325:4,14,16,20,25
326:6,7
**texted** 327:16
**texts** 326:11
**thank** 23:25 27:6
152:23 226:20
285:8 329:7
334:19 336:14,16
**thanks** 240:12
336:9,20
**them's** 170:4

**theme** 73:22
**themed** 73:22
**themes** 73:23
**theory** 333:3
**thing** 155:6 160:23
213:25 279:12
326:12
**things** 29:12 32:16
40:22 45:15 48:10
61:11 64:18 65:25
66:3 67:8 68:3
79:2 84:12 86:24
94:19,22 95:4,10
109:15 123:21,23
127:6 129:18
130:21 140:8
161:11 166:10
170:22 172:17
173:24 181:19
184:6 186:11,17
207:2 255:9 257:6
257:17 322:25
323:6
**think** 12:19 14:9
22:2 26:2 28:16
28:17 31:16 36:18
58:5 61:11 67:15
69:22 76:10 77:4
78:5 85:11 93:18
116:20 117:4
118:11 126:11
128:15 135:1
140:8 142:18
144:8 155:3,15
157:10 159:6
162:1 163:5,7,10
164:19 167:20
172:12 173:24
177:5,15 180:3,13
180:17,18 186:6
186:16 191:16

194:6 195:18
197:11 199:2
200:11 202:24
204:7 206:24
211:19 212:20,20
229:19 232:14
233:17,19 234:22
241:2 246:6 265:5
268:15 276:21,22
279:22 301:21
304:13,22 310:21
318:25 321:16
323:5,12 330:3,11
**thinking** 259:22
306:21,25 307:25
**third** 143:19,19
221:12,19 303:13
**thirty** 338:18
**thomas** 273:22
289:8 292:16
**thought** 72:6
106:5 202:22
306:18,23 308:25
309:1,3,6,9
**thoughts** 157:13
**thousand** 190:22
**thread** 266:12
**three** 42:9 47:23
53:5 76:24 90:24
90:25 129:22
130:7,8,23 148:24
155:20 214:21,24
215:8,18,19
241:14,14 271:16
**threshold** 33:14
40:10,11,13,15,17
40:18,25 41:3,6,10
50:23,24 61:21
62:12,22
**thresholds** 33:13
40:9 41:13,14,16

79:1
**throwing** 73:11
**ticket** 74:5,18
**tie** 251:17
**ties** 252:2
**time** 24:5 25:12,14
25:15 26:2,5,22
28:20 31:5 34:15
34:18 50:25 58:15
59:6,11,15,17,22
60:4,6,13 63:5,6
66:21 68:25 71:7
71:9 72:23 78:18
81:22 82:3 85:13
85:19,21 95:10,13
96:9 101:3 111:6
112:24 113:7
114:20 117:2
121:4 125:10
132:12,13 133:4
134:18 135:8
139:10,14 140:1
140:10 142:19,20
143:4,11,13 144:5
144:19 145:9
146:25 148:4
154:7 156:1
162:20 163:25
164:14 167:3
172:1,4 178:10
180:3,13 183:2
184:20 192:4,18
193:4,10 194:7,8
194:21 199:2
200:25 201:3,5,7,8
201:10,16 202:5,6
202:9 203:21
208:2 211:14
212:21 217:1
218:3 219:20
223:12 227:7

228:8,9 235:3
246:7 247:10
257:15,17 258:1
276:11 282:23
283:4,8,9 295:25
297:2 299:3,25
313:14 315:10
317:19 319:15,18
327:11,19 329:3,8
329:15 331:8,20
332:5 336:16,21
337:15
**times** 4:14 80:4
99:11,14 110:12
162:18 193:3
198:17 200:8,9
207:10 220:9
224:12
**timetable** 287:8
**title** 130:19 192:17
194:11 228:7
274:17
**titled** 138:4 147:5
228:25 237:9
243:5 248:12
252:23 284:21
**tmcaleer** 318:18
319:4
**today** 14:4,13,16
14:18 15:3 17:19
27:12 32:1 37:23
38:18 51:17,19
69:5 78:5 81:18
105:11 137:16
139:12,15 140:11
141:10,12 143:7
146:16,21 172:22
173:3 185:2
210:21 236:1
268:20 281:16
287:21 289:18

