Highly Confidential - Subject to Further Confidentiality Review

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
                      -  -  -
 3     IN RE:  NATIONAL          :  HON. DAN A.
       PRESCRIPTION OPIATE       :  POLSTER
 4     LITIGATION                :  MDL NO. 2804
                                 :
 5     This document relates to: :  Case No. 17-MD-2804
                                 :
 6     The County of Summit, Ohio :
       Ohio et al. v. Purdue Pharma :
 7     L.P., et al., Case No.     :
       17-OP-45004                :
 8                                :
       The County of Cuyahoga v.  :
 9     Purdue Pharma Purdue Pharma :
       L.P., et al., Case No.     :
10     18-OP-45090                :
11                   -  -  -
12         - HIGHLY CONFIDENTIAL -
       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
13
                     VOLUME I
14                    -  -  -
                  May 9, 2019
15
16            Videotaped deposition of
       CRAIG J. McCANN, Ph.D., CFA, taken
17     pursuant to notice, was held at the law
       offices of Morgan Lewis & Bockius, LLP,
18     1111 Pennsylvania Avenue, NW, Washington,
       D.C., beginning at 10:03 a.m., on the
19     above date, before Michelle L. Gray, a
       Registered Professional Reporter,
20     Certified Shorthand Reporter, Certified
       Realtime Reporter, and Notary Public.
21
                      -  -  -
22
           GOLKOW LITIGATION SERVICES
23     877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
24
```

```
 1    APPEARANCES:

 2

      LEVIN PAPANTONIO THOMAS MITCHELL
 3    RAFFERTY PROCTOR, P.A.
      BY:  PETER MOUGEY, ESQ.
 4    BY:  PAGE POERSCHKE, ESQ.
      316 Baylen Street
 5    Pensacola, Florida 32502
      (850) 435-7000
 6    pmougey@levinlaw.com
      ppoerschke@levinlaw.com
 7
              - and -
 8

      WAGSTAFF & CARTMELL, LLP
 9    BY:  TYLER W. HUDSON, ESQ.
      4740 Grand Avenue, Suite 300
10    Kansas City, Missouri 64112
      (816) 701-1100
11    Thudson@wcllp.com
      Representing the Plaintiffs
12

13    BRANSTETTER, STRANCH & JENNINGS, PLLC
      BY:  TRICIA HERZFELD, ESQ.
14    223 Rosa L. Parks Avenue
      Suite 200
15    Nashville, Tennessee 37203
      (615) 254-8801
16    triciah@bsjfirm.com
      Representing the Tennessee Plaintiffs

17

18

19

20

21

22

23

24
```

```
 1    APPEARANCES:  (Cont'd.)

 2

 3    MORGAN LEWIS & BOCKIUS LLP
      BY:  ELISA P. McENROE, ESQ.
 4    1701 Market Street
      Philadelphia, Pennsylvania 19103
 5    (215) 963-5917
      elisa.mcenroe@morganlewis.com
 6
              - and -
 7
      MORGAN LEWIS & BOCKIUS LLP
 8    BY:  JOHN M. MALOY, ESQ.
      101 Park Avenue
 9    New York, New York 10178
      (212) 309-6682
10    John.maloy@morganlewis.com
      Representing the Defendant, Rite Aid of
11    Maryland, Inc., doing business as
      Mid-Atlantic Customer Support Center
12
13    MORGAN LEWIS & BOCKIUS LLP
      BY:  MARTHA A. LEIBELL, ESQ.
14    200 South Biscayne Boulevard
      Suite 5300
15    Miami, Florida 33131
      (305) 415-3387
16    Martha.leibell@morganlewis.com
      Representing the Defendant, Teva
17    Pharmaceuticals, Inc. Cephalon Inc,
      Watson Laboratories, Actavis LLC, Actavis
18    Pharma, Inc.
19
      KIRKLAND & ELLIS, LLP
20    BY:  JENNIFER G. LEVY, ESQ.
      BY:  CATIE VENTURA, ESQ.
21    1301 Pennsylvania Avenue, N.W.
      Washington, D.C. 20004
22    (202) 389-5000
      Jennifer.levy@kirkland.com
23    Catie.ventura@kirkland.com
      Representing the Defendant, Allergan
24    Finance
```

```
 1    APPEARANCES:  (Cont'd.)

 2

 3    COVINGTON & BURLING, LLP
      BY:  CHRISTOPHER K. EPPICH, ESQ.
 4    1999 Avenue of the Stars
      Los Angeles, California 90067
 5    (424) 332-4764
      Ceppich@cov.com
 6
              - and -
 7
      COVINGTON & BURLING, LLP
 8    BY:  EMILY L. KVESELIS, ESQ.
      BY:  ALISON DiCIURCIO, ESQ.
 9    850 Tenth Street, NW
      Suite 586N
10    Washington, D.C. 20001
      (202) 662-5613
11    ekveselis@cov.com
      Adiciurcio@cov.com
12    Representing the Defendant, McKesson
      Corporation
13
14    WILLIAMS & CONNOLLY, LLP
      By:  PAUL E. BOEHM, ESQ.
15    725 12th Street, NW
      Washington, D.C. 20005
16    (202) 434-5148
      pboehm@wc.com
17    Representing the Defendant, Cardinal
      Health
18
19
      BARTLIT BECK, LLP
20    BY:  KATHERINE M. SWIFT, ESQ.
      54 West Hubbard Street
21    Chicago, Illinois 60654
      (312) 494-4440
22    katherine.swift@bartlit-beck.com
      Representing the Defendant, Walgreens
23
24
```

```
 1    APPEARANCES:  (Cont'd.)

 2

 3    O'MELVENY & MYERS, LLP
      BY:  TAD ALLAN, ESQ.
 4    400 South Hope Street, 18th Floor
      Los Angeles, California 90071
 5    (213) 430-6665
      Tallan@omm.com
 6

             - and -
 7

      TUCKER ELLIS, LLP
 8    BY:  ANDREA GLINKA PRZYBYSZ, ESQ.
      233 S. Wacker Drive, Suite 6950
 9    Chicago, Illinois 60606
      (312) 624-6322
10    andrea.przybysz@tuckerellis.com
      Representing the Defendant, Janssen and
11    Johnson & Johnson

12
      MARCUS & SHAPIRA, LLP
13    BY:  SCOTT D. LIVINGSTON, ESQ.
      One Oxford Centre, 35th Floor
14    Pittsburgh, Pennsylvania 15219
      (412) 338-4683
15    Livingston@marcus-shapira.com
      Representing the Defendant, HBC
16    Service Company

17
      LOCKE LORD, LLP
18    BY:  JOHN P. McDONALD, ESQ.
      BY:  C. SCOTT JONES, ESQ.
19    2200 Ross Avenue
      Suite 2800
20    Dallas, Texas  75201
      (214) 740.8758
21    Jpmcdonald@lockelord.com
      Representing the Defendant, Henry Schein,
22    Inc.

23

24
```

```
 1    APPEARANCES:  (Cont'd.)
 2
      BARNES & THORNBURG, LLP
 3    BY:  WILLIAM A. HAHN, ESQ.
      11 South Meridian Street
 4    Indianapolis, Indiana 46204
      (317) 236-1313
 5    William.hahn@btlaw.com
      Representing the Defendant, H.D. Smith
 6
 7    FOX ROTHSCHILD, LLP
      BY:  STEPHAN A. CORNELL, ESQ.
 8    2700 Kelly Road
      Suite 300
 9    Warrington, Pennsylvania 18976
      (215) 918-3680
10    scornell@foxrothschild.com
      Representing the Defendant, Prescription
11    Supply Inc.
12
      ZUCKERMAN SPAEDER, LLP
13    BY:  ADAM L. FOTIADES, ESQ.
      1800 M. Street NW, Suite 1000
14    Washington, D.C. 20036
      (202) 778-1845
15    afotiades@zuckerman.com
      Representing the Defendant, CVS
16
17    ARNOLD & PORTER KAYE SCHOLER, LLP
      BY:  JOANNA PERSIO, ESQ.
18    BY:  JOSHUA M. DAVIS, ESQ.
      601 Massachusetts Avenue, NW
19    Washington, D.C. 20001
      (202) 942-5866
20    Joanna.persio@arnoldporter.com
      Representing the Defendants, Endo
21    Health Solutions; Endo Pharmaceuticals,
      Inc.; Par Pharmaceutical Companies, Inc.,
22    f/k/a Par Pharmaceutical Holdings, Inc.
23
24
```

```
 1   APPEARANCES:  (Cont'd.)

 2

 3   ROPES & GRAY LLP
     BY:  TORRYN M. TAYLOR, ESQ.
 4   BY:  RICHARD GALLAGHER, ESQ.
     Three Embarcadero Center
 5   San Francisco, California 94111
     (415) 315-6300
 6   Torryn.taylor@ropesgray.com
     richard.gallagher@ropesgray.com
 7   Representing the Defendant,
     Mallinckrodt

 8

 9   FOLEY & LARDNER, LLP
     BY:  JAMES MATTHEWS, ESQ.
10   111 Huntington Avenue, Suite 2500
     Boston, Massachusetts 02199
11   (617) 502-3281
     jmatthews@foley.com
12   Representing Actavis Laboratories
     UT, Inc., Actavis Pharma, Inc.,
13   ANDA, Inc., and Actavis,  Inc.,
     (N/k/a Allergan Finance, LLC, Watson
14   Laboratories, Inc.)

15

     JONES DAY
16   BY:  TARA A. FUMERTON, ESQ.
     77 West Wacker
17   Chicago, Illinois  60601
     (312) 269-4066
18   tfumerton@jonesday.com
     Representing the Defendant, Walmart

19

20   DECHERT, LLP
     BY:  DEBRA D. O'GORMAN, ESQ.
21   1095 Avenue of the Americas
     New York, New York 10036
22   (212) 698-3500
     Debra.ogorman@dechert.com
23   Representing the Defendant, Purdue
     Pharmaceuticals

24
```

```
 1    APPEARANCES:   (Cont'd.)

 2

 3    REED SMITH, LLP

      BY:  ERIC L. ALEXANDER, ESQ.

 4    1301 K Street, NW

      Suite 1000, East Tower

 5    Washington, D.C. 20005

      (202) 414-9403

 6    ealexander@reedsmith.com

      Representing the Defendant,

 7    AmerisourceBergen

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1    TELEPHONIC/STREAMING APPEARANCES:
 2
      GREENE KETCHUM, LLP
 3    PAUL T. FARRELL, JR., ESQ.
      419 Eleventh Street
 4    Huntington, West Virginia 25701
      (304) 521-4778
 5    Paul@greeneketchum.com
 6          - and -
 7    MCHUGH & FULLER
      BY:  MICHAEL J. FULLER, ESQ.
 8    BY:  A.J. ELKINS, ESQ.
      97 Elias Whiddon Road
 9    Hattiesburg, Mississippi 39402
      (800) 939-5580
10    mike@mchughfuller.com
      aj@mchughfuller.com
11
            - and
12
      KELLER ROHRBACK, LLP
13    BY:  DAVID J. KO, ESQ.
      1201 Third Avenue, Suite 3200
14    Seattle, Washington 98101
      (206) 623-1900
15    dko@kellerrohrback.com
16          - and -
17    WEISMAN KENNEDY & BERRIS CO LPA
      BY:  DANIEL P. GOETZ, ESQ.
18    1600 Midland Building
      101 W. Prospect Avenue
19    Cleveland, Ohio 44115
      (216) 781-1111
20    Dgoetz@weismanlaw.com
      Representing the Plaintiffs
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    TELEPHONIC/STREAMING APPEARANCES:
      (Cont'd.)
 2
      LEVIN PAPANTONIO THOMAS MITCHELL
 3    RAFFERTY PROCTOR, P.A.
      BY:  JEFF GADDY, ESQ.
 4    316 Baylen Street
      Pensacola, Florida 32502
 5    (850) 435-7000
      jgaddy@levinlaw.com
 6
              - and -
 7
      BARON & BUDD, P.C.
 8    BY:  WILLIAM G. POWERS, ESQ.
      600 New Hampshire Avenue, NW
 9    The Watergate, Suite 10-A
      Washington, D.C. 20037
10    (202) 333-4562
      Wpowers@baronbudd.com
11    Representing the Plaintiffs
12
      FOLEY & LARDNER, LLP
13    BY:  KATY E. KOSKI, ESQ.
      111 Huntington Avenue, Suite 2500
14    Boston, Massachusetts 02199
      (617) 502-3281
15    Kkoski@foley.com
      Representing Actavis Laboratories
16    UT, Inc., Actavis Pharma, Inc.,
      ANDA, Inc., and Actavis,  Inc.,
17    (n/k/a Allergan Finance, LLC, Watson
      Laboratories, Inc.)
18
19    CAVITCH FAMILO & DURKIN, CO., L.P.A.
      BY: ERIC J. WEISS, ESQ.
20    1300 E. 9th Street
      Cleveland, Ohio 44114
21    (216) 621-7860
      eweiss@cavitch.com
22    Representing the Defendant,
      Discount Drug Mart
23
24
```

```
 1   TELEPHONIC/STREAMING APPEARANCES:
     (Cont'd.)
 2

 3

     BAILEY WYANT PLLC
 4   BY:  JUSTIN C. TAYLOR, ESQ.
     500 Virginia Street East
 5   Suite 600
     Charleston, West Virginia 25301
 6   (304) 345-4222
     Jtaylor@baileywyant.com
 7   Representing the Defendant, West Virginia
     Board of Pharmacy
 8

 9
     ALSO PRESENT:
10

11   Josh Gay, Legal Investigator
     Katie Mayo, Paralegal
12   (Levin Papantonio - via telephone)
13   Lora Chafin, Paralegal
     (Greene Ketchum - via telephone)
14
     Amy Kennedy, Paralegal
15   (Weisman Kennedy - via telephone)
16

17   VIDEOTAPE TECHNICIAN:
18   Devyn Mulholland
19

20

21

22

23

24
```

```
 1                      -  -  -
 2                   I N D E X
 3                      -  -  -
 4
    Testimony of:
 5
                 CRAIG J. McCANN, Ph.D., CFA
 6
 7        By Ms. McEnroe                 16
 8        By Mr. Eppich                 253
 9        By Mr. Boehm                  323
10
11
                      -  -  -
12
                 E X H I B I T S
13
                      -  -  -
14
15   NO.          DESCRIPTION          PAGE
16   McCann-1      Notice of Videotaped 17
                   Deposition
17
18   McCann-2      Banker Box            23
                   Initial Report
19                 1-11 Appendices
                   Supplemental Report
20                 A through F Appendices
                   Second Supplemental
21                 Report
                   Appendices 1 and 2
22                 & Attachment
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -
 2          E X H I B I T S  (Cont'd.)
 3                    -  -  -
 4
 5    NO.           DESCRIPTION           PAGE
 6    McCann-3      Expert Report of       24
                    Craig J. McCann, Ph.D.
 7                  3/25/19
 8    McCann-4      Appendix 1            105
                    Resumé
 9
      McCann-5      Appendix 2            111
10                  Correction to the
                    ARCOS Data
11
      McCann-6      Expert Report of      231
12                  Professor David Cutler
                    3/25/19
13
      McCann-7      Morgan Keegan v       248
14                  Garrett Synopsis
15    McCann-8      Appendix 6, List of   315
                    Reporter Company
16                  Families
17    McCann-9      Appendix D,           321
                    Additional McKesson
18                  Figures and Tables
19    McCann-10     Excessive Purchases   370
                    Schedule II
20                  Exhibit P
                    CAH_MDL_PRIORPROD_DEA07_
21                  01384160-R-61
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -
 2           DEPOSITION SUPPORT INDEX
 3                    -   -   -
 4
 5    Direction to Witness Not to Answer
 6    PAGE    LINE
      None.
 7
 8    Request for Production of Documents
 9    PAGE    LINE
      None.
10
11    Stipulations
12    PAGE    LINE
      None.
13
14    Questions Marked
15    PAGE    LINE
      None.
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -

 2              THE VIDEOGRAPHER:  We are

 3         now on the record.  My name is

 4         Devyn Mulholland.  I'm a

 5         videographer with Golkow

 6         Litigation Services.

 7              Today's date is May 9, 2019.

 8         The time is 10:03 a.m.

 9              This video deposition is

10         being held in Washington DC, in

11         the matter of National

12         Prescription Opiate Litigation.

13              The deponent is Craig J.

14         McCann.

15              Counsel will be noted on the

16         stenographic record.

17              The court reporter is

18         Michelle Gray and will now swear

19         in the witness.

20                    -  -  -

21         ... CRAIG J. McCANN, Ph.D., CFA,

22    having been first duly sworn, was

23    examined and testified as follows:

24                    -  -  -
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    EXAMINATION

 2                    -  -  -

 3   BY MS. McENROE:

 4          Q.    Good morning, Dr. McCann.

 5          A.    Good morning.

 6          Q.    My name is Elisa McEnroe.

 7   I'm counsel for Rite Aid of Maryland,

 8   Inc., doing business as Mid-Atlantic

 9   Customer Support Center.  Just call that

10   Rite Aid.  I'll be asking you questions

11   this morning.  You've been deposed

12   before, correct?

13          A.    Yes.

14          Q.    And you are here as an

15   expert witness on behalf of the

16   plaintiffs in the National Prescription

17   Opiate Litigation; is that correct?

18          A.    Yes.

19          Q.    You've submitted a number of

20   reports in this matter, correct?

21          A.    Yes.

22          Q.    An initial report on

23   March 25th and two supplemental reports

24   thereafter?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.     Yes.

2            Q.     You understand that you're

3     appearing here today pursuant to a

4     deposition notice?

5            A.     Yes.

6            Q.     I'd like to hand you what

7     I've marked as Exhibit 1.

8                   (Document marked for

9                   identification as Exhibit

10                  McCann-1.)

11                  THE WITNESS:  Thank you.

12    BY MS. McENROE:

13           Q.     And this is a copy of that

14    deposition notice, correct?

15           A.     Yes.

16           Q.     So I know you've been

17    deposed a number of times before.  Just a

18    couple quick reminders as we get going.

19    Especially for this litigation, we're

20    quite pressed for time, although we have

21    two days with you, 14 hours.  So a number

22    of different counsel are going to ask you

23    questions through the two days.  And

24    you're going to see that we're going to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    try and move things along pretty
 2    expeditiously.  So we ask that you help
 3    us cooperate with that.
 4                 Of course we want you to get
 5    complete answers as intended on the
 6    record, but just so you understand
 7    upfront, there will be some sensitivity
 8    to the time throughout the two days.
 9                 Do you understand that?
10        A.    I do.
11        Q.    And you're here to answer
12    our questions and hopefully we won't
13    speak over one another.  I ask that you
14    let me finish my questions and I will do
15    my best to let you finish your answers.
16    You understand?
17        A.    I will.  I do.  Thank you.
18        Q.    And if you ever need a
19    break, just let us know.  My only request
20    is that you finish any question that
21    is -- you answer any question that is
22    pending at the time of the break.  All
23    right?
24        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    One last thing is, if you
 2   don't speak up, I'm going to assume that
 3   you understand my question.  So if you
 4   don't understand it, and especially when
 5   we get into some of the more technical
 6   things.  I may not ask it a way that
 7   makes exact sense to you.  So just let me
 8   know, and then I can always try to
 9   rephrase the question or ask it a
10   different way.  Okay?
11        A.    Yes.
12        Q.    Who contacted you first in
13   connection with this case?
14        A.    I believe it was Mr. Mougey.
15        Q.    When was that?
16        A.    Approximately a year ago.
17   So early last year, February or March of
18   2018 is what I recall.
19        Q.    And have you been working on
20   this case since that time?
21        A.    Or shortly thereafter.  So I
22   was contacted sometime a few weeks or a
23   month perhaps before I would say that we
24   actually started working on the case.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Have you worked with

 2   Mr. Mougey before?

 3          A.     Yes.

 4          Q.     On how many cases?

 5          A.     It depends a little bit on

 6   how you count the cases --

 7          Q.     Sure.

 8          A.     -- because my office

 9   processes a lot of cases that I'm not

10   personally involved in.

11                 The cases that I'm

12   personally involved in would be in the

13   dozens, but out of the three or 4,000

14   cases I've been involved in, I don't know

15   how to quantify it more than to say some

16   dozens, anyway.

17          Q.     When did you first meet

18   Mr. Mougey?

19          A.     When we were both much

20   younger.  I think almost 20 years ago.

21   15 years ago, at least, but maybe even a

22   little bit longer.

23          Q.     And did you meet in a

24   professional setting?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.    Yes.

 2           Q.    In connection with a case

 3   that you were working on?

 4           A.    Yes.

 5           Q.    As an expert witness?

 6           A.    Yes.

 7           Q.    On the same side as

 8   Mr. Mougey?

 9           A.    Yes.

10           Q.    And prior to this

11   litigation, what's the most recent other

12   case that you've worked on with

13   Mr. Mougey?

14           A.    I testified at a FINRA

15   arbitration, securities arbitration

16   hearing with Mr. Mougey about a year ago.

17           Q.    Are you working with

18   Mr. Mougey on any cases unrelated to the

19   opioid litigation at present?

20           A.    Yes.  At least my office is

21   involved in processing FINRA arbitrations

22   for Mr. Mougey's firm.

23                 I don't think in recent

24   months, maybe even since last summer I've
```

1    personally been involved in those.  But

2    we have done some work.  My firm has done

3    some work for Mr. Mougey's firm in the

4    last year.

5           Q.    And when you say FINRA

6    arbitrations, you are referring to

7    finance-related type of arbitrations; is

8    that correct?

9           A.    Correct.

10          Q.    Mostly having to do with

11   securities?

12          A.    Entirely.

13          Q.    Okay.  A little bit of

14   housekeeping upfront.

15                So you mentioned that you

16   had submitted an expert report, and you

17   agree that there were two supplements.

18   You included with those -- that report

19   and those two supplements some

20   attachments and exhibits, correct?

21          A.    Yes.

22          Q.    So that we have it, this is

23   what we believe to be the entirety of

24   what you've submitted thus far.  And

Highly Confidential - Subject to Further Confidentiality Review

1    we're going to go through it in a little

2    bit more detail.  So that the record is

3    complete later on, and in case any other

4    defendant wants to refer back to it, this

5    is what we believe is the entirety of

6    what you've submitted to us thus far in

7    terms of report, supplement, appendices,

8    and exhibits.  Not all the supporting

9    background code.  That was a little too

10   much to try to print out that your

11   counsel has provided.

12           But we're going to mark this

13   as Exhibit 2.  And we're just going to

14   hold onto it.  But if at any time you

15   want to refer to anything that you've

16   submitted to us, you just let us know,

17   and we can grab it out of Exhibit 2.  Is

18   that right?

19         A.    Yes.  Thank you.

20             (Document marked for

21             identification as Exhibit

22             McCann-2.)

23   BY MS. McENROE:

24         Q.    I put a sticker on the box.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   I'm going to hold onto it.

 2              MR. MOUGEY:   That sounds

 3        good.

 4   BY MS. McENROE:

 5        Q.    To make things a little bit

 6   easier, what we've done is for Exhibit 3,

 7   we've bound together your original report

 8   from March 25th -- and I'll hand this to

 9   you in a minute so you can look at it,

10   with one addition.

11              We swapped in what I think

12   you referred to as an errata page, at

13   Page 35?

14        A.    Yes.

15        Q.    And then we included behind

16   a blue slip sheet the first supplemental

17   report that was submitted on April 3,

18   2019, without any of the attachments or

19   exhibits.  And then behind the next blue

20   slip sheet, the April 15th supplemental

21   report.  Okay?

22              Do you see that?

23        A.    Thank you.  Yes.

24              (Document marked for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        identification as Exhibit

 2        McCann-3.)

 3   BY MS. McENROE:

 4        Q.    We're going to mark that as

 5   Exhibit 3.

 6             And today, if we're

 7   referring -- today or tomorrow, if we're

 8   referring to paragraphs and whatnot, in

 9   any of the reports you've submitted, it's

10   probably easiest if we refer to this

11   version.  But if you do want any of the

12   appendices or exhibits for completeness,

13   we can definitely arrange that.  All

14   right?

15        A.    Thank you.  Thank you.

16        Q.    So take a quick second and

17   look at that with me, just to make sure

18   that we are speaking the same language

19   here.

20             So the first cover sheet is,

21   as I said, the March 25th report, the

22   original report that you submitted,

23   correct?

24        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Does that look familiar,

 2    that's appropriate behind it, generally

 3    speaking.  You don't need to study it,

 4    but --

 5          A.    Yes.

 6          Q.    -- that that's your report?

 7                And this Page 35 we

 8    included, that is the errata sheet we

 9    just got this week correcting a figure?

10          A.    Correct.

11          Q.    In the chart, and in the

12    body?

13          A.    Correct.

14          Q.    And what you'll -- what

15    you'll see we've done is we've

16    paper-clipped it in.  So if you want to

17    see the older one you can just flip it.

18          A.    Thank you.

19          Q.    Okay?

20                Then if you please keep

21    turning until you get to the first blue

22    slip sheet.  That's your supplemental

23    expert report dated April 23rd; is that

24    correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.    Yes.

2           Q.    And then please proceed

3    forward to the next blue slip sheet, is

4    your second supplemental expert report

5    dated April 15th, correct?

6           A.    Yes.

7           Q.    Why were you retained in

8    this litigation?

9           A.    Because my firm had special

10   expertise in handling large datasets and

11   producing reliable results.

12          Q.    In the securities setting?

13          A.    In any setting.  Data is

14   data.

15          Q.    But in the security setting

16   in particular?

17          A.    No, not necessarily.

18          Q.    In any of the cases you've

19   done previously, have you ever worked

20   with ARCOS data?

21          A.    No.

22          Q.    Has anyone at your firm ever

23   worked with ARCOS data to your knowledge?

24          A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    So let's turn in your first

 2   report, your March 25th report to

 3   Paragraph 10.  And this is under a

 4   heading that says "Assignment."

 5               Do you see that?

 6          A.    Yes.

 7          Q.    And Paragraph 10 says, and

 8   I'll try to read slow for Michelle:  "I

 9   have been asked by plaintiff's counsel to

10   document how I processed, validated and

11   augmented opioid transaction data

12   produced by the Drug Enforcement

13   Administration, DEA, and from the

14   defendants."

15               Did I read that correctly?

16          A.    Yes.

17          Q.    And that opioid transaction

18   data produced by the DEA you are talking

19   about, that's the ARCOS data?

20          A.    Correct.

21          Q.    Okay.  The next Paragraph 11

22   says, "I have been asked to summarize

23   shipments in the ARCOS data, especially

24   those shipments into Cuyahoga County and
```

Highly Confidential - Subject to Further Confidentiality Review

1    Summit County."

2              Did I read that correctly?

3         A.    Yes.

4         Q.    And then the third in your

5    assignment sections is, "I have also been

6    asked to report the results of applying

7    certain algorithms to the ARCOS data."

8              Did I read that correctly?

9         A.    Yes.

10        Q.    And does that section

11   accurately summarize your assignment in

12   this litigation?

13        A.    As accurately, as fully as

14   three sentences can.  If I were to, you

15   know, explain it a little bit more fully,

16   if I were to add three more sentences or

17   nine more sentences, it would be a more

18   complete description, but I think it's

19   a -- it's a good three-sentence

20   description of my assignment.

21        Q.    So could you give me the

22   three more sentences of what's been left

23   out of this assignment so I can

24   understand, please?

```
 1          A.    Well, there's been nothing

 2    left out.  I'm just saying that I could

 3    offer some more detail.

 4               So for instance -- I haven't

 5    thought through how I would write three

 6    more sentences.  I was trying to be as

 7    succinct as possible there.

 8          Q.    Sure.

 9          A.    But for example, in the

10    third sentence I say, "I have also been

11    asked to report the results of applying

12    certain algorithms to the ARCOS data."

13               Now, later when we get to

14    that section of the report, you'll see

15    that those algorithms are -- are also

16    applied to some supplement from the

17    defendants' individual transaction data.

18               And the same thing with the

19    prior sentence where I write, "I have

20    been asked to summarize shipments in the

21    ARCOS data, especially those shipments

22    into Cuyahoga County and Summit County."

23               So I -- it is correct that I

24    do summarize the shipments in the ARCOS
```

Highly Confidential - Subject to Further Confidentiality Review

1    data, but I also have included in some of

2    those summaries the individual defendant

3    transaction data.  So those are two

4    examples where, if I wanted to add

5    another sentence or another phrase, I'd

6    make that discussion more complete.

7                    Those would be some

8    examples.  But I actually add those

9    details in the subsequent section.  So I

10   think the three-sentence summary of my

11   assignment is fine the way it is.

12           Q.    Great.  And you had, when

13   I -- when I asked you earlier, asked

14   about why you had been retained.  You

15   made reference to handling large

16   datasets, which, in my read, matches with

17   the explanation in the -- in the

18   assignment here in broad strokes.

19                    Is there anything other than

20   handling datasets in some way that you're

21   trying to say is part of your assignment

22   in this litigation?

23           A.    Not that I can think of as I

24   sit here.

```
 1          Q.    At this point you have been

 2    focused on, and you mention in

 3    Paragraph 11 here, Cuyahoga and Summit

 4    Counties.  Have you been retained by

 5    plaintiffs with respect to any other

 6    litigation in the opioids MDL, which is

 7    the multi-district -- district litigation

 8    that's organized in the Northern District

 9    of Ohio, if you know?

10          A.    I'm sorry, I need a little

11    bit of qualification --

12          Q.    Sure.  Absolutely.

13          A.    -- in that -- in that

14    question.

15          Q.    Let me -- let me ask it a

16    different way.

17                So Cuyahoga and Summit

18    Counties are discussed in your reports.

19    Do you know if you've been retained by

20    plaintiffs to provide any opinions or to

21    do any data handling for any other

22    plaintiffs --

23                MR. MOUGEY:  Objection.

24    BY MS. McENROE:
```

```
 1          Q.     -- other than Cuyahoga and

 2   Summit Counties?

 3          A.     Well, there's a -- that's a

 4   compound question.  And so without

 5   misleading you, I'll just say yes.  The

 6   answer to that question would be yes.

 7          Q.     Have you been retained for

 8   other federal cases, do you know?

 9                 MR. MOUGEY:  Objection.

10                 THE WITNESS:  I'm not sure

11          as I sit here.

12   BY MS. McENROE:

13          Q.     Have you been retained for

14   any state cases, opioid related?

15          A.     I believe so.

16          Q.     Which states?

17          A.     We've handled some data for

18   a handful of states that I'll -- I'll

19   describe in a minute, I'll list to the

20   best of my ability in a minute.

21                 I'm not sure whether --

22   well, I am certain that we have not been

23   retained as testifying experts in any of

24   those cases.
```

1    And I'm not completely sure

2    of -- of how much work we may have done

3    for one state versus another.

4    We have been retained to

5    provide summary reports like what you see

6    attached to the first report, what I

7    would call pharmacy reports or labeler

8    reports or distributor reports,

9    summarizing shipments into counties and

10   states.

11   We've been retained to

12   provide those preliminary high level

13   summaries to most of the states in the

14   country. And then we've been retained to

15   do a little bit of additional analysis

16   for three or four or five states,

17   Delaware, Oklahoma, Ohio, New York, and

18   Florida are the ones that come to mind,

19   those five, but varying greatly in how

20   much work we've done from almost nothing

21   to a little bit more than nothing.

22       Q.    Aside from the reports that

23   we've already talked about today and

24   marked as Exhibits 2 and 3, have you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    submitted any other expert reports in an

 2    opioids-related litigation, whether it's

 3    in federal or state court?

 4         A.    No.

 5         Q.    Are you engaged for any

 6    other purpose in connection with the

 7    opioids litigation?  And what I mean by

 8    that is, for example, to write discovery

 9    responses on behalf of plaintiffs?

10         A.    No.

11         Q.    You're getting paid in

12    connection with your work on behalf of

13    plaintiffs in this litigation?

14         A.    Yes.

15         Q.    And $475 an hour?

16         A.    Yes, that's correct.

17         Q.    Just --

18         A.    I'm sorry.

19         Q.    Oh, yeah.  Go ahead.

20         A.    That's not quite accurate.

21    I personally, I'm not being paid.  My

22    firm is billing at $475 an hour for my

23    time and at lesser amounts for staff

24    working on the project.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    You got my next question.

2  So you're billing through the Securities

3  Litigation and Consulting Group; is that

4  correct?

5      A.    Correct.

6      Q.    And if I call that SLCG,

7  you'll know what I'm talking about today?

8      A.    Yes.

9      Q.    What is your relationship to

10 SLCG?

11     A.    I own it.

12     Q.    You own it.  Does anybody

13 else own part of it with you?

14     A.    No.

15     Q.    And are you the founder as

16 well of SLCG?

17     A.    Yes.

18     Q.    Are there any other

19 principals or partners with you?

20     A.    Well, a principal or partner

21 is sometimes more of a marketing title

22 than a legal ownership.  So there are

23 other people who we refer to as

24 principals.  And I might refer to a peer

Highly Confidential - Subject to Further Confidentiality Review

```
 1    as a partner sometimes, but I'm the sole

 2    owner.

 3          Q.    Are any other principals,

 4    for marketing purposes or otherwise,

 5    working on the opioid litigation along

 6    with you from SLCG?

 7          A.    Yes.

 8          Q.    Who are they?

 9          A.    I think Mike Yan, Y-A-N.

10          Q.    And what about Joshua

11    Mallett?  Is he a principal?

12          A.    I don't think we've attached

13    that marketing title to him but he has

14    worked on the project.  That's correct.

15          Q.    What about other SLCG staff

16    members?  So Mike Yan as principal, and

17    Joshua Mallett presumably then as staff?

18          A.    I just don't recall what

19    Joshua's title is.  We could look at my

20    website -- at our website and it would

21    tell you what his title is.  I'm not

22    recalling as I sit here.  But in addition

23    to Mike and Joshua, Chuan, C-H-U-A-N,

24    Qin, Q-I-N, has worked on the project.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Regina Meng, M-E-N-G.  Susan Song,

 2    S-O-N-G.  Briant with an I, B-R-I-A-N-T,

 3    Lyu, I think his last name is L-I-U

 4    (sic).  There may be a couple of other

 5    staff who have worked on the project,

 6    Lanxi, L-A-N-X-I.  And I apologize I'm

 7    blanking on her last name.  It's another

 8    Chinese last name.  Again, you'll find

 9    her on our website.  There may be one or

10    two additional names.  But those are the

11    people that come to mind who have worked

12    on the project over the last year.

13           Q.   Are they all still -- or I

14    should -- strike that.

15                Are they all employed by

16    SLCG?

17           A.   Yes.  I'm sorry.  I thought

18    your question was SLCG employees who have

19    worked on the project.

20           Q.   Correct.  I just want to

21    make sure they are still employed, is my

22    question.

23           A.   Yes, they are.

24           Q.   Have they continuously been
```

Highly Confidential - Subject to Further Confidentiality Review

1    employed since they worked on the project

2    as SLCG?

3           A.    Yes.

4           Q.    In your report, you wrote

5    that there was a range from 100 to $350

6    for the staff from SLCG working on this

7    matter.  Is that accurate?

8           A.    Yes.  It might be a little

9    bit tighter than that.  I'm not sure that

10   anybody is -- anybody's billing rate is

11   $100 an hour.  The lowest billing rate

12   might be 125 or 135.  I don't know.  But

13   that range certainly covers it.

14          Q.    And they get billed out and

15   the money then flows to SLCG; is that

16   correct?

17          A.    Correct.

18          Q.    And then they get paid some

19   salary, presumably, by SLCG?

20          A.    Correct.

21          Q.    And then you -- you

22   personally do profit somewhat from the

23   work that they've done on behalf of SLCG;

24   is that correct?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Yes.  Of course there's a
2   lot more than just salary involved before
3   you get to me.  But at the end of the
4   year, if there's anything left over it
5   comes to me.
6        Q.    And that's true of the
7   amount that you get billed out at as
8   well; is that true?
9        A.    Correct.
10       Q.    Let's start with Mike Yan
11  just briefly.  What is, in broad strokes,
12  his educational background?  What's his
13  highest degree if you know?
14       A.    Yes.  He's got a Ph.D. in
15  applied mathematics from -- from UC
16  Davis.
17            (Brief interruption.)
18            MS. McENROE:  Let's give it
19       one second.  Off the record.
20            THE VIDEOGRAPHER:  Off the
21       record.
22            (Whereupon, a discussion was
23       held off the record.)
24            THE VIDEOGRAPHER:  We are
```

1          back on the record at 10:27 a.m.

2     BY MS. McENROE:

3          Q.    So we were just talking

4     about Dr. Yan has a Ph.D. in applied

5     mathematics from UC Davis; is that

6     correct?

7          A.    Yes.  I believe it's applied

8     mathematics.  If we looked at his bio and

9     his resumé on my website, it might be

10    applied statistics or applied

11    mathematics.  And then he did a post-doc

12    for three years at Cal Tech.

13         Q.    In what?

14         A.    In the math department.

15    Teaching mathematics at Cal Tech.

16         Q.    Do you intend him to testify

17    in this matter?

18         A.    No.  It's not for me to

19    intend, but I don't -- I don't anticipate

20    that happening.

21         Q.    Joshua Mallett, is he a

22    Ph.D. as well?

23         A.    No.  He is what I think what

24    we call ABD, all but dissertation, in

Highly Confidential - Subject to Further Confidentiality Review

```
 1   accounting from the University of

 2   Michigan.

 3        Q.    Chuan Qin, if I said that

 4   correctly.  What is that person's highest

 5   level of education?

 6        A.    He also has a Ph.D. in

 7   applied mathematics or applied statistics

 8   from UC Davis.

 9        Q.    Regina Meng, her highest

10   level of education?

11        A.    She has a master's degree in

12   finance.  Might be styled a master's of

13   science in finance at University of

14   Maryland at College Park.

15        Q.    Susan Song?

16        A.    She has a -- same degree,

17   master's of science in finance from the

18   University of Maryland.

19        Q.    Briant Lyu?  Lyu?  Is that

20   correct?  I'm sorry.

21        A.    After 20 years I'm still not

22   pronouncing these names right.

23              He has the same or similar

24   degree from John Hopkins.  So...
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    A master's?

 2          A.    A masters in finance or

 3   master's of science in finance from the

 4   University of -- from John Hopkins.

 5          Q.    And was it Lanxi?  The last

 6   name I wrote down.

 7          A.    Yes.

 8          Q.    And what is that person's

 9   highest level of education?

