1

```
 1               IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION

 3   IN RE:  NATIONAL      :  MDL No. 2804
     PRESCRIPTION OPIATE   :
 4   LITIGATION            :  Case No. 17-md-2804
                           :
 5   APPLIES TO ALL CASES  :  Hon. Dan A. Polster
                           :
 6                         :

 7

 8                    HIGHLY CONFIDENTIAL

 9        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                      - - - -

12                    JANUARY 25, 2019

13                      - - - -

14    VIDEOTAPED DEPOSITION OF ROBERT A. MCCLUNE,

15   taken pursuant to notice, was held at Marcus &

16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17   Pennsylvania 15219, by and before Ann Medis,

18   Registered Professional Reporter and Notary Public in

19   and for the Commonwealth of Pennsylvania, on Friday,

20   January 25, 2019, commencing at 9:11 a.m.

21                      - - - -

22             GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
23                  deps@golkow.com

24

25
```

2

1                    A P P E A R A N C E S

2    On behalf of Plaintiffs

3            WAGSTAFF & CARTMELL, LLP
             BY:  ERIC D. BARTON, ESQUIRE
4            AND  BRITT WICKLUND, ESQUIRE
             4740 Grand Avenue, Suite 300
5            Kansas City, Missouri  64112
             816.701.1100
6            ebarton@wcllp.com
             bwicklund@wcllp.com
7

8    On behalf of Defendant AmerisourceBergen Drug
     Corporation
9
             (By Phone/Livestream)
10           JACKSON KELLY, LLP
             BY:  ANDREW N. SCHOCK ESQUIRE
11           50 South Main Street, Suite 201
             Akron, Ohio  44308
12           330.252.9078
             anschock@jacksonkelly.com
13

14   On behalf of Defendant Cardinal Health, Inc.

15           PIETRAGALLO GORDON ALFANO BOSICK &
             RASPANTI, LLP
16           BY:  JOHN A. SCHWAB, ESQUIRE
             One Oxford Centre, 38th Floor
17           301 Grant Street
             Pittsburgh, Pennsylvania  15219
18           412.263.2000
             jas@pietragallo.com
19

20   On behalf of Defendants Endo Pharmaceuticals, Endo
     Health Solutions and Par Pharmaceuticals
21
             (By Phone/Livestream)
22           ARNOLD & PORTER KAYE SCHOLER LLP
             BY:  DAVID KOUBA, ESQUIRE
23           601 Massachusetts Avenue, NW
             Washington, DC  20001-37453
24           202.942.5743
             david.kouba@arnoldporter.com
25

3

1                A P P E A R A N C E S (Continued)

2    On behalf of Defendant HBC Service Company

3                MARCUS & SHAPIRA, LLP
                 BY:  JOSHUA A. KOBRIN, ESQUIRE
4                AND  ROBERT M. BARNES, ESQUIRE
                 One Oxford Centre, 35th Floor
5                Pittsburgh, Pennsylvania  15219
                 412.471.3490
6                jkobrin@marcus-shapira.com
                 rbarnes@marcus-shapira.com
7

8    On behalf of Defendant McKesson Corporation

9                COVINGTON & BURLING, LLP
                 BY:  RAJ PAUL, ESQUIRE
10               One CityCenter
                 850 Tenth Street, NW
11               Washington, DC  20001-4956
                 202.662.5807
12               rpaul@cov.com

13

     On behalf of Defendant Walmart
14
                 (By Phone/Livestream)
15               JONES DAY
                 BY:  ALEXANDRA J. WOLTER, ESQUIRE
16               555 South Flower Street
                 Fiftieth Floor
17               Los Angeles, California  90071
                 213.243.2651
18               awolter@jonesday.com

19
     Also present
20
                 Kevin Frank, legal videographer
21

22

23

24

25

4

```
 1                    * I N D E X *

 2   ROBERT A. MCCLUNE                           PAGE

 3     EXAMINATION BY MR. BARTON            7, 223
       EXAMINATION BY MS. WICKLUND             209
 4     EXAMINATION BY MR. KOBRIN               219

 5          * INDEX OF HBC-MCCLUNE EXHIBITS *

 6   NO.                DESCRIPTION            PAGE
     Exhibit 1   Robert McClune's LinkedIn profile   16
 7
     Exhibit 2   Giant Eagle Pharmacy Administration  78
 8               as of August 2015 org chart
                 HBC_MDL00002191
 9
     Exhibit 3   Invitation to the presentation of   80
10               Giant Eagle Pharmacy Year 2015 AOP/
                 Business Plan, 6/24/14
11               HBC_MDL00034114 - 00034149

12   Exhibit 4   Email chain, 8/28/14, from J. Fogt   99
                 to K. Remas, subject: RE: VAWD
13               Information still needed, attaching
                 Prasco VAWD documents
14               HBC_MDL00128238 - 00128260

15   Exhibit 5   Suspicious Order Monitoring Summary  105
                 HBC_MDL00132616
16
     Exhibit 6   Email chain, 8/12/15, from D.        145
17               Bertucci to A. Zakin, et al.,
                 subject: VAWD Physical Inspection
18               Preparation, attaching VAWD Survey
                 Process Guide
19               HBC_MDL00076207 - 00076218

20   Exhibit 7   Email chain, 8/20/15, from G.        149
                 Carlson to J. Jenson, et al.,
21               subject: FW: Thrifty White Notes
                 HBC_MDL00069566 - 00069571
22

23

24

25
```

```
 1       * INDEX OF HBC-MCCLUNE EXHIBITS (Continued) *

 2    NO.                 DESCRIPTION              PAGE
      Exhibit 8    Email, 8/28/15, from J. Millward to  158
 3                 E. Hart, et al., subject: 30-010 -
                   Inventory Control - Suspicious Order
 4                 Policy FINAL.docx, attaching 30-010 -
                   Inventory Control - Suspicious Order
 5                 Policy FINAL.docx
                   HBC_MDL00169475 - 00169477
 6
      Exhibit 9    Email chain, 8/28/15, from R.        163
 7                 McClune to J. Millward, et al.,
                   subject: RE: 30-010 - Inventory
 8                 Control - Suspicious Order Policy
                   FINAL.docx
 9                 HBC_MDL00169466

10    Exhibit 10   Email chain, 9/2/15, from E. Hart    167
                   to R. McClune, subject: RE Vault/
11                 Refrigeration
                   HBC_MDL00127457 - 00127460
12
      Exhibit 11   Email chain, 8/31/15, from R.        172
13                 McClune to P. Raub, et al., subject:
                   FW: Thank you, attaching Thrifty
14                 White policies and procedures
                   HBC_MDL00055709 - 00055788
15
      Exhibit 12   Email, 9/16/15, from R. McClune to   176
16                 G. Chunderlik, et al., subject:
                   Thrifty White Controlled Substance
17                 Policies, attaching subject document
                   HBC_MDL00042149 - 0004226
18
      Exhibit 13   Email chain, 10/8/15, from R.        182
19                 McClune to G. Chunderlik, subject:
                   FW: Consultant Retained by MNK for
20                 SOM and Other Matters: BuzzeoPDMA,
                   attaching various BuzzeoPDMA
21                 documents
                   HBC_MDL00028251 - 00028272
22
      Exhibit 14   Email, 12/3/15, from J. Millward     183
23                 to G. Chunderlik, et al., subject:
                   Order Monitoring System Policy and
24                 Procedures.docx, attaching subject
                   document
25                 HBC_MDL00056199 - 00056203
```

6

```
 1       * INDEX OF HBC-MCCLUNE EXHIBITS (Continued) *

 2    NO.                   DESCRIPTION              PAGE
      Exhibit 15   Email, 9/28/15, from R. McClune to   188
 3                 J. Millward, et al., subject:
                   Control Blocking Policy and Procedure
 4                 HBC_MDL00005466 - 00005467

 5    Exhibit 16   Email, 11/21/16, from P. Raub to     200
                   M. Doerr, et al., subject: RE:
 6                 Suspicious Order Monitoring (SOM)
                   HBC-MDL00046220 - 00046228
 7
      Exhibit 17   Email chain, 10/8/15, from G.        210
 8                 Carlson to R. McClune, subject: FW:
                   Giant Eagle First Amendment,
 9                 attaching First Amendment to
                   Services Agreement
10                 HBC_MDL00035614 - 00035624

11    Exhibit 18   Giant Eagle First Amendment to       216
                   Services Agreement
12                 HBC_MDL00132477 - 00132479

13                          - - - -

14

15

16

17

18

19

20

21

22

23

24

25
```

7

```
 1              P R O C E E D I N G S

 2                    - - - -

 3         THE VIDEOGRAPHER:  We are now on the

 4    record.  Today's date is January 25, 2019, and the

 5    time is approximately 9:11 a.m.

 6       This is the videotaped deposition of Robert

 7    McClune in the National Prescription Opiate

 8    Litigation.

 9       All counsel and parties present will be noted

10    on the stenographic record.

11       Will the court reporter please swear in the

12    witness.

13                ROBERT A. MCCLUNE,

14      having been first duly sworn, was examined

15             and testified as follows:

16                   EXAMINATION

17    BY MR. BARTON:

18       Q.   Mr. McClune, my name is Eric Barton.

19    I'm here from Wagstaff & Cartmell in Kansas City.

20    We met just before the deposition; correct?

21       A.   Correct.

22       Q.   Would you go ahead and -- just a

23    formality -- but state your full name for the

24    record again, please.

25       A.   Sure.  It's Robert Anthony McClune.
```

8

1      Q.   Thank you.  I'm going to have a number

2   of questions for you today.

