THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

IN RE: NATIONAL : HON DAN A
PRESCRIPTION OPIATE : POLSTER
LITIGATION :
:
APPLIES TO ALL CASES : NO
: 1:17-MD-2804
:

- HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -

January 9, 2019

- - -

Videotaped deposition of JINPING McCORMICK, taken pursuant to notice, was held at the offices of Kessler Topaz Meltzer & Check, 280 King of Prussia Road, Radnor, Pennsylvania, beginning at 9:13 a m , on the above date, before Michelle L Gray, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter, and Notary Public

- - -

GOLKOW LITIGATION SERVICES
877 370 3377 ph | 917 591 5672 fax
deps@golkow com

APPEARANCES:

ROBBINS GELLER RUDMAN & DOWD, LLP
BY: AELISH M BAIG, ESQ
Post-Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, California 94104
(415) 288-4545
aelishb@rgrdlaw com

- and -

ROBBINS GELLER RUDMAN & DOWD, LLP
BY: CARISSA J DOLAN, ESQ
655 West Broadway, Suite 1900
San Diego, California 92101
(619) 231-1058
cdolan@rgrdlaw com
Representing the Plaintiffs

GERMANO LAW, LLC
BY: JUDITH H GERMANO, ESQ
460 Bloomfield Avenue, Suite 200
Montclair, New Jersey 07042
(201) 247-7970
jgermano@germanolaw com
Representing the Witness

MORGAN LEWIS & BOCKIUS, LLP
BY: JONATHAN E MAIER, ESQ
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-5806
Jonathan maier@morganlewis com
Representing the Defendant, Teva Pharmaceuticals

APPEARANCES: (Cont'd )

KIRKLAND & ELLIS, LLP
BY: TIMOTHY W KNAPP, ESQ
300 North LaSalle Street
Chicago, Illinois 60654
(312) 862-2595
Timothy knapp@kirkland com

- and -

KIRKLAND & ELLIS, LLP
BY: CATIE VENTURA, ESQ
655 15th Street, NW
Washington, D C 20005
(202) 879-5907
catie ventura@kirkland com
Representing the Defendant, Allergan Finance

JONES DAY
BY: SARAH G CONWAY, ESQ
555 South Flower Street,
50th Floor
Los Angeles, California 90071
(213) 489-3939
Sgconway@jonesday com
Representing the Defendant, Walmart

COVINGTON & BURLING, LLP
BY: CLAYTON BAILEY, ESQ
850 Tenth Street, NW
Suite 586N
Washington, D C 20001
(202) 662-5769
Cbailey@cov com
Representing the Defendant, McKesson Corporation

TELEPHONIC APPEARANCES:

ALLEGAERT, BERGER & VOGEL, LLP
BY: LAUREN J PINCUS, ESQ
BY: DAVID A SHAIMAN, ESQ
111 Broadway, 20th Floor
New York, New York 10006
(212) 616-7060
lpincus@abv com
dshaiman@abv com
Representing the Defendant, Rochester Drug Co-Op

BAKER HOSTETLER, LLP
BY: MELISSA D BERTKE, ESQ
127 Public Square, Suite 2000
Cleveland, Ohio 44114
(216) 861-7309
mbertke@bakerlaw com
Representing the Defendants, Endo Health Solutions; Endo Pharmaceuticals, Inc ; Par Pharmaceutical Companies, Inc f/k/a Par Pharmaceutical Holdings, Inc

REED SMITH LLP
BY: SHANA E RUSSO, ESQ
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, New Jersey 08540
(609) 987-0050
srusso@reedsmith com
Representing the Defendant, AmerisourceBergen Drug Corporation

ALSO PRESENT:

VIDEO TECHNICIAN:
Dan Lawlor
LITIGATION TECHNICIAN
Zach Hone

- - -
INDEX
- - -

Testimony of:
JINPING MCCORMICK

By Ms. Baig 13

By Mr. Maier 322

- - -
EXHIBITS
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Allergan McCormick-1 | E-mail, 8/23/17 Subject, J McCormick Resumé Acquired_Actavis_00588522-25 | 20 |
| Allergan McCormick-2 | E-mail, 1/12/10 Subject, PER4MA Self Appraisal JPM Acquired_Actavis_00604252-56 | 44 |

- - -
EXHIBITS (Cont'd.)
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Allergan McCormick-3 | E-mail, 11/22/10 Subject, PER4MA Form 2010 Self Appraisal Acquired_Actavis_00185283-89 | 62 |
| Allergan McCormick-4 | E-mail, 11/29/11 Subject, PER4MA 2011 Level 2 and 3 ACTAVIS0481204 | 72 |
| Allergan McCormick-5 | E-mail 11/15/12 Subject, JM Final 2012 Level 2 3 PER4MA Self Assessment Acquired_Actavis_01661039-46 | 90 |
| Allergan McCormick-6 | E-mail, 8/7/11 Subject, Monday Call ALLERGAN_MDL_00235615-16 | 116 |
| Allergan McCormick-7 | E-mail Thread 11/11/09 Subject, Oxycodone ER Launch ALLERGAN_MDL_03998242-63 | 120 |

- - -
EXHIBITS (Cont'd )
- - -

| NO | DESCRIPTION | PAGE |
|---|---|---|
| Allergan McCormick-8 | E-mail Thread 8/19/11 Subject, McKesson Marketing Opportunities ACTAVIS0623776-81 | 136 |
| Allergan McCormick-9 | E-mail Thread 8/22/11 Subject, Q2 2011 Market Share Reports ACTAVIS0816122-28 | 160 |
| Allergan McCormick-10 | E-mail, 9/1/11 Subject, Oxymorphone ER Pharmacy Placement Details Acquired_Actavis_00945856-58 | 181 |
| Allergan McCormick-11 | E-mail Thread 2/7/12 Subject, Morphine CB Trend Details ACTAVIS11129567-68 | 190 |
| Allergan McCormick-12 | E-mail Thread 1/10/12 Subject, Dr Schwartz Pharmacies ACTAVIS0328319-36 | 194 |

- - -
EXHIBITS (Cont'd.)
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Allergan McCormick-13 | E-mail Thread 1/27/12 Subject, Actavis ValueTrak Renewal Trading Partners ALLERGAN_MDL_01213261-65 | 209 |
| Allergan McCormick-14 | E-mail Thread 2/27/12 Subject, Renewal ALLERGAN_MDL_03226918-05 | 218 |
| Allergan McCormick-15 | E-mail Thread 3/9/12 Subject, Actavis 852/867 Data Acquired_Actavis_00951998-05 | 231 |
| Allergan McCormick-16 | Excel Spreadsheet Top 254 Target Kadian Prescribers June 2011 - May 2012 Acquired_Actavis_00951998-05 | 240 |
| Allergan McCormick-17 | E-mail, 9/2/11 Subject, Follow-Up Discussion Re Actavis Oxymorphone Campaign Acquired_Actavis_00379710-99 | 246 |

- - -
E X H I B I T S (Cont'd.)
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Allergan McCormick-18 | E-mail Thread 1/24/12 Subject, Oxymorphone Prescription Trends ALLERGAN_MDL_02460224-26 | 246 |
| Allergan McCormick-18 | E-mail Thread 9/2/11 Subject, Follow-up Discussion Re: Actavis Oxymorphone Campaign Acquired_Actavis_00379710-99 | 254 |
| Allergan McCormick-18 | E-mai Thread 1/24/12 Subject, Oxymorphone Prescription Trends ALLERGAN_MDL_02460224 | 264 |
| Allergan McCormick-19 | E-mail Thread 8/26/11 Subject, Follow-Up Discussion, Re Actavis Oxymorphone Campaign ACTAVIS0350871-07 | 269 |

- - -
E X H I B I T S (Cont'd.)
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Allergan McCormick-20 | E-mail Thread 9/15/11 Subject, Marketing Plan and Media Plan ACTAVIS0346651-52 | 282 |
| Allergan McCormick-21 | E-mail Thread 9/2/11 Subject, Revised Marketing Plan ACTAVIS0622787-89 | 289 |
| Allergan McCormick-22 | E-mail Thread 11/21/11 Subject, Generic Kadian Update ALLERGAN_MDL_ 00396954-60 | 289 |
| Allergan McCormick-23 | E-mail Thread 4/27/11 Subject, RiskMAP Draft Acquired_Actavis_02114868-82 | 301 |

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
PAGE LINE
None.

Request for Production of Documents
PAGE LINE
None.

Stipulations
PAGE LINE
None.

Questions Marked
PAGE LINE
None.

THE VIDEOGRAPHER: We are now on the record. My name is Dan Lawlor, I'm a videographer with Golkow Litigation Services.

Today's date is January 9, 2019, and the time is 9:13 a.m.

This video deposition is being held in Radnor, Pennsylvania, in the matter of National Prescription Opiate Litigation, MDL Number 2804.

The deponent is Jinping McCormick.

Counsel will be noted on the stenographic record.

The court reporter is Michelle Gray and will now swear in the witness.

- - -

... JINPING MCCORMICK, having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION

\- - -
BY MS. BAIG:
Q. Hi, good morning, Ms. McCormick.
A. Good morning.
Q. We met briefly off the record. But could you please state your name and address for the record?
A. Jinping McCormick. I live [redacted]
MR. MAIER: Counsel, just one thing before we get started. Apologies. We'd just request a stipulation that an objection for one of either the defendants' counsel or Ms. McCormick's counsel, counts as an objection for all.
MS. BAIG: That's fine.
MR. MAIER: Thank you.
BY MS. BAIG:
Q. Ms. McCormick, have you ever had your deposition taken before?

A. Yes.
Q. How many times?
A. Several times.
Q. Okay. And did you have it taken before in relation to your work at Actavis?
A. No.
Q. Did you have it taken before in relation to your work at Alpharma?
A. No.
Q. Okay. What did you do to prepare for today's deposition?
A. I met with my counsel and the -- oh, then Teva's counsel yesterday.
Q. Okay. And you are represented by whom today?
A. By -- maybe just have them say their name.
Q. So are you represented by --
A. Oh, yeah, I do -- yeah.
Q. -- Allergan and Teva's counsel, or are you represented by Ms. Germano?
A. I am represented by

Ms. Germano.
Q. Okay. Are you also represented by Allergan and Teva's counsel?
A. Yes.
Q. Okay. And you have had your deposition taken before how many times?
A. I don't remember exact numbers. A few times.
Q. Few times. But you are familiar with the procedures of a deposition then?
A. Yes.
Q. And you understand that your testimony today is under oath?
A. Yes.
Q. And you -- if you do not understand a question that I am asking, please ask me to rephrase.
A. Sure.
Q. Otherwise I'll assume that you have understood. Okay?
A. Sure.
Q. Okay. Did you review

documents in preparation for your deposition testimony here today?
A. Yes.
Q. And did those documents refresh your recollection with respect to various issues?
A. Yes.
Q. And do you recall -- do you recall what documents you looked at?
A. We have reviewed a lot of documents, but nothing stood out.
Q. You reviewed e-mails from your time at Actavis?
A. Yes.
Q. Primarily?
A. Yeah.
Q. Anything else that you recall reviewing?
A. E-mails from Actavis as you stated.
Q. You don't recall looking at anything else?
A. No.
Q. At what company did you

first work on opioids?
A. Actavis.
Q. You didn't work on opioids at all at Alpharma?
A. Alpharma -- let's see. I don't remember the timeline exactly when it became Alpharma and Actavis.
Q. Okay. And your position at -- when did you first start working at Alpharma?
A. 2004.
Q. Okay. And what was your position there?
A. I was senior business analyst.
Q. And what were your responsibilities there?
A. I was working on special projects for business analytics.
Q. What does that mean?
A. I was working with special projects that the general manager deemed appropriate and important for the company.

Q. On various special projects?
A. On various projects, yes.
Q. Okay. And were you in the marketing division?
A. Not when I started in that position.
Q. Okay. Which division were you in when you started?
A. I was not in marketing, I was just in general management.
Q. Okay. And when did you switch over to the marketing department at Alpharma?
A. Six months after I started.
Q. And what were your responsibilities in the marketing department at Alpharma?
A. I started out as a marketing manager or product manager.
Q. For what products?
A. For a selection -- for wholesale products, a number of them.
Q. Do you recall whether any of those products were opioids?

A. I do not remember specific products at that -- now, so many years ago.
Q. Okay. So you don't remember any of the products that you worked on when you were at Alpharma?
A. Just at the beginning, right?
Q. When you were in the marketing department at Alpharma?
A. Yeah.
Q. Before you were with Actavis?
A. Right.
Q. You don't remember any of those products?
A. I remember products. I just don't remember exactly what the products are at this moment, because there are so many products. And more products were added as I -- as I progressed, because I have been there for eight years.
THE VIDEOGRAPHER: Excuse me one second. Can we go off the

record for just a moment? Going off record. The time is 9:19.
(Short break.)
THE VIDEOGRAPHER: We are going back on record, beginning of Media File 2. The time is 9:26.
BY MS. BAIG:
Q. So what were the various positions that you held at Alpharma?
A. Senior business analyst to start with, then marketing manager, and at some time post-Alpharma, the company became Actavis.
Q. And when the company became Actavis, did that change your responsibilities at all?
A. No.
(Document marked for identification as Exhibit Allergan-McCormick-1.)
BY MS. BAIG:
Q. We'll have this document marked as Exhibit 1.
This document is Bates

stamped Acquired_Actavis_00588522 through 588525. And it appears to be a copy of your resumé as of August of 2012; is that right?
A. Yes.
Q. And is this a true and correct copy of your resumé and your accomplishments and positions held as of that time?
A. Appears so.
Q. And so here you have that you were working at Actavis from 2004 to the -- to the then present, 2012, correct?
A. So I started in 2004 in Alpharma, then Alpharma became Actavis. And then I stayed with the company till the end of 2012.
Q. Okay.
A. Yes.
Q. And where did you go in 2012?
A. So at the beginning of 2013 I joined the company called Dr. Reddy's

Laboratories. That's where I am working today.
Q. Okay. And are you currently working on any opioid products at Dr. Reddy's?
A. Yes.
Q. Which products are you working on there?
A. Oxycodone acetaminophen.
Q. Any other opioid products?
A. There are other Schedule II. Methylplenidate, mixed amphetamine salts.
Q. Anything else?
A. Some of the pipeline products.
Q. Okay. Yes.
And what is your position at Dr. Reddy's?
A. I'm the vice president of sales and marketing for Retail Rx product for the U.S. market.
Q. When you were a senior business analyst at Alpharma, who did you report to?

A. Doug Boothe.
Q. And who did he report to?
A. Fred Lynch. If I remember correctly.
Q. And who did he report to?
A. I'm not sure. I think he reported to the CEO. But I'm not 100 percent sure.
Q. The CEO of Allergan?
A. Of Alpharma.
Q. CEO of Alpharma. Do you know who that was at the time?
A. I don't -- I don't remember now. I did know back then.
Q. Okay. And when you moved from your position of senior business analyst to marketing manager at Alpharma, who did you report to?
A. I reported to Joe Corsetti.
Q. And what was his position?
A. He was the director of marketing.
Q. And who did he report to?
A. I'm not really sure. I mean

I couldn't remember now.
Q. Okay. When you were at Actavis, your first -- did you -- did your position stay the same when Alpharma became Actavis?
MS. VENTURA: Objection to form.
THE WITNESS: I had the same position and title.
BY MS. BAIG:
Q. And did you have the same reporting structure?
A. Yes.
Q. That didn't change?
A. That's correct.
Q. Okay. And at what point -- at what point did your position change from the position of marketing manager?
A. You mean from the marketing manager to senior manager?
Q. Yes.
A. It's some time in 2006.
Q. So you went from marketing manager?

A. To senior manager.
Q. To senior manager. To?
A. Director.
Q. Director of marketing?
A. Marketing.
Q. And was that the last position that you held at Actavis?
A. Yes.
Q. And when you were director of marketing, were you director of marketing for brand name drugs and generic drugs?
A. Only generic drugs.
Q. And who was in charge of marketing of brand name drugs?
A. Nathalie Leitch.
Q. So when you were director of generic marketing at Actavis, is this, looking at the first page of your resumé here, is this a fair summary of your responsibilities in that position, starting with bullet -- Bullet Number 1, that you led generic prescription marketing team, partnering closely with

sales, pricing and contract teams, making significant contributions by achieving four consecutive years of sales and profit growth and exceeding budget in a highly competitive and dynamic marketplace.
Is that a fair summary of what you were doing in that position at that time?
A. Yes.
Q. And in the next bullet point where you have strategize with VP of sales and marketing, was that Mike Perfetto?
A. That's correct.
Q. But you didn't report to Mike Perfetto?
A. I did at that time. As the director of marketing I reported to Mike Perfetto.
Q. Okay. So when did your reporting structure change?
A. When I got promoted to the director of marketing, that's the head of

marketing, then I reported to Mike Perfetto.
Q. Okay. And Mike Perfetto reported to whom?
A. Doug Boothe.
Q. And Doug Boothe reported to?
A. Doug Boothe reported to a number of people over the years, because there was, of course, management change.
Q. Mm-hmm.
A. At one time he reported to Siggi Olafsson.
Q. To who?
A. Siggi Olafsson.
Q. Okay. What was Siggi Olafsson's position?
A. He was the CEO for a period of time. Like I said, Doug also reported to others when the management changed at the top, at the corporate.
Q. Mm-hmm.
As the director of marketing of generic products, do you recall -- at Actavis, do you recall which generic

opioid products you were marketing?
A. Yes.
Q. Which ones?
A. Oxycodone immediate-release tablets, Oxycodone extended-release tablets -- that's generic for OxyContin. There's fentanyl patch. Oxymorphone extended-release, that's generic for Opana ER. What other one? There's the authorized generic, generic Kadian, so that's generic morphine sulfate extended-release. What other ones?
If you showed me a list, it probably would help.
Q. We'll get to that, I'm sure, in the documents.
A. Okay. That's just off the top of my head.
Q. Okay.
(Telephonic interruption.)
THE VIDEOGRAPHER: Going off the record. The time is 9:38.
(Short break.)
THE VIDEOGRAPHER: We are

Page 29

going back on record. Beginning of Media File 3. The time is 9:42.
BY MS. BAIG:
Q. So when you were at Actavis, did you work on any drugs that were used to help with opioid addiction?
A. Yes.
Q. What drugs were those?
A. That's Suboxone sublingual tablets.
Q. And what do you recall about your marketing efforts with respect to Suboxone?
MS. VENTURA: Objection to form.
THE WITNESS: We were getting ready to launch. The product was not launched while I was there. It was launched later.
BY MS. BAIG:
Q. When was the product launched? Do you know?
A. I did not track post -- I

Page 30

left the company.
Q. So they were preparing to launch in 2013?
MS. VENTURA: Objection to form.
MR. MAIER: Objection, form.
THE WITNESS: When I was there, we were preparing to launch in 2012, but did not launch till after I left.
BY MS. BAIG:
Q. And what did you do in connection with the preparation to launch Suboxone in -- when you were there?
A. I was working with product development team and project manager to make sure we have, you know, product available and ready to launch from both technical and the market perspective.
Q. Which product development team, who was on your product development team for Suboxone?
A. I don't remember now. It was a team in the R&D organization and

Page 31

the technical services.
Q. You don't remember anybody on that team?
A. No, I don't.
Q. Do you recall the project manager that was working on the Suboxone launch in 2012?
A. Project manager, I think it's Bruce Sullivan.
Q. And when you say you were working with the product development team and the product manager --
A. Project manager.
Q. -- project manager in connection with the launch, what did that work entail exactly?
A. We would have regular meetings talking about various tasks and -- both technical and prep -- and just technical and logistic to get the product ready so we can -- so we have enough product to -- when the approval comes.
Q. And so were there marketing

Page 32

materials created in connection with Suboxone?
MR. MAIER: Objection to form.
THE WITNESS: No. It was too early.
BY MS. BAIG:
Q. Would there have been product launch materials created in connection with Suboxone when you were there?
MR. MAIER: Objection to form.
THE WITNESS: No.
BY MS. BAIG:
Q. It was too early?
A. Right.
Q. So that happened after you left? I mean, it would have happened after you left?
MS. VENTURA: Objection.
MR. KNAPP: Objection.
THE WITNESS: In the normal course of business, I would --

Page 33

yeah, I would think that is what happened.

MS. VENTURA: I would like to just note for the record that objection that was made was objection to foundation.

BY MS. BAIG:

Q. I think you noted on your resumé you received a prestigious HDMA DIANA award. DIANA refers to Distribution Industry Awards for Notable Achievement in Healthcare; is that right?

A. Yes. It -- meaning the company. The company received the award.

Q. I see. Okay. That was for the best new generic product introduction category; is that right?

A. Yes.

Q. And so what exactly was that award received for?

A. It was for the introduction of oxymorphone ER.

Q. Okay. And can you tell me a little bit about the DIANA award

Page 34

generally. I mean, what is that award for?

A. The DIANA award was offered by the HDMA. It's industry association for healthcare distribution. So the wholesaler distributor of medicines, that organization.

The award offers different categories for both the brand and generic companies and brand and generic product.

Q. And you included it on your resumé because you were in charge of the launch of oxymorphone ER; is that right?

A. It was in my group, yeah, so we managed the launch of the product.

Q. On the next page of your resumé, you have listed for the years 2005 and 2006, marketing manager for U.S. human pharmaceuticals at Alpharma.

Do you see that?

A. Yes.

Q. Okay. And it states here that you conducted a variety of market research.

Page 35

Do you see that?

A. Yes.

Q. Using IMS, Wolters Kluwer, and MediSpan.

Do you see that?

A. Yes.

Q. What type of market research were you conducting at that time?

A. So these are second degree market research using the data provided by these firms IMS, Wolters Kluwer, and MediSpan. I don't remember specific research. But typically the research I've done at Alpharma was about the, you know, industry trend, product-specific movement, product-specific change, different, you know, dosage forms, and how companies -- in the company's portfolio.

So typically of that nature, the volumes of particular products, the sales.

Q. And what is the difference -- what does the IMS data

Page 36

that -- what does that data show you?

A. So IMS -- it depends on the subscription you have. Typically it would have the sales dollar, the volume by strength, by NDC, by prescription numbers, and in multiple years. That's the kind of data we purchased.

MS. BAIG: We can go off the record for a moment.

THE VIDEOGRAPHER: Going off the record at 9:50.

(Short break.)

THE VIDEOGRAPHER: We are going back on record. Beginning of Media File 4. The time is 9:55.

BY MS. BAIG:

Q. So you testified that the IMS data allows you to track sales dollars, volume of sales by strength and by NDC, correct?

A. Yes.

Q. Okay. And it allows you to do that for all of the sales to your

Page 37

customers?

MR. MAIER: Objection to form.

THE WITNESS: It's sales for the entire U.S. market. For every product that IMS obtains data for.

BY MS. BAIG:

Q. So it allows you to track the sales not only for your customers, but also for your competitors' customers, correct?

MR. MAIER: Objection to form.

THE WITNESS: IMS sales, yes.

BY MS. BAIG:

Q. What do you mean by IMS sales?

A. IMS has its own methodology to collect data and project data in their own, you know, with their proprietary methodology. That's not the same as the company's reported sales.

Q. How is it different?

Page 38

A. So IMS has -- so from a practical point of view, IMS sales captures the pharmacy -- what a pharmacy paid to where they get the product from. And we have to keep in mind that the data is not 100 percent, -- it's not collected 100 percent. So IMS uses their own methodology to project to the 100 percent of the market.

Q. I see. And this data, does that allow you to -- generally to track market share?

A. Yes.

Q. And to track highest prescribers?

MS. VENTURA: Objection to form.

THE WITNESS: So the data generic use, we do not get data by prescriber. Only the national level aggregated data.

BY MS. BAIG:

Q. So only to the pharmacy level, is that what you're saying?

Page 39

MR. MAIER: Objection to form.

