## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION
- - -

IN RE: NATIONAL        :HON. DAN A. POLSTER
PRESCRIPTION OPIATE    :
LITIGATION        :MDL NO. 2804
            :
APPLIES TO ALL CASES     :NO.
        :1:17-MD-2804
    - HIGHLY CONFIDENTIAL -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
- - -
December 14, 2018
- - -
Videotaped sworn deposition of
COLLEEN McGINN, taken pursuant to
notice, was held at GOLKOW LITIGATION
SERVICES, One Liberty Place, 1650 Market
Street, Philadelphia, Pennsylvania,
beginning at 9:39 a.m., on the above
date, before Margaret M. Reihl, a
Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.
- - -
GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

## Page 2

1    A P P E A R A N C E S :
2
    WAGSTAFF & CARTMELL LLP
3    BY:  THOMAS CARTMELL, ESQUIRE
        KATHLEEN E HUDNALL, ESQUIRE
4    4740 Grand Avenue, Suite 300
    Kansas City, Missouri  64112
5    (816) 701-1100
    tcartmell@wcllp.com
6    khudnall@wcllp com
    Representing the Plaintiffs
7
8
    BRANSTETTER, STRANCH & JENNINGS, PLLC
9    BY:  BENJAMIN A  GASTEL, ESQUIRE
    The Freedom Center
10   223 Rosa L  Parks Avenue
    Suite 200
11   Nashville, Tennessee  37203
    (615) 254-8801
12   beng@bsjfirm com
    Representing the Tennessee Plaintiffs
13
14
    SKIKOS, CRAWFORD, SKIKOS & JOSEPH LLP
15   BY:  MARK G  CRAWFORD, ESQUIRE
        UZAIR SALEEM, ESQUIRE
16   One Sansome Street, Suite 2830
    San Francisco, California  94104
17   (425) 546-7300
    mcrawford@skikos com
18   usaleem@skikos com
    Representing the MDL Plaintiffs
19
20
21
22
23
24

## Page 3

1    A P P E A R A N C E S :  (cont'd)
2
3    MORGAN LEWIS & BOCKIUS LLP
    BY:  NATHAN J. ANDRISANI, ESQUIRE
4        ADAM HAMMOUD, ESQUIRE
    1701 Market Street
5    Philadelphia, Pennsylvania  19103-2921
    (215) 963-5362
6    nandrisani@morganlewis.com
    adam.hammoud@morganlewis.com
7    Representing the Defendant Teva
8
    REED SMITH LLP
9    BY:  ANNE E. ROLLINS, ESQUIRE
    Three Logan Square
10   1717 Arch Street
    Philadelphia, Pennsylvania  19103
11   (215) 851-8262
    arollins@reedsmith.com
12   Representing the Defendant,
    AmerisourceBergen Drug Corp.
13
14   PIETRAGALLO GORDON ALFANO
    BOSICK & RASPANTI LLP
15   BY:  LESLIE A. MARIOTTI, ESQUIRE
    1818 Market Street
16   Suite 3402
    Philadelphia, Pennsylvania 19103
17   (215) 988-1451
    lam@pietragallo.com
18   Cardinal Health
19
20
21   ALSO PRESENT:  Bill Geigert, VIDEOGRAPHER
22
23
24

## Page 4

1    TELEPHONIC APPEARANCES:
2
3    ARNOLD & PORTER KAYE SCHOLER, LLP
    BY:  TIFFANY IKEDA, ESQUIRE
4    777 South Figueroa Street, 44th Floor
    Los Angeles, California  90017-5844
5    (213) 243-4160
    tiffany ikeda@arnoldporter.com
6    Representing the Defendants,
    Endo Health Solutions, Inc ,
7    Endo Pharmaceuticals, Inc ,
    Par Pharmaceutical, Inc ,
8    Par Pharmaceutical Companies, Inc
    (FKA Par Pharmaceutical Holdings, Inc )
9
10   JONES DAY
    BY:  LOUIS P  GABEL, ESQUIRE
11   150 West Jefferson Avenue
    Suite 2100
12   Detroit, Michigan  48226
    (313) 733-3939
13   lpgabel@jonesday com
    Representing the Defendant, Walmart
14
15   COVINGTON & BURLING LLP
    BY:  GABRIEL FULMER, ESQUIRE
16   One CityCenter
    850 Tenth Street, NW
17   Washington, DC  20001-4956
    (202) 662-5769
18   gfulmer@cov com
    Representing the Defendant,
19   McKesson Corporation
20
21   ROPES & GRAY LLP
    BY:  ELIZABETH TOLON, LAW CLERK
22   1211 Avenue of the Americas
    New York, New York  10036-8704
    (212) 596-9374
23   elizabeth tolon@ropesgray com
    Representing the Defendant,
24   Mallinckrodt

## Page 5

```
 1    TELEPHONIC APPEARANCES (CONT'D)
 2
      MORGAN & MORGAN
 3    BY:  JAMES D. YOUNG, ESQUIRE
      76 South Laura Street, Suite 1100
 4    Jacksonville, Florida  32202
      (904) 398-2722
 5    Representing Plaintiffs
 6
 7
 8
 9                     _ _ _
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 6

```
 1              I N D E X
 2    WITNESS                    PAGE
 3    COLLEEN McGINN
        By Mr. Cartmell        11
 4      By Mr. Crawford        372
        By Mr. Gastel          437
 5
 6           E X H I B I T S
 7    TEVA-MCGINN    DESCRIPTION    PAGE
 8    McGinn-1  Resume of Colleen McGinn    18
 9    McGinn-2  Organization charts
              TEVA_MDL_A_00455258    24
10
      McGinn-3  2018 Mid-Year Review for
11            Colleen McGinn
              TEVA_MDL_A_10226902    48
12
      McGinn-4  E-mail dated 5/22/2018
13            Subject, FW:  Letters
              TEVA_MDL_A_09588503    56
14
      McGinn-5  E-mail string, top one
15            dated 10/14/2005
              TEVA_MDL_A_09563657    81
16
      McGinn-6  E-mail string, top one
17            dated 2/18/15
              attached Performance
18            Management Full Report
              Subject, No Subject-2127.EML
19            TEVA_MDL_A_02333635    88
20    McGinn-7  Prescription Opioid Sales
              and Deaths, 1999-2013
21            no Bates    101
22    McGinn-8  Teva Opioid Market Share
              Calculation : All Opioids
23            TEVA_MDL_A_00455086    104
24
```

## Page 7

```
 1           E X H I B I T S (cont'd)
 2    TEVA-MCGINN    DESCRIPTION    PAGE
 3    McGinn-9  E-mail string, top one
              dated 7/16/12
 4            Subject, FW: DEA Suspicious
              Order Monitoring Program
 5            TEVA_MDL_A_06618645    110
 6    McGinn-10 E-mail string, top one
              dated 9/16/12
 7            Subject, RE: DEA Mock Audit
              - Pomona
 8            TEVA_MDL_A_06442142    144
 9    McGinn-11 E-mails dated 5/24/12
              Subject, RE: Cardinal SOM
10            issues
              TEVA_MDL_A_01453866    154
11
      McGinn-12 Teva Internal Memorandum
12            dated June X, 2012
              Drug Enforcement Agency
13            ("DEA") Suspicious Order
              Monitoring Program
14            TEVA_MDL_A_06925565    191
              {**CLAWED BACK}
15
      McGinn-13 File Provided Natively
16            TEVA_MD L_A_02336504    206
17    McGinn-14 Performance Management
              Evaluation dated 8/25/15
18            TEVA_MDL_A_10226863    238
19    McGinn-15 Compliance Solutions
              Powered By Buzzeo PDMA
20            TEVA_MD L_A_01060005    243
21    McGinn-16 Intranet messaging
              dated 12/3/2015
22            TEVA_MDL_A_01056183    267
23
24
```

## Page 8

```
 1           E X H I B I T S (cont'd)
 2    TEVA-MCGINN    DESCRIPTION    PAGE
 3    McGinn-17 BuzzeoPDMA letter dated
              7/14/13, and attached
 4            site audit report
              TEVA_MDL_A_01464264    278
 5
      McGinn-18 BuzzeoPDMA letter dated
 6            8/6/13, and attached
              compliance review report
 7            TEVA_MDL_A_01464245    285
 8    McGinn-19 E-mail string, top one
              dated 4/2/2013
 9            TEVA_MDL_A_01464010    300
10    McGinn-20 E-mails dated 3/14/2013
              Subject, RE: FYI
11            TEVA_MD L_A_01456869    313
12    McGinn-21 File provided natively
              slide deck, "SOM and
13            Current Cases"
              TEVA_MDL_A_02480 (cutoff)    352
14
      McGinn-22 E-mail string, top one
15            dated 8/19/2015
              Subject, FW: Global Internal
16            Audit: DEA - Final Report
              TEVA_MDL_A_02475564    324
17
      McGinn-23 E-mails dated 8/19/2009
18            Subject, RE: Suspicious
              Order Monitoring
19            TEVA_MDL_A_09576608    369
20    McGinn-24 E-mails dated 10/16/2017
              Subject, RE: 60 Minutes
21            TEVA_MDL_A_01470384    384
22    McGinn-25 E-mail dated 2/8/2016
              Subject, RE: Anti-Diversion
23            Industry Working Group
              ALLERGAN_MDL_02146317    389
24
```

Page 9

E X H I B I T S (cont'd)

TEVA-MCGINN     DESCRIPTION     PAGE

McGinn-26 E-mails dated 2/11/2016,
with attached letter
Subject, RE: Letter from
Cardinal on Behalf of -
Minor edits and follow up
ALLERGAN_MDL_01373076     402

McGinn-27 E-mail dated 2/18/2016
with attached letter
Subject, Letter to DEA
ALLERGAN_MDL_01373080     405

McGinn-28 E-mail dated 5/26/2016
Subject, RE: Yesterday's
call
ALLERGAN_MDL_03536260     411

McGinn-29 E-mails dated 8/9/2011
Subject, RE: Quota -
Administrative Reviews
PPLPC019000568843     418

McGinn-30 E-mail string, top one
dated 7/12/2012
Subject, RE: SOM ARCOS
(all) reports generated
by DEA doc
PPLPC020000593125     427

McGinn-31 E-mail dated 2/27/2013
Subject, NJPIG Meeting -
Information on FDA
Hydrocodone Hearing
TEVA_MDL_A_02063833     430

McGinn-32 E-mail string, top one dated
11/7/2016
Subject, RE: New Jersey
Pharmaceutical Industry
Group Meeting - November
10, 2016
TEVA_MDL_A_01469841     433

Page 10

E X H I B I T S (cont'd)

TEVA-MCGINN     DESCRIPTION     PAGE

McGinn-33 E-mail dated 8/15/2012
Subject, RE: You are
invited ...
PPLPC031000957565     433

McGinn-34 E-mail dated 3/19/2013
Subject, RE: Customer
Service Training PPT
TEVA_MDL_A_02331426     446

McGinn-35 April 2015 Chargeback
Analysis
no Bates     457

--- ---

Page 11

1    THE VIDEOGRAPHER:  Good morning.
2    We are now on the record.  My name is
3    Bill Geigert, I'm a videographer for
4    Golkow Litigation Services.  Today's
5    date is December 14th, 2018, and the
6    time is 9:39 a.m.
7         This video deposition is being
8    held in Philadelphia, Pennsylvania in
9    the matter of In Re: National
10   Prescription Opioid Litigation for the
11   United States District Court, Northern
12   District of Ohio, Eastern Division.
13        The deponent is Colleen McGinn.
14   Counsel will be noted on the
15   stenographic record.  The court reporter
16   is Peg Reihl, and she will now swear in
17   the witness.
18        ... COLLEEN MCGINN, having been
19        duly sworn as a witness, was examined
20        and testified as follows:
21   BY MR. CARTMELL:
22        Q.   Good morning, Ms. McGinn.
23        A.   Good morning.
24        Q.   My name is Tom Cartmell, we just

Page 12

1    met off the record, and I'm going to be asking
2    you questions first today.  I want to say a few
3    things about this process before we get started.
4         Have you ever had your deposition
5    taken before?
6         A.   No.
7         Q.   Few things.  First of all, I want
8    to make sure that you're comfortable, so if at
9    any time during the deposition you need to take
10   a break for any reason, if you need to take a
11   restroom break or talk to your counsel or
12   anything like that, just tell me and we'll go
13   ahead and have a break, okay?
14        A.   Okay.
15        Q.   The other thing is I want to make
16   sure that you're communicating with me or
17   understanding my questions.  So if I ever ask
18   you something that you don't understand for any
19   reason or if you just need me to restate a
20   question for any reason, go ahead and just ask
21   me and I'll rephrase it or restate it, okay?
22        A.   Okay.
23        Q.   All right.  Let's just kind of
24   start by talking about some of your background,

Page 13

1  but, first of all, I want to know what your
2  current residential address is?
3      A.    I live in Pennsville, New Jersey.
4      Q.    Okay.  And can you give me that
5  address, please.
6
7
8      Q.    And we're in Philadelphia today.
9  How far is that from here?
10     A.    I don't know how many miles.  It
11 was about an hour's drive.
12     Q.    I see, okay.
13            And what is your current business
14 address?
15     A.    It's 145 Brandywine Parkway in
16 West Chester, Pennsylvania.
17     Q.    Are you currently employed by
18 Teva?
19     A.    I am.
20     Q.    That's a pharmaceutical company;
21 is that correct?
22     A.    It is.
23     Q.    How long have you been employed
24 by Teva?

Page 14

1      A.    I started with Cephalon in 2004.
2  Cephalon was acquired by Teva.
3      Q.    For purposes of this deposition,
4  I'm going to try to distinguish the two, in
5  other words, refer to Cephalon when I'm asking
6  you questions about that and then refer to Teva
7  during that time period when I'm asking you
8  questions about Teva, okay?
9      A.    Okay.
10     Q.    And those are two separate
11 pharmaceutical companies; is that correct?
12     A.    They were, before the
13 acquisition.
14     Q.    Okay.  And we'll talk about that
15 acquisition, but was the acquisition by Teva of
16 Cephalon; is that correct?
17     A.    Teva acquired Cephalon.
18     Q.    Okay.  Have you ever given
19 deposition -- excuse me, strike that.
20            Have you ever given testimony
21 under oath at all prior to today?
22     A.    Never.
23     Q.    Okay.  Have you ever been a
24 witness in any investigations by federal

Page 15

1  prosecutors or the DEA?
2      A.    No.
3      Q.    Have you ever been interviewed by
4  federal prosecutors or the DEA?
5      A.    Define an interview.
6      Q.    Well, I guess what I mean by
7  interview is representatives of a governmental
8  entity, specifically the U.S. Attorney's office
9  or let's include the FDA or the DEA who have
10 asked to speak with you about anything to do
11 with your job responsibilities either at
12 Cephalon or Teva.
13     A.    I interact with DEA on a regular
14 basis.  They inspect our facilities.  I would --
15 if you want to consider that an interview, then
16 I've talked to DEA.
17     Q.    That's a good point.  Maybe I
18 should have been more specific in my question.
19            Really what I'm trying to get at
20 is have you ever been interviewed during the
21 course of an investigation by the DEA or FDA or
22 the U.S. Attorneys?
23     A.    We had an informal hearing with
24 DEA at one point in time for a Virginia facility

Page 16

1  that was an inspection, but nothing came out of
2  it.
3      Q.    What time period was that?
4      A.    That would have been 20 -- I'm
5  guessing that it was 2013.
6      Q.    Okay.  We'll talk a little bit
7  more about that later.
8            Any other times when you think
9  potentially you were a witness or interviewed
10 related to your job responsibilities by the U.S.
11 Attorneys or the FDA or the DEA?
12     A.    No.
13     Q.    Okay.  Now, you understand that
14 in 2008, Cephalon, your former company or
15 employer, pled guilty to illegal off-label
16 marketing?
17            MR. ANDRISANI:  Objection.
18            THE WITNESS:  Yes.
19 BY MR. CARTMELL:
20     Q.    And you understand that as a
21 result of that guilty plea for illegal off-label
22 marketing by Cephalon, they paid a $425 million
23 fine?
24            MR. ANDRISANI:  Objection.

Page 17

1        THE WITNESS:  I don't know how
2  much the fine was.
3  BY MR. CARTMELL:
4      Q.    Were you aware that they paid a
5  fine?
6      A.    Yes.
7      Q.    And as a result of that, is it
8  true that they entered into a corporate
9  integrity agreement?
10       MR. ANDRISANI:  Objection.
11       THE WITNESS:  I don't have
12       details about that.
13  BY MR. CARTMELL:
14      Q.    Were you at all involved in that
15  investigation by the U.S. Attorneys or the
16  federal government?
17      A.    No.
18      Q.    Okay.  In other words, nobody
19  asked you to give an interview or to speak to
20  you about your job responsibilities at Cephalon?
21       MR. ANDRISANI:  Objection, form.
22       THE WITNESS:  No.
23  BY MR. CARTMELL:
24      Q.    Were you involved at all in

Page 18

1  compiling information or preparing documents
2  that were provided to the U.S. Attorneys in that
3  investigation?
4      A.    I don't recall.
5      Q.    Could have been?
6      A.    I honestly don't remember.
7      Q.    You understand you're under oath
8  today?
9      A.    I do.
10      Q.    Okay.  Now, I want to look and
11  talk about your employment history a little bit
12  more.
13       MR. CARTMELL:  703, please.
14       (Document marked for
15       identification as McGinn Deposition
16       Exhibit No. 1.)
17  BY MR. CARTMELL:
18      Q.    I'll hand you what's been marked
19  as Exhibit 1.
20       MR. ANDRISANI:  Is it one page or
21  two?
22       MR. CARTMELL:  It's just one.
23  BY MR. CARTMELL:
24      Q.    Ms. McGinn, this is a copy, I

Page 19

1  believe, of your LinkedIn page that we found on
2  the internet.
3       Do you recognize this?
4      A.    Yes.
5      Q.    Okay.  Because I want to talk a
6  little bit about your employment history, I
7  thought this would be a good reference, but it
8  states here that, as you stated, that from 2004
9  until 2012, you were an associate director,
10  corporate controlled substances.
11       Do you see that?
12      A.    I do.
13      Q.    Now, it states that that was for
14  Teva Pharmaceuticals but, actually, at that
15  time you were an employee of Cephalon, which was
16  later acquired by Teva; is that true?
17      A.    From 2004 till the acquisition in
18  2011, yes.
19      Q.    And, actually, when was it that
20  you first became an employee of Teva?
21      A.    It would have been the day of the
22  acquisition.
23      Q.    Do you -- can you give me some
24  ballpark about when that was, please?

Page 20

1      A.    I believe that it was
2  October 2011.
3      Q.    Okay.  Thank you.  Now, you say
4  here that you were the director -- associate
5  director of corporate controlled substances
6  until September of 2012, and so I guess my
7  question is even after the acquisition in
8  October of 2011, you retained that title as
9  associate director, corporate controlled
10  substances?
11      A.    That's correct.
12      Q.    Okay.  Tell us, if you can, when
13  you were hired by Cephalon in April of 2004,
14  were you at that time an associate director of
15  corporate controlled substances?  Was that your
16  title?
17      A.    No.
18      Q.    Okay.  So what was your title
19  when you were hired?
20      A.    It was manager, controlled
21  substances.
22      Q.    Tell us what your duties entailed
23  as the manager of controlled substances.
24      A.    I was responsible for the

Page 21

1  activities at the West Chester facility.  They
2  had a laboratory.  They had a vivarium, a
3  clinical manufacturing or packaging operation at
4  the facility.  So I was responsible for the
5  controlled substance activities, DEA records,
6  reports, quota applications, destructions,
7  inventories, reconciliations, inspections,
8  anything that had to do with West Chester.
9      Q.    We're going to talk a lot today
10  about controlled substances.
11          Will you tell the jury what that
12  means?
13      A.    A controlled substance is a
14  pharma -- a product that DEA regulates or
15  controls.
16      Q.    And in the course of your
17  deposition, because we're talking about times
18  and your duties at pharmaceutical companies,
19  we're talking about prescription pharmaceuticals
20  that are actually categorized as controlled
21  substances; is that right?
22      A.    Not all of the controlled
23  substances we handle would have a prescription.
24  So things that were used in the laboratory for

Page 22

1  testing on animals, for clinical trials would
2  not have required a prescription, but in
3  general, yes.
4      Q.    Okay.  Thank you for that
5  clarification.
6          Real quick.  I forgot to ask you,
7  is there a reason why on your LinkedIn page you
8  don't mention Cephalon, and you categorize your
9  time from eight -- excuse me -- from April of
10  2004 through 2011 as being an employee of Teva
11  when you were not?
12          MR. ANDRISANI:  Objection, form.
13          THE WITNESS:  So once the
14      acquisition was completed, Cephalon is
15      Teva, was Teva, and it just didn't seem
16      important on LinkedIn.
17  BY MR. CARTMELL:
18      Q.    Okay.  Now, when was it after you
19  first went to work for Cephalon in 2004 that you
20  received a promotion to associate director?
21      A.    Actually, I received a promotion
22  to senior manager first.
23      Q.    Senior manager of controlled
24  substances?

Page 23

1      A.    Yes.
2      Q.    When was that?
3      A.    I don't remember the exact year.
4      Q.    What were your job duties as
5  senior manager of controlled substances?
6      A.    It was not much different than
7  what I was already doing.
8      Q.    At that time were you responsible
9  for one of Cephalon's facilities?
10      A.    Yes, for West Chester.
11      Q.    The West Chester facility?
12      A.    Mm-hmm.
13      Q.    Okay.  When you were hired at
14  Cephalon, what was your educational background?
15      A.    Just a high school diploma.
16      Q.    So prior to going to work for
17  Cephalon, you had never gone to college?
18      A.    I had completed a couple of years
19  but never got a degree.
20      Q.    I see.  Did you have any medical
21  training prior to that time?
22      A.    No.
23          (Document marked for
24      identification as McGinn Deposition

Page 24

1      Exhibit No. 2.)
2  BY MR. CARTMELL:
3      Q.    Let me hand you what's been
4  marked as Exhibit 2, and I just have a real
5  quick question about this document that was
6  produced by Teva in this litigation.
7          As you'll see, Exhibit 2 is a
8  series of corporate organizational charts with
9  Cephalon's logo.  This document was produced
10  from Teva's internal files, and I want to ask
11  you about the page that has the last three Bates
12  numbers 264.
13          MR. ANDRISANI:  Is that the one
14      up on the screen?
15          MR. CARTMELL:  Yes, sir.
16          MR. ANDRISANI:  Okay.
17  BY MR. CARTMELL:
18      Q.    Ms. McGinn, this is titled "GLP
19  and GCP & GPvP QA."
20          Do you see that?
21      A.    Yes.
22      Q.    What is -- tell the jury what
23  that means.
24      A.    Good laboratory practices and

## Page 25

1    good clinical practices and good
2    pharmacovigilance practices and QA.
3        Q.   Was that actually the department
4    at Cephalon that you were in?
5        A.   Yes.
6        Q.   You'll see in the bottom of this
7    document, there's a date of January 13th, 2010.
8            Do you see that?
9        A.   Yes.
10        Q.   And you're on this corporate
11    organizational chart from Cephalon.  It looks
12    like Ernest Kelly was the vice president, or
13    that would be the highest ranking member of this
14    department; is that correct?
15        A.   Yes.
16        Q.   And then Kathy Callison is senior
17    director of good laboratory practice, quality
18    assurance and DEA compliance.
19            Do you see that?
20        A.   Yes.
21        Q.   You were directly under
22    Ms. Callison as of January 10, 2010; is that
23    right?
24        A.   Yes.

## Page 26

1        Q.   And it looks like your title was
2    associate director, controlled substances.
3            Do you see that?
4        A.   Yes.
5        Q.   When was it that you were
6    promoted to associate director, controlled
7    substances?
8        A.   I don't remember the date.
9        Q.   We know it was before January of
10    2010.  Do you think it was somewhere around that
11    time period?
12        A.   It would be a total guess, but it
13    wasn't long before that.
14        Q.   Okay.  Now, was this department
15    that you were in essentially a DEA compliance
16    department?
17        A.   Yes.
18        Q.   And did your responsibilities and
19    duties at that time have to do with compliance
20    with the DEA related to the sale or manufacture
21    of controlled substances?
22        A.   Yes.
23        Q.   Now, at the time you were at
24    Cephalon starting in 2004, Cephalon was a

## Page 27

1    multibillion dollar pharmaceutical company; is
2    that correct?
3        A.   I'm not exactly sure what they
4    were worth or -- but it was a pharmaceutical
5    company.
6        Q.   Okay.  Did you know whether or
7    not they were worth over a billion dollars?
8        A.   No.  I don't recall that.
9        Q.   I see.  So during this time
10    period, though, when you worked at Cephalon, was
11    Cephalon selling controlled substances?
12        A.   Yes.
13        Q.   One of the products that Cephalon
14    was selling that qualified as a controlled
15    substance was a problem -- excuse me -- a
16    product called Actiq; is that right?
17        A.   Yes.
18        Q.   Did I pronounce it right?
19        A.   You did.
20        Q.   Actiq is a fentanyl-based opioid
21    product; is that right?
22        A.   Yes.
23        Q.   And I think the records that
24    we've received in this litigation suggests that

## Page 28

1    Cephalon first started selling Actiq around
2    2001.
3            Is that consistent with your
4    memory?
5        A.   I don't know because it was
6    before I started there.  I don't remember when
7    they started.
8        Q.   All you know is that when you
9    started in 2004, that was an opioid product that
10    Cephalon was selling?
11        A.   Yes.
12        Q.   Were they manufacturing and
13    selling it?
14        A.   Yes.
15        Q.   Now, were there any other opioid
16    products at that time that Cephalon was selling?
17        A.   Can you define "selling"?
18        Q.   Well, let's see, I guess what I
19    meant was providing the product for a price to
20    other individuals or entities?
21        A.   Okay.  Were there any other
22    opioids to -- you're talking about commercial
23    product to patients, or could it include
24    clinical material?

Page 29

1       Q.    I think it could include both.
2       A.    And could you repeat the
3   question.
4       Q.    Were there any other opioid
5   products that Cephalon was selling when you
6   started in 2004?
7       A.    No.
8       Q.    Ultimately, at some point, I
9   believe around 2006, Cephalon started selling
10  another opioid product called Fentora; is that
11  right?
12      A.    I don't remember the exact year
13  but Fentora was one of our products.
14      Q.    And Fentora was another opioid
15  product; is that right?
16      A.    Yes.
17      Q.    Was Fentora actually the product
18  that was launched following the time that the
19  prior Actiq opioid went off patent?
20      A.    I don't know when it went off
21  patent.
22      Q.    Okay.  For purposes of my
23  question, I want to talk about the sale of Actiq
24  and Fentora, the controlled substance opioid

Page 30

1   narcotics that Cephalon was selling to
2   pharmacies or distributors during your eight and
3   a half years and not about the use of those
4   products for clinical trials, okay?
5       A.    Okay.
6       Q.    During that period of time, did
7   your job as associate director of controlled
8   substances involve compliance with the
9   Controlled Substance Act as far as the sale of
10  Actiq and Fentora in the -- in the chain to
11  pharmacies and doctors and distributors?
12          MR. ANDRISANI:  Objection.
13          THE WITNESS:  At what period of
14  time?
15  BY MR. CARTMELL:
16      Q.    I guess I'm talking about any
17  time when you were associate director of
18  controlled substance.
19      A.    And so could you repeat the
20  question again, please.
21      Q.    Sure.  I'm not sure it was a good
22  one.  It was pretty long.
23          What I was trying to find out was
24  did your job as associate director of controlled

Page 31

1   substances in the DEA compliance department at
2   Cephalon involve anything to do with the sale of
3   Actiq and Fentora to pharmacies or doctors or
4   patients?
5           MR. ANDRISANI:  Objection.
6   BY MR. CARTMELL:
7       Q.    And the DEA compliance aspects of
8   that?
9           MR. ANDRISANI:  Objection.
10          THE WITNESS:  First, let me say
11      that we did not sell directly to doctors
12      or pharmacies.  We sold to wholesalers
13      or distributors.
14  BY MR. CARTMELL:
15      Q.    Okay.  Let's make that clear for
16  the record.  That's a good point.
17          So during the time that you were
18  at Cephalon and Cephalon was selling opioids on
19  the open market, they were selling them to who?
20      A.    It's my understanding that we
21  were selling directly to wholesalers or
22  distributors.
23      Q.    Give us an example of the
24  customers for Cephalon, the wholesalers and

Page 32

1   distributors that Cephalon was selling these
2   opioids too.
3       A.    AmerisourceBergen, Cardinal
4   Health, McKesson.
5       Q.    So I think the three names that
6   you just gave are very large pharmaceutical
7   distributors in the United States; is that
8   correct?
9       A.    Yes.
10      Q.    Sometimes in the documents I've
11  seen reference to the big three.
12          Have you seen reference to that?
13      A.    I have.
14      Q.    And is that because that's
15  referring to those three companies,
16  AmerisourceBergen, Cardinal and McKesson, those
17  are multibillion dollar distributors of
18  pharmaceuticals, correct?
19          MS. ROLLINS:  Objection to form.
20          THE WITNESS:  I don't know what
21      they're worth.
22  BY MR. CARTMELL:
23      Q.    All you know is they're very big;
24  fair enough?

Page 33

1      A.   They're large, yes.
2      Q.   Okay.  And so at Cephalon when
3  you were selling Actiq and you were selling
4  Fentora for those eight and a half years while
5  you were there, those products and the customers
6  of Cephalon were the big three, for example, and
7  other wholesale distributors as well; is that
8  fair?
9           MR. ANDRISANI:  Objection, form.
10          THE WITNESS:  I don't remember
11      exactly who the customers were, but I'm
12      sure there were others.
13  BY MR. CARTMELL:
14      Q.   Do you have any idea how many
15  customers there were that Cephalon was selling
16  these opioids to?
17      A.   I do not have an exact number.
18      Q.   So you were clarifying something,
19  and I want to go back to my question now.  I'm
20  trying to understand if your job
21  responsibilities while at Cephalon had anything
22  to do with, for example, suspicious order
23  monitoring related to the opioids that you were
24  selling at Cephalon?

Page 34

1      A.   At the point I became associate
2  director, yes.
3      Q.   And I think you said that you
4  don't recall specifically when that was, but it
5  was close in time to January of 2010?
6      A.   Yes.
7      Q.   Okay.  Tell us what your job
8  responsibilities were at Cephalon when you
9  became -- strike that.
10          What were your job
11  responsibilities at Cephalon related to
12  suspicious order monitoring of those opioids
13  that Cephalon was selling?
14          MR. ANDRISANI:  Objection.
15          THE WITNESS:  My job would have
16      been to report any suspicious orders.
17  BY MR. CARTMELL:
18      Q.   Okay.  We're going to talk more
19  about that later.  I want to go back, if we can
20  to, Exhibit 1, which is your LinkedIn page, and
21  we've talked previously that there was the
22  acquisition by Teva of the pharmaceutical
23  company called Cephalon in 2011.
24          At that time did your job

Page 35

1  responsibilities change when you went from
2  Cephalon to Teva as an employee?
3      A.   I would not have been responsible
4  for suspicious order monitoring at that point.
5  Teva would have assumed the responsibility for
6  suspicious order monitoring, but I was in charge
7  of the Cephalon manufacturing sites.
8      Q.   And that started in October of
9  2011; is that fair?
10      A.   I don't know when that exactly
11  started.
12      Q.   Okay.  But around that time?
13      A.   There would have been a
14  transition period, I'm sure.
15      Q.   When you -- strike that.
16          Did you remain in the position at
17  Teva titled director, DEA compliance from
18  September 2012 until October 2015?
19      A.   Yes.
20      Q.   And tell us during that period of
21  time what your job responsibilities were with
22  respect to suspicious order monitoring of the
23  opioids that Teva was selling?
24      A.   I would have assumed the

Page 36

1  responsibility.
2      Q.   Starting when, September?
3      A.   September '12, yes.
4      Q.   Who did you assume the
5  responsibility from at that time?
6      A.   Dennis Ferrell.
7      Q.   Did he leave the company?
8      A.   Not in 2012, but he's since left
9  the company.
10      Q.   Why was it that Dennis Ferrell
11  stopped the responsibilities related to
12  suspicious order monitoring?
13          MR. ANDRISANI:  Objection.
14          THE WITNESS:  Dennis Ferrell was
15      in charge of the DEA compliance group at
16      Teva, and by September 2012 they asked
17      me to assume that role.
18  BY MR. CARTMELL:
19      Q.   Was he promoted to a different
20  role?
21      A.   No.
22      Q.   Where did he get transferred to,
23  what job?
24      A.   I don't know what his title was.

Page 37

1    Q.    When you started in
2  September 2012 as the director of DEA compliance
3  at Teva Pharmaceuticals, what did your job
4  entail?
5    A.    All of the DEA compliance
6  activities at the facilities, all of the Teva
7  facilities, the Cephalon facilities and
8  suspicious order monitoring.
9    Q.    When -- strike that.
10       So as the director of DEA
11  compliance at that time at Teva Pharmaceuticals
12  in September of 2012, were you responsible for
13  all DEA compliance in all of the facilities for
14  Teva?
15    A.    The only piece that I was not
16  responsible for at that point was the quota
17  applications.  Dennis still handled the quota.
18    Q.    What do you mean by
19  "applications"?
20    A.    So to manufacture Schedule II
21  drugs, we have to submit an application to DEA
22  to procure Schedule IIs, and so you have to
23  justify through an application that you submit
24  to DEA.

Page 38

1    Q.    When Teva acquired Cephalon in
2  approximately October of 2011, they acquired the
3  opioids that Cephalon had been selling; is that
4  correct?
5       MR. ANDRISANI:  Objection.
6       THE WITNESS:  Yes.
7  BY MR. CARTMELL:
8    Q.    That included Actiq and Fentora?
9       MR. ANDRISANI:  Objection.
10       THE WITNESS:  Yes.
11  BY MR. CARTMELL:
12    Q.    And I didn't ask you this, but
13  Actiq and Fentora are fentanyl-based opioids; is
14  that right?
15       MR. ANDRISANI:  Objection.
16       THE WITNESS:  Yes.
17  BY MR. CARTMELL:
18    Q.    And those would be considered
19  high risk opioids; is that fair?
20       MR. ANDRISANI:  Objection, form.
21       THE WITNESS:  They're Schedule
22    IIs like any other Schedule II.
23  BY MR. CARTMELL:
24    Q.    But you know from your experience

Page 39

1  and speaking at Buzzeo conferences, dealing with
2  the DEA over the years, that there are certain
3  opioid drugs that are classified as high risk or
4  higher risk, correct?
5       MR. ANDRISANI:  Objection.
6       THE WITNESS:  All Schedule IIs
7    are Schedule IIs.  They all carry a risk
8    of abuse and diversion.
9  BY MR. CARTMELL:
10    Q.    Are some higher risk than others?
11       MR. ANDRISANI:  Objection.
12       THE WITNESS:  There's a risk of
13    abuse.
14  BY MR. CARTMELL:
15    Q.    Are some opioids like Actiq and
16  Fentora or oxycodone higher risk for, for
17  example, abuse and diversion?
18       MR. ANDRISANI:  Objection form.
19       THE WITNESS:  All Schedule IIs
20    are high risk for abuse and diversion.
21  BY MR. CARTMELL:
22    Q.    Okay.  And that's really what I
23  was getting at.
24       These are high risk drugs, these

Page 40

1  opioids that Cephalon was selling and Teva has
2  been selling for abuse and diversion, correct?
3       MR. ANDRISANI:  Objection.
4       THE WITNESS:  They were Schedule
5    IIs.
6  BY MR. CARTMELL:
7    Q.    Okay.  I don't mean to -- I just
8  want to make sure the record is clear.  You said
9  a minute ago -- isn't it true, Ms. McGinn, that
10  Fentora and Actiq, drugs like oxycodone are high
11  risk drugs for diversion and abuse?
12       MR. ANDRISANI:  Objection, form.
13  BY MR. CARTMELL:
14    Q.    In your words?
15    A.    And I said all Schedule IIs are
16  at risk for abuse and diversion.
17    Q.    You said high risk, didn't you?
18    A.    Okay, they're high risk.
19    Q.    Okay.  Now, when you took over at
20  Teva as the director of the DEA compliance
21  group, did the buck stop with you, so to speak,
22  with respect to all DEA compliance related to
23  the opioids?
24       MR. ANDRISANI:  Objection.

Page 41

1        THE WITNESS:  Did the buck stop
2    with me?  I mean, I reported in to
3    somebody else who -- where the buck
4    would have stopped, but I assume the
5    responsibility for DEA compliance.
6    BY MR. CARTMELL:
7        Q.    Okay.  But the buck stopped with
8    the person over you in DEA compliance I think is
9    what you're saying?
10       A.    Yes.
11            MR. ANDRISANI:  Objection form to
12       the question.
13   BY MR. CARTMELL:
14       Q.    And who was that in September of
15   2012?
16       A.    I reported to Chris Lowery.
17       Q.    And what was Mr. Lowery's
18   position?
19       A.    He was the corporate security
20   officer.  I reported to him for a period of
21   about a month.
22       Q.    And then who did you report to
23   after that?
24       A.    He left the company, and I

Page 42

1    reported to Laura Queen in HR for a couple more
2    months.
3        Q.    And then who did you report to
4    after that?
5        A.    Karin Shanahan.
6        Q.    How long did you report to her?
7        A.    I don't remember exactly.  It was
8    around the time of the Actavis integration that
9    I was moved out from underneath of Karin.
10       Q.    I think that was at some point in
11   2016.
12            Is that consistent with your
13   memory?
14       A.    Yeah, somewhere around there.
15       Q.    Okay.  We talked about Cephalon
16   but -- strike that.
17            As far as Teva as a
18   pharmaceutical company when you started there in
19   approximately October of 2011, was Teva already
20   selling and manufacturing opioid drugs?
21       A.    I don't remember what their
22   product line is -- was, to be honest.
23       Q.    You don't know --
24       A.    I remember a couple of products,

Page 43

1    but not the entire product line.
2        Q.    Okay.  Let me go back and make
3    the record clear on that.
4            When you started in approximately
5    October of 2011 as an employee of Teva, it's
6    your recollection that at that time, Teva had
7    been for some period of time selling opioids?
8        A.    I'm not sure.  At the time of the
9    acquisition, my responsibilities remained at
10   Cephalon, and we didn't really discuss the
11   portfolio for Teva or what products they had.
12       Q.    All right.  But I think you just
13   said a minute ago, and I just want to follow up
14   on that to make it clear, that you knew that
15   when you started at Teva, there were a few
16   opioid products that Teva was selling; is that
17   fair?
18            MR. ANDRISANI:  Objection.
19            THE WITNESS:  I'm saying that I
20       knew they had Schedule IIs.  I don't
21       know -- I don't remember if I knew in
22       2012 which opioids or if they even had
23       opioids.  I don't remember.
24   BY MR. CARTMELL:

Page 44

1        Q.    Mr. Hasler, who was a designated
2    30(b)(6) witness or corporate representative for
3    Teva, was deposed in this litigation and
4    testified that Teva had been selling opioid
5    products since 2006.
6            If that's true, do you have any
7    reason to dispute that?
8            MR. ANDRISANI:  Objection, form.
9            THE WITNESS:  No.
10   BY MR. CARTMELL:
11       Q.    I take it shortly after you began
12   as an employee at Teva in October of 2011 and
13   then were or became the associate director --
14   strike that.
15            I take it that shortly after you
16   became the director of DEA compliance at Teva in
17   2012, you learned that, in fact, Teva had been
18   selling opioids for a period of time, correct?
19       A.    At the time of the promotion in
20   2012, I became more familiar with the
21   manufacturing sites and the products that they
22   manufactured.
23       Q.    Is that because at that time you
24   now had to become responsible for not only

Page 45

1    Cephalon's sites related to TVA -- DEA
2    compliance but also Teva's sites and facilities
3    related to DEA compliance?
4        A.    Correct.
5        Q.    And I take it at that time in
6    2012, you then learned that Teva was not only
7    now selling Actiq and Fentora, the opioids that
8    they had acquired from Cephalon, but they had
9    also been selling generic opioids for a period
10   of time prior to the time that you went to Teva,
11   fair?
12       A.    Yes.
13       Q.    Do you have any idea how many
14   opioid products, different opioid products that
15   Teva had been selling as of 2012 when you got
16   there?
17       A.    No.
18       Q.    You just know it was several
19   products?
20       A.    Yes.
21       Q.    And now, I noticed from the
22   documents that were produced from your custodial
23   file, at this point you had been described as
24   the head of the largest network of controlled

Page 46

1    substance sites in the pharmaceutical industry;
2    is that correct?
3            MR. ANDRISANI:  Objection.
4            THE WITNESS:  Yes.
5    BY MR. CARTMELL:
6        Q.    And you've also been classified
7    or Teva has as the largest manufacturer of
8    controlled substances in the pharmaceutical
9    industry, correct?
10           MR. ANDRISANI:  Objection.
11           THE WITNESS:  I'd say generic,
12       yes.
13   BY MR. CARTMELL:
14       Q.    Okay.  And let's explain that for
15   the jury.
16           There are generic opioids, and
17   there are brand name opioids; is that correct?
18       A.    Yes.
19       Q.    Explain that to the jury, what
20   the difference is.
21           MR. ANDRISANI:  Objection, form.
22           THE WITNESS:  I mean, I'm maybe
23       not qualified to really explain it well,
24       but a brand is where you have your own

Page 47

1        product and it's yours, you have a
2        patent protection.  Whereas a generic is
3        the off-label from the brand.
4    BY MR. CARTMELL:
5        Q.    So is it fair to say that your
6    understanding is that Teva, the pharmaceutical
7    company that you're working for and have been
8    for several years, is the largest manufacturer
9    of generic opioids in the United States?
10           MR. ANDRISANI:  Objection.
11           THE WITNESS:  I -- could you
12       repeat the question, please.
13   BY MR. CARTMELL:
14       Q.    Teva is the largest manufacturer
15   of generic opioids in the United States,
16   correct?
17           MR. ANDRISANI:  Objection, form.
18           THE WITNESS:  As of when?
19   BY MR. CARTMELL:
20       Q.    I was just actually asking about
21   now, presently.
22           MR. ANDRISANI:  Objection.
23           THE WITNESS:  I can't say that
24       presently, no.

Page 48

1    BY MR. CARTMELL:
2        Q.    They were at one time?
3        A.    I can't say that they were --
4            MR. ANDRISANI:  Objection.
5            THE WITNESS:  -- the largest
6        manufacturer of an opioid.  They are the
7        largest manufacturer of generic
8        pharmaceuticals, for sure.
9    BY MR. CARTMELL:
10       Q.    Do you know if they're the
11   largest manufacturer of generic opioids in the
12   United States?
13           MR. ANDRISANI:  Objection.
14           THE WITNESS:  I don't.
15           (Document marked for
16       identification as McGinn Deposition
17       Exhibit No. 3.)
18   BY MR. CARTMELL:
19       Q.    Ms. McGinn, we were produced
20   documents in this litigation, including copies
21   of your performance reviews over the time that
22   you have worked for Teva, and I want to ask you
23   a few questions about that.
24           I've handed you Exhibit 3.  Do

Page 49

```
 1    you see that?
 2        A.    Yes.
 3        Q.    This is a copy of your 2018
 4    midyear review.
 5              Do you see that?
 6        A.    I do.
 7        Q.    How often since you've been an
 8    employee at Teva are you reviewed?
 9        A.    Since I've been at Teva, they're
10    required to do it at least annually.
11        Q.    This is a midyear review.  Are
12    you typically reviewed twice a year?
13        A.    That is the current procedure.
14        Q.    How long has that been going; do
15    you know?
16        A.    I don't.
17        Q.    During 2011 and 2012 during the
18    period of time when you were transitioning from
19    Cephalon to Teva as an employee once Teva
20    acquired Cephalon, were you reviewed during
21    those periods of time?
22        A.    I don't recall.
23        Q.    Well, do you recall ever having a
24    year when you didn't have a review of your
```

Page 50

```
 1    performance?
 2        A.    I don't.
 3        Q.    Okay.  Your best guess is that
 4    every year that you've worked for Cephalon or
 5    Teva, you actually had a performance review,
 6    fair?
 7        A.    It's hard to say during the
 8    transition year what would have happened.
 9        Q.    Who would know that?
10        A.    I assume HR.
11        Q.    And what does your review consist
12    of?
13              MR. ANDRISANI:  Objection, form.
14              THE WITNESS:  Are you -- are
15        you -- could you ask --
16    BY MR. CARTMELL:
17        Q.    Typical review, what does it
18    consist of?
19              MR. ANDRISANI:  Objection.
20              THE WITNESS:  So it's your
21        performance based on the goals.
22    BY MR. CARTMELL:
23        Q.    And we can see from this document
24    that you were asked to provide input; is that
```

Page 51

```
 1    correct?
 2        A.    Yes.
 3        Q.    And talk about all the good
 4    things that you've done as an employee, correct?
 5              MR. ANDRISANI:  Objection.
 6              THE WITNESS:  Yes.
 7    BY MR. CARTMELL:
 8        Q.    And then you get feedback, I take
 9    it, from your superiors related to your
10    performance as well; is that right?
11        A.    Correct.
12        Q.    I want to ask you about on this
13    performance review, if you go down to "Goal
14    Details."
15              Do you see that.
16        A.    Yes.
17        Q.    Under b. it states, "Support
18    litigation defense with necessary documents and
19    information."
20              Do you see that?
21        A.    Yes.
22        Q.    So part of your job as of late
23    has been to behind the scenes sort of collect
24    documents and provide information related to
```

Page 52

```
 1    this case; is that right?
 2              MR. ANDRISANI:  Objection to
 3        form.
 4              THE WITNESS:  A portion.
 5    BY MR. CARTMELL:
 6        Q.    How much time or what percentage
 7    of your job duties have been related to working
 8    on this litigation behind the scenes?
 9              MR. ANDRISANI:  Objection, form.
10              THE WITNESS:  My time spent on
11        this has been minimal.
12    BY MR. CARTMELL:
13        Q.    Okay.  Well, as part of your
14    midyear legal -- excuse me, strike that.
15              As a part of your midyear review,
16    it states one of two things here is that you are
17    working on this case, correct?
18              MR. ANDRISANI:  Objection, form.
19              THE WITNESS:  It's not
20        necessarily me.  It could be somebody
21        working for me.
22    BY MR. CARTMELL:
23        Q.    So you have the ultimate duty or
24    are given credit, I guess, in your review for
```

Page 53

1    working on this litigation behind the scenes,
2    but you've asked somebody else to collect the
3    materials for you; is that what you're saying?
4            MR. ANDRISANI:  Objection, form.
5            THE WITNESS:  It was part of my
6        goals.
7    BY MR. CARTMELL:
8        Q.    Okay.  And did you actually
9    achieve your goals and work on this litigation
10   behind the scenes to collect documents and
11   provide information?
12           MR. ANDRISANI:  Objection, form.
13           THE WITNESS:  I have provided
14       information and documents.
15   BY MR. CARTMELL:
16       Q.    Who to?
17       A.    Several people.
18       Q.    Who are they?
19       A.    In-house legal, Adam.
20       Q.    Your attorneys?
21       A.    Yes.
22       Q.    And have you been inside the
23   company sort of the point person related to
24   compliance for this litigation?

Page 54

1            MR. ANDRISANI:  Objection, form.
2            THE WITNESS:  No.
3    BY MR. CARTMELL:
4        Q.    Who has been; do you know?
5            MR. ANDRISANI:  Objection.
6            THE WITNESS:  I would say Joe
7        Tomkiewicz.
8    BY MR. CARTMELL:
9        Q.    Is that who you have actually
10   asked to gather the information and documents?
11       A.    I have not asked.
12       Q.    You mentioned previously that you
13   may be asking some others to do that work for
14   you.
15           Who have you asked to do the
16   work?
17       A.    If I asked somebody to do the
18   work, it would have been Joe.
19       Q.    Okay.  Have you ever asked him?
20       A.    I don't know that I have.
21       Q.    How many hours a week do you
22   spend or does somebody at your direction spend,
23   let's say, for the last year on compiling
24   information and documents related to this

Page 55

1    litigation?
2            MR. ANDRISANI:  Objection.
3            THE WITNESS:  I don't know
4        exactly how many, but it was minimal.
5    BY MR. CARTMELL:
6        Q.    How long has your goal been to
7    support the litigation defense in this case --
8            MR. ANDRISANI:  Objection.
9    BY MR. CARTMELL:
10       Q.    -- as indicated -- let me start
11   over.
12           How long has your goal been, as
13   indicated on your performance review, to support
14   the litigation defense with necessary documents
15   and information in this case?
16           MR. ANDRISANI:  Objection, form.
17           THE WITNESS:  I don't remember
18       exactly when that was entered.
19   BY MR. CARTMELL:
20       Q.    Do you have an approximation of
21   how long you have been -- strike that.
22           Do you recall that -- let me
23   start over.
24           Do you know who Senator McCaskill

Page 56

1    is?
2        A.    I do.
3        Q.    Senator McCaskill is from
4    Missouri; is that right?
5        A.    I don't know where she's from.
6        Q.    Senator McCaskill has requested
7    through a subpoena on behalf of a committee that
8    she serves on in the Senate to receive documents
9    from Teva; is that correct?
10           MR. ANDRISANI:  Objection, form.
11           THE WITNESS:  I think I saw the
12       letter.
13           MR. CARTMELL:  Let me hand you
14       Exhibit 4.
15           (Document marked for
16       identification as McGinn Deposition
17       Exhibit No. 4.)
18   BY MR. CARTMELL:
19       Q.    Ms. McGinn, I'm going to actually
20   hand you what's been marked as Exhibit 4.
21           And, just for the record, Exhibit
22   4 actually is going to be an e-mail with
23   attachments to it that include the letter from
24   Claire McCaskill?

Page 57

1      MR. ANDRISANI:  Do you have the
2  letter here?
3      MR. CARTMELL:  I have a copy of
4  the letter here.  What I would ask is
5  that we can display it.  She's got a
6  display right in front of it, and then
7  we will supplement the record with a
8  copy, if that's fair enough for you.
9      MR. ANDRISANI:  That's fine.  Can
10  Ms. McGinn read the letter in hard copy?
11  It's easier than on the screen.
12      MR. CARTMELL:  No problem, and
13  I'll just get that back when she's done.
14      MR. ANDRISANI:  Sure.
15      (Witness reviews document.)
16      THE WITNESS:  Is this another
17  copy of the same letter?
18  BY MR. CARTMELL:
19      Q.   There are two letters.  I'm just
20  going to ask you questions about the first
21  letter.
22      A.   Okay.
23      MR. ANDRISANI:  That will be the
24  one attached for the record, just the

Page 58

1  one dated May 16th?
2      MR. CARTMELL:  Yeah, when we
3  supplement the record --
4      THE WITNESS:  They're both dated
5  --
6      MR. CARTMELL:  -- we'll put
7  everything that was on the document as
8  produced.
9      MR. ANDRISANI:  Perfect.
10  BY MR. CARTMELL:
11      Q.   Ms. McGinn, I want to ask you
12  some questions about this Exhibit 4 that I've
13  provided to you, but if you look, you'll see
14  that there's an e-mail from you to Michelle
15  Osmian dated May 22nd, 2018; is that correct?
16      A.   Yes.
17      Q.   And you're asking Ms. Osmian if
18  she had seen the attachments which are letters
19  from Senator McCaskill, correct?
20      A.   Yes.
21      Q.   Who is Ms. Osmian?
22      A.   Michelle works at Teva.
23      Q.   What is her position?
24      A.   I don't -- I don't know her

Page 59

1  title, but she's customer service.
2      Q.   Why is it that you would ask her
3  if she had seen the letters that we're about to
4  go over from Senator McCaskill?
5      A.   I was concerned about the DOD
6  contracts.
7      Q.   Okay.  And DOD is Department of
8  Defense?
9      A.   Yes.
10      Q.   And at that time Teva had in
11  place contracts with the Department of Defense
12  to provide opioids; is that right?
13      MR. ANDRISANI:  Objection, form.
14      THE WITNESS:  That's what the
15  letter stated.
16  BY MR. CARTMELL:
17      Q.   And you knew that, correct?
18      A.   I did not.
19      Q.   Okay.  Let's go ahead and go
20  through the letter, and I want to ask you some
21  questions.
22      Now, this is a letter you'll
23  see -- one second, sorry.
24      THE WITNESS:  Is it okay if we

Page 60

1  take a bathroom break while we're doing
2  this.
3      MR. CARTMELL:  You want to take a
4  bathroom break.
5      THE WITNESS:  Is that okay?
6  Sorry.
7      MR. ANDRISANI:  Absolutely.
8      MR. CARTMELL:  Sure, that's okay.
9      MR. ANDRISANI:  It will give us a
10  chance to put the letter up on the
11  screen.
12      MR. CARTMELL:  Yeah, perfect.
13      THE VIDEOGRAPHER:  Off the record
14  at 10:27.
15      (Brief recess.)
16      THE VIDEOGRAPHER:  We are back on
17  the record at 10:37.
18  BY MR. CARTMELL:
19      Q.   Ms. McGinn, we're back on the
20  record after a short break.  Are you ready to
21  proceed?
22      A.   Yes, thank you.
23      Q.   Okay.  So before the break --
24      MR. CARTMELL:  Go ahead.

Page 61

1    MR. ANDRISANI:  Tom, may I put on
2  the record what we discussed?
3    MR. CARTMELL:  Yes.
4    MR. ANDRISANI:  Thank you very
5  much.
6    I had been objecting to form
7  because of the phrasing of that Teva
8  sells opioids and they sell products
9  that contain opioids or
10  opioid-containing products.  Instead of
11  objecting to form each time, Ms. McGinn
12  understands what he's talking about, I
13  understand what he's talking about, but
14  we've agreed that that objection will
15  stand.
16    MR. CARTMELL:  Thank you.
17    MR. ANDRISANI:  Thank you.
18  BY MR. CARTMELL:
19    Q.    And, actually, that's a very good
20  point by your counsel, Ms. McGinn.  I want to
21  make it clear that you have understood when I'm
22  talking about opioids that I'm actually
23  referring to opioid-containing products,
24  correct?

Page 62

1    A.    Yes.
2    Q.    For example, Actiq and Fentora,
3  those types of products that Cephalon was
4  selling when you worked there and the
5  opioid-containing products that Teva has sold,
6  when I have referred to opioids, you've
7  understood that I have been referring to those
8  types of products, fair?
9    A.    Fair.
10    Q.    Okay.  Before the break we were
11  talking about a letter that Teva received and
12  they have produced from their internal files in
13  this case, and, actually, it came from your
14  file, from Senator McCaskill to the Honorable
15  James Mattis, Secretary, Department of Defense,
16  and we're showing the jury a copy of that letter
17  right now.
18    Do you see that?
19    A.    I do.
20    Q.    Now, this was a letter that
21  somehow you read, it got to you; is that fair?
22    A.    Yes.
23    Q.    Do you know how it got to you?
24    A.    According to this e-mail, it came

Page 63

1  from Joe Tomkiewicz.
2    Q.    Joe Tomkiewicz, we'll talk about,
3  his deposition has been taken in this case.  He
4  was actually the manager of suspicious order
5  monitoring in the DEA compliance department; is
6  that fair?
7    MR. ANDRISANI:  Objection to
8  form.
9    THE WITNESS:  Yes.
10  BY MR. CARTMELL:
11    Q.    Is that still his position at
12  Teva?
13    A.    Yes.
14    Q.    Okay.  And so he would report
15  directly to you?
16    A.    He does.
17    Q.    And did at this time, I take it,
18  back in May?
19    A.    Yes.
20    Q.    So Joe Tomkiewicz sends this
21  letter to you, and then you forward it on to
22  somebody, you said Ms. Osmian in customer
23  service; is that right?
24    A.    Yes.

Page 64

1    Q.    You said you did that because you
2  were concerned about the contracts Teva has with
3  the Department of Defense, right?
4    A.    Yes.
5    Q.    I want to go through this with
6  you, and you can see that this is on letterhead
7  from the United States Senate.  It's dated
8  May 16th, 2018.
9    And you can see there it states,
10  "Committee on Homeland Security and Governmental
11  Affairs."
12    Do you see that?
13    A.    Yes.
14    Q.    It says "Dear Mr. Secretary:  I
15  write to share information regarding Teva
16  Pharmaceutical Industries, a contractor for the
17  Department of Defense, which has arisen during
18  my recent investigation into the U.S. opioid
19  epidemic."
20    Do you see that?
21    A.    Yes.
22    Q.    And I should have asked you
23  previously, but Teva Pharmaceutical Industries,
24  is that your employer?

Page 65

1    A.   Yes.
2    Q.   That's the na -- there's various
3  Teva entities, I know, but that's the name of
4  your employer?
5         MR. ANDRISANI:  Objection, form.
6         THE WITNESS:  Yes.
7  BY MR. CARTMELL:
8    Q.   Okay, thank you.
9         It then goes on and states, "I
10  initiated an investigation into the role
11  high-volume generic opioid manufacturers and
12  distributors have played in fueling the current
13  public health crisis.  Over the course of
14  several months, each of the distributors and two
15  of the manufacturers provided documents and
16  information in response to requests concerning
17  their efforts to prevent opioid diversion.
18  Teva, however, refused to provide information in
19  response to my requests."
20        Do you see that?
21    A.   I do.
22    Q.   "Despite correspondence in which
23  I noted that 'the company's decision to obstruct
24  basic oversight on the opioid epidemic should

Page 66

1  deeply concern shareholders,' Teva stated that a
2  response could impact ongoing litigation and
3  chill the willingness of its customers to
4  address opioid abuse."
5         Do you see that?
6    A.   Yes.
7    Q.   Now, we have established
8  previously that as a part of your duties from
9  your performance review, one of those duties and
10  goals that you've been involved in has been to
11  behind the scenes work on this litigation by
12  providing information and documents, correct?
13        MR. ANDRISANI:  Objection, form.
14        THE WITNESS:  On this litigation
15  I have provided documents.
16  BY MR. CARTMELL:
17    Q.   Okay.  And information, I take
18  it?
19    A.   And information.
20    Q.   Okay.  Now, when was it that you
21  first learned that Senator McCaskill on behalf
22  of the Committee on Homeland Security and
23  Governmental Affairs was requesting information
24  from Teva about their efforts to prevent opioid

Page 67

1  diversion?
2         MR. ANDRISANI:  Objection.
3         THE WITNESS:  I don't know.  The
4  letter was not addressed to me.
5  BY MR. CARTMELL:
6    Q.   I understand.  But this was
7  received by your department, fair?
8    A.   No.
9    Q.   Mr. Tomkiewicz received it and
10  provided it to you, correct?
11    A.   He had a copy.  I don't know that
12  he received this directly.
13    Q.   One -- strike that.
14        Did you actually get involved in
15  trying to gather any information that was being
16  requested by Senator McCaskill to provide to the
17  Committee on Homeland Security and Governmental
18  Affairs about the efforts to prevent opioid
19  diversion?
20        MR. ANDRISANI:  Objection.
21        THE WITNESS:  Can you repeat the
22  question.
23  BY MR. CARTMELL:
24    Q.   I'll start over and try to

Page 68

1  rephrase or restate what I'm trying to get at.
2         Senator McCaskill is asking for
3  information about Teva's actions to try to
4  prevent opioid diversion.
5         Do you see that?
6    A.   Yes.
7    Q.   And you were at this time the
8  director of the DEA compliance department,
9  correct?
10    A.   Yes.
11    Q.   And part of the duties of the
12  director of DEA compliance would be to make sure
13  that your company, Teva was or had proper
14  safeguards against opioid-containing products'
15  diversion, correct?
16    A.   Yes.
17    Q.   And so if information was going
18  to be provided, your department that you were
19  the head of would have had a lot of this type of
20  information to give to Senator McCaskill, fair?
21        MR. ANDRISANI:  Objection, form.
22        THE WITNESS:  Yes.
23  BY MR. CARTMELL:
24    Q.   Did anybody ever come to you and

Page 69

1  ask you to gather this information for Senator
2  McCaskill?
3        MR. ANDRISANI:  Objection.
4        THE WITNESS:  I do not recall
5        anyone asking me for information for
6        this.
7  BY MR. CARTMELL:
8     Q.    Did anybody tell you that they
9  were going to refuse to provide this information
10 because they were worried it could impact the
11 ongoing litigation?
12        MR. ANDRISANI:  Objection, form
13 and to the extent that it asks for -- if
14 you spoke with lawyers about this, you
15 don't need to answer.
16        THE WITNESS:  I spoke with
17        internal legal counsel about the
18        response --
19        MR. ANDRISANI:  I'm going to ask
20        you not to say any more.
21 BY MR. CARTMELL:
22     Q.    Other than speaking to internal
23 counsel about this, did you talk to anybody else
24 at the company related to Senator McCaskill's

Page 70

1  request for information about Teva's actions to
2  prevent opioid diversion?
3        MR. ANDRISANI:  Objection to
4        form.
5        THE WITNESS:  I'm not sure I
6        understand what you're asking.
7  BY MR. CARTMELL:
8     Q.    Did you talk to anybody else
9  other than your lawyers about this request from
10 Senator McCaskill about the actions your company
11 has taken to prevent opioid diversion?
12        MR. ANDRISANI:  Objection, form.
13        THE WITNESS:  To gather the
14        information or about the letter in
15        general?
16 BY MR. CARTMELL:
17     Q.    About the letter in general.
18     A.    We probably talked about the
19 letter in general.
20     Q.    What do you recall?
21        MR. ANDRISANI:  Objection.
22        THE WITNESS:  I don't recall
23        specifics.
24 BY MR. CARTMELL:

Page 71

1     Q.    Do you recall anything general?
2     A.    No, I don't.
3     Q.    It goes on to state, "Teva's
4  refusal to cooperate with Congressional requests
5  strongly suggests they have something to hide.
6  I'd hope that everyone involved or associated
7  with the company takes note that they're dealing
8  with an entity that's stonewalling a Senate
9  investigation examining a national public health
10 crisis."
11        Do you see that?
12     A.    Yes.
13     Q.    You stated before that you were
14 concerned about the contracts between Teva and
15 the Department of Defense.
16        Do you see that?
17     A.    Yes.
18     Q.    Was that why you were concerned?
19     A.    No.  That was why I forwarded it
20 to customer service.
21     Q.    Why would customer service have
22 something to do with this response or have
23 something to do with a concern about the
24 contracts between the Department of Defense and

Page 72

1  Teva?
2        MR. ANDRISANI:  Objection, form.
3        THE WITNESS:  Because they're the
4        face of the customer, which in this case
5        is DOD.
6  BY MR. CARTMELL:
7     Q.    So the customer service
8  department -- if I understand what you're
9  saying, the customer service department would be
10 sort of the sales team who would interact with
11 the Department of Defense about the sales of the
12 opioids to the Department of Defense?
13     A.    I wouldn't say they were part of
14 the sales team, but they would receive the
15 orders and process them.
16     Q.    Well, customer service involves
17 sales, correct?
18        MR. ANDRISANI:  Objection, form.
19        THE WITNESS:  They're two
20        different departments.  There's sales
21        and then there's customer service.
22        Salespeople go out and meet the
23        customers.  Customer service processes
24        the orders, handles any interaction with

Page 73

1      them after that.
2  BY MR. CARTMELL:
3      Q.    Related to future sales, correct?
4      A.    I don't know what customer
5  service does exactly.  I don't know if they
6  talked to them about future sales.
7      Q.    Do you know if customer service
8  has -- strike that.
9           Do you know if the customer
10  service department would be considered part of
11  Teva that's involved with sales with the
12  customers or not?
13           MR. ANDRISANI:  Objection, form.
14           THE WITNESS:  They would process
15      the sales.
16  BY MR. CARTMELL:
17      Q.    Okay.  And so the if you turn to
18  the next page it states, "I urge you to consider
19  whether Teva's refusal to comply with my
20  requests affects Teva's present responsibility
21  as a government contractor."
22           Do you see that?
23      A.    Yes.
24      Q.    What do you know about the

Page 74

1  contract between the Department of Defense and
2  Teva related to opioid-containing products?
3      A.    I don't know.
4      Q.    It states, "As the Federal
5  Acquisition Regulation states, federal
6  contractors must 'promote an organizational
7  culture that encourages ethical conduct and a
8  commitment to compliance with the law.'"
9           Do you see that?
10      A.    Yes.
11      Q.    Do you agree with that?
12           MR. ANDRISANI:  Objection, form.
13           THE WITNESS:  I don't know what
14      the Federal Acquisition Regulation
15      states.  I've never read it.
16  BY MR. CARTMELL:
17      Q.    Okay.  But do you agree with the
18  concept or what's stated that Teva must promote
19  an organizational culture that encouraging
20  ethical conduct and a commitment to compliance
21  with the law?
22           MR. ANDRISANI:  Objection, form.
23           THE WITNESS:  I would hope that
24      we're working with an ethical company

Page 75

1      and that's part of our culture with a
2      commitment to compliance.
3  BY MR. CARTMELL:
4      Q.    Right.  You're an expert in
5  compliance, correct?
6      A.    Yes.
7      Q.    That's something you strive for,
8  right?
9      A.    I do.
10      Q.    It states, "At the very least,
11  the actions of Teva during my investigation -
12  which has focused on one of the most pressing
13  public health issues in the United States -
14  should prompt a close look at existing financial
15  relationships between the company and the
16  federal government."
17           Do you see that?
18      A.    Yes.
19      Q.    So it looks like from this
20  letter, Senator McCaskill was putting the
21  Department of Defense on notice that Teva, the
22  company employing you as their DEA compliance
23  director, was not providing information that had
24  been requested by Senator McCaskill related to

Page 76

1  opioid diversion prevention; is that right?
2      A.    That's --
3           MR. ANDRISANI:  Objection, form.
4           THE WITNESS:  That's what it
5      says.
6  BY MR. CARTMELL:
7      Q.    And do you know if, in fact, any
8  of the information that Senator McCaskill on
9  behalf of this Senate committee asked for was
10  ever provided?
11           MR. ANDRISANI:  Objection, form.
12           THE WITNESS:  I don't recall.
13  BY MR. CARTMELL:
14      Q.    But it says that other
15  distributors and manufacturers of
16  pharmaceuticals did provide information.
17           Do you see that?
18      A.    I saw that.
19      Q.    Did you ever talk to any of the
20  other manufacturers or distributors of
21  pharmaceuticals to ask whether or not they
22  thought it was appropriate to provide this sort
23  of information about preventing opioid
24  diversion?

Page 77

1       A.    I don't recall.  I don't
2   remember.
3       Q.    Did you ever talk to any other
4   representatives from other opioid-containing
5   product distributors or manufacturers about
6   Senator McCaskill's request?
7       A.    We probably discussed it.
8       Q.    You're a member of a lot of
9   groups or organizations that include
10  representatives from many different
11  pharmaceutical companies and pharmaceutical
12  distributors; is that fair?
13      A.    Yes.
14      Q.    What are some of the
15  organizations or groups that you're a member of?
16      A.    The New Jersey Pharmaceutical
17  Industry Group.
18      Q.    I saw that in the documents,
19  that's one.
20            What is -- is it called AWIG or
21  ADWIG?
22      A.    No.  It's actually worse.  NJPIG.
23      Q.    NJPIG.
24      A.    Yeah.

Page 78

1       Q.    That's the New Jersey
2   pharmaceutical group?
3       A.    That's correct.
4       Q.    I've also seen some indication in
5   your files of other groups that you work with
6   that have representatives of multiple different
7   pharmaceutical companies.  Tell me some names of
8   others.
9            MR. ANDRISANI:  Objection, form.
10           THE WITNESS:  Yeah, I can't
11  remember.  There was another group that
12  Actavis was a part of before we acquired
13  them that I was invited to join, and I
14  believe it was the ADWIG that you're
15  talking about, but I don't remember what
16  it stands for.
17  BY MR. CARTMELL:
18      Q.    I think it's A-D-W-I-G; is that
19  right?
20      A.    I think so.
21      Q.    But you don't remember what that
22  stands for?
23      A.    No, I came in late and only
24  attended a few meetings with that group.

Page 79

1       Q.    Some of these groups that you're
2   a member of or actually are involved in lobbying
3   federal regulators like the DEA or the FDA on
4   behalf of opioid manufacturers and distributors;
5   is that correct?
6            MR. ANDRISANI:  Objection, form.
7            THE WITNESS:  I don't know that.
8   BY MR. CARTMELL:
9       Q.    Okay.  Sometimes you know that
10  there are organizations of pharmaceutical
11  representatives from manufacturers and
12  distributors of opioids who fight for issues for
13  those organizations?
14           MR. ANDRISANI:  Objection.
15           THE WITNESS:  When you say
16  "fight," what do you mean "fight"?
17  BY MR. CARTMELL:
18      Q.    Well, if there's issues of
19  regulations, for example, that the DEA or the
20  FDA are trying to put in place, some of these
21  organizations that you're a member of will band
22  together and provide opposition or try to defeat
23  those regulations, fair?
24           MR. ANDRISANI:  Objection, form.

Page 80

1            THE WITNESS:  No.
2   BY MR. CARTMELL:
3       Q.    Okay.  We'll talk about that in a
4   little while.
5            I'm interested, do you know with
6   respect to Senator McCaskill's letter whether or
7   not the same lawyers that are representing you
8   in this case represented Teva related to the
9   request for documents and information from
10  Senator McCaskill?
11           MR. ANDRISANI:  Objection, form.
12           THE WITNESS:  I don't know.
13  BY MR. CARTMELL:
14      Q.    Okay.  I want to change gears
15  here and ask you some questions.  Ms. McGinn, do
16  you consider yourself a DEA compliance expert?
17           MR. ANDRISANI:  Objection.
18           THE WITNESS:  I would consider
19  myself someone who has been in DEA
20  compliance a very long time.
21  BY MR. CARTMELL:
22      Q.    Right, I think since
23  approximately 2004?
24      A.    Before that.

Page 81

1    Q.    When was it that you first became
2  involved with DEA compliance?
3    A.    I would say it was around 1998.
4    Q.    I'm going to hand you what's been
5  marked as Exhibit 5.
6      (Document marked for
7      identification as McGinn Deposition
8      Exhibit No. 5.)
9  BY MR. CARTMELL:
10   Q.    I just have a few questions about
11  Exhibit 5.
12         This is actually an e-mail string
13  that was produced from your files in this
14  litigation, and I'm just going to ask you
15  quickly about the e-mail from you on the top
16  that's dated October 14th of 2005.
17   A.    (Witness reviews document.)
18   Q.    As you can see, Ms. McGinn, the
19  top e-mail is from you to someone named Tom
20  Marvel.
21         Who is that?
22   A.    That is my aunt's husband.
23   Q.    So your uncle?
24   A.    Yeah, I guess by law, yes.

Page 82

1    Q.    Okay.  The date of this is
2  October 14th, 2005; is that right?
3    A.    Yes.
4    Q.    So this has been a long time ago,
5  13 years ago, and it states, "My title is
6  controlled substances manager.  I wouldn't say I
7  was important, only when there's a problem.  I
8  happened to find a little niche in the
9  pharmaceutical industry that not a lot of people
10  know about or want to get involved in."
11         What do you mean by that?
12         MR. ANDRISANI:  Objection.
13         THE WITNESS:  There what I meant
14         was that there's not a lot of people
15         that do DEA compliance.
16  BY MR. CARTMELL:
17   Q.    Not a lot of people that have
18  expertise in that area?
19   A.    Yes.
20   Q.    You then state, "DEA is a little
21  scary and people just don't want to deal with
22  it."
23         What do you mean by that?
24         MR. ANDRISANI:  Objection.

Page 83

1         THE WITNESS:  People don't want
2         to get generally involved with DEA.
3  BY MR. CARTMELL:
4    Q.    "I've been doing it for so long
5  that I've seen and heard almost everything there
6  is with DEA regulations and I try to predict how
7  they're going to react to certain situations."
8         Now, this is in 2005, and you're
9  basically saying you know everything about the
10  DEA regulations back then, correct?
11         MR. ANDRISANI:  Objection.
12         THE WITNESS:  No.
13  BY MR. CARTMELL:
14   Q.    And I don't want to put words in
15  your mouth, but you say "I've seen and heard
16  almost everything there is with DEA
17  regulations," correct?
18         MR. ANDRISANI:  Objection, form.
19         THE WITNESS:  Almost everything.
20  BY MR. CARTMELL:
21   Q.    Almost everything, okay.
22         So since 2005, in the last 13
23  years, I take it you've seen a lot more related
24  to DEA regulations and learned a lot more; is

Page 84

1  that fair?
2    A.    I have seen a lot of things and
3  dealt with a lot of things in 13 years, yes.
4    Q.    And fair to say that at Teva, for
5  example, or Cephalon, you know as much or more
6  than anybody about DEA compliance?
7         MR. ANDRISANI:  Objection, form.
8         THE WITNESS:  Yes.
9  BY MR. CARTMELL:
10   Q.    You state that, I try to predict
11  how DEA is going to react to certain situations.
12         What do you mean by that?
13         MR. ANDRISANI:  Objection, form.
14         THE WITNESS:  It means that we're
15         trying to adjust our business to the
16         changing regulations.
17  BY MR. CARTMELL:
18   Q.    Okay.  The reason I had that
19  question is, in this case, the regulations that
20  we're going to deal with related to, for
21  example, suspicious order monitoring programs or
22  safeguards to prevent the diversion of
23  controlled substances like opioids.
24         That law has been in place ever

## Page 85

1  since the 1970s, correct?
2       MR. ANDRISANI:  Objection.
3       THE WITNESS:  Correct.
4  BY MR. CARTMELL:
5       Q.    So there really hasn't been any
6  changing regulations, so to speak, related to
7  the suspicious order monitoring program or just
8  the idea that Teva and Cephalon had to have in
9  place at all time safeguards against the
10  diversion of opioids; is that fair?
11       MR. ANDRISANI:  Objection to
12       form.
13       THE WITNESS:  I want to clarify
14       that the regulation itself has not
15       changed, although the way that DEA
16       insinuates what we're supposed to do has
17       changed.
18  BY MR. CARTMELL:
19       Q.    And we'll talk more about that,
20  but I think I want to make it clear for the
21  record.
22       The law on the books that says
23  that Teva and Cephalon and pharmaceutical
24  manufacturers of controlled substances who are

## Page 86

1  distributing those have to have adequate
2  safeguards in place to prevent the diversion of
3  those controlled substances, that law has been
4  the same since the '70s, correct?
5       MR. ANDRISANI:  Objection to
6       form.
7       THE WITNESS:  That's not the
8       exact wording of the law but --
9  BY MR. CARTMELL:
10       Q.    Pretty close?
11       A.    It has not changed.
12       Q.    Okay.  You say "it's fun."
13       What do you mean by that, it's
14  fun, to try to predict what the DEA is going to
15  do?
16       A.    What I --
17       MR. ANDRISANI:  Objection, form.
18       THE WITNESS:  What I meant by
19       that is that I enjoyed my job.
20  BY MR. CARTMELL:
21       Q.    Okay.  Now, when you say you're
22  trying to predict what they're going to do, does
23  that mean as the DEA compliance officer for
24  these pharmaceutical companies, that your focus

## Page 87

1  is on whether or not the DEA is going to enforce
2  the law versus actually making sure you're
3  following the law?
4       MR. ANDRISANI:  Objection, form.
5       THE WITNESS:  No.
6  BY MR. CARTMELL:
7       Q.    In other words, you would agree
8  with me, wouldn't you, that regardless of
9  whether or not DEA is going to enforce the law,
10  you need to make sure that your company is in
11  compliance with the law, fair?
12       A.    I am going to do -- my job is to
13  make sure that we did everything we could to
14  make sure that we were in compliance with the
15  law.
16       Q.    And trying to predict whether or
17  not they're going to enforce things or what
18  they're going to do, do you feel like that's
19  also part of your job?
20       A.    Not whether they're going to
21  enforce it, but how they interpret things maybe.
22       Q.    Now, part of your job as the DEA
23  compliance director is to establish a
24  relationship with the DEA, correct?

## Page 88

1       MR. ANDRISANI:  Objection, form.
2       THE WITNESS:  Yes.
3  BY MR. CARTMELL:
4       Q.    And, for example, Teva expects
5  you to spend time with the DEA representatives
6  and get to know them, correct?
7       MR. ANDRISANI:  Objection, form.
8       THE WITNESS:  I don't know that
9       Teva expects that.
10       (Document marked for
11       identification as McGinn Deposition
12       Exhibit No. 6.)
13  BY MR. CARTMELL:
14       Q.    I've handed you what's been
15  marked as Exhibit 6, and I will tell you that
16  this was produced from Teva's files.  This is
17  another performance review for you from Teva
18  that is 2014 period of time.
19       Do you see that?
20       A.    Yeah, it was for the 2014 year.
21       Q.    Okay.  And if you go to page 8 of
22  10, I want to ask you a few questions about
23  this.
24       MR. ANDRISANI:  First, let her go

Page 89

```
1         through the document.
2              MR. CARTMELL:  There's honestly
3         really no reason to look at the first
4         seven pages because I'm just -- they
5         have nothing to do with what I'm going
6         to ask about.  I'm just going to ask
7         specifically about her comments on page
8         8.
9              (Witness reviews document.)
10   BY MR. CARTMELL:
11        Q.    Ms. McGinn, so I want to ask you
12   about your performance review here, and, again,
13   this is a review where you as an employee are
14   able to give input and state the things, for
15   example, during the year 2014 that you thought
16   were valuable to the company, correct?
17        A.    Yes.
18        Q.    And, for example, if you go to --
19   strike that.
20             And, also, your manager, for
21   instance, who is doing the performance
22   evaluating and evaluating you as an employee
23   will give their comments, right?
24        A.    Correct.
```

Page 90

```
1         Q.    If you look in the middle of the
2    page under "Manager comments" it states,
3    "Colleen works very effectively with the DEA
4    during inspections and has often influenced the
5    outcomes in our favor."
6              Do you see that?
7         A.    I do.
8         Q.    Now, we're going to talk a lot
9    about the DEA today and some about inspections.
10             Is it true that one of the things
11   that DEA does is they will come to your
12   facilities from time to time and do inspections?
13        A.    Yes.
14        Q.    To make sure that your
15   facilities, and I'm talking about with respect
16   to opioids or controlled substances, are in
17   compliance?
18        A.    Yes.
19        Q.    And one of the issues you have as
20   the DEA compliance director is that oftentimes
21   those audits by the DEA will be unannounced
22   before, for example, correct?
23        A.    Yes.
24        Q.    And so you got to be ready
```

Page 91

```
1    because the DEA may come into your facility and
2    you got to be prepared, fair?
3         A.    Yes.
4         Q.    Okay.  And it's a real advantage
5    to the company if you can figure out when
6    they're coming before they come, isn't it?
7              MR. ANDRISANI:  Objection to
8         form.
9              THE WITNESS:  It's more of an
10        advantage to know when they're coming
11        than to not know.  That does not
12        normally give us time to recreate
13        records over a period of two years.
14   BY MR. CARTMELL:
15        Q.    I understand.
16             One of the things that you
17   envision your job to entail, I take it, is that
18   you try to influence the DEA's decisions, right?
19             MR. ANDRISANI:  Objection, form.
20             THE WITNESS:  I don't know that I
21        can influence what's written on DEA
22        records and reports.
23             MR. CARTMELL:  I'm going to
24        object and move to strike.  I think
```

Page 92

```
1         that's a little different than my
2         question.
3    BY MR. CARTMELL:
4         Q.    One of the things that you try to
5    do as the DEA compliance director at Teva is try
6    to influence the DEA's findings, for example,
7    correct?
8         A.    The only influence I would have
9    is to understand what they're asking for and
10   what they're looking for and provide it in a
11   timely manner.  The inspection is based on
12   records and reports.
13        Q.    Below this manager comment
14   talking about you influencing the outcomes in
15   our favor -- strike that.
16             What do you think your manager
17   means by you are able to influence the outcomes
18   in your favor when the DEA comes to your
19   facilities?
20             MR. ANDRISANI:  Objection to
21        form.
22             THE WITNESS:  I'm not sure what
23        she meant.  You'd have to ask her.
24   BY MR. CARTMELL:
```

Page 93

1     Q.    Do you think that's true, though,
2  that you are able to influence the outcomes in
3  your favor, in Teva's favor?
4     A.    I'm able to effectively manage a
5  DEA inspection.
6     Q.    Okay.  But by influencing the
7  DEA?
8     A.    I don't under -- I don't know
9  what she means by that.
10    Q.    If you go down to "Employee
11 comments," these are your comments, correct?
12    A.    Mm-hmm.
13    Q.    It states, "We were also able to
14 influence DEA during several inspections this
15 year by leveraging my industry experience and
16 reputation."
17          Do you see that?
18    A.    Yes.
19    Q.    So is that part of your job at
20 Teva is your seniors want you out there trying
21 to increase your reputation and your
22 relationships in the industry and with the DEA
23 representatives so that you can influence
24 outcomes?

Page 94

1          MR. ANDRISANI:  Objection, form.
2          THE WITNESS:  I think doing this
3  job as long as I have and meeting so
4  many DEA investigators through
5  inspections and passing them without
6  issue adds to reputation, and if you
7  want to call that influence, that's fine
8  too, but, you know, it's basically
9  having a reputation for handling DEA
10 compliance correctly.
11 BY MR. CARTMELL:
12    Q.    Okay.  But those are your words;
13 you called it influencing, correct?
14    A.    Right.
15    Q.    And you called it leveraging,
16 true, too, correct?
17    A.    That's what it says.
18    Q.    If you go down it states, Our
19 relationship with the Philadelphia DEA office
20 allowed us to gain knowledge about upcoming
21 inspections at other sites prior to serving
22 notice.
23          Do you see that?
24    A.    Yes.

Page 95

1     Q.    And so what you're telling your
2  superiors is that you're valuable to the company
3  because you have such a good reputation and such
4  a good relationship with DEA officers that you
5  can find out about unannounced audits before
6  they happen, correct?
7          MR. ANDRISANI:  Objection to
8          form.
9          THE WITNESS:  On certain
10         occasions, and this was not me that they
11         called to say that was coming.  This was
12         an employee that worked for me, and they
13         wanted to make sure that he was going to
14         be there in the upcoming days of the
15         inspection.
16 BY MR. CARTMELL:
17    Q.    Okay.  But this talks about two
18 sites, SV and NW, that because of your
19 reputation and your relationship with this DEA
20 representatives, you were able to find out about
21 these audits that were supposed to be
22 unannounced early, correct?
23         MR. ANDRISANI:  Objection, form.
24         THE WITNESS:  What it says is our

Page 96

1  relationship, and when I say "ours,"
2  it's the group.
3  BY MR. CARTMELL:
4     Q.    Meaning Teva as a whole?
5     A.    Meaning DEA compliance people at
6  Teva.
7     Q.    And then you state, "This advance
8  knowledge allowed us to better prepare the sites
9  and concentrate efforts."
10          Do you see that?
11    A.    Yes.
12    Q.    And that's part of the advantage,
13 right, of getting early knowledge because of
14 your relationship with DEA is you can prepare
15 better for these audits when they come; you can
16 prepare your facility better, correct?
17    A.    We can make sure that someone is
18 going to be at the site and have records
19 prepared if we have enough time.
20    Q.    Well, you can also prepare to
21 make sure that everything is in order so that
22 you might not get citations, for example?
23    A.    We could.
24    Q.    So would you agree with me, and I

Page 97

1  think you said, regardless of your relationship
2  with DEA offices or your reputation, your job is
3  the DEA compliance director at Teva is to make
4  sure that Teva is following the law, fair?
5      A.  Yes.
6      Q.  And the law is the law related to
7  suspicious order monitoring that's been on the
8  books since the '70s, correct?
9          MR. ANDRISANI:  Objection, form.
10         THE WITNESS:  That regulation has
11     been in place since the '70s.
12 BY MR. CARTMELL:
13     Q.  You would agree that you wouldn't
14 want to try to leverage your relationship or
15 influence the DEA to not cite you or follow the
16 law if, in fact, your company was not actually
17 following the law, fair?
18         MR. ANDRISANI:  Objection to
19     form.
20         THE WITNESS:  I don't have that
21     kind of influence.
22 BY MR. CARTMELL:
23     Q.  Okay.  Would you agree with me,
24 Ms. McGinn, that there is currently an opioid

Page 98

1  epidemic?
2      A.  Yes.
3      Q.  And I take it you, like most of
4  us, have had personal effects in your families
5  or friends as a result of the epidemic?
6      A.  Yes.
7      Q.  How has the opioid epidemic
8  personally affected you?
9      A.  Are you looking for examples?
10     Q.  Sure.
11     A.  So, I mean, I've had a couple of
12 friends' children, teenage children die, a
13 cousin has died.
14     Q.  I'm sorry about that, but I take
15 it that personal experience from that has
16 influenced you as a DEA director, I take it?
17     A.  Yes.
18     Q.  Now, would you agree with me that
19 we have in our country widespread occurrence of
20 addiction to opioid prescription pain pills?
21     A.  Yes.
22     Q.  And would you agree that it's a
23 public health emergency in our country?
24         MR. ANDRISANI:  Objection, form.

Page 99

1          THE WITNESS:  I've heard it
2      called that.
3  BY MR. CARTMELL:
4      Q.  Would you agree with that?
5      A.  Yes.
6      Q.  And that public health emergency
7  has been in existence for some time, correct?
8          MR. ANDRISANI:  Objection, form.
9          THE WITNESS:  Yes.
10 BY MR. CARTMELL:
11     Q.  The prescription pain pills like
12 opioid-containing pain pills that Teva and
13 Cephalon, the companies that you have worked for
14 have been selling have led to massive numbers,
15 for example, of overdoses during the last ten
16 years, agree?
17         MR. ANDRISANI:  Objection, form.
18         THE WITNESS:  I don't know how
19     many were directly related to Teva
20     products.
21 BY MR. CARTMELL:
22     Q.  I understand, but, in general,
23 prescription opioid-containing products that are
24 sold by Teva, that are sold by Cephalon when you

Page 100

1  worked there and sold by lots of other
2  pharmaceutical companies, those prescription
3  drugs have led to massive numbers of overdoses.
4      Would you agree with that?
5          MR. ANDRISANI:  Objection, form.
6          THE WITNESS:  They have led to
7      overdose.
8  BY MR. CARTMELL:
9      Q.  Do you agree that they have led
10 to massive numbers of hospitalizations?
11         MR. ANDRISANI:  Objection, form.
12         THE WITNESS:  Yes.
13 BY MR. CARTMELL:
14     Q.  Would you agree that they have
15 led to massive numbers or very large numbers of
16 deaths over the last 10 or 15 years?
17         MR. ANDRISANI:  Objection, form.
18         THE WITNESS:  Yes.
19 BY MR. CARTMELL:
20     Q.  And would you agree that because
21 of that or these prescription opioid sales and
22 abuse and diversion that there has been massive
23 costs to communities as a result?
24         MR. ANDRISANI:  Objection to

1      form.
2          THE WITNESS:  I've read it.  I
3      don't know that personally, but I've
4      seen that.
5      BY MR. CARTMELL:
6          Q.    Do you agree that it's likely
7      true?
8          MR. ANDRISANI:  Objection, form.
9          THE WITNESS:  I'd have to assume
10     so.
11     BY MR. CARTMELL:
12         Q.    And -- strike that.
13         I want to show you a graph that
14     I'm certain you're familiar with, Exhibit 7.
15         (Document marked for
16         identification as McGinn Deposition
17         Exhibit No. 7.)
18     BY MR. CARTMELL:
19         Q.    Let me ask you, before I ask you
20     about this, Ms. McGinn, one of the things you do
21     as the DEA compliance director at Teva and
22     before that working in compliance at Cephalon is
23     you try to keep up on articles and publications
24     related to opioids; is that fair?

1          A.    Yes.
2          Q.    Including articles and
3      publications relating to the rising numbers of
4      hospitalizations or deaths or overdoses,
5      correct?
6          A.    Yes.
7          Q.    And including also publications
8      and articles that have to do with the increasing
9      numbers of actions or enforcement actions the
10     DEA has brought against distributors of opioid
11     pharmaceuticals and manufacturers and
12     pharmacies; fair to say?
13         A.    Yes.
14         Q.    Okay.  I take it you are familiar
15     with this graph on Exhibit 7?
16         A.    It looks familiar.
17         Q.    This is -- the source of this is
18     from the National Vital Statistics System, Drug
19     Enforcement Administration.
20         Do you see that?
21         A.    Yes.
22         Q.    And is that an organization that
23     you're familiar with?
24         A.    DEA, yes.

1          Q.    Okay.  Now, if you look at this
2      graph, it includes the blue line "prescription
3      painkiller sales," as you can see, since before
4      2000 until 2012 where this ends, there is a
5      rising number of sales of opioid prescriptions
6      during that time.
7          Do you see that?
8          A.    Yes.
9          Q.    And also there's an orange line
10     that talks about prescription painkiller deaths
11     per 100,000 people, and that is a rising line of
12     deaths from 200 -- or excuse me -- 2000 to 2012
13     as well.
14         Do you see that?
15         A.    Yes.
16         Q.    And it looks like basically this
17     graph is demonstrating that with the rising
18     prescription opioid sales in America, there's
19     been a rising death rate as well.
20         Do you see that?
21         A.    Yes.
22         Q.    And is that consistent with your
23     belief as to what has happened in our country?
24         MR. ANDRISANI:  Objection, form.

1          THE WITNESS:  Yes.
2      BY MR. CARTMELL:
3          Q.    And Teva, for instance, where you
4      are the DEA compliance director is, as we've
5      discussed, a very high volume manufacturer and
6      seller of opioids in this country, correct?
7          MR. ANDRISANI:  Objection to
8      form.
9          THE WITNESS:  We manufacture
10     products containing opioids, yes.
11     BY MR. CARTMELL:
12         Q.    At a very high volume, correct?
13         MR. ANDRISANI:  Objection, form.
14         THE WITNESS:  I don't know what
15     it is compared to everybody else.
16         (Document marked for
17         identification as McGinn Deposition
18         Exhibit No. 8.)
19     BY MR. CARTMELL:
20         Q.    Okay.  Let me show you what's
21     been marked as Exhibit 8, which is a document
22     that was produced from Teva's files in this
23     litigation.  And I'm really just going to ask
24     you about the first page.

1      You'll see that the first page of
2  Exhibit 8 is titled "Teva Opioid Market Share
3  Calculation: All Opioids."
4      Do you see that?
5      A.   Yes.
6      Q.   So when your company, Teva, is
7  talking about opioid-containing products,
8  oftentimes they will call them opioids as well;
9  is that fair?
10     A.   Yes.
11     Q.   And the first line, "Teva opioid
12 script volume," is your understanding that a
13 script is a prescription?
14     A.   Yes.
15     Q.   And you'll see that as you go
16 across from 2012 to 2016, there are totals of
17 the numbers of scripts, for example, 12,950,466
18 in 2012, pretty steady until 2015 and it goes up
19 to 15,176,735.  And then in 2016, 30,897,678
20 prescriptions of opioids.
21     Do you see that?
22     A.   Yes.
23     Q.   And I take it you know from your
24 experience that one prescription for opioids can

1  be for 30 or 60 or 90 or more pills, correct?
2      MR. ANDRISANI:  Objection to
3  form.
4      THE WITNESS:  Yes.
5  BY MR. CARTMELL:
6      Q.   So is it fair to say that during
7  this period of time, five years at least, Teva,
8  as far as numbers of opioid prescriptions, is
9  well -- well, it's much more than, for example,
10 50 million scripts, correct?
11     MR. ANDRISANI:  Objection.
12     THE WITNESS:  Much more than
13     50 million scripts?  I don't think I
14     understand where you're going.
15 BY MR. CARTMELL:
16     Q.   Well, I'm just saying if you
17 totaled those up, we know that we're -- that
18 Teva during that period of time from 2012 to
19 2016 had an increasing number of opioid
20 prescriptions as far as share of the market, and
21 it was well in excess of, for example,
22 60 million prescriptions of opioids.
23     Do you see that?
24     A.   Yes.

1      Q.   Okay.  And we know because every
2  prescription could be 60 or 90 pills or more, as
3  far as the number of actual opioid pills that
4  Teva has put on the market in prescriptions
5  in that period of time could be hundreds of
6  millions of pills, correct?
7      MR. ANDRISANI:  Objection, form.
8      THE WITNESS:  I don't know how
9      many pills they are.  What I see here
10     is, you know, the increase in 2016
11     likely due to the Actavis integration
12     and taking on those products.
13 BY MR. CARTMELL:
14     Q.   Right.  In 2016 --
15     A.   Yes.
16     Q.   -- there was another acquisition
17 by Teva of a pharmaceutical company called
18 Actavis; is that right?
19     A.   Yes.
20     Q.   And Actavis was also a
21 manufacturer and seller of opioid-containing
22 products, correct?
23     A.   Yes.
24     Q.   High volume and, as a result,

1  Teva then became more high volume related to
2  manufacturing and selling generic opioids, fair?
3      MR. ANDRISANI:  Objection, form.
4      THE WITNESS:  Yeah, according to
5      this, at that point in time, they would
6      have had 14% of the total market or
7      total scripts.
8  BY MR. CARTMELL:
9      Q.   Okay.  And I was just going to
10 get to that.
11     So this actually tells us that as
12 of 2016, we don't know about 2017 or '18, Teva
13 had 14% of the share that was being sold of the
14 scripts of opioids in America, correct?
15     MR. ANDRISANI:  Objection to
16     form.
17     THE WITNESS:  That's what it
18     says.
19 BY MR. CARTMELL:
20     Q.   Okay.  Would you agree with me
21 that -- that Teva has been and continues to be a
22 high volume producer, manufacturer and seller of
23 opioids in our country?
24     MR. ANDRISANI:  Objection, form.

Page 109

1          THE WITNESS:  We make a lot of
2  opioid-containing products.
3  BY MR. CARTMELL:
4      Q.    And if you look below, there is
5  "Teva products include" paragraph, and that's a
6  list of all of the opioids that Teva is actually
7  manufacturing and selling as of this time.
8          Do you see that?
9          MR. ANDRISANI:  Objection, form.
10          THE WITNESS:  Yes.
11  BY MR. CARTMELL:
12      Q.    It's fair to say that's dozens of
13  opioid-containing products?
14      A.    Dozens of different products, but
15  some of the same products, yes, different
16  formulations of the same product.
17      Q.    All opioid-containing products,
18  correct?
19      A.    Correct.
20      Q.    We've talked a little bit about
21  the law that applies to Teva related to
22  manufacturing and selling opioids, but I want to
23  talk in a little more detail and hand you
24  Exhibit 9.

Page 110

1          (Document marked for
2          identification as McGinn Deposition
3          Exhibit No. 9.)
4  BY MR. CARTMELL:
5      Q.    I'm handing you two copies of
6  Exhibit 9, one for you and one for your counsel.
7  This is produced from Teva's files in this
8  litigation, and I will represent to you that
9  this was information that came from your file.
10          You'll see from the e-mail on the
11  first page of this document, there's an e-mail
12  from LeighAnn Tulleson dated June 15, 2012 to
13  you and many others, and the subject is "DEA
14  Suspicious Order Monitoring Program."
15          Do you see that?
16      A.    Yes.
17      Q.    It states, "we have scheduled a
18  meeting to discuss the DEA suspicious order
19  monitoring program and its impact to Teva and
20  our customers."
21          It states, "This launch meeting
22  is critical to the overall understanding of the
23  issues and will require each of the parties
24  listed on this memo to attend."

Page 111

1          You see that?
2      A.    Yes.
3      Q.    Okay.  So it looks like as of
4  June of 2012, which is not long after you
5  started at Teva, is that fair, within a year?
6      A.    Yes.
7      Q.    There was going to be a launch
8  meeting to discuss the suspicious order
9  monitoring program?
10      A.    That's what it looks like.
11      Q.    Okay.  Attached to this e-mail
12  that you received is a series of letters from
13  the U.S. Department of Justice Drug Enforcement
14  Administration; is that right?
15      A.    Yes.
16      Q.    And I want to talk to you
17  specifically about the one that is actually a
18  crummy copy, but it's dated February 7, 2007.
19          Do you see that?
20      A.    That's a bad copy for sure.
21      Q.    Well, we got this from the files,
22  and, unfortunately, we were looking for a better
23  copy, but we couldn't find one, so we'll have to
24  make our way through this, if you don't mind.

Page 112

1          But I want to go through this,
2  and this is a letter, I take it, that you had
3  seen prior to 2012; is that right?
4      A.    It's hard to see where -- I
5  assume that I had.
6      Q.    Well, am I right that there are a
7  series of letters that were sent to
8  manufacturers and distributors of
9  opioid-containing products from a man named
10  Joseph Rannizzisi?
11      A.    Yes.
12      Q.    Okay.  And I know that you are
13  familiar with Mr. Rannizzisi, correct?
14      A.    Yes.
15      Q.    You have had dealings with him,
16  pretty extensive dealings with him in the past;
17  is that fair?
18      A.    Not personally.  I may have
19  talked to him once or twice.
20      Q.    At any rate, these letters, the
21  series of letters that are attached, and I think
22  there's three, are commonly known as the
23  Rannizzisi letters, correct?
24      A.    I had not called them that.  I

Page 113

1   had not heard that.
2       Q.   What do you call them?
3       A.   Distributor letters.
4       Q.   Okay.  And I take it that you
5   were familiar with these letters even back at
6   Cephalon, before you started at Teva?
7       A.   Yes.
8       Q.   Okay.  And let's go through this
9   February 7, 2007 letter, you see the date, and
10  you can see that this is a letter from the Drug
11  Enforcement Administration out of Washington,
12  DC.
13          It states, Dear Sir or Madam,
14  this letter is being sent to every commercial
15  entity in the United States registered with the
16  Drug Enforcement Administration to distribute
17  controlled substances.  The purpose of this
18  letter is to reiterate the responsibilities of
19  controlled substance distributors in view of the
20  prescription drug abuse problem in our -- our
21  nation currently faces.
22          Do you see that?
23      A.   Yes.
24      Q.   Okay.  So would you agree with me

Page 114

1   that that was the purpose of these letters was
2   to put or to reiterate to manufacturers of
3   opioid drugs and other controlled substances and
4   distributors of these drugs of their
5   responsibilities related to the law that applies
6   to manufacturing and selling controlled
7   substances?
8           MR. ANDRISANI:  Objection, form.
9           THE WITNESS:  Yes.
10  BY MR. CARTMELL:
11      Q.   And it looks like the DEA was
12  reiterating the law that applied to
13  manufacturers and distributors of opioids at
14  this time because there was an emerging
15  controlled substance prescription drug problem,
16  correct?
17          MR. ANDRISANI:  Object to the
18  form.
19          THE WITNESS:  I assume that's
20  why.
21  BY MR. CARTMELL:
22      Q.   And this was back in 2007, right?
23      A.   Yes.
24      Q.   It states, "Background, as each

Page 115

1   of you is undoubtedly aware, the abuse
2   (nonmedical use) of controlled prescription
3   drugs is a serious and growing health problem in
4   this country.  DEA has an obligation to combat
5   this problem, as one of the agency's core
6   functions is to prevent the diversion of
7   controlled substances into illicit channels."
8           Do you see that?
9       A.   Yes.
10      Q.   What does that mean, "illicit
11  channels"?
12          MR. ANDRISANI:  Object to form.
13          THE WITNESS:  I'm going to assume
14  that he means that it ends up anywhere
15  than where it was intended to go.
16  BY MR. CARTMELL:
17      Q.   Okay.  "Congress assigned DEA to
18  carry out this function through enforcement of
19  the Controlled Substances Act and DEA
20  regulations that implement the Act."
21          So does that mean that actually
22  the Drug Enforcement Administration is the
23  agency that Congress has given the power to
24  enforce the law related to the sale and

Page 116

1   manufacture of controlled substances?
2       A.   Yes.
3           MR. ANDRISANI:  Objection, form.
4   BY MR. CARTMELL:
5       Q.   Including opioid-containing
6   products?
7           MR. ANDRISANI:  Objection, form.
8           THE WITNESS:  Yes.
9   BY MR. CARTMELL:
10      Q.   The Controlled Substances Act was
11  designed by Congress to combat diversion by
12  providing for a closed system of drug
13  distribution.
14          What does it mean to be a closed
15  system?
16      A.   The way it's been --
17          MR. ANDRISANI:  Object to form.
18          THE WITNESS:  -- described to us
19  is that controlled substances would only
20  be shipped to DEA registrants.
21  BY MR. CARTMELL:
22      Q.   And then it says further down,
23  "If the closed system is to function properly as
24  Congress envisioned, distributors must be

Page 117

```
 1   vigilant in deciding whether a prospective
 2   customer can be trusted to deliver controlled
 3   substances only for lawful purposes.  This
 4   responsibility is critical, as Congress has
 5   expressly declared that the illegal distribution
 6   of controlled substances has a substantial and
 7   detrimental effect on the health and general
 8   welfare of the American people."
 9            Do you see that?
10       A.   Yes.
11       Q.   And do you agree with that?
12            MR. ANDRISANI:  Objection to
13   form.
14            THE WITNESS:  Yes.
15   BY MR. CARTMELL:
16       Q.   Now, it then talks about actually
17   the law that manufacturers and distributors are
18   bound by related to the sale and manufacture of
19   controlled substances, correct?
20            MR. ANDRISANI:  Objection, form.
21            THE WITNESS:  I'm sorry.
22       Could -- I missed it.  Sorry, I was
23       reading.
24   BY MR. CARTMELL:
```

Page 118

```
 1       Q.   Sorry I interrupted you.  Were
 2   you done?
 3       A.   I'm done.  I'm sorry.
 4       Q.   We'll talk about the rest of the
 5   letter in some detail, but I want to -- I was
 6   just pointing out that the rest of the letter
 7   actually talks about the regulations and the law
 8   that applies and that the DEA is enforcing,
 9   correct?
10       A.   Yes.
11       Q.   And one of the things, just so
12   it's clear for the jury, that is important to
13   know is that companies like Teva, for example,
14   because they sell and manufacture
15   opioid-containing products, they have to
16   register with the DEA to be able to do that; is
17   that right?
18       A.   Yes.
19       Q.   And is it true that they become
20   known as a registrant, for example, is that
21   referred to?
22       A.   Yes.
23       Q.   Okay.  And that registration, is
24   it true, provides, for example, Teva a license
```

Page 119

```
 1   that allows them through their multiple
 2   facilities to go ahead and distribute those
 3   opioids?
 4       A.   Yes.
 5       Q.   Okay.  And so, for example, if
 6   Teva had its license suspended or pulled from
 7   the DEA to sell or manufacture opioid-containing
 8   products, then they would no longer be able to
 9   sell those; is that fair?
10       A.   Yeah, they would not be able
11   to -- not just sell but they would not be able
12   to transfer drug anywhere.
13       Q.   If you go to the second page in
14   the third paragraph it states, the statutory
15   factors DEA must consider in deciding whether to
16   revokes a distributor's registration are
17   contained in 21 U.S.C. 823(e).
18            Do you see that?
19       A.   Yes.
20       Q.   So when you talk about statutes
21   and all that, that's legal mumbo-jumbo, that's
22   the actual -- that's the law, right?
23            MR. ANDRISANI:  Objection, form.
24            THE WITNESS:  U.S. Code.
```

Page 120

```
 1   BY MR. CARTMELL:
 2       Q.   Go ahead.
 3       A.   It's U.S. code.
 4       Q.   Okay.  "Listed first among these
 5   factors is the duty of distributors to maintain
 6   effective controls against diversion of
 7   controlled substances into other than legitimate
 8   medical, scientific and industrial channels."
 9            Do you see that?
10       A.   Yes.
11       Q.   And so that just means that every
12   manufacturer or distributor of opioid-containing
13   products and other controlled substances, they
14   have to make sure that they actually have
15   effective controls against diversion of those
16   drugs in place, correct?
17            MR. ANDRISANI:  Objection, form.
18            THE WITNESS:  Yes.
19   BY MR. CARTMELL:
20       Q.   For example, if Teva had
21   ineffective controls that weren't working, then
22   that would not be compliant with the law,
23   correct?
24            MR. ANDRISANI:  Objection, form.
```

## Page 121

1    THE WITNESS:  Yes.
2  BY MR. CARTMELL:
3    Q.   It states, In addition,
4  distributors must comply with appropriate state
5  and local law.  Congress also gave DEA authority
6  under this provision to revoke a registration
7  based on the distributor's past experience in
8  the distribution of controlled substances and
9  based on such other factors as may be relevant.
10    Do you see that?
11    "Relevant to and consistent with
12  the public health and safety."
13    Do you see that?
14    A.   Yes.
15    Q.   Okay.  Now, I want to focus on
16  this next section, because this next section is
17  talking specifically about something called
18  suspicious orders of controlled substances.
19    Do you see that?
20    A.   Yes.
21    Q.   Tell us what suspicious orders of
22  controlled substances means?
23    A.   Would you like me to read what
24  the regulation states.

## Page 122

1    Q.   I'll withdraw the question, and
2  I'll read it, okay.
3    Let's go through this section,
4  and I'm going to follow up and ask you some
5  questions.
6    "The DEA regulations require all
7  distributors to report suspicious orders of
8  controlled substances.  Specifically, the
9  regulations state the registrant shall design
10  and operate a system to disclose to the
11  registrant suspicious orders of controlled
12  substances.  The registrant shall inform the
13  Field Division Office of the Administration in
14  his area of suspicious orders when discovered by
15  the registrant.  Suspicious orders include
16  orders of unusual size, order deviating
17  substantially from a normal pattern and orders
18  of unusual frequency."
19    Do you see that?
20    A.   Yes.
21    Q.   Okay.  So let me see if I can
22  interpret that for the jury.
23    Does that mean that, for example,
24  Teva at all times when they are licensed and

## Page 123

1  selling, for example, opioid-containing
2  products, they have to have what's called a
3  suspicious ordering monitoring program in place?
4    MR. ANDRISANI:  Objection, form.
5    THE WITNESS:  If they are selling
6    commercial product, yes.
7  BY MR. CARTMELL:
8    Q.   Okay.  And so the DEA requires
9  and the law requires, according to the
10  regulations, that if Teva, for example, is going
11  to sell these opioids, that they have to put a
12  program in place that is going to effectively
13  identify suspicious orders of opioids, correct?
14    MR. ANDRISANI:  Objection to
15    form.
16    THE WITNESS:  Yes.
17  BY MR. CARTMELL:
18    Q.   In other words, if Teva has
19  customers, and I take it that they do, who
20  contact Teva and they say, "we want to buy or
21  purchase some of your opioid-containing
22  products," that happens, doesn't it?
23    A.   Yes.
24    Q.   And the customer says, for

## Page 124

1  example, we want 4,000 pills, is it -- does it
2  happen that way?  Do they ask by the pill?
3    A.   They don't call me to place an
4  order, so I don't know exactly how they do it,
5  but I assume it's by carton or bottle or NDC.  I
6  don't know.
7    Q.   Okay.  But you're actually
8  responsible as the DEA director at Teva for the
9  suspicious order monitoring program, aren't you?
10    A.   I don't physically go and review
11  orders.  I am responsible -- ultimately
12  responsible for it, but I don't actually process
13  the orders or investigate them.
14    Q.   Okay.  So a customer might
15  contact Teva and say we want cartons -- X number
16  of cartons of opioids or bottles of opioids,
17  something like that, fair?
18    A.   Yes.
19    MR. ANDRISANI:  Objection, form.
20  BY MR. CARTMELL:
21    Q.   And this is saying that Teva, as
22  a company, has to monitor those orders from its
23  customers and make sure they're not suspicious,
24  right?

Page 125

1           MR. ANDRISANI: Objection, form.
2           THE WITNESS: Yes.
3    BY MR. CARTMELL:
4           Q.    And if Teva finds that these
5    orders from its customers who are buying these
6    opioids are suspicious, then this says that
7    those orders have to be actually reported to the
8    DEA, correct?
9           MR. ANDRISANI: Objection, form.
10          THE WITNESS: Correct.
11   BY MR. CARTMELL:
12          Q.    And if there are suspicious
13   orders from customers to Teva, actually, Teva is
14   not supposed to go and ship those bottles or
15   crates of opioids to the customer, right?
16          MR. ANDRISANI: Objection, form.
17          THE WITNESS: Yes.
18   BY MR. CARTMELL:
19          Q.    And this process called
20   suspicious order monitoring is part of the law
21   that says Teva has to have effective safeguards
22   in place to prevent diversion of these opioids
23   or controlled substances, right?
24          MR. ANDRISANI: Objection, form.

Page 126

1           THE WITNESS: Yes.
2    BY MR. CARTMELL:
3           Q.    Okay.  Now, Teva also has, as a
4    part of this law and these regulations from the
5    DEA, also has the responsibility to make sure
6    that they investigate if they find suspicious
7    orders from their customers for opioids; is that
8    right?
9           MR. ANDRISANI: Objection, form.
10          THE WITNESS:  We investigate
11    orders of interest and report suspicious
12    orders.  We have that obligation.
13   BY MR. CARTMELL:
14          Q.    That's the duty of Teva to do
15   that, correct?
16          A.    Yes.
17          MR. ANDRISANI: Objection to
18    form.
19   BY MR. CARTMELL:
20          Q.    And if you go down it states, "It
21   bears emphasis that the foregoing reporting
22   requirement is in addition to, and not in lieu
23   of, the general requirement under 21 U.S.C.
24   823(e) that a distributor maintain effective

Page 127

1    controls against diversion."
2           Do you see that?
3           A.    Yes.
4           Q.    "Thus, in addition to reporting
5    all suspicious orders, a distributor has a
6    statutory responsibility to exercise due
7    diligence to avoid filling suspicious orders
8    that might be diverted into other than
9    legitimate medical, scientific and industrial
10   channels."
11          Do you see that?
12          A.    Yes.
13          Q.    Okay.  Let's talk about that due
14   diligence.  If I'm reading this correctly, and
15   correct me if I'm wrong, the DEA is saying that
16   Teva, for example, when selling and
17   manufacturing opioids, when they get suspicious
18   orders, they can't just fill those orders, they
19   actually have to investigate and do due
20   diligence to determine or make sure that those
21   opioid pills are not going to be diverted to
22   illegal and illicit places, correct?
23          MR. ANDRISANI: Objection, form.
24          THE WITNESS:  If it's deemed

Page 128

1    suspicious, we have an obligation not to
2    ship.
3    BY MR. CARTMELL:
4           Q.    You have an obligation not to
5    ship, but when this talks about due diligence,
6    you also have an obligation to investigate,
7    right?
8           MR. ANDRISANI: Objection, form.
9           THE WITNESS:  We investigate any
10    order that's pended in the system, and
11    then if we do our due diligence on that
12    and we determine that it's a suspicious
13    order, then we have to report it.
14   BY MR. CARTMELL:
15          Q.    So would you agree with me that
16   it's the responsibility of manufacturers and
17   distributors of opioids, including Teva, and
18   when you were at Cephalon as well, that if they
19   have potentially suspicious order, their duty
20   and responsibility is to investigate that order?
21          A.    Yes.
22          Q.    Okay.  And if the company fails
23   to investigate those potentially suspicious
24   orders, then they have breached their duty and

Page 129

1  responsibility, correct?
2          MR. ANDRISANI:  Objection, form.
3          THE WITNESS:  Yes.
4  BY MR. CARTMELL:
5      Q.    And if Teva, for instance, has a
6  suspicious order monitoring system or fails to
7  have one that is effective and is actually
8  identifying suspicious orders and they're not
9  investigating those properly, then they will
10  have breached their duty and responsibility,
11  correct?
12          MR. ANDRISANI:  Objection, form.
13          THE WITNESS:  We have an
14      obligation to make sure that we have an
15      effective system in place.
16  BY MR. CARTMELL:
17      Q.    I understand that.  My question
18  is a little bit different.
19          If, in fact, Teva, for instance,
20  has a suspicious order monitoring system that is
21  not effective and it isn't adequately
22  identifying suspicious orders, and it's not --
23  and those orders are not adequately being
24  investigated by the company, then Teva would

Page 130

1  have breached its duties and responsibilities,
2  according to the DEA regulations, correct?
3          MR. ANDRISANI:  Objection, form.
4          THE WITNESS:  I just want to say
5      that the suspicious order monitoring has
6      been a moving target, and what was
7      effective in one year -- considered
8      effective in one year may not have been
9      considered effective in another year.
10      So, you know, we try to monitor DEA
11      action to see where they're headed with
12      it, because they're basically
13      promulgating rules without writing
14      regulations, updating regulations, so we
15      try to monitor that.  What I'm saying is
16      it depends on the time that you were
17      looking at the system in determining
18      whether it was effective or not.  But at
19      the time, it should have been effective
20      with the information that we knew at the
21      time.
22  BY MR. CARTMELL:
23      Q.    I appreciate that.  I'm going to
24  object and move to strike, and I'm going to ask

Page 131

1  you again and see if I can get an answer to that
2  question.
3      A.    Okay.
4      Q.    And we'll talk about that in more
5  detail, but, Ms. McGinn, if, in fact, Teva had a
6  suspicious order monitoring program that was
7  ineffective and not adequately identifying
8  suspicious orders and those orders that were
9  pended, when they did identify suspicious
10  orders, were not being adequately investigated,
11  then Teva, according to the regulations of the
12  DEA, would have breached its duty and
13  responsibility, fair?
14          MR. ANDRISANI:  Objection, form.
15          THE WITNESS:  Yes.
16  BY MR. CARTMELL:
17      Q.    Go ahead.
18      A.    Yes.
19      Q.    I want to go back to Exhibit 7,
20  if you would, and I just want to ask you a
21  question, and I think this gives us a good way
22  to demonstrate for the jury what I'm asking
23  about.
24          Now, this graph shows rising

Page 132

1  deaths with rising prescriptions, and it's true
2  that the law we just talked about and that the
3  DEA in its letter of 2007 was reiterating is
4  that at all times, for example, from 2000 until
5  2012 that law requiring Teva, for example, to
6  have effective -- effective systems in place to
7  prevent diversion, that was in effect, correct?
8          MR. ANDRISANI:  Objection, form.
9          THE WITNESS:  Yes.
10  BY MR. CARTMELL:
11      Q.    In other words, the law that
12  we're talking about was in effect in 2000 and
13  2001, all the way up to 2008, 2009, all the way
14  to 2012, and it's still in effect today?
15      A.    Yes.
16          MR. ANDRISANI:  Objection, form.
17  BY MR. CARTMELL:
18      Q.    And so at all times, even back in
19  2004, 2003, any times from 2000 on, Teva had
20  that duty to have in effect a suspicious order
21  monitoring program, correct?
22          MR. ANDRISANI:  Objection, form.
23          THE WITNESS:  Yes.
24  BY MR. CARTMELL:

Page 133

1      Q.    And Teva had the duty during that
2  period of time all the way back to 2004 or
3  whenever it was they started selling controlled
4  substances, they needed to have effective
5  systems, including a suspicious order monitoring
6  program, in place that would prevent diversion
7  of opioids, correct?
8              MR. ANDRISANI:  Objection, form.
9              THE WITNESS:  Yes.
10  BY MR. CARTMELL:
11      Q.    Okay.  In other words, Teva
12  couldn't start that program in 2010 or 2012, and
13  if they did that, they would have breached their
14  duties and responsibilities to do that prior to
15  that time, fair?
16              MR. ANDRISANI:  Objection, form.
17              THE WITNESS:  Yes.
18  BY MR. CARTMELL:
19      Q.    And would you agree with me,
20  Ms. McGinn, that if Teva did not monitor
21  effectively for suspicious orders or in a
22  responsible way and that actually contributed to
23  the epidemic, then Teva would be responsible for
24  that?

Page 134

1              MR. ANDRISANI:  Objection, form.
2              THE WITNESS:  If Teva was
3        responsible for that, it certainly was
4        never intentional.
5  BY MR. CARTMELL:
6      Q.    I understand that.  My question
7  is a little different, though, and I'm not
8  trying to put words in your mouth either, but
9  would you agree with me that if Teva, in the
10  past, has not had effective systems in place to
11  prevent diversion, including a suspicious order
12  monitoring program for suspicious orders of
13  opioids, if that system has not been effectively
14  in place and has not been diverting opioids,
15  that could contribute to the epidemic, correct?
16              MR. ANDRISANI:  Objection, form.
17              THE WITNESS:  In some way, yeah.
18        I mean, we were just one part of the
19        supply chain.  There were many other
20        steps in the process before it got to a
21        patient for a death.
22  BY MR. CARTMELL:
23      Q.    And I'm not trying to say that
24  Teva would be solely responsible for that, but

Page 135

1  if Teva didn't follow the DEA regulations and
2  have effective systems in place to prevent
3  diversion, they could be a contributor or would
4  be a contributor to the epidemic, correct?
5              MR. ANDRISANI:  Objection, form.
6              THE WITNESS:  In some way, yes.
7  BY MR. CARTMELL:
8      Q.    Okay.  And the same is true with
9  other manufacturers of opioids and distributors
10  of opioids; they too could be contributors if
11  they didn't do a good job and have appropriate
12  systems in place to prevent diversion of
13  opioids, correct?
14              MR. ANDRISANI:  Objection, form.
15              THE WITNESS:  Yes.
16  BY MR. CARTMELL:
17      Q.    Okay.  And if, in fact, that's
18  the case, then, for example, would you believe,
19  in your opinion, that Teva would be partly
20  responsible for the epidemic?
21              MR. ANDRISANI:  Objection, form.
22              THE WITNESS:  In some part, yes.
23              MR. CARTMELL:  Let's take a
24        break.

Page 136

1              THE VIDEOGRAPHER:  Going off the
2        record at 11:52 a.m.
3        (Luncheon recess.)
4              THE VIDEOGRAPHER:  We are back on
5        the record at 12:38.
6  BY MR. CARTMELL:
7      Q.    Ms. McGinn, we're back on the
8  record after a lunch break.  Are you ready to
9  proceed?
10      A.    I am, thank you.
11      Q.    Did you have a nice lunch?
12      A.    I've had better, but I've had
13  worse too so we're okay.
14      Q.    Okay, good.
15              Well, before we broke for lunch,
16  we were talking about, you'll recall, Exhibit 9,
17  which is the Rannizzisi letter that was sent
18  from the Drug Enforcement Administration to,
19  among others, manufacturers and distributors of
20  opioids.
21              You recall our conversation in
22  that regard?
23      A.    Yes.
24      Q.    Okay.  And I don't think I made

Page 137

1    this point, but I want to, and I don't mean to
2    put words in your mouth, but is it true that
3    these laws that require opioid manufacturers and
4    distributors to have safeguards that are
5    effective in place to prevent diversion of those
6    drugs, those laws are for safety purposes,
7    correct?
8            MR. ANDRISANI:  Objection, form.
9            THE WITNESS:  I'm sure that's one
10   aspect.
11   BY MR. CARTMELL:
12       Q.    In other words, safety of
13   individuals so that the drugs aren't diverted to
14   people who could abuse them or not even abuse
15   them and have overdoses and hospitalizations and
16   deaths, things like that, fair?
17           MR. ANDRISANI:  Objection to
18   form.
19           THE WITNESS:  It's there for
20   legitimate medical need.
21   BY MR. CARTMELL:
22       Q.    Okay.  All right.  Now, in
23   preparation for your deposition today, did you
24   read the deposition of Mr. Tomkiewicz?

Page 138

1        A.    I did not.
2        Q.    Okay.  Let's switch gears now,
3    and I want to talk about your time at Teva, and
4    I know we've talked about you started in October
5    approximately of 2011 as an employee of Teva.
6    For a period of time you were working in
7    facilities, manufacturing facilities; is that
8    right?
9        A.    I was at the R&D building, yeah.
10       Q.    And your compliance jobs during
11   that period of time had to do with compliance
12   with the manufacturing and storage and security
13   of those opioid-containing products; is that
14   right?
15       A.    Yes.
16       Q.    But at that point for a short
17   period of time, you were not overseeing the
18   suspicious order monitoring program, correct?
19       A.    At Cephalon -- which?
20       Q.    We're talking about once you got
21   to Teva in 2011.
22       A.    Yes.
23       Q.    For several months I think you
24   said that you weren't responsible for the

Page 139

1    suspicious order monitoring program, correct?
2        A.    Correct.
3        Q.    And then when you became the
4    director of the compliance department, DEA
5    compliance department, that's when you took over
6    the responsibilities for the suspicious order
7    monitoring program, correct?
8        A.    Correct.
9        Q.    Okay.  I take it that when you
10   started there at Teva and took over as the DEA
11   director that you needed to understand what
12   safeguards Teva had in place or what systems
13   were in place at Teva related to suspicious
14   order monitoring and other safeguards to prevent
15   the diversion of those opioids, correct?
16       A.    Correct.
17       Q.    And did you learn at that time
18   that Teva had never ever, prior to that time,
19   identified and reported a suspicious order of
20   opioids?
21       A.    I had learned that after a period
22   of time, yes.
23       Q.    Okay.  So, in other words, to
24   make it clear, if Mr. Hasler, the corporate

Page 140

1    representative of Teva who was deposed, is
2    correct and Teva has been selling opioids since
3    2006, from 2006 until 2012 or through 2012, Teva
4    had never once identified a single suspicious
5    order of opioids, correct?
6            MR. ANDRISANI:  Objection, form.
7            THE WITNESS:  That was my
8    understanding.
9    BY MR. CARTMELL:
10       Q.    And let's see how many years that
11   is.  2006 through 2012, that's seven years?
12       A.    Six.
13       Q.    Let's see, '06, '07, '08, '09,
14   '10, '11, '12, that's seven years?
15       A.    Okay.
16       Q.    So for seven years while selling
17   opioids and, as we've discussed, high risk
18   opioids, Teva had never identified a single
19   suspicious order of opioids from a customer; is
20   that correct?
21           MR. ANDRISANI:  Objection to
22   form.
23           THE WITNESS:  That's what I
24   heard.

Page 141

1  BY MR. CARTMELL:
2      Q.   Okay.  And did you, upon learning
3  that, set out to determine whether or not
4  possibly there was a problem with their
5  suspicious order monitoring program, such that
6  it actually wasn't identifying suspicious
7  orders?
8          MR. ANDRISANI:  Objection, form.
9          THE WITNESS:  When I came into
10         the group, it was my intention to
11         evaluate the program to see if
12         improvements were necessary.
13 BY MR. CARTMELL:
14     Q.   Okay.  And I take it part of that
15 reason why you maybe wanted to look to see if
16 improvements were necessary is because you
17 figured out that in seven years and hundreds and
18 hundreds of thousands of orders, they'd never
19 identified a single suspicious order; is that
20 true?
21         MR. ANDRISANI:  Objection, form.
22         THE WITNESS:  I sought out to see
23         if there was improvements because I had
24         little experience in dealing with a

Page 142

1  suspicious order monitoring program over
2      that many products, and it was -- I just
3      didn't have that much experience to know
4      whether it was right or not.
5  BY MR. CARTMELL:
6      Q.   When you -- strike that.
7          You just mentioned your
8  experience with suspicious order monitoring as
9  of September 12th when you started and took over
10 the suspicious order monitoring opioid program
11 at Teva, how much experience did you have with
12 overseeing a program like that?
13     A.   So I would have assumed SOM
14 responsibilities at Cephalon when I took the
15 associate director position, what did we say
16 that was 2010, in around there, but Cephalon's
17 world was much smaller than Teva's.  We had two
18 opioids and a very limited number of customers.
19 Teva was much larger, had many more products and
20 a lot more customers.
21     Q.   Okay.  And so I want to now let's
22 take a look at whether or not Teva, when you
23 started and took over the DEA compliance
24 department, actually had an effective suspicious

Page 143

1  order monitoring program in place that would
2  safeguard against and prevent diversion of the
3  opioids, okay?
4      A.   Okay.
5      Q.   Now, when you took over the DEA
6  compliance department, were you also responsible
7  for the facilities and manufacturing plants to
8  make sure that they were DEA compliant?
9      A.   Yes.
10     Q.   Okay.  So you had not only had to
11 determine whether or not the manufacturing
12 plants were in compliance with the DEA, you also
13 had to determine if Teva was in compliance
14 related to suspicious order monitoring, correct?
15     A.   Correct.
16     Q.   Okay.  And when you arrived at
17 Teva, was Teva doing what are called mock DEA
18 audits from time to time?
19     A.   When I took over at Teva?
20     Q.   Yes.
21     A.   I don't remember.
22     Q.   What is a mock DEA audit?
23     A.   It would be an audit that was
24 conducted with internal people to replicate what

Page 144

1  DEA would do in an inspection.
2      Q.   Okay.  And you're doing that why?
3      A.   Just to make sure that they're
4  compliant.
5          (Document marked for
6          identification as McGinn Deposition
7          Exhibit No. 10.)
8  BY MR. CARTMELL:
9      Q.   Okay.  Let me hand you what's
10 been marked as Exhibit 10.  Ms. McGinn, Exhibit
11 10 was produced to us from Teva's files and
12 actually from your custodial file in this
13 litigation, and this is an e-mail string
14 involving you and someone named Jason Gardner.
15         Do you see that?
16     A.   Yes.
17     Q.   Okay.  Now, the date of this
18 e-mail, if you start at the bottom, is
19 September 15th, 2012, and I think we've
20 established that that was right around the time
21 or very shortly after you took over as DEA --
22 excuse me -- director of the DEA compliance
23 department at Teva; is that right?
24     A.   Yes.

Page 145

1    Q.    And I take it during this period
2    of time you were trying to get up to speed and
3    determine whether or not Teva was in compliance
4    with DEA regulations and the law, correct?
5        A.    Correct.
6        Q.    Part of that was going around to
7    the facilities and trying to determine if they
8    were in compliance, right?
9        A.    Yes.
10       Q.    Okay. And let's start at the
11   bottom of this e-mail. It states "DEA Mock
12   Audit - Pomona."
13            What is Pomona?
14       A.    Pomona was one of the Teva
15   facilities in New York.
16       Q.    It states "Jason, I'm finding
17   that in Virginia, there is very little control
18   over product between registrations."
19            What does that mean?
20       A.    So the site has multiple
21   registrations with DEA, and it sounds like what
22   we were seeing is product moving between the
23   registrations without paperwork. We had saw
24   recordkeeping issues.

Page 146

1    Q.    You're talking about product, was
2    it an opioid product?
3        A.    I have no way of knowing that.
4        Q.    Okay. Well, it might tell us
5    later, but let me go on. It states, "Areas for
6    each registration are not marked and material is
7    not segregated at all."
8            Now, you're sending this e-mail.
9    Who is Jason Gardner?
10       A.    Jason reports to me.
11       Q.    He was in the DEA compliance
12   department at this time?
13       A.    Yes.
14       Q.    And he still is?
15       A.    He is.
16       Q.    What is his position?
17       A.    He is associate director DEA
18   compliance.
19       Q.    Okay. "Areas for each
20   registration are not marked and material is not
21   segregated at all."
22            When you're talking about
23   material, are you talking actually about the
24   product?

Page 147

1        A.    Yes.
2        Q.    I'm seeing -- and we're talking,
3    before I go on, we're talking about controlled
4    substances, right?
5        A.    Yes.
6        Q.    Because we're talking about the
7    DEA?
8        A.    Yes.
9        Q.    So these are actually narcotics,
10   Class II controlled substances, correct?
11       A.    It could be anywhere from
12   Schedule V to Schedule II.
13       Q.    Okay. "I'm seeing a lot of
14   problems with shipping material out on the wrong
15   registration number."
16            What does that mean?
17       A.    It means that the registration
18   referenced on paperwork was not the correct
19   registration number.
20       Q.    "Things received under the
21   distributor are being shipped out under the
22   manufacturer. Can you make sure Pomona has some
23   way to control that?"
24            And then he responds, Mr. Gardner

Page 148

1    responds to you later, "Of course. Sounds like
2    a huge mess. Hopefully this is isolated to
3    Virginia. How do they reconcile the inventories
4    at year end?"
5            And let me ask you, before I read
6    your e-mail back, but was Mr. Gardner also new
7    at Teva at that time?
8        A.    Jason was a Cephalon employee, so
9    we were just coming on at the same time to Teva.
10       Q.    So you and Jason were both new to
11   Teva in that you had been at Cephalon
12   previously, correct?
13       A.    Yes.
14       Q.    And you're just both trying to
15   figure out whether or not Teva has been
16   compliant with the DEA, right?
17       A.    Yes, I believe he was conducting
18   an internal audit at Pomona while I was in
19   Virginia.
20       Q.    Okay. And were you conducting
21   the internal audit in Virginia?
22       A.    Based on this e-mail, it looks
23   like I was probably in Virginia.
24       Q.    And is there a manufacturing

Page 149

1   facility in Virginia?
2       A.    Yes.
3       Q.    Does that facility or did it at
4   this time manufacture opioids?
5       A.    They must have, I mean, just
6   based on this e-mail.
7       Q.    Okay.  So you responded to
8   Mr. Gardner when he says that it's a huge mess
9   you say, "Well, I've been hearing for the last
10  10 months that it takes them 2-3 months for
11  reconcile.  Now I know why.  We just found a
12  discrepancy on the Fentanyl Year End Report for
13  2011.  It's a huge mess."
14          Do you see that?
15      A.    Yes.
16      Q.    And fentanyl is an opioid,
17  correct?
18      A.    Yes.
19      Q.    And so is it fair to say that
20  when you went to this facility and did your DEA
21  audit, you found that this facility was
22  noncompliant with DEA?
23          MR. ANDRISANI:  Objection, form.
24          THE WITNESS:  We found there were

Page 150

1   recordkeeping errors.
2   BY MR. CARTMELL:
3       Q.    Okay.  And is it fair to say when
4   you say it was a huge mess that this would have
5   been noncompliant if audited by the DEA?
6           MR. ANDRISANI:  Objection, form.
7           THE WITNESS:  Yes.  Can I just
8       add something to that?
9           MR. ANDRISANI:  No.  You have to
10      respond to questions.  I'm sorry.
11          THE WITNESS:  Okay, I'm sorry.
12  BY MR. CARTMELL:
13      Q.    Now, you mentioned that when you
14  became DEA compliance director in 2012, you were
15  doing an analysis of what types of safeguards
16  Teva had been doing related to preventing the
17  diversion of the opioids they were selling, and
18  that included an analysis of what their
19  suspicious order monitoring program had been
20  prior to you getting involved, correct?
21      A.    Yes.
22      Q.    And you were trying to determine,
23  I take it, whether it was effective in
24  identifying suspicious orders and safeguarding

Page 151

1   against diversion?
2       A.    I'm sorry.  Can you repeat the
3   question.
4       Q.    And I suspect you were trying to
5   determine whether this program for suspicious
6   order monitoring that is required by law was
7   effective in actually identifying suspicious
8   orders and safeguarding against diversion?
9           MR. ANDRISANI:  Objection, form.
10          THE WITNESS:  I was bringing
11      somebody in to see if there was some way
12      we could improve the system.
13  BY MR. CARTMELL:
14      Q.    Okay.  So is it fair to say that
15  when you say you wanted to bring somebody in to
16  improve it that you had determined in your
17  initial analysis that it needed improvements?
18      A.    Again, I didn't have experience,
19  enough experience to determine whether or not
20  this was an effective system for the number of
21  products they had over, you know, that period of
22  time.
23      Q.    But you knew enough, obviously,
24  to say that you wanted to bring somebody in to

Page 152

1   improve it, correct?
2       A.    To see if there was some way we
3   could.
4       Q.    Okay.  Was that analysis of the
5   suspicious order monitoring program and the
6   systems regarding safeguarding against the
7   diversion of opioids, was that analysis already
8   underway before you got there, or did you start
9   that?
10      A.    Before I got to Teva?
11      Q.    Yes, ma'am.
12      A.    I remember having the discussion.
13  I don't know if it had started before.  I don't
14  know what they discussed before I started with
15  the company, but when I took over the group, I
16  recommended that we bring somebody in.
17      Q.    Somebody in to do what?
18      A.    To see if there was a way to
19  improve the suspicious order monitoring program.
20      Q.    Okay.  And I guess my question is
21  do you know if that analysis had been done
22  before you got there, and maybe you don't?
23      A.    I don't.
24      Q.    Okay.  Who was your discussion

Page 153

1   with that you had to discuss bringing somebody
2   in to improve the suspicious order monitoring
3   program?
4        A.   I would have had to have a
5   discussion with my direct supervisor, Chris
6   Lowery.
7        Q.   And did you ask Mr. Lowery at
8   that time to bring in somebody who had more
9   experience with suspicious order monitoring?
10       A.   I'm sure I did.
11       Q.   Did you ask Mr. Lowery who was
12  actually handling the suspicious order
13  monitoring prior to you showing up?
14       A.   I knew who what was.
15       Q.   And that was Mr. Lowery?
16       A.   That was Dennis Ferrell.
17       Q.   I'm sorry, Mr. Ferrell.
18       And did you at that time learn
19  through Mr. Ferrell or Mr. Lowery what the
20  actual process had been prior to your arrival?
21       A.   I'm sure there was some
22  discussion about that.
23       Q.   Do you know, as you sit here
24  today, what that process had been prior to you

Page 154

1   arriving?
2        A.   I don't.  I don't remember.
3        Q.   I'm going to hand you what has
4   been marked as Exhibit 11.
5        (Document marked for
6   identification as McGinn Deposition
7   Exhibit No. 11.)
8   BY MR. CARTMELL:
9        Q.   And these are documents that were
10  produced in Teva's files in this litigation.
11  They're actually in a little different view for
12  some reason, and the front page has e-mails
13  involving you that are in the landscape style.
14  I learned that phrase.
15       A.   (Witness reviews document.)
16       Q.   Ms. McGinn, this exhibit, Exhibit
17  11, has on its cover page or first page e-mails
18  involving you and Dennis Ferrell and Chris
19  Lowery, who I think we've just talked about,
20  those were your superiors in the DEA compliance
21  department; is that correct?
22       A.   Yes.
23       Q.   And there's attachments to this
24  e-mail that we were produced, and we'll go

Page 155

1   through those, but if you start at the bottom,
2   the first e-mail, in May of 2012 you were
3   writing an e-mail to Mr. Ferrell and Mr. Lowery
4   about some findings you had related to a DEA
5   enforcement action against one of the big
6   distributing companies of opioids called
7   Cardinal Health; is that correct?
8        A.   Yes.
9        Q.   Okay.  And let me ask you, this
10  is May of 2012, was this the time period when
11  you had told your seniors that you all needed to
12  do some analysis and improving of the suspicious
13  order monitoring program?
14       A.   I don't know that I brought it up
15  or if I was directed to do it.
16       Q.   Okay.  But somebody at that time
17  had said, we need to do an analysis of our
18  suspicious order monitoring program and see if
19  we can improve it?
20       MR. ANDRISANI:  Objection, form.
21       THE WITNESS:  Yes, not just SOM,
22  but DEA compliance across the board.
23  BY MR. CARTMELL:
24       Q.   Okay.

Page 156

1        A.   So it wasn't isolated to SOM.
2        Q.   But these e-mails are related
3   specifically, if you look at the subject, to SOM
4   issues, correct?
5        MR. ANDRISANI:  Objection, form.
6        THE WITNESS:  Yes.
7   BY MR. CARTMELL:
8        Q.   And SOM again is suspicious order
9   monitoring?
10       A.   Yes.
11       Q.   All right.  And that's what the
12  DEA requires, correct?
13       A.   Yes.
14       Q.   All right.  It states "check this
15  out.  Mike Meggiolaro got a copy of the cardinal
16  court papers."
17       Do you see that?
18       A.   Yes.
19       Q.   And then you say some facts from
20  the Court papers that I take it are allegations
21  against Cardinal by the DEA for why they were
22  not following the law; is that fair?
23       MR. ANDRISANI:  Objection, form.
24       THE WITNESS:  That's information

1       that was forwarded to me by Mike
2  Meggiolaro.
3  BY MR. CARTMELL:
4       Q.    Okay.  It states, "Lack of site
5  visits which would have revealed that 40-42% of
6  the oxycodone prescriptions were paid for in
7  cash, an indicator of potential diversion under
8  Cardinal's policies."
9            Do you see that?
10      A.    Yes.
11      Q.    And as a DEA compliance employee
12  at this time who had worked in the industry for
13  many, many years, did you know that payments in
14  cash by customers was one of the factors often
15  that was looked at to determine whether or not
16  there was potential or suspicious orders going
17  on that might be -- lead to a diversion?
18      A.    It was something that DEA had
19  mentioned in a conference.  I don't know which
20  year they started mentioning it, but it had been
21  mentioned.
22      Q.    Okay.  It then says, Inadequate
23  investigation of the exponential increase of
24  oxycodone purchases by CV.

1            Do you see that, CVS?
2       A.    Yes.
3       Q.    That's CVS, the actual pharmacy?
4       A.    Yes.
5       Q.    That we all see on the street
6  corners?
7       A.    Yes.
8       Q.    Okay.  And oxycodone is a high
9  risk opioid, correct?
10      A.    Yes.
11      Q.    So what you're saying here is one
12  of the allegations by the DEA was that there was
13  a very large increase in an order for oxycodone,
14  and the claim was that Cardinal Health had not
15  done an adequate investigation of that?
16           MR. ANDRISANI:  Objection.  Tom,
17      I think she said that was forwarded
18      this by Mike Meggiolaro, so she's not
19      saying that.
20           MR. CARTMELL:  I'm sorry.  Let me
21      restate it.
22  BY MR. CARTMELL:
23      Q.    To explain what this says that
24  was forwarded to you by Mike, "inadequate

1  investigation of the exponential increase of
2  oxycodone," did you interpret that to mean that
3  one of the allegations against Cardinal was that
4  they had this very large increase in oxycodone
5  ordered, Cardinal Health did, and that they --
6  the allegation was they failed to adequately
7  investigate that increased order?
8       A.    That's what it says here, yes.
9       Q.    Okay.  And then it states,
10  "Awareness and approval of this dramatic
11  increase, raising the allowed threshold amounts
12  and sometimes disregarding the amounts."
13           And then it says "allowing almost
14  all shipments through, even those that had been
15  held for further inquiry."
16           What did that mean to you?
17      A.    I would interpret that as
18  allowing pended orders to be shipped.
19      Q.    So to explain to the jury, am I
20  right that you interpreted that to mean that
21  increased orders might be tagged or red flagged
22  as potentially suspicious, and this is saying
23  that Cardinal was letting all of those through,
24  even those that had been held for further

1  inquiry or investigation, fair?
2           MR. ANDRISANI:  Objection, form.
3           THE WITNESS:  What it says is
4      that they were allowing almost all
5      shipments to go through.
6  BY MR. CARTMELL:
7       Q.    Almost all orders, is that what
8  shipments would be?
9       A.    Yes.
10      Q.    Orders of opioids?
11      A.    Yes.
12      Q.    And then it says "failure to
13  report the two pharmacies to the DEA."
14           Do you see that?
15      A.    Yes.
16      Q.    What did that mean to you?
17      A.    I'm not sure exactly what he's
18  referring to there.  Apparently, two customers
19  were not reported to the DEA.
20      Q.    Why was it at this time in 2012
21  that you were looking into DEA enforcement
22  actions against other distributors of opioids?
23      A.    We were trying to gather as much
24  information as we could about suspicious order

Page 161

1    monitoring.
2         Q.   Why is that?
3         A.   To see if there were any
4    improvements that could be made to our program.
5         Q.   Do you know, as you sit here
6    today, whether or not anyone at Teva had tried
7    to gather all of this information about
8    suspicious order monitoring during the years
9    2006 to 2012?
10        A.   I wouldn't know that.
11        Q.   Okay.  Chris Lowery responds to
12   you by saying, "Okay - good job, add this to
13   your white paper."
14             Do you see that?
15        A.   Yes.
16        Q.   And were you actually putting
17   together a white paper at that time?
18        A.   I don't remember exactly what the
19   white paper he's referring to was.  I know that
20   we are collecting all the data and probably
21   trying to put something together as guidance.
22        Q.   And who was the white paper --
23   strike that.
24             Was the white paper, based on

Page 162

1    your memory and maybe this helps your
2    recollection, going to be a white paper that
3    described, in your mind, what was necessary for
4    an appropriate suspicious order monitoring
5    program?
6         MR. ANDRISANI:  Objection, form.
7         THE WITNESS:  I think that the
8         white paper was -- I don't actually
9         remember what the actual white paper
10        was, but I have to assume that it was a
11        description of all of the information we
12        had on suspicious order monitoring as a
13        comparator.
14   BY MR. CARTMELL:
15        Q.   Okay.  If you look at the
16   attachment up above it states, "DEA Suspicious
17   Monitoring Compliance Draft."
18             Do you see that?
19        A.   Where is it?  I'm sorry.  Oh, the
20   header.
21        Q.   Let me strike and restate it
22   again.
23             If you look at the top e-mail
24   from Chris Lowery to you, under attachments it

Page 163

1    states "DEA Suspicious Monitoring Compliant
2    Draft."
3             Do you see that?
4         A.   Yes.
5         Q.   Do you suspect that that's the
6    white paper that was being put together?
7         A.   I don't know.
8         Q.   It could be?
9         A.   It could be, it could maybe not
10   be.
11        Q.   And Chris Lowery, at least at
12   that time, says that you are the one putting the
13   white paper together, correct?
14        A.   That's what it says.
15        Q.   Okay.  If you go to the
16   attachments.
17             MR. ANDRISANI:  Tom, can I stop
18        you for a second.  Do you know why
19        there's not a 67.  Is it just a blank?
20        It looks like it goes 66 to 68.
21             MR. CARTMELL:  Oh, you're talking
22        about Bates?
23             MR. ANDRISANI:  Yeah, I'm sorry.
24             MR. CRAWFORD:  It may be that the

Page 164

1    second page just had --  I don't see the
2    disclaimer that was on the bottom of
3    that.  It may be that the disclaimer got
4    cut off or something.
5             MR. ANDRISANI:  Yeah, I didn't
6        know if it --
7             MR. CARTMELL:  We'll make sure to
8        check it out and whatever -- if there is
9        a page supplement the record with that
10       and put it in correctly.
11            MR. ANDRISANI:  Okay.
12   BY MR. CARTMELL:
13        Q.   Ms. McGinn, if you look at the
14   next page, which appears to be part of the
15   attachments to the e-mail between you and
16   Mr. Lowery, there is what is called an
17   "Executive Summary."
18             Do you see that?
19        A.   No.  I can see something.
20             MR. CARTMELL:  We found it.  It's
21       just a signature.
22             MR. ANDRISANI:  Okay, that's
23       fine.
24             MR. CARTMELL:  Okay.  You can put

Page 165

1    it in there, if you want.
2         MR. ANDRISANI:  I figured it must
3    have just been something that got copied
4    wrong.  Thank you.
5    BY MR. CARTMELL:
6         Q.    I'll start over.
7              Ms. McGinn, if you turn the page
8    to the attachments to the e-mails between you
9    and Mr. Lowery, there is what's titled an
10   "Executive Summary."
11             Do you see that?
12        A.    Yes.
13        Q.    Okay.  Did you prepare this?
14        A.    I don't remember.
15        Q.    Okay.  Let's go through this.
16             It states, "The goal is to create
17   a defendable position to meet the DEA
18   regulations and current DEA required practices."
19             Do you see that?
20        A.    Yes.
21        Q.    And is that consistent with your
22   memory that at that time you all were looking at
23   whether you had appropriate safeguards and
24   effective safeguards in effect at Teva to try to

Page 166

1    prevent diversion of the opioid products being
2    sold?
3         A.    We wanted to ensure that we were
4    meeting DEA regulations.
5         Q.    You want to make sure you were in
6    compliance, right?
7         A.    Yes.
8         Q.    Okay.  Because if you're not in
9    compliance, then you risk the DEA doing an audit
10   and potentially taking your license away to sell
11   those opioids, correct?
12        A.    Potentially, yes.
13        Q.    Okay.  It states, "This is
14   considered a compliance area in which we are 'at
15   risk' and therefore the highest priority should
16   be placed to close all gaps."
17             Do you see that?
18        A.    Yes.
19        Q.    Okay.  So correct me if I'm
20   wrong, but when you say "at risk," that's
21   something that are -- a term of art within your
22   industry, correct?
23             MR. ANDRISANI:  Objection.  She
24        said she didn't recall if she wrote

Page 167

1    this.
2         MR. CARTMELL:  Let me restate it,
3         subject to your objection.
4    BY MR. CARTMELL:
5         Q.    Ms. McGinn, it states "at risk,"
6    is your understanding that that is a term of art
7    within DEA compliance?
8         A.    A term of art.  It is a term that
9    we would use.
10        Q.    And you would use that because if
11   your company is at risk, you're recognizing that
12   you could be found by the DEA to not be
13   compliant and, therefore, lose your license or
14   be fined or have other actions taken against
15   your company, correct?
16             MR. ANDRISANI:  Objection, form.
17             THE WITNESS:  What we knew was
18        that everyone was at risk with
19        suspicious order monitoring.
20   BY MR. CARTMELL:
21        Q.    Right.  And "at risk" means you
22   know that if you're audited, potentially the DEA
23   can take your license away for one, correct?
24             MR. ANDRISANI:  Objection, form.

Page 168

1              THE WITNESS:  Yes.
2    BY MR. CARTMELL:
3         Q.    Or potentially you could suffer
4    millions of dollars in fines, correct?
5              MR. ANDRISANI:  Objection, form.
6              THE WITNESS:  Yes.
7    BY MR. CARTMELL:
8         Q.    And the result of being
9    noncompliant and at risk could increase the
10   likelihood that these opioids are actually not
11   being identified as suspicious and being
12   diverted, correct?
13             MR. ANDRISANI:  Objection, form.
14             THE WITNESS:  It could.
15   BY MR. CARTMELL:
16        Q.    So that's why this was the
17   highest priority at the company, correct?
18             MR. ANDRISANI:  Objection,
19        misstates the statement.
20             THE WITNESS:  It was a priority.
21   BY MR. CARTMELL:
22        Q.    Well, it says it was the highest
23   priority, correct?
24        A.    It was a high priority.

Page 169

1    Q.   And because of that you needed to
2   immediately spring into action with your
3   co-workers to try to close what is called the
4   gaps, correct?
5        A.   We were going to look at the
6   program to see if there were any improvements
7   that we could make to the program to make it
8   better.
9        Q.   But my question is a little bit
10  different.
11       What you state here or what is
12  stated here in this document which was in your
13  file was that you all were going to go to work
14  to try to close the gaps between being
15  noncompliant and compliant, correct?
16       MR. ANDRISANI:  Objection,
17  misstates it.
18       THE WITNESS:  We would do that
19  for any aspect of DEA compliance, that's
20  our job, is to make sure that we close
21  any and all gaps as we are aware of
22  them.
23       MR. CARTMELL:  Object and move to
24  strike.  I want to ask it again.

Page 170

1   BY MR. CARTMELL:
2        Q.   When you say here or what is said
3   here that you're going to close the gap --
4   strike that.
5        You know what's referred to as a
6   gap analysis?
7        A.   Yes.
8        Q.   That's sort of a term of art in
9   your industry as well, correct?
10       A.   Yes.
11       Q.   What is a gap analysis?
12       A.   It's identifying what's taking
13  place today versus the requirement.
14       Q.   Right.  You want to close the gap
15  between your current structure or system in
16  place and make sure to make it compliant,
17  correct?
18       A.   We want to make it effective,
19  yes.
20       Q.   You want to make it compliant,
21  right?
22       A.   And by being compliant, you'd to
23  be effective, yes.
24       Q.   Right.  So what was being said

Page 171

1   here in this executive summary was that this is
2   a -- the highest priority and you all were going
3   to go to work to close the gap to make sure that
4   you all would become compliant, correct?
5        MR. ANDRISANI:  Objection, form.
6        THE WITNESS:  We were going to
7        identify the gap and close any that we
8        identified.
9   BY MR. CARTMELL:
10       Q.   Right.  And then it states, "I
11  understand that there are two primary areas for
12  consideration.  They are, 1, Suspicious Ordering
13  Program," and it states "in good shape."
14       Do you see that?
15       A.   Yes.
16       Q.   Now, it's true, Ms. McGinn, that
17  that's actually not an accurate statement,
18  correct?
19       MR. ANDRISANI:  Objection.
20       THE WITNESS:  I don't know that.
21  BY MR. CARTMELL:
22       Q.   Well, you did know after getting
23  into this at Teva and going to work and finding
24  out the systems that they had in place that, in

Page 172

1   fact, the suspicious order monitoring program
2   needed improvements, correct?
3        A.   Yes.
4        Q.   And, in fact, at that time, that
5   program was putting the company at risk,
6   correct?
7        MR. ANDRISANI:  Objection, form.
8        THE WITNESS:  I don't -- again, I
9        don't know that I knew enough at the
10       time to say whether it was compliant or
11       not.  Again, I don't have the experience
12       to know that.
13  BY MR. CARTMELL:
14       Q.   And then 2, "Know your Customer
15  program," it says "not compliant," correct?
16       A.   That's what it says, yes.
17       Q.   And "not compliant" means not
18  compliant with the DEA, correct?
19       MR. ANDRISANI:  Objection, form.
20       THE WITNESS:  I don't know.
21  BY MR. CARTMELL:
22       Q.   You don't know?
23       A.   Yeah, I'm not sure.  Like I said,
24  I don't know who put this together.  It could

## Page 173

1  have been me.  It doesn't say what it's
2  compliant with.
3      Q.   Well, you work in the DEA
4  compliance department, you know what you're
5  talking about when you say not compliant, don't
6  you?
7      A.   Again, no, I said I didn't have
8  the experience overseeing a suspicious order
9  monitoring program the size and scope of Teva's
10 system.
11     Q.   I understand.
12         But whoever put this together,
13 you as the reader, as a DEA compliance expert at
14 that time, knew that when it said not compliant,
15 it was referring to not compliant with the DEA
16 regulations, correct?
17     A.   I would assume that it would need
18 some work.
19     Q.   You understood that that meant
20 not compliant with the DEA regulations, correct?
21     A.   It does not say that.  It just
22 says "not compliant."
23     Q.   Okay.  Is your testimony to the
24 jury that when it says "not compliant," you

## Page 174

1  didn't know whether or not that meant compliant
2  with DEA regulations?
3         MR. ANDRISANI:  Objection, asked
4  and answered.
5         THE WITNESS:  What I'm saying is
6  I'm not sure what the person who wrote
7  this intended that to say.
8  BY MR. CARTMELL:
9      Q.   Okay.  At any rate, whoever wrote
10 this intended to say that the suspicious order
11 monitoring program and the Know your Customer
12 program were putting the company at risk related
13 to DEA sanctions, and that needed to be the
14 company's highest priority to make improvements
15 and close the gaps, correct?
16         MR. ANDRISANI:  Objection, form.
17 It misstates what's on the paper.
18 BY MR. CARTMELL:
19     Q.   Go ahead.
20     A.   It says that it was a risk and we
21 should give it high priority.
22     Q.   Okay.  Below it says, "DEA will
23 use its authority to revoke and suspend
24 registrations in appropriate cases."

## Page 175

1         You see that?
2      A.   Yes.
3      Q.   Does that help you to understand
4  where it says under number 2 Know your Customer
5  program if they were talking about not being
6  compliant with the DEA?
7      A.   I would assume that that's what
8  they were referencing.
9      Q.   Okay.  Know your Customer
10 program, tell the jury what that is?
11     A.   It's looking into your customers,
12 knowing the background, the officers.  It's due
13 diligence on your customer.
14     Q.   And we saw the phrase due
15 diligence in the law from Mr. Rannizzisi in his
16 letter, correct?
17     A.   I think so.
18     Q.   And so the law requires for
19 manufacturers and sellers of opioids like Teva
20 that if they have potentially suspicious orders,
21 they have to do due diligence and actually do
22 investigation of those, correct?
23     A.   Yes.
24     Q.   And part of that investigation,

## Page 176

1  the DEA has said, is to get to know your
2  customers, correct?
3         MR. ANDRISANI:  Objection, form.
4         THE WITNESS:  Yes.
5  BY MR. CARTMELL:
6      Q.   And do investigation on your
7  customers to see if possibly they're involved in
8  suspicious activity related to controlled
9  substances, correct?
10         MR. ANDRISANI:  Objection, form.
11         THE WITNESS:  Yes.
12 BY MR. CARTMELL:
13     Q.   And what this document says is
14 that at this time, Teva was not compliant in
15 that regard, correct?
16         MR. ANDRISANI:  Objection.
17         THE WITNESS:  That's what it says
18 here.
19 BY MR. CARTMELL:
20     Q.   I want to ask you -- strike that.
21         And then if you go through the
22 next several pages, there is information put
23 together that summarizes, for example, the law
24 that we already went through from the DEA

Page 177

1    letter, correct?
2        A.    Yes.
3        Q.    And it -- you had gathered
4    information on what the best practices were for
5    a suspicious order monitoring program, correct?
6            MR. ANDRISANI:  Objection as to
7        form with respect to her preparing this.
8            THE WITNESS:  This document does
9        contain information about other
10       companies.
11   BY MR. CARTMELL:
12       Q.    I'll restate it to hopefully take
13   care of the objection.
14           And then the attachment pages
15   also include information that you or somebody
16   gathered about what the best practices are
17   related to having a suspicious order monitoring
18   program, correct?
19       A.    It looks like information that
20   was available.  I don't -- I have to look
21   through it to see if it's best practices
22   necessarily.  Oh, there is best practices.
23       Q.    You see that?
24       A.    Yes.

Page 178

1        Q.    Okay.  And then the DEA as far
2    back as the early 2000s had actually given
3    information to distributors of controlled
4    substances and manufacturers of controlled
5    substances of questions that might be asked to
6    customers to determine whether orders are
7    suspicious, correct?
8        A.    I believe so.
9        Q.    Okay.  And that's included in
10   here as well, correct?
11       A.    Yes.
12       Q.    And then I want to ask you about
13   the page at last three digits of the Bates 886.
14           Ms. McGinn, if you look at page
15   886, the title of that is "What are the current
16   challenges to industry to implement these
17   programs?"
18           Do you see that?
19       A.    Yes.
20       Q.    And that's -- that's when it says
21   programs referring to, I take it, suspicious
22   order monitoring programs?
23       A.    Yes.
24       Q.    And you'll see it's talking

Page 179

1    specifically about Teva challenges.
2            Do you see that?
3        A.    Yes.
4        Q.    Number 1 has to do with sales
5    downstream; is that right?
6        A.    Yes.
7        Q.    And we'll talk about this in some
8    detail, but one of the things the DEA wanted
9    manufacturers and distributors to do was to get
10   to know their customers and even get to know
11   their customers' customers, right?
12           MR. ANDRISANI:  Objection, form,
13       lacks foundation.
14           THE WITNESS:  The -- that was a
15       comment the DEA made.
16   BY MR. CARTMELL:
17       Q.    Okay.  And one of the ways you
18   know from your experience as a DEA compliance
19   officer is to actually gather information or do
20   due diligence on your customer's customer,
21   right?
22       A.    One of the things that we would
23   try to do is have some visibility downstream.
24       Q.    Right.

Page 180

1            It states, "We may be able to use
2    the data to identify high risk organizations."
3            Do you see that?
4        A.    Yes.
5        Q.    What data is that talking about?
6        A.    I have to assume it's the
7    chargeback and rebate information two bullets
8    above.
9        Q.    Oh, I'm sorry, two bullets above
10   it states, it may be possible to use
11   chargeback/rebate information to see customer
12   further down the supply chain, but the
13   information is only visible to indirect
14   shipments to wholesalers.
15           You see that?
16       A.    Yes.
17       Q.    And what is chargeback or rebate
18   data?
19       A.    It's a -- I'm trying to think how
20   to explain this.  There's a contract price for
21   drugs and if it -- one of our contracted
22   customers sells for less than the contracted
23   amount, they have the opportunity to apply for a
24   rebate or chargeback for the difference.

Page 181

1    Q.   I see.  And is it true that you
2  have learned as a DEA compliance expert that
3  that sort of data helps you to determine whether
4  or not orders are suspicious?
5    A.   It can give us visibility
6  downstream to see if there is suspicious
7  activity.
8    Q.   And at this time Teva had not and
9  was not using chargeback data to try to
10  determine whether or not there were suspicious
11  orders, correct?
12    A.   I really don't know what they
13  were doing at the time, before I got there.  I
14  think the document is saying that we could use
15  it.  I don't know if they were actually looking
16  at it.
17    Q.   Okay.  Well, it says we may be
18  able to use it, so doesn't that mean to you,
19  most likely, that they hadn't been doing it?
20    A.   I couldn't say whether they were
21  or not, to be honest.
22    Q.   Well, don't you know actually,
23  and we'll look at this later in your employment
24  file, but don't you know that, in fact, Teva

Page 182

1  didn't start using chargeback data until 2015?
2    A.   I couldn't tell you what Dennis
3  Ferrell did before I got to Teva or took over
4  the group in 2012.
5    Q.   You took over the group in 2012,
6  and you know that at that time chargeback data
7  was not being used, correct?
8    A.   Dennis Ferrell was not a part of
9  the process, and we were trying to figure out
10  what that process was.  It was probably not
11  being used.
12    Q.   And you know that when you took
13  over the program in 2012, it was not actually
14  then used until 2015, correct?
15    A.   I'm not -- I don't know what
16  year.
17    Q.   It then states, number 3,
18  "Balancing business relationships with DEA
19  reporting requirements - what are the legal
20  ramifications of refusing to fill an order and
21  reporting the order as suspicious to the DEA?"
22    Do you see that?
23    A.   Yes.
24    Q.   And business relationships you're

Page 183

1  talking about are the relationships between Teva
2  and the customers, right?
3    A.   Yes.
4    Q.   And is it true that when putting
5  together an appropriate anti-diversion
6  monitoring program related to opioids that the
7  business relationships are the sales and the
8  potential of losing those sales should not win
9  out over patient safety?
10    A.   Never.
11    Q.   It states in number 4, "Lack of
12  resources to conduct due diligence audits of
13  customers and to thoroughly investigate 'orders
14  of interest.'"
15    Do you see that?
16    A.   Yes.
17    Q.   So at this time when you joined
18  this organization, Teva and the DEA compliance
19  division, there was a lack of resources in the
20  division, correct?
21    MR. ANDRISANI:  Objection, form.
22    THE WITNESS:  There were a lack
23    of resources to conduct due diligence
24    audits from what this says.

Page 184

1  BY MR. CARTMELL:
2    Q.   Right.  And so at this point,
3  there was a lack of resources and it was
4  preventing Teva from doing adequate
5  investigations of the orders of interest,
6  correct?
7    MR. ANDRISANI:  Objection, form.
8    THE WITNESS:  Due diligence does
9    not have to be -- have to be an on site
10    visit.  I mean, there could be other due
11    diligence efforts to know your customer
12    without having to go through their site.
13    MR. CARTMELL:  Objection, move to
14    strike.
15  BY MR. CARTMELL:
16    Q.   My question is a little bit
17  different.
18    At the time you joined this
19  department and you were looking at whether or
20  not there was a valid compliant suspicious order
21  monitoring program, one of the challenges Teva
22  had is that there was a lack of resources to
23  allow your DEA compliance department to do due
24  diligence audits, correct?

Page 185

1    MR. ANDRISANI:  Objection, form.
2    THE WITNESS:  At the time this
3 was written, I was not in charge of the
4 group, but I -- when I took over the
5 group, I would say that we needed
6 dedicated people to do audits.
7 BY MR. CARTMELL:
8    Q.    Okay, I'm going to ask you this
9 question to see if I can get your answer to it.
10 If you can't answer it, that's fine, just tell
11 me.
12    At the time -- and I'm going to
13 try to correct the question because you said it
14 when you took over.
15    At the time that you were doing
16 this analysis or people were putting this white
17 paper together to determine whether or not the
18 suspicious order monitoring program was
19 appropriate and compliant, at that time,
20 according to this document, there was a lack of
21 resources at Teva to conduct due diligence
22 audits of customers, correct?
23    MR. ANDRISANI:  Objection, form.
24    THE WITNESS:  That's what it

Page 186

1 says.
2 BY MR. CARTMELL:
3    Q.    Okay.  And you found that
4 actually when you took over the department,
5 correct?
6    A.    I wanted more people in
7 suspicious order monitoring.
8    Q.    And it also says there was a lack
9 of resources to allow the company, Teva, to
10 thoroughly investigate orders of interest,
11 correct?
12    MR. ANDRISANI:  Objection, form.
13    THE WITNESS:  That's what it
14 says.
15 BY MR. CARTMELL:
16    Q.    And you found that too, when you
17 started taking over this department and the
18 suspicious order monitoring program, that there
19 was a lack of resources not adequately allowing
20 you to thoroughly investigate these potentially
21 suspicious orders, right?
22    A.    When I took over the group, I
23 wanted people dedicated to investigating orders
24 of interest.

Page 187

1    Q.    And there hadn't been that
2 before, had there?
3    A.    They had a team of people that
4 did suspicious order monitoring, plus other DEA
5 compliance activities.
6    Q.    And what you found, and do you
7 agree with this, that that lack of resources
8 actually was limiting the ability to thoroughly
9 investigate these potentially suspicious orders?
10    A.    That's what it says here.
11    Q.    And did you find that to be true?
12    A.    If we're looking backwards, I
13 couldn't tell you.  Looking forward, the way I
14 wanted it handled, I needed additional people.
15    Q.    Okay.  And then it states in
16 number 5, "Cooperation from customers - how much
17 are they willing to share and will inquiries
18 drive business away?"
19    Do you see that?
20    A.    Yes.
21    Q.    But, as we discussed, whether or
22 not you lose business and lose profits should
23 not be what drives you on whether or not to have
24 a valid program, correct?

Page 188

1    MR. ANDRISANI:  Objection, form.
2    THE WITNESS:  I'd agree.
3 BY MR. CARTMELL:
4    Q.    So this number 5, would you agree
5 with me, that shouldn't be anywhere in anybody's
6 mind about being relevant to whether or not you
7 have a valid program, correct?
8    MR. ANDRISANI:  Objection, form.
9    THE WITNESS:  I think it's listed
10 as a challenge.
11 BY MR. CARTMELL:
12    Q.    And it's a challenge because you
13 know from being in this industry for so long,
14 there's a sales side of these pharmaceutical
15 companies that their job is to sell as much
16 product as possible, correct?
17    MR. ANDRISANI:  Objection, form.
18    THE WITNESS:  They want to sell
19 as much pharmaceutical product to
20 legitimate customers as they can.
21 BY MR. CARTMELL:
22    Q.    Right.  And the reason they want
23 to sell as much as possible of these opioids,
24 for example, is because their bonuses in part

Page 189

1  depend on it, correct?
2          MR. ANDRISANI:  Objection, form.
3          THE WITNESS:  The salespeople?
4  BY MR. CARTMELL:
5      Q.    Yes.
6      A.    Honestly, every -- I don't know
7  what the salespeople do make, what their bonus
8  is, I don't know.
9      Q.    Salespeople sell, right?
10     A.    Yes.
11     Q.    And that's what this is talking
12  about is, you know, losing business is a
13  challenge for Teva when it comes to compliance,
14  correct?
15         MR. ANDRISANI:  Objection, form.
16         THE WITNESS:  I believe we were
17         saying it was -- what is being said here
18         is that it would be a challenge, whether
19         there was for customer service to deal
20         with, but somebody should be aware that
21         we were going to face some challenges
22         with the customers.
23  BY MR. CARTMELL:
24     Q.    And if you're compliant, right,

Page 190

1  as a pharmaceutical company and you are
2  identifying suspicious orders and you are
3  stopping those orders from shipping, the company
4  might lose sales, correct?
5          MR. ANDRISANI:  Objection, form.
6          THE WITNESS:  It's possible.
7  BY MR. CARTMELL:
8      Q.    And the sales side of the
9  company, you know from your experience might be
10 reluctant to allow that to happen, correct?
11         MR. ANDRISANI:  Objection, form.
12         THE WITNESS:  The sales team
13         would not want to damage a relationship
14         they had with a customer, but, you know,
15         would still -- they would still want to
16         be in compliance with regulations.
17  BY MR. CARTMELL:
18     Q.    Okay.  Now, all of this
19  preparation of the white paper and the material
20  that had been put together by someone in the
21  group related to the DEA regulations and the law
22  and the best practices, that was in preparation
23  for a meeting that you were going to have with
24  your superiors; is that correct?

Page 191

1      A.    Yes.
2      Q.    And I'm going to hand you Exhibit
3  12.
4         (Document marked for
5         identification as McGinn Deposition
6         Exhibit No. 12.)
7         [The following portion of this
8         transcript are deemed Attorneys' Eyes
9         Only.  As per counsel's instructions,
10        pages 192 through 199 are contained in a
11        separate booklet.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 200

1          THE VIDEOGRAPHER:  We are back on
2  the record at 2:02.
3          MR. ANDRISANI:  Thank you for the
4  break.  This is Nate Andrisani on behalf
5  of Teva, and after reviewing what was
6  marked as Exhibit 12 and counsel began
7  to ask questions about, we've determined
8  that this document in Teva's efforts to
9  comply with discovery and cooperate as
10 much as it could in producing documents
11 inadvertently produced a document that
12 is privileged.  It's to counsel.  It
13 appears to be seeking legal advice.  It
14 also refers to other discussions with
15 counsel, and, accordingly, we are
16 clawing back what was produced and
17 marked as Exhibit 12, which bears
18 Teva_MDL_A_06925565 through 588, clawing
19 that back and designating it as
20 privileged at this time.  We will take
21 steps to claw it back from everywhere
22 that it was inadvertently produced.
23         In speaking with counsel and
24 explaining the situation with counsel,

Page 201

1    we've agreed that for the time being,
2    the testimony that was presented on the
3    questioning with respect to Exhibit 12
4    will be -- we're moving to strike from
5    it the record officially but will be
6    deemed attorneys' eyes only and will be
7    redacted from the transcript that is
8    circulated amongst the parties in this
9    matter until time where the plaintiffs
10   can bring a motion either to declare
11   this not privileged or that it was -- or
12   the privilege was waived or that we can
13   defeat such a motion or if that can be
14   resolved between the parties externally,
15   but there will be no more questioning on
16   Exhibit 12 today.  It was inadvertently
17   produced as privileged information, and
18   we're clawing it back by agreement.
19       MR. CRAWFORD:  Okay.  And the
20   plaintiffs' response is that we disagree
21   that this is a privileged document or it
22   should be withheld based on privilege,
23   but we are mindful in understanding that
24   counsel is asserting the privilege here

Page 202

1    and asserting the claw back.
2        I'm not sure exactly how the
3    privilege and claw back procedures are
4    to apply in the instance of a deposition
5    and a deposition exhibit testimony, but
6    we, you know, fully intend to comply
7    with whatever orders might be
8    applicable.  In the event the orders
9    don't precisely fit the situation, we
10   are amenable to having the portions of
11   the transcript and the exhibit be
12   excerpted from the circulated draft of
13   the rough and the final until such time
14   as it is -- the issue is resolved and
15   that the excerpted or removed portions
16   would be for attorneys' eyes only and
17   not to be circulated outside of the
18   plaintiffs' attorneys and also to
19   potentially our privilege counsel,
20   Anthony Irpino.
21       MR. ANDRISANI:  Okay.  And then
22   it would be limited to -- and it would
23   be limited Teva's attorneys as well, the
24   other parties excluded.

Page 203

1        MR. CRAWFORD:  Exactly, Teva's
2    attorneys.  With that we're agreeable,
3    but we're going to check on the
4    procedures, and if there's any issue
5    there or change that there is, in fact,
6    addressed, we'll try to implement those
7    procedures.
8        The other thing we'd like to
9    assert too is that if it turns out this
10   is ruled to be not privileged, that we
11   reserve our right to recall the witness
12   and be able to question her on this
13   document on related topics.
14       MR. ANDRISANI:  Understood, thank
15   you.
16   BY MR. CARTMELL:
17   Q.    Ms. McGinn, we're back on the
18   record after a break.
19       Are you ready to proceed?
20   A.    Yes.
21   Q.    Before the break we were talking
22   about 2012 and your involvement with now trying
23   to implement a new suspicious order monitoring
24   program.

Page 204

1        Do you recall that?
2    A.    We were looking for improvements
3    to the program, yes.
4    Q.    Okay.  Well, you were going to
5    launch a new program, correct?
6    A.    Yes.
7    Q.    Okay.  And one of the things that
8    you were asked to do by your superiors was to
9    actually do a gap analysis related to the
10   program, correct?
11   A.    I don't recall if it was a gap
12   analysis or gathering data about suspicious
13   order monitoring.  Based on what I've seen here,
14   it was gathering data to say what should happen
15   or best practices or any information that we can
16   use to build a better program.
17   Q.    Let me -- strike that.
18       And the reason you want to make
19   sure you're building a better program or, as we
20   just discussed, launching a new program is
21   because you want to make sure that the program
22   is actually able to identify suspicious orders
23   and prevent diversion, correct?
24   A.    We want to stay on top of the

1  regulation and be compliant with DEA.
2      Q.    Well, is the goal just to be
3  compliant with the DEA, or is the goal the
4  safety of patients and people?
5          MR. ANDRISANI:  Objection, form.
6          THE WITNESS:  DEA writes
7      regulation for the safety of the
8      patients, and if we comply with the DEA
9      regulation, then, ultimately, yes, it's
10     for patient safety.
11 BY MR. CARTMELL:
12     Q.    Right, and we've already seen
13 that in one respect the program was found in the
14 executive summary to be noncompliant, correct?
15         MR. ANDRISANI:  Objection, form.
16         THE WITNESS:  A portion.
17 BY MR. CARTMELL:
18     Q.    And you don't want to do the bare
19 minimum, do you?
20     A.    No.
21     Q.    I mean, you want to do more than
22 just the bare minimum to ensure that these drugs
23 are not diverted and causing deaths and
24 overdoses and things like that, correct?

1      A.    We go over the bare minimum and
2  several aspects of DEA compliance.
3      Q.    So patient safety should be the
4  goal and shouldn't be trumped by whether or not
5  you were just meeting the bare minimum that the
6  DEA requires, correct?
7          MR. ANDRISANI:  Objection, form.
8          THE WITNESS:  My job is to ensure
9      that we're in compliance with DEA
10     regulations or better.
11 BY MR. CARTMELL:
12     Q.    Or better so that patients are
13 safe, right?
14         MR. ANDRISANI:  Objection to
15     form.
16         THE WITNESS:  Ultimately, yes.
17     (Document marked for
18     identification as McGinn Deposition
19     Exhibit No. 13.)
20 BY MR. CARTMELL:
21     Q.    I'm going to hand you what's been
22 marked as Exhibit 13.
23         Exhibit 13 was produced from
24 Teva's internal files in this litigation and

1  from your custodial file specifically, and as
2  you can see, this is a PowerPoint presentation
3  titled "Suspicious Order Monitoring."
4          Do you see that?
5      A.    Yes.
6      Q.    And, actually, I think you put
7  this together; is that right?
8      A.    I believe I did.
9      Q.    And who did you present this to;
10 do you know?
11     A.    I don't remember if this was for
12 the team of people that Chris was presenting to
13 for buy in to the program.  I don't remember if
14 it was to Chris.  I don't remember.
15     Q.    Okay.  If you go to the second
16 page, you have a slide titled "Complete SOM
17 Solution."
18         Do you see that?
19     A.    Yes.
20     Q.    Complete suspicious order
21 monitoring solution; is that right?
22     A.    Yes.
23     Q.    And it looks like from this, it's
24 talking about what you believe, based on your

1  research at that time, is required for a full
2  and robust suspicious order monitoring program?
3      A.    Based on the information I had at
4  the time, yes.
5      Q.    Okay.  And at this time, based on
6  all the information you had, you felt that you
7  not only needed to do first line customer
8  vetting of customers, you needed to do an
9  analysis of the customer orders and then
10 subsequently downstream customer monitoring,
11 correct?
12     A.    Yes.
13     Q.    Okay.  And you couldn't recall if
14 you did an actual gap analysis, but if you take
15 a look at slide 5.
16     A.    Yes.
17     Q.    Actually, this might be a page
18 off.  There's a slide that is titled "Gap
19 Assessment."
20         Do you see that?
21     A.    That's 6, yes.
22     Q.    And so does this refresh your
23 recollection that, in fact, you did do a gap
24 assessment on the suspicious order monitoring

Page 209

1    program?
2        A.    Yes.
3        Q.    And as we saw previously in the
4    executive summary that was produced from the
5    files, the goal of your company actually making
6    this the highest priority was to try to close
7    the gap and make the program compliant, correct?
8            MR. ANDRISANI:  Objection, form,
9        lacks foundation.
10           THE WITNESS:  It was to make sure
11       that the program was in compliance.
12   BY MR. CARTMELL:
13       Q.    Okay.  And the way to do that is
14   close the gaps, right?
15       A.    Yes.
16       Q.    Okay.  And so, for example, I
17   want to explain sort of to the jury what your
18   slide here means, but on the left, if you look
19   under "Activity," that is the -- sort of the
20   first prong of what you thought was an
21   appropriate suspicious order monitoring program,
22   and that was "first-line customer vetting,"
23   correct?
24       A.    Yes.

Page 210

1        Q.    And do you mean by that for
2    all of Teva's customers that were ordering, for
3    example, opioids, Teva needed to actually do
4    some due diligence things and investigate those
5    customers to make sure that they didn't have
6    suspicious activity going on, for example?
7        A.    Yes.
8        Q.    And then you say current
9    suspicious order monitoring program, you mean
10   the current program at Teva, right?
11       A.    At the time, yes.
12       Q.    And so all that was being done at
13   Teva at this time was that Teva was checking
14   bank references of the clients and also Dunn and
15   Bradstreet reports for the clients, correct?
16           MR. ANDRISANI:  Object to the
17       form.
18           THE WITNESS:  Based on the
19       information I had at the time, that's
20       what I understood the current program to
21       be.
22   BY MR. CARTMELL:
23       Q.    Right, and you were asked to
24   investigate this by your superiors, correct?

Page 211

1        A.    Yes.
2        Q.    Okay.  And I take it you did a
3    full and complete investigation?
4        A.    I hope so.
5        Q.    Okay.  Well, then there's this
6    big blanks below that and that blank space
7    basically is the gap that needs to be filled in,
8    correct?
9            MR. ANDRISANI:  Objection, form.
10           THE WITNESS:  I don't know that
11       that's the blank space.  It's just blank
12       space because there's more on the model
13       program than is on the current.
14   BY MR. CARTMELL:
15       Q.    Okay.  Because all you were doing
16   at that time was those two things, correct?
17           MR. ANDRISANI:  Objection.
18           THE WITNESS:  That's my
19       understanding.
20   BY MR. CARTMELL:
21       Q.    Okay.  And then the last -- the
22   last thing you look at is what you call a model
23   suspicious order monitoring program?
24       A.    Yes.

Page 212

1        Q.    And that is a program that you
2    thought would be in compliance and satisfying
3    the law of the DEA?
4            MR. ANDRISANI:  Objection.
5            THE WITNESS:  That's a program
6        that I thought at the time would be in
7        compliance with DEA.
8    BY MR. CARTMELL:
9        Q.    Okay.  And there's lots of things
10   listed there that needed to be done in order to
11   appropriately first line customer vet, correct?
12       A.    Yes.
13       Q.    For example, on-site visits to
14   the customer, correct?
15       A.    Yes.
16       Q.    That was done being done by Teva,
17   right?
18           MR. ANDRISANI:  Objection, lacks
19       foundation.
20           THE WITNESS:  Not that I know of.
21   BY MR. CARTMELL:
22       Q.    Okay.  And there needed to be a
23   customer responsibility agreement, right?
24       A.    DEA doesn't require that, but

Page 213

1  that was my idea for a model program.
2      Q.   And Teva was not doing that,
3  correct?
4      A.   No.
5      Q.   There needed to be a customer
6  self-assessment questionnaire, right?
7      A.   Again, not specifically called
8  out in a DEA regulation, but it was an idea that
9  I came up with.
10      Q.   Okay.  But you also, from the
11  documents I've seen in your file, you also were
12  talking to representatives of other companies,
13  for example, correct?
14      A.   Yes.
15      Q.   And you were asking them what
16  they did for their suspicious order monitoring
17  programs, right?
18      A.   Yes.
19      Q.   In fact, you talked to
20  representatives of Mallinckrodt?
21      A.   Yes.
22      Q.   And that's another pharmaceutical
23  company that sells -- manufactures and sells
24  opioids, correct?

Page 214

1      A.   Yes.
2      Q.   And some of these ideas that you
3  got came from what other manufacturers of
4  opioids were already doing in their programs,
5  correct?
6      A.   Yes.
7      Q.   Okay.  But Teva -- Teva wasn't
8  doing either the customer responsibility
9  agreement or the self-assessment questionnaire,
10  correct?
11      A.   Correct.
12      Q.   You said that there should be a
13  risk score assignment for each of the customers,
14  correct?
15      A.   Yes.
16      Q.   And Teva wasn't doing that,
17  correct?
18      A.   No.
19      Q.   You said that there needed to be
20  a method for reporting unusual transactions,
21  correct?
22      A.   Yes.
23      Q.   And Teva was not doing that
24  either, correct?

Page 215

1      A.   They did not have a written
2  method for reporting unusual transactions.
3      Q.   But you felt they needed one,
4  right?
5      A.   Yes.
6      Q.   If you go to the next page of
7  your gap assessment the activity listed is
8  "SORDS."
9          Do you see that?
10      A.   Yes.
11      Q.   What is SORDS?
12      A.   That was Teva's electronic
13  database that all of the controlled substance
14  orders ran through for evaluation.
15      Q.   So let me -- let me see if I
16  understand that.
17          Does that mean when orders would
18  come in for, for example, opioids from
19  customers, they would put -- be put through this
20  computer algorithm called SORDS?
21      A.   Yeah, all control -- the
22  controlled substances would go through SORDS.
23      Q.   Okay.  And was SORDS supposed to
24  be the first line sort of step or computer

Page 216

1  algorithm that would flag potentially suspicious
2  orders?
3          MR. ANDRISANI:  Objection.
4          THE WITNESS:  It was the
5      computerized algorithm that would flag
6      potentially suspicious orders.
7  BY MR. CARTMELL:
8      Q.   Okay.  And you say that the
9  current program at Teva included validation of
10  the customer's DEA registration, right?
11      A.   Yes.
12      Q.   So you would just make sure that
13  your customer had a valid license, right?
14      A.   Yes.
15      Q.   And then Teva would also verify
16  normal ordering patterns based on 24 months of
17  historical data by that product class, correct?
18      A.   Yes.
19      Q.   So that was the two -- I'm not a
20  computer guy, but the two factors that the SORDS
21  algorithm would look at to try to flag
22  potentially suspicious orders, fair?
23          MR. ANDRISANI:  Objection, lacks
24      foundation.

Page 217

1       THE WITNESS:  That's what I
2   understood at the time.
3   BY MR. CARTMELL:
4       Q.   Okay.  And then you looked at the
5   gap between what Teva was doing and what you
6   thought based on all your research and talking
7   to other companies and reviewing the literature
8   and talking to consultants what a model computer
9   algorithm product should be, correct?
10      A.   Yes.
11      Q.   And that includes that the
12  computer program for a model program should look
13  at orders of unusual size, frequency or
14  deviating from a normal pattern, right?
15      MR. ANDRISANI:  Object to form.
16      THE WITNESS:  Yes.
17  BY MR. CARTMELL:
18      Q.   And it's true that at the time
19  that you did this gap assessment, the computer
20  algorithm that Teva was using was not actually
21  able to identify orders that were unusual
22  frequency or deviating from the normal pattern,
23  correct?
24      MR. ANDRISANI:  Objection.

Page 218

1       THE WITNESS:  The computer system
2   did not do that, but that does not mean
3   it wasn't being done manually.
4   BY MR. CARTMELL:
5       Q.   Okay.  But when you're talking
6   about SORDS, we know that Teva's computer
7   program was not doing anything but identifying
8   orders of unusual size, right?
9       A.   The computer program, yes.
10      Q.   Okay.  And just so it's clear to
11  the jury, we know that the actual law, the
12  regulations from the DEA say that you have to
13  look not only at suspicious orders based on
14  unusual size but also based on unusual frequency
15  or those that deviate from the normal pattern,
16  correct?
17      A.   Yes, but it doesn't say that it
18  all has to be done electronically, doesn't say
19  how to do that.
20      Q.   I understand.  I understand.
21      A.   Yes.
22      Q.   But it's just required to look at
23  all those things and make sure you're looking at
24  all those things to try to determine if an order

Page 219

1   is suspicious?
2       A.   That's the regulation, but it
3   doesn't say how to do it.
4       Q.   Okay.  Then, secondly -- strike
5   that.
6       But you felt that the computer
7   program should have that capability, and
8   currently at Teva it didn't, correct?
9       MR. ANDRISANI:  Objection, form.
10      THE WITNESS:  I felt that the
11      program should have it, and if a
12      computerized system could do it, then we
13      should have the computerized system take
14      care of the other components.
15  BY MR. CARTMELL:
16      Q.   And it's true, isn't it, that
17  when you talked to other companies, distributors
18  and manufacturers, you found out that their
19  computerized systems actually did that?
20      A.   I don't know at the time this was
21  written that I knew that.
22      Q.   You figured that out later?
23      A.   Yes.
24      Q.   Okay.  You also state that the

Page 220

1   computerized program should look at a comparison
2   of the order with registrants or other customers
3   of the same type, right?
4       A.   Yes.
5       Q.   And so an example of that would
6   be if the customer, for example, was a wholesale
7   distributor that was a small wholesale
8   distributor, for example, you would want to
9   compare that size wholesale distributor to other
10  customers of that size, correct?
11      A.   Yes.
12      Q.   And, currently, at this time when
13  you were doing your gap assessment, Teva's
14  program was not looking at that, correct?
15      A.   It doesn't appear that it was at
16  the time.
17      Q.   Okay.  You also wanted your
18  computer program to look at the location
19  actually of the customer, right?
20      A.   I wanted a review of the customer
21  location to be included in an SOM program.
22      Q.   Well, did you want it --
23      A.   Whether or not the computer could
24  do it or not remained to be seen.

Page 221

1    Q.    Okay.  And is the reason why you
2  wanted the location to be included because, as a
3  DEA expert, you knew that there were certain
4  locations in the country where, for example,
5  diversion of opioids or other controlled
6  substances is greater than other places?
7    A.    Yes.
8    Q.    Okay.  For example, at this time
9  Florida, correct?
10    A.    Yes.
11    Q.    Okay.  But Teva's system at the
12  time at least was not including that type of
13  information in the analysis, correct?
14    A.    It didn't appear so at the time,
15  no.
16    Q.    Okay.  Then you wanted the
17  computerized algorithm to also look at RiskMap
18  or REMS data.
19        Do you see that?
20    MR. ANDRISANI:  Objection, form.
21    THE WITNESS:  Yeah, I don't want
22    to say that I wanted the computerized
23    system, the algorithm to look at RiskMap
24    or REMS, but it should be -- we should

Page 222

1  review the RiskMap or REMS data in the
2  program in its entirety.
3  BY MR. CARTMELL:
4    Q.    I see.  Whether or not it's done
5  by the computer?
6    A.    Right.
7    Q.    And we know that at this time,
8  though, Teva's suspicious order monitoring
9  program was not doing that, correct?
10    A.    I do not believe that Teva had a
11  REMS program in place at the time.  We brought
12  REMS with the Fentora and Actiq from Cephalon.
13  They may not have -- I don't think that they had
14  REMS programs for any of their products.
15    Q.    Did they have RiskMap?
16    A.    I don't know.
17    Q.    Okay, but -- okay.
18        Next it states, "Breadth and type
19  of products ordered."  You wanted the program to
20  include a look at that information, correct?
21    MR. ANDRISANI:  Objection, form.
22    THE WITNESS:  Yes.
23  BY MR. CARTMELL:
24    Q.    And, currently, Teva's product or

Page 223

1  program was not doing that, correct?
2    A.    Yes.
3    Q.    And then, finally, you wanted
4  orders of interest investigations done through a
5  proceduralized process and to be reviewed by an
6  oversight committee?
7    A.    Yes.
8    Q.    And those things were not
9  currently being done at Teva, correct?
10    A.    I do not believe that there were
11  written procedures in place at Teva.  They may
12  have had a procedure but not in writing and --
13    Q.    You just don't recall?
14    A.    I don't remember.
15    Q.    Okay.
16    A.    They had a -- they had a system,
17  they had a procedure, I don't think that it was
18  in writing.
19    Q.    Okay.  But you also wanted there
20  to be an oversight committee that would be
21  formed to monitor this program, correct?
22    A.    I wanted an oversight committee
23  to review any potential actions, any results of
24  investigations so that we weren't the only ones

Page 224

1  making a decision.
2    Q.    And Teva wasn't doing that when
3  you took over, correct?
4    A.    Not that I know of.
5    Q.    Okay.  And so from perspective of
6  the gap analysis related to the computer
7  algorithm, there were big gaps between what Teva
8  was doing and what you felt should be done,
9  correct?
10    MR. ANDRISANI:  Objection, form.
11    THE WITNESS:  Again, all of the
12    things I have listed in the model
13    program did not necessarily have to be
14    taken care of by a computerized
15    algorithm but should be a part of the
16    program in its entirety.
17  BY MR. CARTMELL:
18    Q.    I understand, but you wouldn't
19  have put these things here if they were
20  currently being done by Teva, correct?
21    A.    Agreed.
22    Q.    Okay.  So my point is there were
23  big gaps between what you looked at in the
24  program, whether it's SORDS or not, related to

Page 225

1    what you think -- you thought the program should
2    do, correct?
3        MR. ANDRISANI:  Objection, form.
4        THE WITNESS:  There were things
5        that I thought that could be improved
6        than what they were currently doing.
7    BY MR. CARTMELL:
8        Q.    It was multiple things, correct?
9        A.    Multiple things.
10       Q.    Okay.  If you go to the next
11   page -- let me ask you, because I forgot to,
12   about SORDS.
13          Was SORDS the computer program
14   that Cephalon was using and brought over with
15   them?
16       A.    No.
17       Q.    Teva already had it?
18       A.    Yes.
19       Q.    What was the computer program
20   that Cephalon was using?
21       A.    There was not a computer program.
22       Q.    Was there any type of computer
23   algorithm at Cephalon at all?
24       A.    There was not a computer program

Page 226

1    at Cephalon.  We had a third party distributor,
2    from what I can recall, that had a computerized
3    system.
4        Q.    Was Cephalon actually using a
5    third party to do their suspicious order
6    monitoring?
7        A.    We -- when I say "we," Cephalon
8    reviewed the orders manually, processed them,
9    sent them to the third party, and then those
10   orders would have been processed through their
11   electronic system, but we ultimately reviewed
12   and approved before it got to them.
13       Q.    I'm confused, because when they
14   would be reviewed by you and then sent to them,
15   was that -- were those orders sent to them to
16   try to do some algorithm to find out if they
17   were suspicious or not?
18       A.    I think it was a second review,
19   say that Cephalon reviewed orders manually,
20   looked to see if there was anything out of line.
21   If there was, and it was not done by me, it was
22   done by the distribution and logistics people,
23   if there was anything suspicious, they would
24   have reported it to me, and then those orders

Page 227

1    would have been sent to the distribution center
2    and processed through their electronic system.
3        Q.    Who is the third party that would
4    process those?
5        A.    It was Cardinal Health.
6        Q.    So is it correct to say that
7    Cephalon was using Cardinal Health in some
8    respects to help with their suspicious order
9    monitoring?
10       A.    It would have been a second level
11   review.
12       Q.    Okay.  And was Cardinal Health an
13   actual customer of Cephalon's?
14       A.    Cardinal would have -- I'm
15   guessing that Cardinal would have been a
16   customer of Cephalon's.
17       Q.    Like the biggest customer?
18       A.    One of the big three, yes.
19       Q.    Okay.  The next page of your gap
20   assessment, the activity that you're looking at
21   is what's called "know your customer's
22   customer," correct?
23       A.    Yes.
24       Q.    And just to refer back, this is

Page 228

1    one of the areas in the executive summary that
2    we looked at that was found to be noncompliant
3    at this time, correct?
4        A.    Was it know your customer or know
5    your customer's customer that was found to be
6    noncompliant?
7        Q.    I'm sorry.  It may have been know
8    your customer.  I think it was.
9        A.    Okay.
10       Q.    Okay.  This is different than
11   that?
12       A.    Yes.
13       Q.    Okay.  But at this time, you felt
14   like a model suspicious order monitoring program
15   should include activities of Teva trying to know
16   their customer's customers, right?
17       A.    It was trying to know what our
18   customers' customers did with our product
19   downstream.
20       Q.    And because it gets kind of
21   confusing when you say customer's customer, I
22   want to try to explain it for the jury and give
23   an example.  Sometimes that makes it easier.
24          But, for example, if let's say

Page 229

1    one of the big three, AmerisourceBergen has
2    ordered a bunch of opioids from Teva and then
3    AmerisourceBergen is going to distribute those
4    opioids to a pharmacy in Florida, the pharmacy
5    in Florida would be Teva's customer's customer,
6    correct?
7            MR. ANDRISANI: Objection, form.
8            THE WITNESS: Yes.
9    BY MR. CARTMELL:
10       Q.    Okay. So what you're saying is
11   you thought, based on all your research and
12   talking to other companies and looking at the
13   DEA guidelines and best practices submissions,
14   that to be compliant you all needed to have in
15   your program some investigation of that to make
16   sure that you were identifying appropriately
17   suspicious orders of opioids, fair?
18           MR. ANDRISANI: Objection, form,
19       misstates the testimony.
20           THE WITNESS: To improve our
21       program I thought we should do whatever
22       we could to know what was happening with
23       our product downstream.
24   BY MR. CARTMELL:

Page 230

1        Q.    I understand.
2            But you knew from talking to
3    other representatives of other manufacturers and
4    distributors that they had been doing that,
5    correct?
6        A.    I knew that other distributors
7    had chargeback information to evaluate.
8        Q.    And you also knew that Teva was
9    not doing anything related to knowing your
10   customer's customer at this point, correct?
11       A.    That was my understanding.
12       Q.    Okay. And so the gap was you
13   felt like rather than do nothing in that regard,
14   Teva should use Value Centric or chargeback data
15   to evaluate the risk from your customer's
16   customer, correct?
17       A.    Yes.
18       Q.    Okay. And, in fact, I've seen
19   documents on this, and we'll talk about this a
20   little bit more, but at this time, Teva had
21   chargeback data, correct?
22       A.    They had some chargeback data.
23       Q.    And I've seen indications in the
24   document that it was approximately like 51% of

Page 231

1    the generic opioids had data like that; is
2    that --
3        A.    That's my understanding.
4        Q.    Okay. So but even though Teva
5    had this chargeback data on 51% of the products,
6    it wasn't using any of that data at this time,
7    correct?
8            MR. ANDRISANI: Objection.
9            THE WITNESS: That's my
10       understanding.
11   BY MR. CARTMELL:
12       Q.    And you knew at this time, in
13   2012, from your work with the DEA that, in fact,
14   the DEA was requiring companies to use that data
15   to try to find and identify suspicious orders,
16   correct?
17           MR. ANDRISANI: Objection, form.
18           THE WITNESS: DEA was suggesting
19       that you use chargeback data, but it was
20       not specified in the regulation.
21   BY MR. CARTMELL:
22       Q.    DEA was requiring it, weren't
23   they?
24           MR. ANDRISANI: Objection.

Page 232

1            THE WITNESS: A requirement would
2        be in the regulation. They suggested
3        that we use the chargeback data if we
4        had it. It is not a regulation.
5    BY MR. CARTMELL:
6        Q.    I understand it wasn't a
7    regulation, but your understanding, based on the
8    documents that I've reviewed, was that you
9    believed DEA was requiring it; is that true?
10           MR. ANDRISANI: Objection.
11           THE WITNESS: DEA was suggesting
12       that we use and look at chargeback data.
13   BY MR. CARTMELL:
14       Q.    And you wanted the program to be
15   able to look at that data quarterly, correct?
16       A.    Yes.
17       Q.    And, in fact, it was not until
18   2015 that Teva started using chargeback data to
19   identify potentially suspicious orders, correct?
20           MR. ANDRISANI: Objection, form.
21           THE WITNESS: I don't know what
22       year we started doing that.
23   BY MR. CARTMELL:
24       Q.    Okay. We'll come back to that.

Page 233

1        Now, I think that completes your
2   gap assessment that you had done; is that
3   correct?
4        A.   Yes.
5        Q.   Okay.  Fair to say would you
6   agree with me that when you did this assessment
7   and actually got in there, looked at everything
8   that Teva was doing in their suspicious order
9   monitoring program versus all the information
10  you gathered and what you thought the program to
11  identify suspicious orders should look like that
12  there were very large gaps there?
13       A.   I would agree there was room for
14  improvement.
15       Q.   Okay.  Would you agree that there
16  were very large gaps?
17       A.   I would agree that there were
18  gaps and there were several things that we could
19  do to improve it.
20       Q.   Okay.  The next slide is actually
21  dealing with the costs to set up this new
22  program for suspicious order monitoring that you
23  were going to launch, correct?
24       A.   Yes.

Page 234

1        Q.   And I want to go through this
2   real quick, but the bottom line is that you were
3   asking your superiors for money to help make
4   this program better able to identify suspicious
5   orders, fair?
6        A.   Yes.
7        Q.   Okay.  And according to your
8   calculations, it was going to cost a little more
9   than half a million dollars to do that, right?
10       A.   In-house, yes.
11       Q.   Okay.  What does that mean?
12       A.   If we did the work ourselves, if
13  we hired people and did it ourselves, it was
14  about 500,000.
15       Q.   Okay.  And when you say
16  "in-house", you did mention hiring people and,
17  actually, you have up there I think --
18       A.   Yes.
19       Q.   Yeah, a cost for doing that?
20       A.   Yes.
21       Q.   Hire two FTEs for 150,000
22  approximately?
23       A.   Yes.
24       Q.   What are FTEs?

Page 235

1        A.   Full-time employees.
2        Q.   And did you, in fact, get
3   authority from your superiors to do that?
4        A.   Yes.
5        Q.   If you turn the page, you talk
6   about developing a SOM implementation task
7   force, right?
8        A.   Yes.
9        Q.   And you talk about who you wanted
10  to be on that task force, and that was
11  members -- or a member from diversions
12  operations, legal, commercial sales, IT and
13  customer service, right?
14       A.   Yes.
15       Q.   Was that program set up?
16       A.   I don't -- I don't know.  I mean,
17  we would have had to consult with each one of
18  those people to change the SOM system.  We would
19  have had to have input from all these people.  I
20  don't recall ever having a meeting called the
21  task force meeting, but we would have consulted
22  with a representative from each one of these
23  departments.
24       Q.   Okay.  But this task force was

Page 236

1   going to be put together so that you could
2   implement this new program in a timely fashion,
3   correct?
4        A.   Yes.
5        Q.   And then the next page is next
6   steps and talks about program launched by a
7   third party.
8             What do you mean by "third
9   party"?
10       A.   A contractor.
11       Q.   What do you mean a contractor, a
12  consultant?
13       A.   A consultant.  I'm sorry,
14  consultant.
15       Q.   You're talking about an outside
16  consultant?
17       A.   Yes.
18       Q.   And did you, in fact, hire an
19  outside consultant to help you with implementing
20  the new program for suspicious order monitoring?
21       A.   We consulted with a third party
22  to talk about developing the architecture for a
23  new program.
24       Q.   And was that Ronald Buzzeo?

Page 237

1    A.   Yes.
2    Q.   Okay.  And Ronald Buzzeo is
3  somebody that you've worked with for a long
4  time?
5    A.   Yes.
6    Q.   You speak at his seminars
7  sometimes?
8    A.   Sometimes.
9    Q.   He's sort of a guru on DEA
10  compliance?
11    A.   He's been around for a very long
12  time.
13    Q.   You call him an expert, right?
14    A.   I would.
15    Q.   Okay.  And then the next slide
16  talks about hiring two diversion investigators.
17  Was that the FTEs?
18    A.   Yes.
19    Q.   So was there actually an ask by
20  you of your superiors to hire three people?
21    A.   No.  I don't recall.  I think we
22  were just talking about two people.  Ultimately,
23  we ended up with a manager and an investigator.
24    Q.   Okay.  All right.  I'm done with

Page 238

1  that exhibit, but before we go on, just because
2  we were talking about it, I'm going to hand you
3  a -- I'm going to hand you what's been marked as
4  Exhibit 14 real quick, and I just have a very
5  quick question.  It's another one of your
6  reviews from the year 2015, okay.
7         (Document marked for
8         identification as McGinn Deposition
9         Exhibit No. 14.)
10  BY MR. CARTMELL:
11    Q.   This is your performance review
12  from 2015.
13         And if you go to the second page
14  of that review, under -- in the middle of the
15  page under employee contacts -- strike that.
16         If you go to the middle of the
17  page under your goal, which is to enhance the
18  review of customer orders and improve the
19  investigation process for DEA holds.
20         Do you see that?
21    A.   Yes.
22    Q.   That's talking about enhancing
23  the suspicious order monitoring program, right?
24    A.   Yes.

Page 239

1    Q.   Number 2 states, "BI reporting
2  has become more user friendly so that the
3  investigators can quickly switch from DefOps to
4  BI with one click."
5         Do you see that?
6    A.   Yes.
7    Q.   What are BI reports?
8    A.   Business intelligence reports.
9    Q.   It states, business intelligence
10  reports are now also being used to collect
11  chargeback data which is helpful in seeing where
12  controlled substances are distributed by
13  customer.
14         Do you see that?
15    A.   Yes.
16    Q.   Then you say, "This type of
17  information is critical in investigations and
18  has not been analyzed by Teva for this purpose
19  prior to 2015."
20         Do you see that?
21    A.   Yes.
22    Q.   So even though the DEA
23  recommended using that data and that data, as
24  you said, is critical for looking for suspicious

Page 240

1  orders of the opioids, Teva wasn't using it
2  before 2015, correct?
3         MR. ANDRISANI:  Objection, form.
4         THE WITNESS:  I can only say that
5  Teva wasn't using it from the time that
6  I arrived in 2012.  I don't know what
7  they did prior to my arrival, if they
8  looked at it in any way.
9         To my knowledge, I don't know
10  what they did with that information.
11  BY MR. CARTMELL:
12    Q.   Okay.  Well, let's explore that a
13  little bit.
14         Do you honestly believe based on
15  what you found when you became the DEA
16  compliance director that Teva before 2012 might
17  have been using chargeback data to try to find
18  suspicious orders?
19         MR. ANDRISANI:  Objection,
20  argumentative.
21         THE WITNESS:  I don't know to be
22  sure.
23  BY MR. CARTMELL:
24    Q.   Okay.  All you know is when you

Page 241

```
 1    got there, they weren't doing it, right?
 2        A.    What I know, yes.
 3        Q.    And from 2012 when you got there
 4    and did your gap analysis and felt like it
 5    should be used and was recommended by the DEA,
 6    it wasn't until 2015 that you actually used it,
 7    correct?
 8            MR. ANDRISANI:  Objection, form.
 9            THE WITNESS:  It wasn't until
10        2015 that we could use it in a useful
11        way.
12    BY MR. CARTMELL:
13        Q.    Okay.  You had the data, 51% of
14    it before then, correct?
15        A.    There was data there, yes.
16        Q.    Just you never tried to use it,
17    did you?
18            MR. ANDRISANI:  Objection, form.
19            THE WITNESS:  I believe that we
20        looked at trying to use it.  It was a
21        little time consuming before it was
22        incorporated with BI.  I don't think
23        that we got any useful data out of it
24        where we were able to manipulate the
```

Page 242

```
 1    data to get what we needed out of it in
 2    any useful way.
 3            It wasn't until 2015 with the
 4        interaction with BI and DefOps that we
 5        were able to pull in the information.
 6    BY MR. CARTMELL:
 7        Q.    So I just want to be clear, are
 8    you telling this jury under oath that before
 9    2015, your company looked at chargeback data and
10    tried to utilize it to identify suspicious
11    orders of opioids?
12            MR. ANDRISANI:  Objection, asked
13        and answered, argumentative, misstates
14        her testimony.
15            THE WITNESS:  What I said was
16        that we had looked at ways to use
17        chargeback data.  I'm not saying that it
18        was useful in any way, that we could do
19        an analysis to see downstream.  There
20        was no way to organize that data in a
21        useful way until 2015 with the
22        incorporation of BI and DefOps.
23    BY MR. CARTMELL:
24        Q.    Well, are you saying that just
```

Page 243

```
 1    because it was time consuming before?
 2        A.    It would have taken a significant
 3    amount of time.
 4        Q.    Other companies were doing it;
 5    you know that, right?
 6            MR. ANDRISANI:  Objection.
 7            THE WITNESS:  Yes.
 8            (Document marked for
 9        identification as McGinn Deposition
10        Exhibit No. 15.)
11    BY MR. CARTMELL:
12        Q.    I hand you what's been marked as
13    Exhibit 15.
14            Ms. McGinn, this document,
15    Exhibit 15, was produced in this litigation from
16    Teva's internal files and was also included in
17    your file.
18            Do you recognize this document?
19        A.    Yes.
20        Q.    And, in fact, this document is
21    addressed to you; is that correct?
22        A.    Yes.
23        Q.    We talked a minute ago about Teva
24    actually hiring a third party or an outside
```

Page 244

```
 1    consultant to help them with implementing the
 2    new suspicious order monitoring program,
 3    correct?
 4        A.    Yes.
 5        Q.    And I think we mentioned Ronald
 6    Buzzeo, and, in fact, this is the letter from
 7    Ronald Buzzeo that addresses the consulting or
 8    some of the consulting that Mr. Buzzeo did for
 9    Teva; is that right?
10            MR. ANDRISANI:  Objection, form,
11        foundation.
12            THE WITNESS:  Ron Buzzeo's
13        organization audited.  Ron did not audit
14        Teva.
15    BY MR. CARTMELL:
16        Q.    Okay.  And so was there an audit
17    that actually was performed by Mr. Buzzeo's
18    company?
19        A.    Yes.
20        Q.    His company is called what?
21        A.    At the time it was Cegedim.
22        Q.    The title at the top Cegedim?
23        A.    Yes.
24        Q.    And Teva had asked Mr. Buzzeo to
```

Page 245

1    do an audit on its suspicious order monitoring
2    program; is that right?
3        A.    We asked him to evaluate our
4    suspicious order monitoring program.
5        Q.    And you had evaluated and done a
6    gap analysis, right?
7        A.    Yes.
8        Q.    And now you wanted a trained
9    professional with more expertise than you to do
10   the same thing, correct?
11           MR. ANDRISANI:  Object to form.
12           THE WITNESS:  That is correct.
13   BY MR. CARTMELL:
14       Q.    You can answer.
15       A.    That is correct.
16       Q.    Okay.  I want to go through this
17   a little bit, but the date of this is
18   September 25, 2012, and it states, Dear
19   Ms. McGinn, enclosed is our report regarding
20   Teva Pharmaceuticals' suspicious order
21   monitoring system.  Teva has a rudimentary
22   suspicious order monitoring system with a
23   process for opening new accounts and pending
24   orders pursuant to calculations performed by a

Page 246

1    computer program known as SORDS."
2            And we just talked about that a
3    minute ago, correct?
4        A.    Yes.
5        Q.    And I want to turn your attention
6    to the next sentence, or, actually, the last
7    sentence states, "Teva has never identified a
8    suspicious order and thus no orders have ever
9    been reported to the DEA."
10           Do you see that?
11       A.    I see it.
12       Q.    Okay.  So at least by September
13   of 2012, after you started and became the DEA
14   compliance manager, you know that in all the
15   years that Teva had been selling and
16   manufacturing opioids, Teva had never identified
17   a single suspicious order, correct?
18           MR. ANDRISANI:  Objection, form.
19           THE WITNESS:  That's what it says
20   here.
21   BY MR. CARTMELL:
22       Q.    Do you have any reason to
23   disagree with that?
24       A.    No.

Page 247

1        Q.    Okay.  And not only had they
2    never identified a single suspicious order of
3    opioids, they had never reported anything to the
4    DEA, correct?
5        A.    That's what it states.
6        Q.    Okay.  And then it talks about,
7    like you found, that their customer due
8    diligence procedures were limited to checking to
9    see if they were registered and had credit
10   worthiness, right?
11           MR. ANDRISANI:  Objection, form.
12           THE WITNESS:  Is that on the
13   first page?
14   BY MR. CARTMELL:
15       Q.    Yeah, first page, the second
16   paragraph, first sentence.
17           MR. ANDRISANI:  I'll object to
18   the form of the question.
19           MR. CARTMELL:  What did I do?
20           MR. ANDRISANI:  I think you
21   implied that it was limited to that.  I
22   think it states that's what they do, but
23   it doesn't say that's all that they do.
24           MR. CARTMELL:  Okay.  Let me

Page 248

1    restate it.
2            MR. ANDRISANI:  Sure.
3    BY MR. CARTMELL:
4        Q.    And then it states that the
5    customer due diligence procedures, according to
6    the consultant who reviewed the program, the
7    "due diligence procedures are limited to
8    checking customer registrations and credit
9    worthiness," that's what the consultant states,
10   correct?
11       A.    That's what it says here, yes.
12       Q.    And that's the same thing you
13   found in your gap analysis, correct?
14       A.    Correct.
15       Q.    Okay.  Now, then it talks about
16   SORDS a little more, and it says, "SORDS is not
17   sufficiently sensitive to customer ordering
18   practices to result in any meaningful analysis
19   of customer order practices.
20           Do you see that?
21       A.    I see it.
22       Q.    Okay.  And you found the same
23   thing in your gap analysis, didn't you?
24       A.    I don't believe I said that from

Page 249

1    a statistical standpoint it's not sufficiently
2    compliance and suspicious.
3         Q.    Well, I take it that you would
4    defer to the experts in that regard, correct?
5         A.    I would rely on their expertise.
6         Q.    Okay.  And I think this is a very
7    important sentence.  What this expert who was
8    hired by Teva is saying is that the computer
9    system which is the first line of identifying
10   potentially suspicious orders is not sensitive
11   enough to identify those suspicious orders,
12   correct?
13              MR. ANDRISANI:  Objection, form.
14              THE WITNESS:  This consultant was
15         also trying to sell us their own program
16         at the time, so it wouldn't surprise me
17         that they said that ours was
18         insufficient either.
19              MR. CARTMELL:  Object and move to
20         strike.  My question is a little
21         different.
22   BY MR. CARTMELL:
23         Q.    This consultant who you hired and
24   I take it your company hired this consultant

Page 250

1    because you felt that they were actual experts
2    on DEA compliance and suspicious order
3    monitoring programs, right?
4         A.    Yes.
5         Q.    Okay.  I take it you would have
6    hired who you thought was -- were the best
7    experts in the field?
8         A.    Yes.
9         Q.    Okay.  And this expert from Ron
10   Buzzeo's company found that the computer
11   program, the algorithm that was the first line
12   of trying to identify suspicious orders was not
13   sensitive enough to actually meaningfully
14   identify suspicious orders.
15              That's what this consultant
16   found, correct?
17              MR. ANDRISANI:  Objection to
18         form.
19              THE WITNESS:  That's what it says
20         here, yes.
21   BY MR. CARTMELL:
22         Q.    If that's true, then suspicious
23   orders to Teva from customers over the years
24   while they've been using SORDS have not been

Page 251

1    identified, correct?
2              MR. ANDRISANI:  Objection, form.
3              THE WITNESS:  I don't know that.
4    BY MR. CARTMELL:
5         Q.    You don't know one way or the
6    other, right?
7              MR. ANDRISANI:  Objection.
8              THE WITNESS:  If I wasn't there,
9         no, I don't know that.
10   BY MR. CARTMELL:
11        Q.    But you had been there for a
12   period of time and responsible, correct?
13        A.    I was responsible in
14   September 2012 when this report was written.
15        Q.    Okay.  And it was in effect, this
16   program, SORDS that the expert said was not
17   sensitive enough to meaningfully identify
18   customer order practices, that was in effect
19   while you were the director for much more than a
20   year after this, correct?
21              MR. ANDRISANI:  Objection, form.
22              THE WITNESS:  Could you ask the
23         question again.
24   BY MR. CARTMELL:

Page 252

1         Q.    Yeah.  My point is this
2    consultant, the expert you hired from Teva -- or
3    that Teva hired says that this system you're
4    using, the computer algorithm is not sensitive
5    enough to be identifying suspicious orders,
6    correct?
7         A.    Yes.
8         Q.    This system that was in effect in
9    September of 2012, Teva kept this system in
10   effect for over a year after this, correct?
11        A.    That is not correct.  SORDS II
12   was put in place in October 2012.
13        Q.    Okay.  But --
14        A.    That was an improvement on SORDS.
15        Q.    But this is talking about SORDS
16   II?
17        A.    No.  It's SORDS.  SORDS was in
18   effect in September.  SORDS II was not validated
19   and put into place until October 2013 -- 2012.
20        Q.    Okay.  So your testimony is that
21   this system that had been in place since you
22   don't know for how long, correct?
23        A.    No.
24        Q.    Could have been years, you just

Page 253

1  don't know?
2      A.   I don't know.
3      Q.   Okay.  You're saying that
4  Buzzeo's consultants stated that SORDS II was
5  then appropriate and sensitive enough to
6  identify suspicious orders?
7      A.   They did not evaluate SORDS II.
8      Q.   Okay.
9      A.   This references SORDS, not SORDS
10  II.
11      Q.   Okay.  Well, we'll go to the
12  actual report that is attached to this cover
13  letter, if you would, page one, the next page.
14      A.   Mm-hmm.
15      Q.   Just -- and the first paragraph
16  just talks about how the consultants actually
17  came to Teva and did an on-site review and
18  assessment of the system, right?
19      A.   Mm-hmm.
20      Q.   Is that right?
21      A.   Yes.  I'm sorry.
22      Q.   It's okay.  And then in the last
23  paragraph, I want to direct your attention to
24  those sentences.

Page 254

1          The last paragraph states, "new
2  accounts are opened infrequently and there is
3  minimal due diligence.  Pended orders are
4  'cleared' based on telephone interviews with
5  customers, which are handled by Teva customer
6  service staff."
7          Do you see that?
8      A.   Yes.
9      Q.   And one of the things that you
10  had said you thought an appropriate program
11  should have on-site visits, correct?
12      A.   Yes.
13      Q.   And I believe in this report that
14  you're familiar with, the consultants agreed
15  with that, correct?
16      A.   Yes.
17      Q.   And then if you turn the page, it
18  states, again, "Teva has never reported any
19  suspicious order to the DEA and there is no
20  program to review 'downstream distribution' of
21  Teva products."
22          And that's what you found,
23  correct?
24      A.   Yes.

Page 255

1      Q.   And then it states, "there are no
2  formal Standard Operating Procedures or official
3  guidelines."
4          Do you see that?
5      A.   Yes.
6      Q.   So this suspicious order
7  monitoring program that was supposedly in effect
8  and being used prior to the time you got there
9  didn't have any policies and procedures or
10  guidelines for that procedure?
11      A.   I don't want to --
12          MR. ANDRISANI:  Objection, form.
13          THE WITNESS:  I want to say that
14      when we say "formal," we meant -- I
15      believe that he means written.  I don't
16      know that there were any written
17      procedures, which is what I found, but
18      that does not mean that they didn't have
19      some kind of process or procedure.
20  BY MR. CARTMELL:
21      Q.   Right.  There's no formal written
22  procedures, right?
23      A.   Formal as in written.
24      Q.   Okay.  And then it states that

Page 256

1  there weren't even any official guidelines,
2  right?
3      A.   That's what it says.
4      Q.   Do you think that a suspicious
5  order monitoring program for a very large
6  pharmaceutical company that is manufacturing and
7  selling large quantities of opioid and is
8  required by law to have a program to try to
9  prevent diversion should have standard operating
10  procedures in place or at least official
11  guidelines?
12          MR. ANDRISANI:  Objection, form.
13          THE WITNESS:  I want to say that
14      there's no DEA regulation that states
15      that you have to have a written
16      procedure in place.
17  BY MR. CARTMELL:
18      Q.   I understand that, but I asked
19  your opinion whether you think that's good
20  practice?
21      A.   It's not a practice that I would
22  want.  I would prefer things to be in writing.
23      Q.   Okay.  And then it refers to you
24  actually being at or organizing the meetings and

Page 257

1  being the review facilitator; is that right?
2      A.   Yes.
3      Q.   Marianne Geiger was the one who
4  spoke to the consultants about the establishment
5  of new accounts and clearing pending orders,
6  correct?
7      A.   Yes.
8      Q.   And Marianne Geiger is in
9  customer service, right?
10     A.   Yes.
11     Q.   As we established previously,
12  that's somebody who has interaction with the
13  customers about the accounts and sales?
14     A.   Yes.
15     Q.   So at the time you took over this
16  program, it was actually somebody from customer
17  service who was in charge of clearing pending
18  orders, correct?
19     A.   That is not my understanding.
20     Q.   Okay.  Well, then why did the
21  consultant talk to Marianne Geiger from customer
22  service about clearing these orders, these
23  potentially suspicious orders?
24          MR. ANDRISANI:  Objection, form.

Page 258

1          THE WITNESS:  I don't know.
2  BY MR. CARTMELL:
3      Q.   It next states that below that
4  "Teva has approximately 200 active customers" at
5  this time.
6          Was that consistent with your
7  memory?
8      A.   Yes.
9      Q.   And then it mentions some of
10  those customers including the big four, right,
11  or the big three, AmerisourceBergen, Cardinal
12  Health and McKesson?
13     A.   Yes.
14     Q.   And then major pharmacy chains
15  like CVS and Walgreens, they are also customers,
16  right?
17     A.   Yes.
18     Q.   And then smaller wholesale
19  distributors, like grocery stores, like
20  Winn-Dixie or Kroger; is that right?
21     A.   Yes.
22     Q.   I'm not going to go through all
23  of these findings, but would you agree with me
24  that it's fair to say that the consultant or

Page 259

1  consultants from Ron Buzzeo's company found
2  multiple deficiencies in Teva's suspicious order
3  monitoring program?
4      A.   I would say they found multiple
5  findings.
6      Q.   Well, look at page 4, because I
7  want to use the words of the actual consultants.
8          Do you see that, the first full
9  paragraph of page 4?
10     A.   Yes.
11     Q.   It talks about additional
12  deficiencies.
13          Do you see that?
14     A.   I see it.
15     Q.   Those are the consultant's words,
16  not mine, right?
17     A.   And not mine either.
18     Q.   Okay.  But would you agree with
19  me that the consultants found multiple
20  deficiencies in Teva's suspicious order
21  monitoring program?
22          MR. ANDRISANI:  Objection, form.
23          THE WITNESS:  They found multiple
24      areas where the program could be

Page 260

1  improved.
2  BY MR. CARTMELL:
3      Q.   They called them deficiencies,
4  did they not, ma'am?
5      A.   They did call them deficiencies.
6      Q.   If you look under number 2
7  finding on page 3 when it's talking about the
8  SORDS program, it states in the last sentence of
9  the first paragraph, "according to customer
10  service manager Marianne Geiger, the system
11  'pends' less than ten orders a week."
12          Do you see that?
13     A.   Yes.
14     Q.   So I think that means that of all
15  the orders for opioids and other controlled
16  substances coming into Teva at this time, the
17  system in place at that time would only flag or
18  catch approximately ten a week; is that fair?
19          MR. ANDRISANI:  Objection, form.
20          THE WITNESS:  That's what
21      Marianne Geiger states here or is stated
22      in the report.
23  BY MR. CARTMELL:
24     Q.   And would you agree with me that

Page 261

1　that is in and of itself an indication that the
2　program is not sensitive enough?
3　　　　MR. ANDRISANI: Objection, form.
4　　　　THE WITNESS: I wouldn't know
5　　　that.
6　BY MR. CARTMELL:
7　　　Q.　Would you agree with me, and
8　we'll look at some of the documents, maybe
9　you're familiar, that around this time a few
10　years later, Teva had as many as 10,000 orders
11　per week?
12　　　A.　Flagged?
13　　　Q.　10,000 orders.
14　　　A.　Oh, in general.  I have -- I
15　don't know how many orders they received.
16　　　Q.　Okay.  The last paragraph does
17　say that the consultants did analyze and assess
18　SORDS II, doesn't it?
19　　　A.　It looks like they reviewed the
20　concept, but there is a section in here that
21　says the improved system -- page 1, that "SORDS
22　II is in testing and is close to
23　implementation."  So they may have looked at the
24　user requirements, but at the time of the audit,

Page 262

1　it was not implemented.
2　　　Q.　I understand, but I want -- I
3　just want to be clear, these consultants
4　actually did evaluate and assess SORDS II, even
5　though it was not yet in play, correct?
6　　　A.　They may have looked at the user
7　requirements, but that's all that would have
8　been available to them at the time.
9　　　Q.　Okay.  But what else would they
10　look at?  That's what the consultant is
11　interested in is what is the algorithm, correct?
12　　　A.　I mean, there's a lot of things
13　they could have looked at, but I don't know what
14　they specifically looked at to evaluate SORDS
15　II.  The only thing we would have had in place
16　at the time were user requirements.
17　　　Q.　No, I understand, but SORDS II
18　was a month from being done, and this consultant
19　actually at page 3 evaluated SORDS II and made
20　some conclusions, correct?
21　　　A.　They evaluated --
22　　　　MR. ANDRISANI: Objection, form.
23　　　　THE WITNESS: They evaluated
24　　　something, I don't know whether it was

Page 263

1　　　somebody describing it to them or user
2　　　requirements.  I don't know what they
3　　　looked at to make their evaluation.
4　BY MR. CARTMELL:
5　　　Q.　At any rate, it states for SORDS
6　II that it is an improvement, however, the
7　orders are not normalized across different NDC
8　numbers.  (This means, for example, that a
9　customer could order frequent smaller amounts of
10　hydrocodone, an opioid, in three or four
11　different products and avoid a violation of the
12　three standard deviation rule).
13　　　　Do you see that?
14　　　A.　Yes.
15　　　Q.　What it's saying is that there
16　are loopholes here, according to the sensitivity
17　of even SORDS II, that would allow them not to
18　pick up potentially suspicious orders, correct?
19　　　　MR. ANDRISANI: Object to the
20　　　form.
21　　　　THE WITNESS: It states here --
22　　　yeah, I mean, I --
23　BY MR. CARTMELL:
24　　　Q.　Do you see what I'm saying?

Page 264

1　　　A.　It's written here -- they have a
2　sentence that BI can be used to enhance
3　predicted outcomes and/or trends.  Yes, I see
4　what you're saying.
5　　　Q.　In other words, you see I'm
6　saying that even SORDS II, according to these
7　consultants, still had loopholes or the
8　inability to pick up some suspicious orders for
9　opioids, correct?
10　　　　MR. ANDRISANI: Objection, form.
11　　　　THE WITNESS: What they're saying
12　　　is that SORDS II could still be
13　　　improved.
14　BY MR. CARTMELL:
15　　　Q.　Okay.  And, in fact, during your
16　time as the director, SORDS II at some point was
17　taken out of commission, correct?
18　　　A.　Yes.
19　　　Q.　And that was because, like you
20　said, you wanted something that was more
21　sensitive, correct?
22　　　A.　We wanted to make continuous
23　improvements to the program.
24　　　Q.　But it wasn't until 2015 that the

Page 265

1  new program called DefOps was put into play,
2  correct?
3       A.   I don't remember exactly what
4  year, but that sounds about right.
5       Q.   Well, I'll show you -- if you
6  look at -- I'm going to try to find this exhibit
7  -- if you look at your 2015 review.
8            MR. ANDRISANI:  What exhibit was
9  that?
10 BY MR. CARTMELL:
11      Q.   That's Exhibit 14, and if you
12 look around the area where we were looking, I
13 don't have it in front of me right now.
14      A.   That's page -- the second page, I
15 see it.  It was officially launched in May 2015.
16      Q.   Right.  So the updated, more
17 improved, more sensitive computer algorithm was
18 not updated for nearly three years after the
19 Buzzeo consultant said that the SORDS product
20 was not entirely sensitive enough, correct?
21           MR. ANDRISANI:  Objection, form.
22           THE WITNESS:  Two and a half
23 years.
24           MR. CARTMELL:  Let's take a

Page 266

1  break.
2            THE VIDEOGRAPHER:  Going off the
3  record at 3:06 p.m.
4            (Brief recess.)
5            THE VIDEOGRAPHER:  We are back on
6  the record at 3:30.
7  BY MR. CARTMELL:
8       Q.   We're back on the record after a
9  short break.
10           Ms. McGinn, are you ready to
11 proceed?
12      A.   I am ready.
13      Q.   Before we took the break, we were
14 talking some about the computer algorithm or
15 computer algorithms SORDS I and II.
16           Do you recall that?
17      A.   Yes.
18      Q.   And we talked about how the
19 updated software or algorithm to try to identify
20 the suspicious orders that came in was put in
21 place in mid No -- or excuse me -- mid-2015,
22 correct?
23      A.   Yes.
24           (Document marked for

Page 267

1       identification as McGinn Deposition
2       Exhibit No. 16.)
3  BY MR. CARTMELL:
4       Q.   Now, I want to hand you what's
5  been marked as Exhibit 16 and ask you some
6  questions about this document that was produced
7  to us from Teva's internal files.
8            Exhibit 16 appears to be a string
9  of texts; is that correct?
10      A.   Looks like IM.
11      Q.   Okay.
12      A.   Maybe an IM.
13      Q.   Instant messaging?
14      A.   Yes.
15      Q.   Is that something that Teva
16 employees use?
17      A.   Yes.
18      Q.   To talk to each other; is that
19 right?
20      A.   Yes.
21      Q.   Okay.  I want to go through this
22 and ask you some questions.
23           This is in December of 2015,
24 correct?

Page 268

1       A.   Yes.
2       Q.   All right.  So you've been
3  involved in directing DEA compliance and the
4  suspicious order monitoring program, you've had
5  oversight on that for a little over three years,
6  is that right, at this time?
7       A.   Yes.
8       Q.   It states -- strike that.  This
9  is a text -- excuse me -- strike that.
10           This is an IM stream, instant
11 messaging stream between you and the manager of
12 suspicious order monitoring, his name is Joseph
13 Tomkiewicz; is that right?
14      A.   Yes.
15      Q.   He says at 3:28 in the afternoon,
16 "if you could give me a call when you get the
17 chance," and gives you his number.
18           And you say, I'm on a plane right
19 now and won't land in Philly until 5:30.  Do you
20 want me to call tonight or tomorrow?
21           And then he says it can wait.
22           And then you say, "Does it have
23 to do with CS releasing orders?"  And I take it
24 that means customer service?

Page 269

1      A.    That's what it looks like, yes.
2      Q.    Okay.  "How did that happen" is
3  what you say.
4            And he says "Yep, not sure how it
5  happened, it appears that that ability has been
6  there all along to SORDS."
7            Do you see that?
8      A.    Yes.
9      Q.    He says, "There's a handful that
10 mostly look like errors, but one that doesn't.
11 And it's an oxy."
12           Oxy is what in your mind?
13     A.    I would assume he was talking
14 about oxycodone.
15     Q.    And oxycodone is an opioid,
16 correct?
17     A.    It is a Schedule II opioid.
18     Q.    Okay.  Highly -- high risk;
19 opioid, correct?
20     A.    It's a Schedule II.
21     Q.    And then you say, "Why would
22 someone release an order like that?  Was this
23 person new?"
24           And you say, "How are we going to

Page 270

1  prevent them from doing that until Leroy can fix
2  it?"
3            And when you talk about them,
4  you're talking about people in customer service,
5  aren't you?
6      A.    Yes.
7      Q.    And we talked about customer
8  service reps, and those are the people that have
9  the relationships with the actual customers and
10 talk to them about sales, correct?
11     A.    Yes.
12     Q.    Okay.  And we've talked about how
13 sometimes customer service representatives are
14 reluctant to stop sales or have sales of opioids
15 held, correct?
16           MR. ANDRISANI:  Objection, form.
17           THE WITNESS:  It's not -- it's
18     not in their job descriptions to hold
19     orders.
20 BY MR. CARTMELL:
21     Q.    Right.  In other words, they want
22 to sell product, correct?
23           MR. ANDRISANI:  Objection, form.
24           THE WITNESS:  They want to move

Page 271

1      product to customers.
2  BY MR. CARTMELL:
3      Q.    And they don't -- yeah, because I
4  think -- strike that.
5            They don't like to, as you said,
6  upset their customers, correct?
7            MR. ANDRISANI:  Objection, form.
8            THE WITNESS:  It's their job to
9      make the customer happy.
10 BY MR. CARTMELL:
11     Q.    It then says, it was an order --
12 Mr. Tomkiewicz then says, "It was an order that
13 Matt & I held late Monday, for further review
14 Tuesday.  Marianne released the hold late
15 Monday."
16           Do you see that?
17     A.    Yes.
18     Q.    Okay.  Now, we've talked about
19 Marianne earlier, didn't we?
20     A.    Yes.
21     Q.    That's Marianne Geiger?
22     A.    Yes.
23     Q.    And Marianne Geiger is in
24 customer service, right?

Page 272

1      A.    Yes.
2      Q.    And, in fact, when the
3  consultants from Buzzeo's firm came and did an
4  analysis of the suspicious order monitoring
5  program, they talked actually to Marianne Geiger
6  about releasing orders.
7            Do you remember that?
8            MR. ANDRISANI:  Objection, form.
9            THE WITNESS:  I believe it said
10     clearing pended orders.
11 BY MR. CARTMELL:
12     Q.    Right, which would be the same as
13 releasing pended orders, correct?
14     A.    Yes.
15     Q.    In other words, when an order
16 looks potentially suspicious, it would be
17 pended, as you say, right?
18     A.    Yes.
19     Q.    And it would be held and not
20 released, right?
21     A.    Yes.
22     Q.    And what's supposed to happen is
23 that there's supposed to be further
24 investigation into whether or not that could be

Page 273

1    a suspicious order for opioids, right?
2        A.   Yes.
3        Q.   Okay.  Buzzeo talked to Marianne
4    Geiger in customer services who was telling him
5    how orders were released, right?
6            MR. ANDRISANI:  Objection, form,
7        lacks foundation.
8            THE WITNESS:  That was not the
9        typical practice for customer service to
10       release orders.  I can tell we're
11       surprised that this happened in the --
12       in the exchange that you just handed me.
13   BY MR. CARTMELL:
14       Q.   Okay.  And then it states, "Why
15   would she do that?"
16           You say, "You can tell her that
17   she can write up the justification for release -
18   with her name on it."
19           I'm sensing a little frustration
20   there?
21       A.   Yes.
22       Q.   And some sarcasm?
23       A.   Slight.
24       Q.   What you're saying there, I take

Page 274

1    it, is that if something bad happens, then she
2    should be the one whose name on it and should
3    take the fall for it, correct?
4        A.   What I'm saying is I want to know
5    why she released it.
6        Q.   No, you're saying she can write
7    up the justification in her name, aren't you?
8        A.   I am saying that she released it
9    and that we needed justification as to why it
10   was released.
11       Q.   You're saying put her name on it
12   because if something goes bad, her name should
13   be on it, not you, right?
14       A.   What I said was that she should
15   write the justification because she released it.
16       Q.   Okay.  And were you saying that
17   because in case there was a suspicious order
18   that was released and there was diversion or
19   some type of DEA action that it should be clear
20   that she was the one that released it and not
21   you?
22           MR. ANDRISANI:  Objection, asked
23       and answered.
24           THE WITNESS:  I wouldn't -- if

Page 275

1        you're asking me, I would -- I don't
2        release orders myself, Joe does it.
3    BY MR. CARTMELL:
4        Q.   So let me, just to make it clear,
5    were you saying that her name should be on it in
6    case there's DEA action or some investigation
7    because she should be the one known to release
8    it and not Joe?
9            MR. ANDRISANI:  Objection, again,
10       asked and answered.
11           THE WITNESS:  I wanted her name
12       on it because she's the one who released
13       it.
14   BY MR. CARTMELL:
15       Q.   Okay.  And then Mr. Tomkiewicz
16   says "Good question -- she should know better."
17           Do you see that?
18       A.   Yes.
19       Q.   Now, so this SORDS program,
20   according to this instant messaging, at least as
21   of this time had some sort of loophole in it so
22   that customer service could release held orders?
23           MR. ANDRISANI:  Objection.
24           THE WITNESS:  It looks like there

Page 276

1        was a glitch that we did not know about
2        prior to this.
3    BY MR. CARTMELL:
4        Q.   Right, and is it fair to say you
5    have no idea how many times this had happened in
6    the past?
7            MR. ANDRISANI:  Objection,
8        assumes facts not in evidence.
9            THE WITNESS:  I don't remember
10       what we did after this, if there was a
11       backward look at it.  I don't recall the
12       details of the discussion after this.
13   BY MR. CARTMELL:
14       Q.   Okay.  But my question is a
15   little different.
16           Is it fair to say that you caught
17   this one, according to this, but there could
18   have been in the past many other times when
19   customer service was releasing orders that your
20   DEA compliance department had said need to be
21   held and not released?
22           MR. ANDRISANI:  Objection, form.
23           THE WITNESS:  What I would say is
24       they had the opportunity.  I do not

Page 277

1    remember after this conversation if we
2    did a backward look to see if anything
3    had been released by anyone other than
4    DEA compliance.  I can't remember that.
5  BY MR. CARTMELL:
6    Q.    Okay.  But you would agree with
7  me that having a computer system with a glitch,
8  as you called it, allowing customer service
9  people who are reluctant to hold orders to
10  release orders that are potentially suspicious
11  is not good practice?
12    A.    I would agree.
13    Q.    And that would not be indicative
14  of a compliant SOM or suspicious order
15  monitoring program, agree?
16    MR. ANDRISANI:  Objection, form.
17    THE WITNESS:  There is nothing in
18    the regulation that states that customer
19    service couldn't release an order.  I
20    would not consider it best practice.
21  BY MR. CARTMELL:
22    Q.    You wouldn't consider it best
23  practice because why?
24    A.    Just based on experience.

Page 278

1    Q.    And knowing that customer service
2  people, as we've discussed, because they do not
3  want to disrupt relationships with clients, are
4  reluctant to hold orders for opioids and other
5  controlled substances, correct?
6    MR. ANDRISANI:  Objection to
7    form, asked and answered.
8    THE WITNESS:  It is not their job
9    to hold orders.
10  BY MR. CARTMELL:
11    Q.    When -- strike that.
12    (Document marked for
13    identification as McGinn Deposition
14    Exhibit No. 17.)
15  BY MR. CARTMELL:
16    Q.    Hand you Exhibit 17.
17    Is it true, Ms. McGinn, that Teva
18  also consulted with Mr. Buzzeo's company and had
19  his company do audits of other facilities, some
20  of the manufacturing plants?
21    A.    Yes.
22    Q.    And I've handed you a document
23  that was produced by Teva from their internal
24  files that is discussing an audit that was

Page 279

1  performed by Buzzeo's consulting firms --
2  consulting firm in July of 2013; is that
3  correct?
4    A.    Yes.
5    Q.    Now, you've been at Teva as the
6  director of DEA compliance for about a year at
7  this time; is that right?
8    A.    Yes.
9    Q.    And you've actually been at Teva
10  for approximately two years at this time; is
11  that right?
12    A.    Approximately, yes.
13    Q.    I want to ask you a few questions
14  about this document.  The letter on the first
15  page is to you.  It states, Dear Colleen, please
16  find enclosed the report regarding the recent
17  site audit conducted at Teva Pharmaceuticals in
18  Salt Lake City, Utah.
19    Does Teva have a manufacturing
20  site in Salt Lake City?
21    A.    Yes.
22    Q.    And does that site actually
23  distribute controlled substances?
24    A.    I would say that the site

Page 280

1  distributes to our distribution center who
2  distributors to our customers.
3    Q.    Okay.  It states, "As noted
4  during the audit, there were numerous
5  recommendations made to enhance compliance,
6  which are included in this report."
7    Do you see that?
8    A.    Yes.
9    Q.    And, again, like in the last
10  audit report that we discussed previously, there
11  are several findings and recommendations that
12  the consultant gives, correct?
13    A.    Yes.
14    Q.    And I want to ask you about the
15  one at page 10 when the consultant actually did
16  an audit on site at this facility at Teva, a
17  finding was this:  "It was stated that Teva
18  Pharmaceuticals only ships controlled substances
19  to the person/company for which each shipment is
20  prepared and does not have a suspicious order
21  monitoring program."
22    Do you see that?
23    A.    Yes.
24    Q.    And according to the law under

Page 281

1   that, 21 CFR 1301.74(b), that's the federal
2   regulation, correct?
3       A.    Yes.
4       Q.    The law says that "The registrant
5   shall design and operate a system to disclose to
6   the registrant suspicious orders of controlled
7   substances."
8           Do you see that?
9       A.    Yes.
10      Q.    And the recommendation was that
11  Teva as required by the regulations must monitor
12  all controlled substances orders.  In addition,
13  they must analyze customer requests for contract
14  manufacturing for possible indications of
15  suspicious or unusual requests and should have a
16  procedure to report any suspicious orders to the
17  DEA.
18          Do you see that?
19      A.    Yes.
20      Q.    So when Mr. Buzzeo's consulting
21  company that was hired by Teva did an analysis
22  and an audit of this Salt Lake City facility, it
23  found that it did not have a suspicious ordering
24  monitoring program, correct?

Page 282

1           MR. ANDRISANI:  Objection to
2   form.
3           THE WITNESS:  Let me again state
4   that this facility in Salt Lake City did
5   not distribute controlled substances to
6   customers.  The distribution activity
7   was handled through the Chalfont
8   facility, and all of those orders went
9   through the suspicious order monitoring
10  program.
11  BY MR. CARTMELL:
12      Q.    I understand, but if it is deemed
13  that they are -- strike that.
14          If it's deemed that one of your
15  facilities has distribution of controlled
16  substances, the consultants found that they
17  needed a suspicious order monitoring program,
18  correct?
19          MR. ANDRISANI:  Objection, form.
20          THE WITNESS:  This facility did
21  not distribute directly to customers.
22  BY MR. CARTMELL:
23      Q.    I understand.
24      A.    We had a suspicious order

Page 283

1   monitoring program through whatever was in
2   place, SORDS.  All the orders for Salt Lake City
3   product went through the Teva system in 2013.
4       Q.    This consultant stated that a
5   suspicious order monitoring system was needed
6   for this facility, correct?
7           MR. ANDRISANI:  Objection, form,
8   misstates the document.
9           THE WITNESS:  I'm sorry.  Could
10  you repeat it, please.
11  BY MR. CARTMELL:
12      Q.    I'm just asking you what the
13  document says.
14      A.    Yes.
15      Q.    And you can respond.
16      A.    Okay.
17      Q.    But, first of all, this
18  consultant, when doing the audit of this
19  facility determined that this facility needed
20  its own suspicious order monitoring program,
21  correct?
22          MR. ANDRISANI:  Objection, form,
23  misstates the document.
24          THE WITNESS:  This finding states

Page 284

1   that Teva does not have a suspicious
2   order monitoring program.
3   BY MR. CARTMELL:
4       Q.    At this facility, correct?
5       A.    The audit was of this facility.
6       Q.    Right.  And the expert who was
7   hired who did this said and recommended that
8   this facility have its own suspicious order
9   monitoring program, correct?
10          MR. ANDRISANI:  Objection.
11          THE WITNESS:  That's what it
12  says.  I would disagree.
13  BY MR. CARTMELL:
14      Q.    Okay.  So you disagree with the
15  expert consultant that your company hired?
16      A.    Yes.
17      Q.    Hand you -- and so I take it as
18  the director of that program, you did not follow
19  the recommendation, and the Salt Lake City
20  facility never put in place its own suspicious
21  order monitoring program, correct?
22      A.    Their orders run through the Teva
23  system.
24      Q.    Is it true, then, that you did

Page 285

1    not follow the recommendation of the consultant?
2        A.   I do not remember what we did
3    after that.
4            (Document marked for
5            identification as McGinn Deposition
6            Exhibit No. 18.)
7    BY MR. CARTMELL:
8        Q.   I've handed you Exhibit 18.
9            This is another audit of another
10   Teva facility, manufacturing facility, correct?
11       A.   Yes.
12       Q.   This one is in Brooklyn Park,
13   Minnesota, correct?
14       A.   Yes.
15       Q.   Ron Buzzeo's consultants that
16   were hired by Teva went into that facility and
17   did an audit, correct?
18       A.   Yes.
19       Q.   And they were doing a DEA audit
20   to look whether or not the facility was in
21   compliance with the DEA regulations, correct?
22       A.   Correct.
23       Q.   If you look at page 5 there is a
24   finding by the consultant that I want to ask you

Page 286

1    about.
2            It states under number 4, the
3    last paragraph, CIMA.  First of all, what is
4    CIMA?
5        A.   CIMA labs is a facility in
6    Minnesota that was part of the Cephalon
7    organization.
8        Q.   And is this the actual
9    manufacturing facility CIMA that where the audit
10   was?
11       A.   Yes.
12       Q.   Okay.  So that's another name for
13   the facility in Brooklyn Park, Minnesota that
14   was being audited, correct?
15       A.   Yes.
16       Q.   And the auditor, the expert from
17   Ron Buzzeo's company that was consulting states
18   "CIMA does not have a suspicious order
19   monitoring program for the controlled substance
20   transferred from the Manufacturing Registration
21   to the firm's other registrations or DEA
22   Registered Reverse Distributors or to other DEA
23   Registered Manufacturers for repackaging and
24   distribution for clinical trials."

Page 287

1            Do you see that?
2        A.   Yes.
3        Q.   And then it states the law which
4    requires a suspicious order monitoring program,
5    correct?
6        A.   Correct.
7        Q.   And then, again, this is another
8    facility where the consultant went in and made
9    the recommendation that this facility, CIMA
10   needed a suspicious order monitoring program,
11   and it didn't have one, correct?
12       A.   That's what it says.
13       Q.   Do you disagree with this finding
14   as well?
15       A.   The CIMA labs facility did not
16   manufacture product for patient use.  They used
17   -- they manufactured clinical trial material.
18       MR. CARTMELL:  Object, and move
19       to strike the answer.
20   BY MR. CARTMELL:
21       Q.   Do you disagree with this finding
22   by Teva's consultant that was hired to do an
23   audit as well?
24       A.   Based on the activities performed

Page 288

1    at the CIMA Labs facility, yes, I would disagree
2    that they needed a suspicious order monitoring
3    program.
4        Q.   So you believe you had more
5    expertise related to suspicious order monitoring
6    than the consultants from Ron Buzzeo's company
7    that you hired?
8        MR. ANDRISANI:  Objection.
9        THE WITNESS:  I believe I had
10       more expertise in the activities handled
11       at CIMA Laboratories than the consultant
12       did, yes.
13   BY MR. CARTMELL:
14       Q.   So I take it that in the
15   Minnesota facility, you did not follow the
16   consultant's recommendation, and you did not put
17   in a suspicious order monitoring program in that
18   facility; is that fair?
19       A.   I want to say that today we have
20   SOPs that cover any shipments from facilities
21   outside of the commercial distribution area, but
22   I don't know when it was implemented.
23       Q.   So, ultimately, your company did
24   decide to follow the recommendation?

Page 289

1      A.   We --
2           MR. ANDRISANI:  Objection, form.
3           THE WITNESS:  We revised an SOP
4      to include any distribution activities
5      that would happen to occur from any
6      facility other than the distribution
7      center.
8  BY MR. CARTMELL:
9      Q.   I understand.  But to make it
10 clear, ultimately, your company decided to
11 follow that recommendation by the Buzzeo
12 consultant related to the Minnesota facility,
13 correct?
14          MR. ANDRISANI:  Objection, form.
15          THE WITNESS:  Ultimately, we made
16     sure that it was covered.
17 BY MR. CARTMELL:
18     Q.   Okay.  Now, I believe that you
19 hired for the first time a suspicious order
20 monitoring manager in January of 2013; is that
21 correct?
22     A.   That sounds about right.
23     Q.   And who was the suspicious order
24 monitoring manager that you hired?

Page 290

1      A.   It was Kevin Kreutzer.
2      Q.   Prior to that time, the company,
3  as far as you know, had never had an individual
4  who was specifically assigned to manage the
5  suspicious order monitoring program; is that
6  right?
7      A.   That's correct.
8      Q.   And this was part of the
9  resources that you had requested from your
10 superiors?
11     A.   Yes.
12     Q.   As we discussed, the documents
13 reflected that there was a feeling that your DEA
14 compliance division was under-resourced, and
15 this was a job that you felt was necessary,
16 correct?
17     A.   Yes.
18          MR. ANDRISANI:  Objection, form.
19 BY MR. CARTMELL:
20     Q.   Where was Mr. Kreutzer hired
21 from?
22     A.   I believe he was working at
23 AmerisourceBergen.
24     Q.   AmerisourceBergen is one of the

Page 291

1  big three distributors of opioids; is that
2  correct?
3      A.   They were one of the big three
4  distributors of controlled substances, yes.
5      Q.   Okay.  And what position was
6  Mr. Kreutzer working in when at
7  AmerisourceBergen?
8      A.   I don't remember his title, but
9  he was doing suspicious order monitoring.
10     Q.   I see.  So was the reason why --
11 strike that.
12          Did you actually recruit
13 Mr. Kreutzer?
14     A.   I don't remember if I reached out
15 to him or somebody did.  I don't know if he just
16 applied for the job.  I don't recall.
17     Q.   Okay.  At any rate, you were
18 involved in the interviewing process with him?
19     A.   Yes.
20     Q.   Was there anybody else involved?
21     A.   In the interviews?
22     Q.   Yes.
23     A.   Yes.
24     Q.   Who else?

Page 292

1      A.   I don't remember exactly.  I can
2  make some assumptions, but I can't recall.
3      Q.   Was the idea that you wanted to
4  hire somebody who had experience with suspicious
5  order monitoring at another company, distributor
6  of opioids?
7      A.   Yes.
8      Q.   Was that the idea?
9      A.   Yes.
10     Q.   Okay.  And Mr. Kreutzer
11 ultimately only lasted at your company for about
12 two and a half months; is that right?
13     A.   Yes.
14     Q.   Now, when you hired him, do you
15 now know that he was a part of an investigation
16 by the U.S. Attorneys and the DEA about opioids?
17     A.   Could you rephrase the question?
18     Q.   I want to --
19     A.   At the time of hire?
20     Q.   Let me -- let me restate it.
21          I want you to go back in time, if
22 you can, and tell me at the time you were
23 interviewing Mr. Kreutzer, did you know that he
24 was actually involved in an investigation by the

Page 293

1    DEA and the U.S. Attorneys related to opioid?
2         A.   Him specifically or ABC as a
3    company?
4         Q.   Either one.  Just tell me what
5    you know, if you can.
6         A.   I mean, I knew -- I mean, I can
7    say that I know that ABC at some point had been
8    fined by DEA or was under investigation.  I
9    don't remember what I recall at the time.
10        Q.   Specifically, though, did you
11   know that Mr. Kreutzer was involved as a
12   potential witness or being interviewed by the
13   DEA or the U.S. Attorney's Office related to the
14   distribution of opioids by AmerisourceBergen?
15        A.   I don't --
16             MS. ROLLINS:  Object to form.
17             THE WITNESS:  I don't remember
18   specifically.
19   BY MR. CARTMELL:
20        Q.   Did you know -- did you know
21   anything about Mr. Kreutzer's involvement with
22   any DEA of U.S. Attorney investigation related
23   to opioids at the time you were interviewing
24   Mr. Kreutzer?

Page 294

1             MS. ROLLINS:  Objection to form.
2             THE WITNESS:  Not that I recall.
3    I don't know.
4    BY MR. CARTMELL:
5         Q.   You don't think he told you about
6    that?
7         A.   I don't remember if he did or
8    not.
9         Q.   Do you now know that within a
10   matter of weeks or months prior to the time he
11   started at your company, he had been interviewed
12   by DEA agents?
13             MS. ROLLINS:  Objection to form.
14             THE WITNESS:  It does not ring a
15   bell.
16   BY MR. CARTMELL:
17        Q.   Was that something that you would
18   have liked to have known?
19             MS. ROLLINS:  Object to the form.
20             THE WITNESS:  It probably would
21   have been nice to know.
22   BY MR. CARTMELL:
23        Q.   Have you since learned what that
24   investigation by the DEA and/or the U.S.

Page 295

1    Attorneys related to opioids was that
2    Mr. Kreutzer was being interviewed about?
3             MS. ROLLINS:  Objection to form.
4             MR. CARTMELL:  What's the reason
5    for the objection?
6             MS. ROLLINS:  Calls for
7    speculation, foundation.
8             MR. CARTMELL:  I just asked if
9    she now knows it.  I'll restate it.
10   BY MR. CARTMELL:
11        Q.   Have you now learned anything
12   about what the investigation by the DEA or the
13   U.S. Attorneys was related to opioids?
14        A.   No, and I think I'm confused
15   about whether we're talking about an
16   investigation of Kevin personally or ABC.
17        Q.   Okay.  Well, I don't want to
18   confuse you, because what I'm talking about is
19   you had some interviews with Mr. Kreutzer before
20   hiring him spelling, correct?
21        A.   Yes.
22        Q.   You were interested in hiring him
23   because he was working for AmerisourceBergen,
24   one of the big three distributors of opioids,

Page 296

1    correct?
2         A.   Yes.
3         Q.   And I take it you were interested
4    in his credentials and his experience with
5    suspicious order monitoring, right?
6         A.   Yes.
7         Q.   And I'm just trying to find out
8    what you knew when you agreed to hire him
9    related to an investigation that was going on
10   where he met with the DEA and the US attorneys?
11             MS. ROLLINS:  Objection to form.
12             THE WITNESS:  I don't remember.
13   BY MR. CARTMELL:
14        Q.   Okay.
15        A.   What happened?
16        Q.   My fault.  We'll move on.
17             I'm going to ask you questions
18   about that.  It was actually not Mr. Kreutzer.
19   It was Mr. Tomkiewicz.
20             Did you know that?
21        A.   No wonder I was confused.  No.
22        Q.   They both worked there?
23        A.   I was like what are you talking
24   about?

Page 297

1    Q.   Okay.  Sorry about that.  We'll
2  talk about that in a minute.
3         When you hired Mr. Kreutzer as
4  manager of the suspicious order monitoring
5  system, what did you ask him to do?
6    A.   What did I ask Kevin Kreutzer to
7  do?
8    Q.   Yeah.
9    A.   He was going to be responsible to
10 improve the suspicious order monitoring program
11 in general, put in some written procedures and
12 really make some of the improvements that had
13 been recommended.
14   Q.   Okay.  Why was Mr. Kreutzer fired
15 within a matter of two and a half months after
16 you hired him?
17   A.   He just was not a good fit.
18   Q.   One of the things Mr. Kreutzer
19 testified to in this litigation is that, in
20 large part, he was fired because he actually
21 contacted a customer about a held order.
22        Do you have any knowledge of that
23 being part of the reason why he was fired?
24        MR. ANDRISANI:  Objection to

Page 298

1  form.
2         THE WITNESS:  Absolutely not.
3  BY MR. CARTMELL:
4    Q.   Do you recall that he actually
5  did contact a customer or a customer's customer?
6    A.   No.
7    Q.   You don't remember that?
8    A.   I don't remember a discussion
9  about that at all.
10   Q.   Do you recall a situation when
11 you were angry at him for doing that?
12   A.   I don't recall.
13   Q.   So after firing Mr. Kreutzer, was
14 it you who actually fired him?
15   A.   Yes.
16   Q.   Okay.  After firing him, once
17 again, you were under-resourced, correct?
18   A.   Yes.
19   Q.   And how long was it before you
20 were able to actually then hire a suspicious
21 order monitoring manager?
22   A.   I don't know the date.  We hired
23 Joe Tomkiewicz.  I don't remember how long it
24 was.

Page 299

1    Q.   I think the records reflect that
2  he was hired in January of 2014.  Is that
3  consistent with your memory?
4    A.   Joe Tomkiewicz?
5    Q.   Yes.
6    A.   I don't remember.  I couldn't
7  tell you.  In the interim, Matt Benkert assumed
8  some of the responsibilities for SOM.
9    Q.   Matt Benkert, was he the
10 investigator that was hired for the department?
11   A.   Matt Benkert was already employed
12 by Teva at the time, and we transitioned him
13 into SOM.
14   Q.   Where was he working prior to
15 that?
16   A.   He -- I believe he was at the
17 distribution center.  What's happening?
18   Q.   Go ahead.
19   A.   I believe Matt's position was at
20 the distribution center.  He was an investigator
21 in our New Britain distribution center.
22   Q.   Okay.  Before we talk about
23 Mr. Tomkiewicz, which I want to ask you about
24 the exact same questions I already did ask you

Page 300

1  about with Mr. Kreutzer, that we should strike
2  from the deposition, I want to ask you about a
3  document.
4         (Document marked for
5         identification as McGinn Deposition
6         Exhibit No. 19.)
7  BY MR. CARTMELL:
8    Q.   Hand you Exhibit 19, which is a
9  series of e-mails that was produced by Teva in
10 this case from your custodial file.
11        And I'd like to talk to you about
12 this, and because e-mails go in reverse order, I
13 want to start on the last page, the e-mail from
14 Kevin Kreutzer to Matt Benkert and Michael
15 Edwards.
16        Do you see that?
17   A.   Yes.
18   Q.   The subject is "DEA Holds This
19 Afternoon."  Does that likely mean that there
20 was a potentially suspicious order for
21 controlled substances that was being held?
22   A.   It meant that there were orders
23 that were held that needed to be reviewed.
24   Q.   Okay.  They were controlled

Page 301

1  substances, correct?
2      A.   Yes.
3      Q.   And we'll talk about it in a
4  minute, but if you just quickly -- well, let me
5  -- let's start over.
6          So the e-mail states on
7  February 27th, 2013, I am leaving at 3:30 for an
8  appointment.  Could you check customer orders
9  after I leave.
10         Do you see that?
11     A.   Yes.
12     Q.   So I take it because Mr. Kreutzer
13 was in charge of monitoring the suspicious
14 orders, occasionally when he was gone, he would
15 have Matt fill in for him?
16     A.   Yes.
17     Q.   And if you go up one page, Matt
18 responds and says, "Kevin, there were 5 holds in
19 Oracle tonight.  All were for different ABC
20 locations."
21         Do you see that?
22     A.   Yes.
23     Q.   So this is AmerisourceBergen
24 that's being talked about, one of the big three

Page 302

1  distributors of opioids or controlled
2  substances, right?
3      A.   Yes.
4      Q.   And, apparently, there were
5  orders that you can see at the bottom of the
6  page that were for controlled substances that
7  were held because the order was potentially
8  suspicious?
9      A.   Yes.
10     Q.   Okay.  In the second paragraph it
11 says, "Can you also provide Mike, Tim and I some
12 guidance on what your criteria is reviewing,
13 evaluating and releasing these orders moving
14 forward."
15         So I take it that Matt is
16 basically saying if these guys are going to fill
17 in for Kevin Kreutzer, they need to know the
18 criteria on how they should look at these and
19 determine whether or not to release the orders;
20 is that fair?
21         MR. ANDRISANI:  Objection, form.
22         THE WITNESS:  That's what it
23 looks like.
24 BY MR. CARTMELL:

Page 303

1      Q.   Okay.  And then Matt asks a
2  series of questions, the first question being,
3  "Are we evaluating orders from the big 4
4  differently than the rest?"
5          Do you see that?
6      A.   I see it.
7      Q.   I take it that means are they
8  evaluating whether to hold or release
9  potentially suspicious orders from the big four
10 distributors or big four customers differently
11 than the rest of the customers; is that your
12 understanding?
13         MR. ANDRISANI:  Objection, form.
14         THE WITNESS:  I couldn't say what
15 Matt was talking about here, other than
16 to read the sentence.
17 BY MR. CARTMELL:
18     Q.   Okay.  Well, you're going to end
19 up being on this string of e-mails, so if you
20 want to take your time.
21     A.   Okay.
22     Q.   But you were asked specifically
23 about that --
24     A.   Okay.

Page 304

1      Q.   -- later in the e-mail.  So all
2  I'm asking you --
3      A.   Can I read it?
4      Q.   Yeah, go ahead, and I'll wait and
5  ask you in a minute.
6      A.   (Witness reviews document.)  It
7  appears that some of this is cut off, the
8  e-mail.
9      Q.   Yeah, that's the way it was
10 produced to us by Teva.  We actually searched
11 the documents to try to find one that wasn't
12 cutoff and we can't find it.
13     A.   Okay.
14     Q.   Okay.  So back to Mr. Benkert's
15 response on February 27, 2013 at 7:17 p.m., he's
16 asking questions of Kevin Kreutzer, the manager
17 of the suspicious order monitoring program, and
18 saying, "Are we evaluating orders from the big 4
19 differently than other customers," right?
20     A.   Yes.
21     Q.   And then if you go forward a
22 couple pages or three pages, Mr. Kreutzer
23 actually answers that questions and the other
24 questions, right?

Page 305

1      A.   Yes.
2      Q.   And he says to Mr. Benkert and
3   others, "Matt, Mike and Tim, in regards to your
4   questions," and then he lists the first
5   question, "are we evaluating orders from the big
6   4 differently than the rest?"
7           And he says, "Yes, I am not
8   scrutinizing the big 4 as closely as the
9   secondary distributors and retail pharmacy
10  chains."
11          Do you see that?
12     A.   I see it, but there's some cut
13  off.  I can't see what else he says.
14     Q.   It says something like we all
15  know but we can't -- I don't know what it says
16  because it wasn't provided to us.
17          Do you see that?
18     A.   Yeah, I don't know what it says
19  either.
20     Q.   Okay.  But it -- let me ask you
21  first about that.
22          Do you believe it is appropriate
23  for a manager of the suspicious order monitoring
24  program to scrutinize potentially suspicious

Page 306

1   orders for opioids differently or less for the
2   big four customers than for other customers, do
3   you think that's appropriate?
4      A.   Honestly, I wouldn't know if it
5   was appropriate or not.  I've never actually
6   investigated any suspicious orders.  This is the
7   guy that had the experience, so we were relying
8   on his expertise at the time.
9      Q.   So as the director of the DEA
10  compliance department and who has oversight of
11  the suspicious order monitoring program at that
12  time, you actually didn't know whether it would
13  be appropriate to scrutinize potentially
14  suspicious orders of opioids from the big
15  customers that provided a lot of sales to Teva
16  than it would be for the smaller customers?
17          MR. ANDRISANI:  Objection, form.
18  BY MR. CARTMELL:
19     Q.   You didn't know that one way or
20  the other?
21     A.   I was relying on Kevin's
22  expertise, and I don't think he lasted much past
23  this time anyway.  I think he was let go not
24  long after this.

Page 307

1      Q.   Okay.  Well, let's go forward.
2           Then in the next e-mail on the
3   first page at the bottom, it's from Matt
4   Benkert, and it says, Colleen and Mike, this is
5   to you on April 1st of 2013 and to Mike Edwards.
6   Colleen and Mike, below is some criteria for
7   order releases that Kevin had developed I
8   requested from him about a month ago.  I wanted
9   to follow up now and confirm is this still
10  criteria you would like us to use going forward
11  or is there part or all of this you would like
12  to see modified?
13          Do you see that?
14     A.   Yes.
15     Q.   So it sounds like maybe
16  Mr. Kreutzer had been fired at this point?
17     A.   Probably.
18     Q.   And Matt Benkert you said is
19  taking over for him, right?
20     A.   He has not taken over for Kevin.
21  He is backfilling.  He was not promoted to
22  manager of the SOM program.  He was filling in.
23     Q.   Okay.  Let me put that a
24  different way.

Page 308

1           I think you testified previously
2   that Mr. Benkert was filling in for
3   Mr. Kreutzer's responsibilities for the
4   suspicious order monitoring program after
5   Mr. Kreutzer was fired; is that fair?
6      A.   Matt was reviewing and releasing
7   orders.
8      Q.   And so he was doing the job that
9   Mr. Kreutzer had been doing?
10     A.   A portion --
11     Q.   Before fired?
12     A.   -- a portion of the job.
13     Q.   Right.  And so now Matt is going
14  to have to be the one who is going to decide
15  whether or not an opioid order that is
16  potentially suspicious should be held and
17  investigated or released to the customer,
18  correct?
19     A.   Yes.
20     Q.   And he's asking you should we
21  keep this criteria that Mr. Kreutzer had
22  outlined for us, or should we change it, right?
23     A.   Yes.
24     Q.   And you respond on April 1st at

Page 309

1    8:03 p.m.
2          "Matt, thanks for reviewing the
3    orders.  I really appreciate the support from
4    you and Tim.  I would continue to use the
5    criteria laid out by Kevin in his e-mail.  If
6    you are uncomfortable with any part of the
7    advice he's given, let me know."
8          Do you see that?
9    A.    Yes.
10   Q.    So, as you've testified, you
11   really didn't have the expertise or knowledge to
12   determine really what the criteria should be for
13   releasing orders at that time, correct?
14          MR. ANDRISANI:  Objection.
15          THE WITNESS:  Yes.
16   BY MR. CARTMELL:
17   Q.    That's true, right?
18   A.    I would say that I did not have
19   the experience in reviewing orders in a
20   suspicious order monitoring program and
21   releasing them.
22   Q.    And so the criteria included
23   Mr. Kreutzer's criteria, which was to
24   scrutinize -- strike that.

Page 310

1          And so one of the criteria that
2    you said was okay and should continue was to not
3    scrutinize the big distributors or the big four
4    as Mr. Kreutzer put it as closely as the
5    secondary distributors when trying to determine
6    whether you should hold and investigate
7    potentially suspicious orders or release them,
8    correct?
9          MR. ANDRISANI:  Objection, form.
10          THE WITNESS:  I said that, and in
11   the next sentence I said if you're
12   uncomfortable with any part of the
13   advice he's given, let me know.
14   BY MR. CARTMELL:
15   Q.    Okay.  But Mr. Benkert was
16   actually asking Mr. Kreutzer for his advice
17   because he thought Mr. Kreutzer had more
18   experience, right?
19   A.    Matt handled suspicious order
20   monitoring at ABC as well.  He had experience in
21   suspicious order monitoring prior to being
22   employed at Teva.
23   Q.    Now, after years of experience
24   being the director of the DEA compliance, as

Page 311

1    we've discussed, at one -- if not, the largest
2    manufacturer of generic opioids in the United
3    States and for having oversight of the
4    suspicious order monitoring program for years,
5    would you agree with me that it would not be a
6    good practice to scrutinize the big four
7    customers, distributors of opioids less than
8    other distributors of opioids?
9          MR. ANDRISANI:  Objection to
10   form.
11          THE WITNESS:  Based on the
12   information I have today in 2018, I
13   would say no.
14   BY MR. CARTMELL:
15   Q.    You would agree that would not be
16   a good practice, correct?
17   A.    I would agree based on the
18   information now that we have today that it would
19   not be a good practice.
20   Q.    And so did this policy that
21   essentially was put in place in April continue
22   in effect for eight months until Mr. Tomkiewicz
23   was hired?
24          MR. ANDRISANI:  Objection, form.

Page 312

1    BY MR. CARTMELL:
2    Q.    Or do you know?
3    A.    I don't know.
4    Q.    It's possible, right?
5          MR. ANDRISANI:  Objection, form.
6          THE WITNESS:  I couldn't tell you
7    one way or the other.
8    BY MR. CARTMELL:
9    Q.    Would you agree with me that if
10   less scrutiny had been given to the big four
11   distributors of opioids, then it's possible that
12   suspicious orders put in by those big four may
13   have slipped through the cracks and been
14   diverted?
15          MR. ANDRISANI:  Objection to
16   form.
17          THE WITNESS:  I can't say that.
18   BY MR. CARTMELL:
19   Q.    You don't know?
20   A.    I don't know.
21   Q.    Can I hand you what's been marked
22   as Exhibit 20.
23          (Document marked for
24   identification as McGinn Deposition

Page 313

1    Exhibit No. 20.)
2    BY MR. CARTMELL:
3        Q.   Ms. McGinn, Exhibit 20 is a
4    one-page e-mail --
5            Ms. McGinn, Exhibit 20 is a
6    one-page e-mail that was produced from your
7    custodial file in this litigation that involves
8    you and Mr. Kreutzer, who we have been talking
9    about.
10           Do you see that?
11       A.   Yes.
12       Q.   As we discussed, based on the
13   records, Mr. Kreutzer was fired by you in April
14   of 2013 is that consistent with your memory?
15       A.   Somewhere around there, yeah.
16       Q.   Starting from the bottom, this
17   states in March of 2013, Mr. Kreutzer sends an
18   e-mail to you saying, "FYI.  You may be hearing
19   from Michelle Osmian about me contacting a
20   Cardinal customer by phone.  Initially, I did go
21   through customer service rep but the
22   conversation was more involved and I needed
23   clarification.  So Daniel in customer service
24   set up a call with the purchaser and I spoke to

Page 314

1    him yesterday."
2            Do you see that?
3        A.   Yes.
4        Q.   So it looks like what was
5    happening here was Mr. Kreutzer who was in
6    charge of investigating potentially suspicious
7    orders of controlled substances was trying to
8    investigate a hold on an order of controlled
9    substances and he reached out to the customer
10   himself, right?
11       A.   He reached out to our customer's
12   customer himself.
13       Q.   Okay.  We've talked about doing
14   due diligence and investigating your customer's
15   customer, right?
16       A.   Yes.
17       Q.   That's one of the things that the
18   DEA has said Teva and other manufacturers and
19   distributors of opioids should do in order to
20   help them identify suspicious orders, correct?
21           MR. ANDRISANI:  Objection to
22   form.
23           THE WITNESS:  They've said it,
24   but not how to do it or what you're

Page 315

1        supposed to do.
2    BY MR. CARTMELL:
3        Q.   Yeah, but you know that that's
4    one of the things that the DEA has said would be
5    a good practice and would be helpful to identify
6    potentially suspicious or suspicious orders of
7    opioids, correct?
8            MR. ANDRISANI:  Objection, form.
9            THE WITNESS:  Would be to know
10       your customers -- who your customer's
11       customer is.
12   BY MR. CARTMELL:
13       Q.   Well and investigate them, right?
14           MR. ANDRISANI:  Objection, form.
15           THE WITNESS:  Investigate is a
16       big word.  To know who they were and how
17       they operated.
18   BY MR. CARTMELL:
19       Q.   Right, and the reason you want to
20   know them, who they are and how they operate is
21   because you want to see if there's any
22   potentially suspicious activity, correct?
23       A.   Yes.
24       Q.   Okay.  So Mr. Kreutzer has

Page 316

1    reached out to the customer's customer, and he's
2    telling you that you may get a call about that,
3    and then you respond to his e-mail, "I don't
4    understand why you would contact Cardinal's
5    customer.  We have no relationship with them."
6            Do you see that?
7        A.   Yes.
8        Q.   So Mr. Kreutzer has done some
9    downstream investigation, and it sounds like
10   you're angry at him for doing that, correct?
11       A.   What I'm saying here is I don't
12   understand.  We would typically ask our customer
13   to get the information from their customer and
14   not reach out to a customer's customer directly.
15       Q.   Did that make you angry?
16       A.   I don't know about angry.  I just
17   didn't understand it.
18       Q.   And then he responds, I e-mailed
19   Daniel in customer service about an order with
20   acetaminophen with codeine, which is a
21   controlled substances, correct?
22       A.   Yes.
23       Q.   That exceeded the quarterly
24   limit.

Page 317

1    He then says at the end, lesson
2  learned, I will only communicate, in all caps
3  only, with customer service.  I apologize.
4        Do you see that?
5    A.  Yes.
6    Q.  And there was a policy at Teva,
7  and still is today, that when investigating
8  suspicious orders of opioids, that the initial
9  contact and investigation should be done by
10  customer service, correct?
11        MR. ANDRISANI:  Objection, form.
12        THE WITNESS:  The contact is
13        initiated by customer service.  We, as
14        in Joe Tomkiewicz provides the
15        information that we need from the
16        customer.  The customer service reps
17        forwards that information to the
18        customer.
19  BY MR. CARTMELL:
20    Q.  And is the reason why only
21  customer service is supposed to have the contact
22  with the customer about the investigation is
23  because you don't want to disrupt the
24  relationship?

Page 318

1    A.  Let me be clear, there are times
2  when Joe talks to a customer directly --
3    Q.  I understand that.
4    A.  -- when it's warranted, so it's
5  not every time.  But the initial contact is
6  usually done through customer service.
7    Q.  I understand that.  My question
8  is a little different.
9        Is the reason why customer
10  service typically or the policy is they make the
11  initial contact about the investigation of
12  potentially suspicious opioids because you don't
13  want to disrupt the business relationship with a
14  customer?
15        MR. ANDRISANI:  Objection, form,
16        lacks foundation.
17        THE WITNESS:  They have the
18        personal contact with the customer that
19        we don't have.  They know the people
20        typically and would prefer to maintain
21        that relationship with them.
22  BY MR. CARTMELL:
23    Q.  Is there a fear by the customer
24  service that possibly being contacted by DEA

Page 319

1  compliance may upset them or upset the
2  relationship?
3        MR. ANDRISANI:  Objection, form.
4        THE WITNESS:  I don't know what
5        their belief is.
6  BY MR. CARTMELL:
7    Q.  Now, when Mr. Tomkiewicz was
8  hired to work at Teva as the new suspicious
9  order monitoring manager after Mr. Kreutzer was
10  fired, were you involved in recruiting him?
11    A.  When you say "recruiting,"
12  interviewing him, yes.
13    Q.  Was he recruited by you?
14    A.  Matt Benkert brought him to my
15  attention and thought it would be a good idea to
16  hire Joe.
17    Q.  And you had been looking for a
18  new suspicious order monitoring manager for
19  eight months; is that right?
20    A.  That's probably about right.
21    Q.  And did you know when you were
22  interviewing Mr. Tomkiewicz that he was involved
23  in an investigation by the DEA and the U.S.
24  Attorneys related to opioids?

Page 320

1        MR. ANDRISANI:  And I'll object
2        to form.  It lacks foundation.
3        THE WITNESS:  I don't remember if
4        it was brought up during the interview,
5        but at some point in time, I became
6        aware of it.
7  BY MR. CARTMELL:
8    Q.  Do you think he told you before
9  you hired him?
10    A.  I honestly don't remember.
11    Q.  Mr. Tomkiewicz worked for
12  AmerisourceBergen, one of Teva's customers; is
13  that right?
14    A.  Yes.
15    Q.  And, again, I take it that you
16  wanted to hire somebody who worked at a big
17  distributor or manufacturer of opioids and who
18  had experience related to suspicious order
19  monitoring?
20    A.  We wanted somebody who had
21  experience in suspicious order monitoring, yes.
22    Q.  Okay.  Did he tell you, you
23  think, while you were interviewing him and
24  before you hired him that DEA agents had shown

Page 321

1    up at his door and told him that he needed to
2    get counsel?
3              MR. ANDRISANI:  Objection, asked
4    and answered, lacks foundation.
5              THE WITNESS:  I don't know if he
6    told me during the interview, but I am
7    aware that he revealed that at some
8    point in time.
9    BY MR. CARTMELL:
10        Q.    Could have been after you hired
11   him?
12             MR. ANDRISANI:  Objection, form.
13             THE WITNESS:  It may have been.
14   BY MR. CARTMELL:
15        Q.    Did he ultimately tell you what
16   the investigation was about in which he was
17   contacted by DEA agents and met with DEA agents
18   and U.S. Attorneys?
19        A.    If he did, I don't remember the
20   specifics.  I obviously knew it was something to
21   do with suspicious order monitoring, but I don't
22   know if I knew the specifics.
23        Q.    Did he tell you that
24   AmerisourceBergen, where he had worked, had been

Page 322

1    under investigation by the DEA since 2008?
2              MR. ANDRISANI:  Objection, form,
3    lacks foundation.
4              MS. ROLLINS:  Objection, form.
5              THE WITNESS:  I don't know if he
6    had told me how long they were being
7    investigated, but I knew that ABC was
8    being investigated.
9    BY MR. CARTMELL:
10        Q.    Did you ever find out whether or
11   not any of the allegations in the investigation
12   in which he was contacted about had to do with
13   any of his actions, or do you know?
14             MR. ANDRISANI:  Objection, form.
15             THE WITNESS:  I don't know.
16   BY MR. CARTMELL:
17        Q.    Okay.  Now, I think you mentioned
18   that the new suspicious order manager -- or
19   monitoring manager was hired to, for one, put
20   into effect some formal written SOPs, right?
21        A.    Yes.
22        Q.    Standard operating procedures,
23   right?
24        A.    Yes.

Page 323

1         Q.    And as of 2014 or the middle of
2    2014, there were no formal written standard
3    operating procedures for the suspicious order
4    monitoring program, correct?
5         A.    There were drafts.
6         Q.    They didn't go into effect until
7    I believe the summer of 2014; is that right?
8         A.    I don't know when they went into
9    effect, to be honest.  I don't know the exact
10   date.
11        Q.    Mr. Tomkiewicz testified that he
12   was hired in part to revamp or improve the
13   suspicious order monitoring algorithm that was
14   used, the computer algorithm that was used?  Is
15   that true?
16             MR. ANDRISANI:  Objection, form.
17             THE WITNESS:  We would have
18   wanted him to be involved in that, yes.
19   BY MR. CARTMELL:
20        Q.    And the new algorithm that was
21   put in place in 2015, is that something
22   Mr. Tomkiewicz wrote?
23        A.    It's the DefOps.
24        Q.    Yes.

Page 324

1         A.    Yes.
2         Q.    Okay.  So he wrote that in
3    conjunction with Teva's IT?
4         A.    Yes.
5         Q.    This is a good thing, I'm going
6    through pages here.
7         A.    Please keep going.
8              MR. ANDRISANI:  We're all happy
9    watching you.
10             THE WITNESS:  Are you getting
11   tired?
12   BY MR. CARTMELL:
13        Q.    Big Xs, big Xs are good.
14             MR. ANDRISANI:  Nobody is happier
15   than the young lady to your right.
16             THE WITNESS:  I don't know about
17   that.
18             (Document marked for
19   identification as McGinn Deposition
20   Exhibit No. 22.)
21   BY MR. CARTMELL:
22        Q.    I hand you what's been marked as
23   Exhibit 22, and this is an internal audit that
24   was produced by Teva from their internal files

Page 325

1    in this litigation.  This was a document that
2    was found in your custodial file.
3             Are you familiar with this audit?
4        A.   Yes.
5        Q.   I want to ask you some questions
6    about this audit, but, first of all, to put this
7    in perspective, we've now fast forwarded to
8    2015.
9             Do you see that?
10       A.   Yes.
11       Q.   And so at this time, you had been
12   the director, and I think you may have been
13   senior director now, of the DEA compliance
14   department; is that correct?
15       A.   Yes.
16       Q.   You got a promotion, right?
17       A.   Yeah, yes.
18       Q.   This e-mail is talking about an
19   internal audit of the DEA compliance department
20   at Teva, right?
21       A.   Yes.
22       Q.   And that was the department that
23   you were the senior director of, correct?
24       A.   Correct.

Page 326

1        Q.   It states, Dear all, attached
2    please find the Final Audit report of Teva's DEA
3    department, right?
4        A.   Yes.
5        Q.   All right.  So if you turn the
6    page, the attachment is, in fact, the final
7    audit; is that right?
8        A.   Yes.
9        Q.   It's dated August 19th of 2015,
10   correct?
11       A.   Yes.
12       Q.   And the next page, there is an
13   "Executive Summary" that I just want to ask you
14   about.
15            Under "Preface" it states the
16   Operational and R&D Audit group of Global
17   Internal Audit conducted during July 2015 an
18   audit of the DEA department.  The audit was
19   conducted in accordance with 2015 GIA Plan as
20   approved by the audit committee of Teva's Board
21   of Directors.
22            Do you see that?
23       A.   Yes.
24       Q.   So I take it at this time in

Page 327

1    2015, Teva's Board of Directors or pursuant to
2    their orders was doing audits of internal
3    departments, different internal departments; is
4    that correct?
5        A.   Yes.
6        Q.   Okay.  And what do you recall
7    about this audit, as far as how it occurred?
8            MR. ANDRISANI:  Objection, form,
9        vague.
10           THE WITNESS:  Yeah, I'm not sure
11       what you're looking for.  I mean, it was
12       conducted by the global internal audit
13       committee from Israel.
14   BY MR. CARTMELL:
15       Q.   They came over from Israel?
16       A.   Yes.
17       Q.   And I'll ask you some specific
18   questions.
19            They interviewed lots of people,
20   right?
21       A.   Yes.
22       Q.   Was most people in management
23   definitely within your group were interviewed?
24       A.   Yes.

Page 328

1        Q.   Including you, correct?
2        A.   Yes.
3        Q.   And then they were on site to do
4    an assessment of whether or not the group was in
5    compliance with the DEA, correct?
6        A.   Yes.
7        Q.   It states under "Objectives,
8    Scope and Method, The aims of the audit were to
9    review the overall way in which the DEA
10   activities are handled in the US by the DEA
11   department, to assess the various internal
12   processes and to ensure that the risks
13   associated with the activities are properly
14   managed."
15            Do you see that?
16       A.   Yes.
17       Q.   And that's the department you
18   were managing at this time, right?
19       A.   That's correct.
20       Q.   If you turn the page under "The
21   DEA Department," the second bullet point states,
22   "The dept. has 17 members who oversee the DEA
23   compliance functions and processes for Teva's
24   registered facilities."

Page 329

1     So the size of your department at
2  that time was 17.  Is that consistent with your
3  memory?
4     A.    Yeah, somewhere around there, I'm
5  sure.
6     Q.    Is that about the same as it is
7  now?
8     A.    Yes.
9     Q.    Has it -- has it shrunk?
10    A.    It has fluctuated.  It grew
11 larger and then has shrunk.
12    Q.    How many is it now; do you think?
13    A.    It's 17 now.
14    Q.    Okay.  And then the second to
15 last bullet point states, "The organizational
16 structure of the team is highly decentralized.
17 The 17 team members are based in seven different
18 locations."
19    So that just means that your
20 group is not all in one place, they're in lots
21 of different areas and locations, right?
22    A.    We would have representatives at
23 the manufacturing sites at each DEA registrant,
24 for the most part.

Page 330

1     Q.    Okay.  I want to ask you about
2  some of the findings, and if you go to the
3  detailed report at the last three Bates digits 5
4  -- let's see, 575, there was a finding related
5  to risk management in your department.
6     Do you see that?
7     A.    Yes.
8     Q.    The observation from the internal
9  audit group who came and audited your department
10 said, "The overall risk of the DEA operation is
11 in noncompliance with DEA requirements."
12    Do you see that?
13    A.    I see it.
14    Q.    "This can lead from anything to
15 issuing 'letter of admonition' up to withdrawal
16 of the sites' registrations."
17    Do you see that?
18    A.    Yes.
19    Q.    So at least the finding by the
20 auditors as of 2015 in the summer, they were
21 saying that from a risk management perspective,
22 there was a risk to your department that could
23 lead to the loss of a license, correct?
24    MR. ANDRISANI:  Objection, form.

Page 331

1     THE WITNESS:  What he's saying
2     here is that risk management is part --
3     is a DEA requirement, which it is not.
4  BY MR. CARTMELL:
5     Q.    Is this another audit internally
6  that was done by your company that you disagree
7  with?
8     A.    This is an audit done by an
9  internal audit professional that had no DEA
10 experience.
11    Q.    So is this another audit from --
12 internally that your company has done, the third
13 audit that we've talked about that you disagree
14 with?
15    MR. ANDRISANI:  Objection, form,
16    argumentative.
17    THE WITNESS:  I would dis --
18    MR. ANDRISANI:  Misstates the
19    testimony.
20    THE WITNESS:  I would disagree
21    that a risk heat-map is a requirement by
22    DEA.
23 BY MR. CARTMELL:
24    Q.    Okay.  At any rate, let's talk

Page 332

1  about the findings.  Second paragraph states,
2  "Various risks (security, quota, suspicious
3  monitoring, import/export and handling of
4  documentations) are handled at differing levels
5  of performance, but not in an overall,
6  methodological and orderly way."
7     Do you see that?
8     A.    I see it.
9     Q.    Do you disagree with that?
10    A.    What he's talking about here is
11 --
12    Q.    I'm not asking about what he's
13 talking about, okay.  Let me restate my
14 question.
15    A.    Okay.
16    Q.    Do you disagree with that?
17    A.    Yes.
18    Q.    It then states, "There is no
19 organized overall risk management process, no
20 centralized and orderly list of DEA risks and no
21 orderly heat-map of the risks that the DEA
22 department deals with."
23    Do you see that?
24    A.    Yes.

Page 333

```
 1        Q.   Do you disagree with that?
 2        A.   What I disagree with is that it's
 3   a requirement by DEA.
 4        Q.   Okay.  Do you disagree with the
 5   findings?  MR. ANDRISANI:  Objection, form.
 6             MR. ANDRISANI:  Objection, form.
 7             MR. CARTMELL:  That this was --
 8        go ahead, sorry.
 9             MR. ANDRISANI:  Objection, form.
10   BY MR. CARTMELL:
11        Q.   Do you disagree with the findings
12   that there's no organized overall risk
13   management process --
14             MR. ANDRISANI:  Objection.
15   BY MR. CARTMELL:
16        Q.   -- no centralized and orderly
17   list of DEA risks and no orderly heat-map of the
18   risk that the DEA department deals with, do you
19   disagree with those findings by the internal
20   auditors?
21             MR. ANDRISANI:  Objection, form.
22             THE WITNESS:  At the time of the
23        audit, there was not a risk map for DEA
24        compliance.
```

Page 334

```
 1             MR. CARTMELL:  Okay.  I'm going
 2        to object and move to strike that and
 3        ask the question again.
 4   BY MR. CARTMELL:
 5        Q.   Do you disagree with the auditors
 6   who found that there's no organized overall risk
 7   management process, no centralized and orderly
 8   list of DEA risks and no orderly heat-map of the
 9   risks that the DEA department deals with as of
10   2015?
11             Do you disagree with those
12   findings by the auditor?
13             MR. ANDRISANI:  Objection, form.
14             THE WITNESS:  At the time of the
15        audit --
16   BY MR. CARTMELL:
17        Q.   I'm really just asking if you
18   disagree with the findings.
19             MR. ANDRISANI:  I'm going to
20        object because, one, these are
21        observations, not findings, and she's
22        trying to explain what she disagrees
23        with because it's hard to just agree or
24        not agree with something written on a
```

Page 335

```
 1        piece of paper by somebody else.
 2             MR. CARTMELL:  Okay.  But I think
 3        what she's trying to do is answer a
 4        different question, okay, and really all
 5        I want to know, for the record, is
 6        whether these -- and I'll call them
 7        observations, she disagreed with or not,
 8        and then I'll move on.
 9   BY MR. CARTMELL:
10        Q.   Let me restate the question.
11             The observations by the auditors
12   who interviewed you and several other members of
13   your department that you were running at the
14   time, the observations that there was no
15   organized overall risk management process, that
16   there was no centralized and orderly list of DEA
17   risks and that there was no orderly heat-map of
18   the risk that the DEA department deals with, do
19   you disagree that those were observations, those
20   were accurate observations by the auditor as of
21   2015?
22             MR. ANDRISANI:  Objection, form.
23             THE WITNESS:  It would be
24        accurate to say that we did not have a
```

Page 336

```
 1        risk map.
 2   BY MR. CARTMELL:
 3        Q.   Do you disagree that they
 4   observed that you didn't have any organized
 5   overall risk management process?
 6        A.   Not the one he was looking for.
 7        Q.   So you disagree with that, or you
 8   agree?
 9        A.   We know what the risks are with
10   DEA compliance.  He was looking for a heat-map,
11   which he did not have -- we did not have at the
12   time of the audit.
13        Q.   Do you disagree with his
14   observations that you had no centralized and
15   orderly list of DEA risks?  Do you disagree with
16   that observation by the auditor?
17        A.   Yeah, I mean, as he states here,
18   the main risks are somehow handled in a routine
19   management process, but no centralized risk
20   management approach led by the DEA department in
21   the paragraph below.
22             MR. CARTMELL:  Object and move to
23        strike.
24   BY MR. CARTMELL:
```

Page 337

1     Q.    Do you disagree with the finding
2   by this auditor where he says that your
3   department had no centralized and orderly list
4   of DEA risks?  Do you disagree with that?
5     A.    I would disagree.
6     Q.    And do you disagree with the
7   observation of the auditor when he said that
8   your department -- various risks are handled at
9   differing levels of performance but not in an
10  overall methodological and orderly way?
11         MR. ANDRISANI:  Objection to
12     form.
13         THE WITNESS:  He's talking about
14     the risks and the components of a DEA
15     program, I would disagree.
16  BY MR. CARTMELL:
17    Q.    The auditor actually then states
18  the potential risks that were found, and he
19  says, "Lack of overall vision of the risks and
20  unfocused handling thereof, mistaken
21  prioritization of the time and manner in which
22  they should be handled."
23         Do you see that?
24    A.    I see it.

Page 338

1     Q.    This is your department he's
2   talking about, isn't he?
3     A.    He is.
4     Q.    Do you disagree with that
5   potential risk that the auditors found at Teva?
6     A.    I would disagree.
7     Q.    And then the auditors stated that
8   the category of these findings of your
9   department related to risk management was high,
10  correct?
11    A.    Yes.
12    Q.    And we can determine what a high
13  risk or a high category, high risk category
14  means if you go to the last page, right?
15  There's definition of risk rankings.
16    A.    Mm-hmm.
17    Q.    And high risk means "This is a
18  serious internal control or risk management
19  issue that if not mitigated may, with a high
20  degree of certainty, lead to substantial losses
21  (at Local level), possibly in conjunction with
22  other weaknesses in the control framework or the
23  organizational entity or process being audited.
24  Serious violation of corporate strategies,

Page 339

1   policies or values.  Serious reputation damages,
2   such as negative publicity in national or
3   international media.  Significant adverse
4   regulatory impact, such as loss of operating
5   licenses and material fines."
6          Do you see that?
7     A.    Yes.
8     Q.    Your department that you were
9   running after three years of being the director
10  of the DEA compliance department was found to be
11  high risk as far as risk management, correct?
12         MR. ANDRISANI:  Objection, form.
13         THE WITNESS:  That was his
14     opinion.
15  BY MR. CARTMELL:
16    Q.    It then states, "As a high risk
17  issue, immediate management attention is
18  required.  The finding is reported to the Audit
19  Committee quarterly."
20         Do you see that?
21    A.    Yes.
22    Q.    And so it's clear, if you go back
23  to the prior page where this observation is,
24  there's a section, this is at 575, if you go

Page 340

1   back to the page that we talked about where the
2   observations were that led to the high risk
3   category, there is a "Management Response/Action
4   Plan."
5          Do you see that?
6     A.    Yes.
7     Q.    And it says "Agreed," doesn't it?
8     A.    Yes.
9     Q.    So at the time you were asked
10  what the response would be of your department,
11  you agreed with those findings, didn't you?
12    A.    I agreed to provide him a risk
13  heat-map.
14    Q.    Okay.  Let's go and look at
15  another finding related to your department on
16  last three digits 581.
17         The auditors also evaluated and
18  assessed the suspicious order monitoring program
19  that was in effect in your department; is that
20  right?
21    A.    Yes.
22    Q.    In other words, they came over
23  and they interviewed you and the other managers
24  in the department and other employees in the

Page 341

1  department to find out whether or not that was a
2  fully compliant suspicious order monitoring
3  program, correct?
4       A.   Yes.
5       Q.   Okay.  If you look at the
6  observations by the auditor, it states, "In
7  order to identify anomalous sales activity, an
8  overall process of reviewing all sales order is
9  conducted by the 'DefOps'."
10           Now, that's the computer program
11  that Mr. Tomkiewicz wrote and became in effect
12  in the middle of 2015, correct?
13      A.   In March 2015, yes.
14      Q.   Oh, I'm sorry, it was March,
15  okay.
16           Skipping down a little bit, it
17  says, "DefOps sifts through approximately 10,000
18  monthly order line items and automatically
19  releases approximately 95% of the orders that
20  fit a customer's normal order pattern."
21           Do you see that?
22      A.   Yes.
23      Q.   The remaining 5% of the orders
24  that did not pass initial sorting are manually

Page 342

1  checked and placed on hold until they will be
2  rechecked by trained team members of
3  suspicious -- of excuse me -- suspicious order
4  monitoring and then the release is enabled.
5           Is that consistent with the
6  process?
7       A.   That's what's stated here.  I
8  don't know if the process, if the percentages
9  are accurate, but that's what's stated here.
10      Q.   Okay.  Now, I want to refer you
11  back to when we were talking earlier about the
12  SORDS computer.  You'll remember that
13  Mr. Buzzeo's consulting company when it was
14  actually evaluating the SORDS system and the
15  suspicious order monitoring program, it said
16  that approximately I think was ten orders were
17  pended or flagged weekly.
18           Do you remember that?
19      A.   Yes.
20      Q.   So, apparently, when DefOps took
21  over and SORDS went out and maybe SORDS II had
22  more than that, it went up to 10,000 orders and
23  500 of those a month being pended, correct?
24           MR. ANDRISANI:  Objection, form.

Page 343

1           THE WITNESS:  Based on the
2           percentages he has here.
3  BY MR. CARTMELL:
4       Q.   So the SORDS computer algorithm
5  that was used by Teva for many years to identify
6  suspicious orders was, according to Buzzeo
7  report, pending or flagging as potentially
8  suspicious orders approximately 40 a month,
9  correct?
10      A.   Yes.
11      Q.   And DefOps was pending and
12  flagging potentially suspicious orders of
13  approximately 500 a month, correct?
14           MR. ANDRISANI:  Objection, form.
15           THE WITNESS:  Based on this, yes.
16  BY MR. CARTMELL:
17      Q.   Fair to say that a large number
18  of potentially suspicious orders were likely
19  slipping through the cracks when SORDS was in
20  effect?
21           MR. ANDRISANI:  Objection, form,
22           lacks foundation.
23           THE WITNESS:  I mean, that's
24           three years later.  I don't know what

Page 344

1           the product mix was, how many more
2           orders it was.  I have nothing to base
3           that on.
4  BY MR. CARTMELL:
5       Q.   If you go down a little bit, it
6  states, "From a total share of delayed orders,
7  only a small quantity are delayed for more than
8  one day (approx. 25 orders a month)."
9           Do you see that?
10      A.   Yes.
11      Q.   So out of the 500 that are pended
12  monthly or flagged for potentially being
13  suspicious, approximately 25 of those actually
14  are even held for more than one day for
15  investigation, right?
16           MR. ANDRISANI:  Objection, form.
17           THE WITNESS:  That's what he says
18           here.
19  BY MR. CARTMELL:
20      Q.   And I've looked at the document,
21  and it looks like the documents from the system,
22  the Oracle system that's used, a huge number of
23  the held orders are actually released within a
24  matter of minutes, aren't they?

Page 345

1      A.    I don't know, because I don't
2  release the orders, I couldn't tell you.
3      Q.    It states, "and during the last
4  year only 2 suspicious order reports were
5  submitted to the DEA agency."
6          Do you see that?
7      A.    Yes.
8      Q.    And we're in 2015, correct, at
9  the time of this audit report?
10     A.    Yes.
11     Q.    So out of the 10,000 monthly or
12  120,000 orders in a year, only two of those
13  orders were actually found to be suspicious
14  orders; is that right?
15     A.    It says here over the last year,
16  only two were reported.
17     Q.    Right, and if you do the math,
18  right, there's 120,000 in a year, right?
19         MR. ANDRISANI:  Objection.
20         THE WITNESS:  120,000 orders?
21  BY MR. CARTMELL:
22     Q.    Yeah, 10,000 a month, 12 months.
23     A.    If that was consistent, I mean,
24  if -- I don't know if that's an average.  I

Page 346

1  don't know.
2      Q.    Okay.  It then states, "The
3  manual testing process for the segment of
4  suspicious orders and the release of
5  approximately 5% of them is conducted by one
6  person who has the authority to change the
7  status of orders from 'hold' to 'release'.
8  Granting exclusive authority to a single person
9  to release a suspicious order constitutes a risk
10  for mistakes."
11         Do you see that?
12     A.    I see it.
13     Q.    Do you agree with that?
14     A.    Certainly not a requirement.
15         MR. CARTMELL:  Okay.  I'll object
16  and move to strike.
17  BY MR. CARTMELL:
18     Q.    I'm not asking if there's a DEA
19  requirement.
20         I'm asking if you agree with the
21  observation, so let me ask it again.
22         The observation and finding by
23  the auditor where he states, "Granting exclusive
24  authority to a single person to release a

Page 347

1  suspicious order constitutes a risk for
2  mistakes," do you agree with that?
3      A.    I don't know if I agree with that
4  or not.
5      Q.    And when he's talking about
6  mistakes here, what he's talking about is the
7  potential that a suspicious order for an opioid
8  product actually not being properly held and
9  being shipped and then diverted, correct?
10         MR. ANDRISANI:  Objection, form.
11         THE WITNESS:  You'd have to ask
12  him.  He wrote it.
13  BY MR. CARTMELL:
14     Q.    Well, you know what he means by
15  mistakes, don't you?
16         MR. ANDRISANI:  Objection.
17         THE WITNESS:  I know what a
18  mistake is, yes.
19  BY MR. CARTMELL:
20     Q.    And a mistake in a suspicious
21  order monitoring program means that a suspicious
22  order that actually should be held and
23  investigated and potentially reported to DEA is
24  not, and it's actually shipped to the customer

Page 348

1  and potentially diverted, correct?
2          MR. ANDRISANI:  Objection, form,
3      argumentative and lacks foundation.
4          THE WITNESS:  A mistake could
5      also mean that a order was reported to
6      DEA and shouldn't have been.  A mistake
7      could go either way.
8  BY MR. CARTMELL:
9      Q.    There's only two reports out of
10  120,000 orders, correct?
11     A.    You asked me if I knew what a
12  mistake was.  A mistake is human error here.
13     Q.    Right.  Well, under potential
14  risk it states what he means by mistake, doesn't
15  it?
16     A.    He states that in potential
17  risks.
18     Q.    Right.  What he's talking about
19  is a false approval and release of suspicious
20  sales orders, right?
21     A.    That's what he says.
22     Q.    So a mistake is there's supposed
23  to be an order that is held and investigated and
24  your system he's saying that you have in effect

Page 349

1   may be leading potentially to orders that are
2   suspicious and may be diverted down the road,
3   are not being held and they're mistakenly being
4   shipped to customers, correct?
5           MR. ANDRISANI: Objection, lacks
6       foundation, form.
7           THE WITNESS: He's saying that
8       there's a potential risk that that could
9       happen.
10  BY MR. CARTMELL:
11      Q.   And do you agree with the finding
12  of the auditor from Teva who did this analysis
13  and assessment by interviewing people and
14  looking at your systems process?
15          MR. ANDRISANI: Objection, form,
16      lacks foundation. Again, are you
17      referring to the risk he puts in
18      observations or the potential risk for
19      suspicious order monitoring program
20      that's at F?
21          MR. CARTMELL: She can answer.
22          MR. ANDRISANI: Confusing the
23      record.
24          THE WITNESS: Could you repeat

Page 350

1   the record, please.
2   BY MR. CARTMELL:
3       Q.   Do you agree with him -- let me
4   see what the question was.
5           MR. CARTMELL: Read it back,
6       please.
7           (Whereupon, the court reporter
8       read back the following:
9           Q. And do you agree with the
10      finding of the auditor from Teva who did
11      this analysis and assessment by
12      interviewing people and looking at your
13      systems process?)
14          MR. ANDRISANI: And I object to
15      the form.
16          THE WITNESS: I believe that we
17      put in a second person review into the
18      process to alleviate the potential risk.
19  BY MR. CARTMELL:
20      Q.   So that was actually your
21  adoption of the finding, your agreement with the
22  finding, that there could be potential mistakes
23  and orders released that shouldn't have been,
24  correct?

Page 351

1           MR. ANDRISANI: Objection.
2           THE WITNESS: That was our way to
3       reduce the risk of error or mistakes.
4   BY MR. CARTMELL:
5       Q.   Okay. And then it talks about
6   the category of risk, and the risk category here
7   is a moderate risk.
8           Do you see that?
9       A.   Yes.
10      Q.   And if we look at the back page,
11  there's a definition of the moderate risk. A
12  moderate risk is an internal control or risk
13  management issue that could lead to financial
14  losses. Loss of controls within the
15  organizational entity or process being audited.
16  Reputation damage, such as negative publicity in
17  local or regional media. Adverse regulatory
18  impact, such as public sanctions or immaterial
19  fines.
20          Do you see that?
21      A.   Yes.
22      Q.   Do you agree that those were the
23  potential risks that were in play in your
24  department in 2015 related to the suspicious

Page 352

1   order monitoring program?
2       A.   That was the auditor's
3   assessment.
4       Q.   And I'm asking if you agree with
5   the assessment that that was the potential risk
6   to your company as a result of the program you
7   had in effect?
8           MR. ANDRISANI: Objection, form.
9           THE WITNESS: (Witness reviews
10      document.) Yes.
11          (Document marked for
12      identification as McGinn Deposition
13      Exhibit No. 21.)
14  BY MR. CARTMELL:
15      Q.   I'm going to hand you Exhibit 21.
16  I don't think these are stapled, I apologize.
17  There's one.
18          MR. ANDRISANI: I think we can
19      manage. This guy is unbelievable.
20          MR. CARTMELL: He's got a
21      stapler. You are really a nerd.
22          MR. ANDRISANI: It goes beyond
23      the stapler.
24  BY MR. CARTMELL:

Page 353

1    Q.    Ms. McGinn, this is a PowerPoint
2    presentation that was produced by Teva from the
3    internal files, and I believe -- yeah, this was
4    actually in your custodial file as well.
5         Do you recognize this PowerPoint
6    presentation?
7    A.    Yes.
8    Q.    And this PowerPoint presentation
9    it looks like was prepared and presented by
10   Joseph Tomkiewicz, who is DEA compliance manager
11   within the DEA compliance department, correct?
12   A.    Yes.
13   Q.    Mr. Tomkiewicz has testified in
14   this case that he has been since 2014 and
15   continues to be the manager of the suspicious
16   order monitoring program at Teva, correct?
17   A.    Yes.
18   Q.    Now, I want to start by looking
19   at slide three.  This document reflects the
20   number of suspicious orders from 2014 through
21   2017 that your company, Teva, had identified
22   during those four years, correct?
23   A.    Yes.
24   Q.    And we know from the internal

Page 354

1    audit that we just saw in 2015, it actually said
2    that within the last year, there had been two,
3    but we know from prior documents that Teva
4    didn't even start making or identifying
5    suspicious orders until 2013.
6         Is that consistent with your
7    memory?
8         MR. ANDRISANI:  Objection, form.
9         THE WITNESS:  That's all I would
10        have knowledge of, based on the
11        documents that we saw, yes.
12   BY MR. CARTMELL:
13   Q.    Okay.  And I believe there was
14   one report of a suspicious order in 2013,
15   correct?
16   A.    I think so.
17   Q.    And then so if we go before that
18   to 2012, we know that there was not any orders
19   of suspici -- excuse me -- not any -- strike
20   that.
21        And then we know if we go back to
22   2012, there was not any suspicious orders of
23   opioids identified by Teva, correct?
24        MR. ANDRISANI:  Objection.

Page 355

1         THE WITNESS:  Yes.
2    BY MR. CARTMELL:
3    Q.    Okay.  And, in fact, if
4    Mr. Hasler is right and Teva had been selling
5    and manufacturing opioids since 2006, they had
6    never found a single suspicious order from 2006
7    until 2013, those seven years, correct?
8         MR. ANDRISANI:  Objection.
9         THE WITNESS:  Yes.
10   BY MR. CARTMELL:
11   Q.    So I want to talk about during
12   the period of time that you were at Teva from
13   2012 to 2016, it looks like there was six
14   suspicious orders of opioids or other controlled
15   substances that was identified by Teva; is that
16   correct?
17   A.    From 2012, yes.
18   Q.    From 2012 through '16, correct?
19   A.    Yes, that's what it looks like
20   here.
21   Q.    Okay.  And if we can believe the
22   audits reports that during that time there was
23   approximately 10,000 orders a month or 120,000 a
24   year, that would be 720,000 orders; is that

Page 356

1    correct?
2         MR. ANDRISANI:  Objection.
3         THE WITNESS:  I have no way of
4         telling that 10,000 was a one month look
5         or if it's an average.  It didn't say.
6         I don't know how many orders.
7    BY MR. CARTMELL:
8    Q.    Okay.  Well, do you have any idea
9    whether or not that's been a consistent number
10   or whether that's gone up over time?
11   A.    I don't.  I don't review the
12   orders.  I don't see what comes through the
13   system.
14   Q.    At any rate, we know from the
15   documents in this case and from the testimony
16   that for those six years, until 2017, from 2012
17   to 2017, there were millions and millions, maybe
18   over 100 million opioid opioid pills that Teva put into
19   communities, and from those only six suspicious
20   orders were found by your company, correct?
21        MR. ANDRISANI:  Objection, form,
22        lacks foundation.
23        THE WITNESS:  I don't know how
24        many tablets Teva produced during that

Page 357

```
 1        time frame.
 2   BY MR. CARTMELL:
 3        Q.    Well, you remember we looked at
 4   documents that showed that there was close to
 5   70 million prescriptions during 2012 through
 6   '16, correct?
 7        A.    I'd have to go back to the
 8   document, if you want to pull that out. I don't
 9   remember which one it was.  It's not something
10   that my department produced.
11        Q.    Exhibit 8.
12        A.    Eight. I got it.  Okay.
13        Q.    Close to 70 million prescriptions
14   during 2012 to 2016 at Teva for opioids,
15   correct?
16        A.    Where does it say that?
17        Q.    If you add the columns 2012
18   through 2016.
19             You see that?
20        A.    Yes.
21        Q.    That's rough math.  And, as we
22   discussed, each of those prescriptions could
23   include 30, 60, 90 or more pills, correct?
24        A.    I have no way of knowing how many
```

Page 358

```
 1   pills were included in each prescription.
 2        Q.    Well, you know it's millions and
 3   millions?
 4        A.    It's millions.
 5        Q.    You know it's much more than
 6   70 million, correct?
 7             MR. ANDRISANI:  Objection.
 8             THE WITNESS:  Based on rough math
 9        here, it's millions of scripts.
10   BY MR. CARTMELL:
11        Q.    And during those years, only six
12   suspicious orders were found by Teva, correct?
13             MR. ANDRISANI:  Objection, asked
14        and answered.  She's told you that.
15             THE WITNESS:  Yes.
16   BY MR. CARTMELL:
17        Q.    Now, if you go back a page, I
18   want to ask you a few questions about the first
19   slide in Mr. Tomkiewicz's presentation.
20             You're familiar with this slide,
21   I take it?
22        A.    Yes.
23        Q.    And this shows that over time
24   from 2000 to 2015, there has been a steady
```

Page 359

```
 1   increase of deaths by overdose from opioids.
 2             Do you see that?
 3        A.    Yes.
 4        Q.    Including from prescription
 5   opioids that Teva and other manufacturers and
 6   distributors have put into the system, correct?
 7             MR. ANDRISANI:  Objection, form.
 8             THE WITNESS:  That we distributed
 9        to patients.
10   BY MR. CARTMELL:
11        Q.    And during all this period of
12   time that Teva has actually manufactured and
13   distributed or sold opioids, they've been
14   required to have an effective suspicious order
15   monitoring program and effective safeguards in
16   place to prevent diversion of those opioids,
17   haven't they?
18             MR. ANDRISANI:  Objection, form,
19        asked and answered.
20             THE WITNESS:  Yes.
21   BY MR. CARTMELL:
22        Q.    We saw documents that when you
23   started at Teva in 2002 -- '12 as the director,
24   in the executive summary it was determined that
```

Page 360

```
 1   part of that program was not compliant and was
 2   at risk, correct?
 3             MR. ANDRISANI:  Objection, form,
 4        asked and answered.  How much time --
 5        how much more do you have?  It's 5:00.
 6             MR. CARTMELL:  Very little.
 7             THE WITNESS:  Sorry.  Could you
 8        repeat.
 9   BY MR. CARTMELL:
10        Q.    We saw that documents, if we go
11   to this back in 2012 when you first started,
12   showed when you were first looking at the
13   suspicious order monitoring program at Teva that
14   it was not compliant, correct?
15             MR. ANDRISANI:  Objection, form,
16        asked and answered.
17             THE WITNESS:  I saw that there
18        could be improvements to the program.
19   BY MR. CARTMELL:
20        Q.    Well, you also saw from the
21   executive summary that you said you may have put
22   together that part of that program related to
23   the due diligence or know your customer was
24   noncompliant, correct?
```

Page 361

1       MR. ANDRISANI:  Objection, form.
2       THE WITNESS:  We knew that there
3   was some improvement to make.
4   BY MR. CARTMELL:
5       Q.   The words were noncompliant; is
6   that correct?
7       A.   That's what the report said.
8       Q.   And we know that outside
9   consultants you hired in your gap analysis
10  showed that there were lots of gaps in the
11  suspicious order monitoring program, and there
12  were deficiencies by Mr. Buzzeo's consulting
13  company found in that program, correct?
14      A.   There were findings written up in
15  the report that he called deficiencies.
16      Q.   Do you think that if, in fact,
17  the suspicious order monitoring program at Teva
18  had been fully compliant and had not had the
19  gaps that you identified in your analysis and
20  that the Buzzeo consultant identified in his
21  analysis that potentially there could have been
22  less diverted opioids that were distributed or
23  sold by Teva?
24      MR. ANDRISANI:  Objection, form.

Page 362

1       THE WITNESS:  I have no way of
2   knowing that.
3   BY MR. CARTMELL:
4       Q.   Do you think if your company from
5   2012 till now had a more robust and as you
6   called it a model suspicious order monitoring
7   program, there's a chance that there would have
8   been less diversion of the opioids from those
9   orders that came to Teva?
10      MR. ANDRISANI:  Objection, form.
11  BY MR. CARTMELL:
12      Q.   Or do you know?
13      MR. ANDRISANI:  Objection, form,
14  lacks foundation.
15      THE WITNESS:  I have no way of
16  knowing that.
17      MR. CARTMELL:  How long have we
18  been going?
19      THE WITNESS:  All day.
20      MR. ANDRISANI:  We've been going
21  about an hour and a half since the last
22  break.
23      MR. CARTMELL:  Let's take a
24  break.

Page 363

1       THE VIDEOGRAPHER:  Off the
2   record, 5:05.
3       (Brief recess.)
4       THE VIDEOGRAPHER:  We are back on
5   the record at 5:20.
6   BY MR. CARTMELL:
7       Q.   Ms. McGinn, we're back on the
8   record after a short break.  Are you ready to
9   proceed?
10      A.   As I'll ever be.
11      Q.   Okay.  We are going to now move
12  into a different topic, and I want to switch
13  gears.  We've talked a lot about your time at
14  Teva, and I want to talk a little bit about your
15  time at Cephalon in compliance, okay?
16      A.   Okay.
17      Q.   And we know from your prior
18  testimony, you were at Cephalon as an employee
19  in compliance for eight and a half years; is
20  that right?
21      A.   Yes.
22      Q.   Okay.  And you told me, but I
23  apologize and I can't remember, during what
24  period of time at Cephalon were you involved

Page 364

1   with or responsible for the suspicious order
2   monitoring program?
3       A.   It would have been the promotion
4   for associate director.  I can't remember when
5   that was.
6       Q.   I think you were promoted to
7   associate director, according to your LinkedIn
8   page, in September of 2012?
9       A.   It's not clear from that.  I
10  think we see it on the org chart in 2010 that my
11  title is listed as associate director, so it was
12  somewhere around 2010 or shortly before that.
13      Q.   Okay.  So the time period that
14  you would have been involved in suspicious order
15  monitoring for opioids prior to coming to Teva
16  and becoming the compliance -- DEA compliance
17  director was at sometime around 2010 until 2012;
18  is that right?
19      A.   Yes.
20      Q.   But you got to Teva in October of
21  2011, correct?
22      A.   Yes, yes.
23      Q.   Okay.  So let's divide it up into
24  the period of time before you were involved in

Page 365

1  Cephalon's suspicious order monitoring program,
2  did you have any idea what that program
3  consisted of at Cephalon from 2004 until 2010?
4      A.   It's my understanding that the
5  logistics and distribution department reviewed
6  incoming customer orders, and then those orders
7  were forwarded to a third party distributor,
8  Cardinal Health, and they would have had an
9  electronic system, I don't know when their
10 system was put in, but it was reviewed on a
11 manual level at Cephalon and then also passed
12 through Cardinal's system.
13     Q.   Okay.  As we have discussed as a
14 part of your testimony related to Teva, to have
15 a complete suspicious order monitoring program,
16 it's not just the computer program, you also
17 need to be having, for example, due diligence
18 and investigations of potentially suspicious
19 orders, correct?
20     A.   Yes.
21     Q.   What did Cephalon do in that
22 regard, do you know, and who did it?
23     A.   I don't know.  We had a very
24 small number of customers that we were dealing

Page 366

1  with.  Randy Bradway was in charge of the
2  logistics and distribution department.  He
3  maintained a relationship with the customers.
4      Q.   So was Randy Bradway the
5  individual responsible for suspicious order
6  monitoring of the opioids Cephalon was selling
7  between 2004 and 2010?
8      A.   Randy Bradway was responsible for
9  reporting anything that would have looked
10 suspicious to me to report to DEA.
11     Q.   But only to you after 2010,
12 right?
13     A.   Right.
14     Q.   Who was Randy Bradway responsible
15 to report those potentially suspicious orders to
16 prior to 2010?
17     A.   I don't know.
18     Q.   Do you know who was responsible
19 for the suspicious order monitoring program
20 prior to 2010?
21     A.   I don't -- they didn't -- I'm
22 going to assume that he would have come to me at
23 some point as the DEA person on site.  He was in
24 West Chester as well, that he would have come to

Page 367

1  me.
2      Q.   During the eight and a half years
3  that you were at Cephalon, did Cephalon ever
4  identify a suspicious order for either Actiq or
5  Fentora?
6      A.   No.
7      Q.   Is it your understanding that
8  Cephalon never when selling Actiq starting in
9  2001 and Fentora starting in 2006 ever reported
10 to the DEA a suspicious order for those drugs?
11     A.   2001 to 2006?
12     Q.   Let me -- that was a confusing
13 question.
14          I'm trying to figure out if
15 Cephalon ever, from the time it started actually
16 manufacturing and selling opioids, and we've
17 talked that those two opioids that it did sell
18 and manufacture were Actiq and Fentora, correct?
19     A.   Yes.
20     Q.   Did Cephalon ever identify and
21 report a suspicious order for either of those
22 opioids?
23     A.   In the time period I was there
24 from 2004 forward, I am not aware of any.

Page 368

1      Q.   And you think you would have
2  known if they had?
3      A.   I would think so.
4      Q.   As far as the time period with
5  Actiq from 2001 to 2004, do you think you would
6  have known if there had been a suspicious order
7  identified and reported to the DEA during that
8  period of time?
9      A.   I don't know.
10     Q.   Okay.  Is it true that at
11 Cephalon there was never a formal written
12 standard operating procedure related to
13 suspicious order monitoring?
14     A.   I recall a section of a SOP where
15 we added a line about reporting suspicious
16 orders.  I don't remember exactly what it said,
17 but it was added to a logistics and distribution
18 procedure.
19     Q.   There was an order monitoring
20 policy put in effect in 2009.
21          Do you think that's what you're
22 referring to?
23     A.   Probably.
24     Q.   Let's take a look real quick.  It

Page 369

```
 1    is document 1295.  Hand you what's been marked
 2    as Exhibit 24 -- I'm sorry -- 23.
 3            (Document marked for
 4        identification as McGinn Deposition
 5        Exhibit No. 23.)
 6    BY MR. CARTMELL:
 7        Q.   It's just a one-page e-mail that
 8    was produced from Teva's files related to the
 9    time period 2009 when you were still an employee
10    of Cephalon, correct?
11        A.   Yes.
12        Q.   And if you look at the bottom
13    e-mail from you to Kevin Friel, who is that?
14        A.   I don't remember what department
15    Kevin worked in.  He must have been in
16    logistics.
17        Q.   Okay.  This is an e-mail from
18    August 19th from you to Kevin.  The subject is
19    Suspicious Order Monitoring.
20            "Kevin, I have some people coming
21    in sometime over the 4th quarter to do an
22    internal DEA audit.  One of the things they
23    mentioned they wanted to review was our
24    suspicious order monitoring program.  I know we
```

Page 370

```
 1    were working on SOP, but was it ever finalized?
 2    If not, we need to get that done before the
 3    audit.  If there's anything I can do to help,
 4    let me know."
 5            And up above Kevin responds,
 6    "Colleen, this was approved on June 1st."
 7        Q.   Do you see that?
 8        A.   Yes.
 9        Q.   So is this -- does this refresh
10    your recollection, in other words, that the
11    suspicious order monitoring formal written
12    standard operating procedure was put in effect
13    in August of 2009?
14        A.   The written procedure, yes.
15        Q.   Okay.  Were there any
16    responsibilities that Cephalon had for
17    suspicious order monitoring related to the risk
18    map for Actiq or Fentora; do you know?
19            MR. ANDRISANI:  Objection, vague.
20            THE WITNESS:  I'm sorry.  Can you
21        repeat that.
22    BY MR. CARTMELL:
23        Q.    Were there any responsibilities
24    that Cephalon had for suspicious order
```

Page 371

```
 1    monitoring related to the risk map for Actiq or
 2    Fentora?
 3            MR. ANDRISANI:  Objection.
 4            THE WITNESS:  To the risk map?
 5    BY MR. CARTMELL:
 6        Q.   Do you know what the risk map
 7    was?
 8        A.   I know that there is a risk map.
 9    I just don't know which one you're referring to.
10        Q.   Which risk map?
11        A.   Yes, quality did a risk map.  I
12    know that I had a risk map that I contributed to
13    for quality.
14        Q.   But it wasn't related to --
15        A.   At Cephalon.
16        Q.   It wasn't related to suspicious
17    order monitoring?
18        A.   It was DEA compliance in general,
19    and I don't know if it included suspicious order
20    monitoring.
21            MR. CARTMELL:  Okay.  I think
22        that's all the questions I have.  Thank
23        you very much for your time.  Actually,
24        my partner over here -- okay, that's all
```

Page 372

```
 1    the questions I have.  Thank you.
 2            THE VIDEOGRAPHER:  Going off the
 3        record, 5:31.
 4            (Pause.)
 5            THE VIDEOGRAPHER:  We are back on
 6        the record at 5:33.
 7    BY MR. CRAWFORD:
 8        Q.   Good afternoon, I think we're
 9    still there.
10        A.   Good evening.
11        Q.   Yeah, good evening maybe.  Mark
12    Crawford for the plaintiffs as well, the MDL
13    plaintiffs.  I just have a few topics, not
14    nearly as long as Mr. Cartmell.  I did want to
15    follow up with your discussion of Cardinal
16    Health with regard to the Cephalon program.
17            Was Cardinal Health one of
18    Cephalon's customers for its Actiq and Fentora
19    products?
20        A.   Their distribution, yes, they
21    would have been a customer.
22        Q.   And did -- and they were a
23    distributor of Actiq and Fentora, correct?
24        A.   Yes.
```

Page 373

1    Q.    And did Cephalon have any other
2  customers that it shipped Actiq and Fentora to?
3    A.    Yes.
4    Q.    And were they any of the other
5  big three, McKesson or AmerisourceBergen?
6    A.    I'm sure it was.
7    Q.    So you did mention that there was
8  a secondary review conducted by Cardinal Health
9  of suspicious orders, right?
10    A.    Yes.
11    Q.    And so what happened when, say,
12  McKesson ordered Actiq or Fentora product; would
13  you run those orders through Cardinal Health's
14  suspicious order program first?
15    A.    The first review is done on site
16  by the logistics and distribution team.  They
17  reviewed everything that came in manually and
18  then forwarded any orders to the Cardinal
19  distribution center.
20    Q.    So if McKesson ordered product
21  from Cephalon, it would first go -- the order
22  would go to Cardinal Health first to run through
23  their analytics and then -- for suspicious
24  orders and then it would be shipped to McKesson?

Page 374

1    A.    It went through Cephalon first,
2  the manual system, and then to Cardinal system
3  as a secondary.
4    Q.    Okay.  And then if it cleared the
5  Cardinal system, was it then shipped to
6  McKesson?
7    A.    If they ordered it, yes.
8    Q.    Okay.  So regardless of who you
9  sold the product to, you always had Cardinal
10  Health run their analytics on it, correct?
11    A.    That's my understanding.
12    Q.    And so the analytics when
13  Cardinal was the customer, it would have to run
14  the analytics of its own customers through its
15  program, right?
16    A.    Yeah, I just want to be clear
17  that Cardinal had a lot of different types of
18  business that I assume were separated.  When we
19  used a third party logistics, it may have been
20  separate from the actual distributor that
21  distributed to customers.  I don't know if it
22  was the same way.  It was a contracted
23  warehouse, and I don't know if they shipped
24  their own products out of there or if it was

Page 375

1  just strictly contracted services.  I don't know
2  what other business ran through that building.
3    Q.    So it may have been a Cardinal
4  affiliate then or something?
5    A.    It was a Cardinal company.  It
6  was called Cardinal Health, but Cardinal had
7  different business segments.  Like, I worked for
8  Cardinal Health in Somerset, New Jersey, and all
9  they did was contract work from other companies.
10  So we manufactured clinical trial material, it
11  wasn't our product, somebody asked us to make it
12  for them.  And then you had the Cardinal Health
13  that was the major distributor of drugs, and
14  that was a complete separate facility.
15          So Cardinal had different
16  business segments that did different things.
17  Now I don't know if Cardinal that distributed
18  our product is the same as the big Cardinal
19  distributor that would distribute Actiq and
20  Fentora to customers.  I don't know if it was a
21  contract facility is what I'm saying.
22    Q.    And did you at one point work for
23  Cardinal Health?
24    A.    I worked for Cardinal, yes.

Page 376

1    Q.    And what years was that?  Was it
2  prior to joining Cephalon?
3    A.    2002 to 2004 I worked for
4  Cardinal Health.
5    Q.    Was your relationship with
6  Cardinal Health as far as the suspicious order
7  monitoring related at all to your employment
8  there?  In other words, did you make any kind of
9  decision to have them conduct the review?
10    A.    Could you rephrase that.  I'm
11  sorry.
12    Q.    Yeah.  So you had a prior
13  relationship with Cardinal being that you were
14  employed there.  I'm wondering if there was any
15  relationship between them having to do this kind
16  of additional review and your employment there,
17  did you send the business to Cardinal, or was it
18  already in place?
19    A.    No, it was already being done
20  when I started with Cephalon.
21    Q.    That's exactly what I was asking.
22    A.    Okay.
23    Q.    Thank you.
24          So you're aware that Cardinal

Page 377

1   Health had paid a fine of $34 million related to
2   its suspicious order monitoring in 2008,
3   correct?
4       A.   I know that they paid a fine.
5       Q.   And how about in 2017, they paid
6   another fine as well, correct?
7       A.   Yes.
8       Q.   And that was $44 million, is that
9   about right?
10      A.   I don't know how much it was.
11      Q.   And that was as a result of a
12  settlement they had reached with the federal
13  government in 2012 with regard to its suspicious
14  order monitoring program, correct?
15          MS. ROLLINS:  Objection, form.
16          MR. ANDRISANI:  Objection.
17          THE WITNESS:  I don't know what
18      the terms of the settlement were.  I
19      mean, I know vaguely that they were
20      fined and that there was a problem.
21  BY MR. CRAWFORD:
22      Q.   Were you aware at the time that
23  you were at Cephalon that they were being
24  investigated by the federal government in any

Page 378

1   way or the DEA with regard to its suspicious
2   order monitoring program?
3       A.   I don't recall.
4       Q.   All right.  So I'm going to --
5   how many customers when you were at Cephalon,
6   let's start with the 2010 period when we had the
7   org chart, how many customers did Cephalon have
8   at that time?
9       A.   I don't know exactly how many
10  customers they had.
11      Q.   How about generally?
12      A.   When you say "customers," are you
13  talking shipped to locations, you know, just
14  ABC, Cardinal as one, no matter how many ship
15  tos?  I don't know.
16      Q.   That's a good question.  The
17  customers, ones that actually bought the product
18  and paid for it, how many would you say, kind of
19  an approximate amount?
20      A.   The number that sticks in my
21  head, from a conversation I had with Randy
22  Bradway was that we had somewhere around 20 to
23  25 customers.
24      Q.   And were they -- they were the

Page 379

1   big three national wholesale distributors,
2   right?
3       A.   They would have been included.
4       Q.   And did it also include retail
5   pharmacy chains, your customers?
6       A.   It was my understanding at the
7   time that we did not ship directly to
8   pharmacies, only to distributors.
9       Q.   Of the other customers besides
10  the big three, what were the -- generally, what
11  types of customers were they?  Were they
12  hospitals, formularies?
13      A.   I honestly don't remember.  It
14  was my -- my recollection that we only shipped
15  to distributors, wholesalers.
16      Q.   And were they similar but smaller
17  types of wholesalers than the big three?
18      A.   Again, I don't recall exactly who
19  those customers were.
20      Q.   Right, but about 25 you had?
21      A.   That's the number that sticks in
22  my head.
23      Q.   And was it Randy Bradstreet?
24      A.   Bradway.

Page 380

1       Q.   Bradway, and give me his -- if
2   you could please reference what was his position
3   again at Cephalon?
4       A.   He was in charge of logistics and
5   distribution.  I don't recall his exact title.
6       Q.   And he didn't report to you, did
7   he?
8       A.   No.
9       Q.   All right.  Under the Cephalon
10  program, how would -- how would you know or find
11  orders that were pended at that time in 2010,
12  when you were in the suspicious order monitoring
13  position?
14          MR. ANDRISANI:  Objection, form,
15      vague.
16  BY MR. CRAWFORD:
17      Q.   Is there a computer program or
18  was there a -- just a kind of a log book or how
19  did it work?
20      A.   It was a manual process.
21      Q.   So does that mean there was a
22  written log book that would come in, or what
23  does that mean?
24      A.   I don't know.

Page 381

1    Q.    And the manual process -- so you
2  had 25 customers, about how many orders would
3  come in a month?
4    A.    I don't know.
5    Q.    And what was the manual process
6  you had in place at Cephalon for reviewing the
7  orders for suspicious order activity?
8    A.    I do not recall exactly what they
9  did to review those orders.
10    Q.    But it was a manual process,
11  right?
12    A.    Yes.
13    Q.    And you were at that time in
14  charge of the suspicious order monitoring in
15  2010 at Cephalon, right?
16    A.    Yes.
17          MR. ANDRISANI:  Objection, asked
18    -- come on, it's 6:00.
19          MR. CRAWFORD:  I know, but you
20    didn't know -- I know, we've got time,
21    though.
22          MR. ANDRISANI:  We've done it all
23    day.
24  BY MR. CRAWFORD:

Page 382

1    Q.    But you don't know as being in
2  charge of it what the process was to manually
3  review those orders?
4          MR. ANDRISANI:  Objection, asked
5    and answered.
6          THE WITNESS:  I do not recall.
7  BY MR. CRAWFORD:
8    Q.    Did Cephalon have a process
9  whereby they had pended orders that weren't
10  deemed suspicious, but they were just pended or
11  separated out for further investigation?
12    A.    I don't know.
13    Q.    Was there any documentation at
14  the time that you're aware of in 2010 when you
15  were in charge of this program of orders that
16  were -- that were reviewed or pended?
17          MR. ANDRISANI:  Objection, asked
18    and answered.
19          THE WITNESS:  I'm sorry.  Could
20    you repeat the question.
21  BY MR. CRAWFORD:
22    Q.    Yeah, I'm just trying to find --
23  because, looking back, if we were going to ask
24  for documentation of the review or the orders

Page 383

1  that were pended or anything, you know, how was
2  that documented at Cephalon, this manual review?
3  I think that's really what my question is.
4    A.    Yeah, I don't know because I
5  wasn't actually doing the review.
6    Q.    And who was?
7    A.    It would have been logistics
8  and -- somebody in logistics and distribution.
9    Q.    Mr. Bradway?
10    A.    He was in charge of the group.
11    Q.    Okay.  But you were in charge of
12  suspicious order monitoring, right?
13          MR. ANDRISANI:  Objection.  The
14    whole thing.
15          MR. CRAWFORD:  It's a disconnect.
16          MR. ANDRISANI:  All day she's
17    been saying she's in charge.
18  BY MR. CRAWFORD:
19    Q.    Okay.  I'm just trying to
20  understand.  It sounded like logistics was the
21  one doing the suspicious order monitoring at
22  Cephalon, right?
23    A.    They reviewed the orders.
24    Q.    Right, and you weren't involved

Page 384

1  in that at all, correct, in your department?
2    A.    I would only get involved if they
3  found something that was suspicious.
4    Q.    Okay.  And then logistics would
5  come to you when they found something
6  suspicious, right?
7    A.    Yes.
8    Q.    And how often did that happen in
9  2010 and before you left?
10    A.    I can't recall it happening.
11    Q.    Are you aware if there were any
12  suspicious order monitoring investigations when
13  you were in -- at Cephalon, you know,
14  investigation of a particular customer order?
15    A.    I do not recall any
16  investigations.
17    Q.    Thank you.
18          I would like to mark the first
19  exhibit, I think we're up to 24, that I'm going
20  to do here.
21          (Document marked for
22    identification as McGinn Deposition
23    Exhibit No. 24.)
24  BY MR. CRAWFORD:

Page 385

1    Q.    This is Exhibit 24.  So what
2  we've marked here, again, starting at the first
3  e-mail is an October 16, 2017 e-mail from you to
4  Jeffrey Zerillo.  The subject is 60 Minutes.
5         Who is Jeffrey Zerillo at the
6  time?  Was he with your company?
7    A.    Yes, he was my supervisor.
8    Q.    And what was his position?
9    A.    He's vice president, supply chain
10  management - America's region.
11    Q.    Is he your immediate person above
12  you?
13    A.    He was my immediate supervisor.
14    Q.    And is he there right now with
15  Teva?
16    A.    No.
17    Q.    And has he left the company?
18    A.    Yes.
19    Q.    Okay.  And do you know when he
20  left?
21    A.    Recently, I would say it was
22  around the April 2018 time period.
23    Q.    And he came from Purdue, correct?
24    A.    He was part of the Actavis

Page 386

1  acquisition.  He came with Actavis.
2    Q.    Okay.  But, originally, before
3  joining Actavis, he was with Purdue?
4    A.    I believe so.
5    Q.    Okay.  And you write here
6  regarding 60 Minutes -- do you recall watching a
7  60 Minutes segment on opioids?
8    A.    I do.
9    Q.    Okay.  And can you briefly
10  describe for me what the segment was that you
11  saw on 60 Minutes?
12    A.    It was -- if I remember
13  correctly, it was an interview with Joe
14  Rannizzisi talking about suspicious orders or
15  the opioid epidemic in general.
16    Q.    And we heard about Mr. Rannizzisi
17  earlier.  He had written those letters back in
18  2006 and '07, correct?
19    A.    Yes.
20    Q.    And you had those letters back
21  around that time frame, right?
22    A.    Yes.
23    Q.    And you write here to
24  Mr. Zerillo, "Did you see this last night?  My

Page 387

1  first thought was that Joe Rannizzisi has lost
2  his mind and the second was that it was a very
3  one-sided story."
4         Is that correct?
5    A.    That is correct.
6    Q.    And why was it one-sided?
7    A.    It only presented information
8  from -- about pharmaceutical industry and not
9  the part that doctors played in the whole opioid
10  epidemic.
11    Q.    And what was the part about the
12  -- you said the pharmaceutical industry.  What
13  was the part about the pharmaceutical industry
14  that he was discussing on 60 Minutes?
15    A.    My recollection is that he blamed
16  the entire opioid epidemic on pharmaceutical
17  companies.
18    Q.    And what did he say they did
19  wrong?
20         MR. ANDRISANI:  Objection.
21  BY MR. CRAWFORD:
22    Q.    If you recall.
23    A.    I don't remember exactly what he
24  said.

Page 388

1    Q.    And you say he has lost his mind.
2  What does that mean he has lost his mind?
3    A.    I don't remember why I said that.
4  I just thought it was a very one-sided view and
5  that he basically blamed everything on the
6  pharmaceutical industry.
7    Q.    Okay.  And then Mr. Zerillo
8  responds back, "LOL," is that lots of laughing,
9  is that what that stands for?
10    A.    You'd have to ask him, but I
11  assume so.
12    Q.    And it says, "Joe just made a lot
13  of friends?"
14         Right?
15    A.    Yes.
16    Q.    And you respond to him, "Right?
17  I guess he's not interested in working for
18  industry."
19         Correct?
20    A.    Yes.
21    Q.    What do you mean he's not
22  interested in working for industry?
23    A.    That he would not be able to work
24  for a pharmaceutical company.

Page 389

1    Q.    But he works for the DEA.  Why
2   would he work --
3    A.    He wasn't --
4    Q.    -- for a pharmaceutical company?
5    A.    He wasn't working for DEA at the
6   time of this interview.
7    Q.    Is it your experience that a lot
8   of people who leave the DEA go work in the
9   industry?
10    MR. ANDRISANI:  Objection.
11    THE WITNESS:  Some do.
12    MR. CRAWFORD:  Next we'll go to
13   Exhibit 25.
14    (Document marked for
15   identification as McGinn Deposition
16   Exhibit No. 25.)
17    MS. ROLLINS:  Counsel, I think
18   your exhibit numbers -- i think there
19   might have been two 23s and two 24s?
20    MR. CRAWFORD:  I think we're
21   sequential, okay.  Yeah, they're great.
22   Thank you, though.
23    MS. HUDNALL:  21 and 22 were out
24   of order.

Page 390

1    MR. CRAWFORD:  Thank you.
2   BY MR. CRAWFORD:
3    Q.    You testified earlier a little
4   bit about industry groups including ADIWG, is
5   that a group that at one point Teva belonged to?
6    A.    It was a group that Actavis
7   belonged to, and Tom was informing me and making
8   an introduction about the group, and I attended
9   a couple of phone calls with that group.
10    Q.    And did Teva ever join that
11   group?
12    A.    I don't know if there was any
13   joining.  We attended some of the discussions
14   that they had.
15    Q.    And what was the purpose of the
16   group?
17    A.    I don't recall.  I mean, it was a
18   working group to discuss DEA issues.
19    Q.    And let's go again to the bottom
20   of the e-mail.  It's from Tom Napoli to you
21   dated February 8th, 2016.  Subject is
22   Anti-Diversity Industry Working Group.  That's
23   the ADIWG, correct?
24    A.    It's anti-diversion, not

Page 391

1   diversity, industry group.  I don't want you to
2   think that I'm against diversity.
3    Q.    No, that's fine.  Thank you for
4   correcting me there.
5    Okay.  So he's with Actavis.  At
6   this point, is Actavis part of Teva?
7    A.    I believe that the acquisition
8   was not completed until August 2016.
9    Q.    But it was in the process at this
10   point in time?
11    A.    We were in the process.
12    Q.    And Actavis -- Teva had purchased
13   the Actavis generic opioid or just generic
14   pharmaceutical business, correct?
15    A.    We purchased the Actavis generic
16   business, yes.
17    Q.    Right, and that was for about
18   $40 billion, correct?
19    MR. ANDRISANI:  Objection.
20    THE WITNESS:  Somewhere around
21   there.
22   BY MR. CRAWFORD:
23    Q.    And he mentions here, the second
24   sentence, "The working group is comprised of the

Page 392

1   major pharma companies/distributors that play a
2   significant role in the manufacture and
3   distribution of opioid products, the group,
4   which Don coordinates" -- who is Don?
5    A.    He references Don Lohman from
6   Mallinckrodt in the sentence above.
7    Q.    Right, and Mallinckrodt was the
8   company that you'd gone to when you were
9   investigating suspicious order monitoring
10   programs, right, when you were -- back in 2012,
11   right?
12    A.    That I had gone to?
13    Q.    You had interviewed them and
14   talked to them about their program?
15    A.    I don't know that I interviewed
16   them.
17    Q.    But you talked to them?
18    A.    I had talked to them.
19    Q.    And was Don one of the people
20   that you talked to there?
21    A.    I knew who Don was.  I don't
22   think I talked to him directly.  I may have
23   talked to other people that worked for him.
24    Q.    And it has organizations such as

Page 393

1 Mallinckrodt, Qualitest, Cardinal, McKesson, ABC
2 and, of course, Allergan/Actavis. Those are all
3 manufacturers and distributors, the major
4 distributors of opioid products, correct?
5        MR. ANDRISANI: Objection, form,
6    lacks foundation.
7        THE WITNESS: They're
8    manufacturers and distributors of
9    controlled substances, yes.
10 BY MR. CRAWFORD:
11    Q.    Right. But also opioid products,
12 correct?
13    A.    Opioids would be included.
14    Q.    And Mallinckrodt, Qualitest and
15 Allergan/Actavis are the manufacturer members of
16 this group, right?
17    A.    Yes.
18    Q.    And McKesson, Cardinal and ABC,
19 they're the big three distributors, right?
20    A.    Yes.
21    Q.    All right. So down at the bottom
22 he writes, when Don reached out, I advised him
23 that in addition to myself, it may be a good
24 idea to have you on the call as we are

Page 394

1 transitioning over -- next page -- soon. There
2 has not been a date established for the call as
3 of yet, but if you would like I can have Don add
4 you to the distribution.
5        So do you recall getting this
6 e-mail and being invited to join this call?
7    A.    Yes.
8    Q.    And he also asks, "Jeff told
9 me" -- this is the last paragraph -- "that the
10 intent was not to initially integrate the legacy
11 Actavis SAP and Teva Oracle systems, but run
12 side by side. I was wondering if it made sense
13 and would be feasible to carve out the CS SKUs
14 from the Actavis platform and migrate to the
15 Teva system as a means to have these products
16 flow through your automated SOM program on day
17 1. Just a thought."
18        So he's talking about the
19 upcoming anticipated integration of the two SOM
20 programs of Actavis and Teva, right?
21    A.    Yes.
22    Q.    And were those two systems
23 eventually integrated?
24    A.    The Actavis orders were

Page 395

1 eventually migrated into Teva system.
2    Q.    And currently Teva uses its
3 system that was put in place by Mr. Tomkiewicz
4 to monitor the orders of the combined company's
5 activities, right?
6    A.    Yes.
7    Q.    Was there anything adopted from
8 the Actavis system into the procedures for the
9 Teva system?
10    A.    I don't know. I don't recall
11 anything. Joe would have been responsible for
12 that.
13    Q.    And, currently, the Actavis --
14 tell me what the Teva Oracle system is. What
15 does it do?
16    A.    It's a ERKDS(ph.) system, it's an
17 enterprise system to manage inventory, among
18 other things.
19    Q.    And does that system help in
20 monitoring suspicious orders in any way or
21 contain data about that?
22    A.    No, it does not help -- I mean,
23 it feeds into DefOps, but it's really just an
24 inventory management system.

Page 396

1    Q.    So it's DefOps, which is the
2 internally derived system, draws from the Oracle
3 system that the orders have come in?
4    A.    I don't -- I can't say for sure
5 if it comes from the Oracle system, the BI
6 system or there's a WM system that the
7 distributor runs off of.
8    Q.    So what was Actavis' system when
9 they joined? Did they -- I mean, how did they
10 monitor suspicious orders? Are you aware of
11 their system?
12    A.    I don't know specifics. Joe
13 would have handled the review of their SOM
14 procedures and specifics.
15    Q.    Is there anyone from the Actavis
16 suspicious order monitoring -- the department or
17 whatever department did it, that now currently
18 works at Teva?
19    A.    No.
20    Q.    And who was the -- who was in --
21 who was your -- was there kind of a counterpart
22 to you with Actavis when they joined?
23    A.    Tom Napoli would have been the
24 counterpart, my contact during the integration.

Page 397

1    Q.    And what was -- how about
2  Mr. Zerillo, was he -- did he report to Tom
3  Napoli?
4    A.    Tom reported to Jeff Zerillo.
5    Q.    Okay, all right.  All right.  So
6  let's go back to the e-mail chain.  You respond
7  on February 8th, 2016, Hi Tom, I'm definitely --
8  "I'd definitely be interested in hearing about
9  this working group Don is putting together."
10  And then you say, I sat in on a
11  multi-disciplinary discussion the order to cash
12  system.
13        What is the order to cash system?
14    A.    It's the whole -- it's the
15  segment of the ERP system that was included,
16  everything from taking an order from a customer
17  to invoicing.
18    Q.    So there's no real cash
19  exchanged, it's just simply an electronic
20  financial transaction?
21    A.    I would assume so.  It's just
22  what they call a business segment of the Oracle
23  system is order to cash.
24    Q.    Thank you.  And then he responds

Page 398

1  up above, "Thanks Colleen.  I will forward your
2  info on to Don.  We have seen part of the
3  working group for a couple -- we have been part
4  of the working group for a couple of years and
5  under the previous DEA leadership, it was very
6  challenging for us to engage in any meaningful
7  dialogue with them.  Now that there has been a
8  leadership turnover, we may have reasonable --
9  may have reason to be a little more optimistic.
10  One of our major accomplishments as a group was
11  to collaborate on the production of a pharmacy
12  "Red Flags" video which was provided free of
13  charge to state boards of pharmacies.
14        So he's optimistic here about a
15  DEA leadership change.
16        Were you optimistic as well?
17    A.    I don't know what leadership he's
18  talking about, if he's talking about Jeff or
19  coming under Teva.  I'm not sure what he was
20  referring to.
21    Q.    Was there a change in -- at the
22  DEA in leadership at the time?
23    A.    Oh, yes, yes.
24    Q.    And were you optimistic about

Page 399

1  that change as well?
2    A.    I was hoping that there would be
3  a little more communication.
4    Q.    And what do you mean by "more
5  communication"?
6    A.    So when Joe Rannizzisi left, his
7  policy was  basically not to communicate with
8  industry, and the new acting administrator had
9  reached out at a couple of conferences and said
10  that he wanted to build bridges with
11  pharmaceutical industry and was looking forward
12  to working together to solve the opioid crisis.
13    Q.    So he was friendlier to industry
14  then, correct?
15    A.    He communicate -- he's told us
16  that he would be more willing to communicate
17  with industry.
18    Q.    Now, DEA is charged with
19  regulating the industry, right?
20        MR. ANDRISANI:  Objection, form.
21        THE WITNESS:  Yes.
22  BY MR. CRAWFORD:
23    Q.    Right.  And part of the
24  regulation is to punish -- one, to investigate

Page 400

1  and if they find a violation of DEA regulations
2  to punish the company, correct?
3        MR. ANDRISANI:  Objection, form.
4        THE WITNESS:  Would be to serve
5      some kind of regulatory administrative
6      action, yes.
7  BY MR. CRAWFORD:
8    Q.    Right.  And one of the actions it
9  could take for a violation of the Controlled
10  Substances Act is to revoke the company's
11  registration to sell those products, correct?
12        MR. ANDRISANI:  Objection, form.
13        THE WITNESS:  That's one action,
14      yes.
15  BY MR. CRAWFORD:
16    Q.    And that's pretty severe and
17  serious, right?
18    A.    It is very serious.
19    Q.    So it's -- would you agree that
20  it's important for the DEA to have some kind of
21  separation from it, from the industry that it
22  regulates?
23        MR. ANDRISANI:  Objection, form.
24        THE WITNESS:  I would disagree in

Page 401

1     that I don't think that the DEA can
2     solve the opioid crisis alone without
3     help from industry, from doctors and
4     from every piece of the supply chain.  I
5     think that they need to have help.
6   BY MR. CRAWFORD:
7     Q.    Did they need help back before
8   there was an epidemic to ensure that there
9   wouldn't be an epidemic?  Did they need help
10  from industry?
11          MR. ANDRISANI:  Objection, form.
12          THE WITNESS:  DEA had conducted
13     several industry group meetings to
14     partner with industry to figure out best
15     practices.  For example, the CCOs
16     program was built with the help of
17     pharmaceutical industry.
18  BY MR. CARTMELL:
19    Q.    And what -- when was that done?
20    A.    I don't remember what year it
21  was.
22    Q.    Was it recently?
23    A.    No, it was years ago, 10 plus
24  years ago before Rannizzisi.

Page 402

1     Q.    Right.  But Rannizzisi when he
2   came in or when he was at the DEA in 2006 and
3   2007 wrote those letters indicating that the
4   industry -- he needed help from the industry,
5   the DEA did, correct?
6          MR. ANDRISANI:  Objection, asked
7   and answered.
8          THE WITNESS:  I'd have to go back
9   and look, but I'll take your word for
10  it.
11         MR. CRAWFORD:  Okay.  Go to the
12  next exhibit, 26.
13         (Document marked for
14  identification as McGinn Deposition
15  Exhibit No. 26.)
16  BY MR. CRAWFORD:
17    Q.    Now, we marked Exhibit 26 here,
18  and I'll just briefly characterize it.  It is an
19  e-mail chain starting from an e-mail from
20  Mr. Donald Lohman,
21  Donald.Lohman@mallinckrodt.com to a number of
22  people, including you, correct?
23    A.    Yes.
24    Q.    And it's dated February 11th,

Page 403

1   2016, right?
2     A.    Yes.
3     Q.    And he's attached a draft letter,
4   please provide comments to Bob and me by close
5   of business 2016.  Thanks.
6          Do you see that?
7     A.    Yes.
8     Q.    So he is forwarding you -- this
9   is in follow-up to the earlier e-mail that we
10  just looked at in Exhibit 25, right?
11    A.    Yes.
12    Q.    And he's forwarding to you a copy
13  of a draft letter for potential comment if you
14  wanted, correct?
15    A.    Yes.
16    Q.    And do you recall receiving this
17  e-mail?
18    A.    I recall communication, yes.  I
19  don't know if I recall this specific one.  I'd
20  have to look at it.
21    Q.    All right.  And if you look at
22  the draft, it's in red line format.  The next
23  page on the fourth line down, they have added as
24  a red line change in addition Teva

Page 404

1   Pharmaceuticals has recently joined the ADIWG.
2          Do you see that?
3     A.    I do.
4     Q.    So Teva has joined, in fact, the
5   ADIWG, correct?
6     A.    We had joint meetings with the
7   ADIWG at that point.
8     Q.    But did you join the ADIWG, as
9   it's reflected here?
10         MR. ANDRISANI:  Objection.
11         THE WITNESS:  I don't know
12     exactly what join means.  There's no fee
13     that we paid to join.  We just started
14     calling in to their meetings.
15  BY MR. CRAWFORD:
16    Q.    All right.  And your -- and the
17  next page at the last line you were added as a
18  CC, correct?
19    A.    Yes.
20    Q.    Okay.  And it lists you as
21  director, DEA compliance, Teva Pharmaceuticals,
22  correct?
23    A.    Yes.
24    Q.    All right.  So you had a chance

Page 405

1     to make revisions.
2          Do you know if you revised any of
3     these additions about Teva and yourself on
4     there?
5          A.   I don't recall.
6          MR. CRAWFORD:  Let's go to the
7     next Exhibit, 27.
8          (Document marked for
9          identification as McGinn Deposition
10         Exhibit No. 27.)
11    BY MR. CRAWFORD:
12         Q.    And what I marked here as Exhibit
13    27 is a February 18th, 2016 e-mail.  It's from
14    Robert Giacalone to -- I see your name here,
15    Colleen McGinn, down there.
16         Do you see that?
17         MR. ANDRISANI:  It's also to
18    another group of people too.
19         MR. CRAWFORD:  Correct, yep,
20    thank you.
21    BY MR. CRAWFORD:
22         Q.    So it's to a group of people,
23    including yourself, correct?
24         A.   Yes.

Page 406

1          Q.    And this apparently is the
2     attached final letter that was written, right?
3          A.   Apparently.
4          Q.    Okay.  And the letter is dated
5     February 18th, 2016, correct?  This is the next
6     page.
7          A.   Yeah, I'm going to assume the
8     date on the second page is wrong at the top of
9     the page.  It says 2015 after that but --
10         Q.    Where does it say 2015?
11         A.   At the top of the second and
12    third page says February 18th, 2015.  I have to
13    assume it was 2016 and that that was a typo.
14         Q.    Yes, it looks like that was a
15    typo, okay.
16         But at the top of the second
17    page, it says February 18th, 2016, right?
18         A.   Yes.
19         Q.    All right.  So it's written to
20    Mr. Louis J. Milione, deputy assistant
21    administrator, Office of Diversion Control with
22    the U.S. Drug Enforcement Administration.
23         Do you see that?
24         A.   Yes.

Page 407

1          Q.    So this is Cardinal Health, were
2     they kind of taking the lead on communicating
3     the ADIWG's views here?
4          A.   It looks like it.
5          Q.    Okay.  So Cardinal -- Cardinal is
6     writing here, the first paragraph it says, "I am
7     writing to you on behalf of the Anti-Diversion
8     Industry Working Group (ADIWG).  The ADIWG is a
9     group of leading pharmaceutical manufacturers
10    and distributors comprised of Mallinckrodt
11    Pharmaceuticals, Cardinal Health,
12    AmerisourceBergen, McKesson Corporation,
13    Actavis/Allergan and Par Pharmaceutical
14    (formerly Qualitest).  In addition, Teva
15    Pharmaceuticals has recently joined the ADIWG."
16         So this went out indicating that
17    Teva had joined the ADIWG, correct?
18         A.   Yes.
19         Q.    So this was a letter written on
20    behalf of the ADIWG by Robert Giacalone, right?
21         A.   Yes.
22         Q.    I don't think I'm saying his name
23    right, Giacalone?
24         A.   It's close enough.  I'm not even

Page 408

1     sure how to pronounce it myself.
2          Q.    All right, okay.  Fair enough
3     there.
4          Now, Cardinal Health at the
5     time -- you're aware that in 2017, Cardinal
6     Health had actually paid a fine for -- with
7     regard to its suspicious order monitoring
8     program in 2017, correct?
9          MR. ANDRISANI:  Objection.
10         MS. MARIOTTI:  Objection.
11         THE WITNESS:  I knew that
12         Cardinal was fined.  I don't recall
13         exactly what year.
14    BY MR. CRAWFORD:
15         Q.    But it was after this letter,
16    right?
17         MR. ANDRISANI:  Objection.
18         MS. MARIOTTI:  Objection.
19         THE WITNESS:  I don't know.
20    BY MR. CRAWFORD:
21         Q.    And was it in the range of
22    $44 million?
23         MR. ANDRISANI:  Objection.
24         MS. MARIOTTI:  Objection.

Page 409

1        THE WITNESS:  I don't know.
2   BY MR. CRAWFORD:
3        Q.    All right.  So Mr. Giacalone of
4   Cardinal Health writes in the second paragraph,
5   "First, congratulations to you on your
6   appointment as the new Deputy Assistant
7   Administrator for the DEA's Office of Diversion
8   Control."
9        Do you see that?
10       A.    Yes.
11       Q.    Okay.  And then he says, "Second,
12  we believe that many of the statements you
13  provided in your January 27, 2016 testimony
14  before the Judiciary Committee (and elsewhere)
15  reflect the same views and philosophy of ADIWG."
16       Do you see that?
17       A.    Yes.
18       Q.    So do you believe at the time,
19  you personally believe at the time that
20  Mr. Milione had the same views and philosophy as
21  this group?
22       A.    I had only been aware of this
23  group for ten days before this letter went out.
24  I can't say that I know all the views of the

Page 410

1   group at the time.
2        Q.    Okay.  But did Mr. Milione's
3   views, were they the same views and philosophy
4   that Teva had?
5        MR. ANDRISANI:  Objection, form,
6   lacks foundation.
7        THE WITNESS:  I'm not familiar
8        with the testimony that they're
9        referring to.
10  BY MR. CRAWFORD:
11       Q.    But you got a draft of this
12  letter and you -- and Teva was added to the
13  letter before it went out, right?
14       MR. ANDRISANI:  Objection, asked
15       and answered.  You've established that.
16       THE WITNESS:  Teva was added to
17       the letter.
18  BY MR. CRAWFORD:
19       Q.    And you had gotten a draft
20  beforehand, right?
21       MR. ANDRISANI:  Objection, asked
22       and answered.
23       THE WITNESS:  I received a draft
24       beforehand.

Page 411

1   BY MR. CRAWFORD:
2        Q.    Okay.  And then look at the end
3   of the second page, he writes, "However, we
4   truly believe that working together with DEA to
5   help fight these problems can make a
6   significant, positive impact.  To that end, we
7   write to extend an invitation to you and any
8   members of your staff to meet in-person with the
9   ADIWG to discuss how we can use our
10  collaborative efforts to discuss prescription
11  drug diversion and abuse.  In addition, we look
12  forward to discussing any other topics related
13  to diversion control of interest to you.  Of
14  course, all ADIWG attendees agree not to discuss
15  any issues, investigations or matters pending
16  before the Agency."
17       So are you aware whether
18  Mr. Milione had met with any members of the
19  ADIWG group as a result of this invitation?
20       A.    No, he did not.
21       MR. CRAWFORD:  And -- all right.
22       Let's go to Exhibit 28, please.  Mark
23       that here.
24       (Document marked for

Page 412

1        identification as McGinn Deposition
2        Exhibit No. 28.)
3   BY MR. CRAWFORD:
4        Q.    Now, we're moving forward here to
5   May 26, 2016, and this is Mr. Napoli writing to
6   you about yesterday's call.
7        At this point Mr. Napoli, he's at
8   Actavis, but Actavis is at this point -- I guess
9   now the merger hasn't quite happened yet in May,
10  right?
11       A.    Correct.
12       Q.    Okay.  And he writes to you,
13  "Good morning, I hope that the other distributor
14  members on the call will reel in ABC regarding
15  their suggestion to ask DEA the 'hard
16  questions'."
17       Does this refresh your
18  recollection about what call he's referring to?
19       A.    We had several calls with this
20  group.  I don't know what specific call -- I
21  can't remember the details of this call,
22  particularly.
23       Q.    And is this a call with the ADIWG
24  group?

Page 413

1     A.   I would assume that it was.
2     Q.   All right.  And -- but you don't
3  recall the specifics of the call?
4          MR. ANDRISANI:  Objection, asked
5     and answered.
6          THE WITNESS:  No, I don't.
7  BY MR. CRAWFORD:
8     Q.   You write back here "That Bob guy
9  was a little out of control yesterday with his
10  'I'll pick up the damn phone and cancel the
11  meeting' comment.  I have a feeling that this is
12  going to get a little crazy but we'll see.  I
13  have no problem backing out if necessary."
14          So what -- who is Bob from ABC?
15     A.   I don't remember his last name.
16     Q.   And what meeting was he referring
17  to?
18     A.   Who was referring to?
19     Q.   The Bob guy and I'll pick up the
20  damn phone and cancel the meeting.
21     A.   I don't remember, to be honest
22  with you.  I remember some of these calls being
23  very unorganized.
24     Q.   And these are the ADIWG calls?

Page 414

1     A.   Yes.
2     Q.   And you say you have no problem
3  backing out, meaning withdrawing Teva from the
4  membership, right?
5     A.   Yes.
6     Q.   So -- so what was he crazy about?
7     A.   What I remember is that nobody on
8  this group could agree to the content of the
9  meeting with Lou Milione.  They -- there was a
10  lot of disagreement between the members of this
11  group about what they wanted this meeting's
12  purpose to be, and everybody had a different
13  idea, and nobody could agree on the content.
14     Q.   So Mr. Milione at this point had
15  agreed to meet with the group, right?
16     A.   I think that he had agreed to
17  meet with the group.
18     Q.   And was this -- was there any
19  prior meeting at all, or was this his first
20  meeting, I you recall, with the group?
21     A.   To my knowledge, there was no
22  previous meeting with the group.  They had
23  requested a meeting and he had accepted.
24     Q.   All right.  So this meeting was

Page 415

1  coming up.  Do you know did that meeting
2  actually occur?
3     A.   No.
4     Q.   And did anyone cancel the
5  meeting?  Who canceled the meeting?
6     A.   The meeting was canceled, but I
7  do not recall who canceled it.
8     Q.   Was it canceled by the ADIWG side
9  or by the DEA side?
10     A.   I don't recall.
11     Q.   And this call presumably was a
12  discussion about what to -- what to discuss in
13  the meeting, right?
14     A.   Yes.
15     Q.   And then Mr. Napoli writes, "I
16  agree about walking away if there is a sense
17  that someone will go off the grid."
18          Do you know what he's referring
19  to as going off the grid?
20          MR. ANDRISANI:  Objection, form.
21          THE WITNESS:  I don't know what
22     he meant.  I can guess.
23  BY MR. CRAWFORD:
24     Q.   I don't want you to guess, but if

Page 416

1  you have an inkling of it or might have some
2  knowledge.
3          MR. ANDRISANI:  Objection, form.
4          THE WITNESS:  I don't know.
5     You'd have to ask Tom.
6  BY MR. CRAWFORD:
7     Q.   So you respond, "This was my
8  concern all along.  When Don was going on in the
9  beginning about getting in there for a meeting,
10  I told him that there was a chance that DEA
11  would ask us for things we couldn't provide.
12  The SOM discussion is a clear example."
13          So what was it about what the DEA
14  could ask in the meeting about SOM that you
15  couldn't provide that was in your mind at the
16  time?
17     A.   Yeah, I can't remember
18  specifically.  I just remember that there was
19  definite opinions about what the distributors --
20  the wholesalers thought an SOM program should
21  look like and things that the manufacturers
22  thought that the SOM could look like, and the
23  two groups could not agree on a -- what a real
24  SOM system should look like or consist of.

Page 417

1    Q.   So you write, moving on, you
2  said, "It's not consistent with a group
3  mentality."
4         Was it your feeling that the
5  group should be unified in their approach to
6  this meeting?
7    A.   I thought that we should take a
8  consistent approach.
9    Q.   And you write, "I'm skeptical
10 that we can get this together in two months."
11        So the meeting must have been in
12 two months, right, or scheduled for that, at
13 least?
14   A.   I don't know if we're talking
15 about -- there was a plan at some point for the
16 members of the ADIWG to get together face to
17 face before a meeting with DEA, and I don't know
18 if he's -- if I'm referencing the meeting with
19 ADIWG or DEA, but I believe that there was a
20 meeting scheduled with DEA at this point.
21   Q.   Right, and I skipped a sentence.
22 You said, "We shouldn't be talking about
23 distributors need this and manufacturers need
24 that."

Page 418

1         Is that correct?
2    A.   Yes.
3    Q.   And that was what you were
4  referring to is that there was discussion about
5  having two different approaches for each, right?
6    A.   Each group thought that they
7  needed something different and couldn't agree.
8    Q.   And you thought that they should
9  have a consistent, unified position?
10        MR. ANDRISANI:  Objection, asked
11 and answered.
12        THE WITNESS:  I thought that we
13 needed a consistent approach.
14        MR. CRAWFORD:  Next exhibit will
15 be 29.
16        (Document marked for
17        identification as McGinn Deposition
18        Exhibit No. 29.)
19 BY MR. CRAWFORD:
20   Q.   This is an e-mail chain, the top
21 e-mail on the first page is August 9, 2011 from
22 Jack Crowley to a number of individuals,
23 including yourself at Cephalon.
24        Was this before you had --

Page 419

1  Cephalon had become part of Teva?
2    A.   Yes.  My recollection is that
3  Teva acquired Cephalon in October 2011.
4    Q.   And the subject is "Quota -
5  Administrative Reviews," correct?
6    A.   Yes.
7    Q.   And who is Jack Crowley?
8    A.   Jack Crowley was the DEA
9  compliance person at Purdue.
10   Q.   All right.  So he is writing to
11 you, "Latest thinking while the paper is being
12 reviewed as we speak.  There will be no
13 author/sponsor," and that's in bold and
14 underlined.
15        He says, the paper will be made
16 available to every company to provide to their
17 key stakeholders and federal government affairs
18 colleagues, etc. for their lobbying efforts.
19        The goal is to get it out
20 tomorrow to my VP, federal government affairs -
21 and to each of you - as well as the wider NJ
22 group.  Hopefully, I'll have a review by close
23 of business today.
24        The paper will also be made

Page 420

1  available to other groups and audiences besides
2  manufacturers - like the Pain Care Forum which
3  has its monthly meeting in Washington this
4  Thursday.  The meeting will be held at Purdue in
5  the District.  It's usually a two-hour meeting
6  with lunch provided - and attendees from the
7  following join in (sort of like NJPIG - not
8  everyone participates at the meeting).
9         So this e-mail is basically being
10 circulated amongst the NJ -- I don't want to say
11 NJPIG because it's kind of a weird acronym, but
12 NJPIG, right?
13   A.   Yes.
14   Q.   All right.  And that was a group
15 that Teva was a member of?
16   A.   Teva was a member of NJPIG at the
17 direction of the DEA field office in Newark who
18 got together the registrants in New Jersey and
19 asked them to talk about DEA compliance issues.
20   Q.   So who at the DEA field office
21 asked this group to get together?
22   A.   I believe it was Dennis
23 Mihalopoulos that initially got it together.  I
24 wasn't a part of the initial discussion.  I was

Page 421

1    working at Cephalon, and we didn't have a New
2    Jersey office, but when Teva acquired Cephalon,
3    I became aware of this group, and what they told
4    me was that the field office called in their
5    registrants and asked them to get together to
6    talk about DEA issues.
7        Q.   Was there a letter or something
8    or was there a phone call, or how did this
9    start?
10       A.   I'm not sure because I didn't get
11   the initial communication, but I do know that
12   the Buzzeo group was involved in initially
13   facilitating the meeting with DEA.
14       Q.   And did the DEA meet with this
15   group?
16       A.   Yes.
17       Q.   How many times?
18       A.   I don't know how many times, but
19   every time we planned a meeting we invited DEA
20   to attend.
21       Q.   Okay.  But was it more than once
22   or more than five times?
23       A.   I would say it was five times or
24   more.

Page 422

1        Q.   And we're talking here about some
2    kind of paper being prepared by the group,
3    correct?
4        A.   That's what it looks like.
5        Q.   What is this paper about?
6        A.   I don't -- I would have to -- is
7    it attached here?
8        Q.   I don't know.  I don't think so,
9    no.
10       A.   I don't know what it was about.
11       Q.   All right.  And the Pain Care
12   Forum, what is that organization?
13       A.   I don't know.
14       Q.   And was Teva a member or actually
15   Cephalon a member of this Pain Care Forum?
16       A.   I'm not sure.
17       Q.   Go to second page, about a little
18   over halfway down, you see on the left Cephalon
19   listed there.  Does that -- it says,
20   "Participating Organizations of the Pain Care
21   Forum" on the first page, and then below it
22   Cephalon is listed, correct?
23       A.   Yes, I see that.
24       Q.   Would you disagree that Cephalon

Page 423

1    was a member of the Pain Care Forum at this
2    time?
3            MR. ANDRISANI:  Objection, asked
4        and answered.  She didn't know.
5            MR. CRAWFORD:  Right, but I've
6        now shown her where it is, and maybe it
7        refreshed her recollection, right.
8            THE WITNESS:  According to this
9        document, they were.
10   BY MR. CRAWFORD:
11       Q.   Okay.  And the Pain Care Forum,
12   have you ever heard of the Pain Care Forum?
13       A.   I don't remember the Pain Care
14   Forum, I don't recall.
15       Q.   It appears to be a mixture of
16   pharmaceutical industry members and pain
17   advocacy groups, correct?
18           MR. ANDRISANI:  Objection, form.
19           THE WITNESS:  It looks like
20       manufacturers, different associations
21       and groups related to pain management.
22   BY MR. CRAWFORD:
23       Q.   Have you ever heard of any of
24   these pain management groups?

Page 424

1        A.   Yes.
2        Q.   Which ones have you heard of,
3    just a couple?
4        A.   The groups on the list?
5        Q.   Yeah.
6        A.   Abbott Laboratories --
7        Q.   No, the pain groups, not the
8    pharmaceutical in -- not the pharmaceutical
9    companies.
10       A.   Oh.  The HDMA I had heard of,
11   Healthcare Distribution Management Association.
12   Partnership for a Drug Free America, I've heard
13   of.  RADARS system I've heard of.  Those are the
14   ones that sound familiar.
15       Q.   All right, thank you.  If you
16   could go to the second to last page.  This is
17   kind of the start of the e-mail chain.
18   Mr. Crowley is writing -- look at the page
19   before that, does not look like you were on this
20   e-mail, but I want to ask you a couple questions
21   about this.  He writes here, the second sentence
22   there on the second to last page, page 848, he
23   writes, "The stage has been set to utilize the
24   quota process as an enforcement tool, without

Page 425

1    regards to healthcare providers or patients."
2        Q.   Do you recall at this point in
3    time that there was a possibility that the quota
4    process could be used as an enforcement tool by
5    the DEA?
6        MR. ANDRISANI:  Objection, lacks
7    foundation.  Somebody else's statement
8    that she didn't receive.
9        MR. CRAWFORD:  Right, but I'm
10   just asking if she remembers anything
11   similar to what's being discussed here.
12       THE WITNESS:  I don't recall
13   exactly what was being discussed in
14   terms of using quota as enforcement in
15   2011.
16   BY MR. CRAWFORD:
17       Q.   Have you ever heard of quota
18   being used as enforcement -- an enforcement tool
19   by the DEA ever?
20       A.   Up to today?
21       Q.   Up till today.
22       A.   Yes.
23       Q.   And in what context have you
24   heard about that?

Page 426

1        MR. ANDRISANI:  Objection.
2        THE WITNESS:  DEA here, you know,
3    Jeff Sessions talk about DEA using more
4    tools for enforcement actions, and I
5    know quota was mentioned as one, was a
6    recommendation to use that.
7    BY MR. CRAWFORD:
8        Q.   So that would have been in the
9    past two years?
10       A.   Yes.
11       Q.   And can you tell me what quota
12   is?
13       A.   Yeah.  A quota is something that
14   DEA -- we apply for based on sales data.  We
15   apply for quota, DEA tells us how much we can
16   procure for Schedule IIs in a given calendar
17   year.
18       Q.   So the way -- is it your
19   understanding that quotas can be used as an
20   enforcement tool in a way that if the DEA learns
21   that there is some kind of deficiency or failure
22   of a company's suspicious order monitoring
23   system, that they could simply reduce the quota
24   of opioids that that company can sell, is that

Page 427

1    what your understanding of how it might be used
2    as an enforcement tool against a pharmaceutical
3    company?
4        MR. ANDRISANI:  Objection, form,
5    lacks foundation.
6        THE WITNESS:  DEA has always had
7    the ability to lower quota.
8    BY MR. CRAWFORD:
9        Q.   And you were talking about
10   Mr. Sessions and using potentially quota as an
11   enforcement tool.
12       Is that one way that you
13   understood that it could be used when he used it
14   in that context?
15       MR. ANDRISANI:  Objection, form,
16   vague.
17       THE WITNESS:  Yes.
18       MR. CRAWFORD:  Go to Exhibit 30
19   here.
20       (Document marked for
21   identification as McGinn Deposition
22   Exhibit No. 30.)
23   BY MR. CRAWFORD:
24       Q.   Okay.  What we marked here is --

Page 428

1    go to the first e-mail on the second page.  We
2    marked as Exhibit 30 an e-mail chain from you,
3    Colleen McGinn, dated July 6, 2012 to Jack
4    Crowley, subject "SOM."
5        Jack Crowley, again, was the head
6    of the DEA compliance at Purdue at the time,
7    correct?
8        A.   Yes.
9        Q.   All right.  And you write, "Jack,
10   are you in the office next week?  We (as in
11   Teva) have an opportunity to set up a meeting
12   with John Partridge to discuss challenges that
13   manufacturers (and maybe distributors) have with
14   the SOM process."
15       Who is John Partridge?
16       A.   John Partridge worked at
17   headquarters, and I don't know what his exact
18   title was, but he was an assistant to Joe
19   Rannizzisi.
20       Q.   All right.  So you were actually
21   getting an opportunity potentially to meet with
22   one of Rannizzisi's assistants about SOM
23   process, right?
24       A.   It looks like it.

Page 429

1    Q.    And did that meeting take place?
2    A.    Not that I recall, no.
3    Q.    And do you know why the meeting
4  fell through?
5    A.    I don't.
6    Q.    So back here on the first page,
7  Mr. Crowley writes back to you on July 12, 2012,
8  he writes to you, "Hello Colleen, in follow-up
9  to our discussion, Chris could approach John by
10  asking exactly what we talked about."
11         Skipping down a bit to the fourth
12  paragraph he writes, we know that they are
13  starting to hold these manufacturers accountable
14  and will move to reduce their quota by the same
15  percent as the diversion percent they can prove.
16  Example - Pharmacy Z filled 400 prescriptions
17  for controlled substances last week.  394 of the
18  400 were for oxycodone 30 milligrams IR; 393
19  were for cash.  The NDC number indicated that
20  the product used to fill those prescriptions
21  came from manufacturer X.  Bingo.
22         Is that your understanding of one
23  way that the DEA can use quota as an enforcement
24  tool through that example that he's providing?

Page 430

1         MR. ANDRISANI:  Objection,
2    foundation, lacks foundation, form.
3  BY MR. CRAWFORD:
4    Q.    I'm just asking for your
5  understanding.  Is that a way you can use it as
6  an enforcement tool?
7    A.    That was Jack's understanding.
8    Q.    And did you ever have an
9  understanding of that might be how an
10  enforcement tool might work if the DEA chose to
11  use quota as an enforcement tool?
12    A.    I guess that was one way they
13  could look at it.
14         MR. CRAWFORD:  Let's mark Exhibit
15    31 here.
16         (Document marked for
17    identification as McGinn Deposition
18    Exhibit No. 31.)
19  BY MR. CRAWFORD:
20    Q.    This is an e-mail from you to the
21  NJPIG group regarding -- it's in February 27,
22  2013 regarding "NJPIG Meeting - Information on
23  FDA Hydrocodone Hearing."
24         You write, "As promised, I'm

Page 431

1  forwarding information from FDA hearing on the
2  rescheduling of Hydrocodone to all meeting
3  attendees.  It was great seeing all of you
4  yesterday.  Thanks PF Labs for hosting (again)."
5         Very quickly, do you recall
6  hosting this meeting for NJPIG around this time
7  period?
8         MR. ANDRISANI:  Objection,
9    misstates the document.
10         THE WITNESS:  I did not host.  PF
11    Labs hosted the meeting.
12  BY MR. CRAWFORD:
13    Q.    I'm sorry, you're right.
14         So but do you recall -- do you
15  recall this meeting at PF Labs?
16    A.    I remember being at PF Labs for
17  NJPIG meeting, yes.
18    Q.    And was PF Labs that
19  associated with Purdue Pharmaceutical?
20    A.    It is.
21    Q.    And do you recall the subject FDA
22  hearing on the rescheduling of Hydrocodone, this
23  subject?
24    A.    Do I recall the subject?

Page 432

1    Q.    Yeah.
2    A.    I remember that there was a
3  rescheduling action.
4    Q.    Okay.  And what was -- what would
5  have been the concern or subject of the meeting
6  with regard to that rescheduling action?
7         MR. ANDRISANI:  Objection, form.
8         THE WITNESS:  At the time -- this
9    is an FDA hearing.  There was discussion
10    about rescheduling Hydrocodone to a
11    Schedule II, Hydrocodone combo products.
12  BY MR. CRAWFORD:
13    Q.    At what time and did that, in
14  fact, happen; did it get scheduled to a Schedule
15  II?
16    A.    Yes.
17    Q.    And so do you know if the DEA or
18  any representative attended this particular
19  meeting?
20    A.    I do not recall.
21    Q.    And do you see anyone on the to
22  line from the DEA on this?
23    A.    We would not have forwarded this
24  information to DEA.

Page 433

1    Q.    And why is that?
2    A.    They weren't a member of the
3  group.  They may have come to speak, but they
4  were not a member of the NJPIG.
5    Q.    And the members of the group,
6  were they manufacturers and distributors of
7  opioid products?
8    A.    Yes.
9      MR. CRAWFORD:  Next exhibit, 32.
10      (Documents marked for
11    identification as McGinn Deposition
12    Exhibit Nos. 32 and 33.)
13      THE WITNESS:  Is it okay if I
14    take a break, just a quick one, please?
15      MR. ANDRISANI:  Absolutely.
16      THE VIDEOGRAPHER:  Off the
17    record, 6:35.
18      (Brief recess.)
19      THE VIDEOGRAPHER:  We are back on
20    the record at 6:43.
21  BY MR. CRAWFORD:
22    Q.    I have limited time here.  I have
23  marked Exhibits 32 and 33, and I just have one
24  question on 33.  I want to go to that first.

Page 434

1      This is an e-mail chain with the
2  last e-mail -- second to last e-mail from you
3  to Jack Crowley and others, August 15, 2012, and
4  take a look at this document, but the question I
5  want to ask you here is you write, "Ron Buzzeo
6  has been talking about this group a lot."
7      They're talking about the CCSM
8  group that's forming.  "Apparently people are
9  using them to fight SOM issues."
10      And I'm just trying to find out
11  what you meant by "fight SOM issues."  If you
12  could take a look at that and let me know what
13  that means.
14    A.    (Witness reviews document.)
15      I'm sorry.  Can you repeat the
16  question now that I've read it.
17    Q.    Yeah, I just want to know what
18  you meant.  You say, "Apparently people are
19  using them" -- this is the CCSM group that's
20  forming -- "to fight SOM issues."
21      What do you mean by "fight SOM
22  issues"?
23    A.    By defending their companies
24  against regulatory action by the DEA about SOM

Page 435

1  issues.
2    Q.    And the CCM -- CCSM apparently
3  had hired two attorneys from the DEA to speak at
4  this initial meeting they're having, right?
5    A.    I don't know if they hired them
6  or they volunteered.  I don't know if they were
7  paid to do it or if they started it.  It's not
8  clear to me where this came from.
9    Q.    All right.  And then briefly on
10  Exhibit 32, this is another NJPIG meeting on
11  November 10, 2016, and my only two questions
12  here are, one, is this a meeting that Teva
13  hosted at its facilities and you had coordinated
14  this, and, two, if anyone from the DEA attended
15  this meeting, according to this attendee list?
16    A.    It looks like Teva hosted the
17  meeting and that DEA was invited, according to
18  Mike Meggiolaro.  They were waiting to see if
19  someone would come.  I do know that DEA did
20  attend one of the meetings that we hosted.  I
21  don't know if it's this particular one.
22    Q.    All right.  But the agenda is
23  listed at top, and no DEA speaker is in the top
24  five on the agenda, right?

Page 436

1    A.    They would not have included them
2  on the agenda.  Usually if DEA came to these
3  meetings, it would be over lunch period, and
4  then we would have the opportunity to talk to
5  them, but it would not have been included on the
6  agenda because we weren't sure if they were
7  going to show up.
8      MR. CRAWFORD:  That's all I have.
9  Thank you.
10      THE VIDEOGRAPHER:  Off the
11    record, 6:47.
12      (Brief recess.)
13      THE VIDEOGRAPHER:  Back on the
14    record, 6:48.
15      MR. GASTEL:  Good evening.
16    Before I start asking you some
17    questions, I'm going to lodge our
18    general objection, which your counsel
19    will understand.
20      My name is Ben Gastel.  I'm
21    representing the plaintiffs in the
22    Tennessee lawsuit, Dunaway versus
23    Purdue, and I want to state for the
24    record that we object to the deposition

Page 437

1    going forward on behalf of my clients
2    due to Teva's continuous failures to
3    meet its obligations set forth in the
4    state and federal cooperation protocol
5    as laid out in our previous deposition
6    records and in our pending motion to
7    quash.  With all of that being said, I
8    do have some questions for you.
9  BY MR. GASTEL:
10    Q.    As I just stated, I'm
11  representing a different group of plaintiffs
12  than the ones that the previous questioners were
13  asking you about throughout today, and my
14  clients are all located in the state of
15  Tennessee, so I'll begin by asking you, have you
16  ever been to the state of Tennessee?
17    A.    At some point in time, yes.
18    Q.    Was that for work-related
19  purposes?
20    A.    Yes.
21    Q.    Do you recall what that instance
22  was?
23    A.    I recall going to the Cardinal
24  facility in La Vergne, Tennessee.

Page 438

1    Q.    Do you know approximately when
2  that was?
3    A.    No, it was -- I don't remember.
4    Q.    And do you know if that was in
5  your work with Teva or one of the other
6  companies that you've worked for?
7    A.    Cephalon.
8    Q.    So it's fair to say that that
9  visit was prior to Teva's acquisition of
10  Cephalon?
11    A.    Yes.
12    Q.    But you don't remember the exact
13  year?
14    A.    No, I don't.
15    Q.    Do you recall the nature of your
16  visit to the Cardinal facility?
17    A.    It would have been to evaluate
18  Cardinal's controlled substance program.
19    Q.    And do you remember the results
20  of that evaluation?
21    A.    I don't recall the exact results,
22  no.
23    Q.    Do you know if there was a
24  written report from that evaluation?

Page 439

1    A.    There -- I'm sure there was.
2    Q.    Do you know if you wrote such a
3  report?
4    A.    I probably did.
5    Q.    Do you know if you would have
6  handed it to somebody or given it to somebody?
7    A.    The people at the Cardinal
8  facility would have received a copy.
9    Q.    And do you remember their names?
10    A.    I do not.
11    Q.    Apart from that visit to the
12  Cardinal facility in La Vergne, do you ever
13  recall going to the state of Tennessee for
14  work-related reasons?
15    A.    I don't recall.
16    Q.    Throughout today we've been
17  discussing a lot about the opioid diversion
18  issues in America, and I think that you had
19  previously characterized the opioid issues as an
20  epidemic.
21        Do you remember that testimony?
22    A.    Yes.
23    Q.    And are you aware that the opioid
24  diversion problem is particularly large or

Page 440

1  particularly problematic in certain places in
2  the country?
3    A.    Yes.
4    Q.    And one of those places is in
5  Appalachia, right?
6    A.    Yes.
7    Q.    And have you ever heard of the
8  Appalachian High-Intensity Drug Trafficking
9  Area?
10    A.    I know -- I don't know that I've
11  ever heard it called that specifically, but I
12  know what you're talking about.
13    Q.    And not to insult your
14  intelligence about American geography, but are
15  you aware that east Tennessee falls in or lies
16  adjacent to that Appalachian corridor?
17    A.    Yes.
18    Q.    And then prior to 2015, did Teva
19  treat orders going into that area of the country
20  any different than orders going elsewhere?
21    A.    Prior to 2015 was your question.
22  I couldn't say.  I didn't process the orders.
23    Q.    Was there a point in time when
24  Teva would have started treating orders going to

Page 441

1    that area of the country differently than orders
2    going somewhere else?
3        A.    I know that it's something that
4    Joe Tomkiewicz would review or look at in his
5    suspicious order monitoring program.
6        Q.    And do you know when he started
7    doing that?
8        A.    No.
9        Q.    In your mind, what is a
10   suspicious order for prescription opioids?
11       A.    A suspicious order for any
12   controlled substance would be an order of
13   unusual size, an order of unusual frequency or
14   with an unusual pattern.
15       Q.    And, in your mind, what is a
16   diverted prescription opioid?
17       A.    It's a product that lands outside
18   of the intended destination.
19       Q.    What are the sources of illegally
20   diverted prescription opioids?
21       A.    What are the sources?
22       Q.    How can opioids be diverted?
23       A.    They could be stolen from the
24   facility or anywhere in the supply chain.

Page 442

1    That's what I think of.
2        Q.    Any other ways for prescription
3    opioids to be delivered -- or diverted, in your
4    mind?
5        A.    Yeah, I mean, patients -- I mean,
6    people could steal the drugs for a legitimate
7    patient.  They could take somebody else's drug.
8        Q.    What do you mean by "legitimate
9    patient"?
10       A.    So you assume that a doctor
11   writes a prescription for somebody who really
12   needs the medication that we provide, and
13   somebody would take it that wasn't prescribed
14   the drug.
15       Q.    Have you ever looked -- or strike
16   that.
17           What is your understanding of
18   opioid prescription rates in the state of
19   Tennessee?
20       A.    I don't know.
21       Q.    What is your understanding of the
22   prescription opioid crisis in the state of
23   Tennessee?
24       A.    I don't have specifics.

Page 443

1        Q.    Have you ever reviewed materials
2    published by the Tennessee Department of Health
3    on Tennessee's opioid crisis?
4        A.    Not that I recall.
5        Q.    Are you aware that as of 2013,
6    2014, the Tennessee Department of Health has
7    estimated that there are 221,000 adults in
8    Tennessee using prescription opioids for
9    nonmedical purposes?
10           MR. ANDRISANI:  Objection, form,
11   lacks foundation.
12           THE WITNESS:  I was not aware,
13   no.
14   BY MR. GASTEL:
15       Q.    In your mind, what are the
16   reasons why a person might use a prescription
17   opioid for nonmedical purposes?
18       A.    The reason why, is that the
19   question?
20       Q.    Yes.
21       A.    For the high, I guess.
22       Q.    Are you aware that in 2015,
23   according to IMS data, doctors in Tennessee
24   wrote more than 7.8 million opioid prescriptions

Page 444

1    in the state of Tennessee?
2            MR. ANDRISANI:  Objection, form,
3    lacks foundation.
4            THE WITNESS:  No.
5    BY MR. GASTEL:
6        Q.    Do you know if that -- would it
7    surprise you that that correlates to 1.18
8    prescriptions for every man, woman and child in
9    the state of Tennessee?
10           MR. ANDRISANI:  Objection, form.
11           THE WITNESS:  I was not aware.
12   BY MR. GASTEL:
13       Q.    Would it surprise you if that
14   were true?
15       A.    Yes.
16       Q.    Would you agree that it's wrong
17   to participate in the illegal diversion of
18   prescription opioids to consumers that intend to
19   use those opioids for nonmedical purposes?
20       A.    It would not be legal.
21       Q.    In your mind, would that be
22   wrong?
23       A.    Yes.
24       Q.    Would you agree that some

Page 445

1  consumers of prescription opioids obtain those
2  opioids for the express purpose of using them
3  for nonmedical purposes?
4       A.   I'm sorry.  Can you repeat the
5  question.
6       Q.   Sure.  Would you agree that some
7  consumers of prescription opioids obtain those
8  opioids for the express reason to use them for
9  nonmedical purposes?
10       MR. ANDRISANI:  Objection, form.
11       THE WITNESS:  I've heard that,
12  yes.
13  BY MR. GASTEL:
14       Q.   We've talked a lot about Teva's
15  special -- suspicious order monitoring program
16  today, and apart from the SOM program, what else
17  does Teva do to prevent the illegal diversion of
18  its prescription opioid products?
19       A.   We have procedures in place to
20  ensure that the material is not diverted from
21  our supply chain or that we detect it.
22       Q.   And what you mean by that is you
23  have controls at your -- at your individual
24  manufacturing facilities?

Page 446

1       A.   We have physical security
2  controls, and we have procedures for employees
3  to follow.
4       Q.   Anything else?
5       A.   And the question was apart from
6  the SOM?
7       Q.   Yeah.
8       A.   Besides physical security and
9  written procedures, no.
10       Q.   Is the purpose of Teva's
11  suspicious order monitoring program to track
12  potential orders of prescription opioids that
13  may end up on the illegal drug market?
14       MR. ANDRISANI:  Objection, form.
15       THE WITNESS:  Ultimately, yes.
16  BY MR. GASTEL:
17       Q.   I'm going to hand you a document
18  that we will mark as McGinn-34.
19       (Document marked for
20       identification as McGinn Deposition
21       Exhibit No. 34.)
22  BY MR. GASTEL:
23       Q.   This is an e-mail chain between
24  you and Kevin Kreutzer from March of 2013.

Page 447

1       Do you see that?
2       A.   Yes.
3       Q.   And attached to it is a
4  PowerPoint presentation.
5       Do you see that?
6       A.   Yes.
7       Q.   And do you see going to the first
8  e-mail in the chain, which is dated March 15th,
9  2013.
10       Do you see that?
11       A.   Yes.
12       Q.   It says, "Colleen, could you take
13  a look at the PPT that Bob came up with."
14       A.   Yes.
15       Q.   And do you recall who Bob is?
16       A.   It would be Bob Williamson from
17  Buzzeo PDMA.
18       Q.   And he then -- Mr. Kreutzer then
19  asked you to make some comments on this
20  PowerPoint presentation that Bob put together,
21  right?
22       A.   He wanted me to review it.
23       Q.   Do you see that the purpose of
24  this PowerPoint presentation is apparently, or

Page 448

1  at least the title of it is Teva suspicious
2  order monitoring training?
3       A.   Yes.
4       Q.   And was the intent to give this
5  PowerPoint presentation at training for internal
6  Teva employees?
7       A.   It looks like it.
8       Q.   And do you know if this
9  presentation was ever given?
10       A.   I do not recall.
11       Q.   Do you see -- flip over to slide
12  5 of the PowerPoint presentation, and we're
13  going to see a chart that at least today is
14  probably somewhat familiar.
15       Do you see that?
16       A.   Page 5?
17       Q.   Yes.
18       A.   Yes.
19       Q.   This is similar to a chart that
20  Mr. Cartmell showed you earlier, right?
21       A.   Yes.
22       Q.   And his chart I think went out a
23  little bit farther than 2010, but it comes from
24  the exact same National Vital Statistics System.

Page 449

1      Do you see that reference?
2      A.   Yes.
3      Q.   And it shows the sales of
4  prescription opioids increasing from 1999 to
5  2010, right?
6      A.   Yes.
7      Q.   And it shows prescription opioid
8  deaths rising consistently with the sales
9  figures.
10      Do you see that?
11      A.   I see it.
12      Q.   And then also the treatment
13  admissions per 10,000 people also rises
14  consistently with the sales data.
15      Do you see that?
16      A.   Yes.
17      Q.   And you were putting that in
18  your -- or at least Teva was putting that in
19  training materials for its SOM staff as early as
20  2013, right?
21      A.   This is something that Bob
22  Williamson put in the slides that we asked for.
23      Q.   And then will you flip to the
24  next slide, and it shows -- there's a figure

Page 450

1  there that shows the "Past Month Nonmedical Use
2  of Types of Psychotherapeutic Drugs among
3  Persons Aged 12 or older:  2002-2011."
4      Do you see that?
5      A.   Yes.
6      Q.   And the top line is identified as
7  pain relievers, right?
8      A.   Yes.
9      Q.   And that would include
10  prescription opioids, right?
11      A.   Yes.
12      Q.   And it shows that on a per month
13  basis from 2002 to 2011, the percentage of the
14  United States population that are using
15  prescription pain relievers for nonmedical
16  purposes fluctuates between 1.7% and 2.1%.
17      Do you see that?
18      A.   Yes.
19      Q.   And then on the next figure
20  they -- I think what has happened here is that
21  they've converted that into actual number of
22  people.
23      So will you flip to page 7.  And
24  do you see that it references that there are

Page 451

1  6.1 million people use controlled
2  pharmaceuticals for nonmedical uses in 2011?
3      Do you see that?
4      A.   I see that.
5      Q.   And then it says that the rates
6  of current nonmedical uses of controlled
7  substances declined to 2.8%.  That's 2.8% of the
8  American population, right?
9      A.   I don't know what that's a 2.8%
10  of.
11      Q.   Well, again, if we go back to the
12  previous slide, this is the ages of 12 or older
13  from 2002 to 2011.
14      Do you see that?
15      A.   Yes.
16      Q.   And then if you go back to the
17  seventh page, you see that there's kind of like
18  a party going on at the bottom.
19      Do you see that?
20      A.   I see it.
21      Q.   Do you know why people are
22  celebrating the fact that 6.1 million people use
23  controlled pharmaceuticals for nonmedical uses
24  in 2011?

Page 452

1      MR. ANDRISANI:  Objection, form,
2  argumentative.
3      THE WITNESS:  We did not create
4  this PowerPoint.  It came from Bob
5  Williamson.
6  BY MR. GASTEL:
7      Q.   But it was created with the
8  intend to train your SOM staff?
9      A.   I asked him for a PowerPoint, Bob
10  Williamson.
11      Q.   And so as early as 2013, you were
12  presented with information from -- and I don't
13  want to retread ground here, but from a trusted
14  expert in this field that there were at least
15  6.1 million people in this country who were
16  using controlled pharmaceuticals for nonmedical
17  uses, right?
18      A.   That's what he states here.
19      Q.   And during that time period,
20  again, I don't want to retread ground here, but
21  based on your testimony earlier, during that
22  period, Teva Pharmaceuticals was not reporting a
23  single one of its prescription opioid orders as
24  suspicious to the DEA, right?

Page 453

1          MR. ANDRISANI:  Objection, form,
2      asked and answered.
3          THE WITNESS:  During which time
4      period?
5  BY MR. GASTEL:
6      Q.    From the period covered by this
7  slide.
8      A.    2011?
9      Q.    Yes.
10     A.    Yes.
11     Q.    We've talked a lot today about
12 chargeback data.
13         Do you remember that testimony?
14     A.    Yes.
15     Q.    Have you ever seen chargeback
16 data -- well, I think the testimony earlier is
17 that at some point in 2015, Teva started using
18 chargeback data which it received on a monthly
19 and quarterly basis.
20         Do you remember that testimony?
21     A.    I remember saying that I don't
22 know what we were doing with chargeback data.
23 We may have reviewed it, but not using it in a
24 systematic manner that we started using it in

Page 454

1  2015.
2      Q.    And at some point in 2015 you
3  started using it as part of your SOM program,
4  correct?
5      A.    We began using it on a regular
6  basis.
7      Q.    And so -- and the chargeback data
8  allows you as Teva, the manufacturer of these
9  prescription opioids, to track down the supply
10 chain to see where your pharmaceuticals are
11 ultimately ending up, right?
12         MR. ANDRISANI:  Objection, form,
13     lack of foundation.
14         THE WITNESS:  For those people
15     that apply for chargebacks, yes, we
16     would have that data.
17 BY MR. GASTEL:
18     Q.    And it's not every single order
19 from the Teva system, but it's the ones that you
20 have the data for, right?
21     A.    Yes.
22     Q.    And you're getting that monthly
23 and quarterly?
24     A.    I don't know what the period is.

Page 455

1  I don't review it myself.
2      Q.    Have you ever looked at it
3  yourself?
4      A.    No.
5      Q.    Well, let me --
6          MR. GASTEL:  Will you pull up the
7      Excel spreadsheet.
8  BY MR. GASTEL:
9      Q.    I did not bring a copy of this
10 Excel spreadsheet because it's enormous.
11 You will see at the top that
12 it's -- the document is labeled Teva MDLA
13 01037285, and it carries the name "April 15
14 Chargeback Analysis."
15         Do you see that?
16     A.    Yes.
17         MR. ANDRISANI:  Do you know if it
18     had came with a year?
19         MR. GASTEL:  That is the name of
20     the document as it appears in its native
21     file, okay, "April 15 Chargeback
22     Analysis."
23         MR. CRAWFORD:  Do you have a
24     Bates number for that.

Page 456

1          MR. GASTEL:  Yeah, yeah, it's
2      there at the top.
3          MR. CRAWFORD:  Okay, thank you.
4  BY MR. GASTEL:
5      Q.    And then you'll see the column A
6  there is calendar month 2015/04.
7          Do you see that?
8      A.    Yes.
9      Q.    Would that suggest to you that
10 this data is covering calendar month April 2015?
11     A.    I would assume so.
12     Q.    And then it has a customer ID
13 across the top, right, end customer?
14     A.    Yes.
15     Q.    Would that suggest to you that
16 this is -- assuming that it's chargeback data is
17 the chargeback data for the end customer who
18 ultimately got the product that's listed there?
19         MR. ANDRISANI:  Again, objection,
20     lack of foundation.  She said she's
21     never looked at this before.
22         MR. GASTEL:  That's all right.
23         THE WITNESS:  I'm not familiar
24     with the spreadsheet at all.

Page 457

1  BY MR. GASTEL:
2      Q.    Sure.  And you've used Microsoft
3  Excel before, right?
4      A.    Yes.
5      Q.    So and you know that you can
6  manipulate data in Excel to make charts and
7  tables, right?
8      A.    Yes.
9      Q.    I'm going to hand you a document
10  that is what's called a pivot table that I made
11  from this data, okay.
12          (Document marked for
13      identification as McGinn Deposition
14      Exhibit No. 35.)
15          MR. ANDRISANI:  It is a document
16  you created?
17          MR. GASTEL:  Yes, from the data
18  that's in this spreadsheet.  And, again,
19  I forget the exact number of lines in
20  this spreadsheet, but it is hundreds of
21  thousands, sorry, it's a 140,198 lines
22  of data.
23          MR. ANDRISANI:  And I think the
24  chargeback data is stipulated as being

Page 458

1  confidential on this, so this exhibit
2  should also be marked confidential.
3          MR. GASTEL:  Sure, and I'm --
4          MR. ANDRISANI:  And if you could
5  put on the record how you -- if you know
6  what you used to create the pivot.
7          MR. GASTEL:  Well, it's a pivot
8  table and so --
9          MR. ANDRISANI:  So you have to
10  search on something, right?
11          MR. GASTEL:  No.  You just -- you
12  select the columns that you want to add
13  up.
14  BY MR. GASTEL:
15      Q.    And if you go to --
16          MR. GASTEL:  Can you scroll to
17  the far end of the spreadsheet.
18  BY MR. GASTEL:
19      Q.    And it says there at the top
20  Indirect "Sales Quantity," do you see that?
21      A.    Yes.
22      Q.    And it lists the quantity for the
23  individual.
24          Okay.  So what this pivot table

Page 459

1  is doing, just so you know, it's adding up --
2  you can see at the top that the "State (End
3  Customer)" is Tennessee.
4          Do you see that?
5      A.    Yes.
6      Q.    Okay.  And then it's adding up
7  the sum of the indirect sales quantity.
8          Do you see that?
9          MR. ANDRISANI:  I again object.
10  I don't mind her saying that she sees
11  it.
12          MR. GASTEL:  Yeah, I understand.
13          MR. ANDRISANI:  But you'd have to
14  be witness as to how it's created.
15          MR. GASTEL:  Sure.
16          THE WITNESS:  I see it.
17          MR. GASTEL:  And then can you
18  pull up the chart now, please, which is
19  document 2.
20  BY MR. GASTEL:
21      Q.    And I don't want to focus on all
22  of the drugs here.  I do want to focus on the
23  prescription opioids listed.
24          Do you see "Hydrocodone/APAP

Page 460

1  10/325MG Tab 500"?
2      A.    Yes.
3      Q.    Do you see that?
4      A.    Yes.
5      Q.    And then it lists -- it lists
6  essentially the customer that purchased this
7  drug from Teva and then, again, as we talked
8  about chargeback data, it's a way to track where
9  these drugs ultimately end up.
10          You understand that that's what
11  chargeback data does, right?
12      A.    Yes.
13          MR. ANDRISANI:  And I object to
14  the form and the foundation as to what
15  these are.
16          MR. GASTEL:  Sure.
17  BY MR. GASTEL:
18      Q.    And so, according to this
19  document, Teva sold during the period covered by
20  this particular spreadsheet, 5,807 of these
21  bottles to AmerisourceBergen.
22          Do you see that?
23          MS. ROLLINS:  Objection to form.
24          MR. ANDRISANI:  I object to it as

Page 461

1       well.  This lacks foundation.
2           THE WITNESS:  I see it.
3   BY MR. GASTEL:
4       Q.    And then you see that it says tab
5   500, that's -- tab 500 means the number of pills
6   that are in that order, right?
7           MR. ANDRISANI:  Objection, form,
8       lacks foundation.
9           THE WITNESS:  Yes.
10  BY MR. GASTEL:
11      Q.    So if we're assuming that that is
12  correct and you do the math, 5,807 of these
13  prescription opioid bottles are being sold to
14  AmerisourceBergen, and that constitutes
15  2.9 million pills?
16          MS. ROLLINS:  Objection to form.
17          MR. ANDRISANI:  Objection.
18  BY MR. GASTEL:
19      Q.    Which is roughly 5,807 times 500?
20          MS. ROLLINS:  Objection to form.
21          THE WITNESS:  Okay.
22  BY MR. GASTEL:
23      Q.    Assuming -- again, assuming that
24  this -- that that's what this shows, that this

Page 462

1   is 500 pills and being sold in the quantity
2   5,807, that would mean that that's 2.9 million
3   pills, right?
4           MS. ROLLINS:  Objection to form.
5           MR. ANDRISANI:  Objection.
6           THE WITNESS:  Rough math, yeah.
7   BY MR. GASTEL:
8       Q.    And then, again, if you want to
9   go down to the "Oxycodone HCL 15 MG Tab 500,"
10  and, again, just looking at the
11  AmerisourceBergen line item, there's 5,411 of
12  those orders, right?
13          MS. ROLLINS:  Objection to form.
14          MR. ANDRISANI:  Objection, lacks
15      foundation, form.
16  BY MR. GASTEL:
17      Q.    And that would translate into
18  541,100 pills, right?
19          MS. ROLLINS:  Objection to form.
20          MR. ANDRISANI:  Objection.
21          THE WITNESS:  Yes.
22  BY MR. GASTEL:
23      Q.    And then going to the next one,
24  "Oxycodone HCL 30MG, Tab 100," there's, 4,009 of

Page 463

1   those orders, right?
2           MS. ROLLINS:  Objection to form.
3           MR. ANDRISANI:  Same objection to
4       the foundation.
5           THE WITNESS:  Yes.
6   BY MR. GASTEL:
7       Q.    And, again, if that tab 100 means
8   that's the number of pills, that's 400,900
9   pills, right?
10          MS. ROLLINS:  Objection to form.
11          MR. ANDRISANI:  Objection.
12          THE WITNESS:  Yes.
13  BY MR. GASTEL:
14      Q.    And then take the last one there,
15  "Oxycodone/APAP 10/325MG Tab 100."
16          Do you see that?
17      A.    Yes.
18      Q.    And then AmerisourceBergen is
19  listed as receiving 1,200 -- I'm sorry -- 12,871
20  of those?
21          MS. ROLLINS:  Objection to form.
22          MR. ANDRISANI:  Objection to the
23      foundation.
24          THE WITNESS:  Yes.

Page 464

1   BY MR. GASTEL:
2       Q.    Which would translate to
3   1.2 million pills?
4           MS. ROLLINS:  Objection to form.
5           MR. ANDRISANI:  Objection.
6           THE WITNESS:  Yes.
7   BY MR. GASTEL:
8       Q.    Which, again, this is just
9   limited to the state of Tennessee based on the
10  data that was in that spreadsheet.
11          MS. ROLLINS:  Objection to form.
12          MR. ANDRISANI:  And objection to
13      foundation how this was created.
14  BY MR. GASTEL:
15      Q.    And so that would translate that
16  for whatever period of time that is covered by
17  this chargeback analysis, Teva's internal data
18  shows that it sent 5 million pills into
19  Tennessee during that time period, right?
20          MS. ROLLINS:  Objection to form.
21          MR. ANDRISANI:  And again
22      objection, assumes facts not in
23      evidence.
24          THE WITNESS:  It doesn't assume

Page 465

1        that they stayed in Tennessee.
2    BY MR. GASTEL:
3        Q.    Well, the chargeback data
4    ultimately is meant to show what customer of
5    your customer purchased these drugs, right?
6        A.    Yes.
7        Q.    And that's the whole purpose of
8    the chargeback data is that it allows you to
9    track it through the supply chain so that you
10   can actually get down to see where your drugs
11   are actually going, right?
12       A.    Yes.  Again, I have never looked
13   at the chargeback data or know how the table
14   works or what it's -- what you're saying here.
15   I have never used it, I have never looked at it.
16       Q.    Sure.  And let's just assume that
17   that fact is true.  You as the -- as the senior
18   director of DEA compliance, would it cause you
19   concern that Teva was sending 5 million pills
20   into the state of Tennessee?
21           MR. ANDRISANI:  Objection.
22           THE WITNESS:  Unless one of my
23       SOM people told me there was a problem,
24       I wouldn't know.

Page 466

1    BY MR. GASTEL:
2        Q.    And chargeback data is data of
3    pills sent out, right?
4           MR. ANDRISANI:  Objection.
5           THE WITNESS:  It's not all the
6       pills that were sent out but there's
7       some portion of it.
8    BY MR. GASTEL:
9        Q.    I get that.  This is actually a
10   lower estimate, because at the end of the day
11   the chargeback data doesn't capture all the
12   pills that go out?
13       A.    It's a portion.
14       Q.    It's a portion.
15           And in 2015 do you recall
16   Mr. Tomkiewicz says how many suspicious orders
17   that the SOM program at Teva had flagged?
18       A.    I do not recall off the top of my
19   head.
20       Q.    If you recall, does four sound
21   about right?
22       A.    Can I look at the data?
23       Q.    Sure.
24       A.    I think it was Joe's

Page 467

1    presentation.  In 2015 there were four.
2        Q.    2014 there was one?
3        A.    Yes.
4        Q.    2013 there was one?
5        A.    It's not on here.
6        Q.    2016 there was zero?
7        A.    Yes.
8        Q.    So six total suspicious orders
9    reported to the DEA?
10       A.    Yes.
11       Q.    And then all other orders were
12   shipped out?
13       A.    Yes.
14       Q.    And, in fact, we saw the slide
15   from 2015 from the audit that, according to the
16   SOM process that you have in place, 95% of your
17   controlled substances orders go out the door no
18   questions asked, right?
19           MR. ANDRISANI:  Objection,
20       misstates the evidence.
21           THE WITNESS:  According to what I
22       remember, 95 -- according to what the
23       auditor said, 95% of the orders were not
24       flagged by the system.

Page 468

1    BY MR. GASTEL:
2        Q.    And then shipped out, right?
3        A.    I don't know that all of them
4    shipped out.  They could have been canceled in
5    the meantime.  We may not have been able to
6    supply.
7        Q.    But other than that, you're
8    shipping out all of the orders, right?
9           MR. ANDRISANI:  Objection, form.
10           THE WITNESS:  If we were able to
11       supply it, yes.
12   BY MR. GASTEL:
13       Q.    We talked a lot today about the
14   big four distributors, which include
15   Amerisource, correct?
16       A.    Yes.
17       Q.    And Cardinal?
18       A.    Yes.
19       Q.    Has Teva, to the best of your
20   recollection, ever reported a single order from
21   those customers to the DEA as suspicious?
22       A.    I don't recall.
23       Q.    We saw in your internal training
24   documents earlier the line that said that there

Page 469

1  were 6.1 million Americans in 2011 that were
2  abusing controlled substances, right?
3       A.    That was in the Bob Williamson
4  presentation, yes.
5       Q.    And throughout today we've seen
6  that various PowerPoint presentations where you
7  have the slide with the sales and the deaths and
8  the hospital admissions due to addiction, right?
9       A.    Yes.
10      Q.    Did Teva ever attempt to scale
11 down the upper control limits in its SOM
12 algorithm to account for the fact that patients
13 were abusing diverted opioids?
14      A.    I don't know because I didn't
15 make adjustments to upper control limits.
16      Q.    Did anybody make adjustments to
17 upper control limits?
18      A.    Other people had the ability to
19 adjust upper control limits.
20      Q.    Do you know if that was ever
21 done?
22      A.    Adjustments in general?
23      Q.    Yes.
24      A.    Yes.

Page 470

1       Q.    Were adjustments ever done to
2  Amerisource's orders?
3       A.    I don't recall.  I don't do it,
4  so I don't know.
5       Q.    Who would you ask that question
6  to?
7       A.    Joe Tomkiewicz.
8       Q.    Did Teva ever attempt to go back
9  and scale down the upper control limits in its
10 SOM program to account for the fact that prior
11 to 2012, it had a rudimentary SOM system in
12 place, according to Mr. Buzzeo?
13      MR. ANDRISANI:  Objection, form.
14      THE WITNESS:  Again, that was his
15      words, and he never audited the system,
16      but I don't know if the upper control
17      limits were adjusted.
18 BY MR. GASTEL:
19      Q.    Did you ever talk to anybody in
20 sales about the need to reduce sales to account
21 for the fact that patients were abusing diverted
22 opioids?
23      A.    I don't recall a conversation.
24      Q.    Do you know in what form the

Page 471

1  chargeback data that Teva has is stored in?
2       MR. ANDRISANI:  Objection.
3       THE WITNESS:  I don't.
4  BY MR. GASTEL:
5       Q.    Does Teva still get chargeback
6  data on a monthly basis?
7       MR. ANDRISANI:  Objection.  She
8       said she doesn't handle that.
9       THE WITNESS:  I don't know how
10      often he gets it.
11 BY MR. GASTEL:
12      Q.    You were privy to the West
13 Virginia Attorney General's 2012 lawsuit against
14 AmerisourceBergen, correct?
15      MS. ROLLINS:  Objection to form.
16      THE WITNESS:  I don't -- I don't
17      remember.  I know that West Virginia was
18      suing a number of people at one time.  I
19      don't know if that's what you're talking
20      about or --
21 BY MR. GASTEL:
22      Q.    Do you know if the West Virginia
23 Attorney General also filed suit against
24 Cardinal Health?

Page 472

1       A.    I don't.
2       Q.    Did, to your knowledge, anybody
3  ever adjust the upper control limits in the SOM
4  program to account for the allegations in these
5  complaints made by these public officials?
6       MR. ANDRISANI:  Objection, form.
7       THE WITNESS:  I don't know.
8  BY MR. GASTEL:
9       Q.    Would you agree with me that
10 opioid prescription rates per capita is one
11 indicator of potential abuse of use of
12 prescription opioids?
13      MR. ANDRISANI:  Objection, lacks
14      foundation.
15      THE WITNESS:  Yes.
16      MR. GASTEL:  Let me review my
17      notes.  Could we take a five-minute
18      break.
19      MR. ANDRISANI:  Sure.
20      MR. GASTEL:  And we are very
21      close to being done.
22      THE VIDEOGRAPHER:  Off the
23      record, 7:26.
24      (Brief recess.)

## Page 473

1    THE VIDEOGRAPHER:  We're back on
2  the record at 7:29.
3    MR. GASTEL:  Ms. McGinn, I'm sure
4  that this is going to be music to your
5  ears, but subject to my previous
6  objection, that's all the questions that
7  I have for you right now.
8    MR. ANDRISANI:  We have no
9  questions.  Thank you.
10    MS. ROLLINS:  No questions.
11    THE VIDEOGRAPHER:  That concludes
12  today's deposition.  The time is 7:29.
13    (Witness excused.)
14    — — —
15
16
17
18
19
20
21
22
23
24

## Page 474

1    C E R T I F I C A T I O N
2    I, MARGARET M. REIHL, a
3  Registered Professional Reporter,
4  Certified Realtime Reporter, Certified
5  Shorthand Reporter, Certified LiveNote
6  Reporter and Notary Public, do hereby
7  certify that the foregoing is a true and
8  accurate transcript of the testimony as
9  taken stenographically by and before me
10  at the time, place, and on the date
11  hereinbefore set forth.
12    I DO FURTHER CERTIFY that I
13  am neither a relative nor employee nor
14  attorney nor counsel of any of the
15  parties to this action, and that I am
16  neither a relative nor employee of such
17  attorney or counsel, and that I am not
18  financially interested in the action.
19
20
21  ------------------------------
   Margaret M. Reihl, RPR, CRR, CLR
22  CSR #XI01497  Notary Public
23
24

## Page 475

1    - - - - - -
2    E R R A T A
3    - - - - - -
4  PAGE  LINE  CHANGE
5  ____  ____  _____
6  REASON:  _____
7  ____  ____  _____
8  REASON:  _____
9  ____  ____  _____
10  REASON:  _____
11  ____  ____  _____
12  REASON:  _____
13  ____  ____  _____
14  REASON:  _____
15  ____  ____  _____
16  REASON:  _____
17  ____  ____  _____
18  REASON:  _____
19  ____  ____  _____
20  REASON:  _____
21  ____  ____  _____
22  REASON:  _____
23  ____  ____  _____
24  REASON:  _____

## Page 476

1    ACKNOWLEDGMENT OF DEPONENT
2
3    I, COLLEEN McGINN, do hereby
4  certify that I have read the foregoing
5  pages, and that the same is a correct
6  transcription of the answers given by me
7  to the questions therein propounded,
8  except for the corrections or changes in
9  form or substance, if any, noted in the
10  attached Errata Sheet.
11
12
13
   _____
14  COLLEEN McGINN            DATE
15
   Subscribed and sworn to before me this
16
   _____ day of _____, 2018.
17
   My commission expires:_____
18
19  _____
   Notary Public
20
21
22
23
24