Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION

 3    *************************

      IN RE:  NATIONAL
 4    PRESCRIPTION OPIATE      MDL No. 2804
      LITIGATION

 5                            Case No.

      This document relates to:   17-MD-2804
 6

      The County of Summit,
 7    Ohio, et al. v. Purdue    Hon. Dan A. Polster
      Pharma L.P., et al.
 8    Case No. 17-OP-45004

 9
      The County of Cuyahoga v.
10    Purdue Pharma L.P., et al.
      Case No. 18-OP-45090

11
      *************************

12
      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
13          CONFIDENTIALITY REVIEW

14    VIDEOTAPED DEPOSITION OF THOMAS G. MCGUIRE, Ph.D.
15            Tuesday, April 23rd, 2019
16                  9:02 a.m.

17

18        Held At:
19            Robins Kaplan LLP
20            800 Boylston Street
21            Boston, Massachusetts
22
23    REPORTED BY:
24    Maureen O'Connor Pollard, RMR, CLR, CSR
```

---

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2

      FOR THE PLAINTIFFS:
 3

 4        MICHAEL J. PENDELL, ESQ.
              MOTLEY RICE LLC
 5            One Corporate Center
              20 Church Street
 6            Hartford, Connecticut 06103
              860-218-2722
 7            mpendell@motleyrice.com

 8                 -and-

          DAVID J. KO, ESQ.
 9            KELLER ROHRBACK, LLP
              1201 Third Avenue, Suite 3200
10            Seattle, Washington 98101
              206-623-1900
11            dko@kellerrohrback.com
                   -and-
12
13        THOMAS M. SOBOL, ESQ.
              HAGENS BERMAN SOBOL SHAPIRO LLP
14            55 Cambridge Parkway, Suite 301
              Cambridge, Massachusetts 02142
15            617-482-3700
              tom@hbsslaw.com

16

17

      FOR CUYAHOGA COUNTY:
18

          JOSEPH L. CIACCIO, ESQ.
19            NAPOLI SHKOLNIK PLLC
              400 Broadhollow Road, Suite 305
20            Melville, New York 11747
              631-224-1133
21            jciaccio@napolilaw.com
22
23
24
```

---

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued):
 2    FOR PURDUE PHARMA:
 3        JACQUELINE D. HARRINGTON, ESQ.
              DECHERT LLP
 4            1095 Avenue of the Americas
              New York, New York 10036
 5            212-698-3500
              jacqueline.harrington@dechert.com
 6

 7
      FOR McKESSON CORPORATION:
 8
          JOHN W. ZIPP, ESQ. (Remotely)
 9            COVINGTON & BURLING LLP
              One CityCenter
10            850 Tenth Street, NW
              Washington, DC 20001-4956
11            202-662-5518
              jzipp@cov.com

12
                   -and-
13
          DAVID HALLER, ESQ.
14            COVINGTON & BURLING LLP
              620 Eighth Avenue
15            New York, New York 10118
              212-841-1000
16            dhaller@cov.com

17

18    FOR CARDINAL HEALTH, INC.:
19        J. ANDREW KEYES, ESQ.
          JOSEPH S. BUSHUR, ESQ.
20            WILLIAMS & CONNOLLY LLP
              725 Twelfth Street, N.W.
21            Washington, DC 20005
              202-434-5452
22            akeyes@wc.com
              jbushur@wc.com
23
24
```

---

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued):
 2
      FOR AMERISOURCEBERGEN DRUG CORPORATION:
 3
          BRIAN T. HIMMEL, ESQ.
 4            REED SMITH LLP
              225 Fifth Avenue
 5            Pittsburgh, Pennsylvania 15222
              412-288-4058
 6            bhimmel@reedsmith.com

 7
 8    FOR DISCOUNT DRUG MART, INC.:
          ERIC J. WEISS, ESQ. (Remotely)
 9            CAVITCH FAMILO & DURKIN, CO., LPA
              1300 E. 9th Street, 20th Floor
10            Cleveland, Ohio 44114
              216-621-7860
11            eweiss@cavitch.com

12
13    FOR WALGREENS:
14        SHARON DESH, ESQ. (Remotely)
              BARTLIT BECK LLP
15            54 West Hubbard Street
              Chicago, Illinois 60654
16            312-494-4445
              Sharon.Desh@bartlitbeck.com

17
18
      FOR H.D. SMITH:
19
          WILLIAM J. LEEDER, III, ESQ.
20            BARNES & THORNBURG LLP
              171 Monroe Avenue, NW
21            Grand Rapids, Michigan 49503
              616-742-3979
22            bill.leeder@btlaw.com
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     APPEARANCES (Continued):
 2
 3     FOR WALMART:
 4          CLAIRE E. CASTLES, ESQ.
                JONES DAY
 5              555 South Flower Street, 15th Floor
                Los Angeles, California 90071-2300
 6              213-489-3939
                ccastles@jonesday.com
 7
 8     FOR ALLERGEN:
 9          MARTIN L. ROTH, ESQ.
                KIRKLAND & ELLIS LLP
10              300 North LaSalle
                Chicago, Illinois 60654
11              312-862-7170
                martin.roth@kirkland.com
12
13
       FOR JANSSEN and JOHNSON & JOHNSON:
14
15          JUSTIN E. RICE, ESQ.
                TUCKER ELLIS LLP
16              950 Main Street, Suite 1100
                Cleveland, Ohio 44113
17              216-696-3670
                justin.rice@tuckerellis.com
18
       FOR HBC SERVICES, INC.:
19
20          RICHARD I. HALPERN, ESQ.
                MARCUS & SHAPIRA LLP
21              One Oxford Centre, 35th Floor
                301 Grant Street
22              Pittsburgh, Pennsylvania 15219-6401
                412-338-4690
23              halpern@marcus-shapira.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     APPEARANCES (Continued):
 2
 3     FOR ENDO PHARMACEUTICALS INC., ENDO HEALTH
       SOLUTIONS INC., PAR PHARMACEUTICAL COMPANIES,
 4     INC. (f/k/a PAR PHARMACEUTICAL HOLDINGS, INC.)
 5          SAMUEL LONERGAN, ESQ.
            REBECCA E. ZOLLER, ESQ.
 6              ARNOLD & PORTER KAYE SCHOLER LLP
                250 West 55th Street
 7              New York, New York
                212-836-7408
 8              samuel.lonergan@arnoldporter.com
                rebecca.zoller@arnoldporter.com
 9
10
       FOR RITE AID:
11
12          ELIZABETH I. BUECHNER, ESQ. (Remotely)
                MORGAN, LEWIS & BOCKIUS LLP
13              101 Park Avenue
                New York, New York 10178
14              212-309-6864
                elizabeth.buechner@morganlewis.com
15                  -and-
16          MARTHA LEIBELL, ESQ. (Remotely)
                MORGAN, LEWIS & BOCKIUS LLP
17              200 S. Biscayne Boulevard, Suite 5300
                Miami, Florida 33131-2339
18              305-415-3387
                john.lavelle@morganlewis.com
19              martha.leibell@morganlewis.com
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     APPEARANCES (Continued):
 2
 3     FOR HENRY SCHEIN, INC., and HENRY SCHEIN MEDICAL
       SYSTEMS, INC.:
 4
 5          MADELINE E. BRUNNER, ESQ. (Remotely)
                LOCKE LORD LLP
                2200 Ross Avenue, Suite 2800
 6              Dallas, Texas 75201
                214-740-8445
 7              madeline.brunner@lockelord.com
 8
 9     FOR MALLINCKRODT, LLC:
10          CHRISTINE D'AURIA, ESQ.
                ROPES & GRAY LLP
11              800 Boylston Street
                Boston, Massachusetts 02199-3600
12              617-951-7000
                christine.dauria@ropesgray.com
13
14
       ALSO PRESENT REMOTELY:
15
       JONATHAN JAFFE
16     ERICA BENTON
17
18     VIDEOGRAPHER:  Robert Martignetti
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      INDEX
 2     EXAMINATION                              PAGE
 3     THOMAS G. MCGUIRE, Ph.D.
 4       BY MR. KEYES                              9
 5
 6
 7              E X H I B I T S
 8     NO.        DESCRIPTION                   PAGE
 9     1    Expert Report of Professor Thomas
            McGuire, Damages to Bellwethers,
10          March 25, 2019...................... 10
11     2    Thumb drive containing Excel
            Spreadsheet produced by Summit
12          County, Bates SUMMIT_001952976,
            and Excel Spreadsheet produced by
13          Cuyahoga County, Bates
            CUYAH_014627783.....................295
14
15     3    Operating Budget 2017 for Summit
            County, Bates SUMMIT_000007551
            through 8339........................298
16
17     4    Spreadsheet, ADM Board, Cash
            Balance Forecast Summary, Bates
            SUMMIT_001103655....................339
18
19     5    Document titled Summit County
            Children Services Operating
20          Forecast As of December 31, 2018,
            Bates SUMMIT_002057610..............346
21
22
23
24
```

```
 1          P R O C E E D I N G S

 2

 3          THE VIDEOGRAPHER:  We are now on the

 4    record.  My name is Robert Martignetti, I'm a

 5    videographer for Golkow Litigation Services.

 6    Today's date is April 23rd, 2019, and the time

 7    is 9:02 a.m.

 8          This video deposition is taking place

 9    in Boston, Massachusetts In Re: National

10    Prescription Opiate Litigation.

11          The deponent is Thomas McGuire.

12          Counsel will be noted on the

13    stenographic record.

14          The court reporter is Maureen Pollard,

15    and will now swear in the witness.

16

17          THOMAS G. MCGUIRE, Ph.D.,

18    having been duly identified and sworn, was

19    examined and testified as follows:

20          EXAMINATION

21    BY MR. KEYES:

22          Q.  Good morning, Professor McGuire.

23    Would you state your full name for the record?

24          A.  Thomas Gregory McGuire.
```

```
 1          Q.  My name is Andrew Keyes, and I'm one

 2    of the lawyers on the defense side of this case.

 3    I'm with the law firm of Williams & Connolly,

 4    and we represent Cardinal Health, one of the

 5    defendants.

 6          Showing you what has been marked as

 7    McGuire Exhibit Number 1.

 8          (Whereupon, McGuire Exhibit Number 1

 9          was marked for identification.)

10    BY MR. KEYES:

11          Q.  Would you take a look at this exhibit

12    and confirm that this is your report plus the

13    various appendices that you prepared?

14          A.  Yes, it looks right.

15          Q.  Would you turn to Page 47 of

16    Exhibit 1?  Are you there?

17          A.  I am, yes.

18          Q.  There's a signature there.  Is that

19    your signature?

20          A.  Yes, it is.

21          Q.  Did you sign it?

22          A.  Yeah.

23          Q.  On March 25, 2019?

24          A.  I did.
```

```
 1          Q.  And this Exhibit 1 is titled Expert

 2    Report of Professor Thomas McGuire, Damages to

 3    Bellwethers, dated March 25, 2019.

 4          When you refer to bellwethers, are you

 5    referring to Summit County and Cuyahoga County?

 6          A.  Yes.

 7          Q.  And does this report set forth your

 8    opinions in this case?

 9          A.  Yes, it does, noting that I have

10    another report in the case.

11          Q.  Okay.  You have a second report

12    regarding nuisance?

13          A.  Yes.

14          Q.  And I'll show that to you in a moment.

15          A.  Okay.

16          Q.  But regarding damages to Summit County

17    and Cuyahoga County, this is your report?

18          A.  Yes, it is.

19          Q.  And does it reflect your calculations?

20          A.  Well, it reflects my calculations

21    building on others' calculations.

22          Q.  Including Mr. Cutler?

23          A.  Including Professor Cutler and

24    Professor Rosenthal.
```

```
 1          Q.  And does this set forth your work?

 2          A.  Yes.

 3          Q.  Okay.  Now, did you have anyone

 4    assisting you in this engagement on behalf of

 5    Summit County and Cuyahoga County?

 6          A.  Yes, I did.

 7          Q.  How many people assisted you?

 8          A.  This was -- would have been staff at

 9    Compass Lexecon.  I would say I know of four or

10    five by name.  And my impression was that there

11    was some more junior people doing some of the

12    kind of data entry work.

13          Q.  Who are the four or five people at

14    Compass Lexecon you know by name that assisted

15    you in this engagement?

16          A.  Hal Sider.

17          Q.  Can you spell the name?

18          A.  Last name is S-I-D-E-R.  Erica Benton,

19    B-E-N-T-O-N.  Alice Kaminski, K-A-M-I-N-S-K-I.

20    And there's a statistician guy who I'll remember

21    before we leave today, but there's another guy I

22    worked with by name.

23          Q.  Are those the names of the people at

24    Compass Lexecon that you can remember right now?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Hal Sider, Erica Benton, and Alice

3    Kaminski?

4    A.    Yes.

5    Q.    And then a statistician whose name you

6    think you'll remember later today?

7    A.    Yes.

8    Q.    Anyone else?

9    A.    There might be.  I'll -- if I remember

10   someone, I'll let you know.

11   Q.    What was Hal Sider's role in this

12   engagement?

13   A.    He was a kind of project manager, I

14   would say.

15   Q.    What do you mean by "project manager"?

16   A.    The most senior person at Compass Lex.

17   Q.    And what work did he perform on this

18   engagement?

19   A.    You mean in my report, or overall in

20   the --

21   Q.    In your report.

22   A.    In my report.  He would have been one

23   of the people advising me about the -- kind of

24   the form of presentation of some of the numbers,

Highly Confidential - Subject to Further Confidentiality Review

1    and we went over the detailed budgets together,

2    so he would have had input into some of that.

3    Q.    What kind of input?

4    MR. SOBOL:  Just the subject, not the

5    content.

6    A.    Inputs regarding the treatment of

7    different kind of costs that were listed in the

8    budgets.

9    BY MR. KEYES:

10   Q.    Anything else you can tell me about

11   the work that Mr. Sider performed in connection

12   with this engagement?

13   A.    That was the primary thing.  He was

14   aware of what was going on, so...

15   Q.    What do you mean?

16   A.    I mean, he was aware of drafts of

17   report.  He was aware of the stages of work.

18   Q.    What was Erica Benton's role in this

19   engagement?

20   A.    She was -- is also a senior person.  I

21   met -- I haven't met her.  I've just spoken with

22   her on the phone.  She oversaw much of the data

23   collection from the bellwethers.

24   Q.    And when you refer to bellwethers,

Highly Confidential - Subject to Further Confidentiality Review

1    you're referring to Summit County and Cuyahoga

2    County?

3    A.    Yes.

4    Q.    And only those two counties?

5    A.    Yes.

6    Q.    And what do you mean she oversaw the

7    data collection?

8    A.    She was a good person to ask questions

9    of with respect to various components of the

10   cost report, and I -- my impression was she was

11   kind of on top of things and was working with

12   other people and would help them in their data

13   work.

14   Q.    What work did she perform on this

15   engagement?

16   MR. SOBOL:  Just the types, not the

17   content.

18   A.    I think supervising some Compass Lex

19   staff, and also she would have participated in

20   some of the decisions about different forms of

21   costs in the budget.

22   BY MR. KEYES:

23   Q.    What do you mean she participated in

24   decisions?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    A component of my work was to identify

2    from budgets -- from the public budgets of the

3    bellwether counties the components of the costs

4    that might be affected by harms that were due to

5    misconduct of the defendants, and not all of the

6    costs, not all of the budget items would be

7    subject to that, so there was a kind of

8    selection of the budget items that were

9    economically justified and included in that

10   analysis.

11   Q.    Well, you said she participated in

12   decisions regarding the different forms of costs

13   in the budget.  Who made the decisions?

14   A.    I made all the decisions.

15   Q.    So what was her role when you said she

16   participated in the decisions?

17   A.    Well, she would have been involved in

18   the conversations.  When we talked about these

19   things, she would have helped explain what

20   non-compensation costs are there for this

21   particular division.  So there was a lot of kind

22   of interpretation of the details of the budget

23   documents that she helped with.

24   Q.    You mentioned Alice Kaminski.

```
1      A.   Yes.
2      Q.   What was her role in this engagement?
3      A.   Less senior to Erica.  I hope I'm not
4  getting the hierarchy wrong at Compass Lex.  She
5  worked on some of the budget items.  I think she
6  may not have been involved in all of them, but
7  in a component, some components of it.
8      Q.   Anything else you can say about her
9  role in this engagement?
10     A.   No.
11     Q.   What work did she perform on this
12 engagement then?
13     A.   She would have supervised some of the
14 data entry that appears in the Excel
15 spreadsheets in my report.
16     Q.   Anything else?
17     A.   Not that I can think of.
18     Q.   And what was the role of the
19 statistician you referenced?
20          MR. SOBOL:  Was it Evan?
21     A.   Evan.
22 BY MR. KEYES:
23     Q.   What's Evan's last name?
24     A.   I can't remember, I'm sorry.
```

```
1      Q.   Okay.
2           MR. SOBOL:  McKay?
3      A.   Evan McKay, yes.
4           MR. KEYES:  I appreciate the
5  assistance, but for now I'd just like to know
6  what Professor McGuire knows without assistance.
7  BY MR. KEYES:
8      Q.   What is Evan's last name, as you
9  remember it?
10     A.   Evan McKay.
11     Q.   What was Evan McKay's role in --
12     A.   I call him a statistician because he
13 seemed to be aware of and interested in some of
14 the conduct of the data analysis, and he was
15 also helpful to me on the budget side.
16     Q.   What work did McKay perform in
17 this engagement?
18     A.   He helped explain to me some of the
19 analysis being done by Professor Cutler.
20     Q.   Did he help explain to you some of the
21 analysis done by Professor Rosenthal?
22     A.   No, he didn't.
23     Q.   What about the work done by
24 Professor Gruber?
```

```
1      A.   I'm sorry, what about it?
2      Q.   Did Mr. McKay help explain to you some
3  of the analysis done by Professor Gruber?
4      A.   No, he didn't.
5      Q.   Okay.  Did Mr. McKay explain to you
6  some of the analysis by anyone else in this case
7  beside Professor Cutler?
8      A.   No, he didn't.
9           I have more of another category of
10 assistants once you're done with Compass Lex.
11     Q.   Okay.  Did you speak with
12 Professor Cutler about the work he did in this
13 case?
14     A.   Yes.
15     Q.   Did you speak with Professor
16 Rosenthal?
17     A.   I did, yes.
18     Q.   Did you speak with Professor Gruber?
19     A.   Yes.
20     Q.   And when you said a moment ago that
21 Mr. McKay helped explain some of the analysis by
22 Professor Cutler, are you referring to the
23 statistical analysis that Professor Cutler did?
24     A.   Yes, the regressions.
```

```
1      Q.   Why did you need Mr. McKay's
2  assistance in understanding the statistical
3  analysis done by Professor Cutler?
4           MR. SOBOL:  Objection.
5      A.   Well, I wanted to be sure I understood
6  it.
7  BY MR. KEYES:
8      Q.   And you found Mr. McKay helpful to
9  your understanding of what statistical analysis
10 and regressions Professor Cutler had performed?
11     A.   Yes.
12     Q.   What else did Mr. McKay do?  You said
13 he seemed to be aware of and had an interest in
14 the conduct of the data analysis.  You said he
15 helped explain to you some of the statistical
16 analysis performed by Professor Cutler.  What
17 else, if anything, did Mr. McKay do?
18     A.   That was his primary role.
19     Q.   And have you met with Mr. Sider?
20     A.   Yes.
21     Q.   How many times?
22     A.   Six, seven.
23     Q.   Have you met with Ms. Benton?
24     A.   No, not in person.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Have you talked with Ms. Benton over

2  the phone?

3    A.   Yes.

4    Q.   How many times?

5    A.   Ten.  These are estimates.

6    Q.   Have you met with Ms. Kaminski?

7    A.   Yes.

8    Q.   How many times?

9    A.   One time.

10   Q.   And have you met with Mr. McKay?

11   A.   Never, only spoken on the phone.

12   Q.   How many times?

13   A.   Eight times.

14   Q.   How many?

15   A.   Eight.  These are estimates.

16   Q.   Can you tell me anything more about

17  the work that Mr. Sider, Ms. Benton,

18  Ms. Kaminski, or Mr. McKay did to assist you in

19  this engagement?

20        MR. SOBOL:  Objection.

21   A.   They would answer questions for me if

22  I had something more I wanted to know about

23  something.

24  BY MR. KEYES:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Anything else?

2    A.   No, not that I can think of.

3    Q.   Okay.  Did you receive assistance from

4  anyone who was not employed by Compass Lexecon?

5        MR. SOBOL:  Objection to form.

6    A.   Yes.  This was the other category of

7  assistance I wanted to be sure to mention.

8  BY MR. KEYES:

9    Q.   What is this category?

10   A.   This was the primary statistical

11  analyst who helped Meredith Rosenthal.  His name

12  is Forrest.  Last name is McCluer,

13  M-c-C-L-U-E-R.  And similarly to Evan in helping

14  me understand what Dave Cutler did, Forrest was

15  helpful in explaining the analysis that Meredith

16  Rosenthal did.

17   Q.   Forrest McCluer, did I get that name

18  right?

19   A.   Yes.

20   Q.   Did Mr. McCluer work for

21  Professor Rosenthal?

22   A.   Meaning, I'm sorry, at her direction,

23  or for her in some employment relationship?

24   Q.   You said there was a primary

Highly Confidential - Subject to Further Confidentiality Review

1  statistical analyst.  So was Mr. McCluer

2  assisting Professor Rosenthal?

3    A.   He was assisting her in her work, yes.

4    Q.   And so although you did not speak with

5  Professor Rosenthal about her work, you spoke

6  with Mr. McCluer about her work?

7        MR. SOBOL:  Objection.

8  BY MR. KEYES:

9    Q.   Is that correct?

10   A.   No, that's not correct.

11        MR. SOBOL:  Objection.

12  BY MR. KEYES:

13   Q.   Okay.

14   A.   I spoke with both of them about their

15  work.

16   Q.   Okay.

17   A.   I thought I said that.

18   Q.   I may have misunderstood then.

19        And how many times did you speak with

20  Mr. McCluer?

21        MR. SOBOL:  Objection to form.

22   A.   Probably six to eight.

23  BY MR. KEYES:

24   Q.   Do you have an expertise in

Highly Confidential - Subject to Further Confidentiality Review

1  statistics?

2    A.   I'm pretty good at statistics, yes.

3    Q.   Do you claim to have an expertise?

4    A.   I'm sorry, what was the question?

5    Q.   Do you claim to have an expertise in

6  statistics?

7    A.   Well --

8        MR. SOBOL:  Object to the form.

9    A.   -- I would say yes.  And I'll briefly

10  explain, and, of course, you feel free to follow

11  up as you like.

12        Much of the work that I do is applied

13  health economics, and looking back at the work

14  that has had the most impact and received the

15  most recognition in terms of awards and prizes

16  has been applied econometrics.  So while I

17  wouldn't be mistaken for an econometrician,

18  which is a statistician who works with

19  economics, I have expertise in it, and, in fact,

20  much of my academic research is oriented toward

21  statistical methods.

22  BY MR. KEYES:

23   Q.   Have you performed a regression

24  analysis yourself?

Highly Confidential - Subject to Further Confidentiality Review

1    A.   Ever?

2    Q.   Yes.

3    A.   Many times.

4    Q.   Did you perform any regression

5  analysis in this case, in this engagement?

6    A.   No, I didn't.

7    Q.   Do you consider yourself capable of

8  doing a regression analysis in this engagement?

9         MR. SOBOL:  Objection.

10   A.   Well, that would depend on the

11 assignment.

12 BY MR. KEYES:

13   Q.   Well, could you have done the work

14 that Professor Rosenthal did?

15   A.   Could I have done it?  Not as well as

16 she could.

17   Q.   Do you have the expertise to do the

18 work that Professor Rosenthal did?

19   A.   I'd say I've some of the expertise.

20   Q.   So you think you could have done the

21 regression analyses that Professor Rosenthal

22 performed?

23        MR. SOBOL:  Objection to form.

24   A.   Well, the work of specifying the

Highly Confidential - Subject to Further Confidentiality Review

1  regressions is something that draws on

2  experience as well as technical expertise, and

3  Meredith trumps me on those.  So I might have

4  been able to do it, but Meredith is in a better

5  position to do it.

6  BY MR. KEYES:

7    Q.   Have you -- could you do the work that

8  Professor Cutler did in this case?

9         MR. SOBOL:  Objection.

10   A.   I think my answer would be the same.

11 BY MR. KEYES:

12   Q.   Could you perform the regression

13 analyses that Professor Cutler conducted?

14   A.   It's the same answer.

15 Professor Cutler is first rank in this kind of

16 work, and while I have some qualifications as a

17 statistician, I think he's better positioned to

18 do the work he did.

19   Q.   So you've mentioned four or -- you've

20 mentioned four people by name at Compass Lexecon

21 who assisted you in this engagement.

22   A.   Yes.

23   Q.   You've mentioned the conversations you

24 had with Mr. McCluer.

Highly Confidential - Subject to Further Confidentiality Review

1    A.   Yes.

2    Q.   Did anyone else assist you in this

3  engagement?

4    A.   I don't think so.

5         You're talking about damages?

6    Q.   I am talking about damages right now.

7    A.   Okay.

8    Q.   Anyone else?

9    A.   I don't think so.

10   Q.   There are references in your damages

11 report, which is Exhibit Number 1, to staff and

12 team.  When you refer to staff in your report,

13 who are you referring to?

14   A.   It would have been the staff at

15 Compass Lex primarily.  I guess Forrest would

16 have been included in that.

17   Q.   And when you refer to your team in

18 your damages report, which is Exhibit 1, who are

19 you referring to?

20   A.   Do you mind if you point that to me so

21 I can see where the context is?

22   Q.   Sure.  Will you turn to Page 8 in your

23 report?

24   A.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  Paragraph 12.

2    A.   Okay.

3    Q.   It says, "In preparing this report, I,

4  and staff under my direction: analyzed data,

5  reviewed economic literature, court filings,

6  documents produced in this litigation, public

7  information and deposition testimony; and spoke

8  with representatives of the Bellwether

9  governments."

10   A.   Okay.

11   Q.   Do you see that language?

12   A.   Yes.

13   Q.   When you refer to "staff" in that

14 sentence, who are you referring to?

15   A.   The people we just spoke about.

16   Q.   Including Mr. McCluer?

17   A.   Yes.

18   Q.   And then if you turn to Page 28.

19   A.   Okay.

20   Q.   Are you there?

21   A.   Yes.

22   Q.   In Paragraph 51 you say, "To identify

23 affected divisions, I, and my team under my

24 direction, reviewed budget and expenditure

Highly Confidential - Subject to Further Confidentiality Review

1  information from the Bellwether governments."
2       Do you see that language?
3  A.   Yes, I do.
4  Q.   Who are you referring to there?
5  A.   That would be the same people.
6  Q.   Anyone else?
7  A.   No.
8  Q.   Later in the same paragraph a few
9  lines down you say, "In addition, I and members
10 of my team met with local officials to confirm
11 my understanding of both the activities
12 undertaken by these divisions and whether those
13 activities had been affected by the opioid
14 crisis."
15       Do you see that language?
16 A.   I do, yes.
17 Q.   Who are you referring to in that
18 sentence when you say "members of my team"?
19 A.   The same group of people.
20 Q.   Anyone else?
21 A.   No.
22 Q.   Now, you are charging $900 per hour
23 for your time on this engagement, correct?
24 A.   Yes, I am.

Highly Confidential - Subject to Further Confidentiality Review

1  Q.   How many hours have you spent as of
2  today on this engagement?
3       MR. SOBOL:  Did you say damages only
4  again?
5  A.   Oh, damages only?
6  BY MR. KEYES:
7  Q.   Damages.
8  A.   Oh, gosh.  I haven't divided my hours
9  between damages and my other report.
10 Q.   Okay.
11 A.   Except it would be in the details of
12 the listing of my hours.  So I would -- I'll
13 guess for you.
14      MR. SOBOL:  Do you want to do that?
15 BY MR. KEYES:
16 Q.   What's your best estimate of the
17 number of hours you have spent on the damages
18 analysis?
19 A.   I would say 250.
20 Q.   And how much time have you spent on
21 the nuisance report?
22 A.   About the same.
23 Q.   So is it your best estimate that
24 you've spent approximately 500 hours on this

Highly Confidential - Subject to Further Confidentiality Review

1  engagement?
2  A.   Yes.
3  Q.   How many hours has Mr. Sider spent on
4  this engagement?
5  A.   I don't know.
6  Q.   How many hours has Ms. Benton spent on
7  this engagement?
8  A.   I don't know.
9  Q.   How many hours has Ms. Kaminski spent
10 on this engagement?
11 A.   I don't know.
12 Q.   How many hours has Mr. McKay spent on
13 this engagement?
14 A.   I don't know.
15 Q.   How many hours has Mr. McCluer spent
16 on this engagement?
17 A.   I don't know.
18 Q.   How much has Compass Lexecon billed
19 the plaintiffs in this case for their work on
20 this engagement?
21 A.   I don't know.
22      MR. SOBOL:  Objection to form.  Sorry,
23 I fell asleep there for a second.  Objection to
24 form.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. KEYES:
2  Q.   How much has Compass Lexecon incurred,
3  even if not billed to plaintiffs, for their work
4  on this engagement?
5  A.   I don't know.
6  Q.   Would you turn to Page 19 of your CV.
7  A.   My CV.  Okay.
8  Q.   You attached your CV as Appendix IV.A.
9  A.   Yes, I have it.
10 Q.   And this lists your litigation
11 experience 2014 through present?  Yes?
12 A.   Yes.
13 Q.   And this continues from Pages 19 and
14 20.  Is this something you prepared?
15 A.   Yes.
16 Q.   Is it accurate?
17 A.   Well, there's a couple of additions.
18 Q.   Okay.  What are the additions?
19 A.   The additions are reports I submitted
20 since this was submitted.  On March 25th I
21 submitted a report in a reverse payment case,
22 and then I think April 3rd I may -- or 1st I
23 submitted also a reverse payment case report.
24 Q.   Any other reports or testimony you

1 would add to this list?

2    A.   No.

3    Q.   When you say "a reverse payment case,"

4 what do you mean?

5    A.   I mean it's an antitrust case

6 involving the potential anti-competitive effects

7 of a patent settlement.

8    Q.   And did you quantify damages in either

9 of those two cases you just mentioned where you

10 submitted reports on March 25th and April 3rd?

11    A.   No, I didn't.

12    Q.   And in the report that you submitted

13 on March 25th, who did you submit the report on

14 behalf of?

15    A.   It was a -- class plaintiffs.

16    Q.   How about in the report that you

17 submitted on April 3rd?

18    A.   The same.

19    Q.   If you go back to the first page,

20 Page 19, you list the In re: Nexium Antitrust

21 Litigation.

22    A.   Yes.

23    Q.   Was that a reverse payments case?

24    A.   Yes, it was.

1    Q.   And did you offer opinions in support

2 of the plaintiff?

3    A.   Yes, I did.

4    Q.   Did you calculate damages in that

5 case?

6    A.   No, I didn't.

7    Q.   And the next case you list, United

8 States of America, ex rel. Saldivar versus

9 Fresenius Medical Care Holdings.

10    Do you see that?

11    A.   Yes.

12    Q.   What type of case was that?

13    A.   It was -- I'm probably pronouncing

14 this incorrectly, but a qui tam case.

15    Q.   And for which party did you submit a

16 report and serve as an expert?

17    A.   For the plaintiffs.

18    Q.   Did you quantify damages in that case?

19    A.   No, I didn't.

20    Q.   What were your opinions in that case?

21    A.   They had to do with fraudulent billing

22 and manipulation of tests.

23    Q.   And the next case you list, Monica

24 Barba and Jonathan Reisman, on behalf of

1 themselves and all others similarly situated

2 versus Shire U.S., Inc.

3    Do you see that?

4    A.   I do.

5    Q.   What kind of case was that?

6    A.   That was a reverse payment case.

7    Q.   For which party did you issue these

8 reports and serve as an expert?

9    A.   The plaintiffs.

10    Q.   Did you quantify damages in that case?

11    A.   No, I didn't.

12    Q.   Turn to the next case, United States

13 of America, ex rel., Tracey George and Dawn

14 Simmons versus Fresenius Medical Care Holdings,

15 Inc.

16    Do you see that one?

17    A.   Yes, I do.

18    Q.   Was that also a reverse payment case?

19    A.   No.  That was another qui tam case.

20    Q.   And for what party did you issue a

21 report and serve as a testifying expert?

22    A.   The plaintiffs.

23    Q.   Did you quantify damages in that case?

24    A.   No, I didn't.

1    Q.   What were your opinions about in that

2 case?

3    A.   It was also about fraudulent billing

4 and test manipulation.

5    Q.   And then the next case you list are In

6 Re: Cipro Cases I & II.

7    Do you see that?

8    A.   I do.

9    Q.   What kind of case was that?

10    A.   That was a reverse payment case.

11    Q.   For what party did you serve as an

12 expert, or provide a report?

13    A.   The plaintiffs.

14    Q.   Did you quantify damages in that case?

15    A.   No, I did not.

16    Q.   Turn to the next page of your CV, In

17 Re: Solodyn Antitrust Litigation.

18    Do you see that?

19    A.   Yes, I do.

20    Q.   What kind of case was that?

21    A.   That was a reverse payment case.

22    Q.   For what party did you serve as an

23 expert and submit these expert reports?

24    A.   For the plaintiffs.

1    Q.   Did you quantify damages?

2    A.   No, I didn't.

3    Q.   Next one is In Re: Asacol Antitrust

4  Litigation.

5         Do you see that?

6    A.   I do.

7    Q.   What kind of case was that?

8    A.   That was also a reverse payment case.

9    Q.   For what party did you serve as an

10  expert and submit these expert reports?

11   A.   For the plaintiffs.

12   Q.   Did you quantify damages?

13   A.   No, I didn't.

14   Q.   Next case is United States of America

15  ex rel. Stephen A. Krahling and Joan Wlochowski

16  versus Merck & Co., and In Re: Merck Mumps

17  Vaccine Antitrust Litigation.

18        Do you see that?

19   A.   I do.

20   Q.   Were those distinct cases?  You list

21  them together.

22   A.   I do.  I submitted one report.  I'm

23  not sure about the case question.

24   Q.   Okay.  Well, for the two cases listed

1  there, what kind of cases were they?

2    A.   They were cases of monopolization, I

3  would say.

4    Q.   So would you consider them to be

5  reverse payment cases?

6    A.   No, they're not reverse payment cases.

7    Q.   And what were your opinions in that

8  case?

9    A.   It was monopolization.

10   Q.   And for what party did you serve as an

11  expert and submit expert reports?

12   A.   For the plaintiffs.

13   Q.   Did you quantify damages in that case?

14   A.   I quantified overpayments in that

15  case, yes.  Excuse me.  It may have been also a

16  qui tam case.

17   Q.   You say this may have been one?

18   A.   This may have been one.  I'm not

19  100 percent sure.

20   Q.   So in this case you quantified

21  overpayments?

22   A.   Yes.

23   Q.   Overpayments by whom?

24   A.   Public and private payers.

1    Q.   To whom?

2    A.   To the company involved.

3    Q.   What was the company involved?

4    A.   It was Merck.

5    Q.   And did you call those overpayments

6  damages in that case?

7    A.   I don't remember.

8    Q.   Did you consider those overpayments to

9  be damages in that case?

10        MR. SOBOL:  Objection.

11   A.   I'm not sure how to answer.  I just

12  considered them overpayments.

13  BY MR. KEYES:

14   Q.   In Re: Niaspan Antitrust Litigation,

15  what kind of case was that?

16   A.   That was a reverse payment case.

17   Q.   For what party did you serve as an

18  expert and submit expert reports?

19   A.   For the plaintiff.

20   Q.   Did you quantify damages in that case?

21   A.   No, I didn't.

22   Q.   And then the last one you list here is

23  In Re: Loestrin 24 FE Antitrust Litigation.

24        Do you see that?

1    A.   Yes.

2    Q.   What kind of case was that?

3    A.   That was a reverse payment case.

4    Q.   For what party did you serve as an

5  expert and submit the expert report?

6    A.   Also for the plaintiff.

7    Q.   Did you quantify damages?

8    A.   No, I didn't.

9    Q.   We've reviewed the cases that are

10  listed on Pages 19 and 20 of your CV, plus the

11  two cases that you said earlier you had

12  submitted reports in after the date of this CV.

13  Are there any other cases where you have served

14  as an expert and you have quantified damages?

15   A.   Yes, with the explanation that a

16  report was never submitted, but I was charged

17  with quantifying damages.

18   Q.   What case was that?

19   A.   I don't remember the name of the drug

20  involved.  It was a damages phase of a case in

21  which a generic firm had been determined to

22  enter and sell and profit illegally.  And then

23  the issue in the case at the time I became

24  involved was what the damages should be.

1    Q.   You did not submit an expert report in
2  that case?
3    A.   I did not.
4    Q.   Did you testify at all in deposition
5  or hearing or trial?
6    A.   No, I don't think so.
7    Q.   And for what party in that case did
8  you serve as an expert?
9         THE WITNESS:  Is it -- I can answer
10 this freely?
11        MR. SOBOL:  Well...
12        THE WITNESS:  I don't mind, whatever
13 is --
14        MR. SOBOL:  Was the engagement
15 confidential?
16        THE WITNESS:  I believe it was
17 confidential.
18        MR. SOBOL:  So why don't you testify,
19 if it's acceptable, what side of the V you were
20 on, whether the claimant or the defendant, and
21 leave it at that, if you know.
22    A.   Would you mind asking the question
23 that I should answer?
24 BY MR. KEYES:

1    Q.   Well, I'd like to know the name of the
2  party for which you served as an expert in this
3  case where you claim to have quantified damages
4  but you did not submit an expert report and you
5  did not give any testimony.  I'd like to know
6  the name.  If you don't want to give the name,
7  I'd like to know whether it was the claimant or
8  the defendant.
9    A.   It was the defendant.  I'm happy to
10 take instruction if I give you the name.  It's
11 not -- I'm not hiding anything.  I just want
12 to --
13        MR. SOBOL:  The party is not here.
14 BY MR. KEYES:
15    Q.   I can't give you instructions.  I can
16 only ask questions.
17    A.   I'm appealing to whoever can give me
18 instructions.
19        MR. SOBOL:  Well, I'm here, and I'm
20 giving you instructions.  If you have good
21 reason to believe that the engagement was
22 supposed to be confidential without speaking to
23 the party, don't divulge it.  The attorneys will
24 deal with it off-line.  You've identified it was

1  the defendant, and that should be acceptable for
2  now.
3         THE WITNESS:  All right.
4  BY MR. KEYES:
5    Q.   Did you testify in a case called Blue
6  Cross and Blue Shield United of Wisconsin versus
7  Marshfield Clinic?
8    A.   I submitted a report and was deposed
9  in that case.
10    Q.   Did you testify at trial in that case?
11    A.   No.
12    Q.   What kind of case was that?
13    A.   That was also -- that was a damages
14 case.  I was involved with damages.  The case
15 itself was monopolization.
16    Q.   So you prepared a report on damages?
17    A.   Yes.
18    Q.   Quantifying damages?
19    A.   Yes.
20    Q.   For which party?
21    A.   For the plaintiff, which was Blue
22 Cross/Blue Shield of Wisconsin, I guess.
23    Q.   Did that case settle?
24    A.   I don't remember.

1    Q.   Why didn't you give trial testimony in
2  the case?
3         MR. SOBOL:  Objection to the form.
4    A.   My understanding was I came in on
5  appeal stage.  And I'm not sure why I wasn't
6  asked to testify.
7  BY MR. KEYES:
8    Q.   Did you offer expert opinions in a
9  case called Agostino versus Quest Diagnostics,
10 Inc.?
11    A.   Yes, I did.
12    Q.   Did you submit a report?
13    A.   Yes.
14    Q.   Were you deposed?
15    A.   I don't remember.
16    Q.   Did you give testimony at trial?
17    A.   No.
18    Q.   What kind of case was that?
19    A.   That was a fraudulent billing case.
20    Q.   Did you quantify damages?
21    A.   I don't remember.
22    Q.   What were your opinions in that case?
23    A.   It was fraudulent billings.
24    Q.   That's it?

1    A.    Well, there was a lot of backup to

2    that.

3    Q.    Well, I'm asking for your best

4    recollection.  In that case, did you offer

5    opinions quantifying damages?

6    A.    I don't remember.

7    Q.    And for what party did you serve as an

8    expert and submit that report?

9    A.    For a class, plaintiff, for

10   plaintiffs.

11   Q.    Did you serve as an expert in the case

12   titled In Re: Actiq Sales and Marketing

13   Practices Litigation?

14   A.    Yes, I did.

15   Q.    Did you submit a report?

16   A.    Yes.

17   Q.    Were you deposed in that case?

18   A.    I don't remember.

19   Q.    Did you testify at any trial?

20   A.    No.

21   Q.    What kind of case was that?

22   A.    That, I'm not sure of the legal

23   classification.  My work had to do with improper

24   marketing.

1    Q.    Did you quantify damages?

2    A.    No.

3    Q.    For what party did you serve as an

4    expert?

5    A.    For the plaintiffs.

6    Q.    Did you serve as an expert in a case

7    titled United States ex rel. Tracey in the

8    Northern District of Alabama?

9    A.    Can you remind me what -- I need more

10   information on it than that.

11   Q.    Do you remember a case in the Northern

12   District of Alabama?

13   A.    You'll have to remind me.

14   Q.    Okay.  Do you remember a case

15   involving the United States ex rel. Tracey?

16   A.    I don't remember.  Sorry.

17   Q.    No recollection of that?

18   A.    No recollection.

19   Q.    Okay.  Besides the cases we've talked

20   about, can you think of any other time when you

21   have served as a testifying expert where you are

22   attempting to quantify damages?

23   A.    I can't think of any.

24   Q.    Have you ever served as a testifying

1    expert where you have quantified damages

2    suffered by a municipality, other than this

3    case?

4    A.    No, I haven't.

5    Q.    Have you ever served as a testifying

6    expert where you quantified damages suffered by

7    a government other than this case?

8    A.    I think I would say no.

9    Q.    So have you ever served as a

10   testifying expert where you've quantified the

11   damages allegedly suffered by a municipality or

12   a government as being the expenditures for

13   providing services to their constituents?

14         MR. SOBOL:  Objection.

15   A.    Is this different than the previous

16   question?

17   BY MR. KEYES:

18   Q.    I think it's a subset of the prior

19   question.

20   A.    To which I said no to.

21   Q.    Okay.  So what's your answer to this

22   question?

23         MR. SOBOL:  Objection.

24   A.    So it has to be no, unless I'm

1    misunderstanding what you're asking.

2    BY MR. KEYES:

3    Q.    Have you ever served as a testifying

4    expert where you've quantified the damages

5    allegedly suffered by a municipality or a

6    government as being the expenditures for the

7    municipality or government providing services to

8    their constituents?

9          MR. SOBOL:  Objection.

10   A.    I believe I answered the more general

11   question prior to that.  If there's a

12   distinction, I'm missing it.

13   BY MR. KEYES:

14   Q.    It's very simple.  It's a yes-or-no

15   question.  If it's no, you can say no.

16         MR. SOBOL:  Or if he doesn't

17   understand it, he can say he doesn't understand

18   it, which he just did.

19   BY MR. KEYES:

20   Q.    Have you ever served as a testifying

21   expert where you have quantified the damages

22   allegedly suffered by the municipality or the

23   government as being the expenditures the

24   municipality or government incurred in providing

1   services to their constituents?

2       MR. SOBOL:  Objection.

3       A.  Okay.  I'm not sure what the objective

4   is of asking a general question and then a

5   subquestion that I think is covered by the

6   general question to which I answered no.  And if

7   there's a distinction, I'm missing it.

8   BY MR. KEYES:

9       Q.  So is your answer to my question no?

10      MR. SOBOL:  Objection.

11      A.  It's the answer I just gave ten

12  seconds ago.

13  BY MR. KEYES:

14      Q.  No, you haven't answered it, sir.  I

15  asked a broad question, and you gave me a

16  straight answer.  You said no.  Now I'm asking a

17  more specific question.  And I'm entitled to ask

18  the questions I want.  You may not think it

19  makes any sense --

20      A.  I'm not --

21      Q.  -- but I'm entitled to ask the

22  questions I want.

23      MR. SOBOL:  No question before you.

24  BY MR. KEYES:

1       Q.  So I'm asking you to answer my

2   question, whether you think it's useful or not.

3   Okay?

4       MR. SOBOL:  Objection.  There's no

5   question before you.

6   BY MR. KEYES:

7       Q.  Okay.  Have you ever served as a

8   testifying expert where you purported to

9   quantify the damages suffered by a municipality

10  or government as being the expenditures incurred

11  by the municipality or the government in

12  providing services to its constituents?

13      MR. SOBOL:  Objection to form.

14      A.  We seem to be stuck.  I have answered

15  what I regarded to be a question that covers

16  this, and I'm puzzled why that answer doesn't --

17  isn't sufficient, and my puzzlement leads me to

18  wonder if there's something I'm missing.

19  BY MR. KEYES:

20      Q.  So you're refusing to answer the

21  question?

22      MR. SOBOL:  No, he's not.  He's given

23  the answer several times now.

24  BY MR. KEYES:

1       Q.  Have you ever served as a testifying

2   expert where you offered the opinion that an

3   expenditure has an opportunity cost and that

4   opportunity cost is "damages"?

5       MR. SOBOL:  Objection.

6       A.  I'm sorry, I missed the first part.

7   This is research, or this is testifying expert

8   you're asking about?

9   BY MR. KEYES:

10      Q.  Testifying expert.

11      Have you ever served as a testifying

12  expert where you offered an opinion that an

13  expenditure has an opportunity cost, and that

14  opportunity cost is "damage"?

15      A.  So this would -- there's no government

16  qualifier there.  It's any expenditure?

17      Q.  Correct.

18      A.  So this needn't be a government

19  related case, am I -- just so I'm following?

20      Q.  I asked ever.

21      A.  Okay.

22      Q.  So have you ever served as a

23  testifying expert where you have offered the

24  opinion that the expenditure has an opportunity

1   cost, and that opportunity cost is "damages"?

2       A.  I would say that's the general

3   economic approach to a question like this, that

4   spending is the right metric for damages because

5   of opportunity cost considerations, and then

6   yes, it's damages.

7       Q.  So please name for me the specific

8   cases where you have offered the opinion that an

9   expenditure has an opportunity cost, and that

10  opportunity cost is "damages."

11      A.  All the cases in which I've responded

12  to your questions that I do damages, that's what

13  damages are regarded in economics.

14      Q.  And did any of those cases involve

15  quantifying damages allegedly suffered by a

16  municipality or a government?

17      A.  No, they did not.

18      Q.  Has a court ever excluded you from

19  testifying as an expert?

20      A.  There was in Nexium some of the work

21  that I did that was not heard by the jury.  I'm

22  not sure if that's what you're asking about.

23      Q.  And it was not heard by the jury

24  because of a decision by the judge?

1    A.   By Judge Young, yes.

2    Q.   What was the basis for the judge's

3  decision to not let the jury hear your opinion?

4    A.   My understanding was that -- I did a

5  series of reports in that case, and with respect

6  to one of the later reports I conducted some

7  analysis that Judge Young thought, given the way

8  the case was shaping up, in his view, that it

9  wouldn't be helpful, is my understanding.

10    Q.   So what were the opinions that you

11  were offering that the judge decided the jury

12  could not hear?

13    A.   The opinion was an analysis of stock

14  price movement around the announcement of the

15  settlement between the brand and the generic in

16  that case.

17    Q.   What did the judge say in explaining

18  why he thought that opinion would not be helpful

19  to the jury?

20    A.   I don't remember how he put it.

21    Q.   Has a testifying -- has a court ever

22  barred you from offering opinions on damages?

23    A.   Not so far as I know.

24    Q.   Has a court ever criticized your

1  approach or your methodology for quantifying

2  damages?

3    A.   In the Marshfield case that you

4  mentioned a bit ago, Judge Posner and I didn't

5  see eye to eye on the kind of statistical

6  comparisons that should be done.

7    Q.   What was Judge Posner's criticism of

8  your approach?

9    MR. SOBOL:  Objection to the form.

10    A.   The -- I was ahead of my time a bit on

11  that case.  The analysis that I did to quantify

12  damages is what goes now by the name of

13  difference in difference, which is an

14  econometric method where you identify a kind of

15  control group, and you follow that control group

16  forward, you follow your group forward,

17  something happens to the group you're interested

18  in, and you use the control group as a way to

19  adjust for other factors.

20    I don't think I -- I have all the

21  respect in the world for Judge Posner, but I

22  don't think he had seen much of this at that

23  point, which was a number of years ago.  It's

24  now very common methodology.  But my

1  understanding of his objection was that I didn't

2  have explicit variables in the model to account

3  for things that would have been adjusted for,

4  controlled for in the difference in difference

5  analysis.

6  BY MR. KEYES:

7    Q.   Have there been other instances where

8  a court has criticized your approach or

9  methodology for quantifying damages?

10    MR. SOBOL:  Objection to the form.

11    A.   None that I can think of.

12  BY MR. KEYES:

13    Q.   Has a court ever barred you from

14  offering opinions on other topics besides

15  damages?

16    MR. SOBOL:  Objection.

17    A.   Not that I know of.

18  BY MR. KEYES:

19    Q.   Has a court ever criticized the

20  opinions you were seeking to offer on other

21  topics besides damages?

22    A.   I don't know.

23    Q.   You can't think of an instance?

24    A.   I can't think of any.

1    Q.   Has a court ever excluded your

2  opinions on the ground that you failed to

3  consider competing explanations for your

4  findings?

5    MR. SOBOL:  Objection.  Form.

6    A.   Not so far as I know.

7  BY MR. KEYES:

8    Q.   So have you given me every instance

9  where a court has either excluded you from

10  testifying as an expert, or has barred the

11  opinions you've sought to offer, or have

12  criticized your approach or methodology?

13    MR. SOBOL:  Objection to the form.

14    A.   I'm giving you my best recollection,

15  yes.

16  BY MR. KEYES:

17    Q.   Are you a doctor?

18    A.   I'm not a medical doctor.  I'm an

19  economist.

20    Q.   Have you ever written a prescription

21  for drugs?

22    A.   No, I never have.

23    Q.   Are you a pharmacist?

24    A.   I am not a pharmacist.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Have you ever filled a prescription
2  for drugs?
3    A.    Not from the pharmacy side, no.
4    Q.    Are you a pharmacologist?
5    A.    No, I'm not a pharmacologist.
6    Q.    Are you a sociologist?
7    A.    No, you wouldn't say I'm a
8  sociologist.
9    Q.    Are you an epidemiologist?
10    A.    No, I'm not an epidemiologist.
11    Q.    Have you ever worked for a
12  manufacturer of pharmaceuticals?
13    A.    Worked for.  Not in an employment
14  relationship.  As a consultant a few times.
15    Q.    In connection with litigation?
16    A.    Yes.
17    Q.    Have you ever worked as an employee of
18  a distributor of pharmaceuticals?
19    A.    Never as an employment relationship.
20    Q.    Have you ever worked for a pharmacy?
21    A.    Not in an employment relationship.
22    Q.    Have you ever worked for a law
23  enforcement agency?
24    A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Are you an expert in law enforcement?
2    A.    I wouldn't say I'm an expert in law
3  enforcement, no.
4    Q.    Have you ever worked for the DEA?
5    A.    Never worked for the DEA.
6    Q.    Are you a DEA expert?
7    A.    No, I'm not a DEA expert.
8    Q.    Are you a drug policy expert?
9    A.    I work on drug policy, so I would say
10  yes.
11    Q.    What areas, then, of drug policy do
12  you consider yourself to have an expertise in?
13    A.    The economics of competition,
14  regulation in the pharmacy area.
15    Q.    Anything else?
16    A.    Those are pretty general.
17    Q.    Have you ever worked for the FDA?
18    A.    No, I don't think so.
19    Q.    Are you an FDA regulatory expert?
20    A.    No, I wouldn't say I'm an FDA
21  regulatory expert.
22    Q.    Are you an FDA labeling expert?
23    A.    No, I'm not.
24    Q.    Are you an FDA expert?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Well, I know some things about the
2  FDA.  But expert, I would say no.
3    Q.    Are you an expert in addiction?
4    A.    Well, one of my areas of economics
5  expertise is what's called behavioral health,
6  and that refers to mental health and substance
7  abuse, and addiction falls within that, yes.
8    Q.    So how would you describe your
9  expertise in the area of addiction?
10    A.    I'm an expert in the economics of
11  mental health and behavioral health, and there's
12  a lot of aspects of that.
13    Q.    You're an expert in the economics of
14  behavioral health?
15    A.    Yes.
16    Q.    Okay.
17    A.    And policy.
18    Q.    Are you an expert in pain management?
19    A.    No, I'm not.
20    Q.    Are you an expert in neonatal
21  abstinence syndrome?
22    A.    I am not a medical expert, no, in that
23  or other areas.
24    Q.    Are you an expert in neonatal care?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Not in the -- no, no.
2    Q.    In your report you periodically refer
3  to "bellwether governments."  When you do so,
4  are you referring to Summit County and Cuyahoga
5  County?
6    A.    Yes.
7    Q.    Are you only referring to them?
8    A.    Yes.
9    Q.    And similarly, you refer in your
10  report to bellwether jurisdictions.  When you do
11  so, again, are you referring to Summit County
12  and Cuyahoga County and only those two counties?
13    A.    Yes.
14    Q.    You refer in your report to
15  prescription opioid shipments.  What do you mean
16  by that?
17    A.    I mean shipments of -- I'm not sure.
18  I'm not clear about that question.  Shipments of
19  opioid prescriptions to local areas.
20    Q.    Well, I said, you refer in your report
21  to prescription opioid shipments.  What do you
22  mean?  And you said, I'm not sure about the
23  question, so I want to make sure you understand
24  the question.

1  A.  Okay.

2  Q.  There are references throughout your

3  report to prescription opioid shipments.  I want

4  to make sure we're on the same page about what

5  you're referring to when you use the phrase

6  prescription opioid shipments.

7  A.  Okay.  I'm using them -- that term in

8  exactly the same way that Professor Cutler uses

9  it in his report, and it is the volume of

10  prescription opioids -- I'm trying not to use

11  the words in the question -- sent to the local

12  jurisdictions, the bellwether jurisdictions.

13  Q.  Sent to pharmacies in those local

14  jurisdictions?

15  A.  They would be sent to pharmacies, yes.

16  Q.  Sent anywhere else besides pharmacies

17  in those local jurisdictions?

18  A.  I'm not sure.

19  Q.  Where else would these prescription

20  opioids be sent in the local jurisdictions

21  besides pharmacies, as you understand it?

22  A.  They might be sent to healthcare

23  providers.

24  Q.  Do you know one way or the other?

1  MR. SOBOL:  Objection to the form.

2  A.  I would have to go back and check and

3  see what Cutler did.

4  BY MR. KEYES:

5  Q.  And when you refer to local

6  jurisdictions, are you referring again to

7  Cuyahoga County and Summit County?

8  A.  Yes.

9  Q.  And only those two counties?

10  A.  Yes.

11  Q.  In your report you refer to the opioid

12  epidemic.  What do you mean by that?

13  A.  I mean the very large death and

14  sickness associated with opioid use.

15  Q.  Which drugs?

16  A.  The prescription opioids.

17  Q.  Do you include illegal drugs?

18  A.  It depends on the context.

19  Q.  What constitutes an epidemic, as you

20  use the term?

21  A.  You know, a major public health issue

22  that affects many people.

23  Q.  And when did the -- to use your term,

24  opioid epidemic, when did it start?

1  A.  When did it reach epidemic

2  proportions?  Is that the nature of your

3  question?

4  Q.  Well, you refer in your report a

5  number of times to the opioid epidemic, and I

6  want to understand, when did it start, the

7  opioid epidemic?

8  A.  There's two different ways I could

9  answer that:  When did it become an epidemic,

10  which is when the epidemic started; or when some

11  prior causes were involved that started it, and

12  I'm not sure.

13  Q.  When did the epidemic start?  You just

14  gave me two --

15  A.  You're not helping me here.

16  Q.  You said when -- "there's two

17  different ways I could answer that:  When did it

18  become an epidemic, which is when the epidemic

19  started."  Okay.  When did the epidemic start?

20  MR. SOBOL:  Wait.  Could you just put

21  a full question?  Because I think the record is

22  a little bit unclear right now.

23  BY MR. KEYES:

24  Q.  You've referred to opioid epidemic.

1  A.  Yes.

2  Q.  And I want to understand, from your

3  perspective based on the work you've done, when

4  do you understand that opioid epidemic started?

5  A.  What I would say is that answering

6  your question in the sense of when did the

7  opioid crisis become an epidemic, it would have

8  been a gradual process, and the threshold of,

9  yes, we have an epidemic would have been, I

10  don't know, at the time the acceleration in

11  deaths took place, which is ten years ago.

12  Q.  And what is your --

13  A.  Excuse me, I want to make a

14  distinction between that answer and when events

15  that led to the epidemic started, which I

16  understand to be a different question.

17  Q.  What was the peak of the opioid

18  epidemic?

19  MR. SOBOL:  Objection.

20  A.  Well, that depends on how you measure

21  the epidemic.  And if you measure it by deaths

22  from opioids, we're still waiting for the peak.

23  BY MR. KEYES:

24  Q.  What if you measure it another way?

```
 1              MR. SOBOL:  Objection.
 2    BY MR. KEYES:
 3         Q.  You said you could measure it multiple
 4    ways.  What are the other ways you could measure
 5    the peak of the opioid epidemic?
 6         A.  I would tend to measure the nature of
 7    the epidemic by the harms that are caused by the
 8    epidemic, and there are various ways to do that.
 9    Some other metrics might show a different time
10    pattern.
11         Q.  So if you use those other metrics,
12    when do you place in time the peak of the opioid
13    epidemic?
14              MR. SOBOL:  Objection.  Form.
15         A.  Well, I wouldn't -- I think it's the
16    kind of question that defies a single answer
17    like "2011."  As an economist interested in
18    policy, I would want to keep track of the
19    various kind of harms that were associated with
20    the opioid epidemic, and some go up more
21    quickly, some go up more slowly, some may have
22    even peaked.  It's hard to give a year answer to
23    that question.
24    BY MR. KEYES:
```

```
 1         Q.  Have you studied the opioid epidemic?
 2         A.  Well, yes, I would say yes.
 3         Q.  So what has your study been?
 4              MR. SOBOL:  Objection.
 5    BY MR. KEYES:
 6         Q.  When you say "yes," what have you done
 7    to study the opioid epidemic?
 8         A.  Well, I've written two reports on this
 9    in the last, whatever, ten months or so, that
10    involved a lot of study.  I've taught about it.
11    That's -- I've helped prepare federal grant
12    proposals to contend with the opioid epidemic.
13    All those involve study.
14         Q.  In your report you refer to
15    distributors a number of times.  Who are the
16    distributors you're referencing?
17         A.  The firms that distribute prescription
18    opioids.
19         Q.  Can you name them?
20         A.  I can name some.  Cardinal Health,
21    McKesson.
22         Q.  Can you name any others?
23         A.  I'll stop there.  Rochester Drug.
24              Not right now, no.
```

```
 1         Q.  So when you refer to distributors in
 2    your report, you're referring to the firms that
 3    distribute prescription opioids?
 4         A.  Yes.
 5         Q.  And you can think of Cardinal Health,
 6    McKesson, and Rochester Drug?
 7         A.  Yes.
 8              MR. SOBOL:  Without the report in
 9    front of him?
10    BY MR. KEYES:
11         Q.  Can you think of any others?
12              MR. SOBOL:  Without the report in
13    front of him?
14              MR. KEYES:  Sure.
15              MR. SOBOL:  Just so it's clear, the
16    report is in front of him, but you don't want
17    him to go through the report to answer the
18    question, right?
19              MR. KEYES:  I'd like his answer.
20    BY MR. KEYES:
21         Q.  What do you remember, without looking
22    at the report?  We'll look at your report later.
23         A.  Without looking at the report, I gave
24    you the ones I can think of.
```

```
 1         Q.  You also refer to the distributor
 2    defendants a number of times.  When you use that
 3    term, who are you referring to?
 4         A.  The distributors who are defendants in
 5    this case.
 6         Q.  Okay.  And can you name any of those
 7    besides the ones you just listed?
 8              MR. SOBOL:  Objection to the form.
 9         A.  Not without looking at my report.
10    BY MR. KEYES:
11         Q.  What do you know about the role of
12    distributors in the supply chain?
13              MR. SOBOL:  Objection to the form.
14         A.  Well, I know in general what their
15    role is.  They take product and move it to
16    retail.
17              I'm not sure what you're asking.
18    BY MR. KEYES:
19         Q.  Have you ever studied their practices?
20         A.  In connection with some of these
21    cases, I need to be aware of the general
22    business practices of wholesalers.  And even in
23    my research on the economics of the pharmacy
24    sector, you know, one needs to be aware of the
```

Highly Confidential - Subject to Further Confidentiality Review

1    role of wholesalers.

2        Q.   What do you know about the role of

3    distributors in the supply chain that only

4    distribute to their own retail pharmacies?

5        MR. SOBOL:  Object to the form.

6        A.   What do I know about them?  I'm sorry,

7    I'm not getting the point of your question.

8    BY MR. KEYES:

9        Q.   Okay.  Can you be more specific about

10   the policies and practices of distributors that

11   distribute to their own retail pharmacies?

12       MR. SOBOL:  Objection to the form.

13       A.   I'm still not sure what you're getting

14   at here.  I'm sorry, I'm just not following what

15   you're asking.

16   BY MR. KEYES:

17       Q.   Okay.  We'll return to that.

18            You refer to opioids.  And can you

19   turn to Page 4 of your report?  Are you there?

20       A.   Yes, I am.

21       Q.   Okay.  The last sentence of

22   Paragraph 6 in the middle of the page says, "In

23   discussing opioids, I follow the CDC's

24   definition, which includes both legal and

Highly Confidential - Subject to Further Confidentiality Review

1    illicit opioids."

2        Do you see that?

3        A.   I do, yes.

4        Q.   Okay.  So when you refer to opioids in

5    your report, you are referring to both legal and

6    illicit opioids, correct?

7        A.   Well, it depends on the context.  And

8    when I just -- which includes when I say both

9    legal and illicit, footnote 9, and that explains

10   what it means.

11       Q.   Well, footnote 9 gives a definition

12   of -- the CDC definition of opioids, correct?

13       A.   That's right.

14       Q.   Okay.  But you said in -- on Page 4

15   that when you discuss opioids, you follow the

16   CDC's definition, which includes both legal and

17   illicit opioids.

18            So I'm trying to understand, when

19   there are references later in the report to

20   opioids without any further clarification,

21   you're referring to both legal and illicit

22   opioids?

23       MR. SOBOL:  Objection.  Asked and

24   answered.

Highly Confidential - Subject to Further Confidentiality Review

1        A.   I would have to see the context to be

2    sure what is being meant.

3    BY MR. KEYES:

4        Q.   Would you turn to Page 8 of your

5    report?  Paragraph 12, "In preparing this

6    report, I, and staff under my direction:

7    analyzed data."

8            What specific data did you analyze?

9        A.   The data I analyzed were the budget

10   information of the bellwether jurisdictions, the

11   bellwether governments.

12       Q.   Can you be more specific?  When you

13   refer to the budget information, what are you

14   referring to?

15       A.   Okay.  Each year for each county

16   there's a document that explains the functions

17   of and the expenditures of various divisions in

18   the county, and it's a lot of data that includes

19   breakdowns of expenditures in a division,

20   sometimes by purpose, sometimes by type of

21   expenditure, and it's those data that I analyzed

22   in order to determine damages in this case.

23       Q.   What is that document called?

24       A.   There's many documents.  There's a

Highly Confidential - Subject to Further Confidentiality Review

1    series of budget documents for Cuyahoga, and a

2    series of budget documents for Summit.  It's

3    named later in my report.

4        Q.   Okay.  Anything that you would add

5    besides this budget information that you've

6    described when you refer to analyzing data?

7        A.   That certainly was, you know, the very

8    large majority of what I analyzed.

9        Q.   So besides budget information of the

10   two counties, what data did you personally

11   analyze?

12       A.   That's why I'm wondering if there

13   might be something else that I'm not

14   remembering.  Not that I can remember here.

15       Q.   On Page 6, Paragraph 9 -- do you have

16   that in front of you?

17       A.   Yes.

18       Q.   -- you say, "Through review of the

19   Bellwether governments' budgets and expenditures

20   and interviews with Bellwether government

21   personnel, I have identified certain divisions

22   that are affected by the opioid epidemic, listed

23   here in Table IV.1."

24            Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1    A.   I do, yes.

2    Q.   When you reference interviews with

3 bellwether government personnel, you're

4 referring to personnel of Summit County and

5 Cuyahoga County?

6    A.   Yes.

7    Q.   Which personnel?

8    A.   I don't remember their names.

9    Q.   Do you remember their titles?

10    A.   Oh, there were --

11    MR. SOBOL:  This is without looking at

12 his report, correct?

13    MR. KEYES:  He has the report in front

14 of him.

15    MR. SOBOL:  He has the report in front

16 of him, then why don't you direct him to the

17 page that has this information?

18    MR. KEYES:  It's his report.  He says

19 that through interviews with bellwether

20 government personnel he has identified certain

21 divisions that are affected by the opioid

22 epidemic.

23 BY MR. KEYES:

24    Q.   I want to know who you interviewed.

---

Highly Confidential - Subject to Further Confidentiality Review

1 Who are these bellwether personnel to whom

2 you're referring?

3    MR. SOBOL:  My point is there's an

4 appendix, Materials Considered, and if you'd

5 like him to look at that, he may, and if you

6 want him to remember without looking at that,

7 then he won't.

8 BY MR. KEYES:

9    Q.   Without looking at your report, you

10 said -- you already said you don't remember any

11 names.  I'm asking, do you remember the titles

12 of the people?

13    MR. SOBOL:  Without looking at the

14 materials considered, correct?

15    MR. KEYES:  Sure.

16    A.   There were budget officials, sheriff,

17 people from ADAMHS Board, budget director.

18 There was about 40 in total.

19 BY MR. KEYES:

20    Q.   And did you personally participate in

21 these interviews?

22    A.   No, not all, no.

23    Q.   Again, I'm asking you about the

24 bellwether government personnel you interviewed.

---

Highly Confidential - Subject to Further Confidentiality Review

1    A.   That I personally interviewed?

2    Q.   Yes.

3    MR. SOBOL:  And you want him to do it

4 without looking at the materials considered,

5 correct?

6    MR. KEYES:  For the moment, yes.

7    MR. SOBOL:  Okay.

8    MR. KEYES:  I don't think there's

9 anywhere in his report where he identifies any

10 interview with anyone who works for Summit

11 County or Cuyahoga County, but I don't want to

12 waste the time at this point to scan the report

13 for something that doesn't exist.

14 BY MR. KEYES:

15    Q.   I want your recollection.  When you

16 refer to interviews with bellwether government

17 personnel, you said those are personnel of

18 Summit County and Cuyahoga County, and I'd like

19 to know who are those people that you

20 interviewed?

21    A.   These people were interviewed by my

22 staff.

23    Q.   Did you interview any of these people,

24 to use your phrase?

---

Highly Confidential - Subject to Further Confidentiality Review

1    A.   They were all interviewed by my staff.

2    Q.   Did you interview anyone who worked

3 for Summit County?

4    A.   I can't remember 100 percent

5 whether -- which of the calls I may have been

6 on.  I'm sorry, I just don't remember.

7    Q.   Okay.  So sitting here today, do you

8 remember participating in any interview of

9 anyone who works for Summit County?

10    A.   I can't remember.

11    Q.   Did you interview anyone at Cuyahoga

12 County?

13    A.   I can't remember.

14    Q.   Sitting here today, can you remember

15 participating in any interview of anyone who

16 worked for Cuyahoga County?

17    A.   I can't remember.

18    Q.   So when you say "Through review of the

19 Bellwether governments' budgets and expenditures

20 and interviews with Bellwether government

21 personnel, I have identified certain divisions

22 that are affected by the opioid epidemic listed

23 here in Table IV.1," you're referring

24 exclusively to interviews that someone else

Highly Confidential - Subject to Further Confidentiality Review

1   conducted, correct?

2      A.   These interviews --

3      MR. SOBOL:  Object to the form.

4      Go ahead.

5      A.   These interviews were conducted by

6   staff under my direction.

7   BY MR. KEYES:

8      Q.   Okay.  And did anyone take notes of

9   these interviews of anyone who worked for Summit

10  County or Cuyahoga County?

11     A.   I'm not sure.

12     Q.   Have you seen any notes --

13     A.   I have not.

14     Q.   -- that anyone took of any interviews

15  of anyone who worked for Cuyahoga County or

16  Summit County?

17     A.   No, I have not.

18     Q.   All right.  So with respect to the

19  bellwether government personnel listed here, you

20  didn't participate in those interviews, and you

21  don't remember the names of who was interviewed

22  by your staff, correct?

23     A.   Well, I told you what I could

24  recollect about that.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Okay.  And you said you don't remember

2  the names.  I asked you for the titles, and you

3  told me budget officials, the sheriff, the

4  ADAMHS Board people, and the budget director.

5  That's what you said so far.  Can you add to

6  that list?

7     A.   Not as I sit here, no.

8     Q.   Who interviewed the budget director

9  for Summit County?

10     A.   Staff at Compass Lexecon.

11     Q.   Who?

12     A.   I'm not sure.

13     Q.   Who interviewed the budget director at

14  Cuyahoga County?

15     A.   I'm not sure.  It would have been

16  staff at Compass Lex.

17     Q.   Who interviewed officials from the

18  ADAMHS Board for Summit County?

19     A.   Staff at Compass Lex.

20     Q.   Who?

21     A.   I'm not sure.

22     Q.   Who interviewed the ADAMHS Board

23  officials for Cuyahoga County?

24     A.   Same answer, it would have been staff

Highly Confidential - Subject to Further Confidentiality Review

1   at Compass Lex.  I'm not sure of the name of the

2  person.

3      Q.   Who interviewed the sheriff for Summit

4  County?

5     A.   It would be the same answer.

6     Q.   Who interviewed the sheriff for

7  Cuyahoga County?

8     A.   Same answer.

9     Q.   Who interviewed the budget officials

10  for Summit County?

11     A.   Same answer.

12     Q.   Who interviewed the budget officials

13  for Cuyahoga County?

14     A.   Same answer.

15     Q.   So what you know sitting here today is

16  that personnel at Compass Lexecon interviewed

17  these officials, correct?

18     A.   Yes, they did.

19     Q.   And you don't know whether they took

20  notes, correct?

21     A.   I've never seen any notes.

22     Q.   Do you know whether they took notes?

23     A.   I'm not sure.

24     Q.   And you don't know the names of the

Highly Confidential - Subject to Further Confidentiality Review

1   people they interviewed, correct?

2      A.   Well, I've told you what I know.

3      Q.   Were these interviews by Compass

4  Lexecon in person or over the phone?

5     A.   They were a combination.

6     Q.   Which of these officials were

7  interviewed in person?

8     A.   I'm not sure.

9     Q.   Which of these interviews -- officials

10  were interviewed over the phone?

11     A.   I'm not sure.

12     Q.   How many different interviews were

13  there with the budget officials from Summit

14  County?

15     A.   There were about -- oh, for the budget

16  officials only?  For someone like that, there

17  likely would have been multiple interviews.

18     Q.   You say "likely."  Do you know the

19  number of interviews that Compass Lexecon

20  conducted of budget officials in Summit County?

21     A.   I don't know the count, no.

22     Q.   How about for the budget officials in

23  Cuyahoga County?

24     A.   Same answer.

1    Q.   Same answer for the sheriff for Summit

2    County?

3         A.   Same answer.

4         Q.   Same answer for the sheriff of

5    Cuyahoga County?

6         A.   Same answer.

7         Q.   Same answer for the ADAMHS Board

8    officials for either Summit County or Cuyahoga

9    County?

10        A.   Same answer.

11        Q.   Same answer for the budget director

12   for Summit County or Cuyahoga County?

13        A.   Same answer.

14        Q.   Now, would you turn to Page 8 of your

15   report?  Paragraph 12, "In preparing this

16   report, I, and staff under my direction:

17   analyzed data; reviewed economic literature,

18   court filings, documents produced in this

19   litigation, public information and deposition

20   testimony; and spoke with representatives of the

21   Bellwether governments."

22             Do you see that?

23        A.   Yes.

24        Q.   And again, that reference to

---

1    bellwether governments is a reference to

2    representatives of Summit County and Cuyahoga

3    County, correct?

4         A.   That's correct.

5         Q.   And just seeing this language, does

6    that spark any recollection of you speaking with

7    anyone who was a representative of either Summit

8    County or Cuyahoga County?

9         A.   No, it doesn't.

10        Q.   Okay.  Would you turn to Page 28 of

11   your report?  In Paragraph 51, about halfway

12   down there's a sentence that begins "In

13   addition."

14             Do you see that?

15        A.   Yes.

16        Q.   "In addition, I and members of my team

17   met with local officials to confirm my

18   understanding of both the activities undertaken

19   by these districts and whether those activities

20   had been affected by the opioid crisis."

21             Do you see that?

22        A.   Yes, I do.

23        Q.   And when you refer to local officials,

24   you're talking about officials of Cuyahoga

---

1    County and Summit County, correct?

2         A.   I am.

3         Q.   Okay.  But you didn't meet with any

4    officials of Summit County or Cuyahoga County,

5    correct?

6         A.   Well, members of my team did.

7         Q.   You said "I and members of my team met

8    with local officials."  That's not accurate,

9    correct?

10        A.   It depends on how you regard the

11   subject of the sentence.

12        Q.   I may be missing something, but I

13   understand the subject to be I and my members --

14   and members of my team.

15        A.   I think I clarified that these

16   interviews were conducted by members of my team.

17        Q.   Exclusively?

18        A.   Not by me.

19        Q.   Right.

20             So it is inaccurate to say, I met with

21   local officials to confirm my understanding?

22             MR. SOBOL:  Objection to the form.

23        A.   That's not what the sentence says.

24   BY MR. KEYES:

---

1         Q.   It says "I and members of my team."

2         A.   Yes, that's correct.

3         Q.   Okay.  Is this statement accurate that

4    you and members of your team met with local

5    officials?  Yes or no, is it accurate?

6              MR. SOBOL:  Objection.

7         A.   Yes.

8    BY MR. KEYES:

9         Q.   Would you turn to Page 21 of your

10   report?  Are you there?

11        A.   Yes.

12        Q.   In Paragraph 37 you say, "One transfer

13   is 'Rev-FTS Social Services 1,' which DCFS

14   personnel explained comes into the county as a

15   lump sum to be used towards any social service."

16             Do you see that language?

17        A.   I do, yes.

18        Q.   What DCFS personnel is this sentence

19   referring to?

20        A.   I'm not sure.

21        Q.   What does DCFS stand for?

22        A.   Division of Children and Family

23   Services.

24        Q.   And when you refer here to DCFS

Highly Confidential - Subject to Further Confidentiality Review

```
 1    personnel, you're referring to DCFS for which
 2    county?
 3         A.   This is Cuyahoga.
 4         Q.   And who, if you didn't speak with the
 5    DCFS personnel, who did?
 6         A.   This would have been staff at Compass
 7    Lex.
 8         Q.   Which staff at Compass Lexecon spoke
 9    with DCFS personnel?
10         A.   I'm not sure.
11         Q.   When did they speak with the DCFS
12    personnel?
13         A.   It would have been sometime in the,
14    like I say, July to September time frame.
15         Q.   And who specifically at DCFS provided
16    this explanation?
17         A.   I don't know.
18         Q.   Was this explanation given by these
19    unspecified DCFS personnel in person or over the
20    phone?
21              MR. SOBOL:  Objection to the form.
22         A.   I'm not sure.
23    BY MR. KEYES:
24         Q.   Did they take notes?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.   I don't know.
 2         Q.   So how did you come to learn what DCFS
 3    personnel explained when it came to Rev-FTS
 4    Social Services 1?
 5         A.   I would have spoken to a staff member
 6    at Compass Lex about this.
 7         Q.   Okay.  But which staff person at
 8    Compass Lexecon did you speak with?
 9         A.   I don't remember.
10         Q.   When you got an update about what
11    budget officials for either of the counties had
12    said, who reported to you what they said?
13              MR. SOBOL:  Objection.
14         A.   Where are you now?
15    BY MR. KEYES:
16         Q.   Well, earlier we talked about
17    interviews with personnel of Summit County and
18    Cuyahoga County.  You didn't remember the names
19    of the people, but -- and you didn't remember
20    titles, but you said they included budget
21    officials.
22         A.   Yes.
23         Q.   Okay.  So who reported to you what
24    these budget officials said?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.   Okay.  It would have been staff at
 2    Compass Lex.
 3         Q.   Who?
 4         A.   I'm not sure.
 5         Q.   Who reported to you what the sheriff
 6    for Summit County or Cuyahoga County said in
 7    these interviews?
 8         A.   It would have been a staff member at
 9    Compass Lex, and I don't remember the person's
10    name.
11         Q.   Who reported to you what the ADAMHS
12    Board officials for Summit County or Cuyahoga
13    County said in these interviews?
14         A.   It would have been a staff member at
15    Compass Lex, and I don't remember the person's
16    name.
17         Q.   Who reported to you what the budget
18    director for Summit County or Cuyahoga County
19    said in these interviews?
20         A.   It would have been a staff member at
21    Compass Lex, and I don't remember the person's
22    name.
23         Q.   So is it fair to say that you didn't
24    participate in any interviews with anyone who
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    works for Summit County or Cuyahoga County,
 2    correct?
 3              MR. SOBOL:  Objection.
 4         A.   Well, that's not what I said earlier.
 5    BY MR. KEYES:
 6         Q.   Did you speak with anyone who works
 7    for Summit County or Cuyahoga County?
 8              MR. SOBOL:  Objection.
 9         A.   I believe you already asked that, and
10    I said I may have participated in some of the
11    phone interviews, but I just don't remember.
12    BY MR. KEYES:
13         Q.   Okay.  You don't remember anything
14    that was said?  If you participated in those,
15    you don't remember what was said?
16              MR. SOBOL:  Objection.
17         A.   I'm sorry, I don't.
18    BY MR. KEYES:
19         Q.   And you don't remember who those
20    people were who participated in the interviews?
21         A.   I'm sorry, I don't.
22         Q.   So what you do know is that the
23    references to interviews throughout this report
24    are interviews conducted by someone at Compass
```

1  Lexecon?

2      A.   Primarily, yes.

3      Q.   Well, who else besides the people at

4  Compass Lexecon interviewed employees of Summit

5  County or Cuyahoga County?

6      A.   Well, I may have been involved in some

7  of the phone interviews.

8      Q.   Right.  You've said that.  May, may

9  not have been.

10     A.   I don't want you to forget it.

11     Q.   Okay.  Can you tell me anything about

12  any conversations that you participated in with

13  anyone at Summit County or Cuyahoga County?

14          MR. SOBOL:  Objection to the form.

15  BY MR. KEYES:

16     Q.   Anything at all?

17          MR. SOBOL:  Objection.

18     A.   Okay.  I'm thinking.  I can't recall

19  anything in particular, no.

20  BY MR. KEYES:

21     Q.   Okay.  And who of the people you named

22  earlier would have conducted these interviews?

23     A.   I would have expected all the people I

24  named earlier -- not Evan, most likely not, and

1  most likely not Hal.  So it would have been

2  primarily Alice and Erica.

3      Q.   And why do you say that?

4      A.   Hal and Evan had somewhat different

5  roles.

6      Q.   If we want to reconstruct what was

7  covered in these interviews, what would we need

8  to do?

9          MR. SOBOL:  Objection.

10     A.   I suppose you would need to find

11  someone with a better memory, number one.  And

12  talk to the people who were there.

13  BY MR. KEYES:

14     Q.   Either the people who were conducting

15  the interview from Compass Lexecon or the people

16  who were interviewed?

17     A.   It would be my thought, yeah.

18          MR. KO:  Okay.  Andy, we've been going

19  for about an hour and a half, so whenever -- if

20  you reach a good point to take a break.

21          MR. KEYES:  Yes, let me just finish

22  one point and then take a break.

23  BY MR. KEYES:

24     Q.   Would you turn to Page 35 of your

1  report?  Are you there?

2      A.   Yes.

3      Q.   Okay.  And on Page 35, Paragraph 59,

4  you say, "From these expenditure data, I

5  identify those costs that would be expected to

6  vary in response to changes in the services

7  provided by these divisions.  This

8  identification was also informed by discussions

9  with the personnel in the respective divisions."

10          Do you see that?

11     A.   Yes.

12     Q.   Okay.  What respective divisions are

13  you talking about?  Are you talking about what

14  you identify in your report as the affected

15  divisions?

16     A.   Yes.

17     Q.   So which personnel in these divisions

18  provided information that informed your

19  identification of the costs that would be

20  expected to vary?

21     A.   I don't remember the names.

22     Q.   Do you remember their titles?

23     A.   Only what I provided in my answer

24  earlier.

1      Q.   Do you remember their functions within

2  the divisions?

3      A.   These would be people who understand

4  the budgets.

5      Q.   And who conducted these interviews or

6  discussions with the so-called personnel in the

7  respective divisions?

8      A.   This would have been staff at Compass

9  Lexecon.

10     Q.   Do you know who?

11     A.   I'm not sure which interview was

12  conducted by which staff member.  It would have

13  been Alice and Erica primarily.

14     Q.   And how many discussions were there

15  with the personnel in each of these affected

16  divisions?

17     A.   It was about 40 in total.

18     Q.   How do you know that?

19     A.   I just remember being aware of that.

20     Q.   From whom?

21     A.   I've been in contact with staff at

22  Compass Lex, and I was interested in making sure

23  we were doing this thoroughly enough and

24  checking to see, well, what's happened, and

1  that's the number that sticks in my mind.

2      Q.  Okay.  And were these discussions with

3  the personnel in the respective divisions over

4  the phone or in person?

5      A.  They would have been a combination.

6      Q.  How do you know that?

7      A.  Well, I know it from talking to staff

8  at Compass Lex.

9      Q.  Were notes taken in connection with

10  any of these so-called discussions with the

11  personnel in the respective divisions?

12          MR. SOBOL:  Objection to the form.

13      A.  I don't know.

14          MR. KEYES:  All right.  Why don't we

15  take a break.

16          THE VIDEOGRAPHER:  The time is

17  10:34 a.m., and we're off the record.

18          (Whereupon, a recess was taken.)

19          THE VIDEOGRAPHER:  The time is

20  10:56 a.m., and we're on the record.

21  BY MR. KEYES:

22      Q.  Professor, you said that Compass

23  Lexecon conducted these interviews at your

24  direction.  What directions did you give Compass

---

1  Lexecon?

2      A.  Well, I wanted to confirm that the

3  divisions involved were affected by the opioid

4  crisis, and then to confirm that the activities

5  that the divisions involved could be affected by

6  the opioid crisis, and confirm an understanding

7  of what the various budget items and cost

8  categories consisted of.

9      Q.  You said you wanted to confirm those

10  things.

11          My question was, what direction did

12  you give to Compass Lexecon before they

13  conducted these interviews?

14      A.  Well, to seek confirmation.  The

15  material, the printed material has information

16  about divisions' budgets and division

17  activities, but then these need to be confirmed

18  by interviews.

19      Q.  So did you prepare charts that set

20  forth your understanding of which divisions were

21  affected and which costs were affected such that

22  those charts were then shared with personnel in

23  Summit County or Cuyahoga County to get them to

24  confirm your understanding?

---

1          MR. SOBOL:  Objection.

2      A.  I don't recall any charts that were

3  used.

4  BY MR. KEYES:

5      Q.  How about work product?

6      A.  Work product?

7      Q.  Sure.  Charts, analyses.  I asked you

8  what directions you gave.  You said your purpose

9  was to confirm your understanding.  So how did

10  you or Compass Lexecon go about interviewing

11  Summit County and Cuyahoga County officials to

12  confirm your understanding?

13          MR. SOBOL:  Objection.

14      A.  How did we go about it?  Just a matter

15  of talking to people.  Unless I'm missing

16  something in your question.

17  BY MR. KEYES:

18      Q.  Well, did you communicate to Compass

19  Lexecon a specific understanding you had that

20  they then needed to confirm with certain

21  personnel?

22          MR. SOBOL:  Objection.

23      A.  As I mentioned, the budget documents

24  indicate how much divisions spend, and they

---

1  describe the nature of the activities of the

2  division which, you know, upon reading, say,

3  okay, this might be something affected by the

4  opioid crisis.  Then it's a matter of saying,

5  okay, are they really affected by the opioid

6  crisis?  How do we understand the cost

7  categories within that division?  As far as I

8  know, it was all done by interview.

9  BY MR. KEYES:

10      Q.  Okay.  You said you reviewed budget

11  documents?

12      A.  Yes.

13      Q.  And these are documents that

14  articulate what dollars will be budgeted in a

15  particular year for a particular division?

16      A.  Yes, more or less.  Some of them are

17  actual -- some of the actuals you would say what

18  was spent, and some would be budgeted.  For

19  2018, I guess, was budgeted and -- 2018 was

20  budgeted at the time we had the documents.

21      Q.  And who did the review of these budget

22  documents, you or Compass Lexecon?

23      A.  I did a lot of the review of those

24  documents.

1    Q.   So tell me how you would look at a
2  budget document to identify affected divisions
3  or affected costs?
4        MR. SOBOL:  Objection.
5    A.   Well, you -- these things are 100 or
6  200 pages, they're public documents, and I made
7  sure I understood the document and understood
8  the nature of the division organization and read
9  about the division's activities and made an
10  initial decision about what looked to me like
11  divisions that would be affected.
12  BY MR. KEYES:
13    Q.   Okay.  So you reviewed these documents
14  to identify which divisions were affected by the
15  opioid crisis --
16        MR. SOBOL:  Objection.
17  BY MR. KEYES:
18    Q.   -- correct?
19        MR. SOBOL:  Objection.
20    A.   Well, that was one of the purposes,
21  yeah.
22  BY MR. KEYES:
23    Q.   And you said you made an initial
24  decision.

1    A.   I did say that, yes.
2    Q.   Okay.  And so why didn't you leave it
3  at that, based on reviewing the budget
4  documents?  Why did you take another step?
5    A.   Well, I wanted to make sure I was
6  going in the right direction.
7    Q.   And why weren't you certain that you
8  were going in the right direction just based on
9  your review of the budget documents?
10        MR. SOBOL:  Objection.
11    A.   It just seemed prudent to me to make
12  contact and get clarification.
13  BY MR. KEYES:
14    Q.   Why?
15        MR. SOBOL:  Objection.
16    A.   As I said, it just seemed sensible to
17  talk to officials in the divisions.
18  BY MR. KEYES:
19    Q.   Right.  But why?  Why was it sensible
20  to you to talk to officials in the affected
21  divisions?
22        MR. SOBOL:  Objection.  Asked and
23  answered.
24    A.   I would think it's, you know, in the

1  normal course of what I would do.  In the normal
2  course of my research, if I'm trying to identify
3  costs of some kind, and I have the opportunity
4  to talk to people who are actually working
5  there, that's something, you know, someone like
6  me or an economist would generally do.  It just
7  seemed natural to me.
8  BY MR. KEYES:
9    Q.   It's generally your practice?
10    A.   Yeah.
11    Q.   And was it your practice here because
12  you had some questions or some uncertainty based
13  on your review of the budget documents?
14        MR. SOBOL:  Objection.
15    A.   Well, I review the budget documents,
16  here's my judgment, talk to local officials to
17  confirm the judgment.
18  BY MR. KEYES:
19    Q.   Did -- after you reviewed the budget
20  documents, did you believe that they told the
21  whole story and you had all the information you
22  needed?
23        MR. SOBOL:  Objection.
24        About what?

1  BY MR. KEYES:
2    Q.   To identify affected divisions or
3  affected costs.
4    A.   Well, as I say in my report, I don't
5  think I necessarily got everything, so what I
6  tried to do was to look where larger budget
7  divisions were involved in terms of their
8  spending, where it seemed more evident that
9  these divisions would be involved in the opioid
10  crisis, and pursue those.  There are probably
11  things left on the table in the sense of other
12  divisions that either weren't spending a lot or
13  not so obvious that I or the staff didn't talk
14  to.  So in the sense of not knowing everything,
15  I probably -- I'm sure that I missed some
16  things.
17    Q.   Okay.  You say in your report at
18  Paragraph 51, "To identify affected divisions,
19  I, and my team under my direction, reviewed
20  budget and expenditure information from the
21  Bellwether governments."
22        Do you see that?
23    A.   Yes.
24    Q.   So I want you to identify with as much

1  precision as you can what this budget
2  information was.
3      A.  Okay.  They are the annual reports of
4  the bellwether governments about spending and
5  revenues.  The exact name of them are -- is
6  somewhere later in my report.  They come out
7  every year.
8      Q.  Okay.  So when you say that you and
9  the team under your direction reviewed budget
10  information, are you referring to anything
11  besides these annual reports?
12      A.  That's what I'm referring to here.
13      Q.  Okay.  And when you refer to you and
14  your team under your direction reviewing
15  expenditure information, what expenditure
16  information are you talking about?
17      A.  This would be the same documents.
18      Q.  Okay.  So when you refer to budget
19  information and expenditure information, you're
20  referring to these annual reports?
21      A.  Yes.
22      Q.  Did you look at anything besides these
23  annual reports in order to identify affected
24  divisions?

1      A.  I don't recall, so I don't want to say
2  definitely no or definitely yes.  I may have
3  looked at other materials.
4      Q.  But sitting here today, what you
5  remember looking at are the annual budget
6  reports for Summit County and Cuyahoga County?
7      A.  Yes, I can absolutely confirm that I
8  looked at many of those documents.  I don't
9  recollect what other ones I may have looked at.
10      Q.  Now, when you looked at these annual
11  reports for Summit County and Cuyahoga County,
12  what was it in the reports that helped you
13  identify whether they were affected or not by
14  the opioid crisis?
15      A.  Well, primarily the functions,
16  reported functions of the division.
17      Q.  What do you mean by that, "the
18  reported functions"?
19      A.  What they did.
20      Q.  Okay.
21      A.  For example, public safety, pursuit of
22  criminals, Children and Family Services taking
23  care of kids who need to be taken out of homes.
24      Q.  Anything more specific than that?

1      A.  Sorry, with respect to what?
2      Q.  With respect to what you saw in these
3  annual budget documents that identified for you
4  that they were affected by the opioid crisis.
5      A.  Okay.  In general, the areas of
6  affect, or effect, that I would be looking for
7  have to do with crime and public safety, and so
8  I was interested in divisions that had to do
9  with crime and public safety.  I was interested
10  in Children and Family Services, so divisions
11  that were active in that area were also ones I
12  focused on.  And public health.
13      Q.  Is it fair to say that if you read in
14  the annual reports that the particular division
15  had something to do with crime and public
16  safety, you would consider it an effective
17  division?
18          MR. SOBOL:  Objection.
19      A.  I would consider it to be considered.
20  I think it's not -- you need to do more.
21  BY MR. KEYES:
22      Q.  Okay.  Same question for child and
23  family services, is it fair to say that if you
24  read in the annual reports that a particular

1  division had something to do with Children and
2  Family Services you would consider it an
3  affected division?
4          MR. SOBOL:  Objection.
5      A.  Well, I would investigate whether it
6  was an affected division.
7  BY MR. KEYES:
8      Q.  Same question for public health --
9          MR. SOBOL:  Objection.
10  BY MR. KEYES:
11      Q.  -- again, you would do more, you would
12  investigate?
13          MR. SOBOL:  Objection.
14      A.  Yes.
15  BY MR. KEYES:
16      Q.  So tell me what you would do to
17  investigate.  You've read the budget reports,
18  you see that a division has something to do with
19  crime and public safety or Children and Family
20  Services or public health, it's now to be
21  considered, as you said, but you need to do more
22  and you need to investigate, right?
23      A.  Yeah, that's fair.
24      Q.  Okay.  So what did you do to

1  investigate?

2      A.  Well, each division in the budget

3  documents actually has a pretty extensive report

4  on what they do and what their activities, so

5  you do the first level investigation, then go

6  back into the document and read more to be able

7  to characterize more accurately the nature of

8  how the division might be affected.

9          Then the next -- in that process there

10  would be interviews with the officials to make

11  sure that we were understanding those activities

12  correctly, and then go to the numbers, go to the

13  cost numbers and associate the budget items or

14  expenditure items to the activities as best we

15  could.

16      Q.  You said you would go to the officials

17  to confirm your understanding.

18      A.  Yes.

19      Q.  Yes?

20      A.  I said that.

21      Q.  Okay.  So how did you communicate your

22  understanding to the people who were actually

23  going to talk to the officials?

24      A.  Well, you seem to be making this

1  process more complicated than it was.  We

2  understand how the opioid crisis can impact

3  families, how it can impact crime, how it can

4  impact public health.  There didn't need to be a

5  lot of explanation to be able to confirm that

6  police officers were not only arresting drug

7  criminals, but they would have been involved in

8  first responder activities.  They may be the

9  first on the scene with an opioid overdose.

10  Firefighters may be the first on the scene with

11  respect to opioid overdose.  I'm confident that

12  I and members of my team had a joint

13  understanding of what we are looking for in

14  these divisions in terms of the nature of their

15  activities and how might they be influenced by

16  the opioid crisis.

17      Q.  When you refer to your team --

18          MR. SOBOL:  Have you finished your

19  answer?

20          THE WITNESS:  Yes.

21  BY MR. KEYES:

22      Q.  When you refer to your team having a

23  joint understanding, you're referring to

24  yourself and the Compass Lexecon personnel?

1      A.  Yes, I am.

2      Q.  Okay.  Again, I'm just trying to

3  understand what you did.  So you said you

4  reviewed these budget reports.  You said if it

5  had to do with public safety, children and

6  family services, or crime that you would -- or

7  public health, you would identify it as a

8  potentially affected division, but you had to do

9  more.  You said that you then went and read more

10  about those divisions in the budget documents,

11  correct?

12      A.  Yes.

13      Q.  And then you said at some point you

14  went to the officials of the two counties to

15  confirm your understanding, right?

16      A.  That's correct.

17      Q.  But you didn't talk to those officials

18  yourself?

19          MR. SOBOL:  Objection.

20      A.  Well, I think we've covered this

21  already.

22  BY MR. KEYES:

23      Q.  Right, because you --

24          MR. SOBOL:  He hasn't finished his

1  answer.

2  BY MR. KEYES:

3      Q.  Because you --

4          MR. SOBOL:  He has not finished his

5  answer.

6      A.  I do have one more sentence to say

7  about that.

8          I've already -- we've already

9  discussed this extensively, and it was primarily

10  done by Compass Lex, and I don't remember

11  whether or not I was involved in some of the

12  calls.

13  BY MR. KEYES:

14      Q.  Right.

15          But you formed an understanding based

16  on the review of these budget reports you've

17  already described, and you wanted to confirm

18  that understanding.  How did you communicate

19  your understanding to the Compass Lexecon people

20  who then went to the local officials to confirm

21  that understanding?

22          MR. SOBOL:  Objection.

23      A.  I'm going to repeat myself, because it

24  wasn't that complicated.  I think we had a joint

Highly Confidential - Subject to Further Confidentiality Review

1   understanding of what it means to be impacted by

2   the opioid crisis.  Crime, kids, services

3   needed, first responders, this wasn't higher

4   math, what we're looking for here.

5   BY MR. KEYES:

6        Q.   Did you give written directions to

7   Compass Lexecon setting forth your understanding

8   and what they should try to confirm with the

9   local officials?

10       A.   No, I don't think so.

11       Q.   And when the Compass Lexecon personnel

12  spoke with the local officials, did they ever

13  report back to you on what they learned?

14       A.   Yes, they did.

15       Q.   And what did they tell you about these

16  interviews with these officials that confirmed

17  your understanding of which divisions were

18  affected?

19       MR. SOBOL:  Generally speaking.

20       A.   They, after the interviews, had a

21  confirmation that the budget categories were

22  correct and being potentially affected by the

23  opioid crisis.

24  BY MR. KEYES:

Highly Confidential - Subject to Further Confidentiality Review

1        Q.   And was it at that point that then you

2   moved to the second step, which is for each

3   affected division to identify what you call

4   affected costs?

5        MR. SOBOL:  Objection.

6        A.   Broadly speaking, that's correct.

7   BY MR. KEYES:

8        Q.   And in your approach, affected costs

9   are costs that vary as the composition of

10  opioid-related services provided by that

11  division changes?

12       A.   Broadly that's correct.

13       Q.   Okay.  And you -- go ahead.

14       A.   They may vary in the activity against

15  which they're directed.

16       Q.   And you break so-called affected costs

17  down into two buckets, compensation costs and

18  non-compensation costs, correct?

19       A.   That's correct.

20       Q.   Okay.  So I want to review your

21  process for identifying the affected costs for

22  any particular affected division.  Okay?  You

23  say you looked at detailed expenditure data for

24  Cuyahoga County.

Highly Confidential - Subject to Further Confidentiality Review

1        A.   Yes, I did.

2        Q.   And you say you looked at expenditure

3   data for Summit County.

4        A.   I did.

5        Q.   Would you turn to Page 34 of your

6   report?

7        A.   Sure.

8        Q.   Are you there?

9        A.   Yes.

10       Q.   At the bottom of Page 34 you say,

11  "Detailed expenditure data for Cuyahoga County

12  were obtained from the Cuyahoga County Budget

13  Office for all divisions and departments within

14  these divisions."

15            Do you see that?

16       A.   Yes.

17       Q.   And then you drop a footnote, footnote

18  82, which references one document, Bates number

19  CUYAH_014627783.

20            Do you see that?

21       A.   I do, yes.

22       Q.   Okay.  So is that the document that

23  contains this detailed expenditure data for

24  Cuyahoga County?

Highly Confidential - Subject to Further Confidentiality Review

1        MR. SOBOL:  That's referenced here.

2        A.   I would -- I don't remember what

3   014627783 is.

4   BY MR. KEYES:

5        Q.   Well, you say that -- let's turn this

6   over -- you also received expenditure data for

7   Summit County from the county government, and

8   you list SUMMIT_001952976.

9            Do you see that?

10       A.   I do, yes.

11       Q.   Did you look at any other expenditure

12  data for Summit County?

13       A.   I looked at every year for these

14  places.

15       Q.   Okay.

16       A.   And I don't remember the footnotes or

17  what these things exactly are referring to, but,

18  yeah, a lot of documents.

19       Q.   So were these budget documents or

20  something different when you reference this

21  expenditure data?

22       A.   Well, I --

23       MR. SOBOL:  Objection to form.

24       A.   The expenditure data were actuals that

1  came from the annual reports which were actual
2  expenditures.
3          The budgeted, as I mentioned earlier,
4  I believe, referred just to the last year.
5  BY MR. KEYES:
6      Q.   So other than the two files that are
7  listed here in these footnotes, what expenditure
8  data did you look at for either Cuyahoga County
9  or Summit County?
10      A.   Well, as I said, I don't know exactly
11  what this Bates is referring to or the one in
12  footnote 83 without checking exactly what
13  documents are referred to there, but I looked at
14  the budget documents for all the years for both
15  jurisdictions.
16      Q.   Other than the budget documents, did
17  you look at any expenditure data?
18      A.   By that I mean expenditure data.  I
19  try to keep that clear, but maybe I haven't been
20  as clear as I should be on that.
21          So for the years up through, I
22  believe, 2017, these are reports of what was
23  actually spent by category and sometimes by line
24  item in these affected divisions.  For 2018, the

1  actuals were not yet in at the time I did this,
2  and there the budgets needed to be looked at.
3  So they were planned expenditures, you would
4  say.
5      Q.   So is it one document that contained
6  all the expenditure data for Cuyahoga County up
7  through 2017?
8      A.   Some of the documents included more
9  than one year, but there was an annual report
10  every year.
11      Q.   Okay.  Same question for Summit
12  County, was it one document that contained all
13  the expenditure data for Summit County up
14  through 2017?
15      A.   Some of the documents included more
16  than one year, but it was a report for each
17  year.
18      Q.   Okay.  Well, you tell me, because you
19  say in the very next sentence, Paragraph 59, you
20  say, "From these expenditure data, I identify
21  those costs that would be expected to vary in
22  response to changes in the services provided by
23  these divisions."
24          Do you see that?

1      A.   Yes.
2      Q.   And these expenditure data refers to
3  the two documents that were noted in footnotes
4  82 and 83 --
5          MR. SOBOL:  Objection.
6  BY MR. KEYES:
7      Q.   -- correct?
8          MR. SOBOL:  Objection.
9      A.   Well, I think I've commented on the
10  particular Bates numbers in those footnotes.
11  And I don't know exactly what that's referring
12  to, so it's hard for me to answer precisely with
13  respect to that Bates number.  But what I can
14  tell you is I looked at expenditure data for
15  each division for each bellwether for each year.
16  BY MR. KEYES:
17      Q.   So describe that data for me.
18          MR. SOBOL:  Objection.
19  BY MR. KEYES:
20      Q.   Tell me what you looked at.
21      A.   It comes in a big book, and it is
22  organized around the organization of the
23  government.  And then there are divisions and
24  sometimes departments within divisions, and

1  there is multiple tables that describe in
2  summary form and in detail form what the
3  spending is for each unit per division.
4      Q.   How did you use that data, then, to
5  identify what you call affected costs?
6      A.   Okay.  The purpose here is to
7  identify, as you said in your earlier question,
8  costs that might vary as the demands put on
9  public services by the opioid crisis vary.
10          So, for example, there will be some
11  costs that do not fall in that category.  If
12  there's an IT system and IT staff with respect
13  to the police department, I made the assumption
14  for labor categories that seemed to be
15  associated with kind of fixed costs or
16  overhead-type expenditures that those people
17  would not -- the cost associated with those
18  people would not be affected as the opioid
19  crisis went up or down.
20          But there was other personnel such as
21  police officers who are involved in crime
22  prevention who would be affected by the opioid
23  crisis.  And the budget documents are actually
24  quite detailed in terms of the job title, the

Highly Confidential - Subject to Further Confidentiality Review

```
1    salaries of these people, enabling me in most
2    cases to be -- to make a pretty good
3    determination, in my view, that the costs are
4    allocated reasonably between those that might
5    and might not be affected by the waxing and
6    waning of demands presented by opioids.
7        Q.   So you would do this based on -- what
8    information --
9            MR. SOBOL:  You just asked an
10   open-ended question.  You should find out
11   whether the witness has finished his answer.
12   BY MR. KEYES:
13       Q.   Have you finished with your answer?
14       A.   Yes, I am.
15       Q.   So how did you go about specifically
16   going through the expenditure data to determine
17   whether something was overhead or not overhead?
18       A.   It was, you know, my judgment based on
19   the job activities of the people involved.
20       Q.   Did you use someone else's judgment to
21   assist you, or solely your judgment?
22       A.   I think we discussed it as a team at
23   different times, yeah.
24       Q.   Who else did you discuss it with?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.   This would have been a Compass Lex
2    team effort.
3        Q.   Who?
4        A.   Same team we discussed.  Hal would
5    have been in this, I'm not sure about Evan, but
6    Alice and Erica.
7        Q.   And then how would you know whether
8    something was fixed or not, to use your term,
9    based on your review of the expenditure data?
10       A.   Well, once I made a determination that
11   I put it into fixed costs, if it weren't fixed
12   then I'm being conservative, so I tried to be
13   reasonable and even conservative in that
14   allocation.  And if I put the IT staff in the
15   fixed cost area, even if they're not, even if
16   more crimes lead to overtime of the IT guys,
17   then since I'm not counting it, I didn't worry
18   about it after that.
19       Q.   You've identified IT as an example of
20   a fixed cost, right?
21       A.   Yes.
22       Q.   My question is broader than that.
23            When you're looking through the costs
24   in the expenditure data, how do you determine
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    whether that cost is fixed or not?
2        A.   It was a matter of judgment.
3        Q.   Okay.  And how did you bring your
4    judgment to determine for any particular
5    cost whether it was fixed or not?
6        A.   Well, economists deal in costs of
7    different types, there's marginal costs, there's
8    variable costs, there's fixed costs, so as just
9    general training one is oriented to this kind of
10   distinction.  And I went through the budget, in
11   many cases job title by job title, to make a
12   determination of, with respect to the
13   compensation costs, where people belonged in one
14   or the other.
15       Q.   So you looked at this expenditure
16   data, you used your judgment to determine
17   whether it was fixed or not, overhead or not?
18       A.   Broadly speaking, that's correct.
19       Q.   Okay.  And then you say "This
20   identification" -- that is, the identification
21   of varied costs, variable costs -- "was also
22   informed by discussions with the personnel in
23   the respective divisions."
24            How was that accomplished?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.   I mean, it would have been the same
2    process.  Talking to them.
3        Q.   So did you have a list that broke out
4    all of the costs into variable costs and fixed
5    costs, and that list was then provided to
6    Compass Lexecon, and Compass Lexecon reviewed it
7    with personnel from Summit County or Cuyahoga
8    County?
9            MR. SOBOL:  Objection.
10       A.   It wasn't as mechanical as that.
11   There had to be a classification into one or the
12   other, so in that sense, yes, there was a list
13   for each of the, you know, many, many
14   expenditure categories for a particular
15   division.  So this was no, this was yes, this
16   was no, this is yes.  So that's -- in a sense
17   there was a list.
18            The list wasn't -- didn't come from me
19   to them.  It came as a team effort to determine
20   which of the things belong in one category or
21   the other, and then it's confirmation that --
22   you know, it's not mechanical, but general
23   confirmation with officials in the local
24   jurisdictions.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. KEYES:
2        Q.   What do you mean it's not mechanical?
3        A.   Well, it is what I just described it
4    to be, which to me wasn't a mechanical Tom's
5    list, CL's list, send list to officials.  It
6    was, we made this determination, we checked with
7    them with respect to some things that might have
8    been unclear.
9        Q.   When you said "we made the
10   determination," you're talking about you and
11   your Compass Lexecon team?
12       A.   Yes, that was inputs from not just me.
13       Q.   And based on the inputs from your team
14   and your judgment, you took every cost and you
15   put it into one category or the other, it was
16   either variable or it was fixed, correct?
17           MR. SOBOL:  Objection.
18       A.   Basically that's the methodology, yes.
19   BY MR. KEYES:
20       Q.   What steps were taken then to take
21   that list that breaks every cost into variable
22   or fixed and confirm it with someone at the
23   county?
24           MR. SOBOL:  Objection.  Asked and
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    answered.
2        A.   There, in most cases it's pretty clear
3    where a certain cost belongs, and in those cases
4    it's just pretty clear.
5    BY MR. KEYES:
6        Q.   Meaning no one followed up with
7    someone at Summit County or Cuyahoga County,
8    correct?
9            MR. SOBOL:  Objection.
10       A.   Well, everything wasn't cleared with
11   officials in Summit County.  If I were confident
12   that it was a variable cost, then I'm prepared
13   to stand behind it.
14   BY MR. KEYES:
15       Q.   Okay.  So I understand you formed your
16   judgment, every cost category was put into
17   variable cost or fixed cost, Compass Lexecon
18   participated in that process, correct?
19       A.   Yes.
20       Q.   If I understand you correctly, you
21   said that not every determination was then
22   cleared with officials from Summit County or
23   Cuyahoga County because you were so confident
24   you got it right --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            MR. SOBOL:  Objection.
2    BY MR. KEYES:
3        Q.   -- right?
4        A.   In many cases I was very confident
5    that this determination was correct.
6        Q.   Okay.  But there are other instances
7    where you weren't very confident, where there
8    was some step to go to the officials to confirm
9    your judgment as to whether it was a fixed or a
10   variable cost, right?
11       A.   I believe there were some that were
12   unclear, and there was -- some additional work
13   had to be done by Compass Lex to make that
14   determination.
15       Q.   Which ones were unclear?
16       A.   I don't remember.
17       Q.   And so for the ones that were unclear,
18   I realize you don't remember which ones they
19   were, but the ones that were unclear, you say
20   some additional work had to be done.  I take it
21   that work was to go to people at Summit County
22   or Cuyahoga County to get them to tell you
23   whether you were right in either calling that
24   cost variable or fixed?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            MR. SOBOL:  Objection.
2        A.   Well, let me give you an example which
3    I think will be helpful in understanding.
4            Initially the costs associated with
5    vehicles, police cars, was not put in the
6    variable category, and that seemed to me to be
7    overly conservative, that if police are riding
8    around and dealing with opioid problems they're
9    going to use their cars more frequently, and
10   some of their auto expenses would be properly
11   regarded as variable.  So that means, okay, what
12   about this cost.  We went back into the
13   documents, looked at the capital costs.  Some of
14   them are in the capital budgets as opposed to in
15   the expenditure budget, so we take a look at
16   that, and what should be done about that.
17           And I'm not 100 percent sure that this
18   would have been talked about with the local
19   official, but that's an example of the kind of
20   thing where there was some uncertainty about how
21   we should handle police cars.
22   BY MR. KEYES:
23       Q.   But I'm trying to get to your
24   methodology as a general matter.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        You've gone through all of the costs
 2   for each of the affected divisions, and you've
 3   made a judgment whether that -- each cost is
 4   fixed or variable.  You said some you were very
 5   confident about.
 6        A.  Most I was very confident about.
 7        Q.  And those didn't require any further
 8   confirmation?
 9        A.  Not in my view.
10        Q.  But there were others where you were
11   not very confident, correct?
12            MR. SOBOL:  Objection.
13        A.  Well, I just gave you an example of
14   one.
15   BY MR. KEYES:
16        Q.  Okay.
17        A.  That sort of looks like a fixed cost,
18   but on the other hand, you can make an argument
19   it's a variable cost.
20        Q.  And how do we reconstruct which ones
21   you were very confident about and which ones you
22   weren't?
23        A.  I'm confident in all the
24   classifications that are available to you.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  How do we reconstruct which ones you
 2   were very confident on and which ones you were
 3   not very confident based on your review of the
 4   cost categories before you sought confirmation
 5   from some unspecified local officials?
 6            MR. SOBOL:  Objection.
 7   BY MR. KEYES:
 8        Q.  Is there any way to reconstruct that
 9   now?
10            MR. SOBOL:  Objection.
11        A.  I'm not sure that would be -- I think
12   it's -- I'm sure you and everyone has been
13   involved in these complicated decisions about
14   something that is mostly conversation, and it's
15   hard for me to think how one would reconstruct
16   that beyond talking to the people.
17        But even then, like, I can't tell you
18   necessarily which of the categories, what we
19   thought about IT, what we thought about health
20   insurance costs, whether they would be regarded
21   as fixed or variable.  All those things were
22   considered, and it was a process is all I can
23   tell you.
24   BY MR. KEYES:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  Okay.  But again --
 2        A.  Excuse me.
 3        The answer to that process of what I
 4   decided is described exactly in this report, and
 5   I'm very confident that the variable costs are
 6   variable, and if there's some evidence or some
 7   question you have about any particular cost,
 8   then I'm all for talking about it.
 9        Q.  Okay.  But which ones of those are you
10   very confident about now because of the
11   reassurance Compass Lexecon got from Summit
12   County and Cuyahoga County officials?
13            MR. SOBOL:  Objection.
14        A.  I wouldn't have included something in
15   the variable cost category unless I were
16   confident about it.  Some of them seemed obvious
17   to me.  And compensation for beat cops, that's a
18   variable cost.  Some others, I don't remember
19   the process, it may have been a team discussion,
20   it may have been a confirmation with officials,
21   but it was ultimately an economic decision about
22   what are the variable costs associated with
23   these divisions, taking what I considered to be
24   a pretty conservative approach and not putting
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   everything into a variable, but to explicitly
 2   set aside stuff that -- cost categories that
 3   wouldn't seem in the short run to vary with the
 4   nature of, say, crime or the nature of why a
 5   child is taken from a home, why a corpse comes
 6   into the medical examiner.  There's some things
 7   that don't vary with that, which I set aside.
 8   BY MR. KEYES:
 9        Q.  Can you identify which of the cost
10   categories you were not confident about based on
11   your review of the expenditure data such that
12   someone from Compass Lexecon went out to local
13   officials to get some kind of confirmation?
14            MR. SOBOL:  Objection.  Asked and
15   answered twice.
16   BY MR. KEYES:
17        Q.  Can you identify those today?
18            MR. SOBOL:  Objection.  Asked and
19   answered twice.
20        A.  I believe I answered that question
21   completely a few minutes ago.  If you'd like me
22   to take another shot at it, I'm happy to do
23   that.  The cost categories that you see in my
24   report, I'm confident in all those cost
```

1  categories.  I use my judgment as an economist

2  to identify what I thought were variable costs.

3  Some of this involved discussion with team

4  members who may have been more familiar with

5  some of the operations of the division, and some

6  of it may have involved confirmation with local

7  officials, but I don't remember.

8  BY MR. KEYES:

9     Q.  I'm not asking you about confidence

10  today.

11     MR. SOBOL:  He's not finished.

12     A.  One more second.

13  BY MR. KEYES:

14     Q.  You're not answering my question.

15     MR. SOBOL:  You're interrupting his

16  answer.

17     MR. KEYES:  I am, because he said it

18  before, and he's not answering the question.

19  BY MR. KEYES:

20     Q.  Do you understand the question?

21     MR. SOBOL:  He understands the

22  question.  If you want to interrupt him,

23  interrupt him, but he's going to continue the

24  answer to the question when you finish your

---

1  interruption.

2  BY MR. KEYES:

3     Q.  Do you understand my question?

4     MR. SOBOL:  Don't answer that

5  question.  Finish answering the other question

6  that he asked so he doesn't create a record

7  which is inaccurate.

8     A.  I was about to wrap up and say while

9  I'm confident in all the cost allocations that

10  are made in my report, I don't remember, you

11  know, which one would have been -- at what stage

12  the confidence arose.

13  BY MR. KEYES:

14     Q.  So can you identify for me now which

15  of the cost categories you are not confident

16  about based on your review of the expenditure

17  data such that someone from Compass Lexecon went

18  out to local officials to get some kind of

19  confirmation?

20     MR. SOBOL:  Asked and answered four

21  times.

22  BY MR. KEYES:

23     Q.  Can you identify those categories?

24     MR. SOBOL:  Asked and answered four

---

1  times.

2     A.  I'm not sure what I said earlier did

3  not answer that question.

4  BY MR. KEYES:

5     Q.  It's a yes-or-no question.

6     A.  If you want me to repeat the answer,

7  I'm happy to do that.

8     Q.  I don't want you to explain what you

9  think now and why you're confident now.  I'm

10  trying to understand which ones were so obvious

11  to you based on your review of the expenditure

12  data and which ones you said, this is my

13  judgment, but I'm not certain, we should go

14  check with the local officials.  And I can't get

15  an answer from you as to which ones those were.

16  I want to know which ones required

17  going out to local officials.  Can you tell me

18  which ones those were?

19     MR. SOBOL:  Andrew, I think you're

20  frustrated because you haven't listened to his

21  answers.  If you'll listen to the answer, you'll

22  hear the answer to the question in it.  He'll

23  repeat himself, but you're not listening.

24     A.  I want to make clear that every

---

1  allocation in my report between variable and not

2  variable costs is ones -- is an allocation that

3  I'm comfortable with -- more than comfortable

4  with, I'm confident in.  Some of those were such

5  that it seemed obvious to me as an economist

6  that a cost category such as a beat cop would be

7  one that, okay, we're going to make this

8  variable, and that doesn't need discussion with

9  the team, that doesn't need any kind of

10  follow-up at all.

11     Other cost categories were ones that I

12  needed more.  Police cars are a good example of

13  that.  It seemed to me it's in the capital

14  budget.  So maybe I think capital is fixed, but

15  on the other hand, cars wear out.  The more

16  driving around police do, the faster they wear

17  out.  It seemed after consideration and

18  discussion with my team that some of the police

19  car costs should be put into the variable cost

20  category.  There were others that would have

21  needed confirmation from local officials.  I'm

22  not sure which those were.

23     But in the end, I stand by all of my

24  classifications, and if there's any one you want

1  to question, please bring it up.

2  BY MR. KEYES:

3      Q.   Is there any way to reconstruct which

4  cost categories fell into the three buckets you

5  just outlined?

6          MR. SOBOL:  Objection.

7      A.   My memory would not be probably the

8  best way to do that, but one could attempt to

9  talk to the people involved and do the best you

10  can in a reconstruction.

11  BY MR. KEYES:

12      Q.   Is there any other way besides talking

13  to the people at Compass Lexecon to determine

14  which cost categories fell into each of the

15  three budgets you outlined?

16          MR. SOBOL:  Objection.

17      A.   I can't think of any.

18  BY MR. KEYES:

19      Q.   Would you turn to Page 39 of your

20  report.  Paragraph 69, you say, "The approaches

21  for other Bellwether divisions generally follow

22  the examples above; however, there are

23  idiosyncrasies within the Bellwether divisions

24  that require modifications of this approach for

1  some divisions and/or years."

2          Do you see that?

3      A.   Yes.

4      Q.   What are the idiosyncrasies to which

5  you are referring?

6      A.   Let me see what this is here.

7          So what I'm doing in the report here

8  is explaining for the reader how this works, and

9  it is -- involves a lot of work with a lot of

10  numbers for divisions.  And what I chose to do

11  in the report was to pick out one of the

12  divisions and explain in detail how that

13  decision about affected cost gets determined.  I

14  didn't want the reader to think that this is

15  exactly the way it happened in every division.

16          So by idiosyncrasies, it just means it

17  depends on the division how one would kind of

18  make these different determinations.  The total

19  cost would be pretty much the same.  The costs

20  associated with wages and salaries and benefits,

21  those are common to all the divisions.

22          Then the overhead adjustment, that's

23  where differences creep in.  There are

24  idiosyncrasies with respect to the nature of

1  overhead adjustment in each of the divisions.

2      Q.   Are there -- you referred to

3  idiosyncrasies in terms of your overhead

4  adjustment.  Are you referring to any other

5  idiosyncrasies?

6      A.   Well, given 1, 2 and 3, where

7  idiosyncrasies come in within the terms of 3,

8  then 4 follows.  That's just a multiplication.

9  More idiosyncrasies come in on the affected

10  non-compensation costs.  Some divisions, for

11  example, contract out for services.  Most don't.

12  And so those contracting out for services need

13  to be considered as part of a variable cost, and

14  a determination is made.

15          But it's not the same cookie-cutter

16  division by division.  It depends on what they

17  do.  It depends on what they spend their money

18  on.  Then we got affected non-compensation costs

19  offset to affected compensation costs.  This

20  offset could be a governmental transfer, for

21  example, that's division-specific, so that's

22  another source of idiosyncrasy.  And the same

23  with non-compensation costs.

24          So I don't know, you have to -- this

1  was a description of the steps, but the actual

2  application of those in each division varied

3  somewhat.

4      Q.   Did you write this report?

5      A.   Yes, I did.

6      Q.   You actually drafted the language?

7      A.   Yes.

8      Q.   Would you turn to Paragraph 65.

9  That's on Page 37.  And you discussed the

10  overhead adjustment factor.

11      A.   Yes.

12      Q.   You say that you identified the

13  "personnel involved in activities that are

14  unlikely to be related to providing services

15  that are affected by opioids."

16          Do you see that?

17      A.   Yes.

18      Q.   Okay.  And are you able to tell me

19  anything more than what you've already said

20  about how you went about identifying those

21  personnel for purposes of calculating your

22  overhead adjustment factor?

23          MR. SOBOL:  Objection.

24      A.   Well, beyond the statement that it's a

1  division-by-division decision and allocation of
2  particular job titles into those two different
3  categories which depends on the division.
4  BY MR. KEYES:
5      Q.  Once you thought you had identified
6  the personnel who were involved in activities
7  unlikely to be related to providing services
8  that are affected by opioids, did you take any
9  steps to validate your identification to confirm
10  you got it right?
11      A.  Well, in the case of that decision,
12  suppose I take a police chief and say, chief,
13  you're not -- we have to keep you around anyway,
14  and you're not variable with respect to demands
15  on opioids.  If I'm right, I'm right.  If I'm
16  wrong, I'm being conservative.
17          So by the nature of this allocation,
18  it's being at least conservative.  So even if
19  there were some variable costs in that cost
20  category, as long as I'm not counting them, then
21  I'm being conservative in the report.
22      Q.  You just explained to me why you think
23  you were being conservative.  That wasn't my
24  question.

1          My question was, what steps did you
2  take to investigate and confirm that you got it
3  right when you identified people who you thought
4  were involved in activities unlikely to be
5  related to providing services affected by
6  opioids?
7          MR. SOBOL:  Objection.  Asked and
8  answered.
9      A.  This is really an example of the kind
10  of question we went around and around on a bit
11  ago.  This is a classification issue.  Do they
12  belong over here?  Do they belong over there?
13          And the way I answered that question
14  was saying that on the basis of my kind of
15  experience and training as an economist, I felt
16  confident in some.  Some needed team
17  discussions, some needed beyond that, maybe
18  there's something the local officials can help
19  with.  I don't remember which of these
20  allocations fell into where in that process each
21  of those allocations worked themselves out.
22  BY MR. KEYES:
23      Q.  When you identified what you consider
24  to be affected non-compensation costs, what

1  steps did you take to investigate or test your
2  belief that those affected non-compensation
3  costs, in fact, varied with the level of
4  services affected by opioids?
5      A.  Well, this is another version of the
6  same question.  This is putting things into this
7  bucket or that bucket.  Some lab supplies, say,
8  seemed that they would vary in proportion to the
9  number of autopsies performed, so that seemed
10  like an easy one to me.  Others would have
11  required team discussion.  Others would have
12  benefited by confirmation.
13      Q.  So again, you've got the three buckets
14  of obvious to you, call for team discussion, and
15  required confirmation from local officials.
16          MR. SOBOL:  Objection.
17  BY MR. KEYES:
18      Q.  Right?
19          MR. SOBOL:  Objection.
20      A.  Well, I'm really describing a process
21  here.
22  BY MR. KEYES:
23      Q.  As part of your process, though, these
24  affected non-compensation costs fell into one of

1  these three buckets?  Bucket is my word, but
2  you're dividing them into three groups?
3      A.  I'm describing a three-step process.
4  The bucket analogy or metaphor is kind of
5  oversimplification and would seem to indicate
6  that there's a bright line between this bucket,
7  that bucket, and that bucket.  And these are --
8  it's a process.
9      Q.  But can you tell me which of those
10  affected non-compensation costs you sought
11  confirmation for?
12          MR. SOBOL:  Objection.
13      A.  Well, this is another version of the
14  question I talked about earlier, and in this
15  process of making a determination of in that
16  bucket or this bucket, some I felt confident I
17  could make on my own, some were discussion, more
18  discussion, some would have involved checking.
19  I can't tell you sitting here which of those --
20  where they fell out in that process into being
21  put into one bucket or the other.
22  BY MR. KEYES:
23      Q.  Once you identified what you
24  considered to be the affected divisions, and

1  then for each affected division the affected
2  costs, you then attempted to estimate the
3  damages -- what you call damages incurred by
4  those affected divisions as a result of
5  defendants' misconduct, correct?
6      A.  That's right.
7      Q.  And for that you say you rely on the
8  analyses and opinions presented in the Cutler
9  report?
10     A.  That's correct.
11     Q.  So you used the percentages that were
12 derived by Professor Cutler, correct?
13     A.  That's correct.
14     Q.  And is it your understanding that
15 Professor Cutler calculated these percentages
16 using regression analyses?
17     A.  Yes, he did.
18     Q.  Did you replicate Professor Cutler's
19 regression analyses?
20     A.  I didn't conduct my own regression
21 analysis, no.
22     Q.  Did you test Professor Cutler's
23 regression analyses?
24     A.  Well, they -- I tested them in the

1  sense of seeing whether I thought they were
2  reasonable, but I didn't conduct any statistical
3  tests on them.
4      Q.  Did you validate his regression
5  analyses in any way?
6          MR. SOBOL:  Objection.
7      A.  What -- can you explain what you mean
8  by "validate"?
9  BY MR. KEYES:
10     Q.  Yes, confirm that the estimates that
11 he arrived at using his regression analyses are
12 correct.
13     A.  Well, I was familiar enough with the
14 process to know he was doing it correctly.
15     Q.  Did you do your own analysis to
16 attempt to replicate, test, or validate his
17 results?
18         MR. SOBOL:  Objection.  Asked and
19 answered.
20     A.  I didn't replicate his statistics.  I
21 did tests in the sense of asking myself, do
22 these seem reasonable, which they do.  And then
23 validate, I was aware of his methods and thought
24 they were valid methods.

1  BY MR. KEYES:
2      Q.  Do you have the expertise to replicate
3  the regression analyses that Professor Cutler
4  performed?
5          MR. SOBOL:  Objection.  Asked and
6  answered.
7      A.  Well, the hard part of what Cutler did
8  is not writing a one-line Stata code given the
9  specification to come up with his estimates, and
10 I certainly do have -- I could run one line of
11 Stata code.  The hard part of what Professor
12 Cutler did is finding the right data,
13 determining the right specification, in some
14 cases interpreting correctly.  That -- he's
15 better than me for that kind of stuff.
16 BY MR. KEYES:
17     Q.  If Professor Cutler's percentages are
18 wrong, that would have a direct negative impact
19 on your calculations, correct?
20         MR. SOBOL:  Objection.
21     A.  Depends on what direction they're
22 wrong, unless I'm misunderstanding what you mean
23 by "negative."
24 BY MR. KEYES:

1      Q.  Well, if his percentages are too
2  high --
3      A.  Okay.
4      Q.  -- what impact does that have on your
5  calculations?
6      A.  His percentages attribute -- I'm
7  trying to make sure I understand here --
8  attribute too high a percentage to defendants'
9  misconduct.  Then since it's a proportional
10 analysis that I do using those numbers, if his
11 numbers fall in some proportion, my damages
12 numbers would fall in the same proportion.
13     Q.  Does Professor Cutler rely on the work
14 of Professor Rosenthal?
15     A.  Yes, he does.
16     Q.  What is your understanding of what
17 Professor Rosenthal did?
18     A.  Professor Rosenthal investigated the
19 empirical connection between a certain kind of
20 marketing by defendant manufacturers and
21 shipments at the national level, shipments of
22 prescription opioids.
23     Q.  Did Professor Cutler, to your
24 knowledge, replicate Professor Rosenthal's

Highly Confidential - Subject to Further Confidentiality Review

1   regression analyses?

2       MR. SOBOL:  Scope.  Objection, scope.

3     A.  Not to my knowledge.

4   BY MR. KEYES:

5     Q.  Okay.  Are you aware of anything that

6   Professor Cutler did to test or validate

7   Professor Rosenthal's work?

8     A.  Well, I think his role with respect to

9   Professor Rosenthal would have been a little bit

10   like my role with respect to him.  Did it make

11   sense to him?

12       And so before I go on, I shouldn't

13   answer from his kind of subjective perspective,

14   so this -- maybe that's a question for Dave and

15   not for Tom.

16     Q.  If Professor Rosenthal's work has

17   flaws, does that have an impact on

18   Professor Cutler's work?

19       MR. SOBOL:  Objection.  Scope.

20     A.  I think it depends on what you're

21   talking about in terms of what flaws you might

22   mean.

23   BY MR. KEYES:

24     Q.  Well, if Professor Rosenthal's

Highly Confidential - Subject to Further Confidentiality Review

1   percentages are wrong, that has an impact on

2   Professor Cutler's work, correct?

3     A.  Well, there's, again, a proportional

4   mathematical relationship between shares that

5   Professor Rosenthal estimates and shares that

6   David then provides to me.  So mathematically,

7   if Meredith -- Professor Rosenthal's shares are

8   too low, for example, and more of the shipments

9   are attributable to defendants' misconduct, that

10   would raise David's estimated shares of my

11   costs.

12     Q.  And the opposite would be true as

13   well?

14     A.  And the opposite would be true as

15   well.

16     Q.  For your work in your damages report,

17   do you rely at all on Professor Gruber's work?

18     A.  Well, you know, broadly, some of the

19   things that Professor Gruber says in his report

20   are consistent with the analyses of both

21   Professor Cutler and Rosenthal, so my numbers

22   come from Rosenthal-Cutler.

23       My understanding and the

24   reasonableness of my conclusions are confirmed

Highly Confidential - Subject to Further Confidentiality Review

1   by Professor Gruber's work.

2     Q.  Do any of the percentages you use come

3   from Professor Gruber's work?

4     A.  No, the percentages don't.

5     Q.  Do all the percentages that you use in

6   your work come from Professor Cutler?

7     A.  I believe that's correct, yes, for the

8   damages.

9     Q.  Did Professor Cutler's analysis focus

10   only on data from Summit County and Cuyahoga

11   County?

12       MR. SOBOL:  Objection.

13     A.  No, it didn't.

14   BY MR. KEYES:

15     Q.  Okay.  Did he perform his calculations

16   based on national averages?

17       MR. SOBOL:  Objection.

18     A.  I believe most of his empirical

19   analysis was a subset of counties which were, I

20   think, designated large counties, several

21   hundred of these that were about the same size

22   as the bellwether county.

23   BY MR. KEYES:

24     Q.  Several hundred counties across the

Highly Confidential - Subject to Further Confidentiality Review

1   country?

2     A.  Yes.

3     Q.  Which Professor Cutler deemed to be of

4   roughly the same size at Cuyahoga or Summit

5   Counties?

6       MR. SOBOL:  Objection.

7     A.  My understanding is not that they were

8   the same size, but they were large.  They would

9   fit into a category of large, which meant a

10   minimum size.

11   BY MR. KEYES:

12     Q.  And what was the threshold for being

13   large, as you understand it?

14       MR. SOBOL:  Objection.

15     A.  I don't remember.

16   BY MR. KEYES:

17     Q.  And did you do any comparison of the

18   data specific to Cuyahoga County or Summit

19   County versus the data for these several hundred

20   large counties that were part of

21   Professor Cutler's analysis?

22       MR. SOBOL:  Objection.

23     A.  I'm not sure what you're asking.

24   BY MR. KEYES:

1    Q.  Well, I asked you whether -- you use
2  Professor Cutler's percentages.
3    A.  That's correct.
4    Q.  Professor Cutler's percentages are the
5  result of his regression analyses, right?
6    A.  That's one of the things that fed into
7  it, yes.
8    Q.  The inputs for his regression analyses
9  are data for what you describe as several
10  hundred large counties around the country,
11  correct?
12    MR. SOBOL:  Objection.
13    A.  That's my understanding of what he
14  used for his regressions.
15  BY MR. KEYES:
16    Q.  And so I'm asking you whether you, in
17  connection with your work in this engagement,
18  did any comparison of the data for these several
19  hundred large counties, as you describe it,
20  versus the data specific to Summit County or
21  Cuyahoga County.
22    A.  What would be the example of what
23  you're trying to get at?
24    Q.  I don't want to limit it to anything.

1    I mean, for any of the data sets that
2  Professor Cutler drew on that you say came from
3  several hundred large counties around the
4  country, did you compare that data set to an
5  equivalent data set that was specific to Summit
6  County or Cuyahoga County?
7    MR. SOBOL:  Objection.
8    A.  Well, my report wasn't sort of
9  empirical at that level, so I think I would say
10  I didn't do it.
11  BY MR. KEYES:
12    Q.  You prepare your calculations for the
13  period 2006 through 2018?
14    A.  That's correct.
15    Q.  Okay.  Why that time period?
16    A.  That was my assignment.
17    Q.  Your assignment from whom?
18    A.  From counsel.
19    Q.  Which counsel?
20    A.  There's a bunch of them.
21    Q.  Well, who gave you that specific
22  instruction?
23    A.  It was a team.  I don't remember which
24  group in particular.

1    Q.  Do you remember any of the names?
2    A.  David Ko, Tom Sobol, Joe Rice, Ann
3  Ritter, Derek Loeser.
4    Q.  Anyone else?
5    A.  I'm probably forgetting people, but
6  that's all I can remember right now.
7    Q.  And do you have an understanding as to
8  the rationale for picking that period, 2006
9  through 2018?
10    MR. SOBOL:  That's a yes or no
11  question.
12    THE WITNESS:  Sorry, I didn't hear the
13  objection.
14    MR. SOBOL:  It's a yes or a no
15  question.
16    A.  No.
17  BY MR. KEYES:
18    Q.  Have you done any analysis as part of
19  your engagement to determine whether 2006
20  through 2018 is the appropriate time period for
21  measuring damages?
22    MR. SOBOL:  Objection.
23    A.  No, I didn't do that.  I didn't
24  undertake that analysis.

1  BY MR. KEYES:
2    Q.  In Appendix IV.B, which is the
3  Materials Considered, you list a few data sets.
4    A.  Is there a page you've got me looking
5  at here?
6    Q.  Well, it's IV.B, and it follows your
7  CV.
8    MR. SOBOL:  Page 6 of the Materials
9  Considered, is that what you're turning to?
10    MR. KEYES:  Well, I'm calling his
11  attention to IV.B first.
12    A.  I'm in IV.B.
13  BY MR. KEYES:
14    Q.  Then there are several categories, and
15  one category are data sources?
16    A.  Okay.
17    Q.  Are you there?
18    A.  Yes.
19    Q.  Okay.  ARCOS data.  Do you see that?
20    A.  Yes.
21    Q.  What is ARCOS data?
22    A.  That's a county level shipments data
23  set.
24    Q.  And who maintains the ARCOS data?

1    A.   It's a government function.  I can't
2  remember what level of government.
3    Q.   Do you remember what government branch
4  or agency maintains the ARCOS data?
5    A.   I can't remember.
6    Q.   Did you look at the ARCOS data as part
7  of your damages engagement here?
8    A.   Yes.
9    Q.   What ARCOS data did you look at?
10   A.   These would have been shipment
11 summaries.
12   Q.   Okay.  And how did you receive those
13 shipment summaries?
14   A.   They would have been in tables and
15 figures.
16   Q.   Provided by whom?
17   A.   Provided by staff at Compass Lex, or
18 perhaps Greylock McKinnon.
19   Q.   Did you request the ARCOS data?
20   A.   It had been requested, so wherever the
21 original request came, it wasn't from me.
22   Q.   What do you mean "it had been
23 requested"?
24   A.   Some member of the economic team

1  requested the data.  I'm not sure who.
2    Q.   When you refer to the economic team,
3  who are you referring to?
4    A.   The other economic experts in this
5  case.
6    Q.   Referring to Professor Rosenthal,
7  Professor Cutler, Professor Gruber?
8    A.   Yes.
9    Q.   Did you request the ARCOS data?
10   A.   I didn't request it personally.
11   Q.   Okay.  And did you sign a protective
12 order regarding access to and use of ARCOS data?
13   A.   I signed a protective order.  I don't
14 remember signing one with respect to this data
15 alone.
16   Q.   You don't remember signing a
17 protective order specific to ARCOS data?
18   A.   I don't remember.
19   Q.   And was the ARCOS data relevant to
20 your quantification of damages?
21   A.   Yes.
22   Q.   How so?
23   A.   Well, this was the main subject of
24 Professor Cutler's analysis, and it was very

1  relevant, how the data turned out and the
2  results turn out for my damages calculation.
3    Q.   Did you use the ARCOS data in your own
4  calculations?
5    A.   I used them in the sense of the
6  results that Professor Cutler obtained from
7  using the ARCOS data.
8    Q.   Okay.  So you're saying the ARCOS data
9  may have been relevant to Professor Cutler's
10 work and the calculations he arrived at,
11 correct?
12   A.   That's -- yes, that's correct.
13   Q.   Separate from Professor Cutler's
14 calculations, was the ARCOS data relevant to
15 the -- did you use the ARCOS data in your work
16 in this engagement?
17   A.   I don't think I used it in any way
18 independent of Professor Cutler's analysis.
19   Q.   You also referenced BLS data?
20   A.   Yes.
21   Q.   What's BLS?
22   A.   That's Bureau of Labor Statistics.
23   Q.   Did you request the BLS data, or was
24 that something requested by someone else on the

1  economic team?
2    A.   That would have been requested by
3  someone else on the economic team.
4    Q.   Did you review the BLS data?
5    A.   By "review," do you mean look at the
6  data?
7    Q.   Did you look at it?
8    A.   I looked at some tables from the BLS
9  data.
10   Q.   And did you use the BLS data in your
11 work on the damages engagement, separate and
12 apart from relying on Professor Cutler's
13 percentages?
14   A.   I think I understand the question.
15       This was used by David Cutler who
16 contributed percentages to me, but I didn't do
17 any independent analysis of the BLS data.
18   Q.   Okay.  There are a number of other
19 data sources listed here, and we can go through
20 them one by one, but is the same true for each
21 of these other data sources --
22       MR. SOBOL:  Objection.
23 BY MR. KEYES:
24   Q.   -- that it was requested by someone on

1   the economic team, not by you, that it may have
2   been used by Professor Cutler, but separate from
3   what Professor Cutler did to arrive at
4   percentages that you used, you otherwise did not
5   use the data in your work to quantify damages?
6       MR. SOBOL:  Objection.
7       A.  I'm looking.  I'd have to go back and
8   confirm where the crime -- how the crime data
9   plays in here.
10  BY MR. KEYES:
11      Q.  The FBI crime data?
12      A.  The FBI crime data.
13      Q.  Sitting here today, do you know how
14  the FBI crime data is relevant to the work you
15  did separate and apart from relying on
16  Professor Cutler's percentages?
17      A.  I don't want to say the wrong thing.
18  I would have to go back and check and see how
19  the crime accounting was done to be sure.
20      Q.  Okay.  So you don't know as to the FBI
21  crime data.
22          How about the other categories?
23      MR. SOBOL:  Objection.
24  BY MR. KEYES:

1       Q.  Did you actually use the data in any
2   of these other categories that are listed
3   separate and apart from whether they were used
4   by Professor Cutler to arrive at the statistics
5   and the percentages that you used?
6       A.  I would have to go back and check and
7   see about the census data, and even the multiple
8   causes of death data.  This would require a
9   little bit of homework or time --
10      Q.  Okay.
11      A.  -- going back here today.
12      Q.  Well, looking at this list of data
13  sources, can you identify for me any of the data
14  that you used in your work separate and apart
15  from whether Professor Cutler used it to arrive
16  at percentages that you then used?
17      A.  I understand the question.
18          And for a couple of these, I have to
19  go back and check to be sure.
20      Q.  Okay.  And you've identified those.
21      A.  Yes.
22      Q.  What about the other ones?
23      A.  I don't think so.
24      Q.  You don't think you used them?

1       A.  I don't think I used them, except for
2   having been used by other -- one of the other
3   economists.
4       Q.  Did you sign any data use agreement
5   with the National Center for Health Statistics?
6       A.  I don't think so, no.
7       Q.  Okay.  Did you sign any data use
8   agreement with the Pacific Institute for
9   Research and Evaluation?
10      A.  I don't think so.
11      Q.  Did you sign any data use agreement
12  with any other organization in connection with
13  your work on this engagement?
14      A.  I can't think of any.
15      Q.  You list on the prior page, Page 5 of
16  Appendix IV.B, Deposition Transcripts.
17          Do you see those?
18      A.  Yes.
19      Q.  Are those the only deposition
20  transcripts you considered?
21      A.  I can't think of any others.
22      Q.  Okay.  And for -- you list six
23  deposition transcripts here, correct?
24      A.  That's right.

1       Q.  Did you read all of them?
2       A.  Well, I read some of all of them.  I
3   didn't read all of all of them.
4       Q.  Okay.  So you read -- did you read any
5   of these deposition transcripts in its entirety?
6           MR. SOBOL:  Objection.  Asked and
7   answered.
8       A.  I -- well, some of them I may have
9   more like flipped through and seen all the
10  pages, but I don't claim to have read any of
11  them word for word.
12  BY MR. KEYES:
13      Q.  When you skimmed through them, how did
14  you determine what portions to read or skim or
15  not read or skim at all?
16      A.  This is another one of those processes
17  in which in this case the enterprise was I was
18  interested in certain, in this case, evidence
19  from deposition of local officials, and the
20  primary thing I remember is I'm interested in
21  evidence that the opioid crisis has affected the
22  spending in these divisions in some way that may
23  have moved funds over in one direction from
24  another.  And what I would have done is say, and

Highly Confidential - Subject to Further Confidentiality Review

1   asked my staff, here are depositions of people

2   who might know about that, would you please go

3   through these depositions and see if there's

4   some indication that there's evidence for that.

5      Q.   So did your staff give you summaries

6   or --

7      MR. SOBOL:  He hasn't finished.

8      A.   The process isn't quite over.

9      So they would have flagged certain

10  parts of the deposition, and then I would go

11  back and confirm that that was actually what was

12  being said, my interpretation of what was being

13  said, and then I'd read around that to make sure

14  there wasn't some context I was missing, and

15  then I maybe took a quick look at the rest of

16  the deposition.

17  BY MR. KEYES:

18     Q.   Did anyone on your so-called team

19  prepare any summaries of the deposition

20  testimony?

21     A.   Not so far as I know.

22     Q.   Did you intend to read all of the

23  deposition transcripts in the case?

24     MR. SOBOL:  Objection.

---

Highly Confidential - Subject to Further Confidentiality Review

1     A.   I never intended to read all the

2  depositions, no.

3  BY MR. KEYES:

4     Q.   Did you intend to read all the

5  deposition testimony in the case about whether

6  there was evidence that the opioid crisis

7  affected the spending of particular divisions?

8     A.   I think "all" would be an

9  overstatement.  I was looking for sufficient

10  evidence to back up my report, and at this point

11  I thought that was sufficient.

12     Q.   So who identified these six deposition

13  transcripts as being transcripts, at least

14  portions of which you should read for your work

15  in this case?

16     A.   This would have been me saying, I'm

17  interested in testimony of local officials,

18  either in budget documents or something else, or

19  in deposition, that indicates money has been

20  moved as a result of opioid crisis.  So it would

21  have been that level of that's what I would like

22  to see.  And then staff made a determination of

23  who among the deponents maybe has something to

24  say about that, and then they would read those

---

Highly Confidential - Subject to Further Confidentiality Review

1   depositions.

2     Q.   And when you said "I'm interested in

3  the testimony of local officials either in

4  budget documents or something else, or in

5  deposition, that indicates money has been moved

6  as a result of the opioid crisis," to whom did

7  you say that?

8     A.   That would have been a team-type

9  statement.

10     Q.   The economic team?

11     A.   No, it wasn't to --

12     Q.   Compass Lexecon team?

13     A.   This would have been to Compass

14  Lexecon.

15     Q.   And what steps did you take to make

16  sure that they got their hands on all the

17  deposition testimony that met your parameters?

18     A.   As I explained, I didn't feel it

19  necessary to be exhaustive with respect to the

20  deposition of officials who may have said

21  something about this.  I gave them that general

22  direction.  This came back a pretty substantial

23  list that included backup for me that I felt

24  like, okay, check, I have evidence from local

---

Highly Confidential - Subject to Further Confidentiality Review

1   officials that this diversion is taking place.

2     Q.   Who does Donna Skoda work for?

3     A.   Donna Skoda.

4     Q.   Does she work for Summit County?

5     A.   I would have a 50/50 chance of getting

6  this right.  I'm sorry if I don't remember.

7     Q.   Does she work for Cuyahoga County?

8     A.   Same chance.

9     Q.   Does she work for someone besides

10  Summit County or Cuyahoga County?

11     A.   I don't remember who she worked for.

12     Q.   Do you remember what her title is?

13     A.   I think she's a budget person, but

14  I'm, again, just trying to recollect as best I

15  can.

16     Q.   Do you remember what division she

17  works for?

18     A.   I don't remember.

19     Q.   Gary Gingell, who does he work for?

20     A.   I don't remember.

21     Q.   Summit County?

22     A.   I don't remember.

23     Q.   Cuyahoga County?

24     A.   I don't remember.

Highly Confidential - Subject to Further Confidentiality Review

1  Q.  Someone other than Summit County or
2  Cuyahoga County?
3  A.  I don't remember.
4  Q.  Do you know his title?
5  A.  I am afraid I don't.
6  Q.  Do you know what division he worked
7  for?
8      MR. SOBOL:  Objection.
9  A.  I'm afraid I don't.
10 BY MR. KEYES:
11 Q.  Is the same true for Greta Johnson?
12     MR. SOBOL:  Objection.
13     What's the question?
14 BY MR. KEYES:
15 Q.  That you don't know who she works for?
16     MR. SOBOL:  Go ahead.
17 A.  I don't remember Greta Johnson, or
18 where she would have worked.
19 BY MR. KEYES:
20 Q.  Do you know what her title was?
21     MR. SOBOL:  Objection.  Asked and
22 answered.
23 A.  I don't remember what her title is.
24 BY MR. KEYES:

Highly Confidential - Subject to Further Confidentiality Review

1  Q.  Or what division she worked for?
2      MR. SOBOL:  Objection.  Asked and
3  answered.
4  A.  I don't remember that.
5  BY MR. KEYES:
6  Q.  Okay.  How about Jackie Pollard, who
7  did she work for?
8  A.  I don't remember.
9  Q.  What was her title?
10     MR. SOBOL:  Objection.  Asked and
11 answered.
12 A.  I don't -- I don't -- sorry, I don't
13 remember.
14 BY MR. KEYES:
15 Q.  What division did she work for?
16     MR. SOBOL:  Objection.  Asked and
17 answered.
18 A.  I don't remember.
19 BY MR. KEYES:
20 Q.  Margaret Keenan, who did she work for?
21 A.  I don't remember.
22 Q.  What was her title?
23     MR. SOBOL:  Objection.  Asked and
24 answered.

Highly Confidential - Subject to Further Confidentiality Review

1  A.  I don't remember.
2  BY MR. KEYES:
3  Q.  What division did she work for?
4      MR. SOBOL:  Objection.  Asked and
5  answered.
6  A.  I don't remember.
7  BY MR. KEYES:
8  Q.  Molly Leckler, who did she work for?
9  A.  I think she's a substance abuse
10 person.
11 Q.  For?
12 A.  She was talking about drug courts, if
13 I remember her deposition testimony.
14 Q.  Did she work for Summit County or
15 Cuyahoga County, or other?
16 A.  I don't remember which county she
17 would have worked for, sorry.
18 Q.  Do you remember her title?
19 A.  I don't remember her title.
20 Q.  If other people not listed here had
21 testified about whether the opioid crisis
22 affected their division's spending, is that
23 something you would have wanted to see?
24     MR. SOBOL:  Objection.  Asked and

Highly Confidential - Subject to Further Confidentiality Review

1  answered.
2  A.  Well, not necessarily.
3  BY MR. KEYES:
4  Q.  Why not?
5  A.  I think in --
6      MR. SOBOL:  Well, objection.  Asked
7  and answered.
8  A.  In many situations, one needs
9  sufficient information to make a determination.
10 It doesn't mean you need all possible
11 information to make a determination.  And in my
12 judgment, looking through these six depositions
13 gave me sufficient confidence that the approach
14 saying that funds were diverted from other uses
15 to the opioid crisis was a valid and reliable
16 method.
17 BY MR. KEYES:
18 Q.  Which of these six people, if any,
19 worked for the Office of Medical Examiner?
20 A.  I don't remember.
21 Q.  Okay.  If none of them worked for the
22 Office of Medical Examiner, but others who did
23 work for the Office of Medical Examiner were
24 deposed about this very topic, would you want to

Highly Confidential - Subject to Further Confidentiality Review

```
 1   see their testimony?
 2       A.   Well, it's the same question I just
 3   answered.  This set of deponents gave me
 4   sufficient confidence that I was approaching it
 5   in the right way.
 6       Q.   What if personnel from the Office of
 7   Medical Examiner said they couldn't identify any
 8   variable costs, would that be relevant to your
 9   work?
10       A.   Oftentimes real world people use terms
11   differently than economists use them, so it
12   depends, I would say.
13       Q.   What if people who worked for the
14   Office of Medical Examiner testified "I can't
15   think of a single expense we had that changed
16   because of the opioid crisis," would that be
17   relevant to your work --
18            MR. SOBOL:  Objection.
19   BY MR. KEYES:
20       Q.   -- to know that they said that?
21            MR. SOBOL:  Objection.
22       A.   It might be relevant.  I would have
23   to -- I wouldn't necessarily conclude that
24   there's no variable costs.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. KEYES:
 2       Q.   Because you think you might be right
 3   and they might be wrong?
 4            MR. SOBOL:  Objection.
 5       A.   I'm approaching the question in a
 6   particular way, and I would have to really know
 7   the context of how the person -- what the person
 8   was asked, how they might see the world, and
 9   then try to understand their answer.
10   BY MR. KEYES:
11       Q.   When you gave directions to the
12   Compass Lexecon team to go get confirmation
13   either which divisions you thought were affected
14   or which costs you thought were affected, did
15   you tell them to only go talk to people who had
16   been deposed in the case?
17       A.   No.  This was a very general interest
18   of mine that I articulated early, and it was
19   something I was on the lookout for.
20       Q.   Did Compass Lexecon team talk to
21   people who were not deposed in the case?
22            MR. SOBOL:  Objection.  Asked and
23   answered.
24       A.   They would have talked to some of the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   local officials we talked about earlier.
 2   BY MR. KEYES:
 3       Q.   You only identified by broad category,
 4   you don't remember the names.  So I'm trying to
 5   figure out, even if you don't remember their
 6   names, do you know whether Compass Lexecon
 7   talked to people who worked for Summit County or
 8   Cuyahoga County who were not deposed in this
 9   case?
10       A.   I am not sure.  Those are two
11   different lists.  Whether their list was
12   deposed, I really can't tell you one way or the
13   other.
14       Q.   There's a discussion in your report
15   starting on Page 23.  It's the section titled
16   "Municipal Governments Have Been Impacted by the
17   Opioid Epidemic:  Examples from Bellwether
18   Governments."
19            Do you see that?
20       A.   Yes.
21       Q.   Starts on 23 and goes through 28.
22            Do you see that?
23       A.   Yes, I do.
24       Q.   And so this discussion on Pages 23
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   through 28 is based on what you've read,
 2   correct?
 3       A.   Well, so far there are references to
 4   things I would have read.  It looks like
 5   their -- all the backup here is to written
 6   material, yes.
 7       Q.   Okay.
 8       A.   Excuse me.  Pardon me.  There's a
 9   deposition of Molly Leckler here.  See if I got
10   it right with respect -- yes, drug court, Molly
11   Leckler.
12       Q.   So the discussion on Pages 23
13   through 28 is based on what you've read?
14       A.   Including the deposition testimony,
15   yes.
16       Q.   Okay.  Is it accurate to say that this
17   discussion on these pages is not based on any
18   firsthand experience of yours?
19       A.   "Firsthand experience," what do you
20   mean by that?
21       Q.   I mean, you are describing what you
22   read, not what you experienced yourself, you
23   didn't see it yourself, you didn't live it
24   yourself.
```

1   A.   You mean, do I have any firsthand
2   experience with drug abuse?  Is that what you're
3   asking?
4   Q.   No.  I'm asking you, the stuff that
5   you've included in here is stuff you've read.
6   A.   We already established that.
7   Q.   It's not based on what you
8   experienced, it's not based on something you
9   studied yourself, these are not studies that you
10  conducted, correct?
11       MR. SOBOL:  Objection.
12       I think you just asked about four
13  questions in a row, so I think you should
14  reframe the question so we make sure it's clear
15  what question he's answering.
16  BY MR. KEYES:
17  Q.   Let's take them one step at a time.
18       The material on Pages 23 through 28,
19  this is not describing any studies you've
20  conducted, correct?
21  A.   These are studies that I and my team
22  identified that would make the point that
23  municipal governments have been affected.
24  Q.   So it is not material that you have

1   studied yourself?  These are not studies you
2   conducted yourself?
3   A.   It says what they are.  Counsel of
4   Economic Advisors, I did not do that study.  As
5   part of my professional work, I study the
6   studies.
7   Q.   You didn't conduct any of the studies
8   that are referenced on these pages, correct?
9   A.   I didn't conduct any studies here.
10  Q.   And you didn't personally calculate
11  any of the statistics that are reported on these
12  pages, correct?
13       MR. SOBOL:  Objection.
14  A.   Oh, gosh, did I?  I think these are --
15  it's a review of relevant studies.  I didn't
16  conduct any new empirical analysis of any of the
17  things that are reported here in this section.
18  BY MR. KEYES:
19  Q.   Did you test or validate any of the
20  numbers or statistics that are in this section?
21       MR. SOBOL:  Objection.
22  A.   At some place in my report or in this
23  section you're talking about?
24  BY MR. KEYES:

1   Q.   I'm talking about the discussion on
2   Pages 23 through 28.
3   A.   As a self-contained unit, it doesn't
4   count.  Validation might have done elsewhere in
5   the report.
6   Q.   Did you test or validate any of the
7   numbers or statistics in this section?
8   A.   The question is still ambiguous, but
9   I'll try to answer it.
10       I didn't do any validation within this
11  section of the material noted in this section.
12  Q.   Do you think you validated it
13  elsewhere in your report?
14  A.   I do.
15  Q.   Where do you think you validated it
16  elsewhere?
17  A.   This would be in my public nuisance
18  report.
19  Q.   So you're switching reports.
20       I'm talking about this report, damages
21  report.  Did you validate it anywhere in this
22  report?
23       MR. SOBOL:  Asked and answered.
24  BY MR. KEYES:

1   Q.   I want to make sure the record is
2   clear.  Your answer is no?
3       MR. SOBOL:  Objection.
4       To what?
5   A.   Well, let me state what I think is the
6   issue here.
7       Of the studies that are mentioned in
8   this section of my report, I did not in this
9   section of this report conduct any validation of
10  those studies.
11  BY MR. KEYES:
12  Q.   Nor did you conduct any validation of
13  those studies elsewhere in your damages report,
14  correct?
15  A.   I think that's correct, although I did
16  get around to it in another context.
17  Q.   There are some references in your
18  report and in the appendices to a crime-focused
19  adjustment.
20       Do you recall the crime-focused
21  adjustment?
22  A.   Yes, I do.
23  Q.   What is the crime-focused adjustment?
24  A.   Well, this was an approach to

1  recognizing that police do things other than

2  deal with criminals.  They direct traffic, for

3  example, and I wanted to make a cut at not

4  attributing to opioids variable costs associated

5  with police that might be not likely to be

6  affected by opioids.

7       Q.   So do you know which, sitting here

8  right now, which divisions you used a

9  crime-focused adjustment on?

10      A.   I think it primarily would have been

11  the law enforcement.  I have to go back and

12  check to see if it applied to anything else.

13      Q.   Okay.  I believe you used it for the

14  office of prosecutor.  Why?

15      A.   Well, for the same reason.  There are

16  different types of crimes, and some may not be

17  affected by opioids.

18      Q.   And how did you determine what

19  percentage to use for your crime-focused

20  adjustment for the Office of Prosecutor?  Not

21  necessarily the numbers, but what was your

22  method?

23      A.   This would have been looking at the

24  underlying documents.  Probably it would have

1  required a discussion with the team on this one

2  to make a determination of what goes where.

3       Q.   Was that also a subject of follow-up

4  by the Compass Lexecon team with any officials

5  who worked for Summit County or Cuyahoga County?

6       A.   I'm not sure about that.

7       Q.   I believe you also used a

8  crime-focused adjustment for the Court of Common

9  Pleas.

10           Does that sound right to you?

11      A.   That seems right to me.

12      Q.   Why did you use a crime-focused

13  adjustment for the Court of Common Pleas?

14      A.   Because I think that division handles

15  things that wouldn't be affected by the opioid

16  crisis.

17      Q.   Such as?

18      A.   I didn't want to count them.

19           I'm not sure what the category would

20  be.

21      Q.   Did you take the same approach in

22  trying to arrive at a crime-focused adjustment

23  for the Court of Common Pleas as you did for

24  Office of Prosecutor, which is you used your

1  best judgment based on your review of the cost

2  categories?  Then there was a team discussion,

3  and in some instances there was follow-up with

4  local officials?

5       A.   Yeah, the general --

6           MR. SOBOL:  Objection to the form of

7  the question.

8       A.   The general methodology would have

9  been the same.

10  BY MR. KEYES:

11      Q.   I believe you also used a

12  crime-focused adjustment for the sheriff's

13  office.  Does that seem right to you?

14      A.   It does seem right.

15      Q.   Why?

16      A.   For the same reason.

17      Q.   And did you follow the same

18  methodology?

19      A.   The same general process, yes.

20      Q.   You say on Page 20 of your report at

21  Paragraph 35, "On instruction from counsel, I

22  deduct as an offset any revenue received from

23  other governments, or any other external

24  sources, that was provided for the sole purpose

1  of funding opioid-specific activities, to arrive

2  at cost to the Bellwether governments net of

3  outside contributions."

4           Do you see that?

5       A.   Yes.

6       Q.   Which counsel gave you that

7  instruction?

8       A.   I don't remember.

9       Q.   What is your understanding of the

10  rationale for that instruction?

11          MR. SOBOL:  Objection.

12          Can you explain why you think that

13  gets -- does not violate the limitation on

14  discussions between the experts and counsel?

15          MR. KEYES:  Yes, because he

16  specifically discussed it in Paragraph 35 of his

17  report to explain what he's doing, and I want to

18  understand why he's doing that.

19          MR. SOBOL:  I instruct him not to

20  answer that, if that's your reason.

21  BY MR. KEYES:

22      Q.   Okay.  So just so the record is clear,

23  what is your understanding of the rationale for

24  deducting as an offset any revenue received from

1  other governments or any other external sources

2  that was provided for the sole purpose of

3  funding opioid-specific activities?

4        MR. SOBOL:  I instruct him not to

5  answer.

6        You might ask the threshold question

7  whether or not, yes or no, he has an

8  understanding about it, because that might avoid

9  any needless battle over this issue.

10  BY MR. KEYES:

11     Q.  Well, did you follow the instruction?

12        MR. SOBOL:  If he doesn't have a

13  memory --

14  BY MR. KEYES:

15     Q.  Did you follow the instruction?

16        MR. SOBOL:  That's a different

17  question.  He can answer that question.

18     A.  As best I could, yes.

19  BY MR. KEYES:

20     Q.  And did the instruction make sense to

21  you?

22     A.  It made sense to me as an economist.

23     Q.  And as an economist, did the

24  instruction have a reasonable rationale?

1     A.  Well, I can only speak from an

2  economics perspective, and it has a reasonable

3  rationale from the standpoint of economics.

4     Q.  What is that rationale?

5     A.  Under the view that damages consist of

6  costs incurred by the local governments, the

7  local governments, the government of Cuyahoga,

8  the government of Summit County as a result of

9  the opioid crisis, the degree to which those

10  costs are shared with another entity, for

11  example, the state government or a federal

12  government, then they do not count against the

13  damages to the local jurisdictions.

14        Now, as an economic statement, I

15  understand from counsel that there's some legal

16  issues that I don't appreciate, but that's my

17  economic understanding.

18     Q.  So in this engagement, did you

19  endeavor to exclude all expenditures that were

20  funded by revenue from other sources, that is

21  besides the two counties where the funding was

22  dedicated to funding opioid-specific activities?

23        MR. SOBOL:  Objection.

24     A.  Well, this is more subtle than your

1  question may imply.

2        The relevant economic question is, if

3  the division would not have spent, say, $100 on

4  opioid-related activities, then how much would

5  its budgets for other things have to fall?  And

6  depending on the form of the -- what are called

7  in public finance intergovernmental transfers,

8  that question could be answered in different

9  ways.

10        A simple case would be, suppose the

11  federal government pays for 50 percent of

12  community policing devoted to opioids, so if you

13  can identify a budget category, we're going to

14  send police out to do drug work that is directed

15  to opioids, and the feds say we'll pay

16  50 percent of that, then any costs of that are

17  shared between the two entities, and 50 percent

18  of those costs only would have been counted

19  against the damages to the local government.

20        Another example would be, say, a block

21  grant, which is the other kind of spectrum here

22  in which the local government receives an amount

23  that is determined by a formula and said broadly

24  you have to spend this on alcohol-drug abuse and

1  mental health services, but this is the amount

2  you have.  And then in that case, there would be

3  no deduction because they would get that same

4  intergovernmental transfer, however much they

5  spent on opioids or not.

6        So that's -- I know that was long,

7  but --

8  BY MR. KEYES:

9     Q.  So is the difference -- is the

10  difference between --

11        MR. SOBOL:  He hasn't finished.

12     A.  I just have one more sentence.

13        That's the kind of question that needs

14  to be applied to various categories of

15  governmental aid.

16  BY MR. KEYES:

17     Q.  So is the difference between your two

18  hypotheticals whether the locality could take

19  those dollars and spend it on something besides

20  opioids?

21     A.  Well, that's a kind of quick summary

22  of what the issue is, would they have the money

23  available to do something else if they didn't

24  spend it on opioids.

1    Q.   So you endeavor to exclude money that
2    Summit County or Cuyahoga County received that
3    it could only spend on the opioid problem,
4    because if the opioid problem didn't exist they
5    wouldn't have gotten the money, and they
6    couldn't have spent the money on something else.
7    Is that fair?
8         MR. SOBOL:  Objection.
9         You may answer.
10   A.   Well, it's not the way an economist
11   would put the -- not the way an economist would
12   characterize it.  The way I would characterize
13   it is if there's either a total or a share of
14   spending that a local government incurs to
15   defeat opioids, if some of that is offset
16   against intergovernmental transfers, it only
17   would be received if those expenditures are
18   incurred, then that's treated as an offset to
19   the local expenditures because that frees up
20   some of the local money to be spent elsewhere.
21   BY MR. KEYES:
22   Q.   Can you turn to Tables IV.13 and
23   IV.12?  It's the very end of your report.
24   A.   Okay.

1    Q.   So Table IV.12 is the damages for
2    Cuyahoga County, correct?
3    A.   That's correct.
4    Q.   And Table IV.13 is damages for Summit
5    County?
6    A.   That's correct.
7    Q.   And Table IV.14 is the summation of
8    the two?
9    A.   That's correct.
10   Q.   Okay.  And these are damages
11   attributable to the defendants' misconduct,
12   correct?
13   A.   That's my understanding, yes.
14   Q.   Okay.  And you said earlier in your
15   report that the analysis presented here does not
16   attempt to distinguish damages attributable to
17   manufacturers from those attributable to
18   distributors or other CSA registrants."
19        Is that correct?
20   A.   I remember saying that, yes.
21   Q.   Okay.  And when you use the phrase
22   "other CSA registrants," what is the CSA you're
23   referring to?
24   A.   I think it's Controlled Substance Act.

1    Q.   And who are the other CSA registrants?
2    A.   Do you mind if I just go there and
3    take a look?
4    Q.   Sure.  Page 12, Paragraph 19.
5    A.   I believe some pharmacies are also CSA
6    registrants.
7    Q.   Are you including pharmacies in the
8    "other CSA registrants" here?
9    A.   I'm including whatever other CSA
10   registrants there are.
11   Q.   Okay.  And you've identified
12   pharmacies.  Can you identify any other category
13   of people who are CSA registrants besides
14   manufacturers and distributors?
15        MR. SOBOL:  And pharmacies.
16   BY MR. KEYES:
17   Q.   And pharmacies.
18   A.   No, that's all I can do.
19   Q.   Are doctors CSA registrants?
20   A.   I don't know.
21   Q.   Have you looked into that in
22   connection with your work in this case?
23   A.   No, I haven't.
24   Q.   Okay.  Going back to the tables at the

1    end of your report, Tables IV.12, 13, and in the
2    summary 14, these are calculations of what you
3    call damages attributable to defendants'
4    misconduct, correct?
5    A.   That's correct.
6    Q.   And when you refer to defendants'
7    misconduct, you refer to misleading marketing,
8    correct?
9    A.   I believe I'm a bit more general than
10   that, at least in some places.
11   Q.   Okay.  Well, let's go back to Pages 11
12   and 12.  Do you see that it says, "the damage
13   methodology depends on the share of prescription
14   opioid shipments attributable to misleading
15   marketing," the very beginning of Paragraph 19.
16   A.   Okay.  There's the rest of the
17   sentence there.
18   Q.   Right.
19        But you do reference misleading
20   marketing.  So what damages -- have you
21   calculated which damages are attributable to
22   misleading marketing --
23        MR. SOBOL:  Objection.
24   BY MR. KEYES:

```
 1        Q.   -- and not something else?

 2        MR. SOBOL:   Objection.

 3        A.   What I have calculated is an

 4   estimated -- an estimate of the total damages

 5   without attempting to attribute them to any of

 6   the particular defendants.

 7   BY MR. KEYES:

 8        Q.   Okay.  So for the damages you've

 9   calculated, have you determined which portion of

10   those damages were caused by misleading

11   marketing as opposed to something else?

12        A.   Well, the way I would answer that is

13   following the methodology of the framework of

14   Rosenthal, Cutler, and me.

15        Professor Rosenthal estimates that

16   there are shipments due to defendants'

17   misleading advertising, so that's what her

18   empirical estimate is --

19        Q.   And only that, correct?

20        MR. SOBOL:  Were you finished with

21   your answer?

22        A.   No, but I'll try to be brief.

23        That's what Professor Rosenthal does.

24   And then that's applied by Professor Cutler to
```

```
 1   the shipments' harm connection, and that's

 2   applied to me.

 3        So kind of literally the formula of

 4   those three combinations of analyses take

 5   damages and attribute them to misleading

 6   marketing by the defendants.

 7        Now, I don't want to stop my answer

 8   there, because I'm not making a determination

 9   that there might have been other actors,

10   including distributors, including pharmacies,

11   that may have intervened in that process and

12   reduced the damages.

13        I don't know what -- I'm not opining

14   on their legal responsibility or what that

15   empirical allocation is.  I have a kind of

16   total, and I'm not taking that total and saying,

17   this part is for you and this part is for you.

18   BY MR. KEYES:

19        Q.   And when you say "this part is for you

20   and this part is for you," you're talking about

21   which part is attributable to misleading

22   marketing as opposed to something else?

23        A.   Yes.

24        And the other thing I would say about
```

```
 1   this is I don't necessarily think it's a zero

 2   sum game.  And I'm not sure how one would

 3   approach it in the law of saying, well, maybe

 4   more than one party was responsible for

 5   something; then what happened, I don't know.

 6   But my own economic analysis is to say, here's

 7   the -- in aggregate what the damage is.

 8        MR. SOBOL:  Should we take the lunch

 9   break?

10        MR. KEYES:  Soon.  Just give me a few

11   minutes.

12   BY MR. KEYES:

13        Q.   Do these calculations identify which

14   damages are attributable to failures to control

15   the supply chain?

16        A.   Well, as I tried to explain, my

17   damages are a kind of total damage.  And if

18   you're asking me a hypothetical of what would

19   have happened differently had somebody done

20   something, first of all, it's probably not a

21   good question for me.  And then it wasn't part

22   of my assignment to try to sort that out.

23        Q.   Do these calculations identify which

24   damages are attributable to "excessive and
```

```
 1   unnecessary shipments"?

 2        MR. SOBOL:  Objection.

 3        Is that quote from his report, or

 4   something else?

 5        MR. KEYES:  "Excessive and unnecessary

 6   shipments" are in his report, yes.

 7        A.   It does ring true.

 8   BY MR. KEYES:

 9        Q.   So you have identified certain damages

10   that you say are attributable to defendants'

11   misconduct.  Those are set forth in the tables

12   at the end of your report, but those tables do

13   not break out damages based on what's

14   attributable to misleading marketing versus

15   failures to control the supply chain versus

16   excess of and unnecessary shipments, correct?

17        A.   Well, no, I wouldn't put it that way.

18   The three-step empirical analysis associates

19   those damages to misleading marketing.  That's

20   what Professor Rosenthal does connected to

21   Cutler connected to McGuire.  So just from an

22   economic logical causality interpretation,

23   that's what those numbers show.  I -- having

24   said that, there is a sense in which your
```

1   statement is correct, that given those total

2   damages due to misleading advertising, I'm

3   not -- I haven't taken them and decided what

4   portion of these might be attributable to some

5   other actors or who might be jointly responsible

6   for something.  I haven't done that analysis.

7        Q.   And have you identified or linked up

8   damages with particular misleading marketing?

9        A.   Can you --

10       MR. SOBOL:  Objection.

11       A.   -- explain what you mean?

12  BY MR. KEYES:

13       Q.   Well, you've referenced

14  Professor Rosenthal's calculated -- made

15  calculations about the number of opioid

16  shipments that are attributable to misleading

17  marketing and that her work feeds into

18  Professor Cutler, right?  And Professor Cutler's

19  work feeds into your work, and you're the one

20  that calculates damages?

21       A.   That's correct.

22       Q.   Do you offer any damages for this that

23  are linked up with particular misleading

24  marketing?

1        MR. SOBOL:  Objection.

2        A.   "Particular" meaning what?

3   BY MR. KEYES:

4        Q.   Particular marketing by particular

5   defendants that was identified as being

6   misleading.

7        MR. SOBOL:  Objection.

8        A.   My understanding of what

9   Professor Rosenthal did was to aggregate the sum

10  of misleading advertising by the defendants in

11  this case, and that's what followed through.

12       I also understand that if some

13  misleading advertising of that were pulled out

14  in some way, then the calculation would be very

15  straightforward to do the multiplications

16  slightly differently, thanks to Excel, and then

17  come up with different damages numbers, which is

18  to say I think I'm capable of doing that, but in

19  this report I didn't try to attribute to

20  particular defendants.

21  BY MR. KEYES:

22       Q.   Particular groups of defendants or

23  particular defendants, correct?

24       MR. SOBOL:  Objection.

1        A.   I've covered this, I think, in my

2   answers.

3   BY MR. KEYES:

4        Q.   Okay.  Have you in your report offered

5   any calculation of damages caused by any

6   particular defendant?

7        MR. SOBOL:  Objection to the form.

8        A.   I think this is kind of a version of

9   what I just spoke about, and I use the aggregate

10  figures that Professor Rosenthal and David used

11  to come up with aggregate damages.

12  BY MR. KEYES:

13       Q.   And those aggregate figures are based

14  on misleading marketing?

15       MR. SOBOL:  Objection.

16       A.   Well, the aggregate figures are based

17  on step one of this, which is Professor

18  Rosenthal's analysis connecting a measure of

19  misleading advertising to total shipments.  So

20  that is literally the causal statement.

21  BY MR. KEYES:

22       Q.   And that follows through

23  Professor Cutler's work into your work?

24       A.   That's correct.

1        Q.   Do you offer any calculation of the

2   specific damages caused by the specific conduct

3   of any particular manufacturer or manufacturing

4   defendant?

5        MR. SOBOL:  Objection, asked and

6   answered.  Objection, asked and answered.

7        A.   I don't see the difference between

8   what I've already talked about and this

9   question, if there is.  I'm sorry.

10  BY MR. KEYES:

11       Q.   Do you offer any calculation of the

12  specific damages caused by the particular

13  conduct of a particular distributor or

14  distributor defendant?

15       MR. SOBOL:  Objection.  Asked and

16  answered.

17       A.   The answer is broadly similar to what

18  I've answered already with respect to

19  manufacturers.  And what I do is estimate a

20  total, and I don't attribute that to particular

21  defendants, particular distributor defendants,

22  nor do I attempt to allocate it even between the

23  group of distributor defendants and the group of

24  manufacturer defendants.

```
 1    BY MR. KEYES:
 2        Q.   And the same is true for any retail
 3    pharmacy defendants, correct?
 4             MR. SOBOL:  Objection.
 5        A.   I would answer in the same way, yes.
 6    BY MR. KEYES:
 7        Q.   And the same is true for any, quote,
 8    other CSA registrant, to use your phrase?
 9             MR. SOBOL:  Objection.
10        A.   Maybe remind me what "the same" means,
11    sir.
12    BY MR. KEYES:
13        Q.   "The same" means you haven't broken
14    out the damages that you attribute to the
15    conduct of any particular retail pharmacy
16    defendant, just like you said for any particular
17    distributor defendant or any particular
18    manufacturer defendant.
19             MR. SOBOL:  Objection.
20    BY MR. KEYES:
21        Q.   Correct?
22             MR. SOBOL:  Objection.
23        A.   Yes.  What I have estimated is a total
24    damages without attempting to attribute that to
```

```
 1    groups or individual defendants.
 2    BY MR. KEYES:
 3        Q.   Have you undertaken to determine what
 4    damages are attributable to the conduct of
 5    entities that are not defendants in this case --
 6             MR. SOBOL:  Objection.
 7    BY MR. KEYES:
 8        Q.   -- such as pharmacies or prescribing
 9    doctors?
10             MR. SOBOL:  Objection.
11        A.   Well, my analysis was directed to the
12    defendant manufacturers and distributors in this
13    case, and so it was that aspect of damages that
14    I was asked to assess, and that's what I did.
15    BY MR. KEYES:
16        Q.   And so did you factor in the conduct
17    of pharmacies or prescribing physicians in your
18    work?
19             MR. SOBOL:  Objection.
20        A.   That's not really a question at this
21    stage of the analysis.  That's a question that
22    would be better directed to the -- to Rosenthal
23    or Cutler who were attempting to associate
24    shipments or harms to particular behavior.  For
```

```
 1    me, that's an input at this point.
 2    BY MR. KEYES:
 3        Q.   Well, do you have an understanding,
 4    sitting here today, as to whether
 5    Professor Rosenthal or Professor Cutler factored
 6    into their analysis the conduct of pharmacies or
 7    prescribing doctors?
 8             MR. SOBOL:  Objection.  Scope.
 9        A.   What they did was a valid empirical
10    analysis to identify the independent effect of
11    in Meredith's case misleading advertising, and
12    in David Cutler's case shipments on a harm, and
13    if one does that in a valid way, then that
14    answers the question at issue.
15    BY MR. KEYES:
16        Q.   How does looking at the, what you
17    describe as the independent factor of
18    prescription shipments address the role that
19    pharmacies or prescribing physicians played?
20             MR. SOBOL:  Objection.  Scope.
21        A.   This is -- the reports that we're
22    talking about now, the non-McGuire reports we're
23    talking about are reliable and valid approaches
24    to associating the magnitude of harm to the
```

```
 1    factors they're interested in, and if you do
 2    that, then you're kind of done.  So they
 3    determined what they needed to know, and they
 4    designed a good way to do that.
 5    BY MR. KEYES:
 6        Q.   So what did they do to address the
 7    role of prescribing physicians or pharmacies, as
 8    you understand it?
 9             MR. SOBOL:  Objection.  Scope, asked
10    and answered.
11        A.   They specified valid regressions that
12    were capable of identifying causality in a
13    reliable way.
14    BY MR. KEYES:
15        Q.   You use the word "attribute" or
16    "attributable" throughout your report.  What do
17    you mean by that?
18             MR. SOBOL:  Well, can you show him an
19    example?
20             MR. KEYES:  Sure.
21        A.   I'm just going to get a little bit of
22    water while you page through there.
23    BY MR. KEYES:
24        Q.   Sure.  Why don't you look at Page 4.
```

1    A.    Okay.  I'll be right back.

2         (Pause.)

3    A.    Okay.  I'm on Page 4.

4    Q.    Okay.  You talk about "whether there

5  is a valid economic methodology for attributing

6  a share of Bellwether government costs to

7  defendants' misconduct; that is, to attribute

8  damages to defendants' misconduct."

9    A.    Yes.  Okay.

10   Q.    Do you see on Page 5, whether one may

11 identify the costs of the divisions of the

12 bellwether governments which may be attributable

13 to defendants' misconduct?

14   A.    Yes, I see that.  Well, actually I

15 don't, but I believe you.

16   Q.    Damages are estimated by applying the

17 estimates of the percent of harms attributable

18 to defendants' misconduct.

19   A.    I'm sorry.  Where is that last one?

20   Q.    It was on Page 7.

21   A.    Okay.

22   Q.    You talk about -- on Page 9 you talk

23 about an economic framework used to calculate

24 damages to the bellwether divisions that are

---

1  attributable to prescription opioid shipments.

2    A.    I see.

3    Q.    15, "the main economic criteria for

4  identifying costs or providing services" --

5         MR. SOBOL:  Wait, let him get there --

6  or me, he's faster than I am.  Go ahead.

7  BY MR. KEYES:

8    Q.    "The main economic criteria for

9  identifying costs of providing services

10 attributable to the opioid" -- blank, missing

11 word.

12   A.    I'm sorry, which paragraph are you in?

13   Q.    Paragraph 25.

14   A.    25.

15   Q.    A few lines down there's a line that

16 says, "Instead, as discussed in more detail

17 below."

18        Do you see that?

19   A.    Yes.  Okay.

20   Q.    "The main economic criteria for

21 identifying costs of providing services

22 attributable to the opioid," and then there's a

23 missing word.

24   A.    Yeah.  Okay.

---

1    Q.    So you keep saying "attribute" or

2  "attributable."  What do you mean by

3  attributable?

4    A.    Due to.

5    Q.    Due to.  What do you mean by "due to"?

6  Are you offering the opinion that they are

7  caused by the defendants' misconduct?

8         MR. SOBOL:  What's the "they"?

9         MR. KEYES:  The damages, whenever you

10 refer to them.

11   A.    I'm relying on Rosenthal and Cutler

12 before me to have done that causal work so that,

13 given their findings, which I regard to be

14 reliable, then these damages are due to

15 defendants' misconduct.

16 BY MR. KEYES:

17   Q.    So are you offering an opinion on

18 causation?

19        MR. SOBOL:  Asked and answered.

20 Objection.

21 BY MR. KEYES:

22   Q.    You say you rely on Professor

23 Rosenthal and Professor Cutler.  I get it.  Are

24 you offering an opinion on causation?

---

1         MR. SOBOL:  Objection.

2    A.    I know this is a legal word, so let me

3  just be sure of what I am saying about this.

4         Given the valid empirical

5  investigation of both Rosenthal and Cutler, who

6  at the end of his report comes to a conclusion,

7  there is a causal conclusion that Cutler brings

8  forth to say that this share of the harm are due

9  to defendants' misconduct.  That's David

10 Cutler's statement.  Taking that statement as

11 given, then what I say is that this is the

12 magnitude of damages that are due to defendants'

13 misconduct.

14 BY MR. KEYES:

15   Q.    So you believe that Professor Cutler

16 is providing that causal link, and you're

17 relying on him for that causal link?

18        MR. SOBOL:  Objection.  Asked and

19 answered.

20   A.    Well, there's two causal links that

21 are involved, both Rosenthal's report and

22 Cutler's report.

23 BY MR. KEYES:

24   Q.    Okay.  I was going to take them one at

1  a time, but we can take them together.

2      You believe that Professor Rosenthal

3  and Professor Cutler provide the causal links --

4      MR. SOBOL:  Objection.

5  BY MR. KEYES:

6      Q.  -- and you're relying on them for

7  those causal links?

8      MR. SOBOL:  Objection.

9      Which question do you want him to

10  answer?

11      MR. KEYES:  The one I just asked.

12      MR. SOBOL:  Both of them?  Objection

13  to the form then.

14      A.  I do rely on Professor Rosenthal and

15  Professor Cutler whose empirical analyses

16  together reliably, in my view,

17  associates/attributes the harms to the

18  defendants' misconduct, and that's what I need

19  in order to do my allocation of damages.

20  BY MR. KEYES:

21      Q.  Okay.  So you are quantifying those

22  harms --

23      MR. SOBOL:  Objection.

24  BY MR. KEYES:

1      Q.  -- in your report?

2      MR. SOBOL:  Objection.

3  BY MR. KEYES:

4      Q.  You are quantifying what you are

5  saying are the cost consequences of those harms

6  to Summit County and Cuyahoga County?

7      A.  Yeah, that's broadly what I'm doing.

8      Q.  And you are relying on

9  Professor Cutler and Professor Rosenthal for the

10  causal link between the defendants' conduct and

11  those cost consequences?

12      MR. SOBOL:  Objection.  Asked and

13  answered.

14  BY MR. KEYES:

15      Q.  Correct?

16      MR. SOBOL:  Objection.  Asked and

17  answered.

18      A.  I'm not sure what kind of trouble I

19  might get myself into here, but yes, Rosenthal

20  studies the beginning with the misconduct

21  itself, to shipments.  David picks it up at the

22  shipment stage, looks at harms.  And so putting

23  those two reliable econometric investigations

24  together, one can attribute the harms to the

1  misconduct.  And then --

2  BY MR. KEYES:

3      Q.  And that's the work they're doing?

4      MR. SOBOL:  He hasn't finished.

5      A.  Then once those shares have been

6  determined by Professor Cutler, my work is to

7  take those shares, apply them to the variable

8  costs, and determine the dollar number.

9  BY MR. KEYES:

10      Q.  All right.  So you are quantifying

11  what you are saying are the cost consequences of

12  the harms that Professor Cutler and Professor

13  Rosenthal link up with the defendants' conduct?

14      MR. SOBOL:  Objection.  Asked and

15  answered.

16      A.  Well, I mean, I'm -- the same question

17  has come at me like four or five times now, so

18  I'll just defer to my earlier answers on this,

19  if that's all right.

20  BY MR. KEYES:

21      Q.  Did I say something that was

22  incorrect?

23      MR. SOBOL:  Objection.

24      Let's take a lunch break.  People are

1  getting a little testy.  It's getting --

2      MR. KEYES:  I'm not getting testy.

3      MR. SOBOL:  No, you are.

4      MR. KEYES:  I'm just trying to get an

5  answer to my question.

6      MR. SOBOL:  It was 20 minutes ago that

7  I asked for the lunch break.  I have been more

8  than gentlemanly about this.

9      MR. KEYES:  I would like an answer to

10  my question.  So --

11      MR. SOBOL:  "Well, I'm not testy?"

12  Yes, you are.

13  BY MR. KEYES:

14      Q.  You are quantifying what you are

15  saying are the cost consequences of the harms

16  that Professor Cutler and Professor Rosenthal

17  link up with the defendants' conduct.  Is that

18  an accurate --

19      MR. SOBOL:  Objection.

20  BY MR. KEYES:

21      Q.  -- statement or not?

22      MR. SOBOL:  Objection.  Asked and

23  answered.

24      A.  I think that was -- you're just

1  quoting from me, is that right?

2      Q.  I'm repeating my question.  Is that

3  accurate or not?

4          MR. SOBOL:  I don't know where you

5  are.

6  BY MR. KEYES:

7      Q.  If it's inaccurate, tell me why.

8          MR. SOBOL:  I still don't know where

9  we are.

10         Do you understand the question that's

11  before you?

12     A.  I want to go to lunch, too, so you ask

13  a clear question, I'll give a fresh answer, and

14  we'll see where we are.

15  BY MR. KEYES:

16     Q.  In your damages report you are

17  quantifying what you are saying are the cost

18  consequences of the harms that Professor Cutler

19  and Professor Rosenthal link up with the

20  defendants' conduct?

21         MR. SOBOL:  Objection.  Asked and

22  answered.

23     A.  There's three steps in this that make

24  it a causal connection between defendants'

1  misconduct and the cost consequences to the

2  local governments.

3          The first connection is investigated

4  by Professor Rosenthal who connects the

5  misconduct to the shipments.  Cutler picks up

6  the shipments, connects up the harms, comes to a

7  conclusion for me about the share of harms

8  attributable to -- and I mean that in a causal

9  way -- attributable to defendants' misconduct,

10  and that allows me to use that share to quantify

11  it in dollar terms.

12         MR. SOBOL:  Thank you.

13         MR. KEYES:  Okay.  Let's take a break

14  for lunch.

15         THE VIDEOGRAPHER:  The time 1:02 p.m.,

16  and we're off the record.

17         (Whereupon, a luncheon recess was

18         taken.)

19

20

21

22

23

24

1          AFTERNOON SESSION

2

3          THE VIDEOGRAPHER:  The time is

4  2:05 p.m., and we're on the record.

5  BY MR. KEYES:

6      Q.  Professor McGuire, would you turn to

7  Page 16 of your report, which is McGuire Exhibit

8  Number 1?  Are you there?

9      A.  Yes.

10     Q.  And in Paragraph 26 you say --

11  consider a hypothetical, right?

12     A.  Yes, I see that.

13     Q.  You say, "Suppose there is only one

14  Chief and there would need to be one Chief

15  regardless of whether there were an opioid

16  crisis," right?

17     A.  I see that.

18     Q.  And then you continue, "Suppose

19  further that the Chief works 8 hours a day and

20  his or her salary would be the same with or

21  without opioid-related activities."  Correct?

22     A.  I see that, yes.

23     Q.  So in your hypothetical, the sheriff

24  is paid a salary and works eight hours a day?

1      A.  Yes.

2      Q.  Then you say, "In the absence of an

3  opioid crisis, the Chief would spend 8 hours

4  attending to non-opioid-related problems.  If

5  the opioid crisis causes the Chief to spend 1

6  hour a day on opioid-related issues, the time

7  the Chief has for other issues falls by 1 hour."

8          Do you see that?

9      A.  I do, yes.

10     Q.  And then you acknowledge that the

11  government's spending on the chief is fixed.

12         Do you see that?

13     A.  Yes, I don't see it, but I --

14     Q.  Well, the next sentence says --

15     A.  It's part of the example.  I'm not

16  disputing it.

17     Q.  You say in the next sentence, "What is

18  'fixed' in this example is the total work time

19  of (and spending on) the Chief of the Sheriff's

20  Department."

21     A.  Yes.

22     Q.  Okay.  So the government doesn't spend

23  any more or less if the chief spends any time on

24  opioid-related issues, correct?

1    A.   That's the nature of this example,

2  yes.

3    Q.   Okay.  And then you say if he has to

4  start spending one hour per day on

5  opioid-related issues, then he only has seven

6  hours to spend on non-opioid-related issues.

7  Correct?

8    A.   That's what the example says, yes.

9    Q.   And you then assert that "The

10  reallocation of that time to opioid-related

11  activity result in a loss of time and effort on

12  alternative activities, which is an economic

13  cost."  Correct?

14    A.   That's what I say.

15    Q.   And that's an opportunity cost?

16    A.   You can think of that as an

17  opportunity cost.

18    Q.   Which means that something is given up

19  when the chief has to spend that one hour on

20  opioid-related issues, correct?

21    A.   So far so good.

22    Q.   And that opportunity cost could be as

23  simple as leisure time of the chief?

24    MR. SOBOL:  Objection.

1    A.   Well, there you've lost me.

2  BY MR. KEYES:

3    Q.   It could be.

4    MR. SOBOL:  Objection.

5  BY MR. KEYES:

6    Q.   That's not what you specify in your

7  hypothetical, but that is something that could

8  be given up by the chief?

9    MR. SOBOL:  Objection.

10    A.   I don't know.  You're adding something

11  here.  This is --

12  BY MR. KEYES:

13    Q.   I am.

14    A.   This is work-related activities is

15  what the point of the example is.

16    Q.   Okay.  But the opportunity cost is not

17  a financial cost --

18    MR. SOBOL:  Objection.

19  BY MR. KEYES:

20    Q.   -- because the sheriff, the chief's

21  employer, doesn't pay anything more if the chief

22  spends one hour on opioid-related activities and

23  seven hours on non-opioid-related activities

24  instead of all eight hours on non-opioid-related

1  activities, correct?

2    MR. SOBOL:  Objection.

3    A.   No, I disagree with that, too.  The

4  appropriate metric of this opportunity cost is

5  financial.

6  BY MR. KEYES:

7    Q.   But it's not a financial cost.  His

8  employer doesn't spend anything more --

9    MR. SOBOL:  Objection.  Asked and

10  answered.

11  BY MR. KEYES:

12    Q.   -- is that correct?

13    MR. SOBOL:  Objection.  Asked and

14  answered.

15    A.   Well, the example lays out and, in

16  fact, specifies that even in the situation in

17  which the time and the spending on the chief is

18  the same, the appropriate economic approach to

19  this question is the economic value of the

20  activities given up if the chief spends an hour

21  on opioids.

22  BY MR. KEYES:

23    Q.   That's the economic value.  That's not

24  a financial cost necessarily.

1    MR. SOBOL:  Objection.  Asked and

2  answered.

3    A.   I'm really not following what you're

4  trying to get at here.

5  BY MR. KEYES:

6    Q.   What is the extra money that the

7  chief's employer is spending as a result of the

8  chief spending one hour per day on

9  opioid-related activities instead of all eight

10  hours on non-opioid-related activities?

11    A.   Okay.  This example, I think, is very

12  explicit about that, and it states, as you read

13  into the record a few minutes ago, that the

14  spending on the chief is fixed.  And the point

15  of the example is even in this context in which

16  the number of hours worked and the spending on

17  the chief is fixed, the appropriate economic

18  financial measure of the loss to the

19  jurisdiction is the wage of the chief spent on

20  opioids.

21    Q.   If the chief goes from eight hours a

22  day on non-opioid-related activities to one hour

23  on opioid-related activities, and seven hours on

24  non-opioid-related activities, is there any

Highly Confidential - Subject to Further Confidentiality Review

1   out-of-pocket expense for his employer?

2        MR. SOBOL:  Objection.

3        A.  I didn't hear the first part of your

4   hypothetical, sorry.

5   BY MR. KEYES:

6        Q.  If the chief goes from eight hours a

7   day on non-opioid-related activities to one hour

8   per day on opioid-related activities, and seven

9   hours per day on non-opioid-related activities,

10  is there any out-of-pocket expense for his

11  employer?

12       A.  What do you mean by "out-of-pocket

13  expense"?

14       Q.  Is there any additional expenditure of

15  funds by the chief's employer when that switch

16  occurs?

17       MR. SOBOL:  Objection.

18       A.  This example states that there is --

19  the spending is fixed as the chief spends an

20  hour on opioids instead of on the other

21  problems, and it's intended to convey that even

22  in this situation the appropriate economic

23  measure relief is the cost of the chief's time,

24  one hour, spent on opioids.

Highly Confidential - Subject to Further Confidentiality Review

1   BY MR. KEYES:

2        Q.  Okay.  So you acknowledge that in that

3   situation, the switch from eight hours to seven

4   for non-opioid-related activities and one for

5   opioid-related activities does not cause his

6   employer any out-of-pocket cost, any increased

7   out-of-pocket costs?

8        MR. SOBOL:  Objection.

9        A.  Even if the spending is fixed, then

10  the appropriate economic measure of the cost is

11  the value of the chief's time

12  associated/attributable to opioids.

13  BY MR. KEYES:

14       Q.  Sir, you've said that in your report,

15  and you said it several times today, so I think

16  you're covered on that point.

17       A.  Okay.  Good.

18       Q.  I'd ask you to answer my question.

19  You keep referring to even if it is fixed.

20       I'm asking, because it's fixed, even

21  though the sheriff switches how he spends those

22  eight hours a day, his employer is not incurring

23  any additional out-of-pocket cost, correct?

24       MR. SOBOL:  Objection, asked and

Highly Confidential - Subject to Further Confidentiality Review

1   answered.  Objection, asked and answered.

2        A.  The assumption in the -- my

3   hypothetical is that the spending is fixed.

4   BY MR. KEYES:

5        Q.  Which means there's no additional

6   out-of-pocket expense?

7        MR. SOBOL:  Are you finished with your

8   answer?

9   BY MR. KEYES:

10       Q.  That's what my question is about.

11       A.  Well, it puzzles me a little why you

12  have to ask a question if I think I stated

13  extremely clearly in my report that the spending

14  is fixed.

15       But the point of the example is that

16  that does not imply that there's no economic

17  cost to the opioid activities.

18       Q.  Right.  So answer my question.  You

19  keep saying it's fixed.  You're an economist,

20  you're familiar with fixed, not necessarily

21  everybody is familiar with fixed.  And another

22  way of phrasing that is the amount that his

23  employer spends is set, it is fixed, and it will

24  not change.  His employer will not spend any

Highly Confidential - Subject to Further Confidentiality Review

1   more money because he changes how he spends

2   those eight hours a day, correct?

3        MR. SOBOL:  Objection.

4   Mischaracterizes the testimony.

5        A.  I just want to read this back here.

6   In this example the government is paying for one

7   hour of the chief's time to deal with opioids.

8   What is fixed in this example is the total work

9   time of and spending on the chief.

10       I'm mystified why you have to ask me a

11  question that is the spending on the chief

12  fixed, and --

13  BY MR. KEYES:

14       Q.  Because you've already said that in

15  your report and I'm trying to put -- I'm trying

16  to see if that's the same as saying there's no

17  additional out-of-pocket expenditure by his

18  employer.  Yes or no.

19       MR. SOBOL:  Objection.  Asked and

20  answered.  It's not a yes-or-no question.

21  BY MR. KEYES:

22       Q.  He did not answer that question.

23       MR. SOBOL:  He didn't answer it the

24  way you want him to answer the question, but

1  he's the one who is testifying, not you.

2  BY MR. KEYES:

3      Q.   My question is, is there an additional

4  out-of-pocket expenditure by his employer when

5  the make-up -- how he spends his eight hours

6  changes?  That's a yes-or-no question.  It's not

7  about fixed.  It's about whether there's an

8  additional out-of-pocket expenditure when he

9  goes from eight hours on non-opioid to seven

10  hours on non-opioid and one hour on opioid.  You

11  can say no, you can say yes, and then you can

12  explain your answer.  Yes or no, is there an

13  additional out-of-pocket expenditure?

14      MR. SOBOL:  So which question do you

15  want him to ask and -- be asked now?  You asked

16  two questions in that paragraph.

17  BY MR. KEYES:

18      Q.   In your hypothetical, when he goes

19  from eight hours on non-opioid-related

20  activities to seven hours on non-opioid related

21  activities and one hour on opioid-related

22  activities --

23      A.   I think we got that -- sorry to

24  interrupt.

1      Q.   -- does his employer have any

2  additional out-of-pocket expense as compared to

3  when he spent all eight hours on

4  non-opioid-related activities?

5      MR. SOBOL:  Objection.  Asked and

6  answered.

7      A.   This is going to be two sentences.

8  The paragraph makes the assumption that the

9  spending on the chief is fixed.  That does not,

10  however, imply that there is no economic cost to

11  the diversion of the chief's time to the opioid

12  crisis.

13  BY MR. KEYES:

14      Q.   And you didn't say a word about

15  out-of-pocket expense, which is what my question

16  is about.

17      So in that hypothetical, is there an

18  additional out-of-pocket expenditure by his

19  employer?

20      MR. SOBOL:  I instruct you not to

21  answer.

22  BY MR. KEYES:

23      Q.   Yes or no?

24      MR. SOBOL:  He's answered the question

1  five times already.

2  BY MR. KEYES:

3      Q.   Are you saying you can't answer my

4  question yes or no?  Is that your position?

5      MR. SOBOL:  Which question do you want

6  him to answer yes or no?

7      MR. KEYES:  Whether there's an

8  additional out-of-pocket expenditure in that

9  scenario.

10      MR. SOBOL:  He's given the answer

11  several times.

12      (Phone interruption.)

13      MR. KEYES:  Will you mark this point

14  in the transcript?

15      MR. SOBOL:  What was that?

16      MR. KEYES:  I think it's an

17  internal --

18      MR. SOBOL:  Sorry.

19  BY MR. KEYES:

20      Q.   Okay.  Now I'm going to change your

21  hypothetical.

22      What if the chief is paid to work

23  eight hours a day but actually only does work

24  five hours a day, okay, and the rest is leisure

1  time, downtime, where he's not actually working,

2  in that case --

3      MR. SOBOL:  So he's getting paid to

4  work but he's not working?

5      MR. KEYES:  He's getting paid for

6  eight hours, and only working for five hours,

7  and the rest is downtime.

8  BY MR. KEYES:

9      Q.   In that case, having to spend an hour

10  on opioid-related issues does not take away any

11  of the time he needs to spend on

12  non-opioid-related issues, correct?

13      MR. SOBOL:  Objection.

14      A.   No, I disagree with that.

15  BY MR. KEYES:

16      Q.   If he only works five hours and he's

17  paid to work eight hours, then how does working

18  an hour on opioid-related activities take away

19  from the time he's actually spending on

20  non-opioid-related activities?

21      MR. SOBOL:  Objection.

22      A.   Well, this is something I explicitly

23  addressed in my report, which is that it's not

24  realistic to expect that each individual or each

Highly Confidential - Subject to Further Confidentiality Review

1  department is fully occupied at all times.  And,
2  in fact, it's not even optimal from the
3  standpoint of the government not to have some
4  slack capacity in activities of especially a
5  public safety official.
6        The demands on these officials are
7  stochastic, which -- by which I mean it kind of
8  can be up and down, and you want to have some
9  slack capacity.  The diversion of an hour of the
10  chief's time from slack capacity doesn't mean
11  it's not coming at a cost to the government.
12  BY MR. KEYES:
13     Q.  My question didn't pose that.  I'm
14  posing a hypothetical.  You're an expert.  I get
15  to ask you hypothetical questions, and I'd ask
16  you to answer the hypothetical.
17        In my hypothetical he doesn't actually
18  work eight hours a day.  He's paid to work eight
19  hours a day.  He's on the job eight hours a day,
20  actually only does work five hours a day, and
21  the other three hours are downtime.  Okay?
22  That's the hypothetical.
23        In that hypothetical situation, asking
24  him to spend an hour each day on opioid-related

Highly Confidential - Subject to Further Confidentiality Review

1  activities does not take away any time, any of
2  the five hours he has to spend on
3  non-opioid-related activities, correct?
4        MR. SOBOL:  Objection.  Asked and
5  answered.
6     A.  Well, I think it's, you know, simply a
7  farfetched and unrealistic hypothetical with
8  respect to staff of a -- any government
9  department in which the efficient level of
10  staffing would imply that people don't sit
11  around half of the day doing nothing, and it
12  does imply that there's excess capacity in
13  especially public safety related positions.
14  BY MR. KEYES:
15     Q.  Sir --
16     A.  So I'm just not prepared to agree with
17  you that you can make up an hour without having
18  it come out of some capacity of the chief to do
19  something else.
20     Q.  It might come out of his capacity, it
21  might come out of his downtime, it might come
22  out of his leisure time, but it is not taking
23  away from the five hours that he has to spend on
24  non-opioid-related activities precisely because

Highly Confidential - Subject to Further Confidentiality Review

1  he has that capacity, correct?
2        MR. SOBOL:  Objection.  Asked and
3  answered.  I've counted four times now.
4     A.  Which I don't agree with that
5  depiction of the role of staffing in a city
6  government, or any government, or really any
7  position at all.
8  BY MR. KEYES:
9     Q.  Sir, you can call my hypotheticals
10  whatever you want.  You can affix whatever
11  adjective.  I'm asking you within the parameters
12  of that hypothetical whether you agree with it,
13  because it is a matter of logic that if you're
14  only spending five hours and you're not doing
15  any work with the other three hours, then asking
16  someone to spend one of those three hours on
17  opioid-related activities is not pulling away
18  from the five hours on non-opioid-related
19  activities.  Do you agree with me as a matter of
20  logic within that hypothetical?
21        MR. SOBOL:  Wait.  Objection.  Asked
22  and answered five times.
23        You want him to give the same answer,
24  you want to --

Highly Confidential - Subject to Further Confidentiality Review

1        MR. KEYES:  I want him to answer my
2  question.
3        MR. SOBOL:  Yes, I understand.  But do
4  you want him to give the same answer again, or
5  what do you want to do?
6        MR. KEYES:  I'd like you to object,
7  and then he can answer my question.
8        MR. SOBOL:  Okay.  I object.
9  BY MR. KEYES:
10     Q.  You've made your distaste clear,
11  that's fine, but it's my hypothetical.  I want
12  you -- I don't --
13        MR. SOBOL:  He's telling you your
14  hypothetical doesn't make any sense.
15  BY MR. KEYES:
16     Q.  I'm not asking you to handicap whether
17  my hypothetical is correct or not.  I'm asking
18  you to answer within the scope of my
19  hypothetical, logically asking him to spend one
20  more hour on opioid-related activities does not
21  take away from the five hours that he's been
22  spending on non-opioid-related activities,
23  correct, as a matter of logic?
24        MR. SOBOL:  Objection.  Asked and

1  answered.

2  Go ahead, Tom.

3  A.  I think the -- another way to kind of

4  go at this from the standpoint of an answer is

5  that the hypothetical is really incomplete.  It

6  doesn't recognize the stochastic nature of

7  demands on a public safety official that imply

8  there always will be downtime, or almost always

9  will be downtime for a public official.  And

10  it's just simply not correct as a matter of

11  logic that devoting an extra hour to

12  opioid-related activities has no cost to a local

13  government in terms of other things personnel

14  might do.

15  BY MR. KEYES:

16  Q.  You keep reverting to the opinions you

17  want to offer in this case, and you're offering

18  them, and you're entitled to offer them.  I'm

19  not asking you to repeat your opinions.  I'm

20  asking you to answer my hypothetical.  My

21  hypothetical wasn't about whether there was a

22  cost to local government or not.

23  My question was, if he spends that one

24  hour on opioid-related activities, it does not

1  take away from the five hours that he's spending

2  on non-opioid-related activities, because by

3  definition he's on the job for eight hours.  It

4  may take away from his leisure time.  It may

5  take away from his excess capacity.  It does not

6  keep him from doing the five hours of work on

7  non-opioid-related activities.  Do you agree

8  with that as a matter of logic?

9  MR. SOBOL:  Objection.

10  This is the seventh time, and unless

11  the witness has any more to say in response to

12  the question, I suggest that he just say that.

13  A.  I don't have anything new to add.  If

14  you would like me to go back over my answer,

15  I'll do so.

16  BY MR. KEYES:

17  Q.  Okay.  Now I'm going to change the

18  hypothetical, and again I'm going to ask you to

19  stick with my hypothetical, whether you think

20  it's realistic or not.  Okay?

21  A.  Okay.

22  MR. SOBOL:  No, that's not okay.  Hold

23  on a second.  He's not to instruct you how to

24  answer the questions.  I do.

1  MR. KEYES:  No, you're not to instruct

2  him now to answer the questions either.  And

3  I've been rather permissive.  You can object.

4  You can instruct him not to answer.  You cannot

5  instruct him how to answer.  And I'd ask you to

6  stop doing it.

7  MR. SOBOL:  You're right.  You're

8  right about that.

9  But he is not to tell you -- instruct

10  you how to answer the question.  If you think

11  that that hypothetical is unrealistic and you

12  can't answer the question as it's framed, then

13  you answer truthfully as you have been, okay,

14  and not if he tells you, you know, accept my

15  unrealistic hypothetical.  That's not what

16  you're supposed to be doing.  You're supposed to

17  answer the questions truthfully.

18  BY MR. KEYES:

19  Q.  A new hypothetical.

20  The chief works very inefficiently for

21  those eight hours a day.  He takes eight hours

22  to do the work, but he could easily get it done

23  in five hours, and he could use the rest of that

24  time for leisure or downtime.  Okay?

1  Now, in that hypothetical, in that

2  hypothetical, if he worked efficiently and got

3  the non-opioid-related activities done in five

4  hours, then spending an hour on opioid-related

5  issues would not take away from the work on

6  non-opioid-related activities, correct?

7  MR. SOBOL:  Is that a question?

8  Objection to the form.

9  BY MR. KEYES:

10  Q.  Correct.  The logic of a hypothetical.

11  MR. SOBOL:  Objection to form.

12  A.  I kind of get what you're driving at,

13  but I didn't get -- if you wouldn't mind giving

14  me the hypothetical again.

15  BY MR. KEYES:

16  Q.  Sure.  I've got -- in my hypothetical

17  you have a chief that works very inefficiently

18  for eight hours a day, and he takes eight hours

19  to do the work on the job for eight hours a day,

20  and he takes the eight hours to do the work, but

21  he could easily get it done in five hours and he

22  could spend the other three on leisure or

23  downtime.

24  If he worked efficiently and got his

1  work done in five hours instead of taking the
2  full eight hours, then he would have three hours
3  of leisure, or if he were asked to spend an hour
4  of those three hours on opioid-related
5  activities it still wouldn't take away from him
6  getting the non-opioid-related work done,
7  correct?
8          MR. SOBOL:  Object to the form.
9      A.  Well, I think this is also an
10  inappropriate way to characterize the economics
11  of this situation.  Let me go about this by
12  making an analogy for you.
13          Suppose you were talking about
14  consumers instead of local government, and you
15  were asked to -- say someone bangs up my car and
16  I have to pay $75 to fix the car.  So I don't
17  make any more.  My income is fixed.  And I have
18  to take 75 of my dollars and use it to fix my
19  car.
20          What is the cost to that consumer of
21  having to fix the car?  What I say it is, is
22  $75.  It doesn't matter from an economic
23  standpoint that if you look at some other item
24  of the budget I spend my money on -- suppose I

1  go to restaurants with some other part of my
2  money and I don't make a very good choice of
3  restaurants, I choose food inefficiently, I
4  don't get the most calories per dollar or
5  however you want to -- however you want to
6  characterize the efficiency with which I spend
7  the rest of my money, it's still $75.
8          That's the kind of mainstream economic
9  way to quantify the cost, even if you start
10  putting in stuff about he's not spending his
11  money efficiently on his restaurants.
12  BY MR. KEYES:
13      Q.  You're completely changing the
14  hypothetical.  In your hypothetical he has to
15  spend the $75 on one thing or another thing, and
16  you've already admitted in my hypothetical that
17  his employer is going to spend the same amount
18  because it's paying him a salary regardless of
19  how he spends the time.  So I don't want to
20  spend time on your hypotheticals.  They're
21  completely different than mine.
22          In my hypothetical, if he works more
23  efficiently and, therefore, he gets his
24  non-opioid-related work done in five hours and

1  he has three extra hours, he has three hours of
2  leisure time, or if he's asked to spend an hour
3  on opioid-related activities he still gets the
4  five hours of work done on non-opioid-related
5  activities and he's got two hours left for
6  leisure time, do you disagree with the logic of
7  that?  You can tell me it's not realistic, but
8  do you disagree with the logic of that
9  hypothetical?
10          MR. SOBOL:  Objection.
11      A.  I do disagree with the logic of that
12  hypothetical.
13  BY MR. KEYES:
14      Q.  In my hypothetical the only
15  opportunity cost is the chief loses leisure
16  time --
17          MR. SOBOL:  Object.
18  BY MR. KEYES:
19      Q.  -- because instead of three hours of
20  leisure time, now he only has two, with that
21  third hour being spent on opioid-related
22  activities.
23          MR. SOBOL:  Objection.  Asked and
24  answered.

1      A.  I don't agree with that.
2  BY MR. KEYES:
3      Q.  And you've counted that lost leisure
4  time as damages to his employer.
5          MR. SOBOL:  Objection.
6      A.  I don't agree with that at all.
7  BY MR. KEYES:
8      Q.  Have you heard of Parkinson's law?
9      A.  Parkinson's law?
10      Q.  Yes.
11      A.  I have.  Give me a hint.
12      Q.  Well, what does Parkinson's law say,
13  as you remember it?
14      A.  I need a hint.  I know I've heard of
15  it, but --
16      Q.  Have you heard of Parkinson's law
17  saying that work expands to fill the time
18  available for its completion?
19      A.  I have heard of that, yes.
20      Q.  Have you done any studies of
21  Parkinson's law?
22      A.  Well, I would say yes, I have.
23      Q.  Okay.  What have you done to study
24  Parkinson's law?

1    A.    A form of Parkinson's law which is in

2  my -- part of my research that has to do with

3  healthcare payment.

4       So the analogy to Parkinson's law here

5  would be if a healthcare provider, say a

6  hospital, were given a prospective payment, it's

7  called, for taking care of a patient within a

8  hospital, the fixed payment might be $4,000,

9  just to choose a number, and the pressure of the

10  market with hospitals competing for patients

11  would imply that hospitals would spend up to

12  $4,000 to take care of that patient, which is a

13  version of Parkinson's law.

14    Q.    Is that study referenced anywhere in

15  your CV?

16    A.    Many, many times in my -- I've studied

17  that many times.

18    Q.    And what is that study called, if we

19  look for it in your CV?

20    A.    There would be the words prospective

21  payment.  I work on capitation payments to

22  health plans, I work on physician payments and

23  fixed pricing to physicians, hospitals, and

24  other healthcare providers, all of which have

---

1  this element of the effect of competition,

2  implying that plans and providers will tend to

3  spend so as to use the budget they're offered.

4    Q.    And is that a study of how they use

5  time, or how they use dollars?

6    A.    That's a big part of their providers'

7  budgets are the time that they and their workers

8  spend.

9    Q.    Have you studied the application of

10  Parkinson's law in the workplace?

11    A.    Well, these are workplaces.  I'm

12  talking about hospitals, doctors' offices.

13    Q.    You're talking about places where

14  people work.  I'm asking, have you studied the

15  application of Parkinson's law to how people

16  spend their time in the workplace?

17       MR. SOBOL:  Objection.  Asked and

18  answered.

19    A.    How people spend their time?  I'm not

20  sure what you're getting at here.

21  BY MR. KEYES:

22    Q.    Well, have you conducted a study of

23  Parkinson's law as applied to how employees

24  spend their time in the workplace?

---

1       MR. SOBOL:  Objection.  Asked and

2  answered.

3    A.    The Parkinson's law is the time -- the

4  work fills the time available.  The how they

5  spend their time is not a Parkinson's law

6  question.  It's a question about the nature of

7  their work.

8       I'm just trying to understand what

9  your next hypothetical is about.

10  BY MR. KEYES:

11    Q.    So have you studied the application of

12  Parkinson's law to see how employees spend their

13  time in the workplace during the workday?

14       MR. SOBOL:  Objection.  Asked and

15  answered again.

16    A.    Well, I'm going to say yes, although I

17  think it's -- the analogy to Parkinson's law is

18  not as close.

19       The term in economics for this area of

20  inquiry would be the multi-tasking problem in

21  which an employee has a job to do, but that job

22  involves a number of different goals or

23  activities.  And the objective of the employer,

24  or in some cases the regulator or the payer, is

---

1  to convey to the employee, healthcare provider,

2  incentives so they address the multi-tasking

3  problem in a way that is in the interest of the

4  regulator.

5       So this -- that's a little abstract,

6  but it has to do with things like pay for

7  performance, has to do with whether that matters

8  to providers, in what ways pay for performance

9  affects providers.

10       I've done this even in the substance

11  abuse area to evaluate state-based pay for

12  performance systems in substance abuse to see

13  how providers respond to that and address the

14  multiple objectives the state has in that

15  context.

16    Q.    Have you read any studies of the

17  application of Parkinson's law in the workplace

18  as applied to how employees spend their time?

19    A.    Well, if you permit me to include the

20  studies I've just been referring to as falling

21  within the broad category of the level of

22  resources available and the activities of

23  workers, then yeah, I read all kinds of things

24  in this area.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   But your answer is yes with that broad
2  category that you've just described?
3    A.   Well, I'm a health economist, so I
4  tend to read things in the health economics
5  world.
6    Q.   Under Parkinson's law, you cannot
7  conclude that the chief needs eight hours to do
8  his work just because he spent eight hours on
9  it, correct?
10   A.   Under Parkinson's law.  Maybe you
11 could be specific about what you mean by "under
12 Parkinson's law."
13   Q.   Well, given Parkinson's law, which
14 says the time it takes to complete work expands
15 to fill the time allotted, if Parkinson's law
16 holds true, you can't conclude that the chief
17 needs eight hours to do his work just because he
18 spent eight hours doing it --
19        MR. SOBOL:  Objection.  Form.
20 BY MR. KEYES:
21   Q.   -- correct?
22        MR. SOBOL:  Objection.  Form.
23   A.   I know you get to ask the questions,
24 but under my interpretation of Parkinson's law

Highly Confidential - Subject to Further Confidentiality Review

1  here, it would be something like the work
2  expands to fill the time available.  And I'm
3  kind of like that at the office.  I will go in
4  and plan to leave at a certain time, and I'll
5  work the whole time that I'm there.  So the work
6  expands, but it's not like I'm not working.  And
7  if somebody asks me to do something over here
8  that's different, then I do something less over
9  there.
10 BY MR. KEYES:
11   Q.   Under the application of Parkinson's
12 law, the chief may have taken eight hours to do
13 his work because he had eight hours available to
14 do it, so he was going to be on the job for
15 eight hours.
16        MR. SOBOL:  Objection.  Form.
17 BY MR. KEYES:
18   Q.   Right?
19   A.   I don't know about the "right."
20   Q.   Well, correct?  Do you agree with that
21 proposition?
22        MR. SOBOL:  Objection to form.
23   A.   I'm going to withhold agree or
24 disagree until you go on a little bit.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. KEYES:
2    Q.   Well, under the application of
3  Parkinson's law, if it holds true, the chief may
4  have taken eight hours to do the work just
5  because he was going to be on the job for eight
6  hours, not because he actually needed eight
7  hours to get all that work done.
8        MR. SOBOL:  Objection.
9        Is there a question before him?
10 BY MR. KEYES:
11   Q.   I asked you before, do you agree with
12 that statement?
13   A.   I don't agree with that statement.
14   Q.   And you can't rule out that if the
15 chief were only given seven hours to do his work
16 he could get it done in seven hours?
17        MR. SOBOL:  Objection.
18        Is there a question.
19 BY MR. KEYES:
20   Q.   Correct?
21        MR. SOBOL:  Objection.
22   A.   This is an improper economic
23 application of the concept of opportunity cost.
24 The basic idea of opportunity cost is you devote

Highly Confidential - Subject to Further Confidentiality Review

1  resources.  It could be money, it could be time
2  or something over here, and there's stuff lost
3  because of that.  It's why in my restaurant
4  example I didn't need to tell you what I didn't
5  buy in order to be confident that the cost of
6  fixing my car was $75.  Why didn't I need to
7  tell you that?  Why -- and aren't their
8  hypotheticals that you could make up that would
9  interfere with that inference?  But you just
10 don't need to do it in an economic opportunity
11 cost approach.  It comes out of something.
12 It's -- some other activities are there, and
13 there's a cost.
14 BY MR. KEYES:
15   Q.   Or it could come out of leisure.  It
16 doesn't necessarily come out of other work,
17 right?
18        MR. SOBOL:  Objection.
19   A.   You're trying to get -- to avoid the
20 opportunity cost approach.  It's not the way
21 opportunity cost is thought about in economics.
22 BY MR. KEYES:
23   Q.   No, sir.  I understand from economics
24 that everything has an opportunity cost,

1   literally everything, right, because when you
2   make one choice, you're by definition not
3   choosing other things.  I'm not debating whether
4   it has an opportunity cost.
5           I am trying to get you to answer my
6   question whether that opportunity cost can be
7   someone's leisure time or someone's downtime, or
8   it can be excess capacity, it doesn't mean that
9   other work necessarily doesn't get done.  And
10  you seem to be wrestling with that proposition
11  suggesting that, no, the opportunity cost is
12  that other work necessarily does not get done,
13  and I'm trying to understand why you're
14  wrestling with that.
15      A.   I think you said that backwards, but I
16  know what you're getting at.
17           Because it's not the conventional
18  application of the economics of opportunity
19  cost, which is a very time-honored approach to
20  asking the cost of things, as in my car example
21  and the restaurant example.  There's an
22  opportunity cost to that money, there's an
23  opportunity cost to the time, and that tells me
24  what I need to know.

1       Q.   Okay.  So in my hypothetical where it
2   doesn't take the chief eight hours to do his
3   non-opioid-related work and he has at least an
4   hour of downtime or leisure time, if he is then
5   asked to spend an hour on opioid-related work,
6   the opportunity cost is giving up that leisure
7   or downtime?
8           MR. SOBOL:  Objection.
9       A.   That's not the way I would approach it
10  as an economist, which is my approach is
11  grounded in the idea of opportunity cost.  When
12  I spend $75 on my car, I don't need to be
13  quizzed about where that $75 comes from.
14  BY MR. KEYES:
15      Q.   Are you just as productive every
16  single day, or are there some days when you're
17  more productive and some days when you're less
18  productive?
19          MR. SOBOL:  Objection.  Scope.
20      A.   That's a subjective thing, but I
21  sometimes feel more or less productive.
22  BY MR. KEYES:
23      Q.   And so in the same block of time,
24  sometimes you get more done and sometimes you

1   get less done?
2       A.   Yeah, broadly speaking, of course,
3   these days one does more than one thing in the
4   same block of time.
5       Q.   Have you studied -- in order to
6   evaluate whether this hypothetical of the chief
7   is accurate, you'd need to go talk to the chief
8   more and say, how much time do you spend, are
9   you working productively, are you working
10  efficiently, do you have downtime, in order to
11  resolve this debate we're having about whether
12  working on opioid-related activities takes away
13  from non-opioid-related activities?
14      A.   No, I wouldn't need to do that.
15      Q.   You wouldn't need to do that.
16           And so in this case, not in the
17  hypothetical, in order to determine what people
18  are giving up in terms of the activities they're
19  spending during the day, you wouldn't talk to
20  any employees of Summit County or any employees
21  of Cuyahoga County?
22          MR. SOBOL:  Objection.
23           Is there a question?
24  BY MR. KEYES:

1       Q.   Is that right?
2           MR. SOBOL:  Objection.
3       A.   You went very general right at the end
4   of that question.  With respect to?
5   BY MR. KEYES:
6       Q.   With respect to what people are giving
7   up when they spend their time on one activity
8   versus the other.  If you don't want to talk to
9   the chief in my hypothetical or your
10  hypothetical, then I take it you don't want to
11  talk to any of the employees of Summit County or
12  Cuyahoga County.
13      A.   No, I do.
14          MR. SOBOL:  Wait a second.  Objection.
15          MR. KEYES:  Okay.
16          MR. SOBOL:  I don't understand the
17  question.
18      A.   I'm also a bit lost.
19  BY MR. KEYES:
20      Q.   Okay.  I asked in the hypothetical --
21  take your hypothetical or my hypothetical.  We
22  have a disagreement over whether the chief
23  actually needs all eight hours, whether the
24  chief could get the same amount of work done in

```
 1   less time, whether working on opioid-related
 2   activities would take away from
 3   non-opioid-related activities.  You said that's
 4   not a realistic hypothetical.  I say it is a
 5   realistic hypothetical.
 6        In that hypothetical we could go talk
 7   to the chief to figure out whether the chief
 8   does have leisure time, whether the chief does
 9   have downtime, whether the chief is working
10   efficiently, correct?
11        MR. SOBOL:  Objection.
12        Don't answer the question.
13   BY MR. KEYES:
14        Q.  We could do that?
15        MR. SOBOL:  Objection.  I instruct him
16   not to answer.  I have no idea what you asked
17   him.  You just talked for eight lines and then
18   are asking the word "correct."  Makes no sense.
19   BY MR. KEYES:
20        Q.  We could go talk to the chief to learn
21   more about how the chief spends his time,
22   correct?
23        MR. SOBOL:  Objection.  Objection.
24        Who is "we"?
```

```
 1        MR. KEYES:  The professor and I as we
 2   debate our hypothetical.
 3        A.  Our team.
 4   BY MR. KEYES:
 5        Q.  So it is -- we could do that.  You
 6   can't disagree.  Now, you may choose not to do
 7   it, and I asked would you, and you said no, so
 8   now I'm moving from the hypothetical to the
 9   facts of this case.
10        A.  Okay.
11        Q.  Is it the case, then, that you see no
12   need to talk to the employees of Summit County
13   or Cuyahoga County to figure out how they're
14   actually spending their time and whether they
15   have excess time that could be spent on
16   opioid-related activities?
17        MR. SOBOL:  Objection.  Asked and
18   answered.
19        A.  I think our disagreement is more
20   fundamental.  It's about whether the economic
21   concept of opportunity cost is the right way to
22   go here, which I assume it is, as I state in my
23   report.  And once I make a determination that
24   opportunity cost is the way to go, then I'm able
```

```
 1   to identify what the opportunity cost of a
 2   resource is in terms of dollars or in terms of
 3   time by saying this resource is less available
 4   to other things.
 5        And just to -- if I were to try to
 6   convince a fact-finder about this, I think the
 7   analogy to consumers is extremely appropriate,
 8   that we don't ask individuals what would you
 9   have done with that $75 and expect an answer
10   that is -- that you approve of to say that they
11   spent it efficiently, or that they had leisure
12   time and they could have worked more and made
13   the $75.  We don't do that.  And the reason we
14   don't do it is because the idea of opportunity
15   cost as it comes out of them either in terms of
16   money or time, and that's a good solid economic
17   measure of what the value of the resource is.
18   BY MR. KEYES:
19        Q.  Have you studied whether the personnel
20   of any of the affected divisions had excess
21   capacity?
22        A.  I'm going to ask you to define "excess
23   capacity."
24        Q.  You talk about excess capacity in your
```

```
 1   report.
 2        A.  Okay.  So...
 3        Q.  Using excess capacity as defined in
 4   your report, did you interview -- did you study
 5   whether the personnel of any of the affected
 6   divisions had excess capacity?
 7        MR. SOBOL:  Objection.
 8        A.  I discussed excess capacity in my
 9   report, for the purpose of explaining why the
10   presence of excess capacity does not imply that
11   the opportunity cost concept here doesn't work.
12   It does work.
13        And as I said a few minutes ago when
14   we started on this discussion, especially for
15   public safety, there's excess capacity in a
16   sense sometimes when people aren't fully busy,
17   but that's not inefficient.  We have to have
18   that.
19   BY MR. KEYES:
20        Q.  Have you studied whether any of the
21   personnel for any of the affected divisions had
22   excess capacity?
23        MR. SOBOL:  Objection.  Asked and
24   answered.
```

Highly Confidential - Subject to Further Confidentiality Review

1     A.   This wasn't necessary for me to be

2 able to do my -- to apply my opportunity cost

3 analysis.

4 BY MR. KEYES:

5     Q.   So you didn't study it, correct?

6         MR. SOBOL:  Objection.  Asked and

7 answered.

8     A.   It wasn't necessary that I study it.

9 BY MR. KEYES:

10     Q.   Whether it's necessary or not, did you

11 study it?

12         MR. SOBOL:  Objection.

13         That's the fourth time, maybe the

14 third, but certainly more than two.

15     A.   I just want to be clear about the role

16 of excess capacity, and why if the logic I'm

17 applying to it is correct, which I believe it

18 is, then I don't need to be able to make a

19 judgment about the EMS personnel and how much

20 time they sit around the fire station, and is

21 that excess capacity or is that appropriate

22 capacity to be able to respond to stochastic

23 healthcare events.

24 BY MR. KEYES:

Highly Confidential - Subject to Further Confidentiality Review

1     Q.   Do you believe that there is such a

2 thing as optimal excess capacity where you have

3 just enough, but not too much?

4     A.   If you're able to write down a problem

5 sort of completely, then there are ways to

6 characterize what optimal capacity would mean

7 in, for example, say, a bridge or something like

8 that.

9     Q.   Do you believe that there is such a

10 thing as efficient excess capacity and such a

11 thing as inefficient excess capacity?

12     A.   Well, these things would be connected,

13 the concepts you're asking about.  If there's an

14 optimal excess capacity that's a certain level

15 of excess capacity, one could call that the

16 efficient level of excess capacity.  You might

17 be a little more generous with respect to your

18 application depending on what the context is and

19 say there's kind of a range of things we would

20 regard to be efficient in this context, and then

21 you might be able to sometimes determine if

22 there's inefficient excess capacity.

23     Q.   Did you study whether any of the

24 personnel of any of the affected divisions had

Highly Confidential - Subject to Further Confidentiality Review

1 suboptimal or inefficient excess capacity?

2     A.   Well, this -- as I answered a few

3 minutes ago, this is not something I need to do

4 to be able to apply the concept of opportunity

5 cost.

6     Q.   So you didn't do it?

7         MR. SOBOL:  Objection.

8     A.   I didn't need to know what I would

9 have spent with that $75 to be able to answer

10 that it cost me $75 to fix the car.

11 BY MR. KEYES:

12     Q.   Does every municipal government

13 division need excess capacity?

14     A.   I think probably in some sense yes,

15 but it would vary according to the division.

16     Q.   So you would expect that every

17 municipal government division did have excess

18 capacity?

19         MR. SOBOL:  Objection.

20     A.   In the sense that I answered a few

21 minutes just this previous question, it would be

22 a yes, without any implication that excess

23 capacity was inefficient.

24 BY MR. KEYES:

Highly Confidential - Subject to Further Confidentiality Review

1     Q.   Did you study whether any of the

2 affected divisions was short-staffed because of

3 opioid-related needs and, therefore, couldn't

4 respond to an emergency?

5         MR. SOBOL:  Objection.

6     A.   There is evidence in the record for

7 that effect of -- by short-staffing, for

8 example, I mean, police who would have been

9 forced to work on opioid-related activities and

10 could not continue to do some things they'd done

11 previously.

12 BY MR. KEYES:

13     Q.   Anything else?

14     A.   I think it's true in family services,

15 in the medical examiner office.  They weren't

16 able to continue to take contracted work from

17 outside the county.  There may be other

18 examples.

19     Q.   My question was, did you study whether

20 any of the affected divisions was short-staffed

21 because of opioid-related needs and, therefore,

22 couldn't respond to an emergency?

23     A.   Oh, an emergency.

24     Q.   Did you study that?

1    A.   I think in many cases crime is an
2  emergency, so short-staffing of police probably
3  would fit there.
4    Q.   Anything else?
5    A.   Nothing that comes to mind.
6    Q.   Okay.  And what evidence can you point
7  to in this record that there was short-staffing
8  of the police such that the police could not
9  respond to emergencies?
10    A.   Well, I would say there's two types of
11  evidence.  One is the lessened ability of police
12  to respond to emergencies that just logically
13  follows from the fact that police have fewer
14  hours that are not devoted to opioids.  So it
15  seems clear that if, say, 20 percent of police
16  time is devoted to opioids over here, then
17  there's a smaller amount of police time that is
18  available to respond to emergencies with respect
19  to other public safety issues.  And there's some
20  specific testimony in the record also about
21  activities the police had done before, and with
22  opioids now they're not able to do.
23    Q.   Well, you gave an example that said if
24  you're spending, say, 20 percent of police time

1  devoted to opioids over here, then there's a
2  smaller amount of police time that is available
3  to respond to emergencies, so that would draw
4  down on any excess capacity.
5    My question is, are you aware of any
6  evidence that the police of either county were
7  short-staffed such that they could not respond
8  to any emergencies?
9    MR. SOBOL:  Objection.
10    A.   Could not respond.  They could
11  certainly respond less quickly and less well.
12  Was it impossible?  I don't know.
13  BY MR. KEYES:
14    Q.   Are you aware of any evidence that the
15  police of either Summit County or Cuyahoga
16  County were short-staffed such that they did not
17  respond to any emergencies?
18    A.   Well, again, here there's two forms of
19  evidence.  The first one is my inference from
20  the less time police would have to respond to
21  other non-opioid emergencies.  It seems obvious
22  to me that they would be less able to respond to
23  those kind of emergencies.
24    And there's also evidence in the

1  record of -- I'm not sure what official was
2  saying this -- of how police were diverted to
3  opioids and could not respond to homicides and
4  rapes, which I consider to be emergencies.
5    Q.   And whose testimony are you referring
6  to there?
7    A.   See, I don't -- I know I read it.  I
8  don't know if I cite it or it's in the
9  depositions that I read or what exactly.
10    Q.   You cited that deposition testimony
11  and then you cited the inference.  But you're
12  making an assumption that the excess capacity
13  was so drawn down that they were so
14  short-staffed that, in fact, they did not
15  respond to any emergencies, but you can't point
16  to any emergencies they did not respond to,
17  right?
18    MR. SOBOL:  Objection.
19    Which question?
20  BY MR. KEYES:
21    Q.   You can answer.
22    A.   Well, there was two aspects of support
23  I mention with respect to the inference.  One is
24  the less time being available, which seems --

1  I'm not sure why you would not agree with that.
2  And the other is kind of anecdotes of local
3  officials that specifically mention homicides
4  and rapes that would go uninvestigated because
5  police are diverted into opioids.
6    Q.   You cite in your report "the well
7  accepted analogy between government and consumer
8  decision-making with respect to resource
9  allocation."
10    Do you recall that?
11    A.   I do.  If you wouldn't mind --
12    Q.   It's on Page 14 of your report.
13    A.   -- telling me the page.
14    Q.   Do you see that?
15    A.   I do.
16    Q.   And in your discussion you cite
17  Professor Gruber and Professor Rosen and
18  Professor Mikesell?
19    A.   Yes.
20    Q.   And so when you refer to them, do you
21  consider them to be knowledgeable about this
22  analogy and whether this analogy holds?
23    A.   I do, yes.
24    Q.   Do you consider them to be

1  authoritative about this analogy and whether

2  this analogy holds?

3      A.  I do, yes.

4      Q.  On Page 15 you say "Government" --

5  this is at the top of the page, "Governments

6  maximize the welfare of their constituents when

7  resources are allocated to their most highly

8  valued use, leading to a budgetary allocation in

9  which the social value of an additional dollar

10  is equal across services."

11      Do you see that?

12      A.  Yes, I see it.

13      Q.  And you say "Governments maximize,"

14  not governments can maximize.  You say

15  "Governments maximize."  So you're positing that

16  governments in practice maximize the welfare of

17  their constituents when they allocate resources

18  to their most highly valued use, right?

19      A.  Well, this is in the context of the

20  analogy you mentioned a moment ago between

21  government behavior and consumer behavior, and

22  what do we say about consumers when we regard

23  how we approach the question of how consumers

24  behave?  We say they maximize utility, which

---

1  means they make choices on their own behalf that

2  are in their own best interest as they see it.

3      Q.  Where consumer is the solitary single

4  decision-maker of his or her own welfare,

5  correct?

6      A.  Not always, but sometimes.  That's the

7  accepted model of consumer behavior, and we're

8  talking here about the analogy between the model

9  of consumer behavior and the model of government

10  behavior, and that's the analogy.

11      The analogous approach to government

12  would be they have a kind of budget, they have

13  alternative uses for that budget, and they use

14  that budget in order to maximize, which is

15  really the same nature of analogous as you are

16  getting involved in when you say consumers

17  maximize the value of the budget, which has the

18  implication that the resources at the margin are

19  -- held the same value.

20      Q.  Did you study if Summit County and

21  Cuyahoga County governments allocated their

22  resources to the most highly valued use when

23  they allocated their budget dollars?

24      MR. SOBOL:  Objection.

---

1      A.  This is why I included this material

2  right here, so the reader would understand the

3  economic approach that I'm applying to resource

4  allocation, which is a conventional economic

5  approach that has analogies to consumer behavior

6  and that underlies the idea of opportunity cost.

7  BY MR. KEYES:

8      Q.  Did you study if Summit County and

9  Cuyahoga County governments allocated their

10  resources to the most highly valued use when

11  they allocated their budget dollars?

12      MR. SOBOL:  Objection.  Asked and

13  answered.

14      A.  Using this approach to government

15  behavior, the application to any particular

16  government is that yes, they are doing that.

17  BY MR. KEYES:

18      Q.  But that's an ipse dixit.  I posit a

19  theory, therefore it must hold true here.

20      I'm asking you, did you study, did you

21  conduct any investigation of facts and gather

22  empirical evidence to confirm that the theory

23  holds true here such that Summit County and

24  Cuyahoga County allocated their resources to

---

1  maximize their welfare and allocating them to

2  the most highly valued use?  Did you do any kind

3  of study here as to Summit County and Cuyahoga

4  County?

5      MR. SOBOL:  Objection.  Asked and

6  answered twice before.

7      A.  The purpose of this section is to lay

8  out the economic approach to understanding that

9  resource allocation.

10      And the direct answer to your question

11  here, and I'm going to rely on the analogy to

12  consumers again, so the $75 which I've been fond

13  of talking about as the cost to the consumer of

14  fixing their car, do I have to assume that that

15  consumer is maximizing utility in where they

16  took that money from in order for you or some

17  other reasonable person to conclude that $75 is

18  what the cost to them of fixing the car is?

19  Kind of.  I mean, you need to have a conception

20  that consumers are doing something in their

21  self-interest.

22      And the same -- exactly the same

23  analogy is true for the governments here.

24  They're spending their resources, the time of

1    their personnel on something, within an economic
2    framework in which opportunity cost is the
3    appropriate way to judge the value of resources.
4    It's not necessary for me to make an assessment
5    of whether you are maximizing utility at the
6    time you spend $75 to fix your car, and it's not
7    necessary for me to make an investigation of the
8    optimal resource allocation that governments are
9    deciding about in the context of -- we're
10   talking about here today.
11   BY MR. KEYES:
12        Q.   I asked a yes-or-no question.  Did you
13   study if Summit County and Cuyahoga County
14   governments allocated their resources to the
15   most highly valued use when they allocated their
16   budget dollars?  Yes, they did, or no, they
17   didn't?
18        MR. SOBOL:  Or you can't answer the
19   question.
20   BY MR. KEYES:
21        Q.   Yes, you studied, no, I didn't study
22   it, and then if you didn't study it you can tell
23   me why you think it was unnecessary.  But did
24   you study it?

1         MR. SOBOL:  Object to the form.  I'm
2    not sure which question you're asking him.
3         And if you can't answer the question
4    yes or no, he's not required to.  Asked and
5    answered, also, four times.
6    BY MR. KEYES:
7         Q.   Is that a question you can't answer,
8    did you study it or not?
9         MR. SOBOL:  Well, now I don't know
10   what question you're asking.  Are you pressing
11   the one before?  Are you withdrawing that and
12   asking a new one?
13   BY MR. KEYES:
14        Q.   Go ahead.
15        MR. SOBOL:  Go ahead what?
16   BY MR. KEYES:
17        Q.   Answer the question I just posed.
18        MR. SOBOL:  You just posed four of
19   them.
20        MR. KEYES:  You can do your best to
21   interfere.  We're going to just keep going
22   through it.
23        MR. SOBOL:  I know.  I'm just trying
24   to get -- have a clear question and answer.

1    Maybe ask a new question.
2    BY MR. KEYES:
3         Q.   My question is, did you study whether
4    the Cuyahoga County or Summit County governments
5    allocated their resources to the most highly
6    valued use when they allocated their budget
7    dollars?  Yes or no.
8         MR. SOBOL:  Objection.  Asked and
9    answered three times.
10        If you cannot answer the question yes
11   or no, answer the question truthfully.
12        A.   I don't feel like I can answer that
13   question yes or no.
14   BY MR. KEYES:
15        Q.   Okay.  Did you study whether --
16        MR. SOBOL:  Well, you've interrupted
17   him.
18        A.   There is an important sense in which I
19   studied this, which is to consider the
20   appropriate economic framework for understanding
21   local government behavior, relying on the
22   analogy to consumer behavior, which I won't go
23   through again but which you've heard, and using
24   that to enable me to infer from resources

1    allocated to a particular use the opportunity
2    cost of those resources elsewhere.  That's
3    mainstream economics, application of opportunity
4    cost.  Economists do it all the time in consumer
5    and other areas.  That's what it is.
6    BY MR. KEYES:
7         Q.   Did you study whether efficiency drove
8    the Cuyahoga County or Summit County government
9    decision-making in their budget process?
10        MR. SOBOL:  Objection.  Asked and
11   answered.
12        A.   It's a slightly different form of the
13   same question, as I interpret it.  And the
14   nature of my study is to identify the
15   appropriate economic framework for inferring the
16   value of resources in alternative uses in the
17   context of reallocation of resources to the
18   opioid crisis, and just -- excuse me -- that's
19   the opportunity cost approach, it's mainstream
20   economics, and that's exactly what I do here.
21   BY MR. KEYES:
22        Q.   Did you study the impact of other
23   factors on the Cuyahoga County and Summit County
24   government budget setting?

1    MR. SOBOL:  Objection.  Asked and
2  answered.
3    A.  I'm not sure what you mean with this
4  question.
5  BY MR. KEYES:
6    Q.  Well, you're positing without actually
7  looking at the specifics of Cuyahoga County or
8  Summit County that efficiency drove the budget
9  process.  And I'm asking, did you study the
10  impact of other factors on the budget process
11  that would explain why dollars are allocated
12  the way they were in the budget?
13    MR. SOBOL:  Objection.  Asked and
14  answered.
15    A.  You know, I don't have a lot to add to
16  what I've mentioned already, that within the
17  conventional economic framework of government
18  behavior, then identification of the resources
19  devoted to a particular use is the measure of
20  opportunity cost.
21  BY MR. KEYES:
22    Q.  Can you identify what factors other
23  than efficiency might drive or influence the
24  budget process for a municipality?

1    A.  The budget process?  I'm sorry, what
2  do you mean by "the budget process" here?
3    Q.  The process by which decisions are
4  made as to how to allocate dollars in the
5  budget.
6    A.  I think I discuss this a bit in my
7  report.  In some cases governments are
8  constrained by inability to raise additional
9  revenue.  They might, if they're attempting to
10  benefit the citizens, raise more revenue and
11  spend even more than they're able to with their
12  limited budget on some particular application.
13  So there the other factor might be something
14  that makes it difficult or even constrains a
15  local government from raising revenue or
16  borrowing funds, for example.
17    Q.  What if revenue cannot be increased
18  such that the total amount of revenue is fixed,
19  can you identify what factors besides efficiency
20  may drive or influence how those dollars are
21  allocated in the budget?
22    A.  Well, I have a framework for that,
23  which is that the government is using funds in
24  order to benefit the citizens, and that's -- I

1  realize that's a general statement.  Excuse me,
2  one more sec.  There are factors that would play
3  into that which have to do with, say, changes in
4  the population composition that may require more
5  spending on public schools or some other
6  government activity.
7    Q.  Did you study the influence of
8  politics on how Summit County and Cuyahoga
9  County allocated dollars in their budgets?
10    A.  What do you mean "in this case"?  I
11  know what politics is, but what do you mean
12  here?
13    Q.  I mean political considerations.  I
14  mean appeasing certain groups, punishing other
15  groups, maximizing chances of being
16  re-elected --
17    A.  I realize --
18    Q.  -- any of those factors.  Do you
19  understand any of those factors?
20    A.  I realize that elected officials are
21  human beings, but still the accepted economic
22  approach to this is to regard these things as
23  playing out in a way to -- so the funds are used
24  for the benefit of the citizens.

1    Q.  You keep saying the accepted approach.
2  I'm not asking about theory.  I'm asking about
3  Summit County and Cuyahoga County.
4    Did you study, for instance, the
5  impact of lobbying or the influence of interest
6  groups and how Summit County and Cuyahoga County
7  allocated dollars in their budget?
8    A.  Well, that's an example of a factor
9  that would be involved in expression of the
10  interest of the citizens, and it may well
11  influence the budget allocation, but it doesn't
12  change the ability to use opportunity cost as a
13  framework for assessing the impact of opioids.
14    Q.  Did you study the impact of corruption
15  on the decision-making of the Summit County or
16  Cuyahoga County government officials in
17  allocating dollars in the budget?
18    MR. SOBOL:  Objection.  Assumes a fact
19  not in evidence.
20    A.  I don't know that there were -- that
21  there was corruption.  I'm going to stop there,
22  see if you let me get away with that.
23  BY MR. KEYES:
24    Q.  You don't know because you didn't

```
 1   study it, right?  I mean, you didn't know
 2   because you didn't study it.  My question wasn't
 3   whether there was.  My question is, did you
 4   study it?  Did you study whether corruption had
 5   any impact on the decision-making of Cuyahoga
 6   County or Summit County government officials
 7   when they were deciding how to allocate dollars
 8   in their budget?
 9           MR. SOBOL:  Objection.  Assumes a fact
10   not in evidence.
11       A.  That would have been outside the scope
12   of my report.
13           MR. SOBOL:  I could have said that,
14   too, but I was leaving that to you.
15   BY MR. KEYES:
16       Q.  Are you aware of whether there have
17   been issues of corruption in either Summit
18   County or Cuyahoga County?
19       A.  I'm not aware.
20       Q.  Did you look into that at all?  Did
21   you ask the question, has there been a problem
22   with corruption in Cuyahoga County or Summit
23   County?
24           MR. SOBOL:  Objection.
```

```
 1       A.  It wasn't part of my assignment.
 2   BY MR. KEYES:
 3       Q.  Did you do any research into whether
 4   there had been problems with political
 5   corruption in either Summit County or Cuyahoga
 6   County?
 7           MR. SOBOL:  Objection.
 8       A.  It wasn't part of my assignment.
 9   BY MR. KEYES:
10       Q.  Are you aware that there have been
11   high-level Cuyahoga County officials who have
12   been indicted?
13           MR. SOBOL:  Objection.
14       A.  I'm not aware.
15   BY MR. KEYES:
16       Q.  Are you aware that some of them have
17   pled guilty?
18           MR. SOBOL:  Objection.
19       A.  I'm also not aware of that.
20   BY MR. KEYES:
21       Q.  Are you aware that there are several
22   Cuyahoga County officials who are currently
23   indicted, who are being prosecuted for political
24   corruption?
```

```
 1       A.  I'm not aware of that.
 2           Can I ask my able assistant to get me
 3   some water?
 4           MR. SOBOL:  Yes, you may.  You can ask
 5   all you want.  I'll have my assistant get your
 6   water for you.
 7   BY MR. KEYES:
 8       Q.  You say -- on Page 15 in Paragraph 24,
 9   you talk about what efficiency requires.
10           Do you see that?
11       A.  Yes.
12       Q.  Again that's the theory, what
13   efficiency requires?
14       A.  Yes.
15       Q.  But not something that you've studied
16   with respect to Summit County or Cuyahoga County
17   in this engagement, because you're sticking with
18   the theory and you think the theory holds,
19   right?
20       A.  I'm probably going to disagree with
21   you, but why don't you go on a little bit and
22   I'll chime in.
23       Q.  Well --
24           MR. SOBOL:  Well, how about this,
```

```
 1   rather than him going on a while and you chiming
 2   in, questions --
 3   BY MR. KEYES:
 4       Q.  I'm not going to table questions.  You
 5   can answer or not, but --
 6           MR. SOBOL:  How about you ask
 7   questions and you give answers.
 8       A.  I'll be a better witness.
 9           I disagree.
10   BY MR. KEYES:
11       Q.  Okay.  Why do you disagree?
12           MR. SOBOL:  Well, wait.  I don't even
13   know what's going on right now.  I don't know
14   that you're disagreeing or agreeing or whether
15   it's supposed to be --
16           MR. KEYES:  Stop coaching him.
17   BY MR. KEYES:
18       Q.  Why do you disagree?
19           MR. SOBOL:  I'm not coaching him, but
20   I am giving him instructions that he's not to be
21   chiming in or having conversation.  He has to
22   ask questions, and you give an answer.
23           THE WITNESS:  My bad.
24   BY MR. KEYES:
```

1    Q.   Why do you disagree?

2         MR. SOBOL:  Objection.

3         To what?

4    A.   It's not solely a theoretical

5  exercise.  The increased demands that I'm

6  referring to here are the opioid crisis.

7  BY MR. KEYES:

8    Q.   Okay.  You say "This reallocation of

9  resources is the cost of providing Bellwether

10  government services in response to the opioid

11  crisis."  Right?

12   A.   Yes, I say that.

13   Q.   Okay.  What dollars were reallocated

14  to the opioid crisis?

15   A.   The ones that are contained in my

16  report.

17   Q.   Away from what?

18   A.   Away from other activities of the

19  division.

20   Q.   What activities of the division?

21   A.   This is the opportunity cost question

22  again.  I don't need to know where that $75

23  comes from, and I don't need to know what

24  exactly was done less.

1    Q.   Okay.  So if I go through your tables

2  and you point me to dollars that you say are the

3  opportunity cost and are damages in your

4  framework, and I ask you what would those

5  dollars have been spent on if they weren't spent

6  on the opioid crisis, are you going to tell me

7  every time that you don't know and you don't

8  need to know?

9         MR. SOBOL:  Objection.

10   A.   I'm going to tell you that these

11  dollars are a valid measure of opportunity cost.

12  And if you ask me, well, what exactly,

13  Professor McGuire?  It came out of the budget

14  available for other things, and I can't tell you

15  what the mix of those things are, just like --

16  just like if I spend $75 fixing my car, what

17  exactly did that come out of, Tom, when you

18  spend that money?  I may not even know, and it's

19  not important for assessing the opportunity cost

20  of that spending.

21  BY MR. KEYES:

22   Q.   For any affected division, did you

23  attempt to determine what the dollars that you

24  describe as damages would have been spent on if

1  they weren't spent on opioid services?

2         MR. SOBOL:  Objection.

3    A.   I do think I answered that question.

4  BY MR. KEYES:

5    Q.   You said it's not important for

6  assessing the opportunity cost to that spending,

7  so I'm asking, did you attempt to look at it?

8         MR. SOBOL:  Objection.

9    A.   I didn't need to in order to apply the

10  opportunity cost framework.

11  BY MR. KEYES:

12   Q.   So you didn't?

13        MR. SOBOL:  Objection.  Asked and

14  answered.

15  BY MR. KEYES:

16   Q.   Go ahead, you can finish.

17   A.   Because I didn't need to.

18   Q.   You say on Page 18 of your report,

19  Paragraph 30, you say, "the damage analysis

20  presented in this report focuses on the value of

21  resources that the Bellwether jurisdictions

22  shifted from alternative uses to combat the

23  opioid epidemic."

24        Do you see that?

1         MR. SOBOL:  That was a part of the

2  sentence?

3         MR. KEYES:  Yes, it's the part I'm

4  asking the question about, yes.

5    A.   I do see that, yes.

6  BY MR. KEYES:

7    Q.   Okay.  And the resources that you say

8  were shifted from alternative uses are the

9  dollars that you have described as damages --

10        MR. SOBOL:  Objection.

11  BY MR. KEYES:

12   Q.   -- correct?

13        MR. SOBOL:  Objection.

14   A.   Are measured by the dollars.

15  BY MR. KEYES:

16   Q.   And you say that those are resources

17  that were shifted from alternative uses.  What

18  were the alternative uses that would have

19  received those dollars but for the opioid

20  epidemic and the defendants' conduct?

21   A.   It would have been a

22  division-by-division question, and it would

23  consist of the other activities of the division.

24   Q.   And are you able to tell me with any

1  specifics what those are for any division?

2      A.  It does depend on the division.

3      Q.  Did you talk to anyone at Summit

4  County or Cuyahoga County in any division about

5  what they would have done with the dollars that

6  you say were shifted away towards opioid-related

7  services?

8      A.  This relates to what we spoke about

9  earlier this morning and the question of

10 diversion.  And it's something that I was

11 interested in from the get-go, and asked my

12 staff to be on the lookout for evidence of

13 diversion both in terms of their interviews and

14 in terms of the record here, including the

15 deposition.  So in many of these contexts, yes,

16 there was.

17     Q.  In the answer you just gave, you're

18 talking about diversion of dollars, not

19 diversion of opioids, correct?

20     A.  Yes, diversion of resources of the

21 local government, not diversion of the drugs.

22     Q.  If you turn again to the last three

23 tables in your report, these are the total

24 damages that you attribute to the defendants'

1  misconduct.

2      A.  Okay.

3      Q.  Have you calculated the total damages

4  that you attribute to the defendants' misconduct

5  that results from people using or abusing

6  illicit opioids as distinct from prescription

7  opioids?

8      A.  Yes, I think I understand the

9  question.

10         The inputs to my analysis in the form

11 of Professor Cutler's share don't make that

12 distinction, so in my work I don't calculate

13 those separately, which is to say that I don't

14 calculate the harms appearing either through the

15 proximal cost of illicit or licit opioids.

16     Q.  You don't distinguish between illicit

17 opioids and prescription opioids for purposes of

18 your calculation of damages, right?

19     A.  In the sense of the production of

20 these tables, the -- I use the share that David

21 Cutler gives me, and that share is the share of,

22 for example, opioid deaths that could be because

23 of illicit or licit opioids that are

24 attributable to the defendants' misconduct, and

1  in that share of death are both.

2      Q.  You reference these tables.  I should

3  expand my question.

4          Anywhere in your report do you offer

5  calculations of damages that distinguish between

6  damages arising from people's use or abuse of

7  illicit opioids as distinct from people's use or

8  abuse of prescription opioids?

9      A.  I believe this is where I do damages

10 in my report, so it would be here, and that

11 distinction is --

12     Q.  Is not here?

13     A.  -- not made here.

14     Q.  Similarly, anywhere in your report do

15 you offer calculations of damages that

16 distinguish between damages arising from people

17 using prescription opioids that were prescribed

18 to them versus damages arising from people using

19 prescription opioids that were diverted and

20 weren't prescribed to them?

21     A.  I understand the question.

22         The similar answer, the numbers I'm

23 provided by Professor Cutler are total numbers

24 that include whatever route of harm there is

1  from prescription opioids, either through

2  affecting the person directly, through

3  diversion, or through moving on to illicit

4  drugs.  It's all in one number.

5      Q.  So you do not offer calculations that

6  distinguish between those two?

7      A.  I don't break it out into those

8  categories.

9          MR. KEYES:  Okay.  Why don't we take a

10 ten-minute break.

11         THE VIDEOGRAPHER:  The time is

12 3:21 p.m., and we're off the record.

13         (Whereupon, a recess was taken.)

14         THE VIDEOGRAPHER:  The time is

15 3:46 p.m., and we're on the record.

16 BY MR. KEYES:

17     Q.  Professor McGuire, I put in front of

18 you a laptop, and on the laptop and on the

19 various screens in the room is a copy of an

20 Excel spreadsheet that was produced by Summit

21 County.  The Bates number of that Excel

22 spreadsheet in native version is

23 SUMMIT_001952976.

24         Do you see that on your screen?  Do

Highly Confidential - Subject to Further Confidentiality Review

1  you see the Bates number at the top?

2      A.   At the top.  Oh, yes, okay.  I do.

3      Q.   Okay.  And if you'd open your report

4  to Page 35, at the top of Page 35 you say,

5  "Expenditure data for Summit County were

6  provided by the county government."  You drop a

7  footnote, footnote 83 --

8          MR. SOBOL:  I'm sorry, where?  Okay.

9  Go ahead, sorry.

10  BY MR. KEYES:

11     Q.   You drop a footnote.  It's number 83,

12  and it references SUMMIT_001952976.

13          Do you see that?

14     A.   I do.

15     Q.   And that matches the Bates number of

16  the Excel spreadsheet on your screen?

17     A.   Yes.

18     Q.   Earlier you said you couldn't recall

19  the expenditure data and you didn't know what

20  this Bates number referred to.  Does this

21  refresh your recollection?

22     A.   Yes.

23     Q.   So you said in your report that from

24  these expenditure data, identify those costs

Highly Confidential - Subject to Further Confidentiality Review

1  that would be expected to vary in response to

2  changes in the services provided by these

3  divisions.  Now that you have this expenditure

4  data in front of you, can you walk me through

5  how you identified what you've called affected

6  costs and how you identified for affected costs

7  whether they were overhead or non-overhead?

8          MR. SOBOL:  Objection.

9      A.   All right.  This is the original

10  document from Summit County?

11  BY MR. KEYES:

12     Q.   Yes.

13     A.   Okay.  There's a number of components

14  to it.  Just give me a second here to see what

15  else you've got for me.

16          And these charts, were they -- this is

17  all Summit County stuff, not after it's been

18  worked over by Compass Lex?

19     Q.   This is the document as it was

20  produced in discovery, same Bates number as

21  referenced in your report.

22     A.   Okay.

23     Q.   I take it Compass Lexecon worked it

24  over at some point?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. SOBOL:  Objection.

2          MR. KEYES:  Why?  It's the phrase he

3  just used.

4          MR. SOBOL:  Well, because you asked

5  one question, then you asked another question,

6  so now it's compound.  You didn't let him answer

7  the first question.

8      A.   Okay.

9          MR. SOBOL:  See, I'm on top of it.  I

10  know what I'm doing sometimes.

11          MR. KEYES:  Actually that was only one

12  question, but we'll let the record speak for

13  itself.  I think Mr. McGuire is still

14  familiarizing himself with this spreadsheet.

15     A.   Yeah, making -- it's a very long

16  spreadsheet.  So let's take an example here.

17          MR. SOBOL:  Before you do, is it

18  recorded what he's looking at, or -- it is,

19  okay.  Thank you.

20     A.   Okay.  I'm just -- I'm just going down

21  until I find what I think will be a good example

22  to talk about.  Maybe the mental health board.

23  BY MR. KEYES:

24     Q.   If we take the -- what's on the screen

Highly Confidential - Subject to Further Confidentiality Review

1  right now, can you walk me through for any

2  particular account on this screen whether it's

3  an affected cost or not and whether you classify

4  it as overhead or not?

5      A.   Yeah.  The ADM Board, which is what

6  we're looking at now, is a little bit different

7  than a regular division of one of the counties,

8  that it receives funding from the county as well

9  as from the state and the federal government, so

10  that's kind of a special case.

11          I prefer to talk about a more typical

12  case.

13     Q.   Well, can you answer my question as to

14  the ADM Board?  If not, say so.  We'll move to

15  something else.

16     A.   All right, I'll go back to ADM.

17          All right.  So the allocation of costs

18  of expenditures is not done in the revenue

19  lines.  So, for example, row 217, I suppose it

20  is, is a revenue line.

21     Q.   How do you know that?

22     A.   Property taxes, revenue, pool budget.

23     Q.   By the name of the account?

24     A.   Yes, it could be a heading.  So it's

1 historical revenues and expenditures through

2 lines 12, yeah, by the name.  These are revenue

3 categories.

4 Q.  Okay.

5 A.  They may become relevant here, but

6 it's not in the allocation that you asked me

7 about, which is the designation of fixed and

8 variable.  Okay.  So...

9 Q.  You're scrolling through a whole bunch

10 of what appear to be expenses, correct?

11 A.  These are expense categories.

12 Q.  Right.

13 A.  I'm just trying to get a general feel

14 for what these categories are before I go back

15 and answer your question.

16 Okay.  So there's a lot of categories

17 here.  So we've got some -- these are some

18 summaries, I think.  All right.  We're not going

19 to go with the dog kennel, forget dog kennel.

20 All right.  Let me start with account

21 type, 77, where I'm in row --

22 Q.  373?

23 A.  -- 373.  And these would be the form

24 of expenditures that would be in the fixed

1 category.

2 Q.  You say "these," referring to what?

3 A.  373.

4 Q.  Okay.  How do you know that?

5 A.  This is my recollection.  I'm going to

6 be --

7 Q.  It's your recollection of the

8 treatment you gave it?

9 A.  That's correct.

10 Q.  Okay.  But when you were first

11 deciding what treatment to give it, how did you

12 know what bucket to put it in?

13 A.  Well, this was the process we

14 discussed earlier.  Some of these will be, I

15 think, best regarded as fixed, things like

16 building rental, that kind of -- it's a pretty

17 big expense category.  That would always be in

18 the fixed category.  I'm not going to be

19 100 percent.  If you go back to whatever was

20 produced for you and say, well, I'm

21 Professor McGuire, you got that one wrong or

22 that one wrong, I will get things wrong.  But

23 what I can tell you here is looking at these to

24 give you a sense of how it was done and what

1 some of the allocation decisions were made.

2 Q.  Why would you get it wrong if we went

3 through line by line right now?

4 A.  Well, I just don't guarantee with

5 going through 100 categories here.  Then it's

6 kind of a memory test which I won't get

7 100 percent on.

8 Q.  But I thought you said that there were

9 a number of categories where you've looked at

10 the account title, you could use your judgment,

11 and you were very confident you didn't need any

12 discussion, you didn't need to follow up with

13 anyone at Summit County, right?

14 MR. SOBOL:  Objection.

15 A.  Well, I remember that discussion, yes.

16 BY MR. KEYES:

17 Q.  So if it's so clear, then why would

18 you get it one way when you did it before and

19 get it a different way now?

20 MR. SOBOL:  Objection.  Misstates his

21 testimony.

22 A.  I'll get some right.  I'm not saying I

23 won't get many, but I'm only saying I won't get

24 100 percent right.  And the reason being is

1 that, you know, it wasn't an operation that,

2 okay, Professor McGuire, you have a few minutes

3 now, take a look at this spreadsheet that I

4 haven't seen for months and tell me which goes

5 into which category.  It was a more extended, I

6 would say, thoughtful and in some case

7 team-based decision about where some of these

8 things would go.  So I'll do the best I can

9 sitting here today.

10 Would it be helpful, then, for me to

11 keep going in these account types?  I'm not sure

12 whether I'm helping you or not.

13 BY MR. KEYES:

14 Q.  Well, I'd like to understand, now that

15 you've seen the document -- before you said you

16 didn't remember what that Bates number referred

17 to.  Now that you've seen the document and you

18 see the way it's laid out, explain to me how you

19 could make a determination for each account

20 based just on the account title, or whether

21 there are specific accounts you can identify

22 that would require more homework, discussion

23 among your team at Compass Lexecon and then

24 obviously following up with someone at county

1  personnel who can explain what these accounts
2  even cover.
3      MR. SOBOL:  Objection.
4  BY MR. KEYES:
5      Q.  So I'm not trying to quiz you about
6  any particular line.
7      A.  I understand.
8      Q.  I'm trying to understand the process.
9      A.  All right.  I think I understand.
10         The process is something similar to
11  what we're doing now in which I examine these
12  budget documents, some of which were in Excel,
13  some of which were hard copies, and made a
14  judgment about where some of these things would
15  go, and then, you know, worked with my team and
16  gathered further information and made a final
17  decision.
18      Q.  I know you've said before that you
19  used your judgment.  Well, what criteria are you
20  using?  Is it an objective process, or is it
21  subjective where you reach the best you can
22  based on a conversation with your colleagues?
23      MR. SOBOL:  Objection.
24      A.  Well, I think it's a reasonable

1  process.  Publications, fixed.  Equipment,
2  fixed.  Data processing, fixed.  Research
3  project equipment, fixed.  Anything like
4  miscellaneous, I'm not going to throw it into
5  the variable category.
6  BY MR. KEYES:
7      Q.  Could you go to Children and Family
8  Services, then, within this document?
9      A.  Give me a row there.
10      Q.  I don't have a row.  Can you find it
11  using this document?
12      A.  Oh, gosh.  This is a very long
13  document.
14         Does anybody know the answer here in
15  the room?  Give me a hint.
16      MR. SOBOL:  Why don't you "control F
17  family" and see if that helps.
18      THE WITNESS:  I'm not so good at these
19  sort of things, Tom.
20      MR. PENDELL:  Take your time.
21      A.  Okay.  I got it.
22      MR. SOBOL:  Even I want this to move
23  along.
24      A.  "Casey family expenditures."

1      MR. SOBOL:  Go "find next."
2      THE WITNESS:  Maybe this is the family
3  services, Tom.
4      MR. SOBOL:  Sorry.
5      THE WITNESS:  I need to check.
6      MR. KEYES:  I appreciate you want to
7  speed it, but I'd like to know what he can do
8  with this Excel spreadsheet and what he can't,
9  not what lawyers can instruct him to do.
10      (Whereupon, McGuire Exhibit Number 2
11      was marked for identification.)
12  BY MR. KEYES:
13      Q.  If you can't, you can't.
14      A.  Well, you're watching it, it's on
15  video.
16      Q.  Okay.  Can you minimize this file for
17  the moment?  Can you close out this little box?
18      A.  Up there?
19      Q.  No, in the middle of the screen, can
20  you close it out, the search box?
21      A.  Yes.
22      Q.  And then can you go to the upper
23  right-hand corner and minimize this file?
24         Okay.  Now what's on the screen is a

1  native version of an Excel spreadsheet that was
2  produced by Cuyahoga County, and the Bates
3  number at the top of the screen is
4  CUYAH_014627783.
5      A.  Right.
6      Q.  Do you see that?
7      A.  Yeah.
8      Q.  Then if you'd go back to your report
9  to footnote 82.
10      A.  Yes.
11      Q.  Are you there?
12      A.  I am.
13      Q.  Do you see that's the same Bates
14  number that you referenced in footnote 82 as
15  being the detailed expenditure data for Cuyahoga
16  County that you obtained from the Cuyahoga
17  County budget?  Okay?
18      A.  I see that, yes.
19      Q.  Same question.  Does this refresh your
20  recollection as to what the expenditure data
21  that you reference in your report looks like?
22      A.  Yes.
23      MR. SOBOL:  Objection.  Form.
24  BY MR. KEYES:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Did you look at this Excel spreadsheet
2  yourself, or did you delegate that to others?
3    A.   It would have been both.
4    Q.   Did you go through account by account
5  to identify affected costs, and then for
6  affected costs whether they were overhead or
7  non-overhead?
8    A.   I did.
9    Q.   How did you do that for this data for
10  Cuyahoga County?
11    A.   Well, the process is the same.
12        Also "county executive," that's not a
13  good example for an affected division.  "County
14  law department."  I'm finding it a little
15  difficult to give you complete answers to your
16  questions without information to remind me about
17  the functions of these departments.
18    Q.   But what information did you have at
19  your fingertips when you first went through this
20  spreadsheet, when you first did this sorting
21  between affected and non-affected and the
22  sorting between overhead and non-overhead?
23    A.   It was information about the
24  activities of the units that would help me make

Highly Confidential - Subject to Further Confidentiality Review

1  a determination of compensation costs, for
2  example, which is the -- usually the biggest
3  category.
4    Q.   What was the source of this other
5  information that you used to help you in this
6  sorting process?
7    A.   Statements about the activities that
8  the division undertakes.
9    Q.   Statements from -- in what document?
10  Where did you get those statements?
11    A.   These are also in budget and --
12    Q.   The annual budget documents for the
13  county?
14    A.   I believe that's what they're referred
15  to, yes.
16    Q.   Showing you what has been marked as
17  McGuire Exhibit Number 3.
18        (Whereupon, McGuire Exhibit Number 3
19        was marked for identification.)
20    MR. SOBOL:  Perhaps I dosed off, was
21  the spreadsheet, both of those spreadsheets
22  Number 2?
23    MR. KEYES:  Yes, we'll put a slip
24  sheet in and mark them.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. KEYES:
2    Q.   Okay.  Do you recognize McGuire
3  Exhibit 3?
4    A.   This is the kind of thing I looked at,
5  yeah.
6    Q.   The kind of thing, or the thing you
7  did look at?
8    A.   This is the operating budget for 2017
9  for Summit County, correct?
10    A.   Yes.  There were a series of these.  I
11  looked at for both counties.
12    Q.   Okay.  And so when you say "a series,"
13  you mean one for each year?
14    A.   Yes.
15    Q.   So you would have looked at the
16  operating budget for Summit County from 2006
17  through 2018?
18    A.   Yes.
19    Q.   And same thing for Cuyahoga County, an
20  annual operating budget from 2006 to 2018?
21    A.   Yes.
22    Q.   Okay.  So you've referenced using this
23  document to help you identify what the affected
24  divisions were, and within the affected

Highly Confidential - Subject to Further Confidentiality Review

1  divisions what the affected costs were, correct?
2    A.   Yes.
3    Q.   Can you identify for me where in the
4  operating budget you were able to identify which
5  are the affected divisions?
6    A.   I won't go through page by page, I
7  promise.
8    MR. SOBOL:  Well, then how are you
9  going to answer the question?
10    A.   All right.  So, for example, medical
11  examiner is in a -- the table of contents.
12  BY MR. KEYES:
13    Q.   What page are you on?
14    A.   I'm still on the table of contents
15  here.
16    Q.   What's the Bates number at the bottom
17  so we have a clean record?
18    A.   This is SUMMIT, and then 000007557 is
19  the table of contents that identifies where
20  information in this bigger document rests with
21  respect to the different divisions.
22    Q.   Okay.
23    A.   And so this is the kind of thing I
24  would do, say okay, medical examiner looks like

1    it could be a possibility.

2        Q.   So then would you go to the Pages 195

3    to 198 for medical examiner?

4        A.   Yes.

5        Q.   Okay.  Can you take us to Pages 195

6    through 198?

7        A.   That's what I'm doing.

8             Okay.  On Page 196 of the budget

9    document that has a Bates number -- do you want

10   me to read the Bates number?

11       Q.   SUMMIT_7746?

12       A.   Yes.

13       Q.   Okay.

14       A.   On that page there's a program

15   description which indicates the activities of

16   medical examiner office, which is to provide

17   quality forensic death investigation services

18   when persons die suddenly, unexpectedly, which

19   is the case in some opioid-related deaths.  So

20   the medical examiner will be spending some

21   resources dealing with opioid-related deaths.

22       Q.   So based on this program description

23   on Page 196, you then said the Office of Medical

24   Examiner is an affected division for Summit

1    County?

2        A.   It's a potentially -- so it's -- so

3    McGuire is looking at it.  McGuire looks at the

4    functions, seems like reasonable, then if it's

5    somehow in doubt, which I don't think this in

6    particular is in doubt, what the medical

7    examiner might be doing with respect to opioids.

8    And if confirmation is needed, then confirmation

9    is needed.  But this is the kind of indication

10   of the activities of this particular division

11   which I took to be this is a likely affected

12   division.

13       Q.   Was confirmation needed for the Office

14   of Medical Examiner for Summit County?

15       A.   Well, it's -- I don't -- I feel

16   confident this would be correct.  I don't -- I

17   don't recall.  I'm sure I talked to Compass Lex

18   about this, but I don't recall whether there was

19   any confirmation beyond that.

20       Q.   Was there anything else in this

21   description of the Office of Medical Examiner

22   within this operating budget that allowed you to

23   either identify it as an affected division or

24   confirm your belief that it was affected

1    division?

2        A.   Let me see.  I think that was what I

3    needed in this case.

4        Q.   Okay.  Then sticking with the Office

5    of the Medical Examiner example, while you have

6    it in front of you, did you use this document to

7    also identify whether costs were affected or not

8    affected?

9        A.   This is the kind of document, so again

10   I -- my memory will be a little bit uncertain,

11   but here are staff information of what the

12   functions of different staff are.  This is on

13   7747.

14            The next page, 7748, it gives

15   information about the general nature of

16   services.

17       Q.   Back on 7747, what tells you the

18   function of any position?

19       A.   Well, there's a description of the

20   job.

21       Q.   Okay.

22       A.   Chief deputy medical examiner.  That

23   person, I infer, is a medical examiner, forensic

24   investigator.

1        Q.   So you would infer from the titles.

2    There's no narrative to this that describes the

3    function of any particular position, correct?

4        A.   In this document I don't see one.  I

5    don't remember whether there was other documents

6    that might have helped with that.

7        Q.   Okay.  So for the Office of Medical

8    Examiner for Summit County, you read the program

9    description.  You believed that it was an

10   affected division.

11            How, if at all, did you use these

12   pages to identify specific accounts for the

13   Office of Medical Examiner that were affected

14   costs?

15       A.   Okay.  These are -- I think you should

16   think of them as potentially affected costs.

17   But it involves this allocation between costs

18   that were unlikely to be affected and those that

19   are likely to be affected by the degree of harm

20   in opioid.  I think we're talking about the same

21   thing.

22            And what I did was to take a category

23   like salaries, employees, and go back to the job

24   descriptions and make a determination of which

1  of these employees was in each of those two

2  categories.  And this is referred to in my

3  report as the overhead adjustment to

4  compensation costs.

5      Q.  Okay.

6      A.  Very briefly, in the example we went

7  through this morning there was compensation

8  costs.  That would be compensation costs, but

9  all compensation costs shouldn't be counted.

10 The ones that have to do -- that are fixed or

11 with overhead are not counted, and that's

12 referred to as the overhead adjustment here.

13 That's expressed in percentage terms.

14     Q.  Sticking with the list of positions in

15 the Office of Medical Examiner that are on

16 Page 197 of this budget document, which of those

17 did you treat as overhead, and which of those

18 did you treat as non-overhead?

19     A.  Okay.  The approach I took to doing

20 this would have classified sort of the first

21 batch as potentially affected, and things like

22 secretarial, senior administrative, support

23 services administrator, they would have been put

24 into the overhead category.

1      Now, again, I want to acknowledge that

2  if you go back to my report and see what exactly

3  did Professor McGuire do, there's going to be

4  some slippage for the scores of departments and

5  scores of years, scores of categories.  But I

6  didn't do it on the fly.  I didn't do it in a

7  short time frame like this, but that was the

8  general approach.

9      Q.  Okay.  And did you use any other

10 documents, then, besides the expenditure data we

11 saw on the laptop in the Excel file and these

12 annual operating budgets?

13     MR. SOBOL:  Objection.  Asked and

14 answered.

15     A.  I remember looking at some documents

16 that had detail on the salaries of different

17 personnel.  I just don't remember whether they

18 were Cuyahoga or whether they were Summit.

19 BY MR. KEYES:

20     Q.  Anything else?  I'm trying to

21 understand the universe of documents you looked

22 at and consulted in order to identify affected

23 costs versus non-affected costs, overhead costs

24 versus non-overhead costs.

1      You've identified the detailed

2  expenditure data, which is the Excel

3  spreadsheets on the computer.  You've identified

4  these operating budgets, and we just went

5  through a sample of that exercise.  And I asked

6  you whether there's anything else, and you said

7  that you remember there was some detail on

8  salaries, but you don't know where that data is.

9      A.  But I don't remember what exactly that

10 applied.

11     Q.  Okay.  So besides those three sets of

12 documents, did you look at anything else as part

13 of this exercise?

14     A.  I very likely did, but I don't

15 remember what it would be as I sit here today.

16     Q.  Did you consider any other approach to

17 quantifying damages in this case besides your

18 opportunity cost approach?

19     MR. SOBOL:  Objection.

20     You may answer.

21     A.  Well, the opportunity cost is so

22 natural.  No, I don't think so.

23 BY MR. KEYES:

24     Q.  And have you used that opportunity

1  cost approach in any other case where you were a

2  testifying expert quantifying damages?

3      A.  It's really implicit in using

4  expenditures as a quantification of damages.

5  That's the whole idea of doing it that way.

6      Q.  Did you use someone else's internal

7  costs to identify opportunity costs, and then

8  use those opportunity costs as damages in any

9  other case where you've been a testifying

10 expert?

11     A.  The application of opportunity costs

12 that comes to mind in other contexts of damages

13 would have been from the standpoint of a

14 purchaser, extra money that someone has to spend

15 because of something.  It's an opportunity cost

16 concept still.

17     Q.  Did you consider using an incremental

18 cost approach in this case?

19     A.  I'm not sure what you mean by that.

20     Q.  Have you heard of incremental cost

21 approach before to calculating damages?

22     A.  I have heard of incremental cost many

23 times, but it can be used differently in

24 different contexts.

1    Q.   Okay.  So in the context of
2  quantifying damages, have you ever seen someone
3  use an incremental cost approach?
4    A.   I don't recall.
5    Q.   Have you ever seen someone compare
6  what the incremental costs are as a result of
7  something relative to what the costs would be
8  absent that something?
9    A.   Well, I think that's often a good
10  question of what are the costs but-for
11  something, and that could well be called
12  incremental costs.  Maybe that's how you're
13  using it.
14    Q.   Well, do you agree that when you're
15  quantifying damages you're supposed to compare
16  the world as it is versus the world as it would
17  be absent the conduct being challenged?
18    A.   Well, I'd say, broadly speaking, that
19  makes sense to me.  In this case my instructions
20  from counsel were to quantify the costs to the
21  bellwether governments due to the opioid crisis,
22  and that would be regarded as damages.
23    Q.   You were told that that would be
24  called damages in your report, right?

1       MR. SOBOL:  Objection.
2    A.   This is in the front page.  I probably
3  should get this wording correct, but let me just
4  double-check.
5  BY MR. KEYES:
6    Q.   If you'd like some help, it's on
7  Page 4.  It's the end of Paragraph 6.
8    A.   Okay.
9    Q.   You say, "Finally, upon instruction
10  from counsel, I refer to the cost consequences
11  of harms to the Bellwether governments due to
12  defendants' misconduct as damages," right?
13    A.   That's what I was looking for.
14    Q.   That was the instruction you were
15  given?
16    A.   That was the instruction I was given,
17  yes.
18    Q.   And so you were told by counsel to
19  refer to the cost consequences as damages?
20    A.   Yes, that's what the sentence says.
21    Q.   And the cost consequences you're
22  talking about are the opportunity costs of
23  spending dollars on something related to opioids
24  versus something else?

1    A.   Broadly speaking.
2    Q.   So did you attempt to identify any
3  additional dollars that either Summit County or
4  Cuyahoga County spent because of the opioid
5  crisis that it would not have spent absent the
6  opioid crisis?
7       MR. SOBOL:  Objection.
8    A.   Well, embedded in my approach here,
9  any such dollars would have been captured.
10       For example, suppose the budget of the
11  medical examiner was deemed to be insufficient
12  because of the opioid crisis, and that budget
13  allocation was increased by the county, I would
14  see that, and I would count that.
15  BY MR. KEYES:
16    Q.   I understand you would count that.
17  I'm not asking about different ways an existing
18  set of dollars were spent.
19       I'm asking, did you identify any
20  dollars that Summit County or Cuyahoga County
21  spent because of the opioid crisis that it would
22  not have spent absent the opioid crisis?
23    A.   Well, as I explained, to the degree
24  that that happened, in the example of in the

1  absence of the opioid crisis they might not have
2  directed additional funds to the medical
3  examiner office, so the medical examiner's
4  budget did go up as a result of the opioid
5  crisis.  I'm giving you this as an example.
6  Then the degree to which the expenditure was
7  devoted to opioids that are a component of that
8  are captured in my analysis, as well as, as well
9  as any expenditures that are taken from other
10  things the examiner would have otherwise done.
11    Q.   But you're bringing it down to a
12  division level.  I'm asking at the county level.
13    A.   At the county level?
14    Q.   Yes.  Did Summit County or Cuyahoga
15  County spend any additional dollars because of
16  the opioid crisis that they would not have spent
17  absent the opioid crisis?
18       MR. SOBOL:  Objection.
19    A.   That's a very difficult counterfactual
20  for me.  Since I do work at the division level,
21  which is where the method we've been talking
22  about is properly applied, it might be that, I
23  don't know, some additional borrowing, some
24  additional revenue.

1    What matters is where it's spent and
2  how it's spent, not the source of the revenue.
3  So I capture that in the method I've been
4  talking about.
5  BY MR. KEYES:
6    Q.  Okay.  You're not engaging in the
7  question I asked.
8       If Cuyahoga County had $100, you're
9  saying that it might have spent those $100
10  differently because of the opioid crisis
11  relative to what it would have done absent the
12  opioid crisis, right?
13    A.  That's the kind of reasoning that I'm
14  applying, yes.
15    Q.  Did you identify any instance where
16  because of the opioid crisis Summit County or
17  Cuyahoga County spent more than $100, whereas
18  absent the opioid crisis it would have only
19  spent $100?
20    MR. SOBOL:  Objection.
21    A.  See, my job here is to identify the
22  costs to the counties that take the form of
23  additional spending in divisions due to the
24  presence of the opioid problem.

1  BY MR. KEYES:
2    Q.  Additional spending on the division
3  level.
4    A.  I shouldn't have said additional.  Let
5  me strike additional.
6    Q.  Because it's not additional.
7    A.  See, it may or may not be additional.
8    Q.  Do you know one way or the other?
9    A.  The -- what I'm answering is that I
10  capture both.  So the degree to which there's
11  more given to a division that would have
12  otherwise been given in the absence of the
13  opioid crisis, which I think is the point of
14  your hypothetical, if they spend it on
15  opioid-related problems, then I'm going to count
16  it.  It's the same opportunity cost as if they
17  took the money from something else the police
18  chief was doing.
19    Q.  But it's an opportunity cost; it's not
20  an additional dollar spent by either county
21  relative to what it would have spent absent the
22  opioid crisis?
23    MR. SOBOL:  Objection.
24    A.  I wouldn't make that distinction.

1  They're both opportunity costs, whether the
2  dollars come from additional taxes or whether
3  they come from diversion.
4  BY MR. KEYES:
5    Q.  But you looked at one and not the
6  other?
7    A.  I looked at both.  That's what I need
8  to do, is look at both together.  By looking at
9  a budget of a division and what share of that
10  budget goes to different kind of activities, to
11  the degree that budget is going up for some
12  reason, then I'm able to capture that in the
13  accounting I did.
14    Q.  Right.
15       And you capture it as an opportunity
16  cost because those dollars -- those additional
17  dollars are spent by that division rather than
18  someone else within the county, right?
19    A.  Well, the general approach in
20  economics is opportunity cost, so I don't know
21  if you're trying to establish some spending does
22  not have an opportunity cost.
23    Q.  No, I'm trying to identify whether
24  there are incremental costs at the county level

1  because of the opioid crisis, not whether the
2  existing pie was divvied up different ways, but
3  whether the pie chart that reflects spending is
4  bigger because of the opioid crisis.  Did you do
5  that?
6    MR. SOBOL:  Objection.  Asked and
7  answered several times.
8    A.  What I did was fulfill my assignment,
9  which required me to consider both of those
10  sources of funds devoted to the opioid crisis.
11  It need not only be a matter of reallocation of
12  existing resources.  Some budgets of some
13  divisions may have been increased due to the
14  opioid crisis.  That's, I think, the spirit of
15  what you're asking.
16       And to the degree that happened and
17  the degree to which those were devoted to
18  opioids, then I count them, as I should.
19  BY MR. KEYES:
20    Q.  In 2006, how much less would Summit
21  County or Cuyahoga County have spent if there
22  had been no opioid crisis compared to what it
23  did spend?
24    MR. SOBOL:  Objection.  Asked and

1  answered several times.
2  BY MR. KEYES:
3      Q.  Total dollars.
4          MR. SOBOL:  Objection.  Asked and
5  answered several times.
6      A.  The answer I have for that is the
7  spending at the division level on services
8  related to opioids, which had that been freed
9  up, which I think is the nature of your
10  question.
11  BY MR. KEYES:
12     Q.  You keep talking about the division
13  level.  I didn't ask about the division level.
14         I asked on the county level, in 2006,
15  how much less would Summit County or Cuyahoga
16  County have spent if there had been no opioid
17  crisis compared to what it did spend that year?
18         MR. SOBOL:  Objection.  Asked and
19  answered.
20     A.  This is kind of the inverse of your
21  earlier question.  Now we're taking the opioid
22  crisis away, and we're freeing up funds that
23  also have these two destinations.  Previously I
24  talked about this in terms of sources to say

1  that the sources of funds could either be
2  diversion or new funds, and I want to count both
3  of those with respect to quantifying the
4  opportunity cost of spending on opioids.
5          Now the question is kind of the
6  opposite, suppose you take the opioids spending
7  away, there's two destinations for those funds.
8  They could be in some kind of reallocation in
9  which they went to other services that the
10  county provided, or they could also be
11  associated with a fall in the total budget of
12  the county.
13         So it's really the same answer in
14  reverse, that -- and it's kind of the forward
15  direction, yes, I want to count both, I do count
16  both.  In the backward direction, the amount I
17  want to take away, it could be diverted or it
18  could have led to fewer revenue collections for
19  the county.
20  BY MR. KEYES:
21     Q.  Referring you again to the last three
22  charts in your report, it's Tables IV.12, IV.13
23  and IV.14.
24     A.  Okay.

1      Q.  Are you there?
2      A.  Yes.
3      Q.  These are the damages you calculated?
4      A.  Yes.
5      Q.  And these are the only damages you
6  calculated in this engagement on damages,
7  correct?
8      A.  That's correct.
9      Q.  Okay.  The dollars that you say are
10  total dollars are dollars that you say would
11  have been spent by the bellwether governments on
12  something else if there was no opioid problem,
13  correct?
14     A.  Is that a quote from me?
15         MR. SOBOL:  Objection.
16  BY MR. KEYES:
17     Q.  No, I think that's what you've been
18  saying.  It's not a quote.
19         MR. SOBOL:  Objection.
20  BY MR. KEYES:
21     Q.  Is it accurate to say that the dollars
22  that you say are total damages are dollars that
23  would have been spent by Summit County or
24  Cuyahoga County on something else if there was

1  no opioid problem?
2          MR. SOBOL:  Objection.
3      A.  All right.  We've been talking about
4  this the last few minutes, and I think I've
5  clarified that the dollars spent on the opioid
6  crisis could be taken from other activities in
7  that division, or even conceivably activities of
8  some other division, or could be associated with
9  increased budgets of the affected divisions, and
10  both of those are opportunity costs, both of
11  those should be counted, and I count both of
12  them.  So I...
13  BY MR. KEYES:
14     Q.  Are you offering an opinion that if
15  there had been no opioid problem the dollars you
16  list as total damages would not have been spent
17  by the Summit and Cuyahoga Counties?
18         MR. SOBOL:  Objection.  Asked and
19  answered.
20     A.  That's not my testimony.
21  BY MR. KEYES:
22     Q.  Are you offering the opinion that the
23  dollars that you describe as total damages are
24  monies that the bellwether government spent only

1  because of the opioid problem?

2         MR. SOBOL:  Objection.  Asked and

3  answered.

4     A.  That's also not an accurate statement.

5  BY MR. KEYES:

6     Q.  So you are not offering that opinion,

7  correct?

8         MR. SOBOL:  Objection.

9     A.  That's an inaccurate statement.

10  BY MR. KEYES:

11     Q.  Did you examine what dollars Summit

12  County or Cuyahoga County spent in excess of

13  their budgets because of the opioid problem?

14         MR. SOBOL:  Objection.  Same, that's

15  his answer.

16     A.  This is a version of the earlier

17  discussion, and any, any additional funding for

18  a division that may have come from going over

19  budget, which I have a general understanding of

20  what that would imply, are properly counted, and

21  yes, I counted them as part of my cost analysis.

22  BY MR. KEYES:

23     Q.  Did you examine what dollars Summit

24  County or Cuyahoga County spent in excess of

1  their budgets because of the opioid problem?

2         MR. SOBOL:  Objection.  Asked and

3  answered.

4     A.  My accounting of funds included funds

5  that would have been diverted from some other

6  use, and any additional funds that would be

7  coming from funds over budget that were devoted

8  to the opioid crisis.

9  BY MR. KEYES:

10     Q.  Where in your report do you identify

11  the dollars that Summit County or Cuyahoga

12  County spent in excess of their budgets because

13  of the opioid problem?

14     A.  That's not necessary for me to do, to

15  be able to count the opportunity costs of

16  dealing with the opioid crisis.

17     Q.  Okay.  So did you -- do you set forth

18  anywhere from your report a quantification of

19  the dollars that Summit County or Cuyahoga

20  County spent in excess of their budgets because

21  of the opioid problem?

22     A.  What I did is take the total

23  opportunity cost, which could have come from

24  different sources, as I've said a number of

1  times in the last few minutes, additional

2  budgets from alternative additional budget

3  sources including unanticipated spending or

4  other additional budget sources and from

5  anything that takes the form of diversion.

6     Q.  Your answer says "could have come from

7  different sources."  You're acknowledging the

8  possibility, right?

9         MR. SOBOL:  Objection.

10  BY MR. KEYES:

11     Q.  "Could have come from other sources."

12         MR. SOBOL:  Objection.

13     A.  Maybe ask a question so I'm

14  understanding what I'm answering.

15  BY MR. KEYES:

16     Q.  I'm not asking whether some of the

17  dollars somewhere in your quantification might

18  have come from somewhere else.

19         I'm asking you, do you set forth

20  anywhere in your report a quantification of the

21  dollars that Summit County or Cuyahoga County

22  spent in excess of their budgets because of the

23  opioid problem?

24         MR. SOBOL:  Objection.  Asked and

1  answered.

2     A.  I didn't need to identify any sources

3  of additional budgets for divisions in order to

4  make a quantification of the opportunity cost of

5  the funds.

6  BY MR. KEYES:

7     Q.  Do you set forth anywhere in your

8  report a quantification of the dollars that

9  Summit County or Cuyahoga County spent in excess

10  of their budgets because of the defendants'

11  conduct?

12         MR. SOBOL:  Objection.

13         I think you just asked that question.

14         MR. KEYES:  No, I asked because of the

15  opioid problem.  This one is because of the

16  defendants' conduct.

17     A.  This is new.

18         Yes, I do.

19  BY MR. KEYES:

20     Q.  And so show me --

21     A.  I'm sorry.

22     Q.  Yeah, you keep saying I don't need to,

23  so I thought you were going to say --

24     A.  I forgot the first part of your

```
 1   question, so --
 2      Q.  Let me ask it again.
 3      A.  Thank you.
 4      Q.  Do you set forth anywhere in your
 5   report a quantification of the dollars that
 6   Summit County or Cuyahoga County spent in excess
 7   of their budgets because of the defendants'
 8   conduct?
 9          MR. SOBOL:  Objection.  Asked and
10   answered.
11      A.  There is a similar answer to the
12   question, even though it's a different question.
13   I realize it's a different question.
14   BY MR. KEYES:
15      Q.  You're going to tell me you didn't
16   need to.
17      A.  I'm going to tell you that --
18          MR. SOBOL:  Why are you asking the
19   questions if you know the answers?
20          MR. KEYES:  Because he won't give me a
21   yes-or-no answer.
22   BY MR. KEYES:
23      Q.  I know you won't.
24      A.  I lost my train of thought.  So in
```

```
 1   order to --
 2      Q.  It's a yes-or-no question.
 3          MR. SOBOL:  He has to remember what
 4   the question was.
 5   BY MR. KEYES:
 6      Q.  Well, it's a yes-or-no question.  I
 7   appreciate you being candid in saying you're not
 8   going to give me a yes-or-no answer.  I think
 9   the record bears it out today, even though it's
10   a yes-or-no question.  But I'm going to ask it
11   of you, and I'm going to ask for your answer.
12          Do you set out anywhere in your report
13   a quantification of the dollars that Summit
14   County or Cuyahoga County spent in excess of
15   their budget because of the defendants' conduct?
16          MR. SOBOL:  Objection.  Asked and
17   answered.
18      A.  Such funds would be reflected in the
19   budgets that I looked at by division and
20   allocated to defendants' misconduct.
21   BY MR. KEYES:
22      Q.  So tell me where in your report I go
23   to find that, to find the dollars that Summit
24   County or Cuyahoga County spent in excess of
```

```
 1   their budgets because of the defendants'
 2   conduct.
 3      A.  I didn't need to make that
 4   quantification.
 5      Q.  Did you study what the normal costs
 6   are to be incurred by Summit County or Cuyahoga
 7   County because of opioids?
 8      A.  The normal costs.  I'm sorry, what
 9   might you mean by "normal costs"?
10      Q.  The typical or ordinary costs in a
11   given year.
12      A.  I studied costs.  I didn't try to
13   determine what was typical.
14      Q.  Or normal or ordinary, correct?
15      A.  I would have a hard time interpreting
16   that from an economic standpoint.
17      Q.  Did you identify any costs that were
18   incurred by Summit County or Cuyahoga County
19   because it was participating in the marketplace?
20      A.  I'm sorry, I don't understand what
21   you're getting at.
22      Q.  Did you attempt to identify or
23   quantify costs that were incurred by Summit
24   County or Cuyahoga County participating in the
```

```
 1   marketplace and having to spend money in the
 2   marketplace?
 3          MR. SOBOL:  Objection.
 4   BY MR. KEYES:
 5      Q.  Perhaps be overcharged.
 6          MR. SOBOL:  Objection.
 7      A.  I don't think I get your question.
 8   But just to move along a little bit, the cost
 9   components of the division that we discussed
10   earlier are payments to what an economist would
11   call resources that are traded in, for example,
12   labor markets, so yes.
13   BY MR. KEYES:
14      Q.  Did you attempt to identify instances
15   where Cuyahoga County or Summit County was
16   overcharged in the marketplace?
17      A.  Overcharged.
18          MR. SOBOL:  Objection.
19      A.  Help me by defining what overcharge
20   is, what you mean by overcharge.
21   BY MR. KEYES:
22      Q.  Well, you told me this morning that
23   you've calculated overpayments as an expert in
24   other cases before, right?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.   Yes.

2    Q.   So paying more than someone says is

3   the right benchmark.  Right?

4    A.   Well, normally the right benchmark is

5   a competitive price.

6    Q.   Okay.  So if we use a competitive

7   price, did you undertake to identify any costs

8   that were incurred by Summit County or Cuyahoga

9   County by spending money in the marketplace

10  above a competitive price?

11   A.   Let me tell you why I didn't need to

12  do that.

13   Q.   Well, first just say yes or no.  You

14  can say no, and then you can tell me why you

15  didn't need to do it.  I know you've been

16  trained in your years to never say no, but

17  you're essentially saying no every time you say

18  "I don't need to."

19       For the sake of a clean record, can

20  you say, no, I didn't do that, and here's why I

21  didn't need to?

22       MR. SOBOL:  Objection.

23       Whatever, go ahead.

24  BY MR. KEYES:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Did you do that?

2        MR. SOBOL:  Now, what's the question?

3   I was almost letting you go forward, and then

4   you did that.

5   BY MR. KEYES:

6    Q.   Did you undertake to identify any

7   costs that were incurred by Summit County or

8   Cuyahoga County by spending money in the

9   marketplace above a competitive price?

10       MR. SOBOL:  Objection.

11       You may answer.

12   A.   This was irrelevant, and I'll explain

13  by example.

14       Suppose there were market power in the

15  labor market, and we're talking about, I don't

16  know, some category of workers that are able to

17  extract a wage that's above the competitive

18  wage, but the county has to pay this because

19  they -- well, they just have to pay it.  They

20  pay it.  It still has the same opportunity cost.

21       If I pay my $75 and, oh, my gosh, the

22  auto repair company is a monopolist in my town

23  and the competitive price would have been $35, I

24  end up paying $75.  It's the same, the same from

Highly Confidential - Subject to Further Confidentiality Review

1   my standpoint.  The opportunity cost is the

2   same.

3   BY MR. KEYES:

4    Q.   In your report you claim that by

5   incurring opioid-related expenditures the

6   quality of other services provided by Summit

7   County and Cuyahoga County was reduced.  Is that

8   your opinion?

9    A.   In some cases that would be correct,

10  yes.

11   Q.   Okay.  So what other services are you

12  referring to such that the quality went down?

13   A.   I think I discuss an example, maybe

14  two examples, of the quality of police services.

15  What do you mean by "the quality of police

16  services"?  You mean things like response time?

17  You mean things like they're able to handle this

18  category of offense?  You mean things like

19  officers have adequate time to pursue an

20  investigation, and the degree to which those

21  things are interfered with because of officer

22  time that needs to be devoted to the opioid

23  crisis?  That's an effect on the quality of

24  police services.

Highly Confidential - Subject to Further Confidentiality Review

1        I think the other example that I

2   mention somewhere in the report is Division of

3   Family Services, that if there's more children

4   who need attention because of the opioid crisis,

5   the parents are dying, the kids have to be taken

6   care of, there's other kids who would have been

7   referred to family services anyway, and there's

8   less time for those kids.

9        So in an important sense, much of what

10  public service is about is time.  And to the

11  degree to which that time is interfered with by

12  anything in this case, the opioid crisis, it's a

13  deterioration in the quality of the public

14  services.

15   Q.   Those are the two examples you had in

16  mind when you made that statement in your

17  report?

18   A.   I believe those are examples that we

19  discussed in my report, or mentioned in my

20  report.  The -- probably division by division it

21  would be, you know, because I already talked

22  about what kind of quality deterioration as

23  workers have less time to devote to other things

24  that would have been due to the opioid crisis.

1    Q.   Did you measure the quality of the
2   police services provided by either Summit County
3   or Cuyahoga County?
4    A.   This is one of those categories that
5   trusting the concept of opportunity cost, the
6   value of any reduced services is indicated by
7   the dollars devoted to opioids.
8    Q.   So you have a theory of calculating
9   damages where the theory does it all.  By
10   definition the theory gives you what you want.
11   You don't need to study the real world, you've
12   got the theory, right?
13       MR. SOBOL:  Objection, objection,
14   objection, to each of the three questions.
15    A.   I wouldn't put it that way, no.
16   BY MR. KEYES:
17    Q.   Well --
18       MR. SOBOL:  You don't even let me do
19   my objection thing.
20       THE WITNESS:  Pardon me.
21       MR. SOBOL:  You're not even letting me
22   do my objecting thing.
23       THE WITNESS:  I'm trying to.
24   BY MR. KEYES:

1    Q.   Did you study the quality of police
2   services before the opioid epidemic?
3    A.   The --
4    Q.   I don't want you to tell me in theory
5   what happens.  I want to know whether you
6   actually studied it with respect to Summit
7   County or Cuyahoga County police.
8    A.   You need to know and understand in
9   answering this question that the deterioration
10   and the time that police have to do things is
11   associated with a decline in that quality.
12   That's the thing that's important to me.  That's
13   the thing -- if you want to call that an
14   assumption, all right, but that's the important
15   element that you need to understand in
16   understanding my answer to that question.
17    Q.   Okay.  So you think it's important for
18   me to know that.
19       Separate from that, did you measure
20   the quality of the police services before the
21   opioid crisis?
22    A.   What dates are you talking about here?
23    Q.   Well, before 2006.
24    A.   My work began with spending in 2006,

1   so...
2    Q.   Did you measure the quality of police
3   services in 2006 or any subsequent year?
4    A.   Any subsequent year.  I measured the
5   resources available for police services in those
6   years.
7    Q.   That's not my question.
8    A.   I know.
9    Q.   Did you -- okay, well, if you know it,
10   then answer the question I'm posing.
11       My question is, did you measure the
12   quality of police services in 2006 or any
13   subsequent year?
14    A.   See, this wasn't necessary for me to
15   conduct my assignment, so I didn't do that.
16    Q.   Is it accurate to say that you never
17   measured the quality of police services for
18   Summit County or Cuyahoga County at any point
19   before 2006 -- in 2006 or any year after 2006?
20    A.   The application of the theory of
21   opportunity cost didn't require me to do that.
22    Q.   Did you measure the quality of the
23   services provided by the Department of family --
24   Children and Family Services at any point in

1   time?
2    A.   It would have been the same answer.
3    Q.   You didn't need to?
4       MR. SOBOL:  Objection.
5    A.   I didn't need to in order to identify
6   the opportunity cost of the funds devoted to
7   opioids.
8   BY MR. KEYES:
9    Q.   Is it accurate to say that you never
10   measured the quality of services provided by the
11   Department of Children and Family Services for
12   Summit County or Cuyahoga County at any point
13   before 2006, in 2006, or any year after 2006?
14       MR. SOBOL:  Objection.  Asked and
15   answered, compound.
16    A.   I think it's the same answer for
17   police, that it wasn't necessary for me to
18   fulfill my assignment.
19   BY MR. KEYES:
20    Q.   And for any period of time from before
21   2006 through the present, have you measured any
22   or quantified any change in the quality of the
23   services provided by the police or the
24   Department of Children and Family Services?

1    MR. SOBOL:  Objection.  Asked and

2  answered.

3    A.  What I studied was the resources

4  available to deal with other services.  The

5  connection to quality is, I think, clear.

6  BY MR. KEYES:

7    Q.  Not my question.

8    My question is, for any period of

9  time, have you measured or quantified any change

10  in the quality of the services provided by the

11  police or the Department of Children and Family

12  Services for either Summit County or Cuyahoga

13  County?

14    MR. SOBOL:  Objection.  Asked and

15  answered, compound.

16    A.  My answer is the same, because I want

17  the reader of this to understand why it is, that

18  for me to identify the opportunity cost didn't

19  require me to make that quantification.

20  BY MR. KEYES:

21    Q.  So you didn't do it?

22    MR. SOBOL:  Objection.  Asked and

23  answered.

24  BY MR. KEYES:

1    Q.  I mean, typically when someone says

2  did you do X, the witness, particularly an

3  expert witness who has been through the drill

4  before, can say yes, I did, and no, I didn't,

5  and the reason I didn't is the following.  You

6  won't even say yes or no.  I don't know what

7  you're trying to muddle here.  I just want a

8  clean answer to all these questions about did

9  you do this or not.

10    Do I understand, though, that every

11  time I've asked you did you do something and you

12  say it wasn't necessary, that means you didn't

13  do it?

14    MR. SOBOL:  Objection.  To which time

15  he said that?

16    A.  Yeah, I would have to see what you're

17  talking about in that context.

18    MR. KEYES:  Okay.  Why don't we take a

19  break.

20    THE VIDEOGRAPHER:  The time is

21  4:49 p.m., and we're off the record.

22    (Whereupon, a recess was taken.)

23    THE VIDEOGRAPHER:  The time is

24  5:12 p.m., and we're on the record.

1    (Whereupon, McGuire Exhibit Number 4

2    was marked for identification.)

3  BY MR. KEYES:

4    Q.  Professor McGuire, I'm showing you

5  what has been marked as McGuire Exhibit 4.  Do

6  you know what this document is?

7    A.  Yes.

8    Q.  What is it?

9    A.  It's the -- contains budget

10  information for the ADAMHS Board.

11    Q.  For what period of time?

12    A.  There's 2009 to -- 2009 to 2020.

13    Q.  And it shows actuals for 2009 through

14  2017, correct?

15    A.  That's correct.

16    Q.  And then budgeted amounts from 2018

17  through 2020?

18    A.  That's correct.

19    Q.  Okay.  And if you look at the bottom

20  of the chart, there's a line that says "Ending

21  Cash Balance."

22    Do you see that?

23    A.  I do.

24    Q.  What is the ending cash balance, as

1  you understand it, for the Summit County ADM

2  Board?

3    A.  That would be how much money they have

4  available at the end of the year.

5    Q.  So these are excess, unused funds as

6  of the end of each year?

7    A.  Something like that.  Well, they're

8  available for future years.

9    Q.  So it's calculated as of the end of

10  each year, and it's the unused funds that are

11  available for expenditures going forward?

12    A.  Yeah, something like that.

13    Q.  And so those are funds that could be

14  spent on an unmet need?

15    A.  Well, they could be spent on anything.

16    Q.  Including whatever the ADM Board

17  identifies as an unmet need?

18    A.  Yes.  I mean, yes.

19    Q.  And do you see that the excess funds

20  for the Summit County ADM Board as of the end of

21  2009 was 17.7 million?

22    A.  I do see that, yes.

23    Q.  It increased at the end of 2010 to

24  28.3 million?

1    A.  Yes.

2    Q.  Increased at the end of 2011 to

3  35.9 million?

4    A.  Yes.

5    Q.  And then increased in 2012 to

6  40.3 million?

7    A.  Yes.

8    Q.  Increased in 2013 to 41.2 million?

9    A.  Yes.

10   Q.  Increased to 45.8 million as of the

11  end of 2014?

12   A.  Yes, I see.

13   Q.  And then it was still around

14  $48 million in 2015 and 2016?

15   A.  I see that, yes.

16   Q.  And in most of those years, the excess

17  funds were enough to cover an entire year's

18  worth of ADM Board expenses, correct?

19   A.  Most of those years.  Well, by the

20  time you get to 2013, the ending cash balance is

21  about the same as the annual total expenditures.

22   Q.  Did the Summit ADM Board ever seek

23  authorization to spend the extra funds that are

24  reflected in the ending cash balance?

1    A.  I'm not sure.

2    Q.  Did you look into that?

3    A.  My staff may have.  I don't recall

4  looking into it myself.

5    Q.  Do you know whether there was a

6  requirement for the fund balance for the Summit

7  ADM Board?

8    A.  I'm not aware of any.

9    Q.  Do you know whether there was any

10  requirement at all, separate from what that

11  requirement level was?

12   A.  I'm not aware of the existence of one.

13   Q.  So the ending cash balance identifies

14  the amount of money that was available to the

15  ADM Board to spend on other things if it wanted

16  to do so, correct?

17   A.  Well, I'm not familiar with whatever

18  budget rules they have, but broadly speaking,

19  something like that would be correct.

20   Q.  Can you go back to McGuire Exhibit 3,

21  which is the operating budget for 2017 for

22  Summit County?

23   A.  Okay.

24   Q.  And would you turn to page

1  SUMMIT_7600?  Are you there?

2    A.  I'm there.

3    Q.  And the title of this page that's part

4  of the budget is "County of Summit 2017 Budget

5  Total Expenditures."

6       Do you see that?

7    A.  I do.

8    Q.  And it lists a series of funds, and

9  for each fund it shows what the adopted budget

10  is for 2017?

11   A.  I see that.

12   Q.  And do you see that there's a specific

13  line that shows the 2017 adopted budget for the

14  Alcohol, Drug & Mental Health Board for Summit

15  County?

16   A.  I see that.

17   Q.  And what's the amount that the Summit

18  County ADM Board could spend per the 2017

19  adopted budget?

20   A.  According to this document, the entry

21  is $47,729,340.

22   Q.  Can you go back to McGuire Exhibit 4

23  which shows the actual expenditures for the

24  Summit County ADM Board?

1    A.  I'm looking at that.

2    Q.  And if you look in the column that

3  says "2017 Actual."

4       Do you see that?

5    A.  I do.

6    Q.  And if you go to the -- close to the

7  bottom it shows "Total Expenditures"?

8    A.  I see that.

9    Q.  What are the total expenditures by the

10  Summit ADM Board in 2017?

11   A.  45,430,368.

12   Q.  Okay.  So that's less than the amount

13  that it was authorized to spend in 2017,

14  correct?

15   A.  It appears to be.

16   Q.  By about $2.3 million?

17   A.  It appears to be.

18   Q.  So in 2017, the Summit ADM Board

19  didn't even spend $2.3 million that it was

20  authorized to spend on needs that it was charged

21  with addressing, correct?

22     MR. SOBOL:  Objection.

23   A.  Well, I think the arithmetic here is

24  all perfectly fine.  Interpreting it in terms of

1   their behavior and so on, I'm not sure.
2   BY MR. KEYES:
3       Q.   Well, it doesn't require any
4   interpretation of the behavior.
5            It shows that they were authorized to
6   spend 47.7 million, they only spent
7   45.4 million, which leaves 2.3 million, roughly,
8   in monies that were specifically authorized, put
9   into their budget that the ADM Board did not
10  spend that year, correct?
11      A.   The gap between the budget and the
12  expenditures is, as you described, around
13  $2 million.
14      Q.   So these are dollars that the Summit
15  ADM Board could have spent on another need, but
16  didn't for whatever reason?
17           MR. SOBOL:   Objection.
18      A.   Well, that would be an assumption.  I
19  don't know that for sure.
20  BY MR. KEYES:
21      Q.   Going back to McGuire Exhibit
22  Number 3, same page.  What did the Summit County
23  adopt as the 2017 budget for the Children's
24  Services Board?

1       A.   This is 51,914,589.
2            (Whereupon, McGuire Exhibit Number 5
3            was marked for identification.)
4   BY MR. KEYES:
5       Q.   Showing you what has been marked as
6   McGuire Exhibit 5.  What is McGuire Exhibit 5?
7       A.   It's the Summit County Children's
8   Services Operating Forecast as of December 31,
9   2018.
10      Q.   And it's Bates number
11  SUMMIT_002057610, correct?
12      A.   That's correct.
13      Q.   And does it show the actual
14  expenditures for the Summit County Children's
15  Services Board in 2017?
16      A.   It appears to, yes.
17      Q.   And what is that amount for 2017?
18      A.   That amount is 47,960,000.
19      Q.   Whereas it was authorized to spend in
20  2017 51.9 million, it only spent 47.9 million,
21  correct?
22      A.   Well, this is -- yeah, this is what
23  was budgeted.  I'm just looking at the documents
24  and confirming what they appear to be.

1       Q.   Right.
2            So one is the amount that it was
3   budgeted to spend for 2017, the other shows what
4   it actually spent in 2017, right?
5       A.   That's true.
6            You know, we haven't talked about the
7   revenues.  And in 2017, for example, the
8   Children's Services was running a deficit, and
9   I, you know, don't know without more
10  investigation whether the presence of that
11  deficit would have led to spending more than it
12  was budgeted.
13      Q.   But comparing what it was authorized
14  to spend in the budget versus what it actually
15  spent in 2017, it did not spend roughly
16  $3.9 million that it was authorized to spend on
17  the needs it was charged with addressing,
18  correct?
19      A.   Well, I don't know that for sure.
20  This is budgeted.  I'm not sure what may have
21  been authorized, what contingencies there might
22  have been on revenue with respect to that, so I
23  can only answer about what I see before me.
24      Q.   Did you look into this kind of issue

1   to see whether any of the so-called affected
2   divisions had monies that were approved to spend
3   in a particular year that they did not spend?
4            MR. SOBOL:   Objection.
5       A.   This is another version of the -- what
6   I need to do in order to address my assignment.
7   These funds that are the ending balance carrying
8   forward can be used for other services as you
9   established, I think, in your preface to these
10  set of questions.  They could be used for other
11  services next year or the year after that.
12           What is the value of those other
13  services?  A good measure of that is the
14  dollars.  So anything that takes away from or
15  diverts funds from other categories, including
16  the operating surplus or deficit, is measured by
17  opportunity cost.
18  BY MR. KEYES:
19      Q.   Even if the ADM Board or the
20  Children's Services Board had additional dollars
21  available to it and did not spend them?
22      A.   Well, I think the --
23           MR. SOBOL:   Objection.
24      A.   No, I'll just disagree with that.

1  BY MR. KEYES:

2      Q.   On what basis?

3      A.   It's not a sound economic -- not sound

4  economic logic.  These funds have other

5  purposes, other potential uses.

6      Q.   Aren't you positing that the dollars

7  that you've quantified as damages have an

8  opportunity cost because by being spent on

9  opioid-related services they were not available

10  to be spent on something else?

11          MR. SOBOL:  Objection.  Form.

12      A.   Well, broadly speaking, there was the

13  diversion part, and any increase in spending

14  part due to the opioid crisis that would have

15  fed into the opportunity cost accounting.

16  BY MR. KEYES:

17      Q.   So what basis do you have in fact for

18  positing that if those dollars were not spent on

19  opioid-related services, they, in fact, would

20  have been spent on something else when the

21  evidence we have is that these boards didn't

22  even spend the dollars they had?

23      A.   Well, you're looking at a bunch of

24  categories that have to add up in the way that

1  we've been discussing.  Could I say that if

2  whatever opioid-related expenditures were not

3  here, I would know that other would go up, or

4  paid placements would go up, or any of these

5  individual categories would change in any way,

6  including the last one we've been talking about,

7  which you have to consider that to be a change

8  in fund balance which is what might be affected

9  by any spending on opioids.

10          And the whole kind of emphasis of some

11  of our discussions earlier was that it's not

12  necessary for me to be able to determine where

13  that money came from in order to attribute the

14  opportunity cost of how the dollars I do.

15      Q.   Do you agree a carry-forward balance

16  is fairly characterized as a surplus?

17      A.   It sometimes -- at least in this

18  document the surplus is more of an annual flow

19  concept, whereas the balance is a stock concept.

20  But I'm not sure what you're then asking.

21      Q.   My question is, when it refers to the

22  ending carry-forward balance here for Summit

23  County Children's Services in McGuire Exhibit 5,

24  could that fairly be characterized as a surplus

1  that existed as of year-end each year?

2      A.   If you define "surplus" to be the

3  balance, this exhibit doesn't seem to use the

4  term that way.  But I understand what you're

5  asking.

6      Q.   So what's the answer?  You said you

7  understand what I'm asking.  Could the

8  carry-forward balance shown on McGuire Exhibit 5

9  be fairly characterized as a surplus that the

10  Summit County Children's Services had?

11      A.   That's not the way the term is used in

12  this document.

13      Q.   Did you look at any deposition

14  testimony from anyone who worked for Summit

15  County Children's Services about the ending

16  carry-forward balance?

17      A.   Oh, I don't remember.

18      Q.   And do you know what anyone who

19  actually worked for Summit County Children's

20  Services said about how the carry-forward

21  balance could be characterized?

22      A.   I don't remember.

23      Q.   Did you look?

24      A.   I don't remember that either.  I'm

1  sorry.

2      Q.   I asked you earlier whether you had

3  ever testified using a theory of calculating

4  damages where internal costs were provable as

5  damages.

6          Do you remember that?

7      A.   I don't remember the internal word,

8  but I do remember the general nature of the

9  question.

10      Q.   And I think you responded that those

11  internal costs were similar, in your words, to

12  an increased purchase price.

13      A.   I actually don't recall this, what I

14  was saying about that, so I'm sorry.

15      Q.   Okay.  Well, have you ever testified

16  as an expert in a case where you have quantified

17  damages as being the opportunity costs

18  associated with the expenditures of a

19  municipality?

20      A.   Possibly.  And what I mean by that is

21  there have been cases in which purchasers are

22  sometimes labor funds and may have been

23  government self-insured healthcare costs, but I

24  can't be sure.

1   Q.   You say it may be.  If you did, what
2   case or cases would that have been in?
3   A.   That's what I can't tell you.
4   Q.   So sitting here today, can you
5   identify any case where you've said that?
6   MR. SOBOL:  Objection.
7   A.   I can't tell you which case this would
8   have come up.  I just don't remember.
9   BY MR. KEYES:
10  Q.   Have you ever testified as an expert
11  where you claim that the internal compensation
12  costs of a municipality or a company were
13  claimed as damages as distinguished from
14  payments to an outside party?
15  A.   Compensation costs are normally
16  considered to be wages and benefits, and the
17  degree to which this government entity, that I'm
18  not remembering the details about, was paying
19  for healthcare, that would be part of a
20  compensation to the workers.  So in that sense,
21  yes.
22  Q.   Did you treat those compensation costs
23  as damages?
24  A.   They would have been spending -- extra

1   healthcare spending due to whatever it was, and
2   that would have been damages, yes.
3   Q.   And were those dollars paid to the
4   employees or paid to third parties in connection
5   with employees?
6   A.   They would have been paid to third
7   parties.
8   Q.   Okay.  So my question was about
9   internal compensation costs where you are paying
10  your own employees.
11      Have you ever testified as an expert
12  where those internal compensation costs, what
13  you're paying to employees, is claimed as
14  damages?
15  A.   I have to ask you to clarify.  By
16  "internal compensation cost," do you mean wages
17  only, or do you mean something else?
18  Q.   Well, I mean any compensation paid to
19  employees.
20  A.   Any compensation, so it includes
21  employer contribution to health insurance
22  premiums?
23  Q.   Paid to employees, any compensation
24  paid to employees, not paid to third parties on

1   behalf of employees.
2   A.   I can't think of anything.  But this
3   gets to be a little bit of a gray area about
4   employer payments that have to do with
5   healthcare costs that take the form of extra
6   compensation for workers, so I'll leave it at
7   that.
8   Q.   So your recollection is fuzzy as to
9   whether you've ever done this before?
10  A.   I think fuzzy would be a perfectly
11  good word to characterize my recollection here.
12  This is something I may have done, but I can't
13  point to particular examples.
14  Q.   Does Summit County pay reimbursements
15  for prescription opioids through their
16  healthcare plans for county employees?
17  A.   Can you read me that again, please?
18  Q.   Sure.
19      Does Summit County pay reimbursements
20  for prescription opioids through their
21  healthcare plans for county employees?
22  MR. SOBOL:  Sorry.  Objection.
23  Go ahead.
24  A.   Reimbursements to whom?

1   BY MR. KEYES:
2   Q.   Either the insurer or the employee.
3   A.   It would be very unlikely to the
4   employee.  Modern health insurance doesn't work
5   that way.
6   Q.   Okay.  Do you know what Summit County
7   does?
8   A.   I do know some things about what
9   Summit County does.
10  Q.   Okay.  So tell me what it does.
11  A.   There's more than one plan that
12  applies to employees in Summit County, and some
13  of the plans change over time, sometimes
14  different groups of workers.  Some of those, I
15  think the largest bulk of those would be
16  considered to be self-insured, in which most of
17  the risk would have been borne by the employer,
18  in this case the city government.
19      When you say self-insured, though,
20  it's not a clean yes, they bear the risk versus
21  insured, no, they don't bear the risk.  It's
22  typical that there's some risk-sharing between a
23  third-party administrator and the government in
24  this case.

Highly Confidential - Subject to Further Confidentiality Review

1  So what all this means is that the
2  county government would be on the hook for and
3  pay part of healthcare costs on behalf of its
4  workers.  I guess in that case reimbursement is
5  a little bit of a funny word, but they would be
6  paying healthcare costs on behalf of their
7  workers.
8      Q.  Do you calculate as alleged damages in
9  this case any of those payments?
10     A.  I believe that this is part of
11 compensation from the standpoint of the
12 counties, and the degree to which health
13 insurance costs were included in compensation
14 for the portion of workers that are not set
15 aside by the overhead adjustment, yes, I do.
16     Q.  So where would we find that in your
17 work product?
18     A.  It would be under compensation.
19 There's wages and salaries and there's other
20 categories, and in the other category.
21     Q.  Okay.  And is the same true for
22 Cuyahoga County or not?
23     A.  The same would be true, yeah.
24     Q.  So for both Summit County and Cuyahoga

Highly Confidential - Subject to Further Confidentiality Review

1  County, to the extent that either of the
2  counties is making payments in connection with
3  prescription opioids written to county
4  employees, those expenses are included in your
5  calculations as non-overhead affected costs, and
6  they are included in your damages?
7      A.  Yes, for employees that are in the
8  variable cost category, I examine their
9  compensation package, which is wages plus
10 benefits, and health insurance costs are
11 comprehensive and include prescriptions for the
12 workers.
13     Q.  What about payments made by Summit
14 County or Cuyahoga County on behalf of injured
15 workers that are attributable to opioids?
16     A.  You're asking about the health
17 insurance payments in this context?
18     Q.  Well, I'm trying to be broad to make
19 sure I cover it.  Yes.
20     A.  I'm sorry, so ask me again, please?
21     Q.  Well, I'm asking about health
22 insurance payments made by Summit County or
23 Cuyahoga County on behalf of injured workers
24 that are attributable to opioids, are those

Highly Confidential - Subject to Further Confidentiality Review

1  included in your calculations?
2      A.  I would have to check to see if the
3  workers' comp costs are included in the variable
4  category, and I don't remember.  But it's in my
5  material.  We could figure that out if we wanted
6  to.  If it is, then I would again -- the
7  workers' comp costs include health insurance
8  costs, so they would be included.
9      Q.  Sitting here today, do you think you
10 included it as an affected non-overhead cost or
11 not?
12     A.  I don't remember.
13     Q.  Well --
14     A.  Sorry.
15     Q.  You don't remember what you did, but
16 I'm asking you, sitting here today, as you
17 approach it, what do you think you should do?
18     MR. SOBOL:  Objection.
19     He said he didn't remember.
20     MR. KEYES:  I understand he doesn't
21 remember what he did.
22 BY MR. KEYES:
23     Q.  I'm not asking about what you did.
24     I'm asking, sitting here today, what

Highly Confidential - Subject to Further Confidentiality Review

1  do you think you should do?  Should it be
2  included in your total damages, or excluded?
3      A.  It probably depends on the context and
4  the division.  If it's reasonable to believe
5  that some of the on-the-job injuries are part of
6  the normal course of work, then probably it
7  should be included.  But truthfully, I would
8  have to go back and try to reconstruct what I
9  did in that case.
10     Q.  Okay.  But again, to be clear, I'm not
11 asking what you did before.  I realize you don't
12 remember that.
13     Sitting here today, as you approach it
14 as a specific example of figuring out whether
15 something is an affected cost or not, whether
16 it's an overhead cost or not, how do you think
17 you treated these payments?  How do you think
18 you should treat these payments?
19     A.  Well, I should make a judgment about
20 whether they belong in one category or the
21 other.  I'm not --
22     Q.  So what judgment do you think you
23 should draw today?
24     A.  Well, I said it would probably depend

1    on the division and whether I thought it was
2    likely that the workers' comp costs were part of
3    what workers might be exposed to in the normal
4    course of their work.
5        Q.   That's the criteria you would use?
6        A.   That's the criteria I would use.
7        Q.   Who are the manufacturer defendants in
8    this case?
9            MR. SOBOL:  Off the top of his head?
10       A.   Off the top of my head, I know Teva,
11   Mallinckrodt, Purdue, Endo.  I'm sure there are
12   others.  I don't want to make a slur on some
13   manufacturer's name if I'm not sure.
14   BY MR. KEYES:
15       Q.   Do you identify the manufacturer
16   defendants --
17           MR. SOBOL:  Is this deposition
18   transcript confidential?
19           MR. KEYES:  I have not designated it
20   so, no.
21           MR. SOBOL:  Okay.  So don't slur
22   anybody then.
23           THE WITNESS:  That's what I thought I
24   should do.

1    BY MR. KEYES:
2        Q.   Do you identify in your damages report
3    who the manufacturer defendants are?
4        A.   I don't think I do.
5        Q.   Do you identify in your damages report
6    who the distributor defendants are?
7        A.   I don't think I do that either.
8        Q.   Or any of the retail pharmacy
9    defendants?
10       A.   Same answer.
11       Q.   Okay.  Are any of your analyses set
12   forth in your damages report defendant-specific?
13           MR. SOBOL:  Objection.  Asked and
14   answered.
15       A.   No, in the sense that the damages I
16   estimate are in total those due to defendants'
17   misconduct, defendants', plural, misconduct.
18   BY MR. KEYES:
19       Q.   And what is the misconduct by the
20   manufacturing defendants?
21       A.   The component of misconduct that
22   Rosenthal studies in her report is misleading is
23   advertising, but there's more to it than that.
24       Q.   Your understanding is that what

1    Professor Rosenthal is measuring as the
2    manufacturers' misconduct is misleading
3    advertising?
4        A.   Well, yes, that's what I understand to
5    be the case.
6        Q.   What is your basis for that
7    understanding?
8        A.   My familiarity with the Rosenthal
9    report.
10       Q.   And what do you mean by "advertising"?
11       A.   What Rosenthal does is count detailing
12   visits.
13       Q.   What is detailing?
14       A.   Detailing is a practice by which sales
15   reps from drug manufacturers pay face-to-face
16   visits to doctors' offices and help inform and
17   persuade physicians to use their employer's
18   product.
19       Q.   And what does Professor Rosenthal
20   assume about that detailing or promotion?
21           MR. SOBOL:  Objection.
22       A.   Well, there's a set of things.  Not
23   sure what -- where you want me to go off and
24   talk here.

1    BY MR. KEYES:
2        Q.   Well, does she identify a particular
3    promotion by particular manufacturing defendants
4    that she says was unlawful?
5        A.   She is able to identify particular
6    defendants' detailing activities, which I
7    understand she makes a determination, I believe,
8    on the basis of counsel instructions of whether
9    that is misconduct.
10       Q.   Does she identify a subset of the
11   promotion by the manufacturing defendants that
12   she assumes is or concludes is unlawful?
13           MR. SOBOL:  Objection.
14       A.   My understanding is that she -- in
15   relating the total volume of detailing visits to
16   shipments, on instruction from counsel,
17   Professor Rosenthal attributes that portion of
18   shipments to defendants' misconduct.  That
19   probably wasn't very clear.
20   BY MR. KEYES:
21       Q.   I'd like to know your understanding.
22       Does she say that all promotion by the
23   manufacturing defendants was unlawful, most of
24   it, some of it, a particular type of promotion

Highly Confidential - Subject to Further Confidentiality Review

1  was unlawful?  What is your understanding of
2  what she assumes for purposes of her analyses?
3      A.  My understanding is what she assumes
4  on the basis of what I believe to be instruction
5  from counsel is that all her measured
6  advertising activities are misconduct --
7  represent misconduct.
8      Q.  All measured advertising activities?
9      A.  Detailing visits.
10     Q.  Right.
11         So does she assume that for purposes
12  of conducting her analysis all or virtually all
13  promotion by the manufacturer defendants from
14  1995 to the present was unlawful?
15         MR. SOBOL:  Objection.
16     A.  My understanding is that she was asked
17  to assume that.
18  BY MR. KEYES:
19     Q.  And because your opinions and your
20  quantification of damages relies on Rosenthal's
21  conclusions, your opinions also rely on that
22  assumption, correct?
23         MR. SOBOL:  Objection.
24     A.  The particular damages numbers that I

Highly Confidential - Subject to Further Confidentiality Review

1  present in my report depend on the results of
2  both Professor Rosenthal and Cutler's work.
3  BY MR. KEYES:
4      Q.  And, therefore, your particular
5  damages numbers that you present in your report
6  depend on the assumptions that Professor
7  Rosenthal and Professor Cutler make in doing
8  their work, correct?
9      A.  All the things that feed into their
10  conclusions in some sense I depend on.
11     Q.  But I was asking specifically about
12  assumptions.
13         Your particular damages numbers that
14  you present in your report depend on the
15  assumptions that Professor Rosenthal and
16  Professor Cutler make in doing their work,
17  correct?
18         MR. SOBOL:  Objection.
19     A.  That's a little too broad to give a
20  yes answer to, but a number of their assumptions
21  that underlie their empirical work would
22  influence their empirical estimates which would
23  then feed into affecting my damages.
24  BY MR. KEYES:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.  What assumptions do Professor
2  Rosenthal and Professor Cutler make in doing
3  their work that do not impact your damages
4  quantification?
5         MR. SOBOL:  Objection.  Scope.
6         He doesn't have the reports in front
7  of him.
8      A.  I would have to -- I think it might
9  help or it might not give me an answer to this.
10  I was just kind of noting that your original
11  question was too broad, that there's a number of
12  assumptions that are made in the report that
13  don't affect the empirical results, and I didn't
14  want to say that every assumption that Meredith
15  Rosenthal or Cutler makes would affect their
16  results.  That's all I'm saying.
17     Q.  Professor Rosenthal and
18  Professor Cutler did make assumptions that do
19  affect their empirical results, correct?
20     A.  I agree with that.
21     Q.  Those assumptions also have an impact
22  on the damages quantification that you did,
23  correct?
24     A.  That would be correct.  So if there

Highly Confidential - Subject to Further Confidentiality Review

1  were an assumption that affected their
2  estimates, then it would feed through and affect
3  my quantification.
4      Q.  So now can you identify for me
5  assumptions that either Professor Rosenthal or
6  Professor Cutler made that did not affect their
7  empirical results?
8         MR. SOBOL:  Same objection as
9  previously when the question was asked.
10     A.  There probably are some.  I don't have
11  any off the top of my head.
12  BY MR. KEYES:
13     Q.  Can you identify a single one, a
14  single assumption they made in their work that
15  does not affect their empirical work?
16         MR. SOBOL:  Objection.  Same objection
17  as previously.
18     A.  That's not quite the same question,
19  but nothing occurs to me.
20  BY MR. KEYES:
21     Q.  Can you identify a single assumption
22  that Professor Rosenthal or Professor Cutler
23  made in their work that does not affect their
24  empirical results?

Highly Confidential - Subject to Further Confidentiality Review

1    MR. SOBOL:  Objection.  Same objection
2  as before.
3    A.  Same answer.
4  BY MR. KEYES:
5    Q.  Have you done any independent
6  examination of the opioid manufacturer
7  defendants' marketing?
8    A.  I'm familiar with material in this
9  case that plays into my public nuisance report.
10    Q.  But I'm asking about whether you've
11  done any examination, not just familiarity.
12      Have you studied or examined the
13  opioid manufacturer defendants' marketing?
14    MR. SOBOL:  Objection.
15    A.  I've examined.  That seems to be -- to
16  me to be studied.
17  BY MR. KEYES:
18    Q.  And you did that in connection with
19  your nuisance report?
20    A.  Yes.
21    Q.  Did you do any examination of the
22  opioid manufacturer defendants' marketing in
23  connection with your damages report?
24    A.  No, I don't think so.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.  Did you do any examination of the
2  opioid manufacturer defendants' promotion in
3  connection with your damages report?
4    A.  No, I don't think so.  That's a
5  Rosenthal thing.
6    Q.  Did you do any examination of the
7  opioid manufacturers' detailing in connection
8  with your damages report?
9    A.  That's also the Rosenthal thing.
10    Q.  Is that a no?
11    A.  That's I didn't do it.  Progress.
12    Q.  Do you believe that all of the
13  promotion conducted by manufacturer defendants
14  is false?
15    MR. SOBOL:  Objection.
16    A.  I didn't study it.
17  BY MR. KEYES:
18    Q.  So do you have that belief or not?
19    MR. SOBOL:  Objection.
20    A.  I don't know.
21  BY MR. KEYES:
22    Q.  Do you believe that all of the
23  promotion conducted by the manufacturer
24  defendants was unlawful?

Highly Confidential - Subject to Further Confidentiality Review

1    MR. SOBOL:  Objection.
2    A.  As we -- as you established a few
3  moments ago, I didn't study it.
4  BY MR. KEYES:
5    Q.  In connection with your work on your
6  nuisance report, do you believe all of the
7  promotion conducted by manufacturer defendants
8  was false?
9    MR. SOBOL:  Objection.
10    A.  I don't need that belief in the sense
11  of to be -- it wasn't necessary for me to come
12  to a judgment that 100 percent of the
13  advertising was false.
14  BY MR. KEYES:
15    Q.  In connection with your work on your
16  nuisance report, do you believe that all of the
17  promotion conducted by manufacturer defendants
18  was unlawful?
19    MR. SOBOL:  Objection.  Asked and
20  answered.
21    A.  I didn't need to come to a
22  determination of that.  It wasn't part of my
23  assignment, for one thing.
24  BY MR. KEYES:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.  For purposes of your damages report,
2  have you analyzed how your calculations would
3  change if, in fact, the defendant manufacturers
4  had marketed their products in a lawful way?
5    MR. SOBOL:  Objection.
6    A.  This is something that would be -- let
7  me take an example, I think, of what you're
8  asking about.
9      Suppose one manufacturer were
10  determined to be completely lawful, and those
11  detailing visits were then not deemed to be
12  inappropriate, that's something that Professor
13  Rosenthal could readily calculate, and then the
14  proportionality of that affect would flow
15  through Cutler and would flow through to my
16  damages report.  So it's something that the
17  methodology is capable of doing.
18  BY MR. KEYES:
19    Q.  Has Professor Rosenthal done that?
20    A.  She's done some analysis of the affect
21  on share of shipments attributable to misconduct
22  under assumptions of different compositions in
23  the defendant pool, so yes, I think she has.
24    Q.  You said that's something she could

Highly Confidential - Subject to Further Confidentiality Review

```
 1   do.  So has she performed calculations on the
 2   assumption that one manufacturer's conduct was
 3   completely lawful and the detailing visits were
 4   not deemed to be inappropriate?
 5       A.   I believe she has, yes.
 6       Q.   Okay.  For which manufacturer?
 7       A.   She did it for a series of them.
 8       Q.   Okay.  And have you seen that in her
 9   report?
10       A.   I have.
11       Q.   Your work in your report relies on the
12   work of Professor Rosenthal and Professor
13   Cutler, correct?
14       A.   That's correct.
15            MR. SOBOL:  Object.
16   BY MR. KEYES:
17       Q.   So before --
18            MR. SOBOL:  I'm getting a little slow
19   here, but objection, asked and answered.
20            Go ahead.
21   BY MR. KEYES:
22       Q.   So before you issued your damages
23   report on March 25th, how did you know what
24   Professor Cutler's work was, and how did you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   know what Professor Rosenthal's work was?
 2       A.   Well, we all needed one another.
 3   David needed to know -- David Cutler needed to
 4   know which divisions were likely to be affected
 5   by opioids, so I had to tell him that.  I had to
 6   tell him that ahead of March 25.  And then so I
 7   could do my work, he needed to tell me what the
 8   content of essentially the Excel spreadsheets
 9   where there's a share of harms associated with
10   misconduct, what those numbers would look like.
11   And then we could do the rest of our reports
12   sort of on our own.
13       Q.   So how did you communicate to
14   Professor Cutler which divisions were affected?
15       A.   I let counsel know what I'm going to
16   be saying about that, and then they told David.
17       Q.   Did you share a draft of your
18   conclusions and your discussion about which
19   divisions were affected with Professor Cutler?
20            MR. SOBOL:  I thought that drafts were
21   off limits in this case.
22            MR. HALLER:  Not if Cutler is relying
23   on it.
24            MR. SOBOL:  But Cutler identifies what
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   he relies upon in his report, and there's no
 2   draft he identifies as relying on in his report.
 3            MR. KEYES:  I'm asking the question
 4   what was shared.  I'm not even asking for a copy
 5   of it at this point.
 6            MR. SOBOL:  I'm going to instruct him
 7   not to answer until I know better, and we'll
 8   reserve until the next time.
 9   BY MR. KEYES:
10       Q.   Well, to be clear, did you share a
11   draft of your conclusions and your discussion
12   about which divisions were affected with
13   Professor Cutler?
14            MR. SOBOL:  Yes, I'm instructing him
15   not to answer until I have a better clarity
16   where this line gets drawn.
17   BY MR. KEYES:
18       Q.   Well, you said Professor Cutler relied
19   on your determination of which divisions were
20   affected, to use your terminology, right?
21       A.   I said something like that, yes.
22       Q.   Okay.  So if Professor Cutler is
23   relying on your determination of which divisions
24   are affected, I need to know how he learned what
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   divisions were affected.  He learned it from
 2   you?
 3       A.   That's correct.
 4       Q.   So did you send him a draft report or
 5   a draft discussion that identified which
 6   divisions were affected?
 7            MR. SOBOL:  Same instruction.
 8            MR. KEYES:  Even though he's just said
 9   that Professor Cutler relied on it?
10            MR. SOBOL:  He doesn't know what
11   Professor Cutler relied on or not.  Professor
12   Cutler knows what he relied upon.  And I've read
13   Professor Cutler's report, and Professor
14   Cutler's report has materials that he
15   considered, and there's no draft of McGuire
16   report in there.
17            MR. KEYES:  Well, with respect, you're
18   not the witness, you're not the expert, and what
19   you believe is irrelevant, given that Professor
20   McGuire, who is the expert and is the witness,
21   just said that he understands that Professor
22   Cutler relied on his determination of which
23   divisions were affected.
24   BY MR. KEYES:
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.  So given your testimony, Professor
2  McGuire, that you did something that Professor
3  Cutler relied on, I'd like to know, did you send
4  him a draft or some discussion relating to which
5  divisions were affected to Professor Cutler so
6  that he could do the work he said depended on
7  it?
8          MR. SOBOL:  To the extent the question
9  asks about whether you sent him a draft, I
10  instruct you not to answer.  To the extent that
11  it asks differently as to whether or not you had
12  a discussion with him, you may answer yes or no.
13  BY MR. KEYES:
14      Q.  How did you communicate to
15  Professor Cutler your analysis and your findings
16  about which divisions were affected?
17          MR. SOBOL:  I instruct you not to
18  answer if it's by way of a draft.
19      A.  It was a very simple list of nine and
20  ten divisions in two different counties.  It
21  didn't require a lot of prose backup.  Here they
22  are.
23  BY MR. KEYES:
24      Q.  So how was that communicated to

Highly Confidential - Subject to Further Confidentiality Review

1  Professor Cutler?
2      A.  I would have given him that list.
3      Q.  How?
4      A.  I don't remember.
5      Q.  Now, you said that Professor Cutler's
6  percentages were something you needed to rely on
7  for your work?
8      A.  Yes.
9      Q.  Did you look at drafts of
10  Professor Cutler's report?
11          MR. SOBOL:  Again, I instruct him not
12  to answer.
13          MR. RICE:  Counsel, can I have your
14  basis for the objection, please?
15          MR. SOBOL:  It's not clear to me
16  whether, under the existing rules for these
17  depositions, whether it is fair game for people
18  to be talking about drafts of various expert
19  reports.
20          MR. RICE:  So is it attorney/client
21  privilege-based concern?
22          MR. SOBOL:  No.  It's whether or not
23  the orders that apply to this case and drafts of
24  expert reports are to be discussed by the

Highly Confidential - Subject to Further Confidentiality Review

1  experts.  I think this comes very close to the
2  line.  Since Professor McGuire will be back next
3  week, I've indicated that I'm instructing him
4  now not to answer until I have better direction
5  from others.
6          MR. KEYES:  Seems like your concern is
7  whether the draft report is discoverable.  I'm
8  not asking for a copy of the draft report at
9  this time.  I just want to know whether
10  Professor McGuire received it and saw it.
11          MR. SOBOL:  That's not my concern.  I
12  mean, I've stated my concern.  I don't know
13  whether or not discussions about drafts, not the
14  drafts themselves, but whether discussions of
15  drafts are discoverable or not.
16          MR. KEYES:  I haven't asked about
17  discussions about drafts.  You're jumping the
18  gun.  I'm asking, did he get a draft of
19  Professor Cutler's report that provided the
20  percentages upon which Professor McGuire has
21  expressly said he relied.
22          MR. SOBOL:  Okay.  Well, like I said,
23  the instructions there, I'm not worried at all
24  about the instruction.  If you guys want to

Highly Confidential - Subject to Further Confidentiality Review

1  bicker about it, fine, but you're running out of
2  time for the day.
3  BY MR. KEYES:
4      Q.  How do you know what Professor
5  Cutler's percentages are?
6          MR. SOBOL:  Other than drafts, you may
7  answer.
8      A.  It takes the form of Excel tables that
9  are reproduced in my report.  And it's also not
10  a prose issue, it's here is the Excel
11  spreadsheet, here are the percentages, then I'm
12  off and running.
13  BY MR. KEYES:
14      Q.  And when did you get those
15  percentages, the Excel spreadsheet that lists
16  the percentages?
17      A.  Not the night before, not too much
18  earlier than the deadline date, so it would have
19  been a few days ahead, something like that.
20      Q.  And upon receipt of those percentages
21  from Professor Cutler, who inputted them into
22  your spreadsheets for purposes of running your
23  calculations?
24      A.  Compass Lex would have done that.

1  Q.   And what steps did you take to
2  double-check that the percentages were entered
3  correctly and that the math was correct in your
4  own calculations?
5  A.   Well, I spot-check these things.
6  Q.   What do you mean you spot-check them?
7  A.   Just look at some of the products,
8  does it look right, and then --
9  Q.   What do you mean does it look right?
10 What benchmarks, criteria, standards are you
11 using to determine whether it looks right?
12 A.   You're multiplying two numbers in each
13 year for each division, it's not a complicated
14 mathematical operation.  The numbers are pretty
15 small in most cases, by which I mean that the
16 percent of harms attributable to misconduct are
17 pretty small numbers, sometimes they're around
18 1, 2, 3, 4, 5 percent.  So what I do is look at
19 the damages result to see if it seems to be 1,
20 2, 3, 4, 5 percent of the potentially affected
21 costs.
22 Q.   Would you turn to Appendix IV.C-1.1 in
23 your report?
24      MR. KO:  Sorry, Andrew, which --

1       MR. KEYES:  Appendix IV.C-1.1.
2       MR. KO:  Thanks.
3  BY MR. KEYES:
4  Q.   Are you there?
5  A.   Yes.
6  Q.   Okay.  This is a spreadsheet showing
7  damages that you calculated for the Cuyahoga
8  ADAMHS Board, correct?
9  A.   That's correct.
10 Q.   And I just want to confirm line 2 is
11 titled "Opioid-Related Percentage of Services"?
12 A.   Right.
13 Q.   Do you see that?
14 A.   I do, yes.
15 Q.   And did you get those percentages from
16 Professor Cutler?
17 A.   No, those are budget information that
18 I put together.
19 Q.   Okay.  Can you look at the sources and
20 notes for number 2?
21 A.   Yeah, that's a metric analysis in the
22 Cutler report, but it applies the metric
23 analysis to the numbers in the budget.  This
24 isn't -- these numbers don't depend on Cutler's

1  empirical results about the effective shipments
2  or Meredith's results, this particular line.
3  Q.   Okay.  Now turning to line 5, there's
4  a series of percentages.
5       Do you see that?
6  A.   I see it, yes.
7  Q.   Did you get those from
8  Professor Cutler?
9  A.   Yes.
10 Q.   Do you see that line 7, the
11 percentages?
12 A.   I do.
13 Q.   Did you get those from
14 Professor Cutler?
15 A.   Those are Cutler.
16 Q.   Line 9, do you see those percentages?
17 A.   I do.
18 Q.   Those are percentages from Professor
19 Cutler?
20 A.   Those are also Cutler.
21 Q.   Line 11, there are percentages there,
22 you got those percentages from Professor Cutler?
23 A.   Yes.
24 Q.   Line 13, do you see those percentages?

1  A.   I do.
2  Q.   You got those percentages from
3  Professor Cutler?
4  A.   Also, yes, from Professor Cutler.
5  Q.   Line 15, do you see those percentages?
6  A.   I do.
7  Q.   Did you get those from Professor
8  Cutler?
9  A.   Yes.
10 Q.   Line 17, do you see those percentages?
11 A.   Also from Professor Cutler.
12 Q.   Line 19?
13 A.   Same answer.
14 Q.   Okay.  So on this chart, all of the
15 percentages that are listed in lines 5, 7, 9,
16 11, 13, 15, 17, and 19 are percentages that you
17 received from Professor Cutler?
18 A.   That's right.
19 Q.   And for any of those percentages, did
20 you tinker with them, modify them, change them
21 before you inputted them into your calculations?
22 A.   No.
23 Q.   You accepted them as accurate by
24 relying on Professor Cutler's work?

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.   Yes.
2       Q.   And if I went through the same
3  exercise for each chart for each affected
4  division for Cuyahoga County and each chart for
5  each affected division of Summit County, would
6  you give me the same answers?
7            MR. SOBOL:  Well, objection.
8  BY MR. KEYES:
9       Q.   That is, the opioid-related percentage
10 of services is something you prepared based on
11 Professor Cutler's metric analysis, correct?
12      A.   It would differ division by division,
13 but at some point when we start talking about
14 the rows following something like approach one,
15 that's where the Cutler percentages start coming
16 in.
17      Q.   And again, all of those percentages
18 come from Professor Cutler.  You accepted them
19 without modifying, tinkering them, you accepted
20 them as-is based on Professor Cutler's work?
21      A.   Yes.
22           MR. SOBOL:  How are we doing with
23 time?
24           MR. KEYES:  I have a note we have five
```

Highly Confidential - Subject to Further Confidentiality Review

```
1  minutes remaining.  And unless there are any
2  objections, I'm happy to call it quits today.
3            MR. SOBOL:  Just tack it onto the next
4  time.
5            MR. KEYES:  Sure.
6            THE VIDEOGRAPHER:  The time is
7  6:09 p.m.
8            MR. KEYES:  Does anyone else have
9  questions they want to use for the five minutes?
10 No?  Okay.
11           THE VIDEOGRAPHER:  The time is
12 6:09 p.m.  This day of deposition has concluded,
13 and we are off the record.
14           (Whereupon, the deposition was
15           adjourned.)
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1  COMMONWEALTH OF MASSACHUSETTS )
2  SUFFOLK, SS.                  )
3            I, MAUREEN O'CONNOR POLLARD, RMR, CLR,
4  and Notary Public in and for the Commonwealth of
5  Massachusetts, do certify that on the 23rd day
6  of April, 2019, at 9:02 o'clock, the person
7  above-named was duly sworn to testify to the
8  truth of their knowledge, and examined, and such
9  examination reduced to typewriting under my
10 direction, and is a true record of the testimony
11 given by the witness.  I further certify that I
12 am neither attorney, related or employed by any
13 of the parties to this action, and that I am not
14 a relative or employee of any attorney employed
15 by the parties hereto, or financially interested
16 in the action.
17           In witness whereof, I have hereunto
18 set my hand this 25th day of April, 2019.
19
20      _____
21      MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC
22      Realtime Systems Administrator
23      CSR #149108
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            INSTRUCTIONS TO WITNESS
2
3            Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8            After doing so, please sign the
9  errata sheet and date it.  It will be attached
10 to your deposition.
11           It is imperative that you return
12 the original errata sheet to the deposing
13 attorney within thirty (30) days of receipt of
14 the deposition transcript by you.  If you fail
15 to do so, the deposition transcript may be
16 deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
```

```
 1              - - - - - -
            E R R A T A
 2              - - - - - -

 3    PAGE  LINE  CHANGE

 4    ____  ____  _____

 5        REASON: _____

 6    ___  ____  _____

 7        REASON: _____

 8    ____  ____  _____

 9        REASON: _____

10    ____  ____  _____

11        REASON: _____

12    ____  ____  _____

13        REASON: _____

14    ____  ____  _____

15        REASON: _____

16    ____  ____  _____

17        REASON: _____

18    ____  ____  _____

19        REASON: _____

20    ____  ____  _____

21        REASON: _____

22    ____  ____  _____

23

24
```

```
 1

 2          ACKNOWLEDGMENT OF DEPONENT

 3

 4       I, _____, do
    Hereby certify that I have read the foregoing
 5    pages, and that the same is a correct
    transcription of the answers given by me to the
 6    questions therein propounded, except for the
    corrections or changes in form or substance, if
 7    any, noted in the attached Errata Sheet.

 8

 9    _____

    THOMAS G. MCGUIRE, Ph.D.    DATE
10

11

12

13

14

15

16    Subscribed and sworn
    To before me this
17    _____ day of _____, 20_____.

18    My commission expires: _____

19

    _____
20    Notary Public

21

22

23

24
```

```
 1              LAWYER'S NOTES

 2    PAGE  LINE

 3    ____  ____  _____

 4    ____  ____  _____

 5    ____  ____  _____

 6    ____  ____  _____

 7    ____  ____  _____

 8    ____  ____  _____

 9    ____  ____  _____

10    ____  ____  _____

11    ____  ____  _____

12    ____  ____  _____

13    ____  ____  _____

14    ____  ____  _____

15    ____  ____  _____

16    ____  ____  _____

17    ____  ____  _____

18    ____  ____  _____

19    ____  ____  _____

20    ____  ____  _____

21    ____  ____  _____

22    ____  ____  _____

23    ____  ____  _____

24    ____  ____  _____
```