Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   IN RE: NATIONAL           )
     PRESCRIPTION              )   MDL No. 2804
 4   OPIATE LITIGATION         )
     _____    )   Case No.
 5   THIS DOCUMENT RELATES TO:  )   1:17-MD-2804
                               )
 6   The County of Summit, Ohio )   Hon. Dan A.
     et al. v. Purdue          )   Polster
 7   Pharma L.P., et al.       )
     Case No. 17-OP-45004      )
 8                             )
     The County of Cuyahoga v. )
 9   Purdue Pharma L.P., et al. )
     Case No. 18-OP-45090      )
10
11            TUESDAY, APRIL 30, 2019
11
12       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
              CONFIDENTIALITY REVIEW
                   - - -
13
14           Videotaped deposition of Thomas G.
15   McGuire, Ph.D., Volume II, held at the offices
16   of Robins Kaplan LLP, 800 Boylston Street,
17   Suite 2500, Boston, Massachusetts, commencing
18   at 8:31 a.m., on the above date, before
19   Carrie A. Campbell, Registered Diplomate
20   Reporter and Certified Realtime Reporter.
21
22
23
                   - - -
24         GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
25             deps@golkow.com
```

---

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2            A P P E A R A N C E S :
 3   HAGENS BERMAN SOBOL SHAPIRO LLP
     BY:  THOMAS M. SOBOL
 4        Tom@hbsslaw.com
     55 Cambridge Parkway, Suite 301
 5   Cambridge, Massachusetts 02142
     (617) 482-3700
 6
 7   KELLER ROHRBACK LLP
     BY:  DAVID KO
 8        dko@kellerrohrback.com
             (VIA TELECONFERENCE)
 9   1201 Third Avenue, Suite 3200
     Seattle, Washington 98101
10   (206) 623-1900
11   MOTLEY RICE LLC
     BY:  ANDREW P. ARNOLD
12        aarnold@motleyrice.com
     28 Bridgeside Boulevard
13   Mount Pleasant, SC 29464
     (843) 216-9000
14   Counsel for Plaintiffs
15
16   NAPOLI SHKOLNIK PLLC
     BY:  SHAYNA SACKS
17        ssacks@napolilaw.com
     360 Lexington Avenue, 11th Floor
18   New York, New York  10017
     (212) 397-1000
19   Counsel for Cuyahoga County
20
21   WILLIAMS & CONNOLLY LLP
     BY:  J. ANDREW KEYES
22        akeyes@wc.com
          JOSEPH S. BUSHUR
23        jbushur@wc.com
     725 Twelfth Street, N.W.
24   Washington, DC 20005
     (202) 434-5331
25   Counsel for Cardinal Health, Inc.
```

---

Highly Confidential - Subject to Further Confidentiality Review

```
 1        COVINGTON & BURLING LLP
 2        BY:  JOHN W. ZIPP
                jzipp@cov.com
 3                (VIA TELECONFERENCE)
          850 Tenth Street, NW
 4        Washington, DC 20001-4956
 5        (202) 662-5518
          and
 6        COVINGTON & BURLING LLP
          BY:  DAVID HALLER
 7             dhaller@cov.com
 8        620 Eighth Avenue
          New York, New York 10118
 9        (212) 841-1000
          Counsel for McKesson Corporation
10
11   REED SMITH LLP
     BY:  BRIAN T. HIMMEL
12        bhimmel@reedsmith.com
     225 Fifth Avenue
13   Pittsburgh, Pennsylvania 15222
     (412) 288-4058
14   Counsel for AmerisourceBergen
15
16
     BARTLIT BECK LLP
17   BY:  SHARON DESH
          sharon.desh@bartlit-beck.com
18           (VIA TELECONFERENCE)
     54 West Hubbard Street, Suite 300
19   Chicago, Illinois  60654
     (312) 494-4400
20   Counsel for Walgreens
21
     CAVITCH FAMILO & DURKIN, CO., LPA
22   BY:  ERIC WEISS
          eweiss@cavitch.com
23           (VIA TELECONFERENCE)
     1300 East 9th Street, 20th Floor
24   Cleveland, Ohio 44114
     (216) 621-7860
25   Counsel for Discount Drug Mart, Inc.
```

---

Highly Confidential - Subject to Further Confidentiality Review

```
 1   JONES DAY
     BY:  CLAIRE E. CASTLES
 2        ccastles@jonesday.com
     555 South Flower Street, 15th Floor
 3   Los Angeles, California 90071-2300
     (213) 489-3939
 4
 5        and
 6   JONES DAY
     BY:  EDWARD M. CARTER
 7        emcarter@jonesday.com
     325 John H. McConnell Boulevard, Suite 600
 8   Columbus, Ohio 43125-2673
     (614) 469-3939
 9   Counsel for Walmart
10
11   BARNES & THORNBURG LLP
     BY:  MONIQUE A. HANNAM
12        monique.hannam@btlaw.com
             (VIA TELECONFERENCE)
13   11 South Meridian Street
     Indianapolis, Indiana  46204-3535
14   (317) 231-7776
     Counsel for H.D. Smith
15
16   MARCUS & SHAPIRA LLP
     BY:  RICHARD I. HALPERN
17        halpern@marcus-shapira.com
             (VIA TELECONFERENCE)
18   301 Grant Street, 35th Floor
     Pittsburgh, Pennsylvania 15219-6401
19   (412) 338-4690
     Counsel for HBC
20
21
     ROPES & GRAY LLP
22   BY:  CHRISTINE D'AURIA
          Christine.DAuria@ropesgray.com
23   800 Boylston Street
     Boston, Massachusetts 02199-3600
24   (617) 951-7000
     Counsel for Mallinckrodt
25
```

```
 1        ARNOLD & PORTER KAYE SCHOLER LLP
          BY:  SAMUEL LONERGAN
 2             samuel.lonergan@arnoldporter.com
               REBECCA E. ZOLLER
 3             rebecca.zoller@arnoldporter.com
          250 West 55th Street
 4        New York, New York  10019
          (212) 836-7568
 5        Counsel for Endo Pharmaceuticals
          Inc., and Endo Health Solutions Inc.
 6
 7
          MORGAN, LEWIS & BOCKIUS LLP
 8        BY:  MARTHA A. LEIBELL
               martha.leibell@morganlewis.com
 9             (VIA TELECONFERENCE)
          200 South Biscayne Boulevard, Suite 5300
10        Miami, Florida  33131-2339
          Counsel for Teva Pharmaceuticals
11        USA, Inc., Cephalon, Inc., Watson
          Laboratories, Inc., Actavis LLC,
12        Actavis Pharma, Inc., f/k/a Watson
          Pharma, Inc.
13
14
          MORGAN, LEWIS & BOCKIUS LLP
15        BY:  ELIZABETH I. BUECHNER
               elizabeth.buechner@morganlewis.com
16             (VIA TELECONFERENCE)
          101 Park Avenue
17        New York, New York 10178-0060
          (212) 309-6769
18        Counsel for Rite Aid
19
20        LOCKE LORD LLP
          BY:  MADELINE E. BRUNNER
21             madeline.brunner@lockelord.com
               (VIA TELECONFERENCE)
22        2200 Ross Avenue, Suite 2800
          Dallas, Texas 75201
23        (214) 740-8445
          Counsel for Henry Schein, Inc., and
24        Henry Schein Medical Systems, Inc.
25
```

```
 1        ALSO PRESENT VIA STREAM:
 2             CATE BREWER, Keller Rohrback
               JUSTIN TAYLOR, Bailey Wyant
 3
               ERICA BENTON, Compass Lexecon
 4             ALICE KAMINSKI, Compass Lexecon
               HAL SIDER, Compass Lexecon
 5
 6
          VIDEOGRAPHER:
 7             ROBERT MARTIGNETTI,
               Golkow Litigation Services
 8
 9                  - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    INDEX
 2                               PAGE
 3   APPEARANCES................................ 393
 4   EXAMINATIONS
 5   BY MR. KEYES............................... 400
 6   BY MR. LONERGAN............................ 730
 7   BY MR. CARTER.............................. 788
 8   BY MR. HALLER.............................. 835
 9   BY MR. SOBOL............................... 846
10   BY MR. HALLER.............................. 847
11
12                  EXHIBITS
13   No.      Description              Page
14   McGuire 6   Report of Professor Thomas   606
                 McGuire Regarding Public
15               Nuisance, March 25, 2019
16
17
18
19
20
21
22
23
24
25
```

```
 1             VIDEOGRAPHER:  We are now on
 2   the record.  My name is Robert
 3   Martignetti.  I'm a videographer for
 4   Golkow Litigation Services.
 5             Today's date is April 30, 2019,
 6   and the time is 8:31 a.m.
 7             This continued video deposition
 8   of Thomas McGuire is being held in
 9   Boston, Massachusetts, in re: National
10   Prescription Opiate Litigation.
11             Will counsel that was not
12   present for the first part of this
13   deposition please identify themselves.
14        MR. ARNOLD:  Andrew Arnold from
15   Motley Rice for plaintiffs.
16        MS. SACKS:  Shayna Sacks,
17   Napoli Shkolnik, for Cuyahoga County.
18        MR. CARTER:  Ed Carter for
19   Walmart.
20             VIDEOGRAPHER:  The court
21   reporter is Carrie Campbell.
22             Professor McGuire, do you
23   understand that you're still under
24   oath?
25        THE WITNESS:  Yes, I do.
```

Highly Confidential - Subject to Further Confidentiality Review

1   DIRECT EXAMINATION (CONTINUED)

2   QUESTIONS BY MR. KEYES:

3        Q.    Good morning, Professor

4   McGuire.  This is day two of your deposition.

5   Day one was last Tuesday, April 30th {sic}.

6            Do you understand you're still

7   under oath today?

8        A.    I do understand, yes.

9        Q.    What, if anything, did you do

10  in connection with your engagement in this

11  case since you finished your testimony on day

12  one?

13       A.    I continued to study my

14  reports.  I had a phone call with staff

15  Compass Lexecon.  I requested and reviewed as

16  best I could several of the depositions that

17  took place since my initial day, and I met

18  with Tom Sobol yesterday, and I had a brief

19  call with David Ko yesterday as well.

20       Q.    Anything else?

21       A.    No, that's all that I can

22  recall.

23       Q.    You said you continued to study

24  your reports.

25            Do you mean both your report on

---

Highly Confidential - Subject to Further Confidentiality Review

1   what you call damages and your report on what

2   you call the public nuisance?

3        A.    Yeah, those are the two reports

4   I'm referring to.

5        Q.    And did you read them in their

6   entirety?

7        A.    I would say, yes, I read them

8   in their entirety.

9        Q.    How much did you spend, quote,

10  studying your two reports in the last week?

11       A.    I would say I spent maybe six

12  to eight hours.

13       Q.    You said you had a phone call

14  with come Compass Lexecon?

15       A.    That's right.

16       Q.    Who did you speak with at

17  Compass Lexecon?

18       A.    I spoke with Alice Kaminski.

19  And there was another Compass Lex staff

20  person in the room, but I didn't catch her

21  name.

22       Q.    And this was a phone call --

23       A.    Yes.

24       Q.    -- as opposed to as in-person

25  meeting?

---

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes, it was a phone call.

2        Q.    How long was the call?

3        A.    It was less than half an hour,

4   I would say.

5        Q.    And when was the call?

6        A.    I spoke with Alice yesterday.

7        Q.    Did anyone participate in this

8   call besides you, Alice Kaminski and this

9   other person from Compass Lexecon whose name

10  you don't know?

11       A.    No, there was no other person

12  on the call.

13       Q.    Just the three of you?

14       A.    Just the three of us.

15       Q.    Who initiated this phone call?

16       A.    Do you mean who requested the

17  phone call or who --

18       Q.    Yes.

19       A.    -- actually dialed the number?

20       Q.    Who requested the phone call?

21       A.    I requested the phone call.

22       Q.    Why?

23       A.    Because I had a question about

24  some part of the calculations.

25       Q.    Okay.  And what was your

---

Highly Confidential - Subject to Further Confidentiality Review

1   question?

2        A.    My question was I wanted to

3   review the OUD, opioid use disorder,

4   prevalence estimates.

5        Q.    What was your specific question

6   about the OUD prevalence estimates?

7        A.    I just wanted to review the

8   entire section, so we just went through --

9   it's a certain appendix to my report.  We

10  just went through it again.

11       Q.    And did you ask her to explain

12  it to you?

13       A.    Well, we just -- we reviewed

14  it, so she helped me remember some of the

15  stuff that was done there.

16       Q.    What did she help you remember?

17       A.    Really the entire operation.

18       Q.    What do you mean "the entire

19  operation"?

20       A.    I mean the procedure by which I

21  estimated prevalence.

22       Q.    Can you be more specific about

23  what she helped you remember about the

24  procedure by which you estimated the

25  prevalence of OUD?

```
 1       A.    Well, as I said, we went
 2  through the entire appendix step by step,
 3  so...
 4       Q.    And she helped you reconstruct
 5  the various steps that were taken in your
 6  report to estimate the prevalence of OUD?
 7       MR. SOBOL:  Objection.
 8       THE WITNESS:  Well, we
 9       discussed the -- and reviewed the
10       attachment to my report, Attachment D
11       or whatever it is.
12  QUESTIONS BY MR. KEYES:
13       Q.    Did you talk to Ms. Kaminski
14  and this other person from Compass Lexecon
15  about anything else during your call
16  yesterday?
17       A.    Actually, we did.
18       I asked them a question about
19  the crime estimates to remind me of the
20  nature of the -- some of the data I used in
21  the report.
22       Q.    Okay.  And what specific data
23  are you referring to?
24       A.    There's an abbreviation for the
25  data.  It's NIBRS, national institute --
```

```
 1  sorry, National Incident Based Reporting
 2  System.  It's maintained by the FBI.
 3       Q.    Okay.  But what was your
 4  specific question?
 5       Did you ask her what NIBRS
 6  stands for?
 7       A.    No.  No.  I could look up that
 8  easy enough.
 9       Q.    Then what was your specific
10  question?
11       A.    My specific question was the --
12  to remind me about the coverage of that data
13  set, which is incomplete.
14       Q.    How was it incomplete?
15       A.    The data set includes units
16  that report, and not all units report data
17  into the reporting system.
18       Q.    Which units do not report into
19  that system?
20       A.    Well, I think it varies across
21  the country, really.
22       Q.    You said you asked the
23  question.
24       Did she give you an answer?
25       A.    Well, she reminded me that that
```

```
 1  was true, for example, and that the coverage
 2  in our counties was -- while not 100 percent,
 3  was good.
 4       Q.    And can you quantify good, if
 5  not 100 percent?
 6       A.    I think around 80 percent.
 7       Q.    Did you talk to Ms. Kaminski or
 8  the other person from Compass Lexecon about
 9  anything else regarding the crime estimates
10  set forth in your report?
11       A.    No, I didn't.  That was the
12  only question I asked about crime.
13       Q.    Okay.  Besides the questions
14  you asked about how you had estimated the
15  prevalence of OUD and the question you asked
16  about the crime estimates in your report, did
17  you cover any other topics with Ms. Kaminski?
18       A.    No, those were the only two
19  topics that we covered.
20       Q.    And separate from that phone
21  call with Ms. Kaminski and this other unnamed
22  person from Compass Lexecon yesterday, did
23  you speak with anyone from Compass Lexecon
24  about this engagement since your first day of
25  deposition last Tuesday?
```

```
 1       MR. SOBOL:  Objection.
 2       THE WITNESS:  The phone call
 3       yesterday was the only conversation I
 4       had with anyone at Compass Lexecon.
 5  QUESTIONS BY MR. KEYES:
 6       Q.    In your first day of deposition
 7  testimony, you mentioned a number of other
 8  people on the Compass Lexecon team that
 9  assisted you.
10       Do you remember that?
11       A.    I do remember that.
12       Q.    Did you speak with any of those
13  other people since your deposition last
14  Tuesday?
15       A.    The only people from Compass
16  Lex I spoke to were Alice and her colleague
17  yesterday.
18       Q.    And did Ms. Kaminski give you
19  anything in writing either before or after
20  yesterday's call?
21       A.    No, Alice gave me nothing in
22  writing in the week since.
23       Q.    How about the other person on
24  this call yesterday?
25       A.    No, nothing.
```

```
1        Q.     How about anyone else from
2   Compass Lexecon?
3        A.     There was no one else from
4   Compass Lex that sent me any written
5   material.
6        Q.     You said you studied
7   depositions since your first day of
8   deposition testimony; is that correct?
9        A.     I'm not sure I used the word
10  "studied."  I requested depositions and
11  looked at them as best I could.
12       Q.     What depositions did you
13  request?
14       A.     I requested depositions of
15  Dr. Schumacher, Professor Cutler and
16  Professor Gruber.
17       Q.     Did you request any other
18  deposition transcripts?
19       A.     No, I didn't.  Those were the
20  only depositions I requested.
21       Q.     Did you get all three?
22       A.     I did get all three, yes.
23       Q.     Who did you get them from?
24       A.     I got them from counsel.  I
25  think there probably were more than one
```

```
1   source.  I'm not -- I don't remember who sent
2   what.
3        Q.     And you say you looked at the
4   depositions.  What do you mean?
5        Did you read them?
6        A.     Well, I didn't read them in
7   their entirety.  As my mother would say about
8   something like this, my eyes were bigger than
9   my stomach.
10       They're about 400 pages, and
11  I -- "studied them" is too strong a word.
12  Something like "reviewed them" would be a
13  good word.
14       Q.     Okay.  And if you didn't review
15  them in their entirety, how did you decide
16  what parts to read and what parts to skip
17  over?
18       A.     I just -- I looked at the
19  pages.  I seemed -- I tried to look for
20  things that seemed that might be relevant to
21  me, and I did the best I could in the time
22  that I had.
23       Q.     Well, how much time did you
24  spend reviewing these three deposition
25  transcripts?
```

```
1        A.     In total?
2        Q.     In total.
3        A.     I would say about three hours
4   in total.
5        Q.     And how much of that three
6   hours did you spend reviewing
7   Dr. Schumacher's deposition testimony?
8        A.     I would say maybe it wasn't
9   quite an hour for each deposition, but maybe
10  a bit more for Schumacher and a bit less for
11  the other two.
12       Q.     And why is that?  Why did you
13  spend more time on Dr. Schumacher's
14  deposition transcript than the other two?
15       A.     The reason I spent more time
16  with that -- ideally, of course, I'd have all
17  the time in the world.  It had to do with
18  when I received them and how much time I
19  could set aside at the time I got the
20  depositions.
21       Q.     So when did you review the
22  three transcripts?
23       A.     I believe I reviewed all three
24  transcripts yesterday.
25       Q.     Did you request the deposition
```

```
1   testimony of anyone else besides these three
2   people?
3        A.     Those were the only three
4   depositions I requested.
5        Q.     Did you request the deposition
6   testimony of any fact witness in the case?
7        A.     In the time between my last
8   meeting with you and today?
9        Q.     Yes.
10       A.     No.  These were the only three
11  depositions I requested, period.
12       Q.     Did you speak with
13  Dr. Schumacher since the first day of your
14  deposition?
15       A.     No, I did not speak with
16  Dr. Schumacher.
17       Q.     How about Professor Cutler?
18       A.     I did speak with Dr. Cutler.
19       Q.     How about Professor Gruber?
20       A.     No, I didn't speak with
21  Professor Gruber.
22       Q.     So in addition to the things
23  you list before that you had done since your
24  first day of deposition, you also spoke with
25  Professor Cutler, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I did speak with Professor
2    Cutler but not about my testimony.
3    Q.    Okay.  What did you speak with
4    Professor Cutler about?
5    A.    We were at a dinner together.
6    It's called a program dinner.
7    David Cutler is the head of the
8    Ph.D. training program for Ph.D. in health
9    policy at Harvard University.  I'm the
10   director of admissions of that, and I was
11   among the faculty that attended the dinner.
12   There were some students, and I spoke with
13   David at the dinner.
14   Q.    Did you speak with him about
15   his deposition?
16   A.    No, I didn't.
17   Q.    Did you speak with him about
18   your deposition?
19   A.    Not at all, no.
20   Q.    Did you speak with him about
21   any of the work that either of you had
22   performed in this case?
23   A.    There was no substantive
24   discussion -- excuse me.  There was no
25   substantive discussion of any kind of the

Highly Confidential - Subject to Further Confidentiality Review

1    material in this case or really any other
2    area of economic research.
3    Q.    Since you finished your
4    deposition testimony last Tuesday, did you
5    speak with any other expert who either is
6    offering opinions in this case or who
7    provided an expert report in this case?
8    A.    Since Tuesday, I don't think
9    I've spoken with anyone else.
10   Q.    And did you speak with any fact
11   witness in this case since your first day of
12   deposition?
13   A.    No, I spoke to no fact witness
14   since last Tuesday.
15   Q.    You also mentioned that you had
16   met with Mr. Sobol, and you had a brief call
17   with Mr. Ko?
18   A.    That's right.
19   Q.    How long was your meeting with
20   Mr. Sobol?
21   A.    It was about an hour, I would
22   say.
23   Q.    How long was your call with
24   Mr. Ko?
25   A.    My call with David was less

Highly Confidential - Subject to Further Confidentiality Review

1    than half an hour.
2    Q.    And were both the meeting with
3    Mr. Sobol and the call with Mr. Ko yesterday?
4    A.    They were both yesterday, yes.
5    Q.    So you had a long day yesterday
6    in this case to prepare for today's
7    deposition?
8    A.    Well, that only accounts for
9    about six hours in total.
10   Q.    Would you open your report on
11   damages to -- which is Exhibit Number 1,
12   giving you back the original, and would you
13   turn to Appendix 4.C-1.1?
14   A.    Okay.
15   Okay.  I think I'm there.
16   Q.    Do you have Appendix 4.C-1.1 in
17   front of you?
18   A.    I do, yes.
19   Q.    Okay.  And this is titled
20   "Cuyahoga ADAMHS Board damages."
21   Correct?
22   A.    I see that, yes.
23   Q.    Okay.  Turn your attention to
24   line 2.  There's a line that says,
25   "Opioid-Related Percentage of Services."

Highly Confidential - Subject to Further Confidentiality Review

1    Do you see that?
2    A.    I do see that.
3    Q.    Okay.  And then it lists a
4    percentage for each year from 2006
5    through 2017.
6    Do you see that?
7    A.    I see that, too.
8    Q.    And then there's a note for
9    note 2 that says, quote, "Based on metric
10   analysis in the Cutler report, see Table 3.5
11   sub 3."
12   Do you see that?
13   A.    I also see that, yes.
14   Q.    Okay.  And when you say "based
15   on the metric analysis in the Cutler report,"
16   you mean you took the percentage from Cutler
17   report Table 3.5 sub 3 and you just put it
18   into your calculations, correct?
19   MR. SOBOL:  Objection.
20   THE WITNESS:  Well, it's based
21   on.  It doesn't -- I would have to
22   remind myself what 3.5.3 that Cutler
23   did to be -- to refresh my memory
24   about -- of what percent this is.
25

```
1    QUESTIONS BY MR. KEYES:
2         Q.    Well, he had a percentage in
3    that table, correct?
4              MR. SOBOL:  Objection.
5    QUESTIONS BY MR. KEYES:
6         Q.    That was titled "Opioid-Related
7    Percentage of Services"?
8              MR. SOBOL:  Objection.  The
9         document's not in front of him.
10             THE WITNESS:  Yeah, I'd have to
11        take another look to remind myself
12        what this refers to exactly.
13        Excuse me.  This shows you the
14        source, and, you know, I would need to
15        see the source in order to make a
16        determination.
17   QUESTIONS BY MR. KEYES:
18        Q.    Okay.  Sitting here right now,
19   do you know whether you just took the
20   calculation -- the percentage that Professor
21   Cutler had in that table and put it in your
22   table or whether you did something else to
23   his percentage?
24             MR. SOBOL:  Objection.  Asked
25        and answered.
```

```
1              THE WITNESS:  Well, this number
2         is based on Professor Cutler's
3         analysis, and to be able to
4         reconstruct where this came from, I
5         would need to look at what David
6         actually reported.
7    QUESTIONS BY MR. KEYES:
8         Q.    So sitting here right now, when
9    you offered this opioid percentage of
10   services, you can't tell me how you arrived
11   at that number?
12             MR. SOBOL:  Objection.  Asked
13        and answered.
14             THE WITNESS:  This note
15        explains the source.  And I'm happy,
16        if you have happen to have that
17        report, that I can take a look at it
18        and make a determination.
19   QUESTIONS BY MR. KEYES:
20        Q.    Okay.  I understand that if you
21   read Cutler's report, it may refresh or
22   remind you --
23        A.    Yeah, it certainly will.
24        Q.    -- but I'm entitled to probe
25   what you know without looking at a document
```

```
1    or some kind of cheat sheet.
2              MR. SOBOL:  I disagree with
3         that about his entitlements or not.
4         And you're not to listen to what he
5         says about what he's entitled to or
6         not entitled to do.
7    QUESTIONS BY MR. KEYES:
8         Q.    So sitting here today, can you
9    tell me what you did to take the percentages
10   that you say are in the Cutler report at
11   Table 3.5 sub 3 to arrive at the percentages
12   you list here on line 2?
13             MR. SOBOL:  Objection.  Asked
14        and answered.
15             THE WITNESS:  Well, what note 2
16        says is it's based on the metric
17        analysis in the Cutler report.  As I'm
18        sitting here today, I can't
19        reconstruct where these numbers came
20        from based on that analysis.
21   QUESTIONS BY MR. KEYES:
22        Q.    Would it surprise --
23             MR. SOBOL:  He hasn't finished
24        his answer.
25
```

```
1    QUESTIONS BY MR. KEYES:
2         Q.    Did you finish your answer?
3         A.    I don't think I need to say
4    anything more.
5         Q.    Okay.  Would it surprise you if
6    you just took the percentages in
7    Professor Cutler's table and incorporated
8    them here as line 2?
9              Would that surprise you?
10             MR. SOBOL:  Objection.  Asked
11        and answered.
12             THE WITNESS:  Well, I don't
13        know if it would surprise me or not.
14        There are aspects of Cutler's
15        percentages that I did take and use
16        directly, but I don't want to -- I
17        don't feel like I can commit myself to
18        doing that unless I actually refresh
19        my memory about the Cutler report.
20   QUESTIONS BY MR. KEYES:
21        Q.    Okay.  Would you return to
22   Appendix 4.C-2.1.
23             Are you there?
24        A.    I'm there, yes.
25        Q.    And this is titled "Cuyahoga
```

1  Division of Children and Family Services
2  Damages"?
3       A.     Yeah, I see that.
4       Q.     And do you see line 9 says,
5  "Opioid-Related Percentage of Removals"?
6       A.     I see that, yes.
7       Q.     And it then has a note 9.
8  Note 9 says, "Based on metric analysis in the
9  Cutler report, see Table 3.6 sub 1"?
10      A.     I see that.
11      Q.     Okay.  So did you take the
12 percentages that were in that referenced
13 Cutler table and incorporate in this line, or
14 did you do something additional to those
15 percentages?
16      A.     This is the same situation for
17 me.  It's based on the metric analysis in
18 Cutler's report, but for me to determine
19 whether there -- I just kind of took them in
20 a sense or whether I had to do something
21 else, I really would need to refresh my
22 memory about.
23      Q.     So you can't explain sitting
24 here right what, quote, "based on" means?
25            MR. SOBOL:  Objection.  Asked

1  and answered.
2            THE WITNESS:  I can explain
3  what "based on" means.  You know, it's
4  a typical form of academic citation
5  that if you use something, you make a
6  reference to the source of that thing
7  without going through necessarily all
8  the manipulations that led to that
9  number.
10 QUESTIONS BY MR. KEYES:
11      Q.     You say it's a typical form of
12 academic citation.
13            When you take a figure from
14 another source and you incorporate that into
15 your work, do you cite the source, or do you
16 say "based on" the source --
17            MR. SOBOL:  Objection.
18 QUESTIONS BY MR. KEYES:
19      Q.     -- as a matter of your general
20 practice?
21            MR. SOBOL:  Objection.
22            THE WITNESS:  If I understand
23 your question, you're asking about an
24 academic article that wouldn't be
25 necessarily part of a litigation.

1  QUESTIONS BY MR. KEYES:
2       Q.     Well, let's take them one at a
3  time.
4            In your nomenclature, when you
5  say "based on," is that saying "I got the
6  figure from the cited source and here it is,"
7  or are you saying "I got information from the
8  cited source and then I did something else to
9  arrive at the number I'm listing here"?
10            MR. SOBOL:  Objection.  Asked
11 and answered.
12            THE WITNESS:  When I say "based
13 on" -- and I think this would apply
14 here as well as it would apply if I
15 were doing an academic paper -- it
16 could refer to either.  It doesn't say
17 it is the number, it doesn't say
18 describe the calculation, but it
19 points the reader to where one would
20 need to look in order to figure it
21 out.
22 QUESTIONS BY MR. KEYES:
23      Q.     Did you do any independent work
24 to arrive at what you list here as the
25 opioid-related percentage of removals?

1            MR. SOBOL:  Objection.  Asked
2  and answered.
3            THE WITNESS:  Well, I think
4  the -- so we're -- are we -- Table
5  4.C-2.1 is what we're talking about?
6  QUESTIONS BY MR. KEYES:
7       Q.     We're still on
8  Appendix 4.C-2.1, line 9, where you list
9  percentages for each year for, quote,
10 opioid-related percentage of removals.
11            Did you do any independent work
12 to arrive at those figures?
13            MR. SOBOL:  Objection.  Asked
14 and answered again.
15            THE WITNESS:  Well, these are
16 based on Professor Cutler's report, so
17 they would derive from Professor
18 Cutler's work, not derive from my own.
19 QUESTIONS BY MR. KEYES:
20      Q.     So is that to say, no, I did
21 not do any independent work?
22            MR. SOBOL:  Objection.
23 QUESTIONS BY MR. KEYES:
24      Q.     I'm trying to understand what
25 you did, Professor McGuire.

1   So when you list opioid-related

2   percentage of removals and you give a

3   percentage for each year, I want to know:

4   Did you just take that from Professor Cutler,

5   or did you do some work yourself to arrive at

6   those percentages?

7        MR. SOBOL:  Objection.  I

8   instruct you not to answer.

9        MR. KEYES:  Really.  On what

10  basis?

11       MR. SOBOL:  Move on.

12  QUESTIONS BY MR. KEYES:

13  Q.   Are you refusing to answer the

14  question of whether you did any independent

15  work to arrive at line 9 on this chart?

16  A.   I'm following directions.

17  Q.   Okay.  Would you turn to

18  Appendix 4.C-3.1?

19  A.   Okay.

20  Q.   Are you there?

21  A.   I am.

22  Q.   And this is titled "Cuyahoga

23  Office of Prosecutor Damages"?

24  A.   I see that.

25  Q.   And line 10 says,

---

1   "Opioid-Related Percentage of Charges"?

2   A.   I see that, yes.

3   Q.   And you list a percentage for

4   each year from 2006 to 2017, correct?

5   A.   Yes, I see that.

6   Q.   And line 10 has a cite which

7   says, "Based on metric analysis in the Cutler

8   report, see Table 3.4 sub 3."

9        Do you see that?

10  A.   I do, yes.

11  Q.   Okay.  Did you just take the

12  percentages that Professor Cutler had

13  calculated and incorporate them here, or did

14  you do something to those percentages?

15  A.   I would have to answer in the

16  same way that I've answered your previous

17  questions about the previous two tables.  In

18  order to be sure, I would like to -- I would

19  need to refresh myself about what David's

20  Table 3.4.3 consisted of.

21  Q.   Did you do any independent work

22  to determine the, quote, "opioid-related

23  percentage of charges" that you list here for

24  each of those years?

25       MR. SOBOL:  Objection.  Asked

---

1   and answered.

2        MR. KEYES:  No, I haven't asked

3   him that.  This is a different line.

4        MR. SOBOL:  No, you have.

5        THE WITNESS:  Well, as note 10

6   says, this is based on the analysis in

7   Professor Cutler's report.

8        To be able to reconstruct it,

9   I'd have to go back and see what David

10  had done.

11  QUESTIONS BY MR. KEYES:

12  Q.   Okay.  Would you turn to

13  Appendix 4.C-4.1.

14       Are you there?

15  A.   I'm there, yes.

16  Q.   And this is titled "Cuyahoga

17  Office of Public Defender Damages."

18       Correct?

19  A.   Yes, it is.

20  Q.   Do you see line 9?

21  A.   I see line 9.

22  Q.   It's titled "Opioid-Related

23  Percentage of Charges."

24  A.   Yes, it is.

25  Q.   And it lists percentages for

---

1   each year from 2006 to 2017?

2   A.   Yes, it does.

3   Q.   Okay.  And this lists as its

4   cite, based on metric analysis in the Cutler

5   report, "see Table 3.4 sub 3."

6        Do you see that?

7   A.   Yes, I see that.

8   Q.   Did you take the percentages

9   from that cited table that had been

10  calculated by Professor Cutler and

11  incorporate them into your line 9 here, or

12  did you do something else to those

13  percentages?

14  A.   I have to answer this in the

15  same way I would answer the questions about

16  your previous three tables.  It's based on

17  the analysis in the Cutler report, and in

18  order to reconstruct these numbers, I would

19  need to refresh myself about what David's

20  report contained.

21  Q.   Did you do any independent work

22  to arrive at the figures that you list here

23  as, quote, "opioid-related percentage of

24  charges"?

25       MR. SOBOL:  Objection.  Asked

1    and answered.
2         THE WITNESS:  Well, I don't
3    really have anything to add to what I
4    answered, you know, 30 seconds ago.
5    It's based on Cutler's report, and I'd
6    need to see that in order to
7    reconstruct how -- where these numbers
8    came from.
9    QUESTIONS BY MR. KEYES:
10        Q.    Would you turn to
11   Appendix 4.C-5.1?
12        A.    Okay.  I'm there.
13        Q.    It's titled "Cuyahoga Court of
14   Common Pleas Damages"?
15        A.    Yes, it is.
16        Q.    If you turn to line, it says,
17   "Opioid-Related Percentage of Adult Charges."
18        Do you see that?
19        A.    Yes.
20        Q.    And it lists percentages for
21   each year from 2006 to 2017 --
22        A.    Yes, it does.
23        Q.    -- correct?
24        And it says that this is "based
25   on metric analysis in the Cutler report, see

1    Table 3.4 sub 6," correct?
2         MR. SOBOL:  Is there a
3    footnote?
4         You said, "it says."  Was there
5    a footnote, or did the table say that?
6         MR. KEYES:  The footnote 10
7    says, "Based on metric analysis in the
8    Cutler report, see Table 3.4 sub 6."
9    QUESTIONS BY MR. KEYES:
10        Q.    Do you see that?
11        A.    I see that.
12        Q.    Okay.  Did you take the
13   percentages that Professor Cutler listed in
14   that reference table and incorporate them
15   into your line 10, or did you do something
16   additional to those percentages before you
17   included them?
18        A.    Well, I have to answer this
19   question in the same way I've answered the
20   question about the previous three tables.
21        The note notes that this is
22   based on the metric analysis conducted in the
23   Cutler report, and to refresh myself about
24   what was done there and where these -- and
25   how to reconstruct these, I'd need to be able

1    to remind myself what David did in
2    Table 3.4.6.
3         Q.    Did you do any independent work
4    to arrive at the figures that you list here
5    as, quote, "Opioid-Related Percentage of
6    Adult Charges"?
7         MR. SOBOL:  Objection.  Asked
8    and answered.
9         THE WITNESS:  Well, I don't
10   really have anything to add to my
11   previous answer, that this is based on
12   analysis that David did, and I'd need
13   to remind myself about what that
14   analysis was and what was contained in
15   the table in order to tell you where
16   these numbers came from.
17   QUESTIONS BY MR. KEYES:
18        Q.    Would you turn to
19   Appendix 4.C-6.1?
20        A.    I'm there.
21        Q.    Do you see line 9 says,
22   "Opioid-Related Percentage of Juvenile
23   Cases"?
24        A.    I see that yes.
25        Q.    And it lists a percentage for

1    each year from 2006 to 2017?
2         A.    Yes, it does.
3         Q.    And it says in a footnote,
4    "Based on metric analysis in the Cutler
5    report, see Table 3.7 sub 1."
6         A.    I see that, too.
7         Q.    Okay.  Did you take the
8    percentages that Professor Cutler had
9    reported in the reference table and include
10   them here on your line 9, or did you do
11   something else to those percentages before
12   you included them here?
13        A.    I knew you were going to ask
14   that.  The note explains that this is based
15   on the analysis in the Cutler report, and I
16   have to answer the same way I've answered
17   about the previous four tables you've asked
18   about.
19        In order to reconstruct these
20   numbers, I'd need to remind myself about what
21   David did in the table referenced here.
22        Q.    Did you do any independent work
23   to arrive at the percentages you list here
24   as, quote, "Opioid-Related Percentage of
25   Juvenile Cases"?

```
 1          MR. SOBOL:  Objection.  Asked
 2     and answered.
 3          THE WITNESS:  I don't have
 4     anything to add to my previous answer
 5     to this.  It's based on the Cutler
 6     analysis, and I'd need to see that
 7     again in order to remind myself about
 8     how it was done.
 9  QUESTIONS BY MR. KEYES:
10     Q.     Would you turn to
11  Appendix 4.C-7.1?
12     A.     Okay.  I'm there.
13     Q.     It's titled "Cuyahoga Sheriff's
14  Office Damages"?
15     A.     I see that.
16     Q.     Would you turn to line 10,
17  "Opioid-Related Percentage of Charges"?
18     A.     I see that.
19     Q.     Lists a percentage for each
20  year from 2006 to 2017?
21     A.     I see that.
22     Q.     It has a footnote that says,
23  "Based on metric analysis in the Cutler
24  report, see Table 3.4 sub 3"?
25     A.     I see that, too.
```

```
 1     Q.     Did you take the percentages
 2  that Professor Cutler arrived at and reported
 3  in the reference table and include them here,
 4  or did you do anything to those percentages
 5  before you listed them here?
 6          Same answer?
 7     A.     Well, I have to answer this in
 8  the same way I've answered about the previous
 9  five tables you've asked about now.
10          This is based on analysis that
11  David did, and I need to refresh myself about
12  that report in order to see where these
13  numbers come from.
14     Q.     Did you do any independent work
15  to arrive at the figures you list here on
16  line 10 as, quote, "Opioid-Related Percentage
17  of Charges"?
18          MR. SOBOL:  Objection.  Asked
19     and answered.
20          THE WITNESS:  I don't really
21     have anything to add to my previous
22     answer to this question.  It's based
23     on the analysis in the Cutler report,
24     and I'd need to take another look at
25     that in order to determine where these
```

```
 1     numbers came from.
 2  QUESTIONS BY MR. KEYES:
 3     Q.     Would you turn to
 4  Appendix 4.C-8.1?
 5     A.     Okay.  I'm there.
 6     Q.     This is Cuyahoga County Jail
 7  Damages, correct?
 8     A.     I see that.
 9     Q.     Line 9 reports, "Opioid-Related
10  Percentage of Adult Charges"?
11     A.     I see that.
12     Q.     And it lists a percentage for
13  each year from 2006 to 2017?
14     A.     Yes, it does.
15     Q.     And it has a footnote that
16  says, "Based on metric analysis in the Cutler
17  report, see Table 3.4 sub 6"?
18     A.     I see that, too.
19     Q.     Okay.  Did you simply take the
20  percentages that Professor Cutler had arrived
21  at and reported in the reference table and
22  include them here on line 9, or did you do
23  something to those percentages before you
24  listed them here?
25     A.     Well, I have to give the same
```

```
 1  answer to this question as to the previous
 2  six tables you've asked about.
 3          The note indicates it's based
 4  on the metric analysis in the Cutler report,
 5  and in order to determine the source of these
 6  numbers, I'd need to go back and remind
 7  myself about what David's Table 3.4.6 did.
 8     Q.     Did you do any independent work
 9  to arrive at the figures that you list here
10  on line 9 as, quote, "Opioid-Related
11  Percentage of Adult Charges"?
12          MR. SOBOL:  Objection.  Asked
13     and answered.
14          THE WITNESS:  Well, I don't
15     have anything to add to my previous
16     answer on this.
17          They're based on the analysis
18     in the Cutler report, and I'd need to
19     go back and see what was done there to
20     remind myself how these numbers were
21     constructed.
22  QUESTIONS BY MR. KEYES:
23     Q.     Would you turn to
24  Appendix 4.C-9.1?
25          Are you there?
```

```
1        A.    I'm there, yes.
2        Q.    This is titled, "Cuyahoga
3  Office of Medical Examiner Damages."
4              Correct?
5        A.    I see that.
6        Q.    Line 9 says, "Opioid-Related
7  Percentage of Autopsies"?
8        A.    I see that.
9        Q.    It lists a percentage for each
10 year from 2006 to 2017?
11       A.    Yes, it does.
12       Q.    And it has a note that says,
13 "Based on metric analysis in the Cutler
14 report, see Table 3.8 sub 1"?
15       A.    I see that.
16       Q.    Did you simply take the
17 percentages that Professor Cutler arrived at
18 and reported in the reference table and
19 include them here on line 9, or did you do
20 something to those percentages?
21       A.    Well, I have to give the same
22 answer here that I've given to a similar
23 question in the previous seven tables, which
24 is that as the note indicates, it's based on
25 the analysis in the Cutler report.  And in
```

```
1  order to remind myself about the derivation
2  of these numbers, I would need to take
3  another look at Table 3.8.1.
4        Q.    Did you do any independent work
5  to arrive at the figures that are listed on
6  line 9 as, quote, "Opioid-Related Percentage
7  of Autopsies"?
8              MR. SOBOL:  Objection.  Asked
9        and answered.
10             THE WITNESS:  I don't really
11       have anything to add to my previous
12       answer to this question.
13             These numbers are based on the
14       analysis in the Cutler report, and I'd
15       need to remind myself about that
16       before I could give you a precise
17       answer about where these numbers came
18       from.
19 QUESTIONS BY MR. KEYES:
20       Q.    Now, if I go through the same
21 exercise with your appendices that are about
22 affected divisions for Summit County as
23 opposed to Cuyahoga County, will your answers
24 be the same?
25             MR. SOBOL:  Objection.
```

```
1              Which?
2  QUESTIONS BY MR. KEYES:
3        Q.    That every time you list an
4  opioid-related percentage of something, where
5  it lists in a footnote that it's based on the
6  metric analysis in the Cutler report, see
7  table such-and-such in the Cutler report,
8  you're going to tell me you can't tell me
9  whether you just took Professor Cutler's
10 numbers or whether you did something to them
11 before you included them in your appendix?
12             MR. SOBOL:  Objection.
13 QUESTIONS BY MR. KEYES:
14       Q.    Is it fair to say you're going
15 to give me the same answer for each one of
16 those?
17             MR. SOBOL:  Objection.
18             Answer it, if you can.
19             THE WITNESS:  It's a little
20       hard to anticipate how I would answer
21       questions that haven't been asked yet.
22             But there's -- I see a pattern
23       here in what I'm able to tell you
24       about -- this was all Cuyahoga?  Yeah,
25       right.
```

```
1              You'll have to make an
2        inference, if you would like.
3  QUESTIONS BY MR. KEYES:
4        Q.    So in the appendices we've
5  reviewed so far for Cuyahoga County, can you
6  tell me anything about the opioid-related
7  percentage of services that you listed beyond
8  the fact that it's somehow based on what
9  Professor Cutler did?
10             MR. SOBOL:  Objection.
11             Is that a yes or a no question?
12             MR. KEYES:  Yeah.
13             THE WITNESS:  Would you mind
14       reading it back to me?  I'm sorry.
15 QUESTIONS BY MR. KEYES:
16       Q.    Sure.
17             We've reviewed a series of
18 appendices for the different affected
19 divisions for Cuyahoga County.
20             Can you tell me anything about
21 the, quote, "Opioid-Related Percentage of
22 Services" that you listed in the appendix
23 beyond the fact that it's somehow based on
24 what Professor Cutler did?
25             MR. SOBOL:  Objection.  Form.
```

```
 1              THE WITNESS:  Yes.
 2   QUESTIONS BY MR. KEYES:
 3        Q.    What can you tell me?
 4        A.    Well, I can tell you a number
 5   of things.
 6              Which table would you like me
 7   to talk about?
 8        Q.    Well, let's go back to the
 9   first one.  There's go back to
10   Appendix 4.C-1.1.
11              Are you there?
12        A.    I'm -- yes, I'm at 4.C-4.1
13   {sic}, yes.
14        Q.    Okay.  Line 2 says,
15   "Opioid-Related Percentage of Services."
16        A.    Wait a second.  That's not
17   line 2 here.  I'm -- 4.C-4.1?  Or 1 -- I'm
18   sorry.
19        Q.    No.  4.C-1.1.
20              Do you have that in front of
21   you?
22        A.    I do, yeah.
23        Q.    Okay.  And line 2 says,
24   "Opioid-Related Percentage of Services."
25              Correct?
```

```
 1        A.    Yes, it does.
 2        Q.    Okay.  Can you tell me anything
 3   about how that was arrived at, other than it
 4   is somehow based on what Professor Cutler
 5   did?
 6              MR. SOBOL:  And without putting
 7        Professor Cutler's report in front of
 8        him, correct?  Correct?
 9              MR. KEYES:  Correct.
10              THE WITNESS:  Well, I can tell
11        you some things about this.
12              I understand what the task was
13        that Professor Cutler undertook, which
14        was to determine a percent of the
15        ADAMHS -- this is ADAMHS Board? --
16        yeah, the ADAMHS Board activities that
17        were attributable to opioids.
18              And that involved a two-step
19        process:  determining how much of
20        those services were drug-related and
21        then how much of the drug-related were
22        opioid-related.
23   QUESTIONS BY MR. KEYES:
24        Q.    And did you do anything
25   yourself beyond take the percentages from
```

```
 1   Professor Cutler?
 2        A.    Well, this sounds like the
 3   first set of questions you asked.  And what I
 4   can tell you, based on note 2 here, is that
 5   this is based on the metrics in Cutler's
 6   report.  And in order to be more specific
 7   about that, I'd have to tell you -- I'd have
 8   to take a look at what David did and remind
 9   myself.
10        Q.    Would you turn to
11   Appendix 4.D-1.1?
12              Are you there?
13        A.    Yes.
14        Q.    This says the "Summit ADM Board
15   Damages"?
16        A.    Yes.
17        Q.    Line 2 says, "Opioid-Related
18   Percentage of Services"?
19        A.    I see that.
20        Q.    It has a percentage for each
21   year from 2006 to 2017?
22        A.    Yes, it does.
23        Q.    And it, like every other chart,
24   says, "based on metric analysis in the Cutler
25   report."
```

```
 1              This time it references Cutler
 2   report Table 3.5 sub 6?
 3        A.    Yeah, I see that.
 4              MR. SOBOL:  Which other chart?
 5              Objection to the form.  You
 6        said "like every other chart."
 7              Which other chart?
 8              MR. KEYES:  Like every other
 9        chart we've reviewed in the deposition
10        today.
11   QUESTIONS BY MR. KEYES:
12        Q.    Did you do any independent work
13   to arrive at the opioid-related percentage of
14   services that you list on line 2?
15              MR. SOBOL:  Objection.
16              THE WITNESS:  Well, my answer
17        here is going to be the same as it was
18        for Cuyahoga in this case:  that as
19        the note indicates, it's based on the
20        metric analysis in the Cutler report,
21        and in order to determine where these
22        numbers came from more precisely, I'd
23        need to be able to remind myself about
24        what that -- what happened in that
25        table from David's report.
```

```
1    QUESTIONS BY MR. KEYES:
2         Q.    Would you turn to
3    Appendix 4.D-2.1?
4         A.    Okay.  I'm there.
5         Q.    Do you see line 9 says,
6    "Opioid-Related Percentage of Custodies"?
7         A.    I see that, yes.
8         Q.    And it lists a percentage for
9    each year from 2006 to 2017?
10        A.    Yes, it does.
11        Q.    And it has a footnote that also
12   says, "Based on metric analysis in the Cutler
13   report," and it references Cutler report
14   Table 3.6 sub 2?
15        A.    I see that, yes.
16        Q.    Did you do any independent work
17   to arrive at the figures listed here on
18   line 9 as, quote, "Opioid-Related Percentage
19   of Custodies"?
20        A.    I have to answer this in the
21   same way that I've answered questions about
22   questions about other appendix tables.  And
23   what I can tell on the basis of note 9, which
24   I knew, is that it's based on the analysis in
25   the Cutler report.
```

```
1         In order to figure out more
2    precisely what these percentages correspond
3    to, I'd need to go back and see -- remind
4    myself about what happened in Cutler 3.6.2.
5         Q.    Would you turn to
6    Appendix 4.D-3.1?
7         A.    Okay.  I'm there.
8         Q.    Are you there?
9         A.    I'm there.
10        Q.    This is titled "Summit
11   Prosecutor Damages."
12              Correct?
13        A.    I see that, yes.
14        Q.    Line 10 says, "Opioid-Related
15   Percentage of Crimes"?
16        A.    I see that.
17        Q.    It lists a percentage for each
18   year from 2006 to 2017?
19        A.    Yes, I see that.
20        Q.    And it has a note that says,
21   "This is based on the metric analysis in the
22   Cutler report, see Table 3.4 sub 9."
23        A.    I see that, too.
24        Q.    Did you do any independent work
25   to arrive at the figures that you list here
```

```
1    on line 10 as being, quote, "Opioid-Related
2    Percentage of Crimes"?
3         A.    I have to answer this in the
4    same way I've answered the series of previous
5    questions about different appendix tables,
6    which is that as the note indicates, it's
7    based on the metric analysis in the Cutler
8    report.  And in order to determine more
9    precisely where these figures came from, I
10   would need to go back and remind myself about
11   what happened in Table 3.4.9.
12        Q.    Could you turn to
13   Appendix 4.D-4.1?
14        A.    Okay.  I'm there.
15        Q.    Okay.  Line -- this is titled
16   "Summit Court of Common Pleas Damages"?
17        A.    That I see.
18        Q.    Line 10 says, "Opioid-Related
19   Percentage of Crimes"?
20        A.    I see that.
21        Q.    You going to tell me the same
22   thing about how those percentages were
23   arrived at?
24              MR. SOBOL:  Objection.
25              THE WITNESS:  Well, the table
```

```
1         is constructed in the same way.  I'm
2         not sure what you're asking.
3    QUESTIONS BY MR. KEYES:
4         Q.    I'm asking, is this also
5    based -- somehow based on what Professor
6    Cutler did?
7         A.    Well, as the note says, yes,
8    this is based on the metric analysis in the
9    Cutler report.
10        Q.    Did you do any independent work
11   to arrive at the figures listed on line 10
12   as, quote, "Opioid-Related Percentage of
13   Crimes"?
14        A.    Well, I have to answer this in
15   the same way that I've answered questions
16   about a series of other appendices that we've
17   talked about this morning.  And the note
18   indicates it's based on the metric analysis
19   in the Cutler report, and in order to
20   determine more precisely where these
21   particular percentages came from, I'd need to
22   go back and remind myself what happened in
23   Table 3.4.9.
24        Q.    Okay.  Would you turn to
25   Appendix 4.D-5.1?
```

1    A.    Okay.  I'm there.

2    Q.    This is Summit Juvenile Court

3  Damages?

4    A.    I see that.

5    Q.    Do you see line 9 says,

6  "Opioid-Related Percentage of Juvenile

7  Cases"?

8    A.    I see that.

9    Q.    And it again lists a percentage

10  for each year from 2006 to 2017?

11    A.    I see that.

12    Q.    And it also, like every other

13  chart that we've reviewed, says, "Based on

14  metric analysis in the Cutler report"?

15    A.    I see.

16    Q.    And this time it references

17  Table 3.7 sub 2?

18    A.    I see that.

19    Q.    Did you do any independent work

20  to arrive at the percentages you list here on

21  line 9 as, quote, "Opioid-Related Percentage

22  of Juveniles Cases"?

23    A.    Well, I have to answer this in

24  the same way that I've answered questions

25  about a series of other tables you've asked

1  about this morning.  And as the note

2  indicates, it's based on the metrics in the

3  Cutler report, and in order to determine more

4  precisely where these numbers came from, I'd

5  need to remind myself about what happened in

6  Cutler 3.7.2.

7    Q.    Would you turn to

8  Appendix 4.D-6.1?

9    A.    Okay.  I'm there.

10    Q.    This is Summit Sheriff's Office

11  Damages, correct?

12    A.    Yes.

13    Q.    Line 10 says, "Opioid-Related

14  Percentage of Crimes"?

15    A.    I see that.

16    Q.    Lists a percentage for each

17  year from 2006 to 2017?

18    A.    I see that.

19    Q.    And it, like every other chart,

20  references that it's based on the metric

21  analysis in the Cutler report, and it says,

22  "See Table 3.4 sub 9 in the Cutler report,"

23  correct?

24    A.    Yes, it does.

25    Q.    Did you do any independent work

1  to arrive at the figures listed on line 10

2  as, quote, "Opioid-Related Percentage of

3  Crimes"?

4    A.    Well, I have to answer this in

5  the same way I've answered questions about a

6  series of other tables we've talked about

7  this morning.

8          As the note indicates, my work

9  is based on the metrics in the Cutler report,

10  and in order to determine more precisely

11  where these percentages came from, I'd need

12  to be able to review what happened in Cutler

13  3.4.9.

14    Q.    Would you turn to

15  Appendix 4.D-7.1?

16    A.    Okay.  I'm there.

17    Q.    Do you see that it's titled

18  "Summit County Jail Damages"?

19    A.    I see that.

20    Q.    And you have line 9,

21  "Opioid-Related Percentage of Prisoners"?

22    A.    I see that.

23    Q.    It lists a percentage for each

24  year from 2006 to 2017?

25    A.    I see that, too.

1    Q.    And it also references in

2  footnote 9 that it's based on the metric

3  analysis in the Cutler report, and it says,

4  "see Table 3.4 sub 12"?

5    A.    I see that.

6    Q.    Okay.  Did you do any

7  independent work to arrive at the percentages

8  that are listed on line 9 as, quote,

9  "Opioid-Related Percentage of Prisoners"?

10          MR. SOBOL:  Objection.

11          THE WITNESS:  Well, I have to

12      answer this in the same way that I've

13      answered questions about previous

14      tables.

15          The note indicates that line 9

16      is based on the metric analysis in the

17      Cutler report and makes a reference to

18      a particular table there.  And in

19      order for me to reconstruct where

20      these percentages came from, I'd need

21      to go back and take a look at the

22      table referred to in note 9.

23  QUESTIONS BY MR. KEYES:

24    Q.    Please turn to

25  Appendix 4.D-8.1.

1    A.    Okay.

2    Q.    This is titled "Summit

3  Alternative Corrections Damages"?

4    A.    I see that.

5    Q.    Line 5 says, "Opioid-Related

6  Percentage of Prisoners"?

7    A.    I see that.

8    Q.    It has a percentage for each

9  year from 2006 to 2017?

10    A.    Yes, it does.

11    Q.    And it also has a footnote that

12  references being based on the metric analysis

13  in the Cutler report:  "See Table 3.4 sub 12

14  of the Cutler report"?

15    A.    I see that, too.

16    Q.    Did you do any independent work

17  to arrive at the percentages that are listed

18  on line 5 as, quote, "Opioid-Related

19  Percentage of Prisoners"?

20        MR. SOBOL:  Objection.

21        THE WITNESS:  Well, I have to

22        answer that in the same way that I've

23        answered questions about a series of

24        other tables we've talked about this

25        morning.

1            And as the note says, these

2  percentages are based on the metric

3  analysis in the Cutler report, and in

4  order to figure out more precisely

5  where these numbers come from, I'd

6  need to be able to remind myself about

7  what happened in Table 3.4.12.

8  QUESTIONS BY MR. KEYES:

9    Q.    Could you turn to

10  Appendix 4.D-9.1?

11    A.    I'm there.

12    Q.    This is titled "Summit Adult

13  Probation Damages"?

14    A.    I see that.

15    Q.    Line 10 says, "Opioid-Related

16  Percentage of Crimes"?

17    A.    I see that.

18    Q.    It lists a percentage for each

19  year from 2006 to 2017?

20    A.    Yes, it does.

21    Q.    And it, like every other chart,

22  has a footnote that says, "Based on metric

23  analysis in the Cutler report.  See Table 3.4

24  sub 9 of the Cutler report," correct?

25    A.    I see that.

1    Q.    Did you do any independent work

2  to arrive at the figures that you list here

3  as being, quote, "the opioid-related

4  percentage of crimes"?

5    A.    Well, I have to answer this in

6  the same way I've answered questions about a

7  series of other tables we've talked about

8  this morning.

9            And as the note indicates, it's

10  based on the metric analysis in the Cutler

11  report and references a particular table.

12  And for me to be able to reconstruct these

13  percentages, I'd need to go back and remind

14  myself what happened in Table 3.4.9.

15    Q.    Would you turn to

16  Appendix 4.D-10.1?

17    A.    Okay.

18    Q.    This is titled "Summit Medical

19  Examiner Damages."

20        Correct?

21    A.    I see that.

22    Q.    Line 9 says, "Opioid-Related

23  Percentage Autopsies"?

24    A.    I see that, too.

25    Q.    It lists a percentage for each

1  year from 2006 to 2017?

2    A.    Yes, it does.

3    Q.    And it references in a footnote

4  that it's "Based on the metric analysis in

5  the Cutler report.  See Table 3.8 sub 2 of

6  the Cutler report."

7        Correct?

8    A.    I see that.

9    Q.    Did you do any independent work

10  to arrive at the percentages that you list on

11  line 9 as being "Opioid-Related Percentage of

12  Autopsies"?

13        MR. SOBOL:  Objection.

14        THE WITNESS:  Well, I have to

15        answer this in the same way I've

16        answered questions about a series of

17        other tables we've talked about this

18        morning.

19            And as the note indicates, the

20        percentages here are based on the

21        analysis in a particular place in the

22        Cutler report, and in order to

23        reconstruct my numbers, I'd need to

24        remind myself about what happened in

25        Cutler 3.8.2.

```
 1    QUESTIONS BY MR. KEYES:
 2        Q.    Earlier today you said you
 3    talked to Ms. Kaminski at Compass Lexecon to
 4    remind you about certain things you had done
 5    to calculate crime statistics or the
 6    prevalence of OUD?
 7            MR. SOBOL:  Objection.
 8    QUESTIONS BY MR. KEYES:
 9        Q.    Would you also talk to
10    Ms. Kaminski to remind you how you arrived at
11    these various percentages that we've covered
12    in these various charts?
13            MR. SOBOL:  Objection.  Form.
14        Asked and answered.  Compound.
15            THE WITNESS:  There was a verb
16        in there I didn't hear.
17            Was it could, would or did?
18    QUESTIONS BY MR. KEYES:
19        Q.    Would.
20        A.    Would I talk to her?
21            MR. SOBOL:  Why don't we get a
22        fresh question.
23    QUESTIONS BY MR. KEYES:
24        Q.    Well, would you talk to
25    Ms. Kaminski to figure out how you arrived at
```

```
 1    the percentages that you list here on the
 2    lines that we've just spent the last
 3    30 minutes covering?
 4            MR. SOBOL:  Objection.
 5            THE WITNESS:  Would I?  That's
 6        conditional.
 7    QUESTIONS BY MR. KEYES:
 8        Q.    If you wanted to know the
 9    answer, in that condition, would you go to
10    Ms. Kaminski?
11            MR. SOBOL:  Objection.
12            THE WITNESS:  Okay.  So what's
13        the question?
14    QUESTIONS BY MR. KEYES:
15        Q.    If you wanted to know where
16    these percentages came from and what you did
17    with these percentages, would you go to
18    Ms. Kaminski to remind you what you did?
19            MR. SOBOL:  Objection.
20            THE WITNESS:  No.
21            MR. SOBOL:  Which percentages?
22            MR. KEYES:  All of the
23        percentages we've talked about this
24        morning.
25            MR. SOBOL:  I don't know which
```

```
 1        those are.  From Cutler or from
 2        McGuire?
 3    QUESTIONS BY MR. KEYES:
 4        Q.    You can answer.
 5            MR. SOBOL:  Well, I don't
 6        understand the question.
 7            MR. KEYES:  Then you can
 8        object.  You did.  Now he can answer.
 9            MR. SOBOL:  If he can.
10            THE WITNESS:  Well, I have to
11        say it depends.
12    QUESTIONS BY MR. KEYES:
13        Q.    On what?
14        A.    On what exactly you're talking
15    about in terms of what I'm refreshing myself
16    about.
17        Q.    Well, I've just gone through a
18    bunch of charts, some for Cuyahoga County,
19    some for Summit County, and every single
20    chart has a line that says "opioid-related
21    percentage of" something.
22            And every single time there's a
23    footnote, and every single time that footnote
24    says it's based on Professor Cutler's
25    metrics, and every single time it references
```

```
 1    a chart or a table from Professor Cutler.
 2            And every single time you gave
 3    me your answer:  I'll have to give me the same
 4    answer that I gave the last time, which is,
 5    I'd have to go look at Professor Cutler's
 6    report to figure out where these percentages
 7    came from.
 8            And every time I asked you,
 9    "Did you do any independent work?" you said,
10    "I'd have to give you the same answer:  'I
11    don't know.'"
12        A.    I'm laughing with you.
13        Q.    Okay.  So you could go look at
14    Professor Cutler's report, but I'm asking you
15    questions about your report.
16        A.    All right.
17        Q.    And your report says nothing
18    other than "I am doing something based on
19    Cutler's metrics."
20            My question is:  If you want to
21    figure out what you did for this report to
22    get these percentages, who would you go to to
23    get that answer?
24            MR. SOBOL:  Objection.
25
```

Highly Confidential - Subject to Further Confidentiality Review

**Page 460**

```
1    QUESTIONS BY MR. KEYES:
2         Q.    Would it be Ms. Kaminski or
3    someone else at Compass Lexecon?
4              MR. SOBOL:  Objection.
5              Is there some part of the
6    question that you'd like the witness
7    to agree with your speech about, or do
8    you want him to answer your questions
9    that you put?
10             THE WITNESS:  Well, it depends
11   on what the particular percentage is.
12   QUESTIONS BY MR. KEYES:
13        Q.    So would you go to Ms. Kaminski
14   for some percentages but someone else at
15   Compass Lexecon for other percentages?
16             MR. SOBOL:  Objection.
17             If you can answer it, fine.  I
18   don't know what he's talking about.
19   If you can figure it out --
20             MR. KEYES:  Enough of the
21        speaking objections.  If he doesn't
22        know what I'm talking about, he's
23        perfectly capable of saying that.
24   QUESTIONS BY MR. KEYES:
25        Q.    I need your testimony, not what
```

**Page 461**

```
1    you're coached to say.
2              MR. SOBOL:  Well, you can call
3         me Coach Belichick, and I would be
4         flattered, but that's not what I'm
5         doing.
6         I'm just trying to figure out
7    what it is that you're asking and
8    making sure that the witness
9    understands it, too.
10        If you don't want to make
11   yourself better understood, then go
12   for it, but then we'll end up with a
13   fairly inadequate transcript on your
14   part.
15        Do you understand the question
16   before you, Mr. Witness?
17             THE WITNESS:  I think I can be
18   somewhat responsive, which is to say
19   in many cases this is something I
20   would be capable of doing myself.
21        And I might need to ask some --
22   at Compass Lex for some clarification,
23   but it really depends on what
24   you're -- more specifically you're
25   talking about.
```

**Page 462**

```
1    QUESTIONS BY MR. KEYES:
2         Q.    Last week you described your
3    approach for identifying so-called affected
4    costs?
5         A.    Yes.
6         Q.    And you attempted to articulate
7    your approach for identifying affected costs?
8         A.    Yes.
9         Q.    And a number of times you cited
10   the police as an example of how you would go
11   about identifying an affected cost,
12   identifying whether it was fixed or variable,
13   identifying if it was overhead.
14        Do you recall that?
15        A.    I do, yes.
16        Q.    Okay.  So can you identify for
17   me what the responsibilities of the Cuyahoga
18   County Police Department are?
19        A.    In total?  All the
20   responsibilities of the Cuyahoga County
21   Police Department?
22        Q.    Well, your general
23   understanding of the Cuyahoga County Police
24   Department's responsibilities.
25        A.    Okay.  Well, my understanding
```

**Page 463**

```
1    is their primary responsibility is public
2    safety, which involves a number of
3    safety-related activities.
4              They're also responsible for
5    traffic control, if I could use kind of a
6    layperson's word about that.  And some
7    community education, community relations.
8         Q.    Did you talk to anyone who
9    works for the Cuyahoga County Police
10   Department?
11        A.    I don't recall.
12        Q.    Did you read the deposition
13   testimony of anyone who works for the
14   Cuyahoga County Police Department?
15        A.    I may have.  I don't recall.
16        Q.    Do you have an understanding as
17   to what the responsibilities of the Summit
18   County Police Department are?
19        A.    Isn't it sheriff?
20        Q.    Is there a police department in
21   Summit County?
22        A.    I don't remember the title.  I
23   thought it might have been sheriff, but...
24        Q.    Okay.  So for Summit County you
25   think there's a sheriff?
```

```
 1        A.    I'm -- I guess I'm asking, but
 2   I know I can't do that, so...
 3              I guess if I can -- see if I
 4   understand where the question is.  The
 5   question is, did I speak to someone in Summit
 6   County law enforcement?
 7              MR. SOBOL:  Objection.
 8   QUESTIONS BY MR. KEYES:
 9        Q.    No.
10              My question was:  Did you
11   speak -- do you have an understanding of what
12   the responsibilities are of a Summit County
13   Police Department?
14        A.    Responsibilities.  The
15   responsibilities would be very similar.
16        Q.    Did you talk to anyone who
17   works for a Summit County Police Department?
18        A.    I don't recall.
19        Q.    Did you read the deposition
20   testimony of anyone who works for a Summit
21   County Police Department?
22        A.    I may have.  I don't remember.
23        Q.    Okay.  And does Summit County
24   have a police department?
25        A.    They have a -- I don't remember
```

```
 1   whether it's called sheriff or police
 2   department, but they have a function that
 3   would have gone under one of those two names.
 4        Q.    Does Cuyahoga County have a
 5   police department?
 6        A.    It's the same.
 7        Q.    Okay.  And do you have an
 8   understanding as to what the differences are
 9   between a police department and a sheriff's
10   department?
11        A.    Not really, no, I don't
12   understand in terms of the -- whatever the,
13   you know, the connotations of the
14   jurisdiction each of those departments would
15   have.
16        Q.    Do you have an understanding as
17   to whether there are differences between a
18   police department and a sheriff's
19   department --
20              MR. SOBOL:  Objection to form.
21   QUESTIONS BY MR. KEYES:
22        Q.    -- in Cuyahoga County?
23        A.    As I said, I don't have an
24   appreciation of the -- whatever the
25   differences are between those two forms of
```

```
 1   law enforcement.
 2        Q.    How about Summit County?
 3              MR. SOBOL:  Objection.
 4              THE WITNESS:  I'm not sure what
 5        you're asking.
 6   QUESTIONS BY MR. KEYES:
 7        Q.    Do you have an understanding as
 8   to whether there are differences between a
 9   police department and a sheriff's department
10   in Summit County?
11        A.    Well, I would have to give the
12   same answer I gave for Cuyahoga.  I don't
13   have an appreciation of the differences in,
14   you know, authority of the police and
15   sheriff's department.
16        Q.    Okay.  You identified the
17   Summit County ADM Board as an affected
18   division, to use your terminology, correct?
19        A.    Yes, that's correct.
20        Q.    Okay.  So for the Summit County
21   ADM Board, what was the opportunity cost of
22   the opioid-related expenditures that you
23   quantified?
24              MR. SOBOL:  Objection.
25              Do you want him to refer to his
```

```
 1        report, or is this a memory test?
 2              MR. KEYES:  I'm asking him to
 3        identify what the opportunity costs
 4        was.
 5              THE WITNESS:  The opportunity
 6        costs in economics is measured in
 7        dollars, and it's in my report.
 8   QUESTIONS BY MR. KEYES:
 9        Q.    What activity or activities did
10   the Summit County ADM Board forego because it
11   spent those dollars on opioid-related
12   activities?
13              MR. SOBOL:  Objection.  Asked
14        and answered.
15              THE WITNESS:  This is something
16        that we talked about last time in some
17        detail, and the important thing that I
18        need to say about this from the
19        standpoint of an economist is the way
20        opportunity cost works is that it's
21        not necessary to identify the precise
22        nature of the activities that were not
23        undertaken.
24              And if you remember last time,
25        I gave you the example of the
```

1  household that had an accident with
2  their car and it cost them $75.  The
3  opportunity cost of those funds is
4  $75.  That's the economic approach to
5  opportunity cost.
6        It's not necessary for me as an
7  economist to say, well, they didn't go
8  out to dinner one night or they, you
9  know, didn't do whatever.  The
10 opportunity cost is $75.
11 QUESTIONS BY MR. KEYES:
12     Q.  Did you identify whether Summit
13 County ADM Board suffered any harm because it
14 forewent an opportunity because it was
15 spending dollars on opioid-related
16 activities?
17        MR. SOBOL:  Objection.
18        THE WITNESS:  What do you mean
19 by the board suffering harm?
20 QUESTIONS BY MR. KEYES:
21     Q.  Well, I don't know that I can
22 be more specific.
23        In your work, you identified
24 the dollars that you said were devoted to
25 opioid-related activities.  You said that had

1  an opportunity cost.
2     A.  Yes.
3     Q.  I asked you what the ADM Board
4  forewent, something they didn't do, because
5  they were spending those dollars on
6  opioid-related activities.
7        You said you don't need to look
8  at that.
9        I'm asking:  Did you look at
10 whether the Summit County ADM Board suffered
11 or incurred any harm because it forewent
12 another activity because it was spending
13 dollars on the opioid problem?
14        MR. SOBOL:  Okay.  And
15    objection.
16        There was a speech that I
17    assume that the questioner does not
18    expect you to be buying into, but
19    there was a question at the end of it
20    which I assume the questioner was
21    asking you to respond to.
22        THE WITNESS:  I'm still a
23    little confused about what you mean by
24    the board being harmed.
25        The board is a board, which

1  are -- which consists of people on the
2  board.  That's what I understand the
3  board to be.
4        Are you asking how they would
5  be harmed?
6  QUESTIONS BY MR. KEYES:
7     Q.  No.
8        I'm asking how the Summit
9  County ADM Board, as the affected division
10 you identified --
11     A.  Okay.
12     Q.  -- whether it suffered any harm
13 because it forewent another activity because
14 it was spending dollars on opioid-related
15 services.
16        MR. SOBOL:  Objection.
17        THE WITNESS:  Okay.  Well, I am
18    interpreting your question as an
19    opportunity cost question, which is to
20    say something had been foregone
21    because of the funds to go into
22    opioids, and there's a dollar metric
23    of that.
24        And then I'm a little bit lost
25    in the question.  So, sorry.

1  QUESTIONS BY MR. KEYES:
2     Q.  But you were talking about
3  opportunity costs.  You've already talked at
4  length about opportunity costs.  I'm asking
5  about harm.
6     A.  Harm.
7     Q.  Harm.
8        Did you identify any harm that
9  the Summit County ADM Board suffered or
10 incurred --
11        MR. SOBOL:  Objection.
12 QUESTIONS BY MR. KEYES:
13     Q.  -- because it didn't spend
14 money on something else because it was
15 spending those dollars on opioid-related
16 activities?
17        MR. SOBOL:  Objection.  Asked
18    and answered now.
19        THE WITNESS:  Okay.  So I
20    understand you're not asking about
21    opportunity costs.  I'm not sure then
22    what harm means in your question.
23 QUESTIONS BY MR. KEYES:
24     Q.  So you can't -- you don't know
25 what harm means; that's your testimony?

1    MR. SOBOL:  Objection.  It's
2  not his testimony.
3         He doesn't know what you mean
4  by it.
5         THE WITNESS:  I can't answer
6  until -- if you could just use another
7  example or use another word or help me
8  explain -- help me understand what
9  harm means in the question.
10 QUESTIONS BY MR. KEYES:
11    Q.   How about injury?  Did the
12 Summit County ADM Board suffer any injury
13 because it spent money on opioid-related
14 activities rather than the thing it gave up?
15       MR. SOBOL:  Objection.
16       THE WITNESS:  I'm still having
17  a hard time here.
18         Injury is a kind of metaphor.
19  You know, injury, I know what an
20  injury is.  I interpret you using that
21  term as a kind of metaphor here, but
22  I'm not sure as a metaphor for what.
23         I'm happy to answer the
24  question.  I'm just not sure what the
25  direction is you're trying to get at.

1  QUESTIONS BY MR. KEYES:
2    Q.   In 2006 -- that's one of the
3  years covered by your damages report,
4  correct?
5    A.   Yes.
6    Q.   In 2006, if the Summit County
7  ADM Board did not spend the dollars you
8  quantified on opioid-related work, what would
9  it have spent the money on?
10       MR. SOBOL:  Objection.
11       THE WITNESS:  This gets back to
12  the discussion of opportunity costs
13  and how, from an economist point of
14  view, to be able to quantify in dollar
15  terms the opportunity costs.  It's not
16  necessary for me to know what else
17  they would have done with the money.
18         Just like with the household
19  having to pay the $75 to fix their
20  car, it's not important in assessing
21  opportunity costs to know whether, you
22  know, the teenager spent it, the mom
23  would have spent it, the dad would
24  have spent it.  Those -- I don't need
25  to know those questions.  I don't need

1         to know the answers to those
2         questions.
3  QUESTIONS BY MR. KEYES:
4    Q.   Separate from whether you need
5  to know, did you ask the question, and did
6  you look into that as part of your work on
7  this case?
8         MR. SOBOL:  Objection.
9         THE WITNESS:  I looked into
10  what I needed to know in order to
11  identify opportunity costs in a
12  reliable -- a reliable way that's in
13  line with economic practice in this
14  field.
15  QUESTIONS BY MR. KEYES:
16    Q.   Did you conduct any factual
17  inquiry to determine what the Summit County
18  ADM Board would have spent the money on in
19  2006 if it had not spent that money on what
20  you quantified as opioid-related work?
21       MR. SOBOL:  Objection.  Asked
22  and answered.
23       THE WITNESS:  It wasn't
24  necessary for me to be able to
25  determine a reliable estimate of

1         opportunity costs for me to know what
2         the alternative -- the money would
3         have been spent on alternatively.
4         Just like in the case of the
5         household, an economist assesses the
6         opportunity cost of spending on
7         something without needing to know what
8         the funds would have been devoted to
9         in the absence of that cost.
10  QUESTIONS BY MR. KEYES:
11    Q.   Would your answer be any
12  different if I picked 2007 instead of 2006?
13       MR. SOBOL:  Objection.
14       THE WITNESS:  I don't see
15  anything that would be different with
16  2007, but your -- are you referring to
17  a series of questions or a particular
18  question?
19  QUESTIONS BY MR. KEYES:
20    Q.   I'll ask you a question about
21  2006.
22    A.   You asked me a series of
23  questions about 2006.
24    Q.   And now I'm saying 2007.
25       MR. SOBOL:  Objection then.

1    QUESTIONS BY MR. KEYES:
2        Q.    Did you conduct any factual
3    inquiry to determine what the Summit County
4    ADM Board would have spent the money on in
5    2007 if it had not spent that money on what
6    you quantified as opioid-related work?
7        A.    Okay.  I do have to answer this
8    in the same way that I referred to in the
9    earlier year.  In order to develop a reliable
10   estimate of opportunity costs, it's not
11   necessary for an economist to be able to
12   identify what exactly the funds would have
13   been used for.  They could have been used
14   for, you know, different purposes.
15       Q.    And if I ask the same question
16   using 2008 instead of 2007, would your answer
17   be the same?
18            MR. SOBOL:  Objection.
19            THE WITNESS:  Okay.  The same
20        single question --
21   QUESTIONS BY MR. KEYES:
22       Q.    Yes.
23       A.    -- you're referring to?
24            My answer would be the same for
25   2008.

1        Q.    And would your answer be the
2    same to that question for every year between
3    2006 and 2018?
4            MR. SOBOL:  Objection.
5            THE WITNESS:  Well, the
6        principles that I articulate in the
7        question are general, and the
8        methodology for opportunity costs and
9        how to assess it and what an economist
10       needs to know would be the same as --
11       across time.
12   QUESTIONS BY MR. KEYES:
13       Q.    For any year between 2006 and
14   2018, did you conduct any factual inquiry to
15   determine what the Summit County ADM Board
16   would have spent the money on if it had not
17   spent the money on what you quantified as
18   opioid-related work?
19            MR. SOBOL:  Objection.  Asked
20       and answered.
21            THE WITNESS:  Okay.  In order
22       to develop a reliable estimate of
23       opportunity costs, which was what I
24       was trying to do here, it wasn't
25       necessary for me to determine what the

1        funds would have been used for in
2        detail.
3            What's necessary is to know
4        they would have been available to the
5        board to spend on things they thought
6        would be worthwhile.
7    QUESTIONS BY MR. KEYES:
8        Q.    For any year between 2006 and
9    2018, did you conduct any factual inquiry to
10   determine what Summit County Children's
11   Services Board would have spent the money on
12   if it had not spent that money on what you
13   quantified as opioid-related work?
14            MR. SOBOL:  Objection.
15            THE WITNESS:  Well, as in the
16       case of the previous division we spoke
17       about, in order to reliably estimate
18       opportunity costs, which was my
19       objective here, I did what I needed to
20       do to be able to estimate that.
21            What was not necessary for me
22       to do was to identify a hypothetical
23       counterfactual in which the board --
24       sorry, we're at Children's Family
25       Services now -- in which the funds may

1        have been spent differently.
2            And...
3    QUESTIONS BY MR. KEYES:
4        Q.    Okay.  So you list a number of
5    other affected divisions for Summit County.
6    You list the Summit County Prosecutor, Court
7    of Common Pleas, Juvenile Court, Sheriff's
8    Office, County Jail, Alternative Corrections,
9    Adult Probation and Medical Examiner.
10           Okay?
11       A.    That sounds right.
12       Q.    So for any of those affected
13   divisions, for any year between 2006 and
14   2018, did you conduct any factual inquiry to
15   determine what that division would have spent
16   the money on if it had not spent the money on
17   what you quantified as opioid-related work?
18            MR. SOBOL:  Objection in part.
19       Asked and answered.
20            THE WITNESS:  Let me make two
21       comments about this in answer to your
22       question.
23            The first comment is about
24       opportunity costs and the nature of
25       opportunity costs in economics and how

1       an economist studies opportunity
2       costs.  And a good example is a
3       household which incurs, say, an
4       unexpected expense of car repair.  And
5       I'll just pick a number of $75.
6          If the household had not needed
7       to spend that money on car repair, the
8       money would have been available for
9       other things that the household could
10      have purchased.  And there's a range
11      of things that obviously they could do
12      with that money.
13         What is the opportunity costs
14      of the $75 needed for car repair?
15      It's $75.  That's straightforward.
16      Not only economic opportunity costs,
17      but it's also common sense that that
18      would be the opportunity cost of those
19      funds.
20         So that's what I -- that is the
21      economic principle that I applied in
22      this case, which was to do what I
23      needed to do in order to reliably
24      identify the opportunity costs of the
25      funds devoted to opioids.  That's part

1       one of my answer.
2          Part two of my answer is that I
3       did do investigation into the -- into
4       the existence of opportunity costs in
5       the form of confirming that, yes,
6       spending on opioids did divert these
7       funds from other uses.  And it was
8       part of my investigation and part of
9       what we talked about last time, that
10      that confirmatory research was done.
11 QUESTIONS BY MR. KEYES:
12      Q.    Okay.  I asked a yes or no
13 question.  You gave me a long answer.
14         You said that you "did confirm
15 that spending on opioids did divert the funds
16 from other uses."
17         Okay?
18         MR. SOBOL:  In part he said
19     that, yes.
20 QUESTIONS BY MR. KEYES:
21      Q.    So focusing on what you said
22 you did about confirming that spending on
23 opioids did divert the funds from other uses,
24 I want to know for each division what that
25 other use was, what those dollars would have

1 been spent on specifically if they had not
2 been spent on opioid-related activities.
3         MR. SOBOL:  Objection.
4 QUESTIONS BY MR. KEYES:
5      Q.    You tell me what those other
6 uses are specifically for the Summit County
7 ADM Board.
8         MR. SOBOL:  Objection.  Asked
9     and answered.
10        THE WITNESS:  Let me clarify
11     what I just said a minute ago about
12     confirming -- and I'll just call it
13     diversion for short.
14        What I was interested in was
15     does diversion take place.  And
16     there's a series of references in my
17     report to some, I think, some news
18     articles, to some deposition
19     testimony, to some other written
20     material, that indicates that, yes,
21     there is diversion.  When funds are
22     devoted to opioids, other things --
23     some other things don't get done.
24        When you asked me to be -- to
25     turn my attention to the ADAMHS Board,

1       I think is the question you're
2       asking --
3 QUESTIONS BY MR. KEYES:
4      Q.    Yes.
5      A.    -- to turn my attention to the
6 ADAMHS Board in particular, and asked me to
7 identify the particular services that were
8 not done because the money was spent on
9 opioids, it comes back to the answer I gave a
10 minute ago in the previous question, which
11 is, in order to identify opportunity costs,
12 it's sufficient for an economist to measure
13 the spending on, in this case, opioid-related
14 activities.
15         And as long as -- as long as
16 there are alternative uses for the funds,
17 that spending on opioid-related activities is
18 the reliable, it's the economically
19 principled metric for what opportunity costs
20 consist of.
21      Q.    For the Summit County
22 Children's Services Board, can you tell me
23 what the other use was, what the dollars
24 would have been spent on specifically if they
25 had not been spent on opioid-related

1    activities?

2              MR. SOBOL:  Objection.  Asked

3        and answered.

4              THE WITNESS:  Now, this is the

5        same question but for another

6        division --

7    QUESTIONS BY MR. KEYES:

8        Q.    Yes.

9        A.    -- if I understand it?

10             Well, then the answer is going

11   to be the same.

12             With respect to my interest in

13   diversion, I wanted to know and had confirmed

14   in -- with respect to a series of things that

15   I refer to in my report that, yes, diversion

16   is real.  And what I mean by that is that

17   when funds are spent on opioid-related

18   activities, some other things are not done.

19             And when you come to ask me

20   about a particular division, in this case

21   Family Services, then what -- what I did in

22   this case is to identify the opportunity

23   costs of the funds, which is sufficient for

24   an economist to be able to provide a dollar

25   metric of the opportunity cost of the funds.

1    And it's not necessary for me to know

2    precisely what those funds would have been

3    spent on as long as there were alternative

4    use of those funds.

5              That's the economically

6    principled way to go about assessing

7    opportunity costs, and that's what I did.

8        Q.    So if I asked you the same

9    question for each of the other affected

10   divisions for Summit County, is your answer

11   the same?

12             MR. SOBOL:  Objection.

13             THE WITNESS:  My answer would

14        generally be the same, yes.

15   QUESTIONS BY MR. KEYES:

16       Q.    Well, for the Summit County

17   prosecutor, will you tell me what the other

18   use was, that is, what the dollars would have

19   been spent on specifically if they had not

20   been spent on opioid-related activities?

21       A.    Well, let me just remind you of

22   the opportunity costs principle here, which

23   is, for an economist to be able to provide a

24   reliable, theory-based metric of the

25   opportunity cost of spending on a particular

1    activity, it's not necessary for me to know

2    what particular -- what precise services that

3    those funds would have been devoted to in an

4    alternative world in which the opioid crisis

5    were not here.

6              It's sufficient for me to know

7    that this is what they spent on

8    opioid-related activities, and those funds

9    would have been available for something else.

10       Q.    Did you conduct a factual

11   inquiry for any of the Summit County affected

12   divisions to identify the other use, such

13   that you can tell me what the dollars would

14   have been spent on specifically if they had

15   not been spent on opioid-related activities?

16             MR. SOBOL:  Objection.  Asked

17        and answered.

18             THE WITNESS:  Yeah, for each of

19        the Summit County divisions that

20        you're referring to, my objective was

21        to identify the opportunity cost of

22        funds devoted to opioid-related

23        activity.

24             And the economically principled

25        standard way of assessing opportunity

1         costs is to measure the funds devoted

2         to the activity in question, which in

3         this case is opioid-related

4         activities.

5              And so long as there are

6         alternative use of those funds, it's

7         not necessary and it even is just --

8         it's not done to -- it's not necessary

9         to propose a hypothetical world in

10        which something else would have

11        happened.

12             What is sufficient for me is to

13        know that there would have been other

14        uses for the funds of the division,

15        and by devoting them to opioids there

16        was less money available for other

17        things.

18   QUESTIONS BY MR. KEYES:

19       Q.    For any year between 2006 and

20   2018, for any of the Cuyahoga County-affected

21   divisions that you've identified, did you

22   conduct any factual inquiry to identify the

23   other use such that you can tell me what the

24   dollars would have been spent on specifically

25   if they had not been spent on opioid-related

1   activities?

2          MR. SOBOL:  Objection.  Asked

3   and answered.

4          THE WITNESS:  The answer for

5   Cuyahoga County would be similar to

6   the answer for Summit County.

7          What I was doing as an

8   economist in this case is to estimate

9   in dollar terms a measure of the

10  opportunity cost of the funds that

11  were devoted to opioid-related

12  activities and applying standard

13  methodology in economics to measure

14  opportunity costs.

15         It's not necessary for an

16  economist to identify specifically the

17  alternative uses of the funds in a

18  hypothetical world in which they had

19  not been spent on opioids.  It's --

20  opioid-related activities.

21         It's sufficient for me to say

22  this -- these were the funds devoted

23  to opioid-related activities.  They

24  would be available for other uses.

25

1   QUESTIONS BY MR. KEYES:

2          Q.   In 2006, did the Summit County

3   ADM Board create and fund any new position

4   because of the opioid problem?

5          A.   I'm not sure.

6          Q.   How about in 2007?

7          A.   I'm not sure.

8          Q.   How about any year between 2008

9   and 2018?

10         A.   I'm not sure.

11         Q.   Did you look into that at all,

12  to see whether in any year the Summit County

13  ADM Board created and funded any new position

14  because of the opioid problem?

15         A.   I may have.  You know, I was

16  interested in material like this, but I don't

17  remember the details of the Summit ADM Board.

18         Q.   Where did you look to answer

19  that question when you were interested in

20  that question?

21         A.   In various county documents for

22  both counties.

23         Q.   And what did you learn?

24         MR. SOBOL:  Objection.

25         THE WITNESS:  Well, it's --

1          there was particular cases, you know.

2   You'd just find some particular

3   documents, and that --

4   QUESTIONS BY MR. KEYES:

5          Q.   So can you identify for me any

6   year between 2006 and 2018 when the Summit

7   County ADM Board created and funded a new

8   position because of the opioid problem?

9          A.   I don't remember.

10         Q.   Can you identify for me, for

11  any year between 2006 and 2018, when the

12  Summit County Children's Services Board

13  created and funded a new position because of

14  the opioid problem?

15         MR. SOBOL:  Objection.

16         THE WITNESS:  Okay.  Before I

17  answer your question, I want to

18  clarify, it's not necessary for this

19  to take place in order for there to

20  have been opportunity costs.  And I

21  don't remember whether I saw anything

22  about a creation of a position.

23  QUESTIONS BY MR. KEYES:

24         Q.   Did you look into it?

25         A.   Well, I would have been

1   interested in these sort of documents.

2          Q.   Why, if it's not necessary to

3   your inquiry?

4          A.   Well, it just seemed prudent

5   to, you know, be aware of what's going on in

6   the affected divisions.

7          Q.   Did you take any notes as you

8   did this factual inquiry to sort of keep

9   track of what you learned?

10         MR. SOBOL:  Objection.

11         THE WITNESS:  I don't think so,

12  no.

13  QUESTIONS BY MR. KEYES:

14         Q.   Do you talk about it at all in

15  your report?

16         MR. SOBOL:  Objection.

17         THE WITNESS:  Talk about what?

18  QUESTIONS BY MR. KEYES:

19         Q.   About whether the Summit County

20  Children's Services Board created or funded

21  any new position because of the opioid

22  problem in any year between 2006 and 2018?

23         A.   Well, my report contains a lot

24  of details on staffing at all the affected

25  divisions.

```
 1         Q.   Do you talk about that at all
 2  in your report?
 3              MR. SOBOL:  Objection.
 4  QUESTIONS BY MR. KEYES:
 5         Q.   In the narrative report, you
 6  have this --
 7         A.   Narrative report.
 8         Q.   -- you have this long report.
 9              Do you talk about it at all in
10  your report?
11              MR. SOBOL:  Objection.  Asked
12      and answered.
13              THE WITNESS:  Yeah, this is --
14      I'm getting a little lost again.
15              This is ADM?  ADM in a
16      particular county?
17  QUESTIONS BY MR. KEYES:
18         Q.   This is the Summit County
19  Children's Services Board.
20         A.   Summit County Children's
21  Services.
22         Q.   We already covered Summit
23  County ADM Board --
24         A.   Okay.  Sorry.
25         Q.   -- where you said, "I think I
```

```
 1  learned something, but I don't remember what
 2  it is."
 3              MR. SOBOL:  Objection.
 4      Mischaracterizes the answer.
 5  QUESTIONS BY MR. KEYES:
 6         Q.   Same question for Summit County
 7  Children's Service Board.
 8              MR. SOBOL:  What's the
 9      question?
10  QUESTIONS BY MR. KEYES:
11         Q.   You said it's not necessary --
12  I want to be clear.  You said it's not
13  necessary, but you still were interested
14  because you thought it was prudent.
15              And I asked what you remember
16  learning, and you said, I don't know.
17              And I said, do you talk about
18  the concept in the narrative report about
19  whether the Summit County Children's Services
20  Board created and funded any new position
21  because of the opioid problem?
22              MR. SOBOL:  We don't even need
23      a stenographer, do we?
24              Do you have a question?
25              MR. KEYES:  I think the
```

```
 1      stenographer is great.
 2              THE WITNESS:  I --
 3              MR. SOBOL:  There's no question
 4      before you.
 5              He just gave two sentences
 6      about what it is that he recalls the
 7      testimony being.
 8  QUESTIONS BY MR. KEYES:
 9         Q.   Do you talk in the narrative
10  section of your report about whether the
11  Summit County Children's Services Board
12  created or funded any new position because of
13  the opioid problem?
14         A.   I don't think that section in
15  my report discusses a new position.
16         Q.   Can you identify for me any
17  year between 2006 and 2018 when the Summit
18  County Prosecutor created or funded a new
19  position because of the opioid problem?
20              MR. SOBOL:  Objection.
21              THE WITNESS:  Not as I sit here
22      today, as people say.
23  QUESTIONS BY MR. KEYES:
24         Q.   Can you identify for me any
25  year between 2006 and 2018 when the Summit
```

```
 1  County Court of Common Pleas created or
 2  funded a new position because of the opioid
 3  problem?
 4              MR. SOBOL:  Objection.
 5              THE WITNESS:  Again, this is
 6      not necessary for an opportunity cost
 7      investigation.
 8              But in answer to your question,
 9      I don't recall.
10  QUESTIONS BY MR. KEYES:
11         Q.   Can you identify for me any
12  year between 2006 and 2018 when the Summit
13  County Juvenile Court created or funded a new
14  position because of the opioid problem?
15              MR. SOBOL:  Objection.
16              THE WITNESS:  I don't recall.
17  QUESTIONS BY MR. KEYES:
18         Q.   Can you identify for me any
19  year between 2006 and 2018 when the Summit
20  County Sheriff's Office created and funded a
21  new position because of the opioid problem?
22              MR. SOBOL:  Objection.
23              THE WITNESS:  Again, it's not
24      necessary for an opportunity cost
25      analysis, but I don't recall the
```

```
 1        specifics of your question.
 2    QUESTIONS BY MR. KEYES:
 3        Q.    Can you identify for me any
 4    year between 2006 and 2018 when the Summit
 5    County Jail created and funded a new position
 6    because of the opioid problem?
 7            MR. SOBOL:  Objection.
 8            THE WITNESS:  It's the same
 9        answer:  It's not necessary for
10        opportunity costs, and I don't
11        remember anything about a new
12        position.
13    QUESTIONS BY MR. KEYES:
14        Q.    Can you identify for me any
15    year between 2006 and 2018 when Summit County
16    Alternative Corrections created and funded a
17    new position because of the opioid problem?
18            MR. SOBOL:  Objection.
19            THE WITNESS:  It would be the
20        same answer:  It's not necessary for
21        opportunity costs, and I don't recall
22        about a new position.
23    QUESTIONS BY MR. KEYES:
24        Q.    Can you identify for me any
25    year between 2006 and 2018 when Summit County
```

```
 1    Adult Probation created and funded a new
 2    position because of the opioid problem?
 3            MR. SOBOL:  Objection.
 4            THE WITNESS:  It would be the
 5        same answer:  It's not necessary for
 6        opportunity costs, and I don't recall
 7        the specifics of a new position.
 8    QUESTIONS BY MR. KEYES:
 9        Q.    Can you identify for me any
10    year between 2006 and 2018 when Summit County
11    Medical Examiner created and funded a new
12    position because of the opioid problem?
13            MR. SOBOL:  Objection.
14            THE WITNESS:  It would be the
15        same answer:  It's not necessary for
16        opportunity costs, and I don't recall
17        the specifics of Medical Examiner.
18    QUESTIONS BY MR. KEYES:
19        Q.    Turning then to Cuyahoga
20    County.  For any of the divisions that you
21    identified as an affected division, did any
22    of them, in any year between 2006 and 2018,
23    create and fund a new position because of the
24    opioid problem?
25            MR. SOBOL:  Objection.
```

```
 1            THE WITNESS:  This would be the
 2        same answer I gave for the divisions
 3        at Summit:  It's not necessary to
 4        determine opportunity costs to have a
 5        division hired new personnel.
 6            And then with respect to the
 7        specifics about each division and each
 8        year, I don't recall.
 9    QUESTIONS BY MR. KEYES:
10        Q.    Did the Summit County ADM Board
11    in 2006 shift any personnel from one
12    department to another or from one activity to
13    another because of the opioid problem?
14            MR. SOBOL:  Objection.
15        "Shift."
16            THE WITNESS:  Well, the funding
17        for staff means they would have
18        devoted their time to opioid-related
19        activities.  That's what opportunity
20        cost tells you.
21            Beyond that, I'm not sure how
22        to interpret the nature of your
23        question.
24    QUESTIONS BY MR. KEYES:
25        Q.    In 2006, did the Summit County
```

```
 1    ADM Board reassign any personnel from one
 2    department to another?
 3            MR. SOBOL:  Objection.
 4    QUESTIONS BY MR. KEYES:
 5        Q.    Because of the opioid problem?
 6            MR. SOBOL:  Objection.
 7            THE WITNESS:  Well, this,
 8        again, isn't necessary for opportunity
 9        cost, and I -- in answer to your
10        question about the assignment, I'm not
11        sure.
12    QUESTIONS BY MR. KEYES:
13        Q.    Okay.  In 2007, did the Summit
14    County ADM Board reassign any personnel from
15    one department to another?
16            MR. SOBOL:  Objection.
17            THE WITNESS:  This would be the
18        same answer as to the previous
19        question:  It's not necessary for
20        opportunity costs, and I'm not sure
21        about the reassignment.
22    QUESTIONS BY MR. KEYES:
23        Q.    In any year between 2008 and
24    2018, did the Summit County ADM Board
25    reassign any personnel from one department to
```

Highly Confidential - Subject to Further Confidentiality Review

1  another because of the opioid problem?
2      A.    This would be the same answer:
3  It's not necessary from the standpoint of
4  opportunity costs, and I'm not sure about
5  reassignment.
6      Q.    Can you tell me for any year
7  between 2006 and 2018 whether Summit County
8  Children's Services Board reassigned any
9  personnel from one department to another
10 because of the opioid problem?
11         MR. SOBOL:  Objection.
12         THE WITNESS:  This would be the
13  same answer as to the ADAMHS Board:
14  It's not necessary for me to know that
15  in order to estimate opportunity
16  costs.
17         And with respect to your
18  question about reassignment, I'm not
19  sure.
20 QUESTIONS BY MR. KEYES:
21     Q.    For any year between 2006 and
22 2018, did any of the Summit County affected
23 divisions reassign any personnel from one
24 department to another because of the opioid
25 problem?

Highly Confidential - Subject to Further Confidentiality Review

1         MR. SOBOL:  Objection.
2         THE WITNESS:  Again, to
3  estimate opportunity costs, I'm able
4  to do that with the numbers that I
5  have.
6         And with respect to your
7  question about specific reassignments,
8  I'm not sure.
9  QUESTIONS BY MR. KEYES:
10     Q.    In 2000 -- for any year between
11 2006 and 2018, did any of the Cuyahoga County
12 affected divisions reassign any personnel
13 from one department to another because of the
14 opioid problem?
15     A.    This would be the same -- the
16 nature of the answer would be the same as for
17 Summit:  For me to do this work in this
18 matter, to be able to quantify opportunity
19 costs, I had what I needed to know.
20         And with respect to your
21 specific question, I'm not sure about
22 reassignment.
23     Q.    In 2006, did the Summit County
24 ADM Board change the job responsibilities for
25 any employee because of the opioid problem?

Highly Confidential - Subject to Further Confidentiality Review

1         MR. SOBOL:  Objection to the
2  form.
3         THE WITNESS:  Well, this is a
4  version of the question you just
5  asked.
6         I wonder if after I answer this
7  question, if we could take a break for
8  a bit.
9         MR. SOBOL:  Whatever.
10         THE WITNESS:  So in order to
11 estimate opportunity costs, it's not
12 necessary for me to know whether job
13 responsibility was changed.  I think
14 that was the question.  I'm still able
15 to do that with the information that I
16 have.
17         And I'm not sure about in a
18 particular year whether they changed
19 job assignments.
20 QUESTIONS BY MR. KEYES:
21     Q.    Okay.  Let me just finish this
22 line of questioning.
23         In any --
24         MR. SOBOL:  Do you want to take
25 a break?

Highly Confidential - Subject to Further Confidentiality Review

1         MR. KEYES:  Can I ask a few
2  questions just to finish this?
3         MR. SOBOL:  He asked for a
4  break.  Let him have a break.
5         It's up to you.
6         THE WITNESS:  Go ahead.
7  QUESTIONS BY MR. KEYES:
8      Q.    Okay.  For any year between
9  2006 and 2018, did the Summit County ADM
10 Board change the job responsibilities for any
11 employee because of the opioid problem?
12         MR. SOBOL:  Objection.  "Job
13 responsibilities."
14         THE WITNESS:  This answer will
15 be similar to a series of answers I've
16 given the last few minutes:  In order
17 to estimate opportunity costs, I had
18 the information I needed in order to
19 estimate that in dollar terms.
20         And with respect to your
21 question about job responsibilities,
22 it wasn't necessary for me to know if
23 there were job responsibilities
24 altered because of the opioid crisis.
25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. KEYES:
 2        Q.   Okay.  Last question and then
 3    we can take a break.
 4             For any year between 2006 and
 5    2018, did any of the Summit County affected
 6    divisions or any of the Cuyahoga County
 7    affected divisions change the job
 8    responsibilities for any employee because of
 9    the opioid problem?
10        MR. SOBOL:  Objection.
11        THE WITNESS:  Okay.  As an
12    economist, in order to fulfill my
13    assignment in this case, which is to
14    estimate the opportunity cost of these
15    budget funds, I was able to do that
16    based on the information that I had in
17    a reliable and professionally
18    acceptable way.
19             With respect to your question
20    about whether job responsibilities
21    were changed in either county over a
22    11-year period in a total of maybe 19
23    affected divisions, I have to answer
24    that I'm not sure.
25             VIDEOGRAPHER:  The time is
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    10:07 a.m., and we're off the record.
 2        (Off the record at 10:07 a.m.)
 3             VIDEOGRAPHER:  The time is
 4    10:30 a.m., and we're on the record.
 5    QUESTIONS BY MR. KEYES:
 6        Q.   Professor McGuire, in 2006, did
 7    the Summit County ADM Board reallocate any
 8    money from one nonopioid-related program or
 9    account in order to address an opioid-related
10    need?
11        A.   Nonopioid-related account?
12             I'm not sure if they moved
13    money between accounts.  I'm not sure.
14        Q.   In 2007, did the Summit County
15    ADM Board reallocate any money from one
16    nonopioid-related program or account in order
17    to address an opioid-related need?
18        MR. SOBOL:  Objection.
19        THE WITNESS:  Again, this isn't
20    necessary for me to be able to
21    identify opportunity cost.
22             In answer to your question, I'm
23    not sure what programs and accounts
24    may have been subject to some
25    reallocation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. KEYES:
 2        Q.   For any year between 2006 and
 3    2018, did the Summit County ADM Board
 4    reallocate any money from one
 5    nonopioid-related program or account in order
 6    to address an opioid-related need?
 7        MR. SOBOL:  Objection.
 8        THE WITNESS:  Okay.  This would
 9    be a similar answer to I gave a minute
10    ago:  In order to assess opportunity
11    costs, it's not necessary for me to
12    know the kind of program and account.
13             And with respect to your
14    question about program and accounts,
15    I'm not sure if there was reallocation
16    across or within programs and
17    accounts.
18    QUESTIONS BY MR. KEYES:
19        Q.   For any year between 2006 and
20    2018, did any of the Summit County affected
21    divisions reallocate any money from one
22    nonopioid-related program or account in order
23    to address an opioid-related need?
24        MR. SOBOL:  Objection.
25        THE WITNESS:  Okay.  In order
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1             to estimate opportunity costs, it's
 2    not necessary for me to be able to
 3    identify specific reallocations
 4    between or across programs and
 5    accounts.
 6             And in answer to your question,
 7    I'm not sure if there were a program
 8    and/or account-related allocations.
 9    QUESTIONS BY MR. KEYES:
10        Q.   For any year between 2006 and
11    2018, did any of the Cuyahoga County affected
12    divisions reallocate any money from one
13    nonopioid-related program or account in order
14    to address an opioid-related need?
15        MR. SOBOL:  Objection.  In
16    part, asked and answered.
17        THE WITNESS:  Again, this is
18    not something I need to know in order
19    to fulfill my assignment here, to
20    estimate opportunity costs.
21             And with respect to your
22    question, I'm not sure about the --
23    your division reallocation across
24    programs and accounts.
25
```

1  QUESTIONS BY MR. KEYES:
2      Q.    You said you didn't need to
3  know.
4          For any year between 2006 and
5  2018, did you attempt to identify whether any
6  of the Summit County affected divisions
7  reallocated any money from one
8  nonopioid-related program or account to
9  address an opioid-related need?
10     A.    Okay.  What I did for all these
11 years, for all these divisions, is to measure
12 with methods that we've discussed at some
13 point today and yesterday {sic} the funds
14 that each division in each year devoted to
15 opioid-related activities.  And the economic
16 principle of opportunity cost means that
17 that's what I need to know:  how much of
18 these funds that had alternative uses were
19 spent on opioid-related activities.
20     Q.    My question was:  For any year
21 between 2006 and 2018, did you attempt to
22 identify whether any of the Summit County
23 affected divisions reallocated any money from
24 a nonopioid-related program or account to
25 address an opioid-related need?

1          MR. SOBOL:  Objection.  Asked
2  and answered.
3          THE WITNESS:  My task was to
4  estimate opportunity costs, which is
5  what I focused on.  And the estimate
6  of opportunity cost is based on a
7  measure of the funds devoted to the
8  opioid-related activity.
9          It's sufficient for me as an
10 economist to be able to determine
11 opportunity cost, to measure those
12 funds and to be aware that there are
13 other uses for those funds.
14         In that context, the numbers I
15 came up with are the right ones.
16 QUESTIONS BY MR. KEYES:
17     Q.    What steps did you take to be
18 aware that there are other uses for the funds
19 that you've said were the opioid-related
20 expenditures?
21         MR. SOBOL:  Objection.
22         THE WITNESS:  Well, to some
23 degree these -- this is based on
24 experience.  It would be a rare
25 household, it would be a rare

1  department, it would be a rare
2  anything, really, that if an
3  unexpected cost is imposed on the
4  decision-maker that there's nothing
5  else they could do with those funds.
6  That doesn't make a lot of sense to
7  me, just as a microeconomist.
8          And here, as we've discussed, I
9  was interested in confirming that by
10 information related to diversion.  And
11 in speaking with and looking for
12 written material and for reading
13 depositions, there's evidence that
14 diversion did take place.  Specific
15 examples of if the police are doing
16 this, then they couldn't be doing
17 that.
18         So I find it to be, you know, a
19 conclusion that I hold very firmly
20 that, yes, if you're spending money on
21 one thing, you can't spend it on
22 something else.
23 QUESTIONS BY MR. KEYES:
24     Q.    You believe that to be a
25 truism?

1          MR. SOBOL:  Objection.
2          THE WITNESS:  No, that's not a
3  truism, but it's accurate in lots of
4  contexts.
5  QUESTIONS BY MR. KEYES:
6      Q.    And it's an assumption here on
7  your part?
8          MR. SOBOL:  Objection.  Asked
9  and answered.
10         THE WITNESS:  No.
11 QUESTIONS BY MR. KEYES:
12     Q.    Okay.  So tell me the specific
13 steps you took to identify concrete things
14 that any of these divisions would have spent
15 the money on if they did not spend the money
16 on opioid-related activities.
17         MR. SOBOL:  Objection.  Asked
18 and answered.
19         THE WITNESS:  I think this is a
20 version of a similar question I've
21 been asked a few times this morning.
22 And what was necessary for me to do
23 was to identify the funds devoted to
24 opioid-related activities, which are a
25 metric of the opportunity cost of

Highly Confidential - Subject to Further Confidentiality Review

```
 1        those funds so long as there are
 2        alternative uses for those funds.
 3            You know, as in the case of a
 4        household in which, say, $75 is spent
 5        on an unexpected car repair, that $75
 6        is a good measure of the opportunity
 7        cost of those funds.  And I can say
 8        that with confidence, and I can say
 9        that based on sound and well-accepted
10        principles of economics without
11        needing to know whether that $75 would
12        have spent on dog food or whether it
13        would have been, you know, I don't
14        know, spent on anything else.
15            So for me to do my job, it was
16        sufficient for me to measure the funds
17        devoted to the opioid-related
18        activity.
19    QUESTIONS BY MR. KEYES:
20        Q.    I take it you like the $75
21    example.  You've used it a number of times as
22    a hypothetical.
23            And if I understand your
24    hypothetical, someone has a damaged car and
25    it's going to cost $75 to repair it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    That's the basis of my example,
 2    yes.
 3        Q.    Okay.  So I take it that in
 4    your hypothetical someone has gone to a shop
 5    and they've gotten an estimate that says it's
 6    going to cost $75.
 7            MR. SOBOL:  Objection.
 8            Is there a question?
 9    QUESTIONS BY MR. KEYES:
10        Q.    Is that correct?
11        A.    Well, not exactly.  It was more
12    what I -- I think what I said in my example
13    is that they had to pay $75 to repair the
14    car.
15        Q.    Okay.  Well, let me refine this
16    hypothetical.
17            I have a car and it's damaged.
18    I take it to a shop, and I get a $75
19    estimate.  $75 to repair the damage.
20            Okay?
21        A.    Okay.
22        Q.    I have a friend who works at
23    another shop, and he says he can do the work
24    for a hundred dollars to repair the same
25    damage.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Okay?
 2        A.    Okay.
 3        Q.    And I decide I'm going to have
 4    my friend's shop do the repair work because
 5    it gets repaired, and I want my friend's shop
 6    to get the business.
 7            Okay?
 8        A.    Okay.
 9        Q.    So I spend a hundred dollars to
10    get the car repaired.
11        A.    Yes.
12        Q.    Is my opportunity cost $75 or a
13    hundred dollars in that example?
14        A.    Well, for an economist, the --
15    what you purchase with your funds that have
16    to do with car repair, in this case, are a
17    little more complicated because it's not
18    simply one thing, which is to get your car
19    repaired, but you're also getting value from
20    the transaction with your friend.  And
21    that's -- you know, for whatever reason, you
22    find that to be worthwhile doing.  And you
23    make the decision to pay a hundred dollars to
24    get your car fixed.
25            The opportunity cost of those
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    funds is a question about what else could
 2    have been done with the money with respect to
 3    other things your household could have
 4    purchased.  And the answer to that is, you
 5    would have had a hundred dollars had you not
 6    purchased the car repair from the friend.  So
 7    $100.
 8        Q.    So in my hypothetical, my
 9    opportunity cost is a hundred dollars?
10        A.    In your hypothetical, when
11    you've decided that you want to go to your
12    friend for the transaction and you spend a
13    hundred dollars on that, the opportunity cost
14    of that hundred dollars is a hundred dollars
15    less of other stuff you could buy.
16        Q.    Let me change the hypothetical.
17    I still have gone to the shop down the
18    street.  They've still given me a $75 repair
19    estimate for that damage.
20            My girlfriend works at another
21    shop and --
22        A.    Does your wife know?
23        Q.    -- and she says that her shop
24    can fix it for 200 bucks.
25        A.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.    And because I have a crush on
 2   her, I decide I'm going to take my car to
 3   that shop, and I'm going to spend $200 for
 4   that shop to repair it.
 5       A.    Okay.
 6       Q.    In that hypothetical, my
 7   opportunity cost is $75 or $200?
 8       A.    Okay.  This hypothetical, to an
 9   economist, isn't very different than your
10   first hypothetical.
11             You had a friend whose business
12   you -- giving him the business was worth kind
13   of -- I think the implication of your
14   hypothetical, it was worth $25 to you to be
15   able to give the $100 to your friend and to
16   repair your car.
17             You have another friend who you
18   value more highly.  You're even happier about
19   giving her shop the business, and you spend
20   $200 to get your car repaired.  But you're
21   kind of buying -- you would call it in
22   economics a joint product.  You're buying a
23   car repair plus you're buying something else,
24   which is the regard with which your friend
25   holds you, or however you want to phrase
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   that, and you spend $200 for that.
 2             Then the opportunity cost
 3   question is:  How much fewer of other
 4   household items would you be in position to
 5   buy after you decided to spend $200 for your
 6   car repair?  And it's $200 less.
 7             So the answer with respect to
 8   the opportunity cost of that $200 is $200.
 9       Q.    And so the cost consequence of
10   my decision is $200, because that's what I
11   elected to spend, correct?
12       A.    Well, if I could phrase it in
13   my terms, the opportunity cost of those $200
14   is $200.
15       Q.    And to you, it doesn't matter
16   whether I would spend that $200 on something
17   else.  The fact that I have spent $200 means
18   the opportunity cost is $200, correct?
19             MR. SOBOL:  Objection.
20             THE WITNESS:  I'm not sure I'm
21         following what you're trying to get at
22         here.  Sorry.
23   QUESTIONS BY MR. KEYES:
24       Q.    Well, I think you said before
25   it doesn't matter how I would have spent that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   $200 on something else instead of taking this
 2   damaged car to my girlfriend's shop.  To you
 3   the mere fact that I spent $200 means the
 4   opportunity cost is $200, regardless of how I
 5   could have spent the money elsewhere.
 6             MR. SOBOL:  Objection.
 7   QUESTIONS BY MR. KEYES:
 8       Q.    Is that correct?
 9             MR. SOBOL:  Objection.
10             THE WITNESS:  Well, I think the
11         way to say that in conventional
12         economics terms is that it's not
13         necessary for me, as an evaluator of
14         this opportunity cost, to know
15         precisely what you would have done
16         with the $200.  You might have saved
17         some.  You might have taken your wife
18         out to dinner.
19             In any case, the opportunity
20         cost of whatever that is would be
21         $200.  It's very mainstream,
22         down-the-middle-of-the-plate
23         economics.
24   QUESTIONS BY MR. KEYES:
25       Q.    For any year between 2006 and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   2018, did you attempt to identify whether any
 2   of the Cuyahoga County affected divisions
 3   reallocated any money from a
 4   nonopioid-related program or account to
 5   address an opioid-related need?
 6             MR. SOBOL:  Objection.  Asked
 7         and answered.
 8             THE WITNESS:  In order to
 9         identify opportunity cost, which is
10         what I needed to do for my report, it
11         was sufficient for me to get good
12         measures of the funds devoted to
13         opioid-related activities.  It wasn't
14         necessary to be able to, you know,
15         describe the ins and outs of that.
16             And so with respect to your
17         question of reallocation on accounts
18         or programs -- I forget how you
19         phrased it -- I'm not sure.
20   QUESTIONS BY MR. KEYES:
21       Q.    My question was:  Did you
22   attempt to do that identification?
23             You said you didn't need to.
24             My question is not whether you
25   needed to.  My question was did you.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Did you attempt -- for any year
 2  between 2006 and 2018 attempt to identify
 3  whether any of the Cuyahoga County affected
 4  divisions reallocated any money from a
 5  nonopioid-related program or account to
 6  address an opioid-related need?
 7          MR. SOBOL:  Objection.  Asked
 8      and answered.
 9          THE WITNESS:  Yeah.  So that
10      whoever is watching this or reading it
11      understands where I'm coming from on
12      this, I need to explain why I didn't
13      need to do that.
14          And the reason is that my job,
15      as I understood it, was to estimate
16      the opportunity cost of funds devoted
17      to the opioid-related activities.  And
18      that's what I did.  And that told me
19      what I needed to know to be able to
20      get a good measure of the cost to the
21      bellwether counties here.
22          And it wasn't necessary for me
23      to determine what the alternative
24      spending would have been in the
25      affected divisions in either county
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          over the years.
 2  QUESTIONS BY MR. KEYES:
 3      Q.    You have opined to a reasonable
 4  degree of economic certainty that opportunity
 5  costs exist for each of the affected
 6  divisions, correct?
 7          MR. SOBOL:  Objection.  You may
 8      answer.
 9          THE WITNESS:  I'll say okay.
10  QUESTIONS BY MR. KEYES:
11      Q.    And you have placed the value
12  on those opportunity costs as the dollars
13  that you quantified as being spent on
14  opioid-related activities, correct?
15      A.    That was my measure of
16  opportunity costs, yes, the dollars spent on
17  opioid-related activities.
18      Q.    Okay.  For any --
19      A.    Pardon me, just -- I'm sorry,
20  just one qualification of that.
21          Of the potentially affected
22  costs.
23      Q.    For any of the Summit County
24  affected divisions, tell me one concrete way
25  the money would have been spent by that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1  division if those dollars were not spent on
 2  opioid-related activities.
 3          MR. SOBOL:  Objection.  Asked
 4      and answered.
 5          THE WITNESS:  I'm sorry, do you
 6      mean would or could in that question?
 7  QUESTIONS BY MR. KEYES:
 8      Q.    Would.
 9      A.    Would.
10      Q.    Would.
11          For any of the Summit County
12  affected divisions, tell me one concrete way
13  the money would have been spent by that
14  division if those dollars were not spent on
15  opioid-related activities.
16      A.    Okay.
17          MR. SOBOL:  Objection.  Asked
18      and answered.
19          THE WITNESS:  The application
20      of the principle of opportunity costs
21      in this context provides an answer to
22      that in the form that had the money
23      not been devoted to opioid-related
24      activities, it would have been
25      distributed across some other of the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          activities of the division.
 2  QUESTIONS BY MR. KEYES:
 3      Q.    Can you be any more specific
 4  than that?
 5          MR. SOBOL:  Objection.  Asked
 6      and answered.
 7          THE WITNESS:  Well, in order to
 8      estimate opportunity cost, which is my
 9      assignment here, it's not necessary
10      for me to identify exactly what other
11      program or account would have been --
12      would have had access to the funds
13      that were devoted to opioid-related
14      activities.  It's completely
15      sufficient for me to know the
16      opioid-related activity funds.
17  QUESTIONS BY MR. KEYES:
18      Q.    So for any of the Summit County
19  affected divisions, can you give me a single
20  example of what the dollars would have been
21  spent on if they had not been spent on what
22  you identified as the opioid-related
23  expenditures?
24          MR. SOBOL:  Objection.  Asked
25          and answered.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          THE WITNESS:  Well, this is
 2     the -- exactly the same question for a
 3     different county.  And my answer, to
 4     the best of my ability, will be the
 5     same, which is, for me to do my
 6     assignment, what -- you know, and what
 7     that involved is application of the
 8     principle of opportunity cost, then
 9     it's completely sufficient for me to
10     identify the funds that are devoted to
11     opioid-related activities, and it's
12     not necessary for me to identify the
13     particular program or account or
14     activity that any of these divisions
15     would have spent those funds on in the
16     alternative.
17          It's sufficient for me to know
18     they could have spent those on the
19     alternative, and they have, you know,
20     a value in alternative use, which is
21     the idea of opportunity cost.
22     QUESTIONS BY MR. KEYES:
23     Q.   Did you talk to a single person
24     who works for any of the Summit County
25     affected divisions to identify what the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     dollars would have been spent on in a
 2     particular year if they had not been spent on
 3     what you identified as opioid-related
 4     expenditures?
 5          MR. SOBOL:  Objection.  Asked
 6     and answered.
 7          THE WITNESS:  Well, this
 8     follows from the question you asked a
 9     minute ago.
10          For me to do what I needed to
11     do, I needed to know what were the
12     funds devoted to opioid-related
13     activities.
14          To identify an alternative
15     world in which those funds were not
16     devoted to opioid-related activities,
17     it wasn't necessary for me to know
18     what a particular official in a
19     particular division in a particular
20     year would have done alternatively.
21          What I needed to establish is,
22     here's what was spent on
23     opioid-related activities, and these
24     funds had alternative uses.
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     QUESTIONS BY MR. KEYES:
 2     Q.   Right.  You said you didn't
 3     need to do it; you've made that point many
 4     times.
 5          Did you talk to a single person
 6     who works for any of the Summit County
 7     affected divisions to identify what the
 8     dollars would have been spent on --
 9     A.   Yeah.
10     Q.   -- in a particular year if they
11     hadn't been spent on what you identified as
12     opioid-related expenditures?
13          MR. SOBOL:  Objection.
14     QUESTIONS BY MR. KEYES:
15     Q.   Did you do it?
16          MR. SOBOL:  Objection.  Asked
17     and answered.
18          THE WITNESS:  In order to have
19     this answer be well-understood by
20     whoever watches the tape or reads the
21     transcript, I think it's important for
22     me to take a minute to explain the --
23     what I needed to do in this case,
24     which is to identify the funds devoted
25     to opioid-related activities.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          And it wasn't necessary for me
 2     to come up with a reliable estimate of
 3     opportunity cost to know what, in an
 4     alternative world, a particular
 5     official would have done had some of
 6     those funds be freed up for other
 7     uses.
 8          It was sufficient for me to
 9     know that there were alternative uses
10     of those funds, and I have a good
11     economic measure of what the
12     opportunity cost of those funds were.
13     QUESTIONS BY MR. KEYES:
14     Q.   Did you talk to a single person
15     who works for any of the Cuyahoga County
16     affected divisions to identify what the
17     dollars would have been spent on?
18          MR. SOBOL:  Objection.  Asked
19     and answered.
20     QUESTIONS BY MR. KEYES:
21     Q.   Same answer?
22          MR. SOBOL:  Objection.  Asked
23     and answered.
24          You may answer.
25          THE WITNESS:  Well, I would
```

1    just refer to my previous answer,
2    which would be exactly the same, with
3    a change in the location.
4    QUESTIONS BY MR. KEYES:
5        Q.    Did you review any historical
6    budget or finance or accounting documents to
7    identify what the dollars would have been
8    spent on if they had not spent on what you
9    identified as opioid-related activities?
10        MR. SOBOL:  Objection.  Asked
11    and answered.
12        THE WITNESS:  I have a hard
13    time with a "would" verb here, but let
14    me answer as best I can.
15        In order to do my job of
16    estimating opportunity cost, it was
17    sufficient for me to identify how much
18    of the funds of each division were
19    devoted to opioid-related activities.
20        It wasn't necessary for me to
21    identify what would have happened had
22    an official had more budget
23    flexibility and they might have been
24    able to move funds that -- funds that
25    were not needed for opioid-related

1    activities; only that there would be
2    alternative uses for those funds and
3    they would have been devoted to
4    something.
5        But I don't need to know
6    exactly what the official would have
7    done with those funds.
8    QUESTIONS BY MR. KEYES:
9        Q.    Well, if you haven't talked to
10    anyone and you haven't reviewed any
11    historical budgeting, finance or accounting
12    documents to identify what the dollars would
13    have been spent on, because you say, "I just
14    know they would have been spent on something
15    else," how do you know that they would have
16    been spent on something else?
17        MR. SOBOL:  Objection.  Asked
18    and answered.
19        THE WITNESS:  Well, this partly
20    is -- pardon the expression -- common
21    sense.  For a household, for a
22    corporation, for a government
23    division, for the United Nations, for
24    the federal government, if funds are
25    not devoted to something in

1    particular, they have alternative
2    uses.  And in my experience, that's a
3    pretty general characterization of the
4    situation of an economic actor.
5        And a fundamental element of
6    economics is scarcity.  And what
7    scarcity has to do with in this case
8    is funds are limited.  And when funds
9    are limited, they have alternative
10    uses.
11        And just one more quick comment
12    about this.  I was interested in
13    confirming evidence of diversion,
14    which is another --
15    QUESTIONS BY MR. KEYES:
16        Q.    Diversion of funds?
17        A.    Diversion of funds is something
18    we've talked about earlier.
19        And I did speak with and find
20    written evidence of and read deposition
21    testimony of -- that confirmed the presence
22    of, you know, alternative uses of funds.
23        Q.    And when you say "alternative
24    uses," you're saying possibilities; they
25    could have spent the dollars on those other

1    things.
2        MR. SOBOL:  Objection.
3    QUESTIONS BY MR. KEYES:
4        Q.    Not that they would have,
5    because I already asked you the "would have"
6    questions, and you said you'd need to look
7    into that.
8        MR. SOBOL:  Objection.
9    QUESTIONS BY MR. KEYES:
10        Q.    So when you say you did speak
11    with and find evidence in the deposition of
12    that -- testimony that confirms the presence
13    of alternative uses, you are flagging
14    alternative possibilities, correct?
15        MR. SOBOL:  Objection.  Asked
16    and answered.
17        THE WITNESS:  Well, there's two
18    things I spoke about.  The first one
19    was more general in a way, the
20    economics of scarcity that talks about
21    the availability of funds devoted to
22    alternative uses.
23        With respect to some of the
24    diversion, there was more specifics in
25    some of the testimony, some of the

Highly Confidential - Subject to Further Confidentiality Review

1      deposition testimony, that had to do
2      with police officers who may have
3      spent -- had to spend time on
4      opioid-related activities, who,
5      according to the testimony that I
6      remember, they not only could have but
7      would have been attending to rapes and
8      murders.
9          So it's -- I mean, the
10     could/would -- I hope I'm answering in
11     the could/would space that you're
12     asking about here.
13  QUESTIONS BY MR. KEYES:
14     Q.     And the deposition testimony
15  that you're referencing now is the deposition
16  testimony you mentioned in your report?
17     A.     That's correct.
18     Q.     And you said a moment ago you
19  spoke with people.
20         Who did you speak with?
21         I thought you said a week ago
22  you spoke with Compass Lexecon, but you
23  didn't speak with anyone from Cuyahoga County
24  or Summit County.
25     A.     Well, I did --

Highly Confidential - Subject to Further Confidentiality Review

1          MR. SOBOL:  Objection.
2          What's the question?
3  QUESTIONS BY MR. KEYES:
4      Q.     Who'd you speak with?
5          MR. SOBOL:  About?
6          THE WITNESS:  I don't remember
7      the names.
8  QUESTIONS BY MR. KEYES:
9      Q.     And you don't remember their
10  titles, correct?
11     A.     No, I'm not so good on that
12  either.  Sorry.
13     Q.     And you don't remember their
14  functions, correct?
15     A.     Well, there was some public
16  safety people.  There was some EMS people.
17  There was some fire department people.
18     Q.     Do you have any better
19  recollection of any of those conversations
20  today than you had a week ago?
21     A.     Not really, no, sorry.
22     Q.     Okay.  And for the example you
23  gave, how many rapes or murders were not
24  investigated because of opioid-related
25  spending?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     I'm not sure.
2      Q.     How many rapes or murders were
3  not prosecuted because of opioid-related
4  spending?
5      A.     I'm not sure.
6      Q.     How many rapes or murders were
7  not resolved because of opioid-related
8  spending?
9      A.     I'm not sure.
10     Q.     Can you identify for me a
11  single rape or murder that wasn't
12  investigated, wasn't prosecuted and wasn't
13  resolved because of opioid-related spending?
14         MR. SOBOL:  Objection.  Form.
15         THE WITNESS:  I'm sorry, I
16     can't name names of the victims here.
17  QUESTIONS BY MR. KEYES:
18     Q.     And when you spoke to people
19  earlier, you listed those interviews in your
20  report, correct?
21     A.     Yes.
22     Q.     And the people you list in your
23  report all work for Cleveland, correct?
24     A.     Yes.
25     Q.     So as we discussed a week ago,

Highly Confidential - Subject to Further Confidentiality Review

1  you did not talk to anyone who works for
2  Summit County or Cuyahoga County, correct?
3          MR. SOBOL:  Objection.  Asked
4      and answered.
5          THE WITNESS:  I think we --
6      when we talked about this a week ago,
7      there was some phone calls.  I don't
8      remember the names and dates or even
9      how many I was on.
10  QUESTIONS BY MR. KEYES:
11     Q.     Did you study whether any of
12  the affected divisions in any particular year
13  would have saved the money if they had not
14  spent it on opioid-related expenditures?
15         MR. SOBOL:  Objection.  Asked
16     and answered.
17         THE WITNESS:  Again, the
18     principle of opportunity costs implies
19     that the right way to go about this
20     from an economic point of view is to
21     identify the magnitude of funds that
22     are devoted to the opioid-related
23     activities.
24         And what the alternatives to a
25     particular division are will vary.

Highly Confidential - Subject to Further Confidentiality Review

1    And so long as they have alternative
2    uses for the funds, the right metric
3    of opportunity cost is the metric that
4    I applied in my report.
5        So I don't need to know whether
6    they saved it or they spent it.
7    QUESTIONS BY MR. KEYES:
8        Q.    For 2006, did the Summit County
9    ADM Board spend all of the money in its
10   approved budget?
11           MR. SOBOL:  Objection.
12           THE WITNESS:  I would have to
13   go back and look.
14   QUESTIONS BY MR. KEYES:
15       Q.    Was that relevant to your
16   analysis, whether the Summit County ADM Board
17   spent all of the money in its approved budget
18   in 2006?
19       A.    Well, I was able to identify
20   opportunity costs in that case by examining
21   the opioid-related activities and the cost of
22   those activities, without knowing how the
23   funds otherwise would have been used.
24       So just to complete your --
25   complete the answer to the question, it

Highly Confidential - Subject to Further Confidentiality Review

1    wasn't necessary for me to know whether they
2    spent or overspent their budget.
3        Q.    Did you investigate whether,
4    for any year between 2006 and 2018, the
5    Summit County ADM Board spent all of the
6    money in its approved budget?
7            MR. SOBOL:  Objection.
8            THE WITNESS:  Well, this is
9    similar to the question about a
10   particular year.
11           In order to do my job and
12   estimate opportunity cost, it's
13   sufficient for me to measure the funds
14   devoted to opioid-related activities.
15           How much they were spending on
16   other activities, how much they
17   were -- the budget, the fund balance
18   went up and down, is not something I
19   needed to know in order to come up
20   with reliable, principled, definite
21   measure of opportunity costs.
22   QUESTIONS BY MR. KEYES:
23       Q.    Is it accurate to say that you
24   did not investigate whether, for any year
25   between 2006 and 2018, the Summit County ADM

Highly Confidential - Subject to Further Confidentiality Review

1    Board spent all of the money in its approved
2    budget?
3            MR. SOBOL:  Objection.  Asked
4    and answered.
5            THE WITNESS:  Again, this is --
6    in order for me to do my job and to
7    measure the opportunity cost of funds
8    that were devoted to opioid-related
9    activities, it wasn't necessary for me
10   to investigate what other uses there
11   would have been for those funds, other
12   than to establish, yes, there would be
13   other uses for those funds.
14   QUESTIONS BY MR. KEYES:
15       Q.    And when you --
16       A.    And just -- excuse me.
17       And the details of what the
18   funds would have been devoted to are -- I
19   don't need to know those in order to measure
20   opportunity costs.
21       Q.    When you tell me that it wasn't
22   necessary to do it, you're explaining why you
23   did not do it, correct?
24       A.    Yes.
25       Q.    Is it accurate to say that you

Highly Confidential - Subject to Further Confidentiality Review

1    did not investigate whether, for any year
2    between 2006 and 2018, any of the Summit
3    County affected divisions spent all the money
4    in their approved budgets?
5            MR. SOBOL:  Objection.
6            THE WITNESS:  So in order to
7    make sure someone watching this or
8    reading the transcript has a complete
9    answer and a complete understanding of
10   what I did, to the question, I need to
11   explain briefly that the principle of
12   opportunity cost, which is the way an
13   economist thinks about these kind of
14   situations, implies that what I should
15   investigate and what I should measure
16   are the funds devoted to
17   opioid-related activities.  Then I
18   have what I need to know.
19           And it's not necessary for me
20   to go to an alternative world in which
21   the funds would have been available
22   and might have been spent on something
23   else, other than to establish that
24   they would have been available and
25   could have been spent on something

Highly Confidential - Subject to Further Confidentiality Review

```
 1        else.
 2    QUESTIONS BY MR. KEYES:
 3        Q.      When you tell me that it wasn't
 4    necessary to do it, you're explaining why you
 5    did not do it, correct?
 6        A.      I thought that would be
 7    important for the audience to know.
 8        Q.      Is it accurate to say that you
 9    did not investigate whether, for any year
10    between 2006 and 2018, any of the Cuyahoga
11    County affected divisions spent all the money
12    in their approved budgets?
13        MR. SOBOL:  Objection.  Asked
14            and answered.
15            THE WITNESS:  Well, the answer
16            to that would be exactly the same as I
17            gave for the other county a few
18            minutes ago.
19    QUESTIONS BY MR. KEYES:
20        Q.      At any time in 2006, did the
21    Summit County ADM Board seek permission to
22    spend dollars beyond its approved budget on
23    any opioid-related need?
24        A.      This is another version of the
25    question we've been discussing today, and in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    order for me to identify the opportunity
 2    costs of the funds they actually spent, it's
 3    not necessary for me to know what they may
 4    have wished to do, wanted to do, sought
 5    permission to do, in order to accurately
 6    identify what the opportunity cost of the
 7    funds they actually spent are.
 8        Q.      And again, when you tell me
 9    that it wasn't necessary to do it, you're
10    explaining why you did not do it, correct?
11        A.      I think that's important for
12    the audience to hear.
13        Q.      At any time between 2006 and
14    2018, did the Summit County ADM Board seek
15    permission to spend dollars beyond its
16    approved budget on any opioid-related need?
17            MR. SOBOL: Objection.
18            THE WITNESS:  Okay.  So to
19            understand my answer to this question,
20            it's important to keep in mind that
21            I'm applying the well-established
22            economic principle -- pardon me for
23            laughing; it's your fault -- of
24            opportunity cost.
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. KEYES:
 2        Q.      No, you have your speech, and
 3    if you're going to give the speech in
 4    response to every question, that's fine.  But
 5    I'm just trying to get a clear yes or no
 6    answer to these questions, and you keep
 7    giving me a long explanation why it's not
 8    necessary.
 9            At any time between 2006 and
10    2018, did the Summit County ADM Board seek
11    permission to spend dollars beyond its
12    approved budget on any opioid-related need?
13            MR. SOBOL:  Asked and answered.
14            Objection.
15            THE WITNESS:  Now, I'm very
16            aware that we've been round and round
17            on versions of this question.  The way
18            I want to answer the question is to
19            make sure that if some viewer or
20            reader sees only a sound bite of my
21            testimony, that they understand what I
22            did and why I did it.
23            And I have said it a number of
24            times today, but, you know, within the
25            context of any particular question, I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            want to make sure it's been stated.
 2            And to reiterate, my assignment
 3            in this case was to come up with a
 4            reliable estimate of the opportunity
 5            cost of funds that were devoted to
 6            opioid-related activities.  That's
 7            what I did.
 8            And in order to do that, it
 9            wasn't necessary for me to know
10            whether the departments might have
11            preferred to do something else,
12            whether they might have over or
13            underspent on any particular thing,
14            whether they would have changed an
15            account, a program.  All those things
16            are not necessary in order to just
17            follow through in a very common sense
18            thing of how much did they -- what was
19            the cost of opioid-related activities
20            in this division, in this year, is
21            what they spent on those things.
22            If they didn't spend that, they
23            would have had money to do something
24            else.
25
```

1    QUESTIONS BY MR. KEYES:

2        Q.   Did you investigate whether, at

3    any time between 2006 and 2018, any of the

4    Summit County or Cuyahoga County affected

5    divisions sought permission to spend dollars

6    beyond their approved budget on any

7    opioid-related need?

8            MR. SOBOL:  Objection.  Asked

9    and answered.

10           THE WITNESS:  I'd just like to

11   refer to my previous answer, if you

12   find that --

13           MR. SOBOL:  No, if you have --

14   what previous answer?

15           MR. KEYES:  The one you just

16   said was asked and answered.  It

17   wasn't asked and answered.  This is a

18   distinct question.

19   QUESTIONS BY MR. KEYES:

20       Q.   You want to incorporate your

21   last answer, but I want the record to be

22   clear, Professor McGuire.

23       A.   Okay.

24       Q.   So you did not investigate

25   whether at any time, in any year between 2006

1    and 2018, any affected division of either

2    Summit County or Cuyahoga County sought

3    permission to spend dollars beyond their

4    approved budget on any opioid-related need,

5    correct?

6            MR. SOBOL:  Objection.

7    Objection.  Form.  Also objection.

8    Asked and answered.

9            You give any form of an answer

10   you would like.

11           THE WITNESS:  Okay.  I'd like

12   to give a complete answer to the

13   question for a reader to understand my

14   response to your very general

15   question.

16           And my answer is that for me to

17   fulfill my assignment in this case,

18   it's sufficient for me to know what

19   each division, in each year, in each

20   county, spent on opioid-related

21   activities, which was the focus of my

22   report:  to identify those funds.

23           It was not necessary for me

24   to know whether any division, in any

25   year, in either of the counties,

1    sought to do something different.

2            The opportunity cost is a very

3    common sense approach that says, what

4    is the opportunity cost of the

5    $200,000 that this division spent on

6    opioid-related activities.  It's

7    $200,000.  They would have had that

8    money to do something else.

9            And it's sufficient to -- in

10   application of the opportunity cost

11   concept to be able to identify the

12   magnitude of those funds and to

13   establish they could have done

14   something else with those funds.

15           And that's what I did.

16   QUESTIONS BY MR. KEYES:

17       Q.   And so that prior answer, you

18   were explaining why you did not conduct that

19   investigation I asked about, correct?

20           MR. SOBOL:  Objection.  Asked

21   and answered.

22           THE WITNESS:  I was trying to

23   give a complete answer so the audience

24   would understand what I did.

25

1    QUESTIONS BY MR. KEYES:

2        Q.   Right.

3            And the audience should

4    understand that you didn't do it, and you

5    were giving the reasons why you didn't do

6    it --

7            MR. SOBOL:  Objection.

8    QUESTIONS BY MR. KEYES:

9        Q.   -- right?

10           MR. SOBOL:  What's the...

11           THE WITNESS:  Well, I'm -- I

12   was just trying to give a complete

13   answer.  I needed to explain a little

14   bit about what opportunity cost was,

15   what the nature of my assignment was,

16   what I need to know in order to do

17   that.

18           It just doesn't take very long

19   for me to say it.  I'm pretty

20   practiced at it now.  But I think it's

21   something for the audience that they

22   need to hear.

23   QUESTIONS BY MR. KEYES:

24       Q.   Right.

25           But again, you told me what was

```
 1   sufficient.  You told me what wasn't
 2   necessary.
 3               I want to know whether --
 4   regardless of whether it's necessary or not,
 5   did you do it.  Did you investigate at any
 6   time, for any year between 2006 and 2018, for
 7   any affected division for either Summit
 8   County or Cuyahoga County, whether they
 9   sought permission to spend dollars beyond
10   their approved budget on any opioid-related
11   need?
12               MR. SOBOL:  Objection.
13   QUESTIONS BY MR. KEYES:
14       Q.     Did you do it?
15               MR. SOBOL:  Objection.  Asked
16   and answered.
17               You may give an answer in any
18   form you think appropriate.
19               THE WITNESS:  First of all, I
20   don't see any distinction between the
21   question you just asked and the
22   question I referred to a few moments
23   ago as being a very general question.
24               And it seems like it's an
25   important question, so in order to
```

```
 1               address it, I want to be sure to give
 2   a complete answer to the question.
 3               In order for me to do my
 4   assignment in assessing the
 5   opportunity cost for each division,
 6   for both counties, for all the years,
 7   it was necessary for me to identify
 8   the funds devoted to opioid-related
 9   activities.
10               And that's what I did in my
11   report.  And that was sufficient to
12   identify the opportunity cost of those
13   funds.
14               I didn't need to know whether
15   any of those divisions in either of
16   the counties, in any of the years,
17   sought to do something different with
18   their funds.
19               The opportunity cost number is
20   a very common sense concept.  If a
21   division spends $200,000 on
22   opioid-related activities in 2007,
23   they could do something else with that
24   money.  The $200,000 is the
25   opportunity cost of those funds.
```

```
 1   QUESTIONS BY MR. KEYES:
 2       Q.     Did you investigate whether at
 3   any time, for any year between 2006 and 2018,
 4   any of the affected divisions for either
 5   Summit County or Cuyahoga County sought
 6   permission to spend dollars beyond their
 7   approved budget on a need not related to
 8   opioids?
 9               MR. SOBOL:  Objection.  Asked
10   and answered.
11               You may give an answer in any
12   form that you'd like.
13               THE WITNESS:  I see this
14   question as being slightly different.
15   It's also a general question.
16               The difference here is, it's
17   the non-related activities as opposed
18   to the opioid-related activities, if
19   I'm following.
20   QUESTIONS BY MR. KEYES:
21       Q.     Correct.
22       A.     Okay.  And it's also an
23   important question, one I want to make sure I
24   give a thorough answer to.
25               In order for me to fulfill my
```

```
 1   assignment in this report, which is to
 2   identify the opportunity cost of the funds
 3   devoted to opioid-related activities, it was
 4   sufficient for me to -- in each county, for
 5   each division, for each year, to identify the
 6   funds that were spent on opioid-related
 7   activities for that year.
 8               I did not need to know what
 9   might else have been done with those funds
10   had their spending not taken place.  So it
11   wasn't necessary for me to know whether the
12   divisions, in the years and the counties, had
13   made some application for additional funds.
14               The money spent on the
15   opioid-related crisis is a very common sense
16   measure of opportunity costs.  If they spend
17   $200,000 on opioid-related activities and
18   they didn't have to spend that money, they
19   would have had $200,000 to spend on something
20   else.
21               That's, you know, in short what
22   I did.
23       Q.     When you said in your prior
24   answer that it wasn't necessary to do it, you
25   were explaining why you did not do it,
```

```
 1   correct?
 2              MR. SOBOL:  Objection.  Asked
 3       and answered.
 4              THE WITNESS:  Well, I was
 5       explaining some of the basis for that,
 6       that -- what opportunity cost was,
 7       what was and was not necessary for me
 8       to determine that.  You know, I think
 9       it's important for the reader or the
10       viewer to hear that.
11   QUESTIONS BY MR. KEYES:
12       Q.    Did you identify any instance
13   where at any point in time between 2006 and
14   2018 any of the affected divisions for either
15   Summit County or Cuyahoga County sought
16   permission to spend dollars beyond their
17   approved budget on a need related to or not
18   related to opioids?
19              MR. SOBOL:  Objection.  Asked
20       and answered.
21       You may answer.
22              THE WITNESS:  Truthfully -- of
23       course, I've been truthful all
24       morning, but I don't -- this seems to
25       be a compound of two other questions
```

```
 1       that you asked earlier, those -- the
 2       request with respect to opioids and
 3       the request with respect to other
 4       things.
 5   QUESTIONS BY MR. KEYES:
 6       Q.    I asked whether you identified
 7   any instance, before I asked whether you
 8   investigated, and you told me your reasons
 9   for not investigating.
10       A.    Oh.
11       Q.    Now I'm asking:  Did you at any
12   point in this engagement identify any
13   instance, at any point in time between 2006
14   and 2018, when any of the affected divisions
15   for either Summit County or Cuyahoga County
16   requested permission to spend dollars beyond
17   their approved budget, either to meet an
18   opioid-related need or to meet a
19   nonopioid-related need?
20              MR. SOBOL:  Objection.  Asked
21       and answered and compound.
22   QUESTIONS BY MR. KEYES:
23       Q.    Any instance?
24              MR. SOBOL:  Objection.  Already
25       asked and compound.
```

```
 1       But you may answer.
 2              THE WITNESS:  Well, let me give
 3       a fresh answer just to avoid the back
 4       and forth about whether I've answered
 5       it already.
 6          It seems like it's an important
 7       question, it's a general question, and
 8       I want to make sure I give a complete
 9       answer to this.
10          What I needed to do to fulfill
11       my assignment was to identify for each
12       division in each county, for all the
13       years involved, what the
14       opioid-related spending was in that
15       division.  That's the basis for an
16       economist to determine what the
17       opportunity cost of those funds are.
18          What's not necessary for me to
19       do is to know what else might have
20       happened had those funds not been
21       spent on opioid-related activities.
22          So I didn't need to know
23       whether divisions had submitted budget
24       proposals or what particular other
25       activities they would have done in a
```

```
 1       hypothetical had the funds not been
 2       spent on opioid-related activities.
 3       It was sufficient for me to know the
 4       magnitude of those funds.
 5          And I think it's a very common
 6       sense concept that if a division is
 7       spending $200,000 on opioid-related
 8       activities in a year, if they don't
 9       have to spend that, the $200,000 would
10       be available for something else.
11       That's really all -- that's the kind
12       of main point I'm making with the idea
13       of opportunity cost.
14   QUESTIONS BY MR. KEYES:
15       Q.    Did you find a single example
16   of an affected division saying that it was
17   not able to meet a need because funds had
18   been redirected to cover an opioid-related
19   need?
20              MR. SOBOL:  Objection.  Asked
21       and answered.
22              THE WITNESS:  This is also a
23       pretty general question, and I want to
24       make sure to give a complete answer to
25       the question.
```

```
 1            In order for me to do my work,
 2      what I needed to do was identify the
 3      opioid-related spending.  To an
 4      economist, that opioid-related
 5      spending is opportunity cost.  And if
 6      those funds had not been devoted to
 7      opioid-related activities, they could
 8      have been devoted to something else.
 9            I don't need to know what
10      officials in the divisions might have
11      identified as their priorities for
12      those funds but only to -- you know,
13      only to note that those funds do have
14      alternative uses.  And if $200,000 is
15      devoted to opioid-related activities
16      in a particular division in a
17      particular year, had those funds not
18      been used for opioid-related
19      activities, they would have been
20      available for something else.
21            It's not rocket science.  It's
22      pretty straightforward that they spent
23      $200,000 on opioids.  If they didn't
24      have to spend that, they would have
25      had the money for something else.
```

```
 1            That's the idea of opportunity cost.
 2      QUESTIONS BY MR. KEYES:
 3            Q.    Did the Summit County or
 4      Cuyahoga County government incur any injury
 5      because it wasn't able to spend money on
 6      something because it was spending those
 7      dollars on an opioid-related service?
 8                MR. SOBOL:  Objection.  Asked
 9          and answered and form.
10            You may answer.
11            THE WITNESS:  Can you clarify
12          what injury means in this context?
13      QUESTIONS BY MR. KEYES:
14            Q.    Harm.
15            A.    I thought you might say that.
16            Q.    Did Summit County or Cuyahoga
17      County government incur any harm because it
18      wasn't able to spend money on something
19      because it was spending those dollars on an
20      opioid-related service?
21                MR. SOBOL:  Objection.  Asked
22          and answered.  Form.
23                THE WITNESS:  I know you've
24          told me injury is the same as harm,
25          and earlier harm was the same as
```

```
 1      injury.  It's a little unclear to me
 2      what that means in this context.
 3      QUESTIONS BY MR. KEYES:
 4            Q.    Are you offering any opinion
 5      that Summit County or Cuyahoga County
 6      suffered any injury or harm because it wasn't
 7      able to spend money on something because it
 8      was spending that money on an opioid-related
 9      service?
10                MR. SOBOL:  Objection.  Asked
11          and answered.
12                THE WITNESS:  I think I can at
13          least somewhat address your question,
14          and if I'm missing in my answer, then
15          please let me know.
16                It's also a very general
17          question, and it sounds like an
18          important question to me, so I want to
19          be sure to give a complete answer to
20          the question.
21                What I needed to do in my
22          report was to identify the opportunity
23          cost of funds that were devoted to
24          opioid-related activity, and that's
25          what I did in my report.
```

```
 1                It was not necessary for me to
 2          identify what other activities the
 3          funds would have been spent on or what
 4          the value of those other activities
 5          were; only to note that there are
 6          alternative uses for the funds that
 7          were devoted to opioid-related
 8          activities, and the officials in the
 9          division would have done something
10          else with the money.
11                And so an economist is asked:
12          What is the metric or the measure of
13          those opportunity costs?
14                And it's a very natural,
15          down-the-middle-of-the-plate,
16          not-rocket-science part of economics,
17          which is, that if a household spends
18          $75 on a car repair or a division
19          spends $200,000 on an opioid-related
20          activity, that is the opportunity cost
21          of those funds.
22                That told me what I needed to
23          know, and that's what I did.
24      QUESTIONS BY MR. KEYES:
25            Q.    Now, Professor McGuire, you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   know, you've said that, I bet, a few hundred
 2   times between last Tuesday and today.  And
 3   you're an expert for the plaintiffs, and I'm
 4   entitled to probe whether you're offering an
 5   opinion or not.
 6            So this question is a yes or no
 7   question, and I am asking you to answer it
 8   yes or no, and then you can provide whatever
 9   explanation you think is appropriate.
10            Are you offering an opinion
11   that Summit County or Cuyahoga County
12   suffered any injury or harm because the
13   county wasn't able to spend money on
14   something else because it was spending money
15   on opioid-related services?
16            MR. SOBOL:  Objection, first,
17   to the speech.  I'm not sure if in the
18   question you intend the witness to
19   adopt your speech or not.
20            Objection to the form, because
21   you haven't defined injury or harm.
22            And compound.
23            THE WITNESS:  Well, I have been
24   attempting to answer your question as
25   clearly and as completely as I can in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        the order in which I think it's most
 2   informative to provide the
 3   information.
 4            And that order starts with what
 5   was needed for me in order to complete
 6   my assignment.  And then when I go on
 7   to say -- that's what I need to know.
 8   Then I say it was not necessary for me
 9   to investigate that.
10            I think -- I didn't mean that
11   to not be answering your question.
12   When I say it wasn't necessary for me
13   to investigate, then I didn't
14   investigate it.
15   QUESTIONS BY MR. KEYES:
16        Q.    So you did not investigate
17   whether either Summit County or Cuyahoga
18   County suffered any injury or harm because
19   they spent money on opioid-related services
20   rather than something else --
21            MR. SOBOL:  Objection.
22   QUESTIONS BY MR. KEYES:
23        Q.    -- correct?
24            MR. SOBOL:  Objection.  Asked
25   and answered.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Again, you may answer in any
 2   format you'd like, despite the speech
 3   by counsel.
 4            THE WITNESS:  Okay.  This is
 5   returning to that very general and, it
 6   seems to me, potentially important
 7   question; that I think it's important
 8   for a viewer or a reader to understand
 9   what I did and why I did it.
10            And what I did in order to
11   fulfill my assignment was to identify
12   the funds that were devoted to
13   opioid-related activities.  That's
14   what corresponds to the tried and
15   true, well-accepted, down-the-middle-
16   of-the-plate concept of opportunity
17   cost.
18            The opportunity cost of those
19   funds can be identified and measured
20   without investigating what a
21   particular division in a particular
22   county in a particular year would have
23   done in an alternative world in which
24   those funds were not devoted to
25   opioid-related crises.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            So when I come up with a
 2   measure $200,000 were devoted to
 3   opioid-related activities in a
 4   division in a year, that tells me what
 5   I need know.  I don't need to, and I
 6   didn't investigate, the particulars of
 7   what else they would have done with
 8   the funds.
 9   QUESTIONS BY MR. KEYES:
10        Q.    You identify that $200,000 as
11   an opportunity cost.
12            MR. SOBOL:  Objection.
13            Is there a question?
14   QUESTIONS BY MR. KEYES:
15        Q.    Correct?
16        A.    Yes.
17        Q.    And you are not offering an
18   opinion that $200,000 is a harm or an
19   injury to either Summit County or Cuyahoga
20   County, correct?
21            MR. SOBOL:  Objection.  Asked
22   and answered.
23            THE WITNESS:  Well, you're
24   coming back to the harm and injury,
25   and you say harm is injury, injury is
```

```
 1          harm.  Neither of those are very
 2     helpful to me as an economist.
 3               And given the nature of this
 4     question, could you please clarify
 5     what harm and injury means in this
 6     context?
 7  QUESTIONS BY MR. KEYES:
 8          Q.   Are you saying that harm is not
 9  meaningful to you as an economist?
10          MR. SOBOL:  Objection.
11          THE WITNESS:  I'm saying in
12     this context, I'm not sure what you're
13     asking.
14  QUESTIONS BY MR. KEYES:
15          Q.   In the context of this
16  engagement, are you saying that harm is not a
17  meaningful concept to you?
18          MR. SOBOL:  Objection.  Asked
19     and answered.
20          THE WITNESS:  I'm saying in the
21     context of this question, I'm not sure
22     what you're referring to.
23  QUESTIONS BY MR. KEYES:
24          Q.   Well, do you have an
25  understanding of what harm means in the
```

```
 1     context of the opinions that you're offering
 2     regarding damages here?
 3          A.   I understand what damages are.
 4     I understand what opportunity costs are, as I
 5     used it in my report.  But I'm -- if that's
 6     what you mean, if you mean harm equals
 7     damages, then please tell me.  If you mean
 8     harm equals opportunity cost, please tell me.
 9     If you mean harm equals something else, then
10     please tell me that.
11          Q.   Well, my question was:  Do you
12     have an understanding of what harm means in
13     the context of the opinions that you're
14     offering regarding damages here?
15          MR. SOBOL:  Objection.  Asked
16     and answered.
17          THE WITNESS:  I don't have
18     anything to add.  This is -- I'm not
19     meaning to be evasive.  I'm just
20     asking:  In this context, what do you
21     mean by harm?
22          I studied damages.  I studied
23     opportunity costs.  Is there something
24     else?
25
```

```
 1  QUESTIONS BY MR. KEYES:
 2          Q.   Did you study harm?
 3          MR. SOBOL:  Objection.  Asked
 4     and answered.
 5          THE WITNESS:  Without telling
 6     me what it is, I can't tell you.
 7  QUESTIONS BY MR. KEYES:
 8          Q.   Did you study any harm?
 9          MR. SOBOL:  Objection.  Asked
10     and answered.
11          THE WITNESS:  Without you
12     telling me what you mean by the word,
13     I can't tell you.
14  QUESTIONS BY MR. KEYES:
15          Q.   Well, sir, you say on page 4 of
16  your report, you say, quote, "I refer to the
17  adverse health, public welfare, public health
18  and criminal justice consequences of the
19  opioid epidemic as harms."
20               You use the term "harms,"
21  right?  That's in your report.
22          A.   This is Exhibit 1?
23          Q.   Yes, page 4.
24          A.   One second.
25          Q.   Middle of the page, two
```

```
 1     sentences before you begin paragraph 7, you
 2     say, "I refer to adverse health, public
 3     health, public welfare and criminal justice
 4     consequences of the opioid epidemic as
 5     harms."
 6               Do you see that language?
 7          A.   I see that, yes.
 8          Q.   You use the term "harms."
 9          MR. SOBOL:  Objection.
10  QUESTIONS BY MR. KEYES:
11          Q.   Okay?
12          MR. SOBOL:  Objection.  Asked
13     and answered.
14          You may answer.
15  QUESTIONS BY MR. KEYES:
16          Q.   So when you said before you
17  don't know what harm means, I'm trying to
18  reconcile that with the statements in your
19  own report.
20          MR. SOBOL:  There's no question
21     before you.
22  QUESTIONS BY MR. KEYES:
23          Q.   So are you still saying you
24  don't know what harm means --
25          MR. SOBOL:  Objection.
```

```
1    QUESTIONS BY MR. KEYES:
2    Q.    -- in the context of this case?
3        MR. SOBOL:  Objection.
4    Misleading, because it
5    mischaracterizes his previous
6    testimony.
7        If you'd like to ask him what
8    is meant by that section of his report
9    regarding the plural harms, you may.
10       THE WITNESS:  I'm sorry, what
11   question is pending?
12   QUESTIONS BY MR. KEYES:
13   Q.    So are you still saying you
14   don't know what harm means in the context of
15   this case?
16       MR. SOBOL:  Objection.  Asked
17   and answered.
18       THE WITNESS:  I think what I
19   said was I didn't understand the way
20   you were using harm in the question.
21   QUESTIONS BY MR. KEYES:
22   Q.    Did you investigate whether
23   Summit County or Cuyahoga County governments
24   suffered any injury or harm because they
25   spent money on opioid-related services rather
```

```
1    than something else?
2        MR. SOBOL:  Objection.  Asked
3    and answered.
4        THE WITNESS:  I remember that
5    question, and I believe my response
6    was to request from you a
7    clarification of what you mean in your
8    question by harms and injury.
9    QUESTIONS BY MR. KEYES:
10   Q.    Using the concept of harms that
11   you discuss in your report, did you
12   investigate whether Summit County or Cuyahoga
13   County governments suffered any injury or
14   harm because they spent money on
15   opioid-related services rather than something
16   else?
17   A.    Okay.
18       MR. SOBOL:  Objection.
19   Compound.
20       You can answer.
21       THE WITNESS:  All right.  So
22   now we're referring to my report,
23   page 4, where I say, "I refer to the
24   adverse health, public health, public
25   welfare and criminal justice system
```

```
1    consequences of the opioid epidemic as
2    harms."
3        So if I'm interpreting your
4    question correctly, when you say "the
5    county governments," were they
6    affected, governments don't have
7    health.  Governments don't have
8    welfare.  They are engaged in
9    activities related to public health,
10   health and public welfare that
11   involves spending money on those
12   things.
13       So if you're asking me as part
14   of your question, did the health of
15   county government, was that harmed by
16   opioid-related activities, that
17   question doesn't make sense to me.
18       If you're asking me with
19   respect to the activities of the
20   county governments, was their spending
21   on health or public health affected,
22   that question does make sense to me,
23   and I address it in this report in the
24   form of studying opportunity cost.
25
```

```
1    QUESTIONS BY MR. KEYES:
2    Q.    When you refer to adverse
3    health, public health, public welfare and
4    criminal justice consequences of the opioid
5    epidemic as harms, are you saying that those
6    are harms suffered by Summit County or
7    Cuyahoga County governments?
8    A.    Governments?
9        Well, I tried to address this
10   in my previous answer.  And if we take just
11   the first of these, health, if what you mean
12   by affecting the health of a county
13   government, that doesn't make sense to me
14   because governments don't have health.
15       What governments do is spend
16   money on things.  And if -- let me put it
17   this way.  With respect to the issue of
18   whether the opioid epidemic caused government
19   to spend money on health, then that's what my
20   report is about.
21   Q.    Right.  Right.
22       So when you refer in the
23   sentence to adverse health, public health,
24   public welfare and criminal justice
25   consequences of the opioid epidemic as harms,
```

```
 1    you are not referring to them as harms to the
 2    Summit County or Cuyahoga County governments,
 3    correct?
 4              MR. SOBOL:  Objection.  Asked
 5         and answered.
 6              THE WITNESS:  No, that's not
 7         what I said.
 8    QUESTIONS BY MR. KEYES:
 9         Q.    You talked about cost
10    consequences of the harms.  I'm asking about
11    the harms that you refer to.  Are those harms
12    to the Cuyahoga County or Summit County
13    governments?
14              MR. SOBOL:  Objection.  Asked
15         and answered.
16              THE WITNESS:  I don't have too
17         much -- I don't have anything new to
18         say about this, but let me say what I
19         said again.
20              With respect to health and
21         whether there were any harms
22         associated with health to county
23         governments, that doesn't make sense
24         to me as a question.  Governments
25         don't have health.  What governments
```

```
 1         do is spend money on things and --
 2         including spending money on health.
 3              So to the extent that your
 4         question is about harms in the form of
 5         the opioid crisis leading to spending
 6         consequences for the county
 7         governments, I do address that in my
 8         report at some length.
 9    QUESTIONS BY MR. KEYES:
10         Q.    When you then refer to the cost
11    consequences of harms to the bellwether
12    governments, you are talking about the cost
13    consequences to the governments, not the
14    harms to the governments, correct?
15              MR. SOBOL:  Objection.  Asked
16         and answered.
17              THE WITNESS:  I don't know.
18         You're attempting to sort of dissect
19         these words.  I'm not -- maybe you
20         could break it down or something.  I'm
21         not really following.
22    QUESTIONS BY MR. KEYES:
23         Q.    I'm looking at two sentences in
24    your report.
25         A.    Yes.
```

```
 1         Q.    You say, "Finally, upon
 2    instruction from counsel, I refer to the cost
 3    consequences of harms to the bellwether
 4    governments due to defendants' misconduct as
 5    damages."
 6              Do you see that sentence?
 7         A.    I see that, yeah.
 8         Q.    Did you write that sentence?
 9         A.    I absolutely wrote that
10    sentence.
11         Q.    Did you write the prior
12    sentence?
13         A.    I absolutely wrote the prior
14    sentence.
15         Q.    You told me already you wrote
16    the whole report, correct?
17         A.    I did, yes.
18         Q.    Okay.  So focusing on this
19    sentence, "I refer to the cost consequences
20    of harms to the bellwether governments."
21              Do you see that phrase?
22         A.    I see that.
23         Q.    You are talking about the cost
24    consequences to the bellwether governments,
25    not the harms to the governments, correct?
```

```
 1              MR. SOBOL:  Objection.  Asked
 2         and answered.
 3              THE WITNESS:  I'm -- well, the
 4         sentence says what I mean.  I'm not --
 5    QUESTIONS BY MR. KEYES:
 6         Q.    You're talking about the cost
 7    consequences of harms, which consequences you
 8    say are borne by the governments.
 9              MR. SOBOL:  Objection.
10              THE WITNESS:  The sentence
11         says, "I refer to the cost
12         consequences of harms" as damages.
13    QUESTIONS BY MR. KEYES:
14         Q.    Right.
15              And those cost --
16         A.    Okay.
17         Q.    Those cost consequences that
18    you're referring to are what you've
19    identified as the opportunity costs?
20              MR. SOBOL:  Objection.  Asked
21         and answered.
22              THE WITNESS:  That's generally
23         correct, yes.
24    QUESTIONS BY MR. KEYES:
25         Q.    Okay.  And those are
```

Highly Confidential - Subject to Further Confidentiality Review

1  opportunity costs that you say were borne by
2  Summit County and Cuyahoga County government
3  as a result of the harms that you say result
4  to the communities of the opioid epidemic?
5          MR. SOBOL:  Objection.
6          THE WITNESS:  Well, you're
7      reading things that I didn't write
8      here.
9  QUESTIONS BY MR. KEYES:
10     Q.    I'm asking you a question about
11 your opinions.
12     A.    Okay.  I thought we were
13 following along with the text here, but,
14 sorry.  Hit me with a question.
15     Q.    Well, you told me you couldn't
16 explain the texts; you could only just keep
17 referring to the text.  So I'm expanding my
18 questioning to give you different words to
19 use.
20          You said you have identified
21 the opportunity costs as the cost
22 consequences, correct?
23     A.    I said that, yes.
24          MR. SOBOL:  Objection.  Asked
25      and answered.

Highly Confidential - Subject to Further Confidentiality Review

1  QUESTIONS BY MR. KEYES:
2      Q.    And those are the cost
3  consequences of harms, correct?
4          MR. SOBOL:  Objection.  Asked
5      and answered.
6          Or asked and not understood.
7      But either way, I object.
8          THE WITNESS:  I think that's
9      correct, yeah.
10 QUESTIONS BY MR. KEYES:
11     Q.    And those are the cost
12 consequences borne by the Summit County and
13 Cuyahoga County governments, correct?
14     A.    Yes.
15     Q.    And those are the cost
16 consequences of harms that you've identified
17 as adverse health, public health, public
18 welfare and criminal justice consequences of
19 the opioid epidemic, correct?
20          MR. SOBOL:  Objection.
21          THE WITNESS:  I think so.
22 QUESTIONS BY MR. KEYES:
23     Q.    And those are the harms that
24 you said didn't make any sense as being harms
25 suffered by the Cuyahoga County or Summit

Highly Confidential - Subject to Further Confidentiality Review

1  County government, correct?
2          MR. SOBOL:  Objection.
3      Mischaracterizes the testimony.
4          THE WITNESS:  No, that's not
5      what I said.
6  QUESTIONS BY MR. KEYES:
7      Q.    When I asked you before when
8  you referred to these adverse health, public
9  health, public welfare and criminal justice
10 consequences of the opioid epidemic that you
11 describe as harms, and so are those harms
12 incurred or suffered by Cuyahoga County or
13 Summit County, you said that didn't make any
14 sense to you, right?
15     A.    Well, when you talk about the
16 Summit or Cuyahoga County governments, there
17 was a sense in which it did not and a sense
18 in which it did that I tried to explain in my
19 answer.
20     Q.    Have you visited Summit County
21 at any point in connection with your work on
22 this engagement?
23     A.    I don't think I have, no.
24     Q.    Have you visited Cuyahoga
25 County at any point in connection with your

Highly Confidential - Subject to Further Confidentiality Review

1  work on this engagement?
2      A.    Yes.
3      Q.    When did you visit Cuyahoga
4  County?
5      A.    Sometime in July.
6      Q.    Is that when you met with
7  officials from Cleveland?
8      A.    Yes.
9      Q.    Did you do anything else on
10 that trip in connection with this engagement,
11 other than meet with officials from
12 Cleveland?
13     A.    Not that I recall.
14     Q.    Have you visited Summit County
15 for any reason since you were hired on this
16 engagement?
17     A.    No, I don't think so.
18     Q.    Have you visited --
19     A.    I'm sure I didn't.  I haven't
20 been to Summit County.
21     Q.    Have you visited Cuyahoga
22 County for any reason since you were hired on
23 this engagement besides your meeting with the
24 Cleveland officials?
25     A.    No, I have not.

1      Q.      Have you ever been to Summit
2    County?
3           A.      Ever?  Oh, gosh.  I visited a
4    number of counties in Ohio in some other work
5    I did for the Ohio government.  I know I
6    would have been to Columbus.  There were
7    others.  I can't remember which of the others
8    I visited.
9           Q.      Other than your visit with the
10   Cleveland officials in July, have you ever
11   visited Cuyahoga County?
12          A.      Well, in some previous work I
13   did for the State of Ohio, I did some
14   traveling, and it was at least Columbus, but
15   I don't remember where else I would have
16   visited.
17          Q.      Is Columbus in Cuyahoga County?
18          A.      No, it's not.
19          Q.      What county is it in?
20          A.      Columbus.  Is it Columbus
21   County?  Sometimes they have the same name.
22          Q.      Do you know?
23          A.      I don't recall the county.
24          Q.      When were you first engaged on
25   this case?

1           A.      Oh, in this case?
2           Q.      Yes.
3           A.      You mean not the thing I was
4    referring to in the past, but --
5           Q.      This case.
6           A.      -- this case.
7                   It would have been, I think,
8    maybe late May or June of 2018.
9           Q.      And when did you first start
10   working with Compass Lexecon in this
11   engagement?
12          A.      Soon after that.
13          Q.      So also May or June of 2018?
14          A.      Probably June.
15          Q.      Have you ever used a
16   prescription opioid?
17          A.      Yes, I have.
18          Q.      How many times?
19          A.      What I -- this was in
20   connection with hip surgery.  And I was given
21   some opioids to take home, which are
22   prescription opioids, that I took for about
23   two days, and then I stopped taking them.
24          Q.      What was the particular opioid
25   that you were prescribed?

1           A.      I don't remember.
2           Q.      Was it prescribed by your
3    physician?
4           A.      Well, it was given to me -- you
5    know, I don't remember if I had it leaving
6    the hospital, whether I had to pick it up.  I
7    don't remember.  But it was prescribed by a
8    physician in either case.  It would have
9    been, I think, prescribed by my surgeon.
10          Q.      And you took it for two days?
11          A.      Yes.
12          Q.      What was the specific drug?
13          A.      I don't remember.
14          MR. SOBOL:  Objection.  Asked
15       and answered.
16   QUESTIONS BY MR. KEYES:
17          Q.      And why did you take it for
18   those first two days?
19          A.      Because it was prescribed for
20   me by my doctor.
21          Q.      What was it prescribed to you
22   to do, as you understood it?
23          A.      My understanding was that it
24   was prescribed in order to deal with pain.
25          Q.      Did you have pain before you

1    took it?
2           A.      I had a lot of pain before I
3    had my surgery, and then, yeah, there was
4    kind of pain throughout the process, yeah.
5           Q.      Did the prescription opioid
6    that you took help with your pain?
7           A.      Well, you know, it's hard to
8    know.  You're asking, you know, if someone
9    takes a drug -- say you take an
10   antidepressant.  Did your antidepressant
11   help?  It's hard to know.  It's not an
12   individual question.
13                  Maybe you don't -- still don't
14   feel that great, but how would you have felt
15   had you not taken the pill?  You don't really
16   know.
17                  And so in this case I had some
18   pain.  If you asked me the counterfactual
19   question of how much pain I would have had
20   without the opioid, I really can't tell you.
21          Q.      You said you stopped taking it
22   after two days?
23          A.      Yes.
24          Q.      Did you have pain after you
25   stopped taking it?

```
1        A.      I had pain throughout the
2   entire process, yes.
3        Q.      Did your pain increase after
4   you stopped taking the prescription opioid?
5        A.      No, it didn't.
6        Q.      Did you take something else to
7   address the pain when you stopped taking the
8   prescription opioid?
9        A.      I also was, I think,
10  requested -- or recommended to take, I think,
11  ibuprofen.  And I don't remember whether I
12  just continued on the regimen that was
13  recommended to me or whether I increased that
14  in response.  I don't remember.
15       Q.      Why did you stop taking the
16  prescription opioid after two days?
17       A.      I thought it was prudent,
18  frankly.
19       Q.      Why?
20       A.      Because opioids are dangerous
21  drugs, and I didn't want to take it any
22  longer than necessary.
23       Q.      Did you develop an addiction to
24  opioids?
25       A.      No.
```

```
1        Q.      How did you know that opioids
2   are dangerous drugs and you shouldn't take it
3   any longer than necessary?
4        A.      I was just aware of that from
5   my work as a health economist.  This would
6   have been, you know, two or three years ago,
7   so well before I got involved in this matter.
8        Q.      Is this the only time you used
9   a prescription opioid?
10       A.      As far as I know, yes.
11       Q.      You can't think of anything
12  before the hip surgery or after the hip
13  surgery where you used a prescription opioid?
14       MR. SOBOL:  Objection.  Asked
15       and answered.
16       THE WITNESS:  No, I didn't use
17       prescription opioids otherwise.
18  QUESTIONS BY MR. KEYES:
19       Q.      Regarding your quantification
20  of the opportunity costs in this case, do I
21  understand you correctly that if either
22  county government had decided to spend its
23  entire budget on opioid-related services,
24  then the opportunity costs that you describe
25  as damages here would be the entire budget of
```

```
1   the county?
2        MR. SOBOL:  Objection.  Asked
3        and answered.
4        THE WITNESS:  It's kind of a
5        funny question, that among all the
6        things any of these divisions -- or in
7        this case I think you're asking about
8        the entire government -- would have
9        spent only on opioid-related
10       activities, so long as there are
11       alternative uses for those funds, even
12       if the government, in its wisdom,
13       decides only to devote the funds to
14       opioid-related activities, so long as
15       there are other things the government
16       could have done, then it's -- unless
17       I'm misunderstanding your question,
18       then, yes, it's the right measure of
19       opportunity cost.
20  QUESTIONS BY MR. KEYES:
21       Q.      And do I understand that under
22  your approach in quantifying the opportunity
23  costs, that if the county government had
24  decided to spend nothing on opioid-related
25  services, then there would be no opportunity
```

```
1   costs?
2        MR. SOBOL:  Objection.
3        THE WITNESS:  Of course this
4        is --
5   QUESTIONS BY MR. KEYES:
6        Q.      And no damages using your
7   formulation?
8        A.      Well, this is also a funny
9   question, that they would have spent nothing.
10  But in the case in which they literally spent
11  nothing on opioid-related activities, then
12  there was no sacrifice of other uses of the
13  funds.  So the appropriate measure of
14  opportunity cost in that case would be zero.
15       Q.      And under your approach to
16  quantifying opportunity cost, if the county
17  government had decided to spend 50 percent of
18  its total budget on opioid-related services,
19  then you would say the damages are 50 percent
20  of the budget?
21       MR. SOBOL:  Objection.  Asked
22       and answered.
23  QUESTIONS BY MR. KEYES:
24       Q.      Is that correct?
25       MR. SOBOL:  You may answer, but
```

```
1            I do object.
2            THE WITNESS:  Well, I think
3    I've spanned the responsibilities from
4    zero to 100 percent, and 50 percent
5    isn't qualitatively different.
6            If they spent -- and let's just
7    use a number.  If they spent
8    $10 million, it represents 50 percent
9    of their budget on opioid-related
10   activities, then that's the right
11   measure of opportunity cost.
12   QUESTIONS BY MR. KEYES:
13        Q.    And so under your approach to
14   measuring opportunity costs, which you say
15   are damages, the value of the damages depends
16   entirely on how much money the county decides
17   to spend on opioid-related services, using
18   your logic, right?
19            MR. SOBOL:  Objection.  Form.
20            You may answer.
21            THE WITNESS:  Well, in my
22   report I'm applying the, you know,
23   well-accepted concept of opportunity
24   cost.  And, yes, it kind of makes
25   sense as a -- you know, just from
```

```
1    common sense and certainly is
2    well-supported by economics that if a
3    household, or a government in this
4    case, spends a hundred dollars on
5    something, then they would have had
6    that hundred dollars to spend on
7    something else, and that's the right
8    measure of opportunity cost.
9            Unless I'm missing some
10   subtlety in your question, then the
11   answer is, yes, that's the opportunity
12   cost of the funds.
13   QUESTIONS BY MR. KEYES:
14        Q.    And you equate opportunity cost
15   with damages based on the instruction that
16   you received from plaintiffs' counsel,
17   correct?
18        A.    Well, the opportunity cost is
19   an economic concept, and so that's -- that
20   comes from me, you know, what is the
21   opportunity cost of these funds.  We
22   discussed that today.
23            I put damages in quotes because
24   that's -- on instruction from counsel, I
25   refer to them as damages.
```

```
1        Q.    Because -- I want to make sure.
2    You quantify opportunity costs, right?
3        A.    Yes.
4        Q.    And you say the opportunity
5    costs are the cost consequences to the Summit
6    County and Cuyahoga County governments as a
7    result of these harms resulting from the
8    opioid epidemic, right?
9            MR. SOBOL:  Objection.  Asked
10   and answered.
11           THE WITNESS:  I think that's
12   correct, yes.
13   QUESTIONS BY MR. KEYES:
14        Q.    And you call those opportunity
15   costs damages because you were instructed to
16   do so by counsel, correct?
17        A.    Let me just make sure.
18           Upon instruction from counsel,
19   I refer to cost consequences as damages, yes.
20        Q.    Going back to your
21   prescription, what was -- how many days was
22   your prescription for for the prescription
23   opioid?
24        A.    Longer, but I don't remember.
25        Q.    What do you mean by "longer"?
```

```
1    Seven days?
2        A.    More than two.
3        Q.    30 days?  Different?
4        A.    I don't know.  I don't
5    remember.
6        Q.    When you stopped taking the
7    prescription opioid after two days, did you
8    have additional pills left over?
9        A.    Yes.
10       Q.    What did you do with them?
11       A.    Threw them out.
12       Q.    Where?
13       A.    In the trash.
14       Q.    Okay.  How did you know to do
15   that?
16           MR. SOBOL:  Objection.  Assumes
17   a fact not in evidence.
18           THE WITNESS:  Well, I thought
19   it was --
20           MR. KEYES:  He just said he
21   threw them out.
22           THE WITNESS:  Yeah.
23           MR. KEYES:  I'm asking, how did
24   he know to throw them out.
25           MR. SOBOL:  But that assumes
```

```
 1              that he knew to throw them out, rather
 2       than something else.
 3       QUESTIONS BY MR. KEYES:
 4            Q.     Did you throw them out on
 5       purpose or by accident?
 6            A.     They slipped out of my hand and
 7       went in the trash, and they were gone.
 8            Q.     No, for real.  Did you throw
 9       them out by accident --
10            A.     No, I didn't.
11            Q.     -- or on purpose?
12            A.     I threw them out on purpose.
13            Q.     Okay.  How did you know to
14       throw them out on purpose?
15            A.     Well, as I mentioned a few
16       minutes ago, they're risky drugs, and I
17       thought that whatever pain I had was already
18       well-managed, that it didn't make sense to
19       pop these pills.
20            Q.     If you turn to page 44 of your
21       report.
22            A.     Yes.
23                   THE WITNESS:  I'd like to get
24            some water.  We don't need to take a
25            break, but just get some water.
```

```
 1                   MR. KEYES:  Well, why don't we
 2            take a break then.
 3                   VIDEOGRAPHER:  The time is
 4            11:56 a.m., and we're off the record.
 5             (Off the record at 11:56 a.m.)
 6                   VIDEOGRAPHER:  The time is
 7            12:10 p.m., and we're on the record.
 8       QUESTIONS BY MR. KEYES:
 9            Q.     Professor McGuire, do you have
10       Exhibit Number 1 in front of you, which is
11       your report on damages?
12            A.     Yes, I do.
13            Q.     And are you at page 44?
14            A.     Yes, I am.
15            Q.     And in paragraph 76, you
16       identify what you claim are damages for
17       Cuyahoga County under Approaches 1 and 2?
18            A.     That's correct.
19            Q.     And you set forth those damages
20       in Table 4.12?
21            A.     That's correct.
22            Q.     And in paragraph 77, you
23       identify what you claim are damages for
24       Summit County under Approaches 1 and 2?
25            A.     That's correct.
```

```
 1            Q.     And you set forth those damages
 2       in Table 4.13?
 3            A.     That's correct.
 4            Q.     And then you aggregate those
 5       numbers in Table 4.14 on page 46, correct?
 6            A.     That's correct.
 7            Q.     Are those the damages
 8       calculations that you performed?
 9            A.     Yes.
10            Q.     Did you perform any other
11       damages calculations that are not set forth
12       in these tables?
13                   MR. SOBOL:  You mean drafts?
14                   MR. KEYES:  Of any sort.
15                   MR. SOBOL:  Well, then I
16            instruct him not to answer.
17       QUESTIONS BY MR. KEYES:
18            Q.     Well, did you perform any other
19       damage calculations that are not set forth in
20       these tables where you are offering the
21       opinion that those are damages calculations?
22            A.     This is my opinion.  There's no
23       opinions I have other than what you see here.
24            Q.     Okay.  So the opinions that you
25       set forth regarding damages on pages 44, 45
```

```
 1       and 46 are the only opinions you have on
 2       damages?
 3                   MR. SOBOL:  Objection.
 4       QUESTIONS BY MR. KEYES:
 5            Q.     The quantification of damages?
 6                   MR. SOBOL:  Objection.
 7                   THE WITNESS:  I believe that's
 8            correct, yes.
 9       QUESTIONS BY MR. KEYES:
10            Q.     Okay.  Then would you turn to
11       Appendix 4.E of your report.  It's towards
12       the very back.
13            A.     Okay.  Okay.
14            Q.     Are you on Appendix 4.E?
15            A.     I am, yes.
16            Q.     Okay.  4.E is titled "Damages
17       Due to Shipments."
18                   What is Appendix 4.E showing,
19       if you know?
20            A.     I do know.  I tried to explain
21       this in the first couple of sentences there.
22            They show the -- as the title
23       of the tables say, the share of harms due to
24       all shipments.
25            Q.     I must be confused then,
```

1   because I asked you earlier whether the

2   opinions that you set forth regarding damages

3   on pages 44, 45 and 46 are the only opinions

4   you have quantifying damages, and you said,

5   quote, "I believe that's correct, yes."

6           So what is Appendix 4.E

7   intended to show --

8       A.   Okay.

9       Q.   -- if not quantification of

10  damages?

11      A.   Okay.

12           MR. SOBOL:  Objection to the

13      form.

14           You can answer.

15           THE WITNESS:  This appendix was

16      prepared in order to -- just one

17      second.

18           All right.  These were prepared

19      as -- in response to what I needed for

20      the public nuisance report.

21  QUESTIONS BY MR. KEYES:

22      Q.   What do you mean?

23      A.   I mean in the public nuisance

24  report, which we haven't talked about yet,

25  but I think you obviously know what I'm

---

1   referring to, the charge there was slightly

2   different.  It was in order to assess harms

3   and quantify the harms to the counties from

4   the opioid crisis, from -- due to the

5   shipments, and these tables fed into those

6   opinions.

7       Q.   And when you say "quantify the

8   harms to the counties," you're talking about

9   to the communities or individuals in the

10  communities, not the governments, correct?

11      A.    It's not restricted to the

12  governments.

13      Q.    Okay.  So how are the

14  calculations in Appendix 4.E different than

15  the calculations on pages 44, 45 and 46 in

16  your report?

17      A.    Okay.  These are different in

18  that they don't take account of the estimates

19  from the Rosenthal report of the share of

20  shipments due to misconduct.

21           MR. SOBOL:  Let the record

22      reflect that the "these" he was

23      pointing to, Appendix 4.E.

24           THE WITNESS:  The tables in

25      Appendix 4.E that we've been

---

1       discussing.

2   QUESTIONS BY MR. KEYES:

3       Q.   And so which set of

4   calculations do you intend to show a jury:

5   the ones in pages 44 through 46 of your

6   report or the calculations in Appendix 4.E?

7           MR. SOBOL:  Objection.  Form.

8           THE WITNESS:  Well, I think it

9       depends on -- in response to what

10      question I'm asked.

11  QUESTIONS BY MR. KEYES:

12      Q.   Have you performed any other

13  what you call "damages calculations" besides

14  Appendix 4.E and what you list in pages 44

15  through 46 in your report?

16           MR. SOBOL:  Excluding drafts?

17           MR. KEYES:  Excluding drafts.

18           THE WITNESS:  Excluding drafts,

19      no, I don't think so.

20  QUESTIONS BY MR. KEYES:

21      Q.   Okay.  Would you turn to

22  Appendix 4.F.

23           You told me that the only

24  damages calculations you performed were

25  pages 44 through 46.  You said there were no

---

1   others.

2           Then I showed you Appendix 4.E,

3   and you said, yes, those are calculations

4   needed for the nuisance report.

5           I said:  Did you perform any

6   other calculations of what you contend to be

7   damages.

8           You said:  No.

9           What is Appendix 4.F then?

10           MR. SOBOL:  Objection.  I don't

11      think he's asking you, but maybe he

12      is, to adopt his rendition of the

13      prior testimony, which I object to,

14      with the last sentence or -- you can

15      answer:  What is Appendix 4.F?

16           THE WITNESS:  Appendix 4.F is a

17      illustration of how the methodology

18      could be applied to a different

19      question, which would be the share of

20      misconduct attributable to -- this is

21      the distributors.

22  QUESTIONS BY MR. KEYES:

23      Q.   Based on what conduct of the

24  distributors?

25      A.    That's something that I didn't

1  deal with in my report.
2      Q.    Okay.  How did you go about
3  arriving at the figures that are in
4  Appendix 4.F?
5      A.    This is, again, in the same way
6  as some of the other figures, that these
7  percentages were provided to me, and then I
8  applied them to the potentially affected
9  costs to get an estimate of damages.
10     Q.    You say "these percentages."
11 Are you referring to the percentages in Table
12 F.1?
13     A.    F.1 and F.2, yes.
14     Q.    Okay.  What about -- and did
15 you apply those percentages to dollar figures
16 to arrive at the dollars shown in Tables F.3
17 and F.4?
18     A.    That's correct, yes.
19     Q.    Okay.  So did you simply take
20 what you identified as the affected costs and
21 multiply them by the percentages in Table F.1
22 and F.2?
23         MR. SOBOL:  Objection.
24         THE WITNESS:  Yeah.  Yes.
25

1  QUESTIONS BY MR. KEYES:
2      Q.    Where did the percentages come
3  from that you used in these calculations and
4  which are set forth in Table F.1 and F.2?
5      A.    These came from Cutler report,
6  Appendix 3.J.
7      Q.    And how do you know that?
8      A.    I looked at it.
9      Q.    Where do you cite 3.J?  In
10 footnote 1?
11     A.    In footnote 1, yeah.
12     Q.    So you received these
13 percentages from Professor Cutler.
14         Did you independently arrive at
15 those percentages or just take the ones you
16 had received from Professor Cutler?
17         MR. SOBOL:  Object to form.
18         You may answer.
19         THE WITNESS:  This was what you
20     would call input from Professor
21     Cutler.
22 QUESTIONS BY MR. KEYES:
23     Q.    Did you do anything to test or
24 validate that input, namely the percentages
25 that Professor Cutler provided?

1      A.    No, I depended on him for those
2  percentages.
3      Q.    What is Table 4 -- I'm sorry,
4  Appendix 4.G?
5      A.    Professor Rosenthal conducted
6  her empirical work in two ways, and what 4.G
7  refers to is the same kind of calculations
8  with different Rosenthal estimates.
9      Q.    And then did Professor Cutler
10 take those percentages from Professor
11 Rosenthal and do something?
12     A.    My understanding of what
13 Professor Cutler did was multiply some things
14 together.
15     Q.    What did he multiply, as you
16 understand it?
17     A.    The Rosenthal percent times his
18 own percent of harms due to shipments.
19 Rosenthal was misconduct of the shipments.
20 Cutler was shipments due to harms.  And to
21 attribute the share of harms due to
22 misconduct, he multiplies those two things
23 together.
24     Q.    And then he arrives at a
25 percentage?

1      A.    And then he arrives at a
2  percentage.
3      Q.    So he starts with percentages
4  derived by Professor Rosenthal, correct?
5          MR. SOBOL:  Objection.
6          Go ahead.
7          THE WITNESS:  Not maybe start
8      with, but he has them.
9  QUESTIONS BY MR. KEYES:
10     Q.    Okay.  And what testing of
11 Professor Rosenthal's percentages did
12 Professor Cutler do?
13         MR. SOBOL:  Objection.  Scope.
14         THE WITNESS:  Well, that's
15     really a question for Professor Cutler
16     rather than Tom.
17 QUESTIONS BY MR. KEYES:
18     Q.    Do you know what testing, if
19 any, he did?
20         MR. SOBOL:  Objection.  Scope.
21         THE WITNESS:  Well, he would
22     have -- I'm a little reluctant to
23     speak for him subjectively.
24 QUESTIONS BY MR. KEYES:
25     Q.    I'm not asking you to speak for

Highly Confidential - Subject to Further Confidentiality Review

1  him.  I'm asking what you know.

2         What do you know about whether

3  Professor Cutler tested the percentages that

4  he received from Professor Rosenthal?

5         MR. SOBOL:  Objection.  Scope.

6         THE WITNESS:  He would have

7     reviewed them and determined that they

8     were reasonable from his perspective.

9  QUESTIONS BY MR. KEYES:

10     Q.    You say "would have."

11           Did he do that?

12     A.    Yes.

13           MR. SOBOL:  Objection.  Scope.

14  QUESTIONS BY MR. KEYES:

15     Q.    How do you know that?

16           MR. SOBOL:  Objection.

17     Just the -- not the content

18  but -- if counsel were present, but

19  the method.

20           THE WITNESS:  I'm sorry, I

21     didn't hear the objection.

22           MR. SOBOL:  So he just asked

23     you a question.  You could either say

24     it was by telephone or you could give

25     the content of the communication.

Highly Confidential - Subject to Further Confidentiality Review

1           If counsel were there, you're

2     not to testify regarding what the

3     content of the communication was.

4           THE WITNESS:  Okay.  Yes, there

5     were, you know, more than one meeting

6     in which the analyses were reviewed.

7  QUESTIONS BY MR. KEYES:

8     Q.    Okay.  And then Professor

9  Cutler separately derived another set of

10  percentages, right?

11     A.    That's correct.

12           MR. SOBOL:  Objection.

13  QUESTIONS BY MR. KEYES:

14     Q.    And did you test that separate

15  second set of percentages?

16     A.    In the same sense that I

17  mentioned for Cutler and Rosenthal.

18     Q.    Okay.  And then you understand

19  that Professor Cutler took the first

20  percentages that he received from Professor

21  Rosenthal and multiplied them by a set of

22  percentages that he had calculated to arrive

23  at a third set of percentages, correct?

24     A.    Correct.

25     Q.    And that third set of

Highly Confidential - Subject to Further Confidentiality Review

1  percentages Professor Cutler provided to you?

2     A.    Correct.

3     Q.    And those are the percentages

4  that you use in Table G.1 and Table G.2?

5     A.    Correct.

6     Q.    To arrive at your figures?

7     A.    Correct.

8     Q.    Did you do any testing of the

9  percentages that you received from Professor

10  Cutler in order to do the calculations that

11  you performed in Appendix 4.G?

12     A.    Only in the sense that I've

13  mentioned so far.

14     Q.    Nothing else, correct?

15     A.    Well, it's a pretty general yes

16  answer, but...

17     Q.    You prepared a second report on

18  public nuisance, correct?

19     A.    That's correct.

20     Q.    And you also issued that report

21  on March 25, 2019?

22     A.    That's correct.

23           (McGuire Exhibit 6 marked for

24     identification.)

25

Highly Confidential - Subject to Further Confidentiality Review

1  QUESTIONS BY MR. KEYES:

2     Q.    I'm showing you what has been

3  marked as McGuire Exhibit 6.

4           Is this your report?

5     A.    Yes, it is.

6     Q.    Would you turn to page 81 of

7  McGuire Exhibit 6?

8           Are you there?

9     A.    I'm there.

10     Q.    There's a signature?

11     A.    I see it.

12     Q.    Is that your signature?

13     A.    Yes, it is.

14     Q.    And by that signature did you

15  intend to confirm that this is your report?

16     A.    Yes.

17     Q.    And it sets forth your

18  opinions?

19     A.    That's correct.

20     Q.    And your calculations?

21     A.    Yes.

22     Q.    And your work?

23     A.    Yes.

24     Q.    And your words?

25     A.    Yes.

1    Q.    Did you write this opinion?

2    A.    Yes, I did.

3    Q.    Did anyone else write portions

4  of it for you?

5    A.    No.

6    Q.    Okay.  Who else was involved in

7  the preparation of this report?

8    A.    There would have been support

9  staff from the two firms we spoke about last

10  Tuesday:  Compass Lexecon and Greylock

11  McKinnon Associates.

12    Q.    And who from Compass Lexecon

13  assisted you on this report on public

14  nuisance?

15    A.    It would have been Hal Sider,

16  Alice Kaminski, Evan McKay, and someone I

17  forgot to mention last time that I feel a

18  little bad about is Heather Spang, who

19  assisted on both reports.  I just...

20    Q.    How do you spell Ms. Spang's

21  last name?

22    A.    S-p-a-n-g.

23    Q.    And what was her role on the

24  damages report, if you forget to mention her

25  last week?

1    A.    For a while, she was my first

2  contact if there was something to be done on

3  damages and something she did or she would

4  have enlisted other staff.

5    Q.    And what was her role with

6  respect to the substance of your damages

7  report?

8    A.    Well, I mean, her role was what

9  I just described.  If I needed something or

10  had a question, I would first go to her and

11  she would try to help me.

12    Q.    Did you interview people at

13  Summit County?

14    A.    She may have.  I'm not

15  100 percent sure.

16    Q.    Did she interview people at

17  Cuyahoga County?

18    A.    I'm not sure about that either.

19    Q.    How did you remember that

20  Heather Spang had a role in the damages

21  report when it didn't occur to you last

22  Tuesday?

23    A.    That's -- I don't know.  I

24  just -- I had the feeling when we talked last

25  Tuesday that I was forgetting somebody, and I

1  felt bad about it.  And then I went back and

2  checked and I said, "Oh, gosh, I forgot

3  Heather."  So I just forgot.

4    Q.    What did you go back and check?

5    A.    E-mails.

6    Q.    E-mails with Compass Lexecon?

7    A.    Yeah.  Yes.

8    Q.    Okay.  Did anyone else help you

9  on your damages report besides the people

10  you've now mentioned:  Mr. Cider,

11  Ms. Kaminski, Mr. McKay, Ms. Spang?

12    A.    Erica Benton.

13    Q.    And Ms. Benton.

14          Anyone else?

15    A.    Not that I know of.  There may

16  have been other staff that they used, but I

17  don't know.

18    Q.    Okay.  And you mentioned a

19  second firm.

20          Can you spell that for the

21  court reporter?

22    A.    Yeah, it's -- the first name is

23  Greylock, G-r-e-y-l-o-c-k, and it's one word,

24  and then McKinnon, M-a-c-K i-n-n-o-n {sic},

25  Associates.

1    Q.    And what was Greylock McKinnon

2  Associates' role on the damages report?

3    A.    Also to help support my report

4  writing.

5    Q.    What did Greylock McKinnon

6  Associates do to help support your report

7  writing?

8    A.    I would identify literature

9  that I needed to understand or information I

10  needed, and they would help me with that.

11    Q.    How many people were on the

12  Greylock McKinnon Associates team helping you

13  on the damages report?

14          MR. SOBOL:  You mean public

15    nuisance?

16          MR. KEYES:  No, damages report.

17          MR. SOBOL:  Okay.

18          THE WITNESS:  On the damages

19    report?

20  QUESTIONS BY MR. KEYES:

21    Q.    Yeah.

22          I asked you before, what did

23  Greylock McKinnon Associates do to help

24  support your report writing with respect to

25  the damages report.

```
1        A.    Oh, okay.
2             MR. SOBOL:  We both flipped out
3    on that.
4             THE WITNESS:  Yeah, sorry.
5    QUESTIONS BY MR. KEYES:
6        Q.    Did Greylock McKinnon
7    Associates help you on the damages report?
8        A.    Much less.  There may have been
9    some --
10       Q.    Much less than Compass Lexecon
11   did --
12       A.    Yes.
13       Q.    -- on the --
14       A.    The damages report was
15   primarily Compass Lexecon.
16       Q.    So I'm asking:  What did
17   Greylock McKinnon Associates do to help you
18   on the damages report?
19       A.    Okay.  You know, part of what I
20   needed to do in the damages report is
21   understand the reports coming before me,
22   which -- by which I mean the Rosenthal report
23   and the Cutler report.
24             The empirical work in the
25   Rosenthal report was primarily supported by
```

```
1    staff at Greylock McKinnon, and I had
2    occasion to speak with that staff who, you
3    know, helped me understand these.
4        Q.    Who were the members of the
5    Greylock McKinnon Associates team that helped
6    you on the damages report?
7        A.    The fellow's name is Forrest,
8    and then McCluer, M-c-C-l-e-u-r {sic}.
9        Q.    Did anyone besides Mr. McCluer
10   from Greylock McKinnon Associates help you on
11   the damages report?
12       A.    I don't think so.
13       Q.    What was Greylock McKinnon
14   Associates' role on the nuisance report?
15       A.    There was more individuals
16   involved in supporting, but the role was, as
17   I described earlier, they would help me with
18   information and literature.
19       Q.    And who are the -- who are the
20   specific people at Greylock McKinnon
21   Associates who helped you on the nuisance
22   report?
23       A.    Okay.  There are three:  Renee
24   Rushnawitz, and she's one of the owners of
25   the firm; and Adrian Gonzalez, who's -- I
```

```
1    think his title is analyst, probably; and
2    then Amanda Kreider, who also is an analyst
3    there.
4        Q.    And how did these three people
5    help you specifically on your public nuisance
6    report?
7        A.    They helped me track down
8    papers and studies.
9        Q.    Just get copies of them or read
10   them?
11       A.    Sometimes they read them.
12       Q.    And did they prepare summaries
13   of them for you?
14       A.    In some cases there were kind
15   of an indication of what the papers were
16   about, so then it would help me figure out
17   where I needed to read more in more detail.
18       Q.    And are these written
19   indications of what certain papers were
20   about?
21             MR. SOBOL:  Just yes or no.
22             THE WITNESS:  Yes.
23   QUESTIONS BY MR. KEYES:
24       Q.    Did you read these written
25   indications you got from the Greylock
```

```
1    McKinnon Associates team?
2        A.    Mostly, yes.
3        Q.    Did you rely on them to decide
4    what to read yourself?
5        A.    They helped guide me into what
6    I should be looking at in more detail.
7        Q.    So did you rely on them in
8    order to do your work on this engagement?
9             MR. SOBOL:  Objection.
10            THE WITNESS:  Well, I used them
11   in the specific way I just answered.
12   They helped guide what I should pay
13   more attention to.
14   QUESTIONS BY MR. KEYES:
15       Q.    Now, were there times when you
16   read their -- what you describe as a written
17   indication and just use that and not go to
18   the original source?
19       A.    Not that I can think of.
20       Q.    Were there times when you got
21   the written indication of what the paper said
22   and then you actually went to the original
23   source and read it?
24       A.    Many times.
25       Q.    Every time?
```

1        MR. SOBOL: Objection.
2      THE WITNESS: I don't know if I
3   would have sometimes decided something
4   was in one of their outlines that I --
5   for whatever reason I decided, no, I'm
6   not going to look at that. I don't
7   know. That probably happened.
8  QUESTIONS BY MR. KEYES:
9     Q. Prior to this engagement, have
10  you ever offered an opinion that a public
11  nuisance existed?
12     A. Not in any legal sense.
13     Q. In any case?
14     A. In any legal -- in some
15  litigation context?
16     Q. Yeah.
17     A. No, this is my first public
18  nuisance report.
19     Q. And prior to this engagement,
20  have you ever offered opinions about the
21  magnitude of harms or costs associated with
22  the public nuisance?
23     A. This is -- you're also asking
24  in a litigation context?
25     Q. Yes.

1     A. No, this is my first public
2  nuisance venture.
3     Q. Prior to this engagement, have
4  you ever served as a testifying expert
5  offering opinions regarding a public
6  nuisance?
7       MR. SOBOL: Objection. Asked
8   and answered.
9      THE WITNESS: No, this is my
10   first public nuisance venture.
11  QUESTIONS BY MR. KEYES:
12     Q. Prior to this engagement, has
13  Compass Lexecon ever worked on a case
14  involving whether a public nuisance existed?
15     A. I don't know.
16     Q. Prior to this engagement, has
17  Compass Lexecon ever worked on a case
18  attempting to determine the magnitude of
19  harms or costs associated with the public
20  nuisance?
21     A. I don't know.
22     Q. Prior to this engagement, has
23  Greylock McKinnon Associates ever worked on a
24  case involving whether a public nuisance
25  existed?

1     A. I don't know.
2     Q. Prior to this engagement, has
3  Greylock McKinnon Associates ever worked on a
4  case attempting to determine the magnitude of
5  harms or costs associated with the public
6  nuisance?
7     A. I don't know.
8     Q. In paragraph 21 of your report
9  on public nuisance --
10      Are you there?
11     A. Yes, I'm here.
12     Q. -- you discuss physicians being
13  influenced by, quote, "Detailing visits by
14  representatives of brand drug companies and
15  other promotional activities by drug
16  companies."
17     A. Excuse me, I think I must be on
18  the wrong page.
19      Can you give me another --
20     Q. Paragraph 21.
21     A. Paragraph 21. Okay.
22      Okay.
23     Q. Are you there?
24     A. Yes.
25     Q. Okay. In paragraph 21 you

1  discuss physicians being influenced by,
2  quote, "Detailing visits by representatives
3  of brand drug companies and other promotional
4  activities by drug companies."
5      Do you see that?
6     A. I see it.
7     Q. Have you studied detailing
8  visits by manufacturing defendants to
9  physicians?
10     A. Well, I've studied in a sense
11  of reading about it as part of my
12  professional --
13     Q. Reading about them?
14     A. Yes, that's what I said.
15     Q. Okay. Have you done any
16  independent study yourself?
17       MR. SOBOL: Objection.
18  QUESTIONS BY MR. KEYES:
19     Q. Of detailing visits?
20       MR. SOBOL: Objection.
21      THE WITNESS: Okay. Well, I --
22   in sort of a general term, that's an
23   independent study. It's me. It's
24   reading. That's a kind of study.
25      What I haven't done is

1    independently assessed the empirical
2    connection between detailing visits
3    and sales or shipments.
4  QUESTIONS BY MR. KEYES:
5       Q.   You say in paragraph 21, quote,
6  "In the context of prescription opioids,
7  manufacturers were purveying biased
8  information."
9       A.   I'm sorry, you've lost me
10  again.
11       Q.   You say in paragraph 21, "In
12  the context of prescription opioids" --
13       MR. SOBOL:  It's third line
14  down.
15       THE WITNESS:  Okay.  Okay.
16  QUESTIONS BY MR. KEYES:
17       Q.   Okay.  Have you studied what
18  false information was disseminated by
19  manufacturers to physicians?
20       A.   Well, I'm relying on other
21  experts for making that determination.
22       Q.   Who?
23       A.   Well, as it says in the very
24  next sentence there, "As explained in the
25  expert report of Matthew Perri."

1       Q.   Anyone else?
2       A.   It's also covered in some
3  Kessler stuff and Dr. Parran stuff.
4       Q.   Have you studied what false
5  information was disseminated by manufacturers
6  to patients?
7       MR. SOBOL:  Objection.  Form.
8       You may answer.
9       THE WITNESS:  Well, again, I
10  rely on the reports of these other
11  experts for that.
12  QUESTIONS BY MR. KEYES:
13       Q.   You're relying on the same
14  experts you just mentioned?
15       A.   Yes.
16       Q.   Have you studied what false
17  information was disseminated by manufacturers
18  to consumers?
19       A.   I'd be relying on the same
20  experts for that.
21       Q.   Have you studied what, quote,
22  "systematically and intentionally
23  misleading," quote, information was
24  disseminated by manufacturers to physicians?
25       A.   Is that a quote from me?

1       Q.   Yes.  You used the phrase
2  "systematically and intentionally
3  misleading."
4       A.   And where might I find that
5  phrase?
6       Q.   Do you recall using that phrase
7  in your own report?
8       A.   It rings a bell, but I want
9  to -- I'd like to see where you're talking
10  about.
11       Q.   Do you see the sentence that I
12  read you a moment ago about purveying biased
13  information?
14       A.   Yes.
15       Q.   The very next sentence refers
16  to "The information doctors were being given
17  about the dangers of prescription opioids was
18  in most cases false and systematically and
19  intentionally misleading."
20       Do you see that?
21       A.   I do, yes.
22       Q.   Okay.  So have you studied
23  what, quote, "systematically and
24  intentionally misleading," quote, information
25  was disseminated by manufacturers to

1  physicians?
2       A.   Well, on -- in this -- on
3  this -- for this statement I also rely on
4  Dr. Perri, as the footnote indicates.
5       Q.   Have you studied what, quote,
6  "systematically and intentionally
7  misleading," end quote, information was
8  disseminated by manufacturers to patients?
9       A.   The same.  I have -- I rely on
10  these three other experts for this material.
11       Q.   Have you studied what, quote,
12  "systematically and intentionally
13  misleading," end quote, information was
14  disseminated by manufacturers to consumers?
15       A.   In the same way, this is
16  something I rely on the three experts in my
17  report.
18       Q.   Will you turn to page 6 of your
19  report?
20       Are you there?
21       A.   I'm there, yeah.
22       Q.   In paragraph 10 you say, "I
23  will use the term 'defendants' shipments of
24  prescription opioids,' or sometimes just
25  'shipments,' as a shorthand for the activity

```
1    the bellwether plaintiffs claim constitutes a
2    public nuisance regarding both the marketing
3    and distribution of prescription opioids by
4    defendants."
5              Do you see that?
6         A.   I do see that, yes.
7         Q.   And when you refer to "the
8    bellwether plaintiffs" here, you're referring
9    to Summit County and Cuyahoga County,
10   correct?
11        A.   That's correct.
12        Q.   And only those two counties,
13   correct?
14        A.   That's correct.
15        Q.   And when you refer to the
16   bellwether plaintiffs elsewhere in this
17   report, again, you're referring to Summit
18   County and Cuyahoga County, correct?
19        A.   That's correct.
20        Q.   And only those two counties?
21        A.   That's correct.
22        Q.   And so is it accurate based on
23   this statement to say that every time you
24   refer to, quote, "shipments," you are
25   referring to all of the marketing of
```

```
1    prescription opioids by all of the defendants
2    and all of the distribution of prescription
3    opioids by all the defendants?
4         A.   Can you ask me again?  I'm
5    sorry.
6         Q.   Yeah.
7         A.   I have --
8         Q.   I just showed you the language
9    in paragraph 10.
10        A.   Yeah.
11        Q.   I want to confirm:  Is it
12   accurate based on paragraph 10 to say that
13   every time you refer to, quote, "shipments,"
14   end quote, you're referring to all of the
15   marketing of prescription opioids by all of
16   the defendants and all of the distribution of
17   prescription opioids by all of the
18   defendants?
19        A.   Well, if by "marketing" you
20   mean "sales," then I think that's correct.
21        Q.   Would you turn to page 9 of
22   your report?
23        A.   Okay.
24        Q.   Are you there?
25        A.   I'm there.
```

```
1         Q.   Okay.  In paragraph 16 you say,
2    "A public nuisance in economic terms is
3    generally observed when an action or set of
4    actions undertaken by a party or group of
5    parties gives rise to overwhelming negative
6    externalities."
7              Do you see that?
8         A.   I do, yes.
9         Q.   And you use this definition
10   when you opine that a, quote, "public
11   nuisance has resulted from the shipment of
12   prescription opioids into the bellwether
13   communities."
14        A.   And where am I reading when I
15   see that?
16        Q.   Well, that's on page 7,
17   paragraph 14.
18        A.   Okay.  So far so good.
19        Q.   Okay.  So do you see that your
20   reference to "I am of the opinion, to a
21   reasonable degree of certainty in the area of
22   applied microeconomics, that a public
23   nuisance has resulted from the shipment of
24   prescription opioid products into the
25   bellwether communities"?
```

```
1              Do you see that language?
2         A.   I see that, yes.
3         Q.   And when you offer that
4    opinion, referring to a public nuisance, you
5    are using the definition that you provided in
6    paragraph 16 on page 9, correct?
7              MR. SOBOL:  Objection.
8              THE WITNESS:  Well, I wouldn't
9         call this a definition.
10   QUESTIONS BY MR. KEYES:
11        Q.   What would you call it?
12        A.   It's a statement.
13        Q.   Okay.
14        A.   I'm not sure -- it doesn't say
15   definition.  It doesn't mean to be an
16   if-and-only-if statement.
17        Q.   Well, when you are talking in
18   this report about a public nuisance in
19   economic terms, are you using some different
20   standard for public nuisance than what you
21   describe here?
22        A.   Well, this --
23        Q.   Paragraph 16?
24        A.   The definition of public
25   nuisance that I'm using is set out here.
```

```
 1    It's probably -- a little bit earlier.  It
 2    was given to me by counsel.  That's contained
 3    in paragraph 7, which I then interpreted for
 4    my purposes as containing three components.
 5    And if you ask me for a definition, that's
 6    what I would give you.
 7         Q.    Okay.  So you're using the
 8    legal definition that you say was provided to
 9    you by plaintiffs' counsel as set forth in
10    paragraph 7?
11         MR. SOBOL:  Objection.
12         Mischaracterizes his testimony.
13         THE WITNESS:  Well, this is --
14         I was instructed to be guided by this
15         definition, which I was.  And then in
16         order to evaluate whether a public
17         nuisance existed, I used that
18         definition to identify three things
19         that I should study, and the three
20         things are on page 21.
21    QUESTIONS BY MR. KEYES:
22         Q.    Right.
23         So, Professor McGuire, when you
24    are offering the opinion that there is a
25    public nuisance, are you using the definition
```

```
 1    provided by counsel in paragraph 7, or are
 2    you using what you say is a public nuisance
 3    in economic terms as described in
 4    paragraph 16?
 5         MR. SOBOL:  Objection.  Form.
 6         THE WITNESS:  See, I wouldn't
 7         put it that way.  I was guided by the
 8         legal instruction.  Paragraph 38 uses
 9         the word "definition."  So this is
10         what I would point you to in terms of
11         where it's defined.  I consider the
12         elements of a definition, so this is
13         where the definition takes place.
14    QUESTIONS BY MR. KEYES:
15         Q.    So when you offer the opinion
16    that there was a public nuisance, are you
17    using the definition in paragraph 38, or are
18    you using what you describe as a public
19    nuisance in economic terms as set forth in
20    paragraph 16?
21         MR. SOBOL:  Objection.
22         Mischaracterizes.
23         THE WITNESS:  This is the --
24         paragraph 38 uses the word
25         "definition."  So this is where I
```

```
 1         define what I'm -- definition --
 2         definition of a public nuisance.
 3         There it is.  And this is what I do in
 4         my report.
 5    QUESTIONS BY MR. KEYES:
 6         Q.    Okay.  And going back to
 7    paragraph 16 of your report --
 8         A.    Okay.
 9         Q.    -- where you describe what a
10    public nuisance is in economic terms, do you
11    see that language?
12         A.    I do.
13         Q.    Okay.  And you describe it as
14    something that gives rise to overwhelming
15    negative externalities?
16         MR. SOBOL:  Objection.  That's
17         not the whole sentence.
18         THE WITNESS:  Well, the
19         sentence is what I say, but I'm sure
20         you have a question in mind.
21    QUESTIONS BY MR. KEYES:
22         Q.    You say, "A public nuisance
23    gives rise to overwhelming negative
24    externalities."
25         MR. SOBOL:  Objection.  That's
```

```
 1         not what the sentence says.
 2         MR. KEYES:  I already read what
 3         the sentence says.
 4    QUESTIONS BY MR. KEYES:
 5         Q.    Do you disagree with the
 6    concept that a public nuisance gives rise to
 7    overwhelming negative externalities?
 8         A.    The entire sentence says, "A
 9    public nuisance in economic terms is
10    generally observed when an action undertaken
11    by a party or a group of parties gives rise
12    to an overwhelming negative externality."
13         Q.    So in economic terms, does a
14    public nuisance gives rise to overwhelming
15    negative externalities?
16         MR. SOBOL:  Objection.
17         Mischaracterizes his testimony.
18         MR. KEYES:  I'm not
19         characterizing anything.  I'm asking
20         him a question.
21         MR. SOBOL:  Well, leave your
22         words out of it.
23         MR. KEYES:  You're the
24         economist.
25         MR. SOBOL:  Leave your words
```

```
 1        out of it.
 2            MR. KEYES:  You're the
 3        economist.
 4    QUESTIONS BY MR. KEYES:
 5        Q.    So in economic terms, does a
 6    public nuisance give rise to overwhelming
 7    negative externalities?
 8            MR. SOBOL:  Objection.
 9        Mischaracterizes his testimony.
10            THE WITNESS:  Generally
11        observed, when an action -- well, I
12        don't know if there's any point in
13        reading the sentence, which we've done
14        already, but you're changing the
15        meaning.
16    QUESTIONS BY MR. KEYES:
17        Q.    Does an action -- in economic
18    terms, does an action have an externality
19    even if it harms or imposes costs on just one
20    other person?
21            MR. SOBOL:  Objection.
22            THE WITNESS:  Let me see if I
23        follow.
24            Now we're -- you're not using
25        the word "public nuisance" in that
```

```
 1        question.  You're asking a question
 2        about whether an externality in
 3        economic terms can fall on just one
 4        other person?
 5    QUESTIONS BY MR. KEYES:
 6        Q.    Yes.
 7        A.    The answer to that is yes.
 8        Q.    Okay.  In economic terms, does
 9    an action have an externality even if it does
10    not interfere with individuals in their
11    exercise of public rights?
12            MR. SOBOL:  Objection.  Form.
13            THE WITNESS:  Trying to make
14        sure I...
15            Does an action have an
16        externality even if it does not
17        interfere with exercise of public
18        rights?
19            So the answer to that question
20        is that, yes, an externality can
21        involve some other form of negative
22        effect on a second party that could
23        take different forms.
24            So I'm not sure whether it's
25        yes or no, but that's the way I would
```

```
 1        put it.
 2    QUESTIONS BY MR. KEYES:
 3        Q.    Well, when you describe a
 4    public nuisance in paragraph 16, in economic
 5    terms, you say, "When an action or set of
 6    actions undertaken by a party or group of
 7    parties gives rise to overwhelming negative
 8    externalities," correct?
 9            MR. SOBOL:  Objection.  That
10        mischaracterizes the testimony, and
11        it's been asked and answered about
12        four times.
13            I don't know what you don't
14        like about the word "generally."
15            THE WITNESS:  Well, that's the
16        sentence I say, but -- so I'm not sure
17        what the question is then.
18    QUESTIONS BY MR. KEYES:
19        Q.    And when you give that sentence
20    where you're describing a public nuisance in
21    economic terms, it says nothing about
22    interfering with a public right, correct?
23        A.    Well, I don't know.  It says
24    what it says here.
25        Q.    What do you mean you don't
```

```
 1    know?
 2            Look at the -- look at
 3    paragraph 16 and tell me whether it says
 4    anything about interfering with public
 5    rights.
 6            MR. SOBOL:  Objection.
 7            THE WITNESS:  Well, you
 8        wouldn't need to ask that question if
 9        you looked at paragraph 16.
10            No, it doesn't.
11    QUESTIONS BY MR. KEYES:
12        Q.    Okay.  It refers to giving rise
13    to overwhelming negative externalities.
14            What are the criteria in the
15    field of economics for determining whether
16    negative externalities are, quote,
17    "overwhelming," end quote?
18        A.    Well, there's no, I would say,
19    hard-and-fast definition of what overwhelming
20    means.  I guess, you know, it means very
21    large.
22            And where I do get around to
23    defining what a public nuisance is, in
24    paragraph 38 I use words that are, you know,
25    similar:  "continuing, long-lasting effects"
```

Highly Confidential - Subject to Further Confidentiality Review

1    and "significantly interfere."

2              That's what I was asked to

3    assess, and when the numbers run into the

4    billions for two counties, it satisfies my

5    definition of what overwhelming is.

6         Q.    I didn't ask about

7    paragraph 38.  I asked about the language you

8    used in paragraph 16.

9              In paragraph 16 in your report

10   that you say you wrote, you say, "A public

11   nuisance gives rise to overwhelming negative

12   externalities."

13             My question is:  What are the

14   criteria in the field of economics for

15   determining whether negative externalities

16   are, quote, "overwhelming"?

17             MR. SOBOL:  Okay.  First, I

18        object --

19   QUESTIONS BY MR. KEYES:

20        Q.    And you said, "very large."

21             Can you be more specific about

22   the criteria in the field of economics for

23   determining what, quote, "overwhelming"

24   means?

25             MR. SOBOL:  Well, first, I

Highly Confidential - Subject to Further Confidentiality Review

1    object to the speech beforehand.  I

2    don't know whether or not you're

3    asking the witness to adopt the speech

4    or not.

5              But I take it that what you are

6    asking is the end question alone,

7    which is, can you be more specific

8    about the criteria in the field of

9    economics for determining what

10   overwhelming means.

11             THE WITNESS:  Well, I think I

12   interpret this question as another

13   version of the question I had earlier,

14   and as I said there, the term

15   "overwhelming" is one that doesn't

16   have a bright-line criteria of what is

17   overwhelming and not overwhelming.  It

18   depends on the context.

19             What is significant, that's

20   where large is.

21             Continuing, that has to deal

22   with time.

23             Long-lasting, that has to deal

24   with how long negative effects

25   persist.  And that was the charge I

Highly Confidential - Subject to Further Confidentiality Review

1         had here in order to evaluate that.

2              And when you say Table 1, I

3    thought, okay, yes, $20 billion in two

4    counties due to shipments, that meets

5    my criteria.

6    QUESTIONS BY MR. KEYES:

7         Q.    Can you point me to any sources

8    that you would rely on for identifying the

9    criteria for determining whether a negative

10   externality is overwhelming?

11        A.    I don't have anything more than

12   I told you in answer to the last question.

13        Q.    Okay.  Would you turn to

14   page 37?

15        A.    Okay.

16        Q.    You have a section titled "The

17   Interference from Shipments was

18   Unreasonable."

19             Do you see that?

20        A.    I do, yeah.

21        Q.    Now, in offering your opinion

22   that the interference with shipments was

23   unreasonable, you offer the opinion that the

24   number of shipments was unreasonable,

25   correct?

Highly Confidential - Subject to Further Confidentiality Review

1         A.    Yeah, or -- well, I have a

2    criteria for what unreasonable means, which

3    is that -- what do I say here?

4         Q.    Well, are you able to tell me

5    without looking at your report?

6         A.    It helps me to be more specific

7    to look at the report, and it's right here,

8    so it won't take much time.

9              So it's not, I wouldn't say,

10   number.  It's the shipments were unreasonable

11   if they're not justified by clinical need.

12   And it wasn't really a count that I looked

13   at.  I looked at more of a share.

14        Q.    Okay.  I want to be clear that

15   I understand the logic.

16             You say the interference from

17   shipments was unreasonable, right?

18        A.    Yes.

19        Q.    And you're talking about the

20   interference with a public right, correct?

21        A.    Well, I'm talking about exactly

22   what I said earlier, with interference with

23   applicable health and safety.

24        Q.    And you're saying that that

25   interference with those things was

```
1    unreasonable because the volume of shipments
2    was unreasonable --
3                 MR. SOBOL:  Objection.
4    QUESTIONS BY MR. KEYES:
5         Q.   -- right?
6                 MR. SOBOL:  Objection.
7                 THE WITNESS:  That's close.
8         It's not exactly what I was doing.
9             But I have a definition of
10        unreasonable laid out in paragraph 62
11        on instruction from counsel --
12   QUESTIONS BY MR. KEYES:
13        Q.   Right, but that --
14        A.   -- and -- excuse me one sec.
15            I attempted to evaluate whether
16   that was satisfied by the large majority of
17   shipments.
18        Q.   To determine whether the
19   shipments were reasonable or not, using the
20   definition that you just described, which is
21   not justified by a clinical need?
22        A.   I think that's correct.
23        Q.   Okay.  And you were instructed
24   by counsel to assume that unreasonable is, in
25   substance, not justified by clinical need,
```

```
1    correct?
2                 MR. SOBOL:  Objection.
3                 THE WITNESS:  Basically
4         correct, yes.
5    QUESTIONS BY MR. KEYES:
6         Q.   Okay.  And then you opine that
7    shipments were unreasonable in this case
8    because most shipments were not used for
9    clinically justified treatment, correct?
10        A.   The large majority of shipments
11   were not used for scientifically, yes,
12   acceptable, yes, treatment.
13        Q.   Did you do any independent
14   examination of which shipments were used for
15   clinically justified treatment and which were
16   not?
17        A.   By which you mean in a
18   particular year in a particular county of all
19   the shipments, to sort them into two buckets?
20        Q.   Yes.
21        A.   No, I didn't do that.
22        Q.   Who did that?
23        A.   You mean classify or do you
24   mean -- I'm lost about -- excuse me.  Go
25   ahead.  Ask a question.
```

```
1         Q.   Who studied which shipments
2    were used for clinically justified treatment?
3         A.   What I rely on and what I
4    understand about this, in the sense in
5    which -- there's a which here -- is there's a
6    count of opioid shipments that -- this comes
7    from the Rosenthal report -- in kind of
8    theoretical maximum could have been used for
9    appropriate medical treatment.  That's -- the
10   result of that is a kind of share.  It's
11   not as I -- I think I misunderstood the
12   first -- when -- the time you asked the
13   question.
14            It's not saying this shipment
15   yes; this shipment no.  It was looking at of
16   all the shipments, how many of them could
17   have been justified by clinical criteria.
18        Q.   Well, did Professor Rosenthal
19   look at particular shipments to determine
20   whether they were justified -- clinically
21   justified treatment?
22        A.   This is where I make sure I'm
23   not confused again here.
24            By particular shipments,
25   what -- my understanding is that what she did
```

```
1    not do was examine, you know, particular --
2                 MR. SOBOL:  John Doe.
3                 THE WITNESS:  -- shipments to a
4         particular patient or through a
5         particular distributor or through a
6         particular drugstore, but it was to
7         identify in a time period and a
8         location what share of the total
9         shipments could have been attributed
10        to appropriate clinical treatment.
11   QUESTIONS BY MR. KEYES:
12        Q.   What test did she use for that?
13        A.   She relied on -- primarily on
14   expertise of some of the medical experts.
15        Q.   Who?
16        A.   Primarily on Schumacher and
17   Dr. Parran.
18        Q.   Did you examine which shipments
19   for a particular time period in a particular
20   location could be attributed to appropriate
21   clinical treatment?
22        A.   Well, again, the which in the
23   sense of which patient, which outlet, I
24   didn't examine that, but I, you know, applied
25   the estimates from Rosenthal's report about
```

1   the share of the total that could be put in

2   the clinically acceptable/not clinically

3   acceptable categories.

4        Q.   Okay.  So are you relying on

5   Professor Rosenthal then to determine which

6   shipments are for clinically acceptable

7   treatment and which ones are not?

8        A.   Well, two nos there.  Two nos

9   to this question.

10            It's which share, if you

11  would -- if you were to substitute which

12  share of shipments, then I would -- that

13  would be the kind of thing I investigated.

14  And it's not only on Professor Rosenthal.

15  There's other material that supports that.

16       Q.   Okay.  Well, I just want to

17  make sure I understand.

18            You say that counsel instructed

19  you to use not justified by clinical need as

20  the standard for unreasonable, correct?

21       A.   Correct.

22       Q.   And you did not independently

23  examine the extent to which shipments were or

24  were not justified by clinical need, correct?

25       A.   Well, I took the same

1   percentages and the same other inputs that go

2   into that calculation.  I used Professor

3   Rosenthal's numbers for those.

4        Q.   Right.

5             So you're relying on Professor

6   Rosenthal's numbers --

7        A.   One sec, though.

8             What I did, read the backup

9   that she used, and I did, you know, study the

10  other parts of the Cutler and Gruber report

11  that also support that analysis.

12       Q.   Did you independently test

13  Professor Rosenthal's work or conclusions

14  about the share of shipments that were not

15  justified by clinical need?

16       A.   Well, in the sense of checking

17  it against the other evidence in the case,

18  such as the clinical opinions and the work by

19  Gruber and Cutler.

20       Q.   Have you done your own study of

21  the share of prescriptions that are

22  clinically appropriate?

23       A.   Well, what I did is in the

24  report, and I used Professor Rosenthal's

25  estimates in order to apply them to the

1   bellwether counties.

2        Q.   And what is -- what standard

3   did Professor Rosenthal use to determine

4   which shares of shipments were clinically

5   justified treatment?

6        A.   She relied on medical experts

7   for that.

8        Q.   Which experts?

9        A.   Schumacher and Parran, I

10  believe.

11       Q.   Okay.  And does Professor

12  Rosenthal take a position in running those

13  calculations on whether prescription opioids

14  are a clinically appropriate use for chronic

15  pain?

16       A.   I would have to go back and see

17  exactly what she said about that.  She has a

18  qualifier in there, but she did not include

19  any estimates of chronic pain in her

20  clinically appropriate categories.

21       Q.   If people do obtain pain relief

22  from chronic pain when they use prescription

23  opioids, would that change your opinion --

24            MR. SOBOL:  Objection.

25

1   QUESTIONS BY MR. KEYES:

2        Q.   -- as to which share of

3   shipments were for clinically justified

4   treatment?

5             MR. SOBOL:  Objection.

6             You may answer.

7             THE WITNESS:  No.

8   QUESTIONS BY MR. KEYES:

9        Q.   Why not?

10       A.   Well, my opinion about this

11  has, I think, a pretty good basis, and it

12  doesn't depend on a -- you know, a single

13  aspect of the situation.

14            I would say in summary that the

15  weight of clinical evidence is that, in fact,

16  there's no studies that I'm aware of that

17  demonstrate that opioids are effective for

18  long-term clinical pain.

19       Q.   What is the FDA --

20            MR. SOBOL:  He hasn't finished

21       his answer.

22            THE WITNESS:  So that's -- so

23       that's one.

24            You see that in the CDC, and

25       you see that in the medical experts as

```
 1          well.  That's number one.
 2               Number two is the CDC and the
 3      medical experts and other papers say
 4      these are dangerous drugs.  That's
 5      number two.
 6               And number three, in almost all
 7      cases, opioids are a third-line
 8      treatment for long-term chronic pain.
 9               Just one -- I'm wrapping up
10      here.
11               So you put those statements
12      together, and they provide a strong
13      basis for saying that the share of
14      appropriate treatments in the chronic
15      pain category is going to be really
16      small.
17  QUESTIONS BY MR. KEYES:
18      Q.    What does the FDA say about
19  whether prescription opioids can be used for
20  chronic pain?
21           MR. SOBOL:  Objection.
22           THE WITNESS:  I'm not sure.
23  QUESTIONS BY MR. KEYES:
24      Q.    Did you look into that?
25      A.    Well, for that sort of thing is
```

```
 1      what I rely on medical experts for, to read
 2      labels and tell me what is the appropriate
 3      and not appropriate categories.
 4          Q.    Does Medicare cover
 5      prescription opioids?
 6               MR. SOBOL:  Objection.
 7               THE WITNESS:  Yes, I think they
 8          do.
 9      QUESTIONS BY MR. KEYES:
10          Q.    Does Medicare cover
11      prescription opioids for chronic pain?
12               MR. SOBOL:  Objection.
13               THE WITNESS:  Well, normally
14          when you write a prescription as a
15          doctor, you don't even put the
16          diagnosis down.  So the prescription
17          would go through the system, as it
18          were, without a diagnosis.
19      QUESTIONS BY MR. KEYES:
20          Q.    Does Medicare cover
21      prescription opioids that are specifically
22      prescribed for chronic pain?
23               MR. SOBOL:  Objection.
24               THE WITNESS:  Well, Medicare
25          wouldn't know.  They don't get a
```

```
 1          diagnosis on a claim form.
 2      QUESTIONS BY MR. KEYES:
 3          Q.    Well, you can say that.  That's
 4      not my question.
 5               My question was:  Does Medicare
 6      cover prescription opioids that are
 7      specifically prescribed for chronic pain?
 8               MR. SOBOL:  Objection.  Asked
 9          and answered.
10               THE WITNESS:  Let me try to
11          answer it another way.
12               If a physician were to
13          prescribe a prescription opioid for a
14          stomach upset or for a sore foot, that
15          physician could write that
16          prescription and it would be filled at
17          the pharmacy.  Medicare does not know
18          what the particular indication is that
19          the doctor is prescribing that opioid
20          for.
21      QUESTIONS BY MR. KEYES:
22          Q.    Has Medicare made a
23      determination as to whether it will cover
24      prescriptions for opioids that are expressly
25      for the purpose of treating chronic pain?
```

```
 1               MR. SOBOL:  Objection.  Asked
 2          and answered.
 3               THE WITNESS:  I'm not sure.
 4      QUESTIONS BY MR. KEYES:
 5          Q.    Did you look into that?
 6          A.    That's also something that I --
 7      that's obviously a clinical question of what
 8      is the appropriate use of opioids, and that's
 9      something that there are other experts who
10      will be in a good position to talk about.
11          Q.    Has Medicaid made a
12      determination as to whether it will cover
13      prescriptions for opioids that are expressly
14      for the purpose of treating chronic pain?
15               MR. SOBOL:  Objection.
16               THE WITNESS:  Well, Medicaid is
17          in the same position as Medicare when
18          it comes to what information it knows
19          as a claim comes in for a
20          prescription.
21               So if a physician in Medicaid
22          were to prescribe opioids totally
23          inappropriately, Medicaid wouldn't
24          know that.
25               So they're not in a position to
```

1   make a determination claim by claim

2   what is being -- the use of the opioid

3   is for.

4   QUESTIONS BY MR. KEYES:

5   Q.   My question was:  Has Medicaid

6   made a decision to cover opioids that are

7   written expressly for the purpose of treating

8   chronic pain?

9        MR. SOBOL:  Objection.  Asked

10       and answered.

11       THE WITNESS:  I was answering

12       that question in the context of a

13       particular prescription and pointing

14       out that Medicaid, which -- are we

15       talking about in the abstract, is not

16       in a position to make that

17       determination claim by claim.

18       Medicaid is not just one thing

19       in the United States.  There are 50

20       flavors, depending on the state, and

21       even in the state there are different

22       plans that participate in Medicaid,

23       that have formularies that they

24       determine on their own.

25       So it's --

1   QUESTIONS BY MR. KEYES:

2   Q.   Have you looked at the

3   formularies for any Medicaid or Medicare

4   plan?

5   A.   As part of this, no.  That's

6   also the -- within the clinical realm of

7   determining what is the appropriate use of

8   opioids.

9   Q.   Have any private insurers made

10  a decision to cover opioids that are written

11  expressly for the purpose of treating chronic

12  pain?

13       MR. SOBOL:  Objection.

14       THE WITNESS:  You know, it's

15       not so different for the private

16       insurers either.  A claim comes in;

17       they don't have a diagnosis on the

18       claim.  So it's -- they're not in a

19       position on a claim-by-claim basis to

20       make a determination of whether the

21       use of the opioid is appropriate or

22       inappropriate.

23  QUESTIONS BY MR. KEYES:

24  Q.   My question was:  Have any

25  private insurers made a decision to cover

1   opioids that are written expressly for the

2   purpose of treating chronic pain?

3        MR. SOBOL:  Objection.  Asked

4        and answered.

5        THE WITNESS:  Well, it's not

6        possible on a claim-by-claim basis.

7        And then, you know, we have many

8        private insurers in the United States,

9        so I'm really not in a position to

10       answer.

11  QUESTIONS BY MR. KEYES:

12  Q.   Have you looked at the

13  formulary for any private insurer as to

14  whether it covers prescription opioids for

15  chronic pain?

16  A.   Now, this is the realm of the

17  P & T committee at the health plan, which is

18  a clinically driven decision.  And for me as

19  an economist, I'm very happy to rely on the

20  expert, the medical experts, to tell me about

21  this.

22  Q.   In your report regarding the

23  public nuisance, you are attempting to

24  quantify costs incurred by communities and

25  individuals as a result of the opioid

1   problem, correct?

2   A.   That's generally correct, yes.

3   Q.   Okay.  Do you understand that

4   individuals in these communities are not

5   parties to this lawsuit?

6   A.   Well, my understanding is the

7   plaintiffs are the county governments.

8   Q.   Okay.  So do you understand

9   that individuals in Summit County and

10  Cuyahoga County are not parties to this

11  lawsuit?

12  A.   Well, I understand the

13  plaintiffs to be the two county governments.

14  Q.   And not individuals?

15       MR. SOBOL:  Objection.  Asked

16       and answered.

17       THE WITNESS:  And, yes, in that

18       those are the plaintiffs, period.

19  QUESTIONS BY MR. KEYES:

20  Q.   Okay.  And do you understand

21  that the communities in the Summit County and

22  Cuyahoga County are not parties to this

23  lawsuit?

24       MR. SOBOL:  Objection.  Form.

25       THE WITNESS:  In the same way,

```
 1          the same answer.  I understand the
 2      plaintiffs to be the two county
 3      governments, period.
 4  QUESTIONS BY MR. KEYES:
 5          Q.    So when you attempted to
 6      quantify the costs in the areas of mortality,
 7      morbidity, NAS, crime and child maltreatment,
 8      you are quantifying the costs borne by
 9      individuals and communities in those areas,
10      correct?
11          A.    They would be borne by a range
12      of actors.  That would include the
13      governments, but also would include
14      individuals and other members of the
15      community.
16          Q.    You've done specific
17      calculations of the costs borne by Summit
18      County and Cuyahoga County, correct?
19          A.    I've done in my first report,
20      or my damages report, I did do specific
21      calculations of that, yes, that's correct.
22          Q.    Right.
23                But I'm not asking about the
24      damages report now.  I'm asking about the
25      work you did in the public nuisance report.
```

```
 1          A.    Okay.  I understand.
 2          Q.    Okay.  And there, where you are
 3      quantifying costs in the five areas I listed,
 4      you were quantifying the costs that are borne
 5      by individuals or communities other than
 6      Summit County and Cuyahoga County
 7      governments?
 8          A.    Well, you know, I wouldn't
 9      necessarily say that.
10          Q.    Because?
11                MR. SOBOL:  Objection.
12                THE WITNESS:  Because I don't
13          think it's true.
14  QUESTIONS BY MR. KEYES:
15          Q.    Where have you in your report,
16      your public nuisance report, have you
17      quantified the costs borne by the Summit
18      County or Cuyahoga County governments as a
19      result of the public nuisance that you say
20      exists?
21          A.    Where in my report have I
22      quantified those things?
23          Q.    Yes.
24          A.    The most obvious component of
25      costs that I quantify that are borne by the
```

```
 1      county governments are in the sixth category
 2      that I apply, which is an importation from my
 3      earlier report of the damages associated with
 4      shipments as opposed to the shipments'
 5      misconduct attribution.
 6                That doesn't mean that some of
 7      the costs in the other categories would not
 8      have been borne by the county government.
 9          Q.    Professor McGuire, at this
10      point we may be seeking a third day from the
11      special master because you're not answering
12      the questions that are posed, and you keep
13      giving the same kinds of speeches.
14                So we've already covered what
15      you quantified as the costs borne by the
16      Cuyahoga County and Summit County
17      governments.  That's in your damages report,
18      correct?
19                MR. SOBOL:  Objection.
20                The speech should be completely
21          ignored, including the implicit
22          threat, if it's an effort to try and
23          manipulate the truthfulness of your
24          testimony and should be disregarded.
25                You can answer, however --
```

```
 1                THE WITNESS:  I'll focus on the
 2          question.
 3                MR. SOBOL:  -- the question.
 4  QUESTIONS BY MR. KEYES:
 5          Q.    You already quantified what you
 6      said are the costs borne by Summit County and
 7      Cuyahoga County, and you set forth those
 8      calculations in your damages report, correct?
 9                MR. SOBOL:  Objection.  Asked
10          and answered.
11                THE WITNESS:  Well, the costs
12          here are ones due to shipments, not
13          due to misconduct.
14                So report 1, Exhibit 1,
15          damages, assessed costs due to
16          misconduct.
17                This is a different
18          calculation.  And all I was answering
19          in response to your question was
20          clarifying that as a starting point
21          for how I -- for the -- you know,
22          where these costs would land.
23                And that was not a definitional
24          statement, it wasn't a repetition what
25          I did in the first report.  It's an
```

```
1        explanation of the differences between
2        what was done in the first report and
3        this report.
4   QUESTIONS BY MR. KEYES:
5        Q.    And those costs that you say
6   were borne by the Summit County and Cuyahoga
7   County governments you say were imported into
8   your public nuisance report?
9        MR. SOBOL:  Objection.  Asked
10       and answered.
11  QUESTIONS BY MR. KEYES:
12       Q.    Correct?
13       A.    Well, go on.  I mean...
14       Q.    Well, go to page 80 of your
15  report.
16             Are you there?
17       A.    Yes.
18       Q.    You have a Table 13.
19             Do you see that?
20       A.    Yes.
21       Q.    Okay.  You have a summary of
22  monetary value of harms due to prescription
23  opioid shipments based on Dr. Cutler's
24  Approach 2.
25       A.    Right.
```

```
1        Q.    Okay?
2             Now, go to the prior page.
3             You have a Table 12, correct?
4        A.    Yes.
5        Q.    Summary of harms due to
6   shipments from 2006 to 2016, correct?
7        A.    That's correct.
8        Q.    And in each of these two
9   tables, Tables 12 and Table 13, you have six
10  different forms of harm, correct?
11       A.    Correct.
12       Q.    The sixth form of harm in each
13  table is titled "Bellwether Government
14  Costs," correct?
15       A.    That's correct.
16       Q.    And you're referring to Summit
17  County and Cuyahoga County, correct?
18       A.    That's correct.
19       Q.    And the numbers that you list
20  here in each chart as being bellwether
21  government costs are calculations that you
22  imported from your damages report?
23             MR. SOBOL:  Objection.
24             THE WITNESS:  You will find --
25
```

```
1   QUESTIONS BY MR. KEYES:
2        Q.    Correct?
3             MR. SOBOL:  Objection.
4             THE WITNESS:  You will find the
5        basis for these numbers in my damages
6        report.
7   QUESTIONS BY MR. KEYES:
8        Q.    Okay.  Turning to the fifth --
9   the first form of harm, mortality deaths,
10  correct?
11             MR. SOBOL:  Well, in these two
12        tables?
13             MR. KEYES:  Yes.
14  QUESTIONS BY MR. KEYES:
15       Q.    The costs that you are
16  quantifying regarding mortality deaths are
17  costs borne by individuals or communities,
18  not costs borne by Summit County or Cuyahoga
19  County, correct?
20       A.    See, that's not correct.
21       Q.    Where do you show the mortality
22  deaths form of harm as causing specific costs
23  borne by Summit County or Cuyahoga County?
24             MR. SOBOL:  Objection.
25             THE WITNESS:  I didn't do that.
```

```
1        I didn't -- in each of these other
2        harm categories --
3             MR. SOBOL:  There's no
4   question.  You answered the question.
5             MR. KEYES:  Don't interrupt
6   him.  Let him finish his answer.
7             Keep going.
8             MR. SOBOL:  Well, I think he
9   did, and then he started volunteering
10  stuff.
11             MR. KEYES:  No, sir.  He's
12  answering the question.  Please stop
13  interrupting him when he says
14  something that perhaps you don't like.
15             Continue, please.
16             MR. SOBOL:  I love it.  I love
17  everything he has to say.  I just
18  don't want him volunteering things
19  when I'm hungry and want to go to
20  lunch.
21             But go ahead --
22  QUESTIONS BY MR. KEYES:
23       Q.    You were saying?
24             MR. SOBOL:  -- Professor
25  McGuire.
```

1       THE WITNESS:  I was saying, in

2   these categories I estimated the total

3   costs without necessarily attributing

4   them to who bore those costs.

5   QUESTIONS BY MR. KEYES:

6       Q.    Okay.  So in your Tables 12 and

7   13, when you are talking about the form of

8   harm being mortality and deaths, have you

9   quantified the portion of the costs you've

10  calculated as being attributable or borne by

11  Summit County or Cuyahoga County government?

12      A.    That was not my assignment

13  here.  And if I can volunteer an example, at

14  the risk of irritating my counsel, with

15  respect to something like NAS costs --

16      Q.    My question has nothing to do

17  with NAS.  I'm asking about mortalities and

18  deaths.  Answer the question posed.

19      MR. SOBOL:  Now you're

20  interrupting him.

21      MR. KEYES:  I am, because he's

22  talking about something that the

23  question didn't address at all.

24      MR. SOBOL:  All right.  We're

25  going to take a lunch.  We're going to

1   take lunch.

2   QUESTIONS BY MR. KEYES:

3       Q.    In Tables 12 and 13 --

4       A.    I don't mind.  I don't mind.

5   Let's finish this.

6       Q.    In Tables 12 and 13, when

7   you're talking about --

8       A.    Let's talk about morbidity.

9       Q.    -- the form of harm being

10  mortality and death, have you quantified

11  anywhere in your report --

12      MR. SOBOL:  You got overridden

13  on it.  Start the question again.  You

14  got overridden.  Just start the

15  question again.

16      He wants a clean question.  He

17  wants to continue.  Start with a clean

18  question.

19  QUESTIONS BY MR. KEYES:

20      Q.    In Tables 12 and 13, when you

21  were talking about the form of harm being

22  mortality and deaths, have you quantified

23  anywhere in your report the portion of those

24  costs that you say were borne by Summit

25  County or Cuyahoga County governments?

1       MR. SOBOL:  Objection.  Asked

2   and answered.

3       THE WITNESS:  I thought in

4   previous you had also asked about

5   morbidity.  Well, I was going to give

6   you an example of morbidity.  This

7   will clear it up in one minute.

8       With respect to morbidity

9   costs, what I estimate are --

10  QUESTIONS BY MR. KEYES:

11      Q.    I didn't ask about morbidity,

12  sir.  I've asked you about mortality and

13  deaths.

14      MR. SOBOL:  I told you --

15  QUESTIONS BY MR. KEYES:

16      Q.    Okay.  Please answer the

17  question.

18      A.    Okay.

19      MR. SOBOL:  So which question?

20  QUESTIONS BY MR. KEYES:

21      Q.    In Tables 12 and 13, when you

22  were talking about the form of harm being

23  mortality and deaths, have you quantified

24  anywhere in your report the portion of those

25  costs that you say were borne by the Summit

1   County or Cuyahoga County governments?

2       MR. SOBOL:  Objection.  Asked

3   and answered.

4       THE WITNESS:  Okay.  This

5   question is part of a discussion we've

6   had about whether or not the, as I

7   understand it, the bellwether

8   government costs line is a complete

9   identification of the cost borne by

10  the plaintiffs in the categories that

11  I've put forth in these tables.

12      The answer to that is, no, it's

13  not the case.

14      And you then asked me, have I

15  done a specific allocation of some of

16  these costs to the plaintiffs.

17      And what I did was to look at

18  the total.  But if you are familiar

19  with what the components of that total

20  are, you would see some of those would

21  be borne by the governments.  You

22  know, for example, some of the people

23  who die would have been government

24  employees.  Some of the other people

25  who die would have paid taxes to the

Highly Confidential - Subject to Further Confidentiality Review

1    governments.

2         So the total lost productivity,

3    which is a component of the value of

4    statistical life, is a very good

5    example of a cost that is borne by

6    different agents.

7         Now, my assignment, as I

8    understood it, was to give the total.

9    You're asking if that total contains

10   things by the governments.  The answer

11   is yes.

12   QUESTIONS BY MR. KEYES:

13        Q.   No, I didn't ask that.  I

14   didn't ask whether the total contains that.

15        I asked you specifically:  Have

16   you quantified anywhere in your report the

17   portion of those costs that you say were

18   borne by the Summit County or Cuyahoga County

19   governments specific to mortality and deaths

20   anywhere in your report?

21        MR. SOBOL:  Objection.  Asked

22        and answered.

23        THE WITNESS:  Okay.  I just

24        gave what I thought is an important

25        and thorough answer to that question,

Highly Confidential - Subject to Further Confidentiality Review

1    which is that these cost categories

2    contain many components.  And what I

3    did is estimate the total.  And those

4    components would be borne by -- some

5    for the individual, some for other

6    members of the community, some by the

7    county governments.

8         What I did not do, which is a

9    more direct answer to your question,

10   is I didn't allocate those costs in

11   each of these categories to any of

12   those agents.

13   QUESTIONS BY MR. KEYES:

14        Q.   And the same is true for

15   mortality deaths, morbidity, babies with NAS,

16   crimes and child maltreatment, correct?

17        MR. SOBOL:  Objection.  Form.

18        Compound.

19        THE WITNESS:  The same is true

20        with respect to my work in this

21        report, which was to identify the

22        total of those costs and then -- I

23        mean, in answer to your question, some

24        of those costs do fall on different

25        agents, including the governments, but

Highly Confidential - Subject to Further Confidentiality Review

1    I didn't attempt to break out the --

2    what you would call in economic terms

3    the incidence of those costs according

4    to the various actors.

5         MR. KEYES:  Okay.  Why don't we

6    take a break for lunch.

7         VIDEOGRAPHER:  The time is

8    1:24 p.m., and we're off the record.

9    (Off the record at 1:24 p.m.)

10        VIDEOGRAPHER:  The time is

11   2:08 p.m., and we're on the record.

12   QUESTIONS BY MR. KEYES:

13        Q.   Professor McGuire, do you have

14   McGuire Exhibit 6 in front of you, which is

15   your report regarding nuisance?

16        A.   Yes, I do.

17        Q.   Is it accurate to say that in

18   this report you intend to measure the costs

19   of harms that result from the use or abuse of

20   all opioids in Summit County and Cuyahoga

21   County?

22        A.   No, that wouldn't be accurate.

23        Q.   Do you attempt to distinguish

24   between the costs attributable to the use or

25   abuse of illicit opioids versus the use or

Highly Confidential - Subject to Further Confidentiality Review

1    abuse of prescription opioids?

2         A.   Well, I'm interested in harms

3    and costs in either case.

4         Q.   In your report, do you attempt

5    to distinguish between the costs attributable

6    to the use and abuse of illicit opioids

7    versus the use and abuse of prescription

8    opioids?

9         MR. SOBOL:  Objection.  Asked

10        and answered.

11        THE WITNESS:  I'm interested in

12        the sum of the effects of both of

13        those.

14   QUESTIONS BY MR. KEYES:

15        Q.   Okay.  But in your

16   calculations, do you break out the costs that

17   you quantify between the costs that are

18   attributable to the use or abuse of illicit

19   opioids versus the costs resulting from the

20   use or abuse of prescription opioids?

21        MR. SOBOL:  Objection.  Asked

22        and answered.

23        THE WITNESS:  Generally I just

24        look at the total.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. KEYES:
 2        Q.    Okay.  In fact, if you look at
 3    paragraph 39 on page 22...
 4        A.    I'm there.
 5        Q.    The last paragraph you say, "As
 6    a reminder, the harms I attribute to
 7    shipments of prescription opioids includes
 8    harms due to the subsequent use of other
 9    opioids, e.g., heroin, fentanyl, caused by
10    the shipments."
11              Correct?
12        A.    That's correct.
13        Q.    Okay.  So anywhere in your
14    report do you separate out the costs that you
15    quantify based on harms resulting from the
16    use or abuse of illicit opioids from the use
17    or abuse of prescription opioids?
18              MR. SOBOL:  Objection.  Asked
19         and answered several times now.
20              THE WITNESS:  I think I just
21         look at the totals.
22    QUESTIONS BY MR. KEYES:
23        Q.    Anywhere in your report do you
24    separate out the costs that you quantified
25    based on harms resulting from the use or
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    abuse of prescription opioids that were
 2    diverted from the harms resulting from the
 3    use or abuse of prescription opioids that
 4    were used by the people to whom they were
 5    prescribed?
 6        A.    I understand what you mean by
 7    diverted.
 8              Do you mean -- it's hard to
 9    give a clear answer to that question.
10              I looked at the total about
11    whether the harm came from a diversion or
12    whether the harm came from the direct
13    consumption of the person who was prescribed
14    the opioids.
15        Q.    You looked at the total,
16    including both of those categories?
17        A.    It could have been in either
18    category, yes.
19        Q.    Did you separately measure the
20    costs of the harms resulting from people
21    using or abusing prescription opioids that
22    were diverted as opposed to prescription
23    opioids that were used by the people to whom
24    they were prescribed?
25        A.    Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. SOBOL:  Objection.  Asked
 2         and answered.
 3              THE WITNESS:  I think it's the
 4         same question, but I just looked at
 5         the total, which could have been due
 6         to either diversion or consumption of
 7         the person to whom it was prescribed.
 8    QUESTIONS BY MR. KEYES:
 9        Q.    Do you separately measure the
10    cost of the harms resulting from people using
11    or abusing prescription opioids that were
12    either made or distributed by the defendants
13    versus harms resulting from people using or
14    abusing prescription opioids that were made
15    or distributed by entities other than the
16    defendants?
17        A.    I don't attempt to distinguish
18    those made or distributed by the defendants
19    from shipments that were made or distributed
20    by those who might not have been a defendant.
21        Q.    Do you, anywhere in your
22    report, Exhibit Number 2, measure the costs
23    resulting from harms that are attributable to
24    the defendants' misconduct?
25        A.    No, I don't attribute these
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    harms to misconduct.
 2        Q.    In fact, if we look at page 27,
 3    note 57, you say, quote, "In this report, I
 4    assess the external costs associated with
 5    prescription shipments without regard to
 6    whether they were due to defendants'
 7    misconduct."
 8              Correct?
 9        A.    That's what I say there, yes.
10        Q.    And that's an accurate
11    statement?
12        A.    That's an accurate statement.
13        Q.    And you say, quote, "I thus use
14    the share of harms due to shipments without
15    multiplying by Professor Rosenthal's estimate
16    of the share of shipments due to misconduct,"
17    end quote.
18              Do you see that?
19        A.    I do, yes.
20        Q.    And is that an accurate
21    statement?
22        A.    Yes, it is.
23        Q.    You state in your report that
24    you were advised by counsel for the
25    plaintiffs that they intend to prove that the
```

1  public nuisance regarding the shipment of
2  prescription opioids arose in substantial
3  part from the unlawful conduct by the
4  defendants.
5      A.  I'm sorry, where are you now?
6      Q.  Page 16, paragraph 28.
7      A.  Okay.  I see.
8      Q.  Okay.  Do you see that
9  sentence?
10     A.  I see the sentence.
11     Q.  Okay.  What does, quote, "in
12 substantial part" mean?
13     A.  In large part.
14     Q.  And what specific objective
15 criteria do you -- would you use to capture
16 the notion of "in substantial part"?
17     MR. SOBOL:  Objection.
18     THE WITNESS:  Well, this is
19     something that I've been advised by
20     counsel that they intend to do.  It's
21     not something that I intend to do.
22 QUESTIONS BY MR. KEYES:
23     Q.  Which counsel advised you of
24 this?
25     A.  I don't remember.

1      Q.  Okay.  But you don't quantify
2  in this report the cost of harms from the
3  public nuisance that are linked up with
4  defendants' unlawful conduct, right?
5      MR. SOBOL:  Objection.
6      THE WITNESS:  Yeah, that's
7      correct.  That's correct.
8  QUESTIONS BY MR. KEYES:
9      Q.  Did you attempt anywhere in
10 your report to quantify the cost of harms
11 from the public nuisance that did not arise
12 from the defendants' unlawful conduct?
13     MR. SOBOL:  Objection.
14     THE WITNESS:  I was trying to
15     make sure I get the logic of your
16     question correct.
17     The application of the
18     Rosenthal share, which I did not do in
19     this report in terms of quantifying
20     harms, can be interpreted as some that
21     were due to misconduct and the balance
22     not due to misconduct.
23     So in that I sum both those
24     things, I do count both those due to
25     misconduct in the Rosenthal sense as

1      well as those not due to misconduct.
2  QUESTIONS BY MR. KEYES:
3      Q.  And so anywhere in your report
4  do you quantify the cost of harms from the
5  public nuisance that did not arise from the
6  unlawful conduct of the defendants?
7      MR. SOBOL:  Objection.
8      You can answer.
9      THE WITNESS:  Okay.  Well, I
10     think I was answering your question in
11     perhaps a too narrow way.  I was
12     answering it with respect to the
13     Rosenthal question of the -- that
14     particular unlawful -- what will be
15     alleged unlawful act, which is the
16     misleading advertising.
17     What other lawful/unlawful
18     elements of a definition here, I'm not
19     in a position to say.
20 QUESTIONS BY MR. KEYES:
21     Q.  Okay.  You said before that you
22 didn't quantify the cost of the harms from
23 the public nuisance that were due to
24 defendants' misconduct.
25     MR. SOBOL:  Objection.  Asked

1      and answered.
2      THE WITNESS:  I didn't separate
3      those out from the total.  They would
4      be included in the total.
5  QUESTIONS BY MR. KEYES:
6      Q.  Right.
7      So my question was:  Anywhere
8  in your report do you quantify the cost of
9  harms from the public nuisance that did not
10 arise from the defendants' unlawful conduct?
11     A.  In answering, I'm not equating
12 misconduct as studied by Professor Rosenthal
13 with unlawful contact -- sorry, unlawful
14 conduct, which I understand to be a broader
15 term.
16     So if I answer it in the sense
17 of Rosenthal, I count both:  those
18 attributable to Rosenthal misconduct and
19 those not attributable to Rosenthal
20 misconduct.  That's an element of lawful.
21     There may well be other
22 elements of what is lawful and unlawful that
23 apply here that I'm not in a position to talk
24 about.
25     Q.  And the costs that you have

Highly Confidential - Subject to Further Confidentiality Review

1   quantified in this report are the costs of
2   harms in Summit County and Cuyahoga County,
3   correct?
4       A.      That's generally correct.
5       Q.      Did you back out of those cost
6   calculations the cost of harms that occurred
7   in Akron or Cleveland?
8       A.      My estimates were county-level
9   only, without attributing them to
10  jurisdictions within the county.
11      Q.      Right.
12              So did you back out of those
13  calculations at any point the cost of harms
14  that occurred in the cities of Akron or
15  Cleveland?
16      A.      I would say no, they were
17  county-based calculations.
18      Q.      Even though the City of Akron
19  and the City of Cleveland have been
20  specifically excluded from the track 1 case,
21  correct?
22          MR. SOBOL:  Objection.
23          THE WITNESS:  Well, I'm just
24      following what I was asked to do.  And
25      the reasons, I don't know.

Highly Confidential - Subject to Further Confidentiality Review

1   QUESTIONS BY MR. KEYES:
2       Q.      You do recognize that
3   prescription opioids can confer positive
4   benefits on particular individuals when used
5   in accordance with scientifically acceptable
6   clinical criteria?
7       A.      Yes.
8       Q.      What are those positive
9   benefits?
10      A.      Well, there could be a
11  reduction in pain.  There could be an
12  improvement in function.
13      Q.      Anything else?
14      A.      Those are the primary ones.
15      Q.      Do you at any point in your
16  report quantify the benefit of prescription
17  opioids in pain reduction?
18          MR. SOBOL:  Objection.
19          You can answer.
20  QUESTIONS BY MR. KEYES:
21      Q.      Not discuss it; quantify it.
22          MR. SOBOL:  Objection.
23          THE WITNESS:  What I do in my
24      report is an assessment of the
25      quantification of the amount of time

Highly Confidential - Subject to Further Confidentiality Review

1       or days for which clinically
2       appropriate use of opioids would
3       reduce pain, which is a kind of
4       quantification.
5   QUESTIONS BY MR. KEYES:
6       Q.      Where in your report do you
7   have a chart that shows the quantification of
8   the benefit of prescription opioids in the
9   form of pain reduction?
10      A.      I don't think I have a chart.
11      Q.      Where is the number that you
12  calculated to show the dollar benefit of
13  prescription opioids in the form of pain
14  reduction?
15      A.      Okay.  So you're changing the
16  question a little bit.
17              Quantification isn't
18  necessarily a dollar.  Quantification can be
19  done in other units.  And I responded by --
20  part of what I did, which was a
21  quantification in terms of days of -- days
22  with improved pain.
23              Do you want to see where that
24  is?  Is that -- I'm not sure what the
25  question is now.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      Where in your report do you
2   show the dollar value of the benefit of
3   prescription opioids in the form of pain
4   reduction?
5           MR. SOBOL:  Objection.
6           THE WITNESS:  In terms of the
7       question of pain reduction, I didn't
8       need to go so far as to quantify it in
9       terms of dollars.
10  QUESTIONS BY MR. KEYES:
11      Q.      Do you at any point in your
12  report quantify the benefit of prescription
13  opioids in increased productivity?
14      A.      I analyze studies on the effect
15  of opioids on what I -- by productivity, I
16  mean workforce productivity, and determine
17  that whatever benefits there are are less
18  than costs, which is sufficient for me to be
19  able to say that with respect to this
20  category of potential benefits and costs, the
21  costs exceed the benefits.
22      Q.      Did you at any point in your
23  report quantify the benefit of prescription
24  opioids in the form of increased
25  productivity?

Highly Confidential - Subject to Further Confidentiality Review

1    MR. SOBOL:  Objection.  Asked
2    and answered.
3        THE WITNESS:  I think this is
4    the same question.
5        And my answer, I hope, will be
6    the same, which is that I studied the
7    research literature on the effects of
8    prescription opioids on workforce
9    productivity, and as a result of that
10   study, concluded that the positive
11   effects on productivity are outweighed
12   by the negative effects on
13   productivity.
14       So there's no net benefit to be
15   had in the benefit column in terms of
16   dollars or in terms of anything else
17   with respect to opioids on that score.
18   And that was enough for me to be able
19   to say I'm going to be conservative
20   and not count those additional costs
21   that exceed the benefits.
22   QUESTIONS BY MR. KEYES:
23   Q.    Anywhere in your report do you
24   show the dollar value of the benefit of
25   prescription opioids in the form of increased

Highly Confidential - Subject to Further Confidentiality Review

1    productivity?
2        MR. SOBOL:  Objection.  Asked
3    and answered.
4        THE WITNESS:  I understand this
5    to be the same question, and if for
6    some reason it's a different question,
7    I'm happy to try to answer that new
8    question.
9        What I did in my report was to
10   investigate the research literature on
11   the effects of opioid prescriptions on
12   workforce productivity and determined
13   that the negative effects of opioid
14   prescriptions outweighed the positive
15   effects in terms of productivity.
16       So once that's established,
17   quantification in dollar terms isn't
18   necessary in order to say that the
19   costs exceed the benefits.
20       So as long as, you know, costs
21   are greater than benefits, it's not --
22   I don't need to know exactly the
23   dollar benefits in order to make a
24   determination of my assignment in the
25   report.

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. KEYES:
2    Q.    Did you examine any indirect
3    benefits from the use of prescription
4    opioids?
5    A.    I'm sorry, what do you mean by
6    "indirect benefits"?
7    Q.    Nondirect.
8    A.    Do you have another synonym you
9    can give me?
10   Q.    No.
11       You would agree that increased
12   productivity and reduction of pain are direct
13   benefits from the use of prescription
14   opioids?
15       MR. SOBOL:  Objection.
16       THE WITNESS:  Well, people use
17   these terms in different ways, so I'm
18   just trying to find out -- even the
19   word "indirect" in the literature is
20   used in different ways by different
21   people.
22   QUESTIONS BY MR. KEYES:
23   Q.    Did you examine any indirect
24   savings to Summit County or Cuyahoga County
25   from the mortality that results from the use

Highly Confidential - Subject to Further Confidentiality Review

1    or abuse of opioids?
2        MR. SOBOL:  Objection.
3        THE WITNESS:  Well, I'm still
4    not sure what you mean by "indirect"
5    here, so if you can help me with that,
6    I'll give it a shot.
7    QUESTIONS BY MR. KEYES:
8    Q.    Sure.
9        I thought you mentioned earlier
10   in the deposition in response to a question
11   that as a result of the mortality, there
12   would be dollar impacts -- there could be
13   dollar impacts on Summit County or Cuyahoga
14   County?
15   A.    Yes, I did that.
16   Q.    And some of those could be
17   positive dollar impacts, and some of those
18   could be negative, correct?
19   A.    Well, that's not what I said
20   earlier.  I used an example of what I would
21   call a negative impact, which is if someone
22   dies, then -- I think the example I used was
23   tax revenue, that if there's, for example, a
24   local income tax or even a sales tax, some of
25   a person's income would not be available for

```
 1   their consumption.  They would be
 2   contributing to public revenues.
 3         Q.     And why do you call that a
 4   negative effect?
 5         A.     Well, it's a negative effect on
 6   the county because the income is gone from
 7   the individual, and that means less tax
 8   collections.
 9         Q.     And could there be positive
10   dollar impacts on Summit County or Cuyahoga
11   County from the mortality that you attempt to
12   quantify?
13         MR. SOBOL:  So is the county
14         better off with the people being
15         killed by opioids?
16         MR. KEYES:  That's not my
17         question.
18              You can answer my question, not
19         his.  He can ask you questions later.
20         THE WITNESS:  No, generally
21         not.
22   QUESTIONS BY MR. KEYES:
23         Q.     When you referred earlier to
24   studying the economic literature on workforce
25   productivity and the impact of opioids on
```

```
 1   that productivity, what studies did you look
 2   at?
 3         A.     There's a set of studies that I
 4   refer to in my report, are the ones I looked
 5   at.
 6         Q.     Okay.  Can you name any of
 7   them?
 8         A.     Right now?
 9         Q.     Yeah.
10         A.     Yes.  The authors include
11   Kilby, I think Angela is her first name;
12   Janet Currie and Molly Schnell; Alan Krueger;
13   a first authored paper by Aliprantis.  And
14   there's one or two more that I can't remember
15   right now.
16         Q.     Did any of the studies you just
17   listed examine the impact of prescription
18   opioids on worker productivity in Summit
19   County or Cuyahoga County?
20         A.     I think they would have --
21   there're broader studies that would have
22   included -- I'd have to go back and check
23   study by study, but most of them were
24   broad-based studies that might have been the
25   whole United States or perhaps large counties
```

```
 1   in the United States that likely would
 2   have -- some of them, I'm sure, included
 3   Summit and Cuyahoga.
 4         Q.     Why are you so sure?
 5         A.     Because it's my understanding
 6   what the studies did.
 7         Q.     Did you look at any studies
 8   that examined the data specific to Summit
 9   County and Cuyahoga County?
10         A.     Examined the data with respect
11   to what?
12         Q.     Did you look at any studies
13   that examined data specific to Summit County
14   or Cuyahoga County regarding the impact of
15   prescription opioids on worker productivity?
16         A.     One of the Ohio reports that --
17   I think it's -- I refer to it as a Swank
18   report -- is Ohio-specific, and it talks
19   about productivity for Ohio.  And I don't
20   remember whether it broke down its findings
21   county by county, but it would have applied
22   to our bellwether.
23         Q.     In your report you reference
24   alcohol as a potential analogy.
25              Do you recall that?
```

```
 1         MR. SOBOL:  Objection.
 2         THE WITNESS:  I do.
 3   QUESTIONS BY MR. KEYES:
 4         Q.     Yes?
 5         MR. SOBOL:  Objection.
 6   QUESTIONS BY MR. KEYES:
 7         Q.     Do you recall that?
 8         MR. SOBOL:  Objection.
 9         THE WITNESS:  I do recall that.
10   QUESTIONS BY MR. KEYES:
11         Q.     And do you remember saying that
12   alcohol yields a, quote, "overwhelming net
13   cost to society"?
14         A.     I was --
15         MR. SOBOL:  No, that's a
16         mischaracterization of the report.
17              Are you referring to either
18         report?
19         MR. KEYES:  I'm referring to a
20         specific statement he made.
21         THE WITNESS:  Yeah, let me take
22         a look.  I think that would clear up
23         any confusion here.
24              Okay.  So this is paragraph 27.
25         I think there's just one paragraph,
```

```
1          yeah, where it's not exactly an
2          analogy, but it's a kind of
3          clarification that the -- another, you
4          know, potential in this case, I guess
5          the substance that might be considered
6          a -- that may have overwhelming costs
7          versus benefits, is what I'm
8          mentioning here, is not sufficient for
9          it to be regarded as a public
10         nuisance.
11   QUESTIONS BY MR. KEYES:
12         Q.    I'm not sure I understood your
13   answer.
14               You said that even though
15   alcohol may cause overwhelming net costs to
16   society, it is not necessarily a public
17   nuisance?
18               MR. SOBOL:  Objection.  That's
19         a misreading of the report.
20               MR. KEYES:  I'm not asking
21         about the report.  I'm asking about
22         your answer.
23               THE WITNESS:  What I -- my
24         answer is that I didn't use it as an
25         analogy.  I use it as an illustration
```

```
1          of a situation in which the costs may
2          be overwhelming in relation to the
3          benefits.  And that's a hypothetical,
4          as I say here.  I'm sure you know.  I
5          didn't do that analysis.  I'm just
6          saying, well, this might be true.
7                Society might decide to condone
8          that and not pursue any legal theory
9          of fault related to alcohol.
10   QUESTIONS BY MR. KEYES:
11         Q.    Because society has determined
12   that buying and selling and consuming alcohol
13   within certain constraints is permissible?
14         A.    That might be part of it.
15         Q.    And yet selling and
16   distributing prescription opioids is legal
17   within certain constraints, correct?
18         A.    Well, I don't like to talk too
19   much about what is legal and illegal, but my
20   understanding is that some of that is fine.
21         Q.    And if I understand you
22   correctly, you're saying alcohol, because of
23   society's determination that it can be a
24   legal activity, it is not a public nuisance
25   even though it can create an overwhelming net
```

```
1    cost to society, right?
2                MR. SOBOL:  Objection.
3          Mischaracterizes the testimony.
4                THE WITNESS:  Yeah, that's not
5          exactly what I said.
6    QUESTIONS BY MR. KEYES:
7          Q.    You said, "An economic weighing
8    of the benefits versus costs of the
9    prevalence of alcohol could yield an
10   overwhelming net cost to society, yet for
11   myriad reasons, society condones the
12   prevalence of alcohol, and subject to its
13   regulation and appropriate use, selling,
14   buying and consuming alcohol are legal
15   activities."
16         A.    Yes.
17               MR. SOBOL:  Objection.
18         Mischaracterizes the testimony.  It's
19         only one portion of the answer that
20         you just read back.
21   QUESTIONS BY MR. KEYES:
22         Q.    I just read you what you said
23   in your report.
24         A.    I understand that.
25         Q.    Okay.
```

```
1          A.    And as that sentence says "that
2    for myriad reasons."
3                So I understood your question
4    to be asking about the lawful/unlawful, the
5    condonence of selling alcohol, but there's
6    other things that may factor into that.
7          Q.    What differentiates alcohol
8    from prescription opioids if they can both
9    create an overwhelming net cost to society
10   yet be condoned by society and be legal
11   activities within certain constraints?
12               MR. SOBOL:  Objection.
13               THE WITNESS:  Okay.  First of
14         all, I'm -- I don't know that that's
15         true with respect to alcohol.  I'm
16         only using that as an illustration to
17         capture that the overwhelming cost
18         versus benefits isn't a sufficient
19         condition in order to have someone
20         qualify from a legal perspective as a
21         public nuisance.
22   QUESTIONS BY MR. KEYES:
23         Q.    And if it's not sufficient,
24   then what else do you need to qualify from a
25   legal perspective as a public nuisance as you
```

1   approach it as an expert in this case?

2           MR. SOBOL:  Objection.  Scope.

3           THE WITNESS:  Well, I

4       understood my assignment to be guided

5       by a definition of public nuisance

6       that is based on the law, that I

7       interpreted as having three components

8       that we discussed earlier today.

9   QUESTIONS BY MR. KEYES:

10          Q.    And that's the legal definition

11  that you're applying that you got from

12  counsel, correct?

13          A.    Well, the legal definition is

14  in paragraph 7 or something in this second

15  report.  And my interpretation of that in

16  terms that an economist can work with are, I

17  think, in paragraph 38.

18          Q.    So in determining that there's

19  a public nuisance, you are applying your

20  interpretation in paragraph 38 of a legal

21  definition that you were supplied in

22  paragraph 7?

23          A.    Well, I broke down the -- what

24  I thought to be the essential elements of

25  paragraph 7, which is a legal definition, and

1   I said, here's what I think I need to do.

2   And that's -- I am being transparent.  That's

3   what I said I needed to do; that's what I

4   did.

5           Q.    And you're not applying the

6   standard for a public nuisance that you

7   described in economic terms in paragraph 16

8   of your report?

9           MR. SOBOL:  Objection.

10  QUESTIONS BY MR. KEYES:

11          Q.    Correct?

12          MR. SOBOL:  Objection.

13      Mischaracterizes the testimony.

14          THE WITNESS:  Well, I think as

15      we discussed earlier, this is not a

16      definition.  If you want a definition,

17      it's paragraph 38 where I use the word

18      "definition" and I think explain quite

19      clearly how I define a public

20      nuisance.

21  QUESTIONS BY MR. KEYES:

22          Q.    You calculate what you think

23  are the costs of mortality as a result of the

24  opioid epidemic in Summit County and Cuyahoga

25  County, correct?

1           A.    That's not correct.

2           Q.    How is that incorrect?

3           A.    Because that's not what I do.

4           Q.    You have an entire Appendix C

5   on mortality, correct?

6           A.    Correct.

7           Q.    And you identify mortality as

8   one of the harms that results from the opioid

9   epidemic, correct?

10          A.    That's correct.

11          Q.    And then you quantify the costs

12  of that harm, correct?

13          A.    Yes.

14          Q.    Okay.  And --

15          A.    But still, I'm not confirming

16  your question.

17          Q.    When you quantify the costs of

18  mortality as a harm that results from the

19  opioid epidemic, you include all deaths

20  attributable to overdoses on opioids?

21          A.    First of all, that's not what I

22  do.

23          Q.    Why not?

24          How is it wrong?

25          A.    Because it's not what I do.

1           Q.    Tell me how it's wrong then.

2           A.    I do not -- it's wrong to say

3   that I quantify mortality costs due to the

4   opioid epidemic.  I don't do that.

5           Q.    What do you do?

6           A.    What I do is contained in my

7   report, which is to quantify the harm due to

8   shipments.

9           Q.    Okay.  You purport to quantify

10  the costs of mortality as a harm attributable

11  to shipments of opioids, correct?

12          MR. SOBOL:  Objection.

13  QUESTIONS BY MR. KEYES:

14          Q.    Is that correct?

15          MR. SOBOL:  Objection.

16          THE WITNESS:  Do you mind

17      reading it to me again?  Sorry.

18  QUESTIONS BY MR. KEYES:

19          Q.    You purport to quantify the

20  costs of mortality as a harm attributable to

21  shipments of opioids, correct?

22          MR. SOBOL:  Objection.

23          THE WITNESS:  Yeah, that sounds

24      right to me.

25

```
 1    QUESTIONS BY MR. KEYES:
 2         Q.    And in doing so, your
 3    calculations include deaths from overdoses on
 4    opioids that you say are attributable to
 5    shipments of opioids, correct?
 6         A.    That's correct.
 7         Q.    And those deaths include
 8    overdoses on illegal opioids as well as
 9    deaths on -- from overdoses of prescription
10    opioids, correct?
11         A.    That's also correct.
12         Q.    And those deaths include
13    overdoses on prescription opioids that were
14    diverted as well as deaths from overdoses on
15    prescription opioids that were prescribed to
16    the person who died?
17         A.    They would include deaths for
18    the person who received the prescription as
19    well as someone who might have taken those
20    pills if they were resold or diverted in some
21    way.
22         Q.    In your calculations, do you
23    account for the fact that some of the
24    opioid-related deaths in your calculations
25    would have occurred at some point in the
```

```
 1    absence of the users ever using prescription
 2    opioids?
 3              MR. SOBOL:  Objection.
 4              THE WITNESS:  What I do by
 5         attributing deaths to shipments, I
 6         address this issue by asking the
 7         question that -- asking the -- that
 8         logical question:  If the shipments
 9         had been higher or lower, would the
10         death rates have been higher or lower.
11              And the empirical connection
12         that's established between that means
13         that the deaths that I count are
14         caused by the shipments.
15    QUESTIONS BY MR. KEYES:
16         Q.    Now when you say you "addressed
17    that issue," you're saying you address that
18    issue by using percentages you receive from
19    Professor Cutler, correct?
20         A.    That's correct, yes.
21         Q.    Okay.  So does that methodology
22    account for the fact that if there had been
23    no prescription shipment -- opioid shipment,
24    some people still would have used an illegal
25    drug and still would have died?
```

```
 1         A.    It does, yes.
 2         Q.    How so?
 3         A.    Well, Professor Cutler's
 4    method, which is what we're talking about
 5    here, attributes a share of opioid-related
 6    deaths to shipments, not 100 percent.  So
 7    it's not attributing -- sorry -- not
 8    attributing all deaths to opioids to
 9    shipments.
10              In fact, the methodology is
11    designed to be able to distinguish between
12    deaths that might have occurred otherwise and
13    those that can be reliably attributed to
14    shipments.
15         Q.    And in quantifying what you say
16    are the costs of mortality, you use the VSL,
17    correct?
18         A.    I do, yes.
19         Q.    What is the VSL?
20         A.    VSL is an abbreviation for
21    something called the value of a statistical
22    life.
23         Q.    And you cite six studies in the
24    section where you attempt to quantify the
25    costs of mortality, correct?
```

```
 1              MR. SOBOL:  Objection.
 2              THE WITNESS:  I would have to
 3         look to see how many I cited.
 4    QUESTIONS BY MR. KEYES:
 5         Q.    Which of those six studies uses
 6    the VSL, if any?
 7         A.    Well, some do.  I'd have to go
 8    back and look.
 9              Would you like me to do that?
10         Q.    Why don't you look at page 61.
11         A.    All right.  So what are you
12    asking me?
13         Q.    I asked you which of the
14    studies you cite in your discussion actually
15    uses the VSL.
16         A.    All right.  Well, the one I
17    discuss in the paragraph on page 61 uses the
18    VSL.
19         Q.    Is it your understanding that
20    the VSL is usually used for regulatory
21    purposes?
22         A.    Well, it's used for many
23    purposes, but including regulatory purposes,
24    yes.
25         Q.    Have you ever used the VSL to
```

1  quantify costs in a lawsuit?

2      A.    I don't think I have, no.

3      Q.    You calculated the costs of

4  morbidity in your report?

5      A.    Aspect of the cost of

6  morbidity.

7      Q.    That aspect being the number of

8  people who have opioid use disorder?

9      A.    That aspect being the elevated

10 health care costs associated with opioid use

11 disorder.

12     Q.    And you calculate what you

13 think are the number of people with opioid

14 use disorder arising from shipments?

15     A.    I, again, apply results from

16 Professor Cutler to make that determination,

17 yes.

18     Q.    In your calculations of the

19 number of people with opioid use disorder as

20 a result of shipments, you do not distinguish

21 between people who used illicit opioids

22 versus prescription opioids, correct?

23     A.    Well, this is the same issue

24 that you asked about with respect to

25 mortality.  The methodology applied by

1  Professor Cutler is explicitly designed to

2  sort that out and attribute the, in this

3  case, disease due to the shipments.

4      Q.    But you don't distinguish

5  between people who have the disease as a

6  result of using an illicit opioid versus

7  people who have the disease as a result of

8  using prescription opioids --

9          MR. SOBOL:  Objection.

10 QUESTIONS BY MR. KEYES:

11     Q.    -- correct?

12         MR. SOBOL:  Objection.  Asked

13     and answered.

14         THE WITNESS:  Well, what is

15     important for me is to distinguish

16     those that are due to shipments and

17     not due to shipments, and due to

18     shipments could have different routes

19     of cause.

20         And what -- I have that -- the

21     precise answer that I need from

22     Professor Cutler's report.

23 QUESTIONS BY MR. KEYES:

24     Q.    So your calculations include

25 people who have opioid use disorder,

1  regardless of whether they used an illicit

2  opioid or a prescription opioid, correct?

3          MR. SOBOL:  Objection.  Asked

4      and answered several times.

5          THE WITNESS:  Well, it's -- the

6      question I'm called to answer is how

7      much of the opioid disease is due to

8      shipments, and I have very good

9      estimates of that from Professor

10     Cutler.

11 QUESTIONS BY MR. KEYES:

12     Q.    Right.

13         But in doing your calculations

14 and identifying the people with opioid use

15 disorder, did you limit yourself to people

16 who have opioid use disorder as a result of

17 using prescription opioids?

18         MR. SOBOL:  Objection.  Asked

19     and answered.

20         THE WITNESS:  I began with a

21     total number and then took a share of

22     that total number that's attributable

23     to shipments.  That share could have

24     come from either of those groups.

25

1  QUESTIONS BY MR. KEYES:

2      Q.    Did you look at any data sets

3  specific to Summit County or Cuyahoga County

4  regarding the prevalence of opioid use

5  disorder?

6          MR. SOBOL:  Final or draft?

7      Not drafts.

8  QUESTIONS BY MR. KEYES:

9      Q.    Did you look at any data sets

10 specific to Summit County or Cuyahoga County

11 regarding the prevalence of opioid use

12 disorder?

13     A.    I'm not 100 percent sure.  The

14 NSDUH -- sorry.  A data set that's National

15 Survey on Drug Use and Health, affectionately

16 called NSDUH, has some sub-national and, I

17 think for some years, some sub-state

18 information.  I may have looked at that at

19 some point.

20     Q.    Can you be any more specific

21 other than "may have looked at"?

22     A.    Not right now, sorry.

23     Q.    Did you look at any Medicaid

24 data regarding the prevalence of opioid use

25 disorder in Summit County or Cuyahoga County?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.
 2        Q.    What data did you look at?
 3        A.    There was at one point
 4   consideration of a claims data set that
 5   included some Medicaid.
 6        Q.    What data set are you referring
 7   to?
 8        A.    Well, it was a data set that
 9   was available by a claims processer, and I
10   don't remember the name.
11        Q.    Where did you get that data?
12        A.    I didn't ever get it.
13        Q.    You considered looking at it
14   but did not look at it?
15        A.    Well, by "look at data" I mean
16   look at, in some cases, summaries of data.
17   And with respect to Medicaid, the coverage
18   was poor and unreliable for a basis for
19   estimates.
20        Q.    What makes you say it was poor
21   and unreliable?
22        A.    Looking at the tables that had,
23   you know, for example, number of people who
24   were covered by Medicaid in different parts
25   of the state.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    What criteria did you use to
 2   decide it was, quote, poor and unreliable?
 3        A.    Well, my professional
 4   experience in doing empirical work, you need
 5   a certain amount of observations before you
 6   can really say anything.
 7        Q.    Did you analyze any data from
 8   the Summit County ADM Board to determine the
 9   prevalence of opioid use disorder in that
10   county?
11        A.    I'd have to go back and see
12   what I did with the ADM Board.
13        Q.    Well, sitting here today, did
14   you look at that data at any point?
15            MR. SOBOL:  Objection.  Asked
16         and answered.
17            THE WITNESS:  I would have to
18         go back and take a look to remind
19         myself.
20   QUESTIONS BY MR. KEYES:
21        Q.    If you had used it, you would
22   have cited it in your report, correct?
23        A.    Yes, I believe I would have.
24        Q.    Did you analyze any claims data
25   from the Cuyahoga County ADAMHS Board to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   determine the prevalence of opioid use
 2   disorder in that county?
 3        A.    No, I didn't analyze any claims
 4   data for that purpose.
 5        Q.    In your calculations, you
 6   assume that the prevalence of opioid use
 7   disorder in Cuyahoga County and Summit County
 8   is the same as the national rate of
 9   prevalence, correct?
10        A.    Yes, it's a general assumption,
11   which is widely regarded as being
12   conservative.
13        Q.    Widely regarded by whom as
14   being conservative?
15        A.    By people who -- researchers
16   who study this field.
17        Q.    Can you point me to someone
18   specific who says that by looking at national
19   data you're being conservative?
20        A.    Well, there's two senses in
21   which it's conservative.  One sense in which
22   NSDUH is conservative, it misses people who
23   may be institutionalized.  Respondents may be
24   reluctant to acknowledge all their drug
25   history.  Both of those things would lead to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   undercounts.
 2            And then with respect to the
 3   local jurisdictions here, if you look at the
 4   death rate from opioids, the rate is greater
 5   in our bellwethers than the difference in the
 6   rates of opioid use disorder, implying that
 7   the local counts for opioid use disorder are
 8   also underestimates for our bellwethers.
 9        Q.    To estimate the excess costs
10   attributable to opioid use disorder in Summit
11   County and Cuyahoga County, you used the
12   Florence study findings?
13            MR. SOBOL:  Objection.
14   QUESTIONS BY MR. KEYES:
15        Q.    Is that correct?
16            MR. SOBOL:  Objection.
17            THE WITNESS:  Well, if you look
18         at the report, I considered a number
19         of similar studies and then ended up
20         using the Florence numbers for various
21         categories of beneficiaries, depending
22         on what their health insurance
23         coverage was.
24            But these numbers are not very
25         much different in all the studies I
```

1     reviewed.
2  QUESTIONS BY MR. KEYES:
3        Q.    Did you do anything to validate
4  the Florence study?
5              MR. SOBOL:  Objection.
6              THE WITNESS:  Well, one form of
7        validation is checking to see whether
8        the literature, as we call it,
9        contains other papers that seem to
10        come to similar findings, and that's
11        exactly what validation means.
12  QUESTIONS BY MR. KEYES:
13        Q.    You attempt to calculate the
14  number of NAS cases that are attributable to
15  opioid shipments, correct?
16        A.    I do.
17        Q.    And you first took data from
18  the Ohio Department of Health website on the
19  total hospitalizations among Ohio resident
20  newborns for NAS, neonatal abstinence
21  syndrome, correct?
22        A.    That's correct.
23        Q.    And you assumed that all NAS
24  cases were related to opioids, correct?
25        A.    Well, that's based on data from

1  Ohio.
2        Q.    What do you mean it's based
3  on --
4        A.    Well, it's based -- I didn't
5  make that up.  I referred to -- I'd have to
6  again look to see what the specific reference
7  is.
8        Q.    Well, you --
9        A.    But the information I had
10  indicated that almost all cases of NAS in
11  Ohio were due to opioids.
12        Q.    What is your authority for that
13  proposition, that almost all cases of NAS in
14  Ohio were due to opioids?
15        A.    I'd need to look.  I don't know
16  if it's in the appendix or the text, so...
17              According to the Ohio
18  Department of Health, virtually all cases of
19  NAS are due to opioids.  That's paragraph 53.
20        Q.    Did you consider Professor
21  Young's opinions on NAS in doing your
22  calculations?
23        A.    I don't think I needed
24  Professor Young to do this.  I had Ohio data
25  for a count.  I had this information from

1  Ohio about what those NAS cases were due to.
2  I had data on the relative charges of cases
3  with and without NAS.  I confined my
4  assessment to only those costs, which I
5  consider to be probably the most conservative
6  part of this report.  And those were the
7  elements of my calculation regarding the
8  costs due to shipments of extra NAS -- of the
9  harms due to NAS in our bellwethers.
10        Q.    What is the correct term and
11  diagnostic category for infants that
12  experience withdrawal from opioids?
13        A.    I think it's a -- it's within
14  the NAS category.
15        Q.    Is neonatal abstinence
16  syndrome, NAS, the correct term and
17  diagnostic category for infants who
18  experience withdrawal from opioids?
19              MR. SOBOL:  Objection.
20              THE WITNESS:  You're outside my
21        expertise.  Sorry.
22  QUESTIONS BY MR. KEYES:
23        Q.    Did you do any research into
24  whether the correct term and diagnostic
25  category for infants who experience

1  withdrawal from opioids is neonatal
2  abstinence syndrome?
3        A.    I think this sentence addresses
4  that.  "According to the Ohio Department of
5  Health, virtually all cases of NAS are due to
6  opioids."
7              That's what I needed to know.
8        Q.    Okay.  Do you have an
9  understanding as to whether practitioners
10  distinguish between neonatal abstinence
11  syndrome and neonatal opioid withdrawal?
12        A.    Distinguish in what way?
13        Q.    When classifying or reporting
14  incidence, whether they appropriately
15  distinguish between neonatal abstinence
16  syndrome and neonatal opioid withdrawal?
17              MR. SOBOL:  Objection.
18              THE WITNESS:  Again, that's
19        outside my expertise.
20  QUESTIONS BY MR. KEYES:
21        Q.    Did you look into that?
22              MR. SOBOL:  Objection.  Asked
23        and answered.
24              THE WITNESS:  I think the
25        statement that virtually all cases of

```
 1            NAS are due to opioids is exactly what
 2    I need to know.
 3    QUESTIONS BY MR. KEYES:
 4         Q.    In your calculations on the
 5    cost of crime that you say results from
 6    shipments, you used NIBRS data?
 7         A.    That's correct.
 8         Q.    Did you look at any data
 9    specific to Summit County or Cuyahoga County?
10         A.    Yes.
11         Q.    What data did you look at that
12    was specific to Summit County or Cuyahoga
13    County?
14         A.    The data in the NIBRS includes
15    the county indicator.  Those were the crime
16    counts I used.
17         Q.    Did you consider whether the
18    crime rate has stayed the same, fallen or
19    risen in recent years?
20         A.    Yes.
21         Q.    What did you conclude?
22         A.    Well, I concluded very
23    specifically what the rates were in different
24    years.
25         Q.    And has the rate fallen in the
```

```
 1    last two years in either Summit County or
 2    Cuyahoga County?
 3         A.    I'd have to go back and check,
 4    but I have the numbers, which is what I need.
 5         Q.    Based on NIBRS, you're saying?
 6         A.    That's right.
 7         Q.    Did you --
 8               MR. SOBOL:  Do you want him to
 9    look or not?
10               MR. KEYES:  No.  If he has it
11    in his report, then I can look at the
12    report.
13    QUESTIONS BY MR. KEYES:
14         Q.    Did you look at any databases
15    specific to Summit County and Cuyahoga County
16    regarding crimes such as the LERMS database?
17         A.    Well, I did look at
18    county-specific data, yes, in the form of the
19    NIBRS.
20         Q.    Did you look at the LERMS
21    database that is specific to Summit County or
22    Cuyahoga County?
23         A.    No, I used the NIBRS.
24         Q.    When you attempted to quantify
25    the costs that you attribute to children
```

```
 1    being mistreated as a result of opioid
 2    shipments, am I correct in understanding that
 3    you rely on Dr. Young to identify the number
 4    of children who are subject to maltreatment
 5    in Summit County and Cuyahoga County?
 6         A.    Yes, I believe that's correct.
 7         Q.    And you rely on Cutler's
 8    percentage to estimate the share of
 9    maltreated children due to opioid shipments?
10         A.    That's also correct.
11         Q.    And by taking those two
12    figures, you can identify, you think, the
13    number of children whose parents mistreated
14    them as a result of opioid shipments?
15         A.    That's correct.
16               MR. SOBOL:  Objection.
17               THE WITNESS:  That's correct.
18    QUESTIONS BY MR. KEYES:
19         Q.    For purposes of your
20    calculations, you assume that if parents had
21    not used opioids, they would not have
22    mistreated their children, correct?
23               MR. SOBOL:  Objection.
24    Objection.
25               THE WITNESS:  This is a -- this
```

```
 1            is a part of the David methodology,
 2            David Cutler's methodology.
 3    QUESTIONS BY MR. KEYES:
 4         Q.    So you again refer to Professor
 5    Cutler and what he did?
 6         A.    I do refer to Professor Cutler
 7    and what he did.  This is a question he
 8    addressed.
 9         Q.    You say in your report that
10    based on the Perri, Kessler and Egilman
11    reports, quote, "The manufacturing defendants
12    knew or should have known that they were
13    making misleading statements about the safety
14    and efficacy of the prescription opioids they
15    manufactured."
16         A.    Do you mind pointing to where
17    you're reading?
18         Q.    Page 50, paragraph 90.
19         A.    Okay.  I'm there.
20         Q.    And you continue that, quote,
21    "Marketing by the defendants was consistent
22    in conveying the message that the risk of
23    addiction in patients taking opioids for pain
24    was minimal, the tolerance, dependence and
25    addiction were not serious concerns, and that
```

```
1    opioids were the safest and most effective
2    treatment for chronic/long-term pain."
3              Do you see that?
4         A.   I do see that.
5         Q.   And that statement is --
6              MR. SOBOL:  Misquoted.
7    QUESTIONS BY MR. KEYES:
8         Q.   That statement is also based on
9    the Perri, Kessler and Egilman report?
10        A.   Yes.
11        Q.   Okay.  Which defendants engaged
12   in this marketing with misleading statements?
13             MR. SOBOL:  Objection.  Scope.
14             THE WITNESS:  It wasn't
15        something that I studied.
16   QUESTIONS BY MR. KEYES:
17        Q.   Which marketing of the
18   defendants included these misleading
19   statements?
20             MR. SOBOL:  Objection.  Scope.
21             THE WITNESS:  That's also not
22        something I studied.
23   QUESTIONS BY MR. KEYES:
24        Q.   So you're relying entirely on
25   what those three other experts have said when
```

```
1    you make these two statements?
2              MR. SOBOL:  Objection.
3              THE WITNESS:  That's not what I
4         said, no.
5              If you go on in the section,
6         you'll see more.
7    QUESTIONS BY MR. KEYES:
8         Q.   Well, I asked you what your
9    basis -- which defendants you were talking
10   about and which marketing you were talking
11   about, and you said, "That's also not
12   something I studied."
13             I'm asking:  Are you relying --
14   when you make those statements, are you
15   relying on what the three experts said?
16             MR. SOBOL:  Objection.
17             THE WITNESS:  Well, I'm not
18        sure -- what "those statements" you're
19        referring to.
20   QUESTIONS BY MR. KEYES:
21        Q.   The two statements that I just
22   read from your report.
23        A.   Okay.
24             MR. SOBOL:  Objection.  I don't
25        know which two statements you're
```

```
1         talking about.  I see several
2         statements.
3              MR. KEYES:  The two statements
4         I read.
5              THE WITNESS:  Well, what I
6         said --
7              MR. SOBOL:  Well, one of them
8         you misread, and the other one -- are
9         you talking about the sentences or the
10        things within the sentence?  What are
11        you talking about?
12   QUESTIONS BY MR. KEYES:
13        Q.   Go ahead and answer.
14        A.   Just to be sure about
15   interpreting my answer, I interpret your
16   question as being asking about the statements
17   that I made in response to your questions.
18             If I have that wrong, please
19   let me know.
20        Q.   You say at paragraph 90, "As
21   explained in the expert reports of Dr. Perri,
22   Dr. Kessler and Dr. Egilman, the
23   manufacturing defendants knew or should have
24   known that they were making misleading
25   statements about the safety and efficacy of
```

```
1    the prescription opioids they manufactured."
2              Then you say, "Marketing by the
3    defendants was consistent in conveying the
4    message that the risk of addiction in
5    patients taking opioids for pain was minimal,
6    the tolerance, dependence and addiction were
7    not serious concerns, and that opioids were
8    the safest and most effective treatment for
9    chronic/long-term pain."
10             Those are statements in
11   paragraph 90 by you.
12             MR. SOBOL:  Objection.
13        Misstatement.
14   QUESTIONS BY MR. KEYES:
15        Q.   I asked you what manufacturing
16   defendants you were talking about.  You said
17   you didn't know.
18        A.   I said I didn't study it.
19        Q.   Okay.
20             I asked you what specific
21   statements were misleading, and you said you
22   didn't study that.
23             MR. SOBOL:  Objection.
24             THE WITNESS:  Yes.
25
```

```
1    QUESTIONS BY MR. KEYES:
2       Q.   Then you say in the next
3    paragraph that based on your own examination
4    of publicly available documents and discovery
5    produced in this litigation, "defendants had
6    clear knowledge that the shipments had
7    negative impacts on the public health and
8    safety of communities across the nation,
9    including in the bellwether communities."
10      Do you see that?
11      A.   I do.
12      Q.   Okay.  Which defendants are you
13   talking about there?
14      MR. SOBOL:  Objection.  Scope.
15      THE WITNESS:  Well, I go on in
16   this section to give, for example.
17   QUESTIONS BY MR. KEYES:
18      Q.   Okay.
19      A.   And the "for example" refers to
20   Purdue.  And then additionally in the next
21   paragraph I talk about Mallinckrodt.  And
22   then in the next paragraph I talk about
23   Cardinal and McKesson.
24      Q.   Okay.  So in the sentence that
25   I just read to you from paragraph 91 where
```

```
1    you talk about defendants having clear
2    knowledge, you're talking about those four
3    defendants?
4       MR. SOBOL:  Objection.
5       Mischaracterizes the testimony.
6       THE WITNESS:  No.
7    QUESTIONS BY MR. KEYES:
8       Q.   You don't cite any evidence for
9    that statement other than the four examples
10   you just listed?
11      MR. SOBOL:  Objection.
12      THE WITNESS:  Well, when you
13   say "for example," it doesn't mean
14   you've listed the universe of
15   activities of something.
16   QUESTIONS BY MR. KEYES:
17      Q.   In your report, do you list
18   anything other than the four examples you
19   just reviewed?
20      MR. SOBOL:  Objection.
21      THE WITNESS:  Examples of what?
22   QUESTIONS BY MR. KEYES:
23      Q.   Do you cite any evidence as
24   support for your statement that I read to
25   you, other than the four you just listed:
```

```
1    Purdue, Mallinckrodt, Cardinal and McKesson?
2       MR. SOBOL:  Objection.
3       THE WITNESS:  I believe I do.
4    QUESTIONS BY MR. KEYES:
5       Q.   In this section, what other
6    evidence do you cite --
7       A.   In this --
8       Q.   -- as support for your
9    statement that, quote, "Defendants have clear
10   knowledge that the shipments had negative
11   impacts on the public health and safety of
12   communities across the nation, including in
13   the bellwether communities"?
14      MR. SOBOL:  Objection.
15      THE WITNESS:  I have two
16   answers to that question.
17      One is in other sections of my
18   report I discuss various public
19   documents that call attention to the
20   opioid crisis that are something that
21   defendants would have knowledge of.
22      And then the second answer to
23   the question is when a company like
24   Purdue, who I suppose we could call an
25   industry leader in opioids, has a
```

```
1    public settlement of hundreds of
2    millions of dollars, that's something
3    that I would expect other similar
4    companies would have clear knowledge
5    of and understand.
6    QUESTIONS BY MR. KEYES:
7       Q.   What did Purdue's 2007
8    settlement with the United States say about
9    Summit County?
10      A.   I'm not sure.
11      Q.   What did Purdue's 2007
12   settlement with the United States say about
13   Cuyahoga County?
14      A.   I'm not sure.
15      Q.   What did that settlement say
16   about negative impacts on the public health
17   and safety of Summit County or Cuyahoga
18   County?
19      MR. SOBOL:  Objection.
20      THE WITNESS:  I'm not sure.
21   QUESTIONS BY MR. KEYES:
22      Q.   What did the Mallinckrodt 2017
23   settlement with DOJ say about Summit County
24   or Cuyahoga County?
25      MR. SOBOL:  Objection.
```

1      THE WITNESS:  I'm not sure.
2  QUESTIONS BY MR. KEYES:
3      Q.    What did the Mallinckrodt 2017
4  settlement with DOJ say about negative
5  impacts on the public health and safety of
6  Summit County or Cuyahoga County?
7      A.    I'm not sure.
8      Q.    What did the Cardinal
9  settlement agreement with DOJ say about
10 Summit County or Cuyahoga County?
11     A.    I'm not sure.
12     Q.    What did the Cardinal
13 settlement agreement with DOJ say about the
14 public health and safety of -- negative
15 impacts on the public health and safety of
16 Summit County or Cuyahoga County?
17     A.    I'm not sure.
18     Q.    What did the McKesson
19 settlement agreement with DOJ say about
20 Summit County or Cuyahoga County?
21     A.    I'm not sure.
22     Q.    What did the McKesson
23 settlement agreement with DOJ say about
24 negative impacts on the public health and
25 safety of Summit County or Cuyahoga County?

1      MR. SOBOL:  This is a lot of
2  settlements.
3      THE WITNESS:  I'm not sure.
4  QUESTIONS BY MR. KEYES:
5      Q.    That's the four settlements you
6  reference in your report.
7      So sitting here today, you
8  don't know what any of them said about any
9  public health impacts in Summit County or
10 Cuyahoga County --
11     MR. SOBOL:  Objection.
12 QUESTIONS BY MR. KEYES:
13     Q.    -- correct?
14     MR. SOBOL:  Objection.  That's
15 misleading -- I mean, misstates the
16 testimony.
17     THE WITNESS:  I'm not sure what
18 the degree to Summit and Cuyahoga were
19 referred to in these settlements.
20     MR. KEYES:  Okay.  Why don't we
21 take a break.
22     VIDEOGRAPHER:  The time is
23 3:09 p.m., and we're off the record.
24     (Off the record at 3:09 p.m.)
25     VIDEOGRAPHER:  The time is

1  3:23 p.m., and we're on the record.
2      CROSS-EXAMINATION
3  QUESTIONS BY MR. LONERGAN:
4      Q.    Good afternoon, Professor
5  McGuire.  My name is Sam Lonergan.  I'm with
6  the law firm Arnold & Porter Kaye Scholer.  I
7  represent defendants Endo and Par in this
8  litigation.
9      A.    Good afternoon.
10     Q.    I'm going to do my best not to
11 ask any of the questions that Mr. Keyes asked
12 you, but he asked you a lot of questions over
13 the last 12 hours or so, and I can make no
14 guarantees.
15     But I do want to circle back to
16 an issue that you all were discussing right
17 before we just took our last break, and that
18 is the opinions at paragraphs 90 and 91 of
19 your nuisance report.
20     Do you recall that line of
21 questioning?
22     A.    I will when I look at the --
23 remind myself about the paragraphs.
24     Yes.
25     Q.    What did you rely on --

1  generally speaking, what information did you
2  rely on in forming your opinion in
3  paragraph 91 that defendants had clear
4  knowledge that shipments had negative impacts
5  on the public health and safety of
6  communities across the nation, including the
7  bellwether communities?
8      A.    Well, the material that I
9  relied on is contained in this section,
10 Section D, which is made up of several
11 paragraphs.
12     Q.    So the material you're
13 referring to are the four settlements that
14 you describe in paragraphs 92 through 94?
15     A.    Well, as well as the expert
16 reports.
17     Q.    What expert reports?
18     A.    Dr. Perri, Dr. Kessler and
19 Dr. Egilman.
20     Q.    Anything else?
21     A.    Well, I also, I think in
22 response to an earlier question, mentioned
23 the -- in another section of the report
24 discussion of public reports on the opioid
25 crisis that would have fed into the knowledge

1  that someone in the business would have about
2  what's happening.
3      Q.    Anything else?
4      A.    That's all I can think of.
5      Q.    And are those answers the same
6  if I'm asking you about the opinion you issue
7  in paragraph 90 of your nuisance report where
8  you say the manufacturing defendants knew or
9  should have known that they were making
10  misleading statements about the safety and
11  efficacy of the prescription opioids they
12  manufacture?
13      A.    Yes, it would.
14      Q.    You didn't rely on any other
15  information for that opinion?
16          MR. SOBOL:  Objection.
17      THE WITNESS:  Well, I noted
18      this section and then made reference
19      to the public reports, you know.
20  QUESTIONS BY MR. LONERGAN:
21      Q.    Did you rely on any firsthand
22  information that you have in forming either
23  of those opinions?
24      A.    No, I would say not.
25      Q.    Do you believe a juror could

1  reach the same opinions as you've reached in
2  paragraph 90 and 91 of your nuisance report
3  if they reviewed the same materials that you
4  reviewed?
5          MR. SOBOL:  Objection.  Scope.
6      THE WITNESS:  I'm not sure.
7  QUESTIONS BY MR. LONERGAN:
8      Q.    Do you have any reason to
9  believe that a juror could not reach those
10  opinions reviewing those same materials?
11          MR. SOBOL:  Objection.  Scope.
12      THE WITNESS:  I really don't
13      know one way or the other.
14  QUESTIONS BY MR. LONERGAN:
15      Q.    What expertise did you apply in
16  reaching those opinions?
17      A.    Primarily it's relying on the
18  very explicit statements of experts who are
19  medical experts with respect to the
20  manufacture and marketing of opioids.  So
21  it's, you know, directly from people who know
22  about this that I drew my conclusions.
23          And then I think the -- with
24  respect to the other material referenced in
25  this section, it's -- I don't know if you

1  need to be an economist.  And you probably
2  don't need to be an economist to say that,
3  for example, in the case of Purdue, when
4  there's a multi-hundred million dollar
5  settlement that acknowledged misleading
6  advertising, that that would reasonably have
7  been known by other industry participants.
8      Q.    Are you done?
9      A.    Yeah.
10      Q.    So is what you're saying that
11  if somebody can read the same materials that
12  you read, that you think they could come to
13  the same conclusions without any additional
14  economic expertise that you may have?  Is
15  that correct?
16          MR. SOBOL:  Objection.
17      THE WITNESS:  No, that's not
18      what I said.
19  QUESTIONS BY MR. LONERGAN:
20      Q.    What's wrong about what I said?
21          MR. SOBOL:  Objection.
22      He didn't say it was wrong.
23      THE WITNESS:  Well, I mean, I
24      would ask somewhat different questions
25      when I tried to answer them.  I'm not

1      sure what you're asking me to say,
2      actually.
3  QUESTIONS BY MR. LONERGAN:
4      Q.    Let's back up.
5          The question I want an answer
6  to is what expertise did you apply in
7  reaching the opinions in paragraphs 90 and 91
8  of your nuisance report?
9      A.    Okay.  And I believe I answered
10  that I relied on the expertise of the three
11  named medical experts here.
12      Q.    Meaning you read their reports,
13  right?
14      A.    Well, I read their reports and
15  understood what their conclusions would be.
16      Q.    Okay.
17      A.    And then also made reference to
18  two things:  the studies discussed earlier in
19  my report, and these prominent legal
20  decisions that would have been known to
21  members of the industry.
22      Q.    They're all materials you
23  reviewed, right?
24      A.    Yes.
25      Q.    At what point did the

```
 1   manufacturer defendants become aware that
 2   their marketing for opioids was misleading?
 3             MR. SOBOL:  Objection.  Hold on
 4   one second.
 5             It's been brought to my
 6   attention that there's apparently some
 7   limitation about follow-up questions,
 8   that they need to be specific to a
 9   manufacturer.
10             Do I have that wrong?
11             MR. HALLER:  That's wrong.
12             MR. LONERGAN:  Why don't we go
13   off the record.  I don't want to waste
14   time with this.
15             VIDEOGRAPHER:  The time is
16   3:29 p.m., and we're off the record.
17   (Off the record at 3:29 p.m.)
18             VIDEOGRAPHER:  The time is
19   3:33, and we're on the record.
20   QUESTIONS BY MR. LONERGAN:
21       Q.   Sir, at what point did the
22   manufacturer defendants become aware that
23   their marketing was misleading?
24             MR. SOBOL:  Objection.  Scope.
25             THE WITNESS:  I'm not sure.
```

```
 1   QUESTIONS BY MR. LONERGAN:
 2       Q.   Is it the same date for each
 3   defendant?
 4             MR. SOBOL:  Objection.  Scope.
 5             THE WITNESS:  I'm not sure.
 6   QUESTIONS BY MR. LONERGAN:
 7       Q.   Is it your opinion that each
 8   marketing manufacturer -- each manufacturer
 9   defendant was aware of what the other
10   defendants were aware of?
11             MR. SOBOL:  Objection.  Scope.
12             THE WITNESS:  I'm not sure.
13   QUESTIONS BY MR. LONERGAN:
14       Q.   At what point did my client,
15   Endo, become aware that its marketing was
16   misleading?
17             MR. SOBOL:  Objection.  Scope.
18             THE WITNESS:  I'm not sure.
19   QUESTIONS BY MR. LONERGAN:
20       Q.   When did you become aware of
21   the fact that the manufacturer defendants'
22   marketing for prescription opioids was
23   misleading?
24             MR. SOBOL:  Objection.  Scope.
25             THE WITNESS:  I would say when
```

```
 1             I -- it was within the time period of
 2             this report, of my work on this
 3             report.
 4   QUESTIONS BY MR. LONERGAN:
 5       Q.   You mean since you started
 6   working on this report in May of 2018?
 7       A.   Yes.
 8       Q.   You were the editor of the
 9   Journal of Health Economics from 2001 to
10   2011, right?
11       A.   That's correct.
12       Q.   And during the period -- during
13   that period of time, is it correct that the
14   Journal of Health Economics published a
15   number of articles concerning prescription
16   opioids?
17       A.   Probably correct, yes.
18       Q.   And as the editor of that
19   journal, did you familiarize yourself at that
20   time with those publications?
21       A.   No, not necessarily.  There
22   were numerous editors during that time
23   period, at least three, and the way the
24   editorial process worked was there was a kind
25   of delegation of different articles to
```

```
 1   different editors.
 2             And the assigned editor would
 3   have been, you know, paying careful attention
 4   to the paper at issue, but the editors who
 5   were editors that were not assigned would not
 6   necessarily have paid close attention.
 7       Q.   From 2001 to 2011, were you
 8   ever an editor assigned to an article
 9   concerning prescription opioids?
10       A.   You know, I don't remember.
11       Q.   You're no longer affiliated
12   with the Journal of Health Economics?
13       A.   I may be an associate editor.
14   I'm a subscriber.
15       Q.   You consider it to be a
16   reputable journal?
17       A.   I do, yes.
18       Q.   Trustworthy?
19       A.   Yes.
20       Q.   And so the information that it
21   publishes you would expect to be accurate,
22   correct?
23       A.   Well, there's a process by
24   which authors submit; it's reviewed by
25   reviewers; editors help make a determination.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   So the editorial staff does its best to make
2   sure that the papers are accurate and
3   reliable, which is not to say that there
4   aren't sometimes things that are incorrect in
5   the papers.
6       Q.    For the most part, your
7   expectation is that articles published in the
8   Journal of Health Economics are accurate,
9   correct?
10          MR. SOBOL:  Objection.
11          THE WITNESS:  Well, subject to
12      my previous answer that -- I'm not
13      sure what "for the most part is," but
14      the editorial staff does its best to
15      make sure things are accurate.
16  QUESTIONS BY MR. LONERGAN:
17      Q.    Well, "for the most part" was
18  really me responding to you, and you're
19  waffling a little.
20          I guess what percentage of
21  articles published by the Journal of Health
22  Economics do you think are accurate?
23          MR. SOBOL:  Objection to the
24      statement.
25          But you can answer the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       question.
2           THE WITNESS:  It's an odd
3       question.  I know, I'll answer it
4       anyway.
5           It's not so much that articles
6       are accurate or inaccurate, but
7       sometimes statements within articles
8       are accurate or inaccurate.
9           I'm sure all articles have some
10      accurate stuff and, you know, some
11      articles have some inaccurate stuff.
12      It's really impossible for me to put a
13      percentage on.
14  QUESTIONS BY MR. LONERGAN:
15      Q.    Do you agree that there's been
16  a significant number of articles concerning
17  opioid addiction that have been published in
18  any journal dating back to the 1960s?
19      A.    In any journal?
20      Q.    Yeah.
21      A.    I'm sure there have been
22  research papers on it.  I'm not sure what you
23  mean by "significant" in this context, but...
24      Q.    Well, do you agree that there
25  have been articles published dating back to
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   the 1960s concerning the risks of addiction
2   associated with prescription opioids?
3           MR. SOBOL:  Objection.
4           THE WITNESS:  There may well
5       be.  You know, I couldn't name -- name
6       them for you.
7   QUESTIONS BY MR. LONERGAN:
8       Q.    It's not something you
9   familiarized yourself with for purposes of
10  your work on this case, correct?
11      A.    No, this is -- that's something
12  I relied on medical experts for.
13      Q.    When did the defendants become
14  aware of the fact that the shipments was
15  having a negative impact on public health and
16  safety?
17      A.    I'm not sure.
18      Q.    Is it the same for each
19  defendant?
20      A.    In the sense that, yes -- yes,
21  I would not be sure for each defendant when
22  they became aware.
23      Q.    So you don't know when my
24  client, Endo, became aware that its shipments
25  of prescription opioids was having a, in your
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   term, negative impact on the public health
2   and safety, correct?
3           MR. SOBOL:  Objection.
4           THE WITNESS:  I'm not aware
5       when Endo would have become aware of
6       that.
7   QUESTIONS BY MR. LONERGAN:
8       Q.    In reaching the opinions set
9   forth in paragraphs 90 and 91 of your
10  nuisance report, did you make any assessment
11  of what other non-defendant participants in
12  the prescription drug market knew concerning
13  misleading marketing of prescription opioids?
14      A.    No.
15      Q.    Did you make an assessment of
16  what other non-defendant participants in the
17  opioid prescription drug market knew
18  concerning the negative impacts on public
19  health and safety?
20      A.    It was the same.  I didn't
21  investigate what non-defendants would have
22  known or not known.
23      Q.    You didn't make an assessment
24  of what the FDA knew about those things and
25  when?
```

1      MR. SOBOL:  Objection.  Scope.

2      THE WITNESS:  I'm not privy to

3   what the FDA knew and when.

4   QUESTIONS BY MR. LONERGAN:

5      Q.    You didn't make an assessment

6   of what PBMs knew about those things and

7   when?

8      A.    It would be the same.

9      Q.    You didn't make an assessment

10  of what prescription opioid patients knew

11  about those things and when?

12     MR. SOBOL:  Objection.

13  QUESTIONS BY MR. LONERGAN:

14     Q.    Correct?

15     A.    These are things I didn't

16  study.

17     Q.    You didn't make an assessment

18  of when prescribing physicians became aware

19  of the risks associated with prescription

20  opioids and when, correct?

21     MR. SOBOL:  Objection.

22     THE WITNESS:  Well, that's also

23  something I didn't study.

24  QUESTIONS BY MR. LONERGAN:

25     Q.    Did you study when Summit

1   County became aware of misleading marketing

2   concerning prescription opioids?

3      MR. SOBOL:  Objection.  Scope.

4      THE WITNESS:  No, I didn't

5   study that.

6   QUESTIONS BY MR. LONERGAN:

7      Q.    Do you have an opinion on when

8   that was?

9      MR. SOBOL:  Objection.  Scope.

10     THE WITNESS:  I didn't study

11  it.

12  QUESTIONS BY MR. LONERGAN:

13     Q.    Did you study when Cuyahoga

14  County became aware of prescription opioid

15  misleading marketing?

16     MR. SOBOL:  Objection.  Scope.

17     THE WITNESS:  I didn't study

18  that.

19  QUESTIONS BY MR. LONERGAN:

20     Q.    Do you have an opinion on when

21  Cuyahoga County became aware of the

22  misleading marketing?

23     MR. SOBOL:  Objection.  Scope.

24     THE WITNESS:  I didn't study

25  that.

1   QUESTIONS BY MR. LONERGAN:

2      Q.    Did you study when Summit or

3   Cuyahoga County became aware of the negative

4   impacts that prescription opioids were having

5   on the public health and safety?

6      MR. SOBOL:  Objection.  Scope.

7      THE WITNESS:  I also did not

8   study that.

9   QUESTIONS BY MR. LONERGAN:

10     Q.    Is it correct that you do not

11  know when Summit or Cuyahoga County became

12  aware of the negative impacts on public

13  health and safety?

14     MR. SOBOL:  Objection.  Scope.

15     THE WITNESS:  I didn't study

16  that.

17  QUESTIONS BY MR. LONERGAN:

18     Q.    Do you have any reason to

19  disagree with the follow statements:  Medical

20  professionals have known for a long time that

21  opioids are addictive?

22     MR. SOBOL:  Objection.  Scope.

23     THE WITNESS:  I -- no, I have

24  no reason to agree or disagree.

25

1   QUESTIONS BY MR. LONERGAN:

2      Q.    Sir, yesterday you were asked a

3   couple of questions about -- I'm sorry, last

4   week you were asked --

5      A.    That's what I thought you

6   meant.

7      Q.    I don't know where you were

8   yesterday.

9      MR. SOBOL:  He said last month.

10     MR. LONERGAN:  Strike

11  everything I just said, and him.

12     MR. SOBOL:  Certainly mine.

13  QUESTIONS BY MR. LONERGAN:

14     Q.    Last week you were asked a few

15  questions about prior consulting work that

16  you've done for manufacturers, I think,

17  manufacturers and maybe wholesalers.

18     I've only had a chance to

19  review the rough transcript of that

20  deposition, and it's a little fuzzy.  No

21  offense.

22     A.    It was somebody else.  She

23  wasn't here.

24     Q.    So you can object as asked and

25  answered, but I'm going to circle back.

```
 1              Have you ever consulted for a
 2    pharmaceutical manufacturer?
 3         A.    Yes.
 4         Q.    What manufacturer?
 5         A.    There were a couple of one-day
 6    consultancies that I engaged in some time
 7    ago.  One of them I remember was at Johns
 8    Hopkins.  It had to do with schizophrenia
 9    drugs, but I don't remember the manufacturer
10    involved for that.
11              The other was I think in
12    Chicago, and it was convened by someone
13    interested in using claims-like data for
14    marketing purposes to assess potential sales
15    of a drug by -- I don't remember the drug and
16    I don't remember the manufacturer.  It was
17    about the methodology that one could use with
18    respect to that.
19         Q.    And do you recall how you
20    advised that nameless manufacturer about how
21    claims data could be used to conduct analyses
22    concerning sales?
23         A.    I don't remember.
24         Q.    And do you recall what you were
25    brought in to consult on concerning the
```

```
 1    schizophrenia drug?
 2         A.    Sorry, I don't remember.
 3         Q.    What about pharmacies?  Have
 4    you ever consulted for a pharmacy?
 5         A.    No, I have not.
 6         Q.    Have you ever consulted for a
 7    wholesaler?
 8         A.    Wholesalers may have been in a
 9    class in something I was involved in, but
10    never directly with a wholesaler.
11         Q.    You mean they may have been in
12    a class of plaintiffs --
13         A.    Yes.
14         Q.    -- in a litigation you were
15    consulting on?
16         A.    Yes.
17         Q.    Outside of the litigation
18    context, have you ever consulted for a
19    wholesaler?
20         A.    No, I haven't.
21         Q.    Have you ever consulted for an
22    insurer?
23         A.    Yes.
24         Q.    What insurer?
25         A.    Well, many.  Many.  You know,
```

```
 1    my main line of work -- or one of my main
 2    lines of work is health insurance, health
 3    plan payment, health insurance payment
 4    design.  So I think you wouldn't want to go
 5    through my CV and hear all these.
 6         MR. SOBOL:  I would.
 7    QUESTIONS BY MR. LONERGAN:
 8         Q.    In general terms, when you're
 9    advising an insurer concerning their health
10    insurance payment design, what types of
11    things are you advising them on?
12         A.    It would be within the realm of
13    the parameters that they set in their
14    coverage.  You know, something very simple
15    and straightforward would be the degree of
16    coverage for mental health and substance
17    abuse treatment.  I might advise them on what
18    the cost implications would be of doing so.
19         Q.    Do you ever provide them with
20    advice concerning the clinical implications?
21         A.    Well, in the sense that
22    coverage for something like mental health
23    care has implications not just for cost but
24    also for the health and mental health of the
25    enrollees.  And this is something that I know
```

```
 1    about, something that I study, and I get
 2    asked about that and I give my opinion on
 3    that.
 4         Q.    Have you ever advised an
 5    insurer concerning their coverage of
 6    prescription opioids?
 7         A.    No, I don't think I have.
 8         Q.    Have you ever consulted for a
 9    pharmacy benefits manager?
10         A.    No, I never have.
11         Q.    You're familiar with what a
12    pharmacy benefits manager is?
13         A.    Yes.
14         Q.    What is a pharmacy benefits
15    manager?
16         A.    It would be a specialized firm
17    that takes responsibility for managing a
18    pharmacy benefit.
19              So what benefit means in this
20    context as part of a health insurance
21    benefit, that there might be a, you know,
22    single large insurer that has responsibility
23    for the overall picture but then writes
24    contracts with specialized firms, of which a
25    PBM, or a pharmacy benefit manager, is one,
```

Highly Confidential - Subject to Further Confidentiality Review

1   but there are other types of these
2   specialized firms, and either on a cost or a
3   risk basis or some kind of combination of a
4   cost and a risk basis, makes a contract with
5   a PBM.
6           And then the PBM has the
7   responsibility for helping the client select
8   the drugs on the -- to be offered in the
9   formulary, would have responsibility to share
10  with a client of the tiering and the cost
11  responsibility of the enrollees, and would be
12  responsible for doing negotiation with
13  manufacturers around procurement of the drugs
14  for the client, as well as conducting some
15  utilization management activities that might
16  influence actual drug utilization.
17      Q.    And a PBM's customers, are
18  those insurers, either insurance companies or
19  self-insured entities?
20      A.    That would be generally
21  accurate, yes.
22      Q.    Okay.  And what is a
23  self-insured employer?
24      A.    Self-insured refers to the --
25  the practice of an employer who in simple

Highly Confidential - Subject to Further Confidentiality Review

1   terms pays claims directly.  Now that's kind
2   of a simplification.
3           They may contract with a
4   third-party administrator to actually receive
5   the bills, maybe help negotiate the prices
6   for the services, maybe even decide the
7   network of different providers that would be
8   available to a firm's employees.
9           So the TPA would be responsible
10  for some part of the -- you know, in a
11  broader sense the design of the benefit.
12          But then the cost risk
13  associated with that, when you say
14  self-insurance, that falls on the employer.
15          One more quick sentence about
16  this.  It's not always a black and white
17  world in which all the risk is with the
18  insurer, all the risk is with the employer.
19  It's often a shared risk situation.
20      Q.    And a self-insured employer
21  and/or an insurance company, is it correct
22  that they rely on a PBM to administer the
23  pharmacy benefits for their covered lives?
24      A.    Well, they'll partially rely on
25  a PBM, yes.  It wouldn't be entirely.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    Would that be the norm?
2           MR. SOBOL:  Objection.
3           THE WITNESS:  Well, if you --
4       you may not even choose to use a PBM,
5       for example.  You may self-administer
6       your benefit, which a number of
7       insurers do.
8           So PBMs are, number one,
9       optional.  And then the nature of the
10      PBM contract and what your -- what you
11      decide about as an employer or an
12      insurer can vary by PBM and it can
13      vary by contract within the PBM.  So
14      it's hard to generalize.
15  QUESTIONS BY MR. LONERGAN:
16      Q.    Do you have a sense of
17  approximately how many people in the United
18  States today receive their pharmacy benefits
19  through a PBM?
20      A.    A very large number.
21      Q.    Do you have a sense of what
22  percentage of the country it is?
23      A.    Percentage of the country?  Oh,
24  I don't know.  Of the number of people in the
25  country, maybe 70 percent or 80 percent.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    Would you consider that
2   significant?
3           MR. SOBOL:  Objection.
4           THE WITNESS:  That's a pretty
5       big number, yeah.  That's why we pay
6       attention to these in my work.
7   QUESTIONS BY MR. LONERGAN:
8       Q.    I know we had the back and
9   forth on what significant meant before.  I'm
10  just wondering if that's significant.
11      A.    Yeah, that meets my criteria.
12      Q.    Have you had the opportunity to
13  examine Summit County and Cuyahoga
14  County's --
15      A.    This has nothing to do with
16  you.  Sorry.  There was just something in my
17  water.  We're going to put this right over
18  here.
19          MR. SOBOL:  I think it's
20      swimming the backstroke.
21          THE WITNESS:  Sorry.
22          MR. LONERGAN:  It's quite all
23      right.
24  QUESTIONS BY MR. LONERGAN:
25      Q.    Have you had a chance to review

1   how Summit County and Cuyahoga County's
2   insurance plans work for their covered county
3   employees?
4         A.   Yes, generally.
5         Q.   And do they both rely on the
6   services of a PBM?
7         A.   You know, I don't know that I
8   examined that aspect of it.
9         Q.   What aspect of it did you
10  examine?
11        A.   I was -- first of all, my
12  understanding is there's more than one
13  involved in each of the counties, more than
14  one insurer involved, depending -- and they
15  cover different --
16        Q.   Presently or historically?
17        A.   Certainly historically, and
18  there could have even been some years where
19  there was more than one active in any one
20  year.
21             I was more interested when I
22  looked at this stuff in the self-insured
23  versus risk-based contracting.
24        Q.   And what did you find?
25        A.   It's a mix.

1         Q.   What do you mean by that?
2         A.   Huh?
3         Q.   What do you mean by that?
4         A.   I mean there are some of both,
5   and even within contracts that are labeled
6   self-insured, there's some risk, sure.
7         Q.   Did you have an opportunity to
8   review any of the counties' contracts that
9   they've entered into with PBMs?
10        A.   I don't recall.  I don't think
11  so.
12        Q.   Would it surprise you to learn
13  that those contracts gave the counties the
14  ultimate right to make determinations
15  concerning the formulary for the covered
16  patients?
17             MR. SOBOL:  Objection.
18             THE WITNESS:  Yeah, as I said
19        when we were discussing this more
20        generally, the division of labor
21        between what a PBM decides and what an
22        employer, in this case the county
23        government, decides is not fixed in
24        stone, and it varies across different
25        contractual arrangements.  So, no, it

1         wouldn't surprise me.
2   QUESTIONS BY MR. LONERGAN:
3         Q.   Are you familiar with the term
4   "pharmacy and therapeutics committee"?
5         A.   Yes, I am.
6         Q.   Otherwise known as a P & T
7   committee?
8         A.   Yes.
9         Q.   What is a P & T committee?
10        A.   A P & T would be a committee
11  that's part of either a PBM or perhaps an
12  insurer that makes recommendations regarding
13  the formulary coverage of alternative drug
14  products.
15        Q.   Have you ever served on a P & T
16  committee?
17        A.   No, I never have.
18        Q.   Do you know what types of
19  professionals typically serve on a P & T
20  committee?
21        A.   Generally, yes.
22        Q.   What types of professionals?
23        A.   There would be physicians, of
24  course, of different types.  There would be
25  pharmacists.

1         Q.   How about medical ethicists?
2         A.   Medical ethicists?  There may
3   well be.  Some probably have, and some
4   probably don't.
5         Q.   I think you already said this,
6   but in your experience both PBMs and insurers
7   typically have P & T committees; is that
8   correct?
9         A.   That's what I said, yes.
10        Q.   And what types of information
11  do P & T committees typically rely on when
12  evaluating a drug or a class of drugs?
13        A.   They are -- typically evaluate
14  evidence that they find in their research
15  literature on -- mostly on effectiveness.
16        Q.   So they review medical
17  literature; is that correct?
18        A.   That's correct.
19        Q.   Do they review FDA-approved
20  product labels?
21        A.   Yes, I think they do.
22        Q.   Do they, in your experience,
23  review proprietary data concerning their
24  customers' use of products?
25             MR. SOBOL:  Objection.

1      THE WITNESS:  You see, in my
2  experience, I didn't mean to imply a
3  personal experience with a P & T
4  committee.
5      My knowledge about this comes
6  from my work on health plans and my
7  knowledge about that.
8      And then do they what?  I'm
9  sorry.
10 QUESTIONS BY MR. LONERGAN:
11     Q.     Rely on their proprietary
12 data --
13     A.     Proprietary data?
14     Q.     -- concerning their customers'
15 use of pharmaceuticals.
16     MR. SOBOL:  Objection.
17     THE WITNESS:  I'm not sure.
18 QUESTIONS BY MR. LONERGAN:
19     Q.     Okay.  How about clinical
20 guidelines?  Do P & T committees rely on
21 clinical guidelines in making assessments of
22 pharmaceuticals or classes of
23 pharmaceuticals?
24     A.     Clinical guidelines, published
25 clinical guidelines, would be part of the

1  research literature.
2      Q.     What is a formulary?
3      A.     A formulary is a listing of
4  pharmaceutical products that are eligible for
5  some coverage in a particular health
6  insurance plan.
7      It typically would have, say,
8  three tiers, in which tier 1 is typically
9  generic tier, and that's where the copayment
10 obligations of the enrollees are the least.
11 You know, just, for example, it might be $10
12 would be the co-pay on tier 1.
13     Tier 2 would be typically
14 the -- what would be called preferred brand
15 drugs for which there would be some coverage,
16 but the coverage would be not -- would
17 require more than a $10 co-pay.  Maybe, say,
18 a $25 co-pay.
19     And then a third tier would be
20 typically referred to as nonpreferred brand
21 drugs.  These would have some coverage but
22 even higher rates of co-pay.
23     And there may be some products
24 that aren't even on the formulary.  So it's
25 not -- you know, all drugs aren't classified

1  in all tiers, and formularies may well have
2  more than one -- many have more than three
3  tiers, some of them have one tier.  So
4  there's a range of arrangements.
5      Q.     And in your work consulting for
6  health insurance companies, have you worked
7  with them to devise strategies concerning
8  formularies?
9      A.     I'm just thinking.  No, I don't
10 think I have.
11     Q.     Okay.  In your experience, do
12 PBMs and insurers typically employ
13 formularies for the customers they're
14 serving?
15     A.     Yes.
16     Q.     Have you had the opportunity to
17 review or examine the role that formularies
18 may have played in connection with the use of
19 prescription opioids?
20     MR. SOBOL:  Objection.
21     THE WITNESS:  Well, not beyond
22 my general understanding of how
23 formularies work.
24 QUESTIONS BY MR. LONERGAN:
25     Q.     Okay.  In your experience, are

1  drug formularies an effective means of
2  influencing patient behavior concerning
3  selection of prescription pharmaceuticals?
4      MR. SOBOL:  Objection.  Scope.
5      THE WITNESS:  It's not
6  something I studied here.
7  QUESTIONS BY MR. LONERGAN:
8      Q.     So you don't know?
9      A.     Well, it's not something I
10 studied.
11     MR. SOBOL:  Objection.  Scope.
12 QUESTIONS BY MR. LONERGAN:
13     Q.     No, I understand, but -- and
14 I'm not asking if you studied it here.  I'm
15 asking you, in your experience and given that
16 you're a health care economist, are drug
17 formularies an effective means of influencing
18 patient behavior with respect to the
19 selection of prescription pharmaceuticals?
20     MR. SOBOL:  Objection.  Scope.
21     THE WITNESS:  Well, it's part
22 of the intention of formularies to
23 influence not just patients but to
24 influence doctors in what they
25 recommend.  And, yes, formularies can

1     affect selection of drugs.

2     QUESTIONS BY MR. LONERGAN:

3         Q.     And given that you haven't

4     examined the role of formularies with respect

5     to prescription opioids, you have no basis

6     upon which to opine that that was not the

7     case with respect to prescription opioids,

8     correct?

9             MR. SOBOL:  Objection.  Scope.

10            THE WITNESS:  There's a couple

11        of negatives in there.  I'm sorry.  If

12        you don't mind, you can ask it again.

13        I'll get it the second time.

14            MR. LONERGAN:  I'll do my best.

15    QUESTIONS BY MR. LONERGAN:

16        Q.     Given that you haven't examined

17    the role of formularies with respect to

18    prescription opioids, you have no basis upon

19    which to opine that formularies were not

20    effective in influencing the behavior of

21    patients with respect to prescription

22    opioids, correct?

23            MR. SOBOL:  Objection.  Scope.

24            THE WITNESS:  That's something

25        I didn't study.

1     QUESTIONS BY MR. LONERGAN:

2         Q.     So --

3         A.     However, the negative or

4     positives work out there.

5         Q.     So you have no basis upon which

6     to have an opinion one way or the other on

7     the influence of formularies on the use of

8     prescription opioids, right?

9             MR. SOBOL:  Objection.  Scope.

10            THE WITNESS:  I didn't study

11        that.

12    QUESTIONS BY MR. LONERGAN:

13        Q.     Okay.  Outside of formularies,

14    PBMs and insurers also employ utilization

15    management tools to influence patient

16    behavior, correct?

17        A.     That's correct.

18            MR. SOBOL:  Objection.  Scope.

19            THE WITNESS:  I think I

20        mentioned that earlier.

21    QUESTIONS BY MR. LONERGAN:

22        Q.     I think you did.

23            I just want to be a little more

24    specific about what a utilization management

25    tool is.

1             Is a quantity limit, in your

2     mind, a utilization management tool?

3         A.     That would be an example of a

4     utilization management tool.

5         Q.     And what is a quantity limit?

6         A.     It would be a -- you know, kind

7     of rule that a PBM might administer to say

8     that there's a maximum number of, say, pills

9     that would be covered under the formulary.

10        Q.     And in your experience, are

11    quantity limits typically effective at

12    influencing patient behavior with respect to

13    prescription drugs generally?

14        A.     I've never explicitly studied

15    quantity limits.

16        Q.     Okay.  How about step therapy?

17    Is that a utilization management tool?

18        A.     Yes, it is.

19        Q.     What is step therapy?

20        A.     Step therapy refers to another

21    kind of protocol that a PBM would implement

22    that says step 1 might be where a patient

23    with a certain health condition is required

24    to start in terms of treatment.

25            And then to get step 2 to go in

1     an alternative, there would be some

2     conditions under which a patient could move

3     from step 1 to step 2.

4         Q.     Have you studied the

5     effectiveness of step therapy protocols in

6     influencing patient behavior?

7         A.     No, I haven't.

8         Q.     What about prior authorization,

9     is that a utilization management tool?

10        A.     Yes, it is.

11        Q.     And what is prior

12    authorization?

13        A.     Prior authorization refers to

14    another protocol that a PBM or insurer might

15    use to require that before a service is

16    delivered to a patient, which could be some

17    kind of physician procedure or a

18    hospitalization or, in this case,

19    pharmaceuticals, a call needs to be made to

20    someone from the insurer, from the PBM, to

21    authorize the coverage for that service or

22    product.

23        Q.     Earlier today I think you

24    testified that PBMs won't know why a patient

25    is receiving a prescription opioid because

1  they don't receive the diagnosis; is that
2  correct?
3      A.    That's -- generally, that's
4  correct.
5      Q.    If prior authorization were
6  required for the distribution or dispensation
7  of a prescription opioid, you'd agree in that
8  instance a PBM or an insurer would be
9  well-aware of the diagnosis code, correct?
10     A.    Well, I think that's, you know,
11 a different mechanism than getting a claim.
12 And if you ask me in general terms what
13 happens during prior authorization, someone
14 familiar with the medical condition of the
15 patient would make a call and explain the
16 reasons why this product were needed, and it
17 would include a description of the health --
18 you know, what is the basis of the health
19 needs of the patient.
20     Q.    Do you know the extent to which
21 any of these utilization management tools,
22 quantity limits, step therapy or prior
23 authorization, were employed historically in
24 connection with the prescription opioids?
25         MR. SOBOL:  Objection.  Scope.

1          Go ahead.
2          THE WITNESS:  I didn't study
3      that.
4  QUESTIONS BY MR. LONERGAN:
5      Q.    So you don't know?
6          MR. SOBOL:  Objection.  Scope.
7          THE WITNESS:  I didn't study
8      it.
9  QUESTIONS BY MR. LONERGAN:
10     Q.    Do you have any reason to
11 believe that these utilization management
12 tools were not available to be employed by
13 PBMs or insurers with respect to prescription
14 opioids?
15         MR. SOBOL:  Objection.  Scope.
16         THE WITNESS:  I don't really
17     have any reason to believe one way or
18     the other.
19 QUESTIONS BY MR. LONERGAN:
20     Q.    Are you familiar with the NCPDP
21 protocol?  NCPDP standing for National
22 Council of Prescription Drug Programs.
23     A.    I'm not familiar with that.
24     Q.    Okay.  Are you familiar with
25 how pharmacies communicate with PBMs and

1  insurers in connection with the distribution
2  of prescription drugs?
3          MR. SOBOL:  Objection.  Scope.
4          THE WITNESS:  Well, in some
5      ways I'm generally familiar.
6  QUESTIONS BY MR. LONERGAN:
7      Q.    But you're not an expert in
8  terms of what information gets transferred
9  back and forth; is that correct?  Or what
10 protocol is used for that?
11         MR. SOBOL:  Objection.  Scope.
12         THE WITNESS:  Well, I think it
13     depends on what you ask specifically
14     whether I'm likely to know it or not.
15 QUESTIONS BY MR. LONERGAN:
16     Q.    Okay.  So in a hypothetical,
17 let's say your lawyer goes to the pharmacy to
18 pick up a prescription drug, what information
19 does that pharmacy communicate to his insurer
20 and the PBM, and on what protocol is it used
21 to do that?
22         MR. SOBOL:  Objection.
23     Compound.  Scope.
24         THE WITNESS:  I will probably
25     just get this partially right, which

1      is --
2  QUESTIONS BY MR. LONERGAN:
3      Q.    Okay.  He will tell you not to
4  guess, but...
5      A.    The pharmacy would communicate
6  electronically with the PBM or the health
7  insurer about the -- who is being --
8  requested the prescription on behalf of whom,
9  that is, what patient, possibly the doctor,
10 and what the prescription -- what the
11 prescription is.
12     Q.    Is any other information
13 transferred at that time?
14     A.    There may be.
15     Q.    You don't know?
16     A.    That's -- I told you what I
17 know.
18     Q.    Okay.  And you don't know what
19 protocol is used for that communication,
20 correct?
21     A.    I'm sorry, by "protocol" you
22 mean electronic something or the other?
23     Q.    You've already testified you
24 don't know what the NCPDP protocol is, so I
25 probably don't need to ask that question.

1    A.    All right.

2    At paragraph 23 of your public

3  nuisance report, you refer to scientifically

4  acceptable clinical criteria with respect to

5  prescription opioids.

6        Do you see that?

7    A.    Yes.

8    Q.    What are the scientifically

9  acceptable clinical criteria you're referring

10  to in that paragraph?

11    A.    This is a little more general.

12  It says "like prescription opioids," but the

13  scientifically acceptable clinical criteria

14  would be -- you know, medical justification

15  would be another way to -- medically justify

16  would be another way to say it.

17    Q.    Fair.

18        But my question is a little

19  more specific.

20        Is there a specific criteria

21  you believe is the scientifically acceptable

22  criteria for the use of prescription opioids?

23    A.    Well, this is what doctors know

24  about --

25    Q.    Uh-huh.

1    A.    -- what are the medically

2  appropriate treatments based on science, and

3  the science comes from research studies.

4    Q.    What have you done to

5  understand the scientifically acceptable

6  clinical criteria for the use of prescription

7  opioids?

8    A.    I've -- for this I rely on the

9  medical expert reports that I mentioned

10  earlier: Schumacher, Parran, Egilman.

11    Q.    Anything else?

12    A.    I've read things, researched

13  literature.

14    Q.    Is all of the research

15  literature that you've read in connection

16  with this cited or noted in your expert --

17  one of your -- either of your expert reports?

18    A.    The ones I relied on, yes.

19    Q.    Okay.  Anything else?

20        MR. SOBOL:  Objection.

21        THE WITNESS:  Not that I can

22    think of.

23  QUESTIONS BY MR. LONERGAN:

24    Q.    You also in your public

25  nuisance report conduct a cost/benefit

1  analysis concerning the quality of life

2  attributes of prescription opioids.

3        Correct?

4    A.    Well, I wouldn't quite call it

5  that, but I do do an analysis of quality of

6  life.

7    Q.    What would you call it?

8    A.    I would call it an economic

9  assessment of the pluses and minuses of the

10  effect of opioid shipments on quality of

11  life.

12    Q.    And in doing that, you had to

13  identify the instances where you believed

14  that the use of prescription opioids was

15  scientifically acceptable, correct?

16    A.    That's right.

17    Q.    Do you agree that chronic pain

18  is a serious mental, medical condition?

19    A.    I'm sure it is.

20    Q.    Do you agree that chronic pain

21  affects millions of people in the United

22  States?

23        MR. SOBOL:  Objection.  Scope.

24        THE WITNESS:  I see that in

25    things I read.

1  QUESTIONS BY MR. LONERGAN:

2    Q.    Do you agree that chronic pain

3  affects residents of Summit County, Ohio?

4        MR. SOBOL:  Objection.  Scope.

5        THE WITNESS:  Well, I didn't

6    study that, but I'm sure that's true.

7  QUESTIONS BY MR. LONERGAN:

8    Q.    Do you agree that chronic pain

9  affects residents of Cuyahoga County, Ohio?

10        MR. SOBOL:  Objection.  Scope.

11        THE WITNESS:  That's, again,

12    something I didn't study, but I'd be

13    surprised if it weren't true.

14  QUESTIONS BY MR. LONERGAN:

15    Q.    Do you agree that there are

16  risks associated with untreated chronic pain?

17        MR. SOBOL:  Objection.  Scope.

18        THE WITNESS:  I really don't

19    know.

20  QUESTIONS BY MR. LONERGAN:

21    Q.    So you don't know?

22    A.    I don't know.

23    Q.    It's not something you took

24  into account doing your cost/benefit

25  analysis?

```
1        A.    I didn't think I needed to.
2        Q.    Do you agree that every --
3        A.    Excuse me.  By the way, I
4    wouldn't call it a cost/benefit analysis.  I
5    know what you're referring to.
6        Q.    What's the term?  I'll use your
7    term.  I just don't remember what you said.
8        A.    It's an economic assessment of
9    the effect of shipments on quality of life.
10   You can call it --
11       Q.    Can we agree to call it a
12   cost/benefit analysis --
13             MR. SOBOL:  Objection.
14   QUESTIONS BY MR. LONERGAN:
15       Q.    -- for short?
16             MR. SOBOL:  Objection.
17             THE WITNESS:  It kind of
18       bothers me to use the wrong words in
19       that, but you can shorten it to "your
20       analysis of quality of life."
21             MR. SOBOL:  Is that is "your
22       analysis," is that one word or two?
23             THE WITNESS:  It's your
24       analysis.
25             MR. SOBOL:  It's your analysis.
```

```
1    QUESTIONS BY MR. LONERGAN:
2        Q.    Do you agree --
3              MR. LONERGAN:  I'm running
4        against the clock here.  I would love
5        to engage with you guys.
6    QUESTIONS BY MR. LONERGAN:
7        Q.    Do you agree that no single
8    treatment option will be appropriate for
9    every chronic pain patient?
10       A.    I really don't know.  It's
11   not --
12       Q.    It's not something you --
13       A.    -- not my --
14       Q.    -- considered in your economic
15   analysis --
16       A.    It's not my --
17       Q.    -- correct?
18       A.    Yeah, it's not my expertise.
19       Q.    Do you agree that it is
20   important for physicians to have a variety of
21   treatment options to choose from when
22   treating a medical condition?
23             MR. SOBOL:  Objection.  Scope.
24             THE WITNESS:  I really --
25       generally, options are good.  I really
```

```
1        don't have a specific opinion about
2        particular medical options.
3    QUESTIONS BY MR. LONERGAN:
4        Q.    Do you agree that all
5    treatments for chronic pain have risks?
6              MR. SOBOL:  Objection.  Scope.
7              THE WITNESS:  I don't know.
8    QUESTIONS BY MR. LONERGAN:
9        Q.    It's not something you
10   considered as a part of conducting your
11   economic analysis, correct?
12             MR. SOBOL:  Objection.  Scope.
13             THE WITNESS:  Yeah, I didn't
14       study that.
15   QUESTIONS BY MR. LONERGAN:
16       Q.    Do you agree that it's the role
17   of the prescribing physician to weigh the
18   risks and benefits of any pain medication
19   when treating an individual patient?
20             MR. SOBOL:  Objection.  Scope.
21             THE WITNESS:  Well, ideally an
22       agent, which is what the economic
23       literature refers to physicians as --
24       an agent is somebody acting on behalf
25       of the patient -- should help the
```

```
1        patient in making the right decision
2        for them.
3    QUESTIONS BY MR. LONERGAN:
4        Q.    And you believe --
5        A.    Considering --
6        Q.    You believe that didn't happen
7    here, correct?
8        A.    Considering the pluses and
9    minuses.
10             Could you be more specific
11       about what you're asking?
12       Q.    Well, strike that.
13             In paragraph 22 of your public
14   nuisance report, you opined that physicians
15   were misled by defendants' marketing,
16   correct?
17       A.    That's what I say in the last
18   sentence.
19       Q.    And that's your opinion?
20       A.    Well, it's my opinion.  It's,
21   again, based on the reports of the medical
22   experts.
23       Q.    You're not an expert on the FDA
24   regulations concerning prescription
25   pharmaceutical marketing, are you?
```

1    A.    I know something about them.
2  It depends on what you ask.
3    Q.    Do you hold yourself out to be
4  an expert on the FDA regulations concerning
5  prescription pharmaceutical marketing?
6    A.    Well, it again depends.  In my
7  work, I need to know some things.  So it's
8  not zero.  It's not 100 percent.  It really
9  depends on the particular area you're asking
10  about.
11    Q.    Well, the particular area I'm
12  asking about are the FDA regulations
13  concerning prescription pharmaceutical
14  marketing.
15    A.    Yes.
16    Q.    Do you consider yourself to be
17  a 100 percent expert on those regulations?
18      MR. SOBOL:  Objection.  Asked
19    and answered.
20      THE WITNESS:  No, I don't
21    consider myself to be a 100 percent,
22    but I'm also not a zero percent.
23  QUESTIONS BY MR. LONERGAN:
24    Q.    Do you have an opinion in this
25  litigation as to whether defendants'

1  prescription opioid marketing violated the
2  FDA regulations concerning prescription
3  pharmaceutical marketing?
4      MR. SOBOL:  Objection.  Scope.
5      THE WITNESS:  That's not
6    something that I studied.
7  QUESTIONS BY MR. LONERGAN:
8    Q.    Are you able to point to any
9  physician who was actually misled by the
10  opioid manufacturers' marketing?
11      MR. SOBOL:  Objection.  Scope.
12      THE WITNESS:  That's not
13    something I studied.
14  QUESTIONS BY MR. LONERGAN:
15    Q.    Do you agree that physicians
16  are learned intermediaries?
17      MR. SOBOL:  Objection.  Scope.
18      THE WITNESS:  Well, I agree
19    that physicians have medical knowledge
20    that patients generally do not know,
21    and I agree that they're
22    intermediaries in a number of ways
23    between patients and the patients'
24    needs and the health care services and
25    products that patients require.

1  QUESTIONS BY MR. LONERGAN:
2    Q.    What do you understand the term
3  "learned intermediary" to mean?
4    A.    Well, I explained my -- I don't
5  have a specialized legal understanding.  I
6  only explain what the two words mean to me in
7  this context.  I don't know if that was
8  clear.
9      But learned is specialized
10  medical knowledge that patients don't have,
11  and intermediary means they assist the
12  patients in provide -- in getting access to
13  services that the patients needs.
14    Q.    Fine.
15      Using your definition of
16  learned intermediary, do you consider doctors
17  who prescribe prescription opioids to
18  patients to be learned intermediaries?
19      MR. SOBOL:  Objection.  Scope.
20    Form.
21      THE WITNESS:  Well, I think in
22    general doctors are learned
23    intermediaries, and so that covers
24    doctors and, you know, the tasks that
25    they have.

1  QUESTIONS BY MR. LONERGAN:
2    Q.    Sir, is it your understanding
3  that each prescription opioid at issue in
4  this litigation carries with it an
5  FDA-approved label or package insert?
6      MR. SOBOL:  Objection.  Scope.
7      THE WITNESS:  Yeah, I do
8    understand that.
9  QUESTIONS BY MR. LONERGAN:
10    Q.    And you understand that the
11  pharmaceutical manufacturers' employees who
12  detailed doctors provided those labels to
13  physicians during those detail visits?
14      MR. SOBOL:  Objection.  Scope.
15      THE WITNESS:  Well, I don't
16    know what the transaction was between
17    the detail people and the doctors.
18  QUESTIONS BY MR. LONERGAN:
19    Q.    Do you have an opinion as to
20  whether the FDA-approved labels for the
21  prescription opioids at issue in this
22  litigation were misleading?
23      MR. SOBOL:  Objection.  Scope.
24      THE WITNESS:  I don't have an
25    opinion about that.  I didn't study

Highly Confidential - Subject to Further Confidentiality Review

1    it.

2  QUESTIONS BY MR. LONERGAN:

3        Q.    In your opinion, is it possible

4  for an opioid manufacturer to appropriately

5  market a prescription opioid?

6              MR. SOBOL:  Objection.  Scope.

7              THE WITNESS:  Well, it might

8        be.  I didn't study it.

9  QUESTIONS BY MR. LONERGAN:

10       Q.    Well, you did -- I mean, you

11  did opine that the opioid manufacturers

12  misled physicians, correct?

13             MR. SOBOL:  Objection.  Scope.

14             THE WITNESS:  Yeah, based on

15       other reports, yes.

16  QUESTIONS BY MR. LONERGAN:

17       Q.    Right.

18             But based on your understanding

19  that the manufacturing was misleading, right?

20             MR. SOBOL:  Objection.  Scope.

21             THE WITNESS:  Yes.

22  QUESTIONS BY MR. LONERGAN:

23       Q.    And so here we are.  Now I'm

24  asking:  Is it possible for a prescription

25  opioid manufacturer to, in your mind,

---

Highly Confidential - Subject to Further Confidentiality Review

1  appropriately market a prescription opioid?

2              MR. SOBOL:  Objection.  Scope.

3        Form.

4              THE WITNESS:  It might be on --

5        I really didn't study it.  I don't

6        know.

7  QUESTIONS BY MR. LONERGAN:

8        Q.    Is it possible for an opioid

9  manufacturer to market a prescription opioid

10  in a way that expands the market for

11  prescription opioid and still be appropriate?

12             MR. SOBOL:  Objection.  Scope.

13       Form.

14             THE WITNESS:  I don't know.

15  QUESTIONS BY MR. LONERGAN:

16       Q.    As a health care economist, are

17  you familiar with the economic literature

18  concerning the factors that influence

19  physician prescribing?

20       A.    Yes.

21       Q.    And is one of those factors

22  manufacturer marketing?

23       A.    Yes.

24       Q.    Is one of those factors the

25  overall cost to the patient?

---

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Probably sometimes.  Not always

2  as much as it should be.

3        Q.    Is one of those factors the

4  applicable formulary?

5        A.    Sometimes, probably.

6        Q.    Is one of those factors

7  applicable utilization management protocols?

8        A.    Well, generally.

9        Q.    Is one of those factors known

10  to be a physician's experience with a

11  particular medication?

12       A.    That's also one of the factors.

13       Q.    Is one of those factors known

14  to be a physician's experience with a

15  particular disease state?

16       A.    That's also a factor.

17       Q.    Is one of those factors known

18  to be a physician's overall years of

19  experience?

20       A.    Generally a physician's

21  experience affects how they treat patients.

22       Q.    Are there any other factors

23  that you're aware of that are known to affect

24  a physician's prescribing?

25             MR. SOBOL:  Objection.  Scope.

---

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  You gave a pretty

2        long list there.

3              Well, at least there's also

4        financial incentives to physicians --

5  QUESTIONS BY MR. LONERGAN:

6        Q.    Anything else?

7        A.    -- that would also affect it.

8              I think within the buckets you

9  gave, it would capture most of what I can

10  think of.

11       Q.    Given all of the different

12  factors we've just walked through that are

13  known in the economic literature to affect a

14  physician's prescribing, would you agree that

15  marketing would affect a prescribing

16  physician differently from other prescribing

17  physicians?

18             MR. SOBOL:  Objection.

19  QUESTIONS BY MR. LONERGAN:

20       Q.    I can ask that question in a

21  better way.

22       A.    Thank you.

23       Q.    Is it fair to say that

24  detailing would be expected to affect

25  different physicians differently?

1         MR. SOBOL:  Objection.  Scope.

2         THE WITNESS:  It might.  I'm

3  not sure.

4  QUESTIONS BY MR. LONERGAN:

5      Q.    It's not something you have an

6  opinion on?

7      A.    I haven't studied it, no.

8         MR. LONERGAN:  Why don't we

9  take a break.

10        VIDEOGRAPHER:  The time is

11  4:19 p.m., and we're off the record.

12    (Off the record at 4:19 p.m.)

13        VIDEOGRAPHER:  The time is

14  4:32 p.m., and we're on the record.

15        CROSS-EXAMINATION

16  QUESTIONS BY MR. CARTER:

17      Q.    My name is Ed Carter.  I

18  represent Walmart, and I have some questions

19  for you.

20        All right?

21      A.    That's fine.  Yeah, sure.

22      Q.    Who are the retail pharmacy

23  defendants in this case?

24      A.    I can name some.

25      Q.    Which ones can you name?

1      A.    I can name CVS.  I can name

2  Rite Aid.  I guess Walmart would be a retail.

3      Q.    Any others?

4      A.    Those are the only ones I can

5  name.

6      Q.    What consideration, if any, did

7  you pay to the retail pharmacy defendants in

8  preparation of your damages report?

9      A.    I made sure to mention the

10  defendants included signatories to the CSA.

11      Q.    Anything else in your damages

12  report that takes the retail pharmacy

13  defendants into specific consideration?

14      A.    No, there's nothing else in the

15  damages report that gives special attention

16  to the retail pharmacies.

17      Q.    So nothing beyond their status

18  as CSA signatories?

19      A.    That's correct, no other

20  special attention.

21      Q.    Same question for the nuisance

22  report:  What specific attention did you pay

23  to the retail pharmacy defendants in the

24  course of preparing your nuisance report?

25      A.    There was no special attention

1  to the retail pharmacy defendants in the

2  public nuisance report.

3      Q.    What role in terms of conduct

4  do the retail pharmacy defendants play in the

5  context of your damages report?

6      A.    They distribute shipments of

7  opioids.

8      Q.    Do you know to whom they

9  distribute those shipments?

10      A.    Well, to patients.

11      Q.    Do you know whether they --

12  whether the retail pharmacy defendants ever

13  distribute outside of their own corporate

14  network?

15         MR. SOBOL:  Objection.

16         THE WITNESS:  I'm not sure what

17  you mean.

18  QUESTIONS BY MR. CARTER:

19      Q.    So do you know where Walmart --

20  for example, when Walmart distributed

21  opioids, do you know to whom Walmart

22  distributed opioids?

23      A.    Well, they would have sold some

24  from their stores.  I don't know of any other

25  outlet for their opioids.

1      Q.    Do you know whether Walmart

2  ever distributed to a non-Walmart pharmacy?

3      A.    No, I don't know that.

4      Q.    Do you know whether any CVS

5  distribution ever went to a non-CVS Pharmacy?

6      A.    I'm not familiar with where

7  else the CVS shipments might have gone.

8      Q.    Same question for Rite Aid?

9      A.    Same answer:  I'm not sure

10  where the Rite Aid shipments would have gone,

11  aside from Rite Aid pharmacies.

12      Q.    Do you know whether any of the

13  retail pharmacy defendants currently

14  distribute opioids?

15         MR. SOBOL:  Objection.  Scope.

16         THE WITNESS:  I haven't studied

17  that.

18  QUESTIONS BY MR. CARTER:

19      Q.    Will you identify for me all

20  allegedly wrongful conduct on the part of the

21  retail pharmacy defendants that factors into

22  your damages report?

23         MR. SOBOL:  Objection.  Scope.

24         THE WITNESS:  I didn't study

25  that.

1    QUESTIONS BY MR. CARTER:

2         Q.    Okay.  Identify for me all

3    wrongful conduct on the part of the pharmacy

4    defendants that factors into your nuisance

5    report.

6              MR. SOBOL:  Objection.  Scope.

7              THE WITNESS:  I didn't study

8         that.

9    QUESTIONS BY MR. CARTER:

10        Q.    In your damages report, is it

11   possible that there are some defendants in

12   this case that are not responsible for any

13   damages -- any of your damages estimates?

14             MR. SOBOL:  Objection.  Scope.

15        Form.

16             THE WITNESS:  I'm not sure how

17        to even answer that.  I didn't study

18        it.

19   QUESTIONS BY MR. CARTER:

20        Q.    So in the course of preparing

21   your damage reports, is it accurate to say

22   that you did not make any calculation or

23   apportionment of the damages in your estimate

24   to any particular defendant?  Is that a true

25   statement?

1         A.    That's generally a true

2    statement.

3              As I'm sure you know, the work

4    in my report was to identify the potentially

5    affected costs, and then I had input,

6    primarily from Professor Cutler, about the

7    share of those costs that could be attributed

8    to misconduct.

9              Now, the nature of the overall

10   enterprise is that the attribution to

11   particular defendants becomes possible at the

12   Rosenthal stage, depending on some things,

13   but it's not an input that would come into

14   play in my stage.

15        Q.    So putting to one side inputs

16   from Cutler or from Rosenthal, you,

17   personally, you have not conducted an

18   independent assessment of damage estimates

19   apportioned to a particular defendant?

20        A.    That's correct, my damage

21   estimates apply to shipments due to

22   misconduct where I got the inputs from other

23   experts.

24        Q.    Same question for your nuisance

25   report.  Do the estimates in your nuisance

1    report turn in any way on a specific

2    defendant?

3              MR. SOBOL:  Objection.  Form.

4              THE WITNESS:  Can you --

5    QUESTIONS BY MR. CARTER:

6         Q.    Sure.

7         A.    -- explain what you mean by

8    "turn in any way"?  I'm not sure what you're

9    asking.

10        Q.    In looking at your public

11   nuisance report, can anyone pull from that a

12   specific apportionment of damages that you

13   would attribute to an individual defendant?

14        A.    Well, this is a similar answer

15   to the damages report:  that my estimates are

16   aggregate, and against which shares are

17   applied from the Cutler report.

18             So if those shares change

19   because of some other counterfactual, then

20   they would flow through into my public

21   nuisance.

22        Q.    Okay.  Do you know how many

23   defendant parties are in the case currently?

24        A.    I'm not sure.

25        Q.    Okay.  If five defendants left

1    the case tomorrow, would any of the numbers

2    in your damages report change?

3              MR. SOBOL:  Objection.  Scope.

4         Form.

5              THE WITNESS:  I'm not sure.  It

6         depends.  I would have to -- I'd have

7         to know more.  I'd have to probably

8         get some guidance from legal.

9    QUESTIONS BY MR. CARTER:

10        Q.    Okay.  So, for example, if all

11   of the retail defendants were dismissed from

12   the case tomorrow, would you amend or need to

13   change your damages calculations in your

14   report?

15             MR. SOBOL:  Objection.  Scope.

16        Form.

17             THE WITNESS:  I'm not sure.  I

18        didn't study that.

19   QUESTIONS BY MR. CARTER:

20        Q.    Okay.  If five defendants left

21   the case tomorrow, would you need to make any

22   changes to your public nuisance report?

23             MR. SOBOL:  Objection.  Scope.

24        Form.

25             THE WITNESS:  I would have

1    to -- I'm not sure.  I didn't study
2    that, and I probably need guidance
3    from legal.
4  QUESTIONS BY MR. CARTER:
5        Q.    In describing marketing
6  conduct, do you agree that a defendant who
7  never marketed or advertised opioids is not
8  responsible for any alleged harms caused by
9  such marketing?
10            MR. SOBOL:  Objection.  Scope.
11            THE WITNESS:  I'm not really
12       sure about that.
13  QUESTIONS BY MR. CARTER:
14       Q.    Okay.
15       A.    I'm sorry.
16       Q.    So you think it's possible that
17  someone who didn't engage in marketing or
18  advertising could still be responsible from
19  an economic perspective for any such harms
20  caused by that marketing?
21            MR. SOBOL:  Objection.  Form.
22       Scope.
23            THE WITNESS:  I -- I'm not --
24       I'm not sure.
25

1  QUESTIONS BY MR. CARTER:
2        Q.    Okay.  Do you have an expert
3  opinion one way or another on that?
4            MR. SOBOL:  Objection.  Scope.
5       Form.
6            THE WITNESS:  I'm not sure.
7  QUESTIONS BY MR. CARTER:
8        Q.    Okay.  So you don't --
9        A.    I don't have an opinion one way
10  or the other whether that's true or false.
11       Q.    Okay.  You were asked some
12  questions about pages 90 and 92 of your
13  nuisance report.  If you turn to that section
14  with me, please, I just want to orient you.
15            You see the paragraphs 90 and
16  92?
17       A.    Yeah.  Okay.  Good.
18       Q.    The one question that didn't
19  get a form objection.
20            MR. SOBOL:  Well, I was still
21       confused.
22            MR. CARTER:  Fair.
23  QUESTIONS BY MR. CARTER:
24       Q.    So you recall discussing with
25  counsel the defendant -- the Subheading D,

1  defendants were or should have been aware of
2  the interference?
3        A.    I do recall that, yes.
4        Q.    Okay.  Do you know whether any
5  of the retail pharmacy defendants are --
6  well, strike that.
7            Do you intend to include any of
8  the retail pharmacy defendants in the
9  statements that you offer in this section of
10  your report?
11            MR. SOBOL:  Section D?
12            MR. CARTER:  Yes.
13            THE WITNESS:  Yeah,
14       potentially.
15  QUESTIONS BY MR. CARTER:
16       Q.    Okay.  Do you provide any
17  examples that specifically identify retail
18  pharmacy defendants in this section?
19       A.    No, I don't think so.
20       Q.    Did you conduct any separate
21  analysis of the alleged conduct of the retail
22  pharmacy defendants in connection with
23  forming the opinions in Subsection D of this
24  report?
25       A.    The analysis I conducted are

1  contained in the report.  There was nothing
2  specific to the retail defendants.
3        Q.    You were asked a question about
4  whether you knew when the counties first were
5  aware of -- or should have been aware of the
6  various harms referenced in this section of
7  the report.  I want to follow up on that
8  series of questions.
9        A.    Okay.
10       Q.    You indicated that you didn't
11  know when they were first aware.  I want to
12  ask a different question.
13            Is there a time period by which
14  you can opine to a reasonable degree of
15  economic certainty that more likely than not
16  by day X Summit County was aware that it was
17  being harmed as a result of misleading
18  marketing?
19            MR. SOBOL:  Objection.  Scope.
20            THE WITNESS:  I don't think I
21       could do that.  I wasn't asked to
22       study it.
23  QUESTIONS BY MR. CARTER:
24       Q.    Okay.  Same question for
25  Cuyahoga County.

1    MR. SOBOL:  Same objection.

2    Scope.

3    THE WITNESS:  Same answer:  I

4    wasn't asked to study it.  I don't

5    think I could do that.

6 QUESTIONS BY MR. CARTER:

7    Q.    Is there a date by which you're

8 willing to opine more likely than not Summit

9 County was aware that it was incurring harms

10 to the public health and welfare as a result

11 of opioid-related expenses?

12    MR. SOBOL:  Objection.  Scope.

13    THE WITNESS:  I wasn't asked to

14    study that.  I don't think I could

15    answer that question.

16 QUESTIONS BY MR. CARTER:

17    Q.    Same question for Cuyahoga

18 County.

19    A.    Same answer:  I wasn't asked to

20 study it.  I don't think I could answer that

21 question.

22    Q.    Is it your opinion that when

23 Summit County was expending its budget for

24 2006, did the county have any idea that it

25 was making expenditures that were related to

---

1 opioids?

2    A.    I would be speculating, and

3 what is the county here?

4    Q.    Summit.

5    A.    I know.  I meant when you say

6 "Summit County," that kind of knowledge is

7 something that people have, so I would expect

8 it would depend.

9    Q.    So do you know -- do you have

10 an expert opinion one way or the other as to

11 whether in 2006, when expending its budget in

12 the various divisions that you studied,

13 whether Summit County was aware that it was

14 spending even a dollar on opioid-related

15 costs?

16    MR. SOBOL:  Objection.  Scope.

17    Form.

18    THE WITNESS:  Well, I didn't

19    study that.

20 QUESTIONS BY MR. CARTER:

21    Q.    Would that --

22    A.    Just -- excuse me, one more

23 comment.

24    Q.    Sure.

25    A.    It's -- I find it a little odd

---

1 to ask about the county as being aware of

2 something.

3    I assume what you mean by that

4 is something about the people who work in the

5 county.  And since there are many, that would

6 have probably been a different answer for

7 different groups of people.

8    Q.    In your review of the case

9 materials, did you come across individuals in

10 Summit County who were aware of making

11 opioid-related expenditures in 2006?

12    A.    I don't remember talking to

13 anyone about 2006.

14    Q.    What about 2007?  And this is

15 focused on your review of the case materials,

16 whether you're aware of individuals in Summit

17 County reflecting awareness that they were

18 making opioid-related expenditures in 2007.

19    A.    I don't remember anything,

20 sitting here.

21    Q.    Okay.  Do you remember anything

22 for 2008?

23    A.    Same answer:  I don't remember

24 anything sitting here.

25    Q.    2009?

---

1    A.    Same answer:  I don't remember

2 anything.

3    Q.    Same answer the rest of the

4 years through 2018?

5    MR. SOBOL:  Objection.  Scope.

6    THE WITNESS:  Do you mind

7    repeating the question for the block

8    of years there?

9 QUESTIONS BY MR. CARTER:

10    Q.    Sure.  Yes.

11    The last one I did was 2009.

12 So from 2010 to 2018, did you see anything in

13 your review of the case materials reflecting

14 an understanding on the part of individuals

15 in Summit County that they were making

16 opioid-related budget expenditures?

17    A.    I'm pretty sure I did.

18    Q.    Okay.  And what is the first

19 year that you recall seeing something in the

20 case materials reflecting that understanding

21 from an individual in Summit County?

22    A.    I don't remember.

23    Q.    Okay.  What about Cuyahoga

24 County?

25    And I'm asking this question at

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the county level.  Do you know whether the
 2    county, in making its budget expenditures for
 3    2006, if the county was aware that it was
 4    spending even a single dollar on
 5    opioid-related expenses?
 6              MR. SOBOL:  Objection.  Scope.
 7              THE WITNESS:  I didn't study
 8         that.  I'm not sure.
 9    QUESTIONS BY MR. CARTER:
10         Q.   Okay.  Did you study the
11    county's awareness for any period from 2007
12    to 2018 on that same issue?
13         A.   Well, I would have encountered
14    evidence for that.
15         Q.   Okay.  And what do you -- what
16    did you do when you encountered such
17    evidence?
18              How did you factor it into your
19    economic analysis, if at all?
20              MR. SOBOL:  Objection.  Form.
21              THE WITNESS:  Well, I found it
22         to be confirmatory that these are
23         opioid-related expenditures.  I don't
24         remember when, in each of the
25         counties, I heard -- or talked to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         someone that they acknowledged, yes,
 2         these are opioid-related expenditures.
 3              But, I don't know, just in the
 4         course of conversation, that became
 5         clear.
 6    QUESTIONS BY MR. CARTER:
 7         Q.   To the extent you came across
 8    confirmatory evidence, what value, what
 9    weight, would you assign that in the course
10    of your economic analysis?
11              MR. SOBOL:  Objection.
12              THE WITNESS:  I'm not sure how
13         to answer that.
14    QUESTIONS BY MR. CARTER:
15         Q.   So do you know what proportion
16    of -- because we were talking about Cuyahoga
17    County.
18              Do you know what proportion of
19    Cuyahoga County's expenditures you found
20    equivalent, confirmatory evidence that the
21    individuals running those divisions were
22    aware of opioid-related expenditures?
23         A.   I'm not sure.
24              MR. SOBOL:  Objection.
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. CARTER:
 2         Q.   Do you know whether it was more
 3    than 50 percent of the expenditures you
 4    studied?
 5         A.   It could -- it could be or
 6    maybe not -- it could be yes or could be no.
 7    I'm not sure.
 8         Q.   Do you know the percent of
 9    instances in Summit County where you found
10    confirmatory evidence that the individuals in
11    the county in the various divisions were
12    aware that they were making opioid-related
13    expenditures?
14              MR. SOBOL:  Objection.
15              THE WITNESS:  I don't remember
16         one way or the other.
17    QUESTIONS BY MR. CARTER:
18         Q.   Okay.  Does the absence of any
19    such confirmatory evidence give you any pause
20    in the course of your economic analysis?
21         A.   Not really.  The work that I
22    did in identifying opioid-related
23    expenditures is a reliable way to get an
24    opportunity cost, as we discussed quite a bit
25    this morning.  And that is the opportunity
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    cost with respect to what else those funds
 2    could have been used for.  So it was -- I
 3    mean, that's what I needed to know.
 4         Q.   In the course of your example
 5    about getting the car fixed and whether
 6    somebody has $75 in car repairs, I want to
 7    apply that to what we're discussing here.
 8              Would it be possible to have an
 9    opportunity cost for car repairs if the
10    individual didn't even understand that they
11    were spending $75 on car repairs?
12              MR. SOBOL:  Objection to the
13         form.
14    QUESTIONS BY MR. CARTER:
15         Q.   How does the concept of
16    opportunity cost apply when someone doesn't
17    know what they're spending the money on?
18         A.   I think it still applies.
19         Q.   How so?
20         A.   Why not?
21         Q.   So you think that -- well,
22    strike that.
23              Would a reasonable and rational
24    economic actor spend millions of dollars on
25    something without knowing they're spending
```

1    that money on something?

2        A.    They probably would not, but

3    that's different than whether -- what the

4    opportunity costs of that fund -- or those

5    funds are.

6        Q.    So to the extent -- well,

7    strike that.

8             Did you see evidence in the

9    record you reviewed where individuals in

10   various divisions of the county disavowed any

11   opioid-related expenditures prior to, say,

12   2012?

13            Did you see that testimony?

14            MR. SOBOL:  Objection.

15            THE WITNESS:  I don't recall

16   it.

17   QUESTIONS BY MR. CARTER:

18       Q.    Okay.  Do you recall when --

19   well, do you know who Thomas Gilson is?

20       A.    No, sorry.

21       Q.    Do you know who Hugh Shannon

22   is?

23       A.    No, I don't.

24       Q.    Do you know the names of any of

25   the individuals in the Cuyahoga County's

1    Medical Examiner's Office, other than the two

2    I just gave you?

3        A.    Not as I sit here today.

4        Q.    Okay.  Do you know when

5    Cuyahoga County Medical Examiner's Office

6    first identified an opioid-related problem?

7        A.    An opioid-related problem?

8             Problem in what sense here

9    today?  A death due to opioids, or what are

10   you asking?

11       Q.    What they defined as a crisis.

12            Do you know when --

13       A.    They defined as a crisis.

14       Q.    -- they first identified a

15   crisis?

16       A.    I'm not sure --

17            MR. SOBOL:  Well, wait, wait.

18            Objection.  Scope.

19            THE WITNESS:  I didn't study

20   that.

21   QUESTIONS BY MR. CARTER:

22       Q.    Okay.  Do you believe it's

23   possible that the Summit County -- or excuse

24   me, strike that.

25            Do you believe it's possible

1    that the Cuyahoga County Medical Examiner's

2    Office spent millions of dollars on

3    opioid-related expenditures for years before

4    they realized they had an opioid-related

5    crisis?

6             MR. SOBOL:  Objection.  Scope.

7    Form.

8             You can answer.

9             THE WITNESS:  I believe it's

10   possible.

11            Was that a question?

12            Well, I think maybe it's

13   possible.  I didn't study it.

14   QUESTIONS BY MR. CARTER:

15       Q.    Okay.  On page 12 of your

16   nuisance report, if you turn there with me.

17            Okay.  Is your measure of

18   opioid-related expenditures an objective or a

19   subjective measure?

20       A.    With respect to the damages

21   report or -- I thought we were in the public

22   nuisance report.

23       Q.    We're going back to the damages

24   report.

25       A.    And in general in the damages

1    report, opioid-related expenditures you're

2    asking about?

3        Q.    Yes.

4             Is it an objective or

5    subjective measure?

6        A.    It's an objective measure.

7        Q.    Okay.  Are opioid-related

8    expenditures ever self-evident to the people

9    making them?

10       A.    Sometimes, yes.

11       Q.    Are you a political economist?

12       A.    I border on that, yeah.  Some

13   cases.

14       Q.    Do you hold yourself out as an

15   expert political economist?

16       A.    Well, it's something I've done

17   research on, so, again, depending on what the

18   question is, I have some expertise in that,

19   yes.

20       Q.    In your prior litigation

21   experience, have you ever been offered as an

22   expert political economist?

23       A.    Political economist?  I don't

24   think I've conducted a litigation-related

25   investigation that you would call political

1    economy.

2         Q.    Okay.  In the course of your

3    report, you rely on data from Professor

4    Cutler from the National Center of Health

5    Statistics, correct?

6         A.    Yes.

7         Q.    Okay.

8         A.    I believe so.  Or maybe is it

9    Rosenthal?

10              Can you -- I'm sorry, can you

11   let me know where you're talking about so I

12   can take a look?

13        Q.    Let me ask you this:  Are you

14   aware that there are some NCHS data that's

15   considered restricted data?

16        A.    Yeah, I'm generally aware of

17   this sort of issue, yeah.

18        Q.    Did you personally sign a data

19   use agreement with NCHS for your work in this

20   engagement?

21        A.    No, I did not.

22        Q.    Okay.  When you were working

23   with Greylock McKinnon Associates for the

24   nuisance report, do you know whether the

25   staff at Greylock McKinnon signed a data use

1    agreement with NCHS?

2              MR. SOBOL:  Objection.  Scope.

3              THE WITNESS:  As far as I know,

4         they did not.

5    QUESTIONS BY MR. CARTER:

6         Q.    Okay.  As part of your

7    supervision of their work, were you concerned

8    whether they were using restricted data

9    appropriately?

10             MR. SOBOL:  Objection.

11             THE WITNESS:  My understanding

12        of where the NCHS data came in was via

13        Rosenthal report.  If there's -- and

14        that's how I'm answering the question.

15        And any data use arrangements wouldn't

16        have been -- I wouldn't have known

17        about them.

18             If there's some other NCHS

19        piece, then let's take a look.

20   QUESTIONS BY MR. CARTER:

21        Q.    You cited in your nuisance

22   report on page 13, I believe, Dr. Perri's

23   report, and you discussed that a little bit

24   today.

25        A.    I see that.

1         Q.    Okay.  And you were asked

2    specifically about the question -- or excuse

3    me, the statement contained in there where it

4    says, "Information doctors were being given

5    about the dangers of prescription opioids was

6    in most cases false and systematically and

7    intentionally misleading."

8              Do you recall that?

9         A.    I do recall that.

10        Q.    Did you read in preparation for

11   your deposition today Dr. -- Professor

12   Perri's deposition?

13        A.    No, I did not.

14        Q.    If Professor Perri's testimony

15   was that he has not made any determination

16   whether specific marketing was unlawful,

17   false and misleading or whether it was lawful

18   and appropriate, if he's made no such

19   determination and only looked at the

20   marketing in the aggregate, does that impact

21   your reliance on his report on page 13 of

22   your report?

23             MR. SOBOL:  Objection.  Assumes

24        a fact not in evidence.

25             You can answer.

1              THE WITNESS:  It's something I,

2         of course, would benefit from seeing

3         what Dr. Perri said, but it doesn't

4         seem to be in conflict with what I say

5         here.

6    QUESTIONS BY MR. CARTER:

7         Q.    Are you aware of Professor

8    Perri's testimony that regardless of the

9    various input, regardless of the marketing,

10   at the end of the day, physicians have the

11   ultimate responsibility for selecting

12   medications to prescribe?

13             MR. SOBOL:  Objection.  Scope.

14             THE WITNESS:  I'm sorry, was I

15        aware of what Dr. Perri -- was that

16        the question?

17   QUESTIONS BY MR. CARTER:

18        Q.    Yes.

19        A.    Was I aware of what he said

20   about that?

21        Q.    Yes.

22        A.    I'm not aware of what he said

23   about that.

24        Q.    Do you agree that regardless of

25   the marketing input physicians have the

Highly Confidential - Subject to Further Confidentiality Review

1  ultimate responsibility for selecting
2  medications to prescribe?
3            MR. SOBOL:  Objection.  Scope.
4            THE WITNESS:  Well, generally
5       physicians help patients determine
6       what is the appropriate course of
7       treatment.
8  QUESTIONS BY MR. CARTER:
9       Q.   Okay.
10      A.   In -- you know, not just drugs,
11  but in other things, too.
12      Q.   You were asked about your
13  definition of opioids, and it including
14  all-comers, prescription opioids, illicit
15  opioids.  I want to follow up on other
16  illicit drugs.
17           Do overdose deaths and abuse
18  for nonopioid illicits, such as cocaine or
19  methamphetamine, do those factors in any way
20  into your damages report?
21      A.   I don't think directly, no.
22      Q.   Okay.  You agree it would be
23  improper to include estimates in your
24  opinions of damages chargeable to the
25  defendants on account of cocaine abuse and

Highly Confidential - Subject to Further Confidentiality Review

1  overdose deaths, correct?
2            MR. SOBOL:  Objection.  Scope.
3            THE WITNESS:  Well, you know, I
4       interpreted my task as identifying
5       opioid-related deaths due to
6       shipments.  And people die from other
7       things, but that's what I attempted to
8       identify.
9  QUESTIONS BY MR. CARTER:
10      Q.   Does your nuisance report
11  include any damages related to cocaine abuse
12  and overdose?
13           MR. SOBOL:  Objection.  Form.
14           You can answer.
15           THE WITNESS:  I'm thinking
16       where it might come in.
17           You know, if, in the elevated
18       health care costs section, any of
19       those elevated costs are associated
20       with, you know, a range of other
21       health care treatments, then different
22       things could have figured into that
23       estimation.
24  QUESTIONS BY MR. CARTER:
25      Q.   Do you -- sitting here today,

Highly Confidential - Subject to Further Confidentiality Review

1  did cocaine costs find their way into your
2  economic analysis for your nuisance report?
3            MR. SOBOL:  Objection.  Form.
4            You can answer.
5            THE WITNESS:  Yeah, cocaine
6       costs -- what do you mean by "cocaine
7       costs"?
8  QUESTIONS BY MR. CARTER:
9       Q.   Costs that any of the divisions
10  of either of the counties incurred as a
11  result of addressing cocaine.
12      A.   Addressing.  Oh, you mean
13  government expenditures?
14      Q.   Yes.
15      A.   So we're talking damages now.
16           So in terms of damages, I don't
17  think so.
18      Q.   Do you know -- well, strike
19  that.
20           When you were coming up with
21  your division costs for the jail, do you know
22  the rate of expenditures related to dealing
23  with cocaine -- crimes involving cocaine?
24      A.   The rate of expenditures.  I
25  didn't investigate that.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.   Do you know how those rates
2  compare historically over the years to the
3  rates dealing with prescription opioids?
4            MR. SOBOL:  Objection.  Asked
5       and answered.  Scope.
6            THE WITNESS:  I didn't study
7       that.
8  QUESTIONS BY MR. CARTER:
9       Q.   Okay.  What about with respect
10  to the indigent defendant category?  Do you
11  know the costs to the indigent defendant with
12  those division expenditures related to
13  cocaine abuse?
14           MR. SOBOL:  Objection.  Scope.
15           THE WITNESS:  I missed -- the
16       indigent what?
17  QUESTIONS BY MR. CARTER:
18      Q.   The indigent defendants?
19      A.   Indigent defendants.
20      Q.   Yes.
21           One of the divisions that you
22  deal with in the court system, one of those
23  line item costs is indigent defendant cases,
24  correct?
25      A.   Oh, okay.

1    MR. SOBOL:  You don't mean the
2  distributors and manufacturers that
3  are indigent here.
4         THE WITNESS:  Okay.  That's
5  where I was confused here.
6         So it's not -- I thought it was
7  defendants in this litigation, but you
8  mean defendants in the legal process.
9  QUESTIONS BY MR. CARTER:
10    Q.    Yes.
11    A.    So would you mind asking me
12  again?
13    Q.    Sure.
14         One of the divisions that you
15  looked at in the counties related to
16  expenditures in indigent defendant cases in
17  the counties, correct?
18    A.    Yes.
19    Q.    Okay.  Do you know the rate of
20  expenditures related to cocaine abuse in
21  either county for any year that you looked
22  at?
23         MR. SOBOL:  Objection.  Scope.
24  Form.
25         THE WITNESS:  I didn't study

1  that.
2  QUESTIONS BY MR. CARTER:
3    Q.    Okay.  I want to go back to
4  what I was trying to find earlier.  It was
5  page 12 of your damages report.
6         And at the top of the page, the
7  paragraph that continues from the previous
8  page, towards the end, the second to the last
9  sentence of that paragraph reads as follows:
10  "This, in turn, implies that some harms, and
11  thus damages to bellwether governments, could
12  have been avoided if distributor defendants
13  had not acted improperly."
14         Did I read that correctly?
15    A.    Yes, you did.
16    Q.    So do you stand by that
17  statement?
18    A.    Let me just take a look at the
19  paragraph since there's some thuses in there.
20         Yes, I do stand by it.
21    Q.    Okay.  So do you agree that if
22  the defendant distributors in this case had
23  only and exclusively acted in a way that you
24  would consider to be compliant with the law
25  and had done nothing allegedly improper, that

1  there would still be damages in this case?
2         MR. SOBOL:  Objection.  Scope.
3  You can answer.
4         THE WITNESS:  I'm not sure.
5  QUESTIONS BY MR. CARTER:
6    Q.    Do you agree that illicit
7  fentanyl is the overwhelming cause of
8  overdose death in Summit County currently?
9         MR. SOBOL:  Objection.
10         THE WITNESS:  "Cause" is an
11     important word here, and it's the
12     proximate cause.  It may not be the
13     ultimate cause.
14  QUESTIONS BY MR. CARTER:
15    Q.    Okay.  So what's the ultimate
16  cause, if not illicit Chinese fentanyl, in
17  Summit County currently?
18    A.    Well, this is something that
19  Professor Cutler studied, very explicitly.
20    Q.    Do you have an expert opinion
21  as to the ultimate cause?
22    A.    Well, with respect to the
23  ultimate cause, Professor Cutler looked
24  directly at illicit drugs in a post-2010
25  period, including up through -- I guess his

1  empirical work didn't cover 2018, but it went
2  up to 2016.  And he estimated the share of
3  illicit deaths that were attributable to
4  shipments.
5         And that's an analysis about
6  the ultimate cause, which is going back to
7  what set the chain of events in motion.  That
8  was what he determined.
9    Q.    And I want to put Professor
10  Cutler out of my question.
11         My question is:  Do you have an
12  expert opinion as to the ultimate cause?
13         MR. SOBOL:  Objection.  Scope.
14         THE WITNESS:  Well, I would
15     rely on Professor Cutler for that.
16  QUESTIONS BY MR. CARTER:
17    Q.    Okay.  Do you have any
18  separate, independent opinion to add, or
19  would you just repeat what Professor Cutler
20  would have on that point?
21         MR. SOBOL:  Objection.  Scope.
22         THE WITNESS:  Well, I didn't
23     study that personally.  He did a very
24     good job, and I'm very happy to rely
25     on what he did.

Highly Confidential - Subject to Further Confidentiality Review

1  QUESTIONS BY MR. CARTER:
2      Q.    Same question for Cuyahoga
3  County:  Do you yourself have an opinion
4  regarding the overwhelming cause of overdose
5  death currently in Cuyahoga County?
6      A.    Well, in that case as well, I
7  didn't conduct an independent study.  I
8  relied on the opinions of Professor Cutler.
9      Q.    Okay.  With respect to your
10 damages calculations, do the estimates in
11 your damage report account for any progress
12 increased deficiencies in opioid-related
13 expenditures on behalf of the county?
14     A.    I'm not sure what you mean by
15 that.
16     Q.    For example, does it take into
17 account whether, over the years, Cuyahoga
18 County, for example, improved its addiction
19 interventions related to opioids?
20          MR. SOBOL:  Objection.
21          THE WITNESS:  And then the
22       question was, does my analysis take
23       that into account?
24 QUESTIONS BY MR. CARTER:
25     Q.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      A.    The approach of opportunity
2  costs, again, doesn't require me to determine
3  the -- whatever value is received for the
4  services -- for the dollars that were
5  directed to opioid-related activities.  So I
6  don't need to do that.
7      Q.    Does your approach to
8  opportunity costs require any assessment of
9  the propriety of the spending?
10     A.    By "propriety" you mean --
11     Q.    Whether it's done efficiently,
12 whether it's done as an appropriate steward
13 of the county's money or whether it's
14 wasteful.
15          Does it make any normative
16 judgment as to the propriety of the
17 expenditures that are made?
18     A.    The judgment is that, you know,
19 whether you got -- coming back to my car
20 example, whether or not the car repair shop
21 did a very good job or did a very bad job, it
22 still cost you $75 to get that, and the $75
23 could have been devoted to something else.
24          And so I think then in answer
25 to your question, if you consider propriety

Highly Confidential - Subject to Further Confidentiality Review

1  to be what -- how good a job they did, then
2  it's not part of what I needed to know.
3      Q.    Switching gears.
4          In the course of your analysis
5  of the medical examiner division, is one of
6  the things you looked at autopsies related to
7  opioid-related incidents?
8      A.    That was part of the data that
9  fed in, yes.
10     Q.    In the course of analyzing that
11 data, did you control for suicides caused by
12 opioids?
13     A.    I wasn't controlling for
14 things, so I'm not sure what you're getting
15 at here.
16     Q.    So did you exclude from the
17 data of opioid-related deaths, opioid-related
18 deaths caused by suicide?
19          MR. SOBOL:  Objection.  Asked
20       and answered.
21          THE WITNESS:  Okay.  It wasn't
22       necessary for me to exclude suicides
23       given the methodology I was applying,
24       which relied on the share of deaths
25       attributable to shipments from the

Highly Confidential - Subject to Further Confidentiality Review

1      report of Professor Cutler.
2  QUESTIONS BY MR. CARTER:
3      Q.    Switching gears to the Summit
4  County indigent defendants' point.
5          Do you know what rate the State
6  of Ohio reimburses the county for the outside
7  appointed counsel?
8      A.    No, I'm sorry, I don't know
9  that.
10     Q.    Do you know that the State of
11 Ohio does, in fact, reimburse Summit County
12 for the expenditures to outside counsel
13 appointed in indigent defendant cases?
14     A.    I'm not aware of that.
15     Q.    Are you aware that the State of
16 Ohio also reimburses Cuyahoga County for
17 appointment of counsel in indigent defendant
18 cases?
19     A.    I'm not aware of that.
20     Q.    If the State of Ohio reimburses
21 Summit County and Cuyahoga County between 40
22 and 50 percent for the cost of those
23 expenditures, would you make any adjustments
24 to that category of division expenditures in
25 your damages report?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Well, I think as you know, the
2  damages methodology was intended to identify
3  expenditures by the bellwether governments on
4  opioid-related activities.
5         And I investigated the degree
6  to which some of those expenditures would
7  have been supported by other levels of
8  government.  I found some, and I deducted
9  them.
10         I'm -- I think your -- if what
11  you're saying has some basis, then it's
12  something I would want to look at.
13    Q.    So to use your car example, if
14  you paid $75 to repair your car, walked out
15  of the dealer and I gave you $75, would that
16  still be an opportunity cost?
17         MR. SOBOL:  Objection.  Form.
18         THE WITNESS:  The -- it
19         would -- the $75 would still be an
20         opportunity cost.  The question would
21         be who bears that opportunity cost.
22         And just to change your example
23         slightly, which I think is also in the
24         spirit of your question, suppose you
25         were insured and your insurer paid up

Highly Confidential - Subject to Further Confidentiality Review

1  to $50 for a repair, and then you only
2  paid $25.  So the opportunity cost
3  from the standpoint of you, the
4  household, would be $25.
5  QUESTIONS BY MR. CARTER:
6    Q.    Thank you.
7         You also discussed earlier
8  today the national rates of opioid use
9  disorder.  I want to follow up on that.
10         Do you know the criteria for an
11  opioid use disorder?
12    A.    The medical criteria?
13    Q.    Yes.
14    A.    Broadly.
15    Q.    Okay.  What is your
16  understanding of those criteria?
17    A.    Well, this is similar to many
18  mental health diagnoses.  There's a set of
19  kind of questions, there may be even
20  something like 12, which you could call
21  criteria for receiving a diagnosis.
22         And then if the respondent has
23  a yes to some subset of those, perhaps, say,
24  7 of the 12, and this interferes with their
25  normal activities and they occur over a

Highly Confidential - Subject to Further Confidentiality Review

1  sufficient period of time, then the
2  individual would be diagnosed.
3         Of course, doctors do the
4  diagnosis.  But there's a protocol by which
5  this diagnosis takes place that indicate that
6  the person has opioid use disorder.
7    Q.    Have you ever made a diagnosis
8  of opioid use disorder?
9    A.    Well, I'm not a physician, so
10  I'm not -- I was never asked to diagnose
11  anyone.
12         But this is the kind of thing
13  that if I'm studying an area -- mental health
14  and substance abuse is something that I
15  studied a lot, and not only those areas --
16  then this is the kind of thing you need to be
17  at least somewhat familiar with.
18    Q.    And if someone asked you --
19    A.    And -- I'm sorry.  I have one
20  more thing to add.
21    Q.    Sure.
22    A.    I've done research on the
23  criteria that would be used to identify
24  people with disease.  A lot of these
25  protocols are based on a question, so a

Highly Confidential - Subject to Further Confidentiality Review

1  doctor might ask a patient a question about
2  something.  And the design of that question
3  pattern is something I've done research on
4  for mental health and substance abuse
5  diagnoses.
6    Q.    You indicated that you've never
7  been asked to make a diagnosis.  So if
8  someone did ask you to make a diagnosis, you
9  would decline to do so, correct?
10    A.    If someone asked me to make a
11  medical diagnosis, I would say, "You need to
12  talk to a physician."
13    Q.    Okay.  And the criteria for
14  opioid use disorder was first articulated in
15  the DSM-V, correct?
16    A.    Oh, I'm not sure where it was
17  first articulated.
18    Q.    The portion cited in your
19  report cites the DSM-V articulation, correct?
20    A.    That sounds right.
21    Q.    And are you aware that the
22  DSM-V articulation of an opioid use disorder
23  has three different severity classifications
24  of an opioid use disorder?
25    A.    Generally I was familiar with

Highly Confidential - Subject to Further Confidentiality Review

1    that, yes.

2    Q.    So do you know what the three

3    classifications of severity are in DSM-V?

4    A.    One of them's severe.

5    Q.    That's correct.

6    Do you know the other two?

7    A.    I would be guessing. I would

8    say mild? Yes?

9    Q.    That is correct.

10    A.    And not otherwise classified?

11    Q.    Yeah. So mild, moderate and

12    severe.

13    A.    Okay.

14    Q.    In the course of using the

15    statistics for the opioid use disorder

16    prevalence in the counties, did you identify

17    or quantify in any way the breakdown within

18    that prevalence of those that would have a

19    mild opioid use disorder, those who would

20    have a moderate opioid use disorder, and

21    those who would have a severe opioid use

22    disorder?

23    A.    Well, yes, my analysis was

24    based on the SOUD, which is a severe opioid

25    use disorder.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.

2    A.    So and that's important,

3    because that is one area in which my work is

4    very conservative, to not take into account

5    any effects that are working through people

6    who might have mild or a moderate disorder.

7    Q.    Do you know the prevalence rate

8    based on the national data for mild or

9    moderate opioid use disorder?

10    A.    You know, I'm not sure.

11    Q.    Based on your studies, do you

12    know -- are you familiar with DSM-V's

13    guidance to professionals using DSM-V in a

14    forensic setting?

15    A.    In a forensic setting?

16    Q.    Well, you didn't use it in this

17    case in a clinical setting, did you?

18    A.    I used it in an epidemiology --

19    epidemiologic setting, I would say.

20    Q.    And so in a forensic setting,

21    are you familiar with the guidance for how

22    DSM-V is to be used?

23    A.    In general?

24    Q.    Yes.

25    A.    No, I don't know the

Highly Confidential - Subject to Further Confidentiality Review

1    distinction.

2    Q.    Are you familiar with the

3    guidance in DSM-V that the diagnostic codes

4    contained within are not to be used in a

5    checklist or a cookbook fashion?

6    A.    Can you repeat that?

7    Q.    Are you familiar with DSM-V's

8    guidance that the criteria contained within

9    it are not to be used as a checklist or a

10    cookbook?

11    A.    In a forensic context or in

12    just a general --

13    Q.    In all contexts.

14    A.    Well, I told you what I was

15    familiar with, that there is a, you know, a

16    set of questions and there's time period and

17    there's severity.

18    Q.    Okay. Do you know in your

19    research on DSM-V that it's meant to be used

20    with the application of clinical judgment?

21    A.    Generally that's the case, yes.

22    Q.    Okay. And in adopting the

23    prevalence rate from the national data that

24    you reviewed, did you apply any independent

25    clinical judgment to the populations in

Highly Confidential - Subject to Further Confidentiality Review

1    Cuyahoga or Summit County to lead to the

2    conclusion that it was appropriate to use in

3    this case?

4    A.    Well, I didn't apply

5    independent clinical judgment.

6    MR. CARTER: Okay. Based on

7    time, those are the questions I have

8    for you. I'm going to hand the mic to

9    another attorney.

10    Can we go off the record?

11    VIDEOGRAPHER: The time is

12    5:17 p.m., and we're off the record.

13    (Off the record at 5:17 p.m.)

14    VIDEOGRAPHER: The time is

15    5:19 p.m., and we're on the record.

16    CROSS-EXAMINATION

17    QUESTIONS BY MR. HALLER:

18    Q.    Professor McGuire, I'm David

19    Haller of Covington & Burling.

20    Are you able to point me to any

21    accounting records or budget requests from

22    either county which documented any

23    reallocation of resources, either of employee

24    time or other recourses, from one area to be

25    redirected to opioid-related activities?

Highly Confidential - Subject to Further Confidentiality Review

1    MR. SOBOL:  Objection.  Asked
2    and answered.
3         THE WITNESS:  This is a
4    question we spent quite a bit of time
5    on this morning, and it's important to
6    keep in mind that my objective in this
7    report is to identify the funds
8    devoted to opioid-related activities
9    and interpret those as economic
10   opportunity costs, which is what I
11   tried to do in my report.
12        And the question of whether
13   there may or may not have been a
14   budget document requesting
15   reallocation isn't necessary for me to
16   be able to make that determination.
17   QUESTIONS BY MR. HALLER:
18        Q.   My question wasn't whether it's
19   necessary, just whether you did it.
20        MR. SOBOL:  Objection.
21   QUESTIONS BY MR. HALLER:
22        Q.   Did you look for any such
23   documents?
24        MR. SOBOL:  Objection.  Asked
25   and answered.

Highly Confidential - Subject to Further Confidentiality Review

1         THE WITNESS:  In order to give
2    a clear and complete answer to this
3    question, I think it's important,
4    rather than just say yes or no --
5    QUESTIONS BY MR. HALLER:
6         Q.   Can you include yes or no in
7    your answer, at least?
8         MR. SOBOL:  Do you want to
9    withdraw the question?  You want to
10   ask him a question?  Do you want to
11   interrupt him?  What do you want to
12   do?
13        MR. HALLER:  He's going to give
14   a very long question -- a very long
15   response, and I'd like to make sure
16   yes or no is somewhere in there.
17        MR. SOBOL:  Well, he'll answer
18   the question as he can truthfully tell
19   it, not without any coaching by you.
20        MR. HALLER:  I think coaching
21   is your primary domain.
22        MR. SOBOL:  I'm Bill Belichick,
23   so I don't mind being called a coach.
24        Go ahead, Professor.  If you
25   can answer the question in a truthful

Highly Confidential - Subject to Further Confidentiality Review

1    way, go ahead.
2         THE WITNESS:  I think I can
3    answer the question.
4         But it is important to know,
5    for an audience or a reader of my
6    deposition transcript, to understand
7    that my objective in conducting my
8    report was to identify spending by the
9    bellwethers on opioid-related
10   activities, which is -- which
11   corresponds to the very well-regarded,
12   down-the-middle-of-the-plate concept
13   of economic opportunity costs.
14        And using that well-accepted
15   approach does not require me to
16   identify what other services the
17   bellwether counties did or would have
18   wanted to spend those funds on.
19        So, no, it was not necessary
20   for me to do that.
21   QUESTIONS BY MR. HALLER:
22        Q.   And, no, you did not do that;
23   is that right?
24        MR. SOBOL:  Objection.  Asked
25   and answered.

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. HALLER:
2         Q.   I asked you to include
3    somewhere in your long speech a yes or no
4    response to my question, which was whether
5    you did it.
6         MR. SOBOL:  Well, again, he
7    gets to answer the question as best he
8    can and not --
9         MR. HALLER:  If you have an
10   objection, say objection and then
11   leave it at that.
12        MR. SOBOL:  No, I'll say
13   whatever I feel like.
14        MR. HALLER:  You're going to
15   continue being the bully you've been
16   for two days?  Is that what you're
17   going to do?
18        Objection.  Yes or no?
19        MR. SOBOL:  Professor, you can
20   answer the question as truthfully as
21   you can without having to include
22   words that are required by the
23   examining attorney.
24        THE WITNESS:  I think I can be
25   completely responsive to your

1       question.

2                MR. HALLER:  Thank you.

3                THE WITNESS:  And I regard it

4       to be an important question since it

5       was asked so many times.

6                And the answer is the same:

7       that the purpose of my report was to

8       identify the opioid-related spending

9       of the various divisions in the

10      bellwether governments for various

11      years, and that's what I did.

12               The interpretation of that

13      spending is economic opportunity

14      costs.  That tells me what I need to

15      know in order to answer my assignment.

16               It was not necessary for me to

17      know how else the funds might have

18      been used and what other possible

19      desired targets that the bellwether

20      divisions had to for those funds.

21               So it was not necessary, and I

22      didn't do it.

23      QUESTIONS BY MR. HALLER:

24      Q.      Thank you.

25              You started out today talking

1       about a conversation you had had with Compass

2       Lexecon about OUD prevalence between the time

3       of your first day of deposition and today.

4                Do you remember that?

5       A.      I do, yeah.

6       Q.      I take it before you made that

7       call, you reviewed your report section

8       concerning OUD prevalence; is that right?

9       A.      Yes, that's right.

10      Q.      And what was it that was in --

11      how was it that your report wasn't

12      sufficiently clear to you such that you

13      needed clarification from Compass Lexecon?

14               What was it that wasn't

15      sufficiently clear?

16      A.      Well, I -- there's lots of

17      things that one has to keep in mind in a

18      deposition.  And what is clear, you know, to

19      me in rereading my report -- what I said to

20      myself is, well, let's go over this again

21      verbally so I'm in a better position to

22      answer questions about it.

23               So I just wanted to go over the

24      calculations of the OUD rate again so I would

25      be able to answer questions more carefully

1       and more completely.

2       Q.      Sorry.

3               Do you remember what in

4       particular in your report wasn't sufficiently

5       clear to you such that you needed

6       clarification?

7       A.      Well, I wouldn't put it that

8       way.  It wasn't that there was something that

9       wasn't clear to me.  I just found it helpful

10      to talk through some of the operations.  It

11      helps set things in my mind.

12      Q.      Now, in reference to mortality,

13      earlier today you stated that some of the

14      people who died in the two counties would

15      have been county employees.

16               Do you remember that?

17      A.      Yes, I do remember that.

18      Q.      Do you in fact know whether or

19      not anyone who died in Summit or Cuyahoga

20      from an opioid overdose was in fact a county

21      employee?

22      A.      I think you're -- I mean, the

23      point of your question seems correct, that

24      that was an inference on my part, that there

25      were thousands of people who died, and

1       chances are very good that one of them or

2       more was a county employee.

3       Q.      But you don't know for a fact

4       whether any were; is that right?

5       A.      No.  As I said, this was, I

6       think, a reasonable inference on my part.

7       Q.      But do you know for a fact

8       whether any of them were?

9                MR. SOBOL:  Objection.  Asked

10      and answered already.

11               THE WITNESS:  I thought it was

12      a reasonable inference on my part.

13      QUESTIONS BY MR. HALLER:

14      Q.      Do you know the difference

15      between drawing a reasonable inference and

16      knowing something for a fact?

17               MR. SOBOL:  Objection.

18      You can answer --

19      QUESTIONS BY MR. HALLER:

20      Q.      Are those the same things to

21      you?

22      A.      No, I understand the

23      difference.

24      Q.      Okay.  So I want to just know

25      whether you know for a fact whether any of

```
 1    the employees -- whether any of the opioid
 2    overdose victims were in fact county
 3    employees.
 4              MR. SOBOL:  Objection.  Asked
 5         and answered four times.
 6              THE WITNESS:  My statement,
 7         when that was brought about -- we just
 8         discussed that today -- was an
 9         inference on my part.  It was not a
10         fact.
11    QUESTIONS BY MR. HALLER:
12         Q.   Okay.  Are you aware whether
13    the statistics given to you from Professor
14    Cutler and Professor Rosenthal on which you
15    relied were national statistics or whether
16    they were Cuyahoga or Summit County-specific?
17              MR. SOBOL:  Objection.  Form.
18         Which statistics?
19              MR. HALLER:  The harm
20         percentages.
21              THE WITNESS:  Well, there
22         are -- it still depends on what
23         statistics you're talking about.
24    QUESTIONS BY MR. HALLER:
25         Q.   The Cutler harm percentages, do
```

```
 1    you know whether those were national
 2    statistics or Summit and Cuyahoga-specific?
 3              MR. SOBOL:  Objection.  Form.
 4              THE WITNESS:  The Cutler
 5         statistics, of which there's more than
 6         one in the report -- more than one set
 7         in the report, were primarily based on
 8         an econometric analysis of what he
 9         referred to in his report as large
10         counties that included Cuyahoga and
11         Summit.  And in total, I think it was
12         around 300 counties or so.
13              And his estimated shares of
14         harms due to shipments was a -- kind
15         of a summary number coming from that
16         set of counties.
17    QUESTIONS BY MR. HALLER:
18         Q.   And similarly with regard to
19    Professor Rosenthal, are you aware of whether
20    her misconduct percentages, whether those
21    were in relation to national detailing
22    efforts or whether those were specific to
23    Cuyahoga and Summit?
24              MR. SOBOL:  Objection.  Form.
25         Which?
```

```
 1              But you can answer.
 2              THE WITNESS:  Well, Rosenthal's
 3         statistics are somewhat different.
 4         She used national statistics on
 5         shipments and as her dependent
 6         variable, and then national-level
 7         information on detailing as her key
 8         independent variable.
 9              So her percentages were based
10         on a kind of national average.
11              MR. SOBOL:  Okay.  I think
12         that's it.
13              MR. HALLER:  Well, I have many
14         more questions.  I do think you used
15         up, Counsel, a good 30-plus minutes in
16         speaking objections and snide remarks,
17         and I think we have a right to
18         another, at least, 30 minutes.
19              MR. SOBOL:  Well, that's -- no,
20         you don't.
21              CROSS-EXAMINATION
22    QUESTIONS BY MR. SOBOL:
23         Q.   Professor McGuire, I have a
24    couple of questions for you.
25              You testified several times
```

```
 1    yesterday -- last week and today regarding
 2    certain quantitative inputs you received from
 3    Dr. Cutler's report, correct?
 4         A.   Yes.
 5         Q.   Does your model depend upon the
 6    particular quantification of Dr. Cutler's
 7    shares in order for it to be operative?
 8              MR. KEYES:  Objection.  Form.
 9              THE WITNESS:  Can I answer?
10              MR. SOBOL:  Yes.
11              THE WITNESS:  My model would
12         work as well with other estimated
13         shares from Cutler.
14              MR. SOBOL:  Nothing further.
15              RECROSS-EXAMINATION
16    QUESTIONS BY MR. HALLER:
17         Q.   Does your report reflect that
18    additional work you'd need to do, or is that
19    work you would have to do subsequently?
20         A.   It's very straightforward math.
21    So, I mean, I didn't do alternative
22    calculations except with regard to Cutler
23    Approach 1 and Cutler Approach 2.  That, I
24    think, illustrates exactly the thing we're
25    talking about now:  that if the percentages
```

Highly Confidential - Subject to Further Confidentiality Review

1    were somewhat different, as they were in the
2    two approaches, then it's -- you know, it's
3    an Excel operation, really, to be able to
4    determine damages.
5        Q.    But that doesn't appear in your
6    report, correct?
7             MR. SOBOL:  Objection.
8             THE WITNESS:  Yes, it does.
9    QUESTIONS BY MR. HALLER:
10       Q.    The alternative calculations
11   appear in your report or they don't?
12       A.    Yes, they do.
13       Q.    Where are they?
14       A.    This is what's referred to as
15   Approach 1 and Approach 2.
16       Q.    No, I'm saying apart from
17   Approach 1 and Approach 2.  If there were
18   additional -- initial quanti --
19   quantification done by Professor Cutler, you
20   would need to do additional work yourself,
21   right?
22       A.    What I indicated was that
23   the -- and I thought the question was, does
24   my report -- do my damages estimates apply --
25   could they be determined with other Cutler

Highly Confidential - Subject to Further Confidentiality Review

1    percentages.
2             And the answer is, yes, it's
3    easy.  And the fact that I did it for
4    Approach 1 and Approach 2, which involved
5    different Cutler numbers, indicates the
6    readily available calculations I could make.
7             MR. SOBOL:  Time's up.  Thank
8        you very much, everybody.
9             VIDEOGRAPHER:  The time is 7 --
10       or 6:30 p.m., and this deposition has
11       concluded and we're off the record.
12       5:30.
13            MR. CARTER:  Obviously, you
14       know, defendants reserve the right to
15       seek additional time based on the
16       extensive speeches by the witness and
17       the speaking objections, but we'll
18       deal with that offline.
19   (Deposition concluded at 5:31 p.m.)
20            - - - - - - -
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

1                 CERTIFICATE
2
3        I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
4    Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
5    of the examination, Thomas G. McGuire, PhD,
     was duly sworn by me to testify to the truth,
6    the whole truth and nothing but the truth.
7        I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
8    testimony as taken stenographically by and
     before me at the time, place and on the date
9    hereinbefore set forth, to the best of my
     ability.
10
         I DO FURTHER CERTIFY that I am
11   neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
12   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
13   that I am not financially interested in the
     action.
14
15
16       _____
                 Carrie A. Campbell
17       CARRIE A. CAMPBELL,
         NCRA Registered Diplomate Reporter
18       Certified Realtime Reporter
         Notary Public
19       Dated:  May 1, 2019
20
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

1             INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over
4    carefully and make any necessary corrections.
5    You should state the reason in the
6    appropriate space on the errata sheet for any
7    corrections that are made.
8        After doing so, please sign the
9    errata sheet and date it.  You are signing
10   same subject to the changes you have noted on
11   the errata sheet, which will be attached to
12   your deposition.
13       It is imperative that you return
14   the original errata sheet to the deposing
15   attorney within thirty (30) days of receipt
16   of the deposition transcript by you.  If you
17   fail to do so, the deposition transcript may
18   be deemed to be accurate and may be used in
19   court.
20
21
22
23
24
25

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4          I,_____, do
        hereby certify that I have read the foregoing
 5      pages and that the same is a correct
        transcription of the answers given by me to
 6      the questions therein propounded, except for
        the corrections or changes in form or
 7      substance, if any, noted in the attached
        Errata Sheet.

 8

 9

10

11

12      _____
        Thomas G. McGuire, Ph.D.         DATE

13

14

15      Subscribed and sworn to before me this
16      _____ day of _____, 20 _____.
17      My commission expires: _____

18

19      Notary Public

20

21

22

23

24

25
```

```
 1              - - - - - - -
                    ERRATA
 2              - - - - - - -
 3      PAGE    LINE   CHANGE/REASON
 4      _____   ____   _____
 5      _____   ____   _____
 6      _____   ____   _____
 7      _____   ____   _____
 8      _____   ____   _____
 9      _____   ____   _____
10      _____   ____   _____
11      _____   ____   _____
12      _____   ____   _____
13      _____   ____   _____
14      _____   ____   _____
15      _____   ____   _____
16      _____   ____   _____
17      _____   ____   _____
18      _____   ____   _____
19      _____   ____   _____
20      _____   ____   _____
21      _____   ____   _____
22      _____   ____   _____
23      _____   ____   _____
24      _____   ____   _____
25
```

```
 1              - - - - - - -
                 LAWYER'S NOTES
 2              - - - - - - -
 3      PAGE    LINE
 4      _____   ____   _____
 5      _____   ____   _____
 6      _____   ____   _____
 7      _____   ____   _____
 8      _____   ____   _____
 9      _____   ____   _____
10      _____   ____   _____
11      _____   ____   _____
12      _____   ____   _____
13      _____   ____   _____
14      _____   ____   _____
15      _____   ____   _____
16      _____   ____   _____
17      _____   ____   _____
18      _____   ____   _____
19      _____   ____   _____
20      _____   ____   _____
21      _____   ____   _____
22      _____   ____   _____
23      _____   ____   _____
24      _____   ____   _____
25
```