Highly Confidential - Subject to Further Confidentiality Review

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: NATIONAL            )
PRESCRIPTION               )  MDL No. 2804
OPIATE LITIGATION          )
_____     )  Case No.
                           )  1:17-MD-2804
                           )
THIS DOCUMENT RELATES      )  Hon. Dan A.
TO ALL CASES               )  Polster


THURSDAY, NOVEMBER 8, 2018

HIGHLY CONFIDENTIAL – SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

– – –


          Videotaped deposition of Steven

Mills, held at the offices of BARTLIT BECK

HERMAN PALENCHAR & SCOTT LLP, 54 West

Hubbard, Suite 300, Chicago, Illinois,

commencing at 9:07 a.m., on the above date,

before Carrie A. Campbell, Registered

Diplomate Reporter and Certified Realtime

Reporter.




– – –
GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

## Page 2

```
 1        A P P E A R A N C E S :
 2
     LEVIN PAPANTONIO THOMAS MITCHELL
 3   RAFFERTY PROCTOR, P A
       BY:  PETER MOUGEY, ESQUIRE
 4         pmougey@levinlaw com
     316 South Baylen Street
 5   Pensacola, Florida 32502
     (850) 435-7000
 6
 7
     NAPOLI SHKOLNIK, PLLC
 8     BY:  HUNTER J SHKOLNIK, ESQUIRE
           hunter@napolilaw com
 9         JOSEPH CIACCIO, ESQUIRE
           WENDY MITCHELL, ESQUIRE
10         (VIA TELECONFERENCE)
           JODI KLOCKENGA, ESQUIRE
11         (VIA TELECONFERENCE)
     360 Lexington Avenue, 11th Floor
12   New York, New York 10017
     (212) 397-1000
13   Counsel for Plaintiffs
14
15   WILLIAMS & CONNOLLY LLP
       BY:  JOSEPH S BUSHUR, ESQUIRE
16         jbushur@wc com
     725 Twelfth Street, N W
17   Washington, DC 20005
     (202) 434-5331
18   Counsel for Cardinal Health, Inc
19
20   COVINGTON & BURLING LLP
       BY:  J ALEJANDRO BARRIENTOS, ESQUIRE
21         abarrientos@cov com
           (VIA TELECONFERENCE)
22   850 Tenth Street, NW
     Washington, DC 20001-4956
23   (202) 662-6000
     Counsel for McKesson Corporation
24
25
```

## Page 3

```
 1   REED SMITH LLP
       BY:  BRIAN HIMMEL, ESQUIRE
 2         bhimmel@reedsmith com
     Reed Smith Centre
 3   225 Fifth Avenue
     Pittsburgh, Pennsylvania 15222
 4   (412) 288-3131
     Counsel for AmerisourceBergen
 5
 6
     BARTLIT BECK HERMAN PALENCHAR &
 7   SCOTT LLP
       BY:  HAMILTON HILL, ESQUIRE
 8         hamilton hill@bartlit-beck com
           ALEX J HARRIS, ESQUIRE
 9         alex harris@bartlit-beck com
     54 West Hubbard Street, Suite 300
10   Chicago, Illinois 60654
     (312) 494-4475
11   Counsel for Walgreens
12
13   JONES DAY
       BY:  MARK DEMONTE, ESQUIRE
14         mdemonte@jonesday com
     77 West Wacker
15   Chicago, Illinois 60601-1692
     (312) 782-3939
16   Counsel for Walmart
17
18   PELINI, CAMPBELL & WILLIAMS LLC
       BY:  PAUL B RICARD
19         pbricard@pelini-law com
     8040 Cleveland Avenue NW, Suite 400
20   North Canton, Ohio 44720
     (330) 305-6400
21   Counsel for Prescription Supply,
     Inc
22
23
24
25
```

## Page 4

```
 1   ARNOLD & PORTER KAYE SCHOLER, LLP
       BY:  SEAN P HENNESSY, ESQUIRE
 2         sean hennessy@arnoldporter com
           (VIA TELECONFERENCE)
 3   601 Massachusetts Avenue, NW
     Washington, DC 20001-3743
 4   (202) 942-5000
     Counsel for Endo Pharmaceuticals
 5   Inc , and Endo Health Solutions Inc
 6
     MORGAN, LEWIS & BOCKIUS LLP
 7     BY:  MATTHEW R LADD, ESQUIRE
           matthew ladd@morganlewis com
 8         (VIA TELECONFERENCE)
     101 Park Avenue
 9   New York, NY 10178-0060
     (212) 309-6141
10   Counsel for Rite Aid
11
     KIRKLAND & ELLIS, LLP
12     BY:  PAUL J WEEKS, ESQUIRE
           paul weeks@kirkland com
13         (VIA TELECONFERENCE)
     655 15th Street, NW, Suite 1200
14   Washington, DC 20005
     (202) 879-5000
15   Counsel for Allergan Finance, LLC
16
     CAVITCH, FAMILO & DURKIN
17     BY:  L WILLIAM "CHIP" ERB, ESQUIRE
           LWErb@cavitch com
18         (VIA TELECONFERENCE)
     1300 East 9th Street, 20th Floor
19   Cleveland, Ohio 44114
     (216) 621-7860
20   Counsel for Discount Drug Mart
21   VIDEOGRAPHER:
           MICHAEL NEWELL,
22         Golkow Litigation Services
23
     TRIAL TECHNICIAN:
24         COREY SMITH,
           Golkow Litigation Services
25                   - - -
```

## Page 5

```
 1                  INDEX
 2                                       PAGE
 3   APPEARANCES...................................  2
 4   EXAMINATIONS
 5     BY MR. SHKOLNIK..........................  10
 6     BY MR. HILL..................................  391
 7     BY MR. SHKOLNIK.........................  406
 8     BY MR. HILL..................................  410
 9
10              EXHIBITS
11   No.    Description              Page
12   Walgreens  Steven Mills LinkedIn profile    35
     Mills 1   printout
13
     Walgreens  September 27, 2006 letter to    54
14   Mills 2   registrants from the US
           Department of Justice, Drug
15         Enforcement Administration,
           ABDCMDL00269691 -
16         ABDCMDL00269694
17   Walgreens  US Department of Justice, Drug    82
     Mills 3   Enforcement Administration
18         February 7, 2007 letter to
           registrants,
19         ABDCMDL00269687 -
           ABDCMDL00269690
20
     Walgreens  US Department of Justice, Drug    86
21   Mills 4   Enforcement Administration
           December 27, 2007 letter to
22         registrants,
           ABDCMDL00269685 -
23         ABDCMDL0026966
24
25
```

2 (Pages 2 to 5)

