1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION

3    IN RE:  NATIONAL       :  MDL No. 2804
     PRESCRIPTION OPIATE    :
4    LITIGATION             :  Case No. 17-md-2804
                            :
5    APPLIES TO ALL CASES   :  Hon. Dan A. Polster
                            :
6                           :

7

8               HIGHLY CONFIDENTIAL

9       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                   - - - -

12              DECEMBER 20, 2018

13                   - - - -

14   VIDEOTAPED DEPOSITION OF JOSEPH EDWARD MILLWARD,

15   taken pursuant to notice, was held at Marcus &

16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17   Pennsylvania 15219, by and before Ann Medis,

18   Registered Professional Reporter and Notary Public in

19   and for the Commonwealth of Pennsylvania, on

20   Thursday, December 20, 2018, commencing at 9:07 a.m.

21                   - - - -

22          GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
23                deps@golkow.com

24

25

2

```
 1                    A P P E A R A N C E S

 2    On behalf of Plaintiffs

 3            WAGSTAFF & CARTMELL, LLP
              BY:  TYLER W. HUDSON, ESQUIRE
 4                 ERIC D. BARTON, ESQUIRE
              4740 Grand Avenue, Suite 300
 5            Kansas City, Missouri  64112
              816.701.1100
 6            thudson@wcllp.com
              ebarton@wcllp.com
 7

 8    On behalf of Defendant AmerisourceBergen Drug
      Corporation
 9
              REED SMITH, LLP
10            BY:  LOUIS W. SCHACK, ESQUIRE
              Three Logan Square
11            1717 Arch Street, Suite 3100
              Philadelphia, Pennsylvania  19103
12            215.851.8280
              lschack@reedsmith.com
13

14    On behalf of Defendant Cardinal Health, Inc.

15            PIETRAGALLO GORDON ALFANO BOSICK &
              RASPANTI, LLP
16            BY:  JOHN A. SCHWAB, ESQUIRE
                   ADAM J. TRAGONE, ESQUIRE
17            One Oxford Centre, 38th Floor
              301 Grant Street
18            Pittsburgh, Pennsylvania  15219
              412.263.2000
19            jas@pietragallo.com
              ajt@piegragallo.com
20

21    On behalf of Defendants Endo Pharmaceuticals, Endo
      Health Solutions and Par Pharmaceuticals
22            (By phone/Livestream)
              ARNOLD & PORTER KAYE SCHOLER LLP
23            BY:  ERIC SHAPLAND, ESQUIRE
              777 South Figueroa Street
24            Los Angeles, California  90017-5844
              213.242.4000
25            eshapland@arnoldporter.com
```

3

1            A P P E A R A N C E S   (Continued)

2    On behalf of Defendant HBC Service Company

3            MARCUS & SHAPIRA, LLP
             BY:  JOSHUA KOBRIN, ESQUIRE
4                ROBERT BARNES, ESQUIRE
             One Oxford Centre, 35th Floor
5            Pittsburgh, Pennsylvania  15219
             412.471.3490
6            jkobrin@marcus-shapira.com
             rbarnes@marcus-shapira.com

7

8    On behalf of Defendant McKesson Corporation

9            COVINGTON & BURLING, LLP
             BY:  AMBER CHARLES, ESQUIRE
10           One CityCenter
             850 Tenth Street, NW
11           Washington, DC  20001-4956
             202.662.5807
12           acharles@cov.com

13

     On behalf of Defendant Walmart

14
             (By phone/Livestream)
15           JONES DAY
             BY:  PATRICIA OCHMAN, ESQUIRE
16           North Point
             901 Lakeside Avenue
17           Cleveland, Ohio  44114-1190
             216.586.3939
18           pochman@jonesday.com

19

     Also present

20
             Chris Ratano, videographer
21

22

23

24

25

4

1                           * I N D E X *

2    JOSEPH E. MILLWARD                              PAGE

3      EXAMINATION BY MR. HUDSON            9, 269, 276
       EXAMINATION BY MR. KOBRIN              257, 275
4

5          * INDEX OF HBC-MILLWARD EXHIBITS *

6    NO.                  DESCRIPTION              PAGE
     Exhibit 1   Giant Eagle Retail Operations -     45
7                Pharmacy Operations 11/13/14
                 org chart
8                HBC_MDL00002216

9    Exhibit 2   CFR Part 1301.74 from DEA website    72
                 P1.47 - P1.47.2
10

     Exhibit 3   DEA Dear Registrant 6/12/12,        107
11               12/27/07, 2/7/07, 9/27/06 letters
                 ABDCMDL00269683 - 00269694
12

     Exhibit 4   HBC Service Company's Responses to  127
13               Plaintiffs' (First) Set of Combined
                 Discovery Requests
14               P-HBC-0011 - 0011.20

15   Exhibit 5   Giant Eagle Inventory Control -     127
                 Suspicious Order Policies with
16               various effective dates
                 HBC_MDL00078638 - 00078639
17               HBC_MDL00078636 - 00078637
                 HBC_MDL00045916 - 00078918
18               HBC_MDL00051908
                 HBC_MDL00043414
19               HBC_MDL00010092 - 00010093

20   Exhibit 6   DEA Hydrocodone Drug Fact Sheet     153
                 P-GEN-0086 - 0086.2
21

     Exhibit 7   2006 - 2014 cumulative totals of    157
22               hydrocodone dosage units shipped
                 to Cuyahoga and Summit Counties, Ohio
23               P-HBC-0017

24   Exhibit 8   Data of shipments from HBC into     157
                 retail pharmacies in Summit County
25               HBC_MDL00002099

5

1     * INDEX OF HBC-MILLWARD EXHIBITS (Continued) *

2   NO.                    DESCRIPTION                    PAGE

    Exhibit 9    Data of shipments from HBC into        157
3                retail pharmacies in Cuyahoga County
                 HBC-MDL00002100

4

    Exhibit 10   20131030_Daily_HBC_Controls            177
5                HBC_MDL00002348

6   Exhibit 11   20131129_Daily_HBC_Controls            177
                 HBC_MDL00002646

7

    Exhibit 12   20131229_Daily_HBC_Controls            177
8                HBC_MDL00002246

9   Exhibit 13   20140130_Daily_HBC_Controls            177
                 HBC_MDL00002459

10

    Exhibit 14   20140227_Daily_HBC_Controls            177
11               HBC_MDL00002837

12  Exhibit 15   20140330_Daily_HBC_Controls            177
                 HBC_MDL00002336

13

    Exhibit 16   20140429_Daily_HBC_Controls            177
14               HBC_MDL00002627

15  Exhibit 17   20140530_Daily_HBC_Controls            177
                 HBC_MDL00002244

16

    Exhibit 18   20140629_Daily_HBC_Controls            177
17               HBC_MDL00002437

18  Exhibit 19   20140730_Daily_HBC_Controls            177
                 HBC_MDL00002843

19

    Exhibit 20   20140828_Daily_HBC_Controls            177
20               HBC_MDL00002332

21  Exhibit 21   20140929_Daily_HBC_Controls            177
                 HBC_MDL00002700

22

    Exhibit 22   Email chain, 11/25/13, from T.         181
23               Roahrig to J. Millward, subject: FW:
                 Daily HBC Suspicious Purchasing
24               Report
                 HBC_MDL00094599 - 00094600

25

6

1    * INDEX OF HBC-MILLWARD EXHIBITS (Continued) *

2   NO.                    DESCRIPTION                    PAGE
    Exhibit 23  Email chain, 1/10/14, from T.          181
3               Roahrig to J. Millward, subject: RE:
                Daily HBC Suspicious Purchasing
4               Report - 01/09/14
                HBC_MDL00039223
5
    Exhibit 24  Email, 8/23/14, from J. Cornwell to    192
6               P. Raub, et al., subject:
                Order_item_Blocking_5-Dec_13.docx,
7               SuspiciousReporting.sql
                HBC_MDL00086642 - 00086644
8
    Exhibit 25  Email chain, 8/20/15, from G.          212
9               Carlson to J. Jenson, et al., subject
                FW: Thrifty White Notes, attaching
10              Thrifty White Notes
                HBC_MDL00069566 - 00069571
11
    Exhibit 26  Email, 11/13/15, from G. Chunderlik    218
12              to J. Millward, subject: Central
                Signer Procedures, attaching CSOS_
13              Central Signer SOPs.ppt
                HBC_MDL00004646
14
    Exhibit 27  Email, 11/13/15, from J. Millward      221
15              to R. McClune, subject: Notes for
                Purdue Order Monitoring System.docx,
16              attaching notes from Purdue SOM call
                HBC_MDL00028405 - 00028407
17
    Exhibit 28  Email, 11/16/15, from J. Millward      222
18              to P. Raub, et al., subject: SOM
                and Controlled drug monitoring,
19              attaching 2013
                HBC_MDL00004996 - 00004998
20
    Exhibit 29  Email  chain, 12/15/15, from G.        228
21              Chunderlik to J. Millward, subject:
                FW: DEA Questionnaire, attaching
22              Amneal DEA Questionnaire.doc
                HBC_MDL00029194 - 00029198
23

24

25

7

1      * INDEX OF HBC-MILLWARD EXHIBITS (Continued) *

2    NO.                    DESCRIPTION                    PAGE
     Exhibit 30  Email, 12/2/15, from J. Millward        230
3                to G. Chunderlik, et al., subject:
                 Order Monitoring System Policy and
4                Procedures.docx, attaching subject
                 document
5                HBC_MDL00028717 - 00028721

6    Exhibit 31  Email, 12/3/15, from J. Millward        230
                 to G. Chunderlik, et al., subject:
7                Order Monitoring System Policy and
                 Procedures.docx, attaching subject
8                document
                 HBC_MDL00056199 - 00056203
9
     Exhibit 32  Email chain, 11/16/15, from J.          269
10               Millward to J. Lazzaro, subject:
                 RE: Access to Data Warehouse
11               HBC_MDL00092010 - 00092011

12

13                        - - - -

14

15

16

17

18

19

20

21

22

23

24

25

8

1                      P R O C E E D I N G S

2                            - - - -

3              THE VIDEOGRAPHER:  We are now on the

4     record.  My name is Chris Ratano.  I'm the

5     videographer for Golkow Litigation Services.

6     Today's date is December 20, 2018, and the time is

7     approximately 9:07.

8          This video deposition is being held in

9     Pittsburgh, PA at Marcus & Shapira, LLP, One

10    Oxford Centre, 35th Floor, in the matter of

11    National Prescription Opiate Litigation,

12    MDL No. 2804, Case No. 17-md-2804, United States

13    District Court, Northern District of Ohio, Eastern

14    Division.

15         The deponent today is Joseph Millward.

16         Will counsel please identify themselves for

17    the record.

18              MR. HUDSON:  Ty Hudson of Wagstaff &

19    Cartmell for plaintiffs.

20              MR. BARTON:  Eric Barton, Wagstaff &

21    Cartmell, for the plaintiffs.

22              MR. SCHACK:  Lou Schack from Reed Smith

23    for AmerisourceBergen.

