Highly Confidential - Subject to Further Confidentiality Review

```
1              IN THE UNITED STATES DISTRICT COURT
2               FOR THE NORTHERN DISTRICT OF OHIO
3                        EASTERN DIVISION
4                           -  -  -
5
       IN RE:  NATIONAL        :   HON. DAN A.
6      PRESCRIPTION OPIATE      :   POLSTER
       LITIGATION               :
7                               :
       APPLIES TO ALL CASES     :   NO.
8                               :   1:17-MD-2804
                                :
9

            - HIGHLY CONFIDENTIAL -
10
     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11

                         -  -  -
12
                     January 16, 2019
13
                         -  -  -
14
15            Videotaped deposition of
     KEVIN MITCHELL, taken pursuant to notice,
16   was held at the Doubletree Resort by
     Hilton, 2400 Willow Street Pike,
17   Lancaster, Pennsylvania, beginning at
     9:34 a.m., on the above date, before
18   Michelle L. Gray, a Registered
     Professional Reporter, Certified
19   Shorthand Reporter, Certified Realtime
     Reporter, and Notary Public.
20
                         -  -  -
21
22          GOLKOW LITIGATION SERVICES
          877.370.3377 ph| 917.591.5672
23               deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

1 APPEARANCES:
2
3 BARON & BUDD, P.C.
BY: W. SCOTT SIMMER, ESQ.
600 New Hampshire Avenue, NW
4 The Watergate, Suite 10-A
Washington, D.C. 20037
5 (202) 333-4562
Ssimmer@baronbudd.com
6 Representing the Plaintiffs
7
MORGAN LEWIS & BOCKIUS, LLP
8 BY: ELISA P. McENROE, ESQ.
1701 Market Street
9 Philadelphia, Pennsylvania 19103
(215) 963-4824
10 Elisa.mcenroe@morganlewis.com
11   - and -
12 MORGAN LEWIS & BOCKIUS
BY: KELLY A. MOORE, ESQ.
13 BY: MATTHEW R. LADD, ESQ.
101 Park Avenue
14 New York, New York 10178
(212) 309-6734
15 kelly.moore@morganlewis.com
matthew.ladd@morganlewis.com
16 Representing the Defendant, Rite Aid of
Maryland and the Witness
17
18
19
20
21
22
23
24

Page 3

1 TELEPHONIC APPEARANCES:
2
3 BARON & BUDD, P.C.
BY: WILLIAM G. POWERS, ESQ.
600 New Hampshire Avenue, NW
4 The Watergate, Suite 10-A
Washington, D.C. 20037
5 (202) 333-4562
Wpowers@baronbudd.com
6
7   - and -
8 BARON & BUDD, P.C.
BY: NOAH M. RICH, ESQ.
9 600 New Hampshire Avenue, NW
The Watergate, Suite 10-A
10 Washington, D.C. 20037
(202) 333-4562
11 Nrich@baronbudd.com
Representing the Plaintiffs
12
JONES DAY
13 BY: MIRIAM LIABO, ESQ.
77 West Wacker
14 Chicago, Illinois 60601
(312) 269-4166
15 Mliabo@jonesday.com
Representing the Defendant, Walmart
16
17 COVINGTON & BURLING, LLP
BY: LAUREN C. DORRIS, ESQ.
18 850 10th Street, NW
Washington, D.C. 20001
19 (202) 662-6000
ldorris@cov.com
20 Representing the Defendant, McKesson
Corporation
21
22
23
24

Page 4

1 TELEPHONIC APPEARANCES: (Cont'd.)
2
3 ARNOLD PORTER KAYE SCHOLER, LLP
BY: DAVID HIBEY, ESQ.
4 601 Massachusetts Ave, NW
Washington, D.C. 20001
5 (202) 942-6992
David.hibey@arnoldporter.com
6 Representing the Defendants, Endo Health
Solutions Endo Pharmaceuticals, Inc.; Par
7 Pharmaceutical Companies, Inc. f/k/a Par
Pharmaceutical Holdings, Inc.
8
9 JACKSON KELLY, PLLC
BY: ANGELA L. FREEL, ESQ.
10 221 NW Fifth Street
Evansville, Indiana 47708
11 (812) 422-9444
alfreel@jacksonkelly.com
12 Representing the Defendant,
AmerisourceBergen Drug Corporation
13
14 ALSO PRESENT:
15
Gretchen Kearney - Paralegal
16 (Baron Budd)
17 Emma Kaboli, Paralegal
(Baron Budd - via telephone)
18
19 VIDEO TECHNICIAN:
Ray Moore
20
21 LITIGATION TECHNICIAN:
Mike Kutys
22
23
24

Page 5

1   - - -
2 I N D E X
3   - - -
4
Testimony of:
5
          KEVIN MITCHELL
6
7   By Mr. Simmer    12, 340, 343
8   By Ms. McEnroe    323, 341
9
10
11   E X H I B I T S
12
13   - - -
14 NO.    DESCRIPTION        PAGE
15 Rite Aid
Mitchell-1   LinkedIn       20
16             Profile, Kevin
              Mitchell
17
18 Rite Aid
Mitchell-2   E-mail Thread     89
19             1/28/08
              Subject,
20             Information Needed
              Rite_Aid_OMDL_0016954
21 Rite Aid
Mitchell-3   Justice News      116
22             Rite Aid Corporation
              And Subsidiaries Agree
23             To Pay $5 Million
              1/12/09
24

Page 6

E X H I B I T S (Cont'd.)
- - -

NO.        DESCRIPTION        PAGE

Rite Aid
Mitchell-4  Settlement and        124
            Release Agreement
            1/9/09

Rite Aid
Mitchell-5  Memorandum of        127
            Agreement
            1/12/09

Rite Aid
Mitchell-6  E-mail Thread        138
            8/4/08
            Subject, Generic
            Vicodin Replenishment
            Rite_Aid_OMDL_0027316-23

Rite Aid
Mitchell-7  DC Self Assessment    177
            Program
            Rite_Aid_OMDL_0020535

Rite Aid
Mitchell-8  E-mail Thread        217
            10/10/07
            Subject, Control
            Cage Procedures
            Rite_Aid_OMDL_0016204-05

Rite Aid
Mitchell-9  Controlled Drug      221
            Above Average
            Order Monitoring Program
            Rite_Aid_OMDL_0016253-55

Page 7

E X H I B I T S (Cont'd.)
- - -

NO.        DESCRIPTION        PAGE

Rite Aid
Mitchell-10  Drug Diversion      235
            Training
            Rite_Aid_OMDL_0016230-31

Rite Aid
Mitchell-11  E-mail, 5/3/11      242
            Subject, Above
            Threshold
            Rite_Aid_OMDL_0013106-07

Rite Aid
Mitchell-12  Regulatory          264
            Guidelines Policy
            VI Excessive Order
            Monitoring
            Rite_Aid_OMDL_0020703
            Rite_Aid_OMDL_0020727

Rite Aid
Mitchell-13  E-mail Thread       288
            7/31/09
            Subject, Register Now
            for the 7th Annual
            Controlled Substances
            Conference
            Rite_Aid_OMDL_0020388-90

Rite Aid
Mitchell-14  E-mail Thread       294
            4/11/11
            Subject, Suspicious
            Order Monitoring
            Rite_Aid_OMDL_0050628-30

Page 8

E X H I B I T S (Cont'd.)
- - -

NO.        DESCRIPTION        PAGE

Rite Aid
Mitchell-15  Cegedim Web Printout  296
            Suspicious Order
            Monitoring Programs

Rite Aid
Mitchell-16  E-mail, 6/3/11      304
            Subject, SOM
            Rite_Aid_OMDL_0050634

Rite Aid
Mitchell-17  E-mail Thread       311
            11/16/10
            Subject, PSE in
            California
            Rite_Aid_OMDL_0050632

Rite Aid
Mitchell-18  E-mail Thread       315
            12/3/10
            Subject, Threshold
            Cutbacks
            Rite_Aid_OMDL_0046564-65

Rite Aid
Mitchell-19  E-mail Thread       332
            9/22/05
            Subject, DEA Audit
            Perryman Distribution
            Center
            Rite_Aid_OMDL_0047171-72

Rite Aid
Mitchell-20  E-mail Thread       338
            9/30/09
            Subject, DEA Audit
            Rite_Aid_OMDL_0046772-73

Page 9

- - -
P R E V I O U S L Y   M A R K E D
E X H I B I T S
- - -

NO.        DESCRIPTION

Rite Aid
Chapman-1    E-mail Thread
            11/9/09
            Subject, Week of 11/9
            Rite_Aid_OMDL_0020412

Highly Confidential - Subject to Further Confidentiality Review

1        - - -
2        DEPOSITION SUPPORT INDEX
3        - - -

5   Direction to Witness Not to Answer
6   PAGE   LINE
    None.
7
8   Request for Production of Documents
9   PAGE   LINE
    None.
10
11  Stipulations
12  PAGE   LINE
    None.
13
14  Questions Marked
15  PAGE   LINE
    None.
16
17
18
19
20
21
22
23
24

1    THE VIDEOGRAPHER:  We are
2  now on the record.  My name is Ray
3  Moore.  I'm a videographer for
4  Golkow Litigation Services.
5    Today's date is January 16,
6  2019, and the time is 9:34 a.m.
7    This video deposition is
8  being held in Lancaster,
9  Pennsylvania, in the matter In Re
10  National Prescription Opiate
11  Litigation for the United States
12  District Court for the Northern
13  District of Ohio, Eastern
14  Division, MDL No. 2804.
15    The deponent is Kevin
16  Mitchell.
17    Counsel will be noted on the
18  stenographic record.
19    The court reporter is
20  Michelle Gray and will now swear
21  in the witness.
22        - - -
23    ... KEVIN MITCHELL, having
24  been first duly sworn, was

1  examined and testified as follows:
2        - - -
3        EXAMINATION
4        - - -
5  BY MR. SIMMER:
6    Q.   Good morning, Mr. Mitchell.
7  My name is Scott Simmer.  I'm here -- I'm
8  here to ask you some questions on behalf
9  of the plaintiffs in this matter.  Let me
10  go over some of the ground rules before
11  we get started.  First of all, I'm going
12  to be asking you a series of questions
13  that you will answer.  The court reporter
14  is taking down a verbatim transcript of
15  everything that we both say.  So it's
16  important that we don't talk over each
17  other.
18        Do you understand?
19    A.   Yes, sir.
20    Q.   And that you have to answer
21  verbally.  You can't answer just by
22  nodding your head.  She cannot take that
23  down on her transcript.
24        Do you understand?

1    A.   Yes, sir.
2    Q.   You need to answer fully and
3  accurately and verbally as I say.
4        Do you understand?
5    A.   Yes, sir.
6    Q.   If you don't understand a
7  question that I've asked, ask me to
8  rephrase.  I will be glad to do that.
9        Do you understand that?
10    A.   Yes, I do.
11    Q.   And when I say you must
12  answer truthfully, you understand that
13  there are penalties for failing to answer
14  a question truthfully, correct?
15    A.   Yes.
16        MS. McENROE:  Objection to
17    form.
18  BY MR. SIMMER:
19    Q.   And that's called perjury.
20        Do you understand that?
21        MS. McENROE:  Objection to
22    form.
23        You may answer.
24        THE WITNESS:  Yes, sir.

Page 14

1 BY MR. SIMMER:
2     Q.   You can request a break at
3 any time.  I just ask if there's a
4 question pending, you answer the question
5 before you take a break.  Is that fair?
6     A.   Yes, sir.
7     Q.   From time to time, counsel
8 sitting next to you will be lodging
9 objections.  Unless they tell you not to
10 answer, you must still answer the
11 question.
12        Do you understand?
13     A.   Yes, I do.
14     Q.   Is there any reason why you
15 cannot testify truthfully and accurately
16 today?
17     A.   No, sir.
18     Q.   Are you taking any
19 medication that would interfere with your
20 ability to answer these questions
21 truthfully?
22     A.   No, sir.
23     Q.   What's your understanding of
24 why you are here today?

Page 15

1     A.   My understanding is the role
2 that I had while I was at Rite Aid is why
3 I'm here.
4     Q.   Have you reviewed any of the
5 pleadings in this case?
6     A.   No, sir.
7     Q.   Did you meet with attorneys
8 representing the company in preparation
9 for your deposition?
10     A.   Yes.
11     Q.   Who did you meet with?
12     A.   With Elisa, Matt, and Kelly.
13     Q.   And when did you meet with
14 them?
15     A.   Yesterday.
16     Q.   Any other occasions beyond
17 yesterday?
18     A.   Maybe a month and a half,
19 two months ago.
20     Q.   And how long did you meet
21 with them each time?
22     A.   Back, October, November
23 approximately five hours.  And yesterday
24 from 9:30 until about 5:30 yesterday

Page 16

1 evening.
2     Q.   Are you being compensated
3 for your time to testify today?
4     A.   No, sir.
5     Q.   Did you retain Morgan Lewis
6 to be your counsel in this deposition?
7     A.   Yes.
8     Q.   Did you sign a retainer
9 agreement retaining them to represent you
10 today?
11     A.   I have not.
12     Q.   Did you get some kind of a
13 letter from them that you countersigned
14 of any kind where you agreed to have them
15 represent you today?
16     A.   I have not signed, no.
17     Q.   Are you paying them to be
18 your counsel today?
19     A.   No, sir.
20     Q.   Is it your understanding
21 that they are representing you or are
22 they representing Rite Aid?
23     A.   They're rep --
24        MS. McENROE:  Objection to

Page 17

1 form.
2        Go ahead.
3        THE WITNESS:  Representing
4 Rite Aid.
5 BY MR. SIMMER:
6     Q.   Have you been involved in
7 litigation before of any kind?
8     A.   I have not.
9     Q.   What about as a party in,
10 say, a bankruptcy?
11     A.   No, sir.
12     Q.   Any criminal proceedings?
13     A.   No, sir.

Highly Confidential - Subject to Further Confidentiality Review

Page 18



Page 20

1    A.    Nothing.
2    Q.    -- of any kind?
3    A.    No, sir.
4    Q.    Again, you are going to have
5 to let me finish my questions before --
6 before you start answering.
7         Do you have any hardcopy
8 files of any kind?
9    A.    No, sir.
10    Q.    Your understanding, the
11 company provided certain documents that
12 were from your e-mail folders and other
13 folders from your time during your
14 employment with the company?
15    A.    Yes, sir.
16    Q.    Did you give any direction
17 to the Rite Aid's counsel about where to
18 get your materials?
19    A.    No, sir.
20         (Document marked for
21         identification as Exhibit Rite Aid
22         Mitchell-1.)
23 BY MR. SIMMER:
24    Q.    The court reporter has

Page 19

6    Q.    Have you been a witness in
7 any kind of litigation before?
8    A.    No, sir.
9    Q.    Ever testified in a
10 deposition?
11    A.    No, sir.
12    Q.    In advance of today's
13 deposition, did the company ask for you
14 to provide it copies of any documents
15 that you still had from your Rite Aid
16 employment?
17    A.    No, sir.
18    Q.    Do you still have any
19 documents from your time as an employee
20 of Rite Aid?
21    A.    I do not.
22    Q.    Not a computer of any kind?
23    A.    No, sir.
24    Q.    Hard drive --

Page 21

1 handed you what we've marked as Mitchell
2 Exhibit Number 1.  If you can take a look
3 at that for a moment.  I'll ask you some
4 questions.
5         Are you done reviewing
6 the --
7    A.    Yes, sir.
8    Q.    -- document?
9         Again, you -- you let me
10 finish my question before you start to
11 answer.
12         This appears to be your
13 LinkedIn page, correct?
14    A.    Yes, sir.
15    Q.    And did you put the content
16 in here that describes what your
17 employment history has been?
18    A.    Yes, sir.
19    Q.    Does it appear to be
20 accurate?
21    A.    Yes, sir.
22    Q.    One area it does not cover
23 is your education background.  Could you
24 tell us what your education background is

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 starting with high school?
2    A.   George Washington High
3 School, 1983 graduate.
4    Q.   What town is that?
5    A.   Danville, Virginia.  Then I
6 attended Danville Community College,
7 1983, 1984, also in Danville, Virginia.



22    A.   I joined the United States
23 Marine Corps.
24    Q.   How long were you in the

Page 23

1 Marine Corps?
2    A.   Just shy of seven years,
3 sir.
4    Q.   And what was the highest
5 rank that you achieved?
6    A.   Sergeant.
7    Q.   And what were your
8 specializations in the Marine Corps?
9    A.   I worked in the -- I was an
10 0151 which was an administrative clerk
11 and I -- at Camp Lejeune I was the
12 administrative chief, so I was in charge
13 of any and all admin duties as required
14 by the 10th Marine Regimental
15 Headquarters.
16       Then I moved -- my last role
17 was inspector/instructor staff, I&I duty,
18 in Allentown, Pennsylvania, where I was
19 responsible for training reservists.
20    Q.   You received an honorable
21 discharge?
22    A.   Yes, sir.
23    Q.   What's your first employment
24 after you left the Marine Corps?

Page 24

1    A.   I worked as a temp for
2 Manpower for just several months before I
3 started with Frito Lay.
4    Q.   So on your LinkedIn page
5 that's Exhibit 1, it references that you
6 were senior office manager at PepsiCo.
7 Is that related to Frito Lay?
8    A.   Frito Lay is owned by
9 PepsiCo, yes, sir.
10    Q.   And what were your
11 responsibilities?
12    A.   Started as the warehouse
13 manager in Easton, Pennsylvania.  Got
14 promoted, moved to Williamsport,
15 Pennsylvania.  Was the operations
16 manager.  Had both packaging and
17 production.  And then I moved into a
18 senior operations manager role also in
19 Williamsport in charge of the
20 distribution warehousing.  And then I
21 relocated to York, Pennsylvania in 1999,
22 also as a senior operations manager over
23 transportation.
