1

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION

 3   IN RE:  NATIONAL      :  MDL No. 2804
     PRESCRIPTION OPIATE   :
 4   LITIGATION            :  Case No. 17-md-2804
                           :
 5   APPLIES TO ALL CASES  :  Hon. Dan A. Polster
                           :
 6                         :

 7

 8                   HIGHLY CONFIDENTIAL

 9         SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                       - - - -

12                   JANUARY 4, 2019

13                       - - - -

14       VIDEOTAPED DEPOSITION OF ANTHONY MOLLICA,

15   taken pursuant to notice, was held at Marcus &

16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17   Pennsylvania 15219, by and before Ann Medis,

18   Registered Professional Reporter and Notary Public in

19   and for the Commonwealth of Pennsylvania, on Friday,

20   January 4, 2019, commencing at 8:06 a.m.

21                       - - - -

22              GOLKOW LITIGATION SERVICES
            877.370.3377 phone | 917.591.5672 fax
23                   deps@golkow.com

24

25
```

2

```
 1                    A P P E A R A N C E S

 2    On behalf of Plaintiffs

 3            WAGSTAFF & CARTMELL, LLP
              BY:  TYLER W. HUDSON, ESQUIRE
 4            AND  ERIC D. BARTON, ESQUIRE
              4740 Grand Avenue, Suite 300
 5            Kansas City, Missouri  64112
              816.701.1100
 6            thudson@wcllp.com
              ebarton@wcllp.com
 7

 8    On behalf of Defendant AmerisourceBergen Drug
      Corporation
 9
              (By Phone/Livestream)
10            JACKSON KELLY PLLC
              BY:  SANDRA K. ZERRUSEN, ESQUIRE
11            50 South Main Street, Suite 201
              Akron, Ohio  44308
12            330.252.9060
              skzerrusen@jacksonkelly.com
13

14    On behalf of Defendant Cardinal Health, Inc.

15            PIETRAGALLO GORDON ALFANO BOSICK &
              RASPANTI, LLP
16            BY:  JENNIFER BOURIAT, ESQUIRE
              One Oxford Centre, 38th Floor
17            301 Grant Street
              Pittsburgh, Pennsylvania  15219
18            412.263.2000
              jhb@pietragallo.com
19

20    On behalf of Defendants CVS Indiana and CVS Rx
      Services
21
              (By Phone/Livestream)
22            ZUCKERMAN SPAEDER, LLP
              BY:  KYLE A. CRAWFORD, ESQUIRE
23            1800 M Street, NW, Suite 1000
              Washington, DC  20036-5807
24            202.778.1825
              kcrawford@zuckerman.com
25
```

3

```
 1            A P P E A R A N C E S   (Continued)

 2    On behalf of Defendants Endo Pharmaceuticals, Endo
      Health Solutions and Par Pharmaceuticals
 3
                  (By Phone/Livestream)
 4                ARNOLD & PORTER KAYE SCHOLER LLP
                  BY:  DAVID KOUBA, ESQUIRE
 5                601 Massachusetts Avenue, NW
                  Washington, DC  20001-37453
 6                202.942.5743
                  david.kouba@arnoldporter.com
 7

 8    On behalf of Defendant HBC Service Company

 9                MARCUS & SHAPIRA, LLP
                  BY:  JOSHUA KOBRIN, ESQUIRE
10                AND  ROBERT M. BARNES, ESQUIRE
                  One Oxford Centre, 35th Floor
11                Pittsburgh, Pennsylvania  15219
                  412.471.3490
12                jkobrin@marcus-shapira.com
                  rbarnes@marcus-shapira.com
13

14    On behalf of Defendant McKesson Corporation

15                COVINGTON & BURLING, LLP
                  BY:  RAJ PAUL, ESQUIRE
16                One CityCenter
                  850 Tenth Street, NW
17                Washington, DC  20001-4956
                  202.662.5807
18                rpaul@cov.com

19
      On behalf of Defendant Walmart
20
                  (By Phone/Livestream)
21                JONES DAY
                  BY:  CHRISTOPHER MARKHAM, ESQUIRE
22                100 High Street
                  21st Floor
23                Boston, MA 02110-1781
                  617.960.3939
24                cmarkham@jonesday.com

25
```

4

1              A P P E A R A N C E S   (Continued)

2    Also present

3              Chris Ritona, videographer

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                    * I N D E X *

2    ANTHONY MOLLICA                                PAGE

3      EXAMINATION BY MR. HUDSON               8, 232
       EXAMINATION BY MR. BARTON                  168
4      EXAMINATION BY MR. BARNES             207, 242
       EXAMINATION BY MR. KOBRIN                  229

5

6           * INDEX OF HBC-MOLLICA EXHIBITS *

7    NO.                 DESCRIPTION            PAGE
     Exhibit 1   HBC Service Company's Responses to    53
8                Plaintiffs' (First) Set of Combined
                 Discovery Requests
9
     Exhibit 2   Giant Eagle Inventory Control -       54
10               Suspicious Order Policies with
                 various effective dates
11               HBC_MDL00078638 - 00078639
                 HBC_MDL00004386 - 00004387
12               HBC_MDL00045916 - 00078918
                 HBC_MDL00051908
13               HBC_MDL00043414
                 HBC_MDL00010092 - 00010093
14
     Exhibit 3   Letter, 10/18/13, from OARRS to       83
15               HBC, re: Instructions for Reporting
                 Wholesale Transactions to OARRS
16               HBC_MDL00081290 - 00081293
17   Exhibit 4   Email chain, 1/6/14, from J.          85
                 Cornwell to S. Valetta, et al.,
18               subject: RE: Ohio State Board of
                 Pharmacy - Nov. 2013 - Change to
19               OARRS Report - "80 MED" threshold
                 scoring system
20               HBC_MDL00137199 - 00137202
21   Exhibit 5   Ohio State Board of Pharmacy          89
                 Meeting Minutes December 5-7, 2011
22
     Exhibit 6   Ohio State Board of Pharmacy          95
23               Meeting Minutes November 2-4, 2009
24   Exhibit 7   Ohio State Board of Pharmacy          95
                 Meeting Minutes January 4-6, 2010

25

1      * INDEX OF HBC-MOLLICA EXHIBITS (Continued) *

2    NO.                    DESCRIPTION                PAGE
     Exhibit 8   Email chain, 10/24/17, from M.     107
3                Niskach to G. Chunderlik, subject:
                 RE: Control Limits
4                HBC_MDL00009648 - 00009649

5    Exhibit 9   Email, 5/1/12, from A. Mollica     119
                 to G. Chunderlik, subject: FW:
6                2012 Anda Supply Chain Symposium
                 HBC_MDL00064379 - 00064441
7

     Exhibit 10  Email, 11/11/13, from G. Carlson   129
8                to M. Bianco, subject: Fw: Controlled
                 Substance Suspicious Monitoring,
9                attaching invite_4469.ics
                 HBC_MDL00136771 - 00136772
10

     Exhibit 11  Email chain, 1/22/14, from J.      138
11               Millward to G. Carlson, et al.,
                 subject: FW: Wholesale Distributor
12               Questionnaire, attaching Wholesale
                 Distributor Questionnaire
13               HBC_MDL00135570 - 00135574

14   Exhibit 12  Email chain, 1/10/14, from T.      157
                 Roahrig to J. Millward, subject: RE:
15               Daily HBC Suspicious Purchasing
                 Report - 01/09/14
16               HBC_MDL00039223

17   Exhibit 13  Ohio Administrative Code           190
                 Section 4729-9-05 Security
18               requirements

19   Exhibit 14  Ohio Administrative Code Section   190
                 Section 4729-9-11 Security and
20               control of dangerous drugs

21                        - - - -

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                         - - - -

 3           THE VIDEOGRAPHER:  We are now on the

 4    record.  My name is Chris Ritona.  I'm the

 5    videographer for Golkow Litigation Services.

 6    Today's date is January 4, 2019, and the time is

 7    approximately 8:06 a.m.

 8        This video deposition is being held in

 9    Pittsburgh, PA at Marcus & Shapira, LLP, One

10    Oxford Centre, 35th Floor, in the matter of

11    National Prescription Opiate Litigation,

12    MDL No. 2804, Case No. 17-md-2804, United States

13    District Court, Northern District of Ohio, Eastern

14    Division.

15        The deponent today is Anthony Mollica.  The

16    court reporter today is Ann Medis.

17        Will all counsel please identify themselves

18    for the record.

19           MR. HUDSON:  Ty Hudson of Wagstaff &

20    Cartmell for plaintiffs.

21           MR. BARTON:  Eric Barton, Wagstaff &

22    Cartmell, for plaintiffs.

23           MR. PAUL:  Raj Paul, Covington &

24    Burling, on behalf of McKesson.

25           MS. BOURIAT:  Jennifer Bouriat from
```

1    Pietragallo on behalf of Cardinal.

2              MR. BARNES:  Robert Barnes on behalf of

3    HBC, Marcus & Shapira.

4              MR. KOBRIN:  Josh Kobrin, Marcus &

5    Shapira, on behalf of HBC Services Company.

6              THE VIDEOGRAPHER:  Ann, will you please

7    swear in the witness.

8                    ANTHONY MOLLICA,

9       having been first duly sworn, was examined

10              and testified as follows:

11              THE VIDEOGRAPHER:  You may proceed.

12                    EXAMINATION

13   BY MR. HUDSON:

14       Q.   Good morning, Mr. Mollica.  My name is

15   Ty Hudson and I represent several of the

16   plaintiffs in this case.

17       Could you state your name for the record,

18   please.

19       A.   Anthony Mollica.

20       Q.   And what is your current address?

21       A.   9640 Portofino Drive, Brentwood,

22   Tennessee 37027.

23       Q.   And you are a former employee of Giant

24   Eagle?

25       A.   That's right.

1       Q.   Giant Eagle owned HBC Service Company;

2   is that right?

3       A.   Correct.

4       Q.   And are you aware that HBC Service

5   Company is a defendant in this case?

6       A.   I am.

7       Q.   Are you represented by counsel here

8   today?

9       A.   I am.

10      Q.   And who is your attorney?

11      A.   They're in the room, Marcus & Shapira.

12      Q.   And are you paying for their services or

13  is HBC?

14      A.   I don't know who's paying for the

15  services.  Not me.

16      Q.   Have you had your deposition taken

17  before?

18      A.   No.

19      Q.   Let's just make sure then we understand

20  how this process works before we get going.  I'm

21  going to be asking you some questions, and then I

22  would ask that you provide answers unless your

23  counsel instructs you not to answer.  Sometimes

24  they may object for the record, but unless you're

25  instructed not to answer, you agree to answer my

1    questions?

2         A.   Okay.

3         Q.   Second, do you understand that you are

4    under oath as if we were in a courtroom before a

5    judge and a jury?

6         A.   I do.

7         Q.   And is it fair that if you answer my

8    question, I'm going to assume that you understand

9    it.  And the flip side of that is if you don't

10   understand my question, will you let me know so I

11   can clarify or rephrase it?

12        A.   Yes.

13        Q.   And then lastly, if you need to take a

14   break at any time, just let me know.  We can go

15   off the record.  All I would ask is if there's a

16   pending question you answer it.  Is that fair?

17        A.   Sure.

18        Q.   What did you do to prepare for your

19   deposition today?

20        A.   I came in, had some just general

21   procedural conversations about today yesterday

22   with my counsel.

23        Q.   How long did those conversations last?

24        A.   Four hours.

25        Q.   Did you review any documents during the

1    conversations?

2        A.   A brief familiarity with, you know, the

3    types of documents that we'll be discussing today.

4        Q.   And did those documents refresh your

5    recollection?

6        A.   That's hard to say.

7            MR. KOBRIN:  I want to just quickly --

8    don't talk about anything that we discussed.  All

9    of that is privileged.  In general, if you can

10   answer his question "yes" or "no," that's fine.

11           THE WITNESS:  There are some documents

12   that triggered memory, some of them.  Most I've

13   never seen before.

14   BY MR. HUDSON:

15       Q.   And do you understand that this

16   litigation relates to the opioid crisis?

17       A.   That's my understanding.

18       Q.   Is that a phrase that you've heard

19   before, the opioid crisis?

20       A.   I've heard that phrase before on like TV

21   and that type of thing.

22       Q.   How about in connection with your roles

23   or your role at Giant Eagle?

24       A.   No.  I never heard that as a phrase when

25   I was at Giant Eagle.

1        Q.   How about the Controlled Substances Act,

2   was that something in your role at Giant Eagle

3   that you focused on?

4        A.   As a pharmacist I'm familiar with the

5   Controlled Substances Act as it pertains to the

6   practice of retail pharmacy.

7        Q.   How about more specifically at Giant

8   Eagle, was that something that you were involved

9   with, is compliance with the Controlled Substances

10  Act, you personally?

11       A.   In the scope of what I oversaw at Giant

12  Eagle, compliance with the Controlled Substances

13  Act, yes.

14       Q.   Let's, if we could, start with your

15  education.  Could you just -- did you graduate

16  from the University of Pittsburgh with a Bachelor

17  of Science in Pharmacy?

18       A.   Yes.

19       Q.   And was that in 1995?

20       A.   Yes.

21       Q.   Any postgraduate work?

22       A.   Yes.  I have a -- I received an MBA from

23  the University of Waynesburg -- at that time it

24  was called Waynesburg College -- in 2003.

25       Q.   And what did you do between the time

1    that you graduated from -- was it pharmacy school?

2         A.   That's correct.

3         Q.   -- between graduation from pharmacy

4    school and then starting your MBA?

5         A.   What did I do specifically with Giant

6    Eagle or in general?

7         Q.   No, in general.

8         A.   I was a licensed pharmacist retail.  I

9    moved up into regional supervisory positions and

10   eventually into -- I oversaw pharmacy operations,

11   retail operations for Giant Eagle; went on into

12   the specialty pharmacy markets for a company

13   called Omnicare CVS.  And most recently, I'm

14   president of healthcare services for an

15   organization called Brookdale Senior Living.

16        Q.   Let's break that down, if we could.  So

17   you graduated from pharmacy school in 1995;

18   correct?

19        A.   Correct.

20        Q.   And then did you do your MBA while you

21   were still working, or did you go back to school

22   full time?

23        A.   No.  I did it while I was working.  It

24   was a part-time program.

