Page 286

```
 1              IN THE UNITED STATES COURT
 2              NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4
 5           ~~~~~~~~~~~~~~~~~~~~~
 6   IN RE:  NATIONAL PRESCRIPTION   MDL NO. 2804
 7   OPIATE LITIGATION
 8                            Case no.
 9                            17-mdl-284
10                            Judge Dan Polster
11
12   This document relates to:
13   The County of Cuyahoga, Ohio, et al.,
14        V.
15   Purdue Pharma L.P., et al.,
16   Case No. 1:18-OP-45090 (N.D. Ohio)
17           ~~~~~~~~~~~~~~~~~~~~~
18           Continued deposition of
19            SCOTT MORAN, VOLUME II
        PORTIONS OF THE TRANSCRIPT ARE DESIGNATED
20                  CONFIDENTIAL
21              March 27, 2019
                 8:08 a.m.
22
                  Taken at:
23              Ulmer & Berne
              1660 W. Second Street
24              Cleveland, Ohio
25           Wendy L. Klauss, RPR
```

Page 287

```
 1  APPEARANCES:
 2
        On behalf of the City of Cleveland and
 3      the Witness:
           Baron & Budd PC
 4         STERLING CLUFF, ESQ.
           159 Ventura Boulevard
 5         Los Angeles, CA
           (818) 839-2333
 6         Scluff@baronbudd.com
 7      On behalf of Walmart Inc.:
           Jones Day
 8         PATRICIA OCHMAN, ESQ.
           North Point
 9         901 Lakeside Avenue East
           Cleveland, OH  44114-1190
10         (216) 586-3939
           Pochman@jonesday.com
11
        On behalf of CVS Rx Services, Inc. and
12      CVS Indiana, LLC:
           Zuckerman Spaeder LLP
13         DANIEL P. MOYLAN, ESQ.
           100 East Pratt Street, Suite 2440
14         Baltimore, MD  21202-1031
           (410) 949-1159
15         Dmoylan@zuckerman.com
16      On behalf of AmeriSourceBergen Drug
        Corporation:
17         Jackson Kelley, PLLC
           ANDREW N. SCHOCK, ESQ.
18         50 South Main Street
           Akron, OH  44308
19         (330) 252-9060
           Anschock@jacksonkelley.com
20
        On behalf of Johnson & Johnson and
21      Janssen Pharmaceuticals, Inc.:
           Tucker Ellis, LLP
22         JEFFREY M. WHITESELL, ESQ.
           950 Main Avenue, Suite 1100
23         Cleveland, OH  44113
           (216) 592-5000
24         Jeffrey.whitesell@tuckerellis.com
25
```

Page 288

```
 1  APPEARANCES, Continued:
 2      On behalf of Mallinckrodt LLC and
        SpecGx LLC:
 3         Ropes & Gray
           JOSH GOLDSTEIN, ESQ.
 4         Prudential Tower
           800 Boylston Street
 5         Boston, MA  02199-3600
           (617) 951-7000
 6         Joshua.goldstein@ropesgray.com 1211
                   -AND-
 7         HAYDEN MILLER, ESQ.
           1211 Avenue of the Americas
 8         New York, NY  10036
           (212) 596-9451
 9         Hayden.miller@ropesgray.com
10      On behalf of McKesson Corporation:
           Covington & Burling, LLP
11         NEIL K. ROMAN, ESQ.
           JOHN W. ZIPP, ESQ.
12         STEVEN WINKELMAN, ESQ.
           One City Center
13         850 Tenth Street, NW
           Washington, DC 20001-4856
14         (202) 662-6000
           Nroman@cov.com
15         Jzipp@cov.com
           Swinkelman@cov.com
16                 -AND-
           CHRISTOPHER EPPICH, ESQ.
17         1999 Avenue of the Stars
           Los Angeles, CA  900067-4643
18         (424) 332-4764
           Ceppich@cov.com
19
        On behalf of HBC Service Company:
20         Marcus & Shapira, LLP
           MOIRA CAIN-MANNIX, ESQ.
21         One Oxford Centre, 35th Floor
           301 Grant Street
22         Pittsburgh, PA  15219-6401
           (412) 471-3490
23         Cain-mannix@marcus-shapira.com
           ~ ~ ~ ~ ~
24
25
```

Page 289

```
 1          TRANSCRIPT INDEX
 2  APPEARANCES:.............................  287
 3  INDEX OF EXHIBITS .....................  290
 4  EXAMINATION OF SCOTT MORAN
      By Mr. Roman............................  292
 5    By Mr. Goldstein........................  371
      By Mr. Cluff..............................  383
 6    By Mr. Roman.............................  397
      By Mr. Goldstein........................  403
 7
      REPORTER'S CERTIFICATE..................  408
 8
      EXHIBIT CUSTODY
 9  EXHIBITS RETAINED BY COURT REPORTER.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 290

```
 1          INDEX OF EXHIBITS
       NUMBER    DESCRIPTION      MARKED
 2
 3  Exhibit 20  Designated Confidential, .....  296
      Attorney Eyes Only,
 4    Cleveland Police HIDI
      Response Form, Beginning
 5    with Bates Label CLEVE
      003181038
 6  Exhibit 21  54-Page Document, Natively ...  313
      Produced as Bates Number
 7    001479368
 8  Exhibit 22  138-Page Document, Produced ..  313
      Natively At Bates 002404458
 9
      Exhibit 23  Collection of HIDI Response ..  317
10    Forms
11  Exhibit 24  Designated Confidential, .....  326
      Attorney Eyes Only,
12    Cleveland Police HIDI
      Response Form, Beginning
13    with Bates Label CLEVE
      003180887
14
      Exhibit 25  Designated Confidential, .....  329
15    Attorney Eyes Only,
      Cleveland Police HIDI
16    Response Form, Beginning
      with Bates Label CLEVE
17    003180886
18  Exhibit 26  Designated Confidential, .....  333
      Attorney Eyes Only,
19    Cleveland Police HIDI
      Response Form, Beginning
20    with Bates Label CLEVE
      003181042
21
      Exhibit 27  Designated Confidential, .....  335
22    Attorney Eyes Only,
      Cleveland Police HIDI
23    Response Form, Beginning
      with Bates Label CLEVE
24    003181054
25  Exhibit 28  Designated Confidential, .....  338
      Attorney Eyes Only,
```

2 (Pages 287 - 290)

Page 291

1  Cleveland Police HIDI ........
   Response Form, Beginning
2  with Bates Label CLEVE
   003180904
3
   Exhibit 29  Designated Confidential, ..... 342
4      Attorney Eyes Only,
       Cleveland Police HIDI
5      Response Form, Beginning
       with Bates Label CLEVE
6      003180880
7  Exhibit 30  Designated Confidential, ..... 345
       Attorney Eyes Only,
8      Cleveland Police HIDI
       Response Form, Beginning
9      with Bates Label CLEVE
       003180873
10
   Exhibit 31  Designated Confidential, ..... 349
11     Attorney Eyes Only,
       Cleveland Police HIDI
12     Response Form, Beginning
       with Bates Label CLEVE
13     003181107
14 Exhibit 32  Designated Confidential, ..... 353
       Attorney Eyes Only,
15     Cleveland Police HIDI
       Response Form, Beginning
16     with Bates Label CLEVE
       003180898
17
18
19
20
21
22
23
24
25

Page 292

1          SCOTT MORAN, of lawful age, called
2   for examination, as provided by the Statute,
3   being by me first duly sworn, as hereinafter
4   certified, deposed and said further as
5   follows:
6          EXAMINATION OF SCOTT MORAN
7   BY MR. ROMAN:
8          MR. ROMAN:  Thank you.  Maybe we
9   should go around the room and do appearances,
10  please.
11         MR. CLUFF:  Sure.  I'm Sterling
12  Cluff, from the law firm of Baron & Budd,
13  representing the City of Cleveland.
14         MR. WINKELMAN:  Steven Winkelman,
15  Covington & Burling, representing McKesson
16  Corporation.
17         MS. OCHMAN:  Patricia Ochman, Jones
18  Day, for Walmart.
19         MR. MOYLAN:  Daniel Moylan,
20  Zuckerman Spaeder, for CVS.
21         MR. SCHOCK:  Andrew Schock, Jackson
22  Kelley, AmeriSourceBergen Corporation.
23         MR. WHITESELL:  Jeff Whitesell,
24  from Tucker Ellis, on behalf of Johnson &
25  Johnson and Jansen.

Page 293

1          MR. MILLER:  Hayden Miller, Ropes &
2   Gray, on behalf of Mallinckrodt LLC and SpecGx
3   LLC.
4          MR. GOLDSTEIN:  Josh Goldstein,
5   Ropes and Gray, on behalf Mallinckrodt LLC and
6   SpecGx LLC.
7          MR. ZIPP:  John Zipp, of Covington
8   & Burling, on behalf of McKesson Corporation.
9          MR. ROMAN:  Neil Roman, Covington
10  Burling, also on behalf of McKesson.
11         Who is on the phone, please?
12         MS. CAIN-MANNIX:  This is Moira
13  Cain-Mannis, from Marcus & Shapira, for HBC
14  Services Company.
15  BY MR. ROMAN:
16     Q.   Good morning again, Det. Moran.
17  How are you?
18     A.   Good morning.  I'm well.
19     Q.   Is there any reason you cannot give
20  complete and truthful testimony today?
21     A.   There is not.
22     Q.   Have you had an opportunity to
23  review the transcript of your first deposition,
24  which was taken on December 20 of last year?
25     A.   It was provided.  I briefly

Page 294

1   reviewed some of it.
2      Q.   And was there anything in there
3   that you would like to change, anything in
4   there that struck you as incorrect, incomplete,
5   or otherwise?
6      A.   No.
7      Q.   Do you know, did you prepare any
8   errata, any changes to the transcript; did you
9   review it and make any handwritten changes?
10     A.   No.
11     Q.   But you did review it?
12     A.   Yeah.  Briefly.
13     Q.   And separate and apart from the
14  preparation you did for that first deposition,
15  have you done any preparation for your
16  deposition today?
17     A.   Just an initial speak about what
18  this deposition is going to entail.
19     Q.   And that was with Mr. Cluff?
20     A.   Yes, sir.
21     Q.   Anybody else present?
22     A.   No.
23     Q.   And when did you meet with
24  Mr. Cluff?
25     A.   Spoke on the phone yesterday and

3 (Pages 291 - 294)

Page 295

1  met this morning.
2      Q.    And how long did you speak on the
3  phone with him?
4      A.    It wasn't long, five, ten minutes.
5      Q.    And it's early this morning, so you
6  probably didn't meet very long this morning?
7      A.    No.
8      Q.    Was anyone else present when you
9  met with Mr. Cluff this morning?
10      A.    No, sir.
11      Q.    Anyone else on the phone when you
12  talked to him yesterday?
13      A.    No.
14      Q.    Have you discussed the expected
15  substance of your testimony today with anybody
16  besides Mr. Cluff?
17      A.    No.
18      Q.    Have you reviewed any transcripts
19  of any depositions, other than your own?
20      A.    No.
21      Q.    And have we exhausted what you have
22  done for your deposition today?
23      A.    I'm sorry?
24      Q.    Have we exhausted what you have
25  done to prepare for your deposition today?

Page 296

1      A.    You have.
2      Q.    Okay.  Do you recall last time,
3  Det. Moran, you testified that when you arrive
4  at an overdose scene, you fill out a Cleveland
5  Police Department HIDI response form; do you
6  recall that testimony?
7      A.    I do.
8          - - - - -
9          (Thereupon, Deposition Exhibit 20,
10          Designated Confidential, Attorney
11          Eyes Only, Cleveland Police HIDI
12          Response Form, Beginning with Bates
13          Label CLEVE 003181038, was marked
14          for purposes of identification.)
15          - - - - -
16      Q.    Det. Moran --
17          MR. CLUFF:  For the record, this
18  looks like a group of these documents, HIDI
19  response forms, that was recently produced --
20  these were produced by the City of Cleveland
21  without redaction in order to get them out as
22  quickly as possible.
23          We are going to reserve our right
24  to redact victim-identifying information, just
25  to protect their identity and personal

Page 297

1  identifying health information, but after the
2  fact.
3          MR. ROMAN:  Thank you.
4      Q.    Det. Moran, I have handed you what
5  has been marked as Moran Exhibit 20.  It is a
6  one-page document bearing production number
7  CLEVE 003181038.  Have you seen this document
8  before?
9      A.    I have.
10      Q.    And this is a Cleveland Police HIDI
11  response form completed by you, correct?
12      A.    Actually, my supervisor filled the
13  information out on this particular case, that's
14  not my handwriting, but the detective assigned
15  to the case is myself.  I was present when it
16  was filled out though.
17      Q.    When you were talking last time
18  about Cleveland Police HIDI Response Forms,
19  this is an example of such a form, correct?
20      A.    Yes, sir.
21      Q.    And if I refer to it as a HIDI
22  response form, you will understand that this is
23  what I'm referring to?
24      A.    I will.
25      Q.    Can you please go through this form

Page 298

1  with me and tell me what information is
2  reflected, starting with the RMS number.  What
3  does that refer to?
4      A.    RMS number is the Cleveland police
5  incident number.  It is generated by Cleveland
6  police radio.  It's given to the responding
7  zone car that's responding for the initial
8  police report.  So that's just the initial
9  report that's going to be generated.
10      Q.    And what does the date refer to?
11      A.    That's the date of the current.
12      Q.    That's the date that you received
13  the call?
14      A.    Yes.
15      Q.    And then I think fatal and
16  nonfatal, you check one of those two boxes?
17      A.    One or the other.
18      Q.    And what is the time, is that the
19  time you arrive at the scene?
20      A.    That's the time that the initial
21  zone car, the initial black-and-white
22  responding unit receives the call.
23      Q.    Date and time of the death is
24  probably self-explanatory?
25      A.    To a certain extent.  I like to try

4 (Pages 295 - 298)

1  to put when we believe the person died.  Some
2  of the other detectives will put the actual
3  pronounced time of death.  But you could have a
4  body that had been there for a couple days.
5  For my cases though, I like to put when they
6  might have been last seen, based on phone calls
7  and whatnot.
8      Q.    District, that's the Cleveland
9  Police District; is that right?
10     A.    Yes, sir.
11     Q.    And what does Z/C stand for?
12     A.    That's the responding zone car.
13  That is their zone car number.
14     Q.    And hospital, what does that refer
15  to?
16     A.    Hospital is generally for the
17  nonfatal overdoses, the hospital we respond to.
18  Sometimes you could have a fatal overdose for
19  someone who was transported to the hospital
20  that might have passed away in a certain
21  hospital.
22         In this particular incident, Sgt.
23  Baeppler, B-A-E-P-P-L-E-R, filled this out.  He
24  just put the medic that pronounced the time of
25  death at the hospital.

1      Q.    That's medic 33?
2      A.    Yes, sir.  And then to add to that,
3  if it's a nonfatal overdose, underneath that
4  line, we will usually put on the milligrams of
5  Narcan that's required.
6      Q.    How do know that it was Sgt.
7  Baeppler who completed this form?
8      A.    I recall this case.  It was just
9  him and myself that responded, and I'm familiar
10  with his handwriting.
11     Q.    And are there certain times when
12  you fill it out, as opposed to someone else?
13     A.    I prefer, if I'm the detective on
14  the case, I prefer to fill out my own.  On this
15  particular case, I believe he got to the scene
16  before I did.
17     Q.    The incident location is where the
18  person -- where you go to the find the person,
19  correct?
20     A.    That's where the incident occurred.
21  However, if they are transported to a hospital,
22  obviously the hospital goes there, but that's
23  where the actual overdose occurred.
24     Q.    And the buy location, what does
25  that refer to?

1      A.    Yeah.  We don't fill that line in.
2  That's if for some reason there is a follow-up
3  and we conduct a buy from the target that sold
4  the drugs that potentially killed someone, that
5  would be in that line, but generally that line
6  is not filled out.
7      Q.    The next block of information is
8  the victim information; do you see that?
9      A.    Yes.
10     Q.    And if it's a fatal case where
11  there is a fatality, who supplies the
12  information that goes into victim information?
13         Like the victim's name here and the
14  Social Security number, where did you get that,
15  where did Sgt. Baeppler get that?
16     A.    I'm not quite sure I'm following
17  where you are going.  Obviously, if there is a
18  family member and they tell us who that person
19  is and we are able to confirm through pulling
20  up a BMV photo, or if there is a driver's
21  license by that person.
22         Obviously there is times where we
23  may have a body in a vacant house with no ID,
24  and we don't know who that body is until the
25  medical examiner is able to run fingerprints to

1  confirm that.
2         So if you are confident on who that
3  person is, at the time of the incident that box
4  is filled in.  It may take a couple of days for
5  the ME's office to identify that person.  That
6  box may not be filled in until there was
7  positive identification.
8      Q.    Then you have a block of
9  information for interviews; do you see that?
10     A.    Yes, sir.
11     Q.    And, well, tell me what information
12  you provide there?
13     A.    That could generally be the
14  reporting person that found the body.  It could
15  be, if it's a nonfatal overdose -- this is
16  obviously a fatal.  If it is a nonfatal, it
17  could be a mother that said, hey -- that's
18  providing the information, someone that we
19  interview.
20     Q.    And so every time you interview
21  someone, you provide -- you include that
22  information in the interview section of your
23  reports; is that right?
24     A.    Yes.
25     Q.    And if there is nobody, if there is

5 (Pages 299 - 302)

Page 303

1 no information in the interview section, that
2 means you didn't talk to anybody?
3     A.   Yeah.  It could also not even
4 necessarily mean that they weren't actually
5 interviewed.  It might have been the person
6 that found the body.  Instead of pulling the
7 whole police report and scanning through it,
8 this is a quick guide, that this is the phone
9 number, we can call this person.
10     Q.   And if there is no information
11 provided in the interview block, nobody's name
12 is included, no contact information, does that
13 mean you did not talk to anybody about the
14 incident?
15     A.   Correct.
16     Q.   And then the suspect information,
17 that block, where do you get that information?
18     A.   That information could be at the
19 time of the incident.  If we see a cell phone
20 and there is a phone number, we may not have a
21 suspect name, but we could have a suspect phone
22 number in there.
23         It could be something, where if
24 there is a surviving victim, it is not uncommon
25 for one person to live and one to die.  If the

Page 304

1 person that survives says, "Hey we got the
2 drugs from so and so," that information would
3 go in that block.
4     Q.   Then there is a block for
5 additional information; do you see that?
6     A.   I do.
7     Q.   And what information do you
8 typically put in that block?
9     A.   Just information that will help us,
10 once that information goes into that Case
11 Explorer program that I described.  In this
12 particular instance, we recovered crack and
13 heroin.  Some other information that could go
14 it there is if we recovered a cellphone, or if
15 a neighbor says, "I saw a black car at the
16 house two days ago."  Whatever information that
17 we could use to go back to when we input that
18 information into our Case Explorer program.
19     Q.   Then there are a series of eight
20 yes-or-no questions are entries; do you see
21 that?
22     A.   I do.
23     Q.   Can you please explain what each of
24 these refers to?
25     A.   Evidence, which means that we

Page 305

1 collect evidence.
2     Q.   Which would include what?
3     A.   Crack and heroin.  DNA would mean
4 did we submit the item for DNA analysis.  In
5 this particular case, there was packaging, so
6 we submitted the packaging for a DNA analysis.
7         Needle, this particular person
8 opted to use a needle to inject his heroin.  We
9 recovered the needle on this particular case.
10         Photos, we take photos of every
11 fatal overdose, as long as there is an
12 opportunity.  So yes, in this case photos were
13 taken.
14         Packaging obviously means in this
15 particular case the heroin came in packaging.
16 It's not uncommon for heroin not to come in
17 packaging though.  It could just be loose on a
18 table.  So this particular case packaging was
19 recovered.
20     Q.   Could I stop you there for a
21 second.
22         What type of packaging would heroin
23 come in?
24     A.   That's a great question.  It could
25 come in anything.  Some dealers, years ago,

Page 306

1 took pride and would stamp it.  It could come
2 in just a folded-up piece of paper.  It could
3 come in a receipt, come in a lottery ticket, it
4 could come in just about everything.
5         Typically, it is a piece of paper
6 with six to eight folds, and we are trained to
7 look for those folds.  We know what to look for
8 and how it's packaged.
9     Q.   Got it.
10     A.   Keep going?
11     Q.   Yes, please.
12     A.   Cellphone, in this particular case
13 we recovered a cellphone.  If it is locked,
14 there is another line that says lock code.  If
15 there a family member that is there and happens
16 to know that lock code, we will put that lock
17 code in that line.
18         Supplement, you know, these are --
19 they are fluid cases.  You know, this is like
20 the initial responding.  If a supplemental
21 report is going to be generated, we put yes
22 there.
23         And indicted, if there is going to
24 be an indictment -- I'm sorry.  I skipped a
25 line.

6 (Pages 303 - 306)

1    Referral/admitted, that refers to a
2 nonfatal overdose. We are able to get addicts
3 into treatment if they so desire. So referral
4 or admitted means if we are able to get that
5 nonfatal overdose into a treatment program. So
6 that's that line.
7    And an indictment, obviously, if
8 there is going to be an indictment, a
9 prosecution on the case, there would be
10 something on that line.
11    Q.   The detective assigned in this case
12 was you?
13    A.   Yes, sir.
14    Q.   And you always complete one of
15 these response forms when you arrive at an
16 overdose scene, correct?
17    A.   Yes.
18    Q.   Do you also complete one of these
19 forms when you go to the hospital to see an
20 overdose victim?
21    A.   A nonfatal overdose?
22    Q.   Yes.
23    A.   Yes.
24    Q.   But you don't when you go to the
25 hospital where there is a fatal overdose,

1 correct?
2    A.   No. We still do this form.
3    Q.   So you do this in every instance?
4    A.   Every instance.
5    Q.   Hospital and also on the street?
6    A.   Yes, sir. And then that
7 information is inputted into the Case Explorer
8 program.
9    Q.   Okay. Is there information that's
10 in these response forms that does not make it
11 into Case Explorer, and is there information in
12 Case Explorer that's not in these response
13 forms?
14    A.   There is probably information in
15 Case Explorer that's not on the response forms.
16    This is notes at the scene, just
17 real quick. Obviously, in Case Explorer, there
18 is a paragraph where you type out. You know, I
19 don't put just crack, heroin recovered. I
20 responded to the address, found the body. It
21 is more of a paragraph report.
22    Q.   More of a narrative?
23    A.   Yes, sir.
24    Q.   Now, the last time you testified
25 that when you fill out these response forms,

1 you note whether or not there were prescription
2 pills found on the scene; do you recall that
3 testimony?
4    A.   I do.
5    Q.   And it's true, is it not, that
6 every time you find prescription pills on the
7 scene, you include that in the response form,
8 correct?
9    A.   I don't know if every time,
10 honestly. If there is -- if it is a possible
11 prescription pill overdose, there is bottles by
12 the body, we will note it. Specifically every
13 time, I don't know if it's on there every time.
14    Q.   In what circumstances would you not
15 note it on the response form, where you have
16 actually found prescription pills?
17    A.   I mean, I can't speak for every
18 detective.
19    Q.   I'm just asking about you.
20    A.   Me, it depends on what the pills
21 are, where the pills are located. Generally,
22 the medical examiner confiscates, or takes any
23 pills that are found on scene, so it is going
24 to be noted in their report what's collected.
25    So it kind of depends on the scene.

1 It is a case-by-case scenario. If there are
2 pill bottles by the body, I will note that and
3 put it in the response form.
4    Q.   If you find a prescription opioid,
5 as opposed to, let's say, hay fever,
6 prescription hay fever pill, but you have a
7 prescription opioid at the scene, will you
8 always note that on the response form?
9    A.   I can't say "always." I mean, if
10 there is a needle sticking in the guys arm and
11 there is a big bag of dope right by him, we are
12 pretty confident that it is going to be a
13 heroin overdose, and then the medical examiner
14 is going to note that there is prescription
15 pills on the scene.
16    Q.   And where would the -- would the
17 medical examiner's notes then be included in
18 ODMap in Case Explorer.
19    A.   No. They generate their own
20 reports.
21    Q.   Now, I believe you also
22 testified -- well, let me just ask this: In
23 all your overdose investigations, fatal and
24 nonfatal, do you always ask the person about
25 the person who overdosed's drug history, either

Page 311

1 in the case of a nonfatal, ask the person who
2 overdosed or in the case of a fatal, you know,
3 some family member or friend?
4    A.   I try to.  I try to.  There are
5 instances where people don't want to talk to
6 us.  If I am able to establish a dialogue with
7 the person, then I try to build a rapport and
8 get into their history.
9    Q.   And you always try and do that?
10    A.   I try to, absolutely.
11    Q.   And you pretty much succeed most
12 every time, do you think?
13    A.   I don't know.  I succeed sometimes,
14 sometimes I don't.  I don't keep -- I couldn't
15 tell you percentages.
16        I mean, when I interview someone, I
17 try to build a rapport.  I want them to trust
18 me, not just for that case, but things down the
19 road.  So during that rapport-building process,
20 I will try to get into a history of how they
21 started.
22    Q.   Right.  In fact, one of the things
23 about that drug history that you try and get is
24 how exactly that person got started, correct?
25    A.   I try to find out, yes.

Page 312

1    Q.   And so you always ask if he or she
2 started on prescription pills, right?
3    A.   Not always.  Again, if the dialogue
4 takes me that direction, I will ask that.
5    Q.   But that's what you are trying to
6 figure out, among other things, correct?
7    A.   Just how they got started on the
8 opioid abuse.
9    Q.   And then you put down what you
10 learn about the person's drug history on these
11 forms, the HIDI response forms, and then
12 ultimately in ODMap in Case Explorer, correct?
13    A.   Yes, sir.
14    Q.   So if you learn that the person
15 started on prescription pills, you would note
16 that on the response forms and on ODMap in Case
17 Explorer, correct?
18        MR. CLUFF:  Objection.  Compound.
19    A.   I would.
20    Q.   Let's break it up.  So you would,
21 if you learned that a person started abusing
22 opioids by starting on prescription pills, you
23 would note that on a HIDI response form,
24 correct?
