Page 1

1              IN THE UNITED STATES DISTRICT COURT
2                  NORTHERN DISTRICT OF OHIO
3                      EASTERN DIVISION
4
                  ~~~~~~~~~~~~~~~~~~~~~
5
6      IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
       OPIATE LITIGATION
7                                       Case No. 17-md-2804
8                                       Judge Dan Aaron
       This document relates to:       Polster
9
10     County of Cuyahoga v. Purdue
       Pharma L.P., et al.
11
       City of Cleveland, Ohio v. Purdue
12     Pharma L.P., et al.
13     The County of Summit, Ohio, et al.
       v. Purdue Pharma L.P., et al.
14
       Case No. 1:18-OP-45132
15
                  ~~~~~~~~~~~~~~~~~~~~~
16
                       Deposition of
17                     SCOTT MORAN
18
                    December 20, 2018
19                       9:00 a.m.
20                       Taken at:
                      Zashin & Rich
21            950 Main Avenue, Fourth Floor
                    Cleveland, Ohio
22
23           Renee L. Pellegrino, RPR, CLR
24           THE FOLLOWING PAGES WERE DEEMED
25            HIGHLY CONFIDENTIAL: 128-170

Page 2

```
 1   APPEARANCES:
 2   On behalf of the City of Cleveland:
       Zarzaur Mujumdar & Debrosse
 3     DIANDRA DEBROSSE ZIMMERMAN, ESQ.
       2332 2nd Avenue North
 4     Birmingham, Alabama  35203
       (205) 983-7985
 5     fuli@zarzaur.com
              - and -
 6     Zashin & Rich
       AMI J. PATEL, ESQ.
 7     950 Main Avenue, Fourth Floor
       Cleveland, Ohio  44113
 8     (216) 696-4441
       ajp@zrlaw.com
 9
       City of Cleveland:
10     ELENA BOOP, ESQ.
       601 Lakeside Avenue, Room 106
11     Cleveland, Ohio  44114
       (216) 664-3727
12     eboop@city.cleveland.oh.us
13   On behalf of Walgreens:
       Bartlit Beck LLP
14     MATTHEW BREWER, ESQ.
       Courthouse Place
15     54 West Hubbard Street, Suite 300
       Chicago, Illinois  60654
16     (312) 494-4432
       matthew.brewer@bartlit-beck.com
17
       On behalf of Walmart, Inc.:
18     Jones Day
       KRISTIN S.M. MORRISON, ESQ.
19     North Point, 901 Lakeside Avenue
       Cleveland, Ohio  44114-1190
20     (216) 586-3939
       kmorrison@jonesday.com
21
22            ~ ~ ~ ~ ~
23
24
25
```

Page 3

```
 1   APPEARANCES, CONT'D:
 2   On behalf of Endo Pharmaceuticals, Inc., Endo
       Health Solutions, Inc., Par Pharmaceuticals,
 3   Inc. and Par Pharmaceutical Companies, Inc.:
       Baker & Hostetler
 4     TERA COLEMAN, ESQ.
       Key Tower, 127 Public Square
 5     Cleveland, Ohio  44114-1214
       (216) 621-0200
 6     tcoleman@bakerlaw.com
 7   On behalf of McKesson Corporation:
       Covington & Burling LLP
 8     NEIL K. ROMAN, ESQ.
       The New York Times Building
 9     620 Eighth Avenue
       New York, New York  10018-1405
10     (212) 841-1405
       nroman@cov.com
11            - and -
       Covington & Burling LLP
12     JOHN ZIPP, ESQ.
       One CityCenter
13     850 Tenth Street, NW
       Washington, D.C.  20001-4956
14     (202) 662-6000
       jzipp@cov.com
15
       On behalf of Mallinckrodt, LLC and SpecGx, LLC:
16     Ropes & Gray
       JOSHUA GOLDSTEIN, ESQ.
17     Prudential Tower
       800 Boylston Street
18     Boston, Massachusetts  02199-3600
       (617) 951-7000
19     joshua.goldstein@ropesgray.com
              - and -
20     Ropes & Gray
       JESSICA F. SORICELLI, ESQ.
21     1211 Avenue of the Americas
       New York, New York  10036-8704
22     (212) 596-9000
       jessica.soricelli@ropesgray.com
23
24            ~ ~ ~ ~ ~
25
```

Page 4

```
 1   APPEARANCES, CONT'D:
 2   On behalf of AmerisourceBergen Drug Corporation:
       (Via Telephone)
 3     Jackson Kelly
       ANDREW N. SCHOCK, ESQ.
 4     50 South Main Street
       Suite 201
 5     Akron, Ohio  44308
       (330) 252-9060
 6     aschock@jacksonkelly.com
 7
       ALSO PRESENT:  Shaun Crum, Videographer
 8
 9            ~ ~ ~ ~ ~
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1            TRANSCRIPT INDEX
 2
 3   APPEARANCES ......................................2
 4   INDEX OF EXHIBITS .............................6
 5   INDEX OF OBJECTIONS ..........................8
 6
 7   EXAMINATION OF SCOTT MORAN:
 8   BY MR. ROMAN ..................................11
 9   BY MR. BREWER ................................226
10   BY MR. GOLDSTEIN .............................245
11
12   AFTERNOON SESSION ...........................144
13
14   REPORTER'S CERTIFICATE ......................280
15
16   EXHIBIT CUSTODY - RETAINED BY COURT REPORTER
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

INDEX OF EXHIBITS

Number        Description        Marked

Exhibit 1   Cuyahoga County Opiate Task        45
            Force Report 2014

Exhibit 2   Spreadsheet        77

Exhibit 3   Spreadsheet        77

Exhibit 4   Court of Common Pleas Criminal   111
            Division Search Warrant
            Beginning Bates Number
            CLEVE_002250088

Exhibit 5   Multi-Page Document Beginning   122
            Bates Number CLEVE_000305048

Exhibit 6   Cuyahoga County Medical Examiner 128
            Report dated October 8, 2013

Exhibit 7   E-Mail from Hugh Shannon to Tom  140
            Gilson, et cetera, dated January
            5, 2018, with Attachment,
            Beginning Bates Number
            CLEVE_000182046

Exhibit 8   Multi-Page Document Entitled   150
            "Overdose Death Investigation
            and Prosecution" - Highly
            Confidential

Exhibit 9   Multi-Page Document Entitled   150
            "Fentanyl/Heroin Crisis in
            Cleveland" - Highly Confidential

Exhibit 10  E-Mail from Matthew Baeppler to 171
            Gary Gingell dated March 27,
            2018

Exhibit 11  Court of Common Pleas Search   179
            Warrant Beginning Bates Number
            CLEVE_002250978

Page 7

INDEX OF EXHIBITS, CONT'D

Exhibit 12  Search Warrant Beginning Bates  182
            Number CLEVE_002250680

Exhibit 13  City of Cleveland Department of  185
            Public Safety Division of Police
            Organizational Structure

Exhibit 14  E-Mail String Bates Numbered   196
            CLEVE_000274219

Exhibit 15  E-Mail from CCMEO Automated    199
            Alert System to Various
            Recipients, dated May 19, 2018,
            Beginning Bates Number
            CLEVE_000266801

Exhibit 16  Cleveland Police HIDI Response  206
            Form Beginning Bates Number
            CLEVE_000274559

Exhibit 17  Event Summary Beginning Bates   223
            Number CLEVE_000251274

Exhibit 18  Facebook Page Postings        225

Exhibit 19  NADDI Training Schedule dated   266
            August 20, 2018

Page 8

INDEX OF OBJECTIONS

Objection ..............................13
Objection ..............................34
Objection ..............................40
Objection ..............................40
Objection ..............................41
Objection ..............................49
Objection ..............................51
Objection ..............................53
Objection ..............................53
Objection ..............................54
Objection ..............................55
Objection ..............................55
Objection ..............................56
Objection ..............................57
Objection ..............................59
Objection ..............................62
Objection ..............................64
Objection ..............................65
Objection ..............................98
Objection ..............................99
Objection .............................101
Objection .............................102
Objection .............................103
Objection .............................104
Objection .............................105
Objection .............................107
Objection .............................108
Objection .............................109
Objection .............................110
Objection .............................114
Objection .............................115
Objection .............................116
Objection .............................118
Objection .............................118
Objection .............................119
Objection .............................120
Objection .............................121
Objection .............................121
Objection .............................122
Objection .............................125
Objection .............................129
Objection .............................130
Objection .............................132
Objection .............................134

Page 9

INDEX OF OBJECTIONS, CONT'D

Objection .............................134
Objection .............................134
Objection .............................138
Objection .............................139
Objection .............................142
Objection .............................146
Objection .............................146
Objection .............................148
Objection .............................148
Objection .............................153
Objection .............................153
Objection .............................157
Objection .............................161
Objection .............................165
Objection .............................166
Objection .............................167
Objection .............................167
Objection .............................167
Objection .............................168
Objection .............................171
Objection .............................173
Objection .............................174
Objection .............................176
Objection .............................177
Objection .............................181
Objection .............................181
Objection .............................181
Objection .............................183
Objection .............................184
Objection .............................187
Objection .............................189
Objection .............................190
Objection .............................193
Objection .............................195
Objection .............................197
Objection .............................198
Objection .............................200
Objection .............................201
Objection .............................204
Objection .............................216
Objection .............................219
Objection .............................219
Objection .............................220
Objection .............................222

3 (Pages 6 - 9)

Page 10

1        INDEX OF OBJECTIONS, CONT'D
2
3 Objection ...................................224
   Objection ...................................228
4 Objection ...................................229
   Objection ...................................231
5 Objection ...................................235
   Objection ...................................236
6 Objection ...................................237
   Objection ...................................237
7 Objection ...................................239
   Objection ...................................244
8 Objection ...................................247
   Objection ...................................250
9 Objection ...................................253
   Objection ...................................259
10 Objection ...................................260
   Objection ...................................269
11 Objection ...................................270
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 12

1     A.   I do.
2     Q.   Is there any reason why you can't
3 give complete and truthful testimony today?
4     A.   There is not.
5     Q.   Have you ever had your deposition
6 taken before?
7     A.   I have.
8     Q.   On how many occasions?
9     A.   Two.
10    Q.   Were either of those depositions
11 videotaped?
12    A.   No.
13    Q.   In what types of matters were they?
14    A.   One, I was a defendant in 1999, and
15 the other one, I was a plaintiff in, I believe,
16 2001.
17    Q.   These were both civil matters?
18    A.   They were.
19    Q.   And what was the case in which you
20 were a defendant?
21    A.   It was a -- stemming from an arrest,
22 went to federal trial.  We were cleared of
23 anything.
24    Q.   What was the allegation against you?
25    A.   I don't recall.  False arrest maybe.

Page 11

1        SCOTT MORAN, of lawful age, called for
2 examination, as provided by the Federal Rules of
3 Civil Procedure, being by me first duly sworn,
4 as hereinafter certified, deposed and said as
5 follows:
6        EXAMINATION OF SCOTT MORAN
7 BY MR. ROMAN:
8     Q.   Good morning, Mr. Moran.  How are
9 you?
10    A.   Good morning.  I am well.
11    Q.   Good.
12        Can you please state your name for
13 the record?
14    A.   Scott Moran, M-o-r-a-n.
15    Q.   And your work address, please?
16    A.   2001 Payne Avenue, Cleveland, Ohio.
17    Q.   And is there an office associated
18 with that address?
19    A.   Narcotics unit.  We're in a
20 transitional stage in offices.
21    Q.   That's the narcotics unit of the
22 Cleveland Police Department?
23    A.   Yes, sir.  Fourth floor of 2001
24 Payne.
25    Q.   And do you live in Cleveland?

Page 13

1     Q.   Were you the only defendant?
2     A.   No.
3     Q.   Was the police department a
4 defendant?
5     A.   I believe so.
6     Q.   How was that case resolved?
7     A.   Trial.
8     Q.   What happened after trial?
9     A.   We were found not guilty -- or
10 cleared of any allegation.
11    Q.   And tell me about the case in which
12 you were a plaintiff, please.
13    A.   I was injured at work by -- I got
14 rear-ended on the highway and brought a personal
15 injury lawsuit against the driver of the
16 vehicle.
17    Q.   How was that case resolved?
18    A.   I was awarded a settlement.
19    Q.   Has your counsel explained to you
20 today how depositions work?
21    A.   They have.
22        MS. DEBROSSE ZIMMERMAN:  Object to
23 form.
24        Go ahead.
25    Q.   And you have a general familiarity

4 (Pages 10 - 13)

Page 14

1  with how they work?
2      A.   I hope so.
3          MS. DEBROSSE ZIMMERMAN:  Counsel,
4  let's just slow down because we're talking about
5  what he communicated with counsel.
6          So to the extent that he asks
7  questions that would make you answer about any
8  communications you've had with your counsel,
9  you're not to answer those questions, but you
10 can answer otherwise.
11         I'm just going to be very quick with
12 my instructions.
13         If you have any questions about my
14 questions, you don't hear me, you don't
15 understand me, please ask me to repeat or
16 restate.  If you answer the question, I'm going
17 to assume you understand what I was asking.
18         Is that acceptable to you?
19     A.   That's acceptable.
20     Q.   And then if you would need a break
21 for any reason, we'll be happy to take one, just
22 not while a question is pending.
23         Do you understand that?
24     A.   I do.
25     Q.   Have you ever testified before at

Page 15

1  trial?
2      A.   Yes.
3      Q.   On how many occasions?
4      A.   You're regarding criminal matters
5  obviously?
6      Q.   Yes.
7      A.   I have a 22-and-a-half-year career.
8  Between 30 and 50 maybe, approximately.
9      Q.   And of those 30 or 50 times that
10 you've testified at trial, have you testified in
11 open court?
12     A.   I have.
13     Q.   In all of them?
14     A.   Yes.
15     Q.   And in all of those cases in which
16 you testified in open court, did you use your
17 real name?
18     A.   Yes.
19     Q.   And did you identify yourself as a
20 Cleveland police detective?
21     A.   I did.
22     Q.   And did you appear without any mask
23 or anything that would disclose -- cloak your
24 identity, or your appearance I should say?
25     A.   Unfortunately, I did, yes.

Page 16

1      Q.   Why do you say "unfortunately"?
2      A.   I don't like my identity to be seen
3  with what I do for a living.  It's dangerous.
4      Q.   But 30 to 50 times you've been in
5  open court identifying yourself as Scott Moran,
6  correct?
7      A.   Correct.
8      Q.   What did you do to prepare for your
9  testimony today?
10     A.   Met with counsel.
11     Q.   With which counsel did you meet?
12     A.   Ami Patel, Fu.  Sorry.
13     Q.   Anyone else?
14     A.   I believe I met with Sterling once
15 or twice.
16     Q.   Sterling.  Who is Sterling?
17     A.   I can't recall his last name.
18 Another attorney in the case.
19     Q.   Anyone else?
20     A.   In the initial beginnings, I met
21 with someone from our city law department, Elena
22 Boop.
23     Q.   Anyone else?
24     A.   Not to my recollection.
25     Q.   In any of these meetings that you

Page 17

1  had with any of these counsel, was anyone
2  present other than counsel and you?
3      A.   Yes.
4      Q.   Who else was present?
5      A.   Other members of the Cleveland
6  Police Department.
7      Q.   Which other members?
8      A.   On one occasion I believe it was
9  Detective Patena.
10     Q.   Shelley Patena?
11     A.   Yes, sir.
12     Q.   Anyone else?
13     A.   And to back up, there was a -- there
14 was one meeting where the EMS commissioner was
15 here and the chief of police was here, Chief
16 Williams.
17     Q.   Who from EMS was there?
18     A.   I can't -- I don't know her name.
19 She was EMS commissioner.
20     Q.   How many total meetings do you think
21 you have had with counsel specifically to
22 prepare for this deposition?
23     A.   To my best recollection, four to
24 five.
25     Q.   And what do you think are the total

5 (Pages 14 - 17)

Page 18

1 hours you've spent with counsel preparing for
2 this deposition?
3     A.    Best estimate, maybe 12 hours.
4     Q.    Have you reviewed any transcripts of
5 any depositions taken in this case?
6     A.    I've not seen anything from the
7 case.
8     Q.    Have you talked to anyone whose
9 deposition has been taken in this case?
10     A.    No.
11     Q.    Have you reviewed any of the
12 pleadings or papers filed in this case, the
13 complaint, interrogatory responses, anything
14 like that?
15     A.    I believe the original complaint was
16 supplied.  I didn't review the entire complaint.
17     Q.    When did you review the complaint?
18     A.    Months ago.  It was one of the first
19 meetings I had.
20     Q.    Did you supply any information in
21 connection with the drafting of the complaint?
22 In other words, did you talk to counsel before
23 the complaint was filed about this case?
24     A.    No.
25     Q.    Did you review a draft of the

Page 19

1 complaint before it was filed?
2     A.    No.
3     Q.    Do you know what interrogatory
4 responses are?
5     A.    I do not.
6     Q.    Do you recall reading questions that
7 were posed by the Defendants and answered by --
8 in writing by the Cleveland Police Department?
9     A.    Are you referring to -- what are you
10 referring to, the complaints or --
11     Q.    I was referring to interrogatory
12 responses.
13     A.    I have not, no.
14     Q.    Okay.  Have you reviewed any
15 documents that were produced in this case?
16     A.    No.
17     Q.    I understand that we're going to be
18 receiving from -- during the deposition today a
19 couple additional documents that were not
20 previously produced to us that you disclosed --
21 or at least were discussed yesterday.
22         Do you recall that?
23     A.    I do.
24     Q.    Okay.  What are those documents; do
25 you recall?

Page 20

1     A.    One was a PowerPoint that was, my
2 understanding, produced, but I tweak the
3 PowerPoint constantly, so an updated version was
4 produced yesterday.  And I believe there was
5 one -- one other PowerPoint or two other
6 PowerPoints that I've -- during my presentations
7 that I've produced.
8     Q.    Okay.  We'll look at those later
9 today.
10         Did you review any other documents
11 other than those?
12     A.    I have not.
13     Q.    In preparation for your testimony
14 today, have you reviewed any documents that were
15 not produced in the case, anything -- any
16 private notes or anything like that?
17     A.    I have not.
18     Q.    Have you conducted any independent
19 research, on the internet or otherwise, in
20 preparation for your testimony today?
21     A.    No.
22     Q.    Are you from Cleveland?  Were you
23 born in Cleveland?
24     A.    I was born in Cleveland, yes.
25     Q.    Were you raised in Cleveland?

Page 21

1     A.    That's personal, but yes.  Part of
2 my life, yes.
3     Q.    What part of your life have you not
4 lived in Cleveland?
5     A.    Younger years.
6     Q.    From age what to what?
7     A.    2 to 11 or so, 1 to 11.
8         MS. DEBROSSE ZIMMERMAN:  Counsel,
9 when you have a break, can we identify all
10 counsel on the record?  I don't think we did
11 that.
12         MR. ROMAN:  We can do that right
13 now.
14         MS. DEBROSSE ZIMMERMAN:  Okay.
15 Great.
16         Diandra DeBrosse Zimmerman, Zarzaur,
17 Mujumdar & Debrosse, for the Plaintiff, the City
18 of Cleveland.
19         MR. ROMAN:  Neil Roman, Covington &
20 Burling, for McKesson.
21         MR. ZIPP:  John Zipp, Covington &
22 Burling, for McKesson.
23         MR. GOLDSTEIN:  Joshua Goldstein,
24 Ropes & Gray, Mallinckrodt, LLC and SpecGx, LLC.
25         MS. SORICELLI:  Jessica Soricelli

6 (Pages 18 - 21)

Page 22

1 with Ropes & Gray for Mallinckrodt, LLC and
2 SpecGx, LLC.
3      MR. BREWER:  Matt Brewer from
4 Bartlit Beck for Walgreens.
5      MS. COLEMAN:  Tera Coleman, Baker
6 Hostetler, for the Endo Defendants.
7      MS. MORRISON:  Kristin Morrison,
8 Jones Day, for Walmart.
9      MS. DEBROSSE ZIMMERMAN:  Do we have
10 people on the phone?
11      MR. SCHOCK:  Yes.
12      MS. DEBROSSE ZIMMERMAN:  We can't
13 hear a word.  You got background.
14      MR. SCHOCK:  This is Andrew Schock
15 with Jackson Kelly for AmerisourceBergen.
16      MS. DEBROSSE ZIMMERMAN:  Anyone
17 else?
18 BY MR. ROMAN:
19  Q.   Let's resume.
20      Where did you live from ages 1 to
21 11?
22  A.   West Virginia.
23  Q.   And the rest of your life you've
24 lived in Cleveland?
25  A.   Yes, sir.

Page 23

1  Q.   Did you go to college?
2  A.   No, sir.  Trade school.  No college.
3  Q.   What trade school did you attend?
4  A.   I'm trying to think of the name of
5 it.  I believe it was Hickok Technical
6 Institute.
7  Q.   What were you studying there?
8  A.   Computer repair.
9  Q.   From when to when was that?
10  A.   1990 to 1991 or something.
11  Q.   So that was before you joined the
12 police department?
13  A.   Yes.
14  Q.   You joined the police department in
15 1996?
16  A.   Yes, sir.
17  Q.   What did you do between 1991 and
18 1996?
19  A.   Worked in a warehouse, and then I
20 worked as a cable service -- cable installer,
21 cable service.
22  Q.   What company?
23  A.   Originally it was North Coast Cable;
24 then it changed to Cablevision.
25  Q.   Did you have any other jobs during

Page 24

1 this period 1991 to 1996?
2  A.   No.
3  Q.   In connection with your -- well,
4 strike that.
5      At any time have you received any
6 certifications or degrees?
7  A.   What do you mean by
8 "certifications"?
9  Q.   Have you been certified as a -- I
10 don't know.  Well, you were certified as a
11 technician, I gather?
12  A.   Yes.  Are you referring to the
13 police department or are you referring to --
14  Q.   Now I'm transitioning to the police
15 department, so if you received certain
16 certifications through the police department,
17 that would qualify.
18  A.   At one point I was qualified as an
19 expert witness in drug cases.  Numerous
20 trainings.  They're not really certifications,
21 but they're, you know, different types of
22 trainings I've attended.  As far as degrees,
23 that was prior to the police department I had a
24 technician's degree.
25  Q.   What types of trainings have you

Page 25

1 received?
2  A.   A lot.  Basic drug investigations,
3 clandestine meth labs one and two, interview and
4 interrogation, marijuana grows, Mexican drug
5 cartels.  Received -- actually, I'm a certified
6 Cleveland Police instructor for drug awareness
7 classes.  I'm going back 22 years of different
8 classes and whatnot that I've attended.  I can't
9 recall them all.  They're in my personnel file,
10 though.
11  Q.   Have you received these trainings
12 over the course of your time in the police
13 department?
14  A.   Yes, sir.
15  Q.   Have you received any specialized
16 training relating to opioids or opioid addiction
17 or abuse?
18  A.   I've received specialized training
19 in the collection of evidence for evidence
20 preservation in such cases.
21  Q.   Related specifically to opioids or
22 not?
23  A.   Related to what we do for DNA
24 collection.  As far as specifically to opioids,
25 I've gone to numerous, you know, just drug

7 (Pages 22 - 25)

Page 26

1 classes that cover everything from cocaine to
2 heroin to opioids.
3     Q.   Have you received any training that
4 has been specifically and exclusively relating
5 to opioids or opioid abuse or addiction?
6     A.   Not a specific class, no.
7     Q.   Now, you started as a police officer
8 on August 19th of 1996, correct?
9     A.   That was my first day of the police
10 academy, so technically you're not a police
11 officer, you're a recruit, and then once you get
12 out of the police academy, which was December of
13 1996, then you're actually a police officer.
14     Q.   And you were originally assigned to
15 the first district?
16     A.   Yes, sir.
17     Q.   And where is that?
18     A.   3895 West 130th.
19     Q.   And what -- what's the area that the
20 first district is responsible for?
21     A.   At the time it was -- well, it's
22 still the far west side of Cleveland.  The
23 borders have since changed throughout the years.
24 We used to go east to West 65th Street, but
25 they've since changed the borders.

Page 27

1     Q.   And you were later transferred to
2 the fourth district, correct?
3     A.   I volunteered to go to the fourth
4 district.
5     Q.   Why did you volunteer to go to the
6 fourth district?
7     A.   They needed assistance in helping
8 train, there was new recruits coming out, they
9 were going to be short-staffed, so I volunteered
10 to go see another side of the city.
11     Q.   And where is the fourth district?
12     A.   That's the southeast portion of the
13 city of Cleveland.
14     Q.   I'm sorry.  When did you transfer to
15 the fourth district?
16     A.   I believe it was somewhere around
17 1999.
18     Q.   For how long were you there?
19     A.   I was only there approximately a
20 year.
21     Q.   Going back to your time as a police
22 officer in the first district, what were your
23 responsibilities?
24     A.   I was basic patrol.  Our job was to
25 answer radio assignments and then active law

Page 28

1 enforcement when we're not answering radio
2 assignments.
3     Q.   Did you have a title?
4     A.   Police officer.
5     Q.   When you transferred to the fourth
6 district, did your responsibilities change?
7     A.   I was still a police officer, but I
8 was on a fast response car, which means we only
9 answer to high-priority assignments, robberies,
10 shootings, crimes of violence.
11     Q.   And then in 2000 you transferred
12 back to the first district?
13     A.   I did.
14     Q.   Why did you go back to the first
15 district?
16     A.   It was my home.  I knew I was going
17 to have opportunities to go to other units in
18 the first district as opposed to, you know, in
19 the fourth district.
20     Q.   And were you still a police officer
21 in the first district when you transferred?
22     A.   I was.
23     Q.   And for how long did you remain just
24 a -- I don't mean just, but a police officer --
25     A.   I understand.

Page 29

1     Q.   -- in the first district?
2     A.   I did that for a few months, and
3 then I was eventually transferred to the first
4 district vice unit, where I became a detective.
5     Q.   So was this in 2000 or 2001?
6     A.   Right around 2000, 2001, somewhere
7 in that ballpark, late 2000, early 2001.
8     Q.   And is that where you began an
9 active role in undercover drug operations?
10     A.   Originally, yes.
11     Q.   And you spent about three years in
12 that unit?
13     A.   Well, we had a lot of personnel in
14 that unit, so I was there for approximately nine
15 or ten months.  They depleted the unit down to
16 less detectives.  I went back to basic patrol,
17 but I was placed on a uniform drug enforcement
18 car.
19     Q.   And during these three years in the
20 first district, from, you know, late 2000 until,
21 I assume, around late 2003, somewhere around
22 there --
23     A.   Well, I went back to the vice unit
24 in 2002.
25     Q.   Okay.

8 (Pages 26 - 29)

1    A.    Late 2002, early 2003.

2    Q.    So how -- so you come back to the
3 first district in late 1999, 2000, somewhere in
4 there, then you transfer back to the first
5 district, then you're assigned to the vice unit,
6 right?

7    A.    I was originally assigned, went back
8 to basic patrol, and then went back to the vice
9 unit.

10    Q.    Okay.  When did you stop working for
11 the vice unit the second time?  What year was
12 that?

13    A.    Well, that's when I was transferred
14 to the Cleveland Police narcotics unit.  That
15 was in December of 2005.

16    Q.    Okay.  And why were you transferred
17 to the citywide narcotics unit?

18    A.    I was a good detective.

19    Q.    So this was a promotion?

20    A.    It's not -- it's not technically a
21 promotion.  We don't get -- there's not pay
22 increases for police officer and detectives.  It
23 was just a chance to work bigger cases.

24    Q.    And your title was still police
25 officer?

1    A.    No.  It was detective.

2    Q.    Detective?

3    A.    Yes, sir.

4    Q.    When did you become a detective?

5    A.    I was a detective in the vice unit.

6    Q.    Right.

7    A.    And when I went to the narcotics
8 unit, I stayed a detective.

9    Q.    And you're still a detective today?

10    A.    Yes, sir.

11    Q.    And you've been a detective
12 continuously from when you first received that
13 title until today, correct?

14    A.    Yes, sir.

15    Q.    Have you had any other titles?

16    A.    No.

17    Q.    Okay.  How long were you in the --
18 well, you're still in the narcotics unit,
19 correct?

20    A.    Correct.

21    Q.    Have you ever left the narcotics
22 unit?

23    A.    No.

24    Q.    So you've been in the narcotics unit
25 continuously from December of 2005 to the

1 present?

2    A.    Yes.  I was assigned an outside role
3 in a different -- I'm a crisis negotiator as
4 well.  I'm still assigned to the narcotics unit,
5 but I'm also a crisis negotiator.

6    Q.    And have your responsibilities
7 during this 13-year period, have they changed
8 over time?

9    A.    Could you ask that one more time,
10 responsibilities?

11    Q.    Sure.

12        You joined the narcotics unit in
13 December of 2005 and you've been with the
14 narcotics unit from 2005 to -- through the
15 present.  During this time, this 13-year period,
16 have your responsibilities changed at all?

17    A.    It's a difficult question to answer.
18 My responsibility is to get drug dealers off the
19 street, but some of the roles have shifted on
20 what we target now.

21    Q.    How so?

22    A.    When I first went into the narcotics
23 unit, our job was to get mid to upper level drug
24 dealers.  We worked longer cases, larger cases.
25 2013, once we started seeing people dying from

1 heroin overdoses, it shifted towards
2 targeting -- investigating fatal overdose deaths
3 because of, you know, all the people dying from
4 the drug.

5    Q.    "The drug" being heroin?

6    A.    Heroin, fentanyl, carfentanil.

7    Q.    And when you said before you were
8 focused on mid to upper level drug dealers, what
9 types of people and organizations are you
10 talking about?

11    A.    DTOs, drug trafficking
12 organizations.

13    Q.    And who did you start investigating
14 once you shifted to the fatal overdose cases?

15    A.    Well, we still -- obviously our goal
16 is to get drugs off the streets, but at this
17 point, you know, we start looking at the person
18 providing the drugs that led to the person dying
19 from the drug.

20    Q.    How is that different?  I'm trying
21 to understand that.

22    A.    Do you got a minute?

23    Q.    Yes.  That's why we're here.

24    A.    Well, obviously when you're
25 targeting mid to upper level drug dealers,

Page 34

1 you're making larger drug buys, you're going
2 after kilo guys, you know, guys selling large
3 amounts. You're dealing with different sources.
4 Now, when you're coming back down on the heroin
5 overdose death, as I'm sure you know, it takes a
6 very, very small amount of this drug to kill
7 someone, so now we're going after persons that
8 might not be at the top of the food chain that
9 are lower level drug dealers, but obviously our
10 goal is to get to that person and still work our
11 way up.
12     Q.   Throughout this period have you
13 operated in an undercover capacity or sometimes
14 not in an undercover capacity?
15         MS. DEBROSSE ZIMMERMAN:  Object to
16 form.
17         You may answer, Detective.
18     A.   You're going to need to reword that
19 because there's two types of -- it's always an
20 undercover capacity.  There's two different
21 types, though.
22     Q.   Tell me the two different types,
23 please.
24     A.   Well, one type of undercover
25 capacity is actually engaging in hand-to-hand

Page 35

1 transactions, which I have done.  The other,
2 we're always undercover.  We're in neighborhoods
3 that we can't exactly wear our uniforms in, so
4 even if I'm not engaging in a hand-to-hand
5 transaction, I'm still exposed to the public.  I
6 don't want them to know I'm a law enforcement
7 officer because I'm in dangerous neighborhoods
8 dealing with dangerous people.
9     Q.   So is it fair to say that since you
10 joined the narcotics unit in December 2005,
11 you've never worn a uniform in the course of
12 your work?
13     A.   We do not wear uniforms.
14     Q.   Okay.  Now, when you started working
15 the heroin overdose deaths in 2013, was this in
16 connection with the heroin-involved death
17 investigation unit or division?
18     A.   When we started seeing the bodies
19 piling up, there was a need for us to
20 investigate these, so at the time -- that's the
21 acronym.  We're still the narcotics unit.  It's
22 actually HIDI, heroin-involved death
23 investigation, not unit.  That's the acronym
24 they created for what we did.
25     Q.   So the HDI -- H -- strike that.

Page 36

1         So the HIDI is a unit or a division
2 or a group within the Cleveland Police
3 Department?
4     A.   We're still narcotics detectives.
5 It's just an acronym they gave to us for the
6 role that we're now assuming.  It's not a
7 separate unit.  We're still narcotics
8 detectives.  We're still in the narcotics unit.
9 It's just an acronym that the commander gave us.
10     Q.   How many members are there in the
11 HIDI?
12     A.   We started with two, and now we have
13 seven, with supervisors, one regular supervisor
14 and -- well, now there's only two.  There's two
15 other supervisors that will occasionally fill in
16 if the supervisor is not available.
17     Q.   Who are the original two?
18     A.   Myself and Detective Tom Klamert,
19 K-l-a-m-e-r-t.
20     Q.   And who are the seven now?
21     A.   You have Detective John Cline,
22 C-l-i-n-e; Detective John Dlugolinski.  Common
23 spelling, D-l-u-g-o-l-i-n-s-k-i.  He's more of a
24 fill-in role, because he's got another
25 assignment, but if we're short, he fills in.  We

Page 37

1 have Detective Carl Robinson, Detective Frank
2 Lake, and Detective Mike Schroeder,
3 S-c-h-r-o-e-d-e-r.
4     Q.   And when did you go up to seven?
5 Was it gradually over the years or --
6     A.   The overdose deaths kept increasing.
7 It was a large burden for myself and my
8 partners, so gradually we kept -- we had to keep
9 adding because of the caseload.
10     Q.   Do you remember how you -- was
11 anybody added in 2014; do you remember?
12     A.   I believe John Cline and John
13 Dlugolinski were added in 2014, Frank Lake was
14 added in 2015 maybe, and then just this past
15 year we added Detective Schroeder and Detective
16 Robinson.
17     Q.   And you mentioned a supervisor,
18 possibly two supervisors.  Would that be
19 Mr. Gingell?  Is that how you pronounce it?
20     A.   He's the commander for the entire
21 unit.  He's not who we work with.  He's not on
22 the street.  So our immediate supervisor at this
23 point is Sergeant Matt Baeppler,
24 B-a-e-p-p-l-e-r.  And when he's not available
25 for whatever reasons, we have a Sergeant Mike

10 (Pages 34 - 37)

Page 38

1  Ward, W-a-r-d; Sergeant Joe Bovenzi,
2  B-o-v-e-n-z-i, and then we had -- Lieutenant
3  Connelly would fill in, but he's since been
4  promoted, so I don't believe he's going to be
5  involved anymore.
6      Q.   So do these supervisors then report
7  to Mr. Gingell?
8      A.   Yes, sir.
9      Q.   Am I pronouncing it?
10     A.   Gingell, correct.
11     Q.   Okay.  And do you report to
12  Mr. Gingell or you just report to the
13  supervisors?
14     A.   We're all in the same office.  I
15  don't necessarily report to him, but, I mean,
16  I'll discuss cases with him.
17     Q.   And do you know if Mr. Gingell has
18  responsibilities over and above the HIDI?
19     A.   Well, he's in charge -- it's called
20  BSS, Bureau of Special Services, so he's in
21  charge of the narcotics unit, he's also in
22  charge of the Cleveland Police SWAT unit, and he
23  serves as the head supervisor for the crisis
24  negotiation team.
25     Q.   And how much of your time do you

Page 39

1  spend on crisis negotiation?
2      A.   You can't put a number on that.  I
3  mean, it's -- if we get called out for it, we
4  get called out.  There's a few of us, so it's
5  not necessarily every negotiation.  You know,
6  we'd like to respond with three detectives.  So
7  if I'm able to respond, I'll respond.  You can't
8  put an exact number on it.
9      Q.   When you do the crisis negotiation
10  work, is that connected with drugs or it could
11  be any type of situation?
12     A.   It can be.  It can be any type of
13  situation.  I've encountered drug addicts that
14  were barricaded, but I've also encountered
15  persons that just shot at police officers that
16  were barricaded.  So, I mean, you don't know
17  what you're responding to.  You know, persons in
18  need, persons in crisis, persons that are
19  barricaded.
20     Q.   Do you have anyone reporting to you?
21     A.   I'm just a detective.  I'm not a
22  supervisor.
23     Q.   Now, at one point you served in an
24  undercover capacity with a Mexican drug cartel;
25  is that correct?

Page 40

1      A.   I've been in a few with Mexican
2  cartels, yes, sir.
3      Q.   When was that?
4      A.   The most recent one was maybe 2016,
5  where I was conducting undercover purchases.
6  I've -- also, in 2006, 2007 we were doing some
7  large marijuana deals where I was in an
8  undercover capacity.
9      Q.   And when you say you make purchases,
10  who are you buying from?
11     A.   Drug dealers.
12     Q.   So you're not -- you're not embedded
13  with the cartel, you're doing business with the
14  cartel?
15         MS. DEBROSSE ZIMMERMAN:  Object to
16  form.
17     Q.   Is that right?
18     A.   What do you mean by "embedded"?
19     Q.   You don't try and join up with the
20  cartel?
21     A.   No.  I can't join the cartel.
22         MS. DEBROSSE ZIMMERMAN:  Object to
23  form.
24     Q.   So you're making drug -- you're
25  making drug buys from the cartel?

Page 41

1      A.   From cartel members, yes.
2      Q.   And are you posing as a middleman?
3  Is that it?
4          MS. DEBROSSE ZIMMERMAN:  Object to
5  form.
6      Q.   Are you buying large quantities from
7  the cartel?
8      A.   No.  No.
9      Q.   Do the cartel members think you're
10  making small buys for personal use or larger
11  buys for possible distribution to others?
12     A.   There's been various, I mean, small
13  purchases from lower level members that are
14  reporting to higher members.  You know,
15  obviously I try to buy more, but if I'm posing
16  as an addict, I'm not exactly buying ounces of
17  heroin.  So, I mean, it's kind of tough to
18  answer.  It depends on the situations, what the
19  situations were.
20     Q.   When you've done this undercover
21  work with the Mexican cartels, are you doing it
22  in Cleveland or are you doing it elsewhere or
23  both?
24     A.   Drug dealers are very slick, so
25  they'll pick a location, and then that location

11 (Pages 38 - 41)

Page 42

1 can change because they're conducting counter
2 surveillance, so there have been locations that
3 were outside the city of Cleveland, and that
4 location would change to another location, to
5 another location, to another location, before
6 you get the final drug purchase.  So I would say
7 some of the locations were outside the city.
8     Q.    But always within Ohio?
9     A.    Yeah.  Oh, yeah.
10    Q.    Okay.  Have you ever had any
11 responsibilities for police department budgeting
12 or policy setting?
13    A.    No.  That's above my pay grade.
14    Q.    Now, in addition to your police
15 roles and duties, have you also served on task
16 forces and committees relating to drug abuse?
17    A.    You asked two questions there.  You
18 asked about task forces and you asked about
19 committees.  I think you need to specify which
20 one is which because there's two answers there.
21    Q.    Let's start with task forces.  Have
22 you served on any of those?
23    A.    I have been on federal task forces,
24 yes.  I've also been temporarily assigned to
25 federal task forces for wire cases for larger

Page 43

1 drug distributors.
2     Q.    What task forces have you served on?
3     A.    I was in -- I was assisting an FBI
4 task force on numerous occasions on wire cases.
5 I was assigned briefly to a NOLETF, which is
6 Northeast Ohio Law Enforcement Task Force.  I
7 was briefly assigned there for six months or so.
8     Q.    What six months were those?
9     A.    It was like 2012 to, you know, 2013.
10 And then throughout the course of my duties in
11 the narcotics unit, you know, if the FBI were
12 conducting a case, and we know the city like the
13 back of our hand, so we assist with
14 surveillance, sitting wires, doing what's needed
15 to get the drugs off the streets.
16    Q.    Have you served on -- you asked me
17 to break it up and I will do that.
18        Have you served on any committees
19 that relate to drug abuse?
20    A.    I have not been on any committees.
21    Q.    Have you had any involvement with
22 the Cuyahoga County Opiate Task Force?
23    A.    Not -- not directly.  I mean, I
24 don't think so, no.
25    Q.    How about the Ohio High Intensity

Page 44

1 Drug Trafficking Area Group?
2     A.    Well, that's our HIDTA, H-I-D-T-A.
3     Q.    But there's not even a -- it's not
4 part of a greater Ohio organization or not,
5 state organization?
6     A.    Not that I've been involved with.
7 I'm not sure.
8     Q.    Okay.
9     A.    But as far as HIDTA, we have
10 analysts that work out of HIDTA that assist on
11 cases.  And, also, they have a hotel/motel
12 interdiction squad that runs out of HIDTA.
13 That's what Sergeant Bovenzi is in charge of.
14 So we've assisted them if they needed detectives
15 on cases.
16    Q.    I think you alluded earlier to
17 having made presentations; is that correct?
18    A.    I do, yes.
19    Q.    And who do you make presentations
20 to?
21    A.    I serve on faculty for what's called
22 NAGTRI, National Association of Attorney
23 Generals Training Institute.  So I've traveled
24 the country to various cities.
25    Q.    Do you know who pays for you when

Page 45

1 you do that?
2     A.    I'm sorry?
3     Q.    Do you know who pays your expenses
4 when you do that?
5     A.    I don't get paid for it.  They cover
6 my expenses.  NAGTRI covers my flight per diem,
7 and then the City -- it goes toward the duty for
8 the City of Cleveland because I'm representing
9 the City of Cleveland.
10    Q.    Do you know whether the -- whether
11 your expenses in any respect come out of the
12 Cleveland Police Department budget?
13    A.    They do not.
14        -  -  -  -  -
15        (Thereupon, Moran Deposition Exhibit
16        1, Cuyahoga County Opiate Task Force
17        Report 2014, was marked for purposes
18        of identification.)
19        -  -  -  -  -
20    Q.    Mr. Moran, I'm handing you what's
21 been marked as Moran Exhibit 1.  It's a
22 multi-page document.  I don't see a Bates number
23 on here.  So I'm told by Mr. Zipp that it was
24 produced natively.  I have no idea what that
25 means, but --

12 (Pages 42 - 45)

Page 46

1    A.   Neither do I.
2    Q.   Good.  We have common ground here.
3         So this is a task force report from
4  2014.  Do you see that?
5    A.   Yes, sir.
6    Q.   Have you ever seen this document
7  before?
8    A.   I don't recall.  I don't know.
9    Q.   And I believe you said that you've
10  had no involvement with this organization, the
11  Cuyahoga County Opiate Task Force; is that
12  correct?
13    A.   Not to my recollection, no.  I
14  mean --
15    Q.   Okay.  I'd like to direct your
16  attention to the second page of the document.
17  And as you can see, it relates to the -- it
18  relates to prescription drug abuse.
19         Do you see that?
20    A.   In the first sentence, yes, sir.
21    Q.   If you go down to a little below the
22  halfway mark on the page, it says, "Contributing
23  factors that led to this epidemic include."
24         Do you see that?
25    A.   Give me one second.  I'd like to

Page 47

1  review the entire document.
2    Q.   Sure.
3    A.   We're skipping over the 2010 part,
4  right?  We're going down to "Contributing
5  factors"?
6    Q.   That's correct.
7    A.   Okay.
8         Okay.
9    Q.   Have you had a chance to review this
10  page?
11    A.   I have.
12    Q.   Okay.  So you'll -- you see there is
13  a series of six bullet points underneath where
14  it says, "Contributing factors that led to this
15  epidemic"?  Do you see that?
16    A.   I do.
17    Q.   And the epidemic, as we see from
18  above, relates to prescription drug abuse,
19  correct?
20    A.   I do.  Yes.
21    Q.   Okay.  I'd like to direct your
22  attention, first of all, to the final bullet,
23  where it talks about widespread diversion of
24  medications.
25         Do you see that?

Page 48

1    A.   I do.
2    Q.   Do you have an understanding of the
3  term "diversion"?
4    A.   I do.
5    Q.   What is your understanding of that
6  term?
7    A.   Well, maybe I don't have an exact
8  understanding.  I know we have a diversion --
9  diversion detectives in the narcotics unit that
10  deal specifically with prescription pill crimes,
11  being doctor shopping, forging prescriptions.  I
12  don't work hand in hand with them per se.  So, I
13  mean, that's my understanding of diversion.
14  It's what I understand through our narcotics
15  unit.
16    Q.   You understand diversion to include
17  such things as doctor shopping; is that right?
18    A.   Yes.
19    Q.   And what do you understand doctor
20  shopping to entail?
21    A.   Going to various doctors with
22  illnesses, attempting to obtain prescriptions.
23    Q.   To get multiple prescriptions for
24  the same ailment or supposed ailment?
25         MS. DEBROSSE ZIMMERMAN:  Object to

Page 49

1  form.
2    A.   I could agree to that.
3    Q.   Are you familiar with illegal online
4  pharmacies?
5    A.   Not extremely familiar.  I mean, I'm
6  aware that there are online pharmacies.
7    Q.   That sell prescription drugs
8  illegally?
9    A.   Yes.
10    Q.   Do you have an understanding what a
11  pill mill is?
12    A.   I do.
13    Q.   What's that understanding?
14    A.   I mean, for me it's twofold.  I
15  mean -- but it's, you know, when a place opens
16  and they're just -- people are lined up and
17  they're going to get their prescriptions and in
18  and out getting their pills.
19    Q.   So it's a shop where patients are --
20  are given prescriptions to pills without much
21  investigation or thought, correct?
22    A.   I would agree with that, yes, sir.
23    Q.   Okay.  Now, you see there's six
24  bullets here of contributing factors that have
25  led to the prescription drug abuse epidemic:

13 (Pages 46 - 49)

Page 50

1 "Changes made to clinical pain management
2 guidelines during the late 1990s, improper
3 storage and disposal of unused medication,
4 marketing medications directly to consumers,
5 overprescribing, substance abuse and underlying
6 mental health issues," and "widespread diversion
7 of medications such as doctor shopping, illegal
8 online pharmacies, and the establishment and
9 recent closure of pill mills."
10      Do you see that?
11    A.   I do.
12    Q.   And do you agree with that list?
13    A.   I mean, I -- when you take and you
14 look at like the 2010, where how many
15 prescriptions are actually filled, I mean, every
16 American adult -- I mean, it's crazy, so, I
17 mean, obviously there are some contributing
18 factors that could lead to that as well, sure.
19    Q.   Well, what do you think is missing
20 from this list, if anything?
21    A.   What do I think is missing?  I don't
22 know.
23    Q.   Sitting here today, you can't
24 identify anything?
25      MS. DEBROSSE ZIMMERMAN:  Object to

Page 51

1 form.
2    A.   As far as contributing factors
3 for --
4    Q.   Leading to the prescription drug
5 abuse epidemic.
6    A.   I mean, those are pretty on point.
7 I mean, contributing factors could be -- it
8 could be numerous other things; I mean, economic
9 situations, environmental situations,
10 surroundings, persons you're with, upbringing,
11 the vast availability of the drugs.  I mean,
12 like it says -- I mean, that's -- I didn't
13 realize -- I mean, that's pretty alarming on
14 what it says under 2010, so, I mean, the vast
15 availability of this could be a contributing
16 factor.
17    Q.   Let's go through -- well, I'm sorry.
18 What did you mean by "economic situations"?
19    A.   Actually, if you want to strike
20 that.  It was more or less environmental
21 situations, what you grew up with, your
22 surroundings, persons you're with, family
23 upbringing.  I mean, that could be contributing
24 factors.  If you see your parents popping pills,
25 you may wonder what it's about.

Page 52

1    Q.   What else do you mean within -- when
2 you say "environmental situations," do you mean
3 anything else or is that it?
4    A.   Environmental situations could be
5 the neighborhoods you grow up in.  If you're in
6 a neighborhood where maybe the economics aren't
7 that great, it's a lower poverty neighborhood,
8 and you're hanging out with people that are
9 abusing prescription pills, it could be a
10 contributing factor for -- you know, leading to
11 it, with who you're with.
12    Q.   Let's go to the six bullets.
13      Do you know what changes were made
14 to clinical pain management guidelines during
15 the late 1990s?
16    A.   I don't.
17    Q.   Do you know who made them?
18    A.   I don't.
19    Q.   Do you know what's encompassed by
20 improper storage and disposal of unused
21 medication?
22    A.   I do.
23    Q.   What's that?
24    A.   That's persons keeping pills in the
25 cabinet where anyone can access them.  It could

Page 53

1 be someone, you know, passing away and the
2 family not taking care -- taking the proper
3 steps to dispose of the medications in the
4 house.
5    Q.   And in that situation, who is to
6 blame for that?
7      MS. DEBROSSE ZIMMERMAN:  Object to
8 form.
9    A.   I don't think you can blame one
10 person on that.  It's multi-faceted.
11    Q.   But it's the family for not having
12 properly disposed of the medications, correct?
13    A.   I mean, the family, the person
14 taking it.
15    Q.   It wouldn't be the manufacturer that
16 made the pill, the distributor that distributed
17 the pill or the pharmacy that filled the
18 prescription who was involved in that situation,
19 correct?
20      MS. DEBROSSE ZIMMERMAN:  Object to
21 form.
22    A.   The vast availability of the pills
23 and the easy access to get them.  I mean, if
24 someone is getting them without the necessary
25 need, obviously you can blame other people.

14 (Pages 50 - 53)

Page 54

1    Q.   Let's say you have someone who's got
2  a lawfully prescribed medication --
3    A.   Okay.
4    Q.   -- for an opioid, and passes away,
5  and then the relatives come in and take those
6  opioids and sell them or use them.  In that
7  circumstance, who is to blame?
8        MS. DEBROSSE ZIMMERMAN:  Object to
9  form.
10    A.   When you say "lawfully," that's
11  iffy, too, because obviously they're lawfully
12  but maybe not needed, but obviously it would be
13  the family for the improper --
14    Q.   It's not your testimony, is it, that
15  there's no circumstance in which opioids are
16  necessary and properly prescribed?
17        MS. DEBROSSE ZIMMERMAN:  Object to
18  form.
19    A.   I don't --
20    Q.   Is it your testimony that there's no
21  situation in which opioids are medically
22  necessary and -- medically necessary and
23  properly prescribed?
24    A.   Sir, I'm not a doctor.
25    Q.   You are aware that there are

Page 55

1  lawfully prescribed opioids out there?
2    A.   I'm aware that there are lawfully
3  prescribed opioids, yes.
4    Q.   Okay.  And what I'm saying is, in
5  that circumstance where someone gets a lawfully
6  prescribed opioid for a legitimate medical need,
7  but then passes away and the family comes in and
8  takes those unused pills and sells them or uses
9  them themselves -- in that circumstance you
10  would not blame the manufacturer who made the
11  pill, would you?
12        MS. DEBROSSE ZIMMERMAN:  Object to
13  form.
14    A.   In that specific circumstance,
15  describing the way the events unfolded,
16  obviously it's the person -- the persons
17  involved with improper storage and the person
18  obviously taking them, so --
19    Q.   Right.
20        And in that circumstance you also
21  wouldn't blame the distributor that distributed
22  the pill, correct?
23        MS. DEBROSSE ZIMMERMAN:  Object to
24  form.
25    A.   In that circumstance, yes.

Page 56

1    Q.   And, likewise, you would not blame
2  the pharmacy that filled the prescription for
3  that pill, correct?
4    A.   We're still talking lawfully
5  prescribed, right?
6    Q.   Yes, we are.
7    A.   Correct.
8    Q.   Okay.  Do you know who markets
9  medications directly to consumers?
10    A.   I don't.
11    Q.   Do you know who does the
12  overprescribing?
13    A.   Obviously prescriptions are going to
14  come from doctors.
15    Q.   Right.  So do you understand who is
16  at fault when a prescription is overprescribed?
17        MS. DEBROSSE ZIMMERMAN:  Object to
18  form.
19    A.   I do.
20    Q.   Who is that?
21    A.   It would be the doctor.
22    Q.   The next bullet talks about
23  substance abuse and underlying mental health
24  issues.
25        Do you see that?

Page 57

1    A.   I do.
2    Q.   Do you know what's encompassed by
3  that?
4    A.   I believe I do.
5    Q.   What's your understanding?
6    A.   If someone has other substance abuse
7  issues, and there's possibly opioids near them,
8  they may venture into trying different drugs.
9  Obviously underlying mental health issues.  I
10  mean, I'm not a physician, not a psychiatrist,
11  but obviously if you have some issues going on
12  upstairs, you may want to try drugs, too.
13    Q.   Is it your experience that persons
14  who have drug issues will go from one drug to
15  another based on cost and availability; in other
16  words, someone who is taking cocaine one day may
17  well take, you know, heroin the next day, if
18  they can find it, or OxyContin, if they can find
19  that?
20        MS. DEBROSSE ZIMMERMAN:  Object to
21  form.
22    A.   Yes and no.
23        I've seen plenty of opportunities
24  through the course of my career where people
25  have transferred from lawfully prescribed

15 (Pages 54 - 57)

Page 58

1 opioids to being cut off and then transferring
2 to heroin, because it's assessable and cheaper;
3 however, where you're kind of incorrect at,
4 people have their drugs of choice. Cocaine and
5 heroin are two different types. One is a
6 depressant; one is a stimulant. So most people
7 that do cocaine, unless they're inadvertently
8 getting fentanyl, for instance, in their
9 cocaine, they're going to stick to cocaine,
10 whereas people that like heroin, you know, they
11 like to stick to heroin.
12        Now, it's not uncommon for some
13 heroin users to maybe smoke crack on top of it,
14 but for the most part, when persons have their
15 drug of choice, they stick with the drug of
16 choice. However, as I said, you know, the
17 pills, in my course of what I do, I have seen
18 that lead to heroin abuse.
19    Q.    You talked earlier about diversion,
20 at least some forms of diversion, including
21 doctor shopping and illegal online pharmacies
22 and pill mills. Do you have an understanding of
23 who's responsible for diversion?
24        MS. DEBROSSE ZIMMERMAN:  Object to
25 form.

Page 59

1    A.    Again, I don't work in our diversion
2 unit, so --
3    Q.    But you've had involvement with
4 diverted drugs, have you not?
5    A.    Meaning the pills and prescriptions,
6 is that what you're referring to, or --
7    Q.    Where you have a prescription pill
8 that is being used unlawfully.
9    A.    Well, here's -- that gets tricky,
10 too. Obviously I go to fatalities. I've gone
11 to hundreds and hundreds of dead bodies from
12 overdoses. It's not uncommon to be at a
13 fatality and see prescription pills there also.
14    Q.    About how often do you find that as
15 a percentage?
16    A.    I can't give a percentage. I don't
17 know. I've never kept a --
18    Q.    More than half, less than half?
19    A.    I can't give you a percentage.
20    Q.    Since you started on the force in
21 1996, about how many overdose cases have you
22 responded to?
23    A.    Are we talking fatalities or
24 non-fatalities?
25    Q.    Both.

Page 60

1    A.    Well, you can't really say 1996
2 because we started in 2013 solely responding, so
3 since 2013 I would say that I've responded to --
4 I can't give an exact number, but it's over 800
5 fatalities. That's 800 families that have lost
6 a loved one to some sort of overdose.
7    Q.    So can I stop you there for one
8 second, please?
9        How many non-fatalities?
10    A.    That's what I was getting to.
11    Q.    Sorry.
12    A.    In 2014 we started responding to
13 non-fatal overdoses. Our numbers were
14 staggering at first. I would say myself
15 personally -- mind you there's other detectives,
16 so myself personally, since 2014, I would say
17 that I've responded to over a thousand.
18    Q.    And when you respond to a non-fatal
19 overdose, what's the situation? How are you
20 getting called in and what are you being asked
21 to do?
22    A.    We are called in because someone
23 overdosed based off of EMS or, you know,
24 materials on scene, syringes, packaging, the use
25 of Narcan where someone all of a sudden snapped

Page 61

1 out of it. EMS then notifies our uniform
2 officers. Once they deem what they believe to
3 be an overdose, they'll contact us. We then
4 either respond to the scene, if we can, to try
5 to collect evidence, if there's any there, and
6 then we respond to the hospital.
7        Once at the hospital, my job is
8 twofold now. A, I build a rapport, I talk to
9 them. I ask them how they got started using
10 drugs, try to get a common ground where they
11 trust me. I try to find out where the drugs
12 have come from, because sometimes we're able to
13 link a non-fatal overdose, because we have a
14 survivor. We're able to link that drug dealer
15 to a fatal overdose where someone is not able to
16 tell me where they got the drugs.
17        And then we also try to provide
18 treatment resources for the persons of non-fatal
19 overdoses. If they want treatment, we're able
20 to get them into a detox as soon as they leave
21 the hospital.
22    Q.    I want to follow up on that, but
23 before we do, you mentioned Narcan. What is
24 Narcan?
25    A.    Naloxone.

16 (Pages 58 - 61)

Page 62

1    Q.   And what does that do?
2    A.   It reverses the effect of an opioid
3 overdose.
4    Q.   Do you carry it with you?
5    A.   I do.
6    Q.   When did you start carrying it with
7 you?
8    A.   I believe we were issued it in late
9 2015, early 2016.
10    Q.   Is that true of all police officers
11 or just your unit?
12        MS. DEBROSSE ZIMMERMAN:  Object to
13 form.
14    A.   So we were issued it originally
15 because we're dealing with very dangerous
16 chemicals that could potentially kill us.  So we
17 carried it for ourselves because we're not
18 actually responding to calls.  Later, after
19 that, I believe that all members of the Division
20 of Police were issued Narcan.
21        Twofold.  Obviously if they respond
22 to a scene and they're there before EMS, they're
23 able to administer Narcan, but also it's for
24 protection of ourselves because the stuff is
25 highly dangerous.

Page 63

1    Q.   So when you had -- when you started
2 carrying Narcan in 2015 or 2016, were you
3 allowed to administer it to others or was it
4 just for your own protection?
5    A.   I administered it one time, so we
6 were -- we were allowed to administer, yes.
7    Q.   You have administered one time?
8    A.   I have one time.
9    Q.   Okay.  So you mentioned over 800
10 fatalities since 2013 and over 1,000
11 non-fatalities since 2014 that you've
12 investigated, correct?
13    A.   Yes, sir.
14    Q.   What percentage of those involved
15 prescription pills, in other words, someone who
16 is overdosing on a prescription medication?
17    A.   I'm not comfortable with
18 percentages.  We've responded to some instances
19 where we believed it to be a heroin type of
20 overdose.  After building a rapport with the
21 victim, we found out that it was a prescription
22 pill overdose, or it was conveyed to us that it
23 was a prescription pill overdose.
24    Q.   I would assume it's fair to say, is
25 it not, that the overwhelming percentage of --

Page 64

1 I'm sorry, in the overwhelming -- strike that.
2        Is it fair to say that when you are
3 called to respond to a fatal overdose or a
4 non-fatal overdose, in the overwhelming number
5 of cases, that the drug involved is either
6 heroin or fentanyl or carfentanil?
7        MS. DEBROSSE ZIMMERMAN:  Object to
8 form.
9    A.   That's -- that's a yes and no.  I
10 mean, for the most part, that's the
11 contributing -- that's what caused the death,
12 but there's other instances where they have
13 other drugs in their system.
14    Q.   So let's -- first of all, in terms
15 of immediate cause of death, it's true, is it
16 not, that for those 1,800, or more than 1,800
17 cases that you've investigated, that the
18 overwhelming majority of those have involved
19 heroin, fentanyl and carfentanil -- or
20 carfentanil, correct?
21    A.   You said 1,800.  That's -- are we
22 talking fatals or --
23    Q.   We're adding them together.
24    A.   I would say, yeah, absolutely.  I
25 mean, it's a combination of heroin, fentanyl,

Page 65

1 carfentanil, yes, sir.
2    Q.   Okay.  Now, you also suggested that
3 sometimes you found evidence, either on the
4 scene or from having talked to a surviving
5 victim or -- or relatives of a deceased victim,
6 you've gotten evidence that sometimes
7 prescription drugs have also been involved,
8 correct?
9    A.   Yes.
10    Q.   Do you know, of those more than
11 1,800 cases, how many of those have involved at
12 some point down the line either starting on
13 prescription drugs or taking prescription drugs
14 somewhere -- you know, in the middle of their
15 drug-taking history have they used prescription
16 drugs?
17        MS. DEBROSSE ZIMMERMAN:  Object to
18 form.
19    A.   I don't think I quite understand --
20 are you saying -- obviously from the non-fatal
21 overdoses, unless we get -- or the fatal
22 overdoses -- I'm sorry -- unless we get
23 information from the family, we're not quite
24 sure how they started, how they led to heroin.
25    Q.   Right.

17 (Pages 62 - 65)

1     A.   I can tell you that an overwhelming
2  number of the non-fatal overdoses -- you know,
3  we interview them, we talk to them, I try to be
4  as compassionate as I can, you know, get them to
5  talk to me and understand.  There's an
6  overwhelming number that, you know, were
7  originally prescribed pills for some sort of
8  injury.  Some confess that it was a legitimate
9  injury.  Some, you know, confess to going to a
10 doctor that they could easily get a prescription
11 from.  But eventually those prescription pills
12 were cut off, were stopped, and now you have
13 someone that's got a horrible addiction with no
14 resources and they turn to heroin.  And
15 obviously back then, it was, you know, you turn
16 to heroin -- I mean, carfentanil for the city of
17 Cleveland didn't come into play until November
18 of 2014.  So sometimes when I say heroin,
19 fentanyl, it's kind of a combination of the two.
20     Q.   And when you say -- can you quantify
21 how many of those -- of the non-fatal overdose
22 cases that you've investigated, can you quantify
23 how many of those you believe started on
24 prescription opioids?
25     A.   I'm not comfortable putting a number

1  on it.  I've interviewed so many.  I mean, when
2  I say a thousand, it could be 1,200.  I mean,
3  this has been going on for -- I mean, I get no
4  sleep.  We go non-stop 24 hours a day.  So I
5  don't know.  I'm not comfortable putting a
6  percentage.  I know who I've talked to.  I've
7  heard their stories.
8      Q.   By the way, of the thousand or so
9  that you've -- or more than a thousand you've
10 interviewed or tried to interview, how many have
11 you actually interviewed?
12     A.   I just --
13     Q.   Well, you -- not everybody talks to
14 you, right?
15     A.   They talk, I mean, briefly.  They
16 may not provide information.  We still offer
17 resource help to them.  We offer a business card
18 should they decide to talk down the road.  So I
19 would say out of the -- I build a rapport.  You
20 know, they may not tell me who their drug dealer
21 is because they don't want to give that up, but
22 they'll tell me how they started, they'll tell
23 me how they used, they'll tell me the color of
24 the drug that they did.  The information that
25 they might not provide that we would like is who

1  their drug dealer is.  But that's not the
2  ultimate goal.  The ultimate goal is to earn
3  some trust.  There may be a time where that
4  person's best friend did because it's not
5  uncommon for people to die from overdoses in our
6  city, it's a common occurrence.  So we want that
7  person to trust us so that maybe they're on
8  scene, and hey, you know what, this guy was
9  okay at the hospital, I'm going to let him know
10 where these drugs came from.
11     Q.   Okay, but now I'm trying to figure
12 out -- you talk to -- you try and talk to
13 everybody, right?
14     A.   Absolutely.
15     Q.   Okay.  But not everybody tells you
16 how they started, right?
17     A.   Correct.
18     Q.   And do you have a sense of, of the
19 people that you talk to, what percent will tell
20 you -- give you their drug history?
21     A.   I'm just -- I'm not comfortable with
22 percentages.  I mean, it wasn't something as I
23 was responding to these, like I was keeping
24 track of.  There's a good portion that tell us
25 their drug history.

1      Q.   More than half?
2      A.   That talk to us?
3      Q.   Yes.
4      A.   That provide their drug history or
5  just talk to us?
6      Q.   Give you their drug history.
7      A.   You know, I -- yeah, I would say
8  more than half.  That's not something they're
9  ashamed of.  They don't mind telling us how they
10 started.
11     Q.   Okay.  So you have more than half
12 who tell you.  Of that group that will tell you
13 their drug history, what percent say they
14 started off with a prescription opioid?
15     A.   I can't give you a percentage.  It
16 was a high number.  There was a lot.
17     Q.   More than half?
18     A.   Again, I'm not comfortable with
19 percentages.  There was -- I recall through the
20 course of -- you have to remember there was a
21 lot of these interviews.  There was a lot that
22 started through prescription pills, but, at the
23 same time, there were some that didn't.  I'm not
24 comfortable giving a percentage.  I don't know.
25     Q.   Do you record this anywhere?

18 (Pages 66 - 69)

Page 70

1     A.   No.
2     Q.   Do you have any statistics that show
3  this?
4     A.   What do you mean by statistics?
5     Q.   Do you keep track?  I mean, is there
6  any place where, you know, you keep track of how
7  many of these overdose cases start -- the
8  overdose victim, with a fatal or a non-fatal,
9  started with a prescription drug or not?
10    A.   We weren't keeping stats, no.
11    Q.   And do you record notes where that's
12  reflected anywhere?
13    A.   Not so much notes, but there's a
14  database that we enter every overdose into, and
15  if I get the drug history, I'll input that
16  information in the narrative.
17    Q.   And do those documents -- or does
18  that report have a name?
19    A.   We use a database called -- it's a
20  split database.  It's -- it starts off with
21  what's called ODMAP, which is a live overdose
22  tracking system, but when the data is inputted
23  into ODMAP, it goes into Case Explorer, which is
24  a searchable -- searchable engine for us.  It's
25  a database we share with other agencies.  You

Page 71

1  know, be it if we get a drug dealer's phone
2  number and maybe there was an overdose in
3  another city, we get an e-mail stating that
4  there's an alert or a match.
5     Q.   Do you personally input the data?
6     A.   I do.
7     Q.   And do you have access to the data?
8     A.   Yes.
9     Q.   And do you ever search the data to
10  look for patterns or anything like that?
11    A.   Yes.  If we have a drug dealer's
12  phone number or we're trying to locate someone,
13  we search that engine to see if that person has
14  had police encounters in the past.
15        MS. DEBROSSE ZIMMERMAN:  Counsel,
16  one moment.  I just need a five-minute break.
17  Can we go off the record for five minutes?
18        MR. ROMAN:  Okay.  Sure.
19        (Recess had.)
20        MR. ROMAN:  Let's go back on.
21        MS. DEBROSSE ZIMMERMAN:  Just for
22  the record, I think we're all understanding that
23  Detective Moran was not supposed to be
24  videotaped today.  There was an understanding
25  that he would not be subject to a live stream.

Page 72

1  We've determined, after checking initially --
2  initially this morning we asked if it was
3  video'd and we were told no -- that he has been
4  subject to a live stream from the beginning of
5  this deposition to the break that we just
6  recently took.  We asked counsel, who is
7  participating by telephone, if he has taken any
8  images, screenshotted with his phone or any
9  other way of capturing Detective Moran's image.
10  He has represented that he has not.  We made it
11  clear on the record that anyone who is
12  participating remotely cannot take any image of
13  Detective Moran.
14        Okay.  We can continue, counselor.
15        MR. GOLDSTEIN:  Can I just add for
16  the record that no one in this room, as far as
17  we know, requested that the live stream be used
18  today, so certainly defense counsel -- it was
19  not at the request of defense counsel that that
20  was being done.
21        MS. DEBROSSE ZIMMERMAN:  Thank you.
22    Q.   You ready to resume?
23    A.   I am.
24    Q.   Good.
25        We were talking right before the

Page 73

1  break about a database.  Do you recall that?
2     A.   Yes.
3     Q.   And I can't remember whether it had
4  a name.  Was it ODMAP?  Is that the name of it?
5     A.   One of the names, yes.
6     Q.   What was the other name?
7     A.   Case Explorer.
8     Q.   And are those two separate databases
9  or is it just one?
10    A.   They're intertwined.  The ODMAPs
11  feeds information into Case Explorer.
12    Q.   Who maintains ODMAP?
13    A.   HIDTA.
14    Q.   And who maintains Case Explorer?
15    A.   HIDTA.
16    Q.   And do they serve different
17  purposes, ODMAP and Case Explorer?
18    A.   Yes.
19    Q.   What are the different purposes they
20  serve?
21    A.   ODMAP is a live tracking service
22  recording heroin overdoses.  Case Explorer is
23  where the data is inputted.
24    Q.   Is there information that's in ODMAP
25  that's not in Case Explorer?

19 (Pages 70 - 73)

Page 74

1    A.   No.
2    Q.   Is there information in Case
3  Explorer that's not in ODMAP?
4    A.   Yes.
5    Q.   What information is in Case Explorer
6  that's not in ODMAP?
7    A.   If -- specific information relating
8  to --
9         MR. SCHOCK:  Hello.  Am I still
10 connected?
11        MS. PATEL:  Do they have to tell us
12 something?  They might be trying to communicate
13 something to us.
14        MS. DEBROSSE ZIMMERMAN:  No.  He
15 just said -- okay.  Just continue.
16        MR. ROMAN:  Can you hear us?
17        MR. SCHOCK:  Yes, I can.
18        MR. ROMAN:  Sorry.  You were muted.
19 I'm sorry.  We just got started.
20        MR. SCHOCK:  No problem.
21        MR. ROMAN:  Can I have the question
22 read back, please?
23        (Record read.)
24    A.   Case-specific information.
25    Q.   Can you give me an example?

Page 75

1    A.   Suspect's vehicle.
2    Q.   How about information about prior
3  drug history; would that be in both ODMAP and
4  Case Explorer or just in Case Explorer?
5    A.   I believe you can't -- it would be
6  in both.
7    Q.   When did you start using ODMAP?
8    A.   ODMAP was 2016.
9    Q.   And how about Case Explorer?
10   A.   Case Explorer was -- I can't recall
11 exactly.  2000 -- late maybe 2015 data started
12 being inputted.
13   Q.   Who besides you inputs information
14 into ODMAP and Case Explorer?
15   A.   Specific to our department or
16 nationwide?
17   Q.   Your department.
18   A.   Other detectives that respond to
19 overdoses.
20   Q.   So the other six detectives?
21   A.   Yes.
22   Q.   Do you know whether they, like you,
23 always put in prior drug history when they know
24 it?
25   A.   I do not know.

Page 76

1    Q.   Is there any instruction or manual
2  or guidance that you've received about what
3  information is to be included?
4    A.   Yes.
5    Q.   And what is that instruction that
6  you've received?
7    A.   Address of occurrence, date, time,
8  specific information for ODMAP to track it.
9    Q.   What do you mean by "specific
10 information for ODMAP to track it"?
11   A.   Location of occurrence, date, time,
12 name.
13   Q.   Were you also instructed to include
14 prior drug history?
15   A.   There was a narrative that was --
16 that's a narrative that's inputted.  You know,
17 each case detective does his own narrative.
18   Q.   And you include prior drug history
19 in your narratives, where you know it, correct?
20   A.   I have, yes.
21   Q.   And you don't know whether any of
22 the others do or do not?
23   A.   I don't know.
24   Q.   Can you see any reason why they
25 would not include prior drug history if they

Page 77

1  know it?
2    A.   I can't speak for other detectives,
3  sir.
4         - - - - -
5         (Thereupon, Moran Deposition Exhibit
6         2, Spreadsheet, was marked for
7         purposes of identification.)
8         - - - - -
9         (Thereupon, Moran Deposition Exhibit
10        3, Spreadsheet, was marked for
11        purposes of identification.)
12        - - - - -
13   Q.   I'm handing you, Mr. Moran, two
14 documents.  Exhibit 2 requires very good
15 eyesight.  It's a multi-page document that was
16 also produced natively, and, again, I don't know
17 what that means.  Exhibit 3 is a blow-up of some
18 of those items so that we can discuss them
19 without squinting.
20   A.   Yeah.  I can't see Exhibit 2.
21   Q.   Here's Exhibit 3.  This will be
22 easier to read.
23   A.   Okay.  That's a little bit better.
24   Q.   Okay.  So I can represent to you
25 that Exhibit 3 is, in fact, just -- I don't know

Page 78

1  about this end.  Well, I'd like to know what I
2  have.
3           MR. ROMAN:  I'm sorry.  Can I get
4  the Exhibit 3 back from -- can I just get the
5  pages back?  Thank you.
6      Q.   How many pages do you have in
7  Exhibit 3, sir?
8      A.   Five.
9      Q.   Okay.  And what does it say on the
10 first page, please?
11     A.   Specifically where?
12     Q.   Does it say "Create date" in the
13 upper left-hand corner?
14     A.   It does.
15     Q.   And then what does page 2 say?
16     A.   "Incident state" in the upper
17 left-hand corner.
18     Q.   What's the third page say?
19     A.   "Paraphernalia seized."
20     Q.   Okay.  The fourth page?
21     A.   "Number of prior naloxone doses."
22     Q.   And the fifth page?
23     A.   "EMS doses."
24     Q.   Do you have all five of those pages?
25          MS. DEBROSSE ZIMMERMAN:  I don't

Page 79

1  have any.  You took the only exhibit we had.
2           MR. ROMAN:  Would you mind looking
3  on with the witness?  These were just done last
4  night.
5      Q.   Okay.  So do you have Exhibits 2 and
6  3 in front of you, sir?
7      A.   Yeah.  I have 2 and 3.
8      Q.   And do you recognize them?
9      A.   I believe I do.
10     Q.   What is Exhibit 2, please, sir?
11     A.   Without a header, it appears to be
12 part of the ODMAP, Case Explorer, the printout
13 of --
14     Q.   Is it ODMAP, Case Explorer or both?
15     A.   Without a header on here, sir, I'm
16 not really sure.  You have to understand,
17 they're intertwined.  The data that goes into
18 ODMAP comes into Case Explorer.  Without a
19 header, I don't know what this is specifically
20 printed off of.  It just has dates, names, case
21 numbers.  It doesn't appear to really be correct
22 in the way it was even obtained.
23     Q.   How so, sir?
24     A.   Well, you're jumping from July 12th
25 of 2016 to November 6th of 2017.  There are

Page 80

1  numerous overdoses between there.  So this
2  document doesn't look correct.
3      Q.   Well, we pulled this directly from
4  Exhibit 2, so this is how it was printed out.
5  Let me ask -- so this is the database -- this is
6  a printout of the database, or at least one of
7  the databases about which you were just
8  testifying, correct?
9      A.   I can't say that it is.  I've never
10 printed it out.  It has the data that we input,
11 but, you know, without knowing exactly where you
12 printed this from, I've never had -- I've never
13 had the need to print from Case Explorer, so I
14 don't know how it prints out.
15     Q.   Let's go across the columns here and
16 see if this is the information that you input
17 when you put information into ODMAP or Case
18 Explorer.
19          Actually, let me go back for a
20 second.  Do you input information into both
21 ODMAP and Case Explorer or do you just put it
22 into ODMAP and it gets transported into Case
23 Explorer?
24     A.   You asked two questions, so are you
25 referring to now or previously?

Page 81

1      Q.   Well, is your practice different?
2      A.   Yes.
3      Q.   Okay.  Please tell me what you do.
4      A.   We input into ODMAP, which populates
5  into Case Explorer.
6      Q.   Okay.  And originally you did it
7  into Case Explorer because it came first?
8      A.   Correct.
9      Q.   Okay.  And now let's go through the
10 columns, and I think you'll find it much easier
11 if we go through Exhibit 3.
12     A.   Yeah, definitely.
13     Q.   So the first item is the "Create
14 date," correct?
15     A.   Yes, sir.
16     Q.   And what does that show?
17     A.   Are you asking what it shows here or
18 what it is?
19     Q.   Is that the date that you entered
20 the information?
21     A.   Yes.
22     Q.   And then "Create by" is the person
23 who entered the information?
24     A.   Correct.
25     Q.   And, for example, the first one was

21 (Pages 78 - 81)

Page 82

1 entered by you --
2    A.    Yes, sir.
3    Q.    -- on November 6th of 2017, correct?
4    A.    Correct.
5    Q.    What does the "Case Number" refer
6 to?
7    A.    That's the Cleveland Police incident
8 number.
9    Q.    And the first number would be the
10 year; is that correct?
11    A.    Yes, sir.
12    Q.    Okay.  And then the six-digit figure
13 after that, correct?
14    A.    They're not always six figures, but
15 it's the case number, or it's the instant
16 tracking number after that.
17    Q.    And fatal or non-fatal is pretty
18 self-explanatory, correct?
19    A.    Correct.
20    Q.    "Incident date," that refers to the
21 date where the actual overdose occurred; is that
22 correct?
23    A.    Yeah.  It looks like I had a typo
24 there, but --
25    Q.    You got the year wrong?

Page 83

1    A.    Appears so, yes, sir.
2    Q.    Okay.  And, by the way, this is --
3 let's step back for a second.
4          This is a database that shows opioid
5 incidents, correct?  These are instances where
6 there's an overdose on an opioid, correct?
7    A.    Not necessarily.
8    Q.    What else would be included?
9    A.    It's an incident that we responded
10 to.
11    Q.    Involving?
12    A.    We were -- involving an overdose.
13    Q.    So any drug overdose?
14    A.    If we're dispatched for a heroin
15 overdose, the information is placed in.
16    Q.    So these are all -- these reflect
17 instances where you were called in because it's
18 a suspected heroin overdose; is that correct?
19    A.    Yes, sir.
20    Q.    But if you show up on the scene and
21 you find out that it's -- I don't know -- a
22 cocaine overdose, is it still reflected in this
23 database?
24    A.    We will still input the data because
25 we were dispatched out.

Page 84

1    Q.    And if it's a prescription drug
2 overdose, that would also be reflected in this
3 document, correct?
4    A.    Yes, sir.
5    Q.    Okay.  Incident address is where the
6 incident took place, correct?
7    A.    Correct.
8    Q.    And then the apartment numbers, if
9 there's a specific apartment within that
10 address, correct?
11    A.    Correct.
12    Q.    And then the city where it took
13 place, correct?
14    A.    Correct.
15    Q.    And is that always Cleveland?
16    A.    No.
17    Q.    It could be surrounding suburbs?
18    A.    Depending on who else inputs.  It's
19 not just our database.
20    Q.    Okay.  Sorry.
21          And then the incident state,
22 correct, the state where the incident took
23 place?
24    A.    Yes, sir.
25    Q.    And the zip code associated with

Page 85

1 that address, correct?
2    A.    Yes, sir.
3    Q.    The county where it took place is
4 the next column, correct?
5    A.    Correct.
6    Q.    And then next is incident latitude
7 and longitude.  When do you include that
8 information?
9    A.    It automatically populates when you
10 place the address in.
11    Q.    Okay.  What is meant by business
12 address?
13    A.    Whether or not the overdose occurred
14 inside a public facility, McDonald's, Burger
15 King, was it a business or residence.
16    Q.    Okay.  When it says, "Packaging
17 present," what does that refer to?
18    A.    Whether or not we recovered the
19 drugs, the packaging the drugs came in.
20    Q.    So if someone, for example, had a
21 prescription for oxycodone, and they had the
22 container in which it came in at the scene, that
23 would be reflected as a yes in this column?
24    A.    If it was recovered, yes.
25    Q.    Okay.  And the drug seized, what

22 (Pages 82 - 85)

Page 86

1 does that refer to?
2    A.    If we recover drugs.
3    Q.    Any drugs or just the drug that was
4 believed to have caused the overdose?
5    A.    Any drugs.
6    Q.    Okay.  Paraphernalia seized, does
7 that refer to drug paraphernalia?
8    A.    Yes, sir.
9    Q.    And that's any drug paraphernalia
10 seized at the crime, at the scene of the crime,
11 at the scene of the overdose?
12    A.    Correct.
13    Q.    Victim sex is pretty obvious, and
14 the same with race, correct?
15    A.    Correct.
16    Q.    And Naloxone administered, that
17 means whether the person was given Narcan or
18 not, correct?
19    A.    Correct.
20    Q.    And History of prior overdoses means
21 whether the victim has overdosed before,
22 correct?
23    A.    Correct.
24    Q.    And Previously administered naloxone
25 means whether or not the person has ever

Page 87

1 received Narcan before, correct?
2    A.    If it's known, correct.
3    Q.    Somebody would have to tell you
4 that?
5    A.    Right.
6    Q.    Same with the next column, which is
7 Number of prior naloxone doses, correct?
8    A.    Correct.
9    Q.    Victim residential city, is that
10 where the victim lives?
11    A.    Yes.
12    Q.    And same with residential state and
13 zip.
14    A.    Yes.
15    Q.    And county?
16    A.    Correct.
17    Q.    What does LE doses refer to?
18    A.    Law enforcement doses.
19    Q.    What does that mean?
20    A.    If law enforcement administered
21 Narcan.
22    Q.    And fire department doses means
23 whether the fire -- the fire department
24 administered Narcan?
25    A.    Correct.

Page 88

1    Q.    And then EMS doses, same thing
2 except for EMS?
3    A.    Yes, sir.
4    Q.    And other doses, does that refer to
5 if someone privately administered Narcan?
6    A.    Yes, sir.
7    Q.    And then did naloxone work is a yes
8 or no, correct?
9    A.    Correct.
10    Q.    Or an unknown.
11        And then time was how long it took
12 between the time it was administered for it to
13 work and the time it did or did not work; is
14 that correct?
15    A.    Correct.
16    Q.    And then whether or not -- the next
17 column is whether or not the victim was taken to
18 the hospital, correct?
19    A.    Correct.
20    Q.    Drug name 1, what's under that?
21    A.    If we believe it was -- whether
22 heroin or fentanyl, based off of questioning.
23    Q.    Or whatever other drug caused the
24 overdose, correct?
25    A.    Correct.

Page 89

1    Q.    So drug name 1 is the drug that you
2 believe to be primarily responsible for the
3 overdose, correct?
4    A.    Yes, sir.
5    Q.    And drug name 2 means that there's
6 another drug that you believe might have been
7 involved in the overdose, correct?
8    A.    No.
9    Q.    What does drug name 2 mean?
10    A.    Not necessarily involved in the
11 overdose, but if they had used other drugs that
12 day.
13    Q.    Okay.  And that's -- and you would
14 record that in this column?
15    A.    Yes.
16    Q.    And it would be drugs taken that
17 day?
18    A.    Yes.
19    Q.    Meaning the past 24 hours or --
20    A.    Few hours leading up to, if they
21 were drinking.
22    Q.    And how about other drugs?
23    A.    If there was another drug on top of
24 that.  There's multiple columns.
25    Q.    And how would you get the

23 (Pages 86 - 89)

Page 90

1 information for drug name 2 and other drugs?
2     A.    Based on the interview with the
3 victim.
4     Q.    And so it's your practice, if the
5 victim had said, "Yes, I started on prescription
6 opioids," you would make a note of that in this
7 database, correct?
8     A.    Not on this page, no.
9     Q.    What page would you do that on?
10     A.    It would be in the narrative.
11     Q.    And where is the narrative?
12     A.    Not on this form.
13         MR. ROMAN:  Can we go off the record
14 for a second, please?
15     (Discussion had off the record.)
16         MR. ROMAN:  We're back on the
17 record.
18 BY MR. ROMAN:
19     Q.    Mr. Moran, you had indicated before
20 -- we were talking that -- we were going back
21 and forth -- that you didn't know what was the
22 title of this document.  We've gone back into
23 the metadata, which, again, is something that
24 everybody else in this room understands except
25 for me, and it says, "Law department request" --

Page 91

1 I'm sorry.  It says -- strike that.  It says,
2 "Cleveland Police Department law department
3 request 2.0.xls."  Does that help you at all
4 identify what document this is?
5     A.    No.
6     Q.    We understand from, when we took a
7 break, that counsel for the city was going to go
8 and look to see whether or not the narrative has
9 been produced.  They've confirmed that the
10 narrative has not been produced and that --
11         MS. DEBROSSE ZIMMERMAN:  Counselor,
12 that's not accurate.  I have not confirmed that
13 the narrative has been -- has not been produced.
14 What I stated on the break was that we've
15 produced all responsive documents that have not
16 been withheld due to the law enforcement
17 privilege as it relates to the documents that
18 you were discussing with the deponent before we
19 took a break.
20         MR. ROMAN:  So, to be clear, it is
21 the city's position that the narrative to which
22 Mr. Moran has testified is subject to a law
23 enforcement privilege?
24         MS. DEBROSSE ZIMMERMAN:  I'm not
25 taking that position at that time -- at this

Page 92

1 time.  Again, what has been produced with regard
2 to Detective Moran has been responsive,
3 non-privileged documents, and, you know, if you
4 want to send a letter, we can duke it out at a
5 later time, that's fine, but that's the extent
6 of my statement on the issue.
7         MR. ROMAN:  We will do that and we
8 will hold this deposition open.
9     Q.    Apparently there's another name for
10 this document, Mr. Moran.  Maybe this will help.
11 It says, "CPD HIDTA Example Report - CWRU.xlxs.
12 Does that help you at all?
13     A.    No.
14     Q.    Before there was Case Explorer and
15 before there was ODMAP, did you keep records of
16 the information that's set forth in Exhibits 2
17 and 3?
18     A.    Give me one second.
19         Explain what you mean by keeping
20 records.
21     Q.    Well, you -- you testified earlier
22 that you started investigating heroin deaths in
23 2013, correct?
24     A.    Yes, sir.
25     Q.    And did you make a record of what

Page 93

1 you did when you investigated those -- those
2 overdoses in 2013 and 2014, before there was
3 Case Explorer, before there was ODMAP?
4     A.    Yes.
5     Q.    And where did you record that
6 information?
7     A.    If it was a prosecutable case, it
8 would have been with the information to
9 prosecute, being a Form 1, arrest reports.  It's
10 also documented in Cleveland Police LERMs
11 reports, which we can search at any time.
12     Q.    Did you attempt to compile the
13 information in any kind of comprehensive format
14 before there was Case Explorer and before there
15 was ODMAP?
16     A.    Yes and no.
17     Q.    How yes and how no?
18     A.    Yes, meaning we provided information
19 to scenes we responded to, no meaning the
20 information -- I don't think you understand what
21 this is, honestly.  This is something that we
22 share with other departments.  So no, we were
23 not able to have a database that was being
24 shared with other departments; however, we did
25 keep track of what we responded to.

24 (Pages 90 - 93)

Page 94

1  Q.  Okay.  So the Cleveland Police
2 Department internally kept records like this
3 that just weren't available to be shared with
4 other police organizations; is that right?
5  A.  No.
6  Q.  What am I missing?
7  A.  You said, "Like this."
8  Q.  So what were you -- how did you
9 compile this information?  I don't care whether
10 it's shared or not shared, but anywhere at all
11 did you compile the information that's contained
12 in Exhibits 2 and 3 before there was case map --
13 Case Explorer and before there was ODMAP?
14  A.  Again, yes and no.
15  Q.  Please explain.
16  A.  This information has naloxone
17 information in it, it has other information in
18 it.  When we first started doing these, we
19 compiled scenes that we responded to.  It just
20 wasn't this comprehensive on exactly this
21 information.
22  Q.  Okay.  And where did you compile
23 that information?
24  A.  We provided it to -- I believe we
25 had like a flow chart type thing in our unit.

Page 95

1  Q.  Is there a name for this document?
2  A.  I don't recall if there was a name
3 for it.  We provided it -- we provided
4 information to the personal commander's office
5 that would log what we responded to.
6  Q.  Do you know where this document is
7 now?
8  A.  I have not seen it.  I do not know.
9  Q.  If you had to find it, where would
10 you look for it?
11  A.  Where would I look for it?
12  Q.  Yes.
13  A.  In this room or generally?
14  Q.  Generally.
15  A.  My office.
16  Q.  You believe you have it in your
17 office?
18  A.  I don't have it, but it's in the
19 office, yes.
20  Q.  It is in the office?
21  A.  Yes.
22  Q.  And if I were to ask counsel in a
23 letter to get this document, what would you call
24 it?
25  A.  I don't know if she has an exact

Page 96

1 name for it.  I mean, we log everything that we
2 respond to, so it's HIDTA response sheet or
3 something.  I'm not sure what the exact name is.
4  Q.  HIDTA response sheet?
5  A.  I don't know what it's actually
6 titled, but we would log -- I wasn't responsible
7 for logging the information.
8  Q.  You would provide the information?
9  A.  I would provide the information to
10 be logged, yes, sir.
11  Q.  Was it logged electronically or in
12 paper files?
13  A.  There are paper files, but they're
14 kept -- they're kept on a computer, I assume.  I
15 shouldn't assume, but it's a running tally of
16 what we responded to.
17  Q.  So there's a database that has this
18 information?
19  A.  I wouldn't say it's a database.
20 It's a cover sheet for what we respond to that
21 we handled prior to this.  And we still provide
22 that information.  We keep a running chart of
23 what we respond to.
24  Q.  And was this -- I'm sorry.  Just to
25 be clear, was this HIDTA or was this the High

Page 97

1 Intensity Drug Trafficking Area, HIDTA?
2  A.  I don't understand your question.
3 Was what?
4  Q.  You called this a HIDTA document.
5  A.  I said HIDI.  It's a HIDI document.
6  Q.  H-I-D-I?
7  A.  Let me -- explain your question
8 because I'm a little lost on what you're asking.
9  Q.  What's the acronym you're trying to
10 say?  Is it H-I-DI?
11  A.  Referring to what?
12  Q.  The document that we've been talking
13 about for the last three minutes.
14  A.  This one right here or the other one
15 (indicating)?
16  Q.  The other one, the older one.
17  A.  That was one of our documents, HIDI.
18  Q.  HIDI?
19  A.  Yes, sir.
20  Q.  Thank you.
21  Now, going to Exhibits 2 and 3 here,
22 where we talk about drug name 1, drug name 2 and
23 other drugs, how would you determine what those
24 drugs were?
25  A.  Through the interview and our

25 (Pages 94 - 97)

Page 98

1 experience.
2    Q.   Did you ever send them to be tested?
3    A.   There were no drugs to be tested.
4 This is what someone ingested.
5    Q.   I understand that, but if you
6 found -- so -- well, first of all, did you do a
7 toxicology report of the person who overdosed?
8    A.   I'm not a doctor, sir.
9    Q.   Did you ask for a medical examiner
10 or someone to do or a doctor to do, to examine
11 what drugs were found -- were in the overdose
12 victim's body?
13       MS. DEBROSSE ZIMMERMAN:  Object to
14 form.
15    A.   I didn't.
16    Q.   Do you know if anybody did?
17    A.   I did not request one.
18    Q.   Okay.  And if you saw at the scene
19 some unused heroin, would that be something you
20 would report?
21    A.   It's my duty to collect drugs, so
22 yes, sir.
23    Q.   Okay.  So, I mean, when you -- let's
24 say you show up and you just have a body -- you
25 know, a fatal overdose, and there's no one there

Page 99

1 and there are no drugs around.  How would you
2 make a determination as to what drug was
3 involved?
4       MS. DEBROSSE ZIMMERMAN:  Object to
5 form.
6    A.   It's a hypothetical situation.
7    Q.   Right.  What would you do in that
8 circumstance?
9    A.   I can't speak in a hypothetical
10 situation.  I can speak on the bodies I've gone
11 to and what we've done on those, if you want
12 something specific.
13    Q.   Please.
14    A.   What's your question again, though?
15    Q.   If there's nobody there to tell you
16 what drug was used, how do you determine what
17 drug was used?
18    A.   I don't determine.  The medical
19 examiner's office determines.
20    Q.   That's what I was asking before.  So
21 you do send it off -- somebody sends it off for
22 a toxicology report to find out what drugs were
23 in the decedent's body, correct?
24    A.   You weren't talking about a decedent
25 earlier.

Page 100

1    Q.   I was talking about both, but I'll
2 be more specific.  I'm sorry.
3       In the case of a fatal overdose,
4 there's always a toxicology report done?
5    A.   Can we back up then on your first
6 question?
7    Q.   Sure.
8    A.   When you asked about toxicology
9 report on the first question, I was under the
10 assumption you were referring to a non-fatal at
11 a hospital.  If you're referring to a toxicology
12 report on a decedent, the Cuyahoga County
13 Medical Examiner's Office conducts that.
14    Q.   And that's done in every case?
15    A.   Every case an autopsy is done, yes.
16 Yes, sir.
17    Q.   Okay.  So in the case here, where
18 there is a fatal overdose, is the drug name
19 recorded on the basis of what you suspect when
20 you arrive or on the results of a toxicology
21 report?
22    A.   It's what we suspected when we
23 arrived.
24    Q.   And what happens if it later turns
25 out you're wrong?  Is that changed in this

Page 101

1 report or not?
2    A.   It is not.
3    Q.   Okay.  And then in the case of a
4 non-fatal overdose, that information is based
5 solely on what you learned from -- what either
6 the person tells you who overdosed or what the
7 other people in the -- who know him or her
8 report to you?
9    A.   Not necessarily.
10    Q.   How else do you determine it?
11    A.   I got a lot of drug experience.  We
12 conduct a lot of interviews.  We kind of know
13 some of the texture of what fentanyl compared --
14 is as opposed to heroin.
15    Q.   What do you mean, "the texture"?
16    A.   What it looks like.
17    Q.   But if -- so if there's some
18 remaining heroin or remaining fentanyl in the
19 place where you find the victim, that leads to
20 your conclusion?
21    A.   Not necessarily.
22       MS. DEBROSSE ZIMMERMAN:  Object to
23 form.
24    Q.   Is it the way the person looks or
25 acts?  I'm trying to figure out on what do -- in

26 (Pages 98 - 101)

1 the case of a non-fatal overdose, on what
2 information do you base the information that you
3 put under drug name 1?
4     A.   The interview.
5     Q.   The interview?
6     A.   Yes, sir.
7     Q.   Either with the person or with the
8 persons who he was with, correct?
9     A.   With the person.
10     Q.   With the person only?
11     A.   I wouldn't say only.  Sometimes
12 there's other people around that we interview.
13     Q.   So it's all self-reported
14 information.  So whatever that person tells you,
15 even if it's untrue, that's what's recorded
16 under drug name 1?
17          MS. DEBROSSE ZIMMERMAN:  Object to
18 form.
19     A.   It's what is suspected.
20     Q.   So you also use your experience?
21     A.   Yes, sir.
22     Q.   And what -- do you ever find out
23 after the fact that you're wrong, that your
24 initial -- that you thought it was heroin and it
25 turns out to be oxycodone or something like

1 that?  Do you change it if you find out -- if
2 you get subsequent information that changes your
3 conclusion?
4     A.   What are you referring to, non-fatal
5 or fatal?
6     Q.   Non-fatal.
7     A.   It's not changed, no.
8     Q.   Okay.  I gather you would agree
9 that -- and this is both for fatal and for
10 non-fatal, okay -- that the drugs that you find
11 most often in overdose scenes overwhelmingly are
12 either heroin, fentanyl or carfentanil, correct?
13          MS. DEBROSSE ZIMMERMAN:  Object to
14 form.
15     A.   I don't understand your question.
16     Q.   Well, you respond to these overdose
17 scenes, right?
18     A.   Yes.
19     Q.   And you make conclusions as to the
20 drug involved that caused the overdose, correct?
21     A.   Conclusion is finality.  We put what
22 we suspect.
23     Q.   Okay.  So you make a conclusion,
24 whether it's final or tentative or whatever.
25 You put that in there.  When you enter drug name

1 1, that's your belief as to the drug involved,
2 correct?
3     A.   You said two things there.  First
4 you said conclusive and then you said tentative.
5 Which one are we referring to?
6     Q.   When you enter drug name 1 based on
7 your investigation, both fatal and non-fatal,
8 since 2015, the drugs that you put down in that
9 spot are, overwhelmingly, heroin, fentanyl or
10 carfentanil, correct?
11     A.   That is suspected to cause the
12 death?
13     Q.   Yes.
14     A.   Yes.
15     Q.   Okay.  Can you estimate how often
16 you've put in drug name 1, either prescription
17 opioids that have been lawfully prescribed or
18 illicit prescription opioids, how often you've
19 done that?
20          MS. DEBROSSE ZIMMERMAN:  Object to
21 form.
22     A.   You had two parts in your question.
23 I don't quite -- you referred to illicit and
24 lawful.
25     Q.   Well, let me break this down.

1          So for purposes of this examination,
2 let's think about four categories of drugs.  You
3 can push back if you don't agree with this.  One
4 are non-opioids, just -- you would agree, for
5 example, that cocaine is a non-opioid, correct?
6     A.   Yes, sir.
7     Q.   Okay.  Then you have illegal
8 opioids.  Heroin would be an illegal opioid,
9 correct?
10     A.   Heroin is an illegal opioid,
11 correct, yes, sir.
12     Q.   You would also put -- I know that
13 you can get prescriptions for fentanyl, but what
14 I'm talking about is illicit fentanyl.  Do you
15 understand that?
16     A.   Yes.
17     Q.   And that's when you have fentanyl,
18 it's almost always illicit fentanyl as opposed
19 to prescribed fentanyl, is it not?
20          MS. DEBROSSE ZIMMERMAN:  Object to
21 form.
22     A.   Fentanyl is involved.  I mean, yes.
23     Q.   But it's an illegal drug when you
24 find it, correct?
25     A.   Not all the time.

27 (Pages 102 - 105)

Page 106

1     Q.   Do you have any sense of how often
2 you find prescribed fentanyl?
3     A.   Not a lot, but -- it's not always
4 illegal.
5     Q.   So that's category 2. So you have
6 opioids, non-opioids, then you have prescription
7 drugs, prescription opioids.
8     A.   Okay.
9     Q.   And lawful prescription opioids,
10 which, you know, Percocet can be prescribed,
11 it's an opioid, correct?
12     A.   It's a prescribed -- it's
13 prescribed. It could be prescribed, sure.
14     Q.   And then the fourth category would
15 be illicit or diverted prescription drugs. Do
16 you understand that? For example, somebody
17 steals someone's pills. Do you understand that
18 as a fourth category?
19     A.   Yes.
20     Q.   So what I'm asking now is, in these
21 cases where you have responded to overdoses, how
22 often do you find drugs that are in categories
23 three and four, prescription -- lawful
24 prescription opioids or illicit or diverted
25 prescription opioids?

Page 107

1        MS. DEBROSSE ZIMMERMAN:  Object to
2 form.
3     A.   You keep saying "lawful," which I'm
4 assuming you mean prescribed. It can be a
5 prescribed Percocet being used illegally or
6 being used improperly, so I'm a little confused
7 on your lawful comment.
8     Q.   Let's take everything else out. How
9 often do you find prescription opioids when you
10 go to overdose -- when you go to an overdose
11 scene?
12     A.   I don't have a percentage on that.
13     Q.   Less than half, isn't it?
14     A.   I don't have a percentage on that.
15     Q.   Okay. If I represented to you that
16 on the spreadsheet -- and I know we don't have
17 the narrative, but that there are 2,638
18 incidents. That's why the lettering is so
19 small. If I represent to you that of those
20 2,638 incidents, 73 had either the term
21 "prescription drug" with the name of a
22 prescription drug entered in the drug name or
23 other drugs columns, would you have any reason
24 to doubt that?
25     A.   I'd have to review the document and

Page 108

1 count. I can't see the print, though.
2     Q.   We've done that exercise. Does that
3 surprise you that there's such a small number?
4        MS. DEBROSSE ZIMMERMAN:  Object to
5 form.
6     A.   I don't quite -- in what column?
7 What are you referring to?
8     Q.   Drug name 1, drug name 2 and other
9 drugs.
10     A.   Okay.
11     Q.   That out of 2,638 incidents, you
12 either have the words "prescription drug" or the
13 name of the prescription drug entered only 73
14 times.
15     A.   See, that's -- I'll agree in this
16 document -- you have to understand how our unit
17 works and how the department works.
18     Q.   Please explain.
19     A.   We respond to what we originally
20 believe to be a heroin overdose and maybe
21 through the course we find out it's prescription
22 drugs; however, there are prescription overdoses
23 on the streets that we're not necessarily
24 dispatched to, so there are some that could have
25 been missed because we're going to

Page 109

1 heroin/fentanyl overdoses. So out of what we
2 responded to, maybe through the course of the
3 interview we determined 73 were pill overdoses.
4 That doesn't mean that's all the pill overdoses
5 in the city of Cleveland.
6     Q.   You never -- strike that.
7        You would agree, would you not, that
8 there are overdose victims who have never used a
9 legal or diverted or illicit prescription
10 opioid, would you not?
11        MS. DEBROSSE ZIMMERMAN:  Object to
12 form.
13     A.   I don't know.
14     Q.   You believe it's possible that
15 everyone who has overdosed on heroin or fentanyl
16 or whatever has started off using -- or at one
17 time used a prescription opioid; is that your
18 testimony?
19     A.   You're saying prescription. Again,
20 I don't know who has dabbled in what.
21     Q.   But you believe it's possible that
22 everyone out there who has ever overdosed on an
23 opioid has at one time taken a prescription
24 opioid?
25        MS. DEBROSSE ZIMMERMAN:  Object to

28 (Pages 106 - 109)

Page 110

1 form.
2    A.    It's hypothetical.  I don't know.  I
3 can't speak for every single person.
4    Q.    You testified earlier that you've --
5 that you talked to people about their drug
6 histories.  In doing these drug histories, is it
7 your testimony that every one of them has told
8 you that they have either started out on
9 prescription opioids or at some point used
10 prescription opioids?
11    A.    You have two questions there.
12    Q.    I don't believe I do.
13    A.    You do.  You said prescription or
14 used.  They're two different categories.
15    Q.    Okay.  Well, let me simplify it.
16        You've taken all these drug
17 histories, right?  That's correct, right?
18    A.    We've interviewed who speaks to us,
19 yes.
20    Q.    Has every time that you've done one
21 of these drug histories, has the person said,
22 "Yes, at one point I used prescription opioids"?
23    A.    Not every time, no.
24    Q.    Okay.  Do you know what percent of
25 those did not say that they had ever taken a

Page 111

1 prescription opioid?
2    A.    I don't know percentages.  I don't
3 know.
4    Q.    Do you know whether it's more than
5 half or not?
6    A.    I don't know percentages.
7    Q.    I gather you would agree that
8 non-prescription opioids, including heroin,
9 fentanyl and carfentanil, are key contributors
10 to the opioid epidemic in Cleveland?
11    A.    We have a lot of bodies daily, and
12 they are heroin/fentanyl overdoses.
13        - - - - -
14        (Thereupon, Moran Deposition Exhibit
15        4, Court of Common Pleas Criminal
16        Division Search Warrant Beginning
17        Bates Number CLEVE_002250088, was
18        marked for purposes of
19        identification.)
20        - - - - -
21    Q.    Mr. Moran, I'm handing you what's
22 been marked as Moran Exhibit 4.  It's a
23 multi-page document bearing production numbers
24 CLEVE 2250088 through 96.
25        Have you seen this document before?

Page 112

1    A.    I have.
2    Q.    What is Exhibit 39?  I'm sorry.
3 Exhibit 4.
4    A.    It's a search warrant to install a
5 GPS tracking device on a suspect's vehicle.
6    Q.    Now, this is not signed either by
7 the judge nor is the affidavit signed by you.
8 Do you see that?
9    A.    I do.
10    Q.    Do you know why that is?
11    A.    Because this was -- yes.
12    Q.    Why is that?
13    A.    This was on my jump drive that was
14 printed and then taken to a judge to get signed.
15    Q.    This is the application for a search
16 warrant as you presented it to the court?
17    A.    Yes.
18    Q.    And you did so in or around
19 September of 2014, correct?
20    A.    Yes.
21    Q.    And you did so in the ordinary
22 course of business, correct?
23    A.    I'm sorry?
24    Q.    You did this in the ordinary course
25 of business as part of your job?

Page 113

1    A.    It's never ordinary.  It's part of
2 my job, yeah.
3    Q.    But asking for -- applying for
4 search warrants is something that you routinely
5 do, correct?
6    A.    Yes.
7    Q.    Now, this request for a search
8 warrant was in connection with a heroin
9 overdose, correct?
10    A.    It was involving a case we were
11 investigating.  Without looking at the case, I
12 can't recall if it was a heroin or a fentanyl
13 overdose, but it was involved to a fatality that
14 we responded to.
15    Q.    Do you know whether this case
16 involved -- whether the decedent in this case
17 had ever used prescription opioids?
18    A.    I wasn't able to talk to him.  He
19 died.
20    Q.    Did you ever find out any evidence
21 about whether or not the person had started, you
22 know -- if not from the decedent obviously, but
23 from others, whether or not the person started
24 with prescription opioids or at any point used
25 prescription opioids?

29 (Pages 110 - 113)

Page 114

1    A.   In this case, no.
2    Q.   How many search warrants do you
3 think you've applied for since 2013?
4    A.   I don't know.  I don't keep track.
5 I don't keep a running tally.  It's case -- if
6 the case calls for it.
7    Q.   Do you do one a week, do you think?
8    A.   Again, I mean, you can't put
9 averages on it.  It's case by case.
10    Q.   In this case your -- in connection
11 with this deposition, your custodian -- your
12 files were produced, and we found in that
13 production, in your files, 241 search warrants.
14    A.   Okay.
15    Q.   Does that seem about right?
16        MS. DEBROSSE ZIMMERMAN:  Object to
17 form.
18    Q.   Or does that seem low?
19    A.   What type of search warrants are you
20 referring to?
21    Q.   Ones like Exhibit 4.
22    A.   Well, that would be high because
23 this is a GPS warrant.
24    Q.   I don't know the precise nature of
25 the relief sought in all 241, but that's why I'm

Page 115

1 trying to figure out how many search warrants
2 you've sought.
3    A.   There's different types of search
4 warrants.  I'm not sure if you're referring to
5 house search warrants, computer search warrants.
6    Q.   All search warrants.
7    A.   I don't know.  I mean, that seems
8 probably a little low.
9    Q.   Where do you maintain these search
10 warrants?
11    A.   On my jump drive.
12    Q.   Do you know whether or not that was
13 searched?
14    A.   Searched?
15    Q.   Yes.
16        MS. DEBROSSE ZIMMERMAN:  Object to
17 form.
18    Q.   Do you know whether that drive was
19 produced to counsel to be produced to us?
20    A.   It was.
21    Q.   If I represented to you that of the
22 241 search warrants that we found, only seven
23 mentioned prescription opioids, would that
24 surprise you?
25    A.   I don't work diversion cases, so --

Page 116

1    Q.   Is it Detective Patena who works
2 diversion cases?
3    A.   She's one of the detectives.
4    Q.   Who are the others?
5    A.   Detective John Prince.
6    Q.   How do you know at the outset
7 whether or not a case is a diversion case?
8        MS. DEBROSSE ZIMMERMAN:  Object to
9 form.
10    A.   What case are you referring to?
11    Q.   Well, you say you don't work
12 diversion cases, but you have a report of an
13 overdose.  How do you know it's not a diversion
14 case as opposed to, you know, a heroin overdose?
15    A.   Are you referring to the seven
16 search warrants?  Are you referring to a
17 fatality that we're responding to?
18    Q.   In general.  You've drawn a line
19 between diversion cases and non-diversion cases,
20 and I'm trying to figure out -- you get a call.
21 There's, you know, a body in an apartment.  How
22 do you know whether it's a diversion case or not
23 when you get the call?
24    A.   When we initially get the call, we
25 don't know.  That's why we investigate.

Page 117

1    Q.   If there was a case of -- if you
2 investigate, wouldn't you -- how often do you
3 find that it's a case of diversion?  Strike
4 that.
5        Are there times when you show up --
6 you're called to the scene, you show up and you
7 find, as a result of the investigation, that
8 there are diverted prescription opioids
9 involved?  Has that ever happened to you?
10    A.   I can't say that it has or hasn't.
11 I don't think you understand the dynamics of
12 what we do daily.
13    Q.   Please explain it to me.
14    A.   I investigate deaths.  I try to link
15 a drug dealer to that death.  If I have an
16 active lead, we pursue that case.  There are
17 some cases that we do not have active leads on;
18 therefore, I may not request toxicology or
19 whatnot.  So I can't adequately answer that
20 because there could be, but my job is to go
21 after cases that we have solid leads on.
22    Q.   I understand that, but let's say you
23 go, and, again, there's a dead body and you
24 either see there's a container of Vicodin or
25 whatever, or you do a toxicology report and you

30 (Pages 114 - 117)

Page 118

1 find out it's Vicodin and you conclude that's a
2 diverted prescription opioid. Who investigates
3 that and how do you determine -- do you just
4 hand that over to Detective Patena or what
5 happens?
6        MS. DEBROSSE ZIMMERMAN: Object to
7 form.
8        A.   Again, if I have a solid lead,
9 that's the case we pursue. So if there's a case
10 that's -- I would not have personally got the
11 toxicology report because we're going after the
12 active cases where we have the leads on. These
13 cases are very time consuming and extremely
14 difficult to prosecute.
15       Q.   Do you ever get leads that direct
16 you to a supplier of diverted prescription
17 opioids?
18       A.   In the cases that I've brought to
19 trial, no.
20       Q.   How about in the ordinary course
21 before you even get to trial; does that ever
22 happen?
23       MS. DEBROSSE ZIMMERMAN: Object to
24 form.
25       A.   When you say "ordinary course," what

Page 119

1 do you mean?
2        Q.   I mean, have you ever followed up a
3 lead and found out that the source of what
4 caused the overdose was a diverted prescription
5 opioid?
6        A.   It wasn't the case that we went
7 after a dealer on, so I can't -- I don't know.
8        Q.   So at no point have you ever
9 encountered diverted prescription opioids in the
10 course of your work?
11       A.   I'm not saying at no point. We go
12 after the cases that we have solid leads on. I
13 don't think you're understanding that. If it's
14 a case that we don't have certain investigative
15 things that we need, then we can't adequately
16 prosecute.
17       Q.   I'm saying have you never had a
18 solid lead in a case involving diverted
19 prescription opioids?
20       MS. DEBROSSE ZIMMERMAN: Object to
21 form.
22       A.   I've answered this a couple times.
23 I don't know. I go after the cases that we see
24 active evidence that we can prosecute. If
25 someone passed away on -- and we don't have an

Page 120

1 active lead, we're not necessarily looking at
2 that. So I can't answer that question. I'm
3 answering it what we do, and I don't think you
4 have any clue what we do.
5        Q.   That may be the case, but let me ask
6 you this question: Sitting here today, can you
7 name a single case that you investigated that
8 you found that the cause of the overdose was a
9 diverted prescription opioid?
10       MS. DEBROSSE ZIMMERMAN: Object to
11 form.
12       He's asked and answered. You've
13 asked that question many times and he's answered
14 that question many times.
15       Q.   You may answer.
16       A.   Again, you have to understand what
17 we do. We take a body, which I've gone to 800.
18 If we see a lead, we act on that lead
19 immediately to get drugs off the streets. If we
20 have a lead that we don't know necessarily what
21 caused it, we do get toxicology reports back, it
22 goes to the ME's office, but that's not a
23 case -- I'm going after the cases with active
24 evidence that I can pursue. You have to
25 understand the dynamics of what we do.

Page 121

1        Q.   Right. I'm asking whether those
2 active leads have ever led you to a supplier of
3 diverted prescription opioids.
4        MS. DEBROSSE ZIMMERMAN: Same
5 objection.
6        Q.   Has that ever happened to you?
7        A.   The cases that I have brought to
8 trial and investigated have involved heroin and
9 fentanyl. If there have been other cases, we
10 could not find the source.
11       Q.   So the answer to the question is no?
12       MS. DEBROSSE ZIMMERMAN: Same
13 objection.
14       A.   The answer to the question is I
15 don't know.
16       Q.   But you can't recall a single case?
17       MS. DEBROSSE ZIMMERMAN: Counselor,
18 he has answered this question numerous times.
19       Q.   You may answer.
20       MS. DEBROSSE ZIMMERMAN: Now we're
21 approaching harassment. I mean, you must have
22 asked this question six times.
23       MR. ROMAN: You can object to the
24 form and that's all.
25       MS. DEBROSSE ZIMMERMAN: I can

31 (Pages 118 - 121)

Page 122

1  explain the basis of my objection.
2      MR. ROMAN:  No, you cannot.
3      MS. DEBROSSE ZIMMERMAN:  Okay.
4      A.  Again, you have no idea what we do.
5  We take the cases that we can go after and we
6  actively pursue them.  We go after the drug
7  dealers and we get them off the streets.  The
8  other stuff that you're referring to I've
9  answered.  I don't know.
10     Q.  So you can't name one?
11     MS. DEBROSSE ZIMMERMAN:  Same
12 objection.
13     A.  I just said I don't know.
14         - - - - -
15     (Thereupon, Moran Deposition Exhibit
16     5, Multi-Page Document Beginning
17     Bates Number CLEVE_000305048, was
18     marked for purposes of
19     identification.)
20         - - - - -
21     Q.  Mr. Moran, I'm handing you what's
22 been marked as Moran Exhibit 5.  It's a
23 multi-page document.  The cover page is a cover
24 page that says, "This document produced
25 natively," and it bears production number CLEVE

Page 123

1  305048, and then there's an attachment, which
2  does not have Bates numbers, but it's Cuyahoga
3  County Medical Examiner's Office
4  Heroin/Fentanyl/Cocaine Related Deaths in
5  Cuyahoga County."
6      Do you see that?
7      A.  I do.
8      Q.  Have you ever seen this document
9  before?
10     A.  I've seen -- I mean, there's
11 different versions of it each year, but I've
12 seen versions, yes.
13     Q.  Now, you are listed as a custodian
14 of this document, meaning it came out of your
15 files.  Does that surprise you or --
16     A.  I don't know.
17     Q.  Now, the medical examiner's office
18 is a county medical examiner's office, right?
19 There's no Cleveland medical examiner, right?
20     A.  Correct.
21     Q.  So the Cuyahoga County Medical
22 Examiner's Office covers Cleveland and then
23 other portions of the county, correct?
24     A.  Not portions of the county, the
25 whole county.

Page 124

1      Q.  Right.
2      A.  Correct.
3      Q.  I meant remaining portions.
4      If you could turn, please, to the
5  second page.  It says, "Cuyahoga County Overdose
6  Deaths 2006-2017, Most Common Drugs."
7      Do you see that?
8      A.  I do.
9      Q.  And then there's a chart below that.
10 The top line is "Total Drug Overdose Deaths."
11     Do you see that?
12     A.  I do.
13     Q.  And then there are components that
14 comprise that top line.  Do you see that?
15     A.  Components meaning?
16     Q.  "Heroin," "Cocaine," "Carfentanil,"
17 "Fentanyl," and "All opioids not including
18 fentanyl."
19     Do you see that?
20     A.  "Total drug OD deaths," correct.
21     Q.  So, first of all, do you know what's
22 encompassed within all opioids not including
23 fentanyl?  Do you know what would be in there?
24     A.  I didn't compile this report.  I
25 don't know.

Page 125

1      Q.  Okay.  Now let's take 2017 as an
2  example.  So in 2017 you have fentanyl causing
3  459 overdose deaths, cocaine causing 342
4  fentanyl deaths, followed by heroin and
5  carfentanil, then all opioids.
6      Do you see that?
7      MS. DEBROSSE ZIMMERMAN:  Object to
8  form.
9      A.  I'm reviewing the chart.
10     Q.  Have you had an opportunity to
11 review the chart?
12     A.  Yeah.
13     Q.  And do you see the statistics for
14 2017?
15     A.  I do.
16     Q.  Okay.  Let me ask you -- let's back
17 up for a second.  Do you see there's a jump?
18 The largest jump in this chart is from 2015 to
19 2017, where total overdose -- drug overdose
20 deaths went from -- almost doubled, from 370 to
21 666.
22     Do you see that?
23     A.  A lot of people have died in those
24 years, yes, sir.
25     Q.  Do you have -- do you have a belief

32 (Pages 122 - 125)

1 as to what caused that jump?
2    A.   That's -- no, I don't have a belief.
3 I mean, there was a lot of bodies there.  There
4 was a lot of families affected by that.
5    Q.   Right.  But do you know why it went
6 from 370 in 2015 to 666 in 2016?
7    A.   Do I know why?
8    Q.   Yes.
9    A.   Not specifically, no.
10    Q.   Do you know what drugs were
11 involved, were most responsible?
12    A.   Based off of this chart; is that
13 what you're referring to?
14    Q.   If you look at the chart, it looks
15 like fentanyl was the principal cause; wouldn't
16 you agree?
17    A.   Fentanyl is a heavy contributor,
18 yes, sir.
19    Q.   And is that consistent with your
20 experience?
21    A.   Yes, sir.
22    Q.   Do you know what the experience has
23 been in 2018?
24    A.   I haven't reviewed stats.  I don't
25 know.

1    Q.   Do you have a sense, just from your
2 day-to-day work, whether or not the number of
3 overdose deaths in Cleveland has increased,
4 decreased or stayed the same from 2017?
5    A.   Sir, we stay busy.  I don't keep
6 stats.
7
8 *** HIGHLY CONFIDENTIAL PORTION BEGINS ***
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1         - - - - -
2         (Thereupon, Moran Deposition Exhibit
3         6, Cuyahoga County Medical Examiner
4         Report dated October 8, 2013, was
5         marked for purposes of
6         identification.)
7         - - - - -
8    Q.   I'm handing you right now Moran 6.
9 Mr. Moran, I'm handing you what's been marked as
10 Moran Exhibit 6.  It is Cuyahoga County
11 Department of the Medical Examiner's report of
12 October 8th, 2013.
13         Do you have that in front of you,
14 sir?
15    A.   I do.
16    Q.   Have you ever seen this document
17 before?
18    A.   I don't recall ever seeing this.
19    Q.   I'd like to direct your attention to
20 the fifth page, where it says, "Critical
21 Measures Data - Heroin Related Deaths."
22         Do you see that?
23    A.   I do.
24    Q.   And there's a chart there,
25 "2007-2013 Comparison of Most Common Overdose

1 Drugs."
2         Do you see that?
3    A.   I do.
4    Q.   And just as an example, in the last
5 year, in 2013, there are 195 heroin overdose
6 deaths, 116 cocaine overdose deaths, and 45
7 oxycodone overdose deaths.
8         Do you see that?
9    A.   I do.
10    Q.   What is your reaction to this chart?
11 Does this seem about right?
12         MS. DEBROSSE ZIMMERMAN:  Object to
13 form.
14    A.   Two questions.  You have a reaction
15 and -- my reaction is that's a lot of people
16 dying, and it kept going up each year after
17 2013.  As far as the information, I didn't
18 compile the data.
19    Q.   Well, you were responsible for some
20 of this data, right?  Some of these reports are
21 based on what you investigated and concluded,
22 right?
23    A.   No.  I didn't -- I don't conclude.
24 The medical examiner's office concludes.
25    Q.   Okay.  Have you ever, when you've

1 filled in one of these -- one of the
2 spreadsheets, either the -- I can't remember the
3 name -- the ODMAP or Case Explorer spreadsheets,
4 ever put in oxycodone or another prescription
5 drug?
6     MS. DEBROSSE ZIMMERMAN:  Object to
7 form.
8     A.  I don't understand your question.
9 Are you referring -- what are you referring to?
10     Q.  Just you -- you've already testified
11 that you provide information for ODMAP and for
12 Case Explorer?
13     A.  Correct.
14     Q.  And in there you list drugs that
15 were involved in the person's overdose, correct?
16     A.  We list drugs that we suspected to
17 cause the overdose and other drugs that could
18 have been used if relayed to us, yes.
19     Q.  Have you ever -- in those fields
20 where you put that information, have you ever
21 put down oxycodone or another prescription drug?
22     A.  If I can recall, on the forms
23 there's a box for prescription pills that I have
24 checked.  I can't recall if it's specific to
25 prescription or oxycodone, but I have checked

1 that prescription pills, yes.
2     Q.  How often have you done so?
3     A.  Again, sir, I don't know.
4     Q.  How did you draw the conclusion
5 to -- that will permit you to check the box or
6 to indicate otherwise, that there was a
7 prescription drug that either had been causing
8 the overdose or had been taken recently by the
9 person who had overdosed?
10     A.  Based on experience, based on an
11 interview.
12     One of the big purposes of Case
13 Explorer is for information sharing on suspects
14 and victims.  The data is what we suspect, but
15 the purpose of that is an information-sharing
16 database to share information countywide.  Final
17 statistics and toxicology reports are not based
18 off of Case Explorer.  That's a way for us to
19 share -- I mean, you're hung up on the
20 information that goes in there.  We're putting
21 what we alleged, but the purpose of that, which
22 you have no understanding of what it is -- I
23 mean, you have none.  The purpose of that is
24 information sharing, so that we have deaths all
25 over the county -- do you understand that --

1 deaths, people dying left and right, people die
2 in other cities?  That's an information-sharing
3 database.  The drugs placed are based off of
4 experience.  Final cause of death is determined
5 by the Cuyahoga County Medical Examiner, not us.
6     Q.  Now, you say that once you make a
7 conclusion as to -- or find information, I
8 should say, about the drug that was involved,
9 you try to investigate the source, try to get to
10 the drug dealer, right?
11     A.  Yes.
12     Q.  When you have found in the --
13 information that led you to either check a box
14 or to put in information about a prescription
15 drug, have you personally gone and tried to find
16 the source of that drug?
17     MS. DEBROSSE ZIMMERMAN:  Object to
18 form.
19     A.  What are you -- I don't understand
20 what you're asking there.  That's --
21     Q.  Well, for example, if you find -- a
22 typical heroin case.  You come to the scene and
23 you get information that this person took heroin
24 and you try and find out who the dealer was and
25 you go and you try and find that dealer and

1 arrest that dealer, right?
2     A.  I'm a narcotics detective.  Yes.
3     Q.  Okay.  If it's -- if you suspect a
4 prescription drug is involved, do you try and
5 find the source of that prescription drug so
6 that you can arrest the person who sold that
7 person who overdosed the prescription drug?
8     A.  Depends on the scenario.
9     Q.  Well, the scenario where you suspect
10 that prescription drug was involved in the
11 person's overdose.
12     A.  Again, it depends on the scenario.
13     Q.  How so?
14     A.  Someone could have a legit
15 prescription and overdose on a legit
16 prescription, in which case there is no dealer;
17 however, if someone is selling pills and we're
18 able to obtain that information, then
19 absolutely.
20     Q.  Have you ever found someone who
21 overdosed on a legitimate -- on drugs
22 administered pursuant to a legitimate
23 prescription?
24     MS. DEBROSSE ZIMMERMAN:  Object to
25 form.

34 (Pages 130 - 133)

Page 134

1     A.    I don't know.
2     Q.    Sitting here today, can you name
3  one?
4     A.    I just said I don't know.
5         MS. DEBROSSE ZIMMERMAN:  Object to
6  form.
7     Q.    And have you ever -- in cases where
8  there's not a legitimate prescription, have you
9  then investigated the person who is, in fact --
10  who did, in fact, sell the prescription pills to
11  the person who overdosed?
12        MS. DEBROSSE ZIMMERMAN:  Object to
13  form.
14     A.    I can't recall.  I mean, we go to a
15  lot of fatalities.  We investigate the
16  fatalities.  I know sometimes we don't have --
17  on the non-fatals it's very difficult, but I
18  can't recall off the top of my head if, you
19  know --
20     Q.    You can't recall ever having done
21  that?
22     A.    Over the course of my career?
23     Q.    Yes.
24     A.    Selling illegal prescriptions?
25     Q.    Yes.

Page 135

1     A.    Oh, I've investigated that.
2     Q.    Okay.  And that's a form of
3  diversion, is it not?
4     A.    To persons selling illegal
5  prescriptions.
6     Q.    So you have had some involvement in
7  diverted prescription drugs?
8     A.    What do you mean by "diverted," as
9  far as how they obtained it?
10     Q.    I thought we had gone through this.
11        We talked earlier about people
12  sometimes get prescriptions for opioids and they
13  take them as prescribed, and that's not an issue
14  for you, correct?
15     A.    Right.
16     Q.    There are other times that somebody
17  takes, for example -- the simplest case, someone
18  takes grandma's pills out of the medicine
19  cabinet and either takes them himself or sells
20  them on the street, and that's a case of
21  diversion, right?
22     A.    Okay.
23     Q.    Have you ever investigated anything
24  along those lines?
25     A.    I guess I'm not accustomed to using

Page 136

1  the word "diverted."  I have investigated cases
2  of people selling prescription pills.
3     Q.    Okay.  What do you call it?
4     A.    Drug dealing.
5     Q.    So you don't distinguish between --
6     A.    I call it someone selling
7  prescription pills and I'm going to stop it.
8     Q.    Okay.  So how -- how often do you
9  investigate cases involving stolen or otherwise
10  illicit prescription drugs?
11     A.    Now?
12     Q.    Ever.  Since 2013 how often have you
13  done that?
14     A.    Again, you don't understand.  2013
15  is when we started investigating the deaths.  We
16  spend a lot of time investigating deaths.
17  There's a lot of legwork and involvement that
18  goes into it.  Sometimes we don't get to do what
19  we used to do.  Prior to investigating deaths, I
20  had investigated persons selling pills.
21     Q.    Well, have you ever investigated a
22  doctor who may have overprescribed prescription
23  opioids?
24     A.    I've never investigated a doctor.
25     Q.    Have you ever investigated a pill

Page 137

1  mill that may have overfilled prescriptions for
2  opioids or engaged in other unlawful conduct?
3     A.    I have never personally, no.
4     Q.    Have you ever investigated a
5  pharmacy that may have overfilled prescriptions
6  for opioids or for anything else?
7     A.    Personally, I have never.
8     Q.    Have you ever investigated
9  distributors that deliver prescriptions opioids
10  to pharmacies?
11     A.    Personally, I have never.
12     Q.    Have you ever investigated
13  manufacturers that make prescription opioids?
14     A.    I have never.
15     Q.    Have you ever referred cases to your
16  colleagues to do those things?
17     A.    I have.
18     Q.    On how many occasions?
19     A.    I don't recall.
20     Q.    And to whom would you do so?  Would
21  that be Detective Patena and Detective Prince?
22     A.    Correct.
23     Q.    And is that something that you would
24  normally do, is if you found a case where there
25  were -- where prescription opioids were

35 (Pages 134 - 137)

Page 138

1 involved, that you would refer the case to
2 Detective Prince and Detective Patena as a
3 matter of course? Is that what you would do?
4     MS. DEBROSSE ZIMMERMAN: Object to
5 form.
6     A. I don't understand what you're
7 asking.
8     Q. Well, in those cases where you
9 suspect that the drug that is causing the --
10 that caused the overdose was a prescription
11 opioid, do you routinely, in that circumstance,
12 bring in Detective Patena and Detective Prince
13 as opposed to investigating it further yourself?
14     A. It would depend on the information
15 obtained through the course of the interview.
16     Q. What about the information would
17 help inform that choice?
18     A. If, through the course of the
19 interview, we learned that there's a doctor
20 possibly overprescribing or something along the
21 lines of doctors, pharmacies, I refer that
22 information. If it's something involving
23 illegal street sales, that's something we can
24 try to look at.
25     Q. When you do refer matters to

Page 139

1 Detective Patena and Detective Prince, do any
2 involve -- have any of those cases involved
3 investigation of pharmacies?
4     A. I don't know.
5     MS. DEBROSSE ZIMMERMAN: Object to
6 form.
7     Q. How about distributors?
8     A. I don't know.
9     Q. How about manufacturers?
10     A. I don't know.
11     Q. When you say if it's something
12 involving illegal street drugs -- street sales,
13 that's something we can try to look at, what do
14 you mean by that?
15     A. Through investigative techniques, if
16 we can get those drugs off the streets and stop
17 it from happening.
18     Q. But you'll do the investigation
19 yourself?
20     A. If we're able to and if we have
21 cooperators, yes.
22     Q. Do you know how often you've done
23 that?
24     A. Through the course of my career?
25     Q. Yes.

Page 140

1     A. I don't know specific numbers, no.
2     MR. ROMAN: Do you want to take a
3 break now or are you okay?
4     THE WITNESS: No. I was just trying
5 to time lunch out, sir. That's all.
6     - - - - -
7     (Thereupon, Moran Deposition Exhibit
8     7, E-Mail from Hugh Shannon to Tom
9     Gilson, et cetera, dated January 5,
10     2018, with Attachment, Beginning
11     Bates Number CLEVE_000182046, was
12     marked for purposes of
13     identification.)
14     - - - - -
15     Q. Mr. Moran, I've handed you what's
16 been marked as Moran Exhibit 7. This is a
17 multi-page document. The first page bears
18 production number CLEVE 182046, and then there's
19 an attachment, which is the "Cuyahoga County
20 Medical Examiner's Office
21 Heroin/Fentanyl/Cocaine Related Deaths in
22 Cuyahoga County." This is the December 2017
23 update dated January 5th of 2018.
24     Have you seen this document before?
25     A. Are you referring to this one

Page 141

1 (indicating)?
2     Q. Well, first of all -- let me just
3 step back. The first page is an e-mail from
4 Hugh Shannon to a whole bunch of folks, dated
5 January 5th of 2018, and you are among those who
6 have been copied.
7     Do you see that?
8     A. I do.
9     Q. Do you recall receiving this e-mail
10 from Mr. Shannon on or about that date in the
11 ordinary course of business?
12     A. I recall -- I recall receiving it.
13     Q. And Mr. Shannon is the administrator
14 of the Cuyahoga County Medical Examiner's
15 Office, correct?
16     A. Yes, sir.
17     Q. And I direct your attention to the
18 attachment. Have you seen this before?
19     A. I've seen it.
20     Q. Actually, let's go back to the cover
21 page. Mr. Shannon writes that -- this is the
22 second paragraph -- "December ended rather
23 quietly, with a number of fentanyl cases, nearly
24 all mixed with either cocaine, heroin or both.
25 Overall, 2017 ended higher than 2016 not

36 (Pages 138 - 141)

Page 142

1 surprisingly.  Cocaine was prolific.  Heroin
2 began to disappear.  Even mixed with fentanyl,
3 the numbers were lower than 2016.  Non-fentanyl
4 related heroin deaths were at lowest levels in a
5 decade."
6        Do you see that?
7    A.  I do.
8    Q.  Is that consistent with your
9 experience in 2017?
10    A.  Sir, we were busy in 2017.
11    Q.  But did you see, for example, a rise
12 in cocaine-related death and a decrease in
13 heroin-related deaths or not?
14        MS. DEBROSSE ZIMMERMAN:  Object to
15 form.
16    A.  I don't know.  I don't receive all
17 the toxicology reports.  I mean, I go based on
18 what these say.  I don't know.  I know what I
19 do.
20    Q.  Do you get these reports
21 periodically?
22    A.  Yes.
23    Q.  And what do you do when you receive
24 them?  Do you read them?  Do you take an action
25 based on them?  What do you do with them?

Page 143

1    A.  Sir, we stay busy.  We work
2 non-stop.  I try to read e-mails when I get
3 them.  These numbers are numbers.  I'm out there
4 in the streets, going to bodies and trying to
5 help as best I can.
6    Q.  I direct your attention to the page
7 that's Bates stamped 050, lower right-hand
8 corner.  There's a reference in the heading to,
9 all caps, D-A-W-N.
10        Do you see that?
11    A.  I do.
12    Q.  Do you know what that refers to?
13    A.  Yes, I do.
14    Q.  What is it?
15    A.  DAWN kits.
16    Q.  What is a DAWN kit?
17    A.  It's deaths averted with naloxone, I
18 believe.
19        MR. ROMAN:  Why don't we take a
20 lunch break now.
21
22        (Luncheon recess taken.)
23
24
25

Page 144

1        - - - - -
2        AFTERNOON SESSION
3    CONTINUED EXAMINATION OF SCOTT MORAN
4 BY MR. ROMAN:
5    Q.  One quick question.
6        During your time as an undercover
7 detective, you've made a lot of -- you've
8 purchased a lot of drugs, correct?
9    A.  I've purchased drugs.
10    Q.  Have you ever purchased a
11 prescription opioid in your undercover work?
12    A.  I've purchased opioid pills.  How
13 that person obtained it, through a prescription
14 or not, I'm not sure.
15    Q.  How many times have you done that?
16    A.  Not a whole lot.  I have five to ten
17 separate cases.  Those separate cases involved
18 multiple buys.
19    Q.  Five to ten cases involving
20 prescription opioids or five to ten cases in
21 which, during the course of the investigation,
22 you ended up buying prescription opioids?
23    A.  I think I'm hung up on where you're
24 saying "prescription."  Again, I don't know how
25 they were obtained.

Page 145

1    Q.  I'm sorry.  You're right.  I
2 shouldn't have used prescription.  Let's go with
3 opioids.
4    A.  So what was the question?
5    Q.  Actually, I did ask about
6 prescriptions, but let me -- so how many times
7 have you ever bought an opioid pill?
8    A.  There was five to ten cases,
9 multiple buys with each case, so, I mean, I
10 can't recall.  One case may be four buys.  One
11 case may be two buys.  Five to ten cases.
12    Q.  And do you recall what pills you
13 bought?
14    A.  Yes.
15    Q.  What pills were those?
16    A.  OxyContin, Percocets, Vicodins.
17    Q.  And why were you buying OxyContin,
18 Percocet and Vicodin?
19    A.  A drug dealer was offering to sell
20 it to me.
21    Q.  Were you investigating that dealer?
22    A.  That's why I -- that's why I bought
23 the drugs.
24    Q.  Okay.  But did you expect to be
25 buying heroin from him or were you actually

37 (Pages 142 - 145)

Page 146

1 looking to buy prescription pills from him?
2    A.   These were pill cases.
3    Q.   You've investigated pill cases
4 before?
5    A.   I've investigated drug dealers
6 selling pills illegally, yes.
7    Q.   And that's five to ten of those you
8 think?
9    A.   Five to ten cases roughly.
10    Q.   And why did you have those five to
11 ten cases?  Why was that not something that
12 Detective Patena or Detective Prince were doing?
13        MS. DEBROSSE ZIMMERMAN:  Object to
14 form.
15    A.   I was operating in an undercover
16 capacity, buying illegal drugs.
17    Q.   But I thought that mostly cases
18 involving diversion were handled by Detective
19 Patena and Detective Prince.  I'm wondering why
20 you were involved in this one or these ones.
21        MS. DEBROSSE ZIMMERMAN:  Object to
22 form.
23    A.   You answered it yourself.  Most of
24 the cases.  I conduct undercover work.  I was
25 able to make undercover purchases.

Page 147

1    Q.   Okay.  And do you know whether these
2 were real pills that had been manufactured by
3 the companies who -- I mean, strike that.
4        Do you know whether these were real
5 pills or counterfeit pills or a mix of the two?
6    A.   The lab reports came back positive
7 for the drugs that we were buying.  I'm not sure
8 what you're asking, if a manufacturer --
9    Q.   Well, let me step back.
10        Are you aware that one form of
11 diversion is counterfeit pills; for example, you
12 might take fentanyl and make it look like a
13 Vicodin pill?  Are you familiar with that?
14    A.   They look like Percocets, but yes.
15    Q.   Okay.  Percocets.
16    A.   Yes.
17    Q.   Okay.  But you did the lab analysis
18 and determined that these pills were what they
19 purported to be?
20    A.   No.
21    Q.   Somebody else did the lab analysis
22 and determined they were what they purported to
23 be?
24        MS. DEBROSSE ZIMMERMAN:  Object to
25 form.

Page 148

1    A.   Yes.
2    Q.   Do you know where these drug dealers
3 got the prescription pills, or the pills they
4 sold to you?
5        MS. DEBROSSE ZIMMERMAN:  Objection.
6 Form.
7    A.   In those cases we were not able to
8 ascertain that.
9    Q.   What steps did you take to try and
10 figure that out?
11        MS. DEBROSSE ZIMMERMAN:  We're just
12 going to object to the extent that it requires
13 him to testify as to any of their investigative
14 methods.
15        If you can testify without breaching
16 that privilege, go ahead, Detective Moran, and
17 we'll be designating this section of the
18 deposition as highly confidential.
19        Go ahead, Detective Moran.
20    A.   I think this is easy.  When someone
21 exercises their Miranda rights, questioning has
22 to stop.
23    Q.   So you ask them where they got it
24 from and they claim -- they asserted their
25 Miranda rights?

Page 149

1    A.   If Miranda rights were asserted,
2 questioning had to stop.
3    Q.   And that was the case in all of
4 these cases?
5    A.   Yes.
6    Q.   Do you know what happened to these
7 people that were -- from whom you bought the
8 pills?
9    A.   What happened as in what?
10    Q.   Were they convicted?
11    A.   Well, they were indicted.  They were
12 all convicted.  Some went to prison.  Some got
13 probation.
14    Q.   And did you learn, following trial
15 and following the conviction, from where they
16 got the pills?
17    A.   No.
18    Q.   Did you make an effort to learn from
19 where they got the pills following trial?
20    A.   Miranda rights were asserted.  They
21 obtain an attorney.  The attorney chose to not
22 have their client speak with us.
23    Q.   And that was true even through the
24 sentencing phase?
25    A.   Yes.

38 (Pages 146 - 149)

Page 150

1           - - - - -
2       (Thereupon, Moran Deposition Exhibit
3       8, Multi-Page Document Entitled
4       "Overdose Death Investigation and
5       Prosecution" - Highly Confidential,
6       was marked for purposes of
7       identification.)
8           - - - - -
9       (Thereupon, Moran Deposition Exhibit
10      9, Multi-Page Document Entitled
11      "Fentanyl/Heroin Crisis in
12      Cleveland" - Highly Confidential,
13      was marked for purposes of
14      identification.)
15          - - - - -
16      Q.   I'd like to hand you what's been
17 marked as Moran 8 and Moran 9.  These are two
18 documents that were produced to us this morning.
19      Have you seen these documents
20 before?
21      A.   I have.
22      Q.   Let's start with Exhibit 8.  What's
23 Exhibit 8?
24      A.   It's a PowerPoint presentation.
25      Q.   Is this a PowerPoint presentation

Page 151

1 that you prepared?
2      A.   Not entirely.
3      Q.   Is it a PowerPoint presentation that
4 you prepared in part?
5      A.   I contributed, yes.
6      Q.   Who else contributed?
7      A.   As in who?  There would be -- I
8 obtained an original PowerPoint from NAGTRI,
9 from the faculty for it.  I was able to take
10 that PowerPoint, add my content.  I also added
11 content from the medical examiner's office.
12      Q.   And this is a presentation that you
13 gave?
14      A.   Correct.
15      Q.   Do you recall where you gave this
16 presentation or on how many occasions?
17      A.   Approximately, yes.  You want
18 occasions or do you want where?
19      Q.   Start with occasions.  How many
20 times have you given this presentation?
21      A.   It would probably be easier to say
22 where first so we can count.
23      Q.   Then just give me where.
24      A.   Des Moines, Iowa; Topeka, Kansas;
25 Albuquerque, New Mexico; Oklahoma City;

Page 152

1 Honolulu; Anchorage; Jackson, Mississippi;
2 Dover, Delaware.
3      Q.   When did you give these
4 presentations?
5      A.   Through the course of 2017.
6      Q.   That's a lot of time away from home.
7      A.   Short trips.
8      Q.   Anchorage and Honolulu?
9      A.   They don't keep us there long.
10      Q.   What was the audience for these
11 presentations?
12      A.   Law enforcement and prosecutors.
13      Q.   And do you have Exhibit 9 in front
14 of you?
15      A.   I do.
16      Q.   What is that?
17      A.   This is a PowerPoint presentation.
18      Q.   Did you prepare this, at least in
19 part?
20      A.   I did.
21      Q.   Did you prepare it by yourself or
22 with someone else?
23      A.   Lieutenant Connelly, I believe,
24 added some photos, but for the most part I
25 prepared it.

Page 153

1      Q.   Is this in connection with
2 presentations you gave?
3      A.   This was a quick, one-hour
4 presentation.
5      Q.   When was it given and to whom?
6      A.   I can't recall the exact month.  It
7 was spring of this year.  It was to a security
8 group, security officers that met in an office
9 building in Bratenahl.
10      Q.   Since 2013 how many presentations do
11 you think you've given?
12          MS. DEBROSSE ZIMMERMAN:  Object to
13 form.
14      A.   I listed the ones in 2017, this one,
15 and there may be, I think, one more, which that
16 one more is this PowerPoint from Exhibit 8.
17      Q.   And in all these presentations you
18 appear publicly as yourself, right?
19          MS. DEBROSSE ZIMMERMAN:  Object to
20 form.
21      A.   I appear publicly.  It's law
22 enforcement and prosecutors, and there are
23 instructions that no video or pictures are to be
24 taken.
25      Q.   But you appear in public and you

39 (Pages 150 - 153)

Page 154

1 give your name and don't wear any disguise or
2 anything like that, correct?
3      A.   Correct.
4      Q.   What I'd like you to do, because you
5 say I don't understand -- you said that a few
6 times -- I'd like you to walk me through what
7 you do in an investigation.  Perhaps while
8 you're doing that, you can refer to Exhibit 8.
9 That may help.  So if you wouldn't mind doing
10 that.  Tell me, how does it start?
11      MS. DEBROSSE ZIMMERMAN:  You may
12 answer, Detective, subject to the privilege I
13 just stated on the record, and this whole
14 portion of the deposition will be designated
15 highly confidential.
16      Go ahead, Detective.
17      A.   So how does it start?
18      Q.   Right.
19      A.   Someone dies from an overdose or a
20 suspected overdose.
21      Q.   Okay.  Take me through the whole
22 process, please.
23      A.   The entire process or my process?
24      Q.   Your process, what you do.
25      A.   We get a notification.  We respond

Page 155

1 to the scene.
2      Q.   You get a notification from whom?
3      A.   Well, that's where I was going to
4 take you through the whole process.
5      So EMS is notified.  Respond to the
6 scene.  The person has passed away.  A uniform
7 zone car or police car is notified.  They then
8 make a notification to us that it's a suspected
9 heroin overdose.  Once we get that notification
10 from our supervisor, or via an e-mail, myself
11 and two other detectives will respond to the
12 scene and we begin our investigation.
13      Q.   What does that investigation entail?
14 Tell me what you do.  What's the first thing you
15 do when you come into the room?
16      A.   The first thing we do when you come
17 in the room is assess the scene, see exactly
18 what we have, see where the victim is, see if we
19 see any paraphernalia immediately around the
20 body, and then we photograph the scene.
21      Q.   Do you take notes?
22      A.   We take notes.
23      Q.   Okay.  What are the types of things
24 you're looking for besides drugs and
25 paraphernalia?  Anything else?

Page 156

1      A.   Cell phones.
2      Q.   Anything else?
3      A.   Any evidence that's going to lead to
4 where the source of the drugs came from.
5      Q.   Okay.  How long does this take?
6      A.   The scene or the investigation?
7      Q.   This part of the investigation.
8      A.   It varies.  We also meet with an
9 investigator from the medical examiner's office.
10 It could take them 15 minutes to get there.  It
11 could take them two hours to get there.  Then we
12 have to wait for the body to be transported.
13 That could take an hour.  It could take a half
14 hour.  I mean, I can't put a time frame on --
15 some could take an hour.  Some could take five
16 hours.
17      Q.   So you wait until the medical
18 examiner is done with his or her examination?
19      A.   The body is the jurisdiction of the
20 medical examiner's office.  We don't touch or
21 disturb anything until the medical examiner
22 arrives.
23      Q.   And what does the medical examiner
24 do at the scene?
25      A.   They conduct their investigation.

Page 157

1      Q.   And does that include taking blood
2 samples or what do they do?
3      A.   They don't take blood samples on
4 scene.
5      Q.   Okay.  So what do they --
6      A.   They record the scene, temperature
7 of the room, body positioning, paraphernalia on
8 scene, whatever evidence that can help them
9 conclude what the cause and manner of death
10 would be.
11      Q.   And do you -- do you take physical
12 evidence with you when you leave the scene or
13 not?
14      A.   We do.
15      Q.   And what do you do with that
16 evidence?
17      A.   That evidence is conveyed back to
18 our office.
19      Q.   Is there a place where you record
20 everything that you've seen and your thought
21 process?  Where do you put your notes or how do
22 you then -- what's the next step?
23      MS. DEBROSSE ZIMMERMAN:  Object to
24 form.
25      A.   The next step as far as what type of

40 (Pages 154 - 157)

Page 158

1 case?
2    Q.   I'm presuming you go back to your
3 office at some point, right?
4    A.   Correct.
5    Q.   Okay.  And then do you enter this
6 all into the ODMAP or the Case Explorer
7 databases, or what do you do next to kind of
8 advance the ball?
9    A.   Well, the very first thing, when you
10 say "next," next is the evidence is submitted,
11 it's entered for chain of custody purposes.
12 There's other investigative techniques that we
13 utilize for cell phones.  That's started.  The
14 information from the case is also entered into
15 Case Explorer.  Whatever notes that would have
16 been taken would have been placed into a
17 narrative for Case Explorer.
18    Q.   Now, when you're at the scene, you
19 also talk to any witnesses who are around,
20 correct?
21    A.   If there's a witness there.  I mean,
22 unfortunately, some of these people die in
23 bathrooms, in cars.  I mean, there's bodies
24 dying in tons of different places, but
25 obviously, if there's a witness, of course we

Page 159

1 talk to a witness.
2    Q.   You take down their statements and
3 you --
4    A.   If they know anything.
5    Q.   Do you bring a notepad with you or
6 how do you -- what do you do on that?
7    A.   It depends on what detective is
8 doing what that day.  We have a response form.
9    Q.   Right.
10    A.   The response form can -- notes can
11 be placed on that and those notes are placed on
12 the Case Explorer.
13    Q.   When you're interviewing a witness,
14 are you writing things down, are you just
15 listening and then go back later and record it?
16 How is that done?
17    A.   It depends on what they're saying.
18 I mean, if they have specific information and I
19 think I'm going to forget it, obviously it's
20 written down.
21    Q.   Do you do that on a pad of paper or
22 how do you do that?
23    A.   We have a response form.
24    Q.   Right.
25    A.   And I put my notes on a response

Page 160

1 form.
2    Q.   Is that an electronic form or is
3 that a hard piece of paper?
4    A.   It's a piece of paper.
5    Q.   Okay.  And you always bring that
6 with you when you show up at a crime scene -- or
7 an overdose scene?
8    A.   We fill out a response sheet for
9 each of these.
10    Q.   Let's turn to Exhibit 8.  The second
11 page says "Introductions" and the only person
12 introduced is you.  Is that because you were the
13 only one giving the actual presentation?
14    A.   In this particular instance, yes.
15    Q.   So in each of those six cases, you
16 were the person giving this presentation?
17    A.   Six cases?
18    Q.   I think you said -- nine.  Sorry.
19 Nine.
20    A.   No, that's not true.
21    Q.   So who else was presenting besides
22 you?
23    A.   Occasionally I'll co-present with an
24 investigator from the medical examiner's office.
25    Q.   Are you the chief presenter or not?

Page 161

1        MS. DEBROSSE ZIMMERMAN:  Object to
2 form.
3    A.   We co-present.
4    Q.   So on the third page it says,
5 "Cleveland Police HIDI Unit."
6        Do you see that?
7    A.   Which?  Was that this one?  It's
8 kind of blacked out (indicating).
9    Q.   Yes, it is kind of blacked out, but
10 if you get close enough, you can read it.
11    A.   "Heroin involved death
12 investigation"?
13    Q.   Yes.
14    A.   Yes, sir.
15    Q.   And the third bullet says, "2017,
16 1364 non-fatals, approximately 250 fatals."
17        Do you see that?
18    A.   I do.
19    Q.   Does that refresh your recollection
20 as to the number of overdose investigations done
21 by the -- by HIDI in 2017?
22    A.   This is based off the spreadsheet
23 that we -- that's populated, so yes.
24    Q.   Okay.  Then the next bullet reads,
25 "Input all data into ODMAP."

41 (Pages 158 - 161)

1  Do you see that?
2  A.  I do.
3  Q.  So that's part of the protocol, was
4  to input all data into the ODMAP?
5  A.  That's what our protocol is.
6  Q.  Okay.  As far as you know, all
7  detectives follow that protocol, right?
8  A.  Cases are required to be entered
9  into ODMAP.
10  Q.  And not just cases but all data,
11  right?
12  A.  Whatever data is obtained.
13  Q.  Then there's a page, probably about
14  10 or 12 pages in, it says, "Illicit Drugs CCMEO
15  2016-17."
16  Do you see that?
17  A.  I do.
18  MS. DEBROSSE ZIMMERMAN:  Give us
19  five minutes.
20  (Recess had.)
21  MR. ROMAN:  Back on the record.
22  Q.  Do you have that page "Illicit Drugs
23  CCMEO 2016-17" in front of you?
24  A.  I do.
25  Q.  And on this -- tell me what's on

1  this page, please.
2  A.  These are the types of synthetic
3  fentanyls that Cuyahoga County started seeing
4  from 2016 to 2017.
5  Q.  And do you know what the dates next
6  to those fentanyls reflects?
7  A.  I would assume -- well, it's the
8  date that the ME's office -- you know what,
9  strike that.  I'm not a hundred percent positive
10  what the dates --
11  Q.  I understand you're not a hundred
12  percent positive, but do you have an educated
13  understanding?
14  A.  I understand it to be when the
15  medical examiner's office first saw these
16  synthetic fentanyls.  I can't speak on the exact
17  date.
18  Q.  There's a page in here called
19  "Processing the scene."  It's got -- I guess
20  there are four stages.  You have scene
21  processing, victim inspection, scene inspection,
22  evidence gathering.  I can show it to you, sir.
23  A.  Okay.
24  Q.  And are those, in your mind,
25  distinct stages of your investigation?

1  A.  This is a guideline to help other
2  departments; obviously, process the scene, see
3  exactly what you have, view your victim.
4  There's certain ways that a person dies that
5  makes it evident that it's a heroin evidence.
6  There's certain things the body does that makes
7  it evident that it's a heroin overdose.  So you
8  want to look and see if those signs are there.
9  We're not ME persons, but the body does very
10  specific things on these fatalities.  Inspect
11  the scene, and then once you're able to collect
12  the evidence, you collect the evidence.
13  Q.  There's a page about a quarter of
14  the way in, it says, "Possible evidence sought,"
15  and there's a bullet and then three sub-bullets.
16  The first bullet is "Drugs," and then there are
17  three sub-bullets, "Heroin," "Fentanyl,"
18  "Prescription"?
19  A.  Correct.
20  Q.  Why do you have those three bullets
21  there, sub-bullets, there?
22  A.  Sir, this is a PowerPoint.  Those
23  are some bullets.  I speak exclusively on this.
24  Those are some of the drugs we're looking for.
25  I elaborate -- this is just a go-by during the

1  presentation.
2  Q.  So when you go to a scene, you
3  are -- one of the things you are looking for is
4  prescription drugs, correct?
5  A.  If there are prescription drugs on
6  scene, they are seized, yes.
7  Q.  And that's part of what everybody in
8  your unit is trained to do, is when they get to
9  the scene, look for prescription drugs?
10  MS. DEBROSSE ZIMMERMAN:  Object to
11  the form.
12  A.  You're factoring out other persons.
13  The medical examiner's office will also take
14  prescription drugs if they're on scene.
15  Q.  Okay.  But all members of HIDI, one
16  of the things that you do, it's part of your
17  responsibilities, is to seize all the
18  prescription drugs that are on the scene, at the
19  scene, correct?
20  A.  I just answered that.  We take some.
21  The medical examiner's office will also take
22  some.  It varies case by case.
23  Q.  Who decides who takes what?
24  A.  We decide amongst ourselves.
25  Q.  When the medical examiner takes

42 (Pages 162 - 165)

Page 166

1 prescription drugs, do they tell you that
2 they've done that?  Do you make any notation
3 that they've taken that?
4      A.   They make a notation that they take
5 that.  They're required to log everything that
6 they bring into their office as well.
7      Q.   Does that information make it into
8 the databases we've been talking about, the
9 ODMAP and the Case Explorer databases?
10     A.   No.
11          MS. DEBROSSE ZIMMERMAN:  Object to
12 form.
13     Q.   It does not make it in there?
14     A.   It depends what drugs are there.
15 We're also trying to figure out what they took.
16 We're not certain they took those prescription
17 drugs.  We have a person that's unable to speak
18 to us.
19     Q.   Let's say -- is there ever a
20 circumstance where, let's say, there was a -- I
21 don't know -- a container of Vicodin there, that
22 the medical examiner would take that container
23 without you knowing about it?
24          MS. DEBROSSE ZIMMERMAN:  Object to
25 form.

Page 167

1      A.   Without us knowing about it?
2      Q.   Right.
3      A.   We work hand in hand.  We have a
4 partnership with them.  There's communication
5 that goes on on scene.  So if it's taken, we
6 know it's taken.
7      Q.   And you would make a note of that?
8      A.   I answered that a second ago as
9 well.  They have to log everything that they
10 bring into their office.  If it's in the system
11 during a toxicology report, we would find that
12 out.
13     Q.   But I'm asking whether you
14 personally, and other HIDI officers, also make
15 any notation of what the medical examiners
16 take --
17          MS. DEBROSSE ZIMMERMAN:  Object to
18 form.
19     Q.   -- so you have that information in
20 your databases, in the ODMAP, in the Case
21 Explorer databases?
22          MS. DEBROSSE ZIMMERMAN:  Object to
23 form.
24     A.   I'm not sure if it makes it into
25 Case Explorer.

Page 168

1      Q.   How about the ODMAP?
2      A.   That's -- when we talk about those
3 two, they are hand in hand, which I've been
4 trying to explain.  The information that goes
5 into ODMAP is populated into Case Explorer.
6 They're more or less the same entity.
7      Q.   And I believe you testified to this
8 this morning, but you also look for things like
9 prescription pill bottles and any receipts from
10 a pharmacy, anything like that, correct?
11     A.   I didn't testify to receipts of a
12 pharmacy.
13     Q.   Okay.  Well, let me ask this.  Let
14 me just ask you straight out.  Do you also look
15 for and take into evidence prescription bottles
16 and any either prescriptions or prescription
17 receipts or drug store receipts?  Do you take
18 all those things into evidence?
19          MS. DEBROSSE ZIMMERMAN:  Object to
20 form.
21     A.   We take any evidence that we deem
22 will lead us to the source of what caused this
23 person to pass away, so if you're asking if we
24 take paperwork, yes, we take paperwork.
25     Q.   Paperwork including receipts and

Page 169

1 prescriptions?
2      A.   If we see paperwork that we deem
3 important, we take paperwork.
4      Q.   Turning to Exhibit 9, about six or
5 seven pages in, there's a chart, which I believe
6 is the same chart that we looked at this
7 morning, Cuyahoga County overdose deaths 2016 to
8 2017?
9      A.   2006 to 2017.
10     Q.   Sorry.  Thank you.
11          Do you see that?
12     A.   I do.
13     Q.   So you were familiar with this
14 chart?
15     A.   I said I had seen that chart.
16     Q.   Okay.  And you used this as part of
17 your presentation?
18     A.   This particular presentation, yes.
19     Q.   Okay.  What have you said about the
20 statistics on this chart during your
21 presentations?
22     A.   What have I said?
23     Q.   Yes.
24     A.   Look at the alarming number of
25 people that died due to drug overdose deaths.

43 (Pages 166 - 169)

Page 170

1    Q.   Okay.  Do you get any more granular
2  than that?  Do you discuss the components or
3  just -- do you just focus on the total drug
4  overdose deaths?
5    A.   It was more or less to open people's
6  eyes to the amount of people dying in this.  It
7  was not broken down.  This PowerPoint was to
8  raise awareness to the situation we have in the
9  city of Cleveland, the amount of people that are
10  dying, how to protect their loved ones from
11  becoming a statistic, like so many other
12  families.
13      MS. DEBROSSE ZIMMERMAN:  I will be
14  marking Exhibits 8 and 9 highly confidential.  I
15  said that before.
16      MR. ROMAN:  Do we have Bates numbers
17  for those?
18      MS. DEBROSSE ZIMMERMAN:  They will
19  be produced.  I just wanted to make sure you had
20  it for the deposition today.  They may have been
21  produced today already.  I'm not sure.
22
23    *** HIGHLY CONFIDENTIAL PORTION ENDS ***
24
25

Page 171

1        - - - - -
2      (Thereupon, Moran Deposition Exhibit
3      10, E-Mail from Matthew Baeppler to
4      Gary Gingell dated March 27, 2018,
5      was marked for purposes of
6      identification.)
7        - - - - -
8    Q.   Mr. Moran, handing you what's been
9  marked as Moran Exhibit 10, I ask if you've seen
10  this document before.
11    A.   I have.
12    Q.   Exhibit 10 is an e-mail dated March
13  27th of 2018 from Mr. -- is it Baeppler?  Is
14  that how you pronounce it?
15    A.   It's Sergeant Matthew Baeppler.
16    Q.   You received this on or about that
17  date in the ordinary course of business,
18  correct?
19      MS. DEBROSSE ZIMMERMAN:  Object to
20  form.
21    A.   You keep saying "ordinary."  That's
22  so funny.  I got this through an e-mail, yes.  I
23  believe I was cc'd on it.
24    Q.   As part of your -- as part of your
25  business responsibilities, correct?

Page 172

1    A.   Duties, yes, sir.
2    Q.   I believe you testified earlier that
3  Sergeant Baeppler is your direct report?
4    A.   Yes, sir.
5    Q.   He writes, "As far as the narcotics
6  guys go, Klamert, Moran, and I are planning on
7  attending and spending a night at the park.  I
8  would prefer we go at the beginning of the
9  presentation.  I was also going to talk about
10  the new trends in how we are finding half of our
11  cocaine overdoses also contain fentanyl and the
12  influx of counterfeit pills containing fentanyl.
13  This should be followed by the prosecutor and
14  then the intelligence aspect with the analysts.
15  We are excited to be a part of this event.  Let
16  me know if there's anything else you need."
17      Do you see that?
18    A.   I do.
19    Q.   Do you recall attending a conference
20  of the Ohio Tactical Officers Association
21  earlier this year?
22    A.   I do.
23    Q.   And what is that association?
24    A.   I'm not a part of it.  It's tactical
25  officers, SWAT officers throughout the state of

Page 173

1  Ohio.  They have a conference.  There's
2  different types of classes that you can attend.
3    Q.   And where was this event held?
4    A.   Kalahari.
5    Q.   Is that in Ohio?
6    A.   Yes.
7    Q.   Thank you.
8    A.   Sandusky.
9    Q.   And did Sergeant Baeppler, at this
10  conference, give a presentation about new trends
11  in how we are finding half of our cocaine
12  overdoses also contain fentanyl and the influx
13  of counterfeit pills containing fentanyl?
14      MS. DEBROSSE ZIMMERMAN:  Object to
15  form.
16    A.   He gave a presentation.  I gave a
17  presentation.  I wasn't a part of his
18  presentation.
19    Q.   Did you attend his presentation?
20    A.   I came in a little after it started.
21  I can't recall.  It was safety concerns with
22  fentanyl, gear and equipment needed.  I was
23  reviewing my PowerPoint.  I wasn't fully
24  attentive to Sergeant Baeppler.
25    Q.   What presentation did you give?

44 (Pages 170 - 173)

Page 174

1     A.    This one right here, the Exhibit
2  (indicating) --
3     Q.    Exhibit 8?
4     A.    It would be Exhibit 8, yes, sir.
5     Q.    So you gave that presentation in
6  2018 as well as in 2017?
7         MS. DEBROSSE ZIMMERMAN:  Object to
8  form.
9     A.    We are in 2018.  Let me strike
10  back -- I started those presentations in 2017.
11  I gave the bulk of them in 2018.  So on those
12  ones from those other states.  So I apologize
13  for that.  And this PowerPoint was June, I
14  believe, of this year, 2018.
15     Q.    Okay.  I'm sorry.  So Exhibit 8 was
16  given mostly in 2018, but some at the end of
17  2017; is that correct?
18     A.    Yes.  Yes.
19     Q.    And then Exhibit 9 was given in June
20  of this year, you think?
21     A.    Yes.  I forgot what year we were in
22  for a minute.
23     Q.    Wait until you get to be my age.
24         Is the presence of fentanyl in
25  cocaine overdoses something that you've

Page 175

1  experienced, seen?
2     A.    Yes.
3     Q.    How common is that?
4     A.    It's becoming more common.
5     Q.    And when that happens, the user may
6  or may not be aware that there's fentanyl in the
7  cocaine, correct?
8     A.    The person is deceased.  I don't
9  know what they were aware of.
10     Q.    Not everybody dies when that
11  happens, right?
12     A.    Not everyone, no.
13     Q.    So there are times when you come to
14  an overdose scene, a non-fatal overdose scene,
15  and you find that the person has taken cocaine
16  laced with fentanyl, correct?
17     A.    They've taken what they believe to
18  be cocaine, which caused them to go into the
19  symptoms of a heroin/fentanyl overdose, in which
20  naloxone was able to revive them.
21     Q.    Okay.  And when you talk to them, do
22  they say that they knew that there was fentanyl
23  in the cocaine that they were using?
24         MS. DEBROSSE ZIMMERMAN:  Object to
25  form.

Page 176

1     A.    Some believed it to be there.  Some
2  had no clue.
3     Q.    And then with respect to the
4  counterfeit pills, that's also something that
5  you're seeing more of?
6     A.    Yes.
7     Q.    And specifically what types of
8  counterfeit pills are you seeing more of?
9     A.    Pills that look like Percocets that
10  are fentanyl.
11     Q.    Do you know who makes those?
12     A.    No.
13     Q.    When have you started seeing them?
14     A.    This year.
15     Q.    Early this year, mid-year, recently?
16     A.    Myself personally, was later in the
17  year.  We have other guys.  You see this was
18  dated March, so apparently Sergeant Baeppler
19  started seeing them around then.
20     Q.    Have you ever talked to anyone who
21  has taken one of these counterfeit pills?
22     A.    Yes.
23     Q.    And they all believe they're taking
24  the real thing, right?
25     A.    Yes.  Well, not -- strike that.  Not

Page 177

1  all of them.  A good portion of them thought
2  they were taking the real thing.
3     Q.    Do you know who the defendants are
4  in this case?
5     A.    In this case?
6     Q.    Yes.
7     A.    No.
8     Q.    Do you know where heroin comes from?
9         MS. DEBROSSE ZIMMERMAN:  Object to
10  form.
11     A.    Yes.
12     Q.    Where?
13     A.    Drug dealers.
14     Q.    Where do the drug dealers get it?
15     A.    From their supplier.
16     Q.    Where do the suppliers get it or how
17  do they make it?  Do you know where most heroin
18  is made?
19     A.    A good portion comes from Mexico.
20     Q.    Where else?
21     A.    Afghanistan.
22     Q.    Do you know who makes fentanyl,
23  illicit fentanyl?
24     A.    Personally, no.
25     Q.    Do you know where it comes from?

45 (Pages 174 - 177)

Page 178

1     A.   I have beliefs, but personally, no.
2     Q.   Are those guesses or educated
3  understandings?
4     A.   Through courses of other
5  conferences, meeting with other detectives, it's
6  learned that it comes through Mexico as well.
7     Q.   When did carfentanil come into
8  Cleveland?
9     A.   I believe it was 2015, was the first
10  reported cases.
11     Q.   Is it still around or --
12     A.   Oh, yeah.
13     Q.   When it came in, when carfentanil
14  came into Cleveland, did it cause any spike in
15  overdose deaths?
16     A.   Yes.
17     Q.   A pretty dramatic one?
18     A.   Between carfentanil and fentanyl,
19  absolutely.  I mean, you see the numbers.  We
20  were -- the numbers doubled.  I mean, it's
21  staggering how many people died from this.
22     Q.   Because both are more potent than
23  heroin, right?
24     A.   Absolutely more potent than heroin.
25           - - - - -

Page 179

1        (Thereupon, Moran Deposition Exhibit
2        11, Court of Common Pleas Search
3        Warrant Beginning Bates Number
4        CLEVE_002250978, was marked for
5        purposes of identification.)
6           - - - - -
7     Q.   Mr. Moran, I've handed you what's
8  been marked as Exhibit 11, Moran 11.  Have you
9  seen this document before?
10     A.   I have.
11     Q.   What is it?
12     A.   It's an affidavit and a search
13  warrant.
14     Q.   Let me back up for a moment.
15  Exhibit 11 is a multi-page document bearing
16  production numbers CLEVE 2250978 through 83.
17  Mr. Moran, I know that, like the other search
18  warrant we looked at this morning, this one is
19  unsigned.  Do you believe that this was, in
20  fact -- that your affidavit was, in fact, signed
21  and that the warrant was indeed issued?
22     A.   If you give me a minute to review
23  the affidavit and see if I can refamiliarize
24  myself with the facts because addresses are
25  redacted and I kind of go off addresses.

Page 180

1        What was the question, was the
2  warrant signed?
3     Q.   Yes.
4     A.   To the best of my recollection, I
5  believe the warrant was signed.
6     Q.   And this was in December of 2005,
7  correct?
8     A.   Yes.
9     Q.   In your affidavit you indicate
10  that -- this is the first page -- that you
11  believe that the person possessed OxyContin
12  pills.
13        Do you see that?
14     A.   I do.
15     Q.   And that's on the basis of a
16  purchase of OxyContin from that person by an
17  informant, correct?
18     A.   That is correct.
19     Q.   Do you recall any of the specifics
20  of this case?
21     A.   No.
22     Q.   Were you aware of the abuse of
23  OxyContin pills as of December of 2005?
24        MS. DEBROSSE ZIMMERMAN:  Object to
25  form.

Page 181

1     A.   I was aware of a person selling
2  OxyContin pills in 2005.
3     Q.   And that was a problem for you?
4        MS. DEBROSSE ZIMMERMAN:  Object to
5  form.
6     Q.   Strike that.
7        Did you believe that that was a
8  crime?
9     A.   Yes.
10     Q.   And you believed it was a crime
11  worth pursuing, correct?
12     A.   I'm a narcotics detective, sir.  If
13  I have an opportunity to investigate in a drug
14  crime, that's what I do.
15     Q.   And so you viewed the sale of
16  prescription OxyContin as a drug crime, correct?
17     A.   Drug trafficking, yes, sir.
18     Q.   Okay.  When did you first become
19  aware of trafficking of OxyContin pills?
20        MS. DEBROSSE ZIMMERMAN:  Object to
21  form.
22     A.   In this specific case or --
23     Q.   No.  In general.
24     A.   I don't know.
25     Q.   Certainly as of December of 2005,

46 (Pages 178 - 181)

Page 182

1 correct?
2     A.   Yes.
3     Q.   How much before that?
4     A.   I don't know.
5     Q.   Do you recall whether you took steps
6 to investigate the source of the OxyContin that
7 was being sold in this warrant?
8     A.   Sir, to be perfectly honest with
9 you, this was 13 years ago.  Without more
10 specifics, I could not even tell you if this
11 search warrant was executed.
12            - - - - -
13     (Thereupon, Moran Deposition Exhibit
14        12, Search Warrant Beginning Bates
15        Number CLEVE_002250680, was marked
16        for purposes of identification.)
17            - - - - -
18     Q.   Mr. Moran, I'm handing you what has
19 been marked as Moran Exhibit 12.  It's a
20 multi-page document bearing production numbers
21 CLEVE 2250680 through 87.
22        Have you seen this document before?
23     A.   I have.  I typed it.
24     Q.   This is another unsigned search
25 warrant and affidavit, correct?

Page 183

1     A.   It is.
2     Q.   This one from February of 2009,
3 correct?
4     A.   It is.
5     Q.   And you believe that you executed
6 the affidavit and that the search warrant was
7 granted by the judge?
8         MS. DEBROSSE ZIMMERMAN:  Object to
9 form.
10     A.   Can you give me a second to review
11 the affidavit to see if I can refamiliarize
12 myself with the case?  This affidavit was
13 signed, the search warrant was signed.
14     Q.   What makes you so confident?
15     A.   I recall this case.
16     Q.   Tell me what you recall of the case.
17     A.   We executed a search warrant.  The
18 person was trafficking OxyContin and that person
19 went to prison.
20     Q.   Do you know how the person was
21 trafficking in Oxycontin got the Oxycontin?
22     A.   I wish, but no.  Once Miranda rights
23 are asserted, sir, we stop questioning.
24     Q.   And that's what happened in this
25 case?

Page 184

1     A.   Yes, sir.
2     Q.   Have you ever heard of ARCOS,
3 A-R-C-O-S, all caps?
4     A.   I have not.
5     Q.   So do you know -- do you know that
6 ARCOS is a database through which distributors
7 and manufacturers report drug transactions to
8 the DEA?
9         MS. DEBROSSE ZIMMERMAN:  Object to
10 form.
11     A.   I'm not familiar with ARCOS.
12     Q.   Are you familiar with OARRS, the
13 Ohio Board of Pharmacy's Automated Rx Reporting
14 System?
15     A.   Loosely familiar.
16     Q.   Have you ever used it?
17     A.   I believe maybe one time.  Well, not
18 personally.  I don't have OARRS access.  I think
19 I've requested an OARRS report.
20     Q.   Do you know whether others in the
21 police department use the OARRS database?
22     A.   I'm sorry?
23     Q.   Do you know whether others in the
24 Cleveland Police Department use the OARRS
25 database?

Page 185

1     A.   Are there others, yes.
2     Q.   Who uses the OARRS database?
3     A.   Detective Patena, Detective Prince.
4     Q.   They use that in connection with
5 their diversion investigations?
6     A.   Yes.
7            - - - - -
8     (Thereupon, Moran Deposition Exhibit
9        13, City of Cleveland Department of
10        Public Safety Division of Police
11        Organizational Structure, was marked
12        for purposes of identification.)
13            - - - - -
14     Q.   Mr. Moran, I'm handing you what's
15 been marked as Moran Exhibit 13.  Have you seen
16 this document before?
17     A.   I have.
18     Q.   What is Exhibit 13?
19     A.   It's the City of Cleveland
20 Department of Public Safety -- it's the Division
21 of Police organizational structure.
22     Q.   Now, in the lower right-hand corner
23 you'll see that the date is January 3rd of 2011.
24 Do you see that?
25     A.   I do.

47 (Pages 182 - 185)

Page 186

1     Q.   Do you know -- I believe that this
2  is the most recent version that we were
3  provided.  Do you know whether this has been
4  updated?
5     A.   I'm not sure.  I believe it has,
6  with the consent decree, but --
7     Q.   Do you know what changes, if any,
8  should be made to this exhibit to make it
9  current and accurate?
10    A.   I don't.
11    Q.   Do you know which -- well, let me
12 strike that.
13         Well, do you know which bureaus or
14 divisions or units of the Cleveland Police
15 Department investigate opioid use and abuse?
16    A.   I'm sorry?
17    Q.   Which divisions, bureaus, units of
18 the police department investigate opioid use and
19 abuse?
20    A.   The Bureau of Special Services.
21    Q.   Okay.  And do -- within that there
22 are one, two, three, four, five, six, seven,
23 eight, nine units or divisions.
24         Do you see that?
25    A.   Yes, sir.

Page 187

1     Q.   Do all of those units or
2  divisions -- are all those units and divisions
3  involved in the investigation of opioid abuse?
4     A.   No.
5     Q.   So which ones are?
6     A.   Narcotics.  Obviously, you know, the
7  SWAT unit is not.  Primarily the narcotics unit.
8     Q.   How many employees does the
9  narcotics unit have?
10         MS. DEBROSSE ZIMMERMAN:  Object to
11 form.
12    A.   Detectives or -- we have a civilian
13 employee.  Are you asking how many detectives
14 there are in the entire narcotics unit?
15    Q.   Let's start with detectives.  How
16 many detectives are there in the narcotics unit?
17    A.   We've lost more than has been
18 replaced.  I'm trying to count, because members
19 that are in NOLETF, we have detectives over
20 there, so I'm trying to count everyone.
21    Q.   And NOLETF is the Northern Ohio Law
22 Enforcement Task Force?
23    A.   Yeah.  We have three detectives
24 assigned to that.  There's seven of us that do
25 the HIDI, but two of them are actually just

Page 188

1  detailed to us pending a permanent assignment.
2  We have an administrative grand jury female.  We
3  have Detective Patena and Prince, who are in
4  diversion.  Detective Hall is interdiction.  We
5  have an administrative sergeant, Sergeant Ward.
6  Sergeant Baeppler, Sergeant Bovenzi.  What is
7  that, about 15 or 16, give or take.
8     Q.   Give or take.
9          When you say that three are assigned
10 to NOLETF, does that mean that they are not
11 investigating opioid-related crimes in
12 Cleveland?
13    A.   No.
14    Q.   Okay.  Are they coordinating with
15 you or how does that work?
16    A.   NOLETF is a task force.  They
17 partner with members of other agencies.  They
18 investigate larger drug crimes in the city of
19 Cleveland.
20    Q.   Do you -- does HIDI coordinate with
21 NOLETF?
22    A.   We've -- cases have crossed over.
23 We've talked to them.  Yes.
24    Q.   I don't know whether the number was
25 15, 16, or higher or lower --

Page 189

1     A.   Give or take.
2     Q.   Whatever it was, has that number
3  grown or shrunk over the years?
4          MS. DEBROSSE ZIMMERMAN:  Object to
5  form.
6     A.   Kind of a -- we added two detectives
7  because we've been so busy, the two I told you
8  that are detailed pending permanent.  So we've
9  added two because we've been so busy responding
10 to these.  The overall number in the narcotics
11 unit has declined.
12    Q.   And do you know, by the magnitude of
13 the decline, how many have left the unit and
14 since when?
15    A.   I don't know how many guys we've
16 lost through going back to units, promotions.
17 I'm not sure of an exact number.
18    Q.   Do you know why the narcotics unit
19 has shrunk in size over the years?
20    A.   That's above my pay grade, sir.
21    Q.   Do you think that's a good thing or
22 a bad thing?
23    A.   That it's above my pay grade or that
24 it shrunk?
25    Q.   No.  That it shrunk.

48 (Pages 186 - 189)

Page 190

1    A.    My passion is getting drug dealers
2  off the street.  The more drug detectives you
3  have, the better off you are.
4    Q.    So you're unhappy that there aren't
5  more detectives?
6    A.    I wouldn't say unhappy.
7    Q.    You wish there were more detectives
8  in the narcotics unit?
9    A.    I go out and do my job as I'm asked
10  to do.  It's not my job to worry about how many
11  guys I have or what I have to work with.
12    Q.    Do you think there is a sufficient
13  number of detectives in the narcotics unit?
14    A.    That's not up to me to determine.
15    Q.    I didn't ask whether it was up to
16  you to determine.  I was asking what your view
17  is.
18    A.    If we need more people or --
19    Q.    Yes.  Do you need more people?
20    A.    In any situation more people doesn't
21  hurt.
22    Q.    That wasn't the question, sir.
23        MS. DEBROSSE ZIMMERMAN:  Object to
24  form.
25    A.    I mean, I don't have an opinion.  I

Page 191

1  don't have an opinion on it.  I go out and do my
2  thing.  That's what I do.
3    Q.    You've never thought about that?
4    A.    It doesn't cross my mind.  I mean,
5  there are days I'd like to have more guys out
6  there, but you work with what you got.
7    Q.    Do you know anything about grants
8  that the Cleveland Police Department receives in
9  connection with its work combating opioid abuse?
10    A.    Specifically what about grants?
11    Q.    Do you know anything about them at
12  all?
13    A.    One minute portion.
14    Q.    What's that minute portion?
15    A.    If we're operating on a grant, we
16  have to put a certain code on our overtime card.
17  How we get the grants or who applies, I have no
18  knowledge of that.
19    Q.    Do you know about the size of the
20  grants or who awards them or anything like that?
21    A.    No.
22    Q.    When you work overtime, do you know
23  who pays for that?
24    A.    Yes and no.  If it's off a grant,
25  it's paid off the grant.  Who the specific grant

Page 192

1  supplier is, I don't know.
2    Q.    When you work overtime, do you know
3  in advance whether or not it's being paid for by
4  a grant?
5    A.    Yes.
6    Q.    How do you know that?
7    A.    We're told we're on overtime off the
8  grant.  If it's getting close to the grant being
9  over, then, you know, someone watches our hours
10  and maintains that.  I don't do that, though.
11    Q.    How many overtime hours have you
12  worked in 2018?
13    A.    This is a light year for me, so I
14  don't know, 700, 800.  This is a lighter year,
15  though.  I've taken a little more time off.
16    Q.    Do you know whether those 700 or 800
17  hours of overtime that you worked in 2018, how
18  many of those hours were paid for by grants?
19    A.    No.
20    Q.    Was it more than half?
21    A.    I don't know.  I didn't keep track
22  of -- I mean, it was a lot of overtime hours.  I
23  put codes on some cards, some cards I didn't.  I
24  don't know if it was more than half.  I don't
25  know.

Page 193

1    Q.    You know it was more than 5 percent,
2  right?
3    A.    I'd be comfortable with saying more
4  than 5 percent.
5    Q.    Okay.  How about, would you be
6  comfortable saying more than 25 percent?
7    A.    I'm not going to get locked into a
8  percentage.  I don't know.
9    Q.    Do you recall any of the grants that
10  you've noted on any of your overtime cards?
11    A.    I'm sorry?
12    Q.    Do you recall the identity of the
13  grant that you noted on any of your overtime
14  cards?
15    A.    Identity as to what?
16        MS. DEBROSSE ZIMMERMAN:  Object to
17  form.
18    Q.    Who the grantor was.
19    A.    No.  We have a code that we have to
20  put on the overtime card.  I just know the code.
21    Q.    And it's the same code no matter
22  who -- no matter the grant or is it a different
23  code?
24    A.    Different code for what grant.
25    Q.    Do you know how many different codes

49 (Pages 190 - 193)

Page 194

1 you used in 2018?
2     A.   To my best recollection, two.
3     Q.   Do you know who either of the
4 grantors were?
5     A.   No.
6     Q.   Do you know the code numbers?
7     A.   We're not on a code now, so it's --
8 off the top of my head, no.  I had it on a
9 post-it note on my desk.
10     Q.   Have you ever made a request of your
11 superiors for additional resources --
12     A.   No.
13     Q.   -- to combat opioid abuse?
14     A.   No.
15     Q.   If you had additional resources to
16 help combat the opioid crisis in Cleveland, what
17 would you use them for?
18     A.   It's a hypothetical, and I don't --
19     Q.   Would you hire more officers?  Would
20 you --
21     A.   That's a hypothetical.
22     Q.   More Narcan kits?  What would you
23 do?
24     A.   I'm a detective.  I don't make those
25 decisions.

Page 195

1     Q.   Never thought about it?
2     A.   I go out.  I go to fatalities and
3 try to investigate those.  With as many as we
4 have, I have a hard time thinking about
5 anything.
6     Q.   I assume that a number of your
7 investigations start with a 911 call; is that
8 right?
9     A.   Yes.
10     Q.   And does the police department keep
11 statistics concerning the nature of 911 calls,
12 you know, what people are calling about, how
13 many people are calling about a cat in a tree,
14 how many people are calling about armed robbery,
15 how many people are calling about a drug
16 overdose?  Do you keep statistics about that?
17          MS. DEBROSSE ZIMMERMAN:  Object to
18 form.
19     A.   There are stats kept for the nature
20 of the call; however, you spoke on some of those
21 that are easy to explain, armed robbery, easy
22 nature of the call, whatnot, easy nature of the
23 call.  However, a passerby may not know it's a
24 drug overdose.  They may say there's a person
25 passed out behind the wheel of a car, there's a

Page 196

1 person passed out in a McDonald's bathroom.
2 there's a person passed out on the sidewalk.
3 Those are all things that we get.  So that
4 nature of the assignment may be something along
5 the lines of an unknown trouble.
6          - - - - -
7          (Thereupon, Moran Deposition Exhibit
8          14, E-Mail String Bates Numbered
9          CLEVE_000274219, was marked for
10          purposes of identification.)
11          - - - - -
12     Q.   Mr. Moran, I'm handing you what has
13 been marked as Moran Exhibit 14.  It's a
14 one-page document bearing production number
15 CLEVE 274219.
16          Have you seen this document before?
17     A.   I recall sending this to the
18 commander.
19     Q.   First, let me back up.  Exhibit 14
20 is an e-mail chain from March of 2014.  The top
21 e-mail is an e-mail from you to Mr. Gingell of
22 March 15 of 2014, correct?
23     A.   Yes, sir.
24     Q.   And you sent and received these
25 e-mails in or around mid-March in the ordinary

Page 197

1 course of business, correct --
2          MS. DEBROSSE ZIMMERMAN:  Object to
3 form.
4     Q.   -- as part of your business duties?
5     A.   I did.
6     Q.   And you write, "Commander, I read
7 this report and think we all need to be a little
8 careful.  This is titled a VSDL, but no drug
9 evidence was taken.  The phone was seized, but
10 again there is no VSDL follow up since there is
11 no drug evidence taken.  As we spoke earlier in
12 the week, there needs to be some consistency
13 with the reporting."
14          Do you see that?
15     A.   I do.
16     Q.   First of all, to what report were
17 you referring?
18     A.   A generated Cleveland Police report.
19     Q.   What was the report about?
20     A.   Apparently I disagreed with the
21 title of the report.
22     Q.   Do you recall what the title of the
23 report was?
24     A.   Well, it looks -- according to this
25 e-mail I sent, it was titled a VSDL.

Page 198

1    Q.    And VSDL means violation of state
2 drug law?
3    A.    Yes, sir.
4    Q.    And what you were concerned about
5 was that the incident reported wasn't really a
6 VSDL, correct?
7    A.    Correct.
8    Q.    Your concern was that the police
9 department officials were over-designating
10 VSDLs, correct?
11        MS. DEBROSSE ZIMMERMAN:  Object to
12 form.
13    A.    My concern was I felt this report
14 was titled wrong.
15    Q.    And why was that a concern to you?
16    A.    VSDL reports require follow-ups.  If
17 it's a VSDL report and there's open reports in
18 the system, it means no one followed up on the
19 report.  With no VSDL, there's no follow-up for
20 a felony action to be taken.  This was a -- drug
21 overdoses were titled suspected illnesses, so at
22 the time I felt that the officers on scene
23 titled this report wrong.
24        - - - - -
25        (Thereupon, Moran Deposition Exhibit

Page 199

1        15, E-Mail from CCMEO Automated
2        Alert System to Various Recipients,
3        dated May 19, 2018, Beginning Bates
4        Number CLEVE_000266801, was marked
5        for purposes of identification.)
6        - - - - -
7    Q.    Mr. Moran, I've handed you what's
8 been marked as Moran Exhibit 15, a one-page
9 document bearing production number CLEVE 266801.
10        Have you seen this document before?
11    A.    I have.
12    Q.    Exhibit 15 is an e-mail dated May
13 19, 2018 from the CCMEO Automated Alert System
14 to a whole bunch of folks, including you,
15 correct?
16    A.    Yes, sir.
17    Q.    And you received this e-mail on or
18 about that date as part of your business duties,
19 correct?
20    A.    Yes, sir.
21    Q.    CCMEO Automated Alert System is the
22 automated alert system of the Cuyahoga County
23 Medical Examiner's Office, correct?
24    A.    That's correct.
25    Q.    And the alert relates to a suspected

Page 200

1 opioid scene, correct?
2    A.    Yes, sir.
3    Q.    That had been reported by the
4 Cleveland Police Department, correct?
5    A.    Correct.
6    Q.    But the alert says that there were
7 no illicit drugs found.
8        Do you see that?
9    A.    I do.
10    Q.    And when we get to where it says,
11 "Hx: Marijuana use," does that mean the
12 decedent's medical history indicates marijuana
13 use?
14    A.    Hx, history, of marijuana use.
15    Q.    Okay.  Do you know where this was
16 listed as a -- in the Cleveland Police
17 Department records as a suspected opioid scene?
18        MS. DEBROSSE ZIMMERMAN:  Object to
19 form.
20    A.    I don't understand your question.
21    Q.    Well, you have an opioid scene
22 alert, so somebody has entered this into the
23 system as an opioid scene, correct?
24    A.    Not from the Cleveland Police
25 Department.

Page 201

1    Q.    But from the medical examiner's
2 office?
3    A.    It's not -- it's an alert that is
4 sent out to notify us.
5    Q.    Okay.  And then you go and
6 investigate and determine whether, in fact, it
7 is an opioid scene?
8    A.    Yes.
9    Q.    So it's not listed in the records as
10 an opioid scene until you conclude that that's
11 what it was?
12    A.    Are you referring to this as a
13 record or an alert?
14    Q.    It's not an alert, but I assume at some
15 point it's put into the records as -- you know,
16 if you confirmed it, it goes into the records as
17 an opioid scene, correct?
18        MS. DEBROSSE ZIMMERMAN:  Object to
19 form.
20    A.    Again, the medical examiner
21 determines final cause and manner of death.  And
22 I remember this case.  This was an overdose.
23    Q.    An overdose of what?
24    A.    Fentanyl, heroin.
25    Q.    So when it says, "No illicit drugs

51 (Pages 198 - 201)

Page 202

1 or alcohol," does that just mean no illicit
2 drugs or alcohol were found on the scene?
3     A.   Not necessarily.  At the initial
4 observation maybe of the zone car officers, and
5 then we come out and we look, we are trained in
6 this, this is what we do day in and day out,
7 we're trained to look for things that they're
8 not trained to look for.  This is the initial
9 reporting system to have us respond.
10        MR. ROMAN:  Why don't we take a
11 break.
12        (Recess had.)
13        MR. ROMAN:  Let's go back on the
14 order.
15 BY MR. ROMAN:
16    Q.   Two quick follow-up questions.
17        First of all, I believe you
18 testified at the very beginning that you've
19 served as an expert witness?
20    A.   I was in criminal court, yes, sir.
21    Q.   On how many occasions?
22    A.   Twice maybe.
23    Q.   Do you recall the subject matters on
24 which you testified as an expert?
25    A.   Narcotic sales, drug sales, how drug

Page 203

1 sales are done.
2    Q.   Do you recall anything more
3 specifically about what you testified to?
4    A.   I believe one case was a cocaine
5 case.  The other case I can't recall.  Maybe a
6 marijuana case.
7    Q.   Did you talk about the steps in the
8 drug investigation -- or what exactly did you
9 testify to?
10    A.   I don't recall the exact testimony,
11 sir.  They were -- I came in on behalf of the
12 State of Ohio.
13    Q.   Do you recall the names of those
14 cases?
15    A.   No.
16    Q.   Do you recall when they were?
17    A.   Mid-2000s, mid to late 2000s.
18    Q.   Have you ever testified as an expert
19 witness in a case involving opioids?
20    A.   No.
21    Q.   You also testified about a consent
22 decree.  Do you recall that?
23    A.   I do.
24    Q.   What do you recall of the consent
25 decree?

Page 204

1    A.   What do I understand or what do I --
2    Q.   Well, first of all, do you recall
3 when the consent decree was entered?
4    A.   No.  I don't know exactly when.
5    Q.   Do you recall what it provided?
6    A.   I'm sorry?
7    Q.   Do you recall what it provided in
8 broad terms?
9    A.   What --
10    Q.   What the consent decree provided.
11 What did you have to do?
12        MS. DEBROSSE ZIMMERMAN:  Object to
13 form.
14    A.   What did I have to do?
15    Q.   Or what the Cleveland Police
16 Department had to do.
17    A.   Sir, I'm so busy with what I do.
18 When they enforce new policies, I abide by the
19 new policies.  The exact matter of the consent
20 decree, I'm not sure.
21    Q.   Do you recall the case that it arose
22 out of?
23    A.   The case?
24    Q.   Yes, or cases.
25    A.   Not specifically.  I mean, it was a

Page 205

1 multitude.  For whatever reason, the Department
2 of Justice is here and there's a consent decree.
3 That's -- it doesn't affect what I do day to
4 day.
5    Q.   Were you a party to any of those
6 cases?
7    A.   No.
8    Q.   Were you a witness in any of those
9 cases?
10    A.   No.
11    Q.   After the entry of the consent
12 decree, did the way you conducted your business
13 change at all?
14    A.   Explain what you mean by doing my
15 business.  I mean, does it involve the way I
16 investigate?
17    Q.   Yes.
18    A.   I investigate crimes.  It doesn't
19 involve -- it doesn't change my investigative
20 techniques.  It changed other aspects.
21    Q.   What other aspects?
22    A.   Training.
23    Q.   How so?
24    A.   We get more training now.
25    Q.   Training in what?

52 (Pages 202 - 205)

Page 206

1    A.   Whatever the city seems fit;
2 deescalation, unbiased policing.  Whatever
3 training the city puts forth.  We're required
4 more training.  But as far as my day-to-day
5 operations, nothing has changed in that aspect.
6         - - - - -
7         (Thereupon, Moran Deposition Exhibit
8         16, Cleveland Police HIDI Response
9         Form Beginning Bates Number
10        CLEVE_000274559, was marked for
11        purposes of identification.)
12        - - - - -
13    Q.   Mr. Moran, I'm handing you what has
14 been marked as Moran Exhibit 16.  Have you seen
15 this before?
16    A.   I have.
17    Q.   What is Exhibit 16?
18    A.   This is a form generated by our
19 narcotics unit to track and log the non-fatal
20 and fatal overdoses that we respond to.
21    Q.   Actually, let me go back for a
22 second.  This bears -- it's a one-page document
23 and bears production CLEVE 274559.
24        Are these the response sheets that
25 you testified to that you use when you go to a

Page 207

1 suspected overdose scene?
2    A.   Yes, sir.
3    Q.   Okay.  Can you take me through the
4 form and tell me what you put in which -- you
5 know, and where?
6    A.   Absolutely.
7        Obviously the top line, Cleveland
8 Police HIDI Response Form.  RMS number is the
9 populated Cleveland Police report number.
10    Q.   So the first two digits, again,
11 would be the last two digits of the year, so if
12 you were doing an investigation this year, the
13 first -- it would be an 18?
14    A.   Yes, sir.
15    Q.   And then there would be the
16 six-digit number that would follow?
17    A.   Correct.
18    Q.   The date is the date that you
19 respond to the scene?
20    A.   Yes.
21    Fatal, non-fatal, you know, was --
22 obviously goes without saying.  What district it
23 occurred in.  The zone car that's handling the
24 initial report.
25    Q.   I'm sorry.  Zone car, what does that

Page 208

1 refer to?
2    A.   That's the marked police unit that
3 initially responds to the call.
4    Q.   Okay.  And those are always four
5 digits?
6    A.   Well, it's a number.  It's a number,
7 letter, number, but four characters in it.
8    Q.   Okay.
9    A.   Incident location.
10    Q.   It says, "Supervisor."
11    A.   That was the supervisor that was on
12 scene.
13    Q.   And why are there four boxes there?
14 What does that refer to?
15    A.   Badge number or their car number,
16 either/or.  Same thing, supervisor would be 4S
17 whatever.
18    Q.   But it refers to a specific person?
19    A.   A specific unit number, yes.
20    Q.   Okay.  Unit number?
21    A.   Or -- their car number, just like a
22 car number, so car number.
23        Incident location, that's where it
24 occurred.  Victim info, that's the person that
25 either survived the overdose or passed away from

Page 209

1 the suspected overdose.  Interviews, if there's
2 somebody on scene that we interviewed, we want
3 to track that in case we need to do a follow-up.
4 And follow-up is the box where we put notes as
5 far as what we saw.
6    Q.   Well, let's say --
7    A.   Can I take five minutes, sir, or
8 just two minutes real quick?  Do you mind?
9    Q.   Sure.  Well, wait a second.  Is that
10 as to how to answer this question?
11    A.   No.  No.  It's just to the form in
12 general.
13    Q.   Unless there's a question of
14 privilege, you need to continue answering the
15 question.
16    A.   Okay.  That's fine.  That's fine.
17 Okay.
18    Q.   So where were you?
19    A.   Follow-up.
20    Q.   So when you interview someone, here
21 there's spots for you to enter two names.  Let's
22 say you talked to two people.  Where do you --
23 do you make any notes of those interviews?
24    A.   I'll put my notes in follow-up.
25 I'll flip the sheet over.

53 (Pages 206 - 209)

Page 210

1     Q.    Okay.  And so what do you normally
2 put in follow-up?  What information typically
3 goes there?
4     A.    Whatever information I deem to put
5 in there, case-by-case scenario, be it suspect's
6 phone number, what the witness said.
7     Q.    But the follow-up relates to the
8 interviews or can it relate to anything?
9     A.    I use it for anything.
10    Q.    Okay.  What goes under -- when would
11 you check the box yes for evidence and when
12 would you check no for evidence?
13    A.    Well, if there's evidence on scene
14 or if there's not evidence on scene.
15    Q.    Is there ever a case where there's
16 no evidence whatsoever?
17    A.    The drug world is a very, very seedy
18 place to be.  People die and people clean
19 evidence up.  Therefore, sometimes we get there
20 and there's nothing there.
21    Q.    Okay.  DNA?
22    A.    If we're submitting packaging for
23 touch DNA, we check that box.
24    Q.    So it's not whether a DNA sample has
25 been taken?

Page 211

1     A.    It's if we're submitting something
2 for DNA analysis.
3     Q.    Okay.  Needle is whether you find a
4 needle at the scene?
5     A.    Yes, sir.
6     Q.    And when you find a needle, you take
7 it with you?
8     A.    We submit it for evidence to have it
9 tested to see what type of residue was left
10 behind in the syringe.
11    Q.    Photos, is there ever a circumstance
12 where you would not take photos?
13    A.    There are.
14    Q.    When would you not take a photo?
15    A.    If someone was conveyed from a house
16 to the hospital, they passed away at the
17 hospital and we no longer had access to the
18 house.
19    Q.    Packaging, what does that refer to?
20    A.    Drugs come in packages, be it
21 whatever types the drug dealer uses, so if we
22 recover a specific type of packaging on scene,
23 we mark it -- we check that we covered that.
24    Q.    Would that also include, for
25 example, if you found the packaging for a

Page 212

1 prescription drug?
2     A.    No.
3     Q.    So what type of packaging would it
4 be, just for the illegal drugs?
5     A.    We're looking for the packaging that
6 the possible heroin or fentanyl came in.
7     Q.    Okay.  But what if the person had
8 taken a prescription drug?
9     A.    Sir, that box is exactly what I
10 described that box to be, it's for packaging,
11 for packaging for drugs.  I mean, I can't "what
12 if" you.
13    Q.    For illegal drugs?
14    A.    For fentanyl, heroin.  If we recover
15 packaging that the heroin or fentanyl possibly
16 came in, that box is checked.
17    Q.    And cell phone, whether you found
18 one of those.
19          What's the lock code?
20    A.    If we know the lock code on scene,
21 we log it so we can unlock it back at our
22 office.
23    Q.    Okay.  What does supplement refer
24 to?
25    A.    Supplement means if there's going to

Page 213

1 be a follow-up with possible prosecution or not
2 and we have to complete a multitude of
3 supplemental reports.
4     Q.    Suspect, that's if there's a -- if
5 you have a specific person in mind?
6     A.    Correct.  That could be not
7 necessarily a suspect, but it could be a suspect
8 phone number, suspect vehicle, suspect address,
9 whatever information we deem.
10    Q.    Or it could be a description, white
11 male?
12    A.    It could be.
13    Q.    Okay.  And then what about other?
14    A.    What other notes that need to be
15 taken.
16    Q.    And do you carry this on a clipboard
17 or how do you --
18    A.    Yeah, I have a clipboard.  Yes.
19    Q.    Okay.  And do you often write on the
20 back of it or not?
21    A.    If I need to, yeah.
22    Q.    And this is where all your
23 information is initially recorded, is on one of
24 these response sheets?
25    A.    No.

54 (Pages 210 - 213)

Page 214

1    Q.    Where else is information recorded?
2    A.    Well, an original Cleveland Police
3 report is also generated by the responding zone
4 cars, which is entered into our reporting
5 system, which also has, you know, facts of the
6 case.  That may not have suspect info and
7 privileged info that we need.
8    Q.    And does that information also make
9 it into the database or not?
10   A.    It goes into our Cleveland Police
11 database, yes, sir.
12   Q.    But does it go into the ODMAP and
13 the Case Explorer databases or not?
14   A.    All -- we input every case in the
15 ODMAP, yes, sir.
16   Q.    No, but to the extent that the -- is
17 the information contained in the original police
18 report also included in the ODMAP and Case
19 Explorer databases?
20   A.    It is to a certain extent.  There's
21 a -- if you remember the ODMAP, we input the
22 case number, so that case number is -- so if we
23 need to go back and access the report, we have
24 the case number and we go back into our
25 database, into our reporting system.

Page 215

1    Q.    And that case number is the same one
2 that will be on Exhibit 16, correct?
3    A.    They have to coincide.  It's the
4 same case.
5    Q.    Okay.  Where are these -- after
6 you've entered the information from these forms
7 into the database, what do you do with them?
8    A.    I keep mine.
9    Q.    Where do you keep them?
10   A.    At my desk.
11   Q.    Do you have a special folder for
12 response forms or how do you --
13   A.    Depends on the situation.
14   Q.    Tell me where the places that you
15 keep them are.
16   A.    I just said, on my desk.
17   Q.    On your desk?
18   A.    Yes, sir.
19   Q.    And did you produce all the -- or
20 give to counsel for production in this case all
21 the response sheets that are on your desk?
22   A.    All this information is put into a
23 spreadsheet also.  It's also in Case Explorer.
24 So it's my understanding the information has
25 been provided because it's just a duplicate of

Page 216

1 what this is.
2    Q.    That wasn't my question, sir.
3    A.    That's the best way I could answer
4 it.
5        MS. DEBROSSE ZIMMERMAN:  Object to
6 form.
7    Q.    Did you give the response sheets
8 that are on your desk to counsel to be produced
9 in this case?
10   A.    Not the actual response sheets.
11 There are investigative items on there.  There
12 are suspects.  There are active cases that we're
13 following up on.
14       MR. ROMAN:  And, counsel, we would
15 request that as well.  It will be in our letter.
16       MS. DEBROSSE ZIMMERMAN:  We'll be
17 asserting the privilege as to the investigations
18 that are ongoing, but we'll wait on your letter.
19   Q.    Has the form that's been marked as
20 Exhibit 16 been consistent the whole time you've
21 used it?
22   A.    No.
23   Q.    Has it changed at all?
24   A.    Yes.
25   Q.    Is this the current form?

Page 217

1    A.    No.
2    Q.    When was this form in effect, from
3 when to when?
4    A.    This is one of the earlier forms,
5 and there's a couple boxes that are different.
6 It's essentially the same form.  There's a
7 couple boxes that are taken out.  There's
8 another box that's added.
9    Q.    What's been taken out and what's
10 been added?
11   A.    Supervisor is taken out.  There's
12 now a line for date and time of death to track
13 that.  I believe the follow-up might be worded
14 differently.  It might be notes or something.
15 Those lines are -- there's an extra line.  I
16 believe there's an actual suspect line as well
17 now.  Essentially the same form, just modified
18 slightly.
19       MR. ROMAN:  We'll be asking for that
20 as well.
21   Q.    Do you know whether other HIDI
22 detectives use these forms?
23   A.    Yes.  That's how we input the data
24 in the ODMAP is off this form.
25   Q.    Do you know whether they maintain

55 (Pages 214 - 217)

Page 218

1 the forms after they input the data into the
2 database?
3     A.   Sir, I can speak for myself.  The
4 information that's here is duplicated into Case
5 Explorer.  This is a go-by for us on scene.
6 It's a cheat sheet basically.  This information,
7 whatever is on this sheet, is completely entered
8 into Case Explorer.
9     Q.   I understand that, sir, but I was
10 asking do you know whether any of them keep the
11 response forms.
12     A.   As I said, I can speak for myself,
13 sir.
14     Q.   Do you ever throw out your response
15 forms?
16     A.   Not that I recall.
17     Q.   And all of them are on your desk?
18     A.   Or they're in case files on active
19 cases.
20     Q.   What do you consider to be an active
21 case?
22     A.   A case where I'm trying to catch the
23 drug dealer that just sold drugs that killed
24 somebody.
25     Q.   Well, if someone overdoses and there

Page 219

1 are no leads, is it open or closed?  When do you
2 close a case?
3     A.   We never close a case.  We could get
4 information two years from now regarding a
5 death.  We had one case that took a year and a
6 half before we solved it.  These cases don't
7 close.
8     Q.   So -- well, cases close once there's
9 a conviction, correct?
10     A.   Absolutely, of course, when there's
11 a conviction.
12     Q.   Okay.  Did you receive a notice from
13 counsel when this litigation was initiated
14 telling you not to -- not to delete any records?
15         MS. DEBROSSE ZIMMERMAN:  I'm going
16 to object to that to the extent it asks for
17 protected attorney-client communications.
18     Q.   It's a yes or no question.  You can
19 answer.
20         MS. DEBROSSE ZIMMERMAN:  Do not
21 answer that question.  If you had personal
22 notice from the city, but not from the
23 lawyers --
24     Q.   Did you receive a notice from the
25 city asking that you maintain your records

Page 220

1 pending resolution of this litigation?
2     A.   I believe so, but it's irrelevant.
3 I save my -- if there are active cases, I'm
4 working on them, I have no reason to delete
5 anything.
6     Q.   So do you recall when you received
7 that notice?
8     A.   No.
9     Q.   Do you not delete any of your
10 records ever?
11     A.   Cases stay open, sir, so -- I just
12 explained to you --
13     Q.   But not everything is -- I'm not
14 just asking about the response forms, but there
15 are other documents that you have that are,
16 arguably, relevant to this case.  Do you delete
17 any of your records?
18     A.   What --
19         MS. DEBROSSE ZIMMERMAN:  Object to
20 form.
21     Q.   Well, for example, e-mails, do you
22 delete e-mails or not?
23     A.   I have to delete e-mails, but they
24 are saved on a server.  If I don't delete
25 e-mails, my inbox gets full and I cannot receive

Page 221

1 e-mails.  So I have to delete e-mails in order
2 to receive new e-mails, but the e-mails are
3 saved on a server, which is maintained by the
4 City of Cleveland.
5         MR. ROMAN:  Do you know whether that
6 server was searched?
7         MS. DEBROSSE ZIMMERMAN:  Send us a
8 letter.  We've produced all responsive
9 documents.
10         MR. ROMAN:  Well, that's plainly not
11 the case.
12         MS. DEBROSSE ZIMMERMAN:  Well,
13 that's argumentative.  Do you want to take the
14 deponent's testimony or do you want to argue
15 with me?
16         MR. ROMAN:  I just want to get the
17 documents so I can examine the witness.
18         MS. DEBROSSE ZIMMERMAN:  Well, you
19 send the letter.
20         MR. ROMAN:  We sent a document
21 request.  That should have been enough.
22     Q.   Does your department have a document
23 retention policy?
24     A.   I don't know.
25     Q.   Do you take notes in meetings?

56 (Pages 218 - 221)

1      MS. DEBROSSE ZIMMERMAN:  Object to
2  form.
3      A.   What kind of meeting?
4      Q.   Do you ever meet with your
5  supervisor?
6      A.   I do meet with my supervisor.
7      Q.   Do you ever take notes in those
8  meetings?
9      A.   What kind of meeting?
10     Q.   What type of meetings do you have?
11     A.   We have all kinds of meetings.
12     Q.   Tell me about some of them.
13     A.   We have search warrant briefings.
14  We have controlled buy briefings.  We have buy
15  bust briefings.  We have search warrant
16  briefings.  We have general meetings where we're
17  drinking coffee.  It depends what kind of
18  meeting you're referring to.
19     Q.   Well, with respect to any of the
20  ones other than the ones where you're just
21  drinking coffee, do you take notes in those
22  meetings?
23     A.   It depends what my role on that
24  particular assignment is.
25     Q.   And what do you do with those notes?

1  Do you keep them?
2      A.   Yeah.
3      Q.   How long do you keep them for?
4      A.   It's a simple thing; we're looking
5  for a silver car, we're searching this house.  I
6  mean, it's -- the information is going to be
7  saved on a -- once the search warrant is
8  executed.  I take notes for myself.
9      Q.   Do you text or instant message in
10  relation to your work at all or not?
11     A.   Yeah, we've texted before.  Yes.
12     Q.   And did you turn over your phone to
13  be imaged with respect to any texts that you
14  might have?
15     A.   It's my understanding all the
16  information was gathered.  I have not turned
17  over a phone, no.
18          - - - - -
19          (Thereupon, Moran Deposition Exhibit
20          17, Event Summary Beginning Bates
21          Number CLEVE_000251274, was marked
22          for purposes of identification.)
23          - - - - -
24     Q.   Mr. Moran, I've handed you what's
25  been marked as Moran Exhibit 17.  It's a

1  multi-page document.  I'm sure there's a good
2  reason why it's not Bates stamped.  It appears
3  it's not Bates Stamped.  Oh, sorry.  It bears
4  production number CLEVE 251274 through 83.
5          Have you seen this document before?
6      A.   No.
7      Q.   Do you know what it is?
8      A.   I do not.
9      Q.   Do you know to what it refers?
10     A.   I'm sorry?
11     Q.   Can you recognize, for example -- it
12  says it's an event summary.  Can you tell -- for
13  example, looking at the first entry, can you
14  tell what that is, what it's describing?
15          MS. DEBROSSE ZIMMERMAN:  Object to
16  form.
17     A.   No.  The only thing I can tell you,
18  it's priority two on April 1st, 2017 and a time
19  and location.  I don't know what it is.
20     Q.   So you don't know whether this is --
21  reflects an arrest or an event of any type?
22     A.   I do not.
23     Q.   Do you know what SDO stands for
24  under "Type"?
25     A.   I do not.

1      Q.   Same thing about "Subtype," 1M, 2M?
2      A.   I do not.
3      Q.   That makes two of us.
4          - - - - -
5          (Thereupon, Moran Deposition Exhibit
6          18, Facebook Page Postings, was
7          marked for purposes of
8          identification.)
9          - - - - -
10     Q.   Mr. Moran, I've handed you what's
11  been marked as Exhibit 18.  Have you seen this
12  document before?
13     A.   I have.
14     Q.   This is your Facebook page?
15     A.   I believe so.
16     Q.   Are you aware that you maintain a
17  public Facebook page with photographs that can
18  be viewed by anyone with access to the internet?
19     A.   I am now.  I didn't know before.  I
20  thought it was just friends and family.  So you
21  have opened my eyes.
22          MR. ROMAN:  Thank you, Mr. Moran.  I
23  have no further questions.  Well, let me
24  rephrase.  Pending -- I have no further
25  questions until we get the documents that we

57 (Pages 222 - 225)

1  will be requesting.
2       Off the record, please.
3       (Recess had.)
4       EXAMINATION OF SCOTT MORAN
5  BY MR. BREWER:
6    Q.  Good afternoon.
7    A.  Good afternoon.
8    Q.  Detective Moran, my name is Matt
9  Brewer.  I represent Walgreens.  I'll ask some
10  follow-up questions.
11    A.  Okay.
12    Q.  The same rules apply from earlier
13  today.
14       Did you bring any documents here
15  with you today to the deposition?
16    A.  No.
17    Q.  Earlier you talked about your job
18  responsibilities and I want to just revisit some
19  of that testimony.
20       You mentioned that you -- you're
21  involved in crisis negotiation.  You also
22  mentioned that you, in your phrase, help getting
23  drug dealers off the street.
24       Do you recall that testimony?
25    A.  Yes.

1    Q.  Are there any other activities you
2  would include under your job description or your
3  job responsibilities?
4    A.  I believe I stated earlier, I'm also
5  an instructor for the police academy.
6    Q.  Any other job responsibilities?  I
7  want to make sure we just get everything out.
8    A.  That's it.
9    Q.  And with respect to getting drug
10  dealers off the street, can you talk about what
11  that entails?
12    A.  I can.  Which aspect?  I mean,
13  that's pretty broad.  I'm a narcotics detective.
14  You know, prior to 2013, where we were focused
15  on the death investigations, it was -- involved
16  drug complaints, persons selling drugs.  We
17  would conduct an investigation and attempt to
18  place that person in custody.  2013, it shifted,
19  and now we're looking to prosecute persons that
20  are selling drugs that are leading to deaths.
21  It's the same type.  We have to prove a drug
22  deal occurred in order to make these
23  convictions.
24    Q.  Is it fair to say, and if I'm
25  characterizing this wrong, tell me, that prior

1  to 2013 they were largely drug complaints that
2  caused the investigation into the source of the
3  drugs and post-2013 it was overdose deaths that
4  caused the investigation into the source of the
5  drugs?
6       MS. DEBROSSE ZIMMERMAN:  Object to
7  form.
8    A.  It's a two-part question.  If I can
9  answer the first part.
10    Q.  Sure.
11    A.  The first part, you were kind of
12  correct, kind of incorrect.  Not necessarily
13  drug complaints.  It could stem from arresting
14  someone and then keeping on going.  So it's not
15  necessarily a complaint per se that comes in.
16  So it's just whatever street or avenue lead you
17  to that.
18       And then to go to the second half of
19  your question, drug -- people are dying.
20  There's a lot of deaths.  We began to
21  investigate them.
22    Q.  Do you know why, in the beginning of
23  2013, you shifted focus to overdose deaths?
24    A.  We started seeing the numbers of
25  people dying from overdoses, it was a crime that

1  could be investigated, and we began to
2  investigate it.
3    Q.  Did you receive a direction or an
4  instruction to start focusing on overdose deaths
5  around that time?
6    A.  What do you mean by a direction
7  or -- I don't understand.
8    Q.  My understanding of your testimony
9  is that there was an organizational shift or a
10  mandate or a new approach to the drug problem by
11  focusing on overdose deaths, and I'm wondering
12  where that came from.
13    A.  It's higher than me.  I mean, deaths
14  were occurring.  We saw that deaths were
15  occurring.  The police department and the
16  medical examiner's officer partnered up to
17  figure out a way to dispatch us to the scenes to
18  investigate these deaths.
19    Q.  At some point the way you approached
20  your job changed a little bit because you were
21  focusing more on the overdose deaths.  And how
22  did you come to learn about that change?
23       MS. DEBROSSE ZIMMERMAN:  Object to
24  form.
25    Q.  I'm not trying to stump you.

58 (Pages 226 - 229)

Page 230

1   A.   No.  You have two questions there.
2   What was the first question?  Was -- I didn't
3   catch the first part.
4   Q.   It was more of a -- sort of an
5   assumption, which was that at some point the way
6   you approached your job started to change,
7   meaning you were focusing more on overdose
8   deaths than on -- on drug deals.
9   A.   Myself personally and my partner at
10  the time, our roles shifted.  Not necessarily
11  the narcotics unit.  We still have people in
12  NOLETF still conducting other investigations,
13  but we began -- we shifted to what our primary
14  responsibility was.
15  Q.   And how did you learn that your role
16  shifted?
17  A.   From our commander.  I mean, you
18  know, we all had meetings, tried to, you know,
19  implement a policy or a procedure.  Not so
20  much -- a policy was eventually implemented, but
21  initially it was just a procedure to have us
22  respond to the scenes.  We had to partner and we
23  had to meet with our prosecutor's office to make
24  sure we had applicable charges that could apply
25  to these.  We couldn't just without being able

Page 231

1   to charge someone with a crime.
2   Q.   And you talked a lot today about
3   fentanyl and carfentanil.  Can you talk about
4   your experience in trying to determine the
5   sources of carfentanil and fentanyl?
6   A.   When you say "sources," at what
7   source are you referring to, because there's
8   multiple sources in the drug game?  I mean,
9   there's multiple sources.  So which source are
10  we getting at?
11  Q.   I'm honestly interested in the
12  entire chain.
13  A.   Listen, I'm --
14      MS. DEBROSSE ZIMMERMAN:  Object to
15  form.
16  A.   I'm a City of Cleveland detective.
17  It's very difficult for me to go all the way to
18  Mexico.  If I have information that I can pass
19  on obviously to larger agencies that are
20  statewide, I can.  Our ultimate goal -- I mean,
21  obviously you want to go up, but the priority at
22  the time is to find the source of what led to
23  the fatal overdose.
24  Q.   Sure.
25  A.   I mean, your ultimate goal is

Page 232

1   obviously to go up the chain.  I mean, that goes
2   without saying in what I do.
3   Q.   Sure.  That's a fair point, and I
4   guess I'm only asking you about the sources that
5   you come across in the scope of your work.  And
6   so I understand that may not go back to Mexico
7   or other countries, or even places outside of
8   Ohio.  But in the scope of your work, can you
9   talk about your efforts to try to get to the
10  sources of fentanyl and carfentanil that have
11  caused overdoses?
12  A.   Obviously, you know, when we have an
13  overdose and -- and that's -- let's say we
14  arrest that person for that -- for that death.
15  We've met with our prosecutor's office, they
16  deem that we have enough and we're able to
17  indict that person and arrest them.  We always
18  conduct a follow-up interview.  I can't force
19  someone to talk.  If they exercise Miranda
20  rights, we stop.  They may talk and say, "I'm
21  just not telling you this."  So there's never a
22  time that we don't attempt it, but,
23  unfortunately, I mean, drugs are drugs.  Drug
24  people are violent people.  They're not going to
25  necessarily cooperate all the time.

Page 233

1   Q.   And you mentioned earlier that there
2   are diversion detectives in the narcotics unit
3   that specifically deal with prescription pill
4   crimes.  You don't necessarily work hand in hand
5   with them?
6   A.   No.
7   Q.   Is your primary focus on -- let me
8   ask it differently.
9       What drugs do you primarily focus
10  on?
11  A.   Our acronym is HIDI, which is
12  actually -- I mean, you can kind of -- I mean,
13  it's heroin, fentanyl, carfentanil, whatever is
14  causing someone to die from this or nearly die
15  from this.
16  Q.   You testified earlier that you've
17  investigated over 800 fatal overdoses, and since
18  2013, over a thousand non-fatal overdoses.
19  A.   I think maybe a word got
20  misconstrued on the 800.  You say
21  "investigated."  Some of these cases, it's a
22  small investigation, which you're responding to
23  the scene, but it's not a full tilt, we're going
24  to prosecute, investigation.  We may go and
25  there's just nothing there that we can do.

59 (Pages 230 - 233)

Page 234

1    So technically, yes, I investigated,
2  but it's not a -- it may not be a case that's
3  going to go anywhere.  So responded to might be
4  more of a fair statement there.
5        I've also responded to over a
6  thousand non-fatal overdoses where we're trying
7  to get persons into treatment, obviously trying
8  to find sources of drugs, trying to find if we
9  can link a non-fatal to a fatal overdose.
10    Q.   And to make sure I'm drawing the
11  distinction properly between responded to versus
12  investigated, if you've investigated a case, it
13  means that you've looked into trying to
14  determine the source of the drug that caused the
15  overdose and that's not necessarily the case if
16  you've responded to it?
17    A.   Well, again, it's investigated.  We
18  arrive on scene.  We conduct an investigation.
19  So it's -- when one of these cases is brought
20  for prosecution, it's a full-blown investigation
21  that could take months.  We've had one that took
22  well over a year.  So an investigation could be
23  as simple as two hours on scene, examining what
24  evidence or what lack of evidence is there.  I
25  mean, there's cases that a person passes away

Page 235

1  and there's ten people there, and we get there
2  and there's not a single spec of evidence, cell
3  phones are gone and no one is telling us
4  anything.  It's still an investigation, but it's
5  not an investigation that's potentially going to
6  lead to prosecution.
7    Q.   Understood.
8        Is it fair to say, then, that you
9  attempted to track this source of drugs that
10  caused over 1,800 fatal and non-fatal overdoses?
11    A.   You could say we attempted.  I mean,
12  we responded.  If the evidence was there, we
13  pursued it.
14    Q.   Do you know if any of those
15  overdoses are the result of conduct by any
16  pharmacies that dispense prescription opioids?
17    A.   Which overdoses are we referring to?
18    Q.   Fatal and non-fatal.
19        MS. DEBROSSE ZIMMERMAN:  Object to
20  form.
21    A.   So do I know if any of the cases
22  I've responded to were a direct result of a
23  pharmacy?  Do I understand the question?
24    Q.   Yes.  In trying to track the source
25  of the drugs that caused the overdose, have you

Page 236

1  tracked any of them back to pharmacies that
2  dispense prescription opioids?
3    A.   We have not.
4    Q.   Have you tracked any of the drugs
5  that have caused overdoses to manufacturers or
6  distributors of prescription opioids?
7    A.   No.
8    Q.   And earlier you testified that
9  you've seen plenty of opportunities in your
10  career where people have transferred from
11  lawfully prescribed opioids to being cut off and
12  then transferring to heroin.  Do you recall
13  that?
14    A.   Yes.
15    Q.   Do you know if people that
16  transferred from lawfully prescribed opioids to
17  heroin did so as a result of any conduct by
18  pharmacies that dispense prescription opioids?
19        MS. DEBROSSE ZIMMERMAN:  Object to
20  form.
21        You may answer, Detective.
22    A.   I'm trying to understand the
23  question.  So what were -- can you ask it again?
24  I'm sorry.
25    Q.   Sure.

Page 237

1        I'm asking -- we're talking now
2  about the people you testified about earlier,
3  who you seen transfer from lawfully prescribed
4  opioids to being cut off and then transferring
5  to heroin.
6    A.   Okay.
7    Q.   And I'm asking if -- whether you
8  know if these people transferred to heroin as a
9  result of any conduct by pharmacies that
10  prescribe lawful prescription opioids.
11        MS. DEBROSSE ZIMMERMAN:  Object to
12  form.
13    A.   I don't know.  I mean, obviously if
14  a prescription is stopped or a prescription is
15  not filled, that person can't get that
16  prescription anymore.  So I don't know.  I don't
17  know what the reason that the person no longer
18  was receiving their prescription was.
19    Q.   But you're not aware of any conduct
20  by the pharmacy that would have caused that
21  person to transition from lawful prescription
22  opioids to heroin?
23        MS. DEBROSSE ZIMMERMAN:  Object to
24  form.
25    A.   I am not.

60 (Pages 234 - 237)

Page 238

1    Q.   Earlier you saw Exhibit 8, and I
2 want to just revisit that for a second.  Exhibit
3 8 is a little tricky because we don't have page
4 numbers, so I want to try to be as descriptive
5 as I can.
6    A.   Okay.
7    Q.   Well, we can just start by going to
8 the page that you saw earlier.  It's a big -- on
9 the left side there's a big pile of powder and
10 it says "heroin."
11    A.   Um-hum.
12    Q.   It's maybe 35 percent of the way
13 through.
14    A.   I'm aware of the page, so if you
15 want to ask the question.
16    Q.   Before I do that, the presentation
17 in general, you mentioned that you played a
18 role -- you contributed to preparing the
19 presentation; is that right?
20    A.   I was provided an original
21 PowerPoint, which I presented -- the first time
22 I ever presented, I presented off of their
23 PowerPoint, and then I tweaked it to add case
24 studies, some of the stuff that's worked for us.
25 So a big portion was provided to me, but I was

Page 239

1 able to tweak it and make it my own
2 presentation.
3    Q.   And did you also provide some of the
4 photos that are included in here?
5    A.   I provided some on the medical
6 examiner's office.  I think I testified earlier
7 I co-presented with one of the investigators.
8 She provided some of the photos as well.
9    Q.   Okay.  So I want to go back to that
10 page we were just talking about with the big
11 pile of powder and it says "heroin."  And I
12 think you were asked about this page before, and
13 the caption here is "Possible evidence sought,"
14 and it lists "drugs, heroin, fentanyl,
15 prescription."
16        Do you see that?
17    A.   I do.
18    Q.   You testified earlier that
19 prescription drugs is possible evidence and that
20 you would collect that as part of your standard
21 routine?
22    A.   I wasn't fully --
23        MS. DEBROSSE ZIMMERMAN:  Object to
24 form.
25    Q.   If I mischaracterized it, please

Page 240

1 correct me.
2    A.   We're looking for prescription pills
3 as well, but there can also be labels -- when I
4 present, there could be labels on prescription
5 bottles, which could indicate -- if the person
6 was found by themself and we believe there was
7 someone with them, it would maybe tie us to who
8 was possibly with that person when they
9 overdosed.  So we're looking at names on labels,
10 we're looking for prescription pills as well.
11    Q.   Sure.
12        And then if you go one, two, three,
13 four, six pages later, there's a slide titled
14 "Case Study"?
15    A.   Yes.
16    Q.   Is this one of the case studies that
17 you prepared?
18    A.   Yes.
19    Q.   And these are photos you provided?
20    A.   Not the first one.
21    Q.   The next page has a different layout
22 to it, but it's titled "Cleveland Police
23 Department dead body suspected heroin overdose
24 contraband seized."
25    A.   Yes.

Page 241

1    Q.   This is your slide?
2    A.   It's a slide that's in the
3 PowerPoint.  I didn't actually -- I didn't
4 prepare that PowerPoint, but I incorporated that
5 PowerPoint into the presentation.  Well, not --
6 we'll get to the next -- some of it I did, but
7 some of the initial pictures and whatnot.
8    Q.   What I'm really interested about is
9 what follows, and it looks like it's a specific
10 case study and there's names of lieutenants and
11 detectives.  Your name is listed on this next
12 page.
13    A.   Right.
14    Q.   So does that mean that this case
15 study we're looking at is one that you were
16 personally involved in?
17    A.   Yes.
18    Q.   Do you recall this specific case?
19    A.   I do.
20    Q.   Can you tell me at a high level what
21 you recall, meaning what happened?
22    A.   There's a lot.  I mean --
23    Q.   Sorry.  Go ahead.  I'll ask specific
24 questions.
25    A.   Yeah.  This is -- I mean, it's a

61 (Pages 238 - 241)

Page 242

1 case, and these cases you don't solve overnight.
2 I mean, ideally you wish you could, but this was
3 a case where someone died of a suspected
4 overdose.  We were able to identify the sources
5 of the drugs that led to this death.  We were
6 able to arrest those persons and prosecute.
7     Q.    And in this case what were the drugs
8 that led to the death?
9     A.    There was a -- I'd have to review
10 it, but there's a toxicology report that's
11 listed in here.
12    Q.    Sure.
13    A.    We've had some that were heroin,
14 fentanyl.  I'd have to see exactly what this one
15 was.
16         This one, if you flip through all
17 the pictures and whatnot, it's the second last.
18 It's after this toxicology report.  You have to
19 go through all -- there's quite a few.
20    Q.    This one (indicating)?
21    A.    Yes.  That's it.
22    Q.    And just for the record, we're on
23 the slide with the title that reads "Cause of
24 Death"?
25    A.    Correct.  And in this particular

Page 243

1 case it was acute heroin, alprazolam and
2 diazepam toxicity.  It was an accidental death.
3     Q.    And I want to go back a few slides
4 in here.  There are a series of photos that are
5 taken from different rooms in the house.
6     A.    Correct.
7     Q.    Is it standard for you to take these
8 types of photos?
9     A.    Yes.
10    Q.    And I'm looking at one that reads,
11 "Kitchen window sill, cigarette wrapper and
12 spoon"?
13    A.    Which one is it?
14    Q.    This one (indicating).
15    A.    Kitchen bag and window sill next to
16 kitchen, that one, or you got the wrapper one?
17    Q.    Wrapper and spoon.
18    A.    "Kitchen window sill, cigarette
19 wrapper and spoon."
20    Q.    And what's your rationale or
21 reasoning for taking a photo like this?
22    A.    We don't know what's going to play a
23 role in these cases.  It's best to have more
24 pictures than not enough.  In this particular
25 case, this picture was irrelevant.

Page 244

1     Q.    Did you take the photo?
2     A.    I did not take these photos.
3     Q.    And going three slides over, there's
4 a photo from the northeastern bedroom and it's a
5 photo of the dresser?
6     A.    Correct.
7     Q.    Did you take this photo?
8     A.    I didn't take any of these photos.
9     Q.    And did this photo prove to be
10 relevant?
11    A.    It just showed -- I believe it had
12 the decedent's name, showed he had -- he was in
13 that house, just showed some of the other
14 medications that could have been in his tox
15 reports when he was -- when the toxicology came
16 back.
17    Q.    But none of these drugs were the
18 cause of his death, were they?
19         MS. DEBROSSE ZIMMERMAN:  Object to
20 form.
21    Q.    I'm sorry.  Did you respond?
22    A.    I did not.  I mean, as I read
23 earlier, the cause of death was heroin,
24 alazopram and diazepam, accidental.
25    Q.    And that's not any of these drugs?

Page 245

1     A.    It is not.
2     Q.    Are you -- do you consider yourself
3 an expert on prescription opioids?
4     A.    On prescriptions, no.
5     Q.    Do you consider yourself an expert
6 on illegal opioids, the ones we've talked about,
7 heroin, fentanyl, carfentanil?
8     A.    Expert is a word that, you know,
9 some people may use.  I think I'm good at what I
10 do.
11    Q.    And you've received training on
12 that?
13    A.    I have.
14    Q.    And your career, your experience is
15 based around investigating sources of that?
16    A.    Yes.
17    Q.    But not for prescription opioids?
18    A.    No.
19         MR. BREWER:  I think we can take a
20 break.  I think that's all I have.
21         EXAMINATION OF SCOTT MORAN
22 BY MR. GOLDSTEIN:
23    Q.    Hi, Detective Moran.  My name is
24 Josh Goldstein.  As I said before, I represent
25 some of the defendants in this litigation.  I'm

62 (Pages 242 - 245)

Page 246

1 going to ask you a few additional questions.
2 Thanks for bearing with us today.
3         Can you name any of the -- so we've
4 talked about a number of prescription opioids
5 that you've encountered in the course of your
6 police work.  Do you recall that?
7     A.   I do.
8     Q.   Can you name the manufacturers of
9 any of those products?
10     A.   I cannot.
11     Q.   Any of the distributors?
12     A.   I cannot.
13     Q.   Do you know how any of those
14 products are marketed?
15     A.   I don't.
16     Q.   Do you have an understanding of what
17 I mean when I refer to pharmaceutical marketing?
18     A.   I do, but it's probably wrong, so --
19     Q.   Fair enough.
20         Have you ever reviewed any marketing
21 materials produced by any of the manufacturers
22 in this case?
23     A.   I have not.
24     Q.   Have you ever investigated any of
25 the manufacturers in this case in connection

Page 247

1 with their marketing materials?
2         MS. DEBROSSE ZIMMERMAN:  Object to
3 form.
4     A.   I have not.
5     Q.   Are you familiar with the
6 distinction between branded and generic
7 prescription opioids?
8     A.   I think I am.  I believe so.
9     Q.   What's that understanding?
10     A.   Just the generic name for whatever
11 drug was originally manufactured, just another
12 cheaper version.
13     Q.   We talked about briefly your police
14 work in the narcotics unit prior to 2013.  What
15 was the -- was there a particular area of focus
16 you had during that time?
17     A.   When you say "area of focus,"
18 what -- because I hear "area" and I think one
19 thing, so I think we're on different pages.  So
20 when you say "area of focus," what exactly do
21 you mean?
22     Q.   Sure.  Well, let's start with what
23 do you think when --
24     A.   When I hear "area," I think of a
25 specific neighborhood or a specific place, so I

Page 248

1 think that's not the direction you're going, so
2 if you want to explain a little bit more.
3     Q.   Sure.  Well, let's start with that.
4 Were there particular areas that you focused
5 your police work on?
6     A.   No.
7     Q.   And that covers the whole time when
8 you were in the narcotics unit?
9     A.   Our job was, you know, mid to upper
10 level drug dealers or wherever it took us.  We
11 weren't doing street corner things, you know,
12 driving around looking.  We were doing bigger
13 cases and making purchases.
14         With those mid or upper level drug
15 dealers, were there particular drugs that you
16 were focused on in particular?
17     A.   There were.  I mean, obviously it's
18 whatever direction our case would take us, you
19 know.  And primarily when I first was down
20 there, there was a lot of cocaine, crack
21 cocaine.  2008, 2009 or so, roughly, we started
22 seeing a shift in heroin being more prevalent.
23     Q.   Are there any particular drug
24 arrests during that time that stand out in your
25 mind?

Page 249

1     A.   By who?
2     Q.   Were there cases that you felt were
3 particularly important during that time?
4     A.   I mean, are you talking to me
5 personally or a unit or --
6     Q.   Let's start with your police work
7 personally.
8     A.   I mean, to me, I take pride in what
9 I do.  Every case is important, being a felony 5
10 or an MDO.  But yeah, we had some great arrests
11 during that time.  We had some awesome arrests.
12     Q.   What are the ones that you recall?
13     A.   I mean, you're going back years and
14 we were out there every night doing it.  A
15 couple kilos of coke, a couple kilos of heroin,
16 multiple ounces of coke, multiple ounces of
17 heroin.  I mean, we had a really good unit that
18 was proactive in doing what we do.
19     Q.   Were there any -- now speaking about
20 your department as a whole, were there any that
21 were sort of particularly successful cases?
22     A.   When you say "successful" --
23     Q.   How do you measure success?  Is it
24 in the amount of drugs seized, the number of
25 arrests made, the level of the arrest?

63 (Pages 246 - 249)

Page 250

1      MS. DEBROSSE ZIMMERMAN:  Object to
2  form.
3      A.   I mean, a successful case is a case
4  that you get prosecution on, no matter it being
5  a low level or upper level.  I mean, obviously
6  if you're getting -- I mean, it goes without
7  saying.  You know, if you get a larger case,
8  obviously you're -- it's a great case and you're
9  cutting off some supply.  Or if you get a guy
10  here -- I mean, if you get an upper level,
11  you're affecting the balance of how the drug
12  system works.  So if you get a guy with even
13  half a kilo of heroin, that guy has got multiple
14  people he sells to, so you're taking a little
15  ding out of one drug trafficking organization.
16  So, I mean, obviously the bigger the case, the
17  happier you are, but when you say "successful,"
18  in my eyes a successful case is something that
19  ends in a prosecution, be it a felony 5 or
20  felony 1.
21      Q.   Sure.  That makes sense.
22          So is the sort of ultimate -- strike
23  that.
24          How do you identify the upper levels
25  of drug trafficking activity?

Page 251

1      A.   How do I identify it?
2      Q.   How do you determine when you've
3  made an arrest of a -- of a high-level drug
4  trafficker?
5      A.   It's -- that's a difficult question.
6  You may have a high-level drug dealer that you
7  know is a high-level drug dealer based off of
8  prior investigations or based off of informant
9  information.  You may get that guy -- you may
10  get him when he's out of his supply.  You didn't
11  necessarily get him that good but you were able
12  to put a case on him.  You may know that person
13  is a multi-kilo dealer.  You may have only got
14  him with a half ounce because he's waiting for
15  his supply.  So that's a very difficult question
16  to answer as far as how that goes.
17      Q.   Are there times that you recall
18  where you were involved or your -- the narcotics
19  unit was involved in an arrest of a high-level
20  dealer where you saw results translate on the
21  street right away, whether in terms of drug
22  activity or overdoses?
23      A.   That's a two-part question, so let's
24  back up to the first part.
25      Q.   Sure.

Page 252

1      A.   Absolutely.  We arrested a guy off a
2  wire case, seized seven kilos of heroin, almost
3  a million dollars.  It wasn't my -- it was a
4  task force case.  That affected the city.
5          Now, when you are going into
6  overdoses, I mean, break that down.  Sure, it
7  could affect overdoses.  However, for us, 2013
8  is when we started looking really hard at the
9  overdoses.  So when that case happened, you're
10  affecting -- you're affecting everyone, from the
11  guy who sells a half kilo to an ounce to that
12  guy that's selling 40 bucks to that guy that's
13  going to eventually overdose.  So that goes
14  without saying.  When you take a major leg off a
15  drug trafficking organization, you're going to
16  affect it all the way down to the person that
17  potentially could overdose.
18      Q.   When you say you started focusing on
19  the drug overdoses in 2013, what would you say
20  the focus was on prior to that?
21      A.   Well, that's when we were just
22  working normal mid to upper level drug cases in
23  the narcotics unit.
24      Q.   So it was sort of on the supply?
25          MS. DEBROSSE ZIMMERMAN:  Object to

Page 253

1  form.
2      A.   To get as much drugs from that
3  person was obviously the ultimate goal.
4      Q.   And I think you mentioned that the
5  case you were recalling in particular involved a
6  wire tap case.  Is that a tactic or a tool that
7  you used in connection with your investigative
8  work of mid and upper level drug dealers?
9      A.   When you said "you," I'm going to
10  say no.  I've never been an affiant on a Title
11  23.
12      Q.   Fair enough.  That you're aware of,
13  the narcotics unit?
14      A.   It is an investigative tool, yes,
15  sir.
16      Q.   And during -- with respect to
17  investigations of mid and upper level drug
18  dealers, what are some of the other tools that
19  the narcotics unit utilizes?
20          MS. DEBROSSE ZIMMERMAN:  You may
21  answer to the extent it doesn't violate
22  privilege.
23          Go ahead, Detective Moran.
24      A.   I mean, there's a lot of different
25  tools.  I mean, it could go to something that's

64 (Pages 250 - 253)

Page 254

1 just me putting a hoodie on and a baseball hat
2 and going and sitting and watching a house.
3 That's a tool, watching what this person does.
4 I mean, when you're talking tools, I mean, it's
5 just like a carpenter building a house.  He's
6 got a tool belt with a lot of tools in that tool
7 belt.  I'm a narcotics detective.  I've got a
8 lot of tools in my tool belt, too, and some of
9 them we like to keep close to the hip.
10      Q.   Sure.
11           In terms of -- so a wire tap is one
12 form of surveillance, correct?
13      A.   Electronic surveillance on
14 telephones, absolutely.
15      Q.   Are there other tools related to
16 surveillance in particular that you used when
17 you were targeting mid and upper level dealers?
18      A.   There are.
19      Q.   What are they?
20      A.   Other forms of electronic
21 surveillance.  I mean, we're getting into
22 investigative tools of our trade.  That's --
23           MS. DEBROSSE ZIMMERMAN:  We're going
24 to assert the same privilege just throughout
25 this testimony as it relates to investigative

Page 255

1 privilege and not revealing investigative
2 techniques.
3      Q.   Just to be clear, I'm just trying to
4 understand where that line exists.  Clearly you
5 talked about they utilize wire tap surveillance.
6 I'm not clear on what's proprietary to the
7 narcotics unit, what is sort of a widely
8 accepted, widely known practice.
9      A.   Sir, I have a very dangerous job.
10 There are things that I do that put my life on
11 the line every single day.  When I start putting
12 investigative techniques out there, it puts me
13 in a spot that maybe I don't want to be in, to
14 be perfectly honest with you.  I study
15 electronic surveillance.  We're all adults in
16 this room.  I think you could figure out what
17 that is, but once that starts getting out there,
18 when I'm doing certain things, that puts my life
19 in jeopardy.
20      Q.   To be clear, I'm certainly not
21 trying to, with this question, get you to
22 testify about things that are not generally
23 known, generally accepted police practices.  So
24 are there other forms of electronic surveillance
25 that you would say are generally accepted,

Page 256

1 generally known that you utilize in targeting
2 high level drug dealers?
3      A.   I can't answer that question because
4 I don't know what some drug dealers know and
5 what some drug dealers don't.  The less that I
6 can put out there, the more comfortable I am
7 doing my job.
8      Q.   With respect to your work starting
9 in 2013 -- is that when you started with HIDI,
10 2013?
11      A.   That's when the unit was more or
12 less created, yeah.
13      Q.   And you were there from the outset?
14      A.   From the beginning.
15      Q.   Did the tools that you used change
16 at all?
17      A.   Tools are always there.  You just
18 got to apply them to the case that's needed.
19      Q.   That's fair.  Let me ask a better
20 question.
21           Did you apply the same tools in your
22 work after 2013 as you did prior to 2013?
23      A.   There's more tools that we use more
24 often than others, which are basically the power
25 of the search warrant.  There's other

Page 257

1 investigative tools that requires me to be in
2 the field and do things.  But what I've done
3 over the course of my 16 years of drug work has
4 pretty much stayed the same, just some things
5 are applied differently in certain cases than
6 others.
7      Q.   Since 2013, in your work with HIDI,
8 have you been involved in any cases that
9 involved wire tap surveillance?
10      A.   No.  I don't work the larger cases
11 anymore.  We do the -- you know, the guy that's
12 selling 10 bucks worth of dope that's killing
13 somebody.  That's the stuff I'm doing.
14      Q.   And I think you talked a little bit
15 about this in your prior testimony, but when you
16 make an arrest or when you identify someone who
17 is selling $10 worth of dope, what happens next?
18      A.   That's a very, very broad question.
19      Q.   Let me ask it this way:  Are there
20 times that, rather than arresting that dealer,
21 you place them under surveillance?
22      A.   We do conduct surveillance, and
23 there are times that conducting surveillance and
24 maybe the pieces of the puzzle don't fit and we
25 can't put a case -- I mean, but we still try.

65 (Pages 254 - 257)

Page 258

1 We still put surveillance on a guy if we have
2 the time and the opportunity to do so.
3 Absolutely.  We stay -- you have to understand
4 how many people have died and how busy we are.
5 There are some cases that we have to jump on
6 immediately because we know who that dealer is
7 and we know he's responsible for three or four
8 bodies.  There's other cases that may have to go
9 on the back burner until we got this guy locked
10 up and then we can go back and try to go after
11 that guy.  But at that point he might have
12 changed locations, changed cars, and that makes
13 it a little bit more difficult.  But with the
14 amount of people that die, we got to go on the
15 ones that we have a lead on that we can act on
16 immediately.
17     Q.   So fair to say that's the focus of
18 HIDI is targeting the immediate seller of a drug
19 that led to the overdose?
20     A.   I wouldn't say it's the focus.  I
21 mean, there's other cases that take some time
22 to -- I mean, if there's something that we can
23 do immediately through some of the tools that we
24 use, absolutely.  In some cases we're at the
25 mercy of receiving results back from various,

Page 259

1 you know, agencies and other places.  So some
2 cases may take a little bit longer to prosecute
3 than others.
4     Q.   Who in the city of Cleveland would
5 you say is responsible for targeting high-level
6 heroin dealers?
7     A.   We have, you know, multiple task
8 forces that still do, you know, bigger cases.
9 You have FBI task forces, DEA task forces.  You
10 have the NOLETF task force.  I mean, there's
11 still agencies in -- within the city that do
12 that.  You know -- however, you know, us, we
13 shifted to the overdose deaths because there's
14 just so many of them.
15     Q.   I think you've referred to those
16 drug dealers that sell directly to individuals
17 who overdose and have fatal overdoses before as
18 killers.  Is that consistent with your belief
19 about those individuals?  Do you think of them
20 as murderers?
21         MS. DEBROSSE ZIMMERMAN:  Object to
22 form.
23     A.   I never said "killer" and I never
24 said "murderer."  That never came out of my
25 mouth.  I said they provided a drug that

Page 260

1 actually led to someone's death.
2     Q.   Okay.
3     A.   I'm just saying I never said that.
4 If they're convicted, they're convicted of
5 involuntary manslaughter.  You know, if you want
6 to label them a murderer or killer, that's on
7 you.  I look at them as drug dealers that sold
8 drugs that led to a death.
9     Q.   We've talked about diversion today.
10 What are the different ways that -- well, strike
11 that.
12         What are the different types of
13 diversion that you've encountered in your police
14 work, whether it was in the narcotics unit or
15 HIDI in particular?
16         MS. DEBROSSE ZIMMERMAN:  Object to
17 form.
18     A.   See, we -- I believe I said earlier,
19 we get tied up in that diversion word.  If I got
20 someone selling pills and I'm able to buy pills
21 or put a case on that person, I am.  When it
22 comes to other types of diversion, that's where
23 we have another unit for that.
24     Q.   How are the -- how are cases
25 referred to that unit?

Page 261

1     A.   I don't know.
2     Q.   Have you ever referred a case to --
3 and by "that unit," this is Detective Patena and
4 Detective Prince?
5     A.   Right.
6         If I've gotten information regarding
7 bad scripts or maybe a -- what we believe to be
8 a doctor that may prescribe too easily, you
9 know, I'll relay that information to them.
10     Q.   Can you think of an instance in
11 which that's occurred?
12     A.   Not specific instances, no.
13     Q.   So you don't recall identifying a
14 particular doctor that you thought prescribed
15 too easily?
16     A.   Not a specific instance.  I mean,
17 over the course of years I have a handful of
18 times.
19     Q.   Do you remember when the last time
20 that was?
21     A.   Actually, I do.  It was -- we were
22 at a -- what we believed to have been a fatal
23 overdose death, and the boyfriend that talked
24 about a doctor that she used to get pills from
25 that he believed -- I mean, obviously she was

66 (Pages 258 - 261)

Page 262

1 deceased -- I couldn't find out from her -- that
2 he believes may have overprescribed that could
3 have led to her turning to fentanyl, heroin. So
4 it was before -- maybe around spring of this
5 year. I had a doctor's name and just kind of
6 said, you know, have you ever heard of this guy,
7 and the guy had been around for a while, so, I
8 mean, he was familiar, but I don't recall the
9 doctor's name.
10    Q.   When you say "he was familiar," he
11 was familiar to you?
12    A.   Not to me, no. I mean, I don't work
13 doctor cases, but --
14    Q.   To the detectives you referred the
15 case to?
16    A.   Yeah.
17    Q.   Do you know if an arrest has been
18 made in that case?
19    A.   I don't know. I don't think so. I
20 don't know, though. And, again, that was just
21 based off of a belief of a -- of, you know, a
22 boyfriend who just lost his loved one to an
23 overdose. I mean, he was talking.
24    Q.   Sure. And you think, in the course
25 of your police work and your time in the

Page 263

1 narcotics unit or with HIDI, that's happened a
2 handful of times?
3    A.   I mean, through the course of, you
4 know, my entire career. I mean, through HIDI,
5 you know, once or twice, not a whole lot of
6 times. I mean, I didn't get a lot of doctor
7 cases.
8    Q.   We talked earlier about ODMAP and
9 Case Explorer. Do you know if, other than the
10 Cleveland Police Department, any other law
11 enforcement agencies rely on those databases?
12    A.   Yeah, they do. That's the whole --
13 as I was trying to explain, that's an
14 information-sharing database, so there's
15 suburbs, county sheriffs. There's other
16 departments that utilize it.
17    Q.   Anyone else?
18    A.   I don't know. Parma. Parma
19 Heights. I mean, various suburbs. I mean,
20 ideally we would love to get everyone in the
21 county on it, but that's their department's
22 ultimate decision, not ours or HIDTA's. I mean,
23 the more people we get, the more -- on the
24 database, the more information that's shared
25 that helps us, you know, track cases.

Page 264

1    Q.   Are there agencies you can think of
2 in Cuyahoga County that aren't in that database?
3    A.   Again, I don't know the specific
4 agencies on there. I mean, the goal was, when
5 it was laid out, to try to get everyone on it.
6 Who's on it and who's not, I mean, I worry about
7 us and my guys, and we put our stuff in and I
8 can't -- I don't know what the rest of the
9 county does.
10    Q.   Sure.
11       What about other counties in Ohio?
12    A.   Ideally, ODMAP -- there are HIDTAs
13 in a lot of states. I believe he referred to
14 something -- a trip I was going to take or
15 something, but ideally, you know, HIDTA wants to
16 get the whole country on it, as many people as
17 possible. You know, the ODMAP is a way to live
18 track, to see if you have a problem in your
19 community. I mean, if it gets put in
20 immediately, you can see we just got four
21 overdoses in this four blocks. We have a
22 problem. And then the Case Explorer, they go
23 hand in hand, so you can share information. So
24 ideally, the more people that's on here, the
25 more beneficial it is to law enforcement, but,

Page 265

1 you know, unfortunately, you can't force a
2 department to utilize something that's not -- if
3 they don't want to do it.
4    Q.   Sure.
5       Can you just explain a little bit
6 more about what the benefits are of being part
7 of that database?
8    A.   It's -- it's a searchable database.
9 So if I go to a fatal overdose and we obtain --
10 maybe there's not something concrete in a text
11 message conversation where someone is saying,
12 hey, I need a 20, meet me here, but maybe
13 there's a list of four or five phone numbers.
14 The last typically -- I don't know if you've
15 ever watched the news or you've ever seen when
16 people die from overdoses. I'm going to assume
17 you haven't. They die quickly, very, very
18 quickly. So, generally, one of the last numbers
19 called, it's a good possibility that that's that
20 drug dealer. So when you have a searchable
21 database and maybe I went to a non-fatal
22 overdose two days ago and I obtained that drug
23 dealer's phone number from the person that
24 survived, or it happened in another city, I can
25 take the last couple phone numbers I see, plug

67 (Pages 262 - 265)

Page 266

1 them in and search them, and go, look at this,
2 this phone number caused an overdose two days
3 ago.  There's a good chance that this was the
4 last number this guy called before he died
5 instantly from an overdose.  I bet you this is
6 my guy.
7          -  -  -  -  -
8          (Thereupon, Moran Deposition Exhibit
9          19, NADDI Training Schedule dated
10         August 20, 2018, was marked for
11         purposes of identification.)
12         -  -  -  -  -
13     Q.   Showing you a one-page document
14 that's been marked Moran Exhibit 19, do you
15 recognize this document?
16     A.   Oh, I do.
17     Q.   What is it?
18     A.   I was asked to speak at a NADDI --
19 which I don't know what that stands for.  I was
20 asked just to give a one-hour -- quick, one-hour
21 presentation, kind of a layout of what the
22 Cleveland Police Department does for
23 investigations.
24     Q.   Does the National Association of
25 Drug Diversion Investigators sound right?

Page 267

1     A.   That sounds right.
2     Q.   Do you remember who asked you to
3 give the presentation?
4     A.   Detective Prince and Detective
5 Patena.
6     Q.   Was that your only involvement with
7 this organization?
8     A.   Yeah.
9     Q.   You weren't familiar with them
10 before that time period?
11     A.   I've seen the acronym, I mean, but I
12 didn't -- I mean, I don't do diversion, so I
13 don't know.
14     Q.   Understood.
15         Do you recall giving this
16 presentation?
17     A.   Yeah.  It was basically just, you
18 know, a condensed version of this PowerPoint
19 that I generally present on, just a quick,
20 one-hour, just an overview of how we prosecute
21 and some tools.
22     Q.   Who were you presenting to?
23     A.   I was under the assumption it was
24 mostly law enforcement there.  I didn't ask who
25 was in the crowd.  I was asked by Detective

Page 268

1 Prince and Patena.
2     Q.   The presentation you gave, was it a
3 condensed version of Exhibit 8?
4     A.   Yeah.
5     Q.   I assume, by the way, the exhibit,
6 when you give this presentation, it's not --
7 it's redacted, or is it?
8     A.   There's redactions.
9     Q.   When you give it?
10     A.   When I give it, yeah.  Well, I mean,
11 there's certain redactions.  There's one --
12 there's a couple slides that we don't include in
13 the PowerPoint, but as far as faces and, you
14 know, the brutal honesty of what a heroin death
15 looks like, that's not redacted.  There's a
16 warning, you know, before I present it that
17 there's going to be some bad stuff here, but
18 that's what we live in every day.
19     Q.   Understood.
20         And did you understand that the
21 purpose of this training was to help law
22 enforcement better do their jobs?
23     A.   You know, I was asked to give a
24 quick hour presentation on kind of the layout of
25 what we do and how we investigate.  You know, I

Page 269

1 didn't even attend the entire seminar.  I came
2 for my one hour and went back home.
3     Q.   But was that your understanding of
4 the one-hour presentation you did?
5     A.   Yeah.
6     Q.   You can put that aside.
7         How long does a typical HIDI
8 investigation last that you would be involved
9 with?
10         MS. DEBROSSE ZIMMERMAN:  Object to
11 form.
12     A.   You're saying the word "typical."
13 Nothing is typical, I mean, unless -- again, I
14 explained earlier -- you know, he was asking me
15 about investigations.  There may be an
16 investigation that, you know, our only portion
17 of that investigation is to respond to the scene
18 and then hope that maybe some information comes
19 in down the line; however, if you're bringing a
20 case to prosecution -- you know, we had a case
21 that took over a year to prosecute.  I mean, so
22 there's absolutely nothing typical at all about
23 what we do.  You can't put any type of average
24 on it at all.
25     Q.   Are there challenges in -- and this

68 (Pages 266 - 269)

Page 270

1 applies to your work, generally whether it's the
2 narcotics unit or HIDI in particular. Are there
3 challenges with respect to policing fentanyl and
4 carfentanil that are unique to those drugs?
5        MS. DEBROSSE ZIMMERMAN: Object to
6 form.
7        A. When you say "challenges," what
8 exactly do you mean by "challenges"?
9        Q. Are there obstacles that are present
10 that aren't typically present with respect to
11 other drug investigations?
12        A. That's a hard question to answer
13 because I don't understand where you're going
14 with challenges and obstacles. I will tell you
15 this: One of the challenges or one of the
16 obstacles -- I wouldn't necessarily call it
17 challenges or obstacles -- I'd call it dangers.
18 Every day I go into a room that potentially a
19 white powder could be pumped into my nose that
20 could kill me. So if you want to call that a
21 challenge or an obstacle. I'm dealing with a
22 drug that can get on my skin, go inside and
23 ultimately cause my death, if I don't know it's
24 there. So, I mean, I wouldn't call it a
25 challenge or an obstacle. I would call it a

Page 271

1 danger of dealing with such a dangerous
2 chemical.
3        Q. Is that a danger that's unique to
4 fentanyl and carfentanil?
5        A. Yes. It's highly potent and highly
6 toxic.
7        Q. What sorts of safety precautions do
8 you take in light of those dangers?
9        A. What don't I? Masks, gloves,
10 glasses, goggles so it doesn't get in my eyes.
11 Whatever I can do to make sure that I go home at
12 the end of the day without having someone
13 shoving Narcan up my nose.
14        Q. And is that generally you put on
15 that protective equipment when you have
16 identified the powder or you respond to every
17 overdose in --
18        A. We'll assess the scene and see. I
19 mean, put it this way: We chase drug dealers
20 that are selling fentanyl and running instead of
21 dropping their fentanyl or throwing it in our
22 faces trying to kill us. That's how dangerous
23 this drug is.
24        Q. Do you -- relatedly, when you
25 started at HIDI, when other detectives start at

Page 272

1 HIDI, do they receive training, you know,
2 related to that work in particular?
3        A. When you say "work in particular,"
4 you mean what exactly, work -- the crime scenes?
5        Q. No. All -- related to any aspect of
6 HIDI's work.
7        A. We receive training, yeah.
8        Q. Is it formal training?
9        A. It was through the medical
10 examiner's office. It was through Ohio BCI.
11 But yeah, we received training when we started
12 doing these cases.
13        Q. What's BCI stand for?
14        A. Bureau of Criminal Investigation.
15        Q. And that's training you didn't
16 receive during your time in the narcotics unit?
17        A. No, because there's certain things
18 that we do now that's a little bit different.
19 You know, we're collecting evidence in such a
20 way that we're attempting to obtain DNA evidence
21 off of it, so we have to be trained on proper
22 evidence collection. So that's -- so I've
23 collected properly without contaminating items.
24 Scene investigations, I've also gone to
25 St. Louis for death investigations, to

Page 273

1 understand how to do death investigations. So
2 we receive training before -- you know, in order
3 to accommodate what we do.
4        Q. Which entity was providing the
5 training in St. Louis?
6        A. Which -- I'm sorry?
7        Q. Which entity, organization was
8 providing the training in St. Louis?
9        A. It was through -- it was in
10 St. Louis. I may be wrong. It was through --
11 but it was through their county medical
12 examiner's office. I'm not sure of the actual
13 county that St. Louis is in. I thought it was
14 St. Louis County. It was their county medical
15 examiner's office. It was a five-day death
16 investigation course through their medical
17 examiner's office.
18        Q. You testified earlier, I believe,
19 that you've been involved in, roughly, five to
20 ten cases in which you've purchased prescription
21 opioids. Do you remember that?
22        A. We're going on that word
23 "prescription" again. I've been -- I don't know
24 if they were legal prescriptions or what. There
25 was five to ten cases where I was purchasing

69 (Pages 270 - 273)

Page 274

1 Percocet, OxyContins that were being sold
2 illegally.
3      Q.   Understood.
4      Do you remember when the last time
5 was you were involved in one of those purchases?
6      A.   I've done a lot of cases in my
7 career.  I mean, 2010 maybe, 2011.  Buy busted a
8 female selling a lot of pills.
9      Q.   So fair to say that during your time
10 at HIDI you haven't been involved in one of
11 those purchases?
12      A.   No.  We don't have time.  I mean,
13 there's -- cases are hard.  There's a lot of
14 them.
15      Q.   Are there any policies and
16 procedures that you rely on in the course of
17 your work with HIDI?
18      A.   That's kind of open-ended, also.
19 When you say "policies and procedures," there is
20 a -- there's a department policy for how an
21 overdose is to be treated and how we're to
22 respond, so we do work under the protocol
23 policies and procedures as outlined by the
24 Division of Police.  When you go into
25 investigative techniques, there's not a policy

Page 275

1 or procedure for that.  I mean, that's just each
2 individual detective's take on how they're going
3 to handle that case.
4      Q.   The policy that's related to how an
5 overdose needs to be treated, do you know when
6 that was put in place?
7      A.   It was revised a few times.  I'm not
8 sure of the exact year.  I can't commit to an
9 exact year.  It would come out and get revised.
10 After we started this, obviously, but I can't --
11 I don't know the exact year.  I mean, shortly
12 after we started doing this.
13      Q.   So the policy is specifically
14 designed for the work that HIDI does?
15      A.   There's a policy to instruct the
16 uniform officers on how to treat a suspected
17 overdose scene and the protocol in which we
18 should respond.  As far as how many of us
19 respond or how we respond, that's internal
20 amongst us, but there's a policy out there on
21 how to treat an overdose and how to make the
22 proper notifications.
23      Q.   And just to be clear, that policy
24 was put in place after HIDI started?
25      A.   Well, originally -- so the way this

Page 276

1 originally started was partnered with the
2 medical examiner's office.  So we receive those
3 notifications as -- one of the exhibits was an
4 e-mail.  We receive those notifications via the
5 medical examiner's office.  Then a policy got
6 implemented on how -- how to have the zone cars
7 notify us prior to the ME's office.  It's a
8 twofold system, so that ideally -- I think
9 there was a reference to whether or not one was
10 an overdose, how do we know.  We would rather go
11 to a scene and it not be an overdose than not go
12 to a scene and find out two weeks later with a
13 mom calling me saying, "What are you doing about
14 my son that just died."  So a policy was
15 implemented to ensure that we can get to as many
16 as these as we can so that we can take a chance
17 to adequately investigate.
18      Q.   And why was that policy not
19 implemented prior to 2013?
20      A.   Prior to 2013 we weren't going to
21 every overdose in the city.  We weren't going --
22 we weren't going to the non-fatal overdoses.  We
23 were just going to fatals.  So there was a --
24 there was a policy, but it wasn't a division
25 policy.  It was more or less just an agreement,

Page 277

1 whatnot -- use the word that you want -- between
2 the medical examiner's office and us for us to
3 respond.
4      In November of 2014 fentanyl came.
5 Bodies started dropping like crazy.  People were
6 dying left and right.  People were overdosing
7 daily.  I mean, a Friday night we would go to 22
8 overdoses in five hours.  That's how bad this
9 was.  A particular weekend we would have 12 guys
10 die in two days.  So obviously they wanted to
11 have a policy put in place so that the uniform
12 officers know to notify us, that this is --
13 what's going on in our city is astounding, how
14 many people are dying and nearly dying from this
15 drug.  We want to make sure that we get the
16 chance to investigate.  So there was a policy.
17 It was just with the ME's office.  It's 2014
18 when the wheels fell off.
19      Q.   The policy that was in place prior
20 to 2013, was that a written policy or just
21 informal?
22      A.   I don't know if it was -- I don't
23 know if it was -- I don't know if there was
24 something -- I mean, we knew what we had to do,
25 we knew that we would get notifications.  I'm

70 (Pages 274 - 277)

Page 278

1 not sure if the ME's office made some sort of
2 notification of their investigators on what to
3 do, so I don't know.
4     Q.   The policy that's in place now that
5 you said it's been revised a few times, it
6 sounds like that's a written policy?
7     A.   Yes.
8     Q.   Do you know when the last time it
9 was revised?
10     A.   I don't.
11         MR. GOLDSTEIN:  With that, I think
12 the defense counsel is done questioning for
13 today.  We, of course, as we've stated before,
14 reserve our rights to keep the deposition open
15 as well as all other rights related to the
16 document production issues, but thank you for
17 your time today, Detective Moran.
18         THE WITNESS:  Thank you.
19         MS. DEBROSSE ZIMMERMAN:  We don't
20 have any questions.
21
22     (Deposition concluded at 4:14 p.m.)
23         - - - - -
24
25

Page 279

1 Whereupon, counsel was requested to give
2 instruction regarding the witness' review of
3 the transcript pursuant to the Civil Rules.
4
5         SIGNATURE:
6 Transcript review was requested pursuant to
7 the applicable Rules of Civil Procedure.
8
9         TRANSCRIPT DELIVERY:
10 Counsel was requested to give instruction
11 regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 280

1         REPORTER'S CERTIFICATE
2 The State of Ohio,   )
3                      ) SS:
4 County of Cuyahoga.  )
5
6     I, Renee L. Pellegrino, a Notary Public
7 within and for the State of Ohio, duly
8 commissioned and qualified, do hereby certify
9 that the within named witness, SCOTT MORAN, was by
10 me first duly sworn to testify the truth, the whole
11 truth and nothing but the truth in the cause
12 aforesaid; that the testimony then given by the
13 above referenced witness was by me reduced to
14 stenotypy in the presence of said witness;
15 afterwards transcribed, and that the foregoing is a
16 true and correct transcription of the testimony so
17 given by the above referenced witness.
18     I do further certify that this
19 deposition was taken at the time and place in the
20 foregoing caption specified and was completed
21 without adjournment.
22
23
24
25

Page 281

1     I do further certify that I am not a
2 relative, counsel or attorney for either party,
3 or otherwise interested in the event of this
4 action.
5     IN WITNESS WHEREOF, I have hereunto set
6 my hand and affixed my seal of office at
7 Cleveland, Ohio, on this 26th day of December, 2018.
8
9
10
11
12 _Renee L. Pellegrino_
13 Renee L. Pellegrino, Notary Public
14 within and for the State of Ohio
15
16 My commission expires October 12, 2020.
17
18
19
20
21
22
23
24
25

71 (Pages 278 - 281)

Page 282

```
 1          Veritext Legal Solutions
              1100 Superior Ave
 2               Suite 1820
            Cleveland, Ohio 44114
 3          Phone: 216-523-1313
 4
    December 26, 2018
 5
    To: Diandra Debrosse Zimmermann, Esq,
 6
    Case Name: In Re: National Prescription Opiate Litigation
 7
    Veritext Reference Number: 3170010
 8
    Witness: Scott Moran     Deposition Date: 12/20/2018
 9
10  Dear Sir/Madam:
11
    Enclosed please find a deposition transcript.  Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change.  Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
    If the errata is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA
```

Page 284

```
 1          DEPOSITION REVIEW
           CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 3170010
 3  CASE NAME: In Re: National Prescription Opiate Litigation
    DATE OF DEPOSITION: 12/20/2018
 4  WITNESS' NAME: Scott Moran
 5      In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7      I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9      I request that these changes be entered
    as part of the record of my testimony.
10
        I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
    Date          Scott Moran
14
        Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18      in the appended Errata Sheet;
        They signed the foregoing Sworn
19      Statement; and
        Their execution of this Statement is of
20      their free act and deed.
21  I have affixed my name and official seal
22  this _____ day of_____, 20____.
23  _____
        Notary Public
24
25  _____
        Commission Expiration Date
```

Page 283

```
 1          DEPOSITION REVIEW
           CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 3170010
 3  CASE NAME: In Re: National Prescription Opiate Litigation
    DATE OF DEPOSITION: 12/20/2018
 4  WITNESS' NAME: Scott Moran
 5      In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7      I have made no changes to the testimony
    as transcribed by the court reporter.
 8
 9  _____
    Date          Scott Moran
10      Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
        Statement; and
14      Their execution of this Statement is of
        their free act and deed.
15
    I have affixed my name and official seal
16  this _____ day of_____, 20____.
17
18  _____
        Notary Public
19
    _____
20      Commission Expiration Date
21
22
23
24
25
```

Page 285

```
 1          ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
 2        ASSIGNMENT NO: 12/20/2018
 3  PAGE/LINE(S) /       CHANGE      /REASON
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  Date          Scott Moran
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
        Notary Public
24
    _____
25      Commission Expiration Date
```

72 (Pages 282 - 285)

**&**

**&** 1:20 2:2,6 3:3,7
  3:11,16,20 21:17
  21:19,21,24 22:1

**0**

**000182046** 6:16
  140:11
**000251274** 7:13
  223:21
**000266801** 7:10
  199:4
**000274219** 7:7
  196:9
**000274559** 7:12
  206:10
**000305048** 6:11
  122:17
**002250088** 6:10
  111:17
**002250680** 7:3
  182:15
**002250978** 6:24
  179:4
**02199-3600** 3:18
**050** 143:7

**1**

**1** 6:5 21:7 22:20
  45:16,21 88:20
  89:1 93:9 97:22
  102:3,16 104:1,6
  104:16 108:8
  250:20
**1,000** 63:10
**1,200** 67:2
**1,800** 64:16,16,21
  65:11 235:10
**10** 6:21 162:14
  171:3,9,12 257:12
  257:17

**10018-1405** 3:9
**10036-8704** 3:21
**101** 8:13
**102** 8:14
**103** 8:14
**104** 8:15
**105** 8:15
**106** 2:10
**107** 8:16
**108** 8:16
**109** 8:17
**11** 5:8 6:23 21:7,7
  22:21 179:2,8,8,15
**110** 8:17
**1100** 282:1
**111** 6:8
**114** 8:18
**115** 8:18
**116** 8:19 129:6
**118** 8:19,20
**119** 8:20
**12** 7:3 18:3 162:14
  182:14,19 277:9
  281:16
**12/20/2018** 282:8
  283:3 284:3 285:2
**120** 8:21
**121** 8:21,22
**1211** 3:21
**122** 6:11 8:22
**125** 8:23
**127** 3:4
**128** 6:12
**128-170** 1:25
**129** 8:23
**12th** 79:24
**13** 7:4 8:3 32:7,15
  182:9 185:9,15,18
**130** 8:24
**130th** 26:18

**132** 8:24
**134** 8:25 9:3,3
**1364** 161:16
**138** 9:4
**139** 9:4
**14** 7:6 196:8,13,19
**140** 6:14
**142** 9:5
**144** 5:12
**146** 9:5,6
**148** 9:6,7,7
**15** 7:8 156:10
  188:7,25 196:22
  199:1,8,12
**150** 6:17,19
**153** 9:8,8
**157** 9:9
**16** 7:11 188:7,25
  206:8,14,17 215:2
  216:20 257:3
**161** 9:9
**165** 9:10
**166** 9:10
**167** 9:11,11,12
**168** 9:12
**17** 1:7 7:13 223:20
  223:25
**171** 6:21 9:13
**173** 9:13
**174** 9:14
**176** 9:14
**177** 9:15
**179** 6:23
**18** 7:14 207:13
  225:6,11
**181** 9:15,16,16
**182** 7:3
**1820** 282:2
**182046** 140:18
**183** 9:17

**184** 9:17
**185** 7:4
**187** 9:18
**189** 9:18
**19** 7:9,15 199:3,13
  266:9,14
**190** 9:19
**193** 9:19
**195** 9:20 129:5
**196** 7:6
**197** 9:20
**198** 9:21
**199** 7:8
**1990** 23:10
**1990s** 50:2 52:15
**1991** 23:10,17 24:1
**1996** 23:15,18 24:1
  26:8,13 59:21
  60:1
**1999** 12:14 27:17
  30:3
**19th** 26:8
**1:18** 1:14
**1m** 225:1
**1st** 224:18

**2**

**2** 5:3 6:6 21:7 77:6
  77:14,20 78:15
  79:5,7,10 80:4
  89:5,9 90:1 92:16
  94:12 97:21,22
  106:5 108:8
**2,638** 107:17,20
  108:11
**2.0.xls.** 91:3
**20** 1:18 7:16
  265:12 266:10
  283:16 284:22
  285:22
**200** 9:21

**2000**  28:11 29:5,6 29:7,20 30:3 75:11
**20001-4956**  3:13
**2000s**  203:17,17
**2001**  11:16,23 12:16 29:5,6,7
**2002**  29:24 30:1
**2003**  29:21 30:1
**2005**  30:15 31:25 32:13,14 35:10 180:6,23 181:2,25
**2006**  40:6 169:9
**2006-2017**  124:6
**2007**  40:6
**2007-2013**  128:25
**2008**  248:21
**2009**  183:2 248:21
**201**  4:4 9:22
**2010**  47:3 50:14 51:14 274:7
**2011**  185:23 274:7
**2012**  43:9
**2013**  6:13 32:25 35:15 43:9 60:2,3 63:10 92:23 93:2 114:3 128:4,12 129:5,17 136:12 136:14 153:10 227:14,18 228:1,3 228:23 233:18 247:14 252:7,19 256:9,10,22,22 257:7 276:19,20 277:20
**2014**  6:5 37:11,13 45:17 46:4 60:12 60:16 63:11 66:18 93:2 112:19 196:20,22 277:4 277:17

**2015**  37:14 62:9 63:2 75:11 104:8 125:18 126:6 178:9
**2016**  40:4 62:9 63:2 75:8 79:25 126:6 141:25 142:3 163:4 169:7
**2016-17**  162:15,23
**2017**  79:25 82:3 125:1,2,14,19 127:4 140:22 141:25 142:9,10 152:5 153:14 161:15,21 163:4 169:8,9 174:6,10 174:17 224:18
**2018**  1:18 6:15,22 7:9,16 126:23 140:10,23 141:5 171:4,13 174:6,9 174:11,14,16 192:12,17 194:1 199:3,13 266:10 281:7 282:4
**202**  3:14
**2020**  281:16
**204**  9:22
**205**  2:4
**206**  7:11
**212**  3:10,22
**216**  2:8,11,20 3:5 9:23
**216-523-1313**  282:3
**219**  9:23,24
**22**  15:7 25:7 277:7
**220**  9:24
**222**  9:25
**2227**  281:12

**223**  7:13
**224**  10:3
**225**  7:14
**2250088**  111:24
**2250680**  182:21
**2250978**  179:16
**226**  5:9
**228**  10:3
**229**  10:4
**23**  253:11
**231**  10:4
**2332**  2:3
**235**  10:5
**236**  10:5
**237**  10:6,6
**239**  10:7
**24**  67:4 89:19
**241**  114:13,25 115:22
**244**  10:7
**245**  5:10
**247**  10:8
**25**  193:6
**250**  10:8 161:16
**251274**  224:4
**252-9060**  4:5
**253**  10:9
**259**  10:9
**26**  282:4
**260**  10:10
**266**  7:15
**266801**  199:9
**269**  10:10
**26th**  281:7
**27**  6:22 171:4
**270**  10:11
**274219**  196:15
**274559**  206:23
**27th**  171:13
**280**  5:14

**2804**  1:6,7
**2m**  225:1
**2nd**  2:3

**3**

**3**  6:7 77:10,17,21 77:25 78:4,7 79:6 79:7 81:11 92:17 94:12 97:21
**30**  15:8,9 16:4
**300**  2:15
**305048**  123:1
**312**  2:16
**3170010**  282:7 283:2 284:2
**330**  4:5
**34**  8:3
**342**  125:3
**35**  238:12
**35203**  2:4
**370**  125:20 126:6
**3895**  26:18
**39**  112:2
**3rd**  185:23

**4**

**4**  6:8 111:15,22 112:3 114:21
**40**  8:4,4 252:12
**41**  8:5
**44113**  2:7
**44114**  2:11 282:2
**44114-1190**  2:19
**44114-1214**  3:5
**44308**  4:5
**45**  6:5 129:6
**45132**  1:14
**459**  125:3
**49**  8:5
**494-4432**  2:16
**4:14**  278:22

| | |
|---|---|
| **4s** 208:16 | **77** 6:6,7 |

**5**

**5** 6:11,15 122:16 122:22 140:9 193:1,4 249:9 250:19
**50** 4:4 15:8,9 16:4
**51** 8:6
**53** 8:6,7
**54** 2:15 8:7,8
**55** 8:8,9
**56** 8:9
**57** 8:10
**586-3939** 2:20
**59** 8:10
**596-9000** 3:22
**5th** 140:23 141:5

**6**

**6** 5:4 6:12 128:3,8 128:10
**601** 2:10
**60654** 2:15
**617** 3:18
**62** 8:11
**620** 3:9
**621-0200** 3:5
**64** 8:11
**65** 8:12
**65th** 26:24
**662-6000** 3:14
**664-3727** 2:11
**666** 125:21 126:6
**696-4441** 2:8
**6th** 79:25 82:3

**7**

**7** 6:14 140:8,16
**700** 192:14,16
**73** 107:20 108:13 109:3

**8**

**8** 5:5 6:13,17 128:4 150:3,17,22 150:23 153:16 154:8 160:10 170:14 174:3,4,15 238:1,3 268:3
**800** 3:17 60:4,5 63:9 120:17 192:14,16 233:17 233:20
**83** 179:16 224:4
**841-1405** 3:10
**850** 3:13
**87** 182:21
**8th** 128:12

**9**

**9** 6:19 150:10,17 152:13 169:4 170:14 174:19
**901** 2:19
**911** 195:7,11
**950** 1:21 2:7
**951-7000** 3:18
**96** 111:24
**98** 8:12
**983-7985** 2:4
**99** 8:13
**9:00** 1:19

**a**

**a.m.** 1:19
**aaron** 1:8
**abide** 204:18
**able** 39:7 61:12,14 61:15,19 62:23 93:23 113:18 133:18 139:20 146:25 148:7 151:9 164:11

175:20 230:25 232:16 239:1 242:4,6 251:11 260:20
**absolutely** 64:24 68:14 133:19 178:19,24 207:6 219:10 252:1 254:14 258:3,24 269:22
**abuse** 25:17 26:5 42:16 43:19 46:18 47:18 49:25 50:5 51:5 56:23 57:6 58:18 180:22 186:15,19 187:3 191:9 194:13
**abusing** 52:9
**academy** 26:10,12 227:5
**acceptable** 14:18 14:19
**accepted** 255:8,23 255:25
**access** 52:25 53:23 71:7 184:18 211:17 214:23 225:18
**accidental** 243:2 244:24
**accommodate** 273:3
**accurate** 91:12 186:9
**accustomed** 135:25
**acknowledge** 283:11 284:16
**acronym** 35:21,23 36:5,9 97:9 233:11 267:11

**act** 120:18 258:15 283:14 284:20
**action** 142:24 198:20 281:4
**active** 27:25 29:9 117:16,17 118:12 119:24 120:1,23 121:2 216:12 218:18,20 220:3
**actively** 122:6
**activities** 227:1
**activity** 250:25 251:22
**acts** 101:25
**actual** 82:21 160:13 216:10 217:16 273:12
**acute** 243:1
**add** 72:15 151:10 238:23
**added** 37:11,13,14 37:15 151:10 152:24 189:6,9 217:8,10
**addict** 41:16
**addiction** 25:16 26:5 66:13
**addicts** 39:13
**adding** 37:9 64:23
**addition** 42:14
**additional** 19:19 194:11,15 246:1
**address** 11:15,18 76:7 84:5,10 85:1 85:10,12 213:8 282:15
**addresses** 179:24 179:25
**adequately** 117:19 119:15 276:17

adjournment 280:21
administer 62:23 63:3,6
administered 63:5 63:7 86:16,24 87:20,24 88:5,12 133:22
administrative 188:2,5
administrator 141:13
adult 50:16
adults 255:15
advance 158:8 192:3
affect 205:3 252:7 252:16
affiant 253:10
affidavit 112:7 179:12,20,23 180:9 182:25 183:6,11,12
affixed 281:6 283:15 284:21
afghanistan 177:21
aforesaid 280:12
afternoon 5:12 144:2 226:6,7
age 11:1 21:6 174:23
agencies 70:25 188:17 231:19 259:1,11 263:11 264:1,4
ages 22:20
ago 18:18 167:8 182:9 265:22 266:3

agree 49:2,22 50:12 103:8 105:3 105:4 108:15 109:7 111:7 126:16
agreement 276:25
ahead 13:24 148:16,19 154:16 241:23 253:23
ailment 48:24,24
ajp 2:8
akron 4:5
al 1:10,12,13,13
alabama 2:4
alarming 51:13 169:24
alazopram 244:24
albuquerque 151:25
alcohol 202:1,2
alert 7:8 71:4 199:2,13,21,22,25 200:6,22 201:3,13 201:14
allegation 12:24 13:10
alleged 131:21
allowed 63:3,6
alluded 44:16
alprazolam 243:1
american 50:16
americas 3:21
amerisourceberg... 4:2 22:15
ami 2:6 16:12
amount 34:6 170:6,9 249:24 258:14
amounts 34:3
analysis 147:17,21 211:2

analysts 44:10 172:14
anchorage 152:1,8
andrew 4:3 22:14
answer 14:7,9,10 14:16 27:25 28:9 32:17 34:17 41:18 117:19 120:2,15 121:11,14,19 154:12 209:10 216:3 219:19,21 228:9 236:21 251:16 253:21 256:3 270:12
answered 19:7 119:22 120:12,13 121:18 122:9 146:23 165:20 167:8
answering 28:1 120:3 209:14
answers 42:20
anybody 37:11 98:16
anymore 38:5 237:16 257:11
apartment 84:8,9 116:21
apologize 174:12
apparently 92:9 176:18 197:20
appear 15:22 79:21 153:18,21 153:25 283:11 284:15
appearance 15:24
appearances 2:1 3:1 4:1 5:3
appears 79:11 83:1 224:2

appended 284:11 284:18
applicable 230:24 279:7
application 112:15
applied 114:3 257:5
applies 191:17 270:1
apply 226:12 230:24 256:18,21
applying 113:3
approach 229:10
approached 229:19 230:6
approaching 121:21
approximately 15:8 27:19 29:14 151:17 161:16
april 224:18
arcos 184:2,6,11
area 26:19 44:1 97:1 247:15,17,18 247:20,24
areas 248:4
arguably 220:16
argue 221:14
argumentative 221:13
armed 195:14,21
arose 204:21
arrest 12:21,25 93:9 133:1,6 224:21 232:14,17 242:6 249:25 251:3,19 257:16 262:17
arrested 252:1
arresting 228:13 257:20

**arrests**  248:24 249:10,11,25
**arrive**  100:20 234:18
**arrived**  100:23
**arrives**  156:22
**ascertain**  148:8
**aschock**  4:6
**ashamed**  69:9
**aside**  269:6
**asked**  42:17,18,18 43:16 60:20 72:2 72:6 80:24 100:8 120:12,13 121:22 190:9 239:12 266:18,20 267:2 267:25 268:23
**asking**  14:17 81:17 97:8 99:20 106:20 113:3 121:1 132:20 138:7 147:8 167:13 168:23 187:13 190:16 217:19 218:10 219:25 220:14 232:4 237:1,7 269:14
**asks**  14:6 219:16
**aspect**  172:14 206:5 227:12 272:5
**aspects**  205:20,21
**assert**  254:24
**asserted**  148:24 149:1,20 183:23
**asserting**  216:17
**assess**  155:17 271:18
**assessable**  58:2

**assigned**  26:14 30:5,7 32:2,4 42:24 43:5,7 187:24 188:9
**assignment**  36:25 188:1 196:4 222:24 283:2 284:2 285:2
**assignments**  27:25 28:2,9
**assist**  43:13 44:10
**assistance**  27:7
**assisted**  44:14
**assisting**  43:3
**associated**  11:17 84:25
**association**  44:22 172:20,23 266:24
**assume**  14:17 29:21 63:24 96:14 96:15 163:7 195:6 201:14 265:16 268:5
**assuming**  36:6 107:4
**assumption**  100:10 230:5 267:23
**astounding**  277:13
**attached**  284:7
**attachment**  6:15 123:1 140:10,19 141:18
**attempt**  93:12 227:17 232:22
**attempted**  235:9 235:11
**attempting**  48:22 272:20
**attend**  23:3 173:2 173:19 269:1

**attended**  24:22 25:8
**attending**  172:7 172:19
**attention**  46:16 47:22 128:19 141:17 143:6
**attentive**  173:24
**attorney**  16:18 44:22 149:21,21 219:17 281:2
**audience**  152:10
**august**  7:16 26:8 266:10
**authorize**  284:11
**automated**  7:8 184:13 199:1,13 199:21,22
**automatically**  85:9
**autopsy**  100:15
**availability**  51:11 51:15 53:22 57:15
**available**  36:16 37:24 94:3
**ave**  282:1
**avenue**  1:21 2:3,7 2:10,19 3:9,21 11:16 228:16
**average**  269:23
**averages**  114:9
**averted**  143:17
**awarded**  13:18
**awards**  191:20
**aware**  49:6 54:25 55:2 147:10 175:6 175:9 180:22 181:1,19 225:16 237:19 238:14 253:12

**awareness**  25:6 170:8
**awesome**  249:11

**b**

**b**  37:24 38:2
**back**  17:13 25:7 27:21 28:12,14 29:16,23 30:2,4,7 30:8 34:4 43:13 66:15 71:20 74:22 78:4,5 80:19 83:3 90:16,20,22 100:5 105:3 120:21 125:16 141:3,20 147:6,9 157:17 158:2 159:15 162:21 174:10 179:14 189:16 196:19 202:13 206:21 212:21 213:20 214:23,24 232:6 236:1 239:9 243:3 244:16 249:13 251:24 258:9,10,25 269:2 282:15
**background**  22:13
**bad**  189:22 261:7 268:17 277:8
**badge**  208:15
**baeppler**  6:21 37:23 171:3,13,15 172:3 173:9,24 176:18 188:6
**bag**  243:15
**baker**  3:3 22:5
**bakerlaw.com**  3:6
**balance**  250:11
**ball**  158:8
**ballpark**  29:7

**barricaded** 39:14
  39:16,19
**bartlit** 2:13,16
  22:4
**base** 102:2
**baseball** 254:1
**based** 57:15 60:23
  88:22 90:2 101:4
  104:6 126:12
  129:21 131:10,10
  131:17 132:3
  142:17,25 161:22
  245:15 251:7,8
  262:21
**basic** 25:2 27:24
  29:16 30:8
**basically** 218:6
  256:24 267:17
**basis** 100:19 122:1
  180:15
**bates** 6:9,11,15,24
  7:3,6,9,11,13
  45:22 111:17
  122:17 123:2
  140:11 143:7
  170:16 179:3
  182:14 196:8
  199:3 206:9
  223:20 224:2,3
**bathroom** 196:1
**bathrooms** 158:23
**bci** 272:10,13
**bearing** 111:23
  179:15 182:20
  196:14 199:9
  246:2
**bears** 122:25
  140:17 206:22,23
  224:3
**beck** 2:13 22:4

**beck.com** 2:16
**becoming** 170:11
  175:4
**bedroom** 244:4
**began** 29:8 142:2
  228:20 229:1
  230:13
**beginning** 6:9,11
  6:15,24 7:3,9,11
  7:13 72:4 111:16
  122:16 140:10
  172:8 179:3
  182:14 199:3
  202:18 206:9
  223:20 228:22
  256:14
**beginnings** 16:20
**begins** 127:8
**behalf** 2:2,13,17
  3:2,7,15 4:2
  203:11
**belief** 104:1
  125:25 126:2
  259:18 262:21
**beliefs** 178:1
**believe** 12:15 13:5
  16:14 17:8 18:15
  20:4 23:5 27:16
  37:12 38:4 46:9
  57:4 61:2 62:8,19
  66:23 75:5 79:9
  88:21 89:2,6
  94:24 95:16
  108:20 109:14,21
  110:12 143:18
  152:23 168:7
  169:5 171:23
  172:2 174:14
  175:17 176:23
  178:9 179:19
  180:5,11 181:7

183:5 184:17
  186:1,5 202:17
  203:4 217:13,16
  220:2 225:15
  227:4 240:6
  244:11 247:8
  260:18 261:7
  264:13 273:18
**believed** 63:19
  86:4 176:1 181:10
  261:22,25
**believes** 262:2
**belt** 254:6,7,8
**beneficial** 264:25
**benefits** 265:6
**best** 17:23 18:3
  68:4 143:5 180:4
  194:2 216:3
  243:23
**bet** 266:5
**better** 77:23 190:3
  256:19 268:22
**big** 131:12 238:8,9
  238:25 239:10
**bigger** 30:23
  248:12 250:16
  259:8
**birmingham** 2:4
**bit** 77:23 229:20
  248:2 257:14
  258:13 259:2
  265:5 272:18
**blacked** 161:8,9
**blame** 53:6,9,25
  54:7 55:10,21
  56:1
**blocks** 264:21
**blood** 157:1,3
**blow** 77:17
**blown** 234:20

**board** 184:13
**bodies** 35:18 59:11
  99:10 111:11
  126:3 143:4
  158:23 258:8
  277:5
**body** 98:12,24
  99:23 116:21
  117:23 120:17
  155:20 156:12,19
  157:7 164:6,9
  240:23
**boop** 2:10 16:22
**borders** 26:23,25
**born** 20:23,24
**boston** 3:18
**bottles** 168:9,15
  240:5
**bought** 145:7,13
  145:22 149:7
**bovenzi** 38:1
  44:13 188:6
**box** 130:23 131:5
  132:13 209:4
  210:11,23 212:9
  212:10,16 217:8
**boxes** 208:13
  217:5,7
**boyfriend** 261:23
  262:22
**boylston** 3:17
**branded** 247:6
**bratenahl** 153:9
**breaching** 148:15
**break** 14:20 21:9
  43:17 71:16 72:5
  73:1 91:7,14,19
  104:25 140:3
  143:20 202:11
  245:20 252:6

**brewer** 2:14 5:9
22:3,3 226:5,9
245:19
**briefings** 222:13
222:14,15,16
**briefly** 43:5,7
67:15 247:13
**bring** 138:12
159:5 160:5 166:6
167:10 226:14
**bringing** 269:19
**broad** 204:8
227:13 257:18
**broken** 170:7
**brought** 13:14
118:18 121:7
234:19
**brutal** 268:14
**bss** 38:20
**bucks** 252:12
257:12
**budget** 45:12
**budgeting** 42:11
**build** 61:8 67:19
**building** 3:8 63:20
153:9 254:5
**bulk** 174:11
**bullet** 47:13,22
56:22 161:15,24
164:15,16
**bullets** 49:24
52:12 164:15,17
164:20,21,23
**bunch** 141:4
199:14
**burden** 37:7
**bureau** 38:20
186:20 272:14
**bureaus** 186:13,17
**burger** 85:14

**burling** 3:7,11
21:20,22
**burner** 258:9
**business** 40:13
67:17 85:11,15
112:22,25 141:11
171:17,25 197:1,4
199:18 205:12,15
**bust** 222:15
**busted** 274:7
**busy** 127:5 142:10
143:1 189:7,9
204:17 258:4
**buy** 41:15 146:1
222:14,14 260:20
274:7
**buying** 40:10 41:6
41:16 144:22
145:17,25 146:16
147:7
**buys** 34:1 40:25
41:10,11 144:18
145:9,10,11

**c**

**c** 36:22 37:3 184:3
**ca** 282:25
**cabinet** 52:25
135:19
**cable** 23:20,20,21
23:23
**cablevision** 23:24
**call** 95:23 116:20
116:23,24 136:3,6
195:7,20,22,23
208:3 270:16,17
270:20,24,25
**called** 11:1 38:19
39:3,4 44:21
60:20,22 64:3
70:19,21 83:17
97:4 117:6 163:18

265:19 266:4
**calling** 195:12,13
195:14,15 276:13
**calls** 62:18 114:6
195:11
**capacity** 34:13,14
34:20,25 39:24
40:8 146:16
**caps** 143:9 184:3
**caption** 239:13
280:20
**capturing** 72:9
**car** 28:8 29:18
155:7,7 195:25
202:4 207:23,25
208:15,21,22,22
223:5
**card** 67:17 191:16
193:20
**cards** 192:23,23
193:10,14
**care** 53:2 94:9
**career** 15:7 57:24
134:22 139:24
236:10 245:14
263:4 274:7
**careful** 197:8
**carfentanil** 33:6
64:6,19,20 65:1
66:16 103:12
104:10 111:9
124:16 125:5
178:7,13,18 231:3
231:5 232:10
233:13 245:7
270:4 271:4
**carl** 37:1
**carpenter** 254:5
**carried** 62:17
**carry** 62:4 213:16

**carrying** 62:6 63:2
**cars** 158:23 214:4
258:12 276:6
**cartel** 39:24 40:13
40:14,20,21,25
41:1,7,9
**cartels** 25:5 40:2
41:21
**case** 1:7,14 12:19
13:6,11,17 16:18
18:5,7,9,12,23
19:15 20:15 43:12
70:23 73:7,11,14
73:17,22,25 74:2,5
74:24 75:4,4,9,10
75:14 76:17 79:12
79:14,18,20 80:13
80:17,21,22 81:5,7
82:5,15 92:14
93:3,7,14 94:12,13
100:3,14,15,17
101:3 102:1
113:10,11,15,16
114:1,5,6,9,9,10
116:7,7,10,14,22
117:1,3,16 118:9,9
119:6,14,18 120:5
120:7,23 121:16
130:3,12 131:12
131:18 132:22
133:16 135:17,20
137:24 138:1
145:9,10,11 149:3
158:1,6,14,15,17
159:12 165:22,22
166:9 167:20,25
168:5 177:4,5
180:20 181:22
183:12,15,16,25
201:22 203:4,5,5,6
203:19 204:21,23

209:3 210:5,5,15
214:6,13,14,18,22
214:22,24 215:1,4
215:20,23 216:9
218:4,8,18,21,22
219:2,3,5 220:16
221:11 234:2,12
234:15 238:23
240:14,16 241:10
241:14,18 242:1,3
242:7 243:1,25
246:22,25 248:18
249:9 250:3,3,7,8
250:16,18 251:12
252:2,4,9 253:5,6
256:18 257:25
260:21 261:2
262:15,18 263:9
264:22 269:20,20
275:3 282:6 283:3
284:3
**caseload** 37:9
**cases** 15:15 24:19
25:20 30:23 32:24
32:24 33:14 38:16
42:25 43:4 44:11
44:15 59:21 64:5
64:17 65:11 66:22
70:7 106:21
115:25 116:2,12
116:19,19 117:17
117:21 118:12,13
118:18 119:12,23
120:23 121:7,9
122:5 134:7 136:1
136:9 137:15
138:8 139:2
141:23 144:17,17
144:19,20 145:8
145:11 146:2,3,9
146:11,17,24

148:7 149:4
160:15,17 162:8
162:10 178:10
188:22 203:14
204:24 205:6,9
216:12 218:19
219:6,8 220:3,11
233:21 234:19,25
235:21 242:1
243:23 248:13
249:2,21 252:22
257:5,8,10 258:5,8
258:21,24 259:2,8
260:24 262:13
263:7,25 272:12
273:20,25 274:6
274:13
**cat** 195:13
**catch** 218:22
230:3
**categories** 105:2
106:22 110:14
**category** 106:5,14
106:18
**cause** 64:15
104:11 120:8
126:15 130:17
132:4 157:9
178:14 201:21
242:23 244:18,23
270:23 280:11
**caused** 64:11 86:4
88:23 103:20
119:4 120:21
126:1 138:10
168:22 175:18
228:2,4 232:11
234:14 235:10,25
236:5 237:20
266:2

**causing** 125:2,3
131:7 138:9
233:14
**cc'd** 171:23
**ccmeo** 7:8 162:14
162:23 199:1,13
199:21
**cell** 156:1 158:13
212:17 235:2
**certain** 24:15
119:14 164:4,6
166:16 191:16
214:20 255:18
257:5 268:11
272:17
**certainly** 72:18
181:25 255:20
**certificate** 5:14
280:1 284:11
**certification** 283:1
284:1
**certifications** 24:6
24:8,16,20
**certified** 11:4 24:9
24:10 25:5
**certify** 280:8,18
281:1
**cetera** 6:14 140:9
**chain** 34:8 158:11
196:20 231:12
232:1
**challenge** 270:21
270:25
**challenges** 269:25
270:3,7,8,14,15,17
**chance** 30:23 47:9
266:3 276:16
277:16
**change** 28:6 42:1,4
103:1 205:13,19
229:22 230:6

256:15 282:13,14
284:8 285:3
**changed** 23:24
26:23,25 32:7,16
100:25 103:7
205:20 206:5
216:23 229:20
258:12,12
**changes** 50:1
52:13 103:2 186:7
282:12 283:7
284:7,9
**characterizing**
227:25
**characters** 208:7
**charge** 38:19,21
38:22 44:13 231:1
**charges** 230:24
**chart** 94:25 96:22
124:9 125:9,11,18
126:12,14 128:24
129:10 169:5,6,14
169:15,20
**chase** 271:19
**cheaper** 58:2
247:12
**cheat** 218:6
**check** 131:5
132:13 210:11,12
210:23 211:23
**checked** 130:24,25
212:16
**checking** 72:1
**chemical** 271:2
**chemicals** 62:16
**chicago** 2:15
**chief** 17:15,15
160:25
**choice** 58:4,15,16
138:17

chose  149:21

cigarette  243:11
243:18

circumstance  54:7
54:15 55:5,9,14,20
55:25 99:8 138:11
166:20 211:11

cities  44:24 132:2

city   1:11 2:2,9 7:4
16:21 21:17 27:10
27:13 42:3,7
43:12 45:7,8,9
66:16 68:6 71:3
84:12 87:9 91:7
109:5 151:25
170:9 185:9,19
188:18 206:1,3
219:22,25 221:4
231:16 252:4
259:4,11 265:24
276:21 277:13

city's  91:21

city.cleveland.o...
2:12

citycenter  3:12

citywide  30:17

civil  11:3 12:17
279:3,7 283:5
284:5

civilian  187:12

claim  148:24

clandestine  25:3

class  26:6

classes  25:7,8 26:1
173:2

clean  210:18

clear  72:11 91:20
96:25 255:3,6,20
275:23

cleared  12:22
13:10

clearly  255:4

cleve  6:10,11,16
6:24 7:3,7,10,12
7:13 111:17,24
122:17,25 140:11
140:18 179:4,16
182:15,21 196:9
196:15 199:4,9
206:10,23 223:21
224:4

cleveland  1:11,21
2:2,7,9,11,19 3:5
6:20 7:4,11 11:16
11:22,25 15:20
17:5 19:8 20:22
20:23,24,25 21:4
21:18 22:24 25:6
26:22 27:13 30:14
36:2 38:22 41:22
42:3 45:8,9,12
66:17 82:7 84:15
91:2 93:10 94:1
109:5 111:10
123:19,22 127:3
150:12 161:5
170:9 178:8,14
184:24 185:9,19
186:14 188:12,19
191:8 194:16
197:18 200:4,16
200:24 204:15
206:8 207:7,9
214:2,10 221:4
231:16 240:22
259:4 263:10
266:22 281:7
282:2

client  149:22
219:17

cline  36:21 37:12

clinical  50:1 52:14

clipboard  213:16
213:18

cloak  15:23

close  161:10 192:8
219:2,3,7,8 254:9

closed  219:1

closure  50:9

clr  1:23

clue  120:4 176:2

coast  23:23

cocaine  26:1 57:16
58:4,7,9,9 83:22
105:5 123:4
124:16 125:3
129:6 140:21
141:24 142:1,12
172:11 173:11
174:25 175:7,15
175:18,23 203:4
248:20,21

code  84:25 191:16
193:19,20,21,23
193:24 194:6,7
212:19,20

codes  192:23
193:25

coffee  222:17,21

coincide  215:3

coke  249:15,16

coleman  3:4 22:5
22:5

colleagues  137:16

collect  61:5 98:21
164:11,12 239:20

collected  272:23

collecting  272:19

collection  25:19
25:24 272:22

college  23:1,2

color  67:23

column  85:4,23
87:6 88:17 89:14
108:6

columns  80:15
81:10 89:24
107:23

combat  194:13,16

combating  191:9

combination
64:25 66:19

come  30:2 45:11
54:5 56:14 61:12
66:17 132:22
155:15,16 175:13
178:7 202:5
211:20 229:22
232:5 275:9

comes  55:7 79:18
177:8,19,25 178:6
228:15 260:22
269:18

comfortable  63:17
66:25 67:5 68:21
69:18,24 193:3,6
256:6

coming  27:8 34:4

commander  36:9
37:20 196:18
197:6 230:17

commander's  95:4

comment  107:7

commission
281:16 283:19
284:25 285:25

commissioned
280:8

commissioner
17:14,19

commit  275:8

committees 42:16
42:19 43:18,20
common 6:8,23
36:22 46:2 61:10
68:6 111:15 124:6
128:25 175:3,4
179:2
communicate
74:12
communicated
14:5
communication
167:4
communications
14:8 219:17
community
264:19
companies 3:3
147:3
company 23:22
compared 101:13
comparison
128:25
compassionate
66:4
compile 93:12
94:9,11,22 124:24
129:18
compiled 94:19
complaint 18:13
18:15,16,17,21,23
19:1 228:15
complaints 19:10
227:16 228:1,13
complete 12:3
213:2
completed 280:20
282:15
completely 218:7
components
124:13,15 170:2

comprehensive
93:13 94:20
comprise 124:14
computer 23:8
96:14 115:5
concern 198:8,13
198:15
concerned 198:4
concerning 195:11
concerns 173:21
conclude 118:1
129:23 157:9
201:10
concluded 129:21
278:22
concludes 129:24
conclusion 101:20
103:3,21,23 131:4
132:7
conclusions
103:19
conclusive 104:4
concrete 265:10
condensed 267:18
268:3
conduct 101:12
137:2 146:24
156:25 227:17
232:18 234:18
235:15 236:17
237:9,19 257:22
conducted 20:18
205:12
conducting 40:5
42:1 43:12 230:12
257:23
conducts 100:13
conference 172:19
173:1,10
conferences 178:5

confess 66:8,9
confident 183:14
confidential 1:25
6:18,20 127:8
148:18 150:5,12
154:15 170:14,23
confirmed 91:9,12
201:16
confused 107:6
connected 39:10
74:10
connection 18:21
24:3 35:16 113:8
114:10 153:1
185:4 191:9
246:25 253:7
connelly 38:3
152:23
consent 186:6
203:21,24 204:3
204:10,19 205:2
205:11
consider 218:20
245:2,5
consistency
197:12
consistent 126:19
142:8 216:20
259:18
constantly 20:3
consumers 50:4
56:9
consuming 118:13
cont'd 3:1 4:1 7:1
9:1 10:1
contact 61:3
contain 172:11
173:12
contained 94:11
214:17

container 85:22
117:24 166:21,22
containing 172:12
173:13
contaminating
272:23
content 151:10,11
continue 72:14
74:15 209:14
continued 144:3
continuously
31:12,25
contraband
240:24
contributed 151:5
151:6 238:18
contributing
46:22 47:4,14
49:24 50:17 51:2
51:7,15,23 52:10
64:11
contributor
126:17
contributors
111:9
controlled 222:14
conversation
265:11
conveyed 63:22
157:17 211:15
convicted 149:10
149:12 260:4,4
conviction 149:15
219:9,11
convictions 227:23
cooperate 232:25
cooperators
139:21
coordinate 188:20
coordinating
188:14

copied  141:6
corner  78:13,17
  143:8 185:22
  248:11
corporation  3:7
  4:2
correct  16:6,7
  26:8 27:2 31:13
  31:19,20 38:10
  39:25 44:17 46:12
  47:6,19 49:21
  53:12,19 55:22
  56:3,7 63:12
  64:20 65:8 68:17
  76:19 79:21 80:2
  80:8 81:8,14,24
  82:3,4,10,13,18,19
  82:22 83:5,6,18
  84:3,6,7,10,11,13
  84:14,22 85:1,4,5
  86:12,14,15,18,19
  86:22,23 87:1,2,7
  87:8,16,25 88:8,9
  88:14,15,18,19,24
  88:25 89:3,7 90:7
  92:23 99:23 102:8
  103:12,20 104:2
  104:10 105:5,9,11
  105:24 106:11
  110:17 112:19,22
  113:5,9 123:20,23
  124:2,20 130:13
  130:15 135:14
  137:22 141:15
  144:8 151:14
  154:2,3 158:4,20
  164:19 165:4,19
  168:10 171:18,25
  174:17 175:7,16
  180:7,17,18
  181:11,16 182:1

182:25 183:3
  196:22 197:1
  198:6,7,10 199:15
  199:19,23,24
  200:1,4,5,23
  201:17 207:17
  213:6 215:2 219:9
  228:12 240:1
  242:25 243:6
  244:6 254:12
  280:16
corrections  282:12
  284:17
cost  57:15
counsel  13:19 14:3
  14:5,8 16:10,11
  17:1,2,21 18:1,22
  21:8,10 71:15
  72:6,18,19 91:7
  95:22 115:19
  215:20 216:8,14
  219:13 278:12
  279:1,10 281:2
counselor  72:14
  91:11 121:17
count  108:1
  151:22 187:18,20
counter  42:1
counterfeit  147:5
  147:11 172:12
  173:13 176:4,8,21
counties  264:11
countries  232:7
country  44:24
  264:16
county  1:10,13 6:5
  6:12 43:22 45:16
  46:11 85:3 87:15
  100:12 123:3,5,18
  123:21,23,24,25
  124:5 128:3,10

131:25 132:5
  140:19,22 141:14
  163:3 169:7
  199:22 263:15,21
  264:2,9 273:11,13
  273:14,14 280:4
  283:10 284:15
countywide
  131:16
couple  19:19
  119:22 217:5,7
  249:15,15 265:25
  268:12
course  25:12
  35:11 43:10 57:24
  58:17 69:20
  108:21 109:2
  112:22,24 118:20
  118:25 119:10
  134:22 138:3,15
  138:18 139:24
  141:11 144:21
  152:5 158:25
  171:17 197:1
  219:10 246:5
  257:3 261:17
  262:24 263:3
  273:16 274:16
  278:13
courses  178:4
court  1:1 5:16 6:8
  6:23 15:11,16
  16:5 111:15
  112:16 179:2
  202:20 283:7
courthouse  2:14
cov.com  3:10,14
cover  26:1 45:5
  96:20 122:23,23
  141:20

covered  211:23
covers  45:6 123:22
  248:7
covington  3:7,11
  21:19,21
cpd  92:11
crack  58:13
  248:20
crazy  50:16 277:5
create  78:12 81:13
  81:22
created  35:24
  256:12
crime  86:10,10
  160:6 181:8,10,14
  181:16 228:25
  231:1 272:4
crimes  28:10
  48:10 188:11,18
  205:18 233:4
criminal  6:8 15:4
  111:15 202:20
  272:14
crisis  6:20 32:3,5
  38:23 39:1,9,18
  150:11 194:16
  226:21
critical  128:20
cross  191:4
crossed  188:22
crowd  267:25
crum  4:7
current  186:9
  216:25
custodian  114:11
  123:13
custody  5:16
  158:11 227:18
cut  58:1 66:12
  236:11 237:4

**cutting** 250:9
**cuyahoga** 1:10 6:5
6:12 43:22 45:16
46:11 100:12
123:2,5,21 124:5
128:3,10 132:5
140:19,22 141:14
163:3 169:7
199:22 264:2
280:4
**cwru.xlxs.** 92:11

**d**

**d** 36:23 37:3 38:1
44:2 97:6 143:9
**d.c.** 3:13
**dabbled** 109:20
**daily** 111:11
117:12 277:7
**dan** 1:8
**danger** 271:1,3
**dangerous** 16:3
35:7,8 62:15,25
255:9 271:1,22
**dangers** 270:17
271:8
**data** 70:22 71:5,7
71:9 73:23 75:11
79:17 80:10 83:24
128:21 129:18,20
131:14 161:25
162:4,10,12
217:23 218:1
**database** 70:14,19
70:20,25 73:1
80:5,6 83:4,23
84:19 90:7 93:23
96:17,19 131:16
132:3 184:6,21,25
185:2 214:9,11,25
215:7 218:2
263:14,24 264:2

265:7,8,21
**databases** 73:8
80:7 158:7 166:8
166:9 167:20,21
214:13,19 263:11
**date** 76:7,11 78:12
81:14,19 82:20,21
141:10 163:8,17
171:17 185:23
199:18 207:18,18
217:12 279:11
282:8 283:3,9,19
284:3,13,25
285:20,25
**dated** 6:13,14,22
7:9,15 128:4
140:9,23 141:4
171:4,12 176:18
199:3,12 266:9
**dates** 79:20 163:5
163:10
**dawn** 143:15,16
**day** 2:18 22:8 26:9
57:16,17 67:4
89:12,17 127:2,2
159:8 202:6,6
205:3,4 206:4,4
255:11 268:18
270:18 271:12
273:15 281:7
283:16 284:22
285:22
**days** 191:5 265:22
266:2 277:10
282:18
**dea** 184:8 259:9
**dead** 59:11 117:23
240:23
**deal** 48:10 227:22
233:3

**dealer** 61:14 67:20
68:1 117:15 119:7
132:10,24,25
133:1,16 145:19
145:21 211:21
218:23 251:6,7,13
251:20 257:20
258:6 265:20
**dealer's** 71:1,11
265:23
**dealers** 32:18,24
33:8,25 34:9
40:11 41:24 122:7
146:5 148:2
177:13,14 190:1
226:23 227:10
248:10,15 253:8
253:18 254:17
256:2,4,5 259:6,16
260:7 271:19
**dealing** 34:3 35:8
62:15 136:4
270:21 271:1
**deals** 40:7 230:8
**dear** 282:10
**death** 6:17 34:5
35:16,22 64:11,15
104:12 117:15
132:4 142:12
150:4 157:9
161:11 201:21
217:12 219:5
227:15 232:14
242:5,8,24 243:2
244:18,23 260:1,8
261:23 268:14
270:23 272:25
273:1,15
**deaths** 33:2 35:15
37:6 92:22 117:14
123:4 124:6,10,20

125:3,4,20 127:3
128:21 129:6,6,7
131:24 132:1
136:15,16,19
140:21 142:4,13
143:17 169:7,25
170:4 178:15
227:20 228:3,20
228:23 229:4,11
229:13,14,18,21
230:8 259:13
**debrosse** 2:2,3
13:22 14:3 21:8
21:14,16,17 22:9
22:12,16 34:15
40:15,22 41:4
48:25 50:25 53:7
53:20 54:8,17
55:12,23 56:17
57:20 58:24 62:12
64:7 65:17 71:15
71:21 72:21 74:14
78:25 91:11,24
98:13 99:4 101:22
102:17 103:13
104:20 105:20
107:1 108:4
109:11,25 114:16
115:16 116:8
118:6,23 119:20
120:10 121:4,12
121:17,20,25
122:3,11 125:7
129:12 130:6
132:17 133:24
134:5,12 138:4
139:5 142:14
146:13,21 147:24
148:5,11 153:12
153:19 154:11
157:23 161:1

162:18 165:10
166:11,24 167:17
167:22 168:19
170:13,18 171:19
173:14 174:7
175:24 177:9
180:24 181:4,20
183:8 184:9
187:10 189:4
190:23 193:16
195:17 197:2
198:11 200:18
201:18 204:12
216:5,16 219:15
219:20 220:19
221:7,12,18 222:1
224:15 228:6
229:23 231:14
235:19 236:19
237:11,23 239:23
244:19 247:2
250:1 252:25
253:20 254:23
259:21 260:16
269:10 270:5
278:19 282:5
decade  142:5
deceased  65:5
175:8 262:1
decedent  99:24
100:12 113:16,22
decedent's  99:23
200:12 244:12
december  1:18
26:12 30:15 31:25
32:13 35:10
140:22 141:22
180:6,23 181:25
281:7 282:4
decide  67:18
165:24

decides  165:23
decision  263:22
decisions  194:25
decline  189:13
declined  189:11
decrease  142:12
decreased  127:4
decree  186:6
203:22,25 204:3
204:10,20 205:2
205:12
deed  283:14
284:20
deem  61:2 168:21
169:2 210:4 213:9
232:16
deemed  1:24
282:19
deescalation  206:2
defendant  12:14
12:20 13:1,4
defendants  19:7
22:6 177:3 245:25
defense  72:18,19
278:12
definitely  81:12
degree  24:24
degrees  24:6,22
delaware  152:2
delete  219:14
220:4,9,16,22,23
220:24 221:1
deliver  137:9
delivery  279:9,11
department  7:4
11:22 13:3 16:21
17:6 19:8 23:12
23:14 24:13,15,16
24:23 25:13 36:3
42:11 45:12 75:15
75:17 87:22,23

90:25 91:2,2 94:2
108:17 128:11
184:21,24 185:9
185:20 186:15,18
191:8 195:10
198:9 200:4,17,25
204:16 205:1
221:22 229:15
240:23 249:20
263:10 265:2
266:22 274:20
282:22
department's
263:21
departments
93:22,24 164:2
263:16
depend  138:14
depending  84:18
depends  41:18
133:8,12 159:7,17
166:14 215:13
222:17,23
depleted  29:15
deponent  91:18
deponent's  221:14
deposed  11:4
deposition  1:16
12:5 17:22 18:2,9
19:18 45:15 72:5
77:5,9 92:8
111:14 114:11
122:15 128:2
140:7 148:18
150:2,9 154:14
170:20 171:2
179:1 182:13
185:8 196:7
198:25 206:7
223:19 225:5
226:15 266:8

278:14,22 280:19
282:8,11 283:1,3
284:1,3
depositions  12:10
13:20 18:5
depressant  58:6
des  151:24
described  212:10
describing  55:15
224:14
description  6:3
213:10 227:2
descriptive  238:4
designated  154:14
designating
148:17 198:9
designed  275:14
desk  194:9 215:10
215:16,17,21
216:8 218:17
detailed  188:1
189:8
detective  15:20
17:9 29:4 30:18
31:1,2,4,5,8,9,11
34:17 36:18,21,22
37:1,1,2,15,15
39:21 71:23 72:9
72:13 76:17 92:2
116:1,5 118:4
133:2 137:21,21
138:2,2,12,12
139:1,1 144:7
146:12,12,18,19
148:16,19 154:12
154:16 159:7
181:12 185:3,3
188:3,4 194:24
226:8 227:13
231:16 236:21
245:23 253:23

[detective - document]

254:7 261:3,4
267:4,4,25 278:17
detective's 275:2
detectives 29:16
30:22 36:4,8 39:6
44:14 48:9 60:15
75:18,20 77:2
116:3 155:11
162:7 178:5
187:12,13,15,16
187:19,23 189:6
190:2,5,7,13
217:22 233:2
241:11 262:14
271:25
determination
99:2
determine 97:23
99:16,18 101:10
118:3 190:14,16
201:6 231:4
234:14 251:2
determined 72:1
109:3 132:4
147:18,22
determines 99:19
201:21
detox 61:20
device 112:5
di 97:10
diandra 2:3 21:16
282:5
diazepam 243:2
244:24
die 68:5 132:1
158:22 210:18
233:14,14 258:14
265:16,17 277:10
died 113:19
125:23 169:25
178:21 242:3

258:4 266:4
276:14
diem 45:6
dies 154:19 164:4
175:10
different 24:21
25:7 32:3 33:20
34:3,20,22 57:8
58:5 73:16,19
81:1 110:14 115:3
123:11 158:24
173:2 193:22,24
193:25 217:5
240:21 243:5
247:19 253:24
260:10,12 272:18
differently 217:14
233:8 257:5
difficult 32:17
118:14 134:17
231:17 251:5,15
258:13
digit 82:12 207:16
digits 207:10,11
208:5
ding 250:15
direct 46:15 47:21
118:15 128:19
141:17 143:6
172:3 235:22
direction 229:3,6
248:1,18
directly 43:23
50:4 56:9 80:3
259:16
disagreed 197:20
disappear 142:2
disclose 15:23
disclosed 19:20
discuss 38:16
77:18 170:2

discussed 19:21
discussing 91:18
discussion 90:15
disguise 154:1
dispatch 229:17
dispatched 83:14
83:25 108:24
dispense 235:16
236:2,18
disposal 50:3
52:20
dispose 53:3
disposed 53:12
distinct 163:25
distinction 234:11
247:6
distinguish 136:5
distributed 53:16
55:21
distribution 41:11
distributor 53:16
55:21
distributors 43:1
137:9 139:7 184:6
236:6 246:11
district 1:1,2
26:15,20 27:2,4,6
27:11,15,22 28:6
28:12,15,18,19,21
29:1,4,20 30:3,5
207:22
disturb 156:21
diversion 47:23
48:3,8,9,13,16
50:6 58:19,20,23
59:1 115:25 116:2
116:7,12,13,19,19
116:22 117:3
135:3,21 146:18
147:11 185:5
188:4 233:2 260:9

260:13,19,22
266:25 267:12
diverted 59:4
106:15,24 109:9
117:8 118:2,16
119:4,9,18 120:9
121:3 135:7,8
136:1
division 1:3 6:9
7:5 35:17 36:1
62:19 111:16
185:10,20 274:24
276:24
divisions 186:14
186:17,23 187:2,2
dlugolinski 36:22
37:13
dna 25:23 210:21
210:23,24 211:2
272:20
doctor 48:11,17,19
50:7 54:24 56:21
58:21 66:10 98:8
98:10 136:22,24
138:19 261:8,14
261:24 262:13
263:6
doctor's 262:5,9
doctors 48:21
56:14 138:21
document 1:8 6:11
6:17,19 45:22
46:6,16 47:1
77:15 80:2 84:3
90:22 91:4 92:10
95:1,6,23 97:4,5
97:12 107:25
108:16 111:23,25
122:16,23,24
123:8,14 128:16
140:17,24 150:3

[document - dynamics] Page 15

150:10 171:10
179:9,15 182:20
182:22 185:16
196:14,16 199:9
199:10 206:22
221:20,22 224:1,5
225:12 266:13,15
278:16
**documented**  93:10
**documents**  19:15
19:19,24 20:10,14
70:17 77:14 91:15
91:17 92:3 97:17
150:18,19 220:15
221:9,17 225:25
226:14
**doing**  40:6,13
41:21,22 43:14
94:18 110:6
146:12 154:8,9
159:8 205:14
207:12 248:11,12
249:14,18 255:18
256:7 257:13
272:12 275:12
276:13
**dollars**  252:3
**dope**  257:12,17
**doses**  78:21,23
87:7,17,18,22 88:1
88:4
**doubled**  125:20
178:20
**doubt**  107:24
**dover**  152:2
**draft**  18:25
**drafting**  18:21
**dramatic**  178:17
**draw**  131:4
**drawing**  234:10

**drawn**  116:18
**dresser**  244:5
**drinking**  89:21
222:17,21
**drive**  112:13
115:11,18
**driver**  13:15
**driving**  248:12
**dropping**  271:21
277:5
**drug**  4:2 24:19
25:2,4,6,25 29:9
29:17 32:18,23
33:4,5,8,11,19,25
34:1,6,9 39:13,24
40:11,24,25 41:24
42:6,16 43:1,19
44:1 46:18 47:18
49:25 51:4 57:14
57:14 58:15,15
61:14 64:5 65:15
67:20,24 68:1,20
68:25 69:4,6,13
70:9,15 71:1,11
75:3,23 76:14,18
76:25 83:13 84:1
85:25 86:3,7,9
88:20,23 89:1,1,5
89:6,9,23 90:1
97:1,22,22 99:2,16
99:17 100:18
101:11 102:3,16
103:20,25 104:1,6
104:16 105:23
107:21,22,22
108:8,8,12,13
110:5,6,16,21
117:15 122:6
124:10,20 125:19
130:5,21 131:7
132:8,10,15,16

133:4,5,7,10 136:4
138:9 145:19
146:5 148:2
168:17 169:25
170:3 177:13,14
181:13,16,17
184:7 188:18
190:1,2 195:15,24
197:8,11 198:2,20
202:25,25 203:8
210:17 211:21
212:1,8 218:23
226:23 227:9,16
227:21 228:1,13
228:19 229:10
230:8 231:8
232:23 234:14
247:11 248:10,14
248:23 250:11,15
250:25 251:3,6,7
251:21 252:15,19
252:22 253:8,17
256:2,4,5 257:3
258:18 259:16,25
260:7 265:20,22
266:25 270:11,22
271:19,23 277:15
**drugs**  33:16,18
39:10 43:15 49:7
51:11 57:8,12
58:4 59:4 61:10
61:11,16 64:13
65:7,13,13,16
68:10 85:19,19
86:2,3,5 89:11,16
89:22 90:1 97:23
97:24 98:3,11,21
99:1,22 103:10
104:8 105:2 106:7
106:15,22 107:23
108:9,22 120:19

124:6 126:10
129:1 130:14,16
130:17 132:3
133:21 135:7
136:10 139:12,16
144:8,9 145:23
146:16 147:7
155:24 156:4
162:14,22 164:16
164:24 165:4,5,9
165:14,18 166:1
166:14,17 200:7
201:25 202:2
211:20 212:4,11
212:13 218:23
227:16,20 228:3,5
232:23,23 233:9
234:8 235:9,25
236:4 239:14,19
242:5,7 244:17,25
248:15 249:24
253:2 260:8 270:4
**dtos**  33:11
**due**  91:16 169:25
**duke**  92:4
**duly**  11:3 280:7,10
**duplicate**  215:25
**duplicated**  218:4
**duties**  42:15 43:10
172:1 197:4
199:18
**duty**  45:7 98:21
**dying**  32:25 33:3
33:18 129:16
132:1 158:24
170:6,10 228:19
228:25 277:6,14
277:14
**dynamics**  117:11
120:25

**e**

**e** 6:14,21 7:6,8
36:19,22 37:3,3,24
37:24 38:2 71:3
140:8 141:3,9
143:2 155:10
171:3,12,22 196:8
196:20,21,21,25
197:25 199:1,12
199:17 220:21,22
220:23,25 221:1,1
221:2,2 276:4
**earlier** 44:16
58:19 92:21 99:25
110:4 135:11
172:2,21 197:11
217:4 226:12,17
227:4 233:1,16
236:8 237:2 238:1
238:8 239:6,18
244:23 260:18
263:8 269:14
273:18
**early** 29:7 30:1
62:9 176:15
**earn** 68:2
**easier** 77:22 81:10
151:21
**easily** 66:10 261:8
261:15
**east** 26:24
**eastern** 1:3
**easy** 53:23 148:20
195:21,21,22
**eboop** 2:12
**economic** 51:8,18
**economics** 52:6
**educated** 163:12
178:2
**effect** 62:2 217:2

**effort** 149:18
**efforts** 232:9
**eight** 186:23
**eighth** 3:9
**either** 12:10 61:4
64:5 65:3,12
101:5 102:7
103:12 104:16
107:20 108:12
110:8 112:6
117:24 130:2
131:7 132:13
135:19 141:24
168:16 194:3
208:16,25 281:2
**elaborate** 164:25
**electronic** 160:2
254:13,20 255:15
255:24
**electronically**
96:11
**elena** 2:10 16:21
**email** 282:17
**embedded** 40:12
40:18
**employee** 187:13
**employees** 187:8
**ems** 17:14,17,19
60:23 61:1 62:22
78:23 88:1,2
155:5
**enclosed** 282:11
**encompassed**
52:19 57:2 124:22
**encountered** 39:13
39:14 119:9 246:5
260:13
**encounters** 71:14
**ended** 13:14
141:22,25 144:22
274:18

**endo** 3:2,2 22:6
**ends** 170:23
250:19
**enforce** 204:18
**enforcement** 28:1
29:17 35:6 43:6
87:18,20 91:16,23
152:12 153:22
187:22 263:11
264:25 267:24
268:22
**engaged** 137:2
**engaging** 34:25
35:4
**engine** 70:24
71:13
**ensure** 276:15
**entail** 48:20
155:13
**entails** 227:11
**enter** 70:14 103:25
104:6 158:5
209:21
**entered** 81:19,23
82:1 107:22
108:13 158:11,14
162:8 200:22
204:3 214:4 215:6
218:7 284:9
**entire** 18:16 37:20
47:1 154:23
187:14 231:12
263:4 269:1 283:5
284:5
**entirely** 151:2
**entitled** 6:17,19
150:3,10
**entity** 168:6 273:4
273:7
**entry** 205:11
224:13

**environmental**
51:9,20 52:2,4
**epidemic** 46:23
47:15,17 49:25
51:5 111:10
**equipment** 173:22
271:15
**errata** 282:13,18
284:7,10,18 285:1
**esq** 2:3,6,10,14,18
3:4,8,12,16,20 4:3
282:5
**essentially** 217:6
217:17
**establishment**
50:8
**estimate** 18:3
104:15
**et** 1:10,12,13,13
6:14 140:9
**event** 7:13 172:15
173:3 223:20
224:12,21 281:3
**events** 55:15
**eventually** 29:3
66:11 230:20
252:13
**everybody** 67:13
68:13,15 90:24
165:7 175:10
**evidence** 25:19,19
61:5 65:3,6
113:20 119:24
120:24 156:3
157:8,12,16,17
158:10 163:22
164:5,12,12,14
168:15,18,21
197:9,11 210:11
210:12,13,14,16
210:19 211:8

234:24,24 235:2
235:12 239:13,19
272:19,20,22
**evident** 164:5,7
**exact** 39:8 48:7
60:4 95:25 96:3
153:6 163:16
189:17 203:10
204:19 275:8,9,11
**exactly** 35:3 41:16
75:11 80:11 94:20
155:17 164:3
203:8 204:4 212:9
242:14 247:20
270:8 272:4
**examination** 5:7
11:2,6 105:1
144:3 156:18
226:4 245:21
**examine** 98:10
221:17
**examiner** 6:12
98:9 123:19 128:3
132:5 156:18,21
156:23 165:25
166:22 201:20
**examiner's** 99:19
100:13 123:3,17
123:18,22 128:11
129:24 140:20
141:14 151:11
156:9,20 160:24
163:15 165:13,21
199:23 201:1
229:16 239:6
272:10 273:12,15
273:17 276:2,5
277:2
**examiners** 167:15
**examining** 234:23

**example** 74:25
81:25 85:20 92:11
105:5 106:16
125:2 129:4
132:21 135:17
142:11 147:11
211:25 220:21
224:11,13
**excited** 172:15
**exclusively** 26:4
164:23
**executed** 182:11
183:5,17 223:8
284:10
**execution** 283:14
284:19
**exercise** 108:2
232:19
**exercises** 148:21
**exhibit** 5:16 6:5,6
6:7,8,11,12,14,17
6:19,21,23 7:3,4,6
7:8,11,13,14,15
45:15,21 77:5,9,14
77:17,20,21,25
78:4,7 79:1,10
80:4 81:11 111:14
111:22 112:2,3
114:21 122:15,22
128:2,10 140:7,16
150:2,9,22,23
152:13 153:16
154:8 160:10
169:4 171:2,9,12
174:1,3,4,15,19
179:1,8,15 182:13
182:19 185:8,15
185:18 186:8
196:7,13,19
198:25 199:8,12
206:7,14,17 215:2

216:20 223:19,25
225:5,11 238:1,2
266:8,14 268:3,5
**exhibits** 5:4 6:1
7:1 79:5 92:16
94:12 97:21
170:14 276:3
**exists** 255:4
**expect** 145:24
**expenses** 45:3,6,11
**experience** 57:13
98:1 101:11
102:20 126:20,22
131:10 132:4
142:9 231:4
245:14
**experienced** 175:1
**expert** 24:19
202:19,24 203:18
245:3,5,8
**expiration** 283:19
284:25 285:25
**expires** 281:16
**explain** 92:19
94:15 97:7 108:18
117:13 122:1
168:4 195:21
205:14 248:2
263:13 265:5
**explained** 13:19
220:12 269:14
**explanatory** 82:18
**explorer** 70:23
73:7,11,14,17,22
73:25 74:3,5 75:4
75:4,9,10,14 79:12
79:14,18 80:13,18
80:21,23 81:5,7
92:14 93:3,14
94:13 130:3,12
131:13,18 158:6

158:15,17 159:12
166:9 167:21,25
168:5 214:13,19
215:23 218:5,8
263:9 264:22
**exposed** 35:5
**extent** 14:6 92:5
148:12 214:16,20
219:16 253:21
**extra** 217:15
**extremely** 49:5
118:13
**eyes** 170:6 225:21
250:18 271:10
**eyesight** 77:15

**f**

**f** 3:20
**facebook** 7:14
225:6,14,17
**faces** 268:13
271:22
**faceted** 53:10
**facility** 85:14
**fact** 77:25 102:23
134:9,10 179:20
179:20 201:6
**factor** 51:16 52:10
**factoring** 165:12
**factors** 46:23 47:5
47:14 49:24 50:18
51:2,7,24
**facts** 179:24 214:5
**faculty** 44:21
151:9
**fair** 35:9 63:24
64:2 227:24 232:3
234:4 235:8
246:19 253:12
256:19 258:17
274:9

false  12:25
familiar  49:3,5
  147:13 169:13
  184:11,12,15
  247:5 262:8,10,11
  267:9
familiarity  13:25
families  60:5
  126:4 170:12
family  51:22 53:2
  53:11,13 54:13
  55:7 65:23 225:20
far  24:22 25:24
  26:22 44:9 51:2
  72:16 129:17
  135:9 157:25
  162:6 172:5 206:4
  209:5 251:16
  268:13 275:18
fast  28:8
fatal  33:2,14 60:13
  60:18 61:13,15,18
  64:3,4 65:20,21
  66:2,21 70:8,8
  82:17,17 98:25
  100:3,10,18 101:4
  102:1 103:4,5,6,9
  103:10 104:7,7
  175:14 206:19,20
  207:21,21 231:23
  233:17,18 234:6,9
  234:9 235:10,10
  235:18,18 259:17
  261:22 265:9,21
  276:22
fatalities  59:10,23
  59:24 60:5,9
  63:10,11 134:15
  134:16 164:10
  195:2

fatality  59:13
  113:13 116:17
fatals  64:22
  134:17 161:16,16
  276:23
fault  56:16
fbi  43:3,11 259:9
february  183:2
federal  11:2 12:22
  42:23,25
feeds  73:11
fell  277:18
felony  198:20
  249:9 250:19,20
felt  198:13,22
  249:2
female  188:2
  274:8
fentanyl  6:20 33:6
  58:8 64:6,19,25
  66:19 88:22
  101:13,18 103:12
  104:9 105:13,14
  105:17,18,19,22
  106:2 109:1,15
  111:9,12 113:12
  121:9 123:4
  124:17,18,23
  125:2,4 126:15,17
  140:21 141:23
  142:2,3 147:12
  150:11 164:17
  172:11,12 173:12
  173:13,22 174:24
  175:6,16,19,22
  176:10 177:22,23
  178:18 201:24
  212:6,14,15 231:3
  231:5 232:10
  233:13 239:14
  242:14 245:7

262:3 270:3 271:4
  271:20,21 277:4
fentanyls  163:3,6
  163:16
field  257:2
fields  130:19
fifth  78:22 128:20
figure  68:11 82:12
  101:25 115:1
  116:20 148:10
  166:15 229:17
  255:16
figures  82:14
file  25:9
filed  18:12,23 19:1
files  96:12,13
  114:12,13 123:15
  218:18
fill  36:15,24 38:3
  160:8
filled  50:15 53:17
  56:2 130:1 237:15
fills  36:25
final  42:6 47:22
  103:24 131:16
  132:4 201:21
finality  103:21
find  57:18,18
  59:14 61:11 81:10
  83:21 95:9 99:22
  101:19 102:22
  103:1,10 105:24
  106:2,22 107:9
  108:21 113:20
  117:3,7 118:1
  121:10 132:7,15
  132:21,24,25
  133:5 167:11
  175:15 211:3,6
  231:22 234:8,8
  262:1 276:12

282:11
finding  172:10
  173:11
fine  92:5 209:16
  209:16
fire  87:22,23,23
first  11:3 18:18
  26:9,15,20 27:22
  28:12,14,18,21
  29:1,3,20 30:3,4
  31:12 32:22 46:20
  47:22 60:14 64:14
  78:10 81:7,13,25
  82:9 94:18 98:6
  100:5,9 104:3
  124:21 140:17
  141:2,3 151:22
  155:14,16 158:9
  163:15 164:16
  178:9 180:10
  181:18 196:19
  197:16 202:17
  204:2 207:10,13
  224:13 228:9,11
  230:2,3 238:21
  240:20 248:19
  251:24 280:10
fit  206:1 257:24
five  17:24 71:16
  71:17 78:8,24
  144:16,19,20
  145:8,11 146:7,9
  146:10 156:15
  162:19 186:22
  209:7 265:13
  273:15,19,25
  277:8
flight  45:6
flip  209:25 242:16
floor  1:21 2:7
  11:23

**flow** 94:25
**focus** 170:3 228:23
  233:7,9 247:15,17
  247:20 252:20
  258:17,20
**focused** 33:8
  227:14 248:4,16
**focusing** 229:4,11
  229:21 230:7
  252:18
**folder** 215:11
**folks** 141:4 199:14
**follow** 61:22 162:7
  197:10 198:16,19
  202:16 207:16
  209:3,4,19,24
  210:2,7 213:1
  217:13 226:10
  232:18
**followed** 119:2
  125:4 172:13
  198:18
**following** 1:24
  149:14,15,19
  216:13
**follows** 11:5 241:9
**food** 34:8
**force** 6:5 43:4,6,22
  45:16 46:3,11
  59:20 187:22
  188:16 232:18
  252:4 259:10
  265:1
**forces** 42:16,18,21
  42:23,25 43:2
  259:8,9,9
**foregoing** 280:15
  280:20 283:13
  284:18
**forget** 159:19

**forging** 48:11
**forgot** 174:21
**form** 7:11 13:23
  34:16 40:16,23
  41:5 49:1 51:1
  53:8,21 54:9,18
  55:13,24 56:18
  57:21 58:25 62:13
  64:8 65:18 90:12
  93:9 98:14 99:5
  101:23 102:18
  103:14 104:21
  105:21 107:2
  108:5 109:12
  110:1 114:17
  115:17 116:9
  118:7,24 119:21
  120:11 121:24
  125:8 129:13
  130:7 132:18
  133:25 134:6,13
  135:2 138:5 139:6
  142:15 146:14,22
  147:10,25 148:6
  153:13,20 157:24
  159:8,10,23 160:1
  160:2 161:2
  165:11 166:12,25
  167:18,23 168:20
  171:20 173:15
  174:8 175:25
  177:10 180:25
  181:5,21 183:9
  184:10 187:11
  189:5 190:24
  193:17 195:18
  197:3 198:12
  200:19 201:19
  204:13 206:9,18
  207:4,8 209:11
  216:6,19,25 217:2

217:6,17,24
220:20 222:2
224:16 228:7
229:24 231:15
235:20 236:20
237:12,24 239:24
244:20 247:3
250:2 253:1
254:12 259:22
260:17 269:11
270:6
**formal** 272:8
**format** 93:13
**forms** 58:20
  130:22 215:6,12
  217:4,22 218:1,11
  218:15 220:14
  254:20 255:24
**forth** 90:21 92:16
  206:3
**forward** 282:15
**found** 13:9 63:21
  65:3 98:6,11
  114:12 115:22
  119:3 120:8
  132:12 133:20
  137:24 200:7
  202:2 211:25
  212:17 240:6
**four** 17:23 105:2
  106:23 145:10
  163:20 186:22
  208:4,7,13 240:13
  258:7 264:20,21
  265:13
**fourth** 1:21 2:7
  11:23 27:2,3,6,11
  27:15 28:5,19
  78:20 106:14,18
**frame** 156:14

**frank** 37:1,13
**free** 283:14 284:20
**friday** 277:7
**friend** 68:4
**friends** 225:20
**front** 79:6 128:13
  152:13 162:23
**fu** 16:12
**fuli** 2:5
**full** 220:25 233:23
  234:20
**fully** 173:23
  239:22
**funny** 171:22
**further** 138:13
  225:23,24 280:18
  281:1

**g**

**g** 36:23
**game** 231:8
**gary** 6:22 171:4
**gather** 24:11
  103:8 111:7
**gathered** 223:16
**gathering** 163:22
**gear** 173:22
**general** 13:25
  116:18 181:23
  209:12 222:16
  238:17
**generally** 95:13,14
  255:22,23,25
  256:1 265:18
  267:19 270:1
  271:14
**generals** 44:23
**generated** 197:18
  206:18 214:3
**generic** 247:6,10
**getting** 49:18
  53:24 58:8 60:10

60:20 190:1 192:8
226:22 227:9
231:10 250:6
254:21 255:17
**gilson** 6:14 140:9
**gingell** 6:22 37:19
38:7,10,12,17
171:4 196:21
**give** 12:3 46:25
59:16,19 60:4
67:21 68:20 69:6
69:15 74:25 92:18
151:23 152:3
154:1 162:18
173:10,25 179:22
183:10 188:7,8
189:1 215:20
216:7 266:20
267:3 268:6,9,10
268:23 279:1,10
**given** 49:20 86:17
151:20 153:5,11
174:16,19 280:12
280:17
**giving** 69:24
160:13,16 267:15
**glasses** 271:10
**gloves** 271:9
**go** 13:24 23:1
26:24 27:3,5,10
28:14,17 37:4
46:21 51:17 52:12
57:14 59:10 67:4
71:17,20 80:15,19
81:9,11 90:13
91:7 107:10,10
117:20,23 119:11
119:23 122:5,6
132:25 134:14
141:20 142:17
145:2 148:16,19

154:16 158:2
159:15 164:25
165:2 172:6,8
175:18 179:25
190:9 191:1 195:2
195:2 201:5
202:13 206:21,25
214:12,23,24
218:5 228:18
231:17,21 232:1,6
233:24 234:3
239:9 240:12
241:23 242:19
243:3 253:23,25
258:8,10,10,14
264:22 265:9
266:1 270:18,22
271:11 274:24
276:10,11 277:7
**goal** 33:15 34:10
68:2,2 231:20,25
253:3 264:4
**goes** 45:7 70:23
79:17 120:22
131:20 136:18
167:5 168:4
201:16 207:22
210:3,10 214:10
232:1 250:6
251:16 252:13
**goggles** 271:10
**going** 14:11,16
19:17 25:7 27:9
27:21 28:16 34:1
34:7,18 38:4 47:4
48:21 49:17 56:13
57:11 58:9 66:9
67:3 68:9 90:20
91:7 97:21 108:25
118:11 120:23
129:16 136:7

143:4 148:12
155:3 156:3
159:19 172:9
189:16 193:7
212:25 219:15
223:6 228:14
232:24 233:23
234:3 235:5 238:7
243:22 244:3
246:1 248:1
249:13 252:5,13
252:15 253:9
254:2,23 264:14
265:16 268:17
270:13 273:22
275:2 276:20,21
276:22,23 277:13
**goldstein** 3:16
5:10 21:23,23
72:15 245:22,24
278:11
**good** 11:8,10,11
30:18 46:2 68:24
72:24 77:14 177:1
177:19 189:21
224:1 226:6,7
245:9 249:17
251:11 265:19
266:3
**gotten** 65:6 261:6
**gps** 112:5 114:23
**grade** 42:13
189:20,23
**gradually** 37:5,8
**grand** 188:2
**grandma's** 135:18
**grant** 191:15,24
191:25,25 192:4,8
192:8 193:13,22
193:24

**granted** 183:7
**grantor** 193:18
**grantors** 194:4
**grants** 191:7,10,17
191:20 192:18
193:9
**granular** 170:1
**gray** 3:16,20 21:24
22:1
**great** 21:15 52:7
249:10 250:8
**greater** 44:4
**grew** 51:21
**ground** 46:2 61:10
**group** 36:2 44:1
69:12 153:8
**grow** 52:5
**grown** 189:3
**grows** 25:4
**guess** 135:25
163:19 232:4
**guesses** 178:2
**guidance** 76:2
**guideline** 164:1
**guidelines** 50:2
52:14
**guilty** 13:9
**guy** 68:8 250:9,12
250:13 251:9
252:1,11,12,12
257:11 258:1,9,11
262:6,7 266:4,6
**guys** 34:2,2 172:6
176:17 189:15
190:11 191:5
264:7 277:9

## h

**h** 35:25 37:3 44:2
97:6,10
**half** 15:7 59:18,18
69:1,8,11,17

107:13 111:5
156:13 172:10
173:11 192:20,24
219:6 228:18
250:13 251:14
252:11
**halfway** 46:22
**hall** 188:4
**hand** 34:25,25
35:4,4 43:13
48:12,12 78:13,17
118:4 143:7
150:16 167:3,3
168:3,3 185:22
233:4,4 264:23,23
281:6
**handed** 140:15
179:7 199:7
223:24 225:10
**handful** 261:17
263:2
**handing** 45:20
77:13 111:21
122:21 128:8,9
171:8 182:18
185:14 196:12
206:13
**handle** 275:3
**handled** 96:21
146:18
**handling** 207:23
**hanging** 52:8
**happen** 118:22
**happened** 13:8
117:9 121:6 149:6
149:9 183:24
241:21 252:9
263:1 265:24
**happening** 139:17
**happens** 100:24
118:5 175:5,11

257:17
**happier** 250:17
**happy** 14:21
**harassment**
121:21
**hard** 160:3 195:4
252:8 270:12
274:13
**hat** 254:1
**hdi** 35:25
**head** 38:23 134:18
194:8
**header** 79:11,15
79:19
**heading** 143:8
**health** 3:2 50:6
56:23 57:9
**hear** 14:14 22:13
74:16 247:18,24
**heard** 67:7 184:2
262:6
**heavy** 126:17
**heights** 263:19
**held** 173:3
**hello** 74:9
**help** 67:17 91:3
92:10,12 138:17
143:5 154:9 157:8
164:1 194:16
226:22 268:21
**helping** 27:7
**helps** 263:25
**hereinafter** 11:4
**hereunto** 281:5
**heroin** 6:20 26:2
33:1,5,6 34:4
35:15,16,22 41:17
57:17 58:2,5,10,11
58:13,18 63:19
64:6,19,25 65:24
66:14,16,18 73:22

83:14,18 88:22
92:22 98:19
101:14,18 102:24
103:12 104:9
105:8,10 108:20
109:1,15 111:8,12
113:8,12 116:14
121:8 123:4
124:16 125:4
128:21 129:5
132:22,23 140:21
141:24 142:1,4,13
145:25 150:11
155:9 161:11
164:5,7,17 175:19
177:8,17 178:23
178:24 201:24
212:6,14,15
233:13 236:12,17
237:5,8,22 238:10
239:11,14 240:23
242:13 243:1
244:23 245:7
248:22 249:15,17
250:13 252:2
259:6 262:3
268:14
**hey** 68:8 265:12
**hi** 245:23
**hickok** 23:5
**hidi** 7:11 35:22
36:1,11 38:18
97:5,5,17,18 161:5
161:21 165:15
167:14 187:25
188:20 206:8
207:8 217:21
233:11 256:9
257:7 258:18
260:15 263:1,4
269:7 270:2

271:25 272:1
274:10,17 275:14
275:24
**hidi's** 272:6
**hidta** 44:2,9,10,12
73:13,15 92:11
96:2,4,25 97:1,4
264:15
**hidta's** 263:22
**hidtas** 264:12
**high** 28:9 43:25
69:16 96:25
114:22 241:20
251:3,6,7,19 256:2
259:5
**higher** 41:14
141:25 188:25
229:13
**highly** 1:25 6:18
6:20 62:25 127:8
148:18 150:5,12
154:15 170:14,23
271:5,5
**highway** 13:14
**hip** 254:9
**hire** 194:19
**histories** 110:6,6
110:17,21
**history** 65:15
68:20,25 69:4,6,13
70:15 75:3,23
76:14,18,25 86:20
200:12,14
**hold** 92:8
**home** 28:16 152:6
269:2 271:11
**honest** 182:8
255:14
**honestly** 93:21
231:11

**honesty** 268:14
**honolulu** 152:1,8
**hoodie** 254:1
**hope** 14:2 269:18
**horrible** 66:13
**hospital** 61:6,7,21
68:9 88:18 100:11
211:16,17
**hostetler** 3:3 22:6
**hotel** 44:11
**hour** 153:3 156:13
156:14,15 266:20
266:20 267:20
268:24 269:2,4
**hours** 18:1,3 67:4
89:19,20 156:11
156:16 192:9,11
192:17,18,22
234:23 277:8
**house** 53:4 115:5
211:15,18 223:5
243:5 244:13
254:2,5
**hubbard** 2:15
**hugh** 6:14 140:8
141:4
**hum** 238:11
**hundred** 163:9,11
**hundreds** 59:11
59:11
**hung** 131:19
144:23
**hurt** 190:21
**hx** 200:11,14
**hypothetical** 99:6
99:9 110:2 194:18
194:21

**i**

**idea** 45:24 122:4
**ideally** 242:2
263:20 264:12,15

264:24 276:8
**identification**
45:18 77:7,11
111:19 122:19
128:6 140:13
150:7,14 171:6
179:5 182:16
185:12 196:10
199:5 206:11
223:22 225:8
266:11
**identified** 271:16
**identify** 15:19
21:9 50:24 91:4
242:4 250:24
251:1 257:16
**identifying** 16:5
261:13
**identity** 15:24
16:2 193:12,15
**iffy** 54:11
**illegal** 49:3 50:7
58:21 105:7,8,10
105:23 106:4
134:24 135:4
138:23 139:12
146:16 212:4,13
245:6
**illegally** 49:8
107:5 146:6 274:2
**illicit** 104:18,23
105:14,18 106:15
106:24 109:9
136:10 162:14,22
177:23 200:7
201:25 202:1
**illinois** 2:15
**illnesses** 48:22
198:21
**image** 72:9,12

**imaged** 223:13
**images** 72:8
**immediate** 37:22
64:15 258:18
**immediately**
120:19 155:19
258:6,16,23
264:20
**implement** 230:19
**implemented**
230:20 276:6,15
276:19
**important** 169:3
249:3,9
**improper** 50:2
52:20 54:13 55:17
**improperly** 107:6
**inadvertently** 58:7
**inbox** 220:25
**incident** 78:16
82:7,20 83:9 84:5
84:6,21,22 85:6
198:5 208:9,23
**incidents** 83:5
107:18,20 108:11
**include** 46:23
48:16 76:13,18,25
85:7 157:1 211:24
227:2 268:12
**included** 76:3 83:8
214:18 239:4
282:13
**including** 58:20
111:8 124:17,22
168:25 199:14
**incorporated**
241:4 284:12
**incorrect** 58:3
228:12
**increased** 127:3

**increases** 30:22
**increasing** 37:6
**independent** 20:18
**index** 5:1,4,5 6:1
7:1 8:1 9:1 10:1
**indicate** 131:6
180:9 240:5
**indicated** 90:19
**indicates** 200:12
**indicating** 97:15
141:1 161:8 174:2
242:20 243:14
282:13
**indict** 232:17
**indicted** 149:11
**individual** 275:2
**individuals** 259:16
259:19
**influx** 172:12
173:12
**info** 208:24 214:6
214:7
**inform** 138:17
**informal** 277:21
**informant** 180:17
251:8
**information** 18:20
65:23 67:16,24
70:16 73:11,24
74:2,5,7,24 75:2
75:13 76:3,8,10
80:16,17,20 81:20
81:23 83:15 85:8
90:1 92:16 93:6,8
93:13,18,20 94:9
94:11,16,17,17,21
94:23 95:4 96:7,8
96:9,18,22 101:4
102:2,2,14 103:2
129:17 130:11,20
131:13,15,16,20

131:24 132:2,7,13
132:14,23 133:18
138:14,16,22
158:14 159:18
166:7 167:19
168:4 210:2,4
213:9,23 214:1,8
214:17 215:6,22
215:24 218:4,6
219:4 223:6,16
231:18 251:9
261:6,9 263:14,24
264:23 269:18
ingested  98:4
initial  16:20
  102:24 202:3,8
  207:24 241:7
initially  72:1,2
  116:24 208:3
  213:23 230:21
initiated  219:13
injured  13:13
injury  13:15 66:8
  66:9
input  70:15 71:5
  80:10,16,20 81:4
  83:24 161:25
  162:4 214:14,21
  217:23 218:1
inputs  75:13 84:18
inputted  70:22
  73:23 75:12 76:16
inside  85:14
  270:22
inspect  164:10
inspection  163:21
  163:21
install  112:4
installer  23:20
instance  58:8
  160:14 261:10,16

instances  63:18
  64:12 83:5,17
  261:12
instant  82:15
  223:9
instantly  266:5
institute  23:6
  44:23
instruct  275:15
instructed  76:13
instruction  76:1,5
  229:4 279:2,10
instructions  14:12
  153:23
instructor  25:6
  227:5
intelligence
  172:14
intensity  43:25
  97:1
interdiction  44:12
  188:4
interested  231:11
  241:8 281:3
internal  275:19
internally  94:2
internet  20:19
  225:18
interrogation  25:4
interrogatory
  18:13 19:3,11
intertwined  73:10
  79:17
interview  25:3
  66:3 67:10 90:2
  97:25 102:4,5,12
  109:3 131:11
  138:15,19 209:20
  232:18
interviewed  67:1
  67:10,11 110:18

209:2
interviewing
  159:13
interviews  69:21
  101:12 209:1,23
  210:8
introduced  160:12
introductions
  160:11
investigate  35:20
  116:25 117:2,14
  132:9 134:15
  136:9 181:13
  182:6 186:15,18
  188:18 195:3
  201:6 205:16,18
  228:21 229:2,18
  268:25 276:17
  277:16
investigated  63:12
  64:17 66:22 93:1
  120:7 121:8
  129:21 134:9
  135:1,23 136:1,20
  136:21,24,25
  137:4,8,12 146:3,5
  229:1 233:17,21
  234:1,12,12,17
  246:24
investigates  118:2
investigating  33:2
  33:13 92:22
  113:11 136:15,16
  136:19 138:13
  145:21 188:11
  245:15
investigation  6:17
  35:17,23 49:21
  104:7 117:7 139:3
  139:18 144:21
  150:4 154:7

155:12,13 156:6,7
156:25 161:12
163:25 187:3
203:8 207:12
227:17 228:2,4
233:22,24 234:18
234:20,22 235:4,5
269:8,16,17
272:14 273:16
investigations
  25:2 161:20 185:5
  195:7 216:17
  227:15 230:12
  251:8 253:17
  266:23 269:15
  270:11 272:24,25
  273:1
investigative
  119:14 139:15
  148:13 158:12
  205:19 216:11
  253:7,14 254:22
  254:25 255:1,12
  257:1 274:25
investigator  156:9
  160:24
investigators
  239:7 266:25
  278:2
involuntary  260:5
involve  139:2
  205:15,19
involved  35:16,22
  38:5 44:6 53:18
  55:17 63:14 64:5
  64:18 65:7,11
  89:7,10 99:3
  103:20 104:1
  105:22 113:13,16
  117:9 121:8
  126:11 130:15

132:8 133:4,10
138:1 139:2
144:17 146:20
161:11 187:3
226:21 227:15
241:16 251:18,19
253:5 257:8,9
269:8 273:19
274:5,10
**involvement** 43:21
46:10 59:3 135:6
136:17 267:6
**involving** 83:11,12
113:10 119:18
136:9 138:22
139:12 144:19
146:18 203:19
**iowa** 151:24
**irrelevant** 220:2
243:25
**issue** 92:6 135:13
**issued** 62:8,14,20
179:21
**issues** 50:6 56:24
57:7,9,11,14
278:16
**item** 81:13
**items** 77:18
216:11 272:23

**j**

**j** 2:6
**jackson** 4:3 22:15
152:1
**jacksonkelly.com**
4:6
**january** 6:14
140:9,23 141:5
185:23
**jeopardy** 255:19
**jessica** 3:20 21:25

**jessica.soricelli**
3:22
**job** 27:24 32:23
61:7 112:25 113:2
117:20 190:9,10
226:17 227:2,3,6
229:20 230:6
248:9 255:9 256:7
**jobs** 23:25 268:22
**joe** 38:1
**john** 3:12 21:21
36:21,22 37:12,12
116:5
**join** 40:19,21
**joined** 23:11,14
32:12 35:10
**jones** 2:18 22:8
**jonesday.com**
2:20
**josh** 245:24
**joshua** 3:16 21:23
**joshua.goldstein**
3:19
**judge** 1:8 112:7,14
183:7
**july** 79:24
**jump** 112:13
115:11 125:17,18
126:1 258:5
**jumping** 79:24
**june** 174:13,19
**jurisdiction**
156:19
**jury** 188:2
**justice** 205:2
**jzipp** 3:14

**k**

**k** 3:8 36:19,23
**kalahari** 173:4
**kansas** 151:24

**keep** 37:8 70:5,6
92:15 93:25 96:22
107:3 114:4,5
127:5 152:9
171:21 192:21
195:10,16 215:8,9
215:15 218:10
223:1,3 254:9
278:14
**keeping** 52:24
68:23 70:10 92:19
228:14
**kelly** 4:3 22:15
**kept** 37:6,8 59:17
94:2 96:14,14
129:16 195:19
**key** 3:4 111:9
**kill** 34:6 62:16
270:20 271:22
**killed** 218:23
**killer** 259:23
260:6
**killers** 259:18
**killing** 257:12
**kilo** 34:2 250:13
251:13 252:11
**kilos** 249:15,15
252:2
**kind** 41:17 58:3
66:19 93:13
101:12 158:7
161:8,9 179:25
189:6 222:3,9,17
228:11,12 233:12
262:5 266:21
268:24 274:18
**kinds** 222:11
**king** 85:15
**kit** 143:16
**kitchen** 243:11,15
243:16,18

**kits** 143:15 194:22
**klamert** 36:18
172:6
**kmorrison** 2:20
**knew** 28:16
175:22 277:24,25
**know** 17:18 19:3
24:10,21 25:25
28:18 29:20 33:3
33:17 34:2,5 35:6
38:17 39:5,16,17
41:14 43:9,11,12
44:25 45:3,10
46:8 48:8 49:15
50:22 52:10,13,17
52:19 53:1 56:8
56:11 57:2,17
58:10,16 59:17
60:23 65:10,14
66:2,4,6,9,15 67:5
67:6,20 68:8,9
69:7,24 70:6 71:1
72:17 75:22,23,25
76:16,19,21,23
77:1,16,25 78:1
79:19 80:11,14
83:21 90:21 92:3
95:6,8,25 96:5
98:16,25 101:7,12
105:12 106:10
107:16 109:13,20
110:2,24 111:2,3,4
111:6 112:10
113:15,22 114:4
114:24 115:7,12
115:18 116:6,13
116:14,21,22,25
119:7,23 120:20
121:15 122:9,13
123:16 124:21,23
124:25 126:5,7,10

126:22,25 131:3
134:1,4,16,19
139:4,8,10,22
140:1 142:16,18
142:18 143:12
144:24 147:1,4
148:2 149:6 159:4
162:6 163:5,8
166:21 167:6
172:16 175:9
176:11 177:3,8,17
177:22,25 179:17
181:24 182:4
183:20 184:5,5,20
184:23 186:1,3,7
186:11,13 187:6
188:24 189:12,15
189:18 191:7,11
191:19,22 192:1,2
192:6,9,14,16,21
192:24,25 193:1,8
193:20,25 194:3,6
195:12,23 200:15
201:15 204:4
207:5,21 212:20
214:5 217:21,25
218:10 221:5,24
224:7,9,19,20,23
225:19 227:14
228:22 230:18,18
232:12 235:14,21
236:15 237:8,13
237:16,17 243:22
245:8 246:13
248:9,11,19 250:7
251:7,12 256:4,4
257:11 258:6,7
259:1,7,8,12,12
260:5 261:1,9
262:6,17,19,20,21
263:4,5,9,18,25

264:3,8,15,17
265:1,14 266:19
267:13,18 268:14
268:16,23,25
269:14,16,20
270:23 272:1,19
273:2,23 275:5,11
276:10 277:12,22
277:23,23 278:3,8
**knowing** 80:11
166:23 167:1
**knowledge** 191:18
**known** 87:2 255:8
255:23 256:1
**kristin** 2:18 22:7

**l**

**l** 1:23 36:19,22,23
36:23 37:24 280:6
281:13
**l.p.** 1:10,12,13
**lab** 147:6,17,21
**label** 260:6
**labels** 240:3,4,9
**labs** 25:3
**laced** 175:16
**lack** 234:24
**laid** 264:5
**lake** 37:2,13
**lakeside** 2:10,19
**large** 34:2 37:7
40:7 41:6
**largely** 228:1
**larger** 32:24 34:1
41:10 42:25
188:18 231:19
250:7 257:10
**largest** 125:18
**late** 29:7,20,21
30:1,3 50:2 52:15
62:8 75:11 203:17

**latitude** 85:6
**law** 16:21 27:25
35:6 43:6 87:18
87:20 90:25 91:2
91:16,22 152:12
153:21 187:21
198:2 263:10
264:25 267:24
268:21
**lawful** 11:1 104:24
106:9,23 107:3,7
237:10,21
**lawfully** 54:2,10
54:11 55:1,2,5
56:4 57:25 104:17
236:11,16 237:3
**lawsuit** 13:15
**lawyers** 219:23
**layout** 240:21
266:21 268:24
**le** 87:17
**lead** 50:18 58:18
117:16 118:8
119:3,18 120:1,18
120:18,20 156:3
168:22 228:16
235:6 258:15
**leading** 51:4 52:10
89:20 227:20
**leads** 101:19
117:17,21 118:12
118:15 119:12
121:2 219:1
**learn** 149:14,18
229:22 230:15
**learned** 101:5
138:19 178:6
**leave** 61:20 157:12
**led** 33:18 46:23
47:14 49:25 65:24
121:2 132:13

231:22 242:5,8
258:19 260:1,8
262:3
**left** 31:21 78:13,17
132:1 189:13
211:9 238:9 277:6
**leg** 252:14
**legal** 109:9 273:24
282:1 285:1
**legit** 133:14,15
**legitimate** 55:6
66:8 133:21,22
134:8
**legwork** 136:17
**lerms** 93:10
**letter** 92:4 95:23
208:7 216:15,18
221:8,19 282:19
**lettering** 107:18
**level** 32:23 33:8,25
34:9 41:13 241:20
248:10,14 249:25
250:5,5,10 251:3,6
251:7,19 252:22
253:8,17 254:17
256:2 259:5
**levels** 142:4
250:24
**lieutenant** 38:2
152:23
**lieutenants** 241:10
**life** 21:2,3 22:23
255:10,18
**light** 192:13 271:8
**lighter** 192:14
**likewise** 56:1
**line** 65:12 116:18
124:10,14 207:7
217:12,15,16
255:4,11 269:19
282:13 284:7

285:3

**lined** 49:16

**lines** 135:24
138:21 196:5
217:15

**link** 61:13,14
117:14 234:9

**list** 50:12,20
130:14,16 265:13

**listed** 123:13
153:14 200:16
201:9 241:11
242:11 284:7,17

**listen** 231:13

**listening** 159:15

**listing** 284:7

**lists** 239:14

**litigation** 1:6
219:13 220:1
245:25 282:6
283:3 284:3

**little** 46:21 77:23
97:8 107:6 115:8
173:20 192:15
197:7 229:20
238:3 248:2
250:14 257:14
258:13 259:2
265:5 272:18

**live** 11:25 22:20
70:21 71:25 72:4
72:17 73:21
264:17 268:18

**lived** 21:4 22:24

**lives** 87:10

**living** 16:3

**llc** 3:15,15 21:24
21:24 22:1,2

**llp** 2:13 3:7,11

**locate** 71:12

**location** 41:25,25
42:4,4,5,5 76:11
208:9,23 224:19

**locations** 42:2,7
258:12

**lock** 212:19,20

**locked** 193:7
258:9

**log** 95:5 96:1,6
166:5 167:9
206:19 212:21

**logged** 96:10,11

**logging** 96:7

**long** 27:18 28:23
31:17 88:11 152:9
156:5 223:3 269:7

**longer** 32:24
211:17 237:17
259:2

**longitude** 85:7

**look** 20:8 50:14
71:10 80:2 91:8
95:10,11 126:14
138:24 139:13
147:12,14 164:8
165:9 168:8,14
169:24 176:9
202:5,7,8 260:7
266:1

**looked** 169:6
179:18 234:13

**looking** 33:17 79:2
113:11 120:1
146:1 155:24
164:24 165:3
212:5 223:4
224:13 227:19
240:2,9,10 241:15
243:10 248:12
252:8

**looks** 82:23 101:16
101:24 126:14
197:24 241:9
268:15

**loosely** 184:15

**lost** 60:5 97:8
187:17 189:16
262:22

**lot** 25:2 29:13
69:16,21,21
101:11,12 106:3
111:11 125:23
126:3,4 129:15
134:15 136:16,17
144:7,8,16 152:6
192:22 228:20
231:2 241:22
248:20 253:24
254:6,8 263:5,6
264:13 274:6,8,13

**louis** 272:25 273:5
273:8,10,13,14

**love** 263:20

**loved** 60:6 170:10
262:22

**low** 114:18 115:8
250:5

**lower** 34:9 41:13
52:7 142:3 143:7
185:22 188:25

**lowest** 142:4

**lunch** 140:5
143:20

**luncheon** 143:22

**m**

**m** 11:14 36:19

**madam** 282:10

**magnitude** 189:12

**mail** 6:14,21 7:6,8
71:3 140:8 141:3
141:9 155:10

171:3,12,22 196:8
196:20,21,21
197:25 199:1,12
199:17 276:4

**mails** 143:2
196:25 220:21,22
220:23,25 221:1,1
221:2,2

**main** 1:21 2:7 4:4

**maintain** 115:9
217:25 219:25
225:16

**maintained** 221:3

**maintains** 73:12
73:14 192:10

**major** 252:14

**majority** 64:18

**making** 34:1 40:24
40:25 41:10
248:13

**male** 213:11

**mallinckrodt** 3:15
21:24 22:1

**management** 50:1
52:14

**mandate** 229:10

**manner** 157:9
201:21

**manslaughter**
260:5

**manual** 76:1

**manufactured**
147:2 247:11

**manufacturer**
53:15 55:10 147:8

**manufacturers**
137:13 139:9
184:7 236:5 246:8
246:21,25

**map** 94:12

**march** 6:22 171:4
171:12 176:18
196:20,22,25
**marijuana** 25:4
40:7 200:11,12,14
203:6
**mark** 46:22
211:23
**marked** 6:3 45:17
45:21 77:6,10
111:18,22 122:18
122:22 128:5,9
140:12,16 150:6
150:13,17 171:5,9
179:4,8 182:15,19
185:11,15 196:9
196:13 199:4,8
206:10,14 208:2
216:19 223:21,25
225:7,11 266:10
266:14
**marketed** 246:14
**marketing** 50:4
246:17,20 247:1
**markets** 56:8
**marking** 170:14
**mask** 15:22
**masks** 271:9
**massachusetts**
3:18
**match** 71:4
**materials** 60:24
246:21 247:1
**matt** 22:3 37:23
226:8
**matter** 138:3
193:21,22 204:19
250:4
**matters** 12:13,17
15:4 138:25
202:23

**matthew** 2:14 6:21
171:3,15
**matthew.brewer**
2:16
**mcdonald's** 85:14
196:1
**mckesson** 3:7
21:20,22
**md** 1:7
**mdl** 1:6
**mdo** 249:10
**me's** 120:22 163:8
276:7 277:17
278:1
**mean** 24:7 28:24
38:15 39:3,16
40:18 41:12,17
43:23 46:14 48:13
49:5,14,15 50:13
50:15,16,17 51:6,7
51:8,11,12,13,14
51:18,23 52:1,2
53:13,23 57:10
64:10,25 66:16
67:1,2,3,15 68:22
70:4,5 76:9 87:19
89:9 92:19 96:1
98:23 101:15
105:22 107:4
109:4 114:8 115:7
119:1,2 121:21
123:10 126:3
131:19,23 134:14
135:8 139:14
142:17 145:9
147:3 156:14
158:21,23 159:18
178:19,20 188:10
190:25 191:4
192:22 200:11
202:1 204:25

205:14,15 212:11
223:6 227:12
229:6,13 230:17
231:8,20,25 232:1
232:23 233:12,12
234:25 235:11
237:13 241:14,22
241:25 242:2
244:22 246:17
247:21 248:17
249:4,8,13,17
250:3,5,6,10,16
252:6 253:24,25
254:4,4,21 257:25
258:21,22 259:10
261:16,25 262:8
262:12,23 263:3,4
263:6,19,19,22
264:4,6,19 267:11
267:12 268:10
269:13,21 270:8
270:24 271:19
272:4 274:7,12
275:1,11 277:7,24
**meaning** 59:5
89:19 93:18,19
123:14 124:15
230:7 241:21
**means** 28:8 45:25
77:17 86:17,20,25
87:22 89:5 198:1
198:18 212:25
234:13
**meant** 85:11 124:3
**measure** 249:23
**measures** 128:21
**medical** 6:12 55:6
98:9 99:18 100:13
123:3,17,18,19,21
128:3,11 129:24
132:5 140:20

141:14 151:11
156:9,17,20,21,23
160:24 163:15
165:13,21,25
166:22 167:15
199:23 200:12
201:1,20 229:16
239:5 272:9
273:11,14,16
276:2,5 277:2
**medically** 54:21
54:22
**medication** 50:3
52:21 54:2 63:16
**medications** 47:24
50:4,7 53:3,12
56:9 244:14
**medicine** 135:18
**meet** 16:11 156:8
222:4,6 230:23
265:12
**meeting** 17:14
178:5 222:3,9,18
**meetings** 16:25
17:20 18:19
221:25 222:8,10
222:11,16,22
230:18
**members** 17:5,7
36:10 41:1,9,13,14
62:19 165:15
187:18 188:17
**mental** 50:6 56:23
57:9
**mentioned** 37:17
61:23 63:9 115:23
226:20,22 233:1
238:17 253:4
**mercy** 258:25
**message** 223:9
265:11

**met** 16:10,14,20
153:8 232:15
**metadata** 90:23
**meth** 25:3
**methods** 148:14
**mexican** 25:4
39:24 40:1 41:21
**mexico** 151:25
177:19 178:6
231:18 232:6
**mid** 32:23 33:8,25
176:15 196:25
203:17,17 248:9
248:14 252:22
253:8,17 254:17
**middle** 65:14
**middleman** 41:2
**midwest** 282:17
285:1
**mike** 37:2,25
**mill** 49:11 137:1
**million** 252:3
**mills** 50:9 58:22
**mind** 60:15 69:9
79:2 154:9 163:24
191:4 209:8 213:5
248:25
**mine** 215:8
**minute** 33:22
71:16 174:22
179:22 191:13,14
**minutes** 71:17
97:13 156:10
162:19 209:7,8
**miranda** 148:21
148:25 149:1,20
183:22 232:19
**mischaracterized**
239:25
**misconstrued**
233:20

**missed** 108:25
**missing** 50:19,21
94:6
**mississippi** 152:1
**mix** 147:5
**mixed** 141:24
142:2
**modified** 217:17
**moines** 151:24
**mom** 276:13
**moment** 71:16
179:14
**month** 153:6
**months** 18:18 29:2
29:15 43:7,8
234:21
**moran** 1:17 5:7
11:1,6,8,14 16:5
45:15,20,21 71:23
72:13 77:5,9,13
90:19 91:22 92:2
92:10 111:14,21
111:22 122:15,21
122:22 128:2,8,9
128:10 140:7,15
140:16 144:3
148:16,19 150:2,9
150:17,17 171:2,8
171:9 172:6 179:1
179:7,8,17 182:13
182:18,19 185:8
185:14,15 196:7
196:12,13 198:25
199:7,8 206:7,13
206:14 223:19,24
223:25 225:5,10
225:22 226:4,8
245:21,23 253:23
266:8,14 278:17
280:9 282:8 283:4
283:9 284:4,13

285:20
**moran's** 72:9
**morning** 11:8,10
72:2 150:18 168:8
169:7 179:18
**morrison** 2:18
22:7,7
**motel** 44:11
**mouth** 259:25
**mujumdar** 2:2
21:17
**multi** 6:11,17,19
45:22 53:10 77:15
111:23 122:16,23
140:17 150:3,10
179:15 182:20
224:1 251:13
**multiple** 48:23
89:24 144:18
145:9 231:8,9
249:16,16 250:13
259:7
**multitude** 205:1
213:2
**murderer** 259:24
260:6
**murderers** 259:20
**muted** 74:18

**n**

**n** 4:3 11:14 36:22
36:23 38:2 143:9
**naddi** 7:15 266:9
266:18
**nagtri** 44:22 45:6
151:8
**naloxone** 61:25
78:21 86:16,24
87:7 88:7 94:16
143:17 175:20
**name** 11:12 15:17
16:17 17:18 23:4

70:18 73:4,4,6
76:12 88:20 89:1
89:5,9 90:1 92:9
95:1,2 96:1,3
97:22,22 100:18
102:3,16 103:25
104:6,16 107:21
107:22 108:8,8,13
120:7 122:10
130:3 134:2 154:1
226:8 241:11
244:12 245:23
246:3,8 247:10
262:5,9 282:6
283:3,4,15 284:3,4
284:21
**named** 280:9
**names** 73:5 79:20
203:13 209:21
240:9 241:10
**narcan** 60:25
61:23,24 62:20,23
63:2 86:17 87:1
87:21,24 88:5
194:22 271:13
**narcotic** 202:25
**narcotics** 11:19,21
30:14,17 31:7,18
31:21,24 32:4,12
32:14,22 35:10,21
36:4,7,8 38:21
43:11 48:9,14
133:2 172:5
181:12 187:6,7,9
187:14,16 189:10
189:18 190:8,13
206:19 227:13
230:11 233:2
247:14 248:8
251:18 252:23
253:13,19 254:7

255:7 260:14 263:1 270:2 272:16

**narrative** 70:16 76:15,16,17 90:10 90:11 91:8,10,13 91:21 107:17 158:17

**narratives** 76:19

**national** 1:6 44:22 266:24 282:6 283:3 284:3

**nationwide** 75:16

**natively** 45:24 77:16 122:25

**nature** 114:24 195:11,19,22,22 196:4

**near** 57:7

**nearly** 141:23 233:14 277:14

**necessarily** 38:15 39:5 83:7 89:10 101:9,21 108:23 120:1,20 202:3 213:7 228:12,15 230:10 232:25 233:4 234:15 251:11 270:16

**necessary** 53:24 54:16,22,22

**need** 14:20 34:18 35:19 39:18 42:19 53:25 55:6 71:16 80:13 119:15 172:16 190:18,19 197:7 209:3,14 213:14,21 214:7 214:23 265:12

**needed** 27:7 43:14 44:14 54:12

173:22 256:18

**needle** 211:3,4,6

**needs** 197:12 275:5

**negotiation** 38:24 39:1,5,9 226:21

**negotiator** 32:3,5

**neighborhood** 52:6,7 247:25

**neighborhoods** 35:2,7 52:5

**neil** 3:8 21:19

**neither** 46:1

**never** 35:11 59:17 80:9,12,12 109:6,8 113:1 119:17 136:24 137:3,7,11 137:14 191:3 195:1 219:3 232:21 253:10 259:23,23,24 260:3

**new** 3:8,9,9,21,21 27:8 151:25 172:10 173:10 204:18,19 221:2 229:10

**news** 265:15

**night** 79:4 172:7 249:14 277:7

**nine** 29:14 160:18 160:19 186:23

**noletf** 43:5 187:19 187:21 188:10,16 188:21 230:12 259:10

**non** 59:24 60:9,13 60:18 61:13,18 63:11 64:4 65:20 66:2,21 67:4 70:8 82:17 92:3 100:10

101:4 102:1 103:4 103:6,10 104:7 105:4,5 106:6 111:8 116:19 134:17 142:3 143:2 161:16 175:14 206:19 207:21 233:18 234:6,9 235:10,18 265:21 276:22

**normal** 252:22

**normally** 137:24 210:1

**north** 2:3,19 23:23

**northeast** 43:6

**northeastern** 244:4

**northern** 1:2 187:21

**nose** 270:19 271:13

**notarized** 282:14

**notary** 280:6 281:13 282:25 283:10,18 284:15 284:23 285:23

**notation** 166:2,4 167:15

**note** 90:6 167:7 194:9 282:12

**noted** 193:10,13

**notepad** 159:5

**notes** 20:16 70:11 70:13 155:21,22 157:21 158:15 159:10,11,25 209:4,23,24 213:14 217:14 221:25 222:7,21 222:25 223:8

**notice** 219:12,22 219:24 220:7

**notification** 154:25 155:2,8,9 278:2

**notifications** 275:22 276:3,4 277:25

**notified** 155:5,7

**notifies** 61:1

**notify** 201:4 276:7 277:12

**november** 66:17 79:25 82:3 277:4

**nroman** 3:10

**number** 6:3,9,11 6:15,24 7:3,9,11 7:13 39:2,8 45:22 60:4 64:4 66:2,6 66:25 69:16 71:2 71:12 78:21 82:5 82:8,9,15,16 87:7 108:3 111:17 122:17,25 127:2 140:11,18 141:23 161:20 169:24 179:3 182:15 188:24 189:2,10 189:17 190:13 195:6 196:14 199:4,9 206:9 207:8,9,16 208:6,6 208:7,15,15,19,20 208:21,22,22 210:6 213:8 214:22,22,24 215:1 223:21 224:4 246:4 249:24 265:23 266:2,4 282:7,13

**numbered** 7:6
196:8
**numbers** 60:13
79:21 84:8 111:23
123:2 140:1 142:3
143:3,3 170:16
178:19,20 179:16
182:20 194:6
228:24 238:4
265:13,18,25
284:7
**numerous** 24:19
25:25 43:4 51:8
80:1 121:18
**nw** 3:13

**o**

**o** 11:14 36:23 37:3
38:2 184:3
**oarrs** 184:12,18,19
184:21,24 185:2
**object** 13:22 34:15
40:15,22 41:4
48:25 50:25 53:7
53:20 54:8,17
55:12,23 56:17
57:20 58:24 62:12
64:7 65:17 98:13
99:4 101:22
102:17 103:13
104:20 105:20
107:1 108:4
109:11,25 114:16
115:16 116:8
118:6,23 119:20
120:10 121:23
125:7 129:12
130:6 132:17
133:24 134:5,12
138:4 139:5
142:14 146:13,21
147:24 148:12

153:12,19 157:23
161:1 165:10
166:11,24 167:17
167:22 168:19
171:19 173:14
174:7 175:24
177:9 180:24
181:4,20 183:8
184:9 187:10
189:4 190:23
193:16 195:17
197:2 198:11
200:18 201:18
204:12 216:5
219:16 220:19
222:1 224:15
228:6 229:23
231:14 235:19
236:19 237:11,23
239:23 244:19
247:2 250:1
252:25 259:21
260:16 269:10
270:5
**objection** 8:3,3,4,4
8:5,5,6,6,7,7,8,8,9
8:9,10,10,11,11,12
8:12,13,13,14,14
8:15,15,16,16,17
8:17,18,18,19,19
8:20,20,21,21,22
8:22,23,23,24,24
8:25 9:3,3,4,4,5,5
9:6,6,7,7,8,8,9,9
9:10,10,11,11,12
9:12,13,13,14,14
9:15,15,16,16,17
9:17,18,18,19,19
9:20,20,21,21,22
9:22,23,23,24,24
9:25 10:3,3,4,4,5,5

10:6,6,7,7,8,8,9,9
10:10,10,11 121:5
121:13 122:1,12
148:5
**objections** 5:5 8:1
9:1 10:1
**observation** 202:4
**obstacle** 270:21,25
**obstacles** 270:9,14
270:16,17
**obtain** 48:22
133:18 149:21
265:9 272:20
**obtained** 79:22
135:9 138:15
144:13,25 151:8
162:12 265:22
**obvious** 86:13
**obviously** 15:5
33:15,24 34:9
41:15 50:17 53:25
54:11,12 55:16,18
56:13 57:9,11
59:10 62:21 65:20
66:15 113:22
158:25 159:19
164:2 187:6 207:7
207:22 231:19,21
232:1,12 234:7
237:13 248:17
250:5,8,16 253:3
261:25 275:10
277:10
**occasion** 17:8
**occasionally** 36:15
160:23
**occasions** 12:8
15:3 43:4 137:18
151:16,18,19
202:21

**occurred** 82:21
85:13 207:23
208:24 227:22
261:11
**occurrence** 68:6
76:7,11
**occurring** 229:14
229:15
**october** 6:13 128:4
128:12 281:16
**od** 124:20
**odmap** 70:21,23
73:4,12,17,21,24
74:3,6 75:3,7,8,14
76:8,10 79:12,14
79:18 80:17,21,22
81:4 92:15 93:3
93:15 94:13 130:3
130:11 158:6
161:25 162:4,9
166:9 167:20
168:1,5 214:12,15
214:18,21 217:24
263:8 264:12,17
**odmaps** 73:10
**offer** 67:16,17
**offering** 145:19
**office** 11:17 38:14
95:4,15,17,19,20
99:19 100:13
120:22 123:3,17
123:18,22 129:24
140:20 141:15
151:11 153:8
156:9,20 157:18
158:3 160:24
163:8,15 165:13
165:21 166:6
167:10 199:23
201:2 212:22
230:23 232:15

[office - organization]

239:6 272:10
273:12,15,17
276:2,5,7 277:2,17
278:1 281:6
**officer** 26:7,11,13
27:22 28:4,7,20,24
30:22,25 35:7
229:16
**officers** 39:15 61:2
62:10 153:8
167:14 172:20,25
172:25 194:19
198:22 202:4
275:16 277:12
**offices** 11:20
**official** 283:15
284:21
**officials** 198:9
**oh** 42:9 135:1
178:12 224:3
266:16
**ohio** 1:2,11,13,21
2:7,11,19 3:5 4:5
11:16 42:8 43:6
43:25 44:4 172:20
173:1,5 184:13
187:21 203:12
232:8 264:11
272:10 280:2,7
281:7,14 282:2
**okay** 19:14,24
20:8 21:14 29:25
30:10,16 31:17
35:14 38:11 42:10
44:8 46:15 47:7,8
47:12,21 49:23
54:3 55:4 56:8
63:9 65:2 68:9,11
68:15 69:11 71:18
72:14 74:15 77:23
77:24 78:9,20

79:5 81:3,6,9
82:12 83:2 84:5
84:20 85:11,16,25
86:6 89:13 94:1
94:22 98:18,23
100:17 101:3
103:8,10,23
104:15 105:7
106:8 107:15
108:10 110:15,24
114:14 122:3
125:1,16 129:25
133:3 135:2,22
136:3,8 140:3
145:24 147:1,15
147:17 154:21
155:23 156:5
157:5 158:5 160:5
161:24 162:6
163:23 165:15
168:13 169:16,19
170:1 174:15
175:21 181:18
186:21 188:14
193:5 200:15
201:5 207:3 208:4
208:8,20 209:16
209:17 210:1,10
210:21 211:3
212:7,23 213:13
213:19 215:5
219:12 226:11
237:6 238:6 239:9
260:2
**oklahoma** 151:25
**older** 97:16
**once** 16:14 26:11
32:25 33:14 61:2
61:7 132:6 155:9
164:11 183:22
219:8 223:7

255:17 263:5
**ones** 114:21
146:20 153:14
170:10 174:12
187:5 222:20,20
245:6 249:12
258:15
**ongoing** 216:18
**online** 49:3,6 50:8
58:21
**op** 1:14
**open** 15:11,16
16:5 92:8 170:5
198:17 219:1
220:11 274:18
278:14
**opened** 225:21
**opens** 49:15
**operated** 34:13
**operating** 146:15
191:15
**operations** 29:9
206:5
**opiate** 1:6 6:5
43:22 45:16 46:11
282:6 283:3 284:3
**opinion** 190:25
191:1
**opioid** 25:16 26:5
54:4 55:6 62:2
69:14 83:4,6
105:5,8,10 106:11
109:10,17,23,24
111:1,10 118:2
119:5 120:9
138:11 144:11,12
145:7 186:15,18
187:3 188:11
191:9 194:13,16
200:1,17,21,23
201:7,10,17

**opioids** 25:16,21
25:24 26:2,5 54:6
54:15,21 55:1,3
57:7 58:1 66:24
90:6 104:17,18
105:4,8 106:6,6,7
106:9,24,25 107:9
110:9,10,22 111:8
113:17,24,25
115:23 117:8
118:17 119:9,19
121:3 124:17,22
125:5 135:12
136:23 137:2,6,9
137:13,25 144:20
144:22 145:3
203:19 235:16
236:2,6,11,16,18
237:4,10,22 245:3
245:6,17 246:4
247:7 273:21
**opportunities**
28:17 57:23 236:9
**opportunity**
125:10 181:13
258:2
**opposed** 28:18
101:14 105:18
116:14 138:13
**order** 202:14
221:1 227:22
273:2
**ordinary** 112:21
112:24 113:1
118:20,25 141:11
171:17,21 196:25
**organization** 44:4
44:5 46:10 250:15
252:15 267:7
273:7

**organizational** 7:5
185:11,21 229:9
**organizations** 33:9
33:12 94:4
**original** 18:15
36:17 151:8 214:2
214:17 238:20
**originally** 23:23
26:14 29:10 30:7
62:14 66:7 81:6
108:19 247:11
275:25 276:1
**ounce** 251:14
252:11
**ounces** 41:16
249:16,16
**outlined** 274:23
**outset** 116:6
256:13
**outside** 32:2 42:3
42:7 232:7
**overall** 141:25
189:10
**overdose** 6:17
33:2,14 34:5
35:15 37:6 59:21
60:6,19 61:3,13,15
62:3 63:20,22,23
64:3,4 66:21 70:7
70:8,14,21 71:2
82:21 83:6,12,13
83:15,18,22 84:2
85:13 86:4,11
88:24 89:3,7,11
98:11,25 100:3,18
101:4 102:1
103:11,16,20
107:10,10 108:20
109:8 113:9,13
116:13,14 119:4
120:8 124:5,10

125:3,19,19 127:3
128:25 129:5,6,7
130:15,17 131:8
133:11,15 138:10
150:4 154:19,20
155:9 160:7
161:20 164:7
169:7,25 170:4
175:14,14,19
178:15 195:16,24
201:22,23 207:1
208:25 209:1
228:3,23 229:4,11
229:21 230:7
231:23 232:13
234:9,15 235:25
240:23 242:4
252:13,17 258:19
259:13,17 261:23
262:23 265:9,22
266:2,5 271:17
274:21 275:5,17
275:21 276:10,11
276:21
**overdosed** 60:23
86:21 98:7 101:6
109:15,22 131:9
133:7,21 134:11
240:9
**overdoses** 33:1
59:12 60:13 61:19
65:21,22 66:2
68:5 73:22 75:19
80:1 86:20 93:2
106:21 108:22
109:1,3,4 111:12
172:11 173:12
174:25 198:21
206:20 218:25
228:25 232:11
233:17,18 234:6

235:10,15,17
236:5 251:22
252:6,7,9,19
259:17 264:21
265:16 276:22
277:8
**overdosing** 63:16
277:6
**overfilled** 137:1,5
**overnight** 242:1
**overprescribed**
56:16 136:22
262:2
**overprescribing**
50:5 56:12 138:20
**overtime** 191:16
191:22 192:2,7,11
192:17,22 193:10
193:13,20
**overview** 267:20
**overwhelming**
63:25 64:1,4,18
66:1,6
**overwhelmingly**
103:11 104:9
**oxycodone** 85:21
102:25 129:7
130:4,21,25
**oxycontin** 57:18
145:16,17 180:11
180:16,23 181:2
181:16,19 182:6
183:18,21,21
**oxycontins** 274:1

**p**

**p** 37:24,24
**p.m.** 278:22
**packages** 211:20
**packaging** 60:24
85:16,19 210:22
211:19,22,25

212:3,5,10,11,15
**pad** 159:21
**page** 6:11,17,19
7:14 45:22 46:16
46:22 47:10 77:15
78:10,15,18,20,22
90:8,9 111:23
122:16,23,23,24
124:5 128:20
140:17,17 141:3
141:21 143:6
150:3,10 160:11
161:4 162:13,22
163:1,18 164:13
179:15 180:10
182:20 196:14
199:8 206:22
224:1 225:6,14,17
238:3,8,14 239:10
239:12 240:21
241:12 266:13
282:13,15 284:7
285:3
**pages** 1:24 78:5,6
78:24 162:14
169:5 240:13
247:19
**paid** 45:5 191:25
192:3,18
**pain** 50:1 52:14
**paper** 96:12,13
159:21 160:3,4
**papers** 18:12
**paperwork** 168:24
168:24,25 169:2,3
**par** 3:2,3
**paragraph** 141:22
**paraphernalia**
78:19 86:6,7,9
155:19,25 157:7

**parents** 51:24
**park** 172:7
**parma** 263:18,18
**part** 21:1,3 44:4
  47:3 58:14 64:10
  79:12 112:25
  113:1 151:4
  152:19,24 156:7
  162:3 165:7,16
  169:16 171:24,24
  172:15,24 173:17
  197:4 199:18
  228:8,9,11 230:3
  239:20 251:23,24
  265:6 284:9
**participating** 72:7
  72:12
**particular** 160:14
  169:18 222:24
  242:25 243:24
  247:15 248:4,15
  248:16,23 253:5
  254:16 260:15
  261:14 270:2
  272:2,3 277:9
**particularly** 249:3
  249:21
**partner** 188:17
  230:9,22
**partnered** 229:16
  276:1
**partners** 37:8
**partnership** 167:4
**parts** 104:22
**party** 205:5 281:2
**pass** 168:23
  231:18
**passed** 119:25
  155:6 195:25
  196:1,2 208:25
  211:16

**passerby** 195:23
**passes** 54:4 55:7
  234:25
**passing** 53:1
**passion** 190:1
**patel** 2:6 16:12
  74:11
**patena** 17:9,10
  116:1 118:4
  137:21 138:2,12
  139:1 146:12,19
  185:3 188:3 261:3
  267:5 268:1
**patients** 49:19
**patrol** 27:24 29:16
  30:8
**patterns** 71:10
**pay** 30:21 42:13
  189:20,23
**payne** 11:16,24
**pays** 44:25 45:3
  191:23
**pellegrino** 1:23
  280:6 281:13
**pending** 14:22
  188:1 189:8 220:1
  225:24
**people** 22:10
  32:25 33:3,9 35:8
  49:16 52:8 53:25
  57:24 58:4,6,10
  68:5,19 101:7
  102:12 110:5
  125:23 129:15
  132:1,1 135:11
  136:2 149:7
  158:22 169:25
  170:6,9 178:21
  190:18,19,20
  195:12,13,14,15
  209:22 210:18,18

228:19,25 230:11
232:24,24 235:1
236:10,15 237:2,8
245:9 250:14
258:4,14 263:23
264:16,24 265:16
277:5,6,14
**people's** 170:5
**percent** 68:19
  69:13 110:24
  163:9,12 193:1,4,6
  238:12
**percentage** 59:15
  59:16,19 63:14,25
  67:6 69:15,24
  107:12,14 193:8
**percentages** 63:18
  68:22 69:19 111:2
  111:6
**percocet** 106:10
  107:5 145:18
  274:1
**percocets** 145:16
  147:14,15 176:9
**perfectly** 182:8
  255:14
**period** 24:1 32:7
  32:15 34:12
  267:10
**periodically**
  142:21
**permanent** 188:1
  189:8
**permit** 131:5
**person** 33:17,18
  34:10 53:10,13
  55:16,17 68:7
  71:13 81:22 86:17
  86:25 98:7 101:6
  101:24 102:7,9,10
  102:14 110:3,21

113:21,23 131:9
132:23 133:6,7
134:9,11 144:13
155:6 160:11,16
164:4 166:17
168:23 175:8,15
180:11,16 181:1
183:18,18,20
195:24 196:1,2
208:18,24 212:7
213:5 227:18
232:14,17 234:25
237:15,17,21
240:5,8 251:12
252:16 253:3
254:3 260:21
265:23
**person's** 68:4
  130:15 133:11
**personal** 13:14
  21:1 41:10 95:4
  219:21
**personally** 60:15
  60:16 71:5 118:10
  132:15 137:3,7,11
  167:14 176:16
  177:24 178:1
  184:18 230:9
  241:16 249:5,7
  283:11 284:15
**personnel** 25:9
  29:13
**persons** 34:7
  39:15,17,18,18
  51:10,22 52:24
  55:16 57:13 58:14
  61:18 102:8 135:4
  136:20 164:9
  165:12 227:16,19
  234:7 242:6

**pharma**  1:10,12
   1:13
**pharmaceutical**
   3:3 246:17
**pharmaceuticals**
   3:2,2
**pharmacies**  49:4,6
   50:8 58:21 137:10
   138:21 139:3
   235:16 236:1,18
   237:9
**pharmacy**  53:17
   56:2 137:5 168:10
   168:12 235:23
   237:20
**pharmacy's**
   184:13
**phase**  149:24
**phone**  22:10 71:1
   71:12 72:8 197:9
   210:6 212:17
   213:8 223:12,17
   265:13,23,25
   266:2 282:3
**phones**  156:1
   158:13 235:3
**photo**  211:14
   243:21 244:1,4,5,7
   244:9
**photograph**
   155:20
**photographs**
   225:17
**photos**  152:24
   211:11,12 239:4,8
   240:19 243:4,8
   244:2,8
**phrase**  226:22
**physical**  157:11
**physician**  57:10

**pick**  41:25
**picture**  243:25
**pictures**  153:23
   241:7 242:17
   243:24
**piece**  160:3,4
**pieces**  257:24
**pile**  238:9 239:11
**piling**  35:19
**pill**  48:10 49:11
   50:9 53:16,17
   55:11,22 56:3
   58:22 59:7 63:22
   63:23 109:3,4
   136:25 145:7
   146:2,3 147:13
   168:9 233:3
**pills**  49:18,20
   51:24 52:9,24
   53:22 55:8 58:17
   59:5,13 63:15
   66:7,11 69:22
   106:17 130:23
   131:1 133:17
   134:10 135:18
   136:2,7,20 144:12
   145:12,15 146:1,6
   147:2,5,5,11,18
   148:3,3 149:8,16
   149:19 172:12
   173:13 176:4,8,9
   176:21 180:12,23
   181:2,19 240:2,10
   260:20,20 261:24
   274:8
**place**  2:14 49:15
   70:6 84:6,13,23
   85:3,10 101:19
   157:19 210:18
   227:18 247:25
   257:21 275:6,24

**277:11,19 278:4**
   280:19
**placed**  29:17
   83:15 132:3
   158:16 159:11,11
**places**  158:24
   215:14 232:7
   259:1
**plainly**  221:10
**plaintiff**  12:15
   13:12 21:17
**planning**  172:6
**play**  66:17 243:22
**played**  238:17
**pleadings**  18:12
**pleas**  6:8,23
   111:15 179:2
**please**  11:12,15
   13:12 14:15 34:23
   60:8 74:22 78:10
   79:10 81:3 90:14
   94:15 99:13
   108:18 117:13
   124:4 154:22
   163:1 226:2
   239:25 282:11,11
**plenty**  57:23 236:9
**plug**  265:25
**point**  2:19 24:18
   33:17 37:23 39:23
   51:6 65:12 110:9
   110:22 113:24
   119:8,11 158:3
   201:15 229:19
   230:5 232:3
   258:11
**points**  47:13
**police**  7:5,11 11:22
   13:3 15:20 17:6
   17:15 19:8 23:12
   23:14 24:13,14,16

**24:23 25:6,12
   26:7,9,10,12,13
   27:21 28:4,7,20,24
   30:14,22,24 36:2
   38:22 39:15 42:11
   42:14 45:12 62:10
   62:20 71:14 82:7
   91:2 93:10 94:1,4
   155:7 161:5
   184:21,24 185:10
   185:21 186:14,18
   191:8 195:10
   197:18 198:8
   200:4,16,24
   204:15 206:8
   207:8,9 208:2
   214:2,10,17 227:5
   229:15 240:22
   246:6 247:13
   248:5 249:6
   255:23 260:13
   262:25 263:10
   266:22 274:24
**policies**  204:18,19
   274:15,19,23
**policing**  206:2
   270:3
**policy**  42:12
   221:23 230:19,20
   274:20,25 275:4
   275:13,15,20,23
   276:5,14,18,24,25
   277:11,16,19,20
   278:4,6
**polster**  1:8
**popping**  51:24
**populated**  161:23
   168:5 207:9
**populates**  81:4
   85:9

portion 27:12
68:24 127:8
154:14 170:23
177:1,19 191:13
191:14 238:25
269:16
portions 123:23
123:24 124:3
posed 19:7
posing 41:2,15
position 91:21,25
positioning 157:7
positive 147:6
163:9,12
possessed 180:11
possibility 265:19
possible 41:11
109:14,21 164:14
212:6 213:1
239:13,19 264:17
possibly 37:18
57:7 138:20
212:15 240:8
post 194:9 228:3
postings 7:14
225:6
potent 178:22,24
271:5
potentially 62:16
235:5 252:17
270:18
poverty 52:7
powder 238:9
239:11 270:19
271:16
power 256:24
powerpoint 20:1,3
20:5 150:24,25
151:3,8,10 152:17
153:16 164:22
170:7 173:23

174:13 238:21,23
241:3,4,5 267:18
268:13
powerpoints 20:6
practice 81:1 90:4
255:8
practices 255:23
precautions 271:7
precise 114:24
prefer 172:8
preparation 20:13
20:20
prepare 16:8
17:22 152:18,21
241:4
prepared 151:1,4
152:25 240:17
preparing 18:1
238:18
prescribe 237:10
261:8
prescribed 54:2
54:16,23 55:1,3,6
56:5 57:25 66:7
104:17 105:19
106:2,10,12,13,13
107:4,5 135:13
236:11,16 237:3
261:14
prescription 1:6
46:18 47:18 48:10
49:7,25 51:4 52:9
53:18 56:2,16
59:7,13 63:15,16
63:21,23 65:7,13
65:13,15 66:10,11
66:24 69:14,22
70:9 84:1 85:21
90:5 104:16,18
106:6,7,9,15,23,24
106:25 107:9,21

107:22 108:12,13
108:21,22 109:9
109:17,19,23
110:9,10,13,22
111:1,8 113:17,24
113:25 115:23
117:8 118:2,16
119:4,9,19 120:9
121:3 130:4,21,23
130:25 131:1,7
132:14 133:4,5,7
133:10,15,16,23
134:8,10 135:7
136:2,7,10,22
137:13,25 138:10
144:11,13,20,22
144:24 145:2
146:1 148:3
164:18 165:4,5,9
165:14,18 166:1
166:16 168:9,15
168:16 181:16
212:1,8 233:3
235:16 236:2,6,18
237:10,14,14,16
237:18,21 239:15
239:19 240:2,4,10
245:3,17 246:4
247:7 273:20,23
282:6 283:3 284:3
prescriptions
48:11,22,23 49:17
49:20 50:15 56:13
59:5 105:13
134:24 135:5,12
137:1,5,9 145:6
168:16 169:1
245:4 273:24
presence 174:24
280:14

present 4:7 17:2,4
32:1,15 85:17
160:23 161:3
240:4 267:19
268:16 270:9,10
presentation
150:24,25 151:3
151:12,16,20
152:17 153:4
160:13,16 165:1
169:17,18 172:9
173:10,16,17,18
173:19,25 174:5
238:16,19 239:2
241:5 266:21
267:3,16 268:2,6
268:24 269:4
presentations 20:6
44:17,19 152:4,11
153:2,10,17
169:21 174:10
presented 112:16
238:21,22,22
239:7
presenter 160:25
presenting 160:21
267:22
preservation
25:20
presuming 158:2
pretty 51:6,13
82:17 86:13
178:17 227:13
257:4
prevalent 248:22
previously 19:20
80:25 86:24
pride 249:8
primarily 89:2
187:7 233:9
248:19

**primary** 230:13
233:7
**prince** 116:5
137:21 138:2,12
139:1 146:12,19
185:3 188:3 261:4
267:4 268:1
**principal** 126:15
**print** 80:13 108:1
**printed** 79:20 80:4
80:10,12 112:14
**printout** 79:12
80:6
**prints** 80:14
**prior** 24:23 75:2
75:23 76:14,18,25
78:21 86:20 87:7
96:21 136:19
227:14,25 247:14
251:8 252:20
256:22 257:15
276:7,19,20
277:19
**priority** 28:9
224:18 231:21
**prison** 149:12
183:19
**private** 20:16
**privately** 88:5
**privilege** 91:17,23
148:16 154:12
209:14 216:17
253:22 254:24
255:1
**privileged** 92:3
214:7
**proactive** 249:18
**probably** 115:8
151:21 162:13
246:18

**probation** 149:13
**problem** 74:20
181:3 229:10
264:18,22
**procedure** 11:3
230:19,21 275:1
279:7 283:5 284:5
**procedures** 274:16
274:19,23
**process** 154:22,23
154:23,24 155:4
157:21 164:2
**processing** 163:19
163:21
**produce** 215:19
**produced** 19:15
19:20 20:2,4,7,15
45:24 77:16 91:9
91:10,13,15 92:1
114:12 115:19,19
122:24 150:18
170:19,21 216:8
221:8 246:21
**production** 111:23
114:13 122:25
140:18 179:16
182:20 196:14
199:9 206:23
215:20 224:4
278:16 282:15,17
282:22
**products** 246:9,14
**prolific** 142:1
**promoted** 38:4
**promotion** 30:19
30:21
**promotions**
189:16
**pronounce** 37:19
171:14

**pronouncing** 38:9
**proper** 53:2
272:21 275:22
**properly** 53:12
54:16,23 234:11
272:23
**proprietary** 255:6
**prosecutable** 93:7
**prosecute** 93:9
118:14 119:16,24
227:19 233:24
242:6 259:2
267:20 269:21
**prosecution** 6:18
150:5 213:1
234:20 235:6
250:4,19 269:20
**prosecutor** 172:13
**prosecutor's**
230:23 232:15
**prosecutors**
152:12 153:22
**protect** 170:10
**protected** 219:17
**protection** 62:24
63:4
**protective** 271:15
**protocol** 162:3,5,7
274:22 275:17
**prove** 227:21
244:9
**provide** 61:17
67:16,25 69:4
96:8,9,21 130:11
239:3
**provided** 11:2
93:18 94:24 95:3
95:3 186:3 204:5
204:7,10 215:25
238:20,25 239:5,8
240:19 259:25

**providing** 33:18
273:4,8
**prudential** 3:17
**psychiatrist** 57:10
**public** 3:4 7:5 35:5
85:14 153:25
185:10,20 225:17
280:6 281:13
283:10,18 284:15
284:23 285:23
**publicly** 153:18,21
**pulled** 80:3
**pumped** 270:19
**purchase** 42:6
180:16
**purchased** 144:8,9
144:10,12 273:20
**purchases** 40:5,9
41:13 146:25
248:13 274:5,11
**purchasing** 273:25
**purdue** 1:10,11,13
**purported** 147:19
147:22
**purpose** 131:15,21
131:23 268:21
**purposes** 45:17
73:17,19 77:7,11
105:1 111:18
122:18 128:5
131:12 140:12
150:6,13 158:11
171:5 179:5
182:16 185:12
196:10 199:5
206:11 223:22
225:7 266:11
**pursuant** 133:22
279:3,6
**pursue** 117:16
118:9 120:24

122:6
**pursued** 235:13
**pursuing** 181:11
**push** 105:3
**put** 39:2,8 75:23
80:17,21 102:3
103:21,25 104:8
104:16 105:12
114:8 130:4,20,21
132:14 156:14
157:21 159:25
191:16 192:23
193:20 201:15
207:4 209:4,24
210:2,4 215:22
251:12 255:10
256:6 257:25
258:1 260:21
264:7,19 269:6,23
271:14,19 275:6
275:24 277:11
**puts** 206:3 255:12
255:18
**putting** 66:25 67:5
131:20 254:1
255:11
**puzzle** 257:24

**q**

**qualified** 24:18
280:8
**qualify** 24:17
**quantify** 66:20,22
**quantities** 41:6
**quarter** 164:13
**question** 14:16,22
32:17 74:21 97:2
97:7 99:14 100:6
100:9 103:15
104:22 120:2,6,13
120:14 121:11,14
121:18,22 130:8

144:5 145:4 180:1
190:22 200:20
209:10,13,15
216:2 219:18,21
228:8,19 230:2
235:23 236:23
238:15 251:5,15
251:23 255:21
256:3,20 257:18
270:12
**questioning** 88:22
148:21 149:2
183:23 278:12
**questions** 14:7,9
14:13,14 19:6
42:17 80:24
110:11 129:14
202:16 225:23,25
226:10 230:1
241:24 246:1
278:20
**quick** 14:11 144:5
153:3 202:16
209:8 266:20
267:19 268:24
**quickly** 265:17,18
**quietly** 141:23
**quite** 65:19,23
104:23 108:6
242:19

**r**

**r** 11:14 36:19 37:3
37:3,24 38:1
184:3
**race** 86:14
**radio** 27:25 28:1
**raise** 170:8
**raised** 20:25
**rapport** 61:8
63:20 67:19

**rationale** 243:20
**reaction** 129:10,14
129:15
**read** 74:22,23
77:22 142:24
143:2 161:10
197:6 244:22
283:5,6,12 284:5,6
284:17
**reading** 19:6
282:19
**reads** 161:24
242:23 243:10
**ready** 72:22
**real** 15:17 147:2,4
176:24 177:2
209:8
**realize** 51:13
**really** 24:20 60:1
79:16,21 198:5
241:8 249:17
252:8
**rear** 13:14
**reason** 12:2 14:21
76:24 107:23
205:1 220:4 224:2
237:17 282:14
284:8 285:3
**reasoning** 243:21
**reasons** 37:25
**recall** 12:25 16:17
19:6,22,25 25:9
46:8 69:19 73:1
75:10 95:2 113:12
121:16 128:18
130:22,24 134:14
134:18,20 137:19
141:9,12,12
145:10,12 151:15
153:6 172:19
173:21 180:19

182:5 183:15,16
193:9,12 196:17
197:22 202:23
203:2,5,10,13,16
203:22,24 204:2,5
204:7,21 218:16
220:6 226:24
236:12 241:18,21
246:6 249:12
251:17 261:13
262:8 267:15
**recalling** 253:5
**receipt** 282:18
**receipts** 168:9,11
168:17,17,25
**receive** 142:16,23
219:12,24 220:25
221:2 229:3 272:1
272:7,16 273:2
276:2,4
**received** 24:5,15
25:1,5,11,15,18
26:3 31:12 76:2,6
87:1 171:16
196:24 199:17
220:6 245:11
272:11
**receives** 191:8
**receiving** 19:18
141:9,12 237:18
258:25
**recess** 71:19
143:22 162:20
202:12 226:3
**recipients** 7:9
199:2
**recognize** 79:8
224:11 266:15
**recollection** 16:24
17:23 46:13
161:19 180:4

194:2

**record** 11:13
21:10 69:25 70:11
71:17,22 72:11,16
74:23 89:14 90:13
90:15,17 92:25
93:5 154:13 157:6
157:19 159:15
162:21 201:13
226:2 242:22
284:9

**recorded** 100:19
102:15 213:23
214:1

**recording** 73:22

**records** 92:15,20
94:2 200:17 201:9
201:15,16 219:14
219:25 220:10,17

**recover** 86:2
211:22 212:14

**recovered** 85:18
85:24

**recruit** 26:11

**recruits** 27:8

**redacted** 179:25
268:7,15

**redactions** 268:8
268:11

**reduced** 280:13

**refamiliarize**
179:23 183:11

**refer** 82:5 85:17
86:1,7 87:17 88:4
138:1,21,25 154:8
208:1,14 211:19
212:23 246:17

**reference** 143:8
276:9 282:7 283:2
284:2

**referenced** 280:13
280:17 283:11
284:15

**referred** 104:23
137:15 259:15
260:25 261:2
262:14 264:13

**referring** 19:9,10
19:11 24:12,13
59:6 80:25 97:11
100:10,11 103:4
104:5 108:7
114:20 115:4
116:10,15,16
122:8 126:13
130:9,9 140:25
197:17 201:12
222:18 231:7
235:17

**refers** 82:20
143:12 208:18
224:9

**reflect** 83:16

**reflected** 70:12
83:22 84:2 85:23

**reflects** 163:6
224:21

**refresh** 161:19

**regard** 92:1

**regarding** 15:4
219:4 261:6 279:2
279:11

**regular** 36:13

**relate** 43:19 210:8

**related** 25:21,23
123:4 128:21
140:21 142:4,12
142:13 188:11
254:15 272:2,5
275:4 278:15

**relatedly** 271:24

**relates** 1:8 46:17
46:18 47:18 91:17
199:25 210:7
254:25

**relating** 25:16
26:4 42:16 74:7

**relation** 223:10

**relative** 281:2

**relatives** 54:5 65:5

**relay** 261:9

**relayed** 130:18

**relevant** 220:16
244:10

**relief** 114:25

**rely** 263:11 274:16

**remain** 28:23

**remaining** 101:18
101:18 124:3

**remember** 37:10
37:11 69:20 73:3
130:2 201:22
214:21 261:19
267:2 273:21
274:4

**remotely** 72:12

**renee** 1:23 280:6
281:13

**repair** 23:8

**repeat** 14:15

**rephrase** 225:24

**replaced** 187:18

**report** 6:5,13 38:6
38:11,12,15 45:17
46:3 70:18 92:11
98:7,20 99:22
100:4,9,12,21
101:1,8 116:12
117:25 118:11
124:24 128:4,11
167:11 172:3

184:7,19 197:7,16
197:18,19,21,23
198:13,17,19,23
207:9,24 214:3,18
214:23 242:10,18

**reported** 102:13
178:10 198:5
200:3

**reporter** 5:16
283:7

**reporter's** 5:14
280:1

**reporting** 39:20
41:14 184:13
197:13 202:9
214:4,25

**reports** 93:9,11
120:21 129:20
131:17 142:17,20
147:6 198:16,17
213:3 244:15

**represent** 77:24
107:19 226:9
245:24

**represented** 72:10
107:15 115:21

**representing** 45:8

**request** 72:19
90:25 91:3 98:17
113:7 117:18
194:10 216:15
221:21 284:9,11

**requested** 72:17
184:19 279:1,6,10

**requesting** 226:1

**require** 198:16

**required** 162:8
166:5 206:3
282:25

**requires** 77:14
148:12 257:1

**research** 20:19
**reserve** 278:14
**residence** 85:15
**residential** 87:9,12
**residue** 211:9
**resolution** 220:1
**resolved** 13:6,17
**resource** 67:17
**resources** 61:18
  66:14 194:11,15
**respect** 45:11
  176:3 222:19
  223:13 227:9
  253:16 256:8
  270:3,10
**respond** 39:6,7,7
  60:18 61:4,6
  62:21 64:3 75:18
  96:2,20,23 103:16
  108:19 154:25
  155:5,11 202:9
  206:20 207:19
  230:22 244:21
  269:17 271:16
  274:22 275:18,19
  275:19 277:3
**responded** 59:22
  60:3,17 63:18
  83:9 93:19,25
  94:19 95:5 96:16
  106:21 109:2
  113:14 234:3,5,11
  234:16 235:12,22
**responding** 39:17
  60:2,12 62:18
  68:23 116:17
  189:9 214:3
  233:22
**responds** 208:3
**response** 7:11 28:8
  96:2,4 159:8,10,23

159:25 160:8
  206:8,24 207:8
  213:24 215:12,21
  216:7,10 218:11
  218:14 220:14
**responses** 18:13
  19:4,12
**responsibilities**
  27:23 28:6 32:6
  32:10,16 38:18
  42:11 165:17
  171:25 226:18
  227:3,6
**responsibility**
  32:18 230:14
**responsible** 26:20
  58:23 89:2 96:6
  126:11 129:19
  258:7 259:5
**responsive** 91:15
  92:2 221:8
**rest** 22:23 264:8
**restate** 14:16
**result** 117:7
  235:15,22 236:17
  237:9
**results** 100:20
  251:20 258:25
**resume** 22:19
  72:22
**retained** 5:16
**retention** 221:23
**returned** 282:18
**revealing** 255:1
**reverses** 62:2
**review** 18:16,17
  18:25 20:10 47:1
  47:9 107:25
  125:11 179:22
  183:10 242:9
  279:2,6 282:12

283:1 284:1
**reviewed** 18:4,11
  19:14 20:14
  126:24 246:20
**reviewing** 125:9
  173:23
**revised** 275:7,9
  278:5,9
**revisit** 226:18
  238:2
**revive** 175:20
**reword** 34:18
**rich** 1:20 2:6
**right** 21:12 29:6
  30:6 31:6 40:17
  47:4 48:17 55:19
  56:5,15 65:25
  67:14 68:13,16
  72:25 87:5 94:4
  97:14 99:7 103:17
  110:17,17 114:15
  121:1 123:18,19
  124:1 126:5 128:8
  129:11,20,22
  132:1,10 133:1
  135:15,21 143:7
  145:1 153:18
  154:18 158:3
  159:9,24 162:7,11
  167:2 174:1
  175:11 176:24
  178:23 185:22
  193:2 195:8
  238:19 241:13
  251:21 261:5
  266:25 267:1
  277:6
**rights** 148:21,25
  149:1,20 183:22
  232:20 278:14,15

**rise** 142:11
**rms** 207:8
**road** 67:18
**robberies** 28:9
**robbery** 195:14,21
**robinson** 37:1,16
**role** 29:9 32:2 36:6
  36:24 222:23
  230:15 238:18
  243:23
**roles** 32:19 42:15
  230:10
**roman** 3:8 5:8
  11:7 21:12,19,19
  22:18 71:18,20
  74:16,18,21 78:3
  79:2 90:13,16,18
  91:20 92:7 121:23
  122:2 140:2
  143:19 144:4
  162:21 170:16
  202:10,13,15
  216:14 217:19
  221:5,10,16,20
  225:22
**room** 2:10 72:16
  90:24 95:13
  155:15,17 157:7
  255:16 270:18
**rooms** 243:5
**ropes** 3:16,20
  21:24 22:1
**ropesgray.com**
  3:19,22
**roughly** 146:9
  248:21 273:19
**routine** 239:21
**routinely** 113:4
  138:11
**rpr** 1:23

**rules** 11:2 226:12
279:3,7 283:5
284:5
**running** 96:15,22
114:5 271:20
**runs** 44:12
**rx** 184:13

**s**

**s** 36:23 37:3 184:3
282:15 284:8,8
285:3
**s.m.** 2:18
**safety** 7:5 173:21
185:10,20 271:7
**sale** 181:15
**sales** 138:23
139:12 202:25,25
203:1
**sample** 210:24
**samples** 157:2,3
**sandusky** 173:8
**save** 220:3
**saved** 220:24
221:3 223:7
**saw** 98:18 163:15
209:5 229:14
238:1,8 251:20
**saying** 55:4 65:20
107:3 109:19
119:11,17 144:24
159:17 171:21
193:3,6 207:22
232:2 250:7
252:14 260:3
265:11 269:12
276:13
**says** 46:22 47:14
51:12,14 85:16
90:25 91:1,1
92:11 122:24
124:5 128:20

160:11 161:4,15
162:14 164:14
200:6,10 201:25
208:10 224:12
238:10 239:11
**scenario** 133:8,9
133:12 210:5
**scene** 60:24 61:4
62:22 65:4 68:8
83:20 85:22 86:10
86:11 98:18
107:11 117:6
132:22 155:1,6,12
155:17,20 156:6
156:24 157:4,6,8
157:12 158:18
160:6,7 163:19,20
163:21 164:2,11
165:2,6,9,14,18,19
167:5 175:14,14
198:22 200:1,17
200:21,23 201:7
201:10,17 202:2
207:1,19 208:12
209:2 210:13,14
211:4,22 212:20
218:5 233:23
234:18,23 269:17
271:18 272:24
275:17 276:11,12
**scenes** 93:19 94:19
103:11,17 229:17
230:22 272:4
**schedule** 7:15
266:9
**schock** 4:3 22:11
22:14,14 74:9,17
74:20
**school** 23:2,3
**schroeder** 37:2,15

**scope** 232:5,8
**scott** 1:17 5:7 11:1
11:6,14 16:5
144:3 226:4
245:21 280:9
282:8 283:4,9
284:4,13 285:20
**screenshotted**
72:8
**scripts** 261:7
**sdo** 224:23
**se** 48:12 228:15
**seal** 281:6 283:15
284:21
**search** 6:9,23 7:3
71:9,13 93:11
111:16 112:4,15
113:4,7 114:2,13
114:19 115:1,3,5,5
115:6,9,22 116:16
179:2,12,17
182:11,14,24
183:6,13,17
222:13,15 223:7
256:25 266:1
**searchable** 70:24
70:24 265:8,20
**searched** 115:13
115:14 221:6
**searching** 223:5
**second** 30:11
46:16,25 60:8
80:20 83:3 90:14
92:18 124:5
125:17 141:22
160:10 167:8
183:10 206:22
209:9 228:18
238:2 242:17
**section** 148:17

**security** 153:7,8
**see** 27:10 45:22
46:4,17,19,24
47:12,15,17,25
49:23 50:10 51:24
56:25 59:13 71:13
76:24 77:20 80:16
91:8 108:1,15
112:8 117:24
119:23 120:18
123:6 124:7,11,14
124:19 125:6,13
125:17,22 128:22
129:2,8 141:7
142:6,11 143:10
155:17,18,18,19
161:6,17 162:1,16
164:2,8 169:2,11
172:17 176:17
178:19 179:23
180:13 183:11
185:23,24 186:24
197:14 200:8
211:9 239:16
242:14 260:18
264:18,20 265:25
271:18
**seedy** 210:17
**seeing** 32:25 35:18
128:18 163:3
176:5,8,13,19
228:24 248:22
**seen** 16:2 18:6
46:6 57:23 58:17
95:8 111:25 123:8
123:10,12 128:16
140:24 141:18,19
150:19 157:20
169:15 171:9
175:1 179:9
182:22 185:15

196:16 199:10
206:14 224:5
225:11 236:9
237:3 265:15
267:11
**seize** 165:17
**seized** 78:19 85:25
86:6,10 165:6
197:9 240:24
249:24 252:2
**self** 82:18 102:13
**sell** 49:7 54:6
134:10 145:19
259:16
**seller** 258:18
**selling** 34:2 133:17
134:24 135:4
136:2,6,20 146:6
181:1 227:16,20
252:12 257:12,17
260:20 271:20
274:8
**sells** 55:8 135:19
250:14 252:11
**seminar** 269:1
**send** 92:4 98:2
99:21 221:7,19
**sending** 196:17
**sends** 99:21
**sense** 68:18 106:1
127:1 250:21
**sent** 196:24 197:25
201:4 221:20
**sentence** 46:20
**sentencing** 149:24
**separate** 36:7 73:8
144:17,17
**september** 112:19
**sergeant** 37:23,25
38:1 44:13 171:15
172:3 173:9,24

176:18 188:5,5,6,6
**series** 47:13 243:4
**serve** 44:21 73:16
73:20
**served** 39:23
42:15,22 43:2,16
43:18 202:19
**server** 220:24
221:3,6
**serves** 38:23
**service** 23:20,21
73:21
**services** 38:20
186:20
**session** 5:12 144:2
**set** 92:16 281:5
**setting** 42:12
**settlement** 13:18
**seven** 36:13,20
37:4 115:22
116:15 169:5
186:22 187:24
252:2
**sex** 86:13
**shannon** 6:14
140:8 141:4,10,13
141:21
**share** 70:25 93:22
131:16,19 264:23
**shared** 93:24 94:3
94:10,10 263:24
**sharing** 131:13,15
131:24 132:2
263:14
**shaun** 4:7
**sheet** 96:2,4,20
160:8 209:25
218:6,7 282:13
284:7,10,18 285:1
**sheets** 206:24
213:24 215:21

216:7,10
**shelley** 17:10
**sheriffs** 263:15
**shift** 229:9 248:22
**shifted** 32:19 33:1
33:14 227:18
228:23 230:10,13
230:16 259:13
**shootings** 28:10
**shop** 49:19
**shopping** 48:11,17
48:20 50:7 58:21
**short** 27:9 36:25
152:7
**shortly** 275:11
**shot** 39:15
**shoving** 271:13
**show** 70:2 81:16
83:20 98:24 117:5
117:6 160:6
163:22
**showed** 244:11,12
244:13
**showing** 266:13
**shown** 282:16
**shows** 81:17 83:4
**shrunk** 189:3,19
189:24,25
**side** 26:22 27:10
238:9
**sidewalk** 196:2
**signature** 279:5
281:12 282:14
**signed** 112:6,7,14
179:20 180:2,5
183:13,13 283:13
284:18
**signing** 282:19
**signs** 164:8
**sill** 243:11,15,18

**silver** 223:5
**simple** 223:4
234:23
**simplest** 135:17
**simplify** 110:15
**sincerely** 282:21
**single** 110:3 120:7
121:16 235:2
255:11
**sir** 11:23 17:11
22:25 23:2,16
25:14 26:16 31:3
31:10,14 38:8
40:2 46:5,20
49:22 54:24 63:13
65:1 77:3 78:7
79:6,10,15,23
81:15 82:2,11
83:1,19 84:4,24
85:2 86:8 88:3,6
89:4 92:24 96:10
97:19 98:8,22
100:16 102:6,21
105:6,11 125:24
126:18,21 127:5
128:14 131:3
140:5 141:16
142:10 143:1
161:14 163:22
164:22 172:1,4
174:4 181:12,17
182:8 183:23
184:1 186:25
189:20 190:22
196:23 198:3
199:16,20 200:2
202:20 203:11
204:17 207:2,14
209:7 211:5 212:9
214:11,15 215:18
216:2 218:3,9,13

[sir - standard]

220:11 253:15 255:9 282:10

**sitting** 43:14 50:23 120:6 134:2 254:2

**situation** 39:11,13 53:5,18 54:21 60:19 99:6,10 170:8 190:20 215:13

**situations** 41:18 41:19 51:9,9,18,21 52:2,4

**six** 43:7,8 47:13 49:23 52:12 75:20 82:12,14 121:22 160:15,17 169:4 186:22 207:16 240:13

**size** 189:19 191:19

**skin** 270:22

**skipping** 47:3

**sleep** 67:4

**slick** 41:24

**slide** 240:13 241:1 241:2 242:23

**slides** 243:3 244:3 268:12

**slightly** 217:18

**slow** 14:4

**small** 34:6 41:10 41:12 107:19 108:3 233:22

**smoke** 58:13

**snapped** 60:25

**sold** 133:6 148:4 182:7 218:23 260:7 274:1

**solely** 60:2 101:5

**solid** 117:21 118:8 119:12,18

**solutions** 3:2 282:1 285:1

**solve** 242:1

**solved** 219:6

**somebody** 87:3 99:21 106:16 135:16 147:21 200:22 209:2 218:24 257:13

**someone's** 106:17 260:1

**son** 276:14

**soon** 61:20

**soricelli** 3:20 21:25,25

**sorry** 16:12 27:14 45:2 51:17 60:11 64:1 65:22 74:18 74:19 78:3 84:20 91:1 96:24 100:2 112:2,23 145:1 160:18 169:10 174:15 184:22 186:16 193:11 204:6 207:25 224:3,10 236:24 241:23 244:21 273:6

**sort** 60:6 66:7 230:4 249:21 250:22 252:24 255:7 278:1

**sorts** 271:7

**sought** 114:25 115:2 164:14 239:13

**sound** 266:25

**sounds** 267:1 278:6

**source** 119:3 121:10 132:9,16

133:5 156:4 168:22 182:6 228:2,4 231:7,9,22 234:14 235:9,24

**sources** 34:3 231:5 231:6,8,9 232:4,10 234:8 242:4 245:15

**south** 4:4

**southeast** 27:12

**speak** 77:2 99:9,10 110:3 149:22 163:16 164:23 166:17 218:3,12 266:18

**speaking** 249:19

**speaks** 110:18

**spec** 235:2

**specgx** 3:15 21:24 22:2

**special** 38:20 186:20 215:11

**specialized** 25:15 25:18

**specific** 26:6 55:14 74:7,24 75:15 76:8,9 84:9 99:12 100:2 130:24 140:1 159:18 164:10 181:22 191:25 208:18,19 211:22 213:5 241:9,18,23 247:25,25 261:12 261:16 264:3

**specifically** 17:21 25:21,24 26:4 48:10 78:11 79:19 126:9 176:7 191:10 203:3 204:25 233:3

275:13

**specifics** 180:19 182:10

**specified** 280:20

**specify** 42:19

**spelling** 36:23

**spend** 39:1 136:16

**spending** 172:7

**spent** 18:1 29:11

**spike** 178:14

**split** 70:20

**spoke** 195:20 197:11

**spoon** 243:12,17 243:19

**spot** 104:9 255:13

**spots** 209:21

**spreadsheet** 6:6,7 77:6,10 107:16 161:22 215:23

**spreadsheets** 130:2,3

**spring** 153:7 262:4

**squad** 44:12

**square** 3:4

**squinting** 77:19

**ss** 280:3

**st** 272:25 273:5,8 273:10,13,14

**staffed** 27:9

**stage** 11:20

**stages** 163:20,25

**staggering** 60:14 178:21

**stamped** 143:7 224:2,3

**stand** 248:24 272:13

**standard** 239:20 243:7

**stands** 224:23
266:19
**start** 33:13,17
42:21 62:6 70:7
75:7 150:22
151:19 154:10,17
187:15 195:7
229:4 238:7
247:22 248:3
249:6 255:11
271:25
**started** 26:7 32:25
35:14,18 36:12
59:20 60:2,12
61:9 63:1 65:24
66:23 67:22 68:16
69:10,14,22 70:9
74:19 75:11 90:5
92:22 94:18
109:16 110:8
113:21,23 136:15
158:13 163:3
173:20 174:10
176:13,19 228:24
230:6 248:21
252:8,18 256:9
271:25 272:11
275:10,12,24
276:1 277:5
**starting** 65:12
256:8
**starts** 70:20
255:17
**state** 11:12 44:5
78:16 84:21,22
87:12 172:25
198:1 203:12
280:2,7 281:14
283:10 284:15
**stated** 91:14
154:13 227:4

278:13
**statement** 92:6
234:4 283:13,14
284:19,19
**statements** 159:2
**states** 1:1 174:12
264:13
**statewide** 231:20
**stating** 71:3
**statistic** 170:11
**statistics** 70:2,4
125:13 131:17
169:20 195:11,16
**stats** 70:10 126:24
127:6 195:19
**stay** 127:5 143:1
220:11 258:3
**stayed** 31:8 127:4
257:4
**steals** 106:17
**stem** 228:13
**stemming** 12:21
**stenotypy** 280:14
**step** 83:3 141:3
147:9 157:22,25
**steps** 53:3 148:9
182:5 203:7
**sterling** 16:14,16
16:16
**stick** 58:9,11,15
**stimulant** 58:6
**stolen** 136:9
**stop** 30:10 60:7
67:4 136:7 139:16
143:2 148:22
149:2 183:23
232:20
**stopped** 66:12
237:14
**storage** 50:3 52:20
55:17

**store** 168:17
**stories** 67:7
**straight** 168:14
**stream** 71:25 72:4
72:17
**street** 2:15 3:13,17
4:4 26:24 32:19
37:22 135:20
138:23 139:12,12
190:2 226:23
227:10 228:16
248:11 251:21
**streets** 33:16
43:15 108:23
120:19 122:7
139:16 143:4
**strike** 24:4 35:25
51:19 64:1 91:1
109:6 117:3 147:3
163:9 174:9
176:25 181:6
186:12 250:22
260:10
**string** 7:6 196:8
**structure** 7:5
185:11,21
**studies** 238:24
240:16
**study** 240:14
241:10,15 255:14
**studying** 23:7
**stuff** 62:24 122:8
238:24 257:13
264:7 268:17
**stump** 229:25
**sub** 164:15,17,21
**subject** 71:25 72:4
91:22 154:12
202:23
**submit** 211:8

**submitted** 158:10
**submitting** 210:22
211:1
**subscribed** 283:10
284:14 285:21
**subsequent** 103:2
**substance** 50:5
56:23 57:6
**subtype** 225:1
**suburbs** 84:17
263:15,19
**success** 249:23
**successful** 249:21
249:22 250:3,17
250:18
**sudden** 60:25
**sufficient** 190:12
**suggested** 65:2
**suite** 2:15 4:4
282:2
**summary** 7:13
223:20 224:12
**summit** 1:13
**superior** 282:1
**superiors** 194:11
**supervisor** 36:13
36:16 37:17,22
38:23 39:22
155:10 208:10,11
208:16 217:11
222:5,6
**supervisors** 36:13
36:15 37:18 38:6
38:13
**supplement**
212:23,25
**supplemental**
213:3
**supplied** 18:16
**supplier** 118:16
121:2 177:15

192:1
**suppliers** 177:16
**supply** 18:20
250:9 251:10,15
252:24
**supposed** 48:24
71:23
**sure** 32:11 34:5
44:7 47:2 50:18
65:24 71:18 79:16
96:3 100:7 106:13
115:4 144:14
147:7 167:24
170:19,21 186:5
189:17 204:20
209:9 224:1 227:7
228:10 230:24
231:24 232:3
234:10 236:25
240:11 242:12
247:22 248:3
250:21 251:25
252:6 254:10
262:24 264:10
265:4 271:11
273:12 275:8
277:15 278:1
**surprise** 108:3
115:24 123:15
**surprisingly** 142:1
**surrounding**
84:17
**surroundings**
51:10,22
**surveillance** 42:2
43:14 254:12,13
254:16,21 255:5
255:15,24 257:9
257:21,22,23
258:1

**survived** 208:25
265:24
**surviving** 65:4
**survivor** 61:14
**suspect** 100:19
103:22 131:14
133:3,9 138:9
213:4,7,7,8,8
214:6 217:16
**suspect's** 75:1
112:5 210:5
**suspected** 83:18
100:22 102:19
104:11 130:16
154:20 155:8
198:21 199:25
200:17 207:1
209:1 240:23
242:3 275:16
**suspects** 131:13
216:12
**swat** 38:22 172:25
187:7
**sworn** 11:3 280:10
283:10,13 284:14
284:18 285:21
**symptoms** 175:19
**synthetic** 163:2,16
**syringe** 211:10
**syringes** 60:24
**system** 7:8 64:13
70:22 167:10
184:14 198:18
199:2,13,21,22
200:23 202:9
214:5,25 250:12
276:8

**t**

**t** 36:19 44:2
**tactic** 253:6

**tactical** 172:20,24
**take** 14:21 50:13
54:5 57:17 72:12
107:8 120:17
122:5 125:1
135:13 140:2
142:24 143:19
147:12 148:9
151:9 154:21
155:4,21,22 156:5
156:10,11,13,13
156:15,15 157:3
157:11 159:2
165:13,20,21
166:4,22 167:16
168:15,17,21,24
168:24 169:3
188:7,8 189:1
202:10 207:3
209:7 211:6,12,14
221:13,25 222:7
222:21 223:8
234:21 243:7
244:1,2,7,8 245:19
248:18 249:8
252:14 258:21
259:2 264:14
265:25 271:8
275:2 276:16
**taken** 1:20 12:6
18:5,9 72:7 88:17
89:16 109:23
110:16,25 112:14
131:8 143:22
153:24 158:16
166:3 167:5,6
175:15,17 176:21
192:15 197:9,11
198:20 210:25
212:8 213:15
217:7,9,11 243:5

280:19
**takes** 34:5 55:8
135:17,18,19
165:23,25
**talk** 18:22 61:8
66:3,5 67:15,18
68:12,12,19 69:2,5
97:22 113:18
158:19 159:1
168:2 172:9
175:21 203:7
227:10 231:3
232:9,19,20
**talked** 18:8 58:19
65:4 67:6 110:5
135:11 176:20
188:23 209:22
226:17 231:2
245:6 246:4
247:13 255:5
257:14 260:9
261:23 263:8
**talking** 14:4 33:10
56:4 59:23 64:22
72:25 90:20 97:12
99:24 100:1
105:14 166:8
237:1 239:10
249:4 254:4
262:23
**talks** 47:23 56:22
67:13
**tally** 96:15 114:5
**tap** 253:6 254:11
255:5 257:9
**target** 32:20
**targeting** 33:2,25
254:17 256:1
258:18 259:5
**task** 6:5 42:15,18
42:21,23,25 43:2,4

[task - time]                                                                    Page 45

43:6,22 45:16
46:3,11 187:22
188:16 252:4
259:7,9,9,10
**tcoleman** 3:6
**team** 38:24
**technical** 23:5
**technically** 26:10
30:20 234:1
**technician** 24:11
**technician's** 24:24
**techniques** 139:15
158:12 205:20
255:2,12 274:25
**telephone** 4:2 72:7
**telephones** 254:14
**tell** 13:11 34:22
61:16 66:1 67:20
67:22,22,23 68:19
68:24 69:12,12
74:11 81:3 87:3
99:15 154:10
155:14 162:25
166:1 182:10
183:16 207:4
215:14 222:12
224:12,14,17
227:25 241:20
270:14
**telling** 69:9 219:14
232:21 235:3
**tells** 68:15 101:6
102:14
**temperature**
157:6
**temporarily** 42:24
**ten** 29:15 144:16
144:19,20 145:8
145:11 146:7,9,11
235:1 273:20,25

**tentative** 103:24
104:4
**tenth** 3:13
**tera** 3:4 22:5
**term** 48:3,6
107:20
**terms** 64:14 204:8
251:21 254:11
**tested** 98:2,3 211:9
**testified** 14:25
15:10,10,16 91:22
92:21 110:4
130:10 168:7
172:2 202:18,24
203:3,18,21
206:25 233:16
236:8 237:2 239:6
239:18 273:18
**testify** 148:13,15
168:11 203:9
255:22 280:10
**testifying** 80:8
**testimony** 12:3
16:9 20:13,20
54:14,20 109:18
110:7 203:10
221:14 226:19,24
229:8 254:25
257:15 280:12,16
283:6,7 284:6,9,12
**text** 223:9 265:10
**texted** 223:11
**texts** 223:13
**texture** 101:13,15
**thank** 72:21 78:5
97:20 169:10
173:7 225:22
278:16,18
**thanks** 246:2
**themself** 240:6

**thing** 88:1 94:25
155:14,16 158:9
176:24 177:2
189:21,22 191:2
208:16 223:4
224:17 225:1
247:19
**things** 48:17 51:8
104:3 119:15
137:16 155:23
159:14 164:6,10
165:3,16 168:8,18
196:3 202:7
248:11 255:10,18
255:22 257:2,4
272:17
**think** 17:20,25
21:10 23:4 41:9
42:19 43:24 44:16
50:19,21 53:9
65:19 71:22 81:10
93:20 105:2 114:3
114:7 117:11
119:13 120:3
144:23 146:8
148:20 153:11,15
159:19 160:18
174:20 184:18
189:21 190:12
197:7 233:19
239:6,12 245:9,19
245:20 247:8,18
247:19,23,24
248:1 253:4
255:16 257:14
259:15,19 261:10
262:19,24 264:1
276:8 278:11
**thinking** 195:4
**third** 78:18 161:4
161:15

**thirty** 282:18
**thought** 49:21
102:24 135:10
146:17 157:20
177:1 191:3 195:1
225:20 261:14
273:13
**thousand** 60:17
67:2,8,9 233:18
234:6
**three** 29:11,19
39:6 97:13 106:23
164:15,17,20
186:22 187:23
188:9 240:12
244:3 258:7
**throw** 218:14
**throwing** 271:21
**tie** 240:7
**tied** 260:19
**tilt** 233:23
**time** 24:5 25:12
26:21 27:21 30:11
32:8,9,15 35:20
38:25 63:5,7,8
68:3 69:23 76:7
76:11 88:11,12,13
91:25 92:1,5
93:11 105:25
109:17,23 110:20
110:23 118:13
136:16 140:5
144:6 152:6
156:14 184:17
192:15 195:4
198:22 216:20
217:12 224:18
229:5 230:10
231:22 232:22,25
238:21 247:16
248:7,24 249:3,11

258:2,21 261:19
262:25 267:10
272:16 274:4,9,12
278:8,17 280:19
**times** 3:8 15:9
16:4 108:14 117:5
119:22 120:13,14
121:18,22 135:16
144:15 145:6
151:20 154:6
175:13 251:17
257:20,23 261:18
263:2,6 275:7
278:5
**title** 28:3 30:24
31:13 90:22
197:21,22 242:23
253:10
**titled** 96:6 197:8
197:25 198:14,21
198:23 240:13,22
**titles** 31:15
**today** 12:3 13:20
16:9 19:18 20:9
20:14,20 31:9,13
50:23 71:24 72:18
120:6 134:2
170:20,21 226:13
226:15 231:2
246:2 260:9
278:13,17
**told** 45:23 72:3
110:7 189:7 192:7
**tom** 6:14 36:18
140:8
**tons** 158:24
**tool** 253:6,14
254:3,6,6,8
**tools** 253:18,25
254:4,6,8,15,22
256:15,17,21,23

257:1 258:23
267:21
**top** 34:8 58:13
89:23 124:10,14
134:18 194:8
196:20 207:7
**topeka** 151:24
**total** 17:20,25
124:10,20 125:19
170:3
**touch** 156:20
210:23
**tough** 41:17
**tower** 3:4,17
**tox** 244:14
**toxic** 271:6
**toxicity** 243:2
**toxicology** 98:7
99:22 100:4,8,11
100:20 117:18,25
118:11 120:21
131:17 142:17
167:11 242:10,18
244:15
**track** 68:24 70:5,6
76:8,10 93:25
114:4 192:21
206:19 209:3
217:12 235:9,24
263:25 264:18
**tracked** 236:1,4
**tracking** 70:22
73:21 82:16 112:5
**trade** 23:2,3
254:22
**trafficker** 251:4
**trafficking** 33:11
44:1 97:1 181:17
181:19 183:18,21
250:15,25 252:15

**train** 27:8
**trained** 165:8
202:5,7,8 272:21
**training** 7:15
25:16,18 26:3
44:23 205:22,24
205:25 206:3,4
245:11 266:9
268:21 272:1,7,8
272:11,15 273:2,5
273:8
**trainings** 24:20,22
24:25 25:11
**transaction** 35:5
**transactions** 35:1
184:7
**transcribed**
280:15 283:7
**transcript** 5:1
279:3,6,9,11
282:11,12 283:5
283:12 284:5,11
284:17
**transcription**
280:16
**transcripts** 18:4
**transfer** 27:14
30:4 237:3
**transferred** 27:1
28:5,11,21 29:3
30:13,16 57:25
236:10,16 237:8
**transferring** 58:1
236:12 237:4
**transition** 237:21
**transitional** 11:20
**transitioning**
24:14
**translate** 251:20
**transported** 80:22
156:12

**traveled** 44:23
**treat** 275:16,21
**treated** 274:21
275:5
**treatment** 61:18
61:19 234:7
**tree** 195:13
**trends** 172:10
173:10
**trial** 12:22 13:7,8
15:1,10 118:19,21
121:8 149:14,19
**tricky** 59:9 238:3
**tried** 67:10 132:15
230:18
**trip** 264:14
**trips** 152:7
**trouble** 196:5
**true** 62:10 64:15
149:23 160:20
280:16
**trust** 61:11 68:3,7
**truth** 280:10,11,11
**truthful** 12:3
**try** 40:19 41:15
57:12 61:4,10,11
61:17 66:3 68:12
117:14 132:9,9,24
132:25 133:4
138:24 139:13
143:2 148:9 195:3
232:9 238:4
257:25 258:10
264:5
**trying** 23:4 33:20
57:8 68:11 71:12
74:12 97:9 101:25
115:1 116:20
140:4 143:4
166:15 168:4
187:18,20 218:22

229:25 231:4
234:6,7,8,13
235:24 236:22
255:3,21 263:13
271:22
**turn** 66:14,15
124:4 160:10
223:12
**turned** 223:16
**turning** 169:4
262:3
**turns** 100:24
102:25
**tweak** 20:2 239:1
**tweaked** 238:23
**twice** 16:15 202:22
263:5
**two** 12:9 20:5 25:3
34:19,20,22 36:12
36:14,14,17 37:18
42:17,20 58:5
66:19 73:8 77:13
80:24 104:3,22
110:11,14 129:14
145:11 147:5
150:17 155:11
156:11 168:3
186:22 187:25
189:6,7,9 194:2
202:16 207:10,11
209:8,21,22 219:4
224:18 225:3
228:8 230:1
234:23 240:12
251:23 265:22
266:2 276:12
277:10
**twofold** 49:14 61:8
62:21 276:8
**type** 34:24 39:11
39:12 63:19 94:25

114:19 157:25
211:9,22 212:3
222:10 224:21,24
227:21 269:23
**typed** 182:23
**types** 12:13 24:21
24:25 33:9 34:19
34:21,22 58:5
115:3 155:23
163:2 173:2 176:7
211:21 243:8
260:12,22
**typical** 132:22
269:7,12,13,22
**typically** 210:2
265:14 270:10
**typo** 82:23

### u

**u** 36:23
**ultimate** 68:2,2
231:20,25 250:22
253:3 263:22
**ultimately** 270:23
**um** 238:11
**unable** 166:17
**unbiased** 206:2
**uncommon** 58:12
59:12 68:5
**undercover** 29:9
34:13,14,20,24
35:2 39:24 40:5,8
41:20 144:6,11
146:15,24,25
**underlying** 50:5
56:23 57:9
**underneath** 47:13
**understand** 14:15
14:17,23 19:17
28:25 33:21 48:14
48:16,19 56:15
65:19 66:5 79:16

91:6 93:20 97:2
98:5 103:15
105:15 106:16,17
108:16 117:11,22
120:16,25 130:8
131:25 132:19
136:14 138:6
154:5 163:11,14
200:20 204:1
218:9 229:7 232:6
235:23 236:22
255:4 258:3
268:20 270:13
273:1
**understanding**
20:2 48:2,5,8,13
49:10,13 57:5
58:22 71:22,24
119:13 131:22
163:13 215:24
223:15 229:8
246:16 247:9
269:3
**understandings**
178:3
**understands** 90:24
**understood** 235:7
267:14 268:19
274:3
**unfolded** 55:15
**unfortunately**
15:25 16:1 158:22
232:23 265:1
**unhappy** 190:4,6
**uniform** 29:17
35:11 61:1 155:6
275:16 277:11
**uniforms** 35:3,13
**unique** 270:4
271:3

**unit** 11:19,21 29:4
29:12,14,15,23
30:5,9,11,14,17
31:5,8,18,22,24
32:4,12,14,23
35:10,17,21,23
36:1,7,8 37:21
38:21,22 43:11
48:9,15 59:2
62:11 94:25
108:16 161:5
165:8 187:7,7,9,14
187:16 189:11,13
189:18 190:8,13
206:19 208:2,19
208:20 230:11
233:2 247:14
248:8 249:5,17
251:19 252:23
253:13,19 255:7
256:11 260:14,23
260:25 261:3
263:1 270:2
272:16
**united** 1:1
**units** 28:17 186:14
186:17,23 187:1,2
189:16
**unknown** 88:10
196:5
**unlawful** 137:2
**unlawfully** 59:8
**unlock** 212:21
**unsigned** 179:19
182:24
**untrue** 102:15
**unused** 50:3 52:20
55:8 98:19
**upbringing** 51:10
51:23

update 140:23
updated 20:3
  186:4
upper 32:23 33:8
  33:25 78:13,16
  248:9,14 250:5,10
  250:24 252:22
  253:8,17 254:17
ups 198:16
upstairs 57:12
use 15:16 41:10
  54:6 60:24 70:19
  102:20 184:21,24
  185:4 186:15,18
  194:17 200:11,13
  200:14 206:25
  210:9 217:22
  245:9 256:23
  258:24 277:1
user 175:5
users 58:13
uses 55:8 185:2
  211:21
utilize 158:13
  255:5 256:1
  263:16 265:2
utilizes 253:19

**v**

v 1:10,11,13 38:2
varies 156:8
  165:22
various 7:8 41:12
  44:24 48:21 199:2
  258:25 263:19
vast 51:11,14
  53:22
vehicle 13:16 75:1
  112:5 213:8
venture 57:8
veritext 282:1,7
  285:1

veritext.com.
  282:17
version 20:3 186:2
  247:12 267:18
  268:3
versions 123:11,12
versus 234:11
vice 29:4,23 30:5,8
  30:11 31:5
vicodin 117:24
  118:1 145:18
  147:13 166:21
vicodins 145:16
victim 63:21 65:5
  65:5 70:8 86:13
  86:21 87:9,10
  88:17 90:3,5
  101:19 155:18
  163:21 164:3
  208:24
victim's 98:12
victims 109:8
  131:14
video 153:23
video'd 72:3
videographer 4:7
videotaped 12:11
  71:24
view 164:3 190:16
viewed 181:15
  225:18
violate 253:21
violation 198:1
violence 28:10
violent 232:24
virginia 22:22
volunteer 27:5
volunteered 27:3
  27:9
vsdl 197:8,10,25
  198:1,6,16,17,19

vsdls 198:10

**w**

w 38:1 143:9
wait 156:12,17
  174:23 209:9
  216:18
waiting 251:14
waived 282:19
walgreens 2:13
  22:4 226:9
walk 154:6
walmart 2:17 22:8
want 35:6 51:19
  57:12 61:19,22
  67:21 68:6 92:4
  99:11 140:2
  151:17,18 164:8
  209:2 221:13,14
  221:16 226:18
  227:7 231:21
  238:2,4,15 239:9
  243:3 248:2
  255:13 260:5
  265:3 270:20
  277:1,15
wanted 170:19
  277:10
wants 264:15
ward 38:1 188:5
warehouse 23:19
warning 268:16
warrant 6:9,24
  7:3 111:16 112:4
  112:16 113:8
  114:23 179:3,13
  179:18,21 180:2,5
  182:7,11,14,25
  183:6,13,17
  222:13,15 223:7
  256:25

warrants 113:4
  114:2,13,19 115:1
  115:4,5,5,6,10,22
  116:16
washington 3:13
watched 265:15
watches 192:9
watching 254:2,3
way 34:11 55:15
  67:8 72:9 79:22
  83:2 101:24
  131:18 164:14
  205:12,15 216:3
  229:17,19 230:5
  231:17 238:12
  252:16 257:19
  264:17 268:5
  271:19 272:20
  275:25
ways 164:4 260:10
we've 44:14 63:18
  72:1 90:22 91:14
  97:12 99:11 108:2
  110:18 166:8
  187:17 188:22,23
  189:7,8,9,15 221:8
  223:11 232:15
  234:21 242:13
  245:6 246:3 260:9
  278:13
wear 35:3,13
  154:1
week 114:7 197:12
weekend 277:9
weeks 276:12
went 12:22 29:16
  29:23 30:7,8 31:7
  32:22 119:6
  125:20 126:5
  149:12 183:19
  265:21 269:2

[west - zimmerman]                                                                 Page 49

**west** 2:15 22:22 26:18,22,24

**whatnot** 25:8 117:19 195:22 241:7 242:17 277:1

**whatsoever** 210:16

**wheel** 195:25

**wheels** 277:18

**whereof** 281:5

**white** 213:10 270:19

**widely** 255:7,8

**widespread** 47:23 50:6

**williams** 17:16

**window** 243:11,15 243:18

**wire** 42:25 43:4 252:2 253:6 254:11 255:5 257:9

**wires** 43:14

**wish** 183:22 190:7 242:2

**withheld** 91:16

**witness** 24:19 79:3 140:4 158:21,25 159:1,13 202:19 203:19 205:8 210:6 221:17 278:18 279:2 280:9,13,14,17 281:5 282:8,11 283:1,4,11 284:1,4 284:15

**witnesses** 158:19

**witness'** 282:14

**wonder** 51:25

**wondering** 146:19 229:11

**word** 22:13 136:1 233:19 245:8 260:19 269:12 273:22 277:1

**worded** 217:13

**words** 18:22 57:16 63:15 108:12

**work** 11:15 13:13 13:20 14:1 30:23 34:10 35:12 37:21 39:10 41:21 44:10 48:12 59:1 88:7 88:13,13 115:25 116:11 119:10 127:2 143:1 144:11 146:24 167:3 188:15 190:11 191:6,9,22 192:2 223:10 232:5,8 233:4 246:6 247:14 248:5 249:6 253:8 256:8,22 257:3,7 257:10 260:14 262:12,25 270:1 272:2,3,4,6 274:17 274:22 275:14

**worked** 23:19,20 32:24 192:12,17 238:24

**working** 30:10 35:14 220:4 252:22

**works** 108:17,17 116:1 250:12

**world** 210:17

**worn** 35:11

**worry** 190:10 264:6

**worth** 181:11 257:12,17

**wrapper** 243:11 243:16,17,19

**write** 197:6 213:19

**writes** 141:21 172:5

**writing** 19:8 159:14

**written** 159:20 277:20 278:6

**wrong** 82:25 100:25 102:23 198:14,23 227:25 246:18 273:10

**y**

**yeah** 42:9,9 64:24 69:7 77:20 79:7 81:12 82:23 113:2 125:12 178:12 187:23 213:18,21 223:2,11 241:25 249:10 256:12 262:16 263:12 267:8,17 268:4,10 269:5 272:7,11

**year** 15:7 27:20 30:11 32:7,15 37:15 82:10,25 123:11 129:5,16 153:7 172:21 174:14,20,21 176:14,15,15,17 192:13,14 207:11 207:12 219:5 234:22 262:5 269:21 275:8,9,11

**years** 21:5 25:7 26:23 29:11,19 37:5 125:24 182:9 189:3,19 219:4

**worth** 249:13 257:3 261:17

**yesterday** 19:21 20:4

**york** 3:8,9,9,21,21

**younger** 21:5

**z**

**z** 38:2

**zarzaur** 2:2 21:16

**zarzaur.com** 2:5

**zashin** 1:20 2:6

**zimmerman** 2:3 13:22 14:3 21:8 21:14,16 22:9,12 22:16 34:15 40:15 40:22 41:4 48:25 50:25 53:7,20 54:8,17 55:12,23 56:17 57:20 58:24 62:12 64:7 65:17 71:15,21 72:21 74:14 78:25 91:11 91:24 98:13 99:4 101:22 102:17 103:13 104:20 105:20 107:1 108:4 109:11,25 114:16 115:16 116:8 118:6,23 119:20 120:10 121:4,12,17,20,25 122:3,11 125:7 129:12 130:6 132:17 133:24 134:5,12 138:4 139:5 142:14 146:13,21 147:24 148:5,11 153:12 153:19 154:11 157:23 161:1 162:18 165:10

166:11,24 167:17
167:22 168:19
170:13,18 171:19
173:14 174:7
175:24 177:9
180:24 181:4,20
183:8 184:9
187:10 189:4
190:23 193:16
195:17 197:2
198:11 200:18
201:18 204:12
216:5,16 219:15
219:20 220:19
221:7,12,18 222:1
224:15 228:6
229:23 231:14
235:19 236:19
237:11,23 239:23
244:19 247:2
250:1 252:25
253:20 254:23
259:21 260:16
269:10 270:5
278:19
**zimmermann**
 282:5
**zip**   84:25 87:13
**zipp**   3:12 21:21,21
 45:23
**zone**   155:7 202:4
 207:23,25 214:3
 276:6
**zrlaw.com**   2:8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.