295:6 301:1
304:18,25 305:6
312:19 322:23
330:12,17
**today's** 11:1
**told** 13:7,13 15:23
26:5 204:3 235:4
235:18 236:3
309:8
**tool** 175:14,15,25
**top** 115:18 116:25
136:22 145:11
149:23 157:1
167:14 169:9
170:12 173:23
174:10 196:1
199:9 237:3 244:1
255:22 265:6
324:25
**topic** 283:6 292:22
293:5
**topics** 132:15
319:7
**tossing** 148:7
**total** 129:22 130:7
183:12 306:10,16
306:23 309:6
**touch** 76:17
322:11
**touched** 166:22
324:7
**tough** 119:14
**town** 9:12 292:1
292:21 294:19
295:11,18,23
296:8,11,12
299:14 304:8
**track** 63:3 95:14
95:20
**tracked** 95:17

**tracking** 211:22
229:23 307:5
**tracks** 112:24
**trades** 64:16
**traditional** 160:24
**train** 233:8,15,18
233:24 234:6
**trained** 235:7,21
236:16
**training** 30:2,7,14
30:17,20,23
232:10,24 234:15
235:9,23 236:22
268:8 269:8
**transcribed** 339:7
**transcribing** 15:2
**transcript** 338:11
338:12 339:5,12
340:5,11,17
**transcripts** 25:1
**transfer** 75:21
263:3,12,14,17,19
264:6,15,16,25
271:11 334:9
**transferred**
270:20 271:9
**transferring**
263:20
**transfers** 263:1,2
**transitioning**
333:18
**transportation**
104:22,23 124:1
**travel** 292:23
**travels** 336:21
**treasurer** 38:22
**treat** 18:11 235:8
235:22 236:16
300:10
**treating** 301:9

**treatment** 161:17
161:22 162:8
226:6 237:5 238:6
240:3 332:16
**treatments** 161:4
**trend** 95:9,12
**trends** 127:25
128:13
**trevor** 1:15 2:8 7:3
12:2 54:21,23,23
55:2,5 133:13
141:16 142:7
191:21,25 273:22
279:15 297:8
311:18 321:15,16
321:18,21 325:3
325:14 337:3
338:8 339:4,9
340:4,13 341:20
**tried** 105:2 134:14
197:12
**tries** 252:9,10
**trouble** 190:21
**true** 118:15 159:8
214:4 335:20
337:12
**trumbell** 27:25
**trust** 281:3
**trustees** 80:16
**try** 14:20 15:5
34:12 74:16 87:16
92:23 166:4
170:13 172:8
195:15 201:2
211:10 232:15
288:24 306:20
321:23 332:11
**trying** 28:16 58:3
67:21 69:24
134:17 147:1
181:12,13 331:22

333:14

**tucker** 5:17 11:16

**tuckerellis.com**
5:23

**tuesday** 9:9
284:22

**turk** 185:21,22

**turn** 136:7 137:3
147:5 149:6
168:19 230:16
253:24 268:1
300:1 302:18

**turning** 104:5
216:15 247:24

**tweaked** 257:22

**twelfth** 4:6

**twitter** 323:6

**two** 13:2,3 15:20
17:10 20:7,25
24:3,21 39:11
43:2,3 48:10 53:7
53:9 56:19 58:19
58:23 62:18
119:15 129:21
153:1,2,3 155:8
156:6 164:5 169:9
170:1 182:24
198:4 214:7 215:7
241:14 252:6
271:19 274:22
275:19 298:10
319:20

**type** 22:15 38:7
45:15 70:25 73:23
79:3,20,23 101:18
102:18 103:20
106:13 134:6
155:6 161:6
192:17 194:13
204:19 275:7
326:12 331:23