10          A.    It's the same degree.  I

11   think it's from John Hopkins.  It might

12   be from the University of Maryland.  We

13   have to just look at our website or her

14   resumé to tell you for sure.

15          Q.    Collectively, do you know

16   how many hours you have yet -- sorry.

17   Strike that.

18                Collectively, do you know

19   how many hours you have worked on the

20   opioids litigation altogether since your

21   engagement?

22          A.    No.

23          Q.    Can you give me a ballpark

24   estimate?
```

```
 1          A.    It would have a pretty big

 2   range, if we were not to look at the

 3   invoices or the billing records.  But

 4   it's varied from month to month since we

 5   started a year ago.  Some months as

 6   little as 40 or 50 hours, some months as

 7   much as 100 or 125 hours.  And so it

 8   would just be the sum of those numbers

 9   that varied by a month, since we started

10   working on the project early on, maybe

11   even less than 40 or 50 hours.  But most

12   of the months would be somewhere between

13   40 and 50 hours, and maybe as much as

14   125 hours.

15          Q.    Have you yet invoiced

16   plaintiffs for your work on the opioids

17   litigation?

18          A.    Yes.

19          Q.    Okay.  Have those invoices

20   been paid?

21          A.    Yes.

22          Q.    How much total, if you know?

23          A.    I don't.

24          Q.    Can you ballpark that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.  Some months, as I

 2   said, my own personal hours, there is a

 3   significant variation.  Some months as

 4   little as maybe $75,000 and some months

 5   as much as 225- or $250,000.

 6          Q.    For a month?

 7          A.    Correct.

 8          Q.    And that's just from your

 9   time?

10          A.    No.  That's -- you are

11   asking about the firm.

12          Q.    Oh yeah.  Got it.  Okay.

13          A.    So that would be the firm.

14          Q.    Yeah.  And do you have an

15   estimate on the hours that your staff,

16   the SLCG staff has worked on this matter

17   so far?

18          A.    In hours or dollars?

19          Q.    I was going to ask both.  So

20   both would be great.

21          A.    Well, the easiest way for me

22   to think about it is in -- in dollars

23   working back from the answers that I just

24   gave you.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Sure.

2      A.    Right.  So my -- my

3  involvement at 40 or 50 hours is 15- or

4  $20,000 at $475 an hour; as much as 60-

5  or $70,000 at 125 hours a month.  So my

6  time has been roughly proportionate, I

7  think, with other people's time.  So if I

8  billed 20- or $25,000 in a month, it's

9  like that would be likely one of the

10  months where we were less active, maybe

11  early in the project.  And so if the

12  invoice was $75,000, other staff put in

13  perhaps $50,000 worth of time in those

14  lesser activity months.

15           Just ballparking it at $200

16  an hour, that would be maybe 250 hours.

17  And then we did the --

18      Q.    Collectively or for separate

19  individuals?

20      A.    Oh no, collectively.  I have

21  no idea individuals.  You know, we would

22  have to look at the records to tell you.

23  I'm just trying to give you --

24      Q.    Sure.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    -- the best estimate I can

 2   as I sit here.

 3               And then you do the same

 4   arithmetic for the higher activity

 5   months.  If I put in 125 hours, that

 6   would come to 50- or $60,000.  And if in

 7   total we billed $225,000, it would be

 8   another 150- or $160,000 of staff time,

 9   that would be roughly 800 hours.

10               So I -- I'm just giving you

11   very broad ranges and estimates based on

12   what I think as I sit here.

13          Q.    Thank you.

14               And does that staff, they

15   work at your direction; is that correct?

16          A.    Yes.

17          Q.    You oversee their work?

18          A.    I do.

19          Q.    You check their work?

20          A.    I do.

21          Q.    And you approve their work?

22          A.    I do.

23          Q.    And you are adopting some of

24   their work in the opinions you've
```

1    expressed in this litigation?

2           A.    Yes.

3           Q.    Are you involved in hiring

4    the staff?

5           A.    I am.

6           Q.    And interviewing them?

7           A.    Yes.

8           Q.    Aside from your hourly rate

9    and the hourly rate of the other SLCG

10   employees, are you otherwise being

11   compensated in any way in connection with

12   the opioids litigation?

13          A.    No.

14          Q.    You haven't been paid

15   anything else or promised anything else?

16          A.    Of course not.

17          Q.    Okay.  Do you have any

18   outstanding invoices at present?

19          A.    Just the most recent one.

20   Just the one that I submitted a week ago

21   for -- for April.

22          Q.    And how much was that one?

23          A.    I don't remember.

24          Q.    What did you do, if

```
 1    anything, to prepare for today's
 2    deposition?
 3          A.    Well, I did a year's worth
 4    of work and supervised my staff doing
 5    that work.
 6                I wrote a significant report
 7    and two smaller supplements.  I, as part
 8    of that, reviewed a lot of material, did
 9    a lot of analysis.  And then more
10    recently went over some of that with --
11    with attorneys in my office and with my
12    staff.
13          Q.    I want to ask you a couple
14    questions about what you just said.  So
15    you said attorneys in my office.  Does
16    SLCG employ attorneys, or is it that
17    outside attorneys came and physically
18    were in your office?
19          A.    We don't employ attorneys.
20    It's employee -- lawyer -- sorry, we
21    don't employ lawyers.  What I meant to
22    refer to there is attorneys coming to my
23    office to discuss the deposition.
24          Q.    Who?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    So there would be three:

 2   Page Poerschke, Ty or Tyler Hudson, and

 3   Jeff Gaddy, G-A-D-D-Y.

 4          Q.    When was that?

 5          A.    I may not get the date

 6   exactly right, but two weeks ago today

 7   for part of the day, one week ago today

 8   for part of a day, and yesterday for a

 9   part of the day.

10          Q.    Aside from the three

11   attorneys you named, have you met with

12   any other attorneys to prepare for your

13   deposition?

14          A.    No.  Over breakfast this

15   morning, I -- I had coffee with

16   Mr. Mougey, but I wouldn't call that

17   preparing for my deposition.

18          Q.    And going back to your

19   answer before, about what you did to

20   prepare for today's deposition.  You

21   mentioned that you reviewed a lot of

22   material, separate from just reviewing

23   your report.  What were you referring to

24   there?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   Well, as I describe in the

 2    report, we received data and documents

 3    starting back as early as April of last

 4    year, maybe even just a little bit before

 5    that.  I'm not 100 percent clear on that

 6    as I sit here.  But since 13 months ago,

 7    we were receiving documents and data.

 8    And that's what I was referring to when I

 9    said that I reviewed a lot of material.

10          Q.   Are the materials you're

11    referring to listed in your reports?

12               So we can take a look.  You

13    have in front of you your March 25th

14    report.  If you flip back a page, to

15    Section 2, "Materials Reviewed."  You'll

16    see there's a section here listing a

17    number of things.

18               Is this the description,

19    combined with the materials reviewed

20    sections in the two supplemental reports

21    that you're referring to?

22          A.   Well, it may not be

23    exhaustive of everything I've looked at

24    over the last 13 months.  But it's what
```

1    came to mind as material I reviewed or

2    considered as I was writing these

3    reports.  I -- there's not anything

4    necessary for the results that I report

5    in this report that I know of, as I sit

6    here.  If -- if there is -- there may be

7    additional items, as I say in

8    Paragraph 9(m), additional items in

9    footnotes, referred to in the text below.

10              Other than what's in this

11   paragraph and those items in the text and

12   footnotes, I'm not aware of anything

13   else.

14        Q.    Just so the record is clear,

15   aside from documents or items cited in

16   your reports, did you consider any other

17   materials in forming your opinions in

18   this case?

19        A.    I don't recall.  Not that

20   I'm sitting -- not that I can think of as

21   I'm sitting here.

22        Q.    Okay.  Have you ever seen

23   any deposition transcripts from this

24   case?

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.    No, I don't think so.

2         Q.    Have you ever asked to see

3    any deposition transcripts from this

4    case?

5         A.    No.

6         Q.    We've collected up your

7    reports.  And I know we've marked the

8    full set of them.  Do these -- do -- do

9    your reports represent the full sum of

10   opinions you intend to offer in this

11   litigation?

12        A.    With some minor

13   qualifications, there might be some small

14   qualitative differences between the

15   opinions that I would ultimately express

16   and what's included here.

17              And then of course whatever

18   the court requests.  If the court

19   requests any additional analysis, or if

20   it's determined some additional analysis

21   would be helpful to the court, I fully

22   intend to, of course, do that work and

23   offer those opinions.

24        Q.    What small qualitative
```

```
 1    changes do you anticipate making before

 2    trial?

 3             A.    Well, for instance, when

 4    we -- when I -- I discuss the defendants'

 5    transaction production, I identify a

 6    number of defendants whose production

 7    seems to fall short of what they were

 8    submitting to ARCOS in realtime.

 9                  Over the last few months as

10    a result, I think, of requests from

11    plaintiff's counsel, defendants have been

12    supplementing that production after my

13    initial report was filed.  In fact, just

14    yesterday, one of the distributors

15    produced the data that we had identified

16    was missing from their earlier

17    production.

18                  There are still other

19    defendants that have not filled in gaps

20    in their transaction data, at least where

21    we think there are gaps.  So that would

22    be an example where there might be some

23    slight quantitative changes to the

24    opinions that are expressed if the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1  defendants continue to produce data as

 2  they did yesterday.

 3          But I don't anticipate that

 4  production to change the opinions that

 5  I've expressed here.

 6          In fact, the production

 7  yesterday I think further strengthens one

 8  of the core opinions.

 9      Q.   Aside from some productions

10  being made later in time, with respect to

11  the documents and data and information

12  that was available to you when you

13  already issued your reports, do you

14  anticipate making any small qualitative

15  changes prior to trial?

16      A.   Well, not that I know of as

17  I sit here.  But I'm humanly imperfect.

18  As we discussed before we went on the

19  record, there was a small -- maybe we

20  discussed it on the record.  There was a

21  small errata to Table 15.  And so it

22  doesn't change the opinions in any way at

23  all.  But there was one -- one number in

24  the text that needed to be edited and a
```

```
 1    table where a few numbers needed to be

 2    edited.  So there may be examples like

 3    that that I'm not aware of.  But there's

 4    nothing as I sit here, nothing that I'm

 5    aware of where there would be some,

 6    again, very small de minimus edit or two.

 7          Q.    Let's take a look at that

 8    page, 35, that errata sheet.

 9          A.    Sure.

10          Q.    And we did our best to print

11    it out.  So you can see up in the text

12    there's a strikethrough --

13          A.    Yes.

14          Q.    -- on a portion of that

15    figure.  And that figure has been updated

16    in the Table 15 down below; is that

17    correct?

18          A.    Correct.

19          Q.    Have there been any other

20    changes to this Page 35?  That was the

21    only one that I had seen, those two,

22    without spending a lot of time studying

23    the whole thing.

24          A.    Well, if you look across the
```

```
 1    bottom of Table 15, you'll see in the

 2    number of transactions in the report.  It

 3    says 542,898.

 4          Q.    Yeah.

 5          A.    The software and the data

 6    that we gave you produces a table that

 7    says 542,900.  So that's an example of

 8    what I think is a truly trivial change.

 9                It's maybe a couple of

10    thousandths of one percent difference.

11    And as you read across you'll see the

12    same thing with the MME.  The difference

13    there is 300 and -- sorry, 435 MME on

14    four billion MME.

15                So there are very tiny, tiny

16    differences between Table 15 on the

17    errata page and Table 15 that had been

18    put in as a draft in the report in which

19    I hadn't updated.

20                So that's an example where

21    there may be a number that I would change

22    by a few hundredths of a percent or even

23    a few thousandths of a percent.  I can

24    explain why that might be.
```

1          But other than that sort of

2    thing, I don't -- I don't anticipate

3    changing anything other than changing it

4    as a result of the continued production

5    by the defendants.

6          The very next page, Page 36,

7    illustrates that.  Figure 3 on Page 36

8    will have to be changed because of the

9    data that was produced yesterday.

10        Q.    So how did errata -- the

11   errata of Page 35 come to be?  Did you

12   make -- type in these changes?

13        A.    No.

14        Q.    Who did?

15        A.    Well, the code that we gave

16   you, we actually gave you two pieces of

17   code and two data files that create Table

18   15 for Cardinal Health.  This table

19   refers to Cardinal Health.

20        And in the production of

21   data and code to you, we gave you two

22   versions -- inadvertently gave you an

23   earlier version of the code and data that

24   produced the version of the table that is

Highly Confidential - Subject to Further Confidentiality Review

1    in the report.  And there had been some

2    very slight modification to the data or

3    code.  And we gave you that as well.  And

4    so what we did was we ran the code that

5    we gave you.  And it produces an Excel

6    tab that has the content of Table 15.

7    And then someone in my office, Joshua

8    Mallett, I believe, copied and pasted

9    that content which is an Excel file tab

10   into this table.

11              And then I, I believe,

12   struck through the 2336 in Paragraph 86

13   which should obviously be 1618.

14        Q.    Did you type the remainder

15   of your report, the body of it?

16        A.    Virtually all of it.

17   Some -- some portions of it may have been

18   first -- some words, or even sentences

19   may have been first typed by someone else

20   in my office.

21        Q.    Anyone in particular or just

22   one of the people working with you?

23        A.    No one in particular.  I

24   think I wrote every sentence that's in

Highly Confidential - Subject to Further Confidentiality Review

```
1   this report.  And in fact I certainly of
2   course adopt every sentence that's in
3   this report.  But I either wrote it from
4   beginning to period or someone else wrote
5   some version of a sentence that I edited.
6        Q.    We talked a couple minutes
7   ago about your assignment in this matter.
8   Do you remember that?
9        A.    Yes.
10       Q.    Who delivered that
11  assignment to you?  I'm looking back, if
12  it's helpful, on Page 4 at Paragraphs 10,
13  11 12.  It says, "I have been asked by
14  plaintiff's counsel," to start out.
15            So I'm just wondering who
16  actually that was that delivered that
17  assignment to you?
18       A.    I don't recall it being
19  conveyed by any individual, but rather an
20  understanding that I developed as a
21  result of discussions with attorneys over
22  the past six months -- past, yeah, six
23  months maybe and -- which I summarized in
24  my own words in these three sentences.
```

```
 1          Q.     From whom did you develop

 2   that understanding?

 3          A.     From interactions with

 4   primarily three or four lawyers.

 5          Q.     Who?

 6          A.     Maybe -- in total I may have

 7   interacted with a dozen lawyers that

 8   informed my summary of what my assignment

 9   was.  But I would say -- I would say

10   primarily Mr. Mougey.

11          Q.     You said three to four, from

12   the interactions primarily with three to

13   four.  So besides Mr. Mougey, who are the

14   other two to three?

15          A.     I'm not sure to what extent

16   these others might have informed my

17   understanding of what I was being asked

18   to do.  But over time I spoke to Paul

19   Farrell, F-A-R-R-E-L-L, Mike Fuller.

20   Page Poerschke, Tyler Hudson, Joe Rice.

21              And then on the -- more on

22   the periphery, just other people that I

23   interacted with this on this project over

24   the last six months.
```

1      Q.    Can you list them for me,

2    please, that you can remember?

3      A.    Do you need an exhaustive

4    list of who I've interacted with or who I

5    think I interacted with that might have

6    informed my understanding of the

7    assignment?

8      Q.    Yes, good question.  So

9    throughout you've made reference to

10   plaintiffs' counsel.  And I'm just trying

11   to get an understanding, when you do

12   that, to whom you are referring.

13     A.    Well, my primary point of

14   contact was Mr. Mougey, although I did

15   have interaction with others, including

16   the ones that I've just identified for

17   you.

18     Q.    Did you speak directly with

19   anyone from Cuyahoga County?

20     A.    Not that I'm aware of.

21     Q.    Summit County?

22     A.    Not that I'm aware of.

23     Q.    The City of Akron?

24     A.    Not that I'm aware of.

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.    City of Cleveland?

 2           A.    Not that I'm aware of.

 3           Q.    Did you speak with anyone

 4   other than plaintiffs' counsel to form

 5   any opinions or understandings you had

 6   about any facts in this case?

 7           A.    Yes.

 8           Q.    Who?

 9           A.    Well, my staff.

10           Q.    Okay.  Outside of your staff

11   and outside of plaintiffs' counsel, did

12   you discuss anything with anyone in

13   connection with this case?

14           A.    If that connects up to your

15   prior question, the answer would be no.

16           Q.    Not connecting up to my

17   prior question.  So just as a brand new

18   question.  Aside from plaintiffs' counsel

19   and aside from other of your staff, have

20   you discussed the opioids litigation with

21   anybody else?

22           A.    Yes.

23           Q.    Who?

24           A.    I don't remember their names
```

```
 1    but there have been other consultants to

 2    the plaintiffs.  Maybe a nonlawyer

 3    employee of Levin Papantonio or one of

 4    the other firms, and then maybe outside

 5    consultants, maybe some other testifying

 6    experts.

 7            But none of those

 8    interactions informed my understanding of

 9    my assignment or any of the conclusions

10    that I reached.

11        Q.    You mentioned that you maybe

12    spoke with outside consultants for

13    plaintiffs.  With whom did you speak?

14        A.    I don't recall the names.

15    But early on, there were some who I -- I

16    think to be former DEA employees.

17            Oh, I should also add, very

18    early on, we spoke to some current DEA

19    employees about the data.

20            Again, I don't think that

21    any of those discussions affected my

22    understanding of my assignment or the

23    opinions that I expressed, but for

24    completeness, it would include those two
```

Highly Confidential - Subject to Further Confidentiality Review

1    categories at least.

2           Q.    Do you recall the names of

3    any of the former or current DEA

4    employees with whom you spoke?

5           A.    I think if you mention the

6    names it would prompt my memory.  But the

7    only one that comes to mind is

8    Mr. Rafalski.  But there were two or

9    three others.  And the conversation that

10   I had with current DEA employees was just

11   a very brief telephone conference back in

12   March or April of last year, so 13 or

13   14 months ago, about the data we were

14   going to receive, what -- what format it

15   would be in, what size it would be.  A

16   little bit of explanation, kind of a

17   preliminary description of the fields

18   that might be in the data.

19                That was a very short call.

20   There were three or four people from the

21   DEA on the call.  One person seemed

22   particularly knowledgeable about the

23   data.  The entire call -- with -- with

24   attorneys on the call as well, but the

1    entire call was six or eight or

2    ten minutes.  That's the only interaction

3    I'm aware of.

4         Q.    You mentioned that there

5    were attorneys on that phone call with

6    the DEA you were just talking to.  Was

7    that counsel for plaintiffs, counsel for

8    defendants, both, do you know?

9         A.    I think it was counsel for

10   plaintiffs and counsel at the DEA.

11        Q.    You mentioned in addition to

12   that you maybe spoke to outside

13   consultants that you also maybe spoke to

14   outside experts.  You mentioned

15   Mr. Rafalski.  Anybody else that comes to

16   mind in terms of plaintiffs' experts with

17   whom you've spoken?

18        A.    Yes.

19        Q.    Who?

20        A.    I recognize three names, I

21   think, who may or may not have filed

22   expert reports.  But a Professor

23   Rosenthal, Professor Cutler, and a

24   Ms. Keller.  There may be others, but

```
1    those are the names that come to mind as

2    people who may have filed expert reports

3    in this case as well.

4           Q.    When did you speak with

5    Mr. Rafalski?

6           A.    I believe he was in my

7    office very early on in the process in

8    April or May of last year.  And then I

9    believe he was in my office more recently

10   in the last couple of months.

11              He was -- I think he has

12   family in the area and he wanted to

13   borrow my conference room.  So I didn't

14   have any substantive discussion with him

15   that last time.  But he -- he has been in

16   my office once in the last few months to

17   spend a day in my conference room

18   working.

19          Q.    In terms of substantive

20   discussions with Mr. Rafalski regarding

21   the opioids litigation, was it just the

22   one conversation you had with him in your

23   office early on in April of May -- April

24   or May?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I don't recall if he was in

 2   my office just once or if he was in my

 3   office twice.

 4                    The first time I believe

 5   there were four individuals and

 6   Mr. Rafalski is the only name I

 7   recognize.  And then later there were two

 8   or three of that same -- a subset of the

 9   first group that had been in my office.

10   And I don't recall whether Mr. Rafalski

11   was one of them or not.

12              Q.    When you say there were four

13   individuals, to whom are you referring,

14   yourself, Mr. Rafalski and who else?

15              A.    No, I'm sorry.  When I -- I

16   was referring to four individuals, I

17   mean -- my recollection now, 13 or

18   14 months ago, is that when we first got

19   the data, there were three or four former

20   DEA employees in my office to help us

21   understand at a high level what the data

22   was, we were looking at.

23                    THE COURT REPORTER:  If

24              counsel on the phone can actually
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              mute themselves?  We're getting a

 2              lot of feedback here.  Thank you.

 3    BY MS. McENROE:

 4         Q.    And you don't remember who

 5    those DEA agents were, correct, former

 6    DEA agents?

 7         A.    I remember their faces.  I

 8    don't remember their names.  I'm sorry.

 9         Q.    Did you ever provide

10    anything in writing to Mr. Rafalski?

11         A.    No.

12         Q.    Did you ever provide him

13    with any computer code or data?

14         A.    No, not to my knowledge.

15         Q.    Did you show him computer

16    code or data when he was in your office?

17         A.    Not personally.  Although,

18    the purpose of him being there, I think,

19    wasn't my request.  I'm inferring what

20    the purpose was.  But I think the purpose

21    was to look at the data as it was coming

22    in from the DEA.

23              It came in in -- in three or

24    four tranches.  And when we first got the
```

1    data, I think they were there to help us

2    understand what the data fields were.

3    Some description in the ARCOS handbook.

4    But there's more data in the production

5    than in the -- described in the ARCOS

6    handbook.

7              And so my recollection is we

8    have a very large computer monitor, but

9    it's -- think of it like a television,

10   40-inch computer monitor, so that we

11   could display all of the data.

12             And so he was probably

13   looking at data on the screen.  I don't

14   recall him looking at -- at any code.

15   And the only data that I recall him

16   looking at was as it would be displayed

17   on a computer monitor, as we opened the

18   files we received from the DEA.

19        Q.    You mentioned you spoke with

20   Professor Rosenthal.  When was that?

21        A.    I actually don't recall

22   speaking with her.  If I said it that

23   way, I was being imprecise.

24             I was in a meeting sitting a

 1    few chairs down from Professor Rosenthal,

 2    and I don't recall either her or I

 3    speaking.  She may have spoken a little

 4    bit.  And so I think I said hello as

 5    we -- as we went to get a bagel or a

 6    coffee at a break.  But I -- so I met

 7    her.  I don't recall speaking to her

 8    other than hello, I'm Craig McCann.

 9          Q.    Who else was in that

10    meeting?

11          A.    I think Professor Cutler was

12    there.

13          Q.    Is that when you spoke with

14    Professor Cutler?

15          A.    Yes.  And again I'm not

16    really sure I spoke to him other than

17    saying I -- I was in the same room as the

18    two of them, so I know their names.  And

19    I -- if I interacted with them, it was --

20    it was kind of just civil talk getting

21    some lunch.

22          Q.    And is that when you also

23    interacted with Ms. Keller?

24          A.    I interacted with her more

Highly Confidential - Subject to Further Confidentiality Review

1   than on that occasion.  But I did

2   interact with her on that occasion as

3   well, and about the same level, just to

4   say hello, how are you today.

5          Q.    Aside from Professor

6   Rosenthal, Professor Cutler, and

7   Ms. Keller, was anybody else in that

8   meeting?

9          A.    Yes.

10         Q.    Who?

11         A.    My recollection is it was a

12  large group, approximately 30 or 40

13  people.  They were strangers to me, other

14  than a few people, as Professor Cutler

15  and Professor Rosenthal were strangers to

16  me, but I -- I recall the name.

17                Mr. Mougey was there.

18  Mr. Rice was there.  Mr. Farrell was

19  there.  I think Ms. Singer from Joe

20  Rice's office was there.

21                And then there were a

22  Mr. Sobol, S-O-B-O-L.  And -- and then

23  some other people, whether they were

24  consultants or lawyers, I -- I don't

```
 1    know.  They were strangers, and I didn't

 2    interact with them.

 3                 I was only there myself for

 4    a couple of hours in a room about the

 5    size of this room, maybe a little bit

 6    smaller with a similar intimidating

 7    number of people.

 8         Q.    When was this meeting?

 9         A.    I'm not sure.  It was

10    sometime last year.  Maybe in the summer,

11    but whether it was the early summer or

12    the late summer, I don't recall.

13         Q.    Beside Professor -- I'm

14    sorry.

15                 Aside from this one meeting,

16    had you spoken to Professor Rosenthal or

17    Cutler separately at all?

18         A.    Never.

19         Q.    Have you ever e-mailed with

20    them or had any other interactions with

21    them?

22         A.    Never.

23         Q.    You mentioned that you had

24    more interactions with Ms. Keller than
```

Highly Confidential - Subject to Further Confidentiality Review

1    that one meeting.  What are those other

2    interactions just in broad strokes, and a

3    little quickly if we could?

4            A.    Ms. Keller attended a couple

5    of other meetings that I attended.  I'm

6    not sure whether it's two or three.  And

7    we interacted a little bit otherwise in

8    the presence of the attorneys, either via

9    e-mail or on conference calls, as -- as

10   we were working on the ARCOS data.

11           Q.    You say as we were working

12   on the ARCOS data.  What role, if any,

13   did Ms. Keller play in your opinions?

14           A.    None.

15           Q.    Did you provide Ms. Keller

16   with any data or code?

17           A.    Not directly.  I don't know

18   whether counsel provided Ms. Keller with

19   any data that we processed or developed.

20           Q.    Just a couple quick

21   questions and then I'd like to move on if

22   we could.  You made some references to

23   having interacted with other consultants.

24                   In connection with this

Highly Confidential - Subject to Further Confidentiality Review

```
 1    litigation, did you ever interact with

 2    Compass Lexecon?

 3         A.    Yes.

 4         Q.    Okay.  And what was the

 5    nature of those interactions?

 6         A.    There were either one or two

 7    brief conference calls with -- with one

 8    or more of the plaintiffs' attorneys and

 9    one or more consultants from Compass

10    Lexecon.

11         Q.    Did they play any role in

12    the formation of your opinions or the

13    preparation of your reports?

14         A.    No.

15         Q.    What about Greylock

16    McKinnon, did you ever interact with them

17    in connection with the opioids

18    litigation?

19         A.    Yes.

20         Q.    Please describe the nature

21    of that interaction.

22         A.    It was similar to the

23    interaction with Compass Lexecon.  There

24    was one -- one very brief conference call
```

1    hosted by one of the plaintiffs'

2    attorneys, Mr. Sobol I think.  And they

3    provided us with some IQVIA data --

4    I-Q-V-I-A data -- which we reviewed but

5    did not inform any of my opinions.

6            Q.    What about the Pacific

7    Institute of Research and Evaluation?

8            A.    No.

9            Q.    When did you decide to

10   supplement your report the first time?

11   Again, if it's helpful to you, we can

12   turn to the first supplemental report, is

13   dated April 3rd, 2019.

14           A.    There's only eight or

15   ten days between these two.  So in the

16   first few days after the main report was

17   filed, I was contacted and told that

18   some -- some of our early work product,

19   graphs or tables from the ARCOS data, had

20   been used in depositions, and the

21   attorneys wanted me to supplement the

22   report adopting that work product.  It is

23   our work product, but to acknowledge

24   that.

Highly Confidential - Subject to Further Confidentiality Review

1            And I believe that there was

2    some additional tables that could be

3    calculated, prepared, from the material

4    that's in the initial report, but we

5    hadn't produced it -- those tables in

6    that format, these highly summarized

7    tables.

8            And as I understood it, the

9    summaries of what we produced in the

10   initial report were being used by another

11   expert and we were asked to -- to create

12   the summaries -- recreate the summaries

13   from the underlying analysis in the

14   initial report.

15           So it all happened in a few

16   days after the initial report.  We were

17   asked to make those two supplements.

18        Q.    When you submitted your

19   March 25th report, did you already intend

20   to supplement at a later time?

21        A.    No.

22        Q.    You mentioned that you were

23   contacted and told regarding the use of

24   some of the materials at depositions, who

Highly Confidential - Subject to Further Confidentiality Review

```
1    contacted you?  Plaintiffs' counsel?

2          A.    Oh, yes.  I believe

3    Ms. Poerschke, but I'm not 100 percent

4    certain.

5          Q.    You mentioned that in

6    addition to the deposition materials, you

7    also included some highly summarized

8    tables.  When did you make those tables,

9    you or somebody else at your firm?

10         A.    Oh, shortly before

11   April 3rd, 2019.  In the -- in the few

12   days preceding that date.

13         Q.    So those were prepared

14   between the March 25th report and when

15   those highly summarized tables came out

16   in the supplemental report on April 3rd?

17         A.    Correct.

18         Q.    And you mentioned that some

19   of your summary tables you came to

20   understand were being used by another

21   expert.  Which expert?

22         A.    I'm not 100 percent certain,

23   but I think it is Professor Cutler.

24         Q.    When did you decide to
```

Highly Confidential - Subject to Further Confidentiality Review

 1    submit your second supplemental report?

 2    And if it's helpful, the next blue sheet

 3    will be in front of the second

 4    supplement.  And that's dated April 15,

 5    2019.

 6                   MR. MOUGEY:  Anybody is on

 7            the phone, if y'all can just mute

 8            it.  The noise continues to come

 9            through.

10                   Thanks.

11    BY MS. McENROE:

12            Q.    I can refine that question a

13    little bit more.

14                   Did you decide to

15    supplement, with your second supplemental

16    report, after March 25th?

17            A.    Oh, yes, definitely.

18            Q.    Did you decide to supplement

19    with your second supplemental expert

20    report after April 3rd?

21            A.    Yes.

22            Q.    When did you do the work

23    that's reflected in the second

24    supplemental expert report?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MOUGEY:  Guys, somebody
 2         is still not on mute.  If anybody
 3         can double-check who's not on
 4         mute.  But there's continuous
 5         noise that's coming through.
 6              THE WITNESS:  I'm sorry.
 7         Could you ask that again, please.
 8    BY MS. McENROE:
 9         Q.    Absolutely.  So when did you
10    do the work that's reflected in the
11    second supplemental report?
12         A.    Well, the underlying work
13    goes back six, eight, ten months, right,
14    because it's based on the analysis that
15    was already done and reported out.  In
16    the March 25th report there is some
17    additional work and it was done in the
18    first two weeks of April.  But most of
19    it, most of the work that is underlying
20    that second supplement is work that was
21    done prior to March 25th.  It was just
22    addressing a different question.
23              We were asked to take the
24    data and the analysis that we previously
```

1    had done and address a slightly different

2    question with the data.  But most of the

3    sort of underlying work had been done

4    over the prior year.

5           Q.    Prior to the period between

6    April 3rd and April 15th when you were

7    running the reports that ended up being

8    reflected in the second supplemental

9    expert report, had you been processing

10   data regarding the manufacturers as is

11   now reflected in the second supplemental

12   expert report, or did that all start in

13   that more narrow window?

14          A.    We had done some work

15   related to the manufacturers,

16   memorialized in the March 25th report.

17   And so some work done related to

18   manufacturers before March 25th.

19          Q.    But of the information

20   that's more uniquely in the second

21   supplemental report, is that a new set of

22   work that you did during that more narrow

23   period of time, the April 3rd to

24   April 15th window?

```
 1          A.    Well, there is some

 2   additional work.  As I said, we had done

 3   a lot of work related to the

 4   manufacturers, a lot of it reported out

 5   in the initial report.  And I was asked

 6   to provide answers to some questions that

 7   that prior work would inform, but hadn't

 8   been posed to me before sometime after

 9   March 25th.

10          Q.    Aside from maybe having

11   forgotten to include certain materials in

12   your first supplemental report, is there

13   any reason why what's contained in your

14   first supplemental report could not have

15   been included in your March 25th report?

16          A.    I would take some of the

17   color out of your question.  I didn't say

18   that I forgot to include something in the

19   initial report.  But there's some

20   material there that was not included in

21   the initial report, like a discussion of

22   those demonstratives used in the

23   deposition, or the highly summarized

24   tables reflecting material that was in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   the March report.

 2                 So kind of setting aside

 3   some of the context that you put in your

 4   question, I would say that if -- if I had

 5   thought of or been instructed to include

 6   the material that's in that first

 7   supplemental, it could have been included

 8   in the first report.

 9         Q.    And same would be true of

10   the materials included in the second

11   supplemental report, correct?

12         A.    Well, it's a little

13   different.  There's -- there's very

14   little additional work or thought in the

15   supplemental report.  So it's material

16   that didn't require a lot of additional

17   work to produce the first supplemental.

18                 The second supplemental

19   involves more substantial thought on my

20   part and work on my staff's part.

21                 So I wouldn't say that as of

22   March 25th, if we had been asked to

23   produce the content that's in the second

24   supplemental report, we could have done
```

1    it that day.

2             I think that it's probably

3    true for the first supplemental report,

4    that if we had thought to include those

5    summary tables or to adopt the

6    demonstratives used in the deposition,

7    that could have been done quickly and

8    included in the initial report.

9         Q.    But is there any reason why

10   you could not have done the analysis you

11   did for the second supplemental report

12   earlier, such that that result could have

13   been reflected in the March 25th report?

14        A.    I'm sorry, what do you mean

15   by any reason?

16        Q.    So for example, we can take

17   a look.  In the second supplemental

18   report at Paragraph 2, you have materials

19   considered -- sorry, materials reviewed,

20   specific to the second supplemental

21   report adding some things.

22             None of those came to exist

23   for the first time after March 25th but

24   before April 15th, correct?

```
 1          A.    Correct.

 2          Q.    So you could have been

 3   provided with this instruction and these

 4   materials previously and could have

 5   potentially included the opinions in your

 6   second supplemental report in your

 7   March 25th report, correct?

 8          A.    Yes.

 9                MS. McENROE:  We've been

10          going for about an hour.  Take a

11          quick break?

12                MR. MOUGEY:  That sounds

13          good.  What -- what's your

14          definition of quick?

15                MS. McENROE:  Let's go off

16          the record.

17                THE VIDEOGRAPHER:  Off the

18          record at 11:18 a.m.

19                (Short break.)

20                THE VIDEOGRAPHER:  We are

21          back on the record at 11:31 a.m.

22   BY MS. McENROE:

23          Q.    I'd like to direct your

24   attention in your March 25th report to
```

Highly Confidential - Subject to Further Confidentiality Review

1    Page 3, which is a continuation of

2    Paragraph 9, which has a list of

3    materials reviewed.  Let me know when

4    you're there.

5          A.    Yes.

6          Q.    Great.  And take a look at

7    the next page, it's a continuation of

8    that list.

9                And Item I you have listed

10   as Masters Pharmaceutical, Inc., versus

11   Drug Enforcement Administration; is that

12   correct?

13         A.    Yes.

14         Q.    When did you first read

15   Masters?

16         A.    Last spring or summer.

17   Approximately a year ago.

18         Q.    Do you rely on it in any way

19   in issuing your expert opinions?

20         A.    No, I don't think so.

21         Q.    You are not a lawyer,

22   correct?

23         A.    Correct.

24         Q.    You don't apply caselaw in

Highly Confidential - Subject to Further Confidentiality Review

```
 1    your analysis in your expert reports?

 2           A.    I don't.  If I do, it's

 3    inadvertent.

 4           Q.    Okay.  You also don't

 5    have -- you do not have listed here the

 6    Controlled Substances Act; is that

 7    correct?

 8           A.    Correct.

 9           Q.    Did you review that in whole

10    or in part in connection with the opioids

11    litigation work you've done?

12           A.    If I did, I don't recall.

13           Q.    Did you rely on it in any

14    way with respect to any of the opinions

15    you've put forth?

16           A.    No.

17           Q.    So you didn't review

18    Title 21, Section 1301.74(b) from the

19    Code of Federal Regulations, correct?

20           A.    Not that I'm aware of.  If

21    you put it in front of me, I may

22    recognize the text.  But I don't -- I

23    don't recall it by that citation.

24           Q.    Well, did you rely on any
```

1    regulations in connection with forming

2    the opinions in your expert reports?

3         A.    Not directly.  There may be,

4    at a second remove, an impact of a -- a

5    regulation on my thinking.  But -- the

6    data, but not -- not directly.

7         Q.    What do you mean by second

8    remove impact?

9         A.    Well, at a high level what I

10   think I did was to determine whether the

11   transactions that the defendants reported

12   to the DEA in realtime match the

13   transactions that they report to the

14   court in this case.

15              And there's a couple of

16   different ways of thinking about that,

17   framing that exercise.

18        Q.    Sure.

19        A.    But I understand that the

20   defendants are required by regulation or

21   law to report those transactions timely

22   and accurately to the DEA through ARCOS.

23   And so one interpretation of what I did

24   was to -- to take the transactions that

Highly Confidential - Subject to Further Confidentiality Review

1   the defendants produced in this case, and

2   determine whether the defendants produced

3   their actual transactions in these 14

4   opioids.  And a way to do that is to say,

5   well, in addition to whatever

6   responsibility the defendants have to the

7   court in this case, they had separate

8   from that in realtime, a responsibility

9   to report the transactions to ARCOS.  And

10  so I then compare those two datasets.

11          So when I say sort of at a

12  second remove, regulation may impact my

13  opinion, it's at a -- a tenuous

14  connection.  What I'm really doing is

15  just comparing two datasets.  But my

16  thinking about that is probably informed

17  by an understanding that the defendants

18  both had a responsibility to the court,

19  and then, through regulation, had a

20  responsibility to accurately and timely

21  report their transactions.

22          Q.    When you say responsibility

23  of the court, you are talking about in

24  discovery in this litigation?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes.

 2              Q.    And you made mention that

 3    defendants are required by regulation to

 4    report their data timely and accurately.

 5    Are you referring to ARCOS when you made

 6    that statement?

 7              A.    Yes.

 8              Q.    Are you making any opinions

 9    in any of your expert reports whether any

10    defendant did or did not comply with

11    their reporting obligations vis-a-vis

12    ARCOS?

13              A.    I don't think so.  It's

14    certainly not an opinion that I

15    expressed.  We see some gaps in the ARCOS

16    data.  But I don't know if that result --

17    if that resulted from a defendant not --

18    not timely reporting transactions or not.

19    That's a slightly different question.

20              Q.    When you interacted with

21    current or former DEA personnel with

22    respect to the ARCOS data, did any of

23    them tell you that any of the defendants

24    did not meet their obligations with
```

```
 1    respect to reporting ARCOS data?