3         You understand you're here to have your

4   deposition taken in a case that is pending in the

5   Northern District of Ohio by plaintiffs, cities,

6   and counties, against a number of companies,

7   including HBC, arising out of the opioid epidemic?

8      A.   Yes.

9      Q.   You understand that's why you're here

10  today?

11     A.   Yes.

12     Q.   Have you ever had your deposition taken

13  before?

14     A.   I've had a deposition before, yes.

15     Q.   And when was -- when was that?

16     A.   Last deposition, two years ago, roughly.

17     Q.   Okay.

18     A.   Not for this case.

19     Q.   So you've been deposed more than one

20  time?

21     A.   I had one formal.  The other one, I

22  don't think it would count as a deposition.  So

23  just one; just one.

24     Q.   And how about testifying in trials?

25  Have you ever actually testified in a courtroom,

9

```
 1    in a trial, for any reason?
 2         A.   No.
 3         Q.   The deposition, if you don't mind me
 4    asking, I don't need you to get into real details
 5    of it, but what was the nature of the case in
 6    which you have previously given a deposition?
 7         A.   It was an antitrust case.
 8         Q.   And you say that was about two years
 9    ago?
10         A.   Yes.
11         Q.   Do you know what court that case was
12    pending in?
13         A.   I do not.
14         Q.   Were you deposed as an employee or
15    representative of Giant Eagle?
16         A.   Yes.
17         Q.   Were you represented at that deposition
18    by this same law firm, Marcus & Shapira?
19         A.   Yes.
20         Q.   Do you remember any of the parties
21    involved in that case other than Giant Eagle?
22         Do you remember the names of anyone else
23    involved?  The defendants?
24         A.   By "defendants," you mean the
25    manufacturers that would be associated in the
```

1   case?

2        Q.   I guess, yes, if there were

3   manufacturers involved, yes.

4        A.   AbbVie and Teva Pharmaceuticals.

5        Q.   So it was an antitrust case involving

6   pharmaceuticals?

7        A.   Yes.

8        Q.   So you've been through this process

9   before, so we don't have to belabor too much of

10  the rules of the road.  But let me just ask you a

11  few, again, just to make sure we have the same

12  understanding.

13       You do understand you are under oath today,

14  just as if you were testifying in a courtroom at

15  trial; correct?

16       A.   Yes.

17       Q.   And you understand that this deposition

18  is being videotaped in the event that there may be

19  a trial, and you may not be required to appear

20  personally at that trial, but your testimony today

21  could be used as some of the testimony to be

22  played at that trial?

23       A.   Yes.

24       Q.   If today I ask you a question that you

25  don't understand, would you please feel free to

1     tell me so and I will phrase it?

2          A.   Yes.  No problem.

3          Q.   And as we get going, if you fail to give

4     like an audible answer, a "yes" or a "no," and

5     instead just nod your head or say "uh-huh," I

6     might ask for a clarification for the sake of our

7     written record.

8          Is that okay?

9          A.   Yes.  I'll do my best.

10         Q.   Generally, and I'm not asking you to

11    reveal any, you know, actual communications,

12    conversations that you've had with your lawyers

13    here today, but what did you do generally to

14    prepare for this deposition today?

15         A.   I've worked for Giant Eagle for ten

16    years and in preparation for this case reviewed

17    relevant case materials that would possibly come

18    up as part of this deposition.

19         Q.   And case materials, for example -- I'll

20    just ask you a few specifics just to see.

21         Did you review any of the actual what we call

22    pleadings, the complaint, what the case alleges,

23    or any of those types of documents that have been

24    filed in court?

25              MR. KOBRIN:  I'm going to object.  I

1    mean, I'm okay with you asking him -- objection.

2        I'm okay with you asking him about whether he

3    looked at documents, but I don't want you doing a

4    line of inquiry that's going to essentially reveal

5    whatever we showed him, because I think that's

6    work product.

7             MR. BARTON:  That's fine.  I think we

8    can just take that as it goes, but I'm only asking

9    just a general sense of what he looked at.

10       I'm not going to try to have him tell me

11   every single document --

12            MR. KOBRIN:  Yeah.  If you're trying to

13   narrow it down by asking the areas of documents

14   and the types of documents, I think that would be

15   inappropriate.

16            MR. BARTON:  I think I'm keeping it to

17   categories is my goal.

18   BY MR. BARTON:

19       Q.   But just categorically, did you review

20   any of the pleadings in the case?

21       A.   Early on, yes.

22       Q.   And I assume you might have gone back

23   and looked at emails that you were involved in,

24   you know, that may have pertained to the time

25   period relevant to the case?

13

```
 1              MR. KOBRIN:  Object to form.

 2              THE WITNESS:  Yes.

 3    BY MR. BARTON:

 4         Q.   Have you, other than -- well, I assume

 5    you met with your attorneys to prepare for the

 6    deposition before today?

 7         A.   Yes.

 8         Q.   About how long did you spend preparing

 9    with them?

10         A.   Since HBC was added to the case.

11              MR. KOBRIN:  Do you mean in general or

12    yesterday?

13              MR. BARTON:  I guess all total.

14    BY MR. BARTON:

15         Q.   You met maybe perhaps more than one time

16    with counsel to prepare for the deposition?

17              MR. KOBRIN:  To prepare for the

18    deposition.

19              THE WITNESS:  I met yesterday to prepare

20    for the deposition eight to ten hours.

21    BY MR. BARTON:

22         Q.   Other than meeting with counsel, have

23    you spoken with others to help you prepare for the

24    deposition?  "Others" meaning other employees of

25    Giant Eagle first.
```

14

```
 1        A.   Yes.  We've spoken about the case.

 2        Q.   Other people have been deposed.  And so

 3   maybe you've spoken with others who had their

 4   depositions taken.

 5            MR. KOBRIN:  You're talking about just

 6   in preparation for the deposition?

 7            MR. BARTON:  Correct.

 8            THE WITNESS:  Yes.

 9   BY MR. BARTON:

10        Q.   Who have you spoken to just in

11   preparation for this deposition in terms of other

12   employees at Giant Eagle?

13        A.   Can you restate that question.

14        Q.   Yeah.  What other employees of Giant

15   Eagle have you spoken to in preparation for your

16   deposition today?

17        A.   George Chunderlik, Jim Tsipakis, Mike

18   Bianco, Fred Bencivengo.  Just others that would

19   be involved with this case.

20        Q.   In terms of any of those conversations

21   you've had with them that have not been in the

22   presence of counsel, that have not been during a,

23   you know, prep session at which counsel was

24   present, have you had those conversations just in

25   the hallway?
```

1            MR. KOBRIN:  I object to that.  I don't

2    want him to get the impression that just because

3    counsel was not present in person during

4    conversations where he's preparing for his

5    deposition that it's not privileged.

6        If it was at the direction of counsel or we

7    were involved in any way, I think that's still

8    privileged.  So I still don't want him getting

9    into the nature of those preparatory

10   conversations.

11           MR. BARTON:  Okay.

12   BY MR. BARTON:

13       Q.   I don't want you to reveal anything that

14   you may have talked about with George Chunderlik

15   or Mike Bianco that is advice or communications

16   you've had with counsel, relaying to each other

17   things that you've spoken about with counsel.  I'm

18   putting that aside.

19       I'm just getting a sense for what subjects

20   have you talked with them about in preparation for

21   your deposition.

22       A.   Most of our conversations were with

23   counsel present, not to say there haven't been

24   cases where there haven't been.  Most of it was

25   just rehashing --

1           MR. KOBRIN:  Don't get into the content

2     of the conversation.  Just the fact that we were

3     present means it's privileged.

4           MR. BARTON:  Well, I think the subjects

5     are okay, just subject matter.

6           MR. KOBRIN:  No.  I'd rather he not talk

7     about subject matter.  I think that's work product

8     and confidential privileged communications.

9           MR. BARTON:  Well, we'll move on.  I

10    disagree, but we'll move on from that right now.

11    BY MR. BARTON:

12        Q.   So other than other employees of Giant

13    Eagle, is there anyone else who you may have

14    spoken with in preparation for the deposition?

15        A.   No.

16            (HBC-McClune Exhibit 1 was marked.)

17    BY MR. BARTON:

18        Q.   I'm going to hand you what we've marked

19    as Exhibit 1.  It's P-GEN 128.

20        I'll represent to you that we have, I

21    believe, printed this from LinkedIn.  And it

22    appears to be a profile that you can download in

23    PDF from LinkedIn that summarizes your work and

24    educational background.

25        Is that true?

1        A.    Yes.  Based on my review, it does look

2    like it came from LinkedIn.

3        Q.    And what is LinkedIn?

4             MR. KOBRIN:  Object to form.

5             THE WITNESS:  An online social media

6    site more for business networking.

7    BY MR. BARTON:

8        Q.    You're familiar with LinkedIn as a

9    social media platform, whatever it is?

10        A.    Yes.

11        Q.    Is this Exhibit 1 content that you

12    provided to LinkedIn to create or maintain your

13    profile on LinkedIn?

14        A.    I've not read this document verbatim,

15    but it does appear to be information that I

16    updated online and posted.

17        Q.    And that's my question.  At some point

18    in time, this is content that you likely provided

19    as opposed to somebody -- some other third party

20    providing content?

21        A.    Yes.  That's correct.

22        Q.    Well, I just want to walk through some

23    of the history here, your employment background,

24    educational background, starting with -- I noted

25    that you graduated from Beaver Area Senior High

18

1    School in 1997; correct?

2        A.   That is correct.

3        Q.   Beaver, Pennsylvania, kind of between

4    here and Youngstown?