MS. VENTURA: Objection.

THE WITNESS: No. Not even what we have. We do not have the ability to -- the pharmacy level data either. We have just national aggregate, no regional data.

BY MS. BAIG:

Q. Through IMS?

A. Yes.

Q. So if IMS did not give you pharmacy level data, what data is it actually, is it providing the data for the wholesalers?

MR. MAIER: Objection to form.

THE WITNESS: So the data we purchased provide the total U.S. market data. So as a country, total sales, total volumes for a particular drug.

BY MS. BAIG:

Page 40

Q. I see. And if you wanted to see -- at any point were you tracking your downstream customers, were you tracking the sales of, say, various pharmacies?

MR. MAIER: Objection to form.

MS. VENTURA: Objection to form.

THE WITNESS: That data was not available. Or at least the data we purchased did not contain such data.

BY MS. BAIG:

Q. From IMS?

A. From IMS.

Q. Okay. Was that data available to you through any other means?

A. The pharmacy level would be available through our internal chargeback data, if that chargeback data was available.

Q. And so the chargeback data would be able to show -- would be able to

track the pill from Actavis all the way to the pharmacy; is that right?
MR. MAIER: Objection to form.
MS. VENTURA: Objection to form.
THE WITNESS: So maybe I should explain the chargeback. So the chargeback data was provided, submitted by the wholesalers to Actavis. Only to the extent the data was submitted that Actavis would have that data.
BY MS. BAIG:
Q. And were you receiving IMS data for the entire time that you were at Alpharma and Actavis?
A. Yes.
Q. And were you receiving chargeback data for the entire time that you were at Alpharma and Actavis?
A. The company received chargeback data.
Q. Did you have access to that

chargeback data?
A. Yes.
Q. And what was the Wolters Kluwer data that you were -- that the company was receiving at that time?
A. Wolters Kluwer was similar to IMS, just a different company. Presumably have different methodology.
Q. Why would you purchase both Wolters Kluwer and IMS data, what was the -- what was the difference in terms of the data that you actually received, what was the benefit to getting both?
A. So they are competitors. Getting different data could -- would allow us to have a more accurate view of the market because they each use their different methodology, presumably different data collection to assess the market.
Q. What was the MediSpan data?
A. MediSpan has the list, the price list for product.
Q. Can you explain that in more

detail, which price list?
A. So MediSpan would have this called WAC list for -- basically for all the products on the market.
Q. Okay. And what -- generally when you say that you were conducting a variety of market research, were you creating documents to show trends or what were you doing with the -- this data as you looked at it?
A. I don't remember exactly the project I did with -- with regard to market research.
Q. But generally speaking?
A. Generally we would look at, I would look at the -- for example, the company market share and how the market share has changed over time.
I would be looking at the products, certain product, and see how the product is performing and trending. And then -- and I would typically look at how the competitors -- how the competitors are doing, were doing, and

how they were changing as well. And then there were different therapeutic areas to see how the different products within the therapeutic categories were performing. That would be a fairly typical market research.
(Document marked for identification as Exhibit Allergan-McCormick-2.)
BY MS. BAIG:
Q. We'll have this marked as Exhibit 2.
This document, which is Bates-stamped Acquired_Actavis_0064252 through 4255. And this appears to be a performance evaluation for you from 2009.
Do you see that?
A. Yes.
Q. And did you see this through the course of your regular business at Actavis?
A. Yes.
Q. Was this a self-performance evaluation?

Page 45

A. So the -- this is a typical company performance evaluation starting with self-appraisal first.
Q. And it states here, if you look at the third page of the total document, that there was a -- it says product sales of $520 million.
Do you see that?
A. Yes.
Q. Was that a target?
A. Yes.
Q. And had that been your target for 2009?
A. So that's the budget.
Q. Okay. Did you have a target, a target in terms of sales for 2009?
A. So the -- so this is a part of my -- one of my objectives, to achieve the sales for the portfolio generic products that I was responsible for. So that's -- for generic, it's the same as mine.
Q. And so was your target

Page 46

$430 million for that year?
A. Where is the 400?
Q. I'm looking just a little further down on the right-hand side. It says, "Achieved estimated $430 million in sales."
A. I see.
Q. And I'm just wondering if that -- where does it show on this document what your target actually was and whether you achieved it?
A. Okay. So you rightly said the budget is $520 million for the year. And that's the company's budget for the generic product. What the company achieved was the $430 million in sales roughly by the end -- it says estimate, I think, because this is probably not finalized yet.
Q. And it says, "$430 million achieved and $231 million in GP for fiscal year 2009."
What is the 231 referring to?

Page 47

A. That's the gross profit.
Q. And do you see under Item 2 there it says, "Successfully managed the oxycodone CR launch to surpass expectation of $105 million"?
A. Yes, I saw that.
Q. And so was 105 -- my question to you is did you have a target that you were trying to achieve?
MS. VENTURA: Objection to form.
THE WITNESS: I did not have product-specific target.
BY MS. BAIG:
Q. Okay.
A. I have -- so as a performance evaluation were my own objective for the year, it's everything, all the different objectives in this document. So sales, as a portfolio, not any individual product.
Q. So if you go back up to Objective 1, Item 4, it says, "Monitor performance versus targets." I'm just

Page 48

trying to find out how you received your targets.
A. Oh, so the target meaning the budget.
Q. So staying within budget?
A. So it's interchangeable. Used in this sense, the target was the budget, and the budget was the 520.
Q. I see. So your target was 520. And where it shows -- so your target was 520. Did you meet that target?
MR. MAIER: Objection to form.
THE WITNESS: So 430, of course, was less than 520.
BY MS. BAIG:
Q. You didn't quite meet the target. Okay.
However, it states in Item 2 that you exceeded target market share and sales upon relaunch of oxycodone, fentanyl, buprenorphine XL, and new launch of levetiracetam syrup and several

AG products from Galderma; is that right?
A. Yes.
Q. And what does that mean exactly?
A. So for a year-end performance appraisal, even though the total number was not achieved, there was -- I guess these are -- were the performance that was highlighted. And so target were not achieved for a number of reasons. There are all different kinds of reasons that could prevent achievement of companywide budget.
Q. And looking to the next page. It states as Objective 3 that Objective 3 was to, "Improve the brand image and trust in Actavis-labeled products."
Do you see that?
A. Yes.
Q. And under that it states, one, "Improve/refresh brand image, advertising campaign working with agency."

What agency were you working with?
A. I don't remember the name of agency. I know it's a small agency.
Q. It was an advertising agency?
A. Yes.
Q. And was it an advertising agency to help you promote your generic products, including your generic opioids?
MS. VENTURA: Objection to form.
MR. MAIER: Objection to form.
THE WITNESS: It's an agency to help us to manage our entire advertising activities which include the creation of the material as well as the -- contacting media, to, you know, place the material in the right channel.
BY MS. BAIG:
Q. Okay. And it did so for

your generic products, correct?
MS. VENTURA: Objection to form.
THE WITNESS: It included generic products.
BY MS. BAIG:
Q. Including generic opioids?
A. So every -- so all the products were, you know, managed by this agency.
Q. Okay. Including the generic opioids?
A. Yes.
Q. Okay. And you don't recall the name of the agency?
A. I don't. It also changed sometime while I was there too.
Q. Do you recall any such agencies that you worked with while you were there?
A. I don't because I have people who manage them on a day-to-day basis.
Q. And who are those people?

A. David Meyers.
Q. Anyone else?
A. David Meyers was the main person who managed the agency relationship and promotion and advertising.
Q. The company would have had a contract with that agency, correct?
MR. MAIER: Objection to form.
THE WITNESS: I would think so.
BY MS. BAIG:
Q. And would that company have assisted you with the creation of, for example, sizzle slides or was that something that was done internally?
A. Sizzle slide, I think it would be done internally.
Q. Okay.
A. At least typically.
Q. And what is a sizzle slide exactly?
A. That's just a term that Mike

Page 53

Perfetto liked using. Normally just referred to a one-page summary.

Q. Summary of the product that you're trying to sell?

A. It doesn't have to be product specific. It could be typically whatever the update that we wanted to provide to customers.

Q. In order -- the purpose being to try to grow sales, correct?

A. Of course.

Q. It also says, next to the reference to the sizzle slide, "Company presentation was updated quarterly."

What company presentation is being referred to here?

A. The -- actually, it's a company presentation we typically presented to customers during the customer meetings.

Q. And who would do those presentations to customers during customer meetings?

A. The presentations were

Page 54

typically presented by either the sales team or myself or Mike, depending on who were at the meeting.

Q. And were they product specific?

A. The company presentation typically was not product specific.

Q. It was just about company, the company?

A. Yeah.

Q. What types of things about the company were in it?

A. Typically the company's capability, overviews, maybe even financial performance of the last year, just general company information.

Q. And the next item in that same box references, "Advertising in E-newsletter has increased and received favorable feedback."

Do you see that?

A. Yes.

Q. Were you responsible for creating advertising in E-newsletters for

Page 55

opioid products?

A. So agency created, you know, any of -- all material -- all of our material.

Q. Did you review them once the agency created them?

A. I did.

Q. The next reference in that block is to, "Inviting customers to tour our plants"?

A. Yes.

Q. Can you talk a little bit about -- about what that was and how that fit into the marketing plan?

MR. BAILEY: Objection to form.

THE WITNESS: For a customer to see our manufacturing plant, it gave them a real-life experience, how the manufacturing were conducted and talked to the people who were in the plant to understand -- that customer understand how, you know, people

Page 56

in the front line feel about they're work, what they do, the process and procedures.

So it's to help -- to help customers to feel, you know, that we are a very responsible company, how we conduct our business. It is overall, I would say just to enhance the company's image and credibility.

BY MS. BAIG:

Q. And who would talk with the customers during those tours?

A. So typically is one of those plant head or supply team managers, manufacturing leaders, based on their schedule too.

Q. Would you be involved in those tours as well?

A. I could. I don't go all the time. I didn't go all the time.

Q. Would there typically be somebody from the marketing department on those tours?

A. Typically there were people from sales. Could be from marketing. Depends on, you know, who -- who were available at that time.
Q. The next item references that "brand image advertising have not rolled out yet." Do you see that?
A. Yeah.
Q. And who was responsible for creating the brand image advertising for opioid products?
MS. VENTURA: Objection to form.
THE WITNESS: So I want to -- the brand imaging -- this brand is referring to Actavis, the company brand. It's not an opioid brand.
BY MS. BAIG:
Q. I see.
A. Yeah.
Q. And so who was responsible for creating the brand image advertising for the company?

A. That would be David working with the agency.
Q. David Meyers?
A. Yes.
Q. Did you meet with customers on a regular basis?
A. Yes.
Q. What types of customers did you meet with?
A. Our typical customers, wholesalers, retail chains.
Q. And where and how did you meet with them, did you meet with them at trade shows, did you set up individual meetings with them, what did that process look like?
MR. BAILEY: Objection to form.
THE WITNESS: Typically I met them at the trade shows or the large meetings.
BY MS. BAIG:
Q. And did you have smaller meetings with them as well?

A. I assume over the course of my working there many years there were those cases too.
Q. Okay. And --
A. Can I make one thing -- you asked me earlier about the name of the agency. I see one here, R&J. I guess that was one of them. Just --
Q. Where do you see that?
A. On the right hand, Objective 3, end-of-year comments.
Q. Does R&J stand for something, or is that the name of the advertising company?
A. It's the name of the advertising agency that was dissolved of course. So we changed to a new one.
Q. When was it dissolved roughly, do you know?
A. I don't remember specifically, but probably during the 2009.
Q. And do you recall who you used after that?

A. I don't.
Q. Do you recall who you worked with at R&J?
A. So David Meyers worked with them directly. I just really don't remember the, you know, people he worked with.
Q. A little further down in that same box it references a photography project of all product images, in parens, tablet, pills -- tablets, pills, near completion.
Do you remember that photography project?
A. Yes.
Q. What was that about?
A. We -- it's really just a photograph of all the product images, the actual pills and tablets for -- we were looking to get all of that in a catalogue or -- excuse me -- just do better categorize them, catalogue them.
Q. Were those photographs used for advertisements?

A. Typically not.
Q. So they were used for an internal cataloguing system?
A. The intention was I think to use both internally and externally.
Q. How would you use it externally?
A. So product, there were -- there were companies that collect product image as identification. So they would want the product image of all the products.
How do I explain this?
When you have -- when you look at the medicine you get from pharmacy, that could be identification, embossing, or printing on the pill, the size and the color of the pill for identification so you make sure you got the right medication. And so this company supply, basically collect all of the images and then, you know, just really for pharmacy and patient use.
Q. I see.

(Document marked for identification as Exhibit Allergan-McCormick-3.)
BY MS. BAIG:
Q. Let's have this document marked as Exhibit 3.
This is a document Bates stamped Acquired_Actavis_00185283 through 85289.
And it appears to be a similar type of performance evaluation but for 2010. Do you see that?
A. Yes.
Q. And you saw this in the course of your regular business at Actavis?
A. Yes.
Q. And where we looked before of the -- at the estimated target of $520 million, is that analogous to the estimated target here that appears to be $477.5 million?
MR. MAIER: Objection to form.

THE WITNESS: This is the budget sales.
BY MS. BAIG:
Q. This is analogous to the same figure that we looked at earlier which was at $520 million product sales, correct?
MR. MAIER: Objection to form.
THE WITNESS: Yes.
BY MS. BAIG:
Q. Okay. And I think you said that the -- the budget was the same as your target?
A. Yes.
Q. Correct? Okay.
So is your target going down from $520 million to $477.5 million; is that right?
A. So when we do budget we didn't look at this way. We were just building our product and roll up to the budget. So, of course, 477 is less than 530.

Q. Do you recall why it went down?
A. As I explained, when we did -- when we did the budget for the following year, we would look at existing product, look at the new product, and build up for each product what the reasonable performance might be and add them up, roll up to a total.
Q. Okay. And in 2009, we had an achieved estimated $430 million in sales, and in 2010 we have generic net sales of $441 million; is that right?
A. Not -- correct. Because this is -- the 441 is year-to-date November 19th. It was not a full year sales.
Q. I see. So the full year sales would likely be higher than $441 million then?
A. Yes.
Q. And your primary objective as set forth here was to maximize revenue and profit of prescription products; is

that right?
MS. GERMANO: Objection.
THE WITNESS: That's the -- one of the objectives.
BY MS. BAIG:
Q. It's Objective Number 1, correct?
A. That's correct.
Q. Did you receive bonus income when you worked at Alpharma and Actavis?
A. I did receive bonus.
Q. Okay. And what was the bonus structure of your compensation like?
A. There was base. There was annual bonus. And then depending on time frame, later on I received long-term incentive plan too.
Q. And roughly what was your base salary when you worked there?
A. Which time frame?
Q. Well, where did it start and where did it end up roughly? I know you're not going to remember specific

dollar amounts, but --
A. I know it's over 100 when I started. When I left last year -- I'm talking about base, right?
Q. Mm-hmm.
A. When I left, I know it was over 140. But I don't remember exactly number.
Q. And what was your average bonus during those years or how did it change over the years?
A. It changed over the years because I was -- I had increasingly more responsible position. So it changed over the years. It also depended upon, of course, company's performance. I don't know how to come up with average.
Q. So when you started, do you recall roughly what your bonuses were in the earlier years?
MS. GERMANO: Objection. Foundation.
BY MS. BAIG:
Q. And roughly what they were

when you left?
A. I don't. I don't remember those specific numbers, because they change.
Q. Do you remember generally?
A. I -- so when I first started, it was somewhere between 10 to 15 percent. That's the target bonus. Then when I left, so I know the last year was 25 percent. Again, that's the target annual bonus.
Q. And did you receive the target bonus? Do you know?
A. I think some years we did, and other years I did not.
Q. And --
A. I mean, difference in years.
Q. Do you recall receiving a bonus every year, though?
A. Yes.
Q. What was your long-term incentive plan?
A. That was towards the end in -- I mean during my years at Actavis,

it was a private company. So roughly it's about three-year payout. Every year I received some, and then after the first three years there was a payout of certain percentages.
Q. And what were roughly those percentages?
A. So -- so a percentage got paid out of the plan. It depends on the company's performance. I don't remember specifics.
Q. But do you remember how much generally you received, whether it was comparable to your entire salary or a percentage of it, or roughly what it looked like?
MS. GERMANO: Objection to form.
THE WITNESS: I don't remember specific, but I -- for example, I remember one year it was -- I don't know -- it was 100, roughly $100,000.
BY MS. BAIG:

Page 69

Q. Do you remember what year that was?
A. No, I don't.
Q. Do you remember whether it was closer to the 2008 time frame or the 2013 time frame?
A. It's closer to 2013, not 2008. I think probably the program started in 2008 or '9.
Q. So that year you would have received your base salary plus your target bonus, or whatever bonus they gave to you in the 15 to 25 percent range or 10 to 25 percent range, and on top of that you would have received the long-term incentive bonus?
MS. GERMANO: Objection to form.
MR. MAIER: Objection to form.
THE WITNESS: Which year are you referring to?
BY MS. BAIG:
Q. The year that you received

Page 70

the long-term incentive bonus?
MS. GERMANO: Objection to form.
THE WITNESS: Yes. That would be the three components.
BY MS. BAIG:
Q. That would be the three components that you would have received for that year; is that right?
A. For that year, that's correct.
Q. And do you remember how many years you received a long-term incentive bonus on top of the target bonus and the annual salary?
A. Not many years because the program started -- I don't know -- 2008 or '9, and then there was three years -- it was three years till the first payout. And then --
Q. So your first payment -- payout would have been either 2011 or 2012?
A. That's correct.

Page 71

Q. And then did you receive payouts each year until you left the company?
A. I left the company beginning of 2013.
Q. Right. So it could have been '11, '12 -- '11 and '12, I suppose?
A. Could be.
Q. Did you receive more than one long-term incentive payout?
A. Yeah.
Q. And those long-term incentive payouts were contingent on what? What was your understanding of what you had to do in order to receive them?
A. Those were contingent upon the total company performance, both the sales and EBITDA.
Q. And so it was your understanding that you would have to grow sales for your portfolio in order to contribute to your being able to receive a long-term incentive plan?

Page 72

MS. GERMANO: Objection to form.
MR. MAIER: Objection to form.
BY MS. BAIG:
Q. Is that right?
A. I mean, it's everyone's job to grow the company's business.
(Document marked for identification as Exhibit Allergan-McCormick-4.)
BY MS. BAIG:
Q. We'll have this document marked as Exhibit 4, please.
This document is Bates-stamped ACTAVIS_481204 through 481210. And again, it appears to be a performance evaluation, correct?
A. Yes.
Q. And you received this or saw this in the regular course of your business at Actavis, correct?
A. Correct.
Q. And this is your performance

Page 73

evaluation for the year 2011; is that right?
A. Appears so.
Q. And here we see that the target is increasing from what was $477.5 million in 2010 to $535 million in 2011; is that right?
MR. MAIER: Objection to form.
THE WITNESS: That's the budget, yes.
BY MS. BAIG:
Q. And under completion criteria, it says, "Achieve 2011 budget, generic product sales of $535 million," correct?
A. It was on track to achieve the budget.
Q. Okay. So does that -- does this state that it did achieve or -- or just that it's on track?
A. It said it was on track, because this was in November.
Q. I see.

Page 74

A. So it had November sales.
Q. I see. And the weight assigned to this particular goal is 30 percent; is that right?
A. That's correct.
Q. Do you see at the bottom of the end of your comments it says, "Kept marketing expense below the budget despite multi-channel marketing effort in oxymorphone ER"?
A. Yes, I saw that.
Q. And what is that referring to, the multi-channel marketing effort in oxymorphone ER? Can you discuss that?
A. So oxymorphone ER was generic Opana ER. It was first to market, first generic product to enter the market to launch. And so typically we do not do a lot of marketing for generic products because of business model. And this one, we had to do more than so-called typical, just to make physicians and the pharmacists aware of the introduction of a generic alternative

Page 75

to the brand. So it's awareness marketing.
Q. How many people were in your marketing department?
A. So my group had, I'm trying to think. David Meyers, something -- probably four.
Q. David Meyers, yourself and who else?
A. Rachelle Galant and Violet and Karen Stoddart.
Q. What was Violet's position?
A. She was analyst. Either sales or -- either sales or marketing analyst.
Q. So typically you didn't do a lot of marketing for generic products, I think is what you testified. But you had an entire marketing department dedicated to marketing of generic products, correct?
MS. GERMANO: Objection to form.
MR. MAIER: Objection to

Page 76

form.
THE WITNESS: So when I say marketing department, it includes our primary responsibility was product management, plus the company brand image promotion.
BY MS. BAIG:
Q. Your title was director of marketing, correct?
A. Yeah, mm-hmm.
Q. Okay. What were the multi-channel marketing efforts that were undertaken in connection with oxymorphone ER that are referenced here?
A. So multi-channel means it's print, digital. So typically it just refers to those.
Q. Anything else?
A. No. We don't do TV.
Q. Does the multi -- do the multi-channel marketing efforts here include the advertising agencies that you were working with?
A. Yeah. The agency created

Page 77

all the materials we need for these activities.
Q. Do you see a little further down under end-of-year comments, it states, "In addition to midyear comments, my group is instrumental in the implementation of Oxycodone SOP and ensuring what we do protects the interest of the patients and the company."
Do you see that?
A. Yes.
Q. And it goes on to state, "Also contributed significantly to the development and refinement of our SOM system"?
A. I saw that.
Q. What was your involvement in developing the SOM system?
MS. VENTURA: Objection to form.
THE WITNESS: I was working with Nancy Baran who was the head of customer service, and legal and IT, to enhance and -- and refine a

Page 78

very sophisticated suspicious order monitoring system.
So I participated from the very start until the -- actually execution of the system.
BY MS. BAIG:
Q. And when was the -- the very start?
A. I mean the start of the project itself. We had a team to work, specifically work on enhancing the system.
I don't remember a specific date. Is that what you're asking?
Q. Is it -- what were the enhancements that you recall working on?
A. Actually there were very good enhancement for the -- for the system. I remember the -- the system became more automated. It was a more defined process. It was a greater clarity, you know, what needs to be done and how we do it as a company. So lots of enhancement to really perfect the

Page 79

system and make it an industry cutting-edge SOM system.
Q. And when you say it was more automated, who was responsible for implementing the automation of the SOM system?
A. So we have IT, we have consultant, who provided guidance or input. We also worked the -- with internal IT folks to enhance our own system.
Additionally, we brought in outsider -- outside like ValueTrak to enhance our -- our own system.
Q. And when you say it was automated, does that mean that it would be an automatic system that would flag orders of interest if they were above the 50 percent threshold for the six-month average, is that what you're talking about?
MS. VENTURA: Objection, mischaracterizes the testimony.
MR. MAIER: Objection to

Page 80

form.
MS. BAIG: This is a question. Don't coach the witness please. It's just a question.
MS. VENTURA: I'm allowed to put my objection in --
MS. BAIG: Yeah, but you're not allowed to coach the witness. It doesn't mischaracterize any testimony. It doesn't purport to state prior testimony. It's simply a question.
BY MS. BAIG:
Q. You can answer.
A. So the -- it's not that simple of a threshold to understand the -- the automation is just the first step, was the building algorithm to flag the order of the interest.
So it's not a 25 or 50, not any just threshold. But patterns, or frequencies. There's actually a very sophisticated algorithm to build in to flag the order of interest.

Q. What was the sophisticated algorithm?
A. I mean I don't know the -- it was available. I don't remember personally.
Q. Who would know that? If you wanted to know, who would you ask what the sophisticated algorithm was?
A. It -- it was written as -- so IT folks would know them, because it needs to be built into the system.
Q. Okay.
A. Yeah.
Q. Do you know what IT folks would know that; if you wanted to ask somebody, who would you ask now?
A. The IT head at that time was Bill Ostrowski, and then there were people in his group who worked on the specific implementation of the -- of the system.
Q. But you can't tell me about the sophisticated algorithm in any detail; is that right?