Highly Confidential - Subject to Further Confidentiality Review

**Page 6**

1  Walgreens US Department of Justice, Drug    109
   Mills 5  Enforcement Administration June
2       12, 2012 letter to registrants,
        ABCDMDL0269683 -
3       ABCDMDL0026964
4  Walgreens  Settlement and Memorandum of    120
   Mills 6  Agreement, P-WAG-0001
5
6  Walgreens  E-mail(s),                       155
   Mills 7  WAGMDL00308265 - WAGMDL00308266
7  Walgreens  E-mail(s),                       183
   Mills 8  WAGMDL00308192 - WAGMDL00308212
8
9  Walgreens  E-mail(s),                       189
   Mills 9  WAGMDL00308327 - WAGMDL00308349
10 Walgreens  E-mail(s),                       198
   Mills 10  WAGMDL00060739 - WAGMDL00060764
11
12 Walgreens  E-mail(s),                       238
   Mills 11  WAGMDL00303383 - WAGMDL00303384
13 Walgreens  E-mail(s),                       261
   Mills 12  WAGMDL00245867 -
14       WAGMDL00245879; WAGMDL00245916
        - WAGMDL00245920
15
16 Walgreens  E-mail(s),                       285
   Mills 13  WAGMDL00299885 - WAGMDL00299888
17 Walgreens  E-mail(s),                       296
   Mills 14  WAGMDL00312091 - WAGMDL00312093
18
19 Walgreens  E-mail(s),                       299
   Mills 15  WAGMDL00414048 - WAGMDL00414049
20 Walgreens  E-mail(s),                       315
   Mills 16  WAGMDL00060931 - WAGMDL00060933
21
22 Walgreens  E-mail(s),                       326
   Mills 17  WAGMDL00056871 - WAGMDL00056876
23 Walgreens  E-mail(s),                       330
   Mills 18  WAGMDL00108483 - WAGMDL00108485
24
25 Walgreens  E-mail(s),                       337
   Mills 19  WAGMDL00107173 - WAGMDL00107177

**Page 7**

1  Walgreens  E-mail(s),                       340
   Mills 20  WAGMDL00107557 - WAGMDL00107565
2
3  Walgreens  E-mail(s),                       350
   Mills 21  WAGMDL00107267 - WAGMDL00107271
4  Walgreens  E-mail(s),                       354
   Mills 22  WAGMDL00059074 - WAGMDL00059081
5
6  Walgreens  E-mail(s),                       362
   Mills 23  WAGMDL00413949 - WAGMDL00413950
7  Walgreens  E-mail(s),                       364
   Mills 24  WAGMDL00107384 - WAGMDL00107386
8
9  Walgreens  E-mail(s),                       366
   Mills 25  WAGMDL00107468 - WAGMDL00107469
10 Walgreens  E-mail(s),                       372
   Mills 26  WAGMDL00110737 - WAGMDL00110738
11
12 Walgreens  E-mail(s),                       375
   Mills 27  WAGMDL00244813 - WAGMDL00244815
13 Walgreens  E-mail(s),                       377
   Mills 28  WAGMDL00102390 - WAGMDL00102392
14
15 Walgreens  E-mail(s),                       383
   Mills 29  WAGMDL00414646 - WAGMDL00414648
16 Walgreens  E-mail(s),                       388
   Mills 30  WAGMDL00062061
17
        (Exhibits attached to the deposition )
18
19
20
21
22
23
24
25

**Page 8**

1       VIDEOGRAPHER:  We are now on
2  record.
3       My name is Michael Newell.  I'm
4  a videographer for Golkow Litigation
5  Services.
6       Today's date is November 8,
7  2018, and the time is 9:07 a.m.
8       This video deposition is being
9  held in Chicago, Illinois, in the
10 matter of National Prescription Opiate
11 Litigation.
12      The deponent is Steve Mills.
13      Will counsel please identify
14 themselves.
15      MR. SHKOLNIK:  Hunter Shkolnik
16 on behalf of the MDL plaintiffs.
17      MR. CIACCIO:  Joseph Ciaccio on
18 behalf of MDL plaintiffs.
19      MR. MOUGEY:  Peter Mougey on
20 behalf of the MDL plaintiffs.
21      MR. RICARD:  Paul Ricard,
22 Prescription Supply, Inc.
23      MR. HIMMEL:  Brian Himmel for
24 AmerisourceBergen.
25      MR. BUSHUR:  Joseph Bushur for

**Page 9**

1  Cardinal Health.
2       MR. DEMONTE:  Mark DeMonte for
3  Walmart.
4       MR. HARRIS:  Alex Harris for
5  Walgreens.
6       MR. HILL:  Hamilton Hill for
7  Walgreens.
8       VIDEOGRAPHER:  The court
9  reporter today is Carrie Campbell and
10 will now swear in the witness.
11      MR. BARRIENTOS:  Alejandro
12 Barrientos for McKesson.
13      MR. HILL:  Anyone else on the
14 phone?
15      MR. LADD:  Matthew Ladd, Morgan
16 Lewis, representing Rite Aid.
17      MR. SHKOLNIK:  Say that one
18 again, please.
19      MR. LADD:  Matthew Ladd from
20 Morgan, Lewis & Bockius representing
21 defendant Rite Aid.
22      MR. HENNESSY:  And this is Sean
23 Hennessy from Arnold & Porter
24 representing the Endo and Par
25 Pharmaceutical defendants.

3 (Pages 6 to 9)

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1           MR. ERB:  And this is Chip Erb
2    with Cavitch, Familo & Durkin
3    representing Discount Drug Mart.
4           MR. WEEKS:  Paul Weeks for
5    Allergan Finance.
6           MS. KLOCKENGA:  Jodi Klockenga
7    with Napoli Shkolnik.
8           MS. MITCHELL:  Wendy Mitchell
9    with Napoli Shkolnik.
10
11          STEVEN MILLS,
12   of lawful age, having been first duly sworn
13   to tell the truth, the whole truth and
14   nothing but the truth, deposes and says on
15   behalf of the Plaintiffs, as follows:
16
17          DIRECT EXAMINATION
18   QUESTIONS BY MR. SHKOLNIK:
19       Q.    Mr. Mills, my name is Hunter
20   Shkolnik.  I'm going to be asking you a
21   series of questions here today, but anytime
22   you don't understand me, please let me know.
23          I have a tendency to sometimes
24   talk fast.  Usually by the time it starts
25   affecting you, the court reporter usually

Page 11

1    throws something at me and stops me.  But if
2    at any time I start going too fast, just tell
3    me to slow down.
4           If you don't understand a
5    question, let me know.  I try my best, but
6    every once in a while I do ask a bad
7    question.  So if you don't understand it,
8    just say.  I'll rephrase the question.
9           Okay?
10       A.    Okay.
11       Q.    And whenever there's a
12   question, it has to be a verbal answer.  A
13   nod doesn't -- doesn't help.  May show up on
14   the video but not on the transcript.
15          Okay?
16       A.    Got it.
17       Q.    Sir, you work for Walgreens at
18   the current time?
19       A.    I do.
20       Q.    And how long have you worked
21   for Walgreens?
22       A.    The past 13 years.
23       Q.    So over the 13 years you've
24   been working at Walgreens, do you have an
25   understanding that there was an opioid

Page 12

1    epidemic developing in the United States?
2        A.    I have an understanding, yes.
3        Q.    When did you first become aware
4    that there was an opioid epidemic developing
5    in the United States?
6           MR. HILL:  Object to the form.
7           THE WITNESS:  2012.
8    QUESTIONS BY MR. SHKOLNIK:
9        Q.    So what happened in 2012 that
10   made you come to a realization that there was
11   an opioid epidemic in the United States?
12       A.    There was a creation of the RX
13   integrity team, which I'm currently a member
14   of.
15       Q.    And prior to 2012, were you
16   involved in any capacity with prescription
17   integrity at Walgreens?
18          MR. HILL:  Object to the form.
19          THE WITNESS:  No.
20   QUESTIONS BY MR. SHKOLNIK:
21       Q.    Was prescription integrity a
22   new department that was developed at some
23   point in time at Walgreens while you were
24   there?
25       A.    Yes.