24              MR. SCHWAB:  Tom Schwab from

25    Pietragallo.  I represent Cardinal Health.

9

1           MS. CHARLES:  Amber Charles from

2   Covington & Burling representing McKesson

3   Corporation.

4           MR. BARNES:  Robert Barnes, Marcus &

5   Shapira, HBC.

6           MR. KOBRIN:  Joshua Kobrin from Marcus &

7   Shapira.  I also represent HBC.

8           THE VIDEOGRAPHER:  The court reporter

9   today is Ann Medis, and she will now please swear

10  in the witness.

11               JOSEPH E. MILLWARD,

12      having been first duly sworn, was examined

13           and testified as follows:

14                  EXAMINATION

15  BY MR. HUDSON:

16      Q.   Good morning, sir.  Could you please

17  state your name for the record.

18      A.   Joseph Edward Millward.

19      Q.   And, Mr. Millward, my name is Ty Hudson,

20  and I represent several of the plaintiffs in this

21  matter.

22      Where do you currently reside?

23      A.   Erie, Pennsylvania.

24      Q.   And you are a former employee of Giant

25  Eagle?

10

```
 1        A.   I am.

 2        Q.   And Giant Eagle owns HBC Service

 3   Company; is that right?

 4        A.   Correct.

 5        Q.   And are you represented by counsel here

 6   today?

 7        A.   I am.

 8        Q.   And are Mr. Barnes and Josh your

 9   attorneys?

10        A.   Yes, they are.

11             MR. HUDSON:  And, Josh, I apologize for

12   mispronouncing your last name.

13   BY MR. HUDSON:

14        Q.   And are they paying for your services

15   here today or is HBC?

16        A.   HBC.

17        Q.   Have you had your deposition taken

18   before?

19        A.   Yes.

20        Q.   How many times?

21        A.   Once.

22        Q.   And what was the subject matter of the

23   litigation?

24        A.   It was an employment matter.

25        Q.   Were you a party to the matter?
```

```
 1        A.   Yes.

 2        Q.   Personally, or was Giant Eagle a party

 3   to the matter?

 4        A.   Giant Eagle was a party.

 5        Q.   So you weren't personally named in the

 6   lawsuit?

 7        A.   Oh, correct; correct.  I'm sorry.

 8        Q.   No problem.  I just want to make sure

 9   we're on the same page.

10        Well, for this deposition, let's just make

11   sure that we've got the ground rules.  I know

12   you've gone through this once before, but just to

13   be sure.

14        I'm going to be asking questions.  You're

15   going to be providing answers.  I would ask,

16   unless your counsel instructs you not to answer,

17   that you answer my questions.

18        Is that fair?

19        A.   Understood.

20        Q.   Second, you are under oath as if we were

21   in a courtroom in front of a judge and a jury.

22        Do you understand that?

23        A.   I do.

24        Q.   And if you answer my question, I'm going

25   to assume that you understand it.  A different way
```

1   to say that is:  If you don't understand my

2   question, will you just let me know so I can

3   rephrase it?

4        A.   Absolutely.

5        Q.   And you're doing a good job of this, but

6   the court reporter needs to take down audible

7   answers.

8        So you know that; right?

9        A.   I understand.

10       Q.   And, lastly, if you need to take a break

11  at any time, just let me know, and we'll go off

12  the record.  All I would ask is that you answer

13  any pending questions.

14       Is that fair?

15       A.   Understood.

16       Q.   You graduated from the University of

17  Pennsylvania School of Pharmacy; is that right?

18       A.   University of Pittsburgh.

19       Q.   University of Pittsburgh -- I'm sorry --

20       A.   Yeah.

21       Q.   -- School of Pharmacy?  And that was in

22  1995?

23       A.   That is correct.

24       Q.   Any postgraduate work?

25       A.   No.

1      Q.   What did you do after you graduated from

2  pharmacy school?

3      A.   I worked for a company called Option

4  Care, which was a home infusion pharmacy, in

5  Johnstown, Pennsylvania.

6      Q.   What does home infusion pharmacy mean?

7      A.   So at the pharmacy we would do home

8  intravenous therapy.  So facilitating earlier

9  discharges out of the hospital for patients to

10  finish their IV antibiotic, IV chemotherapy, total

11  parenteral nutrition, pain management, hydration,

12  all intravenous, working with nurses employed or

13  nursing agencies.

14      Q.   And how long were you with that company?

15      A.   From '95 to 1997.

16      Q.   And what was your role?

17      A.   I was the pharmacist and then pharmacy

18  manager.

19      Q.   Did you deal with controlled substances

20  in that role?

21      A.   Yes, we did.

22      Q.   Did you have any training or

23  experience -- did you obtain any training in that

24  role with complying with the Controlled Substances

25  Act?

14

1          A.    The training was through pharmacy school

2     and our law classes to prepare us for meeting the

3     regulatory requirements.

4          Q.    In part of your schooling, did you cover

5     the Controlled Substances Act?

6          A.    We certainly did.

7          Q.    Did you cover the Controlled Substances

8     Act provisions that relate to manufacturers,

9     distributors, or dispensers?

10         A.    We covered the Controlled Substances Act

11    in its full scope as part of it.

12         Q.    Was the focus on the obligations of

13    pharmacists?

14         A.    You're going way back.  So I would say

15    it covered the Act focused with pharmacy's role,

16    certainly.

17         Q.    Did you take any business classes in

18    pharmacy school that focused on the requirements

19    of manufacturers or distributors under the

20    Controlled Substances Act?

21              MR. KOBRIN:  Object to form.

22              THE WITNESS:  No.

23    BY MR. HUDSON:

24         Q.    In 1997, you left that company; right?

25         A.    Correct.

1       Q.   What did you do next?

2       A.   I married a girl from Erie and relocated

3   to Erie, Pennsylvania, Fairview actually, and

4   started working as a pharmacy manager at a

5   Rite-Aid pharmacy.

6       Q.   And that was a -- that was a Rite-Aid

7   pharmacy in Erie, Pennsylvania?

8       A.   Union City was the actual town, just a

9   little town outside of Erie.

10      Q.   And how long did you work at that

11  pharmacy?

12      A.   Until about 1999.  And then I was

13  transferred into a Rite-Aid store in Erie.

14      Q.   And then how long did you stay at that

15  store?

16      A.   Until 2001, approximately September.

17      Q.   So from 1997 to 1999, was your role as a

18  pharmacist at a particular pharmacy?

19      A.   Correct.

20      Q.   And then from 1999 to 2001, was your

21  role, again, as a pharmacist at a particular

22  pharmacy?

23      A.   It was.

24      Q.   And then in 2001, what was your new

25  role?

16

```
 1        A.   I was promoted to pharmacy district

 2   manager.

 3        Q.   And how long did you remain in that

 4   role?

 5        A.   Until approximately September 2006.

 6        Q.   And what happened in September 2006?

 7        A.   I was promoted to district manager.

 8        Q.   And how long did you stay in the role as

 9   district manager?

10        A.   Until I left Rite-Aid, December of 2007.

11        Q.   So if we go back to the 2001 to 2006

12   time period, describe for me what your role was as

13   a pharmacy district manager for Rite-Aid.

14        A.   So as a pharmacy district manager for

15   Rite-Aid, I had responsibility for the pharmacy

16   P & L, pharmacy operations of the 24 to 26

17   Rite-Aid locations that were in my district,

18   involving training, making sure that they were

19   executing to company standards and adhering to

20   policies and procedures.

21        Q.   In your role as a pharmacy district

22   manager, did you have any responsibility for

23   designing or creating policies or procedures?

24        A.   No.

25        Q.   Did you have -- in your role as pharmacy
```

17

1    district manager, did you play any role in

2    adhering to the requirements of the suspicious

3    order monitoring requirements of the Controlled

4    Substances Act?

5              MR. KOBRIN:  Object to form.

6              THE WITNESS:  The -- from the suspicious

7    order monitoring, no.  That would have been

8    handled at the distribution level, not the retail

9    level.

10   BY MR. HUDSON:

11       Q.   In your role as a pharmacy district

12   manager at Rite-Aid, did you have any knowledge of

13   the requirements of the suspicious order

14   monitoring system, any of those requirements under

15   the Controlled Substances Act?

16             MR. KOBRIN:  Object to form.

17             THE WITNESS:  Can you be more specific,

18   please?

19   BY MR. HUDSON:

20       Q.   Sure.  In your role as a pharmacy

21   district manager, did you understand that the

22   Controlled Substances Act included specific

23   requirements for manufacturers and distributors to

24   monitor suspicious orders of controlled

25   substances?

1           MR. KOBRIN:  Object to form.

2           THE WITNESS:  That was covered in

3    pharmacy school in the -- in the law class, as

4    stated previously.

5        In the day-to-day operation, the role of the

6    pharmacy district manager was execution of the --

7    making sure the individual pharmacies were

8    compliant with the rules and regulations under the

9    Controlled Substances Act, as well as the state

10   boards of pharmacy.

11   BY MR. HUDSON:

12       Q.   In your role though as the pharmacy

13   district manager, did you gain any knowledge about

14   the requirements for distributors to monitor

15   suspicious orders under the Controlled Substances

16   Act?

17           MR. KOBRIN:  Object to form.

18           THE WITNESS:  As a pharmacy district

19   manager, no.  That was not in play.

20   BY MR. HUDSON:

21       Q.   And did you gain any knowledge as a

22   district manager?

23       A.   No.

24       Q.   So is it fair to say that when you left

25   Rite-Aid in 200- -- December of 2007, any

19

1    knowledge that you had about the requirements for

2    distributors in terms of monitoring suspicious

3    orders under the Controlled Substances Act was

4    acquired while in pharmacy school or law classes?

5            MR. KOBRIN:  Object to form.

6            THE WITNESS:  Correct.  As it was not

7    part of the job requirement, did not deal with

8    that aspect.

9    BY MR. HUDSON:

10        Q.   Let's talk then more specifically about

11   what knowledge you acquired in pharmacy school and

12   law classes about suspicious order monitoring

13   system requirements.

14        Can you be more specific about the knowledge

15   that you gained?

16           MR. KOBRIN:  Object to form.

17           THE WITNESS:  We would have covered or

18   we did cover the Controlled Substances Act as part

19   of the curriculum.

20   BY MR. HUDSON:

21        Q.   Can you recall any specific classes that

22   you took that did a deeper dive specific to the

23   requirements of distributors under the Controlled

24   Substances Act to monitor suspicious orders?

25           MR. KOBRIN:  Object to form.

20

1          THE WITNESS:  There were no specific

2     classes to that curriculum, to that part, unique

3     to that.

4     BY MR. HUDSON:

5          Q.  As you sit here today, can you

6     describe -- and I know it's difficult because it's

7     been a number of years.

8          But can you describe what you understood from

9     pharmacy school and your law classes about the

10    requirements of distributors to monitor suspicious

11    orders under the Controlled Substances Act?

12          MR. KOBRIN:  Are you asking what he

13    understood --

14          THE WITNESS:  23 years ago?

15          MR. KOBRIN:  -- during that time or

16    today?

17          MR. HUDSON:  Right.

18    BY MR. HUDSON:

19          Q.  As you exited pharmacy school, do you

20    have any recollection of what you understood in

21    terms of the requirements of a distributor to

22    monitor suspicious orders under the Controlled

23    Substances Act?

24          MR. KOBRIN:  Object to form.

25          THE WITNESS:  I don't have specific

21

1    recollection of that from 24 years ago.