24    Q.   And your last date of

Page 25

1 employment at Frito Lay was what?
2    A.   I think it was June of
3 2000 -- 2000.
4    Q.   And why did you leave that
5 position?
6    A.   I was terminated.
7    Q.   For what reason?
8    A.   I was moving into a role
9 other than the one that I was in, and
10 word got out that I was moving before
11 that actually happened.  And so they
12 terminated me because word got out,
13 although it didn't get out by me.
14    Q.   I'm not sure I entirely
15 follow.  Word got out that you were
16 moving from one position to another, and
17 they fired you for that?
18    A.   Correct.  I was told not to
19 say anything.  I did not say anything.
20 Someone else -- it got out, and I got
21 accused of saying it, so they let me go.
22    Q.   And what was your next
23 position after leaving Frito Lay?
24    A.   I went to work at Rite Aid

Page 26

1 in September of 2000 as pharmacy support
2 manager.
3      Q.   Was there a period of time
4 where you were out of work between the
5 Frito Lay job and Rite Aid?
6      A.   Yes, sir.
7      Q.   How many months?
8      A.   From June to September.  So
9 three months.
10      Q.   And what were your
11 responsibilities as pharmacy support
12 manager?
13      A.   To provide liaison between
14 the pharmacy distribution centers and
15 regulatory agencies, such as DEA, FDA,
16 cigarette, tobacco, auditors from
17 different states, and process
18 improvement.
19      Q.   Did you actually manage some
20 employees in that position?
21      A.   I did not.
22      Q.   How did you receive training
23 to -- for your new job?
24      MS. McENROE:  Objection to

Page 27

1      form.
2      MR. SIMMER:  Strike that.
3 BY MR. SIMMER:
4      Q.   Did you receive any training
5 for your new job?
6      A.   Yes, I did.
7      Q.   What kind of training did
8 you receive?
9      A.   The former deputy director
10 of DEA, Ron Buzzeo, who owned his own
11 company, Buzzeo PDMA, actually came to
12 the Perryman, Maryland distribution
13 center and performed audits, training me
14 to do the same.
15      Q.   So were you working out of
16 the Perryman facility at that time?
17      A.   No, sir.
18      Q.   Where were you working out
19 of?
20      A.   Rite Aid headquarters.
21      Q.   And where were they?
22      A.   Camp Hill, Pennsylvania.
23      Q.   Did you receive any written
24 materials as part of this training?

Page 28

1      A.   I don't recall.
2      Q.   So he trained you how to
3 perform a distribution center audit; is
4 that correct?
5      A.   A DEA audit, in particular.
6      Q.   Okay.  And what is it --
7 what were you trained to do in a DEA
8 audit?
9      MS. McENROE:  Objection to
10 form.  Calls for a narrative.  You
11 may answer.
12      THE WITNESS:  Ron had a
13 checklist basically that was --
14 that he had put together based on
15 the Code of Federal Regulations,
16 what's required by DEA.  And that
17 was the document that we used to
18 audit the pharmacy control drug
19 cage and the pharmacy department.
20 BY MR. SIMMER:
21      Q.   So when I asked you about
22 written materials, wouldn't that
23 checklist be one of the written materials
24 that would have been used in your

Page 29

1 training?
2      A.   That would be correct.
3      Q.   So when I asked you did you
4 receive any written materials, the answer
5 would have been yes, correct?
6      MS. McENROE:  Objection to
7 form.
8      THE WITNESS:  Correct.
9 BY MR. SIMMER:
10      Q.   Do you want to then change
11 your earlier answer?
12      A.   Yes, sir.
13      Q.   Who is your supervisor at
14 this time?
15      A.   Neil Meischeid.
16      Q.   Can you spell his last name,
17 please?
18      A.   M-E-I-S-C-H-E-I-D.
19      Q.   First name?
20      A.   Neil, N-E-I-L.
21      Q.   And who are you working for
22 at this time?
23      A.   Rite Aid Headquarters
24 Corporation.

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1   Q.   What name is actually on
2 your paycheck that you receive?
3   A.   Rite Aid Headquarters
4 Corporation.
5   Q.   You didn't work for Rite Aid
6 of Maryland; is that correct?
7   A.   Correct, sir.
8   Q.   And Mr. Meischeid also
9 worked for Rite Aid Corporation
10 Headquarters, right?
11   A.   Correct, sir.
12   Q.   How long were you a pharmacy
13 support manager?
14   A.   I believe it was two and a
15 half years.
16   Q.   That would be from 2000 to
17 2002 or '3?
18   A.   2003, yes, sir.
19   Q.   And what was your next
20 position?
21   A.   Senior manager of regulatory
22 compliance.
23   Q.   Were you performing
24 different duties than you had as a

Page 31

1 pharmacist support manager?
2   A.   No, sir.
3   Q.   So the only change is the
4 title?
5   A.   Yes, sir.
6   Q.   When did you receive -- is
7 this a promotion by the way?
8   A.   Yes, sir.
9   Q.   When did you receive this
10 promotion?
11   A.   2003.
12   Q.   Okay.  And what were your
13 responsibilities as senior manager of
14 regulatory compliance?
15   A.   The same as pharmacy support
16 manager.  Liaison with the DEA and Rite
17 Aid pharmacy distribution centers.
18   Q.   So that means that you had
19 direct contact with the DEA?
20   A.   At times, yes, sir.
21   Q.   And who at the DEA did you
22 have contact with?
23   A.   Patricia Good, Mark
24 Caverley.  They're the ones that I

Page 32

1 remember.
2   Q.   How do you spell Ms. Good's
3 last name?
4   A.   G-O-O-D.
5   Q.   And Mr. Caverley's last
6 name?
7   A.   C-A-V-E-R-L-E-Y.
8   Q.   And when you say you had
9 contact with them, what did you actually
10 do?
11   A.   I don't recall.
12   Q.   Was that face-to-face
13 contact?
14   A.   Phone contact.
15   Q.   How often did you have this
16 phone contact with these individuals?
17   A.   Rarely.
18   Q.   You said that you also had
19 contact with Rite Aid pharmacy
20 distribution centers; is that correct?
21   A.   Yes, sir.
22   Q.   What kind of contact was
23 this?
24   A.   I perform mock audits at

Page 33

1 their locations.
2   Q.   And how often did you
3 perform these mock audits?
4   A.   I would say an average of
5 one to two times annually.
6   Q.   And what did you do when you
7 performed one of these mock audits?
8   A.   I basically would go in
9 unannounced and ensure compliance with
10 the Code of Federal Regulations.
11   Q.   And how did you do that?
12   A.   With the checklist that was
13 provided from Mr. Buzzeo.
14   Q.   Do you know how Mr. Buzzeo
15 developed that checklist?
16   A.   I do not know.
17   Q.   And that checklist that you
18 used, is that something that the company
19 had in its possession?
20   A.   Yes, sir.
21   Q.   Is that something that
22 others in the company also used as well,
23 besides yourself?
24   A.   At times, yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    Q.   How long was Mr. Buzzeo's
2  checklist used by the company?
3    A.   Prior to my arrival, I would
4  say up to a year after I started, and
5  then I'd change the checklist.  I
6  updated it as new jurisdiction -- new
7  legislation was passed to ensure we were
8  current with current regulations.
9    Q.   So the answer to my question
10 is that Mr. Buzzeo's checklist was used
11 for a period of time and then you changed
12 it; is that right?
13   A.   That's correct, sir.
14   Q.   When do you recall first
15 changing Mr. Buzzeo's checklist?
16   A.   Early 2000s.
17   Q.   You said as new legislation
18 was passed you changed the checklist to
19 ensure that you were up-to-date with
20 current regulations, correct?
21   A.   Yes, sir.
22   Q.   Where did you get the
23 information that you were using to base
24 your decision to make these changes?

Page 35

1    A.   From the Code of Federal
2  Regulations.
3    Q.   Did you receive any legal
4  training in order to read these
5  regulations to make these changes?
6    A.   No, sir.
7    Q.   Did you consult with any
8  other sources other than the regulations
9  themselves in order to make these
10 changes?
11   A.   At times, Ron Buzzeo used to
12 also offer conferences where he would
13 provide counsel, document -- or counsel
14 or suggestions as to how we remained
15 compliant.  So I may have taken a
16 suggestion from one of the conferences
17 and implemented it into our checklist.
18   Q.   How often did you attend
19 these conferences?
20   A.   During my tenure I probably
21 attended five or six conferences.  So
22 every couple of years.
23   Q.   You went every couple of
24 years?

Page 36

1    A.   Yes, sir.
2    Q.   And did he give written
3  materials to -- strike that.
4         Did the -- at the
5  conference, did you receive written
6  materials?
7    A.   At times, yes.  And at times
8  they would send via e-mail.
9    Q.   And were those materials
10 then distributed to others in the
11 organization?
12   A.   At times, yes.
13   Q.   When was the first
14 conference that you attended?
15   A.   I don't recall.
16   Q.   What was the next position
17 that you held at Rite Aid?
18   A.   Director of regulatory
19 compliance.
20   Q.   And when did you receive
21 that title?
22   A.   Two and a half years
23 afterwards, so 2005, 2006.
24   Q.   What were your

Page 37

1  responsibilities?
2    A.   The same.
3    Q.   Just a different title?
4    A.   Yes, sir.
5    Q.   This is a promotion?
6    A.   Yes, sir.
7    Q.   And who did you report to in
8  this position?
9    A.   Started with Robbie Roberson
10 who is the vice president of logistics.
11 And then in 2007 I reported to Rick
12 Chapman who is also the vice president of
13 logistics.
14   Q.   So Mr. Roberson, can you
15 spell his last name, please?
16   A.   R-O-B-E-R-S-O-N.
17   Q.   So in this position as
18 director of regulatory compliance, as you
19 saw changes in the federal regulations,
20 again you would make changes in the
21 checklist that you would use to perform
22 your mock audits; is that correct?
23   A.   If deemed appropriate, yes,
24 sir.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1  Q. Did you ever provide copies
2  of your checklists to the company's legal
3  counsel?
4       MS. McENROE: Objection to
5       form. And I caution the witness
6       to be careful about not stepping
7       onto privileged issues and any
8       substance that you may have
9       discussed with counsel.
10      THE WITNESS: I -- I
11      honestly do not recall.
12 BY MR. SIMMER:
13      Q. Do you know whether Rite
14 Aid's legal counsel ever reviewed your
15 checklist?
16      A. I do not. I do not know.
17      Q. In your position as director
18 of regulatory compliance, did you ever
19 have any interaction with the company's
20 legal counsel?
21      A. I have had interaction, yes.
22      Q. About what should go into
23 your mock audits?
24      A. No, sir.

Page 39

1      Q. Did you have any interaction
2  with the company's compliance people?
3      A. Yes, sir.
4      Q. About the mock audits?
5      A. Define compliance people, if
6  you would, please, sir.
7      Q. Well, did the company have a
8  compliance function?
9       MS. McENROE: Objection to
10      form.
11      THE WITNESS: They had
12      several. They have an internal
13      assurance department, and we also
14      had a privacy officer that was
15      part of the government affairs
16      department. And I've had
17      interaction with each.
18 BY MR. SIMMER:
19      Q. Did the work you did as
20 director of regulatory compliance overlap
21 with any of the company's compliance
22 personnel?
23      MS. McENROE: Objection.
24 BY MR. SIMMER:

Page 40

1      Q. What they were doing?
2       MS. McENROE: Objection to
3       form.
4       THE WITNESS: Yes.
5  BY MR. SIMMER:
6      Q. Which one of the compliance
7  functions did you overlap with?
8      A. Internal assurance.
9      Q. And so did you collaborate
10 with internal assurance on the mock
11 audits and the checklists that you were
12 describing?
13      A. On or about 2009, yes.
14      Q. And who did you interact
15 with in 2009?
16      A. There were various people.
17 Steven Sheinfeld, Ashley Kido, Bryan
18 Strahan, Curt Saleme.
19      Q. Can you spell
20 Mr. Sheinfeld's last name?
21      A. S-H-E-I-N-F-I-E-L-D (sic).
22      Q. And Ms. -- I guess Ashley,
23 what was her last name?
24      A. It was Kido when I left.

Page 41

1  K-I-D-O.
2      Q. Mr. Strahan, how do you
3  spell his last name?
4      A. S-T-R-A-H-A-N.
5      Q. And Mr. Strapell, how do you
6  spell his last name?
7      A. Mr. who?
8      Q. You said Curt. I didn't get
9  his last name.
10      A. Saleme.
11      Q. Saleme. I'm sorry. How do
12 you spell his last name?
13      A. S-A-L-E-M-E.
14      Q. And where were these -- what
15 department were these people employed in?
16      A. Internal assurance.
17      Q. And is that part of the
18 corporate headquarters in Camp Hill?
19      A. Yes, sir.
20      Q. And so the work that you did
21 on these mock audits, is that something
22 that you interacted with these people in
23 internal assurance on?
24      A. On or around 2009, yes, sir.

Page 42

1  Q.  What happened in 2009 that
2 you had interaction with these
3 individuals?
4  A.  We collectively developed a
5 compliance -- a CSA team.  I don't recall
6 what CSA stands for.  But it was a
7 collaboration between the supply chain
8 department and the internal assurance
9 department to perform audits at the 12
10 distribution centers that Rite Aid had.
11  Q.  CSA, is that Controlled
12 Substances Act?
13  A.  CSA would stand for that,
14 yes, sir.
15  Q.  So what you were looking at
16 is controlled substances; is that
17 correct?
18      MS. McENROE:  Objection to
19      form.
20      THE WITNESS:  Yes, sir.
21 BY MR. SIMMER:
22  Q.  Do you know what prompted
23 the CSA team to be created?
24  A.  It was an idea that I

Page 43

1 actually had that we could collaborate
2 with the internal assurance group.  There
3 were audits conducted by them that we
4 felt, as the supply chain team, that were
5 a little inaccurate and felt that this
6 was an opportunity to collaborate and
7 utilize experts in the field within the
8 Rite Aid distribution network to conduct
9 audits at the distribution centers to
10 again ensure that we continued to stay
11 prepared for any and all audits.
12  Q.  When you say you were
13 utilizing experts in the field.  Are
14 these external experts?
15  A.  No, sir.
16  Q.  So these were internal
17 personnel?
18  A.  Rite Aid personnel, yes,
19 sir.
20  Q.  And what kind of expertise
21 are you talking about that they had?
22  A.  So DEA coordinators from
23 each of the buildings where appropriate.
24 So they could come into another pharmacy

Page 44

1 distribution center and do -- conduct an
2 audit and actually feel comfortable that
3 they knew what they were looking for.
4 And basically every facet of the
5 operation.  So again, as an example, the
6 transportation managers from one location
7 may go to a different location to conduct
8 an audit on transportation.
9  Q.  So I take it that these DEA
10 coordinators would not audit the
11 distribution centers where they worked?
12  A.  That's correct.
13  Q.  So they would go to a
14 different distribution center and conduct
15 the audit you're talking about?
16  A.  That's correct.
17  Q.  The CSA team that you're --
18 you've just mentioned, was there any
19 written product they created?
20  A.  Yes, sir.
21  Q.  What was this product
22 called?
23  A.  There was a training that
24 was conducted, and then there was

Page 45

1 checklists that were created as well.
2  Q.  So the training that was
3 conducted, I take it there were
4 written -- written materials for that?
5  A.  Yes, sir.
6  Q.  What were those materials
7 called or what -- what were they?
8      MS. McENROE:  Objection to
9      form.
10      THE WITNESS:  I don't recall
11      the proper name for them, but...
12 BY MR. SIMMER:
13  Q.  And you say there were
14 checklists created as well?
15  A.  Yes, sir.
16  Q.  And what were -- what were
17 those checklists called?
18  A.  I don't recall the proper
19 name.
20  Q.  Do you know where these --
21 either the training materials or the
22 checklists, where they were housed at
23 Rite Aid?
24  A.  The training material would

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1　be housed by the internal assurance
2　group.  I probably had a copy of it
3　myself.
4　　　　The checklist was created by
5　multiple people within the headquarters
6　operation.  We consolidated everything to
7　Steve Sheinfeld in internal assurance.
8　Bryan Strahan built the portfolio, the --
9　the scorecard, if you will, that we used
10　to conduct audits.
11　　　Q.　So you called it a checklist
12　a moment ago.  Now, you are calling it a
13　scorecard or a portfolio.  Which is it?
14　　　A.　It -- it's a checklist that
15　at the conclusion of the audit provides a
16　score.
17　　　Q.　So is it right that
18　Steven -- or Steve Sheinfeld was the
19　person who headed this effort?
20　　　A.　I would say jointly.  He --
21　he headed it for the CSA team.
22　　　Q.　Along with you?
23　　　A.　Yes, sir.
24　　　Q.　So did this fall in your

Page 47

1　actual job responsibilities, the work you
2　were doing with the CSA team?
3　　　A.　Written responsibilities,
4　no, sir.
5　　　Q.　So describe for us actually
6　what the CSA team did.
7　　　　MS. McENROE:  Objection to
8　　form.
9　　　　THE WITNESS:  We -- the CSA
10　team would actually go out to each
11　Rite Aid distribution center.
12　　　　We created two teams.  There
13　was a red team.  There was a blue
14　team.  And each team was
15　designated six Rite Aid DCs to
16　audit throughout the course of the
17　year.
18　　　　So each month there would be
19　a rotating basis where the red
20　team would audit January, March,
21　May, et cetera.
22　　　　Blue team would be
23　alternating months.  And they
24　would go -- conduct a full

Page 48

1　　　wall-to-wall audit at each
2　　　distribution center.
3　BY MR. SIMMER:
4　　　Q.　Did you have any external
5　experts that you -- the company worked
6　with on any of these mock audit
7　activities that you've been describing?