25        Q.   If you could, after you graduated from

1    pharmacy school in 1995, what was the first job

2    that you had?

3         A.   A staff pharmacist for Giant Eagle.

4         Q.   And where were you located?

5         A.   I believe my first -- I floated to many

6    locations.  But I believe my first permanent like

7    one store role was in Waterworks in Pittsburgh.

8         Q.   And how long did you remain in that

9    role?

10        A.   As a staff pharmacist, I want to say

11   maybe a year and a half to two years.  It's hard

12   to -- that's 25 years ago.  One or two years.

13        Q.   And then at some point, did you get

14   promoted?

15        A.   I became a pharmacy manager, which is

16   more supervisory, over a single pharmacy.

17        Q.   And that was sometime in the 1997, 1998

18   timeframe?

19        A.   That's correct, right.

20        Q.   How long did you remain in that role?

21        A.   I remained in that role I'd say maybe a

22   year and a half.  It could be two years.  I'm

23   trying to remember those specifics dates.

24        Q.   Sure.  No, I understand.  And then at

25   that point, what did you do after you were a

1  pharmacy manager?

2      A.   I left Giant Eagle for a staffing

3  company called MedTech and then eventually for a

4  few months in one of the sites that they assigned

5  me to as a -- MedTech was a staffing company.  So

6  they would send you in and fill in for pharmacists

7  where they had needs.

8      One of the companies they had me fill in for

9  offered me a position there.  And then I stayed

10  there for probably about -- I'd say about maybe

11  four or five months.  Then I came back to Giant

12  Eagle.

13      Q.   And was that in 200- -- when was that?

14      A.   I'm trying to think.  I was there maybe

15  2000 to 2001.  I think that's about right.  Then I

16  came back to Giant Eagle in 2001.

17      Q.   And then when you came back to Giant

18  Eagle, what was your role?

19      A.   I was a floating pharmacist because at

20  that time, I had gone back to get my MBA and I

21  needed flexibility in the schedule.  So they used

22  me as full time but as a fill-in pharmacist when

23  pharmacists were on vacation.  I had multiple site

24  roles at that time.

25      Q.   And how long did you stay in that role

1    as a floating pharmacist?

2         A.   Until -- I want to say until 2003.  2003

3    I believe is when.  Then I was promoted to a

4    pharmacy -- at that time they called it pharmacy

5    specialist, basically a regional supervisor.

6         Q.   Is that different than a pharmacy

7    district leader?

8         A.   Same.  It's just vernacular difference

9    at the time.

10        Q.   And then you were in the role as a

11   specialty pharmacist from 2003 to 2006?

12        A.   Yeah, that sounds right.

13        Q.   Then in March of 2006, were you promoted

14   to the VP of pharmacy operations?

15        A.   No.  I was in that role for I want to

16   say maybe a year.  Then I went to Rite-Aid.  I

17   spent maybe I think 90 days at Target.  Target at

18   that time was opening up in the Pittsburgh market,

19   and they were looking to bring folks into -- groom

20   into their supervisory roles.

21        At the same time I got an offer from Rite-Aid

22   to be a -- same position for Rite-Aid, pharmacy

23   supervisory.  I went there for 18 months.  Then I

24   came back to Giant Eagle in 2006, I think spring

25   of 2006.

1      Q.   And when you came back to Giant Eagle,

2  were you then the VP of pharmacy operations?

3      A.   No, no.  I came back in the same

4  position I left in, as a pharmacy supervisor.

5      Q.   And why did you come back?

6      A.   Giant Eagle was expanding its markets

7  into the Cleveland area through an acquisition.

8  They said that they needed help, stronger -- they

9  needed some strong leadership in terms of

10  assimilating a new -- a market like that.  And it

11  sounded like a good opportunity for advancement to

12  come back.

13      Q.   How long did you remain in the role as a

14  pharmacy supervisor for Giant Eagle in the

15  Cleveland market?

16      A.   About eight months.  And then I was

17  promoted to director of operations.

18      Q.   And at that time, were you living in

19  Cleveland?

20      A.   No, no.  I lived in Pittsburgh.  I just

21  commuted.

22      Q.   How long did you remain director of

23  pharmacy operations?

24      A.   Well, my -- I was -- my position as

25  director of pharmacy operations -- I had title

1    changes up to VP of operations.  So until I left,

2    basically the same role, but as the Giant Eagle

3    continued to grow, they just retitled the position

4    senior director of operations and then eventually

5    vice-president of operations.  But the basics of

6    the role were the same.

7         Q.   And was that from March of 2006 --

8    excuse me -- February of 2006 to March of 2014?

9         A.   No, no.  Like I say, I became director

10   of operations I want to say very early on in 2007.

11   And then the gyrations of my role, the titles

12   changed, but the same basic position through March

13   of 2014.

14        Q.   And if you could, when you became the

15   director of pharmacy operations in 2007, could you

16   just describe the organizational structure of

17   Giant Eagle?

18        A.   Sure.  Giant Eagle -- well, the grocery

19   part of Giant Eagle, I'm not as familiar with

20   their distribution centers and wholesale grocery

21   piece.  I can talk -- speak more intelligently

22   about the grocery piece that I report into.  Is

23   that what you're asking here?

24        Q.   You mean the pharmacy piece?

25        A.   Giant Eagle has a lot of -- Giant Eagle

1    ran distribution warehouses and lots of different

2    businesses.  They had a real estate organization,

3    gas stations, lots of stuff.  I'm familiar with

4    the basic structure of the grocery store chain of

5    which the pharmacy was part of.

6        Inside that structure was a basic structure

7    where there was a merchandising vertical and then

8    operations vertical.  Merchandising included

9    things like sales drivers, marketing,

10   distribution, et cetera.

11       Operations was what happened inside of the

12   store.  So inside of that structure pharmacy at

13   the time that I became director of operations, at

14   that specific time, because it changed later,

15   pharmacy was part of the merchandising part of

16   Giant Eagle in terms of the grocery store section.

17       Inside of that structure, inside of pharmacy

18   you had -- pharmacy I think was the only unique

19   one in which the operations of pharmacy reported

20   into the merchandising structure of pharmacy at

21   that time versus the overall company operation

22   structure.  So I reported into a gentleman named

23   Randy Heiser who was VP of pharmacy.

24       Q.   And who did Mr. Heiser report to?

25       A.   I believe he reported to John Tedesco.

1    I don't recall what his title was at that time.  I

2    don't recall what John's title was.  I'm sure you

3    have that somewhere.

4         Q.   So was there a CEO of Giant Eagle?

5         A.   At that time David Shapira was the CEO.

6         Q.   Was that the highest officer in the

7    company?

8         A.   Yes.

9         Q.   Just walk me through, if you could, the

10   structure from yourself to Mr. Heiser up through

11   to the CEO.

12        A.   At that time what I believe, as I

13   recall  -- I mean, I know who I reported to, was

14   Randy, but Randy reported to John Tedesco.  John

15   Tedesco either reported to David directly or he

16   may have reported to John Lucot who was the chief

17   operating officer.  I believe he reported to John

18   Lucot though.

19        Q.   And as the director of pharmacy, what

20   were your roles and responsibilities?

21        A.   Retail store operations.  I would say

22   from the third line of the P & L down.  It would

23   be cost controls, labor, hiring and firing, making

24   sure that you were following the regulatory

25   practices for the pharmacy and dispensing, those

21

1    type of things, doing our quality inspections,

2    accuracy of the prescriptions, basic P & L

3    responsibilities.

4        Operations then drive sales, meaning the

5    marketing, and the sales tactics and things like

6    that were part of the merchandising part of the

7    pharmacy department, but I ran what happens inside

8    the stores.

9        Q.   And who reported to you as the director

10   of pharmacy?

11       A.   The pharmacy, regional pharmacy

12   supervisors reported to me.  And then eventually

13   as things progressed inside of the organization,

14   we added some quality managers for prescription

15   accuracy.  So that reported to me.  I'm trying to

16   think.

17       We had some trainers, technician training

18   program, that type of thing, that reported into my

19   org chart.  That's basically my org chart, was as

20   the operations lead.

21       Q.   At some point, did Joe Millward join as

22   the senior manager of compliance in pharmacy

23   quality?

24       A.   Yeah.  Joe Millward was our quality

25   person that I referred to.

                                                                          22

1          Q.   And did he report to you?

2          A.   He reported to me.

3          Q.   And his role as senior manager -- am I

4    correct he was senior manager of compliance and

5    pharmacy quality?

6          A.   When we hired Joe, originally it was for

7    quality.  And then the regulatory pieces started

8    to fall under the quality bucket, too.  And his

9    role expanded in the time he was there.  So it was

10   constantly evolving.  There's a lot of hats you

11   wear in a company the size of Giant Eagle.  So he

12   had a lot of different roles in terms of how he

13   added value to the organization.

14         And then Joe supported regulatory, not just

15   for the retail operations piece, but also for the

16   merchandising part of the organization, which

17   included, like I said, the sales designs, the

18   distribution centers and that type of thing.

19         Q.   Do you have a recollection about at what

20   point Mr. Millward's position expanded from just

21   quality to quality and compliance?

22         A.   No, no, no.  I don't have recollection

23   of an exact day or something like that or when.

24   It was more evolving.

25         Q.   How about what year?

23

1          A.   I'd say within his first year as things

2     started to evolve.

3          Q.   Would that be like 2010, 2011?

4          A.   I don't recall when he was -- I'm trying

5     to think when he was brought on, because he was a

6     supervisor for us, pharmacy supervisor, before he

7     moved into that role.  I don't recall the dates

8     when he was brought into that role.

9          Q.   Did you know Mr. Millward prior to him

10    joining Giant Eagle?

11         A.   Yes.

12         Q.   How did you know him?

13         A.   We went to college together.  We had --

14    he also worked at Rite-Aid.  He worked for

15    Rite-Aid when I was there, but we were in

16    different divisions.  He was part of Rite-Aid.

17         Q.   Was he a friend of yours in pharmacy

18    school?

19         A.   Yes.

20         Q.   Did you recruit him over to Giant Eagle?

21         A.   I recruited him into Giant Eagle as a

22    pharmacy supervisor.

23         Q.   Who made the decision to promote

24    Mr. Millward up to his position in quality and

25    then compliance?

                                                                              24

1              MR. KOBRIN:  Object to form.

2              THE WITNESS:  We had a -- we had a CQI

3     committee, which was represented by multiple parts

4     of the organization that interviewed Joe and made

5     the recommendation for the role.

6     BY MR. HUDSON:

7          Q.   What does CQI stand for?

8          A.   Quality control initiative.

9          Q.   And who was on that committee?

10         A.   It was a combination of operators,

11    merchandisers, legal, both internal and external

12    counsel.

13         Q.   Do you recall approximately how many

14    people were on that committee?

15         A.   No.  More than five, but I can't recall

16    the exact number.

17         Q.   Am I correct that compliance within the

18    pharmacy portion of Giant Eagle fell under your

19    role as director of pharmacy?

20             MR. KOBRIN:  Object to form.

21             THE WITNESS:  The compliance --

22    compliance person who was running regulatory,

23    which is Joe, reported to me, but he had dotted

24    line responsibilities to parts of the business

25    that included retail operations, which I oversaw,

25

1  but also parts of the business that I didn't

2  touch.

3  BY MR. HUDSON:

4      Q.   My question though was in terms of the

5  regulatory department for pharmacy operations,

6  where did that fall within the organization?  Who

7  was responsible for that?

8          MR. KOBRIN:  Object to form.

9          THE WITNESS:  I was responsible for the

10  pieces of regulatory that pertained to retail

11  pharmacy.

12  BY MR. HUDSON:

13      Q.   How about the pieces that related to

14  distributors or HBC?

15      A.   Yeah.  That fell to other parts of the

16  org charts.  That was Randy Heiser, Brett Merrell,

17  Greg Carlson.  I didn't have any oversight over

18  any distribution areas.

19      Q.   Randy Heiser, Brett Carlson?

20      A.   Brett Merrell, Greg Carlson.  There

21  could be supervisors at the warehouses.  I wasn't

22  familiar with that part of the business.

23      Q.   Did you ever visit the HBC warehouse?

24      A.   I believe I did a generalized tour of

25  the overall warehouse one time, which I'm trying

1    to remember.  There was a cage.  They showed me

2    that, hey, you know, that's the HBC cage.  But

3    I've never had a tour of the specific HBC

4    warehouses that pertained to pharmacy or for

5    pharmacy reasons.

6         Q.   Do I understand you correctly then that

7    Mr. Millward, when he became the senior manager of

8    compliance, for lack of a better phrase, wore two

9    hats.  In other words, one hat was dealing with

10   compliance issues relating to the retail

11   pharmacies and then another hat would be relating

12   to other compliance issues relating to other parts

13   of the business?

14        A.   That's correct.

15             MR. KOBRIN:  Object to form.

16             THE WITNESS:  That's correct.  In a

17   matrix organization, you can support multiple

18   areas.  He reported to me more of an

19   organizational design.  Someone has to do

20   performance appraisals and that type of thing.  He

21   sat on my org chart, but he touched multiple areas

22   of the pharmacy, not just retail operations.

23   BY MR. HUDSON:

24        Q.   And was one of the areas that he touched

25   or was responsible for was compliance as it

27

```
 1    relates to HBC acting as a distributor of

 2    controlled substances?

 3            MR. KOBRIN:  Object to form.

 4            THE WITNESS:  I can't say that for sure.

 5    Greg Carlson, to my knowledge, was in charge of

 6    the warehouse.  But utilizing Joe as a resource

 7    for things absolutely occurred, but to what

 8    extent, I'm not -- I wasn't in that piece of the

 9    business.

10    BY MR. HUDSON:

11        Q.  Is it fair to say that the piece of the

12    business that you were responsible for was related

13    to retail pharmacies?

14        A.  That's all my responsibility was.  My

15    responsibility started at the front door of the

16    pharmacy and ended at the counter.

17        Q.  And did that remain true from 2007 until

18    you left Giant Eagle?

19        A.  Yes.

20        Q.  Were you aware at some point that HBC

21    became a licensed distributor of controlled

22    substances?

23        A.  Yes.

24        Q.  Were you aware of which types of

25    controlled substances or schedule drugs HBC was
```

28

```
 1    acting as a distributor for?

 2         A.   General awareness.  I wasn't intimate

 3    with the specific formularies of the warehouse,

 4    but general awareness, yes.

 5         Q.   And what was your general understanding?

 6         A.   That they had an assortment of Schedules

 7    III through V in addition to -- but the majority

 8    of what they had there was nonscheduled drugs.

 9         Q.   And what was your understanding of who

10    acted as the distributor for Schedule II drugs?

11         A.   McKesson.

12         Q.   Did you have any interaction with

13    McKesson in your role?

14         A.   Business interactions were more I was

15    part of Giant Eagle.  So I'd see McKesson maybe

16    for dinner once a year at NACDS and sit in maybe

17    when they gave an annual report of the

18    relationship of the business, but I didn't have

19    direct business relationships with McKesson.

20         Q.   Do you have any knowledge of McKesson's

21    controls or procedures as it relates to complying

22    with the Controlled Substances Act?

23         A.   No, no.  I'm not in that part of the

24    business.

25         Q.   How about for HBC, do you have any
```

29

1    knowledge about policies or procedures that HBC

2    had in place to comply with the Controlled

3    Substances Act?

4        A.   No.













35





37



38



BY MR. HUDSON:

    Q.   Do you have any education specifically

on compliance, in other words, complying with laws

related to the Controlled Substances Act?