25    A.   I'll take a note.  Again, these are

Page 313

1 notes to go by, prior to the narrative going
2 into Case Explorer.  So I would note it on
3 here, and then put it in the narrative of Case
4 Explorer.
5    Q.   Det. Moran, I'm handing you what
6 has been marked as Moran 21.  I hope you
7 brought your reading glasses.
8    A.   I almost forget them, but I
9 remembered.
10        - - - - -
11        (Thereupon, Deposition Exhibit 21,
12        54-Page Document, Natively Produced
13        as Bates Number 001479368, was
14        marked for purposes of
15        identification.)
16        - - - - -
17    Q.   I'm also handing you Moran 22,
18 which is likewise small writing and lots of
19 pages.
20        - - - - -
21        (Thereupon, Deposition Exhibit 22,
22        138-Page Document, Produced Natively
23        At Bates 002404458, was marked for
24        purposes of identification.)
25        - - - - -

Page 314

1        MR. CLUFF:  It's colorful too.
2        MR. ROMAN:  Yeah, I know.
3    Q.   So Exhibit 21 is a 54-page
4 document, and it was natively produced at Bates
5 number 001479368.
6        Exhibit 22 is a 138-page document
7 produced natively at Bates 002404458.
8        Det. Moran, I would like to ask you
9 whether you recognize these documents?
10    A.   Honestly, no, but I believe I would
11 know what the document is.
12    Q.   These are both from ODMap Case
13 Explorer, correct?
14    A.   I have never actually printed one
15 out, so I'm assuming that's what it's from, but
16 I've never seen it in this format before,
17 because I pull it on a computer.
18    Q.   Sure.  So do you have any reason to
19 believe this is not information pulled from
20 ODMap in Case Explorer?
21    A.   I do not.
22    Q.   And I'll just note that for Exhibit
23 21, the dates run from February 27 of 2016
24 through February 2, 2017, and for Exhibit 22,
25 they run from January 2 of 2017 through

8 (Pages 311 - 314)

Page 315

1  November 28 of 2017.  So there is actually an
2  overlap of one month.
3         MR. CLUFF:  It looks like the top
4  left date on Exhibit 21 is 10-3-76, but I'm
5  guessing that is probably a typo in somebody's
6  entry.
7         MR. ZIPP:  If you look at the
8  narrative.
9         MR. ROMAN:  Thank you.  Mr. Zipp
10  has pointed out that in the narrative, it makes
11  clear that it is October 3 of 16.
12         MR. CLUFF:  Do you know in their
13  native form whether these were marked with a
14  confidentiality designation?
15         MR. ROMAN:  I don't know, but we
16  are happy to treat these as confidential.
17         MR. CLUFF:  Okay.  We will just
18  preserve whatever the confidentiality was in
19  the native form.
20         MR. ROMAN:  And along those lines,
21  we note that the names from Exhibit 21 have
22  been redacted, but they are not in Exhibit 22.
23         MR. CLUFF:  In Exhibit 22, if you
24  look over in the right third, it looks like
25  there is a victim's first name and last name

Page 316

1  column.  Those are all redacted.  Is that what
2  you are --
3         MR. ROMAN:  Right.  Okay.  I'm
4  sorry.  We are talking about the entry, not
5  names, but let's move on here.
6     Q.   So you recall, Det. Moran, that we
7  marked similar spreadsheets as exhibits in your
8  first deposition, but those -- as Exhibits 2
9  and 3, but those exhibits did not include the
10  narrative sections; do you recall that?
11     A.   I believe so, yes.
12     Q.   In fact, that's one of the reasons
13  why we are here today.
14     A.   Okay.
15     Q.   Those narrative sections, that
16  includes the information that you learn about
17  the person's drug history, correct?
18     A.   Sure.  Yes, if it is learned.
19     Q.   And again, that history would
20  include whether or not the person started on
21  prescription opioids, correct?
22     A.   If it is learned, yes.
23     Q.   We have one more big exhibit.
24         Det. Moran, I'm handing you what
25  has been marked as Moran Exhibit 23.

Page 317

1         - - - - -
2         (Thereupon, Deposition Exhibit 23,
3         Collection of HIDI Response Forms,
4         was marked for purposes of
5         identification.)
6         - - - - -
7     Q.   This is a collection of HIDI
8  response forms; do you see that?
9     A.   I do.
10     Q.   And I can represent to you that at
11  least by our count, there are 317 of these
12  guys.
13     A.   Okay.
14     Q.   And they are all forms that appear
15  to have been completed by you, covering the
16  period 2017 to 2018, and if you could, kind of,
17  flip through and just quickly see if that's
18  correct.  You don't need to look at every one,
19  obviously.
20     A.   It appears what you say is correct.
21     Q.   In fact, on some of these where it
22  says detective assigned, there will be the
23  number 1888; do you see that?
24     A.   Yes, sir.
25     Q.   And you are detective 1888?

Page 318

1     A.   Correct, that's my badge number.
2     Q.   And you prepared all these response
3  forms in the ordinary course of business,
4  correct, as part of your police duties?
5     A.   I mean, like there might be like
6  that particular instance where my supervisor
7  filled it out, there could be -- I mean,
8  without looking at every single document, the
9  majority of these are my sloppy handwriting, so
10  I would say the majority of these are mine, but
11  there is a chance that another detective could
12  have filled it out and I was assigned the case.
13     Q.   Those that have your sloppy
14  handwriting, those were prepared by you as part
15  of your police duties?
16     A.   Correct.
17     Q.   Now, 317 of these for 2017 and
18  2018, does that seem about the right number for
19  you, does that seem about the right number of
20  forms that you would have filled out during
21  that period?
22     A.   Myself or the unit?
23     Q.   Well, yourself, including cases in
24  which, for example, you are with Sgt. Baeppler.
25     A.   I still don't understand.

9 (Pages 315 - 318)

Page 319

1    Q.    These, as far as we could tell,
2  these were all the ones -- all the cases in
3  which you were involved?
4    A.    No.
5    Q.    So you think there should be more
6  of these?
7    A.    There could be other fatal
8  overdoses where there is another detective
9  that's the lead on it that I may have assisted
10  on.
11    Q.    And your name would not be included
12  among the detectives involved?
13    A.    It would have been.  I believe this
14  stack came from my specific pool.
15    Q.    What do you mean by your "specific
16  pool"?
17    A.    What I specifically provided from
18  my desk.
19    Q.    These all came from your desk?
20    A.    Yes, I believe so.  I would say so.
21    Q.    So it is possible that there were
22  other -- that there are other response forms
23  involving cases in which you responded, but
24  they are on somebody else's desk?
25    A.    However they did their filing

Page 320

1  system.  I mean, in Case Explorer or whatnot.
2    Q.    So, for example, this one, Exhibit
3  20, where Sgt. Baeppler filled it out, how did
4  it end up on your desk?
5    A.    Sgt. Baeppler is a supervisor.  He
6  doesn't do investigations.  It's assigned to
7  me.
8    Q.    But he filled out the form.  How
9  did you end up with it?
10    A.    I took the form.  As I explained,
11  he just got to the scene prior to me and
12  started filling it out.
13    Q.    Okay.  How many more cases do you
14  think you were involved in than these 317 in 17
15  and 18?
16        MR. CLUFF:  Objection.
17    A.    Honestly, I don't know.  I mean, as
18  a unit, I think we responded to nearly a
19  thousand.  So I don't know.
20    Q.    So where would the other 700 forms
21  be, do you think?
22    A.    Other detectives fill them out.
23    Q.    Which other detectives would those
24  be?
25    A.    We have Det. Cline, C-L-I-N-E; Det.

Page 321

1  Klamert, K-L-A-M-E-R-T; there is a Det. Lake,
2  L-A-K-E; there is a Det. Dlugolski, common
3  spelling, D-L-U-G-O-L-S-K-I.
4        And at one point, we had two other
5  detectives assigned to us.  I'm not sure if it
6  is in that timeframe.  They have been there
7  over a year, but it would be a Det. Schroeder,
8  S-C-H-R-O-E-D-E-R, and there is a Det.
9  Robinson, R-O-B-I-N-S-O-N.
10    Q.    Are these all the response forms
11  that were on your desk?
12    A.    Yes.
13    Q.    So did you fill out HIDI response
14  forms before 2017?
15    A.    Yes.
16    Q.    Where are those forms?
17    A.    We used to do files for cases, and
18  it just got to be too much to do.  For me
19  personally, it just got to be too much to do
20  actual files, because it just took up too much
21  room.  So I would just keep the response forms
22  handy, and kind of like by date, so I can refer
23  back to them.  If there is a prosecutable case,
24  obviously then a case file was generated.
25        There is cases that are followed up

Page 322

1  as a result of interviews, then case files are
2  generated.  But I keep these at my desk, just
3  to go by, you know, if two months ago at
4  such-and-such, I can pull up the folder and
5  look at it.
6    Q.    But where, for example, say there
7  was one in June of 2016, where would that form
8  be?
9    A.    It could have been -- we used to do
10  a filing system in a filing cabinet.  We used
11  to do actual case files for each overdose.
12    Q.    So is that in one of those filing
13  cabinets, would that be one of those filing
14  cabinets?
15    A.    It would be there, yes.
16    Q.    And how far back do they go, do you
17  know?
18    A.    We started doing fatal overdoses in
19  2013.  We started doing nonfatals in 2014.  I'm
20  not sure when we actually began doing this
21  actual form, I can't recall the exact date, but
22  that would go back to roughly 2014ish.
23    Q.    And do you know where those case
24  files are located?
25    A.    I imagine they would be in a filing

10 (Pages 319 - 322)

Page 323

1  cabinet in the narcotics unit.
2      Q.   Do you know who maintains that
3  filing cabinet?
4      A.   What do you mean by "maintain"?
5      Q.   Is there somebody who is in charge
6  of filing things in there?
7      A.   We would -- back then, we would
8  just file our own cases by date, but again, the
9  numbers were so huge, that for myself
10  personally, it was just easier to keep a sheet,
11  and then if there was a follow-up to it, then I
12  would generate an actual case and attach
13  reports and whatnot.
14      Q.   Now, as you recall when we spoke in
15  December, you testified that a high number of
16  those who overdosed started with prescription
17  opioids; do you recall?
18      A.   I do.
19      Q.   And that is still your belief and
20  testimony?
21      A.   I do believe that, yes.
22      Q.   Now, we went through these 317 HIDI
23  response forms for 2017 and 2018, and only 25
24  mentioned prescription pills.
25      A.   Okay.

Page 324

1      Q.   Does that number surprise you?
2      A.   I don't know how to answer that.
3  Some of the information -- I should stand back.
4          Some of the information that was
5  relayed may not have made it in.  It started to
6  get put in towards the end.  Some of the
7  information was just towards talking.  25, it
8  seems like it would be more to me.  Maybe just
9  some of the information didn't make it on the
10  sheets.
11      Q.   Well, if you were given that
12  information, it was your practice to put it in
13  the sheets, correct?
14          MR. CLUFF:  Objection.  Form.
15      Q.   If you were given the information
16  about a person's drug history, including how
17  that person started on prescription opioids,
18  you would have put that information on the
19  sheet, right?
20      A.   When we originally started doing
21  these, it was -- the goal was dealer
22  information, source of drugs, what kind of
23  drugs.
24          As our unit has slowly evolved into
25  more information, it's not from day one to

Page 325

1  whatever day we are at now, it's not the same.
2  Does that make sense to you?
3          So as we began to become aware that
4  more information needed to go on the sheets,
5  the information would be reflected to the
6  sheets.
7      Q.   And when did you start putting more
8  of that type of information on the sheets?
9      A.   A year, two years ago, year and a
10  half ago, two years ago.  I can't recall
11  exactly when.
12      Q.   So probably sometime in 2017, you
13  think?
14      A.   I would say so.
15      Q.   That's not to say you never
16  included it before 2017, you just were more
17  diligent about it after 2017; is that right?
18      A.   Yes.
19      Q.   And do you have a sense of when in
20  2017 you started becoming more diligent?
21      A.   I do not.
22      Q.   It could have been January, it
23  could have been June?
24      A.   Sir, I mean, this is just an
25  example of what I do.  I mean, I stay busy.  I

Page 326

1  can't recall.
2      Q.   That's clear you do.
3      - - - - -
4          (Thereupon, Deposition Exhibit 24,
5          Designated Confidential, Attorney
6          Eyes Only, Cleveland Police HIDI
7          Response Form, Beginning with Bates
8          Label CLEVE 003180887, was marked
9          for purposes of identification.)
10      - - - - -
11      Q.   Det. Moran, I've handed you what
12  has been marked as Moran Exhibit 24.  It is a
13  one-page document bearing production number
14  CLEVE 003180887.  Have you seen this document
15  before?
16      A.   I have.
17      Q.   And this is -- I'll just tell you.
18  This one and the ones that follow are all from
19  this collection that's been marked as Exhibit
20  23.  Just didn't want to have to try and figure
21  out where in the collection it was.
22          MR. CLUFF:  Counsel, just one
23  second.  So for 23 and then 24, which is an
24  excerpt from 23, we are going to maintain the
25  reservation to redact the personal identifying

11 (Pages 323 - 326)

Page 327

1  health information of the victim.
2        MR. ROMAN:  That's fine, and you
3  can do the same for future exhibits.
4        MR. CLUFF:  Great.
5    Q.   So this is one of your -- a
6  response form that you completed, correct?
7    A.   Yes, sir.
8    Q.   And it relates to a nonfatal
9  overdose scene to which you responded in
10 November of 2018, correct?
11   A.   Correct.
12   Q.   And at the bottom where it states
13 additional information, you write, "Claimed he
14 found pills while dumpster diving"; do you see
15 that?
16   A.   I do.
17   Q.   And so this is the victim reporting
18 to you how he found the pills on which he
19 overdosed, correct?
20   A.   This is the story that he provided
21 to me at the hospital.
22   Q.   Right.
23   A.   Right.  I have to do -- even if I
24 don't necessarily believe someone, I will
25 document what they reported to me, for the sake

Page 328

1  of reporting back to my supervisors.
2    Q.   Right.  That's why you used the
3  word "claim"?
4    A.   Correct.
5    Q.   Do you know how he got the pills?
6    A.   I don't believe it was pills, but
7  he claimed he found pills while dumpster
8  diving.
9    Q.   What did you think it was?
10   A.   I believe he had a heroin/fentanyl
11 overdose.
12   Q.   What made you believe that?
13   A.   Just the amount of Narcan he was
14 given, 4 milligrams of Narcan.  I believe he
15 had a history of overdosing in the past with
16 us, and honestly, I just didn't believe his
17 story.
18   Q.   Do you recall whether you did any
19 further investigation in this case?
20   A.   No.
21   Q.   And you don't know whether this
22 person started on prescription pills or not, do
23 you?
24   A.   I don't.
25   Q.   Det. Moran, I'm handing you what

Page 329

1  has been marked as Moran Exhibit 25.
2        - - - - -
3        (Thereupon, Deposition Exhibit 25,
4        Designated Confidential, Attorney
5        Eyes Only, Cleveland Police HIDI
6        Response Form, Beginning with Bates
7        Label CLEVE 003180886, was marked
8        for purposes of identification.)
9        - - - - -
10   Q.   So Exhibit 25, Det. Moran, is a
11 one-page document bearing production number
12 Cleveland 003180886.  Have you seen this
13 document before?
14   A.   I have.
15   Q.   And this is another one of your
16 response forms.  It relates to a nonfatal
17 overdose, also from November of 2018, correct?
18   A.   Correct.
19   Q.   Can you please read the additional
20 information entry and explain what that means?
21   A.   "Additional info: Drives black
22 Fusion."  That refers to the suspect, which
23 there is a suspect name, age, and suspect phone
24 number, so that's just a note for me on what
25 the drug dealer drives.

Page 330

1        And then this is a particular case
2  where I asked him how he started using, and he
3  started using opioids in connection with an
4  injury.
5    Q.   Do you know what he overdosed on?
6    A.   On this particular case?
7    Q.   Right.
8    A.   I believe it was a heroin/fentanyl
9  overdose.
10   Q.   And you note that you found a
11 needle, correct?
12   A.   Correct.
13   Q.   And is that what led you to believe
14 that was a heroin and fentanyl issue?
15   A.   I believe he said it.  I mean, some
16 of the information -- this is just notes.  The
17 narrative is actually in the Case Explorer the
18 very next day or that day I input that
19 information.  This is just a quick go-by.
20   Q.   But you remember all this stuff?
21   A.   I don't remember everything.  I
22 mean, I didn't know there was a needle.  There
23 is a needle.
24   Q.   So before on Exhibit 24, you
25 mentioned that there were four milligrams of

12 (Pages 327 - 330)

Page 331

1 Narcan administered.  That's not on the sheet,
2 but you remember that?
3     A.   Yes, it is.
4     Q.   Is it?  Where is that?
5     A.   Underneath hospital.
6     Q.   Ah, there we go.  Okay.  Thank you.
7     A.   You're welcome.
8     Q.   I was impressed.  When you talk
9 about drives black Fusion, that refers to the
10 suspect?
11    A.   Yes.
12    Q.   But then the started using in
13 connection with the injury, that's the victim?
14    A.   Correct.
15    Q.   Do you know what he started using
16 in connection with this injury?
17    A.   I don't.
18    Q.   Do you know if, in fact, he started
19 using it -- if that is, in fact, correct, that
20 he started using prescription pills in
21 connection with an injury?
22    A.   That's the information that was
23 related to me.  I don't know.
24    Q.   Did you do any further
25 investigation?

Page 332

1     A.   Brief.  Do you want me to --
2     Q.   Please.
3     A.   Obviously, we do a little homework
4 on the suspect's home number, if there is time.
5 I mean, we are crazy busy.  If there is time,
6 we will go into the neighborhood that we
7 believe this car may have been in, or just
8 through my normal daily travels, I'm pretty
9 astute, I'm looking for a black Fusion as I'm
10 driving.  If I see it, I will go take a look at
11 it.
12         But as far as controlled purchases
13 or anything, there is no massively further
14 investigation, but some homework on the phone
15 number and whatever we could come up with.
16    Q.   And going back to the victim's drug
17 history, you don't know, for example, first of
18 all, whether he started with prescription
19 opioids, correct?
20         MR. CLUFF:  Object to form.
21    A.   He started using in connection with
22 an injury, meaning, when I put that in, he was
23 prescribed opioids after an injury.  That's how
24 he got transformed to heroin.
25    Q.   That's what he told you?

Page 333

1     A.   Yes.
2     Q.   So first of all, you don't know
3 whether that's true?
4     A.   I don't, no.
5     Q.   And do you know whether, for
6 example, that that injury happened ten years
7 ago, and there is a break of eight years, and
8 then he just started using heroin?
9     A.   I don't know.
10    Q.   You don't know that?
11    A.   No.  Thank you.  A little bit
12 easier.
13         - - - - -
14         (Thereupon, Deposition Exhibit 26,
15         Designated Confidential, Attorney
16         Eyes Only, Cleveland Police HIDI
17         Response Form, Beginning with Bates
18         Label CLEVE 003181042, was marked
19         for purposes of identification.)
20         - - - - -
21    Q.   Det. Moran, I'm handing you what's
22 been marked as Moran Exhibit 26, a one-page
23 document bearing production number CLEVE
24 003181042.  Have you seen this document before?
25    A.   I have.

Page 334

1     Q.   So this is a report of a nonfatal
2 overdose from January of 2018, correct?
3     A.   Yes, sir.
4     Q.   And the victim here snorted four
5 Percocets, correct?
6     A.   That's the information she relayed
7 to us.
8     Q.   Were you able to verify that or
9 not?
10    A.   No.
11    Q.   So here you found no packaging.
12 Did that cast any doubt on whether, in fact,
13 the person had snorted Percocets?
14    A.   Can I elaborate?
15    Q.   Sure.
16    A.   We do not respond to every scene.
17 In this particular case, she was conveyed to a
18 hospital.  So the police car, EMS, everyone
19 leaves the house to go to the hospital.
20         So we don't get the chance to go to
21 the scene to actually look for packaging every
22 single time.  So this merely means the
23 packaging was not recovered.  It doesn't
24 necessarily mean it wasn't there.  It just
25 means that we didn't recover it, because we

13 (Pages 331 - 334)

Page 335

1  went straight to the hospital to interview.
2      Q.   So you don't know whether you did,
3  in fact, go to her home?
4      A.   Actually, I remember this.  For
5  whatever reason, I remember this one, but, no,
6  we did not get inside the house on this one.
7      Q.   Did you verify that she had, in
8  fact, snorted Percocets?
9      A.   That's what she told us.
10      Q.   Do you know if she got these
11  Percocets from a legitimate prescription?
12      A.   I don't know.
13          MR. CLUFF:  Object to form.
14      Q.   Do you know if these were diverted
15  Percocets?
16          MR. CLUFF:  Object to form.
17      A.   I don't know.
18          - - - - -
19          (Thereupon, Deposition Exhibit 27,
20          Designated Confidential, Attorney
21          Eyes Only, Cleveland Police HIDI
22          Response Form, Beginning with Bates
23          Label CLEVE 00318054, was marked for
24          purposes of identification.)
25          - - - - -

Page 336

1      Q.   Det. Moran, I'm handing you what
2  has been marked as Moran Exhibit 27, a one-page
3  document bearing production numbers CLEVE
4  003181054.  Have you seen this document
5  before?
6      A.   I have.
7      Q.   And this is another one of your
8  response forms?
9      A.   It is.
10      Q.   And as with Exhibits 24, 25 and 26,
11  you prepared this form in the course of your
12  police duties on or about the date indicated,
13  correct?
14      A.   I did.
15      Q.   And this reports on a nonfatal drug
16  overdose from January of 2018, correct?
17      A.   Yes.
18      Q.   And here in the additional
19  information, you write, "Stated he only took an
20  extra Percocet"; do you see that?
21      A.   I do.
22      Q.   So that's what the overdose victim
23  told you?
24      A.   Correct.
25      Q.   And again, you had no idea whether

Page 337

1  or not that was correct?
2      A.   I do not.
3      Q.   And do you know whether or not this
4  person had a legitimate prescription for
5  Percocets?
6          MR. CLUFF:  Objection to form.
7      A.   I do not.
8      Q.   Is this another case where you just
9  interviewed him at the hospital?
10      A.   Sir, the majority of them are just
11  hospital interviews.  I don't specifically
12  remember this case, but the majority are
13  hospital interviews.
14      Q.   So you don't know whether or not
15  you went back to his home to look for packaging
16  or anything like new?
17      A.   This didn't occur at his home.
18  This was a -- 3979 Pearl is a business, but I
19  don't recall.
20      Q.   Did you go back -- you don't recall
21  whether you went back to 3979 Pearl to look for
22  packaging?
23      A.   I don't believe I did.
24      Q.   And the same with his home, you
25  don't believe -- do you recall going to his

Page 338

1  home to look for packaging?
2      A.   No, I did not go to his home.
3          - - - - -
4          (Thereupon, Deposition Exhibit 28,
5          Designated Confidential, Attorney
6          Eyes Only, Cleveland Police HIDI
7          Response Form, Beginning with Bates
8          Label CLEVE 003180904, was marked
9          for purposes of identification.)
10          - - - - -
11      Q.   Det. Moran, I've handed you what
12  has been marked as Moran Exhibit 28.  It is a
13  one-page document bearing production number
14  CLEVE 03180904.  Have you seen this document
15  before?
16      A.   I have.
17      Q.   Is this a -- again, this is a
18  response form that you filled out in the
19  ordinary course of business -- excuse me -- on
20  or about September 29, 2018, correct?
21      A.   Correct.
22      Q.   And this reports on a fatal
23  overdose on or about that date, correct?
24      A.   Correct.
25      Q.   Can you please read what

14 (Pages 335 - 338)

Page 339

1  information is included in the additional
2  information section?
3      A.   Yeah, and if I'm allowed to explain
4  how we got to that.  But it says, "Dr.
5  Castleberry, Cedar and Ford, pill mill, $140
6  cash, probable pill OD, Thursday and Fridays."
7      Q.   Let's break that down.  First of
8  all, do you know on what the person overdosed?
9      A.   On this case, I don't recall.  I
10  don't know what the exact cause of death was.
11  We didn't have any further leads or packaging.
12  I don't recall what the actual cause of death
13  was on this one.
14      Q.   Do you recall whether it was, in
15  fact, a pill overdose?
16      A.   I don't know.
17      Q.   And you don't know then if it was a
18  prescription pill overdose, do you?
19      A.   I do not.
20      Q.   So let's go through this.  When you
21  wrote Dr. Castleberry, Cedar and Ford, pill
22  mill, what was that referring to?
23      A.   The victim here was with her -- and
24  it is not in the interview section.  There are
25  times where someone is grieving, and if I know

Page 340

1  their name is in the actual police report, I'm
2  not going to rehash and have them give me their
3  name again and go through all that.  So in this
4  particular case, I can obtain that information
5  from the police report.
6          She was there with it was either a
7  boyfriend or a husband, one of the two, I can't
8  recall, and that person supplied the
9  information on where she would get pills, and
10  how he believed it was a pill mill, how he
11  believed that that doctor has been arrested in
12  the past.  Just this person's feelings about
13  that doctor and how the victim would obtain
14  pills.
15      Q.   Did you investigate Dr.
16  Castleberry?
17      A.   I passed this information along to
18  the diversion team.
19      Q.   Do you recall who in the diversion
20  team?
21      A.   I provided the information to Det.
22  Prince.
23      Q.   Do you know what Det. Prince did
24  with it?
25      A.   I do not.  I believe, to the best

Page 341

1  of my information, he was familiar with that
2  doctor's name though.
3      Q.   Do you know whether Det. Prince
4  arrested anyone in connection with this
5  overdose?
6      A.   I do not.
7          MR. CLUFF:  Given the time period,
8  I caution you not to reveal anything that would
9  undermine any ongoing investigation.  If you
10  can answer the question generally, without
11  doing that, then feel free to answer.
12      A.   I do not.
13      Q.   What is the reference to $140 cash?
14      A.   I think that's what she had in her
15  purse.  She had a little bit of money left
16  over.
17      Q.   And what led you to conclude that
18  was a probable pill OD?
19      A.   I wouldn't say I concluded it.
20  Just based on the interview with the husband,
21  that's just what we felt.  So I just put that
22  down, that it is a probable pill OD.
23          I'm not sure if it was an actual
24  fentanyl or a pill overdose.  There was no
25  follow-up on this case.