**types** 68:23 79:18
84:7 102:1 155:3
162:5 184:2
224:25 225:7,16

**typical** 193:21

**typically** 49:21
79:24 83:14 94:5
112:22 146:4
191:7 192:10
196:8,14,21 201:2
208:2 211:10
212:6 228:18
241:19 266:23
277:8

**typo** 233:12,19,21

**u**

**u.s.** 313:17 314:4
314:13

**uh** 200:3 243:16

**ultimate** 168:11

**ultimately** 126:18
176:12 220:24
221:19 222:11
223:23 249:17
272:15 334:4

**umbrella** 92:19

**unable** 114:18,21

**unanswered**
211:20 229:25

**undersigned**
337:11,19

**understaffed**
111:17

**understand** 12:13
14:3,6,19 18:6,21
20:16 34:13 36:12
39:16 52:1 126:23
127:9 129:13,20
137:7 144:3,22
156:12 183:24
195:14 212:25

226:9 238:20
245:4 277:4
297:25 332:23
333:15

**understanding**
12:17 17:21,25
18:2,18 19:4,7,12
19:21 20:9,14
21:5 33:24 35:4
35:20,24 36:22,24
37:20 39:5,12
53:12 55:9 101:23
110:1 116:6
124:14,17 125:3
128:3,19,20 135:3
154:5,6 171:21
175:12 180:9,24
180:25 186:1
213:19,23 214:9
224:14,15,25
225:3,7 247:20
249:2 252:19
253:10 281:1
282:23 283:4
287:7 293:4,12
300:14,25 302:8
304:14 312:6
314:8 315:7 326:3
333:9 334:14,17

**understood** 14:24
15:16 169:21

**unexpected** 65:25

**unfortunately**
299:7 305:14

**united** 1:1 2:11

**university** 28:5,6
28:9

**unlawfully** 307:5

**unlimited** 166:16

**unmanageable**
111:2

**unpaid** 106:17

**unrelated** 102:20
162:8 204:6 328:3

**unusual** 267:16

**upcoming** 55:17
65:22 157:9

**update** 7:11 139:9
198:19 219:17,18
321:23

**updated** 147:13
149:24 223:15

**updates** 138:12
249:22 255:15,18

**uphold** 125:16

**urban** 29:16

**url** 285:3

**use** 49:7,13,16,17
49:21 55:20 68:8
97:20 147:12,18
147:22 148:5,6
149:1 151:9
159:23 160:13
173:9 190:19
191:10 214:10
258:1 319:6,15,25
320:3,19 321:10
327:11,13

**uses** 53:13

**usually** 83:12
194:1 201:22
204:15 211:2
212:5 213:6
267:16 273:10,12

**utilities** 64:17

**v**

**v** 1:9 338:6 339:3
340:3

**vacancies** 67:4

**vacancy** 73:10

**vacant** 67:24
84:11,12

valid  34:23
values  128:20
  178:14,19
variance  95:8
varied  71:1
varies  201:21
  202:16,17
various  18:5,23
  32:16,23 35:12
  39:1 40:21 47:7
  57:2 63:23 66:11
  67:16 68:23 73:23
  92:5 99:5,9
  100:10 103:20
  122:13 126:8
  132:14,21 135:12
  157:13 161:11
  162:3 175:16
  224:12 238:22
  250:12 255:6
  317:3
vary  94:17 203:11
  203:12
vendor  46:25
  60:25
veritext  338:1,7
  341:1
veritext.com.
  338:17
version  220:2,24
  221:18,19 223:2
  265:13 316:7
versus  40:4 85:1
  93:20 103:9
  203:16 279:2
vice  145:13
video  74:2 202:8
  277:18 286:7,10
videographer  6:15
  11:1,20 77:8,11
  152:16,20 190:1,4