 2         A.    No.

 3         Q.    Are you making any opinions

 4    in any of your expert reports about

 5    defendants' failure to comply with their

 6    discovery obligations in this litigation?

 7         A.    Well, it's not an opinion.

 8    I think some of our observations have

 9    informed further discovery production.

10    And I expect may continue to.

11              AmerisourceBergen provided

12    data yesterday in discovery that we

13    identified in the March 25th report

14    hadn't been produced before.  So I

15    don't -- that's not an opinion really,

16    but it -- it is a comment on the

17    discovery, at least the production that

18    we've received.  And I expect there may

19    be more production.  But it's not -- it's

20    not opinion.

21         Q.    Okay.  You didn't list in

22    your materials considered any, what we

23    call "dear registrant" letters which are

24    letters from the DEA to registrants
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    regarding suspicious order monitoring.

2    Did you review any in connection with

3    forming any of your opinions?

4           A.    Not that I recall.

5           Q.    Okay.

6           A.    I'm sorry, the answer would

7    definitely be no, because if I saw

8    something like that, it didn't in any way

9    inform any of my opinions.  My opinions

10   are really about the data.  Not about --

11   about some subject matter conduct by any

12   of the parties.

13          Q.    Aside from any documents

14   cited in your expert reports, did you

15   review any documents produced by

16   defendants regarding their own suspicious

17   order monitoring programs?

18          A.    I don't think I did

19   personally, but my staff did see some

20   suspicious order monitoring reports.  I

21   know that we received some.  They didn't

22   inform any of my opinions.

23          Q.    Okay.  What did they

24   receive?
```

```
 1        A.    I don't know.

 2        Q.    Do you know regarding which

 3   defendants?

 4        A.    No.  I'm sorry.  I might

 5   have answered a little too quickly to the

 6   prior question.

 7              I think what my recollection

 8   is, that I was told, that we received

 9   kind of a hodge-podge of e-mails or

10   memos, that the reporting wasn't

11   particularly systematic or organized, to

12   the best of my recollection.

13              As I said, it didn't

14   inform -- wasn't used in any way in my

15   analysis and didn't inform in any way my

16   opinions.  But that's my recollection of

17   what we received.

18        Q.    And are you referring to

19   actual suspicious order reports or are

20   you referring to suspicious order

21   monitoring programming?

22              I just want to make sure we

23   are talking about the same thing.

24        A.    I've told you everything I
```

1    know already on the subject.  I can't

2    qualify it any more than that.

3         Q.    Okay.  Did you consider any

4    documents relating to investigations that

5    defendants may have done into potentially

6    suspicious orders?

7         A.    No.

8         Q.    Did you consider any

9    documents regarding audits of the

10   suspicious order monitoring programs by

11   DEA, Board of Pharmacy, or otherwise?

12        A.    No.

13        Q.    Did you review any

14   communications between defendants, any of

15   them, and the DEA?

16        A.    Only again at one step

17   removed.  The ARCOS data, 10 or 12 of the

18   34 fields we received are transmitted by

19   the defendants to the DEA.  And so the

20   source material that we received

21   ultimately came in large part from the

22   defendants, but by communication, if you

23   mean letters or e-mails or analysis, no,

24   I did not.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Since issuing your original

 2    report or either of your two supplements,

 3    besides defendants having supplemented

 4    their transactional data, have you

 5    reviewed anything else regarding the

 6    opioids litigation, anything else

 7    produced in discovery?

 8          A.    I don't think so.

 9          Q.    The materials reflected in

10    your materials reviewed section of your

11    reports, are those materials that you

12    asked for or are they materials that were

13    provided to you without you asking for

14    them?

15          A.    I'm sorry.  I don't think I

16    can answer the question the way that

17    you've asked it.  I can rephrase it for

18    you if you like or you could --

19          Q.    Sure.  As long as we do it

20    relatively quickly.

21          A.    Well, it's neither, right.

22    You asked me was it provided to me

23    without me asking for it or did I ask for

24    it.  So most of those items are items
```

1    that we would source ourselves during our

2    work, researching the data that we

3    receive.  So just take for an example, D,

4    E, F, G, H, those are all examples, as we

5    were -- and B and C, these are all items

6    that as we were developing the data last

7    summer, we sourced without asking for it

8    from the plaintiffs' counsel or the

9    plaintiffs' counsel providing it to us

10   without us asking for it, which were the

11   two possibilities your question covered.

12        Q.    Thank you.  So was there

13   anything that you asked for in forming

14   your opinions that plaintiffs' counsel

15   did not give you?

16        A.    No, not that I can think of.

17        Q.    Let's take a quick look on

18   Page 4 of your initial report.  Paragraph

19   13, under heading "Summary of Opinions."

20             Do you see where I am?

21        A.    Yes.

22        Q.    Paragraph 13 says, "Based

23   upon my comparison of the ARCOS data

24   produced by the DEA and the public ARCOS

Highly Confidential - Subject to Further Confidentiality Review

1    retail drug summary reports, I conclude

2    that, after correcting a relatively small

3    number of records, the ARCOS data

4    produced by the DEA is reliable."

5             Did I read that correctly?

6        A.    Yes.

7        Q.    And then if we go ahead to

8    Paragraph 17, still under "Summary of

9    Opinions," the first sentence there says,

10   "I conclude from my review of the ARCOS

11   data, the retail drug summary reports,

12   and transaction data produced in

13   discovery by the defendants, that the

14   ARCOS data is reliable."

15            Did I read that accurately?

16       A.    Yes.

17       Q.    And then that paragraph

18   continues, correct?

19       A.    Yes.

20       Q.    So is it fair to say that

21   you are of the opinion that the ARCOS

22   data is generally reliable?

23            THE WITNESS:  Bless you.

24            Yes, with the qualification

1          that I make throughout the report,

2          that is my opinion.

3     BY MS. McENROE:

4          Q.    An in -- at, like, a

5     30,000-foot level, the sort of first half

6     of your report is largely taking

7     transactional data that defendants have

8     produced in this litigation, comparing it

9     to the ARCOS data to help you form that

10    opinion that ARCOS data is reliable?

11              I'm not trying to make this

12    one a trick question.  If you want to

13    describe it a different way, go ahead.

14         A.    I would -- I would just add

15    to that a comparison with the retail drug

16    summary reports, which is what we looked

17    at on Paragraph 13.  But if you add

18    comparing the ARCOS data that we received

19    from the DEA, the retail drug summary

20    reports, and the defendant transaction

21    data, comparing those three views of what

22    should be the same underlying data, we

23    think that at least those three views are

24    consistent, is how I would describe it.

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.    And to maybe put a finer

2    point on it, that is the analysis

3    conducted in Section 5, I believe, of

4    your report; is that correct?  Five and

5    six?

6         A.    Five and six.  Yes.

7         Q.    Great.  And so the purposes

8    of Sections 5 and 6 are both to reach

9    that conclusion that we were just

10   discussing; is that correct?

11        A.    Well, there's a little bit

12   more to it than that.  But as you said,

13   at a high level, I think that's fair.

14        Q.    Okay.  So you got

15   defendants' transactional data, and you

16   got different data from each of the

17   defendants' production.  Is that fair to

18   say?

19        A.    Yes.

20        Q.    And how did you get access

21   to defendants' productions?  Did you have

22   access to the production database of the

23   documents produced directly from

24   defendants or was it provided to you
```

```
 1   separately?

 2        A.    Well, there's some

 3   technology there that I may be challenged

 4   to describe.  So the easiest way for me

 5   to think about the data we received is

 6   the ARCOS data was received on DVDs or

 7   hard drives.

 8        Q.    Yep.

 9        A.    And then some additional

10   production was received through some

11   internet-based technology shared between

12   the plaintiffs' counsel and my office.  I

13   wasn't directly involved in the

14   transmission, so there's some technical

15   details there that I'm not familiar with.

16        Q.    Did your office have access

17   to the defendants' overall production, so

18   more than what was produced for

19   transactional data?

20        A.    Yes.

21        Q.    Did your office go looking

22   at things more than the transactional

23   data?

24        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            Q.    What did they go looking at?

2            A.    Well, we -- we talked a

3    little bit earlier about the suspicious

4    order reports, what I'm calling generally

5    the suspicious order reports.  That would

6    be one example.

7                  I can't think of other

8    examples as I'm sitting here.  But I'm

9    sure there is other material besides the

10   individual defendant transaction data and

11   the suspicious order reports, what I'm

12   referring to generally and somewhat

13   vaguely, because it's just my

14   understanding of how to describe some set

15   of e-mails or reports on suspicious order

16   monitoring.

17                 Chargeback data is another

18   example.  We don't use the chargeback

19   data very much.  But that's another

20   example of data that was produced by the

21   defendants, as I understand it.

22                 What additional categories

23   of documents or data my staff might have

24   looked at, I don't -- I don't know.  I
```

1    have described what I can recall.

2         Q.    And did you look at any of

3    the suspicious order reports documents,

4    as you've described them?

5         A.    I don't recall.  If I did,

6    it was just on a screen.  It wasn't

7    something that was printed off or a

8    binder or, you know, a folder.  It was

9    seeing what looked like an e-mail or a

10   memo or something like that, looking over

11   the shoulder of one of my staff and being

12   told that's what the suspicious order

13   files look like.

14        Q.    Does that inform any of your

15   opinions in your report?

16        A.    No.

17        Q.    Take a look at Page 29 of

18   your first report, Paragraph 29

19   coincidentally.  I'm sorry.  Footnote 29

20   is what I meant.

21        A.    Yes.

22        Q.    So the footnote says, "The

23   13 defendants are ANDA,

24   AmerisourceBergen, Cardinal Health, CVS,

```
 1   Discount Drug Mart, HBC, Henry Schein, HD

 2   Smith, McKesson, Prescription Supply,

 3   Rite Aid, Walgreens and Walmart.

 4              "I do not discuss the data

 5   produced by Rite Aid or Henry Schein

 6   because the produced data was

 7   insufficient to compare with the ARCOS

 8   data.

 9              "Rite Aid did not produce

10   the buyers' DEA numbers, and the data

11   produced by Rite Aid does not identify

12   which counties are included in the data.

13              "Henry Schein did not

14   include the buyers DEA number or NDCs."

15              And then you go on to say,

16   "Appendix 7 lists the data fields

17   provided by each defendant.  I have

18   standardized the names of the field to

19   simplify the presentation."

20              Did I read that correctly?

21        A.   Yes.

22        Q.   What did you do to seek out,

23   if anything, the data produced by Rite

24   Aid and Henry Schein?
```

```
 1        A.    We notified the plaintiffs

 2   of the deficiencies in the data just as

 3   we did for some of the other defendants.

 4        Q.    Okay.  And plaintiffs did

 5   not come back to you specifically with

 6   respect to Rite Aid with clarification

 7   regarding the location of the Rite Aid

 8   data in the production database?

 9        A.    Not that I recall.

10        Q.    Footnote 30 says, "For

11   example, Rite Aid only produced

12   transactions for 2007 and only for

13   hydrocodone, 9193."

14              Then it keeps going.

15        A.    Yes.

16        Q.    In a number of your charts

17   you put N/A for certain Rite Aid entries,

18   because presumably you didn't have that

19   data.  Do you recall that?

20        A.    No.

21        Q.    So for example, see if I

22   can -- take a look at Page 63.  You'll

23   see Rite Aid is third from the bottom

24   above the total?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.    Yes.

 2           Q.    And you have N/A for

 3   oxycodone, morphine, hydrocodone,

 4   oxymorphone.

 5                 Do you see that?

 6           A.    Yes.

 7           Q.    For Rite Aid?

 8                 Did you understand or have

 9   any understanding that Rite Aid did not

10   distribute any of those specific drugs?

11           A.    I don't know one way or

12   the -- the other, but if that's the case,

13   then N/A would cover it.

14           Q.    Would it properly be zero as

15   opposed to N/A, if you knew that?

16           A.    I don't know.  I'd have to

17   think about that.

18           Q.    Let's take a look at your

19   resumé.  Hold on one second.

20                 (Document marked for

21                 identification as Exhibit

22                 McCann-4.)

23   BY MS. McENROE:

24           Q.    I'm going to mark this as
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Exhibit 4, which I believe is Appendix 1
 2    to your March 25th report.
 3              A.    Thank you.
 4              Q.    Great.  Thank you.
 5                    And I'll represent to you
 6    that this is what you had included as
 7    Appendix 1.  Does this look familiar?
 8              A.    Yes.
 9              Q.    Is there anything you'd like
10    to correct in Exhibit 4, or is it all
11    right if we consider this to be your
12    qualifications and experiences?
13              A.    There -- there, of course,
14    would be a couple of additional entries.
15    The two -- if we were preparing this
16    report -- this resumé today rather than
17    on March 25th, it would be the two
18    supplemental reports, and then I gave a
19    deposition last week or the week before
20    in the case that's third down on -- on
21    Page 97, the SEC V RPM.
22                    Other than that, I -- I'm
23    not aware of any changes that I would
24    make to it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    So you have a Bachelor's

 2   degree, a Master's degree, and a Ph.D.;

 3   is that correct?

 4          A.    Correct.

 5          Q.    And your Ph.D. is in

 6   economics, correct?

 7          A.    Correct.

 8          Q.    Okay.  You are not a medical

 9   doctor, correct?

10          A.    Correct.

11          Q.    You did not attend medical

12   school?

13          A.    Correct.

14          Q.    You are not a physician's

15   assistant?

16          A.    Correct.

17          Q.    You are not licensed to

18   write prescriptions?

19          A.    Correct.

20          Q.    You are not a pharmacist?

21          A.    Correct.

22          Q.    Fair to say you're not an

23   expert in healthcare or the healthcare

24   industry?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes.

2          Q.    Fair to say that you do not

3    have professional experience with

4    suspicious order monitoring?

5          A.    Yes.

6          Q.    You have not been involved

7    in designing a suspicious order

8    monitoring program, correct?

9          A.    Correct.

10         Q.    You have not reviewed

11   guidance from the DEA regarding

12   suspicious order monitoring, correct?

13         A.    Correct.

14         Q.    You are not experienced with

15   supply chain; is that correct?

16              So what I mean by that is

17   the moving of products along a supply

18   chain, like in this case,

19   pharmaceuticals, are you an expert in

20   that?

21         A.    Yeah, I was going to say,

22   I'm -- I'm familiar with the concept.

23   And a little bit familiar with operations

24   research.  But I would not call myself an
```

```
 1    expert in supply chain management.

 2            Q.    Would you consider yourself

 3    an expert in suspicious order monitoring?

 4            A.    No.

 5            Q.    Would you consider yourself

 6    an expert in issues from -- relating to

 7    the Drug Enforcement Agency?

 8                  MR. MOUGEY:  Objection.

 9                  THE WITNESS:  That's a

10            little too broad a question.

11            There may be some aspects that I

12            would be an expert in, for

13            instance, the -- the aspects that

14            I actually address in my expert

15            report, which is the assessment of

16            the data.

17                  But if you mean something

18            more specific to the DEA as

19            opposed to the data that the DEA

20            produced to me, then I would

21            say -- I would agree with you,

22            what -- whatever the implication

23            was of your question.

24    BY MS. McENROE:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            Q.    Sure.  And so I can say it

2    another way.  You've never worked at the

3    DEA, correct?

4            A.    Correct.

5            Q.    You've never worked at the

6    FDA?

7            A.    Correct.

8            Q.    You've never worked at the

9    CDC?

10           A.    Correct.

11           Q.    Do you have any

12   healthcare-related experience, aside from

13   being potentially a consumer of

14   healthcare, that's not reflected in your

15   Appendix 1 to your expert report?

16           A.    No.

17           Q.    Is it fair to say that the

18   vast majority of your professional

19   experience relates to securities-related

20   issues?

21                 Or I can say that a

22   different way if you'd prefer.

23                 And I think I've seen you

24   having written this a number of times.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    That the majority of your consulting work

 2    since you left the SEC has primarily

 3    involved the analysis of investments.

 4              Is that a true statement?

 5         A.    Yes.

 6         Q.    This case does not involve

 7    the analysis of investments, correct?

 8         A.    Correct.

 9         Q.    Do you know what the word

10    "anhydrous" means?

11         A.    Someone told me and I forget

12    right now.  It's not something that --

13    that I recall.

14         Q.    In your report, you have

15    certain statements with regards to

16    certain drug weights or the makeup of

17    certain pharmaceuticals.  Do you have

18    personal knowledge on which you can be

19    making those statements?

20         A.    I'm sorry, could you give me

21    an example?

22         Q.    Sure.  So let's take a

23    look -- let's do Appendix 2.

24              (Document marked for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          identification as Exhibit

 2          McCann-5.)

 3   BY MS. McENROE:

 4          Q.    I'm going to hand you what

 5   I'm marking as Exhibit 5, which is

 6   Appendix 2 to your March 25th report.

 7          A.    Thank you.

 8          Q.    Sure.  And let's take a look

 9   together at Paragraph 191.  So this is

10   just an example.

11               And I'm going to be

12   starting, a couple lines down, there's a

13   sentence towards the end of the line that

14   starts "I reviewed the ingredient base

15   weights."

16               Do you see that?

17          A.    Yes.

18          Q.    Okay.  And it says, "I

19   reviewed the ingredient base weights in

20   the NDC dictionary for all NDCs with

21   dosage units in the ARCOS data and

22   flagged ingredient base weights as

23   potentially incorrect, if the weight of

24   the drug per dosage form, e.g., capsule,
```

```
 1    tablet, patch, was significantly

 2    different than the other drug products

 3    with the same base drug and dosage

 4    strength."

 5              Do you see that?

 6         A.    I do.

 7         Q.    What methodology did you use

 8    to make those determinations?

 9         A.    Well, I compared NDCs with

10    the same active ingredient, the same drug

11    code, and noted that for some NDCs, the

12    ingredient base weights were orders of

13    magnitude different than other NDCs for

14    the same drug code.

15              So to give you a simple

16    example, if I may.  There might be an NDC

17    for a package of 10 pills and an NDC code

18    for a package of 30 identical pills.  And

19    the -- the base weights for those two

20    packages should be in that same

21    proportion, three to one.  And there are

22    just a handful of examples, maybe a dozen

23    or two dozen examples, where -- where

24    there appears to be an error.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              We actually see some of

2    those errors being corrected over time in

3    the NDC dictionary.  Because if you

4    access the NDC dictionary today it will

5    be slightly different than the NDC

6    dictionary that you accessed a year ago.

7              And so we give you an

8    example in the next -- I give you an

9    example in the next paragraph of exactly

10   what I'm describing.

11        Q.    Did you do anything other

12   than consult with the dictionary to check

13   that that methodology was appropriate or

14   correct?

15        A.    Well, yes, you can see in

16   Footnote 62 I'm referencing an appendix

17   to the ARCOS handbook that is sort of an

18   independent check on the calculation that

19   I did.  So we've -- we first, when we got

20   the ARCOS data, and checked some of the

21   calculated base weights in the ARCOS data

22   against the ingredient base weight in the

23   NDC dictionary, we found some patterns

24   like the pattern I just described to you
```

```
1    across those two NDC codes.

2              And from that and from some

3    additional analysis, we see a, depending

4    on the drug code, a factor or a ratio

5    between the stated strength and the

6    ingredient base weight.

7              And then later we -- we

8    verified those with the ratios described

9    in Appendix 3 of the ARCOS handbook.

10        Q.    Can you turn to Paragraph

11   204 in that Exhibit 5.

12        A.    Yes.

13        Q.    In the section headed

14   "Transactions with Obvious Errors in

15   Quantity."

16        A.    Yes.

17        Q.    It says, "I also exclude

18   transactions with obvious errors in

19   quantity.  For example, I exclude a

20   single sale transaction of

21   hydrocodone/APAP tablets from a

22   distributor to a practitioner in the

23   Northern Mariana Island that has

24   calculated base rate of 34 metric tons."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Did you exclude any other

 2   entries aside from that one obvious

 3   error?

 4         A.    At some points in our

 5   report, certainly yes, as I described in

 6   the early part of the report when I'm

 7   summarizing the data as we received it

 8   from ARCOS.  I forget the tables exactly,

 9   but we could look at them if you like.

10   As we go from Table 3 to 4, or something

11   like that, I condensed some of the ARCOS

12   data, for example, excluding reverse

13   distributors from an intermediate

14   discussion of the data because there are

15   examples where -- where there's a

16   manufacturer shipment to a reverse

17   distributor of -- I'll make the number

18   up -- but 1,000 units.  And the same NDC

19   code with the same quantity but a

20   different unit code is shipped from the

21   reverse distributor to an analytical lab.

22              The reverse distributor and

23   the manufacturer in my example are both

24   reporting that first transaction, but the
```

```
 1   reverse distributor is putting in the

 2   wrong unit code and reporting a base

 3   weight or implying a base weight --

 4        Q.   Sir, I'm sorry to interrupt

 5   you.  But we're a little short on time,

 6   so I just want to make sure.

 7             It looks, in this Appendix

 8   2, that you've differentiated

 9   transactions involving reverse

10   distributors, analytical labs, importers,

11   exporters, or researchers from

12   transactions with obvious errors in

13   quantities.  In this section, you walk

14   through methodologically -- sorry, lost

15   the word -- of how you got through this

16   data.

17             And I'm asking specifically

18   with respect to transactions with obvious

19   errors in quantity, whether you know if

20   you've excluded any others on that

21   specific basis.

22        A.   I'm sorry.  I wasn't at a

23   period.  If I could just have a few more

24   words to complete my sentence.
```

```
 1            Q.    No, I'm sorry.  I'm sorry.

 2   Special Master Cohen has ruled, at least

 3   at the deposition of Dr. Eagleman, that

 4   we're entitled to cut you off.  And I can

 5   say for the record, the record can

 6   reflect, that your answer was not

 7   complete.

 8            MR. MOUGEY:  Special Master

 9        Cohen -- that you can cut the

10        witness off in the middle of a --

11            MS. McENROE:  Correct, and

12        we can just consider it --

13            MR. MOUGEY:  -- on a

14        response to a question.

15            MS. McENROE:  Yes.  Yes.  We

16        are very limited by time.

17            MR. MOUGEY:  If you can show

18        me the --

19            MS. McENROE:  I certainly

20        can get you --

21            MR. MOUGEY:  That would be

22        great.  So we can cut each other

23        off during the course of the

24        depositions --
```

```
 1              MS. McENROE:  We can.

 2              MR. MOUGEY:  And we can

 3         give -- the witness can't give an

 4         opportunity to --

 5              MS. McENROE:  At my peril.

 6              MR. MOUGEY:  -- to answer

 7         the question?

 8              MS. McENROE:  At my peril,

 9         that his answer is not complete.

10         I'm just trying to make sure -- he

11         wasn't answering the correct

12         question because he was answering

13         a different question.  So I'm

14         trying to make sure that we

15         preserve our time.

16    BY MS. McENROE:

17         Q.   So with respect specifically

18    to Subsection F here, transactions with

19    obvious errors in quantity.  Taking into

20    account that you have your other sections

21    talking about other corrections you've

22    made to the data, can you recall any

23    other specific obvious errors with

24    quantity that you corrected?
```

```
 1            A.    I believe there are others.

 2    But they are de minimus.  I don't recall

 3    another example as I sit here, besides

 4    the one that I give you there.

 5            Q.    Okay.  Let's turn to

 6    Paragraph 121 on Page 50 of your

 7    March 25th report.  So that will be in

 8    the bound document there.

 9                  So on Page 50, that last

10    line in Paragraph 21 (sic) there's a

11    sentence that starts with

12    "buprenorphine."

13                  Do you see that?

14            A.    Yes.

15            Q.    Okay.  "Buprenorphine and

16    fentanyl have a large MME relative to

17    their dosage units because both are

18    prescribed as skin patches, which

19    dispense the drug for up to one week."

20                  Do you see that?

21            A.    Yes.

22            Q.    And you have no citation

23    there, right?

24            A.    Correct.
```

```
 1          Q.     Do you know if there are

 2   other formulations of buprenorphine or

 3   fentanyl?

 4          A.     Yes.

 5          Q.     And how do you know that?

 6          A.     From the NDC dictionary.

 7          Q.     Do you know about drug or

 8   pharmaceutical formulations other than

 9   from the NDC dictionary or the ARCOS

10   registrant handbook?  Do you have other

11   professional or educational experience on

12   which to base the statements that you put

13   in your report along those lines?

14          A.     No.

15          Q.     What is -- do you know what

16   it means for a drug to be Schedule I,

17   Schedule II, III, IV, V?

18          A.     Generally, but not part of

19   my -- as part of my expert experience or

20   opinion.

21          Q.     Are you aware that the only

22   drugs at issue in this litigation are a

23   particular set of opioid pain medications

24   that are or ever have been Schedule II?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    From my understanding, you

 3    include codeine in your analysis; is that

 4    correct?

 5          A.    Yes.

 6          Q.    Including certain

 7    formulations with -- involving codeine

 8    that are and have always been a Schedule

 9    III; is that correct?

10          A.    I'm not sure.  That, I

11    think, goes beyond my expertise.  What

12    I've done is I've analyzed the data that

13    the DEA produced and that the defendants

14    produced.

15          Q.    Right.  But you're not using

16    all of the data that the DEA and the

17    defendants produced in your analysis,

18    right?  You're picking certain of the

19    data for your analysis?  So, for example,

20    you exclude certain treatment-related

21    medications from some of your analysis,

22    right?

23          A.    I think that's a different

24    issue.  But yeah, some of the tables do
```

1    not include two treatment drugs.

2        Q.    Did you intend to include

3    Schedule III drugs that are not within

4    the scope of this litigation in your

5    analysis?

6        A.    I intended to analyze all of

7    the data that the DEA produced and that

8    the individual defendants produced

9    regardless of what schedule they were on.

10   It's just reporting of the data for the

11   benefit of the court.

12       Q.    So if the data was produced

13   by the DEA but does not concern a drug

14   that's at issue in this litigation, it's

15   possible that could be accounted for in

16   your analysis?

17       A.    I would say it a little bit

18   differently.  If it's a drug that was

19   produced by the DEA and by the individual

20   defendants, it's in our analysis.

21           MS. McENROE:  Can we go off

22       the record for a second.

23           THE VIDEOGRAPHER:  Off the

24       record at 12:13 p.m.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Whereupon, a discussion was

 2         held off the record.)

 3                   -  -  -

 4              (Lunch break.)

 5                   -  -  -

 6     A F T E R N O O N   S E S S I O N

 7                   -  -  -

 8              THE VIDEOGRAPHER:  We are

 9         back on the record at 1:03 p.m.

10                   -  -  -

11              EXAMINATION (Cont'd.)

12                   -  -  -

13   BY MS. McENROE:

14         Q.    Hi, Dr. McCann, thank you

15   for joining us again.

16              I'd like to direct your

17   attention, in your March 25th report,

18   which I think is Exhibit 3 if I'm

19   recounting correctly.

20         A.    Yes.

21         Q.    Great.  Could you please

22   turn to Page 6 which is Paragraph 21.

23         A.    Yes.

24         Q.    And it says in Section 9, if
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I'm getting my Roman numerals correct; is

 2    that right?

 3         A.    Yes.

 4         Q.    Okay.  "In Section 9, I

 5    describe a nonexhaustive set of

 6    algorithms that can be systematically

 7    applied to the ARCOS data and present a

 8    check on the various estimates presented.

 9    In Section 10, I provide certain

10    estimates regarding the total aggregate

11    shipments of opioids into Ohio from 1997

12    to 2018.  In Section 11, I describe

13    certain charts and tables that are

14    attached to this report.  In Section 12,

15    I give my conclusions."

16              Did I read that correctly?

17         A.    Yes.

18         Q.    Okay.  And you say in that

19    first sentence that you're describing a

20    nonexhaustive set of algorithms that can

21    be systematically applied to the ARCOS

22    data.

23              Are you planning to apply

24    any other algorithms not articulated in
```

1    your March 25th report or either of your

2    supplements to the ARCOS data in this

3    litigation?

4         A.   Not as I sit here.

5         Q.   And when you say that, you

6    say because you might do some later, but

7    you haven't been asked to yet?

8         A.   Right.  It's not something I

9    intend to do or that I am contemplating

10   as I sit here.  But there might be

11   additional facts developed or there might

12   be some instruction from the court or for

13   some other reason, another alternative

14   may come to mind that I would develop and

15   implement.  But I -- I don't have

16   anything in mind, as I sit here.

17        Q.   So even though you say that

18   in Section 9 you are describing a

19   nonexhaustive set of algorithms, you're

20   not meaning that to say that you have not

21   listed all the algorithms that are

22   forming your opinions in this report in

23   this report?

24        A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And you say that the

 2    algorithms can be systematically applied.

 3    Do you see where it says that?

 4          A.     Yes.

 5          Q.     And in saying can be

 6    systematically applied, are you saying

 7    that they are appropriate or should be

 8    applied or -- are you taking that

 9    opinion?

10          A.     No, I think that would get

11    into some subject matter expertise that

12    I'm not claiming to have.  I was asked to

13    implement these algorithms, which at some

14    broad level, has some assumptions.  And

15    then make an additional assumption or

16    two, apply it to the data and report out

17    the results.  And that's what I've done.

18          Q.     So speaking in a broad

19    level, which I think makes sense to start

20    and then we'll get a little bit more

21    specific.

22                 And I don't mean this to be

23    pejorative in any way.  But is it fair to

24    say that you are serving in a role like a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    computer, a sort of old school computer,

 2    that -- that you are taking in the data,

 3    processing it and putting out output in

 4    your opinions?

 5         A.    Yes.  Exactly.

 6         Q.    Okay.  And you're not saying

 7    that the sort of black box that data is

 8    going into is the right or the only

 9    algorithm to be used on that data.  You

10    are just the one who is actually doing

11    the calculations; is that correct?

12         A.    Well, close.  It's not a

13    black box at all.  A black box is

14    something where something -- data goes in

15    and results come out and you can't tell

16    what's happening.  In fact, this is not a

17    black box.  It's the opposite of that.

18               I'm describing for you in

19    detail, I think, exactly what's being

20    done to the data.  I don't take a

21    position on whether -- which or if any of

22    these algorithms and the associated

23    assumptions are appropriate, I think was

24    the word you used earlier?
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.     Yep.

2        A.     I'm just saying that you

3    take the -- the data that we've prepped,

4    and apply these formulas to it, you get

5    particular results.

6        Q.     And is that also true not

7    only about whether those algorithms, the

8    assumptions, are appropriate, but also

9    true that you are not making any opinion

10   as to whether they are legally required?

11       A.     Right.  I think all of these

12   issues are being handled by other

13   experts.  I -- as you said a minute ago.

14   And I didn't take it as a pejorative.

15   I'm just serving as a calculator.

16       Q.     And in this Paragraph 21 you

17   use the -- the phrase "algorithms" to

18   discuss what's being applied in

19   Section 9.  But you also use the word

20   "approaches" later I believe.

21              Are you saying the same

22   thing?

23              So are -- in -- calling it

24   algorithms here in Paragraph 21, are you

1    describing what you later in your report

2    call an approach, Approach 1, Approach 2,

3    Approach 3?

4         A.    Yes.

5         Q.    Let's take a look at

6    Section 9.  So in particular I'll point

7    you to Paragraph 130, which is -- starts

8    on Page 56.

9              Are you there?

10        A.    Yes.

11        Q.    Great.  And the section

12   heading is "Transaction Analysis."

13             Do you see that?

14        A.    Yes.

15        Q.    And this is what we were

16   just referring to when we were talking

17   about the algorithms?

18        A.    Yes.

19        Q.    And Paragraph 130 starts, "I

20   implemented various approaches to

21   identify transactions meeting specified

22   criteria using the non-public ARCOS data

23   from 2006 to 2014, supplemented with

24   defendant transaction data where the

```
 1    ARCOS data is obviously missing

 2    transactions that are included in the

 3    transactions produced by defendants in

 4    discovery, and to the extent I have

 5    defendant transaction data for the

 6    periods before 2006 and after 2014, I

 7    calculated the results separately for

 8    each of the 12 controlled substance drug

 9    codes."

10              Do you see that?

11         A.   Yes.

12         Q.   And then you have a footnote

13    there that "you do not analyze

14    transactions in two treatment drugs,

15    buprenorphine and methadone."

16              Do you see that?

17         A.   Yes.

18         Q.   How did you pick that list

19    of 12 controlled drug codes?

20         A.   Well, by taking the 14 drug

21    codes we received from the DEA and

22    excluding the two, what I understand to

23    be treatment drugs identified in

24    Footnote 54.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.  And you didn't -- you

 2    didn't apply any other criteria?

 3          A.    Not that I can think of.

 4          Q.    Okay.  In that Paragraph 130

 5    that I just read out, you say at the

 6    beginning that you implemented various

 7    approaches.  And is that talking about

 8    the approaches that are discussed later

 9    in that section, Approaches 1, 2, 3, 4

10    and 5?

11          A.    Yes.

12          Q.    You are not talking about

13    anything else than that?

14          A.    Correct.

15          Q.    And then you have five

16    approaches in this report; is that

17    correct?

18          A.    Yes.

19          Q.    And the first one is the

20    maximum monthly trailing six-month

21    threshold, correct?

22          A.    Correct.

23          Q.    And the second is the twice

24    trailing 12-month average pharmacy dosage
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    units, correct?

 2         A.    Yes.

 3         Q.    And we can do it slower,

 4    sorry, you're flipping through.

 5              MR. MOUGEY:  Which page are

 6         you referencing?

 7              MS. McENROE:  I'm just going

 8         through a list of them, but --

 9              MR. MOUGEY:  Right.

10              MS. McENROE:  -- that's

11         fine.

12    BY MS. McENROE:

13         Q.    The third one starts on

14    Page 64.  So the third one is the three

15    times trailing 12-month average pharmacy

16    dosage units; is that correct?

17         A.    Yes.

18         Q.    The fourth one starts on

19    Page 68, is the maximum 8,000 dosage

20    units monthly; is that correct?

21         A.    Yes.

22         Q.    And the fifth one, starts on

23    Page 72, is maximum daily dosage units.

24              Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    I do.

 2          Q.    So if I refer to your five

 3   approaches, will you understand that I'm

 4   referring to those five approaches as

 5   I've just read them out?

 6          A.    Yes.

 7          Q.    Did you apply any other

 8   approaches aside from those five in

 9   reaching your conclusions?

10          A.    Not with respect to the

11   conclusions I reached in Section 9 at

12   least.

13          Q.    Okay.  From where did you

14   get the five approaches that you apply in

15   Section 9?

16          A.    From discussions with

17   counsel.

18          Q.    Who?  Is it the same list of

19   people that we discussed earlier today?

20          A.    Yes.  There may be some

21   additional lawyers whose names didn't

22   come to mind when I was giving you the

23   names of people I interacted with

24   earlier.
```

```
 1              Q.     Anyone come to mind?

 2              A.     It would be -- it would be

 3     something like that list and perhaps

 4     more.

 5              Q.     Anyone in particular that

 6     you think you left out earlier that comes

 7     to mind?

 8              A.     No.

 9              Q.     Did you get any input on

10     these five approaches from any of your

11     discussions with current or former DEA

12     agents?

13              A.     No.

14              Q.     Did you take any other step

15     to verify with the DEA that any or all of

16     these approaches are appropriate in this

17     setting?

18              A.     I'm sorry.  I don't know

19     what you mean by any other, but I didn't

20     do anything other than serve as the

21     computer, you referred to me as earlier.

22     I took these approaches and implemented

23     them, applied them to the data.  That's

24     what I did.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.  So just so that I can

 2   make sure that I have it all straight.

 3   So you got the five approaches from

 4   plaintiffs' counsel, and you applied them

 5   to the data, and that's it, with respect

 6   to Section 9?

 7          A.    Correct.

 8          Q.    So it's fair to say that any

 9   one of these approaches could be or could

10   not be appropriate for use in this

11   particular setting; you're just not

12   taking an opinion on that one way or the

13   other?

14          A.    Right.  I think other

15   witnesses are going to deal with that

16   issue.

17          Q.    And just to make sure I'm

18   totally clear, you're not opining

19   anywhere that any of these approaches is

20   or is not required by law in any way?

21          A.    Correct.

22          Q.    I think you mentioned

23   earlier that there are certain

24   assumptions that are built into your
```

1    approaches.  Do you remember mentioning

2    that?

3         A.    Yes.

4         Q.    Let's take a look at Page

5    100 -- sorry, Paragraph 131 of your

6    report.

7              This is under the Heading A,

8    "Maximum Monthly Trailing Six-Month

9    Thresholds."

10             Do you see that?

11        A.    Yes.

12        Q.    Okay.  And in this

13   paragraph, it starts, "Under the first

14   approach, I identify transactions that

15   cause the number of dosage units shipped

16   by a distributor to a pharmacy in a

17   calendar month to exceed the highest

18   number of dosage units shipped by the

19   distributor to the pharmacy in any one of

20   the six preceding calendar months."