5        A.   That's correct.

6        Q.   And those are the Beaver Bobcats?

7        A.   That's also correct.

8        Q.   And I wonder why they weren't called the

9    Beaver Beavers.

10       A.   Yeah.  It's a good question.  I think

11   there are other neighboring schools that use that

12   as a mascot.

13       Q.   At Penn State, you list a bachelor of

14   science, but what did you get your degree in?

15       A.   My undergrad is in advertising.

16       Q.   Did you have any computer or information

17   systems kind of coursework or studies in college?

18       A.   Yes.  A lot of my coursework was built

19   around analytics, advertising analytics.

20       Q.   So that was part of your advertising

21   degree, I guess?

22       A.   Yes.

23       Q.   Have you taken any graduate school of

24   any kind?

25       A.   I took one postgrad programming class at

19

1    Penn State.  I don't have it listed on there.

2         Q.    And was that programming in any, you

3    know, kind of particular language or --

4         A.    SQL.

5         Q.    And SQL, is that -- I won't be very

6    precise in some of the technical questions.  But

7    is that kind of a database language --

8         A.    Yes.

9         Q.    -- for lack of a better word?

10        A.    Standard query language, yes.

11        Q.    Standard query language.  That's what

12   SQL stands for?

13        A.    Yes.

14        Q.    Do people sometimes say SQL instead of

15   SQL?

16        A.    Yes.

17        Q.    So that is -- well, describe for me,

18   since you know more about it than I do, what is

19   the function of SQL?

20        A.    It's a language that allows you to merge

21   together and run reports, analytics, calculations

22   against standard structure database, so a

23   relational database.

24        Q.    Relational database is a good way to put

25   it perhaps as just a broad category?

1      A.    Yeah.

2      Q.    So other than that, that postgraduate

3   class in the SQL language, have you had any other

4   formal technical training past your undergraduate

5   degree?

6      A.    No.

7      Q.    I want to flip to what's on page 4.

8   Just noting that you went to work in August 2004

9   for AstraZeneca; correct?

10     A.    Yes.

11     Q.    And worked for, it looks like, about a

12  year and a half as a marketing representative;

13  correct?

14     A.    Yes.

15     Q.    Was this job your first experience

16  working in the pharmaceutical industry?

17     A.    Yes.

18     Q.    And as part -- I know the first bullet

19  point that you list there describing some of your

20  job responsibilities says, "Conducted and designed

21  marketing programs targeting physicians for

22  products including Nexium and Crestor."

23     Do you see that?

24     A.    Yes.

25     Q.    That's one thing you did for

21

1    AstraZeneca?

2        A.   Yes.

3        Q.   Did you learn through the experience of

4    working for AstraZeneca that the prescribing

5    habits and choices of individual physicians have a

6    significant impact on how much of any one drug or

7    class of drug is sold?

8            MR. KOBRIN:  Object to form.

9            THE WITNESS:  Can you repeat that

10   question.

11   BY MR. BARTON:

12       Q.   Yeah.  It probably wasn't very well

13   said.

14       Did you learn through your experience with

15   AstraZeneca, your first job in the pharmaceutical

16   industry, that the individual prescribing habits

17   or practices of physicians can have a significant

18   impact on the quantity of any given drug being

19   sold?

20           MR. KOBRIN:  Object to form.

21           THE WITNESS:  Being that I wasn't

22   directly involved with the sales team, I'm not

23   sure of the influence.  But our programs were

24   designed to provide information to doctors so they

25   can make a more educated decision.

22

1   BY MR. BARTON:

2       Q.   With the end goal of the company being

3   to sell the drugs that the company makes to sell;

4   correct?

5            MR. KOBRIN:  Object to form.

6            THE WITNESS:  I suppose that's correct.

7   BY MR. BARTON:

8       Q.   Nexium and Crestor, those are -- are

9   those controlled substances?  Like, are they

10  Schedule anything controlled substances?

11      A.   From a DEA perspective non-schedule, but

12  Schedule VI technically.

13      Q.   Right.  Nexium, is that -- that's like a

14  reflux medication?

15      A.   Yes.

16      Q.   And Crestor, is that a cholesterol

17  medication, lowering your cholesterol?

18      A.   Yes.

19      Q.   At any time, when working for

20  AstraZeneca, were you involved in marketing any

21  Schedule II or III controlled substances?

22           MR. KOBRIN:  I just want to object to

23  form.

24       How far do you think you're going to go down

25  the path on AstraZeneca?  Because I may want to

23

1    talk to the client at some point just to make sure

2    that we're not breaching any kind of

3    confidentiality here.

4              MR. BARTON:  Not very far.  I'm asking

5    basically the question I just asked, and that's

6    probably about it.

7              MR. KOBRIN:  Okay.

8    BY MR. BARTON:

9        Q.  Did you ever sell -- did you ever help

10   market any opioid pain medications for

11   AstraZeneca?

12       A.  No.

13       Q.  Or any other controlled substances that

14   you recall?

15       A.  No.

16       Q.  All right.  Your next position it

17   appears was with an entity called IMS Health;

18   correct?

19       A.  Yes.

20       Q.  How would you describe the business of

21   IMS Health at the time that you worked for them?

22       A.  IMS Health is a major data provider for

23   the pharmaceutical industry.  There were many

24   aspects of the business that I was not intimately

25   involved with.

24

1        My group worked on Rx database management,

2    working with retailers, bringing that information

3    into a database, and then selling that information

4    back out to manufacturers.

5        Q.   Is IMS Health based in Pittsburgh?

6        A.   No.

7        Q.   Where are they headquartered?

8        A.   I'm not a hundred percent -- I think

9    they're using Stamford, Connecticut as their

10   headquarters right now.  I was based out of

11   Plymouth Meeting, Pennsylvania, just outside of

12   Philadelphia.

13       Q.   And your position you described as

14   business analyst.  And you just described a little

15   bit about what the company did; correct?

16       A.   Yes.

17       Q.   Can you tell me just what your -- in

18   general, describe what you did for IMS Health at

19   that time.

20       A.   Yes.  I worked with the retailers to

21   make sure their data came into our repository, the

22   data was in line with our projected or imputed

23   expectations.

24       Once we qualified that data, we married it

25   into our larger database that drove deliverables

1    out to the manufacturing community.

2        Q.    So if I understand what you're saying,

3    one of the things that IMS Health did, and maybe

4    still does, is to collect sales transactional data

5    from retailers about their sales of prescription

6    drugs; correct?

7        A.    Yes.

8        Q.    And then it collects that information

9    from a number of different retailers; right?

10       A.    Yes.

11       Q.    And then it will combine all that data

12   into a larger database so that it can evaluate

13   larger trends and get a bigger picture of what's

14   going on than just any one retailer might see from

15   their own data?

16            MR. KOBRIN:   Object to form.

17   BY MR. BARTON:

18       Q.    Is that one of the purposes of doing

19   that?

20       A.    Yes.

21       Q.    And so the retailers can, I assume,

22   subscribe or enter into a relationship of some

23   kind with IMS Health to be able to provide their

24   data and, in return, get access to the analytics

25   and the analysis of the larger data that IMS

26

1    Health may use; correct?

2        A.    At this point in time when I was with

3    IMS, the deliverables were mainly manufacturer

4    focused.

5        Q.    And so the deliverables, meaning the

6    output of IMS from the analysis that it did of

7    whatever data they got.

8        A.    Yes.

9        Q.    That's what you mean by "deliverables"?

10       A.    Correct.

11       Q.    And so they were -- their customers were

12   manufacturers who were interested in knowing what

13   all of the retailer data looked like?

14       A.    Yes.

15       Q.    One of the bullet points on the IMS

16   Health position I just wanted to ask you about, it

17   looks like it's five bullet points down, but you

18   say -- one of the things that you've listed there

19   was to build an Excel-based analytical tool used

20   by the entire department for processing and

21   comparing data in parallelling systems during the

22   migration from a mainframe system to an Oracle

23   database system.

24       Did I read that correctly?

25       A.    Yes.

```
1        Q.   The Excel-based analytical tool, I just

2    want to ask, is that a reference -- you're using a

3    lower case E there, but is that a reference to

4    Microsoft Excel?

5        A.   Yes.

6        Q.   And Microsoft Excel is a program that is

7    part of the Microsoft Office suite that a lot of

8    people have on their computers?

9        A.   Yes.

10       Q.   And that was true -- "that" being that

11   Microsoft Excel was part of the Microsoft Office

12   package, that was true back in 2006, 2007;

13   correct?

14       A.   Yes.

15       Q.   I remember it.  I even remember way back

16   then.

17       Was this job at IMS Health your first

18   full-time job that focused on data analytics

19   specifically in the pharmaceutical industry?

20       A.   Yes.

21       Q.   And that was maybe the change from

22   AstraZeneca to IMS Health, is you really started

23   to get into data analytics with IMS Health?

24            MR. KOBRIN:  Object to form.

25            THE WITNESS:  Yes.  I did less analytics
```

28

```
 1   at AstraZeneca than I did at IMS.
 2   BY MR. BARTON:
 3       Q.   While you were at IMS Health, did you
 4   meet or come into contact with people from Giant
 5   Eagle?
 6       A.   No.  Giant Eagle was not a data provider
 7   to IMS at that point in time.
 8       Q.   That's why I asked.  Because we actually
 9   have some emails where we see that Giant Eagle did
10   provide data to IMS later in time.
11       And that's why I just wondered if that was a
12   connection of how you got to Giant Eagle, but --
13       A.   No, it's not.
14       Q.   -- we'll get there.  We'll get there.
15   Okay.  I just wondered.
16       A.   I'm from here.  That's how.
17       Q.   Okay.  Very good.
18       A.   Just fast-forward.
19       Q.   You're from Beaver.
20       A.   Close enough.
21       Q.   Before I leave it, I realize this is
22   kind of elementary to you.  But a lot of people
23   are, at least in my world, pretty familiar with
24   Microsoft Word, word processing program, and maybe
25   fewer people in my world are as familiar with
```