A. I am not expert in IT. I know in principle, those are the considerations to build the algorithm.
Q. Do you know what the corporate awareness ad, quote-unquote, tree is? Halfway down the page on, what are we at, 207?
A. Oh, tree is an image of a tree.
Q. And bird?
A. Because there were different images, this was just referring to one of those image.
Q. And these were images in the advertisements for fentanyl; is that right?
A. That's not correct.
Q. For -- oh. "This year we created new ads for oxymorphone, methylphenidate, amphetamine combo, buprenorphine naloxone, and clobetasol lotion and shampoo"; is that right?
A. Which one are you looking at?

Q. I'm looking at --
MS. GERMANO: Objective --
BY MS. BAIG:
Q. -- end-of-year comments here, and it's discussing -- on the left-hand side, it says, "Developed product specific ads for oxymorphone, methylphenidate," do you see that?
A. Oh, I see.
Q. And then it says --
A. On the second page --
Q. -- "Corporate ad tree is done. Another one is in development."
A. Okay.
Q. Do you see that?
A. Yes, I saw that.
Q. Okay. And then on the right-hand side it says, "This year we created new ads for oxymorphone," and it goes on, correct?
A. Yes. I saw that.
Q. And then it says, "Additionally the fentanyl ad has received a model" -- "a remodel."

Do you see that?
A. Oh, I see.
Q. Okay.
A. Yeah.
Q. Okay. And then it goes on to state, "The corporate awareness ad 'tree' has been in use and bird has received a change in messaging."
Do you see that?
A. I saw that.
Q. Okay. So the fentanyl ad received a remodel. What was the remodel of the fentanyl ad?
MR. MAIER: Objection to form.
THE WITNESS: I don't remember specifically.
BY MS. BAIG:
Q. Do you remember generally?
A. I remember what the fentanyl ad looked like. I don't remember what the remodel was.
Q. What did the fentanyl ad look like?

Page 85

A. I think it was a pair of binoculars.
Q. What was that intended to symbolize?
A. I don't remember now why that was -- you know, what the -- what the discussion, why that was the case.
Q. And the corporate awareness ad for tree and bird, do you remember what the intent behind those messages were?
A. I think the trees were just the healthy growing tree.
Q. And for bird?
A. I actually don't remember what the bird looked like. And those were for company -- the -- the brand, when we referring to the brand is the company brand.
Q. And just below that it states, "Revamped corporate presentation for NACDS. With more customer focus and it was well received by both internal and external audiences."

Page 86

Do you see that?
A. Yes.
Q. How did you revamp the corporate presentation for NACDS?
A. I don't remember the specifics.
Q. Do you remember generally?
A. No.
Q. Okay. What is NACDS?
A. It's National Association of Chain Drugstores. It is a big meeting where basically we participate every year.
Q. And then it goes on state, "Presentation and sizzle slide is updated regularly."
Do you see that?
A. Yes.
Q. And this is the company presentation and the product sizzle slides that we discussed earlier?
A. So sizzle slides is not necessarily product specific.
Q. Oh, it can be product or

Page 87

company; is that right?
A. It's normally just one page, a short version of company update.
Presentation could be multiple pages.
Q. A company update created by the marketing department, correct?
A. Yes.
Q. Which can include product information, correct?
A. Depend on what you mean by product information. When they say we launched Product A, B.
Q. And would those sizzle slides be handed out at the NACDS meeting?
A. We did not hand out anything.
Q. These --
A. These were just presentation.
Q. You didn't -- oh, I see. They would be presented at the NACDS meeting?

Page 88

A. It would be used at NACDS meetings with customers.
Q. Used how? Presented or handed out?
A. So just presented.
Q. In a PowerPoint or something?
A. Yeah.
Q. I see. And would you give those presentations to NACDS?
A. No.
Q. Who would do that?
A. Okay. So NACDS does not have these big -- so the presentations are not for specific -- let me take it back.
The presentations we have are one-on-one meetings with customers. It's not on the stage big presentation to everyone.
Q. I see. So you're just presenting it individually to the customers?
A. Yeah.

Page 89

Q. At the meeting?
A. Yeah.
Q. I see. And the next item is, "The improved U.S. website, Actavis.us, was launched in the spring and has been given continuous updates to add new/remove products."
Do you see that?
A. Yes.
Q. Was the marketing department involved in preparing the -- in improving the website?
A. Yes.
Q. And what was your involvement in that?
A. I provided some guidance and comments.
Q. Do you remember anything more specifically than that?
A. Not really.
MS. VENTURA: Before we move to the next document, do you folks mind if we take a restroom break?
MS. BAIG: Sure. That's

Page 90

fine.
THE VIDEOGRAPHER: Going off the record. The time is 10:54.
(Short break.)
THE VIDEOGRAPHER: We are going back on record. Beginning of Media File 5. The time is 11:12.
(Document marked for identification as Exhibit Allergan-McCormick-5.)
BY MS. BAIG:
Q. Okay. Let's have this document marked as Exhibit 5. It is a document Bates-stamped Acquired_Actavis_0166139 through 1046. Appears to be another performance evaluation from 2012.
Do you see that?
A. Yes.
Q. And you saw this in the regular course of your business at Actavis, right?
A. Yes.

Page 91

Q. And here it appears that the budget/target has increased to $610 million per year. Do you see that?
A. Yes.
Q. And in the -- under the end-of-year comments it says, "2012 has been a fantastic year in achieving our financial objectives. November 6th year-to-date generic net sales was $705 million which is already 16 percent over the full year budget of 610."
Do you see that?
A. Yes.
Q. So by only November of that year, you had already met and exceeded generic product sales?
MR. MAIER: Objection to form.
BY MS. BAIG:
Q. Is that right?
A. Yes.
Q. Okay. And the weight assigned to meeting the target here was 40 percent; is that right?

Page 92

A. Correct.
Q. Do you see on the next page it states, under completion criteria, "Establish appropriate product specific advertising programs aligned with regulatory affairs and product approvals."
Do you see that?
A. Yes.
Q. Do you recall what product specific advertising programs you helped establish that year?
A. I don't remember specific products.
Q. But your objective was to expand advertising programs via a variety of channels to increase the outreach to target audiences, correct?
A. That's in the objective, yes.
Q. Do you remember what new corporate branding advertisement you developed?
A. I don't.

Q. Do you recall that you were updating the sizzle slide monthly?
A. That was normal course of business and normal business activity. So I would expect those to be updated on a regular basis.
Q. Do you see in the next box it talks about "we continue to promote oxymorphone ER." Do you see that?
A. I do see that.
Q. Okay. TRx refers to what?
A. Total scripts.
Q. I see. "Total scripts now has exceeded the brand peak level prior to brand discontinuation in March 2011," correct?
A. I saw that.
Q. "We also promoted mixed amphetamine ER salts to pharmacists as well as wholesalers."
What were the mixed amphetamine ER salts?
A. That's generic Adderall.
Q. And you promoted those

through direct mailing to physicians, advertising in pediatrics journal, as well as compliance at the trade level; is that right?
MR. KNAPP: Objection to form.
THE WITNESS: Let me clarify that. The mixed amphetamine salts were to pharmacists and the wholesaler McKesson, not to the physician.
BY MS. BAIG:
Q. Oh, I see. The direct mailing to physicians refers to what?
A. That refers to methylphenidate. That's Ritalin LA.
Q. Got it. "Corporate branding, new advertisement is developed but not aired due to Watson acquisition."
So you developed it prior to learning about it Watson acquisition, or what happened there?
MR. MAIER: Objection to form.

THE WITNESS: So the Watson acquisition, those are large deals. None of us would know until it's announced.
BY MS. BAIG:
Q. So you were developing the corporate branding advertisement, and then did not use it; is that right?
A. That's correct.
Q. I think you stated that you left the company in 2013. Why did you leave Actavis?
A. Because Actavis was acquired by Watson. So there was leadership change.
Q. So were you asked to leave at that time?
A. I did not have my existing position.
Q. Did they offer another position to you?
A. There were interest to offer me other positions, but I wasn't interested.

Q. I see. You understand that you've been designated as a custodian of documents to be produced in this case?
MR. MAIER: Objection to form.
THE WITNESS: Yes.
BY MS. BAIG:
Q. That your files were sought in connection with this litigation, right?
A. Yes.
Q. Okay. And do you know which of your files were searched for in connection with that production?
MS. GERMANO: Objection to the extent that it goes into any privileged communications.
THE WITNESS: I left Actavis six years ago. I would not know what was searched. I would assume everything that was available were searched.
BY MS. BAIG:
Q. But you don't know one way

or another?
A. I do not.
Q. Did you ever use personal computers or other devices such as phones or iPads for work purposes?
A. Which time period are you referring to?
Q. When you were at Alpharma and Actavis?
A. Oh, I used the company's computer for company business. And I had the phone from company. I did not have an iPad at that time.
Q. And did you have to return the phone when you left the company?
A. Yes.
Q. And did you use text -- text messages for company business?
A. Yes.
Q. Did you ever use any other sort of program other than e-mail -- did you use a personal -- actually, did you use a personal e-mail address to conduct company business ever?

A. Not in the normal course of business.
Q. Do you know if you have any personal e-mails? Do you know if you have any company e-mails on your personal account that still exist?
A. I don't believe so.
Q. Have you looked?
A. Personal e-mail, I did.
Q. Did you find any e-mails?
A. No, I did not.
Q. Did you receive other performance evaluations while at Actavis other than the ones that we've just been through, that you recall?
A. This is a standard -- every year everyone received them.
Q. When you left the company, did you enter into a severance agreement?
A. Yes.
Q. And did that severance agreement -- under that severance agreement, were you paid a lump sum of money?

A. No. It was in the form of continuation for -- you know, like a regular paycheck, come for a period of time.
Q. So they continued to pay you for your regular salary?
A. So it's a severance. Instead of a lump sum, it was distributed in the interval of the normal paycheck.
Q. And what amount was distributed to you as part of the severance agreement?
A. I don't remember.
Q. Do you remember roughly?
A. Roughly it's based on the year of service, so I want to say it's 16 weeks.
Q. 16 weeks of salary?
A. Yeah. It's two weeks per year of service.
Q. As the director of generic marketing, you were the one leading the generic marketing team that we discussed, correct?

A. Yes.
Q. And you were the one responsible for leading the oxymorphone ER launch; is that right?
A. Yes.
Q. And you reviewed market research and delivered quarterly market share reports; is that right?
A. The quarterly market share reports cover every product.
Q. And who were those delivered to?
A. Those were delivered to sales and marketing and people who might need them. It's internal.
Q. And you delivered quarterly market share reports for every product, including generic opioids, correct?
A. For every product.
Q. And you provided marketing in financial evaluations?
A. Can you clarify what -- clarify your question, please.
Q. In the capacity of director

of marketing, did you provide marketing and financial evaluations to anyone at the company on a regular basis?
MR. MAIER: Objection to form.
THE WITNESS: Yeah, as part of my job, of course there's marketing information to, you know, my managers and people who are regularly conducting business. And the evaluation would be supporting business development, product selection. Yeah, various teams.
BY MS. BAIG:
Q. And would you also create marketing forecasts for pipeline products?
A. I did.
Q. And would you -- were you responsible for developing sales projections of all generic products in the annual budget?
A. Ultimately, yeah, it fell

within my responsibility.
Q. And were you responsible for creating targets for the people that reported to you?
A. So target -- if I were to consider them the same as my objectives, so it's not a single number or anything. Target is really objectives in different aspects of doing the job.
Q. Which sometimes include numbers as well, correct?
A. Of course.
Q. Okay.
A. It's part of our job, right, to --
Q. So, I'm just trying to understand if it was your responsibility to create those target numbers for the people that worked for you?
A. Yes.
Q. Okay. And how did you go about doing that?
A. Typically each individual would look at the company objectives and

then take that into consideration and align with their individual responsibility and come up with goals and objectives for the year. And I would approve them.
Q. And did you work with anybody in creating those target numbers?
A. You mean the sales budget or the objectives?
Q. Whatever target numbers that you were giving to the members of your team?
A. Yes. I worked with all of them to create those objectives.
Q. You worked -- you would provide them the target numbers or -- who did you -- my question is, who did you work with to come up with targets for your team?
A. So the process is such the company set the objectives first. And we wanted our objectives to be aligned with a company's perspective -- objectives.
Q. Sure. I'm talking about the

numbers for now.
A. Okay.
Q. I appreciate that there are a number of different objectives. The budgets/targets that we discussed before --
A. Okay.
Q. -- that were increasing year over year for you. And I'm wondering if you set targets for your team members similar to the ones that you had, or -- or different.
MS. GERMANO: Objection --
MR. MAIER: Objection to form.
MS. GERMANO: -- as to form and to accuracy.
THE WITNESS: Okay. I know it's a little complicated, but the budget number was set at the company level. Then became my budget. I had product managers who have individual budget which depend on the product they manage.

Page 105

So those -- the sum of the product they manage becomes their budget. Does that make sense?

BY MS. BAIG:

Q. Did they have sales goals?

A. They have budget objectives such as mine, similar to mine.

Q. Were those sales goals?

A. Those were revenue objectives.

Q. Okay. And how did you go about setting those revenue objectives for your -- the people that reported to you?

A. Okay. So if I were to use example, if the company's budget is, say $600 million, each person in my group, if they manage product, let's say if the product they manage 20 product, that 20 product revenue adds up to $200 million, then their budget objective would be $200 million.

Q. Okay. And their bonus potential would be in part measured

Page 106

against their ability to meet those targets; is that right?

A. The -- the ability to meet those budget numbers are one of the component of their evaluation.

Q. And did you work with anybody else in setting those numbers for your team, did you work with the person you reported to, or anybody else, in setting those numbers, or did you do that on your own?

A. So with my team, I worked with my team individually to set up those goals.

The company budget was set, of course, working with many other teams to set the company budget, Mike Perfetto, and his boss, you know, product development team. So many other people, to come up with the company budget.

Q. And how many people did you have reporting to you when you were at Actavis, was it just those four that we've talked about already, or did you

Page 107

have others reporting to you as well?

A. So there were turnover of course. So there were people who came, who joined the team, who left the team, we, you know, filled those positions. So there were other peoples during my course of eight years there.

Q. Was the number of people that reported to you ever larger than four?

A. I'm really not sure.

Q. Okay. But it was never like 50 or something like that?

A. No. It could be five.

Q. It was in that range?

A. Yeah.

Q. Okay. In looking at your performance evaluations, I can see that your targets were increasing year over year. Do you know whether or not that was consistent with the targets that you set with your -- for your team members?

MS. GERMANO: Objection --

BY MS. BAIG:

Page 108

Q. Were theirs increasing year over year as well?

MS. GERMANO: Objection. Mischaracterizes.

MS. VENTURA: Join the objection.

THE WITNESS: So my team's objectives are aligned with mine, which was aligned with the company objectives. So it depends on the product they manage, you could fluctuate.

BY MS. BAIG:

Q. You were ultimately responsible for trying to drive generic sales for all of your products, but including your opioid products, correct?

MR. MAIER: Objection to form.

MS. VENTURA: Objection to form.

THE WITNESS: I'm one of the people who were responsible for driving the company's business.

Page 109

BY MS. BAIG:
Q. But talking about you, you were responsible for driving the company's generic opioid sales, correct?
MR. MAIER: Objection to form.
THE WITNESS: See, in these days it's always a team, right? So I headed the marketing. And there was my boss, there's a sales team, and really product development team. Everyone was working to drive the company's growth.
BY MS. BAIG:
Q. Were you also responsible for driving brand name drug sales?
A. I was not.
MS. GERMANO: Objection.
BY MS. BAIG:
Q. So you were primarily involved with driving generic drug sales?
MS. GERMANO: Objection.
MR. MAIER: Objection to

Page 110

form.
THE WITNESS: Only generic prescription drug sales.
BY MS. BAIG:
Q. Okay. And in your efforts to do that, what marketing tools did you use to drive --
MS. GERMANO: Objection to form --
BY MS. BAIG:
Q. -- sales for generic products?
MS. GERMANO: -- and foundation.
THE WITNESS: I mean this is a big question. To drive a business growth, it required really the whole company. It wasn't just me.
BY MS. BAIG:
Q. Sure. No, I understand that. I'm just talking to you about what you know and the tools that you used in the -- in your capacity as marketing

Page 111

director.
What marketing tools did you do to try to drive those sales of generic opioid products?
MR. MAIER: Objection to form.
THE WITNESS: So generic sales typically would -- to drive the growth of generic sales involves a number of factors.
One of them is really gaining the distribution at wholesalers, distributors, retail chains.
And second, is by lowering the cost, working with the production team. And to gain that distribution or market share at our customers require us to, you know, be a good supplier which means a good consistent supply, as well as competitive price.
BY MS. BAIG:
Q. So, but you were the

Page 112

director of marketing. My question to you is, what marketing tools did you use to try to drive sales?
We've talked about a few. We talked about sizzle slides, for example. We've talked about meetings that you've had with the customers.
What -- we've talked about -- your use of ad agencies.
What other types of tools did you drive -- did you use to try to drive sales?
A. So --
MR. KNAPP: Objection to form and foundation.
MS. VENTURA: Objection to form.
MR. MAIER: Objection to form.
THE WITNESS: So to drive sales -- the generic marketing really is different from, if you were to think about the consumer goods or the brand marketing.

Generic marketing is so much about product management which means to supply -- to make the medicine available, accessible and affordable with good service and supply to the customers.

So this notion of advertising that drives it is -- is such a minor component of generic marketing.

BY MS. BAIG:

Q. But you did hire an advertising agency.

A. Yeah. That's why it's a small one.

Q. Okay. And did you use Kadian sales reps to detail generic opioids to doctors?

MS. VENTURA: Objection to form.

THE WITNESS: We did not hire the Kadian sales rep to detail the generic opioids.

BY MS. BAIG:

Q. No. Did you use them though, is my question.

A. We --

MR. KNAPP: Please just let the witness finish. I think she was still answering the question.

MS. VENTURA: And objection to form.

THE WITNESS: So we used them just to make the doctors aware that generic products on very select cases was available. They were not detailing any benefit of the -- the medicine.

BY MS. BAIG:

Q. And who trained the Kadian sales reps on what they were to say about generic opioids when they were visiting doctors?

A. I mean there was sales team, there was training from marketing and legal. I don't remember exactly who trained them. But they were properly trained.

Q. They were what?

A. They were properly trained.

Q. Well, were you at the training?

A. I was not.

Q. So you weren't involved in training -- in training the sales reps?

A. I was involved in the material used to train them.

Q. What were the materials used to train them?

A. I -- it's really just to let them know the -- what they could or could not say. It really was about the availability of the generic product.

Q. And do you know when the company started using Kadian sales reps to market generic opioids?

MS. VENTURA: Objection to form.

THE WITNESS: It was only on the very selective cases, like oxymorphone and the generic Kadian. So, morphine sulfate.

BY MS. BAIG:

Q. Sure. But my question was, do you know when the company started using Kadian sales reps to market generic opioids?

MS. VENTURA: Same objection.

MR. MAIER: Objection to form.

THE WITNESS: I don't remember.

(Document marked for identification as Exhibit Allergan-McCormick-6.)

BY MS. BAIG:

Q. I'll have this document marked as Exhibit 6.

This document is Bates-stamped ALLERGAN_MDL_00235615 through 5616. It's just an e-mail between you and Rachelle Galant and others.

Do you see that?

A. Yes.

Page 117

Q. And you're asking her to lead the call for marketing. Was there a regularly scheduled call on Mondays for marketing?
A. We had regular calls on Monday.
Q. And do you see where it's listed oxymorphone ER?
A. Yes.
Q. And it references, "Encouraging initial feedback from Kadian sales reps."
Is that a reference to receiving encouraging feedback from Kadian sales reps?
A. I think it's to -- to get feedback from the sales team on -- on their activity.
Q. So if you read, the next sentence, it says, "Physicians are receptive and welcome the generic strengths."
Do you see that?
A. Yes.

Page 118

Q. Does that suggest to you that that is the encouraging feedback that you're getting from Kadian sales reps?
MR. MAIER: Objection to form.
THE WITNESS: So oxymorphone, the two strength we launched were discontinued by brand, and so this is referring to welcome the generic strength, because brand had discontinued.
BY MS. BAIG:
Q. Do you recall why the brand was discontinued?
A. I do not.
Q. You didn't have any information on that at the time?
A. We had information at the time. I just do not remember now.
Q. Do you recall whether or not it was related to abuse potential?
MR. MAIER: Objection to form.

Page 119

MS. VENTURA: Objection to form.
THE WITNESS: I do not know that.
BY MS. BAIG:
Q. Would Jennifer Altier have been the person that would have trained the Kadian sales reps with respect to the marketing of generic opioids?
MS. VENTURA: Objection to form.
THE WITNESS: I don't remember.
BY MS. BAIG:
Q. Did you have something called sell sheets?
A. Yes.
Q. What are sell sheets?
A. It's a -- typically a one-page, maybe two, of material that we would use with customers.
Q. Material about specific products?
A. It could be products. It

Page 120

could be -- it could be company. But typically it's a product.
Q. Okay. And how were the sell sheets provided to the customers?
A. Customers were -- let me put it -- it's -- our customers are not patients and physicians typically. So they are the buyers from the pharmacy or the wholesalers. So we could either just e-mail to them, show it to them. Typically, it's in those forms, or have a meeting with them, could leave it to them.
(Document marked for identification as Exhibit Allergan-McCormick-7.)
BY MS. BAIG:
Q. I'll have this document marked as Exhibit 7. This document has a Bates stamp -- has a Bates stamp of ALLERGAN_MDL_03998242 through 3998263.
And you'll see it begins with an e-mail from you to Lisa Pehlke, Mike Dorsey, Mike Perfetto, and others,

stating, "Enclosed, please find the following information for oxycodone ER launch." And this is dated November 10, 2009.

Do you see that?

A. Yes.

Q. And the first bullet point is, "Sell sheet including PI" -- what's PI?

A. Product information.

Q. -- "including product information can be sent to customers."

So is the sell sheet attached here?

A. Yes.

Q. Which one is the sell sheet?

A. The Bates number ending 246.

Q. Okay. So this was the sell sheet that you were using for the oxycodone ER launch; is that right?

A. Yes.

Q. And is this sell sheet -- how many pages is the sell sheet?

A. One, plus the PI.

Q. Product information begins on the next page?

A. Those are labels. Those are small prints. Those are FDA-approved product label. So all the small prints --

Q. The very small print, that's the product information?

A. Yeah.

Q. Okay. And then if you turn to the page beginning 253, is that still part of the product information or is this different?

A. 253? Oh, this is the HDMA form.

Q. What is an HDMA form?

A. It's -- so the Healthcare Distribution Management Association, HDMA, requires companies to fill this form, standard form for drug distribution for every product you sell. And this is used for basically wholesalers and retailers that buy the product.

Q. Did you use pricing and

incentive programs to try to market generic opioids?

MR. MAIER: Object to form.

THE WITNESS: So generic compete -- one of the very important components is to compete on pricing to make the medicine affordable to patients.

BY MS. BAIG:

Q. And so in order to do that, did you implement certain pricing and incentive programs?

A. This pricing incentive is built into the product offer, to our customers. It's also built into the master agreement.

Q. Were you involved in developing pricing and incentive programs or was that a different department?

A. Contract and sales are more involved with setting up the contract.

Q. So you didn't have any involvement with developing pricing and incentive programs in order to market the

generics?

MR. MAIER: Objection to form.

MS. GERMANO: Objection to form.

THE WITNESS: In general, I did not.

BY MS. BAIG:

Q. Are you familiar with something called the marketing choice program?

A. No, I'm not.

Q. Are you familiar with the term "customer connectivity program"?

A. I don't remember.

Q. In terms of the rebates that were offered to certain of your customers, were you involved in determining what they should be or where they should be set?