Page 13

1        Q.    So before the company developed
2    prescription integrity department -- withdraw
3    that.
4           Was it called the prescription
5    integrity department?
6        A.    Pharmaceutical integrity.
7        Q.    Okay.  Pharmaceutical integrity
8    department.
9           Prior to the development of the
10   pharmaceutical integrity department at
11   Walgreens in 2012, was there any other
12   department in existence at Walgreens that had
13   the same responsibilities as the now new
14   pharmaceutical integrity group --
15          MR. HILL:  Object to the form.
16   QUESTIONS BY MR. SHKOLNIK:
17       Q.    -- or department?
18       A.    I don't know.
19       Q.    Did you do anything prior to
20   2012 in terms of pharmaceutical --
21   pharmaceutical integrity work, the type
22   you're doing after 2012 prior to 2012?
23       A.    No.
24       Q.    What type of work did you do
25   before 2012?

4 (Pages 10 to 13)

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1     A.   Prior to 2012, I was working in
2  the pharmacy inventory group where we manage
3  item vendor catalog setup so our stores can
4  order product accordingly.  If the item's not
5  set up, then our stores don't have the
6  ability to order it per our ordering system.
7     Q.   Was there any specific aspect
8  of that job that dealt with opioids or
9  Class II, Class III pharmaceuticals?
10     A.   Can you rephrase your question?
11     Q.   Sure.
12          Was any aspect of your job
13  prior to 2012 dealing with the distribution
14  of opioids?
15     A.   To answer your question, yes, I
16  would be responsible for setting up items to
17  be available for ordering through our catalog
18  for opioids, C-II, C-III.  I believe that's
19  what you're asking.
20     Q.   Okay.  Tell me what you did
21  with respect to setting up and cataloging of
22  opioid, C-II, C-III, drugs prior to 2012.
23     A.   So it would be logging into a
24  computer system, to a web UI, setting up the
25  NDC codes, setting up the UPC numbers and

Page 15

1  then loading that into our ordering system so
2  stores would be able to get replenishment.
3     Q.   So it was a job that focused
4  more on the logistics aspect of the
5  pharmaceutical side of the company or just --
6  withdraw that.
7          So was your job dealing more
8  with logistics, making sure that product was
9  available and product could be shipped?
10     A.   Nothing to do with product
11  availability.
12     Q.   Okay.
13     A.   It was more data entry and item
14  maintenance.
15     Q.   What is your background in
16  terms of education, sir?
17     A.   Communications degree from
18  Northeastern University.
19     Q.   And when you were at
20  Northeastern, did you work for Walgreens as
21  part of any of the -- they have the work
22  study programs there.  Did you start with
23  Walgreens back then?
24     A.   I started with Walgreens while
25  I was in college, yes.

Page 16

1     Q.   Like the co-op programs they
2  had back then?
3     A.   I didn't take advantage of any
4  programs.
5     Q.   So you've been with Walgreens
6  ever since Northeastern up until the present
7  time?
8     A.   Yes.
9     Q.   Now, going back to the issue of
10  opioid epidemic, tell me what it was that
11  triggered in your mind that 2012 there was an
12  opioid epidemic in the United States.
13          MR. HILL:  Object to the form.
14          THE WITNESS:  Due to the
15     information that was available around
16     the DEA visits to our Jupiter DCs
17     around opioid dispensing.
18  QUESTIONS BY MR. SHKOLNIK:
19     Q.   And other than the fact that
20  the DEA came down on Walgreens through its
21  Jupiter distribution facility, you had not
22  been aware that there was a problem with
23  opioids in the United States and it was at
24  epidemic level before that?
25          MR. HILL:  Object to the form.

Page 17

1     Assumes facts.
2          THE WITNESS:  I don't know.  It
3     wasn't part of my job responsibilities
4     prior.
5  QUESTIONS BY MR. SHKOLNIK:
6     Q.   Well, I mean, did people talk
7  about it at Walgreens prior to 2012, there's
8  an opioid problem in the United States?
9          MR. HILL:  Object to the form.
10          THE WITNESS:  I can't remember.
11  QUESTIONS BY MR. SHKOLNIK:
12     Q.   Did you know any people that
13  had suffered from the ill effects of opioids
14  prior to 2012?
15     A.   No.
16     Q.   Prior to 2012, to your
17  knowledge, did -- withdraw that.
18          Part of your job is suspicious
19  order monitoring work; am I correct?
20          MR. HILL:  Object to the form.
21          THE WITNESS:  That is a part of
22     my job, yes.
23  QUESTIONS BY MR. SHKOLNIK:
24     Q.   Prior to 2012, had you ever
25  heard of the phrase "suspicious order

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    monitoring"?
2         A.    No.
3         Q.    Prior to 2012, did you have any
4    knowledge of any of the requirements that
5    applied to Walgreens regarding monitoring of
6    the dispensing of C-II or C-III
7    pharmaceuticals?
8         A.    No.
9         Q.    Prior to 2012, did you have any
10   experience whatsoever with the Walgreens
11   responsibility regarding the distribution of
12   opioids?
13        A.    No.
14        Q.    Prior to 2012, did you have any
15   training whatsoever in the proper oversight
16   of suspicious orders and distribution in
17   Walgreens?
18             MR. HILL:  Object to the form.
19             THE WITNESS:  No.
20   QUESTIONS BY MR. SHKOLNIK:
21        Q.    When in 2012 did you first get
22   any training on what is known as suspicious
23   order monitoring in the distribution chain of
24   opioids or C-II, C-III --
25             MR. HILL:  Object to the form.