2    BY MR. HUDSON:

3         Q.   I understand.

4         And to the best of your recollection, do you

5    have any memory of taking any classes that went

6    into any of the specifics of what was required of

7    distributors to monitor suspicious orders of

8    controlled substances?

9              MR. KOBRIN:  Object to form.

10             THE WITNESS:  There were no specific

11   classes distributor-focused.

12   BY MR. HUDSON:

13        Q.   Then in December of 2007, did you leave

14   Rite-Aid to join Giant Eagle?

15        A.   I did.

16        Q.   And at Giant Eagle, what role did you

17   assume?

18        A.   Pharmacy district leader.

19        Q.   And at that time, was Giant Eagle a

20   regional supermarket chain?

21        A.   Yes.

22        Q.   And just describe, if you could, what

23   your role was as a pharmacy district leader.

24        A.   The role was parallel to the role at

25   Rite-Aid in that, again, responsible for the

1   pharmacy profit and loss; for the execution of

2   initiatives; making sure the pharmacies were

3   compliant through audit checks of whether it was

4   state board or DEA; responsible for the

5   recruiting, on-boarding and training plans for

6   pharmacists and supporting them in what other

7   issues that they needed.

8          Q.   And you remained in your role as a

9   pharmacy district leader for about three years, a

10  little less than three years?

11         A.   A little less, correct.

12         Q.   December of 2007 to October of 2010?

13         A.   Correct.

14         Q.   Does that sound right?

15         A.   That is correct.

16         Q.   What district did you cover?

17         A.   My district was Youngstown to -- in

18  Ohio.  So I had stores in Youngstown, Austintown,

19  north to as far west as Madison, Ohio, east

20  through Erie, and across Interstate 80 to DuBois

21  would probably be the -- DuBois, Pennsylvania --

22  the furthest east.

23         Q.   Did you cover all of the pharmacies that

24  were located in Ohio?

25         A.   No; just that subset.

23

1     Q.    What other districts were located in

2  Ohio at that time, if you can recall, or how many

3  other pharmacy district leaders were there that

4  covered stores in Ohio at that time?

5     A.    Sure.  There were three other pharmacy

6  district leaders in Ohio and three other in

7  Pennsylvania.

8     Q.    So seven total pharmacy district leaders

9  at that time?

10    A.    Correct.

11    Q.    And did that change between when you

12 started in 2007 and then shifted roles towards the

13 end of 2010?

14    A.    I believe seven was maintained.

15    Q.    And how many pharmacists reported to you

16 in your district?

17    A.    I don't remember the exact number.

18    Q.    Any ballpark?

19    A.    Approximately 24 stores.  But the exact

20 number of pharmacists, I don't remember.

21    Q.    Is there sort of an average or what's

22 typical of how many pharmacists were in each

23 store?

24    A.    So part of Rite-Aid, the stores that I

25 had had between two pharmacists to four full-time

24

1    pharmacists.  So counting part-timers, it may be

2    closer to -- it works out -- let me do the math

3    real quick.  It's early.  Maybe 90.

4        Q.   90 to a hundred?

5        A.   Yeah.  Yeah.  Ballpark it.

6        Q.   Sure.  At the time you were a pharmacy

7    district leader, to whom at Giant Eagle did you

8    report?

9        A.   I reported to Anthony Mollica.

10       Q.   What was his title?

11       A.   He was the vice president of pharmacy

12   operations, I believe, although his role -- his

13   title then may have been different.  It may have

14   changed.

15       Q.   And was that true for the three, little

16   less than three years that you were pharmacy

17   district leader the entire time that you reported

18   to Mr. Mollica?

19       A.   I did.

20       Q.   Did he at some point leave Giant Aid --

21   I mean Giant Eagle?  Combining Rite-Aid...

22       A.   Yes; yes, he did.

23       Q.   And do you know when that occurred?

24       A.   I don't know the exact day or exact day

25   or month.  In ballpark, it was maybe '14-ish, '13,

25

1    '14.  I don't recall off the tiptop of my head.

2         Q.   Sure.  Do you recall who replaced him?

3         A.   Ultimately, it was Greg Carlson, was

4    named as the vice president of pharmacy

5    operations.

6         Q.   And to the best of your recollection,

7    that was in 2014?

8         A.   Yeah.  Actually, 2014 sounds about

9    right.

10        Q.   At the time that you were a pharmacy

11   district leader, did you have any involvement with

12   designing or creating any policies or procedures

13   to comply with the Controlled Substances Act?

14        A.   I did not have any role in creating

15   policies.

16        Q.   At the time you were a pharmacy district

17   leader, did you gain any familiarity with the

18   requirements of the Controlled Substances Act that

19   applied to distributors of opioids?

20             MR. KOBRIN:  Object to form.

21             THE WITNESS:  As a pharmacy district

22   leader, no, I did not deal with that aspect.

23   BY MR. HUDSON:

24        Q.   At the time you were a pharmacy district

25   leader, did you have any knowledge of whether

1    Giant Eagle or HBC had a suspicious order

2    monitoring program?

3           MR. KOBRIN:  Object to form.

4    BY MR. HUDSON:

5        Q.   Or system.

6           MR. KOBRIN:  Same objection.

7           THE WITNESS:  Yeah.  I don't recall --

8    BY MR. HUDSON:

9        Q.   I mean, to your --

10       A.   -- policies.  I mean, I didn't -- yeah.

11   I don't recall the policies that were in place for

12   suspicious order monitoring for HBC.

13   BY MR. HUDSON:

14       Q.   To the best of your recollection, is it

15   fair to say that Giant Eagle and HBC did not have

16   a manual or a book where you could go and see what

17   suspicious order monitoring system existed for the

18   company?

19          MR. KOBRIN:  Object to form.

20          THE WITNESS:  I can't speak to that as I

21   was not in that role.

22   BY MR. HUDSON:

23       Q.   At the time that you were a pharmacy

24   district leader, did you know that the Controlled

25   Substances Act required a registrant who was

27

```
 1    distributing controlled substances to design and

 2    operate a suspicious order monitoring program?

 3              MR. KOBRIN:  Object to form.

 4              THE WITNESS:  As we stated earlier.

 5    BY MR. HUDSON:

 6        Q.  So you knew that that requirement

 7    existed --

 8        A.  For all distributors.

 9        Q.  Right.  And, again, up through the point

10    in time that you were a pharmacy district leader

11    at Giant Eagle, any knowledge that you had of that

12    was derived from your time in pharmacy school and

13    law classes; correct?

14              MR. KOBRIN:  Object to form.

15              THE WITNESS:  I'd say that's fair.

16    BY MR. HUDSON:

17        Q.  At the time that you were a pharmacy

18    district leader, did you understand that Giant

19    Eagle had a separate company called HBC Service

20    Company?

21              MR. KOBRIN:  Object to form.

22              THE WITNESS:  We knew -- yes.  I know of

23    H- -- yeah, absolutely.  HBC was the generic

24    warehouse.  Whether it was a separate company or

25    not is -- a separate entity, is that what you're
```

1    referring to?

2    BY MR. HUDSON:

3        Q.   Yes, yeah.  At the time that --

4        A.   Okay.

5        Q.   At the time you were a pharmacy district

6    leader, what was your understanding of HBC or HBC

7    Service Company?

8        A.   Sure.  That was our -- that HBC Service

9    was the generic distribution center.  So it was an

10   in-house distribution facility.

11       Q.   When you say "generic," what do you mean

12   by that?

13       A.   The drug mix that we would see or that

14   was carried by that facility was focused on

15   generic legend drugs, and I believe -- yeah,

16   generic legend drugs --

17       Q.   So generic --

18       A.   -- to the best of my knowledge.

19       Q.   Sure.

20       A.   So from lisinopril to metformin.

21       Q.   You mean generic drugs as opposed to

22   brand drugs?

23       A.   Correct.

24       Q.   And that HBC distribution facility, do

25   you know when it began operations?

29

1      A.   It was before I started with the

2   company.  So it was already up and running by the

3   time I transitioned over.

4      Q.   At the time that you were a pharmacy

5   district leader, did you learn that that facility

6   had obtained a license to distribute certain

7   controlled substances?

8           MR. KOBRIN:  Object to form.

9           THE WITNESS:  We knew -- I knew that the

10   pharmacy or that distribution center was able to

11   distribute Schedules IIIs, IVs, and Vs, but no

12   Schedule II controlled substances, based on the

13   ordering system and what the stores received.

14   BY MR. HUDSON:

15      Q.   And at the time that you were a pharmacy

16   district leader, did you make distinctions between

17   Schedule II and Schedule III controlled

18   substances?

19      A.   How do you mean?

20      Q.   Well, I mean, you've alluded that there

21   were different ordering systems; right?

22      A.   Sure.

23      Q.   So did you understand that the

24   Schedule II controlled substances were being

25   shipped in from McKesson or Anda?

1     A.   Absolutely.

2     Q.   And --

3     A.   Via the 222 form, triplicate form.

4     Q.   And what is the 222 form?

5     A.   That's the DEA's form to order

6  Schedule II controlled substances.

7     Q.   And at the time you were a pharmacy

8  district leader, did you understand that in 2009,

9  HBC started to act as a distributor for

10  Schedule III controlled substances?

11     A.   In 2009, I was with Rite-Aid.  So, no, I

12  did not.

13     Q.   Right.  Did you learn at some point in

14  your role as a pharmacy district leader, though,

15  that HBC had begun to distribute Schedule III

16  controlled substances?

17     A.   When I on-boarded with Giant Eagle, so

18  in December, and then through my training in the

19  subsequent -- following January, yes, I knew that

20  Schedule IIIs, IVs, and Vs could come from HBC.

21     Q.   At the time you were a pharmacy district

22  leader, did you ever visit the HBC warehouse?

23     A.   Actually, can I -- I apologize.  Can I

24  go back to that?

25     Q.   Sure.

1          A.    You said 2009.  So, yes, I was already

2    with Giant Eagle.  I apologize.

3          Q.    That's okay.

4          A.    Yes.  I knew that we did receive

5    Schedule IIIs, IVs, and Vs then.

6          Q.    Just so we clean up the record --

7          A.    Sure.

8          Q.    -- between December of 2007 and 2010,

9    when you were a pharmacy district leader, there

10   came a time in 2007 when you learned that HBC was

11   beginning to act as a distributor for Schedule III

12   controlled substances?

13          MR. KOBRIN:  Object to form.

14    You said 2007.

15   BY MR. HUDSON:

16          Q.    I'm saying 2009 --

17          A.    2009.

18          Q.    -- you learned --

19          A.    Correct.

20          Q.    -- that HBC became a distributor for

21   controlled substances.

22    I'm not sure I cleaned up the record, but I

23   think we're on the same page.

24    At the time you were a pharmacy district

25   leader, did you ever visit the HBC warehouse?