8　　　A.　As far as the CSA, no.  We
9　did work with outside -- outside
10　counsel -- not counsel.  Outside support
11　during an VAWD accreditation at some
12　point during the 2000s.
13　　　Q.　Who was that?
14　　　A.　I think her name was
15　Samantha Falter.  She worked with Ron
16　Buzzeo group.
17　　　Q.　Spell her last name?
18　　　A.　F-A-L-T-E-R.
19　　　Q.　She was part of Buzzeo,
20　correct?
21　　　A.　Yes, sir.
22　　　Q.　And what did she do to help
23　you in your -- your audit activities?
24　　　A.　It wasn't audit activity,

Page 49

1　sir.  It was actually just creating a
2　standard operating procedure for VAWD
3　accreditation.
4　　　Q.　What is VAWD accreditation?
5　　　A.　I don't recall what VAWD
6　stands for.  However, it was an
7　accreditation that the State of Indiana
8　required for legend drugs.
9　　　Q.　So you created some standard
10　operating procedures; is that correct?
11　　　A.　Yes, sir.
12　　　Q.　And what were those called?
13　　　A.　Did I create them?  Let me
14　back up if I could please.
15　　　　There were procedures in
16　place when I started.  They were
17　regulatory guidelines.
18　　　Q.　And were those SOPs?
19　　　A.　In an essence, yes, sir.
20　　　Q.　Were they written down?
21　　　A.　Yes, sir.
22　　　Q.　And what were they called?
23　　　A.　Regulatory guidelines is
24　what I recall.

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  Q.   And did those change over
2  time?
3      A.   Yes, sir.
4      Q.   Who was responsible for --
5  for updating those regulatory guidelines?
6      A.   That would be me.
7      Q.   Throughout your time period,
8  that was your responsibility?
9      A.   Yes, sir.
10     Q.   And Ms. Falter helped you
11 review those procedures?
12     A.   No, sir.
13     Q.   I'm sorry, I thought you
14 said she helped you with the
15 accreditation that you were receiving.
16     A.   That was VAWD accreditation,
17 not regulatory guidelines.  That was
18 totally separate procedures.
19     Q.   And what did she actually
20 do?
21     A.   She drafted SOPs to be
22 compliant with the VAWD accreditation
23 needs.
24     Q.   And this is accreditation

Page 51

1  for the State of Indiana?
2      A.   Yes, sir.
3      Q.   Was it only for your
4  distribution center in Indiana?
5      A.   And Perryman, Maryland.
6      Q.   And why did you need that
7  for Perryman, Maryland, since it's not
8  located in Indiana?
9      A.   Perryman distributed to
10 Indiana.
11     Q.   And where else did Perryman
12 distribute?
13     A.   I don't recall every state.
14     Q.   And what kind of changes
15 resulted as a part of the accreditation
16 procedure that you were going through the
17 VAWD accreditation?
18     A.   I don't recall any changes
19 that -- that took place.
20     Q.   So it's unclear to me what
21 exactly she did then when she came and
22 helped you with this accreditation?
23     A.   She just simply drafted a
24 different set of SOPs that VAWD required

Page 52

1  for accreditation.  And I guess it had
2  something to do with their licensure, or
3  us being able to renew our licensure with
4  Indiana.
5      I believe it was more of a
6  formatting issue than -- than anything.
7      Q.   So the SOPs covered
8  formatting only?
9      MS. McENROE:  Objection to
10 form.
11     THE WITNESS:  I don't recall
12 specifically.
13 BY MR. SIMMER:
14     Q.   You don't recall
15 specifically what the SOPs covered?
16     A.   Those SOPs, no, sir.
17     Q.   What type frame was it that
18 she -- you were going through this VAWD
19 accreditation?
20     A.   I don't recall.
21     Q.   Okay.  What was your next
22 job at Rite Aid?
23     A.   Senior director of
24 regulatory compliance.

Page 53

1      Q.   And when did you receive
2  that job promotion?
3      A.   December 2010.
4      Q.   And I called that a
5  promotion.  I assumed it was a promotion.
6      A.   Yes, sir.
7      Q.   Did your duties change?
8      A.   I assumed responsibility
9  over pharmacy returns as well as my
10 current responsibilities.
11     Q.   Had someone else been doing
12 that to that point?
13     A.   Yes, sir.
14     Q.   So was this taking on
15 additional responsibilities for you?
16     A.   Yes, sir.
17     Q.   Did you have people
18 reporting to you in this position?
19     A.   Yes, sir.
20     Q.   How many people?
21     A.   Three.
22     Q.   Who were they?
23     A.   Kevin Peterson.  I don't
24 remember the -- the last name, Dawn.  I

Highly Confidential - Subject to Further Confidentiality Review



Page 54

1 honestly do not recollect her last name.
2 And the third person I can't -- Rich
3 Handy was the third person.
4       Q.   Rich Handy?
5       A.   Yes, sir.
6       Q.   Okay.  And were you still
7 working out of Camp Hill at this time?
8       A.   Yes, sir.
9       Q.   And who was your supervisor?
10      A.   Rick Chapman.
11      Q.   Do you know who
12 Mr. Chapman's supervisor was?
13      A.   Wilson Lester.
14      Q.   And in turn who is
15 Mr. Lester's supervisor?
16      A.   It changed so frequently,
17 I -- I don't recall.
18      Q.   So what department were --
19 was this function that you were
20 performing housed in at the time?
21      A.   Supply chain in Camp Hill,
22 Pennsylvania.
23      Q.   And you had responsibility
24 for all the distribution centers that the

Page 56

1 with Rite Aid.
2       Q.   What was your next job at
3 Rite Aid?
4       A.   That was the last job at
5 Rite Aid.
6       Q.   When did you leave your
7 employment?
8       A.   January 2012.

Page 55

Page 57

5       MR. SIMMER:  It's a
6 completely improper objection.
7       MS. McENROE:  Okay.  We can
8 call Special Master Cohen if you'd
9 like.
10 BY MR. SIMMER:
11      Q.   How did -- how did --
12      MR. SIMMER:  You can.
13      MS. McENROE:  Yeah, we can
14 go off the record and call the
15 special master.
16 BY MR. SIMMER:
17      Q.   How did these personal --
18      MS. McENROE:  We're going to
19 stop the deposition and call the special
20 master.
21      THE VIDEOGRAPHER:  The time
22 is now 10:14 a.m.  We're going off
23 the record.
24      (Whereupon, a discussion was

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1     held off the record.)

2        THE VIDEOGRAPHER:  The time

3     is now 10:17 a.m.  We are back on

4     the record.

5 BY MR. SIMMER:

6     Q.   I'm going to withdraw the

7 last question.  Was there anything about

8 the job itself that you felt that you

9 could no longer perform?

10     A.   No, sir.

11     Q.   And when you left your

12 employment at Rite Aid, what did you do

13 next?

14     A.   My next position was general

15 manager at CEVA Logistics.

16     Q.   Was there a gap in

17 employment between the job you had at

18 Rite Aid and the job that you had at CEVA

19 Logistics?

20     A.   Yes, sir.

21     Q.   How long?

22     A.   Just shy of four months.

23     Q.   What were you doing at CEVA

24 Logistics?

Page 59

1     A.   And general manager of a

2 third-party logistics firm, supporting

3 the startup of a Microsoft business.

4     Q.   And where was that job?

5     A.   In Carlisle, Pennsylvania.

6     Q.   And you left that job after

7 six months, you say?

8     A.   Thereabouts, yes, sir.

9     Q.   Why did you leave that job?

10     A.   I resigned to assume a

11 position with Crescent Park.

12     Q.   Crescent Park is the name of

13 the company?

14     A.   Yes, sir.

15     Q.   And what were you doing

16 there?

17     A.   General manager as well.

18     Q.   In Mechanicsburg,

19 Pennsylvania, correct?

20     A.   Yes, sir.

21     Q.   How long did you hold that

22 position?

23     A.   Until the end of May, June

24 of 2013.

Page 60



15     Q.   And what was your next

16 position after that?

17     A.   General manager with my

18 current employer, 48forty Solutions.  And

19 just to clarify, they've had -- that's

20 the third name since I've worked there.

21 It started out as IFCO Systems, then

22 became CHEP Recycled, and now 48forty

23 Solutions.

24     Q.   What were your

Page 61

1 responsibilities there?

2     A.   Oversight over a pallet

3 recycling manufacturing company, and I'm

4 in charge of both purchasing recycled

5 pallets and the sale of recycled pallets

6 to retailers throughout the country.

7     Q.   So your responsibility as

8 general manager is for the entire

9 company?

10     A.   For the entire --

11 Pennsylvania, for Biglerville,

12 Pennsylvania.

13     Q.   But the pallets themselves

14 are being sold to retailers throughout

15 the United States?

16     A.   Yes.

17     Q.   And your responsibility is

18 only for Pennsylvania?

19     A.   Pennsylvania, Maryland.  We

20 can ship anywhere in the U.S.

Highly Confidential - Subject to Further Confidentiality Review



**Page 62**

15    MR. SIMMER:  Can we go off
16  the record for a minute.
17    THE VIDEOGRAPHER:  The time
18  now is 10:22 a.m.  We are going
19  off the record.
20    (Short break.)
21    THE VIDEOGRAPHER:  The time
22  is now 10:42 a.m.  We are back on
23  the record.
24  BY MR. SIMMER:

**Page 64**

4    Before our break, you
5  mentioned that there was a corporate
6  assurance department; is that right?
7    A.   Internal assurance
8  department, yes, sir, at the corporate
9  office.
10    Q.   That was its formal title
11  was the, internal assurance department?
12    A.   Internal assurance or
13  internal audit.  Either one.  I'm not --
14  I'm not sure.
15    Q.   And while it -- while you
16  worked at Rite Aid, was that its name
17  throughout that time period?
18    A.   As far as I recall, yes,
19  sir.
20    Q.   What were the specific
21  functions as you know it for the internal
22  assurance department?
23    MS. McENROE:  Objection to
24  form.

**Page 63**

**Page 65**

1    THE WITNESS:  To conduct
2  independent audits of the
3  distribution centers.  I know, as
4  it relates to the supply chain
5  group, that's what they did.
6    As far as their other jobs,
7  I have no idea.
8  BY MR. SIMMER:
9    Q.   It sounds like that those
10  functions overlapped with what you were
11  doing, correct?
12    A.   They could, yes.
13    Q.   Had the responsibilities of
14  the internal assurance department changed
15  over time while you worked at the
16  company?
17    MS. McENROE:  Objection to
18  form.
19    THE WITNESS:  I don't recall
20  them being involved with the
21  distribution centers until later
22  in the 2000s, 2007, 2008 time
23  frame.
24  BY MR. SIMMER:

Page 66

1    Q.   So after that time period,
2  they were responsible for audits of
3  distribution centers, correct?
4         MS. McENROE:  Objection to
5     form.
6         THE WITNESS:  They could
7     have been all along.  That's just
8     what I remember.
9  BY MR. SIMMER:
10    Q.   Did they have responsibility
11 for all of the Rite Aid entities?
12        MS. McENROE:  Objection to
13    form.
14 BY MR. SIMMER:
15    Q.   Strike that.  Let me
16 rephrase.
17        Did the corporate assurance
18 department or the internal assurance
19 department have responsibility for all of
20 the Rite Aid distribution centers
21 following that time period?
22        MS. McENROE:  Objection to
23    form.
24        THE WITNESS:  I do not know.

Page 67

1  BY MR. SIMMER:
2    Q.   Did they have any
3  responsibility for suspicious order
4  monitoring?
5         MS. McENROE:  Objection to
6     form.
7         THE WITNESS:  I do not know.
8  BY MR. SIMMER:
9    Q.   Who would we need to talk to
10 that would clarify what their
11 responsibilities were?
12    A.   One of the associates in
13 internal assurance.
14    Q.   Where was the internal
15 assurance department housed within the
16 company structure?
17    A.   At headquarters, the Annex
18 building in Camp Hill, Pennsylvania.
19    Q.   I'm talking about the org
20 chart.  What department were they part
21 of?
22    A.   That, I do not know.
23    Q.   Do you know who the head of
24 the internal assurance department was?

Page 68

1    A.   Tony Bellezza.
2    Q.   Can you spell his last name,
3  please?
4    A.   I will attempt.
5  B-E-L-L-E-Z-Z-A.
6    Q.   Is he still working for the
7  company as far as you know?
8    A.   I do not know.
9    Q.   And did he hold that title
10 or was he -- strike that.
11        Was he head of the internal
12 assurance department throughout the time
13 period that you worked at the company?
14    A.   As far as I can recall, yes.
15    Q.   Did he hold that position
16 when you left the company?
17    A.   Yes.
18    Q.   Help us understand.  It
19 looks like they overlap with you pretty
20 substantially.  It seems like it would be
21 a confusing structure.  Were they -- was
22 that function completely separate from
23 yours or are you basically working doing
24 the same responsibilities?

Page 69

1         MS. McENROE:  Objection to
2     form.
3         THE WITNESS:  Completely
4     different functions.
5  BY MR. SIMMER:
6    Q.   Based on your work as senior
7  director, supply chain regulatory
8  compliance, is it fair to say that you're
9  familiar with the term "diversion" in the
10 context of controlled substances?
11    A.   Yes, sir.
12    Q.   What does diversion mean in
13 your own words?
14    A.   Diverting from a normal
15 course of action.
16    Q.   And based on your knowledge
17 and experience, you'd agree with me Rite
18 Aid had an obligation to prevent
19 diversion?
20        MS. McENROE:  Objection to
21    form.
22        THE WITNESS:  Yes, sir.
23 BY MR. SIMMER:
24    Q.   As senior director of supply

Page 70

1  chain regulatory compliance, you
2  understand that the DEA required that
3  Rite Aid prevent diversion?
4        MS. McENROE:  Objection to
5  form.
6        THE WITNESS:  Yes, sir.
7  BY MR. SIMMER:
8     Q.   And based on your work and
9  experience, you are familiar with the
10 concept of a "suspicious order" in the
11 context of controlled substances?
12       MS. McENROE:  Objection to
13 form.
14       THE WITNESS:  Yes, sir.
15 BY MR. SIMMER:
16    Q.   And what does it mean?
17    A.   Suspicious would be
18 anything, just that, suspicious.
19    Q.   Can you clarify what you
20 mean by a suspicious order?
21    A.   Anything abnormal.
22    Q.   Where did you gain your
23 understanding about what a suspicious
24 order was?

Page 71

1     A.   Through training with Ron
2  Buzzeo.
3     Q.   Would that be only at the
4  conferences that you attended?
5     A.   It really started when Ron
6  came to train me two months into my
7  employment.
8     Q.   Back in 2000?
9     A.   Yes, sir.
10    Q.   How extensive was that
11 training with Mr. Buzzeo?
12    A.   I like to think it was
13 pretty extensive.  We spent three or
14 four days together going through his
15 checklist, not just auditing, but
16 explaining really what the spirit of the
17 regulations mean, and then how to ensure
18 that, you know, as a registrant that they
19 were doing the things needed to do to be
20 compliant with all the rules and
21 regulations set forth.
22    Q.   So let me clarify this.  You
23 received three or four days of training
24 in 2000 when you first began working for

Page 72

1  Rite Aid, correct?
2     A.   That's correct, sir.
3     Q.   Did you have any additional
4  training with Mr. Buzzeo up until those
5  conferences you talked about, that you
6  attended later?
7     A.   Yes.
8     Q.   And what kind of training
9  did you receive from Mr. Buzzeo in that
10 interval in between?
11    A.   Just the exact same things.
12    Q.   He came back?
13    A.   Yes, sir.
14    Q.   And trained you
15 additionally?
16    A.   We worked together
17 additionally, yeah.  So I can give you an
18 example.  When I first got there, in --
19 well, 2000 -- in November 2000 Ron and I
20 performed the training.  He performed the
21 training with me.  The results were what
22 they were.
23       And I invited him to come
24 back in six months and do a re-audit and,

Page 73

1  you know, give us a chance to treat
2  our -- address any deficiencies so that
3  six months from now when you come back,
4  you should see a different story.
5        So four months after the
6  fact I called Ron and invited him back
7  and told him we were ready.
8        Ron came back a week or two
9  after our phone call and conducted
10 another audit.  He conducted the audit
11 with me there, again asking questions,
12 trying to continue to learn and found no
13 deficiencies.
14    Q.   So what was he auditing when
15 he came back the second time?
16    A.   Could you rephrase?  I'm
17 sorry.
18    Q.   You said he conducted a
19 re-audit.  What was he actually auditing?
20    A.   The control drug cage and
21 all the processes, the SOPs, biennial
22 inventories, you name at --
23    Q.   At Perryman?
24    A.   -- accountability -- yes,

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1  sir, at Perryman.
2      Q.   Okay.  So when he first
3  trained you in 2000, he actually
4  conducted an audit of Perryman at that
5  time?
6      A.   Yes, sir.
7      Q.   I take it that that wasn't a
8  positive audit?
9      A.   That would be correct, sir.
10     Q.   What were the deficiencies
11 that you recall he noted in -- in 2000?
12     A.   I -- I don't recall
13 individual.
14     Q.   Was there a written report
15 that he prepared?
16     A.   Yes, sir.
17     Q.   And is that something that
18 the company retained in its records as
19 far as you know?
20     A.   I would assume but I do not
21 know for sure.
22     Q.   When he came back, I guess
23 was it four months or six months later?
24     A.   Four months.

Page 75

1      Q.   Did he prepare a report at
2  that time?
3      A.   Yes, sir.
4      Q.   And again, that was only of
5  the Perryman facility, correct?