        MR. KOBRIN:  Object to form.

        THE WITNESS:  I'm familiar with the

Controlled Substances Act as it pertains to the

39

1    practice of retail pharmacy.

2    BY MR. HUDSON:

3        Q.   How about the Controlled Substances Act

4    as it relates to manufacturers or distributors of

5    controlled substances?

6        A.   No, no, I'm not familiar with those

7    regs.

8        Q.   Any knowledge of the distributor

9    requirements under the Controlled Substances Act?

10            MR. KOBRIN:  Object to form.

11            THE WITNESS:  No.

12   BY MR. HUDSON:

13       Q.   Ever been in any meetings where there

14   was ever any discussion about actions being taken

15   by HBC to meet the distributor requirements of the

16   Controlled Substances Act?

17            MR. KOBRIN:  Object to form.

18            THE WITNESS:  No, not specific to HBC.

19   I was in generalized meetings just about overall

20   company quality practices and things like that, of

21   which, you know, I can't -- I wouldn't be able to

22   say that I've never heard an HBC question being

23   asked or a comment being made, but I've never been

24   in a meeting specifically to design a warehouse

25   function.  I was in retail.

1   BY MR. HUDSON:

2        Q.   Did you have an understanding that

3   distributors had an obligation to design a system

4   to disclose to the distributor suspicious orders

5   of controlled substances?

6             MR. KOBRIN:  Object to form.  Assumes

7   facts not in evidence.

8             THE WITNESS:  I'm aware that

9   organizations and distributors have controls in

10  place and we have to trust those controls.  But

11  the specifics of those I'm not familiar with.

12  BY MR. HUDSON:

13       Q.   Do you know whether or not distributors

14  had an obligation to design a system to monitor

15  for suspicious orders of controlled substances?

16            MR. KOBRIN:  Object to form.

17            THE WITNESS:  I'm not aware of specific

18  requirements when it comes to that area.  I wasn't

19  in that part of the business.

20  BY MR. HUDSON:

21  ████████████████████████████████████

22  ███████████████████████████████████████

23  █████████████████████████████████████

24  ████████████████████████████████████

25  ███████████████████████████████████████

41













47





49



BY MR. HUDSON:

Q.   In your training as a pharmacist, did
you have any training specific to opioids?

A.   Not specific.  Our training was more
about the Pharmacy Act.  It was legal in general
of which controlled substances were part.

Q.   Do you have any knowledge, either
specific knowledge or training, on diversion of
controlled substances?

MR. KOBRIN:  Object to form.

1        THE WITNESS:  My knowledge is what the

2   legal requirements are to run a practice of a

3   pharmacy.

4   BY MR. HUDSON:

5        Q.   And it focused specifically on retail

6   pharmacies?

7        A.   Well, that was my focus.  You can do a

8   lot of different things with a pharmacy degree.

9        Q.   Did you have any knowledge, for example,

10  of opioids that were most likely to be abused or

11  diverted?

12        A.   No, not specific to opioids diversion.

13  ███████████████████████████████████████████████

14  ███████████████████████████████████████████████

15  ███████████████████████████████████████████████

16  ███████████████

17  ███████████████

18  ████████████████████████████████

19  ███████████████

20  ███████████████████████████████████████

21  ███████████████████████████████████████████████

22  █████████████████████████████████████████

23  ████████████████████████████████████████

24  ███████████████████████████████████████████████

25  ██████████████████████████████████████████

















1    chance to ask him questions, and you can clarify

2    at that time if you think there's something that's

3    misleading.

4    BY MR. HUDSON:

5        Q.   You testified, sir, that it's your

6    belief that there were policies relating to the

7    monitoring of suspicious orders.  Did I get that

8    right?

9        A.   No.  What I'm saying is --

10           MR. KOBRIN:  Object to form.

11           THE WITNESS:  -- I'm aware of policies

12   that are designed to prevent diversion, and there

13   are many of them that we had in terms of the

14   practice of pharmacy.

15   BY MR. HUDSON:

16       Q.   And were those written policies?

17       A.   We had written procedures when it came

18   to controlled substances, what our stances were.

19   We had many nonwritten reinforcements that

20   pharmacists were in a position to make good

21   decisions in terms of dispensing practices and we

22   would honor those decisions.

23       We had written policies in terms of who

24   handled controlled substances and training

25   procedures for technicians and documentation

1   requirements being held based on legal

2   requirements, et cetera.

3        Q.   Let's just, if we could, make a list of

4   these policies.  So the first that I heard was

5   good decisions on dispensing.

6        A.   We supported pharmacists' right to make

7   professional judgments as to what was proper and

8   improper in terms of dispensing, made sure the

9   pharmacists knew that they had the right, final

10  right of decision making when it came to

11  dispensing.

12       We had our controlled substance procedures

13  that we made sure was distributed.  We had audit

14  procedures that were done quarterly and documented

15  in accordance with what our procedures and

16  policies were at the time.  We had practices in

17  terms of document retention and what needed to be

18  done in terms of proper ordering, training,

19  training on -- we had manuals and references

20  regarding not only the DEA, but Pharmacy Act and

21  fraud, waste and abuse policies, CBTs, annual

22  meetings with a lot of discussions of what the

23  obligation of pharmacists were and helped in any

24  way.

25       We've had DEA inspections which were never --

1    never got any feedback that we weren't doing

2    anything other than what was required from us from

3    a legal perspective.

4        Q.   So I just want to make sure I've got an

5    exhaustive list.  One was good decisions on

6    dispensing.  Then you said you gave pharmacists or

7    professionals the ability to make professional

8    judgments on dispensing controlled substances?

9        A.   Yeah, supported by the Pharmacy Act,

10   yes.

11       Q.   And then the second one was controlled

12   substance procedures?

13       A.   Again, Giant Eagle had a controlled

14   substance policy that's part of the control box,

15   and the company made sure that we communicated

16   what those procedures are to the pharmacy.

17       Q.   And what were those policies?

18       A.   I can't recite them.  It was part of the

19   control box.

20       Q.   When you say control box, what do you

21   mean by that?

22       A.   There was a physical box in every

23   pharmacy that was a single place to look for

24   procedures, documents, records, that type of

25   thing.  We called it the control box.

1      Q.   It was a control box for Schedule II

2   controlled substances?

3      A.   Yes.  It had other information in there.

4   It was all controls, but Schedule II was part of

5   that.

6      Q.   Do you know if the control box -- if

7   Schedule III controlled substances would be

8   contained in the control box?

9      A.   Well, just general --

10         MR. KOBRIN:  Object to form.

11         THE WITNESS:  Not to my knowledge.  I

12   don't think there's specific -- like DEA manuals

13   aren't specific just to that.  They're all

14   inclusive of the thing.

15   BY MR. HUDSON:

16      Q.   So all controlled substances would be in

17   the control box?

18         MR. KOBRIN:  Object to form.

19         THE WITNESS:  Information regarding,

20   yeah.

21   BY MR. HUDSON:

22      Q.   Information regarding controlled

23   substances.  So it's not like a physical box that

24   you put certain controlled substances into?

25      A.   Oh, no, no.  I'm talking about

63

1   documentation here.  No.  Controlled substances,

2   Schedule IIs, were kept in lock and key, in safes.

3   III through Vs would be distributed in the

4   pharmacy in a proper fashion in accordance with

5   the law.

6       Q.   The control box then would be a box that

7   would have policies or procedures in it?

8       A.   Policies, procedures, the records in

9   terms of ordering and dispensing, all the

10  reference materials, fraud, waste and abuse, the

11  technician certifications, those types of things.

12      Q.   And would there be a control box that

13  would be contained at each Giant Eagle retail

14  pharmacy?

15      A.   Yes.

16      Q.   And would the control box contain the

17  same basic set of -- would you call them policies

18  or procedures or how would you describe them?

19      A.   Both.

20      Q.   Would there be things beyond just

21  policies and procedures in the control box?

22      A.   I don't recall exactly what was in each

23  tab of the box, but things like the order records.

24  If you had CIIs, those order records would be

25  maintained, or dispensing logs associated with it.

64

1          At one time I want to say that there was

2    records of the actual audits we would do monthly,

3    but that moved over to an electronic format, and I

4    can't recall if that was part of the box after

5    that.

6          Q.   The third thing I had was audit

7    procedures.  So if you could, just describe for me

8    what the audit procedures were.

9          A.   First of all, the state and local

10   authorities would do audits at will.  In terms of

11   ours, we did quarterly audits that were all

12   inclusive of operational practice.  That included

13   making sure that the box was in order and the

14   things that needed to be there were in there.

15         Every month we would audit every controlled

16   substance.  Annually we would do a hand count of

17   every controlled substance in the pharmacy.  We

18   would do routine audits, virtual inventory logs,

19   lots of stuff like that.

20         Q.   So for those audits of controlled

21   substances, would you do a physical count of each

22   prescription --

23              MR. KOBRIN:  Object to form.

24   BY MR. HUDSON:

25         Q.   -- or each bottle?  Describe for me what

65

1    that procedure looked like.

2                MR. KOBRIN:  Object to form.

3                THE WITNESS:  Which procedure?

4    BY MR. HUDSON:

5         Q.   The audit procedure.

6         A.   Which one?

7         Q.   For reviewing inventory.

8         A.   Every month there was a requirement to

9    hand count every CII narcotic, record that against

10   what was dispensed.

11        Q.   Was the process the same for Schedule II

12   controlled substances versus Schedule III

13   controlled substances?

14        A.   Schedule IIIs through Vs, there was -- I

15   believe the state requires it every two years.  We

16   did it annually.

17        Q.   So was the monthly audit procedure

18   focused exclusively on the Schedule II controlled

19   substances?

20        A.   That particular procedure was about

21   control IIs, yes.

22        Q.   So there was not a monthly audit

23   procedure that applied to Schedule III controlled

24   substances?

25                MR. KOBRIN:  Object to form.

1          THE WITNESS:  First of all, there was a

2     daily audit of all controls.  We had a virtual

3     log.  Every pharmacist got the chance to see the

4     virtual inventory dispensings and what was being

5     ordered on a nightly basis.

6          Records were printed every night in terms of

7     what was dispensed on the controlled substance.

8     I'm speaking specifically to a required audit

9     which was a monthly procedure, not day in/day out

10    operating procedures.

11         There was daily monitoring of who could touch

12    the safe, who could count.  If anything, I think

13    we always erred on the side do more rather than

14    less when it came to procedures with controlled

15    substances.

16    BY MR. HUDSON:

17         Q.   Were Schedule IIIs though in the vault?

18         A.   I don't recall Schedule IIIs being in

19    the vault.  Actually, Vicodin or hydrocodone

20    products, at one time I believe we made -- we

21    treated them with the same control II substance

22    policy.  I don't recall the dates around that, but

23    I do recall moving the hydrocodone combination

24    products into the safe or at least a portion of

25    those.  I don't recall the specifics of that.



















76

















84



85









89



21          (HBC-Mollica Exhibit 5 was marked.)

22    BY MR. HUDSON:

23       Q.   Let me hand you what I've marked as

24    Exhibit 5.

25             MR. HUDSON:  This one I do have copies

90

1    of.

2    BY MR. HUDSON:

3        Q.   Mr. Mollica, my questions are going to

4    be focused on pages 4, 5, 6 and 7 of this

5    document.

6        A.   Are these numbers or numbered?

7        Q.   No, I'm sorry, I don't believe the pages

8    are numbered.

9        A.   You said 4?

10       Q.   Yeah, where it says Settlement Agreement

11   with the State Board of Pharmacy.  Then underneath

12   that, Giant Eagle #4098.

13       Do you agree or do you see at the front that

14   these are minutes of the December 5 through 7,

15   2011 meeting of the Ohio State Board of Pharmacy?

16       A.   Yes.

17       Q.   And Giant Eagle operated retail

18   pharmacies in Ohio; correct?

19       A.   Yes.

20       Q.   And do you know Kelly Chappell?

21       A.   I'm familiar who she is.

22       Q.   Who is Kelly Chappell?

23       A.   A pharmacist.

24       Q.   And was she a pharmacist at a Giant

25   Eagle pharmacy in Ohio?

91

1       A.   Yes.

2       Q.   And do you see on the seventh page of

3   this document -- I apologize it's two sided -- do

4   you see the signature of Kelly Chappell there

5   dated 11/11/2011?

6       A.   I don't see a signature, no.  I'm sorry.

7       Q.   No problem.

8       A.   I see a line where it has her name on

9   it, yes.

10      Q.   You see the S?

11      A.   Yes.  Thank you.

12      Q.   So it's an electronic signature.

13      A.   Understood.

14           MR. KOBRIN:  Ty, do you know if it's

15   related to the jurisdictional question?

16           MR. HUDSON:  I don't.

17   BY MR. HUDSON:

18      Q.   If you could, just take a moment to look

19   at the section of these minutes that start

20   Settlement Agreement with the State Board of

21   Pharmacy, Docket Number D-110714-197, that page

22   through the page which Ms. Chappell has signed.

23           MR. KOBRIN:  I have a standing objection

24   to this because I think this incident and

25   everything related to it occurred outside of the

92

1    City of Cleveland, County of Summit, County of

2    Cuyahoga and any other jurisdiction relevant to

3    this Track One case.  I'm not sure how this is

4    relevant.