Page 342

1      Q.   And when it says Thursday and
2  Fridays, what does that refer to?
3      A.   That's when he believed she
4  refilled her prescription, was either Thursday
5  or Friday.
6      Q.   Do you know whether any
7  pharmaceutical manufacturers or distributors
8  were contacted about Dr. Castleberry or the
9  Cedar & Ford pill mill?
10          MR. CLUFF:  Objection to form.
11  Calls for speculation.
12      A.   I don't.
13          - - - - -
14          (Thereupon, Deposition Exhibit 29,
15          Designated Confidential, Attorney
16          Eyes Only, Cleveland Police HIDI
17          Response Form, Beginning with Bates
18          Label CLEVE 003180880, was marked
19          for purposes of identification.)
20          - - - - -
21      Q.   Det. Moran, I'm handing you what
22  has been marked as Moran Exhibit 29.  It is a
23  one-page document bearing production number
24  003180880.  This is another one of your
25  response forms, correct?

15 (Pages 339 - 342)

1    A.   It is.
2    Q.   And you completed this form on or
3  around November 28 of 2018 in the ordinary
4  course of business, correct?
5    A.   I did.
6    Q.   This reports on a nonfatal overdose
7  in Parma, correct?
8    A.   No.  Is was in Cleveland.  2210
9  Brookpark Road, that's a Cleveland address.
10    Q.   That's a New Yorker trying to guess
11  these things.
12    A.   That's just the hospital.
13    Q.   Okay.  And the additional
14  information, can you read that, please?
15    A.   $30, white, percs, 90 perc, 10s for
16  bruised toe.
17    Q.   Do we know -- well, why don't we go
18  through this.  What did you mean by $30?
19    A.   I actually -- you're doing an
20  amazing job, all of these I responded to, I
21  actually really remember this one.
22        I was able to speak with the victim
23  for -- I was with her for a long time.  She
24  bought $30 of heroin, that's where it says
25  white, the heroin, or the fentanyl/heroin, it

1  was white drugs that she purchased on this
2  date, and this is one of the ones where I got
3  into how she began using.
4        She began using from Percocets.
5  She was actually prescribed 90 Percocets,
6  because she told her doctor she had a bruised
7  toe.
8    Q.   Do you know whether she, in fact,
9  had a bruised toe?
10    MR. CLUFF:  Object to form.
11    A.   This was years before.  I don't
12  know.  I believe she admitted that she had
13  a -- she had a bruised toe.  She dropped
14  something on her toe, but she was prescribed 90
15  Percocets because of the bruised toe, according
16  to her.
17    Q.   So this is one of those cases that
18  you believe the person started on prescription
19  opioids and then migrated to nonprescription
20  opioids, such as in this case heroin, correct?
21    A.   I talked to her extensively.  I
22  really remember this because I tried to get her
23  help.  I believed her, yes.
24    Q.   Did you find out from her what
25  doctor prescribed her the 90 Percocets for a

1  bruised toe?
2    A.   She would not provide the doctor's
3  name.
4        - - - - -
5        (Thereupon, Deposition Exhibit 30,
6        Designated Confidential, Attorney
7        Eyes Only, Cleveland Police HIDI
8        Response Form, Beginning with Bates
9        Label CLEVE 003180873, was marked
10        for purposes of identification.)
11        - - - - -
12    Q.   Det. Moran, I've handed you what
13  has been marked as Moran Exhibit 30.  It is a
14  one-page document bearing production number
15  CLEVE 003180873.  This is another one of your
16  response forms, correct?
17    A.   Yes.
18    Q.   And you completed this one on or
19  about December 27 of 2018 in the ordinary
20  course of business, correct?
21    A.   Yes.  I did not fill this one out
22  or conduct the interviews.  This was filled out
23  by Sgt. Baeppler.
24    Q.   It is the same handwriting as
25  Exhibit 20; isn't it?

1    A.   Yeah.
2    Q.   But you were involved in this case,
3  correct?
4    A.   I responded, yes.
5    Q.   How do you know he was the one that
6  conduct the interview?
7    A.   Because that's his handwriting
8  there, in the additional info.
9    Q.   Do you know anything about this
10  case, other than what is written here?
11    A.   Just what -- there is no evidence
12  recovered at the scene, as far as packaging,
13  whatnot.
14        I believe this was -- yeah, he died
15  on his birthday.  So he was out partying and
16  came home and passed away.  We recovered no
17  evidence at the scene and there was no evidence
18  in the cellphone, any drug transactions.
19    Q.   Do you recall whether you went to
20  his home to look for packaging?
21    A.   We were at his home.
22    Q.   You were at his home.  I'm sorry.
23  And you saw no packaging?
24    A.   Correct.
25    Q.   Did you draw any conclusions based

Page 347

1  on the absence of packaging?
2       MR. CLUFF:  Object to form.  It is
3  a little vague.
4       A.  Honestly, I don't know how to
5  answer that.  I mean --
6       Q.  Let me ask a different question
7  then.
8          If somebody is taking prescription
9  pills, those tend to come in a package,
10  correct?
11          MR. CLUFF:  Objection.  Assumes
12  facts.
13       A.  No.
14       Q.  You don't get a little bottle that
15  says Percocet or whatever?
16          MR. CLUFF:  Let him finish his
17  question.
18       Q.  Go ahead.  I'm sorry.  Am I
19  misunderstanding packaging?
20       A.  I think I'm misunderstanding how
21  you are referring to someone getting pills.
22       Q.  Right.
23       A.  I think narcotics, hand to hand,
24  pill to pill, the proper way would be in a
25  bottle.

Page 348

1       Q.  Right.
2       A.  But that's not the only way.
3       Q.  Does the absence of packaging here,
4  that you didn't find any bottle, container that
5  you would normally get from a pharmacy, which
6  would have the information on there that would
7  say what the drug is, how often you are
8  supposed to take it, who the prescribing doctor
9  is, the fact that you didn't find that, did
10  that lead you to believe that, in fact, that
11  this person who overdosed in Exhibit 30 was not
12  getting pills through a legitimate
13  prescription?
14          MR. CLUFF:  Object to the form.
15  Compound.  Incomplete hypothetical.  Calls for
16  a legal conclusion.
17       Q.  You may answer.
18       A.  It's hard to answer, in this
19  particular case.
20          In the notes, Det. Baeppler learned
21  from the wife that this person abused pills.
22  That doesn't necessarily mean this was a pill
23  overdose.  It still could have been a heroin or
24  fentanyl overdose.  The absence of packaging
25  could indicate a multitude of things.

Page 349

1       I mean, it could be drugs were
2  obtained without packaging; it could be family
3  found the victim and got rid of the packaging
4  before we got there.
5          So I don't think we necessarily
6  draw conclusions.  Could we speculate on some
7  possibilities?  Yeah, but as far as the
8  conclusion, no, if that makes sense.
9       Q.  Right.  So you don't know, either
10  based on this report or otherwise, whether or
11  not this person started off with prescription
12  opioids, correct?
13       A.  I don't.
14          - - - - -
15          (Thereupon, Deposition Exhibit 31,
16          Designated Confidential, Attorney
17          Eyes Only, Cleveland Police HIDI
18          Response Form, Beginning with Bates
19          Label CLEVE 003181107, was marked
20          for purposes of identification.)
21          - - - - -
22       Q.  My guess, Det. Moran, is that we
23  have about a half an hour or so more, 40
24  minutes maybe.
25          MR. CLUFF:  Do you want to take a

Page 350

1  break?
2       Q.  The question is whether you want to
3  take a break or whether you're okay?
4       A.  I have a very busy day, so I would
5  like to roll through.
6       Q.  You seemed a little --
7       A.  I have a lot on my plate today.
8       Q.  I'm sorry.
9       A.  I'm good.  I'm fine.
10       Q.  We will get through this as quickly
11  as we can.
12          Det. Moran, I've handed you what
13  has been marked as Moran Exhibit 31.  It is a
14  one-page document bearing production number
15  CLEVE 003181107.
16          Have you seen this document before?
17       A.  I have.
18       Q.  This is a response form that you
19  filled out on or around November 4, 2017 in the
20  ordinary course of business, correct?
21       A.  November 4, yes, correct.
22       Q.  And this reports on a nonfatal
23  overdose on or about that date, correct?
24       A.  Yes, sir.
25       Q.  Can you please read the additional

17 (Pages 347 - 350)

Page 351

1  information line on this one?
2      A.   "Never used heroin, thought it was
3  anxiety meds/white.  Kia Spectra, red."
4      Q.   Can you please go through that and
5  explain what information is being conveyed
6  there?
7      A.   Yeah.  I actually vaguely remember
8  this one as well.  Interviewing the victim, the
9  victim denied using heroin in this case.  There
10 is thought they were getting -- they thought
11 they were getting some sort of anxiety pill.
12 They took that anxiety pill, which caused them
13 to lose consciousness, resulting in four
14 milligrams of Narcan.  The pill was white.  The
15 person, you know, drove a red Kia Spectra.
16     Q.   The person who sold the drugs to
17 the victim?
18     A.   Yes.
19     Q.   And what conclusions did you draw
20 from the pills being white?
21         MR. CLUFF:  Objection.  Form.
22     Q.   If any.
23     A.   I relayed the information that she
24 relayed to me.  I'm not 100 percent certain she
25 was truthful in this, but this is the

Page 352

1  information that was relayed.
2      Q.   What did you think was going on?
3      A.   I mean, I obviously believed she
4  thought she did some sort of heroin or
5  fentanyl, snorted something.  We talk to
6  people, and sometime they don't want to admit
7  what they did, so they try to say certain
8  things.
9          It was around this time also we
10 started -- I was always a little more sceptical
11 of some of the pill overdoses, when they were
12 getting a certain amount of Narcan.  You know,
13 one Percocet and they get six milligrams, I
14 tended to be sceptical.  Then we started
15 actually getting pressed fentanyl pills, which
16 led us to kind of start looking at the pills a
17 little more believable.
18     Q.   So you need more milligrams of
19 Narcan if it is a fentanyl or a heroin
20 overdose, correct?
21     A.   In my experience, I was skeptical.
22 When someone would say they snorted, they took
23 one Percocet, and they were getting six or
24 eight milligrams of Narcan, made me think that
25 they weren't truthful with their story.

Page 353

1      Q.   If you had taken just -- let's say
2  you were overdosing on a small, relatively
3  small amount of Percocet.  How many milligrams
4  of Narcan would you expect that would require?
5          MR. CLUFF:  Object to form.
6      A.   I don't know.
7      Q.   You mentioned four a couple times.
8  Is that a big amount are not?
9      A.   It is two doses.
10     Q.   Is that enough for an overdose of a
11 prescription pill or not?
12     A.   Again, it depends on what is taken.
13     Q.   And again, you have no idea with
14 respect to the person in Exhibit 31 whether or
15 not she started with prescription opioids,
16 correct?
17     A.   I don't know.
18     Q.   I think this is the last one of
19 these.
20     A.   We are not doing 310 more?
21         - - - - -
22         (Thereupon, Deposition Exhibit 32,
23         Designated Confidential, Attorney
24         Eyes Only, Cleveland Police HIDI
25         Response Form, Beginning with Bates

Page 354

1          Label CLEVE 003180898, was marked
2          for purposes of identification.)
3          - - - - -
4      Q.   Det. Moran, I'm handing you what's
5  been marked as Moran Exhibit 32.  It is a
6  production number CLEVE 003180898.  Have you
7  seen this document before?
8      A.   I have.
9      Q.   This is a response form that you
10 completed on or about October 19 of 2018 in the
11 ordinary course of business, correct?
12     A.   It is.
13     Q.   And this reports on a nonfatal
14 overdose, correct?
15     A.   It is.
16     Q.   Can you please go through the
17 additional information and read it and tell me
18 what's going on, please?
19     A.   Again, I'm impressed that you
20 picked another one that I remember.
21         She overdosed, she was given eight
22 milligrams of Narcan at Fairview.
23     Q.   So that's a lot?
24     A.   Four doses, it is a decent amount.
25 I was able to speak with her for a little

18 (Pages 351 - 354)

Page 355

1  while.  Prescribed pills, she started based off
2  a prescription.  I put progressed, meaning it
3  progressed from prescribed pills to heroin.
4      So prescribed pills, progressed,
5  she was clean for 14 months.  Today's reason
6  for the overdose, she was attempting to commit
7  suicide.  She told me that the heroin was a
8  light brown, she got it through a middle
9  person, which generally if it's another addict,
10  they won't supply who that addict is.
11      The drugs were in a lottery ticket,
12  and then underneath, she obtained $20, and
13  where it says "B," she believes that the middle
14  person, the heroin addict, gets heroin from a
15  drug dealer named "B."
16      Q.  And she was trying to commit
17  suicide by taking the heroin?
18      A.  Yeah.
19      Q.  So this is one of those cases that
20  you believe where somebody starts with
21  prescription opioids and then progresses to
22  nonprescription opioids, correct?
23      A.  I interview the person.  This is
24  the information that was provided.  I remember
25  her.  I had no reason to doubt her

Page 356

1  truthfulness.
2      Q.  Now, she was, you said -- she says
3  she was clean for 14 months, correct?
4      A.  That's what she indicated, yes.
5      Q.  So there was a -- she didn't
6  progress straight from prescription pills to
7  heroin, correct?
8      MR. CLUFF:  Object to form.
9      Q.  By her own account?
10      MR. CLUFF:  Assumes facts as well.
11      A.  I'm not understanding your
12  question.
13      Q.  Well, there was -- she reported a
14  14-month gap between when she was taking
15  prescription pills and when she returned to --
16  or when she moved to nonprescription opioids,
17  in this case heroin, correct?
18      A.  No, you are wrong.
19      Q.  So tell me what is going on?
20      A.  She's been clean for 14 months,
21  prior to using that day.  Not 14 months off
22  prescription pills to heroin.  She was
23  prescription pills, moved to heroin, steady
24  cycle of addiction, and then she was clean for
25  14 months, 14 months and one day or whatever,

Page 357

1  on this particular date.  She relapsed after
2  being clean for 14 months.
3      Q.  Do you know whether there was any
4  further investigation here?
5      A.  No.  We didn't have a phone number
6  or any follow-up.  I mean, every single one of
7  these we provide cellphone numbers for the
8  victim to reach out should there be additional
9  information that could be provided for a
10  follow-up investigation.  There was nothing in
11  this one.
12      Q.  So let's go back to Exhibit 21,
13  please.
14      So in Exhibit 21, this is the ODMap
15  Case Explorer entries from February 27, 2016
16  through February 2, 2017; do you see that?
17      A.  I do.
18      MR. CLUFF:  For the record, I note
19  these are not in chronological date order, I
20  don't think.  I'm sorry.  I was looking at 22.
21      Q.  And Mr. Zipp tells me that there
22  are 771 rows in this spreadsheet, 771 incidents
23  reported.  I think we are going to have to take
24  him at his word.
25      MR. CLUFF:  No.  I'll object to

Page 358

1  that statement.
2      Q.  Now, the dates here all correspond
3  to dates of overdose incidents that occurred in
4  Cleveland during this period February of 2016
5  to February of 2017, correct?
6      A.  Yes.
7      Q.  And does 771 strike you as about
8  the right number?
9      MR. CLUFF:  Object to form.
10      A.  From when to when?
11      Q.  Basically a year, from February of
12  2016 to February of 2017, maybe 11 months.
13      A.  I mean, there could be, you know, a
14  few more, guys didn't put some in, but that
15  seems relatively close.
16      Q.  But you are instructed to put all
17  of this information in Case Explorer, that's
18  part of your job duties, right?
19      A.  We do.  We do.  Sometimes there is
20  busy weekends, and, I mean, I can't speak for
21  everyone, but I mine in, but things happen.
22      Q.  Do you know anybody who doesn't put
23  them in?
24      MR. CLUFF:  Objection.
25      A.  Not intentionally.  We are

19 (Pages 355 - 358)

Page 359

1  instructed to put them in.  I'm not saying that
2  mistakes don't occur.  And there are also
3  instance that may be a natural death that we
4  respond and fill out a sheet to document that,
5  but it might not go in Case Explorer once we
6  find out it is a natural death.
7      Q.   Got it.  So we cross-checked these
8  771 entries against Exhibits 2 and 3.  Those
9  are the ones that we looked at last time we
10  were together, and by our calculation, you
11  entered 210 of these entries.
12      A.   Okay.
13      Q.   So you have 210 in here.  We went
14  through the narratives for your 210 entries,
15  and out of these 210 entries, you mentioned
16  prescription pills only three times.
17      A.   Okay.
18          MR. CLUFF:  Object to form.  We are
19  not going to take that as an accurate
20  representation.  If you want to point to where
21  you believe that actually happened, you can do
22  that, but this thing where you are going
23  through and telling him numbers about a
24  voluminous document, I don't think is an
25  accurate way to make a record.

Page 360

1          I'm sorry.  I don't want to talk
2  over your deposition.  We will just object.
3  The documents speak for themselves.
4          MR. ROMAN:  That's totally fine.
5      Q.   Assuming that that's correct, that
6  prescription pills are mentioned in only three
7  out of 210 of your entries from February of
8  2016 to February of 2017, how do you explain
9  that?
10          MR. CLUFF:  Object to form.  Don't
11  assume anything.  You can answer that question
12  if you have an understanding of the facts, but
13  you don't have to answer that question based on
14  his representation.
15      A.   The reporting process of that began
16  to be more diligent.  I interviewed everyone.
17  I sit in hospital rooms with addicts, sir, for
18  an hour just talking.
19          As our units progressed, that
20  information started getting documented.  When
21  we originally began doing these, we documented
22  suspect information, drug information, whatnot,
23  and that was information that I just gathered
24  through sitting with someone who nearly died
25  and speaking with them for an hour.

Page 361

1          Through the course of our unit
2  evolving, the information started being
3  recorded more.
4      Q.   Let's go to Exhibit 22.  So this is
5  also from ODMap in Case Explorer, but this one
6  contains entries from January of 2017 to
7  through November of 2017.
8          MR. CLUFF:  This is one where I
9  believe the dates are out of order.
10          MR. ROMAN:  Yes, they are.
11          MR. CLUFF:  You see if that's
12  accurate.
13      Q.   Take whatever time you need to look
14  at this, Det. Moran.
15      A.   It seems consistent with --
16          MR. CLUFF:  For the record, I'm not
17  insinuating you guys did anything.  I'm sure
18  this is the way it was produced.
19          MR. ROMAN:  I took no offense, but
20  John may have, about that's his problem.
21      Q.   So let's look at the second column.
22  It says created by.  That's where the detective
23  who entered the information puts his name,
24  correct?
25      A.   Yeah.

Page 362

1      Q.   And those are all detective names
2  or, I don't know, email addresses or whatever,
3  correct?  You can identify the detective by the
4  name in that second column, right?
5      A.   Correct.
6      Q.   So here there a 1879 rows of
7  incidents, and by our calculation, 407 of these
8  are entries that were entered by you.  So
9  that's for the period January of 2017 through
10  November of 2017.  Does that seem about right
11  to you?
12          MR. CLUFF:  Object to form.  The
13  document speaks for itself.
14      A.   I don't know.  I mean, I did a lot.
15      Q.   I know you did.
16      A.   I do a lot, sir.
17      Q.   I'm not questioning that.
18      A.   It seems remotely accurate, I
19  mean...
20      Q.   So we go to the narrative section
21  of these 417 entries, and in them -- I'm sorry.
22  The narrative you can find in the fifth column;
23  do you see that?
24      A.   Yes, sir.
25      Q.   And in the narrative of these 417

20 (Pages 359 - 362)

Page 363

1 entries, we found the term "prescription drug"
2 or the name of a prescription drug a total of
3 14 times.  Does that seem about right to you?
4      MR. CLUFF:  Object to form.  The
5 document speaks for itself.
6      A.  I'll take you -- I mean, I don't
7 know.  You are saying prescription or name of
8 prescription, you are saying 14 times, okay.
9      Q.  But I guess the question is, would
10 you have expected more than that, more mentions
11 than that in the narrative section?
12      MR. CLUFF:  Objection.  Calls for
13 speculation.  Based on an incomplete
14 hypothetical.
15      THE WITNESS:  Should I answer?
16      MR. CLUFF:  Yeah.  Unless I tell
17 you not to answer, you should.
18      A.  Well, honestly, what's your
19 question though?
20      Q.  Well, do you have an explanation
21 for why only 14 of your 407 entries from
22 January 2017 through November 2017 mention
23 either prescription drugs or the name of a
24 prescription drug?
25      MR. CLUFF:  I'll object to form.

Page 364

1 Calls for speculation.  Based on an incomplete
2 hypothetical.
3      A.  I don't know how to answer that,
4 because there could be terminology in there, or
5 began using, where I don't necessarily put
6 prescription, so the words might be left out.
7      Q.  Right.  So what type of terminology
8 would that include?
9      A.  It could have been something,
10 victim began using based off of injury, where
11 I'm not specifically putting prescription or
12 the name of the pill.  I may have left it out,
13 because when I read it, I know what it means,
14 or when another police officer reads it, they
15 know what it means, so maybe I didn't actually
16 type in the word prescription or the actual
17 pill itself.
18      If you said that the word
19 prescription or pill is in there 14 times, I'm
20 going to say okay, it's in there 14 times.  It
21 doesn't necessarily mean that is an accurate
22 reflect of all these incidents.
23      Q.  So injury is one type of thing that
24 would sort of signal that to you.  What are the
25 other types of things that would indicate

Page 365

1 earlier use of opioids?
2      A.  What do you mean?
3      Q.  If you say the words, "Began using
4 after injury," that would signal to you that
5 the person started using by using prescription
6 opioids, correct?
7      A.  Yes.
8      Q.  Are there other buzz words or
9 phrases that might signal that to you?
10      A.  I would put recreationally, if it
11 wasn't based off an injury, partying.  I can't
12 think of anything else off the top of my head.
13      Q.  Why would words like
14 "recreationally" or "partying" signal to you
15 use of prescription opioids?
16      A.  Again, as we progressed, you know,
17 we have got more diligent, and I'll ask, how
18 did you start, and if someone says, "I started
19 using off of pills," I don't just automatically
20 assume they was prescribed pills.  I go, "Did
21 you start using off a prescription or did you
22 just start recreationally, partying with
23 people?"
24      So I try now, I try to
25 differentiate between how the pills were

Page 366

1 originally used.  Just because they started on
2 a Percocet doesn't mean they were necessarily
3 prescribed a Percocet.  They could have just
4 been with other people that were doing
5 Percocets.
6      Q.  So if you saw, actually,
7 "recreationally" or "partying," that would
8 indicate that was not prescription opioids, or
9 at least that they were not prescribed an
10 opioid, correct?
11      A.  Yes.
12      Q.  Can you please turn to page 109.
13      A.  This gets really small.
14      Q.  This is very bad, I agree.
15      MR. CLUFF:  Do you know what the
16 Bates number of the document is again?
17      MR. ROMAN:  One second.
18      MR. CLUFF:  I want to see if I can
19 find the electronic copy and show him that.
20      THE WITNESS:  I'm good, I think.
21      Q.  On the sixth entry from the bottom,
22 August 22 of 2017; do you see that entry?
23      A.  I believe we are looking at the
24 same one.
25      Q.  And it says Scott Moran, and then

21 (Pages 363 - 366)

Page 367

1 17-267254?

2    A.  Okay.  Yes, we are on the same one.

3    Q.  And then it talks about -- then the

4 date is August 22 of 2017; do you see that?

5    A.  I do.

6    Q.  And then we go to the narrative,

7 and the person's name has been redacted; do you

8 see that?

9    A.  I do.

10    Q.  And then you write, "Was having

11 hand pains and went to a friend's residence and

12 asked for a Percocet or Percocets.  The male

13 gave him a blue/green pill stamped with an M.

14 He took it and went home, where he passed out.

15 He Googled the pill and believed it was a fake

16 pill laced with fentanyl.  He passed out, was

17 given eight milligrams of Narcan before being

18 conveyed to Fairview Hospital"; do you see

19 that?

20    A.  I do.

21    Q.  Let's break that down, if we could.

22 First of all, this was obviously someone who,

23 at least by his or her account, was not

24 prescribed an opioid, correct?

25    A.  Correct.

Page 368

1    Q.  And we don't know exactly what the

2 person was given, but it probably was fentanyl,

3 correct?

4    MR. CLUFF:  Objection to form.

5    A.  I don't know.  That's what this

6 person believed it to be.

7    Q.  And the fact that eight milligrams

8 of Narcan was administered was consistent with

9 that, correct?

10    MR. CLUFF:  Objection to form.

11 Calls for speculation, for expert opinion.

12    A.  It could have been.

13    Q.  If you had -- I mean, you do this

14 an awful lot.  Would that have been your

15 assumption going forward?

16    MR. CLUFF:  Object to form.

17    A.  There was a timeframe when we were

18 starting to get pressed fentanyl pills, and

19 this is consistent with that timeframe.

20    Q.  So everything in this report is

21 consistent with it being fentanyl, correct?

22    MR. CLUFF:  Object to form.  The

23 document speaks for itself.

24    A.  I had no reason to not believe this

25 person.

Page 369

1    Q.  Have you, in your work, come across

2 counterfeit opioids, counterfeit prescription

3 opioids?

4    A.  Are you meaning pressed fentanyl

5 pills?

6    Q.  Made to look like a Percocet or

7 some other form of prescription opioid.

8    A.  I've been involved in cases where

9 pills like that were recovered.  I have never

10 been the actual lead on one of those cases.

11    Q.  One thing we know for sure is that

12 this overdose was not the result of a

13 prescription opioid, correct?

14    MR. CLUFF:  Objection to form.

15 Calls for an expert opinion.

16    A.  I'm not -- I'm going based on what

17 he said, and I have no reason to not believe

18 it.

19    Q.  Have you ever investigated the

20 Chesterfield Pharmacy at 17004 Melgrave Avenue

21 in Cleveland?

22    A.  No.

23    Q.  How about the Medic Discount Drug

24 at 709 East 185th Street?