224:4,7 227:21,24
  258:3,6 272:1,4
  310:24 311:3
  329:14,16,19,22
  336:23
videotaped  1:14
  2:8
view  17:13
viewed  333:1
vis  70:15,15
visible  165:4
vital  300:9,20
  301:2,5,8
vlt  73:21,22,25
vlts  73:22
volume  130:21
  140:5,8 172:6
volunteer  327:12
  328:13
volunteered
  328:17,18
vote  43:12 54:12
  54:15 55:24 83:2
  87:1 88:4 171:13
  247:5
voted  37:12 54:21
  54:23,24 55:6
  60:8,15 88:10
  173:23 246:9
voter  171:2,17
voters  34:7,9,13
  169:6 170:25
  328:9
votes  171:9,11
  247:18
voting  54:9,16,17
  174:2 257:14
voucher  49:22

**w**

wait  141:23 239:6
  271:20
waiting  245:11,12
waived  337:17
  338:19
wal  5:3
walgreens  335:4
  335:24 336:5
walk  82:11 195:13
walked  153:9
walking  192:6
walmart  5:3 11:15
  334:24 335:1,23
  336:5
want  14:9 16:20
  65:22 73:7 77:3
  94:19 103:24
  131:23,23 141:14
  141:15 152:10
  168:7 170:3 205:4
  214:7 223:20
  224:9 235:15
  240:23 243:10
  257:25 270:9
  271:16,17,19,20
  271:21 274:5
  288:24 329:9,10
  329:12,16 336:17
wanted  15:25 43:4
  47:15 63:4 88:9
  101:14 102:1
  122:12 139:3
  152:24 169:7
  176:3 203:6
  215:21 218:18
  221:13 230:1
  234:3 240:7
  243:13 274:21
  275:17 276:4,5,17
  277:5,16 281:15

281:23
wants  91:2 156:2
  204:25
warn  296:21
washington  4:7
watch  128:13
watching  276:22
  277:2,18
water  258:1
way  26:25 42:1
  46:7 47:14 48:1
  50:22 51:22 83:16
  83:19 84:15 91:13
  91:19 118:11
  154:18 166:2,8
  167:5 174:13
  219:14 234:17
  257:18 265:3
  271:2 292:21
  299:9 309:1 323:9
  332:12
ways  134:18
  165:22 231:7
  265:1 288:16
wblvd1272  145:2
wc.com  4:9
we've  77:4 103:19
  104:10,25 109:13
  116:1 130:15
  160:8 162:16
  166:20 174:12
  175:3 195:14
  224:11 240:13
  253:1 254:3
  257:12,18 293:14
  293:21 304:23
  305:5 307:23
  318:16 330:17
website  284:20
  285:3 286:23
  287:4

[week - x]                                                                 Page 60

**week** 45:22
**weekly** 56:19
**weeks** 274:23
  275:19
**weiland** 2:9 337:4
  337:24
**welcome** 152:22
  226:21
**went** 24:4 29:3
  38:20,23,24 63:16
  67:9 69:19,21
  70:1 71:15 121:11
  169:4 172:21
  177:15 185:22
  292:25 294:5
  312:12
**wheelhouse** 93:16
**whichever** 83:10
**white** 166:25
  167:10
**wholes** 120:16
**wholesale** 21:20
**wide** 70:20 77:23
  78:7 80:14
**wife** 27:11,14
**wilcox** 1:22
**william** 279:15
**williams** 4:4 11:19
  12:10
**window** 71:17
  245:1 246:1
  247:13
**winning** 74:19
**winter** 292:24
  294:4,13
**witness** 11:8 12:1
  12:18 16:7,13
  17:2,9,16 18:9,13
  18:25 19:17 20:13
  20:19,24 21:13
  26:11 33:7 34:3

35:17,24 36:4,9,16
36:22 37:6,12,25
43:18,23 44:7
45:1 47:17 51:16
52:1 53:16 56:10
56:18 57:19 60:2
60:11,17 62:16
63:1 76:20 77:2
85:18 86:1,14
87:4 88:7,13 89:2
93:4 94:24 96:15
98:3,8,14 100:3,15
101:9,17 102:9,22
106:20 109:6
110:10 111:13,21
115:1,22 119:20
126:3,11 127:2,13
127:22 131:8,14
131:20 141:2,18
141:23 144:13
146:20 152:4,8,12
154:15 166:1
173:22 175:6
178:16 179:6,17
180:11 181:10,22
194:1 197:4
210:18 222:3,22
226:12 233:4
239:8,15 255:2
256:13 270:9,24
271:23 275:15
276:1,21 279:4
280:11,18 283:2
285:22 288:2,20
290:6 293:8 295:2
300:17 302:6,12
308:6,14 309:14
309:21 310:9
330:21 331:7
336:2 337:3,8,14
337:16,22 338:8