21             Did I read that correctly?

22        A.    Yes.

23        Q.    And then you go on and you

24   have an example, right?  It says, "For

Highly Confidential - Subject to Further Confidentiality Review

```
 1   example, if the number of dosage units

 2   containing hydrocodone shipped from a

 3   distributor to a pharmacy in February,

 4   March, April, May, June, and July, were

 5   5,000, 10,000, 7,000, 8,000, 9,000, and

 6   9,500 respectively, a requested

 7   transaction in August would be flagged,

 8   if it would cause the number of dosage

 9   units containing hydrocodone, the

10   distributorship to the pharmacy, to

11   exceed 10,000."

12            Did I read that correctly?

13       A.    Yes.

14       Q.    And then it continues, "Any

15   reported transactions containing

16   hydrocodone on that date and all reported

17   transactions containing hydrocodone from

18   that distributor to that pharmacy

19   thereafter are flagged."

20            Did I read that correctly?

21       A.    Yes.

22       Q.    And is that all part of an

23   approach that came from plaintiffs'

24   counsel?  So that's what they asked you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   to do in this approach?

 2          A.    I'm pausing just for a

 3   second to make sure when you say, is that

 4   all, prior to the instruction that I got

 5   from counsel, I think the answer is yes.

 6          Q.    Paragraph 132 says, "In this

 7   approach and the others implemented

 8   below" -- just pausing there for a

 9   second.  The others implemented below are

10   the rest of the five approaches in this

11   Section 9; is that correct?

12          A.    Yes.

13          Q.    So it says, "In this

14   approach, and the others implemented

15   below, I have been asked by counsel to

16   assume that the distributor did not

17   effectively investigate the flagged

18   transactions, and so every subsequent

19   transaction of that drug code is also

20   flagged because the distributor had an

21   unfulfilled obligation to detect and

22   investigate the first flagged

23   transaction."

24                 Is that assumption made in
```

```
 1    Paragraph 132 also from direction of

 2    counsel?

 3         A.    Yeah, so I might shorten

 4    that sentence up a great deal, because

 5    there's some of that sentence that's not

 6    necessary to describe our implementation.

 7         Q.    Explain to me what you mean

 8    by that.

 9         A.    Well, as it's written, as I

10    wrote it --

11         Q.    Yeah.

12         A.    -- I said counsel asked me

13    to assume that the distributor did not

14    effectively investigate the flagged

15    transactions.  And so every subsequent

16    transaction of that drug code is also

17    flagged because the distributor had an

18    unfulfilled obligation to detect and

19    investigate the first flagged

20    transaction.

21              Operationally, you could

22    condense that to just say, I was asked to

23    flag every subsequent transaction after

24    the first transaction is flagged.  It
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    doesn't need the rest of the context to

2    describe the calculation that I did.

3              It's there because I'm sort

4    of describing my understanding, but it's

5    not necessary to describe the

6    calculations.  Just if you hit a flag,

7    everything after that is flagged.  And

8    some other witness will deal with whether

9    there was effective due diligence and

10   whether in the absence of that there was

11   an ongoing duty that should trigger a

12   flag on all the subsequent transactions.

13        Q.    Is it your assertion after

14   the because -- so where it says -- you

15   know, it says the first part that you

16   were just reading, and then it says,

17   "Because the distributor had an

18   unfulfilled obligation to detect and

19   investigate the first flagged

20   transactions."

21             Is that coming from you or

22   is that coming from plaintiffs' counsel,

23   the reasoning of the because?

24        A.    It's coming from the
```

1   plaintiffs' counsel.  I don't -- you

2   know, I was asked to assume everything

3   that's in that sentence, including that

4   last clause that you've read.

5          Q.    And just so I make sure that

6   I understand, that assumption -- that is,

7   flagging every subsequent transaction for

8   that specific drug after you have a

9   flagged transaction -- you apply across

10  all five of the methodologies or

11  approaches used in Section 9; is that

12  correct?

13         A.    Correct.

14         Q.    For every distributor, for

15  each of the drugs that you use or

16  manufacture as appropriate for the second

17  supplemental report?

18         A.    Correct.

19         Q.    So that I understand and

20  make sure we're totally clear.  You have

21  a methodology that you explain here in

22  Paragraph 131 regarding the maximum

23  monthly trailing six-month threshold; is

24  that correct?  We were just talking about

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that.

 2           A.    Yes.

 3           Q.    Okay.  And then once you

 4    have a triggering entry, the rest of them

 5    are flagged.  Do you apply that maximum

 6    monthly trailing six-month threshold to

 7    those remaining subsequent transactions

 8    in any way?

 9           A.    Yes.

10           Q.    And how is that?  Because if

11    they seem that you have a triggering and

12    the rest of them are all just flagged,

13    are you doing the analysis of the rest of

14    them, of which ones should be flagged and

15    which ones should not?

16           A.    No.  The end of your prior

17    question was "in any way."  And what I

18    meant by saying yes to that is that those

19    subsequent transactions are only flagged

20    because of the application of that rule,

21    having flagged one transaction.  Anything

22    after that is flagged.  So they are

23    affected, the identification of those

24    transactions are affected by the
```

```
 1    application of the rule.

 2           Q.    I see.  Okay.  So I see.  So

 3    I just want to make sure that the

 4    transactions that come later could be

 5    more than the trailing six months before

 6    it or they could be lower than the

 7    trailing six months before it, but

 8    they're flagged because they are coming

 9    after one triggering entry?

10           A.    Correct.

11           Q.    And did you do the analysis,

12    if you didn't use that assumption about

13    the subsequent flagging after you have

14    one triggering entry about how many of

15    the entries would be flagged or not

16    flagged if you didn't use that

17    assumption?

18               MR. MOUGEY:  Objection.

19               THE WITNESS:  I'm sorry,

20         could you repeat that again?

21    BY MS. McENROE:

22           Q.    Sure.

23           A.    The static is --

24    BY MS. McENROE:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    It's a little distracting.
 2              MS. McENROE:  Anybody on the
 3        line, if you can make sure to mute
 4        yourself, that would be greatly
 5        helpful.
 6              Thank you.
 7   BY MS. McENROE:
 8        Q.    So my question is this, did
 9   you run an analysis applying any of your
10   approaches to the transactions that are
11   flagged because of the assumption based
12   on them being subsequent transactions to
13   one that had been flagged, to see what
14   proportion of those would be flagged or
15   not flagged in their own right regardless
16   of the assumption about the first
17   triggering transaction?
18              MR. MOUGEY:  Objection.
19              THE WITNESS:  Not for
20        purposes of this report.  And --
21        and in some prior analysis of the
22        data, getting to understand the
23        data, we did some variations like
24        what you described.  I don't know
```

```
 1        if it's exactly what you

 2        described.  But we -- we did other

 3        analysis.

 4   BY MS. McENROE:

 5        Q.    Without that assumption

 6   about the first triggering transaction

 7   flagging the remainders?

 8        A.    Correct.

 9        Q.    Across the different -- the

10   five different approaches?

11        A.    I don't recall whether that

12   is correct or not.

13        Q.    So you don't know one way or

14   the other, but you may have?

15        A.    Correct.

16        Q.    And do you have a sense of

17   the difference that this one assumption

18   makes about flagging the subsequent

19   transactions in terms of the number of

20   transactions or the proportion of

21   transactions that are flagged?

22             MR. MOUGEY:  Objection.

23             THE WITNESS:  I have some

24        general intuition.  I don't
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          have -- I don't -- I don't have a

 2          quantified answer for you.  But I

 3          have a general intuition.

 4   BY MS. McENROE:

 5          Q.    What's your general

 6   intuition?

 7          A.    Well, because for most of

 8   these defendants, you see a substantial

 9   increase over time, especially leading up

10   to 2010 or 2011.  If you reset that

11   trailing six-month maximum to be the

12   maximum of the most recent six months,

13   then you end up with fewer transactions

14   being flagged.

15          Q.    Okay.  So it would be a

16   downward trend if you took away the

17   assumption about the subsequent

18   transactions being flagged?

19          A.    Correct.

20          Q.    We've been using the

21   terminology of a transaction being

22   flagged.  And that's language you used in

23   your report as well, correct?

24          A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    What do you mean by a

 2   flagged transaction?

 3          A.    Well, for my purposes it's

 4   just a -- an example we were looking at a

 5   minute ago, a fairly simple, if-then

 6   step.  I think of everything I -- I've

 7   done here in terms of what you can do in

 8   Excel.  And so imagine that you've got

 9   numbers in two columns and you've got a

10   rule that says if Column A exceeds

11   Column B, put a one in that cell.  And I

12   would think of that one as a flag.  And

13   the absence of that one, signifying that

14   A does not exceed B, being an unflagged

15   transaction.

16              And then it's only a slight

17   further modification to say in that third

18   column, it's a one if A exceeds B or if

19   the column above -- the value above is

20   one.  And then you would just fill in

21   ones in every cell after the first time A

22   exceeds B.

23              And all I mean by flagging

24   is that it's got that checkmark or one
```

Highly Confidential - Subject to Further Confidentiality Review

1    for that transaction and everything that

2    follows it.

3           Q.    Are you of the opinion that

4    a flagged transaction means that that

5    transaction represents a suspicious

6    order?

7           A.    That's way beyond my report,

8    I think.

9           Q.    Are you --

10          A.    I'm sorry, I apologize.  I

11   don't have an opinion one way or the

12   other.  If -- if you inferred from my

13   answer that I think it means that it is

14   not a suspicious order, I didn't mean

15   that.  I just mean I don't have an

16   opinion one way or the other.

17          Q.    Understood.  But just to

18   make sure we are speaking the same

19   language.  It's fair to say that you are

20   not taking the opinion that a flagged

21   transaction is necessarily a suspicious

22   order?

23          A.    Correct.

24          Q.    And it's also fair to say

Highly Confidential - Subject to Further Confidentiality Review

1   that you are not saying that a flagged

2   transaction is necessarily illegal or

3   representative of illegal conduct?

4          A.    Correct.

5          Q.    It's also fair to say that a

6   flagged transaction in your opinion does

7   not necessarily mean there's been a

8   failure of due diligence?

9          A.    Correct.

10         Q.    I want to take a look real

11  quick specifically at this first

12  approach, the maximum monthly trailing

13  six-month threshold.

14              And I want to -- your --

15  your -- strike that.

16              Your example here is very

17  helpful for understanding it, so I

18  appreciate that.

19              But I want to get an

20  understanding for, in practical terms,

21  various of the defendants for different

22  reasons may have gaps in their data.  So

23  for example, they may have been serving a

24  pharmacy for a period of time, the

Highly Confidential - Subject to Further Confidentiality Review

```
1    pharmacy switched to a different

2    distributor, and then went back to that

3    distributor.

4              Are you familiar with those

5    kinds of changes or variations in the

6    data, just speaking generally?

7         A.    Yes.

8         Q.    Okay.  How were gaps in the

9    data or entries without anything included

10   handled in figuring out the maximum

11   monthly trailing six-month threshold?

12        A.    I'm sorry, I don't think I'm

13   understanding that question.

14        Q.    Sure.  So I have a

15   hypothetical for you.  We can try and

16   walk through it to see if that helps to

17   clarify.

18        A.    Okay.

19        Q.    We have a pharmacy

20   purchasing from a distributor in January

21   through June, let's say of 2007.  I'm

22   just picking a year.  But does not

23   purchase from that distributor from July

24   through December of 2007.  Okay?  So
```

```
 1    there's been a gap there.

 2              If the pharmacy purchases

 3    from the distributor again in

 4    January 2008, how do you set that

 5    threshold when you pick up again with the

 6    distribution to that pharmacy?

 7         A.    Well, that's a good

 8    question.  That's a hypothetical I hadn't

 9    thought of.  I'd have to look at the data

10    and see the -- and see how -- how

11    significant that is.

12              A slight variant on your

13    hypothetical would be if -- if the

14    pharmacy had bought from the distributor,

15    let's say in four of the previous six

16    months, then it would be just as I

17    described it there in the example.  If

18    you imagine in -- in March and May the

19    quantity is zero, so that the quantities

20    are 5,000, 7,000, 9,000, and 9,500, then

21    it still would be the case that if a

22    transaction in August put you past, in

23    this hypothetical, 9,500, not 10,000, you

24    would flag the transaction.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   So blanks in the six-month

 2      window don't affect the calculation.  The

 3      conditional statement is still, if the

 4      cumulative transactions that month exceed

 5      the highest of the preceding six calendar

 6      months, you flag the transaction.

 7                   We don't ever flag a

 8      transaction in the first -- at least

 9      under this methodology, in the first six

10      months of the purchases from a

11      distributor.  But if a pharmacy is buying

12      from a distributor and then there's a gap

13      of greater than six months, six months or

14      greater, I'd have to think through and

15      maybe just check and see how that is

16      handled.  It -- whether we handle it as

17      restarting the clock, but I just don't

18      recall as I sit here.

19           Q.    Do you know if you guys

20      input, you and your staff I should say,

21      input any threshold or baseline, if there

22      was no data included, so you would pick a

23      number and put it in there?

24           A.    No, not for that purpose.
```

1    There is another slight -- you'll see

2    in -- in the code, besides what's

3    described here, an assumption that's a

4    little bit conservative.  You have to

5    exceed the prior six months maximum and

6    also exceed a thousand pills in my

7    recollection, a thousand dosage units.

8              So if you were -- if your

9    transactions were 100, 100, 100, 100,

10   200, we don't flag that transaction.  So

11   there are sort of de minimus quantities

12   that are not being flagged.  But I don't

13   recall anything else.

14        Q.    And with the application of

15   these approaches to the data, am I

16   correct that you were limiting the

17   analysis to shipments from distributors

18   to pharmacies and excluding other

19   shipments, for example, to hospitals and

20   clinics or other practitioners?

21        A.    In Section 9, that's

22   correct.

23        Q.    Across all five of the

24   approaches?

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.    Yeah.  So at least that was

 2   our -- our intention was to only include

 3   retail and chain pharmacies, to exclude

 4   mail order pharmacies and what is

 5   referred to, I think, as closed door

 6   pharmacies.

 7         Q.    What do you mean by closed

 8   door pharmacies?

 9         A.    Well, they would be things

10   like long-term care facilities perhaps,

11   or -- I don't know if you're from the

12   area, but near where I live there's a

13   Sunrise assisted living facility that I

14   drive past every day.  And I think that's

15   my next home.  And I think that there are

16   other locations of Sunrise around here.

17               And in my mind, anyway, when

18   I refer to closed door pharmacy, I'm

19   thinking about a facility like that that

20   may have received drugs and sent them out

21   to patients in a residence and affiliated

22   facilities, but they're not taking

23   walk-in customers, if you will.

24         Q.    Sure.  Off the street.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Right.

 2          Q.    Okay.  And so I also just

 3    want to get an understanding.  A number

 4    of your approaches use months as a unit.

 5          A.    Correct.

 6          Q.    Did you use calendar months?

 7          A.    Yes.

 8          Q.    Okay.  So you didn't use

 9    30 days as a more standardized month?

10          A.    I don't know if more

11    standardized, but we're using calendar

12    months.

13          Q.    Calendar months.  Okay.  So

14    some could be 28 days or 31 days.  It

15    could vary depending on whatever that

16    month is?

17          A.    Correct.

18          Q.    And that's true for each of

19    the approaches in Section 9 that uses a

20    month unit; is that fair?

21          A.    Yes.

22          Q.    We talked a little bit

23    earlier.  You are not a pharmacist,

24    correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Correct.

 2          Q.    Have you ever worked in a

 3   pharmacy?

 4          A.    No.

 5          Q.    Aside from being a customer

 6   at a pharmacy, do you have any

 7   professional experience with pharmacies?

 8          A.    No.

 9          Q.    Fair to say that you are not

10   an expert in pharmacy practice?

11          A.    Yes.

12          Q.    And you're not an expert in

13   pharmacy business?

14          A.    Correct.

15          Q.    Fair to say you're not an

16   expert of wholesale pharmaceutical

17   distribution?

18          A.    Yes.

19          Q.    Fair to say you're not an

20   expert in pharmacy manufacture?

21          A.    Yes.

22          Q.    Have you -- strike that.

23                In your report, I don't see

24   anything making reference to the business
```

Highly Confidential - Subject to Further Confidentiality Review

1   of pharmacy, so how pharmacies conduct

2   their business, for example how

3   frequently they order drugs.  Did you do

4   any research or take in that -- take

5   those issues into account in any way in

6   your opinions?

7               MR. MOUGEY:  Objection.

8               THE WITNESS:  Yes, at least

9       in some sense.

10  BY MS. McENROE:

11      Q.    And I can make it a little

12  bit of a crisper question.  So have you

13  undertaken any study to understand how

14  pharmacies go about ordering drugs from a

15  distributor?

16      A.    No.

17      Q.    Do you have any

18  understanding of how frequently

19  pharmacies order drugs from a

20  distributor?

21      A.    Yes.

22      Q.    And do you have any

23  understanding that some pharmacies could

24  be on a set schedule, like a weekly

Highly Confidential - Subject to Further Confidentiality Review

```
 1   schedule?

 2        A.    Yes.

 3        Q.    And so using your calendar

 4   month approach, would it be fair to say

 5   that you could, for example, have some

 6   months where a pharmacy might have four

 7   orders and some months where a pharmacy

 8   might have five orders in that specific

 9   month?

10        A.    Yes.

11        Q.    Did you take that into

12   account in any way when you used your

13   monthly based approaches in Section 9?

14        A.    Yes.

15        Q.    How did you do that?

16        A.    Well, if -- if there are

17   five orders in a month in the first six

18   months or in the trailing six months, the

19   sum of those five shipments are in that

20   threshold, the month's total.  And that

21   may or may not be the highest of the six

22   months totals.

23              And if the month that you're

24   looking at, in comparison to the prior
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    six months has either four or five weekly

 2    orders in your hypothetical, then they're

 3    all included.

 4         Q.    Right.  So I understand that

 5    they get swept into the analysis because

 6    that's just the way that the calendar

 7    works, and they're part of those months.

 8    But did you correct it out in any way to

 9    more than standardize the fact that some

10    months may look bigger than other months

11    in your monthly based analyses in Section

12    9 because of the different variation of

13    how many weeks could be in a month?

14         A.    No, but I reject your color

15    in that question.  I don't see anything

16    needs to be corrected.  So when you say

17    did you correct something out, I'm

18    acknowledging that in -- in 12 months,

19    covering 52 weeks, some of those months

20    have four weeks in them, or you know,

21    some of them have five weeks, some of

22    them have five Thursdays, some have four

23    Thursday.  I don't think that's something

24    to be connected.  It's a fact of the
```

```
 1    data.

 2               And my read of the -- of the

 3    data is as I described it, it's calendar

 4    months, there's nothing to be connected.

 5               MS. McENROE:  Okay.  For the

 6          record.  I strike -- I move to

 7          strike everything after "no."

 8               Thank you.

 9    BY MS. McENROE:

10          Q.    And so do you account in any

11    way in your analyses for legitimate

12    pharmacy growth over time?

13          A.    Well, I'm not a subject

14    matter expert or a lawyer.  When you say

15    legitimate growth, I don't think that's a

16    question that I can answer for you.

17          Q.    Sure.  So let me restate the

18    question a little bit differently.  So

19    you're not a pharmacy business expert,

20    but you own a business, right?

21          A.    Correct.

22          Q.    And you've operated in the

23    business world.  You've been an expert in

24    certain securities-related issues in the
```

```
 1    business world; is that correct?

 2         A.    Yes.

 3         Q.    And you understand that over

 4    time, businesses can grow, not saying

 5    that they have to, that would be nice,

 6    but they can grow, right?

 7         A.    Yes.

 8         Q.    And there can be perfectly

 9    legitimate reasons for that.  For

10    example, your own consultancy has gotten

11    bigger over time, I presume?

12         A.    Yes.

13         Q.    Do you agree that there

14    could be perfectly legitimate reasons why

15    a pharmacy business might grow over time?

16              MR. MOUGEY:  Objection.

17    BY MS. McENROE:

18         Q.    You may answer.

19         A.    Yes.

20         Q.    Have you done any analysis

21    of the DEA's quotas for opioids over

22    time?

23         A.    No.

24         Q.    Do you have any
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    understanding of what that means?

2          A.    No.

3          Q.    In any of your approaches

4    discussed in Section 9 of your report,

5    did you take into account or analyze in

6    any way how natural disasters or other

7    changes may have impacted your output?

8    So for example, if there was a hurricane

9    in a certain area or something of the

10   like?

11              MR. MOUGEY:  Objection.

12              THE WITNESS:  Not that I

13         could think of as I sit here.

14   BY MS. McENROE:

15         Q.    Okay.  Do you have an

16   understanding that there could be a

17   legitimate reason why a pharmacy may have

18   a spike in its needs?

19         A.    Yes.

20         Q.    Let's turn to Paragraph 136.

21   So we're going to move into Approach

22   Number 2.  And this is -- do you see

23   where I am, on Page 60?

24         A.    I do.  Thank you.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    It says, "Twice trailing

 2   12-month average pharmacy dosage units."

 3                Do you see that?

 4          A.    Yes.

 5          Q.    Great.  And so Paragraph 136

 6   says, "I identified transactions that

 7   cause the number of dosage units shipped

 8   by a distributor to a pharmacy in a

 9   calendar month to exceed twice the

10   trailing 12-month average dosage units to

11   retail and chain pharmacies served by the

12   distributor.  I have been asked by

13   counsel to assume that the distributor

14   did not effectively investigate the

15   flagged transactions, and so every

16   subsequent transaction of that drug code

17   is also flagged because the distributor

18   had an unfulfilled obligation to detect

19   and investigate the first flagged

20   transaction."

21                Did I read that correctly?

22          A.    Yes.

23          Q.    So the first sentence of

24   Paragraph 136 is explaining what I'm
```

Highly Confidential - Subject to Further Confidentiality Review

1    calling Approach Number 2 or B, it's the

2    second one, in your Section 9, correct?

3         A.    Yes.

4         Q.    And then the second sentence

5    in Paragraph 136, is that articulating

6    the same assumption we discussed just a

7    minute ago regarding the flagging of

8    every transaction after you have a

9    triggering one?

10        A.    Yes.

11        Q.    Okay.  And just to be clear,

12   that assumption has been included in each

13   of your five approaches for Section 9,

14   correct?

15        A.    Yes.

16        Q.    So I want to get an

17   understanding for the use of the word

18   "average."  And I know you probably know

19   a lot more about averages than I do at

20   least.  So we're going to try to keep it

21   simple if we can.

22              What do you mean, or how did

23   you arrive at the average used in this

24   approach?

```
 1          A.    So again I think of things

 2    in terms of what you could do in Excel or

 3    I visualize it as an Excel spreadsheet if

 4    I may?

 5          Q.    Sure.  Yeah, please.

 6          A.    So let's suppose that you've

 7    got a spreadsheet that has shipments

 8    measured in dosage units of each drug

 9    code from a distributor to all of the

10    pharmacies that they ship that drug code

11    to at any time in the last 12 months.

12          Q.    Over what geography?

13          A.    The country.  So I'll make

14    it a little bit more concrete.

15                Cardinal Health in January

16    of 2008, I look at what Cardinal Health

17    shipped to every pharmacy it ever shipped

18    to in 2007.  And so the -- the columns

19    would be, in my example, the pharmacies

20    that it shipped to.  And let's say that

21    there's 3,000 pharmacies across the

22    country.  And down the -- the rows I have

23    the 12 months in 2007.  And what I'm

24    filling in in that spreadsheet is the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    number of dosage units that Cardinal

2    Health shipped to each of those

3    pharmacies in each of those months in

4    2007 of a particular drug code.

5                And then you could, in

6    Excel, just say, take the average of all

7    of that, where there's a positive number.

8    So if there's a zero or a negative, you

9    ignore it.

10               Take the average of all of

11   the dosage units in any month to any of

12   the pharmacies.  And whatever that

13   average is, is your threshold to multiply

14   by two or by three to determine whether

15   the shipments in January of 2008 get

16   flagged.

17       Q.    So that's for the way you

18   use the word "average" for your second

19   and third approaches in Section 9; is

20   that correct?

21       A.    Correct.

22       Q.    Okay.  And so to make sure

23   I'm understanding, using your

24   hypothetical example of the Excel
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    spreadsheet, you would sum up all of the

 2    rows and then divide them by the number

 3    of entries that have something that's not

 4    zero or negative?

 5         A.    No.  You are summing across

 6    all of the observations at one time.  So

 7    in my example, let's say there's 100

 8    pharmacies and 12 months.  If there was

 9    something shipped to each of the

10    pharmacies, you'd have 1200 observations.

11    100 pharmacies, 12 months.

12              So you'd add up those 1200

13    numbers and you'd divide by 1200 to get

14    the average.

15         Q.    Thank you.  And so you said

16    you skipped the zeros and you skipped the

17    negative.

18              What do you mean by negative

19    entries in that setting?  What kind of

20    observations are you talking about?

21         A.    Well, I don't know if there

22    were any, but it could be that there was

23    a return that would show up as a negative

24    dosage unit.
```

```
1          Q.    So you did not -- if there

2    were returns, you didn't back those out

3    of the totals you were using?

4          A.    In -- in some places that is

5    done.  But I would not be -- I have to

6    confirm this, but I don't believe that in

7    my prior example if 1,199 entries were

8    positive and one of the entries was

9    negative, I included the negative.  But

10   I'm just not 100 percent sure as I sit

11   here.

12         Q.    So you think you did take

13   that into account?

14         A.    Well, as I said, in -- in

15   some parts of the analysis, yes.  It's --

16   it's very de minimus, but I just -- I'm

17   not 100 percent certain as I sit here in

18   the example that I just gave you, if one

19   of those 1200 observations was a negative

20   number, how we dealt with it.

21         Q.    So is it fair to say that in

22   these five approaches in Section 9, you

23   don't know how returns were handled?

24         A.    My -- my recollection, I'd
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    have to confirm it, but my recollection

 2    is that returns would be included in

 3    the -- in the monthly totals that would

 4    be in the 1200 cells in my example.  And

 5    the cumulative orders in January of 2008

 6    would also include a return if there was

 7    a return prior to the transaction that

 8    flagged, got flagged and then caused all

 9    subsequent transactions to be flagged.

10    That's a very de minimus issue, but I

11    just don't -- to be precise, I'm not --

12    I'm not 100 percent certain.

13          Q.    So taking a couple steps

14    back.  In the application of these

15    various approaches, there is computer

16    code; is that fair to say?

17          A.    Yes.

18          Q.    And we defendants asked for

19    plaintiffs' counsel to provide us the

20    computer code, and -- and we got a large

21    amount of information regarding the codes

22    that you and your team used.  Are you

23    aware of that?

24          A.    Yes.
```

```
 1          Q.    Do you write computer code?

 2          A.    Not in 35 years.

 3          Q.    Okay.  Did you write any of

 4   the computer code used in connection with

 5   your opinions in this litigation?

 6          A.    I don't believe so.

 7          Q.    Did you review any of the

 8   computer code used in this litigation?

 9          A.    Yes.

10          Q.    And did you confirm that the

11   computer code as applied in this

12   litigation, reflects what you intended it

13   to reflect based on what you expressed in

14   your report?

15          A.    Yes.

16          Q.    And do you have an

17   understanding of how the computer code

18   calculates the averages used for the

19   second and third approaches in Section 9?

20          A.    Yes.

21          Q.    Can you please explain that

22   to me?

23          A.    Well, it's just as I

24   described it.
```

```
 1              Q.     So, I am by no means an

 2    expert on computer code.  But I -- people

 3    who are better at these things than I am

 4    took a look at it.  And what they told me

 5    is there are three different ways that

 6    you calculated an average, and then used

 7    those three to reach the average you used

 8    in your report.  Does that sound familiar

 9    to you?

10              A.     I'm sorry, it doesn't.

11              Q.     Okay.  And that with doing

12    that, there were different files that had

13    source code and then different codes that

14    used that -- I'm sorry, there were

15    different datasets and code that used

16    those datasets.  Are you familiar with

17    that kind of concept?

18              A.     Yeah.  That's a different

19    issue, but yeah, certainly.

20              Q.     Yeah.  And in doing those

21    averages, they did use some of those

22    datasets and certain code.  Does that

23    make sense to you?

24              A.     Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  In applying the

 2    averages to the different defendants in

 3    this case, is it your intention that each

 4    defendant have their average calculated

 5    in substantially the same way?

 6              A.    Yes.

 7              Q.    If that were not the case,

 8    would that be a mistake?

 9              A.    Not necessarily.

10              Q.    What do you mean by that?

11              A.    Well, I forget which, but

12    one of the defendants had -- had a little

13    or no data outside of Ohio, and so the

14    average would be calculated -- you could

15    think of it calculated on a state basis

16    instead of nationally.

17                    There may be other reasons

18    why.  There might be some variation on

19    the general description that I gave you.

20    I'd have to look and see what your

21    consultants think they saw in the code

22    that they would do differently.

23                    I have -- I've attempted to

24    describe what the code did and I've
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    attempted to implement the code to

2    reflect what I intended.

3              It's -- it's possible that

4    someone would say that -- that an average

5    should be calculated differently or the

6    sequencing of steps in the code should be

7    done differently.

8              And I just have to evaluate

9    such an assertion.  I -- I do not believe

10   any such evaluation would result in -- in

11   any material change in any calculation

12   that we did.

13        Q.   Was it your intention that

14   different defendants would be treated

15   differently for the purposes of averages

16   depending on if the spelling of that

17   defendant's name matched in the source

18   data versus the code in which the data

19   was used?

20        A.   Well, certainly not.  We

21   tried to correct a lot of misspelling or

22   variations in spelling in the data.  But

23   it's possible that we didn't catch all of

24   it.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    And it's possible that those

2    would then be mistakes?

3        A.    I wouldn't think of them as

4    mistakes, no.  It would be issues with

5    the data that the data we were provided

6    don't have standardized spelling or same

7    entity, named differently.  And it would

8    be a mistake in the data, not in our

9    analysis.

10        Q.    But your team wrote the

11    code, right?

12        A.    Correct.

13        Q.    So if the code names of the

14    defendants doesn't match the source

15    datasets such that the datasets are not

16    run in the code and you just get a whole

17    bunch of zeros, that would not be a

18    mistake in the dataset; that would be a

19    mistake in the code, correct?

20        A.    I don't know.  I'd have to

21    see the example and look at the data and

22    see whether -- whether the code should be

23    modified to pick up more transactions.

24        Q.    Was it your intention that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    certain defendants who have national data

 2    available had their averages calculated

 3    only for Summit and Cuyahoga Counties?

 4          A.    Yes.  That would certainly

 5    be true in some situations.

 6          Q.    But a couple minutes ago you

 7    told me your intention was to calculate

 8    national averages for the purposes of

 9    your Approaches 2 and 3 in Section 9,

10    correct?

11          A.    That's correct.

12          Q.    So if what I'm telling you

13    is that some of the defendants who had

14    national data available actually had

15    their averages calculated based just on

16    Cuyahoga and Summit Counties, would that

17    be a mistake for those defendants?

18          A.    No, I don't think so.  I can

19    explain if you'd like.

20          Q.    Please do.

21          A.    But maybe I'm not

22    understanding your --

23          Q.    Well, please explain, and

24    then we can see if I'm --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Sure.

 2          Q.    -- trying to ask something

 3    different.

 4          A.    So in Approach 2 and 3

 5    you've got trailing 12-month averages.

 6    And for some of the defendants, we get

 7    individual defendant transaction data

 8    prior to the ARCOS period, prior to 2006.

 9    I'll use Cardinal as an example, because

10    I think we have data from Cardinal Health

11    going back to 1997.  But we only have

12    that data for Cuyahoga and Summit, or

13    maybe for Ohio more broadly.  For some of

14    the defendants we had more or less data

15    prior to 2006.

16              So for the -- for whatever

17    data we have from a defendant prior to

18    2006 we would calculate the average

19    across the pharmacies that they gave us

20    data for, up to January of 2007.

21              When you get to January of

22    2007, we then have 12 months of ARCOS

23    data.  And so you would start using ARCOS

24    data nationally for the calculation.  So
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    for some of those defendants, we're

 2    using -- you could interpret that as

 3    using state or county averages when

 4    national data is available.

 5              But if you're -- if I'm

 6    articulating the calculation correctly, I

 7    think you would agree that we should be

 8    using the county or state data that the

 9    defendants produced in the pre-ARCOS

10    period for calculating the averages up

11    through January of 2007.

12              So there's a data issue

13    there.  If, in addition to that data

14    issue I identified for you, there's some

15    issue with some spelling or some other

16    issue that you think means that we've

17    applied a different methodology for

18    different defendants with the same data

19    available, I'm happy to look at that.

20    But there are situations where you would

21    use more narrow data even when national

22    data is available.  And throughout 2006

23    would be a good example of that, and

24    after 2014 as well.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    You mentioned a little bit

 2   earlier that your code needs to be run in

 3   a particular sequence.  Do you remember

 4   that?

 5          A.    No.  That's not the way I

 6   said it.

 7          Q.    Okay.  But to understand

 8   what you did, you ran things in a certain

 9   sequence when you were doing your

10   analysis, correct?

11          A.    Correct.

12          Q.    And is there a way that we

13   can tell from your report in what

14   sequence you took those different steps

15   to apply your approaches?

16          A.    Yes.

17          Q.    How?

18          A.    Well, it's -- gets pretty

19   deep in the weeds.  But the programming

20   has, as you were alluding to a few

21   minutes ago, some intermediate data files

22   that are created and then used by

23   subsequent modules of the code, or by

24   code written in other applications that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    read in those intermediate files.

 2              Even within the same file of

 3    code there are sections of that code that

 4    we call -- that we describe as being

 5    commented out, and by commented out, what

 6    I mean is you might write a lengthy piece

 7    of code which is just a text file, it

 8    looks like a text file without the nice

 9    formatting that you would have in words.

10    So think of it like a Wordpad file.

11              And when you write 20 or 30

12    pages of that code, each time you run it,

13    you don't necessarily want every line of

14    that code executed.  And so you comment

15    it out, it depends on the language, but

16    with a percentage sign or with a couple

17    of backslashes.

18              And so depending on what you

19    want to execute of that lengthy code, you

20    are commenting out stuff or undoing the

21    commenting.  You can get to all of the

22    tables in my report by using the code

23    that we provided to you.  Sometimes you

24    might have to comment something out,
```

1    or -- or take some of the commenting out.

2             There might be a couple of

3    instances where you might have to write

4    another single line reading in a file

5    that we forgot to identify.  I mean, it's

6    identified, but there may be -- out of

7    tens of thousands of lines of code, there

8    might be a line or two or five that an

9    experienced programmer would say, yes,

10   Craig really intended for you to read in

11   a file that's identified up at the top

12   again, and it's missing.  But with very

13   little effort, the code that we provided

14   to you recreates all of this analysis.

15        Q.   Did you provide the

16   intermediate data files that you made

17   reference to?

18        A.   I believe all of the ones

19   that are saved, so along the way when you

20   write code, there are intermediate files,

21   temp files, if you will, that are created

22   by the code and then discarded.  And so

23   they're not saved anywhere.  But I think

24   any -- any file that's saved was provided

Highly Confidential - Subject to Further Confidentiality Review

```
1    to you.  Again, that would be my

2    intention.

3          Q.    So how could we recreate

4    your process without what you're calling

5    those temp files?

6          A.    Because they're described in

7    the code.

8          Q.    And your position is that

9    you've provided sufficient information

10   for us to know the sequencing of the code

11   that you ran?

12         A.    Yes.

13         Q.    And you don't have any other

14   documentation on the sequencing of the

15   code that you ran that we haven't been

16   provided with?

17         A.    That's correct.

18         Q.    If you were to start from

19   scratch and apply your own code afresh,

20   would you be able to do it in precisely

21   the same sequence that you did it the

22   first time based on what you provided to

23   us?

24         A.    I believe so.  That was my
```

```
 1    intention.

 2         Q.    Is it your intention that

 3    our experts would be able to apply the

 4    code that you provided to us in exactly

 5    the same sequence based on what you've

 6    provided to us?

 7         A.    If they're experienced

 8    programmers, yes.  As I said, there might

 9    be a couple of instances where, when you

10    run the code -- I know you don't want me

11    to take much time.  But maybe if I could

12    take 30 seconds, I could explain it.

13         Q.    Please.

14         A.    So again, think of the code

15    as 30 pages of text file.  And as we're

16    running the code to create a table or a

17    figure or do some analysis or create an

18    intermediate file, you're choosing which

19    part of that 30 pages to run and which

20    part not to run.

21              And so you can't run

22    necessarily all 30 pages.  You are

23    executing some part of the code.  And

24    what we provided to you was all of that
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    30 pages.

2              And someone who's an expert

3    programmer will look at that and say,

4    okay, here are blocks of the text that

5    were executed the last time this code was

6    executed.  But if I want to -- if I want

7    to execute some other text, I need to

8    uncomment some lines, or if as doing --

9    in doing that I want to comment out some

10   other lines, or as I said, there might be

11   a data file that's referenced in

12   subsequent code, but the code above it

13   doesn't read in the data file and a

14   programmer would say, somehow Craig

15   inadvertently deleted or forgot to

16   include a single line here that says read

17   in a file that is mentioned in the next

18   paragraph of the code.

19              So I do believe that I

20   provided you all of the code that will do

21   everything that you've asked for.

22        Q.   All right.  Let's take a

23   look at Paragraph 140 on Page 64.  And

24   this is the three times trailing 12-month
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     average pharmacy dosage units.

 2               Do you see that?

 3          A.    Yes.

 4          Q.    And Paragraph 140 says, "I

 5     identified transactions that caused the

 6     number of dosage units shipped by a

 7     distributor to a pharmacy in a calendar

 8     month to exceed three times the trailing

 9     12-month average dosage units to retail

10     and chain pharmacies served by the

11     distributor.  I have been asked by

12     counsel to assume that the distributor

13     did not effectively investigate the

14     flagged transactions so every subsequent

15     transaction of that drug code is also

16     flagged because the distributor had an

17     unfulfilled obligation to detect and

18     investigate the first flagged

19     transaction."

20               Do you see that?

21          A.    Yes.

22          Q.    And is that substantially

23     the same as what we discussed about your

24     second approach, the two times trailing
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    12-month average with respect to your

 2    assumption on the subsequent transactions

 3    being flagged?

 4         A.    Yes.

 5         Q.    And so it's fair to say that

 6    the language following "because at the

 7    end, the distributor had an unfulfilled

 8    obligation to detect and investigate the

 9    first flagged transaction," those are not

10    your words, that's not your concept?

11         A.    Correct.  That sentence

12    could be collapsed to about eight words.

13         Q.    Okay.  Talking about first

14    this specific approach, the three times

15    trailing 12-month average.  There is no

16    citation for where it comes from; is that

17    right?

18         A.    Except in the first

19    paragraph that introduces Section 9 where

20    I say that I was asked to implement these

21    algorithms by plaintiffs' counsel.  So

22    the cite would be plaintiffs' counsel.

23         Q.    Okay.  So the cite would be

24    plaintiffs' counsel.  It's not some other
```

```
 1    industry document or guidance like we

 2    talked about earlier with respect to any

 3    of the approaches, correct?

 4           A.    Correct.

 5           Q.    Your fourth approach starts

 6    at Paragraph 144.  Do you see that on

 7    Page 68?

 8           A.    Yes.

 9           Q.    It says maximum 8,000 dosage

10    units monthly; is that correct?

11           A.    Yes.

12           Q.    And it says, on

13    Paragraph 144, "I identify transactions

14    that cause the number of dosage units

15    shipped by a distributor to a pharmacy in

16    a calendar month to exceed 8,000 dosage

17    units.  I have been asked by counsel to

18    assume that the distributor did not

19    effectively investigate the flagged

20    transactions and so every subsequent

21    transaction of that drug code is also

22    flagged because the distributor had an

23    unfulfilled obligation to detect and

24    investigate the first flagged
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    transaction."

 2              Did I read that correctly?

 3       A.    Yes.

 4       Q.    Just like we talked about

 5    with your third approach, I don't see a

 6    cite for the source of this fourth

 7    approach.  Is it also plaintiffs'

 8    counsel?

 9       A.    Yes.

10       Q.    And is it also the same as

11    to the assumption that the concept

12    towards the end following the "because

13    the distributor had an unfulfilled

14    obligation to detect and investigate the

15    first flagged transaction," that's not

16    your words, that's counsel's words?

17       A.    Correct.

18              I'm sorry, I would say it a

19    little bit differently.

20              As I said a couple of times

21    now when we talked about that sentence

22    which we see five times in the report, it

23    could be condensed to just say I've been

24    asked by counsel to flag all subsequent
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    transactions after a transaction has been

2    flagged.  And it could be full stop with

3    that.

4         Q.    Okay.

5         A.    It doesn't require the rest

6    of what's in that sentence.

7         Q.    And the rest of that

8    sentence is not your opinion?

9         A.    Correct.

10        Q.    And you don't have a basis

11   other than counsel for including that in

12   your report?

13        A.    It's not an opinion I have.

14        Q.    Okay.  Taking a quick look

15   at Page 72, Paragraph 148.  You'll see

16   maximum daily dosage units.

17              Do you see that?

18        A.    Yes.

19        Q.    And this is your fifth

20   approach, right?

21        A.    Correct.

22        Q.    And Paragraph 148 says, "I

23   identified transactions that caused the

24   number of dosage units shipped by a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    distributor to a pharmacy in a day to

 2    exceed a number of dosage units that

 3    varies by drug type and within some drug

 4    types by formulation."

 5              Then you have a citation.

 6    We'll get back to that in a second.

 7              And then it says, "I have

 8    been asked by counsel to assume that the

 9    distributor did not effectively

10    investigate the flagged transactions and

11    so every subsequent transaction of that

12    drug code is also flagged because the

13    distributor had an unfulfilled obligation

14    to detect and investigate the first

15    flagged transaction."

16              Did I read that accurately?

17       A.    Yes.

18       Q.    And this is describing the

19    fifth approach that we talked about a

20    little bit earlier?

21       A.    Yes.

22       Q.    And in that last clause

23    following the "because," this is the same

24    language we were just discussing, that
```

1    the distributor had an unfulfilled

2    obligation to detect and investigate the

3    first flagged transaction, like we talked

4    about, is not an opinion of yours, that

5    was provided to you by plaintiffs'

6    counsel, correct?