29

```
 1   Microsoft Excel and what it does and what it can

 2   do.

 3        Can you just describe generally for us what

 4   Microsoft Excel is to you?

 5             MR. KOBRIN:  Object to form.

 6        To the extent that you know.

 7   BY MR. BARTON:

 8        Q.   Just describe what -- what does it do?

 9        A.   It's a spreadsheet application that is

10   used to organize data and information for business

11   or personal or whatever use.

12        Q.   So within Microsoft Excel you can enter

13   a lot of data and organize it, as you said;

14   correct?

15        A.   Yes.

16        Q.   And is it also possible within Microsoft

17   Excel to create formulas or sort data in ways that

18   you can, you know, compare one dataset to another

19   dataset, for example?

20        A.   Yes.

21        Q.   So if you know how to manipulate

22   Microsoft Excel, it is a software program that

23   allows you to create and do certain things with

24   data in a database; true?

25             MR. KOBRIN:  Object to form.
```

                                                              30

1              THE WITNESS:  Yes.

2     BY MR. BARTON:

3         Q.   Would you agree, I guess, that Microsoft

4     Excel is one kind of tool for data analytics?

5         A.   Yes.

6         Q.   Just moving up your job history here, it

7     appears you then moved from IMS Health initially

8     to the Nielsen Company; correct?

9         A.   Yes.

10        Q.   And that job looks like it wasn't really

11    focused in the pharmaceutical industry.  Is that

12    true?

13        A.   That is true.

14        Q.   And then the next position -- you were

15    there until July 2008 at the Nielsen Company.  And

16    then in July 2008, it appears that you became a

17    business analyst and a senior pharmacy business

18    analyst.  And that was for Giant Eagle; correct?

19        A.   Yes.

20        Q.   So you started employment with Giant

21    Eagle in approximately July 2008?

22        A.   Yes.

23        Q.   How did you come to be hired by Giant

24    Eagle?

25        A.   How much history do you want?

1      Q.   Well, I know you lived in Beaver, and I

2   know you're from here.

3      But I guess I was just curious if you had a

4   specific connection to a person here or just what

5   happened.

6      A.   No.  The Nielsen Company, the position

7   was here in Pittsburgh.  My job was transferred to

8   San Francisco, and I did not want to move.  So I

9   put my r sum  out there, applied for positions at

10  Giant Eagle, and was contacted by HR for an

11  interview.

12     Q.   Well, it would appear that the job

13  description, as you provided it here on your

14  profile, the kinds of things you did, it appears

15  like it was a pretty good fit for some of the

16  experience you already developed with IMS Health

17  and before; correct?

18     A.   I would agree with your opinion.

19     Q.   So in your position as a business

20  analyst and senior pharmacy business analyst --

21  well, first of all, are those two different titles

22  that you held during that two-year form of

23  timeframe?

24     A.   Yes.  And just to help, as you progress

25  through this, I've lumped -- sometimes I'm in the

32

```
 1   role and promoted pretty much doing the same

 2   function.

 3        I've, in this breakdown, lumped those

 4   together.  So you'll see that maybe more than once

 5   as we continue through.  I haven't fully reviewed

 6   what I have on here because I don't update it that

 7   often.

 8        Q.   So that's how I read it and assumed that

 9   was true, that those were two different titles,

10   but the kind of description of what you did below

11   that is relatively applicable to that whole

12   timeframe when you held a couple of different

13   titles; correct?

14        A.   Yes.  That's correct.

15        Q.   So can you tell me, if you remember,

16   where in the organizational chart for Giant Eagle,

17   where did the -- obviously, you were in the

18   pharmacy side of the business; correct?

19             MR. KOBRIN:  Object to form.

20   BY MR. BARTON:

21        Q.   Let me just try to narrow it down.

22        I'm just trying to figure out where this fell

23   organizationally, and let me just ask more

24   specific questions.

25        Did you have someone you reported to in that
```

33

1    position?

2         A.   Yes.

3         Q.   Who was that?

4         A.   Sean Raynak.

5         Q.   What was Sean Raynak's position?

6         A.   He was -- I may not have the title

7    exactly right because it's been ten years now --

8    manager of pharmacy finance.

9         Q.   Do you know who Sean Raynak reported to

10   at that time?

11        A.   I believe he reported directly to Randy

12   Heiser.

13        Q.   Who was?

14        A.   The VP of pharmacy at that point in

15   time.

16        Q.   Thanks.  Did you, in turn, at this point

17   in time -- from July of 2008 to October of 2010,

18   do you recall, did you have people under you or

19   who worked for you and who reported to you?

20        A.   No.

21        Q.   Were you part of a team of business

22   analysts or senior pharmacy business analysts who

23   reported to --

24        A.   Sean Raynak?

25        Q.   Sean, yeah.  I'm sorry.

34

1          A.    It was a team of one.

2          Q.    Do you recall, was that a newly created

3     position for you and for Giant Eagle, or were you

4     filling someone's shoes who had left?

5          A.    I was filling someone's shoes that had

6     transferred to a different position internally.

7          Q.    Who was that person, if you recall?

8          A.    I believe it was Al Makita.

9          Q.    This position, one of the things that

10    you describe as your responsibilities then was

11    that you were accountable for the design,

12    management and distribution of all pharmacy

13    advanced analytics; correct?

14         A.    Yes.  That's what I wrote on here.

15         Q.    When you use design in that description,

16    what do you mean by design?

17         A.    Work with the business lead to

18    understand what information they needed, harvested

19    that information from the database and provided it

20    in a report.

21         Q.    Okay.  So...

22         A.    I guess to elaborate a little more, it

23    wasn't my responsibility.  I was in support of the

24    business leads.  So they technically maybe would

25    have been the designers.  I was just supporting

1    their design.

2         Q.   And I'm trying to think of a way to

3    describe it.

4         But you had some technical skills with

5    respect to the analytical tools, the database

6    tools.  You had the ability to extract or find

7    data and have it analyzed in certain ways.

8         And so if somebody asked you to try to come

9    up with a way to analyze data, you could use the

10   tool to try to figure out how to do that.  That's

11   a poor description, but is that somewhat accurate?

12        A.   Yes.

13             MR. KOBRIN:  Object to form.

14             MR. BARTON:  Yeah.  I'd object to the

15   form of that, too.  That was bad.

16   BY MR. BARTON:

17        Q.   Let me try it a little better, just

18   because I -- when we get into the areas of

19   technical computer skill and that, those of us who

20   don't have that lose some of the facility of the

21   language.

22        So with your various software tools,

23   including Microsoft Excel and others that were

24   available to you for analytics, you had the

25   ability and the knowledge to customize those and

1    use those tools to design or create the kind of

2    reports that might be requested of you from the

3    businesspeople for whatever objectives they had.

4              MR. KOBRIN:  Object to form.

5              THE WITNESS:  Yes.

6    BY MR. BARTON:

7         Q.   And so that was your job -- part of your

8    job from 2008 to October 2010, July 2008 to

9    October 2010; correct?

10        A.   Yes.

11        Q.   And the next bullet point again says you

12   created an automated Excel-based reporting system;

13   right?

14        A.   Yes.

15        Q.   And that again -- you use lower case E,

16   but you're, again, referring there to Microsoft

17   Excel; correct?

18        A.   Yes.  Maybe I should capitalize those.

19        Q.   No, I'm not being critical.  You know,

20   excel, lower case E, could mean something else,

21   you know.

22        A.   No.  No.

23        Q.   You could excel at something.

24        A.   I appreciate the clarity and the

25   feedback.  I'll make sure I update that right

37

1    after this.

2         Q.   Well, it's fine.  It's kind of a

3    millennial thing to use lower case.

4         A.   I don't categorize the millennials.

5         Q.   No, neither do I.  That's why I don't

6    know what I'm talking about.

7         So in the next bullet point you say,

8    "Responsible for all technical Giant Eagle

9    pharmacy strategic analysis."

10        That sounds like a lot.  Can you kind of

11   describe for me what you mean by that?  What

12   technical Giant Eagle pharmacy strategic analysis

13   are you referring to in general there?

14   ████████████████████████████████

15   ████████████████████████████████

16   ████████████████████████████████

17   ████████████████████████████████████

18   ████████████████████████████████

19   ████████████████████████████████████

20   ████████████████████████████

21   ████████████████████████████████████

22   ████████████████████████████████

23   ████████████████████████████

24   ██████████████████

25   ████████████████████████████████████

















1     ████████████

2     ████████████████████████████

3     ████████████████████████

4     ██████████

5       Q.   The next job on your r sum  is also with

6   Giant Eagle, correct, the senior business analyst,

7   strategic financial planning and analysis; right?

8       A.   Yes.

9       Q.   And that's from October 2010 to August

10   of 2012, so almost a two-year period there;

11   correct?

12       A.   Yes.

13       Q.   And that also appears to not be

14   exclusive to the pharmacy side; true?

15       A.   Yes.  I would agree.

16       Q.   So did you kind of move in the

17   organizational chart out from under reporting

18   to --

19       A.   Sean Raynak.

20       Q.   -- Sean Raynak -- sorry.  That name is

21   not sticking.

22       But did you move from reporting to him to

23   reporting to somebody else during that period of

24   time?