A. Typically not.

Q. Can you remember any instances when you were, for generic opioids?

A. So products typically were sold falling under the master agreement. And price is specific. But the agreement was not product specific.

Q. Do you recall whether there were product specific rebates that were offered?

A. You could have product-specific rebate and -- during the time that a product was offered to our customers.

Q. Were you involved in developing that --

A. I was not.

Q. -- or was that outside of your --

A. That was outside of my responsibility.

Q. Okay. So you don't have any knowledge of the rebate percentages that would have been used for various opioid products; is that right?

A. I did not.

Q. You don't have any knowledge

of that right now?

A. I don't.

Q. Other than the advertising agencies that you referenced earlier, are there any other entities that you worked with in order to market or promote generic opioids?

MR. MAIER: Objection to form.

THE WITNESS: I don't remember working with anyone other than the one we mentioned earlier, and then the -- the one following that agent.

BY MS. BAIG:

Q. Do you recall whether or not Actavis was paying marketing fees to customers?

MS. VENTURA: Objection to form.

THE WITNESS: If there was specific marketing programs set up with the customers, that could be a fee. But in general, we don't

pay specific -- we don't pay marketing fees to customers.

BY MS. BAIG:

Q. So what's the example, what's an example of a specific marketing program that could be set up with customers?

A. So if we ask McKesson to promote a product, there will be specific program fees for the -- for that product -- for that product and project. So that would be separate approval and...

Q. Separate approval from whom?

A. Separate fees, separate approval from -- from both the McKesson side and from the Actavis side.

Q. And if you ask McKesson to promote a product, would that be reflected in the product agreement with McKesson or what agreement -- would that be a separate standalone promotional agreement with McKesson?

MR. KNAPP: Objection to form.

MR. MAIER: Objection to form.

BY MS. BAIG:

Q. Where would I find that language?

A. That would be a separate agreement. And -- so the agreement between Actavis and all their customers have a master agreement.

Q. So there would be one master agreement and then there would be a separate marketing agreement if one existed; is that right?

A. Yes.

Q. Okay. And do you recall any such agreements with any customers?

A. We have used -- occasionally used wholesalers to promote the product, really in the way to make it aware, really it's about awareness that the generic product became available.

Q. So when you use wholesalers to market the product, do you review the materials that they use to do that before

Page 129

they use them?
MR. MAIER: Object to form.
THE WITNESS: I did not review the -- their material.
BY MS. BAIG:
Q. Do you recall a program being set up with McKesson to that effect?
MR. BAILEY: Objection to form.
THE WITNESS: I remember one, mixed amphetamine salts. We set up a program with McKesson so they could reach out to their pharmacies to make it aware that our -- our product was available, you know, as one example, I remember.
BY MS. BAIG:
Q. Do you recall any others?
A. Not specifics.
Q. Generally?
A. Not at this point.
Q. Do you recall using volume

Page 130

incentive programs to try to market generic opioids?
MR. MAIER: Objection to form.
MS. GERMANO: Objection to form.
THE WITNESS: We use volume incentive program to grow the business with a customer, not a specific product.
So it's for the entire basket of product with the customers and not a product specific volume incentive rebate.
BY MS. BAIG:
Q. Okay. But you would use volume incentive programs for a basket of products that included opioid products, correct?
MS. VENTURA: Objection to form, foundation.
THE WITNESS: So the basket typically is not specific to any product. It could include

Page 131

basically the entire portfolio of Actavis product with the objective of growing the business with a particular customer.
BY MS. BAIG:
Q. You mean the basket is not specific to the product or the volume incentive is not specific to the product?
A. So the volume incentive is not specific to do product. So all of the Actavis product are included in the basket.
Q. Including the generic opioids, correct?
A. Including all of the product.
Q. Do you remember what those volume incentive programs looked like?
A. Some of them. Each product -- so each customers may have different volume incentive program, different variation. And not all customers have volume incentive program.
Q. Are they primarily offered

Page 132

to your larger customers?
A. No.
Q. Are they primarily like -- which customers would -- would be offered the volume incentive programs?
A. It's -- it could be a mixture of both small and large.
Q. What goes into that analysis?
A. So the analysis is what the customer's value in terms of their business operation. Some prefer a volume incentive program. Others would just prefer a low net price.
So it is catering to, you know, different strategies for different customers.
Q. Did you do trade shows as part of your work at Actavis and Alpharma, did you attend trade shows?
A. Yes, I did.
Q. What type of trade shows?
A. So there are lots -- there were lots of trade shows. Typically

wholesaler conduct trade shows. Like Amerisource, Cardinal, McKesson, all had their own trade shows. And so I attended some of those throughout the years.

There were meetings and they're -- they might be referred as trade shows. But there were meetings like NACDS, or ECRM and HDMA conference -- conferences.

Q. What is ECRM?

A. It -- I don't remember exactly the acronym. Efficient -- efficient collaborative marketing. Something to that effect.

Q. And you would attend these trade shows for the purpose of building relationships with your customers?

A. Yes. To also understand the customers' perspective.

Q. And your competitors would attend as well?

A. Yes.

Q. And would you have booths at the trade shows?

A. Depends on the shows. Typically we do, except ECRM which has just meeting rooms, no booths.

Q. And if you had a booth at a trade show, would you hand out materials at the trade show?

A. Depends on the -- the show itself. At NACDS really there were just one-on-one meetings with customers. We could potentially give them a sell sheet like this, or any of them.

Typically we don't have much of material to hand out.

Q. Were the sizzle slides sometimes handed out at the trade shows?

A. Actually not, most of the time not.

Q. They were never handed out at trade shows?

A. So the sizzle slides were only presented to customers on a one-on-one basis. We could have e-mailed them, but we would not just hand out to anyone who walked by.

Q. But if you were at a trade show in which you were meeting with the customers one-on-one, would you hand out the sizzle slides there?

A. We could. We -- we would show them or talk to it, yes.

Q. And who was responsible for preparing the materials that were used at the trade shows?

A. Depends on the material. The marketing group typically worked on the sales presentations, as well as the sizzle slides. And so my group would be responsible for preparing the material.

Q. And what were the sales presentations?

A. Best business review. It typically has company update, business review specific to the customer we were meeting. And maybe pipeline of product and how to grow the business, as well as maybe some open discussion points, issues that the sales team wanted to address with that specific customer.

(Document marked for identification as Exhibit Allergan-McCormick-8.)

BY MS. BAIG:

Q. I'll have this document marked as Exhibit 8.

In addition to volume incentives, did you offer other types of incentives to stores in order to promote generic opioids?

MR. MAIER: Object to form.

THE WITNESS: I'm just reading through the material that you provided here.

BY MS. BAIG:

Q. Okay. So in addition to volume incentives, did you offer other types of incentives to stores in order to promote generic opioids?

MR. MAIER: Object to form.

THE WITNESS: As I'm reading through these e-mails, so this is more of a stocking program because the oxy ER -- sorry, oxymorphone

Page 137

ER was discontinued by the brand.
BY MS. BAIG:
Q. Okay. Do you see that -- so this is an e-mail that is -- did I put the Bates stamp number? That's Bates-stamped ACTAVIS_0623776 through 781.
And do you see the subject of the e-mail is "McKesson marketing opportunities, Actavis oxymorphone ER."
Do you see that?
A. Yes.
Q. Okay. And this is written from you, correct?
A. I replied to Ara's e-mail. Yes.
Q. And it's sent -- at least the first e-mail string is sent from you and dated August 19, 2011, correct?
A. Yes.
Q. All right. So it's a discussion about McKesson marketing opportunities for Actavis oxymorphone ER; is that right?

Page 138

A. This is a proposal discussion, yes.
Q. That's the heading of the discussion, right?
A. Mm-hmm.
Q. Okay. And you're writing here, "I agree, if we provide incentive to stores, say $25 for first bottle, that's $12,500 and an additional $10 to McKesson for the first bottle order which is $5,000. This way we can put product at 500 stores."
Is this an example of an incentive that would be offered to stores in order to promote generic sales?
MR. MAIER: Object to form.
THE WITNESS: This is, I think, the only time I remember we did this to -- with McKesson to promote the product to really -- to get the stock, initial stock at the store.
BY MS. BAIG:
Q. This is the only one that

Page 139

you remember as you sit here right now?
A. This is the only one that I can remember right now.
Q. Okay. And when you're offering $25 for first bottle, is that a discount that you're offering?
MR. BAILEY: Objection to form.
THE WITNESS: I don't remember exactly what form it took. It could be discount or effectively discount.
BY MS. BAIG:
Q. What do you mean "effectively discount"? Do you mean like a rebate?
A. We -- so it could take on different form. It could be just a reduction in the price, or initial order discount.
Q. What other forms could it take?
A. We could give a total back to -- back to the store.

Page 140

Q. Like a chargeback?
A. No.
Q. Something different?
A. It's, just from logistic point of view, you could also give them -- just give them credit, for example.
Q. And what would that be called if it was given as credit? Is it called a coupon or a rebate or a chargeback, or what it's called?
A. It wouldn't be called a coupon. It wouldn't be called a chargeback. It would either be off invoice or a credit.
Q. Okay. And do you see a little further down, there's an e-mail from Ara to you and Mike Perfetto and it says, "Think we are on the same page. Like the limited focus of calls to only those stores that have purchased brand in the past nine months (or do we refine to six months?) Let's ratchet it down with what we pay them to make the calls and

Page 141

potentially give them an opportunity to earn five times or six times the number (25K to 30K) based on providing proof of store stocking in a period of 30 days. With the 25K to 30K, we should get some to the retailer to incentivize them to order and fast."

Do you see that?

A. Yes.

Q. Okay. Is this -- first of all, what is the -- what are the calls that he's talking about, "We pay them to make the calls"?

A. So McKesson, that was -- what's Ara is referring to is to have McKesson call the pharmacies to stock the product to get it started, because the brand had initially discontinued the product and the pharmacies may not be aware that a generic product equivalent to the brand Opana is avail -- was available at that time.

Q. So you're paying McKesson to call the pharmacies regarding the

Page 142

product; is that right?

MR. BAILEY: Object to form.

THE WITNESS: It's for the stocking the store.

BY MS. BAIG:

Q. And it says here, "And potentially give them an opportunity to earn five times or six times the number." What does that mean? Who's earning five times or six times the number?

A. I wouldn't know what he meant. I would think it's McKesson.

Q. So McKesson has the opportunity to earn money if they make these calls?

MR. BAILEY: Object to form.

BY MS. BAIG:

Q. Is that how you read this?

A. Yes, because for them to sell more product and they have opportunity to make more profit. I mean, that's their business model. They're distributors. They're in the -- wholesaler/distributor.

Page 143

Q. And they would then have that opportunity to make more profit based on providing proof of store stocking. Who do they have to provide proof of store stocking to? To you?

A. To us, to get the -- say, the $25 credit.

Q. I see. "With the 25 to 30,000 we should get some of the retailer to incentivize them to order and fast."

So the purpose behind this was to drive sales by incentivizing the retailers to order fast; is that right?

MR. MAIER: Object to form.

MS. VENTURA: Objection to form.

THE WITNESS: So oxymorphone is a very low volume product, and the brand discontinued.

Actavis was the first generic to launch this product. Therefore, the retailer, meaning the pharmacies, did not know we actually had this generic

Page 144

available for the patient who might actually need them. So this is awareness to put the product, the first bottle in the -- in the store.

BY MS. BAIG:

Q. And you don't recall why the brand was discontinued, right?

A. I do not.

Q. You never learned anything about why Opana ER was discontinued?

A. I do not remember.

Q. Do you see on the next page there's an e-mail from John Hansen. Who is John Hansen again?

A. John Hansen was director of marketing at McKesson.

Q. Oh, okay. Did you have a relationship with John Hansen?

A. I did work with him.

Q. Did you work with him regularly?

A. No.

Q. And John Hansen is

Page 145

responding with a, quote, "Slightly modified proposal for our promotional opportunities." Is that right?
A. Yes.
Q. He goes onto state, "In light of the fact that we are targeting only 500 pharmacies with significant brand sales, I've lowered the prices for the GenericsConnect phone campaign and the fax blast in addition to reducing the store count for the mailer."
Do you see that?
A. Yes.
Q. So does this suggest to you that McKesson is doing the GenericsConnect phone campaign, fax blast and mailers, or is that something that Actavis is doing?
MR. BAILEY: Objection to form.
THE WITNESS: It's McKesson.
BY MS. BAIG:
Q. McKesson is doing it. So that's --

Page 146

A. It's -- generic Connect is a McKesson program.
Q. I see. And when he talks about targeting 500 pharmacies with significant brand sales, how would he have the data of the 500 pharmacies with significant brand sales?
MR. BAILEY: Objection to form and foundation.
THE WITNESS: So wholesalers would sell to pharmacies. They should have that data, while Actavis didn't.
BY MS. BAIG:
Q. Okay. Well, you would have that data to the extent that the wholesalers provided it to you in the chargeback data, correct? We discussed that earlier.
MR. BAILEY: Objection to form.
MS. GERMANO: Objection to form.
MS. VENTURA: Objection to

Page 147

form.
THE WITNESS: We would have data only on the product we sell. We would not have chargeback data on somebody else's product.
BY MS. BAIG:
Q. I see.
A. And this is brand sales.
Q. I see. So it makes sense that you used McKesson to target these 500 pharmacies because they have the data to all of the pharmacies that were high prescribers for the brand drug that you're now selling the generic for?
MS. GERMANO: Objection to form.
MR. MAIER: Objection to form, foundation.
THE WITNESS: So I would not know what they have, but these are not prescribers, these are pharmacies who dispense brand Opana.
BY MS. BAIG:

Page 148

Q. So high dispensers?
A. Yes.
Q. And they would target the high dispensers?
MS. GERMANO: Objection to form.
MR. MAIER: Objection to form.
MR. BAILEY: Objection to form.
BY MS. BAIG:
Q. Is that right? He says it right here. "We are targeting only 500 pharmacies with significant brand sales." Is that your understanding of what was happening?
A. The 500 pharmacies?
Q. Right.
A. Yeah.
Q. With significant brand sales?
A. Yes.
Q. So that suggests, does it not, that he's targeting pharmacies that


Page 149

have higher sales?
MR. MAIER: Object to form.
THE WITNESS: With higher sales, yes, in the past.
BY MS. BAIG:
Q. Do you know anything more about the GenericsConnect phone campaign?
A. I don't know the details.
Q. Was that campaign such that McKesson was going to be contacting pharmacies by phone to market oxymorphone ER?
MR. MAIER: Objection to form.
MR. BAILEY: Objection to form.
THE WITNESS: So this program is specific to oxymorphone, so that would be our expectation that's what this phone campaign would be, to make the pharmacies aware of the availability of the generic oxymorphone ER.

Page 150

BY MS. BAIG:
Q. And who were the people that were making those phone calls, those were McKesson employees?
MR. BAILEY: Objection, form.
THE WITNESS: I do not know who these people were.
BY MS. BAIG:
Q. Do you know whether they -- would you expect that they would be people from McKesson's marketing department?
MR. MAIER: Objection to form, foundation.
THE WITNESS: I do not know how they structured their marketing program or -- nor the employees.
BY MS. BAIG:
Q. You don't know anything about that?
A. I don't.
Q. And you didn't have any

Page 151

involvement in training the people that were calling the pharmacies about the generic oxymorphone ER from McKesson, correct?
MR. BAILEY: Objection to form.
THE WITNESS: I did not have involvement with the training.
BY MS. BAIG:
Q. And do you see he references also a fax blast?
A. Yeah.
Q. Would you have had involvement in -- in the materials that were being blasted by fax?
A. There -- as far as I understand, all these messages that they proposed to do would have to go through their legal reviews.
Q. Not yours, correct?
MS. VENTURA: Objection to form.
THE WITNESS: We provide the information to them. Those

Page 152

information would go through our internal review. And I wouldn't think it's any different from the -- earlier the sell sheets or the profile you've seen, similar to that.
BY MS. BAIG:
Q. But you don't know because you didn't review it, correct?
A. That's correct.
MR. BAILEY: Objection to form.
BY MS. BAIG:
Q. And is that -- he discusses also a mailer. Do you know what McKesson was sending out in its mailers with respect to oxymorphone ER?
MR. BAILEY: Objection to form.
THE WITNESS: Mailer is -- so when they ship product, they will include some additional material in the -- in the box. So that's what the mailer is for.

BY MS. BAIG:
Q. Okay.
A. Yeah.
Q. Do you know who Amber Kehoe's product management team is?
A. Yes.
Q. Who is that?
A. That is McKesson product management team who interacted with manufacturers.
Q. Okay. So do you see the e-mail here from John Hansen, director of marketing at McKesson stating, "In collaboration with Amber Kehoe's product management team, I've put together a marketing plan to promote awareness of your recently launched oxymorphone ER tablets."
Do you see that?
MR. BAILEY: Objection to form.
THE WITNESS: Which page are you looking at?
BY MS. BAIG:

Q. Next page.
A. Oh, I see. Yes, I saw that. Mm-hmm.
Q. Okay. And do you see he goes on to state, "I understand that you are looking to target this to the approximately 500 accounts with significant brand purchase history and have accounted for that in the proposal. Please note, however, that many of our communications vehicles can reach a larger population at no additional charge."
Do you see that?
A. Yes, I saw that.
Q. Do you know what communications vehicles he's talking about?
MS. GERMANO: Objection.
THE WITNESS: I would think that's referring to the phone, the fax, and the store -- and the mailer.
BY MS. BAIG:

Q. Okay. And on the next page, do you see an e-mail from Ara Aprahamian?
A. Okay.
Q. What was his position again?
A. Ara?
Q. Mm-hmm.
A. He was the director of pricing and contract.
Q. And do you see that he's reached -- he's reaching out to Amber Kehoe at McKesson stating, "As you know, we have recently launched oxymorphone ER 7.5 milligrams and 15 milligrams, (attached launch notice), and need your assistance with the following: One, run a query of brand Opana ER 7.5 milligrams and 15-milligram sales within McKesson for the past nine months to identify high purchasing pharmacies."
Do you see that?
A. Yes.
Q. So you're relying on McKesson to identify the high purchasing pharmacies that you can then target for

generics marketing; is that right?
MR. BAILEY: Objection to form.
MR. MAIER: Objection to form.
THE WITNESS: We're relying on them to know these pharmacies.
BY MS. BAIG:
Q. That you can then have them contact about generic oxymorphone, correct?
A. Yes. Awareness. As you see John wrote back saying to promote awareness of the recently launched oxymorphone ER tablets.
Q. And he goes on to state -- Ara goes on to state, "Coordinate a stocking promotion/offer to those target stores."
Do you see that?
A. Yes.
Q. Are there other types of stocking promotion offers that you can recall being used to promote generic

Page 157

opioids?
MR. MAIER: Objection to form.
THE WITNESS: See, oxymorphone was a special case, because the brand discontinued and it was a very small volume product.
BY MS. BAIG:
Q. My question to you is, are there other types of stocking promotion offers that you can recall being used to promote generic opioids?
MR. MAIER: Object to form.
THE WITNESS: I do not remember at this time.
BY MS. BAIG:
Q. Okay. And then he goes on to state, "Item 3, ship product to those target stores, based on receiving pharmacy order inhouse." And then he goes on to state, "We are promoting awareness direct to physicians on the availability of Actavis generic

Page 158

oxymorphone ER 7.5 milligrams and 15 milligrams, but facing some stocking challenges in the pharmacy and would like to partner with you on this."
Do you see that?
A. Yes.
Q. Okay. So your understanding is that they were promoting awareness direct to physicians, correct?
MR. BAILEY: Objection to form.
MS. VENTURA: Objection to form.
THE WITNESS: We were making the physician aware of the availability of our generic product.
BY MS. BAIG:
Q. But you are using McKesson to do that, correct?
MR. BAILEY: Objection to form and foundation.
THE WITNESS: We're using McKesson to make the pharmacy

Page 159

aware of the generic availability.
BY MS. BAIG:
Q. Oh. Who was doing the promotion direct to physicians?
MR. MAIER: Objection to form.
THE WITNESS: That's the Kadian sales team to make physicians aware of the availability of the generic product.
BY MS. BAIG:
Q. So that's not McKesson?
A. That's not McKesson.
Q. This e-mail is not contemplating McKesson doing that, that's --
A. Oh no.
Q. That's just Actavis doing that, correct?
MR. MAIER: Objection to form.
THE WITNESS: Yes.
BY MS. BAIG:

Page 160

Q. Are you familiar with --
MS. GERMANO: Counsel, are we moving into a new area? I'm just watching the clock.
MS. BAIG: Maybe.
MS. GERMANO: I'm wondering if this is a good time to break for lunch?
MS. BAIG: We can.
THE VIDEOGRAPHER: Going off record. The time is 12:28.
\- - -
(Lunch break.)
\- - -
A F T E R N O O N S E S S I O N
\- - -
THE VIDEOGRAPHER: We are going back on the record. This is the beginning of Media File Number 6. The time is 1:16.
\- - -
EXAMINATION (Cont'd.)
\- - -
(Document marked for

identification as Exhibit Allergan-McCormick-9.)

BY MS. BAIG:

Q. I'll have this document marked as Exhibit 9. This document is Bates stamped Actavis 86122 through 128.

MS. VENTURA: If I can just note for the record, this document was reproduced with an MDL Bates number and a confidentiality designation. I'll state that once in case any similar documents are introduced later in the deposition, and we would just like to replace those with the MDL Bates-stamped version that has the confidentiality designation.

MS. BAIG: Okay.

BY MS. BAIG:

Q. This starts as an e-mail from you to David Marlow dated August 22, 2011. Who is David Marlow?

A. He was a supply chain manager.

Q. At Actavis?

A. Yes.

Q. Okay. And it states a little further down, "Attached please find quarter 2 2011 market share book based on the most recent IMS data ending June 2011."

And it sets forth that there are five reports attached. Do you see that?

A. Yes.

Q. Part 1 is top competitor, top products report. Report 2 is SOD which includes all SOD entities. What is SOD?

A. Solid oral dose. Solid oral dose.

Q. Okay.

A. Product.

Q. Does that -- and what's ASA that's listed there?

A. It's ASA in South Florida, it's one of the entities of Actavis.

Q. Okay. Do you remember what

it stands for?

A. I don't. It's a company we acquired. It starts with an A, Abrika.

Q. And was it a company that was working on opioid products?

A. We acquired them, that -- that company had fentanyl patch. Or developed fentanyl patch.

Q. They developed the fentanyl patch?

A. They developed the generic fentanyl patch.

Q. And who would -- who did you work with from that company?

A. That's -- I didn't work with anyone when it was its own company. I worked with people after they were acquired by Actavis.

Q. Who did you work with?

A. I didn't really work with anyone particularly from there, that site, because it was just part of the company as a whole.

Q. Well, who -- who do you know

shifted in from ASA?

A. There isn't -- there wasn't anyone from -- for the sales and marketing.

Q. Do you recall anyone at all?

A. Yeah. Dale, I can't remember his last name. He passed away. He was doing business development.

Q. Do you remember anybody else that came in from ASA?

A. There was product -- so the -- the head of R&D. It was Jim Huang. I knew him.

Q. Anybody else?

A. There were people doing -- in the operations, Rudy Zulickman.

Q. So ASA was acquired by Actavis?

A. Yes.

Q. And once it was acquired by Actavis, who marketed its fentanyl patch? Your team did?

A. Yes.

Q. And what is ELZ?

Page 165

A. That's Elizabeth site. It's one of the manufacturing facilities of Actavis.
Q. In New Jersey?
A. Yes.
Q. And what's third party refer to?
A. Meaning our partners who were not part of the Actavis company.
Q. You mean your clients?
A. No. We have -- so it's partners for products. They could be contract manufacturing. They could be contract manufacturers of our product or they could be partner meaning they developed the product and we marketed their product.
Q. Okay. So who are those, as far as the opioids were concerned?
A. As far as opioids were concerned, I don't think there is -- I'm thinking about the product -- no, I don't think there was any other than fentanyl patch.