Page 19

1    QUESTIONS BY MR. SHKOLNIK:
2         Q.    -- pharmaceuticals?
3              MR. HILL:  Object to the form.
4              THE WITNESS:  It was once we
5    established the ground rules of the
6    creation of the RX integrity -- or
7    pharmaceutical integrity team that
8    those ground rules were kind of set.
9    QUESTIONS BY MR. SHKOLNIK:
10        Q.    Was that in June of 2012?
11        A.    No.  The team officially was
12   created in December of 2012.
13        Q.    So in essence, your first
14   experience with anything related to
15   suspicious order monitoring and distribution
16   of opioids didn't occur until the last month
17   of December 2012 at Walgreens?
18        A.    Yes.
19        Q.    How many other people were
20   joined together into this prescription
21   integrity group in 2012?
22        A.    Are you speaking currently
23   or --
24        Q.    No, then.
25        A.    Then?

Page 20

1         Q.    Yeah.
2              MR. HILL:  Object to the form.
3              THE WITNESS:  It was just two
4    of us at the moment.
5    QUESTIONS BY MR. SHKOLNIK:
6         Q.    Who was the other person?
7         A.    Tasha Polster.
8         Q.    And she was your superior at
9    that time?
10        A.    Yes.
11        Q.    Is she still -- I'm not saying
12   it in a negative way.  She's a direct report
13   up?
14        A.    At that moment she was.
15        Q.    Now she's two up; am I correct?
16        A.    Yes.
17        Q.    So for the year 2012, let's
18   talk from January until December, you had no
19   involvement whatsoever with any aspect of
20   opioid suspicious order monitoring at
21   Walgreens?
22             MR. HILL:  Object to the form.
23             THE WITNESS:  I can't remember.
24   QUESTIONS BY MR. SHKOLNIK:
25        Q.    Is it possible it may have been

Page 21

1    a day or two before December?  Is that the
2    issue?
3         A.    Yeah, there could have been --
4    the timing.
5         Q.    Okay.  When you started with
6    suspicious order monitoring -- withdraw that.
7              When you started with the
8    integrity group, did you -- did you sit down
9    with Ms. Polster and say, "Why are we doing
10   this now?  Why are we starting this process
11   now?"
12        A.    No, that conversation never
13   happened.
14        Q.    Did you have an understanding
15   as to why it was starting then versus years
16   before?
17        A.    Yes.
18             MR. HILL:  Object to the form.
19   QUESTIONS BY MR. SHKOLNIK:
20        Q.    What was your understanding?
21   Could you tell the Court and jury?
22        A.    Due to the investigation the
23   DEA had performed at our Jupiter DC and the
24   seizure of licensure at six of our locations
25   in Florida, our team was created to ever

6 (Pages 18 to 21)

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    prevent anything like this from happening
2    again.
3        Q.    Okay.  And was there also an
4    investigation on the facility in Ohio at the
5    same time but they hadn't seized it?
6            MR. HILL:  Object to the form.
7    Foundation.
8            THE WITNESS:  I don't know.
9    QUESTIONS BY MR. SHKOLNIK:
10       Q.    And when you first got together
11   with Ms. Polster, did you ask her, "What did
12   we do at Walgreens before 2000 --
13   December 2012 in terms of suspicious order
14   monitoring since we're now going to implement
15   the program for going forward?"
16       A.    I can't remember if I ever had
17   that conversation.
18       Q.    Well, did you ever undertake
19   any investigation on your own to say, "What
20   were we doing to monitor suspicious orders in
21   our company before I got charged with that
22   job?"
23           MR. HILL:  Object to the form.
24           THE WITNESS:  No.
25

Page 23

1    QUESTIONS BY MR. SHKOLNIK:
2        Q.    Was it your understanding that
3    there were some failures on the part of
4    Walgreens in terms of suspicious order
5    monitoring for opioids prior to 2012?
6        A.    Yes, that is my understanding.
7        Q.    And I take it you took it very
8    seriously, when you were assigned to this new
9    team, to make sure those type of failures
10   didn't happen again, correct?
11       A.    Correct.
12       Q.    And that was the goal of the
13   integrity team:  Let's put something in place
14   that's not going to let these prior failures
15   happen again.
16           MR. HILL:  Object to the form.
17           THE WITNESS:  Correct.
18   QUESTIONS BY MR. SHKOLNIK:
19       Q.    And would it be fair to say
20   that from that point on, when you got
21   involved, you have done your best to make
22   sure that Walgreens adheres to the -- the
23   letter of the law in terms of suspicious
24   order monitoring as best as you could?
25           MR. HILL:  Object to the form.

Page 24

1    Foundation.
2            THE WITNESS:  Yes.
3    QUESTIONS BY MR. SHKOLNIK:
4        Q.    I mean, that's your
5    responsibilities for the company, to do that
6    as best as you can, correct?
7            MR. HILL:  Same objections.
8            THE WITNESS:  Yes.
9    QUESTIONS BY MR. SHKOLNIK:
10       Q.    And your team of two people
11   grew after December of 2012, correct?
12       A.    Yes.
13       Q.    Now, over the period of time
14   after 2012, did you continue to have some
15   further understanding that the epidemic in
16   the United States, the opioid epidemic, was
17   growing -- a growing problem?
18           MR. HILL:  Object to the form.
19           THE WITNESS:  Just from what
20   I've noticed in the news.
21   QUESTIONS BY MR. SHKOLNIK:
22       Q.    Did you notice that any
23   other -- that any companies were implicated
24   or in some way referenced as being part of
25   the cause of the epidemic?

Page 25

1            MR. HILL:  Same objection.
2            THE WITNESS:  Just what I've
3    noticed in the news and in reading.
4    QUESTIONS BY MR. SHKOLNIK:
5        Q.    I understand.
6            So tell me some of the
7    companies that you came to understand were
8    sort of implicated in this opioid epidemic
9    developing.
10           MR. HILL:  Object to the form
11   and calls for speculation.
12           THE WITNESS:  Nothing really
13   stands out at the moment.  That was
14   several years ago.  I can't recall.
15   QUESTIONS BY MR. SHKOLNIK:
16       Q.    How about Purdue Pharma?  Does
17   that name ring any bells that may have been a
18   factor in developing the epidemic, the opioid
19   epidemic?
20           MR. HILL:  Same objections.
21           THE WITNESS:  I know that they
22   manufacture OxyContin.  That's a very
23   potent opioid.
24   QUESTIONS BY MR. SHKOLNIK:
25       Q.    You've also come to know that

7 (Pages 22 to 25)

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    that was also an opioid that has been linked
2    to abuse, correct?
3        MR. HILL:  Same objection.
4        THE WITNESS:  Yes, these
5    medications can be abused.
6    QUESTIONS BY MR. SHKOLNIK:
7        Q.    But specifically the OxyContin
8    from Purdue, that was one that's been
9    implicated as being connected with abuse and
10   the opioid epidemic, correct?
11       MR. HILL:  Object to the form.
12   Calls for speculation.
13       THE WITNESS:  I've heard their
14   name referenced in news articles, yes.
15   QUESTIONS BY MR. SHKOLNIK:
16       Q.    How about Mallinckrodt; do you
17   know that company?
18       A.    Yes.
19       Q.    And do you know they make
20   generic versions and brand versions of
21   opioids?
22       A.    Yes.
23       Q.    And do you know that that
24   company has been implicated in terms of the
25   opioid epidemic as one of the companies