32

```
 1        A.   No.
 2        Q.   So in October of 2010, you were promoted
 3   to senior manager, pharmacy quality and
 4   compliance?
 5        A.   That's correct.
 6        Q.   And did you remain in that role until
 7   March of 2016?
 8        A.   That is correct.
 9   ████████████████████████████████████████
10   ██████████
11   ███████████████████████████████████
12   ███████████████████████████████████
13   █████████████████████████████████
14   ███████████
15        Now, I had been commuting from Erie to
16   Pittsburgh four days a week, so 260 miles a day
17   the round trip.  And it was an -- and had been on
18   the road, as we discussed, since 2001 as pharmacy
19   district leader and the roles.  And it was an
20   opportunity to go from 260 miles a day to 18.
21   And, actually, I couldn't be happier for it.
22        Q.   What have you done since leaving Giant
23   Eagle?
24        A.   So I am a pharmacy manager again at a
25   Rite-Aid location in Erie.
```

33

1      Q.   Is it one of the locations that you were

2   the manager at back in the '90s?

3      A.   No.

4      Q.   Different location?

5      A.   Yeah, different locations.

6      Q.   But you've got no -- you're just located

7   in a single store now?

8      A.   Correct.  I'm a pharmacy manager again.

9      Q.   Is it a similar role to the role that

10  you had in the two different Rite-Aid stores --

11     A.   It is.

12     Q.   -- from '97 to '99 --

13     A.   It is.

14     Q.   -- and then '99 to 2001?

15     A.   That is -- that is correct.

16  ████████████████████████████████████████

17  ████████████████████████████████████████

18  ████████████████████████████████████████

19  ██████████████████████████████████████

20  ██████████

21  ██████████████████████████████████

22  ████████████████████████████

23  ██████████████████████

24  ███████████████████████████

25  █████████████████████████







37





39



BY MR. HUDSON:

    Q.   I want to focus then on your position as the senior manager of compliance.

    Were you the company's top compliance officer?

        MR. KOBRIN:  Object to form.

        THE WITNESS:  No.  For the company, no.

BY MR. HUDSON:

    Q.   Who was the top compliance officer?

        MR. KOBRIN:  Object to form.

    Are you talking about when he started or --

        THE WITNESS:  Yeah.  What timeframe?

40

1    BY MR. HUDSON:

2         Q.    In October of 2010, when you assumed the

3    role of senior manager of compliance.

4         A.    Good gosh.  Perhaps -- so the top

5    corporate compliance officer, the only name I can

6    think of --

7              MR. KOBRIN:  Don't speculate.

8              THE WITNESS:  Yeah.  I don't remember

9    the exact name of the person who was in -- or if

10   that was his role, his title.

11   BY MR. HUDSON:

12        Q.    Can you recall the name of anyone who

13   was more senior to you in terms of a compliance

14   role at Giant Eagle?

15        A.    On the legal side, in the legal

16   department, Rick Russell was the head of the

17   department, as the attorney.

18        Who else was in there?  From HIPAA

19   compliance, it fell under Robbi Robinson.

20        I don't remember on top who was -- for the

21   whole company piece back then.

22        Q.    When you assumed the role of senior

23   manager, did you have two different

24   responsibilities, one being pharmacy quality and

25   the other being compliance?

41

1      A.   Correct.

2      Q.   And did you have two separate teams for

3  those two separate roles?

4      A.   I had two people that reported to me,

5  one for each.

6      Q.   And then did they have a team underneath

7  them?

8      A.   No.

9      Q.   Did they have anyone underneath them?

10      A.   Nobody else reported to them.

11      Q.   From October of 2010 to March of 2016,

12  were you the head compliance manager at Giant

13  Eagle focused on designing and operating policies

14  to comply with the Controlled Substance Act?

15          MR. KOBRIN:  Object to form.

16          THE WITNESS:  For the -- the initial

17  focus was on the retail pharmacies.

18  BY MR. HUDSON:

19      Q.   In your role though from October of 2010

20  to March of 2016, just describe for me or list for

21  me every person who would be involved with

22  designing or operating a system to comply with the

23  Controlled Substances Act.

24          MR. KOBRIN:  Object to form.

25          Within his group or the entire company?

42

```
 1              MR. HUDSON:  At Giant Eagle.

 2              THE WITNESS:  Oh, good heavens.

 3              MR. KOBRIN:  To the extent you can.

 4              THE WITNESS:  What's that?

 5              MR. KOBRIN:  To the extent you can.

 6              THE WITNESS:  Yeah.  On the -- well, it

 7     would involve the pharmacy IT group which, when I

 8     started, would have fallen under Joe Mishanski,

 9     and under him Shawn Voyten.  Let's see.  And then

10     their admin for that piece.

11     BY MR. HUDSON:

12         Q.   So Shawn Voyten.  And who was the other

13     person?  I'm sorry.

14         A.   The head of the pharmacy information

15     technology piece at the time was Joe Mishanski.

16         Q.   And where were -- where were the --

17     where was the pharmacy IT group physically

18     located?

19         A.   It was located in -- it was at the

20     corporate campus in a couple different buildings.

21         For policies and procedures with regard to

22     controlled substances, again, I was involved in

23     that, in creating policies along with George

24     Chunderlik.

25         In our policies and procedures group, where
```

43

1   we dealt with more than just controlled substances

2   but pharmacy quality policies as well, that

3   also -- that group involved Adrienne Anthony,

4   which I don't know her married name now.  So she

5   was also my other person that reported to me on

6   the pharmacy quality side.

7          Steve Zubrow, which was Marcus & Shapira

8   counsel.  Jane Barnes, who was internal risk

9   compliance for Giant Eagle, then later Mary

10  Gibson.  And Rick Springer was part of that as

11  well.  He provided the -- essentially, the

12  training modules, would create the training

13  modules.

14         Q.   Tell me Rick's last name again.

15         A.   Springer.

16         Q.   Springer.  And training modules for

17  what?

18         A.   So computer-based training modules for

19  the pharmacists and pharmacy technicians to do in

20  the stores.

21         Q.   Jane Barnes and Mary Gibson, those were

22  attorneys at Giant Eagle?

23         A.   Correct.  They were both internal

24  counsel.

25         Q.   Anyone else?

44

1          A.    In that room or that was in that

2     procedure meeting?

3          We tried to pull stakeholders in from the

4     other operational groups.  So we may at times have

5     had one of the pharmacy project managers in there.

6     So that would have been Dominic Bertucci.

7          Let me think who else would have been

8     involved in policies and procedures with regard to

9     controlled substances.

10         In those monthly meetings, we would discuss

11    all types of policies that involved pharmacy.

12              MR. KOBRIN:  I don't want you to get

13    into too much detail.

14              THE WITNESS:  Okay.

15              MR. KOBRIN:  You've already identified

16    that counsel were in those meetings and involved

17    in those meetings.  So just be aware or cognizant

18    that you're not sharing privileged information.

19    BY MR. HUDSON:

20         Q.    Did those monthly meetings occur during

21    the entire time that you were the senior manager

22    of compliance?

23         A.    Shortly after starting there.  Starting

24    in that role I should say.  Qualify that.

25         Q.    So when you initially started in the

1    role of senior manager of compliance, you didn't

2    have monthly meetings, but at some point shortly

3    thereafter you began to; is that fair?

4        A.    Yeah.   I can't say what they did before.

5    The role was newly created.   When I came, it

6    was -- I promoted into a newly created role.

7            (HBC-Millward Exhibit 1 was marked.)

8    BY MR. HUDSON:

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

46



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

24      Q.   Before assuming the role as Giant

25   Eagle's head of -- or Giant Eagle's role as senior

47

1    manager of compliance, did you have any prior work

2    experience in a compliance role?

3            MR. KOBRIN:  Object to form.  Asked and

4    answered.

5            THE WITNESS:  No specific education or

6    training beyond that.

7    BY MR. HUDSON:

8       Q.  At the time that you assumed your

9    compliance role at Giant Eagle, did you obtain any

10    training to prepare you for your new role in

11    compliance?

12           MR. KOBRIN:  Object to form.

13           THE WITNESS:  There were no classes or

14    anything more than continuing education programs

15    as part of maintaining a valid and active pharmacy

16    license in the State of Pennsylvania.

17    BY MR. HUDSON:

18       Q.  And you testified that your position was

19    a newly created position; correct?

20       A.  That is correct.

21       Q.  At the time that you assumed the role of

22    senior manager of compliance, were you tasked with

23    monitoring the company's policies and procedures

24    that were in place as it relates to the Controlled

25    Substances Act?

```
 1              MR. KOBRIN:  Object to form.

 2              THE WITNESS:  Can you repeat the

 3    question, please?

 4    BY MR. HUDSON:

 5       Q.   Sure.  At the time you assumed your

 6    compliance role at Giant Eagle, were you tasked

 7    with monitoring the company's policies and

 8    procedures that related to the Controlled

 9    Substances Act?

10              MR. KOBRIN:  Same objection.

11              THE WITNESS:  I was responsible for

12    reviewing the policies and procedures for all

13    legal compliance beyond just the CSA, to include

14    state board of pharmacy, that the pharmacies were

15    up to date and our policies were in line and

16    complying.

17    BY MR. HUDSON:

18       Q.   Could you estimate, during the time that

19    you were the senior manager of compliance at Giant

20    Eagle, approximately what percentage of your time

21    related to compliance with the Controlled

22    Substances Act?

23       A.   I couldn't give a percent specific.

24       Q.   Even a ballpark?

25       A.   I don't think it would be an accurate
```

1    number to say a definitive number.

2         Q.   Do you feel like it was a big part of

3    your role, a small part of your role?  Anything

4    you could say to describe what compliance with the

5    Controlled Substances Act --

6              MR. KOBRIN:  Object to form.  He's

7    already said it would be inaccurate to assess his

8    percentage.

9              THE WITNESS:  There's no way to

10   accurately say.  The needs of the day and the

11   issues or legislative changes would kind of

12   dictate the -- and the company initiatives would

13   kind of dictate the direction and energy spent.

14        So to give an accurate time over the -- or an

15   accurate percentage, I'm not able to box it in

16   that way.

17   BY MR. HUDSON:

18        Q.   Between 2011 and 2016, do you have a

19   recollection of any legislative changes or company

20   initiative changes that occurred as they relate to

21   the Controlled Substances Act?

22        A.   Sure, there were.

23             MR. KOBRIN:  Object to form.

24             THE WITNESS:  There were a number of

25   changes.  The rescheduling of hydrocodone from a

1    Schedule III to a Schedule II, that was when?

2    October of '14-ish.  I apologize.  I don't

3    remember the exact date that that occurred.

4         Ohio made changes to their OARRS, for

5    example, to where -- I believe it was unscheduled

6    at the time, but Tramadol had to be reported in

7    before it was -- before it became a Schedule --

8    controlled substance.  So just two examples.

9    BY MR. HUDSON:

10        Q.   Any other examples you can think of?

11        A.   There were tech certification

12   requirements from West Virginia.  Sudafed

13   requirement changes for reporting, rolling out the

14   meth check, for example, for pseudoephedrine in

15   the various states and the keeping up with those

16   requirements.

17        But I don't think I can list them all sitting

18   here almost three years from then.