6      A.   That's correct.
7      Q.   And specifically in regard
8  to controlled substances, correct?
9      A.   That's correct.
10     Q.   And he found, you said no
11 deficiencies, correct?
12     A.   Correct.
13     Q.   Do you know what he actually
14 did in conducting that audit?
15         MS. McENROE:  Objection to
16     form.
17         THE WITNESS:  He basically
18     did the exact same thing the DEA
19     audits -- or DEA agents did later
20     in my tenure.  Did a very
21     comprehensive audit of the entire
22     control drug cage, security,
23     records, et cetera.
24 BY MR. SIMMER:

Page 76

1      Q.   Did he conduct any audits
2  of -- at other distribution centers?
3         MS. McENROE:  Objection to
4     form.
5         THE WITNESS:  I don't know
6     for sure if he himself did.  I
7     know his company did.
8  BY MR. SIMMER:
9      Q.   So it's your belief that --
10 that others with Buzzeo conducted audits
11 at the distribution centers?
12         MS. McENROE:  Objection to
13     form.
14         THE WITNESS:  I believe that
15     would be correct.
16 BY MR. SIMMER:
17     Q.   Do you know when they did
18 this?
19     A.   That I do not know.
20     Q.   Do you know who it was at
21 Buzzeo that did these audits of the other
22 distribution centers?
23     A.   I recall one name, Ron
24 Garribato.

Page 77

1      Q.   You better spell that name.
2      A.   G-A-R-R-I-B-A-T-O.
3      Q.   And do you know what his
4  title was at Buzzeo?
5      A.   I do not.
6      Q.   Do you know when he did
7  this?
8      A.   I can recall early 2000s.
9      Q.   And which distribution
10 center did he audit?
11     A.   Woodland, California.
12     Q.   Why was that one audited?
13     A.   It was just, again, a mock
14 audit.
15     Q.   And throughout the time
16 period when you worked at the company,
17 you undertook these same kind of mock
18 audits, correct?
19     A.   Yes, sir.
20     Q.   And you did essentially the
21 same kind of -- of procedures as
22 Mr. Buzzeo had trained you, correct?
23     A.   That's correct.
24     Q.   Did you actually write up

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 reports after you did each of these mock
2 audits?
3      A.   I honestly do not recall.
4      Q.   Did you put anything in
5 writing when you -- after you conducted a
6 mock audit at a distribution center?
7      A.   I may have given the
8 checklist to them that I had used during
9 my time there.  It's just been so many
10 years ago, I just honestly don't remember
11 all the details.
12      Q.   So how long was the
13 checklist that you used?
14      A.   I don't recall how many
15 pages.
16      Q.   Was there a scoring system
17 of any kind in the checklist?
18      A.   Initially, no.
19      Q.   There was later a scoring
20 system of some kind used?
21      A.   The -- the certified
22 self-assessment that we were talking
23 about earlier with internal assurance,
24 that did have a scoring system with it.

Page 79

1      Q.   And when did you put in
2 place that scoring system?
3      A.   Say approximately 2009.
4      Q.   Was that in conjunction with
5 the -- the changes that you talked about
6 earlier with the controlled substances
7 team?
8         MS. McENROE:  Objection to
9      form.
10         THE WITNESS:  Would --
11         MR. SIMMER:  Strike that.
12 BY MR. SIMMER:
13      Q.   Was that in conjunction with
14 the changes you'd talked about earlier
15 with the CSA team?
16      A.   Yes, sir.
17      Q.   That you put the scoring
18 system into place as part of the changes
19 that the CSA team had implemented,
20 correct?
21      A.   That's correct.
22      Q.   Based on your work as senior
23 director supply chain regulatory
24 compliance, you'd agree that Rite Aid had

Page 80

1 an obligation to report any suspicious
2 orders to the DEA, right?
3         MS. McENROE:  Objection to
4      form.
5         THE WITNESS:  Yes, sir.
6 BY MR. SIMMER:
7      Q.   And did that, in fact,
8 happen, that the company reported any
9 suspicious orders to the DEA while you
10 were the senior director supply chain
11 regulatory compliance?
12         MS. McENROE:  Objection to
13      form.
14         THE WITNESS:  I'm not aware
15      of any suspicious orders during my
16      tenure.
17 BY MR. SIMMER:
18      Q.   That wasn't my question.
19 Were there any reports to the DEA?
20      A.   Not that I'm aware of.
21      Q.   Based on your work as senior
22 director supply chain regulatory
23 compliance, you'd agree that Rite Aid had
24 an obligation not to ship any suspicious

Page 81

1 orders, right?
2         MS. McENROE:  Objection to
3      form.
4         THE WITNESS:  Yes, sir.
5 BY MR. SIMMER:
6      Q.   Are you aware of any
7 instance when the company refused to ship
8 what it felt was a suspicious order?
9         MS. McENROE:  Objection to
10      form.
11         THE WITNESS:  I'm not aware,
12      no, sir.
13 BY MR. SIMMER:
14      Q.   So that never happened as
15 far as you know?
16      A.   As far as I know.
17      Q.   Based on your work as senior
18 director supply chain regulatory
19 compliance, do you know what the DEA red
20 flags for diversion are?
21         MS. McENROE:  Objection to
22      form.
23         THE WITNESS:  Could you ask
24      the question a different way

Page 82

1 please?
2 BY MR. SIMMER:
3     Q.   Do you know what the term --
4 are you familiar with the term "red flags
5 of diversion"?
6     A.   I am not.
7     Q.   Never heard of that before?
8     A.   I have not.
9     Q.   You never heard the DEA's
10 red flags for potential diversion?
11         MS. McENROE:  Objection to
12     form.  Asked and answered.
13         THE WITNESS:  I have not.
14 BY MR. SIMMER:
15     Q.   So I take it that you in
16 your position as senior director supply
17 chain regulatory compliance did nothing
18 to monitor any of the DEA red flags for
19 diversion, correct?
20         MS. McENROE:  Objection to
21     form.
22         THE WITNESS:  That's
23     inaccurate.
24 BY MR. SIMMER:

Page 83

1     Q.   How is it inaccurate?
2     A.   We had policies and
3 procedures in place that -- for excessive
4 order monitoring.
5     Q.   Okay.  I asked you a moment
6 ago if you were familiar with the DEA red
7 flags for diversion and you said you were
8 not, correct?
9     A.   I have not heard the term
10 "red flag," that's correct.
11     Q.   So I then asked you if you
12 had undertaken any monitoring of the red
13 flags for diversion.  And you said that
14 you feel like you had.
15     A.   Monitoring to diversion,
16 yes.  Monitoring red flags, I would have
17 to say no.  Again, I'm not familiar --
18 I'm sorry, not familiar -- not familiar
19 with the term.
20     Q.   So the answer to my
21 question, did you do any monitoring of
22 the red flags of diversion, the answer
23 would be no; isn't that right?
24         MS. McENROE:  Objection to

Page 84

1     form.  Misstates testimony.
2         THE WITNESS:  I would say
3     "red flag" being the keyword,
4     again not familiar with the term.
5     So I would say no.
6 BY MR. SIMMER:
7     Q.   During your time as senior
8 director supply chain regulatory
9 compliance, Rite Aid distributed
10 controlled substances, correct?
11     A.   Yes, sir.
12     Q.   And it distributed these
13 controlled substances only to Rite Aid
14 stores, correct?
15     A.   That is correct.
16     Q.   During your time as a Rite
17 Aid employee, did it have a suspicious
18 order monitoring program?
19     A.   Yes, sir.
20     Q.   Can you describe what that
21 program was?
22     A.   It was to -- I don't recall
23 the exact verbiage.  But it was basically
24 to identify anything that seemed

Page 85

1 suspicious, out of the ordinary.  And if
2 a suspicious order was detected, the
3 registrant would then call the government
4 affairs department at the corporate
5 headquarters in which they would report
6 directly to DEA.
7     Q.   Let's clarify what you mean
8 by -- who is the registrant in -- in what
9 you just described?
10     A.   So Rite Aid of Maryland in
11 Perryman's case.
12     Q.   And if Rite Aid of Maryland
13 became aware of a suspicious order, they
14 would call government affairs at -- at
15 corporate headquarters and they would
16 report directly to the DEA, correct?
17     A.   Correct.
18     Q.   Did that ever happen to your
19 knowledge?
20     A.   Not that I'm aware of.
21     Q.   Explain what you mean by any
22 suspicious order as being out of the
23 ordinary, what did you mean by that term?
24     A.   Suspicious to me means

Page 86

1 anything that's -- that is outside of a
2 normal pattern.
3      Q.    And how would you determine
4 that an order was out of the ordinary
5 pattern?
6           MS. McENROE:  Objection to
7      form.
8           THE WITNESS:  It could be
9      the size of the order.  It could
10      be the frequency of the order.
11      That to me would get my attention.
12 BY MR. SIMMER:
13      Q.    And what would be a size of
14 an order that you would have deemed to
15 have been suspicious?
16           MS. McENROE:  Objection to
17      form.
18           THE WITNESS:  I don't
19      personally know.  I didn't work at
20      the distribution center.
21 BY MR. SIMMER:
22      Q.    But it was your
23 responsibility to identify suspicious
24 orders, correct?

Page 87

1           MS. McENROE:  Objection to
2      form.
3           THE WITNESS:  It was the
4      distribution center's
5      responsibility to identify
6      suspicious orders.
7 BY MR. SIMMER:
8      Q.    What was your role in
9 identifying suspicious orders?
10      A.    Again, I didn't work at the
11 distribution center.  So I would not have
12 had visibility over suspicious orders, or
13 any orders for that matter.
14      My role would have been to
15 have had a policy or procedure in place.
16      Q.    And what did the policy and
17 procedure say was a suspicious order?
18      A.    I don't recall the verbiage.
19      Q.    What about the frequency of
20 an order would make it suspicious?
21           MS. McENROE:  Objection to
22      form.
23           THE WITNESS:  If I were at a
24      DC and if I were seeing an order

Page 88

1 every day in large quantities for
2 the same item, again, that
3 would -- that would get my
4 attention.
5 BY MR. SIMMER:
6      Q.    Did that ever happen?
7      A.    Not that I recall.
8      Q.    So during the time that you
9 worked for the company, you have no
10 recollection of anytime there have been
11 an order that was identified as being
12 suspicious because it was too frequent,
13 right?
14      A.    I do not.
15      Q.    At any time while you worked
16 for the company as the director of supply
17 chain regulatory compliance, were there
18 any orders that were deemed to have been
19 suspicious that were reported to the DEA
20 or to government affairs?
21           MS. McENROE:  Objection to
22      form.
23           THE WITNESS:  Not that I'm
24      aware of.

Page 89



Highly Confidential - Subject to Further Confidentiality Review









Page 102

Page 104

Page 103

Page 105

²⁴ relations was doing, right?



Highly Confidential - Subject to Further Confidentiality Review



Page 112

1   get a good chance to take a quick
2   comfort break, that would be
3   appreciated on this side.
4       MR. SIMMER:  Can we just go
5   a little bit further?
6       MS. McENROE:  Yeah.  Finish
7   your line of questioning, that
8   would be fine.

Page 111

24      MS. McENROE:  Scott, if we

Page 113

Page 114

Page 116

6       THE VIDEOGRAPHER:  The time
7   is now 11:25 a.m.  We're going off
8   the record.
9       (Short break.)
10      THE VIDEOGRAPHER:  The time
11  is now 11:42 a.m.  We are back on
12  the record.
13      (Document marked for
14      identification as Exhibit Rite Aid
15      Mitchell-3.)
16  BY MR. SIMMER:
17      Q.   Sir, we're going to -- I
18  hand you what we marked as Mitchell
19  Exhibit 3.  I'll identify it for the
20  record as a press release issued by the
21  Department of Justice on January 12th,
22  2009.  It is a two-page document.  We
23  printed the exhibit front and back.  So
24  just take a moment to look at that.

Page 115

Page 117

1       A.   Okay.
2       Q.   Do you see where the
3   headline to this press release, it says,
4   "Rite Aid Corporation and subsidiaries
5   agree to pay $5 million in civil
6   penalties to resolve violations in eight
7   states of the Controlled Substances Act"?
8       A.   Yes, sir.
9       Q.   And this would have occurred
10  during the time that you were working for
11  the company; is that correct?
12      A.   Yes, sir.
13      Q.   Do you recall this
14  settlement?
15      A.   I do not.
16      Q.   Do you recall whether this
17  settlement had any impact on your work as
18  the director of supply chain regulatory
19  compliance?
20      MS. McENROE:  Objection to
21      form.
22      THE WITNESS:  No, sir.
23  After reading this, it's pretty
24  clear it was 100 percent related



Highly Confidential - Subject to Further Confidentiality Review

Page 118

1    to the Rite Aid stores.
2 BY MR. SIMMER:
3    Q.   Okay.  Look at the first
4 bullet in the middle of the page, on Page
5 1.  Do you see where it says, "At
6 pharmacies in Kentucky and New York, Rite
7 Aid knowingly filled prescriptions for
8 controlled substances that were not
9 issued for a legitimate medical purpose
10 pursuant to a valid physician-patient
11 relationship"?
12    A.   Yes, sir.
13    Q.   So would you agree with me
14 that when it says that it had no
15 legitimate medical purpose, those are
16 prescriptions for which there was no
17 legitimate need?
18       MS. McENROE:  Objection to
19    form.
20       THE WITNESS:  No.  I
21    wouldn't necessarily say that.
22 BY MR. SIMMER:
23    Q.   And why wouldn't you?
24    A.   They may be needed for

Page 119

1 another patient, but maybe not in the
2 example that they're giving.
3    Q.   But with regard to those
4 specific prescriptions, when it says here
5 that there was no legitimate medical
6 purpose, wouldn't it be true that there
7 was no need to even have those
8 prescriptions issued in the first place?
9       MS. McENROE:  Objection to
10    form.
11       THE WITNESS:  No.  Again, I
12    would disagree.
13 BY MR. SIMMER:
14    Q.   And again, what is your
15 disagreement with that?
16    A.   I don't know how dispensing
17 a script has anything to do with on-hand
18 inventory at store level.
19    Q.   Nothing at all?
20    A.   Right.
21    Q.   So when a pharmacy actually
22 has inventory, isn't that inventory being
23 used to fill prescriptions?
24       MS. McENROE:  Objection to

Page 120

1    form.
2       THE WITNESS:  Yes.  Yes, it
3    would be.
4 BY MR. SIMMER:
5    Q.   And the orders that the
6 pharmacy makes of controlled substances,
7 those would be to fill prescriptions,
8 right?
9    A.   That would be correct.
10    Q.   And with regard to these
11 specific pharmacies, when they say there
12 was no legitimate medical purpose, that's
13 coming out of their inventory of the
14 shipments they had gotten from the
15 Perryman facility, right?
16       MS. McENROE:  Objection to
17    form.
18       THE WITNESS:  Yeah, it could
19    be, certainly, or it could have
20    come from McKesson.
21 BY MR. SIMMER:
22    Q.   In either event, those
23 shipments were sent to a Rite Aid
24 pharmacy, right?

Page 121

1       MS. McENROE:  Objection to
2    form.
3       THE WITNESS:  Correct.
4 BY MR. SIMMER:
5    Q.   And you're disputing the
6 fact that when it says no legitimate
7 medical purpose, whether that is coming
8 out of the inventory for which there is
9 no legitimate need as well, right?
10       MS. McENROE:  Objection to
11    form.
12       THE WITNESS:  I wouldn't
13    have any insight as to what
14    inventory -- what inventory
15    balances a store would be required
16    to have.  So I guess the point
17    that I was trying to make is that
18    I don't think it's out of the
19    ordinary for a store to have, for
20    example, ten bottles of a
21    particular drug if there are going
22    to be scripts sold for that drug.
23       I would have absolutely no
24    way of knowing the

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1   doctor-physician-pharmacy-patient
2   relationship.  I mean, what
3   happens at the store level, I have
4   no knowledge or observation of.
5   BY MR. SIMMER:
6       Q.   So when a store, and in this
7   example these stores in Kentucky and New
8   York, issued prescriptions for which
9   there was no legitimate medical purpose,
10  would you agree with me that they would
11  need to replenish their stock with
12  additional controlled substances?
13          MS. McENROE:  Objection to
14      form.
15          THE WITNESS:  Replenishment
16      is based on sales, so yes.
17  BY MR. SIMMER:
18      Q.    And so in that instance, if
19  those sales were reflective of
20  prescriptions for which there was no
21  legitimate medical purpose, correct?
22          MS. McENROE:  Objection to
23      form.
24          THE WITNESS:  That's --

Page 123

1       that's what it says.  Again, I
2       have no knowledge of that
3       whatsoever.
4   BY MR. SIMMER:
5       Q.   Following the $5 million in
6   fines that Rite Aid paid here, can you
7   tell us what changes the company made to
8   its suspicious order monitoring system to
9   ensure that orders were being shipped
10  based on legitimate medical purpose?
11          MS. McENROE:  Objection to
12      form.
13          THE WITNESS:  Again, this
14      is -- this entire document is
15      relating to the stores.  Never
16      once does it talk about a
17      distribution center.  And I am
18      confident that the programs we had
19      in place, based on DEA audits,
20      specifically Perryman in 2005 and
21      in 2009, we had glowing results.
22  BY MR. SIMMER:
23      Q.   That wasn't what my question
24  was.

Page 124

1           Can you tell us what changes
2   the company made to its suspicious order
3   monitoring system to ensure that orders
4   were being shipped based on legitimate
5   medical purpose?
6           MS. McENROE:  Objection to
7       form, including asked and
8       answered.
9           THE WITNESS:  I am not aware
10      of any changes.
11          (Document marked for
12      identification as Exhibit Rite Aid
13      Mitchell-4.)
14  BY MR. SIMMER:
15      Q.   I'll hand you what we've
16  marked as Mitchell Exhibit Number 4.