5            (Witness reviewed the exhibit.)

6            THE WITNESS:  I've read it.

7    BY MR. HUDSON:

8        Q.   Mr. Mollica, have you had a chance to

9    review the settlement agreement between Giant

10   Eagle and the State Board of Pharmacy?

11       A.   The four pages that start on page 4 and

12   end with Kelly Chappell's signature, yes.

13       Q.   Yes.  If you see on the first page

14   there, I guess a third of the way down on page 4,

15   it starts out R2012-102 Settlement Agreement with

16   the State Board of Pharmacy.

17       A.   Yes.

18       Q.   And before coming here today, were you

19   aware that Giant Eagle pharmacy entered into a

20   settlement agreement with the State Board of

21   Pharmacy in Ohio?

22       A.   Yes.

23            MR. KOBRIN:  Objection.

24   BY MR. HUDSON:

25       Q.   You were aware of this particular

1    agreement?

2        A.   I don't know the details of the

3    agreement, but I'm aware there was a situation in

4    that particular location and that we complied with

5    whatever the state board pieces were.

6            MR. KOBRIN:  Ty, do you consent to our

7    standing objection on this being outside the

8    jurisdiction?

9            MR. HUDSON:  Yes.

10   BY MR. HUDSON:

11       Q.   Mr. Mollica, you've testified to your

12   knowledge, Giant Eagle always complied with the

13   law; right?

14       A.   That's correct.

15       Q.   But this would be an example where the

16   State of Ohio Board of Pharmacy charged Giant

17   Eagle with not complying with the law; correct?

18           MR. KOBRIN:  Object to form.

19           THE WITNESS:  That's actually not how

20   I'm reading it, no.

21   BY MR. HUDSON:

22       Q.   You don't read this as the State of Ohio

23   accusing Giant Eagle Pharmacy of not complying

24   with the law?

25           MR. KOBRIN:  Object to form.

94

1          THE WITNESS:  Could you direct me to a

2    particular passage where it says that Giant Eagle

3    was compliant with the law?

4    BY MR. HUDSON:

5          Q.   Was not compliant with the law?

6          A.   Could you direct me to a part there?

7          Q.   I'll just walk you through.  We'll go

8    through numbers two, three.

9          Number two says, "Giant Eagle Pharmacy #4098

10   did from May 1, 2009 through January 21, 2011 fail

11   to provide effective and approved controls and

12   procedures to deter and detect theft and diversion

13   of dangerous drugs, to wit:  The following

14   controlled substances and dangerous drugs where

15   stolen from the pharmacy, yet internal control

16   procedures failed to deter or detect the theft.

17   The drugs were stolen by an inadequately

18   supervised technician who admitted to a board

19   agent that the drugs were diverted to her addicted

20   husband and also sold to another individual."

21          A.   I see that line, but I don't see a

22   reference that it's not complying with the law.

23   It sounds like a criticism of the internal

24   control.

25          Q.   Who has the responsibility to create

1    internal controls?

2              MR. KOBRIN:  Object to form.

3              THE WITNESS:  Everyone including the

4    pharmacist, the company, everybody.

5    BY MR. HUDSON:

6         Q.   Who is the named party in this action

7    that's brought by the Ohio State Board of

8    Pharmacy?

9              MR. KOBRIN:  Object to form.

10             THE WITNESS:  I don't know how to read

11   the legal document.  Are you referring to Giant

12   Eagle 4098?

13   BY MR. HUDSON:

14        Q.   Yeah.  The legal entity is Giant Eagle;

15   right?

16        A.   Yeah.

17             MR. KOBRIN:  Object to form.

18        (HBC-Mollica Exhibits 6 - 7 were marked.)

19   BY MR. HUDSON:

20        Q.   As an example, I'll show you.  Let me

21   mark a couple more.  We can look at those and

22   compare those.  I hand you what I've marked

23   Exhibit 6.  We'll mark this one as Exhibit 7.

24        If we take a look here, Exhibit 5 are minutes

25   of the December 5 through 7, 2011 meeting of the

96

```
 1    Ohio State Board of Pharmacy.  Do you see that?

 2    That's the one we've been talking about.

 3         A.   Yes.

 4         Q.   And if you look there, the named entity

 5    in the action by the Ohio State Board of Pharmacy

 6    is Giant Eagle; right?

 7         A.   Right.  Okay.

 8         Q.   Now, if we look at Exhibits 6 and 7,

 9    those are minutes of the November 2 through 4,

10    2009 Ohio State Board of Pharmacy and then minutes

11    of the January 4 through 6, 2010 Ohio State Board

12    of Pharmacy; right.  Do you see that?

13         A.   Yes.

14         Q.   So if you look at these two -- and,

15    again, I apologize these aren't numbered -- but if

16    you look at these two and you go back one, two,

17    three, four, five, six, the seventh full page.

18              MR. KOBRIN:  This is Exhibit 6?

19              MR. HUDSON:   This is 7.

20    BY MR. HUDSON:

21         Q.   Sixth page back and actually onto the

22    next, seventh page, right, do you see that?

23         A.   Yes.

24         Q.   Do you see there Justin Allan Bracken?

25              MR. KOBRIN:  Which one?
```

97

```
 1            THE WITNESS:  Would you turn yours so I
 2   can make sure?
 3   BY MR. HUDSON:
 4       Q.   Sure.  Exhibit 6.
 5       A.   No.  I got that.  The page you're on.
 6       Q.   It's just the back, I think, of page 6 I
 7   believe.
 8            MR. KOBRIN:  Six of six?
 9            MR. HUDSON:  Yep, and seven, the back
10   page of it.
11            THE WITNESS:  These are single pages.
12            MR. HUDSON:  That's why.  It's probably
13   14.
14   BY MR. HUDSON:
15       Q.   If you could just in Exhibit 6, the
16   pharmacist is Justin Allan Bracken and in Exhibit
17   7, the pharmacist is Myra Joy Hindes.  It should
18   be page 12.
19       So in Exhibit 6 you see the pharmacist is the
20   named party Justin Allan Bracken?
21       A.   Yes.
22            MR. KOBRIN:  Is this a Giant Eagle case?
23            MR. HUDSON:  Yes.
24   BY MR. HUDSON:
25       Q.   And then if we look at Exhibit 7, we go
```

98

```
1    back, I believe, the 13th page.

2            MR. KOBRIN:  Do you know if these fall

3    within the jurisdiction?

4            MR. HUDSON:  I don't, but I'll give you

5    a standing objection.

6            MR. KOBRIN:  This one is in West

7    Virginia?

8            MR. HUDSON:  She's a pharmacist in West

9    Virginia.

10           THE WITNESS:  Can we have a standing

11   objection to the reference pages on Exhibit 7,

12   outside the jurisdiction in this case, and also a

13   standing objection as to Mollica 6 which I believe

14   is also outside the jurisdictions in this Track

15   One litigation, in Track One of this litigation.

16   So both of these incidents are unrelated to Track

17   One.

18   BY MR. HUDSON:

19       Q.   Mr. Mollica, do you see there on

20   Exhibit 7 that the pharmacist is the person named?

21       A.   Yes.

22       Q.   And I'll represent to you in both of

23   these cases, they relate to incidents that

24   occurred at Giant Eagle pharmacies.  Okay?

25       A.   Okay.
```

1      Q.   If we go back to Exhibit 5, you agree

2   that particular set of instances, the Ohio State

3   Board of Pharmacy was charging Giant Eagle with

4   having insufficient internal controls; correct?

5      A.   Yeah.  My original question was I just

6   didn't know how to read the document.

7      Q.   Right.  But you agree though now

8   understanding how to read the document this is an

9   example of the Ohio State Board of Pharmacy

10   accusing Giant Eagle of not complying with the

11   law; correct?

12           MR. KOBRIN:  Object to form.

13           THE WITNESS:  I just don't agree with

14   that statement.  There's a -- there's a question

15   about were the practices effective enough, but it

16   doesn't state anything about not following the

17   law.

18   BY MR. HUDSON:

19      Q.   The State of Ohio Board of Pharmacy

20   accused Giant Eagle of not having internal control

21   procedures to deter or detect the theft of these

22   controlled substances; right?

23           MR. KOBRIN:  Object to form.

24           THE WITNESS:  As I'm reading it, it's

25   stating that the controls that we have in place

100

```
 1    weren't effective in this case.

 2    BY MR. HUDSON:

 3        Q.   Right.  And as a result, they've brought

 4    an action against Giant Eagle.

 5        A.   Yes.

 6            MR. KOBRIN:  Object to form.

 7    BY MR. HUDSON:

 8        Q.   They didn't bring this action against

 9    the individual pharmacist.  They brought it

10    against Giant Eagle.

11            MR. KOBRIN:  Object to form.

12            THE WITNESS:  As I'm reading this, that

13    would be my understanding.  I'm not that familiar

14    with legal documents like this.

15    BY MR. HUDSON:

16        Q.   Sure.  If we go to the third paragraph,

17    it says, "Giant Eagle Pharmacy #4098 did from

18    May 1, 2009 through January 21, 2011 fail to

19    provide effective and approved controls and

20    procedures to deter and detect theft and diversion

21    of dangerous drugs, to wit:  The following

22    controlled substances and dangerous drugs were

23    stolen from the pharmacy, yet internal control

24    procedures failed to deter or detect the theft.

25    The drugs were stolen by an inadequately
```

1    supervised technician who admitted to a Board

2    agent that the drugs were diverted to her addicted

3    husband and also sold to another individual."

4        Do you see that?

5        A.   I see that.

6        Q.   And then down below, it's got a list of

7    drugs.  Do you see there a series of hydrocodone

8    combination products?

9        A.   Yes.

10       Q.   Of different strengths; correct?

11       A.   Yes.

12       Q.   Then underneath that, it says, "Such

13   conduct is in violation of Rule 4729-9-05 of the

14   Ohio Administrative Code."

15       A.   Yes.

16       Q.   And this document shows Giant Eagle

17   entering into a settlement of these accusations;

18   correct?

19            MR. KOBRIN:  Object to form.

20            THE WITNESS:  That's how I would

21   interpret it with the couple paragraphs I read.

22   BY MR. HUDSON:

23       Q.   Sure.  If Giant Eagle had the internal

24   control procedures in place like you talked about

25   that were tracking specifically each order as it

1    was being filled, why then was Ohio charging them

2    with having inadequate internal controls?

3              MR. KOBRIN:  Object to form.  You're

4    asking him not only to understand what someone

5    else did, but what another state entity did?

6              THE WITNESS:  I can't speak to what

7    Ohio's position was on it.  We had controls in

8    place.  It looks like in this particular

9    situation, an employee who understood our

10   procedures was violating those procedures.

11   BY MR. HUDSON:

12       Q.   Right.  In a couple of other instances,

13   the State of Ohio actually sued or brought

14   charges, I should say, or brought actions against

15   those two specific pharmacists; right?

16       A.   I don't know.  I honestly don't know.

17       Q.   Well, that's Exhibits 6 and 7 that we

18   looked at; right?

19       A.   You asked me to look at a name on

20   Exhibit 7.

21       Q.   Let's just take a quick look then, if we

22   could, at Exhibit 6 and go back to that section in

23   the action against Justin Allan Bracken.

24             MR. KOBRIN:  You're consenting to our

25   standing objection on 6 and 7, Ty?

1          MR. HUDSON:  Yes.

2     BY MR. HUDSON:

3          Q.   If you look there, and we go back to --

4     the action against Justin Allan Bracken, if you go

5     back to the fourth page of this particular action,

6     look at paragraph 8.

7          So in this particular case, this is Ohio

8     making allegations specifically against Justin

9     Allan Bracken.  Do you see that?

10         A.   Yes.

11         Q.   "That he did from April 30, 2007 to

12    May 20, 2009 with purpose to divert, knowingly

13    obtain or exert control over dangerous drugs, the

14    property of Giant Eagle Pharmacy #4152 beyond the

15    express or implied consent of the owner, to wit:

16    Justin Allan Bracken possessed a stock container

17    of" -- do you know how to pronounce that drug?

18         A.   Temazepam.

19         Q.   -- "temazepam, 15-milligram, from his

20    employer.  Audit figures indicate shortages of the

21    same drug Justin Allan Bracken possessed."

22         Do you see that?

23         A.   Yes.

24         Q.   If we look in Exhibit 6, this would be

25    an example where the audit figures actually caught

104

1    Justin Allan Bracken taking possession of these

2    controlled substances; is that fair?

3           MR. KOBRIN:  Object to form.

4           THE WITNESS:  You can imply that from

5    here.  I don't know the exact circumstances of how

6    he was caught.

7    BY MR. HUDSON:

8        Q.   It says audit figures indicate shortages

9    of the same drugs Justin Allan Bracken possessed;

10   right?

11       A.   Sure.  I guess I'm just saying I don't

12   know if that's how he was caught.

13       Q.   If we go back to Exhibit 5, the action

14   against Giant Eagle, in that particular situation,

15   the State of Ohio Board of Pharmacy is actually

16   bringing the action against Giant Eagle because

17   its internal controls failed to detect these

18   actions being taken; right?

19          MR. KOBRIN:  Object to form.

20   Misrepresents the exhibit.

21          THE WITNESS:  I disagree.  Internal

22   controls would have caught a shortage if someone

23   was manipulating internal controls.  That's my

24   feeling on what was going on here.

25

1  BY MR. HUDSON:

2       Q.   Your feeling would be that if somebody

3  was manipulating the drugs, the internal controls

4  would catch them each and every time?

5            MR. KOBRIN:  Object to form.

6            THE WITNESS:  No.  I'm saying if someone

7  was manipulating the internal control, the person,

8  in this case, a pharmacist who we put in charge of

9  keeping the standard of our internal control, was

10  manipulating that control in this particular

11  situation, they would -- it created, it looks

12  like, a diversion.

13       But that's not to imply that there wasn't

14  internal controls that wouldn't have caught it if

15  someone is manipulating those internal controls.

16  BY MR. HUDSON:

17       Q.   Do you know why Giant Eagle agreed to

18  settle these accusations by the State of Ohio

19  Board of Pharmacy?

20            MR. KOBRIN:  Object to form.

21            THE WITNESS:  No.  I don't know the

22  specifics on why.