25    A.  No.

Page 370

1    Q.  The Walgreen Pharmacy at 11401

2 Union Avenue?

3    A.  No.

4    Q.  Do you know if others in the

5 Cleveland Police Department have done so?

6    MR. CLUFF:  Object to form.  Calls

7 for speculation.

8    A.  I don't know.

9    MR. ROMAN:  Why don't we take a

10 five-minute break.  I think we may be done

11 here.

12    MR. CLUFF:  Are other counselor

13 going to have questions?

14    MR. GOLDSTEIN:  I'll have a few.

15    (Recess taken.)

16    MR. ROMAN:  Back on the record.

17    Q.  Thank you, Det. Moran, the only

18 issue is -- once again we have document issues

19 that you have identified, but subject to

20 receiving those further documents, I'll pass

21 the questioning to Mr. Goldstein.

22    MR. CLUFF:  For the record, what

23 document are you talking about?

24    MR. ROMAN:  We don't have all the

25 response forms, among other things.

22 (Pages 367 - 370)

Page 371

1    MR. CLUFF: I was anticipating the
2  response forms. What other things are you
3  referring to?
4    MR. ROMAN: That's it, the response
5  forms.
6    MR. CLUFF: Okay.
7    MR. ROMAN: Sorry.
8    EXAMINATION OF SCOTT MORAN
9  BY MR. GOLDSTEIN:
10   Q.   Good morning, detective. I'll try
11 and be brief. Thank you for being here today.
12     You testified earlier that you
13 began investigating nonfatal overdoses in 2016;
14 do you recall that?
15   A.   November of 2014.
16   Q.   November of 2014 is when you began
17 investigating nonfatal overdoses?
18   A.   Yes.
19   Q.   And when did you begin
20 investigating fatal overdoses?
21   A.   July of 2013.
22   Q.   And why was there the gap?
23   A.   I'm trying to explain this the
24 simplest way.
25     Originally, we were investigating

Page 372

1  deaths, and that's what our goal was. November
2  of 2014 is when we started getting an enormous
3  amount of overdoses, and that's when we
4  determined that fentanyl had hit the streets.
5     So we began going to the nonfatal
6  overdoses. At the time we didn't know the
7  extent of what the fentanyl problem was going
8  to be. We didn't know if it was going to be
9  from November of 2014 to this day. We were
10 hoping it was just a quick in and out.
11     So we went to the hospitals to
12 interview the survivors, because we wanted to
13 get this fentanyl off the streets as fast as we
14 could, and we were hoping that these survivors
15 would be able to pass that information to us.
16     It evolved where we just began with
17 began with the treatment options and
18 information gathering, and that information
19 from nonfatals can lead to solving a fatal
20 overdose. So we just kept going.
21   Q.   And just to be clear, when you say
22 you started investigating nonfatals, do you
23 mean the department?
24   A.   Our unit, correct.
25   Q.   You mentioned the increase in

Page 373

1  fentanyl use. Has it been your experience that
2  drug users sometimes seek out fentanyl use?
3    MR. CLUFF: Object to form.
4  Misstates the testimony.
5    A.   Some do. Some don't like it. I
6  mean, I can't speak for every addict. That's
7  an individual-by-individual answer. Some like
8  it, some hate it. So the answer to your
9  question, sure, some seek it out. Also you
10 don't have much of an option.
11   Q.   What do you mean by that?
12   A.   Fentanyl is in everything.
13   Q.   I'm sorry. Can you explain a
14 little further. What do you mean by
15 everything?
16   A.   Fentanyl is in coke, fentanyl in is
17 heroin, fentanyl is in meth. I mean, fentanyl
18 is in just about every single thing we analyze,
19 along with 44 different synthetic types of
20 fentanyl.
21   Q.   So is that indicative of the drug,
22 the illegal drug trade in the Cleveland area,
23 there is a lot of fentanyl; is that your
24 testimony?
25     MR. CLUFF: Objection to form.

Page 374

1  Calls for an expert conclusion.
2    A.   I'm not quite sure I understand
3  your question though.
4    Q.   Right. Sure. Do I understand your
5  testimony that the illegal drug market in
6  Cleveland includes a lot of fentanyl?
7    A.   It does.
8    Q.   And is that a reflection in your
9  mind of the demand for fentanyl among users?
10     MR. CLUFF: Objection to form.
11 Calls for an expert conclusion.
12   A.   I can't answer for a user.
13   Q.   Sure. Let me ask it this way --
14   A.   They may not have a choice, that's
15 what's there.
16   Q.   Why do you think that fentanyl is
17 so prevalent in the Cleveland drug market?
18     MR. CLUFF: Objection. Calls for
19 speculation.
20   A.   There could be a multitude of
21 reasons. I mean, I don't know the specific
22 reason. I mean, there is a multitude of
23 reasons of why fentanyl replaced a lot of other
24 drugs.
25   Q.   Are there any that come to mind

23 (Pages 371 - 374)

Page 375

1 today?
2        MR. CLUFF:  Objection to form.
3 Calls for speculation.  And I caution you not
4 to guess.
5    A.   Specifically, I can't give you
6 specifics.
7    Q.   I believe you testified earlier
8 that you are able to get addicts into treatment
9 if they so desire; do you recall that
10 testimony?
11    A.   Yes.
12    Q.   What did you mean by that?
13    A.   We have -- not so much partnered,
14 but the ADAMHS board in Cleveland, which
15 assists mentally challenged, partnered with us,
16 and we have a program called LEADS, which is
17 law enforcement assisted detox.
18        If I respond to a hospital and
19 someone so desires detox, I can call one of
20 three places, and as soon as that person is
21 discharged from a hospital, either myself or a
22 zone car will take him immediately to a detox
23 center to start aiding in treatment.
24    Q.   Now, if an individual declines that
25 offer, that opportunity to go to treatment at

Page 376

1 that point in time, is there any follow-up done
2 with respect to that individual?
3    A.   What do you mean by "follow-up"?
4    Q.   Are treatment services
5 provided -- offered at any other point in time,
6 as a regular practice, to that individual?
7    A.   Metro Hospital has a program called
8 Ascent, A-S-C-E-N-T, where they also assist
9 with detox or treatment options.  I can't speak
10 on if there is a follow-up with them.
11        I always leave a business card with
12 an addict.  Should they decide that maybe they
13 don't want detox that day, but a week from now
14 they go, hey, I need some help, I'm still able
15 to try to assist in helping, but as far as me
16 reaching out to them personally, I can't.
17    Q.   Understood.  And just so the record
18 is clear, you don't provide their information
19 to some other service to follow up?
20    A.   No.
21    Q.   Now, you testified that sometimes
22 you are not actually -- you don't actually
23 respond to a scene of the overdose, you meet
24 the individual at the hospital.
25        In these instances, does a police

Page 377

1 officer usually respond to the scene, even if
2 it is not a HIDI investigator?
3    A.   Ideally.  Ideally a marked uniform,
4 you know, first responder, police car, uniform,
5 would respond.  There are instances where EMS
6 may arrive, and the person needs to get rushed
7 to the hospital right away, and they leave
8 prior to a police car arriving.
9        We do have a protocol in place
10 though, however, if when that person leaves the
11 house, if they are not conscious or have not
12 regained consciousness through the use of
13 Narcan, then that police car is to maintain
14 custody of that house or stay at that house so
15 we can respond, because we would then process
16 that as a potential fatal overdose.  At that
17 time the collection of evidence is prudent.
18    Q.   Do you have a sense as how often in
19 a nonfatal fatal overdose an uniformed officer
20 will respond to the scene?
21    A.   I can't give you a specific
22 percentage or number, but ideally, every time.
23 If they were notified by EMS, they may respond
24 to the scene, but EMS may already be gone, so
25 they don't actually physically go inside, but

Page 378

1 they would respond to the scene.
2        As far as exact numbers, I can't
3 give you numbers.  I have no idea.  Ideally, if
4 we are called, a police car would respond.
5 They may not be able to go if emergency
6 services have already left.
7    Q.   Understood.  And when officers do
8 respond to the scene, if they are let inside,
9 they are trained to look for packaging?
10        MR. CLUFF:  Objection to form.
11 Assumes facts.
12    A.   They are advised to look for
13 packaging.  If they see packaging and they
14 determine that they are comfortable collecting
15 it and transporting it to the hospital to meet
16 us, they will.
17        Fentanyl is very dangerous.  Some
18 officers don't want to get near it.  So if they
19 are afraid to collect for fear of an accidental
20 ingestion, we will respond to the scene.
21    Q.   Now, when you testified about your
22 investigation of individuals who, according to
23 your records, overdosed while taking a
24 prescription opioid, whether through a valid
25 prescription or not, do you ask the individuals

24 (Pages 375 - 378)

Page 379

1  how they took the opioid?
2      A.   As far as ingested or snorted?
3      Q.   Correct.
4      A.   Sometimes.  I can't recall doing it
5  every time.  Sometimes it is volunteered, "I
6  crushed a perc," but I don't know.  Sometimes
7  it comes up.  I can't recall specifically
8  asking on each instance.
9      Q.   Based on your experience, was it
10  more often the case that those who have
11  overdosed while using a prescription opioid
12  have taken it in one manner versus another?
13      A.   I don't know, honestly.  And that's
14  based on even if it was a pill overdose.
15      I mean, that's what is being
16  purported to us.  Sometimes information is
17  purported because they don't want it to look
18  like a certain other type of overdose, but as
19  far as your specific question, I don't know, I
20  really don't know.
21      Q.   What is an example of another type
22  of overdose they don't want it to look like?
23      A.   What do you mean?
24      Q.   You just said that sometimes they
25  might say one thing so it doesn't look like a

Page 380

1  different type of overdose.  I'm just trying to
2  understand what falls into the second category?
3      A.   Heroin overdose.  They don't want
4  their family to know that they ingested heroin.
5  A Percocet overdose might not look so bad to
6  the family member, that they progressed to the
7  next step.
8      Q.   You testified with respect to at
9  least one particular case that you referred the
10  case to the diversion unit; do you recall that?
11      A.   Earlier today?
12      Q.   Yes.
13      A.   Yes.
14      Q.   How do you determine when to refer
15  a case to the diversion unit?
16      A.   When it deals specifically with
17  doctors, I'll pass that information on to the
18  division unit.
19      Q.   How often is that the case, would
20  you say?
21          MR. CLUFF:  Object to form.  Calls
22  for speculation.
23      A.   Whenever I get the information.  I
24  mean, I can't give you exact numbers.  It's not
25  a lot.  It's not a lot.  But if I get specific

Page 381

1  doctor information, I'll definitely provide
2  that information to diversion.
3      Q.   So are you trained to administer
4  Narcan?
5      A.   Yeah.  We have all watched, yeah,
6  yes.  I mean, it's not really a training, it's
7  a video, and we went to an EMS demonstration.
8  We have all been trained.  I guess you would
9  say trained.  It's not like you get a Narcan
10  certificate, you know, but, yeah, we have been
11  advised on how to provide it.
12      Q.   Do you recall when you received
13  that?
14      A.   I mean, I watched a video.  We
15  also, myself personally, I taught -- I gave a
16  quick ten-minute preparation to EMS, like their
17  inservice, their yearly requalification.
18      And then all of our officers had to
19  go through it in the department, and we would
20  sit in on those classes to let the uniformed
21  guys know what we do specifically.  So I saw
22  the whole department get taught how to use it,
23  so I sat in on those too.  So numerous times.
24      Q.   And what is your understanding of
25  what the proper criteria are to use when

Page 382

1  administering Narcan?
2      A.   What you mean, like proper
3  criteria?
4      Q.   I'll strike the question.
5          How do you determine when to
6  administer Narcan?
7      A.   I mean, you have someone that
8  passed out, and they just shot heroin, and they
9  are not breathing, and they are not moving, you
10  administer Narcan.
11          Normally EMS beats us to that
12  before we get there.  In my entire career, I
13  have administered Narcan one time.  So it is
14  not up to me to make that determination.  I
15  know what I see, but the one time I
16  administered it, it came across as a heroin
17  overdose, and I was just around the corner.
18          But normally EMS beats us prior to
19  that.  If it's not a heroin overdose, you know,
20  Narcan doesn't have adverse effects to harm a
21  person if they are wrong.
22          MR GOLDSTEIN:  I think that's all I
23  have for today.  That you very much.
24          MR. CLUFF:  I'm going to ask a few
25  clean-up questions.

25 (Pages 379 - 382)

Page 383

1      EXAMINATION OF SCOTT MORAN
2  BY MR. CLUFF:
3      Q.   To start, Det. Moran, you were
4  asked a lot today about the HIDI response forms
5  that is Exhibits 20, 23 and 24 to 32, and also
6  about what I believe was referred to as a
7  hybrid reference to ODMap in Case Explorer.
8         First, just to understand, are
9  ODMap and Case Tracker the same thing?
10     A.   They are intertwined together.
11  ODMap is actually a live tracking -- overdose
12  tracking server, but the information provided
13  in the ODMap goes go in the Case Explorer.
14     Q.   And then you were shown two
15  voluminous printouts that were appreciatively
16  printed on very large paper.  That's 21 and 22.
17        Do you know if these are either
18  ODMap or Case Tracker; can you tell by looking
19  at them?
20     A.   I believe these are off of ODMap.
21     Q.   What is it for you that indicates
22  these are from ODMap?
23     A.   The Case Explorer comes out -- you
24  know what, I'll be honest, I'm not sure.  I've
25  printed out case-by-case examples.  So I don't

Page 384

1  know if this is -- which format.  I've never
2  had the need to print this.  I don't know.
3     Q.   That's fine either way, but for the
4  record, you can't tell, looking at these
5  printouts today, whether they were printed from
6  the ODMap or Case Tracker?
7     A.   Yeah.
8         MR. GOLDSTEIN:  Objection to form.
9     Q.   So I want to take a step back and
10  kind of understand how the HIDI response forms
11  and the ODMap in Case Tracker, and does that
12  information relate to your job responsibilities
13  as a narcotics detective.
14        So to back up, your primary
15  responsibility in the Cleveland Police
16  Department is as a narcotics detective,
17  correct?
18     A.   Yes.
19     Q.   And if I have understood it
20  correctly today during your deposition, your
21  job as a narcotics detective is essentially to
22  get drugs and drug dealers off the street and
23  help addicts get into treatment?
24        MR. ROMAN:  Object to the form.
25     Q.   Is that accurate?

Page 385

1         MR. ROMAN:  Object to the form.
2     A.   Yes.
3     Q.   As a subset of your
4  responsibilities in the narcotics department, I
5  understand that you also investigate heroin and
6  other drug overdoses?
7     A.   Yes.
8     Q.   So how does investigating heroin
9  overdoses tie into the overall responsibilities
10  of getting drugs and drug dealers off the
11  street as a narcotics detective?
12        MR. ROMAN:  Object to the form.
13     A.   When we would interview the person
14  from a nonfatal overdose, if they are able to
15  provide suspect information and were able to
16  identify who that suspect is, we initiate an
17  investigation, and ideally, we can arrest that
18  person, if not for the overdose, but for
19  selling drugs in the City of Cleveland.
20     Q.   So the purpose of filling out the
21  HIDI response form and including information in
22  Case Tracker or ODMap was not to document a
23  victim's drug use history, it was to identify
24  drug dealers?
25     A.   Yes.

Page 386

1         MR. ROMAN:  Object o the form.
2     Q.   So then in filling out -- or in
3  pursuing that goal of finding the drug dealer,
4  was it essential or predictable that you
5  identify a victim's drug use history?
6         MR. ROMAN:  Object to the form.
7     A.   No.
8     Q.   The HIDI response forms, going back
9  to those, just generally, those are filled out
10  either at the scene or at a hospital -- at a
11  hospital, essentially?
12     A.   Yes.
13     Q.   And would you describe those as
14  ideal conditions for conducting an interview?
15        MR. ROMAN:  Object to the form.
16     A.   No.
17     Q.   Why not?
18     A.   When you are at the scene at a
19  fatal, it is chaotic.  Family members crying, a
20  lot of activity.
21        Hospitals sometimes, you know, they
22  are being worked on by ER staff.  Sometimes it
23  is hard to conduct that interview, not to
24  mention their high just got taken away from the
25  use of Narcan.  They can get angry, they are

26 (Pages 383 - 386)

Page 387

1 not happy, but they are not all the time in the
2 most ideal situation.
3    Q.   And again, when you are filling out
4 a HIDI response form, the goal there is to
5 identify the drug dealers and the drug, right,
6 not the drug history?
7        MR. GOLDSTEIN: Objection to form.
8    Q.   So that's not information that
9 always, necessarily, gets recorded in a HIDI
10 response form?
11        MR. ROMAN:  Same objection.
12    A.   Correct.
13    Q.   And if it is learned about during a
14 verbal discussion, does that guarantee that it
15 gets recorded in a written format in the HIDI
16 response form?
17        MR. GOLDSTEIN:  Same objection.
18    A.   It is not guaranteed.  I try to
19 include it every time I can.  I can't speak for
20 everyone.  It is not guaranteed.
21    Q.   So earlier you were asked by
22 counsel a question about your prior testimony,
23 and you represented that you previously
24 testified that the vast majority of heroin
25 overdoses started with prescription pills.  Is

Page 388

1 that still your recollection?
2    A.   Yeah, my recollection.
3    Q.   And I believe you were asked about
4 the 317 HIDI response forms that are included
5 in Exhibit 23.  Would those 317 always
6 necessarily including information about prior
7 drugs use, if it was learned?
8        MR. ROMAN:  Object to the form.
9 Asked and answered.
10    A.   I would have liked a breakdown on
11 this.  You have 317.  I don't know how many are
12 nonfatals and fatals.  Obviously, if it is a
13 fatal, we can't interview that person to find
14 out how they started.  But, I mean, through the
15 course of building a rapport with someone that
16 survives, I do try to obtain that information.
17    Q.   And if you do obtain that
18 information, sometimes it is recorded in a HIDI
19 response form, but not always?
20        MR. ROMAN:  Object to the form.
21 Asked and answered.  Leading.
22    A.   Yes.
23    Q.   So just reviewing your HIDI
24 response form is not an accurate way of
25 ascertaining your knowledge about a victim's

Page 389

1 prior drug use?
2        MR. ROMAN:  Same objections.
3    A.   Sure.
4    Q.   And then I'm going to ask you about
5 Case Tracker.
6        First of all, we were asked about
7 these Case Tracker ODMap forms, Exhibit 21 and
8 22.  In each of these forms, there is a column
9 that has a narrative; do you see that?
10    A.   Yes.
11    Q.   And that appears to be a much more
12 detailed description of information that is
13 included in the additional info section of the
14 HIDI response form; is that correct?
15        MR. ROMAN:  Object to the form.
16    A.   Yes.
17    Q.   Why is there so much more detailed
18 information included in the narrative in the
19 ODMap and Case Tracker as compared to the HIDI
20 response form?
21        MR. ROMAN:  Objection to the form.
22    A.   Again, this was originally, this is
23 a go-by for you us to just puts notes in at the
24 hospital so we have something to log it.  This
25 is a more of a formal document, where we are

Page 390

1 actually putting a narrative in.
2    Q.   So the HIDI response form is sort
3 of like Cliff Notes of what you learned during
4 the interview at the scene, correct?
5        MR. ROMAN:  Objection to the form.
6    A.   Yes.
7    Q.   But it is not a perfect recitation
8 of everything that you learned at the scene?
9        MR. ROMAN:  Objection to the form.
10    A.   Yes.
11    Q.   The Case Tracker and ODMap
12 narrative section is a more detailed and
13 complete statement of information that's
14 contained?
15        MR. ROMAN:  Objection to the form.
16    A.   That's correct.
17    Q.   And the ODMap and Case Tracker,
18 relating back to your overall goal as a
19 narcotics detective, are these again tools you
20 would use to help you track down drug dealers
21 and to get drugs off the street in Cleveland?
22        MR. ROMAN:  Objection to the form.
23    A.   Yes.
24    Q.   And again, to accomplish this goal,
25 is it necessary that you record in Case Tracker

27 (Pages 387 - 390)

1  a victim's prior drug use?
2      A.   No.
3      Q.   So even if you had learned about
4  that in a verbal interview, it might not
5  necessarily be written in ODMap or Case
6  Tracker?
7          MR. ROMAN:  Objection to the form.
8      A.   Correct.
9      Q.   So once again, although you
10  attempted to be accurate when creating these
11  narratives, it doesn't necessarily always
12  reflect your personal knowledge about a
13  victim's prior drug use?
14          MR. ROMAN:  Objection to the form.
15      A.   Correct.
16      Q.   Okay.  You were also asked some
17  questions earlier about specific pharmacies.
18  Do you recall being asked those questions?
19      A.   I do.
20      Q.   It is not within your job
21  responsibilities in the narcotics unit to
22  investigate pharmacies, is it?
23          MR. ROMAN:  Objection to the form.
24      A.   It is not.
25      Q.   So you wouldn't have had any reason

1  to investigate pharmacies?
2          MR. ROMAN:  Object to the form.
3      A.   I would not.
4      Q.   You talked earlier with counsel
5  about packaging; do you recall that?
6      A.   I do.
7      Q.   What do you mean when you refer to
8  packaging?
9      A.   Packaging is what the drug would
10  come in, if it's packaged.  It could be a zip
11  lock bag, take the corner, put the drugs in the
12  corner of the zip lock bag, pull it, tie it,
13  that's packaging.
14          Inch-by-inch wax bags, which used
15  to be the stamped bags, is what used to be
16  really popular with heroin.  Little Velcro --
17  not Velcro, but zip lock at the top, a little
18  inch by inch, which is really popular.
19          Lottery tickets, you know, a roll
20  of lottery tickets, just rip a little piece
21  off, do a six-to-eight fold.
22          But now it's evolved to anything
23  from pieces of magazines.  Certain crews will
24  use certain types of magazines.  It could be
25  just a receipt, you know, a McDonald's, and

1  it's just packaging.  It is what ideally would
2  hold the drug.
3          However, some drug dealers don't
4  use packaging.  It's known that we are able to
5  obtain information off of packaging.  I have
6  done undercover operations, hand-to-hand
7  transactions, where loose fentanyl was just put
8  right in my hand, with no packaging, because
9  there is no way of tracing what it came in and
10  linking it to someone.
11      Q.   You talked earlier about packaging
12  related to -- in relation to prescription
13  drugs, and if a person obtains a prescription
14  from their doctor and then they acquire a
15  prescription opioid, is it going to come in a
16  prescription kind of packaging?
17      A.   In my narcotics mentality, I don't
18  consider that packaging.  I consider that a
19  pill bottle.  I guess it's packaging, it is
20  what it came in, but for me prescription pills
21  come in a prescription pill bottle.
22          If you talk -- if you're buying
23  prescription pills illegally off the street, it
24  comes in a package, a piece of paper, a plastic
25  bag or something, not necessarily in the pill

1  bottle itself.
2      Q.   So if somebody obtains prescription
3  pills right off the street, right, not from a
4  doctor, then there would be some form of
5  packaging sometimes?
6          MR. ROMAN:  Object to the form.
7      A.   It would depend.  It could be in a
8  zip lock bag or just, "Here's the pills."
9      Q.   Have you ever seen illicit drugs
10  come in pill bottles for packaging?
11      A.   Yeah, I have seen it.  Yeah, I have
12  seen, you know, a pill bottle with heroin in it
13  or coke in it or marijuana.  I mean, marijuana
14  is something that smells, and with that pill
15  bottle, it is going to seal so maybe you won't
16  smell it, per se, coming out.  But, yeah, I've
17  seen illicit drugs in pill bottles.
18      Q.   You talked earlier about a scene
19  where you responded to an overdose on the
20  gentleman's birthday and there was a note that
21  there was no packaging.
22          So was that an indication -- was
23  there any specific indication to you about the
24  kind of overdose he had because there was no
25  packaging?

28 (Pages 391 - 394)

Page 395

1       MR. ROMAN:  Can I take the question
2   again?
3       Q.    Okay.  I'll repeat it.
4           Was there, did the absence of
5   packaging at that scene indicate any kind of a
6   specific overdose to you?
7       A.    It's kind of hard to answer.  I
8   mean, you know, we like to look at everything
9   as a possible heroin overdose.  Obviously,
10  there is times that they are not.
11          The absence of packaging, I have
12  been in over 900 fatalities of -- you know,
13  bodies I've stepped over, and you have all
14  kinds of ideas that go through your head:  Was
15  this a heroin overdose, did the wife clean it
16  up, did he use at the neighbor's house and just
17  walk home and pass away?
18          Our initial investigation is us
19  talking amongst ourselves, what do you think,
20  how do you feel about this, what could this be,
21  what could that be.
22          So, I mean, I have done so many of
23  them, you don't get an initial this was
24  definitely this, and just because in that case
25  the wife said he abused pills, it doesn't mean

Page 396

1   this was a pill overdose.  Very easily he could
2   have done some heroin at bar, and by the time
3   he got home, it hit him and he passed out.
4           The absence of packaging doesn't
5   tell us a lot all the time.  Sometimes it does,
6   if we know for a fact it was heroin.  Like
7   there is a syringe, there is a text message
8   that says, "Give me the dog food," which is
9   slang for heroin, and all of a sudden there is
10  nothing there.  But we know he was with people,
11  that tells us someone cleaned that scene.
12          So it's a case-by-case scenario.
13  The absence of packaging in that case didn't
14  really raise any red flags for us.
15      Q.    Its sounds like the investigation
16  of these fatal and nonfatal overdoses is kind
17  of a fluid process, right?
18          MR. ROMAN:  Object to the form.
19      A.    Absolutely.
20      Q.    You can't make any absolute
21  conclusion based on one factor or other?
22          MR. ROMAN:  Object to the form.
23      A.    Not an absolute, no.  Obviously, if
24  you have a body and a needle is still in the
25  guy's arm, you can make a pretty fair

Page 397

1   assumption on that, but even then, it is not
2   100 percent.
3           MR. CLUFF:  That's all I have.
4           MR. ROMAN:  I have one, possibly
5   two more questions.
6           EXAMINATION OF SCOTT MORAN
7   BY MR. ROMAN:
8       Q.    Det. Moran, when you have a fatal
9   overdose, you can, in fact, ask friends and
10  family about the overdose victim's drug
11  history; can you not?
12          MR. CLUFF:  Objection to form.
13  Calls for speculation.  Incomplete
14  hypothetical.