338:11 339:1,4,11
340:1,4,15
**witnesses** 151:11
**witness'** 338:14
**wondering** 166:9
  218:16 241:6
  261:8 292:20
  305:17
**word** 91:11 112:7
  160:13 191:11
  214:11 232:13
**words** 128:14
  283:10,25
**work** 28:14 29:7
  29:24 43:8 51:22
  63:24 65:16 66:4
  68:9 69:15 95:12
  129:9 131:11,11
  131:15 132:16
  162:3 167:17
  168:10,14 174:4
  195:7 206:5 211:5
  240:18 245:23
  268:8 269:8
  313:11 317:14,17
  318:15,20 319:7,9
  319:10 322:18
  325:21,24 326:2
  327:11,11,13,17
  328:2,3,13 329:13
  333:13
**worked** 31:1,5,12
  31:13 32:11 34:17
  63:7 135:17
  167:10,25 168:8
**worker** 24:4,6
  78:21 116:15
  130:6
**workers** 85:3
  110:25 111:1,5,8
  111:10,23 116:17

116:25 121:24
203:14 209:17
321:16 327:10
**working** 48:22
  65:19,21 67:2,21
  69:11,19,24 86:22
  118:25 136:23
  137:18 139:20,22
  139:24 149:13
  168:14 176:7
  182:24 186:8
  319:19
**workload** 157:13
**works** 64:11,12
  83:16 131:1
  195:14,19 224:10
  247:21 323:13,19
**worth** 61:25
**wow** 134:25
**write** 148:23
  166:25 274:10,20
**writes** 267:21
  268:24 281:13
  282:17 292:19
  294:17 298:14
**writeup** 91:18
**written** 167:6
  222:25 286:9
  314:19
**wrong** 69:23 72:7
  120:3 128:6 163:8
  279:12 288:24
**wrote** 275:2
  327:17

|  x  |
| --- |

**x** 55:3,7 86:22
  105:25 158:18
  177:17,18 207:1
  207:17

**[y - yvonne]** Page 61

| y | |
|---|---|
| **y** 105:25 | 314:1 |
| **yeah** 32:13 43:14 | **york** 3:8,8 4:14,16 |
| 50:24 74:9 88:17 | 4:16 |
| 140:19 141:11 | **youngstown** 28:5 |
| 153:4 164:8 165:6 | 28:8 29:1 |
| 170:22 171:7 | **ysu2121** 326:15,18 |
| 172:25 183:3 | **yvonne** 82:6 163:2 |
| 188:24 190:18 | |
| 197:4 199:24 | |
| 200:6 201:2 | |
| 205:23 215:1,13 | |
| 223:24 225:9 | |
| 251:12 260:23 | |
| 264:1,3 267:13 | |
| 285:25 291:14 | |
| 297:13 326:24 | |
| **year** 26:3 48:21 | |
| 63:25 65:23 67:7 | |
| 67:8,14 70:18,20 | |
| 70:21,22,22,24 | |
| 71:3,4 75:20 | |
| 100:22 113:1,2,2 | |
| 134:16 157:16 | |
| 162:21 172:21 | |
| 178:3,18 187:5 | |
| 191:10 197:13 | |
| 255:8 259:2 | |
| 273:13 309:17 | |
| **years** 41:4 42:9,13 | |
| 53:7,9 58:20,23 | |
| 79:8 81:24 95:21 | |
| 100:22 104:19 | |
| 108:14 112:7 | |
| 119:15 124:11 | |
| 155:20 156:6 | |
| 160:25 178:6 | |
| 187:6,10 221:10 | |
| 319:20 330:14 | |
| **yesterday** 23:3 | |
| 25:5,10 26:7,23 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.