7         A.    Yes.

8         Q.    Why did you cite to the

9    document you have in Paragraph Number 55?

10        A.    Well, because there's a

11   daily threshold that varies across the

12   drugs and it's a little bit more

13   complicated than the first four methods,

14   how you identify a flag.  And so rather

15   than itemize in the footnote what each of

16   the daily thresholds are by drug, we cite

17   to the document where we used values for

18   the daily thresholds, where we find --

19   I'm sorry, where we find values for the

20   daily thresholds.

21        Q.    How did you come to cite

22   that document in Footnote 55?

23        A.    The document was provided to

24   us by counsel and we were asked to

Highly Confidential - Subject to Further Confidentiality Review

```
1    implement an approach that uses the daily

2    thresholds in that document.

3           Q.    Are you taking any position

4    or making any opinion on the

5    appropriateness or that lack thereof, of

6    applying those thresholds from that

7    document cited in Footnote 55?

8           A.    No.

9           Q.    Substantively, do you have

10   an understanding of what that document

11   is?

12          A.    I have a general

13   understanding, not an expert opinion.

14   But a general understanding of the

15   document.

16          Q.    And how did you come to a

17   general understanding of that document?

18          A.    Well, I reviewed it.  It's a

19   two-page document.  I think it's a

20   Cardinal Health document.  And it gives,

21   on those two pages -- I've heard it

22   referred to as the cage vault rule.  I'm

23   not sure exactly the significance of that

24   term.
```

```
 1                 But my understanding is

 2    that -- that it -- it limited shipments

 3    or flagged shipments of the various drugs

 4    that are listed there to a certain amount

 5    per day.

 6                 The significance is not --

 7    is -- for me is just a list of drugs and

 8    a list of numbers, daily limits.  I -- I

 9    don't -- I didn't investigate the origin

10    of that document or how it might have

11    been used in realtime.

12         Q.    Sure.  And was that document

13    provided to you?

14                 You mentioned it was a

15    two-page document?

16         A.    That's my recollection.

17         Q.    Was it provided to you as

18    part of a thicker document or just as a

19    two-page document?

20         A.    I don't know.

21         Q.    And you said sometimes it's

22    referred -- referred to as the cage vault

23    rule.  By whom?

24         A.    I've heard my staff refer to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    it as cage vault.  I don't know what the

 2    origin of that term is.

 3           Q.    Okay.

 4           A.    When you are at a good

 5    stopping point for a comfort break --

 6           Q.    Let's take a break right

 7    now.  Perfect.  Let's do it.

 8                 THE VIDEOGRAPHER:  Off the

 9           record at 2:14 p.m.

10                 (Short break.)

11                 THE VIDEOGRAPHER:  We are

12           back on the record at 2:43 p.m.

13    BY MS. McENROE:

14           Q.    Dr. McCann, could you please

15    turn to Page 76 of your report.  There's

16    a section headed "Additional

17    Information."

18                 Do you see that?

19           A.    No.  I'm sorry.  "Additional

20    Identification."

21           Q.    Additional -- did I -- yes,

22    sorry, I'll start over.

23                 So we're on Page 76, right

24    above Paragraph 152 is a header that says
```

```
 1    "Additional Identification," correct?

 2          A.    Yes.

 3          Q.    It says, "I have been asked

 4    by counsel to assume that chain

 5    distributors may have had knowledge of --

 6    or information available to inform them

 7    of -- opioid shipments from all

 8    distributors to the chain distributors'

 9    affiliated pharmacies."

10                Do you see that?

11          A.    Yes.

12          Q.    Did I read that correctly?

13          A.    Yes.

14          Q.    And it goes on to say, "I

15    have rerun the five identification

16    routines described above assuming that

17    the chain distributors could have flagged

18    transactions based on this expanded

19    information set and the report" -- "and

20    report the results for the chain

21    distributors in Tables 34 through Table

22    43 below."

23                (Telephonic interruption.)

24    BY MS. McENROE:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    "Additional charts and

2   tables reflecting the result of applying

3   methodologies below to each chain

4   distributor are in Appendix 11."

5                With my couple hiccups, did

6   I read that correctly?

7          A.    Yes.

8          Q.    Okay.  And so if I'm

9   understanding correctly, you took the

10  five approaches from earlier in Section 9

11  of your report and rerun -- reran them

12  here, but looking at the chain

13  distributors from the perspective of what

14  they were receiving as customers?  Is

15  that a fair way to characterize it?

16         A.    Yes.  I didn't think of it

17  that way, but that's -- that's right I

18  think.

19         Q.    And the assumptions and

20  understandings that we discussed earlier

21  today with respect to the five

22  methodologies or approaches, those

23  assumptions would continue to hold true

24  as applied here in the additional
```

```
 1    identification section, correct?

 2         A.    Correct.

 3         Q.    Do you have any

 4    understanding of the legal claims brought

 5    against what you're referring to as the

 6    chain distributors?

 7         A.    No.

 8         Q.    Have you read the complaint

 9    in this case?

10         A.    I did.

11         Q.    Do you have -- do you know

12    that the chain distributors are not being

13    sued in their dispensing capacity, so for

14    the pharmaceuticals that they were buying

15    and dispensing out to patients?  Do you

16    have an understanding one way or the

17    other?

18         A.    That's my general

19    understanding, that there -- yes, what

20    you just said is consistent with my

21    general understanding.

22         Q.    So you think the chain

23    distributors are being sued because

24    they're pharmacies and how they dispense
```

1    the drugs?

2         A.    No.  It's the opposite.

3    What I'm saying is I agree -- my general

4    understanding, as you said a minute ago,

5    that they are being sued as distributors,

6    not as pharmacies.

7         Q.    Okay.  And looking, for

8    example, at Table 34 on the top of Page

9    77, just using Rite Aid as an example,

10   you have numbers populated in each of

11   those columns, correct?

12        A.    Correct.

13        Q.    So for oxycodone,

14   hydrocodone, morphine, hydromorphone,

15   oxymorphone, and other; is that correct?

16        A.    Correct.

17        Q.    And that would represent the

18   drugs that were flowing to Rite Aid

19   pharmacies for each of those different

20   types of drugs, correct?

21        A.    Correct.

22        Q.    Some of which may have been

23   distributed by Rite Aid to itself and

24   some of which may not, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Correct.

2        Q.    That would be true of each

3   of the rows, if you will, thinking of

4   this as an Excel, listed there, right,

5   CVS, Discount Drug Mart --

6              (Telephonic interruption.)

7   BY MS. McENROE:

8        Q.    -- HBC, Giant Eagle, Rite

9   Aid, Walgreens, and Walmart?

10       A.    Yes.

11       Q.    And that other column, what

12  is reflected there?

13       A.    Well, the analysis is done

14  on 12 drugs.  And there's five listed

15  there.  So it would be the additional

16  seven.

17       Q.    Did you do any work to

18  identify or examine whether the

19  medication reflected here was dispensed

20  to patients pursuant to lawfully written

21  prescriptions?

22       A.    No.

23       Q.    Not one way or the other?

24       A.    Correct.
```

```
 1          Q.     And looking back at

 2   Paragraph 152, there's a sentence towards

 3   the middle that starts, "I have rerun."

 4                 Do you see that sentence?

 5          A.     Yes.

 6          Q.     "I have rerun the five

 7   identification routines described above

 8   assuming that the chain distributors

 9   could have flagged transactions based on

10   this expanded information set and report

11   the results for this chain," and it keeps

12   going on.

13                 Do you see that?

14          A.     Yes.

15          Q.     Where did you get that

16   assignment from?

17          A.     Plaintiffs' counsel.

18          Q.     So plaintiffs' counsel asked

19   you to do that?

20          A.     Yes.

21          Q.     Are you saying that chain

22   distributors should have flagged these

23   transactions, or you're just saying that

24   it's possible that they could have?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    I'm definitely not saying

 2    should.  What I'm saying is if you make

 3    the assumption in the previous sentence

 4    that the chain distributors could see all

 5    of the distributors' shipments to each of

 6    the chain distributors' pharmacies, then

 7    you can apply the five algorithms from

 8    the previous sections to that set of

 9    transactions that include not just the

10    chain distributors' transactions to the

11    pharmacies.

12                  And if you did, you would

13    flag a different set of transactions.

14    You'd flag additional transactions.

15            Q.    So you're not suggesting

16    that there are any particular patients

17    for whom these chain pharmacies should

18    have refused to fill prescriptions,

19    correct?

20            A.    Correct.

21            Q.    And you're not suggesting in

22    your report that at a certain point in

23    time or because of a certain triggering

24    transaction, any specific pharmacy should
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    have stopped dispensing a drug

 2    altogether, correct?

 3          A.    Correct.  I think that's for

 4    other witnesses.

 5          Q.    Do you have in mind in

 6    particular who you're thinking would make

 7    that opinion?

 8          A.    No.  I just mean I'm -- I'm

 9    focused on the data and applying certain

10    methodologies and certain assumptions.

11    And other witnesses will -- will either

12    support or lead to a modification of

13    those assumptions.  The methodologies

14    that I've laid out here are flexible

15    enough to incorporate different sets of

16    facts as they're developed for the court,

17    for the judge or for the jury.

18          Q.    Well, you have five

19    approaches here.  And those are the five

20    you apply, correct?

21          A.    Correct.

22          Q.    So if you were to apply a

23    different approach, that would require a

24    whole different set of analysis of this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    same data, correct?

 2         A.    Not a whole different set.

 3    There would be a tremendous amount of

 4    overlap.  I can give you an example.  But

 5    no, it would not be a whole different

 6    set.  It might be just a very slight

 7    modification to an assumption or two.  It

 8    might -- of the thousands and thousands

 9    of lines of code, it might -- it might

10    involve changing one or two lines of

11    code.  It's not a whole new analysis.

12         Q.    But presumably it would

13    change the output, so the tables, the

14    figures, the actual numbers in them would

15    need to change?

16         A.    If you applied a different

17    methodology, sure.

18         Q.    Let's take a look all the

19    way back to Page 6 of your report,

20    Paragraph 21.

21         A.    Yes.

22         Q.    And let's see.  You have a

23    line that starts three lines down.  It

24    starts, "In Section 10."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you see that?

 2         A.    Yes.

 3         Q.    "In Section 10, I provide

 4    certain estimates regarding the total

 5    aggregate shipments of opioids into Ohio

 6    from 1997 to 2018."

 7                    Do you see that?

 8         A.    Yes.

 9         Q.    Okay.  So let's head to -- I

10    think it's -- Paragraph 153 on Page 82.

11                    Do you see that?

12         A.    Yes.

13         Q.    And above that is a heading

14    called "Excessive Shipments."

15                    Do you see that?

16         A.    Yes.

17         Q.    Now, when you discussed this

18    Section 10 at the front of your report,

19    you did not use the word "excessive" in

20    your summary of opinions in what we just

21    looked at, correct?

22         A.    Correct.

23         Q.    Is that word here,

24    "excessive," your word?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.    Yes.

2         Q.    Why did you use the word

3    "excessive" here?

4         A.    Well, you have to read the

5    title in the context of the four or five

6    or eight pages that follow.  And you can

7    see in what follows.  I report the

8    shipments per capita, and then a couple

9    of baselines that the judge or a jury may

10   find helpful.  And excessive is then

11   defined to just be the difference between

12   what you observe and those example

13   thresholds.  The modeling allows for

14   variations in those thresholds, the two

15   thresholds are just examples that I've

16   given you.  And then I've described the

17   difference between what was shipped per

18   capita and those baselines as excessive.

19              I -- I'm not -- I'm not

20   describing them as excessive in some

21   epidemiological sense, or -- or legal

22   sense.  I'm just describing it relative

23   to the benchmarks that I've -- or

24   baselines that I've described.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  I mean I want to make

 2   sure I understand the use of the word

 3   excessive here.  Do you literally mean

 4   that it -- the data exceeds something, so

 5   you're using the word excessive?  Is that

 6   what you're referring to?

 7        A.    Exactly.

 8        Q.    So you're not saying that

 9   you think it's too much in that means of

10   excessive.  You're trying to just say

11   it's above some threshold you've

12   identified?

13        A.    Correct.

14        Q.    Okay.  So you're not making

15   a qualitative judgment about the

16   excessiveness in this section, you are

17   making a quantitative judgment?

18        A.    I think that's correct.

19        Q.    You are not saying in your

20   report that excessive means suspicious

21   for the purposes of suspicious order

22   monitoring, correct?

23        A.    Correct.

24        Q.    You are not saying that
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    excessive means unlawful in any way,

2    correct?

3         A.    Correct.

4         Q.    Let's take a look at

5    Paragraph 160 which is later on in this

6    section, right at the end of it, on

7    Page 88.

8              Do you see that?

9         A.    Yes.

10        Q.    And toward -- I would say a

11   little more than halfway down there's a

12   sentence that starts "the purpose."

13             Do you see that?

14        A.    Yes.

15        Q.    "The purpose of identifying

16   transactions -- to determine which

17   transactions warrant some further due

18   diligence -- is likely to only be met by

19   flagging more transactions than those

20   which are used to fill medically

21   unnecessary prescriptions.  Thus the

22   decline in opioid use in Ohio and the

23   implication that more than 70 percent of

24   opioids shipped into Ohio were excessive
```

1    supports my identification of

2    transactions."

3              Did I read that correctly?

4         A.    Yes.

5         Q.    Now, I want to make sure I

6    understand what you're saying here.

7              When you are talking about

8    the purpose of identifying transactions,

9    is that the same as flagging transactions

10   like we've discussed today?

11        A.    Yes.

12        Q.    And you are now saying that

13   means to determine which transactions

14   warrant some further due diligence.

15             Do you see that?

16        A.    Yes.

17        Q.    And is that coming from you

18   or is that coming from plaintiffs'

19   counsel, that the flagging means that

20   those transactions warrant some further

21   due diligence?

22        A.    I'm not sure.  Maybe a

23   mixture of both.  But I'm -- I'm just

24   trying to provide some context.  My

1    understanding of the context.  I'm not

2    suggesting that I'm a subject matter

3    expert on that issue.  But I -- I'm --

4    I'm generally aware that -- that these

5    are opioids as opposed to children's toys

6    or bitcoin.  And I have a general

7    understanding of the purpose of the

8    analysis.  And that's all I'm trying to

9    convey there, is my general understanding

10   of the context and how Sections 9 and 10

11   relate to one another.  I'm not in those

12   couple of sentences expressing an opinion

13   about what -- what is suspicious and what

14   due diligence ought to follow in a

15   suspicious that's raised.

16        Q.    I may not go so far as

17   children's toys.  But let's see, did you

18   compare your analysis of opioids to an

19   analysis of other medications over those

20   periods of time?

21        A.    No.

22        Q.    You used the phrase, in the

23   language that I had just read out, of

24   medically unnecessary prescriptions?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    You don't define that in

 3    your report, correct?

 4          A.    Correct.

 5          Q.    And you are not a medical

 6    doctor?

 7          A.    Correct.

 8          Q.    And do you have any basis

 9    for saying what is or is not medically

10    unnecessary of a prescription?

11          A.    No.  And I didn't mean to

12    imply that I did.

13          Q.    Let's take a look at

14    Paragraph 154.  So we're going to go back

15    a little bit in the same section.

16          A.    Yes.

17          Q.    And it says -- you see it,

18    it's on Page 83?

19          A.    Yes.

20          Q.    "Figure 21, Figure 22, and

21    Figure 23 illustrate a similar pattern.

22    In Ohio and in Cuyahoga County and Summit

23    County, per capita opioid MME increased

24    from 1997 to 2010 and thereafter
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    declined, so that per capita opioid MME

 2    in 2017 was 3.7 times per capita opioid

 3    MME in 1997 in Ohio."

 4              Do you see that?

 5        A.    Yes.

 6        Q.    Do you know what MME means?

 7        A.    Yes.

 8        Q.    What does it mean?

 9        A.    Morphine milligram

10    equivalent.

11        Q.    Do you have any basis to

12    know what if any proportion of the

13    population in Ohio had untreated pain in

14    1997?

15        A.    No.

16        Q.    Have you done any research

17    on that point?

18        A.    No.

19        Q.    Do you have any expertise on

20    that point?

21        A.    Not on the epidemiological

22    or pharmacological or medical aspects of

23    that point.  But to the extent that

24    the -- that there is publicly available
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    data or data that could be developed on

2    that point, I would have expertise in

3    analyzing that data.  Maybe not

4    interpreting the data fully, but

5    certainly, so some aspect of what you

6    just described.

7           Q.    Sure.

8           A.    But -- but not on the

9    interpretation of such data.

10          Q.    So how did you arrive at

11   1997 as opposed to 1996 or 1998?

12          A.    My recollection is that the

13   retail drug summary reports go back to

14   1997.  So it's the beginning of the data

15   that's publicly available.

16          Q.    So there was no medical

17   reason or reason from the medical

18   community about why 1997 was serving as

19   your baseline for a number of your

20   analyses in your report?

21          A.    Correct.  That's just the

22   beginning of the ARCOS retail drug

23   summary report data.

24          Q.    In your analysis of the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    data, did you do any comparison between

 2    what was shipped into either the state of

 3    Ohio or these specific counties in Ohio

 4    versus what was being dispensed to

 5    patients pursuant to lawfully written

 6    prescriptions in those geographies?

 7          A.    No.

 8          Q.    So in some instances in this

 9    section you used 19 -- I'm sorry.  Strike

10    that.

11                In some instances in this

12    section you used 1997 as the baseline.

13    And then you also used what you called

14    the 1997 to 2018 interpolated baseline,

15    correct?

16          A.    Yes.

17          Q.    And let's look at

18    Paragraph 155 on Page 84.  And it says,

19    "A possible upper bound on the medically

20    necessary opioid MME per capita baseline

21    is the per capita MME interpolated from

22    1997 to 2018.  This baseline assumes that

23    all prescriptions of opioids in 1997 and

24    in 2018 were medically necessary and that
```

Highly Confidential - Subject to Further Confidentiality Review

1    the drivers of legitimate opioid use,

2    e.g., aging of the population evolved

3    gradually rather than discontinuously

4    over time.

5              Plaintiffs allege that

6    opioid consumption in 2018 remained

7    excessive and was still influenced by the

8    defendants' alleged fraudulent conduct.

9              Did I read that correctly?

10       A.    Yes.

11       Q.    Did you decide that the

12   interpolation from 1997 to 2018 was a

13   possible upper bound?

14       A.    Yes.

15       Q.    On what basis?

16       A.    Well, I observed MME per

17   capita consumption in 1997.  I observed

18   it in 19 -- in 2018.  And I observed the

19   dramatic increase, and then decline

20   between those two dates.

21              And in addition to just

22   observing that dramatic increase, I

23   thought the court might be interested in

24   seeing how much of that increase was in

Highly Confidential - Subject to Further Confidentiality Review

1    excess of -- of these two example base

2    lines, that could be varied with

3    different assumptions.

4                I might have thought of a

5    third baseline or a fourth baseline.  But

6    these are the two that I thought of.  And

7    so I offer them as possible upper and

8    lower bounds.  Someone could suggest

9    something different.  But this is what --

10   what I thought and the rationale for it.

11               I think you've already read

12   into the record.

13        Q.    And this came from you, not

14   from plaintiffs' counsel?

15        A.    Yes.

16        Q.    So in this paragraph, and in

17   this section, you're talking about what

18   you deem to be medically necessary at

19   certain points in time, correct?

20        A.    No.  That's not what that

21   paragraph says.

22        Q.    So if I were to take the

23   interpolated line between 1997 and 2018,

24   I recognize that you're treating that as

```
 1    what you call an upper bound, correct?

 2         A.    A possible upper bound.

 3         Q.    Possible upper bound.  So

 4    are you of the opinion that any

 5    distribution of opioids above that

 6    possible upper bound was not medically

 7    necessary?

 8         A.    No.  That's not what it

 9    says.

10         Q.    Well, I'm asking you.  Is

11    that your intention through what you're

12    doing here?

13         A.    No.

14         Q.    So of what consequences the

15    analysis that you're doing in this

16    section?

17         A.    Well, I think of it in two

18    parts.  I think that the first part of

19    Section 10 illustrates for the court, for

20    the jury, this enormous hump in opioid

21    per capita consumption in Ohio, in

22    Cuyahoga and Summit.  And if Section 10

23    ended there, that might be of service.

24              Then, in addition, I'm
```

Highly Confidential - Subject to Further Confidentiality Review

1    saying is there something more that the

2    data from the retail drug summary reports

3    can tell us?  And in particular, how much

4    of that tremendous hump in the

5    consumption could be thought of as in

6    excess of a reasonable baseline.

7              And I -- I offered two

8    alternatives.  Someone could say that the

9    2018 levels are still excessive or

10   someone to say that the 2018 levels

11   reflect underprescribing or just about

12   are exactly right.  I'm not taking a

13   position on which of those three

14   possibilities are the case.

15        Q.    Okay.

16        A.    I'm also not even taking a

17   position on whether the drivers of

18   legitimate or medically necessary opioids

19   evolved gradually.  I'm just saying if

20   you assume they evolve gradually and you

21   assume that the 2007 -- the 1997 and 2018

22   levels are about right, then this is an

23   interpolated benchmark and anything above

24   that is excessive.

```
1                  Again, not expressing an

2       opinion on any kind of epidemiological,

3       any public health, any legal, any medical

4       issue in the case.  I'm just reporting

5       out the data.  And this is an

6       illustration of that.

7                  I'm reporting what the data

8       would tell us if you apply these

9       assumptions in that paragraph you just

10      read.

11           Q.    So it's fair to say that you

12      are not taking into account how many new

13      opioid formulations were approved by the

14      FDA between '97 and 2018?

15           A.    No, I don't think that's

16      true.

17           Q.    You think you are taking

18      that into account, in your interpolated

19      line you're using?

20           A.    Well, sure.  To the extent

21      that the 2018 levels are about three

22      times the 1997 levels, if -- and this is

23      per capita, so we're already controlling

24      for the change in the population in Ohio
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    and these counties.  So the fact that the

 2    2018 levels are so much higher than the

 3    1997 levels, even after the big decline,

 4    may reflect the additional approved drugs

 5    or treatments that you've just mentioned.

 6          Q.    Did you specifically take

 7    into account whether any new opioid

 8    formulations were approved by the FDA

 9    between 1997 and 2018?

10          A.    Not beyond what's reflected

11    in the 2018 data.

12          Q.    Aside from ways that it

13    might be reflected in the data itself,

14    did you take into account health

15    insurance coverage for any of these drugs

16    over time?

17          A.    No.

18          Q.    Aside from how any of this

19    may be reflected in the data itself, did

20    you take into account about the growth of

21    cancer or other pain-related diseases

22    during that time?

23          A.    Yes.  In addition to how it

24    would be reflected in the 2018 data, my
```

```
 1    upper -- possible upper bound assumes

 2    that the evolution in those conditions or

 3    the acceptance of opioid use for

 4    treatments evolved gradually rather than

 5    discontinuously as you read.

 6          Q.    And did you take that into

 7    account somehow in calculating that

 8    interpolated baseline from '97 to 2018?

 9          A.    Yes, exactly.

10          Q.    But how?  So aside from just

11    looking at the data itself, did you

12    qualitatively take into account

13    increases, if any, in cancer or other

14    pain-related diagnoses over that time?

15    Did you go out and look at studies for

16    these things or talk to experts in the

17    field about this?  Did you take that into

18    account other than just crunching the

19    data numbers?

20          A.    Well, those are two

21    different questions.  But the answer to

22    your last question is no.

23          Q.    The answer to the first

24    question?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2                I'm sorry.  The answer to

 3     the first question is yes.  The answer to

 4     the second question is no.

 5          Q.    And your answer to the first

 6     question is yes because you think that's

 7     reflected in the data that you used to

 8     get to the 2018 point?

 9          A.    No, not that only.  It's

10     also the assumption that those factors

11     evolved gradually over time, and so I'm

12     interpolating between those two values,

13     the 1997 level and the 2018 level, by

14     assuming a constant percentage growth.

15          Q.    So it shakes out to be a

16     near linear growth between 1997 and 2018,

17     it looks like?

18          A.    Right.  It's a constant

19     annual growth, so the line curves a

20     little bit.  But yes.

21          Q.    And on what basis do you

22     make that assumption?

23          A.    That it's a useful

24     illustration of a potential baseline.
```

```
 1           Q.    So you had the start --
 2   sorry -- strike that.
 3              You had the start data point
 4   in '97 and the end data point in 2018.
 5   What methodology did you use to chart the
 6   curve as between '97 and 2018?
 7              (Telephonic interruption.)
 8           THE WITNESS:  Well, you're
 9        probably familiar with the rule of
10        72, which says if you take a
11        percentage growth rate in
12        percentage terms and divide it
13        into 72, it gives you the number
14        of years it takes for something to
15        double.  So let me give you an
16        example.
17              Let's say that the ending
18        value is twice the beginning
19        value.  And you've got a 12-year
20        period.  That would mean that six
21        percent compound growth over
22        12 years would cause the ending
23        value to be twice the beginning
24        value.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              And so, what I did was
 2         really a variant on that.  I've
 3         got the 2018 per capita
 4         consumption.  I've got the 1997
 5         per capita consumption.  The ratio
 6         of those two raised to the
 7         power -- you do this in Excel --
 8         but raised to the power of one
 9         divided by the number of years
10         would give you that constant
11         annual growth rate.
12              That's the calculation that
13         I did, and then used that constant
14         annual growth rate each year
15         applied to the 1997 starting value
16         and each prior year as you move
17         forward, and you end up at the
18         2018 level.
19              All I'm doing is saying, if
20         it's true, if -- I'm assuming if
21         it's true that the 1997 levels are
22         medically necessary or legitimate
23         or whatever term you want to use,
24         and the 2018 levels are medically
```

```
 1          necessary or legitimate, and the

 2          drivers of that legitimate opioid

 3          use evolved gradually over time,

 4          in my example a 6 percent growth

 5          rate would be reasonable as

 6          opposed to some discontinuous

 7          change in what would be medically

 8          necessary or legitimate.

 9              I am not expressing an

10          opinion anywhere here about what

11          is medically necessary or

12          legitimate.  I'm just trying to

13          provide some context, some

14          description of how this model

15          might be useful to the court.

16  BY MS. McENROE:

17      Q.    How did you choose to apply

18  that methodology to get from 1997 to

19  2018, rather than, for example, a

20  straight line or a curve that curved in

21  the other direction?  I mean, concave

22  instead of convex and vice versa.  On

23  what basis?

24      A.    Well, it's really just my
```

1   intuition, that these were two useful

2   examples.  I could implement the

3   alternatives that you suggest.  They are

4   real -- really trivially different than

5   what I did.  And if I did those four,

6   there could be four more examples.

7           What I'm describing here is

8   a general methodology that might be

9   useful to the court.  And I've provided

10  two illustrations, but you can -- you can

11  specify other illustrations.

12      Q.    What was the basis of your

13  expertise for interpolating that line in

14  that way, for this particular setting?

15      A.    Well, I have a Ph.D. in

16  economics.  I have -- I have probably had

17  hundreds of semester hours of

18  arithmetic --

19      Q.    Sure.  So let me stop you

20  there.  I -- I don't mean to quibble

21  about your computational bases for doing

22  that.

23           I'm saying from a

24  methodological standpoint, in terms of

 1    picking how to get from one point to

 2    another in Figure 24, which is on

 3    Page 85, I think it might be the easiest

 4    way for us to look at this.  On what

 5    basis are you doing it in this way?

 6          A.    I'm not being articulate.  I

 7    thought I had answered that a whole bunch

 8    of times.

 9          Q.    Yeah, so let me ask the

10    question a different way, because I'm not

11    trying to say from a math standpoint how

12    you get from one line to the other.  What

13    I'm trying to say is, from a healthcare,

14    from an epidemiology perspective, from a

15    pharmaceutical industry perspective, how

16    is it that you're telling the court that

17    this is the right line to be looking as

18    an upper bound?

19          A.    I'm not doing that.  I've

20    said that several times today.  I'm not a

21    subject matter expert.  I'm not offering

22    an opinion in any section of the report,

23    but including on this page in that

24    figure, based on some subject matter

Highly Confidential - Subject to Further Confidentiality Review

```
 1    expertise.  Other witnesses will be

 2    offering the court that expertise.

 3              I'm just saying, if the

 4    expertise and the facts are developed

 5    that support these assumptions, this is

 6    the baseline.  If -- if the facts are

 7    developed in a different way, then a

 8    variant on this would be developed.  I'm

 9    just describing the general methodology

10    and two illustration.

11        Q.    Thank you.  So on Page 86,

12    in Paragraph 159 that we were just

13    looking at a minute ago.  There is a

14    sentence towards the bottom that says,

15    "My estimates."

16              Do you see that?

17        A.    Yes.

18        Q.    It says, "My estimates of

19    excessive opioid shipments into Ohio can

20    be varied to reflect how much if any of

21    the increase from 1997 to 2008 in per

22    capita MME above the 1997 levels was

23    medically justifiable."

24              Is that what you were just
```

Highly Confidential - Subject to Further Confidentiality Review

1   referring to?

2        A.    Yes.  Well, that would be an

3   example of it, yes.

4        Q.    Okay.  And so you are not

5   suggesting that the numbers that you have

6   reflected here for an upper bound or a

7   baseline is medically necessarily the

8   appropriate line.  You are giving this as

9   a frame of reference?

10       A.    Yes.  We might use the terms

11  a little bit differently, but they are

12  illustrations.  You could imagine even

13  above or below the '97 levels or the 2018

14  levels as being legitimate or medically

15  necessary.

16            All I'm really doing is

17  saying you can get from '97 to 2018 a

18  couple of different ways.  You could get

19  it between those two levels, and other

20  ways as well.

21            And however you create the

22  baseline, whatever those baseline MME per

23  capita are, you could subtract those

24  baseline amounts each year from what's

```
 1    actually shipped into Cuyahoga and

 2    Summit, and get an excess.  I'm not --

 3    I'm not opining about --

 4         Q.    Sure.

 5         A.    -- what the right baseline

 6    is or what the right resulting excessive

 7    amount is.

 8         Q.    And when you say excessive,

 9    again that's in the way we were talking

10    about it earlier this afternoon,

11    excessive as in being higher than

12    something, so in excess of something?

13         A.    Well, as I'm using it that's

14    correct.  I'm just calculating the

15    difference between two numbers and

16    calling them excessive.

17              Now, at trial, if -- if the

18    jury were to conclude that one of these

19    baselines was correct or some variant on

20    it, then the amount above that would seem

21    to me to be excessive in their judgment.

22    But that's not something that -- that I'm

23    opining on in any way.  And I'm not using

24    the term that way.
```

```
 1          Q.    And there would need to be

 2    other expert, in fact, evidence in the

 3    record to be able to get to that point.

 4    You can't just get there from what you

 5    have in your expert reports, correct?

 6          A.    Absolutely.

 7          Q.    Okay.  So let's take a look,

 8    still, I'm on Page 87 now, and you have a

 9    number of bullet points.  And I think

10    this is technically still part of

11    Paragraph 159.  And you have a number of

12    bullet points here on 87 and then the top

13    of 88 that use the word "excessive."

14                And is this all throughout

15    your report consistent with how we've

16    been discussing the use of the term

17    "excessive" here, not that you're making

18    a qualitative judgment, but that you're

19    making a quantitative observation?

20          A.    Yes.  I'm not using the term

21    "excessive" in -- in any -- in any sort

22    of liability sense, or sense that it

23    might be used in the argument.  It's just

24    a difference in two numbers.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. McENROE:  Can we go off

 2         the record for a quick second?

 3              THE VIDEOGRAPHER:  Off the

 4         record at 3:20 p.m.

 5              (Short break.)

 6              THE VIDEOGRAPHER:  We are

 7         back on the record at 3:23 p.m.

 8    BY MS. McENROE:

 9         Q.    Dr. McCann, I'm going to

10    hand you what we've marked as Exhibit 6.

11              (Document marked for

12         identification as Exhibit

13         McCann-6.)

14              MS. McENROE:  I have another

15         copy.

16    BY MS. McENROE:

17         Q.    This is another expert

18    report submitted by plaintiffs in this

19    case on behalf of Professor David Cutler.

20    You mentioned Professor Cutler earlier

21    today, correct?

22         A.    Yes.

23         Q.    Have you seen this report

24    before?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    Yes.

2            Q.    In final form as submitted?

3            A.    Only in final form as

4     submitted.

5            Q.    And when did you see

6     Dr. Cutler's report?

7            A.    Sometime after March 25th.

8            Q.    I gave you -- I think the

9     version I gave you has a little purple

10    flag in it?

11           A.    Yes.

12                 MS. McENROE:  And for

13           plaintiffs' counsel's benefit,

14           it's on -- at Table J-1 in

15           Appendix 3 of Dr. Cutler's report.

16    BY MS. McENROE:

17           Q.    Do you see that?

18           A.    Yes.

19           Q.    Does this table look

20    familiar to you?

21           A.    I believe I saw this table

22    or this page sometime after my report was

23    filed.

24           Q.    Did you prepare this table?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    No.

2          Q.    Did you provide this to

3    Professor Cutler?

4          A.    I didn't personally.

5          Q.    Did somebody from SLCG

6    provide this to Professor Cutler?

7          A.    Not to Professor Cutler.  It

8    may be that a table, something like that,

9    was provided to the counsel that we were

10   interacting with.  And it was provided to

11   counsel Professor Cutler was interacting

12   with.  And Professor Cutler then

13   included, I don't know, but I did not and

14   my staff did not have any communication

15   with Professor Cutler.

16         Q.    I looked, but I couldn't

17   find this Table J-1 in any of your expert

18   reports submitted in this case or any of

19   the appendices.  Do you have any reason

20   to think that it is included in any of

21   your expert reports or any of your

22   appendices you've included?

23         A.    I don't know one way or the

24   other.
```

1          Q.     So this table could be, but

2   you don't know?

3          A.     Correct.

4          Q.     And on what basis are you

5   saying that?

6          A.     Well, because I -- I

7   provided you with something like 5,000

8   tables.  And I can't say with certainty

9   that this table, or substantially this

10  table or content that could be used to

11  easily create this table isn't anywhere

12  in any -- my report or my two

13  supplements.

14         Q.     Let's take a look --

15         A.     I could do a search for that

16  if you'd like, but I just can't tell you

17  for sure one way or the other as I sit

18  here.

19         Q.     Sure.  Let's take a look at

20  your supplemental expert report submitted

21  on April 3rd.