25       A.   Yes.

47

 1       Q.   Who did you report to?

 2       A.   Valery Ciarimboli.

 3       Q.   And what was her position?

 4       A.   May not remember the exact title.

 5   Manager of business planning and FP&A.

 6       Q.   That last thing you said, FP&A, what

 7   does that stand for?

 8       A.   Financial planning and analysis.

 9       Q.   Got it.  What was the reason for your

10   change of position then?

11       A.   FP&A needed an SQL programmer and they

12   sought me out.

13       Q.   How did that work differ from what you

14   had been doing before?

15       And I know it's obvious, if you were out of

16   pharmacy and you're now in sort of the bigger

17   Giant Eagle scope.  But like how did it differ,

18   the work you were doing?

19       A.   Dramatically.  I worked with other lines

20   of businesses helping them build business plans.

21       Q.   And in terms of helping the other lines

22   of business build business plans, what was your

23   role and contribution in helping them do that?

24       A.   Many business leaders are not analytics

25   or financial experts.  So you would work with them

48

1    on their business plan to understand what their

2    goals were and then construct either the budget or

3    the analytics needed in order for them to achieve

4    their goals.



49



50



19      Q.   Then it appears in August 2012 you moved

20  back to the pharmacy side of the business;

21  correct?

22      A.   Yes.

23      Q.   And so from August 2012 to

24  December 2014, you had the positions of manager

25  and senior manager of financial planning for the

                                                                    51

1    pharmacy side; right?

2        A.   Yes.

3        Q.   In that position, who did you report to

4    then?

5        A.   Under the manager title, directly to

6    Greg Carlson.  Under the senior manager title,

7    directly to Brett Merrell.

8        Q.   So that was in a different place

9    organizationally in the company than you had been

10   back when you were a business analyst in July 2008

11   to October 2010; correct?

12       A.   Yes.

13       Q.   Some of the descriptions you provide of

14   the work that you were doing seem like there's

15   some overlap or they seem somewhat similar.

16       But why don't you tell me:  How did this job

17   from August 2012 to December 2014 differ from what

18   you had been doing July 2008 to October 2010?

19       A.   When I returned, I was in a more

20   elevated role.  I was replacing Sean Raynak who

21   had left the organization, which is why you see a

22   lot of the same business functions.

23       Q.   In the first bullet point you are just

24   describing analytics for the pharmacy department,

25   in general, and describe some types that you were

                                                                52

1    doing.  You mention shrink.

2         What does shrink mean as you use it there?

3         A.   Shrink is lost, expired product that we

4    have to return to the manufacturer for

5    instruction, or could be valuation changes on a

6    product.

7         Q.   So shrink then would represent any

8    change in the value of the inventory of product on

9    hand due to expiration, loss or reduction of

10   value?

11             MR. KOBRIN:  Object to form.

12             THE WITNESS:  Yes.

13   BY MR. BARTON:

14        Q.   You reference the acquisition of the

15   first closed-door specialty pharmacy in that third

16   bullet point.

17        What was the specialty pharmacy that was

18   acquired there?  What did it do?

19        A.   The specialty pharmacy was primarily

20   focused on hepatitis C patient management.

21        Q.   Where was it located?

22        A.   Rocky River, Ohio.

23        Q.   As you recall, if you recall, was that

24   created because there was a particular hepatitis C

25   problem that that specialty pharmacy could serve

53

```
 1    for that area?

 2         A.   I don't recall.

 3              MR. KOBRIN:  How are you doing

 4    time-wise?  Do you want to take a break?  Is this

 5    a good time for you to take a break?

 6              MR. BARTON:  That's fine.

 7              THE WITNESS:  Yeah.  I wouldn't mind

 8    using the restroom and getting another coffee.

 9              THE VIDEOGRAPHER:  Going off the record.

10    The time is 10:11 a.m.

11              (Recess from 10:11 a.m. to 10:33 a.m.)

12              THE VIDEOGRAPHER:  Now going back on the

13    record 10:33 a.m.

14    BY MR. BARTON:

15         Q.   We're back on the record.  And I've been

16    asking you about your employment history at Giant

17    Eagle and just some of the positions you've had,

18    some of the responsibilities you've had, who you

19    worked for, those types of things.

20         I have a few more down that, and so we'll

21    stay with your LinkedIn profile here for a little

22    bit.  But I wanted to go back just to clarify

23    something in my own mind that I don't think I

24    asked or didn't understand.

25         I'm trying to understand the relationship
```

54

```
 1    similarities/differences between the job that you

 2    had as the business analyst from July 2008 to

 3    October 2010 and then the job that you had two

 4    jobs later, from August 2012 to December 2014,

 5    both in the pharmacy department, both involving

 6    some data analytics components to it.

 7         But as you have testified, you were really

 8    reporting to different people at the time, and so

 9    it wasn't the same job.  It was a little bit of an

10    elevated job for you, the second one; right?

11         A.   Just to clarify, you're contrasting

12    August 2012 to December 2014 with July 2008 to

13    October 2010?

14         Q.   Yes.  That's what I'm trying to do.  I'm

15    trying to understand how those jobs were similar

16    or different and who else kind of had those

17    similar jobs.  I'm just trying to figure out where

18    you were in the company each time.

19         And so what I understand you to have told me

20    is that when you were the business analyst from

21    July 2008 to October 2010, that at that point in

22    time, you were -- and now I can't even read my

23    notes -- but you were reporting to Sean Raynak?

24         A.   Correct.

25         Q.   And Sean Raynak at that time you
```

1   understood to be reporting to whom?

2        A.   I believe it was Randy Heiser.

3        Q.   Randy Heiser.  Right.  Okay.  That's

4   what I thought.  And so that's kind of what you

5   recall having been the case from July 2008 to

6   October 2010.

7        And then when you moved into the position of

8   the manager, senior manager of financial planning

9   in August 2012 -- so you had gone out of the

10  pharmacy side and then came back to the pharmacy

11  side -- at that time, what you've told me is you

12  kind of replaced Sean Raynak, but you were

13  reporting at that time initially, to Greg Carlson;

14  correct?

15       A.   Yes.

16       Q.   And had Greg Carlson at that point --

17  was Randy Heiser still with the company?

18       A.   I can't recall.

19       Q.   So at the time that you were reporting

20  to Sean Raynak in the business analyst position,

21  so back in 2008 to 2010 -- and I'm sorry I'm

22  jumping back and forth.  I'm trying to understand

23  kind of just if there were changes

24  organizationally in the company that I'm just

25  trying to figure out.  That's all.

1          At the time you reported to Sean Raynak, you

2     had told me you were -- you were kind of a team of

3     one in terms of this data analytics person with

4     the SQL and Visual Basic skills under him;

5     correct?

6          A.   Yes.  That's correct.

7          Q.   At that time, do you know, was there any

8     data analytics person with programming skills

9     reporting to Greg Carlson -- or it may not have

10    been Greg Carlson, but reporting to that other

11    line of business that you moved into in 2012?

12              MR. KOBRIN:  Object to form.

13              THE WITNESS:  Can you restate that.

14    BY MR. BARTON:

15         Q.   Yeah.  I'm trying to decide -- I'm just

16    trying to understand -- I know we're talking about

17    two different time periods, but I'm just trying to

18    understand if you kind of -- let me ask it

19    differently.

20         If you know, during the time of July 2008 to

21    October 2010, during that time that you were in

22    business analytics, team of one, reporting to Sean

23    Raynak, do you know anyone else on the pharmacy

24    side who also was in data analytics for purposes

25    of the pharmacy, who had the SQL skills, those

57

1    types of things?

2            MR. KOBRIN:  Did he know at that time --

3            MR. BARTON:  Yes.

4            MR. KOBRIN:  -- or does he know of now

5    whether there was somebody at that time?

6            MR. BARTON:  I'm asking him.

7    BY MR. BARTON:

8        Q.  Do you know now whether there was

9    somebody at that time?

10       A.  There were IT people with varying skill

11   sets, but I can't recall specifics.

12       Q.  Do you recall working with anyone else

13   during that period of time who also kind of had

14   programming skills and used them for data

15   analytics purposes for the pharmacy?

16       A.  No.

17       Q.  Did Sean Raynak have those kinds of

18   programming or data analytics skills?

19       A.  No.

20       Q.  And did Greg Carlson?

21       A.  No.

22       Q.  Now moving forward to the August 2012 to

23   December 2014 period again, so I'll leave 2008 to

24   2010 alone now, in this time period of August 2012

25   to December 2014, did you, by then, have people

1    under you who reported to you?

2        A.    Between August 2012 and December 2014 in

3    the manager and senior manager roles, I had

4    several direct reports during that time.

5        Q.    Who were they?

6        A.    Kayla Voelker, Brad Devine, Sheila

7    Yates, Jennifer Horin.  I think that's it.

8        Q.    Did they have similar job

9    responsibilities or did they all differ, the four

10   of them?

11       A.    They all had different job

12   responsibilities.

13       Q.    Did any of them have programming skills

14   or background?

15           MR. KOBRIN:  Object to form.

16           THE WITNESS:  Can you rephrase that or

17   restate that.

18   BY MR. BARTON:

19       Q.    Those four you just mentioned, did any

20   of those four who were your direct reports, did

21   any of them have skills in programming, either in

22   Visual Basic or in SQL development skills?

23       A.    Yes, but very light.

24       Q.    Which of them had those skills?  Did

25   they all have those skills or did just some of

1    them?

2         A.    Kayla Voelker had skills.  The other

3    three obtained skills during their tenure, but did

4    not enter the organization with those skills.

5         Q.    And tell me a little more about Kayla

6    Voelker.  Do you know when she entered the

7    organization?

8         A.    I don't recall specifically.

9         Q.    Do you know if she was in the

10   organization as far back as the 2008 to 2010 time

11   period?