Page 166

Q. Because everything else was happening within Actavis, is that what you're saying?
A. The product we discussed, the opioid, they were all manufactured by Actavis itself except fentanyl patch.
Q. Okay. And that was manufactured by ASA until ASA was acquired?
A. The fentanyl patch was developed by ASA, manufactured by Corium. Corium is an independent company.
Q. Okay.
A. They were the contract manufacturer.
Q. Okay. And they continued to be the contract manufacturer even after Actavis acquired ASA; is that right?
A. That's correct.
Q. Okay. What does SSL stand for?
A. Semi-solid and liquid.
Q. Now, are these the types of reports that you would put together

Page 167

with -- using the IMS data?
A. Yes. This is the -- one of the report we talked about or referred to earlier.
Q. Mm-hmm. So you have Greenstone products, Mylan top products, Sandoz products, these are your competitors' products?
A. These were product of those companies that's under the title, under the heading.
Q. So if you -- so if you look, for example, at the Mallinckrodt page, Mallinckrodt top products ranked by Q2 '11 IMS sales.
A. Yes.
Q. What was the purpose of putting this together? Did you create it, first of all?
A. I did.
Q. For what purpose?
A. Just for knowing our competitors.
Q. For understanding what --

Page 168

what about your competitors exactly?
A. Just as a part of the normal course of business, we all want to understand what the competitors were doing, what products they had, and, yeah.
Q. And where you have the column that has 12-month growth versus prior period, is that sales growth?
A. That's volume growth in extended units.
Q. What does that -- what does that tell you?
A. Okay. So there are two columns. It says 12-month growth, right?
Q. Mm-hmm.
A. The one to the left is the growth in IMS sales dollars. The one to the far right is the growth based on volume of extended units.
Q. Based on volume of extended units, what does that mean?
A. Extended unit is IMS term. And it's -- for oral solids, it's one pill. For liquid it's a gram.

Q. So you have it in terms of dollars and in terms of pills or grams; is that right?
A. In this particular contact, it would be the pills.
Q. The -- the far right column?
A. Yeah, that's the -- the percentages based on the prior volume you could -- you know, the calculation based on the column preceding that.
Q. Okay. So if you look, for example, at oxycodone HCL. You have a 7 percent growth in terms of sales dollars.
MR. MAIER: Objection to form.
BY MS. BAIG:
Q. Is that right?
A. So --
Q. For Mallinckrodt.
A. In that file you are looking at 7 percent growth of IMS sales for the 12-month period.
Q. For oxycodone HCL for

Mallinckrodt.
A. For that particular product.
Q. Okay. And then you also see a 9 percent growth in terms of the actual pills; is that right?
MR. MAIER: Objection to form.
THE WITNESS: That's what it shows, a 9 percent growth.
BY MS. BAIG:
Q. Okay. And if you -- if you move several pages past that, you see a different type of document that's headed SOD - Elizabeth and third-party product market share grid. Do you see that?
A. Yes.
Q. And you created this document?
A. So my team created the -- the document. It could be multiple people working on this.
Q. Okay. And what purpose was this document created for?
A. This entire document was for

monitoring the competitors as well as knowing the market by product, how -- you know, how we performed and how we performed against our competitors.
Q. When you say this entire document, you mean the whole exhibit, correct?
A. I mean --
Q. Or just even the --
A. -- this entire market share report is, you know, part of the market research.
Q. Okay.
A. We know where our business is at.
Q. And this particular grid that we're looking at right now?
A. Yeah. This particular is just a summary of the pages behind it.
Q. Okay. So this, for example, is showing, for fentanyl transdermal, it's showing -- is this showing Actavis' market share in the first column for quarter 1 of 2011?

A. Yes. The 8.5 will be the Q1 2011 market share.
Q. That's Actavis' market share of fentanyl transdermal?
A. Yes.
Q. Okay. And if you look on the next page, then you see that for the first quarter of 2011, Actavis' market share for oxycodone IR tablets was 44.1 percent; is that right?
MR. KNAPP: Objection to form.
MR. MAIER: Objection to form.
THE WITNESS: This is how it's captured based on the calculation of the IMS -- IMS data.
BY MS. BAIG:
Q. Okay. And there's no percentage listed for oxymorphone ER tabs. Do you know why that is?
A. I don't know. Was it launched or did -- what time -- which

Page 173

timeline this was. 2011.
Q. It was prelaunch?
A. It could be. I don't know when the launch time -- it could be two reasons. One is it wasn't launched. Two, if we launched, maybe IMS didn't capture any data.
Q. Okay. And the next chart is labeled "SSL House Label Market Share Grid Report, Q2, 2011, IMS data."
What is this chart intending to show?
A. This is the same as the prior ones. It's a summary of the pages of specific products, market share, just for the semi-solids and liquid products.
Q. I see. So different products?
A. Yeah.
Q. Okay. And then there are a series of sheets that follow. What types of reports are these?
A. Each page is for one product.

Page 174

Q. And they're created why?
A. So as part of the marketing department function, we always want to know how we're performing and what the size of the market was and how the market was changing.
Q. So if you flip to the one that is discussing the buprenorphine naloxone sublingual tablets, in parentheses it says Suboxone.
A. Okay.
Q. What is it showing Actavis' market share for that product?
A. So Actavis was not here because it was not launched.
Q. So what does this report show then?
A. So if you look at the front of the e-mail, this could have marketed product, but could also have the potential new product to be launched in the short-term. So this is example of a new product that Actavis had not launched but in the pipeline.

Page 175

Q. I see. That's why it says generic share zero?
A. So there were other people -- there were other manufacturers in the market for this product. And that's why they -- they were shown there. For example, Teva has 17.1 percent. So there were other manufacturers in generic.
Q. Where are you seeing Teva?
MS. VENTURA: I think she's on the page prior to it.
THE WITNESS: Buprenorphine is --
BY MS. BAIG:
Q. Oh, you're looking at Subutex?
A. I'm looking at the buprenorphine sublingual tablets.
Q. If you look at the next page --
A. Oh, I see.
Q. -- that's the buprenorphine naloxone.

Page 176

A. Okay. Got it.
Q. So what is the -- does Actavis have market share in this drug at this point?
A. No. Actavis did not. It was not launched.
Q. Okay. So same issue. So that's why it says generic share zero all the way across; is that right?
A. Yes. There was no generic on the market.
Q. Okay. And did you include this in here because Actavis was considering bringing the generic drug to market?
A. We were working on that.
Q. Okay. If you go several pages further on -- four or five pages further, you see morphine sulfate ER capsules, Kadian.
Do you see that?
A. Yes.
Q. And you created these documents?

Page 177

A. Yeah, my group did.
Q. Okay. So your group was creating or doing certain trend analyses for not only the generic drugs but also the branded drugs; is that right?
MR. MAIER: Object to form.
THE WITNESS: This was not analysis for the brand. This was in the same situation as Suboxone, that it's a product that we could potentially launch as a generic. So it was included in the report from the generic perspective.
BY MS. BAIG:
Q. I see. And what did this report serve to tell you about the drug?
A. So for the product, whether it's existing generic or pipeline product, what it tells is what the IMS sales were, what the IMS volume were, and the change in the market.
Q. So total IMS sales were 268 --
A. Million.

Page 178

Q. -- million. And that's in the market overall for all of the companies that had this drug, correct?
MS. VENTURA: Objection to form.
THE WITNESS: So that's the IMS-reported sales for Kadian itself. And Kadian was only marketed by Actavis.
BY MS. BAIG:
Q. I see. And if you move to the next page, two pages down, you see oxycodone tablets?
A. Yes.
Q. And here it shows the total sales are $57 million; is that right?
A. Yes. This is only for the five-milligram.
Q. I see. Okay. And Actavis was marketing this drug, correct?
MR. MAIER: Objection to form.
THE WITNESS: Actavis did not market this drug.

Page 179

BY MS. BAIG:
Q. Oh, they didn't -- Actavis did not market five-milligram?
MR. MAIER: Objection to form.
THE WITNESS: That's correct.
BY MS. BAIG:
Q. Okay. And so where you have down here competitive share, those are all the companies that did market --
A. Yes.
Q. -- this drug -- -
MR. MAIER: Objection.
BY MS. BAIG:
Q. -- at the -- at the five milligrams level.
MR. MAIER: Objection.
BY MS. BAIG:
Q. And looking at the last page of the report, you have generic company ranking report.
Do you see that?
A. Yes.

Page 180

Q. And this has Actavis ranked Number 11 in what?
A. So you go to the e-mail I wrote to the group, for distribution. "Generic company ranking report based on IMS total scripts dispensed."
So it's based on, if you look at the volume here, ranking -- there's also a footnote to that page. "Ranking based on IMS total TRx dispensed for the second quarter 2011."
Q. So total prescriptions dispensed of all generic drugs?
A. Of all generic drugs. So if you were to look at the last column with the number, that's a 12 -- not the last one. The Q2, the quarter labeled "Q2 JNE/11 TRx," it should be based on that -- that number.
Q. Which column are you looking at?
A. So the fifth from the right.
Q. The fifth from the right shows what, exactly, $17 million?

A. So 17 million scripts dispensed.
Q. Generic scripts dispensed?
A. Generic scripts.
Q. Okay.
A. In all products.
Q. That's all products.
What percentage of your generic scripts were opioid scripts? Do you know?
A. I don't know.
Q. Do you know roughly?
A. No. We never tracked it that way.
(Document marked for identification as Exhibit Allergan-McCormick-10)
BY MS. BAIG:
Q. I'll have this document marked as Exhibit 10. This is a document Bates stamped 945856 through 858. It's an e-mail from you to Michael Perfetto and others dated September 1st, 2011, entitled oxymorphone ER pharmacy

placement details via chargeback.
Do you see that?
A. Yes.
Q. Okay. And it states, "To begin, the detailed chargeback finance has processed provide us a good picture of oxymorphone ER stocking at the pharmacy level. Since launching in July 15th, a total number of 671 pharmacies had submitted chargeback for 883 bottles on 15 milligrams."
That's 15 milligrams of oxymorphone, correct?
A. Yes.
Q. And then it goes on to state, "Details of pharmacy locations are in the attached file."
And that "Walmart is leading the chargeback." Do you see that?
A. Yes.
Q. Okay. So is this an example of the type of chargeback data that we discussed earlier which allowed you to track -- which allowed you to track

exactly where your pills were -- were winding up?
MR. MAIER: Objection to form.
THE WITNESS: So this is a chargeback data available, submitted by wholesalers or distributors.
BY MS. BAIG:
Q. Mm-hmm. For what purpose?
A. So they submit it actually for -- for the most part, for finance purpose.
Q. So that if they are entitled to a chargeback, then you can then pay them based on the date that that they submit to you, correct?
A. Yes.
Q. Okay. And this allows you to track which pharmacies are dispensing your drugs, correct?
MR. MAIER: Object to form.
THE WITNESS: So this does have pharmacy level data.

BY MS. BAIG:
Q. Does this chargeback data allow you to track your downstream customers?
MR. MAIER: Object to form.
THE WITNESS: In theory, yes.
BY MS. BAIG:
Q. Why do you say in theory?
A. Just because this is a newly launched product in a small volume, so this is due to the phase of launch, and we can see how -- where the product is going.
Q. But generally speaking, the chargeback data allows you to track the drugs to your downstream customers; is that right?
MR. MAIER: Object to form.
THE WITNESS: That's correct.
BY MS. BAIG:
Q. And did you have access to the chargeback data?

A. Yeah, I have access.
Q. Where was the chargeback data stored?
A. It's in the company's ERP system.
Q. When you look at the first page of the chargeback data, do you see, for example, it lists -- it lists access drugs as the first row. Do you see that?
A. Yes.
Q. And then it has the address of access drugs in Chattanooga, Tennessee. And the product identifier identifies which product we are talking about, right?
A. Yes.
Q. And what is the "sum to" there, what does that refer to there?
A. That's the number of bottles submitted chargeback from the period identified in the -- in running the report.
Q. So they would receive -- what -- what does the sum tell you? You

give them a certain amount of money based on that sum; is that right?
A. No. So the report is since launching July 15th, so you see as of August 31st. So that means that this is from July 15th to August 31st. And this is the chargeback, the number of bottles, that's two bottles, submitted by the wholesalers that the drug went to this particular pharmacy.
So it's a number of bottles -- not necessarily received, but submitted by the wholesaler to claim chargeback.
Q. So you would then pay the wholesaler a chargeback amount based on two bottles; is that right?
A. That's correct.
Q. Whatever the agreed upon amount was that would be reflected in the contract; is that right?
MR. MAIER: Objection to form.
THE WITNESS: So the

agreed -- there is such thing as agreed -- agreed upon quantity. The chargeback is -- is a -- the difference between the WAC price and the contract price, the difference is the chargeback.
BY MS. BAIG:
Q. So that difference would be paid for two bottles for this particular row?
A. Yes.
Q. Okay. Did you use this chargeback data for purposes of suspicious order monitoring?
MS. VENTURA: Objection to form.
MR. MAIER: Objection to form.
THE WITNESS: In -- so we have a suspicious order monitoring system, the Safe and Secure in ValueTrak that would have this kind of data that would be -- can be used for suspicious order

monitoring.
BY MS. BAIG:
Q. And do you know if anyone was tracking the chargeback data for purposes of suspicious order monitoring?
MR. MAIER: Object to form.
THE WITNESS: So we have a fairly extensive suspicious order monitoring program. And the product manager will be looking at this. But we also rely on the system to set flags to -- to flag the suspicious activity.
BY MS. BAIG:
Q. That's the automated system we discussed earlier?
A. Yes.
Q. And do you know when that was put in place?
MS. VENTURA: Objection to form.
THE WITNESS: I don't remember specifically. It was during the period of, I think,

Page 189

2011.

BY MS. BAIG:

Q. Did you yourself work with the chargeback data at all for purposes of suspicious order monitoring?

A. It's a small team, so I certainly participated in many of the activities.

Q. But my question specifically is whether you worked with chargeback data to review chargeback data for purposes of suspicious order monitoring?

A. So chargeback data could be -- I mean, we could receive chargeback data on many, many product. And certainly chargeback data is one of the tools that we would use to, yeah, to do the suspicious order monitoring.

Q. Do you recall any specific instances when you looked at chargeback data for suspicious order monitoring purposes for an opioid?

A. So much is day-to-day activity, I don't recall anything that

Page 190

really stands out as of today.

(Document marked for identification as Exhibit Allergan-McCormick-11.)

BY MS. BAIG:

Q. I'll have this document marked as -- as Exhibit 11.

This document is Bates stamped Actavis 1129567 through 568. However, I note that 568 is a multi-page document entitled morphine ER capsules chargeback trend details.

And here is an e-mail from you to Rachelle Galant and others dated February 7, 2012, with the subject morphine ER CB trend details. Do you see that?

A. Yes.

Q. Okay. And you are stating here that "we can run trend report for the indirect store level too."

Do you see that?

A. Yes.

Q. You go on to state, "It

Page 191

might be helpful occasionally for a variety of purposes, e.g., monitoring product placement, SOM(?)" -- you have a question mark there -- "unusable, change in trend in CB."

Do you see that?

A. Yes.

Q. And CB is chargeback, right?

A. Chargeback.

Q. Okay. Do you recall what the nature of this communication was?

A. I don't. I mean, it's very common business activities to, you know, to run various reports.

Q. Do you know why you put a question mark next to SOM?

A. I think it refers to the specific report because the suspicious order monitoring, we're looking at mostly -- not mostly -- often to have the order of interest, right. This is chargeback. That means it's already shipped and chargeback were submitted.

Q. I see. So the chargeback

Page 192

data shows products that are already shipped?

A. Yes.

Q. And was that why there was a question mark placed as to whether or not it would be useful for suspicious order monitoring?

MR. MAIER: Objection to form.

THE WITNESS: I don't remember exactly the analysis, or the thought that went through my mind when I wrote the e-mail. I would reasonably guess that would be the reason.

BY MS. BAIG:

Q. Okay. And the lower e-mail is also from you to Nathalie Leitch, and it states, "I will run this monthly for your team."

Are you talking about the chargeback data?

A. This particular, yes, this is the chargeback data trend.

Q. So you yourself would actually go into the chargeback system and run the data. You wouldn't simply request it from somebody else; is that right?
A. I could actually request from someone else.
Q. So when you're saying, "I will run this monthly for your team," did you wind up doing that? Did you run chargeback data monthly for the team?
MS. VENTURA: Objection to form.
THE WITNESS: I don't recall whether I run it or I requested it and someone else run the report.
BY MS. BAIG:
Q. Okay. You had it run. Okay.
And if you look at the first page of the chargeback trend details, it starts with morphine sulfate.
Do you see that?
A. Yes.

Q. And in the far right column there's a number of 27,625?
A. Yes.
Q. What does that refer to?
A. That's the sum of the prior four period.
Q. The sum of what?
A. Of the 2,984, the 12,301, 11,011 and 1,329.
Q. Right. But what do those figures reflect?
A. Oh, those are the bottles.
Q. The number of bottles of morphine sulfate that were charged back?
A. Yes.
(Document marked for identification as Exhibit Allergan-McCormick-12.)
BY MS. BAIG:
Q. I'll have this document marked as Exhibit 12. This is a document Bates-stamped ACTAVIS_328319 through 328335. It starts as an e-mail from you to Michael Dorsey, Mike Perfetto, Ara

Aprahamian, dated January 10th, 2012. The subject is, "Dr. Schwartz - pharmacies."
Do you see that?
A. Yes.
Q. Okay. Do you recall a certain high prescriber by the name of Dr. Schwartz?
MR. MAIER: Object to form.
THE WITNESS: I just saw it here.
BY MS. BAIG:
Q. You don't recall -- have an independent recollection --
A. No, I don't.
Q. -- of a discussion about Dr. Schwartz?
A. No, I don't.
Q. Okay. Who's -- Patrick McClanahan was the regional business director; is that right?
A. He was one of the business director, yes.
Q. At Actavis?

A. Yes.
Q. I'm looking at the last page, and it says Actavis/inVentiv. Do you know whether he worked at Actavis or inVentiv?
A. So he was an employee of inVentiv but worked for Actavis account.
Q. Okay. And were there employees of inVentiv that were not only marketing brand drugs but also marketing generic drugs?
MR. MAIER: Objection to form.
THE WITNESS: No. All the inVentiv people were working for the Actavis brand. None of them were working for generic.
BY MS. BAIG:
Q. So you don't have any knowledge of Michelle Altier's training inVentiv employees with respect to talking to doctors about generic drugs?
MS. VENTURA: Objection to form.

Page 197

THE WITNESS: I do not have knowledge of her training.
BY MS. BAIG:
Q. Do you have knowledge that that in fact happened?
A. I do not have knowledge of that.
Q. Okay. I think I misspoke when I said Michelle Altier. I meant Jennifer.
A. Jennifer.
Q. Did you know who I was talking to -- talking about?
A. I think so.
Q. Okay. All right. So there's an e-mail here from Patrick McClanahan to Nathalie Leitch towards the beginning of the string. And he says he spoke with Dr. Schwartz's office late Friday and that they're having trouble finding generic Kadian.
Do you see that general reference?
A. Yes.

Page 198

Q. And he goes on to state, "I told her that we would send out communication to the retail pharmacies in the Oklahoma area and make sure they have access to generic Kadian."
Do you see that?
A. Yes.
Q. Is that -- is that sort of communication something that you would have been in charge of?
A. No.
Q. And so why is he looping you in on all of this?
MR. MAIER: Objection to form.
THE WITNESS: Because I was in charge of the generic Kadian. And their pharmacy could not -- so, basically, the patient could not find the generic Kadian at a local pharmacy.
BY MS. BAIG:
Q. Okay. So who is going to be -- who's going to do the communication

Page 199

to the pharmacy? That's Patrick McClanahan's job?
A. Oh, you mean as a "we," what that "we" might be?
Q. "We would send" -- "I told her that we would send out communication to the retail pharmacies." Who is it that's sending out communications to the retail pharmacies about generic Kadian?
A. I do not know.
Q. You don't know. That typically wouldn't come from your department?
A. No.
Q. And do you see a little further up the page, there's a reference. It says, "Mike D., Steve, what would you suggest? Can you call the distribution center to send products? For CVS, would we call wholesaler or call pharmacy directly?"
Do you know what that is referring to?
A. Yes. Because this pharmacy

Page 200

in Oklahoma City could not get product. It came to me. I was asking the team how could we get the product to this pharmacy. Those were some of the suggestions.
Q. I see. And do you see at the top of the page where it states, "Need to put some generic Kadian to the following pharmacies in Oklahoma City. This doctor is one of the top prescribers in Kadian."
Do you see that?
A. Yes.
Q. And you wrote that?
A. I wrote that.
Q. How did you know that he was one of the top prescribers in Kadian?
A. I must have talked to Nathalie and her team.
Q. Well, what data would have been available to you or Nathalie that would show that Dr. Schultz (sic) was a top prescriber?
MS. VENTURA: Objection.

MR. MAIER: Objection.
Form. Foundation.
THE WITNESS: I did not have direct access to the Kadian prescriber data. But Nathalie and her team had data.
BY MS. BAIG:
Q. Where does that data come from, the prescriber data?
MS. GERMANO: Objection to form.
THE WITNESS: So the data could come from either Wolters Kluwer or IMS.
BY MS. BAIG:
Q. Okay. So I thought you testified earlier that you did not purchase prescriber data from IMS?
A. For the generic business, I did not purchase any data with prescriber details.
Q. So for the brand name opioids, the company was purchasing prescriber data?

MS. VENTURA: Objection, foundation.
MR. MAIER: Object to form.
THE WITNESS: I think any brand company would have prescriber data.
BY MS. BAIG:
Q. You mean -- my question is, did Actavis have the prescriber data?
MS. VENTURA: Objection, foundation.
MR. MAIER: Objection.
THE WITNESS: I think Actavis did have Kadian prescriber data.
BY MS. BAIG:
Q. And did it have generic Kadian prescriber data?
A. See, I didn't have access to that data. I don't know what was in the data.
Q. But if you look further down, we're talking about generic Kadian. We're not talking about brand name

Kadian, right?
MR. MAIER: Objection to form.
THE WITNESS: That's correct. But when doctor writes a script, I don't -- so doctor typically writes the brand name.
When the product was dispensed at a pharmacy, pharmacy could have the option to substitute it with a generic product. So doctor typically do not write generic product, just in general.
BY MS. BAIG:
Q. But my question is simply whether or not Actavis had access to prescriber data for generic Kadian. This e-mail seems to suggest that it did, because it states that this is one of the top prescribers.
MR. MAIER: Object to form.
MS. VENTURA: Objection. Form.

THE WITNESS: So Actavis had the prescriber data for Kadian. The prescriber data didn't necessarily distinguish whether it's brand or generic.
BY MS. BAIG:
Q. I see. And that prescriber data came from IMS?
A. Yes.
MS. VENTURA: Objection. Form.
THE WITNESS: Well, let me correct. Could come from IMS. It could also come from Wolters Kluwer.
BY MS. BAIG:
Q. And where was the data housed at Actavis?
MS. VENTURA: Objection. Foundation.
THE WITNESS: I don't know.
BY MS. BAIG:
Q. Did you have access to it?
A. I did not.

Page 205

Q. If you had wanted to know something that would be found in the prescriber data, who would you have asked for it?

A. I would ask Nathalie.

Q. Do you see on the first page of the document, towards the bottom, in an e-mail from Michael Dorsey to you and others. In the middle of the e-mail Michael Dorsey notes, "We are spending a lot of resources for this one doctor. If Patrick below has already discussed with Tatia, I would have him ask her to fax/call in a request for the store to stock. Store will do so knowing that the patient is coming in there."