Page 27

1    involved in the cause?
2        MR. HILL:  Object to the form.
3    Calls for speculation.
4        THE WITNESS:  I can't recall if
5    I ever read any specific articles
6    about Mallinckrodt.
7    QUESTIONS BY MR. SHKOLNIK:
8        Q.    Any other companies while we're
9    sitting here that may ring -- you know, now
10   that we've been talking about it that may
11   have been implicated in the opioid epidemic?
12       A.    Maybe Watson.  That's the only
13   one I can -- kind of comes to my mind.
14       Q.    How about McKesson, the
15   distributor?
16       MR. HILL:  Same objections.
17   QUESTIONS BY MR. SHKOLNIK:
18       Q.    Did that ever come up in terms
19   of your knowledge of companies being somehow
20   connected to failures and suspicious order
21   monitoring as it related to the opioid
22   epidemic?
23       A.    I don't recall reading about
24   McKesson.
25       Q.    Okay.  Now, in terms of

Page 28

1    suspicious order monitoring and the
2    prescription integrity responsibility, do you
3    have an understanding on -- as to why you
4    have to monitor the opioid distribution in
5    that department?
6        MR. HILL:  Object to the form.
7    QUESTIONS BY MR. SHKOLNIK:
8        Q.    What's your understanding of
9    your job?
10       MR. HILL:  Objection.
11   Compound.
12       MR. SHKOLNIK:  I'll rephrase
13   the question.
14   QUESTIONS BY MR. SHKOLNIK:
15       Q.    What's your understanding of
16   your job in the prescription integrity group
17   in terms of suspicious order monitoring and
18   why you do it?
19       MR. HILL:  Same objection.
20       THE WITNESS:  My position in
21   the team is to ensure that we impose
22   specific limits on specific drugs to
23   ensure that there isn't a -- that no
24   one -- one store is getting an
25   overload of medication.

Page 29

1        So we put limits and processes
2    in place to ensure that if -- stores
3    don't get too much product.
4    QUESTIONS BY MR. SHKOLNIK:
5        Q.    Why wouldn't you want a store
6    to get too much product?  Wouldn't it be a
7    good thing from a corporate perspective to
8    make sure there's plenty of product on hand?
9        MR. HILL:  Object to the form.
10   Foundation.
11       THE WITNESS:  I don't know.
12   QUESTIONS BY MR. SHKOLNIK:
13       Q.    Is it possible that if a store
14   has too much product on hand, it may result
15   in diversion of the drug into inappropriate
16   streams?
17       MR. HILL:  Object to the form.
18   Foundation.
19       THE WITNESS:  I don't know.
20   QUESTIONS BY MR. SHKOLNIK:
21       Q.    So as part of the training for
22   the prescription integrity group, no one ever
23   sat down and said, "We're doing this for some
24   specific reason, our job is for a reason,
25   other than to make sure drugstores don't have

8 (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    too many pills on hand."
2         Other than that, did anyone
3    tell you anything else?
4              MR. HILL:  Object to the form.
5              THE WITNESS:  We were told
6       that, you know, we need to make sure
7       that the medication is being dispensed
8       to the legitimate patients, and the
9       stores that have the legitimate
10      patients are getting the legitimate
11      product.
12   QUESTIONS BY MR. SHKOLNIK:
13        Q.    And one of the problems is if
14   there's too many pills at a store or a store
15   is getting too much, there's a possibility
16   the pills may end up in the hands of
17   inappropriate users; is that a fair
18   statement?
19             MR. HILL:  Object to the form.
20      Speculation.
21             THE WITNESS:  No.
22   QUESTIONS BY MR. SHKOLNIK:
23        Q.    So, really, it doesn't make a
24   difference if too many pills were sitting in
25   the pharmacy; is that a fair statement?

Page 31

1              MR. HILL:  Object to the form.
2              THE WITNESS:  No.
3    QUESTIONS BY MR. SHKOLNIK:
4         Q.    If a pharmacy is -- I mean,
5    there has to be a reason why you want to
6    control how many pills end up in each one of
7    your pharmacies, other than for inventory
8    management; am I correct?
9         A.    Yes.
10        Q.    I mean, your job isn't designed
11   to say, "We don't want too many pills in
12   store X in Cleveland because they just happen
13   to have too many for an inventory purpose."
14        That's not your job, to monitor
15   that, correct?
16             MR. HILL:  Object to the form.
17             THE WITNESS:  No, that's not my
18      job.
19   QUESTIONS BY MR. SHKOLNIK:
20        Q.    Your job is to make sure that
21   pharmacy in Cleveland doesn't have too many
22   pills on hand and those pills don't get into
23   the wrong hands from the pharmacy; fair
24   statement?
25             MR. HILL:  Object to the form.

Page 32

1              THE WITNESS:  My role is to
2       make sure that the legitimate patients
3       receive the medication for their
4       legitimate medical needs.
5    QUESTIONS BY MR. SHKOLNIK:
6         Q.    And the converse of that is,
7    your job's responsibility is to make sure the
8    illegitimate users don't get those pills
9    through your pharmacies, correct?
10             MR. HILL:  Same objection.
11             THE WITNESS:  Correct.
12   QUESTIONS BY MR. SHKOLNIK:
13        Q.    And one of the ways of doing
14   that is to closely monitor how many pills are
15   being distributed out of a distribution
16   center to an individual pharmacy and whether
17   or not that pharmacy is following proper
18   procedures in terms of dispensing those
19   drugs; fair statement?
20        A.    Yes.
21        Q.    And that's part of your
22   responsibility in pharmacy integrity?
23        A.    Yes.
24        Q.    And there's another group that
25   you work kind of hand-in-hand with that's --

Page 33

1    would that be the pharmacy -- is it a
2    management group?  There's a group that
3    actually gets the pills distributed to the
4    stores?
5         A.    We work closely with the
6    pharmacy inventory management group.
7         Q.    Inventory management, I'm
8    sorry.
9         A.    Okay.
10        Q.    And would it be fair to say the
11   pharmacy inventory management group, their
12   goal is to get the pills into the stores to
13   make sure the stores are properly stocked at
14   all times, correct?
15             MR. HILL:  Object to the form.
16      Foundation.
17             THE WITNESS:  Their goal is to
18      ensure that the logic is in place for
19      reordering and making sure that
20      inventory replenishment is successful.
21   QUESTIONS BY MR. SHKOLNIK:
22        Q.    And the pharmacy may say, "We
23   need pills," they go up through pharmacy
24   inventory management, but then your
25   department actually looks at that request and

9 (Pages 30 to 33)