19        Q.   Sure.  No, I understand.  I'm just

20   trying to get an understanding --

21        A.   Sure.

22        Q.   -- of what some of those would be.

23   ████████████████████████████████████████

24   ██████████████████████████████████████████

25   ████████████████████████████████████



1 ████████████████████████████████████████

2 █████████████████████████

3      Q.   When you say "GERX," is that how you

4 refer to the -- is that the Giant Eagle Rx

5 distribution center?

6      A.   I believe that's what they refer to it

7 now.

8      Q.   Okay.

9      A.   At the time it was the pharmacy

10 distribution inside of what I believe was FFM, so

11 Fresh Foods something.  It's AFE.  It's an acronym

12 for everything.

13      Q.   Explain that to me, if you could.

14     It was a distribution facility within Fresh

15 Foods?

16         MR. KOBRIN:  Object to form.

17     Is that a question?

18         THE WITNESS:  Yeah.  Can you please --

19 what do you -- can you ask that again?

20 BY MR. HUDSON:

21      Q.   When GERX first opened, how would you

22 describe that?

23      A.   It was a -- dedicated pharmacy

24 distribution centers within the structure of an

25 existing Giant Eagle distribution center, next to

1  a Giant Eagle central fill pharmacy.  That was one

2  of the other initiatives.

3      Q.   And how did the structure of the GERX

4  then change over time?

5          MR. KOBRIN:  Object to form.

6          THE WITNESS:  We'll GERX was -- we'll

7  call it GERX, because I didn't know it as GERX

8  then, in that timeframe.  But we'll refer to it

9  from this point on.

10 BY MR. HUDSON:

11     Q.   Okay.

12     A.   It opened a month before I left, I

13 believe as we previously said, and initially, I

14 think, only distributing -- distributing

15 noncontrols first, I believe.

16     Q.   After you left Giant Eagle, have you

17 maintained any knowledge base or do you know

18 anything about how the facility has operated since

19 you left?

20     A.   No, no.

21         MR. KOBRIN:  Do you want to take a

22 break?  Are you doing all right?

23         THE WITNESS:  I'm okay.

24         MR. KOBRIN:  Ten minutes or so.  Is that

25 all right with you, Ty?

54

1              MR. HUDSON:  Sure.

2    BY MR. HUDSON:

3        Q.   I want to just talk about a compliance

4    program now.  Do you agree that a company handling

5    prescription drugs should have an effective

6    compliance program?

7              MR. KOBRIN:  Object to form.

8              THE WITNESS:  The regulations state that

9    in there.  But under the CSA, it's spelled out

10   within the Controlled Substances Act as the

11   requirements for a distributor.

12   BY MR. HUDSON:

13       Q.   I guess my question though is just more

14   general.

15       Do you agree that a company handling

16   prescription drugs needs an effective compliance

17   program?

18             MR. KOBRIN:  Object to form.

19             THE WITNESS:  I believe the company

20   handling prescription drugs has an obligation to

21   be compliant with the rules and regulations set

22   forth.

23   BY MR. HUDSON:

24       Q.   Do you agree that the purpose of a

25   compliance program in a company is to have

55

1    policies and procedures that prevent the

2    organization and employees from breaking laws and

3    regulations?

4              MR. KOBRIN:  Object to form.

5              THE WITNESS:  Policies and procedures

6    are put in place to ensure that all agents of the

7    organization are compliant with laws, rules, and

8    regulations.

9    BY MR. HUDSON:

10        Q.   Do you agree that an effective

11   compliance program should include establishing

12   procedures for documenting actions in writing to

13   show compliance with laws and regulations?

14             MR. KOBRIN:  Object to form.

15             THE WITNESS:  Restate the question.

16   BY MR. HUDSON:

17        Q.   Do you agree that an effective

18   compliance program should include establishing

19   procedures for documenting actions in writing to

20   be able to show compliance with the law?

21             MR. KOBRIN:  Object to form.

22             THE WITNESS:  I believe that if it is

23   required by law to retain those documents, then

24   the program should be designed to retain the

25   documents as legally required.

1    BY MR. HUDSON:

2         Q.   And if there isn't a legal requirement

3    to retain documents, then from a compliance

4    perspective, what would you do?

5              MR. KOBRIN:  Object to form.

6              THE WITNESS:  There's many aspects of

7    pharmacy that do have specific -- or that -- laws

8    that require documents to be retained for

9    prescribed amount of times -- or lengths of time.

10   Sorry.

11        And the compliance program must make sure

12   that those legal requirements are met.

13   BY MR. HUDSON:

14        Q.   Do you agree it's easier to show

15   compliance with laws and regulations if a company

16   documents its actions in writing?

17             MR. KOBRIN:  Object to form.

18        Easier to show to who?

19             MR. HUDSON:  Just "Objection.  Form"

20   please.

21             THE WITNESS:  Yeah.  Can you be more --

22   BY MR. HUDSON:

23        Q.   Do you agree --

24        A.   Can you restate that, please?

25        Q.   Sure.  Do you agree it is easier to show

57

1    compliance with laws and regulations if a company

2    documents its actions in writing?

3           MR. KOBRIN:  Object to form.

4           THE WITNESS:  Where they're required to

5    retain those documents, then yes.

6    BY MR. HUDSON:

7       Q.   I'm just saying, in general, do you

8    agree that a company is going to have an easier

9    time showing it complied with the law if it

10    documents in writing the actions that it took?

11           MR. KOBRIN:  Object to form.

12           THE WITNESS:  To document or to show

13    compliance to whom?

14    BY MR. HUDSON:

15       Q.   To anyone.

16       A.   Again, I believe the compliance program

17    should be designed that it meets the requirements

18    for documentation.

19       Q.   From a corporate perspective, in your

20    view as a nonlawyer, are there strategic reasons

21    to not retain documents and put them -- and put in

22    writing the actions that are being taken by the

23    company?

24           MR. KOBRIN:  Object to form.

25           THE WITNESS:  I don't think there's

58

1    any -- again, I'm not sure I follow where you're

2    leading there.

3    BY MR. HUDSON:

4        Q.   I'm just saying:  You were the senior

5    manager of compliance at Giant Eagle for about six

6    years; right?  Five years?

7        A.   Yeah; correct, correct.

8        Q.   And what I'm saying is:  During that

9    time, would you agree that from a compliance

10   perspective, it's going to be easier for Giant

11   Eagle to show it complied with the law if Giant

12   Eagle put the actions that it took in writing?

13            MR. KOBRIN:  Object to form.

14            THE WITNESS:  And that was through our

15   policies and procedures.

16   BY MR. HUDSON:

17       Q.   Right.  I guess what I'm trying to get

18   at is just, "yes" or "no," do you agree with the

19   idea that it's easier for Giant Eagle to show it

20   complied with the law if it puts in writing the

21   actions that it's taking?

22            MR. KOBRIN:  Object to form.

23            THE WITNESS:  And that would be correct,

24   why I would say yes, through the policies and

25   procedures.

59

```
1    BY MR. HUDSON:
2         Q.   So in your time as the senior manager of
3    compliance, was one of the -- was one of the roles
4    that you undertook to make sure that there were
5    policies or procedures in place so that important
6    actions being taken at Giant Eagle were documented
7    in writing?
8              MR. KOBRIN:  Object to form.
9              THE WITNESS:  I don't recall doing any
10   policies and procedures beyond -- for document
11   retention.  That would have been through the
12   corporate policy or through the -- yeah.  Those
13   would have been above my area.  That would have
14   encompassed all of the corporation, not just
15   exclusive to pharmacy.
16        Pharmacy would be required per the various
17   document retention requirements for the boards of
18   pharmacy, for example.
19             MR. KOBRIN:  It's been about ten
20   minutes.  Do you want to take a break now?
21             THE WITNESS:  Yeah.  Let's take a break.
22             THE VIDEOGRAPHER:  10:13.  We're off the
23   video record.
24             (Recess from 10:13 a.m. to 10:30 a.m.)
25             THE VIDEOGRAPHER:  10:30.  We're on the
```

60

```
1    video record.

2    BY MR. HUDSON:
```





62









66













72



22          (HBC-Millward Exhibit 2 was marked.)

23     BY MR. HUDSON:

24          Q.   Let me hand you what we've marked as

25     Exhibit 2.  And Exhibit 2 --

73

```
 1              MR. HUDSON:  Our internal sticker is

 2    P-GEN-10.

 3    BY MR. HUDSON:

 4        Q.   And this is a CFR that we pulled from

 5    the Department of Justice DEA website on diversion

 6    control division.

 7        Do you see there at the top Part 1301,

 8    Registration of Manufacturers, Distributors and

 9    Dispensers of Controlled Substances?

10              MR. KOBRIN:  I just want to object on

11    the record real quick.  This is only a small

12    section of what's a larger set of regulations, and

13    they are all interconnected and cross-reference

14    each other.

15        You can answer.

16              THE WITNESS:  That's exactly what it

17    says at the top.

18    BY MR. HUDSON:

19        Q.   So my focus is really on 1301.74(b).  Do

20    you see that there?

21        A.   Yes.

22        Q.   "The registrant shall design and operate

23    a system to disclose to the registrant suspicious

24    orders of controlled substances.  The registrant

25    shall inform the field division office of the
```

1    Administration in his area of suspicious orders

2    when discovered by the registrant.  Suspicious

3    orders include orders of unusual size, orders

4    deviating substantially from a normal pattern, and

5    orders of unusual frequency."

6        Do you see that?

7        A.   I do see that.

8        Q.   And what I've done is I just created a

9    little bit of a demonstrative here.  I just want

10   to know if you agree with this.  That in terms of

11   complying with -- this is -- this provision that

12   we're talking about is the suspicious order

13   monitoring system or the SOMS obligation of the

14   Controlled Substances Act; correct?

15            MR. KOBRIN:  Object to form.

16   Misrepresents both the regulation and the record.

17   BY MR. HUDSON:

18       Q.   You can answer.

19       A.   I'm sorry.  Can you say that again?

20       Q.   Sure.  Do you agree that this section

21   that we've been looking at of 1301.74(b) is the

22   suspicious order monitoring system requirement of

23   the Controlled Substances Act?

24            MR. KOBRIN:  Object to form.  Same

25   objection.

75

1          THE WITNESS:  1301.74(b) is part of a

2   whole list of security and control requirements.

3   So it's one of the many listed ones in the other

4   parts of the regulation that distributors are

5   required to follow, dispensers.

6   BY MR. HUDSON:

7      Q.   And can we agree though that this

8   section (b) is the suspicious order monitoring

9   system requirement?

10          MR. KOBRIN:  Object to form.

11   Misrepresents the regulation.

12          THE WITNESS:  Section (b) is the system

13   to disclose suspicious orders of controlled

14   substances, as it states.

15   BY MR. HUDSON:

16      Q.   And can we refer to this as SOMS today?

17          MR. KOBRIN:  Object to form.

18   BY MR. HUDSON:

19      Q.   In other words, if we talk about the

20   requirements of this particular regulation, will

21   you understand that to mean the SOMS requirements?

22          MR. KOBRIN:  So any time after this

23   point, when you refer to SOMS, you're establishing

24   you are only referring to Section 1301.74(b)?

25

1        MR. HUDSON:  Correct.

2        MR. KOBRIN:  That's all you're going to

3   be referring to when you refer to SOMS?