17          I'll identify it for the
18  record.  It is a settlement agreement and
19  release.  We've obtained this off -- it's
20  a public document.  We obtained it off
21  the internet.
22          If you'd like to review the
23  entire document, that's fine.  But I'm
24  just going to ask you a few general

Page 125

1   questions about it.
2       A.   Okay.
3       Q.   Do you recall ever having
4   seen this document before?
5       A.   No, sir.
6       Q.   Is it fair to say that this
7   settlement agreement and release, so far
8   as you know, did not result in any
9   changes in how you conducted your work as
10  director of supply chain regulatory
11  compliance at Rite Aid?
12          MS. McENROE:  Objection to
13      form.
14          THE WITNESS:  That is
15      correct.
16  BY MR. SIMMER:
17      Q.   Okay.  I'll direct your
18  attention to one specific paragraph,
19  Paragraph 10 on Page 11.
20          Do you see where it says,
21  "Rite Aid represents that it has taken
22  good faith actions to detect and prevent
23  diversion, including without limitation,
24  agreeing to implement the policies and

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 procedures that are the subject of a
2 memorandum of agreement between Rite Aid
3 and the Drug Enforcement Administration,
4 dated January 12, 2009, and attached
5 hereto as Appendix B."
6       Do you see that?
7    A.   Yes.
8    Q.   Did you undertake any
9 changes in your work as Rite Aid's
10 director of supply chain regulatory
11 compliance as part of these good faith
12 actions that the company agreed to
13 undertake?
14       MS. McENROE: Objection to
15    form.
16       THE WITNESS: Is there a
17    copy of the MOU that they are
18    referring, or memorandum of
19    agreement?
20 BY MR. SIMMER:
21    Q.   Well, we'll get to that in a
22 moment. I just recall -- I'm asking
23 whether you -- whether you recall
24 undertaking any good faith actions at all

Page 127

1 as a result of this settlement?
2       MS. McENROE: Objection to
3    form.
4       THE WITNESS: I do not
5    recall.
6       (Document marked for
7    identification as Exhibit Rite Aid
8    Mitchell-5.)
9 BY MR. SIMMER:
10    Q.   Just to be clear for the
11 record. Do you recall any discussions at
12 all about this $5 million settlement
13 while you were working with Rite Aid?
14       MS. McENROE: Objection to
15    form.
16       THE WITNESS: I do not
17    recall.
18 BY MR. SIMMER:
19    Q.   I'll hand you what we've
20 marked as Mitchell Exhibit Number 5.
21       I'll identify it for the
22 record as a document entitled memorandum
23 of agreement. And again, it's a document
24 we obtained from the internet. Multi

Page 128

1 pages.
2       I think it's the memorandum
3 of agreement that was being discussed in
4 the prior exhibit. Take a moment to look
5 at that.
6       By all means, look at the
7 entire document if you need to. But I
8 just have a few specific questions
9 relatively straightforward.
10       Just the first paragraph. I
11 can point to you a couple passages, and
12 if you need to look at the rest of the
13 document, do so.
14       First paragraph, do you see
15 that it says, "This is administrative
16 memorandum of agreement entered into on
17 this 12th day of January, 2009, by and
18 between the United States Department of
19 Justice, Drug Enforcement Administration,
20 hereinafter DEA, and Rite Aid
21 Corporation"?
22       Do you see that?
23    A.   Yes, sir.
24    Q.   And that Rite Aid

Page 129

1 Corporation, that's the entity that you
2 work for, correct?
3       MS. McENROE: Objection to
4    form.
5       THE WITNESS: Yes, sir.
6 BY MR. SIMMER:
7    Q.   You see at the end of that
8 paragraph it says, "A list of Rite Aid
9 subsidiaries is attached hereto as
10 Exhibit A"?
11       I'm sorry, Appendix A?
12    A.   Yes, sir.
13    Q.   Can I direct you to
14 Appendix A at the back, it's Page 9.
15       And this is a list of all
16 the Rite Aid subsidiaries, correct?
17    A.   Yes, sir.
18    Q.   And they were a party to --
19 as far as the way this is referencing,
20 they were a party to the settlement as
21 well, correct?
22    A.   Apparently so, yes, sir.
23    Q.   And in the case of the
24 Perryman facility, is that what's

Highly Confidential – Subject to Further Confidentiality Review

| Page 130 |
|---|
| 1 indicated, Rite Aid of Maryland Inc.? |
| 2     MS. McENROE: Objection to |
| 3   form. |
| 4     THE WITNESS: Yes, sir. |
| 5 BY MR. SIMMER: |
| 6     Q. Can I take you back to |
| 7 Page 3 of this exhibit. At the last |
| 8 sentence of the first paragraph on that |
| 9 page, do you see where it says, "Rite Aid |
| 10 acknowledges and agrees that the |
| 11 obligations undertaken in this |
| 12 subparagraph do not fulfill the totality |
| 13 of its obligations under the CSA"? |
| 14     A. Yes, sir. |
| 15     Q. So you agree with me that -- |
| 16 that the compliance that the company had |
| 17 entered into wasn't all its obligations |
| 18 were under the Controlled Substances Act, |
| 19 right? |
| 20     A. Yes, sir. |
| 21     Q. And in the next paragraph, |
| 22 you see where it says, "Rite Aid shall |
| 23 monitor compliance at all Rite Aid |
| 24 locations in properly maintaining records |

| Page 131 |
|---|
| 1 in accordance with the CSA. Within one |
| 2 year of the effective date of this |
| 3 agreement, Rite Aid loss prevention |
| 4 managers will conduct a separate audit of |
| 5 all Rite Aid pharmacies for compliance in |
| 6 all material respects with all applicable |
| 7 DEA regulatory requirements, including |
| 8 regulatory" -- or "including |
| 9 recordkeeping, reporting and security." |
| 10     Do you see that? |
| 11     A. Yes, sir. |
| 12     Q. Did you have any role and |
| 13 responsibility with regard to those |
| 14 audits of the -- of the Rite Aid |
| 15 pharmacies? |
| 16     A. No, sir. |
| 17     Q. Were you aware that -- that |
| 18 as part of this settlement, there were |
| 19 allegations that there were prescriptions |
| 20 issued for which there was no legitimate |
| 21 medical need? |
| 22     MS. McENROE: Objection to |
| 23   form. Asked and answered. |
| 24     THE WITNESS: No, sir. |

| Page 132 |
|---|
| 1 BY MR. SIMMER: |
| 2     Q. Had you known that, would it |
| 3 have -- have prompted you to make any |
| 4 changes to Rite Aid's suspicious order |
| 5 monitoring program? |
| 6     MS. McENROE: Objection to |
| 7   form. Calls for speculation. |
| 8     THE WITNESS: I don't think |
| 9   so. |
| 10 BY MR. SIMMER: |
| 11     Q. Because in your -- your |
| 12 view, what happened at the pharmacies was |
| 13 irrelevant to what was happening at the |
| 14 distribution center level? |
| 15     MS. McENROE: Objection to |
| 16   form. |
| 17     THE WITNESS: I felt |
| 18   comfortable that the distribution |
| 19   centers had good policies and |
| 20   procedures and measures already in |
| 21   place to prevent the DCs from -- |
| 22   from shipping to stores. |
| 23 BY MR. SIMMER: |
| 24     Q. So as far as you know, were |

| Page 133 |
|---|
| 1 the distribution centers -- centers |
| 2 actually monitoring whether there was |
| 3 legitimate medical need for the |
| 4 prescriptions that they were filling? |
| 5     MS. McENROE: Objection to |
| 6   form. |
| 7     THE WITNESS: The |
| 8   distribution center would have |
| 9   absolutely no idea about a |
| 10   legitimate medical need. |
| 11     They would be able to look |
| 12   at -- you know, first of all our |
| 13   distribution centers, they |
| 14   distributed Schedules III through |
| 15   V. So Schedule IIs were not |
| 16   distributed at the DC. |
| 17     And again, there was a |
| 18   monitoring program in place to |
| 19   look for anything out of the norm; |
| 20   excessive, suspicious, et cetera. |
| 21 BY MR. SIMMER: |
| 22     Q. But the fact that in this |
| 23 settlement agreement, the -- the company |
| 24 admitted that there were prescriptions |

Page 134

1  that were filled at pharmacies where
2  there was no legitimate medical need,
3  that had no bearing on what you were
4  doing in your job; is that right?
5      MS. McENROE:  Objection to
6  form.
7      THE WITNESS:  That would be
8  correct.  This is 100 percent
9  related to deficiencies at the
10  pharmacies.  It's not the pharmacy
11  distribution centers.
12 BY MR. SIMMER:
13     Q.   So -- so when a --
14     MS. McENROE:  Hold on.  Did
15  you have something more to say?
16 BY MR. SIMMER:
17     Q.   Yeah, were you --
18     A.   Again, I was just going to
19  kind of go back to, we had had -- we have
20  had multiple DEA audits, where again DEA
21  has come in, they -- they've looked at
22  the entire gamut of the operation.  They
23  have continually praised the distribution
24  center on its compliance programs, on the

Page 135

1  effectiveness on the programs.
2      And again, with DEA being
3  kind of my scorecard as to how I rate my
4  ability to help the DCs become compliant,
5  if the DC -- if the DEA is telling me
6  that your program is awesome, then I have
7  no -- no really valid business reason to
8  want to change that.
9  BY MR. SIMMER:
10     Q.   Point well taken.
11     So what you're testifying,
12  as I understand it, the fact that the
13  company had admitted in this settlement
14  agreement that there were prescriptions
15  filled where there was no legitimate
16  medical need was irrelevant to what
17  the -- the company was doing in
18  suspicious order monitoring, correct?
19     MS. McENROE:  Objection to
20  form.
21     THE WITNESS:  I'm saying I
22  had no oversight or knowledge of
23  it.
24 BY MR. SIMMER:

Page 136

1      Q.   And I'm trying to
2  understand.  As you -- in your
3  responsibilities as the director of
4  supply chain regulatory compliance at
5  this time, what you're -- you're
6  testifying that the fact that there were
7  prescriptions filled where there was no
8  legitimate medical need, you felt that
9  they had nothing to do with the company's
10  obligation to have a suspicious order
11  monitoring program that was in operation
12  at the time, right?
13     MS. McENROE:  Objection to
14  form.
15     THE WITNESS:  No, that's not
16  what I said.
17     I said that my
18  responsibility was oversight over
19  the distribution centers.
20     I was not aware of any of
21  this when it happened.  Therefore,
22  if I'm not aware of it, I
23  wouldn't, or couldn't have made
24  changes to the program at the DCs.

Page 137

1  BY MR. SIMMER:
2      Q.   Do you have an understanding
3  of who in the company would have had an
4  obligation to tell you about this
5  settlement agreement and how it might
6  impact what the company was doing about
7  its suspicious order monitoring program?
8      MS. McENROE:  Objection to
9  form.
10     THE WITNESS:  I could assume
11  that multiple people could have,
12  or should have notified the supply
13  chain department.
14 BY MR. SIMMER:
15     Q.   And who were those
16  individuals you believe that could have
17  or should have notified the supply chain
18  department?
19     A.   Whoever was involved in
20  making the settlement.  So I'm -- I would
21  assume the Rite Aid legal team, or
22  government affairs or pharmacy
23  operations.
24     Q.   And your best recollection

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  is none of those individuals, none of
2  those departments, ever notified you of
3  any changes that should be made to Rite
4  Aid's suspicious order monitoring
5  program, right?
6          MS. McENROE:  Objection to
7  form.
8          THE WITNESS:  I am not
9  aware, no.
10         (Document marked for
11  identification as Exhibit Rite Aid
12  Mitchell-6.)
13  BY MR. SIMMER:



Page 140

Page 139

Page 141

Highly Confidential - Subject to Further Confidentiality Review



Page 142

Page 144

Page 143

Page 145



Page 146

Page 148

Page 147

Page 149





Highly Confidential - Subject to Further Confidentiality Review



Page 158

Page 159

18    Let me just stop right
19  there. Is there a difference between an
20  excessive order and a suspicious order?
21      MS. McENROE:  Objection to
22    form.
23      THE WITNESS:  In my opinion,
24    yes.

Page 160

1  BY MR. SIMMER:
2      Q.   How do they differ?
3      A.   Excessive is just that, it's
4  excessive to the point that it's more
5  than -- more than historically the store
6  would order.
7          Suspicious would be
8  something out of the ordinary, not just
9  from a number, but maybe from a number
10  and a frequency.
11      Q.   Let me ask you.  So are all
12  excessive orders suspicious?
13      MS. McENROE:  Objection to
14    form.
15      THE WITNESS:  I do not think
16    so, no.
17  BY MR. SIMMER:
18      Q.   Are all excessive orders
19  potentially suspicious?
20      MS. McENROE:  Objection to
21    form.
22      THE WITNESS:  In my opinion,
23    no.
24  BY MR. SIMMER:

Page 161

1      Q.   Are all suspicious orders
2  potentially excessive?
3      MS. McENROE:  Objection to
4    form.
5      THE WITNESS:  I -- no.
6  BY MR. SIMMER:
7      Q.   Based on your work as senior
8  director supply chain regulatory
9  compliance, do you have any idea what the
10  correlation is between an excessive order
11  and a suspicious order?
12      MS. McENROE:  Objection to
13    form.
14      THE WITNESS:  I want to make
15    sure I understand your question.
16    So are you asking do I understand
17    the difference between the two?
18  BY MR. SIMMER:
19      Q.   I asked whether there is a
20  correlation between them.
21      MS. McENROE:  Objection to
22    form.
23      THE WITNESS:  There -- there
24    could be.

Page 162

BY MR. SIMMER:

Q. I'm not asking whether it could be.

So your system is identifying excessive orders, right?

A. It would --

MS. McENROE: Objection to form.

THE WITNESS: Our system would identify both.

BY MR. SIMMER:

Q. Okay. So if I -- if your system is identifying excessive orders beyond the threshold, right?

A. Yes, sir.

Q. I'm asking do you have any -- any idea how -- what the frequency is where that excessive order actually turned out to be a suspicious order?

MS. McENROE: Objection to form.

THE WITNESS: I don't recall any suspicious orders during my tenure with Rite Aid.

Page 163

BY MR. SIMMER:

Q. So the fact that you were identifying excessive orders has no correlation at all to there being any suspicious orders, right?

MS. McENROE: Objection to form.

THE WITNESS: I would agree.

BY MR. SIMMER:

Q. Because your system didn't identify any suspicious orders, right?

MS. McENROE: Objection to form.

THE WITNESS: Not that I recall.

BY MR. SIMMER:

Q. And what is your understanding how why identifying orders over 5,000 units per month would identify suspicious orders?

MS. McENROE: Objection to form.

THE WITNESS: Could you ask that again, please?

Page 164

BY MR. SIMMER:

Q. Sure.

Based on your experience as senior director supply chain regulatory compliance, do you have any understanding how identifying orders over 5,000 units per month would identify suspicious orders?

MS. McENROE: Objection to form.

THE WITNESS: I do not.

BY MR. SIMMER:

Q. Based on your experience as senior director of supply chain regulatory compliance, do you know what happened if Rite Aid identified an order as being excessive?

A. Yes, I do.

Q. What happened?

A. So, there was a policy in place, Rite Aid would actually contact -- the Rite Aid distribution center would contact the store and ask the store, hey, we got an order for 53 units, did you

Page 165

mean to order 53 units. Depending on what they said, again typically, I think we talked about this earlier, they would say, "No, I'm sorry, the order, it should be five," or "It should be three."

They would make a note of that on a log. And then cut that order back to whatever the true amount was that was -- that should have been ordered.

Q. In the example, if -- if the order was being filled in the middle of the night, what would the overnight shift do at Perryman if an order came in that was over the threshold?

A. I think -- well, they did a couple things. First of all, you can't contact the store in the middle of the night. So sometimes I'm sure nothing was done. It may have just automatically been cut back. And then I'm sure there were probably times where they may have left a note for somebody on the dayshift that, hey, this happened at nightshift. If that order had not shipped already for

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1 the dayshift to contact somebody from the
2 store.
3         Again, all of that would be
4 my -- just my opinion based on -- I
5 wouldn't know when the order -- when it
6 left the building.  But again, if it was
7 still in the building, they would have
8 the ability to call.  Otherwise they
9 would just automatically cut it down to
10 the threshold before shipping.
11     Q.    So in the example where they
12 were cutting it back like that, they
13 would cut it back to simply the threshold
14 and then somebody else would follow up
15 later; is that right?
16     A.    That could happen, yes.
17     Q.    Or -- or it could also
18 happen that nobody ever called the
19 pharmacy to check about why the order
20 exceeded the threshold, right?
21     A.    That could be true as well.
22     Q.    So is it the case that the
23 part that was actually shipped was deemed
24 to have not been excessive, right?

Page 167

1         MS. McENROE:  Objection to
2     form.
3         THE WITNESS:  Based on the
4     thresholds, that would be correct.
5 BY MR. SIMMER:



Highly Confidential - Subject to Further Confidentiality Review



S. McENROE: Objection to form.



Page 174



3 BY MR. SIMMER:
4     Q.   Is there anything else about
5 the suspicious order monitoring program
6 or excessive order monitoring program
7 that you understood happened beyond what
8 she's described here?
9          MS. McENROE:  Objection to
10     form.
11          THE WITNESS:  Not that I
12     recall.
13 BY MR. SIMMER:
14     Q.   So does the company use the
15 terms "excessive order monitoring
16 program" and "suspicious order monitoring
17 programs" to mean the same thing?
18          MS. McENROE:  Objection to
19     form.