23  BY MR. HUDSON:

24       Q.   Do you have any more knowledge about

25  whether Giant Eagle took any additional actions

```
 1    after the settlement to address the accusations by

 2    Ohio that the internal controls were inadequate?

 3              MR. KOBRIN:  Object to form.  It

 4    misrepresents the evidence.

 5              THE WITNESS:  I know that as a result of

 6    any incident, and especially ones like this, that

 7    Giant Eagle took many actions to continually try

 8    to improve and build new mousetraps when it comes

 9    to internal controls and how we measure them.

10    BY MR. HUDSON:

11       Q.   Anything more specific you can say about

12    specific actions or steps Giant Eagle took after

13    the settlement with the Ohio Board of Pharmacy in

14    2011?

15       A.   Sure.  I mean, I can't say that they're

16    specific to this particular situation, but from

17    2011 moving forward, there were things like moving

18    to more virtual inventory and moving away from

19    paper to electronics.  There was a company called

20    Supply Logics that Giant Eagle engaged to bring

21    more visibility to this.  You could see if an

22    associate was manipulating an internal control or

23    changing an inventory figure to read more

24    favorably on a report.  Heightened awareness in

25    terms of physical audits that we would do, more
```

1    training.

2        We always tried to use situations where bad

3    players is an opportunity to reevaluate and come

4    up with new procedures to stay ahead of it.

5        Q.   In your mind, did the procedures at

6    Giant Eagle become better at detecting diversion

7    over time?

8        A.   I would like to think they became

9    better.  That was always the goal, was to make it

10   better and better.  You don't know what you don't

11   know.  But when you see a weakness in an area or

12   if someone can exploit it, you work to try to stop

13   someone from being able to exploit it.

14            (HBC-Mollica Exhibit 8 was marked.)

15   BY MR. HUDSON:

16   ████████████████████████████

17   ███████████████████████████

18   ██████████████████████

19   ████████████████████████████

20   ██████████████████████████████

21   ███████████████████████████

22   █████████████████████████████

23   ███

24   ██████████████████████████████

25   ██████████████████████████████



109



1

2

3

4

5

6

7

8

9

10

11

12

13  BY MR. HUDSON:

14      Q.  At the time that you were with Rite-Aid,

15  do you know whether Rite-Aid had controls or

16  limits?

17      A.  I actually --

18          MR. KOBRIN:  Object to form.  Just be

19  careful.  I don't know how much we want to get

20  into your experience at Rite-Aid or any company

21  information with regard to Rite-Aid.  So if you

22  think you're getting into anything that is

23  confidential or anything related to Rite-Aid, if

24  you can let us know before you testify to that

25  information.

110

1            THE WITNESS:  In my time as a pharmacy

2     supervisor with Rite-Aid, I'm not familiar with

3     any limit on a dispensing practice.

4     BY MR. HUDSON:

5        Q.   Was there any reason why there couldn't

6     be limits on dispensing certain quantities of

7     controlled substances?

8        A.   That's hard to say because not every

9     patient is the same.  You could have a controlled

10    substance that's dispensed for someone who came

11    from the dentist, and you can have controlled

12    substances dispensed to someone who is, you know,

13    chronically ill with cancer.  Their dispensing

14    guidelines are completely different.

15        Because there's so much circumstantial and

16    relevant decisions have to be made to a specific

17    patient, I don't know how you can do that

18    effectively.  How do you have a scarlet line as to

19    what a patient needs?  The doctor is really

20    involved with that.

21        The pharmacist's role is to make sure that

22    those physicians are operating within the guidance

23    of what we believe their practice should be and

24    that it's not violating a safety requirement in

25    terms of what the dispensing doses should be from

111

```
 1    the manufacturer.  I just don't know how you would

 2    do that.

 3         Q.   How would you exercise professional

 4    responsibilities?  What criteria would a

 5    pharmacist apply to determine whether or not a

 6    quantity of controlled substances is too much to

 7    be dispensed?

 8              MR. KOBRIN:  Object to form.

 9              THE WITNESS:  I can give you examples

10    from my experiences, you know.  A combination drug

11    with hydrocodone and Tylenol in it, you would have

12    to make sure -- there's guidelines from the

13    manufacturer in terms of what normal dispensing

14    is.  There's also limits of which the amount of

15    Tylenol would exceed a safe dose.  And if there

16    were things outside those limits, you would call

17    and verify with the physician the accuracy of that

18    and make professional judgment decisions as to

19    whether or not they make sense.

20    BY MR. HUDSON:

21         Q.   How would you apply the dispensing

22    guidelines set by the manufacturer?  In other

23    words, how would you go and apply that to a

24    particular patient who brings in a prescription?

25         A.   Well, I mean, as an example, if a dosing
```

112

1  guideline for a drug says, you know, up to four

2  times a day and the doctor was writing ten times a

3  day, you would question that and document that, or

4  with the physician sometimes say, no, I'm not

5  filling this.  I feel it's not safe.





114



BY MR. HUDSON:

Q.   Anything more specific than though what

pharmacists learn in pharmacy school to obtain a

license that you can say in terms of a criteria

that --

MR. KOBRIN:  Object to form.

THE WITNESS:  What I'm talking about is

clinical.

MR. KOBRIN:  Object to form.

THE WITNESS:  Clinical training is what

pharmacists get, and they use that clinical

training to make evaluations as to whether or not

1    something meets those guidelines.

2    BY MR. HUDSON:

3        Q.    Let me ask it this way:  Do you believe

4    that we have a problem with diversion of opioids

5    in our country?

6        A.    Our country has a problem with opioids?

7        Q.    Yes.

8        A.    I think opioids can create harm in the

9    country if they're used illicitly, yes.

10       Q.    But my question specifically is:  Do you

11   believe that we have a problem with diversion of

12   opioids in our country?

13       A.    I believe that there are folks who will

14   use these types of products illicitly, yes.

15       Q.    My question is broader than that.

16       Do you believe we have a problem with

17   diversion of opioids in our country?

18       A.    I don't know if diversion is the opioid

19   problem versus illicit use of it.  My feeling is

20   the problem the country has is illicit use of

21   these products.  If diversion is a part of

22   illicit, then I believe it's an illicit use of

23   these things.

24       Q.    That's what I'm trying to figure out.

25   Everybody who is a pharmacist had go to pharmacy

116

1    school; right?

2        A.   Yes.

3        Q.   They had to take the oath and get a

4    license to obtain the ability to dispense drugs;

5    right?

6        A.   Yes.

7        Q.   The government, I think it's widely

8    known, has said that we have a problem with

9    diversion of opioids in our country.

10       My question is:  How can that occur if

11   pharmacists are always following what they learned

12   in pharmacy school and what they had to do in

13   order to get a license given that type of

14   professional judgment?

15           MR. KOBRIN:  Object to form.

16           THE WITNESS:  So you don't think that

17   someone could steal something out of someone's

18   medicine cabinet or take something out of

19   someone's bag or those types of things?  That's

20   why when you're saying diversion, I'm saying

21   illicit.  If someone is obtaining these things in

22   an improper way, yes, I believe it can cause harm.

23   ████████████████

24   ██████████████████████████████████████

25   ████████████████████████████████



118











123







126





128



129











134





136



137



138



139





141

1    BY MR. HUDSON:

2        Q.   Well, here you can see on the first page

3    of his question he's talking about question one in

4    this questionnaire, "Company has a suspicious

5    order monitoring program which complies with 21

6    CFR 1301.74(b) for controlled substances"; right?

7        A.   Yes.

8        Q.   Do you think there's any relationship

9    between that and Mr. Millward's statement above

10   that we need to lock down an SOM SOP ASAP?

11       A.   I honestly don't know.  These things are

12   not in my daily practice.  I don't -- I'm not

13   familiar with these codes.

14       Q.   Do you know why you were copied on this

15   email?

16       A.   No, but I can guess, you know.  Because

17   it was a common practice that people would copy

18   the operators.  It's more of an FYI so if

19   something were to change.  If he's talking about a

20   procedure here that needs to be changed, you can

21   almost assume that there's going to be an

22   operating step that needs to happen to make sure

23   that procedure happens.  I think it's more of a

24   heads up type of thing.

25       Q.   Well, do you know as you sit here today

142

```
 1    looking at these documents whether or not Giant

 2    Eagle had a written suspicious order monitoring

 3    policy in place at this time in January of 2014?

 4         A.   For the Sudafed drug that he's talking

 5    about there?

 6         Q.   No, just in general, suspicious order

 7    monitoring program as a whole, in other words,

 8    written policies.

 9         A.   We had written policies.  My definition

10    of suspicious monitoring though is inclusive of

11    everything within the practices and for the

12    pharmacy.  So my answer would be yes.

13         Q.   This question says, "Company has a

14    suspicious order monitoring program which complies

15    with 21 CFR 1301.74(b)"; right?

16         A.   I don't know what that's referring to.

17    I'm sorry.  I'm just not familiar with this thing.

18         Q.   So today everything you've testified

19    about, any written policies or procedures that

20    existed at Giant Eagle, you don't know one way or

21    the other whether or not those are suspicious

22    order monitoring programs that would add to

23    compliance with 21 CFR 1301.74(b)?

24              MR. KOBRIN:  Object to form.  Misstates

25    the testimony and the evidence.
```

143

```
 1              THE WITNESS:  What I'm saying is I'm not
 2    familiar with what -- if you said it earlier, I
 3    apologize.  I don't know what 21 CFR 1301.74(b)
 4    is.  I don't know what it's referring to.
 5    BY MR. HUDSON:
 6         Q.   If you go back to the prior exhibit, the
 7    exhibit you just had?
 8         A.   This thing from Anda?
 9         Q.   You got it exactly.  And you go back to
10    Bates 4413, if you compare Exhibit 9, which is
11    this Anda description; right?  And see it makes
12    reference to 1301.74(b)?  And then we compare that
13    to Exhibit 11, and they're also talking about a
14    suspicious order monitoring program which complies
15    with 21 CFR 1301.74(b); right?
16              MR. KOBRIN:  Object to form.  I just
17    want to clarify for the record that this is not an
18    Anda presentation.  Some other third party
19    presented it at the Anda conference that the
20    witness has said he doesn't know anything about.
21    BY MR. HUDSON:
22         Q.   It's actually a presentation by Mike
23    Mapes, chief compliance officer of Assured RX
24    Services, and Robert DelVecchio, chief executive
25    officer of Assured RX Services.
```

1     If you go back and you compare these two, it

2     seems like in the industry there's a fair amount

3     of talk of putting a suspicious order monitoring

4     program in place; right?

5             MR. KOBRIN:  Object to form.

6             THE WITNESS:  I still want to point out

7     though on this form, it says other security

8     controls for nonpractitioners.  I'm saying it's

9     because I was on the practitioner side of how

10    these things relate, that's why I'm not as

11    familiar with these as someone who would be

12    connected.

13    BY MR. HUDSON:

14        Q.   No.  I appreciate that.  I guess that's

15    what I'm trying to get at.  You've testified today

16    about policies or procedures that you were aware

17    of that existed at the retail pharmacy level;

18    right?

19        A.   Right.

20        Q.   So what I'm focused in on is policies or

21    procedures that existed at the nonpractitioner

22    level, meaning the manufacturer or distributor

23    level.

24        So my question is:  Can you say as you sit

25    here today whether or not Mr. Millward's email

145

1    here in January of 2014 that you're copied on is

2    indicating that Giant Eagle needed to create a

3    suspicious order monitoring program to comply with

4    1301.74?

5            MR. KOBRIN:  Object to form.

6            THE WITNESS:  No, I can't say that.

7    What he says here is as it relates to an

8    over-the-counter drug, he has a question regarding

9    to that referenced section.

10   BY MR. HUDSON:

11       Q.   He says in his email, "We need lock down

12   an SOM SOP ASAP"; right?

13       A.   Yeah, specific to Sudafed,

14   over-the-counter drug.

15       Q.   Well, how do you know that, that it's

16   specific to Sudafed?

17       A.   Because he says we are reporting PSE,

18   which is Sudafed (a listed chemical) sales from

19   HPC to the stores monthly before he makes that

20   statement.

21       Q.   But down below can we agree the

22   questionnaire is asking more broadly about --

23   number four says, "Please provide a copy of your

24   suspicious order monitoring program SOP or Summary

25   of Program."

1        A.    I don't know what this document is.

2   What are these questions?  This SOM and

3   anti-diversion program piece, I just don't know

4   what this is.

5        Q.    That's what I'm getting at, is whether

6   you're able to say as you sit here today whether

7   or not Giant Eagle had written policies that were

8   specifically aimed at meeting these requirements

9   of 1301.74(b).

10            MR. KOBRIN:  Object to form.

11            THE WITNESS:  When you asked me -- to me

12   you're asking about a difference between a policy

13   that's of a distributor versus the pharmacy, and

14   I'm saying that it's the same company distributing

15   to itself.  So by definition, any and all of our

16   suspicious -- whether diversion related measures

17   that we had in place are going to be part of the

18   suspicious monitoring system, to my opinion.

19   BY MR. HUDSON:

20        Q.    Is there anything as you sit here today,

21   any manual or anything in writing?

22        A.    Everything that we have, our dispensing

23   procedures, our documentation tracking, our

24   requirements in training that we do with

25   technicians, all our procedures are going to be

```
 1    part of that.

 2         Q.    Those are all geared towards identifying

 3    unusually large orders of controlled substances?

 4         A.    That's not what it's asking on here.

 5    It's asking about if there's suspicious

 6    order monitoring.

 7         Q.    What is a suspicious order?

 8              MR. KOBRIN:  Object to form.

 9              THE WITNESS:  I don't have a definition

10    of suspicious order.  If there are orders that

11    require, you know, a go look-see or further

12    information, we were going to go look and see.

13    BY MR. HUDSON:

14         Q.    Well, what does the regulation say about

15    a suspicious order?

16              MR. KOBRIN:  Object to form.  If you

17    want to show him the regulation, but I don't think

18    he should be expected to know that or should

19    testify to it.  I'm going to say don't answer

20    that.

21              MR. HUDSON:  Are you instructing him not

22    to answer?

23              MR. KOBRIN:  I think you should clarify

24    or tell him what you're doing.  I mean, you're

25    asking him to tell you about legal regulations
```

148





































166





168



```
 1
 2
 3
 4
 5
 6
 7
 8              MR. HUDSON:  Let's take a break.
 9              THE VIDEOGRAPHER:  11:54 we're off the
10   video record.
11              (Recess from 11:54 a.m. to 12:36 p.m.)
12              THE VIDEOGRAPHER:  12:36 we're on the
13   video record.
14                        EXAMINATION
15   BY MR. BARTON:
16        Q.   Mr. Mollica, we met at the beginning of
17   the deposition.  My name is Eric Barton here with
18   Mr. Hudson representing the plaintiffs.  I just
19   have some follow-up questions for you on a few of
20   the topics that have already been touched on this
21   morning, if that's all right.
22        I understand from your testimony at the
23   beginning of the deposition about your work
24   history that you were in -- I think you just
25   described it as a leadership role in the Cleveland
```

169

1    area for about eight months before you became the

2    director of operations, pharmacy operations for

3    Giant Eagle; is that right?

4        A.   Yes.  The titles changed.  It used to be

5    called pharmacy specialist.  Now it's called

6    pharmacy district leader.  That was the role.