15      A.    I can.
16      Q.    And you, in fact, do that as part
17  of your regular practice; do you not?
18      A.    Sir, the object of us responding to
19  a fatal overdose is to hold that drug dealer
20  that sold it accountable.
21          Throughout the course of bonding
22  with the family or trying to -- you know, we
23  are there for a while.  We are there waiting
24  for personnel to show up.  If that information
25  comes out and it's volunteered by that family,

Page 398

1   obviously that's information we will take, but
2   when that person died, that person's drug
3   history really is irrelevant to us.  Our
4   relevancy is someone is selling something that
5   killed him or her and could potentially kill
6   someone else.
7           So our focus is in a totally
8   different direction.  If that information comes
9   out, we'll hear it, but our focus is a totally
10  different direction on that.
11      Q.    So you are not concerned at all
12  about, for example, trying to learn how people
13  become addicted to prescription opioids in
14  general?
15          MR. CLUFF:  Objection.  Misstates
16  the testimony.
17      Q.    Let me withdraw.
18          So you are not concerned at all
19  about how people become addicted to heroin and
20  fentanyl, as a general matter?
21          MR. CLUFF:  Same objection.
22  Misstates testimony.
23          Are you asking him specifically, or
24  in his role as a narcotics investigator?
25      A.    Are you referring to a fatal or

29 (Pages 395 - 398)

Page 399

1  nonfatal?
2      Q.   Well, I mean, your job, as I
3  understand it, and we all appreciate it, is to
4  make the streets safe and to help address the
5  opioid epidemic, correct?
6          MR. CLUFF: Objection. Misstates
7  testimony.
8      A.   My job is to get drug dealers and
9  drugs off the street, absolutely.
10     Q.   And sometimes you respond to fatal
11  overdoses and sometimes they are nonfatal,
12  right?
13     A.   Right.
14     Q.   And one of the reasons -- one of
15  the things with a nonfatal is you want to find
16  out what is going on with the person and how
17  the person became addicted to whatever it is he
18  overdosed on, right?
19         MR. CLUFF: Objection. Misstates
20  testimony.
21     A.   That is part of my questioning to
22  build a rapport with that person.  Just to
23  talk, treat them as a human, not as a jerk cop
24  coming in yelling at you for being an addict.
25  I sit and talk.  I mean, I want to understand

Page 400

1  them.  I mean, I actually care about what
2  happens to addicts.  I don't want to step over
3  a thousand bodies.
4      Q.   Right.
5      A.   So it is part of my questioning how
6  they got started.  It's my natural curiosity.
7      Q.   Right.  So one of the ways you can
8  step over fewer bodies is if you help find out
9  what leads to all those bodies -- all those
10  people dying in the first instance, right?
11         MR. CLUFF: Object to form.  Calls
12  for speculation, exert opinion, and misstates
13  testimony.
14     Q.   You're not trying to find out why
15  there is so many bodies out there?
16         MR. CLUFF: Objection to form,
17  argumentative, calls for speculation, and
18  misstates testimony.
19     A.   I'm not even sure you have asked
20  the question.  How that person started is
21  curious to me and how they progressed to that.
22  How that person started is not going to stop
23  other people from dying.  The information they
24  provide, as far as suspects, who provided the
25  drugs, that's the information I ultimately

Page 401

1  want, because I ultimately want that drug
2  dealer.  I don't want other people to die.
3          If I can earn a trust and a rapport
4  by talking to that person, treating them as a
5  human, understanding how their addiction got to
6  where it is, to get them to provide information
7  to me, as far as who that drug dealer is, I'm
8  going to sit there and talk to them about what
9  color the sky is.  I'm going to get as much
10  information from them and earn their trust as I
11  possibly can to get them to relay information
12  to me.
13     Q.   But when we met in December, you
14  testified that there was a high number, you
15  weren't specific, but there was a high number
16  of folks who began down the path of addiction
17  with prescription opioids; do you recall that?
18     A.   I do.
19     Q.   And you reached that conclusion,
20  you said, on the basis of talking to victims
21  and family members, correct?
22     A.   Yes.
23     Q.   And one of the reasons that you
24  reached this conclusion, one of the things
25  that -- one of the reasons why you noticed this

Page 402

1  is that this is part of your concern, is that
2  there are too many prescription opioids out
3  there, right?
4          MR. CLUFF: Objection to form.  Do
5  you have a specific citation on the testimony
6  you are referring to?  Because at this point,
7  you are now talking about his prior testimony.
8  I see he has a copy of the depo.
9      Q.   You can answer the question.
10         MR. CLUFF: If you can recall that
11  that was your testimony, you can answer.
12     A.   I can't recall.
13     Q.   Well, I'm not asking you to recall
14  anything.  I'm asking -- well let me ask this
15  question:  Have you drawn conclusions about the
16  causes of the opioid epidemic in Cleveland?
17         MR. CLUFF: Objection to form,
18  calls for an expert conclusion, and
19  speculation.  You can testify about your
20  experience.
21     A.   I'm not drawing a conclusion to the
22  overall opioid epidemic in Cleveland.
23     Q.   So you don't have any views as to
24  whether or not there are too many prescription
25  opioids out there?

1    MR. CLUFF:  Objection to form.
2  Argumentative.  Calls for speculation.
3  Misstates testimony.
4    A.  I don't have an opinion.  My job is
5  to get drugs off the street.
6    MR. ROMAN:  Thank you.  No further
7  questions.
8    EXAMINATION OF SCOTT MORAN
9  BY MR. GOLDSTEIN:
10    Q.  Just a couple more questions.
11    You testified that in 2017, you
12  began asking every time about whether an
13  individual had used prescription opioids
14  previously; is that accurate?
15    MR. CLUFF:  Objection.  That
16  misstates testimony.
17    A.  I don't feel it is accurate.  I
18  mean, maybe I started getting more diligent
19  about documenting that in 2017.  I can't say
20  every time.  I mean, I walk into a room and a
21  guy is going to tell me go "F" myself.
22    If I build a rapport and there is a
23  conversation and time talking back and forth
24  with someone, I ask.  To say every time, it's
25  an unfair label.

1    Q.  I understand.  That was part of
2  your common practice?
3    MR. CLUFF:  Objection.  Misstates
4  testimony.
5    A.  I attempt to at every opportunity.
6    Q.  Why was there -- why did you start
7  doing that in 2017?
8    A.  Again, our unit has been a fluid
9  unit.  It evolved.  We just started documenting
10  more information.
11    Q.  Was there any directive that came
12  down to you regarding asking for that
13  prescription opioid history?
14    MR. CLUFF:  Object to form.
15    A.  There was no written directive.  I
16  don't recall a directive.  I mean, I always
17  asked, and we decided to start documenting.  I
18  mean, I can't even say if everyone documents.
19  I try to when I'm able to.
20    Q.  But was there any kind of
21  communication in your unit on that?
22    MR. CLUFF:  Objection.  Vague as to
23  communication.
24    A.  Not that I recall.  I have always,
25  like I said, I have always done it.  I don't

1  recall any direct order or any direct
2  communication or specific commands or any of
3  that stuff.
4    Q.  I believe you also testified that
5  for your unit, that was the practice, in your
6  unit, was to ask about historical drug use as
7  of 2017?
8    MR. CLUFF:  Objection.  Misstates
9  testimony.
10    A.  I don't recall saying as a unit.  I
11  recall speaking of myself personally.  I mean,
12  I always ask.
13    Q.  Do you know if others in your unit
14  also ask?
15    A.  I believe they do.  I have been
16  with one partner that I've heard him ask in the
17  past.  Again, I could speak for myself.
18    Q.  And you were asked to talk to them
19  about why they asked that question?
20    A.  No.
21    Q.  And on a separate topic, when you
22  identified a nonfatal, when you responded to a
23  nonfatal overdose, is there any effort made to
24  flag that individual or in any way to prevent
25  them from getting a prescription opioid in the

1  future?
2    MR. CLUFF:  Objection to form.
3  Calls for speculation.
4    A.  No, no.  I mean that's nothing that
5  we did, no.
6    Q.  Are you familiar with the OARRS
7  database?
8    A.  I am.
9    Q.  Do you ever -- you never input
10  information into OARRS?
11    A.  I don't.
12    Q.  And information you collect on
13  nonfatal overdoses, as far as you know, is
14  never added into the OARRS database?
15    MR. CLUFF:  If you know.
16    A.  Not to my knowledge.
17    MR. GOLDSTEIN:  I have nothing
18  further.
19    MR. ROMAN:  Thank you.
20    MR. CLUFF:  He will read the
21  deposition.
22    (Deposition concluded at 10:26 a.m.)
23    - - - - -
24
25

31 (Pages 403 - 406)

Page 407

1  Whereupon, counsel was requested to give
2  instruction regarding the witness's review of
3  the transcript pursuant to the Civil Rules.
4
5       SIGNATURE:
6  Transcript review was requested pursuant to the
7  applicable Rules of Civil Procedure.
8
9       TRANSCRIPT DELIVERY:
10  Counsel was requested to give instruction
11  regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 409

1       I do further certify that I am not
2  a relative, counsel or attorney for either
3  party, or otherwise interested in the event of
4  this action.
5       IN WITNESS WHEREOF, I have hereunto
6  set my hand and affixed my seal of office at
7  Cleveland, Ohio, on this 2nd day of
8  April, 2019.
9
10
11
12
13            _Wendy L. Klauss_
14       Wendy L. Klauss, Notary Public
15       within and for the State of Ohio
16
17  My commission expires July 13, 2019.
18
19
20
21
22
23
24
25

Page 408

1       REPORTER'S CERTIFICATE
2  The State of Ohio,   )
3            SS:
4  County of Cuyahoga.  )
5
6       I, Wendy L. Klauss, a Notary Public
7  within and for the State of Ohio, duly
8  commissioned and qualified, do hereby certify
9  that the within named witness, SCOTT MORAN, was
10  by me first duly sworn to testify the truth,
11  the whole truth and nothing but the truth in
12  the cause aforesaid; that the testimony then
13  given by the above-referenced witness was by me
14  reduced to stenotypy in the presence of said
15  witness; afterwards transcribed, and that the
16  foregoing is a true and correct transcription
17  of the testimony so given by the
18  above-referenced witness.
19       I do further certify that this
20  deposition was taken at the time and place in
21  the foregoing caption specified.
22
23
24
25

Page 410

1         Veritext Legal Solutions
              1100 Superior Ave
2                 Suite 1820
              Cleveland, Ohio 44114
3           Phone: 216-523-1313
4
   April 2, 2019
5
   To: Sterling Cluff
6
   Case Name: In Re: National Prescription Opiate Litigation v.
7
   Veritext Reference Number: 3272305
8
   Witness:  Scott Moran, Vol II     Deposition Date:  3/27/2019
9
10  Dear Sir/Madam:
11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

32 (Pages 407 - 410)

Page 411

1       DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 3272305
3  CASE NAME: In Re: National Prescription Opiate Litigation v.
    DATE OF DEPOSITION: 3/27/2019
4  WITNESS' NAME: Scott Moran, Vol II
5     In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have made no changes to the testimony
    as transcribed by the court reporter.
8
9  Date _____ Scott Moran, Vol II
10    Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
     They have read the transcript;
13    They signed the foregoing Sworn
     Statement; and
14    Their execution of this Statement is of
     their free act and deed.
15
    I have affixed my name and official seal
16
  this _____ day of _____, 20____.
17
18    Notary Public
19
    Commission Expiration Date
20
21
22
23
24
25

Page 412

1       DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 3272305
3  CASE NAME: In Re: National Prescription Opiate Litigation v.
    DATE OF DEPOSITION: 3/27/2019
4  WITNESS' NAME: Scott Moran, Vol II
5     In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9     I request that these changes be entered
    as part of the record of my testimony.
10
     I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13
    Date _____ Scott Moran, Vol II
14
    Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17    They have read the transcript;
    They have listed all of their corrections
18    in the appended Errata Sheet;
    They signed the foregoing Sworn
19    Statement; and
    Their execution of this Statement is of
20  their free act and deed.
21  I have affixed my name and official seal
22  this _____ day of _____, 20____.
23
    Notary Public
24
    Commission Expiration Date
25

Page 413

1       ERRATA SHEET
     VERITEXT LEGAL SOLUTIONS MIDWEST
2    ASSIGNMENT NO: 3/27/2019
3  PAGE/LINE(S) /     CHANGE    /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
    _____   _____
20  Date        Scott Moran, Vol II
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23
    Notary Public
24
    Commission Expiration Date
25

33 (Pages 411 - 413)

**[& - 3]**                                                            Page 1

| & | |
|---|---|
| **&** 286:23 287:3,20 288:3,10,20 292:12,15,24 293:1,8,13 342:9 | |

| **0** | |
|---|---|
| **001479368** 290:7 313:13 314:5 | |
| **002404458** 290:8 313:23 314:7 | |
| **00318054** 290:24 335:23 | |
| **003180873** 291:9 345:9,15 | |
| **003180880** 291:6 342:18,24 | |
| **003180886** 290:17 329:7,12 | |
| **003180887** 290:13 326:8,14 | |
| **003180898** 291:16 354:1,6 | |
| **003180904** 291:2 338:8 | |
| **003181038** 290:5 296:13 297:7 | |
| **003181042** 290:20 333:18,24 | |
| **003181054** 336:4 | |
| **003181107** 291:13 349:19 350:15 | |
| **02199-3600** 288:5 | |
| **03180904** 338:14 | |

| **1** | |
|---|---|
| **10-3-76** 315:4 | |
| **100** 287:13 351:24 397:2 | |
| **10036** 288:8 | |
| **109** 366:12 | |

**10:26** 406:22
**10s** 343:15
**11** 358:12
**1100** 287:22 410:1
**11401** 370:1
**1211** 288:6,7
**13** 409:17
**138** 290:8 313:22 314:6
**14** 355:5 356:3,14 356:20,21,25,25 357:2 363:3,8,21 364:19,20
**140** 339:5 341:13
**15219-6401** 288:22
**159** 287:4
**16** 315:11
**1660** 286:23
**17** 286:9 320:14
**17-267254** 367:1
**17004** 369:20
**18** 320:15
**1820** 410:2
**185th** 369:24
**1879** 362:6
**1888** 317:23,25
**19** 354:10
**1999** 288:17
**1:18** 286:16

| **2** | |
|---|---|
| **2** 314:24,25 316:8 357:16 359:8 410:4 | |
| **20** 290:2 293:24 296:9 297:5 320:3 345:25 355:12 383:5 411:16 412:22 413:22 | |
| **20001-4856** 288:13 | |

**2013** 322:19 371:21
**2014** 322:19 371:15,16 372:2,9
**2014ish** 322:22
**2016** 314:23 322:7 357:15 358:4,12 360:8 371:13
**2017** 314:24,25 315:1 317:16 318:17 321:14 323:23 325:12,16 325:17,20 350:19 357:16 358:5,12 360:8 361:6,7 362:9,10 363:22 363:22 366:22 367:4 403:11,19 404:7 405:7
**2018** 317:16 318:18 323:23 327:10 329:17 334:2 336:16 338:20 343:3 345:19 354:10
**2019** 286:21 409:8 409:17 410:4
**202** 288:14
**21** 290:6 313:6,11 314:3,23 315:4,21 357:12,14 383:16 389:7
**210** 359:11,13,14 359:15 360:7
**212** 288:8
**21202-1031** 287:14
**216** 287:10,23
**216-523-1313** 410:3

**22** 290:8 313:17,21 314:6,24 315:22 315:23 357:20 361:4 366:22 367:4 383:16 389:8
**2210** 343:8
**2222** 409:13
**23** 290:9 316:25 317:2 326:20,23 326:24 383:5 388:5
**24** 290:11 326:4,12 326:23 330:24 336:10 383:5
**2440** 287:13
**25** 290:14 323:23 324:7 329:1,3,10 336:10
**252-9060** 287:19
**26** 290:18 333:14 333:22 336:10
**27** 286:21 290:21 314:23 335:19 336:2 345:19 357:15
**28** 290:25 315:1 338:4,12 343:3
**2804** 286:6
**284** 286:9
**287** 289:2
**29** 291:3 338:20 342:14,22
**290** 289:3
**292** 289:4
**296** 290:2
**2nd** 409:7

| **3** | |
|---|---|
| **3** 315:11 316:9 359:8 | |

[3/27/2019 - admitted]                                                    Page 2

**3/27/2019** 410:8
411:3 412:3 413:2
**30** 291:7 343:15,18
343:24 345:5,13
348:11
**301** 288:21
**31** 291:10 349:15
350:13 353:14
**310** 353:20
**313** 290:6,8
**317** 290:9 317:11
318:17 320:14
323:22 388:4,5,11
**32** 291:14 353:22
354:5 383:5
**326** 290:11
**3272305** 410:7
411:2 412:2
**329** 290:14
**33** 300:1
**330** 287:19
**332-4764** 288:18
**333** 290:18
**335** 290:21
**338** 290:25
**342** 291:3
**345** 291:7
**349** 291:10
**353** 291:14
**35th** 288:21
**371** 289:5
**383** 289:5
**397** 289:6
**3979** 337:18,21

**4**

**4** 328:14 350:19,21
**40** 349:23
**403** 289:6
**407** 362:7 363:21
**408** 289:7

**410** 287:14
**412** 288:22
**417** 362:21,25
**424** 288:18
**44** 373:19
**44113** 287:23
**44114** 410:2
**44114-1190** 287:9
**44308** 287:18
**45090** 286:16
**471-3490** 288:22

**5**

**50** 287:18
**54** 290:6 313:12
314:3
**586-3939** 287:10
**592-5000** 287:23
**596-9451** 288:8

**6**

**617** 288:5
**662-6000** 288:14

**7**

**700** 320:20
**709** 369:24
**771** 357:22,22
358:7 359:8

**8**

**800** 288:4
**818** 287:5
**839-2333** 287:5
**850** 288:13
**8:08** 286:21

**9**

**90** 343:15 344:5,14
344:25
**900** 395:12
**900067-4643**
288:17

**901** 287:9
**949-1159** 287:14
**950** 287:22
**951-7000** 288:5

**a**

**a.m.** 286:21
406:22
**able** 301:19,25
307:2,4 311:6
334:8 343:22
354:25 372:15
375:8 376:14
378:5 385:14,15
393:4 404:19
**absence** 347:1
348:3,24 395:4,11
396:4,13
**absolute** 396:20
396:23
**absolutely** 311:10
396:19 399:9
**abuse** 312:8
**abused** 348:21
395:25
**abusing** 312:21
**accidental** 378:19
**accomplish** 390:24
**account** 356:9
367:23
**accountable**
397:20
**accurate** 359:19
359:25 361:12
362:18 364:21
384:25 388:24
391:10 403:14,17
**acknowledge**
411:11 412:16
**acquire** 393:14
**act** 411:14 412:20

**action** 409:4
**activity** 386:20
**actual** 299:2
300:23 321:20
322:11,21 323:12
339:12 340:1
341:23 364:16
369:10
**adamhs** 375:14
**add** 300:2
**added** 406:14
**addict** 355:9,10,14
373:6 376:12
399:24
**addicted** 398:13
398:19 399:17
**addiction** 356:24
401:5,16
**addicts** 307:2
360:17 375:8
384:23 400:2
**additional** 304:5
327:13 329:19,21
336:18 339:1
343:13 346:8
350:25 354:17
357:8 389:13
**address** 308:20
343:9 399:4
410:15
**addresses** 362:2
**administer** 381:3
382:6,10
**administered**
331:1 368:8
382:13,16
**administering**
382:1
**admit** 352:6
**admitted** 307:1,4
344:12

**adverse**  382:20
**advised**  378:12
  381:11
**affixed**  409:6
  411:15 412:21
**aforesaid**  408:12
**afraid**  378:19
**age**  292:1 329:23
**ago**  304:16 305:25
  322:3 325:9,10,10
  333:7
**agree**  366:14
**ah**  331:6
**ahead**  347:18
**aiding**  375:23
**akron**  287:18
**al**  286:13,15
**allowed**  339:3
**amazing**  343:20
**americas**  288:7
**amerisourceberg...**
  287:16 292:22
**amount**  328:13
  352:12 353:3,8
  354:24 372:3
**analysis**  305:4,6
**analyze**  373:18
**andrew**  287:17
  292:21
**angeles**  287:5
  288:17
**angry**  386:25
**anschock**  287:19
**answer**  324:2
  341:10,11 347:5
  348:17,18 360:11
  360:13 363:15,17
  364:3 373:7,8
  374:12 395:7
  402:9,11

**answered**  388:9
  388:21
**anticipating**  371:1
**anxiety**  351:3,11
  351:12
**anybody**  294:21
  295:15 303:2,13
  358:22
**apart**  294:13
**appear**  317:14
  411:11 412:15
**appearances**
  287:1 288:1 289:2
  292:9
**appears**  317:20
  389:11
**appended**  412:11
  412:18
**applicable**  407:7
**appreciate**  399:3
**appreciatively**
  383:15
**april**  409:8 410:4
**area**  373:22
**argumentative**
  400:17 403:2
**arm**  310:10
  396:25
**arrest**  385:17
**arrested**  340:11
  341:4
**arrive**  296:3
  298:19 307:15
  377:6
**arriving**  377:8
**ascent**  376:8
**ascertaining**
  388:25
**asked**  330:2
  367:12 383:4
  387:21 388:3,9,21

389:6 391:16,18
  400:19 404:17
  405:18,19
**asking**  309:19
  379:8 398:23
  402:13,14 403:12
  404:12