22         A.     Yes.

23         Q.     And earlier today you

24  described this to me as supplemental

```
 1    tables in the body of your report.

 2    Figures and tables used in depositions,

 3    right?

 4         A.    Yes.

 5         Q.    You had some summary tables?

 6         A.    Yes.

 7         Q.    Does this table at J-1 in

 8    Professor Cutler's report appear anywhere

 9    in your first supplemental report, to

10    your knowledge?

11              MR. MOUGEY:  Asked and

12         answered.

13    BY MS. McENROE:

14         Q.    It's okay.  You can answer.

15              MR. MOUGEY:  It depends on

16         how many times we ask it.  I

17         haven't said much today.  But, I

18         mean, he just said he didn't know.

19              MS. McENROE:  Well, I'm

20         narrowing the question a little

21         bit.  That was a broad --

22              MR. MOUGEY:  If he doesn't

23         know if he was anywhere, how is he

24         going to know if it was in this
```

```
 1        report?

 2             MS. McENROE:  You can object

 3        to form.  It's memorialized on the

 4        record.

 5             MR. MOUGEY:  That's the

 6        first thing I've said -- I mean, I

 7        just -- today.  I think I've

 8        objected three times in --

 9             MS. McENROE:  I appreciate

10        that.

11             MR. MOUGEY:  -- six hours.

12        Y'all should read your

13        transcripts.  Y'all object every

14        13 seconds.  So I just -- I

15        just -- I mean, it's asked and

16        answered.  He said he didn't know

17        where it was.

18             MS. McENROE:  Okay.  He can

19        answer now.  Thank you.

20             MR. MOUGEY:  You're welcome.

21   BY MS. McENROE:

22        Q.   Go ahead.

23        A.   I don't know.

24        Q.   Let's take a look back to
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    your March 25th report, in particular, to

2    Paragraphs 181, 182, and 183, which are

3    towards the end at Page 93 to 94.  Let me

4    know when you're there.

5           A.    I'm there.

6           Q.    And this section is labeled

7    "Conclusion," correct?

8           A.    Yes.

9           Q.    And Paragraph 181 says,

10   "Based upon my comparison of the ARCOS

11   data produced by the DEA, the public

12   ARCOS retail drug summary reports, and

13   the defendants' transactional data, I

14   conclude that -- after correcting a

15   relatively small number of records -- the

16   ARCOS data produced by the DEA is

17   complete and reliable."

18               Did I read that correctly?

19          A.    Yes.

20          Q.    That's an opinion you're

21   advancing in this litigation?

22          A.    Yes.

23          Q.    And then Paragraph 182, "I

24   further conclude that Cardinal Health's
```

```
 1   transactional" -- "transaction records

 2   produced in discovery are a reliable

 3   source of transactions data before 2006

 4   and after 2014.  More generally, with the

 5   exception of AmerisourceBergen, the other

 6   defendants' transaction data is also a

 7   reliable source of transaction data for

 8   the periods covered by its production."

 9              Did I read that correctly?

10        A.   Yes.

11        Q.   And that's an opinion that

12   you're advancing in this litigation?

13        A.   Yes.

14        Q.   Paragraph 183, "The ARCOS

15   data can be used to identify transactions

16   in a state, county, zip code, or

17   individual pharmacy meeting certain

18   criteria as I have illustrated above."

19              Did I read that correctly?

20        A.   Yes.

21        Q.   And that's an opinion that

22   you're advancing in this litigation?

23        A.   Yes.

24        Q.   Are you advancing any other
```

```
 1   opinions in this litigation?

 2              MR. MOUGEY:  Objection.

 3              THE WITNESS:  Well, yes, of

 4        course.  These are one or

 5        two-sentence summaries of what in

 6        the body of the report might be 20

 7        or 30 pages.  And so I think at a

 8        very high level these summarize my

 9        opinions.

10   BY MS. McENROE:

11        Q.    Are there any other high

12   level categories of opinions that's not

13   articulated here in your conclusion

14   section in your primary report?

15        A.    Only to the extent they are

16   not otherwise discussed earlier in this

17   report or in the two supplements.

18        Q.    Is there anything, sitting

19   here today, that you'd like to correct or

20   modify in your original report or either

21   of your two supplements?  Taking into

22   account the errata sheet for Page 35.

23        A.    Well, I noticed a typo here

24   or there.  For instance, as you were
```

Highly Confidential - Subject to Further Confidentiality Review

1    reading Paragraph 181 into the record,

2    there should be an apostrophe after

3    defendants.  You read it as

4    transactional.  It says transaction data.

5            Q.    Sorry about that.

6            A.    So there's little quibbles

7    like that.  And there's a place where I'm

8    talking about a three-digit zip code in

9    Arizona, it's 851.  And in the paragraph,

10   851 is mentioned three or four times.

11   And one time a four gets slipped in

12   there.  It's 8451 or something like that.

13               It's obvious that there

14   should be an apostrophe there or that

15   four shouldn't have been in the

16   three-digit zip code.

17               Similarly, there might be an

18   example here or there of something that,

19   upon reflection, I might change.  But

20   they would be trivial.  It would be

21   literally typos, the way the typos are

22   that I've just described to you.  But

23   there's nothing material that I would

24   change in any of these reports.

```
 1          Q.    Any -- anything come to mind

 2    in particular of something that you would

 3    change?  And I'm not talking about

 4    typographical errors.

 5          A.    No.

 6          Q.    Okay.  Can we flip back to

 7    Paragraph 22 in your primary report.

 8                In both this report and in

 9    your second supplemental report, you

10    include the same language that's at

11    Paragraph 22.  It's the page -- it's at

12    the top of Page 7.

13                It says, "I continue to

14    review documents and gather information

15    and reserve the right to update my

16    analysis and opinions based upon that

17    further review of documents and based on

18    any new information -- including possibly

19    reports of other experts -- I may

20    receive."

21                Do you see that?

22          A.    Yes.

23          Q.    Do you have a present

24    intention to supplement your report for a
```

```
 1   third time?

 2                MR. MOUGEY:  Objection.

 3                THE WITNESS:  Well, almost

 4        definitely, yes.

 5   BY MS. McENROE:

 6        Q.    And tell me what you mean by

 7   that.

 8        A.    Well, just yesterday

 9   AmerisourceBergen produced data that was

10   supposed to be produced previously and

11   which I called attention to in this first

12   report.

13                I also called attention to

14   other defendants whose production seems

15   to be missing months or NDC codes or even

16   years.

17                And to the extent what I'm

18   trying to do here is reconcile the data,

19   the defendants' transaction data produced

20   in discovery with the ARCOS data and

21   create a dataset that's reliable that the

22   court can rely on, if the defendants --

23   well, first, I will want to review the

24   data that AmerisourceBergen produced
```

1    yesterday and see if -- it's clear I was

2    showing you a figure earlier, we were

3    looking at, where that new data would

4    fill in a bunch of yellow bars on that

5    figure.

6              It also would change some of

7    the numbers in, for instance, Table 13

8    and 14.

9              So for this report to be

10   accurate now, given the updated data that

11   was produced after this report was

12   produced, I'll have to make some changes

13   to those two tables.  And if other

14   defendants produce other data, I would

15   have to update the figures and tables to

16   reflect that.

17             And I understand that your

18   experts will be filing expert reports

19   this weekend.  And if combing through

20   tens of thousands of lines of code,

21   someone identifies a line of code that

22   maybe we should have written differently

23   or inserted in a different order, I'll

24   evaluate that, with -- entirely with the

```
 1    goal of ending up with a set of

 2    transaction data that the court can rely

 3    on.

 4         Q.    Aside from data issues or

 5    issues identified by defendants' experts,

 6    do you have any intention to supplement

 7    your expert report again based on other

 8    of plaintiffs' expert reports?

 9         A.    No.

10         Q.    Other than potentially

11    correcting for data that's been produced

12    only recently or potential issues

13    identified by defendants' counsels, do

14    you have any other substantive intention

15    to modify or supplement your report?  And

16    what I mean by that is, for example,

17    changing one of the five approaches

18    you've used?

19         A.    No.  Although in your

20    question I think you have to include not

21    only data that was only produced

22    recently, yesterday, but additional data

23    that might be produced by the defendants

24    in the future.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Going forward?

 2          A.    Yes.

 3          Q.    Okay.  Is there any reason

 4    why you could not answer my questions

 5    truthfully today or any of the other

 6    defendants' questions today or tomorrow

 7    truthfully?

 8          A.    No.  And I'm -- I'm doing my

 9    best.  If I'm understanding them, then

10    I'm answering them truthfully.

11          Q.    I appreciate that.

12                And you understand that you

13    have the obligation to tell us if

14    anything in your report is false or

15    inaccurate?

16          A.    Absolutely.

17          Q.    Okay.  And is it possible

18    that in relying on your staff for some of

19    the underlying work that they did, that

20    they could have made mistakes or errors?

21          A.    Well, we're all humanly

22    imperfect.  We're certainly doing our

23    very best to create this dataset, but it

24    may be there would be some de minimus
```

1    issue that you would identify and I would

2    accept as something we could do

3    differently or a judgment that could be

4    exercised reasonably in an alternative.

5         Q.    And you're saying de

6    minimus.  But it's also possible they

7    could have made a big mistake

8    hypothetically, correct?

9         A.    It's -- I don't believe that

10   that's the case.  But I can't say with

11   100 percent certainty that that is not

12   the case.  I -- I don't believe it's the

13   case.

14        Q.    But it's possible which

15   would make your opinions, some of them at

16   least, could potentially be untrue and

17   you wouldn't know it?

18        A.    Well, it's sort of

19   topological as you've posed it.  And so I

20   can't disagree with it.  But I -- I do

21   not believe that there is any material

22   error that would affect any of the

23   conclusions.  At a high level, the

24   conclusions are -- seem unobjectionable

1    until at least you get to Section 9.  And

2    I think that we have the same goal up

3    through Section 9, and in Section 9, all

4    I'm doing is applying methodologies to

5    the best of our ability.

6              If it turned out that those

7    methodologies are not appropriate or some

8    slight variation on those methodologies

9    is warranted, we would do that for the

10   court as well.

11        Q.   And you've previously had an

12   experience where your staff made a

13   significant error in a case in which

14   you've testified, correct?

15        A.   I'm not sure what you're

16   referring to.

17        Q.   You're not sure, with a

18   federal court having called your opinions

19   fraudulent, you don't recall that?

20        A.   Oh my gosh.

21              I recall a situation where a

22   federal court said that and an appeals

23   court said that there was no basis for

24   that.

```
 1          Q.    Well, the federal court said

 2    that your opinions were fraudulent

 3    because they said you testified knowing

 4    they were false at the time.  But the

 5    appellate court said it wasn't that you

 6    knowingly testified that it was false,

 7    and I'm not accusing you of having done

 8    that, but the Fifth Circuit was that it

 9    was that your staff had made a

10    significant error leading you to testify

11    inaccurately; is that correct?

12              MR. MOUGEY:  Objection.

13              THE WITNESS:  No, that's

14         still not a correct

15         characterization of the Fifth

16         Circuit's opinion.

17    BY MS. McENROE:

18          Q.    But you know what I'm

19    talking about?

20          A.    I do.  Of course.  I lived

21    it for a couple of years.

22              (Document marked for

23         identification as Exhibit

24         McCann-7.)
```

```
 1   BY MS. McENROE:

 2        Q.    So I'm going to hand you

 3   what I'm marking Exhibit 7.

 4        A.    Thank you.

 5        Q.    This is the District Court

 6   opinion, not the Fifth Circuit opinion.

 7   But this is the District Court opinion

 8   from Morgan Keegan & Company versus

 9   Garrett, correct?

10        A.    Correct.

11        Q.    And is this the case we were

12   just talking about, where the District

13   Court referred to your testimony as

14   having been fraudulent, right?

15        A.    Yes.

16        Q.    And if we could, you can

17   hold that aside.  And can you pull out

18   the exhibit with your resumé, please.  So

19   that's Appendix 1 to your March 25th

20   report.

21        A.    Yes.

22        Q.    And which exhibit number was

23   that for the record?

24        A.    4.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    4.  And I looked and looked,

 2   and I didn't see this Morgan Keegan &

 3   Company case referenced in your resumé.

 4   Instead what I saw was on Page 109 you

 5   have a line that says, "Dr. McCann has

 6   testified before more than 300 NASD, NYSE

 7   and FINRA arbitrations."

 8              Am I correct in that?

 9          A.    Correct.

10          Q.    Okay.  So you have in here

11   300 cases from FINRA and other

12   circumstances listed, but not fully

13   listed out one by one, including the

14   underlying opinion that led to the appeal

15   to the District Court in Texas, correct?

16          A.    Correct.

17          Q.    Okay.  And so looking at

18   what you've disclosed with your expert

19   reports, nowhere do you identify that

20   there's an opinion that counsel could

21   then pull and look at, in which a

22   District Court judge, even if they were

23   overturned, had declared you as having

24   given fraudulent testimony, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1               MR. MOUGEY:  Objection.

 2               THE WITNESS:  That's not a

 3          correct characterization of this.

 4               I did not testify before

 5          Judge Hughes.  In fact, I

 6          attempted to get a day in his

 7          court and it was denied.  I have

 8          not, in the last 15 years,

 9          itemized the FINRA arbitrations I

10          testify in; I've now testified in

11          over 400.

12               So years before the Garrett

13          case, my resumé looked exactly

14          like it does now, where it would

15          say McCann has testified in 100

16          FINRA arbitrations, 200, 300.  I

17          did not testify in Judge Hughes'

18          court, although I certainly tried

19          to.

20     BY MS. McENROE:

21          Q.   But that's not the only

22     instance in which you've had an issue

23     with the federal court looking at your

24     opinions, correct?
```

```
 1                    So for example, I'm talking

 2      about the Freddie Mac litigation from the

 3      Southern District of New York in 2012.

 4              A.    Yes.

 5              Q.    Do you recall that case?

 6              A.    Yes.

 7              Q.    In which the judge found

 8      "McCann's analysis changed so many times

 9      in important ways and was so internally

10      inconsistent that I found it unreliable

11      and unpersuasive."

12                    Do you remember that?

13              A.    Yes.

14              Q.    Okay.  And in that

15      litigation you issued two reports,

16      correct?

17              A.    Correct.

18              Q.    And in this litigation

19      you've already issued three reports and

20      you've testified you might provide more

21      in the future, correct?

22              A.    Yeah, I don't think that

23      they line up the way you are implying,

24      but it is true that I filed a report and
```

```
 1    two small supplements in this case.

 2              MS. McENROE:  I'd like to

 3         take a break.

 4              THE VIDEOGRAPHER:  Off the

 5         record at 3:43 p.m.

 6              (Short break.)

 7              THE VIDEOGRAPHER:  We are

 8         back on the record at 4:00 p.m.

 9                   -   -   -

10              EXAMINATION

11                   -   -   -

12    BY MR. EPPICH:

13         Q.    Dr. McCann, my name is Chris

14    Eppich, I represent McKesson, one of the

15    distributors in this litigation.  I'll

16    have a few questions for you this

17    afternoon.  I -- there have already been

18    quite a few questions.  I'm going to do

19    my best not to repeat what -- what we've

20    heard already today.  But I hope you'll

21    bear with me.

22              You testified earlier today

23    that you had spoken with some former DEA

24    employees?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes.

2          Q.    You mentioned Mr. Rafalski;

3   is that correct?

4          A.    Yes.

5          Q.    Have you ever spoken with

6   Mr. Joe Rannazzisi?

7          A.    Yes.

8          Q.    On how many occasions?

9          A.    Just once I think.

10         Q.    And when was that?

11         A.    Sometime last summer or

12  fall.

13         Q.    Was Mr. Rannazzisi employed

14  by the DEA when you spoke with him?

15         A.    I don't think so.

16         Q.    Was he a consultant in the

17  case when you spoke with him?

18         A.    I don't know, but I think

19  so.

20         Q.    Who else was present when

21  you spoke with Mr. Rannazzisi?

22         A.    Oh, there were a number of

23  people, somewhere between 30 and 40

24  people.  I don't know who all they were.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    Is this the -- are you
2    referring to the same meeting that you
3    met with the three or four other experts
4    as well as a number of plaintiffs'
5    counsel?
6          A.    No.  It was a different
7    meeting.
8          Q.    Who was present at this
9    meeting with 30-some-odd people in it?
10          A.    Well, it was primarily
11   plaintiffs' counsel and some of their
12   consultants.  I wasn't introduced to
13   everybody, so I don't know who all was
14   there.  But generally plaintiffs' counsel
15   and maybe some consultants working for
16   plaintiffs' counsel.
17          Q.    And what was the purpose of
18   the meeting?
19          A.    I don't know.  I didn't call
20   the meeting.
21          Q.    Do you remember any topics
22   that were discussed during this meeting?
23          A.    Yes.
24          Q.    What were those topics?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Most or all of the

 2   discussion dealt with the ARCOS data,

 3   what had been produced, what additional

 4   data might be produced.  I'm not sure of

 5   that second topic.  I'm not sure if we

 6   received all of the data that we

 7   ultimately received.  The last of that

 8   data was in August of 2018.  So I'm not

 9   recalling precisely whether this meeting

10   was shortly before or shortly after.

11              I think -- I think it was

12   the day of my mother's funeral, which was

13   June 12th or 10th or the day after.  I

14   returned from Canada where I grew up for

15   that meeting.  It was in my office.

16   There were about 30 people there.  I

17   wasn't -- I wasn't entirely clear on what

18   was going on.  I was dealing with other

19   issues.

20              And I believe Mr. Rannazzisi

21   was at that meeting.  I remember meeting

22   him at our break.

23        Q.    And did he speak to the

24   group at this meeting?
```

```
 1          A.    Not in any sort of formal

 2    way.  There was an open discussion, and

 3    he may have contributed a thought or two

 4    to that discussion, but not -- not a

 5    presentation or some lengthy discourse.

 6          Q.    So there was a meeting

 7    around June 12th of 2018 that you had

 8    attended with some of the DEA

 9    representatives.  There was another

10    meeting that you mentioned earlier where

11    you met with some consultants and experts

12    involved in this case.

13                Were these the only two

14    meetings where -- that you attended where

15    DEA employees or former DEA employees

16    and/or experts were present?

17          A.    I'm sorry, I offered you the

18    June 10th or June 12th date.  I could be

19    precise, because I recall the connection

20    to the service in Canada.

21                I could be more precise on

22    that date.  So just allow me to say I

23    think that's the date.  And if you're

24    interested, if it's important to you I'll
```

Highly Confidential - Subject to Further Confidentiality Review

 1    get you the precise date.

 2              No.  But in answer to your

 3    question, no, there were -- there was at

 4    least one or two other instances where I

 5    met with former DEA employees.

 6         Q.    Did you meet with a former

 7    DEA employee named Kyle Wright?

 8         A.    I don't know.  I don't

 9    recognize that name.

10         Q.    Mike Mapes?

11         A.    I don't recognize that name.

12         Q.    Did you meet with Stacy

13    Harper-Avilla?

14         A.    I don't know.  I don't

15    recognize that name.  I did meet -- so

16    the DEA employs that I recognized or

17    understood to be DEA employees are four

18    or five men and one woman, but I don't

19    know if that's the person that you've

20    just identified.  I don't recognize that

21    name.

22         Q.    Did you meet with Katherine

23    Chaney?

24         A.    Same answer.  I don't

```
 1    recognize that name.

 2           Q.    Frank Younker?

 3           A.    I think so.  One of the DEA

 4    employees, former employee's name was

 5    Frank.  And that may be the person that

 6    you're referring to.

 7           Q.    Is the person that you're

 8    thinking of a consultant to the

 9    plaintiffs in this litigation?

10           A.    Was at the time anyway.

11    It's a year ago now or nearly a year ago.

12           Q.    Did you meet with a former

13    DEA employee by the name of Jim Geldhof?

14           A.    I think so.  That name

15    sounds familiar.

16           Q.    How about David Schiller?

17           A.    Maybe, although that name is

18    not familiar to me.

19           Q.    Christine Sannerud?

20           A.    Not that I'm aware.  The

21    name is not familiar to me.

22           Q.    Lou Milione?

23           A.    I don't think I recall that

24    name.  That's not familiar to me.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.    Have you ever spoken with

2    DEA employees Keith Martin?

3         A.    Not that I'm aware of.

4         Q.    How about Tom Prevoznik?

5         A.    Not that I'm aware of.

6         Q.    June Howard?

7         A.    Not that I'm aware of.  Let

8    me explain why I say I'm -- "not that I'm

9    aware of."  I was on a telephone call

10   very earlier with -- I mentioned earlier

11   today with two or three or four people

12   from the DEA.  I don't know how many

13   people were on the call, but set up by

14   the plaintiffs' attorneys to discuss data

15   that we might be receiving.  So it was

16   back in February or March of last year.

17              And I didn't take notes of

18   the names of the people who were on the

19   call.  There was at least one female

20   voice and at least one male voice that I

21   understood to be from the DEA.  I don't

22   know what their names were.

23        Q.    Generally did all of your

24   conversations with these former DEA
```

```
 1    employees involve ARCOS data?

 2         A.    Yes.

 3         Q.    And specifically in those

 4    conversations, what did they tell you

 5    about ARCOS data?

 6         A.    Nothing of substance that

 7    sticks with me.  Nothing that informs any

 8    of the opinions that I expressed in my

 9    reports or that we discussed earlier

10    today.

11              There was a lot of kind of

12    telling war stories standing around the

13    watercooler about the ARCOS data.  I

14    don't recall anything of substance.  As I

15    said, nothing that informs any of the

16    opinions that I expressed.

17         Q.    Did any of the war stories

18    include any of the defendants in this

19    litigation?

20         A.    I don't recall.

21         Q.    Do you recall the war

22    stories involving the distributors

23    McKesson or Cardinal Health or

24    AmerisourceBergen, for example?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    No, I'm sorry, I don't

 2     recall.  What I recall was more the

 3     difficulty of in the field getting quick

 4     pulls on the ARCOS data and how difficult

 5     the ARCOS data was to -- was for them to

 6     access and produce reports from.

 7                   It was from very early on in

 8     our accumulation of the data and

 9     processing and understanding of the data.

10     And so they were in some sense

11     foreshadowing for us the data that we

12     were to receive.  We end up with kind of

13     a different experience with that data

14     than they had.  But they were conveying

15     their experience with the data.  That's

16     what I recall.

17              Q.    And to be clear, their

18     experience with the data, or at least the

19     experiences that they were discussing

20     with you from their time in the field

21     offices, they were describing ARCOS data

22     and reports as difficult to obtain?

23              A.    Well, those were my words.

24     I don't recall a year later now, a casual
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   conversation, the exact words that were

 2   used.  Just that -- that from the field

 3   offices that they would request a report,

 4   and that it took some time.

 5             So difficult to obtain, I

 6   don't mean that there was a lot of

 7   paperwork to fill out or that it took

 8   months, but it wasn't instantaneous or in

 9   minutes the way we can create reports

10   from this ARCOS data today given our data

11   capabilities.

12        Q.    And did they describe to you

13   or tell you when a change happened at DEA

14   where ARCOS data was more readily

15   available to them?

16        A.    Well, I think that assumes

17   facts not in evidence.  I don't recall

18   them telling me that things have changed.

19   I just am describing to you what I recall

20   them conveying to me about their

21   experience and nothing that particularly

22   sticks with me.  That's -- that's the

23   only part of the discussion that sticks

24   with me.  And none -- none of that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    informs any of the opinions that I

 2    expressed -- that I hold or express.

 3          Q.    Do you remember any other

 4    topics that you may have discussed with

 5    these former DEA employees?

 6          A.    No.

 7          Q.    If we could turn to

 8    Exhibit 2 or 3, your report, and I'll

 9    refer specifically to the March 25th

10    report.  If we can turn to Page 75.

11          A.    Yes.

12          Q.    Page 75 includes Table 32.

13    And this table, if you -- if you look at

14    certain entries, there are N/As and there

15    are zeros.

16          A.    Yes.

17          Q.    What does an N/A represent?

18          A.    Well, in general it would be

19    nonapplicable as opposed to nonavailable,

20    or not applicable as opposed to not

21    available.

22          Q.    So it means --

23          A.    It's just what we were

24    referring to earlier as -- as the cage
```

Highly Confidential - Subject to Further Confidentiality Review

1    vault rule.  I've just heard that term

2    used generally.

3              And I think if you look at

4    that footnote that is earlier here that

5    cites to a two-page document, I don't

6    think oxymorphone is one of the drugs in

7    that list, and that's why the column says

8    N/A.  We could check that, but that's my

9    recollection.

10             The other places where it's

11   N/A as opposed to zero, I just have to

12   check.  I'm not certain.

13        Q.   Well, as a general rule, and

14   I -- and I didn't mean to -- to confuse

15   you or make you hone in on the fact that

16   Table 32 is about maximum daily dosage

17   unit threshold by transaction.

18             Just generally in your

19   tables, what does N/A mean?

20        A.   Not applicable.

21        Q.   And what does a zero mean?

22        A.   Well, that we ran the

23   methodology and it didn't flag any

24   orders.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    So in your mind what's the

 2   difference between an N/A and a zero?

 3          A.    Well, this is actually a

 4   really good illustration of that.  Maybe

 5   at least my thinking about how those

 6   terms might be used.

 7               So if we look at that source

 8   document that's cited in the footnote on

 9   Page 72, it gives daily limits for

10   different drugs.  And it does not, my

11   recollection, give a daily limit for

12   oxymorphone.  It does give a limit for

13   the other drugs.  And so if a distributor

14   doesn't ship a drug, then there might be

15   an N/A -- a drug for which there is a

16   daily limit in that source document.

17   There might be an N/A if they do ship

18   that drug, but never does that drug

19   exceed the daily limit, then there would

20   be a zero.  That's the way I would

21   interpret those two.

22               I might -- I might go back

23   and check to see if there's some

24   situation where we wrote N/A when a zero
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    would be appropriate or where we wrote a

 2    zero when an N/A would be appropriate.

 3              But looking at this example

 4    you've pointed me to, that would be the

 5    interpretation that I would take from it.

 6         Q.    Now, Dr. McCann, have you

 7    ever heard the term "diversion" used in

 8    connection with prescription opioids?

 9         A.    Yes.

10         Q.    What does diversion mean to

11    you?

12         A.    I only have the very vaguest

13    of kind of layman's understanding of that

14    term.  I don't -- I don't have an

15    understanding that would be helpful here,

16    I don't think.  I'm happy to tell you

17    what it is, but I'm not sure that it's

18    helpful.

19         Q.    Yeah, please.

20         A.    Sure.  So I would just say

21    it sounds like it's related to diverted

22    and that diversion means that some drugs,

23    some prescription drugs were diverted

24    from their intended use, or from their
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   legitimate intended uses to illicit

 2   activities.

 3          Q.    Do you agree that diversion

 4   is a crime?

 5          A.    I have no -- no opinion --

 6                MR. MOUGEY:  Objection.

 7          Outside the scope.

 8                THE WITNESS:  -- one way or

 9          the other.

10   BY MR. EPPICH:

11          Q.    Are you planning to offer

12   any opinions about whether or not any of

13   the defendants diverted prescription

14   opioids in this litigation?

15          A.    No.

16          Q.    I'd like to turn back to

17   Page 56 of your report.  Page 56 is the

18   start of Section 9, transaction analysis,

19   you'll recall.

20                I'd like to return to the --

21   the five methodologies that you implement

22   to identify what you call flagged orders.

23   Okay?

24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     You testified earlier that
 2     the plaintiffs' counsel provided these
 3     five methodologies for identifying
 4     flagged transactions to you, correct?
 5            A.     Yes.
 6            Q.     You didn't come up with the
 7     five methodologies yourself?
 8            A.     No.
 9            Q.     You have no opinion of -- on
10     whether any of the five methodologies is
11     appropriate for evaluating whether or
12     not -- or, excuse me.  Let me strike
13     that.
14                   You have no opinion on
15     whether any of the five methodologies are
16     appropriate for identifying what you call
17     flagged transactions, correct?
18            A.     Correct.
19            Q.     There may be other
20     appropriate methodologies for -- for --
21     let me strike that.
22                   You'd agree there may be
23     other appropriate methodologies for
24     flagging suspicious orders, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Yes.

2          Q.    But you have no opinion

3    about the other methods of flagging

4    suspicious orders, correct?

5          A.    Or even that they exist.  I

6    just allow, in your previous question,

7    that they may exist.  I don't have an

8    opinion one way or another on -- on any

9    of the subject matter material.

10         Q.    You used algorithms to

11   identify the first flagged transactions

12   in these methodologies?

13         A.    Yes.

14         Q.    And then you flagged every

15   transaction after that, correct?

16         A.    Correct.

17         Q.    That was according to

18   plaintiff -- plaintiffs' counsel's

19   instruction, correct?

20         A.    Correct.

21         Q.    And you did that for all

22   five methodologies?

23         A.    Correct.

24         Q.    You did not use your

1    algorithm in the five methodologies to

2    identify any of the subsequent

3    transactions that you flagged after the

4    first transaction?

5         A.    If I understand that

6    question, is the same as the question

7    asked earlier today.  The methodologies

8    flagged that first transaction and

9    everything after that gets flagged.  So,

10   in some complete description, the

11   methodology does flag those later

12   transactions, because it flags the first

13   one and every one that follows.

14             But the methodology is not

15   reapplied to each transaction anew.  I --

16   I guess is the way I would say it.

17        Q.    Another way to say that

18   would be there's no computational

19   analysis on any of the subsequent

20   transactions after that first flagged

21   transaction, correct?

22        A.    Correct.

23        Q.    Who developed your

24   algorithms for each of these five

Highly Confidential - Subject to Further Confidentiality Review

```
 1    methodologies?

 2            A.    I'm sorry, what do you mean

 3    by developed?

 4            Q.    Well, you wrote algorithms

 5    for each of these five methodologies,

 6    correct?

 7            A.    Correct.

 8            Q.    Who wrote those algorithms?

 9            A.    Well, it was a joint effort

10    of -- so at a very high level you can

11    think of the instruction about which

12    algorithms to use and the assumption that

13    once a transaction is flagged, everything

14    on that day and thereafter is flagged.

15    You could think of that as part of

16    developing or writing the algorithm.

17                 So plaintiffs' counsel, some

18    discussion of that between me and -- and

19    my staff and plaintiffs' counsel, and

20    then the actual programming of those

21    rules, members of my staff.

22            Q.    It's true that none of your

23    methodologies was ever used by a

24    distributor to identify suspicious
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   orders, correct?

 2        A.    I don't know one way or the

 3   other.

 4        Q.    And are you offering any

 5   opinions or do you plan to offer any

 6   opinions about whether or not your five

 7   methodologies were ever used by a

 8   distributor to -- to identify suspicious

 9   orders?

10        A.    No.

11        Q.    Do you have any experience

12   with any of the distributors' suspicious

13   order monitoring programs?

14        A.    No.

15        Q.    You didn't review any

16   distributor testimony in this case, did

17   you?

18        A.    No.

19        Q.    You didn't review the

20   suspicious order monitoring programs for

21   any distributor in this case?

22        A.    No.

23        Q.    You didn't review McKesson's

24   Section 55 of its operations manual?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Not that I'm aware of.  If

 2    I -- if I did, it didn't stick with me.

 3            Q.    You didn't review McKesson's

 4    lifestyle drug monitoring program?

 5            A.    Same answer.

 6            Q.    You didn't review McKesson's

 7    controlled substance monitoring program?

 8            A.    No.  Not that I'm aware of.

 9            Q.    You didn't review

10    AmerisourceBergen's suspicious order

11    monitoring programs?

12            A.    No, not that I'm aware of.

13            Q.    You didn't review Cardinal

14    Health's suspicious order monitoring

15    programs?

16            A.    No, not that I'm aware of.

17            Q.    You have no opinions about

18    McKesson's suspicious order monitoring

19    program?

20            A.    Correct.

21            Q.    Do you plan to offer any

22    opinions about McKesson's suspicious

23    order monitoring program?

24            A.    No.
```

```
 1          Q.    Do you have any opinions

 2    about AmerisourceBergen's suspicious

 3    order monitoring program?

 4          A.    No.

 5          Q.    And do you intend to offer

 6    any opinions about AmerisourceBergen's

 7    suspicious order monitoring program?

 8          A.    No.

 9          Q.    Do you have any opinions

10    about Cardinal Health's suspicious order

11    monitoring program?

12          A.    No.

13          Q.    Do you intend to offer any

14    opinions about Cardinal Health's

15    suspicious order monitoring program?

16          A.    No.

17          Q.    Do you have any opinions

18    about any other distributors' suspicious

19    order monitoring programs?

20          A.    No.

21          Q.    Do you intend to offer any

22    opinions about any other distributors'

23    suspicious order monitoring programs?

24          A.    No.
```

```
 1              Q.    Now, we talked -- we've

 2   talked about the five methodologies at

 3   length today.  I just have a few

 4   follow-up questions.

 5              Which -- which of the

 6   methodologies considers legitimate

 7   pharmacy growth over time?

 8       A.    As distinct from illicit or

 9   illegitimate pharmacy growth?  I'm not

10   sure I -- I follow that.  Take

11   "legitimate" out of the question --

12       Q.    Fair enough.  Let me strike

13   the question, and I'll re-ask the

14   question.

15              Which methodologies consider

16   pharmacy growth over time?

17       A.    All five of them, but

18   primarily the first three.

19       Q.    How does the maximum monthly

20   trailing six-month threshold consider or

21   account for pharmacy growth over time?

22       A.    Well, to the extent that

23   pharmacies receipt of a drug increases

24   over time, it gets flagged under that
```

```
 1   method.  So it considers the growth.  And

 2   if the pharmacy's shipments increase, at

 3   some point the shipments -- a shipment

 4   and the shipments thereafter get flagged.

 5        Q.    Is it your opinion that a

 6   flagged order, or what you call a flagged

 7   order indicates the growth of the

 8   pharmacy?

 9        A.    Well, by definition it does

10   in this section, right?  Because the only

11   way an order gets flagged is if in a

12   month the pharmacy receives more drugs

13   than it received at the maximum in the

14   previous six months.  And that's growth,

15   right?  That's a higher number in the

16   seventh month than in the previous six

17   months.

18        Q.    What are some reasons why a

19   pharmacy may grow over time?

20             MR. MOUGEY:  Outside the

21        scope.  Objection.

22             THE WITNESS:  I don't know.

23        I haven't thought through those

24        issues.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. EPPICH:
 2         Q.    Now, you say that your
 3    methodology flags orders, correct?
 4         A.    Yes.
 5         Q.    If the distributors had
 6    refused to ship each of your flagged
 7    orders, would any legitimate
 8    prescriptions have gone unfilled?
 9              MR. MOUGEY:  Objection.
10              THE WITNESS:  I don't know.
11    BY MR. EPPICH:
12         Q.    Are you planning to offer
13    any opinions in this case as to whether
14    or not distributors' refusal to ship
15    would result in any legitimate
16    prescriptions having gone unfilled?
17              MR. MOUGEY:  Objection.
18              THE WITNESS:  Not as I sit
19         here.
20    BY MR. EPPICH:
21         Q.    Now, if the distributors had
22    refused to ship each of your flagged
23    orders, would that have prevented the
24    opioid crisis?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MOUGEY:  Objection.

 2              THE WITNESS:  I have no

 3          idea.  No opinion one way or the

 4          other.

 5   BY MR. EPPICH:

 6          Q.    And do you plan to offer any

 7   opinions about whether or not

 8   distributors play a role or played a role

 9   in causing or preventing the opioid

10   crisis?

11              MR. MOUGEY:  Objection.

12              THE WITNESS:  No.  As with a

13          lot of this stuff, that's going to

14          be the subject of other experts'

15          reports and testimony.

16   BY MR. EPPICH:

17          Q.    Now, you used ARCOS data for

18   your methodologies, correct?

19              MR. MOUGEY:  Objection.

20              THE WITNESS:  Along with

21          other data.  But, yes, I used

22          ARCOS data.

23   BY MR. EPPICH:

24          Q.    And you understand that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    registrants are required to submit ARCOS

 2    data to the DEA on a monthly or quarterly

 3    basis?

 4              MR. MOUGEY:  Objection.

 5              THE WITNESS:  That's my

 6         general understanding.  I don't

 7         have an expert opinion or expert

 8         understanding.  But in context, as

 9         part of the context, I have, when

10         analyzing the data, that's my

11         understanding.

12    BY MR. EPPICH:

13         Q.   And based on your review of

14    this ARCOS data, would you agree that

15    registrants have submitted accurate data

16    to DEA?

17         A.   I would say it a little bit

18    differently, but something very close to

19    that.

20         Q.   How would you say it?

21         A.   Well, what I see is not

22    necessarily exactly what registrants

23    submit to the DEA.

24              What I see is what the DEA
```

```
 1    produced to me.  And so I want to make

 2    that slight qualification.

 3                    And an example of that would

 4    be, there's 20 or 21 days where I think

 5    for Ohio there are no Cardinal Health

 6    transactions in ARCOS.  I may have the

 7    jurisdictions slightly off.  But there's

 8    a period there where there are a bunch of

 9    Cardinal Health transactions that were

10    produced in discovery in this case, to

11    pharmacies over a 20 or 21-day period

12    that is not in the ARCOS data produced to

13    me by the DEA.

14                    And so I can't say that that

15    data was produced by Cardinal Health to

16    the DEA and they just didn't produce it

17    to me, or in the alternative, that

18    Cardinal Health didn't produce those

19    21 days of transactions to the DEA.

20                    Setting aside an issue like

21    that, what I would say is that the data

22    that I received from the DEA as ARCOS

23    data is consistent after fixing a few

24    things, largely consistent with the data
```

Highly Confidential - Subject to Further Confidentiality Review

1    that the defendants produced in this case

2    in discovery.  It's a little bit

3    different than what you said, but it's

4    close.

5         Q.    So to restate, you'd agree

6    that the ARCOS data that the DEA provided

7    to you was accurate?

8         A.    That's certainly how I

9    shorthanded in a sentence or two a couple

10   of times in the report.  But if you read

11   the entire report what I'm saying is that

12   the ARCOS data that I received after

13   making some corrections on allowing for

14   some periods where they don't match

15   perfectly, match the defendant

16   transaction data produced in discovery

17   quite closely.

18        Q.    You're aware that only the

19   DEA has access to ARCOS data?

20        A.    I don't know if that's true.

21   I don't know one way or another.

22        Q.    Are you aware that

23   distributors could not see the ARCOS data

24   of any other distributor?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    I don't know if that's true.
 2    I don't know one way or the other.
 3          Q.    Do you plan on offering any
 4    opinions about whether or not a
 5    distributor has access to ARCOS data?
 6                MR. MOUGEY:  Objection.
 7                THE WITNESS:  Not other than
 8          to their own data, I don't have an
 9          opinion one way or the other.
10    BY MR. EPPICH:
11          Q.    Do your methodologies comply
12    with the Controlled Substance Act and the
13    applicable DEA regulations?
14          A.    I'm not familiar with the
15    details of the Controlled Substance Act
16    or the applicable regulations.  But there
17    seems to be a disconnect between whatever
18    is in those documents and what I've
19    described here as my methodologies.
20          Q.    What is that disconnect?
21          A.    Well, by a disconnect, I
22    mean in layman's terms they are kind of
23    apples and oranges.  I've described in
24    the reports the methodologies that I
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    applied and the results of applying those

2    methodologies to the ARCOS data for

3    Cuyahoga and Summit, supplemented with

4    the defendants' transaction data

5    produced.

6              I'm not sure what -- I don't

7    understand the applicability of the

8    Controlled Substances Act or the

9    regulations they're under to the

10   calculations that I've done.  So I don't

11   know if it's consistent or not

12   consistent.  I don't see the connection

13   between them.

14        Q.    And do you intend to offer

15   any opinions in this case about whether

16   or not your methodologies comply with the

17   Controlled Substances Act or its

18   regulations?

19              MR. MOUGEY:  Objection.

20              THE WITNESS:  Not as I sit

21        here.  I don't see the connection,

22        as I just said.