12        A.    She started with the organization after

13   I started.

14        Q.    Which was July 2008.  But do you recall?

15   Can you even ballpark it?  Do you know how long

16   after you started that she did?

17             MR. KOBRIN:  Object to form.

18             THE WITNESS:  I can't -- I can't

19   speculate.

20   BY MR. BARTON:

21        Q.    What's her background with programming

22   or analytics as you would describe it?

23        A.    When she entered the organization, very

24   light.  During her tenure with the organization,

25   she obtained a bachelor's degree in a similar

1   skill area.  I don't recall the specific degree.

2        Q.   And as you sit here, do you know when

3   she acquired that bachelor's degree?

4        A.   I don't.

5        Q.   You think it was in some kind of

6   technical computer-related field of study?

7        A.   I believe that to be true.

8        Q.   And you characterize her skills at the

9   time she entered the company as very light;

10  correct?

11       A.   Yes.

12       Q.   That does distinguish her from the other

13  three I think you listed who were also your direct

14  reports during that 2012 to 2014 time.

15       Am I correct in understanding they -- as

16  understand it, they may have entered the company

17  with no such skills, but then whatever they

18  learned, they learned on the job?

19            MR. RYAN:  Object to form.

20            THE WITNESS:  Can you restate which

21  specific skills you're referring to?

22  BY MR. BARTON:

23       Q.   Yeah.  Good question.  The skills I'm

24  referring to right now are skills that involve

25  using effectively the tools of data analytics,

1    including Excel and any of the other tools that

2    we've talked about so far that you've used for

3    data analytics.

4        A.   So to retract my earlier comment, they

5    all had some level of Excel skill prior to

6    reporting directly to me.

7        Q.   Okay.

8        A.   Kayla had some programming language

9    experience.  The other three did not.

10       Q.   Thank you for that clarification.  And I

11   think that's kind of what I understood from what

12   you said before anyway, but I didn't probably

13   phrase the -- I wanted to phrase the basic

14   question broadly to see what the baseline was

15   there.

16       In the last bullet point of your summary of

17   your experience for the August 2012 to December

18   2014 job -- so I'm looking at the top of page 3,

19   Exhibit 1 -- that bullet point references the

20   development of the pharmacy enterprise reporting

21   system.  Do you see that?

22       A.   I do see that.

23   ████████████████████████████████████████

24   ████████████████████████████████

25   ████████████████████████████████████



















71



72



11      Q.   When you said you began writing reports

12  in 2008, as you've said, as your r sum  says, you

13  were managing or generating over 100 unique

14  periodic reports; correct?

15      A.   That's correct.

16      Q.   You were generating lots of reports in

17  as early as the 2008 to 2010 timeframe; correct?

18      A.   Yes.





75



25      The next two jobs that are shown on your

1    LinkedIn profile in Exhibit 1 that we haven't

2    talked about is a director of pharmacy business

3    analytics, December 2014 to September 2015.

4         First, how was that a change from your

5    previous position?

6         A.   Generally speaking, the position was the

7    same.  They promoted me again, but they flipped me

8    over to report again to SFP&A rather than up

9    through the pharmacy org chart.

10        Q.   So in terms of individuals, you started

11   reporting at that point to whom?

12        A.   Jason Lapina.

13        Q.   And during that ten-month period, did

14   you continue to have a team of individuals under

15   you who were directly reporting to you?

16        A.   Yes.

17        Q.   So did the whole team move over, so to

18   speak, in the org chart?

19        A.   I can't recall specifically.  If I had

20   to guess, I'd say yes.

21        Q.   And then the last job that is -- well,

22   no.  I guess there are two more.

23        Then we see director of pharmacy category

24   management, August 2015 to January 2018, correct,

25   on page 1.

77

1          A.    That's correct.

2          Q.    So then how was that a change from your

3    preceding positions?

4          A.    In August 2015, they took me out of

5    pharmacy finance and analytics and made me

6    responsible for brand and generic manufacturer

7    relationships in procurement, and I relinquished

8    all analytics and finance direct reports.

9          Q.    What prompted that change for you?

10         A.    The former senior category manager had

11   left the organization, and they needed someone to

12   fill the place.

13         Q.    And who was the former senior category

14   manager?

15         A.    I should retract that.  I'm not sure

16   that was his exact title.  It was Mike Bianco.

17         Q.    In general terms, you replaced Mike

18   Bianco when he left the organization?

19         A.    Yes.

20         Q.    And was that something you chose or just

21   were directed to do?

22         A.    They asked me if I was interested.  Do

23   you really have a choice?

24         Q.    I don't know.  It depends.

25         A.    I accepted the position.

78

```
 1        Q.   In that position who were you reporting
 2   to?
 3        A.   I reported to Adam Zakin.
 4             MR. BARTON:  Let's go ahead and mark
 5   Exhibit 2.
 6             (HBC-McClune Exhibit 2 was marked.)
 7             THE WITNESS:  I won't be able to find my
 8   name there.
 9             MR. BARTON:  I won't either.
10   BY MR. BARTON:
11        Q.   I've handed you what we've marked as
12   Exhibit 2.  And it just appears to be a partial
13   organizational chart for pharmacy administration
14   as of August 2015.  Is that true?
15        A.   Based on my look at this right now, yes.
16        Q.   And it appears to match up with what you
17   were just testifying about, the change in your
18   position as of August 2015, that you started
19   reporting directly to Adam Zakin; correct?
20        A.   Yes.
21        Q.   And it would appear that at this point
22   in time, at least from an organizational chart
23   standpoint, there was a team of individuals under
24   you reporting to you; correct?
25        A.   That's correct.
```

79

1      Q.   One of the members of that team is Kris

2   Remas; correct?

3      A.   Yes.

4      Q.   Is that Kris male or female?

5      A.   It's female.

6      Q.   So by this point in time, given the

7   change of role for you, were you kind of out of

8   the analytics and data programming side of things

9   by now?

10     A.   Yes.

11     Q.   And then it appears that in February of

12  2018, you took on a new position again referred to

13  as senior director of pharmacy procurement and

14  business analytics.

15     Do you see that?

16     A.   Yes.

17     Q.   And that's your current position?

18     A.   That is correct.

19     Q.   Does that reflect kind of coming back

20  into the analytics side of things?

21     A.   It is me maintaining the procurement

22  piece and then reassuming the analytics side.

23     Q.   The job just keeps growing.

24     A.   Yes.

25     Q.   We might be done with Exhibits 1 and 2.

1          A.   I'll keep them handy in case you want to

2     go back.

3               MR. BARNES:  We should get through three

4     or four exhibits today.

5               MR. BARTON:  If we're lucky.

6               (HBC-McClune Exhibit 3 was marked.)

7     BY MR. BARTON:

8          Q.   I've handed you what I've marked as

9     Deposition Exhibit 3.  This is a multiple-page

10    document.  It has our reference number of

11    P-HBC-1003 at the top and a Bates number at the

12    bottom HBC_MDL00034114.

13         Do you have that in front of you?

14         A.   Yeah.  That's what it looks like.

15         Q.   And we won't spend a lot of time on

16    this, but I have a couple of questions about it.

17         First, on the cover page there, it would

18    appear to be a meeting appointment type of notice

19    that was sent to you, among others; correct?

20         A.   Yes.

21         Q.   And so it would appear that it's kind of

22    setting a meeting in the boardroom for Tuesday

23    executive updates to all of the people who

24    received that invitation; correct?

25         A.   Yes, based on my review here.

81

```
 1        Q.    Were you someone who regularly attended
 2   a meeting like Tuesday executive updates?
 3        A.    Not Tuesday executive updates.  In this
 4   particular -- I think they used that as a meeting
 5   organizer, not necessarily a person in the Outlook
 6   system.
 7        Q.    Was this something that was just kind of
 8   distributed to you in the regular course of your
 9   job at Giant Eagle?
10        A.    This particular document, this would --
11   it's for an annual operating plan, so it's once a
12   year.
13        The Tuesday meetings happened every week.  So
14   I didn't go every Tuesday, but I would go at least
15   once a year, oftentimes more, but at least once.
16        Q.    And if something like an annual plan
17   were to be on the agenda for a Tuesday meeting,
18   that might make it more likely that you would have
19   gone then?
20        A.    I would agree with you there.
21        Q.    So let's just talk about what this plan
22   really was.
23        First, on the first page it refers to Fiscal
24   Year 2015 AOP/Business Plan; correct?
25        A.    Yes.
```

82

1      Q.   And this appears to just relate to the

2   pharmacy division or part of Giant Eagle; correct?

3      A.   Looking at the front page, yes.

4      Q.   Right, based on the title.

5      And it has a date of June 24, 2014.  And I

6   believe that's when the meeting notice on the

7   first page appears to have been set.

8      So, first, let me just ask:  What was the

9   fiscal year for Giant Eagle at that time?  Did it

10   run midyear to midyear or calendar year?

11      A.   Since I've been at Giant Eagle, it runs

12   July to June.

13      Q.   July 1 to June 30?

14      A.   Yeah.  Date falls slightly off because

15   of the leap years, et cetera.

16      Q.   So was it usual and customary for Giant

17   Eagle as it approached the end of a fiscal year

18   to develop, circulate and talk about a plan for

19   the coming fiscal year?

20      A.   Yeah.  We go through planning cycles.

21      Q.   That's kind of a normal business thing

22   to do; correct?

23      A.   Based on my experience at Giant Eagle,

24   yes.

25      Q.   Yes.  And fiscal year 2015 would refer

1    to the fiscal that began July 1, 2014 and ended

2    June 30, 2015; is that right?

3        A.    Roughly.  Again, not sure if it started

4    on the 1st, but...