What -- what's being referred to as a lot of resources being spent for this one doctor, Dr. Schwartz?

MR. MAIER: Objection. Foundation.

MS. VENTURA: Objection. Foundation.

MR. BAILEY: Object to form.

Page 206

THE WITNESS: I'm not sure.

BY MS. BAIG:

Q. Do you have any understanding of what was meant by that when he sent this e-mail?

MR. BAILEY: Foundation.

THE WITNESS: Judging from the trailing e-mails, people were talking about different ways we could do to get the product to the pharmacy. I think that's what Michael Dorsey was referring to.

BY MS. BAIG:

Q. In terms of spending a lot of resources for this one doctor?

A. Yes.

Q. And your response above is that "per Nathalie, this is a huge prescriber - largest prescriber in the country," correct?

A. Yes.

Q. And was that to suggest that it's okay -- it's understandable to spend more resources for this one prescriber

Page 207

because he is such a huge prescriber?

MS. GERMANO: Objection. Form.

MS. VENTURA: Objection to form.

MR. MAIER: Object to form.

THE WITNESS: See, my team did not know, you know, any of these doctors. Typically we don't really get to the pharmacy level. So what Mike was suggesting is you just have the pharmacy call the wholesalers and we have product at the wholesalers and the pharmacy can just -- can just order from the wholesalers.

So what I'm saying, he's a large prescriber, so that's why we're helping to get the product to the pharmacy.

BY MS. BAIG:

Q. Did you ever do any research to see how many of your pills wound up with Dr. Schultz?

Page 208

A. No, I did not.

Q. I meant Schwartz, Dr. Schwartz.

Same answer, correct?

A. Same answer, I did not research.

Q. Did you, in addition to the data tracking services we've already discussed, also use ValueTrak to provide data?

A. Can you repeat your question again?

Q. Did you use ValueTrak to provide data?

A. We used ValueTrak to analyze data.

Q. Okay. What type of analysis did ValueTrak provide?

A. So ValueTrak was a service that insert itself between the wholesalers and the manufacturers for the EDI data. So the EDI data particularly has the chargeback data, the inventory data which shows the quantities at the

wholesalers, quantity of our product at the wholesalers, as well as the quantities that moved from the wholesalers to the pharmacies.

(Document marked for identification as Exhibit Allergan-McCormick-13.)

BY MS. BAIG:

Q. Let's have this document marked as Exhibit 13.

All right. This document is Bates stamped ALLERGAN_MDL_01213261 through 3265.

It starts as an e-mail from you to Rachelle Galant and Ara Aprahamian dated January 27, 2012.

And it's titled Actavis - ValueTrak renewal (trading partners).

And is Conrad Morgiewicz the contact that you had at ValueTrak for analyzing data?

A. Conrad was the sales account manager for our account.

Q. What is different about the

service that you're receiving from ValueTrak and the service that you're receiving from IMS?

MS. VENTURA: Objection to form.

THE WITNESS: Those two were very, very different services.

So ValueTrak used Actavis data, so the data provided to Actavis from wholesalers and distributors through electronic transfer system.

So it's actual data supplied by wholesalers of Actavis product only.

IMS collects their own data for all the products in the market to the extent that data were available, and then project the data to include the entire market.

So data was not 100 percent collected. And the data also includes more than just Actavis product.

BY MS. BAIG:

Q. So Actavis would provide ValueTrak with chargeback data, correct?

A. So, yeah, ValueTrak received -- so ValueTrak received the data that -- that the wholesalers provided to Actavis.

Q. Okay. And what do they do with it?

A. So the service of ValueTrak provided an easy user interface to allow the easier analysis and trending of those data. And the data were voluminous.

Q. So when you created some of your trending reports that we looked at earlier, were you using IMS data or were you using ValueTrak analysis?

MS. GERMANO: Objection to form.

BY MS. BAIG:

Q. Or both?

A. It depends on which report you're talking about. So if it's specific labeled IMS, then it was from

IMS, like the market share report. But if it says chargeback data, it was never from IMS.

Q. Okay. But what did you need ValueTrak for? Why couldn't you just use the chargeback data in your own system to create those reports? What was -- what added value was ValueTrak giving?

MR. MAIER: Object to form.

THE WITNESS: So the data coming back, coming from wholesalers were just voluminous.

We didn't have a very good internal system to make those data to be user friendly.

BY MS. BAIG:

Q. To be used for what, simply for paying back the chargebacks?

A. So the chargeback system actually were really a financial system to pay the chargeback.

We had the system but not user friendly in the way so it's not easy to -- not user friendly to view the data,

to maybe analyze the data --

Q. Analyze for what purpose?

A. See, for product marketing, we want to know the customer, how the product was flowing. And so for general business purpose, that's how you manage the product.

Q. What was the Safe and Secure training session?

A. Safe and Secure was one of the modules that ValueTrak created. And we -- so we originally had the ValueTrak for, you know, for the -- for the inventory management, for the inventory movement and those data.

The Safe and Secure was added to help with the suspicious order monitoring at the pharmacy level.

So we just had a training or looking at what our modules could do and how we could use that for the purpose of suspicious order monitoring.

Q. And did you bring ValueTrak -- when did Actavis start

working with ValueTrak? Do you know?

A. I don't remember specifically. But during my tenure there.

Q. Do you remember generally? Was it right at the beginning of your tenure or was it toward the end or somewhere in the middle?

A. I think somewhere in the middle. It wasn't 2004.

Q. Do you recall whether it was in or about 2011?

A. 2011, I certainly think we had that in 2011.

Q. ValueTrak?

A. Yeah.

Q. You said that you were using ValueTrak because -- for product marketing, you want to know the customer and how the product was flowing. What did you need ValueTrak for in terms of knowing the customer and how the product was flowing that you could not see from your own internal records?

MR. KNAPP: Form.

THE WITNESS: I mean, this is actually a really large topic. If I were to give you example, with ValueTrak you could see -- you can select the time period, the time period that you want that's in the system to see the current inventory level, for example, at, say, Amerisource. And it also shows how many units moved out of Amerisource to pharmacies, to their customers.

For example, if I see at a particular -- at Amerisource an inventory level of a particular product is really high, it's not moving, then we have reason to ask, if it's, say, more than their usual level of inventory, we would ask, "Why didn't this move?" We would explore the reason.

Another way to say is, "Hey, if this particular wholesaler

already has so much product, we might not want to ship additional product to them," because when the product expires, the product can be returned to the manufacturers. So we don't want that to happen. When product was returned, you know, there was credit, there is financial burden to do that. So that's just one example.

Or if the particular a DC was very low on inventory, for some reason wholesaler could have just missed it, right. Maybe they didn't order in time. We potentially could alert them.

And also different trending. So we could see, hey, this -- you know, the sales at a particular wholesaler was going up or stable or down. It would just help us to, you know, to ask the questions and figure out what went on.

BY MS. BAIG:

Q. And you can track -- you can track the sales not only through your customers, but also to their customers; is that right?

MR. MAIER: Objection to form.

MS. VENTURA: Objection to form.

THE WITNESS: So we could see the quantities typically from -- that moved off from the wholesalers to their customers.

BY MS. BAIG:

Q. And you can see which customers they moved to, correct?

MS. VENTURA: Objection to form.

MR. MAIER: Objection to form.

THE WITNESS: You could from the 867 data.

BY MS. BAIG:

Q. And where was the 867 data housed?

A. It's one of the data in -- that ValueTrak actually has and it could analyze.

Q. I see. What is 852 data?

A. 852 is the inventory level at wholesalers.

Q. Let's have this -- this document marked as Exhibit 16, please.

MR. MAIER: I think it jumped from 13 to 16.

MS. BAIG: Okay. Let's mark it 14.

MS. GERMANO: This is 13?

MS. VENTURA: No, this is 14 that she's marking.

(Document marked for identification as Exhibit Allergan-McCormick-14.)

BY MS. BAIG:

Q. This is a document Bates-stamped ALLERGAN_MDL_00226918 through 6692. Starts as an e-mail from you from Mike Perfetto and Ara Aprahamian dated February 27, 2012. And if you turn

to the second-to-last page, you see "Amendment 3 to Hosted Services Agreement."

Do you have an understanding of what this contract is?

A. Yes.

Q. What is it?

A. It's agreement between ValueTrak to provide the service to Actavis.

Q. And it references an initial agreement made as of February 26, 2009. Do you see that?

A. Yes.

Q. Does that refresh your recollection that Actavis and ValueTrak -- I see here it's referred to ValueCentric. Is that the same company, do you know?

A. So ValueTrak is the tool. ValueCentric is the company.

Q. Okay. Does this refresh your recollection that Actavis began working with ValueCentric in or about

February 26, 2009?

MS. VENTURA: Objection to form.

THE WITNESS: That's not correct because if you look at, this is amendment to -- the original amendment, so there is Amendment Number 1 effective 2011, February 10, 2011, and Amendment 2, effective December 28th in 2011.

BY MS. BAIG:

Q. So there's a -- in that -- and if you look down to the "whereas" clause, it says, "Whereas, ValueCentric and Actavis have entered into that certain hosted services agreement made as of February 26, 2009."

So I'm just wondering, and you tell me if I'm wrong, if the initial agreement was February 26, 2009, and the amendments are, as you state, Amendment 1 on February 10, 2011, and Amendment 2 on December 28, 2011 -- is that your

Page 221

understanding?
MS. GERMANO: Objection. Foundation.
THE WITNESS: The original was 29 -- 2009. Then there were two amendments. And this attachment was the third amendment to the original agreement.
BY MS. BAIG:
Q. Got it. So the first agreement was February 26, 2009?
MS. VENTURA: Objection to form.
BY MS. BAIG:
Q. Is that right?
A. Yes.
Q. And now that I understand that that's a difference between ValueCentric and ValueTrak and you said ValueTrak is the tool. When you say tool, what exactly do you mean by tool? Is it a computer system or what is it?
A. It's this hosted service. I don't know how to explain this. It's a

Page 222

hosted service. They have a name called ValueTrak. The company is called ValueCentric.
Q. And the service encompasses the analysis of the data?
MS. VENTURA: Objection to form.
THE WITNESS: The ValueCentric, the service, has different modules of service. And it depends on what you -- what your agreement was -- I mean covered.
BY MS. BAIG:
Q. And when you used the term "ValueTrak" earlier, are you talking about all of those services or are you talking about one specific part of it?
A. We just talk about the tool and whatever the service that we agreed to, you know, to cover.
Q. And what is the tool?
A. So the tool started out as a, you know, inventory -- primarily

Page 223

inventory management, the -- at the wholesaler level. The movement in terms of product movement from wholesalers. It started out as that tool, then morphed into additional capability that included the Safe and Secure module that could be used, really was used for suspicious order monitoring.
Q. Okay. And the ValueTrak tool, is that a computer system, an automated system?
A. It's -- well, everything is a computer system. It's -- how can I explain? This -- this is a tool that was used to -- to help us with the objectives that we set out to do. It is on the desktop. It is hosted by ValueCentric. And accessed by -- accessed by the approved users.
Q. I see. So you would have a password and you could enter it -- you could access it yourself from your desktop at Actavis?
A. Yes.

Page 224

Q. Okay. So if you see at the -- at the top of the first page, you start, "Because we added many small trading partners, there is addition setup fee of 16,200, (2700 per partner setup) and additional monthly fee of 1,620, ($270 per partner addition)."
So is -- is this -- is this an example of how you were charged by ValueCentric? Were you charged on a per partner basis in terms of them providing you with access to and visibility to the customer data?
MR. MAIER: Objection, form.
THE WITNESS: This is just the additional charge because of additional trading partner. The prior agreement, it was -- I don't remember what the agreement was, but it was a negotiated total.
BY MS. BAIG:
Q. Okay. And because you're adding new partners, some of whom are listed here, they are charging you more

Page 225

for the service; is that right?
A. That's correct.
Q. Okay. And you state here, "My question is: What's our SOM risk of not having many of them? We don't need the small guys for inventory management perspective."
Did you ever receive an answer as to what the SOM risk was of not having many of them?
A. I don't remember.
Q. Do you recall whether all of these were added?
A. I don't remember.
Q. Do you recall what factored into the analysis as to whether to include some trading partners and not others in the ValueTrak --
MR. MAIER: Objection to form and foundation.
BY MS. BAIG:
Q. -- portfolio?
A. We started out by really the largest one, largest wholesalers and the

Page 226

distributors to include in the service.
Q. Okay. And then as time went on, you added some?
A. Yeah.
Q. Do you know who was using ValueTrak, if anyone, for purposes of suspicious order monitoring?
A. So the product manager did a lot of the work on a daily basis to monitor these suspicious order monitoring, to be part of the process.
Q. And did the product managers have access to ValueTrak?
A. Certainly.
Q. And do you know whether they were required or what their requirements were in terms of checking ValueTrak or any other data with respect to your customers and your customers' customers --
MR. MAIER: Object to form.
BY MS. BAIG:
Q. -- in implementing suspicious order monitoring?

Page 227

A. As part of daily running the business, it is their job to look, you know, to manage the product and if they had the opioids, it would be part of the daily activity in terms of, you know, the suspicious order monitoring.
Q. So was it your understanding that part of their daily activities was to check ValueTrak for suspicious orders on a daily basis?
MR. MAIER: Object to form.
THE WITNESS: So the -- so as a part of the automated system was there were flags set up. It depends on the day. But on a regular basis, it should happen. And we have a fairly comprehensive suspicious order monitoring. And that has several layers of this monitoring. It could happen at multiple point in the process. And so it's all part of the regular business activity.
BY MS. BAIG:

Page 228

Q. When you started at Alpharma, was there a very comprehensive suspicious order monitoring system in place?
MS. VENTURA: Objection to form, foundation.
MS. GERMANO: Objection to form.
THE WITNESS: I was not aware of that, because I was not managing product when I first started.
BY MS. BAIG:
Q. Okay. Did you ever hear about any sort of suspicious order monitoring program in place at Alpharma when you started?
A. I could not recall.
Q. Do you -- when was the first time that you heard of a suspicious order monitoring program, when was the first time you were trained in suspicious order monitoring?
MS. GERMANO: Objection to

form.
MR. MAIER: Object to form.
THE WITNESS: When we had as part of the business activity or when -- whenever we had Schedule II drugs, there was, you know, a lot of on-the-job training, and we had annual training in terms of the things that we need to be compliant. And Schedule II, whoever managed the Schedule II would have understanding of what's required to handle a Schedule II drug.
BY MS. BAIG:
Q. Do you remember those -- any of those trainings?
A. Not specifically.
Q. What was -- what's the earliest training that you recall actually being at on suspicious order monitoring?
A. I don't recall specific dates.

Q. Do you remember generally a general time frame?
A. I don't.
Q. You don't remember whether it was 2005 or 2011?
MR. MAIER: Objection to form.
THE WITNESS: I don't.
BY MS. BAIG:
Q. Can you narrow it down, whether it's closer to 2005 or 2011 or you just --
MS. GERMANO: Objection.
BY MS. BAIG:
Q. -- you have no memory of suspicious order monitoring?
MS. GERMANO: Objection. Form.
THE WITNESS: I really -- it's been so long, I really don't have a good frame of reference in terms of timeline.
BY MS. BAIG:
Q. Okay. What suspicious order

monitoring training do you recall being at specifically, if any?
A. We had general training on legal and compliance, and suspicious order monitoring could be part of that.
Q. Do you recall it specifically being part of that?
A. We had a regular training on the legal and compliance. I don't recall a specific suspicious order monitoring training.
Q. You don't recall, is that what you said?
A. I don't.
MR. MAIER: Do you mind if we take a quick break?
MS. BAIG: Sure.
THE VIDEOGRAPHER: Going off the record. The time is 2:39.
(Short break.)
THE VIDEOGRAPHER: We are going back on record. Beginning Media File Number 7. The time is 3:04.

(Document marked for identification as Exhibit Allergan-McCormick-15.)
BY MS. BAIG:
Q. Let's have this document marked as Exhibit 15.
This document is Bates stamped Acquired_Actavis_00951998 through 2005. It starts with an e-mail from Rachelle Galant to you dated March 9, 2012. The subject is Actavis 852/867 data.
Can you explain again the difference between the 852 and the 867 data please?
A. 852 is the level of inventory data at the wholesalers.
867 is the quantities that moved from wholesalers to their customers.
Q. And it starts off from Rachelle saying, "Michael and Mike talked about it and they thought a threshold of 50,000 CII units (fentanyl

Page 233

methylphenidate, morphine, oxy, oxy IBu, and Prometh) annually warranted monitoring through ValueTrak. That would eliminate most of the additional trading partners that we were adding except for Value. What are your thoughts?"
And I'm wondering if this refreshes your recollection that -- refreshes your recollection with respect to the analysis that went into determining which partners were being added to the ValueTrak system?
MR. MAIER: Objection to form.
THE WITNESS: I mean I'm reading the e-mail.
BY MS. BAIG:
Q. Okay. Do you remember when we were talking about trading partners being added, potentially added to the ValueTrak system? When you looked at Exhibit 14 there was a list of potential trading partners to be added?
A. Yes.

Page 234

Q. Okay. And it appears here that a certain threshold was set up for certain trading partners, that they would not be added to the ValueTrak system unless they had purchased a certain amount of -- of the drug; is that right?
MR. MAIER: Objection to form.
THE WITNESS: That's the content of Rachelle's e-mail.
BY MS. BAIG:
Q. Okay. And do you -- was it your understanding that that was actually implemented, that that was put into place, that there was a sort of threshold before adding -- adding certain trading partners to the ValueTrak system?
MR. MAIER: Objection to form.
THE WITNESS: I don't remember the specifics.
BY MS. BAIG:
Q. Do you remember generally?
A. I remember we were debating

Page 235

who to add to the ValueTrak system.
Q. And do you remember that there were potentially thresholds set up for warranting monitoring through ValueTrak as was stated in the first line here?
MS. VENTURA: Objection.
MR. MAIER: Objection to form.
THE WITNESS: I actually don't remember until I saw this e-mail.
BY MS. BAIG:
Q. Does this e-mail refresh your recollection that that happened, or do you know if it happened?
A. I don't know if it happened.
Q. It goes on to state, "That would eliminate most of the additional trading partners that we were adding, except for Value."
Do you see that?
A. I saw that.
Q. Is Value a trading partner?

Page 236

A. It's Value Drug.
Q. Okay. And do you know whether most of these were actually eliminated or not?
A. I do not remember that.
Q. Okay. Can you tell me what IQVIA data is?
A. That's the new name for IMS.
Q. Oh. So I-Q-V-I-A is the same as IMS Data?
A. Yes.
Q. Did the data change when it changed names at all or --
A. No. IMS was acquired by someone and changed the corporate name.
Q. Okay. Well, that's good. I thought we had a whole other data analysis to go through.
A. IQVIA.
Q. Okay. Now going back to ValueTrak for a moment. My understanding from the testimony is that ValueTrak only provided you with visibility on your customers and your customers' customers,

Page 237

but it did not provide you with visibility on your competitors' customers; is that correct?
A. That's correct.
Q. Okay. And if you wanted to see if a pharmacy, or how much -- how much oxycodone a pharmacy was dispensing, what data would you look to see that?
A. We did not have visibility to that.
Q. So you could not see how much a pharmacy was dispensing other than for your own data?
A. That's correct.
Let me correct this. We could not see how much a pharmacy could -- I mean were dispensing other people's, and we could not see how much a pharmacy was dispensing even if they had -- the pharmacy had our product but if they did not submit chargeback data.
So the pharmacy -- the visibility only came from either chargeback or 867 data.

Page 238

Q. Did you have access to data that showed you the highest dispensing pharmacies?
MR. MAIER: Objection to form.
THE WITNESS: I never -- I did not.
BY MS. BAIG:
Q. Do you know if the company did or not?
MS. VENTURA: Objection to form.
THE WITNESS: I was not aware.
BY MS. BAIG:
Q. And yet we saw the e-mail before showing that you had visibility to who was the highest prescribing physician?
MR. MAIER: Objection to form.
MS. VENTURA: Objection to form.
BY MS. BAIG:

Page 239

Q. So you're saying you had visibility into the highest prescribers, but not the highest dispensers in terms of pharmacies?
MS. GERMANO: Same objection.
MR. MAIER: Objection to form.
THE WITNESS: I did not have visibility to the highest or to any of the prescriber on a regular basis.
BY MS. BAIG:
Q. But you saw from the prior e-mail that Nathalie Leitch appeared to have it, correct?
MS. GERMANO: Objection.
MR. MAIER: Objection to form.
THE WITNESS: Nathalie, being the head of the Kadian marketing, would have it, but I did not have it.
BY MS. BAIG:

Page 240

Q. Okay.
(Document marked for identification as Exhibit Allergan-McCormick-16.)
BY MS. BAIG:
Q. Let's have this document marked as Exhibit 16.
Would Nathalie, in addition to having the highest prescriber data, would Nathalie Leitch also have had the highest dispensing data?
MR. MAIER: Objection.
MS. VENTURA: Objection. Foundation.
THE WITNESS: I do not know.
BY MS. BAIG:
Q. Okay. The next document is not Bates stamped on the pages, but we have a Bates stamp number that is Actavis 0712859 because it's an Excel spreadsheet. I think you guys were unable to Bates stamp it. It's labeled at the top, "Top 254 target Kadian prescribers, 12 months of prescription

data, June 2011 through May 2012."

MS. VENTURA: We'll just note for the record that the confidentiality designation went with the native file. So this should also be confidential.

MS. BAIG: Okay.

BY MS. BAIG:

Q. And the heading goes on to state, "Targets with more than 50 Kardian -- sorry -- "Kadian scripts in the last six months and more than five scripts' growth in the last three over three months."

All right. Have you seen -- have you seen this document before?

A. No, I have not.

Q. Have you seen a document like it before?

MR. MAIER: Objection to form.

THE WITNESS: I don't remember.

BY MS. BAIG:

Q. Okay. This document you can see is a list of prescribers, if you look at third column, do you see that?

MS. VENTURA: Objection. Foundation.

THE WITNESS: Yes.

BY MS. BAIG:

Q. Okay. I mean is that how you read it, it says prescriber at the top of the column?

A. Yes. I would read that way.

Q. Okay. The next category is Kadian prescriptions. Do you see that?

A. Yes.

Q. And it shows numbers of prescriptions?

MS. VENTURA: Objection. Foundation.

BY MS. BAIG:

Q. Is that how you read it, does it show numbers of prescriptions?

MS. VENTURA: Same objection.

THE WITNESS: That's what it

says, Kadian prescriptions.

BY MS. BAIG:

Q. Right. Okay. And then it gives the numbers of Kadian prescriptions for various time periods.

Do you see that?

MS. VENTURA: Objection. Foundation.

THE WITNESS: Yes.

BY MS. BAIG:

Q. Okay. And do you recall talking about Dr. Michael Schwartz in connection with an e-mail a little bit earlier?

A. I remember that name from that e-mail.

Q. And in the e-mail he was noted as one of the highest prescribers, if not the highest prescriber?

A. I remember that from the e-mail.

Q. Okay. And do you see here that there's Dr. Michael Schwartz listed in Item 2, or in Row 2?

A. Yes.

Q. And it provides numbers of prescriptions for Michael Schwartz.

Do you see that?

MS. VENTURA: Objection. Foundation.

THE WITNESS: Yes.

BY MS. BAIG:

Q. Okay. And do you see, if you move further across the page it appears that he is the second highest prescriber for Kadian, with 16 -- with 1,663 prescriptions?

MS. VENTURA: Objection. Foundation.

THE WITNESS: That's what the data says.

BY MS. BAIG:

Q. And that would have been 1,663 prescriptions for the 12 months from June 2011 through May 2012.

Do you see that?

MS. VENTURA: Objection. Foundation.