Highly Confidential - Subject to Further Confidentiality Review

Page 34   REDACTED

```
 1    determine whether or not inventory management
 2    should actually fulfill that order and send
 3    the pills to that pharmacy, correct?
 4        A.   No.
 5        Q.   So tell me where you come in in
 6    that process.
 7            MR. HILL:  Object to the form.
 8            THE WITNESS:  So if a store is
 9        looking to receive some additional
10        product, they would contact our team.
11        Pharmacy inventory does not involve --
12        there's no involvement there.
13    QUESTIONS BY MR. SHKOLNIK:
14        Q.   So it goes to your team first
15    and then --
16        A.   We make the determination if
17    the product is warranted and should be
18    fulfilled.
19        Q.   Now, before your group got
20    established in 2012, who did that project?
21        A.   Pharmacy inventory management
22    team.
23        Q.   So the request would go
24    straight to inventory management, and they
25    would make the decision whether to ship it
```

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**          **REDACTED**

Page 161

1      simply what we called it.
2    QUESTIONS BY MR. SHKOLNIK:
3        Q.    I mean, they could have called
4    it a "didn't receive form," you know,
5    "investigation of missing order form."  A lot
6    of other things they could have called it
7    other than an override form, correct?
8        A.    Possibly.
9        Q.    I mean, this is basically
10   telling the pharmacist, oops, I hit your
11   limit, now submit a form asking for us to
12   override it.
13       MR. HILL: Objection.  Asked
14       and answered three times now.
15   QUESTIONS BY MR. SHKOLNIK:
16       Q.    Yeah, it's not telling them
17   it's lost, it's understocked, it's a new
18   drug.  It's telling you, fill out an override
19   form to get my pills, correct?
20       MR. HILL:  Object to the form.
21       THE WITNESS:  We simply call it
22       the override form, but the override
23       form can mean many different things.
24       There's no definition that says,
25       "you've hit your limit, fill out this

41 (Pages 158 to 161)

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1     override form."
2     QUESTIONS BY MR. SHKOLNIK:
3         Q.    Well, let's read what it says.
4     "The online form is for pharmacies that
5     required large quantities of orders for any
6     controlled substance C-II to C-V."
7             Then it goes on and tells us
8     what the process is.  "The RX inventory
9     receives the override form from RXS."
10            Who's RXS?
11        A.    At that time RXS was a pharmacy
12    supervisor, so the store's direct supervisor.
13        Q.    "RX inventory reviews the
14    request based on the reason stated and
15    approves or denies the request."
16            There's no reference in here
17    whatsoever that the override form is utilized
18    for anything other than seeking large
19    quantities of controlled pills, substance
20    pills or drugs, correct?
21            MR. HILL:  Object to the form.
22            THE WITNESS:  There is no
23        indication that it's only used for
24        large quantity orders.

Page 163

1     QUESTIONS BY MR. SHKOLNIK:
2         Q.    Well, let's go down to the
3     fourth bullet point.  "Denied orders are sent
4     back to RXS requesting more specific
5     information that may include GFD."
6             Good faith dispensing?
7         A.    Correct.
8         Q.    Does that have anything to do
9     with not enough inventory in the warehouses
10    or a computer glitch or anything like that?
11            MR. HILL:  Object to the form.
12        You're mixing two concepts together.
13            MR. SHKOLNIK:  No, I'm not, and
14        please do not do that.  It has been a
15        number of these speaking objections,
16        which are frowned upon.  In fact,
17        Judge Polster was discussing it the
18        other day, and I'd ask you not to do
19        that.
20    QUESTIONS BY MR. SHKOLNIK:
21        Q.    So let me go back to my
22    question.
23            Denied orders are sent back to
24    RXS.  And it talks about GFD.  GFD has
25    nothing to do with computer malfunction, the

Page 164

1     warehouse being empty or any of those
2     alternative items.
3             That deals with whether or not
4     it's a suspicious order and you hit your max,
5     correct?
6         A.    No.
7         Q.    Okay.  What does it have to do
8     with?
9         A.    There were reasons why we may
10    deny a request.  So, for instance, an item is
11    on backorder or an item -- they had a
12    computer glitch or whatever the issue is.  If
13    the quantity that we are receiving from the
14    override request seems large or inappropriate
15    for whatever reasons, we may deny those
16    requests and then ask for specific
17    information around good faith dispensing.
18        Q.    So if it's a computer glitch,
19    you're going to ask about good faith
20    dispensing?
21        A.    Possibly.
22        Q.    Why?
23        A.    Why not?  It's our duty to
24    perform our due diligence, right?  So if
25    there's some reason why that quantity doesn't

Page 165

1     make sense, we may flag -- we may push back
2     and ask for more information.
3         Q.    So if it's a computer glitch,
4     that means the quantity doesn't make sense?
5             MR. HILL:  Object to the form.
6             THE WITNESS:  We're speaking of
7         the quantity on the override form.
8         I'm not talking about a computer
9         glitch.  I'm talking about the
10        quantity on the override form.
11    QUESTIONS BY MR. SHKOLNIK:
12        Q.    I'm still trying to get to the
13    bottom of why you're calling it an override
14    form if it's for a computer glitch or an
15    empty warehouse, and you're not calling it
16    something else.
17            MR. HILL:  Object to the form.
18    QUESTIONS BY MR. SHKOLNIK:
19        Q.    Sir, the form that is submitted
20    when someone hits their threshold and still
21    wants to get the drugs delivered to the
22    pharmacy is an override form, correct?
23        A.    An override form is what we
24    call it.  It can be used for multiple
25    reasons.

42 (Pages 162 to 165)

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1    Q.    I'm sure it could.
2         But when they hit their max and
3    they still want the drugs, they have to fill
4    an override form?
5    A.    They may not be at their max.
6    There might be a reason why an override form
7    is required that doesn't require them to be
8    at their max.
9    Q.    Then the next bullet point,
10   "Once RXS has provided a detailed
11   explanation" -- so that's the supervisor for
12   the pharmacy -- "then RX inventory approves
13   the order."
14        So at this point, from
15   June 2012 up until October, it's basically
16   the inventory department that decides whether
17   or not to ship or not --
18        MR. HILL:  Object to the form.
19   QUESTIONS BY MR. SHKOLNIK:
20   Q.    -- correct?
21   A.    At this moment in time, we did
22   not have the creation of pharmaceutical
23   integrity, so it fell on the hands of the
24   most appropriate group.
25   Q.    And at that point in time,

Page 167

1    pharmacists were receiving bonuses based on
2    how many pills they were selling --
3         MR. HILL:  Object to the form.
4    QUESTIONS BY MR. SHKOLNIK:
5    Q.    -- correct?
6         MR. HILL:  Sorry.  Object to
7    the form and foundation.
8         THE WITNESS:  I don't know.
9    QUESTIONS BY MR. SHKOLNIK:
10   Q.    Let's go back to Exhibit 6.
11   Exhibit 6, page 12 of 343, paragraph
12   number 6.  "Beginning in 2014, Walgreens will
13   exclude any accounting for controlled
14   substance prescriptions dispensed by a
15   particular pharmacy from bonus computations
16   for pharmacists and pharmacy technicians at
17   the pharmacy."
18        So if my math is correct,
19   June 2012 was before 2014, and at that point
20   in time they were still calculating pharmacy
21   bonuses based on -- bonus computations on
22   accounting for controlled substance
23   prescriptions being dispensed; fair
24   statement?
25        MR. HILL:  Object to the form.