4        MR. HUDSON:  Correct.

5        MR. KOBRIN:  I just want you to make

6   sure that you're clear with the witness on that

7   because I don't know that --

8        MR. HUDSON:  That's why I asked the

9   question.

10        MR. KOBRIN:  I don't want him to get

11   confused.

12        MR. HUDSON:  I appreciate it.  Thank

13   you.

14   BY MR. HUDSON:

15     Q.   Mr. Millward, from here forth, if we

16   refer to the SOMS requirement, will you understand

17   that I'm referring to the requirements of

18   Section 1301.74(b)?

19     A.   I understand what you're saying, as the

20   regulation is read.

21     Q.   Do you agree that, in fact, there are

22   federal regulations that do require distributors

23   to have a suspicious order monitoring system in

24   place?

25        MR. KOBRIN:  Object to form.

1            THE WITNESS:  A system to disclose

2    suspicious orders, is that what you're referring

3    there?

4    BY MR. HUDSON:

5        Q.   Yes.

6        A.   Then in that case, that is correct.

7        Q.   If you look here on what we've got up

8    here on the screen, do you agree that HBC Service

9    Company had an obligation to design a system to

10   disclose to HBC suspicious orders of controlled

11   substances?

12           MR. KOBRIN:  So the record establishes

13   that we're looking at a demonstrative that's not

14   been entered as an exhibit that summarizes the

15   subsection?

16           MR. HUDSON:  Correct.

17           THE WITNESS:  That's what you want him

18   to look at, not the reg. itself?

19           MR. HUDSON:  Correct.

20           THE WITNESS:  The display does show,

21   correct, that -- it says that HBC shall

22   essentially -- not essentially -- but they'll

23   operate a system to disclose suspicious orders of

24   controlled substance and copies and pastes the

25   list from the regs.

78

```
 1    BY MR. HUDSON:

 2        Q.   So you agree that what we've got

 3    displayed on the screen is consistent with the

 4    wording and the obligation that's set forth in the

 5    regulation itself?

 6             MR. KOBRIN:  Object to form.

 7             THE WITNESS:  Worded slightly different,

 8    but correct.

 9    BY MR. HUDSON:

10        Q.   In substance, what's on the screen

11    accurately displays what the regulation requires;

12    is that fair?

13             MR. KOBRIN:  Object to form.

14             THE WITNESS:  Well, not the regulation

15    in the entirety.  I mean, there's the other

16    security pieces that go along with having that

17    total scope of control.  But for the subsection

18    (b), it lists the examples that are listed on the

19    regulation for unusual size, pattern and

20    frequency.

21    BY MR. HUDSON:

22        Q.   So can we agree that between 2009 and

23    2016, HBC had an obligation to design a system to

24    disclose to HBC suspicious orders of controlled

25    substances?
```

1        A.    I believe --

2              MR. KOBRIN:  Object to form.

3              THE WITNESS:  -- the Controlled

4     Substances Act prescribes that for distributors.

5     BY MR. HUDSON:

6        Q.    And can we agree that HBC under the

7     Controlled Substances Act had an obligation to

8     operate a system to disclose to HBC suspicious

9     orders of controlled substances?

10             MR. KOBRIN:  Object to form.

11             THE WITNESS:  As a part of the other

12    security requirements set forth in the other

13    subsections of the regulation, that is correct.

14    BY MR. HUDSON:

15       Q.    And can we agree that under the

16    Controlled Substances Act, suspicious orders

17    include orders of unusual size, orders deviating

18    substantially from a normal pattern and orders of

19    unusual frequency?

20             MR. KOBRIN:  Object to form.

21             THE WITNESS:  That correctly stated the

22    reg.

23    BY MR. HUDSON:

24       Q.    Can we agree that HBC had an obligation

25    to inform the field division office of the

80

```
1    Administration in its area of suspicious orders
2    when discovered by HBC?
3              MR. KOBRIN:  Object to form.
4              THE WITNESS:  As also stated in the
5    regulation.
6    BY MR. HUDSON:
7         Q.   So the answer is "yes"?
8         A.   Correct.
9    ████████████████████████████████████
10   ████████████████████████████████████
11   ████████████████████████████████████
12   ██████████████
13   ██████████████████████████████
14   ████████████████████████████████████
15   ████████████████
16   █████████████████████████
17   ██████████████████████████████████
18   ████████████████████████████████████
19   ████████████████████████████
20             MR. KOBRIN:  He supposes that it was --
21   you're saying designing --
22             MR. HUDSON:  Just let him answer the
23   question, please.
24             MR. KOBRIN:  I would just like to
25   clarify.
```

81

1          MR. HUDSON:  No.  I don't need a

2    clarification.  I've been patient.  You can say,

3    "Objection.  Form."  There's a pending question.

4    I'd like him to answer it.

5          MR. KOBRIN:  I just want to object that

6    it's not clear whether you're saying designing

7    between 2009 and 2016 or earlier.

8          MR. HUDSON:  You can say, "Objection.

9    Form."  That's fine.

10          MR. KOBRIN:  I'd like to get it in the

11    record.  That's all.  I don't think I'm

12    interfering with your deposition.

13          MR. HUDSON:  You are interfering with my

14    deposition because you're trying to clarify my

15    question.  You can say, "Objection.  Form."  Then

16    I'll clarify my question if I think the form is

17    wrong.

18          MR. KOBRIN:  He's struggling to give you

19    an answer.  He's clearly confused by your

20    question.

21          MR. HUDSON:  Do you want to coach

22    anymore?

23          MR. KOBRIN:  I don't think I'm coaching

24    at all.

25          MR. HUDSON:  Do you want to answer for

82

1    him?  "Objection.  Form" please.

2              THE WITNESS:  Go ahead and restate your

3    question.



83











88







91





93























104







107













113



















122



123







126











131





133





135





137





1 ████████████

2 ██████████████████████████

3 ████████████████████████

4 ██████████████████████████████

5 ███████████████████████████████

6 ██████████████

7           MR. HUDSON:  Let's take a break.

8           MR. KOBRIN:  We actually have lunch here

9 if you want to take lunch.

10           THE VIDEOGRAPHER:  12:45.  We're off the

11 video record.

12           (Recess from 12:45 p.m. to 1:38 p.m.)

13           THE VIDEOGRAPHER:  1:38.  We're on the

14 video record.

15 BY MR. HUDSON:

16    Q.  Mr. Millward, are you aware that this

17 litigation is about the opioid crisis?

18           MR. KOBRIN:  Object to form.

19           THE WITNESS:  As it's been explained to

20 me, yes.

21 BY MR. HUDSON:

22    Q.  Do you believe that there is an opioid

23 problem in the United States?

24           MR. KOBRIN:  Object to form.

25           THE WITNESS:  Define opioid problem.

140

1   BY MR. HUDSON:

2        Q.   Do you believe there's an opioid crisis

3   in the United States?

4             MR. KOBRIN:  Object to form.

5             THE WITNESS:  I believe that people

6   misuse illicit drugs or really anything,

7   unfortunately.

8   BY MR. HUDSON:

9        Q.   Do you believe though that there's an

10  opioid crisis in our country?

11            MR. KOBRIN:  Object to form.

12            THE WITNESS:  People misuse opiates.  I

13  believe they do.

14  BY MR. HUDSON:

15       Q.   And do you think that the misuse of

16  opiates has led to a crisis in our country?

17            MR. KOBRIN:  Object to form.

18            THE WITNESS:  I believe people make

19  choices that they end up dying.  It's unfortunate.

20  BY MR. HUDSON:

21       Q.   Do you believe that drug manufacturers,

22  distributors or dispensers have any responsibility

23  for creating problems with opioids in our country?

24            MR. KOBRIN:  Object to form.

25            THE WITNESS:  I can speak for -- well, I

1    believe that the stakeholders have a -- that those

2    medications like other dangerous prescription or

3    any prescription drug must be used appropriately

4    in order to be used safely.

5    BY MR. HUDSON:

6        Q.   So your view is that drugs must be used

7    appropriately in order to be used safely?

8        A.    Prescriptions dispensed, those

9    medications have a very legitimate use as defined

10   by the or as the DEA states in their scheduling as

11   well as the prescription piece, and when used for

12   a legitimate patient have a very legitimate use,

13   to prevent or to treat pain.

14       Q.   Do you have opinions though on whether

15   or not opioids are being misused in our country?

16       A.   Do I have opinions that they are?

17       Q.   Yes.

18           MR. KOBRIN:  Object to form.

19           THE WITNESS:  People abuse opiates.

20   BY MR. HUDSON:

21       Q.   Do you believe that the manufacturers,

22   distributors or dispensers of opioids in our

23   country have any responsibility for causing the

24   opioid crisis?

25           MR. KOBRIN:  Object to form.

1          MR. SHAPLAND:  Object to form.

2          THE WITNESS:  Responsibility for causing

3     that?  I can't speak to the manufacturers.  I can

4     only speak to Giant Eagle.  And the responsibility

5     is to ensure medications, regardless of the

6     medication, are dispensed pursuant to a legitimate

7     prescription for a legitimate medical use for an

8     end user patient.

9     BY MR. HUDSON:

10         Q.   And do you believe that Giant Eagle or

11    HBC has caused or contributed to the diversion of

12    any prescription drugs?

13         MR. KOBRIN:  Object to form.  I just

14    want to get it on the record that I think this is

15    exceeding the discovery ruling on questioning or

16    the discovery on the cause of the, quote-unquote,

17    opioid crisis.  I think that was excluded pursuant

18    to one of the special master's orders.

19    BY MR. HUDSON:

20         Q.   Do you agree that opioids have the

21    potential to be diverted for illegal purposes?

22         MR. KOBRIN:  Object to form.

23         THE WITNESS:  As part of the DEA's

24    classification of controlled substances, that's

25    one of the criteria.  Legitimate medical use is

143

1    part, and the other is likelihood of diversion or

2    misuse.

3    BY MR. HUDSON:

4        Q.   Do you believe that opioids though have

5    the potential for diversion?

6            MR. KOBRIN:  Object to form.

7            THE WITNESS:  As the DEA classifies

8    that, correct.

9    BY MR. HUDSON:

10       Q.   And to you, what does diversion mean?

11       A.   Diversion can be outright theft or that

12   end user patient not using the medication as

13   required or as prescribed or -- once that

14   medication leaves the realm of Giant Eagle's

15   control or the pharmacy's control in general and

16   that patient uses it outside as prescribed.

17       Q.   Anything else in terms of diversion?

18       A.   Not off the top of my head.

19   ████████████████████████████████████████████

20   ██████████████████████████████████████

21   ████████████████████████████████████

22   █████████████████████████████████████

23   ██████████████████████████████████

24   ██████████████████████████████████████

25   ████████████████████████████████████████████







146

147



148





150



151





153

1

2

3

4   BY MR. HUDSON:

5       Q.   Are you aware that HBC was a distributor

6   of hydrocodone combination products?

7       A.   As they were Schedule IIIs.

8       Q.   Are you familiar with hydrocodone

9   combination products?

10      A.   I am.

11      Q.   And you're familiar with hydrocodone?

12      A.   As a pharmacist.

13           (HBC-Millward Exhibit 6 was marked.)