20          THE WITNESS:  No, sir.
21 BY MR. SIMMER:
22     Q.   How are they different?
23     A.   Again, excessive, I think we
24 just talked about this a few moments ago.

Page 175

1 Excessive is just that, it's excessive
2 based on a normal pattern of ordering.
3 Suspicious would be something that's way
4 out of the ordinary.
5     Q.   So the excessive order
6 monitoring program really doesn't
7 identify suspicious orders at all, does
8 it?
9          MS. McENROE:  Objection to
10     form.
11          THE WITNESS:  It -- it
12     could.
13 BY MR. SIMMER:
14     Q.   But is that what its aim is,
15 is to identify suspicious orders?
16          MS. McENROE:  Objection to
17     form.
18          THE WITNESS:  I think our --
19     our responsibility is to remain
20     open-minded every day about
21     looking for suspicious and/or
22     excessive orders.
23 BY MR. SIMMER:
24     Q.   That wasn't my question.

Page 176

1 I'm asking whether the excessive order
2 monitoring program actually identifies
3 suspicious orders.  That -- was that its
4 aim?
5          MS. McENROE:  Objection to
6     form.
7          THE WITNESS:  No, it was
8     not.
9          MR. SIMMER:  Can we take our
10     lunch break?
11          THE VIDEOGRAPHER:  The time
12     is now 12:32 p.m.  We're going off
13     the record.
14          (Lunch break.)
15          THE VIDEOGRAPHER:  The time
16     is now 1:24 p.m.  We are back on
17     the record.
18 BY MR. SIMMER:
19     Q.   Sir, this morning you
20 discussed the fact that you and a group
21 of other individuals at internal
22 assurance in 2009 started what I think
23 you called a -- a CSA team, correct?
24          MS. McENROE:  Objection to

Page 177

1     form.
2          THE WITNESS:  Yes, sir.
3 BY MR. SIMMER:
4     Q.   And I think you said that
5 you developed a checklist of some kind
6 that you went out and used then to
7 conduct audits of the distribution
8 centers; is that correct?
9     A.   The teams conducted the
10 audits, correct, yes, sir.
11     Q.   Okay.  I'll hand you what
12 I'll identify for the record in a moment.
13 Just have you look at it.
14          (Document marked for
15     identification as Exhibit Rite Aid
16     Mitchell-7.)
17 BY MR. SIMMER:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Page 186

Page 188

Page 187

Page 189



24 available to support the change?"



Page 194

Page 196

21    Q.   Do you know what was done to
22  actually audit for that particular item?
23    A.   I do not recall.
24    Q.   So when it says controls in

Page 195

Page 197

1  place, what are -- what are the types of
2  controls in place that that's in
3  reference to?
4      A.   If -- you know, again, I
5  would just want to preface that I don't
6  remember exactly what the audit team
7  would have done.  But I would -- I would
8  be looking for inventory adjustments
9  along with potentially a 106 if there
10  were true theft identified in this.
11    Q.   When it says in reference to
12  diversion though, it -- what type of
13  diversion are we looking for there?
14      MS. McENROE:  Objection to
15    form.
16      THE WITNESS:  I would say
17    we're looking for any kind of
18    diversion, anything that's again
19    out of the norm.
20  BY MR. SIMMER:
21    Q.   Not just theft from the
22  distribution center, but any kind of
23  diversion diverting a drug to an
24  inappropriate use, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1    MS. McENROE: Objection to
2 form.
3    THE WITNESS: Or -- that
4 could be true. It could be in a
5 different department it shouldn't
6 be in. It could be just as simple
7 as that. Just a lack of control.
8 BY MR. SIMMER:
9    Q.   Do you know how the -- the
10 audit team reviewed this particular audit
11 finding or element to make a decision
12 whether the -- the distribution center
13 was in compliance or not?
14    MS. McENROE: Objection to
15 form.
16    THE WITNESS: I would assume
17 that they did a controlled drug
18 accountability on the items to
19 ensure that those numbers
20 balanced, which would show proper
21 control over receipts, sales, the
22 whole gamut.
23 BY MR. SIMMER:
24    Q.   Is that actually looking

Page 199

1 then at shipments to, you know, that --
2 that Perryman was making to determine
3 whether there was any diversion --
4 evidence of diversion there?
5    A.   Yes --
6    MS. McENROE: Objection to
7 form.
8    THE WITNESS: Yes, sir. It
9 would -- it would look at a couple
10 things. So it would look at your
11 on-hand inventory at the
12 distribution center. It would
13 look at your inbound receipts
14 coming from the manufacturers
15 and/or McKesson in this case.
16    And it would also look at
17 our outbound shipments.
18    So once you do the math, you
19 know, add your inbound to your
20 existing minus your sales, you
21 should have an on-hand inventory.
22    And if that on-hand
23 inventory is truly what the system
24 says it is, then we show that

Page 200

1 we've got proper controls and
2 there's been no diversion.
3 BY MR. SIMMER:
4    Q.   So in that particular
5 example, we're just counting numbers,
6 we're not actually digging into the
7 orders themselves to determine whether
8 there was any inappropriate order
9 included, right?
10    MS. McENROE: Objection to
11 form.
12    THE WITNESS: That would
13 have done prior to any shipments
14 being made.
15 BY MR. SIMMER:
16    Q.   By whom?
17    A.   By the pharmacy department.
18    Q.   But not -- at -- out of the
19 Perryman center, they would not -- or
20 distribution center. They would not be
21 looking at whether the orders themselves
22 were appropriate, right?
23    MS. McENROE: Objection to
24 form.

Page 201

1    THE WITNESS: The Perryman
2 facility, those folks would be
3 looking.
4    The -- the CSA audit team,
5 if -- if that's what you're
6 asking, they would not know that.
7 BY MR. SIMMER:
8    Q.   So what did the Perryman
9 facility folks do to determine whether
10 the orders were appropriate?
11    MS. McENROE: Objection to
12 form.
13    THE WITNESS: There -- in
14 the excessive order monitoring
15 program, they -- they have a
16 checklist internally that they
17 would use to identify what -- what
18 was quantities and what -- what
19 was the NDC of the items coming
20 in. They would then review that.
21 And there were things even less
22 than the threshold that could look
23 excessive to them. So if -- you
24 know, if my store typically orders

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1  two of something each week, which
2  is well below the threshold, if
3  they all of a sudden order seven,
4  because you have the same people
5  picking orders day in and day out,
6  that looks excessive.
7  BY MR. SIMMER:
8      Q.   So you're just looking at
9  excessive orders, not suspicious orders?
10     A.   Well --
11         MS. McENROE:  Did you finish
12  your answer?
13         THE WITNESS:  Yes and no.
14  There -- there -- I want
15  to -- I want to kind of correct
16  what I said earlier today too, if
17  I -- if I may.
18  BY MR. SIMMER:
19     Q.   No, there's not a question
20  pending on that, so --
21     A.   Okay.  So I'll move on.
22         Could you please repeat your
23  question again.
24     Q.   So my question is, this

Page 203

1  process you've talked about, where the
2  Perryman folks would have looked at this,
3  they are identifying excessive orders,
4  not suspicious orders, right?
5         MS. McENROE:  Objection to
6  form.
7         THE WITNESS:  Excessive
8  orders could turn into suspicious
9  orders.
10  BY MR. SIMMER:
11     Q.   But they are only really
12  looking at the total number of count of
13  orders relative to a prior period, right?
14         MS. McENROE:  Objection to
15  form.
16         THE WITNESS:  It's probably
17  better that one of them answer
18  that than me.
19         My understanding is that
20  they are looking at anything that
21  just looks abnormal.  Again, it
22  could be small in size, it could
23  be large in size.
24         They would then question it.

Page 204

1  So again, if one store always
2  orders two of a specific item, and
3  all of the sudden they're ordering
4  anything greater than that, they
5  would then -- that would be kind
6  of an eye opener to them.
7         They would then in turn call
8  the store, verify if you really
9  truly needed that seven or if that
10  order should be cut back to two.
11  And they have logs that they keep
12  in the control drug cage that
13  annotate every -- every call they
14  made, who they spoke to, what the
15  outcome of the call was, and if
16  that order was in turn reduced or
17  not.
18  BY MR. SIMMER:
19     Q.   And you had nothing to do
20  with that process that you've described,
21  right?
22         MS. McENROE:  Objection to
23  form.
24         THE WITNESS:  That's

Page 205

1  correct.  I worked at the
2  corporate headquarters.  I did not
3  work at the DC.
4  BY MR. SIMMER:
5     Q.   So when you talked about
6  your understanding, you're just
7  speculating, aren't you?
8         MS. McENROE:  Objection.
9  BY MR. SIMMER:
10     Q.   What they actually did,
11  right?
12         MS. McENROE:  Objection to
13  form.
14         THE WITNESS:  No.  During
15  audits, I've actually seen it
16  happen.  I've witnessed it.
17  BY MR. SIMMER:
18     Q.   Tell us when -- what times
19  you recall having witnessed that
20  occurring.
21     A.   I can't give you specific
22  timelines, but during my 11 and a half
23  years of employment there.
24     Q.   But you can't tell us

Page 206

1  specifically what happened?
2       MS. McENROE:  Objection to
3    form.  Asked and answered.
4       THE WITNESS:  No.  That's
5    19 years ago to seven years ago, I
6    don't recall a specific date.
7  BY MR. SIMMER:
8    Q.   So did you actually
9  participate ever on any of these calls
10 that the distribution center made to a
11 pharmacy to call -- to question whether
12 the order was suspicious or not?
13   A.   Did I participate?  No, I
14 did not.
15   Q.   So in the Perryman center --
16 let me have -- see if I get this right.
17 It was the order picker that would flag
18 whether it was a potentially suspicious
19 order; is that right?
20       MS. McENROE:  Objection to
21    form.
22       THE WITNESS:  That is
23    correct.
24 BY MR. SIMMER:

Page 207

1    Q.   And that is what your
2  understanding is?
3    A.   That is correct.
4    Q.   And the order picker would
5  use what criteria to decide whether an
6  order was suspicious or not?
7       MS. McENROE:  Objection to
8    form.
9       THE WITNESS:  They --
10    experience from daily picking the
11    same stores' orders over and over.
12    They would be able to
13    identify something that looked
14    excessive and/or suspicious.
15 BY MR. SIMMER:
16   Q.   And that's subjective,
17 right?
18       MS. McENROE:  Objection to
19    form.
20       THE WITNESS:  It could be.
21    But again, based on their
22    experience, they felt that it
23    looked outside of the norm.
24 BY MR. SIMMER:

Page 208

1    Q.   So were there any objective
2  criteria used by the order picker in
3  order to determine whether an order was
4  suspicious or not?
5       MS. McENROE:  Objection to
6    form.
7       THE WITNESS:  Correct.
8  BY MR. SIMMER:
9    Q.   I didn't ask a yes-or-no
10 question.  I said were there any
11 objective criteria used by the order
12 picker to determine whether it was
13 suspicious or not?
14       MS. McENROE:  Objection to
15    form.
16       THE WITNESS:  Again, their
17    experience.
18 BY MR. SIMMER:
19   Q.   Were there any SOPs in place
20 that the company used to determine
21 whether an order was suspicious or not?
22       MS. McENROE:  Objection to
23    form.
24       THE WITNESS:  The company

Page 209

1    did have SOPs for suspicious order
2    monitoring.
3  BY MR. SIMMER:
4    Q.   And what were the criteria
5  used to determine whether an order was
6  suspicious or not from those SOPs?
7    A.   I don't recall.
8    Q.   But I think what you're
9  talking about, isn't it, that the pickers
10 would use their experience, right?
11   A.   They would.
12   Q.   Is it your testimony that
13 the order pickers were trained to
14 identify what they believe to be
15 suspicious orders?
16   A.   Yes.
17   Q.   Who did that training?
18   A.   The pharmacy department team
19 at the DCs.
20   Q.   And did they have training
21 materials they used for that training to
22 train the order pickers to determine what
23 was suspicious?
24   A.   They had training materials

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1 and signoffs from each associate that was
2 trained.
3      Q.    And what were the training
4 materials they used for this training?
5           MS. McENROE:  Objection to
6      form.
7           THE WITNESS:  That, I cannot
8      answer.  I don't know.
9 BY MR. SIMMER:
10     Q.    Who prepared the training
11 materials?
12     A.    The DC.
13     Q.    You had nothing to do with
14 it?
15     A.    I did not.
16     Q.    Okay.  Were these pickers
17 evaluated on how accurate they were in
18 determining whether orders were
19 suspicious or not?
20          MS. McENROE:  Objection to
21     form.
22          THE WITNESS:  That, I do not
23     know.
24 BY MR. SIMMER:

Page 211

1      Q.    Do you know whether they
2 received any kind of bonuses or -- in
3 their -- in their evaluations related to
4 their accuracy of identifying suspicious
5 orders?
6           MS. McENROE:  Objection to
7      form.
8           THE WITNESS:  That, I do not
9      know.
10 BY MR. SIMMER:
11     Q.    Do you know whether any
12 order pickers were ever fired for not
13 adequately identifying suspicious orders?
14          MS. McENROE:  Objection to
15     form.
16          THE WITNESS:  I do not know.
17 BY MR. SIMMER:
18     Q.    Do you know if any part of
19 their evaluation whatsoever evaluated the
20 accuracy of their picking suspicious
21 orders?
22          MS. McENROE:  Objection to
23     form.
24          THE WITNESS:  I do not know.

Page 212

1 BY MR. SIMMER:
2      Q.    Did anybody ever audit the
3 accuracy of their picking suspicious
4 orders?
5           MS. McENROE:  Objection to
6      form.
7           THE WITNESS:  I do not know.
8 BY MR. SIMMER:
9      Q.    Yet, this is one of the
10 things that you and the CSA team did, is
11 put together that checklist?  You didn't
12 put anything in your checklist that
13 mandated that the Perryman center and the
14 Woodland center was to be audited for the
15 accuracy of the pickers in identifying
16 suspicious orders; isn't that right?
17          MS. McENROE:  Objection to
18     form.
19          THE WITNESS:  We
20     identified -- what we required was
21     that there be an excessive order
22     and/or suspicious order monitoring
23     program and that it was being
24     used.

Page 213

1           And based on the results and
2      the documents from the DCs, it was
3      being used.  It was being used
4      very effectively.  And DEA as well
5      commented on just how good and
6      solid that program was.
7           MR. SIMMER:  Move to strike
8      everything after "monitoring
9      program and that it was being
10     used."  Everything after that is
11     nonresponsive to the question.
12          MS. McENROE:  For the
13     purposes of the record, Rite Aid
14     disagrees.  And we can fight it
15     out at the time of the trial.  But
16     that you don't like the witness's
17     answer is not a basis to move to
18     strike.
19          MR. SIMMER:  You know what?
20     I can make any objection I want
21     just like you can.
22          MS. McENROE:  And I can --
23          MR. SIMMER:  And you can
24     take it to the judge if you'd

Page 214

1    like.
2        MS. McENROE:  Yep.  I can
3    preserve it for the record.  I
4    said at the time of trial we can
5    deal with it.
6        MR. SIMMER:  That's fine.
7    BY MR. SIMMER:
8        Q.   Sir, is there anywhere in
9    this document that you and the CSA team
10   created the use of the word "suspicious"
11   anywhere?
12       MS. McENROE:  Objection to
13   form.
14       THE WITNESS:  I did not see
15   that in the document, no.
16   BY MR. SIMMER:
17       Q.   And in fact, the -- on the
18   items that we just looked at, the four,
19   five, six items that we looked at, they
20   talk about excessive orders, don't they?
21       A.   Yes, they did.
22       Q.   They don't talk about
23   suspicious orders, do they, anywhere in
24   this document?

Page 215

1        A.   Specifically, I did not see
2    it, no.
3        Q.   So when you talked about in
4    your answer previously that you would --
5    they were looking for excessive and/or
6    suspicious orders, it's just excessive
7    orders, isn't it?
8        MS. McENROE:  Objection to
9    form.
10       THE WITNESS:  It depends on
11   how you interpret it.  But as it's
12   written, yes.
13   BY MR. SIMMER:
14       Q.   Well, the words are the
15   words used in the document that you and
16   the CSA team created, right?
17       MS. McENROE:  Objection to
18   form.
19       THE WITNESS:  That's
20   correct.
21   BY MR. SIMMER:
22       Q.   So if you wanted to evaluate
23   these two distribution centers for
24   whether they had a suspicious order

Page 216

1    monitoring program in place, you would
2    have put that in these criteria for the
3    audit, wouldn't you?
4        MS. McENROE:  Objection to
5    form.
6        THE WITNESS:  I would
7    assume, yes.
8    BY MR. SIMMER:
9        Q.   But you didn't.  You only
10   talk about excessive orders in this
11   document; isn't that right?
12       MS. McENROE:  Objection to
13   form.
14       THE WITNESS:  For this
15   specific document, yes.
16   BY MR. SIMMER:
17       Q.   Well, did it ever change
18   during the time that you worked at the
19   company, that actually was one of the
20   criteria that was looked at, is whether
21   they had -- they were actually doing
22   suspicious order monitoring?
23       MS. McENROE:  Objection to
24   form.

Page 217

1        THE WITNESS:  That may not
2    have been part of this specific
3    program, but it was part of my
4    self-assessment, or my audits that
5    I conducted independently of the
6    CSA team.
7    BY MR. SIMMER:
8        Q.   And you put that in writing
9    someplace?
10       A.   Oh, there's certainly
11   checklists out there, yes.
12       Q.   And that referred to
13   suspicious order monitoring program,
14   right?
15       A.   Yes, yes.
16       Q.   And where would we find that
17   document?
18       A.   It -- it should be in my
19   documents that I had when I was with the
20   company.