7        Q.   That was going to be my first question,

8    what was your title, but it was either pharmacy

9    specialist or pharmacy district leader?

10       A.   Yeah.  I can't remember because they

11   changed it somewhere in that era.

12       Q.   And this was, I think, in about 2006,

13   about then?

14       A.   That's correct.

15       Q.   In that role, whatever your title, in

16   that role do I understand correctly that you would

17   have had some supervisory responsibility for some

18   number of stores in your geographic area, which

19   was the Cleveland area at that time?

20       A.   That's right.

21       Q.   Can you just give us a little more

22   detail about what your area or territory was at

23   that period of time in the Cleveland area for

24   those eight months that you held that position?

25       A.   Yeah, but please understand they changed

1   my territory so many different times.  I've had so

2   many different ones.  I may not be a hundred

3   percent accurate.

4        But it's my recollection the ones in that

5   particular area were on the west side, like in the

6   suburban areas.  I didn't have like inner city

7   ones.  But the ones that were west of Cleveland

8   and maybe southwest.

9        Q.   How many stores in that role, and I

10  understand that may have varied, too --

11       A.   Right.

12       Q.   -- with what you said, but approximately

13  how many stores would you have had supervisory

14  responsibility for?

15       A.   It would have been some number between

16  20 and 30.  They changed the size of the

17  territories over time, too.  It's in that range

18  somewhere.  At that particular time, too, even

19  though it was, quote-unquote, on paper for eight

20  months, there was a big acquisition going on at

21  that time, and I was helping with the acquisition.

22       So I was -- they had interim leaders

23  overseeing my, quote-unquote, stores while I was

24  working on the acquisition piece, too.

25       Q.   Given the number of stores and where you

```
1    were, do you believe that you did have supervisory

2    responsibility during that period of time in the

3    position of pharmacy specialist or pharmacy

4    district leader for Giant Eagle retail pharmacies

5    in Cuyahoga or Summit counties?

6              MR. BARNES:  Object to form.  Can you

7    define what you mean by supervisory?

8              MR. BARTON:  Whatever he would say his

9    roles were as pharmacy specialist or pharmacy

10   district leader.

11             THE WITNESS:  I honestly don't know the

12   counties.  If you show me a map, I'd probably be

13   able to -- I don't know which counties.  I'm from

14   Pennsylvania originally, not Ohio.  So I'm not

15   sure what the county names are.  If you had store

16   specific -- I didn't have any of the ones that

17   were like in Cleveland proper, if that's what

18   you're asking, at that time.

19        It's my recollection that I had -- at one

20   time I had stores that were east of Cleveland and

21   more like going into Youngstown.  But at that

22   time, it's my recollection it was the ones that

23   were kind of further out there in the west.  I

24   didn't have the city stores.

25        Is that what those counties correspond to?
```

172

```
 1   BY MR. BARTON:

 2        Q.   That's fine.

 3        A.   In south, like Medina area, like going

 4   into Akron, you know, the ones that are kind of on

 5   the outskirts.  I didn't have the...

 6   BY MR. BARTON:

 7        Q.   Let me ask a general question about the

 8   Giant Eagle retail pharmacies that we're talking

 9   about here.

10        Is it accurate for us to understand that

11   these retail pharmacies were always connected to

12   or are a part of Giant Eagle supermarket grocery

13   stores?

14        A.   Yes.  Over the years, not in that

15   particular area, over the years there were onesie

16   twosie things where a Giant Eagle would be in an

17   independently-owned grocery store that Giant Eagle

18   distributed groceries to, but they were always

19   Giant Eagle pharmacies.

20        There were none in -- I don't think there

21   were any -- after the acquisition in Cleveland,

22   there were two stores -- I don't even remember the

23   names of them -- that we had Giant Eagle

24   pharmacies in.  I think there were two of them in

25   the Cleveland market that we ran Giant Eagle
```

1    pharmacies inside of the other grocery -- the

2    independent grocery store banner.  But then they

3    were closed in some short time afterwards.  But

4    for the most part, yes.

5         Q.   That's helpful.  So there were rare

6    examples, if I understand correctly, there were a

7    couple of rare examples that didn't last where a

8    Giant Eagle pharmacy that you or Giant Eagle

9    operations people had responsibility for the

10   operations of those pharmacies, but a couple of

11   them may have been physically located for a time

12   in a different grocery store, not a Giant Eagle

13   grocery store?

14        A.   Correct.  I do want to note as my

15   recollection, too, after the acquisition, my

16   territory at least for a couple of months -- I

17   don't remember the exact dates -- were just to

18   help the pharmacies that we just acquired.  Some

19   of those may have been in those counties.  But,

20   like I said, I'm not sure what the county borders

21   are for those.

22             MR. BARNES:  Eric, when you say

23   different, you mean did they run the Giant Eagle

24   banner that they were independent or did they run

25   some other banner?

174

```
 1            MR. BARTON:  Yeah.  Let me ask that
 2    question just to flesh it out.  I realize we're
 3    talking about exceptions, but we might as well
 4    understand all the alternatives here.
 5    BY MR. BARTON:
 6        Q.   In the instances where Giant Eagle owned
 7    and operated or purchased and operated a pharmacy
 8    within a grocery store that had a different
 9    banner, a different brand, not Giant Eagle as the
10    supermarket or grocery store --
11            MR. BARNES:  If that occurred.
12    BY MR. BARTON:
13        Q.   In those instances and if that occurred,
14    did the pharmacy inside that grocery store have
15    kind of clear Giant Eagle signage, branding?
16        A.   Yes, yes.  They were branded, licensed.
17    Even the uniforms were the same.  The bottle
18    labels had Giant Eagle Pharmacy on them.
19    ████████████████████████████████
20    ███████████████████████████████████
21    ████████████████████████████████
22    ███████████████████████████████████
23    ██████████████████████████████████
24    █████████████████████████████
25    ███████████████████████████████████
```





177





179





181









185



186





188





190



8          Q.   I'm going to mark a couple of things as

9     exhibits.   I'm going to hand you 13 and 14 here.

10         (HBC-Mollica Exhibits 13 - 14 were marked.)

11              (Witness reviewed the exhibit.)

12    BY MR. BARTON:

13         Q.   Mr. Mollica, I've handed you two

14    documents, Exhibits 13 and 14.   Do you see that?

15         A.   Yes.

16         Q.   And I'll just represent to you that

17    Exhibit 13 is a printout of the Ohio

18    Administrative Code Section 4729-9-05, and this is

19    the version that was in effect in 2009 through its

20    next amendment, which I believe was in 2011 or

21    '12, although it wasn't a major amendment.

22         But this is during the time that you were in

23    the position of director of operations, pharmacy

24    operations for Giant Eagle; correct?

25         A.   Yes.

191

1        Q.   And then Exhibit 14 is, likewise, a

2    printout of the Ohio Administrative Code, and it's

3    Section 4729-9-11, also the version in effect in

4    2009 through at least 2011 until it was next

5    amended.  Do you see that?

6        A.   Yes.

7        Q.   So these two documents are part of the

8    pharmacy regulations applicable to pharmacies in

9    the state of Ohio.  Do you agree with that?

10       A.   Yeah.  That's what it appears to be,

11   yes.

12       Q.   And these are administered by in Ohio I

13   think the Ohio State Board of Pharmacy; correct?

14       A.   Yeah.  It would be the Ohio state board.

15       Q.   These particular ones, looking at

16   Exhibit 13, which is Section 4729-9-05, that's

17   security requirements for dangerous drugs.  Do you

18   agree with that?

19          MR. BARNES:  Are you reading that from

20   somewhere?

21          MR. BARTON:  No.  I'm just

22   characterizing it.

23   BY MR. BARTON:

24       Q.   The title is Security Requirements.

25   That's the title of this particular regulation?

1        A.    Yeah.

2        Q.    And it's within the chapter applicable

3    to dangerous drugs, do you see there up above?

4    That's what this purports to be addressing; do you

5    agree?

6        A.    I mean, I agree that 4729-9-05 is

7    security requirements.

8        Q.    And so in subsection (A) -- I'm not

9    going to read all of these, but we're just seeing

10   what these are.  In subsection (A), the very first

11   sentence says, "All registrants shall provide

12   effective and approved controls and procedures to

13   deter and detect theft and diversion of dangerous

14   drugs."

15       Did I read that correctly?

16       A.    Yes.

17       Q.    All registrants, using that word in

18   these regulations, would you assume that that

19   refers in this instance to pharmacies if this is

20   regulating pharmacies?

21             MR. BARNES:  Object to form.  Don't

22   speculate.

23             THE WITNESS:  I'm not even sure what

24   you're asking me.  I can verify that's what it

25   says on the piece of paper the way you read it.

1   BY MR. BARTON:

2       Q.   Well, do you believe that in the State

3   of Ohio, all pharmacies were required to have

4   effective and approved controls and procedures to

5   deter and detect theft and diversion of dangerous

6   drugs?

7       A.   Sure.

8       Q.   And in subsection (B), it says that,

9   "Substantial compliance with the standards set

10  forth in 4729-9-11 of the Administrative Code may

11  be deemed sufficient by the State Board of

12  Pharmacy after evaluation of the overall security

13  system and needs of the applicant or registrant."

14      Did I read that correctly?

15      A.   Yes.

16      Q.   So that's Exhibit 14, is the section

17  that's referenced there.  Do you see that?

18  Exhibit 14 is 4729-9-11.

19      A.   Yes.

20      Q.   I want you to -- in the second sentence

21  of subsection (B) back on Exhibit 13, it says, "In

22  evaluating the overall security system of a

23  registrant or applicant, the State Board of

24  Pharmacy may consider any of the following factors

25  as they deem relevant for strict compliance with

194

1    security requirements."

2        Do you see that?

3        A.   Yes.

4        Q.   First of all, strict compliance with

5    security requirements, do you believe that that is

6    what Ohio, the State of Ohio expected for its

7    retail pharmacies?

8           MR. BARNES:  Object to form.

9           THE WITNESS:  I don't know what -- what

10   it says here is that they considered the following

11   as they deem relevant.  So how they deemed these

12   relevant, I can't speak for how the Board would in

13   those particular situations.

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. BARTON:

2        Q.   So one of the factors that the state

3    Board of Pharmacy may deem relevant is down in

4    Section 14 at the bottom of the page on

5    Exhibit 13.  It's "Adequacy of the registrant's or

6    applicant's system for monitoring the receipt,

7    manufacture, distribution and disposition of

8    dangerous drugs in its operation."

9        Do you see that?

10       A.   Yes.

11       Q.   So do you believe the State of Ohio

12   expected pharmacies to have a system for

13   monitoring the receipt of dangerous drugs?

14            MR. BARNES:  Object to form.  Lack of

15   relevance.

16            THE WITNESS:  It says -- it states here

17   that one of the requirements that they may deem

18   relevant is adequacy of the registrant's or

19   applicant's system for monitoring the receipt.

20   BY MR. BARTON:

21       Q.   And if the registrant in the State of

22   Ohio was a registrant or applicant that

23   distributed dangerous drugs, likewise, you believe

24   the State of Ohio expected them to have a system

25   for monitoring the distribution of the dangerous

196

```
1    drugs in its operation; correct?

2            MR. BARNES:  Object to form.  Misstates

3    the very document you're showing him.

4            THE WITNESS:  What I see here is there's

5    14 examples of what they may deem relevant.

6    ████████████

7    ██████████████████████████████

8    ███████████████████████████████

9    ███████████████████████████████

10   ████████████████████████████

11   ██████████████████████████████

12   ████████

13   ████████████████████████████

14   █████████████████████

15   ██████████

16   ██████████████████████

17   ███████████████████████████████

18   ███████████████████████████

19   ████████████████████████

20   ████████

21       Q.   If you turn the page to subsection (D),

22   that says, "Any registrant or applicant" -- sorry.

23   I'll let you get there.  I'm on the second page

24   toward the top.

25           It says, "Any registrant or applicant
```

1  desiring to determine whether a proposed security

2  system substantially complies with or is the

3  structural equivalent of the requirements set

4  forth in Rule 4729-9-11 of the Administrative Code

5  may submit any plans, blueprints, sketches or

6  other materials regarding the proposed security

7  system to the State Board of Pharmacy."

8      Do you see that?

9      A.   Yes.

10      Q.   Do you know whether you ever did that or

11  anyone else from Giant Eagle ever submitted any

12  proposed plans for a security system to the State

13  of Ohio?

14      A.   In Ohio not only did you have to give

15  the blueprint, but they did a physical inspection

16  of the security systems.

17      Q.   And that was part of opening a new

18  pharmacy, for example?

19      A.   Yes.  And they did routine inspections

20  after they were open as well.

21      Q.   Did that include submitting policies and

22  procedures to Ohio, or are you interpreting that

23  as just referring to the physical structure

24  itself?

25      A.   That's what I do believe they are

198

```
 1    referring to here.  That was the requirement.

 2    They have -- in other parts of the Ohio Boards,

 3    there are requirements for what you have to do in

 4    order to open a pharmacy, and this piece is

 5    included in there.
```



1      Q.   Go back to -- let's go back to

2   Exhibit 5, which was the Ohio State Board of

3   Pharmacy proceedings against one particular

4   pharmacy in Ohio.

5           MR. BARNES:  This is the one that's

6   outside Case Track One jurisdiction?

7           MR. BARTON:  It's Exhibit 5, P-GEN-111.

8           THE WITNESS:  I have it here.

9           MR. BARNES:  I think we have a

10  continuing objection that this does not relate to

11  Case Track One jurisdiction.

12          MR. BARTON:  The continuing objection is

13  fine.