**assigned**  297:14
  307:11 317:22
  318:12 320:6
  321:5
**assignment**  411:2
  412:2 413:2
**assist**  376:8,15
**assisted**  319:9
  375:17
**assists**  375:15
**assume**  360:11
  365:20
**assumes**  347:11
  356:10 378:11
**assuming**  314:15
  360:5
**assumption**
  368:15 397:1
**astute**  332:9
**attach**  323:12
**attached**  412:7
**attempt**  404:5
**attempted**  391:10
**attempting**  355:6
**attorney**  290:3,11
  290:15,18,22,25
  291:4,7,11,14
  296:10 326:5
  329:4 333:15
  335:20 338:5
  342:15 345:6
  349:16 353:23
  409:2

**august**  366:22
  367:4
**authorize**  412:11
**automatically**
  365:19
**ave**  410:1
**avenue**  287:9,22
  288:7,17 369:20
  370:2
**aware**  325:3
**awful**  368:14

**b**

**b**  299:23 321:9
  355:13,15
**back**  304:17
  321:23 322:16,22
  323:7 324:3 328:1
  332:16 337:15,20
  337:21 357:12
  370:16 384:9,14
  386:8 390:18
  403:23 410:15
**bad**  366:14 380:5
**badge**  318:1
**baeppler**  299:23
  300:7 301:15
  318:24 320:3,5
  345:23 348:20
**bag**  310:11 392:11
  392:12 393:25
  394:8
**bags**  392:14,15
**baltimore**  287:14
**bar**  396:2
**baron**  287:3
  292:12
**baronbudd.com**
  287:6
**based**  299:6
  341:20 346:25
  349:10 355:1

360:13 363:13
364:1,10 365:11
369:16 379:9,14
396:21
**basically** 358:11
**basis** 401:20
**bates** 290:4,6,8,13
290:16,20,23
291:2,5,9,12,16
296:12 313:13,23
314:4,7 326:7
329:6 333:17
335:22 338:7
342:17 345:8
349:18 353:25
366:16
**bearing** 297:6
326:13 329:11
333:23 336:3
338:13 342:23
345:14 350:14
**beats** 382:11,18
**becoming** 325:20
**began** 322:20
325:3 344:3,4
360:15,21 364:5
364:10 365:3
371:13,16 372:5
372:16,17 401:16
403:12
**beginning** 290:4
290:12,16,19,23
291:1,5,8,12,15
296:12 326:7
329:6 333:17
335:22 338:7
342:17 345:8
349:18 353:25
**behalf** 287:2,7,11
287:16,20 288:2
288:10,19 292:24

293:2,5,8,10
**belief** 323:19
**believable** 352:17
**believe** 299:1
300:15 310:21
314:10,19 316:11
319:13,20 323:21
327:24 328:6,10
328:12,14,16
330:8,13,15 332:7
337:23,25 340:25
344:12,18 346:14
348:10 355:20
359:21 361:9
366:23 368:24
369:17 375:7
383:6,20 388:3
405:4,15
**believed** 340:10,11
342:3 344:23
352:3 367:15
368:6
**believes** 355:13
**berne** 286:23
**best** 340:25
**big** 310:11 316:23
353:8
**birthday** 346:15
394:20
**bit** 333:11 341:15
**black** 298:21
304:15 329:21
331:9 332:9
**block** 301:7 302:8
303:11,17 304:3,4
304:8
**blue** 367:13
**bmv** 301:20
**board** 375:14
**bodies** 395:13
400:3,8,9,15

**body** 299:4 301:23
301:24 302:14
303:6 308:20
309:12 310:2
396:24
**bonding** 397:21
**boston** 288:5
**bottle** 347:14,25
348:4 393:19,21
394:1,12,15
**bottles** 309:11
310:2 394:10,17
**bottom** 327:12
366:21
**bought** 343:24
**boulevard** 287:4
**box** 302:3,6
**boxes** 298:16
**boyfriend** 340:7
**boylston** 288:4
**break** 312:20
333:7 339:7 350:1
350:3 367:21
370:10
**breakdown**
388:10
**breathing** 382:9
**brief** 332:1 371:11
**briefly** 293:25
294:12
**brookpark** 343:9
**brought** 313:7
**brown** 355:8
**bruised** 343:16
344:6,9,13,15
345:1
**budd** 287:3 292:12
**build** 311:7,17
399:22 403:22
**building** 311:19
388:15

**burling** 288:10
292:15 293:8,10
**business** 318:3
337:18 338:19
343:4 345:20
350:20 354:11
376:11
**busy** 325:25 332:5
350:4 358:20
**buy** 300:24 301:3
**buying** 393:22
**buzz** 365:8

### c

**c** 299:11 320:25
321:8 376:8
**ca** 287:5 288:17
410:25
**cabinet** 322:10
323:1,3
**cabinets** 322:13,14
**cain** 288:20,23
293:12,13
**calculation** 359:10
362:7
**call** 298:13,22
303:9 375:19
**called** 292:1
375:16 376:7
378:4
**calls** 299:6 342:11
348:15 363:12
364:1 368:11
369:15 370:6
374:1,11,18 375:3
380:21 397:13
400:11,17 402:18
403:2 406:3
**caption** 408:21
**car** 298:7,21
299:12,13 304:15
332:7 334:18

375:22 377:4,8,13
378:4
**card** 376:11
**care** 400:1
**career** 382:12
**case** 286:8,16
297:13,15 300:8
300:14,15 301:10
304:10,18 305:5,9
305:12,15,18
306:12 307:9,11
308:7,11,12,15,17
310:1,1,18 311:1,2
311:18 312:12,16
313:2,3 314:12,20
318:12 320:1
321:23,24 322:1
322:11,23 323:12
328:19 330:1,6,17
334:17 337:8,12
339:9 340:4
341:25 344:20
346:2,10 348:19
351:9 356:17
357:15 358:17
359:5 361:5
379:10 380:9,10
380:15,19 383:7,9
383:13,18,23,25
383:25 384:6,11
385:22 389:5,7,19
390:11,17,25
391:5 395:24
396:12,12,13
410:6 411:3 412:3
**cases** 299:5 306:19
318:23 319:2,23
320:13 321:17,25
323:8 344:17
355:19 369:8,10

**cash** 339:6 341:13
**cast** 334:12
**castleberry** 339:5
339:21 340:16
342:8
**category** 380:2
**cause** 339:10,12
408:12
**caused** 351:12
**causes** 402:16
**caution** 341:8
375:3
**cedar** 339:5,21
342:9
**cell** 303:19
**cellphone** 304:14
306:12,13 346:18
357:7
**center** 288:12
375:23
**centre** 288:21
**ceppich** 288:18
**certain** 298:25
299:20 300:11
351:24 352:7,12
379:18 392:23,24
**certificate** 289:7
381:10 408:1
412:11
**certification** 411:1
412:1
**certified** 292:4
**certify** 408:8,19
409:1
**challenged** 375:15
**chance** 318:11
334:20
**change** 294:3
410:13,14 412:8
413:3

**changes** 294:8,9
410:12 411:7
412:7,9
**chaotic** 386:19
**charge** 323:5
**check** 298:16
**checked** 359:7
**chesterfield**
369:20
**choice** 374:14
**christopher**
288:16
**chronological**
357:19
**circumstances**
309:14
**citation** 402:5
**city** 287:2 288:12
292:13 296:20
385:19
**civil** 407:3,7 411:5
412:5
**claim** 328:3
**claimed** 327:13
328:7
**classes** 381:20
**clean** 355:5 356:3
356:20,24 357:2
382:25 395:15
**cleaned** 396:11
**clear** 315:11 326:2
372:21 376:18
**cleve** 290:4,13,16
290:20,23 291:2,5
291:9,12,16
296:13 297:7
326:8,14 329:7
333:18,23 335:23
336:3 338:8,14
342:18 345:9,15
349:19 350:15

354:1,6
**cleveland** 286:24
287:2,9,23 290:3
290:12,15,19,22
291:1,4,8,11,15
292:13 296:4,11
296:20 297:10,18
298:4,5 299:8
326:6 329:5,12
333:16 335:21
338:6 342:16
343:8,9 345:7
349:17 353:24
358:4 369:21
370:5 373:22
374:6,17 375:14
384:15 385:19
390:21 402:16,22
409:7 410:2
**cliff** 390:3
**cline** 320:25
**close** 358:15
**cluff** 287:4 289:5
292:11,12 294:19
294:24 295:9,16
296:17 312:18
314:1 315:3,12,17
315:23 320:16
324:14 326:22
327:4 332:20
335:13,16 337:6
341:7 342:10
344:10 347:2,11
347:16 348:14
349:25 351:21
353:5 356:8,10
357:18,25 358:9
358:24 359:18
360:10 361:8,11
361:16 362:12
363:4,12,16,25

[cluff - correct]

366:15,18 368:4
368:10,16,22
369:14 370:6,12
370:22 371:1,6
373:3,25 374:10
374:18 375:2
378:10 380:21
382:24 383:2
397:3,12 398:15
398:21 399:6,19
400:11,16 402:4
402:10,17 403:1
403:15 404:3,14
404:22 405:8
406:2,15,20 410:5
**code** 306:14,16,17
**coke** 373:16
394:13
**collect** 305:1
378:19 406:12
**collected** 309:24
**collecting** 378:14
**collection** 290:9
317:3,7 326:19,21
377:17
**color** 401:9
**colorful** 314:1
**column** 316:1
361:21 362:4,22
389:8
**come** 305:16,23,25
306:1,3,3,4 332:15
347:9 369:1
374:25 392:10
393:15,21 394:10
**comes** 379:7
383:23 393:24
397:25 398:8
**comfortable**
378:14

**coming** 394:16
399:24
**commands** 405:2
**commission**
409:17 411:19
412:25 413:25
**commissioned**
408:8
**commit** 355:6,16
**common** 321:2
404:2
**communication**
404:21,23 405:2
**company** 288:19
293:14
**compared** 389:19
**complete** 293:20
307:14,18 390:13
**completed** 297:11
300:7 317:15
327:6 343:2
345:18 354:10
410:15
**compound** 312:18
348:15
**computer** 314:17
**concern** 402:1
**concerned** 398:11
398:18
**conclude** 341:17
**concluded** 341:19
406:22
**conclusion** 348:16
349:8 374:1,11
396:21 401:19,24
402:18,21
**conclusions**
346:25 349:6
351:19 402:15
**conditions** 386:14

**conduct** 301:3
345:22 346:6
386:23
**conducting** 386:14
**confident** 302:2
310:12
**confidential**
286:20 290:2,11
290:14,18,21,25
291:3,7,10,14
296:10 315:16
326:5 329:4
333:15 335:20
338:5 342:15
345:6 349:16
353:23
**confidentiality**
315:14,18
**confirm** 301:19
302:1
**confiscates** 309:22
**connection** 330:3
331:13,16,21
332:21 341:4
**conscious** 377:11
**consciousness**
351:13 377:12
**consider** 393:18
393:18
**consistent** 361:15
368:8,19,21
**contact** 303:12
**contacted** 342:8
**contained** 390:14
**container** 348:4
**contains** 361:6
**continued** 286:18
288:1
**controlled** 332:12
**conversation**
403:23

**conveyed** 334:17
351:5 367:18
**cop** 399:23
**copy** 366:19 402:8
**corner** 382:17
392:11,12
**corporation**
287:16 288:10
292:16,22 293:8
**correct** 297:11,19
300:19 303:15
307:16 308:1
309:8 311:24
312:6,12,17,24
314:13 316:17,21
317:18,20 318:1,4
318:16 324:13
327:6,10,11,19
328:4 329:17,18
330:11,12 331:14
331:19 332:19
334:2,5 336:13,16
336:24 337:1
338:20,21,23,24
342:25 343:4,7
344:20 345:16,20
346:3,24 347:10
349:12 350:20,21
350:23 352:20
353:16 354:11,14
355:22 356:3,7,17
358:5 360:5
361:24 362:3,5
365:6 366:10
367:24,25 368:3,9
368:21 369:13
372:24 379:3
384:17 387:12
389:14 390:4,16
391:8,15 399:5
401:21 408:16

corrections 410:12
412:17
correctly 384:20
correspond 358:2
counsel 326:22
387:22 392:4
407:1,10 409:2
counselor 370:12
count 317:11
counterfeit 369:2
369:2
county 286:13
408:4 411:10
412:15
couple 299:4
302:4 353:7
403:10
course 318:3
336:11 338:19
343:4 345:20
350:20 354:11
361:1 388:15
397:21
court 286:1 289:9
411:7
cov.com 288:14,15
288:15,18
covering 317:15
covington 288:10
292:15 293:7,9
crack 304:12
305:3 308:19
crazy 332:5
created 361:22
creating 391:10
crews 392:23
criteria 381:25
382:3
cross 359:7
crushed 379:6

crying 386:19
curiosity 400:6
curious 400:21
current 298:11
custody 289:8
377:14
cuyahoga 286:13
408:4
cvs 287:11,12
292:20
cycle 356:24

**d**

d 321:3,8
daily 332:8
dan 286:10
dangerous 378:17
daniel 287:13
292:19
database 406:7,14
date 298:10,11,12
298:23 315:4
321:22 322:21
323:8 336:12
338:23 344:2
350:23 357:1,19
367:4 407:11
410:8 411:3,9,19
412:3,13,25
413:20,25
dates 314:23 358:2
358:3 361:9
day 287:7 292:18
324:25 325:1
330:18,18 350:4
356:21,25 372:9
376:13 409:7
411:16 412:22
413:22
days 299:4 302:4
304:16 410:18

dc 288:13
dealer 324:21
329:25 355:15
386:3 397:19
401:2,7
dealers 305:25
384:22 385:10,24
387:5 390:20
393:3 399:8
deals 380:16
dear 410:10
death 298:23
299:3,25 339:10
339:12 359:3,6
deaths 372:1
december 293:24
323:15 345:19
401:13
decent 354:24
decide 376:12
decided 404:17
declines 375:24
deed 411:14
412:20
deemed 410:19
definitely 381:1
395:24
delivery 407:9,11
demand 374:9
demonstration
381:7
denied 351:9
department 296:5
370:5 372:23
381:19,22 384:16
385:4 410:22
depend 394:7
depends 309:20,25
353:12
depo 402:8

deposed 292:4
deposition 286:18
293:23 294:14,16
294:18 295:22,25
296:9 313:11,21
316:8 317:2 326:4
329:3 333:14
335:19 338:4
342:14 345:5
349:15 353:22
360:2 384:20
406:21,22 408:20
410:8,11 411:1,3
412:1,3
depositions 295:19
describe 386:13
described 304:11
description 290:1
389:12
designated 286:19
290:2,11,14,18,21
290:25 291:3,7,10
291:14 296:10
326:5 329:4
333:15 335:20
338:5 342:15
345:6 349:16
353:23
designation
315:14
desire 307:3 375:9
desires 375:19
desk 319:18,19,24
320:4 321:11
322:2
det 293:16 296:3
296:16 297:4
313:5 314:8 316:6
316:24 320:25,25
321:1,2,7,8 326:11
328:25 329:10

333:21 336:1
338:11 340:21,23
341:3 342:21
345:12 348:20
349:22 350:12
354:4 361:14
370:17 383:3
397:8
**detailed** 389:12,17
390:12
**detective** 297:14
300:13 307:11
309:18 317:22,25
318:11 319:8
361:22 362:1,3
371:10 384:13,16
384:21 385:11
390:19
**detectives** 299:2
319:12 320:22,23
321:5
**determination**
382:14
**determine** 378:14
380:14 382:5
**determined** 372:4
**detox** 375:17,19
375:22 376:9,13
**dialogue** 311:6
312:3
**die** 303:25 401:2
**died** 299:1 346:14
360:24 398:2
**different** 347:6
373:19 380:1
398:8,10
**differentiate**
365:25
**diligent** 325:17,20
360:16 365:17
403:18

**direct** 405:1,1
**direction** 312:4
398:8,10
**directive** 404:11
404:15,16
**discharged** 375:21
**discount** 369:23
**discussed** 295:14
**discussion** 387:14
**distributors** 342:7
**district** 286:2
299:8,9
**diversion** 340:18
340:19 380:10,15
381:2
**diverted** 335:14
**diving** 327:14
328:8
**division** 286:3
380:18
**dlugolski** 321:2
**dmoylan** 287:15
**dna** 305:3,4,6
**doctor** 340:11,13
344:6,25 348:8
381:1 393:14
394:4
**doctor's** 341:2
345:2
**doctors** 380:17
**document** 286:12
290:6,8 297:6,7
313:12,22 314:4,6
314:11 318:8
326:13,14 327:25
329:11,13 333:23
333:24 336:3,4
338:13,14 342:23
345:14 350:14,16
354:7 359:4,24
362:13 363:5

366:16 368:23
370:18,23 385:22
389:25
**documented**
360:20,21
**documenting**
403:19 404:9,17
**documents** 296:18
314:9 360:3
370:20 404:18
**dog** 396:8
**doing** 322:18,19
322:20 324:20
341:11 343:19
353:20 360:21
366:4 379:4 404:7
**dope** 310:11
**doses** 353:9
354:24
**doubt** 334:12
355:25
**dr** 339:4,21 340:15
342:8
**draw** 346:25 349:6
351:19
**drawing** 402:21
**drawn** 402:15
**driver's** 301:20
**drives** 329:21,25
331:9
**driving** 332:10
**dropped** 344:13
**drove** 351:15
**drug** 287:16
310:25 311:23
312:10 316:17
324:16 329:25
332:16 336:15
346:18 348:7
355:15 360:22
363:1,2,24 369:23

373:2,21,22 374:5
374:17 384:22
385:6,10,23,24
386:3,5 387:5,5,6
389:1 390:20
391:1,13 392:9
393:2,3 397:10,19
398:2 399:8 401:1
401:7 405:6
**drugs** 301:4 304:2
324:22,23 344:1
349:1 351:16
355:11 363:23
374:24 384:22
385:10,19 388:7
390:21 392:11
393:13 394:9,17
399:9 400:25
403:5
**duly** 292:3 408:7
408:10
**dumpster** 327:14
328:7
**duties** 318:4,15
336:12 358:18
**dying** 400:10,23

**e**

**e** 299:23,23 320:25
321:1,2,8,8 376:8
**earlier** 365:1
371:12 375:7
380:11 387:21
391:17 392:4
393:11 394:18
**early** 295:5
**earn** 401:3,10
**easier** 323:10
333:12
**easily** 396:1
**east** 287:9,13
369:24

eastern 286:3
effects 382:20
effort 405:23
eight 304:19 306:6
  333:7 352:24
  354:21 367:17
  368:7 392:21
either 310:25
  340:6 342:4 349:9
  363:23 375:21
  383:17 384:3
  386:10 409:2
elaborate 334:14
electronic 366:19
ellis 287:21 292:24
else's 319:24
email 362:2
  410:17
emergency 378:5
ems 334:18 377:5
  377:23,24 381:7
  381:16 382:11,18
enclosed 410:11
enforcement
  375:17
enormous 372:2
entail 294:18
entered 359:11
  361:23 362:8
  412:9
entire 382:12
  411:5 412:5
entries 304:20
  357:15 359:8,11
  359:14,15 360:7
  361:6 362:8,21
  363:1,21
entry 315:6 316:4
  329:20 366:21,22
epidemic 399:5
  402:16,22

eppich 288:16
er 386:22
errata 294:8
  410:13,18 412:7
  412:10,18 413:1
esq 287:4,8,13,17
  287:22 288:3,7,11
  288:11,12,16,20
essential 386:4
essentially 384:21
  386:11
establish 311:6
et 286:13,15
event 409:3
evidence 304:25
  305:1 346:11,17
  346:17 377:17
evolved 324:24
  372:16 392:22
  404:9
evolving 361:2
exact 322:21
  339:10 378:2
  380:24
exactly 311:24
  325:11 368:1
examination 289:4
  292:2,6 371:8
  383:1 397:6 403:8
examiner 301:25
  309:22 310:13
examiner's 310:17
example 297:19
  318:24 320:2
  322:6 325:25
  332:17 333:6
  379:21 398:12
examples 383:25
excerpt 326:24
excuse 338:19

executed 412:10
execution 411:14
  412:19
exert 400:12
exhausted 295:21
  295:24
exhibit 289:8
  290:2,6,8,9,11,14
  290:18,21,25
  291:3,7,10,14
  296:9 297:5
  313:11,21 314:3,6
  314:22,24 315:4
  315:21,22,23
  316:23,25 317:2
  320:2 326:4,12,19
  329:1,3,10 330:24
  333:14,22 335:19
  336:2 338:4,12
  342:14,22 345:5
  345:13,25 348:11
  349:15 350:13
  353:14,22 354:5
  357:12,14 361:4
  388:5 389:7
exhibits 289:3,9
  290:1 316:7,8,9
  327:3 336:10
  359:8 383:5
expect 353:4
expected 295:14
  363:10
experience 352:21
  373:1 379:9
  402:20
expert 368:11
  369:15 374:1,11
  402:18
expiration 411:19
  412:25 413:25

expires 409:17
explain 304:23
  329:20 339:3
  351:5 360:8
  371:23 373:13
explained 320:10
explanation
  363:20
explanatory
  298:24
explorer 304:11
  304:18 308:7,11
  308:12,15,17
  310:18 312:12,17
  313:2,4 314:13,20
  320:1 330:17
  357:15 358:17
  359:5 361:5 383:7
  383:13,23
extensively 344:21
extent 298:25
  372:7
extra 336:20
eyes 290:3,11,15
  290:18,22,25
  291:4,7,11,14
  296:11 326:6
  329:5 333:16
  335:21 338:6
  342:16 345:7
  349:17 353:24

**f**

f 403:21
fact 297:2 311:22
  316:12 317:21
  331:18,19 334:12
  335:3,8 339:15
  344:8 348:9,10
  368:7 396:6 397:9
  397:16

**factor**  396:21
**facts**  347:12
  356:10 360:12
  378:11
**fair**  396:25
**fairview**  354:22
  367:18
**fake**  367:15
**falls**  380:2
**familiar**  300:9
  341:1 406:6
**family**  301:18
  306:15 311:3
  349:2 380:4,6
  386:19 397:10,22
  397:25 401:21
**far**  319:1 322:16
  332:12 346:12
  349:7 376:15
  378:2 379:2,19
  400:24 401:7
  406:13
**fast**  372:13
**fatal**  298:15
  299:18 301:10
  302:16 305:11
  307:25 310:23
  311:2 319:7
  322:18 338:22
  371:20 372:19
  377:16,19 386:19
  388:13 396:16
  397:8,19 398:25
  399:10
**fatalities**  395:12
**fatality**  301:11
**fatals**  388:12
**fear**  378:19
**february**  314:23
  314:24 357:15,16
  358:4,5,11,12

  360:7,8
**feel**  341:11 395:20
  403:17
**feelings**  340:12
**felt**  341:21
**fentanyl**  328:10
  330:8,14 341:24
  343:25 348:24
  352:5,15,19
  367:16 368:2,18
  368:21 369:4
  372:4,7,13 373:1,2
  373:12,16,16,17
  373:17,20,23
  374:6,9,16,23
  378:17 393:7
  398:20
**fever**  310:5,6
**fewer**  400:8
**fifth**  362:22
**figure**  312:6
  326:20
**file**  321:24 323:8
**files**  321:17,20
  322:1,11,24
**filing**  319:25
  322:10,10,12,13
  322:25 323:3,6
**fill**  296:4 300:12
  300:14 301:1
  308:25 320:22
  321:13 345:21
  359:4
**filled**  297:12,16
  299:23 301:6
  302:4,6 318:7,12
  318:20 320:3,8
  338:18 345:22
  350:19 386:9
**filling**  320:12
  385:20 386:2

  387:3
**find**  300:18 309:6
  310:4 311:25
  344:24 348:4,9
  359:6 362:22
  366:19 388:13
  399:15 400:8,14
  410:11
**finding**  386:3
**fine**  327:2 350:9
  360:4 384:3
**fingerprints**
  301:25
**finish**  347:16
**firm**  292:12
**first**  292:3 293:23
  294:14 315:25
  316:8 332:17
  333:2 339:7
  367:22 377:4
  383:8 389:6
  400:10 408:10
**five**  295:4 370:10
**flag**  405:24
**flags**  396:14
**flip**  317:17
**floor**  288:21
**fluid**  306:19
  396:17 404:8
**focus**  398:7,9
**fold**  392:21
**folded**  306:2
**folder**  322:4
**folds**  306:6,7
**folks**  401:16
**follow**  301:2
  323:11 326:18
  341:25 357:6,10
  376:1,3,10,19
**followed**  321:25

**following**  301:16
**follows**  292:5
**food**  396:8
**ford**  339:5,21
  342:9
**foregoing**  408:16
  408:21 411:13
  412:18
**forget**  313:8
**form**  290:4,12,16
  290:19,23 291:1,5
  291:8,12,15 296:5
  296:12 297:11,19
  297:22,25 300:7
  308:2 309:7,15
  310:3,8 312:23
  315:13,19 320:8
  320:10 322:7,21
  324:14 326:7
  327:6 329:6
  332:20 333:17
  335:13,16,22
  336:11 337:6
  338:7,18 342:10
  342:17 343:2
  344:10 345:8
  347:2 348:14
  349:18 350:18
  351:21 353:5,25
  354:9 356:8 358:9
  359:18 360:10
  362:12 363:4,25
  368:4,10,16,22
  369:7,14 370:6
  373:3,25 374:10
  375:2 378:10
  380:21 384:8,24
  385:1,12,21 386:1
  386:6,15 387:4,7
  387:10,16 388:8
  388:19,20,24

**[form - guys]** Page 11

389:14,15,20,21
390:2,5,9,15,22
391:7,14,23 392:2
394:4,6 396:18,22
397:12 400:11,16
402:4,17 403:1
404:14 406:2
**formal** 389:25
**format** 314:16
384:1 387:15
**forms** 290:10
296:19 297:18
307:15,19 308:10
308:13,15,25
312:11,11,16
317:3,8,14 318:3
318:20 319:22
320:20 321:10,14
321:16,21 323:23
329:16 336:8
342:25 345:16
370:25 371:2,5
383:4 384:10
386:8 388:4 389:7
389:8
**forth** 403:23
**forward** 368:15
410:15
**found** 302:14
303:6 308:20
309:2,16,23
327:14,18 328:7
330:10 334:11
349:3 363:1
**four** 330:25 334:4
351:13 353:7
354:24
**free** 341:11 411:14
412:20
**friday** 342:5

**fridays** 339:6
342:2
**friend** 311:3
**friend's** 367:11
**friends** 397:9
**further** 292:4
328:19 331:24
332:13 339:11
357:4 370:20
373:14 403:6
406:18 408:19
409:1
**fusion** 329:22
331:9 332:9
**future** 327:3 406:1

**g**

**g** 321:3
**gap** 356:14 371:22
**gathered** 360:23
**gathering** 372:18
**general** 398:14,20
**generally** 299:16
301:5 302:13
309:21 341:10
355:9 386:9
**generate** 310:19
323:12
**generated** 298:5,9
306:21 321:24
322:2
**gentleman's**
394:20
**getting** 347:21
348:12 351:10,11
352:12,15,23
360:20 372:2
385:10 403:18
405:25
**give** 293:19 340:2
375:5 377:21
378:3 380:24

396:8 407:1,10
**given** 298:6
324:11,15 328:14
341:7 354:21
367:17 368:2
408:13,17
**glasses** 313:7
**go** 292:9 297:25
300:18 304:3,13
304:17 307:19,24
313:1 322:3,16,22
325:4 330:19
331:6 332:6,10
334:19,20 335:3
337:20 338:2
339:20 340:3
343:17 347:18
351:4 354:16
357:12 359:5
361:4 362:20
365:20 367:6
375:25 376:14
377:25 378:5
381:19 383:13
389:23 395:14
403:21
**goal** 324:21 372:1
386:3 387:4
390:18,24
**goes** 300:22
301:12 304:10
383:13
**going** 294:18
296:23 298:9