23   BY MR. EPPICH:

24        Q.    If we can look at Page 56 of
```

Highly Confidential - Subject to Further Confidentiality Review

1   your report, sir, at Paragraph 132.  This

2   has been the subject of some questioning

3   earlier today.

4            And I'm referring to the

5   assumption that is stated in

6   Paragraph 132, where you write, "In this

7   approach" -- and I think we've

8   established that Paragraph 132 is

9   applying to all five methodologies.

10            "In" -- "in this approach

11   and the others implemented below, I have

12   been asked by counsel to assume that the

13   distributor did not effectively

14   investigate the flagged transactions, and

15   so every subsequent transaction of that

16   drug code is also flagged because the

17   distributor had an unfulfilled obligation

18   to detect and investigate the first

19   flagged transaction."

20            Did I read that correctly?

21       A.    Yes.

22       Q.    What did you do to evaluate

23   the validity of this assumption?

24       A.    Nothing.  It was just an

```
 1    assumption that I was asked to make.  And

 2    I implemented it.

 3              There -- if the evidence

 4    were to be developed in some other way,

 5    the methodology could be applied to some

 6    variant on this assumption.  But this was

 7    the assumption that I was asked to make

 8    based on -- on what I understand other

 9    witnesses may testify about.  And

10    ultimately whatever the court decides on

11    this issue could be -- could inform the

12    application of this tool to create a

13    different set of flagged transactions

14    from the same underlying data.

15         Q.    So you didn't review any

16    documents or deposition testimony or

17    any -- any other evidence in this case

18    to -- to validate the assumption?

19         A.    Correct.

20         Q.    You have no knowledge about

21    whether distributors had an unfulfilled

22    obligation to detect and investigate the

23    first flagged transaction?

24              MR. MOUGEY:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  Right, I
 2          said -- as I said, I think that's
 3          outside the scope of the analysis
 4          that I was asked to do.  And I
 5          wouldn't have particular subject
 6          matter expertise that would be
 7          relevant in any case.
 8                All I was asked to do was to
 9          assume that after a transaction
10          gets flagged, the subsequent
11          transactions are also flagged.
12   BY MR. EPPICH:
13          Q.   It's true that you don't
14   even know if distributors have an
15   obligation to detect and investigate the
16   first flagged transaction, correct?
17                MR. MOUGEY:  Objection.
18                THE WITNESS:  As a result of
19          understanding the context of this
20          litigation, I have sort of a
21          general layman's understanding,
22          but I don't have an expert
23          understanding or an expert opinion
24          on the subject.
```

```
 1   BY MR. EPPICH:

 2        Q.    Are you planning to offer

 3   any opinions about any distributor

 4   obligation to detect and investigate what

 5   you call the first flagged transaction?

 6             MR. MOUGEY:  Objection.

 7             THE WITNESS:  No.  That will

 8        be for other witnesses.

 9   BY MR. EPPICH:

10        Q.    Now, if a distributor did,

11   in fact, detect and investigate the first

12   flagged transaction, your methodology

13   would incorrectly flag every subsequent

14   transaction for that base code and

15   pharmacy, wouldn't it?

16             MR. MOUGEY:  Objection.

17             THE WITNESS:  I would say it

18        differently.

19             I would say that I was asked

20        to assume that there was not

21        effective due diligence, or

22        rather, that when one of these

23        algorithms flags a transaction to

24        a pharmacy, the subsequent
```

```
1           transactions should also be

2           flagged.

3                If the evidence were to be

4           developed that during some time

5           periods that's a reasonable

6           assumption and in other time

7           periods it's not, or it's a

8           reasonable assumption for some

9           pharmacies and not others, or for

10          some distributors and not others,

11          or some other variation on this

12          assumption, then those alternative

13          assumptions could be implemented

14          in the algorithm that I've

15          developed here on the data that

16          we've cleaned and processed.

17                I've given you an

18          illustration of one set of

19          assumptions, one fact pattern if

20          you will.  If -- if an alternative

21          fact pattern is developed and a

22          jury is convinced of that

23          alternative fact pattern, then the

24          analysis would be different.  It
```

```
 1          would be the same general

 2          methodology, but the results would

 3          be different because it would --

 4          it would be based on a different

 5          set of assumptions.

 6  BY MR. EPPICH:

 7          Q.    So under this different set

 8  of assumptions where a distributor

 9  detects and investigates the first

10  flagged order, you'd agree that the

11  results would be different and the

12  methodology that we see in this report

13  would be incorrectly flagging every

14  subsequent transaction?

15              MR. MOUGEY:  Objection.

16              THE WITNESS:  No.  I would

17          not say it that way.  I apologize

18          for being wordy.

19              But the way I would say it

20          is that -- that if the -- take a

21          situation where there's a

22          particular order that is the first

23          flagged order in this application

24          for a particular distributor and
```

```
 1            pharmacy.  And the evidence was

 2            developed that that order was

 3            investigated, cleared and shipped,

 4            then the methodology would just be

 5            applied allowing for that

 6            transaction.  And -- so it's the

 7            same methodology.

 8                 I'm not -- I'm not seeing --

 9            maybe I'm -- I apologize.  I may

10            not be seeing the distinction

11            between this question and the

12            answer I gave to the prior

13            question.

14    BY MR. EPPICH:

15         Q.    And I apologize if I'm

16    confusing you.  And let me try and

17    simplify the question.

18                 If a distributor were to

19    detect and investigate the first flagged

20    order and your methodology applied that

21    assumption, you'd agree with me that the

22    results of the flagged subsequent

23    transactions would be different than what

24    we see in the charts and graphs of your
```

1    report?

2           A.    I apologize, yes.  If the

3    facts were to be developed to the jury's

4    satisfaction, to the court's

5    satisfaction, different from the assumed

6    facts in this illustration, then the

7    algorithms would have to be run under

8    that new set of assumed facts and it

9    would generate different results.

10          Q.    Now, I believe you testified

11   earlier today that you ran some of the

12   data without the plaintiffs' assumption.

13   Did I understand that testimony

14   correctly?

15          A.    Yes.

16          Q.    That was in preparing for

17   this report?

18          A.    No.  That was earlier than

19   that.

20          Q.    But that -- that analysis is

21   not found in your report, correct?

22          A.    Correct.

23          Q.    Now, when -- when you did

24   that, what were the results that you saw?

```
 1          A.    Well, as I said earlier, you

 2    end up with fewer transactions being

 3    flagged for sort of obvious reasons.

 4          Q.    So you'd agree that your

 5    reliance on plaintiffs' counsel

 6    assumption to flag every subsequent

 7    transaction increased the number of

 8    flagged transactions?

 9              MR. MOUGEY:  Objection.

10          Asked and answered.

11              Are we -- are we going to --

12          are we going to go through the

13          same questions we did this

14          morning?  I mean, that's -- that's

15          the third time he's answered that

16          question.

17              MR. EPPICH:  I'm doing my

18          best but I --

19              MR. MOUGEY:  I hear you, but

20          when we -- I'm --

21              MR. EPPICH:  Keep your

22          objection as to form.

23              MR. MOUGEY:  I mean, the

24          fact that we are allowing
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          different counsel to ask questions

2          doesn't mean we're going to sit

3          and ask the same questions.  I

4          mean, some of these questions are

5          almost verbatim of what we went

6          through this morning fishing for a

7          different answer.

8               MR. EPPICH:  I disagree with

9          that, sir.

10               MR. MOUGEY:  I mean, I can

11          almost cut and paste these and put

12          them on top.

13               And I think if y'all haven't

14          coordinated who is going to take

15          what topics, I think we need to

16          make sure we do that for tomorrow.

17          Because these questions are almost

18          verbatim to what we went through

19          this morning.  I could answer

20          them.

21   BY MR. EPPICH:

22          Q.   Sir, you may answer the

23   question.

24          A.   If you assume 100 percent
```

1    due diligence, you don't flag very many

2    orders.  If you assume zero due

3    diligence, you flag more orders.  And

4    this model is flexible enough to

5    incorporate different sets of facts

6    developed about the extent of due

7    diligence between zero and 100 percent.

8           Q.    If we could turn to

9    Paragraph 131 of your report which is on

10   Page 56.  This is the first paragraph

11   under the maximum monthly trailing

12   six-month threshold.

13          A.    Yes.

14          Q.    In Paragraph 131 of your

15   report, you provide an example.  You say,

16   "If the number of dosage units containing

17   hydrocodone shipped from a distributor to

18   a pharmacy in February, March, April,

19   May, June, and July were 5,000, 10,000,

20   7,000, 8,000, 9,000, and 9,500

21   respectively, a requested transaction in

22   August would be flagged if it would cause

23   the number of dosage units containing

24   hydrocodone the distributor shipped to

```
 1   the pharmacy to exceed 10,000."

 2              Did I read that correctly?

 3        A.    Yes.

 4        Q.    So if the pharmacy ordered

 5   10,500 in August of 1997, that order

 6   would be flagged under your six-month

 7   threshold analysis, correct?

 8              MR. MOUGEY:  Objection.

 9        Asked and answered.

10              THE WITNESS:  I'm sorry.

11        Which order?

12   BY MR. EPPICH:

13        Q.    If the pharmacy were to

14   order 10,500 in August of, say, 1997,

15   that order would be flagged under your

16   six-month threshold analysis, correct?

17        A.    I think there's some

18   confusion in that question.  Maybe my

19   sentence there is not clear.  I could

20   explain if you'd like.

21        Q.    Well, I'm just trying to

22   figure out if the pharmacy ordered 10,500

23   in August, wouldn't that order be

24   flagged?
```

 1         A.    No.  I'm sorry.  You're not

 2    saying it correctly.  Can I explain?

 3         Q.    Yes, please.

 4         A.    So it's not an order of

 5    10,500.  It's probably a weekly order of

 6    2,000, 3,000, 2,000, 4,000, 1,500.  And

 7    it's the last order that puts you above

 8    10,000.  And it's that order, it's the

 9    order that puts you above 10,000.  So you

10    keep saying the order of 10,500.  It's

11    not an order of 10,500 typically.

12               And it's that order or the

13    orders that day in that drug code and the

14    subsequent orders in that drug code that

15    get flagged.

16         Q.    I appreciate that

17    clarification.

18               So if the pharmacy, if their

19    total orders for the month of August 1997

20    were 10,500 by the end of the month, the

21    last order that they had would be flagged

22    under your six-month threshold analysis,

23    correct?

24         A.    In my example.  But it may

```
 1    not be the last order that triggers the

 2    flag, right.  It could be the

 3    second-to-last order.  But whatever the

 4    orders are on that day in that drug code

 5    and the rest of the orders that month,

 6    and the orders that follow, are what get

 7    flagged.

 8         Q.    That's right.  And so every

 9    order of the drug thereafter would be

10    flagged for this particular pharmacy,

11    correct?

12         A.    Correct.

13         Q.    So orders starting in

14    September '97 or maybe even later in

15    August 1997 until all the way to the end,

16    let's say, 2018, those would all be

17    flagged under your six-month threshold

18    analysis, correct?

19         A.    Correct.

20         Q.    Even if no subsequent

21    monthly orders totaled 10,000, correct?

22         A.    Correct.

23         Q.    Now, let's say the

24    pharmacy -- let's say their orders for
```

```
 1    the month of August 1997 exceeded 10,000

 2    because there was an emergency, let's say

 3    a natural disaster.  That last order in

 4    August would be flagged and every

 5    subsequent order would be flagged under

 6    your six-month threshold, correct?

 7              MR. MOUGEY:  Objection.

 8              THE WITNESS:  I'm sorry.

 9         I'm not sure that I understood

10         that question.  Could you ask it

11         again, please.

12    BY MR. EPPICH:

13         Q.   Of course.  If a pharmacy --

14    if an order in August of 1997 -- let me

15    strike that.

16              If a pharmacy ordered a

17    total number of orders that exceeded

18    10,000 in August of 1997 because there

19    was an emergency, let's say a natural

20    disaster, that order that exceeded 10,000

21    would be flagged under your six-month

22    threshold analysis, correct?

23         A.   If the order itself doesn't

24    exceed 10,000, but the order causes the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   cumulative orders so far that month to

 2   exceed $10,000 -- 10,000 dosage units,

 3   that's correct.  Then that order -- it

 4   might be just 200 dosage units, you know,

 5   taking you from 9,900 to 10,100.  So that

 6   200-dosage-unit order and all subsequent

 7   orders get flagged.

 8         Q.    Even though that store

 9   ordered in excess of the limit of its

10   previous six-month ordering because of an

11   emergency?

12         A.    Correct, the application of

13   the algorithm to the data doesn't take

14   into account that or other hypotheticals

15   that you could develop that would go

16   either -- either way.

17         Q.    Assuming that the store

18   ordered that same drug every month

19   between, say, September 1997 and the end

20   of 2018, your six-month threshold

21   analysis would flag all of those orders

22   as suspicious just because of that one

23   month in 1997, correct?

24         A.    I don't think I used the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    word "suspicious" anywhere in this

 2    report.  I just said that the order is

 3    flagged.

 4                 And that's correct, the

 5    algorithm is flagging the transactions

 6    after that example transaction in your

 7    hypothetical until the end of the data.

 8    It's as equally likely to go the other

 9    way as the way you are suggesting.  But

10    the algorithm is agnostic about that.

11    It's just applying the rule to the data.

12         Q.    I don't understand what

13    you -- what you're saying.  It's equally

14    as likely to go the other way?  Are you

15    saying that once an order is flagged, all

16    subsequent orders are not flagged?

17         A.    No, no.  Not at all.  In

18    your example, the natural disaster occurs

19    in the seventh month.  If it occurs in

20    the fifth month, then you've got a spike

21    in the -- temporary spike in the

22    shipments in the fifth month, and that

23    raises the threshold that would be

24    applied to judge all of the subsequent
```

```
 1    months.

 2              So because of the natural

 3    disaster, a bunch of orders that

 4    otherwise would be flagged are not

 5    getting flagged in your example because

 6    of the natural disaster occurring in the

 7    seventh month instead of the fifth month.

 8    You're suggesting that a bunch of orders

 9    get flagged that wouldn't otherwise get

10    flagged.

11              What I'm saying is, in your

12    hypothetical it could go the other way.

13    It could go exactly the opposite.  And

14    I'm not -- I'm not expressing an opinion

15    other than the two that I've tried --

16    high-level opinions that I've tried to

17    offer, which is that you can clean up a

18    dataset and make it useful.  And you can

19    apply algorithms, some of which I've

20    illustrated here, to that cleaned-up

21    data.

22         Q.   But in your maximum monthly

23    trailing six-month threshold analysis, an

24    order can be flagged and the order was
```

1    placed because of a natural emergency, or

2    perhaps it was diversion, or perhaps it

3    was because of a new doctor moving in

4    down the street.  Your methodology

5    doesn't account for any of those changes;

6    isn't that correct?

7         A.    I'd say it a little bit

8    differently, but yes.

9         Q.    Now, we talked earlier about

10   your twice trailing 12-month average

11   pharmacy dosage units methodology and

12   your three times 12-month threshold

13   analysis.  Do you remember that

14   discussion?

15        A.    Yes.

16        Q.    Now, your twice 12-month

17   threshold analysis and your three times

18   12-month threshold analysis are the same,

19   just with a different multiplier; is that

20   correct?

21        A.    Yes.

22        Q.    The only difference is the

23   amount of the multiplier?

24        A.    That's all I could think of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    as I sit here, yes.

 2           Q.    On Page 68 you introduce the

 3    maximum 8,000 dosage unit monthly

 4    methodology?

 5           A.    Yes.

 6           Q.    Are you aware of any

 7    distributor that has ever used your 8,000

 8    dosage units analysis to identify

 9    suspicious orders?

10                 MR. MOUGEY:  Objection.

11                 THE WITNESS:  That's more

12           than I'm aware of.  I have heard

13           the 8,000 -- maximum 8,000 monthly

14           units sometimes referred to in

15           shorthand as the McKesson rule.

16           But I don't know that that is a

17           rule that was actually applied if

18           by McKesson or anybody else.

19                 I hear that rule or that

20           approach being described as the

21           McKesson 8,000 rule.  I don't know

22           the origin of that

23           characterization.

24    BY MR. EPPICH:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    Do you have any

2    understanding about -- let me strike

3    that.

4                As you sit here today, you

5    have no knowledge about the origin of the

6    McKesson -- of -- let me strike that.

7                And sitting here today, you

8    have no opinion that this methodology was

9    used or not used by McKesson?

10         A.    Correct.

11         Q.    Do you intend to offer any

12   opinions in this case as to whether or

13   not McKesson did or did not use this

14   methodology in practice?

15         A.    No.

16         Q.    Dr. McCann, you are not a

17   pharmacist, are you?

18         A.    No, I'm not.

19         Q.    You have no training in

20   pharmacy science?

21               MR. MOUGEY:  We'll stipulate

22         he's not a pharmacist.  He's not a

23         doctor --

24               MR. EPPICH:  Sir, I'm not
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        asking for your stipulation.
 2             MR. MOUGEY:  Well, we
 3        don't -- we went through this.  Do
 4        you not remember this this
 5        morning?
 6             MR. EPPICH:  I would just
 7        like the -- the witness to answer
 8        the question.
 9             MR. MOUGEY:  Do you remember
10        the answers to the questions this
11        morning about whether or not he's
12        a pharmacist?
13             MR. EPPICH:  I think you
14        spend more time arguing for an
15        objection --
16             MR. MOUGEY:  I promise you,
17        I haven't.
18             MR. EPPICH:  -- than -- than
19        he would just answering the
20        question.
21             MR. MOUGEY:  You really
22        don't remember this this morning,
23        are you a pharmacist, are you a
24        doctor?  You don't remember that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. EPPICH:  Are you -- are

 2         you instructing him not to answer

 3         these questions?

 4                  MR. MOUGEY:  I mean I'm

 5         really not, but can we please be,

 6         I mean, just a little careful

 7         about, I mean, coordinating this

 8         to some extent?

 9                  Can this --

10                  MR. EPPICH:  Let me start

11         this whole -- let me start this

12         again, sir.

13                  MR. MOUGEY:  Yeah, I mean,

14         you do what you feel is necessary.

15                  Are you a pharmacist?  I

16         mean, come on.  I mean, really.

17                  MR. EPPICH:  I'm

18         just sitting -- I'm waiting for

19         you to finish.

20                  MR. MOUGEY:  Well, good.

21         I'm waiting for you to come up

22         with a question that we haven't

23         done yet.

24    BY MR. EPPICH:
```

```
 1          Q.     Dr. McCann, you are aware

 2    that pharmacists fill legitimate

 3    prescriptions filled by legitimate

 4    medical professionals?

 5          A.     Yes.

 6          Q.     And you are aware that

 7    pharmacists stock their pharmacies by

 8    placing orders with distributors?

 9          A.     Yes.

10          Q.     I'd like to talk about your

11    excessive shipments analysis on Page 82

12    of your report.

13                 You testified earlier that

14    you are not aware the DEA established

15    quotas for controlled substances every

16    year; is that correct?

17          A.     Correct.

18          Q.     Do you know that the DEA

19    sets these annual production quotas for

20    controlled substances based on the

21    estimated medical, scientific research

22    and industrial needs of the United

23    States?

24          A.     No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MOUGEY:  Objection.

 2         Asked and answered.

 3    BY MR. EPPICH:

 4         Q.    You didn't consider DEA's

 5    quotas in setting your baselines that

 6    are -- are found in your excessive

 7    shipments methodology?

 8              MR. MOUGEY:  Objection.

 9         Asked and answered.

10              THE WITNESS:  Correct.

11    BY MR. EPPICH:

12         Q.    Now, you know that the quota

13    levels for opioids have consistently

14    increased since 1997, don't you?

15         A.    I just told you I'm not

16    aware of the quotas and I didn't include

17    them in my analysis.  So I don't know how

18    to answer that question.

19         Q.    Well, you'd agree that a

20    baseline rooted in sound scientific

21    principles would include something as

22    significant as the DEA consistently

23    increasing the quota?

24              MR. MOUGEY:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE WITNESS:  It may or it

 2          may not.  I'm not a subject matter

 3          expert.

 4     BY MR. EPPICH:

 5          Q.    It's not something you

 6     considered?

 7          A.    That's correct.  I said that

 8     a couple minutes ago.

 9          Q.    And do you plan to offer any

10     opinions or revise your excessive

11     shipments analysis to include or account

12     for the quotas set by the DEA?

13          A.    Not beyond the extent to

14     which those quotas are already impacting

15     the 2018 levels, no.

16          Q.    But sitting here today, you

17     don't know whether or not the baseline

18     you have for 2018 is impacted by quota?

19          A.    I haven't thought through

20     that issue.  But as you've suggested it

21     to me, I would just have to think through

22     it some more.  But I'm not offering in

23     any case any subject matter opinion.

24                  I'm just saying that --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    well, as I explained earlier, that I have

 2    interpolated between the 1997 and the

 3    2018 levels for the reasons I did.  For

 4    no other reasons.  And that includes for

 5    no other consideration beyond the actual

 6    levels of 2018.  However, they may or may

 7    not be impacted by the quotas you're

 8    describing.

 9         Q.    You don't know as you sit

10    here today, correct?

11         A.    I don't know anything about

12    the quotas, as I said now two or three

13    times.  They did not impact any of my

14    calculations including in this section.

15         Q.    Your report classifies

16    shipments of prescription opioids as

17    excessive, correct?

18         A.    Relative to the benchmarks

19    in Section 10, that's correct.

20         Q.    Which of these shipments

21    should distributors have refused to ship

22    to their pharmacy customers?

23         A.    In Section 10?

24         Q.    Yes, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.    Section 10 doesn't deal with

 2   individual shipments from distributors to

 3   pharmacies.  It's at a higher, more macro

 4   level, describing the shipments into

 5   Ohio, and into Cuyahoga and Summit, and

 6   how those exceed the two example

 7   baselines that I created.

 8           Q.    Yes.  And earlier you -- you

 9   explained what the -- what you meant by

10   excessive shipments.  And so I'm asking

11   you, of these excessive shipments, which

12   of them should distributors have not

13   shipped to pharmacies?

14           A.    I don't have an opinion one

15   way or another beyond what's expressed in

16   Section 10 on that topic.

17           Q.    Were any of what you

18   called -- call excessive shipments

19   diverted?

20           A.    I don't know.

21           Q.    You can't point to any of

22   your excessive shipments that were

23   diverted?

24                 MR. MOUGEY:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Outside the scope.

 2               THE WITNESS:  And it's just

 3          mischaracterizing what I did in

 4          Section 10.  I'm not identifying

 5          individual transactions in

 6          Section 10.

 7               I'm just saying at a macro

 8          level, the amount of MME per

 9          capita shipped into Cuyahoga and

10          Summit went up by a factor of

11          eight or ten, and then came back

12          down by nearly 50 percent, and

13          I've explained how that dramatic

14          increase exceeds some gradual

15          growth from the earlier levels to

16          the later levels.

17     BY MR. EPPICH:

18          Q.   Do you plan to offer any

19     opinions in this case as to whether or

20     not the excessive shipments that are

21     represented in your report in Section 10

22     were diverted?

23          A.   No.

24          Q.   Your 1997 baseline, you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   recall testifying about that earlier

 2   today?

 3            A.    Yes.

 4            Q.    Your 1997 baseline assumes

 5   all prescriptions were necessary?

 6            A.    Yes.

 7            Q.    Your 1997 baseline does not

 8   consider any additional factors beyond

 9   the number of prescriptions that year,

10   correct?

11            A.    There's a whole lot of stuff

12   it doesn't consider.  Like car sales, I

13   don't know what it is that you're

14   referring to.  I don't have any idea what

15   you might be referring to.

16                 It doesn't include anything

17   except the MME per capita shipped in

18   1997.

19                 I apologize.  I don't mean

20   to get snippy.  I'm getting hungry.  I

21   need a Snickers bar.

22            Q.    Would you like to take a

23   break, sir?

24            A.    Whenever is a convenient
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   time.

 2             MR. EPPICH:  We can take a

 3        break.

 4             Let's go off the record.

 5             THE VIDEOGRAPHER:  Off the

 6        record at 5:06 p.m.

 7             (Short break.)

 8             THE VIDEOGRAPHER:  We are

 9        back on the record at 5:17 p.m.

10   BY MR. EPPICH:

11        Q.   Dr. McCann, I'm handing you

12   what we marked as McCann Exhibit 8.

13             (Document marked for

14        identification as Exhibit

15        McCann-8.)

16             THE WITNESS:  Thank you.

17   BY MR. EPPICH:

18        Q.   Dr. McCann, Exhibit 8 is

19   Appendix 6 from your report.  Do you

20   recognize it?

21        A.   Yes.

22        Q.   Now, what is Appendix 6?

23        A.   I forget where in the report

24   we reference it, or I reference it.  But
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    it was -- it was my attempt to aggregate

2    up the different DEA numbers for the same

3    defendant.

4           Q.    So in the left column, you

5    have the company family; is that correct?

6           A.    Yes.

7           Q.    And in the middle column,

8    you have the various entity names that

9    are associated with that family?

10          A.    I would say it a little bit

11   differently.  In the ARCOS data I think

12   what we see is the middle and the right

13   column.  And for purposes of creating our

14   report, sometimes we want to create the

15   report by defendant.  And so you would

16   have multiple DEA numbers with exactly

17   the same name in the ARCOS data and then

18   other times with slight variations on the

19   name.  So we just tried to aggregate

20   those up to the best we could to a common

21   name for each defendant.

22          Q.    So defendants' names are in

23   the left column.  Is that what you're

24   saying?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Correct.

 2          Q.    Okay.  And the entities that

 3    are associated with that defendant are in

 4    the middle column, correct?

 5          A.    I'm sorry, as I would say it

 6    those are the names that we observe in

 7    the ARCOS data.

 8          Q.    Okay.  I don't mean to

 9    confuse you.  I'm sorry about that.

10                But let's -- let me have you

11    turn to Page 6.  It's Page 141 of your

12    report.

13          A.    Oh.  Yes.

14          Q.    Now, on Page 141 the last

15    entry for the McKesson Corporation, is

16    seller name Watson Pharma Incorporated.

17                Do you see that?

18          A.    Yes.

19          Q.    Are you aware that Watson

20    Pharma Incorporated is not a McKesson

21    entity?

22          A.    In general, I know of a

23    Watson entity that is distinct from

24    McKesson.  I'm not sure, as I sit here
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    why -- why this particular seller name

 2    and DEA number is associated with

 3    McKesson.  I would have to check on that.

 4         Q.    But if Watson Pharma --

 5    or -- excuse me.  If Watson Pharma Inc.

 6    is not a McKesson entity, you would agree

 7    with me that including Watson in the

 8    McKesson family would be a mistake?

 9         A.    Unless there was some other

10    reason why it should be included.  And

11    there may or may not be.  I just don't

12    know as I sit here.

13         Q.    How did you determine which

14    DEA numbers coincided with which seller's

15    family?

16         A.    Well the ARCOS data gives

17    the DEA number, the seller DEA number and

18    the seller name.  And so for many of them

19    it was obvious there was a direct

20    correspondence between for instance the

21    30 or 50 or 75 Cardinal Health DEA

22    numbers and Cardinal Health, and the same

23    thing for some of these others.

24              I'm thinking that to the
```

1   extent that there -- that there would be

2   adjustments to our list, it would be to

3   include more DEA numbers with the seller

4   family than what we've included.

5           What we've mostly done is

6   just include the obvious ones, like the

7   McKesson DEA numbers, with the exception

8   of the last two on this list for

9   McKesson.  Prescription Pak, Division of

10  McKesson Corp., well, that seems obvious.

11          Watson Pharma, I just will

12  have to check to see why that particular

13  seller DEA number we've associated with

14  McKesson.

15      Q.    Did you perform this

16  correlation between the seller family and

17  the seller names yourself or did someone

18  on your staff?

19      A.    Someone on my staff.

20      Q.    If we could turn to Page 38

21  of Exhibit 2 or 3, your report, to Page

22  38.  I'm looking at Paragraph Number 93.

23      A.    Yes.

24      Q.    The first sentence says,

```
1    "The McKesson data is missing all

2    transactions involving 47 NDCs, 14

3    million MME."

4           A.    Yes.

5           Q.    Did I read that correctly?

6           A.    Yes.

7           Q.    It's true that nowhere in

8    your report do you state for which NDCs

9    McKesson data is missing, correct?

10          A.    Well, that's not true, or

11   not completely true, anyway.  Footnote 33

12   identifies three of the NDC codes that

13   account for 58 percent of that missing

14   MME.  It doesn't -- it doesn't list the

15   other 44 NDCs that cover the remaining

16   42 percent.  But it lists three of -- the

17   three biggest ones.

18          Q.    And sitting here today, do

19   you know what NDCs you allege are missing

20   from the McKesson data?

21          A.    Not as I sit here, other

22   than the three that are itemized in the

23   footnote.

24          Q.    If we could turn to your
```

```
 1   second report, which is your supplemental

 2   report dated April 3rd.  And if you

 3   wouldn't mind turning to Page 8 of that

 4   report at Paragraph 20.

 5              Paragraph 20 reads, "I was

 6   provided the two pages of figures

 7   attached hereto as Appendix D, which

 8   purport to illustrate the total dosage

 9   units of opioids shipped by McKesson to,

10   A, the United States; and, B, to Ohio."

11              Did I read that correctly?

12        A.    Yes.

13              (Document marked for

14        identification as Exhibit

15        McCann-9.)

16   BY MR. EPPICH:

17        Q.    Let me introduce as

18   Exhibit 9, Appendix D of your report.

19        A.    Thank you.

20        Q.    If we turn to page --

21   Appendix D is Page 85 of your second

22   report.

23              This contains additional

24   McKesson figures and tables, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Correct.

 2          Q.     What are these figures and

 3   tables?

 4          A.     My understanding is that

 5   these are figures and tables that were

 6   used in depositions as demonstratives and

 7   we were asked to verify that this was our

 8   work product.  I think that was the

 9   purpose of this supplemental.

10          Q.     Is this your work product,

11   Dr. McCann?

12          A.     Yes.

13          Q.     All of the tables and

14   figures in Appendix D?

15          A.     Yes.

16          Q.     Did you produce the

17   underlying data files or Excel files that

18   are -- that are associated with each of

19   these charts and tables?

20          A.     I think so.  That was our

21   intention.

22          Q.     Do you plan to offer any

23   opinions about these charts or tables

24   that you have in Appendix D?
```

```
 1          A.     Not other than to perhaps

 2    report what they illustrate.

 3          Q.     Sitting here today, no one

 4    has asked you to offer any opinions about

 5    the methodologies behind these tables and

 6    figures, or what they mean?

 7          A.     Correct.

 8          MR. EPPICH:  Let me pass you

 9          to my colleague.  We'll go off the

10          record.

11          THE VIDEOGRAPHER:  Off the

12          record at 5:28 p.m.

13          (Short break.)

14          THE VIDEOGRAPHER: We are

15          back on the record at 5:31 p.m.

16                  -  -  -

17              EXAMINATION

18                  -  -  -

19    BY MR. BOEHM:

20          Q.     Welcome back after a short

21    break.

22          A.     Thank you.

23          Q.     Mr. McCann, my name is Paul

24    Boehm.  We introduced ourselves very
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    briefly before we went back on the

2    record.  Thank you for being here today

3    and for your time.

4         A.    You're welcome.  Thank you.

5         Q.    Before you were asked to do

6    so by the lawyers in this litigation, did

7    you have any experience reviewing or

8    analyzing distributor transactional data?

9         A.    No.

10        Q.    And when I use the term

11   "distributor transactional data," what do

12   you understand that to mean?

13        A.    I'm sorry.  I understood you

14   to mean specifically opioid or controlled

15   substance transaction data.  We've done a

16   tremendous amount of work on very large

17   datasets, some of them larger than this

18   ARCOS dataset.  Some of which you could

19   think of as involving distributors.  But

20   not pharmaceutical drugs and not

21   distributors of pharmaceutical drugs.

22        Q.    Okay.  So have -- have you

23   ever had experience outside of this

24   litigation reviewing or analyzing
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    distributor transactional data, including

 2    sales data, purchase data, or ordering

 3    data?

 4          A.    Certainly not with respect

 5    to pharmaceutical products that I can

 6    remember.

 7          Q.    How about outside of

 8    pharmaceutical products, as far as you

 9    can remember?

10          A.    Well, earlier in my career,

11    I did a fair bit of antitrust consulting.

12    And there shipments of drugs -- I'm

13    sorry, drugs, other products,

14    agricultural products or automobiles or

15    other products, and their pricing would

16    be relevant to some of that analysis, but

17    it's some time ago and I don't recall the

18    details.  And although I -- I was

19    involved in some antitrust-related work

20    in the pharmaceutical industry, it's

21    not -- it wasn't analyzing data of the

22    type that I've analyzed in this case.

23          Q.    Okay.  Then is it fair to

24    say that you have not, outside of this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   experience in this particular litigation,

 2   ever had the opportunity to analyze or

 3   review transactional data from wholesale

 4   drug distributors?

 5         A.    Yes.  At least not that I

 6   recall.

 7         Q.    Do you agree that, of the

 8   five approaches that are described in

 9   your report in this case, none of them

10   has been standardized or endorsed by the

11   United States Drug Enforcement Agency?

12         A.    I don't know one way or the

13   other.

14         Q.    Do you agree that none of

15   the five approaches that you set forth in

16   your report in this lawsuit have been

17   adopted or mandated by federal or state

18   statute?

19         A.    I don't know one way or the

20   other.

21         Q.    Do you agree that none of

22   the approaches set forth in your report

23   have been endorsed by the Food and Drug

24   Administration?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    I don't know one way or the

 2    other.

 3          Q.    Do you know one way or

 4    another whether or not any of the five

 5    approaches that are set forth in your

 6    report for purposes of this lawsuit have

 7    been endorsed, adopted, or otherwise

 8    mandated by any regulatory agency in the

 9    United States, either federal or state?

10          A.    No.

11          Q.    Are you expressing any

12    opinion or do you otherwise have a view

13    about whether any of the five approaches

14    that you describe in your report are

15    better than any of the other approaches?

16          A.    No.

17          Q.    Do you have any opinion that

18    you're offering at all about the quality

19    of any one of the five approaches that

20    you've used in your report for flagging,

21    is the term that you use, orders?

22          A.    No.

23          Q.    Are you expressing any

24    opinion that any one of these approaches
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    would be more appropriate for a

 2    particular customer or for a particular

 3    geographic location or for any other kind

 4    of particularized analysis than any of

 5    the other approaches that you've set

 6    forth in your report?

 7         A.    No.

 8         Q.    As I understand it, in

 9    applying the metrics or approaches that

10    are set forth in your report for flagging

11    orders, you do not take into account any

12    individualized characteristics of a

13    particular pharmacy or a hospital that

14    might place an order to a distributor; is

15    that correct?

16         A.    Close, but not quite.  So

17    for instance in the first methodology,

18    the first methodology includes what

19    orders that pharmacy has placed with each

20    distributor in the prior six months.  So

21    it takes into account some information

22    about that pharmacy, at least in that

23    regard.  Maybe other regards, other

24    information that it's not taking into
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   account, but it is taking into account

 2   some information about the pharmacy.

 3            Q.    Outside of order history for

 4   a particular pharmacy, do you, in

 5   applying any of the metrics or approaches

 6   described in your report, take into

 7   account any individualized

 8   characteristics of the particular

 9   pharmacies or hospitals that place orders

10   with distributors?

11            A.    Well, there's a little

12   confusion in that question, I apologize

13   for pausing so long.  But the Section 9

14   analysis is on shipments to -- I'm sorry,

15   to retail and chain pharmacies.  And it

16   excludes what is identified as a hospital

17   in the ARCOS data.  So if you take the

18   word "and hospitals" out of your

19   question, then I think I would agree with

20   the implication of your question.

21            Q.    Let me just -- with that

22   clarification, let me see if I can ask

23   that question again in a way that makes

24   it easier for you to answer, hopefully.
```

```
 1   We'll cross our fingers.  I'm able to do

 2   that.

 3             Outside of a particular

 4   pharmacy's history of ordering

 5   prescription opioid medications, do you,

 6   in applying any of the metrics or

 7   approaches that are described in your

 8   report, take into account any

 9   individualized characteristics of a

10   pharmacy that would be placing orders

11   with a distributor?

12        A.    Not other than they're a

13   retailer or chain pharmacy, no.

14        Q.    And when you add that caveat

15   about whether it's a retail or a chain

16   pharmacy, can you please describe what

17   you meant to refer to?

18        A.    Sure.  In Method 2 and

19   Method 3, the two times trailing 12-month

20   national average and three times trailing

21   12-month national average, we average

22   across similar dispensers that the

23   distributor services.  And so looking at

24   the ARCOS data or the individual
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    defendant transaction data, we are -- we

2    are recognizing that the subject pharmacy

3    is a retailer or chain pharmacy, and when

4    calculating the averages across the

5    country, when we have national data and

6    it's relevant, we only look at other

7    dispensers the distributor ships to that

8    is in that same category.

9              So the -- the category

10   matters, so that's an attribute of the

11   individual pharmacy.  And the order

12   history matters in the first approach.

13   Beyond those two ways it matters.  The

14   attributes of the individual pharmacy

15   matter.  I'm not aware of additional ways

16   it matters.

17        Q.   Okay.  Other than what you

18   just mentioned, you don't take into

19   account any individualized

20   characteristics of pharmacies who may be

21   placing orders with distributors for

22   purposes of applying the five metrics

23   or -- or methods that you set forth in

24   your report; is that fair?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yes.  At least not as I

 2    sit -- as I sit here I'm not aware of any

 3    other ways in which that applies.

 4            Q.    As part of your application

 5    of the metrics that are set forth in your

 6    report in this lawsuit, did you take into

 7    account the amount of total foot traffic,

 8    for example, that goes through a

 9    particular pharmacy?

10            A.    No, although we would have

11    if we had had that data perhaps.  There

12    are some alternatives that we can

13    imagine, but it would require data that

14    has not been produced in discovery.

15            Q.    Did you take into account

16    any information about whether or not a

17    particular pharmacy that is placing

18    orders with a distributor is located

19    proximate to a long-term care facility or

20    a major hospital?

21            A.    Not beyond the impact that

22    that might have on the order history of

23    the pharmacy.  I don't think so.

24            Q.    I'm not -- just to be clear,
```

1    I'm not asking about the order history.

2    I'm asking specifically whether or not as

3    part of your application of these methods

4    that you've described for flagging

5    orders, did you specifically take into

6    account whether or not a particular

7    pharmacy was proximate or not to a

8    long-term care facility or a major

9    hospital?

10          A.    What I meant by my answer

11   was, to the extent that a pharmacy is

12   close to a long-term care facility or

13   hospital or not, may affect its ordering.