5        Q.    So if you'll turn with me to what is the

6    fifth page of this -- actually, let's do the

7    fourth page, the one up at the top that's 001.4.

8    I guess there's another page 4 on the bottom;

9    right?

10        There's a box there called Key Initiatives,

11    and it just identifies certain issues.  The first

12    issue that is listed there is an issue called

13    Noncompliance.  Do you see that?

14        A.    Yes.  I see it.

15        Q.    And there's not a lot of detail here and

16    so I don't know whether you can put that in any

17    context for me or not.

18        But do you know in that context what was

19    being conveyed or meant by noncompliance?

20        A.    I do not.

21        Q.    That's fine.  If you turn the page, page

22    5, there's a box listing a series of initiatives;

23    correct?

24        A.    Yes.

25        Q.    And then there are also columns for

84

```
1    what's said is "Owner."  But I presume that's

2    assigning that initiative to a person who is

3    primarily responsible for it; correct?

4         A.   Yes.  That would be my assumption.

5         Q.   And then a target date for some of them;

6    right?

7         A.   Yes.

8         Q.   So the first initiative shown there

9    says, "Obtain vendor accredited wholesale

10   certification at HBC"; right?

11        A.   Yes.  That's how it reads.

12        Q.   Are you familiar with that effort, in

13   general, that Giant Eagle and HBC set out to

14   obtain VAWD, the Vendor Accredited Wholesale

15   Distributors, certification for the HBC facility,

16   and this describes that initiative?

17             MR. KOBRIN:  Object to form.

18             THE WITNESS:  Yes.  I am familiar.

19   BY MR. BARTON:

20        Q.   So as of June 24, 2014, when this was

21   prepared, is it true that VAWD certification for

22   the HBC facility had not yet been obtained?

23        A.   To my best recollection, yes.  It has

24   not been obtained.

25        Q.   And the target date as set here in this
```

1    business plan was for that to happen in -- would

2    you interpret that as the third quarter, Q3, of

3    fiscal year 2015?

4         A.   Yes.

5         Q.   So at the time in June of 2014, the goal

6    of the company as it related to VAWD certification

7    for HBC was to accomplish that by the third

8    quarter of fiscal year 2015, which would have

9    been, I assume, kind of January to March of 2015.

10        A.   Yes.

11        Q.   And it has a bullet point under it.  It

12   says, "Qualifies HBC to distribute to Maryland and

13   Indiana."

14        Did you understand that to be the primary

15   business benefit to HBC in obtaining VAWD

16   certification for the HBC warehouse?

17        A.   Yes.

18        Q.   That was kind of the motivating reason

19   that it was an initiative as of then?

20        A.   Yes.

21        Q.   And then if you go down further, there's

22   an initiative that says, reads, "Enhance

23   suspicious order monitoring system (SOMS) at HBC."

24        Do you see that?

25        A.   Yes.  I see that.

86

1          Q.    And then it cites a federal requirement

2     underneath it, 21 CFR 1301.74(b); correct?

3          A.    Yes, it does.

4          Q.    Do you recall being a part of any

5     discussions at this time or in this meeting about

6     what was needed to enhance the suspicious order

7     monitoring system at that time?

8               MR. KOBRIN:  Object to form.

9               THE WITNESS:  I don't recall specifics.

10    BY MR. BARTON:

11         Q.    But you would agree from this document

12    and that being listed as an initiative like the

13    other initiatives you see there, that as of

14    June 24, 2014, it was an initiative or goal of

15    Giant Eagle to enhance its suspicious order

16    monitoring system at HBC for the coming fiscal

17    year?

18         A.    Based on how this reads, yes, we were

19    looking to continually improve.

20         Q.    But as you sit here today, you don't

21    recall specific discussions about exactly what

22    enhancements were being talked about in this

23    meeting at that time?

24         A.    I don't recall specifics, no.

25         Q.    It would appear that Joe/HBC is

87

```
 1    assigned, if you will, as owner of that

 2    initiative; true?

 3         A.   Yes.

 4         Q.   Does that refer to Joe Millward?

 5         A.   I'm not sure.

 6         Q.   And you would agree that there was not a

 7    target date specifically established, at least in

 8    this plan, as of that time; correct?

 9         A.   According to the document, the date was

10    TBD.

11         Q.   To be determined; correct?

12         A.   If that's your interpretation of it,

13    yes.  Yes.

14         Q.   Is that your interpretation?

15         A.   That would be my interpretation of it.

16         Q.   Are you aware of any specific target

17    date outside of this document that was established

18    then or shortly thereafter for that initiative?

19         A.   I don't recall specifically.

20         Q.   The next one right below it is,

21    "Implement controlled substances ordering system,"

22    and then in paren what we sometimes say as "CSOS,"

23    that's C-S-O-S; correct?

24         A.   Yes.  I see that.

25         Q.   And there's an owner or person assigned
```

88

1    to that that is Greg.  And do you interpret that

2    to mean Greg Carlson?

3         A.   I would agree with that interpretation.

4         Q.   And with a target date of that

5    implementation of second quarter of fiscal year

6    2015; correct?

7         A.   That's correct.

8         Q.   Which, based on the fiscal year and when

9    it falls, second quarter of fiscal year 2015 would

10   have been October, November, December of calendar

11   year 2014; correct?

12        A.   Correct.

13   ████████████████████████████████

14   ████████████████████████████████

15   █████████████

16   ███████████████████████████

17   ██████████

18   ████████████

19   ██████████████

20   █████████████████████████

21   ██████████████████████████

22   ██████████████████████████████

23   ████████████████████████

24   ███████████████████████████

25   ██████████████



90







93


99



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10          MR. BARTON:  Okay.  Very good.  We can
11   take a break now.
12          THE VIDEOGRAPHER:  We're going off the
13   record.  The time now is 11:46 a.m.
14          (Recess from 11:46 a.m. to 12:07 p.m.)
15          THE VIDEOGRAPHER:  We're now going back
16   on the record.  The time is 12:07 p.m.
17          (HBC-McClune Exhibit 4 was marked.)
18
19
20
21
22
23
24
25
```









104



















1    was under the regulations.  And that's what led to

2    his answer that he's not a lawyer.

3        Putting an additional gloss on that and

4    saying he's not comfortable answering certain

5    questions -- he's told you that he is comfortable

6    answering the compliance question, that he

7    believes they were in compliance.

8             MR. BARTON:  Right.  I'm exploring why

9    he's comfortable answering the question about why

10   he knows they're in compliance and not comfortable

11   answering questions what they're subject to.

12   That's all.  I'm just exploring what the basis for

13   that is.

14            MR. KOBRIN:  Yeah.  And I'm just --

15            MR. BARTON:  You can object to form all

16   you want.  I'm just seeing what the witness is

17   willing to tell me.

18            MR. KOBRIN:  My objection to form is

19   that you're misrepresenting what he said and what

20   he was comfortable and not comfortable doing.

21            MR. BARTON:  I disagree.  And if he

22   thinks I've done that, he's free to ask me to

23   rephrase.

24   BY MR. BARTON:

25        Q.   All right.  We don't need to belabor

114

```
1     this, but this exhibit that we're looking at right
2     now, Exhibit 5, in terms of its content, does it
3     describe, at least in part, part of what Giant
4     Eagle was doing at some point in time in an
5     attempt to meet obligations it believed it had
6     under the 21 CFR 1301.74(b)?
7               MR. KOBRIN:  Object to form.
8               THE WITNESS:  In my nonlegal opinion,
9     this would be one of the aspects we used in order
10    to maintain compliance.
11    BY MR. BARTON:
12        Q.   And this aspect described in here, the
13    first sentence of the second paragraph, let's look
14    at that.  "Giant Eagle has created monthly
15    ordering threshold levels for products based on
16    GPI level reporting for controlled substances."
17        Did I read that correctly?
18        A.   Yes.
19        Q.   First of all, what is GPI level?
20        A.   GPI stands for generic product
21    indicator.  The level would be at which the
22    product is that level.  It's organized by GPI and
23    not another level.
24        Q.   I guess I need to ask a little bit more
25    about that just to understand it.
```

1     GPI level, how would GPI level help Giant

2  Eagle -- would the GPI level be used to help

3  create the threshold levels against which it was

4  comparing monthly ordering?

5     A.   Yes.  Reviewing and analyzing at the GPI

6  level rather than the NDC level is the more

7  accurate way to look at any analytics regarding

8  any medication, for that matter.

9     Q.  How so?  Like what's the difference

10  between the GPI level and the NDC level?

11     A.   Under a single 14-digit GPI, you'll --

12  you could have one brand NDC, which stands for

13  National Drug Code, and many generic NDCs that all

14  are therapeutically equivalent in nature.

15     Again, preface this I'm not a clinician, so

16  that may be subject to interpretation.

17     Q.  Who assigns the GPI level to a given

18  medication?

19         MR. KOBRIN:  Object to form.

20         THE WITNESS:  I don't know the answer to

21  that question.

22  BY MR. BARTON:

23     Q.  All I'm trying to understand -- I don't

24  think there's anything nefarious in it.  I'm just

25  trying to understand what it is.

1    A. GPI is issued by Medi-Span.

2    Q. And who is that?

3    A. It's a subsidiary of Wolters Kluwer.

4 It's a data provider for the pharmaceutical

5 industry cataloging.

6    Q. Got it.  So GPI level is just a way to

7 try to identify or capture a certain class or

8 category of related products; is that fair?

9    A. That's a fair assessment, yes.

10    Q. And the reason it's better than NDC

11 level is NDC level -- if you were just trying to

12 count by NDC level, you might miss some generics

13 that are presumed to be therapeutically equivalent

14 and may be prescribed for the same reason as the

15 brand NDC level; right?

16    MR. KOBRIN:  Object to form.

17    THE WITNESS:  Again, not a clinician,

18 but yes.

19 BY MR. BARTON:

20    Q. I think I'm following now.  So GPI level

21 is better because it's hopefully more inclusive

22 than NDC level; right?

23    A. Yes.

24    Q. So the first sentence then, "Giant Eagle

25 has created monthly ordering threshold levels for

117

1    products based on GPI level reported for

2    controlled substances," is that a statement that

3    you think accurately reflects something that Giant

4    Eagle did at some point in time?

5         A.   Again, I don't know if this document was

6    in draft form, final, or what the context was.

7    But yes.

8         Q.   And were you personally involved -- is

9    one of the things you did personally was

10   contribute to that creation of the monthly

11   ordering threshold levels for products?

12        A.   Yes, myself or my team.

13        Q.   And is that part of the programming

14   project that occurred that led to the generation

15   of the daily threshold reports?

16        A.   Again, this document was dated

17   11/16/2014.  We know that the threshold, daily

18   threshold reports started in 2013 based on our

19   earlier review.

20        So this statement would refer to that or some

21   subsequent work associated to that analytics and

22   reporting.

23        Q.   Yeah.  Absolutely fair enough.  And I'm

24   not trying to suggest that it only happened in

25   November of 2014.  I'm actually not concerned --

















126



127



18          MR. KOBRIN:  Break for lunch?

19          MR. BARTON:  Sure.

20          THE VIDEOGRAPHER:  Going off the record.

21  The time is 12:49 p.m.

22          (Recess from 12:49 p.m. to 1:43 p.m.)

23          THE VIDEOGRAPHER:  We're going back on

24  the record.  The time now is 1:43 p.m.

25













134