THE WITNESS: That appears to be what the data says.
BY MS. BAIG:
Q. Okay. And he appears to be the second highest prescriber for morphine sulfate ER as well.
Do you see that?
MS. VENTURA: Objection. Foundation.
THE WITNESS: I don't see that because there are numbers higher than that.
BY MS. BAIG:
Q. So the number I see is 2,608. Is that the number that you're looking at?
A. I'm looking at the 2608 yes.
Q. Yes, okay. And I see one higher, which is 4,281. A-ha. I do see another higher. In Seattle, are you looking at that one?
A. Yes. The line below that it was 3,809.
Q. Yes, the Seattle doctor.

Okay. But in any event, you see that for Dr. Michael Schwartz, he's identified as having 2,608 prescriptions of morphine sulfate ER for that 12-month period, correct?
MS. VENTURA: Objection. Foundation.
THE WITNESS: That's what the data shows.
BY MS. BAIG:
Q. Okay. If you had wanted to see prescriber data like this, who at Actavis would you have asked for this data?
A. I would have asked Nathalie.
(Document marked for identification as Exhibit Allergan-McCormick-17.)
BY MS. BAIG:
Q. I'll have this document marked as Exhibit 17.
Now, did you use direct ads to market generic opioids?
MS. VENTURA: Objection to

form.
MR. MAIER: Objection.
THE WITNESS: So this is part of the McKesson Connect.
BY MS. BAIG:
Q. So did Actavis use direct ads to market generic opioids, whether it be through Actavis directly or through a partner that it hired to do so?
MS. VENTURA: Objection to form.
THE WITNESS: For the oxymorphone marketing program, we worked with McKesson in this context, just for the oxymorphone product.
BY MS. BAIG:
Q. Okay. For direct advertising, correct?
A. So I want to clarify this direct advertising is just the name. It's not direct advertising to consumers or patients. It's the name of their page, called DirectRx.

Q. Okay.
A. So it's part --
Q. This is what's referenced here, "DirectRx advertising example," correct?
A. Yeah. That's if you were -- if that's what you are talking about.
Q. Yeah. I'm looking at the language on the document that says, "DirectRx advertising example."
Do you see that?
A. Yes, I saw that.
Q. Okay. And they seem to be suggesting to you through John Hansen in this e-mail that it's a screen shot of an example of an ad that can be recreated for oxymorphone; is that right?
MS. GERMANO: Objection. Form.
THE WITNESS: That's just example from John.
BY MS. BAIG:
Q. Yeah. And he suggests, "We will create a similar one for

oxymorphone," correct?
A. That's what he said.
Q. Okay. And do you know whether such a direct ad was created for oxymorphone?
MS. VENTURA: Objection to form.
THE WITNESS: I don't remember.
BY MS. BAIG:
Q. But you -- go ahead.
A. But I think we executed the program.
Q. Okay. And if you turn to the third page of the document, do you see there's an e-mail from you to John Hansen at McKesson and others, starting, "John and Wendy"?
A. Okay.
Q. And do you see you go on to say, "Attached are some background information on the product as well as our ad, which is delivered to prescribing physicians and run in August issue of

Practical Pain Management and Pharmacy Times."
Do you see that?
A. Yes, I saw that.
Q. Okay. And it goes on to state, "Similar message/graphics is also e-mailed to all pharmacies around the country about three weeks ago and will be sent again the day after Labor Day."
So are these actions that were taken directly by your department?
A. The message to the pharmacies we used, we used a service to provide that message to the pharmacies.
Q. Which service?
A. I don't remember exactly. But there were lots of marketing services that could do that.
Q. Do you remember some of the marketing services that you used other than R&J that we've discussed already?
A. This will be, for example, a PDQ, for example. They're a marketing service. It could be the PharmAlert.

That's an e-mail service. That could be providing such service.
Q. PharmAlert, P-H-A-R-M?
A. P-H-A-R-M. PharmAlert.
Q. And what does PDQ stand for?
A. I don't know. It's all capital, PDQ. That's the name of a service provider.
Q. Okay. And were there any other marketing services that you were using to promote generic opioids?
MS. VENTURA: Objection to form.
THE WITNESS: We use -- typically these were the two common ones we used to provide service -- messages to the pharmacies.
BY MS. BAIG:
Q. And did you -- did you pay them to do that?
A. For their marketing services.
Q. Sure. So you had contracts

with them?
A. We have -- typically it's just by project. If this is a project, there will be a quote. And then they would do the work.
Q. Okay. And would you have had a contract?
A. So it's not a contract. It's just a quote for the work and then invoice.
Q. Okay.
A. Yeah.
Q. And were they the ones that would run the ads in -- in the issues of Practical Pain Management and Pharmacy Times?
A. No. The -- so our agency would create the piece. And approved by our internal compliance and legal and regulatory. Then our agency will send to the Practical Pain Management and Pharmacy Times, these publications, for -- you know, for the particular issue we decided to run.

Q. And when you say our agency, are you referring to your advertisement agency?
A. Yes. Advertising agency.
Q. So that would be like R&J?
A. Yes. Or their equivalent, successor.
Q. Okay. But you're not talking about PDQ and PharmAlert?
A. No.
Q. Okay. And are these the -- the talking points that you suggested for -- for what actually -- for conversations with pharmacists?
Do you see the suggested talking points here?
MR. BAILEY: Objection to form.
THE WITNESS: Those are the suggested talking points for McKesson to use to the pharmacist.
BY MS. BAIG:
Q. Okay.
MS. VENTURA: If we are

going to a new document, do you mind going off the record just for a moment?
THE VIDEOGRAPHER: Going off the record. The time is 3:29.
(Brief pause.)
THE VIDEOGRAPHER: Going back on the record. Beginning of Media File 8. The time is 3:30.
(Document marked for identification as Exhibit Allergan-McCormick-18.)
BY MS. BAIG:
Q. I'll have this document marked as Exhibit 18. It's Bates stamped ALLERGAN_MDL_02460224 through 226.
And it's an e-mail sent by you to Steve Cohen dated January 24, 2012, titled oxymorphone prescription trends. Do you see that?
A. Yes.
Q. And who is Steve Cohen?
A. He is a person on the sales team.

Q. Okay. And here there is a reference to targeting an e-mail to all 90,000 pharmacists this Friday. Do you see that?
A. Yes, I saw that.
Q. And would this be the type of e-mail -- would this be the type of e-mail blast that we discussed earlier that you would either have your advertising agency do or you would do it directly, or did this go through your advertising agency?
MR. MAIER: Objection to form.
THE WITNESS: So the agency created the material and it was executed, so delivered, by one of the marketing service providers to the pharmacies, to the pharmacists.
BY MS. BAIG:
Q. PDQ or PharmAlert?
A. Yes.
Q. Okay. And do you see

towards the end of the document, there's -- well, there's an e-mail from -- from David Meyers to you and others, providing you with an update regarding the trends on oxymorphone prescription data, correct?
A. Yes, I saw that.
Q. Trends through December of 2011, correct?
A. Yes.
Q. And he notes that "dispensing data on oxymorphone 7.5 milligrams and 15 milligrams continues to grow month after month," correct?
A. That's correct.
Q. And he goes on to state that "when comparing July, the month we launched, versus December data, we see an increase of 110 percent on the 15 milligram and 147 percent on the 7.5 milligram."
Do you see that?
A. Yes.

Q. Did you have a general understanding that sales were increasing in a significant amount at that time?

MR. MAIER: Objection to form.

THE WITNESS: It should be, because July was launching. When you launch, this is four-month, six-month after launch, it should be increasing.

BY MS. BAIG:

Q. Okay. And you see a little bit further down, it states that "the marketing group is once again utilizing the Kadian sales force to promote oxymorphone to pain doctors, as well as running both direct mail and e-mail promotional programs in January and February."

Do you see that?

A. Yes.

Q. And he states, "Our goal is to continue the growth trend through 2012."

Do you see that?

A. Yes.

Q. And was it your understanding that the marketing group was utilizing the Kadian sales force to promote oxymorphone to pain doctors?

MR. MAIER: Objection to form.

THE WITNESS: Yes. I was aware to promote. I think we want to clarify that promote, really just to make it aware of the availability of this product, as those marketing material we had reviewed earlier.

BY MS. BAIG:

Q. And that -- and you are also running both direct mail and e-mail promotional programs, correct?

A. Yes. So all of these programs were just awareness program. It wasn't promoting the product on any of the benefits or anything.

Q. Did you have an

understanding of the addictive qualities of the product at the time?

MR. MAIER: Objection to form.

THE WITNESS: So product being Schedule II has addictive potential.

BY MS. BAIG:

Q. And do you know whether the Kadian sales force was promoting the awareness of the addictive qualities of oxymorphone to pain doctors?

MR. MAIER: Object to form and foundation.

MS. VENTURA: Join in the objection.

THE WITNESS: What we asked Kadian sales force was just awareness campaign to the doctors, so they are aware, so they -- the doctors were aware of the ability of the generic because the -- because Opana ER was discontinued.

BY MS. BAIG:

Q. Do you remember -- do you know why Opana ER was discontinued?

A. I do not remember why it was discontinued. At that time, what we knew is was not because of safety reason.

Q. You never heard that Opana ER was discontinued because of safety reasons?

A. It was not -- it was not because of safety reasons.

Q. You know that?

A. That's how we understood at the time.

Q. Have you come to a different understanding since then?

MR. MAIER: Objection to form.

MS. VENTURA: Objection to form.

THE WITNESS: I have not -- I have not worked with this product since I left Actavis.

BY MS. BAIG:

Q. Okay. But you still work

Page 261

with -- with opioid products, correct?
MS. GERMANO: Objection, form.
THE WITNESS: I do now.
BY MS. BAIG:
Q. Did -- were you involved at all in tracking the return on investment for your marketing --
MR. MAIER: Objection to form.
BY MS. BAIG:
Q. -- of generic products?
A. So marketing -- generic marketing had -- so first of all, if you were talking about the promotional expense or activities, it was very small to begin with. It was -- we didn't track -- we did not track by product, for example. We did not track about return on investment in general.
Q. So you did not -- so Actavis did not track return on investment for its marketing activities?
MR. MAIER: Objection to

Page 262

form.
MS. VENTURA: Objection to form.
THE WITNESS: We did not track the return on investment for generic product marketing expense.
BY MS. BAIG:
Q. I see. So -- but certainly Actavis tracked return on investment for marketing generally, correct?
MS. VENTURA: Objection to form, foundation.
MR. MAIER: Objection to form.
THE WITNESS: I do not know that.
BY MS. BAIG:
Q. If you wanted to know, who would you ask?
A. It never occurred to me to ask.
Q. Sure. But you worked at Actavis and Alpharma for a long time, You know the people there. If you wanted to

Page 263

know who was tracking return on investment, you had a pretty senior level position there. Who would you have asked?
MR. MAIER: Objection to form.
THE WITNESS: I could have asked Nathalie, for example, if I knew she -- of course I knew she was the head of Kadian marketing.
I could -- you know, I could ask Doug Boothe, the CEO.
BY MS. BAIG:
Q. In addition to the two magazines that we looked at with respect to the ads, were there any other magazines that were targeted for marketing purposes?
MR. MAIER: Object to form.
THE WITNESS: I don't remember the marketing -- the journals for this product specifically. We did work with a number of other publications

Page 264

during the course of my work there.
BY MS. BAIG:
Q. Which publications do you recall working with?
A. Typically there was Drug Store News. So Drug Store News. I don't recall all the names that we were working with.
Q. Do you recall any other names?
A. Let me think through that. Oh, Pharmacy Times.
I mean, if you do have a list, it's probably a lot easier to think back.
(Document marked for identification as Exhibit McCormick-19.)
BY MS. BAIG:
Q. Okay. Let's have this document marked as Exhibit 19. This document is Bates-stamped ACTAVIS_0350871 through 907. It starts from an e-mail

from you to John Hansen, dated August 26, 2011. Subject, "Follow-up discussion regarding" -- or, "Re Actavis oxymorphone campaign."
Do you see that?
A. Yes.
Q. And it says, as an attachment, is the oxymorphone sell sheet and oxymorphone summary for McKesson.
Do you see that?
A. Okay.
Q. And it states, "Attached are some background information on the product as well as our ad which is delivered to prescribing physicians and run in August issue of Practical Pain Management and Pharmacy Times."
So these are two of the medical journals that you would post ads in; is that right?
MR. MAIER: Objection to form.
THE WITNESS: Yes, those were the two we used.

BY MS. BAIG:
Q. Okay. And it goes on to state that, "The similar message/graphics is also e-mailed to all pharmacies around the country about three weeks ago and will be sent again the day after Labor Day." Do you see that?
A. Yes.
Q. And here are the talking points. It looks in part like this is a duplicate of an e-mail that we saw earlier.
A. It looks that way.
Q. But this one has attachments. And so if you look to the next page. Is this the sell sheet, the first page?
A. The first page, yeah, that looks like the sell sheet.
Q. And on the next page where it says, "Now available from Actavis," and down at the bottom it says, "To learn more, contact your Actavis representative or wholesaler or call customer service,"

and there's a number.
Do you see that?
A. Yes.
Q. And if they called the Actavis representative, who would they talk to?
A. It would be someone from the customer service department.
Q. Okay. And were there scripts created for the people in customer service who were talking directly with customers?
MR. MAIER: Objection to form.
MS. VENTURA: Objection to form.
THE WITNESS: So these are -- the words, "Contact your Actavis representative or wholesalers," I think those were the material that would be for the pharmacy. So the customer service would be pharmacists too. The pharmacists would call the

customer service typically.
BY MS. BAIG:
Q. Okay. And were there scripts that the people answering the phone would use to talk with the callers?
MR. MAIER: Objection to form.
MS. VENTURA: Objection to form, foundation.
THE WITNESS: I don't know.
BY MS. BAIG:
Q. You don't know. You never saw the scripts, if there were any?
A. I've never -- I never asked if they had scripts.
Q. Okay. Well, were you involved in training of any of those people that would take calls?
A. No. I was not involved. This is the customer service that answered all of the calls.
Q. Okay. Who would have trained those folks?
A. So Nancy Baran was the head

Page 269

of customer service.
Q. Okay. Then if you go to the second-to-last page, there's another picture of the sell sheet. And it says, "Sell sheet front and back."
Is that your understanding of the sell sheet that we've been discussing for oxymorphone hydrochloride extended release?
A. Yeah, that's the same we've seen on the front.
Q. Okay.
A. Yeah.
(Document marked for identification as Exhibit McCormick-20.)
BY MS. BAIG:
Q. We'll have this document marked as Exhibit 20. Here you go.
This document starts as an e-mail from you to Brenda Vesey. It's Bates-stamped ACTAVIS_346651 through 655.
Who's Brenda Vesey?
A. She was the head of HR.

Page 270

Q. And do you see the subject is marketing plan and media plan?
A. Yes.
Q. And this was a marketing and media plan for what?
A. So I think it's this -- this media plan for the year, for generic.
Q. For all of the generic drugs?
A. So for the generic division.
Q. And what was the purpose, why did you create this and send this to Brenda Vesey?
A. So the media plan was part of the normal business operation. We have this plan to really plan out the whole year for our media activities.
Q. And you state in here, "We occasionally target prescribing physicians as needed, for example oxymorphone to promote our products," correct?
A. I stated that, "occasionally."

Page 271

Q. You mean you state, "We occasionally target"? Is that what you're saying? The word "occasionally" is in there?
A. Yeah.
Q. Yeah. And you go on to state that, "Practical Pain Management falls into this category."
A. Yes.
Q. So was it your intent to target pain management physicians?
MR. MAIER: Objection to form.
MS. VENTURA: Objection to form. Foundation.
THE WITNESS: So what it's indication, oxymorphone was for pain management and the Practical Pain Management was one of the journals that -- that were read by physician.
BY MS. BAIG:
Q. And you go on to state, "Every year we aim to develop new

Page 272

corporate ad to fresh the image. This year we planned for two new ones. One is being used in ad," and then you have, "(Green planet, zero carbon, we call tree ad)."
Is that ad actually -- it's not attached, right?
A. Not here. At least I didn't see it. Let me see.
Q. What was the green planet ad? That was for oxymorphone?
A. That was just for corporate Actavis, the corporate brand, not product-specific ad.
Q. I see. And then you go on to state, "We also did more product-specific promotions this year, as we discussed earlier. Fentanyl, Zolpidem, and oxymorphone are published." Correct?
A. Yes.
Q. And those were published where?
A. I don't remember exactly

Page 273

where. But oxymorphone we already talked about in the two journals.
Q. Okay. You go on to say, "We did extensive promotion and media campaign for oxymorphone." Correct?
A. Yes.
Q. And on the next page, there's a list of products, and then it states a column for ad and a column for sell sheet.
Do you see that?
A. Yes. I saw that.
Q. Okay. And what is this? This is just to let them know that you -- that you have certain ads and sell sheets prepared already?
A. These are the new product to be launched, and then we're working on either the sell sheets or the ad.
Q. I see. And these are the estimated time frame for the launches?
A. I don't know if it's an estimated or it happened.
Q. Okay. And on the next page,

Page 274

you see that Actavis 2011 media plan?
A. Yes.
Q. And did you create this media plan?
A. No, I did not.
Q. Who created it?
A. Our agency working with -- working with David Meyers, to create this plan.
Q. The advertising agency, J&R?
A. The advertising agency, either R&J or its successor.
Q. Okay. And what was the purpose of creating this media plan?
A. Just most of the work we do, we created a plan throughout the year so we know what our plans were and what the budget would be and, you know, that's a plan.
Q. And so the far left column is entitled "Publications," correct?
A. Yes. That's the publication.
Q. And were those the

Page 275

publications where you were placing ads to promote generic opioids?
MR. MAIER: Objection to form.
THE WITNESS: Those were the journals that we worked with to place our ads. It could be product specific, but more frequently it was corporate ads.
BY MS. BAIG:
Q. And those publications included American Health and Drug Benefits, Chain Drug Review, Chain Drug Store Daily - NACDS, Drug Store Management, Drug Store News, Drug Topics, JAMDC Membership Directory, MPR, Non-Foods Management, Pharmacy Purchasing and Products, Pharmacy Times, Pharmacy Today, Practical Pain Management, U.S. Pharmacist on this list, correct?
A. Mm-hmm. I can see on that.
Q. What does MPR stand for?
A. I don't know. That's just their name.

Page 276

Q. Okay. And what's identified in these -- in, say, these red boxes, do you know?
A. That's the planned insertion date, and then the ad, the content.
Q. So if it says mortar ad, what does that mean?
A. That's a corporate ad. It's referring to an image that has mortar in it.
Q. Okay. What was the thinking behind having mortar as a graphic for a corporate ad?
MR. MAIER: Objection to form and foundation.
THE WITNESS: There was a lot of -- I mean there were a lot of reasons why we created the ads, along -- along with the associated images.
BY MS. BAIG:
Q. Do you remember what the reason was for the mortar ad?
A. Well, it's normally related

to pharmacies.
Q. Mortar?
A. Mortar was -- yes. It was the old-fashioned pharmacy.
Q. I see. And then you have, say, four -- six rows from -- columns from the right, there's a reference to an oxymorphone ad. Do you see that?
A. It's hard to see.
Q. I know.
There are a couple references to oxymorphone ads, do you see those? Six columns from the right towards the bottom.
A. Oh I see. You have good eyesight.
Yes, I saw that.
Q. So those would be, for example, oxymorphone ads being placed into Pharmacy Times and Practical Pain Management?
A. Yes.
Q. Okay. And the next page has 2011 budget launches. Would this have

also been created by your advertising agency?
A. No. This was created by the marketing group.
Q. By your marketing group?
A. Yes.
Q. Okay. And what was the purpose of this?
A. This was for us to track the new product launches for a particular year.
Q. And it provides market share targets; is that right?
A. That's the target assumption in the 2011 budget.
Q. It's the market share target in the 2011 budget?
A. Yes.
MS. VENTURA: Can you just reference the specific -- there's two charts that have the same title. One has got some green rows, the other has grey rows. Can we just make sure that we are

all talking about the same one?
MS. BAIG: I think those have the same heading on the boxed column.
MS. VENTURA: And they have the same Bates number. It looks like there's a color difference that we can use to reference which one we are talking about.
BY MS. BAIG:
Q. What is Sagent, S-A-G-E-N-T? I see it on the -- the first of those two pages?
A. Sagent. It's a company.
Q. What company is it, why is it referenced here? Is it an Allergan company?
A. No, it's not.
Q. Okay. So why were you creating budget launches for Sagent?
MR. MAIER: Objection to form.
THE WITNESS: So Sagent primarily had injectable product,

and Actavis did not have injectable -- injectable product prior to very recent years. So I think we had marketing agreement to have Sagent sell Actavis product. And those were the injectable product.
BY MS. BAIG:
Q. Were any of those products opioids?
A. No. Both the -- the listed there, gemcitabine and paclitaxel are both oncology products.
Q. Do you have a page in your exhibit that looks like this?
A. I think so.
Q. And what is this -- this page? Just for the record it still says Actavis 2011 media plan. December 2019. That must be the produced date or something.
What is this document?
MR. KNAPP: Probably the printed date.

THE WITNESS: So this is a part of the media plan. And those were the potential, those are the journals involving pain management. Those were just the options.

BY MS. BAIG:

Q. Okay. So you have, for example, the Practical Pain Management Journal, right?

A. Mm-hmm.

Q. And the target audience there is clinicians and pharmacists?

A. Yes. That's what it says.

Q. Okay. And this was a journal that you intended to place an ad for a generic opioid; is that right?

MS. GERMANO: Objection. Foundation.

THE WITNESS: This is one we intended to place ad for, oxymorphone availability awareness ad.

BY MS. BAIG:

Q. Okay. And pain -- Pain Medicine is another journal that you were intending to place an ad in; is that right?

MS. GERMANO: Objection to form.

THE WITNESS: No. These were the agency, the ad agency's work to list the potential journals we could place our ad in.

BY MS. BAIG:

Q. I see. And they were providing you with the costs associated with that as well; is that right?

A. Sure.

Q. Okay. And they include Pain Medicine, Pain Medicine News, the Journal of Pain, the Journal of Pain Symptom and Pain Management, and Anesthesiology News, correct?

A. Yes.

(Document marked for identification as Exhibit Allergan-McCormick-21.)

BY MS. BAIG:

Q. Let's have this document marked as Exhibit 21.

It's Bates stamped Actavis 0622787 through 89. It starts as an e-mail from you to David Meyers dated September 2, 2011. Subject is revised marketing plan. Attachment is marketing plan for Actavis.

Do you see that?

A. Yes.

Q. And again, it references an e-mail blast to pharmacists in the first line. Do you see that?

A. Yes, I saw that.

Q. Okay. And a little further down, John Hansen of McKesson is recommending -- appears to be recommending a revised marketing plan for oxymorphone ER that he recommends. Do you see?

A. Yes.

Q. So he's stating he recommends a "bundled promotion

consisting of GC phone campaign to 200 customers, a fax blast to 200 customers, and a McKesson Connect ad for one week."

Do you see that?

MR. MAIER: Object to form.

THE WITNESS: Yes, I saw that.

BY MS. BAIG:

Q. Okay. And the total cost for the bundle was $8500?

A. Yes.

Q. And do you know whether you executed on this?

A. I don't remember. I think we did.

Q. Okay. And for the phone campaign, the 200 customers, how would you have determined who those customers were?

A. We allowed McKesson to decide who those customers were.

Q. So McKesson would determine which 200 of its customers it should target for a phone campaign?

Page 285

MR. BAILEY: Objection to form.
THE WITNESS: Yes.
BY MS. BAIG:
Q. Same with the fax blast, the 200 customers, McKesson would -- would determine that?
A. Yes.
Q. And do you see, two pages later, there's a bullet at the top that says, "Recommendation: One phone awareness campaign to a targeted pool of 200 retail independent pharmacies with significant brand sales in September."
Do you see that?
A. Yes.
Q. And what data would have been used to determine which pharmacies had significant brand sales?
MR. MAIER: Objection to form and foundation.
MR. BAILEY: Objection to form.
MS. VENTURA: Objection to

Page 286

form.
THE WITNESS: That would be McKesson's internal data.
BY MS. BAIG:
Q. And do you see a little further down where it says, "Total cost for bundled promotion." And it states under marketing opportunity, "McKesson Connect banner ad."
Do you see that?
A. Yes.
Q. And they're suggesting that it will reach 30,000-plus McKesson pharmacy customers.
MR. MAIER: Objection to form.
BY MS. BAIG:
Q. Do you see that?
A. I see that.
Q. Okay. And the benefit suggested here is, "A wide reach of message on customers' homepage for one week."
Do you see that?