Page 168

1    Foundation.
2         THE WITNESS:  I don't know.
3    QUESTIONS BY MR. SHKOLNIK:
4    Q.    That's what it says there,
5    doesn't it?
6    A.    I see the words, but I don't
7    know anything about that.
8    Q.    I mean, we can only assume that
9    when they signed this $80 million deal, they
10   were under -- they were stating accurately
11   that their pharmacists were getting a bonus
12   based upon how many controlled substance
13   prescriptions they dispensed, correct?
14        MR. HILL:  Object to the form.
15   Foundation.
16        THE WITNESS:  I don't know.
17   QUESTIONS BY MR. SHKOLNIK:
18   Q.    If we can go back to Exhibit 7,
19   please.
20        So we have the inventory
21   department approving the suspicious order
22   overrides for the pharmacists at the store
23   level who are getting bonuses based on how
24   many pills they sold up to June of 2012 -- up
25   through June 2012, correct?

Page 169

1         MR. HILL:  Same objections.
2         THE WITNESS:  I don't know
3    that.
4    QUESTIONS BY MR. SHKOLNIK:
5    Q.    It's a good inference, is it
6    not?
7         MR. HILL:  Same thing.
8         THE WITNESS:  I don't know.
9    QUESTIONS BY MR. SHKOLNIK:
10   Q.    If the company still had a
11   bonus program in place where the pharmacist
12   got a bonus on how many Schedule II through V
13   controlled substance prescriptions they
14   dispensed, based on what we're reading here
15   as the policy for SOM in the overrides, it
16   was inventory department that was approving
17   the pharmacists' bonuses when they approved
18   the overrides, correct?
19        MR. HILL:  Same objections.
20   Compound.
21        THE WITNESS:  I don't know that
22   to be accurate.
23   QUESTIONS BY MR. SHKOLNIK:
24   Q.    Sir, it's exactly what it says
25   on the document.  In order to get it

43 (Pages 166 to 169)

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1    approved, someone in charge of inventory, the
2    sales inventory of the company, was approving
3    the bonuses for the sale of controlled
4    substance pills at the pharmacy level; fair
5    statement?
6             MR. HILL:  Same objections, and
7        asked and answered.
8             THE WITNESS:  I don't know.
9    QUESTIONS BY MR. SHKOLNIK:
10       Q.   Do you think it's right for a
11   pharmacist to get a bonus based on how many
12   opioid pills they distribute?
13            MR. HILL:  Object to the form.
14            THE WITNESS:  I don't know.
15   QUESTIONS BY MR. SHKOLNIK:
16       Q.   And you wouldn't like -- you
17   don't approve of that yourself, do you?
18            MR. HILL:  Same objections.
19   QUESTIONS BY MR. SHKOLNIK:
20       Q.   Forget about Walgreens.
21   Yourself.
22            Do you approve of the fact that
23   a pharmacist would get a bonus on how many
24   opioid pills they sell?
25            MR. HILL:  Same objections.

Page 171

1             THE WITNESS:  I don't know.
2    QUESTIONS BY MR. SHKOLNIK:
3        Q.   We know there was an opioid
4    epidemic at least in 2012, according to your
5    testimony, correct?
6             MR. HILL:  Object to the form.
7             THE WITNESS:  I was aware of an
8        opioid epidemic.
9    QUESTIONS BY MR. SHKOLNIK:
10       Q.   At that time?
11       A.   At that time.
12       Q.   And do you think getting a
13   bonus on how many pills you could sell --
14   when I say "pills," opioids.  Do you think
15   the incentive of getting a bonus for how many
16   pills you sell may play a role in whether or
17   not you dispense the drug and try to get
18   overrides to get more of the drug to sell?
19            MR. HILL:  Object to the form.
20       Foundation.  Asked and answered.
21            THE WITNESS:  I don't know.
22   QUESTIONS BY MR. SHKOLNIK:
23       Q.   Human nature, isn't it?  You
24   sell more pills, you make more money.
25   Wouldn't that be an incentive to many people?

Page 172

1             MR. HILL:  Same objections.
2             THE WITNESS:  I don't know.
3    QUESTIONS BY MR. SHKOLNIK:
4        Q.   Let's go down to the next
5    section on Exhibit 7.
6             Do you think it's a good idea
7    to pay a bonus to a pharmacist to sell
8    prescription opioids?
9             MR. HILL:  Same objections.
10            THE WITNESS:  I don't know.
11   QUESTIONS BY MR. SHKOLNIK:
12       Q.   I mean, we're not talking
13   Pampers.  We're not talking household
14   products.  We're talking addictive opioid
15   pills.
16            Do you think it's appropriate
17   for a company to be paying the pharmacist a
18   bonus for that by the pill?
19            MR. HILL:  Asked and answered
20       many times.
21            MR. SHKOLNIK:  And it will be
22       asked again.
23            THE WITNESS:  I don't know.
24   QUESTIONS BY MR. SHKOLNIK:
25       Q.   Let's go to history of SOM

Page 173

1    daily reporting.
2             "Beginning October 2012,
3    Cardinal Health has been providing a daily
4    list of pharmacy orders that have triggered a
5    SOM event from the previous order day.  The
6    SOM report is reviewed by RX inventory to
7    identify any red-flagged Florida pharmacies
8    blocked from ordering controlled substances.
9    Also identified are any large orders that the
10   system generated or manually keyed by the
11   pharmacy that are not red-flag locations."
12            First of all, do you know what
13   a red flag means?
14       A.   Red flag can mean anything.
15       Q.   What did it mean in the sense
16   of SOM daily reporting when you took over
17   integrity in December of 2012?
18       A.   A red flag could be an order
19   that was of interest.
20       Q.   Did you ever have any dealings
21   with Cardinal over their SOM policy and the
22   reporting to your company?
23       A.   Can you rephrase that question?
24       Q.   Yeah.
25            Did you ever have any

44 (Pages 170 to 173)

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1   interaction with Cardinal Health in 2012 when
2   you took over -- when you and Tasha took over
3   pharmacy integrity about what their process
4   was when they were receiving orders from your
5   stores?
6       A.    I don't know any -- I don't
7   have any information on what Cardinal was
8   doing.
9       Q.    Was Cardinal a distributor that
10  was being utilized by the stores at that
11  time?
12      A.    Yes, one of many.
13      Q.    If Cardinal was the
14  distributor, was the order going through
15  inventory -- inventory management?
16          MR. HILL:  Object to the form.
17  Foundation.
18  QUESTIONS BY MR. SHKOLNIK:
19      Q.    In that time?
20      A.    What time?  I'm sorry.
21      Q.    In the 2012 time frame before
22  you took over.
23          MR. HILL:  Same objections.
24          THE WITNESS:  Were orders being
25      transmitted to Cardinal; is that what