14  BY MR. HUDSON:

15      Q.   Let me hand you what I've marked as

16  Exhibit 6 here.

17           MR. HUDSON:  Exhibit 6, P-GEN-86 is the

18  internal reference number.

19           MR. KOBRIN:  Is there a date on this

20  document?

21           MR. HUDSON:  I don't know.  I do know on

22  the second page, it says, "Hydrocodone is a

23  Schedule II narcotic that is marketed in

24  multi-ingredient Schedule III products."  So it

25  was before October 2014.

154

1    BY MR. HUDSON:

2         Q.   Have you had a chance to review the DEA

3    Drug Fact Sheet?

4         A.   Finishing up, but yes.

5              MR. KOBRIN:  Do you know where you got

6    this?

7              MR. HUDSON:  I think from the Drug

8    Enforcement Administration.

9              MR. KOBRIN:  Is it still up on their

10   website?

11             MR. HUDSON:  I don't know that.

12             THE WITNESS:  Okay.

13   BY MR. HUDSON:

14        Q.   Do you see there under the Overview, it

15   says, "Hydrocodone is the most frequently

16   prescribed opioid in the United States and is

17   associated with more drug abuse and diversion than

18   any other elicit or illicit opioid"?

19        A.   I do see that sentence.

20        Q.   Do you have any reason to disagree with

21   that sentence?

22        A.   No.  I don't have any data to dispute

23   the DEA's statement.

24        Q.   Then if you go down to the bottom, do

25   you see it says, "There are numerous brand and

155

1   generic hydrocodone products marketed in the

2   United States.  All are combination products.  The

3   most frequently prescribed combination is

4   hydrocodone and acetaminophen."

5        And then it's got examples of Vicodin and

6   Lortab, Lorcet, and then other examples of

7   combination products include those containing

8   aspirin, which, again, is Lortab ASA, ibuprofen

9   and then antihistamines.

10       And those are drugs you're familiar with;

11  correct?

12       A.   Correct.

13       Q.   Those were drugs that HBC acted as a

14  distributor of; correct?

15       A.   The hydrocodone-containing products?

16       Q.   Yeah, hydrocodone combination products.

17       A.   Combination products?

18       Q.   Yes.

19       A.   I'm sorry.  Thank you.  Yes.

20       Q.   Do you have any sense of the volume of

21  hydrocodone combination products that HBC acted as

22  a distributor of?

23       A.   I do not.

24       Q.   Let me -- I'm going to avoid marking

25  these, but I'm going to hand you what I'll

156

1    represent to you is a printout of a spreadsheet

2    that was provided to us, and I believe in the top

3    right it says P-HBC-6011.

4        And, again, I'll represent to you that I took

5    the spreadsheet that was transactional data of HBC

6    and just sorted it by order of date.

7        A.   Okay.  I see that on the third column

8    from the right.

9        Q.   Right.  So you see there and then under

10   the drug name, you see hydro, hydro, hydro, all

11   the way down.  And then it's got the buyer's

12   number, the buyer's address, the buyer's city, the

13   buyer's state.

14       What you have before you are all transactions

15   or shipments that were sent by HBC to retail

16   pharmacies in Summit County.  And you can probably

17   recognize that from the names of the cities.

18       A.   I'll be honest.  I'm not familiar with

19   the county designations for Ohio as a geography

20   thing.

21       Q.   And then also, one of the requirements

22   under the Controlled Substances Act is to report

23   data to the DEA's ARCOS unit; correct?

24       A.   Correct.

25       Q.   And that was also something that HBC did

157

1    during the time it was a distributor; correct?

2         A.   I believe so.  Did not oversee that.

3              (HBC-Millward Exhibit 7 was marked.)

4    BY MR. HUDSON:

5         Q.   Let me hand you what I've marked as

6    Exhibit 7.

7              MR. KOBRIN:  Are we going to make this

8    as an exhibit?  We'd like to mark it as an

9    exhibit.

10             MR. HUDSON:  Do you want to mark it?

11             MR. KOBRIN:  Yeah.  I think it makes

12   sense.

13             (HBC-Millward Exhibit 8 was marked.)

14             MR. HUDSON:  That's fine.  So we'll mark

15   that as Exhibit 8.  I apologize.  I don't have

16   copies because I was not going to mark it.

17             MR. BARTON:  So HBC-6011 is Exhibit 8.

18             (HBC-Millward Exhibit 9 was marked.)

19   BY MR. HUDSON:

20        Q.   What I'll do is I'll go ahead and

21   mark -- I'll go ahead and mark as 9 what I'm

22   handing you here, which is the data into Cuyahoga,

23   the data of shipments from HBC into retail

24   pharmacies in Cuyahoga.

25             MR. KOBRIN:  That is 9?

158

1          MR. HUDSON:  That is 9.

2     BY MR. HUDSON:







161















168

1          And then ultimately, in the last statement on

2     the controlled substances dispensing guidelines, a

3     pledge to the pharmacist that if they determine a

4     prescription was not legitimate or a doctor

5     couldn't justify its use and they chose not to

6     fill it, the company would support them.

7          Q.   But before we talked about the types of

8     diversion, and you said theft; right?

9          A.   Correct.

10         Q.   So you've got written policies in place

11    at the retail pharmacy level to prevent theft;

12    correct?

13         A.   Correct.

14         Q.   Explain to me in the overall suspicious

15    order monitoring system how what happens at the

16    retail operations or what happens at corporate has

17    an impact on a suspicious order monitoring system

18    at the HBC warehouse.

19         A.   Again, it goes down to the levels, the

20    integrated levels of control, that we spoke about,

21    over.

22         Q.   Specifically, what is the integration

23    though?

24         A.   The store level responsibilities to

25    prevent the opportunity for theft and diversion or

169

 1   theft at the store level.  On the handling of the

 2   medication, pharmacies, for example, are required

 3   to do a physical inventory every month.  And

 4   that's a standard of practice across retail, or at

 5   least in my experience through Rite-Aid and Giant

 6   Eagle, as an example of one of those control

 7   mechanisms.

 8        Q.   You keep using the word "integrated,"

 9   integrated system.  How is that policy in place at

10   a retail pharmacy to prevent theft, how is that

11   integrated into what HBC is doing at their

12   warehouse?

13             MR. KOBRIN:  Object to form.

14             THE WITNESS:  Having control of the

15   product the entire -- so Giant Eagle has control

16   of that product the entire way from when it comes

17   into the distribution center to when it goes to

18   the end user patient, and those policies and

19   dispensing procedures and pharmacy laws, rules and

20   regulations all play roles into ensuring that --

21   play a role that the medications are dispensed

22   appropriately for legitimate prescriptions, and

23   have procedures in place that if there is a

24   discrepancy that's found, that it is investigated

25   and reported as appropriate, as required.

170

1   BY MR. HUDSON:

2        Q.   Let me ask you this:  How many shipments

3   to retail pharmacies, Giant Eagle retail

4   pharmacies, did Giant Eagle retail pharmacies

5   report to the DEA as being suspicious?

6             MR. KOBRIN:  Object to form.

7             THE WITNESS:  Timeframe, please.

8   BY MR. HUDSON:

9        Q.   Ever.

10       A.   I can't speak for anything beyond or

11  prior to my time.

12       Q.   2009 to 2016 then.  Are you aware of any

13  Giant Eagle retail pharmacy that ever reported to

14  the DEA a suspicious order of controlled

15  substances?

16       A.   A Giant Eagle pharmacy?

17       Q.   Yes.

18       A.   Reporting a suspicious order?

19       Q.   Correct.

20       A.   Suspicious prescription?  Because the

21  pharmacy would see the prescription.

22       Q.   A suspicious order.  If it's an

23  integrated system, are you saying that the retail

24  pharmacies are playing some role in trying to

25  identify orders of unusual size?

1      A.   The system is designed to prevent orders

2   of unusual size or to identify and call them out.

3      Q.   Right.  So is it your testimony that

4   Giant Eagle retail pharmacies, as part of their

5   integrated system, actually played a role and

6   tried to identify orders of unusual size?

7      A.   I believe there were two orders that

8   were identified and reported.

9      Q.   And those were of buprenorphine?

10     A.   Buprenorphine, yes.  You can say

11  Subutex, which is the brand name of the single

12  entity.

13     Q.   Neither one of those were hydrocodone

14  combination products; right?

15     A.   That is correct.

16     Q.   Both of those were orders that were

17  detected at HBC or were those detected by retail

18  pharmacies?

19     A.   They were detected --

20          MR. KOBRIN:  Object to form.

21          THE WITNESS:  They were detected

22  corporately.

23  BY MR. HUDSON:

24     Q.   And when you say corporately, what do

25  you mean?

172

```
 1        A.   In the office we created a reporting

 2   system to see if there were -- among the other

 3   tools that we had and the other policies and

 4   procedures in place, a tool to assist us in

 5   looking at, as I stated earlier, looking at

 6   monitoring drug movement throughout the

 7   organization.

 8        Q.   And was that the threshold reports?

 9        A.   Threshold was a tool that assisted in

10   the process.

11        Q.   When was this process put in place?

12        A.   Specific date I don't recall.  You may

13   have to refresh me.  But I would say somewhere

14   2013-ish.

15        Q.   Who put the process or practice in

16   place?

17             MR. KOBRIN:  Object to form.

18             THE WITNESS:  It was a team approach.

19   BY MR. HUDSON:

20        Q.   Was this the project with Kayla Voelker?

21        A.   Correct.

22        Q.   And she then created the daily

23   suspicious reports?

24        A.   Well, the white board planning would

25   have been involving more Shawn Boyton.  Kayla was
```

1    the execution piece for generating the reports.

2         Q.   And were you also involved?

3         A.   Yes.

4         Q.   So did you and Shawn Boyton -- you then

5    white boarded a process or a practice to follow to

6    flag suspicious orders?

7              MR. KOBRIN:  Object to form.

8              THE WITNESS:  Shawn was more well versed

9    in the systems, the inventory systems piece beyond

10   me.  That was outside of my expertise.  The

11   nitty-gritty of it I should say.

12   BY MR. HUDSON:

13        Q.   Describe for me how the process or

14   practice worked.

15             MR. KOBRIN:  Object to form.  No

16   foundation.

17             THE WITNESS:  Once the report was

18   generated you mean?

19   BY MR. HUDSON:

20        Q.   In general -- sorry.  I didn't mean to

21   interrupt you.  I'll start over.

22        At some point in 2013, you and Shawn Boyton

23   sat down and white boarded out a process for

24   monitoring shipments of prescription drugs; right?

25             MR. KOBRIN:  Object to form.











179

1       A.   I have no idea.

2            MR. KOBRIN:  Object to form.

3            THE WITNESS:  I don't recall the

4    specific date that they began.

5    BY MR. HUDSON:

6       Q.   Any reason to believe it wasn't October

7    of 2013?

8       A.   Again, I don't know the date it started,

9    the exact date, but somewhere.

10      Q.   I've represented to you the earliest

11   ones I could find is October 2013.

12      My question is just:  Is there any reason

13   that you have to believe that these reports were

14   being created before October of 2013?

15      A.   I don't have, based on the refresh, have

16   any documentation to say that they were created

17   before.