21       (Document marked for
22   identification as Exhibit Rite Aid
23   Mitchell-8.)
24   BY MR. SIMMER:

Highly Confidential - Subject to Further Confidentiality Review



Page 218

Page 220

Page 219

Page 221

11    (Document marked for
12    identification as Exhibit Rite Aid
13    Mitchell-9.)
14  BY MR. SIMMER:

Highly Confidential - Subject to Further Confidentiality Review



Page 222

Page 223

15    Do you see that?
16    A.    Yes, sir.
17    Q.    And I understand that what
18 this is, is basically a description of
19 what's in this above average order
20 monitoring program, correct?
21        MS. McENROE:  Objection to
22    form.
23        THE WITNESS:  Yes, sir.
24 BY MR. SIMMER:

Page 224

1    Q.    Okay.  Now just to clarify
2 for the record.  Was there another
3 program in place to identify suspicious
4 orders?
5        MS. McENROE:  Objection to
6    form.
7        THE WITNESS:  I don't
8    recall.
9 BY MR. SIMMER:
10    Q.    So in terms of what we're
11 talking about here, this just identifies
12 an unusually high order; is that right?
13        MS. McENROE:  Objection to
14    form.
15        THE WITNESS:  That's
16    correct.
17 BY MR. SIMMER:
18    Q.    So when we talked earlier,
19 you said that the -- the -- those who
20 were doing the order picks, they would
21 use their judgment to identify if there
22 was a suspicious order, there wasn't a
23 program in place, except for this program
24 identifying unusually high orders, am I

Page 225

1 right?
2        MS. McENROE:  Objection to
3    form.
4        THE WITNESS:  I would
5    disagree with that.  Because if --
6    if that were true, then the
7    excessive order monitoring logs
8    that they did have would have only
9    been based off thresholds, they
10    wouldn't be based off just -- you
11    know, they -- they would have --
12    they'd have other information
13    other than anything that was
14    higher.
15        Because the document is
16    talking about if Pick-to-Light
17    indicates quantities greater than
18    50 or 10 or 5, the picks
19    automatically stopped.  Because
20    of, as we were talking about
21    earlier with using their judgment,
22    there were oftentimes that the
23    pick was stopped if they
24    identified 7 that just didn't seem

Highly Confidential – Subject to Further Confidentiality Review

Page 226

1 right.
2 BY MR. SIMMER:
3    Q.   But the program itself --
4 we're looking at this document.  The
5 program itself only asked those doing the
6 picking to identify unusually high
7 orders, right?
8        MS. McENROE:  Objection to
9    form.
10        THE WITNESS:  That's what
11    this document says.
12 BY MR. SIMMER:
13    Q.   And I asked you a moment
14 ago, and I just want to reiterate.  There
15 was no written policy for anything to
16 identify suspicious orders, was there?
17        MS. McENROE:  Objection.
18        THE WITNESS:  There were
19    plenty of other written policies
20    that superseded or in conjunction
21    with this.  So there are other
22    policies within Rite Aid that do
23    address suspicious orders.
24 BY MR. SIMMER:

Page 227

1    Q.   A moment ago I asked you
2 this question:  "Now just to clarify for
3 the record, was there another program in
4 place to identify suspicious orders?"
5        Your answer, "I don't
6 recall."
7        Which is it?  Was there
8 other programs to identify suspicious
9 orders or not?
10        MS. McENROE:  Objection to
11    form.
12 BY MR. SIMMER:
13    Q.   Because your -- your answer
14 you just gave contradicts that.
15    A.   My -- the answer I just gave
16 was talking about a policy.
17        So was there a process?
18 Again, the excessive order monitoring,
19 above average monitoring, suspicious
20 order monitoring, you know, in my mind
21 that's how you -- that's how you would
22 identify any of these.
23    Q.   But there was no written
24 policy, am I right, to identify

Page 228

1 suspicious orders?
2        MS. McENROE:  Objection to
3    form.
4        THE WITNESS:  There is a
5    written policy.
6        This is a training document.
7 BY MR. SIMMER:
8    Q.   Was there any written
9 training document, whatever you want to
10 call it, to identify suspicious orders?
11        MS. McENROE:  Objection to
12    form.
13        THE WITNESS:  That I do not
14    recall.
15 BY MR. SIMMER:
16    Q.   Look at the -- I'll direct
17 your attention to the second paragraph,
18 please.

Page 229

8        MS. McENROE:  Objection to
9    form.
10 BY MR. SIMMER:
11    Q.   Can you tell me what that
12 means?
13    A.   I see -- I see the sentence,
14 but I did not create this document so I
15 don't necessarily know what the intent
16 is.
17    Q.   Who would we have to talk to
18 in order to understand the intent of
19 this?
20    A.   If -- if I'm not mistaken, I
21 think Marian Wood would have created
22 these documents.
23    Q.   And what department she --
24 did she work?

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1    A.   She was the pharmacy
2  department manager and DEA coordinator
3  over -- over my tenure.  She held several
4  different roles.
5    Q.   So you sent this information
6  on to Mr. Hensley, right?
7    A.   I forwarded the e-mails,
8  correct.
9    Q.   And did you explain to him
10 what this particular sentence meant?
11   A.   That I do not recall.
12   Q.   But sitting here today, your
13 testimony is that you didn't even know
14 what that sentence means, right?
15   A.   I don't typically read the
16 training documents that the DCs used
17 internally.  That's not something I ever
18 got involved with.
19   Q.   So you just sent these
20 materials on, you didn't -- you don't
21 even remember having read them?
22       MS. McENROE:  Objection to
23    form.
24       THE WITNESS:  I don't

Page 231

1    recall.
2  BY MR. SIMMER:
3    Q.   Look at the second page if
4  you would.  Just directing your attention
5  to the top there.
6        With the exceptions of Store
7  Number 777.  What is Store Number 777?
8    A.   They were a -- if my memory
9  serves correctly, they were an internet
10 company that Rite Aid acquired prior to
11 my tenure.
12   Q.   DrugStore.com?
13   A.   DrugStore.com, correct.
14   Q.   And why do they have an
15 exception?
16   A.   They have a lot more volume
17 than a standalone store.
18   Q.   So do the -- the thresholds
19 just not apply to them?
20       MS. McENROE:  Objection to
21    form.
22       THE WITNESS:  Thresholds
23    were done the same for them as
24    they were for every other store,

Page 232

1  was my understanding.
2  BY MR. SIMMER:



12   Q.   Do you know how this
13 threshold was arrived at for
14 DrugStore.com?
15   A.   I do not.  That would be a
16 question for Janet Hart.
17   Q.   In -- in the audit
18 procedures that we looked at for your CSA
19 team that you developed, was there any
20 kind of audit undertaken to audit the
21 prescriptions that came in through
22 DrugStore.com?
23       MS. McENROE:  Objection to
24    form.

Page 233

1        THE WITNESS:  Not that I'm
2    aware of, no.
3  BY MR. SIMMER:
4    Q.   So the Woodland and Perryman
5  distribution centers were simply not
6  audited for what was going on at -- at
7  DrugStore.com, right?
8        MS. McENROE:  Objection to
9    form.
10       THE WITNESS:  DrugStore.com
11    would have been no more than just
12    another store in Perryman's
13    distribution network.
14 BY MR. SIMMER:
15   Q.   But it got no special
16 attention on your audit checklist that we
17 just talked about?
18   A.   It would be treated like any
19 other store, correct.



23   n't belong
24   to.  Anything should be reported
     that's diverting it out of its

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 242

21    Q.   And do you know where these
22  forms are actually kept for each
23  individual employee?
24    A.   I do not, sir.

Page 243

1      (Document marked for
2   identification as Exhibit Rite Aid
3   Mitchell-11.)
4  BY MR. SIMMER:

Page 244

Page 245

Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review

Page 258



Page 259

16    MR. SIMMER:  Can we take a
17  short break?
18        THE VIDEOGRAPHER:  The time
19  is now 2:38 p.m.  We're going off
20  the record.
21     (Short break.)
22        THE VIDEOGRAPHER:  The time
23  is now 2:59 p.m.  We are back on
24  the record.

Page 260

1  BY MR. SIMMER:
2      Q.   Sir, just a couple more
3  questions about that last exhibit that we
4  were looking at a moment ago.
5        MS. McENROE:  That's
6     Exhibit 11?
7        MR. SIMMER:  Exhibit 11,
8     yes.
9  BY MR. SIMMER:
10     Q.   This was a record that was
11  created reflecting the fact that all of
12  these shipments had been shipped, right?
13        MS. McENROE:  Objection to
14     form.
15        THE WITNESS:  Yes, sir.
16  BY MR. SIMMER:
17     Q.   And you got these reports
18  monthly; is that correct?
19     A.   I honestly do not recall how
20  frequently I got them.
21     Q.   But you received them
22  yourself, right?
23     A.   I did.
24     Q.   Did you look at them when

Page 261

1  you received them?
2     A.   Yes, I did.
3     Q.   Did you ever see any order
4  that was flagged as being a suspicious
5  order and that was not shipped at all and
6  then reported to the DEA?
7        MS. McENROE:  Objection to
8     form.
9        THE WITNESS:  I do not
10     recall ever seeing that.
11  BY MR. SIMMER:
12     Q.   Do you recall ever, as a
13  part of this threshold log process, the
14  identification of any order that was
15  reported to the DEA?
16        MS. McENROE:  Objection to
17     form.
18        THE WITNESS:  I do not.
19  BY MR. SIMMER:
20     Q.   And just to clarify too,
21  what we're seeing in terms of the
22  records -- we went through several of
23  them here -- that's the entire record to
24  reflect what happened in terms of due



Page 262

1 diligence for these orders that were
2 potentially excessive, right?
3        MS. McENROE:  Objection to
4    form.
5        THE WITNESS:  I -- I would
6    assume so.
7 BY MR. SIMMER:
8    Q.   Okay.  So you assume so.
9 You're saying that you don't know?  Is
10 that what you're saying?
11    A.   Again, I don't -- I never
12 worked at the distribution center, so I
13 am assuming this is all they did prior to
14 shipping the drugs.
15    Q.   I'm just trying to clarify.
16 Is there any other due diligence record
17 that was created about these orders other
18 than these lines that are reflected on
19 this threshold log?
20        MS. McENROE:  Objection to
21    form.  Asked and answered.
22        THE WITNESS:  Not that I'm
23    aware of.
24 BY MR. SIMMER:

Page 263

1    Q.   Sir, you testified earlier
2 that the DEA had commented on just how
3 good and solid your program was, right?
4    A.   Yes, sir.
5    Q.   When did they tell you that?
6    A.   2005, 2009.  And that would
7 be the Baltimore office that came in to
8 do an inspection of Perryman.
9    Q.   And who was that?
10    A.   I do not recall their names.
11    Q.   Was it included in the
12 report in writing?
13        MS. McENROE:  Objection to
14    form.
15        THE WITNESS:  The DEA did
16    not issue a report because there
17    were no findings.  They did a
18    recap with the entire pharmacy
19    staff, the general manager of the
20    building, and myself complimenting
21    on us -- complimenting us and
22    telling us -- quite frankly, their
23    exact words were, you should be
24    the gold standard for other

Page 264

1    wholesale distributors to follow.
2 BY MR. SIMMER:
3    Q.   So -- but there's no written
4 report to reflect those statements,
5 right?
6    A.   That's correct.  They only
7 issue a report if there's a finding.
8        (Document marked for
9    identification as Exhibit Rite Aid
10    Mitchell-12.)
11 BY MR. SIMMER:

Page 265

Highly Confidential - Subject to Further Confidentiality Review



Page 266

Page 268

Page 267

Page 269







Highly Confidential - Subject to Further Confidentiality Review



Page 282

Page 284

19 BY MR. SIMMER:
20    Q.    But I think it is your
21 testimony -- I've asked you several
22 times, just to confirm -- you don't know
23 of any suspicious orders that were ever
24 reported at all, right?

Page 283

Page 285

1         MS. McENROE:  Objection to
2     form.
3         THE WITNESS:  That is
4     correct.
5 BY MR. SIMMER:
6    Q.    Besides the work that you've
7 talked about so far today that the
8 company did with Buzzeo, did the company
9 consult with any other third-party
10 companies about its suspicious order
11 monitoring program?
12    A.    I'm unaware if they did.
13    Q.    Buzzeo would be the one that
14 you're aware of that the company worked
15 with on a regular basis, right?
16         MS. McENROE:  Objection to
17     form.
18         THE WITNESS:  From a
19     distribution center standpoint, he
20     is the only one that I can recall
21     working with.  What they did on
22     the stores and on the retail side,
23     I have no -- no knowledge of that.
24 BY MR. SIMMER:

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    Q.   And how frequently did
2  Buzzeo work with the distribution centers
3  in this consulting capacity?
4    A.   As far as conducting audits,
5  probably just the first year or so.
6  Maybe year or two years of my employment.
7          Afterwards, we used him
8  very, very rarely to write SOPs and to
9  assist with the VAWD SOPs that were
10  written, I believe in 2007.  But as far
11  as coming and conducting audits, it was,
12  you know, probably nothing after 2002.
13    Q.   So Buzzeo never came back
14  after 2002 that you recall to audit the
15  company's suspicious order monitoring
16  program, right?
17    A.   Not that I recall, correct.
18    Q.   Okay.  And you do recall
19  that they actually assisted in writing
20  SOPs, right?
21    A.   Yes, that is correct.
22    Q.   And that's with regard to
23  the Indiana VAWD procedure that you
24  talked about earlier, right?

Page 288

1  acronym stands for; is that right?
2    A.   That's correct.
3    Q.   And then the second thing
4  they did was to help prepare SOPs that we
5  just looked at, the excerpts that we just
6  went over, right?
7    A.   That's correct.
8    Q.   Is there anything else that
9  Buzzeo did to assist the company in
10  looking at a suspicious order monitoring
11  program?
12    A.   Not that I recall.
13       (Document marked for
14       identification as Exhibit Rite Aid
15       Mitchell-13.)
16  BY MR. SIMMER:



Highly Confidential - Subject to Further Confidentiality Review



**Page 290**

**Page 291**

Q. Are these the typical areas

**Page 292**

1 that the Buzzeo conferences included?

2 MS. McENROE: Objection to

3 form.

4 BY MR. SIMMER:

5 Q. As you understand it?

6 A. They changed from conference

7 to conference. But any update on DEA

8 regulations or expectations, they

9 typically covered current events.

10 Q. Would you be the only person

11 from the company that would have

12 regularly attended these conferences?

13 MS. McENROE: Objection to

14 form.

15 THE WITNESS: Not

16 necessarily.

17 BY MR. SIMMER:

18 Q. Who else at the company

19 would have attended these conferences

20 besides yourself?

21 A. Janet Hart has attended. I

22 think Andy Palmer has attended, DEA

23 pharmacy. Again, this is distribution

24 I'm speaking of. Pharmacy department

**Page 293**

1 managers have attended. DEA coordinators

2 have attended.

3 Q. And did the company try to

4 always have somebody at these

5 conferences?

6 MS. McENROE: Objection to

7 form.

8 THE WITNESS: No, sir.

9 BY MR. SIMMER:

10 Q. So were there times when no

11 one attended?

12 A. That would be correct, sir.

13 Q. And why would no one attend

14 a conference if it was something that

15 conveyed this kind of current information

16 to you?

17 MS. McENROE: Objection to

18 form.

19 THE WITNESS: That, I can't

20 answer.

21 BY MR. SIMMER:

22 Q. Were there instances where

23 you asked permission to attend that you

24 were not given permission to attend?

Page 294

1      A.   Not that I recall.
2      Q.   So every time you asked, you
3   were generally given permission to
4   attend?
5      A.   I believe that to be true.
6      Q.   Do you know whether you
7   attended this particular one in
8   November 2009?
9      A.   I believe I did.
10         (Document marked for
11      identification as Exhibit Rite Aid
12      Mitchell-14.)
13   BY MR. SIMMER:



Page 295

Page 296

13         (Document marked for
14      identification as Exhibit Rite Aid
15      Mitchell-15.)
16   BY MR. SIMMER:
17      Q.   We just wanted to make sure,
18   as we say it, we're on the same page,
19   that -- because part of it was cut off,
20   we just want to make sure that we could
21   show you the entire page, rather than a
22   cutoff page.
23         MS. McENROE:  And Scott,
24      could you mark that as Exhibit 15?

Page 297

1         MR. SIMMER:  I will mark
2      that, I'm sorry.
3         MS. McENROE:  Yes --
4         THE WITNESS:  Mine is marked
5      as Exhibit 15.
6   BY MR. SIMMER:
7      Q.   And I'm sorry, that's
8   exhibit?
9      A.   15.
10      Q.   15.
11      A.   Yes, sir.
12      Q.   I'll identify it for the
13   record as a page off the Cegedim website
14   that -- that was the identical link as
15   was in Ms. Birklin's e-mail to -- to the
16   witness.  And it's entitled Suspicious
17   Order Monitoring Programs.
18         If you'd just compare at
19   least what you can see of the two, it is
20   identical content?
21         So when -- under -- you see
22   in the middle of this, this particular
23   exhibit, it says, "Confidence in
24   compliance."

Page 298

1    Do you see that?
2    A.   Yes, sir.
3    Q.   And you see where it says,
4  "Establish a statistically defensible
5  order pending system"?
6    Do you see that?
7    A.   Yes, sir.
8    Q.   Do you know what that's in
9  reference to?
10    A.   I do not recall.
11    Q.   Okay.  Under operational
12  effectiveness, where you see where it
13  says, "Improve detection of suspicious
14  orders, quick clearance of legitimate
15  ones."