14  BY MR. BARTON:

15     Q.   So this a Giant Eagle #4098 in Chardon,

16  Ohio; correct?

17     A.   Correct.

18     Q.   And do you know where Chardon is?

19     A.   Yeah.  I think it's -- jeez, now I can't

20  remember.  It's a suburb of the Cleveland area.  I

21  can't recall if it's on the east or the west side.

22     Q.   I'll represent to you I believe it's on

23  the east side.

24     A.   I was just going to say my gut is

25  telling me east side.

200

 1      Q.   Do you know what county it's in?

 2      A.   No, no.

 3      Q.   Do you recall there being a Geauga

 4  County?  I don't know if I say it right.

 5      A.   No.  I know that there's -- I know

 6  there's a part of Ohio called Geauga, but I don't

 7  know if it's a county or town.

 8      Q.   Well, I'll represent that Chardon is in

 9  that county, whether I pronounce it correctly or

10  not, and that county borders Cuyahoga County.

11  It's adjacent to Cuyahoga County to the east.

12  It's the county directly east and adjacent to

13  Cuyahoga County.

14      A.   That makes sense.

15      Q.   Do you have any reason to disagree with

16  that?

17      A.   No.

18      Q.   The map will be what the map is.

19      A.   The map is what the map is.

20      Q.   There was some discussion of this, but I

21  just want to make it clear.  You understand --

22  one, this did happen during the time you were

23  director of pharmacy operations for the company;

24  correct?

25      A.   Yes.

201

```
 1        Q.   And you do understand that this

 2   settlement agreement began and, in fact, it

 3   recites that the state Board of Pharmacy was

 4   charging that pharmacy with violating the

 5   regulations that we just looked at.  Do you

 6   understand that?

 7        A.   No.  Could you refer to that section

 8   again?

 9        Q.   Yeah.  If you look on the second page of

10   the part we're talking about, after the settlement

11   agreement, but the next page.

12        A.   The next page after this one, that one?

13        Q.   Yeah.  That's the one.

14        If you look at the second whereas clause,

15   first of all, it says, whereas, on or about

16   July 14, 2011, pursuant to Chapter 119 of the Ohio

17   Revised Code, that Giant Eagle store was notified

18   of the allegations or charges against it, its

19   right to hearing, its rights in such hearing and

20   its right to submit contentions in writing.

21   Further, a hearing was scheduled and continued by

22   the Board, and the July 14, 2011 notice of

23   opportunity for hearing contains the following

24   allegations or charges.

25        Do you see that?
```

202

1      A.   Yes.

2      Q.   Number two is one of -- you understand

3  that number two then below is one of the

4  allegations or charges that was made by the state

5  Board of Pharmacy against this store?

6      A.   Yes.

7      Q.   And that is that Giant Eagle Pharmacy

8  #4098 did from May 1, 2009 through January 21,

9  2011 fail to provide effective and approved

10  controls and procedures to deter and detect theft

11  and diversion of dangerous drugs, to wit:  The

12  following controlled substances and dangerous

13  drugs where stolen from the pharmacy, yet internal

14  control procedures failed to deter or detect the

15  theft; correct?

16      A.   Yes.  That's what it says.

17      Q.   Then number three also describes the

18  same.  When it carries onto the next page, it

19  actually specifically lists the drugs that were

20  admitted by a technician to a Board agent that

21  that list of drugs were diverted to her addicted

22  husband and also sold to someone else; right?  Do

23  you understand that?

24      A.   Correct.

25      Q.   That are those are the facts being

203

1  alleged.  And it lists the drugs.  It then follows

2  by saying, such conduct is in violation of

3  4729-9-05 of the Ohio Administrative Code, which

4  is what we just looked at in Exhibit 13?

5      A.   It says that after -- it says

6  allegations or charges.

7      Q.   Right.  Your point is this is an

8  allegation or a charge; correct?

9      A.   Correct.

10      Q.   By the State Board of Pharmacy against

11  this specific pharmacy, not just the technician,

12  but against the pharmacy for internal controls not

13  preventing or deferring this from happening;

14  correct?

15      A.   Yes, for this instance, yes.

16      Q.   Then it says in the next sentence below,

17  Giant Eagle #4098 neither admits nor denies the

18  allegations in that notice of opportunity for

19  hearing letter dated July 14, 2011; correct?

20      A.   Yes.

21      Q.   That speaks for itself.  It neither

22  admitted or denied those allegations; correct?

23      A.   Yeah.  It basically says nothing.  It

24  says neither, nor.  So, yes.

25  ████████████████████████████████████

204



12    Q.   One of the things that Giant Eagle 4098

13 agreed to do is listed in paragraph (A) there.

14 Giant Eagle #4098 agrees to adopt and implement

15 the policies as submitted to the Ohio State Board

16 of Pharmacy in its letter dated September 27,

17 2011.  Do you see that?

18    A.   Yes.

19    Q.   And do you recall being a part of

20 reviewing or assisting in the preparation of that

21 letter to the Ohio State Board of Pharmacy?

22    A.   I don't recall specifically, but my

23 feeling is, yes, I would have reviewed that

24 letter.

25    Q.   As you sit here, do you know what

205

1    policies that pharmacy agreed to adopt and

2    implement as part of the settlement agreement?

3         A.   I don't recall that specifically.  If

4    you let me look at them, I could try to

5    refamiliarize myself.  That was eight years ago.

6    I don't remember specific to that incident.

7         Q.   Would you agree that it's reasonable to

8    infer from Giant Eagle's #4098's agreement to

9    adopt and implement policies as part of this

10   settlement that those policies that it agreed to

11   adopt and implement would have been reasonable

12   policies?

13             MR. BARNES:  Object.

14             THE WITNESS:  If you could show me the

15   policies that they're referring to, I could answer

16   that more properly.

17   BY MR. BARTON:

18        Q.   I'm asking a simpler question, which is:

19   Would you agree that what happened here is this

20   store wrote a letter to the State Board of

21   Pharmacy, and it agreed to adopt and implement

22   policies that were outlined in that letter?  Do

23   you agree with that?

24        A.   Yes.

25        Q.   That was part of the settlement of this

206

1    whole thing; right?

2         A.    Yeah.  It states here that there were --

3    agreed to implement policies specific to the

4    incident that were included in this document or

5    along with this.  I guess I'd have to familiarize

6    myself to be specific.

7         Q.    It doesn't actually say agrees to adopt

8    and implement policies specific to this incident,

9    but the letters --

10        A.    Do you not agree that they're specific

11   to this incident?

12        Q.    No.  I'm saying that we don't have the

13   letter, the September 27, 2011 letter.  We'd like

14   to see it.  We don't have that.

15        A.    I don't have it either.

16        Q.    But I'm just asking you -- I'm just

17   asking you:  Do you believe that Giant Eagle #4098

18   as part of the settlement of this proposed to

19   adopt and implement reasonable procedures?

20             MR. BARNES:  Object to form.  Asking you

21   to speculate.

22             THE WITNESS:  What I believe is that

23   Giant Eagle 4098 agreed to adopt and implement

24   policies that were specific to this incident as

25   related to this particular Board inquiry.

207

1    BY MR. BARTON:

2         Q.   And do you believe the policies that it

3    proposed would have been reasonable policies?

4              MR. BARNES:  Object to form.

5              THE WITNESS:  I would think that makes

6    sense, yes, reasonable.

7    BY MR. BARTON:

8         Q.   And you would also agree that those

9    reasonable policies had not yet been adopted or

10   implemented by that store?  Do you agree with

11   that?

12             MR. BARNES:  Object to form.

13             THE WITNESS:  No.  I can't say that

14   that's true.  I don't know what the lag time

15   between the incident occurred here and when this

16   document was written to say when those policies

17   were put into effect.  They could have been done

18   the next hour after we found out.  There's no way

19   of knowing that from this document.

20             MR. BARTON:  I don't think I have any

21   further questions.

22                      EXAMINATION

23   BY MR. BARNES:

24        Q.   I have a few follow-up questions.  You

25   were asked a few questions about Exhibit 5,

1  Mr. Mollica.  This is the Geauga County incident

2  back in 2011?

3      A.   Yes.

4      Q.   You weren't asked questions about the --

5  there was a thousand dollar monetary penalty.  Do

6  you see that?

7      A.   I see that, yes.

8      Q.   And do you see the drugs up above,

9  hydrocodone with APAP?

10      A.   Yes.

11      Q.   What is that?

12      A.   Those are combination products of --

13  APAP is a chemical abbreviation for Tylenol, what

14  you know as Tylenol, acetaminophen.

15      Q.   And were these schedule IIIs or IIs at

16  the time of this incident?

17      A.   Every one of these would have been

18  Schedule III.  Not every one.  I'm sorry.

19  Carisoprodol I don't believe was a Schedule III.

20  I think that was a IV.  And I honestly don't

21  remember what Suboxone was.  That wasn't during my

22  time behind the pharmacy counter.

23      Q.   Under the DEA scheduling regulations,

24  IIIs, IVs and Vs are considered less dangerous

25  than IIs; is that right?

1           A.   Yes.

2           Q.   The thousand dollar fine that was paid,

3      this store agreed to pay this thousand dollar fine

4      related to this incident; is that right?

5           A.   Yes.  That's it says, yes.

6           Q.   Does theft happen from time to time

7      chain-wide?  Given the fact that you employ

8      humans, do humans from the time steal?

9           A.   Yes, they do.  And the problem with

10     associates is they are more familiar with how to

11     get around the controls that you put in place.

12     So, yes, there are occasions when they will steal.

13          Q.   There was a reference to this diversion.

14     This was by somebody who diverted to her addicted

15     husband and apparently he then sold the stolen

16     drugs to another individual.

17          Do you recall being asked about that?

18          A.   I honestly don't recall the details of

19     that theft.  I'm aware of the theft at Chardon,

20     and there was follow-ups, but the details -- I

21     just don't recall what the thief did with the

22     medication after she stole it.

23          Q.   Right.  And I'm not necessarily asking.

24     I'm just saying that you were asked some questions

25     a few minutes ago about what this says here at the

1    top.

2        It says drugs were stolen by an inadequately

3    supervised technician who admitted to a Board

4    agent that the drugs were diverted to her addicted

5    husband and also sold to another individual.

6        I take it you have no idea what her addicted

7    husband did with these drugs?

8        A.   No, no.

9        Q.   In your experience, are pharmacists

10   supposed to follow people out of the store and all

11   the way home and monitor every pill that they take

12   and where they put it or who they sell it to on

13   the street corner or otherwise?

14       A.   No.  Our chain of custody is at the

15   counter.

16       Q.   Are pharmacists responsible for the

17   criminal acts of third parties?

18       A.   No.

19       Q.   This was directed to one pharmacy

20   outside of Case Track One jurisdiction.  How many

21   pharmacies were in the chain at the time?

22       A.   Over 200.  I want to say 212, but once

23   again, acquisitions happen in a fluid manner.  So

24   I don't know the exact number at this particular

25   time, but I would venture to say over 200.

211

```
 1          Q.   And when an employee violates Giant
 2     Eagle's rules like this, are they disciplined or
 3     fired?
 4          A.   They're terminated immediately and where
 5     it's appropriate, we report to the state Board.
 6          Q.   In any organization that you've ever
 7     been in, do they have a 100 percent record of
 8     employees not stealing?
 9          A.   Not the ones I've ever worked at, no.
10          Q.   In your experience, are internal
11     controls sometimes overridden by dishonest
12     employees?
13          A.   I've had situations where employees have
14     overridden internal controls, yes, to steal from
15     an organization, whether it's money, drugs, other
16     things, supplies.
17          Q.   So despite the company's best efforts to
18     put in controls, sometimes people commit criminal
19     acts?
20          A.   You're always trying to build a better
21     mousetrap because of those things.
22          Q.   Now, other than this thousand dollar
23     fine paid in connection with this incident, are
24     you aware of the Ohio State Board of Pharmacy
25     doing anything else with respect to this incident
```

212

1    other than what's revealed in this document?

2         A.   No, not to my -- not to my recollection.

3    I honestly can't remember if they did follow-up

4    inspections or things like that.  They may have.

5    I just don't recall.

6         Q.   And this was specifically directed at

7    one store, not the entire chain or the

8    corporation; is that correct?

9         A.   That's correct.

10         Q.   You said something about the DEA and the

11    Ohio State Board coming into these pharmacies for

12    spot audits, things of that nature.

13         A.   Correct.

14         Q.   Did the Ohio State Board of Pharmacy as

15    a result of this incident do anything with respect

16    to this store's ability to continue to fill

17    prescriptions?

18         A.   No.  Are you referring to any kind of

19    sanction?

20         Q.   Yes.

21         A.   No.

22         Q.   You talked a lot about the integrated

23    system of controls that Giant Eagle had, and I

24    don't want repeat all of that.  But I just want to

25    make sure for completeness of the record.

213

1          Did Giant Eagle at all times hire licensed

2     and trained pharmacists?

3          A.   Yes.

4          Q.   Did they train those pharmacists with

5     respect to diversion?

6          A.   Pharmacists are trained, are aware of

7     the laws regarding diversion as part of licensure.

8     But then, yes, we had training for pharmacists and

9     reference material type of tools within the

10    pharmacy for them to reacquaint themselves with

11    those things at any time.

12         Q.   If a pharmacist doesn't follow Giant

13    Eagle policies and procedures or the law, what

14    happens?

15         A.   If a pharmacist doesn't follow the law,

16    they're terminated, many times reported to the

17    Board if we believe that whatever the termination

18    was a risk to public health.

19         Q.   And you talked earlier today about the

20    professional discretion and judgment that

21    pharmacists use.

22         Is that a line of control in your mind in

23    terms of avoiding diversion?  Is that the first

24    line of defense, that a pharmacist, licensed

25    pharmacist must review the prescription before

214

1    it's filled?

2        A.   Yes.   That's why pharmacies require

3    licensed pharmacists.   That's one of the reasons.

4        Q.   And pharmacies are assisted by

5    technicians in the pharmacy; is that right?

6        A.   Yes.

7        Q.   Are they trained and supervised by the

8    pharmacists themselves?

9        A.   They're trained both by the pharmacist,

10   but there's a formal technician training program

11   as well, a Giant Eagle certification program.