301:17 306:10,21
306:23 307:8
309:23 310:12,14
313:1 326:24
332:16 337:25
340:2 352:2
354:18 356:19

357:23 359:19,22
364:20 368:15
369:16 370:13
372:5,7,8,20
382:24 386:8
389:4 393:15
394:15 399:16
400:22 401:8,9
403:21
**goldstein** 288:3
289:5,6 293:4,4
370:14,21 371:9
382:22 384:8
387:7,17 403:9
406:17
**good** 293:16,18
350:9 366:20
371:10
**googled** 367:15
**grant** 288:21
**gray** 288:3 293:2,5
**great** 305:24 327:4
**green** 367:13
**grieving** 339:25
**group** 296:18
**guarantee** 387:14
**guaranteed**
387:18,20
**guess** 343:10
349:22 363:9
375:4 381:8
393:19
**guessing** 315:5
**guide** 303:8
**guy** 403:21
**guy's** 396:25
**guys** 310:10
317:12 358:14
361:17 381:21

| h | | | |
|---|---|---|---|
| **h**  321:8 | **hear**  398:9 | 387:4,9,15 388:4 | 389:24 |
| **half**  325:10 349:23 | **heard**  405:16 | 388:18,23 389:14 | **hospitals**  372:11 |
| **hand**  347:23,23 | **help**  304:9 344:23 | 389:19 390:2 | 386:21 |
| 367:11 393:6,6,8 | 376:14 384:23 | **high**  323:15 | **hour**  349:23 |
| 409:6 | 390:20 399:4 | 386:24 401:14,15 | 360:18,25 |
| **handed**  297:4 | 400:8 | **historical**  405:6 | **house**  301:23 |
| 326:11 338:11 | **helping**  376:15 | **history**  310:25 | 304:16 334:19 |
| 345:12 350:12 | **hereinafter**  292:3 | 311:8,20,23 | 335:6 377:11,14 |
| **handing**  313:5,17 | **hereunto**  409:5 | 312:10 316:17,19 | 377:14 395:16 |
| 316:24 328:25 | **heroin**  304:13 | 324:16 328:15 | **huge**  323:9 |
| 333:21 336:1 | 305:3,8,15,16,22 | 332:17 385:23 | **human**  399:23 |
| 342:21 354:4 | 308:19 310:13 | 386:5 387:6 | 401:5 |
| **handwriting** | 328:10 330:8,14 | 397:11 398:3 | **husband**  340:7 |
| 297:14 300:10 | 332:24 333:8 | 404:13 | 341:20 |
| 318:9,14 345:24 | 343:24,25,25 | **hit**  372:4 396:3 | **hybrid**  383:7 |
| 346:7 | 344:20 348:23 | **hold**  393:2 397:19 | **hypothetical** |
| **handwritten** | 351:2,9 352:4,19 | **home**  332:4 335:3 | 348:15 363:14 |
| 294:9 | 355:3,7,14,14,17 | 337:15,17,24 | 364:2 397:14 |
| **handy**  321:22 | 356:7,17,22,23 | 338:1,2 346:16,20 | i |
| **happen**  358:21 | 373:17 380:3,4 | 346:21,22 367:14 | |
| **happened**  333:6 | 382:8,16,19 385:5 | 395:17 396:3 | **idea**  336:25 |
| 359:21 | 385:8 387:24 | **homework**  332:3 | 353:13 378:3 |
| **happens**  306:15 | 392:16 394:12 | 332:14 | **ideal**  386:14 387:2 |
| 400:2 | 395:9,15 396:2,6,9 | **honest**  383:24 | **ideally**  377:3,3,22 |
| **happy**  315:16 | 398:19 | **honestly**  309:10 | 378:3 385:17 |
| 387:1 | **hey**  302:17 304:1 | 314:10 320:17 | 393:1 |
| **hard**  348:18 | 376:14 | 328:16 347:4 | **ideas**  395:14 |
| 386:23 395:7 | **hidi**  290:3,9,12,15 | 363:18 379:13 | **identification** |
| **harm**  382:20 | 290:19,22 291:1,4 | **hope**  313:6 | 296:14 302:7 |
| **hate**  373:8 | 291:8,11,15 296:5 | **hoping**  372:10,14 | 313:15,24 317:5 |
| **hay**  310:5,6 | 296:11,18 297:10 | **hospital**  299:14,16 | 326:9 329:8 |
| **hayden**  288:7 | 297:18,21 312:11 | 299:17,19,21,25 | 333:19 335:24 |
| 293:1 | 312:23 317:3,7 | 300:21,22 307:19 | 338:9 342:19 |
| **hayden.miller** | 321:13 323:22 | 307:25 308:5 | 345:10 349:20 |
| 288:9 | 326:6 329:5 | 327:21 331:5 | 354:2 |
| **hbc**  288:19 293:13 | 333:16 335:21 | 334:18,19 335:1 | **identified**  370:19 |
| **head**  365:12 | 338:6 342:16 | 337:9,11,13 | 405:22 |
| 395:14 | 345:7 349:17 | 343:12 360:17 | **identify**  302:5 |
| **health**  297:1 327:1 | 353:24 377:2 | 367:18 375:18,21 | 362:3 385:16,23 |
| | 383:4 384:10 | 376:7,24 377:7 | 386:5 387:5 |
| | 385:21 386:8 | 378:15 386:10,11 | **identifying**  296:24 |
| | | | 297:1 326:25 |

**identity** 296:25
**ii** 286:19 410:8
  411:4,9 412:4,13
  413:20
**illegal** 373:22
  374:5
**illegally** 393:23
**illicit** 394:9,17
**imagine** 322:25
**immediately**
  375:22
**impressed** 331:8
  354:19
**inch** 392:14,14,18
  392:18
**incident** 298:5
  299:22 300:17,20
  302:3 303:14,19
**incidents** 357:22
  358:3 362:7
  364:22
**include** 302:21
  305:2 309:7 316:9
  316:20 364:8
  387:19
**included** 303:12
  310:17 319:11
  325:16 339:1
  388:4 389:13,18
  410:13
**includes** 316:16
  374:6
**including** 318:23
  324:16 385:21
  388:6
**incomplete** 294:4
  348:15 363:13
  364:1 397:13
**incorporated**
  412:12

**incorrect** 294:4
**increase** 372:25
**index** 289:1,3
  290:1
**indiana** 287:12
**indicate** 348:25
  364:25 366:8
  395:5
**indicated** 336:12
  356:4
**indicates** 383:21
**indicating** 410:13
**indication** 394:22
  394:23
**indicative** 373:21
**indicted** 306:23
**indictment** 306:24
  307:7,8
**individual** 373:7,7
  375:24 376:2,6,24
  403:13 405:24
**individuals** 378:22
  378:25
**info** 329:21 346:8
  389:13
**information**
  296:24 297:1,13
  298:1 301:7,8,12
  301:12 302:9,11
  302:18,22 303:1
  303:10,12,16,17
  303:18 304:2,5,7,9
  304:10,13,16,18
  308:7,9,11,14
  314:19 316:16
  324:3,4,7,9,12,15
  324:18,22,25
  325:4,5,8 327:1,13
  329:20 330:16,19
  331:22 334:6
  336:19 339:1,2

  340:4,9,17,21
  341:1 343:14
  348:6 351:1,5,23
  352:1 354:17
  355:24 357:9
  358:17 360:20,22
  360:22,23 361:2
  361:23 372:15,18
  372:18 376:18
  379:16 380:17,23
  381:1,2 383:12
  384:12 385:15,21
  387:8 388:6,16,18
  389:12,18 390:13
  393:5 397:24
  398:1,8 400:23,25
  401:6,10,11
  404:10 406:10,12
**ingested** 379:2
  380:4
**ingestion** 378:20
**initial** 294:17
  298:7,8,20,21
  306:20 395:18,23
**initiate** 385:16
**inject** 305:8
**injury** 330:4
  331:13,16,21
  332:22,23 333:6
  364:10,23 365:4
  365:11
**input** 304:17
  330:18 406:9
**inputted** 308:7
**inservice** 381:17
**inside** 335:6
  377:25 378:8
**insinuating** 361:17
**instance** 304:12
  308:3,4 318:6
  359:3 379:8

  400:10
**instances** 311:5
  376:25 377:5
**instructed** 358:16
  359:1
**instruction** 407:2
  407:10
**intentionally**
  358:25
**interested** 409:3
**intertwined**
  383:10
**interview** 302:19
  302:20,22 303:1
  303:11 311:16
  335:1 339:24
  341:20 346:6
  355:23 372:12
  385:13 386:14,23
  388:13 390:4
  391:4
**interviewed** 303:5
  337:9 360:16
**interviewing**
  351:8
**interviews** 302:9
  322:1 337:11,13
  345:22
**investigate** 340:15
  385:5 391:22
  392:1
**investigated**
  369:19
**investigating**
  371:13,17,20,25
  372:22 385:8
**investigation**
  328:19 331:25
  332:14 341:9
  357:4,10 378:22
  385:17 395:18

396:15
**investigations**
  310:23 320:6
**investigator**  377:2
  398:24
**involved**  319:3,12
  320:14 346:2
  369:8
**involving**  319:23
**irrelevant**  398:3
**issue**  330:14
  370:18
**issues**  370:18
**item**  305:4

**j**

**jackson**  287:17
  292:21
**jacksonkelley.com**
  287:19
**jansen**  292:25
**janssen**  287:21
**january**  314:25
  325:22 334:2
  336:16 361:6
  362:9 363:22
**jeff**  292:23
**jeffrey**  287:22
**jeffrey.whitesell**
  287:24
**jerk**  399:23
**job**  343:20 358:18
  384:12,21 391:20
  399:2,8 403:4
**john**  288:11 293:7
  361:20
**johnson**  287:20,20
  292:24,25
**jones**  287:7 292:17
**jonesday.com**
  287:10

**josh**  288:3 293:4
**joshua.goldstein**
  288:6
**judge**  286:10
**july**  371:21 409:17
**june**  322:7 325:23
**jzipp**  288:15

**k**

**k**  288:11 321:1,2,3
**keep**  306:10
  311:14 321:21
  322:2 323:10
**kelley**  287:17
  292:22
**kept**  372:20
**kia**  351:3,15
**kill**  398:5
**killed**  301:4 398:5
**kind**  309:25
  317:16 321:22
  324:22 352:16
  384:10 393:16
  394:24 395:5,7
  396:16 404:20
**kinds**  395:14
**klamert**  321:1
**klauss**  286:25
  408:6 409:14
**know**  294:7 300:6
  301:24 306:7,16
  306:18,19 308:18
  309:9,13 311:2,13
  314:2,11 315:12
  315:15 320:17,19
  322:3,17,23 323:2
  324:2 328:5,21
  330:5,22 331:15
  331:18,23 332:17
  333:2,5,9,10 335:2
  335:10,12,14,17
  337:3,14 339:8,10

339:16,17,25
  340:23 341:3
  342:6 343:17
  344:8,12 346:5,9
  347:4 349:9
  351:15 352:12
  353:6,17 357:3
  358:13,22 362:2
  362:14,15 363:7
  364:3,13,15
  365:16 366:15
  368:1,5 369:11
  370:4,8 372:6,8
  374:21 377:4
  379:6,13,19,20
  380:4 381:10,21
  382:15,19 383:17
  383:24 384:1,2
  386:21 388:11
  392:19,25 394:12
  395:8,12 396:6,10
  397:22 405:13
  406:13,15
**knowledge**  388:25
  391:12 406:16
**known**  393:4

**l**

**l**  286:25 299:23
  320:25 321:1,2,3,3
  408:6 409:14
**l.p.**  286:15
**label**  290:4,13,16
  290:20,23 291:2,5
  291:9,12,16
  296:13 326:8
  329:7 333:18
  335:23 338:8
  342:18 345:9
  349:19 354:1
  403:25

**laced**  367:16
**lake**  321:1
**lakeside**  287:9
**large**  383:16
**law**  292:12 375:17
**lawful**  292:1
**lead**  319:9 348:10
  369:10 372:19
**leading**  388:21
**leads**  339:11
  375:16 400:9
**learn**  312:10,14
  316:16 398:12
**learned**  312:21
  316:18,22 348:20
  387:13 388:7
  390:3,8 391:3
**leave**  376:11 377:7
**leaves**  334:19
  377:10
**led**  330:13 341:17
  352:16
**left**  315:4 341:15
  364:6,12 378:6
**legal**  348:16 410:1
  413:1
**legitimate**  335:11
  337:4 348:12
**letter**  410:19
**license**  301:21
**light**  355:8
**liked**  388:10
**likewise**  313:18
**line**  300:4 301:1,5
  301:5 306:14,17
  306:25 307:6,10
  351:1 410:13
  412:7 413:3
**lines**  315:20
**linking**  393:10

**listed** 412:7,17
**listing** 412:7
**litigation** 286:7
  410:6 411:3 412:3
**little** 332:3 333:11
  341:15 347:3,14
  350:6 352:10,17
  354:25 373:14
  392:16,17,20
**live** 303:25 383:11
**llc** 287:12 288:2,2
  293:2,3,5,6
**llp** 287:12,21
  288:10,20
**located** 309:21
  322:24
**location** 300:17,24
**lock** 306:14,16,16
  392:11,12,17
  394:8
**locked** 306:13
**log** 389:24
**long** 295:2,4,6
  305:11 343:23
**look** 306:7,7 315:7
  315:24 317:18
  322:5 332:10
  334:21 337:15,21
  338:1 346:20
  361:13,21 369:6
  378:9,12 379:17
  379:22,25 380:5
  395:8
**looked** 359:9
**looking** 318:8
  332:9 352:16
  357:20 366:23
  383:18 384:4
**looks** 296:18 315:3
  315:24

**loose** 305:17 393:7
**los** 287:5 288:17
**lose** 351:13
**lot** 350:7 354:23
  362:14,16 368:14
  373:23 374:6,23
  380:25,25 383:4
  386:20 396:5
**lots** 313:18
**lottery** 306:3
  355:11 392:19,20

## m

**m** 287:22 321:1
  367:13
**ma** 288:5
**madam** 410:10
**magazines** 392:23
  392:24
**main** 287:18,22
**maintain** 323:4
  326:24 377:13
**maintains** 323:2
**majority** 318:9,10
  337:10,12 387:24
**male** 367:12
**mallinckrodt**
  288:2 293:2,5
**manner** 379:12
**mannis** 293:13
**mannix** 288:20,23
  293:12
**manufacturers**
  342:7
**march** 286:21
**marcus** 288:20,23
  293:13
**marijuana** 394:13
  394:13
**marked** 290:1
  296:13 297:5
  313:6,14,23

315:13 316:7,25
  317:4 326:8,12,19
  329:1,7 333:18,22
  335:23 336:2
  338:8,12 342:18
  342:22 345:9,13
  349:19 350:13
  354:1,5 377:3
**market** 374:5,17
**massively** 332:13
**matter** 398:20
**mcdonald's**
  392:25
**mckesson** 288:10
  292:15 293:8,10
**md** 287:14
**mdl** 286:6,9
**me's** 302:5
**mean** 303:4,13
  305:3 309:17
  310:9 311:16
  318:5,7 319:15
  320:1,17 323:4
  325:24,25 330:15
  330:22 332:5
  334:24 343:18
  347:5 348:22
  349:1 352:3 357:6
  358:13,20 362:14
  362:19 363:6
  364:21 365:2
  366:2 368:13
  372:23 373:6,11
  373:14,17 374:21
  374:22 375:12
  376:3 379:15,23
  380:24 381:6,14
  382:2,7 388:14
  392:7 394:13
  395:8,22,25 399:2
  399:25 400:1

403:18,20 404:16
  404:18 405:11
  406:4
**meaning** 332:22
  355:2 369:4
**means** 303:2
  304:25 305:14
  307:4 329:20
  334:22,25 364:13
  364:15
**medic** 299:24
  300:1 369:23
**medical** 301:25
  309:22 310:13,17
**meds** 351:3
**meet** 294:23 295:6
  376:23 378:15
**melgrave** 369:20
**member** 301:18
  306:15 311:3
  380:6
**members** 386:19
  401:21
**mentality** 393:17
**mentally** 375:15
**mention** 363:22
  386:24
**mentioned** 323:24
  330:25 353:7
  359:15 360:6
  372:25
**mentions** 363:10
**merely** 334:22
**message** 396:7
**met** 295:1,9
  401:13
**meth** 373:17
**metro** 376:7
**middle** 355:8,13
**midwest** 410:17
  413:1

migrated 344:19
mill 339:5,22
  340:10 342:9
miller 288:7 293:1
  293:1
milligrams 300:4
  328:14 330:25
  351:14 352:13,18
  352:24 353:3
  354:22 367:17
  368:7
mind 374:9,25
mine 318:10
  358:21
minute 370:10
  381:16
minutes 295:4
  349:24
misstates 373:4
  398:15,22 399:6
  399:19 400:12,18
  403:3,16 404:3
  405:8
mistakes 359:2
misunderstanding
  347:19,20
moira 288:20
  293:12
money 341:15
month 315:2
  356:14
months 322:3
  355:5 356:3,20,21
  356:25,25 357:2
  358:12
moran 286:19
  289:4 292:1,6
  293:16 296:3,16
  297:4,5 313:5,6,17
  314:8 316:6,24,25
  326:11,12 328:25

329:1,10 333:21
  333:22 336:1,2
  338:11,12 342:21
  342:22 345:12,13
  349:22 350:12,13
  354:4,5 361:14
  366:25 370:17
  371:8 383:1,3
  397:6,8 403:8
  408:9 410:8 411:4
  411:9 412:4,13
  413:20
morning 293:16
  293:18 295:1,5,6,9
  371:10
mother 302:17
move 316:5
moved 356:16,23
moving 382:9
moylan 287:13
  292:19,19
multitude 348:25
  374:20,22

n

n 287:17 320:25
  321:9,9 376:8
n.d. 286:16
name 301:13
  303:11,21 315:25
  315:25 319:11
  329:23 340:1,3
  341:2 345:3
  361:23 362:4
  363:2,7,23 364:12
  367:7 410:6 411:3
  411:4,15 412:3,4
  412:21
named 355:15
  408:9
names 315:21
  316:5 362:1

narcan 300:5
  328:13,14 331:1
  351:14 352:12,19
  352:24 353:4
  354:22 367:17
  368:8 377:13
  381:4,9 382:1,6,10
  382:13,20 386:25
narcotics 323:1
  347:23 384:13,16
  384:21 385:4,11
  390:19 391:21
  393:17 398:24
narrative 308:22
  313:1,3 315:8,10
  316:10,15 330:17
  362:20,22,25
  363:11 367:6
  389:9,18 390:1,12
narratives 359:14
  391:11
national 286:6
  410:6 411:3 412:3
native 315:13,19
natively 290:6,8
  313:12,22 314:4,7
natural 359:3,6
  400:6
near 378:18
nearly 320:18
  360:24
necessarily 303:4
  327:24 334:24
  348:22 349:5
  364:5,21 366:2
  387:9 388:6 391:5
  391:11 393:25
necessary 390:25
need 317:18
  352:18 361:13
  376:14 384:2

needed 325:4
needle 305:7,8,9
  310:10 330:11,22
  330:23 396:24
needs 377:6
neighbor 304:15
neighbor's 395:16
neighborhood
  332:6
neil 288:11 293:9
never 314:14,16
  325:15 351:2
  369:9 384:1 406:9
  406:14
new 288:8 337:16
  343:10
nobody's 303:11
nonfatal 298:16
  299:17 300:3
  302:15,16 307:2,5
  307:21 310:24
  311:1 327:8
  329:16 334:1
  336:15 343:6
  350:22 354:13
  371:13,17 372:5
  377:19 385:14
  396:16 399:1,11
  399:15 405:22,23
  406:13
nonfatals 322:19
  372:19,22 388:12
nonprescription
  344:19 355:22
  356:16
normal 332:8
normally 348:5
  382:11,18
north 287:8
northern 286:2

Case: 1:17-md-02804-DAP Doc #: 1982-2 Filed: 07/24/19 50 of 62. PageID #: 240156

notarized 410:14
notary 408:6
   409:14 410:25
   411:10,18 412:15
   412:23 413:23
note 309:1,12,15
   310:2,8,14 312:15
   312:23,25 313:2
   314:22 315:21
   329:24 330:10
   357:18 394:20
   410:12
noted 309:24
notes 308:16
   310:17 313:1
   330:16 348:20
   389:23 390:3
noticed 401:25
notified 377:23
november 315:1
   327:10 329:17
   343:3 350:19,21
   361:7 362:10
   363:22 371:15,16
   372:1,9
nroman 288:14
number 290:1,6
   297:6 298:2,4,5
   299:13 301:14
   303:9,20,22
   313:13 314:5
   317:23 318:1,18
   318:19 323:15
   324:1 326:13
   329:11,24 332:4
   332:15 333:23
   338:13 342:23
   345:14 350:14
   354:6 357:5 358:8
   366:16 377:22
   401:14,15 410:7

410:13
numbers 323:9
   336:3 357:7
   359:23 378:2,3
   380:24 412:7
numerous 381:23
nw 288:13
ny 288:8

o

o 321:3,8,9,9 386:1
oarrs 406:6,10,14
object 332:20
   335:13,16 344:10
   347:2 348:14
   353:5 356:8
   357:25 358:9
   359:18 360:2,10
   362:12 363:4,25
   368:16,22 370:6
   373:3 380:21
   384:24 385:1,12
   386:1,6,15 388:8
   388:20 389:15
   392:2 394:6
   396:18,22 397:18
   400:11 404:14
objection 312:18
   320:16 324:14
   337:6 342:10
   347:11 351:21
   358:24 363:12
   368:4,10 369:14
   373:25 374:10,18
   375:2 378:10
   384:8 387:7,11,17
   389:21 390:5,9,15
   390:22 391:7,14
   391:23 397:12
   398:15,21 399:6
   399:19 400:16
   402:4,17 403:1,15

404:3,22 405:8
   406:2
objections 389:2
obtain 340:4,13
   388:16,17 393:5
obtained 349:2
   355:12
obtains 393:13
   394:2
obviously 300:22
   301:17,22 302:16
   305:14 307:7
   308:17 317:19
   321:24 332:3
   352:3 367:22
   388:12 395:9
   396:23 398:1
occur 337:17
   359:2
occurred 300:20
   300:23 358:3
ochman 287:8
   292:17,17
october 315:11
   354:10
od 339:6 341:18
   341:22
odmap 310:18
   312:12,16 314:12
   314:20 357:14
   361:5 383:7,9,11
   383:13,18,20,22
   384:6,11 385:22
   389:7,19 390:11
   390:17 391:5
offense 361:19
offer 375:25
offered 376:5
office 302:5 409:6
officer 364:14
   377:1,19

officers 378:7,18
   381:18
official 411:15
   412:21
oh 287:9,18,23
ohio 286:2,13,16
   286:24 408:2,7
   409:7,15 410:2
okay 296:2 308:9
   315:17 316:3,14
   317:13 320:13
   323:25 331:6
   343:13 350:3
   359:12,17 363:8
   364:20 367:2
   371:6 391:16
   395:3
once 304:10 359:5
   370:18 391:9
ones 319:2 326:18
   344:2 359:9
ongoing 341:9
op 286:16
operations 393:6
opiate 286:7 410:6
   411:3 412:3
opinion 368:11
   369:15 400:12
   403:4
opioid 310:4,7
   312:8 366:10
   367:24 369:7,13
   378:24 379:1,11
   393:15 399:5
   402:16,22 404:13
   405:25
opioids 312:22
   316:21 323:17
   324:17 330:3
   332:19,23 344:19
   344:20 349:12

353:15 355:21,22
356:16 365:1,6,15
366:8 369:2,3
398:13 401:17
402:2,25 403:13
**opportunity**
293:22 305:12
375:25 404:5
**opposed** 300:12
310:5
**opted** 305:8
**option** 373:10
**options** 372:17
376:9
**order** 296:21
357:19 361:9
405:1
**ordinary** 318:3
338:19 343:3
345:19 350:20
354:11
**originally** 324:20
360:21 366:1
371:25 389:22
**overall** 385:9
390:18 402:22
**overdose** 296:4
299:18 300:3,23
302:15 305:11
307:2,5,16,20,21
307:25 309:11
310:13,23 322:11
327:9 328:11
329:17 330:9
334:2 336:16,22
338:23 339:15,18
341:5,24 343:6
348:23,24 350:23
352:20 353:10
354:14 355:6
358:3 369:12

372:20 376:23
377:16,19 379:14
379:18,22 380:1,3
380:5 382:17,19
383:11 385:14,18
394:19,24 395:6,9
395:15 396:1
397:9,10,19
405:23
**overdosed** 311:2
323:16 327:19
330:5 339:8
348:11 354:21
378:23 379:11
399:18
**overdosed's**
310:25
**overdoses** 299:17
319:8 322:18
352:11 371:13,17
371:20 372:3,6
385:6,9 387:25
396:16 399:11
406:13
**overdosing** 328:15
353:2
**overlap** 315:2
**oxford** 288:21

**p**

**p** 287:13 299:23
299:23
**pa** 288:22
**package** 347:9
393:24
**packaged** 306:8
392:10
**packaging** 305:5,6
305:14,15,17,18
305:22 334:11,21
334:23 337:15,22
338:1 339:11

346:12,20,23
347:1,19 348:3,24
349:2,3 378:9,13
378:13 392:5,8,9
392:13 393:1,4,5,8
393:11,16,18,19
394:5,10,21,25
395:5,11 396:4,13
**page** 290:6,8 297:6
313:12,22 314:3,6
326:13 329:11
333:22 336:2
338:13 342:23
345:14 350:14
366:12 410:13,15
412:7 413:3
**pages** 313:19
**pains** 367:11
**paper** 306:2,5
383:16 393:24
**paragraph** 308:18
308:21
**parma** 343:7
**part** 318:4,14
358:18 397:16
399:21 400:5
402:1 404:1 412:9
**particular** 297:13
299:22 300:15
304:12 305:5,7,9
305:15,18 306:12
318:6 330:1,6
334:17 340:4
348:19 357:1
380:9
**partner** 405:16
**partnered** 375:13
375:15
**party** 409:3
**partying** 346:15
365:11,14,22

**366:7**
**pass** 370:20
372:15 380:17
395:17
**passed** 299:20
340:17 346:16
367:14,16 382:8
396:3
**path** 401:16
**patricia** 287:8
292:17
**pc** 287:3
**pearl** 337:18,21
**people** 311:5
352:6 365:23
366:4 396:10
398:12,19 400:10
400:23 401:2
**perc** 343:15 379:6
**percent** 351:24
397:2
**percentage** 377:22
**percentages**
311:15
**percocet** 336:20
347:15 352:13,23
353:3 366:2,3
367:12 369:6
380:5
**percocets** 334:5,13
335:8,11,15 337:5
344:4,5,15,25
366:5 367:12
**percs** 343:15
**perfect** 390:7
**period** 317:16
318:21 341:7
358:4 362:9
**person** 299:1
300:18,18 301:18
301:21 302:3,5,14

303:5,9,25 304:1
305:7 310:24,25
311:1,7,24 312:14
312:21 316:20
324:17 328:22
334:13 337:4
339:8 340:8
344:18 348:11,21
349:11 351:15,16
353:14 355:9,14
355:23 365:5
368:2,6,25 375:20
377:6,10 382:21
385:13,18 388:13
393:13 398:2
399:16,17,22
400:20,22 401:4
**person's** 312:10
316:17 324:16
340:12 367:7
398:2
**personal** 296:25
326:25 391:12
**personally** 321:19
323:10 376:16
381:15 405:11
411:11 412:15
**personnel** 397:24
**pharma** 286:15
**pharmaceutical**
342:7
**pharmaceuticals**
287:21
**pharmacies**
391:17,22 392:1
**pharmacy** 348:5
369:20 370:1
**phone** 293:11
294:25 295:3,11
299:6 303:8,19,20
303:21 329:23

332:14 357:5
410:3
**photo** 301:20
**photos** 305:10,10
305:12
**phrases** 365:9
**physically** 377:25
**picked** 354:20
**piece** 306:2,5
392:20 393:24
**pieces** 392:23
**pill** 309:11 310:2,6
339:5,6,15,18,21
340:10 341:18,22
341:24 342:9
347:24,24 348:22
351:11,12,14
352:11 353:11
364:12,17,19