14   I think that's the implication of your

15   question.  And so that would also impact

16   the trailing six-month baseline unless

17   it's a newly opened hospital next to the

18   pharmacy that wasn't there during the

19   first six months.

20                So other than the impact

21   that that proximity has on the order

22   history, no.

23          Q.    Okay.  So you did not

24   specifically consider, as part of your

Highly Confidential - Subject to Further Confidentiality Review

1   analysis, whether or not a particular

2   pharmacy was located near a long-term

3   care facility or a major hospital,

4   correct?

5        A.    Correct.

6        Q.    In applying any of the

7   metrics or approaches that you set forth

8   in your report, did you take into

9   account, with respect to any particular

10  pharmacy, the percentage of controlled

11  substances ordered by that pharmacy

12  relative to the pharmacy's total orders

13  of all prescription medications?

14       A.    No.  That's an example of

15  the data I was alluding to a minute ago.

16  If it were produced in discovery, it

17  might be useful, it might be interesting

18  and useful.  But my understanding is it's

19  not available.

20       Q.    Setting aside whatever

21  discovery issues and your understanding

22  of those discovery issues.  I just want

23  to be clear that you have not, as part of

24  your approach in this case, and

Highly Confidential - Subject to Further Confidentiality Review

```
 1    application of these metrics, taken that

 2    information into account, correct?

 3          A.    The information is not

 4    available to me.  If it were, as I said,

 5    it might make for some interesting

 6    analysis.  So I haven't taken into

 7    account any information that's not

 8    available to me.

 9          Q.    So that's a -- that's a no,

10    you did not take that into account,

11    right?  Let me --

12          A.    With an explanation, yes.

13          Q.    Let me -- let me clean it

14    up.  Right, I get the explanation.  So

15    that's on the record.

16                But my basic question to you

17    is, just to be clear, in applying the

18    metrics and approaches that are set forth

19    in your report for flagging orders, you

20    did not take into account with respect to

21    any individual pharmacy the percentage of

22    controlled substances ordered by that

23    pharmacy relative to the pharmacy's total

24    orders of all prescription medications,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    correct?

 2         A.    Correct.

 3         Q.    As part of your application

 4    of the approaches that are set forth in

 5    your report in this lawsuit, did you take

 6    into account specifically any changes in

 7    recommended prescribing practices in the

 8    medical community for the use of

 9    prescription opioids?

10         A.    Not except indirectly,

11    perhaps, in Section 10.

12         Q.    I just want to know

13    specifically if you, as part of your

14    application of these approaches you took

15    into account or not, any changes in

16    recommended prescribing practices for the

17    use of prescription opioid medications?

18         A.    Not directly, if by that you

19    mean on such and such a date there's a

20    change in guidance, do I, on that date,

21    change something in my analysis.  The

22    answer is no.

23              Indirectly, any changes in

24    guidance are affecting the results in 9
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    and 10 -- Section 9 and 10, but there's

2    no direct application of that

3    hypothetical change in guidance on a

4    calculation that the algorithm is run.

5         Q.    Is it fair to say that the

6    algorithm that you and your team were

7    running for purposes of applying the five

8    approaches to flagging orders did not

9    take into account -- there was nothing in

10   the algorithm that took into account any

11   changes to recommendations about

12   prescribing practices of prescription

13   opioid medications?

14        A.    I don't think that's

15   completely accurate.  I think that's --

16        Q.    And I'll pause you there.

17   And will you please explain, if you can,

18   what specifically in the actual algorithm

19   that you and your team applied, with

20   respect to any of the five approaches,

21   that directly took into account changes

22   over time in recommended prescribing

23   practices for the use of prescription

24   opioid medications?
```

```
 1          A.     Well, in Sections --

 2    algorithms or methods or Approaches 2 and

 3    3 were comparing a pharmacy's shipments

 4    to twice or three times the trailing

 5    12-month average to other pharmacies

 6    serviced by the same distributor.  And so

 7    to the extent changes in guidance affects

 8    prescribing behavior, increasing it or

 9    decreasing it, that shows up in the

10    national averages, and so has some impact

11    on Method 2 and Method 3.

12          Q.     To what extent did your

13    application of the algorithms that you

14    set forth in your report measure, if at

15    all, the impact that changes in

16    prescribing guidelines over time had on

17    the application of your approaches?

18          A.     They don't do that.

19          Q.     They don't do that?

20          A.     Correct.

21          Q.     Your algorithms are not set

22    up to measure in any way how changes in

23    prescribing guidelines affected the

24    flagged orders pursuant to the methods
```

```
 1    you're espousing in your report, fair?

 2         A.    Correct.  I don't know about

 3    espousing, but presenting.  I'm not

 4    advocating for one or the other.

 5         Q.    That's a fair clarification.

 6               There was a reference

 7    earlier today about DEA annual quotas.

 8    Do you remember a couple of questions

 9    about DEA quotas?

10         A.    Yes.

11         Q.    Are you familiar with how

12    DEA quotas for prescription opioid

13    medications are set?

14         A.    No.

15         Q.    Do you know the extent to

16    which annual quotas set by the DEA for

17    the use of prescription opioid

18    medications has varied over time?

19         A.    No.

20         Q.    Do you have any knowledge

21    about the ways in which guidelines to the

22    medical community for the appropriate use

23    of prescription opioid medications has

24    changed over time?
```

```
1          A.      No.

2          Q.      I just wanted to make sure I

3    understood this very clearly.  Are you in

4    any way relying on the opinions of, or

5    information from any consultants or

6    experts that the lawyers have retained in

7    this litigation for purposes of informing

8    your own opinions and your own report?

9          A.      No.

10         Q.      There were a couple of

11   questions earlier today about diversion.

12         A.      Yes.

13         Q.      Do you remember that?

14                 I just wanted to make sure I

15   understood, that you do not have any

16   opinions about the physical security that

17   any distributor uses or has used to

18   prevent diversion of controlled

19   substances including prescription opioid

20   medications, true?

21         A.      True.

22         Q.      And you have not identified

23   any specific instances of diversion based

24   on your review of any of the materials
```

```
 1    that you've looked at in this lawsuit,

 2    correct?

 3         A.    Correct.  I haven't made any

 4    attempt to do that.

 5         Q.    One of the things that I

 6    understand you did, pursuant to the

 7    lawyers' request, was to compare

 8    individual defendants' transactional data

 9    with the information that you saw in the

10    DEA's ARCOS database; is that right?

11         A.    Yes.

12         Q.    You tried to match it up?

13         A.    Yes.

14         Q.    And in Cardinal's case, you

15    concluded that the match had nearly

16    perfect overlap.  Do you remember writing

17    that in your report?

18         A.    With the two exceptions that

19    I identified in the report specifically

20    for Cardinal.  So maybe that wording

21    isn't particularly good, because where

22    they do not overlap is biggest for

23    Cardinal Health compared to any of the

24    other defendants.  You've got the ███████
```

1    duplicates for Cardinal Health, and then

2    you've got three weeks where there are no

3    transactions at all in Cuyahoga and

4    Summit for Cardinal Health.

5              So separating those two

6    periods, the rest of the data lines up

7    really well for Cardinal.

8         Q.    You're referring to an

9    exception in the data from March 2008?

10   Is that what you're talking about?

11        A.    That's part of it.

12        Q.    Well, you write on Page 34

13   of your report -- is that where you're

14   looking right now?

15        A.    Yes.

16        Q.    You wrote, "Virtually all of

17   the transactions in Cardinal Health's

18   data and the transactions in the ARCOS

19   data match, with the exception of

20   March 2008."

21              Do you see that?

22        A.    Yes.

23        Q.    Did I read that correctly?

24        A.    Correct.  But you have to

1   read it in the context of an earlier

2   paragraph referring to Cardinal Health.

3   You have to read the two of the

4   paragraphs together.

5        Q.    And then you say, "Otherwise

6   there was nearly perfect overlap of the

7   ARCOS data and the Cardinal Health

8   transaction data."

9             Do you see that?

10       A.    Yes, with the same

11  qualification.  You have to read an

12  earlier paragraph with this paragraph.

13  You can't read it in isolation.

14       Q.    What other paragraph are you

15  referring to?

16       A.    It's whatever paragraph

17  refers to Appendix 2.  I don't have the

18  appendix in this spiral-bound package

19  that was handed to me at the beginning.

20       Q.    Is there another paragraph

21  in your report that you think would

22  direct us to Appendix A that's relevant

23  to my question?

24       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    What paragraph in your
 2  report are you referring to?
 3        A.    I'm -- I'm looking for it.
 4  Bear with me a minute, please.
 5              So if you look at Paragraph
 6  55 on Page 20, it says, "I removed seven
 7  types of transactions from the ARCOS data
 8  before conducting further analysis."
 9              The first one there is,
10  "Obvious duplicate transactions when the
11  same transaction was reported to ARCOS
12  more than once by the same registrant."
13              And what I'm referring to
14  there is itemized in part in
15  Appendix 2 -- yeah, I'm sorry.  Yeah, you
16  can see in the next paragraph, 56, it
17  says, "Appendix 2 provides a detailed
18  explanation of these exclusions and
19  corrections."  And when you then look at
20  Appendix 2, I think the first item is
21         Cardinal Health transactions, by
22  far the biggest correction or exclusion
23  is those --
24        Q.    When you say correction or
```

1    exclusion, are you -- are you saying

2    Cardinal reported that information once

3    and then reported it to the DEA again?

4         A.    As many as 13 times, the

5    same transaction 13 times.  Or at

6    least --

7         Q.    You're not suggesting that

8    Cardinal didn't provide that information

9    to DEA, are you?

10        A.    No, I'm saying that -- that

11   it was produced -- sometimes it appears

12   that the same transaction is produced up

13   to ███ times by Cardinal Health, or at

14   least as we get the data from the DEA --

15   I made that qualification earlier.  I

16   don't know what Cardinal Health produced

17   to the DEA, submitted to the DEA through

18   ARCOS.  I know what the DEA gave me that

19   is attributed to Cardinal Health.  And

20   there is ██████ Cardinal Health

21   transactions that are reported as many as

22   ███ times, the same transaction.

23        Q.    When you say as many as ███

24   times, that -- that could be anywhere

```
 1    between one and ▮▮  Do you have an

 2    actual opinion about how many times you

 3    think it was reported?

 4          A.    Yeah, it's really

 5    interesting.  What you observe --

 6          Q.    No, I just -- I just have a

 7    specific question.  Do you know, between

 8    the number of one and ▮▮, how many times

 9    you think Cardinal Health provided that

10    information to the United States Drug

11    Enforcement Agency?

12              MR. MOUGEY:  Craig, is it

13          listed in Exhibit 2?

14              THE WITNESS:  The complete

15          explanation is not in Appendix 2,

16          but we observe --

17    BY MR. BOEHM:

18          Q.    Could -- could you answer my

19    question and then maybe we could --

20          A.    All right.

21          Q.    -- follow-up, if I have more

22    questions I need to hear about.

23          A.    Sure.  I'm trying to, but if

24    you ask it again, I'll be more succinct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Sure.  You said up to █
 2   times.  So my question to you is, do you
 3   know how many times Cardinal Health
 4   provided to the United States Drug
 5   Enforcement Agency these data that you
 6   believe may have been, although you are
 7   not certain, provided to the DEA more
 8   than one time?
 9          A.    Two parts, but the answer is
10   yes.
11          Q.    How many times?
12          A.    █████████ times.
13          Q.    Okay.  So your testimony is
14   that -- and -- and what package of data
15   are you referring to when you say that
16   Cardinal provided the same data ██
17   times?
18          A.    You're saying it differently
19   than I am.
20          Q.    I'm saying it the way I'm
21   saying it, and that's how I want you to
22   hear it and answer it.  So if you have
23   a -- maybe -- maybe Peter later can
24   clarify if he feels like he needs to.
```

```
 1              But I'm saying it my way on

 2   purpose, because that's what I'm

 3   interested in hearing about.  I don't

 4   want you to flip it from one to ███ and

 5   then ███.  Because you flipped it from up

 6   to ██ and then you said ███.  So I just

 7   want to ask it the way I'm asking it.

 8        A.   Well, the record is going to

 9   be confusing, but okay.  Ask it again and

10   I'll try to answer it the way you're

11   asking it.

12        Q.   Okay.  You say that on

13   Page 20 of your report, you make

14   reference to transactions that may have

15   been reported to the United States Drug

16   Enforcement Agency on more than one

17   occasion, right?

18        A.   No.  That's not what I'm

19   referring to.

20        Q.   Okay.  What do you mean when

21   you say duplicate transactions that are

22   reported to ARCOS?

23        A.   Not on more than one

24   occasion.  On the same day, the same
```

Highly Confidential - Subject to Further Confidentiality Review

1   transaction reported up to ▓ times --

2   exactly the same transaction reported up

3   to ▓ times in single increments.  ▓

▓   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

6            And then it jumps to being

7   in even numbers.  So ▓▓▓▓▓▓▓▓▓▓▓▓

8   ▓▓▓▓▓▓  And then it jumps to ▓▓▓

9            And that's how many times

10  the identical transaction is reported,

11  and it's from a single Cardinal Health

12  facility.

13       Q.    Is it a single transaction

14  that's being reported multiple times?

15       A.    Yes.  That's how we

16  interpret it.  And it's not happening --

17  it's not a single transaction.  It's tens

18  of thousands of transactions by this one

19  DEA number being reported up to ▓ times.

20       Q.    Do you know as you sit here

21  today whether or not whatever it is

22  you're seeing in the ARCOS database is

23  attributable to the nature of the reports

24  made by Cardinal Health as opposed to

Highly Confidential - Subject to Further Confidentiality Review

1   something on the DEA's end of storing

2   those data?

3        A.   No, I tried to make that

4   clear earlier.  I do not -- I can't

5   distinguish between those two.

6        Q.   You don't know.  But in any

7   event, you are not suggesting that with

8   respect to the transactions you're

9   referring to now that they were in some

10  way withheld from the DEA, correct?

11       A.   No.  If anything, the

12  opposite.

13       Q.   Now, going back to the

14  portion of your report where you say that

15  Cardinal's reporting had nearly perfect

16  overlap --

17       A.   Yes.

18       Q.   -- with what you found in

19  the ARCOS database.

20            You remember that, right?

21       A.   Correct.

22       Q.   And indeed, you said in your

23  report that over 99.9 percent of

24  Cardinal's transactional data was a match

Highly Confidential - Subject to Further Confidentiality Review

```
 1    with what you found in the DEA's ARCOS

 2    database.  Do you remember that?

 3           A.    I'm sorry, could you refer

 4    me to the page and paragraph, please?

 5           Q.    Sure.  Happy to.

 6                 If you look at Page 32, you

 7    have a table.  I believe it's Table 14?

 8           A.    Yes.

 9           Q.    And you have in this table

10    identified several distributors, correct?

11           A.    Correct.

12           Q.    And the first one you list

13    is Cardinal Health.

14                 Do you see that?

15           A.    Yes.

16           Q.    And in that first set of

17    columns, you've written transactions that

18    are in both datasets.

19                 Do you see that?

20           A.    Yes.

21           Q.    And I understand that to

22    mean that you're trying to calculate a

23    percentage of transactional data that

24    matches up perfectly with what you find
```

1    in ARCOS, right?

2         A.    Correct.

3         Q.    And in the case of Cardinal

4    Health, you determined that 99.9 percent

5    of the transactional data matched up

6    perfectly with what you found in ARCOS,

7    right?

8         A.    After excluding the known

9    non-overlaps, just as it says in the

10   title, that's correct.

11        Q.    Is it typical for you, when

12   you're reviewing very large datasets and

13   comparing maybe kind of corresponding

14   large datasets, to find small

15   discrepancies here and there?

16        A.    Yes.

17        Q.    Now, as I understand it, and

18   please do correct me if I've

19   misunderstood something, the ARCOS data

20   that you used for purposes of your

21   analyses as -- as set forth in your

22   report covered January 2006 through

23   December 2014; is that right?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    But you did not necessarily

 2     limit your review of the distributors'

 3     transactional data to that same period of

 4     time, right?

 5          A.    Correct.

 6          Q.    As I understand it, the

 7     period of years for the transactional

 8     data you reviewed varied distributor by

 9     distributor, right?

10          A.    Correct.

11          Q.    For some of the distributors

12     you used transactional data that went

13     many years before 2006, right?

14          A.    Yes.

15          Q.    And for some you didn't

16     review any transactional data prior to

17     2006, right?

18          A.    Correct.

19          Q.    Do you recall that for

20     Cardinal the transactional data you

21     looked at went back to 1996?

22          A.    Yes, '96 or '97.  I forget

23     as I sit here.  But back into the mid

24     1990s.
```

```
1          Q.    And, in fact, the data that

2    you looked at for Cardinal went back

3    farther in time than the data that you

4    had for any other defendant, right?

5          A.    Yes.

6          Q.    Earlier today you've given

7    testimony and it's set forth in your

8    report, that whenever one of your methods

9    flagged a transaction, then you would

10   flag every subsequent transaction from

11   that date going forward, correct?

12         A.    Yes.

13         Q.    And that flagging for

14   subsequent transactions was automatic,

15   right?

16         A.    Yes.

17         Q.    In other words, you didn't

18   do any further analysis of the subsequent

19   transactions to measure them in any way.

20   They were automatically flagged, right?

21         A.    Yes.

22         Q.    Given your use of this "flag

23   every subsequent transaction" approach,

24   the question of how far back in time
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    you're looking at a particular

2    distributor's transactional data could

3    have significant implications in terms of

4    the total numbers of orders that are

5    getting flagged under your methodologies,

6    correct?

7         A.    It's a little bit more

8    subtle than that.  But I agree with the

9    general implication, yes, that the

10   further back in time you go, if there's a

11   big increase over time in shipments,

12   you're flagging more orders for the

13   distributors that you go back further in

14   time with.

15        Q.    So if you're going back in

16   time all the way to 1996 for one

17   distributor, but you're only going back

18   in time to 2004 or 2005 or 2006 for

19   another distributor, you would expect

20   that under your approach where you're

21   flagging everything subsequent to a first

22   flagged transaction, that for the

23   distributor where you are going back

24   farther in time, under your
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    methodologies, you are going to end up

 2    flagging more transactions, right?

 3          A.    Again, it's a little bit

 4    more complicated, because it depends on

 5    the pharmacy turnover, you know, how long

 6    the relationship lasts between a

 7    distributor and a pharmacy.  And it

 8    depends on the general trend, up or down,

 9    in the data.  But in this application, I

10    think in general what you're saying is

11    correct.

12          Q.    And why is what -- to

13    anybody who may not be in the weeds of

14    this as much as we are, explain why what

15    I'm saying in general is correct?

16          A.    Well, as I've presented the

17    stylized fact, the amount of prescription

18    opioids increases significantly from 1997

19    to 2010 or '11.  We saw that in Section

20    10 of my report.

21                And if Cardinal Health, for

22    instance, and some other distributor,

23    Distributor B, both were shipping from

24    1997, but for some reason Distributor B
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    only produced data from 2002 in

 2    discovery, we would start observing

 3    Distributor B's data at a higher level

 4    than the levels we first were observing

 5    Cardinal Health's shipments.

 6              And so the Cardinal Health

 7    shipments obviously before the

 8    Distributor B's data is produced, none of

 9    those get flagged, because there is no

10    data produced by Distributor B; whereas,

11    given my stylized hypothetical, a bunch

12    of the Cardinal Health shipments may be

13    flagged.

14              And then separate and apart

15    from that, because some of these

16    thresholds, at least with respect to the

17    first -- it doesn't have any impact on

18    two, three, four or five, I don't think.

19    But with respect to the first one, the

20    relationship, the first six months for

21    Cardinal Health and a pharmacy, is at a

22    lower level.  And so more of the

23    subsequent orders get flagged.

24         Q.   So it's fair to say that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   when you're doing it in the way you did

 2   it, with the data that you had to look

 3   at, these methodologies are going to

 4   create inevitable discordance or

 5   discrepancies in terms of how they get

 6   applied to different distributors

 7   depending on how far back in time you

 8   looked at each distributor's

 9   transactional data, correct?

10        A.   Well, it may or may not.  If

11   you have a distributor that comes on

12   board shipping for the first time in 2002

13   in my example, I think it would be not a

14   data issue.  But you could imagine what

15   would be a purely data issue, one

16   defendant not -- one distributor not

17   producing earlier data would change the

18   results.  It would understate the -- at

19   least under the first methodology, the

20   number of orders that ought to be flagged

21   by -- for that distributor.

22        Q.   In your view, does the fact

23   that there are these inevitable

24   discrepancies as between application of
```

```
 1    your various approaches to different

 2    distributors represent a methodological

 3    flaw in the approach that you've

 4    undertaken?

 5         A.    No, not at all.

 6         Q.    At a minimum, your

 7    methodology results in very different

 8    application of those approaches to

 9    different distributors, depending on how

10    far back in time you look back at any

11    given distributor's transactional data,

12    correct?

13         A.    No, I don't think that's a

14    correct characterization.

15         Q.    Why not?

16         A.    Because what matter --

17         Q.    You just -- you just said

18    Mr. McCann, that if you start in 1996 and

19    you flag that first order -- let's say in

20    January of 1996, you flag an order,

21    right?  Can I create that --

22         A.    Yes.

23         Q.    -- scenario for you?

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    Under your approach, all of

2    your approaches, every subsequent order

3    is going to get flagged, right?

4          A.    Correct.

5          Q.    Okay.  And if you're

6    comparing that to a distributor where

7    you're not even looking at data until

8    2004 or 2005, you've got eight or

9    nine years where you're not even

10   performing an analysis, so there's no

11   opportunity for any of those to get

12   flagged under the very same methodology,

13   right?

14         A.    No.  You're completely

15   mischaracterizing the application.  The

16   application --

17         Q.    How would you apply --

18               MR. MOUGEY:  Paul, that's

19         the second time you've interrupted

20         him.

21               MR. BOEHM:  Okay.  No,

22         sorry.  Sure.

23               MR. MOUGEY:  I just want to

24         make sure that's the term.
```

```
 1              MR. BOEHM:  Fair.  Fair.

 2         Okay.  Go ahead.  I apologize.

 3              THE WITNESS:  If you have a

 4         defendant that only starts

 5         shipping opioids in 2002, and you

 6         have a defendant that started

 7         shipping opioids in 1997, you will

 8         get different results because you

 9         have a different threshold for

10         that defendant that starts

11         shipping later.  In some sense --

12    BY MR. BOEHM:

13         Q.   But I'm not asking -- just

14    to be clear, my question wasn't about

15    when the shipping begins.

16         A.   But in your question you're

17    assuming that I have data that I'm not

18    looking at.  You keep saying --

19         Q.   I'm not assuming that at

20    all.  So let me back up and explain that

21    to you because if that's -- that may be

22    our point of confusion.

23              I'm not asking you to talk

24    one way or another about, you know, what
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    you personally have access to.  I'm just

2    asking you about the actual application,

3    like the actual nuts and bolts.  You

4    talked about you being a computer.  So

5    I'm talking about the technical

6    application, based on whatever you have

7    or you don't have.

8              You are going to have a

9    discrepancy when you have eight or nine

10   more years of data for one distributor

11   versus another distributor where you

12   don't have those same years of data, for

13   whatever reason or you haven't looked at

14   it or you don't have it, whatever the

15   reason is, you haven't looked at it,

16   there is a difference, right?

17              MR. MOUGEY:  Objection.

18              THE WITNESS:  That's a

19         difference in the data.  In your

20         example, there's eight or

21         nine years of data for the

22         defendant that there isn't for the

23         other.  And so you apply the same

24         algorithm to those two datasets,
```

1        you get different results because

2        it's different data.  Not because

3        there's a discordance or an

4        inconsistency.  I don't

5        understand.

6    BY MR. BOEHM:

7        Q.    Well, you get different data

8    because you're looking at some of the

9    data, and either because you don't have

10   it or you chose not to, whatever the

11   reason, you're not looking at data for

12   another distributor, right?  So there's

13   naturally going to be a difference when

14   you are using a carry-it-forward flagging

15   approach, correct?

16           MR. MOUGEY:  Objection.

17           THE WITNESS:  You just snuck

18       back -- I didn't mean that as a

19       pejorative.  But you've just

20       brought in -- back into your

21       question that there's data or

22       there may be data that I don't

23       have or that I'm not looking at.

24           What I'm saying is if you

Highly Confidential - Subject to Further Confidentiality Review

```
 1          apply this methodology to data

 2          from 1997 forward and compare that

 3          to exactly the same defendant but

 4          only apply it from 2004 forward,

 5          you get different results, of

 6          course, because you're applying it

 7          to different data.

 8   BY MR. BOEHM:

 9          Q.    Right.  And there's more

10   opportunity for you to flag more orders

11   earlier on --

12              (Telephonic interruption.)

13   BY MR. BOEHM:

14          Q.    -- because of the assumption

15   that you've made -- actually, it's an

16   instruction that you received from

17   plaintiffs' lawyers, to assume that every

18   subsequent order ought to be flagged as

19   well, right?

20          A.    No.  I wouldn't say that

21   it's more opportunity to flag orders.

22              There's just more orders.

23   There's more data in your hypothetical.

24   You've got five or six more years of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   data.  And since the orders get flagged

 2   in some sense earlier rather than later,

 3   you -- you are picking up years of data

 4   that are being flagged, especially --

 5   partly because the trend is up.

 6               If the trend was down in

 7   opioid consumption, what we are talking

 8   about wouldn't occur at all.  It's the

 9   fact that there's a significant upward

10   trend in Cardinal Health's data and other

11   firm's data that is creating that result.

12        Q.    If you were to mis-identify

13   or mistakenly flag an order or a

14   transaction earlier in time, the

15   implications of that mistake would be

16   even greater under your methodology

17   because every subsequent order also gets

18   flagged, fair?

19               MR. MOUGEY:  Objection.

20               THE WITNESS:  I don't

21         understand that question.  If you

22         can --

23   BY MR. BOEHM:

24        Q.    Sure.  Let me say it again.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     If you don't understand, I'm happy to say

2     it again.

3                 If you mis-identify or

4     mistakenly flag a transaction earlier in

5     time, that has greater implications for

6     more error because of the subsequent

7     flagging that automatically takes place

8     under your methodologies, correct?

9                 MR. MOUGEY:  Objection.

10                THE WITNESS:  Greater than

11        what?  The sentence is --

12    BY MR. BOEHM:

13        Q.    Greater than later.  Greater

14    than later in time.

15                The earlier you make a

16    mistake, the bigger the implications in

17    terms of that error spreading throughout

18    your analysis, right?

19        A.    Maybe, maybe not.  I'd have

20    to think about it.

21        Q.    Well, when you identify an

22    order as flagged under your methodology,

23    would it be fair to say it's like you're

24    knocking over a domino, and every domino
```

Highly Confidential - Subject to Further Confidentiality Review

1    that follows along that chain gets

2    flagged, right?

3         A.    Correct.

4         Q.    So if you knock it over at

5    the very beginning, you are going to

6    knock over more dominoes than if you walk

7    up to the middle of the domino row and

8    knock it over from there, right?

9         A.    Well, I like the analogy.  I

10   just have to think through it a little

11   bit to see if it -- if it applies

12   precisely.  But in general, I think what

13   you're saying is correct.

14        Q.    So if you make a mistake

15   early on and knock over that domino, you

16   are going to mistakenly knock over more

17   dominoes that you didn't mean to knock

18   over, right?

19        A.    I'm not sure that you are

20   correct in -- in all instances.  I'd have

21   to think through it a little bit more.

22             But in general I agree that

23   the earlier the data you have, whenever

24   you first trigger, flag an order, you are

Highly Confidential - Subject to Further Confidentiality Review

```
 1    going to be flagging more orders than if

 2    you had data that started later.  And if

 3    it turned out that there was some

 4    disagreement about, for instance, whether

 5    that order should have been flagged or

 6    maybe was cleared as a result of some due

 7    diligence, the fact that you are assuming

 8    no due diligence with data that goes back

 9    earlier would have a bigger impact maybe,

10    maybe, maybe not, but maybe, than if the

11    data started a few years later.

12         Q.    Starting on Page 72 of your

13    report you apply an approach that you

14    referred to as the "maximum daily dosage

15    units approach."  Do you remember that?

16         A.    Yes.

17         Q.    Did you come up with that

18    name, or was that something that the

19    lawyers or your staff came up with?

20         A.    I came up with it.

21         Q.    Okay.  How did you arrive at

22    that name?

23         A.    Well, I thought it was an

24    accurate description of the source
```

 1   document, and separate and apart from

 2   whether it's the -- accurate description

 3   of the source document, it's an accurate

 4   description of the approach, of the

 5   algorithm.

 6              What I was trying, with the

 7   names that I put on each of these five,

 8   is to accurately describe in shorthand,

 9   anyway, what the approach was, to have

10   the title be descriptive of what we're

11   actually implementing.  And what we're

12   implementing here is a maximum daily

13   threshold in dosage units.  And that's

14   why I call it maximum daily dosage units.

15        Q.    Okay.  Well, you kind of

16   talked about two things.  You first

17   talked about the source document, and

18   then you talked about your approach.

19   Let's see if we can break those up into

20   two separate conversations.  Does that

21   work?

22        A.    Sure.

23        Q.    Okay.  I think earlier today

24   you referred to the -- the -- what you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    just now called a source document for

 2    this approach as a two-page document.  Do

 3    you remember that?

 4         A.    Yes.

 5         Q.    And I think what you meant

 6    by that is that the lawyers who hired you

 7    for this case only gave you two pages to

 8    look at for purposes of this methodology;

 9    is that right?

10         A.    No.  I meant it as I said

11    it.  I don't know whether I received more

12    than two pages or exactly two pages.

13         Q.    Why did you call it a

14    two-page document?

15         A.    Because that's how I

16    visualize it.  That's how I recall seeing

17    it.

18         Q.    You don't recall seeing

19    anything more than two pages?

20         A.    Not in connection with that

21    document, no.

22              (Document marked for

23              identification as Exhibit

24              McCann-10.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOEHM:

 2          Q.    I've marked a document that

 3    I'm handing you as Exhibit 10 for

 4    purposes of your deposition.  It's, I

 5    think, Exhibit P to your report if I

 6    understand the markings on this page

 7    correctly.

 8                Do you see that?

 9          A.    Yes.

10          Q.    Is Exhibit P the two-page

11    document that you referred to earlier

12    today in connection with the so-called

13    maximum daily dosage units approach?

14          A.    Yes.

15          Q.    You said you called it the

16    maximum daily dosage units approach based

17    on something that you saw in the

18    document, these two pages, right?

19                MR. MOUGEY:  Objection.

20                THE WITNESS:  Well, no, I

21          think what I said was that, as I

22          was answering your question, I

23          first said it was something I saw

24          on the document, or rather it is a
```

```
1              description of the algorithm that

2              I implemented.  And what I

3              implemented was a maximum daily

4              dosage unit threshold.

5    BY MR. BOEHM:

6         Q.    Okay.  My colleagues have

7    corrected me.  So let me just for the

8    record say that Exhibit P is on -- as

9    printed on the document is on the

10   original.  Y'all didn't have that?

11        A.    Yeah, I was going to say I

12   don't recall attaching it as Exhibit P.

13   I referenced it in a footnote, but I

14   don't recall attaching it.

15        Q.    Yeah, that's what --

16   correct.  You got it right.  I apologize

17   for that.  It's a reference in

18   Footnote 55 of your report by Bates

19   number.

20        A.    Yes.

21        Q.    Are these the two pages,

22   that are now marked as Exhibit 10, are

23   these the two pages that you had in mind?

24        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Is there anything from the

 2   document itself that informed your

 3   decision to refer to this approach as the

 4   maximum daily dosage units approach?

 5                 I guess another way, what

 6   I'm really asking you is, do you know how

 7   this document was actually understood and

 8   used during the time that it was in

 9   effect at Cardinal Health?

10          A.     No.

11          Q.     Do you have any knowledge

12   about whether or not the way you have

13   applied what you call the maximum daily

14   dosage unit approach, how that compares

15   to what Cardinal was or has done in terms

16   of flagging potentially suspicious

17   orders?

18          A.     No.

19          Q.     And you don't know how this

20   document which is now marked as

21   Exhibit 10 relates to Cardinal Health's

22   actual efforts to flag transactions,

23   right?

24          A.     Correct.
```

```
 1          Q.    Do you know when this

 2   document was created?

 3          A.    No.

 4          Q.    Do you know the period of

 5   time when the guidance in this document

 6   was in effect at Cardinal?

 7          A.    No.

 8          Q.    Do you know what the term

 9   "dosage limit" was understood to mean at

10   Cardinal in the context of this document?

11          A.    No.

12          Q.    Do you know how the term

13   "dosage limit" as used in this document

14   was implemented in terms of actual

15   calculations?

16          A.    No.

17          Q.    So was it the plaintiffs'

18   lawyers who told you how to kind of

19   define the parameters of the maximum

20   daily dosage units approach?

21          A.    Well, not precisely, but yes

22   in general terms, what I was asked to do

23   was implement an approach based on the

24   number of dosage units in the column
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    under retail on this exhibit for the

 2    drugs that are listed here.

 3         Q.    And when you say you were

 4    asked to do that, you mean you were asked

 5    by the lawyers who hired you?

 6         A.    Correct.

 7         Q.    In response to some

 8    questioning earlier today you made a

 9    reference to what I think you called the

10    flexibility of the model.  Do you

11    remember that?

12         A.    Yes.

13         Q.    And I think what you meant

14    is that it would be possible for you to

15    make different assumptions than you

16    actually do in the way you've implemented

17    these five approaches.  Is that fair?

18         A.    Yes.

19         Q.    Okay.  And you're not

20    vouching in any way for the accuracy of

21    your assumptions; you're just

22    implementing them like a calculator

23    would, right?

24         A.    I don't judge assumptions
```

Highly Confidential - Subject to Further Confidentiality Review

1    based on whether they are accurate or

2    not.  The question is whether they're

3    useful or not.  But I'm not -- I'm not

4    opining on the assumptions.  I'm just

5    implementing the assumptions.

6          Q.    You are not vouching in any

7    way for the accuracy of the assumptions

8    that you're making for the purposes of

9    your five approaches, right?

10         A.    Correct.

11         Q.    And your calculations in

12   this lawsuit as set forth in your report,

13   do not actually involve any application

14   of alternative sets of assumptions,

15   correct?

16         A.    Except across the

17   applications -- across the approaches,

18   no.  Maybe I misunderstood.  It might be

19   getting a little late.

20         Q.    Well, it's possible that I

21   flubbed the question too.

22               You said that it would be

23   possible for you to make different

24   assumptions, right?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes.

2          Q.    And that's what you meant by

3    flexibility.  But your computations and

4    calculations and analyses in this case as

5    set forth in your opinions and report

6    don't actually involve any alternative

7    assumptions, right?

8          A.    Except across the -- across

9    the approaches.

10         Q.    Just -- just tell me what

11   you mean by across the approaches.

12         A.    Well, I've got five

13   approaches here we've been talking about.

14   And each of them applies a different set

15   of rules to flagging orders.

16         Q.    Oh, yeah.  There are

17   differences between the five approaches.

18         A.    That's what I meant.

19         Q.    I get that there are

20   differences between the five approaches.

21   But my question to you is, even though

22   you could make assumptions other than the

23   ones that you actually are making for

24   purposes of these five approaches, none
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of your analyses or calculations or

 2    conclusions actually apply alternative

 3    sets of assumptions that are not captured

 4    by your report, right?

 5            A.    Correct.

 6                  MR. BOEHM:  Let's go off the

 7         record for a moment.

 8                  THE VIDEOGRAPHER:  Off the

 9         record at 6:28 p.m.

10                  (Excused.)

11                  (Adjourned at approximately

12         6:28 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2                      CERTIFICATE
 3
 4
 5            I HEREBY CERTIFY that the
       witness was duly sworn by me and that the
 6     deposition is a true record of the
       testimony given by the witness.
 7
             It was requested before
 8     completion of the deposition that the
       witness, CRAIG J. McCANN, Ph.D., CFA,
 9     have the opportunity to read and sign the
       deposition transcript.
10
11
12     _____
       MICHELLE L. GRAY,
13     A Registered Professional
       Reporter, Certified Shorthand
14     Reporter, Certified Realtime
       Reporter and Notary Public
15     Dated:  May 9, 2019
16
17
18            (The foregoing certification
19     of this transcript does not apply to any
20     reproduction of the same by any means,
21     unless under the direct control and/or
22     supervision of the certifying reporter.)
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                INSTRUCTIONS TO WITNESS

 2

 3               Please read your deposition

 4    over carefully and make any necessary

 5    corrections.  You should state the reason

 6    in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8               After doing so, please sign

 9    the errata sheet and date it.

10               You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14               It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1          -   -   -   -   -   -

                E R R A T A

2          -   -   -   -   -   -

3

4    PAGE   LINE   CHANGE

5    _____  _____  _____

6       REASON:   _____

7    _____  _____  _____

8       REASON:   _____

9    _____  _____  _____

10      REASON:   _____

11   _____  _____  _____

12      REASON:   _____

13   _____  _____  _____

14      REASON:   _____

15   _____  _____  _____

16      REASON:   _____

17   _____  _____  _____

18      REASON:   _____

19   _____  _____  _____

20      REASON:   _____

21   _____  _____  _____

22      REASON:   _____

23   _____  _____  _____

24      REASON:   _____

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3
 4              I,_____, do
 5    hereby certify that I have read the
 6    foregoing pages, 1 - 383, and that the
 7    same is a correct transcription of the
 8    answers given by me to the questions
 9    therein propounded, except for the
10    corrections or changes in form or
11    substance, if any, noted in the attached
12    Errata Sheet.
13
14
15    _____
16     CRAIG J. McCANN, Ph.D., CFA        DATE
17
18
19    Subscribed and sworn
      to before me this
20    _____ day of _____, 20____.
21    My commission expires:_____
22
      _____
23    Notary Public
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    LAWYER'S NOTES

 2    PAGE   LINE

 3    _____  _____   _____

 4    _____  _____   _____

 5    _____  _____   _____

 6    _____  _____   _____

 7    _____  _____   _____

 8    _____  _____   _____

 9    _____  _____   _____

10    _____  _____   _____

11    _____  _____   _____

12    _____  _____   _____

13    _____  _____   _____

14    _____  _____   _____

15    _____  _____   _____

16    _____  _____   _____

17    _____  _____   _____

18    _____  _____   _____

19    _____  _____   _____

20    _____  _____   _____

21    _____  _____   _____

22    _____  _____   _____

23    _____  _____   _____

24    _____  _____   _____
```