```
 1    purpose, this part of the suspicious order

 2    monitoring program, that the companywide average

 3    threshold was not optimal?

 4              MR. KOBRIN:  Object to form.

 5              THE WITNESS:  Can you restate the

 6    question?

 7    BY MR. BARTON:

 8         Q.   Yeah.  Did you have personal concerns at

 9    any time that the companywide average threshold

10    was being used as the threshold in this program?

11         Did you have personal concerns that that was

12    not the optimal threshold to use?

13         A.   I didn't have any concerns about that

14    not being the optimal threshold.

15         Q.   Do you recall any conversations or

16    communications, maybe in 2013 or 2014, about

17    whether that threshold should be used or continues

18    to be used as it was?

19         A.   I don't recall any specifics.

20         Q.   Would you agree that a companywide

21    threshold which is used for this purpose to just

22    provide some line against which orders from a

23    given store are compared to see if they fall over

24    the line or not, would you agree that a

25    companywide average, as a threshold, has a
```

```
 1    weakness in terms of its applicability to stores

 2    within the Giant Eagle system that routinely are

 3    based on their own characteristics well below or

 4    well above the company average for sales?

 5            MR. KOBRIN:  Object to form.

 6            THE WITNESS:  Can you restate?

 7    BY MR. BARTON:

 8        Q.   Yeah.  Bad question.  Let me ask a

 9    different question.

10        A.   Okay.  That's fine.

11        Q.   If you use a company average as your

12    threshold -- you have to choose some threshold,

13    right, if that's what you're going to do, is

14    compare orders against a threshold?

15        If you use a company average as a threshold,

16    one thing that you aren't doing then through that

17    is comparing a store's ordering patterns to

18    itself; true?

19            MR. KOBRIN:  Object to form.

20            THE WITNESS:  I mean, if you're using a

21    companywide average, no, you wouldn't be looking

22    at just solely the store's history.

23    BY MR. BARTON:

24        Q.   Right.  Those two things are mutually

25    exclusive.  If what you're looking at is comparing
```

1    the store to the company average, you're not

2    comparing that store to itself; right?

3        A.   Correct.

4        Q.   So, for example, if you had a small

5    store relative to the company average -- and there

6    were such stores, I assume, in the Giant Eagle

7    system; right?

8            MR. KOBRIN:  Object to form.

9            THE WITNESS:  I'd have to see the data,

10   but you're going to have some high-performing and

11   lower-performing stores.

12   BY MR. BARTON:

13       Q.   So if you had a smaller store relative

14   to company average, then always comparing that

15   store's orders to the company average might never

16   reveal a pattern occurring within that store's

17   orders that might deviate or change, but never

18   reach the threshold.

19       That could happen; right?

20           MR. KOBRIN:  Object to form.

21           THE WITNESS:  There are still other

22   processes in place that would catch those

23   abnormalities.  This check was just an additional

24   redundant check.

25













142



143



144



22      Q.   And your job with Giant Eagle, really

23  from the time that you were hired on in various

24  capacities, involved, in large respects, the

25  analysis of data to help Giant Eagle do what it

145

```
 1    was trying to do; right?

 2         A.   I would agree with that assumption.

 3         Q.   Because that's where your skill set

 4    really rested, was in data analytics and figuring

 5    out how to draw the right information and

 6    conclusions from data; correct?

 7         A.   Yes.
```









149







152





154

























166













172



```
21          MR. KOBRIN:  This is a big document.  Do
22   you want to take a break before?  Is it going to
23   be a lot of questions or --
24          MR. BARTON:  It won't be that many, but
25   we can certainly -- I don't know where we are on
```

1    time.  I'm not looking at the clock.  It's

2    probably a good time.  Okay.  Let's go ahead and

3    take a break.

4        I mean, I'm not trying to set him up, but I

5    don't have that many questions about it.  It's

6    relatively self-explanatory how it relates to the

7    last one, I think.

8        But, yeah, take a look.  Take your time.

9            MR. KOBRIN:  Do you want to take a break

10   or do you want to keep on?

11           THE WITNESS:  Why don't we take a break.

12           THE VIDEOGRAPHER:  2:53 p.m., we're

13   going off the record.

14           (Recess from 2:53 p.m. to 3:19 p.m.)

15           THE VIDEOGRAPHER:  We're now back on the

16   record.  The time is 3:19 p.m.

17   ▮▮▮▮▮▮▮

18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮





176

















184











189



190







193













199













205





207





209



21          THE VIDEOGRAPHER:  We're now going back

22    on the record.  The time is 4:28 p.m.

23                    EXAMINATION

24    BY MS. WICKLUND:

25          Q.   Mr. McClune, I'm Britt Wicklund.  We met

210

1    earlier.  I just wanted to ask you a few

2    questions.

3              MS. WICKLUND:  I am going to mark this

4    as Exhibit 17.

5              (HBC-McClune Exhibit 17 was marked.)

6    BY MS. WICKLUND:

7        Q.   I'll pass that to you.  And

8    Exhibit 250 -- I'm sorry -- Exhibit 17 that I've

9    just marked is our internal reference of number

10   HBC-150.  It is an email that is Bates numbered

11   HBC_MDL00035614.

12   ███████████████████████████████████████

13   ███████████████████████████████

14   ███████████████████████████████

15   ████████████████████████████████████████

16   ████████████████████████████████████████

17   ███████████████████████████████

18   ████████████████

19   ████████████████████████████████████████

20   ████████████████████████████████████████

21   ████

22   ██████████████████████████████████

23   ████████████████████████████████

24   ████████████████████████████████████████

25   ████







214





216









```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18            THE VIDEOGRAPHER:  Going off the record.
19   The time is 4:45 p.m.
20            (Recess from 4:54 p.m. to 4:54 p.m.)
21            THE VIDEOGRAPHER:  We're now back on the
22   record 4:55 p.m.
23                      EXAMINATION
24
25
```



















229

```
 1   COMMONWEALTH OF PENNSYLVANIA  )

 2   COUNTY OF ALLEGHENY           )      SS:

 3                 C E R T I F I C A T E

 4          I, Ann Medis, Registered Professional

 5   Reporter, Certified Livenote Reporter and Notary

 6   Public within and for the Commonwealth of

 7   Pennsylvania, do hereby certify:

 8          That ROBERT ANTHONY MCCLUNE, the witness

 9   whose deposition is hereinbefore set forth, was

10   duly sworn by me and that such deposition is a

11   true record of the testimony given by such

12   witness.

13          I further certify the inspection,

14   reading and signing of said deposition were not

15   waived by counsel for the respective parties and

16   by the witness.

17          I further certify that I am not related

18   to any of the parties to this action by blood or

19   marriage and that I am in no way interested in the

20   outcome of this matter.

21          IN WITNESS WHEREOF, I have hereunto set

22   my hand this 30th day of January, 2019.

23

24          _____
                       Notary Public

25
```

230

```
1    COMMONWEALTH OF PENNSYLVANIA   )   E R R A T A
     COUNTY OF ALLEGHENY            )   S H E E T
2

3         I, ROBERT A. MCCLUNE, have read the
     foregoing pages of my deposition given on
4    January 25, 2019, and wish to make the following,
     if any, amendments, additions, deletions or
5    corrections:

6
      Line   Change and reason for change:
7
     ____  ____   _____
8
     ____  ____   _____
9
     ____  ____   _____
10
     ____  ____   _____
11
     ____  ____   _____
12
     ____  ____   _____
13
     ____  ____   _____
14
     ____  ____   _____
15
     ____  ____   _____
16
     ____  ____   _____
17
     ____  ____   _____
18

19   In all other respects, the transcript is true and
     correct.
20

21              _____
                ROBERT A. MCCLUNE
22

23   _____ day of _____, 2019.

24   _____
                Notary Public
25
```