Page 287

MR. MAIER: Objection to form.
THE WITNESS: I see that.
BY MS. BAIG:
Q. Okay. So where is this banner ad being placed?
A. That's when McKesson customer ordered from McKesson.
Q. Sure. Where is the ad being placed?
A. On the --
Q. The banner ad.
A. On the McKesson order page.
Q. Okay. And that would be an ad for one of Actavis' drugs, correct?
MR. MAIER: Objection to form.
THE WITNESS: Yes.
BY MS. BAIG:
Q. In this case it would be for oxymorphone, correct?
A. Yes. It's for oxymorphone.
Q. And then it refers to the fax blast. "The fax sheet will be sent

Page 288

to 200 McKesson pharmacy customers. The benefit would be delivery of the marketing message directly to the pharmacy." Correct?
A. Yes. That's in the proposal.
Q. And then the phone awareness campaign. They are stating it will reach 200 customers, and the benefit would be messaging personally delivered by generics specialist to pharmacy decisionmaker.
Do you see that?
A. I see that.
Q. Who is the generics specialist that delivers the message?
MS. VENTURA: Objection. Foundation.
MR. MAIER: Objection. Foundation.
THE WITNESS: I don't know. It would be McKesson generics specialist.
BY MS. BAIG:

Q. Would you communicate with the generics specialist about what was being messaged?
A. We did not communicate with the people directly.
Q. Did you -- did you see a script or approve a script beforehand?
A. I don't remember.
Q. But you don't remember actually creating the script and sending it to them, correct?
A. We don't create scripts for McKesson and people.
Q. Okay.
(Document marked for identification as Exhibit McCormick-22.)
BY MS. BAIG:
Q. I'll have this document marked as Exhibit 22. Document Bates-stamped ALLERGAN_MDL_00396954 through 960. It's from Jennifer Altier to Jinping McCormick dated November 21st, 2011. And it appears that Jennifer

Altier is talking with you about a flier that's being sent out for marketing purposes; is that right?
MR. MAIER: Objection to form.
THE WITNESS: Let me just take a quick look.
BY MS. BAIG:
Q. Sure.
Do you see on the second-to-last page there is a heading that says, "Generic Kadian Sales and GP Summary"?
A. Yes.
Q. What does GP stand for?
A. Gross profit.
Q. Okay. And so just below that, where it says November 19, 2011, and then it goes on to say, "Market share target 50 percent."
Was that to suggest that the market share target for generic Kadian sales was 50 percent?
A. It's 50 percent of the

generic market.
Q. What do you mean by that? 50 percent of the generic market for Kadian?
A. Kadian.
Q. Correct?
A. For Kadian.
Q. Okay. And the target was 50 percent. But the market share secured was 56.2 percent; is that right?
A. Yes.
Q. Which means you exceeded the target, correct?
A. Correct.
Q. And the list of accounts beneath that, what does that reflect?
A. That's just a key account who signed with us.
Q. For generic Kadian?
A. For generic Kadian.
Q. And the estimated annual net sales was going to be $62.5 million correct?
A. So with the assumption at

the current price and at 90 percent of generic conversion.
Q. And do you see the page before, three-quarters of the way down or so, it says, "The sales team is calling on 5,500 prescribers. Each of these prescribers would need to write Kadian for about 1.3 new patients or convert 1.3 patients from generic MS Contin to generic Kadian per month to reach the threshold."
A. Where is that?
Q. It's on the page with the Bates stamp ending in 956.
A. Sorry. I've almost got it. Saw that.
Q. What threshold is she referring to here?
MR. KNAPP: Foundation.
THE WITNESS: I think she's discussing the merit of keeping the Kadian sales team or not, the expense of having them versus the revenue or additional benefit from

Page 293

having them.
Sorry, it's a long e-mail.
BY MS. BAIG:
Q. I know. So what she's saying is that a certain amount of additional prescriptions would have to be generated in order to justify keeping the sales team on; is that right?
MR. MAIER: Object to form.
MS. GERMANO: Objection to form.
MS. VENTURA: Objection to form and foundation.
THE WITNESS: I didn't have the time to read all the details.
BY MS. BAIG:
Q. So if you look at the paragraph that starts, Based on the net -- on net and net to ASP.
Do you see that?
A. Yeah.
Q. She states, "Based on a net ASP for the generic of 46 percent of brand WAC and assuming average monthly

Page 294

expenses of about 940,000, the sales team would need to generate 3,950 prescriptions for Actavis above and beyond the baseline. No promotion scenario.
"At 56 percent market share, this means that the total incremental prescriptions generated per month would need to be about 7,040. Given that the team could influence where prescriptions were to be filled, the threshold could actually end up being less than 7,040."
Do you see that?
A. I saw that.
Q. Does that suggest to you that she is -- that she is suggesting that a certain amount of prescriptions, incremental prescriptions need to be added in order to justify the sales team?
MR. MAIER: Objection to form.
MS. VENTURA: Object. Foundation.
THE WITNESS: I really

Page 295

couldn't tell you more than what's written on this page.
BY MS. BAIG:
Q. Okay. Well, how do you understand that paragraph?
A. I have to re-read everything because I don't remember to -- you show me this one, this e-mail, so what -- what the context was.
Q. Do you see where she says, "At 56 percent market share, that means the total incremental prescriptions generated per month would need to be about 7,040"?
A. Because we achieved the 50 percent market share, right.
Q. And then just above that --
A. Yes.
Q. -- she says, "I've been looking at the impact of keeping the sales team in the field and what would be required in the way of incremental prescriptions to justify the ongoing expense."

Page 296

Do you see that?
A. Yeah.
Q. Okay. So are you reading that to mean that she is looking at sort of a return on investment analysis as to whether it makes sense to keep the sales team on the field for generic Kadian?
MR. MAIER: Objection to form.
MS. VENTURA: Objection. Foundation.
THE WITNESS: As she said, the -- having the sales team is a big expense. And then the Kadian had already gone generic. So as a brand sales team, what -- so the trade off between having a sales team, incurring the expense and the incremental revenue that would be generated from having the sales team.
BY MS. BAIG:
Q. And she goes on to state that the "sales team is calling on 50" --

"calling on 5500 prescribers," correct?
A. Yeah. That's what they were doing in that time.
Q. And that means they are detailing those prescribers, correct?
MS. VENTURA: Objection to form. Foundation.
MR. MAIER: Objection to form. Foundation.
THE WITNESS: That was they were calling on the physicians for Kadian.
BY MS. BAIG:
Q. Meaning they were going to the physicians' offices, correct?
A. They were calling on the physicians.
Q. What -- what do you understand that to mean?
MR. MAIER: Objection. Foundation.
THE WITNESS: It could be really a call, or could show up in the office.

BY MS. BAIG:
Q. It could be either way?
A. It could be either way.
Q. Okay. Do you see on the page before there's some discussion about whether or not to use the Kadian logo. In the e-mail from Nathalie Leitch to you. It's the second page of the document. It says, "Could you please let Jennifer know what you think of the flier when you get a chance? I for one think we should use the Kadian logo, but I'm easy. This decision may boil down to a legal/regulatory call."
Do you see that?
A. Yes.
Q. Do you know whether they ultimately decided to use the Kadian logo for the marketing of the generic Kadian?
MR. MAIER: Objection to form.
THE WITNESS: I don't remember.
BY MS. BAIG:

Q. What would be the benefit of using the Kadian logo?
MR. MAIER: Objection to form.
THE WITNESS: As I stated there, the -- it's recognized by physicians and patients.
BY MS. BAIG:
Q. And so when you're marketing the generic version of that drug, it's beneficial to use the initial logo, is that what you're saying?
MR. MAIER: Objection to form.
MS. VENTURA: Objection to form.
THE WITNESS: So this is a -- a very special case for generic, because Actavis as a company owns both the Kadian brand and now we're launching a Kadian generic.
So I mean naturally this could -- this would be a topic for

discussion.
BY MS. BAIG:
Q. And wouldn't the launch of the Kadian generic undercut your sales for the Kadian brand name drug?
MS. VENTURA: Objection. Form. Foundation.
THE WITNESS: So Actavis launched the generic Kadian because we -- so you typically don't do that unless there were anticipated or actual generic competition for your brand product.
So in this case, we were expecting a generic competition for the Kadian brand. So, therefore, we launched the authorized generic of Kadian ourselves.
BY MS. BAIG:
Q. I see.
MS. GERMANO: Can we take a quick restroom break at this

Page 301

point?
MS. BAIG: Sure.
THE VIDEOGRAPHER: Going off record. The time is 4:22.
(Short break.)
THE VIDEOGRAPHER: We are going back on record. Beginning of Media File 9. The time is 4:42.
(Document marked for identification as Exhibit McCormick-23.)
BY MS. BAIG:
Q. Okay. I'll have this document marked as Exhibit 23.
This document is Bates-stamped Acquired_Actavis_02114868 through 882.
It's from you to Terri Nataline and others dated April 27, 2011, entitled, "RiskMAP draft." What is a RiskMAP draft?
A. RiskMAP is a risk mitigation evaluation mitigation document for this

Page 302

product, buprenorphine naloxone.
Q. And did you create the draft?
A. I didn't.
Q. Did or didn't?
A. Did not.
Q. Who created it?
A. I don't know.
Q. What was the purpose of it, to your -- to your knowledge?
A. Typically, when generic was launched, when generic is launching, even to get approval, it required comparable service and the -- which includes risk management and evaluation that is similar or substantially similar to the brand product.
And to -- so buprenorphine naloxone branded a RiskMAP, so therefore the generic for us to get ready for launch, we need to create something of substantial similarity to be able to market our product.
Q. And this was a RiskMAP draft

Page 303

for buprenorphine naloxone, correct?
A. Yes.
Q. And that drug is used to treat people who are addicted to opioids; is that right?
A. That's correct.
Q. And I see that there is a Caitlin Simili in the e-mail from ParagonRx.com. Who is that?
A. I think she worked for ParagonRx.
Q. And what is ParagonRx?
A. I think they work with-- I don't know what they are. I think the RiskMAP was managed by regulatory affairs. So I think she was contracted or contacted by regulatory affairs to work on the RiskMAP.
Q. I see. And she is -- so this is not the agency that you were trying to think of earlier. It's not an advertising agency?
A. They are not an advertising agency.

Page 304

Q. Okay. And do you see here -- so it states here that in 2010, Actavis filed new drug applications to market generic formulations of Suboxone. Is that your understanding?
A. That's what it says on the --
Q. I'm looking at the first page, first paragraph. Was that your understanding was that you were seeking approval in or around 2010?
A. That's when the ANDA was filed.
Q. Do you know why the decision was made to seek approval for Suboxone?
MS. VENTURA: Objection. Foundation.
THE WITNESS: We have portfolio management team that was in charge of product selection for development. So this product was selected as a product for development.
BY MS. BAIG:

Page 305

Q. You're not involved in the product selection?
A. I was not involved in the initial selection.
Q. And do you see here on the second page under abuse, misuse and diversion it states, "The rates of abuse of buprenorphine products are well below those of other opioids, such as methadone or oxycodone"?
A. Yes, I saw that.
Q. Okay. And were you aware at the time that there were significant abuse rates for other opioids?
MR. MAIER: Objection to form and foundation.
THE WITNESS: This was not really related to that because schedule -- buprenorphine is Schedule III drug. Schedule II, methadone, oxycodone were Schedule II.
BY MS. BAIG:
Q. Sure. My question is

Page 306

whether or not you had an understanding at the time that there were significant abuse rates for the Schedule II drugs oxycodone and methadone?
MR. MAIER: Objection to form and foundation.
THE WITNESS: I think Schedule II by definition lends itself to potential for abuse.
BY MS. BAIG:
Q. And do you see a little further down it states, "Opioid addicts describe the effects to be similar to those of morphine or heroin at equally potent doses."
Was that your understanding at the time?
MS. VENTURA: Objection. Foundation.
THE WITNESS: I did not know this.
BY MS. BAIG:
Q. You read this when you received it, correct?

Page 307

A. Yes.
Q. And the RiskMAP goal and objective, the key goal as stated on the next page is, "To reduce the risk of abuse, misuse, and diversion of buprenorphine," correct?
A. Yes.
Q. And certain strategies and tools for doing that included restrictive prescribing.
Do you see that?
A. Yes.
Q. And education?
A. Yes.
Q. And the educational materials were to be distributed to physicians, patients and pharmacists.
Do you see that?
A. Yes, I saw that.
Q. Okay. And who distributed those educational materials?
A. This product was not launched while -- during my tenure at Actavis.

Page 308

Q. Okay.
A. So I do not know.
Q. Do you know typically if educational materials are distributed to physicians -- to physicians, patients, and pharmacists upon product launch?
A. Typically, it was not unless it was required.
Q. Required by?
A. So this is a RiskMAP. Sometimes it's called a REMS program.
This was part of the requirement by FDA.
Q. And do you see the next category listed under strategy and tools is prescriber education?
A. Yes.
Q. And did you have a prescriber education -- a person who was in charge of prescriber education generally?
A. Not for generics.
Q. And did you have a person who was in charge of prescriber education

for any opioid products?
MS. VENTURA: Objection. Foundation.
THE WITNESS: So for generic product, we did not have someone who was in charge of prescriber education.
BY MS. BAIG:
Q. My question was with respect to opioid products, all opioid products.
MS. VENTURA: Same objection.
THE WITNESS: So remember, typically generic product, we did not reach out to prescribers or physicians.
BY MS. BAIG:
Q. My understanding -- my question to you is whether or not you had a department or a person who was in charge of prescriber education for any opioid products, whether it be branded or generic. Do you know of anyone that was involved in that?

A. So we have medical affairs department, pharmacovigilance program and department who would be doing, you know, I would say brand.
Q. Who would be doing what?
A. The brand education, or any education-related material.
Q. Okay. And so it would be that department that would devise patient leaflets for prescriber education?
MS. VENTURA: Objection. Foundation.
THE WITNESS: So this is -- so this was a program that would be part of the application. And so this is just a requirement. But we had not, during my tenure there, decided how to execute these requirements.
BY MS. BAIG:
Q. Did you ever have any involvement with prescriber education?
A. I did not.
Q. The next category is patient

education. Did you ever have any involvement with patient education?
MS. GERMANO: Are we talking specific to this drug?
MS. BAIG: No. For any drugs.
MS. GERMANO: Objection as to foundation.
THE WITNESS: As I said earlier, generic product -- generic products selling or marketing typically did not involve patient -- direct patient interaction.
BY MS. BAIG:
Q. Do you recall having any experience with patient education for any opioid products ever while you were at Alpharma or Actavis?
A. I do not recall any such education.
Q. Did you have any involvement with the National Institute on Drug Abuse?

A. I did not.
Q. How about the National Addiction Vigilance and Prevention Program?
A. Where is that?
Q. Couple pages later, 4.1.1.
A. Okay. I see that. It's 875.
Q. Did you have any involvement with that organization?
A. I did not.
Q. Two pages later you see under 4.1.8, street -- something called street surveillance? "Actavis will conduct street surveillance by means of ethnographic research which employs a range of observational data collection methods to perform targeted quantitative investigations to explore discrepancies between what individuals report they do and the actions they effectively take."
Were you aware of any such program at Actavis?
A. There was a product we -- we

had at that time, I was not aware of street surveillance.
Q. All right. Were you aware of any street surveillance at Actavis with respect to any opioid product?
A. I was not aware.
Q. You never heard of it?
A. I heard of, in the sense of in a document like this, and I think because Actavis did not directly conduct such surveillance, that's not to say they did not contract other people to do that.
Q. Who did they contract to do that?
A. This is the responsibility of regulatory affairs group and potentially other groups. It was not the responsibility of marketing, sales and marketing group.
Q. So do you know who those groups worked with for street --
A. I do not.
Q. -- for street surveillance?
A. I do not.

Q. Under 4.1.9 there's a reference to expert advisory group. Do you see that?
A. I see that.
Q. And it says, "Actavis will organize an external, cross-functional expert advisory group comprised of specialists in opioid addiction therapy, epidemiology, bioinformatics or other related disciplines."
Do you see that?
A. Yes.
Q. And that the group would meet quarterly?
A. I see that.
Q. At least quarterly?
A. Yeah. I said it -- I read it's in the document.
Q. Yes. Okay. So do you know anything about that expert advisory group?
A. Are you talking about specific to this program?
Q. Specific to any opioids.

MS. VENTURA: Objection to form.
THE WITNESS: I was not aware of that.
BY MS. BAIG:
Q. Of an expert, any expert advisory group?
A. So I take it back. I was not aware of any expert advisory group for generic product.
Q. How about for any opioid products?
MS. VENTURA: Objection. Foundation.
MR. MAIER: Objection. Foundation.
THE WITNESS: If it's an opioid generic product, I was not aware of that.
BY MS. BAIG:
Q. My question is, were you aware of any expert advisory group for any opioid product, whether it was generic or branded?

MS. VENTURA: Objection. Foundation.
MR. MAIER: Objection. Foundation.
THE WITNESS: I was not aware of any generic expert advisory group for generic product, whether it's opioid or not.
BY MS. BAIG:
Q. Were you aware of any expert advisory group for a branded opioid?
MS. VENTURA: Objection. Foundation.
THE WITNESS: I think there is an advisory group for branded product.
BY MS. BAIG:
Q. Okay. And what is that advisory group?
A. I was not aware. I do not know the details.
Q. But you are aware that it existed?

Page 317

MS. VENTURA: Objection to form.
THE WITNESS: I was not 100 percent sure.
BY MS. BAIG:
Q. Well, when did you first hear about it?
MS. GERMANO: Objection. Foundation.
THE WITNESS: I don't remember.
BY MS. BAIG:
Q. Well, if you wanted to know about the expert advisory group for the branded -- for the branded opioid products, who would you talk to?
MR. KNAPP: Foundation.
THE WITNESS: First, I don't have reason to know whether we have one. But if I needed to, I would ask Nathalie Leitch.
BY MS. BAIG:
Q. You testified that you thought there was an advisory group for

Page 318

branded products. Okay. What do you know about the advisory group for branded opioid products?
MS. VENTURA: Objection. Foundation.
THE WITNESS: I do not know anything about the expert advisory group for brand product.
BY MS. BAIG:
Q. Did you hear that one was put together?
A. I did not.
Q. Well, then why did you testify that you were aware of an advisory group for a branded product?
MR. MAIER: Objection to form.
THE WITNESS: I -- typically brand had an advisory group.
BY MS. BAIG:
Q. I see. Do you know of any of the doctors that were on the -- that were involved in the advisory group?
MR. KNAPP: Objection.

Page 319

Foundation.
MS. VENTURA: Objection. Foundation.
THE WITNESS: I did not.
BY MS. BAIG:
Q. Do you see on the very last page of this document there's a list of -- of references?
A. Yes.
Q. Would you have read these articles when you received the references?
A. I did.
Q. So you are familiar with these articles generally?
MR. MAIER: Objection to form.
THE WITNESS: Well, not the articles, I was looking at the appendix.
BY MS. BAIG:
Q. You would have read the appendix. Would you have read the actual articles cited there?

Page 320

A. No, I did not.
Q. Did you have any interaction with any of the following organizations, the American Pain Society?
A. No, I did not.
Q. The HDA Research Foundation?
A. No, I did not.
Q. Center For Healthcare Supply Chain Research?
A. No.
Q. National Wholesale Druggists Association?
A. National Wholesale Drug Association, is that the HDA?
Q. The National Wholesale Druggist Association. So I think it's -- I don't know if it's the same.
A. Well --
Q. You've had a -- you've had interaction with HDA, is that what you're saying?
A. HDMA, yeah.
Q. HDMA.
How about the American Pain

Foundation?
A. I did not.
Q. American Academy of Pain Medicine?
A. No, I did not.
Q. U.S. Pain Foundation?
A. No.
Q. And what was the extent of your involvement with the HDMA?
A. I attended sometimes the HDMA's annual conference.
Q. Did you ever work with key opinion leaders?
A. No, I did not.
Q. Who worked with the key opinion leaders at Actavis?
MR. KNAPP: Foundation.
MS. VENTURA: Objection to form.
THE WITNESS: I don't know.
BY MS. BAIG:
Q. You never heard of Actavis working with key opinion leaders before?
A. I think brand company

typically work with key opinion leaders, but I don't know any specifics about Actavis' involvement with the key opinion leaders.
Q. Okay. Do you know who any of the key opinion leaders were with respect to opioids?
A. No, I do not.
Q. Okay.
MS. BAIG: I don't have any further questions. Thank you.
THE WITNESS: Thank you.
MR. MAIER: We'll take a couple minutes and come back. We'll very, very quick.
THE VIDEOGRAPHER: Going off the record. The time is 5:02.
(Short break.)
THE VIDEOGRAPHER: We are going back on record. Beginning of Media File 10. The time is 5:12.
- - -
EXAMINATION

- - -
BY MR. MAIER:
Q. Jinping, I just have a couple of questions for you.
You testified earlier today that you understood that Schedule II substances had to be taken seriously and carried certain obligations for suspicious order monitoring. How did you gain that understanding?
A. I gained that understanding through several aspects. First, on-the-job training through interaction with the DEA liaison, our security officer, customer service, and regulatory affairs people.
It's also through our day-to-day operation and working with, you know, people who were ahead of me and understanding the obligations.
Additionally, throughout the -- my working career there, there were constantly enhancement in the SOM process. For example, we would have

sales meeting that would be update on the SOM. Further, several years down the road, we also enhanced the system with more automation and working with a consultant to update our system and to have a more complete, enhanced processes and procedures.
Q. And for as long as you worked with Schedule IIs, did you feel like you had a sufficient understanding of suspicious order monitoring to participate in Actavis' program the way you did?
A. Oh, absolutely. I think it's a constant reminder of what our obligations were and then it was permeated through our day-to-day operation.
MR. MAIER: That's all I have. Thank you.
MS. BAIG: I have nothing.
THE VIDEOGRAPHER: All right. This concludes today's deposition. We're going off the

record. The time is 5:14.

(Excused.)

(The deposition concluded at approximately 5:14 p.m.)

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, JINPING McCORMICK, have the opportunity to read and sign the deposition transcript.

______________________________

MICHELLE L. GRAY,
A Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter and Notary Public
Dated: January 14, 2019

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

\- - - - - -

E R R A T A

\- - - - - -

PAGE LINE CHANGE

____ ____ ____________________
REASON: ________________________

____ ____ ____________________
REASON: ________________________

____ ____ ____________________
REASON: ________________________

____ ____ ____________________
REASON: ________________________

____ ____ ____________________
REASON: ________________________

____ ____ ____________________
REASON: ________________________

____ ____ ____________________
REASON: ________________________

____ ____ ____________________
REASON: ________________________

____ ____ ____________________
REASON: ________________________

____ ____ ____________________
REASON: ________________________

ACKNOWLEDGMENT OF DEPONENT

I,____________________, do hereby certify that I have read the foregoing pages, 1 - 330, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_______________________________________

JINPING McCORMICK DATE

Subscribed and sworn to before me this _____ day of ______________, 20____.

My commission expires:______________

___________________________________

Notary Public

LAWYER'S NOTES

PAGE LINE