Page 175

1       you're asking?
2   QUESTIONS BY MR. SHKOLNIK:
3       Q.    No.  No.
4           If a store needed -- needed
5   more opioids and they were utilizing Cardinal
6   Health as a distributor, would the order go
7   through pharmacy management, or would it go
8   directly from store to Cardinal back then?
9           MR. HILL:  Same objections.
10          THE WITNESS:  I can't recall.
11  QUESTIONS BY MR. SHKOLNIK:
12      Q.    Were stores receiving
13  distribution from Cardinal and Walgreens
14  during the 2012 time frame?
15      A.    I can't recall.
16      Q.    Could a store get multiple --
17  withdraw that.
18          Could stores have multiple
19  sources for opioids when you took over the
20  program?
21          MR. HILL:  Object to the form.
22          THE WITNESS:  I can't recall.
23  QUESTIONS BY MR. SHKOLNIK:
24      Q.    Are there any documents
25  anywhere that would help -- that you think

Page 176

1   would refresh your recollection as to what
2   was done when you took over?
3           I mean, it seems like you don't
4   recall a lot of this stuff.  I'm just trying
5   to figure out what I should be looking at.
6           MR. HILL:  Object to the form.
7           MR. SHKOLNIK:  I'll rephrase
8       it.
9   QUESTIONS BY MR. SHKOLNIK:
10      Q.    Let's continue looking at this
11  document.
12          It says, "Cardinal Health is
13  providing daily lists of pharmacy orders that
14  have triggered SOM event from the previous
15  order day."
16          Would that be maybe something
17  that refreshes your recollection that
18  Cardinal Health was actually distributing to
19  your pharmacies beginning in October 2012?
20          MR. HILL:  Object to the form.
21          THE WITNESS:  They may have
22      been dispense -- or distributing, but
23      they -- I can't speculate on the drugs
24      that were flagged.
25

Page 177

1   QUESTIONS BY MR. SHKOLNIK:
2       Q.    Oh, so this is possibly not
3   related to opioids; is that the issue?
4       A.    Yes.
5       Q.    Well, it goes on to show --
6   say -- I'm sorry, it goes on to say, "Also
7   identified are any large orders that the
8   system generated, SIMS, or manually keyed by
9   the pharmacy that are not red-flag
10  locations."
11          Were you aware of red-flag
12  locations in Florida or around the country
13  when you took over?
14      A.    Only the locations that were a
15  part of the seizure of the licensure in
16  Florida.
17      Q.    "SOM daily report is filtered
18  to identify red-flag Florida stores.  These
19  orders are reviewed by RX inventory to
20  determine how they were generated."
21          Would that be an indication
22  that these stores may have been requesting
23  fills or orders directly from Cardinal and
24  not going through inventory management?
25          MR. HILL:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1      THE WITNESS:  I want to make
2  sure I understand your question.
3  QUESTIONS BY MR. SHKOLNIK:
4      Q.    Yeah.
5      A.    The orders that were
6  identified?
7      Q.    Yeah.
8      A.    Were they placed directly to
9  Cardinal or placed through our system?
10      Q.    Well, it says here they have to
11  do an investigation to see whether or not
12  the -- whether RX inventory -- you know, how
13  it was even generated, the request.
14      Is there a possibility that
15  back at that time when you took over these
16  pharmacies, the store level, were able to
17  just go straight to Cardinal and order these
18  opioids without going through inventory
19  management so no one in the company knew what
20  they were getting?
21      MR. HILL:  Object to the form.
22  Foundation.
23      THE WITNESS:  That's not how
24  the system -- ordering system works.
25      The ordering system, you can't

Page 179

1  order Control IIs or opioids through
2  Cardinal directly.
3  QUESTIONS BY MR. SHKOLNIK:
4      Q.    Was that after you took over or
5  previously --
6      A.    Previously.
7      Q.    -- before that?
8      A.    Previously.
9      Q.    So any order to Cardinal would
10  have gone through inventory management?
11      MR. HILL:  Object to the form
12  and foundation.
13      THE WITNESS:  It would have
14  gone through the ordering system.  May
15  not necessarily need to go to RX
16  inventory for review.
17  QUESTIONS BY MR. SHKOLNIK:
18      Q.    So it would go to the ordering
19  system, but from the ordering system they may
20  click on Cardinal and send the order directly
21  to Cardinal?
22      MR. HILL:  Object to the form
23  and foundation.
24      THE WITNESS:  No, it doesn't
25  work that way.

Page 180

1  QUESTIONS BY MR. SHKOLNIK:
2      Q.    How does it work?
3      MR. HILL:  Same objection on
4  foundation.
5      THE WITNESS:  The store would
6  place the order within the ordering
7  system, SIMS, S-I-M-S, SIMS.  That
8  order is then forwarded to their
9  servicing DC, who completes the
10  required 222 form.  That 222 form is
11  then mailed to the vendor, in this
12  case Cardinal.  Cardinal would receive
13  that 222 form, fill the order and then
14  ship the order.
15  QUESTIONS BY MR. SHKOLNIK:
16      Q.    And you say the DC.  Is that
17  where -- the processing center?
18      A.    Distribution center.
19      Q.    Oh, distribution center, I'm
20  sorry.
21      So it would -- the request
22  would always go through a Walgreens
23  distribution center?
24      MR. HILL:  Object to the
25  foundation.

Page 181

1  QUESTIONS BY MR. SHKOLNIK:
2      Q.    Not that it'll be filled
3  through the distribution center.
4      A.    Yes.  Yes.  Because they are
5  the POA for all of our stores.
6      Q.    POA?
7      A.    Power of attorney.
8      Q.    And as you understand it,
9  there's no way that the pharmacy can go
10  directly to either an Anda or an ABC or a
11  Cardinal to fill an order for opioids absent
12  going directly through the SIM process into
13  Walgreens corporate?
14      MR. HILL:  Object to the form.
15      THE WITNESS:  They cannot.
16  QUESTIONS BY MR. SHKOLNIK:
17      Q.    Or they should not, correct?
18      A.    They cannot.
19      Q.    They cannot?
20      A.    Cannot.  They need a 222 form.
21  Stores do not have 222 forms.
22      Q.    And what is a 222 form, if you
23  could explain that?
24      A.    It is a DEA form that is issued
25  to be able to transfer Control II, such as

46 (Pages 178 to 181)

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



57 (Pages 222 to 225)

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Page 362  **REDACTED**

3
4        marked for identification.)
5    QUESTIONS BY MR. SHKOLNIK:
6        Q.    Mr. Mills, we're handing you
7    what has just been marked as Exhibit 23.
8    It's an e-mail from May of 2013, and at the
9    bottom there's an e-mail from Emily House.

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Golkow Litigation Services - 877.370.DEPS