18      Q.   So who created -- by the way, is that an

19   SQL?  Have you heard that phrase before?

20           MR. KOBRIN:  Object to form.

21           THE WITNESS:  I've heard it.  I'm not an

22   Excel person, to tell you the truth.  So I

23   couldn't create it.

24   BY MR. HUDSON:

25      Q.   Just tell me what you know about how

                                                                    180

1    this daily control report worked.  What would

2    happen?

3              MR. KOBRIN:  Object to form.

4              THE WITNESS:  It is a report that would

5    be the -- it was a daily report and reviewing or

6    identifying stores that had been shipped

7    quantities to -- based on our first pass at what

8    a, as they call them, fresh quantity, again our

9    first pass at what that would be, how their

10   accumulation for the calendar month would be.

11   BY MR. HUDSON:

12        Q.   Would these be generated each day?

13        A.   Correct.

14        Q.   Then who received them?

15        A.   I don't have the email list.  I received

16   them.  There were a number of people that received

17   them.

18        Q.   You received the report each day or you

19   received an email or how -- in what form did you

20   receive a report?

21             MR. KOBRIN:  Object to form.

22             THE WITNESS:  The report came via email,

23   but I cannot recall generated directly from the

24   system or forwarded over after it was -- if it was

25   run, if it was an automatic distribution.







184



185







188













194



195





197





199



200





202





204



```
 1        A.    Anybody who received the report could
 2   reach out.  Nothing precluded those individuals
 3   from doing so.
 4        Q.    Was there a process in place?  How did
 5   you decide who did what?
 6        A.    The process would be either George or I
 7   would reach out to that pharmacy district leader
 8   to contact, contact either by phone, email or
 9   physical on-site visit.
10        Q.    Then as a result of that review or
11   investigation, if there was reason to believe that
12   the order was not legitimate, then you would
13   report that to the DEA and stop the shipment?
14        A.    So based on their -- so the PDL is --
15   the report triggers the PDL's review of the store.
16   Report is forwarded down.  Ultimately, they're the
17   one going in or having that discussion.
18        And then if the movement is deemed as -- so
19   if the movement is deemed as suspicious in the
20   case of a store where we had a change in
21   prescribing pattern, then shipments to the store
22   would be deemed suspicious, stopped and reported
23   to the DEA.
24        Q.    In your time at Giant Eagle, there were
25   only two times that reports were made to the DEA;
```

1   correct?

2       A.   That's correct.

3       Q.   So in your time at Giant Eagle, you're

4   aware of only two suspicious orders that existed

5   of shipments from HBC to Giant Eagle; correct?

6       A.   There were two occasions when the

7   movement, in this case not theft, but an unusual

8   prescribing pattern of buprenorphine products were

9   flagged or stopped, reported.  The store was --

10  shipments to the store for that chemical were

11  halted and the -- which then the team interviewed,

12  retrained on the controlled substance dispensing

13  guidelines, the guidelines in the pharmacist

14  manual from the DEA, as far as understanding and

15  catching red flags, dispensing red flags, in this

16  case, prescriptions from a set of -- subset of

17  prescribers.

18      Q.   I guess what I was getting at is all

19  suspicious orders from Giant Eagle -- I'm sorry --

20  from HBC to Giant Eagle were reported to the DEA;

21  correct?

22           MR. KOBRIN:  Object to form.

23           THE WITNESS:  The two suspicious orders

24  identified were reported to the DEA.

25

207







210



211



212



213



214



215



216



217













223





225



226



227



228



229





231





233



234



235





236



238





240





242



243

BY MR. HUDSON:

Q.   Is that type of business at higher risk for diversion?

MR. KOBRIN:  Object to form.

THE WITNESS:  Well, not being in that business, I can't say, because I don't -- I don't know necessarily.  Okay?  But that type of business certainly has -- requires or garners a significant amount of, let's say, review from the DEA.  And I didn't believe in it, don't believe that was the right thing for any of our business.

BY MR. HUDSON:

Q.   Do you know whether or not Giant Eagle retail pharmacies were filling prescriptions that were being written at pain management clinics?

A.   Giant Eagle pharmacies were filling prescriptions brought by patients that were -- the pharmacists were required to do their due diligence to determine is that a legitimate prescription for a legitimate medical use from a physician acting in their course of practice.

So I believe whether it's from a dentist, as long as the pharmacist made their -- exercised their corresponding responsibility to determine that prescription was legitimate, I believe the

244

1    prescription was -- that they acted in the course

2    of their professional practice as the pharmacist

3    in determining that.

4         Q.   But as a pharmacist, how do you know if

5    the prescription is coming from a legitimate

6    doctor or an illegitimate doctor?

7              MR. KOBRIN:  Object to form.

8              THE WITNESS:  That's a very interesting

9    question.  You have to do your due diligence and

10   make your individual determination based on the

11   prescription, the prescribing pattern of the

12   physician, the patient, to determine is this a --

13   is it being used for legitimate use.  It could be

14   talking to the patient, saying, why are you using

15   this.

16       In our controlled substance dispensing

17   guidelines, it's called out for the pharmacists

18   are empowered to call the doctor to get the

19   diagnoses, to get -- as far as even getting

20   progress notes.  We coach them to say -- the

21   burden of proving that it's a legitimate

22   prescription falls onto the prescriber before they

23   fill that -- before they make that fill or do not

24   fill determination.  That's how our pharmacists

25   were trained and coached.

245





247





249



250



251



252







255





257

```
 1   distributor of those products; correct?

 2       A.   Again, I can't speak to what happened

 3   before I was in the role, understanding -- with

 4   that qualifier.

 5       Q.   At least while you were there though,

 6   you agree there was never a shipment of

 7   hydrocodone combination products that were blocked

 8   from shipment at HBC; correct?

 9       A.   I'm not aware of any shipment that was

10   blocked.

11       Q.   You agree that during the time you were

12   the senior manager of compliance, there was never

13   a shipment of hydrocodone combination products

14   where you notified the DEA that they were a

15   suspicious order; right?

16       A.   Again, I'm not aware that there was a

17   flag that was deemed to be suspicious.

18           MR. HUDSON:  I don't have any further

19   questions.

20                    EXAMINATION

21   BY MR. KOBRIN:

22       Q.   Mr. Millward, you were asked earlier

23   today about stopping shipments on orders of

24   interest while they were being investigated.

25       Do you recall that line of questioning?
```

1        A.   I do.

2        Q.   Tell me, are there different means

3   through which Giant Eagle or HBC investigates an

4   order of interest?

5        A.   Yes.  We talked at length about the

6   threshold or the Voelker report, so to speak, but

7   there were other systems in place.  Giant Eagle

8   invested in two tools from a company by the name

9   of Supply Logics.

10       Supply Logics had two products, Pinpoint

11  Monitor and Pinpoint Audit, one looking at

12  pharmacy purchasing patterns, the other looking at

13  pharmacy dispensing patterns.

14       Giant Eagle also invested in a dedicated

15  person to review those or to have access and

16  review those tools to look for any -- really as a

17  redundant mechanism to look for any kind of

18  movement of controlled substances that could

19  potentially be a flag for investigation.

20       Q.   Just to clarify the record, are there

21  situations where through this investigation you

22  could stop an order of interest before it shipped?

23       A.   That is correct.  If a report was

24  generated or a flag was generated, we had the

25  potential to stop the orders for that store until

```
 1    an investigation could be fully fleshed out.
 2        Q.   That was if a flag was generated by the
 3    person you had hired to do investigation --
 4        A.   Correct.
 5        Q.   -- with this Supply Logic program?
 6        A.   Correct.  His name was Jason Mullen.
 7        Q.   And he could do these investigations and
 8    he could stop the shipment when that store made an
 9    order if he found there was a reason to
10    investigate that store; is that correct?
11        A.   That is correct.
12        Q.   Now, were there other situations in
13    which you could not necessarily stop a shipment
14    even after you identified an order of interest?
15        A.   So the Kayla report was a report that
16    came out the next day after a store had received
17    the order, and that's where that store had already
18    received it.  So it afforded the opportunity to
19    investigate at that point and stop future orders
20    it determined to be suspicious and then
21    subsequently reported as required.
22        Q.   Did you ever do that, stop future
23    orders?
24        A.   We did.
25        Q.   And was there anything else you could do
```

1    even if the order had been started to be filled at

2    the warehouse or even filled at the warehouse and

3    shipped?  Had you lost control of the order?

4        A.   Because, as stated earlier, Giant Eagle

5    distributed to itself, we were our customer, we

6    knew everything about the characteristics of our

7    store and had control of and control of the

8    product from where it entered into the DC till it

9    left in a prescription for an end user patient.

10       If something needed to be quarantined and

11   removed from dispensing stock, we had the ability

12   to have our stores pull that aside, if necessary,

13   to prevent it from being dispensed.

14       Q.   You talked about a visit to Purdue that

15   you made in order to see their practices.  Why did

16   Giant Eagle visit Purdue?

17       A.   It was a conference call.  It was a

18   conference call that we had.  And I believe Purdue

19   reached out to us through the purchasing group,

20   put in contact with me for George and I to have a

21   conference call, again, along the lines of the

22   Thrifty White, for example.

23       It was just another example of reaching out

24   to determine what are some other things other

25   organizations -- now Purdue being very different

261





263







266



267















274



275







278



22      Q.   No further questions.  Thank you.

23            THE VIDEOGRAPHER:  6:14.  We're off the

24      video record.  This concludes the video deposition

25      of Joseph Millward.

279

1          (Whereupon, at 6:14 p.m., the taking of

2    the instant deposition ceased.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    COMMONWEALTH OF PENNSYLVANIA  )

 2    COUNTY OF ALLEGHENY            )     SS:

 3                    C E R T I F I C A T E

 4            I, Ann Medis, Registered Professional

 5    Reporter, Certified Livenote Reporter and Notary

 6    Public within and for the Commonwealth of

 7    Pennsylvania, do hereby certify:

 8            That JOSEPH E. MILLWARD, the witness

 9    whose deposition is hereinbefore set forth, was

10    duly sworn by me and that such deposition is a

11    true record of the testimony given by such

12    witness.

13            I further certify the inspection,

14    reading and signing of said deposition were not

15    waived by counsel for the respective parties and

16    by the witness.

17            I further certify that I am not related

18    to any of the parties to this action by blood or

19    marriage and that I am in no way interested in the

20    outcome of this matter.

21            IN WITNESS WHEREOF, I have hereunto set

22    my hand this 27th day of December, 2018.

23

24            _____
                        Notary Public

25
```

281

1   COMMONWEALTH OF PENNSYLVANIA   )   E R R A T A
    COUNTY OF ALLEGHENY            )   S H E E T

2

3       I, JOSEPH E. MILLWARD, have read the
    foregoing pages of my deposition given on

4   December 20, 2018, and wish to make the following,
    if any, amendments, additions, deletions or

5   corrections:

6

     Line    Change and reason for change:

7

8   _____  _____  _____

9   _____  _____  _____

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18  _____  _____  _____

19  In all other respects, the transcript is true and
    correct.

20

21            _____

22            JOSEPH E. MILLWARD

23  _____ day of _____, 2018.

24  _____

            Notary Public

25