16    Do you see that?
17    A.   Yes, sir.
18    Q.   Do you have any idea what
19  that's in reference to?
20    A.   I mean it appears to me that
21  Ron is trying to sell a service to
22  wholesale distributors.
23    Q.   Okay.  And use those same
24  kind of language that we've talked about

Page 299

1  earlier in terms of identifying
2  legitimate orders, right?
3    A.   Yes, sir.
4    Q.   Okay.  And the third one
5  under strong defensibility.  Do you see
6  where I'm talking?
7    A.   Yes, I do.
8    Q.   You see where it says, "Make
9  decisions built on statistics and math,
10  not best guesses."
11    Do you see that?
12    A.   Yes, sir.
13    Q.   Okay.  Do you know whether
14  the company engaged with Mr. Buzzeo or
15  Cegedim or -- or any of those folks
16  working with them for these services?
17    MS. McENROE:  Objection to
18    form.
19    THE WITNESS:  If so, I'm
20    unaware.
21  BY MR. SIMMER:
22    Q.   Okay.  Do you know, in
23  response are you -- I'm sorry.





Page 302

Page 304

Page 303

Page 305

R: Yeah, we're not going to re-mark it.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 314

5      Q.   Did you ever bring any
6  Buzzeo or any third-party vendors to look
7  at the Rite Aid suspicious order
8  monitoring program to do an audit of any
9  kind?
10         MS. McENROE:  Objection to
11         form.
12         THE WITNESS:  Ron had done
13         audits in the past.  I did not
14         bring anybody on after 2009 to
15         conduct audits on the program.
16  BY MR. SIMMER:
17      Q.   I think you said that the
18  last audit he had done was in 2002,
19  right?
20      A.   That's correct.
21      Q.   He hadn't done any since
22  then, right?
23      A.   Not that I recall no.
24      Q.   And as far as you know,

Page 315

1  nobody else, Mr. Buzzeo or anybody else,
2  had come in and done an audit of the
3  company's suspicious order monitoring
4  program since 2002, right?
5         MS. McENROE:  Objection to
6         form.
7         THE WITNESS:  Other than
8         DEA.
9  BY MR. SIMMER:
10      Q.   Other than what you talked
11  about earlier, right?
12      A.   Yes, sir.
13      Q.   Okay.  And which there was
14  no written record though, right?
15         MS. McENROE:  Objection to
16         form.
17         THE WITNESS:  That is
18         correct, sir.
19         (Document marked for
20         identification as Exhibit Rite Aid
21         Mitchell-18.)
22  BY MR. SIMMER:

Highly Confidential - Subject to Further Confidentiality Review



Page 318

Page 320

Page 319

Page 321

12    Q.   Okay.
13         MR. SIMMER:  Can we go off
14    the record.
15         THE VIDEOGRAPHER:  The time
16    is now 3:51 p.m.  We're going off
17    the record.
18         (Short break.)
19         THE VIDEOGRAPHER:  The time
20    is now 4:07 p.m.
21         We are back on the record.
22         MR. SIMMER:  I have no
23    further questions of the witness
24    at this time.  I would, however,

Page 322

1  reserve any kind of further
2  questioning, assuming you do some
3  cross.
4       But in addition, we reserve
5  the right to come back and conduct
6  further examination given the
7  lateness of the production last
8  night. We have some additional
9  documents that we haven't had a
10 chance to incorporate in today's
11 examination. Anything in there
12 that we may request to come back
13 in a limited additional
14 examination.
15      MS. McENROE: Is that the 17
16 pages from last night or are you
17 talking about something else?
18      MR. SIMMER: I don't know
19 how many pages there are -- I
20 don't know how many pages were
21 produced, but there were some
22 additional pages that we got last
23 night.
24      MS. McENROE: Understood.

Page 323

1  We -- we have a different view of
2  it, but we can deal with that if
3  it becomes an issue.
4       I have a couple follow-up
5  questions for the witness. Is it
6  okay if I do it sitting here, or
7  do you want me to switch?
8       I'm happy to do it from
9  here.
10      MR. SIMMER: If you just
11 want to do it from there, that's
12 great.
13      MS. McENROE: Okay, great.
14      - - -
15      EXAMINATION
16      - - -
17 BY MS. McENROE:
18      Q.  Hi, Mr. Mitchell. I'm Elisa
19 McEnroe. I represent Rite Aid and I'm
20 here on your behalf today as well. You
21 understand that?
22      A.  Yes, I do.
23      Q.  I have just a couple
24 questions for you. And we appreciate you

Page 324

1  being here.
2       When did you cease your
3  employment with Rite Aid?
4       A.  January 2012.
5       Q.  That was a number of years
6  ago, correct?
7       A.  Seven years ago last Friday,
8  correct.
9       Q.  And throughout the
10 discussion today there have been some
11 references to the concept of an excessive
12 order monitoring program and discussion
13 of a suspicious order monitoring program.
14 Do you, generally speaking, recall those
15 discussions?
16      A.  Yes, I do.





Page 326

1 Q. Could you explain for me,
2 just to make sure the record is clear,
3 the relationship, if any, between
4 excessive order monitoring and suspicious
5 order monitoring?
6 A. Excess --
7 MR. SIMMER: Objection to
8 form. Asked and answered.
9 BY MS. McENROE:
10 Q. You may answer.
11 A. Okay. I'm sorry. Excessive
12 is anything out of the norm with size.
13 Where suspicious order monitoring,
14 suspicious was anything that, regardless
15 of size, frequency of the order, and an
16 order pattern that would be different
17 from a normal distribution.

Page 327

18 Q. Can you keep Exhibit 12 out,
19 but also at the same time take out
20 Exhibit 7 please.
21 You'll recall this is a
22 document you went over with counsel
23 earlier. And I'm not going to try and
24 take very much time with it. But it is a

Page 328

1 copy of a Rite Aid Corporation DC
2 self-assessment program regulatory
3 checklist.
4 Do you see that?
5 A. Yes.
6 Q. Okay. I'd like to direct
7 your attention, and I know we had a
8 little bit of trouble with which page is
9 which. But I'm going to go with the
10 numbers at the bottom that say like 2 of
11 16, 3 of 16. Do you see that?
12 A. Yes.
13 Q. Could you please flip to 3
14 of 16?
15 And at the top of that
16 document, do you see that, in the upper
17 right-hand corner, it says A --
18 MR. SIMMER: Just a second,
19 Elisa. Where are you?
20 MS. McENROE: Oh, I'm just
21 trying to --
22 MR. SIMMER: No, but these
23 numbers you're referring to are
24 not on -- on the exhibits we're

Page 329

1 looking at. So I don't know what
2 we're --
3 MS. McENROE: Oh, you know
4 what, mine is printed out
5 differently than yours. So maybe
6 I can try and identify the page
7 differently, if that makes sense.
8 The -- the page I was trying
9 to get to has A.08.02 at the top.
10 MR. SIMMER: Okay. Thank
11 you.
12 MS. McENROE: Great. Do you
13 have -- do you have it?
14 MR. SIMMER: Mm-hmm.
15 BY MS. McENROE:
16 Q. Okay. And are you there, do
17 you have it?
18 A. Yes, I am.
19 Q. Okay.
20 MS. McENROE: And we are all
21 literally on the same page I hope.
22 BY MS. McENROE:

Highly Confidential - Subject to Further Confidentiality Review



Page 330

21    MR. SIMMER:  Objection,
22  form.
23    Are you testifying for the
24  witness?

Page 332

8    Q.   Okay.  You can set those two
9  aside.
10    MS. McENROE:  Can I get two
11  exhibit stickers.
12    (Document marked for
13  identification as Exhibit Rite Aid
14  Mitchell-19.)
15  BY MS. McENROE:
16    Q.   So the copying is not so
17  great.  It's a little bit dark.  But I'm
18  handing you what I marked as Exhibit 19.
19    Do you remember a line of
20  questioning earlier where counsel was
21  asking you about DEA audits at the
22  Perryman facility?
23    MR. SIMMER:  Objection to
24  form.  Misstates prior testimony.

Page 331

1    MS. McENROE:  I'm not, I'm
2  asking him a question.
3    MR. SIMMER:  A leading
4  question of your own witness?
5    MS. McENROE:  Your objection
6  is noted for the record.
7    Your objection is noted for
8  the record.  Thank you.
9  BY MS. McENROE:
10    Q.   You may answer.
11    MR. SIMMER:  Objection to
12  form.
13    THE WITNESS:  That's
14  correct.
15  BY MS. McENROE:

Page 333

1  BY MS. McENROE:
2    Q.   Do you remember at all today
3  discussing DEA auditing at the Perryman
4  facility?
5    MR. SIMMER:  Objection to
6  form.
7  BY MS. McENROE:
8    Q.   You may answer.
9    A.   Yes, I do.
10    Q.   Do you remember a question
11  about whether there was any written
12  record of those audits?
13    A.   Yes, I do.
14    Q.   Do you remember what you
15  testified?
16    MR. SIMMER:  Objection to
17  form.  The record speaks for
18  itself.
19  BY MS. McENROE:
20    Q.   You may answer.
21    MR. SIMMER:  Testimony
22  speaks for itself.
23  BY MS. McENROE:
24    Q.   You still may answer.



**Page 334**

1     A.  The DEA does not provide
2 documentation unless there are findings.

15     MR. SIMMER:  Just one

**Page 335**

1 question, and he answered it.  I
2 was asking him what the document
3 is.  And he just described it to
4 me.  So I'm going to ask some more
5 follow-up questions, and if you
6 have questions after, you're
7 welcome to ask.
8     MR. SIMMER:  Okay.  I tell
9 you what.  Move to strike.
10 Nonresponsive.  The question is,
11 "What does the exhibit say?"  And
12 then he answered something
13 completely different.  Move to
14 strike.  Nonresponsive.
15     MS. McENROE:  All right.
16 Well, I disagree with your motion,
17 but we can deal with that at a
18 later date.
19 BY MS. McENROE:
2

**Page 336**

**Page 337**

18 BY MS. McENROE:
19     Q.  Would you have expected, in
20 your experience, to have gotten a written
21 confirmation from DEA of their outcome of
22 this audit?
23     MR. SIMMER:  Objection to
24   form.  Leading.



Page 338
1     THE WITNESS: No, I would
2 not.
3     (Document marked for
4 identification as Exhibit Rite Aid
5 Mitchell-20.)
6 BY MS. McENROE:

Page 339

Page 340
2     MS. McENROE: I have nothing
3 further.
4     - - -
5     EXAMINATION
6     - - -
7 BY MR. SIMMER:
8   Q.  Sir, could you look back at
9 your e-mail summary in Exhibit 19 that
10 you were just asked some questions about?
11     And so this is
12 September 2005, correct?
13   A.  Yes, sir.
14   Q.  Is there anywhere in your
15 summary that you put together here a
16 reference to the fact that the DEA had
17 actually audited the suspicious order
18 monitoring program?
19   A.  I did not, no.
20   Q.  Is there anywhere in your
21 summary that the DEA audited the
22 excessive order monitoring program?
23   A.  I did -- no, sir, there is
24 not.

Page 341
1   Q.  Look at Exhibit 20. Now,
2 you didn't create this record.
3 Mr. Peifley did, right?
4   A.  Yes, sir.
5   Q.  So these are his words, not
6 yours, right?
7   A.  That's correct, sir.
8   Q.  And in his summary, did he
9 summarize anywhere that the DEA audited
10 the Rite Aid excessive order monitoring
11 program?
12   A.  No, sir.
13   Q.  In his words anywhere, did
14 he say that the DEA audited the Rite Aid
15 suspicious order monitoring program?
16   A.  No, sir.
17   MR. SIMMER: No further
18 questions.
19   MS. McENROE: I just have a
20 quick follow-up.
21     - - -
22     EXAMINATION
23     - - -
24 BY MS. McENROE:

Page 342

1    Q.   Looking at both Exhibits 19
2  and 20, do you have a recall of an
3  understanding of whether the DEA actually
4  would have audited, looked at, the
5  excessive or suspicious order monitoring
6  policies as part of these audits?
7        MR. SIMMER:  Objection to
8    form.  Document speaks for itself.
9  BY MS. McENROE:
10   Q.   You may answer.
11   A.   I can only speak to the
12 audit in 2005 because I was physically
13 there during that audit.  It was a very
14 comprehensive audit and, yes, they did
15 review the excessive order monitoring
16 program as well as the documents that the
17 DC was utilizing upon calling stores.
18       2009, I have no recollection
19 of that at all.
20   Q.   Do you believe -- do you
21 have any reason to believe that they did
22 not audit the excessive or suspicious
23 order monitoring programs in 2009?
24       MR. SIMMER:  Objection as to

Page 343

1    form.
2        THE WITNESS:  I have no
3    reason to believe, but again, I
4    have no knowledge that they did or
5    they didn't.
6        MS. McENROE:  Thank you.  No
7    further questions.
8        - - -
9        EXAMINATION
10       - - -
11 BY MR. SIMMER:
12   Q.   Just a couple follow-ups.
13 You said -- you just answered that you
14 believe they did in 2005.  13 years ago,
15 that's your recollection that they did,
16 right?
17   A.   Yes, sir.
18   Q.   And the records that they
19 would have reviewed, those would have
20 been those excessive order logs we looked
21 at, right?
22   A.   Yes, sir.
23   Q.   There's nothing else in the
24 distribution center logs that they could

Page 344

1  have reviewed in order to evaluate the
2  excessive order monitoring program,
3  right?
4        MS. McENROE:  Objection to
5    form.
6        THE WITNESS:  I recall them
7    looking at all of our SOPs as well
8    as the log that was presented
9    today as we were talking about,
10   you know, what the DCs do.
11 BY MR. SIMMER:
12   Q.   And as you've testified
13 multiple times today, at no time had
14 there been ever a report of any
15 suspicious orders of any kind, right?
16       MS. McENROE:  Objection to
17   form.
18       THE WITNESS:  That's
19   correct.  As far as I know, that's
20   correct.
21 BY MR. SIMMER:
22   Q.   So those logs only reflect
23 some suspicious orders -- excuse me --
24 strike that.

Page 345

1        Those logs reflect a series
2  of potentially excessive orders where a
3  call was made to the pharmacy, and some
4  of which were increased over the
5  threshold, others were not, right?
6        MS. McENROE:  Objection to
7    form.
8        THE WITNESS:  I don't recall
9    any being increased.  But yes, the
10   document is what you are
11   referencing.
12 BY MR. SIMMER:
13   Q.   Well, we looked at some of
14 the examples in the one log we looked at
15 where the pharmacist said, "I need the
16 entire shipment," right?
17   A.   That's correct.
18   Q.   And so that was approved in
19 those instances, right?
20       MS. McENROE:  Objection to
21   form.
22       THE WITNESS:  It was not
23   above the threshold.
24 BY MR. SIMMER:

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1    Q.   And in some of those
2  examples they were, right?
3        MS. McENROE:  Objection to
4  form.
5        THE WITNESS:  There was one,
6    if -- if it's the one that you had
7    highlighted that I recall, maybe
8    fourth from the bottom, that was
9    already an exception.
10       So that was -- that was a
11   little bit different than the rest
12   of these.
13  BY MR. SIMMER:
14   Q.   But the point here is that
15  the only thing the DEA actually looked at
16  were those records, right?
17       MS. McENROE:  Objection to
18   form.
19       THE WITNESS:  That would be
20   correct.
21       MR. SIMMER:  Yeah, nothing
22   further.
23       MS. McENROE:  I have nothing
24   further.  Thank you so much,

Page 347

1  Mr. Mitchell.
2        MR. SIMMER:  Thank you.
3        THE VIDEOGRAPHER:  The time
4  is now 4:26 p.m.  This concludes
5  today's deposition.  We're going
6  off the record.
7        (Excused.)
8        (Deposition concluded at
9  approximately 4:26 p.m.)

Page 348

1
2            CERTIFICATE
3
4
5        I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7
8        It was requested before
   completion of the deposition that the
   witness, KEVIN MITCHELL, have the
9  opportunity to read and sign the
   deposition transcript.
10
11
12
            MICHELLE L. GRAY,
13   A Registered Professional
     Reporter, Certified Shorthand
14   Reporter, Certified Realtime
     Reporter and Notary Public
15   Dated:  January 21, 2019
16
17
18        (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

Page 349

1        INSTRUCTIONS TO WITNESS
2
3        Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8        After doing so, please sign
9  the errata sheet and date it.
10       You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14       It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1        - - - - - -
          E R R A T A
2        - - - - - -
3
4  PAGE  LINE  CHANGE
5  _____  _____
6     REASON: _____
7                     _____
8     REASON: _____
9                     _____
10    REASON: _____
11                   _____
12    REASON: _____
13                   _____
14    REASON: _____
15                   _____
16    REASON: _____
17                   _____
18    REASON: _____
19                   _____
20    REASON: _____
21                   _____
22    REASON: _____
23                   _____
24    REASON: _____

Page 352

1           LAWYER'S NOTES
2  PAGE  LINE
3  _____  _____  _____
4  _____  _____  _____
5  _____  _____  _____
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20 _____  _____  _____
21 _____  _____  _____
22 _____  _____  _____
23 _____  _____  _____
24 _____  _____  _____

Page 351

1
2        ACKNOWLEDGMENT OF DEPONENT
3
4        I,_____, do
5  hereby certify that I have read the
6  foregoing pages, 1 - 352, and that the
7  same is a correct transcription of the
8  answers given by me to the questions
9  therein propounded, except for the
10 corrections or changes in form or
11 substance, if any, noted in the attached
12 Errata Sheet.
13
14
15 _____
16  KEVIN MITCHELL                  DATE
17
18
19 Subscribed and sworn
    to before me this
20 _____ day of _____, 20____.
21 My commission expires:_____
22
   _____
23 Notary Public
24