12       Q.   And the policies, some of the policies

13   that you referenced earlier today, do they include

14   the DEA pharmacist manual?

15       A.   Yes.

16       Q.   Are those in all of the pharmacies?

17       A.   Yes.

18       Q.   Do they include the Giant Eagle

19   Controlled Substance Dispensing Guidelines?

20       A.   Yes.

21       Q.   Are the pharmacists trained on those

22   dispensing guidelines?

23       A.   Yes.

24       Q.   Is that training monitored in some way?

25   In other words, can a pharmacist just skip that

215

 1    training in some way?

 2        A.   I can't imagine you could pass the state

 3    Board exam if you skip it.

 4        Q.   Does Giant Eagle make sure that the

 5    pharmacists when they're hired, they actually

 6    review these guidelines and are trained on them?

 7        A.   Yes.  There's also computer-based

 8    monitoring that had attestations.

 9        Q.   In these so-called PMPs, like the OARRS

10    system, are those in all of the Giant Eagle

11    stores?

12        A.   To my knowledge, yes.

13        Q.   And are pharmacists --

14        A.   I can't recall what the State of West

15    Virginia was with that.  I can't remember if they

16    had electronic or some other system, but whatever

17    West Virginia had, we were complying with that

18    one.  I don't want to say it was exactly like

19    OARRS.  Each state has a right to be a little

20    different there.

21        Q.   Are those a resource tool for the

22    pharmacists to determine the legitimacy of

23    prescriptions?

24        A.   Yes.

25        Q.   You were asked a lot of questions today





218



219

1    audits from time to time?

2         A.   Yes.

3         Q.   The pharmacy district leaders, did they

4    oversee stores in their area and do quarterly

5    internal audits?

6         A.   Yes.

7         Q.   Including compliance audits?

8         A.   Yes.

9         Q.   Did they supervise the training of

10   pharmacists?

11        A.   Yes.

12        Q.   Did they work with law enforcement and

13   the Board of Pharmacy to deter diversion?

14        A.   Yes.

15        Q.   And criminal acts.  Was there red flag

16   awareness training for the pharmacists?

17        A.   Be more specific.  I'm not sure...

18        Q.   Well, in the dispensing guidelines, the

19   red flags to look for to see if a prescription is

20   legitimate.

21        A.   Oh, yes, yes.

22        Q.   Did Giant Eagle have a loss prevention

23   department?

24        A.   Yes.

25        Q.   With experienced diversion

220

1    investigators?

2         A.   Yes.

3         Q.   Did they spend a lot of time in the

4    pharmacies?

5         A.   Yes.

6         Q.   Do they work with the local police and

7    the Boards of Pharmacy and the DEA?

8         A.   Yes.

9         Q.   Did the pharmacists take any steps

10   individually to flag scripts that they thought

11   might be illegitimate?

12        A.   Yes.

13        Q.   Can you give us some examples?

14        A.   If prescriptions didn't look like --

15   once again, you get intimate with your community,

16   so you recognize physicians' signatures when they

17   don't look right, if they're missing pieces of

18   documentation, when there's obvious errors.

19        You would be very surprised at some of the

20   whacky stuff that you see when the public tries to

21   divert, spelling things wrong, not using the right

22   Latin codes, missing numbers, unusual quantities

23   or frequency, dates that look altered, those types

24   of things, photocopies.  There's all kinds of

25   things that you can pick up on.

221

1       Q.    And are Giant Eagle pharmacists trained

2   to look for that kind of --

3       A.    They're trained not just by the

4   organization, but just in their general practice,

5   too.  You need to be in a pharmacy to know that

6   Dr. Smith always writes controls on a blue pad and

7   this one is yellow.  You can't train that.  But

8   pharmacists do those things as part of local

9   awareness as well as the tools that we provide

10  from the company.

11      Q.    Are there security cameras in all of the

12  pharmacies?

13      A.    I actually don't know.  Yes, there are

14  security cameras.  Not for my entire run at Giant

15  Eagle, but when I left, I'm pretty sure every one

16  of them had security cameras.

17      Q.    Are you aware of so-called BOLO notices,

18  Be On The Lookout notices exchanged between the

19  pharmacists?

20      A.    Oh, they do that.  Yeah.  They do that a

21  lot on their own.  It's a very tight network.

22      Q.    You mentioned daily counts of drugs.

23  Did that include hydrocodone combination products

24  when HBC distributed it when it was a Schedule

25  III?





224



225

```
1        A.    It was a small percentage.  Like I say,
2   I can't recall the exact NDCs that were in the
3   warehouse, but even in our overall dispensing,
4   it's a small number, small percentage.
5        Q.    This Exhibit 13, number (B)(4) talks
6   about location of the premises.  Were all these
7   Giant Eagle pharmacies inside Giant Eagle grocery
8   stores?
9        A.    Yes, with the exception of the examples
10  that I spoke to the gentleman about earlier.
11  There was two independently-owned grocery stores
12  in the Cleveland market that we had Giant Eagle
13  pharmacies in.
14       Q.    Those were transitioned then to Giant
15  Eagle stores?
16       A.    They were just -- no.  They never
17  transitioned to Giant Eagle stores.  We just took
18  the pharmacies out.
19       Q.    But being inside of a grocery store, is
20  that a level of control that you consider as part
21  of the security analysis?
22       A.    Not only were they delivered to a store,
23  but they were in cases where the pharmacy -- if
24  there was a situation where the pharmacy wasn't
25  open, they had to be delivered to a locked cage
```

226

1      within the store.

2          Q.    Factor (B)(6) six talks about types of

3      vaults and safes and other secure enclosures.

4          Did the pharmacies at least to your knowledge

5      keep any controlled substances in locked secure

6      locations?

7          A.    Every drug in the pharmacy is in a

8      locked location in the pharmacy, and that's the

9      reason why the state Boards have you send in

10     diagrams of physical barriers so every drug is

11     protected that way.  It doesn't matter if it's

12     controlled or not.  Narcotics inside of that

13     locked pharmacy are in a locked safe or locked

14     cabinet.

15         Q.    Did the Ohio State Board of Pharmacy

16     audit every store at least once per year?

17         A.    I don't know what their frequency was.

18     That sounds reasonable.  If you would ask me how

19     often I think, I would say once a year.

20         Q.    Did anybody from the Ohio State Board of

21     Pharmacy ever come to Giant Eagle to your

22     knowledge and say, hey, you're not meeting those

23     requirements?

24         A.    No.  In fact, we actually had a member

25     of the state Board who worked for us.





229









233



234







237

1    by HBC?

2        A.    I wouldn't know how many orders were

3    reported.

4        Q.    How many times did HBC conduct due

5    diligence or investigations or follow-up on orders

6    that were above the threshold limits?

7        A.    You asked me that a million times.  I

8    don't know how often Joe or anyone from the

9    warehouse would have gone directly to the stores

10   to do that.  It's just not a -- you're asking me

11   questions about how often day in/day out

12   operations happened.  I just don't recall that

13   this far out.

14       Q.    If we turn then from the HBC side that

15   we've been talking about and focus on the 200 or

16   so retail pharmacies, you talked about training

17   and policies that were in place.

18       Are there any records that you can point to

19   that would demonstrate that pharmacists, in fact,

20   refused to fill prescriptions?

21       A.    No, no, no.  I mean, I've stated that a

22   couple times.  There's no requirement, no

23   regulatory or legal requirement to retain

24   documentation like that.

25       Q.    Do we have any idea how many times that

238

1    training actually resulted in action that

2    prevented or stopped the diversion of opioids?

3         MR. KOBRIN:  Were you interrupted there?

4         THE WITNESS:  I was just going to say,

5    and actually my answer to this current question

6    would be the same as what I was going to say, the

7    reason why I can't point to those things is

8    because this is literally day in/day out every

9    single day at a pharmacy.

10        Every single day you're making those

11   judgements literally on every single prescription.

12   No, there's not a way to do that.  That's what the

13   pharmacists are there for.

14   BY MR. HUDSON:

15        Q.   You're making judgments every day;

16   right?

17        A.   Yes.

18        Q.   But do you have any sense of how many

19   times that resulted in a pharmacist actually --

20        A.   I can tell you --

21        Q.   Hold on.  If I could just ask my

22   question this time.  -- how many times that

23   resulted in a pharmacist actually refusing to fill

24   a prescription?

25        A.   I couldn't tell you how often a

239

```
 1    pharmacist refused to fill a prescription because

 2    it's not a legal or regulatory requirement to

 3    track that.

 4        I can tell you from my personal experience

 5    being behind a pharmacy counter, it could have

 6    been daily that those things happened.  It could

 7    be three times in an hour.  It could be one time

 8    in a week.

 9        Q.   Is there any way though across the 200

10    Giant Eagle retail pharmacies to be able to

11    determine how many times that happened?

12        A.   I don't know if there's a mechanism to

13    do that, but it's not a requirement to do that.

14        Q.   Is there any reason why that couldn't

15    have been noted in the systems?

16        A.   I don't know of any reason why we should

17    that I'm aware of in terms of a requirement.

18        Q.   Any technical requirement or anything

19    that would have just prevented creating a log of

20    prescriptions that were refused to be filled so

21    that it could be populated over time in order to

22    improve the efforts to reduce diversion?

23            MR. KOBRIN:  Object to form.

24            THE WITNESS:  No.  I don't know how or

25    why that would improve diversion tracking when you
```

240

```
 1    say no.  And some of those things would be HIPAA
 2    related.  No, I don't know of any reason or
 3    requirement to do anything like that.
 4    BY MR. HUDSON:
 5         Q.   Well, you agree that logging
 6    prescriptions that were not filled because there
 7    was suspicion of diversion, keeping track of those
 8    would allow a retail pharmacy to then have a list
 9    that could then be referenced for the future if
10    there were other suspicions; right?
11              MR. KOBRIN:  Object to form.
12              THE WITNESS:  We have a list and
13    documents that you can track to see if diversion
14    happened.  It's the prescriptions we filled.
15    BY MR. HUDSON:
16         Q.   You can tell from the prescriptions that
17    you filled how you avoided diversion?
18         A.   If the prescriptions we filled are legal
19    and written by physicians, then by definition,
20    that's how you prevent diversion.
21         Q.   How many did not get filled because you
22    avoided the diversion from occurring because you
23    blocked it as being suspicious?
24              MR. KOBRIN:  Object to form.  Asked and
25    answered.
```

241

```
 1              THE WITNESS:  I don't know.
 2              MR. KOBRIN:  He talked about what was
 3    done and the policies behind it and the reasons
 4    behind it.
 5    BY MR. HUDSON:
 6         Q.   And I just want to make sure the record
 7    is clear.  This is my only chance to talk to you.
 8         There's no reason though why Giant Eagle
 9    retail pharmacies nationwide couldn't have kept
10    some sort of record of suspicious or questionable
11    prescriptions that ended up not being filled, is
12    there?
13              MR. KOBRIN:  Are you asking if they
14    should have kept a record of the actual
15    prescriptions themselves?
16    BY MR. HUDSON:
17         Q.   Do you understand the question?
18         A.   You're asking me is there anything that
19    prohibited us from maintaining records of
20    prescriptions we did not fill?
21         Q.   Right.  In other words, if somebody came
22    in and handed you a prescription and you as a
23    licensed pharmacist applying your medical judgment
24    said, you know what, this doesn't seem right, I'm
25    not going to fill this prescription, is there any
```

242

```
 1    reason why you can't write that down, take notes

 2    on that, put it into a computer and then as an

 3    organization log that to try to identify

 4    suspicious or questionable opioid orders that are

 5    being rejected?

 6             MR. KOBRIN:  Object to form.

 7             THE WITNESS:  For what reason?  There's

 8    no requirement to do that, so it would have never

 9    come up.

10             MR. HUDSON:  I don't have any further

11    questions.

12                      RE-EXAMINATION

13    BY MR. BARNES:

14       Q.   I just have one follow-up question.  The

15    formula type program that went into effect in

16    2013, in your view, was that an additional system

17    of controls on top of controls that were already

18    in existence?

19       A.   Yeah.  We're always checking in orders

20    and maintaining inventory requirements.  Like I

21    said, systems evolve in time, and that was an

22    example of one that evolved.

23             MR. BARNES:  Thank you.

24             THE WITNESS:  Thank you.

25             THE VIDEOGRAPHER:  2:01 p.m. we are off
```

243

1    the video record.   This concludes the video

2    deposition.

3              (Whereupon, at 2:01 p.m., the taking of

4    the instant deposition ceased.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

244

```
 1    COMMONWEALTH OF PENNSYLVANIA  )

 2    COUNTY OF ALLEGHENY            )      SS:

 3                   C E R T I F I C A T E

 4             I, Ann Medis, Registered Professional

 5    Reporter, Certified Livenote Reporter and Notary

 6    Public within and for the Commonwealth of

 7    Pennsylvania, do hereby certify:

 8             That ANTHONY MOLLICA, the witness whose

 9    deposition is hereinbefore set forth, was duly

10    sworn by me and that such deposition is a true

11    record of the testimony given by such witness.

12             I further certify the inspection,

13    reading and signing of said deposition were not

14    waived by counsel for the respective parties and

15    by the witness.

16             I further certify that I am not related

17    to any of the parties to this action by blood or

18    marriage and that I am in no way interested in the

19    outcome of this matter.

20             IN WITNESS WHEREOF, I have hereunto set

21    my hand this 8th day of January, 2019.

22
                     _____
23                            Notary Public

24

25
```

245

```
 1   COMMONWEALTH OF PENNSYLVANIA   )    E R R A T A
     COUNTY OF ALLEGHENY            )    S H E E T
 2

 3        I, ANTHONY MOLLICA, have read the foregoing
     pages of my deposition given on January 4, 2019,
 4   and wish to make the following, if any,
     amendments, additions, deletions or corrections:
 5

 6   Page  Line   Change and reason for change:

 7   ____  ____   _____

 8   ____  ____   _____

 9   ____  ____   _____

10   ____  ____   _____

11   ____  ____   _____

12   ____  ____   _____

13   ____  ____   _____

14   ____  ____   _____

15   ____  ____   _____

16   ____  ____   _____

17   ____  ____   _____

18

19   In all other respects, the transcript is true and
     correct.
20

21              _____
                ANTHONY MOLLICA
22

23   _____ day of _____, 2019.

24   _____
                Notary Public
25
```