367:13,15,16
379:14 393:19,21
393:25 394:10,12
394:14,17 396:1
**pills** 309:2,6,16,20
309:21,23 310:15
312:2,15,22
323:24 327:14,18
328:5,6,7,22
331:20 340:9,14
347:9,21 348:12
348:21 351:20
352:15,16 355:1,3
355:4 356:6,15,22
356:23 359:16
360:6 365:19,20
365:25 368:18
369:5,9 387:25
393:20,23 394:3,8
395:25
**pittsburgh** 288:22

**place** 377:9 408:20
**places** 375:20
**plastic** 393:24
**plate** 350:7
**please** 292:10
293:11 297:25
304:23 306:11
329:19 332:2
338:25 343:14
350:25 351:4
354:16,18 357:13
366:12 410:11,11
**pllc** 287:17
**pochman** 287:10
**point** 287:8 321:4
359:20 376:1,5
402:6
**pointed** 315:10
**police** 290:3,12,15
290:19,22 291:1,4
291:8,11,15 296:5
296:11 297:10,18
298:4,6,8 299:9
303:7 318:4,15
326:6 329:5
333:16 334:18
335:21 336:12
338:6 340:1,5
342:16 345:7
349:17 353:24
364:14 370:5
376:25 377:4,8,13
378:4 384:15
**polster** 286:10
**pool** 319:14,16
**popular** 392:16,18
**portions** 286:19
**positive** 302:7
**possibilities** 349:7
**possible** 296:22
309:10 319:21

395:9
**possibly** 397:4
401:11
**potential** 377:16
**potentially** 301:4
398:5
**practice** 324:12
376:6 397:17
404:2 405:5
**pratt** 287:13
**predictable** 386:4
**prefer** 300:13,14
**preparation**
294:14,15 381:16
**prepare** 294:7
295:25
**prepared** 318:2,14
336:11
**prescribed** 332:23
344:5,14,25 355:1
355:3,4 365:20
366:3,9 367:24
**prescribing** 348:8
**prescription** 286:6
309:1,6,11,16
310:4,6,7,14 312:2
312:15,22 316:21
323:16,24 324:17
328:22 331:20
332:18 335:11
337:4 339:18
342:4 344:18
347:8 348:13
349:11 353:11,15
355:2,21 356:6,15
356:22,23 359:16
360:6 363:1,2,7,8
363:23,24 364:6
364:11,16,19
365:5,15,21 366:8
369:2,7,13 378:24

378:25 379:11
387:25 393:12,13
393:15,16,20,21
393:23 394:2
398:13 401:17
402:2,24 403:13
404:13 405:25
410:6 411:3 412:3
**presence** 408:14
**present** 294:21
295:8 297:15
**preserve** 315:18
**pressed** 352:15
368:18 369:4
**pretty** 310:12
311:11 332:8
396:25
**prevalent** 374:17
**prevent** 405:24
**previously** 387:23
403:14
**pride** 306:1
**primary** 384:14
**prince** 340:22,23
341:3
**print** 384:2
**printed** 314:14
383:16,25 384:5
**printouts** 383:15
384:5
**prior** 313:1 320:11
356:21 377:8
382:18 387:22
388:6 389:1 391:1
391:13 402:7
**probable** 339:6
341:18,22
**probably** 295:6
298:24 308:14
315:5 325:12
368:2

**problem** 361:20
372:7
**procedure** 407:7
411:5 412:5
**process** 311:19
360:15 377:15
396:17
**produced** 290:6,8
296:19,20 313:12
313:22 314:4,7
361:18
**production** 297:6
326:13 329:11
333:23 336:3
338:13 342:23
345:14 350:14
354:6 410:15,17
410:22
**program** 304:11
304:18 307:5
308:8 375:16
376:7
**progress** 356:6
**progressed** 355:2
355:3,4 360:19
365:16 380:6
400:21
**progresses** 355:21
**pronounced** 299:3
299:24
**proper** 347:24
381:25 382:2
**prosecutable**
321:23
**prosecution** 307:9
**protect** 296:25
**protocol** 377:9
**provide** 302:12,21
345:2 357:7
376:18 381:1,11
385:15 400:24

401:6
**provided** 292:2
293:25 303:11
319:17 327:20
340:21 355:24
357:9 376:5
383:12 400:24
**providing** 302:18
**prudent** 377:17
**prudential** 288:4
**public** 408:6
409:14 411:10,18
412:15,23 413:23
**pull** 314:17 322:4
392:12
**pulled** 314:19
**pulling** 301:19
303:6
**purchased** 344:1
**purchases** 332:12
**purdue** 286:15
**purported** 379:16
379:17
**purpose** 385:20
**purposes** 296:14
313:14,24 317:4
326:9 329:8
333:19 335:24
338:9 342:19
345:10 349:20
354:2
**purse** 341:15
**pursuant** 407:3,6
**pursuing** 386:3
**put** 299:1,2,5,24
300:4 304:8
306:16,21 308:19
310:3 312:9 313:3
324:6,12,18
332:22 341:21
355:2 358:14,16

358:21,22 359:1
364:5 365:10
392:11 393:7
**puts** 361:23
389:23
**putting** 325:7
364:11 390:1

**q**

**qualified** 408:8
**question** 305:24
341:10 347:6,17
350:2 356:12
360:11,13 363:9
363:19 373:9
374:3 379:19
382:4 387:22
395:1 400:20
402:9,15 405:19
**questioning**
362:17 370:21
399:21 400:5
**questions** 304:20
370:13 382:25
391:17,18 397:5
403:7,10
**quick** 303:8
308:17 330:19
372:10 381:16
**quickly** 296:22
317:17 350:10
**quite** 301:16 374:2

**r**

**r** 299:23 321:1,8,8
321:9
**radio** 298:6
**raise** 396:14
**rapport** 311:7,17
311:19 388:15
399:22 401:3
403:22

reach 357:8
reached 401:19,24
reaching 376:16
read 329:19
338:25 343:14
350:25 354:17
364:13 406:20
411:5,6,12 412:5,6
412:17
reading 313:7
410:19
reads 364:14
real 308:17
really 343:21
344:22 366:13
379:20 381:6
392:16,18 396:14
398:3
reason 293:19
301:2 314:18
335:5 355:5,25
368:24 369:17
374:22 391:25
410:14 412:8
413:3
reasons 316:12
374:21,23 399:14
401:23,25
recall 296:2,6
300:8 309:2 316:6
316:10 322:21
323:14,17 325:10
326:1 328:18
337:19,20,25
339:9,12,14 340:8
340:19 346:19
371:14 375:9
379:4,7 380:10
381:12 391:18
392:5 401:17
402:10,12,13

404:16,24 405:1
405:10,11
receipt 306:3
392:25 410:18
received 298:12
381:12
receives 298:22
receiving 370:20
recess 370:15
recitation 390:7
recognize 314:9
recollection 388:1
388:2
record 296:17
357:18 359:25
361:16 370:16,22
376:17 384:4
390:25 412:9
recorded 361:3
387:9,15 388:18
records 378:23
recover 334:25
recovered 304:12
304:14 305:9,19
306:13 308:19
334:23 346:12,16
369:9
recreationally
365:10,14,22
366:7
red 351:3,15
396:14
redact 296:24
326:25
redacted 315:22
316:1 367:7
redaction 296:21
reduced 408:14
refer 297:21 298:3
298:10 299:14
300:25 321:22

342:2 380:14
392:7
reference 341:13
383:7 410:7 411:2
412:2
referenced 408:13
408:18 411:11
412:15
referral 307:1,3
referred 380:9
383:6
referring 297:23
339:22 347:21
371:3 398:25
402:6
refers 304:24
307:1 329:22
331:9
refilled 342:4
reflect 364:22
391:12
reflected 298:2
325:5
reflection 374:8
regained 377:12
regarding 404:12
407:2,11
regular 376:6
397:17
rehash 340:2
relapsed 357:1
relate 384:12
related 331:23
393:12
relates 286:12
327:8 329:16
relating 390:18
relation 393:12
relative 409:2
relatively 353:2
358:15

relay 401:11
relayed 324:5
334:6 351:23,24
352:1
relevancy 398:4
remember 330:20
330:21 331:2
335:4,5 337:12
343:21 344:22
351:7 354:20
355:24
remembered
313:9
remotely 362:18
repeat 395:3
replaced 374:23
report 298:8,9
303:7 306:21
308:21 309:24
334:1 340:1,5
349:10 368:20
reported 327:25
356:13 357:23
reporter 289:9
411:7
reporter's 289:7
408:1
reporting 302:14
327:17 328:1
360:15
reports 302:23
310:20 323:13
336:15 338:22
343:6 350:22
354:13
represent 317:10
representation
359:20 360:14
represented
387:23

**representing** 292:13,15
**requalification** 381:17
**request** 412:9,11
**requested** 407:1,6 407:10
**require** 353:4
**required** 300:5 410:25
**reservation** 326:25
**reserve** 296:23
**residence** 367:11
**respect** 353:14 376:2 380:8
**respond** 299:17 334:16 359:4 375:18 376:23 377:1,5,15,20,23 378:1,4,8,20 399:10
**responded** 300:9 308:20 319:23 320:18 327:9 343:20 346:4 394:19 405:22
**responder** 377:4
**responding** 298:6 298:7,22 299:12 306:20 397:18
**response** 290:4,9 290:12,16,19,23 291:1,5,8,12,15 296:5,12,19 297:11,18,22 307:15 308:10,12 308:15,25 309:7 309:15 310:3,8 312:11,16,23 317:3,8 318:2

319:22 321:10,13 321:21 323:23 326:7 327:6 329:6 329:16 333:17 335:22 336:8 338:7,18 342:17 342:25 345:8,16 349:18 350:18 353:25 354:9 370:25 371:2,4 383:4 384:10 385:21 386:8 387:4,10,16 388:4 388:19,24 389:14 389:20 390:2
**responsibilities** 384:12 385:4,9 391:21
**responsibility** 384:15
**result** 322:1 369:12
**resulting** 351:13
**retained** 289:9
**returned** 356:15 410:18
**reveal** 341:8
**review** 293:23 294:9,11 407:2,6 410:12 411:1 412:1
**reviewed** 294:1 295:18
**reviewing** 388:23
**rid** 349:3
**right** 296:23 299:9 302:23 310:11 311:22 312:2 315:24 316:3 318:18,19 324:19 325:17 327:22,23

328:2 330:7 347:22 348:1 349:9 358:8,18 362:4,10 363:3 364:7 374:4 377:7 387:5 393:8 394:3 394:3 396:17 399:12,13,18 400:4,7,10 402:3
**rip** 392:20
**rms** 298:2,4
**road** 311:19 343:9
**robinson** 321:9
**role** 398:24
**roll** 350:5 392:19
**roman** 288:11 289:4,6 292:7,8 293:9,9,15 297:3 314:2 315:9,15,20 316:3 327:2 360:4 361:10,19 366:17 370:9,16,24 371:4 371:7 384:24 385:1,12 386:1,6 386:15 387:11 388:8,20 389:2,15 389:21 390:5,9,15 390:22 391:7,14 391:23 392:2 394:6 395:1 396:18,22 397:4,7 403:6 406:19
**room** 292:9 321:21 403:20
**rooms** 360:17
**ropes** 288:3 293:1 293:5
**ropesgray.com** 288:6,9
**roughly** 322:22

**rows** 357:22 362:6
**rpr** 286:25
**rules** 407:3,7 411:5 412:5
**run** 301:25 314:23 314:25
**rushed** 377:6
**rx** 287:11

**s**

**s** 321:3,8,9 376:8 410:15 412:8,8 413:3
**safe** 399:4
**sake** 327:25
**sat** 381:23
**saw** 304:15 346:23 366:6 381:21
**saying** 359:1 363:7 363:8 405:10
**says** 304:1,15 306:14 317:22 339:4 342:1 343:24 347:15 355:13 356:2 361:22 365:18 366:25 396:8
**scanning** 303:7
**scenario** 310:1 396:12
**scene** 296:4 298:19 300:15 307:16 308:16 309:2,7,23,25 310:7,15 320:11 327:9 334:16,21 346:12,17 376:23 377:1,20,24 378:1 378:8,20 386:10 386:18 390:4,8 394:18 395:5 396:11

sceptical  352:10
   352:14
schock  287:17
   292:21,21
schroeder  321:7
scluff  287:6
scott  286:19 289:4
   292:1,6 366:25
   371:8 383:1 397:6
   403:8 408:9 410:8
   411:4,9 412:4,13
   413:20
se  394:16
seal  394:15 409:6
   411:15 412:21
second  286:23
   305:21 326:23
   361:21 362:4
   366:17 380:2
section  302:22
   303:1 339:2,24
   362:20 363:11
   389:13 390:12
sections  316:10,15
security  301:14
see  301:8 302:9
   303:19 304:5,20
   307:19 317:8,17
   317:23 327:14
   332:10 336:20
   357:16 361:11
   362:23 366:18,22
   367:4,8,18 378:13
   382:15 389:9
   402:8
seek  373:2,9
seen  297:7 299:6
   314:16 326:14
   329:12 333:24
   336:4 338:14
   350:16 354:7

394:9,11,12,17
self  298:24
selling  385:19
   398:4
sense  325:2,19
   349:8 377:18
separate  294:13
   405:21
september  338:20
series  304:19
server  383:12
service  288:19
   376:19
services  287:11
   293:14 376:4
   378:6
set  409:6
sgt  299:22 300:6
   301:15 318:24
   320:3,5 345:23
shapira  288:20
   293:13
shapira.com
   288:23
sheet  323:10
   324:19 331:1
   359:4 410:13
   412:7,10,18 413:1
sheets  324:10,13
   325:4,6,8
shot  382:8
show  366:19
   397:24
shown  383:14
   410:16
signal  364:24
   365:4,9,14
signature  407:5
   409:13 410:14
signed  411:13
   412:18

signing  410:19
similar  316:7
simplest  371:24
sincerely  410:21
single  318:8
   334:22 357:6
   373:18
sir  294:20 295:10
   297:20 299:10
   300:2 302:10
   307:13 308:6,23
   312:13 317:24
   325:24 327:7
   334:3 337:10
   350:24 360:17
   362:16,24 397:18
   410:10
sit  360:17 381:20
   399:25 401:8
sitting  360:24
situation  387:2
six  306:6 352:13
   352:23 392:21
sixth  366:21
skeptical  352:21
skipped  306:24
sky  401:9
slang  396:9
sloppy  318:9,13
slowly  324:24
small  313:18
   353:2,3 366:13
smell  394:16
smells  394:14
snorted  334:4,13
   335:8 352:5,22
   379:2
social  301:14
sold  301:3 351:16
   397:20

solutions  410:1
   413:1
solving  372:19
somebody  319:24
   323:5 347:8
   355:20 394:2
somebody's  315:5
soon  375:20
sorry  295:23
   306:24 316:4
   346:22 347:18
   350:8 357:20
   360:1 362:21
   371:7 373:13
sort  351:11 352:4
   364:24 390:2
sounds  396:15
source  324:22
south  287:18
spaeder  287:12
   292:20
speak  294:17
   295:2 309:17
   343:22 354:25
   358:20 360:3
   373:6 376:9
   387:19 405:17
speaking  360:25
   405:11
speaks  362:13
   363:5 368:23
specgx  288:2
   293:2,6
specific  319:14,15
   374:21 377:21
   379:19 380:25
   391:17 394:23
   395:6 401:15
   402:5 405:2
specifically  309:12
   319:17 337:11

364:11 375:5
379:7 380:16
381:21 398:23
**specifics** 375:6
**specified** 408:21
**spectra** 351:3,15
**speculate** 349:6
**speculation**
342:11 363:13
364:1 368:11
370:7 374:19
375:3 380:22
397:13 400:12,17
402:19 403:2
406:3
**spelling** 321:3
**spoke** 294:25
323:14
**spreadsheet**
357:22
**spreadsheets**
316:7
**ss** 408:3
**stack** 319:14
**staff** 386:22
**stamp** 306:1
**stamped** 367:13
392:15
**stand** 299:11
324:3
**stars** 288:17
**start** 325:7 352:16
365:18,21,22
375:23 383:3
404:6,17
**started** 311:21,24
312:2,7,15,21
316:20 320:12
322:18,19 323:16
324:5,17,20
325:20 328:22

330:2,3 331:12,15
331:18,20 332:18
332:21 333:8
344:18 349:11
352:10,14 353:15
355:1 360:20
361:2 365:5,18
366:1 372:2,22
387:25 388:14
400:6,20,22
403:18 404:9
**starting** 298:2
312:22 368:18
**starts** 355:20
**state** 408:2,7
409:15 411:10
412:15
**stated** 336:19
**statement** 358:1
390:13 411:13,14
412:19,19
**states** 286:1
327:12
**statute** 292:2
**stay** 325:25 377:14
**steady** 356:23
**stenotypy** 408:14
**step** 380:7 384:9
400:2,8
**stepped** 395:13
**sterling** 287:4
292:11 410:5
**steven** 288:12
292:14
**sticking** 310:10
**stop** 305:20
400:22
**story** 327:20
328:17 352:25
**straight** 335:1
356:6

**street** 286:23
287:13,18 288:4
288:13,21 308:5
369:24 384:22
385:11 390:21
393:23 394:3
399:9 403:5
**streets** 372:4,13
399:4
**strike** 358:7 382:4
**struck** 294:4
**stuff** 330:20 405:3
**subject** 370:19
**submit** 305:4
**submitted** 305:6
**subscribed** 411:10
412:14 413:21
**subset** 385:3
**substance** 295:15
**succeed** 311:11,13
**sudden** 396:9
**suicide** 355:7,17
**suite** 287:13,22
410:2
**superior** 410:1
**supervisor** 297:12
318:6 320:5
**supervisors** 328:1
**supplement**
306:18
**supplemental**
306:20
**supplied** 340:8
**supplies** 301:11
**supply** 355:10
**supposed** 348:8
**sure** 292:11
301:16 314:18
316:18 321:5
322:20 334:15
341:23 361:17

369:11 373:9
374:2,4,13 383:24
389:3 400:19
**surprise** 324:1
**survives** 304:1
388:16
**surviving** 303:24
**survivors** 372:12
372:14
**suspect** 303:16,21
303:21 329:22,23
329:23 331:10
360:22 385:15,16
**suspect's** 332:4
**suspects** 400:24
**swinkelman**
288:15
**sworn** 292:3
408:10 411:10,13
412:14,18 413:21
**synthetic** 373:19
**syringe** 396:7
**system** 320:1
322:10

| t |
| --- |

**t** 321:1 376:8
**table** 305:18
**take** 302:4 305:10
312:25 332:10
348:8 349:25
350:3 357:23
359:19 361:13
363:6 370:9
375:22 384:9
392:11 395:1
398:1
**taken** 286:22
293:24 305:13
353:1,12 370:15
379:12 386:24
408:20

takes 309:22 312:4
talk 303:2,13
  311:5 331:8 352:5
  360:1 393:22
  399:23,25 401:8
  405:18
talked 295:12
  344:21 392:4
  393:11 394:18
talking 297:17
  316:4 324:7
  360:18 370:23
  395:19 401:4,20
  402:7 403:23
talks 367:3
target 301:3
taught 381:15,22
team 340:18,20
tell 298:1 301:18
  302:11 311:15
  319:1 326:17
  354:17 356:19
  363:16 383:18
  384:4 396:5
  403:21
telling 359:23
tells 357:21 396:11
ten 295:4 333:6
  381:16
tend 347:9
tended 352:14
tenth 288:13
term 363:1
terminology 364:4
  364:7
testified 296:3
  308:24 310:22
  323:15 371:12
  375:7 376:21
  378:21 380:8
  387:24 401:14

403:11 405:4
testify 402:19
  408:10
testimony 293:20
  295:15 296:6
  309:3 323:20
  373:4,24 374:5
  375:10 387:22
  398:16,22 399:7
  399:20 400:13,18
  402:5,7,11 403:3
  403:16 404:4
  405:9 408:12,17
  411:6,7 412:6,9,12
text 396:7
thank 292:8 297:3
  315:9 331:6
  333:11 370:17
  371:11 403:6
  406:19
thing 359:22
  364:23 369:11
  373:18 379:25
  383:9
things 311:18,22
  312:6 323:6
  343:11 348:25
  352:8 358:21
  364:25 370:25
  371:2 399:15
  401:24
think 298:15
  311:12 319:5
  320:14,18,21
  325:13 328:9
  341:14 347:20,23
  349:5 352:2,24
  353:18 357:20,23
  359:24 365:12
  366:20 370:10
  374:16 382:22

395:19
third 315:24
thirty 410:18
thought 351:2,10
  351:10 352:4
thousand 320:19
  400:3
three 359:16 360:6
  375:20
thursday 339:6
  342:1,4
ticket 306:3
  355:11
tickets 392:19,20
tie 385:9 392:12
time 296:2 297:17
  298:18,19,20,23
  299:3,24 302:3,20
  303:19 308:24
  309:6,9,13,13
  311:12 332:4,5
  334:22 341:7
  343:23 352:9
  359:9 361:13
  372:6 376:1,5
  377:17,22 379:5
  382:13,15 387:1
  387:19 396:2,5
  403:12,20,23,24
  408:20
timeframe 321:6
  368:17,19
times 300:11
  301:22 339:25
  353:7 359:16
  363:3,8 364:19,20
  381:23 395:10
today 293:20
  294:16 295:15,22
  295:25 316:13
  350:7 371:11

375:1 380:11
  382:23 383:4
  384:5,20
today's 355:5
toe 343:16 344:7,9
  344:13,14,15
  345:1
told 332:25 335:9
  336:23 344:6
  355:7
tools 390:19
top 315:3 365:12
  392:17
topic 405:21
total 363:2
totally 360:4 398:7
  398:9
tower 288:4
tracing 393:9
track 390:20
tracker 383:9,18
  384:6,11 385:22
  389:5,7,19 390:11
  390:17,25 391:6
tracking 383:11
  383:12
trade 373:22
trained 306:6
  378:9 381:3,8,9
training 381:6
transactions
  346:18 393:7
transcribed
  408:15 411:7
transcript 286:19
  289:1 293:23
  294:8 407:3,6,9,11
  410:11,12 411:5
  411:12 412:5,11
  412:17

**transcription**
408:16
**transcripts**  295:18
**transformed**
332:24
**transported**
299:19 300:21
**transporting**
378:15
**travels**  332:8
**treat**  315:16
399:23
**treating**  401:4
**treatment**  307:3,5
372:17 375:8,23
375:25 376:4,9
384:23
**tried**  344:22
**true**  309:5 333:3
408:16
**trust**  311:17 401:3
401:10
**truth**  408:10,11,11
**truthful**  293:20
351:25 352:25
**truthfulness**  356:1
**try**  298:25 311:4,4
311:7,9,10,17,20
311:23,25 326:20
352:7 365:24,24
371:10 376:15
387:18 388:16
404:19
**trying**  312:5
343:10 355:16
371:23 380:1
397:22 398:12
400:14
**tucker**  287:21
292:24

**tuckerellis.com**
287:24
**turn**  366:12
**two**  298:16 304:16
321:4 322:3 325:9
325:10 340:7
353:9 383:14
397:5
**type**  305:22
308:18 325:8
364:7,16,23
379:18,21 380:1
**types**  364:25
373:19 392:24
**typically**  304:8
306:5
**typo**  315:5

### u

**u**  321:3
**ulmer**  286:23
**ultimately**  312:12
400:25 401:1
**uncommon**  303:24
305:10
**undercover**  393:6
**undermine**  341:9
**underneath**  300:3
331:5 355:12
**understand**
297:22 318:25
374:2,4 380:2
383:8 384:10
385:5 399:3,25
404:1
**understanding**
356:11 360:12
381:24 401:5
**understood**
376:17 378:7
384:19

**unfair**  403:25
**uniform**  377:3,4
**uniformed**  377:19
381:20
**union**  370:2
**unit**  298:22 318:22
320:18 323:1
324:24 361:1
372:24 380:10,15
380:18 391:21
404:8,9,21 405:5,6
405:10,13
**united**  286:1
**units**  360:19
**use**  304:17 305:8
365:1,15 373:1,2
377:12 381:22,25
385:23 386:5,25
388:7 389:1
390:20 391:1,13
392:24 393:4
395:16 405:6
**user**  374:12
**users**  373:2 374:9
**usually**  300:4
377:1

### v

**v**  286:14 410:6
411:3 412:3
**vacant**  301:23
**vague**  347:3
404:22
**vaguely**  351:7
**valid**  378:24
**vast**  387:24
**velcro**  392:16,17
**ventura**  287:4
**verbal**  387:14
391:4
**verify**  334:8 335:7

**veritext**  410:1,7
413:1
**veritext.com.**
410:17
**versus**  379:12
**victim**  296:24
301:8,12 303:24
307:20 327:1,17
331:13 334:4
336:22 339:23
340:13 343:22
349:3 351:8,9,17
357:8 364:10
**victim's**  301:13
315:25 332:16
385:23 386:5
388:25 391:1,13
397:10
**victims**  401:20
**video**  381:7,14
**views**  402:23
**vol**  410:8 411:4,9
412:4,13 413:20
**volume**  286:19
**voluminous**
359:24 383:15
**volunteered**  379:5
397:25

### w

**w**  286:23 288:11
**waiting**  397:23
**waived**  410:19
**walgreen**  370:1
**walk**  395:17
403:20
**walmart**  287:7
292:18
**want**  311:5,17
326:20 332:1
349:25 350:2
352:6 359:20

360:1 366:18
376:13 378:18
379:17,22 380:3
384:9 399:15,25
400:2 401:1,1,2
**wanted**  372:12
**washington**
288:13
**watched**  381:5,14
**wax**  392:14
**way**  347:24 348:2
359:25 361:18
371:24 374:13
384:3 388:24
393:9 405:24
**ways**  400:7
**week**  376:13
**weekends**  358:20
**welcome**  331:7
**wendy**  286:25
408:6 409:14
**went**  323:22 335:1
337:15,21 346:19
359:13 367:11,14
372:11 381:7
**whatnot**  299:7
320:1 323:13
346:13 360:22
**whereof**  409:5
**white**  298:21
343:15,25 344:1
351:3,14,20
**whitesell**  287:22
292:23,23
**wife**  348:21
395:15,25
**winkelman**  288:12
292:14,14
**withdraw**  398:17
**witness**  287:3
363:15 366:20

408:9,13,15,18
409:5 410:8,11
411:1,4,11 412:1,4
412:15
**witness's**  407:2
**witness'**  410:14
**word**  328:3 357:24
364:16,18
**words**  364:6 365:3
365:8,13
**work**  369:1
**worked**  386:22
**write**  327:13
336:19 367:10
**writing**  313:18
**written**  346:10
387:15 391:5
404:15
**wrong**  356:18
382:21
**wrote**  339:21

**y**

**yeah**  294:12 301:1
303:3 314:2 339:3
346:1,14 349:7
351:7 355:18
361:25 363:16
381:5,5,10 384:7
388:2 394:11,11
394:16
**year**  293:24 321:7
325:9,9 358:11
**yearly**  381:17
**years**  305:25
325:9,10 333:6,7
344:11
**yelling**  399:24
**yesterday**  294:25
295:12
**york**  288:8

**yorker**  343:10

**z**

**z**  299:11
**zip**  392:10,12,17
394:8
**zipp**  288:11 293:7
293:7 315:7,9
357:21
**zone**  298:7,21
299:12,13 375:22
**zuckerman**  287:12
292:20
**zuckerman.com**
287:15

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.